## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          )
                                         )
        Plaintiff,                       )
                                         )
VS.                                      )
                                         )
ERIC H. HOLDER, JR. in his               )
official capacity as Attorney            )
General of the United States,            )
                                         )
        Defendant,                       )
                                         )
ERIC KENNIE, et al,                      )
                                         )
        Defendant-Intervenors,           )
                                         )
TEXAS STATE CONFERENCE OF                )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                          )   (RMC-DST-RLW)
                                         )   Three-Judge Court
        Defendant-Intervenors,           )
                                         )
TEXAS LEAGUE OF YOUNG VOTERS             )
EDUCATION FUND, et al,                   )
                                         )
        Defendant-Intervenors,           )
                                         )
TEXAS LEGISLATIVE BLACK                  )
CAUCUS, et al,                           )
                                         )
        Defendant-Intervenors,           )
                                         )
VICTORIA RODRIGUEZ, et al.,              )
                                         )
        Defendant-Intervenors.           )

********************************************
             ORAL DEPOSITION OF
               JULIA RATHGEBER
                MAY 29, 2012
********************************************

## 2

1        ORAL DEPOSITION OF JULIA RATHGEBER, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the MAY 29, 2012, from 8:21 a.m. to 4:21 p.m., before
5   Chris Carpenter, CSR, in and for the State of Texas,
6   reported by machine shorthand, at the offices of The
7   United States Attorney's Office, 816 Congress Avenue,
8   Suite 1000, Austin, Texas 78701, pursuant to the Federal
9   Rules of Civil Procedure and the provisions stated on
10   the record or attached hereto.

## 3

1
2
3           A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS:
5       Matthew Frederick
        Stacey Napier
6   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
7       Austin, TX 78711-2548
8       209 West 14th Street
        8th Floor
9       Austin, TX 78701
        (512) 936-1307
10      matthew.frederick@texasattorneygeneral.gov
        stacey.napier@texasattorneygeneral.gov
11
    FOR THE DEFENDANT, HOLDER, ET AL:
12
        Risa Berkower
13      Spencer Fisher
        Ernest McFarland
14      Elizabeth S. Westfall
        Jennifer Maranzano
15      Bruce Gear
        Michelle McLeod
16   U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
17      NWB - Room 7202
        Washington, DC 20530
18      (202) 305-7766
        risa.berkower@usdoj.gov
19      spencer.fisher@usdoj.gov
20   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
    NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
21   CAUCUS:
22      Ezra D. Rosenberg
        DECHERT, LLP
23      Suite 500
        902 Carnegie Center
24      Princeton, NJ 08540-6531
        (609) 955-3200
25      ezra.rosenberg@dechert.com

## 4

1   FOR THE TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND
    INTERVENORS:
2
        Adam M. Harris
3   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
        One New York Plaza
4       New York, New York 10004
        (212) 859-8953
5       adam.harris@friedfrank.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

INDEX

Appearances...................................3

JULIA RATHGEBER
    Examination by Ms. Berkower...............8
    Examination by Mr. Harris...............329

Signature and Changes........................340

Reporter's Certificate.......................342

EXHIBITS

NO. DESCRIPTION                      PAGE MARKED

5    SB No. 14                          221

28   HB No. 218                         100

29   SB No. 362                         150

33   Senate Journal, March 18, 2009        183

44   HB No. 1706                         90

100  Amended Notice of Deposition           16

101  Texas Legislature Online History, Bill HB   95
     1706
102  Texas Legislature Online History, Bill HB   125
     218

103  Texas Weekly Article, The Week in the       140
     Rearview Mirror
104  Dallas News. com Article, Jan. 14, 2009     166
105  Senate Rules, Jan. 14, 2009         167
106  Texas Legislature Online History Bill SB    190
     362

107  Dewhurst Letter, Jan. 20, 2011      212

108  Lt. Governor Dewhurst Statement Regarding   213
     Governor Perry's Emergency Call, 1-20-2010

## 6

109  Senate Rules, Jan. 19, 2011         291
110  Senate Journal, Jan. 24, 2011       292
111  Lt. Dewhurst Statement Regarding Passage   302
     of Voter ID

112  Fact Check Printout                 310

113  Press Release, March 12, 2012       311

114  Draft Talking Points for Voter ID Bill   313
     Signing, May 27, 2011
115  Talking Points (82R)                315
116  Indiana Law                         317
117  Georgia Law                         317
118  E-Mail, March 12, 2012              322
119  Voter ID Overview                   324
120  Standard of Review By Department of    328
     Justice

## 7

(At 8:21 a.m.)

(Witness sworn.)

THE REPORTER:  Could everybody here make announcements and your affiliations.

MS. BERKOWER:  Risa Berkower for the Attorney General Eric Holder.

MR. FISHER:  Spencer Fisher for the Attorney General Eric Holder.

MR. McFARLAND:  Ernest McFarland for the United States.

MR. ROSENBERG:  Ezra Rosenberg from Dechert LLP for the Texas State Conference of NAACP Branches and the Mexican American Legislative Caucus.

MR. HARRIS:  Adam Harris from Fried, Frank, Harris, Shriver & Jacobson, LLP, for the Texas League of Young Voters Education Fund, Defendant Intervenors.

MR. GEAR:  Bruce Gear for the Attorney General.

MS. NAPIER:  Stacey Napier for the Attorney General, Texas Attorney General.

MR. FREDERICK:  Matthew Frederick for the State of Texas.

MS. RATHGEBER:  Julia Rathgeber, Lieutenant Governor's Office.

## 8

MS. MARANZANO:  Jennifer Maranzano for the Attorney General Eric Holder.

MS. WESTFALL:  Elizabeth Westfall for the Attorney General.

MS. McLEOD:  Michelle McLeod for the Attorney General.

JULIA RATHGEBER,
having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION
By MS. BERKOWER:

Q.  Good morning.

A.  Good morning.

Q.  This is the deposition of Julia Rathgeber.  Is that the correct pronunciation?

A.  "Rath-gaber," but that's okay.

Q.  "Gaber," okay.  In the case State of Texas versus Holder, Case Number 12-CV-128 in the U.S. District Court for the District of Columbia.  My name is Risa Berkower, as you just heard.

Can you give us your full name, please?

A.  Julia Jeffrey Rathgeber.

Q.  Have you ever been known by other names?

A.  My maiden name, but that's it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

**21**

1    Q.   What did you do with it?
2    A.   Provided it to my general counsel, who gave
3    them to the Attorney General's Office.
4    Q.   Can you tell me a little bit your educational
5    background?
6    A.   Yes.  Did you want to know where I went to
7    college?
8    Q.   Yes, please.
9    A.   I went to U.T.  I graduated from the Plan II
10   Honors Program.  I went to the University of Texas Law
11   School and graduated in 1990.  I took the bar.  I passed
12   the bar.  I'm inactive right now.
13   Q.   Okay.
14   A.   I don't practice.
15   Q.   Okay.  What is your current job title?
16   A.   Deputy Chief of Staff and Policy Director for
17   the Lieutenant Governor.
18   Q.   What was your job prior to your current job?
19   A.   Policy director for the Lieutenant Governor.
20   Q.   And what about before that?
21   A.   I worked at General Land Office, where I did --
22   I actually did the Homeland Security report, because the
23   week I joined the General Land Office, I was supposed to
24   do water quality planning, and the Lieutenant Governor,
25   then the Commissioner of the General Land Office, was

**22**

1    named Chair of the Task Force on Homeland Security, and
2    they needed a staff person to work on it.  So instead of
3    doing water quality, I did homeland security.
4    Q.   Do you have any -- and any other legal jobs?
5    A.   Yeah.  I worked at the Texas Commission on
6    Environmental Quality for three years, and I did work on
7    a number of legislative issues.  And then prior to that,
8    I worked for the Lieutenant Governor and the Senate,
9    then Lieutenant Governor Bullock, doing essentially what
10   I do now, policy research.
11   Q.   Okay.  I think I probably went about this the
12   wrong way.  Since you graduated law school, can you just
13   list the jobs you've had and the years you had them?
14   A.   That might have been easier.
15        Okay.  I left law school and joined the
16   Texas Senate, where I worked at the Senate Research
17   Center and also for the Lieutenant Governor, then
18   Lieutenant Governor Bob Bullock; I worked there for
19   eight years.
20        Went to the Texas Commission on
21   Environmental Quality, was there for three years, did
22   strategic planning, which is air quality planning, the
23   water quality planning, and waste quality planning.
24        I left there and went to the General Land
25   Office, where I was supposed to do water quality

**23**

1    planning and did homeland security instead.
2        Then I moved from the General Land Office,
3    after a year and a half being with the Lieutenant
4    Governor, as he was elected, and moved into my current
5    position, which has expanded since I've been there.
6    Q.   So how long have you had your current
7    position?
8    A.   Since 2003, when he became Lieutenant Governor
9    but it expanded in 2009, I guess, when I became Deputy
10   Chief of Staff.
11   Q.   Okay.  Do you have any experience related to
12   election law?
13   A.   Other than the legislation that comes through
14   our office related to election, election law, that's the
15   only -- the only experience I have.
16   Q.   Do you have any experience related to election
17   administration?
18   A.   No.
19   Q.   Have you ever volunteered as a poll worker?
20   A.   No.
21   Q.   Have you ever witnessed any problems when you
22   were at the polls as a -- well, let me back up.
23        Do you vote here in Texas?
24   A.   Yes.
25   Q.   When was last time that you voted?

**24**

1    A.   Oh, gosh, last week, two weeks ago, week and a
2    half ago.  I don't know.  About a week ago.
3    Q.   Okay.
4    A.   I early voted for this election.
5    Q.   Have you ever witnessed any problems at the
6    polls when you were voting there?
7    A.   No.
8    Q.   Have you ever witnessed anyone try to
9    impersonate another voter?
10   A.   Not that I'm aware of.
11   Q.   How far is your polling site from your house?
12   A.   Well, I usually vote at my Randalls, which is
13   about two miles from my house.  My actual polling site
14   is at a school that's about a mile and a half from my
15   house.  And frequently, I vote at the Sam Houston
16   Building which across the street from the Capitol.  So I
17   would say Randalls was the most frequent voting place,
18   then probably the Sam Houston Building, and then my
19   actual polling.  I almost never vote on actual election
20   day.
21   Q.   So you usually vote early voting?
22   A.   Yes.
23   Q.   Do you ever vote by mail?
24   A.   I have, but it's been since I was in college,
25   when I was registered to vote in my hometown.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

**25**

1    Q.  What are your current responsibilities for
2  Lieutenant Governor Dewhurst?
3    A.  Oh, goodness.  I manage most of the human
4  resources issues in our office.  I prepare and ensure
5  that the appropriate briefing materials are prepared for
6  the Lieutenant Governor's meetings and coordinate the
7  policy staff in their preparation for him.  I coordinate
8  -- I coordinate functions within our office to ensure
9  that the appropriate people are working on the
10  appropriate issues.  I prepare the briefing materials
11  for the legislative session, so the bill books that are
12  put together for the Lieutenant Governor's review before
13  he hears a bill on the Floor.  I don't prepare all that
14  information, but I coordinate its preparation.
15    Q.  Do you ever assist with issues that may be
16  taken up by the Legislature?
17    A.  Yes.
18    Q.  What is your -- what do you with regard to
19  those issues?
20    A.  It varies depending on the issue.  I frequently
21  prepare background materials that explains what the
22  issue is, summarizes the material, ask the appropriate
23  policy staff to summarize material, prepare briefing
24  booklets that include all of the paperwork necessary for
25  legislation, which includes things like the fiscal note

---

**26**

1  and the bill analysis, and ensures that the appropriate
2  version of the bill is prepared for the Senate Floor.
3      I occasionally write amendments when
4  people need help drafting an amendment.  I talk to the
5  senators if they don't understand or need a summary or
6  preparation on a different -- on whatever issue is
7  coming up before them.  I think that about covers it.
8    Q.  Do you have any areas that you focus on?
9    A.  No.
10    Q.  Did you work on voter ID?
11    A.  Yes, I did.
12    Q.  Who else in the Lieutenant Governor's worked on
13  voter ID, or worked on voter ID?
14    A.  Bryan Hebert was the policy person who was
15  primarily responsible for the issue, and he's no longer
16  with our office.  I'm sure you know.  He was the lead
17  person on the -- on the legislation and did most of the
18  work on it.  I helped coordinate the materials for the
19  Lieutenant Governor in preparation for hearing the bill
20  on the Floor.  Blaine Brunson helped coordinate with the
21  senators about hearing the bill, and then our general
22  counsel has coordinated materials on this issue with
23  regard to this lawsuit.
24    Q.  Are there certain legislative issues in which
25  the Lieutenant Governor is especially interested?

---

**27**

1    MR. FREDERICK:  I'm going to object here.
2  As everybody probably expects, I will be objecting on
3  privilege to any questions that seek to discover the
4  Lieutenant Governor or his staff's thought process,
5  mental impressions, or opinions about pending
6  legislation.
7      Also, we'll object to any questions that
8  seek the substance of communications between the
9  Lieutenant Governor and his staff about pending
10  legislation or communications between the Lieutenant
11  Governor's Office and other legislators or their staff,
12  state agencies, the Texas Legislative Council or
13  constituents.
14      So to the extent you can answer without
15  revealing thought process, mental impressions, or
16  privileged communications, you may do so.  But
17  otherwise, I instruct you not to answer on the basis of
18  privilege.
19      THE WITNESS:  Okay.
20    Q.  (By Ms. Berkower)  Do you want to hear the
21  question again?
22    A.  Yes.
23    Q.  Are there certain legislative issues in which
24  the Lieutenant Governor is especially interested?
25    MR. FREDERICK:  The same objection.

---

**28**

1    A.  I think I've been instructed not to answer;
2  however, I would say the Lieutenant Governor has always
3  been very focused on the budget.
4    MS. BERKOWER:  So you're not going to let
5  her answer the yes-or-no question whether there are
6  certain issues that he is interested in, without getting
7  into which those are?
8    MR. FREDERICK:  No, I didn't say
9  that.  She can answer a yes-or-no question.
10    A.  Yes, the budget.
11    Q.  (By Ms. Berkower)  What's your role with regard
12  to issues that he is especially interested in?
13    A.  My role doesn't change dramatically for
14  priority issues, although I have never focused on the
15  budget, because we have specific staff that work on
16  budget issues.
17    Q.  Was voter ID one of the issues in which the
18  Lieutenant Governor was especially interested?
19    MR. FREDERICK:  I object on the basis
20  privilege.  To the extent she is asking a yes or a no
21  question, you may answer if you know, but don't reveal
22  the Lieutenant Governor's thought process or any
23  privileged communications.
24    A.  I don't know.  I think he was interested in
25  handling it professionally, handling the issue

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012

| 29 |
|---|

1  professionally.
2       Q.  (By Ms. Berkower) Do you know of any public
3  statements that he made in which he expressed it as a
4  priority of his?
5       A.  Not that I remember.
6       Q.  When the Lieutenant Governor takes an interest
7  in a particular legislative issue, do you assist with
8  legislative drafting?
9       A.  Yes.
10      Q.  Do you assist with committee work?
11      A.  No, not usually.
12      Q.  Why not?
13      A.  Because the committees do that.
14      Q.  Do you assist with ensuring passage of that
15  particular bill, whatever it may be?
16      A.  What did you do mean by ensuring passage?  I
17  make sure all the materials are necessary for the bill
18  to be heard on the floor.
19      Q.  Well, I think -- I guess what I meant is, when
20  the Lieutenant Governor takes an interest in a
21  particular legislative issue, do you assist him in
22  ensuring that that -- whatever bill it is that he is
23  behind, gets passed?
24          MR. FREDERICK:  Objection, vague, and
25  object to the extent it assumes facts not in evidence,

| 31 |
|---|

1  that the bill may have?
2       A.  Sometimes the summary section, which is
3  provided by the bill's sponsor or author, does talk
4  about that.  But we don't write that material, so it
5  depends on what the senators submit.
6       Q.  And in a case where there is some sort of
7  analysis or research or other study conducted with
8  regard to the effect of the bill, is that something that
9  would be included?
10      A.  It depends on whether or not it's in the rules.
11  So some of the rules require there -- criminal justice
12  bills are required to have a criminal justice policy
13  statement associated with them.  So that would be part
14  the materials that are submitted.
15      Q.  What about election-related bills?
16      A.  I'm not aware of any additional materials that
17  have to happen.  I think that happens after the fact
18  when it goes through you.
19      Q.  Sorry?  What was the last thing you said?
20      A.  When we go through voter bills, frequently,
21  they have to go to the federal government for Voting
22  Rights Act.
23      Q.  Oh, okay.  You mean for preclearance?
24      A.  Yes.
25      Q.  So what type of additional work gets done when

| 30 |
|---|

1  but you may answer if you can.
2       A.  We -- we ensure that we prepare the materials
3  in the best way that we know how in order to handle an
4  issue professionally, and to that extent yes, we do.
5       Q.  (By Ms. Berkower) I guess to follow up on
6  that:  What do you mean by to handle a bill
7  professionally?
8       A.  To ensure that nothing falls through the cracks
9  that we have.  Every document that we need, that
10  everything has been filed according to the rules of the
11  Texas Senate; that the pieces are in order, in order to
12  hear a piece of legislation.
13      Q.  And when you say you have every document you
14  need, what documents are those?
15      A.  The bills, according to the Senate rules, are
16  required to have a package in order to be heard on the
17  floor, and that package includes the appropriate version
18  of the bill, that has been filed appropriately,
19  including a fiscal note and a bill analysis.
20      Q.  What does the bill analysis usually contain,
21  just as a general matter?
22      A.  A summary statement of any piece of
23  legislation, and then a section-by-section summary of
24  that, that piece of legislation.
25      Q.  Does the analysis usually get into the effect

| 32 |
|---|

1  bill needs to get precleared?
2       A.  Nothing at the time.  That happens after the
3  bill happens.
4       Q.  So before the bill is passed, you don't focus
5  on anything; you don't conduct any research or anything
6  that might be useful when you send it for preclearance?
7          MR. FREDERICK:  Object as vague.  Object,
8  assumes facts not in evidence.  And I also object on
9  privilege to the extent that it calls for thought
10  process, mental impressions, or privileged
11  communications.
12          If you can answer, you may.
13      A.  I don't remember anything we did to prepare
14  this piece of legislation for preclearance.
15      Q.  (By Ms. Berkower) Did you consider the
16  preclearance factors when you were working on the bill?
17      A.  I did not.
18      Q.  Do you know if anybody else did?
19      A.  I don't know.
20      Q.  Did it come up at all when you discussed the
21  bill?
22          MR. FREDERICK:  Objection.  To the extent
23  this calls for internal communications in the Lieutenant
24  Governor's Office about pending legislation, I will
25  instruct you not to answer this question.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                    MAY 29, 2012

---

**33**

1     A.  I will not answer this question then.
2     Q.  (By Ms. Berkower) Okay.  As a general matter
3  for election-related bills, is it something that's
4  discussed?
5         MR. FREDERICK:  Objection, vague.
6     A.  I don't remember it.
7     Q.  (By Ms. Berkower) So for any election-related
8  bill that's come before the -- before you in your time
9  working for the Lieutenant Governor, you don't remember
10  any discussions about preclearance prior to the bill's
11  passage?
12         MR. FREDERICK:  Object.  Misstates prior
13  testimony.  You may answer if you can.
14     A.  The discussion of preclearance would have
15  happened at the committee level, and I don't handle the
16  committee level.  So it may have been discussed during
17  the committee hearing, and I don't remember it.
18     Q.  (By Ms. Berkower) What about when a bill is in
19  the Committee of the Whole?
20     A.  It may have been discussed in the committee,
21  and I didn't -- I don't remember it.
22     Q.  Okay.  So when the Lieutenant Governor takes an
23  interest in a particular legislative issue, do you
24  communicate with other legislators about the issue?
25     A.  Yes.

---

**34**

1     Q.  Do you ever communicate with the Governor's
2  Office?
3     A.  Yes.
4     Q.  Do you ever handle public relations or anything
5  of that sort for the Lieutenant Governor?
6     A.  Not really.  I will fact check a quote to
7  ensure that it's accurate, but I don't prepare the
8  public relations materials.
9     Q.  Do you communicate with any interest groups?
10     A.  If they want to come and talk to our office,
11  yes.
12     Q.  Do you ever talk to constituents?
13     A.  Yes.
14     Q.  In any given legislative session, how many
15  bills does the Lieutenant Governor contribute to
16  drafting?
17     A.  Oh, Lord.  More than he should.  I really -- he
18  doesn't draft as many as he discusses with the
19  senators.  I would say that drafting, he participates in
20  maybe 20 bills.  But amendments, he may participate in
21  up to 200 bills.
22     Q.  How does he decide which bills that he
23  contributes to drafting?
24         MR. FREDERICK:  Object on the basis of
25  privilege.  It calls for his thought process, and I

---

**35**

1  instruct you not to answer.
2     A.  I will not answer that question.
3     Q.  (By Ms. Berkower) Does he only contribute to
4  drafting for bills that are a priority for him?
5     A.  No.
6         MR. FREDERICK:  Objection.
7     Q.  (By Ms. Berkower) Are you not answering based
8  on advice of counsel?
9     A.  Yeah.  No.  The answer is no.
10     Q.  The answer is no, he contributes to other
11  bills, too?
12     A.  Yes.
13     Q.  Okay.  What is your role in the drafting?
14     A.  It varies by the piece of legislation, and
15  typically, I don't have a role with drafting.  The
16  policy person handling that specific issue handles it,
17  but sometimes I will assist if somebody is really busy.
18     Q.  Do you review drafts when other people are --
19     A.  Yes.
20     Q.  What is your role, generally, when the
21  Lieutenant Governor may vote on a bill?
22     A.  He hasn't voted very often, so I don't think
23  I've had a role, other than preparing the materials that
24  we would prepare for any bill.
25     Q.  You said he hasn't voted very often?  On the

---

**36**

1  occasions where he did vote, did you provide him with
2  any advice on how to vote?
3     A.  No.
4     Q.  Did anybody in your office?
5     A.  Not that I'm aware of.
6     Q.  Do you remember when exactly he voted?
7         MR. FREDERICK:  I'll object, vague, but
8  you can answer.
9     A.  I think he's voted maybe three times since he's
10  been Lieutenant Governor.  One was a gaming bill.  One
11  was this bill.  And I don't remember the third one, but
12  maybe it was school finance.
13     Q.  (By Ms. Berkower) How did he decide when he was
14  going to vote?
15         MR. FREDERICK:  Objection.  It calls for
16  internal thought process.  I instruct you not to answer
17  on the basis of privilege.
18     A.  I will not answer that.
19     Q.  (By Ms. Berkower) Have you ever drafted lists
20  of priorities, priority -- sorry.  I'll start over.
21         Have you ever drafted lists of policy
22  priorities for the Lieutenant Governor?
23     A.  Yes.
24     Q.  When did you do that?
25     A.  Every session, he gives a speech on his policy

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

49

1  staff as well.  But yes, typically.
2      Q.  In your time working for the Lieutenant
3  Governor, has he ever promised anyone he would
4  prioritize certain legislative issues?
5          MR. FREDERICK:  I'll object to the extent
6  this calls for privileged communications.  But if you
7  can answer without revealing privileged communications,
8  you may do so.
9          MS. BERKOWER:  Well, I think, actually,
10  promises concerning legislation are not privileged.
11          MR. FREDERICK:  I think it would depend on
12  the person to whom the promise was made.  I mean,
13  "promise" can be a vague term, so I think a discussion
14  between a legislator and the Lieutenant Governor can be
15  construed, potentially, as a promise if there is an
16  indication that he wants to pass certain legislation.
17          So to the extent this question calls for
18  communications between the Lieutenant Governor and his
19  own staff or other legislators or staff about pending
20  legislation, then I would instruct you not to
21  answer.  But if you can answer without revealing that,
22  you may do so.
23      A.  I don't know how to answer that question
24  outside of saying that Governor Dewhurst does work with
25  senators to help them pass their legislative packages.

---

50

1      Q.  (By Ms. Berkower) Well, I guess I also meant it
2  with regard to people outside the Legislature, including
3  the Governor's Office or constituents or outside groups
4  or interest groups of any sort.
5      A.  I think Governor Dewhurst does like, enjoy
6  working with people to try and help them achieve their
7  objectives.  And I think to the extent that that
8  qualifies as working together to achieve an objective,
9  that's -- that he is willing to do that.
10      Q.  So to your knowledge, though, has he ever
11  promised anyone, outside the other legislators or anyone
12  in your office, that he would prioritize certain
13  legislation?
14      A.  I'm having a problem with the word
15  "promise."  I think he would be willing to say, "Let me
16  work with you to achieve your objectives."  But that's
17  different than saying, "I promise I will do something
18  for you."
19      Q.  Did the legislative issues on which he wanted
20  to help others achieve their legislative objective
21  include voter ID issues?
22          MR. FREDERICK:  I'll object to the extent
23  this calls for what the Lieutenant Governor wanted.
24  That would be his thought process and mental
25  impressions.  I will instruct you not to answer on the

---

51

1  basis of privilege.
2      A.  I won't answer that question.
3      Q.  (By Ms. Berkower) What about immigration
4  issues; has he ever promised he would prioritize certain
5  -- he would -- excuse me.  I'll start over that
6  question.
7          Has he ever promised anyone he would
8  prioritize immigration issues?
9          MR. FREDERICK:  The same objection based
10  on privilege.  Don't reveal communications between the
11  Lieutenant Governor and legislators or their staff or
12  his own thought process.  But to the extent that you may
13  answer without revealing those, you can do so.
14      A.  I think he has told people he would help them
15  or work with them to achieve their objectives.
16      Q.  (By Ms. Berkower) Including on immigration
17  issues?
18      A.  Yes.
19      Q.  Including on voter ID issues?
20      A.  I think --
21          MR. FREDERICK:  The same objection, but
22  you may answer.
23      A.  I think so.
24      Q.  (By Ms. Berkower) While you have worked for the
25  Lieutenant Governor, how many election-related bills

---

52

1  have you been involved in?
2      A.  Oh, I have no idea -- no idea.
3      Q.  A guess?
4      A.  I have really no idea.  We had the Help America
5  Vote Act.  We've had all kinds of mail-in ballot bills.
6  We've had -- I have no idea.  Up to a hundred maybe?
7      Q.  Going back a step, when you said the Governor
8  works with senators to work on their objectives and he
9  talks to them about their priorities, does he work with
10  all senators to work on their priorities?
11      A.  Yes, he does.
12      Q.  How does he ensure that he works with all
13  senators?
14      A.  They want to work with him.  He has meetings
15  with everyone.  He has meetings with the chairs on
16  Monday nights and the vice chairs on Tuesday nights so
17  he has talked to all the Senate, on Mondays and
18  Tuesdays, about the upcoming issues of the week.  That's
19  during the Legislative session.  During an interim, he
20  typically just waits until they call him and asks for
21  help.
22      Q.  If a particular legislator wanted to be in
23  touch with the Lieutenant Governor about a particular
24  issue, what would they do to get his attention?
25      A.  Typically, they walk, during session, to the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 53

1  podium and talk to him about it, or they call him.  They
2  all have his cell phone numbers, and sometimes they just
3  come visit.
4     Q.  Does he work with the minority senators on
5  their objectives?
6     A.  Yes.
7     Q.  Does he work with senators of both parties on
8  their objectives?
9     A.  Yes.
10    Q.  In the time that you have worked for Lieutenant
11  Governor, how many immigration-related bills have you
12  been involved in?
13    A  Again, I have no idea.
14    Q.  More than ten?
15    A.  More than ten.
16    Q.  More than 20?
17    A.  Probably.
18    Q.  More than --
19    A.  I think of immigration as having a very broad
20  description.  That would include the budget that handles
21  a lot of immigration-related issues.  He refers all the
22  bills, so even if he hasn't worked on a bill, he has
23  referred it to a committee.  I would say probably more
24  than 20 immigration-related bills have been referred to
25  committee.

## 54

1     Q.  Okay.  Are you familiar with Section 5 of the
2  Voting Rights Act?
3    A.  Not really familiar.  I'm aware of what it is.
4    Q.  Well, what is your understanding of the
5  requirements of Section 5?
6    A.  I'm not a voting rights expert by any stretch
7  of the imagination, but my understanding is the intent
8  is to rectify a historical underrepresentation of
9  minorities in the voting process in Texas and seven
10  other states, I think, but...
11    Q.  How do you ensure that an election-related
12  change to the law complies with Section 5?
13     MR. FREDERICK:  We'll object.  To the
14  extent this calls for thought process, mental
15  impressions, or communications within the Lieutenant
16  Governor's Office or with legislators, I instruct you
17  not to answer on the basis of privilege.
18    A.  Okay.  I cannot answer that question.
19    Q.  (By Ms. Berkower) I'll take one step back.  Do
20  you, just as a yes-or-no matter, ensure that an
21  election-related change to the law complies with
22  Section 5?
23    A.  No.
24    Q.  Do you believe that compliance with the Voting
25  Rights Act is important?

## 55

1     MR. FREDERICK:  Objection, relevance.
2    Q.  (By Ms. Berkower) You may answer.
3    A.  My personal belief or my professional belief?
4  I mean, what are you asking me?
5    Q.  I guess both.
6    A.  I think we should comply with federal law, yes.
7    Q.  That's your professional belief?
8    A.  And my personal belief.
9    Q.  Does the Lieutenant Governor believe that
10  compliance with the Voting Rights Act is important?
11     MR. FREDERICK:  Objection, calls for --
12  objection, relevance.  Objection, privilege.  I would
13  instruct you not to answer on the basis of privilege.
14    A.  I can't answer that.
15    Q.  (By Ms. Berkower) Do you or the Lieutenant
16  Governor receive any legal advice on election-related
17  matters before the Senate with regard to Section 5
18  compliance?
19    A.  I do think there was testimony in the Committee
20  of the Whole hearing on Section 5 compliance.
21    Q.  What about legal advice; do you receive legal
22  advice on Section 5 compliance?
23     MR. FREDERICK:  I would object to the -- I
24  would object on the basis of attorney-client privilege.
25     To the extent this already presumes the

## 56

1  content of communication with a lawyer, I would instruct
2  you not to answer on the basis of attorney-client
3  privilege.
4    A.  Okay.  I can't answer that.
5     MS. BERKOWER:  Well, I think we're allowed
6  to ask some foundational questions, so I'll go into
7  that.
8     MR. FREDERICK:  You may ask foundational
9  questions, but my objection to that is that it assumes
10  the content of the communication, so I believe that it's
11  going beyond the mere foundational question.
12     MS. BERKOWER:  Okay.  But the subject
13  matter of an attorney-client conversation is a
14  permissible foundation question.
15     MR. FREDERICK:  If you want to ask it
16  again, I'll consider it.
17     MS. BERKOWER:  Okay.
18    Q.  (By Ms. Berkower) Do you receive legal advice
19  on election-related matters before the Senate?
20     MR. FREDERICK:  I will instruct you not to
21  reveal specific substance of any conversation.  However,
22  to the extent that you can answer based on general
23  subject matter, you may do so.
24    A.  I don't remember any communications outside of
25  the testimony that was on the Senate floor and the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 57 | 59 |
|---|---|

57

1 Committee of the Whole.
2      Q. (By Ms. Berkower) So you did not receive any
3 legal advice on election-related matters before the
4 Senate?
5          MR. FREDERICK: Objection, misstates prior
6 testimony.
7      A. I don't remember.
8      Q. (By Ms. Berkower) You don't remember receiving
9 any such legal advice?
10     A. No.
11     Q. Have you or the Lieutenant Governor ever had
12 discussions with other legislators concerning
13 preclearance?
14         MR. FREDERICK: Again, I'll instruct you
15 not to reveal the substance of a communication. But to
16 the extent this only calls for general subject matter on
17 whether the conversation happened, you may answer.
18     A. We have had some conversations about
19 preclearance.
20     Q. (By Ms. Berkower) Do you remember with who?
21     A. No, but the issue was redistricting, not
22 voting -- voter ID.
23     Q. Do you recall ever speaking with Senator
24 Williams or someone from his office about preclearance
25 of election-related matters?

59

1      Q. What are the Lieutenant Governor's executive
2 functions?
3      A. Should the Governor be out of state, he assumes
4 the responsibilities of the Governor and -- or
5 incapacitated, I guess, out of state and incapacitated,
6 he would assume the responsibilities of Lieutenant
7 Governor. He serves as the chair of the Senate, and he
8 makes some appointments that's not in the Constitution.
9      Q. So what -- is that all of the Lieutenant
10 Governor's executive functions?
11     A. That the priorities, yeah.
12     Q. What are the Lieutenant Governor's legislative
13 duties?
14     A. Most of his legislative duties stem from the
15 Senate rules and not from the Constitution. The
16 Constitution just says he is President of the
17 Senate. But the Senate rules allow him to refer all
18 bills to committee, to set up committees, to name
19 committee chairs, to determine when bills are heard on
20 the Senate floor subject to the requirements of the
21 Senate rules.
22     Q. Can you explain a little bit more about what
23 you just said about how he determines when bills are
24 heard on the Senate floor? What do you mean by that?
25     A. The Senate rules set out the process for

| 58 | 60 |
|---|---|

58

1          MR. FREDERICK: Same objection and
2 instruction, but you can answer whether the conversation
3 happened.
4      A. I don't -- I don't remember it.
5      Q. (By Ms. Berkower) Are you generally familiar
6 with the Senate rules in effect from sessions between
7 2005 and 2011?
8      A. Generally.
9      Q. Are you generally familiar with the Texas State
10 Constitution?
11     A. No.
12     Q. You know it's long?
13     A. Yes.
14     Q. Are you generally familiar with the parts of
15 the Texas State Constitution that relate to the
16 Lieutenant Governor's responsibilities and duties?
17     A. Yes, generally.
18     Q. Can you describe, in general terms, the
19 difference between the Lieutenant Governor's executive
20 and legislative duties?
21     A. Well, the Lieutenant Governor is a member of
22 the Executive Branch, but at the same time, he serves as
23 President of the Senate. And then the Legislature, the
24 Texas Senate, through their rules, chooses to give him
25 additional legislative powers.

60

1 hearing bills on the Senate floor. And the senators
2 have chosen to use an alternative system that
3 incorporates the rules in some parts and doesn't in
4 other parts. The senators, before a bill can be heard
5 on the Senate floor, need to have the package of
6 materials, that I referenced earlier, that go with the
7 bill, the actual language of the bill, the fiscal note,
8 the bill analysis, all the pieces that need to be there
9 for the legislative package. So that's subject to the
10 Senate rules. That package has to be together.
11         And if that package is together, the
12 senators then place their bills on the Notice of
13 Intent. The Notice of Intent is sort of outside the
14 rules. It functions as a list of bills that
15 senators intend to or would like to bring up during the
16 next period of time. The senators have five bills that
17 they can place on Intent each day. At that point, the
18 bill needs to be on that Intent calendar for two days
19 before the Lieutenant Governor can bring it up for
20 hearing. And at that point, he typically asks the
21 senators, "Are you ready to go on your bill? Is it time
22 to be heard?" And the Senator will say yes or no, I'm
23 ready or I'm not ready. Let's wait another day.
24     Q. So with regard to when the bill is brought up
25 for a hearing, does the Lieutenant Governor have



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

65

1    doesn't function as a senator.
2        Q.   Can the Lieutenant Governor introduce
3    legislation?
4        A.   No.
5        Q.   Can he introduce legislation in the Committee
6    of the Whole?
7        A.   I've never thought about it.  I guess he
8    could.  But no, I don't think so, because he would have
9    to file legislation before they're in the Committee of
10   the Whole.  So I don't think he could introduce
11   legislation.
12       Q.   Can he introduce amendments?
13       A.   Yes, I think he could, but I'm not certain.
14   Yeah, I think he could, if he's functioning as a Senator
15   in the Committee of the Whole.
16       Q.   So you just said when he's functioning as a
17   senator.
18       A.   Well, in a senatorial role in the Committee of
19   the Whole.  He would not be able to file legislation at
20   that point, so he would not be able to introduce a new
21   bill, but he might be able to introduce an amendment.  I
22   just never thought about it.
23       Q.   So has he, to your knowledge, ever introduced
24   an amendment?
25       A.   No, he has not.

---

66

1        Q.   So to make sure I understand, when a bill is
2    filed --
3        A.   Uh-huh.
4        Q.   -- that's not something the Lieutenant Governor
5    has the power to do?
6        A.   That's correct.
7        Q.   Can the Lieutenant Governor introduce
8    amendments to a bill when it's not in the Committee of
9    the Whole?
10       A.   No.
11       Q.   And the Lieutenant Governor decides when a bill
12   will be referred to the Committee of the Whole; is that
13   correct?
14       A.   Yes.
15       Q.   In fact, he decides where all bills get sent?
16       A.   Yes.
17       Q.   How does he make those decisions?
18            MR. FREDERICK:  I'll object to the extent
19   that calls for the Lieutenant Governor's thought
20   process, mental impressions, or any communications with
21   his staff or other legislators.
22            If you can answer without revealing any of
23   those matters, you may do so.
24       A.   Typically, they're referred by subject matter
25   to the appropriate subject matter committee, but that's

---

67

1    not bound by the rules.
2        Q.   (By Ms. Berkower) What types of -- are there
3    specific subject matters that are considered generally
4    by the Committee of the Whole?
5        A.   No.
6        Q.   So how does the decision get made to refer a
7    bill to the Committee of the Whole?
8            MR. FREDERICK:  The same instruction based
9    on privilege.  Don't reveal thoughts or mental
10   impressions or communications with staff or
11   legislators.  But if you can answer generally without
12   revealing those, you may do so.
13       A.   My impression is that the Committee of the
14   Whole is used when the Lieutenant Governor wants to
15   ensure that the entire Senate hears the same
16   information, has the opportunity to question the same
17   witnesses, and has the benefit of hearing the public
18   testimony on an issue.  And it's a fairness issue of
19   making sure that everybody hears the same info.
20       Q.   (By Ms. Berkower) Is it also fair to say the
21   Lieutenant Governor has a bigger role when the Senate is
22   meeting in the Committee of the Whole?
23       A.   No, I don't think that's the case.
24       Q.   A bigger role as a legislator even?
25       A.   I don't think so.  In my opinion, it's more

---

68

1    powerful to determine when a bill is heard rather than
2    discussing it on the floor.
3        Q.   Does the Lieutenant Governor --
4            MS. BERKOWER:  Actually, maybe this is a
5    good place to take break.
6            MR. FREDERICK:  Okay.  Sure.
7            (Recess from 9:30 a.m. to 9:43 a.m.)
8        Q.   (By Ms. Berkower) So I think before we took the
9    break, we were talking about the Lieutenant Governor's
10   role in the Senate.  So just to continue on that
11   subject.
12            So the Lieutenant Governor cannot
13   introduce legislation at any time; is that correct?
14       A.   That's correct.
15       Q.   Does his office develop legislation for other
16   members to introduce?
17       A.   We work with the members' staff, yes, to
18   introduce legislation.
19       Q.   Do you do original legislative drafting?
20       A.   We have, yes.
21       Q.   Did you do an original legislative drafting for
22   any of the voter ID laws?
23       A.   No.
24       Q.   Who did that; do you know?
25       A.   I'm assuming the Senator Fraser's office

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                              MAY 29, 2012

---

73

1   Commission determines whether or not they should be
2   continued for another 12 years.  And right now, I think
3   we have 24 agencies going through the Sunset process.
4   So there has to be legislation next session to continue
5   those agencies or they die.  And so Governor Dewhurst
6   works with the commission members to determine who
7   carries what, and, typically, that's done by just their
8   interest areas.
9       Q.  Do you ever oversee research for particular
10  areas of legislation?
11      A.  Yes.
12      Q.  When you have done that?
13      A.  That's part of my job.
14      Q.  Well, any particular areas?
15      A.  Every piece of legislation.  If we need
16  additional information associated with it, I'll ask the
17  policy person to find it or I'll find it.
18      Q.  What about for voter ID bills?
19      A.  I don't remember any additional information
20  that I requested.  I know that Bryan Hebert was actively
21  working with Senator Fraser's office to develop whatever
22  background materials they needed.
23      Q.  And you said that sometimes the senators will
24  come to the Lieutenant Governor and say they're
25  interested in a particular issue.

---

74

1       A.  Yes.
2       Q.  Did any senator come to the Lieutenant Governor
3   about their interests in voter ID issues?
4       MR. FREDERICK:  I'll object on the basis
5   of privilege.  I believe the question calls for the
6   substance of a privileged communication.  I instruct you
7   not to answer on the basis legislative privilege.
8       A.  Okay.  I can't answer that question.
9       Q.  (By Ms. Berkower) Okay.  What about, for the
10  record, immigration issues?
11      MR. FREDERICK:  Objection, vague.  Are you
12  asking if --
13      MS. BERKOWER:  I'm asking if any senators
14  told the Lieutenant Governor about an interest they had
15  in carrying immigration legislation.
16      MR. FREDERICK:  The same objection and
17  instruction not to answer on the basis of privilege.
18      A.  Okay.  I can't answer that question.
19      Q.  (By Ms. Berkower) Okay.  Do you ever develop or
20  contribute to the Lieutenant Governor's legislative
21  agenda?
22      A.  Yes.
23      Q.  How do you do that?
24      A.  I ask what he's interested in accomplishing
25  each session, and then I work with our policy staff to

---

75

1   determine if those issues are being developed through
2   legislation by senators, or if we need to develop
3   additional research or drafts on any given issue.
4       Q.  Was voter ID ever one of the issues that he
5   wanted to establish as a legislative priority?
6       MR. FREDERICK:  I'll object on the basis
7   it calls for the Lieutenant Governor's mental
8   impressions and thought process, and I instruct you not
9   to answer on the basis of legislative privilege.
10      A.  Okay.  I can't answer that question.
11      Q.  (By Ms. Berkower) About how many legislative
12  priorities does the Lieutenant Governor have in any
13  given year?
14      A.  Typically, he withholds about 20 bills, the
15  lower, the first 20 bills, and those are his priority
16  issue areas.
17      Q.  How do you ensure that his agenda gets carried
18  out every legislative session?
19      A.  Through a variety of actions.  Sometimes I work
20  with senators.  Sometimes I work with the senators'
21  staff.  Sometimes it's a process that's happening
22  anyway, and so we just make sure that the process is
23  completed.  The typical example of that would be the
24  budget process.  There's already a process in place for
25  developing the budget.  We just make sure we monitor it

---

76

1   and that it incorporates his priorities.
2       Q.  Is there anything specific that you do to try
3   and get bills passed that are a legislative priority for
4   the Lieutenant Governor?
5       MR. FREDERICK:  I would object only to the
6   extent that answering would require you to reveal the
7   Lieutenant Governor's thought process or his privileged
8   communications.  But to the extent you can answer
9   without doing that, you may.
10      A.  I mean, again, it's a -- it runs the gamut of
11  talking with the senators, asking them if they have a
12  problem with a given piece of legislation, and if so, if
13  there's something we can do to address that problem.
14  Again, sometimes I meet with their staff to incorporate
15  something that they would like to incorporate in the
16  legislation.
17      Q.  (By Ms. Berkower) Is there any -- in what ways
18  do you reach out to those other senators?
19      A.  I go talk to them.  Is that what you're asking?
20      Q.  I guess so.
21      A.  Okay.
22      Q.  I guess I'll rephrase it, too.
23          Do you ever take efforts to see if certain
24  senators have concerns about a particular bill?
25      A.  Yes.  I'll ask them.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

77

1   Q.   Do you ask all 31 senators?
2   A.   I typically ask the Senator who is carrying the
3   piece of legislation if they have 21 votes in order to
4   suspend the rules and hear the bill.  If they have the
5   21 votes, then I don't walk around and ask.  Or if we
6   feel like the Senator doesn't know whether or not they
7   have the 21 votes, then sometimes we will go around and
8   ask the senators.
9   Q.   Something I should have asked you before:  Can
10  the Lieutenant Governor sit on any committees?
11  A.   No, not unless it's the Committee of the Whole.
12  Q.   What is his role with regard to committees
13  other than the Committee of the Whole?
14  A.   He designates the chair of the committees and
15  the membership of the committees.  The standing
16  committees are in the rules, and those standing
17  committees have a specific number.  They are listed by
18  title, and they have a specific number of senators by
19  each committee.  So long as he abides by that number
20  listed in the Senate rules and keeps those committees
21  that are listed in the Senate rules, he can put anybody
22  he wants to on those committees and as chair of those
23  committees.
24  Q.   But he can't put himself on those committees,
25  can he?

---

78

1   A.   No, he can't.
2   Q.   And he can't vote in those committees?
3   A.   That's correct.  Just the Committee of the
4   Whole.
5   Q.   How does he decide who to appoint to different
6   committees?
7   MR. FREDERICK:  I'll object only to the
8   extent that it calls for his own thought process.
9   But to the extent you can answer without
10  revealing that or a privileged communication, you may do
11  so.
12  A.   He asks the senators what committees they want
13  to be on.
14  Q.   (By Ms. Berkower) How does he decide where to
15  assign the bills to which committees?
16  MR. FREDERICK:  Same instruction.
17  A.   Typically, it follows issue areas.  And while
18  we don't have specific jurisdiction for committees, like
19  they do on the federal level, he has full flexibility to
20  send anything anywhere.  Typically, we follow the
21  unspoken jurisdiction of the committees.
22  Q.   (By Ms. Berkower) Do the chairs of the
23  committees ever make requests to have bills sent to
24  their --
25  A.   Oh, yes.

---

79

1   Q.   -- committee?
2   A.   Yes.
3   Q.   When does that happen?
4   A.   Regularly, during session.
5   Q.   Is there ever a dispute over which committee a
6   bill should go to?
7   A.   Absolutely.
8   Q.   How are those resolved?
9   A.   Governor Dewhurst makes up his made and decides
10  which way to send them.
11  Q.   What factors does he consider?
12  MR. FREDERICK:  I'll object to the extent
13  this calls for the Lieutenant Governor's thought process
14  and mental impressions and potentially communications
15  within the office.  If you can answer generally without
16  revealing privileged matters, you may do so.
17  A.   You know, typically, it's done by
18  jurisdiction.  But an example would be an economic
19  development bill that dealt with pollution control
20  equipment.  It could go to Natural Resources because it
21  deals with pollution control.  It could go to Economic
22  Development because it's economic development.  And so
23  he will take whatever factors he takes into account and
24  determine whether or not it goes to the Natural
25  Resources or Economic Development.

---

80

1   Q.   Were there any such disputes with regard to any
2   of the voter ID bills?
3   A.   Not that I'm aware of.
4   Q.   Is there any other substantive role that this
5   lieutenant governor plays in the Senate that you haven't
6   already mentioned?
7   A.   Okay.  There's committees, bills, referrals,
8   appointment of conference committees.
9   Q.   How does that work?
10  A.   After a bill is heard in one house and then
11  sent to the other house, and the other house makes
12  changes in that legislation, the senators and the house
13  members can choose whether they want to go to conference
14  and have conference committees that work out those
15  changes so that the two bills match, or -- and that they
16  decide on what that should look like, or the originating
17  house can choose to concur in the other house's
18  amendments, in which case, we don't have to go to
19  conference committee, we just accept the changes, and
20  the senators then re-vote on that, as do the House
21  members, actually.
22  If it goes to conference committees, he
23  determines the rules of the conference committee
24  according to the rules; still it needs to have two
25  members of the committee of origin of that legislation.

---


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                              MAY 29, 2012

---

### 81

1   So he determines who's on the conference committee, and
2   he determines when he's going to recognize conference
3   committee reports and concurrences.  I think that's
4   about it.
5       Q.  Any other substantive role you haven't
6   discussed yet?
7       A.  Appointments.  He has several appointments he
8   makes.  I'd say he makes about 200 appointments.
9       Q.  Any other substantive role in the Senate?
10      A.  Not that I can think of.
11      Q.  And the appointments you're referring to are
12  part of his Executive Branch duties, right?
13      A.  Yes.  Typically.
14      Q.  Does the Lieutenant Governor engage in public
15  relations?
16      A.  Well, does he give speeches?  Is that what
17  you're asking?
18      Q.  Does he put out press releases?
19      A.  Oh, yes.  Okay.
20      Q.  Who is in charge of that in the years actuaries
21  2010 to 2011?
22      A.  Let's see.  2011, Mike Walz came on.  He's our
23  communications director.
24      Q.  What about in 2010?
25      A.  I think Rich Parsons was.

### 82

1       Q.  Does the Lieutenant Governor communicate with
2   any interest groups?
3       A.  Oh, sure.  Yes.
4       Q.  Who was in charge of that in 2010 and 2011?
5       A.  Well, he is.  People send in meeting requests,
6   that he meets with them according to his schedule.
7       Q.  Who did he meet with during that time, what
8   interest groups?
9       A.  Oh, probably thousands of them.  Honestly, over
10  -- well over hundreds.
11      Q.  Did he meet with any relating specifically to
12  voter ID?
13      A.  I don't remember, but I would imagine so.
14      Q.  So you don't remember any particular interest
15  groups that he met with about voter ID?
16      A.  I want to say he met with MALDEF, but I don't
17  remember.
18      Q.  Any others?
19      A.  Maybe NAACP was in with MALDEF, but I don't
20  remember.
21      Q.  Did you attend that meeting?
22      A.  I don't remember.
23      Q.  Are you familiar with the group the American
24  Legislative Exchange Council, or ALEC?
25      A.  Yes.

### 83

1       Q.  What is it?
2       A.  I'm aware that it exists.  That's about as far
3   as I am aware.  I have not been an ALEC meeting.  It's a
4   legislative conference of -- it's a conference on the --
5   on the national level of legislative -- that legislative
6   staff and legislators can attend.  They put on
7   conferences.  They prepare briefing materials.
8       Q.  Do you know if any other members or staff of
9   the Lieutenant Governor's Office are members of ALEC?
10      A.  I'm not aware of anyone.
11      Q.  What about members of the Texas Legislature?
12          MR. FREDERICK:  Objection, vague.
13      Q.  (By Ms. Berkower) Do you know of any --
14      Are they members of ALEC?
15      Q.  Yes.
16      A.  I don't -- I don't know.
17      Q.  Did you ever receive -- did your office ever
18  receive any documents from ALEC related to voter ID?
19      A.  I don't remember voter ID.  We do receive
20  documents from them from time to time.
21      Q.  Did ALEC offer you any technical assistance on
22  voter ID legislation?
23      A.  Not that I'm aware of.
24      Q.  Did you solicit any such assistance yourself
25  from ALEC?

### 84

1       A.  No.
2       Q.  Are you familiar with the National Conference
3   of State Legislators?
4       A.  Yes, I am.
5       Q.  Have you attended any meetings?
6       A.  Yes, I have.  It's been a while, but yes.
7       Q.  Do you remember when it was, though?
8       A.  Oh, let's say -- I would say I've probably been
9   to five of their conferences in the '90s, and one of
10  their drafting conferences and also in the 1990s.  And I
11  have not to be an NCSL conference since the Lieutenant
12  Governor was elected in 2003.
13      Q.  Are there any other groups that focus on policy
14  advice or assistance to legislators that you belong to?
15      A.  I don't know if we pay the Council of State
16  Governments and the Southern Legislative Conference, but
17  both of them provide research materials, but I don't
18  know if we pay in to those.
19      Q.  Did you receive any research materials from
20  either of those groups with regard to voter ID?
21      A.  Not that I'm aware of.
22      Q.  Do you know, what is Texas's current system for
23  determining how to verify the identity -- excuse me --
24  verify the identity of a voter?
25      A.  I mean, the current law before the voter ID

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

## 85

1   legislation?
2       Q.   Yes.
3       A.   Like what we're under right now?
4       Q.   Yes.
5       A.   I mean, you have to register to vote, and
6   beyond that, as long as you show up with your voter
7   registration card, you can vote.
8       Q.   What happens, do you know, if the voter shows
9   up without their certificate?
10      A.   I do that all of time.  And so I used my
11  driver's license, and then I have to swear that I am me,
12  and then I am registered.  They check my name and
13  address against a voter registration roll.  And I have
14  to swear that I am me and that I am from that location.
15      Q.   Are there problems with the system, in your
16  view?
17      A.   I think it's not the most secure system we
18  could have.
19      Q.   Why not?
20      A.   Because there's no photo identification
21  associated with it.
22      Q.   You mean the person could show up just with the
23  voter registration certificate, and that would be
24  enough?
25      A.   Yes.

---

## 86

1       Q.   Any other problems with the current system?
2       A.   I think you can show up with your electric
3   bill, and you don't have to even show up with a driver's
4   license, and then swear that you are you and that you
5   you're the person on the voter ID roll.
6       Q.   And that's a problem with the current system,
7   in your view?
8       A.   I think it is.  If you've got three Bill Jones,
9   how do you know which one it is?
10      Q.   I'm sorry; what?
11      A.   If you've got three people showing up, and they
12  say, "I'm Bill Jones," how do you know which Bill Jones
13  it is, if you don't have some kind of photo reference to
14  the person?
15      Q.   I think we talk about bills so much, in my
16  mind, it's all under a name.
17      A.   Oh, I'm sorry.  William Jones, okay?
18      Q.   I understand.  Okay.
19      A.   I'm sorry.
20      Q.   In your view, has the system failed to prevent
21  in-person voter fraud?
22          MR. FREDERICK:  Objection, relevance.  You
23  may answer.
24      A.   In my opinion, it's not very safe.  I mean, not
25  secure.

---

## 87

1       Q.   (By Ms. Berkower) Has it failed, though, in
2   your view?
3       A.   I believe there's been some testimony on voter
4   fraud, yes.  But I have no personal experience with it.
5       Q.   Do you know of convictions for voter fraud that
6   have been -- any recent convictions for voter fraud?
7       A.   I think there have been some in South Texas,
8   but I am not certain about that.
9       Q.   Were those for in-person impersonation?
10      A.   I'm just -- I don't remember.
11      Q.   Were they for mail fraud?  Sorry.  Mail-in
12  voter fraud?
13      A.   I know there were some for mail-in voter
14  fraud.  I'm not certain whether or not there were some
15  from -- and it seems to me Harris County had some as
16  well, some issues with voter fraud.
17      Q.   So aside from the problems with the current
18  system of verifying a voter's identity that you've
19  already identified, are there any other problems that
20  you know of with the current system?
21      A.   Well, I think more people should vote.  There's
22  a lot of voter apathy, but that's not really what we're
23  here to talk about.
24      Q.   What was the original impetus for voter ID in
25  Texas, given the law that's already in place?

---

## 88

1          MR. FREDERICK:  Object on the basis of
2   privilege to the extent this calls for the Lieutenant
3   Governor's thought process or mental impressions or any
4   communications in the office or his or her staff had
5   with other legislators, state agencies, the Texas
6   Legislative Council or constituents.  If you can answer
7   without revealing those matters, you may do so.
8       A.   If you're asking me the purpose of a voter ID
9   bill, it would be to protect the integrity of the voting
10  system and reduce the opportunity for voter fraud.
11      Q.   (By Ms. Berkower) I think I mean just the
12  original impetus.  Was there a rash of problems that
13  were made public?  Were there certain convictions?  Was
14  there a public outcry?  Anything of that nature.
15          MR. FREDERICK:  The same instruction, but
16  you may answer subject to that.
17      A.   My memory is, there was a real sense that part
18  of the voter apathy was lack of voter confidence in the
19  system.  And so I think to the extent that the
20  Legislature was considering improving the election
21  process by protecting its integrity, it would increase
22  voting by making people feel better about it.
23      Q.   (By Ms. Berkower) Why do you think people
24  didn't believe the system was secure enough?
25          MR. FREDERICK:  Objection, calls for

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                        MAY 29, 2012

---

**89**

1  speculation, but you may answer.
2      A.  I think that's speculative, but I have to
3  present my driver's license to write a check, so I don't
4  think it's too much to ask people to have an ID in order
5  to vote.
6      Q.  (By Ms. Berkower) But do you think that the
7  fact that you don't currently need an ID to vote erodes
8  confidence in the system?
9      MR. FREDERICK:  Objection, relevance, but
10 you may answer.
11     A.  Personally, I think so, yes.
12     Q.  (By Ms. Berkower) Was there any study or
13 analysis that you know of that showed voting apathy was
14 linked to a lack of confidence in the system for this
15 reason, the reasons you identified?
16     A.  I want to say there was, but I don't remember.
17 I really don't remember.
18     Q.  When was Senate Bill 14 signed into law?
19     A.  Governor Perry signed it, I think, late May of
20 2011.
21     Q.  Have there been elections held in Texas since
22 the law was signed in May of 2011?
23     A.  Oh, yeah.  One a day.
24     Q.  Was SB 14 enforced in those elections?
25     A.  No.

---

**90**

1      Q.  Are you aware of any in-person voter fraud that
2  occurred in any of the elections held since the bill was
3  signed?
4      A.  Not personally.
5      Q.  Was there a time when a voter ID was first
6  introduced into the Texas Legislature?
7      MR. FREDERICK:  Objection, vague, but you
8  can answer.
9      Q.  (By Ms. Berkower) In 2005.  How about that?
10     A.  Oh, yeah.  Well, I know one was introduced in
11 '5 and '7 and '9 and '11, so...
12     Q.  Do you remember which bill was introduced in
13 2005?
14     A.  It was a House Bill, 1706.  It's on this, right
15 here (indicating).
16     Q.  It was indeed 1706.  I have what I think we've
17 previously marked as Exhibit 44 in prior depositions.
18     (Exhibit 44 remarked for this deposition.)
19     Q.  (By Ms. Berkower) Do you recognize this?
20     A.  I don't remember this bill at all.  I know we
21 got it late in the session, but I just don't -- I
22 haven't reread it.
23     Q.  Do you want to take a quick look at it?
24     A.  I feel like I'm wasting your time by reading
25 the whole thing.  Do you want to ask a question?

---

**91**

1      Q.  Okay.  Well, yeah, I'll ask you specific
2  questions about it.
3      So first, just as a general matter, do you
4  know what this is?
5      A.  Yes, it's a --
6      Q.  What is it?
7      A.  -- a voter ID bill.
8      Q.  Which one is it?
9      A.  House Bill 1706.
10     Q.  Do you know who sponsored it?
11     A.  Well, it says -- oh, who sponsored it?  I think
12 it was Fraser.
13     Q.  I guess --
14     A.  They authored it as Denny, Pitts, Woolley,
15 Nixon, Bohac, and others.
16     Q.  Okay.  Are you familiar with the forms of
17 allowable ID under Senate Bill 14?
18     A.  Yes.
19     Q.  What are they?
20     A.  There's roughly five of them.  DPS ID, driver's
21 license, an election certificate, a military ID, a
22 concealed carry license, a passport, and a citizenship
23 certificate, whatever that is.
24     Q.  So if you turn to Page 4 of this exhibit.
25     A.  Uh-huh.

---

**92**

1      Q.  And you see the Section 63.0101, Documentation
2  of Proof of Identification, is this the section of the
3  bill that lists the forms of allowable ID?
4      A.  It is for this bill, yes.
5      Q.  For this bill.  Under this bill, are the forms
6  of allowable ID different from those under Senate Bill
7  14?
8      A.  Yes.
9      Q.  How are they different?
10     A.  It allows a student ID, an ID issued by an
11 employer of the person in ordinary course of business --
12 or somebody's business, an ID card issued by the state
13 agency, and a county election administrator ID.  I
14 believe that's all of them.
15     Q.  Does it permit a driver's license that had
16 expired within the last two years?
17     A.  Oh, yes, uh-huh.
18     Q.  And does it also permit a voter to present two
19 forms of nonphoto ID to vote?  I think that may be on
20 Page 5 towards the bottom.
21     A.  Yes, I see it.  Uh-huh, yes.
22     Q.  As to any of these forms of identification, do
23 you know the purpose in including those forms of ID in
24 House Bill 1706?
25     A.  No, I don't.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                      MAY 29, 2012

---

### 93

1   Q.  Do you know why nonphoto ID was included?
2       MR. FREDERICK:  Object.  Object to that
3   question on the basis of relevance and privilege to the
4   extent it calls for anyone's thought process for
5   including anything, it's privileged.  But if you can
6   answer without revealing that, you can do so.
7       A.  I don't.  I don't remember this bill.
8       Q.  (By Ms. Berkower) Do you know if nonphoto ID
9   was included out of concern for Section 5 preclearance?
10      A.  I don't.
11      Q.  Were you or anyone in the Lieutenant Governor's
12  office involved in the development or drafting of this
13  bill?
14      A.  Not that I'm aware of, no.
15      Q.  Are you aware of any communications related to
16  the drafting or development of this bill?
17      A.  No.  We did refer to it to committee, but
18  that's it.
19      Q.  Are you aware of the source of any of the
20  legislative language in this bill?
21      A.  No.
22      Q.  Do you remember anything about the legislators'
23  consideration of this bill after it was filed?  I'm
24  sorry, the Senate's consideration of this bill after it
25  was filed?

### 94

1       A.  I know that we got it late in the session.  It
2   was in May, and we referred it to the Senate State
3   Affairs Committee.  And beyond that, I don't remember
4   anything else.
5       Q.  Why was it referred to the Senate State Affairs
6   Committee and not the Committee of the Whole?
7       MR. FREDERICK:  Object to the extent that
8   it calls for thought process or mental impressions of
9   the Lieutenant Governor or his staff or any
10  communications with legislators or state agencies.
11      I would instruct you not to answer on the
12  basis of privilege.  However, if you can answer without
13  revealing privileged matters, you may do so.
14      A.  I don't remember discussions of this bill, but
15  typically, elections bills go to the Senate State
16  Affairs Committee.
17      Q.  (By Ms. Berkower) Why is it that they typically
18  go to the State Affairs Committee?
19      A.  Because Governor Dewhurst has determined that
20  that's where he will send election bills.
21      Q.  And he made decision to assign the bill to the
22  State Affairs Committee?
23      A.  Yes.
24      Q.  When the bill is in the State Affairs
25  Committee, the Lieutenant Governor can't vote on it,

### 95

1   right?
2       A.  That's correct.
3       Q.  Can he call meetings of the State Affairs
4   Committee?
5       A.  No, he can't.
6       Q.  He can't preside over it either, can he?
7       A.  No.
8       Q.  And he can't introduce amendments either?
9       A.  That's correct?
10      Q.  So when the bill is in the State Affairs
11  Committee, what is the role of Lieutenant Governor?
12      A.  There's not a role.
13      Q.  Why did the Senate State Affairs -- well, do
14  you remember what happened to it when it went to the
15  State Affairs Committee?
16      A.  No.  I'm sorry.
17      Q.  Actually, I can help you with that.  I think I
18  have what we can mark as -- and this is where it gets a
19  little tricky -- 101.
20      (Exhibit 101 marked for identification.)
21      Look at that.  It did come in May.
22      Q.  (By Ms. Berkower) So now, after looking at this
23  exhibit, do you remember what happened to the bill?
24      A.  No, I really don't.
25      Q.  Well, if you look at the history, does it look

### 96

1   like it ever made it out of the State Affairs Committee?
2       A.  No, it did not.
3       Q.  Do you know why the State Affairs Committee did
4   not move the bill?
5       A.  No, I do not.
6       Q.  Is it possible it was too late in the session?
7       A.  It is possible.
8       Q.  Do you know if the Lieutenant Governor took a
9   public position on HB 1706?
10      A.  Not that I remember.
11      Q.  Did the Lieutenant Governor or anyone in his
12  office have any communications with anybody about
13  HB 1706?
14      A.  He would have referred it to the committee, but
15  other than that, no, I'm not aware of any.
16      Q.  Are you aware of any analysis conducted by the
17  Lieutenant Governor's office concerning HB 1706?
18      A.  No.
19      MR. FREDERICK:  Object on the basis of
20  privilege.
21      To the extent you can answer yes or no,
22  you can answer.
23      A.  No, I'm not aware of any.
24      Q.  (By Ms. Berkower) Are you aware of any analysis
25  conducted by anyone in the Legislature related to HB



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

### 97

1  1706?

2         MR. FREDERICK:  The same instruction.

3     A.  I'm sure that the House conducted their own

4  research and put together their own briefing materials,

5  but I'm not aware of that, of those materials.

6     Q.  (By Ms. Berkower) Are you aware of any attempt

7  to determine who among registered voters did not possess

8  the forms of identification required by HB 1706?

9         MR. FREDERICK:  I'll object on the basis

10  of privilege to the extent it calls for communications

11  or thought processes of the Lieutenant Governor.  But to

12  the extent it calls for a yes or a no answer of what you

13  were aware of, you may answer it.

14     A.  I'm not aware of it.

15     Q.  (By Ms. Berkower) Are you aware of any attempt

16  to determine the impact of HB 170 on minority voters?

17         MR. FREDERICK:  The same objection and

18  instruction.

19     A.  I'm not aware of it.

20     Q.  (By Ms. Berkower) Sitting here today, do you

21  have an opinion on this bill?

22         MR. FREDERICK:  Objection, relevance.

23  Objection, vague.

24     A.  Not really.

25     Q.  (By Ms. Berkower) Do you know what the purpose

---

### 98

1  of the bill's authors were in introducing HB 1706?

2     A.  No.

3     Q.  In your view, as someone knowledgeable about

4  voter ID, would this bill, if enacted today, have

5  accomplished the purposes that you identified earlier as

6  -- actually, I'll start that question over.

7         In your view, as someone with knowledge on

8  voter ID, would this bill have improved public

9  confidence in elections?

10         MR. FREDERICK:  Objection.  It calls for

11  speculation.

12     A.  I think it would have improved the current

13  system, but it doesn't improve it to the level that

14  Senate Bill 14 does.

15     Q.  (By Ms. Berkower) Why not?

16     A.  Because it's not a totally photo ID bill.

17  There's no way of checking to see if your Bill or

18  William Jones is the same person.

19     Q.  How does the narrowing of the forms of ID

20  further public confidence in elections?

21         MR. FREDERICK:  Object only to the extent

22  this calls for you to reveal the thoughts processes of

23  the Lieutenant Governor or any privileged

24  communications.  To the extent this is seeking your

25  knowledge only, you may answer if you can.

---

### 99

1     A.  Personally, I think we live in a society where

2  the accepted identification process is a photo ID, and I

3  think that -- I mean, for everything like boarding an

4  airplane or writing a check, you have to have a photo

5  ID.  So, I don't think it's too much to ask to have a

6  photo ID to vote.

7     Q.  (By Ms. Berkower) Is it a fundamental right to

8  board a plane?

9     A.  No.

10     Q.  Is it fundamental right to write a check?

11         MR. FREDERICK:  Objection, it calls for a

12  conclusion.  You can answer if you know the answer.

13     A.  I don't think so.

14     Q.  (By Ms. Berkower) Do you know of any other

15  fundamental rights that require photo ID?

16         MR. FREDERICK:  Objection.  It calls for

17  speculation.  It calls for a legal conclusion and

18  relevance.

19         You may answer if you can.

20     A.  I'm not aware of any.

21     Q.  (By Ms. Berkower) Is voting a fundamental

22  right?

23         MR. FREDERICK:  Objection, it calls for a

24  legal opinion or conclusion.

25         You may answer.

---

### 100

1     A.  I think -- I think in a democracy, it is.

2     Q.  (By Ms. Berkower) And not in other forms of

3  government?

4     A.  Well, if you're a Communist, you're not

5  really.  I mean it's a different social structure.

6     Q.  I guess I mean under the U.S. Constitution, is

7  voting a fundamental right?

8         MR. FREDERICK:  The same objection.

9         You may answer, if you can.

10     A.  From my personal opinion, it is.

11     Q.  (By Ms. Berkower) Do you know if there was a

12  photo ID bill introduced in the next legislative session

13  in 2007?

14     A.  Yes, there was.

15     Q.  Do you remember which one it was?

16     A.  That House Bill 218.

17     Q.  Yes.  I have an exhibit to prove it.

18         MS. BERKOWER:  We'll mark this -- this was

19  actually Exhibit 28 from a previous deposition.

20         (Exhibit 28 remarked for this deposition.)

21         MS. BERKOWER:  Matt, do you have enough

22  copies of that now?

23         MR. FREDERICK:  Yeah.  My records

24  retention policy is very strict on these.

25         MS. BERKOWER:  (Laughing) Okay.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 105

1  conversations occurred.
2       MS. BERKOWER:  I'll rephrase the question.
3       Q.  (By Ms. Berkower) After the Crawford decision
4  was issued, did you discuss plans to introduce
5  subsequent voter ID legislation with anyone in the
6  Lieutenant Governor's Office?
7       MR. FREDERICK:  Object on the basis of
8  legislative privilege, and instruct you not to answer.
9       A.  Okay.  I won't answer that, then.
10      Q.  (By Ms. Berkower) Did you discuss plans to
11  introduce subsequent voter ID legislation with the
12  Lieutenant Governor after the Crawford decision?
13      MR. FREDERICK:  Objection, legislative
14  privilege.  Instruct you not to answer.
15      A.  Okay.  I won't answer that.
16      Q.  (By Ms. Berkower) Did you discuss plans to
17  introduce subsequent voter ID legislation after the
18  Crawford decision with other legislators or their staff?
19      MR. FREDERICK:  Objection, legislative
20  privilege.  Instruct you not to answer.
21      A.  I won't answer that then.
22      Q.  (By Ms. Berkower) After the 2007 legislative
23  session, do you remember if there is discussion of an
24  interim charge on voter ID?
25      A.  I think we did have one during that interim.  I

## 106

1  know we've had at least one interim charge on voter ID.
2  I just don't remember if it was after the 2007 session
3  or after the 2009 session.
4       Q.  And can you explain just quickly what an
5  interim charge is?
6       A.  Yes.  The Lieutenant Governor sends out
7  instructions to committees for their research during the
8  interim in preparation of legislation.  Sometimes it's
9  in preparation of legislation.  Sometimes it just is an
10  issue that needs to be discussed for the state as a
11  whole.
12      Q.  So the interim charge goes to a particular
13  committee then?
14      A.  Yes.
15      Q.  Which committee did it go to for purposes of
16  voter ID?
17      A.  I just don't remember which interim it was, but
18  it would have gone to State Affairs.
19      Q.  Who was in favor of having an interim charge
20  for voter ID?
21      MR. FREDERICK:  Objection.  To the extent
22  it calls for mental impressions of the Lieutenant
23  Governor or any legislator, I instruct you not to answer
24  on the basis of privilege.
25      A.  Okay.  I can't answer that, then.

## 107

1       Q.  (By Ms. Berkower) Do you know if the Governor
2  was in favor of having an interim charge for voter ID?
3       MR. FREDERICK:  Objection, legislative
4  privilege.  I instruct you not to answer.
5       MS. BERKOWER:  I just asked if she knew if
6  the Governor was in favor.  I didn't ask whether he was
7  or not.
8       MR. FREDERICK:  If you can ask it again,
9  I'll permit the yes-or-no answer.
10      Q.  (By Ms. Berkower) Do you know if the Governor
11  -- wait.  Can you repeat that back, what I asked before?
12  Oh, I know.  I can ask myself.
13      Do you know if the Governor was in favor
14  of having an interim charge for voter ID?
15      MR. FREDERICK:  Object on the basis of --
16      A.  No, I don't know.
17      Q.  (By Ms. Berkower) Do you know if the Lieutenant
18  Governor was in favor of having an interim charge for
19  voter ID?
20      MR. FREDERICK:  The same objection.  You
21  may answer whether or not you knew.
22      A.  At one point, he wanted to have a charge,
23  because he issued a charge.  I just don't remember if it
24  was in 2000 -- after the 2007 session or after the 2009
25  session.

## 108

1       Q.  (By Ms. Berkower) And do you know if the
2  Lieutenant Governor was in favor of having the charge?
3       MR. FREDERICK:  The same objection, but
4  you may answer the specific question.
5       A.  He wouldn't issue the charge if he didn't
6  believe it should be studied.
7       Q.  (By Ms. Berkower) And the Lieutenant Governor
8  issues the charge?
9       A.  Yes.
10      Q.  Okay.  Do you know why an interim charge was
11  issued for voter ID?
12      MR. FREDERICK:  Objection.  It calls for
13  legislative privilege matters, and I instruct you not to
14  answer.
15      A.  Okay.  I can't answer that.
16      MS. BERKOWER:  To be clear, I just asked
17  if she knew why, not why.
18      Q.  (By Ms. Berkower) Do you know why an interim
19  charge was considered for voter ID?
20      MR. FREDERICK:  I'll object on the basis
21  of privilege and instruct you that you may answer the
22  specific question whether or not you know why, but do
23  not reveal anyone's thought process or communications as
24  to why.
25      A.  Yes.  I know why.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                              MAY 29, 2012

---

### 109

1  Q.  (By Ms. Berkower) Can you say why?
2       MR. FREDERICK:  Objection, legislative
3  privilege.
4       Instruct you not to answer the question.
5  A.  No.
6  Q.  (By Ms. Berkower) And to be clear, the case I
7  was referring to, the Supreme Court case on the Indiana
8  voter ID law, the citation for that is 553 U.S. 181.
9  A.  Okay.
10 Q.  Does that change your answers in any way?
11 A.  No.
12 Q.  Okay.  So going back to House Bill 218, I think
13 this is the engrossed version.
14 A.  Okay.
15 Q.  Do you recognize it as that?
16 A.  I don't know, but I'm okay if you tell me it
17 is.
18 Q.  Do you know who authored this bill?
19 A.  Brown of Kaufman, Berman, Bohac, Riddle, and
20 others.
21 Q.  Are you familiar with its provisions?
22 A.  Only cursorily.
23 Q.  I think turning to Page 9 of the exhibit,
24 Section 63.0101.  Can you review that section?
25 A.  Okay.  (Reading documents.) Okay.

---

### 111

1  A.  Okay.  Yes.
2  Q.  Any other differences, substantive differences
3  that you see?
4  A.  No, but I haven't referenced them.  Should I do
5  that?
6  Q.  Sure.  You can.
7  A.  I don't see any other differences.
8  Q.  Did you or anyone in the Lieutenant Governor's
9  Office play any role in the development of HB 218?
10 A.  No.
11 Q.  Were you present at any meetings during the
12 development or drafting of HB 218?
13 A.  No, I wasn't.
14 Q.  Are you aware of who in particular drafted
15 HB 218?
16 A.  No.
17 Q.  Do you know of any concerns about Section 5
18 preclearance with regard to HB 218?
19 A.  No.
20 Q.  Do you know if concerns about Section 5
21 preclearance impacted any of the bill's provisions?
22 A.  Not that I'm aware of.
23 Q.  Do you know if that's why nonphoto ID was
24 included in the bill?
25 A.  No.

---

### 110

1  Q.  So we had discussed earlier House Bill 1706.
2  Now that you've reviewed the provisions in House Bill
3  218, does it appear that, for the most part, follows
4  House Bill 1706 with regard to acceptable forms of voter
5  ID?
6  A.  Yes.
7       MR. FREDERICK:  Objection, vague, but you
8  can answer.
9  A.  Yes, for the most part.
10 Q.  (By Ms. Berkower) Are there any differences?
11 A.  Yes.  There are some drafting differences.
12 Q.  Any substantive differences in the types of ID
13 that are accepted?
14 A.  I haven't cross-checked them.  I don't -- I
15 don't see any major differences.
16 Q.  I think if you recall, House Bill 1706 allowed
17 a form of photo ID issued by county election officials.
18 A.  Okay.
19 Q.  Do you see that as an acceptable form of ID in
20 House Bill 218?
21 A.  Sometimes you argue that a county is a
22 political subdivision of the state, so under Subsection
23 8, it could be possible, but it's not the same.
24 Q.  It's not specifically listed in this bill the
25 way it was in House Bill 1706?

---

### 112

1  Q.  Are you aware of any concerns raised during the
2  development, drafting, or consideration of HB 218 about
3  the impact that it would have on Hispanic voters?
4       MR. FREDERICK:  Objection.  To the extent
5  it calls for communications or thought processes of the
6  Lieutenant Governor or any legislator, I instruct you
7  not to answer.  However, to the extent this question
8  just asked whether or not you know, you may answer.
9  A.  I'm not aware of it.
10 Q.  (By Ms. Berkower) You're not aware of any such
11 concerns?
12 A.  No.
13 Q.  Are you aware of any such concerns with regard
14 to the impact the bill might have had on black voters?
15      MR. FREDERICK:  The same instruction.
16 A.  No.
17 Q.  (By Ms. Berkower) You're not aware of any?
18 A.  I'm not aware of any.
19 Q.  What about any concerns raised during the
20 development, drafting, or consideration of the bill that
21 it might have had on other minority voters?
22 A.  I'm not aware of any.
23      MR. FREDERICK:  The same objection.
24 Q.  (By Ms. Berkower) Are you aware of any analysis
25 conducted to determine the impact of the bill on racial

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

113

1    or ethnic minorities?
2         MR. FREDERICK:  The same instruction.  I
3    instruct you not to reveal the substance of any
4    analysis, but you may answer the question whether or not
5    you were aware.
6         A.  I'm not aware of any.
7         Q.  (By Ms. Berkower) Did you monitor consideration
8    of HB 218 in the House?
9         A.  No.
10        Q.  Did you learn of any concerns raised about the
11   bill during its consideration in the House?
12             MR. FREDERICK:  The same instruction.  You
13   may answer whether or not you --
14        A.  No.
15        Q.  (By Ms. Berkower) You did not learn of any such
16   concerns?
17        A.  No.
18        Q.  I think -- do you know Janice McCoy?
19        A.  Yes.
20        Q.  Who is she?
21        A.  She is chief of staff for Senator Fraser.
22        Q.  Two weeks ago, in her deposition, she testified
23   that she had had one or two dozen conversations with the
24   Lieutenant Governor's Office about HB 218, including
25   with the person who staffed the affairs for the

---

114

1    Lieutenant Governor.  Was that you?
2         A.  No.
3         Q.  Do you know who it was?
4         A.  I think it was Bryan, but it may not have been.
5         Q.  If it wasn't him, do you know who it may have
6    been?
7         A.  No.
8         Q.  Do you know if Senator Fraser met with the
9    Lieutenant Governor's Office and indicated that he
10   wanted to sponsor HB 218 in the Senate?
11             MR. FREDERICK:  Objection, and instruct
12   you not to answer on the basis of legislative privilege,
13   because this question calls for the substance of a
14   communication.  I will instruct you not to answer.
15        A.  Okay.  I can't answer that.
16             MS. BERKOWER:  Senator Fraser testified
17   that he had such a meeting.  Are you still going to
18   assert privilege?
19             MR. FREDERICK:  I mean, that -- I don't
20   recall that testimony.  If you want to introduce it as
21   an exhibit here, that's fine, we'll talk about it.  But
22   otherwise, I'll instruct her not to answer.
23        Q.  (By Ms. Berkower) Do you know why Senator
24   Fraser had an interest in voter ID?
25             MR. FREDERICK:  Objection, assumes facts

---

115

1    not in evidence and calls for speculation.  But I also
2    instruct you, based on privilege, not to answer if it
3    requires you to reveal thought processes or any
4    privileged communications.
5         A.  I don't know why.
6         Q.  (By Ms. Berkower) Do you know if he did have an
7    interest in voter ID?
8             MR. FREDERICK:  The same objection, but
9    you may answer whether or not you knew.
10        A.  I assume so.  He carried it four times.
11        Q.  (By Ms. Berkower) With regard to why he had an
12   interest, are you --
13        A.  No, I'm not aware of why he had an interest.
14   Or three times, I guess.  He didn't carry it four times.
15        Q.  Ms. McCoy testified, in her deposition, that
16   she and a staff person from the Lieutenant Governor's
17   Office generally spoke about the process of moving HB
18   218 in the Senate.  Did she speak with you?
19             MR. FREDERICK:  Objection, assumes facts
20   not in evidence.  You may answer if you can.
21        A.  I don't remember that.
22        Q.  (By Ms. Berkower) Do you remember talking to
23   Ms. McCoy at all about HB 218?
24        A.  Not really, no.
25        Q.  Ms. McCoy testified that she never had any

---

116

1    discussions with anyone in the Lieutenant Governor's
2    Office about the impact of HB 218 on minority voters.
3    To your knowledge, is that accurate?
4             MR. FREDERICK:  Objection, assumes facts
5    not in evidence.  You may answer whether or not you
6    believe it's accurate.
7         A.  I think that's accurate.
8         Q.  (By Ms. Berkower) Are you aware of any
9    communications considering the impact of HB 218 on
10   minority voters?
11             MR. FREDERICK:  Objection.
12        A.  I'm not aware of any.
13        Q.  (By Ms. Berkower) I should have added to end of
14   that question.  I'll start that one over.
15        A.  Okay.
16        Q.  Are you aware of any communications within the
17   Lieutenant Governor's Office concerning the impact of HB
18   218 on minority voters?
19             MR. FREDERICK:  I'll object and instruct
20   you not to reveal the substance of any communication,
21   but as to the existence of the communication, you may
22   answer a question.
23        A.  I don't remember any.
24        Q.  (By Ms. Berkower) Are you aware of any
25   communications outside the Lieutenant Governor's Office

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                           MAY 29, 2012

---

### 117

1  concerning the impact of HB 218 on minority voters?
2       MR. FREDERICK:  The same instruction.  You
3  may answer as to the existence of a communication.
4       A.  I know there was testimony in the State Affairs
5  Committee on the bill, but I don't remember the
6  substance of the testimony.
7       Q.  (By Ms. Berkower) Testimony about the impact on
8  minority voters?
9       MR. FREDERICK:  Objection, vague.
10  Objection, form.
11      Q.  (By Ms. Berkower) When you say you're aware of
12  communications concerning the impact of HB 218 on
13  minority voters outside the Lieutenant Governor's
14  Office, and you referred to testimony on the Floor.
15      A.  No, it wasn't on the Floor.
16      Q.  Oh.
17      A.  It was in the Senate State Affairs Committee
18  and I don't remember the substance of the testimony, but
19  I do think that there was some testimony on -- public
20  comment on that issue.
21      Q.  Are you aware of any communications in the
22  Governor's Office concerning the impact of HB 218 on
23  minority voters?
24      MR. FREDERICK:  Objection.  I'll object on
25  the basis of legislative privilege.  You may answer to

### 118

1  whether or not you're aware.
2       A.  No, I'm not aware of it.
3       Q.  (By Ms. Berkower) Are you aware of any
4  communications from election officials that led -- are
5  you aware of any communications from election officials
6  concerning HB 218?
7       A.  Again, I know there was testimony in the Senate
8  State Affairs Committee, but I am not aware of the
9  substance of that testimony.
10      Q.  Did the Lieutenant Governor's Office have any
11  communications with election officials concerning
12  HB 218?
13      MR. FREDERICK:  I'll object and instruct
14  you not to reveal the substance, but you may answer
15  about the existence of a communication.
16      A.  I'm not aware of any.
17      Q.  (By Ms. Berkower) Are you aware that the
18  Secretary of State, at the time, Roger Williams, said he
19  wasn't sure if a photo ID bill would improve turnout?
20      MR. FREDERICK:  Objection.  It assumes
21  facts not in evidence.
22      A.  I'm not aware of that.
23      Q.  (By Ms. Berkower) What is the party affiliation
24  of Roger Williams?
25      A.  He's running for a congressional seat as a

### 119

1  Republican, so I assume he's a Republican.  He's
2  currently running as a Republican, so I assume he's a
3  Republican.
4       Q.  And you said -- I'm sorry.  I missed what you
5  said.  You said you were not aware that he said that
6  voter ID --
7       A.  I was not aware of that.
8       Q.  What were the purposes of HB 218's authors in
9  introducing it?
10      A.  I'm not aware of their purpose.
11      Q.  Do you know if HB 218, in part, was designed to
12  prevent noncitizens from voting?
13      A.  I'm not aware of that.
14      Q.  Do you know -- are you aware of Representative
15  Betty Brown stating on the House Floor that the bill
16  was, quote, "designed to keep illegal aliens,
17  noncitizens, and other people otherwise not qualified
18  from voting"?
19      A.  No.  I'm not aware of that.
20      Q.  Do you know if HB 218 would have prevented
21  noncitizen voting?
22      MR. FREDERICK:  Objection, calls for
23  speculation.
24      A.  I'm not aware of it anyway.
25      Q.  (By Ms. Berkower) You don't know if HB 218

### 120

1  would have prevented noncitizen voting?
2       MR. FREDERICK:  Objection, asked and
3  answered.  Objection, calls for speculation.
4       You can answer.
5       A.  I'm not aware of it, no.
6       Q.  (By Ms. Berkower) Can a noncitizen obtain a
7  driver's license in Texas?
8       MR. FREDERICK:  Objection, calls for
9  speculation.  You may answer.
10      A.  Not under the current DPS rules for issuing a
11  driver's license.
12      Q.  (By Ms. Berkower) What are the current DPS
13  rules for issuing a driver's license?
14      A.  I don't know the specifics, but you have to
15  show citizenship in order to get a driver's license now.
16      Q.  So lawful residents who are not citizens cannot
17  get driver's licenses?
18      A.  Oh, I'm sorry.  Yeah, you can if you're -- I
19  thought you were asking about illegal immigrants.  But
20  legal immigrants would be appropriate visa requirements,
21  or whatever they need from the federal government, can
22  receive driver's licenses.
23      Q.  Can noncitizens obtain concealed handgun
24  licenses in Texas?
25      A.  I think so, if they have the proper

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

## 121

1 documentation for meeting all of the other requirements
2 of concealed carry.  You have to have mental status, and
3 they have to show legal residence here.
4     Q.  Can noncitizens obtain military ID?
5     A.  I'm not aware of whether or not they can.  I
6 would assume they cannot.
7     Q.  Even if they are lawful residents?
8     A.  Well, if they're lawful residents, yes, if they
9 have that.
10    Q.  So just to be clear, for noncitizens who are
11 lawfully within the United States --
12    A.  Right.
13    Q.  -- can they obtain a driver's license in Texas?
14    A.  Yes, they can.  If you show lawful residence.
15    Q.  What about concealed handgun license?
16        MR. FREDERICK:  Objection, form.  You may
17 answer.
18    A.  I think you can, if you show lawful residence.
19    Q.  (By Ms. Berkower) Can lawfully -- can
20 noncitizens who are lawfully in the United States obtain
21 military ID?
22    A.  I assume so.  I don't know.
23    Q.  Would you agree that if the prevention of
24 noncitizens voting was a purpose of HB 218, that in
25 fact, HB 218 would not serve that purpose?

---

## 122

1         MR. FREDERICK:  Objection, calls for
2 speculation.
3     A.  I don't know.
4     Q.  (By Ms. Berkower) Well, what don't you know?
5     A.  I don't know whether or not it would achieve
6 that purpose.
7     Q.  Why not?
8         MR. FREDERICK:  Objection, form.
9 Objection, vague.  Objection, calls for speculation.
10 You may answer.
11    A.  I haven't gone through the specifics of the
12 legislation to determine if you went through each of
13 those requirements to determine.  But I assume if you
14 are lawfully in the United States, that you can get a
15 concealed carry permit and you can vote.
16    Q.  (By Ms. Berkower) So just because you get a
17 concealed carry permit --
18    A.  Or a military ID or a driver's license.
19    Q.  -- you still may be a noncitizen?
20    A.  Yes.
21    Q.  So how does showing a driver's license or a
22 military ID or a concealed carry license ensure that the
23 person who shows up at the polls is actually a citizen?
24        MR. FREDERICK:  Objection, calls for
25 speculation.  You may answer if you can.

---

## 123

1     A.  My understanding is that on a driver's license,
2 it shows whether or not you are a legal resident.  It
3 says Visa or it says -- it is noted on the document.  I
4 don't know about military IDs, and I don't know about
5 concealed carry permits.  But it's my understanding the
6 ID itself says whether or not you have that.
7     Q.  (By Ms. Berkower) Versus a citizen?
8     A.  Yes.
9     Q.  After the House passed HB 218, was it
10 considered by the Senate?
11    A.  Yes, it was.
12    Q.  Do you know which --
13    A.  Well, it was referred to committee in the
14 Senate.
15    Q.  Which committee is that?
16    A.  State Affairs.
17    Q.  Did the Lieutenant Governor make that committee
18 assignment?
19    A.  Yes, he did.
20    Q.  Do you remember who was on the committee?
21    A.  No.  I remember the chair of the committee.
22    Q.  Who was that?
23    A.  Senator Duncan.
24    Q.  And the Lieutenant Governor assigned him to be
25 the chair?

---

## 124

1     A.  Yes.
2     Q.  Did the committee hold hearings on HB 218?
3     A.  Yes, they did.
4     Q.  Since the Lieutenant Governor is not on the
5 committee, can he call witnesses?
6     A.  No.
7     Q.  Was he involved with choosing which witnesses
8 would be called?
9     A.  Not that I remember, no.
10    Q.  Is he ever involved with choosing which
11 witnesses will be called in the committee?
12        MR. FREDERICK:  Objection, vague.  You may
13 answer.
14    A.  Yes, he is.
15    Q.  (By Ms. Berkower) When?
16        MR. FREDERICK:  The same objection.  You
17 may answer.
18    A.  When the committee asks for some help.
19    Q.  (By Ms. Berkower) Did that ever happen with
20 regard to voter ID?
21    A.  Yes.  On Senate Bill 14, I know we were asked,
22 "Can you help make some of the calls to get people here
23 to speak to the Committee of the Whole?"
24    Q.  Any other of the voter ID bills?
25    A.  Not that I remember.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012

---

## 125

1    Q.  So do you know how the witnesses were selected
2  for purposes of testifying about HB 218 in the State
3  Affairs Committee?
4    A.  No, I'm not.
5    Q.  Do you know if the bill was amended in the
6  committee?
7    A.  I don't remember.
8    Q.  Maybe I can help with that.
9       I think what we have what will be
10  Exhibit 102.
11      (Exhibit 102 marked for identification.)
12    Q.  (By Ms. Berkower) What is this?
13    A.  Okay.  This is the legislative tracking history
14  for House Bill 218.
15    Q.  After -- can you review this, please?
16    A.  Sure.  The bill was substituted.
17    Q.  What does that mean?
18    A.  That means that there were some changes made to
19  it, and they were rolled into an entirely new bill,
20  which was then prepared and distributed to the whole
21  Senate.
22    Q.  Do you know what those changes were?
23    A.  No, I'm not aware of them.
24    Q.  After the committee considered it, was it voted
25  out of the committee?

## 126

1    A.  Yes.
2    Q.  Do you remember that vote?
3    A.  I remember it occurred.  I don't remember the
4  details.
5    Q.  Do you remember if it was voted out on party
6  lines?
7    A.  I don't remember.  Wait, I can look.  It looks
8  like it was.
9    Q.  Did HB 218 require the support of two-thirds of
10  senators to bring it to the Floor for a vote?
11    A.  Yes, it did.
12    Q.  Why is that?
13    A.  Because the Senate rules require the senators
14  to follow the regular order of business, which is set
15  out in the rules as an order, in order to hear bills in.
16        The senators typically suspend the regular
17  order of business by a two-thirds vote, which is
18  required by the rules, in order to hear bills out of
19  that order.  This bill would have been taken out of
20  order and -- well, let's just fast forward through the
21  questions -- it failed to suspend the two-thirds rule,
22  so it could not be taken out of the regular order of
23  business.
24    Q.  So to be clear, if the two-thirds rule --
25    A.  It's not a rule.

## 127

1    Q.  -- to suspend -- if senators had to consider
2  every bill in order --
3    A.  Uh-huh.
4    Q.  -- then they would -- if they had priorities of
5  certain bills, they'd have to vote on everything else in
6  front of it in line before they could get to that
7  particular bill.  Is that --
8    A.  That's correct.  So it's actually a suspension
9  of a rule, not a rule.
10    Q.  I see.  Is it used commonly?
11    A.  Yes.
12    Q.  Why two-thirds?
13    A.  That's what the senators chose to put in the
14  Senate rules as being the required vote count for a
15  suspension of those rules.
16    Q.  Do you know why two-thirds is the number that's
17  chosen?
18    A.  No, I don't.  The senators choose it.
19    Q.  Do you know the purpose of the rule?
20    A.  Well, the purpose of the rule is to allow the
21  senators not to abide by the regular order of business
22  so that they can step outside of the regular order of
23  business and hear what they want to hear when they want
24  to hear it, subject to some other rules.
25    Q.  Janice McCoy testified in her deposition that

## 128

1  the purpose of the rule is to get general consensus on
2  bills before they're voted on.  Do you agree with that?
3      MR. FREDERICK:  Objection, assumes facts
4  not in evidence.
5      You may answer.
6    A.  To me, there's a difference between why the
7  senators allow that measure in the Senate rules and the
8  purpose of the rule itself.  I mean, the rule allows for
9  a suspension of the regular order of business, and it's
10  so that you can take up bills.  Now, the reason why that
11  rule was in the Senate rules to allow that suspension is
12  the senators' business, and the senators may have chosen
13  to have that rule because they want to promote
14  consensus.  But the rule itself, it allows suspension of
15  the rules by a two-thirds vote is there -- the purpose
16  of that is to suspend the other rules.
17    Q.  (By Ms. Berkower) And the purpose of that is
18  basically get things done, correct?
19    A.  Yes.  Right.
20    Q.  Otherwise, a bill that has -- that's divisive
21  could potentially hold up all other bills; is that
22  accurate?
23    A.  That's correct, but the motivation for senators
24  putting that rule in their rules that allows for a
25  suspension is something I wouldn't know.  What that rule



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JULIA RATHGEBER                                    MAY 29, 2012

---

**129**

1   does is a factual situation of, it allows you to suspend
2   other rules.
3       Q.   Do you agree that another factual consequence
4   of the rule is that it requires, generally, consensus on
5   bills before they're voted on out of order?
6       A.   I personally feel that way, yes.
7       Q.   Janice McCoy testified in her deposition that
8   most bills are brought to a vote by using the two-thirds
9   rule.
10      A.   That's correct.
11      Q.   What was the partisan composition of the Senate
12  in 2007?
13      A.   Oh, I don't remember.  Was it 20 Republicans
14  and 11 Democrats?  I just don't remember.
15      Q.   Do you remember how many of the Democrats
16  opposed 218?
17      A.   No, I don't.
18      Q.   If all of the Democrats were present on the
19  Floor to vote against a bill, could they block
20  legislation subject to the two-thirds rule?
21      A.   Yes.
22      Q.   Did the Lieutenant Governor attempt to get
23  House Bill 218 brought to the Senate Floor for a vote?
24      A.   Yes, he did.
25      Q.   What's his role exactly when a bill is brought

---

**130**

1   the Senate Floor?
2       A.   The Senator asks him to bring the bill to the
3   Floor for discussion and a vote, and he does so when he
4   chooses to do so.
5       Q.   So another senator has to make a motion to
6   bring it up for a vote?
7       A.   Yes.  The Lieutenant Governor cannot call up a
8   bill by himself.
9       Q.   And the Lieutenant Governor's merely rules on
10  the motion from the other senator?
11      A.   Well, the senator who is sponsoring or
12  authoring the legislation has to ask publicly "may I be
13  recognized on" blah, blah, blah.
14      Q.   And the Lieutenant Governor rules on his
15  request?
16      A.   Recognizes him for hearing on the bill, or her.
17      Q.   Does the Lieutenant Governor have any
18  discretion to grant or deny the senator's request?
19      A.   Yes.
20      Q.   What is that discretion?
21      A.   He can choose not to recognize the senator.
22      Q.   Does that ever happen?
23      A.   It has from time to time.
24      Q.   Why has that happened?
25           MR. FREDERICK:  Objection to the extent it

---

**131**

1   calls for the Lieutenant Governor's reasons for doing
2   something, and I instruct you not to answer.  If you
3   know -- if you can answer without revealing that or a
4   privileged communication, you can do so.
5       A.   To a certain extent, I can't answer this
6   question, to some extent I can.  And sometimes the
7   senator doesn't have the 21 votes and doesn't know the
8   senator doesn't have the 21 votes.  And so sometimes the
9   Lieutenant Governor won't recognize the senator on the
10  bill because he knows it will not suspend.
11      Q.   (By Ms. Berkower) Is it ever the case that the
12  Lieutenant Governor won't recognize a senator because he
13  doesn't want the bill to be brought to a vote?
14           MR. FREDERICK:  Objection, calls for the
15  Lieutenant Governor's thought process, mental
16  impressions.
17           I instruct you not to answer.
18      A.   I can't answer that.
19      Q.   (By Ms. Berkower) When the bill is brought to
20  the -- when a bill is brought to the Floor of the
21  Senate, the Lieutenant Governor can't participate in
22  debate, can he?
23      A.   Not unless he is a member of the Committee of
24  the Whole.
25      Q.   Is his role primarily procedural when he's

---

**132**

1   presiding over the Senate Floor?
2       A.   Yes.
3       Q.   And can he vote if there's not a tie?
4       A.   No.
5       Q.   Can you describe the circumstances under which
6   HB 218 was brought to the Senate Floor?
7           MR. FREDERICK:  I'll object only to the
8   extent it calls for mental impressions or privileged
9   communications.  If you can generally describe the
10  circumstances without revealing that, you may.
11      A.   I don't.  I don't really know what you're
12  asking.  I'm sorry.
13      Q.   (By Ms. Berkower) Okay.  That's fine.
14           Were you present in any meetings or
15  conversations the Lieutenant Governor held concerning
16  the timing of the vote on HB 218?
17      A.   I'm sure I was, but I don't remember any formal
18  meetings.  I remember the bill coming out of committee
19  and then being put on the Intent calendar, and then
20  beyond that, I don't really remember the process.  The
21  end of May is -- or middle of May is really a busy time
22  in the Senate, and I don't remember any formal meetings
23  on this issue.
24      Q.   With regard to the circumstances under which
25  HB 218 was brought to the Floor, is the Lieutenant

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                          MAY 29, 2012

---

**133**

1  Governor the best person who would know what those
2  circumstances were?
3      MR. FREDERICK:  I'll object that this
4  calls for speculation.  I object to relevance as well.
5      A.  I would suggest that the person who can bring
6  up the bill, who is the bill's sponsor, is the best
7  person to ask about the timing of when it was brought
8  up, because they have to request to bring up the bill.
9      Q.  (By Ms. Berkower) Are you aware of any
10  conversation between Senator Uresti and any member of
11  the Senate the day before the vote?
12      A.  Yes, I'm aware that Senator Uresti told people
13  and told the Lieutenant Governor he was not feeling
14  well.
15      Q.  When the Lieutenant Governor called a vote to
16  bring HB 218 to the Senate for a vote, how many senators
17  were present?
18      A.  I don't remember.
19      Q.  Do you remember if anyone was not present?
20      A.  I think Senator Uresti was not present at the
21  first at the time of the vote.
22      Q.  Why not?
23      MR. FREDERICK:  Objection, calls for
24  speculation.  You can answer if you know.
25      Q.  (By Ms. Berkower) Do you remember why?

---

**134**

1      A.  I think he was sick, but I don't know that for
2  a fact.
3      Q.  So why was the vote held when not all members
4  were there?
5      MR. FREDERICK:  Objection.  I'll object on
6  the basis of legislative privilege and instruct you not
7  to answer the question.
8      A.  Okay.  I can't answer that question.
9      Q.  (By Ms. Berkower) Janice McCoy testified in her
10  deposition that each HB 218 was brought to the Floor at
11  a time when it was known that, quote, a particular
12  senator was absent and that this -- unquote, and that
13  this meant the bill would pass.  That's from her
14  deposition at Page 70, if you wanted to look at it.  Do
15  you agree with that statement?
16      MR. FREDERICK:  Object, assumes facts not
17  in evidence and object to relevance.  But you can answer
18  if you can.
19      A.  Again, the senator is the person who chooses
20  when he wishes to bring up the bill, and so it may have
21  been relevant for Senator Fraser to ask at that time.
22      The rules contemplate that not all
23  senators are on the Floor at all times, and the rules
24  contemplate a quorum and what constitutes a quorum, and
25  they require a quorum for votes, but nothing more than a

---

**135**

1  quorum for votes.
2      Q.  (By Ms. Berkower) So does it happen that
3  senators will bring particular bills up for a vote at a
4  time that they know it's more likely to pass given other
5  senators' absence?
6      A.  Yes.
7      Q.  When does that happen?
8      A.  Well, it happens from time to time, depending
9  on what the senators want to accomplish.  It's their
10  bills, and they can choose to bring up a bill or not
11  bring up a bill.
12      Q.  Can you remember any specific instances?
13      MR. FREDERICK:  Objection, vague.
14      Q.  (By Ms. Berkower) Do you understand the
15  question?
16      A.  I think so.  I can't recall any at the moment,
17  but it does happen from time to time.
18      Q.  In May 2007, were you or the Lieutenant
19  Governor aware of any concerns that HB 218s would
20  disproportionately harm minority voters?
21      MR. FREDERICK:  I'll object on the basis
22  of legislative privilege, to the extent this calls for
23  the Lieutenant Governor's or your thought process.
24  However, you may answer as to the question whether or
25  not you were aware.

---

**136**

1      A.  No, I was not aware.
2      Q.  (By Ms. Berkower) Was the Lieutenant Governor
3  aware of any such concerns?
4      MR. FREDERICK:  The same objection.
5      A.  I don't know.
6      Q.  (By Ms. Berkower) Is the Lieutenant Governor
7  the only person who could answer that question?
8      MR. FREDERICK:  Objection, calls for
9  speculation.
10      A.  I don't know.
11      Q.  (By Ms. Berkower) Do you know if the Lieutenant
12  Governor would know if he was aware, in May 2007, of any
13  concerns raised about HB 218?
14      A.  I don't know.  He may not remember.
15      Q.  Assuming he remembered -- forget that.
16      Do you know why the vote on HB 218 was
17  held when not all members are present?
18      MR. FREDERICK:  Objection, calls for
19  speculation and objection, calls for legislative
20  privilege.
21      If you can answer based on something other
22  than internal thought processes or privileged
23  communications, you may do so.
24      A.  No.
25      Q.  (By Ms. Berkower) You don't know why?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

137

1      A.  No.
2      Q.  What is Senator Uresti's race?
3          MR. FREDERICK:  Objection, relevance.
4      Q.  (By Ms. Berkower) You can answer.
5      A.  He's -- it depends on if you use census data,
6   he's of Hispanic background, Anglo.
7      Q.  (By Ms. Berkower) What part of Texas does he
8   represent?
9      A.  Oh, he's got a huge district.  West of
10  San Antonio.
11     Q.  What's the racial composition of his
12  constituents?
13         MR. FREDERICK:  Objection, relevance.
14     A.  I have no idea.
15     Q.  (By Ms. Berkower) Do you know if it's largely
16  minority?
17         MR. FREDERICK:  Same objection.
18     A.  I don't know.
19     Q.  (By Ms. Berkower) Did the Lieutenant Governor
20  have concerns about holding a vote when a Hispanic
21  member of the Senate was sick, given the constituency
22  that he represented and the concerns raised about the
23  impact of the bill on minority voters?
24         MR. FREDERICK:  Objection, compound.
25  Objection, legislative privilege.  I instruct you not to

---

138

1   answer.
2      A.  I can't answer that.
3      Q.  (By Ms. Berkower) Can you think of any other
4   instance when a vote was held, when a member of the
5   Senate was sick, with the intention to pass a bill in
6   the senator's absence?
7          MR. FREDERICK:  Objection, relevance.
8          You may answer if you can.
9      A.  I am certain it has happened, but I can't think
10  of an occasion.
11     Q.  (By Ms. Berkower) Was a request made to verify
12  the vote on HB 218?
13     A.  Yes.
14     Q.  Do you remember the circumstances?
15     A.  Senator Uresti returned to the Senate Floor.
16     Q.  Do you remember if there was a motion to
17  suspend the regular order of business?
18     A.  Yes.
19     Q.  Did that motion fail or pass?
20     A.  It failed.
21     Q.  Do you remember why?
22     A.  It didn't receive 21 votes.
23     Q.  Is that because Senator Uresti managed to
24  return to the Senate in time for the vote?
25     A.  Yes.

---

139

1      Q.  Did the Senate take any further action on
2   HB 218?
3      A.  Yes.  They authorized another co-sponsor.
4      Q.  What happened next?
5      A.  Nothing.
6      Q.  Why not?
7          MR. FREDERICK:  Objection, calls for
8   speculation.  Objection to the extent it calls for
9   mental impressions or privileged communications.
10         If you know and can answer without
11  revealing privileged matters, you may do so.
12     A.  I think it's because Senator Fraser didn't ask
13  to bring it back up again.
14     Q.  (By Ms. Berkower) Do you know why he didn't ask
15  to bring it back up?
16         MR. FREDERICK:  Objection, legislative
17  privilege and instruct you not to answer.
18         MS. BERKOWER:  I just asked if she knew
19  why.
20         MR. FREDERICK:  Okay.  If you want to ask
21  her again.
22     Q.  (By Ms. Berkower) Do you know why Senator
23  Fraser did not seek to bring it back for a vote?
24         MR. FREDERICK:  I'll object on the basis
25  of privilege, only to the extent it calls for what his

---

140

1   understanding was, but as to whether or not you know,
2   you may answer.
3      A.  I think I know, yes.
4      Q.  (By Ms. Berkower) Can you say why?
5          MR. FREDERICK:  Objection, legislative
6   privilege.  Instruct you not to answer.
7      A.  No, I can't.
8      Q.  (By Ms. Berkower) Were there any communications
9   within the Lieutenant Governor's Office about HB 218
10  after it failed to pass the Senate?
11         MR. FREDERICK:  I don't think that I will
12  object and caution you:  I don't believe that this
13  question calls for privileged communications, so I would
14  just caution you not to reveal the substance of any
15  communication within the Lieutenant Governor's Office.
16     A.  I don't -- I don't remember any.
17     Q.  (By Ms. Berkower) Do you remember any
18  communications between you or anyone else in the
19  Lieutenant Governor's Office and any legislators after
20  HB 218 did not pass the Senate?
21         MR. FREDERICK:  Objection, vague, and the
22  same instruction on privilege.
23     A.  Yeah.  I don't remember any.
24     Q.  Okay.  I have what is going to be Exhibit 103.
25         (Exhibit 103 marked for identification.)

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                              MAY 29, 2012

---

141

1    Q.  (By Ms. Berkower) Do you recognize this?
2    A.  No, I'm not familiar with it.
3    Q.  Okay.  Take a second to review it.
4    A.  (Viewing documents.) Okay.
5    Q.  Are you familiar with this article?
6    A.  I don't remember it.  Honestly, I don't.
7    Q.  Do you remember the letter referenced in the
8    article?
9    A.  I remember checking some facts and some talking
10   points, but I don't remember the draft of the letter.
11   Q.  And this would be a letter that Lieutenant
12   Governor David Dewhurst sent to the Senate concerning
13   HB 218?
14   A.  Uh-huh.  Yes, I assume so.
15   Q.  So you did not work on drafting this letter?
16   A.  No.  I may have fact checked it, but I didn't
17   draft it.
18   Q.  Do you know who would have drafted the letter?
19   A.  I really don't remember.
20   Q.  Do you remember when it was written?
21   A.  Well, it says the day after, so I'm assuming
22   it's May 16th, because it says the day after Senate
23   consideration.
24   Q.  In the letter, Lieutenant Governor Dewhurst
25   asserted that photo ID requirements will prevent voting

---

142

1    by persons who are not U.S. citizens; is that correct?
2    A.  Yes, it appears to be.
3    Q.  The letter also asserts that a number of types
4    of IDs that are not photo IDs are enough to establish
5    identity; is that correct?
6    A.  I'm not certain that's what it says.  It says
7    that that's what's in the legislation.  It doesn't say
8    that's enough to establish identity.
9    Q.  Okay.  Well, it says House Bill 218, and this
10   is -- I'm reading now, I guess, from Lieutenant
11   Governor's letter.  "House Bill 218 was amended to allow
12   voters to present other forms of identification, such as
13   a military ID, a valid employee ID, citizenship
14   certificate, passport, student ID card issued by a
15   public college or university, handgun permit, utility
16   bill, bank statement, pay stub, mail from a government
17   entity, marriage license, birth certificate, adoption
18   certificate, pilot's license, hunting license, or even a
19   library card.  What's so hard about this?"
20   A.  Right.  But it doesn't say that all of those
21   are a sure fire form of identification.  It just says
22   that that's what's in the bill -- I mean, House Bill 218
23   says.
24   Q.  But doesn't it imply that those are appropriate
25   forms of ID for voters?

---

143

1    MR. FREDERICK:  Objection, calls for
2    speculation.
3    Q.  (By Ms. Berkower) You can answer.
4    A.  I think it implies that that's what the bill
5    contained.  It doesn't say these are sufficient to
6    constitute identification.
7    Q.  Well, then he goes on to say, "Seriously, how
8    can any American argue that this requirement is too
9    onerous?  I can only conclude that the senators who
10   voted to block consideration of House Bill 218 did so
11   not because it's good public policy, but because they
12   don't believe in the basic American principle of One
13   Person, One Vote.  Doesn't that imply that the IDs that
14   were listed in the previous paragraph would have ensured
15   the basic American principle of One Person, One Vote?"
16   MR. FREDERICK:  Objection, calls for
17   speculation.  Objection, assumes facts not in evidence.
18   A.  I think this is his personal opinion, and I
19   can't speak to that.
20   Q.  (By Ms. Berkower) Is he the only person who can
21   speak to his personal opinion?
22   MR. FREDERICK:  Objection, this calls for
23   speculation and assumes facts not in evidence.
24   A.  I assume so.
25   Q.  (By Ms. Berkower) Can you explain how any of

---

144

1    the IDs listed here would prevent noncitizens from
2    voting?
3    MR. FREDERICK:  Objection, calls for
4    speculation.
5    Q.  (By Ms. Berkower) You may answer.
6    A.  Well, as I said earlier, a passport would keep
7    a noncitizen from voting because you have -- if you're
8    not a citizen, you don't get a U.S. passport.  You have
9    a foreign passport with a U.S. Visa or something, so
10   that would prohibit a noncitizen from voting.  Again, I
11   think that a driver's license has a note on it whether
12   or not you're a citizen.
13   Q.  Well, what about a valid employee ID?
14   MR. FREDERICK:  Objection, form.
15   A.  I wouldn't know whether or not they included
16   citizenship on an employee ID.
17   Q.  (By Ms. Berkower) What about a student card
18   issued by a public college or university?
19   MR. FREDERICK:  Objection, form.
20   A.  Well, again, I don't know whether or not they
21   include citizenship on that.
22   Q.  (By Ms. Berkower) What about a utility bill,
23   bank statement, pay stub, or mail from a government
24   entity?
25   MR. FREDERICK:  Objection, compound.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

145

1    Objection, form.
2        A.   I don't know why a utility bill, bank
3    statement, pay stub would have citizenship on it, but
4    mail from a government entity may.
5        Q.   (By Ms. Berkower) What about a pilot's license,
6    hunting license, or a library card?
7            MR. FREDERICK:  Objection, vague.
8    Objection, compound.
9        A.   I'm not aware of pilots' licenses.  I'm
10   understanding that they have been changed substantially
11   since 9-11, and that they do, at least in some places,
12   show citizenship.  But again, I'm not aware of
13   citizenship on a hunting license or a library card.
14       Q.   (By Ms. Berkower) Do you have a library card?
15       A.   I have had one.
16           MR. FREDERICK:  Objection, relevance.
17       A.   Yes.
18       Q.   (By Ms. Berkower) Is your citizenship listed on
19   it?
20       A.   No.
21       Q.   So this article, Exhibit 103, indicates that
22   the Lieutenant Governor issued a second letter
23   retracting the first letter.  Do you remember that
24   happening?
25       A.   No, I really don't.

---

146

1        Q.   The letter, the initial letter created a lot of
2    fallout in the Senate.  Do you remember that?
3        A.   I know people were upset after the voter ID.
4        Q.   Why were they upset?
5            MR. FREDERICK:  Objection.  To the extent
6    it calls for the thought process and mental impressions,
7    I instruct you not to answer.  But if you can do so
8    without revealing that, you may answer.
9        A.   My understanding is that the Senate doesn't
10   typically like partisan votes, and therefore, they were
11   not happy about voting on partisan lines.
12       Q.   (By Ms. Berkower) They were not happy about
13   voting on partisan lines on the rule to -- the vote to
14   suspend the two-thirds rule?  Is that what you're
15   referring to?
16       A.   I think, yes.
17       Q.   Is that the only reason they were unhappy?
18           MR. FREDERICK:  Objection, speculation.
19   Objection to the extent it calls for the thought process
20   and mental impressions or privileged communications, I
21   would instruct you not to answer.  But if can do so
22   without revealing that.
23       A.   I really don't know.
24       Q.   (By Ms. Berkower) Was there a time when the
25   senator came to the -- sorry.  I'll start again.

---

147

1        Was there a time when the Lieutenant
2    Governor came to the conclusion that photo ID would
3    prevent noncitizens from voting?
4            MR. FREDERICK:  Objection to the extent
5    this calls for what the Lieutenant Governor believed, I
6    would instruct you not to answer based on privilege.
7    However, to the extent it just calls for your knowledge
8    of whether or not there was a time, you may answer.
9        A.   I'm not aware of it.
10       Q.   (By Ms. Berkower) Were you ever a part of any
11   discussions with the Lieutenant Governor concerning
12   whether photo ID would prevent noncitizens from voting?
13       A.   I don't remember being part of a conversation
14   on that issue.
15       Q.   Do you know if any such conversations existed
16   between the Lieutenant Governor and others?
17       A.   I do not.
18       Q.   Would the Lieutenant Governor be the best
19   person to answer that question?
20           MR. FREDERICK:  Objection, calls for
21   speculation.
22       A.   I assume so.
23       Q.   (By Ms. Berkower) Is there a connection between
24   the photo ID bill -- the photo ID bills that the Senate
25   has considered and the growth of the noncitizen

---

148

1    population in Texas?
2            MR. FREDERICK:  Objection.
3        A.   Not that I'm aware of.
4        Q.   (By Ms. Berkower) Have you heard this assertion
5    before?
6        A.   No, I don't think I have.
7        Q.   Exhibit 103 referenced individuals being
8    removing from voters' lists after having voted.  Are you
9    aware of whether any of these individuals that the
10   Lieutenant Governor mentioned were convicted of
11   committing an election-related crime?
12       A.   I think there were some convictions, but I'm
13   not aware of where.  I just remember reading newspaper
14   articles about them.
15       Q.   You don't remember who in particular was
16   prosecuted?
17       A.   No.  I think someone in South Texas and maybe
18   someone in Harris County.
19       Q.   And you don't remember the crimes they were
20   prosecuted for?
21       A.   No.  The information that I received would have
22   come from a newspaper article.
23       Q.   Okay.  Was a photo ID bill filed in the Senate
24   in 2009?
25       A.   Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                MAY 29, 2012



### 149

1     Q.  Is there a reason the photo ID bill originated
2 in the Senate in 2009 and not the House as it had
3 previously done?
4         MR. FREDERICK:  Objection, calls for
5 speculation.  I'll object also on the legislative
6 privilege to the extent that it would involve any
7 privileged matter or thought process.  If you can answer
8 without revealing privileged matters, you may.
9     A.  I don't think I can answer that question.
10     Q.  (By Ms. Berkower) Did the Lieutenant Governor
11 have any role in the decision to have the photo ID bill
12 originate in the Senate and not the House?
13         MR. FREDERICK:  We'll object on privilege
14 and instruct you not to reveal the substance of any
15 communication or any mental impression or thought
16 process of the Lieutenant Governor.  But to the extent
17 it calls for whether or not he had any involvement, you
18 may answer.
19     A.  Yes, I think so.
20     Q.  (By Ms. Berkower) What role was that?
21         MR. FREDERICK:  The same objection and
22 instruction.  Do not reveal the substance of any
23 confidential communication or the Lieutenant Governor's
24 thought process.
25     A.  I can't answer that question.

### 150

1     Q.  Okay.  Exhibit 29.
2         (Exhibit 29 marked for this deposition.)
3     A.  And do we know which version of this one this
4 one is?  Is this as filed or is this --
5     Q.  I think this is as filed.
6     A.  Okay.
7     Q.  Do you recognize this?
8     A.  Yes, I do.
9     Q.  Is this the bill you referred to as introduced
10 in 2009 on voter ID?
11     A.  Yes.
12     Q.  Who introduced it?
13     A.  Senator Fraser.
14     Q.  And what's the bill number?
15     A.  Senate Bill 362.
16     Q.  Do you know what forms of ID would have been
17 permitted under Senate Bill 362?
18     A.  I don't remember.
19     Q.  I think if you turn to Page 5, that might
20 help.
21     A.  Okay.
22     Q.  What forms of ID would have been allowed under
23 Senate Bill 362?
24     A.  This appears to be identical to -- what was the
25 last one -- Senate Bill -- House Bill 218, as

### 151

1 engrossed.  Is that correct?  I think that's correct.
2     Q.  So in comparing House Bill 218 and Senate Bill
3 362, does it appear that it, for the most part, follows
4 House Bill 218?
5     A.  Yes.
6     Q.  I think do you -- do you know if student IDs
7 are still permitted under Senate Bill 362?
8     A.  It doesn't appear that they are.  No, they're
9 not.  There's several of them missing here.
10     Q.  There's several what?
11     A.  I'm going to go through.  Employee card is no
12 longer included, no student ID, and neither is the
13 employee card.
14     Q.  Okay.  Anything else?
15     A.  I don't see it.
16     Q.  Is it possible that student IDs would still be
17 included, although not expressly, as an institution of
18 the state under part --
19     A.  It is possible, but only for public
20 institutions, not private higher ed.
21     Q.  Was photo ID a part of the Lieutenant
22 Governor's legislative agenda for 2009?
23     A.  Yes.
24     Q.  Were you or anyone in the Lieutenant Governor's
25 Office involved in the drafting or development of

### 152

1 SB 362?
2     A.  Not at the as-filed stage.
3     Q.  When were you involved?
4     A.  Our staff people assisted in any drafting of
5 amendments, and so Bryan would have been involved.
6     Q.  Just with amendments?
7     A.  I think so, yes.
8     Q.  So do you know who drafted SB 362?
9     A.  No, I don't.  I assume it was a Texas
10 Legislative Council employee.
11     Q.  In conjunction with Senator Fraser?
12     A.  Yes.
13     Q.  Were there any communications with you or
14 anyone in the Lieutenant Governor's Office with Senator
15 Fraser or his office concerning the drafting or
16 development of SB 362?
17         MR. FREDERICK:  Objection, compound.
18     A.  Not prior to filing the legislation.
19     Q.  (By Ms. Berkower) Senator Fraser testified in
20 his deposition that in essence, he took HB 218 and filed
21 it the following session.  Would you agree with that
22 assessment?
23         MR. FREDERICK:  Objection, assumes facts
24 not in evidence.  It calls for speculation.  You may
25 answer if you can.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                           MAY 29, 2012

---

### 153

1   A.  With -- the drafts are not identical, so there
2   are some changes.  I would assume he used 218 as the
3   basis, but there are some differences.
4   Q.  (By Ms. Berkower) The ones you just described a
5   minute ago?
6   A.  Yes.  There may be more.  I didn't double
7   check.  The whole front page is different.
8   Q.  Are you aware of any other source of any of the
9   legislative language in SB 362?
10  A.  No, I'm not.
11  Q.  Are you aware of whether or not the Legislature
12  considered including any additional forms of
13  identification in SB 362?
14       MR. FREDERICK:  I object and instruct you
15  that you may answer the specific question of whether or
16  not you are aware.  I caution you not to reveal any
17  legislators' thought process or any communication with a
18  legislator.
19  A.  I'm not aware of any additional forms.
20  Q.  (By Ms. Berkower) Are you aware of any analysis
21  about which registered voters did not possess one of the
22  required forms of ID identified in SB 362?
23       MR. FREDERICK:  Objection, legislative
24  privilege.  You may answer the specific question of
25  whether or not you were aware.  Do not reveal the

---

### 154

1   contents of any communication or anyone's thought
2   process.
3   A.  I'm not aware of it.
4   Q.  (By Ms. Berkower) Not aware of any such
5   analysis?
6   A.  I'm not aware of it.
7   Q.  Did you conduct or instruct anyone else to
8   conduct an analysis of the impact of SB 362 on minority
9   voters?
10       MR. FREDERICK:  Objection, legislative
11  privilege and instruct you not to answer.
12  A.  I can't answer that.
13  Q.  (By Ms. Berkower) If SB 362 had been passed and
14  been signed into law, would it have been subject to the
15  requirements of the Voting Rights Acts, Section 5?
16  A.  As I understand the Voting Rights Act, yes, it
17  would.
18  Q.  Did anyone ever direct you not to analyze the
19  impact of SB 362 on minority voters?
20  A.  No.
21       MR. FREDERICK:  Objection, legislative
22  privilege and instruct you not to answer.
23  Q.  (By Ms. Berkower) Is it fair to say that your
24  office was in very close contact with Janice McCoy
25  during the development of SB 362 and while the -- well,

---

### 155

1   just leave it at that.
2       MR. FREDERICK:  Objection, vague.
3   A.  After the filing of it, yes.  Not prior to the
4   filing of the legislation.
5   Q.  (By Ms. Berkower) So not during the development
6   of the bill?
7   A.  No, not that I remember.
8   Q.  Janice McCoy testified in her deposition that
9   she spoke with your office on a daily basis as SB 362
10  was being developed.  Do you remember that at all?
11       MR. FREDERICK:  Objection, it assumes
12  facts not in evidence.
13  A.  She didn't talk to me before filing it.
14  Q.  (By Ms. Berkower) After she filed it, did she
15  talk to you regularly?
16  A.  I have a problem with "regularly," but yes, we
17  had -- we did talk about the legislation.
18  Q.  About how frequently?
19  A.  When we were getting ready to refer the bill
20  and hear the bill, I would talk to her, but it was not a
21  regular -- I mean, I don't think you can say once a
22  week, because it might have been once a week and then
23  three times in one day.  And so it wasn't a rhythmic
24  kind of communication.
25  Q.  So did the frequency of your contact with her

---

### 156

1   or Senator Fraser's office depend on whether a committee
2   or the full Senate was going to actively consider
3   SB 362?
4   A.  I would say it was more about, do we have all
5   of the paperwork necessary.  Have you talked to all of
6   the senators.  Have you -- more procedural questions and
7   comments, which we typically do with all legislation,
8   working with senators to get their legislative packages
9   passed.
10  Q.  So she would contact you concerning procedural
11  matters?
12  A.  Yes.  We have all our paperwork.  We're ready
13  to go now.  That sort of thing.
14  Q.  Did she contact you about the substance of the
15  bill?
16       MR. FREDERICK:  I'll object only to the
17  extent it would call for the substance of your
18  conversations, but as to whether or not she did, you may
19  answer.
20  A.  Not prior to filing the legislation.  We may
21  have had conversations about amendments after -- as the
22  bill was going through the process.
23  Q.  (By Ms. Berkower) What were those
24  conversations?
25       MR. FREDERICK:  We'll object on the basis

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 157

1  of legislative privilege and instruct you not to answer.
2       A.  I can't answer that question.
3       Q.  (By Ms. Berkower) But these were -- to be
4  clear, these are substantive conversations as well as
5  procedural conversations?
6       A.  Yes, I think so.
7       Q.  Outside of the communications between the
8  Lieutenant Governor's Office and Senator Fraser's
9  office, are you aware of any other communications that
10  your office had during the development or drafting of
11  SB 362?
12           MR. FREDERICK:  Objection, vague.  You may
13  answer.
14       A.  I'm not aware of any draft -- any conversations
15  during drafting.  I think there were conversations with
16  other offices during the development of the bill.
17       Q.  (By Ms. Berkower) In your opinion, do you
18  believe that states covered by Section 5 of the Voting
19  Rights Act need not conduct any analysis of the impact
20  of photo voter ID laws on minority voters?
21           MR. FREDERICK:  Objection, relevance.
22       A.  I don't -- I don't see that as a requirement
23  for the states to do that, but I'm not an expert on the
24  Voting Rights Act either.
25       Q.  (By Ms. Berkower) Did the Supreme Court's

### 158

1  decision in the Indiana voter ID case change your view
2  on that?
3           MR. FREDERICK:  Objection, relevance.
4       A.  No.
5       Q.  (By Ms. Berkower) Does your answer explain why
6  the public record contains no indication of any serious
7  effort to determine the impact of SB 362 on minority
8  voters?
9           MR. FREDERICK:  Objection, assumes facts
10  not in evidence.  Objection, relevance, and objection,
11  argumentative.
12       A.  In the normal course of business of handling
13  legislation on the Senate Floor, that would not
14  typically be one of the things that we accomplished or
15  did in our office.
16       Q.  (By Ms. Berkower) Do you know if anybody else
17  would generally look into those issues?
18       A.  I'm not aware of it.
19       Q.  What was the purpose or purposes of SB 362?
20           MR. FREDERICK:  We'll object and caution
21  you that based on legislative privilege and to the
22  extent that you have an understanding of the general
23  purpose of the bill, you may answer the question.
24  However, I will instruct you not to answer, on the basis
25  of legislative privilege, the extent it would require

### 159

1  you to reveal anyone's specific motivation for the bill
2  or subjective personal intent.  But subject to that, you
3  may answer.
4       A.  It's my understanding that it was designed to
5  protect the integrity of the election system and ensure
6  that we uphold One Person, One Vote.
7       Q.  (By Ms. Berkower) How did it do that?
8       A.  It required at least stronger identification
9  than the current system for voting.
10       Q.  And was the law designed to target any
11  particular problem?
12       A.  Not that I'm aware of.
13       Q.  Was it designed to target in-person voter
14  impersonation?
15       A.  I think that was part of the justification for
16  the bill, yes.
17       Q.  What was the rest of the justification for the
18  bill?
19       A.  Again, to enhance voter confidence in the
20  system.
21       Q.  And how did it do that?
22       A.  I think by making people feel like their vote
23  mattered and it was an honest vote with a system
24  that had integrity.
25       Q.  How did it make them feel that their vote

### 160

1  mattered?
2       A.  I think that it counted as their one vote, and
3  that they knew that they were the person voting because
4  there was some additional ID required.  That's my
5  personal opinion.
6       Q.  So requiring some additional ID improved voter
7  confidence?
8       A.  I believe so.
9       Q.  Is there anything else that the law targeted?
10  Any other problems?
11       A.  Not that I'm aware of.  There was additional
12  education requirements, but that's -- I think that's
13  always a good thing.
14       Q.  Did the law target mail-in voter fraud?
15       A.  Not that I'm aware of.
16       Q.  Why not?
17           MR. FREDERICK:  Objection, legislative
18  privilege and instruct you not to answer.
19       A.  I can't answer that.
20       Q.  (By Ms. Berkower) Senator Fraser testified in
21  his deposition that before he filed SB 362, he gave
22  notice to your office.  Is that accurate?
23           MR. FREDERICK:  Objection, assumes facts
24  not in evidence.  You may answer.
25       A.  I seem to remember him calling to say he was


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

165

1        MR. FREDERICK: Objection, vague.
2        A. Yeah. I'm going to have to have some more.
3    What do you mean by that?
4        Q. (By Ms. Berkower) Okay. Did the Lieutenant
5    Governor's Office play a role in attempting to secure
6    passage of SB 362 in the Senate outside of his
7    procedural role as President of the Senate?
8        MR. FREDERICK: I object on the basis of
9    legislative privilege to the extent that it would reveal
10   any nonpublic role, thought process, or private
11   communications.
12       To the extent you can answer generally
13   without revealing that, you may do so.
14       A. Generally, yes.
15       Q. (By Ms. Berkower) What was that role?
16       MR. FREDERICK: The same objection and
17   instruction.
18       A. I can't answer that question.
19       Q. (By Ms. Berkower) What procedures did the
20   Lieutenant Governor use to ensure that SB 362 would pass
21   the Senate?
22       MR. FREDERICK: I object on the basis of
23   privilege to the extent -- I also object on vagueness.
24   But to the extent this seeks nonpublic communications or
25   actions by the Lieutenant Governor, I instruct you not

---

166

1    to answer on the basis of privilege.
2        A. I think that the Lieutenant Governor followed
3    the rules, the Senate rules, as he is allowed to do, in
4    order to have the legislation heard in committee and
5    then passed on the Senate Floor.
6        Q. Anything else that he did?
7        MR. FREDERICK: The same instruction and
8    objection.
9        A. Not that I'm aware of.
10       MS. BERKOWER: Do y'all want to take a
11   five-minute break?
12       MR. FREDERICK: Sure.
13       (Recess from 11:46 a.m. to 11:54 a.m.)
14       Q. (By Ms. Berkower) So we were talking about SB
15   362 now, in 2009. I guess I have what will be Exhibit
16   104.
17       (Exhibit 104 marked for identification.)
18       Q. (By Ms. Berkower) Do you know what this is?
19       A. I'm not familiar with the article.
20       Q. Is it -- does it appear to be an article from
21   the Dallas Morning News dated January 14, 2009?
22       A. Yes.
23       Q. Turning your attention to the fifth and sixth
24   paragraph, can you read those, please?
25       A. Yes.

---

167

1        Q. Or actually, fourth, fifth, and sixth.
2        A. (Reading to herself.)
3        Q. Have you looked at those?
4        A. Yes.
5        Q. The article quotes the Lieutenant Governor as
6    saying, "As far as I know, I don't think the two-thirds
7    rule is going to change," in that -- in the 2009
8    legislative session.
9        Do you remember the Lieutenant Governor
10   saying that?
11       A. No, I don't.
12       Q. Do you know why he said that?
13       A. No, I don't.
14       Q. Would he be the best person to confirm whether
15   he said that and explain why he said that?
16       MR. FREDERICK: Objection, calls for
17   speculation.
18       A. I assume so.
19       Q. (By Ms. Berkower) All right.
20       MS. BERKOWER: I have what's going to be
21   Exhibit 105, I guess. Some of these copies are not as
22   good as the others.
23       Thank you.
24       (Exhibit 105 marked for identification.)
25       Q. (By Ms. Berkower) Can you turn your attention

---

168

1    -- well what is this, first?
2        A. It appears to be a -- the resolution adopting
3    the Senate rules.
4        Q. Which legislative session is that?
5        A. For the 2009 session, 81st Legislature.
6        Q. Can you turn to Rule 5.11.
7        A. Okay.
8        Q. Do you know how this provision was adopted in
9    the 2009 Senate rules?
10       A. The senator's caucus decide on their rules and
11   then bring them to the Floor for adoption and full
12   hearing with the resolution, so I assume they wrote it.
13       Q. Do you know the circumstances for adopting this
14   particular rule?
15       A. No. I wasn't in the caucus.
16       Q. Did you hear anything about it afterwards?
17       MR. FREDERICK: Objection on legislative
18   privilege.
19       Don't reveal the substance of any
20   communication with the legislator or the Lieutenant
21   Governor. Asking the specific question of whether or
22   not you heard anything, you may answer that.
23       A. Yes, I did.
24       Q. What was that -- what was it that you heard?
25       MR. FREDERICK: Objection, legislative

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                              MAY 29, 2012

## 169

1  privilege.
2          Instruct you not to answer.
3      A.  I can't answer that.
4      Q.  (By Ms. Berkower) Is this the two-thirds rule
5  that we were talking about earlier?
6      A.  Yes.  It -- it is or it's part of it.  Yes.
7      Q.  For purposes of the 2009 legislature?
8      A.  Yes.
9      Q.  Turning your attention to Part D of the rule,
10  can you read that to yourself.
11     A.  Yes.
12     Q.  What does this section do?
13     A.  It allows the Senate to go in to the Committee
14  of the Whole and then set a special order by a majority
15  vote of the Senate and not the two-thirds vote.
16     Q.  Does it allow that for any type of legislation?
17     A.  It is specifically for voter identification
18  requirements.
19     Q.  So what's the effect of this section of the
20  rule?
21     A.  The effect is to allow a special treatment of
22  voter identification legislation.
23     Q.  Why did the rule do that?
24          MR. FREDERICK:  Objection.  Calls for --
25  calls for speculation.  Objection, legislative

## 170

1  privilege.
2          Instruct you not to answer.
3      A.  Okay.  I can't answer that.
4      Q.  What was the purpose of exempting voter ID
5  requirements from the rule?
6          MR. FREDERICK:  Same objection.
7          Instruct you not to answer.
8      A.  I can't answer that.
9      Q.  (By Ms. Berkower) Isn't it true that the rule
10  was only changed for purposes of passing a voter ID law?
11          MR. FREDERICK:  Objection, legislative
12  privilege.
13          Instruct you not to answer.
14     A.  I can't answer that.
15     Q.  (By Ms. Berkower) Do you know if the -- why was
16  there special treatment for voter ID law?
17          MR. FREDERICK:  Objection, calls for
18  speculation.  Object to the extent it calls for -- to
19  the extent this question calls for thought processes or
20  confidential privileged communications.
21          I would instruct you not to answer.  So
22  unless you can do so without revealing privileged
23  matters, I'll instruct you not to answer.
24     A.  The senators vote on their rules, not the
25  Lieutenant Governor, and they choose how they want to

## 171

1  handle legislation.
2      Q.  (By Ms. Berkower) Okay.  Well, I guess, you
3  used the term "it gives special treatment to voter ID
4  legislation."  So I was wondering what you meant by
5  "special treatment."
6      A.  It requires a different vote count than the
7  remainder of the bills that go through -- that step
8  outside of the regular order of business.
9      Q.  Are you aware of any discussions among members
10  of the legislature to make the rule specific to exempt
11  voter ID from the two-thirds requirement?
12          MR. FREDERICK:  Object, and instruct you
13  not to reveal the substance of any communications but
14  you may answer whether or not you are aware.
15     A.  Yes, I am aware.
16     Q.  What was the substance of those communications?
17          MR. FREDERICK:  Object on the basis of
18  legislative privilege, and instruct you not to answer.
19     A.  I can't answer that.
20     Q.  (By Ms. Berkower) Was the Lieutenant Governor
21  involved any of those communications?
22     A.  Yes.
23     Q.  What was his involvement in those
24  communications?
25          MR. FREDERICK:  Object on legislative

## 172

1  privilege to the extent it calls for you to reveal the
2  substance of any conversation between the Lieutenant
3  Governor and another legislator or staff.
4      A.  I can't answer that.
5      Q.  (By Ms. Berkower) Who specifically was involved
6  in those conversations?
7      A.  My memory is that Senator Whitmire, Senator
8  Williams -- well, at least a half dozen senators came to
9  tell the Lieutenant Governor they were changing the
10  rules on this issue.
11     Q.  Why did they come to tell him that?
12          MR. FREDERICK:  Objection, calls for
13  speculation, and object on privilege to the extent it
14  calls for their thought process.
15          If you know why independently of that, you
16  may answer.
17     A.  Typically, give him a courtesy telling him when
18  they're changing their rules.
19     Q.  (By Ms. Berkower) You mean changing the rules
20  from the rules from the previous legislative session?
21     A.  Yeah.  Anytime they change the rules.
22     Q.  Can they change the rules midway through the
23  legislative session?
24     A.  Yes, I think they can.
25     Q.  Do you know of any time that's happened?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1      A.  Not that I can think of.
2      Q.  Were you involved in the meeting when the
3  senators came to tell the Lieutenant Governor that they
4  were going to change the rules for voter identification?
5      A.  Not after letting them in the room.
6      Q.  Did you discuss that conversation with the
7  Lieutenant Governor after they left?
8      A.  Yes, I think I did.
9      Q.  What did the Lieutenant Governor tell you?
10         MR. FREDERICK:  Objection, legislative
11  privilege.
12         Instruct you not to answer.
13     A.  I can't answer that.
14     Q.  (By Ms. Berkower) Did the Lieutenant Governor
15  favor the rule change?
16         MR. FREDERICK:  Objection, legislative
17  privilege.
18         Instruct you not to answer.
19     A.  I can't answer that.
20     Q.  (By Ms. Berkower) Do you know if the Lieutenant
21  Governor had a position on the rule change?
22     A.  Yes.
23     Q.  What was that position?
24         MR. FREDERICK:  Objection, legislative
25  privilege.

---

174

1         Instruct you not to answer.
2      Q.  (By Ms. Berkower) How many other times has the
3  two-thirds rule been suspended during the time in which
4  you've worked in this -- for the Lieutenant Governor?
5      A.  Oh, thousands of times.  It's -- the suspension
6  of the -- wait a minute, let me make sure I understand
7  the question.  How many times have the senators voted to
8  suspend the regular order of business?  So it's a -- are
9  you asking how many times they're using the two-thirds
10  rule or let me ask -- will you --
11     Q.  I can restate.  Sorry.
12     A.  Yes.
13     Q.  Do you know of any other instances in which a
14  particular type of legislation was specifically exempted
15  from the two-thirds requirement by the Senate rules?
16     A.  Yes.  In the history of the Senate, I know it's
17  been done for re-districting at some point, I don't
18  remember when.  But that's my memory, it's been done for
19  re-districting.
20     Q.  Do you know when it was re-done for
21  re-districting?
22     A.  No, I don't remember.
23     Q.  Was it done in the past five years for
24  re-districting?
25     A.  My guess is no.  Probably the last twenty

---

175

1  years.
2      Q.  Okay.  Are you aware of any public statement
3  that was made by any legislator regarding why the rule
4  was changed for the class of voter ID legislation?
5      A.  Not that I remember.
6      Q.  Are you aware of any public statement made by
7  the Lieutenant Governor regarding why the rule was
8  changed?
9      A.  No.  Other than this Dallas Morning News
10  article that you gave me.
11     Q.  Would SB 362 have passed the Senate if it had
12  not adopted Rule 5.11 as contained in the 2009 Senate
13  rules?
14         MR. FREDERICK:  Objection, calls for
15  speculation.
16     Q.  (By Ms. Berkower) You may answer.
17     A.  I don't remember the exact vote count but I
18  think that it was along party lines and therefore would
19  not have met the two-thirds rule.  That doesn't mean
20  that it couldn't have gone through the regular order of
21  business and been handled that way.
22     Q.  Using a two-thirds majority, you mean?
23     A.  No.  You don't have to.  You can go in the
24  regular order of business.
25     Q.  Oh, okay.  Given that was Number 362, is that a

---

176

1  realistic option?
2      A.  Honestly, if you sat there and gaveled through
3  the whole thing, it's possible.
4      Q.  Have you seen that happen before?
5      A.  Not in the Senate.
6      Q.  Where --
7      A.  You do sometimes in the House.
8      Q.  Are you aware of any other communications
9  related to any other real modifications to the 2009
10  Senate rules with regard to voter ID bills?
11     A.  Not that I remember.
12     Q.  Was SB 362 considered by any Senate committees?
13     A.  Yes.
14     Q.  Which one?
15     A.  It went to the Committee of the Whole.
16     Q.  Is that the usual procedure?
17         MR. FREDERICK:  Objection, vague;
18  objection, form.
19     A.  It's a usual procedure to send the bill to
20  committee.
21     Q.  (By Ms. Berkower) Why did the bill get sent
22  directly the Committee of the Whole?
23         MR. FREDERICK:  Objection to the extent it
24  calls for the Lieutenant Governor or any legislator's
25  thought process or any privileged communications.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012



---

177

1    I instruct you not to answer.  If you know
2    independent of that and can answer without revealing it,
3    you may answer.
4        A.   The Lieutenant Governor chose to send it to the
5    Committee of the Whole.  It is consistent with the Rule
6    D, and predictable from the senators because they put it
7    in their rules.
8        Q.   (By Ms. Berkower) Uh-huh.
9        A.   So, one could argue he was following the
10   rules.
11       Q.   You mean the rules directed him to send it?
12       A.   They don't directly direct him to, however, the
13   pathway is pretty clear right here.
14       Q.   So the senators themselves indicated they
15   wanted it as part of the rule for voter ID legislation
16   to be considered primarily by the Committee of the
17   Whole?
18       A.   The senators wrote that rule not the Lieutenant
19   Governor.
20       Q.   Under the rules, did the Senate -- did the --
21   excuse me -- the Lieutenant Governor have the authority
22   to refer voter ID legislation to other committees?
23       A.   Yes, he did.
24       Q.   But he still chose to refer it to the Committee
25   of the Whole?

---

178

1        A.   Yes, he did.
2        Q.   Why didn't it go to the State Affairs
3    Committee?
4        MR. FREDERICK:  Objection, legislative
5    privilege.
6            Instruct you not to answer, unless you can
7    do so without revealing mental impressions, thought
8    process, or privileged communications.
9        A.   I don't think I answer that.
10       Q.   (By Ms. Berkower) Ms. McCoy said in her
11   deposition it was unusual for a bill to go straight to
12   the Committee of the Whole.  Do you agree with that?
13       MR. FREDERICK:  Objection, relevance.
14   Objection, assumes facts not this evidence.
15       You may answer.
16       A.   The Committee of the Whole is unusual, however,
17   it is used when the Lieutenant Governor wants to ensure
18   that all 31 senators hear the same information, the same
19   testimony, the same public input, and that was the case
20   with this legislation as it had been with other
21   legislation during his time as Lieutenant Governor.
22       Q.   (By Ms. Berkower) I thought you said, though,
23   that the senators indicated that they wanted it to go
24   straight to the Committee of the Whole through passing
25   Rule 5.11?

---

179

1        MR. FREDERICK:  Objection, misstates prior
2    testimony.
3        You may answer.
4        A.   I did not say that.  I think the senators
5    contemplated that bill going to the Committee of the
6    Whole, but it doesn't direct him to send it to the
7    Committee of the Whole.  The rule does not --
8        Q.   Do you know why -- oh, excuse me.
9        Do you know why the senators might have
10   wanted the bill to go straight to the Committee of the
11   Whole?
12       MR. FREDERICK:  Objection, calls for
13   speculation.  Objection to the extent it calls for the
14   thought process of any legislator.
15       You may, however, answer the specific
16   question whether or not you know why.
17       A.   I don't know why.
18       Q.   (By Ms. Berkower) What was the purpose of
19   assigning SB 362 to the Committee of the Whole?
20       MR. FREDERICK:  I'll object to the extent
21   it calls for any legislator or Lieutenant Governor's
22   thought process or any privileged communications.
23       But if you can identify a purpose without
24   revealing that, you may do so.
25       A.   Generally, the Lieutenant Governor sends a bill

---

180

1    to the Committee of the Whole when he wants to ensure
2    that all 31 senators have the exact same access to the
3    exact same information, the exact same testimony, that
4    exact same opportunity to ask witnesses questions, which
5    is not the case when it goes to a smaller committee.
6    And when he wants to sure -- make sure that everybody
7    has the same information access, that is a fairness issue.
8        Q.   (By Ms. Berkower) Do you know why he thought it
9    was important for SB 362 to go to the Committee of the
10   Whole?
11       MR. FREDERICK:  Objection, to the extent
12   it calls for his -- the Lieutenant Governor's thought
13   process.
14       You may, however, answer the specific
15   question whether or not you know why.
16       A.   I don't know why.
17       Q.   (By Ms. Berkower) What was the Lieutenant
18   Governor's role during the consideration of SB 362 when
19   it was before the Committee of the Whole?
20       A.   The procedure for going in to the Committee of
21   the Whole means that -- requires that the Lieutenant
22   Governor steps down from the dais and actually functions
23   as one the senators.  And so then another senator
24   manages the Committee of the Whole and that senator is
25   designated by the Lieutenant Governor.  And the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JULIA RATHGEBER                                          MAY 29, 2012

---

### 181

1   Lieutenant Governor can act as a senator or committee
2   member for the period of consideration under the
3   Committee of the Whole.
4       Q.   You said he can act?
5       A.   Uh-huh.
6       Q.   Does the senator who is now on the dais get to
7   act as a full senator?
8       A.   Yes, I think so.
9       Q.   So that senator doesn't lose any of his powers?
10      A.   No, I don't think so.  No.
11      Q.   How is a hearing organized for when the Senate
12  is meeting in the Committee of the Whole?  Who calls the
13  meeting?
14      A.   Oh, well, the Lieutenant Governor has to refer
15  the bill to the Committee of the Whole.  At that point,
16  then he has to designate somebody to chair the Committee
17  of the Whole.  Next the Chair of the Committee of the
18  Whole has to call the Senate in to the committee and
19  they have to adopt rules for -- to operate under, for
20  the purposes of the committee.  And then they conduct a
21  regular committee hearing.
22      Q.   How does -- who decides which witnesses are
23  heard from?
24      A.   I guess it's a responsibility of the Chair of
25  the committee, but the senators were asked who they'd

---

### 182

1   like to have testimony -- testify and, of course,
2   there's public testimony so anybody who wanted to come
3   speak, can.
4       Q.   When the Senate is meeting as the Committee of
5   the Whole, does that mean the Lieutenant Governor also
6   gets to call witnesses?
7       A.   You know, "call witnesses" is a not a term we
8   typically use.
9       Q.   Invite witnesses?
10      A.   Typically, it's the Chair of the Committee that
11  determines what witnesses are invited and not the
12  members of the Committee that ask witnesses.  But we did
13  help call people to come testify.
14      Q.   For SB 362?
15      A.   I know we did with 14, I don't know if we did
16  with 362.
17      Q.   Does Lieutenant Governor get to recommend
18  certain witnesses when the Senate is meeting in the
19  Committee of the Whole?
20      A.   I think all senators can recommend.
21      Q.   But it's at the discretion of whoever's
22  presiding whether or not to call them?
23      A.   I think that's correct.
24      Q.   Do you know if any witnesses from groups
25  representing minority voters were heard from on SB 362?

---

### 183

1       A.   Yes, I believe so.
2       Q.   Were you personally involved in selecting any
3   witnesses who testified with regard to SB 362?
4       A.   Not that I remember.
5       Q.   Did you attend the committee meeting for the
6   Committee of the Whole for SB 362?
7       A.   Parts of it, yes.  I was in and out.
8       Q.   Do you remember it?
9       A.   Vaguely.
10      Q.   During the debate on SB 362, did anyone raise
11  concerns about its impact on minority voters?
12      A.   I don't remember that.  They could have.
13      Q.   But you don't remember any?
14      A.   I don't remember the testimony.
15      Q.   Do you remember if the Lieutenant Governor
16  responded in any way to concerns raised about the impact
17  on minority voters?
18      A.   Not that I remember.
19      Q.   Do you know if SB 362 changed at all in
20  response to concerns about its impact on minority
21  voters?
22      A.   I don't remember it.
23           MS. BERKOWER:  I guess this is going to be
24  Exhibit 33 previously marked.
25           (Exhibit 33 remarked for this deposition.)

---

### 184

1       Q.   (By Ms. Berkower) Do you know what this is?
2       A.   It's the Senate Journal for Wednesday March 18,
3   2009.
4       Q.   Do you remember if you were in attendance that
5   day?
6       A.   Typically, I'm on and off the Floor lots and
7   lots of times during the course of the day, so I'm sure
8   I was present but not on the Floor the whole time.  I
9   know I was at work that day.
10      Q.   How do you know that?
11      A.   Because I didn't ever miss a day of the
12  session.
13      Q.   That's a good way to remember.
14      A.   Yes.
15      Q.   Can you turn your attention to Page 591,
16  please.  Do you see there's something, an entry that
17  says it's the Statement Regarding Votes Cast on Senate
18  Bill 362?
19      A.   Yes.
20      Q.   Do you remember this statement?
21      A.   No, I don't.
22      Q.   Do you know what it is now that you have
23  reviewed it?
24      A.   Yes.
25      Q.   What is it?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

**185**

1   A.   It's a statement that Senator West submitted on
2   behalf of -- one, two, three, four, five, six, seven,
3   eight, nine -- ten democratic senators.
4   Q.   And does the statement specify that eight of
5   those democratic senators are ethnic minorities?
6   A.   Yes.
7   Q.   What was the content of this statement?
8   A.   He opposed the -- Senator West authored the
9   statement opposing the process for handling the voter ID
10  legislation.
11  Q.   Does the statement note that all of the ethnic
12  minorities in the Senate opposed that bill?
13  A.   Yes.
14  Q.   Why do you think these senators felt the need
15  to submit, for the record, a statement that all racial
16  and ethnic minorities voted against the voter ID
17  legislation?
18       MR. FREDERICK:  Objection, calls for
19  speculation.  Objection, based on privilege, to the
20  extent that this would call for you to reveal the
21  substance of any conversation with one of these
22  senators.
23  A.   I don't know.
24  Q.   (By Ms. Berkower) What is your opinion of their
25  unified opposition to SB 362?

---

**186**

1        MR. FREDERICK:  Objection, relevance.
2   A.   We frequently have votes where members disagree
3   with the -- with the way -- with a bill.  So we
4   frequently have a non-unanimous bill.  It happens.
5   Q.   (By Ms. Berkower) Do you ever have a bill where
6   all of the ethnic minorities of the Senate vote together
7   with and submit a statement that they all voted against
8   this particular legislation together?
9        THE WITNESS:  You want to say --
10       MR. FREDERICK:  Object, relevance.
11       But you may answer.
12  A.   I am -- I am sure that we have had numerous
13  bills where all minorities voted against them.  However,
14  the statement in the Journal is unusual.
15  Q.   (By Ms. Berkower) Do you -- did you believe
16  that these senators' concerns about the impact of the
17  bill on minority voters was genuine?
18       MR. FREDERICK:  Objection.  Objection,
19  relevance and objection based on legislative privilege.
20  I instruct you not to answer the question.
21       MS. BERKOWER:  Well, I just asked if she
22  believed that their concerns were genuine.
23       MR. FREDERICK:  Well, to the extent,
24  that's asking for her thought process at the time while
25  the bill is pending, as member of the Lieutenant

---

**187**

1   Governor's staff, I believe that's privileged.
2        I would instruct her not to answer.
3   A.   I can't answer that.
4   Q.   (By Ms. Berkower) Do you have an opinion as to
5   whether or not these senators' opposition was genuine?
6        MR. FREDERICK:  Objection,
7   relevance.  Same objection on privilege.
8        Instruct you not to answer.
9   A.   Sorry, I can't answer that.
10       MS. BERKOWER:  I just asked if she has an
11  opinion, not what it was.
12       MR. FREDERICK:  But you're asking the same
13  thing.  I mean, you're asking for an opinion.
14       MS. BERKOWER:  I said, "Do you have an
15  opinion concerning whether these minority senators'
16  concerns were genuine," not "what was your opinion."
17       MR. FREDERICK:  Fair enough.  I will
18  object on the grounds of relevance.
19       But you may answer the question whether or
20  not you have an opinion.
21  A.   I don't have an opinion about whether or not
22  their concerns as expressed in this statement are
23  legitimate or that they believed in them.
24  Q.   (By Ms. Berkower) Do you believe they were
25  acting in good faith in raising concerns about the

---

**188**

1   impact of the bill on minority voters?
2        MR. FREDERICK:  Objection, relevance.
3   Objection, legislative privilege.
4        Instruct you not to answer.
5   A.   I can't answer that.
6   Q.   (By Ms. Berkower) Did you have any concerns
7   that if the state did not respond to these minority
8   senators' concerns, it might threaten the preclearance
9   of SB 362?
10       MR. FREDERICK:  Objection, relevance.
11  Objection, legislative privilege.
12       Instruct you not to answer.
13  A.   I can't answer that.
14       MS. BERKOWER:  I just asked if she had
15  concerns, not what the concerns were.
16       MR. FREDERICK:  Yeah.  I'll stick to the
17  instruction.  I mean, the question implies the substance
18  of the concerns, so answering would reveal the substance
19  of her thought process.
20       So I'll instruct you not to answer the
21  question on the basis of legislative privilege.
22  Q.   (By Ms. Berkower) Are you going to answer?
23  A.   No.
24  Q.   Was it true that some legislators and members
25  of the public stayed up all night during consideration

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 189

1  of SB 362?
2      A.  Yes.
3      Q.  Why do you think there was such strong
4  opposition to SB 362?
5          MR. FREDERICK:  Objection, relevance.
6      Q.  (By Ms. Berkower) You may answer.
7      A.  I think, at the point -- at this point in the
8  legislative session, after several versions of this
9  legislation, that the -- that both parties were actively
10  opposed -- you know, working the members, but I did not
11  participate in any of that -- those conversations.  It
12  was my impression that both the Democratic Party and the
13  Republican Party were pushing their members to vote
14  accordingly.
15      Q.  When you said "working the members," what do
16  you mean by that?
17      A.  Contacting them to ask them to vote either for
18  the legislation or against the legislation.
19      Q.  And when you say the Democratic Party and
20  Republican Party, do you mean the Democratic Party of
21  Texas and the Republican Party of Texas?
22      A.  Yes.
23      Q.  Anybody else?
24      A.  Not that I'm aware of.
25      Q.  Do you know why the parties were asking their

### 190

1  members to vote in a particular way?
2          MR. FREDERICK:  Objection, calls for
3  speculation.
4          You may answer.
5      A.  I do not know.
6      Q.  (By Ms. Berkower) Were there any amendments to
7  the SB 362 during the Senate Floor consideration?
8      A.  I don't remember.
9          (Exhibit 106 marked for identification.)
10      Q.  (By Ms. Berkower) Do you know what this is?
11      A.  Yes.
12      Q.  What is it?
13      A.  This is the legislative history for Senate Bill
14  362.
15      Q.  Does it refresh your memory as to whether or
16  not there are any amendments to SB 362 during Floor
17  consideration?
18      A.  Yes.  This reported favorably without
19  amendments, so, yes.  No, now, I remember.  They did not
20  amend it in committee, they said they would offer
21  amendments on the Floor.
22      Q.  Do you remember any amendments that were made
23  on the Floor?
24      A.  I know that there are a group of them
25  submitted, and they were distributed to the senators in

### 191

1  advance.  And I just don't remember what they all were,
2  but, yes.
3      Q.  Did any of them get included, do you know?
4      A.  Yes, obviously.  It's listed here.
5      Q.  Do you know which ones got included?
6      A.  No.  I don't remember what the amendments did.
7      Q.  Do you know if any of the amendments addressed
8  concerns of minority legislators and minority voters?
9          MR. FREDERICK:  Object on the basis of
10  privilege.
11          But you may answer whether or not you
12  know.
13      A.  I just don't remember the amendments.  No, I
14  don't know.
15      Q.  (By Ms. Berkower) Did you have any role once SB
16  362 was referred to the house?
17      A.  No.
18      Q.  Did the Lieutenant Governor?
19      A.  No.  He may have told the Speaker it was on its
20  way, but beyond that, no.
21      Q.  Does the Lieutenant Governor usually have a
22  role in Senate bills that get sent to the House?
23      A.  No.
24      Q.  What happened to SB 362 in the House?
25      A.  The vote was considered in public hearing and

### 192

1  then it was sent to calendars and it was placed on the
2  major state calendar, but it was the very end of the
3  session, and so the bill died.  It was not heard on the
4  House Floor.
5      Q.  So just to close a loop:  With the exception of
6  SB 362, are you aware of any other election-related
7  bills that the Lieutenant Governor referred directly to
8  the Committee of the Whole?
9          MR. FREDERICK:  Objection, vague.
10          But you may answer.
11      A.  I don't remember any election-related bills.  I
12  know there was school finance that went.  Maybe some tax
13  stuff went to the Committee of the Whole.  But I don't
14  remember elections.
15      Q.  (By Ms. Berkower) And how common or uncommon is
16  it for a bill to be referred directly to the Committee
17  of the Whole?
18      A.  It's -- it's not common but it is done.
19      Q.  In what circumstances is it usually done?
20      A.  As I answered earlier, when for some reason or
21  another the Lieutenant Governor feels it's important for
22  all of the senators to have the same information at the
23  same time and have the opportunity to examine all the
24  witnesses, which does not happen in a committee process
25  where not all senators are present on the committee.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

193

1        MS. BERKOWER:  I think we can take a lunch
2   break now if you guys want.
3        MR. FREDERICK:  Sure.
4        MS. BERKOWER:  Like a half hour.
5        Go off the record.
6        (Recess from 12:26 p.m. to 1:06 p.m.)
7    Q.  (By Ms. Berkower) Okay.  So just a couple more
8   questions about SB 362.
9    A.  Okay.
10   Q.  And then we'll move on.  Do you know of any
11  communications regarding SB 362 and the adverse impact
12  it may have on minority voters?
13       MR. FREDERICK:  Object to the extent it
14  calls for the substance of communications based on
15  legislative privilege.
16       But as to the question of whether or not
17  you're aware, you may answer.
18   A.  Communications with -- on -- not that I
19  remember.
20   Q.  (By Ms. Berkower) Who is Jennifer Fagan?
21   A.  She is the committee coordinator.  She's in
22  charge of the State Affairs Committee.
23   Q.  Is she a lawyer?
24   A.  Yes, I believe she is.
25   Q.  Does she work for a particular legislator?

194

1    A.  Yes, she works for Senator Duncan.
2    Q.  So does she have a dual role as an employee of
3   the committee or she just works for him and he's on the
4   committee?
5    A.  He's the chair of the committee and she works
6   for him.  So she is his staff person that manages the
7   committee.
8    Q.  Oh, okay.  So do you know if anyone else in the
9   Lieutenant Governor's Office had communications with her
10  or anybody else concerning the impact that SB 362 may
11  have had on minority voters?
12       MR. FREDERICK:  I'll object to the extent
13  it calls for the substance of the communication, but to
14  the extent it asks whether you were aware, you may
15  answer.
16   A.  I'm not aware of the communication.
17   Q.  (By Ms. Berkower) What, if any, steps did --
18  were taken by the Lieutenant Governor's Office in 2009
19  to determine if HB 362 had an adverse impact on minority
20  voters?
21       MR. FREDERICK:  Objection, legislative
22  privilege.
23       Instruct you not to answer.
24   A.  I can't answer that.
25   Q.  (By Ms. Berkower) Okay.  After the 2009

195

1   legislative session ended, were you involved in any
2   discussions concerning plans to introduce another voter
3   ID bill in the next legislative session?
4    A.  I probably should have looked this up.  I don't
5   remember if we charged State Affairs with studying voter
6   ID after the 2007 session or after the 2009 session.  We
7   did it one of those times and I just didn't double
8   check, so it could be.  I mean, I don't remember if that
9   was after the 7 session or the 9 session.
10   Q.  And when you say "you charged the State Affairs
11  Committee," what do you mean by that?
12   A.  The Lieutenant Governor issued an interim
13  committee charge to the State Affairs Committee asking
14  them to study voter ID.  It's a longer charge than that,
15  but that's the substance of it.
16   Q.  Is the idea that the State Affairs Committee
17  would have some sort of recommendation at the end?
18   A.  Yes.  All interim committee charges are issued
19  with the assumption that the committees will make
20  recommendations or issue a statement that there doesn't
21  need to be any change to the law.
22   Q.  Do they ever draft the actual legislation
23  themselves?
24   A.  Yes.
25   Q.  So is it possible that at the end of the

196

1   interim charge, the committee would have some sort of
2   new piece of legislation to introduce?
3    A.  That's the purpose of interim committee
4   charges, is that, if there's an opportunity to prepare
5   materials during the interim when people are not really
6   busy and that -- that staff work and the background
7   research is done during that period of time.
8    Q.  Okay.  How -- and how does the Lieutenant
9   Governor decide which committee will be studying a
10  particular issue?
11       MR. FREDERICK:  Objection, privilege to
12  the extent it calls for his thought process.
13       But if you can answer, generally, without
14  revealing that, you may do so.
15   A.  Generally, he sends charges related to a
16  subject matter to the committee that would deal with
17  that subject matter if legislation was filed on that
18  issue.
19   Q.  (By Ms. Berkower) Has the Committee of the
20  Whole ever been given an interim charge?
21   A.  No, not that I'm aware of.
22   Q.  Why not?
23       MR. FREDERICK:  Objection, calls for
24  speculation.  And I'll object that it calls for
25  privileged matter.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

**197**

1     But if you can answer without revealing
2  that, you may answer.
3     A.  The Committee of the Whole doesn't have
4  standing staff.  It's not a standing committee that
5  operates during every session and, therefore, there's no
6  one there to manage any background research during an
7  interim.
8     Q.  (By Ms. Berkower) So if -- if the Committee of
9  the Whole considered a bill during the regular session,
10 would the Lieutenant Governor then have to decide to
11 assign an interim charge to a different committee?
12    A.  No.  I assume he has the ability to charge the
13 Committee of the Whole with studying something as well.
14 It's not prohibited in the rules.
15    Q.  But it's never happened, to your knowledge?
16    A.  Not to my knowledge.
17    Q.  And doesn't sound like it would be very
18 practical?
19    A.  That's my thought.
20    Q.  So after the 2009 legislative session ended,
21 did you speak to anyone else in the Lieutenant
22 Governor's Office about a subsequent voter ID bill to be
23 introduced in the next legislative session?
24    A.  Not that I remember.  Unless it was an interim
25 committee charge during that time.  I'm sorry, I didn't

---

**198**

1  check.
2     Q.  Do you know if you discussed any news articles
3  with other legislative -- sorry -- lieutenant Governor's
4  staff members about voter ID during that interim period?
5     A.  I remember reading quite a few news article
6  following the session on voter ID, but I don't know that
7  our staff gave them to me.  It my have been I just read
8  them in the clips or -- just because I read that kind
9  stuff or read legislative issues in the clips.
10    Q.  What do you remember reading about voter ID?
11    A.  I know there were a series of articles.  Some
12 of them mentioned the polling data where the public was
13 generally, like, 70 percent favorable on the voter ID
14 legislation.  I remember articles that were
15 pro-supportive of voter ID and articles that were
16 opposed to voter ID initiatives.  That's generally all I
17 remember.
18    Q.  Do you remember the details of any of the
19 arguments in favor or against voter ID?
20    A.  Not that I can attribute to a specific news
21 article.
22    Q.  Generally, what were the arguments in favor or
23 against?
24       MR. FREDERICK:  Object to relevance.
25    Q.  (By Ms. Berkower) If you remember.

---

**199**

1     A.  Yeah, I mean, during the course of looking at
2  all the voter ID bills, I think there's, besides the
3  people who have been proponents of legislation have said
4  we need to have a process that ensures the integrity of
5  the voting process, One Person, One Vote, and you know
6  that the person making the vote is the person whose name
7  is on the voter registration rolls, and that that
8  enhances the integrity of the process.  And then
9  opponents to the process have generically said not
10 everybody has an ID; therefore, we shouldn't keep them
11 from voting just because they don't have an ID.
12    Q.  Did any of these arguments impact your views on
13 any futures voter ID legislation that may be introduced?
14       MR. FREDERICK:  Objection, legislative
15 privilege.
16       Instruct you not to answer.
17       MS. BERKOWER:  I asked if it impacted, not
18 how it impacted.
19       MR. FREDERICK:  Can you ask the question
20 again, please.
21    Q.  (By Ms. Berkower) I said did any of the news
22 articles -- or in so many words I said.  Did any of the
23 news articles impact your views on any future voter ID
24 legislation that may be introduced?
25       MR. FREDERICK:  Same objection.

---

**200**

1        You can answer whether or not they did.
2     A.  Not that I remember.  But I don't think my
3  personal views are relevant.  I don't sponsor or author
4  legislation.
5     Q.  (By Ms. Berkower) But you advise the Lieutenant
6  Governor on legislation, don't you?
7     A.  Mostly I provide him the information, pros and
8  cons, and he makes up his own mind.
9     Q.  But if you do research and you supervise the
10 research, don't you gather it together and pick what you
11 think is most relevant and provide that to him?
12       MR. FREDERICK:  Objection, assumes facts
13 not in evidence.
14    A.  We do provide him briefing materials on a
15 regular basis.  But he makes up his own mind how he
16 feels about issues.
17    Q.  (By Ms. Berkower) So is he the only one we can
18 ask about his views on issues?
19       MR. FREDERICK:  Objection, relevance.
20 Objection, calls for speculation.
21    A.  I wouldn't presume to talk for him.
22    Q.  (By Ms. Berkower) Is he the only person who can
23 speak for him?
24    A.  I would assume so, yes.
25    Q.  Did you speak to any legislators or their staff

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

201

1    in the interim period between the 2009 and 2011
2    legislative sessions about voter ID?
3        A.   If that's when we did the interim charge, I
4    would have; but I just don't remember if it was between
5    7 -- after the 7th session or after the 9 session.
6        Q.   During the interim charge that you're thinking
7    about, do you remember who you spoke with?
8        A.   I would have spoken with the committee staff,
9    probably Senator Duncan as well.
10       Q.   Which committee staff?
11       A.   Senate State Affairs.
12       Q.   Why?  Is that the because they were charged
13   with the --
14       A.   Yes.
15       Q.   Do you remember what was discussed?
16            MR. FREDERICK:  Objection.  Object on the
17   basis of privilege.
18            You may identify the general subject
19   matter of the discussion but you may not reveal the
20   substance of any conversation with the staff member or
21   legislator.
22       A.   Typically when I talk to people, Governor
23   Dewhurst typically issues well over a hundred charges
24   out to all of the committees, typically, in late January
25   or early February, following the legislative session.

---

202

1    And at that point, then the committees all call and go,
2    "Who asked are for this?  Who asked for that?  What do
3    you want us to do on this?  How do you -- do we have to
4    have more hearings than one hearing?  Can we have more?
5    What do we need to do?  Is there something else you're
6    thinking about this?  Can you give us additional
7    information?"  I have those kinds of conversations with
8    people all the time and those would have been consistent
9    with what -- conversations I would have had for all of
10   the charges that went out to any committee.
11       Q.   Do you know of any decisions that were made
12   concerning introduction of voter ID legislation in the
13   2011 legislative session before the session started?
14       A.   No.  Senator Fraser did that.
15       Q.   So you were not involved in any decisions about
16   the introduction of voter ID legislation prior to the
17   2011 legislative session?
18       A.   I was not.
19       Q.   Was there a photo ID bill introduced in the
20   Senate in 2011?
21       A.   Yes, there was.
22       Q.   Was it SB 14?
23       A.   Yes.
24       Q.   Did Senator Fraser introduce it?
25       A.   Yes.

---

203

1        Q.   He testified in his deposition that he started
2    to work on it on May 31, 2009.  Do you know if that's
3    accurate?
4            MR. FREDERICK:  Objection, assumes facts
5    not in evidence.
6        A.   I don't -- I don't know.
7        Q.   (By Ms. Berkower) Did Lieutenant Governor or
8    anyone in his office have any conversations prior to May
9    31, 2009 about SB 14?
10       A.   No, not that I'm aware of.
11       Q.   Did Lieutenant Governor or anyone in his office
12   have any conversations after May 31, 2009 about SB 14
13   before it was introduced?
14       A.   Yes, but I need to clarify:  Senator Fraser
15   introduced a piece of legislation in November, I believe
16   it was November of -- prior to the 2011 session.  So it
17   would have been November 2010.  And then he refiled that
18   piece of legislation as Senate Bill 14.
19            Governor Dewhurst had reserved the number
20   Senate Bill 14 and so Senator Fraser chose what he was
21   going to file, filed it, and then refiled that same
22   piece of legislation as Senate Bill 14.
23            So after the original filing of the voter
24   ID legislation, and before it was refiled as Senate Bill
25   14, he had a conversation with Governor Dewhurst who

---

204

1    gave it the number 14, Senate Bill 14.
2        Q.   Okay.  So just to make sure I understand.  You
3    can -- a senator can introduce -- can file legislation
4    before the opening of the legislative session?
5        A.   Yes.
6        Q.   What happens after that?
7        A.   Okay.
8            MR. FREDERICK:  Objection, vague.
9        A.   Can you ask me better?
10       Q.   Well, I'm sorry, sorry.  I can.
11            Why did he need to refile it?
12       A.   He didn't have to refile it.  But the fact that
13   it had a low bill number is an indicator that it is a
14   priority for the legislative session.
15       Q.   Okay.  So when he filed it in November 2010,
16   did have a low bill number?
17       A.   No.  And that's why he refiled it --
18       Q.   Oh.
19       A.   -- as Senate Bill 14.  He -- the senators --
20   the Lieutenant Governor reserves the first 20 bill
21   numbers, sometimes 25, and then he hands them out to
22   senators for specific types of bills.  Sometimes the
23   senators ask for them as priority bill numbers and
24   sometimes the Lieutenant Governor asks them to file
25   legislation on a given topic.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JULIA RATHGEBER                                                    MAY 29, 2012

## 205

1     This was a case of Senator Fraser filed
2   what he wanted to file and Governor Dewhurst asked him
3   to refile it, again, as another bill number.
4     Q.   So the 1 through 25 are reserved for --
5     A.   1 through 20.
6     Q.   -- legislative priorities?
7     A.   Yes.
8     Q.   And Senator Fraser asked Lieutenant Governor
9   Dewhurst if he could --
10    A.   Use one of those numbers.
11    Q.   -- use one of those numbers reserved for
12  legislative priorities?
13    A.   Yes.
14    Q.   Do you know if Lieutenant Governor Dewhurst
15  spoke with Senator Fraser before he first filed the bill
16  in November 2010?
17    A.   I don't think he did.  I'm not aware of that
18  conversation.
19    Q.   So was the Lieutenant Governor involved in any
20  development of the bill before it was filed in November
21  2010?
22    A.   No.  I don't remember that.
23    Q.   Was anyone else in your office?
24    A.   I don't -- I don't think so.
25    Q.   If someone was, who would have person have

## 206

1   been?
2     A.   Probably Bryan Hebert.
3     Q.   Were you?
4     A.   I was not.
5     Q.   How did SB 14 come to be designated as
6   emergency legislation?
7     A.   The Governor gets to decide what he determines
8   to be legislative emergencies.
9     Q.   Does Lieutenant Governor have a role in that
10  process?
11    A.   No, he doesn't.
12    Q.   Does he ever talk to the Governor before
13  legislative emergencies are designated?
14    A.   Well, he talks to the Governor frequently, and
15  I think the Governor's Office gave us a heads up they
16  were about to do it, but they didn't ask us should we do
17  that.  They typically do give us some short period of
18  time heads up before it hits the press.
19    Q.   Do you know how the Governor's Office decides
20  which pieces of legislation will be designated as
21  emergency legislation?
22    A.   No, I don't.
23    Q.   Do you know if the Lieutenant Governor asked
24  for a voter ID to be given that designation?
25    A.   No, I don't.

## 207

1     Q.   What are the consequences for a bill to have
2   this designation?
3        MR. FREDERICK:  Objection, vague.
4     Q.   (By Ms. Berkower) What are the consequences for
5   a bill to be deemed emergency legislation -- legislative
6   emergency?
7     A.   The rules allow a bill to be heard on the
8   Senate Floor in advance of the 60-day deadline, if it's
9   designated emergency by the Governor.
10    Q.   Does it automatically get considered within the
11  first 60 days?
12    A.   No.
13    Q.   It's just permitted?
14    A.   Yes.
15    Q.   Did you have communications with Senator
16  Fraser's staff about the emergency -- about the
17  emergency designation?
18    A.   I don't remember it, but it -- but I could
19  have.
20    Q.   Do you know if Bryan Hebert had any such
21  communications with Senator Fraser's staff?
22    A.   I don't.
23    Q.   Do you know if Blaine Brunson had any
24  communications with Senator Fraser's staff about the
25  emergency designation?

## 208

1     A.   I don't.
2     Q.   Do you know if the Lieutenant Governor sent
3   Senator Fraser a letter on January 20th concerning SB
4   14?
5     A.   I don't remember a letter.
6     Q.   If he did, would you have drafted it?
7     A.   No.  I probably would not have drafted it.
8     Q.   Who would have drafted it?
9     A.   Maybe Bryan, maybe -- maybe Blaine.
10    Q.   Is this something you would have reviewed
11  before it went out?
12    A.   Maybe for any kind of -- if there required any
13  fact checking in the letter, I could have.
14    Q.   Is reserving a number for legislation common?
15    A.   Yes.  It's a tradition, yes.
16    Q.   What do you mean by "it's a tradition"?
17    A.   It's been done by at least -- I've worked for
18  two Lieutenant Governor's and both of them did it.
19    Q.   Every legislative session?
20    A.   Every legislative session that I'm aware of.
21    Q.   How did -- does the Lieutenant Governor
22  generally save some of the numbers for his own
23  priorities and permit senators to request some for their
24  priorities; is that how it works?
25    A.   Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER

MAY 29, 2012

---

### 209

1    Q.   So the Lieutenant Governor would have to
2  coordinate with senators because he can't introduce
3  legislation himself, so he would have to know it's
4  coming, right?
5    A.   Well, in order for them to use one of those
6  numbers, they would have to ask him for that number or
7  he would have to say, "I'll give you this number if
8  you'll file this..."  So, yes, there has to be some
9  communication.
10   Q.   So when he says, "I'll give you this number if
11 you file this bill," does Lieutenant Governor ever draft
12 the bill for that legislature?
13   A.   Yes, we have done so.  It's typically in a
14 limited -- in -- it's typically for something we've been
15 working on through the interim with the Senator's Office
16 and we have helped, as I described earlier, draft
17 portions of the legislation.
18        In complicated legislation, you divvy up
19 the articles and say, "Okay, you handle this part and
20 draft it, and I'll handle this part and draft it, and
21 we'll work it out."  So we may have done that sort of
22 work.
23   Q.   So for SB 14, Lieutenant Governor must have
24 known that Senator Fraser was going to file something?
25   A.   File Senate Bill 14.  Yes, he did know that.

---

### 210

1    Q.   How did he know that?
2    A.   Because he, Senator Fraser, would not have been
3  able to use Senate Bill 14 without Governor Dewhurst's
4  permission.
5    Q.   So did Governor Dewhurst decide after November
6  2010, when Senator Fraser first filed the bill, that he
7  was going to choose that particular bill to get the low
8  number that he had reserved?
9    A.   I don't think I understand the question.
10   Q.   Well, you said that no one from your office had
11 had communications with Senator Fraser before he filed
12 the bill in November 2010, right?
13   A.   Yeah, I don't -- I don't remember
14 conversations.  We could have had conversations but we
15 did not pre-approve his -- the content of that
16 legislation.
17   Q.   So Senator Fraser filed the bill --
18   A.   Right.
19   Q.   -- and then it must have come to Lieutenant
20 Governor Dewhurst's attention at some point?
21   A.   Yeah, they're all filed publicly.
22   Q.   They're all filed publicly?
23   A.   Yes.
24   Q.   So he reviewed it and he decided that that
25 would be something he would ask Senator Fraser to refile

---

### 211

1  and he would give it the number he reserved?
2    A.   Or it could have happened that Senator Fraser
3  asked to refile it as a low bill number.
4    Q.   Okay.  Do you know which of those two --
5    A.   I don't.
6    Q.   -- things happened?
7    A.   I don't remember which -- which way it would
8  have happened.
9    Q.   Do you know who would remember?
10   A.   Probably Senator Fraser.
11   Q.   Would the Lieutenant Governor remember?
12   A.   He may.
13   Q.   Why did Senate Bill 14 need to be considered in
14 the first 60 days of the legislature?
15        MR. FREDERICK:  Objection, assumption of
16 facts not in evidence.
17   A.   The Governor gets to determine that.
18   Q.   (By Ms. Berkower) But you said that just
19 because something's a legislative emergency means it can
20 be considered in the first 60 days but it doesn't have
21 to be considered in the first 60 days?
22   A.   That's correct.
23   Q.   So why did Senate Bill 14 need to be considered
24 in the first 60 days?
25        MR. FREDERICK:  Same objection.

---

### 212

1        You can answer.
2    A.   Generally, the legislature tries to do what the
3  Governor asked them to do.
4    Q.   (By Ms. Berkower) What was the urgency for
5  voter ID legislation?
6    A.   I don't know.  You'll have to ask Governor
7  Perry.
8    Q.   Was the introduction or -- sorry.  Was the
9  designation of voter ID legislation as emergency, a
10 legislative emergency, a procedural tactic designed to
11 ensure passage by preventing bill opponents from slowing
12 down consideration and bleeding out the legislative
13 clock?
14        MR. FREDERICK:  Objection, argumentative.
15   A.   I don't know.  You'll have to ask Governor
16 Perry.
17        (Exhibit 107 marked for identification.)
18   Q.   (By Ms. Berkower) Have you seen this letter
19 before?
20   A.   Yes, I have.
21   Q.   Did you draft this letter?
22   A.   No.
23   Q.   How have you seen this letter before?
24   A.   Well, Governor Dewhurst sent it.  I remember
25 it's his notice to tell everybody what was going to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                    MAY 29, 2012

---

### 213

1  happen in the -- in the legislative process.
2      Q.  Do you know who drafted the letter?
3      A.  No.  I'm sure it was several of us, but
4  Governor Dewhurst probably drafted it.  I do remember
5  this letter.  And the same letter went out to each of
6  the senators.
7      Q.  So the last paragraph of the letter references
8  a draft resolution outlining the procedures for the
9  Committee of the Whole?
10     A.  Uh-huh.
11     Q.  Do you remember what those were?
12     A.  I don't -- I don't remember the specifics, but
13  that's -- that's pretty traditional when you've got a
14  committee hearing.  They have to adopt the rules that
15  the committee will operator under.  And so I'm sure
16  that's what that's referencing is this is -- this is how
17  we're going to run the business.
18     Q.  Do you know if those procedures were adopted in
19  full or if any changes were made?
20     A.  I don't -- I don't remember any changes.
21            (Exhibit 108 marked for identification.)
22     Q.  (By Ms. Berkower)  Do you know what this is?
23     A.  I can read it.  Yes.
24     Q.  Did you draft this?
25     A.  No, I did not.

---

### 214

1      Q.  Do you remember this being released?
2      A.  Vaguely.  I remember a statement.  I would not
3  have been able to tell you what it said.
4      Q.  Is this a press release that Lieutenant
5  Governor Dewhurst issued regarding the designation of
6  voter ID legislation as emergency legislation?
7      A.  Yes.
8      Q.  Can you read the last paragraph of the press
9  release.
10     A.  Yes.
11     Q.  It says, "Texans have fought and died for the
12  principle of 'One Person, One Vote' and Republicans,
13  Independents and Democrats all agree that we must uphold
14  the integrity of our elections."  What is that -- what
15  does the reference to "One Person, One Vote" mean?
16     A.  Well --
17            MR. FREDERICK:  Objection, calls for
18  speculation.
19     A.  I don't know what he was thinking when he gave
20  that quote, specifically, but I think it's fair to say
21  that Texans have historically fought for the ability to
22  vote.
23     Q.  (By Ms. Berkower)  Why is there a need to
24  protect One Person, One Vote at this particular time
25  that this was released?

---

### 215

1            MR. FREDERICK:  Objection, calls for
2  speculation, assumes facts not in evidence.
3      A.  I don't think there is a need just for the
4  period of time this was issued.  I think we should
5  always hope to have an election system with integrity
6  that preserves One Person, One Vote.
7      Q.  (By Ms. Berkower)  At the time this was
8  released, though, was there a special need to protect
9  One Person, One Vote, that wasn't already being met?
10     A.  I don't know.
11     Q.  What was the threat that existed to One Person,
12  One Vote at the time that this was released?
13            MR. FREDERICK:  Objection, calls for
14  speculation.  Objection, calls for facts not in
15  evidence.
16     A.  I don't --
17            MR. FREDERICK:  I'm sorry, go ahead.
18     A.  I don't know that there -- there was a specific
19  threat.  I do think there was a perception that we could
20  make our voting system more reliable and -- and
21  uphold the integrity of one person and one vote.
22     Q.  Well, what was the basis for saying there's a
23  need to uphold the integrity of the elections?
24            MR. FREDERICK:  Objection, calls for
25  speculation.

---

### 216

1      A.  I think current law does not require a thorough
2  process for identifying to ensure -- identifying voters,
3  and this statement implies that legislation would
4  enhance that ability to ensure that one person is
5  actually registered to vote, and does vote, and not
6  somebody else voting for that person.
7      Q.  (By Ms. Berkower)  Are you aware of the notice
8  that the Lieutenant Governor gave to senators of the
9  convening of the Committee of the Whole?
10     A.  This letter, yes.
11     Q.  Do you know how much notice Lieutenant Governor
12  gave to senators of convening the Committee of the
13  Whole?
14     A.  It appears to be four or five days.
15     Q.  Are you aware of how this notice was delivered
16  to senators?
17     A.  I can tell you how, typically, we deliver a
18  notice like this.
19     Q.  How?
20     A.  We would have copies of the letters hand-
21  delivered to each of the senators with a signature sheet
22  to show that each of the senators' offices received
23  it.  Sometimes we put them on their desks on the Senate
24  Floor as well.  And then we'll mail a copy as well.
25     Q.  Do you ever slip notes -- slip the letter under

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

## 217

1 the door of the senators after hours?
2     A.  We do, but on a letter where it's a notice-type
3 letter, we would go back and make sure that there is
4 somebody signing for the letter.
5     Q.  Do you know if that's what happened in this
6 case?
7     A.  I am not aware.  We also fax them out to their
8 district and capital offices frequently.
9     Q.  You want to review this?  I'm not going to
10 introduce it as an exhibit but you can just take a look
11 and see if that refreshes your memory at all.
12         MS. BERKOWER:  I have a copy for you,
13 Matt.
14     Q.  (By Ms. Berkower) Are you done looking at the
15 letter?
16     A.  Yes.
17     Q.  Does this refresh your recollection as to
18 whether or not notice was slipped under the door of
19 senators after hours?
20     A.  Not really, no.  I don't know that that's what
21 happened.
22     Q.  Do you remember -- does this refresh your
23 recollection -- excuse me.  Does this refresh your
24 recollection as to whether senators had been excused
25 from being present in the Capital on the day that the

## 218

1 bill was going to be considered?
2     A.  That's not what this says.  This says they were
3 -- they left town on Thursday, not that they were
4 excused the next -- the 24th.
5     Q.  I think in the second paragraph it says he did
6 after the Senate -- the Senate unanimously passed
7 Senator Whitmire's resolution respectfully --
8 specifically authorizing all senators to be absent from
9 the Capital until Monday afternoon.
10     A.  Yes.  But you said on the day when the voter ID
11 was going to be heard, and they were not.
12     Q.  Well, they were excused from being absent until
13 Monday afternoon.
14         MR. FREDERICK:  Objection, form.  Is there
15 a question?
16     Q.  (By Ms. Berkower) Wasn't voter ID going to be
17 considered on Monday?
18     A.  Well, yes, but they're excused until Monday
19 afternoon.  That means they can be there on Monday.
20     Q.  Was there anything in the notice that
21 Lieutenant Governor sent that said the consideration of
22 SB 14 would be after everyone had returned on Monday
23 afternoon?
24     A.  No, but there was nothing that said otherwise.
25     Q.  But if they wanted to be sure -- if senators

## 219

1 wanted to be sure they would be -- they would be present
2 for consideration of SB 14, wouldn't they have to come
3 in on Monday?
4         MR. FREDERICK:  Objection, argumentative.
5 Objection, assumes facts not in evidence.
6     A.  Well, yes, but they are coming in.  They're
7 excused until Monday afternoon.
8     Q.  (By Ms. Berkower) But the SB 14 could have been
9 considered Monday morning; isn't that true?
10         MR. FREDERICK:  Objection, assumes facts
11 not in evidence.  Objection, relevance.
12     A.  I suppose so, but it's not -- this -- Senator
13 Whitmire's resolution, I would need to look at the words
14 of it, specifically.  But that's from excused for being
15 absent from the Senate Floor.  It does not reference
16 being absent from a Committee of the Whole.  They're two
17 different functions in the Senate.
18         So there were committee hearings happening
19 during the weekend and other committees were happening.
20 So this committee is treated the same way that other
21 committees were.
22     Q.  But doesn't the Committee of the Whole require
23 all the senators to be present?
24     A.  No, it doesn't require all the senators to be
25 present.  It's a committee meeting, it requires a simple

## 220

1 majority.
2     Q.  Are you aware that this -- that the procedure
3 for consideration of SB 14 differed from the notice
4 given in 2009 when senators were given more time to
5 prepare?
6         MR. FREDERICK:  Objection, assumes facts
7 not in evidence.
8     A.  Yeah, I would have to check those.  I don't
9 remember the timing.  I mean, I can read what she wrote
10 in her letter, I'd just need to check that.
11     Q.  (By Ms. Berkower) Well, what about from the
12 bill history.  I think you have that in front of you.
13 Could you look at the bill history and figure out if
14 there was more time given to prepare?
15     A.  From?
16     Q.  In 2009.
17         MR. FREDERICK:  Objection, vague.
18     A.  Well, there's a longer period of time between
19 the date it was referred to the Committee of the Whole
20 and the day that it was schedule for public hearing.
21     Q.  Do you know why a shorter time was allotted in
22 2011 than in 2009?
23         MR. FREDERICK:  Objection, assumes facts
24 not in evidence and calls for speculation.  I object on
25 basis of privilege to the extent this calls for

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



**221**

1  Lieutenant Governor or any legislator's thought process
2  or any privileged communications.
3        MS. BERKOWER:  I asked if she knew why
4  not, not why.
5        MR. FREDERICK:  Same objection.
6        If you can answer only the question of
7  whether or not you know why, you may do so.  But do not
8  reveal any privileged matters.
9     A.  I'm not -- I'm not privileged to know exactly
10 why.  So, no.
11    Q.  You don't know why?
12    A.  I don't know why.
13    Q.  Do you have any guess as to why?
14       MR. FREDERICK:  Objection, calls for
15 speculation.
16    A.  Yes.
17       MR. FREDERICK:  Relevance.
18    A.  But I'm not going to answer that.
19    Q.  (By Ms. Berkower) On the ground of privilege?
20    A.  On the ground of privilege.
21    Q.  Okay.
22       MS. BERKOWER:  This is Exhibit 5.
23       (Exhibit 5 remarked for this deposition.)
24    Q.  (By Ms. Berkower) Okay.
25    A.  This is as filed?

**222**

1     Q.  I believe so.  Oh, yeah, turn to the last
2  page.  I think that may answer your question.
3     A.  Okay.  Thank you.  Oh, this says finally
4  passed.
5     Q.  Do you recognize this?
6     A.  Well, yes.
7     Q.  What is it?
8     A.  It's Senate Bill 14 --
9     Q.  Are you familiar --
10    A.  -- as enrolled.
11    Q.  Are you familiar with its provisions?
12    A.  Yes, generally.
13    Q.  Could you compare SB 362 and SB 14, please?
14       MR. FREDERICK:  Objection, vague.
15    Q.  (By Ms. Berkower) Let's get them both out.
16 I'll go through questions with you.
17    A.  Here we go.
18    Q.  Turning to Section 63.0101, I think it's on
19 Page 9 in SB 14, and 5 on 362.  Can you compare any
20 differences in the forms of ID permitted in SB 14?
21    A.  Yes.
22    Q.  What are those?
23       MR. FREDERICK:  Objection, vague.
24 Objection, form.
25       You may answer, if you can answer.

**223**

1     A.  Okay.  The expirations have changed from two
2  years to 60 days and that's generally consistent through
3  the legislation.  And it allows for a concealed handgun
4  license that is expired for 60 days.
5     Q.  (By Ms. Berkower) Does SB 14 permit the use of
6  an ID issued by a federal agency?
7     A.  No, except of the federal government and
8  military ID.
9     Q.  Does SB 14 permit a voter to use an ID issued
10 by a Texas State agency, institution, or political
11 subdivision?
12    A.  No, it does not, except for those issued by the
13 DPS for concealed handgun licenses.
14    Q.  And driver's licenses?
15    A.  And driver's licenses, yes.
16    Q.  Does SB 14 permit any non-photo identification
17 to be used?
18    A.  No, it does not.
19    Q.  Does SB 362, turning to Page 7 of SB 362,
20 permit the use of identification cards used by a person
21 for obtaining public benefits including veterans
22 benefits, Medicaid or Medicare?
23    A.  No, it does not.  It does allow an exemption
24 for people who've been designated with a disability by
25 the federal government and veterans administration --

**224**

1     Q.  Well, I'm sorry to interrupt you.  I think I
2  was asking you does SB 362 allow -- allow a voter to use
3  a public benefits card, including a card issued by the
4  United States for veterans benefits, Medicaid or
5  Medicare, as one form of non-photo identification that's
6  permitted?
7     A.  Yes, it does.
8     Q.  And does SB 362 permit the use of a utility
9  bill, bank statement, government check, paycheck, or
10 other government document as a form of non-photo ID?
11 That's on Page 6.  There's a --
12    A.  Is it -- okay.
13    Q.  There on the bottom.
14    A.  Okay.  Then, yes.
15    Q.  Does SB 14 permit either of those forms of ID
16 to be used?
17    A.  No, it does not.
18    Q.  Does it permit any non-photo ID to be used?
19       MR. FREDERICK:  Objection, asked and
20 answered.
21       You may answer.
22    A.  No, it does not.  But it does allow provisional
23 voting for people who have a religious objection to
24 photography, consistently use that objection.
25    Q.  Why did the forms of permitted IDs change



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

225

1    between Senate Bill 362 and Senate Bill 14?
2            MR. FREDERICK:  Objection, legislative
3    privilege.
4            I instruct you not answer.
5            I also object on relevance grounds.
6        Q.  (By Ms. Berkower) What's the justification --
7    are you going to answer?
8        A.  No.
9        Q.  What's the justification for any change in the
10   form of permitted IDs?
11           MR. FREDERICK:  Objection, legislative
12   privilege.
13           Instruct you not to answer.
14       Q.  (By Ms. Berkower) Are you going to answer?
15       A.  No.
16       Q.  Why was non-photo ID no longer included as a
17   way voters could verify their identify in SB 14?
18           MR. FREDERICK:  Objection, legislative
19   privilege.
20           Instruct you not to answer.
21       A.  I won't answer that.
22       Q.  (By Ms. Berkower) Why was -- why is the -- for
23   purposes of expired ID, why does it have to be within 60
24   days of presentation?
25           MR. FREDERICK:  Objection, legislative

226

1    privilege.
2            Instruct you not to answer.
3        A.  I won't answer that, no.
4        Q.  (By Ms. Berkower) In your view, do any of these
5    changes to SB 14 make it a better bill than SB 362 --
6            MR. FREDERICK:  Object --
7        Q.  (By Ms. Berkower) -- for purposes of
8    accomplishing -- sorry, I lost my train of thought.
9    I'll start over.
10           Does the change in -- do any of these
11   changes between SB 362 and SB 14 make it more likely --
12   I'll ask something different.
13           Do you view these changes as a substantial
14   difference from the prior bills on voter ID filed in
15   2005, 2007 and 2009?
16           MR. FREDERICK:  Objection, relevance.
17   Objection, vague.
18       A.  Yes, I do.
19       Q.  (By Ms. Berkower) How are these substantial
20   changes?
21           MR. FREDERICK:  Objection, relevance.
22   Objection, vague.
23       A.  362 allowed non-photo ID.  14 only allows photo
24   ID except for some exceptions.
25       Q.  (By Ms. Berkower) What's the purpose of these

227

1    changes?
2            MR. FREDERICK:  Objection, legislative
3    privilege.
4            Instruct you not to answer.
5        A.  I won't answer that.
6        Q.  (By Ms. Berkower) Were you involved in
7    developing SB 14?
8        A.  I was involved with amendments to Senate Bill
9    14, but not in the original legislation.
10       Q.  Is that because Senator Fraser developed it
11   himself and filed it in November 2010?
12       A.  Yes.
13       Q.  Are you aware that the State of Texas in this
14   litigation identified you as someone who was involved in
15   developing SB 14?
16           MR. FREDERICK:  Objection, assumes facts
17   not in evidence.
18       A.  Yes.
19       Q.  (By Ms. Berkower) So how were you involved in
20   developing SB 14?
21       A.  Well, I just said I helped with amendments to
22   -- developing, to me, maybe I don't understand the
23   question.  It's different between the original filed
24   version of the bill and the actual bill as enrolled.
25   And this did go through some changes.  And I did help

228

1    make sure that the -- the documents were processed
2    appropriately from the committee stage to the Floor
3    stage, and then over to the House.  And then went
4    through the appropriate procedures for the Conference
5    Committee and ensuring that the appropriate paperwork
6    was done for the entire process.
7        Q.  That was your complete role in developing SB
8    14?
9        A.  Yes.  And ensuring that the Lieutenant Governor
10   was briefed on all of the issues and ensured that, you
11   know, people who needed information and copies of
12   amendments, got them.  Awful lot of procedural work.
13       Q.  Did you draft any of the amendments to SB 14?
14       A.  No, I did not personally draft any of them.
15       Q.  Who drafted them?
16       A.  I don't know.  Legislative counsel would have
17   drafted some.  Individual members drafted their own
18   amendments, or were responsible for them.  And our staff
19   could have helped draft some if they need to -- needed
20   help.
21       Q.  Did you say early that the Lieutenant Governor
22   has never actually introduced an amendment to a bill?
23       A.  I've never known him to, that I remember.
24       Q.  So when you said you worked on drafting
25   amendments, were you working -- who were you working


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

229

1    for?
2        A.   The senators frequently ask us to help draft
3    amendments.
4        Q.   Do you remember which senators you worked with?
5        A.   Senator Fraser, primarily.
6        Q.   How many amendments did you draft?
7        A.   I didn't draft any directly.  I watched, you
8    know, the process and ensured that the amendments --
9    quite frequently, an amendment will be submitted that
10   doesn't match the line number and the paragraph number
11   necessary to amend the appropriate place in the
12   legislation.  So we'll check those amendments and ensure
13   that they're accurate.  And we do that quite frequently
14   with legislation just to make sure the amendment falls
15   in the right place.
16       Q.   Did you ever use any models -- model
17   legislation from interest groups when you were working
18   on amendments?
19       A.   No.
20       Q.   Who else in your office was involved in
21   drafting and developing either the bill or any of its
22   amendments?
23       A.   Bryan Hebert.
24       Q.   Was he involved with Senator Fraser's office
25   before the bill was filed?

230

1        A.   I don't remember if he was involved before the
2    November 2010 filing, but he was involved after that.
3        Q.   How was he involved?
4        A.   He worked with their staff to see if there were
5    any support information they needed, any assistance they
6    need, and kept the Lieutenant Governor informed of the
7    contents of the legislation.
8        Q.   Did he ever consult with you about any
9    questions that arose during that process?
10       A.   Yes.
11       Q.   What did he ask you?
12          MR. FREDERICK:  Objection, legislative
13   privilege.
14          Instruct you not to answer.
15       A.   I can't answer that.
16       Q.   (By Ms. Berkower) At the time you were in --
17   well, during the development of SB 14, did you have any
18   communications about SB 14 with other current or former
19   legislators that had offered past voter ID bills?
20          MR. FREDERICK:  Objection, vague.
21          You can answer.
22       A.   Can you rephrase that?
23       Q.   (By Ms. Berkower) Sure.  Did you ever consult
24   with current or former legislators who had offered past
25   voter ID bills during the time that you worked on SB 14?

231

1        A.   Senator Fraser carried them all over in the
2    Senate with the exception of the first one that was not
3    picked up.  So, no, we only worked with his office.
4        Q.   Anyone from the House?
5        A.   No.  But Bryan Hebert may have been involved
6    with -- with them.
7        Q.   When you would talk to -- when your office
8    would communicate with Senator Fraser about SB 14, how
9    would you communicate with them?
10       A.   Mostly talked to him in person or to Janice
11   McCoy.
12       Q.   Did you have phone calls?
13       A.   Yes.
14       Q.   E-mails?
15       A.   Actually I don't remember any e-mails.
16       Q.   Did you speak with anybody else from Senator
17   Fraser's office other than him and Janice McCoy?
18       A.   Not unless I was calling to leave a message for
19   one of them to call me back.
20       Q.   Was what the substance of your communications?
21          MR. FREDERICK:  Objection, legislative
22   privilege.  Objection, vague.
23          I instruct you not to answer based on
24   privilege.
25       A.   Okay.  I can't answer that.

232

1        Q.   Did you communicate with officials or
2    legislators from other states about SB 14?
3        A.   When we were looking for people to testify in
4    the Committee of the Whole, we did call someone from
5    Indiana to do testimony.  And, you know, I made one of
6    those telephone calls.
7        Q.   You called the person from Indiana?
8        A.   Yeah, I called their office.  I wasn't the one
9    that was a primary contact for them though.
10       Q.   Who was the primary contact?
11       A.   I think Bryan ended up being the person, but we
12   were all just trying to help.
13       Q.   Did you communicate with anyone in Georgia?
14       A.   Not that I remember.
15       Q.   Did anyone else in your office?
16       A.   They could have.
17       Q.   Did you ever actually speak to the person from
18   Indiana?
19       A.   When he came to testify, yes.
20       Q.   What was the nature of your conversation?
21       A.   Oh, I think he was concerned about what we
22   thought that the Senate really wanted to hear.  And, I
23   mean, I remember having conversations about, "Tell them
24   how you implemented your legislations and if there were
25   any good things or any bad things about it or any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                             MAY 29, 2012

### 233

1   problems."  And out of -- the point was to get somebody
2   who had actually made voter ID legislation work, to talk
3   about what was necessary in order to make it work in
4   Texas.  So that if we had an opportunity to change the
5   legislation to make it easier to implement or more
6   effective, that we made those changes.
7       Q.  So did he focus primarily on how to implement
8   the law?
9       A.  That's my memory, yes.
10      Q.  Did you talk to him about any other topics
11  relating to voter ID?
12      A.  I don't remember that.
13      Q.  What did he tell you about how to implement the
14  law?
15      A.  Oh, I don't remember the specifics.  But I do
16  remember ensuring that there was sufficient voter
17  education in the legislation, and ensuring that -- that
18  we had funding in place to help the people who needed to
19  train the poll workers.  And I think there was just an
20  awful lot of discussion of adequate training for
21  everyone and adequate notice for everyone.
22      Q.  Does SB 14 provide for training of poll
23  workers?
24      A.  Yes.
25      Q.  Does it provide money for training the poll

### 234

1   workers?
2       A.  The bill itself doesn't but that happened
3   through different -- through the budget process.
4       Q.  Was any money allotted --
5       A.  Yes.
6       Q.  -- for poll worker training?
7       A.  I don't remember how it was divvied up but I
8   know there was money associated with the cost of the
9   implementation of this legislation and part of it had to
10  do with training and notice requirements for people.
11      Q.  Do you know how much money was set aside for
12  training and notice requirements?
13      A.  I don't remember.  I remember the total cost
14  was about 2 million dollars.
15      Q.  Do you know how much money was allotted in
16  Indiana for similar efforts?
17      A.  No.
18      Q.  Do you have any sense of how much media time 2
19  million dollars can buy state-wide in Texas?
20      A.  No.
21      Q.  Do you know whether more money has been
22  allotted for other educational -- voter education
23  efforts in past years in Texas?
24      A.  I know that there is quite a lot of money that
25  flows through the Help America Vote Act for education

### 235

1   for voters, but I don't know how much money that is.
2       Q.  Did you have any discussion about whether 2
3   million dollars would be enough money to provided
4   adequate education both for voters and for poll worker
5   training?
6       A.  My memory is that the Secretary of State
7   testified that it was.
8       Q.  Did you communicate about SB 14 with any
9   interest group?
10      A.  I don't remember, personally, communicating
11  with them.  I know we received letters and I know that
12  interest groups testified during the Committee of the
13  Whole process.
14      Q.  Did you have any communications with any groups
15  representing minority voters?
16      A.  Yes.
17      Q.  Who were they?
18      A.  I'm trying to remember.  MALDEF.  Lulac, I
19  would assume.  Seems like the League of Women Voters
20  also sent us a letter.
21      Q.  So when you said -- when I -- to be more
22  specific, did you ever meet with any of those groups, or
23  anyone from your office meet with anyone from those
24  groups?
25      A.  At some point we have.  I just don't remember

### 236

1   when.
2       Q.  What was the substance of what was discussed?
3           MS. BERKOWER:  Object on the basis of
4   legislative privilege.
5           I instruct you not to answer.
6       A.  Okay.  I can't answer that.
7       Q.  (By Ms. Berkower) Did you have communications
8   about SB 14 with constituents?
9       A.  Yes.
10      Q.  When did you have those communications?
11      A.  We received quite a lot of letters on this
12  issue, pro and con.
13      Q.  What do the letters in favor generally say?
14      A.  Generally, that they expect the legislature to
15  pass voter ID.
16      Q.  And you said you also received communications
17  from opponents of voter ID?
18      A.  Yes.
19      Q.  What were those opponents saying?
20      A.  Just, generally, that the letters feel that --
21  or the letter writers feel that voter ID would
22  disenfranchise voters.
23      Q.  Did you get any calls or e-mails from
24  constituents about voter ID?
25      A.  Our e-mail system I think of as our



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                           MAY 29, 2012

---

237

1    correspondence system, so, yes, that would happen
2    through the same process.  I, personally, did not
3    received any separate e-mails associated with that.
4         Q.  How did your office respond to communications
5    from constituents?
6         A.  We -- we respond with a letter.
7         Q.  Did you suggest or make any changes to the bill
8    based on input you got from constituents?
9         A.  I know that there were some changes made on the
10   Floor that -- on -- during Senate deliberation of
11   legislation, that was based on information that they
12   heard during the Committee of the Whole process.
13        Q.  What were those?
14        A.  I know there were some details associated with
15   free IDs -- voter ID -- I mean, the DPS allowing for
16   free voting IDs and how that would be handled.  Those
17   changes happen on the Floor and not in the Committee of
18   the Whole, though.
19        Q.  And that was in response to testimony or in
20   response to concerns raised by constituents?
21        A.  Well, they're the same.  Testimony is typically
22   from constituents as well.  I know that was part of the
23   discussion at some point.
24        Q.  Well, you said that there were also people
25   coming from out of state to testify?

---

238

1         A.  Yes.  But we had an awful lot of testimony from
2    people from in state as well.
3         Q.  Did you have communications about SB 14 with
4    any officials in the government -- sorry, Governor's
5    Office?
6         A.  Like I said, I know that they called to tell us
7    they were going to issue an emergency order with voter
8    ID in it but that was like immediately before issuing
9    it.  Other than that, I'm not aware of it.
10            Like I said, the Governor and the Speaker
11   and the Lieutenant Governor have weekly breakfasts, and
12   I'm sure they discussed the fact that that was going to
13   be an item coming up, at that breakfast, but I was not
14   there at the breakfast.
15        Q.  So if we wanted to know about any
16   communications about SB 14 between the Lieutenant
17   Governor and the Governor, would we need to ask either
18   the Lieutenant Governor or the Governor?
19        A.  Yes.
20            MR. FREDERICK:  Objection, calls for
21   speculation.
22        Q.  (By Ms. Berkower) Did you have communications
23   with any state or local election officials about SB 14?
24        A.  Yes.
25        Q.  Who?

---

239

1         A.  Let's see.  We talked to the Secretary of
2    State's Office, to Coby Shorter.  And I want to say that
3    we did have communications with some of the local
4    election officials about what would be required for
5    training and what sort of needs they might have to
6    implement the legislation.
7         Q.  Do you remember which local election officials
8    you spoke with?
9         A.  No.
10        Q.  Do you remember what counties they were from?
11        A.  I know we talked to someone from Harris
12   County.  I don't remember beyond that.
13        Q.  Was it George Hammerline?
14        A.  I remember that name, but I can't remember the
15   conversation.
16        Q.  Was it Skipper Wallace?
17        A.  I know we've talked to Skipper Wallace, yes.
18        Q.  What was the nature of your conversation with
19   the person you mentioned from the State, Colby?
20        A.  Coby Shorter is an Assistant Secretary of State
21   and he would have asked him, "How much money do you
22   need?  What kind of implementation efforts need to
23   happen?"  The Secretary of State's Office manages the
24   election for the state.
25        Q.  What did he tell you?

---

240

1             MR. FREDERICK:  I'm going to object.
2             And just caution you to not to reveal the
3    substance of any communication with the Secretary of
4    State's Office --
5             THE WITNESS:  Okay.
6             MR. FREDERICK:  -- directly involving
7    pending legislation.  You may, however, identify the
8    general subject matter of your conversations.
9         A.  Well, I think I already did.  What we would
10   have talked to them about is, "What do you need in order
11   to implement this?"  They were the people who developed
12   the fiscal note, or the request for the fiscal note, in
13   order to fund this.
14        Q.  Did you, for the Lieutenant Governor, exchange
15   any drafts of SB 14 or amendments with anyone?
16        A.  Prior to the amendments being heard on the
17   Floor, I think they asked the senators if they wanted to
18   distribute a packet.  And if the senators would like to
19   submit their amendments in advance, we put them in order
20   of where they fall in the bill and then distributed
21   those to the senators.  That was immediately prior to
22   the hearing on the Floor.  And it wasn't mandatory, it
23   was just an efficiency issue.
24            So we would have gathered the amendments
25   if they chose to submit them, put them into a packet in

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 241

1  order, and then distributed them out to the senators.
2  But that would not have been a public document that we
3  shared with other people.
4      Q.  It was just for senators and --
5      A.  Yes.
6      Q.  -- for their reference.
7      A.  It was an efficiency issue.
8      Q.  Other than that, did you ever exchange any
9  drafts of SB 14 amendments with anyone?
10     A.  Not that I remember other than -- Senator
11 Fraser had some amendments and I think we looked at
12 those amendments in advance.  Just as courtesy, he gave
13 us a copy of the amendments.
14     Q.  Did you make any changes to those amendments?
15     A.  Not that I remember.
16     Q.  Did SB 14 change during the drafting process?
17     A.  Okay.
18         MR. FREDERICK:  Objection, vague.
19     A.  Yeah, I -- it was drafted, filed, and then it's
20 not the drafting process, it's the legislative process.
21     Q.  Did SB 14 change during the legislative
22 process?
23     A.  Yes, it did.  It was amended.
24     Q.  In what ways was it amended?
25     A.  I don't remember the details of all the

### 242

1  amendments but I know there were some amendments that
2  dealt with the -- with the ID -- the free IDs.  I do --
3  that's my memory.  The process for -- for getting a free
4  ID and when you qualified for a free ID.  And then later
5  it changed in the House to remove one of the exemptions
6  for people over 70.  It changed that exemption to be
7  under certain situations.
8      Q.  And during the legislative process, did the
9  Lieutenant Governor, or anyone in his office, review any
10 reports or studies relating to voter ID identification?
11     MR. FREDERICK:  Objection.  I'm going to
12 object on the basis of privilege to the extent this
13 would ask you to reveal the substance of any
14 studies.  As to the specific question of whether anyone
15 did or did not review studies, you may answer
16     A.  I don't remember any studies.  I just don't
17 remember any studies.
18     Q.  (By Ms. Berkower) Did you consider including
19 any additional forms of ID in SB 14?
20     MR. FREDERICK:  Objection, relevance.
21 Objections, legislative privilege.
22         I instruct you not to answer that
23 question.
24     A.  I can't answer that question.
25     Q.  (By Ms. Berkower) You can't say yes or no?

### 243

1         MS. BERKOWER:  Matt?
2         MR. FREDERICK:  Yeah, I'm going stick to
3  the instruction on that one.
4      Q.  (By Ms. Berkower) Well, okay.  Did you consider
5  which forms of ID would be acceptable under SB 14?
6      A.  The Senate debated some additional forms of ID
7  publicly as amendments were offered.  But that's
8  different from me personally considering some additional
9  options for ID.
10     Q.  What about the Lieutenant Governor?
11        MR. FREDERICK:  Objection, vague.
12 Objection, form.  Also object on the basis of privilege.
13        And instruct you not to answer.
14     MS. BERKOWER:  I can re-ask.
15     MR. FREDERICK:  Okay.
16     Q.  (By Ms. Berkower) Do you know if the Lieutenant
17 Governor considered which forms of ID would be permitted
18 under SB 14?
19        MR. FREDERICK:  Object on the basis of
20 privilege.
21        You can answer the specific question
22 whether you know or not.  But do not reveal any of the
23 Lieutenant Governor's thought process or any
24 communications with him.
25     A.  He was certainly aware of the debate on

### 244

1  different options because he was presiding over the
2  Senate as that public debate took place.  But he doesn't
3  make amendments to legislation.
4      Q.  (By Ms. Berkower) If your photo ID has expired
5  but was validly issued, why doesn't that prove the
6  person is the same person on the ID?
7         MR. FREDERICK:  Objection, calls for
8  speculation.  Objection, argumentative.  And objection,
9  based on legislative privilege.
10        I would instruct you not to answer on the
11 basis of privilege.
12     A.  Okay, I can't answer that.
13     Q.  What about in your personal experience?
14        MR. FREDERICK:  Objection, vague.
15 Objection, form.  You can answer if you understand the
16        You can answer if you understand the
17 question.
18     Q.  (By Ms. Berkower) Do you want me to repeat it?
19     A.  No, I just want to bring up whether or not
20 anybody had a fake ID in college.  People change over a
21 period of time.  They age, you look different.  It's why
22 we have to redo our driver's licenses.  That's why we
23 have to redo our passports.
24     Q.  Okay.  So an expired license gives rise to
25 fraud, is that your --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER

MAY 29, 2012



### 245

1    A.   Yes, after a period of time.  People change.
2    Q.   But an unexpired license doesn't run that risk?
3         MR. FREDERICK:  Objection, misstates prior
4    testimony, form.
5    Q.   (By Ms. Berkower) Does having an unexpired
6    license reduce the risk that it will be -- reduce the
7    risk of fraud?
8         MR. FREDERICK:  Objection, relevance.
9    Objection, calls for speculation.  I would also object
10   on the basis of privilege to the extent it calls for any
11   thought process about pending legislation.
12        THE WITNESS:  Uh-huh.
13        MR. FREDERICK:  But if you can answer
14   without revealing that, you may do so.
15   A.   Personally, I think a new ID is more designed
16   -- more likely to look like the person who applied for
17   it than an old ID.
18   Q.   Are fakes IDs generally expired?
19        MR. FREDERICK:  Objection, relevance.
20   A.   I don't know.
21        MR. FREDERICK:  Calls for speculation.
22   A.   I don't know.
23   Q.   (By Ms. Berkower) How often in Texas do you
24   have to get your picture taken for a driver's license?
25   A.   Oh, let me think.  I know that you're supposed

### 246

1    to redo your driver's license every six years.  You are
2    not allowed to waive the photo requirement unless you're
3    over, I think, 18 or 19 -- 19, I believe, is correct.
4    And then you can only waive it one time.  So I would
5    think 12 years is the maximum.
6    Q.   That you can go before you have to have your
7    picture taken?
8    A.   That's my understanding, but I'm not absolutely
9    certain about that.
10   Q.   Can't you renew your driver's license by mail
11   though?
12   A.   Yes and online.
13   Q.   And driver's licenses are valid for a period of
14   years, right?
15   A.   Six years, yes.  That's my memory.  Unless
16   you're like a provisional voter, like, a 16 year-old --
17   I mean provisional driver like a 16 year-old or 15 year-
18   old, then those last for a shorter period of time.
19   Q.   Did you conduct any analysis, or anyone in your
20   office conduct any analysis as to how many registered
21   voters possess the required forms of ID required by SB
22   14.
23        MR. FREDERICK:  Objection, legislative
24   privilege.
25        I'm instructing not to answer.

### 247

1    A.   I'm sorry, I can't answer that.
2    Q.   (By Ms. Berkower) Did you conduct any analysis
3    to determine if minority voters would be
4    disproportionately less likely to perform -- possess the
5    forms of ID required in SB 14?
6         MR. FREDERICK:  Objection, legislative
7    privilege.
8         Instruct you not to answer.
9    A.   Sorry, I can't answer that.
10   Q.   (By Ms. Berkower) Janice McCoy testified in her
11   deposition that there were no studies at all that
12   analyzed who has an ID for purpose of SB 14, either
13   public or private?  Do you agree with that?
14        MR. FREDERICK:  Objection, assumes facts
15   not in evidence.  Objection, relevance.  Objection,
16   calls for speculation.
17        You may answer if you can.
18   A.   I'm not aware of any reports.
19   Q.   (By Ms. Berkower) That analyzed who has an ID
20   for purposes of SB 14?
21   A.   Yes.
22   Q.   What is a military ID?
23   A.   My understanding is that it's an ID issued to
24   people who served in the military.  Issued by the
25   federal government to people who have served in the

### 248

1    military.
2    Q.   Do you know how many different forms of
3    military ID there are?
4    A.   No, I don't.
5    Q.   Do you know how many different forms of
6    military ID are acceptable under SB 14?
7    A.   I think it's a generic military ID, so it would
8    be all of them.
9    Q.   Do you know whether the U.S. Military issues
10   IDs to non-citizens?
11   A.   No, I don't.
12   Q.   Do you know if the number of military IDs that
13   are acceptable under SB 14 is more or less than the
14   number of student IDs that would have been acceptable
15   under HB 218?
16        MR. FREDERICK:  Objection, relevance.
17   Objection, calls for speculation.
18   A.   I don't -- I don't know the numbers.
19   Q.   (By Ms. Berkower) Have you ever seen a military
20   -- a U.S. Military ID?
21   A.   Yes, I have.
22   Q.   Which one have you seen?
23   A.   While working on homeland security report, we
24   toured a number of military installations spaces,
25   different things, and I've seen plenty of military IDs



DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012



**249**

1  clipped on people or are used to get us into areas of
2  the military base.
3      Q.  Did you know that the U.S. Military issues IDs
4  to contractors?
5      A.  No.
6      MR. FREDERICK:  Objection, assumes facts
7  not in evidence.
8      You can answer.
9      A.  I was unaware of that.
10     Q.  (By Ms. Berkower) What is a citizenship
11  certificate?
12     A.  I don't know.
13     Q.  Do you know how much it cost to obtain one?
14     A.  No.
15     Q.  Have you ever seen one?
16     A.  No.
17     Q.  Do you know how much a replacement would cost?
18     A.  No.
19     Q.  Do you know what it might take to get a
20  replacement?
21     A.  I've applied for a passport recently, well, a
22  few years ago, and I remember there's a line for
23  citizenship certificates.  And I don't remember the
24  price, but it seems like it was 30 dollars.  I don't
25  remember.

**251**

1      Q.  Did the Lieutenant Governor contribute to that
2  decision in any way?
3      A.  In the initial filing, I don't think so.  In
4  the Senate Bill 14 filing, I do think so.  I mean, I
5  think he -- he agreed to allow that to be filed as it --
6  as it was originally filed.
7      Q.  So if the Lieutenant Governor had wanted to
8  include non-photo ID, would he have done something about
9  it?
10     MR. FREDERICK:  Objection, calls for
11  speculation.
12     A.  He could have.
13     Q.  (By Ms. Berkower) Do you think he would have if
14  he had wanted to include non-photo ID in the bill?
15     MR. FREDERICK:  Objection, calls for
16  speculation.
17     A.  I don't know.
18     Q.  (By Ms. Berkower) Would you have advised him
19  to?
20     MR. FREDERICK:  Objection, relevance.
21  Objection, calls for speculation.
22     A.  Not typically.  On something he knows an awful
23  lot about, that wasn't necessary.
24     Q.  How does the Lieutenant Governor know an awful
25  lot about voter ID?

**250**

1      Q.  Do you know how long it might take to get a
2  replacement citizenship certificate?
3      A.  No.
4      Q.  How much did it cost to get a U.S. passport
5  when you got one?
6      A.  I think I paid 70 dollars because I had it
7  expedited.
8      Q.  Do you know what documents you need to get a
9  passport?
10     A.  Yes.  I typically use my existing passport and
11  showed that to them again but I've also taken my
12  daughter in and it required both parents to sign a form
13  saying that she was our child and a birth certificate
14  and a social security card.
15     Q.  What was the purpose of removing from SB 14 the
16  option for a voter to show non-photo ID?
17     MR. FREDERICK:  Objection, legislative
18  privilege.
19     Instruct not to answer.
20     A.  I can't answer that.
21     Q.  (By Ms. Berkower) Who made the decision to
22  remove non-photo ID from SB 14?
23     A.  The bill sponsor, bill author.
24     Q.  Would that be Senator Fraser?
25     A.  Yes.

**252**

1      MR. FREDERICK:  Objection, legislative
2  privilege.
3      Instruct you not to answer.
4      A.  I'm sorry, I can't answer that.
5      Q.  (By Ms. Berkower) What changed between 2009 and
6  2011 that made two forms of non-photo ID an acceptable
7  option in 2009 but not in 2011?
8      MR. FREDERICK:  Objection, argumentative.
9  Objection, assumes facts not in evidence.  Also object
10  on the basis of legislative privilege.
11     Instruct you not to answer the question.
12     A.  I'm sorry, I can't answer that.
13     Q.  (By Ms. Berkower) You can't even answer about
14  public things, public evidence that -- of changes?
15     MS. BERKOWER:  Matt?
16     MR. FREDERICK:  If you want to rephrase
17  the question, I can alter my instruction.
18     Q.  (By Ms. Berkower) Okay.  Do you know of any
19  evidence that two forms of non-photo ID is no longer
20  enough in 2011?
21     MR. FREDERICK:  Objection, vague.
22  Objection, assumes facts not in evidence.  Objection,
23  argumentative.  Also object on the basis of privilege.
24     Instruct you not to answer except to the
25  extent that you can answer the specific question without



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

1  revealing privilege.
2      A.  I'm not aware.  I'm not aware of what changed.
3      Q.  (By Ms. Berkower) You're not aware of what
4  changed between 2009 and 2011?
5      A.  No.
6      Q.  Janice McCoy testified in her deposition that
7  what had happened between 2009 and 2011 was that things
8  had worked out well in Indiana and Georgia.  Do you
9  agree with that statement?
10         MR. FREDERICK:  Objection, assumes facts
11  not in evidence.  Objection, relevance.  Objection to
12  the extent it calls for thought process or privileged
13  communications.
14         To the extent you can answer without
15  revealing privileged matters, you can do so.
16     A.  I think that's -- Janice is in a position to
17  say how Senator Fraser was feeling when he filed the
18  legislation, and as such, I'm sure she's correct that's
19  what Senator Fraser was thinking.  But it's irrelevant
20  for the purposes of what I know.
21     Q.  (By Ms. Berkower) Do you know the purpose of
22  not allowing non-photo ID in SB 14?
23         MR. FREDERICK:  Objection on the basis of
24  legislative privilege and instruct you not to answer to
25  the extent it's a yes or no question.  Whether you know

254

1  the purpose, you may answer only to that extent.
2      A.  Yes, I think I know the purpose.
3      Q.  What is the purpose?
4         MR. FREDERICK:  Objection, legislative
5  privilege.
6         Instruct you not to answer.
7      A.  I can't answer that.
8      Q.  (By Ms. Berkower) What was the purpose of
9  removing from SB 14 the option for a voter to show a
10  state- or federal-issued photo ID as SB 362 allowed?
11         MR. FREDERICK:  Objection, legislative
12  privilege.
13         Instruct you not to answer.
14     A.  I can't answer that.
15     Q.  Do you know the purpose of removing those forms
16  of ID from SB 14?
17         MR. FREDERICK:  Object on the basis of
18  privilege.  Also object on relevance.
19         To the extent it's a yes or no question
20  whether you know, you may answer only to that extent.
21     A.  No, I don't know.
22     Q.  (By Ms. Berkower) Do you know of discussions
23  concerning the types of ID that would be permitted under
24  SB 14?
25         MR. FREDERICK:  Objection, vague.  Object

255

1  on the basis of privilege to the extent it calls for the
2  substance of any discussion.
3         You may answer only to the extent whether
4  you do know or do not know of such discussions.
5      A.  Can you restate the question?  I'm sorry.
6      Q.  Yes.  Yes.
7         MS. BERKOWER:  Actually, can you read it
8  back?
9      A.  I'm sorry.
10         (The requested portion was read by the
11  court reporter.)
12         MR. FREDERICK:  Same objection.
13     A.  Yeah, I think there was discussion after the
14  filing of the initial bill in November, and before the
15  filing of Senate Bill 14.
16     Q.  (By Ms. Berkower) Is this discussion between
17  the Lieutenant Governor or staff members and
18  legislators?
19     A.  Yes.
20     Q.  Which legislators?
21     A.  Senator Fraser.
22     Q.  Any others?
23     A.  Not that I'm aware of.
24     Q.  Were there also internal discussions in the
25  Lieutenant Governor's Office?

256

1      A.  I -- I think we briefed Governor Dewhurst on
2  the filing of Senator Fraser's original legislation to
3  the extent that happened, yes.
4      Q.  How would allowing the forms of ID permitted in
5  SB 362 prevent the goals of SB 14 from being met?
6         MR. FREDERICK:  Objection to the extent it
7  seeks her opinion.  I object on the grounds of
8  relevance.  Otherwise, I object on the grounds of
9  legislative privilege and would instruct you not to
10  answer.
11     A.  Okay, I can't answer that.
12     Q.  (By Ms. Berkower) Are you aware that the
13  Indiana photo ID allows for a wider range of IDs than SB
14  14 permits?
15         MR. FREDERICK:  Objection, assumes facts
16  not in evidence.
17         You may answer.
18     A.  I remember it having some additional forms of
19  ID but I don't remember what they are.
20     Q.  (By Ms. Berkower) Are you aware of whether
21  that's true with the Georgia photo ID?
22     A.  No, I'm not.
23         MS. BERKOWER:  Can we take a five-minute
24  break off the record?
25         MR. FREDERICK:  Sure.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012

---

257

1         (Recess from 2:29 to 2:38 p.m.)
2         Q.   (By Ms. Berkower)  Since we got that time
3    check, it seems we have an hour and 43 minutes left of
4    time, but I know Ms. Rathgeber needs to leave at 3:30.
5    Is there any flexibility with your plans?
6         A.   There is, but I'd appreciate it if you can get
7    it pretty close to 3:30.  It would very kind of you.
8         Q.   So if we just kept going straight with no more
9    breaks, would that be acceptable?
10        A.   That would be better for me if we could do
11   that.
12        Q.   Okay.  That's what we'll do.  Otherwise, if
13   it's a hard deadline, we could schedule another time to
14   finish.
15        A.   Well, I'd rather not come back.
16        Q.   Okay.
17        A.   While this has been delightful, I'd rather not.
18        Q.   Okay.  Well, then we'll just keep going all the
19   way through.
20        A.   And I haven't let out a "bless your heart" yet,
21   but I'm about to.  Oh, bless your heart.  You don't want
22   to do that to me. (laughing)
23        Q.   Okay.  I don't get that very often. (laughing)
24        MR. FREDERICK:  So just so I'm clear, are
25   we planning on going straight until 3:30?

---

258

1         MS. BERKOWER:  I think we're going to go
2    straight until we finish with the time or until we
3    finish with the questions, whichever comes first.  But
4    we will not take any further breaks unless something
5    unexpected happens.
6         MR. FREDERICK:  Okay.
7         MS. BERKOWER:  That seems to be okay with
8    Ms. Rathgeber.  Is that okay with you, Matt?
9         MR. FREDERICK:  Yeah, that's -- I mean
10   whatever is okay with the witness is fine with me.
11        Q.   (By Ms. Berkower)  Okay.  So getting back to SB
12   14.
13        A.   Uh-huh.
14        Q.   What was the purpose of removing from SB 14 the
15   option for a voter to show a valid employee ID as SB 362
16   allowed?
17        MR. FREDERICK:  Objection, legislative
18   privilege.  I instruct you not to answer.
19        A.   I can't answer that.
20        Q.   (By Ms. Berkower)  Do you know who made that
21   decision?
22        A.   Yes.
23        Q.   Who made that decision?
24        A.   Senator Fraser.
25        Q.   Did you have any discussions or anyone from

---

259

1    your office have any discussions about that decision
2    with him?
3         A.   Not that I'm aware of prior to his original
4    filing.  I'm sure -- I think there were discussions
5    about that issue about what was included and what was
6    not before he filed Senate Bill 14.
7         Q.   What about after he filed Senate Bill 14?
8         MR. FREDERICK:  Objection, form.
9    Objection, vague.
10        A.   Not that I remember.
11        Q.   (By Ms. Berkower)  What was the substance of
12   any discussions that you had?
13        MR. FREDERICK:  Objection, vague.
14   Objection, legislative privilege.
15        I instruct you not to answer.
16        A.   I can't answer that.
17        Q.   (By Ms. Berkower)  What were the circumstances
18   by which the license to carry concealed handgun were
19   included in SB 14?
20        MR. FREDERICK:  Object on the grounds of
21   privilege.  To the extent it requires you to disclose
22   thought process or communications, if you can describe
23   the general circumstances without doing that, you may
24   answer.
25        A.   I think it was a -- the concealed handgun

---

260

1    license had been included in previous drafts, and there
2    was a thought that because of the DPS background check
3    associated with it, that it was a higher form of ID, and
4    therefore, would be perfect to include.
5         Q.   Did you say a higher form of ID?
6         A.   A more strenuous form of ID.
7         Q.   What does that mean exactly?
8         A.   That you had to meet certain requirements in
9    order to get a concealed handgun license that were even
10   more onerous than a driver's license.
11        Q.   Do you know what those additional requirements
12   are?
13        A.   I don't remember all of them.
14        Q.   Do you know the racial composition of license
15   to carry holders?
16        A.   No.
17        MR. FREDERICK:  Objection, relevance.
18        You can answer.
19        A.   No, I don't.
20        Q.   (By Ms. Berkower)  Is it disproportionately
21   White relative to Texas registered voters?
22        MR. FREDERICK:  Objection, relevance.
23        A.   I don't know.
24        Q.   (By Ms. Berkower)  Are you aware of any
25   legislator or staff who suspected that TLC holders are

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012



261

1    disproportionately White?
2          MR. FREDERICK:  Objection, relevance.
3    Objection, calls for speculation.
4       A.  I'm not aware of that issue.
5       Q.  (By Ms. Berkower)  As an attorney, did you have
6    any concern that it might create an appearance that the
7    law was enacted with discriminatory purpose?
8          MR. FREDERICK:  Objection, relevance.
9       A.  I've been inactive with my legal license for a
10   couple of years, so it would be inappropriate for me to
11   be acting as an attorney during the period of time that
12   this bill was being heard.
13      Q.  (By Ms. Berkower)  Well, I'm not asking you to
14   act as an attorney.  I'm just saying that you've had --
15   with the legal training that you do have, did this --
16   did the fact that TLC holders are disproportionately
17   White raise any concerns in your mind that the law may
18   be viewed as an act of discriminatory purpose?
19         MR. FREDERICK:  Object, assumes facts not
20   in evidence.  Object to relevance.  I also object to the
21   extent it seeks her mental process or impressions about
22   the act.
23         I instruct you not to answer on the basis
24   of privilege.
25      A.  I can't answer that.

262

1       Q.  (By Ms. Berkower)  Did anyone conduct a
2    research into the racial composition of TLC -- of
3    license to carry holders?
4          MR. FREDERICK:  Objection, vague.  You may
5    answer if you know.
6       A.  I'm not aware of that data.  I was not aware of
7    that.
8       Q.  (By Ms. Berkower)  How did the exception for
9    individuals with disabilities come to be included in SB
10   14?
11         MR. FREDERICK:  Objection to the extent it
12   calls for you to reveal any legislator's thought process
13   or staff members for a privileged communication that you
14   may answer to the extent you can do so without revealing
15   privileged matters.
16      A.  I remember general discussions of people who
17   would not be able to go outside their homes or living
18   spaces in order to get the appropriate ID in which to
19   vote.  And one of the discussions -- one had -- some of
20   the discussions center around people who were disabled
21   or so significantly disabled that it would be hard to
22   transport them to a place to get the appropriate
23   identification, whether it was a driver's license or a
24   voter ID or any other ID.  And so I think that was the
25   justification.

263

1       Q.  (By Ms. Berkower)  Were there any similar
2    concerns about people who didn't have the financial
3    resources to get themselves to a location where they
4    could get appropriate ID?
5          MR. FREDERICK:  Object on the basis of
6    privilege to the extent it seeks thought process.
7          I will instruct you not to answer on the
8    basis of privilege.
9       A.  I'm sorry.  I can't answer that.
10      Q.  (By Ms. Berkower)  Why didn't the SB 14 include
11   the use of student IDs?
12         MR. FREDERICK:  Objection, legislative
13   privilege.
14         I instruct you not to answer.
15      A.  I can't answer that.
16      Q.  (By Ms. Berkower)  Wasn't it allowed in the
17   previous voter ID bills?
18         MR. FREDERICK:  Objection, relevance.
19   Objection, argumentative.
20      A.  It was allowed in some of the previous bills.
21   I don't remember if it was in 363 or not, or 362 or not.
22      Q.  (By Ms. Berkower)  Was there some change in
23   circumstance between 2009 and 2011 that made student IDs
24   less reliable in some way?
25         MR. FREDERICK:  Objection.  Object on the

264

1    basis of relevance.  Object on the basis of legislative
2    privilege.
3          I instruct you not to answer.
4       A.  I'm sorry.  I can't answer that.
5       Q.  (By Ms. Berkower)  Was there any publicly known
6    reason that student IDs were less reliable in 2009 --
7    I'm sorry, in 2011 than in 2009?
8       A.  Not that I'm aware of.  But I'm not certain
9    they were included in 362, student IDs were a specific
10   inclusion to the 362.  I think only to the extent that
11   you could argue that a valid identification card issued
12   by an institution or political subdivision of the state,
13   which would apply only to those state -- those people
14   attending state institutions as opposed to private
15   colleges.
16      Q.  How many state institutions does Texas have?
17      A.  I don't remember.  Counting community colleges
18   is about 60.
19      Q.  Do you know how many students are enrolled in
20   those schools?
21      A.  No, I don't.
22      Q.  Is it more than a thousand?
23      A.  Yes.
24      Q.  Is it more than 10,000?
25      A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012

---

**265**

1    Q.  Is it more than a hundred thousand?
2         MR. FREDERICK:  Object.  Calls for
3    speculation.
4         You may answer if you know but don't
5    speculate.
6    A.  I know there are more than a hundred thousand
7    students enrolled in higher education in Texas.  I don't
8    know how many of them are Texas residents.
9    Q.  (By Ms. Berkower)  Can you get Texas residency
10   if you're enrolled as a student in a school of higher
11   learning in Texas?
12   A.  Under situations where you've served in the
13   military or lived in the state for a set period of time,
14   there are some exceptions that allow for state
15   residency.  But they're -- they're more limited than --
16   I don't know.  There are some situations where you can
17   get residency, yes.
18   Q.  Was there any concern that you knew of that
19   failure to include student IDs might disproportionately
20   impact minority voters?
21        MR. FREDERICK:  Objection, legislative
22   privilege.
23        Instruct you not to answer.
24   A.  I can't answer that.
25   Q.  (By Ms. Berkower)  Do you know if any analysis

---

**266**

1    was conducted to determine the effect of excluding
2    student IDs?
3         MR. FREDERICK:  Objection, legislative
4    privilege.
5         Instruct you not to answer.
6    A.  I can't answer that.
7    Q.  (By Ms. Berkower)  Did you have any concern,
8    given your legal training, that it might create an
9    appearance that the law was enacted with a
10   discriminatory purpose?
11        MR. FREDERICK:  Objection, vague.
12   Objection, relevance.  Objection, legislative privilege.
13        Instruct you not to answer.
14   A.  I can't answer that.
15   Q.  (By Ms. Berkower)  How did the exception for
16   individuals with religious objections to being
17   photographed come to be included in SB 14?
18        MR. FREDERICK:  Object to legislative
19   privilege, but if you can answer without revealing
20   privileged matters or communications, you may do so.
21   A.  My memory is that there was discussion about
22   people who refused to have their photo taken under any
23   situation, and the general consensus from the senators
24   was that those people should not be excluded from voting
25   if their objection was a habit that they had and -- I

---

**267**

1    mean that it -- it was relevant more than once in their
2    lives, that they had a habit of refusing to have their
3    photo taken for religious objections, that those people
4    should not be excluded from voting.  And so they set
5    forth a process that those people could vote.
6    Q.  (By Ms. Berkower)  Why is it that some changes
7    in response to concerns raised about SB 14 and the types
8    of identification permitted were taken into account and
9    others were not?
10        MR. FREDERICK:  Objection, assumes facts
11   not in evidence, calls for speculation, and object on
12   legislative privilege and instruct you not to answer.
13   A.  I can't answer that.
14   Q.  (By Ms. Berkower)  Well, you just said the
15   legislature made modifications to SB 14 for persons with
16   disabilities, correct?
17   A.  Correct.
18   Q.  The legislature made modifications to SB 14 for
19   persons with particular religious beliefs regarding
20   photography, did they not?
21   A.  Yes.
22   Q.  Did the legislature make modifications to SB 14
23   based on concerns pertaining to racial and ethnic
24   minorities?
25        MR. FREDERICK:  Objection, legislative

---

**268**

1    privilege.
2         Instruct you not to answer.
3    A.  I can't answer that.
4         MS. BERKOWER:  She can't answer yes or no?
5         MR. FREDERICK:  No, she can't, because it
6    implies that -- it implies a thought process.  The
7    concern is identified in the question.
8         MS. BERKOWER:  It doesn't say -- okay.
9    Q.  (By Ms. Berkower)  Can you describe the
10   provisions in the bill pertaining to administration of
11   the ID requirement at the polls?
12        MR. FREDERICK:  Objection, vague.
13        You can answer.
14   A.  Yeah.  I don't know that I understand that.
15   Q.  (By Ms. Berkower)  Well, we can turn to that
16   section.
17   A.  That would be helpful.  Thank you.
18   Q.  I think it's on Page 5.
19   A.  Okay.
20   Q.  Item C.
21   A.  Uh-huh.  Yes.
22   Q.  So why were so few specifics included in the
23   bill about how the new requirement would be implemented
24   at the polls?
25        MR. FREDERICK:  Objection, vague.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 269

1  Objection, speculation.  Objection, legislative
2  privilege.
3      Instruct you not to answer.
4      A.  I'm sorry.  I can't answer that.
5      Q.  (By Ms. Berkower)  Doesn't the success of the
6  bill hinge on proper administration of the polls?
7      MR. FREDERICK:  Objection, argumentative.
8  Objection, calls for speculation.  Objection, relevance.
9      Q.  (By Ms. Berkower)  You can answer.
10     A.  It's typical in legislation to set forth the
11  objective and then allow the agency that administers it
12  to determine what specifically needs to happen through
13  the rule-making process, which is also a public process,
14  and how to implement it.  The legislature understands
15  that they don't know everything, and the people closest
16  to administering it would be the best ones to determine
17  how that should happen.
18     Q.  Well, if that's the case, then why were you in
19  the best position to determine which type of
20  identification should be used?
21     MR. FREDERICK:  Objection, argumentative.
22  Objection, assumes facts not in evidence.
23  Mischaracterizes the prior testimony.  And also calls
24  for legislative privilege.
25     I would instruct you not to answer on the

## 270

1  basis of privilege.
2      A.  I can't answer.
3      Q.  (By Ms. Berkower)  Why didn't the legislature
4  take more steps to specify how poll workers would
5  determine whether the voter had presented an ID that
6  proved their identity?
7      MR. FREDERICK:  Objection, legislative
8  privilege.
9      Instruct you not to answer.
10     A.  I can't answer that.
11     Q.  (By Ms. Berkower)  How was the election
12  identification certificate provision in SB 14 developed?
13     MR. FREDERICK:  Object to the extent it
14  calls for thought process, mental impressions or
15  communications involving specific legislators about
16  pending legislation.
17     If you can answer without revealing
18  privileged matters, you can do so.
19     A.  Which one are you asking about, the --
20     Q.  (By Ms. Berkower)  The election identification
21  certificate.  Do you mean which section?
22     A.  Yeah.  Oh, here it is on 13.  There was a
23  concern or my memory is there was discussion on the
24  Senate floor after testimony that there are people who
25  could not for some reason or another get an ID of one of

## 271

1  the other types, and that there ought to be at least one
2  option that allowed people to get a certificate if they
3  couldn't get the appropriate other identification.  And
4  so they developed a process for creating a specific
5  identification certificate for the purposes of voting.
6      Q.  Did you or anyone in the Lieutenant Governor's
7  office play a role in drafting that provision?
8      A.  I did not.
9      Q.  Do you know what it was modeled on?
10     A.  I do not.
11     Q.  Are you aware of any concerns about this
12  certificate and the difficulty it might -- the
13  difficulty in obtaining it?
14     MR. FREDERICK:  Objection, vague.
15     A.  I'm not aware of what the difficulty would be.
16     Q.  (By Ms. Berkower)  Well, I guess, are you aware
17  of any concerns that the certificate may be difficult
18  for people to obtain?
19     MR. FREDERICK:  Object on legislative
20  privilege to the extent this calls for confidential or
21  nonpublic communications among legislators or
22  legislative thought process.  If you're aware of
23  nonprivileged communications, you may answer the question.
24     A.  There was public discussion on the Senate floor
25  about insuring that there was not a fee for the election

## 272

1  identification certificate.  There was some discussion
2  about whether or not having an election identification
3  certificate was equivalent to a poll tax, and therefore,
4  it was made free so that it would never be considered a
5  poll tax for people, for voters.
6      Q.  (By Ms. Berkower)  Do you know of any nonpublic
7  conversations about any concerns with the certificate?
8      MR. FREDERICK:  Object on the basis of
9  legislative privilege.
10     Instruct you not to answer.
11     A.  I'm sorry.  I can't answer that.
12     Q.  (By Ms. Berkower)  Do you know the average
13  distance to drivers -- to DPS offices in Texas?
14     A.  No.
15     MR. FREDERICK:  Objection, relevance.
16     A.  No, I don't.
17     Q.  (By Ms. Berkower)  Do you know if it's the same
18  in rural and urban areas?
19     MR. FREDERICK:  Objection, relevance.  You
20  may answer.
21     A.  I would assume it was less in urban areas than
22  rural areas, but I don't that for a fact.
23     Q.  (By Ms. Berkower)  Is there a DPS office in
24  every county?
25     A.  I don't think so.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 273

1    Q.  Is there public transportation to all DPS
2    offices?
3    A.  I don't know.
4    Q.  Do you know what the wait time is at DPS
5    offices on average?
6    A.  I know it varies by DPS office.
7    Q.  Do you know about how long it is?
8    A.  I know that they're trying to achieve an
9    objective level, and I don't know what that level is.  I
10   think it's 20 minutes, but I think they're exceeding
11   that at this moment.
12   Q.  Have you ever spent only 20 minutes at a DPS
13   office?
14   A.  Yes, I have.
15   Q.  When was that?
16   A.  Last time I renewed my driver's license.
17   Q.  Where did you go?
18   A.  The DPS had an office that was downtown, and I
19   went and renewed my driver's license, and it took about
20   five minutes.
21   Q.  Downtown here in Austin?
22   A.  Yes.  It's been since closed.
23   Q.  It since closed that office?
24   A.  Uh-huh.
25   Q.  Too few customers?

## 274

1    A.  Could be.
2    Q.  Do you know what the cost of obtaining the
3    underlying documents needed to get an election
4    identification certificate is?
5    A.  No, I don't.
6    Q.  Did you ever hear any of these kinds of issues
7    raised when the bill was being debated in the Senate?
8    A.  I remember a discussion about whether or not
9    the certificate itself cost money, but I don't remember
10   any other discussion about it.
11   Q.  Did you conduct any analysis on these issues?
12   MR. FREDERICK:  Objection, legislative
13   privilege.
14   Instruct you not to answer.
15   A.  I'm sorry.  I can't answer that.
16   Q.  (By Ms. Berkower)  Do you know of any analysis
17   that was conducted on these issues?
18   MR. FREDERICK:  Objection, vague.
19   Also instruct you not to answer on the
20   basis privilege.
21   A.  Not that I remember.  I'm sorry.  I can't
22   answer that.
23   Q.  (By Ms. Berkower)  During the legislative
24   drafting process or the legislature's consideration of
25   SB 14, do you know of any analysis of costs or steps a

## 275

1    voter would need to take to obtain one of these
2    certificates?
3    MR. FREDERICK:  Objection, legislative
4    privilege.
5    Instruct you not to answer.
6    A.  I'm sorry.  I can't answer that.
7    Q.(By Ms. Berkower)  Do you know what documents are
8    needed to obtain an election identification certificate?
9    A.  No.  I'm reading that right now.
10   Q.  But you're not generally familiar with which
11   document?
12   A.  No.  I don't remember.
13   Q.  If the documents that you need to show to get
14   an ID are not themselves free, doesn't that mean the ID
15   itself isn't really free?
16   MR. FREDERICK:  Objection, argumentative.
17   Objection, assumes facts not in evidence.  You may
18   answer.
19   A.  I don't think so.  I think there's a difference
20   between the components of an issue and the actual issue
21   itself.  I mean, I drive myself to work each day, and I
22   don't have -- I don't get paid for my car or my gas in
23   order to get to work, but I get paid for the work I
24   do.  To me, I'm still not getting paid for that
25   transportation to get to work.  I don't see the

## 276

1    components as being necessary to valuing the whole.
2    Q.  (By Ms. Berkower)  Would you take a job where
3    it cost more to get to work than you were paid?
4    MR. FREDERICK:  Objection, relevance.
5    A.  I don't think so.
6    Q.  (By Ms. Berkower)  So if you have to pay -- if
7    you have to pay for documents that you need to get one
8    of these certificates --
9    A.  Uh-huh.
10   Q.  -- doesn't that mean the certificate itself
11   isn't actually free given the underlying costs?
12   MR. FREDERICK:  Objection, argumentative.
13   A.  I don't think I agree with that logic.  I
14   really just don't.  I think that some of these documents
15   could be things that you have from your family or that
16   you didn't pay for in order to get it.
17   Q.  (By Ms. Berkower)  But what if you didn't have
18   any of those to begin with and you had to buy
19   replacements from the state?
20   A.  But if you did, it would be free.
21   Q.  But if you don't, would it still be free?
22   MR. FREDERICK:  Objection, argumentative.
23   A.  I just don't see that as a cost for getting the
24   certificate.
25   Q.  (By Ms. Berkower)  Well, what if you weren't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

277

1    born in at a hospital, then --
2         MR. FREDERICK: Objection. Sorry.
3         Q.  (By Ms. Berkower)  -- and you had to buy a copy
4    of your birth certificate in order to get a replacement
5    copy in order to get the election certificate --
6    information certificate.  Doesn't that mean you're
7    effectively paying for the election certificate?
8         MR. FREDERICK: Objection.
9    argumentative.  Objection, calls for speculation.
10        You may answer if you can.
11        A.  I think there's a process at DHS for -- for
12   getting free copies of your birth certificate.  You
13   can't get an unlimited number of them, but you can get
14   some free ones.
15        Q.  (By Ms. Berkower)  What if it's not free
16   though?
17        MR. FREDERICK: Objection, vague.
18   Objection, form.
19        A.  Then it's not free.
20        MR. FREDERICK: You can answer if you can.
21        Q.  (By Ms. Berkower)  If the documents you need to
22   get an ID are not themselves free, wouldn't that mean
23   there's a cost to voting for those who lack the
24   necessary underlying documents?
25        MR. FREDERICK: Objection, argumentative.

---

278

1    Objection, assumes facts not in evidence.
2         You may answer if you can.
3         A.  I just can't answer that question.  I don't
4    think that's an equivalency.
5         Q.  (By Ms. Berkower)  And it's not an equivalency
6    why?
7         MR. FREDERICK: Objection, form.
8         A.  The fact that you have to pay for something in
9    order to get something else doesn't mean that that
10   something else is actually costing you something,
11   particularly if there are alternatives for achieving
12   that -- that third item.  I just don't see that as a --
13   as a given.  There may be situations where somebody has
14   to spend money in order to obtain a free certificate, but
15   there may be plenty of situations where they're not.
16   That doesn't make the certificate cost money.
17        Q.  (By Ms. Berkower)  Not even for the people who
18   had to pay for the underlying document?
19        MR. FREDERICK: Objection, form.
20        A.  The certificate itself doesn't cost money.  The
21   things required in order to obtain the certificate may
22   cost money.  I do think there's a difference.
23        Q.  (By Ms. Berkower)  Do you know whether Whites,
24   Hispanics or Blacks or any other group are more likely
25   not to have the necessary ID to get one of these

---

279

1    certificates?
2         MR. FREDERICK: Objection.
3         To the extent this calls for your mental
4    impressions or thought process about SB 14 as pending, I
5    would instruct you not to answer on the basis
6    privilege.  Otherwise, I would object based on
7    relevance.  And to the extent you can answer without
8    disclosing privileged information, you can, if you're
9    able to.
10        A.  I don't -- I don't know the statistics on who
11   has IDs and who doesn't.
12        Q.  (By Ms. Berkower)  Did you ever ask?
13        MR. FREDERICK: Objection,
14   form.  Objection, vague.
15        Also instruct you not to answer on the
16   basis of privilege.
17        A.  I'm sorry.  I can't answer that.
18        Q.  (By Ms. Berkower)  Where does one obtain an
19   election identification certificate?
20        A.  I think you can get them from the DPS.
21        Q.  Does SB 14 require employers to provide paid
22   leave to obtain one of these IDs?
23        A.  Not that I'm aware of.
24        Q.  Do some individuals in Texas live at least 50
25   miles from a driver's license office?

---

280

1         A.  I don't know.
2         Q.  How much does gas currently cost per gallon in
3    Texas in your experience?
4         A.  About 3.60.
5         Q.  So how much would it cost at a minimum to drive
6    the hundred miles round trip?
7         MR. FREDERICK: Objection, vague.
8    Objection, calls for speculation.  Objection, relevance.
9         A.  I think it depends on how far your car goes.
10   If you have a Prius, I mean, it doesn't cost too
11   much.  But I do think your point is taken, it costs
12   money to drive somewhere.
13        Q.  (By Ms. Berkower)  Do you have a copy of your
14   birth certificate?
15        A.  Yes, I do.
16        Q.  Where would you get a copy if you lost it?
17        A.  The DHS, Department of Human Services.
18        Q.  Do you know how much that would cost?
19        A.  No, I don't.
20        Q.  Do you know how long it would take?
21        A.  I've done it before, and it seems like to me I
22   called them and picked it up in an afternoon.
23        Q.  How would you go about finding out where to go
24   and how much it cost if you didn't know?
25        A.  All that information is online.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 281

1    Q.   Was any part of the purpose of SB 14 to
2  decrease the number of Hispanic voters?
3         MR. FREDERICK:  Objection, to the extent
4  this calls for you to reveal anyone's thought process or
5  communications, but to the extent it only seeks
6  information about the purpose of the bill itself, you
7  may answer.
8    A.   Not that I'm aware of.
9    Q.   (By Ms. Berkower)  Was any part of the purpose
10  of SB 14 to decrease the number of any other groups of
11  minority voters?
12         MR. FREDERICK:  Same instruction.
13    A.   Not that I'm aware of.
14    Q.   (By Ms. Berkower)  Was any part of the purpose
15  of SB 14 to prevent illegal aliens from voting?
16         MR. FREDERICK:  Same instruction.
17    A.   Not that I'm aware of.  Although I'm aware of
18  representative Brown's quote on the floor in the House,
19  so she may have had that intent, but that was not the
20  intent in the Senate as I'm aware of.
21    Q.   (By Ms. Berkower)  Was it an intent of
22  Lieutenant Governor Dewhurst?
23         MR. FREDERICK:  Objection, relevance.
24  Objection, legislative privilege.
25         Instruct you not to answer.

## 282

1    A.   I'm sorry.  I can't answer that.
2    Q.   (By Ms. Berkower)  Was any part of the purpose
3  of SB 14 to discriminate in any way against a group or
4  groups of minority voters?
5         MR. FREDERICK:  Just give you the same
6  cautionary instruction.  You may testify about the
7  purpose.
8    A.   Not that I'm aware of.
9    Q.   (By Ms. Berkower)  Was any part of the purpose
10  of SB 14 for partisan purposes?
11         MR. FREDERICK:  Same instruction.
12    A.   What do you mean by that?
13    Q.   (By Ms. Berkower)  Well, was any part of the
14  purpose to depress democratic participation --
15  Democrats' participation in elections to further the
16  partisan interests of Republican candidates?
17         MR. FREDERICK:  Same instruction.
18    A.   Oh, not that I'm aware of.
19    Q.   (By Ms. Berkower)  So, in your view, what was
20  the purpose of SB 14?
21    A.   As I've said before, to ensure the integrity of
22  the voting process, to make sure that the person voting
23  is actually the person that they say they are on the
24  voter registration.
25    Q.   Is that -- is that every purpose of SB 14?

## 283

1    A.   Yes, plus the ability to increase voter
2  confidence in the security of the voting process.
3    Q.   Did the purpose of photo ID in Texas evolve
4  over time between legislative sessions?
5         MR. FREDERICK:  Objection.  To the extent
6  that calls for legislative subjective understanding and
7  thought process, I instruct you not to answer.
8    A.   I would say, obviously, the bill drafts changed
9  over a period of time, so, yes, it changed over a period
10  of time.
11    Q.   (By Ms. Berkower)  But did the purpose of the
12  laws change over time?
13    A.   Not from my perspective, no.
14    Q.   Was it always to prevent in-person voter fraud?
15    A.   Yes, I think so.
16    Q.   Was it ever to prevent illegal aliens from
17  voting?
18    A.   Not from my perspective, but I know that there
19  may be people who have said that.
20    Q.   Lieutenant Governor, though, has consistently
21  indicated in his public statements that one of the
22  purposes was to prevent noncitizens from voting.  Can
23  you explain that?
24         MR. FREDERICK:  Objection, calls for
25  speculation.  Also object to the extent that it calls

## 284

1  for the Lieutenant Governor's thought process about
2  pending legislation.  I would instruct you not to
3  answer.
4    A.   I'm sorry.  I can't answer that.
5         MS. BERKOWER:  Some of those statements
6  were public statements.  Matt, she can't answer about
7  the public statements, why he said in public that the
8  purpose was to prevent noncitizens from voting?
9         MR. FREDERICK:  Well, first of all, I
10  don't think she can because she doesn't know what he's
11  thinking.  But to the extent that that question would
12  call for her to reveal his internal thought process
13  about pending legislation, yes, I think that would be
14  privileged.
15    Q.   (By Ms. Berkower)  So you're not answering?
16    A.   No.  I'm not answering.
17    Q.   If we wanted to know why the Lieutenant
18  Governor consistently indicates that one of the purposes
19  of SB 14 was to prevent noncitizens from voting, would
20  we need to ask him?
21         MR. FREDERICK:  Objection, relevance.
22    Q.   (By Ms. Berkower)  You may answer.
23    A.   Yes.
24    Q.   Do you know of any evidence that in-person
25  voter impersonation is a problem?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

285

1       A.  I know that there was some testimony to that
2   effect during the Committee of the Whole process of the
3   Senate floor discussion, but I don't remember the
4   specifics.
5       Q.  Do you know of any studies that documented a
6   widespread problem?
7       MR. FREDERICK:  Objection, vague.
8       Also instruct you not to reveal any
9   confidential communication or investigation by the
10  Lieutenant Governor, but to the extent you can answer
11  without doing that, you may answer.
12      A.  The discussion I remember having was held in
13  public session on the floor.
14      Q.  (By Ms. Berkower)  Are you aware of any
15  incidents, specific incidents of in-person voter fraud
16  in the state of Texas in the last 20 years?
17      A.  I've read newspaper articles that describe
18  voter fraud, but I don't know the specifics.
19      Q.  Do you know of any incidents of mail-in ballot
20  fraud that have occurred in the state of Texas in the
21  last 20 years?
22      A.  Again, I've read newspaper articles that
23  discussed mail-in voter fraud and in-voter registration
24  fraud over the past 20 years or so, but I don't remember
25  the specifics.

---

286

1       Q.  Why was it not a sufficient deterrent to voter
2   fraud to increase criminal penalties?
3       MR. FREDERICK:  Objection, legislative
4   privilege.
5       Instruct you not to answer.
6       A.  I'm sorry.  I can't answer that.
7       Q.  (By Ms. Berkower)  Do you know if the increase
8   in criminal penalties that SB 14 be included are
9   currently in effect?
10      A.  Yes.  The bill's not in effect because it's
11  undergoing DOJ review.
12      Q.  Why would -- why did SB 14 not include any
13  provisions about mail-in ballots?
14      MR. FREDERICK:  Objection, legislative
15  privilege.
16      Instruct you not to answer.
17      A.  I'm sorry.  I can't answer that.
18      Q.  (By Ms. Berkower)  Have you ever heard about
19  voters who did not vote because they were concerned that
20  voter fraud would cancel out their vote?
21      A.  I don't remember a discussion to that effect.
22      Q.  Would a registered voter who has voted in
23  previous elections but who was refused a regular ballot
24  because of SB 14 still have confidence in the system?
25      MR. FREDERICK:  Objection, calls for

---

287

1   speculation.
2       Q.  (By Ms. Berkower)  You may answer.
3       A.  There's a procedure set forth for anybody to
4   vote provisionally and then show up with the appropriate
5   identification within I think six days.  If that's what
6   you're asking.
7       Q.  Would a person who had to take off work or
8   travel to a DPS office to get an election identification
9   certificate have confidence in the system?
10      MR. FREDERICK:  Objection, calls for
11  speculation.
12      A.  I don't know.
13      Q.  (By Ms. Berkower)  Do you think SB 14 will
14  increase turnout?
15      MR. FREDERICK:  Objection, relevance.
16      If you have an opinion, you may answer.
17      A.  I don't know.
18      Q.  (By Ms. Berkower)  Did the Lieutenant Governor
19  play a role in developing a strategy to ensure that SB
20  14 was passed?
21      MR. FREDERICK:  Objection, vague.  I would
22  also object on the basis of legislative privilege.  And
23  instruct you not to reveal any communications, mental
24  impressions or thought process.  To the extent you can
25  answer the specific question whether or not he had any

---

288

1   role, you may do so, if you can do it without revealing
2   privileged information.  I would also object on the
3   grounds that it assumes facts not in evidence.
4       A.  As president of the Senate, he has a role in
5   whether or not a piece of legislation is heard, yes.
6       Q.  (By Ms. Berkower)  That wasn't exactly the
7   question.  The question was whether he played a role in
8   developing a strategy to ensure that SB 14 was passed.
9       MR. FREDERICK:  Same objection.  Same
10  instruction.
11      A.  Same answer.  As president of the Senate, where
12  he controls what's heard on the floor, yes, he would
13  develop a strategy for when a bill is heard.  He gets to
14  choose when they're heard.
15      Q.  (By Ms. Berkower)  What was that strategy in
16  the case of SB 14?
17      MR. FREDERICK:  Objection, on the basis of
18  legislative privilege.
19      Instruct you not to answer unless you can
20  do so without revealing confidential communications or
21  thought processes.
22      A.  In his role as president of the Senate, the
23  Lieutenant Governor operates as a traffic cop, when
24  bills are heard, what order they're heard in.
25  Frequently, a Senator will be out of the -- off the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                      MAY 29, 2012

### 289

1  Senate floor because they need to go give a speech or
2  have lunch with a constituent, and so we don't hear
3  their bills during the period of time that they're not
4  available.
5        So, yes, to the extent that he is the
6  manager of the Senate legislative work process, he does
7  have a role in determining when a bill is heard, how
8  it's heard, how soon it's heard, when it's heard, who is
9  recognized, all the above.
10     Q.  (By Ms. Berkower)  Was it part of the
11  Lieutenant Governor's strategy to pass SB 14 -- was part
12  of the strategy to send the bill directly to the
13  Committee of the Whole?
14     MR. FREDERICK:  Objection, argumentative.
15  Objection, also, on legislative privilege to the extent
16  it asks for the Lieutenant Governor's thought process.
17     To the extent you can answer without
18  revealing that or privileged communications, you may do
19  so, but if you cannot, I instruct you not to answer.
20     A.  I think, as I've answered earlier, the intent
21  was to follow the Senate rules, to the extent possible,
22  to recognize that Governor Perry enlisted as an
23  emergency item, and to allow the Senate, the full
24  Senate, the opportunity to hear all of the testimony,
25  all of the public testimony, and all the witnesses.  And

### 291

1  extent that he tried to do what the Governor listed as
2  an emergency item, yes, he did try and hear the bill
3  during the emergency item period.
4        (Exhibit 109 marked for identification.)
5     Q.  (By Ms. Berkower)  This is Exhibit 109.
6     A.  Okay.
7     Q.  Do you recognize this?
8     A.  I assume these are Senate rules for the 82nd
9  legislature.
10     Q.  Can you turn to Rule 5.11?
11     A.  Okay.  Hold on.  I got two copies here.
12     Q.  Oh.
13     A.  Yes.
14     Q.  Does this suspend the two-thirds requirement
15  for voter ID legislation again in the 2011 legislative
16  session?
17     A.  Yes.  I think it continues the rule as it
18  existed in the 2009 session.
19     Q.  Did the Lieutenant Governor choose to refer SB
20  14 directly to the Committee of the Whole?
21     A.  Yes, he makes that decision.
22     Q.  Did the full Senate adopt a resolution
23  concerning the procedures to apply when in the Committee
24  of the Whole Senate for the duration of the
25  consideration of SB 14?

### 290

1  so, yes, I think hearing it in the Committee of the
2  Whole was his decision.
3     Q.  (By Ms. Berkower)  Did the Lieutenant Governor
4  have any plan to prevent what occurred in 2009 to SB 362
5  from happening to SB 14?
6     MR. FREDERICK:  Objection, assumes facts
7  not in evidence.  Objection, calls for speculation.  I
8  also object on the basis of legislative privilege and
9  instruct you not to answer unless you can do so without
10  revealing privileged matters.
11     A.  I don't understand the question because prevent
12  what from happening to 14 that happened to 316, what are
13  we preventing?
14     Q.  (By Ms. Berkower)  Well, prevent -- prevent
15  anything from happening -- well, I guess, did he have
16  any communications with members of the House or the
17  Governor's office to ensure that the bill would pass
18  both houses?
19     MR. FREDERICK:  Objection, based on
20  privilege.  You may answer whether a communication
21  occurred, but I instruct you not to reveal the substance
22  of any communication.
23     A.  Well, when the Governor issues an emergency
24  proclamation, it's a very public process, and the
25  legislature tries to respond accordingly.  So to the

### 292

1     A.  I assume so.  They had to adopt rules in order
2  to hearing it -- have a hearing.
3     MS. BERKOWER:  Okay.  And we have another
4  exhibit.  This will be 110, I guess.
5        (Exhibit 110 marked for identification.)
6     Q.  (By Ms. Berkower)  Do you recognize this?
7     A.  It's the Senate journal for Monday, January 11,
8  2011.
9     Q.  Can you turn your attention to Page 60,
10  please?  What's the heading of this page?
11     A.  Senate Resolution 79.
12     Q.  And can you read the third paragraph that
13  starts "Resolved"?
14     A.  Okay.  (Reading to herself.)
15     Q.  And then Item 1.
16     A.  Okay.
17     Q.  "The committee shall afford reasonable
18  opportunity to interested parties to appear and testify
19  before the committee."  Do you see that?
20     A.  Yes.
21     Q.  How long was SB 14 considered in the Senate
22  from first reading to passage?
23     A.  I don't remember.  Do you have that here?
24     Q.  Do you want to just refresh your recollection
25  with it?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

293

1      A.  Yes, please.
2      Q.  (Handed to witness.)
3          MS. BERKOWER:  Matt, do you have a copy?
4          MR. FREDERICK:  I can look on with this
5   one.  Thank you.
6      It was filed on the 12th and engrossed on the
7   26th of January.
8      Q.  Compared to other bills you've worked on, was
9   that a relatively short time?
10         MR. FREDERICK:  Objection, vague.
11         You can answer.
12     A.  It happens from time to time.
13     Q.  (By Ms. Berkower)  When else has it happened?
14     A.  Well, we have a special session on the
15  transportation bill and did everything in about three
16  days one summer.  That was summer of 2009.
17     Q.  Do you think that this period of time afforded
18  interested parties a reasonable opportunity to appear
19  and testify?
20     A.  Well, yes.  I mean, they did testify.
21     Q.  Do you think that this was enough time, a
22  reasonable amount of time?
23         MR. FREDERICK:  Objection, relevance.
24     A.  I mean, every bill is required to have a
25  hearing, and this bill had a hearing with public

294

1   testimony and expert witnesses.  It was held in a very
2   public place that is televised for people within the
3   Capitol complex as well.
4      Q.  (By Ms. Berkower)  Did you have a role during
5   -- I'm sorry?
6      A.  Oh, I just -- you can look at it.
7      Q.  Did you have a role during consideration by the
8   Committee of the Whole at SB 14?
9      A.  Did I have a role?
10     Q.  Yes.
11     A.  No.  I didn't have an official role.
12     Q.  Did the Lieutenant Governor?
13     A.  Yes.
14     Q.  What was it?
15     A.  Well, he referred the bill to the Committee of
16  the Whole.  He determined who would be in charge during
17  the Committee of the Whole.  And then he participated
18  as -- acting as a senator during the Committee of the
19  Whole process, listened to testimony.
20     Q.  Did you have a role during consideration of SB
21  14 on the Senate floor?
22     A.  I don't have an official role with it, but we
23  prepared the background information, insured that all
24  the paperwork was prepared and compiled in such a manner
25  so that the bill was ready to be heard according to the

295

1   Senate rules.
2      Q.  Did the Lieutenant Governor have a role during
3   consideration of SB 14 on the Senate floor?
4      A.  Yes.  He was the president of the Senate, and
5   he managed recognizing the senators to hear the bill and
6   discuss it, debate it.
7      Q.  He carried out his procedural duties during
8   that time?
9      A.  Yes, he did.
10     Q.  During the floor debate on SB 14, did anyone
11  raise concerns about its impact on minority voters?
12     A.  I don't remember the specific information, but
13  I rather think Senator West did.
14     Q.  What concerns did he have?
15     A.  I don't remember the details.
16     Q.  Were there any changes to SB 14 during floor
17  consideration that you view as responsive to minority
18  concerns?
19         MR. FREDERICK:  Object, basis of
20  relevance.  Also object to the extent it calls for your
21  own mental impressions as a staff member of the
22  Lieutenant Governor.  I would instruct you not to answer
23  on the basis of privilege.
24     A.  Okay.  I know that there were amendments
25  offered and adopted.  I just don't remember what they

296

1   did.
2      Q.  (By Ms. Berkower)  What does it mean to you
3   when a legislator says on the Senate floor "I'm not
4   advised"?
5      A.  That means that they're not aware of whatever
6   the issue is.
7      Q.  Is part of a bill's sponsor -- is part of the
8   role of the bill's sponsor to answer questions about it?
9      A.  Sometimes that responsibility is shared with
10  other senators.  For instance, we divvy up the budget
11  into articles and each senator -- there are senators who
12  develop expertise on each of those articles of the
13  budget, and they answer the questions about that
14  article, not the Chair of Finance who typically carries
15  the budget.
16     Q.  Do you remember if Senator Fraser repeatedly
17  said "I'm not advised" during a Senate's consideration
18  of SB 14?
19         MR. FREDERICK:  Objection, relevance.
20         You can answer.
21     A.  I don't remember what he said.
22     Q.  (By Ms. Berkower)  Were you ever -- were you
23  aware of whether the forms of ID listed in SB 14 are the
24  least restrictive options to achieve the goal of
25  avoiding voter fraud?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

### 297

1    MR. FREDERICK:  Objection, relevance.
2    Objection, calls for a legal conclusion.  Calls for
3    speculation.  I also object on the basis of privilege
4    and instruct you not to answer.
5    A.  I'm sorry.  I can't answer that.
6    Q.  (By Ms. Berkower)  Do you know if Lieutenant
7    Governor Dewhurst had any communications about what
8    forms of ID to include in SB 362?
9    MR. FREDERICK:  Objection, asked and
10   answered.  Also object to the extent it calls for
11   legislatively privileged communications, but you may
12   answer if you can remember the question whether or not
13   such communications occurred.
14   A.  I know that he was thoroughly briefed on
15   362.  I don't -- I don't think he was involved in the
16   original drafting of it, but he may have been involved
17   in the amendments to that.
18   Q.  (By Ms. Berkower)  Do you know if Lieutenant
19   Governor Dewhurst had any communications about what
20   forms of ID to include in SB 14?
21   A.  He did not in the original filing of SB 14 in
22   November of 2010, but he did get briefed and was aware
23   of what was included before it was given the number SB
24   14 in the January time frame.
25   Q.  Did Lieutenant Governor vote on the amendments

---

### 298

1    offered to SB 14?
2    A.  No.  He was not allowed to do so unless there
3    was a tie.
4    Q.  Were any amendments introduced during the
5    Committee of the Whole?
6    A.  No.  I don't believe so.  It was passed out
7    without amendments, and the amendments occurred on the
8    Senate floor.
9    Q.  Did the Lieutenant Governor play any role in
10   the conference committee's consideration of SB 14?
11   A.  He designates the conference committee
12   membership and then determines whether or not the
13   conference committee can be brought -- the conference
14   committee report can be brought up on the floor, so yes,
15   he does.
16   Q.  Is that something you're involved with as well?
17   A.  Yes.
18   Q.  What is your involvement with that process?
19   A.  I double-check to make sure the conference
20   committee report is complete, that the side-by-side
21   analysis and all the materials that are necessary in
22   that package are there.  When determining who's on the
23   conference committee, we look at the members.  There's
24   always five members of the conference.  Two of them have
25   to be from the committee of origin.

---

### 299

1    In this case, the committee of origin was
2    the Committee of the Whole, so we could have appointed
3    any of the senators to that conference committee.
4    Typically, deference is given to the committee -- the
5    bill author or sponsor, and they will request their five
6    members.
7    Q.  Is it unusual for the conference committee to
8    insert a new provision into legislation?
9    A.  No.
10   Q.  Why did the conference committee change the
11   structure of the free ID offered in SB 14?
12   MR. FREDERICK:  Objection, legislative
13   privilege.
14   Instruct you not to answer.
15   A.  I'm sorry.  I can't answer that.
16   Q.  (By Ms. Berkower)  What was the reason the
17   conference committee removed the provision that would
18   have allowed a tribal ID to be used under SB 14?
19   MR. FREDERICK:  Objection, legislative
20   privilege.
21   Instruct you not to answer.
22   A.  I'm sorry.  I can't answer that.
23   Q.  (By Ms. Berkower)  What was the purpose of the
24   conference committee's decision to remove the provision
25   that would require that voter education would be

---

### 300

1    targeted at low income and minority voters?
2    MR. FREDERICK:  Objection, legislative
3    privilege.
4    Instruct you not to answer.
5    A.  I'm sorry.  I can't answer that.
6    Q.  (By Ms. Berkower)  What was the purpose of the
7    conference committee's decision to remove the provision
8    to require -- to allow temporary driving licenses that
9    contain a photo to be used under SB 14?
10   MR. FREDERICK:  Objection, legislative
11   privilege.
12   Instruct you not to answer.
13   A.  Sorry.  I can't answer that.
14   Q.  (By Ms. Berkower)  Why is the conference --
15   what was the purpose of the conference committee's
16   decision to remove the provision that would have
17   required affidavits for provisional voters to be
18   available in each polling place?
19   MR. FREDERICK:  Objection, legislative
20   privilege.
21   Instruct you not to answer.
22   A.  Sorry.  I can't answer that.
23   Q.  (By Ms. Berkower)  Did the Lieutenant Governor
24   ever discuss whether SB 14 might disproportionately
25   impact minority voters?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012



### 301

1        MR. FREDERICK:  Objection, legislative
2    privilege.
3        Instruct you not to answer.
4        A.  I'm sorry.  I can't answer that.
5        Q.  (By Ms. Berkower)  Was the Lieutenant Governor
6    concerned that SB 14 might disproportionately impact
7    minority voters?
8        MR. FREDERICK:  Objection, relevance.
9    Objection, legislative privilege.
10       Instruct you not to answer.
11       A.  I'm sorry.  I can't answer that.
12       Q.  (By Ms. Berkower)  Did the Lieutenant Governor
13   believe he had an obligation pursuant to Section 5 of
14   the Voting Rights Act to determine whether SB 14 might
15   impact minority voters?
16       MR. FREDERICK:  Objection, relevance.
17   Objection, legislative privilege.
18       Instruct you not to answer.
19       A.  I'm sorry.  I can't answer that.
20       Q.  (By Ms. Berkower)  Are you aware of any
21   legislators making any statements about illegal aliens
22   voting?
23       MR. FREDERICK:  Let me just object and
24   instruct you.  I mean, to the extent these are
25   confidential nonpublic communications, I would instruct

### 302

1    you not to reveal it.
2        THE WITNESS:  Yeah.
3        MR. FREDERICK:  But if you can answer
4    without revealing privileged communications, you may do
5    so.
6        A.  Well, I know Representative Brown made her
7    statement on the House floor, but I'm not aware of that
8    statement being made on the Senate floor.
9        Q.  (By Ms. Berkower)  What about private
10   statements about illegal aliens voting, do you know of
11   any?
12       A.  I'm not aware of any.
13       Q.  Have you ever heard any Texas State legislator
14   who voted in favor of Senate Bill 14 say that it would
15   prevent racial or ethnic minorities from voting in
16   Texas?
17       MR. FREDERICK:  Objection, relevance.  And
18   objection on the basis of privilege.
19       But you may answer the yes-or-no question
20   whether you've ever heard it.
21       A.  No, I've not.  I've not heard of that.
22       (Exhibit 111 marked for identification.)
23       Q.  (By Ms. Berkower)  Do you recognize this?
24       A.  Yes, I do.
25       Q.  Have you seen this before?

### 303

1        A.  I'm sure I have.  I don't remember it.
2        Q.  Is it a press release that Lieutenant Governor
3    issued after SB 14 was passed?
4        A.  Yes.
5        Q.  Do you see that on the second to the -- well,
6    do you see the last sentence says "Voter ID will help
7    stamp out voter fraud and increase public confidence in
8    our elections process by ensuring that only U.S.
9    citizens who are legally eligible vote in Texas
10   elections."  Did I read that correctly?
11       A.  Yes, you did.
12       Q.  Why does this press release reference the need
13   to ensure only U.S. citizens vote?
14       MR. FREDERICK:  Objection, relevance.
15   Objection, calls for speculation.
16       As to the extent that this calls for you
17   to reveal the Lieutenant Governor's thought process
18   about the bill, I'll instruct you not to answer on the
19   basis of privilege.
20       A.  I'm not aware of the answer to your
21   question.  I didn't remember this statement.
22       Q.  (By Ms. Berkower)  Did you review this press
23   release before it went out?
24       A.  I don't think so.
25       Q.  Did you participate in the drafting at all?

### 304

1        A.  I don't -- I don't think so.
2        Q.  What's the basis for saying that the public
3    needs an increase of confidence that only U.S. citizens
4    are participating in elections?
5        MR. FREDERICK:  Objection, calls for
6    speculation.  Objection, relevance.  Also object to the
7    extent it calls for privileged communications or thought
8    process.
9        So to the extent you can answer without
10   revealing privilege, you may do so.  If you can't, I
11   instruct you not to answer.
12       A.  As I've said before today, I do think that
13   there -- that one of the objectives of the voter ID
14   legislation was to increase public confidence in the
15   election process and ensure there wasn't voter fraud,
16   and it's fraudulent for people who are not U.S. citizens
17   to vote.
18       Q.  (By Ms. Berkower)  How does photo ID at the
19   polls ensure that only U.S. citizens are voting?
20       MR. FREDERICK:  Objection.  To the extent
21   it calls for any privileged matters, I instruct you not
22   to answer.  If you can answer without revealing that,
23   you may do so.
24       A.  I think the intent was to make it -- make the
25   election process a stronger process to put additional



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                          MAY 29, 2012

---

### 305

1  safeguards in place to ensure that U.S. citizens were
2  voting and not people voting illegally.  And so to that
3  extent, while it may not be perfect, it's better than
4  our current system.
5      Q.  (By Ms. Berkower)  But how does the ID
6  requirement speak to citizenship at all if it's possible
7  as a noncitizen to get some of the IDs that are
8  permitted under SB 14?
9      MR. FREDERICK:  Objection, argumentative.
10 Objection, calls for speculation.  Objection, relevance.
11 You may answer if you can.
12     A.  I'm under the impression or understanding that
13 many of the IDs state whether or not a person is a
14 citizen or a legal alien.  For purposes -- for that
15 purpose, then it would be evident to the poll workers.
16     Q.  (By Ms. Berkower)  Well, what if the Texas
17 driver's license did not actually include that
18 information?
19     MR. FREDERICK:  Objection, calls for
20 speculation.
21     A.  I think it does.
22     Q.  (By Ms. Berkower)  What's your basis for
23 thinking that?
24     A.  I thought that it says on the back of it if
25 you're -- like it expires when your Visa expires or

### 306

1  something along those lines.  It's that kind of
2  language.  I don't remember exactly.
3      Q.  Is your citizenship listed on your Texas
4  driver's license?
5      A.  No.  I don't think it is, but it may be
6  included in the magnetic strip, come to think of it.
7  That being said, I think that it's for people who have a
8  Visa that it says that it expires when the Visa expires.
9      Q.  Isn't citizenship assessed during the voter
10 registration process?
11     A.  I'm not aware.  I think you have to swear that
12 you are a citizen.
13     Q.  Do you swear under penalty of perjury?
14     A.  That's my memory, yes.
15     Q.  Does that not provide any deterrent to people
16 who aren't citizens trying to register?
17     MR. FREDERICK:  Objection, calls for
18 speculation.
19     A.  It does provide a deterrent, but it doesn't
20 provide the most that we can do to help make sure that
21 it's One Person, One Vote.
22     Q.  (By Ms. Berkower)  What's the most that we
23 could do to help in your view?
24     A.  Well, we could probably tattoo everybody with a
25 U.S. state citizenship, but that's not as far as we're

### 307

1  willing to go with the Texas legislature.  I mean, there
2  are extremes that are ridiculous.
3      However, I think the goal of the voter ID
4  legislation was to ensure that we increase the integrity
5  of the elections process and made it a little bit
6  tighter so that it was One Person, One Vote, and you
7  knew the person who registered was the person that
8  actually showed up to vote.
9      Q.  But it doesn't actually do anything to keep
10 citizens -- noncitizens from voting, does it?
11     MR. FREDERICK:  Objection, argumentative.
12     A.  Well, I think when somebody shows up with a
13 passport, you have at least an increased level of
14 security that they are a U.S. citizen, and therefore,
15 they've met a threshold that wasn't there before.
16     Q.  (By Ms. Berkower)  Did you ever have any
17 communications with Bryan Hebert about whether showing
18 two forms of nonphoto ID would make the electoral system
19 more secure?
20     MR. FREDERICK:  I'm going to object on the
21 basis of privilege.  To the extent that you can answer
22 by identifying a conversation on the general subject
23 matter, you may do so, but don't reveal the substance of
24 any conversation with Mr. Hebert.
25     A.  I know that I received a lot of summary

### 308

1  information from Bryan Hebert on what was included in
2  each piece of this legislation, what types of IDs were
3  included.
4      Q.  (By Ms. Berkower)  When did you get those
5  communications?
6      A.  On a regular basis as each piece of legislation
7  was being considered.
8      Q.  So is this in 2005, 2007, 2009 and 2011?
9      A.  Yes.  I don't really remember 2005 at all, but
10 '07 and '09, '11, yes.
11     Q.  What was the means by which you received this
12 information?
13     A.  Sometimes e-mails, sometimes daily briefings,
14 verbal briefings.
15     Q.  When you were doing the verbal briefings, who
16 else was present?
17     A.  I don't remember.  It's standard operating
18 procedure for me to talk to our policy staff every day
19 about major issues that are going through the
20 legislative process.  And I would get briefings every
21 day from every staff person.
22     Q.  At any time since the passage of SB 14, have
23 you come to believe that the bill will have a
24 retrogressive effect on minority voters?
25     MR. FREDERICK:  Objection, calls for legal

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                                    MAY 29, 2012

---

### 309

1    conclusion.  Objection, relevance.
2         You may answer to the extent you can.
3         A.  No.  I'm not aware of any data that shows
4    that.  In fact, I think I've seen data that it increased
5    minority participation either in Georgia or Indiana, but
6    I wouldn't swear to that.
7         Q.  (By Ms. Berkower)  Where did you see that data?
8         A.  I want to say it was in a newspaper article.
9         Q.  Which newspaper article?
10        A.  I don't remember.  I'm sorry.
11        Q.  Do you even remember which newspaper maybe?
12        A.  No, I don't.
13        Q.  Do you remember about when you read that
14   article?
15        A.  No, but it would have been during the
16   discussion of the last -- after the Indiana case and
17   before present time.
18        Q.  Are you involved at all with Lieutenant
19   Governor Dewhurst campaign for Senate?
20        A.  No, I'm not.  I mean, other than I hope he does
21   well, I mean, you know.  No, I'm not paid by the
22   campaign in any way.
23        Q.  Do you have any communication with his campaign
24   staff?
25        A.  Yes, I do.

---

### 310

1         Q.  How often?
2         A.  Oh, things like can you come over on the
3    weekend and stuff envelopes, that sort of thing.  Not a
4    regular basis.  We do communicate with his schedulers at
5    the campaign office, and we communicate with the
6    scheduler pretty frequently, but that's about
7    maintaining a schedule.  It's not about substantive
8    issues.
9         MS. BERKOWER:  I'm going to have this
10   exhibit, this is 112, I think.
11        (Exhibit 112 marked for identification.)
12        Q.  (By Ms. Berkower)  Are you familiar with this?
13        A.  Oh, yes, I've seen this.
14        Q.  What is this?
15        A.  I've seen it in commercials.
16        Q.  Can you turn to Page 3, please?
17        A.  Okay.
18        Q.  Is this a printout of Lieutenant Governor
19   Dewhurst's campaign website?
20        A.  I really don't know.  It looks like it.
21        Q.  Do you see the section in the middle of the
22   third page?
23        A.  "Strongly opposes illegal immigration," yes.
24        Q.  What are the first two measures that it says
25   "Support"?

---

### 311

1         A.  First says "Dewhurst push for voter ID for two
2    sessions."  Second is "Dewhurst supports conservative
3    legislation such as voter ID."
4         Q.  How do those fall into the category of opposing
5    illegal immigration?
6         MR. FREDERICK:  Objection, calls for
7    speculation.
8         A.  I'm -- I don't do politics.  This is quoting a
9    Jay Rude article and a Houston Chronicle article.  So it
10   looks like a Richard Durham -- Dunham's article.  So it
11   appears to me that what they're doing is quoting public
12   articles.
13        Q.  (By Ms. Berkower)  Okay.  But this is -- if
14   this is from his, Dewhurst's campaign website, doesn't
15   it indicate that he affiliates voter ID with illegal
16   immigration reform?
17        MR. FREDERICK:  Objection, assumes facts
18   not in evidence, calls for speculation, argumentative.
19   You can answer if you can.
20        A.  Well, I wasn't privy to what the thought
21   process was for preparing this information.
22        Q.  (By Ms. Berkower)  So it's not privileged, you
23   just don't know?
24        A.  I don't.  I don't do campaign work.
25        (Exhibit 113 marked for identification.)

---

### 312

1         Q.  (By Ms. Berkower)  Are you familiar with this?
2         A.  Oh, yes, I've read this.
3         Q.  Did you write this?
4         A.  No, I did not.
5         Q.  Is this a press release from the Lieutenant
6    Governor's office?
7         A.  Yes, it is.
8         Q.  When did this come out?
9         A.  March 12, 2012.
10        Q.  And what is the substance of the press release?
11        A.  He is opposing the Justice Department's
12   blocking of Texas voter ID law.
13        Q.  What's the -- does it say that "the Texas voter
14   ID law allows for numerous forms of government-issued
15   photo identification, including passports and concealed
16   handgun licenses.  Offers free identification for those
17   in need, and also provides voter education poll worker
18   training, ensuring every legal citizen can exercise
19   their right to vote"?
20        A.  Yes, it does.
21        Q.  Why does this press release affiliate
22   citizenship with the voter ID law?
23        MR. FREDERICK:  Objection, calls for
24   speculation.  Objection, relevance.
25        You can answer if you know.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

313

1    A.  I don't -- I don't know the answer to that.
2    Q.  (By Ms. Berkower)  If you were called to trial,
3    would you testify that SB 14 has no discriminatory
4    purpose?
5    A.  I don't know the answer to that.
6    Q.  You don't know whether SB 14 has a
7    discriminatory purpose?
8    A.  From my perspective, it does not, but I don't
9    know everybody else's perspective.
10   Q.  If you were called to trial, would you testify
11   that SB 14 has no discriminatory effect on minorities?
12   A.  I don't know the answer to that.  It hasn't
13   gone into effect here in Texas.
14   MS. BERKOWER:  Can we check the time?
15   (Brief discussion off the record.)
16   MS. BERKOWER:  This is going to be Exhibit
17   113; is that right?  114.
18   (Exhibit 114 marked for identification.)
19   Q.  (By Ms. Berkower)  Do you recognize this?
20   MR. FREDERICK:  Let me ask before we go
21   on.
22   MS. BERKOWER:  Yeah.
23   MR. FREDERICK:  How much longer do you
24   think we've got?
25   MS. BERKOWER:  I think we're going to go

314

1    to the full seven hours.  I have some, but then we're
2    going to give it over to Mr. Harris.
3    MR. FREDERICK:  Okay.  Well, can we go off
4    the record for just a minute?
5    (Discussion off the record.)
6    Q.  (By Ms. Berkower)  Okay.  Do you recognize
7    this?
8    A.  I see what it is.
9    Q.  What is it?
10   A.  It's talking points for -- or draft talking
11   points for the voter ID bill signing.
12   Q.  For Lieutenant Governor Dewhurst?
13   A.  I don't know, but that would be consistent
14   with --
15   Q.  Have you reviewed -- have you seen this
16   document before?
17   A.  I don't remember it, but this is the format his
18   talking points take.
19   Q.  Do you know if you were involved in the
20   drafting of this document?
21   A.  Not that I remember, but I could be involved in
22   the fact-checking of it.
23   Q.  It says in the top line, "We know" -- sorry,
24   the top -- the first line of the second paragraph says,
25   "We know the threat of voter fraud is real."  What did

315

1    he mean by that?
2    MR. FREDERICK:  Objection, calls for
3    speculation.  Also object on the basis of privilege.
4    To the extent it seeks the Lieutenant
5    Governor's thought process, if you can answer without
6    revealing privileged matters, you can do so.
7    A.  During the Committee of the Whole process, I
8    know he sat through all of the testimony, and some of
9    the testimony dealt with deceased voters and people who
10   are not qualified to vote voting, and therefore, this
11   could be based on his experience in that committee
12   process.
13   Q.  (By Ms. Berkower)  In your mind, what's the
14   definition of "voter impersonation"?
15   MR. FREDERICK:  Objection, relevance, but
16   you may answer if you can.
17   A.  Well, my impression would be that someone who's
18   not the person on the voter registration certificate
19   showed up and voted in their name.
20   Q.  (By Ms. Berkower)  Did you fact check that
21   statement?
22   A.  Not that I remember.  I don't remember these
23   talking points.
24   MS. BERKOWER:  This will be 115.
25   (Exhibit 115 marked for identification.)

316

1    Q.  (By Ms. Berkower)  Do you recognize this?
2    A.  Yes, I think so.
3    Q.  Did you draft this?
4    A.  No, I didn't.
5    Q.  What is this?
6    A.  I think these were talking points prepared by
7    Bryan Hebert.
8    Q.  What was the occasion for which these talking
9    points were prepared?
10   A.  I don't remember a specific occasion but more
11   along the lines of it being a list of things -- of
12   comments that could be made about voter ID legislation.
13   Q.  What were these talking points adapted -- I'm
14   sorry.  Were these talking points adapted or approved by
15   Lieutenant Governor?
16   A.  He doesn't typically adopt or approve talking
17   points, and frequently, they're from talking points that
18   we give him.
19   Q.  Do you know if these talking points were
20   distributed to other legislators?
21   A.  I'm not aware of it, but it wouldn't surprise
22   me at all if they were shared with at least Senator
23   Fraser's office and perhaps people in the House.
24   Q.  Why wouldn't it surprise you?
25   A.  Because we typically coordinate something like



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 317

1  this with other people working on the issues.  We do it
2  on all kinds of issues.  The budget summaries are
3  typical.  Everybody gets copies of them.
4      Q.  This says that the bill is similar to Indiana
5  and Georgia laws, both of which were upheld by federal
6  authorities.  Didn't you testify earlier that there are
7  a number of IDs acceptable under those laws that are not
8  acceptable under SB 14?
9          MR. FREDERICK:  Objection, argumentative.
10  Misstates prior testimony.
11      A.  I think Matt's right.  I think that misstates.
12  I think there are some additional or differences in
13  Indiana and Georgia laws, but I don't know what they
14  are.  And this does say they're similar, not identical.
15          MS. BERKOWER:  I guess I might do maybe
16  two at a time if that's all right?
17      A.  That would be a good thing.  Anything that's
18  faster.
19          MR. FREDERICK:  Yeah, yeah.
20          MS. BERKOWER:  This is going to be 116 and
21  117, I guess.
22          (Exhibits 116 and 117 marked for
23  identification.)
24          MS. BERKOWER:  Matt, will you look on with
25  her in the interest of time?

### 318

1          MR. FREDERICK:  Of course.
2      Q.  (By Ms. Berkower)  Do you recognize what these
3  are?
4      A.  LexisNexis.  This is the Georgia law.  And this
5  is the Indiana law, I'm assuming.
6      Q.  On the Georgia law, do you see under Section
7  A2, A4 and A6, can you review those quickly, please?
8      A.  Okay.  2 is a voter identification
9  certificate.  And 4 is employer identification card.
10  And 6 is a travel identification card.
11      Q.  So Section 2 permits any state or U.S.
12  government issued ID; is that correct?
13      A.  Yes.
14      Q.  Section 4 permits an employee -- an employee ID
15  issued by a state or U.S. government agency; is that
16  correct?
17      A.  Yes.
18      Q.  And Section 6 permits a travel ID; is that
19  correct?
20      A.  Yes.
21      Q.  Are any of those permitted under SB 14?
22      A.  Well, there are some United States IDs allowed
23  under 14, yes.  And there is a voter identification card
24  that -- under 14, but not all the additional cards.
25      Q.  Is it fair to say that there's a number of IDs

### 319

1  that are permitted under the Georgia law that are not
2  permitted under SB 14?
3      A.  Yes.
4      Q.  Turning your attention to the Indiana law.  On
5  the first page of that exhibit, Item 4.
6      A.  Uh-huh.
7      Q.  The document was issued by the United States or
8  the state of Indiana.  Does that -- does that show that
9  there are some IDs permitted under Indiana law that are
10  not permitted under SB 14?
11      A.  Well, as long as those IDs have all the
12  additional information listed above, an expiration of
13  photograph, and it probably does provide -- apply to the
14  expanded list of identification cards.
15      Q.  So turning back to the talking points.
16      A.  These?
17      Q.  Yes.
18      A.  Okay.
19      Q.  I don't remember which number that is.
20      A.  115.
21      Q.  Turning back to 115, it says that "SB 14 is
22  similar to Indiana and Georgia laws, both of which were
23  upheld by federal authorities."  Do you think that's an
24  accurate characterization of SB 14?
25      A.  Yes, I do.  I do think they're similar.  The

### 320

1  structure of the Indiana law is very different.  And the
2  Georgia law is very similar.  It does allow for some
3  additional identification, but otherwise, the structure
4  is very similar through the rest of the bill.
5      Q.  Why don't the talking points identify any of
6  the differences between those laws?
7          MR. FREDERICK:  Objection, calls for
8  speculation.  Argumentative.
9          You may answer.
10      A.  I don't know.  I don't know the answer to that.
11      Q.  (By Ms. Berkower)  Would you agree that if SB
12  14 were implemented, it would be stricter than the
13  Georgia or Indiana laws?
14          MR. FREDERICK:  Objection, vague.  Calls
15  for speculation.
16          You may answer.
17      A.  On a superficial reading, and I haven't studied
18  these, I would say that Texas is slightly more strict.
19      Q.  (By Ms. Berkower)  Did you conduct any research
20  into either the Georgia or Indiana laws when you were
21  working on SB 14?
22          MR. FREDERICK:  Objection, legislative
23  privilege.  Instruct you not to answer.
24      A.  I'm sorry.  I can't answer that.
25          MS. BERKOWER:  The question of whether she



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                    MAY 29, 2012

---

**321**

1  conducted research, not what she found or how it
2  influenced her?
3          MR. FREDERICK:  Yeah.  I think that goes
4  to thought process and mental impressions of the
5  Lieutenant Governor's.  So, yes, I'll stand by the
6  objection.
7          MS. BERKOWER:  Well, she already testified
8  that she spoke with people from Indiana about their
9  voter ID law.  So --
10         MR. FREDERICK:  And objection, asked and
11 answered.  I mean, I think research is different than
12 did you have conversations, because research would be a
13 legislative investigation, whereas conversations with
14 people outside the state, I think I permitted that
15 question, because I think it's arguable that that would
16 not be a privileged communication to the extent it's
17 just another person outside the legislature.  I think
18 this is different, and I stand by that objection.
19         MS. BERKOWER:  Okay.  So just so I'm clear
20 on it, it's because it was material considered by her in
21 her legislative capacity, is that your objection?
22         MR. FREDERICK:  I think the question seeks
23 to determine the character and content of a legislative
24 investigation made concerning a pending bill, so yes.
25         MS. BERKOWER:  Okay.

---

**322**

1          (Exhibit 118 marked for identification.)
2      Q.  (By Ms. Berkower)  Do you recognize this?
3      A.  Oh, yes.  Uh-huh.  This is a draft.
4      Q.  What is this?
5      A.  This is a draft of the statement that came out
6  and is referenced as number -- whatever this one was,
7  113.
8      Q.  Which statement?
9      A.  It's a draft of that --
10     Q.  Oh, Exhibit 113?
11     A.  Yeah.
12     Q.  Sorry.  Okay.  Sorry.  I didn't -- I see that.
13 Okay.  This is ultimately what became Exhibit 113, that
14 press release?
15     A.  Right.
16     Q.  Did you participate in the drafting of this?
17     A.  No, I didn't.  He sent me a copy of it though.
18     Q.  Who is "he"?
19     A.  Oh, Michael Walz.
20     Q.  Who's Michael Walz?
21     A.  He's the communications director for the
22 Lieutenant Governor's office.
23     Q.  And who's Buddy Barfield?
24     A.  He's the -- I don't know what his official
25 title is, but he works for the campaign.

---

**323**

1      Q.  Oh, I see.  "Dewhurst for Texas."
2      A.  Yes.
3      Q.  Why did Michael Walz copy Buddy Barfield on the
4  e-mail?
5          MR. FREDERICK:  Objection, calls for
6  speculation.
7      A.  I don't know.  I mean, he may have just been
8  telling him about it.
9      Q.  (By Ms. Berkower)  Does your office usually
10 copy the campaign on communications such as this?
11     A.  Typically, it -- I mean, when they do the
12 distribution of the actual statement, that's when that
13 distribution takes place.  That's my understanding of
14 it.  They're on the distribution list that goes out.
15     Q.  Was Lieutenant Governor aware of the
16 possibility that a lawsuit might be brought to obtain
17 preclearance?
18         MR. FREDERICK:  Objection, to the extent
19 it calls for speculation.
20         Also to the extent that it calls for his
21 thought process and mental impressions about pending
22 legislation, I instruct you not to answer on the basis
23 of privilege.
24     A.  Okay.  I'm sorry.  I can't answer that.  I'm
25 sorry.  I can't answer that.

---

**324**

1      Q.  (By Ms. Berkower)  You can't get into whether
2  he knew that judicial preclearance is one way to obtain
3  preclearance?
4      A.  Apparently not.  No.
5      Q.  Okay.  Did the Lieutenant Governor advocate for
6  filing a lawsuit to obtain judicial preclearance?
7      A.  I don't remember him advocating for a lawsuit.
8      Q.  Does the Lieutenant Governor support the
9  lawsuit --
10         MR. FREDERICK:  Objection.
11     Q.  (By Ms. Berkower)  -- to obtain judicial
12 preclearance?
13         MR. FREDERICK:  Objection, relevance.
14     A.  I think he supports the legislation.  He would
15 support implementation in the legislation.
16         MS. BERKOWER:  Okay.
17         (Exhibit 119 marked for identification.)
18     Q.  (By Ms. Berkower)  This is Exhibit 119.  Do you
19 recognize this?
20     A.  Yes.  I've seen this before.
21     Q.  What is this?
22     A.  Wait.  There's two pages.
23     Q.  Oh, is it different?
24     A.  Yes.
25     Q.  Doesn't go together?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER

MAY 29, 2012

---

### 325

1    A.  I don't remember this being together.

2    Q.  Okay.  Well, let's just take the first page

3  then.

4    Yeah.  I don't remember the second page.

5    Q.  Okay.

6    A.  First page I remember.

7    Q.  What is this?

8    A.  I think this is a summary document, and I don't

9  know if it was prepared by Bryan Hebert or by Fraser's

10  office.

11    Q.  Did you work on this?

12    A.  No.  I received it though.

13    Q.  Do you see the bottom section that says "What

14  about people who" -- well, it says, Part 3 says "Likely

15  questions from opponents."

16    A.  Uh-huh.

17    Q.  Are these talking points?

18    A.  I don't -- I don't know that they were ever

19  characterized that way.

20    Q.  What was the document used for, do you know?

21    A.  I think it was just meant to be informative of,

22  you know, here's what's in the legislation, here's what

23  it does, here's some comments that may be said about it,

24  that sort thing.

25    Q.  Under the last section, in the "Likely

---

### 326

1  questions from opponents" section, the last bolded

2  heading says "What about people who do not have access

3  to photo ID?"  And the response seems to be, "I'm

4  confidence that every voter in Texas has or can obtain

5  an acceptable photo ID."  What's the basis for that

6  statement?

7    MR. FREDERICK:  Objection, calls for

8  speculation.  Objection, to the extent it calls for

9  legislatively privileged material, I would instruct you

10  not to answer.  If you can answer without revealing

11  that, you can do so.

12    A.  I don't know what the person who wrote this was

13  thinking, but I do think the legislation set forth

14  opportunities for people to get a free voter ID for

15  voting.

16    Q.  (By Ms. Berkower)  Did you fact-check that

17  statement?

18    A.  No, not that I'm aware.  No.

19    Q.  Do you know if anybody fact-checked that

20  statement?

21    A.  No.

22    Q.  Would you generally send documents like this

23  around your office without fact-checking them?

24    MR. FREDERICK:  Objection, argumentative.

25    A.  Within our office, the point is that you can

---

### 327

1  provide summary information to anybody who might be

2  dealing with a given issue, yes, we would send it out

3  within our office.

4    Q.  (By Ms. Berkower)  Underneath that bullet point

5  that I read, it says "No voter has come forward in the

6  last three sessions of this debate to claim otherwise,

7  and no such voter has come forward in Indiana or Georgia

8  during the last four years."  What's the basis for that

9  statement?

10    A.  I can't answer you.  I don't know.

11    Q.  Do you think that just because no voters have

12  come through in the last three sessions of this debate

13  to claim they couldn't get acceptable ID means that such

14  people don't exist?

15    MR. FREDERICK:  Objection, relevance.

16  Objection, argumentative.  You may answer.

17    A.  I don't know that this sentence can be true

18  without it applying to everyone, so I don't -- I think

19  you can say no voter has come forward in the last three

20  sessions and not mean that no one can get -- I mean,

21  there's no one out there who can't get an ID.

22    Q.  (By Ms. Berkower)  How do you know if no one

23  can get an ID?

24    MR. FREDERICK:  Objection, relevance.

25  Calls for speculation.

---

### 328

1    A.  I think you wouldn't know unless somebody

2  brought it up and asked for an ID and couldn't get one.

3    MS. BERKOWER:  I think this is going to be

4  our last exhibit.

5    A.  Thank you.

6    MS. BERKOWER:  He might have more, but

7  this is my last one.

8    (Exhibit 120 marked for identification.)

9    Q.  (By Ms. Berkower)  Do you recognize this?

10    A.  No.  I don't remember this one.

11    Q.  Do you know what it is?

12    A.  I'm reading the interview by the Department of

13  Justice.

14    Q.  You've never seen it before?

15    A.  Not that I remember.

16    Q.  Whose handwriting is in the top right corner,

17  do you know?

18    A.  No.  It says "Bryan 552, 111, A-L-L."  No, I

19  don't know.

20    Q.  Do you think that indicates it's Bryan

21  Hebert's?

22    A.  I don't recognize the handwriting as being

23  Bryan's, but it could be.

24    Q.  So maybe this begs the question, but did you

25  fact check this document?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JULIA RATHGEBER                                      MAY 29, 2012

---

**333**

1    Q.   (By Mr. Harris) And you and Ms. Berkower also
2    discussed the question of whether one could vote with an
3    expired ID under SB 14 and under previous iterations of
4    the bill.  You remember that?
5    A.   Uh-huh.
6    Q.   And I believe it was your testimony, but please
7    correct me if I'm wrong, but that the reason that you
8    think a bill might exclude an expired ID is that because
9    people change and their looks change, it makes it harder
10   to prove using the expired ID that the person is who she
11   says she is; is that right?
12   A.   That's what I said, yes.
13   Q.   You testified that a driver's license in Texas
14   is valid for six years; is that right?
15   A.   I think that's correct.
16   Q.   Do you know how long a passport is valid?
17   A.   I think it's ten years, except for children,
18   it's five years.
19   Q.   Now, I know you said that you don't do
20   politics; is that right?
21   A.   I try not to.
22   Q.   But I assume that, you know, in your role as
23   someone who works for an elected official, you at least
24   generally follow elections in Texas; is that right?
25   A.   Well, yes, but publicly.  I don't work on the

---

**334**

1    election.
2    Q.   Uh-huh.  Are you generally aware of disparities
3    on how particular -- are you generally aware of
4    disparities on how particular racial or ethnic groups
5    vote in Texas?
6         MR. FREDERICK:  Objection, relevance.
7    A.   I don't think I understand the word
8    "disparities."
9    Q.   (By Mr. Harris)  Are you aware of any
10   propensities for a particular group to support one party
11   more regularly than it supports the other party?
12        MR. FREDERICK:  Objection, relevance.
13   A.   I've certainly read articles about it, but I
14   don't know how valid that is.  I haven't read any valid
15   all Hispanics vote this way, all White people vote that
16   way.
17   Q.   (By Mr. Harris)  What have you read?
18   A.   That generally there's a tendency for Hispanic
19   voters to vote Democratic.
20   Q.   Have you ever discussed that fact with the
21   Lieutenant Governor?
22   A.   No.
23   Q.   Have you ever discussed the importance of the
24   Hispanic vote in general with the Lieutenant Governor?
25        MR. FREDERICK:  Objection, relevance.

---

**335**

1    A.   I have heard Governor Dewhurst say things about
2    the growth in the Hispanic population being the future
3    of Texas.  That where goes the Hispanic population,
4    there goes the State of Texas.  That's not specific to
5    voting.  It's more about the demographics of the state.
6    Q.   (By Mr. Harris)  And when did you hear
7    Lieutenant Governor make those statements?
8    A.   He's made those statements with regard to
9    education and economic development, in jobs programs and
10   the military.  That's all that comes to mind right now.
11   Q.   I think as you've previously stated, today is
12   an election today in Texas; is that right?
13   A.   Yes.
14   Q.   And the Lieutenant Governor is on the ballot in
15   the Republican primary for the U.S. Senate; is that
16   right?
17   A.   Yes.
18   Q.   Have you had discussions with Lieutenant
19   Governor about this current primary election?
20        MR. FREDERICK:  Objection, relevance.
21   A.   Only insofar as it affects my future
22   employment.
23   Q.   (By Mr. Harris)  Gotcha.  It's an important
24   topic to you, I'm sure.
25   A.   Or lack thereof is really what it is.

---

**336**

1    Q.   Have you followed the public polling in the
2    race at all?
3    A.   I've read the newspapers about it, yes.
4    Q.   And do you have a sense of who the chief
5    opposition is to Lieutenant Governor in the race?
6    A.   In the Republican Party, the Democratic Party?
7    Q.   Yeah, in the Republican primaries.  Excuse me.
8    A.   Yes.
9    Q.   And who is that?
10   A.   Well, the top two candidates beneath the
11   Lieutenant Governor are Leppert and Cruz.
12   Q.   And is it correct that recent polling has
13   Mr. Cruz, I guess, in second behind the Lieutenant
14   Governor in the -- in the primary for the U.S. Senate?
15        MR. FREDERICK:  Objection, relevance.
16   A.   I've seen it with Leppert in second, as well.
17   I mean, it's just been in the newspaper.  I don't know
18   how reliable that polling is.
19   Q.   (By Mr. Harris)  Do you have any understanding
20   of Mr. Cruz's ethnic background?
21        MR. FREDERICK:  Objection, relevance.
22   A.   Yes.
23   Q.   (By Mr. Harris)  And what is that
24   understanding?
25   A.   I'm aware his father came from Cuba.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JULIA RATHGEBER                                          MAY 29, 2012

---

**337**

1    Q.  Have you had any discussions with Lieutenant
2  Governor regarding the Hispanic vote in this year's
3  Republican Senate primary?
4          MR. FREDERICK:  Objection, relevance.
5    A.  No, I haven't.
6    Q.  (By Mr. Harris)  Are you familiar with an
7  organization known as King Street Patriots?
8    A.  I have seen it on Governor Dewhurst's schedule,
9  but I have not -- I don't know what they do.  I think
10  they're a tea party organization, but I don't know that
11  for a fact.
12    Q.  Do you know whether the Lieutenant Governor's
13  office had any communications with the King Street
14  Patriots about SB 14?
15    A.  Not to my knowledge.
16    Q.  Do you know whether the Lieutenant Governor's
17  office had any communications with the King Street
18  Patriots about prior iterations of voter ID law in
19  Texas?
20    A.  Not to my knowledge.
21    Q.  Do you know whether the Lieutenant Governor has
22  ever attended events hosted or sponsored by the King
23  Street Patriots?
24    A.  Yes.  I know he has.
25    Q.  And what events are those?

---

**338**

1    A.  I don't know.  I've just seen that on his
2  schedule.  That would not have been handled through the
3  state office.  It would have been a campaign event, and
4  I wouldn't be privy to that information.
5    Q.  Do you know whether the Lieutenant Governor has
6  recently attended any events hosted or sponsored by the
7  King Street Patriots?
8    A.  Yeah.  I don't know how recent, but yes, I
9  think he has been through this campaign season.
10    Q.  You testified that it's your belief that the
11  voter ID law would increase voter confidence in
12  elections in Texas; is that right?
13    A.  Yes.
14          MR. FREDERICK:  Object to the extent it
15  misstates prior testimony, but you can answer.
16    A.  Right.  I do think it increases voter
17  confidence to have a more secure election process.
18    Q.  (By Mr. Harris)  When did you come -- when did
19  you come to that conclusion?
20          MR. FREDERICK:  Objection, relevance.
21    A.  I don't remember the time frame, but it's my
22  personal belief.
23    Q.  (By Mr. Harris)  Have you ever heard any voters
24  in Texas express that belief?
25    A.  I want to say in testimony I have, but it would

---

**339**

1  have been public testimony that people feel like giving
2  an ID is -- for a vote is not onerous, because it's the
3  same as writing a check or getting on an airplane.  And
4  I know there's been testimony to that effect.
5    Q.  Do you recall particular testimony to that
6  effect?
7    A.  Yeah.  I can't tell you who it was or who did
8  it, but I know I've heard that.  It would have been in
9  public.
10    Q.  Well, I appreciate your time, and as promised,
11  we'll try to get you out of here.
12    A.  I appreciate it.
13          MR. HARRIS:  Thank you.  And that will
14  conclude the deposition for the defense interveners
15  subject to reopening the court rules on the motion to
16  compel.
17          (Deposition concluded at 4:12 p.m.)
18
19
20
21
22
23
24
25

---

**340**

1  CHANGES AND SIGNATURE
2    RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20    I, JULIA RATHGEBER, have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted above.
23
24          _____
25              JULIA RATHGEBER

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 1

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,              )
                             )
              Plaintiff,     )
                             )
VS.                          )  CASE NO. 1:12-CV-00128
                             )  (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his  )  Three-Judge Court
official capacity as Attorney)
General of the United States,)
                             )
              Defendant.     )
                             )
ERIC KENNIE, et al.,         )
                             )
              Defendant-Intervenors, )
                             )
TEXAS STATE CONFERENCE OF    )
NAACP BRANCHES, et al.,      )
                             )
              Defendant-Intervenors, )
                             )
TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al.,      )
                             )
              Defendant-Intervenors, )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al.,              )
                             )
              Defendant-Intervenors, )
                             )
VICTORIA RODRIGUEZ, et al.,  )
                             )
              Defendant-Intervenors. )
-------------------------------------------------
                    ORAL DEPOSITION OF
                       DEBBIE RIDDLE
                       MAY 31, 2012
-------------------------------------------------
        ORAL DEPOSITION of DEBBIE RIDDLE, produced as a
```

## 2

```
1    witness at the instance of the Defendant, and duly
2    sworn, was taken in the above-styled and numbered cause
3    on the 31st day of May, 2012, from 9:44 a.m. to
4    5:04 p.m., before Jean Thomas Fraunhofer, CSR in and for
5    the State of Texas, reported by machine shorthand, at
6    the Law Offices of DECHERT LLP, 300 West 6th Street,
7    Suite 210, Austin, Texas 78701, pursuant to the Federal
8    Rules of Civil Procedure and the provisions stated on
9    the record or attached hereto.
```

## 3

```
                    A P P E A R A N C E S

FOR THE PLAINTIFF:
     PATRICK K. SWEETEN
     Assistant Attorney General
     ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
     Austin, Texas 78711
     Tel: (512) 936-1307
     Email: Patrick.sweeten@oag.state.tx.us

FOR THE DEFENDANT:
     MICHELLE A. McLEOD
     JENNIFER MARANZANO
     Trial Attorneys
     U.S. DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue, NW
     Room 7254 NWB
     Washington, DC 20530
     Tel: (202) 305-0115
     Email: Michelle.mcleod@usdoj.gov

FOR THE DEFENDANT FOR THE DEFENDANT-INTERVENOR: TEXAS
STATE CONFERENCE OF NAACP BRANCHES and the MEXICAN
AMERICAN LEGISLATIVE CAUCUS
     EZRA D. ROSENBERG
     DECHERT LLP
     902 Carnegie Center, Suite 500
     Princeton, New Jersey 08540
     Tel: (609) 955-3200
     Email: Ezra.rosenberg@dechert.com
```

## 4

```
                    I N D E X

WITNESS                                     PAGE

DEBBIE RIDDLE
     Examination by Ms. McLeod                  5
     Examination by Mr. Rosenberg             239


Signature and Changes                         274

Reporter's Certificate                        275


                 E X H I B I T S
NO.       DESCRIPTION                       PAGE
Exhibit US-5   SB14 (previously marked)     213
Exhibit US-9   3/23/11 House Journal (previously  229
               marked)
Exhibit US-28   HB218 (previously marked)   141
Exhibit US-44   HB1706 (previously marked)  132
Exhibit US-250  Amended Notice of Deposition  16
Exhibit US-251  District Population Analysis Chart  31
Exhibit US-252  Debbie Riddle website screen pages  73
Exhibit US-253  Report of Bills             106
Exhibit US-254  HB17                        107
Exhibit US-255  HB18                        108
Exhibit US-256  1/11/11 Governor Press Release  110
Exhibit US-257  HB101                       149
Exhibit US-258  2/19/07 Houston Chronicle article  161
Exhibit US-259  HB16                        173
Exhibit US-260  5/26/10 Debbie Riddle website  177
               screen pages
Exhibit US-261  11/16/10 yourhoustonnews.com  182
               article
Exhibit US-262  Texas GOP Vote article      209

IntervGen 1   Facebook page                242
IntervGen 2   SB362                        252
```



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

**5**

1               DEBBIE RIDDLE,
2  having been first duly sworn, testified as follows:
3      MS. McLEOD:  This is the deposition of
4  Representative Debbie Riddle in the matter of Texas v.
5  Holder in the United States District Court for the
6  District of Columbia.  My name is Michelle McLeod.  I'm
7  an attorney with the Department of Justice, and I'm
8  appearing for the defendant, Eric Holder, today.  I'll
9  let the other parties introduce themselves.
10     MS. MARANZANO:  Jennifer Maranzano also
11  for defendant, Attorney General Eric Holder.
12     MR. ROSENBERG:  I'm Ezra Rosenberg from
13  Dechert LLP representing the Texas State Conference of
14  NAACP Branches and the Mexican American Legislative
15  Caucus.
16     MR. SWEETEN:  My name is Patrick Sweeten.
17  I'm with the Texas Attorney General's Office.  I
18  represent the State of Texas and the witness,
19  Representative Debbie Riddle.
20      EXAMINATION
21  BY MS. McLEOD
22    Q.  And, Representative Riddle, if you would just
23  state and spell your name for the record.
24    A.  Debbie Riddle, D-E-B-B-I-E, R-I-D-D-L-E.
25    Q.  Representative Riddle, your deposition is being

**6**

1  taken because you as a member of the Texas legislature
2  were involved in the state's passage of SB14, and you
3  may have information relevant to the case before the
4  District Court in DC.  Have you ever been deposed
5  before?
6    A.  Yes.
7    Q.  Okay.  How long ago was that?
8    A.  11 years ago.
9    Q.  So a little bit.  We'll just go over how things
10  will work today.  I'll ask some questions, and you'll
11  answer them.  At various points, your attorney may
12  object to a question that I may ask.  Many of these
13  objections will be resolved by the court at a later
14  time.  Therefore, unless your attorney specifically
15  directs you not to answer, please respond to my
16  questions.
17      Sometimes your attorney may instruct you
18  not to rely on certain information in answering a
19  question, and if you are following that instruction, if
20  you would just preface with your answer with based on
21  the instruction of my attorney, I can't answer your
22  question or I'm invoking legislative privilege and can't
23  answer your question.  Does that make sense?
24    A.  (Nods head.)
25    Q.  Because the court reporter is taking down

**7**

1  everything being said, I need you to give verbal answers
2  such as yes and no, and not nod your head, as she can't
3  capture that.  The same goes for responses like uh-huh
4  and n-hn.  It's confusing for the record.
5      For the same reasons, we need to make sure
6  that we don't talk over each other, so I'll ask the
7  question, and if you would just wait until I have
8  completed the question to respond, and I'll do the same
9  thing for you.  If for some reason I step on one of your
10  answers, just let me know that you're not finished and
11  I'll back up.
12      As we're going along today, if you want to
13  correct anything that you stated previously or if you
14  want to modify an answer, just let me know, and I'll
15  make sure that gets onto the record, okay?
16    A.  Okay.
17    Q.  If you're not clear on a question that I asked,
18  just let me know and I'll rephrase that, and as we're
19  going along this morning, if you need a break, just let
20  me know, and as long as a question isn't pending, we'll
21  take one, all right?
22    A.  Thank you.
23    Q.  Before we get started, just as a reminder
24  you're under oath and subject to Federal penalties for
25  giving false or misleading testimony, so it's important

**8**

1  to answer my questions truthfully, accurately and
2  completely.  Do you understand?
3    A.  I do.
4    Q.  Okay.  Now are there any reasons such as
5  illness, fatigue or any medications that you are on
6  today that would prevent you from giving full and
7  accurate testimony?
8    A.  No.
9    Q.  Okay.  Do you have any questions about anything
10  we discussed so far?
11    A.  No.
12    Q.  Okay.  We'll just jump right in.
13  Representative Riddle, are you represented by counsel
14  today?
15    A.  Yes.
16    Q.  And who is that?
17    A.  Mr. Sweeten.
18    Q.  Okay.  And we discussed this, but let's go
19  through it again.  Have you been deposed before?
20    A.  Yes.
21    Q.  How many times?
22    A.  Once.
23    Q.  Okay.  And what was the name of the case?
24    A.  It was Riddle versus Harris County Republican
25  Party.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 13

1    A.   The fact that a deposition was being taken.
2    Q.   And did you discussion SB14 at all?
3    A.   No.
4    Q.   Okay.  And did you bring any notes or documents
5  with you today?
6    A.   No.
7    Q.   All right.  I'm just going to talk a little bit
8  about privilege.  It's my understanding as a state
9  legislator today, that you may be invoking privilege.
10  Are you invoking privilege today?
11    A.   Yes, I am.
12    Q.   Have you asserted legislative privilege over
13  documents and other materials in your possession or in
14  possession of your staff members that relate to Texas
15  Senate Bill 14?
16    A.   I think so, but not all.
17    Q.   Okay.  You understand that due to your
18  assertion of privilege, the Office of the Attorney
19  General for the State of Texas has withheld certain
20  documents in your possession that relate to SB14?
21    A.   I'm sorry.  Would you repeat the question?
22    Q.   Certainly.  Do you understand that due to your
23  assertion of privilege, the Office of the Attorney
24  General for the State of Texas has withheld certain
25  documents in your possession that relate to SB14?

## 14

1    A.   M-hm.
2    Q.   And do you further understand that the Office
3  of the Attorney General has not produced those documents
4  to counsel for the US Attorney General in this
5  litigation?
6    A.   Yes.
7    Q.   And do you continue to assert a legislative
8  privilege over documents related to SB14?
9    A.   Yes.
10    Q.   Will you be invoking legislative privilege over
11  your deposition testimony that relates to other voter
12  photo identification bills considered by the Texas
13  legislature in past elections?
14    A.   Yes.
15    Q.   And you realize that you personally hold this
16  privilege; is that right?
17    A.   Yes.
18    Q.   And if you would like to waive the privilege in
19  response to a particular question that I ask during this
20  deposition today, in order to share the truth with the
21  court and the public and your constituents, will you let
22  me know?
23    A.   Yes.
24    Q.   Previously we discussed your deposition
25  preparation.  You said that you met with some

## 15

1  constituents.  What were the names of those
2  constituents?
3    A.   I don't recall the various names.  It wasn't
4  like a sit down meeting.  It was just more in general.
5    Q.   How did it occur?  Over telephone, just in the
6  supermarket?
7    MR. SWEETEN:  With respect to legislative
8  privilege, she's asking you about have you discussed
9  your deposition and so you can discuss that, but
10  don't -- when we get into issues that reveal
11  communications with constituents regarding legislation,
12  then that would be a subject of legislative privilege,
13  so you can question as posed.
14    A.   Just -- We have just finished with a campaign,
15  and I've been spending 8 to 12 hours a day out at the
16  election sites, and so the deposition is pretty much a
17  known fact in my area, and folks would come up and say
18  good luck, I hope everything goes well, that sort of
19  thing.  I could not begin to tell the names.
20    Q.   And so did they know you were being deposed?
21    A.   Well, for one thing, word travels quickly, and
22  I did post it on Facebook, and I did let some folks
23  know, and we're a close community.
24    Q.   Okay.  Sorry.  When did you make the post to
25  Facebook?

## 16

1    A.   I'd have to at my computer, and I don't have it
2  with me.
3    (Exhibit US-250 marked.)
4    Q.   Okay.  Can we please mark this as US
5  Exhibit 250?  Representative, you've been handed United
6  States Exhibit 250.  Do you recognize this document?
7    A.   Give me a chance to read it.
8    Q.   Okay.
9    A.   This is just regarding the deposition, I
10  assume.
11    Q.   Okay.  Do you recognize it as your Notice of
12  Deposition?
13    A.   M-hm.  Yes.
14    Q.   Okay.  And if you would turn to Attachment A,
15  which begins on the third page of the document, but
16  we're actually going to look at the -- I believe it's
17  the fifth page.  If you would just take a look at the
18  documents listed here.
19    A.   Yes.
20    Q.   And just let me know when you are ready.
21    A.   The section that says "documents"?
22    Q.   Yes, ma'am.  And they continue onto the next
23  page as well.
24    A.   Okay.  Okay.
25    Q.   Okay.  Now, did you or a member of your staff



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 29

1    Q.  Okay.
2    A.  You are looking at me really strange.
3        MR. ROSENBERG:  No, I'm just listening
4    very carefully to what you said.
5    Q.  And you are also an author.
6    A.  I don't consider that a profession, yes.
7    Q.  Okay.  So anything else?
8    A.  No.  Back along time ago when we were first
9    married, I worked for an art gallery for a brief period
10   of time.
11   Q.  All right.  And do you have a family history of
12   participation in politics?
13   A.  Yes, I do.
14   Q.  And can you tell me about that?
15   A.  My family has always been very active
16   politically.  My mother is from New Hampshire and a very
17   strong independent, and my daddy is from Texas, and he
18   was very strong Democrat, and so there were lively
19   discussions in our family.
20   Q.  Anyone in your family other than you hold
21   public office?
22   A.  Currently my daughter is Harris County Probate
23   Court 4 judge in Harris County, Texas.
24   Q.  Okay.  And how long have you been a member of
25   the legislature?

### 30

1    A.  I was sworn in April of 2002.
2    Q.  And so that was in the middle of a session?
3    A.  No.  That -- We were in session every odd year.
4    That was during the interim.
5    Q.  Okay.  And have you continually represented
6    House District 150 since 2002?
7    A.  Yes, I have.
8    Q.  And can you describe the geographic location of
9    House District 150?
10   A.  Do you want that geographic location before the
11   redistricting or after the redistricting?
12   Q.  Both.
13   A.  Okay.  Before the redistricting, FM1960 is the
14   southernmost border.  The county line between Harris
15   County and Montgomery County is my northern border.  If
16   you come down FM2978 further north going south, cut that
17   in, draw a line over to Huffsmith-Kohrville, basically
18   that goes from there to Stuebner Airline to 1960, takes
19   a little dogleg that cuts out just a little square,
20   but -- I'm giving you a rough description.  If you carry
21   both the northern boundary and the southern boundary all
22   the way out to Atascocita to Lake Houston, that would
23   describe my district.  It's a large district, and
24   because the population in my district has grown so
25   dramatically, my district basically had to be cut in

### 31

1    half.  So my district was pulled back from the
2    Atascocita area to Aldine Westfield Road and roughly
3    that is now my easternmost boundary.
4    Q.  Okay.  And does your district citizenship stay
5    within Harris County?
6    A.  Totally.
7    Q.  And what's the total population of your
8    district roughly?
9    A.  Prior to the redistricting, I would guess maybe
10   about 250,000.
11   Q.  And can you describe the total after
12   redistricting?
13   A.  We had to cut it by 45,000.
14   Q.  Okay.  And can you describe the racial
15   demographics of your district?
16   A.  I'm sorry.  I don't know.  Constituents are
17   constituents.
18   Q.  Okay.
19   A.  I've not looked at those demographics.
20       (Exhibit US-251 marked.)
21   Q.  Okay.  Can we mark this as US Exhibit 251,
22   please.  Do you recognize this document?
23   A.  Yes.
24   Q.  And can you tell me what it is?
25   A.  It's a district population analysis with the

### 32

1    county subtitles of House District 150.
2    Q.  And do you know what census year it is?  Can
3    you see there at the top?  It's very, very small.
4    A.  It would appear to be 2010 census.
5    Q.  Okay.  And do you see there where it says for
6    total population, B plus H?  The percentage all the way
7    at the end?
8    A.  Yes.
9    Q.  So, I mean, percent BH, not B plus H.  I want
10   you to go down a little further.  Can you tell me what
11   that total population is?
12   A.  Percent BH?
13   Q.  M-hm.
14   A.  It says 43.3.
15   Q.  So would you agree that your current district
16   is about 43 percent black and Hispanic?
17   A.  Or is that what BH stands for?
18   Q.  Yes.
19   A.  If that's what it says.
20   Q.  Okay.  And then was 2002 your first run for
21   public office?
22   A.  Yes, it was.
23   Q.  And did you ever run for, I guess, city council
24   in Georgetown, Texas?
25   A.  Oh, yeah.  Many years ago.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

DEBBIE RIDDLE                                              MAY 31, 2012



45

1    MR. SWEETEN:  I mean, do you -- That's
2  fine.  We can take a break.
3    THE WITNESS:  I mean, this is over a
4  period of quite a bit of time.  This isn't over the past
5  week.  She's asking me and --
6    MR. SWEETEN:  Okay.  Why don't we discuss
7  it and I think we can come back in.  I think -- I mean,
8  are you -- are you asking -- I'll tell you what.  Why
9  don't you just see if you can answer the question, you
10  know, based upon your personal knowledge to the extent
11  you can.  I mean --
12    THE WITNESS:  Okay.  Who have I talked
13  with?  Is that the question?
14    Q.  (BY MS. McLEOD)  Specific constituents, yes,
15  that have mentioned incidents of voter fraud.
16    A.  I'm trying to recall the name that had a
17  concern recently during this past election.  Let me try
18  to pull those names out of my mind, if we can come back
19  to this.  Or we can just take a break as long as you
20  want to.  I'm just going to have to stop and re-roll
21  those tapes because this is -- you asked me a question
22  and what I do is I reach back way into the annals of
23  history in my mind and then you ask me for details.
24  Well, the details reaching way back into the annals of
25  the history of my mind may not be quite as ready, you

46

1  know, to pop out.
2    Q.  Okay.  Well, we certainly can take time while
3  you think of it.  That's fine.  I don't want to ask you
4  other questions because then you'll be thinking about
5  those and not this, so I'll certainly give you time to
6  think.  That's not a problem.
7    A.  My husband is the chairman of the Ballot
8  Security Committee for Harris County Republican Party,
9  and some of this would be through that, and so I'm a
10  little bit concerned about information that might have
11  crossed over coming to me regarding that ballot security
12  committee, and then those two kind of intermingle, and
13  so I have a bit --
14    MR. SWEETEN:  If you are concerned about
15  privilege, then we can discuss that.
16    THE WITNESS:  I am concerned about
17  privilege.
18    MR. SWEETEN:  Okay.  We are going to have
19  a discussion.
20    (Recess from 10:38 a.m. to 10:43 a.m.)
21    Q.  (BY MS. McLEOD)  We're back on the record.
22    A.  I don't have to reveal the content, but some of
23  some of the people.  Kay Smith.
24    Q.  Is it K-A-Y?
25    A.  M-hm.

47

1    Q.  Okay.  Is she a resident of Houston?
2    A.  M-hm.  Yes, yes.
3    Q.  Is she a member of the Texas Tea Party of
4  Republican Women?
5    A.  Yes.
6    Q.  Does she hold any public office?
7    A.  No.  She was just elected, but has not been
8  sworn in yet for the Harris County Board of Education.
9    Q.  Anyone else?
10    A.  Perky Savage.
11    Q.  I'm sorry.  Can you spell that for me?
12    A.  It's an odd name.  P-E-R-K-Y.
13    Q.  Okay.
14    A.  S-A-V-A-G-E.
15    Q.  And is she a resident of Houston?
16    A.  Yes.
17    Q.  And is she a member of the Texas Tea Party of
18  Republican Women?
19    A.  Yes.
20    Q.  Anyone else?
21    A.  The last conversation was just the other day,
22  and I can't remember the name of the constituent because
23  of an instance that we actually saw, so -- but I can't
24  remember his name.  I'm sorry.
25    Q.  It was a he?

48

1    A.  Yes.
2    Q.  And you said "we saw."  Did you observe it as
3  well?
4    A.  M-hm.
5    Q.  And was it in the polling place, the incident?
6    A.  It was -- It wasn't anything that we -- it was
7  so overt that we felt like we could report.  It was just
8  something that we noticed.
9    Q.  Were you a voter at the time?
10    A.  No.  I was there.  I was there meeting with the
11  voters as they came in.  There's a marker that you
12  cannot pass when you're there campaigning.
13    Q.  So you were outside of the polling place?
14    A.  Yeah.  The polling place is like here, the
15  marker is here and I was standing here.
16    Q.  Like 100-foot or 5 feet or, sorry, I'm not sure
17  what it is in Texas, whatever it is.
18    A.  Whatever it is.
19    Q.  And what was the incident that you saw, that
20  you observed?
21    A.  A complete lack of understanding of the voting
22  process, the voting location and not able to communicate
23  in English.  Just a complete disconnect with the entire
24  process.
25    Q.  Okay.  So I just want to clarify a little bit



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



### 49

1    the incident.  So it was a voter or a potential voter,
2    somebody that was presenting to vote?  Was it a male or
3    female?
4        A.  A woman.
5        Q.  Was she of Hispanic origin?
6        A.  It seemed that way.
7        Q.  Was she Spanish speaking?
8        A.  M-hm.
9        Q.  Did she approach you or someone else?
10       A.  She approached the both of us.
11       Q.  She approached you and the gentleman that you
12   were with?
13       A.  M-hm.
14       Q.  And what did she say or attempt to say?
15       A.  My Spanish is very limited, but from what I
16   understood, she didn't seem to have -- she seemed to
17   want to vote, but she had absolutely no idea how to do
18   it, what to do, what was needed.
19       Q.  Did you have any reason to believe that she was
20   not a registered voter or a citizen of the United
21   States?
22       A.  I wouldn't know if she was a citizen or not.
23       Q.  Okay.
24       A.  She was an older lady, so I would have assumed
25   that she would have had more information.

### 50

1        Q.  Okay.  And did you assist her at all in the
2    voting process?
3        A.  I'm not allowed to do that.
4        Q.  Okay.  And did she enter the polling place?
5        A.  We directed her to someone who could assist
6    her.
7        Q.  And can you tell me why that incident -- why
8    you think that was an incident of concern regarding
9    ballot security?
10       A.  That was just simply -- that's a thought I had,
11   no.
12           MR. SWEETEN:  You can testify about your
13   observations related to the incident.
14       A.  99.999 percent of the people that come in know
15   how to come in and vote.  That's really the first time
16   I've ever seen someone -- It was startling to me because
17   I've never seen someone that was just so completely
18   lost.
19       Q.  Was the issue because she didn't know where to
20   go, what to do?
21       A.  She didn't know what to do, where to go, had
22   no -- she was not only limited in English, she really
23   didn't know any English, and I'm limited in my Spanish,
24   though I know some, and I just simply with my limited
25   Spanish directed her to someone else who could help her.

### 51

1        Q.  Okay.  And did you believe that she was, I
2    guess, a nonregistered voter or attempting to
3    impersonate another voter?
4        A.  I have no -- that's -- that was simply the --
5    would be supposition on my part.
6        Q.  And I will clarify the reason why I'm asking.
7    So we were discussing incidents of voter fraud or
8    specific voter fraud that members of the Texas Tea Party
9    of Republican Women may have mentioned.  You gave me two
10   names --
11       A.  This gentleman that was with me was not a
12   member.
13       Q.  I'm sorry.  A third name of the gentlemen that
14   you don't remember, but you said it was an incident that
15   you witnessed together.  When you said incident, I
16   assume you mean incident of voter fraud or an incident
17   that concerned you about ballot security.  So I'm trying
18   to ascertain why you felt that this incident with this
19   particular woman rose to ballot security or a issue with
20   ballot security or an issue with fraudulent voting.
21       A.  The gentleman who was with me that I can't
22   think of his name, we both were perplexed how anyone
23   could come in and attempt to vote and have just a
24   completes disconnect of the entire process.
25       Q.  Okay.  Does Harris County -- do you know are

### 52

1    they subject to 203 or 404 requirements?  Are ballots in
2    the polling place in Spanish?
3        A.  Yes.
4        Q.  Okay.  And so if the woman made it into the
5    polling place, if she could speak Spanish or read
6    Spanish, she would likely be able to cast a vote.
7            MR. SWEETEN:  Objection.  Calls for
8    speculation, but you can answer.
9        A.  I intentionally said to the person that could
10   assist her.
11       Q.  A Spanish speaking poll worker?
12       A.  Indeed.
13       Q.  Okay.  Do you know if she voted?  Do you know
14   at all?
15       A.  I have no idea.
16       Q.  Okay.
17       A.  I cannot go inside the polling location.
18       Q.  I completely understand.  So I just want to
19   turn back to the Texas Tea Party of Republican Women
20   just quickly.  You said they do send out newsletters and
21   they sometimes discuss ballot security and voter fraud.
22   And you discussed some of the topics.  Basically, the
23   general topic you said was they believe in ballot
24   security.  Are there any other specific kinds of
25   discussions that they have within those newsletters --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**69**

1    A.  It would be virtually impossible for me to
2    answer that question without doing that, so --
3        Q.  Well, let's -- let's see if we can.  Let's try.
4    And this is not taking into account any legislation
5    that's -- that was before the legislature.  Outside of
6    conversations that you've had with other legislators or
7    your staff, based on your knowledge as a resident of
8    Texas and virtually -- in Harris County virtually your
9    entire life, someone that is clearly well traveled and
10   well versed in news and things like that, how does voter
11   ID impact freedom?
12       MR. SWEETEN:  I'm going to object to the
13   question.  You are asking for her thoughts, mental
14   impressions, opinions, motivation.  You are asking about
15   voter ID, which is legislation in your question, and it
16   is the -- it's what this litigation is about.  And so
17   when you are asking her her thoughts, mental
18   impressions, you are asking questions that would invade
19   the legislative privilege, and I'm going to instruct you
20   not to answer as to the issue of voter ID.
21       A.  I'm invoking my legislative privilege.
22       Q.  Okay.  And issues are important for your
23   constituents in your district?
24       MR. SWEETEN:  In answering the question,
25   don't reveal specific communications that you've had

**70**

1    with constituents.  If you cannot answer the question
2    without doing so, then do not and my instruction will be
3    not to do so based on the legislative privilege.
4        A.  It would be very difficult for me to answer
5    that question without violating these things, so I'm
6    going to have to invoke legislative privilege on that.
7        Q.  I'm going step back to this question and just
8    be very -- I'm actually just looking for general topics
9    here, not specific conversations you've had with any
10   constituents, but as someone that's represented the
11   district for 10 years.  What do your constituents care
12   about?  It doesn't have to be voter ID if they don't
13   care about that.  I'm just asking for issues in general,
14   not based on any legislation, not based on any specific
15   conversation.  General topics.
16       A.  Freedom.
17       Q.  Anything else?
18       A.  I think everything falls under that umbrella.
19       Q.  Okay.  So what other aside from a religious
20   freedom that we've already mentioned?
21       A.  Safety, security.
22       Q.  Okay.  Like from criminals or what do you mean
23   when you say safety and security?
24       A.  When they take their children to school, they
25   want the streets to be safe.  They want the schools to

**71**

1    be safe.  They want their shopping malls to be safe.
2        Q.  Okay.  Is voter ID and ballot security
3    important to your constituents?
4        MR. SWEETEN:  In answering the question,
5    do not reveal constituent communications that you had.
6    If answering the question and doing so you would be
7    revealing the substance of conversations you had with
8    constituents, do not answer the question.
9        Q.  And, again, I'm not asking for specific
10   communications.  For instance, you said you hold town
11   halls, you hurt your leg at a public event.  There I
12   imagine that constituents express concerns to you.  So
13   in the public forum even, not someone that came into
14   your office.
15       MR. SWEETEN:  You are free to include
16   matters -- This is part of my instruction.  You are free
17   to include matters of the public record.
18       A.  Yes.  In town hall meetings and in that list
19   under freedom, I mentioned security, I would say a
20   secure ballot box would also fall under that.
21       Q.  Anything else because you've talked about
22   religious freedom, ballot box security, safety and
23   security, taking your kids to school or just out and
24   about in Harris County.  Anything else?
25       A.  Border security.

**72**

1        Q.  Okay.  Anything else?
2        A.  I think that pretty much wraps it up.
3        Q.  Okay.  And -- And when you ran for office in
4    2002, did you have a platform, issues that you
5    campaigned on?
6        A.  M-hm.
7        Q.  And what were those issues?
8        A.  I have not changed those issues.  I've said
9    that the number one priority for government and for any
10   official is to make sure that the safety and security of
11   the people of Texas is well established, and if that
12   number one priority isn't done and done well, there is
13   no number two priority.
14       ==Q.  When you say safety and security of the==
15   ==citizens of Texas, what do you mean by that?==
16       ==MR. SWEETEN:  You are asking about what==
17   ==she campaigned on?==
18       ==MS. McLEOD:  Absolutely.==
19       ==A.  Okay.  There's been a big issue in Houston==
20   ==regarding ID theft.  That's not just an issue in==
21   ==Houston.  I think that's probably all over, so ID theft==
22   ==is a big issue.  Crime in Houston is an issue and border==
23   ==security is a big issue.  Security is a major issue.==
24       ==Q.  Okay.  When you say "ID theft," do you mean==
25   ==like stealing someone's identity using their social==



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 73

1    security number?
2    A.  Yes.  Identification theft.
3    Q.  And has that position -- I'm sorry.  The issues
4    that you campaigned on, had they changed -- did they
5    change in 2004?  Did you add additional issues?  Did you
6    change your platform in any way?
7    A.  They have not been changed.  They have been
8    enhanced.
9    Q.  So between 2002 and 2012, what additional
10   issues have you campaigned on?
11   A.  I wouldn't say it was a campaign --
12   Q.  Okay.
13   A.  -- as much as issues that the community has
14   because in that period of time, the Mexican drug cartel
15   gangs have increased dramatically in Houston.
16   Q.  Okay.
17   A.  We've gone like from one gang to seven.
18   Q.  Okay.  And so with the increase in gang, how
19   has that affected, I guess, the issues that are
20   important to you and your constituents or things that
21   you hear in town halls and things that you've
22   incorporated --
23   A.  Goes back to security and freedom.  It circles
24   back around.
25            (Exhibit US-252 marked.)

### 74

1    Q.  Okay.  I'm going to mark this as US
2    Exhibit 252.  I have done an incredible stapling job,
3    which I stapled upside down.  So I'm going to remove the
4    staple before I give this to the Representative.  I'm
5    sorry about that.  And, Representative, just take a look
6    at what you've got there and then let me know when you
7    are ready.
8    A.  (Witness complied.)
9    Q.  Okay.  Are you familiar with this document
10   here?
11   A.  It looks like this came off my website.
12   Q.  Okay.  And what is -- It's, I guess, from your
13   website?
14   A.  It looks like it came off my website.
15   Q.  The issue section of your website?
16   A.  M-hm.
17   Q.  Okay.  And so I just want to walk through these
18   issues, and do you see what's listed there first?
19   A.  Yes.  I'm thanking my constituents for allowing
20   me to honor them or to serve them.  I feel honored by
21   the privilege of serving them.
22   Q.  What's the first thing listed under issues?
23   A.  Illegal immigration.
24   Q.  And so can you tell me why illegal immigration
25   is an issue that's important to you?

### 75

1            MR. SWEETEN:  Hold on.  Don't reveal your
2    thoughts, mental impressions, opinions, motivation about
3    legislation or in furtherance of the legislative process
4    in answering the question.
5    A.  Well, there's really no answer to the question.
6    It's right there.
7    Q.  Okay.  Well, what's right there?
8    A.  "Every year illegal immigrants cost the state
9    billions in your hard-earned tax dollars by providing
10   services to those who have no right to be in our country
11   in the first place.  We must stop all public benefits to
12   illegal immigrants, punish employers who hire them and
13   allow our local law enforcement officials to expedite
14   the process of arresting and deporting them to their
15   country of origin."
16   Q.  Okay.  And the next next issue?
17   A.  Our appraisal caps.
18   Q.  Can you tell us why this issue is important to
19   you?
20            MR. SWEETEN:  Same thing.  Don't reveal
21   thoughts, mental impression, opinions, motivation about
22   legislation or in furtherance of the legislative
23   process.
24   A.  Well, it's pretty self-explanatory.  "Citizens
25   are being taxed out of their homes, not by the tax rate

### 76

1    alone, but by the never ending and radical increase in
2    the appraised value of their homes.  We must continue to
3    fight to allow counties to set the appraisal cap as low
4    as 3 percent to protect families from losing the
5    American dream."  I can't add to that.  It says it all.
6    Q.  Margins tax.  Can you tell me why that's an
7    issue, that's important to you?
8            MR. SWEETEN:  Same objection.
9    A.  Same song, second and third verse.  I can't add
10   to that either.  The margins tax.  "The ugly and unfair
11   margins tax went into effect in 2008 and it's already
12   doing irreparable harm to small businesses in Texas and
13   is threatening the state's economic stability.  We must
14   repeal the tax immediately, return to a broad-based
15   franchise tax and replace the difference in state income
16   by eliminating wasteful government spending."  That says
17   it all.
18   Q.  And the next topics?  What's the next heading?
19            THE WITNESS:  Same thing?
20            MR. SWEETEN:  Same instruction.
21   A.  Once again, can't add to this.  It says it all.
22   Q.  Can you read the heading there for the record,
23   please?
24   A.  Voter ID and Proof of Citizenship.
25   Q.  And why is that an issue that's important to



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 77

1  you?
2        MR. SWEETEN:  Same objection and
3  instruction.
4     A.  It says right here, "The sovereign right to
5  vote that you and I are guaranteed as citizens of this
6  nation is our most precious freedom," emphasize freedom,
7  "second only to our freedom of religion.  This right
8  must be protected through the use of photo
9  identification at the voting place and a requirement
10 that each voter approve upon registration that they are
11 a citizen of the United States."
12    Q.  Okay.  And the next?
13       THE WITNESS:  I assume the same
14 instructions go with that, counsel?
15       MR. SWEETEN:  That's correct.
16    A.  "If over the last 20 years Texas had limited
17 growth in state spending to meet the needs created by
18 the increase of population and rate of inflation, we
19 would have saved more than $300 billion.  We must limit
20 the rate of state spending to meet this standard and
21 implement the same kind of fiscal responsibility at the
22 state level that you and I implement in our household
23 budgets."
24    Q.  Okay.  So are these issues the issues that kind
25 of encapsulate what's important for your constituents?

## 79

1  If you are asking her right now what is the current
2  existing law with respect to that, she can answer that
3  question.
4     Q.  (BY MS. McLEOD)  Yes.  It's completely unrelated
5  to any legislation.  I'm asking about this issue heading
6  from your website, Voter ID and Proof of Citizenship.
7     A.  So let me clarify the question.  Can a
8  noncitizen get a photo ID?
9     Q.  Obtain a photo ID.
10    A.  If they are here legally, I believe they can,
11 but I suspect you could get a Sam's card if you are not
12 legal.
13    Q.  So can a noncitizen obtain a driver's license?
14    A.  If you are here -- if you are here on a visa --
15 If you are here legally on a visa, yes, you can obtain a
16 Texas driver's license.  If you are here legally with a
17 visa, however, the law in Texas now is that your
18 driver's license would expire when your Visa expires.
19    Q.  Okay.  Do you have any reason to believe that
20 noncitizens are voting?
21    A.  That's --
22       MR. SWEETEN:  Hold on a minute.  Don't
23 reveal thoughts, mental impressions, opinions,
24 motivation about legislation or in furtherance of the
25 legislative process included in that.  Don't reveal any

## 78

1     A.  Absolutely.
2     Q.  Okay.  And I would like to go back to the voter
3  ID and proof of citizenship, and I want to ask how is
4  voter ID connected with citizenship unrelated to any
5  legislation that's before the House?  You have grouped
6  here voter ID and proof of citizenship, and I just want
7  to know how they're related?
8        MR. SWEETEN:  In answer to that question,
9  don't reveal your thoughts, your mental impressions or
10 opinions or motivation about legislation or in
11 furtherance of the legislative process.  You can answer
12 the question to the extent you are not doing so.
13    A.  According to the laws of the United States of
14 America, in order to be eligible to vote, you must be a
15 citizen.
16    Q.  Okay.  And so can noncitizens obtain a photo
17 ID?
18       MR. SWEETEN:  You are saying as we're
19 sitting here now under current law?  Is that the
20 question?
21       THE WITNESS:  I don't know if there would
22 be another way, but to ask that question --
23       MR. SWEETEN:  Well, I'm obviously asking
24 for the clarification of the question because I think
25 that helps us as to whether to assert privilege or not.

## 80

1  of the communications that we've outlined before as
2  those would be subject to the legislative privilege, so
3  I'm instructing you accordingly.
4     Q.  Again, unrelated to any legislation related to
5  completely to the issue topic that you have here on your
6  website where you have listed proof of citizenship and
7  voter ID under one heading, do you have reason to
8  believe -- and it says the sovereign right to vote that
9  you and I get -- I'm sorry -- The sovereign right to
10 vote that you and I are guaranteed as citizens in this
11 nation is the most precious freedom.  The right to vote
12 must be protected through the use of photo
13 identification and the requirement that each voter prove
14 upon registration that they are a citizen of the United
15 States.  Do you have a reason to believe that
16 noncitizens are attempting to register to vote?
17    A.  I don't have anything to expand on it.  I've
18 said what I've said, and it's very clear.
19       MR. SWEETEN:  Same instruction.  Go ahead.
20 You can answer the question.
21    A.  It's very clear what I've said.  I can't add to
22 that.
23    Q.  The question was do you have any reason to
24 believe that noncitizens are attempting to register to
25 vote?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 81

1    MR. SWEETEN:  Same objection, same
2  instruction as to legislative privilege.  You can refer
3  to matters of the public record.
4        A.  This is a public record.  This is out.  Other
5  than that, I would have to assert legislative privilege.
6        Q.  But this is unrelated to any legislation.
7  Anything in the public record, anything non-related to,
8  I guess, legislation then, but this is discussing an
9  item on your legislative website.  Do you have reason to
10  believe that noncitizens are registering to vote?
11        MR. SWEETEN:  Same objection and same
12  instruction.
13        Q.  And it's yes or no.
14        A.  Everything that I say here, I cannot add to it
15  or take away anything from it.  I think it's pretty
16  self-explanatory.
17        Q.  I'm not sure if I should wait for an answer,
18  but --
19        MR. SWEETEN:  She's answered the question.
20        MS. McLEOD:  She hasn't answered the
21  question.
22        MR. SWEETEN:  Yes, she's answered the
23  question.
24        A.  I've answered the question.  A hundred percent
25  of it is right here.

---

### 82

1        Q.  Does that mean the --
2        A.  Would you like me to read it again?
3        Q.  No.  Does that mean the answer is yes, that you
4  have reason to believe --
5        A.  I'll be happy to read it again.
6        MR. SWEETEN:  The Representative has
7  answered the question that you've posed.
8        Q.  I definitely think the answer is nonresponsive,
9  but for the sake of the nonresponsive answer that I
10  continue to get, I will move on in the interest of time.
11        Does an applicant for -- A voter
12  registration applicant, do they have to swear to
13  citizenship upon registering to vote?
14        MR. SWEETEN:  You can answer.
15        A.  I believe that they do.
16        Q.  Okay.  We'll move on from this.  In
17  December 2010, you published a book; is that correct?
18        A.  Yes.
19        Q.  And what's the title of your book?
20        A.  Taking Back Your Country, Your Community and
21  Your Kids.
22        Q.  And what's the book about?
23        A.  It's a very easy to read simple book for people
24  who want to become politically active that don't really
25  know how.  It's a book about how to get involved in the

---

### 83

1  grassroots level.  It's not really a partisan book.  I
2  talk about if you are Democrat, how you can get involved
3  with your precinct at the precinct level.  Same
4  Republican, Democrat, how to get involved at the local
5  level with campaigns, elected officials.  I talk about
6  in the book -- You ought to read it.  It's a good book.
7  You can read it in about 45 minutes.
8        Q.  I read it.
9        A.  Did you like it?
10        Q.  It was an interesting read, Representative.
11        THE WITNESS:  She's nonresponsive.
12        MR. SWEETEN:  We can't object to her.
13        THE WITNESS:  I want a yes or no.
14        MR. SWEETEN:  All right.
15        MS. McLEOD:  Okay.
16        A.  Okay.  It was in response to people out of
17  frustration asking what can I do.
18        Q.  Okay.
19        A.  I didn't write it to get an award or to impress
20  anybody or to do anything other than to just simply have
21  a quick easy to read little book that would help people
22  become more politically involved.
23        Q.  Okay.  And how was that book received in the
24  community in your opinion?
25        MR. SWEETEN:  Don't reveal constituent

---

### 84

1  communications, if you can answer.
2        A.  They obviously liked it better than you did.
3        Q.  And how is it received by other legislators?
4        A.  I don't know that all my colleagues have read
5  it.  Those that have liked it.
6        Q.  And they've told you that they liked it.
7        A.  M-hm.  A few.
8        Q.  I just generally want to know how the book was
9  received is all.  Are you a registered voter in Harris
10  County?
11        A.  Yes, I am.
12        Q.  When was the last time you voted?
13        A.  The last election.
14        Q.  When was that?
15        A.  We just had it during early -- I voted during
16  early voting.  I don't remember the exact day.  We just
17  had an -- our election day was the 29th.
18        Q.  And you voted in a polling place then early
19  or --
20        A.  I voted in a polling place early.
21        Q.  Was that your normal polling place?
22        A.  It was actually a new polling place.
23        Q.  Okay.  A new polling place because of
24  redistricting?
25        A.  Parking.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 89

1    Q.  Yes.
2    A.  No.  Probably not that long.  The bus comes
3    around a lot.
4    Q.  Do you know how much it costs to take the bus?
5    A.  I've not ridden the bus for a while.  I don't
6    think it's very much.
7    Q.  Do you know how much it would cost to take a
8    cab from your house to the driver's license office?
9    A.  M-hm.
10   Q.  Do you know the hours of the driver's license
11   office?
12   A.  No.  I would assume work hours, but I don't
13   know.  They might stay open before and after work.  I
14   don't know.
15   Q.  Are they open on the weekends?
16   A.  I don't know.
17   Q.  Do you know how many driver's license offices
18   there are in Texas?
19   A.  No.
20   Q.  Is there a driver's license office in every
21   county in Texas?
22   A.  I don't know.
23   Q.  Do you know whether some driver's license
24   offices are currently closed because of funding issues?
25   A.  That I don't know.

---

### 90

1    Q.  Do you know if any driver's license offices are
2    currently using reduced hours?
3    A.  I don't know.
4    Q.  Do you currently possess a certified copy of
5    your birth certificate?
6    A.  Yes, I do.
7    Q.  Does the name on your birth certificate match
8    the name on your driver's license?
9    A.  Yes, it does.
10   Q.  Do you know where you would go to obtain a
11   certified copy of your birth certificate if you lost it?
12   A.  Yes.
13   Q.  Where would you go?
14   A.  I would go to the office downtown where the
15   records are kept, and I can't think of the name of the
16   building, but it would be downtown, I think.
17   Q.  And how -- how far is that office from your
18   house?
19   A.  Downtown by car is 45 minutes.
20   Q.  Okay.  Do you know -- Do you know how much a
21   copy of a certified birth certificate would cost?
22   A.  No.
23   Q.  Do you know how long it takes to obtain a copy
24   of your birth certificate?
25   A.  N-hn.

---

### 91

1    Q.  So did you legally change your name on your
2    birth certificate upon marriage?
3    A.  I've been married 42 years.  I don't recall.
4    Q.  Okay.  But is the name -- Is Riddle your maiden
5    name?
6    A.  No.
7    Q.  And is the name on your birth certificate
8    Riddle?
9    A.  No.  I thought -- I'm sorry.  I got confused by
10   your question.  No.  My birth certificate has my birth
11   name on it.
12   Q.  Okay.  And do you have the copy of the order
13   that legally changed your name when you did this?
14   A.  I have a marriage license.
15   Q.  Okay.
16   A.  I have a copy of that.
17   Q.  And if you lost your marriage license, do you
18   know where I would go to get it copied?
19   A.  Where you get records for all of those sorts of
20   things.
21   Q.  Do you know the name of that office?
22   A.  It's downtown.  I think it's the county clerk's
23   office, but I'm not sure.
24   Q.  Do you how much a copy would cost?
25   A.  No.

---

### 92

1    Q.  Do you know how long it would take to obtain
2    it?
3    A.  No.
4    Q.  Do you personally possess a United States
5    passport?
6    A.  I do.
7    Q.  And how would a person would go about obtaining
8    a passport?
9    A.  I absolutely know.
10   Q.  What are the steps?
11   A.  The office is downtown.  You can also mail it
12   in through the post office, so you can actually get a
13   passport and not leave your living room.  You can just
14   get that information from the post office and send that
15   in by mail.
16   Q.  What documents are necessary to obtain a United
17   States passport?
18   A.  I believe you have to have a birth certificate,
19   but I don't recall.  I've had my passport now for a
20   while.
21   Q.  Anything else?  Any other documents?
22   A.  Other than a birth certificate, you have to
23   have your Social Security card.
24   Q.  And if the name on your birth certificate
25   didn't mention, for instance, the name on your license

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                           MAY 31, 2012

---

93

1  or the name on your Social Security card, do you know if
2  that would cause a problem?
3      A.  When I got my first passport, I had a birth
4  certificate, marriage license, Social Security number.
5  I had everything with me, so I didn't have any problem.
6      Q.  Do you know if a person would have a problem if
7  the name didn't match, for instance, on your birth
8  certificate?
9      A.  I'm not sure.  I don't know.
10     Q.  Do you know how long it would take to obtain a
11 United States passport?
12     A.  I don't recall.  I've got my passport with me.
13 I could --
14     Q.  It probably doesn't have the cost on it.  Do
15 you know how long it takes to obtain a United States
16 passport?
17     A.  You can actually do it quickly if you need to.
18 You can expedite it.  They do have a process in which it
19 can be expedited.  So if I have a plane ticket or for
20 any other reason, it needs to be expedited, you can
21 request that it be expedited.
22     Q.  Is there an additional cost for that?
23     A.  I believe that there is, but I think that it's
24 not absolutely necessary if you request to have it
25 expedited for -- for a purpose.

---

94

1      Q.  So, for instance, if I didn't have a United
2  States passport, but I had a flight in two weeks, I
3  could get it expedited without paying additional money?
4      A.  I don't know about the money factor, but I do
5  know that you can have it expedited.
6      Q.  And do you know how fast you are able to obtain
7  it, a week, two weeks, three weeks?
8      A.  I think you can expedite it up to a couple of
9  days.
10     Q.  Okay.
11     A.  I've never had to do that.  That's just the
12 information I've been given.
13     Q.  Okay.  And do you have a military ID?
14     A.  No.
15     Q.  Okay.  Do you know if military IDs are uniform
16 across all branches of service?
17     A.  I don't know.
18     Q.  Okay.  Do you know how often military IDs
19 expire?
20     A.  I don't know.
21     Q.  Do you know the process involved with renewing
22 or replacing a military ID?
23     A.  I'm sorry?
24     Q.  Do you know the process involved with renewing
25 or replacing a military ID?

---

95

1      A.  No.
2      Q.  Would you recognize an authentic military ID if
3  you saw one?
4      A.  I'm not an expert on ID.
5      Q.  Would you recognize one if you saw one?
6      A.  I think I would, but fraudulent things are done
7  all the time, so I don't know.
8      Q.  And do you have a tribal ID?
9      A.  No, n-hn.
10     Q.  Do you know how many American Indian tribes
11 there are in Texas?
12     A.  I could probably count them up, but I don't
13 know exactly how many.
14     Q.  More than 50?
15     A.  There's the Alabama Coushatta.  My
16 daughter-in-law is a Wyandotte Indian.  My
17 great-grandmother mother was Crete.  Cherokee.  I could
18 try to count them up in my head, but off the top of my
19 head, I don't know the exact number.
20     Q.  Do you know if it's more than 25?
21     A.  I don't know.  I could try to think of all of
22 them.
23     Q.  Okay.  That's all right.  Do you know if tribal
24 IDs are uniform across all tribes?
25     A.  I don't know that.

---

96

1      Q.  Okay.  And do you know if tribal IDs expire?
2      A.  I don't know that either.
3      Q.  And would you recognize an authentic tribal ID
4  if you saw one?
5      A.  I'm not an expert on authenticity of tribal
6  IDs.
7      Q.  So would you recognize an authentic one if you
8  saw one?
9      A.  If you showed me one, I could recognize it as a
10 tribal ID, but to be able to say it's an authentic ID,
11 I'm not an expert on authenticity of tribal IDs.
12     Q.  What other types of ID are produced by the
13 State of Texas and its agencies?
14     A.  Texas has an ID that costs nothing.  You can go
15 to your -- where you get a driver's license and simply
16 get a state ID that costs you absolutely nothing, and,
17 frankly, the line is not very long, and you can usually
18 get in there and out of there and have a state ID, and I
19 have I recommended that to people because you can't
20 even -- you can't even get to a Federal building -- you
21 can't even get into Eric Holder's building without an
22 ID.
23     Q.  Do you know the underlying documents that are
24 required for that free state ID?
25     A.  No, I'm not sure.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 97

1     Q.  Do you know if those underlying documents are
2   provided for free?
3     A.  I would suspect a birth certificate, but I
4   don't know.  I could check it out for you.
5     Q.  Now, you stated previously that the line is
6   pretty short.
7     A.  That's what I've been told.
8     Q.  Is that for your location?
9     A.  I've been told that's the case pretty much
10  across the board.
11    Q.  Have you heard public testimony or in any
12  public forum lines or wait times in -- for driver's
13  licenses or state IDs that are over an hour or
14  two hours?
15    A.  I can't think of any.
16    Q.  Okay.  Are any other IDs produced by the State
17  of Texas and its agencies?
18    A.  You didn't mention conceal and carry.
19    Q.  Okay.  And do you know if there's a cost
20  associated with obtaining a conceal and carry ID?
21    A.  Yes.
22    Q.  Do you know the cost?
23    A.  I don't know what it is now.
24    Q.  Does conceal and carry ID -- is it a photo ID?
25    A.  M-hm.

## 98

1     Q.  Would you recognize an authentic one if you saw
2   one?
3     A.  I would recognize one.  Again, I'm not an
4   expert on authentic, but I couldn't guarantee it.
5     Q.  As a member of the state legislature, are you
6   provided with a ID -- a legislative ID?
7     A.  I can show you mine.
8     Q.  I'd rather you not show it.
9         MR. SWEETEN:  Just answer her questions.
10    Q.  You are?
11    A.  M-hm.
12    Q.  Does it expire?
13    A.  M-hm.
14    Q.  How often does it expire?
15    A.  Once a year.
16    Q.  Does it have a photo?
17    A.  M-hm.
18    Q.  Does it establish your identity?
19    A.  Yes, it does.
20    Q.  And do state colleges provide students with
21  IDs?
22    A.  M-hm.
23    Q.  Do you know if it has -- if they have photo
24  IDs?
25    A.  I believe it does.

## 99

1     Q.  Do you believe that those establish a photo
2   identity?
3     A.  It establishes the fact that that student
4   attends a college.
5     Q.  And do state employers provide their
6   employees -- Does the State of Texas provide their
7   employees with IDs --
8     A.  Yes.
9     Q.  -- and photo identification?
10    A.  Yes.
11    Q.  And would those establish a person's identity?
12    A.  It establishes the fact that that person is a
13  state employee.
14    Q.  Okay.  Would you recognize a authentic state
15  employee ID if you saw one?
16    A.  I would recognize a state employee ID, but,
17  again, I'm not an expert on authenticity.
18    Q.  What about a state college ID?
19    A.  Again, I would recognize it as a state ID from
20  a university, but I'm not an authority on authenticity.
21    Q.  What ID are you carrying with you today?
22    A.  I have my state ID, my driver's license.  I
23  think my passport is also in my purse, but I'm not sure.
24    Q.  When you say "state ID," what do you mean?
25    A.  The identification that I need to get into the

## 100

1   Capitol building when the doors are locked or to get
2   through.  It's to get on the elevator and stuff.
3     Q.  So that's your -- like your legislator's ID?
4     A.  Yes.
5     Q.  I didn't know if you meant the state ID that
6   you said was provided for free.  And which one of those
7   have your photo on them?
8     A.  All of them.
9     Q.  Okay.  And do any of those establish your
10  citizenship?
11    A.  My driver's license, I think.  Does my driver's
12  license -- I can look at it if you want me to.
13    Q.  No, that's okay.  Do you know if it says on
14  your driver's license if you are a United States
15  citizen?
16    A.  I'd have to look at it and see.
17    Q.  Okay.  And when was the last time you were
18  asked to prove your citizenship?
19    A.  In October.
20    Q.  When was that or for what purpose was that?
21    A.  When I was leaving to go to Israel.
22    Q.  And how did you prove it?
23    A.  With my passport.
24    Q.  Okay.  And how often does that occur?
25    A.  I go to Israel about once a year.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 101

1   Q.  Okay.  At R&R Quarterhorse Farm, how many
2   people do you employ?
3       A.  I don't.  It's a family business.
4       Q.  Okay.
5       A.  It's a family business.
6       Q.  And do you verify citizenship of your
7   employees?
8       A.  Yes.
9       Q.  And how is that done?
10      A.  We look at their information, the birth
11  certificate.
12      Q.  Okay.  So employees provide a birth
13  certificate?
14      A.  M-hm.
15      Q.  Okay.  And would you recognize an authentic
16  birth certificate if you saw one?
17      A.  Recognize a birth certificate when I see one?
18  Again, I'm not an authority on authenticity, but if it
19  looks like a birth certificate, you take it on face
20  value.
21      Q.  Okay.  And the same, I guess, for your
22  husband's firm, Riddle and Akiens --
23      A.  Attorneys at law.
24      Q.  Okay.  Attorneys at law.  Do you know how they
25  verify citizenship of their employees?

## 102

1       A.  Well, we have to have Social Security
2   information.
3       Q.  Okay.
4       A.  And so we have the Social Security information
5   and driver's license and all of that sort of thing that
6   go with it.
7       Q.  Does a Social Security number establish
8   citizenship?
9       A.  Not necessarily, but if -- I understand that
10  there are those who fraudulently have -- I know that
11  that exists, but our employees, we have all their
12  information, driver's license, Social Security numbers,
13  that sort of thing.
14      Q.  Okay.  Anything else that you request from
15  those employees other than driver's license and Social
16  Security number?
17      A.  N-hn.
18      Q.  Okay.
19      A.  Basically the people that we employ that are at
20  the law firm or the R&R Quarterhorse Farms is the same
21  thing.
22      Q.  Okay.  Now, as we sit here today, and I want
23  you to answer this question without regard to any
24  legislation that may have come before the legislature,
25  in your opinion, what documentation would sustain a

## 103

1   potential voter's citizenship?
2           MR. SWEETEN:  In answering the question,
3   don't reveal thoughts, mental impressions, opinions or
4   motivations about legislation or discussions that you've
5   had with legislators, legislative staff, state agencies,
6   Texas legislative counsel or constituents.  You can
7   answer the question to the extent you are not doing that
8   or you can refer to matters in the public record.
9           (Requested portion was read.)
10          MR. SWEETEN:  Same instruction.
11      A.  I think it's pretty much public record that a
12  birth certificate would be quite adequate.
13      Q.  Anything else?
14      A.  If one has legally become a citizen, if they've
15  immigrated here and they've gone through the process and
16  they've become a citizen, then the documentation for
17  that.
18      Q.  Okay.  Like a green card, citizenship papers,
19  something specific, both of those things?
20      A.  Their citizenship papers.
21      Q.  Citizenship papers and a birth certificate.
22  Anything else?
23      A.  I'm trying to think.  In order to sustain
24  citizenship, I think that that would be about it, but I
25  don't know.  I would have to give that more

## 104

1   consideration, but off the top of my head, that's what
2   I'm thinking.
3           MS. McLEOD:  I think this is a great place
4   to break for lunch.
5           (Recess from 12:07 p.m. to 12:40 p.m.)
6       Q.  (BY MS. McLEOD) We're back on the record.
7   Representative Riddle, on the 82nd legislature, you
8   authored a number of bills, correct?
9       A.  Yes.
10      Q.  Do you know how many bills you authored?
11      A.  Oh, I don't remember.
12      Q.  And are you familiar with the term camped in?
13      A.  Yes.
14          MR. SWEETEN:  Did you say camped?
15      Q.  Camped, C-A-M-P-E-D.  Can you tell me what that
16  means?
17      A.  It means camped out actually.
18      Q.  Camped out?
19      A.  We're a scouting family.  That means that you
20  go camp out or if you are referring to my staying at the
21  Capitol, that's probably what you related to.
22      Q.  Can you tell me what did -- was it camped in or
23  camped out?
24      A.  Camped out.  I wanted to have low bill numbers.
25  I do -- Every session I file my bills early.  That gets



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 121

1  state constitution, do they give -- they provide you
2  with a written opinion about the bill's compliance?
3      A.  Not necessarily.  They -- When we get the draft
4  back, we review the draft.  If the bill doesn't
5  accomplish our original intent, then we send it back.
6  We continue that refining until the bill does, but if at
7  any time that it would run counter to the constitution,
8  then they would let us know and we could remedy that.
9      Q.  Okay.  And how would they let you know?
10     A.  Through the communication back and forth.
11     Q.  So it's usually a verbal communication,
12  something that's not written?
13     A.  That would be correct.
14     Q.  So, for instance, when you get a bill back,
15  their draft from Texas legislative counsel, is there
16  ever a written kind of analysis that goes with it?
17     A.  Well, there is a bill analysis that they have
18  with it.
19          MR. SWEETEN:  Just answer her question.
20     To some degree, yes.
21     Q.  And what does the bill analysis include?
22          MR. SWEETEN:  Don't reveal the substance
23  of any bill analysis that you've been provided by the
24  Texas legislative counsel.  If you are answering this
25  question as a general matter, that's fine, but don't

### 122

1  reveal the substance.
2      A.  A brief summary.
3      Q.  What does the summary usually entail?  What do
4  you mean a summary?  Does it include a fiscal impact?
5  Not of any specific legislation, just generally.  I
6  imagine these are standard forms by the Texas
7  legislative council.
8      A.  Well, the LBB does the fiscal impact.
9      Q.  What is included in the Texas Legislative
10  Council summary?
11          MR. SWEETEN:  If you can't reveal it
12  without revealing the detail within it, don't do that.
13     A.  Just a general summary, and then my staff, we
14  work on -- with the general summary as well.
15     Q.  Okay.  I'm think I'm trying to ascertain what
16  would be in the general summary.  Is it a summary of the
17  bill?  Is it a summary of what you asked them to do?
18     A.  No.  Just a brief summary of the bill.
19     Q.  Just a brief summary of, I guess, kind of like
20  the captions that we went through?
21     A.  Exactly.
22     Q.  Does it include any other information?
23     A.  M-hm.
24     Q.  What's the LBB?
25     A.  Legislative Budget Board.

### 123

1      Q.  Okay.  And any bills that you draft or in the
2  all bills that you draft do you receive fiscal impact
3  from the LBB?
4      A.  Yes.
5      Q.  And is the bill, I guess, transmitted to them
6  from the Texas legislative counsel or by your staff?
7      A.  Through ledge council.
8      Q.  Okay.  And at some point you get all this back.
9  Do you get any other reports or any -- from anyone else
10  on the bill?
11     A.  No.
12     Q.  Okay.  Are you familiar with Section 5 of the
13  Voting Rights Act?
14     A.  Vaguely.  I know it exists.
15     Q.  What is your understanding of Section 5
16  requirements?
17     A.  I can't articulate the requirements.  I know
18  that the Voting Rights Act exists.  I know it's law.
19     Q.  Are you familiar with the term retrogression?
20     A.  Vaguely familiar.
21     Q.  And how would you define that?
22          MR. SWEETEN:  In answering the question,
23  don't reveal your thoughts, mental impressions, opinions
24  or motivations about legislation or in furtherance of
25  the legislative process.

### 124

1      A.  I'm not quite understanding.
2      Q.  I was just asking you to define the term
3  retrogression if you can.
4          MR. SWEETEN:  You can define the term
5  retrogression, if you know.
6      A.  I'm not sure.
7      Q.  Okay.  And are you familiar with the term
8  discriminatory intent or discriminatory purpose as it
9  relates to Section 5?
10     A.  M-hm.
11     Q.  How would you define that?
12          MR. SWEETEN:  Objection.  I think you are
13  asking for her mental impressions.  She's not a lawyer.
14  You are asking her about her specific mental impressions
15  about a statute.  I don't think that you've established
16  the foundation that she has any understanding of that
17  before you are asking her to then define it.  So I'm
18  objecting to the question as posed.
19     Q.  You can answer.
20     A.  Could you repeat the question?
21     Q.  Are you familiar with the term discriminatory
22  intent or discriminatory purpose as it relates to
23  Section 5?
24     A.  From my understanding it would be
25  discriminating in allowing people not to vote if they



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 129

1  voting rights of every voter of the State of Texas, did
2  you receive any legal advice on Senate Bill 10 to ensure
3  compliance with Section 5?
4          MR. SWEETEN:  Asked and answered.
5          MS. McLEOD:  I'm sorry.  Senate Bill 14.
6          MR. SWEETEN:  Okay.  You can answer as to
7  whether or not you received legal advice.  I'll limit
8  the answer to that.  Otherwise, she's not going to
9  answer the question.
10      A.  No.  That was the Senate bill.  That was not my
11  bill.
12      Q.  But did the House receive an analysis of
13  compliance on Senate Bill 14?
14          MR. SWEETEN:  Calls for speculation.
15      A.  I can't speculate on that.
16      Q.  Did you receive any document relating to the
17  compliance of Section 5 related to Senate Bill 14?  I'm
18  asking about the existence of a document.
19          MR. SWEETEN:  You can answer to the extent
20  whether or not you received legal advice.  That's it.
21      A.  No.
22      Q.  On Senate Bill 14.
23      A.  No.
24      Q.  Was a document distributed to House members
25  relating to the compliance of Section 5 for Senate Bill

## 130

1  14?
2          MR. SWEETEN:  Objection.  Calls for
3  speculation.
4          MS. McLEOD:  I'm not sure how it's
5  speculation.
6          MR. SWEETEN:  You are saying did the House
7  receive it.  Did the 150 people receive it is your
8  question.  That calls for gross speculation.
9      Q.  (BY MS. McLEOD)  Do you have any knowledge of
10  any House member receiving --
11      A.  I can answer on whether I personally received
12  it, but I can't answer as to everybody else.
13      Q.  What's the answer to that?
14      A.  No.
15      Q.  You never received anything.  Okay.  Did you
16  understand that Senate Bill 14 would be subject to
17  preclearance under Section 5 of the Voting Rights Act?
18          MR. SWEETEN:  Don't answer the question.
19  It requires you to reveal your thoughts, mental
20  impressions, opinions, motivation about legislation or
21  furtherance of the legislation process and as such is
22  legislatively privileged.
23      A.  I'm invoking legislative privilege on that.
24      Q.  Okay.  When you were voting on the bill in what
25  way did you consider whether the bill complied with the

## 131

1  Voting Rights Act?
2          MR. SWEETEN:  Same objection.  Calls for
3  matters subject to the privilege.  Don't answer the
4  question.
5      A.  I'm invoking legislative privilege on that.
6      Q.  Did you have discussions with other legislators
7  regarding compliance with the Voting Rights Act?
8          MR. SWEETEN:  You can answer whether you
9  had discussions with other legislators about this issue.
10  Do not reveal the substance of any communications.
11      A.  Yes.
12      Q.  What legislators did you --
13      A.  I'm invoking my legislative privileges on that.
14      Q.  You can answer as to what
15  legislators you spoke with.  Don't reveal the substance
16  of the communications.
17      A.  I remember speaking with several of
18  my colleagues, but I don't remember exactly who.
19      Q.  You don't remember the name of any legislator
20  you spoke to?
21          MR. SWEETEN:  Objection.  Asked and
22  answered.  But go ahead.  You can answer.
23      A.  We communicated back and forth.  I can't
24  remember an exact -- I know communications went on, but
25  they weren't where we sit down and you remember its the

## 132

1  following day.  I mean, it's just in the member's lounge
2  and that kind of thing when you are talking together.
3      Q.  Okay.  Do you remember when voter ID
4  legislation was first introduced in the Texas
5  legislature?
6          MR. SWEETEN:  You can answer.  It's a
7  matter of public record.
8      A.  I remember when I filed a bill.  I don't
9  remember the first time.  I know that Betty Brown filed
10  a bill and that -- I don't remember which session that
11  was in.
12      Q.  And this has been previously marked as
13  Exhibit 44 in a prior deposition, so we're just going to
14  keep it at that number.  And I'll let you take a look at
15  it and let me know when you are ready.
16      A.  I don't remember -- Okay.  This must have been
17  2005.  This must have been in 2005 with Mary Denny.
18      Q.  And what's the bill number?
19      A.  1706.
20      Q.  Okay.  House Bill 1706?
21      A.  Right.
22      Q.  Okay.  Do you remember the general purpose of
23  the bill?
24      A.  It appears that the purpose of the bill was to
25  have the voter's identity be able to be verified.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                    MAY 31, 2012

### 133

1    Q.  Okay.  Can you tell me what forms of ID are
2    allowable under HB1706?
3       A.  On Line 2 of Page 5, it appears to go over
4    those different forms of identification.  Now, go back
5    to Page 4 on Line 25.  I can read them if you'd like me
6    to.
7       Q.  Sure.
8       A.  "A United States military identification card
9    that contains the person's photograph, a valid employee
10   identification card that contains the person's
11   photograph and is issued by an employer of the person in
12   the ordinary course of the employer's business, United
13   States citizenship certificate that contains the
14   person's photograph, a student identification card
15   issued by a public or private institution of higher
16   education that contains the person's photograph, a
17   license to carry a concealed handgun issued to the
18   Department of Public Safety, an identification card
19   issued by a state agency of this state that contains the
20   person's photograph or an identification card that
21   contains the person's photograph and is issued by a
22   county elections administrator or a county clerk."
23           The following documentation is acceptable
24   as proof of identification under this chapter.  It goes
25   on to say, "Official copy may be addressed to the person

### 134

1    by name from the government entity."  And then it goes
2    on, certificate -- copy of birth certificate or other
3    document confirming birth and is admissible in a court
4    of law.  It continues on.
5       Q.  Okay.  And can you continue on?
6       A.  Yeah, I'd be happy to."A certified copy of a
7    birth certificate or other document confirming birth
8    that is admissible in a court of law and establishes the
9    person's identity, united States citizenship papers
10   issued to the person, an original or certified copy of
11   the person's marriage license or divorce decree, court
12   records of the person's adoption, name change or sex
13   change, an identification card issued to the person by a
14   governmental entity of this state or the United States
15   for the purpose of obtaining public benefits including
16   veterans benefits, Medicaid or Medicare, a temporary
17   driving permit issued to the person out of the
18   Department of Public Safety, a pilot's license issued to
19   the person by the Federal Aviation Administration or
20   another authorized agency of the United States, a
21   library card that contains the person's name issued to
22   the person by a public library located in this state or
23   a hunting and fishing license issued to the person by
24   the Parks and Wildlife Department.  The commissioners
25   court of a county may authorize the county elections

### 135

1    administrator or county clerk as applicable to issue a
2    photo identification card that may be issued as proof of
3    the voter's identification under Subsection (a).
4       Q.  Okay.  And then if you could turn back to Page
5    5, and I think you didn't address the forms of
6    identification or acceptable proof of identification
7    offered under Subsection -- Lines 23 to 25.
8       A.  Oh, did I miss something?
9       Q.  Lines 25 to 25.
10      A.  I'm sorry.  "A copy of a current utility bill,
11   bank statement, government check, paycheck or other
12   government document that shows the name and address of
13   the voter, the official mail address to the person by
14   name from a governmental entity."
15      Q.  Okay.
16      A.  I didn't mean to skip that.
17      Q.  And were the allowable forms of ID to your
18   knowledge ever discussed on the House floor?
19           MR. SWEETEN:  You can answer that
20   question.
21      A.  In which session?
22      Q.  I believe this was the 79th?
23      A.  In 2005?
24      Q.  M-hm.
25      A.  That was a long time ago.  They probably were.

### 136

1       Q.  Do you recall any public discussion?
2       A.  I vaguely do.  That was a long time ago.
3       Q.  And did they ever discuss -- or was there ever
4    a discussion why non-photo IDs were allowed?
5           MR. SWEETEN:  You can refer back to the
6    public record.
7       A.  I think public record is far better than my
8    memory.
9       Q.  Okay.  Do you have a memory of --
10      A.  At this point I'm not sure I have a memory.
11   You asked do I have a memory.  No.
12      Q.  -- of why non-photo ID was allowed?
13      A.  I don't recall.  You can go back to the public
14   records.  You can do so in the archives.
15      Q.  I'm trying to obtain your knowledge.  If you
16   don't know, then that's absolutely fine as well.
17      A.  I really don't recall.
18      Q.  Do you know what purpose a non-photo ID serves
19   in the context of this bill?
20           MR. SWEETEN:  Yeah.  Don't answer the
21   question.  You can answer the question as to the general
22   purpose of the bill.  You don't have to answer specific
23   questions about the meaning of different provisions.
24   That is subject to legislative privilege.
25      A.  No.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 137

1    Q.  No, you're --
2         MR. SWEETEN:  You are asserting
3    legislative privilege, correct?
4    A.  I'm asserting legislative privilege.
5    Q.  Are you aware of the source of any the
6    legislative language in HB1706?
7         MR. SWEETEN:  Don't answer the question.
8    It asks for matters of legislative privilege.
9    A.  I'm invoking legislative privilege on that.
10   Q.  Did the governor take a public position on
11   HB1706?
12        MR. SWEETEN:  You can answer about
13   public -- matters of public record.
14   A.  I don't remember.  That was a long time ago.  I
15   would check with -- in the public records.  I'm sure you
16   have it there.
17   Q.  So you don't have a memory of whether the
18   governor took a public position on HB1706?
19   A.  No.
20   Q.  Are you aware of any attempts to determine the
21   impact of HB1706 on minority voters?
22        MR. SWEETEN:  Don't answer the question.
23   It calls for matters subject to legislative privilege.
24   A.  I'm invoking legislative privilege.
25   Q.  Do you know if there was bipartisan support for

## 138

1    HB1706?
2         MR. SWEETEN:  Don't answer the question to
3    the extent it requires you to reveal conversations
4    you've had with individuals.  You can refer to matters
5    in the public record, however, in answering the
6    question.
7    A.  Public record is far more record on that than I
8    would be.
9    Q.  But do you remember -- do you have a memory of
10   whether there was a partisan for support HB1706?
11   A.  Invoking legislative privilege.  I would tell
12   you to check with the public record on that.  It's going
13   to be far more accurate.
14   Q.  Are you saying that you don't -- that you are
15   unaware because I'm not asking to reveal any -- I'm
16   asking simply for matters of the public record, but as
17   you remember from legislative kind of public debate on
18   the House floor, but if you don't recall, that's a
19   different answer.  But do you recall whether there was
20   bipartisan support for HB1706?
21        MR. SWEETEN:  She's asking if based on the
22   matters of the public record if you recall.
23        THE WITNESS:  Based on the public
24   record -- That question's more complex than she
25   understands.

## 139

1         MS. McLEOD:  Okay.
2         MR. SWEETEN:  If you don't understand the
3    question, then --
4         THE WITNESS:  I understand the question.
5    She doesn't understand how complex that question
6    actually is.
7         MR. SWEETEN:  Okay.  So let me -- let me
8    go ahead and --
9    Q.  (BY MS. McLEOD) Why don't I understand how
10   complex the question is?  Why is it so complex?
11   A.  Because members communicate with each other in
12   a way that they don't necessarily communicate at the
13   front or back mike.
14        MR. ROSENBERG:  And I need the end of your
15   --
16        MR. SWEETEN:  That they don't necessarily
17   on the front or back -- that they communicate with each
18   other.  So objection, legislative privilege as to any
19   communications that you had with any legislators
20   regarding any bill.  So I'm going to invoke privilege or
21   going to suggest that you invoke privilege as to that.
22   I think her question is do you recall based on the
23   public record.  So the non-privileged matters, whether
24   there was bipartisan support.  I'm trying to help.
25   A.  Based on my memory, it was minimal --

## 140

1    Q.  Okay.
2    A.  -- of the public.
3    Q.  Did minority legislators support HB1706?
4         MR. SWEETEN:  Don't reveal communications
5    that you've had with legislators.
6    A.  I can't reveal those communications.
7    Q.  From what you remember from public record,
8    public floor debate on the front and back mike over the
9    course of the House's consideration of HB1706, did
10   minority legislators support the bill?
11        MR. SWEETEN:  She's confined it to matters
12   of public record, therefore, you can answer the question
13   as phrased, but not if you can't recall.
14   A.  I don't think so, but you'd have to go back to
15   the public record to doublecheck.
16   Q.  Did you support HB1706?
17   A.  Yes.
18   Q.  Would this bill if enacted have accomplished
19   the general purpose you described earlier?
20        MR. SWEETEN:  Don't reveal your thoughts,
21   mental impressions, opinions, motivations about
22   legislation or the legislative process in answering the
23   question.  So instruct you not to answer based on
24   legislative privilege.
25   A.  I'm invoking legislative privilege.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 141

1   Q.  In the 80th legislature, you were one of the
2   authors of HB218, another version of the Voter ID Bill
3   introduced in 2005; is that correct?
4   A.  If you have it there, I would -- I don't keep
5   all that logged in my memory.
6   Q.  I believe that has been previously marked as
7   United States Exhibit 28.
8   And your question was?  Do I recognize it?
9   Q.  In the 80th legislature, you were one of the
10  authors of HB218, another iteration of the Voter ID Bill
11  first introduced in 2005; is that correct?
12  A.  Correct.
13  Q.  Can you tell me how a legislator becomes a
14  co-author of a bill, how that works?
15  MR. SWEETEN:  If you can answer as a
16  general matter, you can.  Don't reveal how you became an
17  author with respect to this.  That would invade matters
18  of legislative privilege.
19  A.  Okay.  I didn't author this.  I joint authored
20  it.  There's a difference.
21  Q.  A joint author, can you explain that to me
22  because I'm actually not sure?
23  A.  Yes.  All of the members of the House can
24  co-author a bill.  You simply sign on to that, but
25  there's only four -- you can only have four that joint

## 142

1   author it with the author and that's what -- that's what
2   I did.
3   Q.  Okay.
4   A.  It's a subtle difference.
5   Q.  Okay.  And why did you decide to become a
6   co-author of HB218?
7   MR. SWEETEN:  Don't reveal your thoughts,
8   mental impressions, opinions, motivation about
9   legislation or the legislative process.  To answer that
10  question, you would have to do so.  Therefore, the
11  question is a matter that invades privilege, and I'd
12  instruct you not to answer on the basis of legislative
13  privilege.
14  A.  I'm invoking my legislative privilege on that.
15  Q.  And what's the general purpose of the HB218?
16  MR. SWEETEN:  You can answer it as
17  phrased.
18  A.  To discourage voter fraud.
19  Q.  Is there any other purpose?
20  A.  No.  Just discourage voter fraud.
21  Q.  And can you describe the basic provisions of
22  HB218?
23  A.  Everything that is underlined would be new law.
24  Everything that is not underlined is existing law.
25  Q.  Okay.  For the record, can you please tell me

## 143

1   the basic provisions of the bill?
2   A.  Once again, it's pretty self-explanatory.
3   MR. SWEETEN:  You can refer to the text of
4   the bill.
5   A.  I can start reading it, the underlined areas.
6   It's hard to get more simple than that.  It's quite a
7   bit, but I'll be happy to read it if you want me to.
8   Q.  You don't have to read the whole thing.  If you
9   can just summarize the basic provisions of HB218.
10  A.  Well, to sum it up very quickly, go to Page 8,
11  Line 15, that which is underlined says, "The voter's
12  identity can be verified from the proof presented."
13  Q.  And what does that proof include?
14  A.  Well, then we can go back.  I know in here it
15  goes through a list of all the things.  Okay.  On
16  Line 17, Page 9, "A driver's license, a personal
17  identification card issued to the person by the
18  Department of Public Safety that has not expired or that
19  expired no earlier than two years before the date of the
20  presentation, a United States military identification
21  card that contains the person's photograph, a valid
22  employee identification card that contains the person's
23  photograph and is issued by the employer of the person
24  in the ordinary course of the employer's business,
25  United States citizenship certificate that contains the

## 144

1   person's photograph, a student identification card
2   issued by public or private institution or higher
3   education located in the United States that contains the
4   person's photograph, a license to carry a concealed
5   handgun issued to the person by the Department of Public
6   Safety or a valid identification card that contains the
7   person's photograph and is issued by an agency or
8   institution of the Federal government or an agency,
9   institution or political subdivision of this state."
10  "The following documentation is acceptable
11  as proof of identification under this chapter.  A copy
12  of a current utility bill, bank statement, government
13  check, paycheck, or other government document that shows
14  the name and address of the voter, official mail
15  addressed to the person by name from a governmental
16  entity," a certificate -- I'm sorry -- "a certified copy
17  of a birth certificate or other document confirming
18  birth that is admissible in a court of law and
19  establishes the person's identity, United States
20  citizenship papers issued to the person, an original or
21  certified copy of the person's marriage license or
22  divorce decree, court records of the person's adoption,
23  name change or sex change, an identification card issued
24  to the person by a governmental entity of this state or
25  the United States for the purpose of obtaining public



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 145

1   benefits include veterans benefits, Medicaid or
2   Medicare, a temporary driving permit issued to the
3   person by the Department of Public Safety, a pilot's
4   license issued to the person by the Federal Aviation
5   Administration or another authorized agency of the
6   United States, a library card that contains the person's
7   name issued to the person by a public library located in
8   this state or a hunting and fishing license issued to
9   the person by the Parks and Wildlife Department."
10         Q.   Okay.  Thank you.  Do you know what purpose the
11  inclusion of non-photo ID served for HB218?
12         MR. SWEETEN:  Don't answer the question.
13  You can answer as to the general purpose of House Bill
14  218, but as raised, that does not ask you that and,
15  therefore, it's subject to legislative privilege.
16         A.   I would invoke my legislative privilege on
17  that.
18         Q.   Do you know why these forms of ID weren't
19  included in House Bill 218?
20         MR. SWEETEN:  Same objection.  Calls for
21  matters subject to legislative privilege, instruct not
22  to answer.
23         A.   I invoke my legislative privilege.
24         Q.   Were there allowable forms of ID ever publicly
25  discussed on the House floor?

### 146

1         MR. SWEETEN:  You can answer the question
2   as phrased.
3         A.   In debate, yes.
4         Q.   Did you make any public statements regarding
5   the allowable forms of ID?
6         A.   I honestly don't recall.  I'd have to go back
7   to the archives myself.
8         Q.   Did you have any conversations with other
9   legislators regarding the allowable forms of ID under
10  House Bill 218?
11        MR. SWEETEN:  You can answer as to whether
12  or not you had conversations.  Don't reveal the
13  substance of those communications.
14        A.   Yes, I remember having conversations.  I don't
15  recall the specific individuals, just a lot of
16  conversation.
17        Q.   Are you aware of any communications regarding
18  the drafting or development of House Bill 218?
19        MR. SWEETEN:  Objection.  Vague.  You can
20  answer.
21        A.   I would like to invoke my legislative
22  privilege.
23        Q.   Are you aware of any source of legislative
24  language of HB218?
25        A.   Legislative counsel.

### 147

1         Q.   Did your staff work on HB218?
2         A.   That was Representative Betty Brown's bill.  We
3   did not draft that.  That was not my bill.  That was her
4   bill.
5         Q.   Okay.  But as a joint author was your staff
6   involved in the drafting?
7         A.   There may have been conversations with her
8   staff, I don't recall.  That was some time ago.
9         Q.   Do you remember generally the legislative's
10  consideration of HB218 after it was filed?
11        MR. SWEETEN:  I'm sorry.  Can you read the
12  question back, Madam Court Reporter?
13        (Requested portion was read.)
14        A.   I don't understand the question.
15        Q.   Do you remember the legislator's consideration
16  of HB218 after it was filed?
17        A.   Oh, the debate and the vote?
18        Q.   M-hm.
19        A.   Yeah.
20        Q.   What was the final outcome of HB218?
21        A.   It did not pass, I don't think.
22        Q.   From the debate and vote, did HB218 have
23  bipartisan support?
24        MR. SWEETEN:  You can answer based on the
25  public records.

### 148

1         A.   Front mike, back mike, that publicly I think it
2   was minimal or none.  I can't reveal that on what
3   happened in private conversations.
4         Q.   So the answer -- I'm sorry.  I lost the answer
5   in there.  Did the bill have bipartisan support?
6         MR. SWEETEN:  You can answer based on the
7   public record.  I think you have.
8         A.   On public record, I don't recall the vote, but
9   I don't think there was bipartisan support.
10        Q.   Did minority legislators support HB218?
11        MR. SWEETEN:  Again, you can answer based
12  on the public record.  Don't reveal communications.
13        A.   Based on the public record, I honestly don't
14  recall the vote on it.  I tend to say no, but I don't
15  know for sure.
16        Q.   Did a governor take a public position on HB218?
17        MR. SWEETEN:  You can answer the question
18  as phrased.
19        A.   I don't recall.  I'd have to check the public
20  record.  I think so, but I don't recall for sure.
21        Q.   Did the lieutenant governor take a public
22  position on HB218?
23        A.   I would have to go back to the archives myself.
24  I think he supported it, but I don't recall.
25        Q.   Did any other state officer take a public



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 149

1    position on HB218?
2        A.  I don't recall.
3        Q.  Are you aware of any attempt to determine the
4    impact of HB218 on minority voters?
5            MR. SWEETEN:  Don't answer the question.
6    Calls for matters subject to legislative privilege.
7    Instruct not to answer.
8        A.  I would have to invoke my legislative privilege
9    on that.
10       Q.  Are you aware of any publicly discussed
11   attempts to determine the impact of HB218 on minority
12   voters?
13           MR. SWEETEN:  You can reveal matters on
14   the public record.
15       A.  No, I don't.  I'm not aware of any.
16       Q.  Would this bill if enacted have accomplished
17   the general purpose you described earlier, which was to
18   discourage voter fraud?
19           MR. SWEETEN:  Objection.  Calls for
20   matters subject to legislative privilege.  Instruct not
21   to answer.
22       A.  I invoke my legislative privilege.
23           (Exhibit 257 marked.)
24       Q.  Can we have this marked as US-257?  Okay.  Do
25   you recognize this bill?

## 150

1            MR. ROSENBERG:  What number is this?
2            MS. McLEOD:  257.
3            MR. ROSENBERG:  Thanks.
4        A.  Yes.  This is a bill that I authored in 2007.
5        Q.  Was in the first Voter ID Bill that you
6    authored?
7        A.  I believe so.
8        Q.  And why did you decide to author your own Voter
9    ID Bill in the 80th legislature?
10           MR. SWEETEN:  Don't answer the question.
11   It calls for matters subject to legislative privilege.
12   It would require you to reveal thoughts, mental
13   impressions, opinions, motivations about legislation and
14   in furtherance of the legislative process.
15       A.  I invoke my legislative privilege.
16       Q.  And what was your process in drafting HB101?
17           MR. SWEETEN:  Don't answer to the extent
18   that the question asks to you reveal matters subject to
19   the legislative privilege, okay?
20       A.  I met with legislative counsel on the drafting.
21       Q.  Did you seek constituent input?
22       A.  Seek what?
23       Q.  Seek constituent input.
24           MR. SWEETEN:  I think the way it's
25   phrased, did she seek it, I think you are asking for

## 151

1    mental impressions, thoughts, opinions.  If you want to
2    ask -- I wouldn't object to your question if you asked
3    if she had discussions with constituents regarding the
4    bill, but as phrased objection, legislative privilege.
5            MS. McLEOD:  I'm not asking about the
6    substance of the conversation, if she had such about the
7    bill.  I'm just asking if she did.
8            MR. SWEETEN:  That's fine.  If you want to
9    ask if she had discussions with constituents about the
10   bill, I will let her answer that.
11       A.  I did not seek, but I received.
12       Q.  You stated earlier that most of your bills are
13   constituent driven.
14       A.  Yes.
15       Q.  Was this a constituent driven bill?
16       A.  Yes.
17       Q.  Did you speak with a specific constituent about
18   this bill that asked you to push forward this bill?
19       A.  A multitude.
20       Q.  A multitude?  But there was no specific
21   constituent?
22       A.  A multitude of constituents, not just one.
23       Q.  Did you establishing input from other
24   legislators regarding this bill?
25           MR. SWEETEN:  You can answer whether you

## 152

1    had conversations.
2        A.  I had conversations.
3        Q.  Do you remember what legislators you had
4    conversations with?
5            MR. SWEETEN:  You can answer as phrased.
6        A.  I believe I remember visits with Representative
7    Bohac and others, but I don't remember all of them.
8        Q.  Okay.  Can you repeat the representative's
9    name?
10           MR. SWEETEN:  B-O-H-A-C.
11       Q.  And do you remember conversations you had with
12   any other legislators?
13       A.  I had conversations, but I don't recall.
14       Q.  Okay.  Did you request any studies about the
15   impact of HB101 on minority voters on --
16           MR. SWEETEN:  Objection.  Legislative
17   privilege.  Don't answer the question.
18       Q.  Did you have -- Oh, sorry.
19       A.  I'm invoking my legislative privilege.
20       Q.  Did you have conversations with local elected
21   officials regarding HB101?
22           MR. SWEETEN:  You can answer as phrased
23   whether you had conversations with local.  Don't reveal
24   the substance of the communications.
25       A.  Yes.  General conversations.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 153

1    Q. And who were those officials?
2    A. I'm trying to recall.
3    Q. Okay.
4    A. I think I had some general ones, but I don't
5    recall specifics.
6    Q. Be you don't remember any specific local
7    legislators?
8    A. (Shakes head.)
9    Q. Did they ask you to introduce the bill?
10   A. No.
11   Q. And how did you determine the fiscal impact of
12   HB101?
13         MR. SWEETEN: Don't reveal your thoughts,
14   mental impressions, opinions, motivations about the
15   legislative process for this legislation. Objection.
16   Legislative privilege.
17   A. Legislative --
18         MR. SWEETEN: No, no. I'm instructing you
19   not to answer based on legislative privilege.
20   A. I'm invoking legislative privilege.
21   Q. Did you receive a report from the LBB regarding
22   HB101?
23         MR. SWEETEN: You can answer as to whether
24   you received a report.
25   A. Yes, I did.

## 154

1    Q. Okay. Did that report indicate the fiscal
2    impact of HB101 on minority voters that would have
3    minority voters?
4         MR. SWEETEN: Objection. Legislative
5    privilege.
6    A. Yes, I'm invoking my legislative privilege.
7    Q. Okay. And did you determine the impact that
8    HB -- if any, that HB101 would have on your
9    constituents?
10         MR. SWEETEN: Don't answer the question.
11   It calls for matters subject to the legislative
12   privilege.
13   A. I'm invoking legislative privilege on that.
14   Q. Did you hold any town halls or public chats
15   regarding HB101?
16         MR. SWEETEN: You can answer the question
17   as phrased.
18   A. I believe that I did. General town halls that
19   may have been part of the topic, but it was not the sole
20   purpose.
21   Q. And what, if anything, do you remember about
22   your presentation of HB101 or how you described the bill
23   and its provisions?
24         MR. SWEETEN: At the town hall?
25   A. At the town hall?

## 155

1    Q. Or public chats.
2    A. Just a general -- just a general overview of it
3    and that our attempt was to ensure the security of our
4    ballot box.
5    Q. Okay. And did any of the local elected
6    officials with whom you spoke to about the bill tell you
7    that the voter ID bill was necessary?
8         MR. SWEETEN: Don't answer the question.
9    They're asking you to reveal the substance of
10   communications you had.
11   A. I'm invoking my legislative privilege.
12         MR. SWEETEN: As well as your mental
13   impressions.
14   Q. Did any elected officials come to you and
15   indicate that a Voter ID Bill was necessary?
16         MR. SWEETEN: Objection. Asked and
17   answered.
18   A. I'm still invoking may legislative privilege.
19         MS. McLEOD: I'm asking about unsolicited
20   input from local officials which wouldn't fall under
21   legislative privilege.
22         MR. SWEETEN: She's already answered
23   whether she had communications with elected officials,
24   and she already answered the question that you just
25   posed.

## 156

1         MS. McLEOD: She didn't answer, but I'm
2    asking if legislative official -- I'm sorry -- local
3    elected officials approached her regarding the necessity
4    of a Voter ID Bill.
5         MR. SWEETEN: I think those would fall
6    under constituents. She will -- Hold on. Let me just
7    clear this up. You can answer as to whether you had
8    discussions with local election officials. Do not
9    answer the subject of those conversations. You can talk
10   about when they occurred, who was involved in them.
11   Don't answer the substance. It's legislatively
12   privileged.
13   A. Those local officials were constituents, and
14   that would fall under the category of constituents that
15   those conversations occurred. That was some time ago.
16   There was a lot of conversation, and so to go back and
17   say this, this and this was said by this, this and this
18   person, I can't do.
19   Q. I don't want -- I'm certainly not asking what
20   was said other than the general kind of we need a Voter
21   ID Bill.
22   A. General conversation, yes.
23   Q. And what local legislative officials were
24   those? Like what positions they held even if you don't
25   remember their name?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 157

1        MR. SWEETEN:  You can answer.
2   A.  County clerk.
3   Q.  Okay.  Do you remember her or his name?
4   A.  No.
5   Q.  Any other local elected officials?
6   A.  Our tax collector/assessor.
7   Q.  Do you remember his or her name?
8   A.  It will come to me.
9   Q.  Okay.  Any others?
10  A.  No.  Paul Bettencourt.
11  Q.  And what was the basis of their request?
12       MR. SWEETEN:  Don't reveal the substance
13  of the communication.
14  A.  Mutual concern regarding security of the ballot
15  box.
16  Q.  Okay.  Did they provide you with specific
17  instances of voter fraud?
18       MR. SWEETEN:  Don't answer the question as
19  phrased.  She's asking for specific conversations and
20  specifics instances.
21  A.  I'm invoking my legislative privilege.
22  Q.  Okay.  What was the general purpose of HB101?
23       MR. SWEETEN:  You can answer the question
24  as phrased, the general purpose.
25  A.  To discourage voter fraud.

## 158

1   Q.  Okay.  And was the voter ID legislation or
2   HB101 introduced in part to prevent noncitizens or
3   illegal aliens from voting?
4        MR. SWEETEN:  Don't reveal matters subject
5   to the legislative privilege.  You can answer on the
6   general purpose of the bill.  Don't reveal thoughts,
7   internal processes, motivation about the legislation.
8   A.  The only purpose of the bill is to discourage
9   voter fraud.
10  Q.  Okay.  So is the answer to the question was the
11  voter ID -- was voter ID -- was this voter ID
12  legislation introduced in part to prevent noncitizens or
13  illegal aliens from voting no?
14  A.  If the purpose of this bill was to stop or
15  discourage voter fraud.
16  Q.  Okay.
17  A.  That's it.
18       MR. ROSENBERG:  Mr. Sweeten, can I ask a
19  question just to back up a little?  Other defendants
20  need clarification as to what position you just took on
21  the privilege a couple of minutes ago, and I just want
22  to read from the court's order of May 28, and this is
23  the next to last paragraph.
24       It says, "Finally, some of the contested
25  documents are letters to the LG, lieutenant governor,

## 159

1   from constituents.  Constituent letters reveal the
2   constituent's, not the LG's thoughts and opinions, and
3   so we find that those communications do not fall within
4   any legislative privilege.  Moreover, a response to a
5   constituent by the LG RA staff is a public document and
6   is not privileged."
7        So I thought a few minutes ago in response
8   to some questions by Ms. McLeod as to communications
9   with constituents, you directed the witness not to
10  answer because it had to do with constituents.  As I
11  read the court's opinion, constituent letters, and I
12  assume that it's very easy to go from constituent
13  letters to constituent communications in review of the
14  constituents, not the legislators, because we're dealing
15  with the LG in his legislative capacity, thoughts and
16  opinions.  So I would ask you to reconsider your
17  objection on the basis of privilege.
18       MR. SWEETEN:  I'm aware of what counsel
19  has pointed out, but I read it differently than you do.
20  I read that as an analysis of the lieutenant governor's
21  and in the context of the dispute as to how the
22  legislative privilege covers the lieutenant governor's
23  office.  The court has not ruled and we have continued
24  to maintain with respect to the legislative privilege as
25  to legislators that constituent communications do fall

## 160

1   within the protected area.  So I don't read the order
2   the way that you read it.  I read it as relating to the
3   lieutenant governor's -- the issue that was before the
4   court as to the lieutenant governor.  I don't read it as
5   an analysis or direction by the court with respect to
6   legislators who have a relationship with constituents.
7   I don't read it as the same -- as the same issue, so --
8        MR. ROSENBERG:  Thank you for your
9   clarification.  It's clear that we will continue to
10  agree to disagree.
11       THE WITNESS:  And I'm not --
12       MR. SWEETEN:  I'm not trying to be curt.
13  We're discussing a matter that doesn't call for you to
14  answer a question, so just --
15       THE WITNESS:  Okay.
16       MR. SWEETEN:  Also, I want to clarify for
17  the record, I think this has come up just one time, I
18  think you are talking about the discussion that we just
19  had in today's deposition, so I want to make sure that
20  we are both on the same page, that this is not -- that
21  that's what you are referring to.
22       MR. ROSENBERG:  I'm referring to -- There
23  may have been more than one question that privilege was
24  invoked as to communications with constituents, and I
25  just wanted to understand your position.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

161

1      MR. SWEETEN:  Thank you, counsel.
2          (Exhibit 258 marked.)
3      Q.  (BY MS. McLEOD) Can we mark this as US Exhibit
4   258?  Representative, do you recognize this is an
5   article from the Houston Chronicle?
6      A.  That's what it says.  Let me read this.  Yeah.
7   This was some time ago.  Okay.
8      Q.  What's the date on the article?
9      A.  This was Patricia's first session.
10     Q.  It's at the top.
11     A.  I'm looking for the date.  Oh, I'm sorry.  It's
12  tiny print there.
13     Q.  It's tiny.
14     A.  No wonder I didn't see it.  February 18th,
15  19th -- I can't see that -- 2007.
16     Q.  So that would have fallen within the
17  80th Legislature?  Yes?
18     A.  M-hm.
19     Q.  And I'd just like you to turn to Page 2 and
20  where it says, "Illegal immigrant controls," if you
21  could read the first five lines there.
22     A.  Okay.  "Riddle has filed House Bills 101, 104
23  and 1012 and joint-authored two House Bills, 28 and 29,
24  that clamp down on individuals illegally residing in the
25  United States.  HB101 requires that individuals provide

162

1   proof of citizen for casting votes in elections.  'when
2   we have people go to the polls and step and vote and
3   they are not a citizen, they are robbing another citizen
4   of their right to have their voice heard,' she said.
5   House Bill 104" --
6      Q.  You can -- You can stop.  I want to ask you
7   about the quote that you have there.  What was your
8   basis for saying that noncitizens are voting at the
9   polls?
10     MR. SWEETEN:  Don't reveal matters that
11  are subject to the legislative privilege including your
12  thoughts, mental impressions, opinions, motivations
13  about legislation.  You can refer to matters of public
14  record, but in answering these questions, don't reveal
15  matters that are subject to privilege that I've been
16  instructing about today.
17     A.  I would like to invoke my legislative privilege
18  on that.
19     Q.  Have you had an individual registered voter
20  tell you that they did not vote because they were
21  concerned about canceling out their vote?
22     A.  Have I ever had an individual voter tell me
23  that they didn't vote because they were afraid of
24  canceling somebody's else vote out?
25     Q.  They were concerned about their vote being

163

1   canceled.
2      MR. SWEETEN:  You can answer as to whether
3   a communication occurred, even though it's pretty heavy
4   laced with subject matter, but go ahead.  I'll let you
5   answer the question.
6      MS. McLEOD:  It's based on her public
7   statement.  It's based on what she said.
8      MR. SWEETEN:  Well, what she said does not
9   allow you to ask questions that would require her to
10  reveal her thoughts, mental impressions, opinions or
11  motivations about legislation.  You can ask about the
12  statement, but she doesn't have to reveal matters
13  subject to legislative privilege in answering your
14  question.
15     A.  I've never had a voter not vote because they
16  thought someone else was canceling their vote.
17     MR. SWEETEN:  Okay.  Go ahead.
18     A.  Is that the question?
19     Q.  I don't think so.  I think the question was has
20  anybody ever told you that.
21     A.  Has anybody ever told me that they thought
22  their vote was being canceled?
23     MR. SWEETEN:  Yeah.  You can just answer
24  whether or not you've had someone tell you that.
25     MS. McLEOD:  I just want to return to the

164

1   question.  What is your basis for saying noncitizens are
2   voting at the polls?  This is a question, Patrick, based
3   on her statement -- her public statement and is not tied
4   to any legislative act and to the extent that it is, I
5   think it would be our position that she's giving up
6   legislative privilege by speaking to this matter
7   publicly.
8      MR. SWEETEN:  I'm saying to the extent you
9   are asking about matters that would reveal her thoughts,
10  mental impressions, opinions or motivation, that I'm
11  instructing her not to answer on the basis of
12  legislative privilege.  She can answer as to whether she
13  made the statement, but she doesn't have to provide
14  information that would reveal matters subject to
15  legislative privilege.
16     MS. McLEOD:  In my opinion, this question,
17  what's your basis for saying noncitizens are voting at
18  the polls, is not related to any legislation and,
19  therefore, not legislatively privileged.
20     MR. SWEETEN:  She has her own mental
21  impressions, thoughts, opinions, motivations about
22  legislation, but to the extent you are asking her to
23  reveal those, it does.  To the extent it does not ask
24  her to reveal those, then it does not.  So I'm just
25  instructing her don't answer if it would reveal matters



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

DEBBIE RIDDLE                                                              MAY 31, 2012

---

### 165

1  of legislative privilege.
2       Q.  (BY MS. McLEOD)  Well, I'm not asking you on the
3  basis of any legislation.  I'm asking you from your
4  public statement here, what is your basis for saying
5  that noncitizens are voting at the polls?
6       MR. SWEETEN:  Same objection and
7  instruction.
8       A.  I would invoke my legislative privilege on
9  this.
10      Q.  Are you aware of any investigations regarding
11 noncitizens voting at the polls?
12      MR. SWEETEN:  Objection.  Don't reveal
13 your thoughts, mental process, opinions, motivation
14 about legislation or in furtherance of the legislative
15 process or the conversations that we've outlined
16 previously in answering the question.  If you can't
17 answer the question without revealing those, do not
18 answer it based on legislative privilege.  You can also
19 refer to matters of the public record.
20      Q.  Sorry.  Her awareness of investigations, how
21 would that be legislative privileged?
22      A.  There is public record -- You can get public
23 record in Harris County where, I think, 25,000 voter
24 registrations had been removed where the folks that were
25 registered to vote were dead.

### 166

1       Q.  And --
2       MR. ROSENBERG:  Were -- I'm sorry, dead?
3       A.  Yes, deceased, and that -- that is one example.
4       Q.  I'm sorry.  And so were noncitizens voting
5  under the names of dead --
6       A.  There were --
7       Q.  -- registered voters?
8       MR. SWEETEN:  When you are answering this
9  question, don't reveal communications you've had with
10 legislators, with state agencies, with legislative
11 staff, Texas legislative counsel or constituents in
12 answering the question.
13      A.  Okay.  This -- I would invoke the rest of that
14 with -- regarding legislative privilege, but you can go
15 to public record for Harris County and find that out.
16      Q.  Have there been any convictions related to
17 noncitizens voting using the names of dead registered
18 voters?
19      MR. SWEETEN:  To the extent you can answer
20 that based on -- without revealing matters of privilege
21 including the communications I've outlined, you can do
22 so.  You can also refer to matters of the public
23 records.
24      Q.  And convictions are a matter of the public
25 record.

### 167

1       A.  I would just simply ask you to look at the
2  public record on that.  The remainder of that I would
3  invoke legislative privilege.
4       Q.  I'm asking if you are aware of any convictions.
5  I certainly know that I can go search for convictions.
6  Are you aware of any convictions related to noncitizens
7  voting using the registration of someone that is
8  deceased?
9       A.  Anecdotally, yes, but I -- I'm not recalling
10 the exact on that, but all I can say is anecdotally
11 other than that I would have to just --
12      Q.  And by anecdotally, do you mean people have
13 told you that, constituents?
14      A.  M-hm.
15      Q.  What constituents -- the names of the
16 constituents?
17      A.  The -- the groups -- There are groups, King
18 Street Patriots has done quite a bit in looking into
19 voter fraud and information from their research.
20      Q.  And is there anyone specific from the King
21 Street Patriots that you spoke with?
22      MR. SWEETEN:  You can say --
23      A.  I'm invoking my legislative privilege on that.
24      MR. SWEETEN:  Don't reveal the substance
25 of the communications.  You can reveal whether you had a

### 168

1  conversation with somebody at the King Street Patriots,
2  okay?
3       THE WITNESS:  M-hm.
4       Q.  Is there a specific person at the King Street
5  Patriots that you spoke with regarding this?
6       THE WITNESS:  Should I give the exact
7  name?
8       MR. SWEETEN:  If you know the name of the
9  person, you can give that.
10      A.  Catherine Engelbrecht.
11      Q.  Okay.  I just want to talk a little bit about
12 HB101.  We're going try to speed this up so you don't
13 have to read there.  But I'd like to go through the
14 acceptable forms of ID and oaths completely up to -- you
15 can read the entire thing, but you can certainly go
16 through and just state some of the acceptable documents
17 if you feel comfortable doing that as well.  So what
18 are -- Can you please tell me the forms of ID that are
19 allowable under HB101?
20      A.  "Birth certificate or other document confirming
21 birth that is admissible in a court of law, United
22 States citizenship papers issued to the applicant or" an
23 unexpired Texas -- United States Texas passport -- we
24 are a nation -- "an unexpired United States passport
25 issued to the applicant."  I'm looking to see if I

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                    MAY 31, 2012

---

169

1  missed anything.  Goes on to say, "If the voter's name
2  is on the precinct list of the registered voters and the
3  voter's identity can be verified from the proof
4  presented, the voter shall be accepted for voting."  I'm
5  looking here for anything else.  Am I missing something?
6      Q.  I think there's more on Page 5 -- at the
7  beginning of Page 5 onto Page 6.
8      A.  Okay.  Line 10, "United States military
9  identification card that contains the person's
10  photograph, a valid employee identification card that
11  contains the person's photograph and is issued by an
12  employer of the person in the ordinary course of the
13  employer's business, a United States citizenship
14  certificate that contains the person's photograph, a
15  student identification card issued by a public or
16  private institution of higher education that contains
17  the person's photograph, a license to carry a concealed
18  handgun issued to the person by the Department of Public
19  Safety, an identification card by a state agency of this
20  state that contains the person's photograph or an
21  identification card that contains the person's
22  photograph and is issued by a county elections
23  administrator or a county clerk."
24           "The following documentation is acceptable
25  as a proof of identification under this chapter.

---

170

1  Official mail address to the personal by name from a
2  governmental entity, a certified copy of a birth
3  certificate or other document confirming birth that is
4  admissible in a court of law and establishes the
5  person's identity.  United States citizenship papers
6  issued to the person, an original or certified copy of
7  the person's marriage license or divorce decree, court
8  records of the person's adoption, name change or sex
9  change and identification card issued to the person by a
10  governmental entity of the state or the United States
11  for the purpose of obtaining public benefits including
12  veterans benefits, Medicaid or Medicare, a temporary
13  driving permit issued to the person by the Department of
14  Public Safety, a pilot's license issued to the person by
15  the Federal Aviation Administration or another
16  authorized agency of the United States, a library card
17  that contains the person's name issued to the person by
18  a public library located in this state or a hunting and
19  fishing license issued to a person by the Parks and
20  Wildlife Department.
21           And then, "A commissioners court or a
22  county may authorize the county elections administrator
23  or the county clerk as applicable to issue photo
24  identification cards that may be used as proof of a
25  voter's identification under Subsection (a)."

---

171

1      Q.  Okay.  And back to Page 7, I think we skipped
2  over Lines 8 through 10.
3      A.  Okay.  "A copy of a current utility bill, bank
4  statement, government check, paycheck or other
5  government document that shows the name and address of
6  the voter," an official mail --
7      Q.  I think you did those.
8      A.  Okay.  And what was the purpose of including
9  these forms of ID in HB101?
10          MR. SWEETEN:  Don't reveal matters from
11  your mental impressions, opinions, motivations about
12  legislation and furtherance of the legislative process.
13  You can as the court has said provide a general purpose
14  of the bill which I think you may have already done on
15  this bill, but not the other --
16      A.  The general --
17          MR. SWEETEN:  -- subject to the
18  legislative privilege.
19      A.  The general purpose of the bill was to
20  discourage voter fraud.
21      Q.  But I'm asking what the purpose was of
22  including these forms of ID in HB101?
23          MR. SWEETEN:  Same objection.  Calls for
24  matters of legislative privilege.  Don't answer the
25  question.

---

172

1      A.  I'm invoking the legislative privilege.
2      Q.  And were reliable forms of ID ever discussed on
3  the House floor?
4          MR. SWEETEN:  You can answer.
5      A.  Yes.
6      Q.  Did you make any public statements regarding
7  the allowable forms of ID?
8          MR. SWEETEN:  You can answer.
9      A.  2007.  I don't recall if this made it to the
10  House floor.  I said, yes, but I'm not sure if it made
11  it to the House floor.  I don't think this made it to
12  the House floor.
13      Q.  Okay.  I'm actually not sure, but you don't
14  think it made it to the House floor?
15      A.  (Shakes head.)
16      Q.  Did it die in committee?
17      A.  We wound up, I believe, with four bills and
18  another colleague of mine, their bill is the one that
19  went to the House floor.  I believe that's -- but you
20  can check the public record.  Are we going to get a
21  bathroom break?  Can do that?
22          (Recess from 2:19 p.m. to 2:31 p.m.)
23      Q.  (BY MS. McLEOD) Representative Riddle, I'm
24  going to move into the 82nd legislature.  Did you file
25  another Voter ID Bill in the 82nd legislature?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

173

1     A.  Yes, I did.  HB16.  This was the first bill
2  filed.  I camped in.
3     Q.  Out.  Representative, did you state that the
4  Voter ID Bill should be the top legislative priority for
5  the legislature?
6     A.  Yes, I did.
7     Q.  Okay.  And why did you believe that voter ID
8  should be the top legislative priority?
9        MR. SWEETEN:  That question calls for
10  matters subject to the legislative privilege.  Don't
11  reveal your thoughts, mental impressions, opinions
12  motivations about legislation or in furtherance of the
13  legislative process.
14     A.  I invoke legislative privilege on that.
15     Q.  I'm asking related to public statements you
16  made.
17        MR. SWEETEN:  I'm saying don't answer the
18  question to the extent it would require for you to
19  reveal thoughts, mental impressions, opinions, or
20  motivations about legislation or in furtherance of the
21  legislative process.
22        (Exhibit US-259 marked.)
23     Q.  I know, Representative, but I've handed you the
24  bill and I got it in front of you, but I think you may
25  have made that statement prior to filing, and I just

---

174

1  want to know why you believe legislative -- I'm sorry --
2  the Voter ID Bill should be the top legislative
3  priority.
4        MR. SWEETEN:  Same objection.  Same
5  instruction.  She can answer as to the general purpose
6  of the bill.  She can answer about whether or not she
7  made the statement, but she's not going to reveal
8  matters subject to legislative privilege.
9     A.  The purpose of the bill, and I suspect the
10  statement are one in the same, to make sure that the
11  ballot box is secure to discourage voter fraud.
12     Q.  Okay.  And did you also take a trip to monitor
13  elections in Baghdad?
14     A.  Yes, I did.
15     Q.  Did you state that that prompted you to file
16  voter ID legislation again this session?
17     A.  I don't remember having said that.
18     Q.  Well, I'll -- when did you take the trip to
19  Baghdad?
20     A.  One of the organizations I was telling you that
21  I had forgotten, you know, you were asking me about that
22  list, one was I served on the Jewish Institute for
23  National Security Affairs on that board at Washington
24  DC, and the other one is I was an officer for the
25  National Foundation for Women Legislators.  That office

---

175

1  is also out of Washington DC, and so we were asked to
2  take a bipartisan group of women legislators to Baghdad
3  to the International Election Observers for that
4  election.  There were 12 Americans total and nine in our
5  group, and I helped to lead that group.  We had a
6  Democrat woman from Chicago.  We had me from Texas.  We
7  had several from different states.
8     Q.  Okay.  And what was the purpose of the trip?
9     A.  We were International Election Observers, and
10  it was to help -- that was their first election that
11  they had total control of.  In other words, the security
12  and everything, they were in total control of it, and we
13  had been asked to do one -- two things.  One, to observe
14  the election, and we were in different locations in
15  Baghdad, and, two, to help mentor some of the women who
16  were running for office, and some of the women elected
17  officials there to help mentor them.
18     Q.  Okay.  And can you just again tell me the name
19  of the organization that you traveled with?
20     A.  Yes.  It was the National Foundation for Women
21  Legislators officed out of Washington DC.
22     Q.  How did you get involved with the National
23  Foundation of Women Legislators?
24     A.  It is an organization of women legislators, of
25  women state reps, state senators, governors,

---

176

1  Congresswomen.  We even have one tribal council for
2  the -- I think the Arapaho Nation, and so we're like
3  other organizations that are legislative organizations,
4  and so like ALEC and NCHL and some of those.  The only
5  differences from those is this is strictly for women
6  legislators.
7     Q.  Do you hold an office there or member?
8     A.  I did at one time.
9     Q.  What was that?
10     A.  President.
11     Q.  Okay.  And what were your duties as president?
12     A.  My duties as president was to fundraise in some
13  part for the organization, to communicate with
14  legislators to see what legislators in other states --
15  what they might need.  For example, when Hurricane Ike
16  hit Houston and my district was without electricity and
17  water, much of my district, for three weeks the
18  legislators from the other states kicked into action and
19  there were 28 18 wheelers that were within my district.
20  We put together three pods, points of delivery, and my
21  constituents had food, water, provisions before FEMA
22  even thought about showing up on the scene, and when
23  they did arrive, we told them go home.  We took care of
24  it.
25     Q.  Okay.  And how did the National Foundation of

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                    MAY 31, 2012

---

### 177

1  Women Legislators get involved with, I guess -- I'm not
2  sure if there's a specific organization for
3  international election monitoring.
4      A.  Through the state department.
5      Q.  Through the state department?
6      A.  Yes.
7      Q.  Were you one of the organizers or --
8      A.  Robin Reed was actually the organizer.
9      Q.  Who financed the trip?
10     A.  We paid for our own way to -- paid for our own
11  way -- When did we first land from America over there,
12  we paid our own way and from there we took a C130 into
13  Baghdad and then we stayed there at the embassy compound
14  for the duration and so --
15     Q.  What was the length of the trip?
16     A.  About five days.
17         (Exhibit 260 marked.)
18     Q.  All right.  Can I have this marked as United
19  States Exhibit 260?
20     A.  We paid for our way to Jordan and then
21  everything else was with the military.
22     Q.  And just -- I have a quote here at the bottom
23  of this page, but -- and this is -- I'm sorry.  Do you
24  recognize where this article comes from?
25     A.  M-hm.

---

### 178

1      Q.  Is it from your campaign website or your
2  website?
3      A.  M-hm.
4      Q.  Okay.
5      A.  I believe so.
6      Q.  And then there at the bottom of the page you're
7  discussing your trip to Iraq.  Can you read that quote
8  there at the bottom of the page?  And it goes a little
9  bit, I believe, one or two lines on Page 2 as well.
10     A.  Yes.  "The Iraqi people risk their lives to
11  cast their vote.  They endured extremely stringent
12  identification standards, and not only did they not
13  complain, but they were excited to be participating in a
14  democracy, Riddle said.  It was a reminder to me that
15  the spirit of our own republic is no less alive.  I
16  believe the people of Texas value their right to vote,
17  and I believe they will gladly take whatever steps are
18  necessary to protect the integrity of our system."
19     Q.  Okay.  Now, I just want to ask you a bit about
20  that statement.  What forms of identification were
21  acceptable for Iraqi citizens, if you remember?
22     A.  I don't remember all the forms.  I know that it
23  was very stringent for them, and I'll tell you this
24  much.  They did take their lives in their own hands.  36
25  got killed that day.  When I woke up, I told my husband

---

### 179

1  Iraqis are going to die today because they are trying to
2  vote, and 36 actually did get killed, and one of my
3  colleagues, Democrat from Chicago, we were in different
4  locations, and at the end of the day we got together and
5  we compared notes and we had translators and we could
6  not talk to the people until after they got their purple
7  finger.
8          Everyone showed up dressed to the nines,
9  like Easter Sunday, if they wore western clothes or if
10  they wore the traditional Muslim clothes, but they all
11  brought their children because they knew it was a part
12  of history, and they were excited to be there, and they
13  had a huge voter turn out, and we all saw the same
14  thing, but my colleague from Chicago asked a young man
15  who was there with his wife and his two children,
16  "Aren't you afraid for your life and the lives of your
17  family?"  This was his answer.  He said, "Yes, of
18  course," but then he did his hands like this, and he
19  said, "For the first time in my country's history, we
20  are on track like a railroad track, and if my family and
21  I get killed today while we're trying to vote," he said,
22  "we're totally committed to not allowing our country to
23  be derailed."  And he did this, "but if we get killed
24  today because we're trying to vote, we consider that a
25  tax for freedom that we are willing to pay."  And that's

---

### 180

1  what I brought back home.
2      Q.  Okay.
3      A.  And that's why I made the statement.
4      Q.  Thank you for that testimony.  Do you remember
5  the forms of identification that were acceptable for
6  Iraqi citizens on election day?
7      A.  I don't remember the forms.  I know that it was
8  stringent.  I know that they had to go through quite a
9  lot.
10     Q.  What do you mean by stringent?  Can you define
11  that?
12     A.  The forms of proof of their identity, I know
13  that that was -- but I can't tell you exactly what they
14  were.
15     Q.  Did they include non-photo IDs?
16     A.  I don't believe so.  I believe everything was
17  photo ID.
18     Q.  And do you know how the Iraqi citizens got the
19  types of ID permitted?
20     A.  That I don't know.  I'm not familiar with Iraqi
21  law.
22     Q.  Did you know or did you study how many forms of
23  ID Iraqi citizens carried?
24     A.  No.
25     Q.  Okay.  And do you know how Iraqi citizens

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

DEBBIE RIDDLE                                                    MAY 31, 2012

---

### 181

1  obtained that photo identification?
2      A.  No.  I would assume it would be through the
3  government.
4      Q.  Okay.  And so do you know why those -- why
5  those forms of ID were stringent for Iraqi citizens to
6  obtain?
7      A.  I was told while I was there that it was
8  extremely stringent, and they had quite a lot of hoops
9  they had to jump through is what I was told.
10     Q.  Okay.
11     A.  There were three US retired Congressmen that
12  were also there.
13     Q.  Okay.  And have you studied the voter ID laws
14  in any other countries?
15     A.  No.
16     Q.  And have you studied elections in any other
17  countries?
18     A.  I've not studied elections, but I was there as
19  an observer for the one in Iraq.
20     Q.  And do you know what the purpose of the -- You
21  said that after the Iraqi vote that they got a purple
22  finger.  What was the purpose of that?
23     A.  The purpose of the purple finger was to avoid
24  voter fraud to not allow them to come back and vote a
25  second time.

### 182

1      Q.  Okay.  And now I'd just like to go back to
2  HB16, and what was the general purpose of this bill?
3          MR. SWEETEN:  You can answer.
4      A.  To discourage voter fraud.
5          (Exhibit 261 marked.)
6      Q.  Can I have this marked as US Exhibit 261?
7      A.  Yes.  I camped in.
8      Q.  It did say camped in, I know.  I didn't know
9  exactly where I read that, but I know I saw it
10  somewhere.  Okay.  And do you recognize this as being an
11  article from -- I think it's yourhoustonnews.com?
12     A.  I don't remember if it says Your Houston News.
13  I'll take it on its face value.
14     Q.  Can you tell me the date they ran it?
15     A.  November 16, 2010.
16     Q.  Also, very small.  Okay.  And I think they are
17  kind of grouped in the paragraphs here, but six down, it
18  talks about your Voter ID Bill, and it says, "Voter
19  photo ID will help stem the tide of voter fraud, Riddle
20  said.  It won't necessarily eliminate it, but I think it
21  will have a real strong affect on it.  We aren't trying
22  to make things difficult.  We are just trying to make
23  sure that the integrity of the ballot box is secure."
24          Can you define "stem the tide" for me?
25     A.  From what the information that we were

### 183

1  hearing --
2          MR. SWEETEN:  Hold on.  When you are
3  answering the question, don't reveal your thoughts,
4  mental impressions, opinions or motivation about
5  legislation, nor communications that you had with
6  legislators, legislative staff, state agencies, Texas
7  ledge council or constituents, okay?  You can answer to
8  the extent you aren't revealing those matters, okay?
9      A.  Okay.  From the information that I was
10  receiving regarding questionable voting practices, I
11  felt like that we needed to have a handle on
12  discouraging voter fraud.
13     Q.  Okay.  And when you say -- when you said "stem
14  the tide," can you tell me just specifically what "stem
15  the tide" means?  I know it's an idiom.  I don't know
16  what it means.  I'm really not asking -- asking in
17  relation to any legislation.
18     A.  It means what it means.  That's what it says.
19  If there's a tide coming in and you want to stop the
20  tide, then you stem the tide.
21     Q.  Does stem the tide mean that there's a wave of
22  something?  Does that mean there's a lot of something?
23  I don't want to improperly interpret your statement
24  here.  Does that mean there is a wave of voter fraud or
25  a lot of voter fraud?

### 184

1          MR. SWEETEN:  Same instruction.
2      A.  Yeah, it means what it means.  I don't how to
3  explain it anymore than that it's a common term.
4      Q.  Is my interpretation of the term correct?
5      A.  What is your interpretation?
6      Q.  That there's a lot of voter fraud, to stop a
7  large amount of voter fraud.
8      A.  That or any voter fraud is too much.
9      Q.  Okay.
10     A.  One is too much.
11     Q.  But stem the tide doesn't mean one is too much.
12  It means a lot of voter fraud; is that right?
13          MR. SWEETEN:  Same objection.  Asked and
14  answered.
15     Q.  You can answer, Representative.
16     A.  It means what it means.
17     Q.  I object to that answer as nonresponsive, but
18  in the interest of time, we'll move on.
19          And when you said "stem the tide of voter
20  fraud," did you mean in person voter fraud?
21          MR. SWEETEN:  Don't reveal thoughts,
22  mental impressions about legislation in answering the
23  question or communications that we've outlined
24  previously.
25     A.  I would invoke legislative privilege.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                    MAY 31, 2012

---

### 185

1    Q.  I'm not asking about any information that you
2    received in private.  I'm asking about the public
3    statement that you made in terms of stemming the tide of
4    voter fraud.  What type of voter fraud did you mean?
5        MR. SWEETEN:  You can answer the question
6    to the extent you are not revealing communications that
7    we've outlined previously or other matters that are
8    subject to the legislative privilege I went over with
9    you.  You can also refer to matters of public record.
10       A.  People who would choose to register to vote
11   illegally or, in fact, vote illegally.  There was quite
12   a bit of information regarding that going on, not only
13   here, but through the United States with ACORN and
14   others.  That was public knowledge in the news.
15       Q.  And notwithstanding ACORN, which is I guess
16   relevant to fraudulent voter registration, did you have
17   any knowledge or do you have any knowledge of in person
18   voter fraud?
19       MR. SWEETEN:  Same instruction as to
20   legislative privileged communications.
21       A.  I would need to invoke legislative privilege on
22   that.
23       Q.  Did you receive information about in-person
24   voter fraud from a constituent or legislator?
25       A.  I would need to invoke legislative privilege on

---

### 186

1    that.
2        Q.  What about mail-in voter fraud?  Do you have
3    any --
4        A.  I would need to invoke legislative privilege on
5    that.
6        Q.  So anything that you've heard regarding
7    newspaper person voter fraud or mail-in voter fraud, you
8    are saying came from someone other than a constituent or
9    a legislator?
10       A.  My purpose of invoking legislative privilege on
11   that is clear.
12       Q.  I think it's a little unclear.  If it comes
13   from a constituent, we're able to probe that, and if it
14   comes from a legislator, we're able to probe that.
15       MR. SWEETEN:  She's not to reveal and my
16   instruction is do not reveal thoughts and mental
17   impressions and do not reveal communications she's had
18   with constituents, Texas ledge council, state agencies,
19   legislative staff, legislators.  So to the extent you
20   can answer it based on matters of the public record,
21   you're free to do so.  I think you have partially, but
22   don't reveal those matters that are subject to the
23   legislative privilege in so answering.
24       A.  I think I revealed that which is already of
25   public record.  That which is not of public record, I'm

---

### 187

1    invoking my legislative privilege on that, but there's a
2    lot there the public record regarding ACORN and other
3    concerns regarding voter registration and voter fraud.
4        Q.  Do the constituents ever tell you that they
5    witnessed in-person voter fraud?
6        MR. SWEETEN:  You are asking about a
7    specific conversation.  If you want to -- I mean, I
8    think if you are laying out the subject matter of the
9    communication and the question, so I think for her to
10   answer that would reveal a communication.  If you want
11   to ask it another way whether she had discussions with
12   or constituents, I would allow that question.
13       MS. McLEOD:  I'm sorry.  I do think that's
14   what I asked, discussions with constituents about
15   in-person voter fraud.
16       MR. SWEETEN:  Okay.  If you're asking her
17   has she had --
18       MS. McLEOD:  But specific incident --
19   specific incident of in-person voter fraud that they
20   witnessed.  I mean, it's not too specific.  It doesn't
21   tell the place.  It doesn't tell when.  I'm asking if a
22   constituent ever told her that.
23       MR. SWEETEN:  If you're asking that
24   general subject matter, I will let her answer the
25   question as to whether you had a discussion with a

---

### 188

1    constituent.  Don't reveal any further information.
2        THE WITNESS:  I would be much more
3    comfortable in invoking my legislative privilege.
4        MR. SWEETEN:  Okay.  Well, I think --
5        THE WITNESS:  If that's allowed.
6        MR. SWEETEN:  I think the problem here is
7    that the question is requesting the substance of the
8    conversation, and so I think that it's -- that's the
9    difficulty she's causing.  If you can scale back the
10   specific substance you are asking about, I can have her
11   answer if she's had some communications.
12       MS. McLEOD:  I'm confused as to how to
13   stem it back -- or how to reel it back in at all given
14   that it's just about in-person voter fraud.  I don't
15   know how to make the topic less broad.
16       MR. SWEETEN:  If the question is has she
17   had discussions with constituents about in-person voter
18   fraud, I think that is a general subject matter
19   description, and I would say that that's not covered by
20   legislative privilege.  So if that's the question, you
21   can answer that question.
22       A.  Well, I've already answered a question very
23   similar to that regarding my conversations with
24   Catherine Engelbrecht.
25       Q.  Is there anyone else?  Any other constituents?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

189

1   She works for an organization.  I was specifically
2   asking about constituents.
3       MR. SWEETEN:  She's asking are there any
4   other constituents.
5       A.  Yes.
6       Q.  What's the name of those constituents?
7       A.  Mike Riddle, my husband, is one.  He's chairman
8   of the Ballot Security, and there was a situation --
9       MR. SWEETEN:  Don't reveal the substance
10  of it.  You can just reveal whether you had a
11  conversation about it.
12      A.  Yes, I had a conversation about it.
13      Q.  Any other constituents?
14      A.  Not as you're framing it as a specific that
15  they witnessed right then and there.
16      Q.  And the same question about the witnessing or
17  knowledge of, have you ever -- I guess a constituent
18  ever had a conversation about knowledge of mail-in voter
19  fraud -- I'm sorry -- in-person voter fraud?  And this
20  is even less broad because it's knowledge of.
21      MR. SWEETEN:  If you could read it back,
22  I'm not sure I got the whole thing.
23      (Requested portion was read.)
24      MR. SWEETEN:  You want to rephrase,
25  Michelle?  I think -- or do you want her to answer the

---

190

1   question as phrased?
2       Q.  (BY MS. McLEOD) I can rephrase it especially if
3   it was -- it was even a little confusing to me.  I'm
4   sorry.
5           Just previously we were talking about
6   constituents that may have come to you to say they have
7   witnessed in-person voter fraud and you named Mike
8   Riddle, your husband, but said in the context in which I
9   asked the question about someone actually witnessing
10  in-person voter fraud, no one fit that bill, but has
11  another -- have other constituents come to you to say
12  that while they may not have witnessed, do they have
13  knowledge of in-person voter fraud?
14      MR. SWEETEN:  You can answer the question
15  as phrased as to whether or not a conversation occurred.
16      A.  In general, conversations have occurred, but I
17  think that they were quite broad.
18      Q.  Okay.  And before we -- before we move on from
19  in-person voter fraud, do you have a working definition
20  of what in-person voter fraud is?
21      A.  Would that be an individual that is attempting
22  to vote in person fraudulently?
23      Q.  Okay.  What's in the public record about
24  in-person voter fraud?  I mean, you said I could go to
25  the public record, and I just want to know what's there

---

191

1   regarding in-person voter fraud.
2       MR. SWEETEN:  You are free to answer that
3   question.
4       A.  Well, in Harris County you can go to the county
5   clerk's office and you can see how many voter
6   registration applications have been cleared out because
7   the people were not -- either not citizens or they were
8   dead or not here legally, a variety of reasons, and
9   Harris County Clerk -- Stan Stanart is the Harris County
10  Clerk, so that's a public record.  I think it's quite
11  substantial.  It would be eye opening for you, I think.
12      Q.  So that relates to perhaps the National Voter
13  Registration Act and perhaps problems with registration
14  in Harris County.  I'm asking about items on the public
15  record.  It doesn't have to be Harris County.  We can
16  make it as broad as Harris County.  Someone having
17  witnessed in.  Someone having been brought up on charges
18  of it.  Someone having been convicted of it in the
19  public record.
20      A.  I believe there are.  I did not do my homework
21  on that before I got here, so I would have to recheck
22  that, but to say that it never occurs, I think, would be
23  foolish.
24      Q.  And so you have no knowledge of convictions?
25      A.  I did not say that, no.

---

192

1   **Q.  Okay.  Do you have knowledge of**
2   **investigations --**
3   **MR. SWEETEN:  I think you're now**
4   **getting --**
5   **Q.  -- on the public record?**
6   **MR. SWEETEN:  On the public record?**
7   **A.  What I said is if you check the public**
8   **record --**
9   **Q.  Well, I'm asking what you know, Representative.**
10  **This is your deposition.  I'm here to ascertain what you**
11  **know.**
12  **MR. SWEETEN:  I think it's been asked and**
13  **answered, but go ahead.**
14  **A.  I think I've already answered that I can do the**
15  **research, but I did not do it prior to coming, so to say**
16  **that it doesn't exist would not be accurate.  I don't**
17  **know.  I'll be happy to go do that for you.**
18      Q.  All right.  Do you have a working definition of
19  what mail-in voter fraud is?
20      A.  That would be if someone put wrong
21  information -- intentionally put wrong information or
22  fraudulent information on a mail-in ballot.
23      Q.  Okay.  And do you have a working definition of
24  what voter registration fraud is?
25      A.  When they register to vote, if they give

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                          MAY 31, 2012

---

**193**

1    inaccurate information.
2        Q.   Okay.  And then if we can go back to this
3    exhibit.
4        A.   Which one?
5        Q.   I'm not sure of the number.  What's the number
6    on there?  260?
7        A.   M-hm.
8        Q.   Okay.  And so on the second page --
9        A.   Yeah.
10       Q.   -- there's another quote by you, and I'm just
11   going to read it here.  It says, "Almost everyone is
12   currently carrying a form of ID that would allow them to
13   vote, and for those that aren't, the bill would allow
14   you to get one for free, Riddle said.  When you weigh
15   that against evidence of widespread voter registration
16   fraud by groups such as ACORN, I think it's only common
17   sense for us to take our ballot security as seriously as
18   the wrongdoers take voter fraud."
19           And I just want to discuss the widespread
20   voter registration fraud by groups such as ACORN.  Can
21   you tell me a little bit about that?
22       MR. SWEETEN:  You can reveal matters that
23   are on the public record.  Don't reveal matters that are
24   subject to legislative privilege or conversations you've
25   had with individuals as we have discussed.

---

**194**

1        A.   I think all you know to do is Google ACORN and
2    newspaper records regarding ACORN and the problems that
3    ACORN was having.  That's just common knowledge, and
4    widespread information that people were being paid to
5    register voters and they were doing so using names like
6    Mickey Mouse and other forms like that that were just
7    absolutely ludicrous and actually paying people to -- to
8    fraudulently register, so I think all of that is of
9    public record; is it not?
10       Q.   Did that happen in the State of Texas?
11       A.   From what I understood, ACORN was active here
12   as well.
13       Q.   But did they fraudulently register voters to
14   your knowledge in the State of Texas?
15       A.   From the information that we received from the
16   King Street Patriots, it --
17       MR. SWEETEN:  Don't reveal the specific
18   communications you received from constituents.  Don't
19   reveal those.  Don't reveal matters that are subject to
20   legislative privilege.
21       MS. McLEOD:  Are King Street Patriots
22   constituents?
23       MR. SWEETEN:  As we've defined
24   constituents, yes.
25       A.   I'm invoking legislative privilege on that.

---

**195**

1        Q.   Okay.  And then I'm going to go back -- I
2    believe it was the last exhibit, 261, and where you say,
3    "Voter ID will help stem the tide of voter fraud.  It
4    won't necessarily eliminate it, but I think it will have
5    a real strong effect on it."
6            How will HB16 have a real strong effect on
7    voter fraud?
8        MR. SWEETEN:  Don't answer that.  It calls
9    for matters of legislative privilege.
10       I'm invoking my legislative privilege on that.
11       Q.   What would a voter need to do under the
12   existing law to commit in-person voter fraud?
13       A.   There's a multitude of things that they could
14   do to break the law.
15       Q.   How would they commit in-person voter fraud?
16       A.   If they were not a US citizen, if they were not
17   eligible to vote or if they voted under a false name or
18   if they voted multiple times.
19       Q.   And so in order for a noncitizen to vote --
20   I'll make it more specific.  How would a noncitizen --
21   what would they have to do to commit in-person voter
22   fraud?
23       A.   If they were not eligible to vote and if you're
24   not a citizen, you can't vote.  If they vote, then
25   that's voter fraud.

---

**196**

1        Q.   So would they need to get on the voter
2    registration rolls?
3        A.   They would need to get on voter registration
4    rolls or they just simply show up to vote and present
5    themself as someone that they are not.
6        Q.   So they would either have to present fraudulent
7    identification to fraudulently get onto the voter
8    registration rolls or fraudulently obtain identification
9    and show up to the polls on election day.
10       A.   I'm sure there's a multitude of ways to do it.
11   Criminals think up all kinds of strange things.
12       Q.   Can you think of any other ways a person could
13   commit in-person voter fraud?
14       A.   My mind is not a criminal mind.  They astound
15   me all the time.
16       Q.   What's the punishment under current law for
17   committing in-person voter fraud?
18       A.   I don't know.  I'd have to check to see.
19       Q.   Do you know if it's a felony?
20       A.   I'd have to check to see.
21       Q.   Have you ever witnessed anyone trying to
22   impersonate another voter?
23       A.   Not personally.
24       Q.   Have you ever witnessed a noncitizen attempting
25   to vote?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

197

1    A.  Not personally.
2    Q.  Have you challenged a voter's eligibility?
3    A.  Not personally.
4    Q.  Are you aware of any specific instances of
5  in-person voter fraud in your district in the last
6  20 years?
7              MR. SWEETEN:  In answering the question,
8  don't reveal matters of legislative privilege including
9  the communications we've outlined previously.
10   A.  I would have to -- I would have to invoke my
11 legislative privilege on that.
12   Q.  Are there any matters -- I'm sorry.  Are you
13 aware of any specific incident of in-person voter fraud
14 in your district in the last 20 years that are on the
15 public record?
16   A.  I would have to invoke the legislative
17 privilege on that.
18             MR. SWEETEN:  Don't reveal matters of
19 legislative privilege.  If you learned this information
20 through communications that are privileged, do not
21 reveal that.
22   A.  That is why I'm invoking my legislative
23 privilege.
24   Q.  But my question was are there -- are you aware
25 of any specific incidents of in-person voter fraud in

---

198

1  your district in the last 20 years that are a matter of
2  public record?
3              MR. SWEETEN:  Okay.  So you can -- don't
4  answer it if it requires you to reveal communications.
5  You can answer it if you've learned of it through
6  matters of the public record, what she's asking.
7    A.  Let me give that some thought.  I'm aware of
8  some.  I don't know if it fell within the boundaries of
9  my district or outside the boundaries of my district.
10   Q.  What are those many incidents?
11   A.  Those are instances of --
12             MR. SWEETEN:  Again, don't reveal
13 communications you received that are subject to the
14 privilege.
15             THE WITNESS:  Then I would need to invoke
16 my legislative --
17             MR. SWEETEN:  Okay.  You can reveal
18 matters that you are aware of through the public record.
19 Do not reveal information received from communications
20 that are privileged.
21             THE WITNESS:  Okay.
22   Q.  (BY MS. McLEOD)  Of the tide of voter fraud
23 that you mentioned in your press release, there are no
24 incidents of in-person voter fraud in the last 20 years
25 on the public record in Harris County -- on the public

---

199

1  record.
2    A.  That is -- I don't think that's accurate, no.
3    Q.  Okay.  So what matters of in-person voter fraud
4  are on the public record?  If it's on the public record,
5  the representative can certainly --
6    A.  I would need to go to the public record and do
7  that research.  I don't have that on me.
8    Q.  The answer is you don't know --
9              MR. SWEETEN:  The answer is --
10   --  sitting here today.
11             MR. SWEETEN:  -- she's not going to reveal
12 matters that are subject to legislative privileged
13 communications.  So to the extent that you are asking
14 her outside of that what those are --
15             MS. McLEOD:  I've prefaced this question
16 the last four times I've asked it with on the public
17 record.
18             MR. SWEETEN:  If a communication was
19 delivered to her by someone citing as a source the
20 public record, that would be subject to the legislative
21 privilege because it would be contained within the
22 communication.  So she can answer except to the extent
23 that her answer would reveal matters of communications
24 that are subject to legislative privilege.  I'm letting
25 her answer --

---

200

1    Q.  (BY MS. McLEOD)  I'm not asking her about any
2  covert letters or notices or messages that she may have
3  received.  I'm asking her if she knows as a legislator
4  in her district for 20 years and a resident of the
5  district -- I'm sorry, a legislator of the district for
6  10 years and a resident of the district almost her
7  entire life, if she is aware in the last 20 years of any
8  in-person voter fraud that is on the public record.
9              MR. SWEETEN:  Same objection.  Same
10 instruction.  Don't reveal matters of privilege.  You
11 can answer to the extent you can do so without revealing
12 privileged matters.
13   A.  And I can't answer without doing that, so
14 I'll have to invoke my legislative privilege.
15   Q.  Are you aware of how many convictions the
16 attorney general has secured for in-person voter fraud
17 in the last 20 years in the State of Texas?
18   A.  No, I'm not aware.
19   Q.  Okay.  Are you aware of any?
20   A.  I'm not aware.
21   Q.  To your knowledge have individuals created
22 counterfeit photographic identification cards in Texas?
23             MR. SWEETEN:  Don't reveal matters of
24 privilege.  You can reveal matters that are on the
25 public record.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                          MAY 31, 2012

---

### 201

1     A.  Counterfeit voter --
2     Q.  No.  Just counterfeit IDs.  For instance, kids
3  getting fake IDs, teenagers.
4     A.  Oh, yes.
5     Q.  Okay.  How many incidents of mail-in ballot
6  fraud have occurred in the State of Texas in the last
7  20 years?
8         MR. SWEETEN:  Same objection as to
9  legislative privilege.  Don't reveal matters that are
10  subject to that privilege.  You can answer to the extent
11  your answer will --
12     A.  I don't know about the State of Texas.  My most
13  recent information was about 24,000 in Harris County.
14     Q.  24,000 incidents of mail-in ballot fraud?
15     A.  No, of -- of the voter registration.
16     Q.  So improper names on the voter registration
17  rolls, but --
18     A.  And I can by the way tell you where the --
19         MR. SWEETEN:  Just answer her questions.
20         THE WITNESS:  Okay.
21     Q.  How many incidents of mail-in ballot fraud have
22  occurred in the State of Texas in the last 20 years?
23     A.  I don't know.
24         MR. SWEETEN:  Don't reveal matters of
25  privilege in answering these questions.

---

### 202

1     Q.  Are you aware of whether mail-in ballot fraud
2  has been prosecuted more than in-person ballot fraud in
3  the State of Texas?
4         MR. SWEETEN:  Same instruction.
5     A.  I'm not aware.
6     Q.  Does HB16 focus more on in-person ballot fraud
7  or mail-in ballot fraud?
8         MR. SWEETEN:  You can answer as to the
9  general purpose of the bill.  Don't reveal your
10  thoughts, mental impressions, opinions, motivations
11  about the legislation.
12     A.  The -- Regarding the bill, I think that it --
13  it does obviously --
14         MR. SWEETEN:  You can refer to the text.
15     A.  Let me refer to the text.
16     Q.  Certainly.
17     A.  Everything within the text, I think has more to
18  do with in-person ballot fraud.  It would be difficult
19  regarding mail-in for some of these things.
20     Q.  Okay.  Now, was your process in drafting HB16
21  the same as it has been for previous bills?  You or a
22  member of your staff worked with the Texas legislative
23  council?
24     A.  Yes.
25     Q.  Did you hold any town halls or have any kind of

---

### 203

1  public chats with constituents regarding HB16?
2     A.  I didn't have a specific town hall about HB16,
3  but it was included in town halls.
4     Q.  Okay.  And did you -- did constituents give
5  input on HB16 or voter identification?
6     A.  My constituents are very opinionated, yes.
7     Q.  Okay.  And did you get input from other
8  legislators?
9         MR. SWEETEN:  At the town hall meeting?
10         MS. McLEOD:  No, no, just in the process
11  of drafting HB16.
12         MR. SWEETEN:  In the drafting of the bill?
13         MS. McLEOD:  Yes.
14         MR. SWEETEN:  You can answer as to whether
15  you had discussions with other legislators.  Don't
16  reveal the content of those discussions.
17     A.  Yes, I did, and I'm trying to recall who they
18  were with.  Leo Berman was one, but I don't recall --
19     Q.  You don't recall anyone else?
20     A.  No.
21     Q.  Okay.  And did you seek any other input perhaps
22  from local elected officials?
23     A.  Yes, I did.
24     Q.  And who were those officials?
25         MR. SWEETEN:  Don't reveal the substance

---

### 204

1  of the communications.  You can reveal who you have
2  spoken with.
3     A.  Paul Bettencourt.
4     Q.  Anyone else?
5     A.  No.
6     Q.  Okay.  And did you read or request any studies
7  about the impact of HB16 on minority voters?
8         MR. SWEETEN:  Don't answer the question.
9  It calls for legislative privilege.  Instruct not to
10  answer.
11     A.  I'm invoking my legislative privilege.
12     Q.  And did you receive a report -- I believe it's
13  from the LBB -- about the fiscal impact of the bill?
14     A.  That comes with every bill.
15     Q.  Okay.  And how did you determine the impact
16  HB16 would have on your constituents?
17         MR. SWEETEN:  Don't answer the question.
18  It calls for a matter subject to legislative privilege.
19     A.  I'm invoking my legislative privilege on that.
20     Q.  Did you seek statistical information from DPS
21  regarding possible impact on voters when drafting HB16?
22         MR. SWEETEN:  Don't answer the question.
23  It calls for matters subject to legislative privilege.
24  Instruct not to answer.
25     A.  I'm invoking my legislative privilege.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                          MAY 31, 2012

---

### 205

1   Q.   Did you seek statistical information or any
2   other information from the Secretary of State's Office
3   when drafting HB16?
4        MR. SWEETEN:  Same instruction.
5   Legislative privilege.  Instruct not to answer.
6        A.   I'm invoking my legislative privilege.
7   Q.   I just want to go through HB16 very quickly.
8   Do you have that in front of you?
9        A.   Yes, I do.
10  Q.   And I just want to go through the acceptable
11  forms of identification and don't want to make you read
12  through all of this again, so I'm just going to direct
13  you to Page 5.  And at the bottom there it says, "A
14  driver's license issued by DPS or the equivalent agency
15  of another state that has not expired no earlier than
16  two years before the date of presentation, a military ID
17  with a photograph, an employee ID that contains a
18  person's photograph with an employer operating in the
19  ordinary course of business, a United States citizenship
20  certificate that contains a person's photograph, a
21  United States passport issued to the person, a student
22  identification card issued by a public or private
23  institution of higher education with person's
24  photograph, a license to carry a concealed handgun
25  issued to the person by the Department of Public Safety,

---

### 206

1   an identification card issued by a state agency that
2   contains a person's photograph, a valid identification
3   card that contains a person's photograph issued by a
4   state agency or Federal government."
5        And then in terms of non-photo ID, "a
6   voter registration certificate, a copy of the utility
7   bill, bank statement, government check or other
8   government document with the name and address of the
9   voter, official mail address of the person by a
10  government entity, a certificate of birth," a United
11  States -- "United States citizenship papers, an original
12  or certified copy of the person's marriage license or
13  divorce decree, court records, an identification card
14  issued by a government entity to obtain benefits such as
15  veterans, Medicaid or Medicare, a temporary driver's
16  permit, a pilot's license, a library card, a hunting and
17  fishing license" and anything, I guess, deemed by the
18  "commissioners court as applicable proof of photo
19  identification."
20       Does it seem like I -- Does that seem like
21  a fair and accurate reading of the photo identification
22  allowed in your bill?
23       A.   M-hm.
24  Q.   I'm just trying to get through it a little
25  quicker, but this is the last one that includes that

---

### 207

1   much ID, so we're almost there.
2        What was the purpose of including these
3   specific forms of ID in HB16?
4        MR. SWEETEN:  Objection.  You can answer
5   as to the general purpose of the bill.  Otherwise, it
6   would reveal matters of legislative privilege.  Instruct
7   you not to answer.
8        A.   The intent was not to --
9        MR. SWEETEN:  Instruct not to answer
10  unless it's as to the general purpose of the bill.
11       A.   Okay.  The general purpose of the bill is to
12  prevent voter fraud, and these forms of identification
13  are not difficult.
14  Q.   Okay.  And as to the purpose of including these
15  specific forms of ID, I'm going to try to phrase it
16  another way.  When you say they're not difficult, do you
17  believe that these forms of ID that are included in your
18  bill would help or would help achieve the general
19  purpose of your bill which is to reduce voter fraud?
20       MR. SWEETEN:  Don't reveal your mental
21  impression about the bill, your opinions, your
22  motivations about the legislation.  Don't reveal those.
23  I'm instructing you not to answer, but you can answer as
24  to the general purpose of the bill.
25       A.   Obviously, what is contained within the bill is

---

### 208

1   part of getting to the purpose of discouraging voter
2   fraud.
3   Q.   Okay.  Thank you for that testimony.  Did you
4   seek advice from the Texas Legislative Council when
5   authoring your bill to determine whether it was Voting
6   Rights Act compliant?
7        MR. SWEETEN:  Don't answer the question.
8   As phrased, it asks for the specific substance of
9   communication with the TLC.  You can reveal if she
10  asked -- I mean, I won't object if you are asking her
11  whether she's had communications with TLC, but not to
12  the extent that you've expressed in the preface of the
13  question.
14       MS. McLEOD:  I'm asking specifically about
15  whether you had conversations with the TLC when
16  authoring your bill to determine if it was Voting Rights
17  Acts compliant.
18       MR. SWEETEN:  I think you are asking her
19  to reveal the substance of communication.  I'm
20  instructing you not to answer the question as phrased.
21       A.   When I work, they --
22       MR. SWEETEN:  My instruction is not to
23  answer the question.
24       A.   I'm invoking my legislative privilege.
25  Q.   Okay.  And did you seek advice from any other

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                    MAY 31, 2012

---

### 209

1  organization prior to drafting HB16 on the content of
2  the bill?
3      A.  No.
4      Q.  Okay.  Did a member of your staff talk to any
5  outside sources?
6      A.  I don't recall.
7          (Exhibit US-262 marked.)
8      Q.  Representative, do you recognize this as being
9  an article by Bob Price from the Texas GOP Vote?
10     A.  I have not seen this article before, but it --
11 I know Bob Price, so, yeah -- but I've not -- this is
12 the first time I've seen this.
13     Q.  Okay.  I'd like to flip to the second page.
14 It's got your picture there, I believe.
15     A.  Holy cow, that's a bad picture.  Wow.  Do I
16 look like that?  That's one my opponent used.  That's
17 mean.
18     Q.  You'll have to have a talk with Bob.
19     A.  I am.
20     Q.  So it says here next to your picture, "I have
21 also spoken with Representative Debbie Riddle about her
22 bill, HB16.  Her bill is much less restrictive in that
23 it allows for two forms of non-photo ID if the voter
24 does not present a photo ID.  Representative Riddle
25 believes the inclusion of two forms of non-photo ID is

---

### 210

1  necessary to pass DOJ review."
2          Did you make a statement like that?
3      A.  You bet I did.
4          MR. SWEETEN:  Say it again.  I didn't hear
5  the answer.
6          THE WITNESS:  You bet I did.
7      Q.  Why do you believe two forms of non-photo ID
8  are necessary for DOJ preclearance?
9          MR. SWEETEN:  Don't answer the question as
10 phrased.  She's asking you about your thoughts, mental
11 impressions, opinions, motivations about legislation.
12         THE WITNESS:  She asked if I said it, and
13 I said it.
14         MR. SWEETEN:  I didn't object to whether
15 you said it.  I'm objecting to --
16         MS. McLEOD:  The second question.
17         THE WITNESS:  The next question was?
18         MR. SWEETEN:  She can read it back.
19         (Requested portion was read.)
20         MR. SWEETEN:  Same instruction.  Asks for
21 her to reveal matters of legislative privilege.
22 Instruct her not to answer.
23     A.  I would choose to declare my legislative
24 privilege.
25     Q.  Okay.  Did you have any conversations with

---

### 211

1  other legislators regarding DOJ preclearance and
2  allowable forms of ID?
3          MR. SWEETEN:  That's a general subject
4  matter description.  I'll allow you to answer it to the
5  extent you can.
6      A.  In general, some discussions, but to nail me
7  down and say who, what, when and where is difficult.
8      Q.  So you had general discussions with
9  legislators, but you don't remember specifically whom.
10     A.  M-hm.
11     Q.  Do you remember generally what happened to your
12 bill after it -- after it was referred to elections --
13 to the committee?
14     A.  M-hm.
15         MR. SWEETEN:  You can reveal matters of
16 public record.
17     A.  Okay.  The speaker of the House decided that
18 Patricia Harless's bill and, quite frankly, I agreed,
19 that it was the better bill.
20         MR. SWEETEN:  Don't reveal matters of
21 legislative privilege.  You can reveal matters of public
22 records, public statements, filings.
23     A.  Filings.  It is a public record that the
24 speaker did move ahead with Patricia Harless's bill.
25     Q.  Did anyone ever have conversations or did you

---

### 212

1  ever have conversations with anyone regarding your bill
2  taking a back seat then or being replaced by SB14?
3      A.  Yes.
4      Q.  Okay.  Who did you have those conversations
5  with?
6      A.  I don't recall.  They were in general
7  conversations.
8      Q.  Okay.  And did you at any time try to determine
9  the impact of HB16 on minority voters?
10         MR. SWEETEN:  Don't answer.  It calls for
11 matters of legislative privilege.
12     A.  Yeah.  I'm invoking my legislative privilege on
13 that.
14     Q.  Sitting here today do you believe HB16 would
15 have increased integrity at the ballot box?
16         MR. SWEETEN:  Don't answer the question.
17 It calls for matters of legislative privilege.
18     A.  I'm invoking my legislative privilege on that.
19     Q.  And if HB16 was enacted, would it have
20 accomplished the general purpose you described earlier
21 which was reducing voter fraud?
22         MR. SWEETEN:  Same objection.  Calls for
23 legislative privilege.  Don't answer the question.
24     A.  I'm invoking my legislative privilege on that.
25     Q.  Okay.  Now we're going to move on to Senate

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                             MAY 31, 2012

## 213

1    Bill 14.  We're almost done.  Okay.
2              And this has been previously marked as
3    Exhibit 5.  This has been previously marked as US
4    Exhibit 5.  Representative, do you recognize this
5    document?
6        A.  Yes, I do.
7        Q.  What is it?
8        A.  This is Senate Bill 14.
9        Q.  And who authored the bill?
10       A.  Fraser.  I think it was Fraser.
11       Q.  Okay.  And do you know the general purpose of
12   SB14?
13       A.  Yes, I do.  Was it Senator Fraser?
14       Q.  It was -- You are right.  I'm sorry to move on.
15   I didn't know you were still --
16       A.  Okay.  And you asked the general purpose --
17       Q.  Of SB14.
18       A.  To discourage voter fraud.
19       Q.  Okay.  And if you could turn to Page 9, and we
20   are just going to talk about the documentation and proof
21   of identification that's acceptable -- it's acceptable
22   in form under SB14.  No. 1 here says, "A driver's
23   license and election identification certificate or
24   personal identification card issued by DPS that has not
25   expired or that expired no earlier than 60 days before

## 214

1    the date of presentation."  The second, "A United States
2    military identification card that contains a person's
3    photograph and has not expired no earlier than 60 days
4    before the date of presentation."
5              The next page, "A United States
6    citizenship certificate issued to the person that
7    contains the person's photograph, and a United States
8    passport that has not expired earlier than 60 days
9    before presentation, a license to carry a concealed
10   handgun issued to a person by the Department of Public
11   Safety that has not expired earlier than 60 days before
12   the date of presentation."  And does that you think
13   accurately describe the identification allowed under
14   SB14?
15       A.  Yes.
16       Q.  And does SB14 allow any forms of non-photo
17   identification?
18       A.  No.
19       Q.  Okay.  And what was the purpose of only
20   including photo identification in SB14?
21              MR. SWEETEN:  Objection.  She can answer
22   as to the general purpose, but to -- the question you
23   asked was asking her to reveal of matters of legislative
24   privilege.  I'm going to object based on legislative
25   privilege.

## 215

1        A.  The purpose of the bill is to discourage voter
2    fraud.
3        Q.  And as to why the -- why only photo
4    identification is allowable under SB14, are you invoking
5    legislative privilege on the advice of counsel?
6        A.  Yes.
7        Q.  Okay.  Were the allowable forms of ID ever
8    publicly discussed on the House floor?
9        A.  No, not to my knowledge.  I don't recall --
10   Well, let me go back.  I don't -- I would have to go
11   back to the archives.
12       Q.  Okay.  So you don't recall --
13       A.  I don't recall.
14       Q.  -- sitting here today?
15       A.  I don't.
16       Q.  Did you make any public statements regarding
17   allowable forms of ID?
18       A.  No.
19       Q.  Did you make any public statements on the House
20   floor regarding SB14?
21       A.  No.
22       Q.  Did you have any conversations with other
23   legislators regarding the allowable forms of ID under
24   SB14?
25       A.  Yes.

## 216

1        Q.  Do you remember the other legislators' names?
2        A.  They were, once again, in general within
3    conversation among my colleagues, and I -- we
4    communicate and to go back and say a specific date
5    exactly who, it's general conversations.
6        Q.  Okay.  Are you aware of the source of any
7    legislative language in SB14?
8              MR. SWEETEN:  Don't reveal matters -- your
9    thoughts, mental impressions, opinions or motivation
10   about the legislative process or furtherance of the
11   legislative process.
12       A.  I'm invoking my legislative privilege.
13       Q.  Do you remember if the governor took a public
14   position on SB14?
15              MR. SWEETEN:  You can answer.
16       A.  I believe that he did.
17       Q.  What was it?
18       A.  I believe he was in favor of it.
19       Q.  And how did he communicate that position?
20       A.  I think it was in his state of the state
21   address.  I could be wrong on that.  I don't recall.  I
22   think it was the state of the state, but I could be
23   wrong.
24       Q.  And did the lieutenant governor take a public
25   position on SB14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                    MAY 31, 2012

---

217

1      A.   I believe he did as well.  If no other way, he
2  signed the bill.  It was passed, so --
3      Q.   I'm sorry.  I don't mean to step on your
4  answer.
5      A.   I don't remember if he said something in the
6  state of the state address.  I think he did, but if not,
7  I think he signed it.
8      Q.   Okay.  And did any other officer -- state
9  officer take a public position on SB14?
10     A.   Speaker of the House.
11     Q.   Okay.  And what was his position?
12     A.   He was certainly in favor of it.
13     Q.   And how did he communicate that position?
14     A.   He worked closely with the author.
15     Q.   Okay.
16     A.   And he signed this.  The signature is here.
17     Q.   Okay.  He signed the bill?
18     A.   Yes.
19     Q.   Okay.  And are you aware of any attempt to
20  determine the impact of SB14 on minority voters?
21          MR. SWEETEN:  Don't answer that.  It calls
22  for matters subject to the legislative privilege.
23     A.   Yes.  I'll have to invoke my legislative
24  privilege on that.
25     Q.   Are you aware of any public testimony regarding

---

218

1  any legislator's attempt to determine the impact of SB14
2  on minority voters?
3          MR. SWEETEN:  You can answer as phrased.
4      A.   I'm unaware.
5      Q.   Was there bipartisan support for SB14?
6      A.   That's a public record within the vote.
7      Q.   But to your knowledge was there bipartisan
8  support for SB14?
9      A.   Publicly I don't think it was strong
10  bipartisan, but that was publicly.
11     Q.   Did minority legislators support SB14?
12          MR. SWEETEN:  Don't reveal communications
13  you've had with them.  You can reveal matters of public
14  record including votes.
15     A.   I would have to go back to the public -- to the
16  votes on that to see if there were any minorities that
17  voted in favor of it.  I don't recall.
18     Q.   Okay.  You don't recall if any minorities voted
19  in favor of it?
20     A.   I don't recall.  I'd have to check, but I could
21  check.
22     Q.   And from -- from your discussions with
23  minority -- I'm sorry -- from public discussions on the
24  House, conversations that occurred on the front and back
25  mike, why did minority voters -- I'm sorry -- minority

---

219

1  legislators not support SB14?
2          MR. SWEETEN:  You are asking about what
3  was expressed?  You can answer as to public record.
4      A.   From what they've said at the front and back
5  mike?
6          MR. SWEETEN:  She's asking you from what
7  was expressed on the front and back mike.
8          THE WITNESS:  Why were they objecting to
9  it?
10          MR. SWEETEN:  Yeah, what were they saying.
11     A.   That it would be inconvenient for people that
12  didn't have ID.  They were concerned about the
13  convenience.
14     Q.   Okay.  Any other -- Any other reasons?
15     A.   Convenience seemed to be the big deal.
16     Q.   And do you know what -- When you say
17  "convenience," what do you mean?  Do you mean difficulty
18  in obtaining the documents?  And this is specifically
19  related to what was said.  I'm trying to ascertain what
20  legislators said.  I know that you are saying
21  convenience, but I'm sure on the front and back mike
22  they didn't say convenience.  So I'm just trying to
23  ascertain what was said there.
24     A.   Well, it could potentially pose inconvenience
25  or basically inconvenience.

---

220

1      Q.   Okay.  Do you remember discussions about
2  whether the bill complies with the Voting Rights Act --
3  Section 5 of the Voting Rights Act?
4          MR. SWEETEN:  You can reveal if it was a
5  matter of public record.
6      A.   I don't remember that being a major part of the
7  debate.  It was more about convenience.
8      Q.   And did any groups representing minority voters
9  support SB14?
10          MR. SWEETEN:  Don't reveal conversations
11  you've had.
12     A.   I have to invoke legislative privilege on that.
13     Q.   From your knowledge of the public record, did
14  any groups representing minority voters support SB14?
15          MR. SWEETEN:  You can answer as phrased.
16     A.   I'm unaware.
17     Q.   Okay.  Then with regard to SB14, how does
18  narrowing the forms of ID or the elimination of
19  non-photo ID further the purpose of SB14 which is
20  eliminating voter fraud?
21          MR. SWEETEN:  Don't answer.  Calls for
22  matters subject to the legislative privilege.  Instruct
23  not to answer.
24     A.   I'm invoking my legislative privilege.
25     Q.   Earlier when you mentioned convenience, when

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                      MAY 31, 2012

---

221

1  you say "convenience," were minority legislators worried
2  about disenfranchisement of minority voters?
3      MR. SWEETEN:  Again, are you asking about
4  matter of public record?
5      Q.  I'm sorry.  I didn't preface it that way.  The
6  conversations going on in front and back mike which you
7  described as being issues of convenience, did the
8  minority legislators describe or state that SB14 would
9  disenfranchise their constituents or minority
10  constituents?
11      MR. SWEETEN:  You can answer as phrased.
12      A.  On the public record I think that term was
13  used, but I would determine it's more convenience.
14      Q.  Okay.  Sorry.  And why do you say it's a matter
15  of convenience?
16          MR. SWEETEN:  Objection.  She's talking
17  about -- You asked her questions about what occurred on
18  the public mike.  She's describing what occurred on the
19  public mike, so she's not going to ask her own personal
20  why.  She's describing what occurred on the public mike.
21  So if you want to ask her why she's describing what
22  occurred on the public mike that way, that's a fair
23  question.
24      Q.  Why did you describe what occurred on the
25  public mike, their statements as convenience -- issues

---

222

1  with convenience?
2      A.  Because that was the topic of conversation at
3  the back mike and front mike, was more issues of
4  convenience.
5      Q.  Did minority legislators use the term
6  convenience?
7      A.  I don't know if they used the term convenience.
8  I think that they did, but it was -- but the -- but the
9  general overall topic of conversation of concern was
10  that of convenience.
11      Q.  Do you know how many registered voters in Texas
12  lack a driver's license or state ID?
13          MR. SWEETEN:  In answering the question,
14  don't reveal matters of legislative privilege including
15  conversations you had or your mental impressions, but
16  you can answer --
17      A.  I'm not aware of it.
18      Q.  Prior to your vote for SB14, did you ever try
19  to find out that number?
20          MR. SWEETEN:  Same objection.  In fact,
21  I'm going to object based on legislative privilege.  I'm
22  instructing her not to answer the question.
23      A.  I'm going to invoke my legislative privilege.
24          MR. SWEETEN:  I want to take a break just
25  when you get to a stopping point.  You can ask more.  I

---

223

1  just want to take a break.
2          MS. McLEOD:  We can take a break here.
3          MR. SWEETEN:  Okay.
4          (Recess from 3:40 p.m. to 3:50 p.m.)
5      Q.  (BY MS. McLEOD)  I think when we left off, I
6  asked did you know how many registered voters in Texas
7  lack a driver's license or state ID or license to carry
8  card, and you said you weren't sure of the number.
9      A.  I don't know.
10      Q.  And are you aware that Texas recently informed
11  the attorney general that there are 700,900 -- 795,955
12  such individuals in the State of Texas?
13          MR. SWEETEN:  Objection.  Misstates the
14  record.  You can answer.
15      A.  I was unaware of that.
16      Q.  Okay.  And who do you believe makes up that
17  group of people?  Do you believe it's minority voters?
18          MR. SWEETEN:  In answering the question,
19  don't reveal anything thoughts, mental impressions,
20  opinions or motivations about legislation or
21  communications that you've had.
22      A.  I guess I need to invoke legislative -- I don't
23  know.  That would simply be speculation, so I would just
24  have to invoke legislative privilege on that.
25      Q.  If you don't know, you can say you just don't

---

224

1  know.
2      A.  I don't know.
3      Q.  Okay.  And are poverty rates in Texas similar
4  across racial groups?
5      A.  Are they --
6      Q.  Are poverty rates similar across racial groups?
7      A.  You know what?  I'm not sure.
8      Q.  What about in your district?
9      A.  Within my district I would say the poverty rate
10  is pretty consistently the same.
11      Q.  Okay.  Of minorities?
12      A.  For anybody.
13      Q.  Meaning, blacks, Hispanics and whites it's
14  pretty much the same?
15      A.  Pretty much the same.
16      Q.  Okay.  And do you believe voters will be
17  disenfranchised by the strict photo ID requirements of
18  SB14?
19          MR. SWEETEN:  Objection.  Legislative
20  privilege.  Instruct you not to answer.
21      A.  I invoke the legislative privilege on that.
22      Q.  Do you believe that any individual will be
23  turned away in the November general election because
24  they lack the necessary ID?
25          MR. SWEETEN:  Objection.  Calls for

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                    MAY 31, 2012

---

### 225

1  matters of legislative privilege, her thoughts, mental
2  impressions, opinions, motivations about legislation or
3  furtherance of the process or communications.
4  Objection.  Legislative privilege.
5      A.  I would need to invoke my legislative privilege
6  on that.
7      Q.  If a voter was turned away based on a lack of
8  identification, do you believe that that voter would be
9  disenfranchised?
10      MR. SWEETEN:  Objection.  Calls for
11  matters of legislative privilege.
12      A.  I'm invoking legislative privilege on that.
13      Q.  I'm not asking for any -- anything related to
14  any legislative act.  In November of 2012, which is in
15  the future, if a voter arrived at the polling place to
16  vote and didn't have one of the acceptable forms of ID,
17  a photo ID, and were turned away, would that voter be
18  disenfranchised?
19      MR. SWEETEN:  I think you are asking for
20  her mental impressions, opinions, motivations about
21  legislation, and your question does assume whether
22  Senate Bill 14 has been precleared or not, so I'm not
23  even sure if you are asking under current or former law,
24  current or pending legislation, so I'm objecting based
25  on legislative privilege.

---

### 226

1      A.  I'm invoking legislative privilege on that.
2      Q.  Okay.  And would requiring a voter to pay for
3  an ID be considered a hardship?
4      MR. SWEETEN:  Objection to the extent it
5  calls for matters subject to the legislative privilege,
6  thoughts, mental impressions, opinions about
7  legislation.  I'm instructing you not to answer on that
8  basis.
9      A.  I'm invoking legislative privilege on that.
10      Q.  And is there a provision for free photo ID
11  under SB14?
12      MR. SWEETEN:  You can answer the question
13  as phrased.
14      A.  Yes.  In the State of Texas, you can get a free
15  photo ID.
16      Q.  And do you know what the costs are to acquire
17  the underlying documents if they -- if they aren't in
18  the individual's possession?
19      MR. SWEETEN:  Objection.  Asked and
20  answered.
21      A.  You asked me that earlier and I do not know.
22      Q.  Okay.  If an individual lacks those documents,
23  is it possible to obtain the election identification
24  certificate within SB14 without paying a cost?
25      MR. SWEETEN:  Under the bill?

---

### 227

1      A.  Under the bill -- In the part of the bill where
2  it says that the county -- I think it's the county clerk
3  can do the documentation or can give you that.  Isn't
4  that in here somewhere?  That -- That provision is
5  there.  I think it is, but I don't recall.  I can find
6  it in here.  By the way, the bill has it that if you are
7  70 or older, none of this applies.
8      Q.  Okay.  Are you aware that --
9      MR. ROSENBERG:  Can you repeat that,
10  please?  I didn't hear.
11      A.  If you are 70 or older, none of this applies.
12  She was asking me about documentation, so I felt that
13  that was important to say in here it talks about the
14  documentation and that if you are 70 or older, none of
15  this applies.  I'm trying to find in the bill where she
16  said what happens if you can't get this, and I said,
17  well, I believe it's in the bill that says that it must
18  be the county clerk can give you documentation, but I'm
19  not -- I don't recall what paragraph that's in.
20      Q.  It also states in the bill that if you are 70
21  or older --
22      A.  Yes.  The 70 or older, that is on Page 14, Line
23  27 and on Page 15, Line 1.  Maybe this is what I was
24  looking at.  Page 13, Line 2, "Execute an affidavit
25  described by Section 65.054 in the presence of the voter

---

### 228

1  registrar."  Maybe that's not it.  I don't know.  Okay.
2      Q.  Where you stated that requirements of SB14 --
3  I'm not sure.  I want to quote you accurately, but you
4  said it don't apply to voters that were 70 and older?
5      A.  We can read it and -- go back to the page and
6  read it.  It says, "A certificate expires on the date
7  specified by the department except that a certificate
8  issued to a person 70 years of age or older does not"
9  apply.
10      Q.  Does it say does not apply?
11      A.  I'm sorry.  "Does not expire."
12      Q.  So a person 70 or older would still be required
13  to obtain the underlying documents necessary for a
14  certificate?
15      MR. SWEETEN:  You are asking under the
16  Texas --
17      Q.  Absolutely.  Under the text of the bill, 70 or
18  older would be required to obtain underlying documents
19  and obtain a certificate before voting.
20      A.  I would need to reread that.  I was thinking
21  that there was an age exemption possibly.
22      Q.  So from what you just looked at on the face of
23  the bill, you don't see anything that allows the
24  underlying documents required to be issued for free, and
25  I can give you time to look if you need it.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

233

1    furtherance of the legislative process.
2        Q.  (BY MS. McLEOD) Representative, can you just
3    read the bolded title there of the amendment where it
4    says Section 63.010?
5        A.  "Fees prohibited for certain forms of
6    identification documentation.  Notwithstanding any other
7    law, an agency, institution or political subdivision of
8    this state may not charge any fee for the issuance of
9    any document that may be used as proof of identification
10   under the chapter or to obtain a document that may be
11   used as proof of identification under this chapter."
12       Q.  And then there was a motion to table this
13   amendment.  Do you agree?
14       A.  Yes.
15       Q.  And did you vote yes in favor of the motion to
16   table?
17       A.  Yes, I did.
18       Q.  Okay.  And why did you -- why did you vote to
19   table the amendment?
20       MR. SWEETEN:  Objection.  Calls for
21   matters of legislative privilege.  I'm instructing you
22   not to answer.
23       A.  I'm invoking my legislative privilege.
24       Q.  If we could go to Page 979.
25       A.  171?  971?

---

234

1        MS. McLEOD:  I'm sorry.  Are you going to
2    instruct the representative to invoke legislative
3    privilege for all of the amendments regarding the
4    general purpose?
5        MR. SWEETEN:  She can testify about the
6    amendment, what it says, how she voted on it, but as to
7    the specifics of the general purpose of the legislation
8    she has answered that question all day today on every
9    piece of legislation you've handed her.  But now to have
10   her go through each specific amendment and give the
11   general purpose of this or that amendment would ask her
12   to reveal her thoughts and mental impressions and
13   opinions and motivations about legislation which is
14   something that is protected under the legislative
15   privilege.
16       So to be clear, if you are going to ask
17   her -- if you are going to take out every amendment and
18   you are going to ask her the specific purpose of this
19   amendment or why it was in, why it was out, then that
20   would vitiate the legislative privilege by doing that.
21   I believe the court's order is very clear.  I've read it
22   on the record.  I've considered it.  I believe what it
23   says is that she is to give the general purpose of it,
24   but she does not have to go through and parse each
25   amendment because that would require her to reveal

---

235

1    matters of legislative privilege.  That is my position.
2    It will be my position if you are going to continue to
3    ask her specific questions about amendments if that's
4    what you're asking me.
5        MS. McLEOD:  Notwithstanding the
6    purpose -- I'm sorry -- the parsing out of specific
7    legislation and why something was in and why something
8    was out, with regard to the amendment, are you saying
9    that the representative cannot testify as to the general
10   purpose of the amendment, which was my question?
11       MR. SWEETEN:  I think I've been very
12   clear.
13       MS. McLEOD:  So that's, yes, she will be
14   invoking legislative privilege.
15       MR. SWEETEN:  I will instruct her as to
16   legislative privilege regarding that.
17       MS. McLEOD:  Then we also leave this, I
18   guess, open as a matter for the court.  We believe that
19   the representative can testify as to the general purpose
20   of the amendments as a part of legislative process and
21   falls within court order issued on May 17, 2012.
22       Q.  (BY MS. McLEOD) Representative Riddle, did you
23   do any outreach particularly geared toward minority
24   members of the community in your district?  Do you -- Do
25   you do any outreach to minority members in your

---

236

1    district?
2        A.  Yes, I do.
3        Q.  And can you describe that outreach, those
4    efforts?
5        A.  Within Harris County Republican Party, we have
6    a outreach committee and there are people that have
7    been very active in my campaign that are minorities, and
8    I request from them to help me get speaking engagements
9    to Hispanics and to many blacks.  I visited churches
10   that are predominantly black, and, actually, I have
11   quite a bit of support from those communities.  And I
12   don't like the term outreach.
13       Q.  What term would you prefer?
14       A.  Communicating with constituents.
15       Q.  Okay.
16       A.  The other implies somebody's outside the
17   circle.  We're all within the district.
18       Q.  And have you communicated with any specific
19   Hispanic or African-American organizations within your
20   district?
21       A.  Yes.  The Republican National Hispanic
22   Organization.  There's -- I visited with and been to
23   Fallbrook Church and to others of that sort that are
24   predominantly minority.
25       Q.  Okay.  Representative, was any part of the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 237

1   purpose of SB14 decreased turnout of minority voters?
2        MR. SWEETEN:  Objection.  Legislative
3   privilege.  Instruct not to answer.
4        A.  I am invoking legislative privilege.
5        Q.  At any time since the passage of SB14 have you
6   come to believe that it was passed with a discriminatory
7   purpose -- with any discriminatory purpose?
8        A.  No.
9        Q.  And at any time since the passage of SB14 have
10  you come to believe that the bill would have
11  retrogressive affect on minority voters?
12       A.  Absolutely not.
13       Q.  Okay.  Are there any answers that you provided
14  today that you wish to change?
15       A.  The two organizations, did you get those?
16       Q.  I didn't.  She did.
17       A.  Okay.
18       Q.  So can you state them for her?  She didn't get
19  them.
20       Q.  Okay.  The National Foundation for Women
21  Legislators and the Jewish Institute for National
22  Security Affairs.  Both of these are out of Washington
23  DC.
24       Q.  Jewish Institute for National Security Affairs,
25  and I know we've talked about the National Foundation of

## 238

1   Women Legislators, but for the Jewish -- say it one more
2   time.
3        A.  The Jewish Institute for National Security
4   Affairs out of Washington DC.
5        Q.  And are you a member of that?
6        A.  I was on the board.
7        Q.  You were on the board.  And what was your role
8   as a board member?
9        A.  As a board member it was to support the
10  supportive part of Israel and to attend the board
11  meetings and fundraise and that sort of thing.
12       Q.  What's the general purpose of that
13  organization?
14       A.  To educate people regarding Israel and their
15  security and how that's tied in with our security.
16       Q.  And how do you become a member?
17       A.  You are invited in.
18       Q.  Okay.  Do you have to pay dues?
19       A.  I don't know that you have to pay dues.  I've
20  donated to it, but I don't think it's in the form of
21  dues.
22       Q.  Okay.  And do they communicate via newsletter,
23  email, things like that?
24       A.  The executive director and I are really good
25  friends, and I guess they do some email, but he and I

## 239

1   communicate either in person or on the telephone.
2        Q.  Okay.  So there's no general newsletter that
3   goes out to members?
4        A.  I don't think so.
5        Q.  Okay.  Is there any information that you didn't
6   recall earlier when I asked about it, but you now
7   recall?
8        A.  I can't think of any.
9        MS. McLEOD:  Okay.  We are leaving this
10  deposition open pending a ruling on the privilege motion
11  filed on May 21st, but I'll pass the witness.
12       EXAMINATION
13  BY MR. ROSENBERG
14       Q.  I can ask my questions from here if that's okay
15  with you.  Representative Riddle, we'll try to make this
16  as quick as possible.  I'm not going to go over
17  everything that Ms. McLeod did.  I introduced myself to
18  be you before.  I'm Ezra Rosenberg.  I represent the
19  Texas State NAACP and MALDEF, and I have a couple of
20  questions for you.
21       First, you've been using -- in responding
22  to questions using the phrase purpose.  How do you
23  define legislative purpose?
24       A.  The purpose for the legislation.
25       Q.  And what do you mean by that?

## 240

1        A.  Why the legislation even exists, what do we
2   want to accomplish.
3        Q.  And how do you determine legislative purpose?
4        A.  Reading what the legislation has in its body
5   and determining the intent.
6        Q.  And do you take into conversation any other
7   factors other than just the language of the legislation?
8        MR. SWEETEN:  I think you are asking her
9   to reveal her mental impressions, thoughts, motivations
10  about legislation.
11       MR. ROSENBERG:  But not about specific
12  legislation.  I think I'm allowed to ask these general
13  questions and she's required to answer them.
14       MR. SWEETEN:  She's as to what the general
15  purpose is.  She's now answered what she means by
16  general purpose.  I think that you are now digging into
17  her mental impressions and thoughts of the process.
18       MR. ROSENBERG:  But I'm not asking her any
19  specific piece of legislation.  Are you really going
20  to --
21       MR. SWEETEN:  Hold on a minute.  You are
22  not saying as to Senate Bill 14.  You are saying just as
23  to general purpose.
24       MR. ROSENBERG:  I did not mention Senate
25  Bill 14.



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                    MAY 31, 2012

---

241

1          MR. SWEETEN:  Okay.  Or any specific piece
2   of legislation.  You can answer as to general purpose.
3   I misunderstood what you were asking.
4          A.  Okay.  I think all of us legislators, we look
5   at the intent of the bill by reading the bill, visiting
6   with the author, and if there's any question, then at
7   the back mike we ask for legislative intent and that
8   goes on the record.
9          Q.  So is it your testimony that only what goes on
10  the record is part of the legislative intent?
11         A.  No.  What is in the bill is what is legislative
12  intent, not -- when I go to the back mike and ask
13  legislative intent, then that clarifies, but the bill
14  itself is what is intended regardless of whatever bill
15  it is, whether it's Jessica Law or any other bill.
16         Q.  But if a group of -- let's say the majority of
17  legislators got together and said, well, we really need
18  this bill for this reason, X reason, but we can't say
19  that publicly.  Publicly we're going to say it's for Y
20  reason.  Is it your testimony that the only legislative
21  purpose is that Y reason?
22         A.  In 10 years, I've never seen that happen.
23         Q.  Whether you've seen it happen or not, can you
24  answer my question?
25         MR. SWEETEN:  Objection.  Calls for

---

242

1   speculation.  Objection.  Incomplete hypothetical.
2          A.  That would be ridiculous.
3          Q.  You've mentioned constituents.  Who do you
4   consider your constituents?
5          A.  Everyone that lives within District 150.  If
6   they live within District 150, they are my constituents
7   and I represent them regardless of their race, creed,
8   color, religion or anything else.
9          (Intervenor 1 marked.)
10         Q.  You also mentioned that you had posted the fact
11  that you were testifying here on Facebook -- on your
12  Facebook account; is that right?  Can we have this
13  marked, please?
14         Representative Riddle, is that a copy of a
15  page of your Facebook account?
16         A.  Yes.
17         Q.  Just looking at the first paragraph on the left
18  side, that's not your picture, is it?
19         A.  Yes, it is.
20         Q.  I can't tell from here.  I'm not sure if that's
21  better than the other picture.
22         A.  That was when I was on the gulf coast and going
23  over the oil spill.
24         Q.  The last sentence of that first paragraph,
25  first you talk about the fact that you are going to be

---

243

1   deposed, correct, in that paragraph?
2          A.  M-hm.
3          Q.  Then you say, "Well, this 100-pound woman
4   legislator may have a few words for Eric Holder's
5   lawyers that they may not like."  Do you see that?
6          A.  Let me read this.
7          Q.  Did I read that correctly?
8          A.  M-hm.
9          Q.  What are the words that you have in mind?
10         A.  Why are you not dealing with a Mexican drug
11  cartels and the safety and security of the people of my
12  district rather than this?  Why are you spending your
13  time with me and why are you not looking at the serious
14  life-threatening situations we have in my district?
15         Q.  Anything else?
16         A.  That's about it because the people in my
17  district are at risk and that is being ignored.
18         Q.  Earlier in response to questions from
19  Ms. McLeod concerning objections that were being made on
20  the floor by opponents of SB14, you characterized their
21  objections as relating to matters of convenience; is
22  that correct?
23         A.  M-hm.
24         Q.  You have to say yes or no.
25         A.  Oh, I'm sorry.  Yes.

---

244

1          Q.  Can you tell me what you meant by matters of
2   convenience?
3          A.  Some of what you were talking about here.  How
4   long it would take to get here, how long it would take
5   to get there.  Could you walk there.  You know,
6   whatever.
7          Q.  Okay.  So let me make sure I understand what
8   you are talking about.  When you say how long it would
9   take to get here or there, are you referring to
10  statements on the record by opponents of SB14 concerning
11  the distance to get to driver's license facilities in
12  order to get a driver's license or an election
13  certificate?
14         A.  That and other things that would relate to
15  convenience, yes, sir.
16         Q.  Among those objections that were made, were
17  there statements concerning that might be 50 miles or a
18  hundred miles for people to travel to such places?
19         A.  I don't remember the exact number of miles, but
20  it was -- there was some discussion of that.
21         Q.  And that's one of the things that you call an
22  issue of convenience?
23         A.  I would say so.
24         Q.  And was another statement made by opponents of
25  SB14 concerning the fact that people might not have

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

DEBBIE RIDDLE

MAY 31, 2012

---

## 245

1  transportation to get to driver's license facilities?
2  Was that not one of the things that opponents said on
3  the record?
4      A.  I believe so.
5      Q.  Is that another thing that you would
6  characterize as a question of convenience?
7      A.  M-hm.
8      Q.  Yes?
9      A.  Yes.
10     Q.  And another thing that opponents of SB14 said
11  on the record was that there are driver's license
12  facilities that have very few hours of operation during
13  the week and that could be very inconvenient or
14  impossible for people who are working people and cannot
15  get there when those facilities are open, correct?
16  Wasn't that also said on the record?
17     A.  M-hm.
18     Q.  Yes?
19     A.  Yes.
20     Q.  Is that something else that you considered a
21  matter of convenience?
22     A.  The fact is it's very difficult to do much of
23  anything without any identification, so though there may
24  be a lack of convenience.  If someone becomes very ill,
25  you need that ID to get into the hospital.  So the

## 246

1  inconvenience that they were talking about seemed minor
2  in comparison to the disastrous results of not having it
3  for something other than voting.
4      Q.  And, I mean, you agree that it could be
5  disastrous result of someone not being able to vote if
6  they are otherwise eligible to --
7      A.  That's not what I said.
8          MR. SWEETEN:  Wait a minute.  Answer his
9  questions, and when you are answering the questions
10  don't reveal matters that are subject to legislative
11  privilege that include your mental impressions, thoughts
12  or opinions about the bill.
13         THE WITNESS:  Okay.
14         MR. SWEETEN:  You can refer to matters of
15  the public record.
16         THE WITNESS:  Okay.
17     Q.  (BY MR. ROSENBERG) Can you answer the question?
18     A.  What was your question?
19     Q.  Actually, I'll withdraw the question.  I liked
20  your answer before.  Let me ask another question.
21         Was another statement by the opponents of
22  SB14 on the public record having to do with the cost of
23  getting underlying documents and specifically that it
24  could cost $22 for someone who does not have a birth
25  certificate to get a birth certificate.  Do you recall

## 247

1  that?
2      A.  I don't recall the 22 specifically, but if you
3  find that in the record, I'll accept that.
4      Q.  Do you recall a discussion of the cost of the
5  underlying document such as a birth certificate?
6      A.  I remember vaguely a cost, but I don't remember
7  how much.
8      Q.  Do you consider the cost of $22 to be an
9  inconvenience?
10     A.  I think that in order to have identification so
11  that you can get into the hospital is important and
12  there's more than just voting here.
13     Q.  But to get a birth certificate, in order to get
14  a driver's license or an election insurance certificate,
15  do you agree that $22 could be something that's more
16  than simply inconvenient for some people?
17         MR. SWEETEN:  I think you are asking her
18  to reveal her mental impressions, thoughts or opinions
19  about the legislation itself.  I think that that is a
20  matter that is a legislative privilege.  It's a
21  qualitative judgment about whether or not she thinks --
22  You are getting into her mental processes with that
23  question, so I'm going to object based on privilege.
24     Q.  Are you going to assert privilege?
25     A.  I will assert my privilege.

## 248

1      Q.  Let me ask you this then.  Sitting here today,
2  do you think that paying $22 to pay for a birth
3  certificate may be more than simply an inconvenience for
4  a good number of people?
5          MR. SWEETEN:  You can answer to the extent
6  you are not revealing your thoughts and mental
7  impressions about the legislation.
8      A.  It could prove to be a challenge for some, but
9  I think that it would be more challenging not having it.
10     Q.  Let me turn back to some of the legislation
11  that Ms. McLeod discussed with you.  The first piece of
12  photo ID I think she discussed with you is HB1706.  Do
13  you recall that?
14     A.  I'd have to go back to it.
15     Q.  Okay.  I think that was --
16         MR. SWEETEN:  Here, you can use my copy.
17  It's 44.
18     Q.  Thank you, Mr. Sweeten.  That's Exhibit 44.  Do
19  you recall when that was being considered by the House?
20     A.  I do.  That was Mary Denny's bill.
21     Q.  And that occurred late in the session in May of
22  2005, was it?
23     A.  I'm looking.  I believe you are correct on
24  that.
25     Q.  Do you recall what happened to HB1706?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                                                MAY 31, 2012

---

249

1    A.  It did not pass.
2    Q.  And do you recall why it did not pass?  And
3    when I say why, I'm not asking for mental impressions,
4    opinions.  I'm asking really for facts that you
5    observed.
6    A.  I don't believe it had the votes.
7    Q.  What's a third reading?
8    A.  A third reading -- We have a first reading
9    where it's read at the front mike quickly.  The second
10   reading is when it is -- when the author of the bill
11   lays it out before we vote on it, and then a third
12   reading is when the author of the bill comes back to the
13   front mike the following day or subsequent after that to
14   go over it again and the reading is done and a final and
15   third vote is taken.
16   Q.  What's the point of order?
17   A.  A point of order is if there is an objection to
18   something that violates the rules or if there is a
19   problem within the context of the bill itself.
20   Q.  And under the House rules what happens if a
21   point of order is sustained on the bill on a third
22   reading?
23   A.  If the point of order is sustained, then it can
24   go back -- and I'm not a --
25   Q.  On the third reading.

---

250

1    A.  On a third reading.  I'm not sure.  I don't
2    have my rule book with me, and I nearly brought it with
3    me.  I wished I had.  I believe that on the third
4    reading, it goes back -- it can go back to the committee
5    and be revised and the point of order can be cured, and
6    then it can come back, but it may have to start all over
7    again.  I'd have to check the rules.
8    Q.  Was the point of order sustained on the third
9    read within HB1706; do you recall?
10   A.  I don't recall.
11   Q.  Do you recall if HB1706 passed in the House?
12   A.  I don't recall.  I don't think it did, but I
13   don't recall.
14   Q.  And so you obviously don't recall if it went to
15   the Senate?
16   A.  I don't recall.  That was a long time ago.
17   This is Mary's bill.  I don't recall.  But you can check
18   that out in the House journal.  Do you have the House
19   journal from that period of time?
20   Q.  Unfortunately, I'm the only one who's lucky
21   enough to ask the questions right now, but thank you.
22   You are being helpful, but -- and it's appreciated, but,
23   really, I'm not allowed to answer questions.  I can only
24   ask them.  Let's turn to HB218?  Do you recall HB218 in
25   2007 which was marked as 255?

---

251

1    A.  Okay.  I'm going to give you back this.  That
2    was Betty Brown's bill, yes.
3    Q.  Right.  Do you recall what happened to HB218?
4    A.  I'm sorry?
5    Q.  Do you recall what happened to HB218?
6    A.  It didn't pass.
7    Q.  Do you know why it didn't pass?  And, again,
8    I'm asking for your observations as to what occurred,
9    rather than any mental impressions or opinions.
10   A.  I would have to go back to the House journal.
11   I honestly don't recall.  I know that it didn't pass.  I
12   know that it didn't pass.  It may have been we didn't
13   have the votes, but I truly don't recall.
14   Q.  Do you recall whether it didn't pass in the
15   House or it didn't pass in the Senate?
16   A.  I don't think it passed in the House, but I
17   don't want to say that for dead sure because I don't
18   recall.  After session is over, we kind of shut that
19   door and go on.  Do you understand that?
20   Q.  Do you know what the two-thirds rule in the
21   senate is?  Have you ever heard of that?
22   A.  I do know.
23   Q.  And what is it?
24   A.  In the senate they have a rule that a bill
25   cannot be brought up unless 21 senators agree to it.

---

252

1    Q.  Do you recall whether any photo ID rule -- any
2    photo ID rule did not pass the senate because of the
3    two-thirds rule?
4    A.  I don't recall.  I focused a great deal on the
5    House, not the senate.
6    Q.  Let me have this marked.
7    A.  This is Fraser's bill.
8        (Intervenor 2 marked.)
9        MR. ROSENBERG:  This has been marked as
10   Exhibit No. 2 for the intervenor.
11       MS. McLEOD:  I hate to interrupt you, but
12   I think before you stated that HB218 was Exhibit 255.
13   It's US Exhibit 28.  I think it's a prior marked one.
14       MR. SWEETEN:  I wrote it down after you
15   said it.
16       MR. ROSENBERG:  Don't believe everything I
17   say.
18   Q.  (BY MR. ROSENBERG) We are showing you now
19   SB362.  Are you familiar with this bill?
20   A.  Not as familiar as I am with my own, but I can
21   look at it.
22   Q.  Okay.  Do you recall the House considering this
23   bill?
24   A.  It's been a long day.  I don't recall.
25   Q.  Looking at this, this is a voter photo ID bill,

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                          MAY 31, 2012

---

### 253

1    correct?
2       A.   It is, but we've had so many.  Was this back in
3    2002?
4       Q.   2009.
5       A.   2009.  Okay.
6       Q.   Do you recall something that's been referred to
7    as the Chub-A-Thon?
8       A.   We chub.  They filibuster.
9       Q.   When you say "they," who's the we and who's the
10   they?
11      A.   On the House side we chub.  On the Senate side,
12   they filibuster.
13      Q.   And what you are talking about are ways --
14   procedures that are in each house of the Texas
15   legislature that allow minorities to block legislation?
16      A.   No, you are wrong.
17      Q.   Okay.  What are they?
18      A.   It's a way for anybody to block.
19      Q.   And by minority, I meant minority groups of
20   legislators, not ethic or racial minorities, just so
21   it's clear.
22      A.   Okay.
23      Q.   What -- how did -- How does a chub work or how
24   does chubbing work?  I should use the phrase correctly.
25      A.   I've chubbed before.

---

### 254

1       Q.   Okay.
2       A.   When the clock is running out at the end of the
3    session and we're wanting to kill bills by running out
4    the clock, then we go to the back mike and ask questions
5    that may not even be particularly relevant and run out
6    the clock.
7       Q.   Another way of chubbing is to use a single
8    calendar that doesn't end; is that correct?
9       A.   Running out the clock.  No.  At the end of
10   session, nothing can run -- we cannot extend the clock
11   past midnight on the last day of session.
12      Q.   Do you recall chubbing being used to defeat
13   SB362 in the House?
14      A.   Golly, that's been a long time ago.  We've had
15   so many bills.  We have 7,000 bills filed every session.
16   I don't -- I don't particularly recall the chubbing of
17   this.  If you want to relate some stories that might
18   trigger my memory.
19      Q.   Do you recall chubbing being used to defeat a
20   photo ID bill of any number in the House?
21      A.   No.
22      Q.   Do you recall a photo ID bill being placed on
23   the major state calendar in late May of the legislative
24   session that ended in 2009?
25      A.   That was a long time ago.  If I were to say

---

### 255

1    yes, I'm afraid I would not be --
2             MR. SWEETEN:  Don't guess.
3       Q.   You asked me if I could refresh your
4    recollection with some specifics.
5       A.   Yeah.  Refresh my recollection.  I truly don't
6    recall.
7       Q.   Do you recall a group of representatives using
8    the local and consent calendar as a chubbing vehicle?
9       A.   Oh, yes, I do recall that.  They used the LAC.
10      Q.   Okay.  Can you tell me what you recall about
11   that?
12      A.   Yes.  They were asking ridiculous questions on
13   these local and consent that have to do with -- say, for
14   example, if someone had a bill regarding a MUD for their
15   district, that usually goes very quick because it's very
16   local and doesn't affect the whole state, and they were
17   asking questions like who is on the MUD board and wasn't
18   he the quarterback of the high school football team and
19   didn't he date the cute cheerleader and that kind of
20   stuff.  It's just simply to run out the clock.
21      Q.   But that was sort of a chubbing procedure that
22   had been used in connection with other legislation in
23   past in the House.
24      A.   No.  I've never seen anything quite that
25   ridiculous before.

---

### 256

1       Q.   Have you ever seen chubbing used to stop
2    legislation?
3       A.   I have, but that is the first time that anyone
4    had ever done that to my knowledge in local and consent
5    and to that degree.  It went beyond the pale.  I do
6    remember it clearly.  I had never seen anything quite
7    that ridiculous.
8       Q.   Is it your testimony that no one had ever used
9    the local and consent calendar as a means of chubbing in
10   the past?
11      A.   I have never seen that many.  People chub on
12   absolutely every single last one of the bills that had
13   no relevance to them or their district.
14      Q.   Are you familiar with the select committee that
15   was formed that considered SB14?
16      A.   Yeah.  I know that one was formed.
17      Q.   Do you know how many bills were considered by
18   that committee?
19      A.   No.
20      Q.   Are you familiar with other select committees
21   other than the select committee that considered SB14?
22      A.   No.  I mean, I know that there's other select
23   committees that the speaker appoints, but I'm not
24   familiar -- I don't know what you are referring to.
25      Q.   Well, are you familiar with any select

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DEBBIE RIDDLE                                              MAY 31, 2012

257

1   committee that considered only a single bill?
2       A.  I can't think of any.  I don't know.  I just
3   don't know.
4       Q.  You are aware that Governor Perry declared that
5   voter ID was an emergency item in 2011?
6       A.  Yes.
7       Q.  Are you aware of other situations where the
8   governor declared voter IDs to be an emergency other
9   than in January of 2011?
10      A.  I don't recall.
11      Q.  Are you aware of any new public information
12  between 2009 and 2011 that would have made voter ID an
13  emergency item?
14      MR. SWEETEN:  I think that's calling for
15  matters of legislative privilege and calls for
16  speculation.
17      MR. ROSENBERG:  I asked her specifically
18  if she was aware of any new public information.  If she
19  received that public information through channels which
20  you would consider privileged, then she could assert the
21  privilege.  If she did not receive that information
22  through those channels, she can't, and if she did, then
23  we can go into foundation, fair enough?
24      MR. SWEETEN:  That's fair.
25      A.  I don't recall.

258

1       Q.  You don't recall.  What's your understanding as
2   to the effect on legislative procedure when the governor
3   declares an item to be an emergency item?
4       A.  I don't understand your question.
5       Q.  Well, do you understand what the declaration of
6   an emergency item by the governor means?
7       A.  It is something that is a priority.
8       Q.  And what is the effect of the declaration of
9   something that's a priority on how the legislation is
10  handled by the Texas legislature?
11      A.  It means that it's put on the top of the pile.
12      Q.  Is there any time by which it must be -- has to
13  be considered?
14      A.  It has to be considered before the deadline,
15  before Sine Die.
16      Q.  Before Sine?
17      A.  Sine Die.
18      Q.  Sine Die.  That's Latin, right?
19      A.  For our age, it means Miller time.
20      MR. SWEETEN:  It's S-I-N-E, D-I-E.
21      THE WITNESS:  It's Latin.  It means the
22  end.  But at our age, you understood the joke.
23      MR. SWEETEN:  I got Miller time too.  I'm
24  old enough.
25      Q.  What's an outside bounds resolution, if you

259

1   know?
2       A.  Outside the bounds?  Well, if there's an
3   amendment that would not be germane, then that would be
4   outside the bounds.
5       Q.  Do you know if an outside the bounds resolution
6   was used in connection with the passage of SB14?
7       A.  I'm not aware of that.
8       Q.  Do you recall that a point of order had been
9   raised concerning SB14?
10      A.  I wish that I had gotten the journal record and
11  read all that before I came here.  I'm a little
12  embarrassed that my memory is so foggy.
13      Q.  What's the calendar committee?
14      A.  The calendar committee is the committee that
15  when bills are passed out of committee and they are sent
16  to calendars and then the calendar committee determines
17  which bills are going to go to the floor of the House.
18      Q.  How long do bills typically sit in the calendar
19  committee awaiting placement on the calendar for the
20  floor?
21      A.  Some can go on immediately and some die there.
22      Q.  Can you give me a range of time?  When you say
23  "immediately," do you mean one minute or do you mean --
24      A.  I've seen where they have gone in and they've
25  had a calendar committee meeting.  They had just

260

1   received the bill and they voted it out and it came up
2   for a vote very shortly thereafter, and I've seen bills
3   languish there for months.
4       Q.  Do you know what the average time a bill sits
5   in the calendar committee?
6       A.  I would maybe hazard a guess of maybe a week,
7   maybe two.
8       Q.  And more complex bills, do they typically sit
9   longer in the calendar committee?
10      A.  Not necessarily.
11      Q.  Do you know how long SB14 sat in the calendar
12  committee?
13      A.  No, I don't.
14      Q.  You testified that you had some communication
15  with Catherine Engelbrecht with the King Street
16  Patriots.  How many times did you -- Were these speaking
17  communications as opposed to written communications?
18      A.  Yes.
19      Q.  How many times did you communicate with Ms.
20  Engelbrecht concerning photo ID?
21      A.  I'd say two or three times.
22      Q.  Two or three times?
23      A.  Two time that I can think of.
24      Q.  Were they face-to-face meetings?
25      A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Leticia Salazar                                            June 14, 2012

```
                                                    1
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA

     STATE OF TEXAS,              )
                    Plaintiff,    )
                                  )
     V.                           )
                                  )
     ERIC H. HOLDER, JR.,         )
     in his official capacity     )
     as Attorney General of       )
     the United States,           )
                    Defendant.    )
                                  )
                                  )
     ERIC KENNIE, et al.,         )
          Defendant-Intervenors,  )
                                  )
                                  )
     TEXAS STATE CONFERENCE       )   CASE NO. 1:12-CV-00128
     OF NAACP BRANCHES, et al.,   )   (RMC-DST-RLW)
          Defendant-Intervenors,  )   Three-Judge Court
                                  )
     TEXAS LEAGUE OF YOUNG        )
     VOTERS EDUCATION FUND, et al.,)
          Defendant-Intervenors,  )
                                  )
     TEXAS LEGISLATIVE BLACK      )
     CAUCUS, et al.,              )
          Defendant-Intervenors,  )
                                  )
     VICTORIA RODRIGUEZ, et al.,  )
          Defendant-Intervenors.  )


                   ORAL DEPOSITION OF
                   LETICIA ANN SALAZAR
                       JUNE 14, 2012


          ORAL DEPOSITION OF LETICIA ANN SALAZAR, produced as a
     witness at the instance of the Defendant-Intervenors, and duly
     sworn, was taken in the above-styled and numbered cause on the
     14th day June, 2012, from 9:36 a.m. to 12:31 p.m., before Amy C.
     Kofron, CSR in and for the State of Texas, reported by machine
     shorthand, at the offices of Dechert, 300 West 6th Street,
     Austin, Texas, pursuant to the Federal Rules of Civil Procedure
     and the provisions stated on the record or attached hereto.
```

                                                    3
1                        INDEX
2
3    Appearances. . . . . . . .              2
4    LETICIA ANN SALAZAR
5      Examination by Mr. Vandewalker. . .           4
6      Examination by Ms. Westfall. ..              49
7    Signature and Changes. . . .           64
8    Reporter's Certificate. . .            66
9
10

                       EXHIBITS
12   NO.  DESCRIPTION                      PAGE
13   1    Request for Proposal              11
14   2    Account Tracking                  15
15   3    Affidavit of Keith Ingram         29
16   4    Fiscal Note              33
17   5    Burson-Marsteller document        42
18
19
20
21
22
23
24
25

```
                                                    2
1            A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
     Mr. Reynolds Brissenden
     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
4    P.O. Box 12548
     Austin, Texas 78711-2548
5
6    FOR THE DEFENDANT:
     Ms. Elizabeth Westfall
7    Ms. Michelle McLeod
     U.S. DEPARTMENT OF JUSTICE
8    950 Pennsylvania Avenue NW
     NWB Room 7203
9    Washington, DC 20530
10
     FOR THE DEFENDANT-INTERVENORS, TEXAS
11   STATE CONFERENCE OF NAACP BRANCHES AND
     MEXICAN AMERICAN LEGAL CAUCUS:
12   Mr. Vandewalker, via phone
     Ms. Myrna Perez, via phone
13   THE BRENNAN CENTER FOR JUSTICE
     AT NYU LAW SCHOOL
14   161 Avenue of the Americas, Floor 12
     New York, New York 10013-1205
15
16   Also Present:
     Ms. Lindsey Stencel
17   Mr. Nick Riley, via phone
18
19
20
21
22
23
24
25
```

```
                                                    4
1               LETICIA ANN SALAZAR,
2    having been first duly sworn, testified as follows:
3                   EXAMINATION
4    BY MR. VANDEWALKER:
5      Q.  Good morning, Ms. Salazar.  My name is Ian
6    Vandewalker.  As you just heard, I represent
7    defendant-intervenors in this matter.  And we -- I thank you for
8    coming in today, especially on short notice, and I also thank
9    you in advance for your patience with us as we're on the phone.
10   The travel arrangements didn't work out, and so, you know, there
11   may be some slight logistical hiccups with us being on the
12   phone.  I apologize for that.
13     A.  Okay.
14     Q.  Could you just, for the record, please -- you may have
15   already done this, but just to be sure, state and spell your
16   full name.
17     A.  Leticia Ann Salazar, L-e-t-i-c-i-a, A-n-n,
18   S-a-l-a-z-a-r.
19     Q.  Thank you.  And are you represented by counsel today?
20     A.  Yes.
21     Q.  And who's your attorney?
22     A.  Reynolds.
23     Q.  Could you -- just could we get the full name, please.
24          THE WITNESS:  I'm sorry.  I don't --
25          MR. BRISSENDEN:  Reynolds Brissenden from the
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Leticia Salazar                                                    June 14, 2012

5

1    Texas Attorney General's office.
2          MR. VANDEWALKER:  Thank you.
3      Q.  And, Ms. Salazar, who's your current employer?
4      A.  The Office of the Secretary of State.
5      Q.  Have you ever been deposed before?
6      A.  No.
7      Q.  Okay.  So I'm going to give you some ground rules and
8    instructions that will hopefully make this go as smoothly as
9    possible.
10     A.  Okay.
11     Q.  You're under oath and required to answer all questions
12   truthfully and to the best of your knowledge.  Do you understand
13   that?
14     A.  Yes.
15     Q.  If you don't fully hear a question, especially with
16   this phone situation, please ask me to repeat it.  Will you do
17   that?
18     A.  Yes.
19     Q.  If you don't understand a question, please tell me so.
20   Will you do that?
21     A.  Yes.
22     Q.  Also, please wait for me to complete my question
23   before you start to answer so we don't talk over each other and
24   give the court reporter a headache.  Will you do that?
25     A.  Yes.

6

1      Q.  And you'll probably automatically do this because I am
2    on the phone, but please answer all questions verbally rather
3    than with gestures.  Will you do that?
4      A.  Yes.
5      Q.  Are you taking any medication that would prevent you
6    from giving true and accurate answers today?
7      A.  No.
8      Q.  Is there any other circumstance that you're aware of
9    that would prevent you from giving true and accurate answers
10   today?
11     A.  No.
12     Q.  Thank you.
13         Did you do anything to prepare for today's deposition?
14     A.  I spoke with Reynolds and just went over --
15         MR. BRISSENDEN:  Don't disclose what we
16   discussed.
17     Q.  I'm sorry.  I don't know if the phone cut off.  I
18   heard that you went over, and then I didn't hear any more.
19     A.  I just spoke with Reynolds.
20     Q.  Okay.  And when did you talk to Reynolds?
21     A.  Yesterday.
22     Q.  Okay.  Did you review any documents to prepare for
23   today's deposition?
24     A.  Only the documents that I handed over.
25     Q.  Okay.  Do you know how -- like about how many

7

1    documents that we're talking about?
2      A.  About four or five.
3      Q.  Okay.  Thank you.
4          How long have you worked for the Texas Secretary of
5    State's office?
6      A.  I started there in '98, so going on 14 years.
7      Q.  And have you always had the same title during that
8    time?
9      A.  No.
10     Q.  Okay.  How long have you had -- well, what is your
11   current title?
12     A.  I am a program coordinator/meeting planner.
13     Q.  And how long have you had that title?
14     A.  Since 2002, ten years.
15     Q.  Okay.  Thank you.
16         And what's your official duties in that position?
17     A.  I plan all conferences for the Elections division.  I
18   plan the election night returns for -- during the elections,
19   communicate with media subscribers for ENR.  I do the
20   legislative tracking during session, and I assist with creating
21   the training materials for election officials.
22     Q.  Okay.  You used the term ENR.  What does that mean?
23     A.  I'm sorry.  Election night returns.
24     Q.  Oh, okay.  Sure.  Thank you.
25         Do you -- are you also involved in the Secretary of

8

1    State's voter education initiative?
2      A.  Yes.
3      Q.  And what generally are your responsibilities with
4    respect to voter education?
5      A.  Um, I review items that our legal department creates
6    and get things posted to the web site, assist with reviewing,
7    um, all of the materials and implementing them in whatever way
8    is necessary.
9      Q.  Okay.  What about, um, the training of election
10   workers that the Secretary of State does; are you involved in
11   that?
12     A.  Yes.
13     Q.  And what generally do you do with respect to training
14   election workers?
15     A.  We have an online training program that I oversee.  So
16   our legal department provides the content, and I just ensure
17   that the information gets posted online properly and communicate
18   with the election officials when the training is available and
19   how they go about logging in, the logistics of it.
20     Q.  Right.  Okay.  Thank you.
21         Does the Secretary of State's office have plans to
22   carry out statewide voter education initiatives in 2012?
23     A.  We will if the -- if it's precleared, yes.
24     Q.  Well, I'm talking generally about voter -- all -- any
25   voter education, not specific to the issues in this lawsuit, but



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Leticia Salazar                                    June 14, 2012

9

1   just voter education generally.  Is there a plan to carry out
2   voter education in 2012?
3        A.  Yes.
4        Q.  Okay.  Does the Secretary of State carry out voter
5   education initiatives in every election year?
6        A.  Every even-numbered year.
7        Q.  Okay.  Every even-numbered year.
8            And generally, what is the purpose of these regularly,
9   every-even-numbered-year voter education initiatives?
10       A.  And if I may, I need to go back.  We educate them
11  every election year, but the even-numbered years is when we go
12  out with the strong media output.
13       Q.  I see.  Thank you.
14           And so what would you say the goals of these
15  voter education initiatives are?
16       A.  Um, ensuring that the voters know how to cast a ballot
17  properly, what their rights are, information on voting systems
18  and how to register.
19       Q.  Is the Make Your Mark on Texas voter education plan
20  the voter education initiative for this year?
21       A.  Yes.
22       Q.  Is this plan -- would you say it's different in any
23  significant way than voter education initiatives that the
24  Secretary of State has done in past even-numbered years?
25           MR. BRISSENDEN:  Objection, vague.

10

1            You may answer.
2       A.  No.
3       Q.  Are there any other -- other than "Make Your Mark on
4   Texas," are there any other statewide voter education
5   initiatives planned for 2012?
6       A.  Yes.  We have our -- well, voter education -- yes,
7   that's -- that's all that we have.  I'm sorry.
8       Q.  Okay.  So Make Your Mark on Texas is the only voter
9   education initiative for 2012; is that right?
10      A.  Yes.
11      Q.  Okay.  And did an outside vendor design Make Your Mark
12  on Texas?
13      A.  Yes.
14      Q.  How did the Secretary of State's office select the
15  vendor to design Make Your Mark on Texas?
16      A.  Well, our office sent out an RFP, and there were, I
17  believe, five or six companies that sent a response.  And then a
18  group of us selected three -- the top three.  And then the top
19  three came and provided an oral presentation.
20      Q.  Okay.  If I can ask -- and this is where the logistics
21  of being on the phone get a little complicated -- Ms. Stelcen to
22  enter as an exhibit for us Request -- a document that's titled
23  Request for Proposal No. 12111.
24          MS. STELCEN:  Okay.  I'm handing it to the court
25  reporter to mark.  What do you want this --

11

1           MR. VANDEWALKER:  Thank --
2           MS. STELCEN:  -- marked as, Ian?
3           MR. VANDEWALKER:  Yeah.  Salazar 1 is fine with
4   us, if that works for everyone there.
5           (Exhibit No. 1 marked)
6           MR. BRISSENDEN:  Thank you.
7           MS. STELCEN:  All right.  I'm placing it in front
8   of the witness right now.
9           MR. VANDEWALKER:  Thank you.
10      Q.  Ms. Salazar, is this the RFP that you referred to?
11      A.  Yes.
12      Q.  Who drafted this RFP?
13      A.  I believe it was a joint effort with our then-Director
14  of Communications and general counsel and the purchasing agent.
15      Q.  And who was the Director of Communications at the
16  time?
17      A.  At the time, it was Randall Dillard.
18      Q.  And who was the general counsel at the time?
19      A.  John Sepehri.
20      Q.  And who was the managing agent at the time?
21      A.  Mary Jon Urban.
22      Q.  Thank you.
23          Do you know when this RFP was drafted?
24      A.  No.
25      Q.  Do you know when it was issued?

12

1       A.  No.
2       Q.  And you said that you received about five or six
3   proposals.  Do -- did you -- you were part of the team that
4   reviewed those proposals; is that correct?
5       A.  Yes.
6       Q.  What were the criteria that were used to select the
7   finalists in those proposals?
8       A.  At the time, Senate Bill 14, being able to educate
9   voters on Senate Bill 14, the MOVE Act, along with the general
10  what we always do with casting a ballot, informing the voters on
11  the voting systems.  And that was -- and basically how they
12  utilize the money in the best way.
13      Q.  Do you recall if any of the proposals specifically
14  included plans designed to target African American communities?
15      A.  I don't remember.
16      Q.  What about plans to -- designed to target Spanish
17  speaking communities?
18      A.  Yes, that was -- that was part of it.
19      Q.  And by part of it, do you mean that those --
20  the proposals that you received covered those things, covered
21  Spanish speaking communities?
22      A.  I'm embarrassed to say that I really don't remember.
23      Q.  Well, that's okay.  If you don't remember, you don't
24  remember.  It's -- you know, memory is what it is.
25          In the decision-making process to select the finalists



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Leticia Salazar                                    June 14, 2012

13

1   and select the ultimate vendor, how important was it to the team
2   that the proposals involve efforts to reach out to minority
3   communities?
4           MR. BRISSENDEN:  Objection, vague.
5           You may answer.
6           THE WITNESS:  Do I answer?
7   A.   It was important, yes.
8   Q.   Did it -- did you assign a certain number of points to
9   it in the selection process?
10   A.   There was a points system.  I do not remember how or
11   what the content of that document was.
12   Q.   Let's see.  Who made the ultimate -- the -- I'm sorry.
13   Which vendor was ultimately selected?
14   A.   Burson-Marsteller.
15   Q.   And who made the ultimate decision to select
16   Burson-Marsteller?
17   A.   It was a group of us that scored them, and we chose
18   the highest scored company.
19   Q.   And who was in that group?
20   A.   Myself, Rich Parsons, John Sepehri, Jordy Keith and
21   Louri O'Leary.
22   Q.   Did any legislators encourage anyone in your office to
23   select Burson-Marsteller or another vendor?
24   A.   No.
25   Q.   Did anyone from the governor's office encourage your

14

1   team to select Burson-Marsteller?
2   A.   No.
3   Q.   Did anyone from the Lt. Governor's office encourage
4   your team to select Burson-Marsteller?
5   A.   No.
6   Q.   To your knowledge, does Burson-Marsteller have
7   experience specifically targeting non-white or non-Anglo
8   communities of voters?
9   A.   To my knowledge, no.
10   Q.   Did you participate in the preparation of the fiscal
11   note for S.B. 14?
12   A.   No.
13   Q.   How much money does the Secretary of State's office
14   plan to spend on its Make Your Mark on Texas voter education
15   plan?
16   A.   I'm not part of the budgeting process.  I don't know.
17   Q.   So do you know how much money has been spent so far by
18   the Secretary of State's office on the voter education plan?
19   A.   No, I don't know.
20   Q.   So earlier you talked about how one of the selection
21   criteria for the vendors was how efficiently they would use the
22   money that they would get.  And I'm wondering how you sort of
23   implemented that decision-making if you're not part of the
24   budgeting as the plan is being -- itself is being implemented?
25   A.   Well, comparing what was given to us, you know, if we

15

1   were going -- we knew that media buys were important.  We knew
2   that the -- you know, TV, radio spots, opposed to, for instance,
3   just utilizing what we already have in place and doing something
4   completely different, it -- you know, I -- it doesn't make any
5   sense.
6   Q.   Okay.
7           MR. VANDEWALKER:  And if I could ask Ms. Stelcen
8   to find an exhibit.  It's Bates No. Texas 298674.  The document
9   is entitled Secretary of State/State of Texas Account Tracking
10   Through March 31, 2012.
11           MS. STELCEN:  Okay.  I'm just asking the court
12   reporter to mark this as Salazar 2.
13           (Exhibit No. 2 marked)
14           MS. STELCEN:  Okay.  It's in front of the
15   witness.
16           MR. VANDEWALKER:  Thank you.
17   Q.   Ms. Salazar, have you seen this document before?
18   A.   No.
19   Q.   Is this something that you would encounter in your
20   duties at the Secretary of State's office?
21   A.   No.
22   Q.   Thank you.
23        Ms. Salazar, do you know -- setting aside that exhibit
24   now, do you know whether any of the money that will pay for the
25   Make Your Mark on Texas will come from federal funds?

16

1   A.   It's all from federal funds.
2   Q.   And are those funds under the Help America Vote Act or
3   HAVA?
4   A.   Yes.
5   Q.   Has your office confirmed that HAVA funds can be spent
6   on voter education related to photo ID requirements under
7   S.B. 14?
8   A.   Not that I'm aware of.
9   Q.   Again, thinking about the money budgeted for the Make
10   Your Mark on Texas plan, do you know if any money is
11   specifically reserved out of that amount for educating voters
12   about photo ID requirements under S.B. 14?
13   A.   Not that I'm aware of.
14   Q.   Do you know if the Secretary of State has a plan to
15   continue educating voters about photo ID requirements regarding
16   S.B. 14, if it's precleared, past the 2012 election, after the
17   2012 election I mean?
18   A.   I'm sorry.  Can you repeat that?
19   Q.   Sure.  I'm sorry.  That was a complicated question.  I
20   apologize.
21        Do you know if the Secretary of State's office has
22   plans continuing after the 2012 election to educate voters about
23   the photo ID requirements under S.B. 14, if it's precleared?
24   A.   After the November election?
25   Q.   That's correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Leticia Salazar                                          June 14, 2012

17

1    A.  Yes.  We'll continue to educate them, yes.
2    Q.  And do you know if there's a plan in place as to how
3    the Secretary of State will do that?
4    A.  Not a specific plan, no, but we -- we're ready to go
5    with it at any time.  We're waiting to find out what we need
6    once it's precleared.  We need that information first.
7    Q.  Right.  And do you know if there are any amount of
8    money budgeted for voter education continuing after the November
9    2012 election?
10   A.  Not that I'm aware of.
11   Q.  So we've talked a little bit about the Make Your Mark
12   on Texas plan and also about voter education specific to
13   S.B. 14.  I just want to make sure I understand.
14   The voter -- the efforts to educate voters about
15   the photo ID requirement under S.B. 14, will those be
16   implemented under the Make Your Mark on Texas plan?
17   A.  If it's precleared.
18   Q.  Right.  Yes.  Thank you.  If it's precleared, yes.
19   A.  Yes.
20   Q.  So there won't be any other activities -- and
21   I -- that are outside Make Your Mark on Texas that will have to
22   do with photo ID requirements if S.B. 14 is precleared?
23   A.  I don't understand what you mean by outside
24   activities.
25   Q.  I just mean that the Make Your Mark on Texas, is that

18

1    the whole plan?  Is there anything besides Make Your Mark on
2    Texas that would be used to educate voters about photo ID
3    requirements if S.B. 14 is precleared?
4    A.  No, not that I'm aware of.
5    Q.  What is the Secretary of State going to tell voters
6    about the photo ID requirement under S.B. 14, if it's
7    precleared?
8    A.  What --
9    MR. BRISSENDEN:  Objection, vague, speculation.
10   You may answer.
11   A.  What the new forms of ID are.
12   Q.  So do you mean the forms of ID that will be accepted
13   to allow -- at the polls to allow a voter to vote; is that what
14   you mean?
15   A.  Yes.
16   Q.  So the plan will inform voters what ID will be
17   accepted at the polls on -- if S.B. 14 is precleared.
18   Will it inform them of anything else about the photo
19   ID requirements under S.B. 14?
20   A.  Again, we'd have to -- I don't know.  We'd have to
21   wait to see what we get back.
22   Q.  And what -- and what do you mean by what you get back?
23   A.  Back from DOJ once it's precleared.  And our legal
24   department handles all of that.  So I don't know what else would
25   be under that.

19

1    Q.  Is there anything else that as of this moment you're
2    preparing to do if S.B. 14 is precleared?
3    A.  Yes.  We're in the middle of preparing to train the
4    election officials.
5    Q.  Okay.  But focussing on voter education, is there
6    anything else you're preparing to do right now if S.B. 14 is
7    precleared?
8    MR. BRISSENDEN:  Objection, vague.
9    A.  No, nothing that I'm aware of.
10   Q.  Will the voter education plan about the photo ID
11   requirements under S.B. 14 inform voters of how to get
12   acceptable photo ID if they don't currently have one?
13   A.  Yes.
14   Q.  And how will it do that?
15   A.  How will our plan do that?
16   Q.  Yes.
17   A.  The plan hasn't been set, but we will go out with
18   whatever information that we -- we'll post it on our web site.
19   We'll post it on social media.  We'll go out with community
20   outreach and whatever else we need to do.
21   Q.  I see.
22   But in terms of the content of the messages, what will
23   the plan tell voters about how to get acceptable photo ID under
24   S.B. 14?
25   A.  I'm not involved in the creation of it, so I don't

20

1    know at this time.
2    Q.  Who is going to control the creation of the content?
3    A.  Our legal department.
4    Q.  And do you -- when you say the legal department, do
5    you mean -- is that within the division of elections, or is that
6    for the Secretary of State as a whole?
7    A.  In our Elections division.
8    Q.  And who is the head of the legal department within the
9    Elections division?
10   A.  Elizabeth Hanshaw Winn.
11   Q.  Do you know if the efforts to inform voters about
12   photo ID, if S.B. 14 is precleared, will talk about where they
13   can get acceptable forms of ID?
14   A.  I would -- yes, I would assume so.
15   Q.  But have you -- have you seen a plan or proposed
16   content that has -- that covers that issue?
17   A.  Yes.  On the back of the voter registration
18   certificate, we have the election identification card that's
19   available through DPS.  We have that information already in
20   place.
21   Q.  And so that would -- am I correct in understanding
22   that you mean that that information would tell voters to get an
23   identification certificate at a DPS office?
24   A.  From what I can remember, it just has its -- the
25   Department of Public Safety, you can get this specific card



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Leticia Salazar                                            June 14, 2012

25

1    to give to us?
2        A.  Yes.
3        Q.  Yes, you did?
4        A.  Yes, I did.  I'm sorry.
5        Q.  Thank you.
6            Does the plan to educate voters about photo ID
7    requirements under S.B. 14, if it's precleared, depend on
8    mailers or direct mailings?
9        A.  Not to my -- I don't know yet.
10       Q.  Does the plan to educate voters about photo ID
11   requirements, if S.B. 14 is precleared, make use of newspaper
12   ads?
13       A.  I believe we've got banner ads, but I don't know if
14   they will be used in newspapers.  I'm not sure.
15       Q.  And what is a banner ad?
16       A.  What are they?  They --
17       Q.  Yes.
18       A.  -- they -- I know that we've already implemented them
19   on the internet.  And when you click on it, it takes you to the
20   VoteTexas web site.  We had them implemented.
21       Q.  So a banner --
22       A.  -- for the primary.
23       Q.  I see.
24           So a banner ad is an ad on a web site; is that right?
25       A.  That's what we had implemented.  I'm

26

1    not sure if there is a plan to provide banner ads in the
2    newspaper advertisements.
3        Q.  Do you know -- well, will -- will the Secretary of
4    State's office be using banner ads going forward with voter
5    education from today?
6        A.  I know that for the internet, yes.
7        Q.  Okay.  And will banner ads be part of the effort to
8    educate voters about photo ID if S.B. 14 is precleared?
9        A.  I don't know, but -- I don't know.
10       Q.  Do you know who would know?
11       A.  Rich Parsons.
12       Q.  Does the plan to educate voters about photo ID
13   requirements, if S.B. 14 is precleared, make use of television
14   ads?
15       A.  Yes.
16       Q.  Have any ads discussing photo ID requirements under
17   S.B. 14 been designed or produced yet?
18       A.  Regarding Senate Bill 14, no, not yet.
19       Q.  Do you know how long it will take to design those ads?
20       A.  No, I don't.
21       Q.  Do you know if it will take longer than a week?
22       A.  I don't know.
23       Q.  Do you know if it will take longer than a month?
24       A.  I don't know.
25       Q.  Do you know if ads that may be used to educate voters

27

1    about photo ID requirements, if S.B. 14 precleared, what media
2    markets they would target?
3        A.  Um, I -- I'm not -- I don't know.
4        Q.  Do you know who would know?
5        A.  Rich Parsons.
6        Q.  Thank you.
7            Does the plan to educate voters about photo ID
8    requirements, if S.B. 14 is precleared, make use of radio ads?
9        A.  Well, we already have radio -- we used radio ads
10   during the primary.  Nothing has been implemented yet regarding
11   Senate Bill 14.  As far as Senate Bill 14 goes, we've made it
12   known to the vendor, Burson-Marsteller, that if and when Senate
13   Bill 14 gets precleared, that we are going to require a very
14   quick turnaround to get everything in place within a very
15   reasonable amount of time.  So they have already been made aware
16   of possible changes that are -- that could come about.
17       Q.  I see.  So the plan is to wait for preclearance and
18   then create a voter education plan specific to photo ID
19   requirements; is that right?
20           MR. BRISSENDEN:  Objection, vague,
21   mischaracterization of testimony.
22       A.  Again, we have the main components already in place.
23   When and if Senate Bill 14 gets precleared, they are already on
24   mark that these items need to get updated, and they are prepared
25   to do so as well is -- our office is as well.

28

1        Q.  And when you say the main components, what does that
2    mean?
3        A.  Well, we've already -- we already have TV ads, radio
4    spots.  We've got the VoteTexas web site.  We've got the Face --
5    all social media.  It's all in place.  And we just need to
6    update it, if you will, according to the Senate Bill 14
7    requirements, and we will be able to do that.
8        Q.  Okay.  So it's that updating that will take place
9    after Senate Bill 14 is precleared, if it is; is that right?
10       A.  Essentially, yes.  It's not recreating the wheel.
11   It's just giving it a refresh of the new information.
12       Q.  Has the Secretary of State's office conducted any
13   market research or demographic analysis to determine the most
14   effective way to reach non-white voters?
15       A.  Burson-Marsteller did.
16       Q.  And have you seen that research?
17       A.  It's what I was speaking of earlier.
18       Q.  I see.
19           So the survey that you mentioned earlier that has been
20   produced, that's what you're referring to?
21       A.  Yes.
22       Q.  If S.B. 14 is precleared and the voter education plan
23   regarding photo ID requirements is implemented, what will be
24   your measures for success of that plan?
25           MR. BRISSENDEN:  Objection, vague.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Leticia Salazar                                          June 14, 2012

29

1    A.  Um, I don't know if I -- I don't know.
2    Q.  I just -- I'm just going to try and just be clear.
3        When you say -- do you mean -- do you have trouble
4    understanding the question, or do you just mean you don't know
5    the answer?
6    A.  I guess I don't really understand your question.
7    Q.  Okay.  If S.B. 14 is precleared and a plan to educate
8    voters about photo ID is implemented, how will you know if it
9    worked or not?
10   MR. BRISSENDEN:  Same objection.
11   A.  I don't think our -- I don't think we can measure.  I
12   don't know.
13   Q.  Is there a plan to measure success with, say, polls or
14   new surveys or anything like that?
15   A.  Not that I'm aware of.
16   MR. VANDEWALKER:  Okay.  At this point, I'd like
17   to introduce another document.  If I could have the assistance
18   of Ms. Stelcen.  The affidavit of Keith Ingram?
19   MS. STELCEN:  I'm going to have the court
20   reporter mark it as Salazar 3.
21   (Exhibit No. 3 marked)
22   MS. STELCEN:  I'm now placing this in front of
23   the witness.
24   MR. VANDEWALKER:  Thank you.
25   Q.  Ms. Salazar, have you ever seen this document before?

30

1    A.  No.
2    Q.  Okay.  As I'm sure you can tell, it is an affidavit of
3    Keith Ingram.  Do you know who Keith Ingram is?
4    A.  Yes.
5    Q.  And who is he?
6    A.  He's the director of the Elections division.
7    Q.  Could I ask you to turn -- it's the third page.  I
8    want to look at Paragraph 7.
9    A.  Okay.
10   Q.  If you could just take a second to read paragraph 7,
11   please.
12   A.  Okay.
13   Q.  Thank you.
14       And so Paragraph 7 talks about -- it makes a
15   distinction between a basic education program and a complete
16   program.  Do you know what the difference between those two is?
17   A.  I -- no, not by reading this, no.
18   Q.  Okay.  And have those terms ever been used to talk
19   about voter education plans around the Secretary of State's
20   office that you're aware of?
21   A.  The only thing that I can think of is our basic
22   education program is what we have in place now, and a complete
23   program is if and when Senate Bill 14 gets precleared.  That's
24   the only way I can imagine this is what this means.
25   Q.  Okay.  Now, Paragraph 7 also says, "In order to have a

31

1    basic education program in place to have a successful November
2    2012 election season, the Secretary of State's office would need
3    to have a final decision by August 15, 2012."
4        If the Court doesn't issue a decision about
5    preclearance until August 31st, to your knowledge, will it be
6    then impossible to effectively educate voters about the photo ID
7    requirements under S.B. 14?
8    A.  No --
9    MR. BRISSENDEN:  Objection, form.
10   A.  -- absolutely not.
11   Q.  So do you understand, then, what the first half of
12   that sentence means?
13   A.  Yes.
14   Q.  What does it mean?
15   A.  It means that we will be able to roll out with the
16   necessary training and voter outreach if Senate Bill 14 is
17   precleared by August 15th.
18   Q.  Right.  What I'm asking is what if Senate Bill 14 is
19   precleared after August 15th?
20   A.  We would still be able to have everything implemented.
21   Q.  Do you think the plan would have less of an impact if
22   a preclearance decision isn't made until August 31st?
23   MR. BRISSENDEN:  Objection, vague.
24   A.  No, I do not.
25   Q.  And why not?

32

1    A.  Because we -- we're going to be prepared.  We are
2    prepared to do whatever we need to do to get this out to the
3    public and to our election officials on time.
4    Q.  To your knowledge, did anyone in the Elections
5    division examine voter education plans in other states that have
6    been considered -- I'm sorry.  I'll start over.
7        To your knowledge, did anyone in the Elections
8    division examine voter education plans in other states that were
9    considering or had enacted photo ID laws?
10   A.  I believe so, yes.
11   Q.  And do you know what -- what states' plans were
12   considered?
13   A.  No, I do not.
14   Q.  Do you know who would -- who in the Secretary of
15   State's office was examining other states' plans?
16   A.  Our then-Director of Elections, Ann McGeehan.
17   Q.  And do you know if Ann McGeehan took into account what
18   other states were doing with -- when she was doing what she did
19   to plan Texas' voter education plan?
20   MR. BRISSENDEN:  Objection, vague, calls for
21   speculation.
22   A.  No, I do not.
23   MR. VANDEWALKER:  Okay.  Ms. Salazar, we've been
24   going for about an hour, and it may be a good time to take a
25   break, if you want one.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Leticia Salazar                                            June 14, 2012

41

1    other means of communication.

2        Q.  And what other means of communication will you use?

3        A.  We would post everything on our web site.  We would

4    e-mail it to them, and if necessary, hard copy mail.

5        Q.  If you do use hard copy mail for that purpose that you

6    just mentioned, would that money come from voter education

7    funds?

8            MR. BRISSENDEN:  If you know.

9        A.  No, I don't -- no, I don't know.

10       Q.  Okay.  Turning back to the materials that you produced

11   that are intended for poll workers, are any of those materials

12   specific to Spanish speaking poll workers?

13       A.  No.

14       Q.  So are all of the training materials in English?

15       A.  For the election officials, yes.

16       Q.  And I -- I'm maybe not remembering what you said, but

17   does the Secretary of State's office produce any materials that

18   are intended for the poll workers?

19       A.  Not in Spanish, no.

20       Q.  Okay.  But do you produce any materials at all that

21   are intended for the poll workers?

22       A.  Yes.  It's our online training program.

23       Q.  Right.  Okay.  Okay.  Thank you.

24           And all of those materials are in English; is that

25   correct?

42

1        A.  Yes.

2        Q.  Okay.

3            MR. VANDEWALKER:  And can I just ask Ms. Stelcen

4    if you've got the last exhibit that we talked about at the

5    break?

6            MS. STELCEN:  You know what, Ian, we're actually

7    having some printing issues with that.  So if you want to let

8    Elizabeth do her examination, and then we can go back to that

9    once I have the copy.  Does that make sense?

10           MR. VANDEWALKER:  That's fine with me if that's

11   okay with --

12           MS. STELCEN:  Or we can take a break also.  We're

13   just -- I mean, it shouldn't take more than five minutes.  We

14   were just having a little issue.  Okay.  So why don't -- we can

15   take a quick break.

16           MR. WESTFALL:  Unless he has other questions.

17           MR. VANDEWALKER:  Okay.  Sure.  Perfect.  Let's

18   take a five-minute break, and we'll come back.

19           MS. STELCEN:  Okay.  Thank you.

20           (Recess from 11:05 a.m. to 11:10 a.m.)

21           MR. VANDEWALKER:  So if you could present the

22   exhibit that we've had such excitement about.

23           MS. STELCEN:  Okay.  I'm going to ask the court

24   reporter to mark this as Salazar No. 5.

25           (Exhibit No. 5 marked)

43

1            MS. STELCEN:  And Ms. Salazar has the exhibit.

2            MR. VANDEWALKER:  Thank you.

3        Q.  Ms. Salazar, you mentioned earlier a survey by

4    Burson-Marsteller that talked about, among other things, levels

5    of internet usage.  Is this the survey that you were talking

6    about?

7        A.  Yes.

8        Q.  So if we could just turn to what is the second page.

9    It says Methodology at the top?

10       A.  Okay.

11       Q.  Okay.  So this page sets out three groups that were

12   surveyed.  One of those groups is Hispanic Texas Voter.  The

13   other groups are Texas Voter 18 to 24 and Texas Voter 65-plus.

14       A.  Yes.

15       Q.  Do you know the -- anything about the composition of

16   these groups other than what it says here?

17       A.  No, I do not.

18       Q.  Do you know, for example, what the racial composition

19   of the Texas Voter 18 to 24 group is?

20       A.  No, I don't.

21       Q.  And do you know the racial composition of the Texas

22   Voter 65-plus group?

23       A.  No.

24       Q.  So do you have any reason to think that those two

25   groups that are divided by -- that are set out by age include

44

1    Hispanic voters?

2        A.  I don't know.

3        Q.  Okay.  Do you see anything here indicating whether

4    African American voters were surveyed?

5        A.  No.

6        Q.  Thank you.

7            So if we could just turn -- it may be close to halfway

8    through the document.  I apologize there aren't easily

9    accessible page numbers, but it's Bates No. Texas 298545.

10       A.  Okay.

11       Q.  It's a page entitled Web Sites and Media are Most Used

12   Sources of Voting Information.

13       A.  Yes.

14       Q.  Thank you.

15           So this seems to be the results of a survey asking the

16   question, "When seeking out information or news about voting in

17   your community, where do you find the information you need?"

18           And it shows the second column is Media.  Do you know

19   what Media means there?

20       A.  No, I don't.

21       Q.  Okay.  Well, the first column is Web Sites.  And if we

22   look at little farther down, we see Advertising and also Social

23   networking sites.  Do you know any more about those categories

24   other than what it says right here?

25       A.  Do I know more information?  What do you mean?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Leticia Salazar                                      June 14, 2012

45

1    Q.  Do you know -- I mean, it says here that there's Web
2    sites and Advertising and Social networking sites.  Do you know
3    any more information than what those labels convey?
4    A.  No, I don't.
5    Q.  Now, looking at -- if you take the first column, Web
6    sites, it shows that Hispanics say that they find the
7    information they need on web sites 53 percent of the time, which
8    is less than the group of voters 18 to 24.  Do you see that?
9        MR. BRISSENDEN:  That -- Ian, just -- not to be
10   difficult, but the copy that we have is not in color; it's in
11   black and white.  And so it's difficult to see which of the bars
12   pertain to 18 to 24 versus which ones are -- pertain to
13   Hispanic.  They're all black-and-white.
14       MR. VANDEWALKER:  Yeah.  We have the same problem
15   because the copy that was provided to us is in black and white.
16   So I can't help with that problem.  I can say that the key shows
17   that voters 18 to 24 is the dark mark on the far left, that
18   65-plus is the white mark, and Hispanic is the dark mark on the
19   far right.
20   Q.  Ms. Salazar, do you think it's a reasonable
21   interpretation of this chart that the Hispanic column is the
22   column on the far right in each column?
23   A.  I can't --
24       MR. BRISSENDEN:  If you --
25   A.  I can't decipher that.

46

1        MR. VANDEWALKER:  Okay.  Can we go off the record for
2    a minute, please.
3        (Recess from 11:14 a.m. to 11:16 a.m.)
4    Q.  Okay.  So looking at this chart, the columns -- the
5    first column, it talks about web sites.  And although we don't
6    know which of these columns within that group refers to which,
7    what's the highest number there showing that how many people use
8    web sites to find the information they need?
9    A.  67 percent.
10   Q.  67 percent?
11       So is it your understanding that that indicates that
12   over 30 percent of people don't use web sites to get the
13   information that they need?
14   A.  Yes.
15   Q.  And looking at the next group of columns, again,
16   what's the highest percentage there?
17   A.  84 percent.
18   Q.  And so do you think that that means that over
19   15 percent -- I'm sorry.
20       Do you think that means that over 15 percent of people
21   don't get their information from media?
22       MR. BRISSENDEN:  Objection, vague.
23   A.  Yes.
24   Q.  And just looking over to the Social networking sites
25   column, about halfway through, what's the highest number there?

47

1    A.  24 percent.
2    Q.  And so do you understand that to mean that over 70
3    percent of people don't get the information they need from
4    social networking sites?
5        MR. BRISSENDEN:  Same objection.
6    A.  From the people that they produce this survey with,
7    yes.
8    Q.  Right.  And just -- just to continue asking silly
9    questions about this thing that we can't really read:  For each
10   group of columns, is it the case that -- sorry.
11       I'll limit my questions to the first four groups of
12   columns, web site, media, friends and family and advertising.
13   For each of those, is it true that the three columns in each
14   group are at different levels, indicating that whichever one is
15   Hispanic is a different level from the other two?
16   A.  Yes.
17   Q.  Thank you.
18       I'd like to turn a couple pages later at what is Bates
19   stamped as 298547, the page that says at the top, "Voters find
20   the process fair and accessible."
21   A.  Okay.
22   Q.  So the question they asked is, "Do you believe that
23   the voting process is fair and accessible to all Texans?"
24       And looking at the people who said no, under all Texas
25   voters, the first column, what was the most common answer given

48

1    for the reason that people said that the voting process is not
2    fair and accessible?
3        MR. BRISSENDEN:  Objection, vague.
4    A.  According to the people they surveyed, it says
5    33 percent.
6    Q.  And what was the --
7    A.  For --
8    Q.  -- reason those 33 --
9    A.  I'm sorry.
10   Q.  I'm sorry.
11   A.  Documentation.
12   Q.  Thank you.
13       I'll just ask the question just for the record.
14       What was the reason that those 33 percent gave
15   thinking that the voting process is not fair and accessible?
16   A.  From the people they surveyed, it was documentation.
17   Q.  Thank you.
18       Do you have any reason to think that the people they
19   surveyed are not a representative cross-section of Texas voters?
20       MR. BRISSENDEN:  Objection, vague.
21   A.  I don't know.
22       MR. VANDEWALKER:  Okay.  I think we have
23   exhausted our questions.  If Ms. Westfall would like to take
24   over.
25       MS. WESTFALL:  Thank you very much.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS          )
                        )
                        )
VS.                     )  NO. 12-CV-128
                        )  (DST, RMC, RLW)
                        )
ERIC H. HOLDER, JR.,    )
In his official         )
Capacity as Attorney    )
General of the United   )
States                  )

************************************************
       ORAL DEPOSITION OF CHRISTINA SANDERS
************************************************

    ANSWERS AND DEPOSITION OF CHRISTINA SANDERS, a
witness called by the United States taken before Janalyn
Reeves, Certified Shorthand Reporter for the State of
Texas, on the 1st th day of June, 2012, between the
hours of 9:00 a.m. and 10:41 a.m., in the offices of the
Attorney General, 209 West 14th Street, Austin, Texas,
pursuant to the agreement of counsel for the respective
parties as hereinafter set forth.

---

**3**

1                    INDEX
2                              PAGE
3    Appearances............................   2
4
     BLAINE BRUNSON
5    Examination by Mr. Mitchell............   5
     Examination by Mr. Aston..............  43
6    Examination by Ms. Korgaonkar..........  44
     Further Examination by Mr. Mitchell....  47
7
8    Signature and Changes....................  48
9    Reporter's Certificate ..................  50
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**2**

1                 A P P E A R A N C E S
2
3    FOR THE PLAINTIFF, STATE OF TEXAS:
        OFFICE OF THE SOLICITOR GENERAL:
4        By:  MR. JONATHAN F. MITCHELL
         - and -
5        OFFICE OF THE ATTORNEY GENERAL:
         MR. ADAM W. ASTON
6        209 West 14th Street
         Austin, Texas  78701
7        PH: (512) 936-6432
8    FOR THE INTEVENORS:
        NAACP:
9        By:  MS. NATASHA M. KORGAONKAR
         98 Hudson Street
10       Suite 1600
         New York, NY  10013
11       Ph: (212) 965-2236
12   FOR THE INTEVENORS:
        DECHERT, LLP
13       By:  LINDSEY STELCEN
         300 W. 6th Street
14       Suite 201
         Austin, Texas  78701
15       Ph: (512) 394-3000
16
17
18
19
20
21
22
23
24
25

---

**4**

1    EXHIBITS
2    NO.        DESCRIPTION              PAGE
     1      Notice of Deposition          9
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Christina Sanders                                                June 1, 2012

---

13

1    Q. Are you prepared to testify on Topic 7?
2    A. I am.
3    Q. What did you do to prepare to testify about Topic
4    7?
5        MS. KORGAONKAR:  Renew the objection.  You
6    can answer.
7    A. This is an ongoing thing that our organization
8    does.  So in terms of preparation, there wasn't any
9    additional things for this deposition.  Just this is
10   something that we do continuously.
11   Q. (By Mr. Mitchell)  So it's something you're
12   already familiar with?
13   A. Yeah.
14   Q. Topic No. 8 have you been designated to testify
15   on Topic 8?
16   A. Yes.
17   Q. And are you prepared to testify on Topic 8?
18   A. I am.
19   Q. What did you do to prepare to testify on Topic 8?
20       MS. KORGAONKAR:  Objection to the extent the
21   question asks Ms. Sanders to reveal any of the content
22   of her discussions with counsel or any attorney work
23   product.
24   A. No additional preparations.
25   Q. (By Mr. Mitchell)  Have you been designated to

---

14

1    testify on Topic 9?
2    A. Yes.
3    Q. Are you prepared to testify on Topic 9?
4    A. I am.
5    Q. What did you do to prepare to testify about Topic
6    9?
7        MS. KORGAONKAR:  Objection to the extent the
8    question asks Ms. Sanders to reveal the content of any
9    discussions she had with counsel or any attorney work
10   product.
11   A. No additional preparations.
12   Q. (By Mr. Mitchell)  Have you been designated to
13   testify on Topic 10?
14   A. Yes.
15   Q. Are you prepared to testify on Topic 10?
16   A. I am.
17   Q. What did you do to prepare to testify about Topic
18   10?
19       MS. KORGAONKAR:  Same objection.
20   A. No additional preparations.
21   Q. (By Mr. Mitchell)  Have you been designated to
22   testify on Topic 11?
23   A. Yes.
24   Q. Are you prepared to testify on Topic 11?
25   A. I am.

---

15

1    Q. What did you do to prepare to testify on Topic
2    11?
3        MS. KORGAONKAR:  Objection.
4    A. No additional preparations.
5    Q. (By Mr. Mitchell)  Ms. Sanders, what does your
6    organization do?
7    A. The Texas League of Young Voters Education Fund
8    works around Texas to organize, educate, and engage
9    young voters about the electoral process.
10   Q. Anything else?
11   A. No.  We just cover the whole realm of the
12   electoral process for young people in Texas.
13   Q. How specifically do you go about educating and
14   engaging these young voters in Texas?
15   A. What do you mean specifically?
16   Q. What specific activities do you engage in to
17   educate and engage these young voters?
18   A. We do voter education, we do forums, town halls.
19   We answer calls and questions, engage through social
20   media.  And offer information to young voters and
21   advocate for them having protected access to the ballot.
22   Q. Will your organization be able to perform these
23   activities if Senate Bill 14 is precleared by the
24   courts?
25   A. We would not be able to perform these activities

---

16

1    at our current capacity.
2    Q. Which activities would you no longer be able to
3    perform at your current capacity?
4    A. If Senate Bill 14 is enacted, we would not be
5    able to perform any of our activities at the current
6    capacity.
7    Q. Let me go through them one by one.
8    A. Sure.
9    Q. Voter registration, will you no longer be able to
10   register voters if Senate Bill 14 is precleared?
11   A. The realm of the voters that we're able to
12   register would be impacted.
13   Q. How does Senate Bill 14 effect the realm of
14   voters that you would be able to register?
15   A. Because the bill would make many ineligible.
16   Q. How does the bill do that at the registration
17   phase?  Ms. Sanders, do you agree you'll still be able
18   to register voters if Senate Bill 14 is precleared?
19   A. There will be some voters that will be able to
20   register.
21   Q. I'm sorry.  Could you repeat that?
22   A. We will be able to continue registration.
23   Q. You'll continue to be able to register voters at
24   the same level you did before; isn't that right?
25   A. That is not possibly correct.

---

Christina Sanders                                         June 1, 2012

17

1    Q. Can you explain how Senate Bill 14 would hinder
2  your ability to register a voter?
3    A. The resources that we allocate to voter education
4  would have to be shifted so our focus would be shifted
5  so it would impact our ability to do -- to do that in
6  terms of how we are able to do that.
7    Q. Can you explain that a little bit more?  You seem
8  to be saying that you would have to take resources away
9  from voter registration and shift those into new areas
10  on account of Senate Bill 14.  Is that an accurate
11  description of your testimony?
12       MS. KORGAONKAR:  Can I ask you to read back
13  Mr. Mitchell's question, please, the most recent one?
14       (Requested question was read.)
15    A. That's correct.
16  BY MR. MITCHELL:
17    Q. So tell me what activities you would need to
18  divert these resources toward?
19       MS. KORGAONKAR:  Objection to the extent
20  that the question calls for Ms. Sanders to speculate.
21  You can answer the question if you're able to.
22    A. The exact extent we don't know.  But from what we
23  understand from the requirement for being able to vote,
24  there will be quite a bit of resources that we would
25  need to put towards developing a plan, developing

18

1  strategy as well as resources to actually get young
2  people who may not qualify or have the documents under
3  SB 14.
4    Q. (By Mr. Mitchell)  Do you agree with me that
5  Senate Bill 14 does not in any way hinder one's ability
6  to register to vote?
7    A. In any way, what do you mean?
8    Q. It requires one to present photo identification
9  when they appear to vote at the polls?
10    A. Sure.
11    Q. It does not impose any inconvenience or put any
12  more burden on registering?
13    A. No, I do not agree with that.
14    Q. Tell me why Senate Bill 14 imposes barriers,
15  obstacles, inconveniences or any kind of burden toward
16  registering to vote?
17    A. For individuals who may not be able to get the
18  required documents or may not have the financial
19  resources or a way to get there, they possibly could not
20  register because of not having those documents and
21  knowing that they can vote.
22    Q. Which documents are you referring to that are
23  needed to register?
24       MS. KORGAONKAR:  Objection, you misstated
25  her testimony.  Can you rephrase the question?

19

1  BY MR. MITCHELL:
2    Q. When you're referring to the documentation
3  needed, can you explain what documents you're referring
4  to and what they're needed for?
5    A. A valid driver's license, any of the documents
6  outlined in the bill.
7    Q. Right.  Do you agree those documents are needed
8  only for voting at the polls and not for registering to
9  vote?
10    A. So your question was about barriers and that's
11  the ones that are listed, as well as the ones that
12  people experience every day.
13    Q. Let me take a step back.  I asked you what your
14  organization does?
15    A. Yes.
16    Q. One of the answers you provided was that your
17  organization helps people register to vote?
18    A. Correct.
19    Q. The questions I'm asking you involve how Senate
20  Bill 14 will effect your efforts to help register
21  voters?
22    A. Yes.
23    Q. How will Senate Bill 14 hinder your
24  organization's ability to help people in Texas register
25  to vote, not appear at the polls to vote on election

20

1  day, but register to vote?
2    A. That has a lot to do with the same thing.  A lot
3  of people who may not have the documents or feel like
4  they don't have the resources to get the documents might
5  not register.  It might make it harder for us to
6  register to vote.
7    Q. So your contention is that people who lack photo
8  identification won't bother to register in the first
9  place?
10    A. That's not my contention.  I'm saying that it is
11  a possibility.
12    Q. That you think that is a possibility.  What is
13  the evidentiary support for that belief?
14    A. The history of voter suppression when people are
15  intimidated and people change the rules on folks, it
16  gets folks more hesitant about engaging fully in the
17  process.
18    Q. Have you encountered any person who has told you
19  he will not register to vote because the Texas
20  Legislature has enacted Senate Bill 14?
21    A. Well, the Texas -- they have not -- that's not a
22  law so we have not been going around asking.
23    Q. Have you ever helped someone register to vote?
24    A. I have.
25    Q. Has anyone ever expressed concern about what

21

1    types of identification might be required at the polls
2    on election day in deciding whether to register?
3         A.  There have been many questions.
4         Q.  Has anyone ever asked the question that I just
5    mentioned?  Have they ever chosen not to register to
6    vote out of concern of the types of identification that
7    might be required at the polls on election day?
8         A.  That has occurred.
9         Q.  Can you describe those incidents?
10        A.  Simply asking the question about having their ID.
11        Q.  Has anyone ever chosen not to register to vote
12   when you've encouraged them to register?
13        A.  What do you mean?
14        Q.  Have you ever encouraged a person to register and
15   has that person ever declined your offer of assistance?
16        A.  Ever?
17        Q.  Ever?
18        A.  Yeah.
19        Q.  What reasons did they give for not wanting to
20   register?
21        A.  Ineligibility, ineligibility.
22        Q.  Non-citizens perhaps?
23        A.  No.  Felons.
24        Q.  Felons?
25        A.  Or people assuming that they couldn't vote.

22

1         Q.  You mentioned that your organization conducts
2    town halls?
3         A.  Sure.
4         Q.  Will your ability to conduct town halls be
5    hindered in any way if Senate Bill 14 is precleared?
6         A.  It will be.
7         Q.  How will it be affected?
8         A.  If we have to put together a different project
9    specifically to address the impacts of this legislation,
10   we would have to move people, volunteers and resources,
11   to focus more on making sure that we can fully address
12   the impact of SB 14.  So we would have less people and
13   resources to do that.
14        Q.  Would you hold fewer town hall meetings as a
15   result of Senate Bill 14?
16        A.  If any.
17        Q.  Would you hold fewer town hall meetings if Senate
18   Bill 14 is precleared?
19        A.  If we're able to do any with the amount of time
20   and energy it's going to take.
21        Q.  You think it's possible that you would no longer
22   have town halls?
23        A.  It's very possible.  Well, no, I'm not sure
24   exactly how many, but especially immediately for some
25   period of time it would be very, very limited.

23

1         Q.  Why would you be so limited?
2         A.  There's limited resources.
3         Q.  I understand.  But why would those limited
4    resources no longer be able to be used for town hall
5    meetings?
6         A.  Well, the ramifications of the bill are
7    potentially so great in our population that we have to
8    shift our focus in most areas to addressing the
9    hemorrhage that it could cause.  So town halls would no
10   be able.
11        Q.  Town halls would be on the chopping block
12   essentially?
13        A.  They would be on the waiting list.
14        Q.  What would you be doing if Senate Bill 14 is
15   precleared?  How would that effect the activities of
16   your organization?
17        A.  If Senate Bill 14 was enacted, it would -- it
18   would dramatically effect our organization in the sense
19   that it would cause us to shift focus to target and just
20   really evaluate what we're able to do in terms of
21   continuing our mission and our goals in a resourceful
22   and strategic way.
23        Q.  What specific activities will you do after Senate
24   Bill 14 is precleared, if it is precleared?
25            MS. KORGAONKAR:  Objection to the extent

24

1    that the question calls for speculation.  But you can
2    answer.
3         A.  Specifically, we'd look very closely at the
4    resources that we have available and evaluate or decide
5    the best way to move forward in getting young people out
6    to vote and prepared for election day.
7         Q.  (By Mr. Mitchell)  You'll still be able to
8    register voters after Senate Bill 14 is precleared.  Do
9    you agree?
10        A.  The ability to register voters after or if the
11   bill is precleared would be far less than it is now.
12        Q.  Are you aware that Senate Bill 14 allows voters
13   without photo identification to cast provisional ballots
14   on election day?
15        A.  I do recall reading that.
16        Q.  So why do you think Senate Bill 14 will hurt your
17   efforts to bring young voters to the polls given that it
18   allows them to cast provisional ballots even if they
19   lack photo identification?
20        A.  Because these young voters are eligible to vote
21   and they should not be forced to cast a provisional
22   ballot.  They should be able to vote and not have
23   their -- in any way their votes challenged or
24   questioned.  They have a right to vote.
25        Q.  Do you think they will stop going to the polls on

Christina Sanders                                              June 1, 2012

---

**25**

1  account of Senate Bill 14?
2      A. I don't know. I hope not. The history of
3  disenfranchisement alludes to, yes, people do.
4      Q. Do you think it's possible that Senate Bill 14
5  will increase voter turnout by increasing the public
6  confidence in the electoral system?
7      A. I do not think that.
8      Q. What is your basis for denying that possibility?
9      A. This bill creates more barriers for young voters.
10  And where there are more barriers, that's more
11  difficult. I do not think that this bill with all the
12  barriers will increase voter turnout with all the
13  barriers.
14      Q. Is it true that the League of Young Voters has a
15  chapter in Georgia?
16      A. Yes.
17      Q. Are you aware that Georgia has a voter
18  identification law that requires voters to present
19  identification at the polls that was recently enacted?
20          MS. KORGAONKAR: Objection, that goes, I
21  think, beyond the scope of the notice. I'll allow her
22  to answer this question, but I'll ask that we then go
23  back to what's been listed in the notice. Do you need
24  the question repeated?
25          WITNESS: Yes.

---

**26**

1          (Requested question was read.)
2      A. I'm aware that their law is not the same.
3      Q. (By Mr. Mitchell) Are you aware of any evidence
4  that voter identification laws have decreased voter
5  turnout in any State that has enacted them?
6          MS. KORGAONKAR: Same objection.
7      A. Vaguely. I don't recall specifically.
8      Q. (By Mr. Mitchell) You don't recall specific
9  evidence?
10      A. Very vaguely. But no.
11      Q. Can you say what you mean by vaguely?
12      A. Meaning I don't want to misquote anything.
13      Q. Is the Texas League of Young Voters Fund a
14  non-partisan?
15      A. We are.
16      Q. How many members does your organization have?
17      A. We have about 1200 or so members.
18      Q. When you say you have 1200 members, how are you
19  defining membership?
20      A. We define membership as someone who has
21  volunteered with us, is engaged in one of our programs,
22  taking an action with us, engaged in some way with us.
23      Q. Are you aware of any member of your organization
24  who is a registered voter in Texas and lacks the
25  government issued photo ID required by Senate Bill 14?

---

**27**

1      A. I am.
2      Q. Can you provide the name of that person or
3  persons?
4      A. Yes. Demariano Hill, Dominique Monday. There
5  are other individuals that I just don't remember their
6  names?
7      Q. That's enough. What is the purpose of your
8  organization?
9      A. The purpose of the Texas League of Young Voters
10  Education Fund is to engage young voters.
11      Q. Are there any other purposes?
12      A. It's to engage young voters and to make sure that
13  they understand the electoral process as well as they
14  have full access to the ballot.
15      Q. How do your efforts to oppose Senate Bill 14
16  advance the purpose of engaging young voters?
17      A. The right to vote is a full right of all
18  Americans and young Americans included, and this bill
19  creates many burdens for many young people. It's
20  important that young people understand their right and
21  protect it.
22      Q. Why did you decide to intervene in this lawsuit?
23          MS. KORGAONKAR: Objection to the extent
24  that the question calls for her to reveal any of the
25  content of conversations that she had with counsel.

---

**28**

1      A. The Texas League decided to intervene in this
2  lawsuit because of its potential impact on young people
3  in Texas.
4      Q. (By Mr. Mitchell) Are there any other reasons?
5      A. It's a part of what we do.
6      Q. What's a part of what you do?
7      A. Engaging young voters about their voting rights
8  in the electoral process.
9      Q. Was your decision to intervene motivated
10  exclusively by the effect of this law on young voters in
11  Texas?
12          MS. KORGAONKAR: Objection to the extent
13  that the question calls for her to make a legal
14  determination or to reveal the content of any
15  conversations she may have had with counsel.
16      A. Exclusively, no, because the vote is not
17  exclusive. But definitely yes.
18      Q. (By Mr. Mitchell) Do you believe that the United
19  States Department of Justice will not adequately
20  represent the interest of those who oppose Senate Bill
21  14?
22      A. I'm not understanding your question.
23      Q. The Department of Justice has objected to Senate
24  Bill 14. They are opposing preclearance in court. Do
25  you have any reason to doubt that the United States

Christina Sanders                                          June 1, 2012

29

1  Department of Justice will not adequately and vigorously
2  represent the interest of those who are opposed to
3  Senate Bill 14?
4      A.  When you say they will not, I still don't
5  understand what specifically the question is.
6      Q.  Well, the Department of Justice is opposing our
7  decision in the litigation.  We have asked the courts to
8  preclear Senate Bill 14.  The Department of Justice has
9  opposed that in court.  Do you lack confidence in the
10  Department of Justice's advocacy against Senate Bill 14
11  in any way?
12      A.  I think that the Department of Justice has been a
13  strong advocate against this bill.
14      Q.  Do you intend to seek attorney's fees from the
15  State of Texas if the courts deny preclearance to Senate
16  Bill 14?
17      MS. KORGAONKAR:  Objection, she's not aware
18  She doesn't have legal expertise.  You don't have to
19  answer that question.
20      MR. MITCHELL:  Are you protecting a
21  privilege?
22      MS. KORGAONKAR:  I'm sorry.  I didn't hear.
23      MR. MITCHELL:  Are you protecting a
24  privilege with that instruction?
25      MS. KORGAONKAR:  I'm protecting to the

30

1  extent that answering that question may require her to
2  reveal any conversations that she may have had with
3  counsel.  To the extent you can answer that question
4  without revealing any of the content of conversations
5  that you may have had with counsel, you can answer.  Can
6  you repeat the question?
7      (Requested question was read.)
8      A.  I don't understand what the question means.  I
9  don't know.
10      Q.  (By Mr. Mitchell)  So it is accurate to say that
11  at this time you have no intention of seeking attorney's
12  fees from the State of Texas at the conclusion of this
13  litigation?
14      MS. KORGAONKAR:  Objection, I think that
15  you've not characterized her testimony correctly.
16  BY MR. MITCHELL:
17      Q.  I'll rephrase.  Has your decision to intervene in
18  this lawsuit been influenced in any way by the
19  possibility of recovering attorney's fees from the State
20  of Texas in this litigation?
21      MS. KORGAONKAR:  Objection to the extent
22  that the question asks for Ms. Sanders to reveal the
23  content of any conversations that she may have had with
24  counsel.  But you can answer the question.
25      A.  I'm not familiar with any details that include

31

1  that.
2      Q.  (By Mr. Mitchell)  Are you intervening in this
3  lawsuit, do you hope to deter other states in Section 5
4  jurisdictions from enacting photo identification
5  requirements similar to Senate Bill 14?
6      A.  By intervening, I hope that the bill doesn't go
7  into effect and that no burdens will be placed on young
8  voters.
9      Q.  Are you hoping to deter other states from
10  enacting similar laws?
11      A.  I wouldn't say that I have any control or space
12  over that.  Our interest is the Texas League of Young
13  Voters.
14      Q.  Are you aware that Texas law prohibits non US
15  citizens from voting?
16      A.  I am aware of that.
17      Q.  Are you aware that Texas law does not require
18  persons to present proof of citizenship when they
19  register to vote?
20      A.  By proof of citizenship, what do you mean?
21      Q.  Any proof of citizenship, like a birth
22  certificate?
23      A.  A birth certificate?  I mean, I guess -- I don't
24  know all the forms of citizenship verification.
25      Q.  Are you aware that Texas issues a special

32

1  driver's license to non-citizens that poll workers can
2  easily identify as belonging to a non-eligible voter?
3      A.  I was not aware of that.
4      Q.  If a non-citizen registers to vote, how do you
5  propose Texas should go about preventing that
6  non-citizen from voting at the polls?
7      MS. KORGAONKAR:  Objection, I think that's
8  beyond the scope of the designated topics and calls for
9  speculation on the part of Ms. Sanders.  But you can
10  answer the question.
11      A.  Non-citizens of the United States or the State of
12  Texas?
13      Q.  (By Mr. Mitchell)  A non-citizen of the United
14  States?  And you can't be a citizen of Texas if you're
15  not a citizen of the United States.
16      MS. KORGAONKAR:  Do you need the question
17  read back?  Can you read back the question?
18      (Requested question was read.)
19      A.  I don't have any propositions about it because
20  legislators figure that out.
21      Q.  (By Mr. Mitchell)  When your organization
22  registers voters, do you ask whether the person is a US
23  citizen?
24      A.  We do.
25      Q.  Do you believe that the number of incidents of

Christina Sanders
June 1, 2012

---

**33**

1  non-citizens voting at the polls in Texas is zero?
2       A.  I don't have any belief about what that -- the
3  numbers.
4       Q.  Do you believe that the number of voter
5  impersonation in Texas is zero?  Voter impersonation is
6  when someone shows up at the polls claiming to be
7  someone else.  Do you believe that that number of
8  incidents is zero?
9       A.  I don't have any knowledge of that being zero.
10  But I don't have any evidence of that happening either.
11       Q.  Do you believe that Texas should be required to
12  tolerate voter fraud if it occurs only in small amounts?
13       A.  I believe that Texas should -- should equally be
14  interested in voter suppression and voter fraud.
15       Q.  Would it be accurate to say that your
16  organization believes that Senate Bill 14 should be
17  denied preclearance regardless of the amount of voter
18  fraud it may prevent?
19       A.  I think that regardless is not accurate.
20       Q.  What is the quantity of in person voter fraud,
21  either voter impersonation or voting by non-citizens,
22  that could justify Senate Bill 14 if Senate Bill 14
23  could prevent that type of fraud?
24       A.  As is, Senate Bill 14 creates such a large burden
25  on so many that it wouldn't be sufficient in the

---

**34**

1  electoral process in any way.
2       Q.  So there is no quantity of voter fraud in your
3  view that could justify Senate Bill 14?
4       A.  Senate Bill 14, I don't have any speculation
5  about a quantity.  But the impact that -- on the
6  populations it would effect in terms of not letting it
7  get to the polls.
8       Q.  I understand you believe that it has a
9  significant impact on people's ability to vote.  The
10  question I'm asking is whether that burden can be
11  justified in your view by the prevention of fraud in any
12  circumstance?
13       A.  No voter suppression can be justified.
14       Q.  Ms. Sanders, are you familiar with Section 5 of
15  the Voting Rights Act?
16       A.  Very limited familiar.
17       Q.  Have you read Senate Bill 14?
18       A.  I have.
19       Q.  Do you contend that Senate Bill 14 will have the
20  effect of denying or abridging the right to vote on
21  account of race or color or because of one's status as a
22  member of a language minority group?
23           MS. KORGAONKAR:  Objection to the extent
24  that the question asks for Ms. Sanders to make a legal
25  determination.  You can answer if you're able to.

---

**35**

1       A.  I -- I agree with the Department of Justice's
2  findings more specifically.  But I also agree that the
3  determination can't have fully have been met seeing that
4  the information on other communities of color were not
5  included from the Department of Justice's denial of
6  preclearance.  And that includes African Americans and
7  Asians which are included in our young voter
8  populations.
9       Q.  (By Mr. Mitchell)  What is the evidentiary
10  support for your belief that Senate Bill 14 has the
11  effect of denying or abridging the right to vote on
12  account of race or color?
13           MS. KORGAONKAR:  Same objection as
14  previously.  But you can answer the question.
15       A.  Mostly the history of voter suppression, color,
16  and the potential numbers of young people in our
17  demographic that are in these communities of color that
18  will not be able to vote if this bill goes into place.
19       Q.  (By Mr. Mitchell)  Have you studied the data on
20  whether registered voters in Texas possess government
21  issued photo identification?
22       A.  Studied the data?
23       Q.  Have you looked at it?  Are you familiar with the
24  data?
25       A.  I've read the DOJ's denial, yes.

---

**36**

1           MS. KORGAONKAR:  Can I just ask which data
2  you're referring to?
3       Q.  (By Mr. Mitchell)  Any kind of data.  So the only
4  data of which you're familiar with is the Department of
5  Justice letter denying preclearance in the data
6  discussed in that letter; is that correct?
7       A.  That's not correct.
8       Q.  What other data are you aware of on this point?
9       A.  I read articles and reports, papers, State papers
10  on different numbers and figures regarding the impact of
11  this bill.
12       Q.  What are State papers, are those newspapers?
13       A.  Yes.
14       Q.  Do you believe that no photo identification
15  requirement can be precleared under Section 5 of the
16  Voting Rights Act unless the State demonstrates that the
17  law has an exact proportionate racial impact?
18           MS. KORGAONKAR:  Objection, I think that
19  question calls for a legal determination and Ms. Sanders
20  isn't qualified to make because she's not a lawyer.  You
21  can answer to the extent that you're able.
22       A.  I don't know.  It depends on the State, the
23  population, the census.  I don't know.
24       Q.  (By Mr. Mitchell)  Do you contend that Senate
25  Bill 14 was enacted with a purpose of denying or

---

37

1  abridging the right to vote on account of race or color
2  or because of one's status as a member of a language
3  minority group?
4          MS. KORGAONKAR:  Same objection, but you can
5  answer.
6      A.  There's a lot of history of voter suppression
7  that leads me to believe that that's a strong part of
8  this legislation.
9      Q.  (By Mr. Mitchell)  Are you aware of any statement
10  by any member of the Texas Legislature indicating that
11  Senate Bill 14 was enacted with the purpose of harming
12  minority voters?
13          MS. KORGAONKAR:  Can you repeat the
14  question?
15  BY MR. MITCHELL:
16      Q.  Sure.  Are you aware of any statement by any
17  member of the Texas Legislature indicating that Senate
18  Bill 14 was enacted with the purpose of harming minority
19  voters?
20      A.  Not that I recall.
21      Q.  Can you identify any Texas registered voter who
22  is incapable of obtaining a government issued photo
23  identification required by Senate Bill 14?
24      A.  Incapable, what do you mean?
25      Q.  Not able to obtain it?

38

1      A.  There are many with extreme burdens.  So I don't
2  know if they -- if they would be incapable depending on
3  what, you know, things are like.  I don't know.
4      Q.  When you say extreme burdens, can you describe
5  these extreme burdens?
6      A.  Unemployed.
7      Q.  Can you explain how unemployment constitutes a
8  burden to getting a photo identification that the
9  government offers free of charge?
10      A.  For folks that don't have the other documents
11  needed in order to get the free ID, they'd have to pay
12  for those.  If they don't have an income, if they don't
13  have transportation to go, many folks don't, those
14  things become a barrier.
15      Q.  Are you aware of any person for whom the $22 fee
16  to require a birth certificate prevents a barrier to
17  voting?
18      A.  I'm aware of some persons who $22 is a lot of
19  money to them.
20      Q.  These people can't afford anything that cost $22?
21      A.  I'm not sure of what they can -- if they can't
22  afford anything that cost $22.  But they're disposable
23  income would make it very difficult.  It would make it a
24  burden for them.
25      Q.  Do they have cell phones?

39

1      A.  Some yes, some no.
2      Q.  Some for whom $22 is too much to buy a birth
3  certificate?
4      A.  It definitely presents a difficulty.
5      Q.  Do you believe that the provision in Senate Bill
6  14 that offers election identification certificates free
7  of charge to persons who can't afford them mitigates the
8  burdens imposed by Senate Bill 14?
9      A.  I don't believe that they're free of charge
10  considering the additional things that are required in
11  order to get the IDs, including for some young persons
12  in universities that are from out of state such as
13  Prairie View A&M University.  The cost could be much
14  more including persons who would have to take off of
15  work to be able to go and get the required documents for
16  pre getting the ID as well as going to the designated
17  offices to receive the ID.  So in terms of free, the
18  cost incurred is much more than -- it's not free from
19  where we see it.
20      Q.  What's the highest cost of a birth certificate
21  for which you're aware from other jurisdictions?
22      A.  I don't recall, but I've seen some pretty high.
23      Q.  You're aware of some that exceed the $22 that
24  Texas charges?
25      A.  Absolutely.

40

1      Q.  Do you believe that the provision in Senate Bill
2  14 that allows for provisional ballots to be cast by
3  voters who lack photo identification mitigates the
4  burden of proof imposed by Senate Bill 14?
5      A.  I do not believe that.
6      Q.  You don't believe it mitigates the burdens at
7  all?
8      A.  I don't believe.
9      Q.  So when I say mitigate, I mean lessen the
10  burdens.  You don't believe that the provisional ballots
11  provision in Senate Bill 14 lessens the burdens of the
12  law on voting in any way?
13      A.  No.
14      Q.  Are you familiar with the Supreme Court's
15  decision in Crawford against Marion County?
16          MS. KORGAONKAR:  Objection, she's not a
17  lawyer.
18  BY MR. MITCHELL:
19      Q.  You're not familiar with it?
20      A.  Vaguely.
21      Q.  Just vaguely.  When you entered the building this
22  morning to attend your deposition, were you asked to
23  present photo identification?
24      A.  No.
25      Q.  At the front desk they didn't ask for a photo ID?

Christina Sanders                                          June 1, 2012

---

41

1    A. No.
2    Q. Do you want a break?
3        MS. KORGAONKAR:  Let's take a break.
4        MR. MITCHELL:  Let's take a break.
5        (Brief recess.)
6    BY MR. MITCHELL:
7    Q. Ms. Sanders, how many employees does the Texas
8    League of Young Voters have?
9    A. A total of five including myself.
10   Q. What is your role in the Texas League of Young
11   Voters?
12   A. I am the State Director.
13   Q. What are your responsibilities as State Director?
14   A. To set the vision and the goals.  To manage the
15   operations and projects and programs and make sure
16   they're executed fully.
17   Q. Where are your offices located?
18   A. We have -- our office is located in Houston.
19   Q. To enter your office, would I be required to
20   present photo identification?
21   A. No.
22   Q. Are you familiar with any of the public opinion
23   polls regarding the level of support for Senate Bill 14
24   in Texas?
25   A. Not in particular, no.

---

42

1    Q. Are you not aware of any of the polls showing
2    that the majority of the Texans support voter ID at the
3    polls?
4    A. I am not.
5    Q. Are you aware of any data from any source
6    demonstrating that voter ID laws such as Senate Bill 14
7    decrease rather than increase voter turnout?
8    A. I've seen some information.  But virtually I
9    don't have anything to share.
10   Q. Would you agree that if the data were to show
11   that voter ID laws increase rather than decrease voter
12   turnout, that your organization has not been injured by
13   Senate Bill 14?
14       MS. KORGAONKAR:  Objection to the extent
15   that the question calls for speculation and I think it's
16   a little bit confusing.  Can I ask --
17       MR. MITCHELL  I can rephrase if you want.
18   Q. (By Mr. Mitchell)  If there were data showing
19   that photo identification requirements increase rather
20   than decrease voter turnout, would you agree that your
21   organization is not injured by Senate Bill 14 in its
22   ability to conduct the activities that it performs
23   throughout the State?
24       MS. KORGAONKAR:  I'll object to the extent
25   that it calls for speculation.  But you can answer.

---

43

1    A. The increase in abundance of burden on any
2    population is -- any population of young voters is our
3    concern.  So I don't know about data.  But if there was
4    information showing that young voters would be impacted
5    in a negative way, we wouldn't support that.
6        EXAMINATION
7    BY MR. ASTON:
8    Q. Do you know how many states have a voter ID law?
9        MS. KORGAONKAR:  Objection, I think that's
10   beyond the scope of the notice.  If you know, you can
11   answer.
12   A. Not specifically, no.
13   Q. (By Mr. Aston)  You're aware that a number of
14   states have -- have these laws in effect and Texas is
15   not the first to pass one, correct?
16       MS. KORGAONKAR:  Same objection.  But you
17   can answer.
18   A. I'm not aware of any state with the same realm
19   and specificity like Texas has.
20       MR. ASTON:  Nothing else.
21       MS. KORGAONKAR:  I have a couple of redirect
22   questions.  Can I have just a 5 minutes?  Is that okay,
23   just 5 minutes?
24       (Brief recess.)

---

44

1        EXAMINATION
2    BY MS. KORGAONKAR:
3    Q. Ms. Sanders, I just have a couple of questions
4    for you on redirect and we'll get out of here very
5    shortly I presume.  Okay.  Earlier you stated that you
6    believe that SB 14 if precleared and enacted could have
7    the effect of discouraging eligible potential voters
8    from registering to vote; is that correct?
9    A. That's correct.
10   Q. And what is your basis for that belief?
11   A. Well, we register a lot of people -- we engage or
12   meet a lot of people who are not eligible to vote mostly
13   because of -- most people believe that if you've had a
14   felony you cannot vote anymore ever again.  So when we
15   meet persons that are -- have had felonies, even if
16   they're off probation and off papers, they just don't
17   want to register because they feel like they've heard or
18   think they think that they can't vote at all.
19   Q. So are you saying you have encountered through
20   your work with the League individuals who are indeed
21   eligible to register, but who feel or are concerned that
22   they may not be?
23   A. Yeah.  They're concerned that they can't vote so
24   they don't -- they think that they can't vote.
25   Q. They don't register because they believe that

---

Christina Sanders                                          June 1, 2012



45

1    they won't be able to vote.
2        A.  They don't register because they believe they
3    won't be able to vote, correct.
4        Q.  And it's correct -- strike that.  Is it correct
5    that some of those people could indeed vote?
6        A.  Many people are able to vote.
7        Q.  Is it your belief that SB 14 was enacted with the
8    purpose of suppressing the minority vote, at least in
9    part?
10       A.  In part, I believe.
11       Q.  Are you familiar with any specific relatively
12   recent instances of voter suppression in Texas directed
13   toward young voters of color?
14       A.  I am.  In particular, with Prairie View A&M
15   University in Waller County, Texas there's a very strong
16   history.  We consider that to be ground zero for young
17   voter suppression, student voter suppression as every
18   year there's a barrier.  There was the initial case that
19   decided that young people can vote where they go to
20   school was because of Prairie View and an on the record
21   attempt to not allow those students to vote.
22       Q.  What about anything more recent?
23       A.  As recent as 2004 the District Attorney in Waller
24   County told students that if they registered to vote,
25   they would be sent to jail or they would get a $10,000

46

1    fine if they registered to vote.
2        And even after that in 2006, over about 2,000
3    registrations from students at that university were
4    found in an office and the names didn't make it to the
5    rolls and they were forced to use provisional ballots,
6    which we don't know if they counted to this day because
7    those students never got an opportunity to vote or to
8    get put on the rolls.
9        In 2008, in the same county with this black
10   university, all of the early voting locations were moved
11   out of the City of Prairie View into another city, two
12   cities away.  And the student population represents the
13   largest early vote or the precinct where the students
14   would vote was the largest early vote and one of the
15   largest votes in Waller County.  60 percent of the work
16   force is there.  And they were not given an early vote
17   location in as early as 2008.
18       So there's a constant history of burdens and
19   hurdles, including getting access to registration cards
20   and packets.  Just a constant history that would lead us
21   to believe that this could potentially be a part of an
22   effort to suppress the possible impact of young voters.
23       MS. KORGAONKAR:  Okay.  I don't have
24   anything further.
25

47

1                FURTHER EXAMINATION
2    BY MR. MITCHELL:
3        Q.  Just one question.  You mentioned in 2008 that
4    there was an incident in which the early voting
5    locations were moved out of the City of Prairie View.
6    Do you know whether that decision was precleared by the
7    Department of Justice or by the Federal Court in DC?
8        A.  I don't recall.
9        Q.  We're done.
10           (Deposition concluded.)

48

1              CHANGES AND SIGNATURE
2          RE: STATE OF TEXAS VS. HOLDER
3
4    PAGE   LINE   CHANGE          REASON
5
6
7
8
9
10