**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
    Plaintiff,                     )
                                   )
VS.                                )
                                   )
                                   )
ERIC H. HOLDER, JR., IN            )
HIS OFFICIAL CAPACITY AS           )
ATTORNEY GENERAL OF THE            )
UNITED STATES,                     )
                                   )
    Defendant,                     )
                                   )
ERIC KENNIE, ET AL.,               )
                                   )
    Defendant-Intervenors,         )
                                   )
THE TEXAS SATE CONFERENCE          )
OF NAACP BRANCHES, ET              )  CASE NO. 1:12-CV-00128
AL.,                               )  (RMC-DST-RLW)
                                   )  Three-Judge Court
    Defendant-Intervenors,         )
                                   )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, ET          )
AL.,                               )
                                   )
    Defendant-Intervenors,         )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, ET AL.,                    )
                                   )
    Defendant-Intervenors,         )
                                   )
VICTORIA RODRIGUEZ, ET             )
AL.,                               )
                                   )
    Defendant-Intervenors.         )

**Page 2**

*********************************************

ORAL DEPOSITION OF

MICHAEL SCHOFIELD

JUNE 1, 2012

*********************************************

   ORAL DEPOSITION OF MICHAEL SCHOFIELD, produced as a

witness at the instance of the Defendants Eric H. Holder,

et al., and duly sworn, was taken in the above-styled and

numbered cause on Friday, June 1, 2012, from 9:39 a.m. to

4:48 p.m., before Tamara K. Chapman, CSR in and for the

State of Texas, reported by machine shorthand, at the

Office of the Attorney General, 816 Congress, Suite 1000,

Austin, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF STATE OF TEXAS:
    Mr. John W. McKenzie, III
    Special Counsel to the Attorney General
    General Counsel Division
    P.O. Box 12548
    Austin, Texas 78711-2548
    john.mckenzie@texasattorneygeneral.gov

    Mr. Reynolds Brissenden
    ATTORNEY GENERAL OF TEXAS
    Civil Medicaid Fraud Division
    300 W. 15th Street
    Austin, Texas 78701
    reynolds.brissenden@oag.state.tx.us

    Mr. Justin Gordon
    OFFICE OF THE GOVERNOR
    P.O. Box 12428
    Austin, Texas 78711
    justin.gordon@gov.texas.gov

FOR THE DEFENDANTS ERIC H. HOLDER, ET AL.:
    Mr. Bruce Gear
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    bruce.gear@usdoj.gov

    Mr. Spencer R. Fisher
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    Northwestern Building, Suite 7146
    Washington, DC 20530
    spencer.fisher@usdoj.gov

**Page 4**

FOR THE KENNIE INTERVENORS:
    Mr. Chad W. Dunn
    BRAZIL & DUNN, LLP
    4201 Cypress Creek Parkway, Suite 530
    Houston, Texas 77068
    chad@brazilanddunn.com



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

5

* * *

EXAMINATION INDEX

Page

EXAMINATION BY MR. GEAR.................   7

EXAMINATION BY MR. DUNN..................   225

* * *

INDEX OF EXHIBITS

Page

Exhibit 5....................................   164
    SB 14, HB 218, relating to requiring a
    voter to present proof of
    identification
    (No Bates - 18 pages)

Exhibit 28...................................   61
    HB 218, relating to requiring a voter
    to present proof of identification
    (No Bates - 13 pages)

Exhibit 44...................................   38
    HB No. 1706, relating to requiring a
    voter to present proof of identification
    (No Bates - 10 pages)

Exhibit 101..................................   39
    History of HB 1706
    (No Bates - 3 pages)

Exhibit 102..................................   58
    History of HB 218
    (No Bates - 4 pages)

Exhibit 106..................................   87
    History of SB 362
    (No Bates - 3 pages)

6

Exhibit 223..................................   123
    History of SB 14
    (No Bates - 9 pages)

Exhibit 310..................................   21
    Amended Notice of Deposition
    (No Bates - 7 pages)

Exhibit 311..................................   211
    2/25/2009 e-mail from John Sepheri to
    Michael Schofield
    (Bates TX_00040055 - TX_00024520)

Exhibit 314..................................   88
    SB 362, HB 218, relating to requiring
    a voter to present proof of
    identification
    (No Bates - 9 pages)

7

1       MICHAEL SCHOFIELD,
2   having been first duly sworn, testified as follows:
3                   EXAMINATION
4   BY MR. GEAR:
5       Q.  Good morning, Mr. Schofield.
6       A.  Good morning.
7       Q.  This is the -- this is your deposition today and
8   this is the matter of Texas v. Holder, USDC, for DC Docket
9   Number 1:11 CV 128.
10      Q.  Could you spell your -- state your name and spell
11  it for the record, please?
12      A.  My name is Michael Schofield, S-C-H-O-F-I-E-L-D.
13      Q.  And my name is Bruce Gear.  I'm with the
14  Department of Justice.  I represent Eric Holder in this
15  case, the United States Attorney General.  And if I could
16  just ask everyone else to introduce yourself for the
17  record.
18      MR. MCKENZIE:  Sure.  John McKenzie, for the
19  State of Texas and for the witness.
20      MR. BRISSENDEN:  Reynolds Brissenden, for
21  the State of Texas and the witness.
22      MR. GORDON:  Justin Gordon for the State of
23  Texas and the witness.
24      MR. DUNN:  Chad Dunn, for the Defendant
25  Kennie intervenors.

8

1       MR. FISHER:  Spencer Fisher, for the
2   Attorney General.
3       Q.  (BY MR. GEAR)  Now, you understand that you have
4   been sworn in and that you're under oath -- and you're
5   under oath under penalty of perjury and that this is
6   basically like trial testimony.  Do you understand that?
7       A.  Yes.
8       Q.  Okay.  That during your deposition, you're
9   expected to testify completely, fully and truthfully.  Do
10  you also understand that?
11      A.  Yes.
12      Q.  Okay.  Now, just a couple of ground rules for the
13  deposition.  I'm going to be asking you some questions,
14  and you'll be providing the answers.  Just for the court
15  reporter's purposes, I need to be able to complete my
16  question to you, and then I will give you a complete
17  opportunity to finish your answer to me.  The reason we're
18  doing that is because the court reporter can't record both
19  communications at the same time.  So when you answer, I
20  need a verbal answer.  Shaking your head "yes" or "no"
21  cannot be recorded by the court reporter.  Do you
22  understand that?
23      A.  Yes.
24      Q.  Okay.  So, also, if I ask you a question that you
25  do not understand, you know, you can always stop me or ask



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

21

1    A. Okay.

2    Q. Thank you.

3        (Exhibit 310 was marked.)

4    Q. (BY MR. GEAR)  I'm showing you what's been marked

5    as Exhibit No. 310.  I'll give you a chance to look at

6    that.

7        (Witness reviews document.)

8    Q. (BY MR. GEAR)  Have you had a chance to look at

9    the exhibit marked as Exhibit 310?

10   A. I haven't got to the subpoena duces tecum yet.

11   Has this changed from the first -- this is the amended

12   notice of deposition.  Has it changed from the original

13   notice of deposition?

14   Q. No.  Other than the date and time.

15   A. Okay.

16   Q. So we were discussing Exhibit 310.  Have you

17   reviewed this document before?

18   A. I've not reviewed this document before, because

19   this is the amended notice of deposition.  I saw the

20   original notice of deposition.

21   Q. And I turn your attention specifically to Page --

22   I believe it's Page 5 for you, which is listed as

23   Documents.  Do you see that?

24   A. Yes.

25   Q. Do you recall reviewing the request for documents

22

1    page?

2    A. I did.

3    Q. Okay.  And I turn your attention specifically to

4    Paragraph 1 and ask you to take a look at that.  Did you

5    review Section 1, and did you search for these documents?

6    A. I did.

7    Q. And when I say "you," I mean did you or anyone

8    else within the governor's office search for these

9    documents?

10   A. And, again, I searched my -- my own documents.  I

11   don't -- I can't speak to any documents in the governor's

12   office.

13   Q. So are you aware of whether or not anyone within

14   the governor's office searched for these particular

15   documents?

16   A. I am not aware.

17   Q. And would that be true for each paragraph, 1

18   through 12?

19   A. Yes.  I -- I reviewed the entire subpoena duces

20   tecum before looking through my documents and then kept it

21   open while I was looking so that I could refer back to it.

22   ==Q. And you said you're no longer with the governor's==

23   ==office.  When did you leave the governor's office?==

24   ==A. In September of 2011.==

25   Q. When you left the governor's office, I believe

23

1    you indicated that someone took your place?

2    A. Yes.

3    Q. Okay.  When you left the governor's office, did

4    you leave the files that you had previously worked on at

5    the governor's office?

6    A. Yes.

7    Q. All right.  And that would include e-mails?

8    A. Yes.

9    Q. Communications and other kinds of document?

10   A. Yes.  I did some housecleaning before I left in

11   terms of old paper files from prior sessions and things

12   like that.

13   Q. Did you request -- did you make a request to

14   anyone that is still within the governor's office to

15   search for the documents requested in the notice of

16   deposition?

17   A. I did not.

18   Q. So as you sit here today, you have no knowledge

19   as to whether or not anyone within the governor's office

20   searched for the documents requested in the amended notice

21   of deposition?

22   A. That's correct.

23       MR. GEAR:  Can we go off the record for a

24   second.

25       (Off the record.)

24

1        MR. GEAR:  We can go back on the record.

2    Q. (BY MR. GEAR)  Can you tell me who replaced you

3    when you left the governor's office?

4    A. Yes.  And I know I'm going to blank on his name.

5    I do that all the time.

6    A. I apologize.  I know the man well.  I just can't

7    think his name right now.  I'll have it soon I'm sure.

8        Oh, Ryan Brannon.

9        THE WITNESS:  Sorry, Ryan.  That's two today

10   already.

11   A. B-R-A-N-N-O-N.

12   Q. (BY MR. GEAR)  All right.  While you were in the

13   governor's office, I want to talk about the records that

14   were maintained there.  How are records maintained in the

15   governor's office?

16   A. I'm not sure I understand --

17   Q. How are records maintained in the governor's

18   office?

19   A. I'm sorry, I don't know what you mean by that.

20   Q. How are records maintained?  When I ask you the

21   question about records, are you unclear as to what I mean

22   by that?

23   A. No.  It's the "maintained" part.  I mean, I can

24   tell you what I did.  I don't know -- you know, if I

25   created a document on the computer, it stayed on the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

29

1    A.  I do not, no.

2    Q.  And you mentioned your file cabinet contained

3  notes.  Do you have any knowledge as to whether or not

4  anyone searched the file cabinet for any notes that may be

5  responsive to the notice of deposition?

6    A.  I do not, no.

7    Q.  Do you have any knowledge as to whether anyone

8  within the governor's office may have searched for any

9  reports or analysis that may be responsive to the notice

10  of deposition?

11    A.  I do not, no.

12    Q.  And, again, do you have any knowledge as to

13  whether anyone within the governor's office searched for

14  any other documents that may be responsive to the notice

15  of deposition?

16    A.  I do not, no.

17    Q.  Is there a retention policy in the governor's

18  office for retaining documents?

19    A.  There is.

20    Q.  And can you tell me what that retention policy

21  is?

22    A.  I'm not really familiar with the terms of it.

23    Q.  What was your practice as an employee in the

24  governor's office for maintaining -- retaining documents?

25    A.  If we created something originally, particularly

30

1  dealing with an agency or anything that was official, we

2  kept a copy of it.  Much of what we did in the legislative

3  sphere was transient.  Notes about -- you know, reminding

4  yourself about a hearing tomorrow or things you want to

5  try to get in a bill or whatever.  And I don't know

6  whether I kept copies of that or not.

7    Q.  So when you said things -- you testified to

8  things that are official.  What does that mean?

9    A.  The governor has a number of, you know, official

10  responsibilities, and they're kind of numerous.  If you

11  were doing something with respect to that, I'm sure that,

12  you know, he'd keep a copy of that.

13        And that would be -- that wouldn't be something

14  that I would keep a copy of.  That would be something that

15  the staff -- the staff of the division director would keep

16  a copy of.  Things that went and out --

17    Q.  So when there's --

18    A.  -- correspondence.

19    Q.  I'm sorry.  When there's a document or a

20  communication that is considered official, is there a

21  central filing system for that particular document,

22  generally?

23    A.  I assume there is.  I don't -- I never had to

24  deal with it.

25    Q.  Is there any other method within the governor's

31

1  office of maintaining electronic files, other than your

2  personal computer or your computer that you had at the

3  governor's office?

4    A.  I don't know, because I didn't deal with that.

5    Q.  Who did deal with it?

6    A.  I don't know.

7    Q.  Did you supervise anyone while you were employed

8  with -- at the governor's office?

9    A.  No.

10    Q.  Let's talk briefly about your educational

11  background.  Can you describe your educational background

12  for me.

13    A.  Yes.  I have a BA in political science

14  from Rutgers College -- Rutgers University, and a JD from

15  the Paul M. Hebert Law Center at Louisiana State

16  University.

17    Q.  And do you currently have an active law license?

18    A.  I do.

19    Q.  Do you currently practice law?

20    A.  I do not at the moment.

21    Q.  And regarding your work history, have you ever

22  actually practiced law?

23    A.  Yes.

24    Q.  And can you tell me a little bit about that?

25    A.  Sure.  I graduated from law school in 1992, and I

32

1  practiced in the trial department at Baker Botts from 1992

2  to 1998.  I was an associate at Howrey & Simon, LLP, from

3  1998 to 2000.  I practiced in-house at a company called

4  Equiva Services, LLC, from 2000 until 2002.

5    Q.  And what was the last --

6    A.  Equiva Services, E-Q-U-I-V-A.

7    Q.  All right.  And in any of those capacities

8  working in the various law firms, did you deal with any

9  issues that pertained to election law in the State of

10  Texas?

11    A.  No.

12    Q.  Did you review any issues that pertained to voter

13  ID in the State of Texas?

14    A.  No.

15    Q.  Did you review any issues that pertained to voter

16  fraud in the State of Texas?

17    A.  No.

18    Q.  In your capacity as an attorney in any of these

19  offices, did you either defend or litigate a case that

20  dealt with voter fraud in the State of Texas?

21    A.  No.

22    Q.  So I understand that you are a -- you were a

23  policy analyst in the governor's office, correct?

24    A.  That's correct.

25    Q.  Okay.  And so when did you first become employed



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                          June 1, 2012

33

1  at the governor's office?
2      A.  I became first employed at the governor's office
3  in January of 2003.
4      Q.  And did you -- and when did you leave the
5  governor's office?
6      A.  I left that job in January -- in September of
7  2005.
8      Q.  And where did you go after that?
9      A.  I ran for the legislature.
10      Q.  And did you win?
11      A.  I did not.
12      Q.  So ran for the legislative in 2005.  What did you
13  do after that?
14      A.  After that, I was reemployed by the governor's
15  office, beginning in January of 2007.  And that's when I
16  became a policy analyst.
17      Q.  So from January 2003 until September of 2005,
18  what title or position did you hold?
19      A.  Assistant general counsel.
20      Q.  And can you describe the responsibilities that
21  you held as an assistant general counsel?
22      A.  They were basically two-fold.  I had legal
23  responsibilities involving everything from signing off on
24  settlements of the State, things of that nature, to policy
25  responsibilities involving whatever areas the governor

34

1  would assign me.
2      Q.  So between 2003 and 2005 in your capacity as
3  general counsel, were you ever asked to handle any issues
4  related to voter ID in the State of Texas?
5      A.  I did the elections bills.  I don't recall if
6  there were voter ID bills filed in the 2005 session or
7  not.  I don't believe there were in the 2003 session.
8      Q.  So when you said you did the elections bills,
9  what would that have included?  What responsibilities
10  would that have included?
11      A.  I would analyze the bill, follow the pass of the
12  bill in the legislature and keep track of what was going
13  on.
14      Q.  So I'm trying to stick with the 2003-2005 time
15  period and understand what exactly your responsibilities
16  were.  So you said you would analyze the bills and follow
17  the bills.  Can you explain a little bit more what you
18  mean by "analyze the bills"?  So if, for instance, there
19  was a voter ID bill in 2005, what exactly would you do
20  when it comes to analyzing a bill?
21      A.  I would read the bill, write a summary of what it
22  did, how it changed the law, what it would -- you know,
23  how the law would be different from it is today.  And
24  there was a format that -- for -- regardless of what the
25  subject matter of the bill was, there was a format to

35

1  follow for different questions to ask.  What the bill --
2  and I can't remember the form anymore.  But, you know,
3  every bill had the same format.  And then make a
4  recommendation to the governor as to how the bill, as it
5  currently is written comports with the governor's views,
6  whether he'd recommend supporting it or not.
7      Q.  So do I understand that you would make
8  recommendations to the governor whether to support the
9  bill or not?
10      A.  Yes.  Although it was not directly necessarily to
11  the governor.  It would sort of go to the next level of
12  people, and they would look at it and meet with you and
13  figure out why you were for or against and whether it was
14  a good idea and where we should be.
15      Q.  Okay.  Let me just back up for a second so I can
16  continue to try to understand exactly what you do.
17          You said that you would read the bill.  How would
18  a bill generally come to you and where would it come from?
19      A.  The governor's office subscribes to a service
20  that lets us know when each new bill is filed.  Someone in
21  the governor's office would look at all the captions and
22  assign them to the person who had that subject matter, and
23  then you would get an e-mail saying, "These are all the
24  new bills that were filed in your area today."
25      Q.  And do you know what the name of the service is?

36

1      A.  I don't remember, but I think we use the same one
2  every session.
3      Q.  So again I'm generalizing, if a bill related to
4  voter ID were to -- and is it an e-mail service?  Is it an
5  electronic service?  A paper service?  What exactly is the
6  service?
7      A.  I'm not sure I know the difference between e-mail
8  and electronic, but --
9      Q.  Consider them the same, E-mail, electronic.  Did
10  it come electronically --
11      A.  Yes.
12      Q.  -- or did it come by paper?
13      A.  Electronically.
14      Q.  So when you receive a bill, what's the next step
15  in the process?  What is it that you personally would have
16  had to do?
17      A.  The first thing I had to do is read it.
18      Q.  Okay.  Now, is there a specific process?  You
19  described reading the bill, writing a summary, formatting
20  questions and recommendations and then the recommendation
21  for the governor.  Is there -- is there a specific process
22  that you would follow when you receive a bill beyond this?
23      A.  I don't understand the question.
24      Q.  Okay.  Let me -- let me -- and I'm just -- this
25  is my chance to understand exactly what you know and how



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                June 1, 2012

37

1   things occur, and so I'm just formulating these as we go
2   along, but --
3        So when you read a bill, is there a specific
4   process that you follow in reading a bill?  It's a very
5   general question.  Is there a -- I mean -- do you
6   understand the question?
7        A.  No.
8        Q.  Okay.  So you receive a bill, correct?
9        A.  Right.
10       Q.  Electronically?
11       A.  (Witness nods head.)
12       Q.  You read that bill, correct?
13       A.  Right.
14       Q.  What is it that you are looking for when you are
15   reading a particular bill?  And this is a general
16   question.
17       A.  First of all, you're just looking for what is in
18   it, what is it about, what does it do.  You know, what do
19   the provisions in the bill do to change the law.
20       Q.  Would you compare that bill, for instance, to the
21   existing law, if there is one?
22       A.  Yes.  At least in the sense of saying what this
23   bill does and -- you wouldn't necessarily do a
24   point-by-point comparison.  It depends on the situation.
25       Q.  Okay.  How -- you said it wouldn't be a

38

1   point-by-point comparison --
2        A.  It might be, But not necessarily.
3        Q.  So let's talk a little more specifically now in
4   2005.  If you received a voter ID bill, would you have
5   done a point-by-point comparison?
6        A.  I don't remember.
7        Q.  But you would have reviewed both the bill that
8   you just received and the existing law?
9        A.  Typically.  Again, it depends on the bill.
10       Q.  Once you read the bill, you described that you
11   write a summary.  What exactly does that mean?
12       A.  You write a summary summarizing what the
13   provisions of the bill were.  You know, what they did,
14   what were the main -- not necessarily every single
15   provision, depending on what the bill was.  But, you know,
16   the primary provisions that change the law, what they did.
17       Q.  Between reading the bill and writing the summary,
18   does that involve any additional research?
19       A.  It could.  Depending on the bill.
20       Q.  And more specifically, when dealing with -- if a
21   voter ID bill was received in 2005 by you and after you
22   read the bill, do you believe that you would have done any
23   additional research beyond just simply reading the bill?
24       A.  Again, I don't recall a bill in 2005.
25       (Exhibit 44 was marked.)

39

1        MR. GEAR:  This was previously marked as
2   Exhibit No. 44.
3        Q.  (BY MR. GEAR)  I've handed you what's been marked
4   as Exhibit No. 44.  Take some time and look at that,
5   please
6        (Witness reviews document.)
7        Q.  (BY MR. GEAR)  And let me know when you've had
8   enough time to review it.
9        A.  Okay.
10       Q.  You have had an opportunity to review Exhibit
11   No. 44?
12       A.  Yes.
13       Q.  And can you tell me what that is?
14       A.  This looks like a draft of a bill, House Bill
15   No. 1706.  And it says -- it doesn't have the footer at
16   the bottom that tells you what session it was or, you
17   know, give any indication of whether this is the as-filed
18   version or a committee substitute or something along those
19   lines.
20       Q.  I'm going to also hand you what's been marked as
21   Exhibit 101.
22       (Exhibit 101 was marked.)
23       Q.  (BY MR. GEAR)  Give you a chance to look at that.
24       (Witness reviews document.)
25       Q.  (BY MR. GEAR)  And my general question is, does

40

1   that help put Exhibit No. 44 into context?
2        A.  It does.
3        Q.  Okay.  And can you tell me what Exhibit No. 44
4   is?
5        A.  Well, I don't know what version Exhibit No. 44 --
6   you know, how far along it was in the process.  But it was
7   a bill that ultimately passed the House and then just went
8   nowhere in the Senate.  It was referred to the committee
9   and then just died there, in 2005.
10       Q.  Okay.  And so can you tell me who authored the HB
11   No. 1706?
12       A.  Mary Denny who was chairman of elections at the
13   time.
14       Q.  Okay.  So my understanding is -- is that you were
15   in the governor's office as his legal counsel until 2005,
16   September of 2005?
17       A.  That's correct.
18       Q.  Would you have been involved in reviewing HB
19   No. 1706?
20       A.  I believe I would have.
21       Q.  Okay.  So we were talking generally about if a
22   bill was received by the service and what you would do, so
23   let's turn our attention now to more specifics about HB
24   No. 1706.  Do you recall reviewing this bill in 2005?
25       A.  I don't recall reviewing it specifically.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                                June 1, 2012

41

1    Q.  Now, when you received this bill -- and do you
2    have any idea of when you would have actually received a
3    draft of this bill?
4        A.  When it was filed, probably within two or
5    three days of its filing.  I would get an e-mail that
6    would -- listed all the bills that were filed, and you
7    click on that particular bill when you're ready to work on
8    it.  And then it would sent you to wherever you get the
9    draft of it.
10       Q.  So would you have received HB 1706 in its final
11   form prior to filing, or would you have received a draft
12   that -- would you have received a draft?
13       A.  I don't recall receiving a draft.  The system
14   would just give you the filed version.
15       Q.  I think what I was trying to ask is -- for
16   clarification purposes, where along the process would you
17   actually receive the bill?  And just for clarification
18   purposes if you look at Exhibit 101, there are a number of
19   steps in the process that a bill goes through, obviously.
20   Can you tell me generally where you would have received
21   either a draft or the final version of Exhibit No. 44 by
22   referencing Exhibit No. 101?
23       A.  Yes.  And, again, I'm sorry I don't remember.
24   I'd be happy to tell you if I did.  But typically what
25   would happen is, when there's an official version the

42

1    computer tells you about it and you go get it.  So when
2    there's a version that's filed or a version that's been
3    reported out of committee or a version that's passed the
4    House or -- been reported to a committee -- out of
5    committee in the other House, when there's some -- if I
6    recall correctly, when there's some official version of
7    it, you would get that -- not necessarily drafts -- in
8    fact, not drafts in between.
9        Q.  Okay.  And so when you say "official version,"
10   can you define what you mean by that?
11       A.  It's -- and again, this is what would come
12   through that system.  When the bill is filed, the filed
13   version goes into the system and then you're notified that
14   it's there.
15       Q.  And you would receive the filed version?
16       A.  You would receive the filed version.
17       Q.  Okay.  Do you recall if you were involved in the
18   drafting -- any of the drafting stages of HB 1706?
19       A.  I don't remember.
20       Q.  Would you ever be involved in the drafting of a
21   bill?
22       A.  Sometimes.
23       Q.  Do you recall if anyone within the governor's
24   office was involved in the drafting of HB 1706?
25       A.  I don't.

43

1    Q.  In receiving the official version of the bill, do
2    you recall if you had any communication with
3    Representative Denny?
4        A.  I don't -- I didn't work very closely with
5    Representative Denny.  She's a very nice lady.  I just
6    didn't happen to work very closely with her because I was
7    pretty new.
8        I probably talked with her at committee hearings
9    about it, but I can't recall actually doing that.  And
10   probably not about the bill, either, come to think of it.
11       Q.  So when you're involved in the drafting of a
12   bill, generally how you would you be involved?
13       A.  There weren't very many bills I was involved in
14   the drafting of.  And I don't think I ever got involved in
15   the drafting of the photo ID bill that I can recall, other
16   than, you know, talking with members as the bill's
17   proceeding.
18       Q.  So we've talked about HB 1706, and that was a
19   2005 bill.  You don't recall that you were involved in the
20   drafting of that bill, correct?
21       A.  Yeah.  I don't.
22       Q.  Do you recall that there was a photo ID bill in
23   2007?
24       A.  Yes.
25       Q.  And were you involved in the drafting of that

44

1    bill at all?
2        MR. MCKENZIE:  Well, I'm going to object on
3    the basis of deliberative process privilege to the extent
4    that it's not public that the governor participated in the
5    drafting of any bills.  If it was public information, then
6    you may answer the question.
7        A.  I don't think there's any public information
8    about drafting a bill.
9        Q.  (BY MR. GEAR)  Okay.  Are you refusing to answer
10   my question on the advice of your counsel?
11       A.  I'm going to follow the advice of my counsel.
12       Q.  But as you sit here today, you don't recall being
13   involved in the drafting of any photo ID bills; is that
14   correct?
15       MR. MCKENZIE:  Same objection.
16       Q.  (BY MR. GEAR)  I believe you've already testified
17   to that, but...
18       And you're refusing to answer my question
19   based on advice of counsel?
20       A.  Yes.  I'm -- I'm also not entirely sure what you
21   mean by "drafting."  But apparently I'm being advised not
22   to answer.
23       Q.  Well, when I make the reference "drafting a
24   bill," what do you believe that means?
25       A.  I mean, there's different stages of a bill.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

45

1    There's, you know, putting together the first proposal and
2    coming up with all the terms and all the -- there's also
3    making suggestions along the way of, you know, "We don't
4    like this provision.  We prefer that provision."  Or, you
5    know, "We really hope that comes out before that gets to
6    conference" or things like that.  And those kind of things
7    go on all the time.
8        Q.  Okay.  So let's talk a little bit about the
9    communications that would have gone on in 2005 during the
10   legislative process for HB 1706.  Do you recall having any
11   communications regarding HB 1706?
12       A.  I don't recall any communications from 2005.
13       Q.  Well, you indicated that you may have met with
14   Representative Denny regarding HB 1706?
15       A.  It was common for me to go up to the chairman at
16   a hearing and chat, but I don't recall any talks about
17   specific bills.
18       Q.  Do you have any responsibility when dealing with
19   a bill, to communicate with the authors of that bill?
20       A.  Again, each bill is different.  Sometimes you
21   communicate with the authors regularly; other times --
22   last session, I had over 400 bills.  Some of them -- you
23   know, probably 300 of them, I never talked to anybody
24   about.
25       Q.  Okay.  And so as you sit here today, do you have

46

1    any memory of communicating with any of the authors or
2    coauthors of HB 1706?
3        A.  I don't.
4        Q.  When you searched for responsive documents to the
5    document requests in the notice of deposition, did you
6    search for documents from the 2005 time period?
7        A.  I didn't.  Although, again, the -- what do you
8    call them -- the travel drives were just from this
9    session.
10       Q.  And, again, you're unaware of --
11       A.  "This session" meaning this past session.
12       Q.  2011?
13       A.  2011.
14       Q.  And you're unaware of whether anyone within the
15   governor's office searched for documents within that time
16   period --
17       A.  I'm not aware --
18       Q.  -- 2005?
19       A.  -- as we sit here today.
20       Q.  Can you list every allowable form of
21   identification under SB 1706?
22       A.  Not off the top of my head, no.
23       Q.  Do you --
24       A.  HB 1706.
25       Q.  HB 1706.  Thank you.

47

1        Can you review the document so we can have a
2    discussion about that?
3        A.  Yes.
4            (Witness reviews document.)
5        A.  I found it, but --
6        Q.  (BY MR. GEAR)  Okay.  And just so I'm clear,
7    while you were in the governor's office as general
8    counsel, would that have included a responsibility of
9    reviewing and drafting bills as we discussed here today?
10       A.  Reviewing bills.  I don't know that I drafted any
11   bills.
12       Q.  Okay.  I thought you said previously during your
13   deposition testimony that there were some bills that you
14   were involved in drafting.
15       A.  That came much later.
16       Q.  Okay.  Much later as in -- what do you mean by
17   that?
18       A.  Not during the years that I was working in the
19   general counsel's office.  I don't think I drafted any
20   bills.
21       Q.  Okay.  Would you be involved in coordinating the
22   drafting of those bills as general counsel?
23       A.  No.
24       Q.  Regarding --
25       A.  Again, by "drafting," I'm talking about drafting

48

1    the initial bill as opposed to making suggestions about
2    provisions that --
3        Q.  Well, when I -- when I refer to drafting, I also
4    mean making revisions, not just the initial bill but all
5    the way through to the final version.  Do you understand
6    that?
7        A.  Yes.
8        Q.  Okay.  Would you have been involved in
9    determining any of the allowable forms of identification
10   were under HB 1706?
11           MR. MCKENZIE:  And I'm going to object on
12   the basis of deliberative process privilege.  To the
13   extent you developed any of that during your time as the
14   general counsel or any other position at the govern's
15   office, I would instruct you not to answer.
16       Q.  (BY MR. GEAR)  Are you refusing to answer based
17   on the advice of your counsel?
18       A.  I'm going to follow the advice of my counsel.
19       Q.  And if during the course of this deposition,
20   you're following the advice of your counsel and not
21   answering, if you would just verbally state that, that
22   would make the record clearer.
23       A.  (Witness nods head.)
24       Q.  Thank you.
25       Do you recall any responsibility with HB 1706?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                          June 1, 2012

49

1    A. I don't recall it. I would not be surprised if I
2  was the one who analyzed the bill, but I don't recall it.
3    Q. Okay. And in analyzing the bill, you indicated
4  that you would have created a summary of the bill?
5    A. Yes.
6    Q. And are you aware of whether or not that summary
7  of HB 1706 has been produced to your attorney?
8    A. I don't know.
9    Q. And generally what would a summary of a bill
10 include?
11      MR. MCKENZIE: I caution the witness to
12 answer generally and not specifically as to HB 1706.
13    Q. (BY MR. GEAR) Well, I'm asking generally,
14 because I just would like to know how you go about
15 summarizing the bill?
16    A. As I said, there's -- and maybe this answers the
17 question earlier about -- I think you said what process is
18 used.
19    Q. I did.
20    A. The analysis form kind of was the process.
21    Q. Okay.
22    A. It sort of said, you know, "Give us a summary of
23 what the bill does," and then there would be other
24 questions that change from session to session depending on
25 new things that we -- some things were very simple. Like

50

1  when's the effective of date of this? So you would put
2  that in there. Other things might be, Does it repeal any
3  existing laws. Make sure we know all about those. And
4  then there might be questions, like, does it cost money?
5  Or whatever was being asked that year. And you would go
6  through the bill and make sure you had noted any instances
7  or any situations or are there any constitutional issues,
8  or whatever it might have been that was being asked. And
9  I can't -- to be honest with you, I can't recall all the
10 questions from just last year, much less than 2005, but --
11 and they tended to get longer each session as we thought
12 of more things.
13    Then that gave you the process by which you were
14 to analyze what was in the bill and what it did, and did
15 it affect the ability of Texas to bring in new jobs or
16 whatever it might be the questions were.
17    Q. Okay. And I understand, as you sit here today,
18 you don't recall if you actually were involved in the
19 process for HB 1706; is that accurate?
20    A. That is.
21    Q. But I would like to still focus on the analysis
22 of the bill. When analyzing a bill -- and in particular ,
23 we can expand this to any voter ID bill. Did you ever
24 analyze a voter ID bill to determine the effect of that
25 particular bill on minority voters?

51

1      MR. MCKENZIE: Again, I think that's really
2  a close question as to whether or not that's privileged.
3  I caution the witness to answer generally and not -- when
4  you're talking about specifically voter ID bills, I think
5  that you're getting into internal deliberations of the
6  governor's office. So I'm going to instruct you not to
7  answer.
8    A. On the advice of counsel --
9    Q. (BY MR. GEAR) You're not answering?
10    A. Yes, sir.
11    Q. Have you ever analyzed the effect of a bill on
12 minority voters? And I'm talking about any bill.
13    A. I don't recall ever analyzing a bill by
14 distinguishing between Texans on race or ethnicity or
15 anything like that.
16    Q. Have you ever been asked while in the governor's
17 office, either as general counsel or as a policy
18 analyst --
19      (Multiple voices.)
20    A. Assistant general counsel.
21      MR. MCKENZIE: Again, I object.
22    A. General counsel was my boss.
23    Q. (BY MR. GEAR) I got you. I got you. That's my
24 mistake.
25    -- assistant general counsel or as a policy

52

1  analyst to analyze the effects of a bill on minority
2  voters?
3      MR. MCKENZIE: Again, I'm going to object on
4  the basis of privilege. What he was asked by other folks,
5  I think reveals deliberations of the governor's office,
6  and I'm going to instruct the witness not to answer.
7    Q. (BY MR. GEAR) Have you ever analyzed a bill
8  while in the governor's office to determine the effects of
9  the bill on minority voters?
10      MR. MCKENZIE: Again I'm going to object on
11 the same basis. "Ever" would, of course, reveal about
12 voter ID, as well. So I think it would reflect the
13 internal deliberations of the governor on voter ID, as
14 well.
15    Q. (BY MR. GEAR) Have you analyzed a bill while
16 employed by the governor's office to determine the effect
17 on minority voters?
18      MR. MCKENZIE: Same objection.
19    Q. (BY MR. GEAR) Are you refusing to answer on the
20 advice of counsel?
21    A. I'm going to decline to answer on the advice of
22 counsel.
23    Q. Have you ever analyzed a bill in general to
24 determine the effect on minorities in the State of Texas?
25      MR. MCKENZIE: Same objection. Just to make



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

53

1  the record clear, you're following the advice of counsel.
2      A. I'm following the advice of counsel.
3      Q. (BY MR. GEAR) Have you ever been asked while
4  employed in the governor's office, to analyze a bill to
5  determine the effect of that bill on minorities in the
6  State of Texas?
7          MR. MCKENZIE:  Same objection.
8      Q. (BY MR. GEAR) Have you ever analyzed a bill
9  while employed in the governor's office to determine if it
10  had a disproportionate impact on minorities?
11          MR. MCKENZIE:  Same objection.
12      Q. (BY MR. GEAR) Have you analyzed a bill while in
13  the governor's office to determine if the bill had a
14  disproportionate impact on minorities?
15          MR. MCKENZIE:  Same objection.
16      Q. (BY MR. GEAR) And you're refusing to answer on
17  advice of your counsel?
18      A. I'm going to decline to answer on the advice of
19  counsel.
20      Q. Have you ever been asked to analyze a bill -- and
21  I'm talking about any bill generally -- while employed in
22  the governor's office to determine the impact on minority
23  voters?
24          MR. MCKENZIE:  Same objection.
25      A. I'm going to decline to answer on the advice of

54

1  counsel.
2      Q. (BY MR. GEAR) What was the purpose of HB 1706?
3          MR. MCKENZIE:  I'm going to caution the
4  witness.  You may answer as to the general legislative
5  purpose, but not as to any sort of internal purposes that
6  the governor may have had or the governor's office may
7  have had in deciding whether or not to sign or veto any
8  bill or analyze any bill.
9      A. I'm sorry.  Could you repeat the question?
10      Q. (BY MR. GEAR) What was the purpose of HB 1706?
11      A. I wasn't involved with the drafting of the bill
12  or promoting it.  To be honest with you, I don't really
13  know what the author's purpose was.
14      Q. Do you recall any communications with the
15  governor regarding HB 1706?
16      A. I do not.
17      Q. Do you recall any communications with any of the
18  legislators regarding HB 1706?
19      A. I don't.
20      Q. Do you believe any communications with
21  constituents of the governor regarding HB 1706?
22      A. I don't.
23      Q. Do you recall any communication with any
24  groups -- community groups within the State of Texas
25  regarding HB 1706?

55

1      A. I don't.
2      Q. I may have asked you this, but I'll ask again.
3  Forgive me.
4          Do you recall any communication with anyone
5  regarding HB 1706?
6      A. I do not.  If you have any documents to refresh
7  my memory, I'd be happy to look at them.
8      Q. Do you know if the governor took a position on
9  HB 1706?
10      A. I don't recall.
11      Q. Do you have any knowledge as to whether HB 1706,
12  in part, was designed to prevent undocumented or illegal
13  aliens from voting?
14          MR. MCKENZIE:  Again, you may answer as to
15  general purpose, but not subjective purpose in the
16  governor's office.
17      A. I don't remember.
18      Q. (BY MR. GEAR) Do you recall any concerns that
19  were expressed by constituents regarding HB 1706?
20      A. No.  I really don't remember much about the bill.
21      Q. Okay.  And I understand your testimony.
22          Do you recall any position taken by supporters
23  regarding HB 1706?
24      A. I do not.
25      Q. So it's fair to say as we sit here today, you

56

1  don't recall anything about HB 1706?
2      A. I recall that the -- now that you showed it to
3  me, I recall that the chairman filed the bill.  That's
4  about all I remember.  I didn't even remember it passed
5  the house.
6      Q. And when you say "the chairman filed the bill,"
7  were you present when that occurred?
8      A. No, no.  It was Mary Denny's bill.
9      Q. Mary Denny's bill.
10      A. She's the chairman.
11      Q. And were you present when the bill was filed?
12      A. No.
13      Q. Okay.
14      A. That's a term we use to indicate the person has
15  sponsored the bill and filed it.  I have never physically
16  seen anybody put a bill in the hopper.
17      Q. Okay.  Do you -- in your capacity in the
18  governor's office, do you sit in during the legislative
19  floor debates?  Are you present during those debates?
20      A. Only one time, and it wasn't involving this bill.
21  Back in 2003, I sat in on one floor debate.
22      Q. And do you recall what that bill involved?
23      A. House Bill 4.
24      Q. House Bill 4.
25          And did that have anything to do at all with



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

61

1    A. Normally. Now, I have to put one caveat. I
2  don't know if we had the system up that early. We may not
3  have. But that's normally how we receive them.
4    Q. Now, I just want to understand that. You don't
5  know if you had the system up that early. What does that
6  mean?
7    A. The system by which we receive all those bills
8  and review them gets put in place for the session. It's
9  not Evergreen.
10   Q. Okay.
11   A. And so I don't know for -- I don't recall if we
12 set it up in November. It might have been -- we might
13 have been receiving bills a different way. They may
14 have -- you know, I don't know --
15   Q. Other than --
16   A. They may have just alerted us to the fact that it
17 had been filed. They may have just had us go on the House
18 website and review them. I'm not sure exactly how I
19 received this one because of when it was done.
20   Q. Okay. When you stay "they" may have alerted you,
21 do you know -- can you tell me who "they" is?
22   A. People in the governor's executive office who
23 assign out the bills. And it's somebody different every
24 section.
25       (Exhibit 28 was marked.)

62

1    Q. (BY MR. GEAR) All right. I'm showing you what's
2  been marked as Exhibit 28, and I'm going to give you an
3  opportunity to look at that.
4        (Witness reviews document.)
5    Q. (BY MR. GEAR) Have you had an opportunity to
6  review Exhibit No. 28?
7    A. Yes.
8    Q. And can you tell me what that is?
9    A. This is a copy of House Bill 218 from the 2007
10 legislative session. What I don't know is at what stage
11 of the process it is. I don't know if this is the filed
12 version or the version that passed. It doesn't have any
13 markings either in the top left or on the footer that
14 would tell you sort of where in the process it was.
15   Q. And would Exhibit 102 assist you in determining
16 where in the process it was?
17   A. No, it wouldn't tell me what this portion of the
18 text is.
19   Q. But you recognize that as HB 218, which is a
20 version of the bill -- voter ID bill in 2007?
21   A. Yes. And I don't remember every line, but
22 this -- this looks like the bill.
23   Q. Okay. And can you tell me who the authors of the
24 bill were?
25   A. Yes. The author was Betty Brown.

63

1    Q. Betty Brown.
2    Do you recall if you had any communication with
3  Representative Brown -- with Representative Betty Brown
4  regarding the HB 218?
5    A. I'm pretty sure I did not. I don't recall if I
6  had any conversations with her staff, but I don't -- I
7  definitely don't recall talking to Representative Brown.
8    Q. So as you sit here today, you don't recall
9  whether you had any conversation with Representative Brown
10 or her staff?
11   A. That's correct.
12   Q. Okay. Also an author of the bill is -- it says
13 "Berman." Do you recall having any communications with
14 Mr. Berman or his staff?
15   A. This might have been the session when
16 Representative Berman was chairman of elections. I
17 don't -- as we sit here, I don't remember having
18 conversations with him; but I wouldn't be surprised if he
19 talked about bills in his committee pretty informally. I
20 don't remember having any sit-down meetings with
21 Representative Berman.
22   Q. As part of your responsibilities in the
23 governor's office in 2007 and -- would you have still been
24 assistant general counsel at the time?
25   A. No.

64

1    Q. You would have been a policy analyst at that
2  time?
3    A. Yeah. I think the actually title is Governor's
4  Advisor II. I don't know what that means, but...
5    Q. So let's back up for a second so I can understand
6  what responsibilities you would have as a governor's
7  advisor. And so we're talking about 2007, when you
8  returned to the governor's office. Can you tell me what
9  your responsibilities included at that time?
10   A. Yes. Basically all the same responsibilities as
11 when I was in the general counsel's office, minus the
12 legal responsibilities. I was no longer analyzing, you
13 know, settlements from the State or doing any of those
14 kind of strictly legal work. I was now doing entirely
15 policy, and there was an addition of being a liaison to
16 agencies, which is something I did not do when I was
17 general counsel. So I was a liaison of the lottery
18 commission, the racing commission, and at some point, the
19 Attorney General's Office and all the courts.
20   Q. And when you talk about a liaison to agencies,
21 the AG's office and all the courts, dealing specifically
22 with the 2007 voter ID bill, what responsibilities as a
23 liaison would that include?
24   A. None.
25   Q. So does that mean you were not responsible for



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

65

1  communicating with any of the legislators regarding
2  HB 218?
3       A.  Well, those are -- those are separate functions.
4  As I say, when I was in general counsel, I had sort of two
5  functions:  advising on legislation and legal functions.
6       When I came back, I was in the budget, planning
7  and policy division, where I had, as does everybody there,
8  responsibilities for legislation and also for agencies.
9  You do everything from -- if it's an agency that has
10 meetings, you would attend their meetings and see what was
11 going on with their -- review their agendas, see what
12 they're doing, work on their budget, you know, review that
13 when it comes in, those sorts of thing.  None of that
14 would be, I don't think, pertinent to anything that you're
15 interested in today.
16      Q.  Okay.  And so just so I'm clear and the record is
17 clear, when you returned in 2007, would your
18 responsibilities have remained the same regarding voter ID
19 bills?
20      A.  Yes.
21      Q.  Okay.  And so as a -- as an advisor to the
22 governor at this point, would you have any additional
23 responsibilities regarding photo ID bills?
24      A.  None that was different from when I was there
25 before, if that's what you're getting at.

66

1       Q.  Okay.  Was HB 218 ever considered an emergency
2  item by Governor Perry?
3       A.  I don't believe so, no.
4       Q.  As a policy analyst for Governor Perry, do you
5  know why HB 218 was never considered an emergency item?
6       MR. MCKENZIE:  I'm going to object on the
7  grounds of deliberative process privilege.  To the extent
8  that there's nonpublic deliberations that would be
9  revealed by that answer, I'll instruct you not to answer.
10      THE REPORTER:  If you could slow down a
11 little bit when you're --
12      MR. MCKENZIE:  Oh, I'm sorry.  I'll repeat
13 the objection.
14      I'm going to object on the basis of
15 deliberative process privilege to the extent it reveals
16 any nonpublic information from the governor's office,
17 and I'm going to instruct you not to answer.
18      Q.  (BY MR. GEAR)  What are "emergency items"?
19      A.  Emergency items are a prerogative of the governor
20 under the Texas Constitution to essentially reset the
21 legislative calendar that is laid out in Article 3,
22 Section 5.
23      Under our Constitution, the first 30 days of a
24 legislative session, the legislature basically can't do
25 anything but introduce bills and consider emergency

67

1  expenditures.  The next 30 days, they basically can't do
2  anything except hear bills in committee.  Which means the
3  first 60 days of a 140-day session, they're not entitled
4  to hear any bills.
5       And so the same provision gives the governor the
6  ability to declare something an emergency item, in which
7  case it can be heard earlier.  So if you have a bill that
8  either needs more time to be worked on or that the
9  governor wants to highlight or for whatever reason, the
10 governor has that ability.
11      Q.  And did you ever play a role in designating bills
12 as an emergency item?
13      A.  No.
14      Q.  Can you tell me what the process for designating
15 bills as an emergency item would be?
16      A.  No.
17      Q.  Did you ever advise the governor when or when not
18 to designate bills as an emergency item?
19      A.  No.
20      Q.  So as you sit here today, are you aware of a
21 formal process for designating bills as an emergency item?
22      A.  I am not.
23      Q.  Are you aware of what, if any, steps must be
24 taken prior to declaring a subject matter as an emergency
25 item?

68

1       A.  Prior to declaring or to declare it?
2       Q.  Prior to declaring.
3       A.  No, not that I know of.
4       Q.  Are you aware of any steps that must be taken in
5  declaring a bill as an emergency item or a subject matter
6  as an emergency item?
7       MR. MCKENZIE:  Again you may answer as to
8  matters of public record.
9       A.  My understanding is the governor issues a
10 proclamation.
11      Q.  (BY MR. GEAR)  So, for example, does -- prior to
12 the issuance of the proclamation, does that require any
13 analysis of the emergency item?  And I'm talking
14 generally.
15      MR. MCKENZIE:  I'm still going to object on
16 the basis of privilege, because we know for -- as a
17 foundation that SB 14 was a emergency.  So if he replies
18 generally as to what happens with emergencies, you will
19 necessarily be implicating SB 14.
20      So on that basis, I'm going to instruct you
21 not to answer.
22      MR. GEAR:  Well, and I would say that I'm
23 asking him generally about the process for declaring
24 emergency items.  I didn't ask him specifically about
25 SB 14.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

69

1    Q.  (BY MR. GEAR)  So are you refusing to answer my
2    question --
3        A.  Would you rephrase it in a way that doesn't do
4    that?
5        Q.  What I asked you generally, and I believe I said
6    that in my initial question, is --
7            MR. GEAR:  Can we just read the question
8    back?  Is that possible?
9            (The requested material was read.)
10           MR. MCKENZIE:  All right.  Same objection,
11   because we know that SB 14, in fact, was declared as an
12   emergency.  So I'm still going to instruct him not to
13   answer.
14       Q.  (BY MR. GEAR)  And you're following the advice of
15   your counsel?
16       A.  I will follow the advice of counsel.
17       Q.  Based on your experience as a policy analyst for
18   Governor Perry, can declaring a emergency item be viewed
19   as a political decision?
20           MR. MCKENZIE:  Same objection.
21       A.  I don't even understand the question.
22       Q.  (BY MR. GEAR)  Can declaring an emergency item be
23   viewed as a political decision?
24           MR. MCKENZIE:  Same objection.
25       A.  I guess I'm going to decline to answer on advice

70

1    of counsel, but I'm not sure I understand the question.
2        Q.  (BY MR. GEAR)  Are you aware of any -- any
3    emergency items that have been declared for a political
4    reason?
5            MR. MCKENZIE:  Same objection.
6        Q.  (BY MR. GEAR)  Are you refusing to answer?
7        A.  Yes, sir.
8        Q.  Who helps the governor determine whether a bill
9    becomes an emergency item?
10       A.  I don't know.
11       Q.  Is the declaration of a subject matter as a
12   emergency item a common or uncommon occurrence?
13           MR. MCKENZIE:  Objection; vague.
14           You can answer.
15       A.  There are usually a couple or a few emergency
16   items in a legislative session.  Last session, there were
17   five.
18       Q.  (BY MR. GEAR)  Do you know why the subject matter
19   was declared an emergency item?
20           MR. MCKENZIE:  I'll object on the grounds of
21   deliberative process privilege.
22           MR. GEAR:  I think we're going to take a
23   break for a second.
24           MR. MCKENZIE:  Okay.
25           (Break.)

71

1            MR. GEAR:  We can go back on the record.
2        Q.  (BY MR. GEAR)  So I asked you who, if anyone, in
3    the governor's office helps the -- or assists the governor
4    in determining whether or not a subject matter becomes an
5    emergency item.  Do you recall that question?
6        A.  Yes, I recall the question.
7        Q.  And do you recall how you answered?
8        A.  I said, "I don't know."
9        Q.  And how long -- in 2007, how long had you been
10   working in the governor's office?
11       A.  In 2007, I had just started back.  I had worked
12   there for two sessions before that.
13       Q.  Two sessions before that.  And you're unaware of
14   who, if anyone, in the governor's office would advise the
15   governor on how subject matters become an emergency item?
16       A.  Yes.  That wasn't in my job.
17       Q.  Were you ever involved in any communications with
18   the governor regarding HB 218 when the topic of discussion
19   was determining if the bill became an emergency item?
20       A.  I don't know if there ever was a discussion about
21   it.
22       Q.  Well, were there any communications between staff
23   and the governor regarding HB 218 becoming an emergency
24   item?
25       A.  I don't know.

72

1        Q.  Were there any discussions with anyone outside of
2    the governor's office where you were present where the
3    topic of discussion was declaring HB 218 as an emergency
4    item?
5        A.  I don't recall any.
6        Q.  Do you recall any communications of any kind
7    that -- where the topic was declaring HB 218 as an
8    emergency item?
9        A.  I don't -- I don't recall.
10       Q.  Do you recall any public record which would
11   support the reason why HB 218 was declared an emergency
12   item?
13       A.  It wasn't.  Was it?  I don't remember HB 218
14   being an emergency item.
15       Q.  And you're right.  It was not.
16           Do you recall any public communication where the
17   discussion of HB 218 possibly becoming an emergency item
18   was the topic of discussion?
19       A.  I don't remember any.
20       Q.  Are you aware of anyone in the governor's office
21   involved in the development or drafting of HB 218?
22       A.  No.
23       Q.  Are you aware of any communications at all
24   between the governor's office and the lieutenant
25   governor's office regarding HB 218?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

73

1    A. No.
2    Q. Are you aware of any communication at all between
3    the governor's office and Ms. Betty Brown regarding
4    HB 218?
5    A. I don't remember any.
6    Q. Are you aware of any communications regarding
7    HB 218 with any of the authors out of the governor's
8    office?
9    A. I don't recall any.
10   Q. Are you aware of any communications with any of
11   the coauthors regarding HB 218?  And I'm referring to
12   communications from the governor's office.
13   A. I don't remember any, but I also don't remember
14   who the coauthors were.
15   Q. Okay.  If you turn your attention to Exhibit 102,
16   does that refresh your recollection as to who the
17   coauthors were?
18   A. Yes, it does.
19   Q. Can you tell me what the purpose of HB 218 was?
20       MR. MCKENZIE:  Again, you may answer as to
21   general purpose.  I would ask you not to answer to the
22   extent it would reflect deliberations of the governor's
23   office.
24   A. I don't know what the authors' purpose of the
25   bill was.

74

1    Q. (BY MR. GEAR)  Were you present with the governor
2    during any communications regarding the allowable forms of
3    ID under HB 218?
4    A. I don't recall any -- I don't recall meeting with
5    the governor on this bill at all.
6    Q. Do you recall any meetings with anyone within the
7    Texas state government regarding HB 218?
8    A. No.  I must have talked with somebody about it at
9    some point, I'm guessing; but I don't recall any specific
10   discussions with anybody.
11   Q. Okay.  When you say you must have talked to
12   somebody at some point, what are you basing that on?
13   A. It's a very fluid process that you -- you know,
14   you go to hearings, they're hearing your bill.  And I'm
15   sure I chatted with somebody about it.  I don't recall --
16   and certainly if your legislator had asked about it, I
17   would tell them what I knew.
18   Q. Are you aware of any public debate or testimony
19   regarding HB 218?  Do you recall any public debate or
20   testimony?
21   A. There was a hearing in the House.  I don't recall
22   specifically.
23   Q. Were you present during that hearing in the
24   House?
25   A. I don't remember being present, but I likely was.

75

1    Q. Do you know if HB 218 was designed in part to
2    prevent noncitizens from voting?
3    A. I don't recall.  And I'm not sure I ever knew.
4    Q. Would the governor know that?
5    A. I don't know.
6    Q. Would the governor know the purpose or the intent
7    of HB 218?
8    A. We didn't draft the bill, so I wouldn't think he
9    would know the authors' intent in drafting the bill.
10   Q. Was the governor's office involved in any aspect
11   of drafting HB 218?
12       MR. MCKENZIE:  I'm going to object on
13   privilege grounds, that that's not public information.
14   I guess I'm going to decline to answer on the
15   advice of counsel.
16   Q. (BY MR. GEAR)  Do you recall during the public
17   debate, that Betty Brown stated on the House floor that
18   HB 218 was designed to keep illegal aliens or noncitizens
19   and otherwise not qualified from voting?
20   A. I don't recall what she said.
21   Q. Do you recall any communications with the
22   governor regarding preventing noncitizens or illegal
23   aliens from voting as related to HB 218?
24       MR. MCKENZIE:  I'm going to object on the
25   deliberative process grounds.

76

1    MR. GEAR:  On what grounds, Counselor?
2    MR. MCKENZIE:  Deliberative process grounds.
3    Q. (BY MR. GEAR)  Are you refusing to answer the
4    question based on the advice of your counsel?
5    A. Yes, sir.
6    Q. You had a chance to review HB 218, and did you
7    review the allowable forms of ID?
8    A. I did.  I'd have to go back and look at them
9    again.
10   Q. Would you agree that the allowable forms of ID
11   under HB 218 also include nonphoto IDs?
12   A. I lost my page.
13   I'm sorry.  Can you repeat the question?
14       MR. GEAR:  Could you read it back.
15       (The requested material was read.)
16   A. And, again, I don't know what step in the process
17   this version of the bill is.  I don't know if this is the
18   bill that passed the House or this was just the filed
19   version.  But the version of the bill that is marked as
20   Exhibit 28 allows for -- Page 10, Line 20, has forms of ID
21   that do not include a photograph.
22   Q. (BY MR. GEAR)  Okay.  Do you know if the version
23   that passed the House -- and I'm referring to 218 --
24   allowed for identification that did not include a
25   photograph?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

77

1      A. I believe it did.
2      Q. Are you aware of any analysis conducted by the
3   governor's office regarding HB 218?
4      A. Am I aware of one?
5      Q. Are you aware of any analysis from the governor's
6   office regarding HB 218?
7      A. Yes.
8      Q. And what would that analysis include?
9          MR. MCKENZIE: I'm going to object on the
10   deliberative process privilege grounds.
11      A. You're asking what it included?
12      Q. (BY MR. GEAR) Yes.
13      A. I'm going decline to answer on advice of counsel.
14      Q. Did you prepare that analysis?
15      A. Yes.
16      Q. And is that the summary of the bill as you
17   described in earlier testimony?
18      A. Yes. And whatever else was on our form at the
19   time.
20      Q. Okay. And regarding the analysis of the summary,
21   as you testified, would that have included a comparison of
22   previous voter ID bills?
23          MR. MCKENZIE: I'm going to object on
24   deliberative process privilege grounds as to what the
25   content of that analysis included.

78

1      Q. (BY MR. GEAR) And you're refusing to answer?
2      A. Yes, sir.
3      Q. Would the summary of HB 218 have involved any
4   legal research?
5          MR. MCKENZIE: Again, I'm going to object as
6   to the content of the analysis.
7      A. I decline to answer on the advice of counsel.
8      Q. (BY MR. GEAR) Did the governor take a position
9   on HB 218?
10          MR. MCKENZIE: You may answer as to public
11   position.
12      A. I don't recall.
13      Q. (BY MR. GEAR) Did you take a position on HB 218?
14          MR. MCKENZIE: Again, you may answer as to
15   public position.
16      A. Do I publically take a position?
17      Q. (BY MR. GEAR) Yes.
18      A. I can't imagine that I did.
19      Q. Do you ever take a public position on photo ID
20   bills? Have you ever taken?
21      A. While I'm working for the governor?
22      Q. Yes.
23      A. When I'm working for the governor, my views are
24   my own. And what I do for the governor reflects my advice
25   to the governor, not my public, you know, views or

79

1   whatever.
2      Q. And you stated that you eventually left and ran
3   for office, correct?
4      A. Yes.
5      Q. And was that for the Senate or the House?
6      A. House.
7      Q. And did you take a public position on photo ID
8   when you were running as a candidate for the House?
9      A. Well, the bill had already passed, so it wasn't
10   much of an issue.
11      Q. Did you take a position?
12      A. No. I think I just stated that I worked on
13   certain bills for the governor.
14      Q. And which bills -- which bills did you state you
15   worked on?
16      A. The photo ID bill, loser pay tort reform, eminent
17   domain bill, and probably others.
18      Q. Are you aware of any attempt in -- by the
19   governor's office to determine if HB 218 had a
20   disproportionate impact on minority voters?
21          MR. MCKENZIE: Yeah. I'm going to object on
22   deliberative process grounds as to what type of analysis
23   you guys might do to aid the governor's decision-making.
24      A. I'll decline to answer on advice of counsel.
25      Q. (BY MR. GEAR) And you referred to HB 218 as

80

1   passing. Did I understand that testimony?
2      A. No. I believe it passed the House.
3      Q. And did it pass the Senate?
4      A. I don't think so.
5      Q. Do you recall when it passed the House?
6      A. I do not recall, but it's in Exhibit 102.
7      Q. And what does Exhibit 102 indicate?
8      A. I believe it's late April. April 24th of 2007.
9      Q. Are you aware of any analysis conducted regarding
10   either HB 1706 or HB 218 regarding the voters in the State
11   of Texas that may not have an allowable form of ID under
12   those proposed bills?
13          MR. MCKENZIE: Again, I'm going to object to
14   the content of the analysis you may have conducted for the
15   governor that aided in decision-making. I'm going to
16   instruct you not to answer.
17      A. I'll decline to answer on the advice of counsel.
18      Q. (BY MR. GEAR) Are you aware of any attempts to
19   determine the impact of HB 218 on minority voters?
20          MR. MCKENZIE: Same objection.
21      A. I decline to answer on the advice of counsel.
22      Q. (BY MR. GEAR) Are you aware of any
23   communications regarding -- out of the governor's office
24   regarding any concerns expressed regarding the burden that
25   HB 218 may place on minority voters?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

81

1        MR. MCKENZIE:  Let me ask a question.  Is it
2   public communication you're talking about or all
3   communications?
4        MR. GEAR:  Public communications.
5        MR. MCKENZIE:  Okay.
6   A.  I don't recall.
7   Q.  (BY MR. GEAR)  And that would also be true for
8   the last question regarding the impact to minority voters.
9   Are you aware of any public communication?
10  A.  It wasn't part of my job to draft public
11  communications typically, so I don't recall any.
12  Q.  Whose job was it?
13  A.  It depends on what the communication was.
14  Q.  Regarding photo ID.
15  A.  I mean, it depends on what the communication was.
16  If there was press inquiries, the press shop might do it.
17  You know, it depends on what it was.
18  Q.  Does the governor have a specific press officer
19  or a person assigned to handle his press releases?
20  A.  He has a communications division.
21  Q.  Okay.
22  A.  I'm not sure if that's what it's called.
23  Q.  And do you know who heads up the communications
24  division?
25  A.  In 2007, I don't remember who it was.

82

1   Q.  Do you know if there has been a turnover in the
2   head of the communications division --
3   A.  There usually is.
4   Q.  -- in 2009?
5        THE REPORTER:  Wait.  You guys are talking
6   at the same time.
7        THE WITNESS:  I'm sorry.
8   Q.  (BY MR. GEAR)  So the response was there usually
9   is a turnover --
10  A.  Yes.
11  Q.  -- in the communications division of the
12  governor's office?
13  A.  Yes.
14  Q.  Are you aware of anyone in the governor's office
15  that played a role in attempting to ensure the passage of
16  HB 218?
17       MR. MCKENZIE:  Again, to the extent it's not
18  public and it might reflect policy decisions of the
19  governor, I'm going to instruct you not to answer the
20  question.
21  A.  I decline to answer on advice of counsel.
22  Q.  (BY MR. GEAR)  I may have asked you this, and I
23  apologize, if I did.  Are you aware of whether the
24  governor took a public position on HB 218?
25  A.  I don't recall.

83

1   Q.  Were you involved in any communications with the
2   governor regarding what the forms of allowable
3   identification would be under HB 218?
4        MR. MCKENZIE:  Objection on deliberative
5   process grounds.  I'm going to instruct you not to answer.
6   A.  I decline to answer on the advice of counsel.
7   Q.  (BY MR. GEAR)  Were you ever involved in any
8   communication with constituents regarding HB 218?
9   A.  I don't recall.
10  Q.  Were you ever involved in any communications with
11  any member of the legislature regarding HB 218?
12  A.  I don't recall specific communications, but I
13  would not be surprised if I talked to members during the
14  course of the session.
15  Q.  Do you have any memory of who you may have talked
16  to during the session?
17  A.  No.
18  Q.  Do you have any memory of communicating with any
19  staff regarding HB 218, the staff of legislators?
20  A.  I don't.
21  Q.  Do you have any memory or are you aware of any
22  communications of -- communications with the lieutenant
23  governor's office regarding HB 218?
24  A.  No.
25  Q.  If you engaged in such communication -- and I

84

1   understand that you don't recall the communication -- how
2   would you normally engage in that communication?  By
3   phone, by Blackberry?
4   A.  Either by phone or seeing them in person.
5   Q.  Do you ever send text messages regarding
6   communications?
7   A.  No.
8   Q.  How does one go about meeting with you in your
9   capacity in the governor's office?  Do they need to
10  schedule an appointment, or is it a more informal process?
11  A.  It's more informal.  People can schedule an
12  appointment; but -- particularly, you know, if it suits
13  their schedule.  But people see you in the hallway, people
14  come by.
15  Q.  And do you maintain a calendar, or did you
16  maintain a calendar while in the governor's office?
17  A.  No.  My -- Outlook would have an appointment
18  calendar, if there was one calendared.  If you said, you
19  know, "I want to come in and see you at 3 o'clock
20  tomorrow," I'd put it on there so I wouldn't forget it.
21  But if I just went and saw somebody or we talked on the
22  phone, there's no calendar.
23  Q.  Sure.
24  A.  And that was the vast majority of my
25  communications with people.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                    June 1, 2012

89

1   bills.  But we would have had a system in place to make
2   sure that the correct analysis would get -- correct
3   analyst would get the bill that was assigned to him or
4   her.
5   Q.  And regarding SB 362, would you have written a
6   summary regarding that bill?
7   A.  Yes.
8   Q.  Would you have compared SB 362 to previous photo
9   ID legislation?
10          MR. MCKENZIE:  And again, I'm going to
11  object as to the content of his analysis and instruct you
12  to not answer.
13  A.  I will decline to answer on advice of counsel.
14  Q.  (BY MR. GEAR)  Do you recall if SB 362 was
15  designated as an emergency item?
16  A.  I don't believe it was.
17  Q.  Why not?
18          MR. MCKENZIE:  Again, I'm going to object on
19  deliberative process privilege grounds.
20  A.  I decline to answer on advice of counsel.
21  Q.  (BY MR. GEAR)  Do you see that SB 362 allows
22  forms of ID that do not include a photo ID?
23  A.  I hadn't actually got as far as the forms of ID.
24  Q.  Take your time and look at it.
25  A.  I'm sorry.  Could you remind me of the question?

90

1   Q.  The question that I had asked you previously was,
2   do you see that SB 362 allows forms of ID that are
3   nonphoto ID?
4   A.  Yes.  And again, as with the other bill, there is
5   no heading or footer on this, so I don't know what stage
6   of the process this bill was from, whether it was the
7   filed version or the version that passed the Senate or --
8   or what it was.  But it does allow for forms of ID other
9   than photo ID.
10  Q.  And did the filed version allow for other forms
11  of ID other than photo ID?
12  A.  I believe that it did.
13  Q.  Were you involved in any communications with the
14  governor regarding SB 362?
15  A.  I don't recall communicating with the governor
16  about SB 362.
17  Q.  Were you involved in any communications with the
18  lieutenant governor regarding SB 362?
19  A.  No.
20  Q.  Were you involved in any communications with the
21  legislators regarding 362?
22  A.  I don't recall specific communications, but I
23  very likely communicated with members of the legislature
24  regarding Senate Bill 362.
25  Q.  Now, you said you were very likely to have

91

1   communicated.  Is there a process in your review and
2   summary of 362 which would have required you to
3   communicate with legislators?
4   A.  No.
5   Q.  And when you say you're very likely, what are you
6   basing that on?
7   A.  The fact that I attended the hearings, I would
8   have been involved with some of that.  There was -- it's
9   not a requirement of my job that I discuss things with
10  legislators.  It just either sometimes helped in the
11  performance of the job or sometimes they wanted to know
12  things about the bill, or that sort of thing.
13  Q.  So you recall attending the hearings for SB 362?
14  A.  I don't specifically recall it; but I'm -- very,
15  very likely to have either been there in person or
16  watching from my office.
17  Q.  Okay.  And was that function different from your
18  review and summary of HB 1706 and -- I should just say
19  HB 218?
20  A.  No.  The function didn't really change much over
21  time.  Basically I was responsible for analyzing the bill
22  and tracking its progress through the legislature.  Or
23  lack of progress, depending on the bill.  It was basically
24  my responsibility to know what was going on with the bill
25  and where it was in the process.

92

1   Q.  Do you recall the public debates regarding
2   SB 362?
3   A.  I don't recall specifically the debate.  I'm sure
4   I watched the floor debates.
5   Q.  Do you recall what the concerns raised by
6   opponents of SB 362 were?
7   A.  I don't recall the specific concerns, but I'd
8   certainly -- you'd have to refresh my recollection.  I
9   mean...
10  Q.  Are you familiar with the House Research
11  Organization Bill Analyses?
12  A.  I don't remember it.  I'm sure I saw it.
13  Q.  Have you reviewed House Research Organization
14  Bill Analyses before, previously?  Are you familiar
15  with --
16  A.  Have I ever seen one?
17  Q.  Yes.
18  A.  Yes.
19  Q.  Okay.  And do you recall reviewing one in 2009
20  regarding photo ID?
21  A.  No.
22  Q.  How would the governor's office receive a copy of
23  the House Research Organization Bill Analyses?
24  A.  I don't think we did.  I think if you wanted to
25  see it, you just went online and looked it up.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

93

1      Q.  Do you recall going online and looking it up
2  regarding SB 362?
3      A.  I don't.  I never used anybody else's analysis in
4  creating my analysis.  So if I looked at any limits for a
5  bill, it would be later.
6      Q.  Did you refer back to your previous analysis on
7  voter ID when considering SB 362?
8      A.  I don't recall.
9      Q.  Based on your review of SB 362, do you see that
10  it allows for a driver's license or a personal ID card
11  issued by DPS?
12      A.  Where are you?
13      Q.  SB 362.  Let me see if I can direct you to it.
14      A.  Page 5?
15      Q.  Page 5.
16      A.  I'm sorry, could you repeat the question?
17      Q.  Do you see that it allows a -- for a photo ID,
18  driver's license or a personal ID card issued by DPS?
19      A.  Yes.
20      Q.  That it also allows for a U.S. military card that
21  contained a photograph?
22      A.  Yes.
23      Q.  That it allowed for a U.S. citizenship
24  certificate that contained a photograph?
25      A.  Yes.

94

1      Q.  So when you complete your summary, who reads your
2  analysis or your summary?  Who does that go to?
3      A.  It doesn't go to a specific person.  Once it's in
4  the system, it can be -- it can be used by a few people
5  who are entitled to see it for their -- you know, they
6  have all different purposes.
7      Q.  Who's entitled to see it?
8      A.  I'm not entirely sure who all the people who are
9  entitled to see it.  I know, for example, I was not
10  entitled to see other analysts' analyses, because there
11  would be no reason why I would need to see their bill.  So
12  I couldn't get into them if I wanted to.
13      Q.  So let me ask that question again.
14         Who, that you're aware of, is entitled to review
15  your analysis of SB 362?
16      A.  I know that my direct report would, which is the
17  director of the budget planning and policy.
18      Q.  And who was that?
19      A.  At which time?
20      Q.  During the review and summary of SB 362?
21      A.  This was 2009.  So I guess that was -- forgive
22  me.  My memory is terrible.  I believe Mary Katherine was
23  the VPP director.  Mary Katherine Stout, S-T-O-U-T.
24      Q.  And do you know what Mary Katherine would do when
25  she received -- what her responsibilities were once she

95

1  received your summary of SB 362?
2      A.  Well, she received them from everybody, so she's
3  getting 7,000 of them.
4      Q.  Okay.
5      A.  So I don't think that she's necessarily reading
6  all of them.  But she, I believe, had access to it, the
7  legislative division would, so they could communicate with
8  legislators.  And I don't know who else for sure.
9      Q.  So it's the legislative division that's
10  responsible for -- for the actual communication with
11  legislators?
12      A.  Yes.
13      Q.  Okay.  And so you indicated that you are aware
14  that the director of -- well, Mary Katherine and the
15  legislative division would have gotten copies of your
16  summary.  Anyone else?
17      A.  Well, it's not so much they would get copies.  I
18  think they would have access to the computer and would
19  pull them up if they wanted to see them.  I don't think
20  anybody --
21      Q.  Do you know if --
22      A.  -- as far as I know, actually got a copy.
23      Q.  Do you know if it's the normal course after your
24  summaries have been completed for the legislative division
25  to review those summaries?

96

1      A.  Again, there are -- in some sessions, there are
2  as many as 7,000 bills, so I doubt they read all of them.
3  I'm sure that they have their own process for knowing when
4  they need to see them.
5      Q.  Was SB 362 a legislative priority for the
6  governor --
7         MR. MCKENZIE:  I'm going to object --
8      Q.  (BY MR. GEAR)  -- in 2009?
9         MR. MCKENZIE:  I'm sorry, I didn't mean to
10  talk over you.
11         I'm going to object on deliberative process
12  grounds because -- to the extent it's a nonpublic priority
13  of the governor.  If it's a public priority of the
14  governor, you may answer.
15      A.  I'm not quite sure I know what a public priority
16  is.  I'll decline with respect to the internal --
17         (Multiple voices.)
18      Q.  (BY MR. GEAR)  Okay.  I believe I said
19  "legislative priority."  Was it a legislative priority for
20  the governor in 2009?
21         MR. MCKENZIE:  Same objection.
22      A.  Are you asking me if it was an emergency item?
23      Q.  (BY MR. GEAR)  No.  I'm just asking was it a
24  priority in general for the governor in 2009.
25         MR. MCKENZIE:  Same objection if it's not

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                      June 1, 2012

97

1   public.
2       A. I don't know if it was on any list of priorities
3   or not. I don't remember anymore. That's all I --
4       Q. (BY MR. GEAR) Does the governor generally create
5   a list of priority legislation for any given session?
6       A. It all -- it depends how you're operating. You
7   might have -- you know, you may have a list of priorities;
8   you might just lay out your bills in the state -- of the
9   state that you're interested in; the governor may give
10  speeches and declare it to be something he has a priority
11  and cares about.
12      Priorities definitely were -- we used in the
13  office on a regular basis. How formal it is, I
14  couldn't tell you.
15      Q. Were you involved in any decision-making process
16  regarding the allowable forms of ID under SB 362?
17      MR. MCKENZIE: Again, I'm going to object if
18  that information reflects nonpublic internal government
19  process communications.
20      A. And I'll decline to answer on the advice of
21  counsel.
22      Q. (BY MR. GEAR) Were there any communications
23  regarding the allowable forms of ID pursuant to SB 362?
24      MR. MCKENZIE: Same objections to the extent
25  they're intra-governor staff communications.

98

1       MR. GEAR: I think he can answer the
2   question "yes" or "no" to were there communications
3   regarding SB 362.
4       MR. MCKENZIE: Right. Under -- I guess,
5   like, incrementally, the questions are getting more
6   specific about what the subject matter of the
7   communication was. It starts off as voter ID and it
8   starts to go into -- about what form of ID. And as it
9   gets more and more specific, I feel more inclined to
10  object. So I try to let the broad voter ID questions go.
11  But the stuff about acceptable forms of ID and stuff,
12  that's when I start asserting the objection.
13      Q. (BY MR. GEAR) Were there any communications that
14  you're aware of regarding SB 362?
15      A. I don't recall specifically.
16      Q. Do you know what the intent of SB 362 was?
17      MR. MCKENZIE: You may answer as to general
18  legislative intent, not intra-governor office intent.
19      A. I don't know what Senator Frasier's intent was.
20      Q. (BY MR. GEAR) Do you know what any of the
21  authors' intent was?
22      A. When you say "any of the authors" --
23      Q. Authors of the bill, 362.
24      A. I mean, the way I would do it, the author is the
25  author, and the coauthors are folks who are allowed to

99

1   sign onto the bill. So I don't know who the coauthors
2   are.
3       Q. Well, if you refer to the Texas Legislature
4   Online History for 362, does that indicate who the authors
5   are and the coauthors, as well as the sponsors?
6       A. Yes. And it's different from the copy -- the
7   Exhibit 314. Oh, no, it's not. They list both -- I'm
8   sorry. They list Frasier and then -- both as author and
9   then Nelson and Nichols as coauthor on Exhibit 106.
10      Q. Do you know what the intent of SB 362 was for
11  either the author, coauthor, sponsor or cosponsors?
12      A. I do not.
13      Q. Was the intent of a bill something that you
14  considered or determined in the analysis of any particular
15  bills?
16      MR. MCKENZIE: Objection to the extent it
17  reflects the content of the analysis that you made for the
18  governor or his staff.
19      A. I'll decline to answer based on the advice of
20  counsel.
21      MR. GEAR: I think now would probably be a
22  good time to take a lunch break. Let's do maybe half an
23  hour?
24      MR. MCKENZIE: Yes.
25      (Break.)

100

1       MR. GEAR: Back on the record.
2       Q. (BY MR. GEAR) We're back after lunch. I'd like
3   to take a little more time to really understand what it is
4   you do in the governor's office or what you did in the
5   governor's office. And as I understand your testimony,
6   you indicated that you would receive a bill generally in
7   its final version, electronically by a service, the name
8   you did not remember; is that correct?
9       A. Yeah. I should have inquired about it over
10  lunch, but I forgot it.
11      Q. And you discussed several times the possibility
12  during some of the previous voter ID registration -- I'm
13  sorry -- voter ID legislation that the service may not
14  have been available. Do you recall that testimony?
15      A. Yes.
16      Q. And when the service -- in situations where the
17  service is not set up or not available, how would the
18  governor's office normally receive a bill?
19      A. First of all, I don't know how the governor's
20  office receives it. I just know how I would receive it.
21      Q. Okay.
22      A. I think -- they still probably officially receive
23  stacks of paper bills in the -- and I think I've seen
24  them -- in the central office. So I think the official
25  bill is still a stack of -- you know, you get a stack of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

101

1    paper.  So that's how they would get that.  What I was
2    referring to is the way we would get our assignments to
3    analyze a bill, which would come from -- I would get an
4    e-mail that would say, "These are the bills that were
5    filed in your area today," and it might be 30 of them on,
6    you know, a horrible day.  It might be six.  It might be
7    eight.  Whatever it will be.  And you'd have a certain
8    amount of time to get an analysis written in the system so
9    that anybody who's entitled to use it and needed to see
10   it, they could see it.  And then over the course of the
11   session, you'd follow that bill.
12        Now, you mentioned being in the final form, and
13   that's kind of the opposite of the way I think about it.
14   To me, the final form is the bill at the end of session,
15   after it's gone through committee and it's either passed
16   or not and it's sort of where it is.
17        What you're referring to as final is I believe
18   what I'm referring to as the filed version, which is the
19   version that has been filed with the House or the Senate.
20   And I guess you mean final in the sense they're done
21   writing it.  But that's not what I would consider final.
22   So we refer to those as filed.
23        Q.  Okay.  So when you -- the type of bill that you
24   generally receive is the filed version, correct?
25        A.  Generally.

102

1        Q.  And when you receive the version that is the
2    filed version, do you -- have you at any time added
3    additional language or drafted additional language to the
4    filed version of a bill?
5            MR. MCKENZIE:  And again, you can answer it
6    generally, but not as to specific bills.
7        A.  And it's very different with various different
8    bills.  But in Texas, the governor typically doesn't have
9    as much role in that as in other states.  There are
10   bills where -- there are some bills -- you know, one or
11   two, I was deeply involved in drafting.  None involving
12   photo ID.
13        There are other bills where you'll go and suggest
14   a provision or you suggest a provision come out or a
15   member will come to you and say, "We're thinking about
16   putting this provision in.  What do you think?"  So you're
17   involved in that kind of capacity.  It's not very often
18   that you're involved in actually sitting down drafting a
19   bill.
20        Q.  (BY MR. GEAR)  So as I understand your testimony,
21   you were not involved in drafting any of the photo ID
22   bills?
23        A.  Right.
24        Q.  And is it also your testimony that no one in the
25   governor's office was involved in the drafting of any of

103

1    the photo ID bills?
2            MR. MCKENZIE:  Again, I'm going to object to
3    the extent that their participation was not public and it
4    concerns stuff that they might be done in their
5    deliberative process about photo ID.
6        A.  I don't know for certain if anybody.  I would be
7    highly doubtful that anybody did.
8        Q.  (BY MR. GEAR)  And --
9        A.  And again, when I say "draft," I'm not referring
10   to, during the process, saying, "Hey, what do you think
11   about Subsection B?  Can we" -- you know, "What do you
12   think about Subsection A.  Can we move this?  Can we
13   lose" -- I think we're referring at this stage of our
14   questions to what I'm referring to as the filed version,
15   creating a bill.  We don't -- you know, very seldom have
16   much role in that that I'm aware of.
17        Q.  Now, would you -- do you recall seeing any of the
18   photo ID bills prior to the filed version?
19        A.  I don't remember specifically.  But between
20   sessions, we would certainly see the bill from last time.
21   Whether somebody would send us a version of a bill and
22   say, "This is what I'm thinking of filing this time," on
23   photo ID specifically, I don't recall.  That does happen,
24   but I don't recall if it happened on photo ID.
25        Q.  And so is the record is clear, do you recall any

104

1    communications regarding any of the photo ID bills prior
2    to the -- prior to reviewing or seeing the final
3    version --
4        A.  You mean --
5        Q.  -- filed version?
6        A.  -- the filed version?
7        Q.  Yes.
8        A.  I don't specifically recall them.  But as --
9    again, if there were -- if somebody had submitted
10   something and said, you know, "What do you think about
11   this bill," or "We're thinking of filing this," you know,
12   that is a fairly common occurrence.
13        Q.  Okay.
14        A.  Now, for the vast -- I had 400 bills last time.
15   I would say for at least 3- -- I had 400 and probably 20.
16   For at least 390 of them, the first time I saw anything
17   about them is when they got filed.
18        Q.  And would that be true for the various versions
19   of the photo ID legislation?
20        A.  It certainly was true for the first bill we
21   discussed, the 1706.  I don't think I ever saw anything
22   ahead of time on House Bill 218.  And I don't recall if I
23   saw anything on -- as we got later and later.  Because by
24   that time, the legislature had been working on these bills
25   for, you know, three sessions, and it's common to keep

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                        June 1, 2012

105

1    working on something in between sessions.  So I don't know
2    if I saw anything in particular or somebody saying, "We're
3    thinking about rolling it out this way."
4        Q.  Would that be the same testimony for SB 362?
5        A.  Yes.
6        Q.  Now, you also indicated that you don't like to
7    rely on other people's work when you review a -- or
8    summarize a piece of legislation.  Do you recall that
9    testimony?
10       A.  Yes.
11       Q.  What do you rely on when summarizing a piece of
12   legislation?
13             MR. MCKENZIE:  I'm going to object to the
14   extent you have like specific resources that you relied
15   upon in voter ID bills.  But you can speak generally as to
16   the types of resources that you look at as a general
17   matter.
18       Q.  (BY MR. GEAR)  And I want to be clear.  I'm
19   asking you generally when you are summarizing a bill.  And
20   we can step out of the realm of voter ID for a second.
21   I'm trying to understand exactly how you go about that
22   process.
23       A.  The first thing you do is read the bill.  And
24   that's a different process.  Some bills are one page and
25   some are 200, so it's different.  If you're reading a

106

1    one-page bill that, you know, amends one line of a
2    statute, it could take a couple of minutes.  You look at
3    what it says, you look up the statute, unless you already
4    know it, and you say, "This bill does this and would
5    change the current law to do X."  If something is longer,
6    it may be a more involved process.  But it involves
7    reading the bill myself and writing what I think is in it,
8    not what somebody in leg counsel thought it said or would
9    do or...
10       Q.  Is that it?
11       A.  Yes.
12       Q.  Okay.  And as far as the resources that you would
13   review, if it's a more lengthy bill -- if it's a lengthy
14   bill, is there a certain set of resources that you would
15   go to in reviewing that bill?
16       A.  It depends on the topic.  You know, some of --
17   most of my lengthiest bills involve gaming, and there's
18   nothing to -- there's no current law to compare it to.
19   It's just the bill itself being very, very lengthy, you
20   know, for whatever the author's purpose was in laying
21   everything out.  So you're really trying to figure out
22   what's in this bill and what does it do and how would it
23   work.
24       Q.  So specifically dealing with voter ID
25   legislation, is a particular resource that you would

107

1    review in summarizing the voter ID legislation?
2             MR. MCKENZIE:  Again, I'm going to object on
3    the deliberative process grounds to the extent it would
4    reveal your deliberations as a staff member of the
5    governor's office.
6        A.  I'll decline to answer on the advice of counsel.
7        Q.  (BY MR. GEAR)  Are there any public sources that
8    you would review regarding the summary of voter ID
9    legislation or that you reviewed?
10             MR. MCKENZIE:  The same objection.  Based on
11   what he elected to look at, be it public or private.  If
12   not publically known, I object on deliberative process
13   grounds that he not answer if it would reveal the
14   deliberations as a staff member of the governor's office.
15       Q.  (BY MR. GEAR)  And you're not answering that
16   question?
17       A.  On advice of counsel.
18       Q.  Now, after you complete the review of
19   legislation, you indicated that there was a limited number
20   of people that had access to that summary, correct?
21       A.  Yes.
22       Q.  And where, physically, do you -- what physically
23   do you do with the summary after you have completed your
24   summary?
25       A.  Physically, you hit a button on the computer that

108

1    sends it into the system.
2        Q.  So it's stored electronically?
3        A.  Yes.
4        Q.  And can you tell me where in the system the
5    summary would be stored?
6        A.  I honestly don't know anything about that kind of
7    thing.
8        Q.  Is there a particular file -- electronic file
9    that your summaries are stored on?
10       A.  I don't know.
11       Q.  So when you complete your summary, you just hit a
12   button and you don't know where that goes?
13       A.  Yes.  I mean, I'm -- I don't know very much about
14   computers.  It's -- you open a formatted program, I guess,
15   on the computer that has the different questions and the
16   different things you're to look for in the different
17   analysis and you fill it out.  And once you are -- once
18   you're done writing -- sometimes it's maybe a multi-day
19   process on some bills; others it take five minutes.
20             But when you are done and ready to submit it, you
21   hit a button to submit it.  At that point, it's in the
22   system and, I believe, becomes accessible to whoever is
23   entitled to view it.
24       Q.  So there's a format you follow when, I guess,
25   preparing your summaries to store electronically.  Did I

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                    June 1, 2012

109

1  understand your testimony?
2      A.  There's a format in the software to make sure
3  that we have all the different bases covered and also to
4  make it -- so that the 7,000 bills -- whoever is looking
5  at it isn't looking at all different styles and all
6  different forms.  You know, they know where to look in
7  each bill for whatever they're looking for.
8      Q.  Okay.  So dealing specifically with the voter ID
9  legislation, can you tell me who specifically had access
10  to your summary?
11     A.  Again, I'm not really sure exactly who has access
12  to them.
13     Q.  What entity, what division had access to your
14  summary?
15     A.  I know that my direct boss, the director of
16  budget planning and policy, would have access to them,
17  whether they actually look at them, because there's 7,000
18  of them.  And I know that the legislative staff does, and
19  I'm not sure who else.
20     Q.  And that's the legislative staff for both the
21  House and the Senate?
22     A.  The governor has one staff that works both.  He
23  has a director and then a person for the House and a
24  person for the Senate.
25     Q.  Is there any type of report or analysis that's

110

1  prepared for legislators?
2      A.  No, not that I'm aware of.  I certainly didn't.
3      Q.  Have you ever seen the -- or reviewed the
4  Crawford decision?
5          MR. MCKENZIE:  I'm going to object to the
6  extent you reviewed it as part of your deliberations for
7  the governor.  To the extent you reviewed it independent
8  of your service with the governor, you may answer the
9  question.
10     A.  I read it when it first came out.
11     Q.  (BY MR. GEAR)  Do you have an opinion regarding
12  the Crawford decision?
13         MR. MCKENZIE:  And it's the same objection
14  to the extent the opinion was developed in the course of
15  your service as a staff member of the governor's office.
16  To the extent you had an opinion you developed independent
17  of that, you may answer.
18     A.  I was working for the governor at the time that
19  I -- that I -- anytime that I would have made any use of
20  it.  So I -- I guess I have to decline to answer on the
21  advice of counsel.
22     Q.  (BY MR. GEAR)  Do you believe the Crawford
23  decision has an impact on the State of Texas' crafting of
24  photo identification laws?
25         MR. MCKENZIE:  Again to the extent that

111

1  belief was developed during the course of your service as
2  the governor's staff, I would encourage you not to answer.
3  To the extent you have an opinion outside of that service,
4  you're free to answer.
5      A.  I have to decline to answer on the advice of
6  counsel.
7      Q.  (BY MR. GEAR)  Do you believe that the Crawford
8  decision had an impact on the State of Texas' requirements
9  to obtain preclearance of the photo identification
10  legislation?
11     A.  I'm not sure I understand.
12     Q.  Let me ask the question again.
13         Do you believe that the Crawford decision had an
14  impact on the State of Texas' requirements to obtain
15  preclearance, Section 5 preclearance, of its photo
16  identification legislation?
17     A.  I must not remember the decision well enough,
18  because I don't remember anything about that.  I thought
19  our preclearance came from Section 5.
20     Q.  Do you remember anything about the Crawford
21  decision?
22     A.  I remember some things; I don't remember that.
23     Q.  Did you apply any portion of the Crawford
24  decision in your summary of the photo ID legislation?
25         MR. MCKENZIE:  Same deliberative process;

112

1  objection.  To the extent you -- it reflects deliberations
2  that you had while a staff member at the governor's
3  office, I will ask you not to answer.
4      A.  I'll decline to answer on the advice of counsel.
5      Q.  (BY MR. GEAR)  Did you review the Indiana law
6  regarding its photo identification provisions?
7          MR. MCKENZIE:  Same objections.
8      A.  I'll decline to answer on the advice of counsel.
9      Q.  (BY MR. GEAR)  Have you ever reviewed the Indiana
10  law regarding its photo identification provisions?
11         MR. MCKENZIE:  Same objection to the extent
12  that it reveals your analysis prior to the governor's
13  final decision on the bill.  To the extent you have an
14  opinion separate from that service, you may answer.
15     A.  I'll decline to answer on the advice of counsel.
16     Q.  (BY MR. GEAR)  Are you aware of the provisions of
17  the Indiana photo identification legislation?
18         MR. MCKENZIE:  Same objection to the extent
19  you gathered that awareness as part of your research as a
20  governor's staffer.  To the extent you have independent
21  knowledge, you may answer the question.
22         MR. GEAR:  Well, the fact that he's aware of
23  legislation, what privilege are you asserting?
24         MR. MCKENZIE:  Deliberative process.
25  Because it reveals his mental impressions and what he knew

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                                June 1, 2012

---

**113**

1  about other laws that may have influenced his final
2  analysis on SB 14.
3     Q.  (BY MR. GEAR)  Are you refusing to answer that
4  question based on the advice of your counsel?
5     A.  Yes, sir.
6     Q.  Are you aware of the Georgia voter ID legislation
7  or law?
8         MR. MCKENZIE:  Same objection.
9     Q.  (BY MR. GEAR)  Have you ever reviewed the Georgia
10  voter ID law?
11        MR. MCKENZIE:  Same objection.  If you did
12  it while the governor's staff, I will instruct you not to
13  answer.
14     A.  I'll decline to answer on the advice of counsel.
15     Q.  (BY MR. GEAR)  So in the process that you
16  described, you also said that you made recommendations
17  regarding -- regarding the summary of your bills; is that
18  correct?
19     A.  Yes.
20     Q.  And who the governor's office -- or who do you
21  make those recommendations to?
22     A.  Well, again you make it in your memo; and then,
23  you know, whoever can access it is entitled to access it.
24     Q.  (BY MR. GEAR)  And generally regarding your
25  recommendations, is there a process that you follow or is

---

**114**

1  there a requirement as to how you lay out that
2  recommendation?
3     A.  I'm not sure I understand that.
4     Q.  Generally, I'm just trying to figure out how you
5  lay out recommendations in a bill.  And I'm not referring
6  specifically to the photo ID legislation.  I'm just trying
7  to understand how you go from summarizing to making
8  recommendations.  What do you do in that process?
9     A.  In addition to summarizing the bill, you're
10  analyzing what the provisions mean and what they do.
11  You're answering the questions that regard policy that
12  apply to all bills which can apply to yours, as well.  And
13  then you are taking all of that and trying to fit it into
14  what the governor's philosophy is and whether he would be
15  in favor of that bill or not.
16     Now, you can be wrong.  I don't -- I can't say
17  that a hundred percent of the time I thought we'd be in
18  favor of something and it worked out that way or vice
19  versa.  But that's where you start.
20     Q.  So prior to completing your summary of SB 362,
21  were you aware of the governor's position on photo ID
22  legislation?
23     A.  362 was 2009?
24     Q.  Yes.
25     A.  I believe so, yes.  I believe that I already knew

---

**115**

1  where he stood on photo ID legislation before I read the
2  text of that bill.
3     Q.  And does that influence the summary that you
4  would complete --
5         (Multiple voices.)
6     A.  It would influence the recommendation.  You
7  already know how he feels about it.
8     Q.  (BY MR. GEAR)  Okay.
9     A.  Now, that could also change if how he feels about
10  something in particular -- if the bill doesn't comport
11  with that or, you know, if he likes something in general
12  but the way that this is written, he wouldn't like, or
13  whatever that might be.
14     Q.  And did you provide a recommendation to the
15  governor regarding SB 362?
16     A.  I'm sure I did.
17     Q.  And do you recall what that recommendation was?
18        MR. MCKENZIE:  I'm going to object on the
19  basis of deliberative process privilege.
20     A.  I'll decline to answer on the advice of counsel.
21     Q.  (BY MR. GEAR)  Do you know what the governor's
22  position was on SB 362?
23        MR. MCKENZIE:  Objection -- same objection.
24  You may answer to the extent it was public.  If it's
25  private and only known to governor staff, I'm going to

---

**116**

1  instruct you not to answer.
2     A.  I don't know if it was public, so I have to
3  decline to answer on the advice of counsel.
4     Q.  (BY MR. GEAR)  Did you have any communications
5  with the governor regarding your summary of SB 362?
6     A.  I don't think so.
7     Q.  Did you provide any advice regarding your
8  recommendation of 362 to the governor or anyone in the
9  governor's office?
10     A.  You mean other than the recommendation itself
11  being advice.
12     Q.  Oral advice.
13     A.  I don't recall.
14     Q.  So is it your position today, during this
15  deposition, that you did not consider the Indiana voter ID
16  law when drafting photo ID legislation for the State of
17  Texas?
18        MR. MCKENZIE:  It's the same deliberative
19  process objection.
20     A.  I decline to answer on the advice of counsel.
21     Q.  (BY MR. GEAR)  Did you consider Indiana law when
22  drafting your recommendation for the governor on Texas
23  photo ID legislation?
24        MR. MCKENZIE:  Same objection.
25     A.  I decline to answer on advice of counsel.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                      June 1, 2012

117

1    Q. (BY MR. GEAR)  And same question for Georgia law,
2    did you consider Georgia law when drafting your summary of
3    SB 362?
4            MR. MCKENZIE:  Same objection.
5    A. I decline to answer on the advice of counsel.
6    Q. (BY MR. GEAR)  Did you consider any other
7    existing laws out of state that pertain to photo ID when
8    completing your summary on SB 362?
9            MR. MCKENZIE:  I'm still going to make the
10   same objection.
11   A. I decline to answer on the advice of counsel.
12   Q. (BY MR. GEAR)  Did you compare SB 362 to the
13   previous photo ID legislation?
14           MR. MCKENZIE:  I'll make the same objection.
15   Q. (BY MR. GEAR)  And you're refusing to answer that
16   question?
17   A. Yes, sir.
18   Q. Who or what body typically drafts legislation
19   that the governor determines is a priority?
20   A. I'm sorry?
21   Q. Who or what body typically drafts legislation for
22   the governor's consideration where he would ultimately
23   determine that that would be a priority?
24   A. I'm not sure I understand the process the way you
25   do.  The legislators send their ideas to leg counsel, who

118

1    draft them for them, and then they file them.
2            And the governor, I guess, will -- I'm not quite
3    sure I understand the priority part.  But there is no
4    entity that drafts bills for the governor that I'm aware
5    of.
6    Q. And let me see if I can clarify that.
7            So it's the legislators that send their drafts or
8    bills to the legislative counsel, correct?
9    A. Yes.
10   Q. And that would also be true for voter ID bills or
11   voter ID legislation?
12   A. I would think so, yes.
13   Q. Do you know if any outside entity other than the
14   legislators were involved in the drafting of SB 362?
15   A. I don't know.
16   Q. Do you know if any outside entities other than
17   legislators were involved in the drafting of HB 1706?
18   A. I don't know.
19   Q. And the same question for HB 218?
20   A. I don't know.
21   Q. Have you ever heard of ALEC?
22   A. Yes.
23   Q. Do you know if ALEC was involved in recommending
24   language for SB 362?
25   A. I don't know.

119

1    Q. Did you have any communications with ALEC while
2    an employee of the governor's office?
3    A. No.
4    Q. Are you aware of any communications with ALEC
5    while you were an employee at the governor's office?
6    A. Am I aware of any communications between ALEC and
7    the governor's office?
8    Q. Yes.
9    A. No, I'm not.
10   Q. Did you have any substantive input regarding
11   SB 14?
12           MR. MCKENZIE:  And I'm going to object to
13   the extent that it reflects private intra-government
14   analysis.  To the extent it's public, you may answer.
15   A. I'll decline to answer on the advice of counsel.
16   Q. (BY MR. GEAR)  Were you involved in any
17   communications where the consideration of voter ID was
18   discussed as an emergency item?  Were you involved in any
19   communications where the consideration of voter ID
20   legislation was involved -- strike that.
21           Were you involved in any communications where the
22   consideration of voter ID legislation was considered as an
23   emergency item?
24   A. I don't believe so.
25   Q. Are you aware of whether or not SB 14 was

120

1    determined to be an emergency item?
2    A. Yes, it was.
3    Q. Do you know why SB 14 was determined to be an
4    emergency item?
5            MR. MCKENZIE:  Again, you may answer as to
6    matter of public record that you know or in a proclamation
7    or anything to that effect.  I would instruct you not to
8    answer to the extent it is not public and it is
9    intra-governor staff communications.
10   A. I'm not aware of -- of that.  And I don't recall
11   what the proclamation said, but I'm sure I saw it.
12   Q. (BY MR. GEAR)  Do you know who would be aware of
13   why SB 14 was determined to be an emergency item?
14   A. No, I don't recall being involved in the
15   emergency item discussions.  Three of the emergency items
16   were assigned to me during the session, and I don't
17   remember being involved in the discussion of making them
18   an emergency for any of them.
19   Q. And what three items did you consider as
20   emergency items?
21   A. Not that I considered, that I was assigned the
22   bills that might become emergency items.
23   Q. And what three items were you assigned that
24   became emergency items?
25   A. The voter ID bill, because I had the election law

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652


ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

121

1    bills; the loser pays tort reform bill, because I had
2    bills involving the judiciary; and the eminent domain
3    bill, because I had bills involving eminent domain.
4       Q.  So let me understand your testimony.  As you sit
5    here today, it's your testimony that you were not involved
6    in any communications with the governor or anyone in the
7    governor's office regarding the determination of making
8    SB 14 or the voter ID legislation an emergency item?
9       A.  It's my testimony that I don't remember being
10   involved in any discussions or communications.
11      Q.  Do you know who would assist the governor in
12   determining if voter ID is an emergency item?
13      A.  I do not.
14      Q.  Are you aware of any written communications in
15   the governor's office that would identify why SB 14 was
16   determined to be an emergency item?
17      A.  There would be a proclamation issued by the
18   governor.
19      Q.  Okay.  And who, if anyone, within the governor's
20   office would assist the governor in writing that
21   proclamation?
22      A.  Well, I'm not specifically certain who would
23   assist them in writing it.  And it may be different from
24   bill to bill.  I don't know.
25      Q.  Did you assist them in drafting the proclamation?

122

1       A.  I don't recall that.  There was -- sometimes they
2    would send me something that involved my area and said,
3    "We're thinking about writing this.  Is this correct?"  I
4    don't remember if I got to do that with respect to the
5    emergencies, because I don't -- I don't know that they're
6    that involved in writing.
7       Q.  So I want to take you back to the communications
8    regarding SB 14.  Do you recall any communications between
9    the governor and his staff regarding SB 14?
10      A.  Do I recall any discussions between the governor
11   and his staff?
12      Q.  That's correct.  Regarding SB 14.
13      A.  I don't recall meeting with the governor on the
14   bill, but I wouldn't be surprised if I did.  But I don't
15   recall meeting with him.
16      Q.  Do you recall meeting with anyone in the
17   lieutenant governor's office regarding SB 14?
18      A.  I'm virtually certain I didn't.
19      Q.  Do you recall meeting with any legislators
20   regarding SB 14?
21      A.  Yes.
22      Q.  What legislators or which legislators did you
23   meet with?
24      A.  The night before the bill was laid out in the
25   House, I went and saw Patricia Harless.  I don't remember

123

1    if she remembers the meeting.  It wasn't very long.  Just
2    sort of said, "Good luck tomorrow," and chatted with her
3    for a few minutes.
4       Q.  And what did you discuss?
5          MR. MCKENZIE:  We're probably going to have
6    a debate about this, but we have a pending motion as to
7    whether or not communications between legislators and the
8    governor's office about pending legislation are
9    privileged.  So until that gets resolved, I'm going to
10   assert the legislative privilege to protect Patricia
11   Harless's confidences.
12          MR. GEAR:  Are you saying that he has a
13   legislative privilege on it?
14          MR. MCKENZIE:  No.  Patricia Harless has a
15   legislative privilege, but he can't disclose it without
16   busting her confidentiality.
17      Q.  (BY MR. GEAR)  Can you tell me when that
18   conversation took place?
19      A.  I believe it was the night before the bill was to
20   be laid out.  It may not have -- do you have a copy of
21   this for Senate Bill 14?
22      Q.  I do.
23          (Exhibit 223 was marked.)
24      Q.  (BY MR. GEAR)  I'm showing you what's --
25          MR. GEAR:  And I'm sorry, Counsel, I only

124

1    have one copy of this.
2       Q.  (BY MR. GEAR)  But I'm showing you what's been
3    marked as Exhibit 223 in another deposition.
4          (Witness reviews document.)
5       A.  Looks like it was only considered one time.  It
6    didn't go back on a point of order.  If that's the case,
7    then it was in late March.  And I just wandered down to
8    her office to see Colby and say hi to Patricia Harless
9    and, you know, talk with her about her big day tomorrow.
10      Q.  (BY MR. GEAR)  And did you discuss SB 14?
11      A.  Yes.
12      Q.  And who, if anyone else, was present during that
13   discussion?
14      A.  I don't remember.
15      Q.  Well, you just mentioned her -- one of her staff,
16   correct?
17      A.  I went to see Colby.  I don't -- I don't remember
18   if he went in or not.  I just chatted with her for a few
19   minutes.
20      Q.  Did you provide Ms. Harless with any written
21   documents or communication during your discussion?
22      A.  No.
23      Q.  Do you recall any communications with the
24   Secretary of State's office in your capacity as a policy
25   analyst for the governor's office and tying it into SB 14?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                June 1, 2012

125

1    A. I don't recall. I spoke to them so often on all
2  manner of election bills, that I can't recall if I ever
3  spoke to them about SB 14.
4    Q. Do you recall if the Secretary of State's office
5  expressed any concerns regarding SB 14?
6    A. I don't remember.
7    Q. Do you recall if the Secretary of State's office
8  supported the provisions in SB 14?
9        MR. MCKENZIE: I'm going to object on
10 deliberative process grounds. We've also asserted as to
11 executive agencies that are communicating with the
12 governor's office, so I'm going to instruct the witness
13 not to answer.
14    A. In that case, I'll decline to answer on the
15 advice of counsel.
16    Q. (BY MR. GEAR) Do you recall if there were any
17 communications with constituents regarding SB 14?
18 Constituents of the governor.
19    A. In other words, Texans?
20    Q. Yes.
21    A. There was one group that came to see me regarding
22 their entire legislative agenda and everything they were
23 hoping to pass, and I presume that they talked about
24 Senate Bill 14. I do not recall specifically.
25    Q. And what was the name of the group that came?

126

1    A. They were the King Street Patriots.
2    Q. And that meeting was at the governor's office?
3    A. We had a few meetings. There was a meeting in my
4  office -- probably a couple of meetings in my office. And
5  I think I saw them one day down in the Capitol. My office
6  is not in the Capitol.
7    Q. So let's just start with the first meeting that
8  you recall. Can you tell me when that meeting took place?
9    A. It was likely before session started. Because if
10 I recall correctly, they were coming around with a long
11 list of bills they were hoping that legislators would sign
12 off on. And they would get somebody to introduce --
13    Q. When you say "they" -- you've identified the King
14 String Patriots, but can you tell me who "they" are?
15    A. The leader is a lady named Catherine Engelbrecht.
16 And I think she had other people with her -- one or two
17 other people, but I don't remember that.
18    Q. So from your memory, there were three, maybe
19 more, individuals from the King Street Patriots involved
20 in this first meeting?
21    A. Probably not -- my office isn't that big. So it
22 was possibly two people or maybe three at the most.
23    Q. And as you sit here today, do you remember the
24 names of the other two individuals that were --
25    A. I don't even know for a fact that there were.

127

1    Q. Okay.
2    A. But, no, I don't remember any names.
3    Q. Who, if anyone, was present other than you from
4  your office?
5    A. Probably nobody.
6    Q. What was the subject matter of the communications
7  with the King Street Patriots?
8    A. As I said, they had a list of topics. They
9  weren't bills, because they hadn't drafted any bills. But
10 they had a list of topics that they were hoping someone
11 would support, and they were going to go down and meet
12 with legislators. And they stopped by to show us their --
13 you know, that they were going to do this and hope that we
14 would enjoy their bills.
15    Q. Did one of the list of topics include the photo
16 ID legislation?
17    A. I don't remember. It was a long list. I think
18 it was probably their first time at the Capitol, and they
19 came with a very long list of things.
20    Q. You indicated this as a group that met with you
21 regarding SB 14. Did I misunderstand your testimony?
22    A. Well, I don't remember if they -- they probably
23 did, because all of their bills were election law bills.
24 So they -- I don't remember specifically talking with them
25 about SB 14.

128

1    Q. What other election law bills did they discuss
2  with you?
3    A. They had -- there were numerous bills about
4  registration and about conduct of elections and -- I don't
5  remember the specifics. It was several pages, single
6  spaced, of individual ideas they had.
7    Q. And when -- in response to the deposition notice
8  and the request for documents, did you produce any
9  communications between yourself and the King Street
10 Patriots?
11    A. No, I do not have anything.
12    Q. Did they provide you any written communication
13 during their meeting, the first meeting that you
14 discussed?
15    A. I don't recall. They had a list. I remember,
16 because it was pages long. I don't remember if they gave
17 me a copy.
18    Q. And you discussed the second meeting. Was that
19 also in your office?
20    A. I think -- I think I remember Ms. Engelbrecht
21 coming back after bills had been filed and there were
22 actual bill numbers on bills. So I think she had a very
23 similar list -- may not have been -- they may just have
24 been similar format. But she had another list of bills
25 with actual numbers on them and sponsors and authors.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

129

1    Q.  Was SB 14 specifically discussed during that
2  meeting?
3    A.  I don't remember.
4    Q.  Do you recall who was with Ms. Engelbrecht?
5    A.  No.
6    Q.  Do you recall if there was anyone else present
7  from the governor's office during this meeting?
8    A.  I doubt that there was.
9    Q.  Do you know how long this meeting took place?
10   A.  Oh, probably 20 minutes, half an hour.  That's
11  usually the length of most of my meetings.
12   Q.  What, if any, promises were made to
13  Ms. Engelbrecht and the King Street Patriots regarding
14  photo ID legislation?
15   A.  I don't remember much of what was said, but I can
16  tell you I didn't promise anybody anything.  From where I
17  am, I'm in no position to promise anybody that they're
18  going to pass or not pass or anything a bill.
19   Q.  Did you relay the information from these two
20  meetings to the governor?
21   A.  No.
22        MR. MCKENZIE:  I was going to object on the
23  basis of deliberative process privilege.
24   Q.  (BY MR. GEAR)  Did you consider the information
25  provided by the King Street Patriots when completing a

130

1  summary of SB 14?
2        MR. MCKENZIE:  Same objection.  To the
3  extent that it reflects your private deliberations that
4  are not public, I would instruct you not to answer.
5    A.  I'll decline to answer on the advice of counsel.
6    Q.  (BY MR. GEAR)  Do you recall any other groups
7  that you met with -- actually, strike that.
8        I believe you indicated that there may have been
9  more than just two meetings with the King Street Patriots?
10   A.  Yes.  I think I walked in on a meeting they were
11  having in the Capitol with a legislator.
12   Q.  And what legislator were they having a meeting
13  with?
14   A.  Representative Aliseda.
15   Q.  Was that Ms. Engelbrecht?
16   A.  Yes.
17   Q.  Can you tell me who else was present during that
18  meeting?
19   A.  No.  But there were several people there.
20   Q.  Several people.  Can you given me a number?
21   A.  Probably half a dozen.  I remember, because it
22  crowded his small office.
23   Q.  Were there any other legislators?
24   A.  I don't think so.
25   Q.  Was anyone from your office present during that

131

1  meeting?
2    A.  No.  I just happened by.  I just wanted to say hi
3  to Representative Aliseda.
4    Q.  Did you attend the meeting?
5    A.  For a few minutes.
6    Q.  Do you recall the subject matter of the meeting
7  with the King Street Patriots and Mr. Aliseda?
8    A.  While I was there, they were talking about an
9  English-only language.
10   Q.  As it relates to?
11   A.  I'm not sure, because I didn't participate in the
12  whole thing.  But I think that there was some talk of
13  carrying a bill regarding English only.  I don't know what
14  that really -- whether it was in schools or whether it was
15  in -- I don't -- public documents.  I don't remember.
16   Q.  Do you recall the topic of discussion in the
17  first two meetings that you had addressed the issue of
18  English only?
19   A.  I don't know if that was one of the bills.  It
20  probably was, but I don't know.
21   Q.  Do you have an opinion as to whether or not SB 14
22  should be in English only language?
23   A.  I don't understand the question.
24   Q.  And it wasn't a very good question.
25        Do you have an opinion as to whether or not the

132

1  provisions of SB 14, when implemented, should be in
2  English only?  And let me continue to try to clarify that
3  for you.
4        The election material that pertains to the
5  requirements of SB 14, do you believe that that should be
6  in English only?
7    A.  That never even occurred to me.  Federal law
8  requires -- Texas statewide has to provide English and
9  Spanish.  And we provide Vietnamese ballots in certain
10  areas.  And I think starting this election, Korean, in, I
11  guess, Harris County.
12   Q.  Do you know if the governor has taken a position
13  on English only as it applies to SB 14?
14   A.  I don't think it's ever come up.
15   Q.  Do you know what Mr. Aliseda did in reference to
16  the discussions with the King Street Patriots?
17   A.  No.  No.
18   Q.  You testified earlier that you were involved --
19  that you actually attended some of the legislative debates
20  regarding photo ID; is that correct?
21   A.  No.  What I testified was that the only time I
22  ever attended a floor debate was for House Bill 4, the
23  tort reform bill in 2003.  Other than that, I've never
24  been on the floor -- well, this session, I was on the
25  floor of the Senate for an eminent domain bill.  But I've



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                            June 1, 2012

133

1   never been on the floor for any debate regarding voter ID.
2       Q.  Were you aware that SB 14 was a controversial
3   legislation?
4           MR. MCKENZIE:  I'm going to object to the
5   extent that your awareness was gathered as part of your
6   deliberations as a governor's office official.  To the
7   extent you have an independent basis for your belief, you
8   may answer that question.
9       Q.  (BY MR. GEAR)  Well, based on what's available in
10  the public record, were you aware that SB 14 was
11  controversial?
12      A.  I know there were opponents.
13      Q.  Opponents who expressed concerns about SB 14?
14      A.  Yes.  But I'm also aware that there was a poll
15  that said 70 percent of Texans favored it, so I don't
16  consider that controversial.
17      Q.  So you did not consider SB 14 controversial
18  legislation?
19      A.  Again, that's -- you can decide what you mean by
20  "controversial."  I think there were opponents of the
21  bill, and they made their opposition known.
22      Q.  Well -- and I'm not here to testify.  So what do
23  you believe I mean when I say the term "controversial"?
24      A.  That's really open to interpretation.
25      Q.  Well, what is your interpretation of it?

134

1       A.  I would think that if there was a big split in
2   the public on something, it's controversial.
3       Q.  And you don't believe that there was a split in
4   the public when considering SB 14?
5       A.  I think the political class was very split on it.
6   I think the public seemed to overwhelmingly support it.
7       Q.  And when you say "the political class," what do
8   you mean by that?
9       A.  People who are involved in legislation and
10  politics.
11      Q.  And when you say "political class," are you
12  referring to Democrats and Republicans?
13      A.  Just in general.
14      Q.  Okay.  And how was the political class split when
15  considering SB 14?
16      A.  In the legislature, it was split on partisan
17  lines mostly.
18      Q.  Do you know how Democrats voted on SB 14,
19  generally?
20      A.  Only in the House.
21      Q.  Do you remember what that was?
22      A.  I remember that Representative Pickett voted
23  "yes," and he was the only Democrat who did.
24      Q.  Do you recall any of the concerns expressed by
25  opponents to SB 14?

135

1       A.  Do I recall concerns expressed by opponents?
2       Q.  That's correct.  Any concerns expressed by
3   opponents?
4       A.  Yes.
5       Q.  And what concerns do you recall?
6       A.  I recall opponents saying that they thought
7   elderly or poor voters wouldn't have photo IDs.
8       Q.  In your consideration or summary of SB 14, did
9   you attempt to determine whether or not SB 14 would have a
10  disproportionate impact on elderly or poor voters?
11          MR. MCKENZIE:  I'm going to object on
12  deliberative process grounds.
13      A.  I'll decline to answer on the advice of counsel.
14      Q.  (BY MR. GEAR)  Are you aware of any studies or
15  analysis that would support the position that SB 14 would
16  have a disproportionate impact on elderly or poor voters?
17          MR. MCKENZIE:  And again, to the extent you
18  gathered those analyses or reports in furtherance of your
19  duties as a governor employee, I would instruct you not to
20  answer that question.
21      A.  I don't recall any.
22      Q.  (BY MR. GEAR)  Are you aware of any independent
23  studies regarding the effect of SB 14 on poor or elderly
24  voters?
25          MR. MCKENZIE:  Same objection.

136

1       A.  I don't recall any.
2       Q.  (BY MR. GEAR)  Are you aware that in the state of
3   Texas, minorities are disproportionately poor to the rest
4   of the population?
5           MR. MCKENZIE:  And it's the same objection.
6       Q.  (BY MR. GEAR)  And I'm asking you, generally are
7   you aware that in the state of Texas, that minorities are
8   the population that are disproportionately poor to other
9   Texans?
10      A.  I think that's a very broad statement, and I
11  don't have statistics on the economics.
12      Q.  (BY MR. GEAR)  Did you look at any statistics on
13  the economics of -- that would break down the poverty
14  lines of elderly or the poor?
15          MR. MCKENZIE:  I'm going to object to the
16  extent that you did that as part of your deliberations as
17  a governor employee.  To the extent you just have that
18  knowledge outside of that experience, you may answer the
19  question.
20      A.  I'll decline to answer on the advice of counsel.
21      Q.  (BY MR. GEAR)  Did you deplete a summary of
22  SB 14?
23      A.  Yes.
24      Q.  And did you follow the same process in hitting
25  the button and sending that summary to an electronic file?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                          June 1, 2012

137

1    A. Yes.
2    Q. And is it also accurate that only certain people
3    had access to your summary?
4    A. Yes.
5    Q. And can you tell me who had access to that
6    summary?
7    A. Again, my answer is the same as for the other
8    ones. I don't know exactly who did.
9    Q. Can you tell me the departments or divisions that
10   had access to it?
11   A. The ones that I know are the division director of
12   BPP, where I worked, and the legislative staff.
13   Q. So regarding SB 14, did you conduct any analysis
14   regarding the impact of SB 14 on minority voters?
15       MR. MCKENZIE: And again, I'm beginning to
16   object on deliberative process grounds.
17   A. I'll decline to answer on the advice of counsel.
18   Q. (BY MR. GEAR) Are you aware of any independent
19   study regarding voter ID legislation and the impact on
20   minority voters? And I'm saying any independent study.
21       MR. MCKENZIE: I understand. But to the
22   extent that it's part of the public domain and you pulled
23   it from that domain and used it as part of your analysis
24   in recommending or not recommending a bill to the
25   governor, I would suggest or I would instruct you not to

138

1    answer the question.
2    Q. (BY MR. GEAR) And I want to be clear before you
3    assert any privilege on this. I'm asking you, generally
4    are you, as you sit here today, aware of any analysis
5    regarding the impact of voter ID legislation on
6    minorities?
7        MR. MCKENZIE: Right. So there might be
8    some analyses after the fact -- after your work in the
9    governor's office. But if it's during, I would say don't
10   answer the question.
11   A. I don't tend to read analyses like that for, you
12   know, personal reading. Anything that I would do in that
13   regard would have been in my duties at the governor's
14   office. So in that respect, I would have to decline to
15   answer. But I don't know what studies you're referring
16   to. I don't recall any.
17   Q. (BY MR. GEAR) Well, and that's what I'm trying
18   to find out, did you review any studies. I'm not trying
19   to testify for you.
20   A. I don't recall any.
21   Q. Okay.
22   A. I don't know.
23   Q. Are you aware of any studies on the public record
24   that show that there is an impact to minority voters
25   regarding SB 14?

139

1        MR. MCKENZIE: And same objection. To the
2    extent you pulled them from the public record and relied
3    upon them for analysis that you ultimately presented to
4    the governor or his staff, I would instruct you not to
5    answer.
6        MR. GEAR: Again, I think that's a "yes" or
7    "no" answer, if he's aware of any studies on the public
8    record that address the impact of voter ID legislation on
9    minority voters.
10       MR. MCKENZIE: No, I understand. And I
11   understand you have to make your record. But I still am
12   going to assert the objection, because his awareness
13   reflects his knowledge; and if he acquired that knowledge
14   as part of his deliberations for the governor's office,
15   then I think it would reflect the internal thought
16   processes of the governor's staff. And so I object on
17   that basis.
18       But to the extent you have knowledge outside
19   of your service as a governor employee, then you may
20   answer his question.
21   A. I don't have any knowledge of studies.
22   Q. (BY MR. GEAR) As you sit here today, are you
23   aware of any studies that considered the burden on
24   minority voters regarding voter ID legislation?
25       MR. MCKENZIE: And it's the same objection.

140

1    A. I don't have any personal awareness of studies.
2    Q. (BY MR. GEAR) Is there a public record, an
3    analysis, a report that would show that the -- there was a
4    consideration of the burden regarding voter ID legislation
5    on minority voters?
6    A. I don't know.
7    Q. And you didn't review anything in the public
8    record; is that correct?
9        MR. MCKENZIE: Objection on deliberative
10   process grounds.
11   A. I'm still not sure what you mean by "public
12   record." We've been using this phrase since this morning,
13   and I don't know what you mean by that.
14   Q. (BY MR. GEAR) Well, my understanding is that
15   the -- as the case currently exists, the State of Texas --
16       MR. GEAR: And you can correct me if I'm
17   wrong.
18   Q. (BY MR. GEAR) -- has been allowing deponents to
19   testify to the public report. You prepared for the
20   deposition with your counsel. I don't know what your
21   counsel told you about what the public record consists of.
22   I'm trying to understand what your testimony is and what
23   you know. You're asserting a deliberative process
24   privilege over the public record, so maybe we need to
25   clarify right now what -- how are you interpreting the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

141

1  term "public record"?
2      A.  I literally -- I don't know what you mean when
3  you ask that.  I don't know if you mean studies by the
4  government or -- I don't -- what's a -- I don't know what
5  "public record" is.  I mean, a record of a case I know is
6  the file.  I don't know what you mean by "the public
7  record" in general.  I mean, I'm not trying to be
8  obstreperous --
9      Q.  There was --
10     A.  -- I really don't know.
11     Q.  There was public debate on this, correct?
12     A.  Yes.
13     Q.  There was recorded and public hearings during the
14  debate in the House and the Senate on SB 14, correct?
15     A.  Yes.
16     Q.  There were exhibits that were offered during the
17  public debate on SB 14 in both the House and the Senate.
18  Are you aware of that?
19     A.  I presume there were exhibits in both Houses.
20     Q.  There was testimony by the Secretary of State's
21  office during the consideration of SB 14.  Are you aware
22  of that?
23     A.  Yes.
24     Q.  And there was testimony by various citizens of
25  State of Texas regarding SB 14.  Are you aware of that?

142

1      A.  Yes.
2      Q.  And are you aware of testimony by the Texas
3  Attorney General's Office recording SB 14?
4      A.  Actually, I don't remember that.
5      Q.  So when I reference the "public record," I'm
6  referencing testimony, documents or communications that
7  were distributed during the public debates on SB 14.  Do
8  you understand that?
9      A.  Yes.  Now, when you asked about the studies in
10  the public record, are you saying studies that were
11  attached as exhibits to debate in the legislature?
12     Q.  Studies that were used -- attached to debates,
13  used as consideration for the passage of SB 14.  Does that
14  make sense?
15         MR. MCKENZIE:  For the State of Texas's
16  position on public record, we're allowing witnesses to
17  testify about things that they said or things that might
18  have appeared in the public record that they talked about,
19  and to explain precisely what they meant when they said
20  that stuff on the public record.  When it's stuff in the
21  public record that people may have looked at and privately
22  held in their files as a basis to offer advice, we're sill
23  asserting the objection.
24         But to the extent that you know that
25  information, you never relied on it and it's just out

143

1  there and you didn't rely on it as part of your
2  deliberations, then I would say answer the question.  Or
3  if you don't know the answer to the question, then answer
4  that.  But to the extent you know and it was something
5  that you may have pulled from the public sphere and it's
6  not publically available, what exactly you used, then I
7  would instruct you not to answer.
8      Q.  (BY MR. GEAR)  Your counsel used the term
9  "appeared in the public record," so I will stay with that
10  terminology when I'm asking you about the public record.
11     A.  Okay.
12     Q.  Do you understand?
13         So I'm asking you, are you aware of any
14  communications that appeared in the public record that
15  would show that SB 14 has a disproportionate impact on
16  minority voters?
17         MR. MCKENZIE:  Same objection to the extent
18  you've got it as part of your analyses.  But if not, then
19  go ahead and answer.
20     A.  I'm aware that there were arguments that there
21  was a disproportionate impact.  I'm not aware of any
22  or documentation or any of that.  I don't recall any of
23  that.
24     Q.  (BY MR. GEAR)  And you did not summarize or
25  analyze that issue; is that correct?

144

1         MR. MCKENZIE:  Same objection, deliberative
2  process objection.
3      A.  I would have to decline to answer on the advice
4  of counsel.
5      Q.  (BY MR. GEAR)  Are you aware of any
6  communications that appear in the public record that would
7  support that SB 14 imposed a burden on minority voters?
8         MR. MCKENZIE:  And same objection.  To the
9  extent that there are communications you relied on in your
10  analysis and is not known that you relied on those, please
11  don't answer.  To the extent that you know about them and
12  they were of no factor in your analysis, you're free to
13  answer.
14     Q.  (BY MR. GEAR)  And again, that appear in the
15  public record, as your counsel has now stated.
16     A.  I recall that there was argument.  I don't recall
17  the specifics of what -- what folks used to bolster their
18  argument.
19     Q.  And what was the argument regarding the burden of
20  SB 14 by opponents?  Do you recall that?
21     A.  I recall the argument that minorities or poor
22  voters wouldn't have as much -- wouldn't be as likely to
23  have a photo ID.  I don't remember if there was any
24  evidence to bolster that.  And I remember talk about one
25  district where the representative thought they'd have to

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



Michael Schofield                                                    June 1, 2012

                                                                              145
1   drive a long way to get -- but I don't remember any -- you
2   know, any specifics about that.
3        Q.  During the analysis or the summary of SB 14, did
4   you consider the burden to minority voters?
5        MR. MCKENZIE:  Again, I'm going to object on
6   deliberative process grounds as to what your
7   considerations were in your analysis.
8        A.  I'm going to decline to answer on the advice of
9   counsel.
10       Q.  (BY MR. GEAR)  Are you aware of any communication
11  in the public record that would show that SB 14 does not
12  have a disproportionate impact on minority voters?
13       MR. MCKENZIE:  Same objection to the extent
14  you relied on it in your analysis and is not publically
15  known as to what you factored in your analysis --
16       Q.  (BY MR. GEAR)  And again --
17       MR. MCKENZIE:  -- and on the public record.
18       Q.  (BY MR. GEAR)  And again, I'm not asking you to
19  speak about the public record.
20       MR. MCKENZIE:  Same objection.
21       A.  I'm sorry.  Could you repeat the question?
22       MR. GEAR:  Could you read it back, please.
23       (The requested material was read.)
24       A.  I don't recall the evidence that either side used
25  to bolster its case in terms of what study they may have

                                                                              146
1   used or whatever other exhibits they would have put into
2   the record.
3        Q.  (BY MR. GEAR)  Do you recall any evidence
4   whatsoever in -- that appeared in the public record that
5   would support that SB 14 does not impose a burden upon
6   minority voters?
7        A.  I don't recall.
8        MR. MCKENZIE:  Same objection.
9        Q.  (BY MR. GEAR)  Are you aware of any communication
10  in the public record that would support that voter fraud
11  is a widespread problem in the state of Texas?
12       MR. MCKENZIE:  Again to the extent you
13  pulled stuff from the public record and privately
14  collected it as a basis for your opinion, I would
15  encourage you not to answer it.  To the extent you have
16  public information that you did not rely on in any
17  analysis for the governor's office, you may answer the
18  question.
19       A.  And again, it's basically the same.  I remember
20  argument being made by both sides about that issue.  I
21  don't remember what studies they proffered or other
22  exhibits that they attached or anything like that.
23       Q.  (BY MR. GEAR)  Did the governor's office, you or
24  anyone in the governor's office, including the governor,
25  consider issues of voter fraud when summarizing or

                                                                              147
1   considering SB 14?
2        MR. MCKENZIE:  Objection.  To the extent
3   it's not public, you may answer.  To the extent there's a
4   public statement by the governor that you're aware of
5   about voter fraud, but to the extent that it's a private
6   intra-governor staff communication, I would instruct you
7   not to answer.
8        A.  I decline to answer on advice of counsel.
9        Q.  (BY MR. GEAR)  Are you familiar with what the
10  term "voter fraud" means in the state of Texas?
11       A.  It would be good if we put a definition on it.
12  You know, there are, I guess, multiple things that can all
13  go under that heading.
14       Q.  Sure.  And can you tell me what voter fraud is as
15  defined in the State of Texas election code?
16       A.  In the code?  I do not recall the exact wording
17  in the election code.
18       Q.  Do you recall it being defined anywhere in Texas
19  law?
20       A.  I do not recall the definition of "voter fraud"
21  in Texas law.
22       Q.  Just generally, what do you understand "voter
23  fraud" to mean when referring it to elections in the State
24  of Texas?
25       A.  I refer to it as intentionally either voting when

                                                                              148
1   someone isn't entitled to or voting for someone who's
2   dead, or voting multiple times, or voting in any way that
3   you know is illegal or erasing votes or changing totals,
4   or anything that skews the results from what the actual
5   voters that are entitled to vote, voted on election day
6   and, in our case, in Texas, the days leading up to
7   election day when we allow voting.
8        Q.  Does your definition include voter impersonation?
9        A.  "Voter impersonation" is also a phrase that's
10  been -- just sort of popped up.  And I think different
11  people mean different things when they say it.  Some
12  people mean something very narrow, where they mean just
13  pretending to be Mike Schofield and going to vote.  Other
14  folks would include that to mean voting for somebody other
15  yourself, whether it's a made-up person that you submitted
16  a phony application for or somebody you know who is dead
17  or somebody you know isn't voting.  It depends on what you
18  mean when you're saying "voter impersonation."
19       Q.  Well, what do you mean when you --
20       A.  I mean all those things.  To me, voter
21  impersonation -- although during the debate, we kept
22  hearing people refer to "voter impersonation" and they
23  seemed to only mean me pretending to be you, as opposed
24  to, you know, me filing a bunch of applications for people
25  that don't exist and then voting them all.  They didn't



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

149

1    seem to mean that when they say "voter impersonation."
2    But I'm not sure everything meant the same thing when they
3    used the phrase.
4         Q.  (BY MR. GEAR)  Did you consider voter fraud
5    during your summary of SB 14?
6              MR. MCKENZIE:  Same deliberative process
7    objection.
8         A.  I'll decline to answer on advice of counsel.
9         Q.  (BY MR. GEAR)  Did you consider voter
10   impersonation during your summary of SB 14?
11             MR. MCKENZIE:  Same deliberative process
12   objection.
13        A.  I'll decline to answer on the advice of counsel.
14        Q.  (BY MR. GEAR)  Do you know what the purpose of
15   SB 14 is?
16             MR. MCKENZIE:  You may answer as to general
17   purpose.  Please do not reveal any governor-specific
18   purpose.
19        A.  And I don't know what Senator Frasier's purpose
20   was in filing the bill.
21        Q.  (BY MR. GEAR)  Does SB 14 address the issue of
22   voter fraud?
23        A.  I would say it does, in that it requires a voter
24   to demonstrate the -- their identity.  So we know that the
25   person who is claiming to vote as John Smith is John

150

1    Smith.
2         Q.  So does it address the issue of voter
3    impersonation?
4         A.  It does probably in all the broad senses that
5    I've talked about.
6         Q.  Other than voter impersonation -- again I want to
7    be clear on how you're defining "voter impersonation," so
8    if you wouldn't mind explaining that to me again.
9         A.  As I understand the bill, the voter impersonation
10   that is dealt with there is showing up at the polls either
11   in early voting or on election day and voting as someone
12   that you're not, whether it's a real person that you're
13   voting as or whether it's a person who doesn't exist that
14   you've registered to vote or whether it's somebody who's
15   dead or in any way.  It would be more difficult to do that
16   if you had to show a photo ID because you're less likely
17   to have a photo ID for that person than you are for
18   yourself.
19        Q.  And other than voter impersonation as you just
20   defined it here, does SB 14 address any of the other
21   issues of voter fraud that you testified to?
22        A.  I think that is mostly what I testified to.
23        Q.  Well, by mail ballot voter fraud.  For instance,
24   does voter ID -- does SB 14 address the issue by mail
25   ballot voter fraud?

151

1         A.  To my knowledge, the bill wasn't addressed to
2    mail ballots.  It was addressed to voting in person and
3    polling places.
4         Q.  Did you consider the prevalence of voter
5    impersonation when summarizing SB 14?
6              MR. MCKENZIE:  Again, same deliberative
7    process objection.
8         A.  I'll decline to answer on the advice of counsel.
9         Q.  (BY MR. GEAR)  Can you identify, as you sit here
10   today, any cases of voter impersonation in the State of
11   Texas?
12             MR. MCKENZIE:  Again to the extent you
13   acquired that knowledge of what you may or may not be able
14   to identify in furtherance of your duties as a governor
15   employee, I instruct you not to answer.  To the extent
16   that you have knowledge independent of your service as a
17   governor employee, please answer the question.
18        A.  I don't have firsthand independent knowledge.
19        Q.  (BY MR. GEAR)  Of any cases of voter
20   impersonation in the State of Texas?
21        A.  Yes.  I don't spend much time inside the polling
22   places on election day.
23        Q.  When you say you don't have firsthand knowledge,
24   I'm asking you in your capacity as an employee of the
25   governor's office during the consideration of SB 14, did

152

1    you consider voter impersonation in your summary of SB 14?
2              MR. MCKENZIE:  And I'm going to object on
3    deliberative process grounds.
4         A.  I'll decline to answer on the advice of counsel.
5         Q.  (BY MR. GEAR)  Are you aware of any studies or
6    analysis on the public record that support that voter
7    impersonation is a problem in the State of Texas?
8              MR. MCKENZIE:  Same deliberative process
9    objection.
10        A.  I'll decline to answer on the advice of counsel.
11        Q.  (BY MR. GEAR)  And.  Again, I'm asking you are
12   there -- is there any public record as it's been
13   identified here that would identify that voter
14   impersonation is a problem, exists, in the State of Texas?
15             MR. MCKENZIE:  And again, it's the same
16   objection to the extent that you collected documents that
17   you would have to reveal in answering that question as
18   part of your service to the governor.  To the extent you
19   have knowledge outside of that about any analyses that are
20   in the public record or they didn't factor into your
21   analysis, then you can answer the question.
22        Q.  (BY MR. GEAR)  Before you answer that, again, I
23   want to make it clear that I'm asking is there a public
24   record you're aware of, a record that appears in the
25   public.  I'm not asking you about private communications.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                      June 1, 2012

153

1   I'm not asking you about private records.  I'm asking you
2   about what appears in the public.
3         Are you aware, whether you were employed by the
4   governor or not, is there any communication on the public
5   record that exists that supports that voter impersonation
6   is a problem in the State of Texas?
7         MR. MCKENZIE:  And the reason why I'm making
8   the objection is because the public record is very large.
9   Potentially, it could include news articles, it could
10  include statements on the floor, it could include
11  exhibits.  It's not at all clear to me from the testimony
12  or the witness today that he relied on all of it.  And so
13  to the extent there is a subset of that that he would have
14  to reveal, I think that it would reflect his internal
15  mental impressions and some the advice that he may have
16  given to the governor.  So on that basis, I object on
17  deliberative process grounds.
18        To the extent that my assumptions are
19  incorrect and that it wasn't part of your services to the
20  governor or that you are aware of the entire universe of
21  public record, you may answer the question.  But based on
22  my understanding of what you probably understood, I'm
23  asserting the deliberative process on your behalf as I've
24  been instructed by you and your office.
25        THE WITNESS:  I don't usually ask for a

154

1   break while a question is pending, but I think -- I think
2   it make be helpful to clear this up so I can figure out
3   what it is that's -- so I can answer without waiving a
4   privilege, if I can -- if I can discuss this with counsel
5   for about half a minute.  If you don't want me to while a
6   question's pending, I understand.
7         MR. GEAR:  I think in this situation, I'd
8   like you to answer that question.
9         THE WITNESS:  Okay.
10        Q.  (BY MR. GEAR)  Are you aware of the existence of
11  any public record that supports that voter impersonation
12  is a problem in the State of Texas?
13        A.  And, again --
14        MR. MCKENZIE:  Same objection, but go ahead
15  and say what you were going to say.
16        A.  I don't know what you mean by "a problem."  I've
17  seen articles and I've seen other things that indicate
18  that there have been problems.  There have been problems
19  with voter registration which, of course, leads to voting
20  the ill-gotten registrations, and I've seen other things.
21  As I sit here today, I don't remember what -- what
22  documents or what articles I've seen.  But, yes, I have
23  seen some and, yes, we were concerned about voter fraud in
24  the State of Texas.
25        Q.  (BY MR. GEAR)  And when you say "we," you mean

155

1   the governor's office?
2         A.  Yes.
3         Q.  And when you say you saw studies for analysis
4   about voter registration, do you recall what you saw?
5         MR. MCKENZIE:  Again, I'm going to object on
6   the deliberative process grounds to the extent you saw
7   that stuff in furtherance of your duties as a governor
8   employee.
9         A.  In that case, I'll decline to answer on the
10  advice of counsel.
11        Q.  (BY MR. GEAR)  Okay.  And, again, I want to make
12  sure that I'm limiting this to the public record.  Can you
13  tell me what communications, studies, analysis that you're
14  aware of that you actually reviewed that support that
15  voter ID is a problem.  And you were concerned about the
16  term "problem."  Problem that is documented, that it
17  exists, that there is actual documented knowledge of voter
18  impersonation.
19        MR. MCKENZIE:  And it's the same objection,
20  because the question asks what you reviewed.  And unless
21  you reviewed everything in the public record that had
22  anything to do with voter fraud, it may reveal a subset of
23  information that you relied upon as being more probative
24  or less probative of voter fraud and may have influenced
25  your decision as to what recommendation you were going to

156

1   make to the governor.
2         Q.  (BY MR. GEAR)  And let me clarify my question.
3         I'm not asking you if you reviewed everything in
4   the public record.  I'm asking you if you reviewed
5   anything that appeared in the public record.
6         MR. MCKENZIE:  You may answer a "yes" or
7   "no" question if you reviewed anything in the public
8   record.
9         A.  Yes.
10        Q.  (BY MR. GEAR)  And can you tell me what that was?
11        MR. MCKENZIE:  I'm going to object on
12  deliberative process grounds as to what you reviewed.
13        A.  As we sit here today, I can't remember the
14  specifics of different articles or anything like that.  I
15  just can't recall.
16        Q.  (BY MR. GEAR)  Now, you stated that the
17  governor's office was concerned about voter fraud.  What
18  is the basis of that concern?
19        MR. MCKENZIE:  Again, to the extent it
20  reveals internal intra-governor communications and
21  deliberations, I'm going to instruct you not to answer
22  that question.  To the extent it's a matter of public
23  record and the governor's talked about and you know that
24  he's talked about it, you may answer the question.
25        A.  I'm not sure what he talked publically, so I'll

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                           June 1, 2012

157

1   decline to answer on the advice of counsel.
2       Q.  (BY MR. GEAR)  I'm not sure I understood the
3   preface to your assertion.
4       A.  There was sort of two parts to what he was
5   saying, you know, other than what the governor has said
6   publically.  And to be honest with you, I don't know what
7   the governor said publically or don't recall.  And so with
8   respect to our intra-governor's office communications and
9   discussions, I would assert the privilege and decline to
10  answer on advice of counsel.
11      Q.  Did the governor's office, you or anyone in the
12  governor's office, generate any communication regarding
13  voter fraud in the State of Texas?
14          MR. MCKENZIE:  Again, I'm going to object on
15  deliberative process grounds unless that communication was
16  sent to the public in the form of a press release or
17  something to that effect.  To the extent it's
18  intra-governor office communications about voter fraud,
19  I'm going to instruct you not to answer that question.
20      A.  And I don't know what was -- I don't remember
21  what was publically issued from the governor's office
22  regarding voter fraud.
23      Q.  (BY MR. GEAR)  Did the governor's office meet
24  with the Texas Attorney General regarding voter fraud?
25          MR. MCKENZIE:  I'm going to object on

158

1   attorney-client privilege grounds and on deliberative
2   process privilege grounds to the extent that you had
3   communications with the Attorney General's Office that
4   were legal in character about voter ID -- or voter fraud,
5   I should say.  Voter ID is a broad question that I'm
6   allowing you to answer.  But voter fraud specifically --
7   sorry.
8           Voter ID is a broad question that I'm
9   allowing you to answer.  Voter fraud is more specific.
10  And on that basis, because it could reveal more about the
11  subject matter of confidential communications between you
12  and an attorney or you and the other staff in the
13  governor's office, I'm going to instruct you not to answer
14  that question.
15      A.  I don't recall any names.
16      Q.  (BY MR. GEAR)  Are you aware of any documented
17  cases of voter impersonation in the State of Texas?
18          MR. MCKENZIE:  Same objection to the extent
19  that you acquired that knowledge in service of the
20  governor.
21      A.  I don't recall specific instances.  I know
22  Representative Aliseda prosecuted some, but I don't know
23  specific cases.
24      Q.  (BY MR. GEAR)  Do you know what the subject
25  matter of those prosecutions are?

159

1       A.  I do not recall.
2       Q.  Do you know if they involved voter impersonation?
3       A.  I don't recall.
4       Q.  Do you know if they involved voter fraud, in
5   general?
6       A.  In general, yes.
7       Q.  Have you ever reviewed any communications
8   regarding those prosecutions?
9           MR. MCKENZIE:  To the extent you reviewed
10  them in service of the governor, I will instruct you not
11  to answer.  To the extent you know that information
12  independent of that service, you may answer the question.
13      A.  I'm sorry.  Could you say that again?
14          (The requested material was read.)
15      A.  I believe Representative Aliseda spoke about
16  them.  Other than that, I don't have any knowledge.
17      Q.  (BY MR. GEAR)  And when you say "spoke about
18  them," it appears in the public record?
19      A.  I believe so.  I can't swear to that.  I think he
20  talked about them on the House floor.
21      Q.  Do you recall what the subject matter of the
22  public record -- what it would reflect?
23      A.  I believe it would have been in the debate on
24  this bill.
25      Q.  But you don't recall the subject matter of what

160

1   he spoke about on the House floor?
2       A.  He mentioned having prosecuted those cases and --
3   whether or not he discussed them in depth and talked about
4   the specific cases, I do not recall.
5       Q.  Okay.  So in 2005, were you aware of any
6   documented cases of voter impersonation?
7           MR. MCKENZIE:  To the extent you acquired
8   that knowledge in furtherance of your service to the
9   governor, I would instruct you not to answer.  To the
10  extent you have no knowledge or you have independent
11  knowledge, you may answer the question.
12      A.  Honestly, I don't recall from 2005.
13      Q.  (BY MR. GEAR)  2007, were you aware of any
14  documented cases of voter impersonation?
15          MR. MCKENZIE:  Same objection.
16      A.  I don't recall specific cases.
17      Q.  (BY MR. GEAR)  Regarding 2005, 2007, 2009 or
18  2011 --
19          MR. MCKENZIE:  Same objection.
20      Q.  (BY MR. GEAR)  -- would that be fair to say?
21          MR. MCKENZIE:  Pardon me.  I didn't mean to
22  speak over you.
23          Same objection.
24      A.  I do not have documented -- knowledge of
25  documented specific cases.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                June 1, 2012

161

1    Q. (BY MR. GEAR) And I'm just trying to understand
2  your testimony --
3    A. That I recall.
4    Q. I'm just trying to understand your testimony
5  as far as I can regarding the concern of voter fraud in
6  the governor's office. Is there anything on the public
7  record that would identify what the basis of the concern
8  was that the governor had regarding voter fraud?
9         MR. MCKENZIE: Same deliberative process
10  objection.
11    A. I'll decline to answer on advice of counsel.
12    Q. (BY MR. GEAR) On the public record, something
13  that appeared in the public record?
14         MR. MCKENZIE: No, I understand. Same
15  objection. I'm not going to -- well, I will explain it
16  again -- just because the public record is big and what he
17  considers a part of it is small and I think that that
18  subset of information and him defining it would reveal
19  confidential deliberations at the governor's office. So
20  on that basis, I instruct the witness not to answer.
21    Q. (BY MR. GEAR) When you summarized SB 14, did you
22  consider the purpose of the bill?
23         MR. MCKENZIE: Same objection.
24    A. I'll decline to answer on the advice of counsel.
25    Q. (BY MR. GEAR) What is the purpose of SB 14?

162

1         MR. MCKENZIE: You may answer as to general
2  purpose. Please don't reveal internal subjective purposes
3  that the governor's office has.
4    A. I don't know Senator Frasier's purpose
5  specifically behind why he filed SB 14.
6    Q. (BY MR. GEAR) Do you know if the purpose of
7  SB 14, in part, was to deny undocumented or illegal aliens
8  from voting?
9         MR. MCKENZIE: Same objection as to the
10  internal governor purpose. You may answer as to general
11  purpose.
12    A. I don't recall that as a purpose, But I don't
13  remember the entire debate.
14    Q. (BY MR. GEAR) Do you recall during the -- well,
15  let me say that differently.
16         Do you recall any debate that appears in the
17  public record expressing a concern that undocumented or
18  illegal aliens are voting?
19    A. I don't recall it. That doesn't mean it wasn't
20  mentioned in the debate.
21    Q. Did you communicate with Senator Frasier's office
22  about the emergency designation of SB 14?
23    A. No.
24    Q. Were you present during any communications that
25  the governor may have had regarding SB 14 as an emergency

163

1  designation?
2    A. I don't believe so, no.
3    Q. Can you describe the basic provisions of SB 14?
4    A. The bill requires a voter who's showing up in
5  person at a polling place to provide one of seven forms of
6  photo ID. Failing that, the voter can vote provisionally
7  and provide the necessary documentation within six days.
8  The bill requires that training in this new provision
9  would be made to poll workers and people who were involved
10  in the election. It requires signage and other
11  notification to people. I guess those are the basic
12  provisions.
13    Q. Now, based on your prior testimony during the
14  deposition, you indicated that you were involved in the
15  summary of SB 362. Is that accurate?
16    A. You mean did I draft an analysis in the
17  governor's office on that bill?
18    Q. You completed a summary of SB 362. Is that --
19    A. As part of the analysis, yes.
20    Q. Okay. Do you know why SB 14 removed some of the
21  allowable forms of ID from SB 362, what's the difference
22  between the two?
23    A. Do I know why, or do I know what's the
24  difference?
25    Q. Let me ask that question again.

164

1         You had an opportunity to review SB 14; is that
2  correct?
3    A. I didn't review it today, no.
4    Q. I think we marked that as --
5    A. What I have is the -- maybe it's my fault I took
6  you out of order. But we have the legislative history of
7  it.
8    Q. Not a problem.
9         (Discussion off the written record.)
10         MR. MCKENZIE: Would now be a good time to
11  take a break?
12         MR. GEAR: Sure. We can take a break.
13         (Break.)
14         (Exhibit 5 was marked.)
15    Q. (BY MR. GEAR) So I'm handing you what's been
16  previously marked as Exhibit No. 5. Before we went off
17  the record, we were talking about SB 14, and you
18  graciously reminded me that we had not reviewed the actual
19  bill.
20         Can you take a second and look at that? And then
21  we can have a conversation.
22    A. Certainly.
23         (Witness reviews document.)
24    Q. (BY MR. GEAR) Have you had a chance to review
25  Exhibit No. 5?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

169

1    pursuant to SB 14?
2         MR. MCKENZIE:  And again, I'm going to
3    object on deliberative process grounds as to the contents
4    of communications among the governor's staff.
5         A.  I'll decline to answer on the advice of counsel.
6         Q.  (BY MR. GEAR)  Are you aware of any
7    communications with the Secretary of State's office
8    between the governor's office -- you or anyone in the
9    governor's office and the Secretary of State's office
10   regarding allowable forms of ID?
11        MR. MCKENZIE:  Same objection to the extent
12   it reveals deliberations of the executive branch of Texas.
13   To the extent it doesn't, you may answer the question.
14        A.  I'll decline to answer on the advice of counsel.
15        Q.  (BY MR. GEAR)  Are you aware of any
16   communications from the governor's office that you were
17   present with the Department of -- or DPS regarding
18   allowable forms of ID?
19        MR. MCKENZIE:  Same objection.
20        A.  I'll decline to answer on the advice of counsel.
21        Q.  (BY MR. GEAR)  How would allowing a nonphoto ID
22   enhance the integrity of the ballot box in the State of
23   Texas?
24        A.  How would allowing a nonphoto ID enhance the
25   integrity compared to a photo ID?

170

1         Q.  Strike that question.
2              How would allowing a nonphoto ID -- strike that
3    question.
4              Are you aware that the Indiana photo ID law
5    allows for additional forms of nonphoto -- are you
6    aware -- I'm sorry.  Strike that.  I'll take a drink of
7    water.
8              Are you aware that the Indiana law allows for
9    nonphoto ID?
10        MR. MCKENZIE:  I'm going to object to the
11   extent you acquired that awareness in furtherance of your
12   duties as an analyst for the governor.  To the extent you
13   have any independent knowledge that doesn't derive from
14   your experience with the governor's office, you may answer
15   the question.
16        A.  I'll decline to answer on the advice of counsel.
17        Q.  (BY MR. GEAR)  Are you aware that the Indiana law
18   allows -- and I'm referencing their photo ID law -- allows
19   for more allowable forms of ID than the SB 14?
20        MR. MCKENZIE:  Same objection.
21        A.  I decline to answer on the advice of counsel.
22        Q.  (BY MR. GEAR)  Are you aware that the Georgia law
23   allows for more allowable forms of ID than the -- than SB
24   14 in the State of Texas?
25        MR. MCKENZIE:  Same objection.

171

1         A.  I decline to answer on advice of counsel.
2         Q.  (BY MR. GEAR)  During your analysis or summary of
3    SB 14, did you consider either Indiana or Georgia law and
4    the allowable forms of ID that they would allow under
5    their laws?
6         MR. MCKENZIE:  Same objection.
7         A.  I decline to answer on the advice of counsel.
8         Q.  (BY MR. GEAR)  What's the purpose of removing
9    from SB 14 the option for a voter to show a valid employee
10   ID, as did SB 362?
11        MR. MCKENZIE:  Again you may answer as to
12   publically stated purposes.  Please don't reveal the
13   private purposes of the governor's office.
14        A.  I don't know any publically stated purpose.
15        Q.  (BY MR. GEAR)  Are you aware of any privately
16   stated purpose?
17        MR. MCKENZIE:  You can answer "yes" or "no"
18   if you're aware.
19        A.  I don't recall specific policy.  I remember my
20   reaction to it.  But it was, you know, for the purpose of
21   doing my analysis.
22        Q.  (BY MR. GEAR)  Okay.  What was your reaction to
23   it?
24        MR. MCKENZIE:  I'm going to object on the
25   grounds of deliberative process privilege.

172

1         A.  I'll decline to answer on the advice of counsel.
2         Q.  (BY MR. GEAR)  Do you know who would have made
3    that decision?
4         A.  No.
5         Q.  Are you aware of any communications regarding
6    that decision?
7         A.  I don't remember any.
8         Q.  Do you know what the circumstances by which the
9    license to carry a concealed handgun were included in
10   SB 14?
11        A.  No.
12        Q.  Do you know the racial composition of license to
13   carry concealed handgun holders is in the State of Texas?
14        A.  No.
15        MR. MCKENZIE:  I was going to object to
16   extent that you acquired that knowledge on the basis of
17   serving the governor's office.  But you've already
18   answered, so that's fine.
19        Q.  (BY MR. GEAR)  Are you aware that the individuals
20   in the State of Texas who carry a concealed handgun
21   license are disproportionately white?
22        MR. MCKENZIE:  I'm going to object to the
23   extent you acquired any awareness of that fact during your
24   service at the governor's office.  To the extent you have
25   awareness of that outside your service of the governor's



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                                June 1, 2012

173

1    office, you may answer the question.
2        A.  I'm not aware of any such thing.
3        Q.  (BY MR. GEAR)  Did you, in your function of
4    creating -- of completing an analysis or a summary of
5    SB 14 consider the demographics of individuals who may
6    hold a concealed handgun license?
7            MR. MCKENZIE:  And I'm going to object on
8    the grounds of deliberative process privilege as to what
9    you considered in your analysis.
10       A.  I'll decline to answer on the advice of counsel.
11       Q.  (BY MR. GEAR)  Were you present during any
12   communications while working in the governor's office
13   where legislators were present and discussed their opinion
14   as to whether or not individuals in the State of Texas who
15   carry a concealed handgun license were disproportionately
16   white?
17       A.  No.
18       Q.  Do you recall any public debate?  So is there
19   anything that appears in the public record that would
20   support that individuals who carry a handgun license in
21   the State of Texas are disproportionately white?
22       A.  I don't recall that, no.
23       Q.  Are you aware or do you know why student IDs were
24   removed from consideration of 362 during the passage of
25   SB 14?

174

1            MR. MCKENZIE:  Object.  To the extent you
2    acquired that knowledge during your service to the
3    governor's office in furtherance of those duties, I'd ask
4    you not to answer.  To the extent you know outside of your
5    service to the governor's office, you may answer.
6        A.  I don't know.  And, you know, 362 and 14 were
7    different bills.  I don't really consider it removing from
8    one to the other.  You know, Senate Bill 14 was filed as a
9    new bill.  I understand what you're saying, in that there
10   was a bill that was similar in a previous session; but
11   generally folks work on deals between sessions, and
12   they'll come back a little different.
13       Q.  (BY MR. GEAR)  Fair enough.
14           Student IDs were considered in HB 218, correct?
15       A.  I think that is correct.
16       Q.  Student IDs were considered in SB 362?
17       A.  I'm not certain.
18       Q.  And that would have been the 2009 -- you can
19   review the exhibit.
20       A.  Student ID was included in 218, House Bill 218.
21   And I'm sorry, what was your next question?
22       Q.  362, same question.  And you might as well look
23   at HB 1706, as well.
24           (Witness reviews document.)
25       Q.  (BY MR. GEAR)  Did you have an opportunity to

175

1    review it?
2        A.  I don't see it in Senate Bill 362, which just may
3    mean that I'm missing it.
4        Q.  Well, let me turn your attention to HB 1706,
5    Exhibit 44.  Do you see that it is included in the 2005
6    version of photo ID legislation?  And I turn your
7    attention to Page 3.
8        A.  Again, this is a bill by a different author in a
9    different session.  I don't necessarily think it's a
10   continuation of the same bill.
11       Q.  Do you see that it was considered in 2005?
12       A.  The student identification card issued by a
13   public or private institution was included amongst the ID
14   in House Bill 1706.
15       Q.  Do you know why it was not considered in SB 14?
16           MR. MCKENZIE:  And again, please don't
17   reveal any intra-governor communications.  To the extent
18   you have knowledge outside of your service to the
19   governor's office, you may answer the question.
20       A.  I don't remember who removed it or why or...
21       Q.  (BY MR. GEAR)  Were you involved in any
22   communications where the consideration to remove student
23   IDs was discussed?
24           MR. MCKENZIE:  Same objection.  To the
25   extent it reveals information you obtained at the

176

1    governor's office, I'm going to ask you not to answer the
2    question.
3        A.  I'll decline to answer on the advice of counsel.
4        Q.  (BY MR. GEAR)  Did you conduct any research on
5    the removal of nonphoto ID from consideration on SB 14?
6            MR. MCKENZIE:  Same objection on
7    deliberative process grounds as to what research you did.
8        A.  I don't recall doing any research, but I also
9    don't recall if the bill as filed had that in it or not.
10       Q.  (BY MR. GEAR)  Are you aware of anything that
11   changed between 2009 and 2011 that would have made the
12   identification -- student identification less reliable
13   at -- while voting?
14           MR. MCKENZIE:  Again, I would ask you not to
15   answer that question to the extent you acquired knowledge
16   as to the reliability of student IDs in the course of your
17   service as an employee of the governor.  To the extent you
18   have independent knowledge, you may answer the question.
19       A.  I don't have any independent knowledge.  I don't
20   recall.
21       Q.  (BY MR. GEAR)  Were you involved in any
22   communications where the concern was expressed that
23   removing student IDs from consideration in SB 14 would
24   have a disproportionate impact on minority voters.
25           MR. MCKENZIE:  To the extent those

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                    June 1, 2012

177

1   communications were in the governor's office or among
2   governor staff, I'm going to instruct you not to answer
3   that question.
4           MR. GEAR:  And the question is, were you
5   involved in any communications.
6           MR. MCKENZIE:  Yes.  And I'm still going to
7   lodge the objection.
8       A.  I don't recall any communications.
9       Q.  (BY MR. GEAR)  Do you recall any communications
10  that appear in the public record where the concern was
11  expressed that the removal of student IDs from SB 14 would
12  have a disproportionate impact on minority voters?
13          MR. MCKENZIE:  Same objection to the extent
14  that you pulled information from the public record and
15  relied on it in your analysis.
16      A.  And, again, I don't agree with the
17  characterization of removing it from Senate Bill 14.  It
18  was never in Senate Bill 14.  I'm not sure that it was
19  ever removed from the bill.
20      Q.  (BY MR. GEAR)  Are you familiar with the current
21  law in the State of Texas regarding allowable forms of ID?
22      A.  I am familiar, but I don't know all of them.  I
23  have to look it up myself whenever I have to look at it.
24      Q.  Can you describe for me what's allowed under the
25  current law regarding photo ID?

178

1       A.  I can't, because I always look it up myself.
2       Q.  Does it allow for nonphoto ID?
3       A.  Yes.  Most voters vote with their voter
4   registration certificate.
5       Q.  Okay.  So the current law allows for a voter to
6   use a voter registration certificate, correct?
7       A.  Yes.
8       Q.  And that's a nonphoto ID?
9       A.  Yes.
10      Q.  And the current law allows for voters to use
11  forms of utility bills that display their
12  identification --
13      A.  Yes.
14      Q.  -- and their address, correct?
15      A.  That the local legislature was seeking to change
16  by passing this bill.
17      Q.  Okay.  And the current law as we're discussing it
18  would thereby allow a voter to use a student ID.  Would
19  you agree with that?
20      A.  I don't remember.  As I said, I look it up every
21  time I have to deal with it.  There's a lot of different
22  forms of ID currently.
23      Q.  How did the exception for individuals with
24  disabilities come to be included in SB 14?
25          MR. MCKENZIE:  Please don't reveal any

179

1   communications between the governor and staff or
2   legislative communications, to extent they're not public.
3       A.  I don't remember.  I think it was an amendment on
4   the Senate floor, but I don't remember for sure.
5       Q.  (BY MR. GEAR)  Do you recall who raised the
6   amendment or made the amendment --
7       A.  No.
8       Q.  -- proposed the amendment?
9       A.  But if I'm correct on that, it will be on the...
10      Q.  Okay.  Do you know what the purpose of this
11  amendment was to include disabilities as an exception in
12  SB 14?
13      A.  No.
14      Q.  Do you recall if there were any communications in
15  the governor's office regarding the exception for
16  disabilities pursuant to SB 14?
17          MR. MCKENZIE:  Again, I'm going to object to
18  the extent answering that question would reveal the
19  subject matter of internal governor office communications.
20      A.  I'll decline to answer on the advice of counsel.
21      Q.  (BY MR. GEAR)  How did the exception for
22  individuals with religious objects to being photographed
23  come into -- to be included in SB 14?
24      A.  I don't know.  I don't recall.
25      Q.  Do you know what the purpose of that inclusion

180

1   was?
2       A.  I don't.
3           MR. MCKENZIE:  Same objection.  Go ahead.
4       Q.  (BY MR. GEAR)  Do you know how it -- how the
5   discussion or the purpose -- I'm sorry, strike that.
6           Do you know how that issue arose?
7       A.  I do not recall.
8       Q.  Do you know what concerns, if any, that the
9   exception to religious objections was included into SB 14?
10      A.  I'm sorry.  Could you repeat that?
11          MR. MCKENZIE:  Objection; vague.
12      Q.  (BY MR. GEAR)  Are you aware of any -- are you
13  aware of whether or not the exception for individuals with
14  religious objections to being photographed was included
15  into SB 14 in response to any specific concerns?
16      A.  I don't recall that.
17      Q.  Can you describe the election identification
18  certificate provision of SB 14?
19      A.  Yes.  Currently the Department of Public Safety
20  issues driver's licenses.  They also issue identification
21  cards to people who for whatever reason don't have a
22  driver's license but want to have a identification card.
23  And this was a card to be issued for people who just
24  wanted to vote.  And if I recall in the final version of
25  the bill, they're not allowed to use it for any other

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

181

1  purpose.
2  Q.  Do you know how that portion of the SB 14 was
3  developed?
4  A.  Yes.
5  Q.  What was the purpose of including the election
6  identification certificate into SB 14?
7  MR. MCKENZIE:  I'm going to object to the
8  extent it reveals private governor purposes.  To the
9  extent that it's a matter of public record, you may answer
10  the question.
11  A.  I have to decline on the advice of counsel.
12  Q.  (BY MR. GEAR)  What, if anything, was it modeled
13  on?  Or did it follow any other previous legislation or
14  legislation from other states?
15  MR. MCKENZIE:  Same objection.  To the
16  extent you acquired that knowledge during your service at
17  the governor's office.
18  A.  I'll decline to answer on the advice of counsel.
19  Q.  (BY MR. GEAR)  Would the governor know --
20  A.  I'm fairly --
21  MR. MCKENZIE:  Wait.  Is that the end of the
22  question?  I meant to object.
23  MR. GEAR:  I was in the middle of thinking,
24  but...
25  MR. MCKENZIE:  Okay.

182

1  THE WITNESS:  When we come to a natural
2  stopping point, I'd like to ask my lawyer like a 30-second
3  question to make sure I know something, whenever --
4  MR. GEAR:  I think this is a good time to do
5  it.
6  THE WITNESS:  Okay.
7  (Break.)
8  Q.  (BY MR. GEAR)  Regarding the identification
9  certificate provision, are you aware of any concerns that
10  the -- that were expressed that the election
11  identification certificate would be difficult for
12  constituents in the State of Texas or residents in the
13  State of Texas to obtain?
14  MR. MCKENZIE:  I'm going to object to the
15  extent you acquired that awareness in service of the
16  governor and as part of your analysis.  If you have
17  independent awareness, you may answer the question.
18  MR. GEAR:  And so I don't have to restate
19  the question, I want to make sure that you understand I'm
20  limiting it to the public record.  Are you aware of any
21  concerns that were expressed.
22  MR. MCKENZIE:  And the same objection to the
23  extent that you surveyed the public record and decided to
24  focus on a certain piece of it in order to give analysis
25  to the governor.

183

1  A.  I don't recall a particular objection to the
2  election identification certificate as opposed to in
3  general.  We discussed earlier about -- I remember a
4  debate on the floor about how it was difficult to go
5  downtown or something.  I don't remember anybody
6  specifically talking about the election identification
7  certificate.
8  Q.  (BY MR. GEAR)  Well, you talked about the debate
9  on the public floor.  Can you tell me what that debate --
10  the substance of that debate?
11  A.  If I remember correctly -- and my memory is
12  suspect -- I think Senator Ureste talked about how his
13  district is very large.  He compared it to some other
14  large geographic area and said it was difficult to get
15  downtown.
16  Q.  He talked about the distance his constituents
17  would have to travel?
18  A.  I believe that's correct.
19  Q.  And do you recall testimony regarding some
20  constituents would have to travel as far as a hundred
21  miles?
22  A.  I don't remember the specific testimony.  I'm
23  sure it's all on the record.
24  Q.  Do you know if every county in the State of Texas
25  has a driver's license office?

184

1  MR. MCKENZIE:  And again, I object to the
2  extent you acquired knowledge or not about that during
3  your service as a member of the governor's office staff.
4  To the extent you have independent knowledge about that,
5  please answer the question.
6  Q.  (BY MR. GEAR)  And this doesn't have to be tied
7  to any voter ID legislation.  I'm just asking you, do you
8  know, does every county in the state have a driver's
9  license office?
10  MR. MCKENZIE:  Same objection to the extent
11  you acquired it trying to analyze legislation.  If you
12  have other knowledge, then --
13  A.  I don't have other knowledge.  I guess I have to
14  decline to answer on the advice of counsel.
15  Q.  (BY MR. GEAR)  Would you agree that there are
16  some residents in the State of Texas who would have to
17  travel a hundred miles or more to get to a functional
18  driver's license office?
19  MR. MCKENZIE:  Objection; speculation.  But
20  you may answer.
21  A.  I don't have knowledge of that.
22  Q.  (BY MR. GEAR)  Is there a public
23  transportation -- strike that.
24  Is there public transportation to all driver's
25  license offices in the State of Texas?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

185

1    A. I --
2        MR. MCKENZIE: Objection on speculation
3    grounds. To the extent -- you may answer.
4    A. I don't know.
5    Q. (BY MR. GEAR) Do you know generally what the
6    waiting time would be in the driver's license office to
7    obtain a driver's license or a State-issued ID?
8    A. I don't recall. I know I've done it. I just
9    don't remember long I waited.
10   Q. Do you have a driver's license?
11   A. I do.
12   Q. How did you obtain your driver's license?
13   A. I don't remember if I renewed via mail or if I
14   had to go to an office and -- I just don't remember how
15   I...
16       I assume you mean the most recent time I did it?
17   Q. The most recent time.
18   A. Yeah, I really don't remember doing it.
19   Q. And what county do you live in?
20   A. Harris County.
21   Q. Harris County.
22       And is there a driver's license office in Harris
23   County?
24   A. Yes.
25   Q. How far away is that from your home?

186

1    A. I probably didn't go to the closest one. So
2    the -- I'm not sure how far the closest one is from my
3    house. I probably went to one off of 290, which isn't
4    near my house.
5    Q. Do you recall what documentation, if any, you had
6    to take to obtain or renew your driver's license?
7    A. I don't. But it's in the law. I don't remember
8    what I had to do.
9    Q. Would you agree that there is an underlying
10   requirement for a registered -- before a registered voter
11   could obtain an election identification certificate, that
12   they would have to present some form of identification to
13   obtain that?
14   A. I don't remember exactly what ended up in the
15   provision, and I don't remember what DPS, to the extent
16   that they did any rule-making on that. So I don't recall
17   what you had to demonstrate in order to get the
18   certificate. And I don't know what you have to
19   demonstrate to get the DPS ID, which current law allows,
20   which may be the same thing.
21   Q. As you sit here today, are you aware of any
22   requirements to present underlying documents to obtain an
23   election identification certificate?
24   A. I know you have to present. I forget, if I knew,
25   what ended up being the requirement.

187

1    Q. But as you sit here today, you don't know what
2    those underlying documents are?
3    A. That's correct. I don't recall.
4    Q. Did you consider the underlying documents that
5    have to be presented to obtain an election identification
6    certificate during your analysis of SB 14?
7        MR. MCKENZIE: Object on deliberative
8    process grounds as to what you considered in your
9    analysis.
10   A. I have to decline to answer on the advice of
11   counsel.
12   Q. (BY MR. GEAR) Are you aware of any communication
13   that appears in the public record that would identify what
14   those underlying documents may be?
15       MR. MCKENZIE: And to the extent you
16   acquired that knowledge as part of your analysis by
17   selecting pieces of the public record, I'm going to
18   instruct you not to answer.
19   Q. (BY MR. GEAR) And again, the public record
20   includes debate on the floor.
21       MR. MCKENZIE: Same objection.
22   A. I do not recall what the -- and I don't recall
23   whether it was in the bill or whether it was a DPS rule
24   thereafter. I just don't remember.
25   Q. (BY MR. GEAR) During the drafting process or the

188

1    legislature's consideration of SB 14, was there an
2    analysis of costs or steps a voter would need to take to
3    obtain an election identification certificate?
4        MR. MCKENZIE: I'm going to object to the
5    extent that analysis was performed inside the governor's
6    office.
7    A. I don't recall. I'm not sure that I knew.
8    Q. (BY MR. GEAR) Are you aware of any analysis that
9    exists in the public record regarding that?
10   A. I don't recall.
11   Q. If the underlying documents required to obtain an
12   election identification certificate are not free, would
13   you agree that the election certificate itself would not
14   be free?
15   A. I don't think so, no.
16   Q. Let me clarify, because I see confusion.
17       If you had to pay for the underlying documents,
18   if you didn't have them in your possession, custody or
19   control or you just simply lost them and you had to pay
20   for those, would you agree that there's a cost to the
21   underlying documents?
22   A. No. I mean, if I lost my birth certificate,
23   which I did, and had to go get a new one, that doesn't
24   mean that whatever I got it for cost money; it was -- I
25   had lost the certificate, and I had to go get a new birth



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

189

1    certificate.  So, no, I don't boot strap those together
2    and say that that means the certificate costs money.
3        Q.  Okay.  And so do you know how much it costs to
4    obtain a certified copy of a birth certificate in the
5    State of Texas?
6        A.  I don't.  I was born in New Jersey.
7        Q.  Okay.  So you would have to go to New Jersey?
8        A.  I had to go to New Jersey.  And I only did it a
9    couple of months ago, and I don't remember what it cost.
10       Q.  Do you know how you would obtain a certified copy
11   of a birth certificate from New Jersey?  I understand you
12   just said you did it.
13       A.  I do.  You call them up and you order it and send
14   them a certified check.
15       Q.  Do you know how long that takes?
16       A.  It took about -- and I don't know the exact.  It
17   took maybe a week, maybe 10 days.  I don't think it was
18   that long.  I was actually quite surprised.
19       Q.  As to how long it took?
20       A.  No.  How short a time it took.  I grew up in New
21   Jersey.
22       Q.  A week to 10 days?
23       A.  (Witness nods head.)
24       Q.  Do you remember the cost?
25       A.  I don't.  I may still have the information

190

1    somewhere, but I don't recall as we sit here.
2        Q.  But it was not free?
3        A.  It was not free.  It was inexpensive enough that
4    I ordered three of them.
5        Q.  Well, would you agree that there are residents in
6    the State of Texas who live below the poverty line that
7    may not be able to order three certified copies of their
8    birth certificate?
9            MR. MCKENZIE:  Object on speculation
10   grounds.  You may answer.
11       A.  I would think you wouldn't need three.  I just
12   did it as -- if I lost it once, I figured you could lose
13   it again.
14       Q.  (BY MR. GEAR)  Where can one obtain an election
15   identification certificate?
16       A.  I don't know.  I don't know if it specifies in
17   the bill, and I don't know if DPS came out with the rules
18   on where they would be available.
19       Q.  Did you consider that during your analysis of
20   SB 14?
21           MR. MCKENZIE:  Objection on deliberative
22   process grounds.
23       A.  I decline to answer on the grounds -- or on the
24   advice of counsel.
25       Q.  (BY MR. GEAR)  So it would stand to reason that

191

1    if you don't know where one can obtain a election
2    identification certificate, you also would not know the
3    hours in which they could actually obtain the election
4    identification certificate?
5        A.  I know it was contemplated that you would get
6    them the same places that you obtained driver's licenses
7    and DPS cards during the same hours.  I live in a
8    populous county, so I'm sort of more familiar with that
9    than I am with the way other counties operate.
10       Q.  Does SB 14 require employers to provide paid
11   leave to obtain a driver's license or an ID?
12       A.  Not that I'm aware of.
13       Q.  I asked you before would you agree if some
14   residents in the State of Texas would have to travel a
15   hundred miles or more to obtain a State-issued driver's
16   license or ID, would you agree that there are some
17   residents in the State of Texas that would have to travel
18   at least 50 miles?
19           MR. MCKENZIE:  I'm going to object on
20   speculation grounds and also to the extent you reached an
21   opinion on that during your services as the governor's
22   employee.  If you have an opinion separate from that
23   service, you may answer the question.
24       A.  Yeah.  I'm not the right person to ask.  I don't
25   know how far people have to travel.

192

1        Q.  (BY MR. GEAR)  Are you aware of public debate
2    that express concerns that minority voters are less likely
3    to have the allowable form of idea under SB 14?
4            MR. MCKENZIE:  I'm going to object to the
5    extent that that awareness played a factor in your
6    analysis.  To the extent you have independent awareness,
7    you may answer the question.
8        Q.  (BY MR. GEAR)  And again, I want to make sure you
9    understand what my question is here.
10       Are you aware of any record that appears in the
11   public record or any communication that appears in the
12   public record.  So I'm limiting that question specifically
13   to the public record.
14       A.  Could you give me the whole question again or
15   have it read back, either way.
16           (The requested material was read.)
17           (Discussion off the record.)
18       Q.  (BY MR. GEAR)  Let me just re-ask the question.
19   Are you aware of -- and again, I'm limiting my
20   question to public record, communications, documents that
21   appear in the public record.  Are you aware of any
22   communications or documents or analysis that show that
23   there was a consideration as to whether or not minority
24   voters were less likely to possess the forms of allowable
25   identification under SB 14?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                    June 1, 2012

193

1       MR. MCKENZIE:  Same objection.
2       A.  I believe that was an argument made on the floor
3   by opponents of the bill.  I don't know of any statistical
4   data or anything like that.
5       Q.  (BY MR. GEAR)  Did you consider those concerns
6   during your analysis of SB 14?
7       MR. MCKENZIE:  I'm going to object on
8   deliberative process grounds.
9       A.  I decline to answer on the advice of counsel.
10      Q.  (BY MR. GEAR)  Are you aware of anyone who
11  supported SB 14 that considered the concerns expressed by
12  the opponents regarding that issue?
13      MR. MCKENZIE:  Same objection to the extent
14  you acquired that knowledge in service at the governor's
15  office.
16      A.  I decline to answer on the advice of counsel.
17      Q.  (BY MR. GEAR)  Was any part of the purpose of
18  SB 14 to decrease the number of Hispanic voters?
19      MR. MCKENZIE:  You may answer as a general
20  purpose.  Please do not answer as to any private purposes
21  the governor may or may not have had.
22      A.  Not that I know of.
23      Q.  (BY MR. GEAR)  Was any part of the purpose of
24  SB 14 to decrease the number of any other group of
25  minority voters?

194

1       A.  Not that I know of.
2       Q.  Was any part of the purpose of SB 14 for partisan
3   purposes?
4       A.  I don't --
5       MR. MCKENZIE:  Same objection.  To the
6   extent it reveals publically expressed purposes, you may
7   answer.  To the extent it's private purposes of the
8   governor's office, I'd instruct you not to answer.
9       A.  I don't understand the question.
10      Q.  (BY MR. GEAR)  Political purposes?  If I -- let
11  me just ask the question again.
12      Was any part of SB 14 -- any part of the purpose
13  of SB 14 for political purposes?
14      MR. MCKENZIE:  Same objection.
15      A.  I really can't get into the minds of legislators
16  to know what their purpose is.  I'm sure most bills, they
17  have some hope that it will help make them popular back
18  home.  But I don't really know.
19      Q.  (BY MR. GEAR)  Was any part of the purpose of
20  SB 14 to depress the Democratic participation in elections
21  to further the political interests of Republican
22  candidates?
23      MR. MCKENZIE:  Same objection.
24      A.  I'm sorry.  Could you repeat the question.
25      (The requested material was read.)

195

1       A.  My understanding of the purpose of the bill was
2   to make sure that people who were voting were entitled to
3   vote, and I don't think that that necessarily has to favor
4   one party or the other.
5       Q.  (BY MR. GEAR)  Do you have a concern that SB 14
6   will disproportionally impact minority voters?
7       MR. MCKENZIE:  Object to the extent you
8   developed a concern in the course of your services as a
9   governor employee.  To the extent you don't have a concern
10  in that capacity, you may answer the question.
11      A.  No.
12      Q.  (BY MR. GEAR)  Do you have a concern that SB 14
13  will have a discriminatory effect on minority voters?
14      MR. MCKENZIE:  Same objection.
15      A.  No.
16      Q.  (BY MR. GEAR)  Do you recall any debate on the
17  public record that expressed that in part SB 14 was
18  designed to prevent illegal aliens or undocumented
19  citizens, noncitizens from voting?
20      A.  I don't recall that.  But the debate's on the
21  public record.
22      Q.  Do you recall the lieutenant governor or anyone
23  from the lieutenant governor expressing -- governor's
24  office expressing that concern?
25      A.  I don't.

196

1       Q.  Based on your review and analysis of SB 14, was
2   SB 14 designed to address any specific problem in the
3   State of Texas?
4       MR. MCKENZIE:  I'm going to tell you not to
5   answer to the extent that will reveal your review or
6   analysis of SB 14.
7       A.  How could it not?  I decline to answer on the
8   advice of counsel.
9       Q.  (BY MR. GEAR)  Does SB 14 address any specific
10  problem in the State of Texas?
11      MR. MCKENZIE:  Same objection to the extent
12  your opinion on that derives from the analysis and review
13  you did as an employee of the governor's office.
14      A.  SB 14 was designed to help ensure that the voters
15  who are eligible to vote are able to vote and their vote
16  doesn't get offset by all types of voter fraud that we
17  talked about earlier.  So to the extent that SB 14
18  addresses the problem, that's the problem it's intended to
19  address.  I think it's designed primarily to ensure fair
20  elections and to make sure that we know that the people
21  voting are entitled to do so.
22      Q.  (BY MR. GEAR)  But as you sit here today, you're
23  unable to identify any cases of voter impersonation in the
24  State of Texas; is that correct?
25      A.  That's right.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                             June 1, 2012

197

1   Q.  And as you sit here today, you're unable to
2   identify any specific allegations by mail voter fraud in
3   the State of Texas; is that correct?
4        A.  Mail voter fraud?
5        Q.  By mail voter fraud, correct.
6        A.  I don't know about specific cases.  There's been
7   a lot written on mail voter fraud.  And we had a bill that
8   passed the legislature in 2003 addressing it.  And there's
9   still been newspaper articles and all kinds of stuff about
10  mail voter fraud.
11       Q.  Would you agree that voter impersonation in the
12  State of Texas is rare?
13       A.  No.
14       Q.  And What are you basing that on?
15       A.  We had testimony in the elections committee on a
16  number of applications for -- to register to vote that
17  were fraudulent or for nonexistent people.  And I can't
18  see a motive for registering nonexistent people unless you
19  intend to vote them.
20       Q.  Well, let's talk about this testimony.  You said
21  there was testimony in the elections committee, correct?
22       A.  (Witness nods head.)
23       Q.  Do you know when that testimony took place?
24       A.  I think in 2005 and 2007 and maybe 2009.
25       Q.  All right.  And let's talk specifically about

198

1   2005.  Do you recall who the chair of the elections
2   committee was at that point?
3        A.  I usually get my years mixed up.  I don't know
4   if -- 2003 was Mary Denny, right?  I think 2005 may have
5   been Leo Berman.
6        Q.  Okay.  And so in --
7        A.  That --
8        Q.  I'm sorry.
9        A.  Let me make sure I got that right.  The last
10  session, 2011, was Larry Taylor.  I believe Todd Smith was
11  '9.  So Leo Berman must have been '7.  I think Mary Denny
12  may have been chair in 2005.  I don't -- I'm getting my
13  sessions confused.
14       Q.  Okay.  That's understandable.
15            What was the testimony in 2005, as you recall it?
16       A.  I don't recall specifically, but it's all on the
17  record.  There were -- and I don't remember which was in
18  what session.  But there were -- as I recall, there was
19  testimony regarding that in the House and maybe in the
20  Senate.  I tend to follow the House closer.
21       Q.  And the subject matter of that testimony?
22       A.  Regarded mail -- excuse me -- regarded
23  applications for voter registrations.
24       Q.  And you said "nonexistent individuals"?
25       A.  (Witness nods head.)

199

1        Q.  What does that mean?
2        A.  Filling out an application in the name of
3   somebody who doesn't exist or doesn't live at that
4   address, you know, just with a name.  There apparently
5   were quite a few of them.
6        Q.  Okay.  And so you indicated that SB 14 addresses
7   the issue of voter impersonation, correct?
8        A.  It does in that respect.  I think it more
9   addresses just ensuring that we have -- that we know who's
10  voting because they show a photo ID.  And that way, I know
11  that my vote hasn't been offset by somebody who isn't
12  entitled to vote or is voting in a false name.
13       Q.  Are you aware of any cases where a legitimate
14  voter's vote has not been counted as a result of voter
15  impersonation?
16       A.  Every time there's a voter impersonation.
17       Q.  Are you aware of any cases of voter
18  impersonation?
19       A.  It's impossible to catch, virtually.  That's why
20  there's so few prosecutions.  As I say, we -- there are
21  records of tens of thousands of applications that are
22  incorrect or that are false.  How many of those are
23  maliciously so, I couldn't tell you.
24            But to the extent that anybody files a false
25  voter registration application and then votes it, they

200

1   offset the vote of somebody who voted the other way.
2        Q.  So we're focusing on 2005 right now.  Are you
3   aware of anyone who filed a false voter registration
4   application and voted?
5            MR. MCKENZIE:  And to the extent you
6   developed awareness in the course of your service in the
7   governor's office, I would object on deliberative process
8   grounds.
9        A.  As I say, most of what I learned, I learned
10  through the House hearings.
11       Q.  (BY MR. GEAR)  Okay.  And during the House
12  hearings, was there any documented case of a person who
13  filed a false voter registration application and voted?
14            MR. MCKENZIE:  Same objection.
15       A.  Yeah.  I'd have to go back and look at the
16  testimony.
17       Q.  (BY MR. GEAR)  So as you sit here today, are you
18  aware of any voter in 2005 who filed a false voter
19  registration application and voted?
20       A.  I --
21       Q.  As you sit here today.
22            MR. MCKENZIE:  And to the extent you
23  acquired that knowledge in the course of your service as
24  the governor's employee, I would instruct you not to
25  answer.  To the extent that you have that knowledge based



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                                    June 1, 2012

201

1    upon the service not in the governor's office, then you
2    may answer the question.
3        A.  As we sit here today, I cannot name the -- I
4    assume you mean the name of the applicant or the person,
5    either one.  I could not tell you the names of anybody.
6        Q.  (BY MR. GEAR)  And just to expand on that, are
7    you aware of any documented cases, whether you know the
8    name of the applicants or not, where an applicant filed a
9    false voter registration application and voted?
10       A.  I don't know -- we separate our applications from
11   our conduct of elections in two different offices in most
12   counties.  So the folks who came to testify were the
13   registration people, typically in the Texas tax assessor-
14   collector's office.  They don't handle the conduct of
15   election day activities.  So who voted and who registered
16   at their office, That's not something they would have in
17   their -- so when they came to testify, I don't recall
18   whether they -- whether they traced one all the way
19   through and said, "This was an application for Joe Smith;
20   and then on election day or in early voting, Joe Smith was
21   voted."  I don't know about that.
22       Q.  And would that be the same answer for 2007, 2009
23   and 2011?
24       A.  Yes.  With the exception of the cases that
25   Representative Aliseda referred to having prosecuted, I

202

1    don't know specifically myself of individual cases.
2        Q.  Are you aware of any individual cases of voter
3    impersonation that appear on the public record in the
4    State of Texas that were discussed during SB 14?
5            MR. MCKENZIE:  Same objection as to your
6    awareness -- to the extent your awareness played a role in
7    your analysis.
8        Q.  (BY MR. GEAR)  Again, I'm asking are you aware of
9    any that appear on the public record.
10       A.  Other than the ones that Representative Aliseda
11   referred to, I'm not aware of specific cases.
12       Q.  Have you ever heard about a voter who did not
13   vote because they were concerned that voter fraud would
14   cancel out their vote?
15           MR. MCKENZIE:  Same objection to the extent
16   you acquired stories of that nature during your service as
17   a governor employee.
18       A.  I don't recall any specific stories.
19       Q.  (BY MR. GEAR)  At some point, you campaigned for
20   the House; is that correct?
21       A.  That's correct.
22       Q.  And what year was that?  Could you remind me?
23       A.  It happened twice.  In the 2006 election cycle
24   and then for half of the 2012 election cycle.
25       Q.  Okay.  So during any time during 2006 and for

203

1    half of the 2012 cycle, did any voter ever approach you
2    and indicate that they did not vote because they were
3    concerned about voter fraud cancelling out their vote?
4        A.  No.  I don't think the concern was people not
5    voting because they thought their vote would be canceled.
6    I think the concern was that their vote gets canceled out.
7        Q.  And are you -- strike that.
8        A.  That wouldn't necessarily lead to any action on
9    any part of that particular voter or, in the case of your
10   question, inaction.
11       Q.  Are you done with that answer?
12       A.  Yes, sir.
13       Q.  Under SB 14 are you aware of the provisional
14   ballot provisions?
15       A.  Yes.
16       Q.  And can you describe what the provisions are?
17       A.  Basically a voter who fails to present the
18   appropriate ID has six days to go to the voter registrar
19   and provide ID so that their provisional vote will be
20   counted.  There are other reasons for provisional votes,
21   but that's the voter ID provision.
22       Q.  Do you have any knowledge of how often
23   provisional ballots are counted in the State of Texas?
24           MR. MCKENZIE:  To the extent you acquired
25   that knowledge in the service of the governor, I instruct

204

1    you not to answer.
2        Q.  (BY MR. GEAR)  Let me limit that to your
3    knowledge as a candidate for the House, do you have any
4    knowledge, did you acquire any knowledge about how often
5    provisional ballots are counted?
6        A.  Not in connection with my being a candidate.  I
7    will say that we have not -- this provision obviously has
8    not gone into effect yet so there has been no instance yet
9    of these kind of provisional ballots for this reason where
10   all you have to is go down and show appropriate ID.  There
11   are some things that aren't fixable.
12       For example, when I voted one -- one year and the
13   lady in front of me said, "My mom couldn't get her flight
14   home to vote.  Can she vote here?"  And I said, "She can
15   vote here, but it's going to be provisional and the
16   chances of it counting are very low because she's not
17   registered in this precinct."
18       That isn't fixable.  If you don't present the
19   appropriate ID -- and I'm sure I've shown up without my
20   driver's license, although how I would have driven there
21   without one is questionable, but that's fixable.  So I
22   would anticipate a much higher percentage of provisional
23   ballots would be accepted because you wouldn't cast one, I
24   wouldn't think, unless you go down and demonstrate your photo
25   ID, unless you're trying to make a point or something.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                    June 1, 2012

205

1      So if you showed up and you realized you didn't
2  have a photo ID, you cast your provisional ballot, you
3  would be able to go and demonstrate that you have a photo
4  ID, because you have one.  But again, that's conjecture.
5  I don't mean to --
6      Q.  Sure.
7      A.  So I think it's different from current
8  provisional IDs, which is what I'm getting at.  I would
9  think it would be a higher percentage than current
10  provisional ones because most or many current provisional
11  ballots are uncurable.
12     Q.  Which means they're not counted?
13     A.  In the end if it doesn't comply with whatever the
14  provisions, it can't be counted.
15     Q.  Just stepping outside of SB 14 and even stepping
16  outside of voter ID legislation altogether, do you have
17  any knowledge of how often provisional ballots are counted
18  in the State of Texas?
19     A.  I don't.  I couldn't give you that percentage.
20     Q.  Would it be fair to say that provisional ballots
21  are more often not counted than counted during elections
22  in the State of Texas?
23         MR. MCKENZIE:  Objection; speculation and
24  asked and answered.  But you may answer.
25     A.  I don't know the percentage.

206

1      Q.  (BY MR. GEAR)  During your analysis of SB 14, did
2  you attempt to determine the percentage of how often
3  provisional ballots are counted in the State of Texas?
4         MR. MCKENZIE:  Objection on deliberative
5  process grounds.  I instruct you not to answer.
6      A.  I will decline to answer due to the advice of
7  counsel.
8      Q.  (BY MR. GEAR)  You made a comment about you don't
9  know how someone could get to the polling place without
10  actually having their ID --
11     A.  No, how I would, because I drive.
12     Q.  And my question is, you are aware, of course,
13  that there are individuals in the State of Texas who do
14  not have a driver's license?
15     A.  I am aware of that.
16     Q.  And are you aware that minorities in the State of
17  Texas are less likely to have a driver's license than
18  Anglos?
19         MR. MCKENZIE:  I'm going to object to the
20  extent you developed any awareness on that subject during
21  your service as a governor employee.  Whether or not you
22  were aware speaks to what was on your mind at the time you
23  gave analysis.
24     A.  And I decline to answer on the advice of counsel.
25     Q.  (BY MR. GEAR) Do you think SB 14 will increase

207

1  voter turnout?
2         MR. MCKENZIE:  To the extent you developed
3  an opinion on that during the course of your service as a
4  governor employee I instruct you not to answer.
5      A.  I decline to answer on the advice of counsel.
6      Q.  (BY MR. GEAR)  Did the governor or any of his
7  staff play any role in developing a strategy to ensure
8  sure that SB 14 would pass?
9         MR. MCKENZIE:  I'm going to object.  The
10  deliberative process grounds, as the internal strategy of
11  the governor's office.
12     A.  I decline to answer on the advice of counsel.
13         MR. MCKENZIE:  Objection to the extent that
14  that question would cause you to reveal the internal
15  strategy of the governor's office.
16     Q.  (BY MR. GEAR)  Were you present during any
17  meetings with, communications with legislators where a
18  strategy was discussed to pass SB 14?
19         MR. MCKENZIE:  Again, I'm going to object on
20  the grounds of legislative privilege.  To the extent that
21  legislators were communicating with the governor's office
22  about a strategy on passing SB 14.
23     Q.  (BY MR. GEAR)  It's a yes or no answer.
24         MR. MCKENZIE:  Same objection.
25         MR. GEAR:  Are you directing him not to

208

1  answer?
2      A.  I decline to answer on advice of counsel.
3      Q.  (BY MR. GEAR)  Are you aware of any
4  communications where the strategy to pass SB 14 was
5  discussed?
6         MR. MCKENZIE:  Same objection to the extent
7  it reveals legislator communications or governor
8  communications.
9         MR. GEAR:  I think if we take a quick break,
10  maybe a 10-minute break, I may be able to wrap up quickly.
11         MR. MCKENZIE:  Okay.
12         (Break.)
13         MR. GEAR:  Back on the record.
14         MR. MCKENZIE:  Before you ask your first
15  question I think you wanted to clarify the record about
16  something.
17         THE WITNESS:  Yes.  Reading the bill
18  refreshed my recollection.  I believe, and I could be
19  wrong there were so many questions, but I believe you
20  asked me if I remembered any meetings with the Attorney
21  General's office regarding this bill.
22     Q.  (BY MR. GEAR)  I did ask you that.
23     A.  And I do.  I won't be able to answer any
24  questions on it, but I do recall meetings with the
25  Attorney General's office over a provision of the bill.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                   June 1, 2012

209

1    Q.  There are some questions you can answer.  When
2    did that meeting occur?
3        A.  Late in the session.  I don't know exactly when.
4        Q.  And we're talking about the 2011 session?
5        A.  2011 session during the consideration of Senate
6    Bill 14.
7        Q.  And do you recall who was present during that
8    meeting?
9        A.  I'm sure our general counsel was there and
10   several people from the AG's office, and I can't remember
11   exactly who attended.  They came over to our place, which
12   was rare.
13       Q.  When we're talking about "were there," can you
14   tell me where that meeting occurred?
15       A.  In general counsel's office in the conference
16   room they have.
17       Q.  For the record, can you tell the subject matter
18   of that meeting?
19           MR. MCKENZIE:  I'm going to object to -- for
20   the very broad statement as to something that might appear
21   on a privilege log.  Don't go into any detail as to any
22   communications you had with the office of the Attorney
23   General.
24       A.  Okay.  I definitely need some advice -- and I
25   have my own privilege log --

210

1            MR. MCKENZIE:  You can say it was about
2    voter ID, but I wouldn't get into any further
3    communications than that, if it was about voter ID.  I
4    don't know.  Or the bill number, things of that effect.
5        A.  It was about a provision of the bill.
6        Q.  (BY MR. GEAR)  And you're talking about SB 14?
7        A.  SB 14.
8        Q.  Did the King Street Patriots propose any language
9    for SB 14?
10       A.  Not that I recall.
11       Q.  Did the King Street Patriots propose any language
12   for voter ID in general?
13       A.  No, not that I recall.
14       Q.  Are you aware of whether there were any promises
15   made to the King Street Patriots from the governor
16   regarding voter ID?
17       A.  Not that I know of but -- I'm not aware of any.
18       Q.  (BY MR. GEAR)  Are you aware of any
19   communications with any other outside groups regarding
20   voter ID, communications between the governor and outside
21   groups?
22       A.  As we sit here today, I don't.  But if you can
23   refresh my recollection, that would be very helpful.
24       Q.  I'm just trying to determine what you know.  So
25   is your --

211

1        A.  I don't remember it.  I may have known at the
2    time, but I don't remember any as we sit here today.
3            (Exhibit 311 was marked.)
4        Q.  (BY MR. GEAR)  Showing you what's marked as
5    Exhibit No. 311.
6            MR. GEAR:  For the record, this exhibit does
7    not follow the exhibit numbers of the previously marked
8    exhibits.
9            (Witness reviews document.)
10       Q.  (BY MR. GEAR)  Did you have a chance to review
11   that exhibit?
12       A.  Yes.  Except for the last couple of pages.  Give
13   me just a second.  I want to finish the last couple of
14   pages.
15       Q.  Sure.
16           (Witness reviews document.)
17           MR. MCKENZIE:  Just for the record, these
18   are several documents, right, not all part of one e-mail;
19   is that correct?
20           MR. GEAR:  I was going to let him identify
21   it.
22           MR. MCKENZIE:  Oh, sorry.
23           MR. GEAR:  But that's right.  Yes, there
24   would be several.
25           MR. MCKENZIE:  Okay.

212

1        Q.  (BY MR. GEAR)  Did you have a chance to review
2    the exhibit before you?
3        A.  (Witness nods head.)
4        Q.  Can you identify what this is?
5        A.  These are different e-mails.  Some of them are
6    related to each other and some aren't.  Most of them are
7    from the Secretary of State's office although some of them
8    are from within the governor's office.
9        Q.  So let's just start from Page 1, or the first
10   page of exhibit --
11       A.  40050.
12       Q.  Yes.  40050.  You see that this was produced by
13   the State of Texas, correct?
14       A.  That's the TX designation?
15       Q.  Yes.
16       A.  Yes.
17       Q.  Do you see the designation of legislative
18   privilege on this document?
19       A.  Oh, I'm sorry.  We're on Page 40055?
20       Q.  I'm sorry.
21       A.  I skipped it.  I'm sorry.
22       Q.  Do you see the designation of legislative
23   privilege?
24       A.  Yes.
25       Q.  Are you claiming legislative privilege based on

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Michael Schofield                                    June 1, 2012

225

1    director.
2        Q. And turning your attention to 24520, I believe.
3        A. Yes.
4        Q. I have no further questions on that.
5            Do you want to change any of the answers that you
6    have provided today?
7        A. Not as we sit here today.  I'm sure if I see the
8    transcript and have an errata sheet, but at this time I
9    don't have any.
10       Q. Throughout the course of the deposition you've
11   corrected the record when you've remembered something.  Is
12   there any other corrections or anything that you want to
13   change on the record as you've testified today?
14       A. Not at this time.
15       Q. Is there anything additional you want to share
16   regarding the voter ID legislation?
17       A. No, sir.
18           MR. GEAR:  So at this point I have no
19   additional questions and I'm going to allow Chad to ask
20   you a few questions, but I would say that I'm going to
21   hold this deposition open pending the Court's ruling on
22   the privilege issue.  So, in other words, we may all be
23   back here again.
24                   EXAMINATION
25   BY MR. DUNN:

226

1        Q. Is it Scholfield or Scholfield?
2        A. Scholfield.
3        Q. Scholfield.  I beg your pardon.  My name is Chad
4    Dunn.  I represent the intervenors in the case, several
5    groups of intervenors, and I'm the representative for all
6    of them here today.  I just have a few questions, and some
7    of them are going to sound like I'm asking the same thing,
8    but that's really just trying to get you to the point
9    where you're at the subject matter I want to talk to you
10   about.  Okay.
11           You were asked some questions about voter
12   registration and fraudulent voter registration generally
13   and the public testimony regarding that.  Do you remember
14   that?
15       A. I remember the basic area of testimony.
16       Q. I'm going to be very precise in my questioning
17   and at no point do I intend to ask you a question about
18   anything that's not in the public record.  Okay?
19       A. (Witness nods head.)
20       Q. I'll try to make that clear, but I just want you
21   to know that up front.
22           Other than what is in the public testimony in
23   support of SB 14, do you have any other information
24   regarding voter fraud as it applies to SB 14?
25           MR. MCKENZIE:  I'm going to object on

227

1    deliberative process grounds.
2            MR. DUNN:  I'm not asking what it is, I'm
3    just asking if he has it, yes or no.
4            MR. MCKENZIE:  But you're asking him if he
5    has information on voter fraud.  I was going to inform the
6    knowledge he has before or while an analysis from the
7    governor's office, so I'm going to stand on the objection.
8            MR. DUNN:  So your position to the Court is
9    he can't even identify whether he has information
10   independent from the public record.
11           MR. MCKENZIE:  Yeah.  My position to the
12   Court is that to the extent it would reveal -- the fact
13   that he has information on voter fraud in his office that
14   he could have relied on in his analysis, then that would
15   be privileged, yes.
16           MR. DUNN:  And you understand the Court has
17   said we're allowed to obtain information at least to the
18   effect of a privilege log.  So if I don't even know if
19   there is that information, then it's like not providing a
20   privilege log.  I'm not asking what it is, I'm just asking
21   him to identify whether he's got it.
22           MR. MCKENZIE:  Right, I understand.  But to
23   me the layer is more specific than just talking about
24   voter ID.  You're talking about voter fraud, which is one
25   of the issues that's in contention.  How much it was

228

1    weighed or analyzed by the governor's office I think is
2    something that would be subject to the deliberative
3    process privilege.
4            MR. DUNN:  I just want the record to note
5    that I have a number of questions on this subject, and
6    we'll have to get a Court ruling on it and come back,
7    assuming my interpretation of the Court's earlier rulings
8    are correct.
9        Q. (BY MR. DUNN)  Off of that issue now for the time
10   being, with respect to testimony you gave about there
11   being, I think you said ten thousand or tens of thousands,
12   I'm not sure I heard you right, potentially fraudulent
13   voter registration.  Are you with me at least in the area
14   of the testimony?
15       A. Yes.
16       Q. Do you remember what county or counties that
17   public testimony concerned?
18       A. I remember Harris County in particular.  I don't
19   remember what other counties.
20       Q. Was the testimony from a Harris County official?
21       A. I believe so.  Or staff members.
22       Q. Okay.  Other than that testimony concerning the
23   situation in Harris County, did you hear from any other
24   counties that had a similar problem?
25       A. To be honest, I don't remember the rest of the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                    June 1, 2012

229

1    hearing. I'm from Harris County so I noted, but I don't
2    remember the rest of the...
3        Q. There may have been others, but the only one you
4    can recall is Harris County?
5        A. That's correct.
6        Q. Was -- do you recall if anybody testified at that
7    hearing to sort of rebut the allegations that Harris
8    County had made?
9        A. I don't recall.
10       Q. So essentially your opinions, as you stated them
11   earlier about potential fraud and voter registration was a
12   repetition of the testimony you heard from the Harris
13   County folks; is that true?
14       A. No.
15       Q. In other words, you have independent belief that
16   such fraud in voter registration occurs?
17       A. Yeah, I would say that whatever testimony I heard
18   that day was part of whatever went into making up my
19   analysis at the time.
20       Q. So you had other information regarding
21   fraudulent --
22       A. I can't remember all --
23       Q. -- voter registration?
24       A. I'm sorry, my fault.
25       Q. You had other information regarding fraudulent

230

1    voter registration?
2        A. I believe we did. I do not recall what it was at
3    this time.
4        Q. So by way of example in the public record only,
5    the only thing you can point us to is this Harris County
6    testimony?
7        A. As we sit here today, the only thing I can
8    recall.
9        Q. Are you aware of litigation regarding Harris
10   County's malfeasance in the operation of the voter
11   registration operation?
12       MR. MCKENZIE: To the extent that you
13   acquired knowledge of that during your tenure and during
14   your analysis at the governor's office, I instruct you not
15   to answer it.
16       A. That's the only format in which I learned any of
17   this, so I decline to answer on the advice of counsel.
18       Q. (BY MR. DUNN) Have you observed any of the
19   numerous newspaper and press reporting regarding
20   litigation concerning Harris County's voter registration
21   operation?
22       MR. MCKENZIE: Same objection to the extent
23   you acquired that while you were working at the governor's
24   office and it's part of your analysis.
25       A. I think I've seen articles. I don't remember

231

1    much about them. I don't read "The Chronicle" as much as
2    I should.
3        Q. (BY MR. DUNN) Have you accessed the Court file
4    with regard to that litigation?
5        A. No.
6        Q. And did you play any legal role in advising
7    Harris County as it pertains to that issue?
8        A. No, I've never worked for Harris County.
9        Q. Have you ever dealt with the election officials
10   in Harris County for any reason?
11       A. Yes.
12       Q. On what occasions?
13       A. When I worked in the governor's office.
14       Q. And did it always relate to election matters?
15       A. Do you mean any time I dealt with anybody from
16   Harris County or when I dealt with the people that did
17   election law?
18       Q. When you dealt with Harris County officials, was
19   it for issues other than election law?
20       A. I would deal with them on other issues too, I'm
21   sure.
22       Q. Did you have anything to do with organizing the
23   testimony for the legislative hearings?
24       A. No.
25       Q. If the evidence ultimately demonstrates that

232

1    Harris County doesn't have fraudulent registrations,
2    instead it has an organized outfit to suppress voter
3    registration, then the information you relied upon in
4    support of this bill would also be inaccurate. Would you
5    agree?
6        MR. MCKENZIE: I'm going to object on
7    speculation grounds.
8        A. That certainly calls for a lot of speculation,
9    but also, as I say, there was more than just Harris County
10   involved. Plus, as I testified earlier, there was a
11   general desire to demonstrate to the people who were
12   voting were who they said they were, irrespective of -- as
13   Mr. Gear said problems. It's not just a matter of
14   problems, it's also a matter of if you have the
15   opportunity going forward to demonstrate that voters are
16   who they say they are, that makes your elections more
17   fair.
18       Q. (BY MR. DUNN) There was a general desire to
19   support this legislation in some way factually, isn't that
20   true?
21       A. Repeat that.
22       Q. There was a general desire to support this
23   legislation by some factual basis, isn't that true?
24       MR. MCKENZIE: I'm going to object to the
25   extent that the desire is from the governor's office. To

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                              June 1, 2012

233

1   the extent it's a matter of public record, you can answer.
2       A.  I'm not sure I understand the question.
3       Q.  (BY MR. DUNN)  That's fair enough.  Have you ever
4   done any work actually administering elections?
5       A.  No.
6       Q.  Your experience as its deals with election laws
7   is advising the governor, as far as I can tell.  Is that
8   true?
9       A.  Yes.
10      Q.  In other words, you haven't run campaigns, been
11  an election lawyer, otherwise administered election
12  projects?
13      A.  No, I've been involved in campaigns.  The rest of
14  it I haven't.  I've not been an election lawyer or -- I'm
15  sorry.  Whatever -- what was the --
16      Q.  You haven't administered elections on behalf of
17  some government authority?
18      A.  No.  I think I worked the polls one time.
19      Q.  As an election judge or volunteer?
20      A.  Volunteer.
21      Q.  As an observer appointed by a candidate or party
22  or actually volunteered for the election apparatus?
23      A.  I believe I was a volunteer for the election
24  apparatus once.  I've observed for candidates I guess a
25  couple of times.  I observed the count for the Harris

234

1   County Republican party once.  But normally I -- to the
2   extent that I'd be involved in election, it would be
3   helping a candidate, not necessarily the polls.
4       Q.  I understand you work in Travis County?  That's
5   where we are today, isn't it?
6       A.  Yes.  I do not now.  I did at the time?
7       Q.  Where did work now, in Harris County?
8       A.  I don't.
9       Q.  Are you registered to vote in Harris County or
10  Travis County?
11      A.  Harris County.
12      Q.  Has that remained the same?
13      A.  Yes.
14      Q.  Even while you were working for the governor?
15      A.  Yes.  I always went home on the weekends and
16  maintained my residence in Houston.
17      Q.  Why did you not move your residence to Travis
18  County?
19      A.  I prefer Houston.
20      Q.  Have you ever been to a King Street Patriots
21  meeting?
22      A.  Yes.
23      Q.  How many?
24      A.  Probably four or five.
25      Q.  Did you volunteer to be one of their poll

235

1   watcher/observers?
2       A.  No.
3       Q.  During the 2010 election did you attend any King
4   Street Patriots meetings in the run-up to the 2010
5   election?
6       A.  I don't think so.
7       Q.  When was the last time you'd been to a meeting?
8       A.  I went to one a couple of weeks ago.  They were
9   having -- no, that was a meeting at their building, but it
10  was not a meeting at the King Street Patriots.  I take
11  that back.  But I've been to one during -- during the most
12  recent election cycle.  I've been to probably two or
13  three.
14      Q.  You're talking about this primary that we're
15  stepping into now?
16      A.  Yes.
17      Q.  I see.  Not in 2010?
18      A.  Not in 2010.
19      Q.  Is it true that you relationship, whatever it is,
20  with King Street Patriots didn't start until this election
21  cycle?
22      A.  Yes, except the fact that they came to the office
23  before that.  They came to the governor's office during
24  the last session, if not also maybe the session before.
25      Q.  And I heard your testimony about that.  I'm now

236

1   more focused on your personal interaction in attending the
2   group's functions.  That all occurred in the run-up to
3   this election, as I understand?
4       A.  Most, if not all.  I probably was at a meeting or
5   two prior, but I was not a regular attendee.  In fact I --
6   I spoke at one of their meetings.  They asked me to come
7   speak on -- I was speaking to various groups on the
8   budget, how the Texas state budget works, and I guess they
9   saw me atone and asked me to come speak to their meetings,
10  so I spoke to a King Street Patriots meeting.
11      Q.  Did you offer any information about election laws
12  when you spoke?
13      A.  No, it was a presentation about how the Texas
14  state budget works.
15      Q.  Did you attend any of the meetings that
16  Governor Perry attended?
17      A.  No.
18      Q.  Are you aware that Governor Perry has attended a
19  number of King Street Patriots meetings?
20      A.  I know that he's attended one.
21      Q.  But you weren't present?
22      A.  I was not present.
23      Q.  Would you agree that Governor Perry is a strong
24  supporter of the King Street Patriots?
25      MR. MCKENZIE:  Objection; vague.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Michael Schofield                                          June 1, 2012

---

237

1   A. I'm not sure.
2   Q. (BY MR. DUNN)  Do you have any information or
3   knowledge that you learned about the King Street Patriots
4   poll watching activities from 2010?
5   A. Do I have information about their poll watching
6   activities?
7         MR. MCKENZIE:  I'm going to object to the
8   extent that you learned about that during your time in the
9   last session, 2011 session, in service to the governor.
10  To the extent you have knowledge --
11        I'm going to object to the extent you have
12  knowledge acquired during the 2011 legislative session in
13  service of the governor.  To the extent that you have
14  knowledge outside of that service, you may answer the
15  question.
16  A. I know generally that they had a program of
17  training and providing poll watchers.  I wasn't involved
18  in it.  I don't know specifically about it.
19  Q. (BY MR. DUNN)  Have you volunteered to be a poll
20  watcher for King Street Patriots?
21  A. No.
22  Q. Have you attended any of their training?
23  A. No.
24  Q. Have you watched any of the videos they prepared?
25  A. I didn't know they had any.

---

238

1   Q. Have you attended any events where speakers came
2   and spoke about voter fraud?
3   A. I don't think so.  They have different speakers
4   from around the nation talk, they have authors come in,
5   they have different people.  I usually come to talk to the
6   people I know in the audience rather than to see the
7   speaker, but I don't recall specifically one on voter
8   fraud.
9   Q. Where are these meetings you attend?
10  A. They have a office in Houston by the Loop.
11  Q. Are you aware of allegations that the King Street
12  Patriots poll watchers in 2010 were assigned almost
13  exclusively to minority poling locations?
14        MR. MCKENZIE:  I'm going to object to the
15  extent you acquired that knowledge in the 2011 legislative
16  session in service of the governor.  To extent you have
17  knowledge of that outside of that service, you may answer
18  the question.
19  A. I think Senator Van De Putte made that allegation
20  on the floor.  That's the only time I've heard it.
21  Q. (BY MR. DUNN)  You haven't heard that in any of
22  the press reporting regarding the King Street Patriots?
23        MR. MCKENZIE:  Same objection.
24  A. I don't think so.
25  Q. (BY MR. DUNN)  Were you aware that the Department

---

239

1   of Justice ultimately sent in inspectors in 2010 because
2   of King Street Patriots activities?
3         MR. MCKENZIE:  Same objection.
4   A. No.
5   Q. (BY MR. DUNN)  Have you attended any of the
6   statewide or nationwide summits for King Street Patriots?
7   A. I think one of the events I went to was their
8   first summit.  They had something at a hotel that was
9   being simulcast, and I was there for a couple of hours on
10  a Saturday morning.
11  Q. That was a Sheraton Brookhollow hotel there at
12  610 and 290?
13  A. I don't recall.  I was probably an hour and a
14  half.
15  Q. Did you watch any of the simulcast speeches?
16  A. I probably watched some of the speeches, but
17  again usually I go to the events, I talk to people I know
18  in the audience.  And I don't know for a fact that it was
19  the summit, but it seems like it might have been.
20  Q. Did you see Catherine Engelbrecht there and speak
21  with her?
22  A. I probably did.
23  Q. Have you made any financial donations to King
24  Street Patriots?
25  A. No.

---

240

1   Q. What sort of contact -- have you had any contact
2   with Paul Bettencourt?
3   A. Yes.  He's a friend of mine.
4   Q. How long have you been friends with him?
5   A. Probably since the mid 1990s.
6   Q. Did Mr. Bettencourt ever discuss with you the
7   occasion when he was sued for violating federal laws that
8   related to voter registration?
9   A. Not that I recall.
10  Q. Have you ever worked in the Harris County tax
11  office?
12  A. No.
13  Q. Have you ever applied to work there?
14  A. I don't think so.
15  Q. Have you given any legal advice to the Voter
16  Registration Department in Harris County?
17  A. No.
18  Q. Do you deal with Ed Johnson ever?
19  A. Yes.
20  Q. How do you know him?
21  A. He's a friend of mine.  He lives probably a mile
22  and a half from me.
23  Q. How long have you and Ed Johnson been friends?
24  A. Since at least 2005.
25  Q. Were you associated with Ed Johnson's consulting

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                June 1, 2012

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )  CASE NO. 1:12-CV-00128
                                   )  (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his        )  Three-Judge Court
official capacity as Attorney)
General of the United States,)
                                   )
        Defendant.                 )
                                   )
ERIC KENNIE, et al.,               )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS STATE CONFERENCE OF          )
NAACP BRANCHES, et al.,            )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al.,            )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
        Defendant-Intervenors.     )

-------------------------------------------
              ORAL DEPOSITION OF
                 TODD SMITH
                JUNE 1, 2012
-------------------------------------------
    ORAL DEPOSITION of TODD SMITH, produced as a witness

**Page 2**

1   at the instance of the Defendant, and duly sworn, was
2   taken in the above-styled and numbered cause on the 1st
3   day of June, 2012, from 10:45 a.m. to 4:54 p.m., before
4   Jean Thomas Fraunhofer, CSR in and for the State of
5   Texas, reported by machine shorthand, at the Law Offices
6   of DECHERT LLP, 300 West 6th Street, Suite 210, Austin,
7   Texas 78701, pursuant to the Federal Rules of Civil
8   Procedure and the provisions stated on the record or
9   attached hereto.

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    MATTHEW FREDERICK
    Assistant Attorney General
    ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, Texas 78711
    Tel: (512) 936-1307
    Email: Matthew.frederick@oag.state.tx.us

FOR THE DEFENDANT:

    ELIZABETH S. WESTFALL
    MICHELLE A. McLEOD
    Trial Attorneys
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    Room 7254 NWB
    Washington, DC 20005
    Tel: (202) 305-0115
    Email: Elizabeth.westfall@usdoj.gov

FOR THE DEFENDANT-INTERVENOR: MALDEF
    NINA PERALES
    LUIS FIGUEROA
    MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL
        FUND (MALDEF)
    110 Broadway, Suite 300
    San Antonio, Texas 78205
    Tel: (210) 224-5476
    Email: Nperales@maldef.org

ALSO PRESENT: JUAN CARLOS IBARRA (Advancement Project)
              JANINE LOPEZ (MALDEF)

**Page 4**

I N D E X

WITNESS                                    PAGE

TODD SMITH
    Examination by Ms. Westfall              5
    Examination by Ms. Perales             181

Signature and Changes                      252
Reporter's Certificate                     253

        E X H I B I T S
NO.     DESCRIPTION                        PAGE
EXHIBIT US-28  HB218 (previously marked)    87
EXHIBIT US-29  HB362 (previously marked)    96
EXHIBIT US-81  SB14 (previously marked)    138
EXHIBIT US-88  2/8/11 Letter to John Beck from  239
               David Dewhurst (previously marked)
EXHIBIT US-100  Amended Notice of Deposition     11
EXHIBIT US-101  Documents Privilege Log          58
EXHIBIT US-102  HB1706                           72
EXHIBIT US-103  Texas Legislative Online History  100
                (SB362)
EXHIBIT US-104  Clear Lake GOP website screen   111
EXHIBIT US-105  3/28/09 Lubbock Online website  117
                screen
EXHIBIT US-106  HB401                           128
EXHIBIT US-107  HB1338                          132
EXHIBIT US-108  Texas Legislative Online History  149
                (SB14)
EXHIBIT US-109  3/21/11 House Journal           153
EXHIBIT US-110  3/23/11 House Journal           169
RODRIGUEZ-15   HB1706                           181
RODRIGUEZ-16   3/6/09 Memo to Todd Smith from   189
               Hope Andrade
RODRIGUEZ-17   4/6/09 Committee on Elections    198
               Transcript
RODRIGUEZ-18   4/7/09 Committee on Elections    199
               Transcript (Vol. 1)
RODRIGUEZ-19   4/7/09 Committee on Elections    203
               Transcript (Vol. 3)
RODRIGUEZ-20   4/6/09 Committee on Elections    208
               Transcript (Vol. 2)
RODRIGUEZ-21   A Bill to be Entitled An Act     209
RODRIGUEZ-22   4/29/09 Quorum Report            215
RODRIGUEZ-23   5/6/09 Quorum Report             219
RODRIGUEZ-24   2/9/10 Quorum Report             236



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

21

1    A.  From SMU, I graduated in 1985.
2    Q.  What year did you graduate from the University
3  of Texas?
4    A.  I guess it would have been December of 1988.
5    Q.  Did you maintain an active bar license?
6    A.  Yes.
7    Q.  What state is that with?
8    A.  Texas.
9    Q.  And do you have a license in any other states?
10   A.  No.
11   Q.  Can you list all of the jobs that you have had
12  since you graduated from law school in chronological
13  order starting with right after law school?
14   A.  Locke, Purnell, Rain, Harrell was the name of
15  it.  Now it's Locke Lord, I think, or whatever, and then
16  the Note Boom Law Offices, and then my own law practice.
17   Q.  What is your current job?
18   A.  I am a plaintiff's attorney, sole proprietor,
19  in Bedford, Texas.
20   Q.  What is your area of practice?
21   A.  Personal injury.
22   Q.  How long have you had your own practice?
23   A.  Since 1996.
24   Q.  Do you have any partners?
25   A.  No.

22

1    Q.  When were you first elected to the Texas House
2  of Representatives?
3    A.  1996.
4    Q.  What area does that encompass?
5    Q.  Geographically?
6    Q.  Geographically.
7    A.  Roughly the Hurst, Euless, Bedford area.
8    Q.  What is the number of the district?
9    A.  92.
10   Q.  What are the demographics racially of the
11  district approximately?
12   A.  Oh, gosh.
13   Q.  I don't want to hold you to it precisely.
14   A.  I mean, it's --
15       MR. FREDERICK:  Object on relevance, but
16  you can answer the question.
17   A.  I mean, it's overwhelmingly anglo, but there is
18  a substantial, I guess, Hispanic minority population and
19  a fairly substantial Tongan minority population in south
20  Euless, and I just would be wrong, I think, if I
21  asked -- I mean, I would venture to guess that maybe
22  30 percent is minority of some type.  I could be wrong.
23   Q.  In terms of the growth and changes in
24  population in your house district, has it been trending
25  sort of increasingly Hispanic --

23

1    A.  Sure.
2    Q.  -- since '96?
3    A.  Yes.  I think it's becoming more diverse in a
4  variety of regards.  It's just not Hispanic.  It's very
5  diverse.  We've got elementary schools on the south side
6  of my district where there's 50 languages spoken in that
7  one school, so just very, very diverse from all over the
8  world.
9    Q.  Thank you.  How many staff do you have in your
10  House office?
11   A.  Depends on when you are talking about, but
12  currently during the interim, I have one in Austin and
13  one in the district.
14   Q.  And when the House is in session?
15   A.  Then we add a few temporary employees in the
16  Austin office that work session only usually, students.
17   Q.  Can you identify the name and title of every
18  person who has worked in your office who has handled
19  voter ID or photo ID issues since 2005?
20   A.  Oh, boy.  Golly.
21   Q.  And I put aside interns.
22   A.  I'm trying to remember who my chief of staffs
23  have been since 2005.  I'm not going to be able to
24  remember their names.  That's awful, but --
25   Q.  Could you perhaps identify the central staff

24

1  people who helped you with photo ID and voter ID from
2  2005 to the present?
3    A.  It's like -- These are people that you work
4  with for four months and then they disappear on you and
5  you don't see them again.  Oh, boy.
6    Q.  You know what, Mr. Smith, maybe if you are
7  having difficulty remembering them, we can discuss them
8  in conjunction with particular legislation and that will
9  refresh your recollection.  Would that be helpful?
10   A.  Steven Schar is certainly one of them.  He was
11  the clerk of the elections committee, and then, gosh,
12  the young man that's now works, I think, in the Perry
13  political operation.  I just can't remember his name.
14  Those two -- There were two guys that were kind of
15  actively involved in that issue in the session where I
16  was involved in.
17   Q.  Were -- These two individuals, they worked for
18  you as committee staff or handled your responsibilities
19  on the election committee?
20   A.  Yeah.  My clerk and my assistant clerk, so,
21  yes, elections committee staff.
22   Q.  Was this in 2005 and 2009?
23   A.  Not '05.  It was 2009.
24   Q.  What were their responsibilities generally?
25   A.  Just the -- the -- to conduct the affairs of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

25

1    the elections committee in every respect.
2         Q.   Does that mean coordinating witnesses, working
3    with other members on the committee?  What are those
4    responsibilities?
5         A.   Yeah.  I mean, it means visiting with me about
6    which bills would be set for hearing, making sure
7    that -- that the procedures are followed properly for
8    setting bills for hearing and that -- that members of
9    the committee have the information they need to know
10   what bills are going to be heard and that the -- you
11   know, if it's invited testimony, make sure the people
12   are invited to testify that need to be, and to the
13   extent that it's public testimony, that the proper
14   notice is given so that whatever members of the public
15   wish to testify can do so, and, you know, then following
16   the hearings, arrange other hearings to vote bills out
17   of committee, you know, just what all committee clerks
18   do.
19        Q.   Would those clerks be responsible in any way
20   for communicating with their counterparts in the Senate
21   whether it was -- I guess it would be the committee as a
22   whole in 2009?
23        A.   I don't know.  I mean, I can't say.  I don't --
24   You know, I don't know the extent to which there were
25   incidental communications between staff and the House on

26

1    elections and staff on the Senate.  I presume there was
2    at least some degree of contact along the way.
3         Q.   Did they communicate with members of the
4    Senate?
5         A.   I doubt extensively.  Maybe not at all.
6         Q.   Were you the one who handled those
7    communications yourself?
8         A.   Yet to the extent that they occurred, then that
9    would have been me.  I did -- You know, I would have
10   talked to Fraser a time or two and actually observed
11   some of the proceedings in the Senate, just small
12   portion of the time they spent over there, just
13   watching, talking to people.
14        Q.   Were you on or near the Senate floor when the
15   Senate considered Senate Bill 362 in 2009?
16        A.   For part of it, yes.
17        Q.   How long were you physically there?
18        A.   Boy, I think I probably got bored within a
19   couple of hours, I don't remember how long, but it
20   wouldn't have been nearly as long as they had to be
21   there.
22        Q.   Do you remember which witnesses you got to hear
23   speak?
24        A.   You know, I don't really remember.  I could
25   guess, but I could be -- I could be confusing what I saw

27

1    with what I read, so I don't really remember, no.
2         Q.   Did you recently --
3         A.   It may not even have been witnesses.  It may
4    have been during the time when there was argument being
5    made between senators, and, again, you know, I want
6    to -- it wasn't that -- I want to believe that that was,
7    you know, the time when Senator Fraser said he couldn't
8    hear Wendy Davis.  I do remember that.  If I recall
9    correctly, I think I was on the floor when that
10   happened.
11        Q.   Okay.  Thank you.
12        A.   That didn't have anything to do with voter ID,
13   but it was entertaining.
14        Q.   Did you recently campaign for office in the
15   Senate?
16        A.   Yes.
17        Q.   What district was that?
18        A.   Senate District 9.
19        Q.   Did you resign from the House -- your House
20   seat to run?
21        A.   I did.
22        Q.   Why did you decide to run in the Senate?
23        A.   Oh, boy.
24             MR. FREDERICK:  Objection.  Relevance.
25             MS. WESTFALL:  It's just some background

28

1    foundational questions, Mr. Frederick.
2         A.   You know, that was -- there's lots of reasons
3    why I decided to do that, but just the opportunity.  An
4    open seat was certainly one of them, the belief that
5    those Senate seats on the margin in the Senate were
6    really important and could actually have the ability to
7    influence public policy, unlike my House seat in the
8    current, you know, overwhelming majority situation.  And
9    just a little bit of frustration with my leader, you
10   know, in the House in terms of the most recent
11   legislative session and wanting to have an opportunity
12   to -- to serve in a different place.
13        Q.   You were unhappy with Mr. Straus because of the
14   way he was managing your committee assignments or --
15        A.   Yeah.
16        Q.   -- the way he managed the House or what was the
17   nub of the problem?
18        A.   Oh, it was just disappointment over how I
19   was -- what positions I was given, and it did in my
20   opinion relate to the voter ID issue certainly, and so,
21   yeah, I felt like I was thrown in the bus by him and
22   wasn't happy about it.  So it was just, you know --
23        Q.   Time to try something new?
24        A.   I was a very loyal person who handled it in the
25   way was asked and fully protected him and then had

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com


ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                          June 1, 2012

29

1  every reason to believe that I was going to be given a
2  chairmanship and that did not happen, and so he was not
3  happy, and I don't think that anything could fully
4  repair the way I felt about that.  So it was -- it would
5  have been certainly preferable from my standpoint to
6  have the opportunity to serve in the Senate for a
7  variety of reasons, including that one.
8      Q.  I see.  I see.  And did you have an opponent in
9  your primary election?
10     A.  Yes.
11     Q.  Who was that individual?
12     A.  Kelly Hancock.
13     Q.  What was -- And you described the outcome of
14 the election.  Why do you think Ms. Hancock prevailed?
15     A.  Mr. Hancock.
16         MR. FREDERICK:  Object to relevance, but
17 you can answer the question.
18     A.  I think because he had the -- primarily because
19 he had the endorsement of the Attorney General.
20     Q.  I see.
21     A.  I'm kidding.
22     A.  I'm not from around here.
23     A.  No.  I -- You know, he had the right groups,
24 and he was the, you know, most -- at least the one who
25 was perceived to be the most conservative candidate and

30

1  that was the one who won in all the races in our area in
2  this particular election cycle.
3      Q.  Was photo ID an issue in the campaign?
4      A.  Yeah.  He hit me on it a time or two.  It
5  wasn't the biggest issue, but he did put in his
6  literature that I wanted people to be able to vote with
7  a library card or something like that, even though I
8  believe he voted for the same legislation in a prior
9  session.
10     Q.  Was there anything else that -- that your
11 opponent raised in terms of photo ID during the
12 campaign?
13     A.  Not during this one.  During the one two years
14 ago was the biggest issue.
15     Q.  In 2010?
16     A.  2010.  I had an opponent in my primary -- in my
17 House in that race.  It was the biggest issue.
18     Q.  And what was the substance of --
19     A.  That I killed voter ID on purpose by keeping
20 the bill in committee until late in the process.
21     Q.  And what was your opinion of that charge?
22     A.  That it was ridiculous.
23         MR. FREDERICK:  I'm going to object here.
24 I think we're getting into legislative privilege.  This
25 is seeking your opinion about the process of

31

1  consideration of a specific bill in 2009.  I think that
2  intrudes on legislative privilege.  I will instruct you
3  not to answer the question.
4          MS. WESTFALL:  Mr. Frederick, this is not
5  about a legislative act.  This is about a political
6  campaign that occurred after the consideration of the
7  bill.  The bill was no longer at issue.  I would ask you
8  to allow Mr. Smith to answer that question.  This is not
9  privilege.
10         MR. FREDERICK:  This question directly
11 asks him for his opinion about a charge about his
12 handling of a specific piece of legislation that is at
13 issue in this case that would reveal his thoughts about
14 pending legislation because it required him to reveal
15 how he felt about how the registration was handled.  I
16 would instruct him not to answer on the basis of
17 privilege.
18     Q.  (BY MS. WESTFALL) I will ask it a different
19 way.  How did you respond during the campaign to that
20 charge?
21     A.  You know, by saying that it was false, and,
22 certainly, the date the bill came out of committee was a
23 fact, but it was not -- I spent the entire legislative
24 session almost night and day trying to find a way to
25 pass a voter -- a voter ID bill -- not a photo ID bill,

32

1  but a voter ID bill in a 76/74 legislative body, and so
2  the allegation that I did anything other than stay awake
3  at night trying to find a way to pass this bill was
4  simply false.
5      Q.  Thank you for your testimony.
6      A.  M-hm.
7      Q.  Sir, when was the last time you voted?
8      A.  Tuesday.
9      Q.  Do you usually vote in person or do you vote by
10 mail?
11     A.  Person.
12     Q.  Where is your polling place relative to your
13 residence?
14     A.  Early voting is a library in Euless.  This time
15 I voted on election day at an elementary school, North
16 Euless Elementary School.
17     Q.  Was it far from your home?
18     A.  No.  It's -- The library is 5 miles and the
19 elementary school is 3 miles probably.
20     Q.  So do you usually vote in person at the polls?
21     A.  Yes.
22     Q.  Have you ever seen anyone try to impersonate a
23 voter when you've been voting?
24     A.  No.
25     Q.  Have you ever witnessed what you believe to be



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

33

1    a noncitizen voting?
2        A.   No.
3        Q.   Have you ever challenged the voter's
4    eligibility to vote yourself?
5        A.   Have I ever challenged the voter --
6        Q.   A voter's eligibility at the polls.
7        A.   No.
8        Q.   Have you served on any committee in the House
9    that handled election issues?
10       A.   Yes.
11       Q.   When was the first session that you served on a
12   committee in the House handling election issues?
13       A.   Craddick stuck me there at some point.  I
14   don't -- Under Mary Denny, whenever Mary Denny was
15   chairman.
16       Q.   Was that not something that you welcomed?
17       A.   No.
18       Q.   Is this a committee that members get assigned
19   to that's not always something of their choice?
20       A.   This depends upon who you are.  Betty Brown
21   loved that committee.  I didn't.
22       Q.   Did you have a background in election law --
23       A.   No.
24       Q.   -- as a lawyer?
25       A.   No.

34

1        Q.   Have you ever had any experience researching or
2    understanding issues under the Texas Election Code or
3    Federal election laws before that time?
4        A.   No.
5        Q.   So was 2005 the first time; do you believe?
6        A.   If that's when Mary Denny was chairman, yes,
7    and then he would have gone off and then I was chair in
8    2009.  Those are the only two sessions I ever served on
9    the committee.
10       Q.   Who was the speaker at the time who appointed
11   you to that committee --
12       A.   To chair or to --
13       Q.   -- in 2005 to serve on the committee?
14       A.   Craddick.
15       Q.   And I believe you testified you were the
16   chairman of the committee in 2009; is that correct?
17       A.   That's correct.
18       Q.   What responsibilities does a member have at
19   chairing a committee as opposed to serving on a
20   committee?
21       A.   The power to set bills for hearing.  The power
22   to not set bills for hearing.  The power to put bills up
23   for a vote in committee.  The power not to.  I think
24   that's the biggest part of it.
25       Q.   And are chairs of committees generally directed

35

1    by the House speaker as to those activities or do they
2    act independently?  Do they have their own authority to
3    do --
4        A.   They have their own authority, but I think, you
5    know, there's usually consultation with the speaker's
6    office about things.
7        Q.   Are you familiar with the select committee on
8    voter ID and voter fraud?
9        A.   I knew that there was one last session.
10       Q.   That was in 2011?
11       A.   Yes.
12       Q.   Why was that committee -- or why was that
13   select committee convened?
14            MR. FREDERICK:  Objection.  Object on
15   privilege.  To the extent this question calls for you to
16   reveal any communication with a legislator or a staff
17   member about the reason for why this committee was
18   convened, I'll instruct you not to answer.  If you can
19   answer without revealing that, you may answer.
20       A.   Yeah.  I mean, as far as why it was convened,
21   that would be a question that only the speaker or his
22   staff could answer.  I don't know.
23       Q.   Was it convened in 2010 for the 2011 session?
24       A.   I don't remember that.  My recollection is that
25   it was convened for the first time in the session itself

36

1    in 2011.
2        Q.   Were you a party to any of the communications
3    related to the convening of that committee?
4        A.   No.
5        Q.   How did you learn about it?
6        A.   I think I learned about it when the committee
7    assignments came out that I was not happy about it.
8        Q.   I see.  I see.  And was who was assigned to
9    serve as the chair of that committee?
10       A.   Dennis Bonnen.
11       Q.   And Ms. Harless was also serving on that
12   committee; is that right?
13       A.   I don't remember that.  I don't remember, but I
14   wouldn't be surprised.
15       Q.   Why do you think Mr. Bonnen was assigned to
16   chair that committee?
17       A.   I don't know.
18       Q.   Was it convened to one bill?
19       A.   That's my understanding, but I don't know for
20   sure.
21       Q.   And that bill was Senate Bill 14; is that
22   right?
23       A.   Yes.
24       Q.   And so you did not even serve on that
25   committee; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

37

1    A.   That's correct.
2    Q.   Can you identify based on your experience in
3    the House any other selected committees that were
4    convened to hear one bill in the session?
5    A.   Well, you know, I served on in 2001, I think, a
6    select committee on teacher health insurance, for
7    example, or I think that that committee was all about
8    one bill.
9    Q.   Can you think of any others?
10   A.   I can't, but I wouldn't be surprised if there
11   aren't some because that one -- the only reason I
12   remember that is because I actually served on it myself.
13   Q.   And is it usual for select committees to only
14   consider one bill?
15   A.   Is it usual?
16   Q.   Yes.  If a select committee is convened is it
17   only to consider one bill is my question.
18   A.   I think they generally are at least for
19   considering one subject matter, if not one bill.
20   Q.   Other than that one select committee you
21   remember from 2001 and the select committee on voter
22   fraud, voter ID in 2011, do you remember any other
23   select committees convened while you were serving in the
24   House?
25   A.   Right now I'm serving on a select committee on

38

1    school finance.  Again, you know, that is something that
2    may or may not lead to a single piece of legislation,
3    but it is certainly limited to that purpose.
4    Q.   Are you aware of any other select committees
5    related to voting or elections law that were convened
6    prior to the select committee in 2011?
7    A.   I don't know.  Not that I recall.
8    Q.   Do you know whether the select committee on
9    voter ID or voter fraud was a fast track, so to speak,
10   committee?
11   A.   I don't know what that means really.
12   Q.   Who do you think would know?
13   A.   What a fast track committee means?  I mean, I
14   presume, you know -- I mean, I think the committee could
15   have voted the bill out early or late just like any
16   other committee.  They chose to vote it out early, but I
17   don't know if there's anything about the structure of
18   the committee that required that result.
19   Q.   Did the elections committee still operate
20   during the 2011 session even though there was this
21   select committee on voter ID?
22   A.   Yes.
23   Q.   Did the House elections committee consider any
24   legislation related to mail-in ballot fraud?
25   A.   In 2011?

39

1    A.   Yes.
2    A.   I believe they did.  I believe they considered
3    legislation, and I think I recall Larry Taylor making
4    public comments about that, but I could be wrong.
5    Q.   Were there any hearings related to mail-in
6    ballot fraud in 2011 --
7    A.   I don't know.
8    A.   -- for the committee?
9    A.   I do not know.
10   Q.   Did you attend any of the committee meetings?
11   A.   No.  I was not on the committee.
12   Q.   You were not on the House elections committee
13   in 2011?
14   A.   No.
15   Q.   I see.  Are you familiar with the Federal
16   Voting Rights Act?
17   A.   Generally.
18   Q.   Are you familiar with Section 5 of the Voting
19   Rights Act?
20   A.   Just generally.
21   Q.   What's your understanding of Section 5's
22   requirements based on your experience as a lawyer?
23   A.   That there are certain states that have to have
24   the changes in election law pre-cleared by the
25   Department of Justice in order for them to go into

40

1    effect.
2    Q.   And it was your understanding that Senate Bill
3    14 would have to go through that process?
4    A.   Yes.
5    Q.   As a general matter, not -- not talking about
6    Senate Bill 14 in particular, but based on your service
7    on the elections committee, what steps have you taken,
8    if any, when legislation that's subject to Section 5 is
9    being drafted and developed and considered by the House?
10   MR. FREDERICK:  I think -- I don't believe
11   that this question is intended to call for privileged
12   communications.  I would just object to the extent that
13   it could be construed that way and caution you, you may
14   answer a question, but don't reveal any privileged
15   communication about a specific piece of legislation.
16   A.   Can you repeat the question again?
17   MS. WESTFALL:  Sure.  It was a long
18   question.  Well, actually, court reporter, could you
19   read that back?
20   (Requested portion was read.)
21   A.   I don't -- You know, I don't recall there being
22   any specific additional steps that were taken.
23   Obviously, we can always seek the advice of legal
24   counsel in drafting legislation to the extent that there
25   are questions about whether or not it is likely to meet


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

41

1   that standard or not, and, you know, I don't -- in 2009
2   when I was involved in this, we really didn't get close
3   enough to passing a bill to get too active in that kind
4   of discussion.
5       Q.   Ordinarily at what stage in the process would
6   you consult counsel to make sure that your bill is going
7   to be Section 5 compliant?
8       A.   I don't -- I don't think there is -- I don't
9   know that there has been any other situation where it
10  was really as sensitive as the voter ID bill.
11      Q.   I see.  But, ordinarily, I mean, you would like
12  to have your legislation be pre-cleared --
13      A.   Sure.
14      Q.   -- for Section 5 because you want to implement
15  whatever you enact; is that right?
16      A.   Yes.
17      Q.   So you would want to take steps to make sure if
18  there's any questions or concerns or potential pitfalls
19  that a legislation might have?
20      A.   Right.
21      Q.   To make sure that it was compliant, correct?
22      A.   Right.  And the bottom line was that any
23  legislation that I would have drafted in 2009 that would
24  have had a chance to pass was in my judgment clearly
25  compliant.

42

1       Q.   I see.
2       A.   It wasn't in my view close to any legal line,
3   and I didn't know anybody who thought any of the
4   legislation that we were considering in 2009 that, you
5   know, seriously believes that it would have a problem
6   surviving that -- that Section 5 challenge.
7       Q.   What do you base that understanding on?  And I
8   don't mean to intrude upon any attorney-client
9   communications you might have, but is it based on your
10  own view as a lawyer and understanding of Section 5 or
11  what?
12      A.   Just -- Yeah.  No.  It is a sense that I had
13  from the totality of information that I had available to
14  me, including every conversation I ever had, everything
15  I ever read on the subject and, you know, familiarity
16  with the kind of arguments that are made regarding other
17  forms of the legislation and other states.  And so,
18  yeah, I'm certainly not a -- a legally -- a legal expert
19  opinion.  It was a policymaker's sense and judgment
20  based on everything I knew.
21      Q.   Are you referring to substitute legislation
22  that you sought to advance in 2009 related to SB362?
23      A.   Substitute legislation?
24      Q.   I'm using the wrong term, but --
25      A.   My legislation, yes.

43

1       Q.   Correct.
2       A.   Yes.
3       Q.   Was there a bill number for that?  Did you file
4   that?
5       A.   Yeah.  It was a Senate bill as well.  It went
6   through the Senate first as well, but I don't remember
7   the number.
8       Q.   But it wasn't Senate Bill 362.  It was
9   something else?
10      A.   I don't remember.  I don't remember what the
11  Senate bill was that session.
12      Q.   We'll talk about it a little bit later today,
13  but thank you for your testimony.
14           What is your understanding of Section 5's
15  specific requirements?
16      A.   Gosh.  That -- You know, that -- you must
17  establish that it doesn't -- the legislation doesn't
18  have the intent or the effect of reducing minority
19  voting participation.
20      Q.   And I believe you testified earlier that it
21  applies to all voting changes; is that right?
22      A.   That's my understanding.  Anything that affects
23  elections in most states.
24      Q.   Have you ever received any legal advice from
25  any source on election related matters related to

44

1   Section 5 without revealing the content of that advice?
2       A.   I don't know about -- I mean, just informal
3   conversations with -- you know, with someone who is an
4   attorney and was recommended to me as having some
5   background and expertise in that, yes.
6       Q.   Who is that individual?
7       A.   Ted Cruz.  I think it was a brief telephone
8   conversation with our next senator.
9       Q.   Are you familiar with a Federal law called The
10  Help America Vote Act?
11      A.   You know, again, I couldn't tell you what it
12  does, but I have heard of it, and I'm trying to remember
13  what -- what it does.
14      Q.   Do you know what forms of identification are
15  sufficient under The Help America Vote Act for purposes
16  of first time registrants?
17      A.   No, I don't remember.
18      Q.   Did you review the Supreme Court's decision,
19  Crawford versus Marion County, when it was issued by the
20  Supreme Court in 2008?
21      A.   The Indiana case?
22      Q.   Yes.
23      A.   Yeah, I did.
24      Q.   Did you believe it impacted the state's ability
25  to craft photo ID laws?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

45

1     A.   Did I believe the case --
2     Q.   Do you believe the opinion had an ability on
3  states covered by Section 5 of the Voting Rights Act to
4  develop and enact photo ID laws?
5     A.   I'm not sure I understand the question.
6     Q.   Did Crawford have any impact on the state's
7  ability to get Section 5 preclearance of photo ID laws?
8     A.   I don't -- You know, that's a legal question I
9  don't know that I can answer, but my understanding is
10  Indiana is not a Section 5 state and that the Voting
11  Rights Act was not an issue.  It was just an
12  interpretation of the US constitution.
13     Q.   Are you currently -- Strike that.  Are you
14  familiar with the American Legislative Exchange Counsel?
15     A.   Yes.
16     Q.   What is it?
17     A.   It's a bunch of bills, groups that invite
18  legislators to come and hear their pitch.
19     Q.   Are you a member of what I'll refer to as ALEC?
20     A.   Yes.
21     Q.   In what capacity?
22     A.   State Representative.
23     Q.   How long have you been a member of ALEC?
24     A.   Probably the whole time I've been in the
25  legislature.

46

1     Q.   Do you go to its meetings and conversations?
2     A.   Sometimes I have.
3     Q.   Have you been to meetings and conversations in
4  which photo ID was discussed?
5     A.   I don't remember.  Not that I recall.
6  Actually -- Actually, I do recall.  I think there was a
7  meeting because I, you know, remember the guy that wrote
8  the book that testified in these hearings.  I can't
9  remember his name.  Anyway, I assume you know who I'm
10  talking about, but I can't remember his name.  It starts
11  with an F.  Anyway, I think there was a meeting
12  involving voter ID and -- you know, and it may have been
13  an ALEC meeting and that author that I can't remember
14  his name would have testified and that, you know,
15  Baznowski (phonetic) or --
16     Q.   Von Spakovsky?
17     A.   Yes, him.
18     Q.   When was this meeting?  Maybe you can --
19     A.   You know, I think it was after two -- during
20  the interim after 2009 and before 2011, probably the
21  summer following the 2009 legislative session.
22     Q.   Was the meeting in Washington DC or elsewhere?
23     A.   No, I don't think so.  I'm wanting to say it
24  was like Atlanta.
25     Q.   Did you receive at that conference any

47

1  materials related to model legislation, draft
2  legislation, talking points, any written materials
3  related to voter ID you can think about?
4     A.   I think there was some, but I don't -- and I
5  probably picked it up and probably never read it.
6     Q.   Do you think you retained it in your files?
7     A.   I don't -- Probably not.
8     Q.   So it was in Atlanta sometime in 2010 to the
9  best of your recollection?
10     A.   Yes.
11     Q.   Was it a panel of folks on photo ID?
12     A.   I think so.
13     Q.   And Mr. von Spakovsky was one of the speakers?
14     A.   I think so.
15     Q.   Do you remember any other panel members?
16     A.   The author was there.  I can't remember his
17  name.
18     Q.   Was that the -- Was that ALEC conference the
19  only one you can remember in which photo ID was
20  discussed?
21     A.   That's the only one I remember, yes.
22     Q.   Do you know if other members of the House or
23  Senate are members of ALEC?
24     A.   Sure.
25     Q.   Were any of them in attendance at that meeting

48

1  together?
2     A.   Sure.  Yes.
3     Q.   Who was that?
4     A.   I don't remember.
5     Q.   Do you remember whether Senator Fraser was
6  there?
7     A.   No.
8     Q.   Do you remember whether Lieutenant Governor
9  Dewhurst was there?
10     A.   No, I don't remember specifically anybody being
11  there.  I can't even be sure, you know, which meeting it
12  was, but I'm pretty sure I attended some.
13     Q.   Did --
14     A.   It could have been NCSL, but I think it was
15  ALEC.
16     Q.   Did ALEC offer you any technical advice on
17  voter ID?
18     A.   No.
19     Q.   I believe you just mentioned that the National
20  Conference of State Legislators may have had a meeting
21  about voter ID; is that right?
22     A.   This meeting is the only one that I remember
23  ever having attended, but I think it was ALEC, and it
24  certainly was a conference, and the only other one I had
25  been to was NCSL, so it's possible it's NCSL, but I



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

49

1  don't think so.
2      Q.  Did you receive any voter ID or photo ID
3  materials from NCSL?
4      A.  Not that I remember.
5      Q.  Have you attended any other conferences or
6  meetings of groups at which you received any technical
7  assistance or policy guidance on voter ID or photo ID?
8      A.  Not that I can recall.
9      Q.  What is the current system under current law
10  aside from Senate Bill 14 for determining how to
11  identify a voter at the polls on election day?
12      A.  Say that one more time.
13      Q.  Certainly.  Certainly.  What's -- What's the
14  current law -- since Senate Bill 14 has not been
15  pre-cleared --
16      A.  Yeah.
17      Q.  -- for identifying a voter at the polls on
18  election day?
19      A.  Oh, boy.  My understanding is that they simply
20  have to have a document of some kind, and I believe --
21  and there's a list of documents that are acceptable, and
22  I believe there's also a process by which they can do
23  some kind of provisional ballot under circumstances
24  where they don't have a document.  I'm not sure about
25  that, but I think that's right.

50

1      Q.  Do you know that when you register to vote, the
2  county registrar -- if the county registrar finds you to
3  be eligible, mails you a voter registration card in the
4  mail?
5      A.  M-hm.
6      Q.  Is that one of the forms of identification that
7  can be used at the polls on election day?
8      A.  Yes.
9      Q.  Are you aware of whether a wide variety of
10  photo IDs can be used in polls on election day?
11      A.  I know there's a wide variety of documents, and
12  I presume it includes a number of photo IDs.
13      Q.  Are there also a number of non-photo IDs under
14  current law that can be used?
15      A.  Yes.
16      Q.  So you are aware that if, for example, a voter
17  lost her voter registration card, she would be able to
18  use a lot of different forms of ID at the polls to prove
19  identity.
20      A.  Right.
21      Q.  Are you aware of any reports of voter
22  registration cards being stolen from the mail?
23      A.  You know, reports -- You know, I want to
24  believe, and I can't cite you to any specific comment,
25  that I have anecdotally heard, you know, stories of

51

1  people, you know, coming upon a voter registration card
2  that was sent to the wrong address, and, you know, I
3  don't know if that was -- you know, if that was
4  something where there was evidence that it was actually
5  used and voted or just making the point that it could
6  have been.  I don't recall.
7      Q.  So sitting here today, you can't think of any
8  specific instances of hearing of voter registration
9  cards being stolen and then used by someone else in an
10  election?  Is that your testimony?
11      A.  I can't recall that, no.
12      Q.  Is the current system for identifying voter at
13  the polls effective in your view in identifying voters?
14          MR. FREDERICK:  Objection.  Relevance.
15      A.  Is it effective?
16      Q.  In identifying voters.
17      A.  I don't understand the question.
18      Q.  Do you think it does the job in identifying
19  voters or is it deficient?
20      A.  In most cases, I mean, there are obviously --
21  you know, there are opportunities for fraud that -- that
22  the legislation was intended to at least reduce, you
23  know, the extent to which that occurred is I guess what
24  is up for debate, and -- and I don't know the answer to
25  that question, if I answered your question.

52

1      Q.  Thank you for your testimony.  So is it your
2  understanding that the current system provides for an
3  opportunity for in-person voter impersonation, but that,
4  generally speaking, or in the main or on the whole there
5  is not a history of that it happened in Texas?
6          MR. FREDERICK:  Object to the question.
7  It mischaracterizes the testimony, but you can answer.
8      A.  Yeah.  I think there is the opportunity for
9  fraud, and I'm not saying that it has not occurred.  I'm
10  saying that we don't know the extent to which it has
11  occurred.  It's sort of like -- My sense that if we
12  have -- the way I've described is we have evidence of a
13  few instances.  I really couldn't characterize how many,
14  but at least some.  I think that was conceded even by
15  the opponents of the legislation, and the question was
16  whether that was the tip of the iceberg or whether it
17  was the iceberg.
18      Q.  What do you believe?
19      A.  You know, I --
20          MR. FREDERICK:  Objection.  Relevance.
21      A.  My guess is probably somewhere in between.  In
22  other words, it's not -- it would be unreasonable to me
23  to presume that we know -- what we know is all that has
24  ever occurred.  That doesn't make sense.  On the other
25  hand, I don't believe that it's likely that it is --



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

53

1  what we know is the tip of a huge iceberg where, you
2  know, people are being bussed in to -- to vote illegally
3  in huge quantities.  I don't believe that's likely the
4  case either.  That's my opinion.
5      Q.   So I want to break that down into sort of what
6  you know has happened in terms of -- and we're talking
7  about in-person voter impersonation at the polls.
8      A.   Right.
9      Q.   Because these laws are designed solely to
10  address that issue; is that correct?
11      A.   Yes.
12      Q.   So what -- can you provide me with any other
13  testimony about the basis for the known in-person voter
14  impersonation in Texas, and we'll talk about the public
15  record in a bit, but I want to draw your memory.
16      A.   You know, I'm just not going to remember it
17  all, and, you know, it certainly is true, you know,
18  that -- that many of the -- or some of the allegations
19  of voter fraud could easily be shown to be something
20  other than voter fraud, and Rafael Anchia can fill you
21  in in that regard in great detail.
22          And so the question was how many instances
23  there were that that is not the case, and, you know -- I
24  mean, you know, and what is evidence because we had a
25  lot of -- you know, we had some testimony from certain

54

1  individuals, you know, as a part of our hearing that
2  would say things like, you know, I was working at the
3  polls, and I personally witnessed the same person vote
4  twice.  You know, is that evidence of voter fraud?  I
5  suppose it is.  It was his testimony, and so we had
6  instances like that.
7          There was, I know, a big debate at that
8  time about something that was going on in south Texas
9  that was in the newspapers a lot where there may have
10  been -- at least the allegation was that there was some
11  sort of -- not just, you know, one person doing
12  something on their own, but some kind of actual
13  coordinated effort at voter fraud, but, again, I don't
14  know that that was clearly -- by the time we voted the
15  bill out of committee that it was clear what the -- what
16  had actually happened there.
17      Q.   Was that related to in-person voter
18  impersonation?
19      A.   I believe so.
20      Q.   Were there convictions that came out of that?
21      A.   I don't recall.  I can't even tell you.  I
22  think it was like a school board election in south
23  Texas, but it was happening -- or it was in the
24  newspaper at the time we were considering the bill in
25  2009.  Of course, this last week, there was an instance

55

1  in Tarrant County which has made the newspaper of --
2  of -- I think it was a Democratic precinct chairperson
3  who somebody voted for somebody else using their voter
4  registration card.  It was in the newspaper last week.
5  Obviously, that was not a part of our -- our discussions
6  in 2009.
7          So, you know, I think the bottom line is
8  that Rafael -- people like Rafael -- Rafael certainly is
9  the one who is most knowledgeable in opposition to the
10  legislation, and, you know, I think their position is
11  that it's infrequent.
12      Q.   And is that -- is that your position as well?
13  I mean, are you aware of credible evidence, convictions,
14  something where you know for sure that this was
15  in-person voter impersonation that you can testify about
16  today?
17      A.   My presumption is that you are a fool or you
18  are uninformed if you -- if you are willing to commit a
19  felony in order to add a single vote to the candidate of
20  your choice, and so the question is how many fools are
21  there out there.  And, you know -- and you know -- And,
22  I, you know -- again, I think I've answered that
23  question.  You know, more than the actual cases that we
24  are aware of and not an epidemic.
25      Q.   But in your view your testimony is it would not

56

1  be very rational for an individual to engage in this
2  behavior, so to that extent --
3      A.   It seams to me that the penalty in relation to
4  the benefit is pretty severe, and I can't -- you know,
5  the fear -- you know, the question is do they really
6  understand the consequences.  It is hard for me to
7  imagine people doing it, if they did.  But, you know,
8  some people are really into politics.
9      Q.   So we talked about what -- what you know in
10  terms of things that have happened in the past in terms
11  of in-person voter impersonation, but the unknown future
12  potential for in-person voter impersonation, what is
13  the -- the basis of saying that this bill is
14  necessary for that threat?
15      A.   I think the argument in favor of the bill is --
16  is that we are -- we have, you know, a number of very,
17  very close elections and that because of that, we've had
18  elections decided by a handful of votes and that without
19  regard to the extent to which it occurs, it's important
20  to do what you can do to ensure that it does not occur.
21  And, obviously, you know, the challenge is the tension
22  between the goal on the one hand of voter security and
23  integrity of the ballot box and voter access on the
24  other hand.
25      Q.   And getting back to my earlier question that

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                    June 1, 2012

57

1  I'm not sure you fully answered, what is the problem
2  with the current system for identifying the voter at the
3  polls that you could identify sitting here today?
4      A.  Just, you know, the -- the fact that that
5  precinct chairperson could simply hand their voter
6  registration card to somebody else, and they could go
7  vote for them.  Through a perfectly -- It's just very
8  difficult to imagine how you would prevent that from
9  happening if somebody gets ahold of somebody else's card
10 and they're confident that that person's not going to go
11 back, and I think that's what happened in this instance
12 is the actual person later went and voted using their
13 card, and so that same voter registration card had been
14 voted twice, which is how they discovered it.
15     Q.  How would that work in Texas?  I am not a
16 registered voter in Texas, but when you go in to vote,
17 don't you sign the poll book --
18     A.  Yes.
19     Q.  -- when you present your card?  So it would --
20 this bill would not prevent someone from voting twice
21 because they've already selected the signature once of a
22 voter who comes in with a particular card and indicates
23 that he or she is that voter?
24     A.  Right.  I don't think the concern is with --
25 not limited to someone voting twice.  It is someone

58

1  that's not a legal voter using the legal voter's card to
2  vote.  And, obviously, you know, nothing is foolproof,
3  and the voter ID bill is not foolproof.  You can, you
4  know, go get a fake photo ID just if you, again, are
5  that into politics, but it -- it presumptively makes it
6  more difficult to do.
7          (Exhibit US-101 marked.)
8      Q.  Thank you.  We're going to move on to a
9  different topic.  Could you mark this as US-101?  You've
10 been handed what's been marked US-101.  Do you recognize
11 this document?
12     A.  No.
13     Q.  I will represent to you that this is a
14 privileged log that was produced by your attorney for
15 the state last night concerning documents that have been
16 withheld based on privilege that were in your files that
17 were responsive to the documents we talked about
18 earlier, US-100, the amended notice of your deposition.
19 If you could take a look, I'm going to ask you some
20 questions about this document.  Unfortunately, it's not
21 paginated, but I will try to direct you through the
22 document based on the Bates numbers on the left-hand
23 column.  If you could turn to the second page.
24         Do you see at the bottom or the second
25 entry Texas 0026616?  It indicates that there was a

59

1  communication from the election division in
2  September 2010 to you?  Do you recall that document?
3      A.  No, but it's -- it sounds like it was -- we had
4  a hearing -- an interim hearing.  I presume that some
5  questions were asked during the interim hearing and
6  probably Ann McGeehan followed up with some kind of a
7  communication to the entire committee, I presume.
8          MS. WESTFALL:  Mr. Frederick, I would ask
9  that pursuant to the May 28th order indicating that
10 communications from agencies to legislators are in that
11 order with regard to lieutenant governor can be
12 produced.  I'd ask that this document be produced to us
13 because I do not believe it's covered by legislative
14 privilege.  Will you take that under advisement?
15         MR. FREDERICK:  I'm happy to look at the
16 order and under advisement, but I cannot
17 represent now that we will.
18     Q.  Thank you.  And turning to the next page at the
19 bottom, Texas 00266627 --
20     A.  Yes, ma'am.
21     Q.  -- who was Erica Grigg?
22     A.  She is -- This was my -- one of my employees
23 during two thousand -- I'm trying to remember when she
24 started, but certainly 2011.
25     Q.  Is she still in your employment?

60

1      A.  No.
2      Q.  Do you believe that the date, May 24, 2012, the
3  date of the document is incorrect?
4      A.  No, she would have -- Yeah.  Oh, yeah, yeah,
5  that's definitely incorrect.  Yeah.
6      Q.  What year do you think this was created?
7      A.  Well, let me see what it is.  What is Erica
8  Grigg?  She's the sender?
9      Q.  Yes.
10     A.  The author?  That must be the wrong date.  I
11 can't imagine that something happened last week.
12 Erica's not in my office.
13     Q.  I see.  Do you think this was pertaining to
14 voter ID -- a bill that you were drafting relating to
15 voter ID?
16     A.  I presume.  It must have been -- It must have
17 been May of 2009 is all I can imagine, if that was the
18 case.  Oh, no, it could have been -- You know, I did go
19 ahead and prepare a bill and file it in the 2011
20 session.  I don't know.  That date doesn't make any
21 sense either way.
22     Q.  Turning your attention again -- These are not
23 paginated.  Perhaps your counsel can help you find Texas
24 266717, about five pages in.  Actually, I don't need to
25 direct you there.  Are you familiar with the Georgia



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

photo ID law?
A. I have, you know, certainly in the midst of handling this issue looked at in general other states' approaches to photo ID and Georgia would have been one of them. You know, I have a sense that they have a -- if I'm recalling correctly, a pretty strict photo ID requirement. They are one of the states that does.
Q. Do you know whether it's as strict as Texas Senate Bill 14?
A. I don't know the difference, no.
Q. Could you tell me who Charles Foster is?
A. No.
Q. Directing your attention now a few more documents in to Texas 00266838. Perhaps your counsel can help you find it.
A. Yeah. What is the question?
Q. I want to ask you if you know what these communications were about between -- from Charles Foster to what appears to be your office and your staff.
A. No, I don't.
Q. Is he a staff person in your office?
A. I don't think so.
Q. Is he a constituent?
A. I don't know. Yeah -- No. No, I don't know. Don't know who that is.

MS. WESTFALL: Mr. Frederick, I would ask that to the extent Mr. Foster is a constituent and not staff and there's no basis for any legislative privilege pursuant to the court's May 28th order, that you produce this correspondence.
MR. FREDERICK: The May 28th order is the order that involves the lieutenant governor's privileged log?
MS. WESTFALL: Yes, but it's equally applicable. There is a footnote about constituent correspondence, and the document number for the order is 154. It's the one we received Sunday or Monday night.
MR. FREDERICK: I recall the footnote. I'm happy to take it under advisement, but as I recall the footnote, I'm not sure totally sure that it applies, but I'm happy to look at it.
MS. WESTFALL: Well, I happy to represent now, "Neither a constituent letter nor a response is privileged" is the first sentence in Footnote 6. "Questions to the lieutenant governor and his staff about constituent communications impact on thinking and motivations are privileged." So, clearly, the court is saying constituent letters and responses are not privileged, so we ask that they be produced.
MR. FREDERICK: Okay.

MS. WESTFALL: Take that under advisement?
MR. FREDERICK: I will take it under advisement. I don't necessarily agree with your interpretation, but I understand the position. I'll take it under advertisement.
MS. PERALES: My copy of the order is missing the pages, so I would have given it to you to read, but I just can't find it.
MS. WESTFALL: And I won't give you mine because of my work product.
MR. FREDERICK: Not a problem.
Q. (BY MS. WESTFALL) Turning your attention now to Texas 00266984 of this document, do you see that this document and those that follow refer to draft copy of Power Point presentation on voter ID?
A. Yes.
Q. Did you finalize these Power Points and present these remarks publicly?
A. Yes.
Q. Mr. Frederick, I would ask that -- likewise, that these be produced since they are public remarks that Mr. Smith has made.
Where did you make these remarks, Mr. Smith?
A. Just among Republican party groups in Tarrant

County. That was after the campaign where I was attacked for intentionally killing the bill, and I took my limited dog and pony show out to the groups to help them understand what happened because, obviously, it's -- the argument was procedural, and so it just required an hour of their time really to help them understand what happened.
Q. And it does appear that you made a number of -- based on this privilege log, you made a number of these presentations in May 2010, June 2010, various times in June 2010, April 2010. Does that sound correct?
A. It sounds correct. It would have been after the primary in March of 2010, yes.
MS. WESTFALL: Thank you. Mr. Frederick, I would ask that all of these Power Points be produced since they pertain to publicly disseminated speech and remarks to constituents that were made by Mr. Smith to which he just testified.
MR. FREDERICK: So you are asking us to produce the drafts that were not publicly discussed? Is that what you are asking?
MS. WESTFALL: If he made the remarks and he relied upon a Power Point, I would ask for that Power Point because that is clearly in the public domain that -- remarks that he made to Republican groups. It's

Todd Smith                                                        June 1, 2012

69

1  consider it under the order.
2          MS. WESTFALL:  Thank you.
3      Q.  (BY MS. WESTFALL) What was the original impetus
4  for photo ID in Texas?
5      A.  Original impetus?  Help me.
6      Q.  In the two thousands.  Why did Texas become
7  interested in photo ID?
8      A.  I don't really understand the question.  Why
9  did Texas become interested?  Texas who?
10     Q.  When did you first hear about photo ID in
11  Texas?
12     A.  Oh, gosh.  I think there was legislation, you
13  know, going back to the late '90's.  I think, if I
14  recall correctly, you know, Debra Danberg was involved
15  in the first bill that I'm aware of which requires for
16  the first time that you produce a document, which is
17  current law.  Prior to that, you didn't have to produce
18  a document.
19     Q.  Was there a time in the mid-2000's that
20  interest in photo ID developed in the Texas House?
21     A.  In photo ID?
22     Q.  Yes.
23     A.  Yeah.  I think that whenever it kind of became
24  a national issue that it became a political issue in the
25  State of Texas.

70

1      Q.  And you believe it was based on a national
2  movement and nothing that related to any circumstances
3  going on in the state; is that correct?
4      A.  Yeah.  I think it was an issue in other states
5  and, you know, just through these legislative -- or
6  through any means, numbers, et cetera, we looked at what
7  other states are doing and decided whether or not we
8  think we should do likewise, and, obviously, this one
9  was, you know, something that had a lot of political
10  support at the grassroots level.
11     Q.  Do you understand what the motivation was at
12  the grassroots level for wanting photo ID?
13     A.  The motivation at the grassroots level?
14     Q.  Yes.
15     A.  Gosh.  That's going to vary by human being.
16     Q.  I believe you testified earlier about kind of a
17  vision and talking about bus loads --
18     A.  Yes.
19     Q.  -- of people coming over the border.
20     A.  Right.
21          MR. FREDERICK:  I'll object to the
22  mischaracterization of testimony.
23     Q.  Am I mischaracterizing your testimony,
24  Mr. Smith?
25     A.  I don't know what you are saying.  I did use

71

1  the term bus loads saying I don't believe that that
2  occurs, I think.
3      Q.  But was there a belief that bus loads of
4  individuals were crossing the border and participating
5  in elections?
6      A.  I think there clearly are a lot of people that
7  have the impression or belief that -- that -- that
8  nonlegal citizens are voting in our elections in some
9  significant quantity.
10     Q.  Do you believe that that was motivating some of
11  the movement to enact photo ID in Texas?
12     A.  Was the grassroots belief in that?  Sure.  Yes.
13     Q.  Thank you.  I'm going to hand you what's been
14  previously marked as US-44.  You've been handed what's
15  been previously marked as United States 44.  Do you
16  recognize this document?
17     A.  No.
18     Q.  You don't?
19     A.  No, I don't remember it.
20     Q.  Okay.  Were you involved in any legislation in
21  2005 pertaining to photo ID?
22     A.  2005?
23     Q.  Yes.
24     A.  I probably voted for it if it -- I believe it
25  probably was voted on -- on the floor.

72

1      Q.  Can you look at the final page of this document
2  to see the effective date?
3      A.  Yeah.  I thought it was later than that.  2011.
4      Q.  Have you been -- I'm sorry.  You've been passed
5  the wrong exhibit.  They were mixed up.
6      A.  That's why we were confused.
7          MS. WESTFALL:  Let's go off the record for
8  one second.
9          (Recess from 12:04 p.m. to 12:05 p.m.)
10          (Exhibit US-102 marked.)
11     Q.  (BY MS. WESTFALL) We are back on record.
12  You've been handed what's been marked US-102.  Do you
13  recognize this document?
14     A.  You know, I don't recognize it in terms of
15  recalling having looked at it before.
16     Q.  Do you know who sponsored it?
17     A.  It looks like it was Denny -- Mary Denny, I
18  presume, was the author.
19     Q.  Were you involved in the development of this
20  bill before it was filed?
21     A.  I don't believe so, no.
22     Q.  Do you have any familiarity with this
23  legislation?
24     A.  Yes.  I was on the committee that session.  I
25  mean, I think it's just one of many different versions



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                          June 1, 2012

73

1    of the voter ID bill that was considered by the
2    legislature during the decade.
3        Q.   Could you take a look at Page 4 and just review
4    the document, the proof of identification?
5        A.   What do you want me to review on Page 4?
6        Q.   Just Page 4.  Are you familiar with a list of
7    ID that is listed there?  I just want to see if I can
8    jog your memory a little bit.
9        A.   Yeah.  My recollection is that this bill
10   probably is a not a -- I don't know.  I could be wrong.
11   I believe I'm correct that the House never passed a hard
12   photo ID bill until 2011.  So all of these prior
13   versions at least that came off the floor before that
14   had included two non-photo IDs.
15       Q.   And is that what is indicated in US-103,
16   HB1706?
17       A.   I, mean this has -- this bill has a list of
18   photo IDs and it has a list of non-photo IDs.  The
19   following documentation is acceptable as proof of
20   identification of this chapter, and it includes a number
21   of non-photo IDs.
22       Q.   Are you familiar off the top of your head with
23   the IDs allowable under Senate Bill 14?
24       A.   No.
25       Q.   Do you know what the purpose of House Bill 1706

74

1    was?
2        A.   The purpose?  I'm not sure I understand what
3    you mean by purpose.  Whose purpose?
4        Q.   The legislature's.
5        A.   The legislature?
6        Q.   Well, the bill's sponsors, authors and
7    supporters, what did they intend to do with this bill?
8            MR. FREDERICK:  Let me just object on the
9    basis of privilege.  To the extent that this is asking
10   for you to reveal your own or any other legislator's
11   thoughts or mental impressions about this bill or any
12   communications you had with another legislator about the
13   bill, I would instruct you not to answer, but if you can
14   identify the purpose of the bill without doing that, you
15   may do so.
16       A.   I don't know.  I'm a little confused in terms
17   of trying to identify the intent of a bunch of people.
18   I don't know how to do that.
19       Q.   Well, you're a legislator and you sit in a body
20   that acts collectively.  So on the basis of your role on
21   the legislature and your expertise and service in the
22   House, I would ask if you have any testimony about the
23   purpose of the bill's sponsors, authors and supporters
24   in advancing this bill.
25       A.   I presume that their purpose was to make it

75

1    more difficult to commit voter fraud.
2        Q.   Is that based on any communications you had
3    with anyone?
4        A.   It's based on my -- based on probably more
5    likely than that what I read in the newspaper and stuff
6    about what they were saying about why they were doing
7    it.
8        Q.   Are you aware of any communications concerning
9    the forms of allowable ID in House Bill 1706?
10       A.   Am I aware of any communication about the forms
11   of ID?
12       Q.   Yes, sir.
13       A.   No, I would not have been actively involved in
14   the legislation at that time.  I would have been just a
15   member on the floor voting.
16       Q.   Do you know who drafted this language for the
17   bill?
18       A.   No.
19       Q.   Do you know what --
20       A.   Probably ledge council.
21       Q.   Was there a model that it was based on?
22       A.   I don't know.
23       Q.   Was House Bill 1706 in part designed to prevent
24   noncitizens from voting in the view of its authors and
25   supporters?

76

1            MR. FREDERICK:  Object only to the extent
2    that it calls for subjective intent of any author or
3    supporter.  If you -- If this calls for you to reveal
4    any communications with those individuals or other
5    legislators, I'd instruct you not to answer on the basis
6    of privilege.  If you can answer without doing that, you
7    may do so.
8        A.   I think, you know, the purpose was to prevent
9    any person who is not legally authorized to vote from
10   voting and that would include citizens and noncitizens.
11       Q.   And how did HB1706 serve that purpose?
12       A.   If I -- Without really looking at it and
13   reading every word of it, I believe that it probably
14   required you to have a back up non-photo ID because I
15   believe in general, that's what the legislation did
16   until 2011.
17       Q.   Yes.  And I will represent to you that HB1706
18   allowed for both photo and two forms of non-photo ID.
19   I'm sure your counsel won't disagree with that
20   characterization.
21       A.   Right.  So it's just -- you know, instead of
22   being able to just take somebody else's voter
23   registration card and with impunity hand it to somebody
24   and vote and leave, you have to go to the trouble or if
25   you find a voter registration card or stumble on a voter



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

---

**77**

1  registration card, you probably are not going to stumble
2  on some other identifying document, and so it just -- it
3  makes it, again, somewhat more difficult to commit voter
4  fraud by having to require two forms of non-photo ID.
5        Q.  And how does that prevent people who are not
6  lawfully in the United States from participating in
7  elections?
8            MR. FREDERICK:  I'd object on the basis of
9  privilege.  To the extent that this calls for your own
10 mental impressions, thought processes about this bill or
11 any communications related to the bill with other
12 legislators, if you can answer the question without
13 doing that, you may do so.
14           THE WITNESS:  My own thought processes?
15           MR. FREDERICK:  Your thought processes
16 specific to this bill at the time it was pending.  If
17 you would have to kind of go back --
18           THE WITNESS:  I don't recall what my
19 thought process was at the time of the bill, so there's
20 no danger.
21           MR. FREDERICK:  Then I think we're safe.
22 But to the extent it would require you to reveal a
23 communication from another legislator about this bill, I
24 would caution you just not to reveal that, but you can
25 answer if you can do so without doing that.

**78**

1        A.  You know, again, I think it would make it more
2  difficult for that person, whether they're a resident or
3  not a be resident or a legal citizen or not a citizen,
4  to cast a fraudulent vote because they would have to
5  just go through more trouble and more difficulty in
6  obtaining the information they would need to -- to go
7  and claim to be somebody that they are not.
8        Q.  So doesn't one attest to being a US citizen
9  when one registers to vote in Texas?
10       A.  I believe so.
11       Q.  It's on the registration application; is it
12 not?
13       A.  I believe so.
14       Q.  So that's when citizenship is determined,
15 correct?
16       A.  I believe so.
17       Q.  In House Bill 1706, isn't it true that today
18 you can obtain -- or at the time the bill was considered
19 in Texas, you could obtain a driver's license without
20 being a US citizen; is that correct?
21       A.  I believe -- I believe that's correct.
22       Q.  And you could obtain a military ID card without
23 being a US citizen; is that correct?
24       A.  I don't know about that.
25       Q.  And you could certainly have a employee ID card

**79**

1  without being a US citizen if you were a permanent
2  resident, for example, or here on another type of visa;
3  is that correct?
4        A.  I don't know.
5        Q.  You could have a student ID card without being
6  a US citizen; is that right?
7        A.  I presume.
8        Q.  And may one obtain a license to carry a
9  concealed handgun in the State of Texas without being a
10 US citizen?
11       A.  I don't know.
12       Q.  So why is it that you testified earlier that
13 this bill, 1706, prevents noncitizens from participating
14 in elections if citizenship is determined at the voter
15 registration stage and one may obtain these documentary
16 proof of ID without being a US citizen?
17           MR. FREDERICK:  Object to the extent it
18 mischaracterizes prior testimony.  Object as compound.
19 You may answer.
20       A.  I'm not clear on the extent to which there is
21 any ability to verify on the voter registration card
22 when someone says they are a citizen, that they are in
23 fact a citizen.  My recollection, which could be
24 inaccurate, is that there is nothing that you really
25 are.  It's obviously a crime to claim to be a citizen

**80**

1  and not be a citizen, but there is no formal process by
2  which they go and check and make sure that people who
3  claim to be citizens are in fact citizens.  I don't know
4  if that answers your question at all.
5        Q.  So assuming a noncitizen manages to get on the
6  voters rolls, as you described, and the individual
7  obtains a driver's license --
8        A.  Right.
9        Q.  -- lawfully.
10       A.  Right.
11       Q.  Would this bill, 1706, prevent that individual
12 from voting on election day?
13           MR. FREDERICK:  Object.  Calls for
14 speculation.  You can answer.
15       A.  No, because they -- they -- they could vote
16 with a photo ID under this legislation precisely the
17 same way they could under prior law.
18       Q.  Thank you.  Are you aware of any conversations
19 with legislators about the purpose of House Bill 1706 or
20 other photo ID in 2005 as part of the purpose being to
21 prevent noncitizens from voting?
22           MR. FREDERICK:  Object on the basis of
23 privilege.  The question as phrased asked if you were
24 aware of any conversations.  I believe you can testify
25 to the extent there were or were not.  I would caution

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

81

1    you not to reveal the substance of any communication
2    with another legislator.
3        A.  I don't recall any conversations that I would
4    have had with anybody in 2005.
5        Q.  Regarding noncitizen voting?
6        A.  Regarding anything involving voter ID.
7        Q.  Are you familiar with the legislators who
8    opposed House Bill 1706?
9        A.  Am I familiar?  I mean, most Democrats.  I
10   don't have specific recollections of individual
11   conversations with anybody.
12       Q.  Do you know what their concerns were about the
13   bill?
14           MR. FREDERICK:  I'll object on the basis
15   of privilege.  To the extent this would require you to
16   reveal any concerns expressed to you by another
17   legislator in a conversation, that would be privileged.
18   If you can answer without revealing that, you may do so.
19           MS. WESTFALL:  Mr. Frederick, can you
20   identify any bill opponents who have invoked the
21   legislative privilege affirmatively in this case?
22           MR. FREDERICK:  I don't understand the
23   point of that question.
24           MS. WESTFALL:  There's no legislative
25   privilege on communications from bill opponents to

82

1    Representative Smith.
2            MR. FREDERICK:  He's asserting privilege.
3            MS. WESTFALL:  I'm asking about
4    communications he received from bill opponents.
5            MR. FREDERICK:  Well, I believe you've
6    asked him for the substance of a communication from a
7    bill opponent.  First of all, we don't know who they
8    are, so I don't know that they have waived privilege,
9    but, also --
10           MS. WESTFALL:  Who has affirmatively
11   invoked legislative privilege?  Who has opposed any
12   photo ID bill in Texas?  Who have you identified in your
13   correspondence with the Attorney General?
14           MR. FREDERICK:  I don't know.  That
15   question is irrelevant because Representative Smith has
16   invoked legislative privilege.  To the extent anyone
17   communicates with him about pending legislation, that is
18   privileged.
19           MS. WESTFALL:  Not the content of what
20   they said to him.
21           MR. FREDERICK:  Absolutely it is.  My
22   position -- Our position is there are two people who --
23   at least two people who hold the privilege, and if one
24   of those people has not waived the privilege, that
25   conversation remains privileged and should not be

83

1    disclosed because if it were, it would violate the
2    legislative privilege.
3            MS. WESTFALL:  Are you instructing him not
4    to answer?
5            MR. FREDERICK:  I'm instructing him not to
6    answer to the extent he would have to reveal the
7    substance of any communications.
8            THE WITNESS:  I can save you both a lot of
9    time.
10           MS. WESTFALL:  I'm grateful.
11       A.  I don't remember any such conversation.
12       Q.  I'm grateful.  Are you aware of any action
13   taken by any legislature in 2005 to address any concerns
14   from bill opponents?
15           MR. FREDERICK:  I'm going to object on the
16   basis of privilege.  You may testify whether you or are
17   not aware, but you may not disclose the thought process
18   of any legislator as to why they did something.  That
19   would be privileged.
20       A.  No.  What I will -- What I will recall is in
21   general the arguments that were made that were a matter
22   of public record and newspapers, et cetera, in 2005.  I
23   will not recall any specific conversations with anybody
24   on this particular bill.  And I know the reason that it
25   was a -- it was a less strict version of voter ID at

84

1    this time was because the Senate was still a relatively
2    moderate body, and there simply was no ability to get a
3    stricter bill out of the Senate, and, therefore, there
4    was no attempt to obtain a stricter bill out of the
5    House.  That's my belief.
6        Q.  Are you aware of any analysis that was
7    conducted in 2005 related to who had these forms of ID
8    and who didn't have those forms of ID in 1706 or any
9    other photo ID bill?
10       A.  No.
11       Q.  Are you aware of any attempt to determine the
12   impact of House bill 1706 or other photo ID legislation
13   on minority voters?
14       A.  No.
15       Q.  Did House Bill 1706 pass in the House?
16       A.  I believe so.
17       Q.  Was it referred to the Senate committee on
18   state affairs?
19       A.  I don't know.
20       Q.  Did it get passed in the Senate?
21       A.  I don't think so.  I don't think the bill ever
22   passed in the Senate.  Well, I could be wrong, but I
23   don't think it passed in the Senate until 2009.
24       Q.  Would election bills ordinarily that pass in
25   the House be referred to the State Affairs Committee in

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                    June 1, 2012

85

1  Senate?
2      A.  I don't know.
3      Q.  Is that the committee that would handle
4  election bills ordinarily?
5      A.  In the Senate, I don't know.
6      Q.  It wouldn't be the committee as a whole, would
7  it?
8      A.  It could be.  I mean, it's just their choice.
9  My understanding is the rules allow them to do either.
10     MS. WESTFALL:  Okay.  Great.  Well, do
11  folks want to take a break for lunch?  It's 12:30.  Or
12  we could do another half an hour.  It's your choice.
13     (Recess from 12:30 p.m. to 1:12 p.m.)
14     MS. WESTFALL:  During the break, I had a
15  chance to consult with my colleagues about the subject
16  matter waiver invocation of legislative privilege issue,
17  and I want to advise Representative Smith and you,
18  Mr. Frederick, that the United States will not advance
19  any subject matter waiver argument if Representative
20  Smith chooses to answer and decides not to invoke
21  legislative privilege with regard to individual specific
22  questions that I may ask in today's deposition.  So I
23  wanted to advise you of that position and advise
24  Representative Smith that if there are particular --
25  questions that you -- for which you would want to

86

1  would like to answer and not invoke the privilege, that
2  would be our legal position.
3      MR. FREDERICK:  I appreciate that.  I have
4  also talked about this, and I have -- it is my
5  understanding that despite your kind offer to not
6  advance subject matter waiver arguments, it is our
7  position that that still would not -- that would not
8  protect us from the court ruling that something was in
9  fact a waiver, either subject matter or complete, and so
10  I cannot advise Representative Smith to -- to
11  selectively waive or selectively answer privileged
12  questions, and I will continue to instruct him to assert
13  privilege consistent with my understanding that he is
14  still asserting privilege.
15     MS. WESTFALL:  And your client understands
16  that it's his to invoke, correct?
17     MR. FREDERICK:  Oh, yes, yes.  I think so.
18     THE WITNESS:  Yes.
19     MS. WESTFALL:  That hasn't been made clear
20  by these interesting colloquies.
21     Q.  (BY MS. WESTFALL) Representative Smith, are you
22  familiar with the voter ID bill that was introduced in
23  2007?
24     A.  No, not other than generally an understanding
25  that the legislation that preceded the bill that passed

87

1  in 2011 was always generally similar in that it
2  effectively moved from one form of non-photo ID to two
3  forms of non-photo ID.
4      Q.  Okay.  Would you mark this as Exhibit 28,
5  previously marked?  Representative Smith, you've been
6  handed what's been previously marked as US Exhibit 28.
7  Do you recognize this document?
8      A.  No.
9      Q.  Did you serve on the House elections committee
10  in 2007?
11     A.  No.
12     Q.  Did you have any involvement with any
13  legislation related to photo ID in 2007?
14     A.  Other than voting for it on the floor, no.
15     Q.  Thank you.  Are you aware of any concerns
16  raised during the development of House Bill 218
17  regarding the impact of the bill on Hispanic voters?
18     MR. FREDERICK:  On the basis of
19  legislative privilege to the extent the question
20  requires you to reveal the contents of any communication
21  from a legislator or a legislative staff member about
22  the bill, I'll instruct you not to answer on the basis
23  of privilege.  However, if you can answer without
24  revealing that, you may do so.
25     A.  I think my -- I mean, with the exception of the

88

1  bill passed almost unanimously, if not unanimously, in I
2  think 1999, which required documentation of some kind
3  for the first time, I think that every time the
4  legislation has been considered there have been concerns
5  expressed by opponents of that nature, if that answers
6  your question.
7      Q.  And who are the opponents?
8      A.  MALDEF, NAACP, Democratic party.  Those are the
9  ones that I remember.
10     Q.  What is the basis of their concern that bills
11  like 218 will have an adverse impact on minority voters?
12     MR. FREDERICK:  Let me interpose a
13  cautionary objection.  I don't believe that this is
14  actually calling for privileged material, but to the
15  extent of identifying a basis of concern would reveal
16  the communication from another legislator, I would
17  instruct you not to reveal that, but you can answer --
18     A.  Yeah.  That would only be communications that
19  I've read in the papers and public information, and that
20  is that somehow any additional burden that you place on
21  a voter is going to disproportionately fall on minority
22  voters.
23     Q.  What -- What's the reason for that?
24     A.  The reason for what?
25     Q.  For believing -- For bill opponents believing

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                      June 1, 2012

89

1    that it will disproportionately fall on minority voters.
2         A.   I don't know that I really understand the
3    reason for believing that in instances where you're
4    simply going from one non-photo ID to two non-photo IDs
5    because in those instances, I think you are talking
6    about documentation that is always currently in the
7    possession of every legal voter.  So I don't really
8    understand the argument in that instance.
9         Q.   So just so I understand your testimony, your
10   testimony is that with regard to legislation where both
11   a photo ID and two forms of non-photo ID are allowable,
12   it is your view that that would not disproportionately
13   fall upon minority voters based upon your knowledge?
14        A.   Yeah.  I don't understand the argument that it
15   would really because you're talking about requiring only
16   documentation that is currently in the possession of
17   every legal voter as far as I know because the list is
18   so extensive that I just have never ever seen any
19   evidence of any kind that any legal voter doesn't
20   currently have in their possession what they would need
21   to vote which is different than requiring a photo ID, so
22   I don't understand that argument.  There may be one that
23   I am not aware.  I know there is because they've made
24   it, but I don't understand it.
25        Q.   Were you present at any of the legislative

90

1    public debates on HB218 on the floor?
2         A.   I'm sure I was.  I don't recall it, but I'm
3    sure I was.
4         Q.   Are you aware of any analysis or reports that
5    were generated to determine whether House Bill 218 or
6    other photo ID laws -- I mean, bills introduced in 2007
7    would have a disparate impact on minority voters?
8         A.   No.
9         Q.   And like HB1706, was HB218 in your view in part
10   designed to prevent noncitizens from voting in
11   elections?
12        A.   I think it was designed to prevent any voter
13   who's not legally entitled to vote from voting including
14   noncitizens.
15        Q.   With regard to how that would work with regard
16   to House Bill 218, is your testimony the same as regard
17   to House Bill 1706?
18        A.   Yes, as far as I know.
19        Q.   Did the -- any of the supporters of House Bill
20   218, including legislators, publicly indicate that the
21   bill is designed to prevent noncitizens from voting?
22        A.   I'm sure they probably did.
23        Q.   Do you recall -- I'm sorry.  I didn't mean to
24   interrupt you?
25        A.   No.  I think they -- You know, I don't know

91

1    if -- I would be surprised if there were not public
2    statements by these individuals at the top of this bill
3    listing that -- as being one of the benefits of the
4    bill.
5         Q.   Were you present on the House floor debate of
6    House Bill 218?
7         A.   I don't recall, but I probably was.
8         Q.   Do you recall Representative Betty Brown stated
9    on the House floor that it was "designed to keep illegal
10   aliens, noncitizens and other people otherwise not
11   qualified from voting"?  Does that sounds familiar?
12        A.   It doesn't surprise me, but I don't recall it.
13        Q.   Are you aware of any nonpublic private
14   conversations where legislators indicated that House
15   Bill 218 was designed to prevent noncitizens from
16   voting?
17             MR. FREDERICK:  On the basis of privilege,
18   I think you may answer.  I'm sorry.
19        A.   Conversations with legislators I think is what
20   she was asking.
21             MS. WESTFALL:  Were you present during
22   conversations -- This is a foundational question,
23   Mr. Frederick.
24             MR. FREDERICK:  Can you repeat the
25   question, please?

92

1         Q.   (BY MS. WESTFALL) I certainly could.  Were you
2    present during any private conversations where
3    legislators indicated that House Bill 218 was designed
4    to keep noncitizens from voting?
5             MR. FREDERICK:  Object on the basis of
6    privilege.  The question implies the substance of the
7    conversation, so I instruct you not to answer.
8         Q.   Are you following your counsel's advice?
9         A.   Yes.
10        Q.   If House Bill 218 was implemented, do you think
11   it would have prevented noncitizens from voting?
12        A.   I'd have to read it more carefully than I have
13   read it today, but if it is, as I understand it, to be a
14   piece of legislation that simply goes from requiring a
15   minimum threshold of one non-photo document to two
16   non-photo documents, then I think it makes it more
17   difficult for a -- for any voter who's not legally
18   entitled to vote to vote.
19        Q.   I believe --
20        A.   Somewhat more difficult.
21        Q.   How?
22        A.   Just because, again, I'm sure there are a
23   number of examples, but the easiest one is just someone
24   coming upon a voter registration card in some manner,
25   and they would have to go to the trouble of either



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                          June 1, 2012

93

1  manufacturing or obtaining an additional document that
2  showed their identity as being the same person.  So I
3  think that's just -- in that instance alone, it makes it
4  more difficult to do.
5      Q.   I guess I'm not completely understanding your
6  testimony as to how that relates to noncitizen voting.
7  Could you explain?
8      A.   Well, I mean that person -- the person who is
9  voting with somebody else's voter registration card may
10  or may not be a noncitizen.  It could be anybody.
11      Q.   Right.  But my question was whether you can
12  explain how House Bill 218 would prevent noncitizens
13  from voting.
14      A.   I don't think --
15           MR. FREDERICK:  Objection.  Asked and
16  answered.
17      A.   Yeah.  I don't think any bill completely
18  precludes the possibility of voter fraud.
19      Q.   And I believe you testified earlier that
20  citizenship is determined and ascertained through the
21  county election registration process when an individual
22  submits a registration application and checks a box
23  indicating citizenship and signs under penalty of
24  perjury; is that right?
25      A.   Again, you know, I think the people who support

94

1  this legislation, if I recall correctly, are somewhat
2  skeptical about the extent to which that is -- is
3  actually something that itself prohibits noncitizens
4  from voting because if you are willing to commit voter
5  fraud, then why would you be willing to fraudulently
6  check that box?
7      Q.   I believe you testified earlier that if
8  assuming noncitizens manage to get onto the voter rolls
9  and they go to the polls on election day, that if they
10  present one of the forms of ID listed in House Bill 218
11  such as a driver's license, military ID, license to
12  carry concealed weapon, et cetera, that that would not
13  prevent that voter from participating in voting in the
14  election because one need not necessarily be a citizen
15  to hold and possess and obtain lawfully those documents;
16  is that correct?
17           MR. FREDERICK:  Object to the extent it
18  mischaracterizes the prior testimony, but you can
19  answer.
20      A.   I -- I think I did agree that this legislation
21  didn't change the ability of someone who would vote with
22  a driver's license before from voting with a driver's
23  license after, and to the extent that they have a
24  driver's license and they are a noncitizen, then -- then
25  there's no change.  I don't know if that answers your

95

1  question, but -- but I think there are documents that
2  are on the list, I presume, that are available to
3  noncitizens.
4      Q.   Thank you for your testimony.  Are you aware in
5  2007 of any analysis or research that was conducted to
6  determine who among registered voters had these forms of
7  photo ID identified in House Bill 218?
8      A.   No.
9      Q.   Are you aware of any attempt or research to
10  determine whether House Bill 218 did in fact have an
11  adverse impact on minority voters?
12      A.   Well, it didn't pass.
13      Q.   Was there any effort to determine -- do
14  research as to whether this bill would adversely affect
15  minority voters?
16      A.   Not that I'm aware of.
17      Q.   Did the House pass House Bill 218 to your
18  recollection?
19      A.   I believe they did.
20      Q.   And what happened?  Was it referred to the
21  Senate?
22      A.   I believe that that -- I mean, my general
23  understanding is that prior to 2009, these bills passed
24  the House in some version and died in the Senate, and I
25  don't recall the details of how that happened.

96

1      Q.   Are you aware of the photo ID bill that was
2  introduced in 2009?
3      A.   Yes.
4      Q.   Do you recall the bill number?
5      A.   No, I don't.  Again, I think I filed a shell
6  bill that really didn't have anything in it when I was
7  appointed to the elections chair and then the bill that
8  moved was -- ended up coming from the Senate.
9      Q.   Can you mark this as Exhibit 29?  You've been
10  handed what's been previously marked US-29.  Do you
11  recognize this document?
12      A.   I believe this is the Senate bill that -- or I
13  don't know if this is the version that was passed out of
14  the Senate, but I presume it is and the number refreshes
15  my memory, sounds right.
16      Q.   I believe you just testified that you filed a
17  shell bill when you became committee chair for the House
18  elections committee.
19      A.   Yes.
20      Q.   When were you appointed chair of the House
21  elections committee?
22      A.   Oh, February 2009, I believe, I guess.  I'm
23  pretty sure it had to be February.  It was late, I
24  remember that, because we had a new speaker.
25      Q.   Was that Speaker Straus?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                June 1, 2012

97

1    A.  Yes.
2    Q.  Tell me about how it happened that you became
3  chair of the elections committee?
4        MR. FREDERICK:  Object on the basis of
5  privilege.  I'll just caution you may testify about
6  how it happened, but I would instruct you not to reveal
7  the contents of any communication with a legislator.
8        MS. WESTFALL:  Mr. Frederick, I would ask
9  what legislative act being appointing to a committee it
10  refers to?  It's procedural in nature.  This is not
11  protected by the privilege.
12        MR. FREDERICK:  I'm going to stand by the
13  objection, and I think he can probably -- I expect that
14  he can answer without revealing any matters I would
15  consider privileged, so --
16    A.  The speaker appointed me, I think, to answer
17  the question.
18    Q.  Why did he appoint you?
19    A.  Perhaps just another indication that he didn't
20  like me very much.
21    Q.  Did you -- What was your reaction when you were
22  appointed to the chair of the elections committee?
23    A.  It was not my choice, but I did recognize that
24  it had political significance in that particular
25  legislative session.  And if we were going to get a

98

1  voter ID bill out of the House, if that was possible, I
2  was probably a good person to try to do that under those
3  circumstances.
4    Q.  What was the political significance of chairing
5  the elections committee that year?
6    A.  Just that it was just a very visible -- I mean,
7  my God, I was, you know -- you know, just in charge of
8  public relations.  It was a public relations position is
9  what it really was.  It was just a lot of press, the
10  focus of the session.
11    Q.  Was it Texas press alone, national press?
12    A.  I'm sure there was some national press, but it
13  was primarily Texas press that I was dealing with.
14    Q.  Why was there so much interest from the media
15  in Texas?
16    A.  Well, I don't know, but, you know, there's a
17  lot of -- I don't know the answer to that question.  It
18  was a combination of factors, but it was obviously a
19  significant political issue.
20    Q.  Was it your understanding when you were
21  appointed chair that the primary role that you were
22  going to have on the committee was to move forward a
23  photo ID law -- bill, pardon me?
24    A.  Yes.
25    Q.  That was the chief focus of the session; is

99

1  that right?
2    A.  That was clearly the -- Yes.  I spent almost
3  all of my time that session trying to pass this bill.
4    Q.  And who else of the Republican caucus of your
5  colleagues served on that committee along with you?
6    A.  Betty Brown, Dennis Bonnen, Linda Harper Brown,
7  Dwayne Bohac.  I think that's -- I think I've listed off
8  all the Republicans.  Did you ask me for the entire
9  committee?
10    Q.  Just the members of the Republican caucus.
11    A.  No, those were it.
12    Q.  So there was a time when you introduced shell
13  bill?
14    A.  I believe so.
15    Q.  Was it right after you had been appointed the
16  chair?
17    A.  It was soon after that, just before the
18  deadline to file House bills.
19    Q.  Do you recall the date of that filing?
20    A.  Probably early March.
21    Q.  Was there ongoing activity in the Senate with
22  regard to photo ID?
23    A.  Yes.  I believe the Senate activity had already
24  begun at that point.  I think they took it up very
25  early, may have already been in the process even before

100

1  I was made the chairman.  I don't remember.
2    Q.  Could you mark this --
3    A.  I just remember the Senate went first.
4        (Exhibit US-103 marked.)
5    Q.  Could you mark this as United States 103?
6  You've been handed what's been marked US-103.  Do you
7  recognize this document?
8    A.  No.
9    Q.  I will represent to you this is a legislative
10  history of Senate Bill 362 that may be able to refresh
11  your memory as to dates when things were filed and when
12  they were considered by the Senate and the House.
13    A.  M-hm.
14    Q.  So is it your testimony that as the Senate was
15  considering Senate Bill 362, you had filed a shell bill
16  as soon as you were appointed chairmanship in February
17  of '09; is that correct?
18    A.  I probably filed the shell bill in early March,
19  right before the deadline to file House bills.
20    Q.  Do you recall the number of that bill?
21    A.  No.
22    Q.  Did you work on pushing that bill through
23  legislatively or did you basically wait for the Senate?
24    A.  We waited for the Senate.
25    Q.  Did someone direct you to do that?


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

101

1        MR. FREDERICK:  I'm going to object on the
2   basis of privilege.  I'm going to instruct you not to
3   answer that question.
4        A.  Okay.
5        Q.  Are you going to follow the advice of counsel?
6        A.  Yes.
7        Q.  Was there a time that the Senate passed 362?
8        A.  Yes.
9        Q.  That came to the House and it was referred to
10   your committee; is that correct?
11       A.  Yes.
12       Q.  Tell me what happened after that.
13       A.  Oh, we set it for a hearing right away.  If I
14   recall correctly, two days of hearings, and I don't know
15   what else -- what the question is beyond that, but --
16       Q.  Did you play any role in the development of
17   Senate Bill 362 when it was introduced in the Senate?
18       A.  No.
19       Q.  You just received it in the House and took it
20   as it was; is that correct?
21       A.  Yes.
22       Q.  Is there a reason that you are aware of why
23   voter ID originated in the Senate and not the House?
24       A.  I think it was just because the Senate had
25   failed to pass it in previous legislative sessions and

102

1   the House was not interested in getting involved in it
2   under the circumstances unless the Senate were to pass
3   it because it obviously was very controversial and would
4   be a great waste of time if the Senate once again did
5   not pass the bill for whatever reason.
6        Q.  Are you aware of whether the lieutenant
7   governor saw it as a priority getting passed in Senate
8   right away?
9        A.  Public statements would indicate that he did
10   and his actions.
11       Q.  Turning your attention to Senate Bill 362
12   itself, could you take a look at the forms of ID that
13   are permitted, which if I could refer you to Page 5 of
14   that exhibit -- Have you had a chance to take a look?
15       A.  I've skimmed it, yes.
16       Q.  Could you describe the forms of allowable ID
17   under Senate Bill 362 in a general sense?
18       A.  Well, there's a number of photo IDs that are
19   available as an option and then, again, a long list of
20   non-photo IDs that may be used in lieu of a photo ID.
21       Q.  Was Senate Bill 362 essentially quite similar
22   to previous iterations of photo ID that had been
23   introduced in the House?
24       A.  I believe so, yes.
25       Q.  And is it your understanding that Senate Bill

103

1   362 was introduced in the Senate for the same reasons
2   that previous photo ID bills had been introduced in the
3   House?
4        A.  I presume so.  The policy arguments were the
5   same.
6        Q.  Was there any new purpose that it was serving
7   in 2009?
8        MR. FREDERICK:  Object on the basis of
9   privilege, that you can answer if you can do so without
10   revealing privileged communications.
11       A.  Yeah -- No, not other than just continued
12   demand from the grassroots that this bill be passed
13   building political pressure.
14       Q.  Tell me who -- Are there particular grassroots
15   groups that you in your mind identify with this issue?
16       A.  Just, you know, I think all Republican party
17   groups, Texas Federation of Republican Women and then
18   just any other party affiliated group.  The party
19   activist in general had determined that this was an
20   important issue.
21       Q.  Why was it such a priority for those groups?
22       MR. FREDERICK:  Objection.  Calls for
23   speculation.  You may answer.
24       MS. WESTFALL:  You may answer.
25       A.  Again, the fear that large numbers of votes

104

1   were being cast by people who were not legally entitled
2   to do so and predominantly to the benefit of the other
3   party.
4        Q.  So do you think it was -- it was motivated by
5   the same concerns about noncitizen voting that animated
6   the bills in 2005 and 2007?
7        MR. FREDERICK:  Objection.  Assumes facts
8   not in evidence.  You may answer.
9        A.  Again, I think, you know, their -- certainly,
10   noncitizens voting was a significant concern of theirs,
11   but I think they would be concerned about anybody voting
12   that's not legally entitled to do so.
13       Q.  And are you aware of any facts -- any instances
14   of in-person voter impersonation that had arisen between
15   2007 and 2009?
16       A.  I'm sure there were some, but -- some
17   individual alleged instances, but I can't cite you as to
18   any.
19       Q.  Are you aware of any such instances that are
20   not already discussed on the public record and public
21   debate of 362?
22       A.  No.
23       Q.  Was 362 considered in the Senate committee as a
24   whole?
25       A.  Yes.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                               June 1, 2012

105

1    Q.   Why was it considered in that committee?
2    A.   I don't know.
3    Q.   Was it considered in that committee to expedite
4    its consideration by the Senate?
5    A.   I don't know that that -- If you wanted to
6    expedite it, you would have to go through the committee
7    as a whole rather than substantive committee.
8    Q.   Would it be easier simply to go to the
9    committee as a whole, have the whole Senate and
10   immediately have a vote by the whole Senate?
11            MR. FREDERICK:  Objection.  Calls for
12   speculation.
13   A.   I am not an expert in Senate process, so I
14   don't really know that.
15   Q.   Are you aware of whether the lieutenant
16   governor wanted to play an increased role in
17   consideration of Senate Bill 362 and that's why the bill
18   was considered by the committee as a whole?
19            MR. FREDERICK:  Objection.  Vague.
20   A.   I don't know.  I certainly know that it was
21   important to him politically in light of the fact that
22   he had presided over prior Senates where the bill had
23   not passed to have it pass, but specifically why he
24   chose to do it as a committee as a whole or to the
25   extent to which he was even the one who made that

106

1    decision versus the Senate as a whole, I don't know.
2    Q.   To your knowledge is the lieutenant governor
3    empowered under the Senate rules in assigning bills to
4    committees?
5    A.   I don't know.  I presume.
6    Q.   Did you attend or listen to any of the debate
7    in the Senate for Senate Bill 362?
8    A.   Yes.
9    Q.   Did the committee as a whole hold a hearing on
10   Senate Bill 362?
11   A.   Yes.
12   Q.   Is that the hearing that you are referring to
13   that you listened to parts of?
14   A.   You know, I don't really remember at what
15   points I was over there.  I certainly was over there
16   when the entire Senate was meeting and discussing the
17   issue of voter ID.  Whether it was during the committee
18   as a whole or whether it was when the Senate was meeting
19   or both, I don't recall.
20   Q.   Looking at Exhibit US-103 on the second page --
21   A.   What's that?
22   Q.   The Texas Legislature Online History.  Do you
23   see that?
24   A.   M-hm.
25   Q.   On the second page you are looking at right

107

1    there --
2    A.   M-hm.
3    Q.   -- do you see that on March 10th there was a
4    public hearing in the Senate?
5    A.   M-hm.  Yes.
6    Q.   Does that refresh your recollection as to
7    whether you were in attendance for that portion of
8    consideration of the bill?
9    A.   I just don't remember.  There was obviously
10   some times when they were meeting on voter ID where I
11   was available to go and participate, and there were
12   other times where they were meeting on it and I had a
13   conflict in the House and was not able to attend or just
14   chose not to.
15   Q.   Do you recall hearing that Senator Fraser at
16   that hearing was asked whether an analysis of the racial
17   analysis of voters without a driver's license had been
18   undertaken?
19   A.   No, I don't recall that.
20   Q.   Did you learn at any time after that hearing
21   that the elections division or another entity had
22   submitted any analysis of the racial composition of
23   voters who don't have a Texas driver's license to any
24   member of the legislature?
25   A.   I don't recall ever seeing any information of

108

1    that type the entire time I was dealing with the issue.
2    Q.   While you were -- Actually, strike that.
3         So the bill was passed in the Senate.  Can
4    you look -- Was it not?
5    A.   Yes, it was passed in the Senate.
6    Q.   And looking at US-103, can you see when it
7    passed the Senate?
8    A.   It looks like to me on March the 18th.
9    Q.   And then it came up to the House and in your
10   committee; is that right?
11   A.   Yes.
12   Q.   At that time you scheduled hearings, I believe?
13   That was your earlier testimony, I believe; is that
14   correct?
15   A.   Yes.
16   Q.   When were those hearings?
17   A.   On opening day of the Texas Rangers baseball
18   season, whenever that was, because I couldn't go to the
19   game.  I was upset about it.  Early April.
20   Q.   Were any changes made to Senate Bill 362 in the
21   committee?
22   A.   Yes.
23   Q.   What were those changes?
24   A.   Whatever Linda Harper Brown and Betty Brown
25   wanted ultimately.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                              June 1, 2012

109

1    Q.   Which was?
2    A.   Gosh, I'm trying to remember what they finally
3    agreed to, but we had -- There were basically six
4    members.  I had to get five votes from six members.
5    Republicans and Heflin were the only ones who were even
6    in play, and so any two of them could cooperate and
7    control the language in the bill, and they did.  And so,
8    you know, I don't remember, but it was a -- basically a
9    very strict photo ID requirement, if I recall correctly.
10   Not what I had proposed, but was actually voted out of
11   the committee, and then I filed my bill as an amendment
12   should it have gotten to the floor.
13        It was my intent to get the members of the
14   legislature to vote on both versions, and my expectation
15   is, if we had gotten there, that the strict version
16   would have been defeated and then mine would have been
17   offered as an alternative and would have passed if the
18   base of the party had been willing to support it, and
19   they would not have, I don't think.
20   Q.   So the stricter version that you are referring
21   to was that strictly photo ID without the two non-photo
22   IDs alternatives to the best of your recollection?
23   A.   In general, yes, that's the best of my
24   recollection.
25   Q.   And your amendment --

110

1    A.   Actually, I think I may be wrong about that
2    because I think that the Senate -- because they had
3    voted for two non-photos, that -- that -- I think -- I
4    don't remember.  I just don't remember what they
5    required.  I shouldn't speculate.  I don't remember.
6    But it -- it clearly did not include some of the things
7    that I had proposed for purposes of obtaining the
8    marginal votes like delaying implementation beyond the
9    redistricting year, money for a voter registration
10   drive.  I remember all the -- there's, I think, three
11   different sweeteners that we put in there to try to get
12   the marginal votes.
13        (Exhibit US-104 marked.)
14   Q.   Could you mark this US-104?
15   A.   Actually, I remember now.  At the end of the
16   day, their position was we will vote for the precise
17   Senate bill period.  If I recall correctly, I think what
18   we voted on committee was precisely the Senate bill.
19   Q.   And you were endeavoring a committee to widen
20   the appeal of the bill --
21   A.   Yes.
22   Q.   -- by adding, as you said, some sweeteners to
23   the bill?
24   A.   Yes.
25        (Exhibit US-104 marked.)

111

1    Q.   We'll talk about that in a moment.  In the
2    interim, you've been handed what's been marked as United
3    States 104.
4    A.   M-hm.
5    Q.   Do you recognize this document?
6    A.   No -- Oh, yes.  I recognize not this document,
7    but I recognize what the document is referring to.
8    Q.   What is it?
9    A.   Basically a document that was signed by 71, I
10   believe.  Does it say 71?  Ultimately a document like
11   this was signed by 71 members, I believe.
12   Q.   Could you describe the document?
13   A.   This was just a -- Let me read this one real
14   quick.
15   Q.   Take your time.
16   A.   Yeah.  I was -- This was something that I
17   actually participated in drafting the language that was
18   ultimately signed by 71 of the Republican members of the
19   House.  It was brought to me before it was published,
20   and I was given the opportunity to actually amend it and
21   change some of the language in this document.  For
22   example, I believe I was personally responsible for
23   putting in there the next possible uniform election date
24   rather than the next election date.  There were some
25   changes that I made of that type and, you know, I

112

1    thought it was a good because if we were going to pass
2    the bill, it would -- it would require -- this would
3    allow the 71 members who were willing to support a hard
4    photo ID bill to go on record as that being their
5    preference, which I thought would then free them up to
6    support my version, which is the one that actually got a
7    chance to pass.  Does that make sense?
8    Q.   Actually, it doesn't make sense.
9    A.   They needed to be clear to the extent that the
10   party preferred a strict version, if that's what we're
11   going to call it, and we ultimately passed something
12   that was less strict.  This would allow these members to
13   go on record again as expressing their preference for
14   the version that was preferred by the party, which I
15   hoped would then free them up to then support the
16   version that actually had a chance to pass.
17   Q.   Do you see that this document appears to be
18   dated April 28, 2009 on the upper right?
19   A.   I didn't see that.
20   Q.   On the upper right of the first page.  It could
21   be dated at the bottom of the letter as well, but --
22   A.   Yeah.  I don't think -- There is clearly not 71
23   people that are listed here, and so I don't really know
24   what -- you know, what -- ultimately, there were 71
25   people.  I'm almost sure of that.  I don't recall the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

113

1    number because it really kind of made my point, which is
2    that it takes 76 votes to pass a bill and 71 is not
3    enough.
4        Q.   At what stage in the legislative process was
5    this pledge published to the best of your recollection?
6        A.   Well, it looks like to me it was published on
7    or before April 28, but I don't recall that.  I don't
8    recall specifically.  It was late in the session.  I
9    remember that.
10       Q.   How long was Senate Bill 362 in the House
11   committee?
12       A.   Got there in late March, committee hearing in
13   early April and voted out, if I recall, something --
14   well, it may be on this sheet -- May the 10th or
15   something like that in that range is when I think the
16   bill was voted out of the committee.  It doesn't --
17   Yeah, what does it say?  May 11th.
18       Q.   Thank you.
19       A.   M-hm.
20       Q.   So to reiterate what you told us about the
21   procedural history, the bill came to the elections
22   committee and the bill as it was filed in the Senate
23   essentially, SB362, was advanced by some members of the
24   committee.  You wanted a substitute that had some other
25   provisions in it that would make it more powerful to

114

1    other members of the House --
2        A.   Yes.
3        Q.   -- and then, ultimately, it stayed in your
4    committee until May 11th.
5        A.   Yes.
6        Q.   And what version came out of the committee?
7        A.   The Senate bill.
8        Q.   And then it went to the House, and what
9    happened after that?
10       A.   It never made it to the House floor.  That was
11   the infamous --
12            MS. PERALES:  Chub.
13       A.   Yeah.  Where the -- the opponents of the bill
14   basically talked the session -- talked the remainder of
15   the session so that bill and every bill after it on the
16   calendar died.
17       Q.   So there was, I take it, opposition to Senate
18   Bill 362 in the House?
19       A.   Some, yes.
20       Q.   And can you describe all the quarters of
21   opposition to Senate Bill 362?
22       A.   All the what?
23       Q.   All the different factions or categories of
24   legislators who disliked the bill?
25       A.   I think it was basically every Democrat, and I

115

1    guess we even had a couple of Republicans who had
2    previously voted against it.
3        Q.   What was the basis of the opposition to Senate
4    Bill 362?
5        A.   Well, I think the basis for the Republicans
6    might be different than the basis from the Democrats.
7        Q.   So why don't we start with the Democrats first.
8    What was the basis of their opposition?
9        A.   Okay.  Because my -- I think I've already
10   described it.  Would just be concern that the additional
11   requirements to vote would somehow disproportionally
12   prevent Democrats from voting rather than Republicans.
13   Again, in this version, which was not a strict photo ID
14   requirement, I really don't understand why that would be
15   the case because the document's already in their
16   possession, but they obviously felt like that there was
17   some reason to oppose it.
18       Q.   And --
19       A.   In my opinion it was just foolish politically.
20   In that bill, I think they were foolish politically.
21       Q.   You think the basis was --
22       A.   The Democrats were foolish politically in the
23   way they handled it that session.  If I put on my
24   Democratic party hat and was an advocate for their
25   interests, I think their interest would have been far

116

1    better served by passing the kind of bill that would
2    have passed that session than by being tarred and
3    feathered for killing an entire calendar of bills in
4    order to prevent a very popular piece of legislation
5    from passing.  I do not understand how that could have
6    been in the best interests of the Democratic party's
7    political prospects.
8        Q.   And you are suggesting that opposition from the
9    Democrats was because of self-interest in terms of
10   Democratic voters being depressed by this bill.  Is that
11   your testimony?
12       A.   Again, you know, they obviously believed that.
13   I don't understand why they believed that.
14       Q.   Did they have other concerns?
15       A.   You know, I think they were being pressured.
16   Just like Republicans were being pressured by their
17   grassroots, Democrats were being pressured by some of
18   their activist organizations that are -- you know,
19   probably have different views than some of the rank and
20   file members that were Democrats on the floor.
21       Q.   Was there any concern about disproportionate
22   impact of Senate Bill 362 on minority voters?
23       A.   I think, yeah, the -- the advocacy groups,
24   MALDEF and NAACP, certainly expressed those concerns.
25       Q.   Were there any legislators who expressed those



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                        June 1, 2012

117

1   concerns?
2       A.   Yes.
3       Q.   Who were they?
4       A.   Rafael and Mark Veasey and a number of others.
5       Q.   Anybody else you can name sitting here today?
6       A.   I think Mark and Rafael were the leading two
7   opponents, kind of representative of the two largest
8   minority groups.
9              (Exhibit US-105 marked.)
10      Q.   So I believe you testified -- Actually, strike
11  that.
12             Could you mark this US-105?  You've been
13  handed what's been marked US-105.  Do you recognize this
14  document?  I'll give you a chance to take a look.
15      A.   It's apparently one of many, many news stories
16  in that legislative session about this issue.  Do you
17  want me to read it?
18      Q.   If you could just take a quick glance,
19  particularly, where it talks in the middle of the page
20  about changes that you were proposing to make to
21  accomplish passage in the House of photo ID.
22      A.   It looks like it's talking here primarily about
23  the delay in implementation.
24      Q.   Could you explain that provision of your
25  alternative?

118

1       A.   There was concern -- The allegation from the
2   opposition was that we were trying to somehow adversely
3   affect the redistricting year elections, and my proposal
4   was to prove that that was not the case by simply
5   ensuring that the implementation and legislation would
6   not occur until after that election had occurred, and
7   there was some question about whether or not you could
8   even successfully go through all the legal hurdles in
9   time for this legislation to be implemented by the next
10  election cycle anyway.  So that was what I referred to
11  as a quasi-concession because I wasn't even entirely
12  sure that it was a concession, but, believe me, I -- you
13  know, I was ripped to shreds by the -- some of the
14  Republican activists for having the audacity to suggest
15  such a thing, but it was, you know, one of several
16  things that resulted from my conversations with the
17  people whose votes we needed to pass the bill to try to
18  find ways that we could obtain their votes, and,
19  obviously, I realized I had to do it in a way that would
20  not offend the base, and so I was trying to find things
21  that would get the marginal votes on board, but that
22  would not cause me to lose the base, and I don't know
23  that in that legislative session it was possible to find
24  any language that 76 people would agree to.  In fact, I
25  strongly believe that it was not.  There was no language

119

1   any 76 people would ever agree to.
2       Q.   So you mentioned I think sweeteners, and would
3   you describe that this delay in implementation was one
4   of those provisions?
5       A.   Yes.
6       Q.   Were there other provisions?
7       A.   There were other provisions, yes, and I want to
8   think there were three, and I'm having trouble
9   remembering the third one, but one of them was to spend
10  several million dollars on a major statewide voter
11  registration drive to increase the number of legal
12  registered voters.
13      Q.   Who was going to conduct that drive?
14      A.   I think it was just -- we were just going to --
15  You know, the plan was to flow money for those drives
16  through the voter registrar's office of the counties
17  throughout the state.
18      Q.   Were the county officials going to be doing
19  those drives?
20      A.   Yes.
21      Q.   And were they going to be targeted in areas
22  that were underserved or lower registration levels?
23      A.   I think the intent was to have the county
24  officials in each county to do a county-wide voter
25  registration drive, and, you know, there may have been

120

1   some language in some of the versions in my bill that
2   specified that it had to -- the drive had to be
3   county-wide and had to be an effort to register voters
4   in all parties of the county.
5       Q.   So it was not targeted necessarily to
6   communities where there was historic low levels of
7   registration or where there had been historic levels of
8   disenfranchisement in Texas?
9       A.   I think the intent was to require that the
10  registration drive be implemented everywhere to try to
11  increase the number of registered voters everywhere.
12      Q.   How much monies had you appropriated in the
13  bill or authorized for appropriation?
14      A.   I don't remember, but several million.  It was
15  five or $10,000,000, 4 million.  I don't remember
16  precisely the number.  It was subject to negotiation to
17  the extent that we got there, but I do think there was
18  some money set aside in the appropriations bill for that
19  purpose.
20      Q.   What was the third provision if you can
21  remember it sitting here today?  And if not, I won't
22  press you.
23      A.   Gosh, what was it?  Money to register voters,
24  delay in implementation.
25      Q.   Sir, was it a --

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                                June 1, 2012

121

1    A.  I can't remember.
2    Q.  -- list of sort of a way -- of bright-line rule
3    for determining whether someone had proven their
4    identification at the polls?  Was that it?
5    Q.  Was what now?
6    Q.  Like list your hair color, list your eye color?
7    Was it something very specific about ID at the polls or
8    does that not ring a bell?
9    A.  No.
10   Q.  Okay.
11   A.  It was something -- I just remember --
12   remember there was -- that I had assurances of certain
13   marginal votes that if we added three things to the
14   Senate bill, that they would vote for the bill.
15   Q.  Where did you get this language or ideas for
16   sweeteners?
17   A.  Just from conversations with those people who I
18   knew were the handful of people who had previously voted
19   against it that might be persuaded to vote for it with
20   some changes.
21   Q.  Were those legislators -- were any of them
22   racial minorities?
23   A.  No.
24   Q.  And were attempts to generate a compromise in
25   committee, did they eventually break down?

122

1    A.  Yeah.  Most of my efforts during the session
2    were focused on what -- what I would have to do to get a
3    bill off the floor.  It became quite apparent once it
4    was time to get the bill out of the committee that I
5    wasn't in control of the language of what was coming out
6    of the committee.
7    Q.  Did you vote for the bill in committee?
8    A.  Yes.
9    Q.  And that was essentially 362 that came out of
10   the committee?
11   A.  I believe it was exactly 362.
12   Q.  Was it a straight party line vote?
13   A.  No.  Heflin voted for it.
14   Q.  So I believe you testified that Senate Bill 362
15   was -- didn't reach the House floor because it was
16   chubbed; is that correct?
17   A.  Yes.
18   Q.  Did you remain chair of the committee on
19   elections for the interim session --
20   A.  Yes.
21   Q.  -- in 2010?
22   A.  Yes.
23   Q.  Did you hold hearings on voter ID in 2010?
24   A.  I believe we did.
25   Q.  Did you hold more than one?

123

1    A.  Well, I don't know about 2010.  I don't
2    remember when we had them -- when we had the interim
3    committee, but I imagine that's when it was.
4    Q.  Was it in June of 2010 --
5    A.  Probably just had one hearing on it.
6    Q.  Did you convene the meeting as the chair?
7    A.  I believe so.
8    Q.  What was the focus of the hearing?
9    A.  Just, I think, to hear invited testimony about
10   any additional information that had developed since the
11   last legislative session in terms of other states'
12   involvement with this type of legislation.
13   Q.  Do you recall that Ann McGeehan testified in
14   that hearing?
15   A.  I presume she did.  She's testified in front of
16   the hearing committee so many times, I don't really
17   recall that specific one, but I'm sure she did.
18   Q.  Do you recall at the hearing she had
19   testified that she was aware at that time of 24 election
20   fraud cases for possible prosecution of election fraud
21   in the past two years and that two of those involved
22   in-person voter impersonation?
23   A.  Sounds right.
24   Q.  Did you have any reaction to Ms. McGeehan's
25   testimony?

124

1    A.  No.  I think, you know, by that time I was sort
2    of -- I was pretty aware of that sort of statistic.
3    Q.  Was it your intent at that time to move forward
4    in the next session with a photo ID law?
5    A.  I think that would just entirely depend upon
6    what would happen in the elections following the
7    hearing, but -- and, clearly, once those elections
8    occurred, there was no question that it was going to
9    happen and happen quickly.
10   Q.  So what happened after the 2010 election that
11   caused you to think that?
12   A.  Republicans got 101 votes in the House and
13   maintained their majority in the Senate.
14   Q.  When did you first become aware of the fact
15   that the Texas legislator was going to move forward
16   rapidly on photo ID in 2011?
17   A.  Well, I think just as a -- presumptively, I
18   think I became aware of it when the election results
19   came in.  I would have known that would have followed.
20   In terms of formerly being notified of that, I think it
21   probably wouldn't have happened until the committee
22   assignments were made, and there was a select committee
23   on voter ID.
24   Q.  When did you learn -- So you were no longer on
25   the House election committee in 2011?



ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

125

1    A.   Right.
2    Q.   When did you learn that?
3    A.   Oh, I, you know, did not want to chair the
4    elections committee again, and so, you know, without
5    revealing conversations, my understanding was -- my
6    belief was that I would be given a different
7    chairmanship, and, you know, that makes a lot of sense
8    because, again, the version that I was tauting was the
9    version -- the only version that had a chance to pass,
10   if any did, and I think it turns out none did, but if
11   any did in 2009, and, clearly, the version that had a
12   chance to pass in 2011 was going to be dramatically
13   different, and so it would have been awkward for me to
14   be pushing dramatically different legislation when I was
15   very public in defending the version that had a chance
16   to pass in the prior legislative session.
17        So I think it made perfect sense to have
18   someone else do that, and I just, you know -- you know,
19   would rather -- you know, I never had asked for an
20   assignment that required me to spend all of my time as
21   party chairman.  Not my favorite assignment.
22   Q.   So when are committee assignments -- when were
23   committee assignments determined in 2010 for the 2011
24   session?
25   A.   I don't know when they were determined.  They

126

1    were announced in February, I imagine, of 2011.  Could
2    have been January, but it probably was February.
3    Q.   Did you introduce any election related
4    legislation at the end of 2010 to be filed in 2011?
5    A.   Yes.  I filed -- After having been accused in
6    my election of what I was accused of, I did file a
7    strict photo ID bill at the beginning of the legislative
8    session, but I didn't expect that that would be the
9    vehicle.  It was just something I chose personally to
10   file.
11   Q.   What made you do that having taken the stance
12   you previously had six months earlier?
13   A.   Just because to make it clear, as I had
14   explained to my constituents, that the version I was
15   supporting in 2009 was the most strictest version that
16   had a chance to pass and with 101 Republicans, it was a
17   very different scenario, and, clearly, you know, what my
18   constituents wanted was to make people show a photo ID
19   in order to vote, period.
20   Q.   Was that your motivation?
21   A.   To represent my constituents, yes.
22   Q.   And why were they motivated to tell you we must
23   have this strict photo ID bill?
24        MR. FREDERICK:  Objection.  Calls for
25   speculation.

127

1    A.   I think in general they were -- as we've
2    already discussed were concerned that illegal voters
3    were voting in large numbers and potentially changing
4    the results of elections.
5    Q.   Do you have any understanding of why your
6    constituents believed this or the basis for their
7    belief?
8        MR. FREDERICK:  Objection.  Calls for
9    speculation.  You may answer.
10   A.   Just because it was the number one priority of
11   various different party organizations and was discussed
12   at length at almost every meeting.  It had just become a
13   priority of the party.
14   Q.   I guess in terms of -- I'm going to re-ask my
15   question a different way.  Your constituents had -- I
16   believe you testified your constituents had a view that
17   there was a lot of illegal noncitizen voting occurring
18   and that's why strict photo ID was required, and this
19   was in 2010; is that correct?
20        MR. FREDERICK:  Object.  Mischaracterizes
21   prior testimony.  You may answer.
22   A.   Yeah, again, illegal voting, not necessarily
23   limited to noncitizens, but certainly one of their --
24   you know, yes.  I mean, there was, you know, certainly a
25   major concern that some of the fraudulent voting that

128

1    was occurring could be by people who were not even
2    citizens of the United States.
3    Q.   And are you aware of any facts or information
4    that any of your constituents had about that phenomenon
5    you just described?
6    A.   No.
7        (Exhibit US-106 marked.)
8    Q.   You've been handed what's been marked US-106.
9    Do you recognize this document?
10   A.   I'm sorry.  I'm still looking at this newspaper
11   article.  106?
12   Q.   Yes.
13   A.   Is this the one I filed in 2011?  Yeah, it
14   looks like it.
15   Q.   And was this the bill that you were just
16   referring to in terms of --
17   A.   Yes.  And basically what this is is it's
18   patterned after one of the other states.  I don't
19   remember which state.  I asked ledge counsel to draft a
20   bill that was patterned after -- it could have been
21   Georgia.  I don't remember any state, but I think my
22   decision was to have them draft a bill from a state that
23   was a Section 5 state where it had been implemented, and
24   I don't -- it could have been Georgia.  I just don't
25   recall as I sit here today if that's for sure the case,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

129

1    but a southern state that had successfully implemented a
2    photo ID requirement.
3        Q.  Thank you.
4        A.  M-hm.
5        Q.  Are you familiar with ways in which this bill,
6    House Bill 401, differs from Senate Bill 14 that was
7    filed by Senator Fraser?
8        A.  In general, it simply does not allow you to
9    vote with two non-photo IDs.  Big difference.
10       Q.  And do you see at the first page on Section
11   12 -- well, Section 1 of the bill, the section regarding
12   voter ID cards?
13       A.  M-hm.
14       Q.  Do you know why you included this provision?
15       A.  Probably because whatever state I asked that
16   this legislation being patterned after had some similar
17   provision, but --
18       Q.  And do you see that this requires that the
19   "registrar provide at least one place in the county to
20   accept applications for and issue Texas voter
21   identification cards"?  And do you see that?  Yes?
22       A.  I'm not seeing where exactly it says that.
23       Q.  On Page 1 --
24       A.  Page 1.
25       Q.  -- under Section 12.007.

130

1        A.  M-hm.  Each voter registrar shall issue -- "The
2    voter registrar must provide one place in the county to
3    accept applications for and issue Texas voter
4    identification cards."  Yeah.
5        Q.  Do you remember that provision?
6        A.  I didn't remember it until you pointed it out
7    to me.  You know, I think that's just about ensuring
8    that there is access -- reasonably easy access to these
9    cards.
10       Q.  Do you believe that's important to include in
11   any photo ID bill?
12            MR. FREDERICK:  Objection.  Relevance.
13       A.  I do, yes, believe that it is important that
14   legal voters have access to the polls.
15       Q.  Did you believe that it was an important
16   attempt to try to minimize the burden on voters who
17   didn't possess one of the forms of photo ID?
18            MR. FREDERICK:  Objection.  Relevance.
19   You may answer.
20       A.  I think it is important to take all reasonable
21   efforts to ensure that legal voters have a reasonable --
22   reasonable burden in casting a legal vote.
23       Q.  And do you think it's important in that regard
24   to ensure that voters don't need to travel a significant
25   distance to obtain one of these cards?  Is that why you

131

1    included that provision?
2        A.  You know, yes.  I mean, I think the presumption
3    was that by requiring some such availability by county
4    that the maximum distance that anyone would have to
5    travel to get one could only be so much.
6        Q.  Do you see also that this same paragraph
7    requires a voter registrar can't charge an application
8    fee for the issuance of a Texas voter ID card?
9        A.  Right.
10       Q.  Why did you include that provision in the bill?
11       A.  I think all versions of the bill previously
12   considered had provided this identification card
13   available at no charge, and, you know, because we don't
14   make people pay to vote.
15       Q.  I direct your attention to the forms of voter
16   ID on Page 5 of this document, starts on Page 5 --
17   actually, starts on Page 6.  Pardon me.  Do you see that
18   where it lists forms of ID?
19       A.  M-hm.
20       Q.  How did you create this list of allowable forms
21   of ID?
22       A.  I don't remember.  It was probably something
23   that was just pulled from prior versions of the
24   legislation.
25       Q.  Do you see that it includes student IDs?

132

1        A.  Yes.
2        Q.  Why did you include that provision?
3        A.  Again, it's probably just from a prior version
4    of the legislation, perhaps the language that came out
5    of the Senate that we had used in the prior session.  I
6    don't know for sure, but that would be my guess.
7        Q.  Did you conduct any analysis of voters who do
8    or do not have these forms of ID?
9        A.  No.
10       Q.  Did you consider the racial impact of requiring
11   these particular forms of ID on registered voters?
12       A.  No.
13            (Exhibit 107 marked.)
14       Q.  Was the photo ID bill -- Actually, strike that.
15   Let's mark this.
16            You've been handed what's been marked 107.
17   Do you recognize this document?
18       A.  Only that it was a bill that we filed at some
19   point in the most recent legislative session.
20       Q.  Why did you file this bill?
21       A.  I think because during the prior campaign I had
22   made promises to do so.
23       Q.  Was this a promise to your constituents?
24       A.  Yes.  I believe that's correct.
25       Q.  Could you describe what this bill is intended



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                    June 1, 2012

133

1  to do?
2       A.  Require that a voter provide proof of
3  citizenship when registering to vote rather than simply
4  relying on their honesty in checking the box.
5       Q.  Which of your constituents were --
6       A.  Which of my constituents were what?
7       Q.  I'm sorry.  I'm gathering may thoughts.  Which
8  of your constituents urged you to file this type of
9  legislation?
10      A.  I don't -- I don't know that I can cite
11  specific constituents that urged me to do it.  I think
12  in some of the political literature that we had sent out
13  responding to the attacks that I killed voter ID, we had
14  decided to say we would file certain legislation like
15  this.  So it was a -- you know, just keeping a campaign
16  pledge.
17      Q.  Why do you think this bill was necessary?
18      A.  I don't know that it is necessary.  I think
19  that it's just another way that you can ensure that
20  every legal voter is a citizen.
21      Q.  This was designed to require documentary proof
22  of citizenship when registering to vote; is that right?
23      A.  Right.  I think Arizona did it, if I recall
24  correctly; is that right?
25      Q.  As you sit here today, can you think of any

134

1  facts or information that would support the need for
2  requiring documentary proof of citizenship when
3  registering to vote?
4       A.  Just because there is concern among the people
5  I represent that it's too easy to lie and thereby vote
6  and that, therefore, they presume it's probably
7  happening.
8       Q.  Do you have any evidence or facts or
9  information about noncitizens who had done just that and
10 were on the voter rolls?
11      A.  No.
12      Q.  Did your constituents present you with any such
13 facts or analysis?
14      A.  No.
15      Q.  Do you have any data from the elections
16 division on that point?
17      A.  No.
18      Q.  Were you at all concerned that this legislation
19 would be burdensome to voters if enacted?
20          MR. FREDERICK:  I think I need to object
21 here on privilege.  This has now gotten into your
22 specific mental impressions about this legislation as
23 opposed to its purpose, so I'll instruct you not to
24 answer on the basis of privilege.
25      Q.  Are you following your counsel's advice?

135

1       A.  Yes.
2       Q.  Were hearings held on this bill?
3       A.  I don't think so.  I don't know.  I don't
4  remember.  I can't be sure.
5       Q.  When did you file this bill?
6       A.  Must not have been right at the very beginning
7  of the session because of the number, but it must have
8  been sometime in January, I would imagine, in 2011.
9       Q.  Are you aware of whether Senator Fraser filed a
10 similar bill in the Senate?
11      A.  No.
12      Q.  Did you talk to Senator Fraser about filing
13 this bill?
14      A.  No.
15      Q.  Did you give anyone advance notice about filing
16 this bill?
17      A.  Not other than my constituents in the campaign.
18      Q.  Did this bill pass the House?
19      A.  No.
20      Q.  Why was there not more support for this bill?
21          MR. FREDERICK:  Objection.  Calls for
22 speculation.
23      A.  I don't know.  I don't know.  You know, I think
24 there was support for the bill.  For whatever reason,
25 the chairman of the committee chose not to pass it out

136

1  of committee, if I recall correctly.
2       Q.  Did you have any concerns that this bill would
3  disproportionately fall on Hispanic voters?
4          MR. FREDERICK:  Objection.  Privilege.
5  Instruct you not to answer.
6       Q.  Are you following the advice of counsel?
7       A.  Yes.
8       Q.  Are you aware of any conversations with any
9  legislator or constituent about concerns of this bill
10 falling more heavily on Hispanic eligible voters?
11      A.  Say that one more time.
12      Q.  That was a long question.  Let me try again.
13 Are you aware of any communications about concerns that
14 this bill would fall more heavily on eligible Hispanic
15 voters?
16          MR. FREDERICK:  Objection to the extent
17 that this would call for communications from other
18 legislators or legislative staff and instruct you not to
19 answer on the basis of privilege.  Otherwise, you may
20 answer, if you can.
21      A.  Let me just say I don't believe there were any
22 discussions of any significance, and, you know, to some
23 extent in answering the prior questions, it's not going
24 to create -- in other words, this is not -- I don't
25 think likely to pass, and so bills that do not pass,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                June 1, 2012

137

1    cannot create burdens.
2        Q.   Did it not generate a lot of attention?
3        A.   No.  N-hn.
4        Q.   Did you receive they criticism from any quarter
5    after you filed this bill?
6        A.   I don't recall that ever happening, no.
7        Q.   Were there a number --
8        A.   This is the kind of bill where your presumption
9    is that it's not going to pass unless the leadership of
10   the state wants it to pass, and there's no indication on
11   my part that that was the case, and, therefore, my
12   presumption I was keeping a political pledge and filing
13   a bill that was not likely to go anywhere.
14       Q.   So, in other words, this was a symbolic
15   legislation?
16       A.   It was.  You know, again, I filed it and if the
17   powers that be wanted to move it, it could have moved,
18   but --
19       Q.   Did you --
20       A.   -- I had no indication that that was going to
21   happen.
22       Q.   Did you nevertheless have concerns that some of
23   your Hispanic constituents might be concerned about this
24   bill?
25       A.   No, nobody ever expressed that to me.

138

1        Q.   I'm going to hand you what's been previously
2    marked as US-81.  Do you recognize this document?
3        A.   I presume this is the bill that we passed this
4    prior session on voter ID.
5        Q.   And I will represent to you, I'm sure your
6    counsel won't disagree, this is the version that was
7    filed in the Senate.  This was not the engrossed
8    version.
9        A.   Okay.
10       Q.   Are you familiar with the forms of photo ID
11   allowable under Senate Bill 14?
12       A.   I don't recall off the top of my head, no.
13       Q.   Turning your attention to Page 8 of this
14   document, Section 12, could you take a quick look at the
15   forms of ID allowable listed on Page 8?
16       A.   Okay.
17       Q.   Do you see that it only allows for a relatively
18   limited number of IDs; is that right?
19       A.   Yes.
20       Q.   Does this represent a significant departure
21   from Senate Bill 362 in terms of forms of allowable ID?
22       A.   Yes.
23       Q.   Could you describe those differences?
24       A.   Instead of having a long list of photo IDs
25   and/or to a long list of non-photo IDs that you could

139

1    use in conjunction with one another, you had to provide
2    one of the much smaller number of photo IDs and you
3    could not vote without a photo ID, except I think in the
4    final version there were some exceptions.
5        Q.   And this bill was filed in the Senate, correct?
6        A.   Yes.
7        Q.   This bill was filed by Senator Fraser; is that
8    right?
9        A.   Yes.
10       Q.   Do you know who decided to include these
11   particular forms of ID in Senate Bill 14?
12       A.   No.
13       Q.   Were you at all involved in that decision?
14       A.   No.
15       Q.   Do you know why it was so restrictive in the
16   bill as filed?
17       A.   No.
18       Q.   Do you know why there were only four forms of
19   photo ID?
20       A.   No.
21       Q.   And do you know why any one of these was
22   included in the bill?
23            MR. FREDERICK:  Objection.
24       A.   No.
25       Q.   Do you recall when Senate Bill 362 allowed for

140

1    expired IDs in any cases?
2        A.   No, I don't remember.
3        Q.   And if you don't remember, you can refer back
4    to 362 if you want to look at the list of IDs
5    because I want to ask you some questions to compare.
6        A.   You want me to look at the photo IDs or the
7    non-photo?
8        Q.   The photo.  For example, turning your attention
9    to the driver's license --
10       A.   M-hm.
11       Q.   -- if you see under Senate Bill 14 as filed --
12       A.   Yes.
13       Q.   -- it could not be expired and under Senate
14   Bill 362 it could have been expired within two years of
15   presenting that form of ID; is that correct?
16       A.   Yes.
17       Q.   Do you know why Senate Bill 14 limited the
18   ability to present expired ID that had been in place in
19   362?
20       A.   No.
21       Q.   Is there any difference in terms of proving
22   your identity when you go to the polls and using a form
23   of ID that was expired within two years and one that is
24   current in your view?
25       A.   Not that I can think of.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                            June 1, 2012

141

1   Q.  Do you know why non-photo ID was eliminated as
2  an acceptable form of ID in Senate Bill 14?
3   A.  Just a concern that, again, just like a voter
4  registration card, someone can have one of those
5  documents in their possession and represent that they
6  are somebody they are not and that wouldn't be readily
7  apparent at the polls.
8   Q.  But it was an acceptable form of ID that the
9  Senate had just passed in 2009, correct?
10   A.  Yes.
11   Q.  And in the form of Senate Bill 362, right, that
12  provision was included.
13   A.  Yes.
14   Q.  And the Senate supported it; is that right?
15   A.  Yes.
16   Q.  So why the complete change in approach in 2011?
17      MR. FREDERICK:  Objection.  Asked and
18  answered.
19   A.  I think it was just because in each instance
20  the legislature was trying to pass the strictest photo
21  ID bill it could under the political make-up of the
22  body.
23   Q.  Who would know why non-photo ID was taken out
24  of Senate Bill 14?
25   A.  I think everybody understands why non-photo ID

142

1  was taken out of Senate Bill 362 because it was just a
2  demand by our constituents that we require a photo ID in
3  order for people to vote, and they were very cynical
4  about the notion of allowing non-photo IDs, and you
5  were -- like I said, my opponent used that against me in
6  the most recent election politically, without mentioning
7  that he too had voted for that same version of the bill.
8  So this notion of letting people vote with their library
9  card feeds the perception that you are in favor of
10  liberal laws allowing people to vote even under
11  circumstances where they were not legally entitled to.
12   Q.  Do you know whether there was one person or a
13  group of people who decided that Senate Bill 14 would
14  not include non-photo ID?
15   A.  Like I said, I think every Republican member of
16  the legislature would have been lynched if the bill had
17  not passed.  That was a fairly strict photo ID bill
18  given the political make-up of the body in 2011.
19   Q.  Do you have a feeling of who was driving Senate
20  Bill 14 in the Senate?
21      MR. FREDERICK:  Objection.  Relevance.
22  Objection.  Asked and answered.
23   A.  I think it was being driven by -- you know, you
24  could argue that the grassroots themselves were being,
25  you know, incited by outsiders, but however that

143

1  happened, it clearly had happened, and there was just --
2  everybody that was a Republican was driving that train
3  in the Senate and in the House.
4   Q.  Who was really moving it forward in the Senate
5  legislatively?
6   A.  I just would not know in terms of the Senate.
7  Legislatively, it's Fraser, and, you know, obviously, I
8  think the lieutenant governor had a interest in ensuring
9  that bill passed, but every Republican would have.
10   Q.  Do you think it was the two of them, Senator
11  Fraser and the lieutenant governor who were really
12  advancing Senate Bill 14 and organizing the caucus --
13      MR. FREDERICK:  Objection.  Relevance.
14  Objection.  Calls for speculation.
15   A.  They were prominent among all of the
16  Republicans in the Senate, and, again, if that bill had
17  not passed and you were a Republican senator and it had
18  not come out of the Senate, everybody would have been
19  under quite a bit of political pressure, not just those
20  two.
21   Q.  Did you have any conversations with either
22  Senator Fraser or Lieutenant Governor Dewhurst about
23  Senate Bill 14?
24   A.  In Senate Bill 14, no.
25   Q.  Did you have any conversations with them about

144

1  Senate Bill 362?
2   A.  Sure.  I would not have talked -- I don't
3  recall talking to the lieutenant governor.  I would have
4  talked with his staff.
5   Q.  Did you talk --
6   A.  Abair, would have talked with Fraser and his
7  staff.
8   Q.  Can you describe the nature of those
9  conversations?
10      MR. FREDERICK:  Object on the basis of
11  legislative privilege.  You can answer to the extent you
12  can identify the general subject matter of the
13  conversations, but you may not reveal the substance of
14  any conversation.
15   A.  Just really kind of talking about the game plan
16  in the House and, you know, the extent to which, you
17  know, they were comfortable conversations with the
18  governor's representative about what I was trying to do.
19   Q.  Who from the governor's office did you speak
20  with?
21   A.  I can't remember her name, but blond, 2009,
22  nice bubbly person.  I don't remember her name.
23   Q.  And from Mr. Dewhurst's office it was chief
24  Brian Abair who you spoke to?
25   A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

145

1      Q.   Did you speak to Julie Rathgeber at all in his
2   office?
3      A.   Not that I recall.
4      Q.   Or Mr. Brunson?
5      A.   Not that I recall.
6      Q.   Did you speak with any of those individuals
7   after Senate Bill 362 did not pass in the House?
8      A.   I don't remember.  May have, may not have.  If
9   so -- If so, it might have been in passing sometime
10   during the interim.
11      Q.   During your attention back to Senate Bill 14,
12   do you see it refers to US military identification
13   cards?
14      A.   Yes.
15      Q.   And do you know what type of documents are
16   encompassed in that form of photo ID?
17      A.   No.  I'm not familiar with what the military
18   has by way of identification cards.
19      Q.   Could you describe what a citizenship
20   certificate is?
21      A.   No.
22      Q.   Do you know how much it cost to obtain one?
23      A.   No.
24      Q.   Do you know how much it cost to obtain a US
25   passport?

146

1      A.   I don't know.  It's hundreds of dollars.  I
2   don't know.
3      Q.   And do you know --
4      A.   I can't remember exactly how much, but --
5      Q.   Thank you.
6      A.   Yeah.
7      Q.   Do you know what documents you need to present
8   to get a US passport?
9      A.   No, I don't remember.
10      Q.   I believe you testified earlier --
11      A.   My wife would be better at this than I.
12      Q.   I believe you testified earlier that you're
13   familiar with a Georgia photo ID law; is that right?
14      A.   I testified that I think that is one of the
15   Section 5 states that has a strict photo ID requirement.
16      Q.   Have you reviewed that?  Do you remember ever
17   having reviewed that law?
18      A.   I'm sure I did.  I'm sure -- I don't remember
19   exactly what's in it, but I'm sure I did.
20      Q.   Did you ever review the Indiana photo ID law?
21      A.   I'm sure I did.  I don't remember if I review
22   the bill language or stuff like the opinion itself that
23   described the law.
24      Q.   As you sit here today, do you recall whether
25   Senate Bill 14 is stricter than the Georgia photo ID law

147

1   in terms of restrictive number of photo IDs that may be
2   used?
3      A.   You know, I have a general impression that the
4   Texas law is as strict as any, but I can't tell you that
5   I'm able to compare the list of photo IDs between the
6   two forms of -- the two legislation and say one is
7   stricter than the other.
8      Q.   Could you tell me what the term legislative
9   emergency means within the Texas legislature?
10      A.   Whatever the governor says it means.
11      Q.   Are there any constraints on what the governor
12   can declare a legislative emergency?
13      A.   Apparently not.
14      Q.   What do you mean by that?
15      A.   Well, just because of what happened last
16   legislative session.  It seems to be simply a matter of
17   his legislative priorities.
18      Q.   Was photographic voter ID declared to be a
19   legislative emergency for the 82nd legislature?
20      A.   I believe so.
21      Q.   When did you first learn about that?
22      A.   Whenever he announced it, whenever that would
23   have been.
24      Q.   Are you aware of any conversations related to
25   that decision to include it in the emergency call?

148

1      A.   No.
2      Q.   Do you know why Governor Perry designated voter
3   ID as a legislative emergency?
4         MR. FREDERICK:  Objection.  Relevance.
5   Objection.  Calls for speculation.
6      Q.   You can answer.
7      A.   No, other than the obvious.
8      Q.   The obvious being?
9      A.   That his constituents wanted him to.
10      Q.   Has any election law to your knowledge ever
11   been declared an emergency before voter ID?
12      A.   Not that I recall.
13      Q.   And when an issue area or bill is declared an
14   emergency, what are the consequences in terms of
15   scheduling consideration of the bill?
16      A.   Oh, I think you can just begin -- if I recall
17   correctly, begin hearings on it earlier and the House
18   can take it up earlier.  It's just a matter of being
19   able to get right on it.
20      Q.   Does it mean that the legislature can consider
21   the issue within the first 60 days of session?
22      A.   I believe so.
23      Q.   Do you have any knowledge other than
24   constituent desire for this bill to be passed to which
25   you've testified why there was a need to consider this

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                      June 1, 2012

149

1   legislation within the first 60 days of 2011?
2        A.  Well, I think, you know, there's so much
3   concern expressed about the way that the bill had died
4   in the prior legislative session that everybody
5   understood that there was going to be a need to consider
6   this bill early rather than late under totally different
7   political circumstances and get it out of the way, move
8   onto other things.
9        Q.  Would Senate Bill 14 refer to the committee of
10  the whole Senate?
11       A.  I don't remember, but I think so.  I was not
12  involved in it as much last session.
13           (Exhibit US-108 marked.)
14       Q.  Could you mark this.  US-108?  You've been
15  handed what's been marked US-108.  Do you recognize what
16  this is?
17       A.  I suppose it's information about the bill.
18  Goodness gracious.  Lots of activities, huh?
19       Q.  Do you know why Senate Bill 14 was referred to
20  the committee of the whole Senate rather than state
21  affairs?
22       A.  No.
23       Q.  Did you attend the Senate hearing on
24  January 25th?
25       A.  I don't believe so.

150

1        Q.  Are you aware of any conversations Senator
2   Williams had with Ann McGeehan related to conducting
3   analysis of which voters did not have a driver's
4   license?
5        A.  No.
6        Q.  Did you ever come to learn of -- there was a
7   certain name of registered voters who could not be
8   matched on the driver's license list in October of 2011?
9           MR. FREDERICK:  Objection.  Vague.  You
10  may answer.
11       A.  I'm not sure I understand the question.  Are
12  you saying am I aware of the fact that there are a lot
13  of legal voters that do not have driver's licenses?
14       Q.  My question is whether you are aware of the
15  elections division having matched the voter registration
16  rolls against the driver's license databases to
17  determine which registered voters could not be matched
18  with the record in the driver's license database.
19       A.  No.
20       Q.  Did that ever come to your attention at all?
21       A.  No.  I was not very actively involved in
22  legislation in 2011.
23       Q.  You were a sponsor of Senate Bill 14 in the
24  House though; were you not?
25       A.  Yes.

151

1        Q.  How did that come about?
2        A.  Just a political favor from Patricia who
3   realized the situation I had been put in the prior
4   session.
5        Q.  So she allowed you to be a sponsor even though
6   she was the primary sponsor?
7        A.  Yeah.  That's typical.  A sponsor is someone
8   who's, you know, thought to be a leader in the
9   legislation, but in reality, it's the actual author or
10  sponsor that does the work.
11       Q.  So why did you decide to sponsor a bill that
12  was so dramatically different from what you had been
13  advancing in 2009?
14           MR. FREDERICK:  Objection.  Legislative
15  privilege.  Instruct you not to answer.
16           THE WITNESS:  Okay.
17       Q.  Are you following the advice of counsel?
18       A.  Yes.
19       Q.  How it did come to be that Patricia Harless was
20  the main sponsor of the bill?
21           MR. FREDERICK:  Object to the extent that
22  your answer would reveal any privileged communication.
23  If you can answer without revealing privileged
24  communication, you may do so.
25       A.  My sense is that she was chosen because she's a

152

1   active leader in the Texas Federation of Republican
2   Women, and this was one of their legislative priorities
3   and that she would because of her delightful personality
4   and pleasant demeanor be a good person to put at the
5   front mike on legislation of this type.
6        Q.  Is there any other reason you can think of
7   sitting here today?
8        A.  No.
9        Q.  Was Senate Bill 14 referred to the House select
10  committee on voter identification and voter fraud?
11       A.  I believe so.
12       Q.  Why was it referred to that committee?
13           MR. FREDERICK:  Objection.  Legislative
14  privilege.  Do not reveal the contents of any
15  communication with another legislator about SB14.  If
16  you can answer without doing that, you may.
17       A.  I think really that's kind of like -- that's
18  the same question as why was a committee formed.  Once a
19  committee was formed, it was clear that the bill would
20  be referred to that committee.
21       Q.  Bear with me one moment.  Are you doing okay?
22       A.  Yeah, I'm good.
23           (Exhibit US-109 marked.)
24       Q.  Representative Smith, you've been handed what's
25  been marked as US-109.  Do you recognize this document?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                June 1, 2012

153

1   A.  No.  I recognize what it is, but I don't know
2  if I've ever seen it before.
3   Q.  Could you describe what it is?
4   A.  Just a portion of a House Journal dated -- from
5  Monday, March 21st.
6   Q.  Turning your attention to Page 918 of this
7  document, are you there?
8   A.  M-hm.
9   Q.  Were you on the -- Strike that.  Was this the
10  House Journal of the proceedings on the House floor?
11   A.  Yes.
12   Q.  Were you on the House floor during this debate?
13   A.  I believe so.  Well, I know I was generally --
14  I don't know that I was on the House floor every minute
15  of it, but I do recall being there.
16   Q.  And do you see an exchange between
17  Representative Harless and Representative Anchia about
18  two-thirds of the way down the page concerning whether
19  there are any studies conducted by any state agency
20  about the number of voters that lack required
21  identification and the racial breakdown of those voters?
22   A.  I see it, yes.
23   Q.  Do you recall reading from this exhibit hearing
24  that exchange between the two representatives?
25   A.  No.

154

1   Q.  Do you see that Representative Anchia asked
2  Representative Harless if she was aware of any studies
3  conducted by any state agency about the number of voters
4  that lacked the required ID?
5   A.  Yes.
6   Q.  And what percentage of those voters are
7  African-American or Hispanic?
8   A.  Yes.
9   Q.  Do you see Representative Harless indicated
10  that she was unaware in testimony of any studies?
11   A.  Yes.
12   Q.  And that, further, she was -- she was unaware
13  of the existence of any other studies?
14   A.  Yes.
15   Q.  To your knowledge was Representative Harless
16  aware of any studies of this nature?
17       MR. FREDERICK:  Objection.  Calls for
18  speculation.
19   A.  I don't know.
20   Q.  Were you aware of any studies of this nature at
21  the time of this hearing?
22   A.  At this time of this hearing?
23   Q.  Yes.
24   A.  You know, I would have during the prior session
25  when I was involved in the issue read a number of

155

1  national secondary sources related to this issue, and
2  I'm sure to the extent that I want to recall that,
3  there are at least some attempts to quantify the extent
4  to which that is the case.  I don't recall specifically
5  what they were, so I -- at the time of this debate on
6  the House floor two years later, I would have previously
7  been exposed to probably what existed in that regard.
8   Q.  That was with regard to voters outside of the
9  State of Texas?
10   A.  I think so.
11   Q.  So was that outside of Senate Bill 14?
12   A.  I think so.
13   Q.  Was that outside of Senate Bill 362?
14   A.  Yes.  I think this was kind of anything that
15  there was available to read.  I think even the Supreme
16  Court decision in the Indiana case may have gotten into
17  whatever data is available on those kinds of questions,
18  although maybe not since it wasn't a Section 5, but, you
19  know, I do believe that I would have been exposed to the
20  arguments that it would have a disproportionate effect
21  on minority voters.  You know, I think that's really
22  kind of a matter of -- in terms of the -- you know, if
23  you are asking does the -- We never were even able to
24  quantify what percentage of registered voters do not
25  have a driver's license, and there were various

156

1  different estimates.  I know I've seen that in other
2  states as well, you know, estimates anywhere from
3  10 percent to, you know, less than 1 percent.  I think
4  I've strayed from your question, but -- so go ahead.
5   Q.  It's caused me to think of another question
6  which is do you know specifically the studies that you
7  read about impact of photo ID on minority voters?
8   A.  No.
9   Q.  Do you know when you read those studies?
10   A.  Yeah.  Everything I did would have been in
11  2009.
12   Q.  What was the conclusion of those studies?
13   A.  I don't know that there was only one conclusion
14  to the studies.  You know, there be a study for every
15  conclusion you want to reach.  I don't remember.  You
16  know, to me, again, if the question is are the people
17  that do not have photo IDs more likely to be minorities
18  than those that are not, I think it is a matter of
19  common sense that they would be.  I don't really need a
20  study to tell me that.
21   Q.  Do you think that that view, which you
22  described sort of as a common sense view, was held by
23  other legislators in the House.
24       MR. FREDERICK:  Objection.  Relevance.
25  Objection.  Legislative privilege.  To the extent it

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                      June 1, 2012

157

1    will require you to reveal communications or another
2    legislator's thought process, I instruct you not to
3    answer.
4        Q.  Are you following your counsel's advice?
5        A.  Yes.
6        Q.  Are you aware of any communications about the
7    fact that minorities are less likely to have photo ID.
8            MR. FREDERICK:  Objection.  Vague.
9        A.  I mean --
10       Q.  Amongst legislators.
11       A.  Yeah.  Just, again, primarily from opponents of
12   the legislation.
13       Q.  Are you aware of any supporters of photo ID
14   being a party to any of those communications.
15       A.  I would have been, just listening.
16       Q.  Are you aware of any other supporters of photo
17   ID besides you being present in those communications.
18       A.  I imagine every member of the elections
19   committee would have been there when those arguments
20   were being made as a matter of testimony.
21       Q.  Turning back to US-109, which was dated March
22   21st; was it not?
23       A.  Yes.
24       Q.  Turning back to US-108, when did Senate Bill 14
25   pass the House?

158

1        A.  It looks like almost everything happened on
2    March 23rd.  I guess that's when I guess that's when it happened.  A lot
3    of -- Let's see.  House read third time.  Third reading
4    on the 24th.  So I guess it was the 24th of March, it
5    looks like.
6        Q.  Are you aware of any studies or research having
7    been conducted during 2011 of the impact of Senate Bill
8    14 on minority voters?
9            MR. FREDERICK:  Objection.  Vague.
10       A.  Can you re-ask it?  Just make sure I understand
11   what you are asking.
12           MS. WESTFALL:  Can you read back the
13   question?
14           (Requested portion was read.)
15           MR. FREDERICK:  Same objection.
16       A.  No.  I do believe that as I speak as a result
17   of this litigation that we're here about today that
18   their efforts to try to obtain information from the
19   Secretary of State's office, that would help identify
20   that, but that's all I'm aware of.
21       Q.  Are you aware of the election division having
22   undertaken an effort in February or March of 2011 to
23   match the voter registration list against the driver's
24   license database?
25       A.  I don't recall that.

159

1            MR. FREDERICK:  Objection.  Assumes facts
2    not in evidence.
3        Q.  Did you ever hear about that at all?
4        A.  No, not until today.  Not that I recall.
5        Q.  I will represent to you that Ann McGeehan in
6    her deposition yesterday testified that such a match had
7    been conducted and that it indicated that around 700,000
8    voters did not have access -- that were on the voter
9    registration rolls did not have a driver's license.
10       A.  Currently, yeah.
11       A.  Yes.
12       A.  In that month.
13           MR. FREDERICK:  Objection.  Assumes facts
14   not in evidence.
15       Q.  Does that testimony surprise you?
16       A.  Not really.  I mean, I knew -- my own
17   calculation was that it was 700,000 people, and I didn't
18   really know precisely how many.  It depended on which
19   estimate you used of what percentage of, you know,
20   registered voters do not have driver's licenses, but
21   just my extrapolation from estimates that seemed more
22   reliable from other states.  I think it may have been in
23   the Indiana and Supreme Court opinion and then kind of
24   presuming something about the nature of Texas's
25   population.

160

1            So it might -- I think it may have been a
2    2 percent figure or something like that in that Supreme
3    Court opinion, and so my presumption was it was
4    something higher than that because of the nature of our
5    population.
6            And so I -- you know, I think you'll see
7    if you get that slide show projection, I may have
8    actually, you know, estimated in that slide show
9    projection that it was 700,000 people that did not have
10   a photo ID.
11       Q.  When did you conduct that analysis?
12       A.  2009.  Everything I did on this was in 2009.
13       Q.  And how did you conduct that analysis?
14       A.  Again, I think just from something I read there
15   was a reliable estimate of another state of the
16   percentage of people that were legal voters that did not
17   have a photo ID, and I took that percentage, and I
18   doubled it or something.  And, you know, I mean, some of
19   the states that -- you know, there was -- Again, I think
20   I've already testified there were estimates as low as
21   less than 1 percent, as high as 10 percent, and so in
22   reading it all if you come up with something in between
23   you come up with something close to what you are talking
24   about.  That may be a little higher than I anticipated,
25   but I may have been thinking four or 500,000.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

161

1    Q.   Who in your office conducted that analysis?
2    A.   Me.
3    Q.   And did you -- other than the --
4    A.   Back of the envelope kind of analysis, I can
5    assure you, but --
6    Q.   In the -- in the -- Other than the Power Point
7    you just testified to that was listed in the privilege
8    log that you testified about earlier, did you
9    memorialize that analysis in writing anywhere?
10   A.   No.  But I probably would have mentioned it in
11   committee hearings.
12   Q.   And which committee hearings did you mention
13   that in; do you remember?
14   A.   I don't know, but just anyone where we were
15   discussing voter ID.
16   Q.   Did you share any of your Power Points that you
17   prepared for these communications with constituent
18   groups, with any of your colleagues in the legislature?
19   A.   It seems like I just ran it by the speaker's
20   office before I went out and did it --
21   Q.   Did you share --
22   A.   -- because I felt that was appropriate for me
23   to at least let them know what I was going out in the
24   public while he was a committee chairman and present.
25   Q.   Would that have been, I believe, after your

162

1    primary election?
2    A.   Yes.
3    Q.   And was that in 2009?
4    A.   '10.
5    Q.   In '10.  Okay.
6    A.   Yes.
7    Q.   And so you went out with the Power Point and
8    you showed it to the senator -- to Speaker Straus in
9    advance of this presentation?
10   A.   Not him personally.  I think I probably sent it
11   to Denise in his office.
12   Q.   What is Denise's last name?
13   A.   Davis.
14   Q.   Did you send it to anyone other than Speaker
15   Straus in the legislature?
16   A.   I don't believe so.
17   Q.   Did you send it to anyone on the Senate side?
18   A.   I may have after I gave the presentation sent
19   it to constituents.  People may have asked me for it.
20   Q.   Some constituents?
21   A.   But, no, I don't recall giving it to any other
22   member.  I don't think anyone would care to look at it.
23   Q.   And you made an oral presentation or reference
24   to the data in committee hearings in 2009, is that
25   correct, or 2010?

163

1    A.   I'm just -- I'm not recalling specifically
2    doing that.  I wouldn't be surprised that I did.
3    Q.   Do you recall having any conversations with any
4    members about your analysis?
5    A.   Sure.  I mean, I would have -- I don't recall
6    specific conversations, but I'm sure I would have had
7    discussions like that.
8    Q.   Would they have been with members of the House
9    elections committee?
10   A.   Probably.
11   Q.   Would they have been with any other members of
12   the House?
13   A.   Probably.
14   Q.   Did you have any conversations with members of
15   the senate or their staff?
16   A.   I don't really recall having any conversations
17   with members of the Senate other than Wendy Davis and
18   Fraser.  There may have been others that I don't
19   remember, but those are the ones that I remember.
20   Q.   Do you think you shared any of this analysis
21   with Senator Fraser or his staff?
22   A.   I don't recall whether I did or not.
23   Q.   Did you share any of this analysis with
24   Patricia Harless or her staff?
25   A.   I don't remember.  Gave her my notebook, I

164

1    remember that, and we had some conversations.  But I
2    don't remember whether we talked about how many people
3    don't have driver's licenses that are legal voters.
4    Q.   Did you share any of this information with
5    Mr. Dewhurst's office and, in particular, Brian Abair or
6    any other staff people?
7    A.   Not that I recall.
8    Q.   Did you in doing this analysis try to determine
9    whether there was going to be a disproportionate impact
10   on minority voters?
11   A.   I don't -- I mean, again, I don't think any
12   effort was made to quantify the precise extent to which
13   that was going to occur, but I think, you know, that it
14   was a matter of common sense that however many hundreds
15   of thousands of people we were talking about was -- was
16   disproportionately poor and, therefore, minority.
17   Q.   So did you have a concern based on, you know,
18   your experience as an attorney, your knowledge of
19   Section 5 and this analysis that you conducted in 2009,
20   that -- and based on your common sense view that poor
21   people are less likely to have photo ID and, therefore,
22   be minorities, that this legislation would have
23   difficulty being pre-cleared by the Justice Department?
24       MR. FREDERICK:  Objection.  This is
25   getting into specific legislation.  I instruct you not



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                            June 1, 2012

165

1   to answer on the basis of legislative privilege.
2       Q.  Are you following your counsel's advice?
3       A.  Yes.
4       Q.  Are you familiar with Spanish Surname
5   Registered Voter Analysis?
6       A.  I probably am, if you'll remind me.
7       Q.  Unfortunately, I have to ask you the questions
8   and you have to answer the questions, so I can't remind
9   you.
10      A.  Okay.  I mean, I feel like I have had
11  discussions about it, and Rafael has probably educated
12  me about it, but I can't remember.
13      Q.  Okay.  Thank you for your testimony.  Was there
14  a strategy to ensure that Senate Bill 14 would be passed
15  on the House floor?
16          MR. FREDERICK:  Objection.  Legislative
17  privilege.  Instruct you not to answer.
18      Q.  Are you following your counsel's advice?
19      A.  Yes.
20      Q.  Was there any effort to get around the chubbing
21  problem of 2009?
22          MR. FREDERICK:  I'm going to object to the
23  extent it would require you to disclose confidential
24  communications or any legislator's thought process, and
25  to the extent that you can answer without revealing that

166

1   matter, you can do so.
2       A.  There were offers made by Democrats to the
3   Republicans of a variety of types to -- which would have
4   if accepted ended the chubbing, if that answers your
5   question.
6       Q.  Not really.  Was it horsetrading on other
7   bills?
8       A.  No.  It was really this bill.  I mean, Dunnam
9   offered in writing to the caucus --
10          MR. FREDERICK:  Okay.
11      Q.  It was in writing, and it's on the record?
12      A.  It's probably -- I think it's part of my slide
13  show presentation.
14          MS. PERALES:  Can't wait.
15      A.  Exactly, because I was basically trying to help
16  my constituents understand that the Republican caucus
17  had the opportunity to have the Betty Brown bill, the
18  hard photo ID bill, voted up or down the House floor,
19  and chose not to do that as just another indication of
20  the point that I was making was that that bill did not
21  have the votes.
22      Q.  So can you explain what happened in terms of
23  ensuring that the bill would be passed on the House
24  floor because I'm not really clear in that
25  understanding?

167

1       A.  What would happen?  I'm not sure I understand
2   the question.
3       Q.  To avoid the chubbing.  You were talking that
4   Representative Dunnam --
5       A.  Offered.  In other words, the Democrats clearly
6   had the ability to kill the bill.  At some point it was
7   clear that they could talk the clock out.  So they were
8   offering -- They were offering several things.  I don't
9   recall them all.  The one that was most meaningful to me
10  of which I was later accused of was the offer by Dunnam
11  to have the Betty Brown bill -- to end the chubbing and
12  have that bill brought to the floor and argued by both
13  sides without amendment and then have a vote up or down.
14  And the Republican caucus would not agree do that, and I
15  think that was the right decision on their part -- on
16  our part, and -- and that was to -- because you
17  shouldn't have to, you know, negotiate with terrorists,
18  and, you know -- you know, smiling when I say that, but,
19  you know, that would be bad precedent to sit -- and you
20  are supposed to be able to amend bills.
21          But what it did allow me to demonstrate to
22  my constituents is that it really was my version of the
23  bill that they were most concerned about actually having
24  a chance to pass rather than the Betty Brown bill.  They
25  knew they didn't have the votes, that the Betty Brown

168

1   bill would not pass, but my amendment might very well
2   have gotten the marginal votes and in my opinion would
3   have been better for everybody at that time, but, you
4   know, it's -- that's water under the bridge.
5       Q.  Your testimony was about 2009 and not 2011; is
6   that right?
7       A.  2009.
8       Q.  Okay.
9       A.  Not 2011.  That offer was not relevant or made
10  in 2011 because the terrorists had lost power.  They
11  didn't have they power.
12      Q.  Was there -- So is it your testimony that there
13  didn't have to be a strategy for getting Senate Bill 14
14  passed on the House floor because the Republican had the
15  votes?
16      A.  Yes.  I think you'd really have to -- It was a
17  foolproof majority.  I don't know how you could screw
18  that up.
19      Q.  Did you participate in the House floor debate
20  on the bill?
21      A.  No.
22      Q.  Did you vote to table amendments that were
23  offered?
24      A.  I followed Patricia's lead.
25      Q.  Did you review or give any significant

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                June 1, 2012

169

1   substantive thought to any of the amendments or did you
2   follow her --
3       A.  I was available and talked to Patricia on the
4   floor as things were coming up, if she had a question.
5       Q.  Do you recall an amendment that would have
6   prohibited fees -- charging fees for the underlying
7   documents needed to obtain an election identification
8   certificate?
9       A.  I don't specifically recall that, but I'm not
10  surprised by it.  I don't doubt that there was one.
11      Q.  Can we go off the record?
12      A.  Can I say for myself on the record that I was
13  not really referring to my democratic friends as
14  terrorists.
15          MS. WESTFALL:  Let's go off the record.
16          (Recess from 2:14 p.m. to 2:28 p.m.)
17          (Exhibit 110 marked.)
18      Q.  (BY MS. WESTFALL) Could you please mark this as
19  US Exhibit 110?  You've been handed what's been marked
20  US Exhibit 110.  Do you recognize this document?
21      A.  I recognize what it is.
22      Q.  Could you describe it for the record?
23      A.  It's a portion of -- or perhaps all -- I don't
24  know -- but a portion at least of the House Journal
25  dated March 23rd, 2011, my birthday.

170

1       Q.  Oh.  Do you recall that this was the day when
2   the House considered an amendment to Senate Bill 24?
3       A.  I wouldn't have recalled that.
4       Q.  Directing your attention to Page 969 of this
5   document about Amendment 15.
6       A.  M-hm.
7       Q.  Could you take a look at Amendment 15 and let
8   me know if you recall this amendment?
9       A.  You referred to it earlier in the deposition,
10  it looks like.
11      Q.  Do you remember how you voted on this
12  amendment?
13      A.  I'm sure I followed Patricia.  It looks like I
14  did.
15      Q.  And could you explain why?
16          MR. FREDERICK:  Objection.  Legislative
17  privilege.  Instruct you not to answer.
18      Q.  Are you following the advice of counsel?
19      A.  Yes.
20      Q.  Turning your attention now to Page 979 of this
21  document at Amendment 23, are you familiar with this --
22  with this amendment?
23      A.  23?
24      Q.  Yes.
25      A.  I'm familiar with what it does.  I don't recall

171

1   specifically it happening, but it did.
2       Q.  Could you describe what the amendment would
3   have accomplished?
4       A.  It would have added to the photo IDs that could
5   be used.
6       Q.  Do you recall how you voted on this amendment?
7       A.  It looks like I voted yes to table.
8       Q.  Do you know why you voted that way?
9          MR. FREDERICK:  Objection.  Legislative
10  privilege.  Instruct you not to answer.
11      Q.  Are you following the advice of counsel?
12      A.  Yes.
13      Q.  Do you know generally why student ID wasn't
14  included in Senate Bill 14?
15          MR. FREDERICK:  Objection.  Legislative
16  privilege.  Instruct you not to answer.
17      Q.  Are you following the advice of counsel?
18      A.  Yes.
19      Q.  Turning your attention to Amendment 50 at Page
20  1009.  Do you see that amendment offered by
21  Representative Raymond?
22      A.  M-hm.  Yes, ma'am.
23      Q.  Are you familiar with this memo?
24      A.  No.
25      Q.  Turning your attention to House Journal 1015

172

1   and 16, do you see Amendment 54?
2       A.  Yes.
3       Q.  Are you familiar with this amendment offered by
4   Representative Alvarado?
5       A.  I don't know what you mean by familiar with.  I
6   don't recall it.
7       Q.  Okay.  Thank you.  Do you recall any amendments
8   offered on the House floor to Senate Bill 14 that would
9   have mitigated the effect of the bill on racial or
10  ethnic minorities?
11      A.  Say that one more time.
12      Q.  Do you remember any amendment to Senate Bill 14
13  being offered on the House floor that were adopted that
14  would have mitigated the impact of the bill on minority
15  voters?
16          MR. FREDERICK:  I'm going to object
17  based -- it assumes facts not in evidence.  Also, going
18  to object to the extent that any answer would imply
19  Representative Smith's thoughts and mental impressions
20  about specific amendments.  I would, therefore, instruct
21  you not to answer on the basis of privilege.
22      Q.  Are you going to follow his instruction?
23      A.  Yes.
24      Q.  Turn your attention to Amendment 58 on Page
25  House Journal 1021.  Do you see that Representative



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

173

1  Anchia offered an amendment?
2      A.  Yes.
3      Q.  Do you recall this amendment?
4      A.  No.
5      Q.  Based on your -- Could you take a quick look at
6  that amendment?
7      A.  Okay.
8      Q.  Have you had a chance to review it?
9      A.  Yes.
10     Q.  Could you describe what this amendment would do
11  generally speaking?
12     A.  Says that the bill does not take effect until
13  the later of January 1st, 2012 or the dates on which the
14  Secretary of State completes a study providing a lot of
15  information about the effect of the legislation on
16  voters.
17     Q.  How did you vote on this amendment?
18     A.  I voted yes to table.
19     Q.  Do you know how you voted that way?
20         MR. FREDERICK:  Objection.  Legislative
21  privilege.  Instruct you not to answer.
22     Q.  Are you following the advice of counsel?
23     A.  Yes.
24     Q.  Do you think this information was necessary to
25  gather in conjunction with submitting the bill once it

174

1  was passed for Section5 preclearance?
2         MR. FREDERICK:  Objection.  Legislative
3  privilege.  Instruct you not to answer.
4      Q.  Are you following counsel's advice?
5      A.  Yes.
6      Q.  Are you aware of any communications about the
7  demographics -- the racial demographics of who possesses
8  a license to carry license in the State of Texas?
9         MR. FREDERICK:  Objection.  Vague.  You
10  may answer.
11     A.  No.
12     Q.  Are you aware of any conversations about
13  speculation about the racial demographics of that group?
14         MR. FREDERICK:  Objection.  Vague.  You
15  may answer.
16     A.  The right to carry?
17     Q.  Correct.
18     Q.  You mean a concealed handgun license?
19     Q.  Yes.
20     A.  Am I aware of any conversations where people
21  speculated about the demographic make-up of that group?
22     Q.  Correct.
23     A.  No.
24     Q.  Are you aware of any existing document or
25  report that identifies how many Texas voters are in

175

1  possession of a US military card?
2      A.  No.
3      Q.  Are you aware of any document or report that
4  identifies how many Texas voters are in possession of a
5  passport?
6      A.  No.
7      Q.  Are you aware of any document or report that
8  identifies how many Texas voters are in possession of a
9  citizenship certificate that has a photo?
10     A.  No.
11     Q.  Other than what you've testified about today --
12  Actually, strike that.
13         Could you tell me every single purpose
14  that you're aware of for Senate Bill 14, legislative
15  purpose?
16     A.  Ensuring that every vote that is cast is a
17  legal vote and deterring -- making it more difficult for
18  someone to cast an illegal vote and providing the
19  required identification without any financial burdens
20  associated with it other than the costs associated with
21  travel, I suppose, and whatever documents are required
22  to get the document.  You know, I think that's it.
23     Q.  So other than -- and we -- You've testified at
24  great length about any facts such as they exist related
25  to ensuring all those are legal.  Is there any other

176

1  factual information that you have that would support the
2  connection between Senate Bill 14 and ensuring all votes
3  are legal that you haven't already testified about
4  today?
5      A.  No.
6      Q.  In terms of deterring illegal voting, you've
7  testified about that today.  Are there any other facts
8  or information that you could supply that would support
9  Senate Bill 14 achieving that purpose of deterring an
10  illegal vote?
11         MR. FREDERICK:  Objection.  Vague.  You
12  may answer.
13     A.  I gave Patricia a whole folder or multiple
14  folders of documents that I had collected in the prior
15  session, and I was kind of reviewing in anticipation of
16  the possibility of ending up on the floor with this
17  bill, and I'm sure there's, you know -- John Fund is his
18  name.  You probably already knew that, but, you know,
19  you can read his book and whatever you want.  I imagine
20  that to the extent that there is evidence to support
21  that sort of thing, it is likely to be mentioned in that
22  book, but there's a number of sources, and there is
23  probably information in that packet of some additional
24  evidence that I have not talked about today of voter
25  fraud, you know, again, some of it more credible than



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

177

1    others.
2        Q.   Was that voter fraud in Texas or outside of
3    Texas or both?
4        A.   Probably both, at least questions about the
5    possibility of voter fraud.
6        Q.   When did you supply that to Representative
7    Harless?
8        A.   Right when she started -- when she was first
9    appointed to handle that legislation.
10       Q.   Would that have been in January 2011?
11       A.   Early -- The early session 2011.  I don't
12   remember if it was January or February, but early.
13       Q.   Can you describe the election identification
14   certificate under Senate Bill 14?
15       A.   No.  I mean, it's my understanding that this
16   just would be a unique new card that would be created to
17   use for the sole purpose of voting.
18       Q.   And I believe you -- Go ahead.
19       A.   A photo -- It would include a photo and
20   presumably additional identifying information, but I
21   don't know precisely what.
22       Q.   Where would you obtain that document?
23       A.   Wasn't it like DPS locations?
24       Q.   Was it a driver's license office?
25       A.   I don't remember.

178

1        Q.   And I believe you just testified that obtaining
2    that form of identification would be burdensome insofar
3    a voter would have to travel to the office; is that
4    right?
5            MR. FREDERICK:  Object to the extent it
6    mischaracterizes prior testimony.
7        A.   No.  I mean, again, I think that's a fact
8    question that has to be established in this litigation,
9    and I don't really know the answer to that.  I don't
10   know the distances and number of people in the worst
11   case scenario.  I just don't know.
12       Q.   But is it your understanding that there would
13   be -- to the extent there's travel required to get the
14   document --
15       A.   Sure.
16       Q.   -- that's a burden.  Do you agree with that?
17       A.   The question is is it an unreasonable burden,
18   but I don't think there's any question it's a burden.
19   Yes, it's a burden.
20       Q.   Do you also agree that to obtain the underlying
21   documents to get the election identification
22   certificate, to the extent that costs some sort of
23   out-of-pocket cost, that that's a likewise burden?
24       A.   Sure.
25       Q.   Are there any other burdens that you can think

179

1    of now associated with getting an election
2    identification certificate?
3        A.   You know, I mean, the cost of obtaining the
4    documents to get the ID, to -- you know, I don't know if
5    travel is involved in getting -- in getting the
6    documents, to get the photo ID, but you may have travel
7    involved there, I don't know.  If that is stuff that's
8    handled by the mail or must involve travel, but so other
9    than travel to get the required photo ID and/or the
10   documents that are necessary to get the photo ID and the
11   cost of the documents to get the photo ID, I'm not aware
12   of anything else.
13       Q.   Are you aware of the fact that you may have to
14   go to a driver's license office during business hours
15   only?
16       A.   Yes.  I presume that would be the case.
17       Q.   And for person who work during the day, it
18   might being a burden to obtain time off to travel during
19   business hours to a driver's license office; isn't that
20   right?
21       A.   Yes.
22       Q.   And, also, have you been to a driver's license
23   office recently to renew your driver's license?
24       A.   Depends on your definition of recently, but I
25   have been to one whenever the deadline was here in

180

1    Austin.
2        Q.   Are you aware that sometimes or perhaps often
3    one faces very long lines at driver's license offices?
4        A.   I hear that.  I've been fortunate to avoid it,
5    but, yeah, I know there were concerns about that.
6        Q.   What have you heard about lengthy lines at the
7    driver's license office?
8        A.   Oh, it seems to me didn't we do something
9    legislatively that resulted in even longer lines than
10   normal?  And there were complaints about it last
11   session.
12       Q.   How long are the lines?  How long have you
13   heard that they can extend for people?
14       A.   I don't know, but I presume there were budget
15   cuts that reduced the number of employees or lengthened
16   those lines, but in terms -- I don't know what the
17   anecdotal horror stories are about the longest period of
18   time someone has stood in a line to get a driver's
19   license renewed, I know there has been some concern.
20   I believe there's been some concern about it, whatever
21   time it was before getting even longer because of budget
22   cuts.
23       Q.   Was that a bill that was passed in 2011 at the
24   same time Senate Bill 14 was passed?
25       A.   I don't know.  I believe I'm correct that there

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                          June 1, 2012

181

1  was actually some discussion on the House floor from
2  people that were concerned about additional cuts where
3  they were having complaints from constituents about long
4  lines.
5          MS. WESTFALL:  Thank you.  I think at this
6  time other than we're going to keep the deposition open
7  because, obviously, we have some disagreements about
8  privilege issues, I will turn over the podium to my
9  co-counsel.  Would you like to switch seats?
10         MS. PERALES:  Yes, please.
11         (Exhibit RODRIGUEZ-15 marked.)
12              EXAMINATION
13  BY MS. PERALES
14     Q.  Good afternoon, Representative Smith.  My name
15  is Nina Perales, and I work with the Mexican American
16  Legal Defense Fund, and in this case I represent a group
17  of parties called the Rodriguez Intervenors.  I am going
18  to try very hard to skip any of the material that you've
19  already testified about with Ms. Westfall, so some of my
20  questions might seem like they are moving around a
21  little randomly, but that is so we can get to the end
22  more quickly.
23         I'd like to look at the 2005 bill and just
24  ask you a question about that.  That's HB1706.  And you
25  were on the committee in 2005, but my understanding is

182

1  that HB1706 initially was sent to a subcommittee, so I
2  know that you might not be as completely familiar with
3  it.
4          Does anybody know what the last Rodriguez
5  exhibit was yesterday?  We'll start with 15.  I'd like
6  to mark this Rodriguez 15.  The court reporter has
7  handed you what has been marked Rodriguez Deposition 15,
8  which I will represent to you is the introduced version
9  of HB1706 in 2005 sponsored by Ms. Denny, and my
10  question for you -- And I will also represent to you
11  that you voted for this bill in committee.  In fact, I
12  believe Representative Anchia may have been the only
13  person in the committee who didn't vote for it.  I don't
14  know if that helps refresh your recollection.
15     A.  No.  It doesn't.  That surprises me.
16     Q.  And you will see -- starting on the third page
17  of the bill, you'll start to see the list of documents
18  that will prove identity of a voter.
19     A.  M-hm.
20     Q.  So there's a list under A and a list under B.
21     A.  M-hm.
22     Q.  And so I believe you testified earlier that
23  this seems like a fairly typical list in 2005 of the
24  types of non-photo ID that would be acceptable; is that
25  correct?

183

1     A.  I'm not sure I understand the question of
2  typical list in 2005.  I mean, you know, this is a --
3  this is -- looks like the kind of language that you see
4  repeatedly in these various voter ID laws that were
5  considered in the first decade of this century.
6     Q.  Okay.  When -- And is it your belief that the
7  items that are listed under the photo and non-photo
8  items would assist in proving a voter's identity?
9     A.  Yes, I suppose so.  To some extent there's some
10  evidence of a voter's identity.
11     Q.  Are you familiar with how any of these specific
12  items ended up in the bill?
13     A.  No.
14     Q.  Okay.  Do you know where the bill language came
15  from?
16     A.  No.
17     Q.  Do you recall whether in the engrossed version
18  as it was passed in the House there was an additional
19  provision that counties could make voter ID cards with
20  photos on them?
21     A.  No, I don't recall.
22     Q.  I think I'd like to move now to 2009.  Go ahead
23  and take this.  Why did you file a shell bill?
24         MR. FREDERICK:  I'm going to object on the
25  basis of privilege.  Instruct you not to answer.

184

1          MS. PERALES:  I want to get this clear on
2  the record as well that it's my understanding -- please
3  correct me if I'm wrong, Mr. Frederick -- that when you
4  are advising the representative you are alerting him to
5  the possibility of being able to invoke privilege as
6  opposed to instructing him not to answer the question
7  because it's his privilege to waive or not.
8          MR. FREDERICK:  I believe that is a --
9  that's a fair characterization.  My understanding is I
10  have been advised by the representative that he intends
11  to assert privilege.  Consistent with that instruction
12  as his lawyer, I am alerting him to the existence of the
13  privilege issue and by telling him that I instruct him
14  not to answer, I intend to alert him that he is able to
15  not answer the question based on privilege as opposed to
16  another objection where I would object and say you may
17  answer.
18         MS. PERALES:  And just so the witness
19  knows, he can choose to answer if he likes.
20         THE WITNESS:  I'm aware of that.
21     Q.  (BY MS. PERALES)  Did you support Speaker Straus
22  in his first run for speaker?  By that, I mean did you
23  vote for him?
24     A.  Yes, I did vote for him.
25     Q.  Okay.  That's a better question then.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                June 1, 2012

185

1    A.  Yes.
2    Q.  Is it your understanding that you had the trust
3    of Speaker Straus in 2009 when he named you chair of the
4    elections committee?
5    A.  I believe I do.
6    Q.  And without revealing the content of the
7    conversation, did you come to understand in 2009 that
8    Speaker Straus was entrusting with the responsibility to
9    pass a voter ID bill?
10    A.  He was asking me to do my best.  I don't know
11    about trusting me about the responsibility.  I think
12    everybody understood it was an uphill battle.
13    Q.  It was a very controversial issue, wasn't it?
14    A.  It was very controversial.
15    Q.  In fact, it might have been the most
16    controversial issue of the '09 session; don't you think?
17    A.  Yes.  Clearly.
18    Q.  Do you recall any other controversial issues
19    that were being debated in '09?
20    A.  Always abortion.
21    Q.  True.
22    A.  But I don't -- that was just a dominating issue
23    in that session from a public relations standpoint in
24    terms of what you read about it in the newspaper.
25    Q.  And by that, you mean voter ID?

186

1    A.  Yes.
2    Q.  How about immigration?
3        MR. FREDERICK:  Objection.  Vague.  But
4    you may answer.
5    A.  I don't understand your question.
6    Q.  Was immigration and doing something about
7    immigration a controversial issue in the '09 session?
8    A.  Sure.  It didn't have the same level of
9    visibility in that particular session, more so in the
10    last one, but certainly by that time it had become a
11    major issue.
12    Q.  Did you happen to notice over the past several
13    sessions whether there was an increasing number of bills
14    being introduced that aimed to affect immigrants or
15    regulate immigration in the state?
16    A.  I presume that that's true.
17    Q.  Okay.  So I'm going to ask you now about SB362,
18    which is Exhibit US-29.  Was this introduced?  This is
19    as it came out of the Senate.  Okay.  Well, I'm going to
20    ask you to refer to US-29 so I can ask you a few
21    questions about it.
22    A.  M-hm.
23    Q.  You testified previously that you were the
24    chairman of elections when this bill, SB362, comes over
25    from the Senate and lands in your committee.  Yes?

187

1    A.  Yes.
2    Q.  Okay.  And you've also testified today that you
3    did quite a bit of research into topics related to voter
4    ID, and so I want to follow up on that a little bit.
5    You testified earlier that -- Well, I'll ask you, do you
6    know what a certificate of citizenship is?
7    A.  No.
8    Q.  But it is listed as one of the forms of photo
9    ID that is acceptable for voting, yes, in this bill?
10    Let's go to Page 6.
11    A.  Yeah.  "A United States citizenship certificate
12    issued to the person that contains the person's
13    photograph."
14    Q.  Okay.  And so SB362 specifically adds the word
15    certificate to the pre-existing law and the words that
16    contains the person's photograph, correct?
17    A.  Yes.
18    Q.  And if the voter under this law could produce
19    this document, it would be the only piece of ID
20    necessary because it's on the first list, correct?
21    A.  Yes.
22    Q.  Do you know if this certificate of citizenship
23    is different from the naturalization certificate?
24    A.  No.
25    Q.  Do you know that the United States citizenship

188

1    certificate does not have a photograph on it?
2    A.  No.
3    Q.  So would it be fair to say then that you didn't
4    look into this particular item of ID in the bill?
5        MR. FREDERICK:  Objection.  Vague.
6    A.  I don't recall the extent to which we had
7    testimony on that issue in front of the committee where
8    we went through the photo IDs item by item, but it's
9    possible.
10    Q.  And in terms of your own personal inquiry into
11    the aspects of the bill, would you say you did not make
12    any research or inquiry?
13        MR. FREDERICK:  I'm going to object on the
14    basis of legislative privilege to the extent it's asking
15    for his own investigation.  Instruct you not to answer.
16    Q.  Do you know whether a legal permanent resident
17    immigrant of the United States can get a concealed
18    handgun license?
19    A.  No, I don't know.
20    Q.  You mentioned earlier that you were aware that
21    a legal permanent resident immigrant could obtain a
22    driver's license and drive in the State of Texas.  Yes?
23    A.  I think that used to be the case, and I think
24    it's not any longer.
25    Q.  A legal permanent resident, a green card

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                                    June 1, 2012

189

1  holder?
2       A.  Oh, I don't know.
3       Q.  And you are aware that a legal permanent
4  resident, immigrant young men and women do serve in the
5  US military, correct?
6       A.  I don't know.  I do not know, but I presuming
7  you are right.
8            MS. PERALES:  Okay.  We previously marked
9  Rodriguez 11 in a prior deposition.  Do you know
10  whether -- well, do you know whether -- This is what I'm
11  going to do.  I'm going to give you a copy of what has
12  previously been marked Rodriguez 11, and I'm going to
13  hand the same to the witness.  I am not going to remark
14  this document.  Oh, no, this is incorrect.  I'm sorry.
15  Hand it back, please.  This is not what I asked for.
16  I'm looking for a memo dated -- Do you have that?  I
17  think it was marked yesterday, and we're just trying to
18  find it.
19            MS. WESTFALL:  We can go off the record
20  for a minute.
21            (Recess from 3:02 p.m. to 3:07 p.m.)
22            (Exhibit RODRIGUEZ-16 marked.)
23       Q.  (BY MS. PERALES) Representative Smith, the
24  court reporter has handed you what's been mark as
25  Rodriguez Deposition Exhibit 16.  Do you recognize this

190

1  as a memo to you and the other members of the committee
2  in March of 2009?
3       A.  I don't recall it, but that appears to be what
4  it is.
5       Q.  Okay.  And it makes reference to a
6  March 2nd hearing, but it also says --
7       A.  Organizational meeting.
8       Q.  -- Organizational Meeting.  Do you remember
9  having an organizational meeting?
10      A.  No, I don't specifically recall it, but I
11  presume we did.
12      Q.  Now, is it your understanding that this memo
13  from the Secretary of State is following up on some
14  questions that were raised during the hearing on the
15  meeting?
16      A.  It looks like that, yeah.
17      Q.  Okay.  And, finally, on the last page on No. 5,
18  where it says number voters who have registered since
19  2006 without a license number, do you see that
20  information?
21      A.  M-hm.  Yes.
22      Q.  Did you -- Did you use that information?
23      A.  Use it?
24      Q.  In the sense you were speaking earlier about
25  estimating how many voters in Texas might lack a

191

1  driver's license.  Now, this is only as to people who
2  had registered since 2006, but I was wondering if you
3  had relied on that as part of what you testified earlier
4  about.
5       A.  I doubt it.  I don't think so.  I think I
6  remember my back of the envelope calculation was based
7  on some kind of information I had received from national
8  publications or Supreme Court opinions or something I
9  had read about other State's that were different than
10  Texas with fewer minorities, smaller proportion of poor
11  population, and I just extrapolated from that apparently
12  reliable data.  I don't remember specifically what it
13  was, but it seemed to me the most credible information I
14  could find about other states that seemed credible, and
15  I simply needed to make some judgment about how Texas
16  would differ from that state, whichever one it was.
17      Q.  So if you look at the second group of numbers,
18  it talks about the Secretary of State querying this
19  statewide voter file and estimating that 809,000 voters
20  might lack Texas driver's licenses and Social Security
21  numbers.  Do you see that there?
22      A.  Yeah, I do see it.
23      Q.  Do you remember coming cross that information?
24      A.  I don't remember as I sit here today.  No, this
25  was early in the process.  It may have been very --

192

1  Let's see.  These are the people who did not write down
2  their Social Security number or their driver's license
3  number when they registered to vote.  It's not
4  necessarily people who for sure don't have one; is that
5  correct?
6       Q.  Well, it does say --
7       A.  These are the people that did not indicate --
8  did not provide that information on the voter
9  registration card which is slightly different than
10  knowing for sure they don't have them.  I think -- Is
11  that how I read it?  That's how I'm reading it.
12      Q.  Yes.  I think that's a fair reading of it.
13  It's a little more vague as to the second group.
14      A.  The question is how many of those people that
15  for whatever reason at any time write down the driver's
16  license or their social security number do in fact have
17  one.  I don't know.
18      Q.  So to sort of zoom out from the memo itself,
19  would it be fair to say that at this point in the
20  process -- this is about a month before your hearing in
21  April -- that concerns had begun to be expressed -- and
22  I don't need you to reveal privileged concerns, but,
23  obviously, this is already a conversation that seems to
24  be happening between members of the committee and
25  Secretary of State, are concerns being expressed at this



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                          June 1, 2012

193

1  time point that there might be voters who don't have ID
2  for voting?
3       A.  Oh, I think not.  Everybody knew there were
4  voters that didn't have a photo ID or at least a
5  driver's license.  Let me put it that way.  But I think
6  there was a little uncertainty.  That was part of the
7  difficulty in really trying to ascertain precisely how
8  many people did not have a photo ID because it wasn't
9  just limited to driver's license.  When you got to some
10 reasonable estimate of how many people didn't have a
11 driver's license, then you had to try to guess how many
12 of those people that don't have a driver's license have
13 some kind of other photo ID.
14       I will say this, that we had -- you know,
15 we never -- we couldn't find a single person who
16 testified, and we had, you know, multiple rooms full of
17 people testify, and I specifically -- let the biggest
18 committee hear rooms.  We had overflow crowds in two
19 rooms, and the first thing I did was say I want to
20 prioritize any testimony from anybody who's here today
21 that does not believe they have in their possession the
22 required identification that would allow you to vote.
23       Q.  And that would be under --
24       A.  And one man came forward and said he didn't
25 think he did, and he said because I don't have a

194

1  driver's license, so I don't think I can vote in this
2  bill, and then I -- you know, I said do you have any
3  other photo ID?  He pulled out his billfold.  He not
4  only had the non-photo.  He had another kind of photo ID
5  in his billfold.  He just had the impression that you
6  had to have a driver's license to vote, and people that
7  didn't have a driver's license couldn't vote.
8       And so, you know, again, my opinion -- And
9  this is part of my frustration.  There may be some --
10 you know, some more -- I think more credible issues
11 associated with a hard photo ID bill gets to the issue
12 of how much of a burden is it on certain voters to go
13 certain distances and pay for this information, and
14 that's the kind of fact question that needs to be
15 resolved in this litigation.
16       But insofar as the legislation we were
17 considering in 2009, it was -- there just was not any --
18 I mean, finally, I said, okay, we can't find a human
19 being that doesn't -- nobody can produce a body that
20 would not have on their possession currently the IDs
21 required to vote.  Can you even give me a hypothetical
22 for who might not be able to vote in this bill, and the
23 hypothetical I was given was you could have a homeless
24 person with all their possessions in a backpack, and
25 they could lose the backpack within two weeks of the

195

1  election, and so that was the only hypothetical that was
2  presented for the kind of person -- of course, that
3  person would have had trouble voting under the prior law
4  as well.  So I was a little frustrated from the -- I was
5  frustrated with criticism and complaints from my right
6  and my left in this legislation and part of my
7  frustration.
8       In so for as the criticism from the left
9  was concerned was that the rhetoric that you got from
10 the partisans on the left was exactly the same, even
11 though the language in the bill was dramatically
12 different than it is with a strict photo ID bill.  You
13 got the same arguments about, you know, poor -- even
14 though nobody -- that was the best -- In the committee
15 hearings we had, that was the only suggestion of who
16 would have trouble under that language was the
17 hypothetical of the homeless man with all of his
18 possession in a backpack that lost his backpack, and so
19 it was -- you know, I was a little frustrated that the
20 rhetoric didn't change when the language in my bill
21 changed.  And that's just because the issue was so
22 politicized that it had very little to do with what we
23 were actually doing as a matter of policy.
24       Q.  When you mentioned my bill in your last
25 sentence, you were referring to SB362 or your committee

196

1  substitute?
2       A.  I was referring to the version of the bill --
3  Well, that was true of the Senate bill as well, you
4  know.  All my bill did was add two or three -- I
5  think -- I can't remember what the third one is, but
6  three additional provisions to the Senate bill, but
7  neither version would have required any voter to get a
8  document that's not already in their possession to be
9  able to vote.
10      Q.  Understood and agreed.
11      A.  And to me, that's pretty substantially
12 different from a bill that does.
13      Q.  Such as a hard photo ID bill?
14      A.  Yes.  In terms of there being arguments
15 available that there is a burden created on the voter
16 that -- and we can argue about whether that burden is
17 reasonable or unreasonable, and I guess the courts are
18 the ones that answer that question.
19      Q.  Yes.  So just with respect to 2009 and the memo
20 from the Secretary of State, you -- putting aside the
21 question about all the non-photo ID that was available
22 in HB in SB362, would it be fair to say that questions,
23 concerns had begun to arise with respect to how many
24 voters had a driver's license that could be used for
25 voting as of March 6, 2009 when this memo comes back



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                      June 1, 2012

197

1  from Secretary of State?
2      A.  I just think that the issue of photo ID was
3  a -- by this time until 2009 a national issue that had
4  been where all of the arguments available to both sides
5  were hashed out as a matter of public record, and if you
6  spent, you know, a few minutes or hours or weeks reading
7  what was available on the subjects, you were going to
8  quickly be aware of the fact that that's really what the
9  debate was about.  So I don't know that it was as -- It
10 just was a matter of common knowledge to anyone who was
11 familiar with the issue that those were the issues.
12     Q.  Thank you.
13     A.  M-hm.
14     Q.  And with respect to the committee and a meeting
15 that was held between the Secretary of State and the
16 committee, which then resulted in this memo a little
17 less than a week later where the memo was coming back
18 with information, would it be fair to say then that
19 concerns were being raised within the conversations
20 between the committee and the Secretary of State about
21 the availability of drivers licenses to vote?
22     A.  Right.  And just trying to quantify the number
23 of participate who would actually have to go out and get
24 an additional document if we were to require a photo ID.
25 Again, that being less relevant in light of the fact

198

1  that none of the legislation in this particular session
2  would have required that.
3          (Exhibit RODRIGUEZ-17 marked.)
4      Q.  Thank you.  I'm going to talk to you a little
5  bit now about the hearing that was held on April 6th and
6  April 7th.  I'd like to mark this, please.  This will be
7  Rodriguez-17.  And the court reporter has handed you
8  what was marked Rodriguez-17.  I wanted to say in
9  reviewing these transcripts, I appreciated your civility
10 and uniformed kindness to the witnesses who came to
11 testify.
12     A.  Thank you.
13     Q.  You're welcome.  I could tell that it was -- it
14 was quite the hearing.
15     A.  Yeah, it was interesting.
16     Q.  Look with me if you would -- Is it correct to
17 say that on Page 37 you make reference to what you
18 believe would be a small minority of people who do not
19 have photographic identification?  It's at the beginning
20 of your remarks on Page 37.
21     A.  Yes.  What's the question?
22     Q.  Just whether you make reference to what you
23 believe is a small minority of people who lack
24 photographic identification.
25     A.  Right.

199

1      Q.  Now, if you read backwards onto Page 36, it
2  looks like there's a conversation happening between you
3  and Representative Brown.  She makes reference -- And
4  she makes reference to your having previously used a
5  5 percent figure.  Do you recall that?
6      A.  That may have been, you know, again, in that
7  range of anywhere from less than 1 to 10 where I'm going
8  in between and just pulling the number out of the sky
9  for purposes of discussion.
10         (Exhibit RODRIGUEZ-18 marked.)
11     Q.  Let's go ahead and mark this one.  The court
12 reporter has handed you what has been marked
13 Rodriguez-18.  I'm not going to ask you if you recognize
14 this as a transcript of the hearing -- of the hearing on
15 April 7th because you may not have seen a transcript of
16 the hearing on April 7th.
17     A.  No, I have not.
18     Q.  So I'll represent to you that it's a transcript
19 of the hearing on April 7th.
20     A.  I recall Buck Wood testifying.
21     Q.  Go ahead and look at Page 107, 108.  You begin
22 speaking at the bottom of Page 107.  You say, "It is
23 significant that this legislation, unlike some of the
24 other pieces of legislation, does not require you to get
25 that photo ID."  Do you see that statement?

200

1      A.  M-hm.
2      Q.  And did you believe at the time that it was
3  significant that SB362 did not require photo
4  identification.
5      A.  Yeah.  I don't -- I don't know what is being
6  said before I make that comment, but it may very well
7  that I was expressing my frustration over the fact that
8  the arguments being made against it seemed to be the
9  very same arguments that were being made against a
10 strict photo ID requirement when they would not seem
11 apply in this instance.
12     Q.  Did you believe that it was significant that
13 the bill that you were having your hearing on, SB362,
14 did not require photo ID for voting?
15     A.  It certainly is a substantially different piece
16 of legislation in terms of the kind of questions that
17 were involved in the litigation, yes.
18     Q.  And I think previous to that the witness may
19 have been talking about the cost of obtaining
20 identification, and that might be why --
21     A.  Right.
22     Q.  -- why you are drawing the distinction.
23     A.  Right.
24     Q.  Follow your comments, if you would, over to the
25 next page.  You mention again about there being a very

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

201

1   small percentage of persons without photo ID.
2       A.   M-hm.
3       Q.   And you mentioned 1.2 percent in Indiana.
4       A.   There you go.  Yeah.
5       Q.   And then you say the presumption is it's a
6   little higher in Texas because of the fact that we have
7   a larger minority community.  Do you see that there?
8       A.   Right.  M-hm.
9       Q.   Did you think it was valid to make the
10  percentage a little bit higher in a state like ours with
11  a larger minority community?
12      A.   Sure, I do.
13      Q.   I'd like you to go back to April 6, if you
14  would.  That's Rodriguez Exhibit 17.
15      A.   M-hm.
16      Q.   On Page 180, 181, you are having a conversation
17  here with a witness named Justin Leavitt who came, I
18  believe, from Los Angeles to testify about voter ID, and
19  you see that you start speaking at the bottom of Page
20  180 and you say, "And you agree that by providing a
21  non-photo alternative, in addition to what other means
22  we can take, would significantly lessen any marginal
23  additional burden on some voters?  You agree with that?"
24  Do you see your question there?
25      A.   M-hm.

202

1       Q.   Would it be correct to say that you believe
2   that providing a non-photo alternative would
3   significantly lessen any marginal additional burden on
4   some voters?
5       A.   Yes.
6       Q.   If you would go again to Rodriguez-18 on
7   April 7th, the other transcript.  I get lost in
8   transcripts too.
9       A.   What page?
10      Q.   On this one it is Page 107.  It's the wrong
11  citation.  Hang on one second.  I'll find it.  There it
12  is.  It's on Page 108.  This is the conversation that
13  you are having with a witness named Mary Naranjo and
14  beginning at Line 11, do you see where you say, "With
15  regard to that percent, I think you are correct to the
16  extent we mandated a photo ID there would be potential
17  arguments regarding a mandated cost that might be a
18  barrier to some people at the polls"?  Do you see that?
19      A.   M-hm.  Yes.
20      Q.   And did you believe that if there was a
21  mandated photo ID requirement that it would create
22  barriers for some persons to get to the polls and vote?
23      A.   I think that what I'm stating there is that
24  there are potential arguments -- Again, as I've already
25  testified, clearly all of these things are additional

203

1   burdens and then the question is is there an acceptable
2   burden, an unacceptable burden because any kind of
3   identification requirement is going to be a burden to
4   some degree.  And so the question is what is acceptable.
5            (Exhibit RODRIGUEZ-19 marked.)
6       Q.   Okay.  That's the next volume.  The court
7   reporter is handing you what's been marked Rodriguez
8   Exhibit 19.  It is the continuation of the April 7th
9   hearing in the elections committee.  There was a lot of
10  talking and the multiple volumes --
11      A.   I feel like those poor politicians on Meet the
12  Press when they play their prior statements on that
13  particular show.
14      Q.   I'm being gentle.  Look at Page 625, if you
15  would.  Now, I have in my notes that we should read from
16  625 to 627, so I think there's a back and forth going
17  on, and I wanted to get you some context.  Let me see.
18  Okay.  There's something going back and forth with a
19  Mr. Rodebush.  Do you recall your conversation with him
20  in this hearing?
21      A.   If I read it, I might.  Let's see.  This is
22  invited testimony or public testimony.  This is the
23  second day, right.  Let's see.
24      Q.   This is the second day.
25      A.   Yeah.  That was public testimony, so this is

204

1   just someone from the public.
2       Q.   I think Mr. Rodebush is in favor.  I'm not
3   completely sure.
4       A.   Okay.
5       Q.   On Page 627 -- And, in fact, on these pages, I
6   think that -- would it be fair to say that you are
7   talking to Mr. Rodebush about the possible economic
8   impact of a hard photo ID requirement?
9       A.   Yes.
10      Q.   All right.  And where you say on Page 627,
11  "Indigents will not vote in disproportionate numbers to
12  the extent that you create economic barriers to the
13  polls," is that something that you believed when you
14  said it?  You say I think they're right about that.
15      A.   Sure.  I think economic barriers are more
16  likely to deter poor people from voting than rich people
17  from voting.
18      Q.   Okay.  And did you -- Let's see.  On Page 626
19  starting around Line 17, you say, "I don't know that the
20  problem here" -- I'm sorry.  626 starting at Line 17.
21  "I don't know that the problem here is a legal barrier
22  because I think the kind of thing that we're talking
23  about, and if I'm correct, has been held not to be a
24  legal poll tax, but I still believe it's a legitimate
25  issue as a matter of public policy for us to consider."



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

205

1    Do you see that there?
2        A.   M-hm.
3        Q.   What exactly are you saying is a legitimate
4    issue as a matter of public policy?
5        A.   The effort to do everything that we could
6    feasibly do to minimize any economic barrier to voting.
7        Q.   And in your mind would that include providing
8    more forms of ID in a bill that could be used for voter
9    ID so as to minimize the economic impact?
10           MR. FREDERICK:  I want to clarify.  Are
11   you asking him just for his opinion now or for what he
12   was thinking with regard to a specific bill?
13           Q.   We'll let him answer.  I think I should ask
14   your opinion now.
15       A.   What's the question?
16       Q.   You were talking about it's a legitimate issue
17   as a matter of public policy to think about reducing the
18   economic burdens of voter ID requirement, and my
19   question to you is whether you think that providing a
20   more expansive list of possible IDs for voting is one
21   way to minimize the economic impact.
22       A.   I guess I presume that is the case.  Obviously,
23   I take it that there are some forms of photo ID that are
24   more easily fraudulent than others and that there you
25   kind of, I guess with all of the things we're talking

206

1    about, have to weigh the concerns of security versus the
2    concerns of access, I guess, one another.
3        Q.   But with respect to expanding a photo ID
4    requirement to include non-photo items, in your opinion
5    would that be a way for using the economic impact of a
6    voter ID requirement?
7        A.   Yes.
8        Q.   Because somebody might receive a utility bill
9    in any event because they -- they have a utility bill.
10       A.   Yes.  They already have it in their possession.
11   They don't have to go out and get something new.
12       Q.   Okay.  I got the sense from these transcripts
13   that you spoke positively about what you understood
14   about the Florida voter ID model.  Do you remember
15   being -- feeling positively about the Florida model?
16       A.   That's the third thing.
17       Q.   The affidavit bypass?
18       A.   Yes.
19       Q.   But I don't want to get there yet.  I want to
20   get to your substitute, but I was going to ask you
21   simply why you liked or why you had some positive
22   feeling about the Florida model.
23           MR. FREDERICK:  I'll object on the basis
24   of privilege, asking about your mental impressions on
25   pending legislation.  I'll instruct you not to answer.

207

1        Q.   On the abstract, putting aside the legislation,
2    is there anything about what you know about the Florida
3    model that you liked?
4        A.   What I remember about it was the process by
5    which the -- if I recall correctly, the people who did
6    not have the proper identification when they voted.  The
7    process by which those votes could still count because
8    of some sort of curative action that took place after
9    the fact, was more inclusive, much less likely to have a
10   legal vote not count.
11       Q.   Okay.
12       A.   I don't think it was an affidavit bypass.
13       Q.   I was guessing wrong.
14       A.   I'm trying to remember the process, but I think
15   there was basically a committee that met and --
16       Q.   Verified the voter's signature perhaps?
17       A.   That's what it was.  It was a signature match,
18   yeah.
19       Q.   Okay.  We'll get there.
20       A.   The committee deemed the signatures to be the
21   same than the vote counted, unless the court deemed them
22   to be different.
23           (Exhibit RODRIGUEZ-20 marked.)
24       Q.   The court reporter has handed you what's been
25   Rodriguez Deposition Exhibit 20.  This is the later part

208

1    of the first day of the hearing on April 6th, and I
2    wanted to ask you to take a look at Page 315.  I'm
3    sorry, 351.  Okay.  Okay.
4        A.   Is that me?
5        Q.   That's you.
6        A.   God.  I was pontificating.
7        Q.   Because it carries on.
8        A.   Where does it start?
9        Q.   It starts on 349.  What I'm interested in is
10   sort of near the end of what you were saying there.
11       A.   Okay.
12       Q.   On Line 11, you'll see that you begin a
13   sentence on Page 351.  "There's some things I hope we
14   are going to be able to do on the House side to make it
15   even more sensitive to these concerns."  What did you
16   mean when you made that statement?
17       A.   Those three things we're talking about.
18       Q.   Okay.  So you're referring to the bill that you
19   later introduced as your substitute?
20       A.   Right.
21       Q.   Okay.  I'd like to mark that next.  And this
22   will help you because you'll be able to refer to it.
23       A.   What am I looking at?
24           (Exhibit RODRIGUEZ-21 marked.)
25       Q.   This is -- Do you recognize this exhibit which



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

209

1  has been marked Rodriguez 21 as your substitute?
2      A.   That I filed to be considered on floor after it
3  came out of committee?  Is that what it is?
4      Q.   No, because what ended up coming out of
5  committee was 362, so I believe you circulated this in
6  committee.
7      A.   Well, I actually filed -- In other words, we
8  had -- I think if I recall correctly we had to prefile
9  amendments, so I prefiled a complete substitute of the
10 bill and this could be that.
11     Q.   I think this is something you may have passed
12 out in committee for consideration.
13     A.   Probably.  It's probably the same thing.  I
14 mean, I think --
15     Q.   It could be the same thing.
16     A.   It's basically the Senate bill with those three
17 things, I imagine, is what it is.
18     Q.   Okay.
19     A.   That is money to have a voter registration
20 drive, the adoption of a Florida like process by which
21 you consider the provisional ballots, and it's a process
22 which resulted in those ballots being more likely to
23 count than not count, and the delay in implementation.
24     Q.   All right.
25     A.   That's what it was.  I think that's -- Without

210

1  reading this entire thing, I imagine that's what this
2  is.
3      Q.   Take a look at Page 7 for me.  Paragraphs D
4  does make reference to the procedure for signature
5  verification.  So I'm hoping that you can identify this
6  document as your substitute bill or your floor
7  amendment.
8      A.   Yeah.  It looks like it talks about the
9  signature verification committee on Page 14.
10     Q.   I see an effective date on the last page of
11 January 21, '13.
12     A.   Yeah, delay in implementation.
13     Q.   Are you fairly sure that this is your
14 substitute?
15     A.   It looks like it, yeah.
16     Q.   I have another question for you.
17     A.   It could be one of various different versions
18 of my substitute, but it does appear to be that, yes.
19     Q.   On Page 14 right above the signature
20 verification committee, there is a new section entitled
21 Presentation of Identification for Certain Provisional
22 Ballots.  Would it be fair to say that your substitute
23 also provided an opportunity for the voter to return
24 with ID following the election?
25     A.   Yes.

211

1      Q.   So that's another part that makes it different?
2      A.   I didn't -- That would have been in my bill.  I
3  didn't recall whether it was in Senate Bill 14 or not.
4      Q.   Okay.  362?
5      A.   14, the one that actually passed.  That's what
6  I thought you were comparing it to.
7      Q.   No, I was actually sticking with the 2009
8  process.
9      A.   362?
10     Q.   362.
11     A.   Yeah.  I think that may have been some
12 provision by which you could show up with the correct ID
13 after the fact.  I don't know if this is the same or
14 different.  I think the Senate bill had some provision
15 for that.
16     Q.   Okay.  I have another question for you.  Is
17 there a difference between your substitute and Senate
18 Bill 362 in 2009 with respect to how much discretion the
19 poll worker was allowed to exercise once given the ID?
20 Is it fair to say that your substitute said that if the
21 poll worker simply got the ID, the poll worker had to
22 accept it as opposed to some kind of verification
23 whether the person looked like their picture?
24     A.   Yeah.  I know we talked about that, and I think
25 the decision was made to simply not change the language

212

1  from the current language because it simply hadn't been
2  a problem, and we were afraid if we changed the
3  language, we might create a problem that didn't exist.
4          In other words, there just was -- whatever
5  language was current law seemed to be working so far as
6  photo ID was required, and so -- or allowed, I should
7  say, as a means of identification.  So we I think the
8  final decision was not to monkey with success, if I
9  recall correctly.
10     Q.   Now, around the time that you rolled out your
11 substitute, which I understand is around April 29th, is
12 this is also the time -- and I'm going to ask if you
13 recall this incident -- in which Representative Betty
14 Brown made certain questions to a witness who was Asian
15 American regarding names?
16     A.   Yeah.
17     Q.   Do you recall that incident?
18     A.   Yes, I recall that.
19     Q.   Can you describe it for me?  It happened in a
20 hearing.
21     A.   Yeah.  Gosh, I mean, I think what she did in
22 essence was ask him why he wouldn't just change his name
23 to something easy so that he wouldn't have to worry
24 about there being some communication problem because he
25 had a complicated foreign name or, you know, might



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                          June 1, 2012

213

1   not -- his actual name might not match what's on the
2   voter rolls and so, yeah, I remember.
3       Q.   So this is the context within which you then
4   roll out your proposal for substitute.
5       A.   I don't remember.  I don't -- I don't know -- I
6   don't remember if that was on the same day.  I thought
7   that happened with Representative Brown when we were
8   hearing public testimony in early April.
9       Q.   Did things become more heated after
10  Representative Brown made that comment and it was
11  covered in the media?
12          MR. FREDERICK:  Objection.  Vague.
13      A.   More heated in what regard?
14      Q.   Was there media coverage of Representative
15  Brown's remarks?
16      A.   Yes.  There was like websites where you could
17  like put in a complicated name and it would spit out a
18  real simple one like Jim Bob.
19      Q.   I did not know about that.
20      A.   It was like a Betty Brownometer.
21      Q.   Did it seem to you at that time that there was
22  some racial tension in the reactions to those remarks?
23      A.   There was an audible gasp in the room.  I
24  remember that.
25      Q.   Do you think that following that comment the

214

1   general context surrounding passage of voter ID became
2   more tense?
3          MR. FREDERICK:  Objection.  Vague.
4       A.   I don't know how it could have become more
5   tense, but certainly she, by making comments like that,
6   fed the -- the -- the opposition again.  I don't believe
7   insofar as the version of the legislation we were
8   considering at that time that there was really any
9   justification for that opposition, but to the extent
10  that the opposition was trying to create racial
11  undertones, she certainly aided their cause.
12      Q.   Okay.
13      A.   I don't think that was her intent, but it had
14  that effect.
15      Q.   I need April 29th.  I'm going to ask you about
16  another comment since you were really good about
17  remembering that one.  In 2005 when you were on the
18  elections committee, do you recall a hearing in which
19  Representative Betty Brown was rolling out a bill to
20  require proof of citizenship for voter registration and
21  she had an exchange with Representative Anchia regarding
22  the reasons why one would need to prove citizenship at
23  the time of voter registration?
24      A.   No, I don't recall that.
25      Q.   Okay.  It was good.

215

1       A.   I'm sure.  It's an unfair fight.
2          (Exhibit RODRIGUEZ-22 marked.)
3       Q.   The court reporter has handed you what has been
4   marked Rodriguez Exhibit 22.  Do you recognize this as
5   an April 29, 2009 article in the Quorum Report?
6       A.   Again, it's one of many things that were
7   written about this issue that session.  I don't
8   specifically recall it.
9       Q.   Do you recall speaking to the media about some
10  of the issues --
11      A.   Yes.
12      Q.   -- around this time?
13      A.   Yes.
14      Q.   Okay.
15      A.   I remember a particular incident where I went
16  to the press table and started expressing my
17  frustration.
18      Q.   You do?
19      A.   Yes.
20      Q.   Okay.  Can you tell me what you said at that
21  time?
22      A.   I was -- I don't know.  I have not had a chance
23  to read this document that you marked as Exhibit 22, so
24  I don't know if it pertains to this particular version,
25  but I was frustrated because it appeared that two of the

216

1   members on our committee were actually continually
2   changing the -- what they would need in the bill in
3   order for it to come out, and, you know, for a certain
4   period of time, I was operating under the presumption
5   that they were operating in good faith, and at some
6   point in time I stopped believing that because every
7   time I would have a bill draft that had -- would
8   incorporate what they told me they needed last time,
9   then there would be a new something else they needed.
10          So I got the impression that they were
11  actually themselves trying to frustrate my ability to
12  get a bill out of committee and begin to, you know,
13  speculate that that may have been a part of a political
14  effort to blame Straus or anybody associated with them
15  for failing to pass this bill, and so the only thing I
16  could do was to go public and let the press know that
17  that's what was happening in my committee.
18      Q.   And was that before you rolled out your
19  substitute on April 29 or did that start happening
20  after?
21      A.   I don't remember.  I think -- I want to think
22  that all happened after.  It was kind of happening as we
23  went along.  I mean, it's not that there weren't
24  discussions, but, you know, again, early in the session
25  my focus was on trying to come up with language that 76



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                        June 1, 2012

217

1    people in the House floor would agree with and then
2    later did I begin to focus on whatever would be
3    necessary to get the bill out of committee, which were
4    two very different things in light of the make-up of the
5    committee on the one hand and the House floor on the
6    other, and so, you know, I was just willing to do
7    whatever was necessary to get the bill out of committee
8    and then my intent was to allow a vote on that version
9    and then come in with a substitute that could get the
10   marginal votes.
11        Q.   So would it be fair to say that on
12   April 29th you were already watching your right flank
13   in the committee?
14        A.   Clearly I had to get five of six votes in order
15   to get out of committee and five of those six were
16   Republicans.  And so any two members working together
17   and in cooperation had the power to prevent a bill from
18   coming out of committee, if you understand the math.
19        Q.   And you mentioned those two numbers were Betty
20   Brown and was it Linda Harper Brown?
21        A.   Linda Harper Brown.
22        Q.   And this article mentions some of the things
23   that you've talked about earlier, "$7.5 million for
24   enhanced voter registration efforts and includes a
25   mechanism for allowing voters who don't present

218

1    acceptable ID to have their votes subsequently counted."
2    And it talks about the signature verification committee.
3        A.   M-hm.
4        Q.   And then -- Let's see.  At the bottom of the
5    page you are quoted --
6        A.   It was an eminently fair bill and Matt Engel
7    called me a Tom Delay style partisan thug.
8        Q.   He would.
9        A.   Yeah.  So that's who I'm talking about.  It was
10   just ridiculous how politicized it was.
11        Q.   I think he dreams about Tom Delay.
12        A.   Is that right?
13        Q.   Yeah.  I don't know.  He doesn't talk to me.
14   But at the bottom of the page talks about you defending
15   your bill and quotes you saying, "The bill strikes the
16   proper balance between concerns about security and
17   concerns about voter accessibility."
18        Is that a statement that can be fairly
19   attributed to you with respect to your substitute?
20        A.   Yes, I think so.
21        (Exhibit RODRIGUEZ-23 marked.)
22        Q.   Okay.  Okay.  Let's go on to the next one.  The
23   court reporter has handed you what's been marked
24   Rodriguez 23.  Do you recognize this as a Quorum Report
25   article?

219

1        A.   Yes.  I don't recall it specifically, but it
2    appears to be a Quorum Report article.
3        Q.   Okay.  And it's reporting that you toughened up
4    the ID requirements in your -- the latest iteration of
5    your voter ID bill.
6        A.   Right.
7        Q.   Can you explain that to me?
8        A.   Just what we talked about earlier which is
9    doing what was necessary to get the bill out of
10   committee by having conversations with the people
11   that -- whose votes would be needed to get out of
12   committee, and it looks like I'm expressing frustration
13   that I had drafted a bill that did what I believed they
14   had asked me to include in the bill and yet it still
15   wasn't enough.
16        Q.   It reports that you put in provisions from
17   Ms. Brown's own legislation on the issue.
18        A.   Yes, I believe that's right.
19        Q.   And she continued to oppose it.
20        A.   And for some period of time until I went
21   public.
22        Q.   Okay.  And it also says that this is a hard
23   photo ID requirement.
24        A.   At some point -- Let me just say this.  At some
25   point after I went public, then she said -- they said we

220

1    will vote for the exact same version as came out of the
2    Senate, and then it happened within a few days, but that
3    was the -- you know, that was the first time that that
4    had been communicated to me as a few days before the
5    bill was voted out of committee, so --
6        Q.   Is it correct to say then that at this point on
7    May 6 the version of the bill that you are circulating
8    has a hard photo ID requirement?
9        A.   No, I don't think so.  You know what?  I don't
10   remember.  It's possible.  It is -- I think that is
11   right.  I think -- I think, again, some of the earlier
12   discussions was I want my bill, not the Senate bill, my
13   bill, so I was trying to get her to agree to her bill
14   with the three sweeteners.  That's sort of it -- We had
15   all kinds of discussions, but, anyway, it was -- what
16   they were demanding kept changing and the pressure was
17   starting to build as we got later in the session, and I
18   could see a situation where they were trying to set me
19   up as the guy who kept the bill in committee under
20   circumstances where they were actually preventing me
21   from getting it out by never giving me clarification on
22   what would be required to get the vote.
23        Q.   I see here you talk about the bill having
24   exemptions for the indigent voters over 70 who were
25   never issued a birth certificate, nursing home residents



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                      June 1, 2012

221

1   or those with a religious objection to ID.  That's in
2   that second paragraph there.
3       A.   Again, I imagine that is language that's taken
4   from her prior versions of the bill.
5       Q.   All right.  And was that meant to
6   minimize the impact of the bill on elderly voters who
7   might lack ID?
8       A.   I presume.
9       Q.   And then it mentions in the third paragraph
10  that you kept the roll out period and the appropriation
11  of 7.5 million for what would now be a combination of
12  voter registration and mobile photo ID units.  Do you
13  see that there?
14      A.   M-hm.
15      Q.   Did you include the appropriations for delayed
16  implementation and funding for voter registration in
17  order to minimize any potential negative impact or try
18  to mitigate any potential impact of voter ID?
19          MR. FREDERICK:  Object on the basis of
20  legislative privilege.  She's asking why you include
21  something.  I would object and instruct you not to
22  answer.
23          MS. PERALES:  In response to your
24  objection, I think at this point I'm going to raise or
25  suggest to you that the representative may have waived

222

1   his privilege on this particular issue because he spoke
2   publicly quite a bit in committee and in the press about
3   the positive aspects of those elements of his
4   substitute, the voter registration, the delayed
5   implementation, the signature verification.  These are
6   things that I believe that the representative has talked
7   about enough outside of a privileged setting that he
8   would be able to answer whether the purpose of that or
9   whether his intention with that was to mitigate any
10  negative impact.
11          MR. FREDERICK:  If that is the case, then
12  I would absolutely agree that a public statement would
13  not be privileged even if it's about the purpose behind
14  a specific amendment.  I'm not aware of that though, and
15  so at this point because it is a specific -- I mean, if
16  the representative can specifically recall that it was a
17  public statement, then -- then, you know, I would agree
18  and I think he could answer without revealing privileged
19  information, but I am not aware that that is the case.
20          MS. PERALES:  Okay.
21          MR. FREDERICK:  So --
22          MS. PERALES:  I will ask him a few more
23  questions.
24          MR. FREDERICK:  I think consistent with
25  his assertion of privilege, I have to instruct him not

223

1   to answer that question.
2       Q.   (BY MS. PERALES)  Okay.  Let's talk about before
3   the Betty Brown stuff.  Well, there really is no before
4   the Betty Brown stuff, but going back before
5   April 29th and the day that you roll out your substitute
6   bill, I guess for lack of a better word, and you spoke
7   to the Quorum Report -- provided reports to the Quorum
8   Report and possibly others and where you talk about how
9   the bill strikes the proper balance between concerns
10  about security and concerns over voter accessibility,
11  did you make public statements at that time regarding
12  the three elements of your substitute that were new and
13  that relationship to voter accessibility?
14      A.   I think earlier than this -- earlier in the
15  session there's lots of conversations with the press
16  where I'm talking about balancing the important concerns
17  regarding security on the one hand and access on the
18  other.
19      Q.   Now, with respect to your substitute --
20      A.   Yes.
21      Q.   So let's pick one aspect of the substitute, the
22  7.5 million for voter ed and voter registration.  Did
23  you ever publicly discuss that provision as intending to
24  increase access?
25      A.   Sure.

224

1       Q.   And did you talk about it as also intending to
2   mitigate any potential negative effect of being required
3   to produce ID?
4       A.   What we were trying to do is go out of our way
5   to completely eliminate any possible arguments to
6   that -- to that effect, and I think I succeeded to the
7   point where my right wing was unwilling to go along.
8       Q.   Okay.  And then also with respect to the
9   signature verification committee, which is a really good
10  idea and one that you pulled from another source from
11  Florida --
12      A.   Right.
13      Q.   -- did you also discuss that publicly as in a
14  way in which somebody who might not have ID could still
15  have their legal vote counted?
16      A.   Yes.  Absolutely.
17      Q.   And did you discuss it publicly as a way to
18  mitigate the potential and negative impact of the voter
19  ID requirement --
20      A.   Yes.
21      Q.   -- and delayed implementation?  Tell me about
22  your public comments with respect to delayed
23  implementation and how that might assist in mitigating
24  the potential harmful impact.
25      A.   That was really more about getting the marginal

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Todd Smith                                    June 1, 2012

225

1   votes on the House floor and it created the major
2   backlash on the right because, you know, the Senate had
3   immediate effect.  Again, a two-year delay in
4   implementation is what I would call a quasi-concession
5   because it's not even clear it was a concession at all,
6   and my intent was to publicly talk about a four-year
7   delay in implementation under the presumption that it
8   would go to a conference committee and end up at two
9   because the marginal votes were concerned that if we
10  started with two, we would just go to conference
11  committee and end up current -- it would end up -- we'd
12  end up assuming the Senate's version of immediate
13  effect.
14              And so in order to ensure their support, I
15  agreed to go public with a -- and tried to get off the
16  floor a four-year delay in implementation and the
17  understanding I would not ask them to support the bill
18  unless it came back from conference committee with a
19  two-year delay in implementation.
20              But what ended up happening was we got so
21  much flack from the right for proposing a four-year
22  delay in implementation, that I went back to them and
23  said, listen, guys, this is killing me on the right,
24  please let me come off the House floor with a two-year
25  delay in implementation, and if I can't keep two in

226

1   conference, then I won't ask you to vote for the bill
2   and you are not committing to do so.
3       Q.  Did it work?
4       A.  It obviously didn't.  I mean, we didn't get it
5   to the floor.
6       Q.  You didn't get it out of committee either, so
7   I'm trying to figure out where the not working ended up
8   happening.  I mean, you are trying to get to 76.
9       A.  Yeah.
10      Q.  Did you feel like you got to 76 --
11      A.  No.
12      Q.  -- on your substitute?
13      A.  No.  Because, you know, I was operating under
14  the presumption that the partisans would operate in good
15  faith, which was foolish on my part.  I'm talking about
16  out on the right.  And, you know, the -- they weren't
17  interested in -- they didn't want a bill.  They wanted a
18  particular bill, but didn't have the votes to pass, and
19  in my opinion some people -- it was a part of a
20  political strategy to demand that you pass a bill.  They
21  knew you didn't have the votes to pass, so that they
22  could blame you and the speaker for failing to do it.
23      Q.  So as you were potentially gaining votes on the
24  left, you were losing them on the right.
25      A.  Exactly.  Yeah.

227

1       Q.  Okay.  Do you remember at some point during
2   this time -- it was actually right before you rolled out
3   your substitute around April 20th, 21st, meeting with
4   advocacy groups that had concerns --
5       A.  Yes.
6       Q.  -- about voter ID?
7       A.  Yes.
8       Q.  And that Advocacy, Inc., what's his name?
9   Dustin Rynders from Advocacy, Inc., a disability rights
10  organization.
11      A.  NAACP, you guys.  I remember a meeting like
12  that, yeah.
13      Q.  Do you remember talking with the folks in the
14  room about sort of efforts to try to allay some of the
15  concerns?
16      A.  Yes.
17      Q.  And do you recall Representative Anchia there
18  as well?
19      A.  I believe he was.  I don't know for sure, but I
20  believe he was.
21      Q.  Do you recall saying to this group that you
22  were getting beaten up by your caucus?
23      A.  I don't recall that, but --
24      Q.  Does it -- would it -- is it possible -- Let me
25  see.

228

1       A.  I don't think it was my caucus as much as it
2   was party activists, you know, around the state that
3   were misrepresenting the realities that we faced.
4       Q.  Okay.  Do you also recall mentioning to those
5   people that you were getting pressure from Speaker
6   Straus to make sure there was no blood or huge fight on
7   the floor?
8       A.  No, I don't.  I don't recall saying that, and I
9   don't know that I would have.
10      Q.  Okay.
11      A.  Yeah, because I don't think -- I mean, pressure
12  from Speaker Straus would not being an accurate -- We
13  were all concerned with trying to -- you know, trying to
14  have this legislative session end up as successfully as
15  it possibly could under very difficult circumstances.
16      Q.  Do you think you discussed concerns in that
17  meeting with the possibility that when voter ID hit the
18  House floor, then there could be a big fight?
19      A.  Sure.  I think we presumed there could be a big
20  fight with voter ID on the floor.
21      Q.  Do you think that you communicated to that
22  group that Speaker Straus really didn't want a big fight
23  on the floor on voter ID?
24      A.  I don't -- I don't know why I would have.
25  My -- I may have -- My sense is that there's some



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

229

1  something in the communication that's not completely
2  accurate that somehow what I said is not -- I don't
3  believe I said precisely that, but I may have said
4  something along those lines involving the speaker, but I
5  don't remember anything like that, and what you're
6  telling me doesn't ring true in terms of what I would
7  have likely said.
8      Q.   That's why I'm asking you about it.
9      A.   Yeah.
10     Q.   Do you recall talking with them about bringing
11  in a possible proposal by you about some deceptive
12  practices language from Anchia's bill?
13     A.   Yeah.  Yeah, I do.  We were very open to the
14  idea of creating additional penalties for any effort to
15  send out false information to, you know -- you know,
16  tell people the wrong election date or the wrong place
17  to vote or anything like that, that kind of voter fraud.
18     Q.   Okay.  Do you think that your substitute bill
19  would have been sufficient to guarantee integrity in
20  elections with respect to voter identification?
21     A.   No.
22     Q.   Why not?
23     A.   Because guarantee is too strong a word.
24     Q.   Give me the right way to put it then.
25          MR. FREDERICK:  Objection.  Vague.  You

230

1  may answer.
2      A.   It would have improved the security of the
3  polls, and it would have -- you know, in striking the
4  balance between access and security, it was certainly
5  more on the access end of the spectrum than a hard photo
6  ID requirement which is more on the security end of the
7  spectrum.
8      Q.   But did you feel comfortable that your bill
9  would in fact improve the security end of things?
10     A.   Yes, to some extent.
11     Q.   Only.  Did you -- Did you have hesitation or
12  concerns that your bill wasn't doing enough to guarantee
13  security?
14          MR. FREDERICK:  Objection.  Vague.
15     A.   I had concerns that it wasn't doing as much as
16  my constituents wanted it to do, but I didn't really
17  have to concern myself with the policy choice because it
18  was clear that something along the lines of what I
19  proposed was the only plausible option given the make-up
20  of the House floor.  It was that or nothing.  And I
21  couldn't get the grassroots to understand that or their
22  preference may have been nothing.  I mean, it was just,
23  you know, portrayed very simplistically to them as the
24  weak bad bill versus the strong good bill, and that's
25  all they knew, and, you know, when I went and did my

231

1  little slide show presentation, I told them that every
2  Betty Brown bill prior to that legislation had allowed
3  voting with two non-photo IDs, they were just shocked
4  and appalled, and so it was a matter of great
5  misinformation.  So, anyway --
6      Q.   So there's a number of concepts that are out on
7  the table.  One is the level of strictness in the voter
8  ID bill that your constituents might have been calling
9  on you to propose.
10     A.   M-hm.
11     Q.   Then there's the issue of what could be passed
12  in the House given in 2009 a very close margin between
13  Democrats and Republicans.
14     A.   M-hm.
15     Q.   But I'm asking you about a third thing, which
16  is whether you had any hesitation or discomfort with
17  your substitute because you thought it might not be
18  sufficient to ensure ballot security.
19     A.   Again, nothing ensures ballot security, and
20  what I knew was that this bill would provide more
21  security than we ever had before.
22     Q.   And were you comfortable with that?
23     A.   I was -- Again, if you are asking me in
24  representing my constituents if I had to choose between
25  that version and the version we passed this session,

232

1  obviously, I have to choose the version we passed this
2  session.
3      Q.   But --
4      A.   In terms of, you know -- You know, I mean,
5  clearly, I believe there is certain irrational hysteria
6  on both sides of this issue that is for political
7  reasons perfectly capable of exaggerating its
8  significance.  And to me, one of the primary reasons for
9  passing this legislation was just the importance of
10  getting it behind us so that we could then focus on
11  other things that were at least if not more important to
12  the state.
13          And so I just -- You know, again, I wasn't
14  impressed with the leftist arguments about
15  disenfranchising legal voters with the bills that we
16  were talking about in my legislative session in 2009,
17  and I think there are a lot of people on the Republican
18  side that have a false impression about the frequency
19  with which this occurs.
20     Q.   I know that you mentioned earlier that you were
21  familiar with perhaps a handful of incidents in which
22  people had claimed impersonation voter fraud had
23  occurred.
24     A.   Right.
25     Q.   And you testified earlier that the problem

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                June 1, 2012

233

1  could be larger and that you didn't know.
2      A.  Right.
3      Q.  Right.  And I also don't -- I mean, there's
4  many things that we don't know.
5      A.  No.
6      Q.  Given what you knew -- Because here you are, a
7  policymaker.  You are on top of this issue now.  You've
8  researched it.  You've looked at other states.  You know
9  what the Attorney General's Office and Secretary of
10 State have offered in terms of information about voter
11 fraud and how prevalent or not prevalent it is.
12     A.  M-hm.
13     Q.  Putting aside the question of what you've
14 very -- what you've explained very well as public
15 perception with, respect to the policy of balancing
16 security and access to the ballot, were you comfortable
17 with your bill that it struck the right balance between
18 access and security?
19     A.  I want as much security as you can possibly get
20 that doesn't create an unreasonable burden on legal
21 voters.  And so my preference would be the hard voter ID
22 bill unless there's credible evidence that it creates
23 unreasonable burden on legal voters because it provides
24 additional security.
25     Q.  Did you have specific concerns with respect to

234

1  your substitute that it would not provide enough
2  security?
3      A.  Again, when you say "enough security," I
4  want -- it's like, you know, enough fun, enough --
5      Q.  Enough money?
6      A.  Enough money.  You want as much as you can get
7  that doesn't have any adverse effect, and so more is
8  better unless it creates an unreasonable burden on legal
9  voters.
10     Q.  If your substitute had made it out of committee
11 and passed the House, what would have happened in
12 conference in 2009?
13         MR. FREDERICK:  Objection.  Calls for
14 speculation.  You can answer.
15     A.  Say that one more time.  I was just imagining
16 myself governor, so I lost my train of thought.
17     Q.  If your substitute -- You got that happy look
18 on your face.  If your substitute had passed the House,
19 passed committee, passed the House, what would have
20 happened to it in conference committee?
21         MR. FREDERICK:  Same objection.  You can
22 answer.
23     A.  I think that it would have stayed exactly the
24 way I proposed it because I would have made it very
25 clear to the senators that if they changed anything, I

235

1  wouldn't get the votes in the House.
2      Q.  And you think --
3      A.  I think they would be sensitive to that.
4  That's my guess on how that would have proceeded in that
5  unlikely scenario.
6      Q.  Okay.  Well, it might have happened if you had
7  gotten it out of committee, maybe.
8      A.  Well, you know, no -- In other words, when
9  the -- when the party leaders and activists started
10 characterizing my bill as bad and weak, then I don't
11 think you could have gotten the members to vote for it
12 because they just -- because of the perception that was
13 being created back home.
14     Q.  So were Betty Brown and Linda Harper-Brown
15 responding to the party activists or was it the other
16 way around?
17     A.  I really don't know.  I honestly don't know who
18 they were talking to, but they were talking to somebody.
19 It was kind of a game plan that I wasn't privy to.
20     Q.  Okay.  Do you recall in either 2009 or 2011
21 Lieutenant Governor Dewhurst talking about noncitizen
22 voting as a form of voter fraud?
23     A.  No.
24     Q.  Do you recall in either 2009 or 2011 anybody
25 within Power Texas talking about noncitizen voting as

236

1  voter fraud?
2      A.  No.
3         (Exhibit RODRIGUEZ-24 marked.)
4         MS. PERALES:  Okay.  This is Rodriguez 24.
5  It keeps getting worse, doesn't it?
6         MR. FREDERICK:  I'm sorry.  Was that
7  Rodriguez 23 or 24?
8      Q.  24.  It's 24.  Do you recognize Rodriguez
9  Exhibit 24 as an article from the Quorum Report?
10     A.  Yes.
11     Q.  And help me understand who is SREC?
12     A.  State Republican Executive Committee.
13     Q.  Okay.  And is this article correctly saying
14 that there was an email blast from the State Republican
15 Executive Committee accusing you of deliberately
16 sabotaging the voter ID bill?
17     A.  I don't remember that.  I don't believe that's
18 true.  Where do you see that?
19     Q.  It's just the first line of the article.
20     A.  Email blast?  No just certain members.  Not the
21 committee itself.
22     Q.  Certain members?
23     A.  Yeah.  Couple of members it looks like did
24 that.  I don't remember it, but --
25     Q.  So a couple of members of the State Republican



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                          June 1, 2012

237

1    Executive Committee?
2        A.  M-hm.  Yes.
3        Q.  Do you see down below where it says the SREC
4    email?
5        A.  M-hm.  Yes.
6        Q.  Do you recall ever seeing this email?
7        A.  I don't recall this specific email, but
8    certainly the arguments in it are familiar.
9        Q.  Do you ever recall reading that somebody wrote
10   The chief ally of the Democrats and the Delay game was
11   and is Todd Smith?
12       A.  Where is that?  I don't see that.
13       Q.  It's there on the second page.  It's in the
14   paragraph above the paragraph with the underlining in
15   it.
16           MR. FREDERICK:  The first --
17       A.  I don't know who's writing that.  Who is that?
18   What's the question?
19       Q.  If you ever recall reading an email where it
20   says you were an ally with the Democrats to delay the
21   bill and kill it.
22       A.  Effectively what my political opponent was
23   arguing, and then when I -- you know, anybody that was
24   within a hundred miles of the voter ID issue that
25   session was accused by their political opponent of being

238

1    the one who killed it.  It was Straus.  It was me.  It
2    was Betty Brown.  It was anybody within a hundred miles
3    of it.  If you were running against somebody within a
4    hundred miles, you said they killed it.
5        Q.  Down below that is some text that's titled
6    "Todd Smith's Reply."  Can you read that and tell me if
7    you wrote it?
8        A.  I don't recall having written, but it certainly
9    looks like something that I could have and probably did
10   write.
11       Q.  Okay.  If I had been mad, I probably would have
12   written something a lot worse.
13       A.  If you what now?
14       Q.  If I had been mad, I probably would have
15   written something a lot worse.
16       A.  That would be my voice mail.
17       Q.  Okay.
18       A.  Yeah.  I think this is all very accurate in
19   terms of what it says I wrote here.
20       Q.  And that's with respect to Rodriguez 24?
21       A.  Yes.
22       Q.  The court reporter has handed you what has been
23   marked US-88, and I had asked you a question earlier
24   about whether you recall the lieutenant governor talking
25   about noncitizen voting as voting fraud during the '09

239

1    to '11 period, and you said you couldn't remember, and I
2    was wondering if by looking at this it would have
3    refreshed your recollection at all.
4        A.  I wouldn't have seen this, so it wouldn't be
5    refreshing my recollection.  I have not seen Exhibit 88.
6    It seems to be evidence that he at least wrote one
7    constituent and made some concern like that.
8        Q.  It doesn't jog your memory as to any speeches
9    or mail or anything you got from the lieutenant
10   governor?
11       A.  No.
12       Q.  Do you know whether the SB14 bill language came
13   from the lieutenant governor?
14       A.  No.
15       Q.  Okay.  Now in 2011, you were not on the
16   elections committee, correct?
17       A.  Yes.
18       Q.  Which in hindsight might have been a blessing.
19       A.  It's always a blessing.
20       Q.  In 2011, can you name some of the controversial
21   legislative issues during the session besides voter ID?
22       A.  The budget was 90 percent of the controversy
23   that session, I think.  I was on public ed, so the
24   reforms and reduction in regulation and additional
25   flexibility of two school districts was very

240

1    controversial, reducing or eliminating or changing what
2    I think we eventually did class size, et cetera, making
3    it easy to fire bad teachers and so several things.  I
4    can't remember.  I mean --
5        Q.  How about redistricting?
6        A.  Oh, yeah, that one.  Yeah.
7        Q.  And what about immigration and what was called
8    the Sanctuary Cities bill?
9        A.  Yeah.  Airport screening, you know, was our big
10   issue.  We spent more time on that, I think, than
11   anything else.  Redistricting, again, to me it's not as
12   controversial inside the House among the members as it
13   is in the press.  I mean, if your ox is getting gored
14   then it's a pretty big deal, but people vote their party
15   and it's done.
16       Q.  You are from up there by Euless, right?
17       A.  Yeah.
18       Q.  That may also be why.
19       A.  Why?
20       Q.  Because it's big suburban area, big suburban
21   geography up there.
22       A.  Our districts don't have to change dramatically
23   because we grow about the same rate as the population.
24       Q.  Or faster.
25       A.  Faster.  That's right.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                June 1, 2012

241

1   Q.   So with respect to what was called the
2   Sanctuary Cities bill, would you say that was pretty
3   controversial in the 2011 session?
4   A.   I mean, I think -- You know, my sense is that's
5   one of the bills that all the Republicans and some of
6   the Democrats would support.
7   Q.   But do you remember whether it was
8   controversial?
9   A.   Yeah, it's controversial.  It's got people who
10  disagree with it.
11  Q.   Do you remember it going to a special session?
12  A.   Sure.
13  Q.   All right.  Was that because it died during the
14  regular session and was put back on the call for the
15  special by the governor?
16  A.   Yes.
17  Q.   You had talked with Ms. Westfall about a voter
18  ID bill that you had introduced in the 2011 session that
19  you characterized as a stricter bill.
20  A.   M-hm.  Yes.
21  Q.   And is it fair to say that you included student
22  ID as one of the forms of photographic identification in
23  your stricter bill?
24  A.   I don't know.
25  Q.   Okay.

242

1   A.   I presume if you say I did, I did.
2   Q.   All right.  And if it was in your stricter
3   bill, is that because you believe that a student ID
4   proves somebody's ID?
5        MR. FREDERICK:  Object on the basis of
6   legislative privilege and instruct you not to answer.
7        Nina, when you get to a stopping point,
8   can we take a short break?
9        MS. PERALES:  Yes, let's take a short
10  break right now because I'm sort of coming to the end.
11       (Recess from 4:33 p.m. to 4:40 p.m.)
12  Q.   (BY MS. PERALES) Based on your previous
13  testimony with Ms. Westfall on incidents of voter fraud,
14  would it be correct to say that you cannot specifically
15  remember an incident of impersonation voter fraud other
16  than the one that you mentioned earlier that you talked
17  about happening recently in Tarrant County?
18  A.   In terms of knowing the specifics and the
19  details of any other event, as I sit here today, I would
20  say, yes.  Obviously, I think the opposition to the
21  legislation's characterization of those incidents as
22  being infrequent or uncommon or language like that is a
23  concession on their part that it does occur to some
24  extent, and when you consider the political desire on
25  the part of people I represent to have the legislation

243

1   and a concession that it occurs to some extent, then it
2   really at that point becomes academic in trying to
3   quantify the extent to which it occurs.  It really
4   doesn't matter at that point because we have close
5   elections, and so if it occurs even infrequently and
6   your constituents want you to do it, then there's a
7   reason to do it.
8   Q.   Do you have any information showing that any
9   particular incident of impersonation fraud ever happened
10  with respect to more than one voter in a particular
11  election?
12  A.   I don't -- I just don't -- I can't cite you to
13  any that I can -- I mean, I think the one I talked about
14  in south Texas involved more than one voter, but I do
15  not know whether that ultimately was determined to have
16  been multiple instances of in-person voter fraud or not.
17  I think there were allegations of that.  I don't know
18  whether those allegations were proven to be correct.
19  Q.   Was that also a mix of allegations related to
20  mail ballots?
21  A.   No.  I think that involved in-person fraud
22  because we were certainly honing in on that type of
23  voter fraud.
24  Q.   Was that City of McAllen or Progresso; do you
25  recall?

244

1   A.   Progresso sounds right.
2   Q.   And it's your recollection that with respect to
3   Progresso, there was more than one allegation of
4   impersonation voter fraud?
5   A.   I thought there was.  Yeah, my sense was that
6   it was sort of a -- again, I'm working off of
7   recollection here, but there was allegations of, you
8   know, people doing it in an organized manner and not
9   just one person going out and doing something wild and
10  crazy and completely independently.
11  Q.   Do you know if Progresso is a big city or a
12  little city?
13  A.   I presume it's a little city.
14  Q.   Aside from Progresso can you think of any other
15  information that you ever learned of a voter
16  impersonation incident in a particular election that
17  involved more than one person?
18  A.   I bet if you read the John Fund book, you'll
19  get some evidence of that.
20  Q.   Did you read the John Fund book in 2009?
21  A.   I don't remember.  I may have read portions of
22  it.  I may have read the whole thing.  I don't remember.
23  Q.   Wasn't the John Fund book about a different
24  state than Texas?
25  A.   I this it's about the nation.  It's about voter



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                    June 1, 2012

245

1   fraud nationwide and about voter ID.  I think there's
2   some mention of Texas in that book.
3       Q.  Do you recall whether he presented any specific
4   examples of impersonation voter fraud happening more
5   than one time in a particular election?
6       A.  I think he did.  I could be wrong, but I think
7   he did.  Certainly in other -- you know, if not in
8   Texas, in other states.
9       Q.  Okay.  I wanted to ask you a couple of
10  questions about the bill that you were looking at
11  earlier that you introduced in 2011 requiring
12  documentary proof of citizenship for voter registration.
13  Do you remember that?
14      A.  Yes.
15      Q.  Did you ever introduce a bill requiring
16  documentary proof of mental capacity for people who are
17  registering to vote?
18      A.  I don't recall doing that.
19      Q.  Did you ever introduce a bill requiring
20  documentary proof of age for persons registering to
21  vote?
22      A.  No.
23      Q.  Did you ever introduce a bill requiring
24  documentary proof of residence for persons applying to
25  register to vote?

246

1       A.  I don't believe so.
2       Q.  Would it be fair to say then that with respect
3   to bills that you've introduced regarding eligibility
4   requirements for voter registration, that the only bills
5   you've ever introduced had to do with documentary proof
6   of citizenship?
7       A.  Probably.
8       Q.  Why only citizenship?  You said earlier people
9   can lie.  They can lie about their age, their sanity,
10  their residence, their citizenship.  Why did your bill
11  only focus on citizenship?
12          MR. FREDERICK:  Objection.  Calls for
13  legislative privilege.  Instruct you not to answer.
14      Q.  I'll go at it another way.  Would it be fair to
15  say that with respect to communications from your
16  constituents that the overriding concern with respect to
17  voter eligibility was on US citizenship?
18      A.  Probably.
19      Q.  And you were responding to your constituent
20  concerns when you introduced the bill on documentary
21  proof of citizenship.
22          MR. FREDERICK:  Object based on
23  legislative privilege.  Why you acted is privileged.
24  I'll instruct you not to answer.
25      Q.  You mentioned earlier today about an incident

247

1   of impersonation voter fraud in Tarrant County with
2   respect to a precinct chairman.  Do you recall that?
3       A.  Yes.
4       Q.  That's pretty close to home for you, right?
5       A.  Yes.
6       Q.  Did you read it in the local papers?
7       A.  Yes.
8       Q.  Do you recall that the chairman had arranged
9   for her son to vote impersonating her husband?
10      A.  I think that's right.
11      Q.  Do you know whether the son used a voter
12  registration certificate or whether he used ID where he
13  may have had the same name as his dad?
14      A.  I don't know.
15      Q.  I'll have a junior.  I'll share with you, so my
16  husband and my son have the same name, and I suppose one
17  could go in with the other one's ID.
18      A.  Don't do it.
19      Q.  Don't, no.  So it's possible, isn't it, that if
20  the son had used the ID -- his own ID and he had the
21  same name as his dad, that that kind of voter
22  impersonation would not be fixed by SB14?
23          MR. FREDERICK:  Objection.  Calls for
24  speculation.  You may answer.
25      A.  Say that one more time.

248

1       Q.  It's possible, isn't it, that if in that
2   instance of impersonation voter fraud if the son had
3   been using his driver's license to vote under his dad's
4   name, they were the same name, that that fraud would not
5   have been prevented by SB14?
6       A.  It seems to me that's the kind of fraud that
7   would be prevented by SB14 because presumably he looks
8   different than his dad.
9       Q.  Oh, but if his name matched his dad's name on
10  the rolls and he had an ID showing him with his dad's
11  name, then SB14 would not have been able to prevent that
12  fraud.
13      A.  I guess not, yeah.
14      Q.  But, in fact, in Tarrant County, the fraud was
15  identified, wasn't it, because dad showed up later in
16  the day to vote in the very same precinct.
17      A.  Right.
18      Q.  So because you sign in to vote, they were able
19  to tell under the current system that someone had
20  already voted under his name.
21      A.  Right.
22      Q.  So SB14 in a sense is superfluous because the
23  voter fraud was detected.
24          MR. FREDERICK:  Objection.  Assumes facts
25  not in evidence.  Calls for speculation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Todd Smith                                                     June 1, 2012

249

1    A.   In that instance perhaps.
2    Q.   Okay.  Would you also agree that if Ms. James,
3    that was her name, had used -- had actually used that
4    voter certificate, that she would have had access to her
5    husband's voter certificate by virtue of being in the
6    same household as him?
7         MR. FREDERICK:  Objection.  Calls for
8    speculation.  You may answer.
9    A.   Say it one more time.
10   Q.   Ms. James, the lady precinct chairwoman, by
11   virtue of living with her husband would have had access
12   to his voter certificate because they shared the same
13   home, that, otherwise, in order to secure somebody's
14   voter certificate, you are either going to have to steal
15   it from them or buy it from them or in some way get
16   ahold of it from somebody.
17   A.   Sometimes they're mailed to you because it went
18   to a prior tenant who used to live there that you now
19   know is in New York.
20   Q.   So if you accidentally ended up with somebody
21   else's voter certificate though, that would certainly
22   not be because you were sort of some conspiracy to cast
23   an illegal vote.
24   A.   No.
25   Q.   You had talked earlier in your deposition about

250

1    the fact that there's probably some very small number of
2    people who lack photo ID and that you basically
3    presented that proposition, and I was curious --
4    A.   Who lacked a driver's license.  I don't know
5    that we ever really were able to determine who didn't
6    have -- how many people of the 5 or 6 percent, whatever,
7    2 percent, whatever it is, that don't have a driver's
8    license, what proportion of those have some other form
9    of photo ID that would be acceptable on these list.
10   Q.   So with respect to these people, did you ever
11   in your mind come to an idea of who they might be, what
12   their personal circumstances might be?
13   A.   People who don't drive.
14   Q.   And who are the people who don't drive?
15        MR. FREDERICK:  Objection.  Vague.
16   Objection.  Calls for speculation.  You may answer.
17   A.   Yeah.  I don't know, but I presume very poor
18   would be prominent among the list of people who use
19   public transportation.  Perhaps the very elderly,
20   although -- Don't they have a Social Security or
21   Medicaid Medicare photo ID?  You don't get a photo ID?
22   I thought senior citizens had something, but -- So those
23   are the ones I can think of, the elderly that don't
24   drive and poor.
25   Q.   How about out-of-state college students who

251

1    might not have a Texas driver's license?
2    A.   Certainly --
3         MR. FREDERICK:  Objection.  Vague.
4    A.   -- would be among that group of people.
5         MS. PERALES:  Can I have a one-minute
6    break?  I think I'm done.
7         (Recess from 4:51 p.m. to 4:54 p.m.)
8         MS. PERALES:  I reserve the remainder of
9    my questions and save the remainder for trial and pass
10   the witness to Mr. Frederick.
11        MR. FREDERICK:  I reserve my questions for
12   the time of trial.
13        (Deposition concluded at 4:54 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

252

1         CHANGES AND SIGNATURE
2    RE:  STATE OF TEXAS VS. TEXAS STATE CONFERENCE OF NAACP
     BRANCHES, et al
3
     PAGE   LINE   CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12     I, TODD SMITH, have read the foregoing deposition
     and hereby affix my signature that same is true and
13   correct, except as noted above.
14
15                  _____
                    TODD SMITH, Witness
16   THE STATE OF _____ )
     COUNTY OF _____ )
17
18     Before me, _____, on this day
     personally appeared TODD SMITH, known to me (or proved
19   to me under oath or through _____ )
     (description of identity card or other document) to be
20   the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that they executed the
21   same for the purposes and consideration therein
     expressed.
22     Given under my hand and seal of office this _____
23   day of _____, _____.
24
                    _____
25                  Notary Public in and for the State
                    of _____.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com