Joe Strausiii                                             June 11, 2012

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS,              )
          Plaintiff,         )
                             )
V.                           )
                             )
ERIC H. HOLDER, JR.,         )
in his official capacity     )
as Attorney General of       )
the United States,           )
          Defendant.         )
                             )
ERIC KENNIE, et al.,         )
  Defendant-Intervenors,     )
                             )
TEXAS STATE CONFERENCE       )   CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al.,   )   (RMC-DST-RLW)
  Defendant-intervenors,     )   Three-Judge Court
                             )
TEXAS LEAGUE OF YOUNG        )
VOTERS EDUCATION FUND, et al.,)
  Defendant-Intervenors,     )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al.,              )
  Defendant-Intervenors,     )
                             )
VICTORIA RODRIGUEZ, et al.,  )
  Defendant-Intervenors,     )
```

ORAL DEPOSITION OF
SPEAKER JOE STRAUS, III
JUNE 11, 2012

          ORAL DEPOSITION OF SPEAKER JOE STRAUS, III, produced
as a witness at the instance of the Defendant, and duly sworn,
was taken in the above-styled and numbered cause on the 11th day
of June, 2012, from 9:35 a.m. to 4:10 p.m., before Amy C. Kofron,
CSR in and for the State of Texas, reported by machine
shorthand, at the offices of the United States Attorney, 816
Congress Avenue, Austin, Texas, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record or
attached hereto.

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF AND THE WITNESS:
   Mr. Patrick Sweeten
   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
   P.O. Box 12548
   Austin, Texas 78711-2548
ALSO FOR THE WITNESS:
   Judge Thomas Phillips
   Mr. Jesse Ancira
   Ms. Jill Carvalho

FOR THE DEFENDANT:
   Mr. Daniel J. Freeman
   Ms. Jennifer Maranzano
   U.S. DEPARTMENT OF JUSTICE
   950 Pennsylvania Avenue NW
   NWB Room 7203
   Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS
STATE CONFERENCE OF NAACP BRANCHES AND
MEXICAN AMERICAN LEGAL CAUCUS:
   Ms. Amy L. Rudd
   DECHERT, L.L.P.
   300 West 6th Street
   Suite 2010
   Austin, Texas 78701

**Page 3**

INDEX

Appearances. . . . . . . .                    2
SPEAKER JOE STRAUS, III
   Examination by Mr. Freeman. . .            5
   Examination by Ms. Rudd. . .             184
   Examination by Mr. Sweeten. . .          201
   Further Examination by Mr. Freeman. . .  202
   Further Examination by Mr. Sweeten. . .  203
Signature and Changes. . . .                205
Reporter's Certificate. . .                 207


          UNITED STATES' EXHIBITS

NO.  DESCRIPTION                          PAGE
460  Notice of Deposition                  13
461  Drivers License Offices               20
462  Transcript Of Joe Straus, III         50
463  Rules and Precedents of the Texas House   56
464  Privilege Log                         60
465  Talking points                        69
466  Talking points                        79
467  Talking points                        91
468  E-mail from Janice McCoy             101
469  Blockbuster Application              114

**Page 4**

470  Express News Article                 143
471  Transcript of Todd Smith Deposition  147
472  Texas Tribune Article                153
473  E-mail from DSumner                  154
474  Web Mail Correspondence              164
475  Voter ID Represeatives               168
476  Conference Committee Report Form     175
477  Dallas News Article                  181


          INTERVENOR'S EXHIBITS

NO.  DESCRIPTION                          PAGE
1  Elections Committee Interim Report     188
2  Legislative Budget Board Impact Statement   192
3  Conference Committee Report Form       195
4  Bill Analysis                          196
5  Bill Analysis                          196
6  Bill Analysis                          198


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                    June 11, 2012

17

1    A.  Mostly family related.

2    Q.  Okay.

3    A.  Or as a sole proprietor in the financial services

4    business.

5    Q.  Okay.  And what types of business is your family in?

6    A.  We've been in ranching, real estate and wholesale

7    distributing mainly.

8    Q.  Okay.  Sounds like a good Texas mix.

9        And so you've discussed your two Schedule C

10   appointments in the federal government.  Do you have any other

11   participation in government outside of elected office?

12   A.  No.

13   Q.  Okay.  Any political participation?

14   A.  Over the years, yes.

15   Q.  Yes.  What is the extent of your political

16   participation?

17   A.  I've worked in various campaigns as a volunteer and in

18   various volunteer activities in -- mainly in San Antonio.

19   Q.  Have you worked specifically on any campaigns

20   as an employee or staffer?

21   A.  Yes.  When I was very young, Senator Tower's last

22   reelection campaign and then -- and Congressman Lamar Smith's

23   first campaign for Congress.

24   Q.  Okay.

25   A.  Other than that, it was strictly as a volunteer.

18

1    Q.  Were you ever involved in any policy matters as a

2    businessman, lobbying government, working for proposals or

3    working on regulations?

4    A.  Not that I recall.

5    Q.  Okay.  Have you ever made any requests for materials

6    under the Texas Open Records Act?

7    A.  I don't believe so.

8    Q.  Okay.  When did you last renew your driver's license?

9    A.  Recently.

10   Q.  When was it approximately?

11   A.  I believe it was August or September of this year.

12   Q.  Okay.  Oh --

13   A.  Or last year.

14   Q.  -- last year, yes.

15   A.  Last year, yeah.  Within a year.

16   Q.  Did you renew it in person?

17   A.  Yes.

18   Q.  And where did you go?

19   A.  San Antonio.

20   Q.  Okay.  How far was that office from your home?

21   A.  20 minutes, 30 minutes.

22   Q.  Okay.  Do you remember what the hours of that office

23   were?

24   A.  No.

25   Q.  Okay.  Do you remember what time of day you went?

19

1    A.  Sometime in the afternoon.

2    Q.  Okay.  Where are you normally during those hours?

3    A.  Oh, gosh, it varies.

4    Q.  Working in some --

5    A.  I don't have a --

6    Q.  -- capacity?

7    A.  I don't have a normal schedule.

8    Q.  That's understandable.

9    A.  Yeah.

10   Q.  But working in some capacity?

11   A.  Yes.

12   Q.  Okay.  And how did you get to the office?

13   A.  I drove.

14   Q.  Okay.  How long did you wait in line when you were

15   there?

16   A.  Quite a while.  Two -- as I recall, it was between two

17   and three hours.

18   Q.  Do you remember what documents you brought with you?

19   A.  I don't.

20   Q.  Okay.  Do you know if some driver's licenses are being

21   closed because of lack of funding or have been closed?

22   A.  I don't recall.

23   Q.  Do you know if some driver's license offices have

24   instituted reduced hours?

25   A.  I don't know.

20

1    Q.  Okay.  Do you know if there are driver's license

2    offices in every county in Texas?

3    A.  I'm not aware.

4    Q.  Do you have a rough idea of how many driver's license

5    offices there are in Texas as a whole?

6    A.  I don't know.

7    Q.  Okay.  Do you know how many there are in Bexar County?

8    A.  Several.  I believe there's at least three.

9    Q.  Okay.  Why don't we just -- to refresh your

10   recollection on this.

11       MR. FREEMAN:  This will be marked U.S. 461.

12       (Exhibit No. 461 marked)

13   Q.  And if you could take a quick look at that document

14   and --

15   A.  Okay.

16   Q.  -- tell me what it is.

17   A.  Uh-huh.

18   Q.  What is that document?

19   A.  It says Driver License Offices.

20   Q.  And do you see how many offices there are in Bexar

21   County?

22   A.  Looks like four.

23   Q.  And do you see if there are some offices that are

24   closed temporarily?

25   A.  In Bexar County, no.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                          June 11, 2012

21

1    Q.  In the State of Texas as a whole?
2    A.  Yes.
3    Q.  And how many House districts are there in Bexar
4    County?
5    A.  Ten.
6    Q.  Okay.  So there are -- am I correct that there are
7    more House districts than there are driver's licenses in the
8    county?
9    A.  Yes.
10   Q.  Are you aware of whether there's a particular
11   driver's license station in the Capitol Annex?
12   A.  I've -- I believe someone has told me about it, but
13   I --
14   Q.  Do you know --
15   A.  -- haven't been there.
16   Q.  Do you know how long the delays are there?
17   A.  I have no idea.
18   Q.  Okay.  Do you know if that office is listed on the DPS
19   web site or other public materials?
20   A.  I'm not aware.
21   Q.  Do you know why there would be a DPS station inside
22   the Capitol?
23   A.  No.
24   Q.  Okay.  Do you have a copy of your birth certificate?
25   A.  Do I have one?

22

1    Q.  Uh-huh.
2    A.  Yes.
3    Q.  Do you know where you would get a copy if you lost
4    yours?
5    A.  I've done it before.  I'm trying to remember.  County?
6    County courthouse, I believe.  I'm not sure.
7    Q.  It's not a quiz.  It's just --
8    A.  I don't --
9    Q.  -- to the extent of your knowledge.
10   A.  No, I don't.
11   Q.  Okay.
12   A.  I know.  But I can't remember.
13   Q.  Do you know how much it would cost?
14   A.  I don't.
15   Q.  Okay.  Do you know how long it would take?
16   A.  No.
17   Q.  And how would you go about finding out, if you had to
18   find out?
19   A.  I don't know.
20   Q.  Okay.  What ID are you carrying on your person today?
21   A.  ID?
22   Q.  Uh-huh.
23   A.  Several.  Texas driver's license.
24   Q.  Okay.  Do you -- well, let me try and narrow it down.
25   What photo ID do you have on your person today?

23

1    A.  Texas driver's license.
2    Q.  Anything else?
3    A.  Probably one from -- from the state.
4    Q.  Okay.  The -- a legislator ID?
5    A.  Capitol, yes.
6    Q.  Okay.  Do either of those establish your citizenship?
7    A.  I don't believe so.
8    Q.  To the best of your knowledge?
9    A.  I don't -- I wouldn't -- I don't think so.
10   Q.  Okay.  And in terms of ID that you have but aren't
11   carrying on your person, do you have a passport?
12   A.  A passport?
13   Q.  Yes.
14   A.  Yes.
15   Q.  Do you have a license to carry concealed?
16   A.  Do I have to tell you that?  I'm kidding.  No, I
17   don't.
18   Q.  If you --
19   A.  I don't.
20   Q.  Honestly, if -- it's not an important enough question
21   that I would press you if you didn't --
22   A.  Yeah.
23   Q.  -- want to answer.
24   A.  I do not have one.
25   Q.  Okay.  And do you have a military ID of any kind?

24

1    A.  No.
2    Q.  Okay.  And your legislator ID, does that establish
3    your identity for purposes of entering the Capitol?
4    A.  Yes.
5    Q.  Okay.  What is the drinking age in Texas?
6    A.  21.
7    Q.  Okay.  Are you aware of individuals having ever
8    created counterfeit photographic identification cards in Texas?
9         MR. SWEETEN:  Objection, vague and compound.
10   You can answer.
11        THE WITNESS:  I'm sorry?
12        MR. SWEETEN:  I objected to the question as vague
13   and compound --
14        THE WITNESS:  Oh.
15        MR. SWEETEN:  -- but you can answer the
16   question --
17        THE WITNESS:  Oh.
18        MR. SWEETEN:  -- if you've heard about it.
19   A.  I've heard -- I've heard about it.
20   Q.  Okay.  And have you heard of individuals creating
21   counterfeit photographic identification cards for the purpose of
22   obtaining alcohol?
23        MR. SWEETEN:  Same objection.
24   Go ahead.  You can answer, if you can.
25   A.  I've heard of it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

25

1    Q.  Are you aware of any convictions for fake IDs in the
2    State of Texas in the last 20 years related to alcohol purposes?
3    A.  I'm not aware specifically, no.
4    Q.  Okay.  Are you aware of any investigated incidents
5    concerning the use of fake IDs in Texas?
6    A.  I'm not specifically aware, no.
7    Q.  Okay.  Are you aware of what the security features are
8    on a Texas driver's license?
9    A.  No.
10   Q.  Okay.  Are you aware of whether S.B. 14, the
11   photographic voter identification bill that we will be
12   discussing at length later, provides financing for polling
13   places to have black lights to test the validity of a Texas
14   driver's license?
15        MR. SWEETEN:  You can testify about what's in the
16   text of the bill.  In answering the question, don't reveal any
17   sort of thought processes and mental impressions about the bill
18   that you have.  But you can answer --
19        THE WITNESS:  Okay.
20        MR. SWEETEN:  -- based on the text of the bill.
21   A.  My answer to that is I don't -- I don't recall.
22   Q.  Okay.  And are you aware of whether there's funding
23   relating to barcode scanners for testing the validity of a Texas
24   driver's license?
25   A.  I don't --

26

1        MR. SWEETEN:  Same instruction.
2    A.  I don't recall.
3    Q.  Okay.  Have you ever seen a U.S. citizenship
4    certificate?
5    A.  I don't recall seeing one.
6    Q.  Okay.  Have you ever seen a tribal ID?
7    A.  No.
8    Q.  With regard to the citizenship certificate, are you
9    aware of what photo they usually contain?
10   A.  No.
11   Q.  Okay.  How much does gas go for in San Antonio these
12   days?
13   A.  Regular?
14   Q.  Sure, regular.
15   A.  $3.66.
16   Q.  Okay.  And when was the last time you voted?
17   A.  In the primary.
18   Q.  Okay.  How long ago was that, just for the record?
19   A.  I voted early.  The primary was -- so it must -- it
20   must have been mid May.
21   Q.  Okay.  And how far is the early voting center from
22   your house?
23   A.  Oh, the closest one is a couple of miles, three miles
24   maybe.
25   Q.  So less than --

27

1    A.  Two or three miles.
2    Q.  Less than 20 minutes away?
3    A.  Yes.
4    Q.  Less than 10 minutes away?
5    A.  Probably 10 minutes, yeah.
6    Q.  Okay.  And when is the last time you voted on election
7    day?
8    A.  I don't remember.
9    Q.  Okay.
10   A.  I usually vote early.
11   Q.  And if you were to vote on election day, do you know
12   where your precinct is?
13   A.  Yes.
14   Q.  And how far is the precinct from your house?
15   A.  Not far.
16   Q.  Less than five minutes?
17   A.  Yes.
18   Q.  Okay.
19   A.  Although this year my precinct location was closed.
20   Q.  Okay.
21   A.  So we were rerouted to another location, but still
22   within ten minutes of my house.
23   Q.  Okay.  How do you usually communicate with your
24   legislative colleagues in terms of the medium you use?  Phone?
25   E-mail?

28

1    A.  Typically by phone.
2    Q.  Okay.  How often during a week of legislative session
3    do you communicate via e-mail?
4    A.  Less often than when we're not in session.
5    Q.  Okay.  More than ten times a week?
6    A.  Communicate with members?
7    Q.  With your legislative colleagues, yes.
8    A.  Oh, probably fewer than ten times a week, yeah.  When
9    we're in session, I see them personally.
10   Q.  Okay.  More than five?
11   A.  I don't -- I don't count.  I don't know.
12   Q.  Okay.  Just an approximation.
13   A.  Yeah.  Not very often.
14   Q.  Okay.  Do you communicate with other members via text
15   message?
16   A.  Yes.
17   Q.  And do you communicate with your staff via e-mail
18   during the session?
19   A.  Occasionally.
20   Q.  Okay.  Text message?
21   A.  Yes.
22   Q.  Okay.  When you e-mail with your staff during the
23   session, do you use your official account or your personal
24   account?
25   A.  Both.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                      June 11, 2012

33

1   Q. Okay. Do any of your staff serve as your attorney for
2   the purpose of providing you with legal advice?
3   A. Say that again.
4   Q. Do any of your staff serve as your attorney for the
5   purpose of providing you with legal advice?
6   A. I assume so, yes.
7   Q. And who would that be?
8   A. Right now Jesse Ancira.
9   Q. Okay.
10  A. Uh-huh.
11  Q. Anyone besides your general counsel?
12  A. Currently?
13  Q. Uh-huh.
14  A. I suppose any of the attorneys who are on staff do.
15  Q. And how do you distinguish between when they're
16  providing you with legal advice and when they're providing you
17  with policy advice?
18  A. I don't know how to make that distinction.
19  Q. Okay.
20  A. I suppose we -- I don't -- I don't know how to make
21  that distinction.
22  Q. Okay. So you said that you also have staff who are in
23  charge of various administrative matters, correct?
24  A. Yes.
25  Q. Is there one particular person on your staff who's in

34

1   charge of recordkeeping?
2   A. Hmm. One person in charge of recordkeeping? I'm -- I
3   delegate that to the chief of staff, and it would be at his
4   direction.
5   Q. Okay. So it's delegated down, but you're not sure
6   exactly where?
7   A. That's right.
8   Q. Okay. How are documents maintained in your office?
9   A. Again, I delegate -- I delegate that.
10  Q. Okay. So if you were looking for documents on a
11  particular bill, you'd ask someone for them?
12  A. I would ask someone, yes.
13  Q. Okay. Do you know if you have a record retention
14  policy?
15  A. I'm sure we do, but --
16  Q. Okay.
17  A. -- but again, I delegate that.
18  Q. Okay. Do you know if you maintain files specific to
19  particular pieces of legislation?
20  A. I don't know.
21  Q. Okay. And you said earlier that some search was
22  conducted for documents related to this litigation. Do you know
23  when it was conducted?
24  A. I don't.
25  Q. Do you know if at any time someone searched your

35

1   e-mail using a set of key terms provided by the Office of the
2   Attorney General?
3   A. I don't know.
4   Q. Do you save your text messages?
5   A. Typically not.
6   Q. Okay. Do you routinely specifically delete them?
7   A. To save space, sometimes I do.
8   Q. Okay. So it's not a routine one way or the other,
9   just --
10  A. No.
11  Q. -- haphazard?
12  A. Uh-huh.
13  Q. Okay. Me too.
14     What district do you represent?
15  A. District 121.
16  Q. Okay. When were you first elected?
17  A. In 2005.
18  Q. And that was a special election to fill an open seat,
19  correct?
20  A. That's correct.
21  Q. How many republican candidates were there in that
22  election?
23  A. There were two.
24  Q. And how did the republican candidates distinguish
25  themselves?

36

1   A. How did they distinguish themselves?
2   Q. In terms of the campaign, positions, background,
3   et cetera.
4   A. I don't recall how we distinguished ourselves. There
5   were four candidates: One independent, as I remember, one
6   democrat and two republicans.
7   Q. Okay. Do you recall what issues you campaigned on
8   that year?
9   A. Not specifically.
10  Q. Okay. Is District 121 a safe seat for republicans
11  under the -- well --
12  A. I would certainly hope so this year.
13  Q. Okay. Well, let's, I guess, start under the map from
14  which you were elected in 2010. Is it a relatively safe seat
15  for republicans?
16     MR. SWEETEN: Calls for speculation.
17  Q. To the extent of your knowledge.
18  A. It has -- the seat has elected republicans for many
19  years.
20  Q. Okay. And have you ever released Spanish language
21  campaign materials?
22  A. I don't believe so.
23  Q. Have you ever done Spanish language ads?
24  A. I've done very little advertising --
25  Q. Okay.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                                    June 11, 2012

37

1  A. -- until recently, and it was a -- I don't -- I don't
2  think it -- I don't think it was in Spanish, no.
3  Q. Okay.
4  A. I may have -- actually, I may have -- I can't
5  remember. I might have.
6  Q. Might have? Not certain?
7  A. Yeah.
8  Q. That's fine.
9     Have you ever campaigned -- actually, excuse me.
10    In your first election --
11  A. Uh-huh.
12  Q. -- did you campaign at all on issues related to voter
13 fraud?
14        MR. SWEETEN: You can talk about public speeches
15 you made in the campaign.
16  A. Yeah. I don't -- I don't recall. I believe my -- the
17 issues I campaigned on were generally fiscal issues.
18  Q. Okay. Did you have any republican challengers in
19 2006?
20  A. No.
21  Q. 2008?
22  A. No.
23  Q. 2010?
24  A. No.
25  Q. This year?

39

1  Q. And again, you're not certain if any of those were in
2  Spanish?
3  A. I don't recall any in Spanish.
4  Q. Okay. What issues did you campaign on?
5  A. General record of the legislature.
6  Q. Okay. Anything related to voter ID?
7  A. Perhaps, as part of a list of accomplishments.
8  Q. Okay. Anything specific to voter ID other than as an
9  accomplishment?
10  A. I don't recall.
11  Q. Anything about voter fraud?
12  A. I don't recall.
13  Q. Have you ever had any general election opponent,
14 democratic or libertarian, who got more than 40 percent in the
15 general election?
16  A. No.
17  Q. Okay. Then we can skip that.
18     Was immigration an issue at all in the 2010 -- or
19 excuse me -- in the primary that just happened in 2012?
20  A. Immigration?
21  Q. Immigration.
22        MR. SWEETEN: Objection, vague.
23        Are you asking about his campaign or just
24 generally was immigration an issue?
25  Q. Did either you or your opponent raise the issue of

38

1  A. Yes.
2  Q. And that election just happened, and I believe you
3  won. Am I correct?
4  A. Correct.
5  Q. Congratulations.
6  A. Thank you.
7  Q. What was the -- what was the spread, the result in
8  terms of --
9  A. Over and --
10  Q. -- percentages?
11  A. Over and under?
12  Q. Over and under 50 --
13  A. Yeah.
14  Q. -- is what matters.
15  A. Yeah. It was -- I believe it was 63.
16  Q. Okay. And you said that previously you hadn't done
17 much in the way of advertising, but you had this cycle; is that
18 correct?
19  A. That's correct.
20  Q. Did you do TV?
21  A. Yes.
22  Q. Radio?
23  A. Yes.
24  Q. Mailers?
25  A. Yes.

40

1  immigration?
2  A. My opponent might have.
3  Q. Did you?
4  A. I don't -- I don't recall. No, I don't think so.
5  Q. Do you remember what your opponent said related to
6  immigration?
7  A. I believe he cited disappointment in the lack of an
8  immigration related bill passing the legislature.
9  Q. Do you remember, was that a specific bill?
10        MR. SWEETEN: That he cited?
11        MR. FREEMAN: Yes.
12        MR. SWEETEN: You can answer as phrased.
13  A. I believe he was disappointed that the Sanctuary
14 Cities bill did not pass.
15  Q. Okay. And for the record, what was your opponent's
16 name?
17  A. I try to not remember. Matt -- Matt Beebe.
18  Q. Okay.
19  A. Yeah.
20  Q. In each of your elections, have different numbers of
21 voters turned out in terms of the total number of ballots cast?
22  A. I'm sure.
23  Q. What factors were -- did you perceive to be related to
24 the different levels of turnout, to the extent of your
25 knowledge?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                            June 11, 2012

41

1     A.  I suppose whether or not the election was a
2   presidential election year, typically.
3     Q.  Anything else?
4     A.  No.
5     Q.  Okay.  Why did you initially decide to run?
6     A.  There was an open seat in the legislature.
7     Q.  Were you encouraged to run by anyone?
8     A.  Certain friends who had thought over the years that I
9   might have an interest in further public service.
10    Q.  Did you have any hired campaign staff in the first
11  election?
12    A.  Yes.
13    Q.  And who were they?
14    A.  A fellow named James Barry is the only one that I
15  think was hired.
16    Q.  Okay.  Did you have any consultants?
17    A.  Yes.
18    Q.  And who were they?
19    A.  Frank Guerra.
20    Q.  Okay.  Anyone else?
21    A.  No, not that I remember.
22    Q.  Did you have any consultants in this last primary?
23    A.  Yes.
24    Q.  And who were they?
25    A.  There's a list.  I don't --

42

1     Q.  Is it a list that you recall?
2     A.  You know, I could get it for you.  I don't --
3     Q.  It's okay.  Any highlights?
4     A.  Frank Guerra again.
5     Q.  Okay.
6     A.  But -- and others.
7     Q.  Okay.  Did you have any particular major donors or
8   bundlers in the first election?
9     A.  No.
10    Q.  Any in the primary you just went through?
11    A.  Not specific to the primary.
12    Q.  Okay.  Any major bundlers or donors who have supported
13  you in the last couple of years?
14    A.  I have a large number of contributors that I've
15  attracted over the years.
16    Q.  Okay.  Any major endorsements in the last primary?
17    A.  No.
18    Q.  Okay.  How would you describe the district that you
19  just ran in?  So, I guess, the interim district --
20    A.  When you say major endorsements, I mean, I had a lot
21  of endorsements, but I'm not sure that there was any
22  blockbuster.
23    Q.  Okay.  Anything that you consider particularly
24  notable?  And if --
25    A.  No.

43

1     Q.  -- if naming one would offend the others --
2     A.  No.
3     Q.  -- it's okay.
4     A.  No.
5     Q.  All right.  How would you describe the district that
6   you just ran in, which is, I guess, the interim district by the
7   San Antonio court?
8     A.  I'm not sure I can --
9     Q.  In terms of -- well, in terms of the economics of the
10  district?
11    A.  I guess you -- I mean, you could look at the
12  demographics of the district.
13    Q.  I mean, is it relatively affluent for Texas or for
14  Bexar County?
15    A.  Relatively.
16    Q.  Okay.
17    A.  It's not -- I wouldn't say it's the most affluent in
18  Bexar County.
19    Q.  Okay.  And is it -- am I correct that it's northern
20  Bexar County?
21    A.  Yes.
22    Q.  Okay.  And what are the demographics like in terms of
23  is it relatively Anglo, relatively Latino?
24    A.  I can't remember.
25    Q.  Okay.

44

1     A.  I know it's -- I don't recall exactly what the
2   breakdown is.  I've seen it, but I don't remember.
3     Q.  For Bexar County, is it relatively Anglo?
4     A.  I would assume it's relatively -- a relatively high
5   percentage of Anglos for Bexar County, but I don't remember the
6   specifics.
7     Q.  Is it relatively similar to the district that you had
8   run from previously, or has it been substantially changed?
9     A.  I don't remember.
10    Q.  Okay.  So how about the district that you had run from
11  previously; is that relatively affluent?
12    A.  I would say it's probably similar to the district as
13  it is now, maybe slightly less affluent than the recent
14  alterations.
15    Q.  Is the Hispanic community in your old district more or
16  less affluent than the Anglo community?
17    A.  I don't know.  I would -- I don't know.
18    Q.  Okay.
19    A.  I would assume it would be -- mirror the demographics
20  of the county.
21    Q.  Okay.
22    A.  Don't know.
23    Q.  Well, do you know if in the county as a whole the
24  Hispanic community is more or less affluent than the Anglo
25  community?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                          June 11, 2012

45

```
1    A.  I would assume less.
2    Q.  Is the driver's license office that you went to a
3  little bit less than a year ago, is that in your district?
4    A.  No.
5    Q.  Is it on a mass transit route?
6    A.  I don't know.
7    Q.  Okay.  Are there sidewalks nearby, to the best of your
8  recollection?
9    A.  I think so.
10   Q.  Okay.  All right.  So let's move into legislative
11 procedure then unless -- are you okay to keep going for a bit
12 longer?
13   A.  Sure.
14   Q.  Okay.  So as a general matter, do you believe that
15 compliance with the Texas Constitution is an important
16 consideration in the law-making process?
17        MR. SWEETEN:  Okay.  When you're answering these
18 questions, I don't want you to reveal your thought process, your
19 mental impressions about specific legislation.  Okay?  If you're
20 answering the question, you're not doing so, then I will let you
21 answer at a general matter.  But do not reveal specific
22 mental processes or impressions or motivations with respect to
23 legislation when answering the question.
24        THE WITNESS:  Okay.
25        MR. FREEMAN:  Do you need to have the question
```

47

```
1    A.  I rely on legal counsel.
2    Q.  Okay.  When you say legal counsel, do you mean the
3  general counsel in your office?
4    A.  Or the parliamentarian or other House or legislative
5  counsel.
6    Q.  By legislative counsel, do you mean the Texas
7  Legislative Council?
8    A.  And others, yes.
9    Q.  Do they -- does the Texas Legislative Council offer
10 formal opinions concerning compliance with the Texas
11 Constitution, to the extent of your knowledge?  If you don't
12 know, it's okay.
13   A.  I'm not a lawyer, so I -- I don't -- sometimes I'm
14 listening for things I shouldn't be answering because I don't
15 know.
16   Q.  And that's fine.  And I'll just say as a general
17 matter, if you feel that you have to look over to your general
18 counsel --
19   A.  Yeah.
20   Q.  -- because you don't know --
21   A.  Okay.  I don't know.
22   Q.  -- just saying you don't know --
23   A.  I don't know.  I don't.
24   Q.  -- is absolutely fine.
25   A.  I don't know.
```

46

```
1  read back to you?
2        THE WITNESS:  Sure.
3        (Requested portion was read)
4    A.  Yes.
5    Q.  How do you ensure compliance with the Texas
6  Constitution when you're working on developing a bill?
7        MR. SWEETEN:  Same instruction.  Don't reveal
8  matters of legislative privilege, your thought processes, your
9  analysis when you're -- about specific legislation.  If in
10 answering the question you're not doing that and can answer as a
11 general matter, I'll let you answer the question.
12   A.  Okay.  I rely on legal counsel.
13   Q.  Okay.  Any other steps that you take?
14   A.  No.
15   Q.  Do you believe that compliance with federal law is an
16 important consideration in the law-making process?
17        MR. SWEETEN:  Same instruction.
18   A.  Yes.
19   Q.  And what steps do you take to ensure compliance with
20 federal law when you're working on developing a bill?
21        MR. SWEETEN:  Same instruction.  As to a specific
22 bill, don't reveal your thoughts, mental processes, motivations,
23 impressions about legislation.  If you can answer the question
24 without doing that, you can answer it.  Otherwise, do not answer
25 it.
```

48

```
1    Q.  That's fine.  Again, it's not a pop quiz.  If you
2  don't know an answer, that's an answer.
3    A.  Okay.
4    Q.  Not that I want you to say you don't know, but you
5  understand.
6        Last one of these questions.  Do you believe that
7  compliance with the federal Voting Rights Act is an important
8  consideration in the law-making process?
9        MR. SWEETEN:  If you can answer the question
10 without revealing your thoughts and mental impressions about
11 specific legislation, I'll allow you to do so as a general
12 matter.  Do not reveal your mental impressions or thought
13 processes regarding specific legislation in answering the
14 question.
15   A.  I would -- I would say I'd consider complying with
16 federal law is important.
17   Q.  Okay.  And what steps do you take, as a general
18 matter, not related to any specific legislation or thoughts or
19 mental impressions, how do you ensure that compliance with the
20 Voting Rights Act occurs when you're developing a bill?
21        MR. SWEETEN:  Same instruction.
22   A.  Yeah.  I -- I rely on legal advice.
23   Q.  Okay.  And just a quick question:  You said the
24 parliamentarian provides advice as well.  Is that with regard to
25 the procedures of the Texas House or in some way with the
```



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                          June 11, 2012

49

1   legality of -- the substantive legality of bills?
2       A.  Mainly with the procedures of the Texas House.
3       Q.  But any -- any advice outside, legal advice outside of
4   those procedures?
5       A.  Well, he is a lawyer, but typically, just for
6   advice -- procedural advice and rules of the House.
7       Q.  Okay.  And is the parliamentarian a member of the
8   Speaker's staff, or does the parliamentarian work for the House
9   as a whole?
10      A.  Works for the House.
11      Q.  Okay.  Who is the current parliamentarian?
12      A.  Chris Griesel.
13      Q.  Okay.  But am I correct that Ms. Davis used to be the
14  parliamentarian of the House?
15      A.  That's correct.
16      Q.  Okay.  Okay.  So we had previously discussed that you
17  were deposed during the redistricting preclearance litigation,
18  Texas V. United States, correct?
19      A.  Correct.
20      Q.  And you testified under oath during that deposition,
21  correct?
22      A.  Yes.
23      Q.  Okay.  And you didn't assert a legislative privilege
24  in that deposition, correct?
25          THE WITNESS:  Did I?

50

1           JUDGE PHILLIPS:  If you remember.
2       A.  I don't --
3       Q.  To the extent of your recollection.
4       A.  I -- I don't --
5       Q.  If you don't --
6       A.  -- I don't remember.
7       Q.  If you don't remember, you don't remember.
8       A.  No.
9       Q.  Okay.  I'd like to put in front of you what I'd like
10  to have marked U.S. 462.
11          (Exhibit No. 462 marked)
12      Q.  And I'll represent to you that this is only a partial
13  excerpt of a far longer document.
14          Have you seen this document before?
15      A.  I don't believe so.
16      Q.  Are you able to tell from the face of the document
17  what the document is?
18      A.  Oral deposition of Texas House Speaker.
19      Q.  Okay.  Could you take a look at the end of Page 20 and
20  the beginning of Page 21?
21      A.  Okay.
22      Q.  Would it be fair to say that you explained in your
23  prior deposition that the informal powers of the speaker rest in
24  two categories, the power of appointment and control the flow of
25  legislation?

51

1       A.  Yes, I see that.
2       Q.  Is that still your testimony today?
3       A.  Yes.
4       Q.  Okay.  And if you look at Page 22, would it be fair to
5   say that you explain that your power of appointment includes the
6   power to appoint committee chairs, correct?
7       A.  That's correct.
8       Q.  Is that still your testimony today?
9       A.  Yes.
10      Q.  And would it be fair to say that you also appoint --
11  excuse me.
12          And you appoint the chairs of the standing substantive
13  committees; is that correct?
14      A.  Yes.
15      Q.  And do you also appoint the chairs of standing
16  procedural committees?
17      A.  Yes.
18      Q.  And the conference committees?
19      A.  Yes.
20      Q.  And select committees?
21      A.  Yes.
22      Q.  And if we continue to Page 23, would it be accurate to
23  say that you explained that you appoint half the membership of
24  standing substantive committees, correct?
25      A.  It's -- I believe that's right, yes.

52

1       Q.  But the other half is appointed according to so-called
2   seniority picks, correct?
3       A.  Correct.
4       Q.  Is that still your testimony?
5       A.  Yes.
6       Q.  Okay.  Can you explain the seniority picks system to
7   me?
8           MR. SWEETEN:  Don't reveal -- in answering the
9   question, don't reveal your thought processes with respect to
10  any specific --
11          THE WITNESS:  Okay.
12          MR. SWEETEN:  -- piece of legislation.  Okay?
13          THE WITNESS:  Yeah.
14          MR. SWEETEN:  If you can answer the question
15  without doing that, then you can.  Otherwise --
16          THE WITNESS:  Yeah.
17          MR. SWEETEN:  -- I'm going to instruct you not to
18  answer the question.
19      A.  We -- members at the beginning of a session fill out
20  committee request cards --
21      Q.  Uh-huh.
22      A.  -- based on their personal preferences and on their
23  seniority.
24      Q.  Okay.  And am I correct that the -- each member gets
25  one pick based on seniority where their top choice, they -- they



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                  June 11, 2012

53

1    get that automatically?
2        A.   Well --
3             MR. SWEETEN:  Same instruction.
4        Q.   If they are the most senior person who wanted that
5    slot?
6        A.   Yes.
7        Q.   Okay.  And the Elections committee is a substantive
8    standing committee, correct?
9        A.   Yes.
10       Q.   Okay.  So if a senior member wanted to be on a
11   particular substantive standing committee and they were the most
12   senior members requesting that slot, you would not be able to
13   keep him or her off that committee, correct?
14       A.   Correct.
15       Q.   You would only be able to decide that that member
16   would not be the chair or vice chair, correct?
17       A.   That's correct.
18       Q.   Okay.  However, you appoint the full membership of a
19   select committee, correct?
20       A.   Yes.
21       Q.   And there are no seniority picks for select
22   committees?
23       A.   No.
24       Q.   Okay.  And you have the power to convene a select
25   committee; is that correct?

54

1        A.   To convene one?
2        A.   Yes.
3        A.   It's -- that power is given in the rules, yes, I think
4    so.
5        Q.   Okay.
6        A.   Uh-huh.
7        Q.   Do you -- are you aware of any limitations on when you
8    may appoint a select committee?
9             MR. SWEETEN:  You can answer as general matter
10   of -- of procedure.
11       A.   No.
12       Q.   Okay.  Are there any rule-based limitations of which
13   you are aware concerning the subject matter that a select
14   committee may address?
15       A.   No.
16       Q.   Okay.  So effectively, the appointment of a select
17   committee allows the Speaker to exclude particular members from
18   the committee process addressing a particular bill, if the
19   Speaker so chose, correct?
20            MR. SWEETEN:  Same instruction.  Go ahead.
21       A.   Yes.
22       Q.   Okay.  Now, you also said in your redistricting
23   deposition that you have control over legislative matters, is
24   that correct, just the legislative process to some extent?
25       A.   I guess to some extent.

55

1        Q.   Okay.  And is that still your testimony?
2        A.   Yes.
3        Q.   Okay.  With regard to the flow of legislation, if you
4    can look at Page 26, you explain that you have the power to
5    recognize or not to recognize certain bills, correct?
6             MR. SWEETEN:  Caution the witness to take the
7    time you need to review the document --
8             MR. FREEMAN:  Yeah.
9             MR. SWEETEN:  -- he's asking about.
10       A.   Absolutely.
11       A.   Yes, the answer I gave here is accurate.
12       Q.   Okay.
13       A.   It says, you know, that the Speaker has some power of
14   recognizing certain bills or not, which is rarely ever used.
15   It's more of a consensus building among committee chairs is how
16   the flow is establish.
17       Q.   Can you explain to me what it would mean for the
18   Speaker not to recognize a bill?
19       A.   It would be extraordinary.
20       Q.   Okay.  You could, but you don't, as a general matter;
21   is that correct?
22       A.   Yes.
23       Q.   Okay.  Do you decide to which committees particular
24   bills will be referred, you or your office?
25       A.   The parliamentarian really does the -- does the

56

1    distribution to committees.
2        Q.   Okay.
3             MR. FREEMAN:  If we could try and -- well, if we
4    could have this marked as U.S. 463.
5             (Exhibit No. 463 marked)
6        Q.   And first off, are you aware of whether a separate set
7    of rules for the Texas House were published for the 82nd
8    legislature?
9        A.   Yes.
10       Q.   Okay.  And what is the document in front of you?
11       A.   Rules and Precedence of the Texas House 81st
12   Legislature.
13       Q.   Are you aware of whether the rules for the 82nd
14   legislature have been posted on the Texas House's web site?
15       A.   I would assume they are.  Don't know.
16       Q.   Okay.  If you could take a quick look at Rule 1,
17   Section 4 on Page 3.
18       A.   Okay.
19       Q.   And is it the case that Rule 1, Section 4 states that,
20   "All proposed legislation shall be referred by the speaker to an
21   appropriate standing or select committee with jurisdiction"?
22       A.   That's what it says.
23       Q.   Did that rule change in the 82nd legislature?
24       A.   I don't think so.
25       Q.   So is it possible that that's a -- a duty of the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

57

1   Speaker but one that is largely delegated?
2     A.  That's correct.
3     Q.  Okay.  I just wanted to clear that up.
4       Are there standing committees with overlapping
5   jurisdiction?
6     A.  Yes.
7     Q.  And so if a bill could arguably go before one
8   committee or another, is that your call?
9     A.  I delegate to the -- to the parliamentarian --
10    Q.  Okay.
11    A.  -- on the referral of bills.
12    Q.  Are there any bills where you ever -- let me try and
13  structure the question.
14    A.  Uh-huh.
15    Q.  Your counsel is rightfully making a little bit of
16  noise.  Let me try and rephrase that.
17      As a general matter, would you ever make the call
18  yourself if it were a more important bill and there was some
19  question as to what committee it would be referred to, without
20  addressing any specific bills or your thoughts about any
21  specific individual bills?
22        MR. SWEETEN:  You can answer the question as a
23  general matter.  Just don't reveal matters related to specific
24  legislation.
25    A.  I don't recall an instance where I had any

58

1   disagreement with the parliamentarian in the delegation of
2   that --
3     Q.  Okay.
4     A.  -- of that duty.
5     Q.  Okay.  Can you be overruled by members of the House in
6   terms of the referral of a bill to a particular committee?
7        MR. SWEETEN:  You can testify about general
8   legislative procedures.
9     A.  I don't -- I don't know.
10    Q.  Has that ever happened in -- in your --
11    A.  Hasn't happened since I've -- no.
12    Q.  Okay.  Am I correct that you also rule on points of
13  order during legislative debate?
14    A.  Yes.
15    Q.  Now, if you could turn to Page 27 of your deposition,
16  which is, again, U.S. 462.
17    A.  27?  Okay.  Uh-huh.
18    Q.  Am I correct that you explained on Page 27 that you
19  coordinate with the Lt. Governor to decide which body will act
20  first on certain bills?
21    A.  We have from time to time.
22    Q.  Is -- so that's still your testimony today?
23    A.  In certain matters, yes.
24    Q.  Are you at all involved in deciding who will carry a
25  senate bill when it comes to the House?

59

1     A.  Rarely, if ever.
2     Q.  Okay.  Do you have the power to introduce bills as
3   Speaker?
4     A.  Boy, I don't know.  I haven't.
5     Q.  Okay.
6     A.  I'm not sure.
7     Q.  You answered my next question before I even asked it.
8     A.  Yeah.
9     Q.  Do you have the power to vote on bills?
10    A.  Yes.
11    Q.  Do you have the power to vote on amendments?
12    A.  I assume so, yes.
13    Q.  Have you done so since you became Speaker?
14    A.  Very rarely.
15    Q.  Approximately how many times, to your recollection?
16    A.  I voted for the budget.  I don't recall any other
17  votes.
18    Q.  Okay.  Does the Speaker's office, as a typical
19  procedure, gather signatures of votes before a bill is released?
20        MR. SWEETEN:  You can answer as a general matter.
21    A.  Gather signatures?
22    Q.  Gather commitments to vote for a bill from individual
23  legislators.  I guess what in -- what in Washington is referred
24  to as whipping a bill.
25    A.  Oh.  That's -- typically not, no.  The various

60

1   caucuses might do that.
2     Q.  Okay.  But not the Speaker's office?
3     A.  Typically not.
4     Q.  Okay.  Do you direct your staff to develop summaries
5   of floor amendments for major bills?
6     A.  Not that I recall.
7     Q.  Okay.
8        MR. FREEMAN:  If we could mark this U.S. 464.
9        (Exhibit No. 464 marked)
10    Q.  And I'll represent to you that this is part of a
11  larger document produced by the State of Texas to the attorney
12  general on May 11th.  And it sets out documents that have been
13  withheld from the attorney general on the basis of assertions of
14  privilege.  If you could look on Page 126, which is actually
15  just the second page of the document.
16    A.  Uh-huh.
17    Q.  Do you see the first entry says, "S.B. 14 Floor
18  amendment summaries from the files of Speaker Straus"?
19    A.  I see that.
20    Q.  Are you aware of whether you ever individually
21  reviewed -- was that -- sorry.  Strike that.
22      Was that document ever transmitted to you?
23    A.  Not that I recall.
24    Q.  Okay.  And during your redistricting deposition -- I'm
25  not sure if this is in the excerpt that I provided you -- you



Joe Strausiii                                              June 11, 2012

61

1  previously testified that Gerardo Interiano was deeply involved
2  in providing -- providing substantive input concerning
3  redistricting, correct?
4     A.  He was involved in redistricting, yes.
5     Q.  Are you or your staff typically involved in providing
6  substantive input on other members' bills besides in
7  redistricting?
8         MR. SWEETEN:  Objection, vague.
9            You can answer as a general matter.
10    A.  Ask it again.
11    Q.  Are you or your staff typically involved in providing
12 substantive input on other members' bills prior to a bill being
13 released?
14        MR. SWEETEN:  Same objection and instruction.
15    A.  I -- I don't.
16    Q.  Okay.  Are you aware if your staff does?
17    A.  What was the term you used?
18    Q.  Substantive input.
19    A.  No.
20    Q.  Okay.  Before you became Speaker of the House, what
21 committees did you serve on?
22    A.  I served on Pensions and Investments.  I served on
23 Regulated Industries.  And I served on a committee that has been
24 reformulated, Civil Practices.  I'm not sure what it was called
25 back when I first started.

62

1     Q.  Okay.  What does the Civil Practices committee
2  address?
3     A.  What was it called?  What was that committee called
4  before?  Judiciary.  It was called judiciary.
5     Q.  Okay.  Yeah.
6        So is it often that non-attorneys are appointed to the
7  Judiciary committee?
8     A.  Yes.
9     Q.  Okay.  Were you chairman or vice chairman of any
10 committees?
11    A.  Oh, I was also on economic development for a while.
12    Q.  Okay.
13    A.  And the vice chair of that committee.
14    Q.  Okay.  Did you ever serve on a select committee?
15    A.  Yes.
16    Q.  Which select committee?
17    A.  There was a select committee on
18 electric -- electricity and -- and electric power.
19    Q.  Was this after the fallout from Enron?
20    A.  No.  It had more to do with capacity --
21    Q.  Okay.
22    A.  -- and projecting decades out.
23    Q.  Okay.  Am I correct that the Speaker does not serve on
24 individual committees?
25    A.  That's correct.

63

1     Q.  Okay.  I'm about to get into a new topic.  So if you'd
2  like to take a five-minute break now.
3     A.  I might go to the --
4     Q.  Okay.
5     A.  -- boys room, if that's okay.
6        MR. FREEMAN:  All right.  We can go off the
7  record.
8           (Recess 10:45 a.m. to 10:53 a.m.)
9     Q.  We're back on the record after a short break.
10       Speaker Straus, are you a member of the American
11 Legislative Exchange Council?
12    A.  A member?
13    Q.  Do you participate in the American Legislative
14 Exchange Council?
15    A.  I go to a number of conferences in the summer, and
16 that's -- that's one of them, yes.
17    Q.  Do you ever direct your staff to speak with the
18 American Legislative Exchange Council concerning particular
19 legislation?
20    A.  No.
21       MR. SWEETEN:  Don't answer the question to the
22 extent it would reveal matters of legislative privilege, okay,
23 as to what you would -- your analysis in a bill, et cetera.
24 Don't reveal --
25       THE WITNESS:  Okay.

64

1        MR. FREEMAN:  Mr. Sweeten, to the extent that
2  this is a communication with an outside advocacy group --
3        MR. SWEETEN:  It's certainly fine for him to
4  discuss any communications that he or his staff are aware of
5  with this outside group.  He's not going to give his mental
6  impressions or thought process about any specific legislation as
7  that's prohibited.  So I think that's -- I think that's where
8  the line would be properly drawn.
9     Q.  Okay.  Well, did you ever ask anyone from the American
10 Legislative Exchange Council for a modelled bill concerning
11 voter ID?
12       MR. SWEETEN:  Same objection.  I think that would
13 ask him to reveal his thought processes regarding specific
14 legislation if you were to ask him to reveal that information.
15 He can testify as to whether he had a contact with them.  And
16 he -- in fact, because I think that they would be not a
17 constituent, they would -- you would be allowed to ask him any
18 specific questions that he's -- or discussions he's had with
19 them.  But as far as this legislative process, you can't ask him
20 that question that way.
21       MR. FREEMAN:  Mr. Sweeten, do I have to take
22 out --
23       MR. SWEETEN:  Mr. Freeman --
24       MR. FREEMAN:  -- the Court's order in which the
25 Court said that communications with constituents, lobbyists and



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                    June 11, 2012

69

1     A.  I don't recall.
2     Q.  Okay.  Let's see if we can refresh your recollection.
3     A.  August of '11.  Okay.
4          MR. FREEMAN:  If we could have this marked as
5     U.S. 465.
6              (Exhibit No. 465 marked)
7     Q.  Do you recognize this document?
8     A.  I don't.
9     Q.  Have you seen this document before?
10    A.  I don't remember.
11    Q.  Okay.  What is this document?
12         MR. SWEETEN:  Caution the witness to take the
13    time you need to review the document.
14    A.  I'm not sure what it is.
15    Q.  Is it possible that is a briefing paper --
16    A.  Oh, yes.
17    Q.  -- prepared by your staff?
18    A.  Yeah, uh-huh.
19    Q.  Okay.
20    A.  Briefing paper for 8/15.
21    Q.  And does this briefing paper refresh your recollection
22    as to whether you met with San Antonio Tea Party leaders on
23    August 15th, 2011?
24    A.  Yes.
25    Q.  And are you aware of whether that meeting was recorded

70

1     in any fashion?
2     A.  I'm not aware.
3     Q.  Was the meeting closed to the media?
4     A.  I believe so.
5     Q.  Is that your typical practice, in terms of when you
6     meet with constituents, that -- is it -- are -- are such
7     meetings typically closed to the media?
8     A.  Yes.
9     Q.  Okay.  If you could take -- take a moment to just kind
10    of read through for a bit.
11    A.  Uh-huh.
12    Q.  Are you aware of whether the San Antonio Tea Party was
13    particularly interested in the Sanctuary Cities issue?
14    A.  I don't recall what their main issues are.
15    Q.  Okay.  Do you recall whether you -- and if you could
16    look on the page marked TX_00012594 --
17    A.  Where would I find that?
18    Q.  -- the fourth page of the -- or fifth page of the
19    document.
20         MR. SWEETEN:  It's up there.
21    A.  Fifth page?
22    Q.  Fifth page of the document.
23         MR. SWEETEN:  And you're saying 594 are the last
24    three digits?
25         MR. FREEMAN:  Yep.

71

1     A.  Okay.
2     Q.  Do you see where this says, "Not only voter ID - which
3     I was pleased to see passed this session, but also important
4     Election Integrity Reform to stop vote harvesting"?
5     A.  I see that.
6     Q.  Do you recall if you spoke with that group concerning
7     voter ID and election integrity reform?
8     A.  I don't recall.  It's certainly possible.
9     Q.  Okay.  If you could turn back to the second page,
10    which is marked TX_00012591, just to clear up something from
11    earlier.  Do you see under Background, if you could read through
12    that real quickly, part 2?
13    A.  I see that, yes.
14    Q.  Was your staff under the impression that the meeting
15    was likely to be focused primarily on immigration and state
16    sovereignty issues?
17         MR. SWEETEN:  Objection, calls for speculation.
18    Q.  You may answer.
19    A.  It says, "the meeting is likely to be to be focused
20    primarily on immigration and state sovereignty issues."
21    Q.  In your experience, were audiences that were concerned
22    with sanctuary cities or immigration issues typically also
23    interested in voter ID?
24         MR. SWEETEN:  Objection, compound.  Objection.
25    Calls for speculation.

72

1     Also, in answering the question, I don't want you to
2     reveal your thoughts or mental impressions about legislation.
3     Okay?  So if you can answer the question without doing so, you
4     can go ahead and provide him an answer.
5     A.  The question is?
6     Q.  The question was, in your experience and in your
7     communications with constituents, were constituents who were
8     interested in immigration and state sovereignty typically also
9     interested in voter ID?
10         MR. SWEETEN:  Same objection -- objections
11    expressed and same instruction.
12    Q.  If you need to me to repeat it, I can.
13    A.  I don't -- I don't have expectations about what people
14    are interested in when I meet with them.
15    Q.  Have they often expressed interest in those issues
16    together, the same constituents?
17    A.  I don't -- I don't --
18         MR. SWEETEN:  Objection, foundation, calls for
19    speculation.  Objection, compound.
20         You can testify as to matters of the public
21    record.
22    A.  I don't know.
23         MR. FREEMAN:  Mr. Sweeten, the representative --
24    the Speaker can testify as to his communications with
25    constituents that are not matters of the public record.  And so



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                             June 11, 2012

73

1   I will ask you to withdraw and not reassert that same objection.
2        MR. SWEETEN:  Okay.  Understand where I'm coming
3   from then, because you don't -- you don't seem to understand
4   what I'm saying.  Okay?  What he's not going to do -- and he
5   will, if -- if asked, he will disclose, as the Court order has
6   provided, constituent communications.  Okay?  When you're asking
7   him now to compare one audience's hearsay as to another
8   audience's hearsay, then potentially you -- you are asking him
9   for his qualitative judgment, which could impact the legislative
10  privilege.  I think this is all of no moment because he's
11  indicated that he doesn't know.  But I'm telling you -- I mean,
12  I'm not -- the objection is not just based on the fact that
13  there's a constituent communication.  It's the fact you're
14  asking him to provide an analysis and thought process regarding
15  that, which could impact the legislative privilege.
16       MR. FREEMAN:  I think that's a mighty thin could
17  for a mighty long objection.
18       MR. SWEETEN:  Okay.  Well, let --
19       MR. FREEMAN:  So --
20       MR. SWEETEN:  -- let me just tell you I object to
21  the sidebar.  I'm not really particularly concerned with what
22  you think of my objections.  Okay?  I'm going to make them as I
23  think are appropriate, and I'll continue to do so.
24       Q.  What are the King Street Patriots?
25       A.  I don't know who they are.

74

1        Q.  Okay.  What is True the Vote?
2        A.  I don't know what that is either.  I've heard the
3   terms.  I don't know who they are.
4        Q.  Okay.  Who is Catherine Engelbrecht?
5        A.  I don't know.
6        Q.  So you've never met with Ms. Engelbrecht, to the
7   extent of your recollection?
8        A.  I don't remember.
9        Q.  Okay.  Do you know who Paul Bettencourt is?
10       A.  I know who he is.
11       Q.  Did you ever speak with Mr. Bettencourt since you
12  became Speaker?
13       A.  I don't recall.
14       Q.  Okay.  Do you know who George Hammerlein is?
15       A.  No.
16       Q.  Okay.  Do you know who Skipper Wallace is?
17       A.  Yes.
18       Q.  Did you ever speak with Mr. Wallace since you became
19  speaker?
20       A.  Yes.
21       Q.  Did you speak with him about voter ID?
22       A.  Perhaps.
23       Q.  Okay.  Do you recall when?
24       A.  No.
25       Q.  Do you recall what he might have said to you or did

75

1   say to you?
2        A.  Not specifically.
3        Q.  Okay.  Did you ever speak with any experts concerning
4   voter ID, any Ph.D. holding professors or anything of the type?
5        MR. SWEETEN:  Okay.  I'm going to -- I'm going to
6   instruct you at this point that when he's asking you this
7   question, it could implicate matters of the legislative
8   privilege, including any analysis, thought processes that you
9   had in reviewing legislation.  So to the extent the question
10  asks for that information, don't provide that.  To the extent it
11  does not, you can -- you can answer the question as phrased.
12       A.  No.
13       Q.  Okay.
14       A.  That I recall.
15       Q.  That's fine.
16       Did you ever speak with any minority groups concerning
17  voter ID?
18       MR. SWEETEN:  You can answer the question.
19       A.  I don't -- I don't recall speaking -- I don't recall.
20       Q.  Okay.  Let me just be specific and see if I can jog
21  your recollection at all.
22       Did you ever meet with LULAC concerning voter ID?
23       A.  I don't believe so.
24       Q.  Okay.  Did you ever meet with the American G.I. Forum?
25       A.  I don't believe so.

76

1        Q.  Did you ever meet with MALDEF?
2        A.  I don't think so.
3        Q.  Did you ever meet with the NAACP?
4        A.  On this issue?
5        Q.  Yes.
6        A.  I don't believe so.
7        Q.  Okay.  I'm not trying to trip you up here.
8        A.  Yeah.  No.  I --
9        Q.  I don't have a document that I'm waiting to throw at
10  you.
11       A.  I may have met with -- I may have met with any or all
12  of them, but I don't recall on this issue.
13       Q.  Okay.  That's fine.
14       Did you ever meet with any other constituents
15  concerning voter ID, to the best of your recollection?
16       A.  Not that I can recall.
17       Q.  Okay.  Did you ever exchange correspondence with any
18  constituents concerning voter ID?
19       A.  Perhaps.  I don't remember, but --
20       Q.  Okay.
21       A.  -- I get -- I get letters from constituents routinely,
22  and I'm certain they would have had -- would have received some
23  sort of response, but I don't recall.
24       Q.  Okay.  Do you approve letters, responses to
25  constituents before they go out as a general practice?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

77

1    A.  Not each one.
2    Q.  Do you sort of approve a form response to some extent?
3    A.  Yes.
4    Q.  Okay.  And do you know if your office maintains a
5    general correspondence file?
6    A.  Yes.
7    Q.  Okay.  If you could turn back to the privilege log
8    that I gave you before.
9    A.  This?
10   Q.  Yeah.  And if you could --
11   A.  This one?
12   Q.  Yes.  And that is, for the record, Exhibit 464.  Thank
13   you, sir.
14       If you could turn to Page 126.
15   A.  Okay.
16   Q.  Do you see where it says, "Draft letter from Speaker
17   Straus to constituents regarding Voter ID legislation"?
18       The last entry.
19   A.  Yes, I see it.
20   Q.  Are you aware of whether a final letter ever went out
21   around that date?
22   A.  I'm not aware.  I assume it did.
23   Q.  Do you know if that letter was produced to the Office
24   of the Attorney General as part of your document production?
25   A.  Don't know.

78

1    Q.  Okay.  Prior to the passage of S.B. 14, did you
2    address voter ID in any public speeches of which you're aware?
3    A.  Say the dates again.
4    Q.  So prior to the passage of S.B. 14.  So in, I guess,
5    April 2011, did you address voter ID in any speeches, to the
6    best of your recollection?
7    A.  Perhaps in a long list of items I might have been
8    speaking about.
9    Q.  So do you recall any particular instances?
10   A.  Where I would have spoken on that issue?
11   Q.  Uh-huh.
12   A.  No.  But I could have included it in some public
13   comments.
14   Q.  Okay.  Do you recall what you said?
15   A.  Not specifically.
16   Q.  Okay.  After passage of the bill --
17   A.  Uh-huh.
18   Q.  -- did you address S.B. 14 in any public speeches?
19   A.  Probably.
20   Q.  Do you recall when or where?
21   A.  No.
22   Q.  Okay.  Do you recall what you said?
23   A.  Not in -- not in specific language, no.
24   Q.  Okay.  Do you recall giving a speech in Dallas in
25   September of last year?

79

1    A.  No.
2    Q.  Okay.  Here.  If I can put a document in front of
3    you --
4    A.  Okay.
5    Q.  -- and we can refresh your recollection.
6        MR. FREEMAN:  If we could mark this as U.S. 466.
7        (Exhibit No. 466 marked)
8    Q.  If you could just take a minute to review the
9    document.
10   A.  Okay.
11   Q.  Okay.  Did this refresh your recollection?  Do you
12   recall having given a speech in Dallas in September of 2011?
13   A.  I don't.  But I see here that somebody requested some
14   background information for such an occasion.
15   Q.  Have you seen this document before?
16   A.  I don't remember seeing it.
17   Q.  Okay.  Do you have any recollection as to what -- or
18   what audience you were speaking to in Dallas in September?
19   A.  No, I don't.
20   Q.  Okay.  Do you generally rely on talking points when
21   you're providing speeches?
22   A.  Oh, I always have -- I always like to have them
23   available.
24   Q.  Okay.  Do you know if you used these talking points in
25   Dallas?

80

1    A.  I don't recall.
2    Q.  Do you recall having given speeches after the passage
3    of S.B. 14 in Tyler?
4    A.  A speech in Tyler?
5    A.  Uh-huh.
6    A.  No.  I may have -- may have made some remarks to a
7    support -- group of supporters or business leaders or something,
8    but I don't recall a speech --
9    Q.  Okay.  I mean --
10   A.  -- in public.
11   Q.  I guess I'll -- let's use the term "speech" to broadly
12   include just speaking to a group.
13   A.  Comments.  Yeah.
14   Q.  It doesn't need to be on a --
15   A.  Yes.
16   Q.  -- on a dais, but --
17   A.  I have been -- I have been to Tyler and probably made
18   some public comments.
19   Q.  Okay.  Corpus Christi?
20   A.  Yes.
21   Q.  El Paso?
22   A.  Yes.
23   Q.  Fort Worth?
24   A.  Yes.
25   Q.  Anywhere else that you recall speaking about voter ID



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                              June 11, 2012

81

1    since --
2       A.  No.  I don't remember --
3       Q.  -- the passage of the bill?
4       A.  I don't remember speaking about voter ID at any of
5    those places, but it's certainly possible.
6       Q.  Okay.  Do you recall receiving any different talking
7    points from the ones that are marked as Exhibit U.S. 466?
8       A.  I don't remember -- I don't remember receiving these.
9       Q.  Okay.
10      A.  But staff typically produces something that I could
11   use.
12      Q.  Okay.  Okay.  I'll return to this later.
13      What were the purposes of S.B. 14?
14      MR. SWEETEN:  You can provide the general purpose
15   of the bill.
16      To ensure integrity of our elections.
17      Q.  Anything else?
18      A.  I'd have to read the bill, but that's generally the
19   purpose.
20      Q.  Okay.  And what was your basis for believing that
21   was the purpose of S.B. 14?
22      MR. SWEETEN:  I'm going to object.  I think
23   you're calling for matters of legislative privilege.  You're
24   asking for his analysis on why he thinks something was the
25   purpose.  He can provide testimony, as the Court has said, to

82

1    the general purpose.  He has.  I think that question, you're --
2    you're now seeking to find out his mental processes and
3    impressions about why he believes it accomplished that purpose.
4    So I'm going to object as to legislative privilege and instruct
5    you not to answer the question on that basis.
6       Q.  Okay.  Was the purpose of S.B. 14, in part, to
7    decrease the number of Hispanic voters who could effectively
8    cast a ballot?
9       MR. SWEETEN:  You can answer as to the general
10   purpose of the bill.  To the extent that that's a question about
11   the general purpose, you can answer as phrased.
12      A.  No.
13      Q.  Where in the record could I find evidence related to
14   that purpose?
15      MR. SWEETEN:  I'm going to object.  You're asking
16   for him to find in the public record something that supports his
17   thoughts about why this was the general purpose of the bill.
18   And in so doing, you're asking him to reveal his thoughts and
19   mental impressions, and as such, it is legislatively privileged.
20      Instruct not to answer.
21      Q.  Was the purpose of S.B. 14, in part, to decrease the
22   number of African-American voters who could effectively cast a
23   ballot?
24      MR. SWEETEN:  You can answer the question to the
25   extent it's asking about general purpose.

83

1       A.  No.
2       Q.  Okay.  Was the purpose, in part, to discriminate in
3    any way against any group or groups of minority voters?
4       MR. SWEETEN:  Same instruction.
5       A.  No.
6       Q.  Okay.  What is Texas' current system for determining
7    how to verify the identity of a voter?
8       MR. SWEETEN:  You're asking, as we're sitting
9    here, what current law is in place?
10      MR. FREEMAN:  Yes.
11      MR. SWEETEN:  He can answer that question.
12      If you know.
13      A.  I can't recite -- well, tell me -- ask me again.
14      Q.  What is Texas' current system for determining how to
15   verify the identity of a voter?
16      A.  Voter registration card.
17      Q.  Okay.  So you have to show a voter registration
18   card --
19      A.  Or --
20      Q.  -- when you show up at the polls?
21      A.  -- or an ID, I believe.
22      Q.  Okay.  Do you know if that ID has to be a photo ID?
23      A.  Well, I believe I was asked for one.
24      Q.  Do you know if that --
25      A.  When I voted.

84

1       Q.  Do you know if that's the legal requirement?
2       A.  I don't -- I don't think so.
3       Q.  Okay.  This has previously been marked as U.S.
4    Exhibit 16 in a prior deposition.
5       A.  Okay.
6       Q.  On the day that Governor Perry signed S.B. 14, did you
7    state, "This session we have taken major steps to ensure
8    elections are fair, legal and without fraud, and Texans can know
9    that we are working to make sure their vote is secure and
10   counts"?
11      A.  I see that.  I'm quoted here, yes.
12      Q.  Do you recall having stated that?
13      A.  Yes.  Sounds like --
14      Q.  Okay.
15      A.  -- sounds like something I would have said.
16      Q.  Okay.  And did you thank Representative Patricia
17   Harless for her diligent work in passing voter ID?
18      A.  Yes, I did.
19      Q.  Were you referring only to S.B. 14?
20      MR. SWEETEN:  Objection.  You're asking him to
21   interpret what the -- what this statement means, which is
22   prohibited by the order.  In fact, let me go ahead and read that
23   so we're all on the same page here:  "Although the document must
24   be produced, that does not give defendants license to inquire
25   about otherwise privileged material.  Questions about a



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                    June 11, 2012

85

1 post-enactment statement or document that call for a response
2 about legislative acts legislator took prior to the enactment of
3 Senate Bill 14 and prior voter ID bills and questions regarding
4 the motivations of the legislature with respect to those bills
5 are privileged."
6      So to the extent it would reveal your thoughts and
7 mental impressions, don't answer the question as to even a
8 public statement.
9      Q.  So let me try and rephrase my question and hope
10 against hope that we can avoid the objection.
11      When you were saying that the legislature had
12 "taken major steps to ensure that elections are fair, legal and
13 without fraud," in making that public statement, the major steps
14 that you were referring to in that public statement, were you
15 referring only to S.B. 14?
16      MR. SWEETEN:  Objection.  You're asking him for
17 the meaning of this statement, which is beyond -- could intrude
18 upon the legislative privilege and his thoughts about the
19 statement.  So I think that is what I just read to you from the
20 Court, and that specifically addresses that instance.
21      And I'm going to instruct you not to -- not to answer
22 the question if it would require you to reveal your thoughts,
23 mental impressions about legislation.
24      MR. FREEMAN:  Okay.  Well, I think that we have a
25 difference of opinion as to whether explaining the meaning of a

86

1 public statement asks him to -- about his thoughts or mental
2 impressions about ID or about any other bill.  It simply asks
3 him what he meant about that statement.  But I have a feeling
4 that you don't intend to change your mind on that, so we'll keep
5 moving.
6      MR. SWEETEN:  Do you --
7      MR. FREEMAN:  Am I correct?
8      MR. SWEETEN:  Do you understand my instruction
9 about legislative privilege, to not reveal legislative -- to not
10 reveal your thoughts and impressions about a specific piece of
11 legislation in answering these questions.
12      THE WITNESS:  Okay.
13      MR. SWEETEN:  Okay.
14      MR. FREEMAN:  And you're instructing him not to
15 answer the question as phrased?
16      MR. SWEETEN:  No.  What I -- what I said is he
17 can answer to the extent it does not do so.
18      Q.  Okay.  So in saying, "We have taken major steps to
19 ensure elections are fair, legal and without fraud,"
20 Mr. Speaker, were you referring only to S.B. 14 in that public
21 statement?
22      A.  Well, I made the statement at the bill signing
23 ceremony.
24      Q.  Okay.  So in that statement, you were saying yes?  You
25 mean, yes, just S.B. 14?

87

1      MR. SWEETEN:  Same instruction.
2      A.  I think it's related to -- to that occasion.
3      Q.  Okay.  What would a voter need to do under current
4 law, that we just discussed a moment ago, to commit in-person
5 voter fraud?
6      A.  I'm not -- I'm not sure how to answer the question.
7      Q.  Would they need to obtain someone else's voter
8 registration card?
9      A.  I don't know all the ways someone would commit voter
10 fraud today.
11      Q.  Okay.  Do you know what the punishment is for stealing
12 someone else's voter ID card?
13      MR. SWEETEN:  Under the current law?
14      MR. FREEMAN:  Under current law.
15      A.  I don't.
16      Q.  Okay.  Are you aware of any specific incidents of
17 in-person voter fraud in your district, Texas House District
18 121, in the last 20 years?
19      A.  No.
20      Q.  Are you aware of any specific incidents of in-person
21 voter fraud in Bexar County in the last 20 years?
22      A.  I wouldn't know.
23      Q.  Okay.  Are you aware of any specific incidents of
24 in-person voter fraud in the State of Texas in the last 20
25 years?

88

1      A.  I believe there have been cases.
2      Q.  Can you tell me --
3      A.  That I'm personally aware of?
4      Q.  I want details of --
5      MR. SWEETEN:  Yeah.  Let me caution you here.  Because
6 there is -- the legislative privilege covers constituent -- I
7 mean, covers communications you've had with other legislators,
8 legislative staff, with state agencies, with the Texas
9 Legislative Council.  So if you've heard any of the information
10 through those communications, don't reveal that information.
11 You can answer the question with the instruction.
12      A.  I've seen public -- I've seen public statements made
13 by others indicating there has been voter fraud.
14      Q.  Have you seen any information setting out the number
15 of investigated incidents?
16      MR. SWEETEN:  Same instruction.  You can refer to
17 matters of the public record --
18      A.  I've seen -- yeah.  I've seen --
19      MR. SWEETEN:  -- or matters that are not
20 privileged.
21      A.  I've seen and heard public statements from various
22 individuals who say they've prosecuted these cases.
23      Q.  Are you aware of how many convictions there have been?
24      A.  I'm not.
25      Q.  Okay.  Are you aware of whether Attorney General



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                                   June 11, 2012

89

1   Abbott has dedicated substantial resources over the last decade
2   to investigating allegations of voter fraud?
3            MR. SWEETEN:  Don't reveal privileged matters in
4   answering the question.  You can refer to matters of the public
5   record or nonprivileged matters.
6        A.  I've heard him make public statements about it, but to
7   the extent he's used resources, I don't know.
8        Q.  Okay.  Do you know how many incidents of mail-in
9   ballot fraud have occurred in House District 121 in the last 20
10  years?
11           MR. SWEETEN:  Same instruction.  You can answer
12  to the extent it's not revealing legislative privileged matters.
13  Go ahead.
14       A.  No, I don't.
15       Q.  Do you know how many incidents in Bexar County?
16       A.  No.
17       Q.  How about in the State of Texas?
18           MR. SWEETEN:  Same instruction.
19       A.  Not aware.
20       Q.  Okay.  Do you know whether there have been more
21  incidents of mail-in ballot fraud than in-person voter fraud?
22       A.  I don't know.
23       Q.  Okay.  Do you know if mail-in ballot fraud has been
24  prosecuted more than in-person voter fraud?
25           MR. SWEETEN:  Pause one second.  Let me -- let me

90

1   make my objection.  If it's -- if it's required in answering
2   this question, don't reveal matters of legislative privilege,
3   including the communications that we've discussed or your
4   thoughts and mental processes about legislation.  You can answer
5   to the extent you're not doing that, or you can refer to matters
6   of the public record.
7        A.  I don't -- I don't know.
8        Q.  Okay.  Are you familiar with the term "vote
9   harvesting"?
10       A.  Heard it, yes.
11       Q.  What is vote harvesting, to the extent of your
12  knowledge?
13       A.  It's when someone attempts to collect votes to be
14  delivered.
15       Q.  And is it a form of mail-in ballot fraud?
16       A.  Sounds like it.
17       Q.  Are you aware of any incidents of vote harvesting in
18  District 121?
19       A.  I'm not aware.
20       Q.  Bexar County?
21       A.  I don't know.
22       Q.  Okay.  Texas as a whole?
23       A.  I'm not a prosecutor, so I -- you know, I don't keep
24  up specifically with cases.
25       Q.  Okay.

91

1            MR. FREEMAN:  I'd like to have this document
2   marked as U.S. 467.  Sorry about the pile of paper.
3            (Exhibit No. 467 marked)
4        A.  Okay.
5        Q.  If you could take a minute to review the document.
6        A.  (Reviewing document.)
7        Q.  And really, we're just going to be talking about the
8   first few pages, so...
9        A.  Okay.
10       Q.  What is this document?
11       A.  It is a draft of the accomplishments of the 82nd
12  session.
13       Q.  Is this -- have you seen this document before?
14       A.  Oh, I recall seeing it at one time.
15       Q.  Okay.  Is this, again, talking points for use -- for
16  your use?
17       A.  I think it was -- I think this is the kind of thing
18  that's made available to members.
19       Q.  Okay.  And is it made by --
20       A.  Post-session.
21       Q.  Okay.  And for what purpose is it made available to
22  members?
23       A.  For their own use as they see fit.
24       Q.  But it's produced by your office, correct?
25       A.  Appears to be, yeah.

92

1        Q.  Did you ever use these statements as talking points?
2        A.  Not all of them.
3        Q.  On the third page, which is marked, TX_00012638 --
4        A.  Uh-huh.
5        Q.  -- do you see where it say that, "S.B. 14 will help
6   deter in-person voter fraud by requiring a voter to present a
7   photo ID in order to vote"?
8        A.  Yes, I see that.
9        Q.  So am I correct that the purpose of S.B. 14 was not to
10  address mail-in ballot fraud?
11           MR. SWEETEN:  Okay.  Don't answer the question.  He's
12  already asked you about the general purpose.  You've provided
13  that.  In the context of this statement, what he's asking you
14  for is legislatively privileged material.  I'm going to instruct
15  you not to answer the question on that basis.
16       Q.  Let me see if I can rephrase.
17           Based on the document in front of you, is it your
18  understanding that S.B. 14 does not address mail-in ballot
19  fraud?
20           MR. SWEETEN:  Same objection.  Instruct not to
21  answer based on legislative privilege.
22       Q.  Then I'll just ask specifically about the document
23  itself.
24           Do these talking points developed by your staff state
25  that S.B. 14 deters in-person voter fraud?

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                                  June 11, 2012

93

1          MR. SWEETEN:  You can answer.
2     A.  Yes.
3     Q.  Okay.  When you vote in Texas, are you required to
4   sign a poll book?
5          MR. SWEETEN:  You can answer as to -- as a
6   general matter under current law, if you know.
7     Q.  When you -- when you show up to vote --
8     A.  Yes.
9     Q.  -- do you recall ever signing a book?
10    A.  Oh, yes.
11    Q.  Okay.
12    A.  Yes.
13    Q.  And --
14    A.  What did -- what did you call it?
15    Q.  A poll book.
16    A.  Okay.
17    Q.  Like a polling place.
18    A.  Yeah, yeah, yeah.  Right.
19    Q.  And if you're voting for the first time after
20  registering by mail, do you know if you're required to show any
21  additional forms of identification in addition to a Texas voter
22  registration card?
23    A.  I don't know.
24    Q.  Okay.  Are you familiar with the Help America Vote
25  Act?

94

1     A.  Generally.
2     Q.  Okay.  Do you know if it requires at a national level
3   a form of ID to be provided the first time someone votes after
4   filing a mail-in registration?
5     A.  I don't know.
6     Q.  Okay.  Do you see where this document says, "Although
7   it exists, in-person impersonation is difficult to prove under
8   our current laws since voters are not required to present a
9   photo ID"?
10    A.  I don't see it.
11    Q.  It is the second bullet point on Page 12638.
12    A.  Oh.  Yes, I see that.
13    Q.  Does this statement explain any basis for the
14  assertion at the beginning of the sentence, "Although it
15  exists"?  I'm just asking about the statement.
16         MR. SWEETEN:  You can answer based on the face of
17  the statement itself.  Don't reveal any mental impressions in
18  answering the question.
19    A.  What was your question?
20    Q.  Sorry.  Let me rephrase.  It was inartful at best.
21         The beginning of that sentence where it states,
22  "Although it exists," is that asserting in-person voter
23  impersonation exists?
24    A.  That's what it -- that's what it appears to say, yes.
25    Q.  Does it provide any further support for the statement

95

1   that in-person voter impersonation exists?
2          MR. SWEETEN:  Again, you can answer on the face
3   of the statement itself.
4     A.  I can just -- yeah.  I can just -- I just see what it
5   says, "Although it exists, in-person voter impersonation is
6   difficult to prove under our current laws."
7     Q.  And so my question is does the statement provide any
8   documentation, any evidence, any naming of particular incidents
9   to support its assertion that in-person voter impersonation
10  exists?
11         MR. SWEETEN:  Again, you can answer what's on the
12  statement itself.
13    A.  I don't see that it -- I don't see it.
14    Q.  Okay.  If you wanted to check for in-person voter
15  impersonation, would it be possible to check signatures in the
16  poll book against signatures on record with the state?
17         MR. SWEETEN:  You're -- you're taking -- you're
18  moving away from the document.  You're asking him as to current
19  law --
20         MR. FREEMAN:  Uh-huh.
21         MR. SWEETEN:  -- is that possible to do
22  something?
23         MR. FREEMAN:  Yes.
24         MR. SWEETEN:  You can answer.
25    A.  Is it possible?  I suppose it's -- I suppose it's

96

1   possible.
2     Q.  Are you aware of whether Attorney General Abbott
3   included such searches in his investigation for in-person voter
4   fraud?
5     A.  I'm not aware.
6     Q.  Are you aware of whether Attorney General Abbott
7   uncovered any in-person voter fraud based on such searches?
8          MR. SWEETEN:  Don't reveal communications you had
9   with our office.  Don't reveal matters of legislative privilege.
10  You can answer based upon the public record.
11    A.  I don't know.
12    Q.  Okay.  Do you see where it says in this statement,
13  "Anyone can take another person's voter certificate and
14  fraudulently vote"?
15         Same bullet.
16    A.  I see that, yes.
17    Q.  Are you aware of any recorded incidents of theft of a
18  voter certificate?
19         MR. SWEETEN:  Again, don't reveal legislatively
20  privileged matters.
21    A.  Personally, I'm not aware.
22    Q.  Okay.  Okay.  Does your driver's license indicate that
23  you are Joe Straus, III?
24    A.  Yes.
25    Q.  It separately says III?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                    June 11, 2012

97

1    A.  I don't know.
2    Q.  Want to check?
3    A.  Sure.  Well, I signed it that way.  Yes, it does say
4    that.
5    Q.  Okay.  Do you know if your voter registration card
6    says Joe Straus, III?
7    A.  I don't know.
8    Q.  Okay.  If it -- sorry.  Strike that.
9        Is there a Joe Straus, IV?
10   A.  No, not to my knowledge.
11   Q.  Was your father Joe Straus, Jr.?
12   A.  Yes.
13   Q.  Are you aware of whether his driver's license
14   indicated that he was Joe Straus, Jr. as opposed to Joe Straus?
15   A.  I'm pretty certain it does say that, yes.
16   Q.  Okay.  Are you aware of whether his voter registration
17   certificate said Joe Straus, Jr.?
18   A.  I don't know.
19   Q.  If -- would it be possible of the voter -- or excuse
20   me -- if the voter registration certificate merely says Joe
21   Straus that you could use your driver's license to vote as your
22   father, if you'd wanted to?
23       MR. SWEETEN:  Under current law, you can answer
24   the question.
25   A.  I -- I don't know.

98

1    Q.  Okay.  Okay.  When you spoke in public concerning
2    voter ID, did you ever state that voter ID was a component of
3    immigration reform?
4    A.  Did I?
5    Q.  Yes.
6    A.  I don't recall saying that.
7    Q.  Why not?
8        MR. SWEETEN:  Objection.  Don't -- don't answer
9    the question.  He's asking about your thoughts, mental
10   impressions about legislation.  Instruct not to answer.
11   Q.  In any talking points developed after the bill was
12   passed, did you or your staff ever connect voter ID to
13   immigration reform?
14   A.  You're saying in a public statement?
15   Q.  To the extent of your knowledge.  I'm talking about
16   talking points developed after the bill's passage.
17   A.  Developed by staff?
18   Q.  You or your staff, yes.
19   A.  I don't recall.
20   Q.  Okay.  This has been previously marked as Exhibit 7,
21   U.S. Exhibit 7, in a prior deposition.  What is this document?
22   A.  It looks like something taken off of a web site for
23   Representative Harless.
24   Q.  Okay.  And under immigration reform, does she list
25   "Require Texas photo ID to vote"?

99

1    A.  I see that, yes.
2    Q.  Are you aware of any other legislators or staff,
3    including the lieutenant governor, making any public statements
4    about illegal aliens voting?
5    A.  Am I aware of --
6    Q.  Any legislators or staff or the lieutenant governor
7    making any public statement about illegal aliens voting?
8    A.  I don't recall.
9    Q.  Okay.  Are you aware of any other public statements
10   made by advocates of photographic identification laws for voting
11   that such laws deter illegal aliens from voting?
12   A.  I don't --
13       MR. SWEETEN:  Objection, foundation.  Objection,
14   compound.
15       You can answer the question.
16   A.  Yeah.  I don't -- I don't recall seeing that, but --
17   Q.  Okay.
18   A.  -- possible.
19   Q.  All right.  Have you heard of -- are you aware of any
20   public statements made by advocates of photographic voter
21   identification laws that such laws will deter all noncitizens
22   from voting, documented and nondocumented?
23   A.  Say it again.
24   ==Q.  Are you aware of any other public statements made by==
25   ==advocates of voter ID saying that such laws will deter==

100

1    ==noncitizens from voting?==
2    ==A.  No.==
3    Q.  Okay.  Do you know if it's necessary to swear under
4    oath that you're a U.S. citizen in order -- in order to register
5    to vote?
6        MR. SWEETEN:  You can answer under current law.
7    A.  I don't know what the current law is on that.
8    Q.  If you don't know, you don't know.
9    A.  I don't know.
10   Q.  It's okay.
11   A.  I registered a long time ago.
12   ==Q.  Understandable.==
13   ==    Are you aware of any documented cases of undocumented==
14   ==immigrants or illegal aliens voting?==
15   ==    MR. SWEETEN:  In answering the question, don't==
16   ==reveal matters of legislative privilege, including the==
17   ==communications that we've gone through earlier, which would be==
18   ==leg staff, legislators, state agencies, Texas Leg Council.==
19   ==Also, don't reveal your thought processes with respect to==
20   ==specific legislation.  You can answer to the extent you're not==
21   ==so revealing that information.==
22   ==A.  I'm not aware.==
23   ==Q.  Okay.  Are you aware of any documented cases of any==
24   ==noncitizens voting?==
25   ==    MR. SWEETEN:  Same instruction.==



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                                    June 11, 2012

101

1    A.  I'm not aware.

2    Q.  Okay.  What ethnic, racial or language minority group

3    makes up the majority of immigrants in Texas?

4    A.  Hispanic.

5    Q.  Has the rise in concern about undocumented immigrants

6    voting grown along with the Hispanic population in Texas

7    growing?

8          MR. SWEETEN:  Objection, calls for speculation.

9    Objection to the extent it would ask to reveal your thoughts,

10   mental impressions about any specific legislation or

11   communications.  But to the extent it does not do so, you can

12   answer the question.

13   Q.  And just to clarify, my question addresses only public

14   sentiment of which you're aware concerning the possibility of

15   undocumented immigrants voting and whether that has increased as

16   the Hispanic population has increased.

17   A.  I don't -- I don't know.

18   Q.  Okay.

19         MR. FREEMAN:  If we could have this marked as

20   U.S. 468.

21         (Exhibit No. 468 marked)

22   Q.  I will represent to you that it was produced by the

23   State of Texas without that black block.  Underneath that black

24   block is what we refer to as personally identifiable

25   information.  And so in order to protect the privacy of this

102

1    individual, before it was entered in the record, in the

2    deposition, we've blocked out that information.

3    A.  Okay.

4    Q.  Just an IP address and such.

5          MR. FREEMAN:  And we'll produce that to the State

6    when we do our final batch, if you -- if you'd like it.

7          MR. SWEETEN:  I don't think that's necessary.

8    I -- I accept counsel's representations.

9          MR. FREEMAN:  Okay.  I mean, your -- your Bates

10   stamp is still on there if you feel like checking.

11         JUDGE PHILLIPS:  Do you have copies of that?

12   Q.  What is this document?

13   A.  It's an e-mail to Senator Fraser.

14   Q.  And what does this document express in the e-mail?

15   A.  It says, "YES to voter I.D.  NO to including a school,

16   university or college I.D. as proper identification to vote.

17   Too many illegals have acquired these and it would defeat the

18   purpose.  Thank you."

19   Q.  Did you receive any similar messages during the leadup

20   to voter ID or S.B. 14?

21   A.  Not that I recall.

22   Q.  Okay.  Are you aware of any claims by opponents of

23   S.B. 14 that the bill attempted to exploit fears of illegal

24   immigrants voting?

25         MR. SWEETEN:  In answering the question, don't reveal

103

1    conversations you've had that would be privileged.  You can

2    refer to matters of the public record.  You can answer.

3    A.  Only through public statements, yes.

4    Q.  Okay.  But you are aware of those claims?

5    A.  I've heard them.

6    Q.  Who made those claims, to the extent of your

7    recollection?

8    A.  Various legislators and other public -- other groups

9    making public statements.

10   Q.  Okay.  Did you ever respond publicly to any of those

11   claims?

12   A.  Not that I'm aware of.

13         MR. FREEMAN:  Okay.  We've been going for about an

14   hour, if you want to take another five minutes.

15         MR. SWEETEN:  Okay.

16         MR. FREEMAN:  I know that you have somewhere you

17   need to --

18         THE WITNESS:  I'm trying to remember.  When am I

19   leaving?

20         MR. SWEETEN:  In an hour.

21         THE WITNESS:  In an hour?  Okay.

22         MR. FREEMAN:  All right.  So why don't we take

23   five minutes, and then -- just real quick --

24         MR. SWEETEN:  Okay.

25         MR. FREEMAN:  -- everyone can stretch their legs.

104

1          MR. SWEETEN:  Okay.

2          (Recess from 11:47 a.m. to 12:00 p.m.)

3    Q.  Okay.  So if we could flip back to what had been

4    marked Exhibit U.S. 467, the draft accomplishments of the 82nd

5    Legislature.

6          Do you see where the document states that, "Voter

7    fraud drives honest citizens out of the democratic process and

8    breeds distrust of the election process and the government"?

9    A.  I see that at the top, yes.

10   Q.  Have any of your constituents ever told you that they

11   do not vote because they believe their vote doesn't count

12   because of voter fraud?

13         MR. SWEETEN:  Separate from this statement?

14         MR. FREEMAN:  Separate from the document, yes.

15         MR. SWEETEN:  Okay.  You can answer as to -- this

16   to the fact of whether a constituent has ever asked you that.

17   A.  Specifically that statement?

18   Q.  The sentiment of that statement.  Have any of your

19   constituents ever said, Well, I don't vote because there's so

20   much voter fraud out there?

21   A.  I don't recall -- I don't recall that.

22   Q.  Are you aware of any other basis for this statement in

23   the -- in the talking points here?

24         MR. SWEETEN:  Don't answer the question.  It

25   would require you to reveal matters of legislative privilege.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                          June 11, 2012

105

1   Instruct not to answer.
2           MR. FREEMAN:  You're instructing him not to
3   answer as a whole as to his personal knowledge of whether
4   there's a basis for this statement in the document?
5           MR. SWEETEN:  Absolutely.  That's absolutely
6   covered by the legislative privilege.  It would -- it would
7   require, just as the Court has said, that questions about a
8   post-enactment statement or documents that call for a response
9   about legislative acts or the -- or acts the legislator took
10  prior to the enactment of Senate Bill 14 and prior voter ID
11  bills and questions regarding the motivations of the legislator
12  with respect to these bills are privileged.
13          MR. FREEMAN:  Mr. Sweeten, what legislative act
14  does my question reflect?
15          MR. SWEETEN:  It -- I am instructing him not to
16  answer on the basis of privilege because you're asking about a
17  statement about voter fraud which would implicate his thought
18  process with respect to the voter ID bill passed, which was
19  Senate Bill 14.
20          MR. FREEMAN:  Mr. Sweeten --
21          MR. SWEETEN:  He's not going to reveal his mental
22  impressions about that.
23          MR. FREEMAN:  Mr. Sweeten, if -- if we have to
24  have a sidebar, I don't know if you want it to be on the record
25  or off the record.

106

1           MR. SWEETEN:  Either way.
2           MR. FREEMAN:  Okay.  That's fine.
3           MR. SWEETEN:  I mean, whatever you want to do.
4           MR. FREEMAN:  No.  I just -- you had previously
5   objected to having a sidebar on the record, so --
6           MR. SWEETEN:  No.  I -- to be clear, it was your
7   mocking sidebar that I objected to.  We had a discussion
8   about privilege and it -- and the extent of it.  It was about
9   the specific sidebar, but go ahead.
10          MR. FREEMAN:  And I will object to your
11  characterization of my sidebar as mocking.
12          But --
13          MR. SWEETEN:  Okay.
14          MR. FREEMAN:  -- nevertheless, Mr. Sweeten, I
15  think that you're reading that order far too broadly and that
16  limitations on discussions of post-enactment statements.  There
17  is not a bar on asking questions about basis unless the question
18  would reflect his thoughts or mental impressions about the bill
19  itself or would reflect -- otherwise reflect legislative acts.
20          To the extent that I'm asking about his knowledge
21  that would serve as the foundation for this statement or his
22  awareness of facts, not related to the legislative process but
23  related to voter fraud as a problem in Texas or communications
24  with constituents or public sentiment, that would serve as a
25  foundation for a talking point, I do not believe that it is

107

1   covered by privilege.
2           MR. SWEETEN:  Well, in response to that, my
3   instruction to him is to not reveal matters of privilege, which
4   would -- which is what this specifically is asking when you're
5   asking him to support it.  You know, in other words, you're
6   asking him, It says this, and what is the basis for this
7   statement?  When you're asking him that, that necessarily
8   impacts his legislative process, his mental thoughts, his
9   analysis, his motivation about the specific legislation.  And so
10  I disagree with you on that.
11          MR. FREEMAN:  I am asking -- this statement in
12  the talking points is a statement about public sentiment in
13  Texas.  It's not a statement about S.B. 14 that would -- I mean,
14  there are other statements in here about S.B. 14, but it's a
15  statement about voter fraud in Texas and the effect of the
16  perception of voter fraud on public confidence.  And so my
17  question asks his knowledge concerning those pre-enactment
18  circumstances and the basis for this talking point.
19          MR. SWEETEN:  I fail to see how that does not
20  request information and his considerations about legislation.
21  When we're talking about Senate Bill 14, when we're talking
22  about voter fraud, you're asking him information that would
23  relate to what his thought processes were with respect to this
24  bill, which is a matter of privilege.  I will allow him to
25  testify as to public statements that he's heard that -- you

108

1   know, with respect to a specific issue.  I will allow him to
2   refer to the record.  But when you're asking about -- about his
3   thought processes, which that question necessarily does, you're
4   asking for something that the Court has protected, and it's
5   legislatively privileged.
6           So that's my instruction.  If you can answer to
7   the extent you're not revealing matters of privilege, you can
8   answer the question.  But if you cannot without revealing
9   matters of privilege, do not answer the question.
10  Q.  Do you want the question to be rephrased?
11  A.  Please.
12  Q.  Yes.  The question was, are you aware of any facts
13  supporting the statement that voter fraud drives honest citizens
14  out of the democratic process and breeds distrust of the
15  election process?
16          And in answering that question, I'm not asking -- what
17  I'm not asking is information you learned during debates about
18  voter ID.  I'm not asking about your understanding of what
19  effect S.B. 14 is intended to have or will have.  I'm just
20  asking about your understanding of public perception and the
21  basis for the statement of the talking point.
22          MR. SWEETEN:  So do you understand my
23  instruction?  If you can't --
24          THE WITNESS:  I'm not sure.
25          MR. SWEETEN:  If you can't -- okay.  Then let's



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                    June 11, 2012

109

1    make sure it's clear.  If you cannot answer this question
2    without providing your mental impressions or thought processes
3    about the bill --
4              THE WITNESS:  Uh-huh.
5              MR. SWEETEN:  -- do not answer the question.
6    If -- you can refer to matters of the public record, but if
7    you -- if -- do you understand now?
8              THE WITNESS:  Yeah.
9              Ask it again.
10   Q.  Okay.  Are you aware of any facts supporting the
11   statement in the talking points that voter fraud drives honest
12   citizens out of the democratic process and breeds distrust of
13   the election process and the government?
14   A.  Any facts that --
15   Q.  That are not public sentiment.
16             MR. SWEETEN:  That are not legislatively privileged.
17   A.  No.
18             MR. SWEETEN:  I want you to be careful.
19             THE WITNESS:  Okay.
20   Q.  Do the talking points also state that the very
21   perception of fraud creates low confidence in the election
22   system?
23   A.  Ask it again.
24   Q.  Do they state that the very perception of fraud
25   creates low confidence in the election system?

110

1    A.  Okay.
2    Q.  It is in the --
3    A.  Where was that?
4    Q.  -- fourth bullet.
5    A.  Okay.  The fourth bullet?
6    Q.  I'm pretty sure.  Second sentence.
7    A.  No.  It's the third one.  Third one, I think.  Right?
8    Q.  It's the third.  I am very sorry, sir.
9    A.  Yeah.  That's all right.  "The very perception of
10   fraud creates low confidence in the election system."
11   Yeah, I see that.
12   Q.  Okay.  Whose perception of fraud is this referring to?
13             MR. SWEETEN:  Don't interpret the statement if it
14   would require you to reveal matters of legislative privilege.
15   A.  I don't know.
16   Q.  Is the perception of fraud different from the
17   existence of fraud?
18             MR. SWEETEN:  Same instruction.
19   A.  I don't know.  I suppose it could be.
20   Q.  Are you aware of whether voter confidence increased
21   when Texas first implemented its current ID requirement?
22             MR. SWEETEN:  Same objection.  Don't reveal your
23   thoughts, mental impressions, motivations about legislation in
24   answering the question.  If you cannot do so, do not answer the
25   question.

111

1    A.  I'm not aware.
2    Q.  Okay.  Are you aware of whether voter confidence is
3    currently higher in states where photographic voter ID has been
4    implemented?
5              MR. SWEETEN:  Same instruction.
6    A.  I seem to have read some articles.
7    Q.  What articles?
8    A.  I can't tell you specifically, but I seem to have read
9    something about confidence increasing.
10   Q.  Was it a survey of some kind?
11   A.  I don't remember.
12   Q.  Were they written by The Heritage Foundation?
13   A.  No.
14   Q.  Hans von Spakovsky?
15   A.  No.  It would -- it probably was -- probably in some
16   column or something.  I don't remember.
17   Q.  Okay.  So it wasn't an academic study, was it?
18   A.  No.
19   Q.  Okay.
20   A.  No.
21   Q.  Are you aware of any studies that have reached
22   contrary conclusions?
23             MR. SWEETEN:  In discussing studies, don't reveal
24   your thoughts, mental impressions or analysis that you conducted
25   with respect to the specific legislation.  If you -- if in

112

1    answering the question that would require you to do that, then
2    do not do it.  Otherwise, you can answer the question.
3    A.  No.
4    Q.  Okay.  Do you see in the first bullet of the talking
5    points where it says that, "Many everyday circumstances require
6    citizens to provide a photo ID such as boarding a plane, cashing
7    a check and renting a movie"?
8    A.  Yes, I see that.
9    Q.  Do you believe that to be the case?
10             MR. SWEETEN:  Same objection.  Don't reveal
11   matters of privilege about your beliefs or thought processes
12   about legislation in answering this question.
13   A.  I I see what it says, and it seems -- seems accurate.
14   Q.  Do you know if it's possible to board a plane without
15   a photo ID?
16   A.  I always have one.  I don't know if you can do it
17   without.
18   Q.  Okay.  So you've never seen or heard of an individual
19   not being allowed on a plane because they didn't have a photo
20   ID?
21   A.  I'm not aware of it.
22   Q.  And you've never read a regulation or notice requiring
23   a photo ID?
24   A.  I don't recall reading one, no.
25   Q.  Do you know if it requires the specific types of ID



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                          June 11, 2012

113

1   named in S.B. 14 to get on a plane?

2       A.  I don't know.

3       Q.  If I were to represent to you that I boarded my flight

4   from DC yesterday using an employee ID, would that surprise you?

5       A.  I wouldn't -- I don't know.

6       Q.  Okay.  Is it possible to cash a check without a photo

7   ID?

8       A.  I haven't cashed a check in so long I don't remember.

9   I don't know.

10      Q.  Clearly, you don't live with irresponsible roommates

11  like I do.

12          Have you ever deposited a check at an ATM?

13      A.  No.

14      Q.  Okay.  Have you ever seen an advertisement for Chase

15  Bank and an app that allows you to cash checks using your phone?

16      A.  Don't recall.

17      Q.  Okay.  Do you have any basis to believe that you can't

18  deposit a check at an ATM?

19      A.  I don't -- I don't -- I don't use ATMs.

20      Q.  Okay.  Is it possible to rent a movie without a photo

21  ID?

22      A.  I don't know.

23      Q.  Are you a member of Blockbuster?

24      Q.  Are they still around?

25      Q.  They are limping along.

114

1       A.  Okay.  No, I --

2       Q.  I will represent to you as a member of the bar that

3   they are limping along.

4           When did you last see a Blockbuster application?

5       A.  Probably ten years ago.

6       Q.  Okay.  And I'm going to put this in front of you only

7   because a lot of things have been said in this case about

8   Blockbuster.

9       A.  Okay.

10          MR. FREEMAN:  So this will be marked as U.S. 469.

11          (Exhibit No. 469 marked)

12      Q.  What is this document?  And review it first, please.

13      A.  This is an account application for Blockbuster.

14      Q.  And does this account application require you to show

15  a photo ID?

16      A.  I don't -- I can't find that.

17      Q.  Okay.  Do you know how many registered voters in Texas

18  lack a driver's license, state ID card or license to carry?

19          MR. SWEETEN:  In answering the question, don't

20  reveal matters of privilege, including communications that

21  you've had with the individuals or entities that we talked about

22  or your thoughts or mental -- mental impressions or motivations

23  regarding the bill.  You can answer to the extent you're not

24  doing so.

25      A.  I don't know the number.

115

1       Q.  Okay.  But do you know that there are -- whether there

2   are registered voters in Texas who lack a driver's license,

3   state ID card or license to carry?

4           MR. SWEETEN:  Objection, compound.

5           Go ahead.  You can answer.

6       A.  I assume there are.

7       Q.  Okay.  Do you know how many registered voters in Bexar

8   County lack a driver's license, state ID or license to carry?

9           MR. SWEETEN:  Same instruction on privilege.

10  Don't reveal matters on privilege.  You can answer the question

11  to the extent you are not doing so.

12      A.  I don't know the number.

13      Q.  As a general matter and to the legislature as a whole,

14  did DPS ever provide, during the debates or prior to passage of

15  S.B. 14, that type of data?

16          MR. SWEETEN:  You can refer to matters of the

17  public record.  Don't reveal communications you've had with

18  state agencies regarding that.

19      A.  I don't recall.

20      Q.  Okay.  Do you have any knowledge of what voters are

21  more likely than others to lack ID?

22          MR. SWEETEN:  Same instruction on privilege.

23  Don't reveal matters of legislative privilege in answering the

24  question.

25      A.  I do not.

116

1       Q.  Is it your belief or understanding that rich or poor

2   voters are more likely to lack ID, one group or the other?

3           MR. SWEETEN:  He's asking for your belief.  To

4   the extent that you're revealing information about your belief

5   reveals your beliefs or mental impressions about legislation, do

6   not answer the question.

7       A.  I've read -- you know, again, I've read articles in

8   the newspaper --

9       Q.  Okay.

10      A.  -- that would indicate that poor people would be less

11  likely.

12      Q.  Okay.  And do you typically rely on articles in the

13  newspaper to formulate your understanding of these types of

14  issues?

15          MR. SWEETEN:  And don't answer the question as

16  phrased.  He's asking your thought process, which could

17  reveal your thought process with respect to legislation.  So

18  don't reveal matters of privilege.

19          MR. FREEMAN:  That's all right.  I withdraw the

20  question.  That's fine.

21      Q.  Are poverty rates in Texas similar across racial

22  groups?

23          MR. SWEETEN:  You can answer as to the current

24  facts, if you know.

25      A.  Say that again.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                    June 11, 2012

117

1    Q.  Are poverty rates in Texas similar across racial
2    groups, to the extent you know?
3    A.  Are poverty rates similar across racial groups?  I
4    don't --
5    Q.  Is one racial group more or less likely, as a
6    whole -- sorry.  Strike that.
7        Is a higher percentage of one racial group or another
8    in the State of Texas below the poverty line, to the extent of
9    your knowledge?
10   A.  On average?
11   Q.  Uh-huh.
12   A.  I think so.
13   Q.  Are Hispanics in Texas more likely to be below the
14   poverty line than Anglos?
15   A.  I believe that's correct.
16   Q.  And are African-Americans more likely to be below the
17   poverty line than Anglos?
18   A.  I believe that's correct.
19   Q.  Is it more likely that Hispanics will lack ID than
20   Anglos, based on the conversation we've just had?
21       MR. SWEETEN:  Do not reveal matters of privilege.
22   That means your mental impressions, thoughts or motivations
23   about legislation.  Okay?  If answering this question would
24   require you to do so, do not answer that question.
25       THE WITNESS:  Okay.

118

1    A.  I don't know.
2    Q.  Well, we've just -- we've just discussed about how
3    it's your belief that poor individuals are more likely to lack
4    ID and Hispanics are more likely to be poor.  So as a result, is
5    it more likely that Hispanics are more likely to lack ID than
6    Anglos?
7        MR. SWEETEN:  Don't reveal matters of privilege.
8    A.  I suppose that's possible.
9    Q.  Okay.  Are you aware that Texas recently took the
10   position that there are 795,955 registered voters whose records
11   could not be matched to a driver's license record via a first
12   name, last name and date of birth match?
13       MR. SWEETEN:  Objection, assumes facts not in
14   evidence.
15       You can answer the question.
16   Q.  Let's put some facts in evidence.
17       This has --
18   A.  You're --
19   Q.  -- previously been marked --
20   A.  -- you're about to show me.
21   Q.  I am.
22       This has previously been marked as U.S. 21, and it is
23   a letter from Mr. Sweeten to Ms. Westfall of the Justice
24   Department.
25       MR. SWEETEN:  Caution the witness to read the

119

1    document before answering questions.
2    Q.  Please read the document.
3    A.  Okay.
4    Q.  Okay.  Does this document state that -- that Texas was
5    unable to match 795,955 registered voters to driver's license
6    records?
7    A.  That's what I see, yes.
8    Q.  Okay.  Are you aware of whether the State of Texas
9    ever produced county-by-county totals of registered voters who
10   could not be matched?
11   A.  I don't know.
12   Q.  Okay.  Do you know what documents are necessary to get
13   an election identification certificate under S.B. 14?
14   A.  I'd have to look.
15   Q.  Okay.  What is an election identification certificate?
16   A.  Oh, I don't know.  What is that?
17   Q.  Well, is an election identification certificate the
18   form of ID that is available for voters who lack a driver's
19   license to be used --
20   A.  Oh, I see.
21   Q.  -- strictly for voting purposes?
22   A.  Yeah.
23   Q.  Okay.
24   A.  Exactly.
25   Q.  But you don't know what documents are necessary to get

120

1    that?
2    A.  I don't.
3    Q.  Okay.  If you could flip back to the talking points.
4    A.  Okay.
5    Q.  Try and find the bullet for you.
6        If you could look at the, one, two, three, fourth
7    bullet.  Do you see where this --
8    A.  Uh-huh.
9    Q.  -- states that, "S.B. 14 provides a free ID to those
10   who need it for voting purposes"?
11   A.  Yes, I see that.
12   Q.  Now, we previously discussed that you didn't know how
13   much it costs to get a new copy of a birth certificate, right?
14   A.  Yes.
15   Q.  But it does cost money, doesn't it?
16   A.  I assume so.
17   Q.  So if an individual lacks a birth certificate and a
18   birth certificate is necessary to get an election identification
19   certificate, is it possible for that individual to obtain an
20   election identification certificate without paying a cost?
21       MR. SWEETEN:  Don't reveal matters of privilege
22   in answering the question.
23   A.  I don't know the answer to your question if it's
24   possible.
25   Q.  Let me try and rephrase it.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

121

1    If an individual needs to show a birth certificate in
2    order to obtain an election identification certificate and that
3    individual has to pay some amount of money to get a copy of the
4    birth certificate because they don't have it, will that
5    individual end up needing to pay money to get the election
6    identification certificate?
7        MR. SWEETEN:  Don't reveal matters of privilege
8    in answering the question.
9        A.  I don't know if there's another -- another way.  I
10   don't know.
11       Q.  Okay.  Do you know where voters can obtain an election
12   identification certificate?
13       MR. SWEETEN:  You can answer as to current
14   existing, if you know.
15       A.  I do not know.
16       Q.  Okay.  And just for Mr. Sweeten, the current law does
17   not allow for election identification certificates.  Election
18   identification certificates are created as a -- I'll represent
19   to you that they're created as part of S.B. 14.  So I just don't
20   want there to be some conflict between my question and your
21   attorney's instruction.
22       MR. SWEETEN:  I think he's answered he doesn't
23   know.
24       MR. FREEMAN:  Yeah.  Yeah, yeah.  No.  I'm just
25   trying to clear up the record.

122

1        A.  Well, what if I'd said I did know?
2        Q.  Do you know if you can obtain them at driver's license
3    offices?
4        A.  I don't know.
5        Q.  Okay.  Do you know if most individuals have access to
6    a driver's license office that's as convenient as the one in the
7    Capitol Annex?
8        A.  I wouldn't think so.
9        Q.  Okay.  Do you know if S.B. 14 requires employers to
10   provide paid leave to obtain an ID?
11       MR. SWEETEN:  You can refer to the text of the
12   bill.  Don't provide your thoughts and mental impressions about
13   legislation.
14       A.  Ask the question again.
15       Q.  Do you know if S.B. 14 requires employers to provide
16   paid leave so that their employees can obtain a photo ID if they
17   needed to?
18       A.  I'd have to look at the bill.  No, I don't.
19       Q.  Okay.  Do some individuals in Texas live at least 50
20   miles from a driver's license office?
21       MR. SWEETEN:  You can answer, if you know.
22       THE WITNESS:  Okay.
23       A.  I don't know.  Probably.
24       Q.  About how much do you think gas would cost you to
25   drive 100 miles round trip?

123

1        MR. SWEETEN:  Objection, calls for speculation.
2        Go ahead.  You can answer.
3        A.  50 miles?
4        Q.  100 miles round trip.
5        A.  100 miles round trip would cost me about $7.
6        Q.  Nice car.
7        Would being forced to take a few hours off from work
8    to wait in line at a driver's license office constitute a burden
9    to some of your constituents?
10       MR. SWEETEN:  Do not answer the question if the
11   question asks you to reveal your motivations or thoughts about
12   the legislation, okay?
13       A.  Ask it again, please.
14       MR. SWEETEN:  I would instruct you to invoke
15   privilege in the event that that is the case, that you're
16   revealing matters of privilege.
17       THE WITNESS:  Okay.
18       Q.  Based on your knowledge of your constituents and the
19   district that you serve, do you believe that being forced to
20   take a few hours off from work unpaid would constitute a burden
21   if they needed to take time off in the middle of the day to go
22   to a driver's license office?
23       MR. SWEETEN:  Same instruction.  Are you clear on
24   my instruction?
25       THE WITNESS:  No.  Say it again.

124

1        MR. SWEETEN:  Okay.  What I'm telling you is if
2    in answering this question about a burden --
3        THE WITNESS:  Uh-huh.
4        MR. SWEETEN:  -- if this would require you to
5    reveal your thoughts, mental impressions --
6        THE WITNESS:  Okay.
7        MR. SWEETEN:  -- or motivations about
8    legislation, do not answer it.
9        THE WITNESS:  Okay.
10       A.  It's not about this legislation.  But with early
11   voting over two weeks, I don't think so.
12       Q.  Well, I -- my question was about going to the driver's
13   license office.  If they were required for some reason, where
14   they hadn't been required before, that they would have to go to
15   a driver's license office and sit in line for another three
16   weeks -- or excuse me -- three hours, two hours, whatever you
17   said, would that be a burden?
18       MR. SWEETEN:  Assumes facts not in evidence.
19       Same instruction on legislative privilege.
20       A.  I don't know.
21       Q.  Okay.  For some of your constituents, would an
22   unexpected $22 expense be a burden?
23       MR. SWEETEN:  Same instruction.  If in answering
24   this question you would have to reveal your thought processes
25   about legislation, including Senate Bill 14, do not answer the

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                    June 11, 2012

---

125

1   question.
2       A.  Yeah.  I guess I cannot answer that question.
3       Q.  If you were to -- if the legislature were to increase
4   the cost of driver's licenses by $22, would you expect to hear
5   from your constituents about it?
6           MR. SWEETEN:  Objection, calls for speculation.
7       Go ahead.
8       A.  I hear more from constituents about the length of time
9   standing in line than I do about the fee.
10      Q.  Okay.  But you do hear about the length of time for
11  folks standing in line?
12      A.  I have.
13      Q.  Okay.  And they're not happy about it?
14      A.  Not happy.
15      Q.  Do you think that a three-hour wait in order to be
16  able to vote would deter some voters from turning out?
17          MR. SWEETEN:  If in answering this question it
18  would require you to reveal your thought processes about any
19  legislation, including Senate Bill 14, my instruction to you
20  would be not to answer the question.  Okay?
21      A.  Would a three-hour --
22      Q.  So if there were an additional three-hour wait before
23  you were able to vote, if you had to stand in line for three
24  hours, do you think it would deter some of your constituents
25  from turning out to vote?

---

126

1           MR. SWEETEN:  Same instruction, privilege.
2       A.  I don't know.
3       Q.  Okay.  If it cost $22 to be able to vote, do you think
4   that it would deter some of the voters from your district from
5   turning out to go vote?
6           MR. SWEETEN:  Same objection.  Also assumes facts
7   not in evidence, calls for speculation and legislative
8   privilege.
9           Don't reveal your motivations regarding
10  legislation in answering the question.
11      A.  Okay.  I probably wouldn't answer that.
12      Q.  Okay.  If it takes three hours to get an ID, is the ID
13  really free?
14          MR. SWEETEN:  Same objection.
15          Same instruction on legislative privilege.  Don't
16  reveal your mental thoughts, impressions and motivations about
17  any -- Senate Bill 14 or any legislation in answering this
18  question.  If you cannot do so, do not answer the question.
19      A.  Yeah.  I don't know.
20      Q.  If it costs $22 to get a document necessary to get an
21  ID, is the ID really free?
22          MR. SWEETEN:  Same objection.
23          Instruct not to answer if it would reveal your
24  thoughts and mental processes about a bill, including Senate
25  Bill 14.

---

127

1       A.  Okay.  I wouldn't answer that question.
2       Q.  Okay.  I think this is the last point -- time we're
3   going to go to the talking points, but I do need you to go back
4   to it one more time.
5       A.  Okay.
6       Q.  And this is, again, bullet four.  Does it state that
7   voters can also cast a provisional ballot if they forget their
8   ID on election day.  They simply need to return within six days
9   to present a valid ID to the voter registrar in order for their
10  provisional ballot to be counted?
11      A.  Yes, I see that.
12      Q.  Do you know where the voter registrar is in Bexar
13  County?
14          MR. SWEETEN:  You can answer as to -- if you know
15  about a fact in existence.
16      A.  I think at the courthouse.
17      Q.  Where is the Bexar County courthouse?
18      A.  Downtown.
19      Q.  How far is that from your house?
20      A.  15 minutes.
21      Q.  So farther than your precinct?
22      A.  Pardon me?
23      Q.  Farther than your precinct?
24      A.  Oh, yeah.
25      Q.  And farther than your early voting location?

---

128

1       A.  Yes.
2       Q.  Okay.
3       A.  It's also an early voting location.
4       Q.  But it's not your early voting location?
5       A.  Not the one I went to.
6       Q.  Okay.  And is it your understanding of S.B. 14, based
7   on the text alone, that if a voter doesn't have ID, provisional
8   ballot won't count unless they get one within six days?
9           MR. SWEETEN:  You can refer to the specific text
10  of the bill in answering the question.  Don't reveal your
11  analysis, but go ahead.
12      A.  Say again.
13      Q.  Based on your understanding of S.B. 14 from the text
14  of the bill and based on your reliance on these talking
15  points --
16      A.  Uh-huh.
17      Q.  -- if a voter doesn't have ID, is it correct that a
18  provisional ballot won't count unless they get one within six
19  days and show up at the -- at the voter registrar?
20          MR. SWEETEN:  Same instruction.
21      A.  I believe so.
22      Q.  Do you know how long -- sorry.  You already told me.
23          Am I correct that you already said you didn't know how
24  long it takes to get a birth certificate if you don't have one,
25  right?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

133

1    A.  That's what --
2    Q.  -- state or federal employee ID?
3    A.  That's what it looks like, yes.
4    Q.  Okay.  Does it allow for the use of a tribal ID?
5    A.  "A valid tribal identification card containing a
6    photograph of the elector."
7       Yes.
8    Q.  Okay.  Does the Georgia -- do the forms -- pardon me.
9    Strike that.
10       Do the forms of identification named in the Georgia
11   law establish an individual's identity for the purpose of
12   voting?
13       MR. SWEETEN:  Same objection.  Don't provide your
14   analysis about what establishes identity to the extent that
15   would reveal matters of legislative privilege.  If you can't
16   answer the question without doing that, do not do so.
17   A.  Ask it again.
18   Q.  Sure.  I'm just asking about the function of this list
19   under the Georgia law.
20   A.  Uh-huh.
21   Q.  Do these types of ID establish an individual's
22   identity for the purpose of voting under Georgia law?
23       MR. SWEETEN:  Same objection, legislative
24   privilege.
25   A.  Yeah.  I don't know.  I'm just looking at this law for

134

1    the first time.  I don't know.
2    Q.  Okay.  We've only got four minutes until you guys have
3    to go, and I really am at a natural stopping point.  So I think
4    we should just break now.  Thanks.
5       (Lunch recess 12:40 p.m. to 1:56 p.m.)
6    Q.  We're back on the record after lunch and after
7    Mr. Speaker had a meeting to attend, but ready to go again.
8       Mr. Speaker, are you aware of a photographic voter
9    identification bill that was introduced in the 80th Texas
10   Legislature in 2007?
11   A.  I'm aware there was one.
12   Q.  Was any individual bill subject to serious
13   consideration or debate?
14   A.  I --
15       MR. SWEETEN:  You can answer.
16   A.  As I recall, there was debate on the bill.
17   Q.  Was the bill passed out of the House?
18   A.  I believe it was.
19   Q.  Who introduced that bill; do you recall?
20   A.  I don't.
21   Q.  This has previously been marked as U.S. Exhibit 28.
22   Have you seen this bill before?
23   A.  I probably did back then, yes.
24   Q.  Is this the bill that was passed out of the House in
25   2007?

135

1    A.  I remember Representative Brown carried the bill, yes.
2    Q.  Okay.  What was your public involvement with this
3    bill, if any?
4       MR. SWEETEN:  You can testify about public
5    statements.
6    A.  I don't recall.
7    Q.  Did you make any public statements that you recall?
8    A.  I don't remember.
9    Q.  Okay.  What were the -- do you recall what the basic
10   provisions of the bill were?
11   A.  No, I don't remember specifically.
12   Q.  Okay.  And I'll ask if you need to refresh your
13   recollection with the bill in front of you.  Do you know whether
14   the bill allowed an individual to use one form of photo ID or
15   two forms of non-photo ID to identify themselves prior to
16   voting?
17   A.  I'd have to look in here.
18   Q.  Would you take a look at Sections ^ 7(b) and 11 on
19   Pages -- 7(b) is on Page 6, and 11 begins on Page 9.
20   A.  Okay.  7(b)?  Uh-huh.
21   Q.  And did the bill allow the use of one photo ID or two
22   non-photos ID?
23       MR. SWEETEN:  Confirm the text of the bill in
24   answering the question.
25   A.  One form of the identification listed in Section

136

1    63.0101 or two different forms of identification listed in
2    Section 63.0101.
3    Q.  And can you take a look at Section 11 and see if that
4    first grouping or photo ID is in the second grouping or
5    non-photo IDs?
6    A.  Section 11?
7    A.  Uh-huh, beginning on Page 9.
8    A.  9?  Yeah.  "A driver's license or personal
9    identification card issued to the person by the Department of
10   Public Safety --
11   Q.  Not to interrupt, but I'll ask if you could just
12   review it, because there's a lot there.  So reading it into the
13   record would take awhile and isn't really necessary to answer my
14   question.  I guess if you could look and see if the group that
15   you need, one is photo ID and the group two is non-photo ID.
16   A.  Okay.
17   Q.  And is that correct?  Is that the case?
18   A.  That's the way it looks.
19   Q.  And did H.B. 218 allow exceptions from the ID
20   requirement for individuals who are over the age of 80, disabled
21   veterans, military widows and in the event of some natural
22   disasters?
23   A.  Where would that be?
24   Q.  That would be in Section 7, Section 7(h) through (k),
25   which is on Page 7 of the bill.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

137

1     A.  Age 80 or older or what else?
2     Q.  Disabled veterans, military widows and emergencies,
3     natural disasters.
4     A.  Yes.
5     Q.  Does H.B. 218 use non-photo IDs to establish an
6     individual's identity, from what you've reviewed?
7     A.  I think so.
8     Q.  Does H.B. 218 address non-citizen voting in any way,
9     from what you reviewed?
10          MR. SWEETEN:  You can answer based on the text of
11    the bill.
12    A.  I see a reference to United States citizen papers.
13    Q.  But that's just one form among many to establish your
14    identity, correct?
15    A.  That's the way it appears, yes.
16    Q.  Any other way in which you see that it addresses
17    non-citizen voting?  And take your time, please.
18    A.  I don't see it.
19    Q.  Okay.  Did you vote for this bill?  Do you recall?
20          MR. SWEETEN:  That's a matter of public record.
21    You can testify --
22    A.  Yes.
23    Q.  Do you recall if any republicans voted against it?
24    A.  I believe there were some.
25    Q.  Do you know if they're still members of the Texas

138

1     House?
2     A.  I don't think so.
3     Q.  Okay.  Do you know what happened to the bill, why it
4     didn't become law?
5     A.  I don't recall.
6     Q.  Do you know if it died in the Senate?
7     A.  I really don't remember.
8     Q.  Okay.  When did you first file the necessary papers to
9     seek the speakership?
10    A.  In January of 2011 -- I mean 2009.
11    Q.  Okay.  Who were the ABCs?  Was there a group of people
12    that were referred to as the ABCs?
13    A.  That's how some of the members were referred to in the
14    press.
15    Q.  What did that mean?
16    A.  Well, I wasn't -- I wasn't defined as part of that --
17    Q.  Okay.
18    A.  -- group.
19    Q.  But what did the press mean when it used the term
20    ABCs?
21          MR. SWEETEN:  Objection, speculation.
22    A.  They were opposed to the then-Speaker of the House.
23    Q.  Did ABC mean Anyone But Craddick?
24    A.  Yes.
25    Q.  Did they make any public statements concerning their

139

1     basis for supporting you as opposed to then-Speaker Craddick?
2     A.  They could have.
3     Q.  Any of which you're aware?
4     A.  I don't recall anything specific.
5          MR. SWEETEN:  Other than the name itself.
6     Q.  Did you make any public statements concerning your
7     basis for seeking the speakership?
8     A.  I'm sure I did.
9     Q.  Do you remember what your principal -- your primary
10    bases were at the time, based on the public record?
11    A.  Yes, that most members of the House thought there
12    needed to be a change in leadership.
13    Q.  Okay.  Anything else in terms of the main reasons?
14    A.  Just a philosophy of empowering the members.
15    Q.  Okay.  Would it be fair to describe Representative
16    Craddick as having been an aggressive speaker?
17    A.  I don't know if it would be fair or not.
18    Q.  Okay.  Did Representative Craddick eliminate some of
19    the powers of committee chairs when he was Speaker?
20    A.  I'm not aware.  I wasn't a committee chairman.  I
21    don't know.
22    Q.  Okay.  Did you make any promises when seeking the
23    speakership in 2009?
24          MR. SWEETEN:  You can testify about any public
25    statements you made.  If he's asking you about specific

140

1     conversations you've had with legislators, I would remind you of
2     the legislative privilege and communication elements of that
3     privilege, to the extent it asks you to reveal your mental
4     processes about why you performed a certain legislative act.  So
5     you can answer the question with that instruction.
6          MR. FREEMAN:  Patrick -- Mr. Sweeten.  Sorry.
7          MR. SWEETEN:  That's okay.
8          MR. FREEMAN:  I believe that under clear U.S.
9     case law, U.S. V. ^ Hilstolsky, promises are not subject to the
10    legislative privilege.
11         MR. SWEETEN:  I think with respect to this
12    Court's order, I don't think that it has upheld what you're
13    saying.  If he's made a statement or a statement was made to him
14    by another legislator and it related to a legislative act, then
15    I think that that would still be very clearly under the four
16    corners of the Court's order on privilege.
17         THE WITNESS:  Can I ask you a question.
18         (Sotto voce discussion)
19         MR. SWEETEN:  I believe that any conversation
20    he's had with a legislator is covered by the privilege.
21         MR. FREEMAN:  Okay.
22         MR. SWEETEN:  And so my instruction to him would
23    be to not provide that information.  At the same time, in the
24    event -- if we'll just have an agreement that you won't construe
25    it as a waiver, I'll let him answer that question.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

141

1       MR. FREEMAN:  I'm happy to give you my word that
2   we will not construe it as a waiver.
3       A.  I've been asked this question publicly and answered
4   this question publicly.  No, I made no promises to anyone.
5       Q.  Okay.  Easy enough.  Was there a recorded vote for
6   Speaker in 2009?
7       A.  Yes.
8       Q.  And what was the final vote?
9       A.  150 to 0.
10      Q.  Congratulations.
11          Are you aware of any photographic voter identification
12  bill that was introduced in the 81st Texas legislature in 2009?
13      A.  Yes.
14      Q.  Was any individual bill passed by one house or the
15  other?
16      A.  Yes.
17      Q.  And was that S.B. 362?
18      A.  I don't remember the bill number.
19      Q.  Was it Senator Fraser's bill?
20      A.  Yes.
21      Q.  Do you recall when in the session it was introduced?
22      A.  Early.
23      Q.  Okay.  Do you recall whether Senator Fraser made any
24  public statements as to why he had introduced the bill, just to
25  the best of your recollection?

142

1       A.  I don't recall.
2       Q.  Okay.  Did the Texas Senate alter its procedures in
3   2009 to facilitate passage of voter ID?
4       MR. SWEETEN:  The question calls for speculation.
5   And don't reveal matters of legislative privilege regarding a
6   specific piece of legislation, which that question asks you to
7   do.  If you want to ask him a general purpose question as to a
8   specific rule by the Senate, he can answer that.  But you're
9   asking him to reveal his thoughts, mental impressions about the
10  bill.  That's privileged.  I'll instruct him not to answer.
11      MR. FREEMAN:  I'll withdraw and rephrase.
12      Q.  What is the two-thirds rule in the Texas Senate?
13      A.  It's their rule requiring two-thirds of consent to
14  bring a bill to the floor.
15      Q.  Okay.  In 2009, did the Texas Senate modify the
16  two-thirds rule?
17      A.  I believe that -- I believe the Fraser bill may have
18  come to the floor in a way other than receiving two-thirds
19  consent.
20      Q.  Was the change in 2009 to the two-thirds rule
21  subject-matter specific to voter ID, to the best of your
22  recollection?
23      A.  I don't know.
24      MR. FREEMAN:  If we could have this marked as
25  U.S. 470.

143

1       (Exhibit No. 470 marked)
2       Q.  Have you seen this article before?
3       A.  Yes, I remember seeing this.
4       Q.  What is this article?
5       A.  It's an article that was in the Express News.
6       Q.  Okay.  And -- I didn't mean to cut you off.
7       A.  That's okay.
8       Q.  And are you quoted in this article as saying, "The
9   issue of ballot security is important, but the way the Senate
10  behaved at the first opportunity did nothing to help the House
11  pass a responsible anti-voter fraud bill.  So, at this point,
12  it's become all politics"?
13      A.  I see that comment here, yes.
14      Q.  Do you believe that to be an accurate quote?
15      A.  I suppose.  I suppose it could be, yeah.
16      Q.  Do you recall what you meant when you stated -- and I
17  just mean with regard to the comment that you were making and
18  not a reflection on a bill, but what you meant by the comment
19  itself, what you meant by a responsible anti-voter fraud bill?
20      MR. SWEETEN:  He's not going to give the
21  motivation for why he made this comment.  He's not going to give
22  the why of the comment.  He indicated that was his comment.  You
23  can't ask him what was the support for that.  It reveals matters
24  of privilege.  I'm going to instruct him not to answer the
25  question as phrased.

144

1       Q.  I have a disagreement with your counsel so I am going
2   to ask my question.  He may disagree as to whether or not you
3   can answer it.
4       But what did you mean, not with regard to the
5   substance of the bills, but with regard to the proceedings by
6   saying, "at this point, it's become all politics"?
7       MR. SWEETEN:  Again, I'm going to instruct you
8   not to answer.  The basis of that instruction is the Court's
9   very well defined instruction on legislative privilege,
10  including questions about -- I'm reading from Paragraph E of the
11  Court's order, "questions about a post enactment statement of
12  documents that call for a response about legislative acts the
13  legislator took prior to the enactment of Senate Bill 14 and
14  prior voter ID bills and questions regarding the motivations of
15  the legislator with respect to those bills or privilege."
16      So I'm going to instruct you, as to the specific
17  comment that he's asked you about not to provide your
18  motivations or thoughts about legislation.  That would be
19  legislatively privileged.
20      Q.  Are you not going to answer based on your counsel's
21  instruction?
22      A.  Yeah, I think I won't answer.  The words here seem --
23  are -- the words here are in the story.
24      Q.  Did you have any conversations concerning House
25  sponsorship of the bill, just as a general yes or no matter?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

145

1    MR. SWEETEN: You can answer if you had
2    conversations about sponsorship.
3    A. I probably did.
4    Q. Who was a party to those conversations?
5    MR. SWEETEN: You can answer as to who the party
6    was. Just don't reveal the substance, is what I'm getting at.
7    A. I don't recall specific conversations, but it would
8    not be unusual to talk to the person who authored the bill.
9    Q. Okay. So to talk to the senator about --
10   A. Oh, I don't remember talking to him.
11   Q. Okay. But you would have a conversation as a general
12   matter with the person who was going to carry the bill in the
13   House?
14   A. I very well could, yes.
15   Q. Okay. Did you make any public statements concerning
16   the bill once it was in the House?
17   MR. SWEETEN: You can answer.
18   THE WITNESS: I can?
19   MR. SWEETEN: You can answer public statements.
20   A. I can't answer because I don't recall.
21   Q. Okay. And this has previously been marked as U.S. 29.
22   Is this a copy of S.B. 362?
23   A. Yes.
24   Q. And I'll direct you to Section 6(b) and Section 11 for
25   purposes of refreshing your recollection. Did this bill allow

146

1    the use of one photo ID or two non-photo IDs in order to
2    identify a voter at the polls?
3    A. Where would this be?
4    Q. Section 6(b) begins on Page 3. And Section 11 --
5    pardon me. Section 10 begins on Page 5.
6    A. And your question was?
7    Q. Did S.B. 362 allow voters to use one form of photo ID
8    or two forms of non-photo ID in order to establish their
9    identities at the polls?
10   A. I believe so.
11   Q. And if you can look at Section 11, did S.B. 362 allow
12   the use of a military, excuse me -- of an employee ID to
13   establish identity at the polls?
14   MR. SWEETEN: Can you read the question back, please.
15   (Requested portion was read)
16   MR. SWEETEN: Okay. You can answer based on the text
17   of the bill in front of you.
18   A. It's in Section 11?
19   Q. Section 10. I'm sorry. 10(a)6, to be specific.
20   A. "An employee of an agency or institution"?
21   Q. Yes.
22   A. It appears that way, yes.
23   Q. And if a high school or college is an agency
24   institution or political -- or excuse me -- agency institution
25   of the state such as a public university, would this bill permit

147

1    the use of a student ID as means to establish identity at the
2    polls?
3    MR. SWEETEN: You can answer based on the text.
4    A. I don't know. Is that -- where would I see that?
5    Q. It would be the same provision on the basis of a high
6    school or university being an agency or institution of the
7    state.
8    A. I don't know how to interpret that.
9    Q. Okay. Does the bill address -- pardon me. Strike
10   that.
11   Would the bill have required a voter to establish
12   citizenship prior to voting?
13   MR. SWEETEN: You can answer based on the text of
14   the bill.
15   A. I don't see that.
16   Q. Okay. Are you aware of whether other legislators have
17   been deposed in this case?
18   A. I assume they have. I'm not aware.
19   Q. Are you aware whether Representative Todd Smith has
20   been deposed in this case?
21   A. I don't know.
22   MR. FREEMAN: We can mark this at U.S. 471.
23   (Exhibit No. 471 marked)
24   Q. I'll represent to you that this is an excerpt of a
25   much longer document. What does this document appear to be?

148

1    A. Oral Deposition of Todd Smith, June 1st, 2012.
2    Q. And could you review Pages 28 and 29. And then I'll
3    just ask a quick question about that.
4    MR. SWEETEN: You said 28 and 29, Dan?
5    MR. FREEMAN: Yes.
6    MR. SWEETEN: Okay.
7    A. Tell me again where you want me to look.
8    Q. Just Page 28 and 29, I guess, beginning with --
9    beginning with, "You were unhappy."
10   A. I see that.
11   Q. Is it your understanding from this document that
12   Representative Smith testified that he was a very loyal person
13   who handled voter ID in the way that he was asked and fully
14   protected you and that had every reason to believe that he was
15   going to be given a chairmanship and that did not happen?
16   A. I can just see what his answers were.
17   Q. Yeah. Was Representative Smith given a chairmanship
18   in the 82nd Legislature?
19   A. I can't answer that without --
20   Q. As a matter of public record?
21   A. He was not a chairman in the last session.
22   MR. SWEETEN: I think that's fine. You've
23   testified whether he was or wasn't. That's a matter of public
24   record.
25   THE WITNESS: But was he given one?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                June 11, 2012

149

1          MR. SWEETEN:  That's fine.  He's got the answer.
2          THE WITNESS:  He was not -- okay.
3     Q.   Were any other 2009 chairs -- did any other 2009
4     chairs return to the House but no longer hold chairmanships?
5     A.   I don't recall.
6     Q.   Okay.  If you'll turn to Page 185, which is near the
7     end.  Just read in the middle of the page.
8     A.   Where are we?
9     Q.   Page 185, and I guess beginning at Line 6.  If you
10    could just --
11         MR. SWEETEN:  This is excerpted so it doesn't
12    have all the pages.
13    Q.   Yeah.  The page numbers are at the top of the pages.
14    A.   Okay.
15    Q.   If you could just review that, beginning at Line 6.
16    Do you see where Representative Smith testified that voter ID
17    was the most controversial issue in the 81st Legislature?
18    A.   It was very controversial, he said.
19    Q.   And did he not say -- and he not agree with the
20    question, "In fact, it might have been the most controversial
21    issue of the '09 session"?
22    A.   Yes.
23    Q.   And based on the public statements made concerning
24    voter ID in the 81st Legislature, would you agree with that
25    statement?

150

1          MR. SWEETEN:  You can answer as he has asked you
2     to, based upon the public statements made.  You can answer that
3     question.
4     A.   It was very controversial.
5     Q.   During the 81st Legislature, were you aware of a
6     pledge circulated by the Republican Party of Texas concerning
7     voter ID?
8     A.   I don't recall.
9     Q.   And this has previously been marked as U.S.
10    Exhibit 22.
11    A.   Uh-huh.
12    Q.   Were you asked to sign this pledge -- well, first
13    review it.  Sorry.
14    A.   Was I asked?
15    Q.   Uh-huh.
16    A.   I don't recall.
17    Q.   Do you recall whether you spoke with Eric Opiela about
18    this pledge?
19    A.   I don't recall.
20    Q.   Is it generally courtesy of some kind not to ask the
21    Speaker to sign support pledges?
22         MR. SWEETEN:  Objection, compound.  Objection,
23    calls for speculation.
24         You can answer the question as phrased, as to a
25    general matter.

151

1     A.   I don't know what would be routine for that.
2     Q.   Are such pledges frequently circulated in the Texas
3     House concerning prospective legislation?
4     A.   By political parties or caucuses or groups?
5     Q.   Yes.
6     A.   Probably, yeah.
7     Q.   Are you ordinarily asked to sign them, along with the
8     other members?
9     A.   I have been asked on various issues.
10    Q.   But you don't recall whether you were asked to sign
11    this one?
12    A.   I don't recall.
13    Q.   Okay.  What happened to S.B. 362 in the House?
14    A.   What happened?
15    Q.   Why did it not pass the House?
16         MR. SWEETEN:  You can testify as to matters of
17    public record, but don't reveal matters of privilege, which
18    would be your thought process.
19    A.   There were lengthy delays.
20    Q.   Is that process sometimes referred to as chubbing?
21    A.   Yes.
22    Q.   Does chubbing comply with the letter of the House
23    rules?
24    A.   It did.
25    Q.   Were any points of order raised in an effort to stop

152

1     the chubbing?
2     A.   I don't recall.  Probably.
3     Q.   Okay.  But the chubbing continued.  So if they were
4     raised, you denied those points of order, correct?
5     A.   I don't recall.
6     Q.   Were you challenged for the speakership at the
7     beginning of the 82nd Legislature?
8     A.   Yes.
9     Q.   Who was or --
10    A.   Actually, at the beginning, you mean opening on the
11    first day of the session?
12    Q.   Prior to becoming Speaker for the 82nd Legislature --
13    A.   Yes.
14    Q.   -- did other individuals --
15    A.   Yes.
16    Q.   -- challenge your position as Speaker?
17    A.   Yes.
18    Q.   Who challenged your position as Speaker?
19    A.   Representatives and Paxton.
20    Q.   Did represent Berman challenge your position as
21    Speaker or did he merely support your opponents?
22    A.   Maybe he did at one time.  I don't recall.
23    Q.   What were the issues raised by Representatives Paxton
24    and Chisum publicly?
25    A.   What were the --



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                    June 11, 2012

153

1    Q.   The issues that they raised?

2    A.   I don't remember.

3    Q.   Did you speak publicly concerning any of these issues?

4    A.   Perhaps.  I don't remember.

5         MR. FREEMAN:  Okay.  And if this could be marked

6    as U.S. 472.

7         (Exhibit No. 472 marked)

8    Q.   Have you seen this article before?

9    A.   Might have.  I don't -- probably saw it.

10   Q.   Okay.  And what is the basic sentiment of this

11   article?

12   A.   It appears there were charges made by Representative

13   Berman.

14   Q.   Did Representative Berman allege that you had reached

15   an agreement with the democrats to block voter ID?

16   A.   It alludes to a letter where he said that.

17   Q.   Is the letter -- oh, you mean Representative Berman?

18   A.   Yes.

19   Q.   Okay.

20   A.   It says, "The three things, according to Berman, were

21   that there would be no votes on the House Floor on Voter ID,

22   immigration or pro-life legislation."

23   Q.   And you previously testified that you had not reached

24   any such agreement, correct?

25   A.   That's correct.

154

1         MR. FREEMAN:  Mark this as U.S. 473.

2         (Exhibit No. 473 marked)

3    Q.   What is this document?

4    A.   It's an e-mail to District 24 Taylor.

5    Q.   Who is -- is that Representative Taylor?

6    A.   I assume so.  Is that Representative Larry Taylor?  I

7    don't know what District 24.  I assume so, yeah.

8    Q.   Okay.  Have you seen this e-mail or others like it?

9    A.   No.

10   Q.   Okay.  Were there any large e-mail blasts sent early

11   in the session opposing you in the speakership role?

12   A.   I'm sure there were, yes.

13   Q.   Okay.  What does the term RINO mean?

14   A.   It means nothing to me.

15   Q.   Okay.  Does it mean Republican in Name Only?

16   A.   That's what those who use that phrase mean, yes.

17   Q.   I presume you don't consider yourself to be a RINO?

18   A.   No.

19   Q.   Were any e-mails like this one sent to your account or

20   your office?

21   A.   Probably.

22   Q.   Did your staff deal with them without passing them on

23   to you?

24   A.   I don't -- I don't know.

25   Q.   That may be privileged.

155

1    A.   I don't recall.

2         MR. SWEETEN:  He doesn't recall in the first

3    place, so I'm sure it's difficult for him to say where --

4    Q.   Were any other public statements made concerning voter

5    ID and your fitness to serve as Speaker?

6         MR. SWEETEN:  You can testify as to public

7    statements made.

8    A.   Made by whom?

9    Q.   Anyone who we haven't discussed previously.

10   A.   Probably.  I don't remember specifically.

11   Q.   Any specific statements you recall?

12   A.   No.

13   Q.   And does this letter -- just to be clear for the

14   record, does this letter say that you worked to kill a very good

15   voter ID bill in the prior session?

16   A.   It says it.  I don't know who wrote it.

17   Q.   Yeah.  That's all I'm asking, is whether it says it.

18   Did you respond to the e-mails received by your office that were

19   similar to this one, to your knowledge or recollection?

20   A.   We typically respond to most e-mails or most

21   communications.

22   Q.   Did any member of the public contend at any point that

23   you should not be the Speaker because you could not advocate for

24   conservative Christian values?

25        MR. SWEETEN:  You can testify about any public

156

1    statements in answering this question.

2    A.   Yes, in the media.  That's been reported in the media,

3    yes.

4    Q.   Did you respond publicly to those statements?

5    A.   Maybe not specifically to that statement, but yes, I

6    had a public statement about religious faith and public service.

7    Q.   Okay.  Did Representative Patricia Harless submit a

8    House photographic voter identification bill in the 82nd

9    Legislature?

10   A.   Did she propose legislation?

11   Q.   Her own bill, yes.

12   A.   I believe she did.  There were a number of

13   representatives who filed bills.

14   Q.   And this has previously been marked as U.S. Exhibit 4.

15   A.   Uh-huh.

16   Q.   Is this Representative Harless' bill?

17   A.   Yes.

18   Q.   Was this bill referred to the Select Committee on

19   Voter Identification and Voter Fraud?

20   A.   I think it was, but it could have been referred to

21   Elections Permanent Committee.  I'm not sure.

22   Q.   Do you recall if more than one bill was referred to

23   the Select Committee on Voter Identification and Voter Fraud?

24   A.   I don't -- I don't recall.

25   Q.   This has previously been marked as Exhibit 13.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                              June 11, 2012

157

1    A.   Okay.
2    Q.   Have you seen this kind of report before?
3    A.   Have I seen this?
4    Q.   Uh-huh.
5    A.   I don't recall seeing this.
6    Q.   Is it a printout from the Texas Legislature's web
7    site?
8    A.   Yes.
9    Q.   And does the Texas Legislature's web site generate
10   reports for a given committee for what bills were referred to
11   that committee in a particular session?
12   A.   Yes.
13   Q.   And does this report indicate that only one bill was
14   referred to the Select Committee on Voter Identification and
15   Voter Fraud, and that was S.B. 14?
16   A.   That's what it says, yes.
17   Q.   Okay.   So it's likely that Representative Harless'
18   bill was referred to Elections, correct?
19        MR. SWEETEN:   Objection, calls for speculation.
20   A.   I don't know.
21   Q.   Do you recall speaking with your staff as a
22   general matter concerning H.B. 112, Representative Harless'
23   bill?
24   A.   I don't recall specifically that, discussing her bill.
25   Q.   And if you could review her bill real quickly,

158

1    specifically Section 6(b) and Section 10.   Did this bill allow
2    voters to identify themselves using one form of photo ID or two
3    forms of non-photo ID?
4         MR. SWEETEN:   You can answer based on the text of
5    the bill.
6    A.   6(b)?
7    Q.   Yes.
8    A.   That's what it says, yes.
9    Q.   Okay.   Do you know if you made any public statements
10   concerning this bill?
11   A.   I don't recall.
12   Q.   Do you know if you spoke with any constituents,
13   lobbyists, or advocacy groups about this bill?
14   A.   I don't recall doing that.
15   Q.   This has previously been marked as Exhibit 5.   What is
16   this document?
17   A.   S.B. 14.
18   Q.   Okay.   Does anything in this bill address non-citizen
19   voting?
20        MR. SWEETEN:   You can answer based on the text of
21   the bill.
22   A.   Where would I find that?
23        MR. SWEETEN:   Let's look for it.   Let's see.
24   A.   I don't see it.
25   Q.   Okay.   What forms of identification are allowable to

159

1    identify a voter under this bill?   And you can look to Section
2    14 to refresh your recollection if you'd like, which is on Page
3    9.
4    A.   A driver's license, election identification
5    certificate, personal identification card issued to the person
6    by the Department of Public Safety, military identification card
7    contains the person's photograph, United States citizenship
8    certificate that contains person's photograph, U.S. passport,
9    license to carry concealed handgun.
10   Q.   And that's all, correct?
11   A.   That's all I see, yes.
12   Q.   And so under S.B. 14 it's not possible to establish
13   identity using non-photo ID, correct?
14   A.   That's the way it appears to me.
15   Q.   Okay.   And sorry to make you jump back, but that
16   pledge that I showed you earlier --
17   A.   The what?
18   Q.   The pledge that I showed you earlier?
19   A.   Uh-huh.
20   Q.   Did that ask members to agree that they would use a --
21   they would pass a photo ID bill that allowed -- that required
22   voters to vote only with photo ID?
23   A.   Ensure a valid photo ID is needed to vote.
24   Q.   Okay.   Did you have any discussions, as a general
25   matter, concerning the contents of S.B. 14 prior to its passage?

160

1         MR. SWEETEN:   You can discuss if any
2    conversations did occur.   He's entitled to find out if those
3    occurred, but don't reveal the substance of those conversations.
4    A.   I don't -- specific language or aspects of the bill?
5    Q.   Substance in any way.
6    A.   No.
7    Q.   So no discussions concerning the omission of student
8    ID?
9    A.   No.
10   Q.   No discussions concerning the omission of employee ID?
11   A.   I don't recall having specific discussions about -- or
12   I don't recall having discussions about specific items that
13   would be included or not included in a bill.
14   Q.   Okay.   If you could turn back to Exhibit 466.   Sorry
15   to make you dig in the pile of paper.
16   A.   Which one is that?
17   A.   It was the talking points from Dallas.   It says on the
18   top 12329, if that's helpful.
19        MR. SWEETEN:   Want to just use mine.
20   A.   Okay.
21   Q.   Do you see on the third page, does it say that Texas
22   passed arguably the strictest voter ID law in the nation during
23   the 82nd legislature?
24   A.   That's what it says, yes.
25   Q.   And again, do you know if you used these talking



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                    June 11, 2012

161

1    points during the speech at issue?

2        A.  I don't recall.

3        Q.  And do you understand that talking point to mean --

4    not the substance of the bill, but the talking point -- to mean

5    that you passed a bill that is stricter than other photo ID

6    bills?

7        MR. SWEETEN:  Daniel, objection.  He's not going

8    to characterize -- off the record.

9        (Brief off-record discussion)

10       MR. SWEETEN:  Look, on this he's not going to

11   answer what he meant by saying it.  It says what it says.

12       MR. FREEMAN:  That's fine.  I'll withdraw the

13   question.  Okay.

14       Q.  I'd like to talk about the process by which S.B. 14

15   was introduced.  First off, what does the term "legislative

16   emergency" mean in the Texas Legislature?

17       A.  Well, I assume that's provided by the governor.  And

18   it's simply an item that the governor would decree to be an

19   emergency which would allow the legislature to take up a bill

20   before the requisite number of days normally the legislature

21   would have to wait.

22       Q.  Okay.  Are there any constraints on what the governor

23   may choose to declare as a legislative emergency?

24       MR. SWEETEN:  You can answer as a matter of

25   general legislation.

162

1        A.  I'm not aware of any constraints.

2        Q.  Did you or your staff have any conversations with the

3    governor or the governor's staff, to the extent of your

4    knowledge, as a general matter concerning legislative

5    emergencies in the 82nd legislature?

6        MR. SWEETEN:  You can answer as phrased.  Don't

7    reveal the substance of the conversation.

8        A.  No.

9        Q.  Okay.  Was photographic voter ID declared to be a

10   legislative emergency in 2011?

11       MR. SWEETEN:  If that's a matter of public

12   record, you can answer the question.

13       A.  Yes.

14       Q.  Was it declared to be a matter of legislative

15   emergency in January?

16       A.  I believe so.

17       Q.  And as you said before, it's the governor's office

18   that declared legislative emergencies, right?

19       A.  That's correct.

20       Q.  Is there a specific individual in the governor's

21   office, to the extent that it is public information, who is

22   responsible for declaring legislative emergencies?

23       A.  Not that I'm aware of.

24       Q.  Okay.  Do you know if any election was set to occur

25   during the first 60 days of the session?

163

1        A.  An election?

2        A.  Uh-huh.

3        A.  I don't recall.

4        Q.  Okay.  Do you recall having any conversations with

5    Lieutenant Governor Dewhurst or his staff concerning which house

6    would move first on voter ID?

7        MR. SWEETEN:  You can answer.

8        A.  I don't recall.

9        Q.  Do you know when S.B. 14 passed out of the Senate?

10       A.  I don't.

11       Q.  And this has previously been marked as U.S. 8.

12       A.  Okay.

13       Q.  What is this document?

14       A.  It's the history of legislative -- history of Senate

15   Bill 14.

16       Q.  And does this give you a date on when S.B. 14 passed

17   out of the Senate?

18       A.  I think it does.

19       Q.  Was it January 26th, as noted on Page 6?

20       A.  January 26th?

21       Q.  Yep.

22       A.  Record vote in the gross senate, yes.

23       Q.  Did you or your staff have any conversations

24   concerning who would carry the voter ID bill in the house?

25       MR. SWEETEN:  You can answer as phrased, but

164

1    don't provide any additional substance of the conversation if

2    there was one.

3        A.  Yes, I'm sure we did.

4        Q.  Who did you have those conversations with?

5        A.  I don't recall.  Probably --

6        Q.  Do you know when they occurred?

7        A.  No.

8        Q.  Did you receive any communications from constituents

9    accusing you of delaying S.B. 14?

10       A.  Not that I recall.

11       MR. FREEMAN:  Okay.  And if this could be marked

12   as U.S. 474.

13       (Exhibit No. 474 marked)

14       Q.  What is this document?

15       A.  This is a web mail correspondence, Office of the

16   Governor.

17       Q.  And when is it dated?

18       A.  It's dated the 25th of January, 2011.

19       Q.  And does this state that Speaker Straus is blocking

20   voter ID in the house?

21       A.  It's making that assertion, yes, by two people from

22   Richmond, Texas.

23       Q.  And does it state that the bill is needed in Texas and

24   that the people want it?

25       A.  It says that.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                    June 11, 2012

165

1      Q.  On January 25th, had any bills passed out of the Texas
2   House?
3      A.  I don't believe so, no.
4      Q.  Had you even made committee assignments?
5      A.  No.
6      Q.  In the period that you've served, have any
7   controversial bills ever passed out of the Texas House by
8   January 25th?
9      A.  No.
10     Q.  Okay.  Now, we mentioned this once before, but what is
11  a select committee?
12          MR. SWEETEN:  Objection, asked and answered.
13  You can answer.
14          MR. FREEMAN:  I'm trying to move this deposition
15  along quickly.
16          MR. SWEETEN:  I'm letting him answer.
17     A.  It's a committee appointed at the discretion of the
18  Speaker.
19          MR. FREEMAN:  Let the record reflect that counsel
20  were all laughing.
21     Q.  Who picked the name of the Select Committee on Voter
22  Identification and Voter Fraud?
23     A.  Who picked it?
24     Q.  Uh-huh.
25     A.  The Speaker assigned it, yes.

166

1      Q.  Okay.  Are you aware of any other select committees
2   related to voting or elections in current or past legislatures?
3      A.  Yes.  There have been committees on election contests.
4      Q.  Okay.  Do those have a specific procedural role when
5   there is an election contest?
6      A.  Yes.
7      Q.  Are there any other select committees that have
8   addressed substantive issues related to elections outside that
9   unique field of election contests, to your recollection?
10     A.  I'm not aware.
11     Q.  Are you aware of any other select committees that
12  relate directly to a standing committee in the way that the
13  Select Committee on Voter Identification and Voter Fraud relates
14  to elections?
15          MR. SWEETEN:  Objection, vague.  Objection, calls
16  for speculation.
17          Go ahead.  You can answer.
18     A.  I'd have to think about the other select committees
19  we've had.
20          THE WITNESS:  What other select committees have
21  we had?
22          MR. ANCIA:  None in the last --
23          MR. FREEMAN:  To the extent of your knowledge?
24          MR. SWEETEN:  He can't tell you.  Just answer if
25  you can.

167

1          THE WITNESS:  I can't remember it.
2          MR. FREEMAN:  There's no "phone a friend" in
3   depositions, unfortunately.  And it's fine if you can't answer.
4          THE WITNESS:  I was asking my brain, and it
5   couldn't remember.
6          MR. FREEMAN:  Sometimes it's your friend.
7   Sometimes it's not.
8          THE WITNESS:  Select committees often relate to
9   issues that overlap with other committees.
10     Q.  Okay.  Was the Select Committee on Voter
11  Identification and Voter Fraud a fast-track committee?
12          MR. SWEETEN:  If that's a matter of public
13  record, you can testify to it.
14     A.  A fast-track committee?  I don't know what a
15  fast-track committee would be.
16     Q.  And this has previously been marked as U.S. Exhibit
17  12.  What is this document?
18     A.  It's a public release from Speaker's office.
19     Q.  And at the bottom of the page, does its designate the
20  Select Committee on Voter Identification and Voter Fraud as a
21  fast-track committee?
22     A.  Yes, it does.
23     Q.  Do you know what that meant?
24     A.  No.
25     Q.  Okay.

168

1      A.  This was Wednesday, February 9th.  No, I don't know.
2      Q.  Were any other committees that session designated as
3   fast-track committees?
4      A.  Not that I see here, no.
5      Q.  Are you aware of any public statements made by
6   legislators, party officials, or any advocates that
7   Representative Todd Smith had delayed release of a voter ID bill
8   from the Elections committee in 2009?
9      A.  Am I aware of statements made by others?
10     Q.  Yes.
11          MR. SWEETEN:  Public statements he's asking.
12     A.  From anyone?
13     Q.  Anyone.
14     A.  I seem to recall seeing that.
15     Q.  Do you know who made those statements?
16     A.  I don't.
17     Q.  Did Representative Smith win his primary last month?
18     A.  No.
19     Q.  Do you recall who the members of the Select Committee
20  on Voter Identification and Voter Fraud were?
21     A.  I'd have to look at the list.
22     Q.  Okay.  Ask and you shall receive.
23          MR. FREEMAN:  If this could be designated as U.S.
24  475.
25          (Exhibit No. 475 marked)



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                                              June 11, 2012

169

1    Q.   Who are the members of the Select Committee on Voter
2    Identification and Voter Fraud?
3    A.   Representative Bonnen, Veasey, Aliseda, Gutierrez,
4    Harless, Hilderbran, Hochberg, Pena and Taylor.
5    Q.   So Representative Todd Smith was not on the select
6    committee; is that correct?
7    A.   No.
8    Q.   Are you aware of any testimony in the redistricting
9    litigation concerning whether Representative Aliseda was the
10   preferred candidate of Latino voters in his district?
11   A.   Am I aware of --
12   Q.   Any testimony in the redistricting litigation
13   concerning whether Representative Aliseda was the preferred
14   candidate of Latino voters in his district?
15   A.   I am not.
16   Q.   Are you aware of any public statements made by
17   Representative Pena that he could not win in the interim
18   district drawn by the San Antonio court in which he resided?
19   A.   Public statements, no.
20   Q.   Okay.  Representative Anchia is not on the committee;
21   is that correct?
22   A.   That's correct.
23   Q.   Would it be fair to say that Representative Anchia was
24   the most actively involved in public debates and statements
25   concerning voter ID in prior sessions?

170

1         MR. SWEETEN:  You can answer.
2    A.   You could say that.
3    Q.   Would it be fair to say that he was the most actively
4    involved Hispanic legislator on this issue in past sessions, in
5    terms of his public statements?  I'm happy to cabinet.
6    A.   I think there were others too, but he certainly was
7    high profile, yes.
8    Q.   And Representative Berman is not on the committee; is
9    that correct?
10   A.   That's correct.
11   Q.   Representative Berman was chairman of Elections under
12   Speaker Craddick, was he not?
13   A.   I don't recall.
14   Q.   Okay.  And Representative Berman was on the Elections
15   committee in 2011, correct?
16   A.   I don't remember.
17   Q.   Does Representative Berman use his seniority pick to
18   be on the Elections committee each term?
19   A.   I don't remember.
20        MR. SWEETEN:  Whoa, whoa, whoa.  Okay.  Yeah.
21   That's fine.
22   Q.   Was Representative Berman -- did Representative Berman
23   make public statements concerning voter ID in prior sessions?
24   A.   Did he make public statements?
25   Q.   Uh-huh.

171

1    A.   Could have, I'm sure.
2    Q.   Anything you recall?
3    A.   No.
4    Q.   Would it be fair to say that Representative Berman has
5    made very -- has publicly expressed very strong opinions
6    concerning voter ID?
7    A.   I would assume he has.
8    Q.   Has Representative Berman expressed very strong
9    opinions publicly concerning immigration?
10   A.   Yes.
11   Q.   Did you at any point publicly request that
12   Representative Berman stop offering amendments to other
13   representatives' legislation limiting benefits based on
14   citizenship?
15   A.   Ask the question again.
16   Q.   Did you at any time publicly request that
17   Representative Berman stop offering amendments to other
18   representatives' legislation that would limit benefits based on
19   citizenship?
20        MR. SWEETEN:  You can answer as a public matter.
21   A.   No.
22   Q.   Did any other representative make that request to
23   Representative Berman?
24   A.   Publicly?
25   Q.   Yes.

172

1    A.   Not that I'm aware of.  I don't know.
2    Q.   Did Representative Berman, during the last legislative
3    session, offer a series of amendments to other representatives'
4    legislation that would limit benefits based on citizenship?
5    A.   I seem to recall he did that, but -- was that I guess
6    this last -- I don't remember when that was.  But, yes, he has
7    in the past.
8    Q.   Okay.  Do you recall Representative Berman making any
9    public statements linking voter ID and immigration?
10   A.   I don't.
11   Q.   Okay.  Did you campaign in favor of Representative
12   Berman's challenger in the republican primary?
13   A.   Did I campaign in favor of his challenger?
14   Q.   Or endorse his challenger?
15   A.   No.
16   Q.   Did you donate any money to his challenger?
17   A.   I did not.
18   Q.   Okay.  Did you have any conversations concerning the
19   creation of a select committee to address voter ID?
20   A.   Ask it again.
21   Q.   Did you have any conversations concerning the creation
22   of a select committee to handle voter ID?
23   A.   Did I have conversations for this select committee?
24   Q.   Uh-huh.
25   A.   I probably did.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

173

1    Q.  Do you recall who you had those conversation with?
2    A.  I would assume mainly internally.
3    Q.  So your staff?
4    A.  Yes.
5    Q.  Anyone outside your staff that you recall?
6    A.  I do not recall.
7    Q.  Did you have any conversations concerning the
8    membership of the select committee?
9    A.  Externally?  Meaning where?
10   Q.  In general.  Unfortunately, I can't ask anything more
11   specific than that without angering your counsel so --
12   A.  Right.  I don't recall conversations.
13   Q.  Are you aware of any other examples of committees that
14   have heard only one bill?
15   A.  I'd have to look.  Not aware.
16   Q.  Okay.  Were any bills submitted during the 82nd
17   Legislature whose purpose was to address mail-in voter fraud?
18   A.  I believe so.
19   Q.  But none of them were referred to the Select Committee
20   on Voter Identification and Voter Fraud, right?
21       MR. SWEETEN:  I assume that's a matter of public
22   record so you can testify as to --
23   A.  Yeah.  I suppose the statistics exist.  No.
24   Q.  Okay.  Other than Speaker's discretion, are there any
25   other public criteria for appointing members of a select

174

1    committee?
2    A.  Other than the Speaker's?
3    Q.  Uh-huh.
4    A.  No.
5    Q.  Okay.  Do you know when the select committee took up
6    S.B. 14?
7    A.  I don't recall.
8    Q.  I think you have a document in front of you that
9    should be able to help you refresh your recollection.
10       MR. SWEETEN:  Is it before or after the
11   Blockbuster application?
12       Here we go.  I think that's what he may be
13   talking about.  The bill report.
14       MR. FREEMAN:  Yes.
15   A.  When it was referred to committee?
16   Q.  Yes.
17   A.  February 11th.
18   Q.  And when did it pass out from the committee?
19   A.  The 7th of March.
20   Q.  What is the emergency calendar?
21   A.  The emergency calendar?
22   Q.  Uh-huh.
23   A.  That would be the calendar of emergency items.
24   Q.  And what are the criteria to place something on the
25   emergency calendar?  What makes something an emergency?

175

1        MR. SWEETEN:  If that's a matter of public
2    record, you can testify to it.  If it involves your own thought
3    processes --
4    A.  No, it's not my thought processes.  My recollection is
5    it's one of the items that the governor would identify as an
6    emergency.
7    Q.  Oh.  So any item that is a legislative emergency would
8    be placed on the emergency calendar?
9    A.  I don't recall.
10   Q.  Okay.  I believe this is a matter of public record,
11   but just to clarify.  Did you cast any votes in favor or against
12   S.B. 14 during the floor debate?
13   A.  I did not.
14   Q.  And you appoint house members of a conference
15   committee, correct?
16   A.  Yes.
17   Q.  Do you recall who was on the conference committee?
18   A.  No.
19   Q.  If we could have this marked as U.S. 476
20       (Exhibit No. 476 marked)
21   Q.  Does this document memorialize who the members of the
22   conference committee were?
23   A.  Yes.
24   Q.  And who were the House conferees?
25   A.  Representatives Harless, Aliseda, Bonnen, Truitt and

176

1    Veasey.
2    Q.  And were these all members of the select committee?
3    A.  Most of them.
4    Q.  Was Representative Truitt on the select committee?
5    A.  No.
6    Q.  And, again, this committee did not include
7    Representative Anchia, correct?
8    A.  That's correct.
9    Q.  And it also did not include Representative Guttierez,
10   who was on the select committee, correct?
11   A.  That's correct.
12   Q.  Is there any meaning that can be -- should be imputed
13   to a member's failure to sign a conference committee report form
14   as a matter of public understanding of what it means in the
15   legislature?  I'm not trying to get at anyone's thoughts or
16   mental impressions.  I just want to understand if that has a
17   meaning or designation in terms of a vote?
18       MR. SWEETEN:  Yeah.  I think that would require
19   him to give his thoughts on -- you're handing him a document.
20   Mark Veasey hasn't signed it.  I think you're asking his mental
21   impressions.
22       JUDGE PHILLIPS:  You could ask what's in the
23   rule.
24       MR. FREEMAN:  That's basically what I'm trying to
25   get at, and my question was perhaps not artfully phrased.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                              June 11, 2012

177

1    Q.  I'm just trying to understand, if you have a
2    conference committee report that has eight signatures out of
3    ten, does that mean it was an eight-two vote in favor of the
4    conference committee?
5        MR. SWEETEN:  As a general matter, you can
6    testify to that.
7    A.  As a general matter, I think there's a certain number
8    of signatures required.
9    Q.  How many signatures are required to pass a bill out of
10   a conference committee?
11   A.  A majority.
12   Q.  Okay.  Do you know how long it took S.B. 14 to go
13   through the conference process?
14   A.  I don't.
15   Q.  Were there any public complaints that you are aware of
16   that it was taking too long for S.B. 14 to get out of
17   conference?
18   A.  Any public complaints?
19   Q.  Uh-huh.
20   A.  I'm not aware.
21   Q.  Any public concerns that delay in the conference
22   committee could keep the bill from passing of which you're
23   aware?
24   A.  I don't remember.
25   Q.  Okay.  Were there -- are you aware of whether there

178

1    were any changes introduced to S.B. 14 in the conference
2    committee that had not been in either version of the bill passed
3    by either house?
4    A.  I don't recall.
5    Q.  Can you name any other instance in which a conference
6    committee added a provision that was in neither the House or
7    Senate version of the bill?
8    A.  On any matter?
9    Q.  Yeah.
10   A.  Yes.
11   Q.  Is that a relatively common occurrence?
12   A.  It happens.
13   Q.  Okay.  To your knowledge, has the Secretary of State
14   enforced S.B. 14 in any way?
15   A.  I'm not aware.
16   Q.  Do you know if any local election official has
17   enforced S.B. 14?
18   A.  I'm not aware.
19   Q.  Have you heard any public reports of confusion
20   regarding requirements to vote in terms of identification?
21   A.  No.
22   Q.  Okay.  Who are the main opponents of S.B. 14 in terms
23   of publicly stated opposition?
24       MR. SWEETEN:  You can answer.  It's public.  He's
25   asking public statements.

179

1    A.  Mostly leaders of -- democrat leaders.
2    Q.  Okay.  Any outside groups?
3    A.  I assume so, but I don't --
4    Q.  Any specific ones you can recall?
5    A.  I don't want to leave anybody out.  I don't know.
6    Q.  As a general matter, minority groups, groups
7    representing minority voters' interests?
8    A.  I think so.
9    Q.  Any election officials?
10   A.  Not that I know of.
11   Q.  What were the reasons that the outside groups gave for
12   their opposition to S.B. 14?
13       MR. SWEETEN:  You can answer as to public
14   expressed reasons given.
15   A.  I think generally they claim that it's an impediment
16   to voting.
17   Q.  Did they suggest any particular changes publicly that
18   could be made to reduce the impediment to voting which you're
19   aware?
20   A.  I don't remember specifically.  I'm sure they did.
21   Q.  Okay.  Did you make any public statements concerning
22   the opposition to S.B. 14?
23   A.  I don't recall.
24   Q.  Did you ever discuss publicly whether S.B. 14 would
25   impact minority voters' ability to cast a ballot?

180

1    A.  I don't recall making a statement.
2    Q.  Okay.  Did you ever have any general discussions
3    concerning compliance with Section 5 of the Voting Rights Act
4    regarding S.B. 14?
5    A.  Did I have --
6    Q.  Any conversations?
7    A.  Not that I recall.
8    Q.  Did you have any conversations concerning the
9    submission of S.B. 14 for administrative preclearance?
10   A.  No.
11   Q.  Do you know if your staff had any conversations
12   concerning submission of S.B. 14 for administrative
13   preclearance?
14   A.  Not aware.
15   Q.  Am I correct that during a regular legislative session
16   members may not solicit written pledges of support or promise to
17   vote for any person for the office of Speaker as a matter of
18   public stated House policy?
19   A.  Yes.
20   Q.  Okay.  Have any legislators publicly declared their
21   intention to challenge you for the speakership in the next
22   legislature?
23   A.  Yes.
24   Q.  Have any legislators made a filing of some kind to
25   challenge you?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

181

1    A.  I believe -- I believe one has.
2    Q.  Is that Bryan Hughes?
3    A.  Yes.
4    Q.  Has Mr. Hughes publicly noted any commitments being
5    made in his favor?
6    A.  Not that I'm aware of.
7         (Brief interruption)
8         MR. FREEMAN:  Let's mark this as 477.
9         (Exhibit No. 477 marked)
10   Q.  Have you seen this article before?
11   A.  I think I did see it, yes.
12   Q.  And does Mr. Hughes say in this article that he would
13   support a change in the rules so that bills with widespread
14   support could be snatched out of the committee and be moved
15   directly to the floor?
16   A.  It says that he said --
17   Q.  Okay.
18   A.  -- that he would appoint really conservative members
19   to be chairmen so that bills dealing with anti illegal
20   immigration, anti abortion and limiting government could get
21   through and that he would support a change in the rules so that
22   bills with widespread support could be snatched out of the
23   committees and moved directly to the floor.
24   Q.  Has anyone ever publicly advocated for such a rule that
25   referenced the 2009 procedures for voter ID and the delays that

182

1    occurred there?
2    A.  Ask your question again.
3    Q.  Sure.  Has anyone ever -- it was not well phrased and
4    hopefully I'll do better this time.
5         Has anyone ever publicly advocated for such a rule
6    that would allow the majority of the membership to pull bills
7    out of committee regardless of the committee's vote and
8    referenced voter ID?
9    A.  Not that I'm aware of.
10   Q.  Okay.  And does this article describe you as being
11   genial and well-liked?
12   A.  I hope so.  I don't know.
13   Q.  It does.
14   A.  Yeah, it does.
15   Q.  Have any legislators publicly declared their intention
16   to support another legislator for the office of Speaker in the
17   next legislature?
18   A.  I'm not aware.
19   Q.  Any declared their intentions simply not to vote for
20   you?
21   A.  I'm not aware of that either.
22   Q.  Has voter ID been an issue discussed publicly
23   concerning the speakership for the next session?
24   A.  Not that I'm aware of.
25   Q.  Neither negatively or favorably?

183

1    A.  I don't know.
2    Q.  Okay.  Have any legislators, party committees or other
3    groups or constituents ever publicly stated that if voter ID did
4    not pass in the 82nd Legislature in 2011 that you should be
5    removed from Speaker?
6    A.  I'm not sure.
7    Q.  Okay.  So you had to make sure that voter ID passed
8    regardless of the purpose of the bill to maintain the
9    speakership; am I correct?
10        MR. SWEETEN:  No. Don't answer the question.
11   He's asking for your personal motivations.  It's legislative
12   privilege.  Instruct not to answer.
13        MR. FREEMAN:  We're going to take a break for a
14   couple minutes, and then I will be wrapping up.
15        (Recess from 3:20 p.m. to 3:34 p.m.)
16   Q.  We are back on the record.  I have exactly one
17   follow-up question and then concluding questions.
18        I had asked previously about the purpose of S.B. 14.
19   Are you aware of whether S.B. 362 or any of the prior
20   photographic voter ID bills had a different purpose than S.B.
21   14?
22   A.  No.
23   Q.  Okay.  Are there any answers that you've previously
24   given that you wish to change at this time?
25   A.  No.

184

1    Q.  Any information that you didn't recall that you now
2    recall?
3    A.  No.
4    Q.  Anything you would like to add so we can understand
5    your answers more clearly?
6    A.  No.
7         MR. FREEMAN: This deposition is technically left
8    open pending decisions on privilege over documents and
9    testimony, but I -- given that there have been objections on the
10   basis of privilege, but I don't believe that there will be any
11   actual follow-up beyond this time, and I pass the witness to the
12   defendant intervenors.
13        MS. RUDD: Thank you.  And I am going to apologize
14   in advance.  I may be slightly repetitive.  I will try to get
15   through my questions quickly.  I'm hoping it will take less than
16   half an hour.  So I don't want to belabor your time any more
17   than I have to.
18             EXAMINATION
19   BY MS. RUDD:
20   Q.  Are you aware of any statistical analysis in the
21   public record concerning the effect of S.B. 14 on the
22   African-American population in Texas?
23   A.  I'm not specifically aware, no.
24   Q.  Same question about the Hispanic population.  Are you
25   aware of any statistical analysis that's been placed in the

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Joe Strausiii                                          June 11, 2012

185

1   public record regarding the effect of the legislation on that
2   population?
3       A.   There may have been, but I'm not specifically aware,
4   no.
5       Q.   Okay. How about statistical analysis concerning the
6   effect of S.B. 14 on Texas citizens making less than $35,000 a
7   year?
8       A.   I don't know.
9       Q.   Okay.  Are you aware of any assertions in the public
10  record that low income individuals in Texas may have more
11  difficulty obtaining photo ID under S.B. 14?
12      A.   35,000?
13      Q.   Sure.
14      A.   No.
15      Q.   Okay.  Are you aware of any assertions in the public
16  record that low income individuals are less likely to be able to
17  pay for the types of photo ID that may be required under S.B.
18  14?
19      A.   Public record?
20      Q.   Any testimony in public hearings regarding the
21  legislation?
22      A.   Maybe some floor debate.
23      Q.   Okay.  Can you list for me some of the reasons that a
24  person may need to have a driver's license.  I know we've talked
25  about several before when we were discussing some of the talking

186

1   points.  Driving a car, for example, or boarding a plane.  Can
2   you think of any other reasons why you might need a Texas
3   driver's license?
4           MR. SWEETEN:  You're asking as a general matter?
5           MS. RUDD:  As a general matter.
6       A.   None other than the obvious, operating a vehicle.
7       Q.   Right.  Not all people drive a vehicle, correct?
8       A.   Pardon me?
9       Q.   Not all people drive a vehicle or own a car; is that
10  correct?
11      A.   That's correct.
12      Q.   And not all people can afford to fly wherever they
13  want or at all; is that right?
14      A.   Yes.
15      Q.   You think there are citizens of Texas who have never
16  been on a flight before?
17      A.   Yes.
18      Q.   Okay.  So there are probably many reasons that Texas
19  citizens who are eligible to vote don't have a Texas driver's
20  license; is that right?
21          MR. SWEETEN:  Objection, calls for speculation.
22          You can answer.
23      A.   I would assume that's correct.
24      Q.   Okay.  Are you aware of assertions on the public
25  record that minorities are less likely to own gun licenses?

187

1       A.   No, I'm not.
2       Q.   Do you agree that there are at least some people in
3   Texas, like yourself, who don't own gun licenses?
4       A.   Here we go again. Yes, I'm aware not everyone has a
5   license.
6           MR. SWEETEN:  I don't have one either.
7           MS. RUDD:  Nor do I.
8       Q.   Are you aware of assertions in the public record --
9       A.   I do own -- go ahead.
10      Q.   Are you aware of assertions in the public record that
11  in-person voter fraud is a problem in Texas?
12      A.   Say that again.
13      Q.   Are you aware of assertions on the public record that
14  in-person voter fraud is distinguished from other forms of voter
15  fraud as a problem in Texas?
16      A.   Assertions made by others?
17      Q.   Correct.
18      A.   I believe I have seen statements made by some
19  prosecutors, the attorney general or someone.
20      Q.   Okay.  As you sit here today, can you point me to
21  anything specific that you recall from the public record
22  regarding in-person voter fraud?
23      A.   No.
24      Q.   Okay.  In general, are you aware of any analysis
25  relating to in-person voter fraud in Texas on the public record?

188

1       A.   I don't know.
2       Q.   Okay.  In your mind -- you testified earlier that the
3   purpose of S.B. 14 was protecting the integrity of the ballot
4   box.  Do I have that right?
5       A.   Yes.
6       Q.   In your mind is there a distinction between protecting
7   the integrity of the ballot box and voter fraud, preventing
8   voter fraud?  Are those part and parcel of the same thing?
9           MR. SWEETEN:  Are you asking him as to the
10  legislation or are you asking him as a general matter?
11          MS. RUDD: As a general matter.
12      A.   As a general matter, I think confidence and fair and
13  clean elections is important, yes.
14      Q.   And that confidence in fair and clean elections would
15  include preventing people who aren't eligible to vote from
16  voting; is that right?
17      A.   Yes.
18          MR. SWEETEN:  Don't talk about the specific
19  legislation.
20      A.   In general, yes.
21      Q.   Okay.  Let me see.  I am going to quickly go through
22  some exhibits.  And I think we've been doing this in the past.
23  I'm going to mark these as Straus Intervenor Exhibit 1, and I'll
24  go from there.
25          (Straus Intervenor Exhibit 1 marked)



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                    June 11, 2012

189

1    Q.   Feel free to take a look at this when you're ready,
2    but if you could tell me what this is, that would be great.
3        A.   This looks like the interim report from the committee
4    on elections prior to the 82nd Legislature.
5        Q.   Okay.  So this would be the committee on elections in
6    the 81st legislative session; is that right?
7        A.   Yes.
8        Q.   And if you look at the top, it looks like this
9    document went to you; is that right?
10       A.   That's correct.
11       Q.   Do you typically --
12       A.   To me and to fellow members, yes.
13       Q.   Thank you.  Do you typically read documents addressed
14   to you?
15       A.   Well, I typically do.
16       Q.   Fair enough.  If you will flip with me to Page 26 of
17   that document.  It's Bates labeled Texas_0006525.
18       A.   Okay.
19       Q.   There it says in Charge No. 3, "Examine the prevalence
20   of fraud in Texas elections.  Study new law in other states
21   regarding voter identification and recommend statutory changes
22   necessary to ensure that only eligible voters can vote in Texas
23   elections."  Did I read that correctly?
24       A.   I think so.
25       Q.   Good, I can read.  Okay.  If you'll flip with me now to

190

1    next page of Page 27, which is Texas_6526.  If you look there
2    underneath the heading labeled Testimony.
3        A.   Okay.
4        Q.   The second paragraph down, beginning "Since 2002".
5        A.   Yes.
6        Q.   Let me back up for a second.  Who's Jay Dyer?
7        A.   Deputy Attorney General For Government and External
8    Affairs.
9        Q.   Do you know Mr. Dyer?
10       A.   I've met him, yes.
11       Q.   Okay.  If you look at the second paragraph there, it
12   says, "Since 2002, Mr. Dyer testified that the AG's office
13   received 267 referrals of incidences of alleged illegal voting
14   as defined in Section 64.012 of the Texas Election Code."  Did I
15   read that right?
16       A.   Yes.
17       Q.   And then he goes on to say, "Thirty-five of those
18   alleged violations have been resolved with guilty pleas,
19   dismissals or plea agreements, while 12 cases remain active and
20   the remainder of the cases are either still being investigated
21   or the statute of limitations has expired;" is that right?
22       A.   That's what it says, yes.
23       Q.   So what this is saying is since 2002 -- and this
24   report as you'll recall is in 2011.  So in that nine-year
25   period, approximate nine-year period, there have only been 267

191

1    referrals of instances of alleged voter fraud to the AG's
2    office; is that right?
3        A.   That's what this indicates, yes.
4        Q.   Do you happen to know what the population of the State
5    of Texas was as of the 2011 -- as of 2011?
6        A.   Somewhere in the neighborhood of 24, 25 million.
7        Q.   I'm actually impressed.  I had to look it up.  25.6
8    million is what Google tells me.
9        A.   Okay.
10       Q.   So relative to the 25.6 million person population in
11   the State of Texas, do you consider 267 referrals of voter fraud
12   to the AG's office a significant problem?
13           MR. SWEETEN:  Don't answer the question.  It
14   would call for matters of legislative privilege and his opinions
15   about legislation.  Instruct not to answer.
16       Q.   Okay.  If you look down the page with me.  It says in
17   the middle of the second -- middle of the third paragraph there,
18   "He went on to explain, however, that the extent to which voter
19   fraud cases are prosecuted locally compared to the amount of
20   cases that are referred and handled by the AG's office could not
21   be determined."
22           And then if you continue to the fourth paragraph, it
23   says, "The prosecution of election fraud cases at the local
24   level are generally handled by the district attorney for felony
25   offenses and the county attorney for misdemeanors violations.

192

1    Additional research would need to be conducted to gather
2    information from these officials about voter fraud cases that
3    are referred to and prosecuted by their offices."
4            Did I read that correctly?
5        A.   Yes.
6        Q.   Okay.  Are you aware of any analysis in the public
7    record concerning the number of cases handled locally by the
8    district attorney for felony offenses at the local level, voter
9    fraud?
10       A.   I'm not.
11       Q.   Are you aware of any analysis in the public record of
12   prosecutions of election fraud conducted by county attorneys for
13   misdemeanors violations?
14       A.   No, I'm not.
15       Q.   Are you aware of any additional research reported on
16   in the public record concerning actual incidents of voter fraud
17   in the State of Texas?
18       A.   Ask it again.
19           MS. RUDD: Can you read that back for me.
20           (Requested portion read by the reporter)
21       A.   No.
22           MS. RUDD: Okay.  I'll have this marked as Straus
23   Intervenor Exhibit 2.
24           (Straus Intervenor Exhibit No. 2 marked)
25       Q.   Can you tell me what this document is?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

193

1    A.  It's from the Legislative Budget Board, Criminal
2    Justice Impact Statement, 82nd Legislative Session.
3    Q.  And this is dated May 5th, 2011; is that right?
4    A.  That's right.
5    Q.  And this again, in the To line it says it went to the
6    Honorable David Dewhurst and the Honorable Joe Straus.  That's
7    you, correct?
8    A.  Yes.
9    Q.  Do you recall reading this document when it was sent
10   to you?
11   A.  No, I don't.
12   Q.  And who is John O'Brien?
13   A.  He was the director of the Legislative Budget Board.
14   Q.  Do you know Mr. O'Brien?
15   A.  Yes.
16   Q.  And in the in re: line it says S.B. 14.  Do you see
17   that?
18   A.  Yes.
19   Q.  Okay.  If you'll scan with me down to the last full
20   paragraph on that page.  Sort of the middle of that paragraph
21   begins, "In fiscal year 2010."  Do you see that?
22   A.  Yes.
23   Q.  It says, "In fiscal year 2010, less than five
24   offenders were admitted to prison and less than five were
25   released from prison in illegal voting or attempting to vote

194

1    illegally."
2    Did I read that correctly?
3    A.  Yes.
4    Q.  Do you have any reason to disagree with that
5    statement?
6    A.  No.
7    Q.  And then it continues, "In fiscal year 2010, less than
8    five people were under patrol supervision for illegal voting or
9    attempting to vote illegally."
10   Do you have any reason to disagree with that
11   statement?
12   A.  I do not.
13   Q.  And then continuing, "In fiscal year 2010, five
14   offenders were placed on community supervision and less than
15   five were released from community supervision for illegal voting
16   or attempting to vote illegally."
17   Do you have any reason to disagree with that
18   statement?
19   A.  No.
20   Q.  And finally, "In 2010, less than five people were
21   arrested for illegal voting or attempting to vote illegally."
22   Do you see that?
23   A.  Yes, I do.
24   Q.  Do you have any reason to disagree with that
25   statement?

195

1    A.  No.
2    Q.  And do any of those statements regarding illegal
3    voting make the distinction between in-person illegal voting and
4    any other form of illegal voting?
5    MR. SWEETEN: You're asking about what's on here?
6    MS. RUDD:  Correct.
7    MR. SWEETEN:  You can answer based on the text.
8    A.  Not that I see.
9    MS. RUDD: Okay.  I'm going to have this marked as
10   Straus Intervenor Exhibit 3.
11   (Straus Intervenor Exhibit No. 3 marked)
12   Q.  I believe we looked at the first page of this document
13   just a few moments ago.  This is the full document.  And I'd
14   like you to just take a look through the document and tell me
15   whether you see any analysis in this -- well, first let me ask
16   you to testify as to what this document is.
17   A.  This is the Conference Committee Report For Senate
18   Bill 14.
19   Q.  Okay.  And if you look at the top left-hand corner of
20   this document, it looks like this document went again to
21   Representative Dewhurst and you?
22   A.  Yes, Lt. Governor Dewhurst.
23   Q.  Thank you.  Now, my question is, in looking through
24   this document -- and feel free to take as much time as you need
25   -- is there any analysis in this document regarding the number

196

1    of incidents of voter fraud in the State of Texas?
2    MR. SWEETEN:  You can answer as to what's in the
3    text.
4    A.  In the bill itself or in the analysis or?
5    Q.  In the analysis.
6    A.  Don't see that.
7    Q.  Okay.  I'm going to hand you what I'll have marked as
8    Straus Intervenor Exhibit 4.
9    (Straus Intervenor Exhibit No. 4 marked)
10   Q.  Can you tell me what this document is.
11   A.  It's the senate's bill analysis.
12   Q.  Is this a document that you typically see or is sent
13   to you?
14   A.  Senate analysis, no.
15   Q.  Okay.  If you could just look through that document
16   for me and tell me whether it contains any analysis of the
17   number of incidents of voter fraud or the prevalence of voter
18   fraud in Texas?
19   MR. SWEETEN:  And you can answer based on the
20   text of the bill or the bill analysis.
21   A.  I don't see it.
22   MS. RUDD: Okay. I'll have this marked as Straus
23   Intervenor Exhibit 5.
24   (Straus Intervenor Exhibit No. 5 marked)
25   Q.  Can you identify this document for me.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                      June 11, 2012

197

1     A.   This is the bill analysis of the committee substitute
2     Senate Bill 14.
3     Q.   And let me ask you, do you ever read these types of
4     analyses coming out of the Senate?
5     A.   I'm much more likely to read the House bill analysis.
6     Q.   Have you --
7     A.   House research.
8     Q.   Have you read this type of analysis coming out of the
9     Senate before?
10    A.   Have I?  Maybe in rare cases.
11    Q.   But you're familiar with the fact that this type of
12    analysis is done in connection with Senate bills?
13    A.   Yes.
14    Q.   Same question. Can you tell me whether there's any
15    analysis of the number of incidents of voter fraud or the
16    prevalence of voter fraud in Texas in this document?
17         MR. SWEETEN:  You can answer based on the text of
18    the document she's handed you.
19         THE WITNESS:  I'm looking for an analysis of?
20         MR. SWEETEN:  Incidents of voter fraud, I think is
21    the question.
22    A.   No.
23         MS. RUDD:  Okay.  Last one.  Straus Intervenor
24    Exhibit 7?
25         THE REPORTER:  6.

198

1         (Straus Intervenor Exhibit No. 6 marked)
2     Q.   Can you tell me what this document is?
3     A.   It's another bill analysis for Senate Bill 14, Senate
4     Research Center.
5     Q.   And same question.  Is there any analysis in this
6     document that you can see describing the number of incidents of
7     voter fraud or the prevalence of voter fraud in Texas?
8         MR. SWEETEN:  You can answer based on the text of
9     the document.
10    A.   No.
11    Q.   Okay.  Just a couple of final questions for you.
12        Are House committees required to publicly report on
13    any analysis of legislation done in committee?
14    A.   Are House committees required to?
15    Q.   Publicly report on their analysis of proposed
16    legislation?
17    A.   Yes.
18    Q.   Okay.  And is it true that House bills all come
19    attached -- if they're discussed in the committee all come
20    attached with a fiscal note and a bill analysis?
21    A.   Yes.
22    Q.   Okay.  So is it fair to say that if there is no public
23    report that contains an analysis of the number of incidents of
24    voter fraud or the prevalence of voter fraud in Texas that that
25    analysis didn't occur in any committee of the House?

199

1         MR. SWEETEN: Don't reveal any conversations
2     you've had or matters of privilege in answering the question.
3         Also, objection, calls for speculation.
4         You can answer.
5     A.   I don't know how to judge what isn't in a report.
6     Q.   When you charge as the Speaker of the House a
7     committee with certain tasks, do you expect them to report
8     publicly on what their answer is to the various charges that
9     you've given them?
10        MR. SWEETEN:  Don't reveal your personal
11    motivations.  You can talk about general procedure in answering
12    that question.
13    A.   Yeah, personal charges.
14    Q.   So if we refer back to I think my first exhibit, which
15    is the report of the committee on elections from January 10,
16    2011.
17    A.   Uh-huh.
18    Q.   At the beginning of that document.
19    A.   Yeah.
20    Q.   Page 5, Bates No. Texas_6504, there are five charges
21    there.
22    A.   Uh-huh.
23    Q.   Do you or someone on your staff typically draft the
24    charges to the committees?
25    A.   Yes.

200

1     Q.   Okay.  And is it the committees' duty, in your
2     opinion, to report information consistent with those charges
3     when they publish a committee report?
4     A.   Yes.
5         MR. SWEETEN:  You can answer as a general matter.
6     A.   Yes.
7     Q.   Okay.  So if you've charged a committee with certain
8     assignments, do you expect that any analysis done in connection
9     with those assignments will be publicly reported as part of the
10    committee report at the end of the day?
11        MR. SWEETEN:  Objection, compound.  Objection,
12    calls for speculation.
13        You can answer as a general matter.  Don't reveal
14    matters of privilege.
15    A.   As a general matter, I issue charges during the
16    interim and rely on the committees to work at their own
17    discretion.
18    Q.   Do you know whether, apart from this report on January
19    10th, 2011, there's ever been any public report that contains
20    any analysis of the number of incidents of voter fraud or the
21    prevalence of voter fraud in Texas?
22        MR. SWEETEN:  As to the public record, you can
23    answer.
24    A.   Only -- no, I'm not, other than maybe one you've shown
25    me earlier.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Joe Strausiii                                          June 11, 2012

201

1        MS. RUDD:  No further questions.
2               EXAMINATION
3    BY MR. SWEETEN:
4    Q.  Speaker Straus, you -- Senate Bill 14 was heard first
5    in the Senate, correct?
6    A.  Yes.
7    Q.  And were there public proceedings regarding Senate
8    Bill 14 before it was voted upon?  Do you know?
9    A.  Before it was voted upon by the Senate?
10   Q.  Yes.
11   A.  Committee.  I assume the committee considered it
12   first, yes.
13   Q.  When it came to the House -- and I'm asking as matters
14   of public record -- was there a committee that heard testimony
15   and considered this bill?
16   A.  Yes.
17   Q.  Was this bill debated on the floor of the House with
18   evidence and argument being presented both ways on the floor of
19   the House, based on the public record?
20   A.  Yes.
21   Q.  Okay.  With respect to your vote -- you were voted in
22   as the Speaker of the House on what date?  What year?
23   A.  January -- early January of '09, and the same in early
24   January of 2011.
25   Q.  Okay.  What was the vote in '09 for you to be the

202

1    Speaker of the House?
2    A.  It was unanimous, 150 to 0.
3    Q.  What was the vote in 2011?
4    A.  I don't recall exactly, but it was in the neighborhood
5    of 135.
6    Q.  To?
7    A.  To 15ish.
8         MR. SWEETEN: I don't have any further questions.
9         MR. FREEMAN:  I have a few quick follow-ups just
10   based on Mr. Sweeten's questions.
11             FURTHER EXAMINATION
12   BY MR. FREEMAN:
13   Q.  First, just to clarify, you testified a moment ago
14   that there were proceedings in a committee in the Senate prior
15   to the vote. Was that the committee of the whole?
16   A.  I don't recall.
17   Q.  Okay.  Second, you just testified a moment ago that
18   there was evidence and argument presented on the floor of the
19   Texas House prior to the vote; is that correct?
20   A.  The bill came to the floor.  It was fully debated,
21   yes.
22   Q.  What evidence was presented on the floor of the Texas
23   House in terms of evidence of in-person voter fraud?
24   A.  I don't recall specific evidence.
25   Q.  Is it customary for evidence to be presented during

203

1    legislative debate or is that typically provided in committee?
2    A.  There could be -- it could occur in both committee and
3    on the floor.
4    Q.  But you're not aware of any specific evidence of
5    in-person voter fraud that was presented during the debate on
6    S.B. 14 in the House in 2011, correct?
7    A.  I don't recall specifically, no.
8    Q.  And finally, you just testified a moment ago that the
9    vote for you in 2009 for the speakership was 150 to 0; is that
10   correct?
11   A.  That's correct.
12   Q.  Are speaker votes typically addressed or negotiated
13   internally prior to the public vote?
14   A.  Yes.
15   Q.  Did Speaker Craddick wish to continue to hold the
16   speakership in 2009?  Did he express that publicly?
17   A.  Up to a point, yes.
18        MR. FREEMAN:  I have no further questions.
19   A.  But not when the vote was taken.
20        MR. FREEMAN:  I have no further questions.
21             FURTHER EXAMINATION
22   BY MR. SWEETEN:
23   Q.  With respect to your recollection of the public
24   testimony on the floor of the House or the committee of the
25   House, would the best evidence of that be the actual record

204

1    itself?
2    A.  Yes.
3    Q.  Okay.  Rather than your personal recollection as
4    you're sitting here?
5    A.  Most definitely.
6         MR. SWEETEN:  I don't have any further questions.
7         MR. FREEMAN:  Thank you for your time.
8         (Deposition concluded at 4:10 p.m.)



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| | | |
|---|---|---|

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,              )
                             )
          Plaintiff,         )
                             )
VS.                          )
                             )
ERIC H. HOLDER, JR. in his   )
official capacity as Attorney)
General of the United States,)
                             )
          Defendant,         )
                             )
ERIC KENNIE, et al,          )
                             )
          Defendant-Intervenors, )
                             )
TEXAS STATE CONFERENCE OF    )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,              )  (RMC-DST-RLW)
                             )  Three-Judge Court
          Defendant-Intervenors, )
                             )
TEXAS LEAGUE OF YOUNG VOTERS )
EDUCATION FUND, et al,       )
                             )
          Defendant-Intervenors, )
                             )
TEXAS LEGISLATIVE BLACK      )
CAUCUS, et al,               )
                             )
          Defendant-Intervenors, )
                             )
VICTORIA RODRIGUEZ, et al.,  )
                             )
          Defendant-Intervenors. )
```

```
    *********************************************
                   ORAL DEPOSITION OF
                 SENATOR CARLOS URESTI
                     JUNE 11, 2012
    *********************************************
```

**Page 2**

1   ORAL DEPOSITION OF SENATOR CARLOS URESTI, produced

2   as a witness at the instance of the Defendant, was duly

3   sworn, was taken in the above-styled and numbered cause

4   on the JUNE 11, 2012, from 9:36 a.m. to 1:15 p.m.,

5   before Chris Carpenter, CSR, in and for the State of

6   Texas, reported by machine shorthand, at the offices of

7   The Attorney General of Texas, 209 West 14th Street, 1st

8   Floor Conference Room, Austin, Texas 78701, pursuant to

9   the Federal Rules of Civil Procedure and the provisions

10  stated on the record or attached hereto.

**Page 3**

3            A P P E A R A N C E S
4   FOR THE PLAINTIFF, STATE OF TEXAS:
5       Matthew Frederick
        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
6       P.O. Box 12548
        Austin, TX  78711-2548
7
        209 West 14th Street
8       8th Floor
        Austin, TX  78701
9       (512) 936-1307
        matthew.frederick@texasattorneygeneral.gov
10
11  FOR THE DEFENDANT, HOLDER, ET AL:
12      Bruce Gear
        U.S. DEPARTMENT OF JUSTICE
13      950 Pennsylvania Avenue, NW
        NWB - Room 7202
14      Washington, DC  20530
        (202) 305-7766
15      bruce.gear@usdoj.gov
16  FOR THE DEFENDANT-INTERVENOR MEXICAN AMERICAN
    LEGISLATIVE CAUCUS:
17
        Jose Garza
18      LAW OFFICE OF JOSE GARZA
        7414 Robin Rest Dr.
19      San Antonio, TX 98209
        (210) 392-2856
20      garzpalm@aol.com
21
22
23
24
25

**Page 4**

1   FOR THE DEPOENENT:
2       Roberto "Bobby" Maldonado
        BOBBY MALDONADO, P.C.
3       924 McCullough Avenue
        San Antonio, TX  78215
4       bobby@bobbymaldonado.com



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                June 11, 2012

5

INDEX

1
2   Appearances.......................................3
3   SENATOR CARLOS URESTI
4        Examination by Mr. Frederick...............6
         Examination by Mr. Garza.................115
5        Examination by Mr. Gear..................119
         Further Examination by Mr. Frederick....122
6
     Signature and Changes............................127
7
     Reporter's Certificate...........................129
8
                    EXHIBITS
9
     NO. DESCRIPTION                    PAGE MARKED
10
11   1   Senate Journal, May 9, 2011           39

12   2   Senate Journal, Jan. 26, 2011         40

13
14   3   Declaration of Carolos Uresti         44
15
16
17
18
19
20
21
22
23
24
25

6

                SENATOR CARLOS URESTI,
1
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5                    EXAMINATION
6   BY MR. FREDERICK:
7        Q.  Good morning.  Would you please state your full
8   name for the record?
9        A.  Sure.  Carlos I. Uresti.
10       Q.  Thank you.  And Senator Uresti, are you
11  suffering from an illness or any other condition today
12  that might prevent you from accurately answering my
13  questions?
14       A.  No, sir.
15       Q.  What is your occupation?
16       A.  I'm an attorney.
17       Q.  And you are a member of the Texas Senate; is
18  that right?
19       A.  Yes, sir.
20       Q.  Which district do you represent in the Senate?
21       A.  19th.
22       Q.  Can you describe that district, geographically,
23  just generally for me, please?
24       A.  Sure.  District 19 is approximately 50,000
25  square miles.  It starts from the southeast part of

7

1   Bexar County, the southeast side of San Antonio, and it
2   stretches all the way to El Paso.  It also includes
3   two-thirds of the Texas-Mexico border.  It includes all
4   or part of 23 counties.  It includes 62 school
5   districts.  It's larger than approximately 20 states or
6   so and about 118 countries and two planets.  It's a big
7   district.
8        Q.  Senator Uresti, are you asserting legislative
9   privilege in this case over matters related to Senate
10  Bill 14?
11            (Conferring with Mr. Maldanado.)
12       A.  No, sir, I'm not.
13       Q.  I know you said you're a lawyer.  Have you
14  actually been deposed before?
15       A.  Actually, I think this is the first time I've
16  ever been deposed in 20 years.
17       Q.  Okay.  I won't belabor the ground rules, but
18  I'll go through them very quickly just to remind you.
19            The most important is just to answer
20  audibly so the court reporter can hear.  So instead of
21  nodding your head or shaking your head, if you could say
22  yes or no, that will help our court reporter.
23            And if you don't understand a question I
24  ask, please don't hesitate to ask me to rephrase.  I'll
25  be happy to do so.  Do you understand?

8

1        A.  Yes, sir.
2        Q.  And again, to make the court reporter's job
3   easier, if you could just wait until I finish asking a
4   question to start your answer, that will avoid us
5   talking over each other.  And likewise, I will do my
6   best not to start a new question while you're still
7   answering.  Do you understand that?
8        A.  Yes, sir.
9        Q.  Now, your lawyer may object to some of my
10  questions.  If he does, unless he instructs you not to
11  answer, you can still answer my question.  Do you
12  understand that?
13       A.  Yes, sir.
14       Q.  Thank you, sir.  And you are represented by
15  counsel today; is that right?
16       A.  Yes, sir.  I'm represented by Bobby Maldonado.
17       Q.  Great.  Thank you.
18            Senator Uresti, what did you do to prepare
19  for your deposition today?
20       A.  About the only thing I did was read my
21  affidavit that I had submitted a couple of months ago,
22  and generally reviewed the timeline of the amendments,
23  et cetera, that were filed on the bill.
24       Q.  Did you meet with anyone to discuss your
25  deposition today?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

                            Suite 220
                   3101 Bee Caves Road
                     Austin, TX 78746
                   www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

9

1      A.   Just my attorney.
2      Q.   How many times did you meet with your attorney
3   to discuss your deposition?
4      A.   Once.
5      Q.   About how long did that meeting last?
6      A.   About an hour and a half.
7      Q.   Was anybody else at the -- at your meeting with
8   your attorney?
9      A.   No, sir.
10      Q.   Other than the affidavit you submitted and the
11   timeline of the bill and amendments, did you review any
12   other documents to prepare for your deposition today?
13      A.   Not that I can recall.
14      Q.   Did you bring any documents with you today?
15      A.   No, sir.
16      Q.   Are you currently registered to vote?
17      A.   Yes, sir.
18      Q.   Do you have a current Texas driver's license?
19      A.   Yes, sir.
20      Q.   Do you have a concealed handgun license?
21      A.   No, sir.
22      Q.   Do you have a passport?
23      A.   Yes, sir.
24      Q.   Are there any other members of your household
25   who are of voting age?

10

1      A.   Yes, sir.
2      Q.   And who are they?
3      A.   Well, I guess let me make sure I understand the
4   question.  Are you talking about my immediate family?
5      Q.   Correct, yes.
6      A.   Well, I'm single, and my children are both
7   adults.
8      Q.   Okay.  Are your children registered to vote?
9      A.   Yes, sir.
10      Q.   Do your children have current Texas drivers'
11   licenses?
12      A.   I don't know.
13      Q.   Do you know if your children have a passport?
14      A.   They did when they were minors, but I don't
15   think those passports are valid anymore.
16      Q.   Okay.
17      A.   But I don't know.
18      Q.   How many children do you have?
19      A.   I have two young boys, two young adult boys.
20      Q.   How old are they?
21      A.   29 and 26.
22      Q.   And what are their names?
23      A.   The oldest is Michael C. Uresti, and my
24   youngest is Carlos A. Uresti, Jr.
25      Q.   Do your sons live in Texas?

11

1      A.   Yes.
2      Q.   What town do they live in?
3      A.   Both of them live in San Antonio.
4      Q.   All right.  Do you know if either of your sons
5   has a concealed handgun license?
6      A.   My youngest son does.  I believe he does.
7      Q.   And that's Michael?
8      A.   No, Carlos.
9      Q.   Oh, Carlos.
10      A.   Junior.  He just got out of the Marine Corps.
11      Q.   Oh, okay.  Did your other son serve in the
12   military?
13      A.   No, sir.
14      Q.   Are you aware of whether or not your younger
15   son has a military ID?
16      A.   I believe he does, but I don't know if it has a
17   photo on it or not.
18      Q.   I want to talk about Senate Bill 14, and I'm
19   sure you remember, but just to make clear, when I talk
20   about Senate Bill 14, I refer to the photo voter ID that
21   was passed by the legislature in the 2011 session.
22      A.   Yes, sir.
23      Q.   Did you speak with any lobbyists about Senate
24   Bill 14?
25      A.   I really don't remember speaking to any

12

1   lobbyists about it.  I'm not saying I didn't, but I
2   don't recall speaking to a lobbyist.
3      Q.   Do you recall whether you spoke to any
4   representative of an organization outside the Texas
5   legislature about Senate Bill 14?
6      A.   I don't recall speaking to anybody outside the
7   legislature.
8      Q.   Do you recall speaking to anybody outside the
9   legislature about any of the prior voter ID bills
10   considered in either 2005, 2007 or 2009?
11      A.   I don't recall, other than the Department of
12   Justice, but...
13      Q.   And you spoke to the Department of Justice at
14   some point about Senate Bill 14; is that right?
15      A.   That's correct.
16      Q.   Did you speak to the Department of Justice
17   about any of the previous voter ID bills considered by
18   the legislature?
19      A.   In preparing my affidavit, I did.
20      Q.   And when was that?
21      A.   A couple of months ago.
22      Q.   Okay.  So this was either during or after the
23   2011 session?
24      A.   It was after.
25      Q.   Okay.  Do you recall ever speaking to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                June 11, 2012

13

1  Department of Justice about voter ID before the 2011
2  session?
3       A.  I did not speak to them before.
4       Q.  Do you recall whether you received any
5  materials on voter ID legislation from anyone outside
6  the Texas Legislature during the 2011 session?
7       A.  I don't recall.  I'm not going to say we
8  didn't.  Our office gets, as you know, a lot of
9  different information.  But specifically, I don't
10  recall.
11       Q.  About how many bills get considered during a
12  single legislative session?
13       A.  Well, generally, I know approximately 5,000
14  bills are filed every session, and then you have the
15  substitutes to those bills.  And then, of course, you
16  have amendments and then amendments of amendments.  So
17  you're talking about literally thousands of pieces of
18  legislation, and a result, thousands of different
19  information coming in on those different bills.
20       Q.  Okay.  So I imagine there are at least some
21  groups interested in most, if not all, of those -- of
22  those bills that get filed?
23       A.  Sure.
24       Q.  Do you recall -- do you recall whether you got
25  any material from a group outside the legislature on

14

1  Senate Bill 362 in 2009 or any of the previous voter ID
2  bills considered by the legislature?
3       A.  I don't remember.
4       Q.  Is there a Senate Democratic Caucus group?
5       A.  Yes, there is.
6       Q.  And you are a Democrat, right?
7       A.  Of course.
8       Q.  Okay.  So you're a member of the Democratic
9  Caucus?
10       A.  Yes.
11       Q.  Do you recall whether the Democratic Caucus
12  provided any materials to its members about SB 14 during
13  the 2011 session?
14       A.  I don't recall.
15       Q.  Are you also a member of the Mexican American
16  Legislative Caucus?
17       A.  No, sir.  I'm the chairman of the Senate
18  Hispanic Caucus, so we have our own -- the Senate has
19  their own caucus besides -- separate from the House
20  caucus.
21       Q.  Because the Mexican American Legislative Caucus
22  is the House; is that right?
23       A.  Yes, sir.
24       Q.  Okay.  And is the Senate Hispanic Caucus; is
25  that right?

15

1       A.  Yes, sir.
2       Q.  Did the Senate Hispanic Caucus provide its
3  members with any materials on SB 14 during the 2011
4  session?
5       A.  I don't recall.  I don't think we did, but I'm
6  not positive.
7       Q.  Does the Senate Hispanic Caucus have a chair or
8  a president?
9       A.  I'm the chairman of the caucus.
10       Q.  Okay.  Have you talked to any of your
11  constituents about a photo ID requirement for voting?
12       A.  Yes, sir.
13       Q.  Do you have an idea about how many constituents
14  you have talked to about photo voter ID?
15       A.  Well, I speak to them, I guess, generally in
16  groups.
17       Q.  Uh-huh.
18       A.  And then individually as well.  So I mean, I
19  would be guessing.  It could be hundreds.  It could be
20  in the thousands.  Again, I'm just guessing, because
21  over the several years, I've spoken to literally
22  thousands of people, but not necessarily specifically
23  about the voter ID bill, but... So it's a guess.  I've
24  spoken to a lot of people.
25       Q.  Okay.  So you give a lot of addresses or

16

1  speeches or talks to groups of constituents?
2       A.  Yes, sir.
3       Q.  And it's possible that a talk might include
4  several topics?  Is that right?
5       A.  Yes, sir.
6       Q.  Do you recall whether you've gotten e-mails or
7  letters from your constituents about either SB 14 or
8  generally photo voter ID?
9       A.  Yes, sir, we have.
10       Q.  Do you have a ballpark estimate of how many
11  letters or e-mails you have gotten about SB 14 or photo
12  voter ID?
13       A.  Again, I would be guessing.  Over the years, we
14  literally get, on an average, 3-, 4-, 500 e-mails a day,
15  not on voter ID, but you talk about -- you know, you can
16  pick an issue, so you multiply that out.  So I couldn't
17  even guess at that answer.
18       Q.  Is there a dedicated e-mail address for
19  constituent correspondence in your office?
20       A.  Yes, sir.
21       Q.  Is that an official state legislative account?
22       A.  Yes, sir.  It's my Senate e-mail address.
23       Q.  Is that -- in your experience, is that where
24  constituent e-mails go?
25       A.  Yes, sir.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

17

1    Q.  Do you ever get constituent e-mails to another
2    e-mail account?
3    A.  That's the only one we have set up.  Now, it
4    may go to my staff as well.  But I believe 99 percent of
5    constituent e-mails, at least the initial e-mail, will
6    come to Carlos.Uresti@senate.state.tx.us.
7    Q.  To the extent that you can recall, and
8    understanding that you have a lot of communication with
9    constituents, do any of your constituents support a
10   requirement of photo voter ID for voting?
11   A.  I believe there is probably some that do.
12   Q.  And do any of your constituents, to your
13   knowledge, oppose a photo ID requirement for voting?
14   A.  Yes, sir.  I believe there's many that do as
15   well.
16   Q.  Would you say that most of your constituents
17   support a photo voter ID requirement for voting?
18   A.  No, sir.
19   Q.  Would you say that most of your constituents
20   oppose a photo ID requirement for voting?
21   A.  Yes, sir.
22   Q.  Again, understanding that you have a lot of
23   constituent communications, do you have an estimate of
24   what percentage of your constituents support or oppose
25   photo voter ID requirements for voting?

18

1    A.  Well, if you want me to guess, 75 percent of
2    them.
3    Q.  Okay.  And is that an estimate just based on
4    communications, either oral or written, by e-mail or
5    letter?
6    A.  Most of them would be my interactions with
7    folks once they understand the bill.  I think, again,
8    generally speaking, 75 percent would say -- would oppose
9    it.
10   Q.  Did you prepare any talking points on SB 14 for
11   either a committee proceeding or a Floor debate?
12   A.  Yes, sir.
13   Q.  To the extent you can recall, did you prepare
14   talking points for the previous photo ID bill, SB 362?
15   A.  I'm pretty sure we did.  Knowing how diligent
16   my staff is, I'm pretty sure we had those prepared.
17   Q.  Is it typically your staff that prepares
18   talking points about specific legislation?
19   A.  Generally, they'll draft them, and I'll refine
20   my points.
21   Q.  To the best of your recollection, was it your
22   staff and yourself that prepared talking points for you
23   about SB 14?
24   A.  Yes, sir.
25   Q.  Did anyone else prepare talking points on SB 14

19

1    for you?
2    A.  Not that I believe.
3    Q.  Did anyone else prepare talking points for you
4    about the previous bill, SB 362?
5    A.  Not that I -- not that I know of, no.
6    Q.  Did you conduct any studies about the potential
7    impact of Senate Bill 14?
8    A.  No, sir.  Not individually, no.
9    Q.  Did your staff conduct any studies about the
10   potential impact of SB 14?
11   A.  No, sir.
12   Q.  And Senate Bill 362, to the best of your
13   recollection, did you or your staff conduct any studies
14   about the potential impact of SB 362?
15   A.  No, sir.
16   Q.  Did you review any studies about the potential
17   impact of SB 14?
18   A.  I think we -- I recall vaguely reviewing
19   studies of other voter ID bills, but not once this bill
20   was passed.  If that's your question.  In other words,
21   did I review a study after Senate Bill 14 was passed?
22   No.  Have I reviewed studies of similar pieces of
23   legislation and the effects it would have on minority
24   districts and constituents, yes, I have.
25   Q.  Did you review any studies or projections about

20

1    the specific impact of Senate Bill 14 on Texas voters,
2    either after or before it passed?
3    A.  Well, again, it wasn't specific to Senate Bill
4    14, because we didn't know what the final form of the
5    bill would be.  But generally, similar legislation, yes,
6    I do recall reviewing some studies about how similar
7    legislation would affect my district in Texas.
8    Q.  Do you recall any of the specific studies that
9    you reviewed?
10   A.  No, sir.
11   Q.  And when you say similar legislation, was that
12   legislation that had been considered or passed by other
13   states?
14   A.  Either that, or it was other states -- when the
15   bill was being presented, it would be represented that
16   other states had passed similar legislation.
17   Q.  Do you recall seeing or reviewing any studies
18   about Indiana's photo voter ID law?
19   A.  I don't recall.
20   Q.  Do you recall seeing or reviewing any studies
21   about Georgia's photo voter ID law?
22   A.  Vaguely.  You remember, it's been a couple of
23   years, and -- about a year and a half, I guess.  But
24   vaguely.
25   Q.  Do you recall generally what the substance of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                June 11, 2012

21

1    that study was about the Georgia law?
2        A.   No, sir.
3        Q.   Before the 2011 session, do you recall seeing
4    any studies about the potential impact of Senate Bill
5    362 on Texas voters?
6        A.   Vaguely.
7        Q.   Do you recall any of the specific studies that
8    you reviewed?
9        A.   No, sir.
10       Q.   Do you recall if any were actually specific to
11   Texas?
12       A.   No, sir.
13       Q.   Have you seen any studies on the impact of
14   voter ID laws generally on voter turnout?
15       A.   Not that I can recall.
16       Q.   So you mentioned a few minutes ago that you had
17   spoken with someone at the Department of Justice about
18   Senate Bill 14; is that right?
19       A.   Yes, sir.
20       Q.   Do you recall who you spoke with at the
21   Department of Justice about SB 14?
22       A.   Bruce Geary.
23       Q.   Bruce Gear?
24       A.   Gear.
25       Q.   Was there anyone else at the Department of

22

1    Justice that you spoke to?
2        A.   No, sir.
3        Q.   Did you send any letters or e-mails to the
4    Department of Justice about SB 14?
5        A.   No, sir.
6        Q.   Did you provide any information to the
7    Department of Justice about SB 14?
8        A.   Just the affidavit.
9        Q.   Did the Department of Justice ask you to
10   provide testimony in this lawsuit?
11       A.   Not that I can recall.
12       Q.   Did the Department of Justice ask you to
13   provide a declaration or affidavit in this lawsuit?
14       A.   Just an affidavit.
15       Q.   Do you recall, roughly, when the Department of
16   Justice asked you to provide an affidavit in this
17   lawsuit?
18       A.   February or March, I think, 2012, of this
19   year.  I believe that's the time frame.
20       Q.   Are you aware that the Department of Justice
21   sent a letter to the State of Texas, on March 12, 2012,
22   interposing an objection or refusing to preclear SB 14?
23       A.   I'm not aware of the letter.
24       Q.   Are you aware that the preclearance was denied
25   of SB 14?

23

1        A.   Yes, sir.
2        Q.   Are you aware that that happened on March 12,
3    2012?
4        A.   No, sir.
5        Q.   So you wouldn't be able to say whether or not
6    you spoke to the Department of Justice before or after
7    preclearance was denied?
8        A.   No, sir.
9        Q.   Has the Department of Justice asked you to do
10   anything else in this lawsuit besides provide a
11   declaration or affidavit?
12       A.   No, sir.
13       Q.   Senator, are you -- are you familiar with
14   Section 5 of the Voting Rights Act?
15       A.   Generally.
16       Q.   What's your understanding, just very generally,
17   of Section 5?
18       A.   Generally, due to the state of Texas's history
19   over the last several decades with regard to a
20   discriminatory effect on voters, based on its laws and
21   its policies, that before certain laws can go into
22   effect, it has -- those laws have to be precleared by
23   the Department of Justice to ensure that voters aren't
24   disenfranchised and they continue to have the ability to
25   vote.

24

1        Q.   And is it your understanding that under
2    Section 5, the inquiry goes to whether a particular law
3    has a discriminatory effect or a discriminatory purpose?
4        A.   Yes, sir.
5        Q.   Okay.  I want to talk briefly about the effect
6    part of that specific to SB 14.
7            Do you contend that Senate Bill 14 will
8    have the effect of denying or abridging African American
9    Texans' right to vote?
10       A.   Yes, sir.
11       Q.   What is the basis for that contention?
12       A.   Well, the strict requirements that are in the
13   bill that require all voters to have a photo ID, in
14   addition to their voter's registration card, which I
15   believe is a -- can be -- especially speaking about my
16   district, there will be many obstacles in the way of my
17   constituents obtaining that photo ID in a timely fashion
18   in order to vote, and as a result, it will have that
19   effect.
20       Q.   Do you know, roughly speaking, what percentage
21   of your constituents are African American, Hispanic,
22   Anglo, and Asian American?
23       A.   Yes, sir.  Approximately -- of the 800,000 or
24   so folks that I represent, approximately 69 to 69 and a
25   half percent are Hispanic.  Approximately 5 to 5 and a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                June 11, 2012

25

1  half percent are African American.  Maybe less than 1
2  percent are Asian American.  And then the balance would
3  be Anglo.
4      Q.   And so your contention that Senate Bill 14 will
5  have the effect of denying or abridging African American
6  voters' right to vote, is the contention basically that
7  requiring a photo ID will harm African American voters'
8  right to vote because they may not have the ID that's
9  required?
10      A.   Exactly.
11      Q.   Okay.  Is there any other specific way or any
12  other way that you contend that SB 14 will have a
13  negative impact on African American voters?
14      A.   Well, I think an additional way will be the
15  fact that it may disenfranchise African Americans from
16  voting, based on their long history of having to
17  overcome civil rights violations.  And during all of the
18  things that they've had to go through, I believe that
19  this will disenfranchise them -- disenfranchise them
20  once again based on, perhaps, some of the fear that
21  still exists in African Americans and many of those that
22  live in my district.  Their distrust perhaps, and the
23  intimidation as well.  So I believe because of that,
24  that they may feel that intimidation and fear and
25  distrust, and as a result be disenfranchised and not go

26

1  to the voting booth.
2      Q.   When you say intimidation, is there -- what is
3  it in SB 14 that you understand would intimidate or
4  deter African American voters from voting?
5      A.   The fact that they have to go, for one, to the
6  Department of Public Safety to get a photo ID.  Many of
7  them may not drive.  Many of them may be elderly and
8  have gone through Civil Rights Movement.  They may be in
9  their 70 or 80s.  So that fear that may still exist,
10  perhaps.  I think that could be intimidating.  And
11  knowing that they're going to have to overcome those
12  obstacles, coupled with the fact the fee or the travel,
13  you know, et cetera, all of those factors, either
14  individually or together, I think will lend itself to
15  some intimidation amongst African American voters.
16      Q.   So is it accurate to say that in your
17  understanding, the negative effects that may -- that may
18  occur with respect to African American voters are all
19  based on this requirement that they have to either show
20  or get a specific form of ID that they may not have
21  already?
22      A.   Exactly, especially given the fact that they
23  already have a voter's registration card, that they're
24  going to be required to go and obtain an additional form
25  of identity, specifically a photograph ID, yes, I

27

1  believe so.
2      Q.   Do you contend that Senate Bill 14 will have
3  the effect of denying or abridging Latino Texans' right
4  to vote?
5      A.   Absolutely.
6      Q.   And can you explain to me what the basis for
7  that contention is?
8      A.   Well, again, speaking specifically of my
9  district, first of all, wherein it's almost 70 percent
10  Hispanic, many of my residents live along the border.
11  Again, I represent two-thirds of the Texas-Mexico
12  border.  Many already do not have a valid ID for
13  different reasons, even though they are American
14  citizens.  Once again, I believe the effect of this bill
15  will be to disenfranchise them or to prevent barriers or
16  obstacles keeping them from being able to exercise their
17  constitutional right to vote.
18      Q.   And in your understanding, the barrier or
19  obstacle caused by SB 14 would be the requirement that
20  they have to have -- that if they don't have one of the
21  specific forms of ID, they will not be allowed to cast a
22  ballot; is that right?
23      A.   Absolutely.  That would have been the case with
24  my mother, for example.  She had a voter's registration
25  card.  She was a American citizen born in Texas, hadn't

28

1  driven in many years because of her health, and she
2  would not be able to vote with this -- if this bill goes
3  into effect because she can't get to the DPS office to
4  get a photo ID.
5      Q.   How old is your mother?
6      A.   She passed away last November.  She was 77.
7      Q.   Oh, I'm sorry.
8          Do you believe that SB 14, if it -- if it
9  is implemented, will have the effect of preventing or
10  deterring indigent Texans from voting?
11      A.   There's no question it will.
12      Q.   And is -- can you briefly explain the basis for
13  that?
14      A.   Well, for one, the cost of obtaining the ID.
15  Two, again, keeping in mind that in my district, it's --
16  you know, there are some folks that may live in Kinney
17  County, for example, which is in between Eagle Pass
18  and -- or Uvalde and Del Rio.  To travel to a DPS office
19  could take an hour, an hour and a half one way.  That's
20  assuming there's a DPS office that's open.  And if
21  you're indigent, most likely, you don't have a vehicle.
22  There's no infrastructure wherein you can just hop on a
23  bus and travel there.  And if you do, hopefully you'll
24  get there before the lines are too long and/or before
25  the DPS office has closed.  So there is no question for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

29

1   anyone to think that this bill will not affect the
2   indigent.  They need to come out to my district and talk
3   to those folks.
4       Q.  Do you have a general idea of what percentage
5   of your constituents are indigent?
6       A.  Well, I can tell you that -- I don't know the
7   exact number, but a large number of my constituents
8   either live in poverty or are on the border of living in
9   poverty, where the average -- the average per capita
10  income for my district is $12,500 per year.  So it's a
11  huge number.  When you go along the border, the poverty
12  rates are much bigger than they are than in other parts
13  of Texas.
14      Q.  Do you believe that SB 14 will negatively
15  effect Asian Americans voters' right to vote in Texas?
16      A.  Yes, sir.
17      Q.  Can you tell me the basis for that contention?
18      A.  Well, for the same reasons that I've already
19  mentioned how I think it will effect African Americans
20  and Hispanics as well.  You know, the whole idea of
21  requiring them to obtain an additional form of ID, photo
22  ID, in addition to their voter's registration card, I
23  think imposes conditions upon them that aren't
24  necessary, and given the fact that many of the folks
25  that live in my district live in poverty or are very

30

1   poor, it's just a burden that they're -- it's going to
2   be difficult for them to overcome.  And that goes to
3   basically most folks that live in my district, and I
4   would submit throughout Texas as well.
5       Q.  Do you believe that SB 14 will have a negative
6   effect on Anglo voters in your district?
7       A.  Absolutely.
8       Q.  And is that for the same reason we've talked
9   about, why it will affect other voters in your district?
10      A.  Well, I think more so because of the indigency
11  issue or the poverty issue as well.  You known, if
12  you've ever driven to Presidio, you know that that's a
13  long way from Austin or to any DPS office.  And because
14  of that fact, the geographical issue, coupled with the
15  indigency issue, the fact that they're poor, will make
16  it very difficult.
17      Q.  Are you familiar with any polls about support
18  for voter photo ID legislation among Texans?
19      A.  I don't follow polls generally, so, no, I
20  don't.  I'm not.
21      Q.  Do you recall any polls being introduced or
22  discussed during the legislative debate about SB 14?
23      A.  Generally, there were -- I know somebody who
24  made reference to a poll, but I couldn't tell you the
25  specifics of that poll.

31

1       Q.  I want to move on to a similar but slightly
2   different area and talk about possession of photo IDs.
3           Do you believe that African American
4   voters in Texas are less likely than average to have one
5   of the IDs required by SB 14?
6       A.  Yes, sir.
7       Q.  Do you believe that Latino voters in Texas are
8   less likely than average to have a form of
9   identification required by SB 14?
10      A.  Yes, sir.
11      Q.  Do you believe that Asian American voters in
12  Texas are less likely to have a form of identification
13  required by SB 14?
14      A.  Yes, sir.
15      Q.  Do you believe that elderly voters in Texas are
16  less likely than average to have one of the IDs required
17  by SB 14?
18      A.  Yes, sir.
19      Q.  And do you believe that indigent voters are
20  less likely than average, indigent voters of Texas are
21  less likely than average to have one of the IDs required
22  by SB 14?
23      A.  Absolutely.
24      Q.  Do you believe that disabled voters in Texas
25  are less likely than average to have one of the IDs

32

1   required by SB 14?
2       A.  Yes, sir.
3       Q.  Do you believe that voters in rural areas are
4   less likely than average -- rural areas of Texas are
5   less likely than average to have one of the IDs required
6   by SB 14?
7       A.  Yes, sir.
8       Q.  Do you believe that voters who lack a high
9   school diploma are less likely than average to have a
10  form of identification required by SB 14?
11      A.  Most likely, yes.
12      Q.  And we've talked a little bit about the
13  requirement of actually getting an ID.  If somebody
14  doesn't have one, do you believe that an indigent voter
15  in Texas is less likely than a nonindigent voter to be
16  able to get one of the forms of ID required by SB 14?
17      A.  Yes, sir.
18      Q.  Do you believe that elderly voters are in Texas
19  are less likely than nonelderly voters to be able to
20  obtain one of the IDs required by SB 14?
21      A.  Yes, sir.
22      Q.  Do you believe that disabled voters in Texas
23  are less likely than voters who are not disabled to be
24  able to obtain one of the IDs required by SB 14?
25      A.  Yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                    June 11, 2012

33

1    Q.  Do you believe that voters in rural areas of
2  Texas are less likely than urban or suburban voters to
3  be able to obtain a form of identification required by
4  SB 14?
5    A.  Yes, sir.
6    Q.  Do you believe that young voters in Texas are
7  less likely than average to have one of the IDs required
8  by SB 14?
9    A.  I believe so, yes.
10    Q.  And similarly, do you believe that young voters
11  in Texas are less likely than average to be able to
12  obtain one of the forms of ID required by SB 14?
13    A.  Yes, sir.
14    Q.  I want to move on to talk about -- talk about
15  discriminatory purpose for a little bit.
16         Do you contend that the Texas Legislature
17  intended to harm African American voters by passing
18  SB 14?
19    A.  Not the whole legislature, no.
20    Q.  Do you contend that certain legislators voted
21  in favor of Senate Bill 14 for the specific purpose of
22  harming African American voters?
23    A.  I contend that the bill was passed for that
24  purpose.
25    Q.  Do you contend that that was the purpose of the

34

1  legislature -- back up a bit.
2         Do you contend that the legislature as a
3  whole passed Senate Bill 14 for the purpose of harming
4  African American voters in Texas?
5    A.  Not as a whole, no.
6    Q.  Okay.  But you believe that maybe part of the
7  legislature, or certain legislators supported SB 14 for
8  the purpose of harming African American voters?
9    A.  Well, I can't say that the legislators did that
10  purposefully.  I just know that my position, my
11  contention is, is that the bill had that effect.
12    Q.  Your contention is that SB 14 had the effect of
13  harming African American voters' ability to vote?
14    A.  Yes, sir.
15    Q.  Okay.  but you don't contend that the bill was
16  passed for the purpose of harming African American
17  voters' ability to vote?
18    A.  No, I do contend that.  Yes, I do contend that.
19    Q.  But you don't contend that that was the purpose
20  of the legislature of the whole to harm African American
21  voters?
22    A.  Well, I can't say as a whole, because I didn't
23  vote for the bill, and I know many of my colleagues, at
24  least my Democratic colleagues didn't vote for the
25  bill.  And that's why I can't say as a whole the

35

1  legislature passed that bill.
2    Q.  With respect to the legislators who supported
3  and voted for Senate Bill 14, do you contend that -- do
4  you contend that the legislators who voted for Senate
5  Bill 14 did so for the purpose of harming African
6  American Texans' ability to vote?
7    A.  Well, I certainly think that they knew after --
8  by that time that the bill came up for a vote, based on
9  my objections and some of my colleagues' objections, our
10  concern about how this bill would affect our
11  constituents, I think at that point, if they weren't on
12  notice beforehand, they certainly were on notice at that
13  time.
14    Q.  Do you believe that -- do you believe that the
15  Texas Legislature intended to harm Latino voters by
16  enacting SB 14?
17    A.  Well, again, I can't tell you that the
18  legislature did that, because many voted against it.
19  So I can't say as a whole the legislature passed --
20  intended to do that, because I voted against it, and
21  again, many of my colleagues voted against it.
22    Q.  I understand.  Do you contend that the members
23  of the Texas Legislature who voted for SB 14 voted for
24  the bill in order to harm Latino voters in Texas?
25    A.  And again, I believe that they may not have

36

1  been some of their intent initially, but the -- I
2  believe when the bill passed, that was the intent of the
3  bill.
4    Q.  Okay.  So just to be clear, it's your
5  contention that the legislators who voted in favor of
6  SB 14 did so for the purpose of harming the ability of
7  African American and Hispanic Texans to vote?
8    A.  Well, I think clearly the bill that was passed
9  had that effect.  That's my contention is, the bill that
10  was passed had that effect and they were -- they were
11  the members that voted for that bill.
12    Q.  Do you believe that any individual member of
13  the legislature who voted for SB 14 voted for the bill
14  specifically because they thought that it would
15  negatively affect Latino and African American voters and
16  they wanted it to have that effect?
17    A.  I can't say that for certain, no.
18    Q.  Can you identify any particular legislator who
19  supported SB 14 who you would contend supported the bill
20  in order to harm the voting rights of African American
21  or Hispanic Texans?
22    A.  I can't individually, because I don't know what
23  they were thinking.  But again, I would just submit that
24  they had to know of the effects of the bill, because we
25  made that clear to them, either on the Senate floor and

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                                    June 11, 2012

37

1  I'm assuming on the House floor, the effects the bill
2  would have on our specific districts.
3        Q.  To your knowledge, is there -- do you know of
4  any evidence that any member of the Texas Legislature
5  who voted for SB 14 did so because they understood that
6  the bill would negatively affect African American and
7  Latino voters and they wanted it to have that effect?
8        A.  I guess the only evidence would be the
9  testimony from the legislators, like myself, advising
10 them that this bill would have a negative effect on our
11 districts and our constituency.
12       Q.  So other than -- other than knowledge or
13 presumed knowledge of the effect of the bill, is there
14 any other basis for your contention that members of the
15 legislature voted for SB 14 for the purpose of harming
16 African American or Latino voters?
17       A.  Well, other than the knowledge given to them by
18 their colleagues and myself, I don't know of any other
19 evidence that exists.  I mean, it's on the record.  I
20 believe it's probably in the journal.  I don't know what
21 other knowledge they would need.
22       Q.  And I understand that there was a lot of
23 testimony from several members of the legislature about
24 the potential effect of the bill.  Do you think it's
25 possible that some of the members who supported SB 14

38

1  just disagreed with that testimony or didn't think it
2  would have the same effect?
3        A.  Sure, of course.
4        Q.  Okay.  If a member just didn't agree or thought
5  -- didn't agree with the testimony that it would have a
6  negative effect on Latino or African American voters or
7  just sincerely believed that it would not have any
8  negative effect, would a vote in favor of the bill,
9  would that demonstrate a discriminatory purpose?
10       A.  Well, I would be speculating when I answer that
11 question, but no one knows my district better than I, I
12 would submit.  And when you have 75 percent that are
13 both African American and Hispanic, and I testified to
14 my colleagues this bill will have a discriminatory
15 effect on my constituents, I would think they'd give
16 great weight to that testimony.  Of course, it's their
17 decision to disagree with me, but given what I know
18 about my district, having represented it for six years,
19 I believe a vote contrary would mean that they
20 understood the effects of the bill and notwithstanding
21 the negative consequences and effects of the bill, they
22 decided to vote in favor of that bill.
23       Q.  And when you said they understood the effects
24 of the bill, you can't say for sure, as you sit here,
25 whether any individual member actually understood or

39

1  believed that those effects would happen, can you?
2        A.  Oh, of course not.  I can't --
3             MR. GARZA:  Objection, argumentative and
4  asked and answered.  You can go ahead and answer.
5        A.  Yeah, of course not.  I can't get into their
6  head.
7             MR. FREDERICK:  Chris, mark this as Uresti
8  Deposition Exhibit 1, please.
9             (Uresti Exhibit 1 marked for
10 identification.)
11            MR. GEAR:  Matthew, I don't know if you
12 wanted to put our appearances on the record.
13            MR. FREDERICK:  Oh.
14            MR. GEAR:  Because there's objections
15 and --
16            MR. FREDERICK:  Okay.  Well, yeah, let's
17 go ahead and do before we get into the exhibit.
18            At this time, counsel has requested that
19 everyone put in an appearance for the record.  I'll
20 start.  I'm Matt Frederick.  I'm appearing for the State
21 of Texas.
22            MR. GEAR:  I'm Bruce Gear.  I'm appearing
23 on behalf of Eric Holder, the Defendant.
24            MR. GARZA:  Jose Garza appearing on behalf
25 the defendant intervenors, the Mexican American

40

1  Legislative Caucus.
2             MR. MALDONADO:  Roberto Maldonado
3  appearing on behalf of the deponent.
4        Q.  (BY MR. FREDERICK) Senator Uresti, just to be
5  clear, are you represented today by Mr. Garza?
6        A.  No, sir.  I'm represented by Roberto Maldonado.
7        Q.  Thank you.  If you would look at what's been
8  marked as Deposition Exhibit 1, please.  Can you
9  identify what this document appears to be?
10       A.  Exhibit 1 appears to be Senate Journal, Monday,
11 dated Monday, May 9, 2011, from the 82nd Legislature.
12       Q.  I'm going to give you another exhibit before we
13 get into that one.
14            If you'll mark this one, Chris, as Uresti
15 Exhibit 2, please.
16            (Uresti Exhibit 2 marked for
17 identification.)
18       Q.  (BY MR. FREDERICK) Can you identify that
19 exhibit for the record, please?
20       A.  Exhibit 2 appears to be, again, from the Senate
21 Journal of the 82nd Legislature dated January 26, 2011.
22       Q.  Thank you.  If you'll turn, please, to the
23 second page of Exhibit 2, there -- a couple of lines
24 down from the top -- well, first, does this appear to be
25 the top left, does this appear to be Page 146 of the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                            June 11, 2012

41

1  journal?
2      A.  Yes, sir.
3      Q.  A couple of lines from the top, do you see
4  where it says "Senate Bill 14 on the third reading"?
5      A.  Yes, sir.
6      Q.  And do you see a few lines down, it recites
7  that the bill was read -- read the third time and then
8  passed by a vote of 19 in favor and 11 opposed?
9      A.  Correct.
10     Q.  I would like for you -- I'm going to hand you
11  this pen, and I would like for you to circle the name of
12  any of the legislators who voted in favor of this bill
13  who you contend supported the bill in order to harm
14  African American or Latino voters.
15     A.  Repeat your question.
16     Q.  Of course.  I would like you to circle the name
17  of any senator who voted in favor of the bill who you
18  contend voted in favor of the bill to harm the ability
19  of African American and Latino Texans to vote.
20     A.  Well, again, Counselor, my position is, it was
21  the intent -- it was the effect of the bill, once it was
22  passed, that had the intent to discourage or
23  disenfranchise voters, specifically those of African
24  American or Hispanic that live in my district.  So I
25  can't identify a particular senator.  My position is

42

1  that it was the intent -- it was the effect of the bill,
2  Senate Bill 14, that had that negative consequence.
3      Q.  Okay.  So as you sit here today, you can't
4  identify any specific senator who voted for SB 14 for
5  the purpose of harming African American and Latino
6  Texans' right to vote?
7      A.  It would be very difficult, because I can't get
8  into their head and know what they were thinking when
9  they voted.
10     Q.  So as you sit here today, you cannot identify
11  any specific senator who voted for the bill to harm
12  African American and Latino voters?
13     A.  That's correct.
14     Q.  Thank you.
15         If I were to show you a list of members of
16  the Texas House who voted in favor of SB 14, would you
17  be able to identify any specific House member who you
18  believe voted for SB 14 in order to harm African
19  American and Latino Texans' right to vote?
20     A.  No, sir.
21     Q.  Thank you.
22         Do you contend that the Texas Legislature
23  intended to harm indigent voters by passing SB 14?
24     A.  And again, my response is not the whole
25  legislature, because not all of us voted for the bill.

43

1      Q.  Do you contend that any of the legislators who
2  voted for SB 14 did so for the purpose of harming
3  indigent voters?
4      A.  And again, my response would be similar to your
5  previous questions in that it's the bill that had that
6  effect on the indigent, and that would be my position.
7      Q.  So you couldn't identify any particular
8  legislator who voted for SB 14 for the specific purpose
9  of preventing indigent people from voting?
10     A.  No, sir.
11     Q.  Do you believe that the members of legislature
12  who voted for SB 14 did so in order to harm elderly
13  people by preventing them from voting?
14     A.  And again, my response would be the same, which
15  is that the bill had that effect of harming the elderly
16  or preventing the elderly from voting.
17     Q.  So you couldn't identify a specific legislator
18  who voted for SB 14 for the purpose of preventing
19  elderly people from voting?
20     A.  No, sir.
21     Q.  Do you believe that the members of the
22  legislature who voted for SB 14 did so in order to harm
23  rural voters by preventing them from voting?
24     A.  And again, Counselor, my response would be the
25  same, in that it was the bill, Senate Bill 14, that had

44

1  the effect on preventing rural voters from being able to
2  vote.
3      Q.  So you can't identify any specific legislator
4  who voted for SB 14 for the purpose of harming rural
5  voters by preventing them from voting?
6      A.  No, sir.
7      Q.  So other than the potential effect of SB 14, is
8  there any other evidence that you were aware of to
9  support the contention that SB 14 was passed with a
10  discriminatory purpose?
11         MR. GARZA:  Objection, calls for a legal
12  conclusion.
13     A.  Can you repeat your question again, please?
14     Q.  (BY MR. FREDERICK) Of course.  Other than the
15  potential effect of SB 14 on voters in Texas, is there
16  any other evidence on which you base your contention
17  that the bill was passed with a discriminatory purpose?
18     A.  Not that I can think of, no.
19         MR. FREDERICK:  Do you mind if we take a
20  five-minute break?
21         MR. MALDONADO:  Not at all.
22         THE WITNESS:  Perfect.
23         (Recess from 10:38 a.m. to 10:47 a.m.)
24         MR. FREDERICK:  Mark that as Exhibit 3.
25         (Exhibit 3 marked for identification.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

45

1    Q.  (By Mr. Frederick)  Senator, the court reporter
2    has handed you what's been marked as Deposition
3    Exhibit 3.  If you'll turn to the second page, if you
4    can identify this document, please.  And please take
5    your time to look it over.
6    A.  This appears -- Counselor, this appears to be a
7    declaration of Carlos Uresti, myself, and it's dated
8    April 9, 2012.
9    Q.  Does this appear to be a true and correct copy
10   of the declaration that you provided to the Department
11   of Justice in this lawsuit?
12   A.  Yes, sir.
13   Q.  Who wrote this declaration?
14   A.  I did.
15   Q.  Did anyone at the Department of Justice provide
16   comments on the substance of this declaration?
17   A.  Not that I can recall.
18   Q.  Did anyone at the Department of Justice make
19   edits or changes to the declaration after you had
20   written it?
21   A.  No, sir.
22   Q.  Did anyone else assist you in writing this
23   declaration?
24   A.  No, sir.  And let me clarify that.  I may have
25   asked my staff for specific data like the bill number,

46

1    et cetera, but as far as writing it, no.
2    Q.  Okay.  So your staff may have helped you find
3    some of the information, right?
4    A.  Yes, sir.
5    Q.  But you actually did the writing?
6    A.  Yes, sir.
7    Q.  Is it correct that the Department of Justice
8    asked you to provide a declaration for this lawsuit?
9    A.  Yes, sir.
10   Q.  When was that request made, to the extent that
11   you can recall?
12   A.  Again, well, obviously, it was before April the
13   9th, somewhere between March and April.
14   Q.  How was that request communicated to you from
15   the Department of Justice?
16   A.  I think they called my office, my office called
17   me, and then I contacted the Department of Justice.  I
18   believe that's how it worked.
19   Q.  Did you discuss an affidavit with the
20   Department of Justice before you drafted this affidavit?
21   A.  I don't understand your question.
22   Q.  Sure.  Is it accurate that you had a
23   conversation with someone at the Department of Justice
24   before you actually drafted this declaration?
25   A.  Yes, sir.

47

1    Q.  And did the substance of that conversation
2    include the declaration that you had been asked to
3    draft?
4    A.  If you're asking me if they asked me to prepare
5    an affidavit or declaration, yes, that's correct.
6    Q.  What else did they -- what else did you discuss
7    related to the affidavit with the Department of Justice
8    before you wrote the affidavit?
9    A.  That's pretty much it.
10   Q.  Did the Department of Justice tell you that
11   they wanted you to include anything specific in that
12   affidavit?
13   A.  I think it was the conversation was more about
14   be as specific as you can be.  But again, I don't
15   remember exactly that conversation.
16   Q.  Before that conversation about your -- about
17   this affidavit, which was in -- sometime in March or
18   April of 2012; is that right?
19   A.  Yes, sir.
20   Q.  Before that conversation, had you had a
21   conversation with the Department of Justice?
22   A.  Not that I can recall.  I don't think I've ever
23   spoken to them before.
24   Q.  The Department of Justice didn't call you to
25   ask about Senate Bill 14 during the administrative

48

1    preclearance process?
2    A.  They never spoke to me.  I don't think they
3    ever spoke to my office.
4    Q.  So moving back to the conversation that you had
5    with the Department of Justice about your affidavit, in
6    that conversation, did the Department of Justice ask you
7    if you believed that Senate Bill 14 would have a
8    discriminatory effect?
9    A.  I don't -- I really don't recall if they asked
10   me that specific question or not.
11   Q.  Do you recall if you told them that you
12   believed that Senate Bill 14 would have a discriminatory
13   effect?
14   A.  I honestly don't recall.
15   Q.  Do you recall --
16   A.  What I was going to say is -- this is a side
17   matter.  There was another bill that I was working on.
18   It was a local San Antonio bill called "BexarMet Water
19   District Bill."  Bexar Metropolitan Water District
20   Bill.  That bill required clearance -- preclearance by
21   the Department of Justice, coincidentally.  Had nothing
22   to do with this bill specifically, but because it had to
23   do with voting rights, the Voting Rights Act, it had to
24   be precleared.
25       So I had other conversations not related



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

49

1   to Senate Bill 14 with the Department of Justice,
2   coincidentally, so that's why I'm a little -- trying to
3   make sure I remembered those conversations.
4      Q.  I understand.  Thank you.  And BexarMet Water
5   District, that's Bexar County, right?
6      A.  Yes, sir.
7      Q.  Which includes San Antonio?
8      A.  Yes, sir.
9      Q.  And that's B-e-x-a-r?
10     A.  Thank you.  B-e-x-a-r.  And most of the Bexar
11  Metropolitan Water District is within my senate district
12  as well.
13     Q.  In the conversation or conversations you had
14  with the Department of Justice about the BexarMet Water
15  District Bill, was Senate Bill 14 ever mentioned in
16  those conversations?
17     A.  No, sir.
18     Q.  I appreciate you clarifying that.
19     A.  Yes, sir.
20     Q.  How many conversations did you have with the
21  Department of Justice about the declaration that you
22  provided in this lawsuit?
23     A.  I think two.
24     Q.  How long did each of those conversations last?
25     A.  I'm guessing the first one might have lasted

50

1   five minutes or so.  I really don't recall.  And then
2   the second one was probably maybe 10 minutes.  There
3   might have been a third one.  And if there was a third
4   one, you know, probably along the same lines, 5 to 10
5   minutes.
6      Q.  Just so I'm clear, so the Department of Justice
7   asked you to provide a declaration in this lawsuit,
8   right?
9      A.  Yes, sir.
10     Q.  And you had a conversation sometime in March or
11  April of 2012, you think, about providing that
12  declaration?
13     A.  Yes, sir.
14     Q.  And that -- was that conversation by telephone?
15     A.  Yes, sir.
16     Q.  And I think that you testified earlier, but was
17  it Mr. Gear that you spoke to at the Department of
18  Justice?
19     A.  Initially, I really don't recall if that was
20  the first person I communicated with.  I don't remember.
21     Q.  Is -- do you recall, other than Mr. Gear, any
22  other specific individual at the Department of Justice
23  with whom you spoke about SB 14?
24     A.  Other than the first conversation, because I
25  don't recall who that was, no, I don't believe I spoke

51

1   to anyone else.
2      Q.  So after you spoke to the Department of Justice
3   for the first time, you drafted the declaration; is that
4   right?
5      A.  Yes, sir.
6      Q.  And did you provide that draft to the
7   Department of Justice?
8      A.  I believe so.
9      Q.  Did you -- after you submitted or provided a
10  draft of your declaration, did you discuss your
11  declaration again with the Department of Justice?
12     A.  We reviewed it together, yes.
13     Q.  Were any changes made after you reviewed or
14  discussed the department of -- your declaration, excuse
15  me, with the Department of Justice?
16     A.  I believe the only changes I made were typos
17  that I had made in my affidavit.
18     Q.  Do you know why the Department of Justice asked
19  you to provide an affidavit in this case?
20     A.  I can only assume because they were objecting
21  to the bill.
22     Q.  Did anybody from the Department of Justice ever
23  tell you why they wanted you to provide an affidavit?
24     A.  I assumed they were asking everybody, quite
25  frankly.  I say "everyone," all the Democratic senators

52

1   that opposed it.  I never asked that question.
2      Q.  And nobody ever told you why, specifically,
3   they wanted you to provide an affidavit?
4      A.  No, sir.
5      Q.  Did anyone outside the Department of Justice
6   ever tell you why the Department of Justice wanted you
7   to provide an affidavit in this case?
8      A.  No, sir.
9      Q.  And you said that there were -- you had two
10  phone conversations about your affidavit.  Do you recall
11  any other conversations by phone or in person with the
12  Department of Justice in this case?
13     A.  We never met in person, and there may have
14  been, again, a third one that followed.
15     Q.  Okay.  So after your second conversation when
16  you discussed the affidavit itself, did the Department
17  of Justice then provide you with an affidavit to sign?
18     A.  I prepared the affidavit.
19     Q.  Oh, okay.  So after you had the second
20  conversation, then you finalized the affidavit, signed
21  it, and sent it to the Department of Justice; is that
22  right?
23     A.  Yes, sir.  I signed it and I had it notarized
24  in my office and then sent it off.
25     Q.  And this shows that you signed it and swore to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

53

1    it on April 9th, 2012?
2        A.   Yes, sir.
3        Q.   Other than the Department of Justice and
4    possibly members of your staff, did you discuss this
5    affidavit with anyone else?
6        A.   Never.
7        Q.   Sitting here today, is there anything in this
8    affidavit that you would like to change or clarify?  And
9    please take your time.
10       A.   On page -- I guess it's -- it says Page 3 of 5
11   at the top.
12       Q.   Okay.
13       A.   Paragraph 6.
14       Q.   Yes.
15       A.   The last sentence of the paragraph reads:  "I
16   also called the offices of Senator Jane Nelson and
17   Senator Tommy Williams to inform them that I would be
18   arriving late because of my illness."  It should be
19   Senator Kim Brimer instead of Tommy Williams.
20       Q.   Okay.
21       A.   And the reason I made that mistake is because
22   both of them were chairs of the administrative --
23   Administration Committee, and I was the vice chair.  And
24   I just thought it was Tommy.  It was Kim Brimer.
25       Q.   And this was in 2007?

54

1        A.   Correct.
2        Q.   Okay.  So in Paragraph 6, then, rather than "I
3    also called the office of Senator Jane Nelson and
4    Senator Tommy Williams," it should say "Senator Jane
5    Nelson and Senator Kim Brimer," right?
6        A.   Correct.
7        Q.   And I'll give you time.  Is there anything else
8    that you would like to change or clarify?
9        A.   As far as the substance is concerned, no.  I
10   see a few typos but nothing else.
11       Q.   All right.  Thank you.  I'd like to -- on Page
12   3, if you could direct your attention to Paragraph 7?
13       A.   Okay.
14       Q.   And it looks like this is a discussion about a
15   vote on House Bill 218; is that right?
16       A.   Yes, sir.
17       Q.   And the House Bill 218 was -- that was a photo
18   ID bill that was considered in 2007 by the legislature;
19   is that right?
20       A.   Yes, sir.
21       Q.   And that bill, that bill didn't get passed by
22   the legislature, did it?
23       A.   No, sir.
24       Q.   And I guess the fact that that bill was a House
25   bill that came to the Senate, does that mean that it

55

1    passed the House?
2        A.   Yes, sir.
3        Q.   But then, obviously, it did not pass the
4    Senate, right?
5        A.   It didn't pass the Senate.  I'm assuming it did
6    pass the House to come over.
7        Q.   Okay.  In the Senate, who sets the -- who sets
8    the Senate calendar?
9        A.   The Lieutenant Governor.
10       Q.   Lieutenant Governor.  So there's no calendar
11   committee in the Senate?
12       A.   No, sir.  It's not like in the House where they
13   have their own House Calendars Committee that determines
14   what bills come to the Floor.  In the Senate, it's --
15   there's no such committee, and the Lieutenant Governor,
16   as presiding officer, dictates the calendar.
17       Q.   So what would be required to change the Senate
18   calendar?
19       A.   Well, to bring a bill up, we have, like in this
20   case, the two-third -- I say "this case," Senate Bill
21   14, you have the two-thirds rule, which requires
22   two-thirds of the senators to agree to bring up any
23   particular bill before it can be heard.  But that's only
24   after the Lieutenant Governor determines that a
25   particular bill is going to be called.  So as the

56

1    presiding officer, he still has that power.
2        Q.   I see.
3        A.   So in order to change it, a majority of members
4    can make that decision as they did with Senate Bill 14.
5        Q.   So is it accurate to say that once a -- once a
6    bill has been put on calendar or allowed to go to the
7    calendar by the Lieutenant Governor, it's the members
8    that decide the order the bills get considered in?
9        A.   No.
10       Q.   No?
11       A.   No.
12       Q.   How does -- how is the order in which bills get
13   considered determined?
14       A.   The Lieutenant Governor ultimately makes that
15   decision.  There can be a bill on the calendar that
16   could sit there for two weeks, and then the Lieutenant
17   Governor makes the final decision which bill is going to
18   be called up and when.
19       Q.   I see.  So the Lieutenant Governor, for lack of
20   a better word, decides to bring up a bill; is that
21   right?
22       A.   Yes.
23       Q.   And then at that point, is when under customary
24   procedures, the senators would vote to determine whether
25   that bill gets considered?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

57

1  A.  Exactly.
2  Q.  Now, the requirement of two-thirds, or the
3  two-thirds vote by senators, does that appear in the
4  Senate rules?
5  A.  It's a -- it's a -- well, the first day the
6  session, the senators caucus, and we vote on our
7  rules.  And as far as I can recall, other than Senate
8  Bill 14, the rules have always required two-thirds, a
9  two-thirds vote before a bill comes up to be voted on,
10  on the Senate floor.
11  Q.  Is it customary in the Senate to have what I
12  think is sometimes referred to as a "blocker bill"?
13  A.  Yes, sir.
14  Q.  Can you tell me your understanding of what the
15  blocker bill is?
16  A.  The blocker bill is -- is a bill that's usually
17  not of great importance, I suppose, and it's placed on
18  the calendar to essentially support the whole two-thirds
19  concept.  In other words, before a bill can be taken
20  out of the regular order of business, which means taken
21  around the blocker bill, you must have two-thirds of the
22  senators agree to take up that bill.  And that's
23  primarily the purpose of the blocker bill.
24  Q.  So is it accurate so say then that, again, for
25  lack of a better word, it's kind of a -- there's a line;

58

1  there's a bill that's first in line and then bills
2  behind it in line?
3  A.  Yes.
4  Q.  Is that fair?
5  A.  Yes.
6  Q.  And the custom in the Senate is to have a
7  blocker bill that sits at the head of the line; is that
8  right?
9  A.  Yes, sir.
10  Q.  And the understanding is that that blocker bill
11  is not actually going to get passed, right?
12  A.  Eventually, it might, but it would -- usually
13  it's not until the end of the session, if at all.
14  Q.  Okay.  So at least the expectation, generally,
15  is that that bill will -- it will either not move at all
16  or it will move very late; is that right?
17  A.  Yes, sir.
18  Q.  Okay.  And so the fact that there's a bill at
19  the head of the line means that to consider any other
20  bill behind it, the Senate has to suspend the regular
21  order of business; is that right?
22  A.  Yes, sir.
23  Q.  Because in the regular order of business, bills
24  would just be considered in whatever order they are in
25  the line; is that right?

59

1  A.  Well, generally, but it doesn't always work
2  that way.  Again, it depends on when the Lieutenant
3  Governor decides to bring up your bill.  So there's not
4  a specific line where you can say, "Okay.  I'm Number
5  3."
6  Q.  Okay.
7  A.  It's not that way.  You might think you're
8  Number 3, but it may be, for whatever reason, if the
9  presiding officer determines he's not ready to call up
10  your bill, then the bill doesn't get called up.
11  Q.  Okay.  If for whatever reason there were not a
12  blocker bill in place and so -- if there weren't a
13  blocker bill in place at all, then would bills generally
14  be considered in the regular order of business?
15  A.  I wouldn't know.  I don't think that's been
16  done in decades.
17  Q.  As far as the order of bills, other than the
18  blocker bill, would the Lieutenant Governor have the
19  ability to change the order of bills that went up for
20  consideration?
21  A.  Can you rephrase?
22  Q.  Does that make sense?
23  A.  No.
24  Q.  Let me see if I can ask it more clearly.
25       If there were certain bills that -- that

60

1  were up for consideration, let's say they were behind
2  the blocker bill, would the Lieutenant Governor have the
3  ability to take a new bill and say this bill is now
4  going to be first in line for consideration behind the
5  blocker bill even though these 10 or 20 other bills were
6  already sitting there?
7  A.  Yes, because he did that on House Bill 218.
8       Now it would require the -- in that
9  situation, the two-thirds rule, so two-thirds of the
10  senators present and voting would have to agree to bring
11  up the bill.  But he could call up any bill that's on
12  the calendar.  We're taking up bill, House Bill 214, for
13  example, or Senate Bill 14.
14  Q.  Okay.
15  A.  Generally, you need the two-thirds rule except
16  this last session when that was waived for that bill
17  specifically.
18  Q.  Right.
19  A.  Does that make sense?
20  Q.  I does, yes.  I think so.  So I've been talking
21  about kind of a line and an order of bills, but it
22  sounds like, in a sense, that's not really how it works,
23  because the Lieutenant Governor just calls a bill
24  regardless of where it might be in the line; is that
25  right?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                                June 11, 2012

61

1   A.  Exactly.  Exactly.
2   Q.  Do the Senate rules require that all members be
3   present in order to vote on a bill?
4   A.  Not all members.  Can you rephrase your
5   question?  Because the way -- all members don't have to
6   be present for us to vote on a bill.  A member has to be
7   present to vote on a bill.
8   Q.  Okay.  So the fact that three, four members
9   aren't there for the vote does not prevent the Senate
10  from voting on a bill; is that right?
11  A.  Assuming there's a quorum.
12  Q.  I see.  So there has to be a quorum for the
13  Senate to vote on a bill; is that right?
14  A.  Yes, sir.
15  Q.  But assuming there is a quorum, the fact that
16  one or more senators are not present does not prevent
17  the Senate from voting?
18  A.  Yes, sir, that's correct.
19  Q.  Unless, of course, that enough are gone to
20  break the quorum, right?
21  A.  Correct.
22  Q.  Do the Senate rules require all members to be
23  present in order to suspend the regular order of
24  business?
25  A.  No, sir.

62

1   Q.  Looking back at Paragraph 7 on Page 3 of what
2   we've marked as Deposition Exhibit 3.  So this -- you
3   state in Paragraph 7 that Senator Hinojosa informed you
4   that supporters of HB 218 had changed the Senate
5   calendar when you were absent, and -- is that right?
6   A.  Yes, sir.
7   Q.  And is it accurate that what happened was you
8   were gone, but SB -- HB 218 was called to a vote while
9   you were gone; is that accurate?
10  A.  I was in my apartment sick.  And generally, all
11  the time, every morning they call us to order.  We do
12  the prayer.  You do resolutions honoring, you know, our
13  military.  Somebody's 50th anniversary.  Et cetera, et
14  cetera.  That generally takes a couple of hours.  So
15  that morning, when I was ill, I called in and said "I
16  will be in right after we complete our Senate
17  resolutions," et cetera.  That's when this bill was
18  called up was when -- normally, we would be doing
19  resolutions, but instead, they suspended that to take up
20  this bill, which is highly unusual.  In fact, I don't --
21  I'd say it's extraordinary.
22  Q.  Is it your understanding that HB 218 was moved
23  up or taken up because its proponents thought they could
24  pass it while you were gone?
25  A.  Absolutely.

63

1   Q.  Can you recall -- can you recall any other time
2   during your membership in the Senate when a bill was
3   passed without the presence of all members?
4   A.  Sure.  It's done all the time.
5   Q.  Can you recall any other instance, besides the
6   one you described here in Paragraph 6, when a bill was
7   moved up or taken out of order for a vote while a member
8   was gone?
9   A.  Yes.
10  Q.  Do you recall any specific bills?
11  A.  I can't recall a specific bill, no.  But again,
12  I can never recall -- I can't recall any situation where
13  a bill was taken up before we do the resolutions, you
14  know, the bringing the folks on to the Senate floor,
15  acknowledging them, et cetera.
16  Q.  I see.  Do you recall on the day in the 2007
17  session when -- that you described in Paragraph 6, when
18  HB 218 was voted on, were there any other members who
19  were not present for that vote?
20  A.  The first vote that was taken on House Bill
21  218, from what I recall, Dean Whitmire, John Whitmire,
22  was -- had been on the Floor, but I believe he was on
23  the House floor at the time.  Senator Heger, I think
24  also was on the House floor.  And that's all I can
25  recall as far as those that were absent.

64

1   Q.  So after you got a call from Senator Hinojosa,
2   you went to the Senate floor?
3   A.  I had no choice.  Yes, sir.
4   Q.  And moving down, moving down to Paragraph 9 on
5   the same page, says that HB 218 passed on its first vote
6   before you arrived; is that right?
7   A.  Yes, sir.
8   Q.  And then you say that -- where am I?  Oh, here
9   we are.  Okay.  Still in Paragraph 9, it says "Opponents
10  of the bill forced a second vote."  Is that accurate?
11  A.  Yes, sir.
12  Q.  How did -- how did opponents of HB 218 force a
13  second vote on the bill?
14  A.  The Lieutenant Governor called for a second
15  vote.  Because from what I understand, and I wasn't
16  present, for most of the vote, Senator Whitmire raised
17  objection.  Because generally, the custom of the Senate
18  is if you check in with the secretary of the Senate and
19  you excuse yourself either to go to use the facilities
20  or to go the members' lounge to eat lunch, have coffee,
21  or you may be meeting with the presiding officer,
22  oftentimes in his office, constituents in the back hall,
23  the secretary of the Senate knows that you're present.
24  And for the most part, knows how you're going to vote,
25  which is interesting, but -- based on our past votes, et



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

65

1  cetera.  Senator Whitmire objected to the first vote
2  based on those reasons, and the Lieutenant Governor
3  called for a second vote.  So I wasn't present during
4  most of the second vote.  I appeared moments -- seconds
5  before my name was called.
6      Q.  So Senator Whitmire, if I understand you
7  correctly, he objected because he had checked in and
8  then left, but a vote was called in his absence, even
9  though he had checked in?
10     A.  Yes, sir.
11     Q.  Do you know -- and I understand you weren't
12 there at the time, but do you know whether or not
13 Senator Whitmire specifically objected to the vote on HB
14 218 based on the fact that you were not present?
15     A.  I don't know.
16     Q.  You mentioned that the secretary often knows
17 how members will vote.  Do members of the Senate ever
18 ask the secretary in advance to put them down for a
19 vote, one way or the other, on a bill that they know
20 will be coming up?
21     A.  Some senators do that.
22     Q.  Do senators ever -- ever ask other senators to
23 vote for them on a specific bill, like vote for them one
24 way or the other on a bill?
25     A.  Well, in the Senate, it's different, done

66

1  differently than in the House, whereas the House, you
2  register your vote from your desktop.
3      Q.  Okay.
4      A.  In the Senate, it's usually a roll call vote,
5  although, again, you could leave your vote with the
6  secretary of the Senate, assuming you know that the bill
7  is coming up.
8      Q.  Right.
9      A.  And I will submit to you, in this case, no one
10 knew that this bill was coming up.
11     Q.  So in the House, they basically vote on bills
12 by pushing a button on their desk, correct?
13     A.  Right.  And no one votes for any other member
14 on the House floor either.
15     Q.  No?  Never?  But if they were to do that, they
16 could conceivably just push a button, right?
17     A.  Conceivably.
18     Q.  Okay.  But that's not how it works in the
19 Senate?
20     A.  No, sir.
21     Q.  In the Senate, it's actually, Senator Uresti,
22 you're called and then you state your vote; is that
23 right?
24     A.  Generally, that's how it happens.  But it's,
25 again, if you've ever heard the secretary of the Senate

67

1  call the roll, you'll understand that before she
2  finishes the roll call, halfway before she finishes the
3  roll call, the presiding officer is gaveling.
4      Q.  Okay.  But in any event, you don't vote in the
5  Senate by pressing a button on your desk.
6      A.  No, sir, you don't.
7      Q.  Okay.  At the time that you described -- the
8  time during the 2007 session that you're describing in
9  here in Paragraphs 6 through 9, were you aware that HB
10 218 might come up for consideration?
11     A.  That morning?  No, I was not.
12     Q.  Did you anticipate that it would come up that
13 day?
14     A.  No, sir, because they did not have the votes to
15 pass that bill.  The purpose of my call was out of
16 courtesy, because I sit on two different committees that
17 meet early in the morning, and I thought it was the
18 senatorial thing to do, which was to call the chairman,
19 chairpersons of the different committees to let them
20 know that I would be absent for those committees early
21 in the morning.  And the secretary of the Senate, as
22 well, that I would be absent during the resolutions, but
23 I would be present for regular order of business when it
24 came -- when it did come to be.  But there was no reason
25 for us to believe that House Bill 218 was going to come

68

1  up for a vote because they did not have the votes --
2      Q.  I see.
3      A.  -- to suspend.
4      Q.  Right.  So the Lieutenant Governor called the
5  second vote on HB 218; is that right?
6      A.  Yes, sir.  I was not present at the time,
7  though.
8      Q.  Was there any rule, to your knowledge, that
9  required the Lieutenant Governor to allow a second vote
10 on HB 218?
11     A.  Not a specific rule other than the custom of
12 the Senate, which is not to count a senator absent once
13 they've checked in, unless they've checked out.
14     Q.  Is it accurate to say that it was within the
15 Lieutenant Governor's discretion to have a second vote
16 on HB 218?
17     A.  Sure.  I think especially given the fact of the
18 way the first vote was handled.
19     Q.  But there was nothing that -- there was nothing
20 that required him to allow a second vote, was there?
21     A.  Of course not, other than to follow Senate
22 custom.
23        MR. MALDONADO:  Would you mind if we took
24 a break?
25        MR. FREDERICK:  Not at all.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                              June 11, 2012

69

1        (Recess from 11:25 a.m. to 11:34 a.m.)
2        Q.   (BY MR. FREDERICK) Senator, I'd like to move to
3   the next page of your declaration, Paragraph 13.  It
4   says "During the Senate's consideration of SB 14, I
5   testified that SB 14 would have a disproportionate
6   effect on minority voters in Senate District 19 and the
7   State of Texas as a whole."  Is that accurate?
8        A.   Yes, sir.
9        Q.   And that's your -- that's your position today,
10  is that Senate Bill 14, in your understanding, will have
11  a disproportionate effect on minority voters, both in
12  your district and in the state as a whole, right?
13       A.   Yes, sir.
14       Q.   Do you recall -- do you recall what the
15  specific testimony was that you refer to here in
16  Paragraph 13?
17       A.   Well, generally, I recall.  Again, it's been
18  over a year.  But I -- I touched on the fact that my
19  district is the largest geographical district in the
20  continental U.S., have almost or part of 23 counties,
21  50,000 square miles.  There's 23 counties.  Of the 23
22  counties, that about 8 of them or so either had no DPS
23  office, Department of Public Safety office or had
24  limited hours.  I think that was the thrust of my
25  argument.

70

1        Q.   And by "disproportionate effect," did you mean
2   that minority voters in your district and in the state
3   would be less likely to possess the ID required by SB
4   14?
5        A.   Yes, sir.
6        Q.   How -- how do you know that minority voters in
7   your district are less likely to have the ID required by
8   SB 14?
9        A.   Well, I know that a majority of my folks are
10  poor.  They're working class.  Very few of them have
11  probably traveled outside the country, and therefore,
12  obtained a passport.  As far as a military ID, I have a
13  military ID from when I left the Marine Corps that does
14  not have a photo ID on it.  Although, it's good forever,
15  doesn't have a photo.  So many of my, as you know, my
16  constituents were former military.  And again, given the
17  district, the vast -- geographically, the distance
18  between the towns, I believe that it will have that
19  disproportionate effect on my constituents.  Also given
20  the fact that 75 percent of them or so are either
21  African American or Hispanic.
22       Q.   So you say you have a military ID from your
23  service?
24       A.   That does not have a photo ID on it.
25       Q.   Okay.  When did you leave the active service?

71

1        A.   1989.
2        Q.   And you've had -- is the ID you have now, is
3   the same one you had when you left active duty in '89?
4        A.   That's the one they issued me, yes.
5        Q.   Do you know whether it would be possible, if
6   you wanted to, or needed to, for you to get a new ID
7   from the military with your photo on it?
8        A.   I don't know.  I never tried.  I never tried
9   since I was told that ID was good forever.
10       Q.   Is it your understanding that all military IDs
11  are good forever?
12       A.   I don't know.
13       Q.   If you lost your military ID and needed to get
14  a new one, for any reason, how would you do that?
15       A.   I was told "Don't ever lose your military ID,
16  Marine," so I wouldn't know the process.
17       Q.   Okay.  So you've never -- you, personally, have
18  never had to replace your military ID?
19       A.   No, sir.
20       Q.   And you're not aware of what would be required
21  to replace a military ID?
22       A.   No, sir.
23       Q.   You're not aware of what would be required if
24  you wanted to get a new one, say, with your picture on
25  it?

72

1        A.   No, sir.
2        Q.   Have you conducted any studies of ID possession
3   by voters in your district?
4        A.   No, sir.
5        Q.   Have you seen any studies of ID possession by
6   voters in your district?
7        A.   No, sir.
8        Q.   Have you conducted any survey of your
9   constituents to see how many of them possess the ID
10  required by SB 14?
11       A.   No, sir.
12       Q.   Are you aware of any survey of your
13  constituents to see who possesses or how many possess
14  the ID required by SB 14?
15       A.   No, sir.
16       Q.   Have you or your staff conducted any informal
17  polls of constituents to see how many possess the ID
18  required by SB 14?
19       A.   Not that I'm aware of.
20       Q.   Do you know how many of your constituents lack
21  the -- one of the forms of ID required by SB 14?
22       A.   I don't know the exact amount, but I would
23  imagine many lack several of those specific forms of
24  ID.  My mother is a perfect example.
25       Q.   And so you say you imagine many lack several of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                              June 11, 2012

73

1  the forms.  Is that -- is that a conclusion that you
2  draw from the rates of poverty and the number of elderly
3  people and the number the minority voters in your
4  district?
5      A.  It's from knowing my district and for the
6  reasons, the examples you just gave.  And again, using
7  my mom as a perfect example.  She never had a passport.
8  Her driver's license had expired because she didn't
9  drive.  She was home on hospice.  And was never in the
10  military.  So would not have been able to vote.  She
11  would not have met any of those five exceptions.  She
12  didn't carry a gun.  She didn't have a concealed
13  handgun.  I would say a concealed handgun license.
14      Q.  And she was registered to vote?
15      A.  Yes, sir.
16      Q.  And did she vote?
17      A.  She voted for me.  The most recent time would
18  have been November I believe of 2010.
19      Q.  To the best of your recollection, did your
20  mother typically vote in person?
21      A.  Yes, sir.  She did until she was sent home on
22  hospice.
23      Q.  Do you know how many of your constituents do
24  not have a driver's license?
25      A.  I don't know.

74

1      Q.  Do you know how many of your constituents do
2  not have either a driver's license or a state-issued
3  personal ID card?
4      A.  Well, I assume you're talking about those that
5  are of any particular age.  I don't know.  We're talking
6  about 800,000 people.  So I don't know the answer to
7  your question.
8      Q.  Do you know how many of your constituents have
9  a concealed handgun license?
10      A.  No, sir.
11      Q.  Do you know how many of your constituents have
12  a passport?
13      A.  No, sir.
14      Q.  Do you know how many of your constituents have
15  a military ID card?
16      A.  No, sir.
17      Q.  Can you identify any individual constituent who
18  does not have the identification required by Senate Bill
19  14?
20      A.  My mother was -- is the best example.
21      Q.  Can you identify any other individual, besides
22  your mother, who does not have one of the IDs required
23  by SB 14?
24      A.  That does not have at least one of them?
25      Q.  Yes, that does not have at least one.

75

1      A.  I don't know offhand, but I can think of many
2  that don't have several of them.  I don't know how many
3  of my constituents are driving around without a -- an
4  expired driver's license, for example.  But I know many
5  of them that don't have military IDs, that don't have
6  passports, that don't have a certification of U.S.
7  citizenship, and they don't have a concealed handgun
8  license.  I know many of those folks.
9      Q.  Can you think of the name of any particular
10  constituent who does not have at least one of the IDs
11  required which SB 14?
12      A.  Well, no, again, because I don't know how many
13  of them may have an expired driver's license.  Or may
14  not have, simply, have a valid Texas ID license.  They
15  may not have ever gone to get a Texas ID license -- or
16  Texas ID, rather.
17      Q.  So as you sit here, you can't identify any
18  specific registered voter in your district who does not
19  have at least one of the forms of ID required by SB 14?
20      A.  Well, other than my mother when she was alive.
21      Q.  But other than that, no individuals that you
22  can identify?
23      A.  Not by name.
24      Q.  Can you identify any individual constituent
25  who -- of yours, who does not have the documentation

76

1  that would be necessary to get one of the IDs required
2  by SB 14?
3      A.  That's impossible to do.
4      Q.  So the answer is no, you can't identify any
5  specific person?
6      A.  Correct.  I can't identify any specific person
7  because it's impossible.
8      Q.  Do you know how many registered voters in Texas
9  do not have at least one of the forms of ID required by
10  SB 14?
11      A.  I don't, but I would hope the Secretary of
12  State would know that, because I don't.
13      Q.  So you -- so you can't -- well, scratch that.
14      Can you identify any particular registered
15  voter in Texas who does not have at least one of the
16  forms of ID required by SB 14?
17      A.  I can't.  I would defer to the Secretary of
18  State's Office.
19      Q.  Do you know how many Texas registered voters
20  lack documents necessary to get a state-issued photo ID?
21      A.  I have no idea.  I doubt anybody in Texas knows
22  the answer to that question.
23      Q.  Can you identify any particular registered
24  voter who does not have the documentation necessary to
25  get a state-issued photo ID SB 14?

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



CARLOS URESTI                                          June 11, 2012

77

1    A.  I have no idea.

2    Q.  Are you familiar with the levels of photo ID

3    possession by registered voters in Texas, and by

4    "levels," I mean the percentage of voters from different

5    groups who have the kinds of photo IDs required by SB

6    14?

7    A.  No, not specifically.

8    Q.  You don't -- you don't know how -- what

9    percentage of African American voters have one of the

10   IDs required by SB 14?

11   A.  No.  Generally, I do know that African

12   Americans and Hispanics tend to not have the proper

13   photo identification required by SB 14, and the elderly

14   and disabled, as well, but specific numbers, I don't

15   have that.

16   Q.  So you don't have a percentage for African

17   American or Anglo or Asian American or Hispanic voters?

18   A.  No, sir.

19   Q.  Okay.  You say that you're aware that African

20   American and Hispanic voters, I'm paraphrasing, I don't

21   want to misquote you.  It's your understanding that

22   African American and Hispanic voters tend not to have

23   the photo IDs required by SB 14; is that right?

24   A.  I know that for a fact.

25   Q.  How do you know that?

78

1    A.  Well, I've been a legislator for 15 years.

2    I've block-walked my neighborhood many, many times.  And

3    I have individually spoken to constituents that proudly

4    hold up their voter registration card.  Some of them

5    still call it a "poll tax."  And that they say,

6    "Mr. Uresti, I have my poll tax."  These are

7    individuals, typically, they're elderly, they're

8    Hispanic, they're African American.  They may be

9    homebound.  They may be in a wheel chair.  They don't

10   drive.  They don't travel.  So I know for a fact that

11   they don't have a driver's license.  I know for a fact,

12   as in my mom's case, that they don't drive.  They don't

13   have a passport.  They don't carry a concealed handgun.

14          So I know for a fact, based on

15   representing this district, the Senate District 19 for

16   six years, and as a state representative, District 118

17   for nine years, because I have individually spoken to

18   many of these folks.  That's how I know.

19   Q.  And those individuals that you have spoken to

20   in your experience as a legislator, you mentioned that

21   many of them were elderly or disabled; is that right?

22   A.  Yes, sir.

23   Q.  Would you say that most of those individuals

24   that you are referring to who you think don't have

25   photo ID are elderly or disabled?

79

1    A.  I'm sorry.  Say that again?

2    Q.  Of course.  The individuals that you mentioned

3    who you believe wouldn't have a photo ID, do you believe

4    that most of those individuals were elderly or disabled?

5    A.  Yes.  And of either Hispanic or African

6    American, given my district.

7    Q.  You said you were a House member representing

8    District 118; is that right?

9    A.  Yes, sir.

10   Q.  And is -- 118 is in Bexar County, right?

11   A.  Yes, sir.

12   Q.  Was it -- when you represented the district,

13   was it completely within Bexar County?

14   A.  Yes, sir.

15   Q.  Other than your experience as a legislator,

16   block walking, talking to constituents, is there any

17   other specific basis for your belief that African

18   American and Hispanic voters are less likely to possess

19   the ID required by SB 14?

20   A.  I can't think of a better way of knowing that

21   than actually talking to the folks.  That's all I have.

22   Q.  Is it your understanding that the elderly and

23   disabled voters may be qualified to cast mail-in or

24   absentee ballots in Texas?

25   A.  They might be qualified, yes.

80

1    Q.  So it's possible that an elderly or disabled

2    person, even if he or she did not have the ID required

3    by SB 14, might still be able to cost a regular ballot

4    by mail?

5    A.  They might be able to if they're aware of that,

6    one.  And then two, as you know, Counselor, many -- at

7    least my voters prefer to vote in person.  They want to

8    feel that their vote is counted for and may not trust

9    the mail-in process.

10   Q.  If a voter for whatever reason lacks the ID

11   required to vote in person by SB 14 but could still cast

12   a ballot by mail, in your mind, would that voter's --

13   would that voter be disenfranchised or denied the right

14   to vote by SB 14?

15   A.  If they were allowed and able to vote by mail?

16   Well, assuming they voted by mail, then I don't see how

17   they were disenfranchised, if they actually voted.

18   Q.  Are you familiar with the levels or percentages

19   of photo ID possession by voters in Georgia?

20   A.  No, sir.

21   Q.  Are you familiar with the levels of photo ID

22   possession by voters in Indiana?

23   A.  Probably as much as they are as familiar with

24   Texas.  No, sir, I don't.

25   Q.  Okay.  Going back to the voters who you've



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

81

1   spoken to over the years, can you remember any of those
2   voters by name?
3            I'm sorry. Let me clarify. The voters
4   you've spoken to over the years, can you recall by name
5   any of the voters who you believe did not have a photo
6   ID that would be required under SB 14?
7       A.  Well, I can assume Ms. Lois Luke, perhaps,
8   Mrs. Rodriguez, Mr. Albert. I mean, there are so many.
9   Those are -- I think of an elderly, disabled, Anglo
10  woman, Ms. Luke. Mr. Albert was an African American,
11  wheelchair bound. Mrs. Rodriguez, I recall, was a lady
12  that held up her voter registration card who said "I've
13  got my tax, Mr. Uresti." So those are the first three
14  that just pop in my head.
15      Q.  And Ms. Luke was Lois Luke?
16      A.  Correct.
17      Q.  Do you recall Ms. Rodriguez's first name?
18      A.  No, I don't. There's a lot of Rodriguezes in
19  my district.
20      Q.  Right. What about Mr. Albert, do you recall
21  his first name?
22      A.  No, sir.
23      Q.  And to your recollection, were Ms. Luke,
24  Ms. Rodriguez and Mr. Albert all elderly individuals?
25      A.  Yes, sir. And Mr. Albert, that actually might

82

1   have been his first name. Because he kept calling
2   himself "Mr. Albert," so that actually could have been
3   his first name.
4       Q.  Okay.
5       A.  Just to clarify.
6       Q.  Okay. Looking back at your declaration, which
7   we've marked as Deposition Exhibit 3, in Paragraphs 14
8   through 17, you generally describe the geography and
9   makeup of your district and how that might impose some
10  difficulty on your constituents; is that right?
11      A.  Well, not how it might, but how it would
12  actually impose difficulty on my constituents.
13      Q.  Okay. And you've testified that your district
14  is extremely large, right?
15      A.  Yes, sir.
16      Q.  And many of the counties in your district are
17  rural; is that accurate?
18      A.  Almost all of them except for perhaps Bexar
19  County and El Paso County, yes.
20      Q.  Do you have part of El Paso County in your
21  current district?
22      A.  Yes, sir.
23      Q.  So other than Bexar County and possibly
24  El Paso, you've said all of the other counties in your
25  district are rural?

83

1       A.  Yes, sir.
2       Q.  How many of the counties in your district are
3   -- would you consider to be poor counties?
4       A.  All of them.
5       A.  All of them.
6       A.  I have, I believe, it's the third poorest
7   district in the state of Texas.
8       Q.  Is that the third poorest Senate district?
9       A.  Yes, sir.
10      Q.  Is it your understanding, based on your
11  experience representing the district, that constituents
12  in the rural and poor areas of your district face
13  hardships doing kind of everyday activities such as
14  getting groceries?
15      A.  Getting groceries, getting to school. A lot of
16  my constituents out in West Texas have to be bussed to
17  school. Takes an hour, hour and a half at times to get
18  to school in the mornings. So there's no question about
19  it.
20      Q.  Are there communities in your district that
21  you're -- that you know of where people have to drive 30
22  minutes or more to get to a grocery store?
23      A.  Absolutely.
24      Q.  Can you think of any specific towns or
25  communities where people have to drive more than an hour

84

1   to get to a grocery store?
2       A.  Well, I guess you would have to define a
3   grocery store. If we're talking about an HEB, I could
4   think of towns that would have to drive a couple of
5   hours to get to an HEB. Absolutely. So, again, you
6   with have to define grocery store. But if we're using
7   HEB, which is the one I'm most familiar with, there are
8   towns that aren't -- don't have HEBs in them. In their
9   town.
10      Q.  So their -- safe to say then that there are
11  towns in your district where to get to a supermarket
12  like an HEB, it would take at least an hour or possibly
13  more?
14      A.  Sure. I'll give you an example. I mean, there
15  are towns south of San Antonio that my constituents
16  drive into San Antonio to go to the HEB. To go to the
17  malls. There's malls unheard of in West Texas.
18      Q.  Right.
19      A.  Simply unheard of.
20      Q.  Can you think of any specific towns?
21      A.  I can think of all them. Del Rio, Uvalde,
22  Eagle Pass, Hondo, Castroville, LaCoste, Lytle, Italia,
23  Devine, Presidio, Socorro, Pecos, Fort Stockton.
24      Q.  So -- so do people in Eagle Pass have to drive,
25  they have to drive out of town to get to a supermarket?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                        June 11, 2012

85

1    A.  No.  To get to a mall.
2    Q.  Oh, to a mall.
3    A.  A large mall.
4    Q.  Okay.
5    A.  Absolutely.      And keep in mind, those drives
6    are -- from Ulvade to San Antonio, you know, are a
7    little over two hours.  Eagle Pass to San Antonio is 2
8    hours and 20 minutes.  So we're not talking about a
9    20-minute drive.
10   Q.  Right.  Probably not a lot in-between Eagle
11   Pass and San Antonio, necessarily.
12   A.  There's nothing between there except for a rest
13   stop.  So many of them have to plan that once a month,
14   perhaps, to come in to go buy clothes for their kids.
15   Many of my constituents do that either right before
16   Christmas or right before the school year.  So they plan
17   two trips a year, because that's all they can afford.
18   Q.  Is there -- when they -- when people in your
19   district who have to drive a long way to get clothes for
20   their kids, when they do make those trips, is there
21   public transportation that is available to them?
22   A.  No, sir.  There's not -- I'm assuming they
23   could get a Greyhound bus, perhaps, but you're talking a
24   24-hour trip with kids, perhaps.  No, there's no such
25   transportation.

86

1    Q.  So to make those trips to get things like
2    clothing for their kids, if they make it, they have to
3    have a car to make it; is that right?
4    A.  Well, if they have a vehicle.  Many of my
5    constituents, particularly the ones along the border
6    share a vehicle, and they have to coordinate with other
7    family members or friends.  I know, specifically,
8    families that will do that, and they will come up.
9    Usually, they'll come to San Antonio or they'll go to
10   the outlet malls in San Marcos, try to buy as many
11   clothes as they can afford, and then they go back home.
12   Q.  Is it common for people in the rural areas of
13   your district to have to drive a long way to get to a
14   hospital?
15   A.  Yes, sir.  I mean, depending on what type of
16   hospital you're speaking of, of course.  Particularly
17   our veterans.
18   Q.  Uh-huh.  For -- for basic, say, kind of basic
19   emergency room care, can you think of towns where people
20   would have to drive more than 30 minutes if they wanted
21   to get to an emergency room?
22   A.  If you're out in West Texas, you have a wreck
23   along the highway, it's going to take you more than 30
24   minutes to get to a hospital.  God forbid you're in an
25   accident out there.  And that goes for any Texan, but

87

1    specifically my constituents.
2    And keep in mind that if you had an
3    accident, the time it would take for an ambulance to
4    reach you, to begin with, assuming you had
5    communication, because many times you don't even have
6    cell phone coverage out there in West Texas.  So
7    assuming you had communication for an ambulance to get
8    there, and usually, they're volunteer ambulances, EMS
9    services, et cetera, then to be able to get you back to
10   the closest hospital will be -- would be very difficult.
11   Q.  And so in your district, some of the obstacles
12   you've described, I think two -- some of the obstacles
13   that would be imposed by Senate Bill 14 would include
14   things like limited availability of driver's license
15   offices in certain counties, right?
16   A.  Yes, sir.
17   Q.  And possibly limited hours or limited days for
18   the driver's license offices that exist, right?
19   A.  Yes, sir.
20   Q.  And on top of that, there would be, in many
21   cases, the significant distance to travel even to get to
22   the driver's license offices that exist, right?
23   A.  Exactly.  And all that is exacerbated by the
24   fact that those that are working would have to take off
25   time from work, and to make a trip like that isn't --

88

1    you know, an hour early off of work, it's -- sometimes
2    it's a whole day.
3    Q.  In those circumstances that we were just
4    talking about that might make it difficult for somebody
5    to get a photo ID if they didn't have one, is it your
6    contention that those would disproportionately affect
7    Hispanic or African American voters in your district?
8    A.  Absolutely.
9    Q.  And why is that?
10   A.  75 percent of my district are either African
11   American or Hispanic.
12   Q.  I see.  Is it your contention that in your
13   district, if a Hispanic voter and Anglo voter lived in
14   the same place or same town, that the requirement and
15   burdens of getting a photo ID would affect them
16   differently?
17   A.  Perhaps.
18   Q.  Well -- I'm sorry.  Why would that be?
19   A.  Well, I think when you look at the demographics
20   of the district coupled with the economic status of
21   Hispanics, African American versus Anglos, you will see
22   there's a difference, obviously.  And so I think it's
23   more cumbersome upon the Hispanics and the African
24   Americans, particularly in my district, because they
25   tend to be poorer.  They tend to be more indigent, out


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                    June 11, 2012

89

1  of work.  The unemployment rates are much higher for
2  Hispanics and African Americans than Anglos, not only in
3  my district but in Texas.
4      Q.   So then it's your understanding that a photo ID
5  requirement like that in SB 14 would disproportionally
6  impact Hispanic and African American voters in your
7  district because they would be more likely to be
8  indigent?
9      A.   Correct.  So many of them don't own vehicles
10  and many of them don't drive, and therefore, they don't
11  have a driver's license.
12      Q.   Other than a higher incidence of poverty among
13  Hispanics and African Americans as compared to Anglos,
14  is there any other reason that you're aware of that a
15  photo ID requirement would have a greater impact on
16  Hispanic and African American voters?
17      A.   Other than what?  What was the question?
18      Q.   Other than the higher incidence of poverty.
19      A.   Well, I know that -- I'm sure there are other
20  reasons, as well, besides poverty.  There's also the
21  geographical distance that we've spoken about, one.  I
22  there's an issue of them being educated to understand
23  this bill, the effects of this bill, the requirements of
24  this bill.  Many of my constituents don't realize that
25  if this bill takes effect or when this bill takes effect

90

1  that they can't just show up with their voter -- voter's
2  registration card.
3           So there's that huge concern, that they're
4  not going to be informed, and so when they do show up
5  with their voter registration card, like many of my
6  constituents do, they're going to be turned away from
7  the ballot box, and therefore, not be allowed to vote
8  and exercise their constitutional right.
9      Q.   Do you contend that Senate Bill 14, if
10  implemented, would affect low-income Hispanic voters
11  more than it would affect low-income Anglo voters?
12      A.   Most likely, yes.
13      Q.   Why is that?
14      A.   Again, for the reasons that I stated.
15  Historically, we have to look at the history of Texas,
16  and in that regard, it's not something we can be proud
17  of when it comes to civil rights movement.  Again, not
18  only for African Americans but with the effect they had
19  on Hispanics.  So I think when you look historically at
20  Texas's performance with regard to the voting rights of
21  Hispanics, this bill I believe takes a step backwards.
22  And instead of encouraging all voters to vote and
23  assisting all voters to vote, it disenfranchises them.
24      Q.   So I believe it's been your testimony that SB
25  14, if implemented, would disenfranchise certain

91

1  individuals who did not have the required ID because
2  they would not be allowed to vote, right?
3      A.   Correct.
4      Q.   Other than preventing people without IDs from
5  voting, how -- how specifically would SB 14
6  disenfranchise or prevent people from voting?
7      A.   Ask that again, please.
8      Q.   Sure.  Other than preventing people without an
9  ID from voting, how would SB 14 specifically prevent
10  people from voting?
11      A.   Well, if they don't have their ID to vote, they
12  can't vote.  I don't know of any other way to prevent
13  them.  The bill is already preventing them if they don't
14  have an ID from voting.  And it's not giving them any
15  exceptions to the rule, any hardship exceptions, any
16  grandfathering clauses, if you will.  Students that have
17  college ID aren't able to vote, perhaps, because they
18  choose not to carry a handgun, yet those that decide to
19  carry a handgun are given a higher privilege or more of
20  a privilege to vote.  I don't see how that's
21  constitutional.  I don't see how that's -- treats every
22  citizen equally and fairly.
23      Q.   And I guess my question is -- and I understand
24  that, and I appreciate that.  But is there anything that
25  SB 14 would do, other than obviously preventing people

92

1  without an ID from voting, is there anything that SB 14
2  would do specifically that would prevent people from
3  voting?
4      A.   Well, and I think I touched on this earlier to
5  one of your questions, I think the information, or lack
6  thereof, of this bill, will have unintend -- or intended
7  consequences of discouraging folks from voting if they
8  get misinformation about this bill.  And they're advised
9  that they need a particular ID, they may not know and
10  they may think they can bring their birth certificate,
11  for example, which is not going to suffice, according to
12  this bill.
13          So I think it's -- but there are other
14  ways that this bill is going to prevent bill folks from
15  voting, particularly, my constituents, keep it in mind,
16  many of them speak Spanish, as well.  So I think the --
17  there are side effects, if you will, of this bill that
18  are going to prevent constituents -- my constituents
19  from voting.
20      Q.   Okay.  So people, one, they might not have the
21  ID in the first place, right?
22      A.   Correct.
23      Q.   And they also just might not be aware that they
24  need to have the ID, right?
25      A.   Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

CARLOS URESTI                                          June 11, 2012

93

1    Q.  Are there --
2    A.  And they may be given wrong information,
3    inadequate information, as well.  They may be Spanish
4    speakers, so they may not understand whatever
5    information is given to them in English.  I don't know
6    what information has been provided to them, but if any,
7    it's been very little.
8    Q.  Is there any other specific impact that you can
9    think of that SB 14 would have on voters?
10   A.  Well, I would think that's the most serious
11   impact preventing them or disenfranchising them from
12   voting.
13   Q.  Do you believe that SB 14, if it were
14   implemented, would have a different impact on a Latino
15   voter and an Anglo voter who were in the same location
16   and at the same socioeconomic level?
17   A.  I believe that it could.
18   Q.  How do you think it could?
19   A.  Well, if they're a Spanish speaker, for
20   example, depending on the information provided to them,
21   and there are many Spanish speakers in my district.
22   Q.  Sure.  Other than the potential language
23   barrier, can you think of any other reasons that a
24   Latino and an Anglo or an African American voter of the
25   same location and socioeconomic level might be affected

94

1    differently by SB 14?
2    A.  Perhaps.  But again, I think we have to look
3    historically at the turnout for Anglos versus Hispanics
4    versus African Americans already, and then to -- add
5    this bill to the mix, this bill doesn't do anything to
6    encourage any of them to vote in greater numbers.
7        So I think if, again, in my opinion, I
8    will submit to you, that it will discourage them,
9    disenfranchise them or prevent them.  Because it's not
10   doing -- there's not one thing in this bill, there's not
11   one thing in this bill that encourages those voters to
12   vote or assists them in voting.  Because in fact, it
13   puts one more burden in their way.  And that -- and so I
14   would say that would be my response.
15   Q.  You said your district includes a very long
16   stretch of the Texas-Mexico border; is that right?
17   A.  Yes, sir.  Two-thirds of the Texas-Mexico
18   border, from Eagle Pass to El Paso.
19   Q.  Is it your understanding that many people who
20   live in towns on the Texas-Mexico border cross back and
21   forth frequently between Texas and Mexico?
22   A.  I believe that used to be the case.  I don't
23   think it's as often given the situation in Mexico along
24   the border towns as it used to be.  In fact, I know that
25   many of constituents don't do as much as they used to.

95

1    It used to be a daily routine for many of them, and now
2    it's -- it's a, generally speaking, it's -- it's rare.
3    Q.  And why specifically is that?
4    A.  Because of the violence along the border in
5    Mexico.
6    Q.  Do you have a sense of kind of when that
7    changed, when people maybe stopped going across the
8    border into Mexico as much as they used to?
9    A.  Over the last three or four years, as the
10   violence grew, and -- because I ask my constituents when
11   I visit, because I don't go over there, and I ask them.
12   And a few years ago, "yeah, we'll go once in a while."
13   Couple of years ago, "Well, I'll go visit family or
14   friends."  And now it's most of the responses are they
15   don't go over.
16   Q.  Do many of your constituents who live on the
17   border, they cross over into Mexico to work every day?
18   A.  No.  A small number.
19   Q.  A small number?
20   A.  (Witness nods head yes.)
21   Q.  If someone were to cross the border frequently,
22   they would need a passport, right?
23   A.  I'm assuming.  I don't know if they could use a
24   visa.  I really don't know.  Again, I don't really go
25   into Mexico.

96

1    Q.  To your knowledge, is it -- is it more likely
2    that someone living on the border would have a passport
3    as opposed to somebody who lives in, say, North Texas or
4    somewhere far from the border?
5    A.  No.  Again, from what I recall, if you're just
6    crossing over into Mexico, they don't even check for
7    your ID.  But again, I haven't been in Mexico in a
8    decade, I suppose, so I don't know.
9    Q.  Okay.  If you found out, if it were proven to
10   you that there were no disparity in ID possession
11   between minority voters and nonminority voters in Texas,
12   would you support Senate Bill 14?
13   A.  Ask your question again, please.
14   Q.  Of course.  I'll preface it by saying I
15   understand that it is not your contention that there's
16   no disparity in photo ID possession, but if there's
17   evidence that there was no disparity in photo ID
18   possession between voter and nonminority voters in
19   Texas, would you support SB 14?
20   A.  No.
21   Q.  Why not?
22   A.  Because this bill does nothing to encourage or
23   assist my constituents to vote.  It doesn't have same-
24   day voter registration, for example.  It doesn't allow
25   college kids with IDs to vote.  You know, there are so



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

117

1    legislator should oppose legislation that even if it's
2    overwhelmingly popular?
3        A.   It takes a legislator with courage to do that,
4    yes.
5        Q.   Now, you went over a number of characteristics
6    of your district that are -- present unique obstacles
7    because of the voter ID bill or the photo ID bill to
8    your constituents.  Isn't it true that in your district,
9    because of the demography and because of the
10   socioeconomic status of the district and of your
11   constituents, that there is a higher incidence of people
12   driving without insurance than in other parts of the
13   state?
14       A.   Absolutely.
15       Q.   And isn't there a fairly substantial incidence
16   of drivers' license suspensions because people are
17   driving without insurance?
18       A.   Yes, sir.
19       Q.   Okay.  That would be -- that would cause an
20   otherwise eligible person who is eligible to vote to
21   have additional difficulties in securing the IDs that
22   are required by SB 14?
23       A.   Yes, sir.
24       Q.   And the last area that I wanted to just touch
25   on briefly:  You were asked a number of questions

118

1    regarding individual legislators and their intent in the
2    manner in which they voted on SB 14.  And as I
3    understood your question or your answer, one of the
4    things that you looked at was that you felt that the
5    foreseeable consequences of SB 14 were fairly obvious?
6        A.   Yes, sir.
7        Q.   And that your colleagues were aware of the
8    foreseeable consequences of SB 14 on minority voters?
9        A.   Yes, sir.
10       Q.   And that one of the things that informed your
11   opinion about the intent of the legislation was that in
12   spite of that foreseeable consequence, those legislators
13   voted for the bill?
14       A.   Yes, sir.
15       Q.   Okay.  You weren't attempting to make a broad
16   assessment of the intent, as the courts have made, about
17   the sorts of circumstantial evidence that could prove
18   intent in your answer; is that correct?
19       A.   No, sir.
20       Q.   You didn't look at all of the different factors
21   that a court would look at to gauge intent in your
22   answer today?
23       A.   Of course not.
24       Q.   Okay.
25            MR. GARZA:  I don't have any further

119

1    questions.
2            EXAMINATION
3    BY MR. GEAR:
4        Q.   Turning back to the potential obstacles in your
5    district that you have testified about, regarding
6    poverty in your district, do you know the -- generally,
7    what the percentages of poverty rates are for minorities
8    within your district?
9        A.   I don't know them offhand, but I do know that
10   they are higher than the Anglos in my district.  Again,
11   keeping in mind, 75 percent of my district is either
12   African American or Hispanic, mostly Hispanic, that
13   average per capita income of my district is around
14   $12,500 per year, and again, it's the third poorest
15   senatorial district in the state of Texas.
16       Q.   Do you know the unemployment rates in your
17   district?
18       A.   I don't know them offhand.
19       Q.   And do you know if minorities are more or less
20   likely to be unemployed within your district?
21       A.   They are more likely to be unemployed.
22       Q.   Do you know if minorities are more or less
23   likely to own a car within your district?
24       A.   Less likely.
25       Q.   Are there communities in your district that

120

1    have no public transportation available?
2        A.   There is several.
3        Q.   Do you know the names of those communities, the
4    cities?
5        A.   Presidio, for example, which is out in West
6    Texas.  And again, when you ask that question, I guess
7    we'd have to define what that means, because in
8    San Antonio we have quite an impressive infrastructure
9    with regard to bussing, but in Eagle Pass, that doesn't
10   exist, and in Del Rio, in Uvalde, in Brackettville, in
11   Lytel, Italia, and I could go on and on.
12       Q.   You talked about your testimony on the Floor
13   regarding the burden that would be imposed on minority
14   voters.  Do you recall that testimony during your
15   deposition?
16       A.   Yes, sir.
17       Q.   Do you have any memory as to how the supporters
18   of SB 14 responded to your testimony?
19       A.   They voted to pass the bill.
20       Q.   And there was some testimony about you being
21   out sick.  I believe that's reflected in your
22   declaration.  Was it generally known how you would vote
23   on HB 218?
24       A.   There was no question that folks knew how I
25   would vote, and there was no question that my colleagues



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

121

1    knew I was sick.  And the day before, when some of them
2    encouraged me to go home, I would not go home because of
3    that purpose, and they kidded about it and say, "Don't
4    worry, it's not like we're going to bring up the voter
5    ID bill while you're gone."  Of course they did.  But
6    I'll never make that same mistake again.
7        Q.   And you voted against the bill?
8        A.   Yes, sir.
9        Q.   And I'm talking about 218.
10       A.   Yes, sir.
11       Q.   And just so I'm clear, was 218 calendared for
12   discussion the day it was brought up?
13       A.   Well, again, our calendaring system is
14   different than in the House, so from what I recall --
15   and it's been, gosh, five years -- I believe it was on
16   one of the calendars, but I don't remember which one.
17       Q.   Okay.  Are you aware of any amendments to SB 14
18   that, if passed, would have produced a discriminatory
19   effect on voters?
20       A.   I believe there were several amendments.
21       Q.   Can you tell me about those generally?
22       A.   I'd be guessing.  I believe there was -- I
23   really would be guessing.  Same day registration, for
24   example.  Over 65, et cetera.  I don't recall them
25   exactly.

122

1        Q.   Thank you.
2        A.   But I do know that my colleagues submitted
3    several different amendments that failed.
4            MR. GEAR:  I have nothing further.
5            MR. FREDERICK:  I do have a couple follow-
6    up questions.
7            FURTHER EXAMINATION
8    BY MR. FREDERICK:
9        Q.   You were discussing with Mr. Garza the issue of
10   intent behind Senate Bill 14, and you testified today --
11   you have testified today that you believe senators who
12   voted in favor of SB 14 were aware of the effect that
13   the bill would have on minority voters; is that right?
14       A.   That's correct.
15       Q.   And the reason that they were aware of the
16   effect the bill would have is because their democratic
17   colleagues told them about that effect in their Senate,
18   right?
19       A.   I believe that's one of the reasons.
20       Q.   Are there any other reasons?
21       A.   Well, remember, there were committees that met
22   on this bill in previous sessions where there were a
23   number of folks that testified, individuals, different
24   groups, et cetera, that brought it to their attention.
25       Q.   Were there also groups and individuals that

123

1    testified that the bill would not have a disparate or a
2    discriminatory effect on minority voters?
3        A.   I believe so.
4        Q.   So is it possible that members would voted in
5    favor of Senate Bill 14 simply disagreed with the
6    testimony by individuals and groups and legislators who
7    said that there would be a discriminatory impact?
8        A.   Oh, it's possible, but from what I recall, the
9    groups that testified in favor of the bill didn't
10   represent Hispanic communities or African American
11   communities.  I mean, you didn't have the NAACP coming
12   in supporting the bill.  You didn't have LULAC coming in
13   supporting the bill or MALDEF coming in and supporting
14   the bill.  So those that supported bill weren't groups
15   that represented, you know, the Hispanic or African
16   American communities.
17       Q.   Was it your testimony that the only persons who
18   are qualified to testify about the impact of a bill on
19   minorities are specific minority groups?
20       A.   Absolutely not.
21       Q.   Okay.  So it would be possible, then, for a
22   legislator, based on all of the testimony on either side
23   of an issue, to believe one side over the other, right?
24       A.   Of course.
25       Q.   So if they -- if a member of the Texas

124

1    legislature sincerely believed that SB 14 would not have
2    a discriminatory impact on minority voters, then that
3    legislator's vote would not be evidence of
4    discriminatory intent, would it?
5        A.   I can't say -- I can't answer that question.
6        Q.   Let me try asking it a different way.  If a
7    legislator sincerely, but possibly unreasonably believed
8    that there would be no disparate impact from a bill,
9    then how would a vote for that bill show discriminatory
10   intent?
11           MR. GEAR:  Objection, calls for a legal
12   conclusion, and objection, calls for speculation.
13       A.   I'm not saying that their -- their vote
14   necessarily would show that intent.  What I think I've
15   been saying all along is the product, the bill has that
16   effect.
17       Q.   (BY MR. FREDERICK) Uh-huh.  But you've
18   testified, haven't you, that you believe that SB 14 was
19   the product of discriminatory intent, have you not?
20       A.   I don't think I necessarily put it that way.
21       Q.   Well, is it -- is it your testimony that you
22   don't believe that SB 14 was enacted with a
23   discriminatory intent?
24       A.   The effect of the bill, I think I've said all
25   along, had that effect.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

CARLOS URESTI                                              June 11, 2012

125

1   Q.  All right.  So you -- I think you made it very
2   clear that your position is that SB 14 will have a
3   discriminatory effect, in your understanding, on
4   minority voters in Texas, right?
5   A.  Yes, sir.
6   Q.  But do you contend that the purpose of SB 14
7   was to discriminate against minority voters in Texas?
8   A.  I believe the effect, if that's what you're
9   asking of that bill, if it had that effect, my answer is
10  yes.
11  Q.  Okay.  And so my question is:  If a legislator
12  -- well, are you -- is it your contention that
13  legislators who supported SB 14 acted with a
14  discriminatory intent toward minority voters in Texas?
15  A.  I can't answer that question.  I don't -- I
16  can't tell you what their position was at the time when
17  they developed any particular intent.  I mean, it's
18  possible to get into their minds and say why they voted
19  a certain way, based on the questions you asked.
20  Q.  Okay.  So you're not -- it's not your testimony
21  today that any specific member of the Texas legislature
22  supported SB 14 with the intent to discriminate against
23  minority voters?
24  MR. GARZA:  Objection, asked and
25  answered.

126

1   A.  No.  I'm saying I don't know.  There may have
2   been some that did that.  There's no way of showing
3   that, and I can't get into their head, and somebody may
4   say, "You're darned right I'm going to vote this way."
5   I don't know that, and so I can't answer you and say
6   yes.
7   Q.  (BY MR. FREDERICK) Okay.  But -- I understand.
8   So as you sit here today, you cannot swear
9   under oath that any specific Texas legislator voted for
10  SB 14 with the intent to discriminate against minority
11  voters?
12  MR. GEAR:  Objection, asked and answered.
13  A.  No.  I don't have that knowledge, that any of
14  them did that intentionally.  I can't get in to their
15  head and know why they voted a particular way.
16  MR. FREDERICK:  Thank you.
17  THE REPORTER:  Anybody else?
18  (Signature reserved.)
19  (Deposition concluded at 1:15 p.m.)
20
21
22
23
24
25

127

1   CHANGES AND SIGNATURE
2   RE: TEXAS VS. HOLDER, ET AL
3   PAGE LINE CHANGE        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  I, SENATOR CARLOS URESTI, have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted above.
23
24
25           SENATOR CARLOS URESTI

128

1   THE STATE OF _____)
2   COUNTY OF _____)
3
4   Before me, _____, on this day
5   personally appeared SENATOR CARLOS URESTI, known to me
6   (or proved to me under oath or
7   through_____ (description of identity
8   card or other document) to be the person whose name is
9   subscribed to the foregoing instrument and acknowledged
10  to me that they executed the same for the purposes and
11  consideration therein expressed.
12  Given under my hand and seal of office
13  this_____day of _____, 2012.
14
15
16           _____
              NOTARY PUBLIC IN AND FOR
17           THE STATE OF _____
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Deposition of Juanita Valdez-Cox                          June 13, 2012

                                                    1 (Pages 1 to 4)

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS            }
                         }
VS.                      }   CASE NO. 1:12-CV-00128
                         }   RMC-DST-RLW
ERIC H. HOLDER, JR., in his }
official Capacity as Attorney }
General of the United States }

************************************************

ORAL DEPOSITION OF

JUANITA VALDEZ-COX

JUNE 13, 2012

************************************************

        ORAL DEPOSITION OF JUANITA VALDEZ-COX, produced
as a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 13th day of June, 2012, from 10:00 a.m. to 11:23
a.m., before Tracie L. Wilson, CSR in and for the State
of Texas, reported by machine shorthand, at the Attorney
General of Texas' Regional Administrative Offices, 3331
North McColl Road, McAllen, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions
attached hereto: (that the deposition shall be read and
signed before any notary public.)

---

Page 2

1        A P P E A R A N C E S
2   FOR THE PLAINTIFF (TELEPHONICALLY):
3     Matthew H. Frederick
      ASSISTANT ATTORNEY GENERAL OF TEXAS
4     209 West 14th Street
      Austin, Texas  70711
5     (512) 936-1695
6
7   FOR THE UNITED STATES (TELEPHONICALLY):
8     Steven Wright
      U.S. DEPARTMENT OF JUSTICE
9     950 Pennsylvania Avenue, NW
      NWB-Room 7202
10    Washington, DC  20530
      (202) 305-7766
11
12
    FOR LA UNION DEL PUEBLO ENTERO:
13
      Rebecca L. Robertson
14    AMERICAN CIVIL LIBERTIES
      UNION FOUNDATION OF TEXAS
15    1500 McGowan Street
      Houston, Texas  77004
16    (713) 942-8146
17
18
19
20
21
22
23
24
25

---

Page 3

1              INDEX
2
3   Appearances ................................... 2
4   JUANITA VALDEZ-COX
5     Examination by Mr. Frederick ............... 4
6   Signature and Changes ........................ 49
7   Reporter's Certificate ....................... 51
8
9            EXHIBITS
10  NO.   DESCRIPTION                      PAGE
11
12  1   Notice of Deposition ................... 7
13           REQUESTED DOCUMENTS/INFORMATION
14  NO.   DESCRIPTION                      PAGE
15            (None)
16          CERTIFIED QUESTIONS
17  NO.   DESCRIPTION                      PAGE
18            (None)
19
20
21
22
23
24
25

---

Page 4

1        (Reporter's reading of on-the-record
2   statement was waived.)
3        MR. FREDERICK:  This is Matt Frederick.  I
4   represent the State of Texas in Texas versus Holder.
5   Would the other attorneys like to enter their names for
6   the record?
7        MS. ROBERTSON:  Rebecca Robertson --
8        MR. WRIGHT:  This is Steven Wright -- sorry.
9        MS. ROBERTSON:  Go ahead, Steven.  You go
10  ahead.
11        MR. WRIGHT:  This is Steven Wright on behalf
12  of the United States.
13        MS. ROBERTSON:  Rebecca Robertson of the
14  ACLU of Texas on behalf of LUPE and the witness.
15        MR. FREDERICK:  Thank you.
16            JUANITA VALDEZ-COX,
17  having been first duly sworn, testified as follows:
18            EXAMINATION
19  BY MR. FREDERICK:
20    Q. Would you please state your full name for the
21  record?
22    A. Juanita Valdez-Cox,  C-o-x.
23    Q. Thank you.  Have you ever been deposed, Ms. Cox?
24    A. No.  This is the first time.
25    Q. Okay.

---

Deposition of Juanita Valdez-Cox                    June 13, 2012

3 (Pages 9 to 12)

Page 9

1  the case, and Ms. Valdez-Cox has not been designated as
2  an expert on those matters. We objected to question
3  number two on the grounds that it addresses the right of
4  LUPE to intervene in the lawsuit, a matter which has
5  already been resolved by order of the Court and we
6  objected to question number three regarding LUPE's
7  membership on the grounds that disclosing members would
8  violate LUPE's and the member's right to freedom of
9  association under the U.S. Constitution. So subject to
10  those objections, we're presenting the witness.
11        MR. FREDERICK: With respect to the
12  objection to topic one, the factual bases of the claims
13  of defenses asserted by LUPE, are you objecting to the
14  witness providing testimony about the factual bases of
15  the claims to the extent they exist now?
16        MS. ROBERTSON: We are objecting to the
17  scope of the question, but we -- but Ms. Valdez-Cox is
18  prepared to answer the question to the extent of her
19  knowledge.
20        MR. FREDERICK: Okay. And, again, with
21  respect to topic one, and particularly the objection
22  based on it being the subject of expert testimony, is it
23  the position of LUPE that the only evidence to support
24  claims of discriminatory intent would be coming from
25  experts?

Page 10

1        MS. ROBERTSON: No, that is -- that is not
2  the position.
3        MR. FREDERICK: Okay. Great.
4        MS. ROBERTSON: Again, she'll answer the
5  question to the extent that she has knowledge of it.
6        MR. FREDERICK: Great. Thank you.
7  BY MR. FREDERICK:
8     Q. Ms. Valdez-Cox, if you'll look on page two of
9  Exhibit 1, which is the deposition notice, you see that
10  there are 11 topics listed there.
11     A. I do.
12     Q. And I understand that LUPE has objected. Subject
13  to those objections, are you prepared to testify on all
14  11 of those topics today?
15     A. Yes, I am.
16     Q. Great. I want to turn quickly on topic two. Is
17  it LUPE's contention that the United States does not
18  adequately represent LUPE in this litigation?
19        MS. ROBERTSON: Objection; calls for a legal
20  conclusion. You can answer.
21     A. No. Our concern is the responsibility that I
22  have to our membership as far as how we feel that this
23  will have a negative impact by the denial -- we feel by
24  their denial to exercise their right to vote.
25     Q. Okay. So I understand, so it's not LUPE'S

Page 11

1  position that the United States is not adequately
2  represented in the lawsuit?
3        MS. ROBERTSON: Objection; mischaracterizes
4  her testimony. You can answer.
5  BY MR. FREDERICK:
6     Q. You can answer.
7     A. Yes. No. My answer is that as a grassroots
8  organization, and with my many years of experience, that
9  I am representing the concerns of our community.
10     Q. Okay. And my specific question is, do you --
11  does LUPE contend that the United States does not
12  adequately represent the concerns of LUPE's members or
13  the community that LUPE represents?
14        MS. ROBERTSON: Objection; asked and
15  answer. You can answer.
16     A. No. My answer is that as a membership
17  organization, as a grassroots organization, as an
18  executive director coming from this community with many
19  years of experience, I am here to represent the concerns
20  of our community.
21     Q. Thank you.
22     A. You're welcome.
23     Q. Can you tell me what -- do you have a position
24  within LUPE, you personally?
25     A. Yes, I do.

Page 12

1     Q. And what is that position?
2     A. I am the executive director.
3     Q. Has LUPE engaged in any policy-related activity
4  regarding voter ID legislation in Texas?
5     A. No, we have not.
6     Q. Has LUPE written any articles about -- on the
7  subject of voter ID legislation?
8     A. No, we have not.
9     Q. Has LUPE conducted any studies on voter ID
10  legislation?
11     A. No.
12     Q. Did LUPE have any involvement with Senate Bill
13  14, which is the voter ID bill that was passed by the
14  Texas Legislature in 2011?
15     A. No.
16        MS. ROBERTSON: Objection, vague. Sorry.
17  You can go ahead and answer.
18     A. No, we didn't.
19     Q. Okay. So LUPE did not provide any testimony in
20  the legislature about voter ID legislation?
21        MS. ROBERTSON: Go ahead.
22     A. No, we do not.
23     Q. To your knowledge, did any members of LUPE,
24  individual members, provide testimony in the legislature
25  about voter ID legislation?

Deposition of Juanita Valdez-Cox                    June 13, 2012

4 (Pages 13 to 16)

Page 13

1    A.  We did not.
2    Q.  Did LUPE provide any written materials to any
3    member of the Texas Legislature regarding voter ID
4    legislation?
5    A.  We did not.
6    Q.  Did LUPE communicate by telephone or in person
7    with any member of the Texas Legislature about voter ID
8    legislation?
9    A.  We did not.
10   Q.  Is Lupe a membership organization?
11   A.  It is.
12   Q.  Does that membership include individuals?
13   A.  Yes.
14   Q.  Does LUPE'S membership also include
15   organizations, or is it solely made up of individual
16   members?
17   A.  No.  It's a membership organization.  Just
18   members; no organizations.
19   Q.  Thank you.
20   A.  You're welcome.
21   Q.  How many individual members does LUPE have?
22   A.  It's pretty close to 6,000.
23   Q.  And when you say "6,000," is that individual
24   members in Texas?
25   A.  Yes, in -- mainly in these four counties.

Page 14

1    Q.  And which four counties are those?
2    A.  Hidalgo, Cameron, Starr and Willacy.
3    Q.  Are there any specific criteria for membership in
4    LUPE?
5    A.  No.  Actually, anybody can register, can enroll
6    as a member of the organization.  It's open to anybody
7    in the community.
8    Q.  Can you tell me what the -- what are the primary
9    activities of LUPE as an organization?
10   A.  What we do is -- we have two main components of
11   our organization.  One is to offer social services that
12   meet some of the needs of the membership of the
13   organization as best as we possibly can, and the other
14   one is community organizers.  We have folks that do a
15   lot of outreach in the community that are always meeting
16   with folks having small house meetings to talk about the
17   different issues that many times impact a low income
18   community.
19   Q.  I want to talk briefly about the social services
20   aspect.  Can you tell me what social services LUPE
21   provides to the community?
22   A.  We do many types of different services.  The main
23   two ones are we do income tax -- we offer income tax
24   services to our membership, and then also Immigration
25   services.

Page 15

1    Q.  Can you describe in a little more detail what
2    kind of income tax services LUPE provides?
3    A.  Federal income tax services.  When people are
4    employed during the year and need to pay their taxes to
5    the government, we do the work -- the filing of those
6    taxes, and also advocacy sometimes.  If one of our
7    members has a letter that is written in English and
8    because they are mainly Spanish-speaking, if they need
9    assistance with reading that letter from the IRS and
10   addressing the issues, we do that.
11   Q.  So would it be accurate to say that with respect
12   to income tax services, LUPE generally helps people fill
13   out and file their federal income tax returns?
14   A.  Yes.  That's correct.
15   Q.  And with respect to Immigration services, can you
16   describe in a bit more detail what kind of Immigration
17   services LUPE provides to the community?
18   A.  We have -- we have an Immigration attorney, and
19   if our members need to talk to the attorney about their
20   Immigration case, if they want to file a case with
21   Immigration to immigrate a family member, if they need
22   help learning the history and government of the United
23   States to become citizens, we have that advice also.
24   Q.  As part of the social services that LUPE
25   provides, does LUPE ever assist individuals in obtaining

Page 16

1    identification such as a driver's license?
2    A.  No, we do not.
3    Q.  As part of the Immigration services that it
4    provides, does LUPE help individuals obtain legal
5    documents such as, let's say, a visa or a citizenship
6    certificate, anything like that?
7    MS. ROBERTSON:  Objection; vague.
8    A.  No; no.  No visas, just the citizenship or their
9    green card or passport.
10   Q.  So LUPE helps people -- am I correct in
11   understanding that LUPE helps people get passports?
12   A.  If our member is eligible and qualifies for the
13   requirements set out by the Immigration services, we do.
14   Q.  Do you have a sense of about how many members
15   LUPE has assisted in obtaining a passport?
16   A.  I do not.
17   Q.  Okay.  To the best of your knowledge, would you
18   estimate that LUPE has helped more than 100 individuals
19   get a passport?
20   A.  Yes.
21   Q.  Would you estimate that LUPE has helped more than
22   500 people get a passport?
23   A.  I couldn't say.
24   Q.  Okay.  So more than 100, but beyond that you
25   can't really estimate how many people LUPE has helped

Deposition of Juanita Valdez-Cox                      June 13, 2012

                                          5 (Pages 17 to 20)

| Page 17 | Page 19 |
|---|---|
| 1  get a passport?<br>2   A. No, I can't.<br>3   Q. To your knowledge, does -- has LUPE ever helped<br>4  people get passports who don't have a driver's license<br>5  or a state-issued ID card?<br>6   A. It is my understanding that you're not eligible<br>7  for those.<br>8   Q. And when you say "you're re not eligible," what do<br>9  you mean by that?<br>10   A. Well, if you don't have your documents yet and<br>11  you're in the process of getting your documents, you're<br>12  not eligible to get a state ID or any kind of ID.<br>13   Q. Just so I'm clear -- so is it your understanding<br>14  that someone could get a passport even though he or she<br>15  is not eligible to get a state-issued ID?<br>16   A. Yes, because they have to go through the process<br>17  of Immigration first before they're eligible.<br>18   Q. Okay. So it's possible, in your experience with<br>19  LUPE, that someone could have a passport but they might<br>20  not have a driver's license or a state-issued personal<br>21  ID card?<br>22   A. It's up to the person to apply, so I don't know<br>23  if they would or they wouldn't have one after they get<br>24  their passport.<br>25   Q. Right. But is it your understanding that it's | 1  could be health issues, issues of education,<br>2  Immigration, voter ID requirements. It could be many<br>3  different issues that the organizers work on with the<br>4  community or have a conversation with the community<br>5  about.<br>6   Q. So is it accurate to say that the community<br>7  organization that LUPE engages in involves educating its<br>8  individual members about specific issues?<br>9   A. Yes, among other things.<br>10   Q. Okay. Other than educating members about<br>11  specific issues, what specific things do LUPE's<br>12  community organizers do?<br>13   A. We do -- we do a lot of leadership development,<br>14  for example, because the -- many times the issues are so<br>15  critical, so serious, that we don't have enough outreach<br>16  workers or community workers to deal with that, with all<br>17  of the issues, so we do a lot of leadership development.<br>18  Many times there's a lot of leaders already in the<br>19  community, and our organization is -- has a core value,<br>20  for example, of self-help, so we try to -- we work with<br>21  them to see what the situations are to understand who's<br>22  creating the situation and then have them be involved in<br>23  the solutions to those issues. So they do a lot of the<br>24  leadership development. We also -- for example, if one<br>25  of our communities needs to -- for example, has a |
| **Page 18** | **Page 20** |
| 1  possible to get a passport before one has a driver's<br>2  license or other state-issued ID?<br>3   A. Can you explain the question?<br>4   Q. Sure. So I understand from your testimony a<br>5  moment ago that -- you testified that people who get a<br>6  passport or who LUPE has assisted in getting a passport<br>7  may not yet be eligible to get a state-issued ID such as<br>8  a driver's license, and so I just wanted to be sure I'm<br>9  clear. Is it your understanding that it's possible for<br>10  somebody to get a passport before they get a<br>11  state-issued driver's license or other ID?<br>12   A. Yes.<br>13    MS. ROBERTSON: Objection; mischaracterizes<br>14  her testimony. Okay. You can testify.<br>15   A. Yes.<br>16   Q. Thank you. I want to talk briefly about the<br>17  community organization activities of LUPE. Can you<br>18  just -- can you describe what kind of outreach or<br>19  activities community organizers engage in for LUPE?<br>20   A. Sure. There's many issues that impact South<br>21  Texas, especially colonias in South Texas; and colonias<br>22  are very rural and isolated areas, and that is where the<br>23  majority of our membership -- that's where they live,<br>24  and so the issues could be flooding after a hurricane.<br>25  The issues could be the high unemployment. The issues | 1  drop-out rate in that colonia of young people, then they<br>2  try to bring GED classes so that the students can go<br>3  back and finish their GED, and then -- or if there's a<br>4  need for ESL classes. It's all of that that we work<br>5  with the community in, and I'm sure many more things<br>6  that I can't remember right now.<br>7   Q. Does Lupe -- does LUPE register voters?<br>8   A. It's not -- it's not one of our main programs,<br>9  but we take every opportunity. For example, if they<br>10  come into the office or if we're out there and somebody<br>11  is not registered, that's a very important process that<br>12  we believe in, and so we do.<br>13   Q. Are you familiar with LUPE's budget?<br>14   A. Yes.<br>15   Q. Is there any portion of that budget -- of LUPE's<br>16  budget that is dedicated to voter registration?<br>17   A. We don't have a line item just for voter<br>18  registration.<br>19   Q. Is a portion of LUPE's budget dedicated or<br>20  allocated to Immigration services?<br>21   A. No.<br>22   Q. Are you aware of any specific allocation of funds<br>23  in LUPE's budget?<br>24   A. Yes.<br>25   Q. Can you tell me what some of the -- to the best |

Ace Court Reporting Service          (956) 380-1100 (Office)
   & Digital Videography             (866) 380-1135 (Fax)

Deposition of Juanita Valdez-Cox                    June 13, 2012

6 (Pages 21 to 24)

Page 21

1  of your knowledge, can you tell me all of the specific
2  allocations or line items that are in LUPE's budget?
3           MS. ROBERTSON:  Objection.  This exceeds the
4  scope of the 30(b)(6) topics that were contained in the
5  notice, and so she is not prepared to discuss LUPE's
6  budget in such great detail today.  Juanita, if you know
7  the answer and can give him an answer, you can address
8  the question.
9     A.  I have -- we do like the regular, like, staff,
10  for example.  The staff of the organization, that's a
11  certain amount.  The benefits is another certain amount,
12  you know, like health insurance.  The utilities,
13  transportation; you know, the big main budget line
14  items, but not specifically by programs.
15     Q.  I understand.  Other than staff benefits,
16  utilities, transportation, as you sit here today, can
17  you recall any other specific line item in LUPE's
18  budget?
19           MS. ROBERTSON:  Same objection.
20     A.  I guess --
21     Q.  You may answer.
22     A.  Yeah.  I'm thinking.
23     Q.  Okay.
24     A.  Probably like a contract, like, for example, for
25  our Human Resources Department.  They -- they're

Page 22

1  included in the budget.  I guess the other one would be,
2  like, financial services, you know, the folks that are
3  in charge of paying our accounts, I think would be
4  another one.
5     Q.  Okay.  Anything else that you can think of right
6  now?
7     A.  No.
8     Q.  Does LUPE -- does LUPE provide or engage in any
9  get-out-to-vote type efforts?
10     A.  Yes, we do.
11     Q.  Can you describe what kind of get-out-to-vote
12  efforts LUPE is involved in?
13     A.  Our community -- our community organizers work in
14  certain precincts with our leadership to talk about the
15  issues, you know, that could be coming up in an election
16  and talk about educating the community on the candidate
17  that are running, you know, for office and also maybe
18  conducting forums so that the community gets to know the
19  candidates and, you know, where they stand on certain
20  issues.
21     Q.  Does LUPE -- does LUPE drive people to the polls
22  to vote?
23     A.  Very few.  Very few.  Sometimes they call into
24  the office that they need transportation, and so we
25  will -- we will do that.

Page 23

1     Q.  Is there an official program of driving people to
2  the polls for LUPE, or is it more on a request basis?
3     A.  No, there's not a special program.  If a
4  member -- you know, some of our members need to go to
5  the polls, we will, but most of the time it's left up to
6  the leadership in each community to help -- to help each
7  other out.
8     Q.  And to the extent that leadership in the
9  community helps bring people to the polls, is LUPE
10  directly involved in that, or is it just left up to the
11  leadership?
12     A.  It's left to the leadership.
13     Q.  Okay.  Do you have an estimate of how many people
14  LUPE would drive to the polls in any particular
15  election?
16     A.  I don't.
17     Q.  Going back very quickly, you mentioned that
18  transportation was some part of LUPE's budget.  Could
19  you explain what kind of transportation that is or what
20  is included in the transportation?
21     A.  If we have to go to, like, trainings for the
22  staff, if we have to attend meetings -- certain
23  meetings, sort of like for mileage, those sorts of
24  things.
25     Q.  I see.  I see.  Does LUPE own any vehicles?

Page 24

1     A.  No, we do not.
2     Q.  I would like to move on to some of the claims in
3  the lawsuit.  Are you familiar with Section 5 of the
4  Voting Rights Act?
5     A.  No, I am not.
6     Q.  Does LUPE contend that Senate Bill 14 will
7  prevent African American Texans from voting?
8           MS. ROBERTSON:  Objection; calls for a legal
9  conclusion.  You can answer.
10     A.  Yes.
11     Q.  And does LUPE contend that Senate Bill 14, if it
12  were implemented, would disenfranchise African American
13  voters in Texas?
14           MS. ROBERTSON:  Objection; asked and
15  answered.  You can answer.
16     A.  And Latinos, yes.
17     Q.  And just to clarify, so LUPE also contends that
18  Senate Bill 14 would have the effect of harming Latino
19  voting rights in Texas or preventing Latinos from
20  voting; is that right?
21           MS. ROBERTSON:  Objection; calls for a legal
22  conclusion.  You can answer.
23     A.  Yes.
24     Q.  What is the factual basis for LUPE's contention
25  that SB 14 would have a negative impact on Latino

Page 25

1  voting?
2          MS. ROBERTSON:  Subject to the objections
3  that we have already stated to depo topic number one,
4  the witness can answer.
5      A. I think it comes from the years of experience of
6  the difficulties that the Latino community that we work
7  with of exercising -- of the obstacles many times that
8  are placed to give them the freedom to be able to vote.
9  I think that -- I know that it is something that has
10  been very, very difficult, and I wanted to -- we're
11  concerned because we wanted to make it easier for them
12  to have a voice in those public policies that have an
13  impact on their lives and not make it more difficult,
14  and I feel that this would make it more difficult.
15      Q. Does LUPE contend that SB 14 will make it more
16  difficult for Latinos to vote because they may not have
17  the required forms of photo ID?
18      A. Correct.
19      Q. Is there any other way, aside from potentially
20  lacking the required forms of photo ID, that LUPE
21  contends SB 14 will harm Latino voting rights?
22          MS. ROBERTSON:  Objection; calls for a legal
23  conclusion.  You can answer.
24      A. Can you repeat the question?
25      Q. Of course.  Other than the potential lack of the

Page 26

1  required identification by Latino voters, is there any
2  other way in which LUPE contends that Senate Bill 14
3  would prevent Latino voters from voting in Texas?
4          MS. ROBERTSON:  Objection; calls for a legal
5  conclusion.  You can answer.
6      A. I think that also the cost that's going to be
7  involved for obtaining an ID could be another factor.
8      Q. I see.  So -- I understand.  So LUPE contends
9  that SB 14 may negatively impact Latino voters because
10  certain individuals may lack the required ID, and to the
11  extent they lack the ID, there might be a cost
12  associated with obtaining the required ID; is that
13  right?
14      A. With the cost of obtaining documents that may be
15  required to obtain an ID, and also -- as I was stating
16  earlier, because we work mainly with colonia residents,
17  I think also the transportation would be an issue.  Also
18  we have many elderly voters in our county, in our
19  communities, also many that are, you know, handicapped
20  but that are still U.S. citizens and can vote, so
21  there's all of that also.
22      Q. I understand.  So to the extent that we're
23  talking about transportation and the cost of obtaining
24  underlying documentation, am I correct in understanding
25  that that would all be related to getting one of the

Page 27

1  required forms of ID?
2      A. Yes.
3      Q. Okay.  How many -- how many members of LUPE do
4  not have at least one of the forms of photo ID that
5  would be required by Senate Bill 14?
6      A. I don't have a number.
7      Q. Can you identify any specific member of LUPE who
8  lacks at least one of the forms of photo ID required by
9  Senate Bill 14?
10      A. Yes.
11      Q. And who is that?
12          MS. ROBERTSON:  Okay.  I'm going to object.
13  As we have already discussed, we have an objection to
14  disclosing the names of members of LUPE organization
15  because we feel it impinges on their First Amendment
16  Rights.  I will offer, Matt, however, if you will -- if
17  you are interested in getting the names of the people,
18  and Juanita can identify them for us, we will be happy
19  to check with them, and if they do not object to
20  disclosing their names to the government, we can
21  supplement the deposition record by writing the names in
22  when we get the transcript.
23          MR. FREDERICK:  Well, would you be amenable
24  to designating all or part of this transcript as
25  confidential or attorney's eyes only under the

Page 28

1  protective order in place?
2          MS. ROBERTSON:  I mean, we can certainly do
3  that if the members say that they are amenable to having
4  their names disclosed.  We can -- we would want to
5  designate it as confidential so that they're not a
6  matter of public record, but at this point, the witness
7  is not going to be -- as I stated in my letter this
8  morning, the witness is not going to be providing the
9  names of any members.  We would need the member's
10  permission to make that disclosure.
11          MR. FREDERICK:  Okay.  Well, I think this is
12  is a problem because, as you know, fact discovery ends
13  on June 15th, which is this Friday, and as I understand,
14  LUPE has claimed that SB 14 will prevent individuals
15  from voting because they don't have the required forms
16  of ID, so I think we are entitled to discover the names
17  of persons who LUPE contends will be affected negatively
18  by SB 14, and I would strongly urge that you allow the
19  witness to provide those names because that is a basic
20  fact in this case.
21          MS. ROBERTSON:  I understand your
22  contention, and you have asserted an objection, and so we
23  are at a bit of an impasse.  I have offered to find out
24  the names.  I don't myself know them, but I have offered
25  to find out the names and explore whether the people are

Deposition of Juanita Valdez-Cox                                    June 13, 2012

Page 29

1   willing to have their names disclosed, and if that is
2   the case, we will provide you with the names.  And if
3   that is the case, I would be happy to have a discussion
4   with you about the timing of it so that you are not
5   prejudiced by it, but if the members don't want their
6   names disclosed, we are not going to be the ones to
7   disclose them.
8         MR. FREDERICK:  When will you be able to
9   provide the names of specific members of LUPE who lack
10  one of the required forms of ID?
11        MS. ROBERTSON:  Should we receive their
12  permission to disclose their names, we will put it into
13  the deposition errata sheet so that the names are there.
14        MR. FREDERICK:  Will you agree to -- would
15  you agree to provide -- subject to member permission,
16  would you agree to provide those names confidentially to
17  the State by this Friday?
18        MS. ROBERTSON:  If that is possible, we
19  absolutely will do that subject to member permission,
20  yes.
21        MR. FREDERICK:  Perfect.  Well, I would ask
22  that -- to the extent there are individual members of
23  LUPE who claim to lack one of the required forms of ID,
24  that you provide those names, subject to member
25  permission, by this Friday, and we are happy to, you

Page 30

1   know, maintain strict confidentiality of those names.
2         MS. ROBERTSON:  All right.  I think we have
3   reached an agreement about how to resolve this.
4   BY MR. FREDERICK:
5         Q.  So, Ms. Valdez-Cox, to clarify, is -- was it your
6   testimony that you are not aware of the number of LUPE
7   members who lack one of the forms of ID required by SB
8   14?
9         A.  Not at the moment.
10        Q.  Okay.  Can you provide an estimate of how many
11  members of LUPE lack one of the IDs required by SB 14?
12        A.  No.
13        Q.  Other than its members -- well, scratch that.
14  Does LUPE know how many Texas registered voters lack one
15  of the forms of ID required by SB 14?
16        A.  No.
17        Q.  Other than its members, can LUPE identify any
18  particular Texas registered voter who lacks -- who does
19  not have at least one of the IDs required by SB 14?
20        A.  By name?
21        Q.  Right.
22        A.  Repeat the question.
23        Q.  Sure.  Other than LUPE members, can LUPE identify
24  individual Texas registered voter who does not have at
25  least one of the IDs required by SB 14?

Page 31

1         A.  Yes.
2         Q.  And who is that?
3         A.  That is my mom.
4         Q.  And what is your mother's name?
5         A.  Her name is Angelita, A-n-g-e-l-i-t-a, Valdez.
6         Q.  Okay, great.  And what is her date of birth?
7         A.  It is February 4th, 1921.
8         Q.  And what is her current address?
9         A.  It is 302 North Valley View Road.
10        Q.  Okay.  In what city?
11        A.  It's in Donna, Texas.
12        Q.  D-o-n-n-a?
13        A.  Correct.
14        Q.  And what's the zip?
15        A.  78537.
16        Q.  Thank you.
17        A.  You're welcome.
18        Q.  And so your mother is registered to vote?
19        A.  She is.
20        Q.  And she does not have a Texas driver's license?
21        A.  No.  She's 91.
22        Q.  Okay.
23        A.  She never has anyway, actually.
24        Q.  Okay.  And she does not have a passport?
25        A.  No.  She doesn't travel much.

Page 32

1         Q.  And she doesn't have a state-issued or a
2   Department of Public Safety issued ID card?
3         A.  She had one but she lost it.
4         Q.  Do you remember when she lost it?
5         A.  No.
6         Q.  Was it more than a year ago?
7         A.  Yes.
8         Q.  Would your mother be able to go to a Department
9   of Public Safety office to obtain a reelection
10  identification certificate?
11        A.  No, not on her own.  She doesn't drive.
12        Q.  Is there anybody who would be able to take her to
13  the DPS to get an election identification certificate if
14  necessary?
15        A.  Probably.
16        Q.  Would you be able to take her to the DPS if
17  necessary?
18        A.  I could, but I think that, you know, at her age,
19  she might -- it's not -- it wouldn't be, like, really
20  easy because she also has -- she doesn't -- she's still
21  aware and she knows what's going on, but it would sort
22  of be difficult -- she has her schedule where she goes
23  to day care and then she comes -- she stays with us, and
24  so anything out of her schedule doesn't go too well with
25  her.  I would and I could.  It would just take time

Deposition of Juanita Valdez-Cox                    June 13, 2012

9 (Pages 33 to 36)

Page 33

1   explaining and all of that to her.
2       Q. I understand. Well, let me ask you this: Are
3   you aware of when the last time -- well, let me ask more
4   generally. Does your mother vote?
5       A. Yes.
6       Q. When was the last time that your mother voted?
7       A. Just last -- the last election.
8       Q. Is that the primary elections?
9       A. Yes.
10      Q. Did she vote in person?
11      A. Yes.
12      Q. And so other than your mother, Ms. Valdez, is
13  there any other individual Texas registered voter that
14  you can identify who does not have at least one of the
15  IDs required by SB 14?
16      A. Yes.
17      Q. And who is that?
18          MS. ROBERTSON: Are you talking about
19  members?
20      A. Members of the organization. Members.
21      Q. Okay. Fair enough. Other than individual
22  members of LUPE and your mother, Ms. Valdez, can you
23  identify any other individual registered voter
24  registered in Texas who does not have one of the IDs
25  required by SB 14?

Page 34

1       A. Not at the moment, but as I think -- if I thought
2   about it, I probably -- I probably could.
3       Q. Do you know how many members of LUPE have a
4   passport?
5       A. No, I don't.
6       Q. Is LUPE aware of the level of photo ID possession
7   among different groups of voters in Texas? And by
8   "level," I mean the percentage of voters who are Latino
9   or African American or Anglo or Asian American who have
10  a photo ID in Texas.
11      A. No, I don't.
12      Q. Do you know if any -- well, do you know how many
13  LUPE members have a driver's license?
14      A. No. We don't collect that data.
15      Q. Okay. Do you know how many LUPE members have a
16  military identification card?
17      A. No.
18      Q. Do you know how many LUPE members have a
19  concealed handgun license?
20      A. I hope not too many. No, I don't.
21      Q. Do you know how many LUPE members have a state --
22  a DPS-issued personal ID card?
23      A. No, I don't. I don't know how many. I don't
24  know the number.
25          MS. ROBERTSON: Hey, Matt, we have been

Page 35

1   going just about an hour. If you're getting ready to
2   change topics, I wonder if it would be a good time for a
3   break.
4           MR. FREDERICK: If you would like to take a
5   break, that's fine with me.
6           MS. ROBERTSON: Okay. Or if you have a few
7   more questions along this line and you want to finish
8   up, that's okay, too.
9           MR. FREDERICK: Yeah. If you can give me
10  about five minutes.
11          MS. ROBERTSON: Yeah, of course.
12  BY MR. FREDERICK:
13      Q. Has LUPE conducted any studies to determine how
14  many of its members have the required ID under SB 14?
15      A. No.
16      Q. Has LUPE conducted any studies of Texas
17  registered voters to determine how many may not possess
18  the ID required by SB 14?
19      A. No.
20      Q. Is LUPE -- has LUPE seen or reviewed any studies
21  on the number of Texas voter -- Texas registered voters
22  who lack one of the IDs required by SB 14?
23      A. We haven't done a study, but working in the
24  community, I know that it would be an issue.
25      Q. Has -- but has LUPE conducted any studies -- any

Page 36

1   statewide studies -- I'm sorry. Scratch that. Has LUPE
2   seen or reviewed any studies of how many Texas
3   registered voters might lack the ID required by SB 14?
4       A. We have not conducted a study.
5       Q. Have you reviewed any studies?
6       A. We have not. I have not.
7       Q. Has LUPE conducted any polls of its members or
8   any questionnaires or anything like that to determine
9   how many of them might lack the ID required by SB 14?
10      A. There hasn't been a poll or a questionnaire, but
11  at meetings we do ask.
12      Q. And is it your understanding that certain
13  individual -- certain individuals have reported or
14  self-identified as lacking any of the forms of ID
15  required by SB 14?
16      A. Yes.
17      Q. But you can't -- you can't estimate how many
18  people that is?
19      A. No, because this is at meetings -- at different
20  times of meetings, some that I conduct and others that
21  are conducted out in the different colonias where the
22  organizers have house meetings, so I wouldn't know how
23  many.
24      Q. All right. To your knowledge -- and
25  understanding that you have not been at all of these

Deposition of Juanita Valdez-Cox                                    June 13, 2012

Page 37

1   meetings, to your knowledge when individuals have
2   identified themselves as not having the ID required by
3   SB 14, has LUPE confirmed that any of those individuals
4   are, in fact, registered to vote?
5       A.  They are registered to vote.
6       Q.  And how do you know that?
7       A.  Because they either went through our citizenship
8   classes and then also because we register there at the
9   office, and we know them for many years.  Many of these
10  members are -- have been members for many, many years,
11  so we know when they become citizens and when they
12  register to vote.
13      Q.  I see.  Does LUPE contend that Senate Bill 14
14  will harm the rights of indigent or poor Texans to vote?
15      A.  Yes.
16      Q.  And what is the basis for that contention?
17      A.  On the basis of our membership and the membership
18  that we represent, the poverty in which they live, the
19  situations that they have -- that they face, the
20  obstacles that have been placed.  And so knowing our
21  community, working with them, we know that this is going
22  to be another added issue for them which will make it
23  more difficult.
24      Q.  Does LUPE contend that an Anglo member of LUPE
25  and a Latino member of Lupe would be affected

Page 38

1   differently by Senate Bill 14?
2       A.  I just know our community, our membership, which
3   is Latino, and the difficulties that they face as
4   compared to maybe more affluent folks in our community.
5   I just feel it's going to be more difficult for our
6   membership.
7       Q.  I see.  So is -- in your understanding, is LUPE's
8   membership exclusively Latino?
9       A.  It is.
10      Q.  I see.
11      A.  I mean, like, you know, 98 percent or 99 percent,
12  so it's not, like -- almost 100.
13      Q.  Okay.  Well, assuming hypothetically that there
14  were -- that there was a Latino individual and an Anglo
15  individual who both lived, let's say, in a colonia, same
16  location, same socioeconomic status, is it LUPE's
17  contention that SB 14 would affect those two people
18  differently?
19      MS. ROBERTSON:  Objection; calls for
20  speculation.
21      A.  We don't have that scenario here in our colonias
22  in South Texas --
23      Q.  Right.
24      A.  -- that I know of.
25      Q.  Well, let me ask more generally.  Assuming that

Page 39

1   you had a Latino individual and an Anglo individual
2   living in South Texas in the same neighborhood, and they
3   had the same, you know, socioeconomic status, the same
4   income, is it LUPE's contention that SB 14 would have a
5   greater impact on a Latino individual than an Anglo
6   individual?
7       MS. ROBERTSON:  Objection; calls for
8   speculation.  Go ahead.
9       A.  Yes.
10      Q.  And it's your -- it's LUPE's contention that SB
11  14 would have a greater impact on a Latino individual
12  than an Anglo individual even if those two individuals
13  were situated similarly with regard to location and
14  socioeconomic status?
15      A.  Yes.
16      Q.  And why is that?
17      A.  I think the language also comes in to play.  I
18  think the language has something to do with the issue
19  also.
20      Q.  Other than a potential language issue, is there
21  any other reason why a Latino voter would be affected
22  more by SB 14 than a similarly situated Anglo voter?
23      MS. ROBERTSON:  Objection; calls for a legal
24  conclusion.  Go ahead.
25      A.  I guess also I would say because of the history

Page 40

1   of disenfranchising Latino voters.  I remember my dad
2   telling me many years ago about the poll tax that
3   existed, so it's -- it hasn't been as welcoming to the
4   process of voting for Latinos as it has been for Anglos.
5       Q.  Right.  And how would the history make it -- how
6   would the history of discrimination against Latinos in
7   voting make it more difficult for an individual to get
8   the ID required by SB 14?
9       MS. ROBERTSON:  Objection; calls for
10  speculation.  Go ahead.
11      A.  I think that it does come -- it does affect it in
12  some way in that when you are in a -- when you are in a
13  community that has been -- that has been discriminated,
14  you tend to -- it is more likely that when there's an
15  obstacle placed, just because of its history, that you
16  may not be able to as easily see beyond that and just
17  see it as part of something that happens and maybe give
18  up.  I don't know.  It could  have -- it could have all
19  of those factors.
20      Q.  So is it your -- is it your testimony that
21  because of the history of discrimination and voting, a
22  Latino registered voter might be less likely to obtain
23  the ID required by SB 14?
24      A.  I'm just saying it would be more difficult.
25      Q.  Well, how -- I guess what I'm trying to

Deposition of Juanita Valdez-Cox                           June 13, 2012

Page 41

1    understand is how would the history make it more
2    difficult for an individual to go get one of the
3    required forms of ID?
4         MS. ROBERTSON:  Objection; asked and
5    answered.  Go ahead.
6       A.  I'm just saying that that's -- that those are
7    factors that could play into it.  I didn't say it was
8    the only thing.  We also discussed about the cost, about
9    the transportation, you know, the disabilities, you
10   know, different factors.
11      Q.  Of course, I understand that.  I guess what I'm
12   trying to understand is -- you know, I understand the
13   contention about the cost and, you know, the
14   requirements to travel to go get an ID, and I understand
15   that those might have an impact on somebody's ability to
16   get the ID.  What I'm trying to understand is how -- is
17   how the history of discrimination would actually prevent
18   anyone from getting an ID required by SB 14.
19      A.  In my opinion, it plays a factor in it.  I don't
20   know how else to explain it to you.
21      Q.  Okay.  Well, is it your understanding that the
22   history would -- might make an individual less likely to
23   overcome the -- you know, the burden of getting an ID
24   or, you know, paying the cost to get underlying
25   documents?

Page 42

1       A.  It could be.
2       Q.  Okay.  But you don't contend that SB 14, the
3    actual Bill, places different requirements on Latino or
4    Anglo or African American citizens?
5         MS. ROBERTSON:  Objection; calls for a legal
6    conclusion.  Mischaracterizes her testimony.
7       A.  Can you repeat the question?
8       Q.  Of course.  Does LUPE contend that SB 14 itself
9    imposes a different requirement for Latino voters than
10   it requires for Anglo or African American voters?
11        MS. ROBERTSON:  Objection; calls for a legal
12   conclusion.  Go ahead, if you know.
13      A.  It's just -- I don't know what -- I can't speak
14   for any other community except for the Latino community
15   because that's where I have worked the majority of my
16   life, and I do contend, for the Latino community, it
17   does.
18        MS. ROBERTSON:  So, Matt, would now be a
19   good time for that break?  Is that okay?
20        MR. FREDERICK:  Let me ask a couple of more
21   questions.
22   BY MR. FREDERICK:
23      Q.  Talking about the -- I want to talk a little more
24   about the bill.  So is it your contention that the bill
25   itself, the language of the statute imposes a different

Page 43

1    requirement for Latino voters as opposed to any other
2    group of voters?
3         MS. ROBERTSON:  Objection; mischaracterizes
4    her testimony.
5       A.  Repeat the question, please.
6       Q.  Does LUPE contend that the actual text of SB 14
7    imposes a -- imposes different requirements for Latino
8    voters than it does for any other group of voters?
9         MS. ROBERTSON:  Objection.  The text of the
10   Bill speaks for itself.
11      A.  I don't know the text of the Bill.  I just know
12   of the concern that we have for our -- for the Latino
13   community, our membership.
14      Q.  Is it LUPE's contention that SB 14 requires
15   different forms of ID for Latinos than it requires for
16   other voters?
17      A.  I don't know that it is different.  I just know
18   that by requiring it of Latinos, of the membership that
19   we represent, it would be an obstacle.
20      Q.  I understand.  Have you read Senate Bill 14?
21      A.  No.
22        MR. FREDERICK:  I think now would be a good
23   time to take a very short break, if that's --
24        MS. ROBERTSON:  Yes.
25        MR. FREDERICK:  Is that okay?

Page 44

1         MS. ROBERTSON:  Yes.  We'll be back in five
2    minutes.
3         MR. FREDERICK:  Okay.  Thank you.
4         (Recess from 11:12 a.m. to 11:17 a.m.)
5    BY MR. FREDERICK:
6       Q.  Ms. Valdez-Cox, are you registered to vote?
7       A.  Yes, I am.
8       Q.  And do you have a Texas driver's license?
9       A.  I do.
10      Q.  Do you have a passport?
11      A.  I do.
12      Q.  Do you have a concealed handgun license?
13      A.  No.
14      Q.  Do you have a military identification?
15      A.  No.
16      Q.  Are there other members of your household who are
17   of voting age?
18      A.  Yes.
19      Q.  Are they registered to vote?
20      A.  Yes.
21      Q.  Do they have a driver's license?
22      A.  Not all of them, but most of them.
23      Q.  Do the members of your household who are of
24   voting age and registered to vote have passports?
25      A.  Not all of them.

Ace Court Reporting Service          (956) 380-1100 (Office)
  & Digital Videography              (866) 380-1135 (Fax)

Deposition of Juanita Valdez-Cox                          June 13, 2012

12 (Pages 45 to 48)



Page 45

1   Q. Can you tell me who the members of your household
2   are who are registered to vote but do not have a
3   driver's license or a passport?
4       MS. ROBERTSON: Objection; relevance. This
5   is LUPE's deposition, not Ms. Valdez-Cox' deposition.
6       MR. FREDERICK: Are you permitting her to
7   answer or are you instructing her not to answer?
8       MS. ROBERTSON: I'm not instructing her not
9   to answer. I'm objecting to this question as being
10  beyond the scope of the -- of the subject of this
11  deposition. It's LUPE's deposition and not hers.
12  BY MR. FREDERICK:
13  Q. You may go ahead and answer the question.
14  A. You want me to tell you who?
15  Q. Yes, please.
16  A. My mother.
17  Q. Okay?
18  A. And also a nephew.
19  Q. And who is your nephew?
20  A. I don't have his permission to tell you that.
21      MR. FREDERICK: Okay. I would ask, subject
22  to his permission, if -- and subject -- and similar to
23  our agreement about members of LUPE; subject to his
24  permission, if you would provide his name in the same
25  manner that your counsel has agreed to provide the names

Page 46

1   of LUPE members who are registered to vote but lack a
2   photo ID. I would appreciate that.
3       MS. ROBERTSON: Well, we have asserted an
4   objection to the question, so I'm not going to commit to
5   that. I mean, Ms. Valdez-Cox can say that she's willing
6   to ask, but I'm not going to commit to that since we've
7   objected to the question.
8   BY MR. FREDERICK:
9   Q. Ms. Valdez-Cox, are you familiar with polls
10  regarding support for voter ID legislation in Texas?
11  A. No, I am not.
12  Q. Does LUPE contend that the Texas Legislature
13  intended to harm Hispanic voters by passing SB 14?
14      MS. ROBERTSON: Objection; calls for a legal
15  conclusion.
16  A. I don't know what their intention was. I just
17  know and have concern for the results of their
18  intention.
19  Q. Okay. So am I correct in understanding that LUPE
20  does not contend that the Texas Legislature purposefully
21  acted to harm Hispanic voters by passing SB 14?
22      MS. ROBERTSON: Objection; mischaracterizes
23  her testimony. Go ahead.
24  A. Again, I don't know what their intention was. I
25  just know that it will result in more obstacles placed

Page 47

1   before our membership who needs to vote.
2   Q. I see. So, then -- and I'm not intending to
3   quote you, but is it accurate to say, then, that you
4   don't contend one way or the other about the intention
5   of the Legislature in passing SB 14; is that accurate?
6   A. I am contending that the -- that the
7   legislation -- I don't see a reason for it, and I don't
8   agree with it because it does place obstacles for us.
9   Q. But is it your contention that the legislation
10  was acting with the specific purpose of harming Hispanic
11  voters or preventing Hispanic voters from voting?
12      MS. ROBERTSON: Objection; asked and
13  answered. Go ahead.
14  A. I don't know if it was their intention. I know
15  that I am concerned about the results.
16  Q. I understand.
17      MR. FREDERICK: Those are all of the
18  questions I have. I appreciate your time very much,
19  Ms. Valdez-Cox. Thank you.
20      THE WITNESS: Thank you.
21      MS. ROBERTSON: Matt, would you give us just
22  a second and let me look over my notes? And if Steven
23  has questions, he can go ahead.
24      MR. WRIGHT: We have no questions.
25      MS. ROBERTSON: We'll reserve our questions

Page 48

1   for trial.
2       THE REPORTER: Mr. Wright, did you need a
3   copy of this deposition?
4       MR. WRIGHT: Yeah. If we could get a copy,
5   I would appreciate that.
6       MS. ROBERTSON: And we would like to read
7   and sign.
8       THE REPORTER: Do you want a copy as well?
9       MS. ROBERTSON: Yes.
10      (Deposition concluded at 11:23 a.m.)