Marc Veasey                                             June 7, 2012

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS                    *
                                  *
          Plaintiff,              *
                                  *
vs.                               *   Case No. 1:12-cv-00128
                                  *   RMC-DST-RLW
                                  *
ERIC H. HOLDER, JR., in his       *
official Capacity as Attorney     *
General of the United States      *
                                  *
          Defendant.              *

*****************************************************

ORAL DEPOSITION OF MARC VEASEY

*****************************************************

        ANSWERS AND DEPOSITION OF MARC VEASEY, produced as a
witness at the instance of the Plaintiff, taken in the
above-styled and -numbered cause on the 7th day of June, 2012,
A.D., beginning at 9:15 a.m. before Andrea Reed, a Certified
Shorthand Reporter in and for the State of Texas, in the
offices of TECH Fort Worth Building, located at 1120 South
Freeway, Fort Worth, Texas, in accordance with the Federal
Rules of Civil Procedure and the agreement hereinafter set
forth.

---

**Page 3**

I N D E X

Appearances...........................................Page 2
Exhibit Index.......................................Page 4
Stipulations........................................Page 5
Examination by Mr. Frederick........................Page 5
Signature and Corrections...........................Page 155
Reporter's Certificate..............................Page 156

---

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
   Mr. Matthew H. Frederick
   Mr. Adam W. Aston
   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
   P.O. Box 12548
   Austin, Texas  78711-2548
   209 West 14th Street
   8th Floor
   Austin, Texas  78701
   512.475.4330
   512.370.9077 (fax)
   matthew.frederick@texasattorneygeneral.gov
   adam.aston@oag.state.tex.us

FOR THE DEFENDANT, HOLDER, ET AL.:

   Ms. Maria Hortensia Rios
   U.S. DEPARTMENT OF JUSTICE
   950 Pennsylvania Avenue, NW
   PHB 4014
   Washington, DC  20003
   202.616.9750
   202.514.1005 (fax)
   maria.rios@usdoj.gov
FOR THE KENNIE INTERVENORS:
   Mr. Chad W. Dunn
   BRAZIL & DUNN LLP
   4201 Cypress Creek Parkway
   Suite 530
   Houston, Texas  77068
   281.580.6310
   281.580.6362 (fax)
   chad@BrazilAndDunn.com

WITNESS ADDRESS:
   1120 South Freeway
   Fort Worth, Texas  76104

---

**Page 4**

E X H I B I T   L I S T

No.   Description              Page      Page
                            Marked    Ident.

1     Declaration from Marc Veasey,
      Case 1:12-cv-00128-RMC-DST-RLW
      Document 69-13, Filed 4/10/12..   32      32
2     Lighthouse Opinion Polling,
      Fall 2010 Statewide Landscape
      Benchmark Survey, Special
      Presentation for Senate
      Republican Caucus, January 2010   100     100
3     Twitter Dialogue...............   111     111
4     House Journal..................   134     134
5     Texas House of Representatives
      2011 (82R) (Emergency Calendar)
      Volume 1, Transcribed on
      April 23, 2012.................   137     137

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

13

1    Q. Okay. How often do people come, you know, to your
2    office or contact you during a Session just about issues
3    they're interested in?
4    A. All the time.
5    Q. Pretty much every day?
6    A. Pretty much every day. That would be correct.
7    Q. Do you recall whether the Texas -- well, let me back
8    up a bit. Is there a Democratic Caucus group in the Texas
9    House?
10   A. There is a Democratic Caucus group.
11   Q. And you're a member of that group?
12   A. Yeah. I'm the chairperson of the group.
13   Q. Okay.
14   A. Yeah.
15   Q. Did the Democratic Caucus provide any materials about
16   SB14 to its members in the 2011 Session?
17   A. I do not recall. I would imagine that we did. It
18   was something that we, you know, always talk about every
19   Session. So I would imagine that we did provide members with
20   something, but I don't remember exactly, you know, what it was
21   or exactly what the presentations were.
22   Q. You're a member of the Texas Legislative Black
23   Caucus; is that right?
24   A. That would be correct.
25   Q. Do you recall until the Legislative Black Caucus

14

1    provided any materials to its members about SB14?
2    A. I do not recall but I would imagine that there would
3    have been materials, but I don't recall specifically though.
4    Q. Okay.
5    A. It was something that the Black Caucus was very
6    concerned about.
7    Q. Can you recall any specific individual or group that
8    provided you with materials in the 2011 Session about Voter ID
9    Legislation?
10   A. No, I do not recall any groups.
11   Q. Have you -- have you talked to any of your
12   constituents about Photo Voter ID Legislation?
13   A. Yes, oftentimes.
14   Q. Have you gotten e-mails or letters from constituents
15   about Voter ID Legislation?
16   A. I am certain that I have. Yes, I'm -- but I don't
17   specifically remember from who or what, but, yeah -- but I'm
18   certain that I have.
19   Q. You probably get a lot of e-mails and letters from
20   constituents about a lot of things?
21   A. About a lot of different things. That would be
22   correct.
23   Q. Do you have -- in your office, is there a specific
24   e-mail account where -- that -- where constituent e-mails go?
25   A. There would be -- there is a e-mail account where

15

1    constituent e-mails would go. If you go to House.state.tx.us.,
2    there is a deal where you can contact your legislator, and you
3    put your ZIP code in there, put your address in there, and
4    it'll direct you to your legislator. And then, yeah, we get
5    e-mails through that quite often. And then -- yeah, we get
6    e-mails through that quite often.
7    Q. Are there any other e-mail accounts where
8    constituents would send an e-mail if they wanted to you to get
9    it?
10   A. Sometimes they may send me e-mails to
11   marc@marcveasey.com, or they may send an e-mail to, you know,
12   the staff people on my staff.
13   Q. Is marc@marcveasey.com, is that a personal e-mail or
14   is it an official --
15   A. It's a campaign. Campaign, yeah.
16   Q. And the e-mail that you referred to related to the
17   official Texas House Web site, that would be an official state
18   e-mail account?
19   A. Right. Exactly.
20   Q. And is that the primary account where constituent
21   e-mail would go?
22   A. Yes.
23   Q. Do any of your constituents oppose a photo ID
24   requirement for voting?
25   A. I would say every constituent, if not every

16

1    constituent, like 99 percent of the constituents that have
2    spoken with me about Photo ID or Voter ID have been opposed to
3    it.
4    Q. When you say 99 percent who have spoken to you, does
5    that include people who have e-mailed you about Voter ID?
6    A. That would be constituents that have e-mailed me
7    about Voter ID, yes.
8    Q. And you've also -- have you spoken in person to some
9    constituents about Voter ID?
10   A. Yes, I have.
11   Q. Do any of your constituents support a Photo ID
12   requirement for voting?
13   A. I cannot recall one constituent that has told me that
14   they are for Photo ID laws.
15   Q. To your knowledge, have you produced any constituent
16   e-mails to the state in this litigation?
17   A. No, I have not.
18   Q. Were you ever asked to produce constituent e-mails?
19   A. I do not recall being asked to produce constituent
20   e-mails.
21   Q. Did you prepare talking points for committee hearings
22   for floor debates on SB14?
23   A. If I did not prepare them, then a staff person in my
24   office would have prepared them.
25   Q. Did anybody besides you or your staff prepare talking



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                          June 7, 2012

17

1    points for you for SB14?
2        A.  I know that my staff worked with other members'
3    offices on -- on Photo ID.
4        Q.  Is it pretty common in the legislature for members or
5    staff from different member offices to work together on talking
6    points?
7        A.  Yes, there is, absolutely.
8        Q.  Do you recall any -- or are you aware of any
9    particular office or legislator with whom your staff worked to
10   prepare talking points for SB14?
11       A.  Rafael Anchia.
12       Q.  Did you have any personal meetings with any
13   legislator to discuss SB14?
14       A.  Yes.
15       Q.  Do you recall who you met with?
16       A.  I don't recall everyone who I met with outside of
17   Rafael Anchia and -- yeah, and I'm certain Jessica Farrar who's
18   a member out of Houston.  But I do not -- but I can't recall
19   everyone that I've talked to, but I'm certain that I've talked to
20   more people than them.  I just don't remember, you know, who --
21   everyone that I've talked to.
22       Q.  Do you think you talked to every Democratic member of
23   the Texas House about SB14?
24       A.  I -- if I -- probably.  But I don't remember if I
25   did -- if I spoke to every single one, but more than likely I

18

1    did.
2        Q.  You think -- is it safe to say you talked to most of
3    the Democratic members of the house?
4        A.  I would say that that's correct, whether it was
5    one-on-one or whether or not we were talking in a group setting
6    at a Democratic Caucus meeting.  And, yes, I would say that
7    I've spoken to about every Democratic Caucus member.
8        Q.  Did the Democratic Caucus have any meetings where
9    SB14 was discussed?
10       A.  I'm certain that we did.  Absolutely.
11       Q.  Were there any meetings specifically devoted to SB14
12   or Voter ID?
13       A.  There were -- if I recall correctly, that there were
14   a couple of meetings that we had but don't remember the exact,
15   you know, venue or place.  But, yeah, I would say that
16   absolutely.
17       Q.  Did the Democratic Caucus have any speakers or guests
18   come in at those meetings about SB14 to talk about the bill or
19   Voter ID?
20       A.  I do not recall whether it was just House member
21   driven or whether we had someone from the outside come in and
22   do a presentation.  I do not recall.
23       Q.  Did you invite any witnesses to come testify in the
24   committee about SB14?
25       A.  I do not recall if I did or not.

19

1        Q.  Do you recall if you had any constituents come give
2    testimony on SB14?
3        A.  I do not remember any constituents from District 95
4    coming up to give testimony.
5        Q.  Do you recall if you invited any constituents to come
6    give testimony on SB14?
7        A.  I do not recall.
8        Q.  In the 2009 Session, do you -- did you invite any
9    witnesses to provide testimony on the Voter ID bill in that
10   Session?
11       A.  I don't remember.
12       Q.  Do you remember if any of your constituents testified
13   on the Voter ID bill in the 2009 Session?
14       A.  I do not recall if any constituents testified.
15       Q.  Did you conduct any studies about potential impact of
16   SB14?
17       A.  I did not personally conduct any studies.
18       Q.  Did your staff conduct any studies about SB14's
19   potential impact?
20       A.  My staff did not conduct any -- any studies.
21       Q.  Do you recall whether you or your staff conducted an
22   studies about the impact of the 2009 Voter ID bill?
23       A.  No.  I can tell you that we did not conduct a study
24   on our own, no.
25       Q.  Did you review any studies or see any studies about

20

1    the potential impact of SB14?
2        A.  Yes, I did.
3        Q.  Do you recall which studies you saw?
4        A.  The one study that I remember specifically was the
5    People for the American Way and the study that they did.
6        Q.  Are there any other specific studies you can remember
7    reviewing about Voter ID in the 2011 Session?
8        A.  Read some information from Carter-Baker.  I remember
9    that.  And there was some documentation that I read from --
10   well, the NYU School of Law.  I think the Brennan --
11       Q.  The Brennan Center?
12       A.  Yes.
13       Q.  Sorry to interrupt.
14       A.  Yeah, the Brennan Center.  Exactly.
15       Q.  The People for the American Way study that you
16   mentioned, was -- can you describe that study generally, if you
17   recall?
18       A.  It talked about the impact that it would have upon
19   African American and Latino communities specifically.  But I
20   guess what I remember specifically about it was that there was
21   a picture of an African American -- I believe it was an African
22   American man on the other side of the fence sort of being, you
23   know, like showing -- being like basically, you know, shut out
24   from the polling place and a quote from a guy at the Republican
25   State Convention in the 1980s, you know, advocating for less



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

21

1  people voting.  And I guess, you know, saying that that was the
2  whole -- that that was sort of the point for Voter ID.
3      Q.  Was -- for the People of the American Way study, was
4  there an individual author or authors identified?
5      A.  I do not recall.
6      Q.  Do you recall what -- what the date of that study
7  was?
8      A.  I do not recall the date of the study.
9      Q.  Do you recall the year when it was written?
10     A.  No, I do not.
11     Q.  Was the People for the American Way study -- do you
12  recall the methodology?  Was it a survey or do you recall?
13     A.  No, I don't know how they, you know, came about their
14  numbers.
15     Q.  Did the People for the American Way study that you
16  reviewed, was that a study of Texas or was it a nationwide
17  study?
18     A.  I believe it was a nationwide study.
19     Q.  Do you -- and I know it's been a while, but do you
20  recall whether that study included any data or research about
21  Texas specifically?
22     A.  I do not recall whether it did.  I just remember the
23  quote from the guy at the Republican State Convention, but I
24  don't remember --
25     Q.  And the quote that you mentioned, was that from the

22

1  Texas Republican State Convention?
2      A.  Yes.
3      Q.  And you said that quote was from a convention
4  sometime in the '80s?
5      A.  That would be correct.
6      Q.  You don't recall who the person was that made the
7  quote, do you?
8      A.  No, I do not.  It was someone that is -- that I think
9  was a fairly well-known Republican, active, but I just can't
10  remember his name.
11     Q.  Do you recall the title of that People for the
12  American Way study was?
13     A.  I do not remember the exact title.  If I were to see
14  it today, I would be able to recall it because it had a pretty
15  compelling title to it, but I don't remember it right now off
16  the top of my head.
17     Q.  So you mentioned the People for the American Way
18  study, the Carter-Baker report, and then a study by the Brennan
19  Center.
20         Can you recall any other studies on Voter ID
21  that you considered in the 2011 Session?
22     A.  No, I cannot recall anything specifically.
23     Q.  In the 2009 Session, can you recall any studies that
24  you saw about Voter ID for the 2009 Session?
25     A.  I'm certain in the 2009 Session that I also

23

1  referred -- that I also looked at that People for the American
2  Way.  And then I'm certain that we had -- that there were
3  witnesses from the Brennan Center that also had material that
4  came and testified in '09.
5      Q.  Can you recall any other particular study or report
6  that you read in the 2009 Session?
7      A.  No, I do not.
8      Q.  Have you -- and this is a general question, not for
9  any specific Legislative Session, but have you seen any studies
10  that look at the impact of a Photo ID requirement on voter
11  turnout?
12     A.  Yes, I have.
13     Q.  Do you recall any specific studies that address that?
14     A.  I'm certain that the People for the American Way
15  study that I read, that it had specific numbers on there on
16  voter impact.  I'm certain that -- that many of the people that
17  came to testify against the bill, that they also, you know,
18  had, you know, similar studies.
19     Q.  Of the studies that you've seen about the potential
20  impact on turnout of Photo ID laws, do you recall seeing any
21  that showed a -- that concluded that there would be a decrease
22  in turnout?
23     A.  Yes.
24     Q.  Do you recall seeing any studies on the impact of
25  Photo ID laws on turnout that concluded or predicted that there

24

1  would be an increase in turnout?
2      A.  I do not recall any saying that there would be an
3  increase in turnout.
4      Q.  Do you recall seeing any studies of the impact of
5  Photo ID on turnout that concluded that it would be a wash or
6  kind of no effect on turnout?
7      A.  No, I don't recall seeing any that said that.
8      Q.  Did you talk to anyone at the Department of Justice
9  about SB14?
10     A.  Yes.
11     Q.  Do you recall who you spoke to?
12     A.  I do not recall by name -- by specific name, I do
13  not.
14     Q.  How many times -- when you spoke to the Department of
15  Justice, was it in person or over-the-phone?
16     A.  Over the telephone.
17     Q.  Do you recall how many times you spoke with the
18  Department of Justice?
19     A.  At least twice maybe.  Maybe more, but at least
20  twice.
21     Q.  Do you recall when those conversations took place?
22     A.  No, I do not recall.  It's been -- it was earlier
23  this year, but I don't remember exactly when.
24     Q.  So it was after the 2011 Legislative Session?
25     A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                  June 7, 2012

25

1    Q.  Did -- do you recall any conversations with the
2    Department of Justice, either during the 2011 Session or before
3    the 2011 Session, about Voter ID?
4    A.  Before the 2011 Session, no, I can't -- I do not
5    recall, no.
6    Q.  What did you talk about with Department of Justice?
7    A.  I -- they asked me, you know, questions about Photo
8    ID, but I -- but as far as exactly what they specifically asked
9    me, I couldn't, you know, tell you that.
10   Q.  Do you recall whether the Department of Justice asked
11   you if SB14 would have a discriminatory effect?
12   A.  I believe that they did.
13   Q.  Do you recall what you told them about that?
14   A.  I would have told them, yes.
15   Q.  Do you recall whether the Department of Justice asked
16   you if SB14 was -- had a racially discriminatory purpose?
17   A.  I believe that they asked me that or something to
18   that effect.
19   Q.  Did you send any letters or e-mails to the Department
20   of Justice about SB14?
21   A.  During the Session, possibly.  We -- I may have
22   during Session it seems like, something specifically that we
23   may have written to the Justice Department.  But it's kind of
24   fuzzy because, you know, after we had Photo ID, we had
25   redistricting.  So it was -- we had quite a busy Session.

26

1    Q.  So you think that you may have sent a letter or an
2    e-mail to the Department of Justice, but you're not --
3    A.  Yeah, it just seems like that we -- that we may have.
4    Q.  When you say "we may have," who -- who would have
5    sent that?
6    A.  Myself and other members of the Democratic Caucus.
7    We may have sent a joint letter, or we may have sent individual
8    letters.
9    Q.  And can you recall specifically whether there was a
10   letter specifically about Voter ID or SB14?
11   A.  I -- I believe so.  Like I stated earlier, it's been
12   so -- you know, there was so much that happened after Voter ID
13   that -- that I don't remember exactly what happened.
14   Q.  Do you recall why the Democratic Caucus or Democratic
15   members sent a letter during the Session to the Department of
16   Justice?
17   A.  Any letters that would have been sent during the
18   Session would have been to address concerns dealing with
19   discrimination, you know, based on, you know, my knowledge of,
20   you know, conversations with different Democratic Caucus
21   members.
22   Q.  Have you -- that you can recall today, have you sent
23   letters to the Department of Justice during other Legislative
24   Sessions?
25   A.  Probably.  I'm certain.  Probably.

27

1    Q.  Do you recall any particular letter that you sent to
2    DOJ during a Legislative Session?
3    A.  No, not off the top of my head, I cannot.
4    Q.  Do you recall why you sent letters in previous
5    Sessions to DOJ?
6    A.  Any letters that I would have sent to the Department
7    of Justice probably would have been because I felt something
8    was discriminatory.
9        MR. DUNN:  And just to be clear on the record, I
10   assume you're talking about the voting division and not all of
11   DOJ.
12   Q.  (BY MR. FREDERICK)  Well, I guess now I'm just asking
13   about the Department of Justice.  Do you --
14       MR. FREDERICK:  But fair point.
15   Q.  (BY MR. FREDERICK)  Do you recall sending a letter to
16   any division of the Department of Justice other than the voting
17   section?
18   A.  No, I don't -- no, I do not.
19   Q.  And would the purpose of sending a letter during
20   Session -- to the voting section, would that be to prevent a
21   law from being pre-cleared by the Department of Justice?
22   A.  Yes, it would have been -- not necessarily in all
23   cases, but I would -- generally speaking, I would say that,
24   yeah, we would want the Justice Department to, you know, take a
25   look at a certain law and for the law to not be pre-cleared or

28

1    for them to, you know, look into concerns that I would have
2    felt were discriminatory in nature.
3    Q.  Are you generally familiar with Section 5, the Voting
4    Rights Act?
5    A.  As a nonattorney, yes, I'm familiar with that.
6    Q.  And is it your understanding that Section 5 requires
7    Texas and other states to submit any law that change -- any
8    voting change to the Department of Justice or the DC, district
9    court, to get approval before it can go into effect?
10   A.  Yes.
11   Q.  And so would it have been your understanding that any
12   law about voting that was passed by the Texas Legislature would
13   have eventually gone either to DOJ or to a court in DC?
14   A.  That is correct.
15   Q.  If you knew that -- that a law was going to come
16   before the Department of Justice eventually, why would you send
17   a letter during the Legislative Session before the law had been
18   passed?
19   A.  I don't -- I can't say whether or not I sent the
20   letter before the law was passed or after the law was passed.
21   I couldn't recall when -- exactly when it was sent.
22   Q.  Do you recall any letters that you sent to the
23   Department of Justice about a specific bill before it actually
24   passed the Legislature?
25   A.  No, I cannot recall.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

33

1   A.  The exact date when I signed this declaration, I
2   cannot recall off the top of my head, but it is dated April the
3   9th of this year.
4   Q.  To your knowledge, is this a -- is this a true and
5   correct copy of the declaration that you signed --
6   A.  Yes.
7   Q.  -- for the Department of Justice?
8   A.  Yes.
9   Q.  Who wrote this declaration?
10   A.  I am assuming that -- that the Department of Justice
11   did this declaration -- or wrote this declaration.  Excuse me.
12   Q.  So to your recollection, the Department of Justice
13   wrote this and provided it to you for signature?
14   A.  That would be correct.
15   Q.  Did you discuss the contents of this declaration with
16   the Department of Justice before you got a copy to review?
17   A.  What I recall is that I talked with the Department of
18   Justice to make sure that everything in this document was
19   factual.
20   Q.  Do you recall who you spoke to at the Department of
21   Justice about this declaration?
22   A.  It was a gentleman named Bruce, if I recall that
23   first name correctly.  I believe it was a gentleman named
24   Bruce.  But I do not remember the gentleman's last name.
25   Q.  Is it possible that it was Bruce Gear?  Is that name

34

1   familiar?
2   A.  It's just not ringing a bell.  I've just talked to so
3   many people that it's just not ringing a bell, but that may
4   have been correct.
5   Q.  Okay.  Do you know if the gentleman with whom you
6   spoke was a lawyer at the Department of Justice?
7   A.  I do not know if he was a licensed attorney or
8   whether he was a office worker.  I'm not certain of that.
9   Q.  How many conversations did you have with the
10   Department of Justice about your declaration?
11   A.  At least two.
12   Q.  Did it -- did you have any conversation with anyone
13   at the Department of Justice about your declaration before you
14   got a copy of the declaration to review?
15   A.  Yes.
16   Q.  Do you recall when that conversation took place?
17   A.  I -- the conversation took place on -- you know, on
18   both occasions that we spoke.  On at least two -- on at least
19   two of the occasions where we had conversation by phone, we
20   talked about this to go over to make sure it was correct.
21   Q.  When you say "go over it," do you -- were you -- were
22   you going over an actual draft?
23   A.  When I say "go over it," I mean that the gentleman
24   that I spoke to at DOJ, you know, he wanted to be sure that
25   this declaration -- or, you know, these facts were correct, and

35

1   so he said, okay, let me ask you a question.  You know, your
2   name a Marc Veasey, correct?  Yes.  You were born in 1971 and
3   raised in Tarrant County?  Correct.  You are African American?
4   Correct.  You know, just to go through like what you see before
5   us in this document, 69-13, to make sure that all of the words
6   in here were correct.
7   Q.  And during that conversation, were you looking at a
8   copy of the declaration?
9   A.  No, I was not.
10   Q.  So is it your -- is it your understanding that this
11   declaration was -- or at least a draft of the declaration was
12   written before you spoke to the Department of Justice about it,
13   and then you -- and then you talked about the contents of it?
14   A.  Yes.
15   Q.  Are you aware of anybody else who drafted or made
16   comments or edits to this declaration?
17   A.  No, I'm not aware of anyone that would have edited
18   the document at all.
19   Q.  When you were talking to the Department of Justice
20   about this, did you make any changes?
21   A.  I do not recall making any changes.
22   Q.  Do you know where the Department of Justice got the
23   information that's contained in this declaration?
24   A.  Probably from asking me the questions.  I don't know
25   where else they would have put together the information, but,

36

1   you know, when we were talking -- and, you know, from our first
2   conversation, I'm sure that some of this would have been
3   derived from the conversation that we had.
4   Q.  Okay.  And when you say "the conversation," would
5   that be -- do you mean the conversation where they were asking
6   you questions about SB14?
7   A.  Correct.
8   Q.  Is there anything -- and I'm happy to give you a
9   minute to look through it.  Is there anything in this
10   declaration that you would like to change or clarify today?
11   A.  No, I don't see anything in here that I would like to
12   change or clarify.  I did look at the -- at this document
13   before signing it, and so I feel, you know, pretty confident
14   that everything that is in here is correct.
15   Q.  Did you discuss the contents of this declaration with
16   anybody other than people at the Department of Justice?
17   A.  Yes.
18   Q.  And who was that?
19   A.  My general counsel here in the office.  And I'm
20   sorry, when I say "here in the office," my general counsel in
21   my state legislative office, Anne Hagan.  And that -- for the
22   record, that is Anne with an "e."
23   Q.  Yes.  Did you discuss the contents of this
24   declaration with anybody other than the people at the
25   Department of Justice or your general counsel Ms. Hagan?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                      June 7, 2012

37

1       A.  No.

2       Q.  I'm not -- I don't want you to reveal the substance

3   of any conversation, assuming one occurred, but did you talk

4   about this declaration before signing it with Mr. Dunn or Mr.

5   Hebert?

6       A.  I do not -- this particular declaration, I do not

7   recall talking with them about this.  This, you know, was sent

8   to the office.

9           MR. DUNN:  I'm just going to time-out.  We're

10  getting into attorney-client privilege matters now.  So I

11  object and instruct you not to answer any further.

12      Q.  (BY MR. FREDERICK)  Right.  And I want to be very

13  clear, I'm not trying -- all I want to know is if a

14  conversation happened.  I don't want to know what was said

15  because, I agree, that would be privilege.

16          MR. FREDERICK:  So it is --

17          MR. DUNN:  Let me ask him.  He wants to know if

18  you had a conversation with your lawyers about this

19  declaration.  Without getting into details, "yes" or "no."

20          THE WITNESS:  I do not remember talking to

21  lawyers about this.  This came to the -- this was sent to the

22  office, Anne looked at it.  It looked good to her.  I looked at

23  it.  It looked good to me.  We sent it back.  I don't remember

24  specifically talking to you or Gerry about this documentation.

25      Q.  (BY MR. FREDERICK)  Great.  Thank you.

38

1           If you turn with me to -- let's see -- to

2   Paragraph 12, which is on -- it's marked on the top as Page 4

3   of 5.

4       A.  Okay.

5       Q.  And let's see, down here on about -- starting on the

6   third line of Paragraph 12, is it accurate that this is telling

7   you about the 2007 legislative debate?

8       A.  Yes.

9       Q.  And right here on the -- beginning on the third line

10  ==towards the end, it says, Minority voters are more likely than==

11  ==white voters not to have the necessary identification.==

12          ==Is that an accurate representation of what this==

13  ==says?==

14      ==A.  Yes.==

15      Q.  Now, this -- so this was the 2007 debate.

16          Was the bill in -- do you remember what forms of

17  ID were acceptable under the bill -- the Photo ID bill

18  considered in 2007?

19      A.  Now, I do not remember.

20      Q.  Do you recall whether any of the forms of ID under

21  the 2007 bill were non-Photo ID?

22      A.  I do not recall specifically.  I'd have to go back

23  and look at the bill.  There's been so many different forms

24  that have come before, so I'd have to go back and look.

25      Q.  Is it your understanding under the law as it is now,

39

1   that it's acceptable for voters to show non-Photo ID at the

2   polls?

3       A.  Yes.

4       ==Q.  And you don't know -- you can't -- you don't know==

5   ==whether the proposed 2007 Legislation would have removed all==

6   ==forms of non-Photo ID?==

7       ==A.  I believe that it would have, but I don't recall==

8   ==exactly what forms of ID would have been acceptable in the 2007==

9   ==because the freshest one my mind is obviously the one that==

10  ==passed in '11.==

11      ==Q.  And it's your contention, is it not, that -- that==

12  ==SB14, the bill that passed, would have a negative impact on==

13  ==minority voters; is that right?==

14      ==A.  Yes.  Yes.==

15      ==Q.  And is it your contention that the reason that it==

16  ==would have that impact is that minority voters in Texas are==

17  ==less likely than nonminority voters to have the required ID?==

18      ==A.  That is correct.==

19      Q.  So, I mean, based on this, this statement about 2007,

20  is it fair to say that your concerns about the 2007 bill and

21  the 2011 bill were basically the same?

22      A.  Yes.

23      ==Q.  What evidence do you have that minority voters in==

24  ==your district are more likely than white voters not to have the==

25  ==necessary identification?==

40

1       ==A.  That would be just based on my experience and working==

2   ==in the community.  That would be based on my experience -- my==

3   ==previous election experience, you know, like talking to people==

4   ==that, you know -- you know, that live in apartment to==

5   ==apartment; you know, talking to people that take the bus==

6   ==everywhere; you know, talking to people that, you know, go==

7   ==to -- that don't have a bank account and they have to go to==

8   ==check stores and get checks cashed and different things like==

9   ==that, that I would say that that impact -- and just, I mean,==

10  ==based on different studies that I've read, that that impact==

11  ==would have a greater effect in a -- in a district that is==

12  ==heavily Latino or heavily African American than in areas that==

13  ==were non-Black or non-Latino.==

14      ==Q.  So the people -- you referred to talking to people in==

15  ==the community.  To the best of your recollection, are the==

16  ==people that you spoke to on this issue -- were the people you==

17  ==spoke to African American or Latino?==

18      ==A.  Most of the people that I've spoken to were African==

19  ==American or Latino, yes.==

20      ==Q.  Do you recall talking to any -- I'll use the term==

21  ==that gets used commonly, any Anglo members of the community==

22  ==about this issue of ID possession?==

23      ==A.  Yes.==

24      ==Q.  Do you recall -- do you recall any specific people==

25  ==that you've -- I know it's been a while, but do you recall any==



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                          June 7, 2012

41

1   specific people that you've spoken to in the community about
2   whether they -- they have a Photo ID?
3       A.   No.  I do not remember anything specifically or any
4   single person that I spoke to specifically, but I do remember
5   just, you know, like talking to people that would come in.  We
6   used to have an operation in the mall back in 1998 at La Gran
7   Plaza, which is just a little further up I-35, and at that
8   time, it was called Town Center Mall.  And I can remember
9   talking to, you know, people that would come into our store --
10  Democratic party storefront that we had inside of the mall, and
11  people would say, well, you know, I can't vote because I don't
12  have an ID.  Like, I can remember people saying that.
13           And then we would say, well, no, do you have a
14  bill or do you have a bus pass or something with your -- they
15  said, well, no.  Then you need to take it up there so you can
16  vote.  But I can specifically remember talking to people that
17  would stop into the office or that people that I would like
18  talk to in the mall that told me that they didn't have an ID.
19      Q.   And so what -- you mentioned a Democratic Party
20  storefront in what used to be the Town Center Mall.
21      A.   Yes.
22      Q.   What's the period when you worked there?
23      A.   The 1998 cycle, the 2000 cycle and the 2002 cycle.
24      Q.   Were you working for the Democratic Party at that
25  point?

42

1       A.   I was working for the Tarrant County Democratic Party
2   at that point.
3       Q.   And during that period, roughly '98 through 2002, the
4   Texas law didn't require an actual Photo ID to vote, did it?
5       A.   No.
6       Q.   So the people that came in and said they didn't have
7   ID, they weren't -- were they concerned about the lack of a
8   Photo ID or just any ID?
9       A.   They were concerned about the lack of a -- of a
10  driver's license or a Texas ID.
11      Q.   So people you spoke to during that '98 to 2002 rough
12  period, they -- is it your recollection that they thought they
13  had to have a driver's license or some state-issued Photo ID to
14  vote?
15      A.   Yes.
16      Q.   Do you recall any -- any of the people you talked to
17  telling you why they thought that?
18      A.   I think that they just probably just assumed that
19  like a lot of people assume a lot of things.
20      Q.   Did they assume, to your recollection, that a Photo
21  ID would be necessary to verify their identification?
22      A.   That was my understanding at the time of talking with
23  them.  Or a voter registration card.  They would also say,
24  well, I don't have my voter registration card.  So they would
25  either say that they didn't -- either they didn't have their ID

43

1   or they didn't have their voter registration card.  That was
2   the other document that was -- I guess that was a non-Photo ID
3   that they would often refer to.
4       Q.   As part of that work, did you ever help anybody get a
5   Photo ID?
6       A.   No.
7       Q.   You mentioned -- when I was asking about evidence of
8   ID possession, you mentioned experience in the community and
9   you mentioned some studies.
10           Do you recall specific studies about ID
11  possession by minority voters?
12      A.   Yes.  I know that the People for the American Way,
13  that they had some pretty interesting numbers, pretty
14  compelling numbers on why was that, you know, minorities were
15  less likely to have identification than other members of
16  society.
17      Q.   Were there any other studies that you can recall?
18      A.   Not that I can recall specifically.  But the
19  information that I read from the Brennan Law Center and other
20  documentation over time that was brought into the office, I
21  thought was pretty compelling.
22      Q.   Looking back at this Paragraph 12 --
23      A.   Yes.
24      Q.   -- to your declaration, do you recall specific
25  studies that you would have based this opinion on in 2007?

44

1       A.   Yeah.  Yeah absolutely.  There were, you know,
2   studies that I remember, you know, having.  I don't
3   specifically remember which studies, but studies that we saw
4   from, you know, different people that were concerned and
5   organizations that were concerned about the bill that showed
6   that there was -- that there would be a -- and different things
7   that I've read from, you know, different news organizations and
8   different studies online that specifically, you know, talked
9   about, you know, anywhere from -- most of the studies I saw
10  said -- showed anywhere from like one to 3 percent, you know,
11  dropoff in African American and Latino voter participation.  So
12  in a close election, obviously, that would be enough to swing
13  the election.
14      Q.   Were those studies specifically, to the extent you
15  can recall, were they specifically about Photo ID or was it
16  just ID generally?
17      A.   It -- they were -- it was specifically to Voter ID
18  laws or Photo ID laws.
19      Q.   As you can recall, have you ever seen any studies
20  that conclude that -- that minority voters would have non-Photo
21  ID or would lack non-Photo ID, you know, at a greater rate than
22  non-minority voters?
23      A.   Yes.
24      Q.   Do you know what studies those are?
25      A.   I believe that the studies that I saw from People for

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                          June 7, 2012

45

1   the American Way and the Brennan Center and others that were
2   working on Voter ID at the time showed pretty compelling
3   evidence of that.
4       Q.   Under current Texas law, is it your understanding
5   that there's some ID required, but you can show, say, a voter
6   registration card?
7       A.   Right.  Correct.
8       Q.   And you can also show -- I don't remember the exact
9   list, but you can show things like a utility bill with your
10  address?
11      A.   That is correct.
12      Q.   Do you believe that that kind of law requiring a
13  non-Photo ID has a discriminatory impact on minority voters?
14      A.   No.  I think that the way that the law is currently
15  written, that -- that obviously there still are some -- you
16  know, some barriers for people to go and vote, but they're
17  barriers that can be overcome fairly easily.
18      Q.   Are there any specific barriers you're thinking of
19  under the current system --
20      A.   Uh-huh.
21      Q.   -- that would affect minority voters particularly?
22      A.   Well, I mean, like let's say, for instance, if you're
23  transient, if you live in different apartment complexes, you
24  may not have the -- and you take the bus, you may not
25  necessarily be -- you know, have the ID or you may not

46

1   necessarily have the driver's license and so, you know, your
2   life may be from, you know, place to place, from one apartment
3   complex to your grandmother's house or one apartment complex to
4   your mom's -- I mean, so being able to -- just be able to
5   easily get those things, it may not be as easy for you -- for,
6   you know, people that live that particular lifestyle versus
7   others.
8       Q.   Uh-huh.  Other than a driver's license or some other
9   Photo ID, do you -- do you believe that it's more difficult for
10  minority voters to get non-Photo ID, like a voter registration
11  card or utility bill?
12      A.   I would say that anyone that -- who moves around a
13  lot, like I stated earlier, it's always going to be harder for
14  them to have documentation like that.  But at least you have a
15  wider, you know, range of things that you can have access to,
16  which makes it's a lot more fair.
17      Q.   Do you think on the whole the requirement -- the
18  current requirements of some form of photo or non-Photo ID, do
19  you believe that that has any impact -- any negative impact on
20  minority voters who might not have the ID?
21      A.   I think that -- that right now that any impact would
22  be minimal because I think that is -- because there are so many
23  ways that you can vote right now that it's easy for -- that
24  it's easy for people to meet anything that may be preventing
25  them from voting.  So, you know, like right -- like -- I mean,

47

1   if you have an ID and it's expired right now, you know, no one
2   is necessarily going to prevent you from going to vote.  You
3   know, under the 2011 law, obviously if your ID is more than a
4   certain period expired, then you would not be able to -- you
5   know, to go and vote.
6            And so while there are still definitely some
7   obstacles -- I mean, there was -- I mean, I can remember
8   talking to people at Town Center Mall that were just like, I
9   just don't -- I just don't know where I would get anything like
10  that right now where I can go -- like I remember people
11  specifically saying that to me, like I just don't know like
12  what, you know, I could get that could -- you know, we would
13  tell them, well, go get -- you know, go get you a bill, go
14  get -- and I can remember people saying, I just don't know.  I
15  just don't know what I can get right now to go and vote.
16           And so -- but -- but -- but within that group,
17  most people -- when I say "within that group," I'm talking
18  about the bus rider, the -- you know, the frequent mover, you
19  know, the people that, you know, just kind of live the paycheck
20  to paycheck, that if you -- most of those people if you would
21  say -- tell them, hey, go get a bill, go get your BlockBuster
22  card, you know, go get something with your photo on it or --
23  most of them would say, okay, let me go see what I can do.  I
24  think I can meet that threshold.  But there would always be
25  some that would be like, God, I just -- I just don't know.

48

1   Like I can specifically remember people saying I just don't
2   know if I can even get that.
3       Q.   Do you remember -- do you remember if any of the
4   people who thought maybe they couldn't even get a non-Photo ID,
5   were they registered to vote?
6       A.   They believed that they were registered.  They told
7   use that they were registered.  They believed that they were
8   registered.
9       Q.   Other than -- other than conversations with
10  individuals -- actually, let me back it up and make sure I'm
11  asking you a general question first.
12           Do you have specific evidence that minority
13  voters in your district are more likely than Anglo or
14  non-minority voters not to have necessary ID to vote?
15      A.   Specifically in my district?
16      Q.   Uh-huh.
17      A.   I would say that I believe that minority voters in my
18  district would be less likely to have those IDs because the
19  studies that I've seen, obviously, you know, are -- they're
20  speaking, you know, nationally about the impact of the Photo ID
21  law and what that impact would be in minority communities.  And
22  so, you know, obviously with my area that I represent being
23  heavily, you know, African American and Latino, of course, it's
24  likely that -- that that would be a big issue.
25      Q.   Have you conducted any studies of ID possession by



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                          June 7, 2012

49

1    individuals in your district?

2       A.   I have not.

3       Q.   What about -- have you conducted any studies of ID

4    possession of people in Tarrant County?

5       A.   I have not.

6       Q.   Have you seen any studies of ID possession specific

7    to your district?

8       A.   I have not.

9       Q.   Have you seen any studies of ID possession by people

10   in Tarrant County?

11      A.   I have not.

12      Q.   Have you seen any studies by any -- any studies of ID

13   possession by individuals in -- in Texas?

14      A.   I do not -- I can't -- I cannot recall specifically

15   seeing anything that relates to Texas itself, but that doesn't

16   mean that I haven't seen anything.  I may just -- I just cannot

17   recall right now seeing anything that's specific to Texas, but

18   I've read, you know, so much over the years on Voter ID, I

19   just -- I can't remember exactly everything that I've read.

20      Q.   But you've seen -- you've seen national studies

21   that -- that conclude that there's a disparity in possession of

22   ID --

23      A.   Yes.

24      Q.   -- between minority individuals and non-minority

25   individuals?

50

1       A.   Yes.

2       Q.   And so you -- you assume that people -- that the

3    conclusions in national studies will apply more or less to

4    people in your district?

5       A.   Yes.

6       Q.   Have you conducted a survey of your constituents to

7    see how many of them possess the ID required by SB14?

8       A.   No.

9       Q.   Are you aware of any surveys of your constituents to

10   see how many of them possess the ID required by SB14?

11      A.   No, I have not.

12      Q.   Have you conducted any polls of your constituents to

13   see how many of them might possess the ID required by SB14?

14      A.   No, I have not.

15      Q.   Do you know how many of your constituents do not have

16   one of the forms of ID required by SB14?

17      A.   I do not know that number.

18      Q.   Do you know how many of your constituents don't have

19   a driver's license?

20      A.   I do not know that number.

21      Q.   Do you know how many of your constituents don't have

22   either a driver's license or a DPS issued ID card?

23      A.   I do not know that number.

24      Q.   Do you know how many of your constituents have a

25   concealed handgun license?

51

1       A.   I'm not -- I do not know that number.

2       Q.   Do you know how many of your constituents have a

3    passport?

4       A.   I do not know that number.

5       Q.   And do you know how many of your constituents have a

6    military ID card?

7       A.   I do not know that number.

8       Q.   Can you identify any individual constituent of yours

9    who does not have one of the forms of ID required by SB14?

10      A.   I cannot think of a specific constituent right now,

11   but outside of my district my grandmother, who turns 100 this

12   year, God willing, under this particular bill if she were to

13   lose her mail ballot, which we've had to look for it in the

14   house -- she votes by mail.  And when it comes to her house,

15   sometimes, you know, she may sit it somewhere or she may -- I

16   mean, we have to look for her bills, her ballot, everything.

17   She would not be able to vote if she lost her ballot because

18   her ID is very, very old, and she's not going to look for her

19   birth certificate so she can -- so she can go to DPS to get

20   another.  You know, she wouldn't be able to get that easily,

21   and she wouldn't be able to do it in a hurry.  I mean, it's

22   hard for anybody 99 to do anything in a hurry.  So --

23      Q.   Okay.  So you can't identify any specific constituent

24   of yours who lacks one of the required IDs; is that right?

25      A.   No.

52

1       Q.   Just so I'm clear, you cannot identify any

2    constituent who doesn't have one of the forms of ID?

3       A.   No.  Just off the top of my head right now, no, I

4    cannot.

5       Q.   Other than your grandmother, can you think of any

6    register -- can you identify any registered voter in Texas who

7    does not have one of the documents necessary to get a state

8    issued Photo ID?

9       A.   I cannot specifically think of an individual right

10   now, but I'm sure that if I asked I could find them -- well,

11   like I stated earlier, when we were at Town Center Mall, I met

12   people like that, you know, from time to time that were walking

13   through the mall that came in, and they were curious about what

14   we were doing and, you know, was curious about voting and when

15   election day was or, you know, when they could vote early.  And

16   we would ask them about ID, and they would tell us that they

17   didn't have any of the forms of ID that we told them that they

18   needed.

19      Q.   Do you know for a fact that those people that you

20   spoke to were actually registered to vote?

21      A.   I do not recall, but the -- Tarrant County does

22   have a number, it's a 817884 number, if I recall correctly, and

23   sometimes we would call to see if they were registered, and

24   they would be registered.  But they just -- you know, I mean,

25   it's just -- you know, that's just -- that's the life that they

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                          June 7, 2012

53

1    lived.
2         Q.   When did -- when did you stop working in the -- in
3    that storefront operation in the Town Center Mall?
4         A.   I was -- at the time, I was an employee of the
5    federal government for the United States House of
6    Representatives, and I would take leave of absence from my job
7    as an employee of the U.S. House of Representatives, and I
8    would go and work for the Tarrant County Democratic Party when
9    we would do those storefronts.  And I did that in the '98
10   cycle, the 2000 cycle and the 2002.  So 2002 was the last
11   cycle that I did that.
12        Q.   You were employed by U.S. House.  Did -- what was
13   your job at that time?
14        A.   I was a field representative on the staff of
15   Congressman Martin Frost.
16        Q.   And your grandmother, you said she votes by mail
17   typically?
18        A.   She votes by mail, yes.
19        Q.   And she's certainly eligible to vote by mail?
20        A.   Yes, definitely.
21        Q.   Do you know how many of your constituents don't have
22   the documents that would be necessary to get an ID under SB14?
23        A.   I do not know off the top of my head.
24        Q.   Can you identify any -- any specific constituent who
25   doesn't have the documents necessary to get a Photo ID under

54

1    SB14?
2         A.   No, I cannot think of anyone right now off the top of
3    my head.
4         Q.   Can you identify any registered voter in Texas who
5    does not have the documents necessary to get a Photo ID
6    required by SB14?
7         A.   Off the top of my head right now, I cannot tell you a
8    specific name.
9         Q.   And you mentioned with your grandmother that --
10   mentioned something about a birth certificate.
11             Do you know whether or not your grandmother has
12   a birth certificate?
13        A.   I don't even know if she does, no.
14        Q.   And other than your grandmother, you can't think of
15   any specific registered voter in Texas who doesn't have one of
16   the required forms of ID?
17        A.   I cannot think of anybody off the top of my head.
18        Q.   Are you doing all right?  Do you want to take a quick
19   break?
20        A.   No, I'm good.
21        Q.   If you want to take a break, let me know and I'm
22   happy to --
23        A.   No, no, no.
24             MR. DUNN:  Let's keep moving.
25        A.   Yeah, let's keep moving.

55

1         Q.   (BY MR. FREDERICK)  All right.
2         A.   If you see me moving around or anything, I'm just
3    trying to get comfortable and sit up.
4              MR. DUNN:  If you don't mind, can we pause one
5    minute while I run to the men's room?
6              MR. FREDERICK:  Yeah.  Yeah, of course.  Can we
7    go off the record for just a moment.
8              (Break was taken at 10:36 a.m. to 10:39 a.m.)
9         Q.   (BY MR. FREDERICK)  Are you familiar with the levels
10   of Photo ID possession by voters in Texas?  And by "levels," I
11   mean like the proportion or percentage of voters of different
12   groups that have Photo ID?
13        A.   I do not know off the top of my head.
14        Q.   So you're not familiar with the percentage of African
15   American voters who have a Photo ID required by SB14?
16        A.   No, I do not know that.
17        Q.   And would the same -- and you're not familiar with
18   the percentage of Anglo, Asian American or Hispanic voters who
19   would have the required ID under SB14?
20        A.   No.
21        Q.   Are you familiar at all with the -- with the Voter ID
22   law that was passed by Georgia?
23        A.   Yes, I'm familiar with it to a certain extent.
24        Q.   Are you familiar with the levels of Photo ID
25   possession by Georgia voters that is a percentage of African

56

1    American voters, Asian American, Hispanic voters in Georgia?
2         A.   No.  No.
3         Q.   Are you familiar with the levels of Photo ID
4    possession by voters in Indiana?
5         A.   No.
6         Q.   If you found out that there was actually no disparity
7    in ID possession among Texas voters, that is, if minority and
8    non-minority voters were not anymore less likely than each
9    other to have Photo ID, would you support SB14?
10        A.   I would have to look at the numbers very carefully to
11   see because based on my experience, I would not see -- based on
12   my previous employment experience, I wouldn't see how that
13   would be possible.
14        Q.   Right.  And I understand that --
15        A.   Right.
16        Q.   -- that you probably would disagree with that factual
17   premise.
18        A.   Uh-huh.
19        Q.   If you looked at data information that -- that showed
20   that minority voters were not any less likely to have the ID
21   required by SB14 -- well, I guess, if you looked at the data
22   and it actually did show that, would you then support SB14?
23        A.   No.  Because I believe that SB14, I believe the
24   intent is to -- is to win elections by discriminating against
25   minorities.  I think that that is like the intent of the bill.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                    June 7, 2012

57

1   I don't think the intent of the bill is to make sure that
2   people have a Photo ID when they go and vote.
3       Q.  You don't think the intent of the bill was to make
4   sure that people have a Photo ID --
5       A.  No --
6       Q.  -- when they vote?
7       A.  -- I do not.  I do not believe that.
8       Q.  And that is -- that's what the bill does, right?
9       A.  That is what the bill would do, but I think that the
10  intent of the bill is to win close elections.  I don't think
11  the intent of the bill is to make sure that everybody has an ID
12  when they go and vote.  I think the intent of the bill is to
13  make sure that people win elections by making sure that people
14  who are less likely to have a photo identification don't go and
15  vote, and so if there's an election -- like let's say there's a
16  swing district or something that would politically be
17  identified as a swing district, you know, sort of like the
18  Linda Harper Brown race in 2008 where it was decided by, I
19  think, 20 votes.  In that sort of scenario, if you could -- if
20  you figure a way how to scam one to 3 percent of the voters
21  from voting that were typically -- that are typically
22  minorities, then you could make sure that that sort of -- you
23  could get the desired outcome of that election, you know, by
24  making sure that -- by using a bill like this to prevent people
25  from voting.

58

1       Like I don't believe that the poll tax was to --
2   so people would have to pay to go and vote.  I think that the
3   poll tax was so people, you know, that didn't have the money
4   couldn't vote.
5       Q.  So if you -- even if you found out that minority
6   voters were just as likely to have the ID required by SB14, you
7   would still contend that the bill had a discriminatory purpose?
8       A.  Yes.
9       Q.  So if a legislator -- if any legislator believed that
10  SB14 wouldn't actually have a disproportionate impact on
11  minority voters, do you think that his or her vote for that
12  bill would be motivated by racial discrimination?
13      A.  Now say that again.
14      Q.  Sure.  If a legislator believed for whatever reason
15  that SB14 would not have any disparity -- disproportionate
16  impact on minority voters, would his or her vote in favor of
17  SB14 be racially discriminatory?
18      A.  Not necessarily.
19      Q.  Now, based on -- I mean, as I understand, based on
20  your testimony, you do believe that SB14 will have at least a
21  disproportionate impact on minority voters?
22      A.  Yes, I do believe that.
23      Q.  Is it you are understanding that other members of the
24  Texas Legislature believe that it will not have a
25  discriminatory impact on minority voters?

59

1       A.  There are other members of the Legislature that
2   believe opposite of me.  I think that is correct.
3       Q.  And so if someone were to believe otherwise, to
4   believe that this bill would not have a disparate or
5   Disproportionate impact on minority voters, they could support
6   the bill without being racially discriminatory, right?
7       A.  Repeat that one to me again.
8       Q.  Of course.  So if a legislator did believe that SB14
9   would not have a disproportionate impact on minority voters,
10  they could vote for the bill and support it without acting in a
11  racially discriminatory manner, right?
12      A.  I mean, if you're asking me about if I think that
13  people who vote for it, if they're committing discrimination --
14  I mean, obviously there are people that vote for it because
15  they think it's good public policy, and we just happen to
16  disagree on it.  I don't think that everyone that votes for it
17  is voting for it because they mean to be discriminatory.
18      Q.  And so the fact that -- I mean, the fact that
19  somebody thinks that this is -- "this" being SB14 -- is good
20  public policy and won't have a discriminatory impact on
21  minority voters, the fact that they would vote for it with that
22  belief that doesn't mean that it would be racially
23  discriminatory to support the bill?
24      A.  Right.  Yeah, if you're -- you know, if you represent
25  the Park Cities and you don't come into contact with very many

60

1   minorities, you may not -- you may have not seen the things
2   that I saw at Town Center Mall, and so you may just see it as
3   public policy.  You may not necessarily see it as
4   discrimination.  Your experiences in life may be at Park
5   Cities --
6       Q.  Okay.
7       A.  -- where everybody has IDs and passports and life is
8   good.
9       Q.  So it's possible that, you know, depending on
10  somebody's district -- well, I mean, based on somebody else's
11  life experience, they might -- that might lead them to just
12  think that there wouldn't be any racially discriminatory
13  impact?
14      A.  That's correct.
15      Q.  Okay.  Turn back to your -- to Exhibit 1, your
16  declaration.  I want to look at Paragraph 18.  It's on Page 4.
17      A.  (Witness complies.)
18      Q.  Are you there?
19      A.  Yes.
20      Q.  And is it accurate that this talks about amendments
21  that you offered to SB14 on the House floor?
22      A.  Correct.
23      Q.  Can you -- can you tell me what amendments -- okay.
24  So one of the first amendments, Amendment 11, would have
25  allowed a voter to complete an affidavit saying that they are

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com


ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                          June 7, 2012

61

1    the same person on -- on the voting roll, right?
2         A.  Correct.
3         Q.  And the second amendment, which is No. 21, would have
4    added employee ID cards with photos -- employer issued employee
5    ID cards with a photo as a valid form of ID; is that right?
6         A.  Correct.
7         Q.  If Amendment No. 11 had been accepted, do you think
8    you would have voted for SB14?
9         A.  I probably still would have had some concern about
10   SB14, but had Amendment No. 11 been accepted, then it certainly
11   would have been a sort of, you know, more proof to me that at
12   least, you know, people didn't want -- that people wanted
13   everyone to have the opportunity to vote.  And that was -- that
14   was -- which was the point that I made on the House floor when
15   I offered that particular amendment.  Because if you have a
16   paper trail of someone signing an affidavit, and you could go
17   back and examine that, you know, then that way you could prove
18   whether or not voter impersonation was taking place.
19        And so, you know -- and so by -- you know, when
20   that one was struck down, it just showed me that they really
21   weren't interested in, you know, trying to pass a bill to
22   protect the sanctity of the voting booth, that it was just
23   about, you know, politics.  It was about winning elections.
24        Q.  How would a provision that allowed a voter to
25   complete an affidavit stating that he or she was the person on

62

1    the voting roll, how would that prevent in-person voting fraud
2    in your view?
3         A.  Because if you have to sign an affidavit and there
4    are legal penalties that would be incurred, then most people
5    wouldn't do that.  I mean, that -- you know, that wouldn't be
6    something that people would be willing to risk so they could,
7    you know, cast, you know, a fraudulent vote.  That would be
8    enough to scare most people.
9         Q.  And obviously if you are the right -- I mean, if that
10   is actually you on the roll --
11        A.  Right.
12        Q.  -- you're not going to have any problem swearing?
13        A.  Right.  Exactly.
14        Q.  But if you -- I mean, say I -- if you are somebody
15   who is going in to cast a vote under somebody else's name, how
16   would a signature requirement in your view prevent -- prevent
17   that act of voter fraud?
18        A.  Because it's another step that the person would have
19   to take.  You vote, and then so the person would suspect that
20   you're doing something wrong, and they're asking you to come
21   over here and sign something because they're suspecting that
22   you're doing something wrong.  And so, you know, more than
23   likely, you would be like, you know, what -- you know, well,
24   let me come back when I find my ID.  I mean, somebody would
25   figure out some sort of way to get out of there in my opinion.

63

1    Most people are not going to take that -- that extra step to
2    commit some sort of a fraud when it's explained clearly to them
3    by signing this affidavit, you are committing perjury if this
4    is not you.  Do you understand that?
5         Q.  Uh-huh.  If the bill -- or if the law -- if the law
6    allowed people to complete an affidavit if they didn't have an
7    ID or if they forgot their ID, why would -- why would a poll
8    worker suspect that somebody is doing something wrong just
9    because they didn't have an ID?
10        A.  I would say that -- that some of the -- by some of
11   the e-mails and things like that that have been forwarded to me
12   that there is a -- sort of a stereotype that -- you know, that
13   some Republicans have of people that live in certain areas,
14   like the district that I represent, that there's a lot of, you
15   know, widespread abuse and cheating going on.  And so the poll
16   worker, you know, that may be working there, they may not be
17   from the community.  They may be a Republican poll worker that
18   is working, you know, in this particular, you know, polling
19   area, and they may come in with the impression or with, you
20   know, the stereotype that there is cheating going on in that
21   area.
22        And there was an e-mail that I specifically
23   referred to on the dias (phonetic) while we were -- before SB14
24   passed that, and it was someone calling for a poll worker.  It
25   was a former chairman of the Tarrant County Republican Party.

64

1    And basically the e-mail said, We know that there is cheating
2    going on, and basically, she was talking about the boxes in
3    southeast Fort Worth where we're currently located, that
4    there's cheating -- we know that there's lots of cheating and
5    voter fraud that goes on in that area, so we need election
6    workers to go and work here on election day.  And that was what
7    the e-mail stated.  And so someone that would come in with that
8    sort of a, you know, stereotype about a place, you know,
9    would -- would probably be suspicious of someone.
10        Q.  So the idea would be that if somebody is coming in to
11   maybe a more heavily minority community from outside, they
12   might have some idea that, oh, man, there's going to be a lot
13   of cheating here?
14        A.  I would say based on my experience, this past Session
15   particularly on the elections committee and on this committee
16   and based on the -- the testimony that I heard for not just
17   Photo ID, but lots of bills related to election, that I would
18   say that that particular stereotype of people that live outside
19   of the minority community is unfortunately pretty prevalent.
20        Q.  If a poll worker -- if a poll worker suspected that
21   there might be cheating, and voters, even if they lacked Photo
22   ID, could sign an affidavit that they were who they said they
23   were, and that was just part of the ball, how would that allow
24   the poll worker to -- even if they were suspicious, how would
25   that let them identify people who were cheating or voting for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                      June 7, 2012

---

65

1   somebody else?

2     A. Uh-huh. Well, I mean, if someone were voting like --

3   and they're just not going to vote -- and they're just not

4   going, you know, to just cast -- sign the book and move on, but

5   there's a separate book they have to sign for people that are

6   suspected of cheating, well, then you're singled out. You're

7   like, come over here. I need for you to sign this book. You

8   do not have the proper ID. I need for you to sign this. This

9   is going to be checked. This is going to be authorized. So

10   we're going to call you, you know, Jerry Smith or John Doe to

11   see did he really vote this day and to see is it really, you

12   know, this person.

13       And so, you know, you can actually investigate

14   it a lot easier that way if someone is signing an affidavit

15   that is separate from the book that everyone signs when they go

16   to vote. And so for people to actually take the time to do

17   that, you know, they better make sure that when the voter --

18   when the Tarrant County election administration or whomever or

19   the investigator from the AG's office, then they better -- that

20   Jerry Smith better be at that house because this affidavit has

21   been signed stating that Jerry Smith that lives at 123 Main

22   Street is, in fact, this person. And if not, then there could

23   be some -- obviously some very serious criminal penalties to

24   pay.

25     Q. So in that case if we've got somebody -- somebody's

---

66

1   coming in and they -- maybe they've got Jerry Smith's -- maybe

2   they just want to vote for Jerry Smith, so they'll go -- they

3   got to sign a book or sign an affidavit so they would -- I

4   would think they would sign Jerry Smith, right?

5     A. Right.

6     Q. And so if someone followed up and said, okay, we're

7   going to check -- we're going to check this affidavit and see

8   if this was actually Jerry Smith. So they call Jerry Smith and

9   Jerry Smith says, I don't know who that was. I didn't vote

10   there.

11     A. Right.

12     Q. They still wouldn't know who voted, though, would

13   they?

14     A. Not necessarily. They wouldn't necessarily know who

15   voted, but they would know that that was a vote that didn't

16   count and that vote would be thrown out.

17     Q. You mentioned a separate book, and I confess, I'm not

18   familiar with this amendment, No. 11 specifically --

19     A. Uh-huh.

20     Q. -- but would it have provided for a separate book or

21   a separate list of people who had to sign because --

22     A. Yeah, absolutely. Yeah, the idea of this amendment

23   was for someone who is suspected of committing voter

24   impersonation or voter fraud, for them to have to sign an

25   affidavit stating that they are who they are, and the vote

---

67

1   would count unless they were to go back and -- and it was

2   proven that they were not that person. And so, yeah, it would

3   be a totally -- the idea was for them to have to sign a form,

4   you know, stating that they -- who they are, like something

5   totally separate than the book that you normally sign so that

6   could be examined separately from the rest of the role. That

7   was the exact intent of that amendment.

8     Q. And did that amendment include a requirement that all

9   of the signatures and all the affidavit signatures be verified

10   individually?

11     A. I would need to go back and look at the amendment. I

12   don't remember exactly, but -- but in drafting the amendment,

13   that was certainly what I had in mind, was for those sorts of

14   things to be able to be examined.

15     Q. But under the, you know, the hypothetical we were

16   talking about where voter impersonator or fraudulent voter

17   comes in, signs somebody else's name on the affidavit,

18   unless -- unless somebody recognizes that person who signs the

19   affidavit to be somebody else, there's really no way for that

20   person -- the fraudulent voter to be caught, is there?

21     A. There may not be a way for the fraudulent voter to be

22   actually caught, but at least the vote wouldn't count. And I

23   think that from everyone that I heard that came to testify,

24   they were more concerned -- they weren't necessarily concerned

25   with people being caught, they were more concerned with making

---

68

1   sure that votes that are fraudulently cast aren't counted. And

2   you could do that by having a fail-safe affidavit.

3     Q. So Amendment 21, that would have added an employee

4   identification card with a photo, right?

5     A. Yes.

6     Q. Do you believe that an employee ID would be easier to

7   forge or fake than a state-issued ID?

8     A. It -- I mean, it would certainly depend. You know,

9   if you worked at Lockheed, probably not. You know, it probably

10   wouldn't be very easy to forge that sort of ID. But, yeah --

11   but I thought that having, you know, an ID, you know, once

12   again, you know, with your picture on it, whether it's your --

13   it could be at Tarrant County College or any place just

14   stating -- showing that you are who you say you are, you ought

15   to be able to vote with that. And if -- you know, once again,

16   if someone suspected there was some sort of a, you know,

17   mischief going on or some sort of cheating going on, the person

18   could, you know, again, sign an affidavit, you know, stating

19   that they are the person that's on the work ID.

20     Q. Is it possible that -- that depending on the

21   employer, some employee IDs could be easier to forge than a

22   state ID?

23     A. Yes. I could see where someone would say that.

24     Q. If employee IDs were allowed and a poll worker could

25   make the decision to make somebody who presented an employee

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                                    June 7, 2012

69

1    Photo ID, you know, go sign an affidavit, was there any concern
2    that that would create a potential -- create a potential burden
3    on any group of voters who would be less likely -- or who would
4    be more likely to only have employee ID?
5        A.   Right.  Right.  No, I don't remember that being, you
6    know, discussed at all.  I think what we were trying to do was
7    to make sure that people have -- you know, take less of the
8    burden off of the voter.  Because the way that SB14 is written,
9    it puts much more of a burden on the voter that has an expired
10   driver's license, on the voter that only has college ID, or the
11   voter that only has a work ID.  So we wanted to take less of a
12   burden off of them and provide more opportunities for everybody
13   to be able to vote.
14       Q.   Were there any studies -- excuse me -- any studies
15   that you're aware of to determine how many Texas voters might
16   have an employee Photo ID?
17       A.   No.
18       Q.   And there weren't any studies to determine how many
19   Texas voters might have an employee Photo ID but not another
20   Photo ID?
21       A.   No.
22       Q.   Do low-wage workers typically have photo employee
23   IDs?
24       A.   I would not be able to make that sort of a blanket,
25   you know, statement about any, you know, group or demographic.

70

1        Q.   Have you ever worked at a minimum wage job?
2        A.   Yes, I have.
3        Q.   Okay.  Did you have an employee Photo ID?
4        A.   Right now, the Texas Legislature.
5        Q.   Fair enough.  That's probably below minimum wage.
6        A.   Yeah, exactly.
7        Q.   Other than the Texas Legislature --
8        A.   Yes.
9        Q.   -- have you ever worked a minimum wage job?
10       A.   Yes.
11       Q.   Did you get a photo employee ID there?
12       A.   I'm trying to remember what's the last -- my minimum
13   wage jobs.  I'm trying to -- the jobs that I had in college and
14   in high school, we had -- yeah, we did have a Photo ID at
15   Kroger, didn't we?  That was 20 years ago, but it seems like we
16   did have an ID that we had to check in that had our photo in it
17   when we signed in every day.  We had to swipe a card.  But,
18   yeah -- but, yeah, it's been so long.  I can't remember which
19   places -- which minimum or, you know, lower wage jobs I had,
20   hourly jobs that required a photo ID and which ones did not.
21   Yeah, I want to say when I worked at Kroger when I was in high
22   school that we did have to swipe in with a card that had -- I
23   remember we swiped in with a card, and it seems like it did
24   have our ID on it.  Yeah.  I mean, our picture on it.
25       Q.   Right.

71

1        A.   Yeah.
2        Q.   Do you think it's possible that people at lower wage
3    or hourly jobs might be less likely to have a photo employee ID
4    than people at salaried or higher paying jobs?
5        A.   I think it would depend on the place.  It would --
6    you know, it would depend on a lot of -- whether or not the
7    place wanted it, whether or not -- how high secure it was.
8    Obviously, if you work at -- you know, if you sweep the floors
9    at Lockheed or American Airlines, you're probably going to have
10   to have an ID even if you're making $7 an hour.  So I think it
11   would just depend on the place, and I think it'd be hard to
12   just make a blanket --
13       Q.   Do you believe that minority voters would be less
14   likely than nonminority voters to have a photo employee ID?
15       A.   It would -- I wouldn't be able to make that
16   assessment.
17       Q.   And you say -- and there weren't any studies that
18   you're aware of to determine rates of employee Photo ID
19   possession?
20       A.   No.  I think the intent of the amendment, again, was
21   just to give people an opportunity to vote just in case -- you
22   may have someone that works a -- you may have somebody that
23   their IDs expired.  Maybe they're driving with an expired
24   license because they can't go and get their license --
25   expired -- because they just don't have the money.  They just

72

1    had to get their car repaired, or they just had a big hospital
2    expense come through, or they had to buy cap and gown for their
3    kids to graduate or whatsoever.  And so they -- you know, you
4    put off, you know, paying Peter to pay Paul or what have you.
5    And so you may -- you know, you may -- and you may want to go
6    vote, but your ID is expired, you know, so you can make your
7    life better so you don't have to -- so you're not having to go
8    by paycheck to paycheck.
9            And so if your driver's license is expired but
10   you still want to go vote to try to make your life better
11   because you want to vote for somebody that you think will help
12   improve the community, the idea was just to let that person
13   have an opportunity -- the person that couldn't go and get that
14   license or didn't have the money to go and get a birth
15   certificate to get the free ID or whatever it is.  It's taking
16   the burden off of them so they could have another form of ID to
17   vote.
18       Q.   But there wasn't any evidence that you saw that would
19   indicate how much of a burden that might take off the voters?
20       A.   No.  No, there was not.
21       Q.   I'm going to move on to Paragraph 19 on the next page
22   of your declaration.  And this is talking about Amendment No.
23   55 that you authored.  It says that the bill -- that this
24   amendment would have prevented implementation of the bill if
25   Secretary of State determined that the majority of voters



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                        June 7, 2012

73

1   without an acceptable form of photo identification were racial
2   or ethnic minorities.
3       A.  Uh-huh.
4       Q.  Is that an accurate statement?
5       A.  Yes.
6       Q.  Do you know whether it would be possible for the
7   Secretary of State to determine the race or ethnicity of
8   registered voters in Texas?
9       A.  Well, the idea of this particular bill -- and I
10  called this my -- what I specifically called this was my --
11  this was my conservative talk radio amendment, and this was an
12  amendment -- because oftentimes on conservative talk radio, you
13  will hear -- is people will say, if you show me that there is
14  discrimination, if you can prove to me without a shadow of a
15  doubt that there is discrimination, I'll go out there, and I'll
16  march with, you know, this civil rights leader.  Or I'll go out
17  there and I'll say there was discrimination too, but if not
18  then it's just people saying that there is discrimination going
19  on with no proof.
20          And so what this particular amendment was
21  designed to say, this was the talk radio amendment.  This was
22  the amendment that if people -- if this bill were to pass,
23  SB14, and become law and there were African Americans and
24  Hispanics that lived in Fort Worth and Dallas and no matter
25  where, and it was proven that it was -- it had a discriminatory

74

1   effect, then we could, you know, temporarily, you know, stop
2   the bill because we wouldn't want to have a bill in place that
3   was discriminating against people.
4           So basically what this amendment said was, Hey,
5   if there is proof after election day that people were being
6   discriminated against then, you know, then we need to -- we
7   need to stop the bill from taking place because no one --
8   everyone says that they're against discrimination.  You know,
9   it doesn't matter if you're a conservative, Democrat,
10  Republican, liberal.  Everyone says that they're against
11  discrimination.  So here's discrimination.  We saw that it took
12  place after this bill passed, so let's stop it in its tracks
13  right now.
14      Q.  Okay.  So the idea was to -- was the idea to have an
15  election where ID was required and then determine, based on
16  votes cast in that election or votes not cast --
17      A.  Right.
18      Q.  -- how many people were not able to -- not able to
19  have their vote count because of lack of ID?
20      A.  Right.
21      Q.  Okay.
22      A.  Right.
23      Q.  Okay.  So it was kind of to have a test of the Photo
24  ID requirement and then --
25      A.  Right.  Right.  Exactly.

75

1       Q.  -- and then see what happened?
2       A.  Exactly.
3       Q.  In your understanding, would it be possible under
4   Section 5 to implement SB14 kind of on a test basis to
5   determine whether it would have any discriminatory effect?
6       A.  Can you say that again.  I'm sorry.
7       Q.  Sure.  In your understanding -- and I understand
8   you're not a lawyer -- would it be possible for Texas to
9   implement SB14 on, you know, kind of a test basis for one
10  election in order to determine whether it would have a
11  disparate impact on minority voters?
12      A.  No, I would not be for -- you mean being given a test
13  run basically?
14      Q.  Right.  Right.
15      A.  No.
16      Q.  Isn't that what this amendment would do?
17      A.  No.  What this amendment would do -- and this is --
18  basically if the bill -- if it were -- if we were -- you know,
19  obviously, you know, my belief is that there would be
20  discrimination.  And so if there is discrimination, then, no,
21  we would have to, you know, immediately stop the law from --
22  the Secretary of State would have to stop the law.  And it's
23  not really written that way on here.  But that -- but that is
24  what -- that is the intent of that particular amendment.  But,
25  yeah -- but you're right, though, it is -- the way it's written

76

1   on there, it's not -- it's kind of vague.
2       Q.  Okay.  So your understanding when you proposed the
3   amendment was that whatever you want to call the -- you know,
4   the test election or the first election there that would be
5   gathered, that would take place after the appearance?
6       A.  Yeah, it would have further prevented the
7   implementation of the bill if the Secretary of State determined
8   that the majority of voters without an acceptable form of ID,
9   identification or racial or ethnic minorities.
10      Q.  I understand.
11      A.  But that -- further should be in there.
12      Q.  So how would the Secretary of State have determined
13  the race or ethnicity of voters?
14      A.  Well, I mean, I think that the media -- you know
15  different, organizations, if someone -- if after election date
16  occurs and the people that were turned away were
17  disproportionately African American and Hispanic, then that
18  evidence could be offered up to Secretary Andrade's office.
19  And that was -- and I think that would be you, know, pretty
20  easy to determine.  Like if -- like if in all of Tarrant
21  County, you know, my district and representative -- the
22  district Representative Lon Burnam represents, if those two
23  districts were disproportionately affected by SB14, then we
24  know that there's an issue.
25      Q.  So under this Amendment 55, was it your intention, or

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                          June 7, 2012

77

1  did the amendment provide for actual data collection by the
2  Secretary of State?
3      A.  I don't recall it -- you know, of course, it's been a
4  while, and so I don't recall it saying that.  But I would need
5  to go back and look at the -- exactly how the amendment was
6  written.  I may have had something there for data collection,
7  maybe I didn't.  I'm not sure.
8      Q.  Do you recall if there was any -- if there were any
9  funds provided for in this amendment to allow the Secretary of
10 State to, you know, conduct the study or collect the data?
11     A.  No, I do not.
12     Q.  Do you think it's possible that the -- that this
13 amendment was not accepted because it would have placed a heavy
14 burden on the Secretary of State's office?
15     A.  No.  I just -- no.  I -- my personal belief is that
16 it was not accepted because, you know, people wanted a strict
17 bill and that was going to be the end of it.  That any serious
18 consideration to prevent discrimination or what have you was
19 never really the concern of the people that were for the bill.
20     Q.  You mentioned a moment ago that under this -- under
21 Amendment No. 55, you thought maybe the media and organizations
22 would be able to determine who was prevented from voting by the
23 Photo ID bill; is that right?
24     A.  Uh-huh.
25     Q.  Do you think that -- do you think it would be

78

1  acceptable for the Secretary of State to rely on media reports
2  and reports of nongovernmental organizations in making a
3  determination about whether a law can take effect?
4      A.  I think that -- that we oftentimes rely on the media
5  to, you know, uncover fraud or bring certain things to
6  revelation for the public, and government will act on that.
7  So -- and so just like I said, I would need to go back and look
8  at the amendment to see how it was worded.  I don't know if I
9  had anything in there for data collection or not.  But, you
10 know, I know that, you know, even outside of the media that,
11 you know, that if someone couldn't vote, I would probably get
12 calls at my office the next day saying, hey, you know,
13 Representative Veasey, I tried to go vote and I took, you know,
14 my card up there that I got from this social service agency
15 that, you know, helps me and I was not able to vote, but I had
16 been doing it before but I couldn't this time.  And so I would
17 think that I would probably get calls from those, you know,
18 voters as well.
19          And so I just think that if there was any
20 evidence and the Secretary of State's office, you know,
21 determined that those voters were ethnic minorities and
22 something should be acted upon.  We just shouldn't say, well,
23 they were discriminated against, and -- well, but they'll get
24 it next time.  I mean, we need to -- you know, something should
25 be acted upon to make sure that doesn't happen again.

79

1      Q.  But this Amendment 55 would have allowed however the
2  data was collected, whether it was actual data or media
3  reports, it would have allowed the Secretary of State to make
4  the determination; is that right?
5      A.  If it were proven to be accurate.  I mean, we
6  wouldn't want anything -- any sort of law passed or any -- or
7  any sort of action taken by any, you know, state agency just
8  based on any sort of, you know, rumor or innuendo.  It would
9  need to be something that was proven.
10     Q.  And so how would the Secretary of State go about --
11 under this Amendment No. 55, how would the Secretary of State
12 determine whether -- you know, whether the facts or the reports
13 or whatever were accurate?
14     A.  Well, I mean, they would have to -- I mean, it's
15 their job to make sure that voting is done, you know, legally
16 and correctly here in the state and that certain laws are
17 followed.  And so I don't know -- I don't know why they
18 wouldn't be able to, you know, ascertain whether or not someone
19 were discriminated against when they went to go vote.  I don't
20 see why they wouldn't be able to easily, you know, verify that.
21     Q.  Do you know whether or not the Secretary of State's
22 office collects racial data on people who register to vote?
23     A.  I'm not certain of that.
24     Q.  If the Secretary of State's office did not collect,
25 you know, or did not have a record of every registered voter's

80

1  race or ethnicity, would they be able to -- would they be able
2  to make the determination provided for in this Amendment No.
3  55?
4      A.  I don't see why they wouldn't be able to.  I mean,
5  they do many other things that are related to voting.  I don't
6  know why they wouldn't be able to put this into their purview
7  if and -- because their job is to make sure that people can
8  vote, that people understand about voting, that people
9  understand the various laws related to voting.  So if someone
10 were discriminated against, I don't know why they wouldn't be
11 able to determine that there was discrimination that took place
12 and make some sort of an action or some sort of a, you know,
13 recommendation on how to prevent that discrimination from
14 taking place in the future.  It just -- it seems -- it just
15 seems very -- it just seems very reasonable to me.  As a state
16 legislator and having served on relations committee, it just
17 seems reasonable to me that they would be able to do this
18 without there being any sort of a -- even any sort of a fiscal
19 impact to the office at all.
20     Q.  For this Amendment 55, did you conduct any study or
21 analysis of the fiscal impact?
22     A.  I believe that there was no fiscal impact on that.  I
23 would need to go back and check, but I believe that there
24 was -- that it was determined that they could probably just do
25 that just as their every day regular duty.  I mean, if people



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

85

1   various county election administrators.
2       Q.   But voter registration cards don't indicate race, do
3   they?
4       A.   I think that there is an option on there if you want
5   to put what race you are, but it's optional.  I don't think
6   that you have to.
7       Q.   Okay.  So based on registration -- voter registration
8   records alone, that might not allow the secretary to determine
9   the race of every voter who was not able to vote?
10      A.   No.  No.  And you may have a voter that they may have
11  a Hispanic surname, but they may be married to someone that's
12  Hispanic.  So --
13      Q.   Have you talked about this lawsuit with anybody other
14  than, obviously, your lawyers or the Department of Justice?
15      A.   If I have, it's just been kind of, you know,
16  like -- like I stated earlier with like family or friends
17  saying, hey, I'm a plaintiff in this lawsuit.  I think it's
18  been in the newspaper that I'm a plaintiff in the lawsuit,
19  so -- but, yeah -- but as far as like, you know, declarations
20  or anything specific, no.
21      Q.   You haven't discussed this lawsuit with any of the
22  other parties?
23      A.   I don't believe so.  I know if I have, it's just been
24  in passing, but I don't believe so, though.
25      Q.   I'm going to move to a different area.

86

1           Have you ever called point of order on a bill.
2       A.   Yes, I have.
3       Q.   Do you recall -- do you recall when you have done
4   that?
5       A.   I don't remember every time that I've done it, but,
6   yeah -- I mean, but there's one time in specifically that I
7   remember, but I can't remember every time that I've done
8   that.
9       Q.   What's the specific time you remember?
10      A.   There was a Republican from -- that represented New
11  Braunfels, and they had prevented a fairly, you know, innocuous
12  bill that I had from coming out of their committee, and they
13  did it just because I was a Democrat, and based on the
14  conversations that I had with other people that was Republicans
15  and Democrats on the committee.  And they did it for the
16  chairman of the committee who was a Republican, and it was
17  just -- it wasn't like I was asking them to, you know, let some
18  major, you know, liberal piece of legislation out.  I mean, it
19  was a fairly -- and so -- and he had a point of order that the
20  parliamentarian could absolutely not overrule.  I mean, it was
21  just -- it was very black and white, and they could not
22  overrule my point of order, and so that killed his bill.  And I
23  remember it specifically because some people from New Braunfels
24  called the office and asking did I have anything against New
25  Braunfels.  And so that's why I specifically remember that one.

87

1       But I know I've called points of order more often than that.
2       Q.   So you called a point of order on a bill -- on this
3   Republican from New Braunfels on his bill?
4       A.   Right.
5       Q.   And you called a point of order because he had
6   prevented one of your bills from coming out of his committee?
7       A.   Right.
8       Q.   Do you remember what the bill was?
9       A.   I say it was from coming out of my committee.  It
10  was -- he had prevented a bill that I had from going under the
11  local and consent calendar.  The bill passed -- it passed like
12  eight to one, but it got put on the general calendar, which
13  means that it probably died.
14      Q.   Do you remember what that representative's bill was
15  that you called a point of order on?
16      A.   I don't remember specifically.  It was a local
17  government bill.
18      Q.   When are points of order used in a Legislative
19  Session?
20      A.   Points of order are used in a Legislative Session
21  when another member doesn't agree with the bill.  And so, you
22  know, they scrub the bill or their staff scrubs the bill to see
23  if there are any issues within it, and they call a point of
24  order.
25      Q.   So it's done to -- is it accurate to say that points

88

1   of order are called to prevent a specific bill from going
2   forward?
3       A.   Yes.
4       Q.   Did you call a point of order on the Voter ID bill,
5   on SB14?
6       A.   I do not recall.
7       Q.   You don't recall whether you did or not or --
8       A.   Correct, I do not.
9       Q.   If there had been a sustainable point of order on
10  SB14, is it safe to assume that it would have been called by
11  somebody who opposed the bill?
12      A.   Yes.
13      Q.   And SB14 was sent back to the committee in the House
14  based on procedural defects; isn't that right?
15      A.   That is -- I don't remember exactly why, but I do
16  remember that there was a point of order on it that was sent
17  back.
18      Q.   And it got sent back --
19      A.   Right.
20      Q.   -- on a point of order?
21      A.   Right.
22      Q.   And whatever the defect was, did that get remedied
23  out for -- the point of order was called?
24      A.   It must have because the bill end up passing.
25      Q.   Is a point -- is point of order, is that part of the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

89

1   House rules?
2      A.  Yes.
3      Q.  So calling a point of order is a way to use the House
4   rules to stop a bill or at least slow it down, right?
5      A.  Right.
6      Q.  And there are other House rules that can be used to
7   expedite a bill, right?
8      A.  Yes.
9      Q.  Like, for instance, five-day posting rule?
10     A.  Suspend the rule, absolutely.
11     Q.  What is chubbing?
12     A.  Chubbing is a -- sort of a -- I would describe it as
13  sort of a -- an informal term that is used to -- when members
14  go to the back mic and they ask the author of the bill lots of
15  questions, or if a bill, particular lots of questions, to
16  prevent a bill that is far back in the general calendar from --
17  from taking place.
18     Q.  So in chubbing, a -- so when a bill is chubbed, does
19  that mean that questions are asked about different bills?
20     A.  Correct.
21     Q.  And is the idea -- is the idea to talk about bills
22  that are in front of a bill and kind of order of business in
23  order to just prevent that bill from coming up?
24     A.  Right.  Right.  Exactly.
25     Q.  Is that usual -- I mean, to the extent that there is

90

1   any usual use of chubbing, is it usually done on bills that
2   might not otherwise get a lot of debate?
3      A.  That -- yes and no.
4      Q.  And let me -- as soon as I asked the question, I
5   realized it wasn't very clear.
6         In chubbing when members go to the back mic and
7   ask questions about bills that are in front of --
8      A.  Right.
9      Q.  -- of the line, does it matter what -- does it matter
10  what those bills are?
11     A.  No, it doesn't matter what the bills are.  It does
12  not --
13     Q.  So you just -- is the idea chubbing --
14     A.  It could be a very serious bill, or it could be a
15  bill that would normally just pass out, but, yeah.
16     Q.  But the idea is just to talk about whatever is coming
17  up --
18     A.  Right.
19     Q.  -- just to --
20     A.  Right.
21     Q.  -- to eat up the clock?
22     A.  Right.  It's the House version of the filibuster.
23     Q.  Where is the rule regarding chubbing in the House
24  rules?
25     A.  I do not know if there is a rule on House chubbing.

91

1      Q.  So you're not aware that there is a provision for
2   chubbing in the House rules?
3      A.  No.
4      Q.  Did you engage in any chubbing in the 2009 Session of
5   the Legislature?
6      A.  I do not recall, but -- yeah.  I do not recall if I
7   did or not.
8      Q.  Do you recall that there was any chubbing done in the
9   House in 2009?
10     A.  I would say that there is chubbing that takes place
11  on both sides every Session, particularly towards the end of
12  the Session.  So if you told me that someone did, it would
13  not -- it wouldn't surprise me.  I wouldn't be startled.
14     Q.  Do you recall that there was chubbing in relation to
15  the Voter ID bill, SB362 in 2009?
16     A.  I do not recall.
17     Q.  Do you believe that chubbing is a legitimate maneuver
18  to kill or slow down a bill?
19     A.  Yes.
20     Q.  There was an amendment to the House rules in 2011 --
21  there was an amendment in 2011 to the House rules to limit the
22  practice of chubbing; is that right?
23     A.  I do not recall.
24     Q.  Would you have any reason to dispute that there was a
25  rule change in 2011 to limit chubbing?

92

1      A.  No, I would not.
2      Q.  But you do not recall a specific amendment to the
3   rules?
4      A.  No, I do not.
5      Q.  Have you ever amended a piece of legislation that was
6   under consideration in the House?
7      A.  Yes, I have.
8      Q.  What's the vote count that's required to amend a bill
9   before the full House on second reading?
10     A.  A majority.
11     Q.  A simple majority on second reading?
12     A.  Right.
13     Q.  Is that true for both House bills and Senate bills
14  there on second reading?
15     A.  For Senate bills -- I believe so on Senate bills.  I
16  would need to check to be certain on that, but I believe so.
17     Q.  So it's your understanding that to amend a Senate
18  bill on the House floor, it just requires a simple majority to
19  amend it?
20     A.  I would need to go back -- I would need to go and
21  check on that -- on the Senate to be for sure.  There's --
22  there was one controversy.  We had a home owner's association
23  that -- and it was a Senate bill, and I can't remember.  I'm
24  just -- I'm just temporarily at a loss on the Senate bills.
25     Q.  Have you ever amended a Senate bill that was under



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1   consideration in the House?
2       A.  I don't -- I do not recall.
3       Q.  Are you familiar at all with the Senate rules?
4       A.  No.
5       Q.  Do you know whether a vote in the Senate to concur or
6   got to conference on a bill is decided by a simple majority?
7       A.  I'm not sure.
8       Q.  Do you recall -- in the 2011 Legislature, do you
9   recall how many days past between the day SB14 was referred to
10  committee and the date of the committee hearing?
11          MR. DUNN:  Do you know which committee
12  conference or --
13      Q.  (BY MR. FREDERICK)  Oh, this would be -- this would
14  have been the select -- not the conference committee.  Do you
15  recall how many days passed between the day the bill was
16  referred to committee and the date of the committee hearing?
17      A.  I do not.
18      Q.  If I represented to you that SB14 was referred to the
19  select committee on February 9th, 2011, does that refresh your
20  memory?
21      A.  Not really, it does not refresh my memory.  I do
22  remember that it -- that it happened early on in the months.
23  The House members was both Republican and Democrat where that
24  he wanted to make sure that he had it done quickly so that
25  the -- you know, so the conservatives weren't mad at the

94

1   speaker.
2       Q.  As you sit here, would you have any reason to dispute
3   that the bill -- that SB14 was referred to committee on
4   February 9th, 2011?
5       A.  No, I would not have any reason to dispute that.
6       Q.  Do you recall that the hearing on SB14 in the
7   committee was posted on February 22nd, 2011?
8       A.  No, I don't have any reason to dispute that.
9       Q.  And if I represented to you that the hearing was --
10  the hearing on SB14 in the committee was held on March 1st,
11  2011, would you have any reason to dispute that?
12      A.  No.
13      Q.  So based on that, would you have any reason to
14  dispute that there was seven days that passed between the date
15  the hearing was posted and the date that the hearing was held?
16      A.  No, I would have no reason to dispute that.
17      Q.  What's the -- what's the normal rule for how long a
18  hearing has to be announced before it's held in the House?
19      A.  There is a -- what is it?  A 48-hour layout rule
20  or -- I can't remember the time period exactly.  But it's -- I
21  want to say it's 48 hours.
22      Q.  Okay.  Is there a -- is there a five-day posting
23  rule?
24      A.  I believe so.  I think that's right, yeah.
25      Q.  And so whether it's a 48-hour layout rule or a

95

1   five-day posting rule, seven days would be more than the
2   required notice, right?
3       A.  Right.
4       Q.  Is it unusual to provide more than the required
5   notice for a committee hearing in the House?
6       A.  Is it unusual to provide more?
7       Q.  More than the required notice?
8       A.  I couldn't say whether it's unusual or not.  The only
9   time that people really notice is when -- if a rule was
10  suspended.
11      Q.  And you were a member of the select committee on
12  voter identification and voter fraud in 2011, weren't you?
13      A.  That is correct.
14      Q.  Were you the vice chair of that committee?
15      A.  That is correct.
16      Q.  And so you attended the committee hearing -- the
17  select committee's hearing of SB14?
18      A.  Yes, absolutely I did.
19      Q.  How long did that committee hearing last?
20      A.  I want to say it lasted two days.
21      Q.  Okay.  Is that more than -- is that more than the
22  average committee meeting?
23      A.  Yes.
24      Q.  Is there kind of a ballpark in your mind range of how
25  long a typical committee hearing lasts?

96

1       A.  No, it just depends on the bill.
2       Q.  But two days is longer than average?
3       A.  Two days is longer than average for a controversial
4   bill, not necessarily.
5       Q.  But compared to --
6       A.  But compared to, yeah if you're just passing a bill
7   to, you know, allow cities to build spray parks, then, yeah,
8   you know, that's going to pass out in the committee really
9   quickly.  But, yeah, if it's really controversial, a bill in
10  public health or state affairs, you know, sometimes that
11  will -- it'll go into the next day if it's a really
12  controversial bill.
13      Q.  Do you recall how much time passed between the time
14  of the select committee's hearing of SB14 and the floor debate
15  in the House on SB14?
16      A.  I do not recall.
17      Q.  If I represented to you that it was two weeks, would
18  that refresh your memory?
19      A.  It would not refresh my memory, but considering that
20  I remember that he called the bill pretty early on during
21  Session, I would say that -- that that would -- yeah, that
22  wouldn't surprise me.
23      Q.  Do you believe that members of the public were given
24  adequate time to participate in the Voter ID hearing in the
25  House?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                      June 7, 2012

97

1    A.  Now, I do not know that.
2    Q.  Do you believe that the public was given adequate
3  notice of the committee hearing on SB14 in the House?
4    A.  I do not know.
5    Q.  Do you believe the public was given adequate notice
6  of the floor debate on SB14 in the House?
7    A.  I would need -- I would need to go back and check.
8    Q.  If there were -- if there were two weeks between the
9  committee vote and the floor debate, would that be adequate
10  notice to the public about the floor debate?
11    A.  I would say, yes.
12    Q.  And if there were seven -- if the committee hearing
13  were posted seven days before it was held, would that provide
14  adequate notice to the public about the committee hearing?
15    A.  I would say, yes.  It would still be tough to get
16  people to come in on a weekday or something like that to
17  testify on a bill, but I would say -- but generally speaking,
18  yes.
19    Q.  Would you agree that representatives to the Texas
20  House have a duty to represent their constituents?
21    A.  Yes.
22    Q.  Would you agree that an elected official's most
23  important duty is to represent his or her constituents?
24    A.  Yes.
25    Q.  And would you agree that part of the duty of an

98

1  elected official in representing his or her constituents is to
2  enact policies that his or her constituents favor?
3    A.  Yes.
4    Q.  Would you agree that there's nothing wrong when a
5  representative votes for a policy that's favored by his
6  constituents?
7    A.  I mean, it depends.  I mean, if they -- whether or
8  not they believe that that's the right policy.  But generally
9  speaking, I would say I would agree with that.
10    Q.  So as long as -- fair enough.
11    A.  As long as a representative believes that it's
12  good policy --
13    A.  Right.
14    Q.  -- there's nothing wrong with voting for a policy
15  that's favored by one's constituents?
16    A.  Right.
17    Q.  And generally speaking, it's politically rationale
18  for an elected official to vote for policies that his
19  constituents with favor?
20    A.  Right.
21    Q.  Do you have any basis to dispute that Photo Voter ID
22  for voting is supported by a majority of voters in Texas?
23    A.  The majority of voters in Texas?
24    Q.  Voters in Texas.
25    A.  That would not surprise me.

99

1    Q.  Have you seen any -- are you familiar with polling
2  about -- polling of Texans to determine support for Photo Voter
3  ID requirements?
4    A.  Yes, I have.
5    Q.  Do you recall specific polls you've seen?
6    A.  I don't recall specific polls that I've seen, but I
7  know that during the Voter ID debate, that those particular
8  polls were often cited.
9    Q.  Do you recall what the polls showed?
10    A.  The polls showed that -- that there was support for
11  Voter ID.  But, of course, with the way that the polls were
12  worded, I think that would be the reason why you would see the
13  results the way they were.  I think that if I were to conduct
14  the poll and I worded it the way that I wanted, I think that I
15  probably could have gotten a little bit different results.
16    Q.  Do you recall any of the specific wording in the
17  polls that were discussed in the legislative debate on SB14?
18    A.  I don't remember anything specifically, but I do know
19  they were cited.
20    Q.  How would you -- if you were to conduct a poll on --
21  you know, of Texans on support for Photo Voter ID, how would
22  you phrase the question?
23    A.  I would say do you favor a Voter ID bill that puts
24  a -- has to proof -- has to put a burden on the voter to prove
25  who they were and may have a discriminatory effect on certain

100

1  voters, would you still be in favor of it.  I would ask
2  something along on those lines instead of are you for a Photo
3  ID bill.  I wouldn't just ask that way.  I would like, you
4  know, ask based on what I believe, you know, the bill does.
5    MR. FREDERICK:  Would you please mark this as
6  Exhibit 2.
7    (Deposition Exhibit No. 2 was marked.)
8    Q.  (BY MR. FREDERICK)  So the court reporter has just
9  handed you a document that's been marked Deposition Exhibit 2.
10    A.  Yes.
11    Q.  Are you familiar with this document?
12    A.  No, I'm not familiar with this document.
13    Q.  What does this document appear to be?
14    A.  It is a -- it looks like it's a poll.  It looks like
15  it's a survey.
16    Q.  And it's a survey or a poll conducted by Lighthouse
17  Opinion Polling; is that right?
18    A.  That would be correct.
19    Q.  Have you seen this poll before?
20    A.  I have not seen this particular poll before.
21    Q.  Have you heard this poll mentioned before?
22    A.  I do not believe so.
23    Q.  Okay.  If you will turn -- the pages are not marked,
24  but if you'll turn to the third page of the exhibit.
25    A.  (Witness complies.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                June 7, 2012

101

1   Q.  Down at the bottom, it says Photo Voter ID
2   Requirement, do you see that?
3       A.  Yes.
4       Q.  And the question is, Do you favor or oppose requiring
5   a valid Photo ID before a person is allowed to vote; is that
6   right?
7       A.  Yes.
8       Q.  And this poll shows that 75 percent of Democrats
9   favor -- or responded that they favored such a requirement; is
10  that right?
11      A.  Yes.
12      Q.  And 94 percent of Republicans favored the
13  requirement?
14      A.  Yes.
15      Q.  And then over on -- to the right where it says,
16  Favor, it shows 80 -- it says, White, and 86 percent favor; is
17  that right?
18      A.  Yes.
19      Q.  And then it says, Black, and 82 percent favor; is
20  that right?
21      A.  Yes.
22      Q.  And then it says, Hispanic, and then 83 percent
23  favor; is that right?
24      A.  Yes.  Yes.
25      Q.  So at least based on this poll, this would indicate

102

1   that a pretty overwhelming majority of Texans -- the Texas
2   voters favor a Photo Voter ID requirement; is that right?
3       A.  I would say based on this particular poll, yes.
4       Q.  Sure.  And this poll shows that Texas voters
5   overwhelmingly favor a valid Photo ID requirement to vote
6   regardless of political affiliation; is that right?
7       A.  Yes.
8       Q.  And this poll also shows that Texas voters
9   overwhelmingly favor a valid Photo ID requirement for voting
10  regardless of race or ethnicity; is that right?
11      A.  Yes.
12      Q.  Are you familiar with any other specific polls of
13  Texas voters about Photo ID requirements?
14      A.  I cannot think of any specifically, but I do know
15  that there are other polls out there and that I think have been
16  on various, you know, Web sites and things like that that
17  legislators would normally read.
18      Q.  Based on this poll that we're looking at in Exhibit
19  2, would it be reasonable for a legislator to conclude based on
20  that poll that most Texans favored Photo ID requirement for
21  voting?
22      A.  Yeah, I think based on the way that it's written, I
23  would say that, yes.  Based on the way the polling question was
24  asked.
25      Q.  And so a representative whose constituents were in

103

1   favor of a Photo Voter ID requirement would be acting in
2   politically rationale manner if he or she supported a bill that
3   supported a bill that required Photo ID to vote, right?
4       A.  No, not necessarily.  Because of the way the question
5   is worded, it doesn't tell the entire story.
6       Q.  Oh, sure, yeah, I should have been clear.
7       A.  Right.
8       Q.  I'm not --
9       A.  Right.
10      Q.  I'm talking about the poll anymore.
11      A.  Oh, okay.
12      Q.  Just generally speaking, if a representative knew
13  from whatever source that his or her constituents favored the
14  Voter ID, then it would be politically rationale for that
15  representative to vote for a Photo ID bill?
16      A.  Unless they thought there was some sort of
17  discrimination that was taking place, then it wouldn't be
18  rationale.
19      Q.  Fair enough.
20          So if a representative knew that his
21  constituents were strongly in favor of a Photo ID bill and the
22  representative also did not believe that it would have any
23  discriminatory affect on minority voters, then it would be
24  rationale for that representative to vote on the Photo ID
25  bill.

104

1       A.  Yes.
2       Q.  Okay.  And under those circumstances, it would be not
3   racially discriminatory for that representative to vote for a
4   Photo ID bill; is that right?
5       A.  If it were based on those circumstances alone, that
6   would be correct.
7       Q.  Have you ever decided to introduce or carry a bill
8   because a constituent asked you to do so?
9       A.  Oh, yeah, I would say that I listen to what my
10  constituents wanted and base my bill -- the bills that I file
11  heavily weigh on what they say.
12      Q.  When constituents either asked you to introduce a
13  bill or indicate that they really favor a particular bill, do
14  you undertake any kind of factual or empirical analysis to
15  determine if there's a need for that bill?
16      A.  Yes.  I would definitely, you know, seek out the
17  opinions of others, do research and study, you know, get as
18  many, you know, documents that I could find, seeing this is
19  really a problem or is this something that just one particular
20  constituent has an issue with.  Absolutely.
21      Q.  Can you recall any specific bill where you undertook
22  a factual or empirical analysis to determine that there was a
23  need for that bill?
24      A.  Yeah, I would say that most of the bills that I file,
25  that I would look to see whether or not it's really necessary

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                                    June 7, 2012

105

1    before I filed them and do some sort of an analysis.
2        Q.   Can you think of any specific bill where you've
3    conducted a factual analysis to determine if the bill was
4    necessary?
5        A.   I would say that just about every bill that I file,
6    if there's some sort -- there's some sort of an analysis done.
7    To -- you know, to what extent the analysis -- what you
8    consider an analysis is, you know, obviously -- you know, I
9    don't -- I don't go and pay an expensive polling company to --
10   you know, to come in and do research in my district every time
11   I file a bill, but I do definitely -- I take lots of different
12   things into consideration.
13       Q.   Can you describe generally what the typical analysis
14   is that you undertake to determine whether a bill is necessary
15   or not?
16       A.   I would say from town hall meetings in your district,
17   from different resources that you read.  Like if you hear
18   that -- if your constituent is telling you that health care is
19   an issue, then you may, you know, like find out like what's
20   going on in other state legislatures around the country on how
21   to address certain issues pertaining to health care.  And so
22   you may do -- you may get the idea from your constituents, but
23   you may get further details on how to craft the bill, you know,
24   based on, you know, other things that you read in journals or
25   other periodicals.

106

1        Q.   And how would looking at what other state
2    legislatures are doing, how would that tell you whether the
3    legislation is necessary or not?
4        A.   I would -- I would -- I wouldn't base that on what
5    the state legislature is doing.  I would base that more on the
6    side where I would be listening to what my constituents are
7    saying.
8        Q.   If -- let me ask you this.  If your constituents are
9    telling you that there is a need for a specific piece of
10   legislation, would that be enough for you to conclude that
11   there is a need for that legislation?
12       A.   Not necessarily.  Because sometimes there will be
13   something that you think is not right or something that you
14   think is wrong, and so you wouldn't necessarily want to advance
15   something that you thought was wrong, you know, just because a
16   lot of people are asking you to do it.  I mean, sometimes you
17   need to, you know, sit down and show people that, no, here's
18   what would happen if we were to ask for A, B and C, and so we
19   may want to think twice before we ask for A, B and C.
20       Q.   So other than what you learn in town hall meetings or
21   what other state legislatures are doing, what would you do when
22   you thought there was more work to be done?  What would you do
23   to figure out if there was really a need for legislation that
24   your constituents wanted?
25       A.   There would be, you know, lots of other, you know,

107

1    studying that can be done through the House research
2    organization.  Like there are other -- you know, like the
3    different Legislative Think Tanks, talk with them to determine
4    whether or not, you know, this is reasonable or this particular
5    idea is even feasible and whether or not it's going to work,
6    whether or not there is a fiscal impact.  You know, all sorts
7    of different things.  You know, your constituents may want
8    something that there's going to be a huge fiscal impact, and so
9    you wouldn't necessarily, you know, advance something that
10   would cost the state lots of money that the state doesn't have
11   the money to pay for.
12       Q.   Right.  So if your constituents wanted another
13   international airport right in the middle of Fort Worth --
14       A.   Right.  Exactly.
15       Q.   -- you might have to look at --
16       A.   Right.  Right.  Exactly.
17       Q.   Are there specific think tanks or research
18   organizations other than the House research organization that
19   you have consulted about bills or about potential bills?
20       A.   Yeah, absolutely.
21       Q.   What -- can you tell me what some of those are?
22       A.   Center for Public Policy Priorities, the Texas State
23   Teacher's Association, the NAACP.  Oh, God, man, I mean, lots
24   of different organizations.  Yeah, absolutely.
25       Q.   Kind of depends on the bill, I guess?

108

1        A.   Right.  Right, exactly.
2        Q.   Can you -- can you identify or remember a specific
3    bill that your constituents favored or asked you to introduce
4    that you conducted extra research to make sure it was
5    necessary?
6        A.   I can't think of anything specific right off the top
7    of my head, but I'm certain that, yes, absolutely I have.
8        Q.   Can you think of any specific bills where your
9    constituents really favored something and you didn't conduct
10   more -- you know, other research to determine if it was
11   necessary?
12       A.   I can't think of anything off the top of my head
13   right now.
14       Q.   Have you ever -- to the extent you can recall, have
15   you commissioned any kind of survey or poll to determine
16   whether a bill was necessary?
17       A.   I've done very informal surveys like on my
18   newsletters, like the state newsletters, asking people, you
19   know, certain questions.  Do you favor this?  Do you favor
20   that?  Please send it back if you do.  Obviously that's not the
21   most accurate way to get a reading of something.  Obviously
22   you'd want to do, you know, something that's a little bit more
23   scientific.  But I have done, you know, more informal things
24   like that where I have asked people to reply back to us
25   newsletter that I sent out, you know, asking them, you know, do



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

109

1    they favor A, B or C.
2       Q.  Who gets your newsletters?
3       A.  The constituents that I represent.
4       Q.  And so something like the poll that we've got marked
5    as Exhibit 2, that would be --
6       A.  Yes.
7       Q.  It's fair to say that that's kind of the formal end,
8    you know, of investigation about a bill?
9       A.  Not necessarily.  You still want to talk to other
10   members.  Like you may want to talk to a member that has
11   expertise in a certain area.  Like if I was going to file a
12   bill on education, then you could talk to Scott Hoppler after
13   you've, you know, gotten everything else from, you know, Texas
14   State Teacher's Association.  You know, or LULAC or NAACP on
15   anything that deals with, you know, on education.  Maybe you
16   would go to Scott then to say, Scott, here's the idea that they
17   brought to me.  What do you think about it?  So, you know,
18   maybe you'll talk to other legislators that have specific
19   expertise in a certain area.
20      Q.  Have you ever commissioned any kind of academic study
21   to determine whether a particular bill was necessary?
22      A.  No.
23      Q.  Have you ever commissioned a formal poll to determine
24   whether a specific bill was necessary?
25      A.  No.  A formal poll, you mean like a --

110

1       Q.  (Indicates.)
2       A.  No.
3       Q.  So you've never commissioned a formal poll such as
4    the one we've got as Exhibit 2 --
5       A.  Right.
6       Q.  -- to determine whether a bill is necessary?
7       A.  That would be correct.
8       Q.  Are you aware whether or not there's a mechanism in
9    the House rules to waive certain procedural requirements to
10   expedite a bill's --
11      A.  Yes.
12          THE REPORTER:  I'm sorry.  He cut your last word
13   off.  To expedite a bill's --
14          THE WITNESS:  I think I said "process."
15          MR. DUNN:  Procedural requirements is what I
16   remember.
17          MR. FREDERICK:  Okay.  At the end?
18          MR. DUNN:  Yes, sir.
19      Q.  (BY MR. FREDERICK)  Let me -- I'll ask it again.
20          Are you aware whether the House rules provide a
21   mechanism to waive certain procedural requirements in order to
22   expedite a bill's progress through the Legislature?
23      A.  There are rules to expedite bills through the regular
24   House rules, absolutely.
25      Q.  And is one example of that waiving the five-day

111

1    posting rule in the House?
2       A.  Yes.
3       Q.  Have you ever had a bill set for hearing after the
4    five-day posting rule was suspended that you can recall?
5       A.  Not that I can recall off the top of my head, no.
6       Q.  Is it your belief that you've never set a bill for
7    hearing after suspending the five-day posting rule?
8       A.  I would need to go back and check the House journal.
9    I'm just not -- I just can't answer that to be certain.
10      Q.  So right now based on just your recollection, you
11   can't --
12      A.  Yeah.
13      Q.  -- say for sure whether you have or have not set a --
14      A.  No.
15      Q.  -- bill for hearing after the --
16      A.  No, I have no recollection.
17      Q.  -- after the dive-day posting rule was suspended?
18      A.  I have no recollection.
19          Can we go off the record real quick so I can run
20   to the restroom?
21      Q.  Oh, of course, yeah.
22          (Break was taken at 12:14 p.m. to 12:21 p.m.)
23          (Deposition Exhibit No. 3 was marked.)
24      Q.  (BY MR. FREDERICK)  Okay.  The court reporter has
25   handed you what's been marked as Deposition Exhibit 3.  Can you

112

1    take a moment to look at this, and can you identify this
2    document for the record.
3       A.  Oh, Twitter.
4       Q.  You may have to open it up to see.
5       A.  Yes.
6       Q.  Does this appear to be your Twitter account --
7       A.  Yes.
8       Q.  -- or a printout of your Twitter account?
9       A.  Yes.
10      Q.  If you would, turn to -- with me to Page 27.
11      A.  Okay.
12      Q.  And if you look down, it's the -- it's by the second
13   to last entry down there.  It says, I will also serve as vice
14   chair of a select committee that will look into the fictitious
15   charges of voter fraud; is that accurate?
16      A.  Yes.  Yes.
17      Q.  And you typed that?  You wrote that?
18      A.  Yes.
19      Q.  And it looks like --
20      A.  Well, if I didn't write it, somebody from my staff
21   did.
22      Q.  Okay.
23      A.  Or I would have authorized it, yeah.
24      Q.  And it shows that this was -- this statement was made
25   on February 15th, 2011; is that right?

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139



ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

113

1    A.  Yes.
2    Q.  At the time this statement was made, February 15th,
3    2011, had the select committee heard any testimony on SB14?
4    A.  I do not recall.  This sounds like, by the way the
5    sentence is written, that, no.
6    Q.  Okay.  And to the best of your knowledge, at the time
7    this statement was made, had the select committee received
8    any -- any kind of evidence on SB14?
9    A.  No.
10   Q.  But in this statement, you characterize charges of
11   voter fraud as fictitious --
12   A.  Yes.
13   Q.  -- is that right?
14          Had you already made up your mind at this point
15   that there was no voter fraud in Texas?
16   A.  I was basing this up on my time in the Legislature
17   since 2005 when, you know, year after year, committee hearing
18   after committee hearing, we were -- we've asked the Attorney
19   General's office, we asked the chairman of the committee,
20   whether it was Leo Berman or whomever, the different groups
21   that came to testify on behalf of the Voter ID bill to show
22   evidence of voter fraud, and they never did.
23   Q.  So is it your contention that there is no voter fraud
24   in the State of Texas?
25   A.  My contention is that I do not know of any voter

114

1    fraud in the State of Texas, and I have never been shown
2    anything over all these years to prove there was any voter
3    fraud in the State of Texas.
4    Q.  Any voter fraud at all?
5          MR. DUNN:  Are you talking about any voter fraud
6    or in-person voter fraud?
7          MR. FREDERICK:  Right now I'm talking about any
8    voter fraud.
9          MR. DUNN:  Okay.
10   Q.  (BY MR. FREDERICK)  And just to be clear, referring
11   back to the statement in Exhibit 3, I believe it says,
12   Fictitious charges of voter fraud.  So right now I'm just
13   talking about any voter fraud.
14   A.  Right.
15   Q.  Is it your contention that there's not any voter
16   fraud in the State of Texas?
17   A.  No, I'm not going to say that there's not any voter
18   fraud in Texas.  I've not seen any evidence of -- well, because
19   this particular committee, this vice -- as this select
20   committee was specifically designed to only pass out the
21   voter -- the Photo ID bill.  And so based on my previous
22   experience in the Legislature and after going to committee
23   hearing after committee hearing, I would say that for this
24   specific committee was asked to look into, I have never seen
25   any -- any charges of voter fraud.  And the only charges of

115

1    voter fraud that I had ever heard of had been fictitious.  They
2    had all been sort of either been rumored, innuendo or totally
3    completely misunderstandings.
4    Q.  Okay.  Now, you the mentioned the scope of the
5    committee.  So SB14 was -- the purpose was to address a
6    specific type of voter fraud, right?
7    A.  Yes.
8    Q.  And the purpose was to address in-person voter fraud,
9    right?
10   A.  Right.
11   Q.  As opposed to say mail-in ballot fraud?
12   A.  Right.
13   Q.  Is it your contention that there is no in-person
14   voter fraud in Texas?
15   A.  I don't believe that there is in-person voter fraud
16   going on in Texas because I've not seen any evidence of
17   in-person voter fraud in Texas.
18   Q.  Are you able to swear under oath today that there is
19   no such thing as in-person voter fraud in Texas?
20   A.  I cannot swear under oath that I know anything 100
21   percent certain, but based on the evidence that I've seen and
22   been presented to me, it's not a problem in the State of Texas.
23   Q.  What kind of evidence would it take to change your
24   mind to make you think that there is a problem with in-person
25   voter fraud in Texas?

116

1    A.  If there was a fail-safe -- like, for instance, one
2    thing if there was like a fail-safe affidavit like the
3    amendment that I had and everyone that signed those fail-safe
4    affidavits around the state, if they were examined thoroughly
5    and you could show that there was, you know, people that were
6    committing voter impersonation, then I would believe that there
7    was a problem with voter fraud in the state.
8    Q.  So if there were one conviction of somebody for voter
9    impersonation fraud, would that be enough to make you believe
10   that there was potentially a problem with voter fraud in
11   Texas?
12   A.  If there was one?  No, not if there was one person.
13   Q.  How many --
14   A.  I mean, I can't think of any -- I can't think of
15   any -- for my entire time in the Texas Legislature and just
16   studying, you know, public policy, I mean, I cannot think of a
17   time to where we passed any sort of a bill based on one
18   particular occurrence or incident or something that an
19   individual did ever.  It's just hard for me to -- I can't think
20   of that.
21   Q.  All right.  How many convictions of in-person voter
22   fraud would it take to make you believe that there was some
23   problem with in-person voter fraud in Texas?
24   A.  I would think that there would need to be like a --
25   clearly a problem.  Like there would need to be clear



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

117

1  documentation that there is a wide -- that there is widespread,
2  you know, voter fraud going on.  Those are certainly the
3  accusations that have been made, is that there's widespread
4  voter fraud in the State of Texas.  When people come and
5  testify, when these various conservative groups come before,
6  whether it's elections committee or whether it's this special
7  select committee that I was on, it was always -- they always
8  said that there's widespread voter fraud going on, and I just
9  never saw any evidence of it.  And I think that if there was
10 evidence of it, then, yeah, of course, we all want something to
11 be done -- we don't want to be unfairly.  We want something to
12 be done.
13     Q.  It's your understanding that in-person voter fraud
14 would be more difficult to detect than mail-in voter fraud
15 under the current system?
16     A.  Which one would be more to difficult detect under the
17 current system?
18     Q.  (Shakes head up and down.)
19     A.  It's hard for me to say certainly which one would be
20 harder to detect.  I mean, there are -- people could make
21 points on both -- for both on why, you know, one may be worse
22 than the other.  So I just -- it would be hard for me to say
23 which one is worse than one or the other.
24     Q.  Do you believe that there's some problem with mail-in
25 ballot fraud in Texas?

118

1     A.  I -- I've -- and I've heard in certain areas that
2  there have been some issues with it.  But I would say that
3  generally speaking, that most people really see it as a
4  convenient way of voting.  I know that when I went door-to-door
5  just, you know, these last couple of weeks of early voting, you
6  know, just a few weeks ago here, that the elderly people that
7  for whatever reason had misplaced their ballots and couldn't
8  find them, that they really wanted to vote by mail, and they
9  saw it as a convenience.  But certainly that there is -- you
10 know, like anything else, if there's any sort of abuses going
11 on, it needs to, you know, be rooted out.
12     Q.  Do you believe that there is abuse of mail-in
13 balloting that happens in Texas?
14     A.  I would -- I do not have any personal recollection of
15 it, so I wouldn't be able to say certain if that is the case.
16 But I don't -- I don't think that has been an issue here, I can
17 say that.
18     Q.  When you say "here" --
19     A.  In Fort Worth.
20     Q.  Have you seen any evidence as a legislator that there
21 is mail-in ballot fraud going on in Texas?
22     A.  There have been a couple of articles, you know, in
23 the paper about some problems with mail-in ballots.  But still,
24 though, I would say, you know, 95 percent of the time, most
25 people that mail in their ballots, they see it as a -- as an

119

1  easy and convenient way of voting.  At least that's my --
2  that's my personal experience and just from talking with
3  different people and talking with senior citizens.
4     Q.  Do you believe there is a legitimate concern in Texas
5  about mail-in ballot fraud?
6     A.  No, I don't think there's a legitimate concern.  I
7  think there's a legitimate concern for any -- there's a
8  potential for anything to go bad.  But I don't think that --
9  that -- currently speaking, I don't think that there is that
10 big of an issue.
11     Q.  Would you have any specific reason to disagree with
12 another legislator maybe in a different part of the state who,
13 based on his or her own experience, thought that there was a
14 problem with mail-in ballot fraud?
15     A.  No.
16     Q.  Would you have any reason to disagree with a
17 legislator from another part of the state who, based on his or
18 her experience, thought that there was a legitimate concern
19 about in-person voter fraud?
20     A.  I would want to see, you know, what sort of evidence
21 that they would prevent.
22     Q.  What sort of evidence have you seen of mail-in ballot
23 fraud?
24     A.  I've not seen any evidence of mail-in ballot fraud.
25 Just I've only heard, you know -- you know, various stories

120

1  about it being an issue in other -- in parts of the states
2  outside of North Texas.  That I've not -- you know, me
3  specifically, I don't know of any issues.
4     Q.  But based on the stories you've heard, you think that
5  if someone from maybe another part of the state thought there
6  was mail-in ballot fraud going on, you wouldn't have any reason
7  to disagree with them, right?
8     A.  Not necessarily.
9     Q.  But you're not aware of any specific evidence of
10 mail-in ballot fraud?
11     A.  No.
12     Q.  And you're not aware of any actual convictions for
13 mail-in ballot fraud, right?
14     A.  It seem -- there does seems like there's someone
15 who's been convicted for it before.  It seems like I do vaguely
16 remember that.
17     Q.  Is that enough to -- is that enough to make you think
18 that there's a legitimate concern in Texas about mail-in ballot
19 fraud?
20     A.  Not one person, no.  I would say.
21     Q.  Do you believe there's a legitimate concern in Texas
22 about mail-in ballot fraud based on what you -- what you know?
23     A.  No.  I would say, no.  I would say that there may
24 have been areas in the state where there have been some
25 problems, but overall most people like it, especially now where



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                          June 7, 2012

121

1   most of the people that are 65 or older.  They can read, write.
2   You know, they're from the, you know, baby boom generation, the
3   people that are getting older now.  And, you know, obviously
4   with previous generations where people, you know, necessarily
5   didn't have as much formal education and people would stop
6   going to school 7th, 8th grade, what have to go work in the
7   farmer -- in the farms and fields and things like that.  When
8   those people became older, then there could be some issues.
9   But I think that overall, most of the people that I talk to,
10  they love it.  They absolutely love it.  It's just not -- just
11  hadn't really been an issue.
12      Q.  You're not aware of any specific instance where
13  somebody has been convicted of mail-in ballot fraud; is that
14  right?
15      A.  I do -- I do vaguely remember some people that have
16  been in trouble for it or reading some articles in the paper
17  about it.
18      Q.  So you've read some articles about people being in
19  trouble for mail-in ballot fraud.
20          Do you know if those people were convicted?
21      A.  I don't remember if anybody was specifically
22  convicted.
23      Q.  Do you know if any of those people were indicted?
24      A.  I do -- it does seem like I remember some minorities
25  being indicted for vote-by-mail problems.  Because I think that

122

1   was one of the issues that we raised specifically, was that it
2   seems like the people that were -- that seemed to be targeted
3   were minority.
4       Q.  Are you aware of any newspaper stories or articles
5   about in-person voter fraud?
6       A.  Yes.  There was an article in the Star-Telegram maybe
7   a month ago.
8       Q.  And was that the case -- I believe it was a precinct
9   chairman or someone who --
10      A.  Yes.
11      Q.  It was an instance of alleged in-person voter fraud
12  in Fort Worth?
13      A.  Yes.
14      Q.  Okay.  And there was actually an indictment in that
15  case; is that right?
16      A.  I believe so, yes.
17      Q.  So based on that indictment -- well, are you familiar
18  with any other stories, reports of in-person voter fraud
19  anywhere in Texas?
20      A.  I can't think of any other ones.  That's the only
21  one -- I mean, since we've been studying this, that's the only
22  one.  There was another one.  There was a gentleman from
23  Houston.  It was a white male, and he cast a fraudulent ballot,
24  but he thought that because he was a -- he was not a U.S.
25  citizen, he thought that because -- since he was from Canada

123

1   and he was a resident alien that he could vote.  And so they
2   ended up -- he didn't cast a fraudulent ballot, but he had an
3   ID.  It wasn't a case of voter impersonation.  It was just a
4   case where he had mistaken -- he wanted to vote straight
5   Republican, my understanding.  So --
6       Q.  But you're aware of one in-person ballot fraud case
7   in Houston, and then there's one case of in-person voter fraud
8   in Fort Worth.
9           Are you aware of any other stories about
10  in-person voter fraud in Texas?
11      A.  No, those are the only two that I can think of.
12      Q.  And then remind me, the mail-in ballot fraud.  You
13  said you heard stories of mail-in ballot fraud.  Can you remind
14  me what those are?
15      A.  There was the case of a lady in Texarkana, and I know
16  that there was a lady here in my district who -- who ended
17  up -- it's sadly, still in a nursing home because she was --
18  some people came to visit her house, and she was in the shower
19  and it scared her.  And she ended having medical issues and
20  things like that, and I know that someone had accused her of
21  voter fraud when she hadn't committed it.  And so I know that
22  there were like several minorities that were, you know,
23  targeted by the AG's office for vote-by-mail fraud, but I don't
24  know -- I don't think that anyone was ever convicted.
25      Q.  Was there a conviction in the Texarkana case?

124

1       A.  I do not remember if there was a conviction in the
2   Texarkana case.  I don't know if she -- I don't remember what
3   was the ultimate outcome of that case.  I don't remember.
4       Q.  Based on what you know about mail-in ballot fraud, do
5   you think it's possible that someone could reasonably believe
6   that there is a potential problem with mail-in ballot fraud in
7   Texas?
8       A.  Yes.
9       Q.  And based on what you know about in-person voting
10  fraud, do you believe someone could reasonably think there
11  might be a problem with in-person voter fraud in Texas?
12      A.  Based on everything that I have seen, I just don't
13  see how anybody can think that that's a legitimate problem.
14  Based on every in-person -- all the evidence that's been
15  presented, like all of the people with such zeal and such, you
16  know, determination to prove that there is in-person voter
17  fraud, impersonation going on, and it just hasn't been proven.
18  I just don't see how it is a real problem in this state.  I
19  mean, and you're talking about some people that are just real
20  zealots and they want to show -- they want to be the person
21  that discovers that this is going on, and they just -- and
22  nothing has come of it.
23      Q.  So you don't think there's a reasonable basis to
24  believe in in-person voter fraud, right?
25      A.  Right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

125

1    Q.   You do believe there's a basis to believe in mail-in
2    voter fraud, right?
3    A.   I think that just the idea of someone voting outside
4    of a voting booth could be -- could lead people to think that
5    there could be some concerns just because you're voting outside
6    of a booth.  So that -- you know, but when you go and vote
7    someplace and people are going to see your face, people are
8    going to -- you have to sign something.  You know, there are
9    penalties.  I mean, it's a lot different than when your home
10   becomes your polling place.
11   Q.   Do poll workers have the authority to arrest people
12   for suspecting in-person voter fraud?
13   A.   That, I'm not certain.  I'm not certain of that.  I
14   had a poll worker tell me on election day this past weekend, it
15   was a Republican poll worker that was working over here in
16   southeast Fort Worth, and he told me that he does have the
17   power -- that he does have the power to detain if there were
18   certain activities going on, you know, within 500 feet of the
19   polling.
20   Q.   Oh, that would be election hearing, too close to the
21   polling place?
22   A.   Right.  Right.  Exactly.
23   Q.   You don't know of any specific authority to detain
24   somebody who's suspected of not being the person who they say
25   they are?

126

1    A.   I do not know if they have that ability or not.
2    Q.   Isn't it true under the current system that in order
3    for somebody to be caught for voter fraud, somebody would have
4    to recognize them and know that they were not the person they
5    purported to be based on their registration card?
6    A.   Yes, I would say that's correct.
7    Q.   So it's reasonable to think that in-person voter
8    fraud would be difficult to detect?
9    A.   Well, then that's why I did the fail-safe affidavit,
10   but no one wanted to go for it.  I thought that that would be
11   an easier way to make it -- you can match up signatures and
12   what have you.
13   Q.   But you agree that under the current system, it's
14   difficult to detect in-person voter fraud?
15   A.   I mean, it depends on -- on difficult.  But I would
16   say that even now if you suspected that someone was cheating or
17   someone was who they weren't, I mean, you can always go and
18   check signatures.  There are other, you know, things that you
19   could do.  You could keep, you know, records and say, you know,
20   I don't think this person is really this person.  Let's go and
21   check this name to see if, you know, Mary Smith really did come
22   and vote.  So, I mean, I think that there are certain steps
23   that poll workers could take, you know, right now with extra
24   training or what have you to prevent or detect someone who may
25   commit voter fraud.

127

1    But I just don't think that it's a -- I mean,
2    with a -- I mean, what did we have last time?  I don't know
3    what our turnout was for this last past primary.  But it turned
4    out so low, I just don't see -- I just don't see it being a
5    problem.  I just don't -- I just really haven't seen anything.
6    With all the evidence I've seen, it just doesn't seem like it's
7    there.
8    Q.   You mentioned, in connection with mail-in ballot
9    fraud, that you thought that some of the cases that were
10   prosecuted or pursued were targeting minority voters; is that
11   right?
12   A.   Yes.
13   Q.   Is it your understanding that prosecuting voter fraud
14   is not the sole responsibility of the State Attorney General?
15   Do you understand that?
16   A.   Yeah, I understand what you're asking.  I don't
17   know -- I would imagine that local authorities would be able to
18   prosecute also.
19   Q.   So it's your understanding -- or you wouldn't have
20   any reason to dispute that say the local D.A. --
21   A.   Right.
22   Q.   -- would also --
23   A.   Absolutely.
24   Q.   -- be able to prosecute voter fraud?
25   A.   Absolutely.

128

1    Q.   Don't you think -- I mean, based on your own
2    testimony that there was some targeting of minority voters.
3    Do you think there's a political risk for local
4    prosecutors to prosecute voter fraud?
5    A.   No.
6    Q.   Why not?
7    A.   Because in the county like here where we're at right
8    here, this is a very Republican county, so I mean, they
9    wouldn't be afraid of prosecuting an elderly African American
10   woman that lives in southeast Fort Worth.  Or the same thing in
11   Texarkana.  You know, I just don't know why -- why would the
12   local D.A. feel there would be any political repercussions for
13   that.
14   Q.   What about in Houston or Dallas, would it be
15   different there?
16   A.   In Houston, again, I think the D.A. -- isn't the D.A.
17   a Republican there?  I'm not sure.  But up until 2006, I mean,
18   Dallas had a Republican district attorney.
19   Q.   Do you think any D.A., even in Fort Worth or
20   anywhere, would want to be accused of targeting minority
21   voters?
22   A.   I don't think that anybody would want to be accused
23   of targeting minority voters.
24   Q.   Is it possible that that would be -- well, isn't it
25   also possible, apart from any allegations of racial



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                                    June 7, 2012

129

1    discrimination, that prosecuting somebody for fraudulent voting
2    could be seen as politically biased if, for example, Republican
3    D.A. prosecutes somebody who allegedly voted fraudulently for a
4    Democrat?
5        A.   Uh-huh.  People could definitely say that that would
6    be politically biased, but you could say the same thing about,
7    you know, the AG's office, too.  If it's a Republican
8    prosecuting, you know, all Democrats or all minorities, you
9    could definitely make that case.
10       Q.   And a local D.A. or any D.A. wouldn't want to be
11   accused of political bias or political motivation or
12   prosecution, would they?
13       A.   No, I don't think a local D.A. would, or I don't
14   think anyone would or even someone from Austin.
15       Q.   Do you believe that -- is it your understanding that
16   there are non-citizens who are registered to vote in Texas.
17       A.   I do not believe that there are non-citizens that are
18   registered to vote in Texas.  Can non-citizens accidentally
19   register to vote like that gentleman did in Houston?
20   Absolutely.  But it is up to each election -- or election
21   administration -- county election administration in the state
22   to make sure that the people that are registered to vote are
23   citizens.  But, no, I don't -- so, I don't believe that
24   non-citizens are voting.
25       Q.   Do you believe that non-citizens are registered to

130

1    vote?
2        A.   No.  I think that if non-citizens get registered to
3    vote, I think it's probably thrown out.  I think local election
4    administrators seem to do a good job at that, at rooting out
5    who's eligible to vote and who's not.
6        Q.   So it's your understanding that -- is it fair to say
7    that your understanding is that if there are any non-citizens
8    on the voting rolls in Texas, it's a very small amount?
9        A.   Yes.
10       Q.   And it's your understanding that if a non-citizen
11   makes it onto a voter registration roll, they'll get removed
12   pretty quickly?
13       A.   Right.  Right.  I would say, yes.
14       Q.   And so would it be -- you know, would you think that,
15   you, know if the state were to devote resources to removing
16   non-citizens from voting rolls, that would be not a good use of
17   money?
18       A.   For the state to do that?
19       Q.   Yeah.
20       A.   No, I would think that local election administrators
21   would best equipped to do that.  I absolutely feel that way.
22       Q.   So it wouldn't be a great use of the state's money to
23   go after non-citizens on voting rolls?
24       A.   Right.  Right.  I would say that -- that -- where --
25   that we should have a hearing, and if that's -- if somebody

131

1    thinks that's a problem, that there should be a hearing in the
2    election committee, and that election committee should listen
3    to what the local county administrators have to say and what
4    they would need, whether it was extra resources or whether they
5    already have the, you know, equipment available to be able to,
6    you know, ferret out people that are not, you know, legally
7    registered to vote.
8        Q.   I'm going to move to a slightly different area and
9    talk about the purpose of SB14.
10       A.   Okay.
11       Q.   Is it your contention that the legislature intended
12   to harm African American voters by passing SB14?
13       A.   I would say that, yes, the intent of SB14 was to harm
14   African American and Latino voters.
15       Q.   And what is the basis for that contention?
16       A.   The basis for that contention is several things.
17   Everyone saw all of the documentation and presentations that
18   showed that it would have a negative effect on African
19   Americans and Latinos that go to the polls and vote.  Even
20   amendments like the ones that I had that had the fail-safe
21   affidavit, the one that showed -- the one that we talked about
22   earlier that showed if there was, you know, no pun intended,
23   but just, you know, very blatant examples of discrimination
24   that took place, then the law would no longer exist.  Even
25   people, you know, voted "no" against that, and everybody was

132

1    just ready to get the bill passed.
2        Q.   Is there anything else that supports your contention
3    that SB14 was passed for a discriminatory purpose?
4        A.   The comments that -- the conversation that I had with
5    Representative Berman at the back mic when he asked me why was
6    I, you know, fighting this, which is in the -- which is in
7    69-13 here.  When we were at the back mic and I asked him, and
8    I said -- and he asked me -- he came to me and he said, Why are
9    you, you know, against this bill?  Why are you fighting against
10   this bill?  And I said because I think it -- you know, it
11   discriminates.  I think it would hurt, you know, my
12   constituents.  And he said, It's not going to determine whether
13   or not, you know, or Yvonne -- you know Yvonne Davis, who's an
14   African American member out of Dallas -- whether you or Yvonne
15   or any Black Caucus members get re-elected.
16       And so to me what I saw that as is that, yeah,
17   if you're in a district where -- you know, Al Gore got, you
18   know, 80 percent of vote, then it's not going to hurt you.
19   But, you know, maybe it's going to hurt, you know, someone in a
20   district where Al Gore got 50 percent of the vote.  And so what
21   I saw his statement to me was saying, it's not going to hurt
22   you, so you shouldn't be up here, you know, really worried
23   about this bill.  It may hurt somebody in a Linda Harper Brown
24   type race where it's a 20-vote scenario.  And so that was kind
25   of disturbing to me when he made those comments.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139



ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Marc Veasey                                             June 7, 2012

133

1    Q.   And he made that comment in 2007?

2    A.   Yes.

3    Q.   And that was for -- I forget the bill number, but

4    that was not SB14?

5    A.   No, that was not SB14.

6    Q.   Okay.  So other than the effect amendments that

7    weren't accepted and Representative Berman's statement in 2007,

8    is there anything else that leads you to believe SB14 had a

9    discriminatory purpose?

10   A.   And the e-mail that I received from Stephanie

11   Click.

12   Q.   From who?

13   A.   Stephanie Click.  She's the former Tarrant County

14   election -- I mean, former Tarrant County Republican party

15   executive -- not executive director, but chairman.  You know,

16   where she sent out the e-mail saying that -- that we know that

17   there's all sorts of voter, you know, fraud, voter

18   impersonation that takes place in southeast Fort Worth.  Just a

19   blanket, you know, sort of a statement, not in Colleyville or

20   not in Southlake or, you know, not in Westover Hills, but in

21   southeast Fort Worth.  And that was -- you know, when people

22   say things like that, it makes me think that bills like this

23   are supported by people like her and who encourages legislators

24   to pass bills like this, that there's discriminatory intent

25   when people just make blanket, you know, sort of broad

134

1    statements like that that cover an entire community.

2    Q.   Stephanie Click is not a member of the Legislature,

3    right?

4    A.   No.  She's seeking to be a member of the Legislature,

5    but she's not currently one.

6    Q.   She didn't vote on SB14?

7    A.   No.

8    Q.   Okay.  So other than those four things, is there

9    anything else that leads you to believe that SB14 had a

10   discriminatory purpose?

11   A.   Those are the main four things.

12   Q.   Can you think of anything else?

13   A.   Not right now, no.

14   Q.   Do you -- do you contend that individual legislators

15   voted in favor of SB14 for the specific purpose of harming

16   African American and Latino voters?

17   A.   I do not think that all members that voted for it

18   voted for it for that reason.

19   Q.   Do you think that some members voted for SB14 for the

20   specific person of harming African American and Latino voters?

21   A.   Yes.

22        MR. FREDERICK:  Mark this as 4, please.

23        (Deposition Exhibit No. 4 was marked.)

24   Q.   (BY MR. FREDERICK) Can you identify what's been

25   marked as Deposition Exhibit 4, please.

135

1    A.   This is a House Journal.

2    Q.   Okay.  Is it from March 24th, 2011?

3    A.   Yes.

4    Q.   If you'll turn -- if you'll turn to the last page of

5    this exhibit?

6    A.   Okay.

7    Q.   Does that appear to be Page 1082 --

8    A.   Yes.

9    Q.   -- from the House Journal?

10   A.   Yes.

11   Q.   And there at the top, do you see where it says, SB14

12   was passed by Record 156?

13   A.   Yes.

14   Q.   Okay.  I'm going to ask you to do -- I'd like you to

15   take this pen --

16   A.   Okay.

17   Q.   -- and I would like you to circle the name of every

18   person on this page who voted -- who you believe voted for SB14

19   for the purpose of harming African American or Latino voters.

20   A.   (Witness complies.)

21   Q.   So you've shown me the exhibit that you've marked,

22   and it indicates you have underlined Berman --

23   A.   Uh-huh.

24   Q.   -- is that correct?

25   A.   Yes.

136

1    Q.   And you have not underlined anyone else's name who

2    voted for SB14?

3    A.   Right.

4    Q.   So it's your contention that Representative Berman

5    voted for SB14 for the purpose of harming African American and

6    Latino voters, right?

7    A.   Yeah.

8    Q.   But you don't contend that any other legislator voted

9    for SB14 for the purpose of harming African American or Latino

10   voters, correct?

11   A.   I'm not necessarily contending that.  That's the one

12   where we had a conversation that made me believe that.

13   Q.   Okay.

14   A.   Yeah.

15   Q.   But you're not testifying today that anybody else

16   besides Representative Berman voted for SB14 for the purpose of

17   harming African American or Latino voters, are you?

18   A.   I'm not saying that some of the other people on the

19   list didn't.  I'm just saying that I wouldn't want to make that

20   sort of accusation at someone without having any sort of

21   evidence like I have with Berman where we had a conversation to

22   where he made it pretty clear to me why -- you know, and

23   questioned me on why I was for the bill -- or against the bill.

24   Excuse me.

25   Q.   Right.  So then it's your testimony that you don't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Marc Veasey                                          June 7, 2012

141

1    basically mean that it was not a requirement that everybody
2    would have a Photo ID.
3        A.  Right.
4        Q.  So do you believe that Representative Harless was
5    acting in a racially discriminatory manner in opposing the
6    amendment you offered to have the bypass affidavit?
7        A.  No.  I think that Representative Harless was just
8    acting on what she was told to do.  And I think that the way
9    that the bill was written, and my understanding was that the
10   bill was written -- at least the word in the Legislature was
11   that -- that it was -- that this particular bill was very
12   stringent, and that it was something that was produced out of
13   ALEC, A-L-E-C, and that the bill was -- and that there would be
14   no changes to the bill at all.  So I think that she was just
15   being a foot soldier and just following orders.
16       Q.  But if -- okay.  I appreciate that.  And -- but
17   it's -- it's accurate, isn't it, that if somebody doesn't have
18   an ID but can sign an affidavit and vote even if they don't
19   have an ID, then the bill doesn't actually require a Photo ID
20   to vote, right?
21       A.  Right.
22       Q.  Okay.  I'm going to ask you now to turn, if you
23   would, to Page 100 -- the one at the top left will be Page 173.
24       A.  Okay.
25       Q.  And I will represent to you that there's only one

142

1    Page 173.
2        A.  What volume?
3        Q.  It'll say Volume II at the top.
4        A.  Volume II.
5        Q.  Yeah.  It looks like it's consecutively page --
6    paginated.  Well, it's Volume II in any case.
7        A.  (Witness complies.)
8        Q.  Are you there?
9        A.  Yes.
10       Q.  Okay.  Now, let's see -- so we're at -- we're kind of
11   coming into the middle of the debate here, but if you'll take a
12   look -- does it look to you like what's being debated here is
13   an amendment to provide for same-day voter registration?
14       A.  Right.  Exactly.
15       Q.  Okay.  Do you recall who authored that amendment?
16       A.  It looks like I did.
17       Q.  Oh, okay.
18       A.  I'm guessing.  I don't know.  I mean, I'm just
19   looking -- based on the transcript, but I don't know if I did
20   or not.  I can't --
21       Q.  Okay.
22       A.  I can't say that for certain.  But I -- it looks like
23   he is going back and forth with me on this.
24       Q.  Okay.  But that is what's being debated here?
25       A.  Right.

143

1        Q.  And so the amendment that's being debated, I take
2    from the debate, is it would provide for people to register to
3    vote on the same day that they vote, right?
4        A.  Uh-huh.  Right.
5        Q.  And that's not the system we have now in Texas,
6    right?
7        A.  No, it is not.
8        Q.  Okay.  Now, you --
9        A.  Okay.  It's Rodriguez's bill.
10       Q.  Oh, okay.
11       A.  Yes.
12       Q.  But you -- you spoke in --
13       A.  It's amendment.  Excuse me.
14       Q.  You spoke in favor of the amendment?
15       A.  Yes, definitely.
16       Q.  And you thought it was a good amendment?
17       A.  Definitely.
18       Q.  You thought it would be a good change to SB14,
19   right?
20       A.  Yes.
21       Q.  And this would have been -- I mean, it would have
22   been a substantial change to SB14, right?
23       A.  Right.
24       Q.  Was there testimony in the select committee in the
25   House on same-day registration?

144

1        A.  I do not recall.
2        Q.  Was there any evidence presented to the select
3    committee about same day registration?
4        A.  I don't recall.
5        Q.  So you don't recall whether or not there was any?
6        A.  No.
7        Q.  If you look down at -- is it -- is it common for a
8    substantial amendment to be adopted or accepted to a bill
9    without some evidence being presented in the committee?
10       A.  Occasionally, yeah.
11       Q.  Can you think of a specific case where that happened?
12       A.  Yeah, in 2000 and -- in 2005, Mary Denny had a
13   bill -- she wanted to pass the Voter ID bill, and she tried to
14   amend it on the transportation bill.
15       Q.  Was --
16       A.  And she tried to -- and people were like, hey, we
17   can't put this on -- this is like a major bill.
18       Q.  Okay.  So she tried to put -- in 2005, Representative
19   Denny tried to put a Voter ID provision as an amendment to a
20   transportation bill --
21       A.  Right.
22       Q.  -- is that right?  Okay.
23       A.  And then we had a deal in elections.  There was an
24   ominous -- ominous bill that came out that the Secretary of
25   State's office told us that they had to have.  And the chairman



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

MARK WHELAN                                                    June 19, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                )
                               )
          Plaintiff,           )
                               )
VS.                            )
                               )
ERIC H. HOLDER, JR. in his     )
official capacity as Attorney  )
General of the United States,  )
                               )
          Defendant,           )
                               )
ERIC KENNIE, et al,            )
                               )
     Defendant-Intervenors,    )
                               )
TEXAS STATE CONFERENCE OF      )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                )  (RMC-DST-RLW)
                               )  Three-Judge Court
     Defendant-Intervenors,    )
                               )
TEXAS LEAGUE OF YOUNG VOTERS   )
EDUCATION FUND, et al,         )
                               )
     Defendant-Intervenors,    )
                               )
TEXAS LEGISLATIVE BLACK        )
CAUCUS, et al,                 )
                               )
     Defendant-Intervenors,    )
                               )
VICTORIA RODRIGUEZ, et al.,    )
                               )
     Defendant-Intervenors.    )
*************************************************
                ORAL DEPOSITION OF
             STATE OF TEXAS 30(b)(6)
                   MARK WHELAN
                  JUNE 19, 2012
*************************************************

---

1    ORAL DEPOSITION OF MARK WHELAN, produced as a
2   witness at the instance of the Defendant, was duly
3   sworn, was taken in the above-styled and numbered cause
4   on the JUNE 19, 2012, from 11:45 a.m. to 12:33 p.m.,
5   before Chris Carpenter, CSR, in and for the State of
6   Texas, reported by machine shorthand, at the Offices of
7   the Texas Attorney General, 209 West 14th Street, 6th
8   Floor, Austin, TX 78701, pursuant to the Federal Rules
9   of Civil Procedure and the provisions stated on the
10  record or attached hereto.

---

A P P E A R A N C E S
FOR THE PLAINTIFF, STATE OF TEXAS, AND THE WITNESS:

     Reynolds Brissenden
     Patrick K. Sweeten
     OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
     Austin, TX 78711-2548
     209 West 14th Street
     8th Floor
     Austin, TX 78701
     (512) 936-1307
     patrick.sweeten@texasattorneygeneral.gov
     reynolds.brissenden@texasattorneygeneral.gov

FOR THE DEPARTMENT OF PUBLIC SAFETY AND THE WITNESS:

     Kathleen T. Murphy
     OFFICE OF GENERAL COUNSEL
     4805 N. Lamar
     Austin, TX 78773
     (512) 424-2420
     kathleen.murphy@txdps.tx.us

FOR THE DEFENDANT, HOLDER, ET AL:

     Daniel Freeman
     Victor Williamson
     U.S. DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue, NW
     NWB - Room 7202
     Washington, DC 20530
     (202) 305-7766
     daniel.freeman@usdoj.gov

---

INDEX

Appearances.......................................3
MARK WHELAN
     Examination by Mr. Freeman.................5
Signature and Changes.........................37
Reporter's Certificate.........................39



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

MARK WHELAN                                    June 19, 2012

9

1      A.   No.
2      Q.   The last thing, I want to remind you that you
3   are under oath and subject to federal penalties for
4   giving false or misleading testimony, so it's important
5   you answer my questions truthfully, accurately and
6   completely.  Do you understand?
7      A.   Yes.
8      Q.   Okay.  Do you have any questions so far?
9      A.   No.
10     Q.   Okay.  Thanks.
11          Do you understand that you are testifying
12   on behalf of the State of Texas and not in your
13   individual capacity?
14     A.   Yes.
15     Q.   What is your current position?
16     A.   Technical team lead.
17     Q.   And how long have you held that position?
18     A.   One year.
19     Q.   And how long have you been with the Department
20   of Public Safety?
21     A.   One year and six months.
22     Q.   And what position did you hold prior to
23   becoming a technical team lead?
24     A.   Senior developer.
25     Q.   Congratulations on the quick promotion.  What

10

1   is your educational background?
2      A.   I have a Bachelor's of Science in computer
3   science.
4      Q.   Where did you go to school?
5      A.   University of Missouri.
6      Q.   Okay.
7      A.   Columbia.
8      Q.   Do you have any technical certifications?
9      A.   No.
10     Q.   What is your employment background prior to
11   coming over to DPS?
12     A.   I worked at IBM in Austin.
13     Q.   Anything before or after that?
14     A.   No.
15     Q.   So college, IBM, DPS?
16     A.   Yes.
17     Q.   And what was your position at IBM?
18     A.   Technical team lead.
19     Q.   How long were you at IBM?
20     A.   Ten years, 11 months.
21     Q.   And what type of work did you do for IBM?
22     A.   Software development.
23     Q.   Related to any particular field?
24     A.   Internal security tools.
25     Q.   Anything else?

11

1      A.   (Witness shakes head no.)
2      Q.   And what are your responsibilities as a
3   technical team lead at DPS?
4      A.   I manage a group of developers and I also
5   develop software and review designs.
6      Q.   Okay.  Do you work with any particular
7   databases or subject areas?
8      A.   I work with the driver's license system
9   database.
10     Q.   Just that one?
11     A.   Just that one.
12     Q.   Okay.  And how many people do you supervise?
13     A.   Currently, I have eight developers.
14     Q.   And when you were a senior developer, were you
15   also working with the driver's license system?
16     A.   Yes.
17     Q.   Is there anyone above you who focuses solely,
18   within sort of the chain of command, who focuses solely
19   on the driver's license database?
20     A.   Yes.
21     Q.   On the IT side?
22     A.   Yes.
23     Q.   And who is that?
24     A.   Britt Brookshire.
25     Q.   Britt?

12

1      A.   B-r-i-t-t.
2      Q.   Thanks.  And what is his position?
3      A.   She is my manager.
4      Q.   Sorry to Ms. Brookshire.  And do you know what
5   her title is?
6      A.   No.
7      Q.   Okay.  Anyone besides her?
8      A.   No.
9      Q.   When did you first learn that you would be
10   testifying on behalf of the State?
11     A.   Last Thursday.
12     Q.   Okay.  And this has previously been marked as
13   U.S. Exhibit 830.  If you could take a look at it for a
14   moment.  Okay?
15     A.   Okay.
16     Q.   Have you seen that document before?
17     A.   Not in its entirety.
18     Q.   Have you seen any part of that document before?
19     A.   Yes.
20     Q.   What part of the document have you seen?
21     A.   Page 4.
22     Q.   Okay.  And is Page 4, Exhibit A to the
23   document?
24     A.   Yes.
25     Q.   Okay.  And did you specifically see the list of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

MARK WHELAN                                                    June 19, 2012

13

1  subjects that the Attorney General had requested
2  deposition testimony on?
3      A.  Yes.
4      Q.  And what subject are you prepared to testify
5  about today?
6      A.  9.
7      Q.  Okay.  And if you could read Subject 9 for the
8  record?
9      A.  "The process, manner and method of compiling,
10 cleaning and filtering data from the Department of
11 Public Safety's driver license and license to carry
12 databases, and producing such data to Attorney General
13 and Defendant Intervenors in this litigation."
14     Q.  And am I correct that you are prepared to
15 testify only about the driver's license database?
16     A.  Yes.
17     Q.  Okay, I just wanted to clarify that.
18         What did you do to prepare for this
19 deposition?
20     A.  I met with Reynolds and Patrick yesterday.
21     Q.  Was anyone else present?
22     A.  Kathleen was present and Dennis Leopold.
23     Q.  Who is Dennis Leopold?
24     A.  Dennis Leopold is the subject matter expert on
25 the license to carry database.

14

1      Q.  Did you review any documents while preparing
2  for this deposition?
3      A.  I reviewed my original -- my sequels to the
4  export scripts.
5      Q.  Okay.  And did that document refresh your
6  memory concerning -- concerning what you had done to
7  produce data?
8      A.  Yes.
9          MR. FREEMAN:  Mr. Brissenden, given that
10 that is responsive to Exhibit A, would the Attorney
11 General be willing to produce those sequel scripts
12 without further request?
13         MR. BRISSENDEN:  We'll look into it and
14 see if it has been previously produced as a part of the
15 request for documents.
16         MR. FREEMAN:  Okay.
17         MR. BRISSENDEN:  From DPS.
18         MR. FREEMAN:  Okay.  I'm pretty certain
19 that we haven't gotten any actual scripts so far, but...
20     Q.  (By Mr. Freeman) Okay.  Did you bring any
21 documents with you today?
22     A.  No.
23     Q.  Okay.  Did you speak with anyone else about
24 your deposition today?
25     A.  I told my project manager that I have a

15

1  deposition and I will not be attending meetings.
2      Q.  Did we get you out of any meetings that you
3  didn't want to attend?
4      A.  I don't know.
5      Q.  Okay.  Anyone else?
6      A.  No.
7      Q.  Could you talk me through what steps you
8  took from beginning to end to produce the data that you
9  produced to the Attorney General?
10     A.  The steps I took was discussing with Kathleen
11 Murphy the new fields that were required, and I started
12 writing scripts to export the data from -- into four
13 sets of data.
14     Q.  And are you referring to the May production?
15     A.  Yes.
16     Q.  Okay.  Why don't we actually start with the
17 March 30th production?
18     A.  Okay.
19     Q.  What steps did you go through then?
20     A.  I did not actually do those.
21     Q.  Okay.
22     A.  But I was aware of what happened.
23     Q.  Good.
24     A.  Basically, our database administrator was told
25 to extract person records from the database without

16

1  social security numbers.  And they wrote a script to do
2  that.
3      Q.  Are you aware of any other steps that were
4  taken?
5      A.  (Witness shakes head no.)
6      Q.  Who is your database administrator?
7      A.  It's a team of people.
8      Q.  Okay.  Are you aware of anyone within the team
9  who performed the initial extract on March -- for the
10 March 30th production?
11     A.  I believe it was Rick Smith.
12     Q.  Rick Smith.  And are you aware of whether --
13 are you aware of any other steps that Mr. Smith took,
14 besides receiving instructions and writing a script and,
15 I assume, running the script?
16     A.  Yeah.  I'm not aware of anything else.
17     Q.  Okay.  And that production from March 30th did
18 not include full social security numbers; is that
19 correct?
20     A.  It did not include social security numbers.
21     Q.  Did it not include social security numbers at
22 all?
23     A.  No.
24     Q.  Okay.  Are you aware of what fields it did
25 include?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

MARK WHELAN                                                     June 19, 2012

17

1   A.   I do not know all of them.
2   Q.   This has been marked earlier today as U.S.
3   Exhibit 970.  I'll give you the marked copy.  Could you
4   take a look at the document for a moment?
5   A.   (Reviewing document.)
6   Q.   Have you seen this document before?
7   A.   No.
8   Q.   Okay.  On Page 1, there are a list of fields
9   contained within the driver's license database; is that
10  correct?
11  A.   Yes.
12  Q.   Are these the same lists -- are these the same
13  fields that were produced in the March 30th production
14  with the exception of the social security number field?
15  A.   I believe so.
16  Q.   Okay.  Do you know what tables these fields are
17  contained in?
18  A.   Yes.
19  Q.   Could you tell me how many tables there are in
20  the driver's license database?
21  A.   I don't know the total number of tables.
22  Q.   More than ten, less than ten?
23  A.   More than a hundred.
24  Q.   Okay, that's clear enough.  Could you tell me
25  what tables -- what table Country code is contained in?

18

1   A.   Country table.
2   Q.   And last name?
3   A.   Person.
4   Q.   Is Country code, does that link -- does the
5   three-character field link to a larger table?
6        MR. BRISSENDEN:  I'm sorry, did you say
7   Country or County?
8        MR. FREEMAN:  Country.  Oh, I'm sorry,
9   that says County.  I thank you for the correction.  I
10  meant County code.
11  Q.   (By Mr. Freeman) Does the three-character
12  County code connect to a larger code -- or a larger
13  table with a list of counties?
14  A.   Yes.
15  Q.   Okay.  So will the County code field be
16  contained in multiple tables?
17  A.   Yes.
18  Q.   Okay.  Any tables other than the County table?
19  A.   That's the parent table; that's the reference
20  table.
21  Q.   Okay.  Is there a larger table that links a
22  given record to the County table?
23  A.   The person's demographic table.
24  Q.   The person's demographic table, okay.  How
25  about last name?

19

1   A.   The person table.
2   Q.   Okay.  First name?
3   A.   The person table.
4   Q.   Middle name?
5   A.   The person table.
6   Q.   Name suffix?
7   A.   The person table.
8   Q.   Social security number?
9   A.   The person table.
10  Q.   Gender?
11  A.   The person table.
12  Q.   TDL ID?
13  A.   Issuance record table.
14  Q.   Okay.  And does that cross reference to the
15  person table as well?
16  A.   Yes.
17  Q.   Date of issuance?
18  A.   The issuance record.
19  Q.   Date of birth?
20  A.   The person table.
21  Q.   And ethnicity?
22  A.   The person table.
23  Q.   Okay.  Thank you.
24       As of the March 30th production, are you
25  aware of how many cases were contained in the driver's

20

1   license database, approximately?
2        MR. BRISSENDEN:  Objection, vague.
3   A.   I do not know.
4   Q.   (By Mr. Freeman) Okay.  As part of the March
5   30th production, are you aware of whether any cases were
6   dropped from the production in taking the driver's
7   license database and putting it into the table or tables
8   or common delineated file that would be produced to the
9   Attorney General?
10  A.   No, there's nothing dropped.
11  Q.   No -- all right.  To backtrack just one second,
12  are you aware of what format, just so we can speak
13  clearly, the production to the Attorney General was made
14  in?
15  A.   Yes.  It was a pipe delimited file, formatted
16  file.
17  Q.   Okay.  Are there any test entries contained in
18  the data -- driver's license database?
19       MR. BRISSENDEN:  Objection, vague.
20  Q.   (By Mr. Freeman) You may answer.
21  A.   Not that I'm aware of.
22  Q.   Okay.  Were there any filters applied to the
23  driver's license database prior to production to
24  eliminate any particular category of records?
25       MR. BRISSENDEN:  Again, you're referring



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

MARK WHELAN                                                     June 19, 2012

21

1  to the March production?
2       MR. FREEMAN:  Again, the March 30th
3  production.
4    A.  I was aware that known duplicate records were
5  filtered, and alias people, also called fake people,
6  were filtered.
7    Q.  (By Mr. Freeman) What is a known duplicate
8  record?
9    A.  It's a record that has been flagged by staff as
10 being a duplicate of another record, so the person has
11 two records.
12   Q.  And what is the basis on which a record would
13 be flagged as a known duplicate?
14   A.  Same name, date of birth, social security
15 number.
16   Q.  Is that first name and last name?
17   A.  Yes.
18   Q.  And will a record be flagged as a known
19 duplicate only if all four of those criteria match?
20   A.  I don't know.  Actually, I'd say no because
21 last name changes.
22   Q.  So if an individual has first name, all nine
23 social security number, and identical date of birth,
24 they will be flagged as a known duplicate?
25   A.  Possibly.  It's not automatic.

22

1    Q.  Okay.  Is that a necessary but not sufficient
2  criterion for being flagged as a duplicate?
3       MR. BRISSENDEN:  Objection, vague.
4    A.  I believe it's sufficient.
5    Q.  (By Mr. Freeman) But you're saying that you
6  have to be caught first essentially?
7    A.  It's a manual process.
8    Q.  Okay.  But before you would be flagged, you
9  have to have first name, date of birth, and social, all
10 nine?
11   A.  Yes.
12   Q.  Okay, great.  And what are alias people?
13   A.  An example:  Law enforcement that need a fake
14 ID.
15   Q.  Okay.
16   A.  For undercover purposes.
17   Q.  And those fake ID's will be entered into the
18 driver's license database?
19   A.  Yes.
20   Q.  But they will be flagged as an alias?
21   A.  Yes.
22   Q.  Are there any other reasons, other than law
23 enforcement, that an individual will -- an individual
24 record will be marked as an alias person?
25   A.  Not that I'm aware of.

23

1    Q.  Other than known duplicate records and alias
2  people, were any other filters applied prior to the
3  March 30th match?
4    A.  No.
5    Q.  Okay.  Do you know approximately how many known
6  duplicate records were contained in the driver's license
7  database as of the March 30th match?
8    A.  Around 130,000.
9    Q.  And are those known duplicate records ever
10 eliminated from the database?
11   A.  No.
12   Q.  And are you aware of approximately how many
13 alias people are contained in the driver's license
14 database?
15   A.  Approximately 2,000.
16   Q.  And are those alias records ever purged from
17 the driver's license database?
18   A.  Yes.
19   Q.  When does that occur?
20   A.  I don't know.  It's a manual process.
21   Q.  Okay.  And are you aware, with regard to the
22 March 30th production, when the -- when the script was
23 run, when the data was drawn from the driver's license
24 database?
25   A.  I don't know the exact time.

24

1    Q.  On or about March 30th?
2    A.  Yes.
3    Q.  Okay.  Now if we can move on to the April 2nd
4  production to the Department of Justice, could you walk
5  me through the steps for that production?
6    A.  We took the same exact query that we ran before
7  for the Department of Justice and added social security
8  number to it.
9    Q.  Okay.  So was it a new draw from the database?
10   A.  Yes.
11   Q.  And did you again -- who wrote the script?
12   A.  Rick Smith.
13   Q.  And did Rick Smith run the script?
14   A.  Yes.
15   Q.  And did he again omit known duplicate records?
16   A.  Yes.
17   Q.  And he omitted alias people?
18   A.  Yes.
19   Q.  Okay.  And are you aware of any productions
20 that were run in March or April, other than the March
21 30th and April 2nd production?
22   A.  For the Department of Justice?
23   Q.  Yes.
24   A.  There were production in early May.
25   Q.  Okay.  But I meant March and April.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

MARK WHELAN                                                    June 19, 2012

25

1    A.   No.
2    Q.   Okay.  Any separate productions to the
3    defendant intervenors?
4    A.   Yes.
5    Q.   When was that?
6    A.   I believe it was around early April, or April
7    11th or 12th.
8    Q.   Okay.  And can you talk me through the
9    procedures for that?
10   A.   We took the same exact query except we
11   truncated the social security number to the last four
12   digits.
13   Q.   Okay.  So it --
14   A.   It was a new run.
15   Q.   It was a new run, okay.  And just for the
16   record, you again omitted known duplicate records?
17   A.   Yes.
18   Q.   And alias people?
19   A.   Yes.
20   Q.   And you don't know how many cases were
21   contained in the driver's license database at the time
22   of any of those March or April productions?
23   A.   No.
24   Q.   And do you know how many cases were contained
25   in the productions themselves?

26

1    A.   No.
2    Q.   So moving on to early May, was that production
3    -- was the first production in May, to the Department of
4    Justice, May 4th?
5    A.   Yes.
6    Q.   Can you walk me through the procedure for that?
7    A.   The procedure for that is I met with Kathleen,
8    she informed me that additional fields were required,
9    and I wrote queries to extract that data in four
10   different queries.
11   Q.   What do you mean by four different queries?
12   A.   One query to extract the person data, one query
13   to extract the issuance data, one query to extract the
14   transaction data, and one query to extract the admin
15   statuses.
16   Q.   Okay.  So it's one query per table?
17   A.   Yes.
18   Q.   Okay.  But it's all part of the same program,
19   correct?
20   A.   Yes.
21   Q.   And you built that on top of Mr. Smith's
22   program?
23   A.   I started from scratch.
24   Q.   Okay.  But you drew the same data that
25   Mr. Smith had previously drawn?

27

1    A.   Yes.
2    Q.   Okay.  Who is Kathleen Murphy?
3    A.   She's a lawyer -- my lawyer at the Department
4    of Public Safety.
5    Q.   Okay.  Just for the record.
6    Did you receive any written instructions
7    on what data was needed, or was it oral?
8    A.   I received an e-mail that had a list of fields
9    from the data dictionary that were requested by the
10   Department of Justice.
11   Q.   Was that e-mail from Ms. Murphy?
12   A.   Yes.
13   Q.   Then I will not go any further.
14   And when you ran that query, again, did
15   you omit known duplicate records?
16   A.   Yes.
17   Q.   And you omitted alias people?
18   A.   Yes.
19   Q.   Did you run any other filter on the driver's
20   license database when running that production?
21   A.   There's one additional filter.
22   Q.   And what was that?
23   A.   That was we only exported people that had
24   issuances.
25   Q.   Okay.  Under what circumstances would an

28

1    individual not have an issuance?
2    A.   Most likely legacy data.  It's bad data.
3    Q.   And when was the transition made between
4    systems such that there would be legacy data?
5    A.   I believe it was April of 2009.
6    Q.   Why is the data bad?
7    MR. BRISSENDEN:  Objection, vague.
8    Q.   (By Mr. Freeman) To the extent of your
9    knowledge?
10   A.   The rules of the system is every person must
11   have an issuance.
12   Q.   Okay.  Under what circumstances would the prior
13   legacy system have had people without issuances?
14   A.   I don't know.
15   Q.   Approximately how many people in the driver's
16   license database do not have issuances?
17   A.   Nine.
18   Q.   Okay.  Did you run any comparison of the number
19   of records extracted by your program on May -- for the
20   May 4th production and Mr. Smith's program in March and
21   April?
22   A.   No.
23   Q.   Did you run any other comparison between the
24   data that you produced and the data that Mr. Smith's
25   program produced?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

MARK WHELAN                                        June 19, 2012

29

1     A.   No.
2     Q.   Okay.  And did you produce data for the
3  intervenors also in early May?
4     A.   Yes.
5     Q.   Is that May 8th?
6     A.   Yes.
7     Q.   Okay.  And did you truncate social security
8  numbers from the same data that you produced to the
9  Attorney General or did you do a new run?
10     A.   It was a new run on the -- actually, let me
11  correct the data production.
12     Q.   Sure.
13     A.   The data production was done, I believe, May
14  1st.
15     Q.   Okay.
16     A.   For both Department of Justice and the
17  intervenors.
18     Q.   Okay.  But you did separate runs but both dated
19  to May 1st?
20     A.   Yes.
21     Q.   Okay.
22     A.   They were sequential.
23     Q.   And the data produced for the intervenors had
24  -- sorry, strike that.
25          Was your program identical except for

30

1  adding a bit of code that would truncate the social
2  security numbers?
3     A.   Yes.
4     Q.   Were there any quality control steps taken
5  after you completed the export with regard to the
6  Attorney General's data?
7     A.   No.
8     Q.   Were there any quality control steps taken with
9  regard to the export with regard to the defendant
10  intervenor's data?
11     A.   Yes.
12     Q.   What were those steps?
13     A.   I believe the AG's office ran some searches on
14  the data to determine if there was any social security
15  numbers, and they found 10 to 15 in the zip code fields,
16  and they replaced them with 900-900-900.
17     Q.   And that's as a zip code?
18     A.   Yes.  That's where they found them.
19     Q.   Okay.  So there were no 900-900-900 entries
20  added to a social security number field in the
21  intervenor's data?
22     A.   No.  They only have four digits.
23     Q.   Just making sure so that they aren't matching
24  those social security numbers.
25          So you basically can move those people to

31

1  California, correct?
2     A.   I don't know.
3     Q.   And was the subsequent production of data
4  provided to the Attorney General on May 9th for the
5  driver's license database?
6     A.   Not that I'm aware of.
7     Q.   So the last production that you did for the
8  Attorney General was the May 1 run that was produced on
9  May 4th?
10     A.   Yes.
11     Q.   Okay.  Did you run checks for any other errors
12  in either file besides checking for the social security
13  numbers?
14     A.   Can you be specific about errors?
15     Q.   Any data that shows up that doesn't look like
16  it belongs.
17     A.   No.
18     Q.   Okay.
19     A.   They -- no.
20     Q.   Were there any non-readable characters
21  contained in the driver's license database from which
22  you were drawing the extract?
23          MR. BRISSENDEN:  Objection.
24     A.   I don't know.
25     Q.   (By Mr. Freeman) Do you know if there are any

32

1  non-readable ASCII characters in address fields?
2     A.   I don't know.
3     Q.   Are there any known problems, other than
4  individuals without issuance dates, that result from the
5  conversion from the legacy system to the current system?
6          MR. BRISSENDEN:  Objection, vague.
7     A.   There's -- there's some city -- there's some
8  cities and zip codes that are not accurate.  They may
9  have a city spelled wrong.
10     Q.   (By Mr. Freeman) Okay.  Anything other than
11  cities and zip codes?
12     A.   That's the only thing I'm aware of.
13     Q.   Under what circumstances would a social
14  security number show up in the zip code field?
15          MR. BRISSENDEN:  Objection, vague.
16     A.   I don't know.
17     Q.   (By Mr. Freeman) Is that -- is that -- would
18  that be a manual entry error?
19     A.   Yes.
20     Q.   What are the purge procedures for DPS database?
21     A.   There is none.  We do not purge.
22     Q.   When are known deceased individuals removed
23  from the database?
24     A.   They're never removed.
25     Q.   Are they ever archived?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

MARK WHELAN                                              June 19, 2012

33

1   A.  No.
2   Q.  The database will grow inexorably?
3   A.  Yes.
4   Q.  Was there any removal under the prior system?
5   A.  I don't know.
6   Q.  You came on after the conversion from the
7   legacy system?
8   A.  Yes.
9   Q.  How frequently are records added to the DPS
10  database?
11  A.  Every day.
12  Q.  Okay.  Is it a live system?
13  A.  Yes.
14  Q.  Are there any counties that send them to you in
15  batches, or is everybody live?
16  A.  Everybody is live.
17  Q.  Okay.  Were there any other non-routine or
18  irregular additions to the DPS driver's license database
19  since March 1st?
20      MR. BRISSENDEN:  Objection, vague,
21  compound.
22  A.  No.
23  Q.  (By Mr. Freeman) Were there any non-routine or
24  irregular removals from the DPS database since March
25  1st?

34

1       MR. BRISSENDEN:  Same objection.
2       MR. FREEMAN:  Let's go off the record for
3   a couple of minutes and then we will likely wrap up.
4       THE WITNESS:  Okay.
5       (Recess from 12:25 to 12:29 p.m.)
6       MR. FREEMAN:  Back on the record.
7   Q.  (By Mr. Freeman) I have just a few more
8   questions.
9       Is there a record or database of the
10  records that are removed as aliases no longer in use?
11  A.  We have audit tables that record all changes in
12  the database.
13  Q.  Okay.  But the full alias record is not dumped
14  somewhere else?
15  A.  It's stored in the audit tables.
16  Q.  So all data that would have been in the alias
17  record is now in the audit table?
18  A.  Unless there was an instruction to remove them
19  from the audit tables --
20  Q.  When are --
21  A.  -- because --
22  Q.  Sorry.
23  A.  Because of their sensitivity.
24  Q.  Okay.  Other than a sensitive alias record, is
25  information ever otherwise removed from the audit

35

1   tables?
2   A.  No.
3   Q.  And because, as you testified previously,
4   there's no purge procedure from the driver's license
5   database, is everyone who received a driver's license
6   after a -- sorry.  Is everyone who received a driver's
7   license after a certain date now in the database?
8       MR. BRISSENDEN:  Objection, vague.
9   A.  As far as I know, from April of 2009.
10  Q.  (By Mr. Freeman) Okay.  And am I correct, you
11  -- so you don't know whether purges were done from the
12  prior database, right?
13  A.  Correct, I do not know.
14  Q.  And do you know if, when the conversation was
15  performed, records of a certain age were taken out as
16  part of the conversion process?
17  A.  I do not know.
18  Q.  And so am I correct that individuals whose
19  driver's license has expired since the April 2009
20  conversion, they're still in the driver's license
21  database?
22  A.  Correct.
23  Q.  And individuals who are out-of-state drivers
24  who received tickets in Texas, they go into the driver's
25  license database as well?

36

1   A.  Yes.
2   Q.  So they're all in there?
3   A.  Yes.
4   Q.  All right.  Do you have any other answers that
5   you wish to change at this time?
6   A.  No.
7   Q.  Anything that you suddenly remember now that
8   you didn't recall before?
9   A.  No.
10  Q.  Anything you'd like to add so we can understand
11  your answers more clearly?
12  A.  No.
13  Q.  Okay.
14      MR. FREEMAN:  Well, thank you for your
15  testimony.
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 1

340896 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
STATE OF TEXAS,                         *
          Plaintiff,                    *
VS.                                     *
ERIC H. HOLDER, JR., in his             *
official capacity as Attorney           *
General of the United States,           *
          Defendant,                    *
ERIC KENNIE, et al,                     *
          Defendant-Intervenors,        *
TEXAS STATE CONFERENCE OF NAACP         * CASE NO.
BRANCHES, et al,                        * 1:12-CV-00128
          Defendant-Intervenors,        * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS            * THREE-JUDGE COURT
EDUCATION FUND, et al,                  *
          Defendant-Intervenors,        *
TEXAS LEGISLATIVE BLACK CAUCUS,         *
et al,                                  *
          Defendant-Intervenors,        *
VICTORIA RODRIGUEZ, et al               *
          Defendant-Intervenors.        *
```

DEPOSITION OF SENATOR THOMAS D. WILLIAMS
UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:

Maria H. Rios, Esquire
U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530

Date          Edith A. Boggs, CSR

6-1-12        HOUSTON, TEXAS

## 2

8    DEPOSITION OF SENATOR THOMAS D. WILLIAMS

11   DEPOSITION AND ANSWERS of SENATOR THOMAS D. WILLIAMS,
12   taken before Edith A. Boggs, a certified shorthand
13   reporter in Harris County for the State of Texas, taken
14   at the offices of United States Attorney's Office, 816
15   Congress, Austin, Texas, on the 1st day of June, 2012,
16   between the hours of 9:31 a.m. and 5:29 p.m.

## 3

```
 1        A P P E A R A N C E S
 2
 3
 4   ATTORNEYS FOR PLAINTIFF, STATE OF TEXAS:
 5
     Office of the Attorney General of Texas
 6   P.O. Box 12548 (78711-2548)
     209 West 8th Street, 8th Floor
 7   Austin, Texas  78701
 8   By:  Patrick K. Sweeten, Esquire
     and Jay Dyer, Esquire
 9
     (512) 936-1307
10   patrick.sweeten@aog.state.tx.us
11
12   ATTORNEYS FOR DEFENDANT, HOLDER, ET AL:
13
     U.S. Department of Justice
14   950 Pennsylvania Avenue, NW
     NWB - Room 7202
15   Washington, DC  20530
16   By:  Maria H. Rios, Esquire
     and Jennifer Maranzano, Esquire
17   and Spencer Fisher, Esquire
18   (202) 305-7766
     maria.rios@usdoj.gov
19
20
21
22
23
24
25
```

## 4

```
 1
     A P P E A R A N C E S (Continued)
 2
 3
     ATTORNEYS FOR INTERVENORS:
 4
 5   American Civil Liberties Union Foundation
     Southern Regional Office
 6   230 Peachtree Street
     Atlanta, Georgia  30303-1227
 7   By:  Nancy G. Abudu, Esquire
 8   (404) 523-2721
     nabudu@aclu.org
 9
10   AND
     Advancement Project
11   1220 L Street, NW
     Suite 850
12   Washington, DC  20005
13   By:  Donita Judge, Esquire
14   (202) 728-9557
     djudge@advancementproject.org
15
16
17   REPORTED BY:
18   Ms. Edith A. Boggs
19
20
21
22
23
24
25
```

## 5

EXAMINATION INDEX

QUESTIONS BY                                PAGE

Ms. Rios                              7

Ms. Abudu                           207

Ms. Rios                            253


INDEX OF EXHIBITS

NO.   MARKED        DESCRIPTION
      OR FIRST
      REFERENCED

6    196      LexisNexis Official Code of Georgia
              Annotated

29   124      SB 362

44   83       HB 1706

45   95       Declaration of Carlos Uresti

60   193      PL 109-2005

400  17       Amended Notice of Deposition

401  53       NEW YORK TIMES article The Talk,
              and the Talk, and the Talk, of Austin

402  84       Texas Legislative Council Second
              Revised Privilege Log, May 23, 2012

403  192      HB 218

404  154      Senate Resolution No. 14

405  160      Public Statement from Tommy
              Williams, State Senator, District 4

## 6

406   163      Wednesday, January 14, 2009, Texas
               Senate, 81st Legislature, 2009 Regular Session

407   168      Texas Senate Staff Services, 82nd
               Legislative Session, Excerpt: Senate Bill 14, January
               26, 2011

408   169      Texas Senate Staff Services, 82nd
               Legislative Session, Excerpt: Senate Bill 14, January
               26, 2011

409   169      Committee of the Whole Senate,
               Tuesday, March 10, 2009

410   177      SB 14

411   177      Senate Resolution No. 36

412   253      Excerpt of transcript,
               Consideration of Senate Bill 14, 1/25/2011

## 7

PROCEEDINGS

THE COURT REPORTER:  Would all counsel present state their names and affiliations.

MS. RIOS:  Yes.  Maria H. Rios with the Justice Department.

MS. MARANZANO:  Jennifer Maranzano with the Justice Department.

MS. ABUDU:  Nancy Abudu, defendant-intervenors.

MS. JUDGE:  Donita Judge, defendant-intervenors.

MR. DYER:  Jay Dyer for the State of Texas.

MR. SWEETEN:  Patrick Sweeten from the Texas Attorney General's office on behalf of the State of Texas and on behalf of the witness, Senator Tommy Williams.

MS. RIOS:  Okay.  Good morning.  We are here for the deposition of Senator Tommy Williams in Texas versus Holder.

SENATOR THOMAS D. WILLIAMS was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION

Q.  (BY MS. RIOS)  Sir, could you please state your name for the record.

## 8

A.  Sure.  It's Thomas D. Williams.  I go by Tommy.  That's my nickname.

Q.  Mr. Williams, I'm going to discuss briefly some ground rules.

You should answer my questions truthfully, accurately and completely.

The court reporter will prepare a transcript of everything that is said today, so, you must respond to my questions verbally.  So, no shaking heads, going uh-huh, because she's going to record, you know, whatever is a verbal response.

Please wait for me to finish my questions before you answer, and I'll try to do the same.

And I will try to ask you clear questions but if you don't understand a question, please let me know.

If you wish to stop and take a break, please tell me, and I will try to accommodate you.

Understand that you are under oath and you may be subject to penalty of perjury for giving false or misleading testimony, just like at trial.

Do you understand these instructions?

A.  I do.

Q.  And do you have any questions about these instructions?

A.  No.

Senator Thomas D. Williams                                    June 1, 2012

## 21

1  A. Yes.
2  Q. And how many documents were produced to your
3  attorneys?
4  A. I don't know how many were produced.
5  Q. Do you know if any were produced?
6  A. I know that there's one that's included in the
7  information that we disclosed to you.
8  Q. Okay. And could you describe that document to
9  me, please?
10  A. I think that there is a document that was
11  disclosed to you that talked about how many prosecutions
12  there had been in Harris County related to this in a
13  statement from the Harris County District Attorney that
14  was responsive to this question.
15  Q. And do you recall how many prosecutions are
16  mentioned in this document?
17  A. I do not.
18  Q. Okay. Is there a person in your legislative
19  office who maintains records?
20  A. I'm not sure what you're asking.
21  Q. I'm talking about records and retention. Is
22  there someone in your legislative office, in your --
23  A. That's just in charge of that?
24  Q. Yes.
25  A. No.

## 22

1  Q. And how are records maintained in your office?
2  A. In accordance with state policy.
3  Q. And what is the retention policy?
4  A. I've instructed my staff to follow the state
5  retention policy, and they do that so far as I know.
6  Q. Okay. And do you know where papers filed since
7  2005 are maintained at your office?
8  A. Do I know?
9  Q. Yes.
10  A. No.
11  Q. And how about electronic files, do you know where
12  they are maintained?
13  A. No.
14  Q. So, you do not know if paper files or electronic
15  files are maintained at your office or at another
16  location?
17  A. I don't know.
18  Q. And as to the location where these records are
19  maintained, that would be based on the state retention
20  policy?
21  A. Yes.
22  Q. Okay. Could you briefly describe your
23  educational background?
24  A. I graduated from public high school and attended
25  Texas A&M University. I graduated from there with a BBA

## 23

1  in accounting.
2  Q. Okay. Are you a CPA?
3  A. I am.
4  Q. Okay. Any post college education?
5  A. School of hard knocks, yeah.
6  Q. And since when have you served in the Senate?
7  A. I was elected in 2002.
8  Q. And prior to that, were you a member of the Texas
9  House?
10  A. I was.
11  Q. And the years of your service?
12  A. I was elected in 1996, and I served in the House
13  until I was elected to the Senate.
14  Q. Had you pursued public office before your service
15  as a member of the Texas House?
16  A. No.
17  Q. So, in 1996 when you were elected to the House,
18  that was your first public office?
19  A. Yes.
20  Q. Okay. Could you describe the area encompassed by
21  your district as District 4, The Woodlands?
22  A. Do you want me to describe it as it is configured
23  now or as it was configured before the current
24  redistricting?
25  Q. As it was configured before the current

## 24

1  redistricting.
2  A. It's Southeast Texas. It included all of Orange
3  County, most of Jefferson County except for the City of
4  Port Arthur, all of Chambers County except for the
5  Intercoastal Waterway, all of Liberty County, portions
6  of Harris County, from Kingwood, Atascocita and down to
7  Baytown, and in Montgomery County, the south and eastern
8  portions of the county, The Woodlands, east of Magnolia,
9  New Caney and Porter.
10  Q. And is this close to the Louisiana border?
11  A. A portion of my district is close to the
12  Louisiana border.
13  Q. Okay. And what is the --
14  A. It is the border with Louisiana, a portion of it
15  was, yes, not in my current district but in the district
16  I had before redistricting.
17  Q. And the total population of your district before
18  redistricting?
19  A. I don't recall exactly what it was. I know I was
20  about 20,000 under whatever the new target population
21  was.
22  Q. And could you describe the demographics of your
23  district? And, again, I'm referring to your district
24  before redistricting.
25  A. Well, it's the people of Southeast Texas, and as

Senator Thomas D. Williams                                June 1, 2012

## 25

1   far as the specific breakdown of -- if you're asking me
2   about the ethnic makeup, I couldn't tell you off the top
3   of my head what those numbers are.
4       Q.  Could you give me an estimate of the proportion
5   of Hispanics, African Americans, Native Americans, Asian
6   Americans in your district?
7       A.  I cannot.
8       Q.  And to which committees do you belong in the
9   Senate?
10      A.  Presently or at the time that we considered this
11  bill?
12      Q.  At the time SB14 was considered.
13      A.  That would have been the last legislative
14  session.
15      Q.  Yes.
16      A.  I was a member of the Senate Finance Committee.
17  I was a member of the Senate State Affairs Committee.  I
18  was a member of the International Relations and Trade
19  Committee.  And I was the Chairman of the Transportation
20  and Homeland Security Committee.  I was also a member of
21  the Legislative Audit Committee, and then I served on
22  several subcommittees on the Senate Finance Committee
23  and on several conference committees during the session.
24      Q.  Okay.  And since when have you -- what were the
25  dates of your service in the State Affairs Committee?

## 26

1       A.  You know, I'd have to go back and look exactly.
2   When I came in in 2002, I don't believe I was on the
3   State Affairs Committee in the '03 session but I think
4   in '05 -- maybe I was in '03 and '05 and then I was not
5   in '07 and I was put -- maybe I wasn't in '09.  I don't
6   know exactly.  I know there was one or two sessions that
7   I was not on that committee and then I was put back on
8   the committee.  So, I don't remember the exact dates out
9   of the five or six sessions that I've served in the
10  Senate.
11      Q.  But --
12      A.  But it's a matter of public record.
13      Q.  Okay.  Were you --
14      A.  It's easy enough to check.
15      Q.  Were you a member of the State Affairs Committee
16  in 2009?
17      A.  I think I was.  Can we look and see?  It's of
18  public record.  I know I was in '11.  I don't think I
19  was in '09 but I don't remember.
20      Q.  Going back to your district demographics, are you
21  aware of the demographics of your district post
22  redistricting?
23      A.  Not specifically.
24      Q.  So, you wouldn't be able to tell me about the
25  proportion of Hispanics, African Americans, Native

## 27

1   Americans, Asian Americans in your district?
2       A.  No.  They are all my constituents no matter what
3   color they are.
4       Q.  And do you know if State Affairs has been the
5   sole committee that has considered voter ID bills since
6   you have been in the Senate?
7       A.  I know that it has not been.
8       Q.  What other committees have considered voter ID
9   bills?
10      A.  The Committee of the Whole.
11      Q.  Okay.  And other than the Committee of the Whole
12  and State Affairs, do you know of other committees which
13  have considered voter ID bills?
14      A.  To my knowledge, no other committee in the Senate
15  has considered that legislation.
16      Q.  Okay.  Have you ever -- okay.  Do you belong to
17  any subcommittees of the State Affairs Committee?
18      A.  Not to my recollection.
19      Q.  And any special task forces or other groups that
20  stem from the State Affairs Committee?
21      A.  I'm not sure what you're asking me.
22      Q.  If the State Affairs Committee appoints some of
23  its members to look into a special issue and they
24  constitute like a special subcommittee for consideration
25  of a special issue, that's what I'm referring to.

## 28

1       A.  And your question again is what?
2       Q.  During the time you have been a member of the
3   State Affairs Committee, have you -- you told me that
4   you have not been a member of any subcommittee of the
5   State Affairs Committee.  Have you been a member of any
6   other group that's part of the State Affairs Committee?
7       A.  You know, I don't recall.  I'd have to go back
8   and check the record.
9       Q.  Okay.
10      A.  It's a matter of public record.  If you really
11  want to know, you can find out.
12          We're going to have to get the temperature turned
13  down in here.
14      Q.  Putting aside the voter photo ID bills, how many
15  election-related bills have you sponsored or co-signed?
16      A.  I don't know.
17      Q.  And any voter photo ID bills that you have not
18  co-sponsored or signed but that you have provided input
19  for?
20      A.  What's your question?
21      Q.  Okay.  Any election-related bills that you have
22  not co-authored or co-signed that you have provided
23  input to?
24          MR. SWEETEN:  Objection.  Vague.
25      A.  I mean, I really don't know what it is you're

Senator Thomas D. Williams                                    June 1, 2012

## 53

1  gained as a legislator.
2      Q. (BY MS. RIOS)  Have you ever witnessed anyone try
3  to impersonate another voter?
4      A. Have I personally witnessed that?
5      Q. Yes.
6      A. No, not to my knowledge.
7      Q. Okay.  And have you ever witnessed a noncitizen
8  vote?
9      A. Not to my knowledge.
10     Q. Have you ever challenged a voter's eligibility?
11     A. I have not.
12     Q. I'm going to show you what will be marked as
13  Exhibit 401.
14         (Exhibit 401 marked.)
15     Q. (BY MS. RIOS)  This is an article from the NEW
16  YORK TIMES dated May 30th, 2009, and it's entitled The
17  Talk, and the Talk, and the Talk, of Austin.  I bring to
18  your attention Page 2.  And if you could look at the
19  paragraph towards the bottom of the page that begins
20  with, "Senator Tommy Williams."
21     A. Uh-huh.
22     Q. Okay.  According to this article, you stated, "My
23  grandfather voted in the Democratic primary for 50 years
24  after he was dead."
25     A. That's correct.

## 54

1      Q. And how do you know about this?
2      A. My brother and my grandmother related that
3  information to me.
4      Q. Okay.
5      A. I believe that my brother testified about this in
6  the Committee of the Whole.
7      Q. And did you or anyone from your family take any
8  action in relation to the assertion that your
9  grandfather voted for 50 years after his death?
10     A. My brother and my grandmother tried several times
11  to get my grandfather removed from the rolls.  She was
12  not successful, and she enlisted my brother to help her.
13  And he tried to also get him removed, and I don't
14  believe that he was successful in doing that.
15     Q. And it's removed from which rolls?
16     A. The voter rolls.  He was dead.  He died when my
17  mother was two.
18     Q. And what did he -- what year was this?
19     A. It would have been in the '30s.
20     Q. Okay.  And these were the voter rolls from -- was
21  it from a county?
22     A. Harrison County.
23     Q. Harrison County.  And how many times did your
24  grandmother and your brother try to get your grandfather
25  removed from the rolls?

## 55

1      A. You'd have to ask my brother.  I don't know the
2  answer to that.
3      Q. Do you know if anyone was arrested, prosecuted or
4  convicted for -- did anyone vote for your grandfather
5  during these 50 years?
6      A. Apparently someone did.
7      Q. Okay.  And do you know if anyone was arrested,
8  prosecuted or convicted for voting for your grandfather?
9      A. Not to my knowledge.
10     Q. Okay.  And do you know how often someone voted
11  for your grandfather during these 50 years?
12     A. I do not have -- I do not know exactly.
13     Q. And what evidence do you have that a vote was
14  cast for your grandfather at any time during these
15  50 years?
16     A. My brother testified about it in committee.
17     Q. Does he have -- and what evidence did he have?
18     A. You would have to ask him about it.
19     Q. Did he have any copies of the voter rolls
20  indicating that a vote was cast?
21     A. You would have to ask him about it.
22     Q. Okay.  And these were 50 years beginning in the
23  '30s?
24     A. Yes.  I think it may have been more than
25  50 years.

## 56

1      Q. And do you know of any evidence that the -- that
2  your grandfather's name was on the rolls?
3      A. Yes.  My grandmother received his voter
4  registration card, and when she called and tried to have
5  him removed and she told the person that he had been
6  dead for decades, they said, "No, ma'am, he voted in the
7  last election."
8      Q. Okay.  Did she file a complaint?
9      A. I don't know.  I don't know.
10     Q. Did your brother file a complaint?
11     A. I think that whatever he did is reflected in the
12  testimony that he gave before the Committee of the
13  Whole.
14     Q. Do you have any other evidence or information
15  that your brother did not include in his testimony?
16     A. No.
17     Q. Are you familiar with the National Voter
18  Registration Act?
19     A. I know -- I've heard of it.  I don't know what
20  you mean by "familiar."
21     Q. Okay.  Are you aware that the National Voter
22  Registration Act includes provisions about keeping the
23  voter rolls up to date and accurate?
24     A. I am.
25     Q. Okay.  Do you know whether your grandmother or

Senator Thomas D. Williams                              June 1, 2012

## 57

1  your brother made any complaint under the National Voter
2  Registration Act?
3      A.  And when was that act passed?
4      Q.  That act passed -- that was in 1996.
5      A.  I believe my grandmother was deceased at that
6  time.
7      Q.  And by that time was your grandfather off the
8  voter rolls, do you know?
9      A.  I don't know.
10     Q.  You don't know?  And so, when you stated, "My
11  grandfather voted in the Democratic primary for 50 years
12  after he was dead," was that, you know, based on what
13  your brother and your grandmother told you?
14     A.  Yes.
15     Q.  But do you have any personal knowledge that this
16  assertion is true?
17     A.  I know that they were truthful when they told me
18  that.
19     Q.  But do you --
20     A.  They would have no reason not to be.
21     Q.  But do you have any evidence of this assertion?
22         MR. SWEETEN:  Asked and answered.
23         You can go ahead and answer it.
24     A.  All I have is what they told me.  I believe it to
25  be true.

## 58

1      Q.  (BY MS. RIOS)  Okay.  Are you familiar with
2  Section 5 of the Voting Rights Act?
3      A.  I know -- when you say "familiar," I'm not sure
4  what you mean by that.  Can you clarify that?
5      Q.  Do you know about Section 5 of the Voting Rights
6  Act?
7      A.  Yes.
8      Q.  And what is your understanding of Section 5
9  requirements?
10     A.  My understanding of Section 5 requirements are
11  that it applies only to the states that were members of
12  the confederacy, and it requires those states to -- when
13  there is a change in election law, to preclear that
14  law -- the change in law with either the Justice
15  Department or the DC Court of Appeals.
16     Q.  And do you believe that compliance with this
17  statute is important?
18         MR. SWEETEN:  When you're answering the
19  question, don't reveal your thoughts, mental
20  impressions, opinions, motivations about legislation,
21  including Senate Bill 14, and don't reveal
22  communications that you've had that I've outlined.
23     A.  It's something that we have to deal with state
24  legislators.
25     Q.  (BY MS. RIOS)  And how does a legislator ensure

## 59

1  that election laws comply with Section 5?
2         MR. SWEETEN:  I'm going to object.  I think
3  you're asking him matters that are subject to the
4  legislative privilege that would require him to reveal
5  his thoughts, mental impressions, opinions, motivations
6  about legislation and the furtherance of the legislative
7  process.
8      A.  I'm not going to answer the question on advice of
9  counsel.
10     Q.  (BY MS. RIOS)  And when you said that, "Section 5
11  is something that we have to deal with," what did you
12  mean by that?
13     A.  It's a -- what I meant was that it is a federal
14  law that is something that has to be considered in the
15  legislative process.
16     Q.  And considered how?
17         MR. SWEETEN:  I think when you're asking him
18  how he's considering it, you're asking him to reveal his
19  thoughts, mental impressions, opinions, motivations
20  about legislation and the furtherance of the legislative
21  process.  Objection.  Legislative privilege.  Instruct
22  not to answer.
23     A.  On the advice of counsel, I won't answer that
24  question.
25     Q.  (BY MS. RIOS)  Okay.  Did you receive any legal

## 60

1  advice on the elections-related legislation to ensure
2  compliance with Section 5?
3         MR. SWEETEN:  You can -- go ahead.
4         MS. RIOS:  I'm asking if he does receive
5  legal advice.  I'm not asking about, you know, the
6  subject of this legal advice.
7         MR. SWEETEN:  Okay.  And so, I'm going to
8  let you answer a yes or no as to whether you've received
9  legal advice.  Don't reveal the substance of the
10  conversation.
11     A.  Yes.
12     Q.  (BY MS. RIOS)  And from whom did you receive this
13  legal advice?
14     A.  It could be a number of sources.  It could be a
15  member of my staff.  It could be someone from the
16  Attorney General's office.  It could be someone from the
17  Secretary of State's office.  And it could be someone
18  from the staff of the committee -- from the State
19  Affairs Committee, for example, where that kind of
20  legislation is most frequently considered.
21     Q.  Okay.  And did you receive any legal advice on
22  Senate Bill 14 to ensure compliance with Section 5?
23         MR. SWEETEN:  I think the question gets into
24  the substance of communication.  I think he can -- and I
25  think he has indicated where he's received sources of

Senator Thomas D. Williams                                June 1, 2012

---

### 65

1  deposition, so, I am asking you about whether the
2  current system has failed to prevent voter fraud?
3       MR. SWEETEN:  And I'm going to object based
4  upon the legislative privilege for the reasons I've
5  outlined previously but, again, he can answer based upon
6  matters of public record.  He's not going to reveal his
7  thoughts, mental impressions, opinions or motivations
8  about legislation in answering this question.
9       A.  There is information in the public record that
10  there has been in-person voter fraud, in my opinion.
11  That's what the record shows.
12       In fact, I think in the last session of the
13  legislature, I introduced an affidavit from someone who
14  was paid to be someone else in the Progreso Independent
15  School District.  There was a sworn affidavit to that
16  effect that they were paid and given a voter
17  registration card to go vote.
18       Q.  (BY MS. RIOS)  And this affidavit from the
19  Progreso School District election, did it lead to any
20  criminal charges or convictions?
21       A.  I don't know the answer to that.
22       Q.  Okay.  Do you know if it's a matter of public
23  record whether this affidavit led to any convictions
24  or --
25       A.  I'm sure that it is.

---

### 66

1       Q.  Do you know if there were any convictions or ever
2  criminal charges?
3       A.  I've already answered that I didn't know.  I
4  don't know.
5       Q.  And other than this affidavit, any other evidence
6  that the current system failed to prevent voter fraud?
7       MR. SWEETEN:  Again, don't reveal your
8  thoughts, mental impressions, opinions or motivations
9  about legislation or in furtherance of the legislative
10  process, including Senate Bill 14.  Do not reveal
11  communications you've had with the individuals or
12  entities that I've outlined previously.  You can answer
13  the question.
14       A.  I think that there were a number of instances
15  where there was voter fraud that was in-person voter
16  fraud that was cited during the course of the testimony
17  that we took in committee.
18       Q.  (BY MS. RIOS)  And were these allegations,
19  complaints or convictions?
20       A.  They were complaints.
21       Q.  Complaints that led to convictions?
22       A.  I don't -- I can't tell you whether they led to
23  convictions or not.
24       Q.  Didn't you think that it was important to know
25  whether a complaint or the affidavit from Progreso led

---

### 67

1  to a conviction before introducing it in the record?
2       MR. SWEETEN:  That calls for matters of
3  legislative privilege, including his thoughts, mental
4  impressions, opinions, motivations about legislation or
5  in furtherance of the legislative process.
6       I'm going to instruct him not to answer as
7  to whether he felt it was important as to that issue.
8       You can refer to matters in the public
9  record, if possible, in answering the question.
10  Otherwise, I'm going to instruct you not to answer based
11  on the legislative privilege.
12       A.  I don't think I have anything further to say.
13       Q.  (BY MS. RIOS)  Okay.  If you forget your
14  registration card on election day, can you show any
15  other documents that will enable you to cast a ballot?
16       MR. SWEETEN:  You're asking under current
17  law?
18       MS. RIOS:  Under current law.
19       MR. SWEETEN:  Okay.  You can answer as to
20  current law.
21       A.  Yes.
22       Q.  (BY MS. RIOS)  What other documents can you show?
23       A.  A Texas driver's license, a passport.  Any kind
24  of photo identification that you might have would
25  probably be sufficient.

---

### 68

1  I also believe there's some other -- I'll refer
2  you back to the legislation but there are other things,
3  such as a utility bill and other things, a library card,
4  things that you can show that might be sufficient.
5       Q.  The library card, the utility bill, these are
6  documents that do not have a photograph?
7       A.  Yes.
8       Q.  And by presenting these documents, you would be
9  allowed to vote?
10       A.  Yes.
11       Q.  Okay.  You told me about the affidavit, you know,
12  from the Progreso school system and other allegations of
13  impersonation at the polls.  Any other problems with the
14  current law?
15       MR. SWEETEN:  Objection.  Calls for matters
16  of legislative privilege, including requiring him to
17  reveal his thoughts, mental impressions, opinions,
18  motivation about legislation or in furtherance of the
19  legislative process and/or communications that we've
20  outlined previously.
21       So, you can answer, if you can, to the
22  extent you're not revealing matters of privilege.
23  Otherwise, do not answer the question.
24       THE WITNESS:  Could I ask you to read her
25  question back, please?

## 69

1   (Whereupon, the requested testimony was read back
2   as follows:
3   QUESTION: Okay. You told me about the
4   affidavit, you know, from the Progreso school
5   system and other allegations of impersonation at
6   the polls. Any other problems with the current
7   law?)
8   MR. SWEETEN: Same objection and
9   instruction.
10  A. The problem with the current law is --
11  MR. SWEETEN: Hold on a minute. Don't
12  answer if it's going to invade legislative privilege.
13  You can answer based on matters of public record but
14  you're not going to give your thoughts, mental
15  impressions or opinions or motivation about legislation
16  as you've asserted legislative privilege and that would
17  reveal legislative privilege. So, with that
18  instruction, you can proceed.
19  A. In the absence of a valid photo ID, there's no
20  way to determine if the person who is voting is who they
21  say they are. That's the problem.
22  Q. (BY MS. RIOS) Any other problems that you wish
23  to identify related to the current system?
24  A. No.
25  Q. When was Senate Bill 14 signed into law?

## 70

1   A. You know, I don't know the exact date.
2   Q. Okay.
3   A. We could look at the bill if you have a copy of
4   it. I mean, it's a matter of public record.
5   Q. And do you know if elections have been held since
6   Senate Bill 14 was signed into law in July of 2011?
7   A. Yes.
8   Q. And has the Secretary of State enforced Senate
9   Bill 14?
10  A. I don't believe so.
11  Q. And are you aware of any problems or fraud that
12  have occurred since Senate Bill 14 was signed into law?
13  A. I don't have any specific knowledge.
14  MR. SWEETEN: Ms. Rios, I need to take a
15  bathroom break but I don't have to right now, just if
16  you get to a logical stopping place.
17  MS. RIOS: We can stop right now.
18  Off the record.
19  (Short recess.)
20  Q. (BY MS. RIOS) Okay. Mr. Williams, when did you
21  first hear any support for enacting a photo voter
22  identification statute in Texas?
23  A. '97.
24  Q. '97. And what were the circumstances?
25  MR. SWEETEN: Don't reveal matters of

## 71

1   privilege in answering it but you can answer.
2   A. It's a matter of public record that Democratic
3   Representative Debra Danburg introduced the bill. It
4   passed out of the House with over 140 votes, I believe,
5   that said if you didn't have your voter registration
6   card that you had to present a photo ID to be able to
7   vote, and I voted for that bill.
8   Q. (BY MS. RIOS) Do you know if this was the
9   bill --
10  A. It may not have been '97. It may have been '99.
11  Q. So, in the absence of the voter registration
12  card, the bill provided that you should bring a photo
13  ID?
14  A. Right.
15  Q. And the voter registration card does not have a
16  photo?
17  MR. SWEETEN: You mean right now? You're
18  saying --
19  MS. RIOS: Right now, yes.
20  MR. SWEETEN: -- the voter registration card
21  does not have a photo?
22  A. That's correct.
23  Q. (BY MS. RIOS) And when did you first hear
24  support for having just a photo voter identification
25  statute?

## 72

1   MR. SWEETEN: You can reveal matters that
2   aren't subject to legislative privilege.
3   A. I don't recall.
4   Q. (BY MS. RIOS) Did any of your constituents raise
5   photo voter ID as an important issue to them?
6   MR. SWEETEN: Objection. You can reveal
7   whether or not you've had discussions with constituents,
8   the general matter of those but do not reveal the
9   substance of any communications you've had with
10  constituents.
11  A. I believe my constituents were very concerned.
12  Q. (BY MS. RIOS) And when did they express this
13  concern to you?
14  MR. SWEETEN: You can answer when.
15  A. I know it has been an issue that they've been
16  very concerned about during my entire tenure in the
17  Senate.
18  Q. (BY MS. RIOS) Since 2002?
19  A. (Witness indicated by nodding his head
20  affirmatively.)
21  Q. And how often have your constituents raised photo
22  ID as an important issue to them?
23  MR. SWEETEN: You can talk about the
24  frequency of communications you've had with your
25  constituents regarding the issue of voter ID. You can

Senator Thomas D. Williams                               June 1, 2012

### 73

1 answer that question.
2      A. I don't know. I can't tell you how often. I
3 don't recall.
4      Q. (BY MS. RIOS) Okay. What are the names of the
5 constituents who have raised photo ID as an important
6 issue for them?
7      A. I don't recall their names.
8      Q. Is there any record of constituents raising photo
9 ID as an important issue for them?
10      A. I don't know.
11      Q. Do you have any -- I mean, did they raise their
12 concern about photo ID in writing or orally?
13           MR. SWEETEN: You can answer that.
14      A. I know that I have heard it orally. I may have
15 had written correspondence about it but I don't recall
16 specifically.
17      Q. (BY MS. RIOS) Do you know if this written
18 correspondence was kept in your office?
19      A. It would have been maintained subject to the
20 requirements that we maintain in Texas but only to that
21 extent.
22      Q. Did any of your constituents bring you evidence
23 of voter impersonation at the polls?
24           MR. SWEETEN: I think you're asking him to
25 reveal the substance of communications with

### 74

1 constituents. I think that would invade matters subject
2 to the legislative privilege.
3           So, as to evidence of the substance of the
4 communication, I'm going to object on legislative
5 privilege grounds.
6      A. I don't think I can answer the question without
7 violating a confidence of privilege.
8      Q. (BY MS. RIOS) So, you cannot answer the question
9 about whether they brought you evidence of voter
10 impersonation?
11           MR. SWEETEN: Same instruction.
12      A. That's correct.
13      Q. (BY MS. RIOS) Did other individuals or
14 organizations bring you evidence of voter impersonation
15 at the polls?
16           MR. SWEETEN: Can you read the question
17 back?
18           (Whereupon, the requested testimony was read back
19 as follows:
20           QUESTION: Did other individuals or organizations
21 bring you evidence of voter impersonation at the
22 polls?)
23           MR. SWEETEN: You can answer to the extent
24 it's not a constituent which would be a resident in the
25 State of Texas. You can answer if that was brought to

### 75

1 you by someone other than a constituent.
2      A. I think that my response -- my response is that
3 to the extent that it's available in the public record,
4 I've been made aware of instances of in-person voter
5 fraud. And there's nothing that I can recall beyond
6 that that's already a part of the public record.
7      Q. (BY MS. RIOS) So, in the public record, you put
8 the affidavit from the Progreso Independent School
9 District. Did you put anything else in the public
10 record?
11      A. Specifically, I don't recall that I put it in but
12 I know there was testimony from Harris County, and I
13 don't recall how it got into the record but I recall
14 that it is a matter of public record that there were a
15 large number of people, maybe as many as 3400, that had
16 voted who were not residents of the United States, and
17 they were purged -- later purged from the rolls, and
18 there was other testimony about that but it's all a part
19 of the public record. All I know about is part of the
20 public record.
21      Q. Is the Progreso Independent -- is the Progreso
22 School District in your district?
23      A. It is not.
24      Q. Okay. Where is the Progreso School District
25 located?

### 76

1      A. In the Rio Grand Valley.
2      Q. Have any groups or individuals brought you
3 evidence of other types of voter fraud, meaning voter
4 fraud that is unrelated to impersonation at the polls?
5           MR. SWEETEN: Same instruction as to
6 constituents, if it's not a constituent.
7      A. I need to take a break and visit with counsel
8 before I answer that question.
9           MS. RIOS: Off the record.
10           (Short recess.)
11           THE WITNESS: Could I ask you to repeat the
12 question to me, please?
13           (Whereupon, the requested testimony was read back
14 as follows:
15           QUESTION: Have any groups or individuals brought
16 you evidence of other types of voter fraud,
17 meaning voter fraud that is unrelated to
18 impersonation at the polls.)
19      A. There are well-publicized accounts in my home
20 county of Montgomery County of voter fraud that
21 occurred, and I'm aware of that through the media, in a
22 road utility district election.
23      Q. (BY MS. RIOS) And what type of voter fraud did
24 that pertain to?
25      A. The accounts in the media were that the people --

## 77

1  there were people who were voting in the election that
2  claimed to be residents of the district that were not,
3  in fact, residents of that district.
4      Q.  So, people who -- anyone was charged or convicted
5  for this?
6      A.  I believe my recollection is that there was a
7  conviction.  I don't believe they've been sentenced yet
8  but I don't know.  It is a matter of public record.
9      Q.  And this is unrelated to in-person voter
10 impersonation at the polls, the situation that happened
11 in Montgomery County?
12     A.  I believe that it is.  By the media accounts, I
13 believe it is.
14         MS. RIOS:  Patrick, I am going to ask some
15 of the questions that I already asked with the caveat
16 that it's our position that when constituents provide
17 unsolicited evidence or allegations or complaints to the
18 Senator, that is not protected by the legislative
19 privilege.  These are just communications and evidence
20 that he could receive unrelated to the bills that he's
21 working on.
22         MR. SWEETEN:  Okay.  And if -- and my
23 instruction has been and will continue to be that to the
24 extent you're asking him to reveal communications with
25 constituents that that is a matter subject to the

## 78

1  legislative privilege.
2         So, the substance of those communications,
3  what he talked about, I mean, there's -- that those
4  would be covered by the privilege.
5         You can -- I'm certainly going to let you
6  answer, as the Court order has addressed, the identity
7  of constituents, the general subject matter description
8  of the constituents and what they discussed, the date of
9  the communication, the means and method, whether others
10 were present.  All those foundational questions are fine
11 but I think the core of the legislative privilege
12 includes as one element the constituent communication.
13 So, I'm going to continue my instruction with respect to
14 that issue.
15     Q.  (BY MS. RIOS)  Okay.  Did your constituents bring
16 you unsolicited evidence or complaints of voter
17 impersonation at the polls?
18         MR. SWEETEN:  You can answer if constituents
19 brought you complaints.  Again, the substance of the
20 communication don't reveal but the facts around the
21 communication, I'll let you answer.
22     A.  Yes.
23     Q.  (BY MS. RIOS)  And who were these constituents
24 who brought you evidence of voter impersonation at the
25 polls?

## 79

1         MR. SWEETEN:  You can answer the name of the
2  constituent that's discussed this general subject matter
3  issue with you.
4      A.  There is one constituent that I recall
5  specifically, and her name is Melinda Fredricks.
6      Q.  (BY MS. RIOS)  And when did Melinda Fredricks
7  bring you evidence of voter impersonation at the polls?
8      A.  During the consideration of Senate Bill 14,
9  sometime during that legislative session.  I don't
10 recall the specific date or time.
11     Q.  Did Melinda Fredricks bring you evidence of
12 convictions or charges related to voter impersonation at
13 the polls?
14         MR. SWEETEN:  You don't have to answer the
15 specifics of the communication.  You've given a general
16 subject matter description.  So, I would instruct you
17 not to answer on the basis of legislative privilege as
18 to specific questions about the substance of those
19 communications.
20     A.  On the advice of counsel, I'm not going to answer
21 that question.
22     Q.  (BY MS. RIOS)  Other than Melinda Fredricks, have
23 other constituents brought you evidence of voter
24 impersonation at the polls?
25         MR. SWEETEN:  You can answer as phrased.

## 80

1      A.  I don't have a specific recollection.  They may
2  have.
3      Q.  (BY MS. RIOS)  Have any organizations or
4  community groups brought you evidence of voter
5  impersonation at the polls?
6         MR. SWEETEN:  Can you tell me the question
7  again?  I'm sorry.
8         (Whereupon, the requested testimony was read back
9  as follows:
10        QUESTION:  Have any organizations or community
11        groups brought you evidence of voter
12        impersonation at the polls?)
13        MR. SWEETEN:  You can answer as phrased.
14     A.  Only to the extent that it's a matter of the
15 public record.
16     Q.  (BY MS. RIOS)  Okay.
17     A.  I don't recall anything that's not in the public
18 record.
19     Q.  So, there was no evidence of voter fraud -- of
20 voter impersonation brought by organizations or
21 community groups to you other than what is in the public
22 record?
23        MR. SWEETEN:  Asked and answered.
24        Go ahead.  You can answer.
25     A.  That is correct.

Senator Thomas D. Williams                                    June 1, 2012

---

81

1    Q. (BY MS. RIOS) Okay. Did voter impersonation at
2  the polls become an important issue for you?
3        MR. SWEETEN: You can reveal matters of the
4  public record, not your mental impressions or thoughts
5  but you can reveal matters of the public record in
6  answering that question.
7    A. Yes, it is an issue that I think is very
8  important.
9    Q. (BY MS. RIOS) And when did this issue become
10  very important for you?
11    A. I think that it is a matter of the public record
12  that since I've been in the Senate, this has been an
13  issue that I've taken a strong position on.
14    Q. And why voter impersonation at the polls and not
15  other types of voter fraud?
16        MR. SWEETEN: Yeah, I'm going to object.
17  You're asking him now to reveal his thoughts, mental
18  impressions, opinions and motivations about legislation,
19  and this includes Senate Bill 14. You're trying to get
20  into his thought process. So, I'm going to object based
21  on legislative privilege and instruct you not to answer
22  the question.
23    A. On the advice of counsel, I'm not going to answer
24  that question.
25    Q. (BY MS. RIOS) Are you aware of how many

---

82

1  convictions for in-person voter fraud have been obtained
2  in the last 20 years in Texas?
3        MR. SWEETEN: You can answer as to matters
4  of public record.
5    A. Only to the extent it's been revealed in the
6  public record. I don't have any knowledge other than
7  what was discussed during the debate of the legislation.
8    Q. (BY MS. RIOS) Are you aware of how many
9  investigations for in-person voter fraud have been
10  obtained in the last 20 years?
11        MR. SWEETEN: Don't reveal matters of
12  privilege. You can refer to matters of the public
13  record.
14    A. To the extent that it was discussed in committee
15  or in the debate, yes, but I have no knowledge beyond
16  that.
17    Q. (BY MS. RIOS) Since you were elected to the
18  Senate, when was the first time that a voter -- a photo
19  voter ID has been introduced into the legislature?
20        MR. SWEETEN: Can you read the question
21  again?
22        (Whereupon, the requested testimony was read back
23        as follows:
24        QUESTION: Since you were elected to the Senate,
25        when was the first time that a voter -- a photo

---

83

1  voter ID has been introduced into the
2  legislature?)
3        MR. SWEETEN: Okay. You can answer.
4    A. I don't -- I don't specifically recall. I
5  would -- I think it's the '03 session but I'm not --
6  couldn't tell you for certain without going back and
7  looking at the record.
8    Q. (BY MS. RIOS) Do you have any independent
9  recollection of any legislation introduced in '03?
10    A. I do not.
11    Q. And going back to the public record, do you know
12  how many convictions for in-person voter fraud are in
13  the public record?
14    A. I do not have an independent recollection of
15  that.
16    Q. And do you have an independent recollection of
17  how many investigations for in-person voter fraud are in
18  the public record?
19    A. I do not.
20    Q. I'm going to show you what has been marked as
21  Exhibit 44. That's the number we have used and that's
22  the bill from '05. Do you recognize this bill?
23    A. It appears to be a copy of House Bill 1706 from
24  the 2005 session.
25    Q. Were you involved in the development or drafting

---

84

1  of House Bill 1706?
2    A. I was a member of the Senate. This bill was
3  drafted in the House.
4    Q. But were you involved in any way in the drafting
5  of House Bill --
6    A. No.
7    Q. Let me show you what has -- what will be marked
8  as 402, which is the second revised privilege log dated
9  May 23, 2012.
10        MR. SWEETEN: Can I have a copy?
11        MS. RIOS: Sure.
12        MR. SWEETEN: Thank you.
13        (Exhibit 402 marked.)
14    Q. (BY MS. RIOS) The page that I'm bringing to your
15  attention is Page 89, which is the last one, which is an
16  excerpt, and I bring to your attention the second item
17  on that page.
18    A. Uh-huh.
19    Q. Okay. Who is Jennifer Jackson?
20    A. I don't know.
21    Q. Do you know if she is a member of the TLC, the
22  Texas Legislative Council?
23    A. She may be.
24    Q. Okay. And could you look at Pages 59 and 42?
25  Those are the two preceding ones.

## 85

1    A. I'm looking at Page 42.
2    Q. And Page 59.
3    A. Uh-huh.
4    Q. They also list correspondence between Ms. Jackson
5  and you.  Do you know who Ms. Jackson is?
6    A. You know, it would appear that she's a member of
7  the Legislative Council after looking at this document.
8  That's what it says and, you know, she may be.  I
9  don't -- I've never met her in person.
10    Q. Okay.  And did you receive materials related to
11  voter ID from Attorney Jackson on or about May 5th,
12  2005?
13    A. I don't recall.
14    Q. So, you do not recall receiving the materials
15  listed on this privilege log?
16    A. Not specific.  I don't specifically recall.
17    Q. Okay.  And do you recall when was the first time
18  that you contacted TLC about voter ID?
19    A. I do not.
20    Q. Do you remember -- do you recall if you contacted
21  TLC about voter ID in 2005?
22    A. I do not.
23    Q. Do you recall if you contacted someone at the
24  Secretary of State about voter ID in 2005?
25    A. I do not recall specifically.

## 87

1  allowed under this bill?
2    A. I can read them to you out of this.  They are
3  listed in Section -- it says here 63.0101 B.
4    Q. Okay.
5    A. Do you want me to answer the question?
6    Q. Okay.  Well, you know, comparing Senate Bill 14
7  with the forms of acceptable ID under this bill, does
8  this bill include student ID cards?
9    A. I'll have to look and see.
10      It would appear that it does in Subsection 63 of
11  63.010.
12    Q. And how about in Senate Bill 14?
13    A. I don't have that before me.  I don't believe
14  that it was a part of that bill.  That's not my
15  recollection that it was.
16    Q. Okay.  And does this bill include ID cards issued
17  by Texas state agencies?
18    A. Which bill are we talking about now?
19    Q. 1706.
20    A. It says in Section 1 that a driver's license or
21  personal identification card issued to the person by the
22  Department of Public Safety or the equivalent agency of
23  another state that is not expired.  Is that what you're
24  asking me?
25    Q. I'm looking at number 8.

## 86

1    Q. Did you contact anyone in the Attorney General's
2  office about voter ID in 2005?
3    A. I do not recall specifically.
4    Q. Any legislators?
5    A. I don't have any specific recollection.
6    Q. Any individuals or organizations?
7    A. I don't have any specific recollection.
8    Q. When did you begin to work on voter ID
9  legislation?
10    A. As I've previously stated, I believe that I voted
11  on a voter ID bill in the '97 or '99 session when I was
12  a member of the House.  We would have reviewed the bill
13  before we voted on it.  And once I was elected to the
14  Senate, I spent some time on it.  That would be the
15  first time that I worked on the legislation myself that
16  I -- you know, a bill that I was working on.
17    Q. Okay.  Do you know what are the basic provisions
18  of House Bill 1706?
19    A. Only to the extent that it's a matter of the
20  public record and the bill is before me.  I don't know
21  if this is the introduced version.  I can't tell if this
22  is an engrossed version or what.  So, only to the extent
23  that I -- what you've given me.  I have no specific
24  recollection of the provisions of this bill.
25    Q. Do you know what forms of identification are

## 88

1    A. Number 8.  Okay.  The identification card issued
2  by a state agency of the state that contains the
3  person's photograph.
4    Q. Does Senate Bill 14 accept an identification card
5  issued by the state agency of the state that contains
6  the person's photograph?
7    A. Unless I looked at the bill, I couldn't be
8  certain.  I don't believe that it does but I would have
9  to look at the bill.
10    Q. Okay.  Does this bill allow for two forms of
11  nonphoto ID to be used to verify a person's identity?
12    A. It would appear that this bill allows several
13  different things to be used as a form of identification
14  if more than one can be produced.
15    Q. Okay.  Would two forms of nonphoto ID verify
16  someone's identity?
17      MR. SWEETEN:  Don't answer the question.  It
18  would require you to reveal your thoughts, mental
19  impressions, opinions and motivations about legislation
20  or furtherance of the legislative proces and, as such,
21  would be subject to the legislative privilege.
22    A. On the advice of counsel, I'm not going to answer
23  that question.
24    Q. (BY MS. RIOS)  Do you believe that only a photo
25  ID would verify a person's identity?

## 89

1   MR. SWEETEN:  Same objection.  Same
2   instruction.
3   A.  Based on the advice of counsel, I'm not going to
4   answer that question.
5   Q.  (BY MS. RIOS)  Are you aware of the purpose of
6   House Bill 1706?
7   MR. SWEETEN:  You can testify about the
8   general purpose, if you're aware.
9   A.  House Bill 1706 says that it is a bill to be
10  entitled an act relating to requiring a voter to present
11  proof of identification.
12  Q.  Okay.  And does House Bill 1706 address that
13  issue?
14  MR. SWEETEN:  You're asking does the text of
15  the bill address this issue that he just said, is that
16  the question?
17  MS. RIOS:  Yes.
18  MR. SWEETEN:  You can answer based on the
19  text of the bill.
20  A.  This was -- House Bill 1706 was an attempt to
21  address this requirement.
22  Q.  (BY MS. RIOS)  Okay.
23  A.  I don't recall specifically but I don't think
24  this was passed into law.  I don't know specifically
25  without going back and looking at the record.  I can't

## 90

1   tell by looking at this bill.
2   Q.  Okay.  And are you aware of whether House Bill
3   1706 -- did it have the purpose to prevent noncitizen
4   voting?
5   MR. SWEETEN:  You can testify as to the
6   general purpose of the bill.  In fact, the Court order
7   says that to the extent such privilege exists, the
8   privilege does not protect testimony with respect to the
9   general purpose or the purpose of the legislature as a
10  whole in enacting Senate Bill 14 as opposed to the
11  subjective intent of the legislature.  So, you can
12  testify as to the general purpose of the bill.
13  THE WITNESS:  Would you repeat the question
14  that she asked?
15  (Whereupon, the requested testimony was read back
16  as follows:
17  QUESTION:  Okay.  And are you aware of whether
18  House Bill 1706 -- did it have the purpose to
19  prevent noncitizen voting?)
20  A.  You know, I don't know the answer to that
21  question without looking at it more, without further
22  studying.  Do you want me to read it and try to
23  determine?
24  Q.  (BY MS. RIOS)  Well, I'm asking based on your
25  recollection.

## 91

1   A.  I don't specifically recall this bill.
2   Q.  Okay.  This bill was referred to State Affairs,
3   the Senate Committee in May of 2005.  Were you serving
4   on the committee at the time?
5   A.  It's a matter of public record whether I was or
6   not.  I think I probably was.
7   Q.  Okay.  And do you know what happened to House
8   Bill 1706 after it was referred to the Senate Committee
9   on State Affairs?
10  A.  I do not have a specific recollection.
11  Q.  Did you take a public position on House Bill
12  1706?
13  A.  I don't recall.
14  Q.  Okay.  And do you recall talking to anyone,
15  either within or outside government, regarding House
16  Bill 1706?
17  A.  I have no specific recollection.
18  Q.  Did you talk to your constituents about House
19  Bill 1706?
20  A.  I have no specific recollection.
21  Q.  And did you or your office conduct any analysis
22  related to House Bill 1706?
23  MR. SWEETEN:  I'm sorry, could you read that
24  back, please?
25  (Whereupon, the requested testimony was read back

## 92

1   as follows:
2   QUESTION:  And did you or your office conduct any
3   analysis related to House Bill 1706?)
4   MR. SWEETEN:  Object to the question as
5   vague as to the term "analysis."
6   Don't reveal any communications you've had
7   with your staff on this issue.  You can answer the
8   question.
9   A.  I don't have any specific recollection of this
10  bill from the 2005 session.
11  Q.  (BY MS. RIOS)  Okay.  Do you know if a photo ID
12  bill was introduced in the legislative session in 2007?
13  A.  I don't have a specific recollection.
14  Q.  Okay.  So, let me give you a copy of House Bill
15  218, which will be marked as 403.
16  (Exhibit 403 marked.)
17  Q.  (BY MS. RIOS)  And this is House Bill 218
18  relating to requiring a voter to send proof of
19  identification.  Do you recognize this bill?
20  A.  I see that you have provided me with a copy of
21  the legislation.  I have no idea if this is the
22  introduced version, if it's the --
23  Q.  It's the engrossed version.
24  A.  And how would I know that by looking at this?
25  Q.  It's the engrossed version.

Senator Thomas D. Williams                                    June 1, 2012

## 93

1   A. How would I know that?  It doesn't say that on
2   here.
3   Q. It has been represented to us as that.
4       MR. SWEETEN:  You can answer based on your
5   knowledge.
6   A. And so, you're representing to me that it's the
7   engrossed version of House Bill 218, and it's clearly a
8   copy of that bill.
9   Q. (BY MS. RIOS)  Did you or your staff play a role
10  in the development of House Bill 218?
11      MR. SWEETEN:  Objection.  Vague.
12      You can answer.
13  A. I don't have any specific recollection of working
14  on this bill.
15  Q. (BY MS. RIOS)  Okay.  Were you present at any
16  meetings during the development of House Bill 218?
17  A. I have no specific recollection.
18  Q. And do you know what is the purpose of House Bill
19  218?
20  A. It says in the opening paragraph that it is a
21  bill to be entitled an act relating to requiring a voter
22  to present proof of identification.
23  Q. And what is the purpose of that bill?
24  A. I just read it to you.
25  Q. So, this is just a bill requiring a voter to

## 95

1   Q. Okay.  Let me show you Exhibit 45.  This is a
2   declaration of Senator Uresti.  Bring to your attention
3   paragraph 52 states, "During 2007, House Bill 218 was
4   considered by the Senate."
5   A. Uh-huh.
6   Q. Okay.  And then I bring to your attention number
7   6.
8   A. Uh-huh.
9   Q. And that's the paragraph when Senator Uresti
10  explained that he was sick with flu --
11  A. Uh-huh.
12  Q. -- and that he reviewed the Senate calendar and
13  it indicated that the Senate would debate
14  noncontroversial local legislation in the morning.  "I
15  then called the office of Patsy Spaw, the Secretary of
16  the Senate, to tell her that I would be arriving at the
17  Senate by late afternoon.  I also called the offices of
18  Senator Jane Nelson and Senator Tommy Williams to inform
19  them that I would be arriving late because of my
20  illness."  Do you know why Senator Uresti called your
21  office?
22      MR. SWEETEN:  Objection.  Assumes facts not
23  in evidence.  Objection.  It's compound.  And objection.
24  Calls for speculation.
25      To the extent you can answer the question as

## 94

1   present proof of identification?
2   A. That's what it says.
3   Q. And why?
4       MR. SWEETEN:  Objection to the question as
5   vague.
6       And don't reveal any thoughts, mental
7   impressions or opinions, motivations about legislation.
8       And I think that -- I mean, he can answer as
9   to the general purpose he knows but he doesn't have to
10  provide additional information other than the general
11  purpose of the bill, which he has tried to answer.
12  A. My suggestion to you is that you talk to Brown,
13  Berman, Bohac, Riddle, et al, who drafted the bill.
14  Q. (BY MS. RIOS)  Okay.  After the House passed Bill
15  218, it was considered by the Senate and it was referred
16  to the State Affairs Committee.  Were you a member of
17  the committee in 2007?
18  A. I don't know.
19  Q. Okay.  Do you know whether the Senate Committee
20  held a hearing on House Bill 218?
21  A. I don't have any specific recollection.
22  Q. Do you know if the Senate voted on House Bill
23  218?
24  A. I don't have a specific recollection of this
25  bill.

## 96

1   posed, you can do so.
2   A. I have no idea.
3   Q. (BY MS. RIOS)  Were you in a leadership position
4   in 2007?
5   A. I believe I was Chair of the Republican Caucus.
6   Q. Besides the Republican Caucus, did you have any
7   other committee chair or subcommittee chair positions?
8   A. I don't have a specific recollection without
9   going back.  I don't believe I was a chair of anything
10  in '07 except the Republican Caucus.
11  Q. Okay.  Are you aware why Senator Uresti would
12  call you to inform you that he would be arriving late
13  because of illness?
14      MR. SWEETEN:  Objection.  It calls for
15  speculation.
16      You can answer to the extent -- also --
17  yeah, you can answer.
18  A. I have no idea why he would call me.
19  Q. (BY MS. RIOS)  Okay.  In 2007, during the
20  legislative session, did you take any public position as
21  to House Bill 218?
22  A. Well, I think that it's a matter of public record
23  that I supported this bill.  And now that I have it in
24  context and assuming Senator Uresti's affidavit is
25  correct, then yes, I would have been supporting 218.  I

Senator Thomas D. Williams                              June 1, 2012

97

1    don't have a copy of it here, do I?
2         Yeah, I'm sure I was in support of it.
3         Q.  And what was the purpose of House Bill 218?
4         A.  To prevent in-person voter fraud.
5         Q.  Okay.  Any other purpose?
6         A.  You can read the bill.  It says it's relating to
7    requiring a voter to present proof of identification.  I
8    think that's self-explanatory.
9         Q.  And how would House Bill 218 prevent in-person
10   voter fraud?
11        MR. SWEETEN:  In answering that, that would
12   ask you to reveal your mental impressions, thoughts
13   about legislation and in furtherance of the legislative
14   process, so, I instruct you not to answer that question
15   except to the extent you can refer to matters of the
16   public record.
17        A.  I think other than what I stated publicly and
18   what was said in committee that's a part of the public
19   record, there's nothing else that I -- I don't have any
20   other impressions or recollections beyond that.
21        Q.  (BY MS. RIOS)  Okay.  Did you or your office
22   conduct any analysis prior to taking a position on
23   Senate Bill 218?
24        MR. SWEETEN:  I'm going to object and
25   instruct you not to answer based upon legislative

99

1    that they're protected by legislative privilege.
2         A.  It would be a matter of public record in the
3    committee.  I feel certain that the Secretary of State
4    came and trans -- or someone from that office may have
5    given testimony, possibly from the Attorney General's
6    office but it's a matter of public record.  That would
7    have been the only conversations I would have had would
8    have been in the committee hearing.
9         Q.  (BY MS. RIOS)  Did you have any conversations
10   outside the committee hearing?
11        A.  I don't have any specific recollection of that.
12        Q.  Did you consult the -- did you have any
13   conversations with the Texas Legislative Council about
14   House Bill 218?
15        A.  I don't have a specific recollection of that.
16        Q.  Did you have any conversations with the
17   Lieutenant Governor about House Bill 218?
18        A.  I don't have a specific recollection of that.
19        Q.  Did you have any conversations about House Bill
20   218 with the State Attorney's office?
21        A.  I don't have any specific recollection of that.
22        Q.  And with the Secretary of State?
23        A.  You know, I don't have a specific recollection.
24   If there was any discussion, I reiterate again, it would
25   have been in the committee process where this bill was

98

1    privilege.  To the extent you can refer to matters of
2    the public record, you can do so.
3         A.  On the advice of counsel, I don't think I can
4    answer that question.
5         Q.  (BY MS. RIOS)  Did you or your office conduct any
6    analysis on the impact of House Bill 218 on minority
7    voters?
8         MR. SWEETEN:  Same objection and instruction
9    based upon the legislative privilege.
10        A.  I don't believe I can answer that question, on
11   the advice of counsel.
12        Q.  (BY MS. RIOS)  Okay.  Did you talk to any
13   election officials about House Bill 218?
14        MR. SWEETEN:  You can answer as phrased.
15        A.  To the extent it was discussed in committee, that
16   would be the only recollection I have of talking to any
17   election officials.  I think that's what you asked.  Is
18   that correct?
19        Q.  (BY MS. RIOS)  Yes.
20        A.  Okay.
21        Q.  Who do you recall talking to about House Bill
22   218?
23        A.  Well --
24        MR. SWEETEN:  You can answer but don't
25   reveal the substance of the communications to the extent

100

1    heard, assuming I was a member of the committee, and
2    then only to the extent that the bill was debated on the
3    floor.  All I have -- the only discussions I would have
4    had would have been a matter of public record.
5         Q.  And when you say that you don't have a specific
6    recollection, that means that you don't have a
7    recollection?
8         A.  That's what it means.
9         Q.  Okay.  Were there any concerns about the impact
10   House Bill 218 would have on minority voters?
11        MR. SWEETEN:  Don't reveal -- in answering
12   the question, don't reveal your thoughts, your mental
13   impressions, your opinions, your motivations about
14   legislation, including this bill, and don't reveal
15   communications you've had with staff, with other
16   legislators, state agencies, the Legislative Council or
17   constituents.  You can refer to matters of the public
18   record in answering this question.
19        THE WITNESS:  Would you repeat the question,
20   please?
21        (Whereupon, the requested testimony was read back
22   as follows:
23        QUESTION:  Okay.  Were there any concerns about
24   the impact House Bill 218 would have on minority
25   voters?)

## 101

1    MR. SWEETEN:  Same instruction.
2    A. Yes, my only knowledge would be that that's a
3    matter of the public record, and I know that there were
4    some members who may have publicly expressed that but I
5    don't have a specific recollection.
6    Q. (BY MS. RIOS) So, you do not recall?
7    A. I think I've answered your question.
8    Q. Would you agree that part of the purpose of House
9    Bill 218 was to prevent noncitizens from voting?
10   A. I should look at it again.
11       MR. SWEETEN:  I'm going to object to the
12   question as asked and answered.  He's already expressed
13   his answer as to the general purpose of the bill.
14       I'm not instructing you not to answer.
15   A. My answer is the same, that it would appear to me
16   the purpose of this bill is to prevent in-person voter
17   fraud.  It clearly says that it is a bill to be entitled
18   an act relating to requiring a voter to present proof of
19   identification.
20   Q. (BY MS. RIOS) Okay.  Would House Bill 218
21   prevent noncitizen voting?
22       MR. SWEETEN:  Now you're going beyond the
23   general.  He can answer questions as to the general
24   purpose of the bill.  He's not going to reveal his
25   thoughts, mental impressions, opinions or motivations

## 102

1    about legislation or in furtherance of the legislative
2    process.  So, I'm going to instruct him not to answer
3    other than as to the general purpose of the bill,
4    pursuant to the Court order in this case.
5    A. The purpose of this bill was to prevent in-person
6    voter fraud, and that would mean that someone would have
7    to be a registered voter who was legally able to vote.
8    And beyond that, there's nothing that I can add to that.
9    Q. (BY MS. RIOS) But why would a voter need to
10   present proof of ID to vote?
11       MR. SWEETEN:  I'm going to object.  You're
12   asking for him to reveal his thoughts, his mental
13   impressions, his opinions, his motivation about the
14   legislation and in furtherance of the legislative
15   process and, as such, I'm going to instruct him not to
16   answer based upon legislative privilege.
17       You can refer to matters of the public
18   record if you can.
19       But he's not going to provide more than what
20   the general purpose of the bill is.
21   A. I think I've already answered the question.  I
22   think you're belaboring the point.
23   Q. (BY MS. RIOS) Could you answer the question,
24   please?
25       MR. SWEETEN:  Would you read the question

## 103

1    back?
2        (Whereupon, the requested testimony was read back
3    as follows:
4        QUESTION:  But why would a voter need to present
5    proof of ID to vote?)
6        MR. SWEETEN:  Objection.  It calls for him
7    to reveal matters subject to the legislative privilege.
8    A. On the advice of counsel, I don't believe I'm
9    going to answer that question.
10   Q. (BY MS. RIOS) Okay.  Based on the public record,
11   how does House Bill 218 prevent in-person voter fraud?
12   A. The goal -- first of all, this bill, we know now,
13   did not pass into law.  It was just a bill that was
14   introduced and passed out of the House.
15       I think the purpose of the bill was to require
16   some form of identification so that you knew the person
17   who was voting was the person they claimed to be.
18   Q. Do you know if a noncitizen can obtain a driver's
19   license in Texas?
20       MR. SWEETEN:  Do you mean right now under
21   current law as we're sitting here?
22       MS. RIOS:  Yes.
23       MR. SWEETEN:  You can answer that question.
24   A. Yes, they can.
25   Q. (BY MS. RIOS) And does your driver's license

## 104

1    look the same as a driver's license issued to a
2    permanent legal resident?
3    A. I'm not sure of the answer.  I'm not sure.  I
4    know there have been some differences and I know there
5    have been some changes that have been made to that law
6    but I can't recall whether it would look the same or
7    not.  I think not under current law.  It just changed
8    recently.
9    Q. Does your driver's license state that you're a
10   citizen?
11   A. No.
12   Q. And do you know if the driver's license held by
13   someone who is a legal permanent resident would state
14   that they are an LPR?
15   A. I don't know the answer to that.
16   Q. Okay.  Can a noncitizen be issued a military ID?
17   A. I believe they can if they're a member of the
18   military.
19   Q. And would this military ID indicate their
20   immigration status?
21   A. I don't know the answer to that.
22   Q. During the development of House Bill 218 and
23   subsequent voter ID legislation, did you or your staff
24   look into whether noncitizen driver's licenses say that
25   this license was issued to a noncitizen?

Senator Thomas D. Williams                                    June 1, 2012

---

## 105

1   MR. SWEETEN:  I'm going to object on
2   legislative privilege.  That question requires him to
3   reveal his thoughts, mental impressions, opinions,
4   motivations about legislation and the furtherance of the
5   legislative process.  It would also require him to
6   reveal communications between the staff, other
7   legislators, state agencies, the Texas Legislative
8   Council or constituents.
9       You can testify about matters of the public
10  record.  Otherwise, don't reveal matters subject to the
11  legislative privilege.
12  A.  It's a matter of public record that we passed
13  legislation this past session that requires you prove
14  your legal presence in the country to obtain a Texas
15  driver's license.
16      That language was put in a bill.  It was amended
17  on the House side into a Senate bill, and it was
18  language that was taken out of a bill that I was the
19  sponsor of.
20      So, we require people now to prove their legal
21  presence in the country before they can obtain a Texas
22  driver's license.  And their driver's license will
23  expire when their legal presence in this country
24  expires.
25  Q.  (BY MS. RIOS)  And legal presence is not the same

---

## 106

1   as citizenship, right?
2   A.  Correct.
3   Q.  Based on the public record, were there concerns
4   about the impact of this bill on minority voters?
5       MR. SWEETEN:  You can refer to matters of
6   the public record as the question's preface suggests.
7   Do not reveal legislatively privileged matter.
8   A.  Are we talking about House Bill 218 now?
9   Q.  (BY MS. RIOS)  Yes.
10  A.  I think there were concerns that were expressed
11  as a matter of the public record.
12  Q.  What were these concerns?
13  A.  I'm not able to articulate those specifically at
14  this time.  I think they are a part of the proceedings
15  of the House and the Senate.
16  Q.  And you do not have an independent recollection
17  about these concerns?
18  A.  No.
19  Q.  Okay.  Did you take -- did you or your staff take
20  any action to address these concerns?
21      MR. SWEETEN:  Don't answer the question.  It
22  would call for matters subject to the legislative
23  privilege, requiring you to reveal your thoughts, mental
24  impressions, opinions, your motivations about
25  legislation or furtherance of the legislative process.

---

## 107

1   Instruct not to answer.
2   A.  On the advice of counsel, I'm not going to answer
3   that question.
4   Q.  (BY MS. RIOS)  Okay.  During the pendency of
5   House Bill 218 in 2007, Royal Masset -- is that how his
6   name is pronounced?
7       MR. SWEETEN:  I don't know.
8   A.  Masset.
9   Q.  (BY MS. RIOS)  -- Masset, the former Political
10  Director for the Republican Party of Texas, stated, and
11  I quote, "They are just basically using shear racism to
12  pump their own political points.  They are trying to
13  exploit the public fear of illegal aliens."  What is
14  your reaction to this quote?
15      MR. SWEETEN:  Don't reveal your thoughts,
16  mental impressions, opinions or motivation about
17  legislation or in furtherance of the legislative process
18  in answering that question.
19  A.  I'm not familiar with it until you read it to me,
20  and I suggest that you talk to Mr. Masset about it.
21  Q.  (BY MS. RIOS)  Any opinion about the assertion
22  made by Mr. Masset?
23      MR. SWEETEN:  Don't reveal your thoughts,
24  mental impressions, opinions, motivation about
25  legislation or in furtherance of the legislative

---

## 108

1   process.  Those are subject to the legislative
2   privilege.
3   A.  No.
4   Q.  (BY MS. RIOS)  But as we sit here today, do you
5   have a reaction at this statement?
6       MR. SWEETEN:  It's the same privilege.  Do
7   not -- I understand as we're sitting here today, you've
8   put that in the question but he's still not going to
9   reveal his thoughts, mental impressions or his opinions
10  or motivation about legislation, and so, to the extent
11  that answering that question would require him to do so,
12  I'm going to instruct him not to answer that question.
13  A.  I don't -- I don't have an opinion about what
14  Mr. Masset said.  Why would I care?
15  Q.  (BY MS. RIOS)  Okay.  Once House Hill 218 was
16  referred to the Senate, do you recall who testified on
17  behalf of this bill?
18      MR. SWEETEN:  You can answer.
19  A.  I do not.
20  Q.  (BY MS. RIOS)  Do you recall if the Republican
21  party testified at the committee hearing?
22  A.  I do not.
23  Q.  Okay.  Do you recall any amendments made in the
24  Senate to House Bill 218?
25  A.  I do not.

Senator Thomas D. Williams                                    June 1, 2012

---

### 109

1    Q.  Okay.  Do you know what happened when this bill
2  was brought to the Senate floor to vote?
3       MR. SWEETEN:  I think you're asking matters
4  of the public record, which he's free to refer to.
5       A.  Based on what you're showing me here and Senator
6  Uresti's affidavit, we tried to -- this bill apparently
7  was voted out of committee and was pending on the
8  calendar, and we tried to bring the bill up on the
9  floor, and I was involved in that process of trying to
10 get the bill -- make sure that we had our two-thirds of
11 the members present and voting to get the bill before
12 the body.
13      Q.  (BY MS. RIOS)  Okay.  And so, this bill required
14 the support of two-thirds of the senators to bring it to
15 the floor for a vote?
16      A.  To take the bill out of the regular order of
17 business, we would have had to suspend the regular order
18 of business, and that requires two-thirds of the members
19 present and voting.
20      Q.  And why two-thirds?
21      A.  That's what the rule says.  That's the Senate
22 rule.
23      Q.  The Senate rule.
24      A.  It was at that time.  The House has the same
25 rule, by the way.

---

### 110

1       Q.  And when House Bill 218 was brought to the Senate
2  floor for a vote, how many Senators were present?
3       A.  It's a matter of public record.  I don't recall
4  specifically how many were there.  You have to have a
5  quorum, so, there was a quorum present.
6  I know that we believed that we had two-thirds.
7  The Republicans believed that we had the necessary
8  two-thirds to bring the bill up, and that's what I was
9  engaged in doing was trying to make sure that all of our
10 members were on the floor.
11      Q.  And when you're referring that all of the members
12 were on the floor, you're referring to the Republican
13 members?
14      A.  Correct.
15      Q.  And how were you involved in bringing this bill
16 to the floor?
17      A.  I think I just explained that to you.
18      Q.  Okay.
19      A.  I was trying to make sure that all of the
20 Republican Senators were on the floor so that we had the
21 two-thirds to get the bill up and have it considered by
22 the body.
23      Q.  Okay.  And when -- based on your reading, do you
24 remember if -- strike that.
25      Do you remember if Senator Uresti was present

---

### 111

1  when you were bringing the bill to the floor?
2       A.  He was not there when we first attempted to bring
3  it to the floor.  He was there later.
4       Q.  And why was the vote held when not all of the
5  members of the Senate were present?
6       MR. SWEETEN:  I think when you're asking the
7  why, I think we're getting into him revealing thoughts
8  and mental impressions, opinions and motivations about
9  legislation.  You can testify about facts that are
10 matters of public record but I think that's
11 legislatively privileged.
12      A.  There are frequently bills that are passed
13 through the Texas Senate when all members aren't
14 present.
15      Q.  (BY MS. RIOS)  And did you make the decision to
16 bring it to the floor at that instant?
17      A.  I was involved in that decision, yes.
18      Q.  And who else was involved in the decision to
19 bring 218 at that instant?
20      A.  You know, I don't recall everyone who was
21 involved in it.  I would guess it would -- my
22 recollection would be it would be the Senate sponsor,
23 and I presume that was Senator Fraser but I don't know
24 that for a fact.
25      And also, I discussed it with the Lieutenant

---

### 112

1  Governor because he would have to recognize me for me --
2  or he would have to recognize the bill's author to be
3  able to bring the bill up.
4       Q.  And what is Senator Uresti's race or national
5  origin?
6       A.  He's a citizen of the United States and a Marine
7  Corps Veteran.
8       Q.  I asked about his race or national origin.  I'm
9  very well aware of his military service.
10      A.  He's Hispanic.  Is that what you're asking?
11      Q.  Yes.
12      A.  Yeah.
13      Q.  And do you dispute any fact in paragraphs 5 or
14 6 -- 6 or 7?
15      MR. SWEETEN:  Objection.  The question is
16 compound.
17      She's on this one now.
18      A.  I don't know where we are.
19      MR. SWEETEN:  Uresti's affidavit.
20      Can you tell us the number of the exhibit
21 and we'll pull that up and take a look at it?
22      MS. RIOS:  It might be over there.
23      MR. SWEETEN:  I think he's got it now.
24      MS. ABUDU:  Patrick, do you now have an
25 extra copy of Uresti's affidavit?  I see it on top.

Senator Thomas D. Williams                                      June 1, 2012

## 113

1      MR. SWEETEN:  Let's see.  I don't.
2      A.  I don't have any recollection that Senator Uresti
3  called my office, and I have no way of knowing whether
4  he called Senator Nelson's office or not.  I don't have
5  any way of knowing whether he called Patsy Spaw or not.
6  And so, you know, I -- I just can't verify that but I
7  don't have -- specifically with respect to my office, I
8  don't know why he would call me, and I don't recall that
9  he did.
10      Q.  (BY MS. RIOS)  Okay.
11      A.  It would be very unusual for him to call my
12  office.
13      Q.  When you say that bills frequently are passed
14  without all of the senators present, with a quorum but
15  not all of the senators present, are you including bills
16  that are strongly opposed by the other party?
17      MR. SWEETEN:  Objection.
18      A.  Yes.
19      MR. SWEETEN:  Objection.  Vague.
20      But you answered.  That's fine.
21      Q.  (BY MS. RIOS)  And how about bills strongly
22  opposed by racial and ethnic minority members of the
23  Senate?  Let me ask the question -- the whole question.
24      MR. SWEETEN:  Okay.
25      Q.  (BY MS. RIOS)  When you say that bills are

## 114

1  frequently passed without all of the Senators being
2  present, how about bills strongly opposed by the racial
3  and ethnic minority members of the Senate?
4      MR. SWEETEN:  Objection.  I think it calls
5  for speculation.  Objection to the question as vague.
6  Also to the extent it would reveal a communication
7  you've had with a legislator, don't reveal that portion
8  of it but to the extent you can answer the question --
9      A.  I don't have any specific recollection.
10      Q.  (BY MS. RIOS)  I was talking in general terms
11  when you know that minority -- racial minority and
12  ethnic minority Senators are strongly opposed to a bill,
13  is it -- does the -- are bills frequently passed when
14  they are not present?
15      MR. SWEETEN:  I'm going to impose the same
16  objection.
17      A.  I think I've already answered the question.
18      Q.  (BY MS. RIOS)  And your answer was?
19      A.  I don't have a specific recollection.
20      Q.  It's a yes or no answer.
21      A.  I've answered the question to the best of my
22  ability.
23      Q.  Okay.  Did Senator Uresti call your office
24  because you were involved with bringing House Bill 218
25  to the floor?

## 115

1      MR. SWEETEN:  Objection.  Calls for
2  speculation.  Objection.  Assumes facts not in evidence.
3      You can answer.
4      A.  I think you need to call Senator Uresti and ask
5  him that.
6      Q.  (BY MS. RIOS)  What part of Texas does Senator
7  Uresti represent?
8      A.  He represents an area from San Antonio to El
9  Paso.  The Big Bend area --
10      Q.  And what did --
11      A.  -- would be included in that.
12      Q.  And what do you know about the racial or ethnic
13  makeup of Senator Uresti's constituents?
14      A.  I don't have any specific knowledge about it.
15  Generally, I would presume he has a large Hispanic
16  population in that part of the state.
17      Q.  And did you have any concerns about holding a
18  vote on House Bill 218 given that the constituency that
19  Senator Uresti represents is Hispanic?
20      MR. SWEETEN:  Don't reveal your thoughts,
21  your mental impressions, opinions or motivations about
22  legislation, including this bill, but to the extent you
23  can refer to matters of the public record, you are free
24  to do so.
25      A.  I think as a matter of public record, I've said

## 116

1  frequently that I support this voter identification
2  legislation, and beyond that, I don't have anything to
3  say beyond what my public record is, what I've said in
4  the public record.  It is strongly supported among all
5  racial and ethnic groups in Texas and strongly supported
6  by Democrats and Republicans across the state.
7      Q.  (BY MS. RIOS)  And you're basing this assertion
8  on what?
9      MR. SWEETEN:  Again, you can refer to
10  matters of the public record.  Don't reveal your
11  internal thought process.
12      A.  It's a matter of public record that there's been
13  extensive surveys done on this and they were discussed
14  as a part of the debate of all of these -- all of this
15  legislation.
16      Q.  (BY MS. RIOS)  So, besides the surveys on the
17  support on voter ID legislation, did you conduct any
18  studies about the people who might be affected by this
19  legislation?
20      MR. SWEETEN:  Don't reveal matters that are
21  not on the public record.  Don't reveal your thoughts,
22  mental impressions, motivations, opinions about
23  legislation or your communications with state agencies,
24  with legislative staff, with legislators, constituents
25  in answering the question.

Senator Thomas D. Williams                          June 1, 2012

---

## 117

1    A.  You know, I don't have any comment beyond what's
2  already in the public record.
3    Q.  (BY MS. RIOS)  Okay.  And which are these
4  surveys?
5    A.  You know, they're a matter of public record.  I
6  can't tell you as I sit here today.  I don't recall what
7  they were.  They are well documented as part of the
8  public record.
9    Q.  And did you study these surveys?
10   MR. SWEETEN:  You can reveal matters of the
11  public record but don't reveal your internal thought
12  processes, mental impressions, motivations about the
13  legislation in answering the question.  It's subject to
14  legislative privilege.
15   A.  My recollection is that it was discussed in
16  committee.  It was discussed during the debate on all of
17  this legislation.  So -- and it was widely reported in
18  the press.
19   Q.  (BY MS. RIOS)  Okay.  And do you know what
20  specific questions were asked to the public in these
21  surveys?
22   A.  I can't tell you beyond what's already a part of
23  the public record.  I don't have a specific
24  recollection.
25   Q.  Did you make any inquiries about the specific

---

## 118

1  questions that they made to the people that were
2  contacted as part of the survey?
3   MR. SWEETEN:  Don't reveal your thoughts,
4  mental impressions, opinions, motivations about
5  legislation or the communications we've outlined
6  previously in answering the question.  You're free to
7  refer to matters of the public record.
8   A.  As I've said already, I don't have a specific
9  recollection.
10   Q.  (BY MS. RIOS)  Okay.  There was a second vote on
11  House Bill 218, as it is stated in Senator Uresti's
12  declaration and in the public record.  What were the
13  circumstances of this second vote?
14   MR. SWEETEN:  You can refer to matters of
15  the public record.  Don't reveal communications that are
16  privileged.
17   A.  I remember that there was a second vote.  I
18  don't -- I know that it involves some controversy about
19  whether one of the members was on the floor and voting
20  or not, and it was the discretion of the Lieutenant
21  Governor to decide whether there was going to be another
22  vote on it or not.  So, he exercised that discretion.  I
23  think it's a matter of the public record.  It's in the
24  Senate Journal.
25   Q.  (BY MS. RIOS)  Okay.  And do you know the result

---

## 119

1  of this second vote?
2   A.  The legislation -- we couldn't suspend the rules
3  to bring the legislation before the body as a result of
4  the second vote.
5   Q.  So, it failed because of the two-thirds rule?
6   A.  We weren't able to suspend the regular order of
7  business.
8   Q.  And in order to suspend the regular order of
9  business, you needed two-thirds vote?
10   A.  Correct.
11   Q.  And what is the purpose of getting two-thirds
12  vote in order to suspend the regular course of business?
13  I'm asking what is the purpose of that rule, the
14  two-thirds rule?
15   MR. SWEETEN:  Okay.  You can testify as to
16  the general purpose of the two-thirds rule.
17   Are you talking about -- you want to show
18  him the statute?
19   MS. RIOS:  No, in general.
20   MR. SWEETEN:  You can testify about the
21  general purpose of the two-thirds rule to the extent
22  you --
23   A.  Yeah.  The rule is contained in both the House
24  and the Senate rules, and it is a common parliamentary
25  procedure.  In the U.S. Senate, I believe they require

---

## 120

1  60 percent instead of two-thirds.
2   The way it is implemented in the Senate, it is a
3  calendar mechanism.  It is the way we control the flow
4  of legislation to the floor.
5   In the House, that's done by the Calendars
6  Committee.  In the Senate, the members decide which
7  legislation will be considered by the body, along with
8  the Lieutenant Governor, who has the power of
9  recognition.
10   So, that power is vested in a committee in the
11  House that's appointed by the Speaker.  And in the
12  Senate, that member -- that power is vested in the
13  members, along with the Lieutenant Governor, through the
14  power of recognition.  So, it is a mechanism to control
15  the flow of legislation to the floor.
16   Q.  (BY MS. RIOS)  And what is the purpose of this
17  rule?
18   MR. SWEETEN:  Objection.  Asked and
19  answered.
20   Q.  (BY MS. RIOS)  Okay.  Is a purpose of this rule
21  to have general consensus on bills?
22   A.  The purpose of the rule is to -- it is a calendar
23  mechanism.  It is a way to control the flow of
24  legislation to the floor of the Senate.  That is the
25  primary purpose of the rule.

## 121

1    Q.  And are most bills brought under this rule?
2    A.  Many bills are brought under that rule.  Not all.
3    Q.  Okay.  And how many times during your tenure in
4    the Senate has this rule been suspended?
5    A.  I'm not -- it's been -- we suspend the two-thirds
6    rule every time we take up a piece of legislation to
7    consider it.  To consider a piece of legislation, the
8    vote is to suspend the two-thirds rule -- or it takes a
9    two-thirds vote to suspend the regular order of
10   business.
11       So, every time -- so, the rule is -- that's how
12   we get bills to the floor.  I'm not sure what you're
13   asking.
14   Q.  Okay.  You need a two-thirds vote to get a bill
15   to the floor, that's how it works, right?
16   A.  Not always.
17   Q.  Not always but the --
18   A.  If you want to take a bill out of the regular
19   order of business, you have to suspend the two-thirds
20   rule.  You have to suspend the regular order of
21   business.  It takes two-thirds to do that.
22   Q.  Okay.  How many times during your tenure has the
23   Senate suspended the two-thirds rule so that a bill can
24   be brought without the two-thirds vote?
25   A.  We frequently consider legislation in the regular

## 122

1    order of business, and I can't tell you how often that
2    is done.  I will give you an example.  This last session
3    the budget passed in the regular order of business.  We
4    frequently pass House bills in the regular order of
5    business, and it's often done in special session.
6    Q.  I'll have to come back to this.
7        Okay.  Did you have any conversations about House
8    Bill 218 after it did not pass the Senate?
9        MR. SWEETEN:  You can reveal whether or not
10   you had such conversations but don't reveal the
11   substance of them.  They're privileged.
12   A.  You know, I don't have a specific -- this was
13   several years ago.  I don't have a specific
14   recollection.
15   Q.  (BY MS. RIOS)  Okay.
16   A.  I'm sure that I talked to people about it but I
17   don't have a specific recollection.
18   Q.  Did you have any conversations about voter ID
19   bills after HB 218 didn't pass the Senate?
20   A.  I'm sure I did.
21   Q.  With whom did you have these conversations?
22   A.  You know, I don't know.  I mean, I can't tell
23   you.  It's been so long and there's so many people that
24   I talk to.  Beyond what's a matter of the public record,
25   I don't have any recollection at all.

## 123

1    Q.  Did you have any conversations about voter ID
2    bills with other legislators?
3    A.  I'm sure I did.
4    Q.  And did you have conversations with executive
5    branch employees?
6    A.  I don't know.
7    Q.  Did you talk about voter ID legislation with the
8    Lieutenant Governor?
9    A.  I'm sure I did.
10   Q.  And when did you have this conversation?
11   A.  I don't have a specific recollection.
12   Q.  And what was the nature of these communications?
13       MR. SWEETEN:  Don't reveal the nature of the
14   communications if she's asking about the substance.
15       MS. RIOS:  I can ask about the general
16   subject matter of the communications.
17       MR. SWEETEN:  And with what group are you
18   referring to?
19       MS. RIOS:  I'm referring to legislators.
20       MR. SWEETEN:  Okay.  I think he's already
21   said he doesn't recall specifically who he talked to.
22   So, it would be --
23       But you can answer the question as to the
24   general subject matter.
25   A.  You know, I don't recall a specific -- any

## 124

1    specific conversation from that long ago.
2    Q.  (BY MS. RIOS)  And did you have any conversations
3    with the Lieutenant Governor?
4    A.  None that I recall specifically.
5    Q.  You earlier noted that you talked to the
6    Lieutenant Governor.
7    A.  I'm sure I talked to him.  I'm sure I talked to
8    several of my colleagues in the Senate but I don't have
9    a specific recollection of the time or what was
10   discussed.  I'm sure we were frustrated that the bill
11   had not passed.
12   Q.  Okay.  This has been marked as Exhibit 29, and
13   this is Senate Bill 362.  Were you involved in the
14   development of Senate Bill 362?
15   A.  Is this the bill from the '09 session?
16   Q.  Yes.
17   A.  Yes, I was involved in this.
18   Q.  And can you describe the process by which Senate
19   Bill 362 was developed?
20       MR. SWEETEN:  Yeah, I think here you're
21   asking him to reveal his thoughts, mental impressions,
22   opinions, motivations about legislation, including
23   communications that he's had with other legislators'
24   staff.  So, I think we're going to need to assert our
25   legislative privilege as to that question.

Senator Thomas D. Williams                                June 1, 2012

## 125

1    A. I'm not going to be able to answer your question
2  the way you've phrased it.
3    Q. (BY MS. RIOS) Do you recall when did you start
4  working on the development of Senate Bill 362?
5        MR. SWEETEN: Objection. Vague.
6        MS. RIOS: When?
7        MR. SWEETEN: Well, I know but what is the
8  development of, and I'm not sure how that's defined
9  but --
10   Q. (BY MS. RIOS) You can answer.
11       MR. SWEETEN: You can answer when you
12 started working on the bill.
13   A. I don't have a -- I don't recall the specific
14 time that I began to work on this bill but it would have
15 been sometime prior to or concurrent with the 2009
16 session.
17   Q. (BY MS. RIOS) Okay. Did you look at past photo
18 ID bills in the Texas Legislature?
19       MR. SWEETEN: Don't answer the question. It
20 would require you to reveal your thoughts, mental
21 impressions, opinions and motivations about legislation
22 or furtherance of the legislative process and, as such,
23 would be legislatively privileged.
24   A. On the advice of counsel, I'm not going to answer
25 your question.

## 126

1    Q. (BY MS. RIOS) Did you have any communications
2  about Senate Bill 362 with other current or former
3  legislators who had offered past photo ID bills?
4        MR. SWEETEN: You can answer. Just don't
5  reveal the subject of the communications other than a
6  general subject matter description.
7    A. I may have. I wasn't the primary author of the
8  bill. So, I don't have a specific recollection of
9  talking to anybody who was a former legislator. Is that
10 what you're asking?
11   Q. (BY MS. RIOS) Or current.
12   A. No, I don't. Senator Fraser, I believe, is the
13 primary author of this.
14   Q. Did you talk to Senator Fraser about Senate Bill
15 362?
16   A. Yes.
17   Q. And when did you talk to him?
18   A. I don't recall specifically.
19   Q. Did you talk to him one time, many times?
20   A. Many times, I'm sure.
21   Q. And when did you have these conversations with
22 Senator Fraser?
23   A. As I told you, I don't recall specifically.
24   Q. Okay. Do you recall if anyone else was present
25 during these conversations you had with Senator Fraser?

## 127

1    A. I do not.
2    Q. Okay. Did you communicate with Senator Fraser on
3  the telephone about Senate Bill 362?
4    A. I may have.
5    Q. Do you know when these conversations took place?
6    A. I do not.
7    Q. Okay. Did you communicate with Senator Fraser by
8  E-mail regarding 362?
9    A. I doubt it.
10   Q. And why do you doubt it?
11   A. I doubt that I had any E-mail communications with
12 him about this. I would have talked to him in person.
13   Q. Okay. Did you have any communications with
14 officials or legislators from other states about Senate
15 Bill 362?
16   A. Not to the best of my recollection.
17   Q. Did you have any communications with anyone in
18 Georgia?
19       MR. SWEETEN: Objection. Asked and
20 answered.
21       You can answer.
22   A. Not to the best of my recollection.
23   Q. (BY MS. RIOS) Any communications with anyone
24 from Indiana?
25       MR. SWEETEN: Same objection.

## 128

1        You can answer.
2    A. To the extent that it's a matter of the public
3  record, when the bills were considered in committee,
4  there may have been people from Indiana there. There
5  may have been people from Georgia. I don't recall
6  specifically without looking at the record.
7    Q. (BY MS. RIOS) But outside of the hearings, did
8  you have any communications with anyone from Georgia or
9  Indiana?
10   A. I don't recall.
11   Q. Did you have any communications about Senate Bill
12 362 with interest groups?
13   A. I'm not sure what you're asking me there. Help
14 me. I don't know what you're getting at.
15   Q. With any organizations.
16   A. It's a matter of public record that there were a
17 lot of people who came and testified for and against
18 this bill, and that's -- really the only thing that I
19 would have any recollection of would be what's a matter
20 of the public record.
21   Q. But I'm referring to any communications that you
22 had outside the Senate chambers.
23   A. I just answered your question.
24   Q. So, you do not recall?
25   A. That is correct.

Senator Thomas D. Williams                          June 1, 2012

## 129

1       Q.  Okay.  Did you have any communications with any
2   groups representing minority voters?
3       A.  It's a matter of the public record that we did
4   take testimony from groups that represented minority
5   interests.
6       Q.  But did you have any communications with these
7   groups outside the Senate chambers?
8       A.  I don't know.  I don't recall.
9       Q.  Did you have any communications about Senate Bill
10  362 with your constituents?
11      A.  I don't recall specifically.
12      Q.  Okay.  And did you have any communications about
13  Senate Bill 362 with election officials?
14      A.  It's a matter of public record that there were
15  election officials that testified about the bill.
16  Beyond that, I have no specific recollection.
17      Q.  Did you have any communications with Melinda
18  Fredricks about Senate Bill 362?
19      A.  I may have.  I don't have any specific
20  recollection.
21      Q.  And if you had any communication with
22  Ms. Fredricks, do you recall if this was oral or
23  written?
24      A.  You know, I don't have any specific recollection
25  beyond what's a matter of the public record.  I'm trying

## 131

1   privilege.  It would require him to reveal his thoughts,
2   mental impressions, opinions, motivations about the
3   legislation or in furtherance of the legislative
4   process.  He had communications that we've outlined
5   previously.
6           So, I'm going to instruct not to answer
7   based on the legislative privilege unless you can refer
8   to matters of the public record.
9       A.  There may be statements that I made that are a
10  part of the public record but beyond that, there's
11  nothing that I can reveal.
12      Q.  (BY MS. RIOS)  Okay.  Did you have any
13  communications with anyone about the forms of
14  identification to be included in Senate Bill 362?
15          MR. SWEETEN:  You can answer the question as
16  phrased.  Don't reveal the substance of any such
17  communications that would be legislatively privileged as
18  outlined before.
19      A.  Yes.
20      Q.  (BY MS. RIOS)  With whom?
21          MR. SWEETEN:  You can answer.
22      A.  With Senator Fraser.
23      Q.  (BY MS. RIOS)  Anyone else?
24      A.  Not that I recall.
25      Q.  And when did you have this conversation with

## 130

1   to remember if she testified before the committee or
2   not.  I don't recall.
3       Q.  Did you have any communications about Senate Bill
4   362 with the Attorney General's office?
5       A.  I'm -- I feel like they probably testified in
6   committee about that but beyond that, I don't have any
7   specific recollection.
8       Q.  And any communications about the bill with staff
9   from the Secretary of State?
10      A.  Only to the extent that it was part of the public
11  record is all I'm able to recall.
12      Q.  Did you have any communication with the TLC?
13      A.  I don't have any specific recollection of that.
14      Q.  So, what you're telling me today is that the
15  communications that you had with the -- about Senate
16  Bill 362 are limited to what is in the public record?
17      A.  As we sit here today, the only thing that I would
18  have any recollection of would be what is in the public
19  record.
20      Q.  Are you aware of the purpose of excluding from
21  Senate Bill 362 the student ID as a form of allowable
22  identification that voters may show when they come to
23  the polls?
24          MR. SWEETEN:  I'm going to object.  I think
25  that calls for matters subject to the legislative

## 132

1   Senator Fraser about what forms of ID to include in
2   Senate Bill 362?
3       A.  I don't recall the specific time or the general
4   time.
5       Q.  Okay.  Do you recall if there were others present
6   when you had these conversations?
7       A.  I do not.
8       Q.  And these were in-person discussions?
9       A.  Yes.
10      Q.  Okay.  How about by phone or E-mail?
11      A.  I don't recall.  It would be very unusual that I
12  would have discussed it in an E-mail with him.  We don't
13  generally communicate that way.  And I may have talked
14  to him about it on the phone but I don't have a specific
15  recollection.
16      Q.  Okay.  And what was the general subject matter of
17  your communications with Senator Fraser about what forms
18  of ID to include in the bill?
19          MR. SWEETEN:  I think that is the general
20  subject matter.  You're starting to ask for the
21  specifics of the conversation.  Your preface of your
22  question asked about forms of ID, and he's revealed the
23  communications that would have been about forms of ID.
24  To ask any more detail about that communication would
25  implicate the legislative privilege that both senators

## 133

1  have asserted.
2      A. I don't think I can answer the question based on
3  what counsel has told me.
4      Q. (BY MS. RIOS)  Did you analyze or direct anyone
5  to analyze which registered voters did not possess one
6  of the required forms of ID identified in Senate Bill
7  362?
8          MR. SWEETEN: Senator, in answering the
9  question, don't reveal thoughts, mental impressions,
10 opinions, motivation about legislation or furtherance of
11 the legislative process or communications you've previously listed.
12 with the entities or individuals I've previously listed.
13 You can refer to matters of the public record but don't
14 reveal privilege in answering the question.
15         THE WITNESS: Could you repeat the question
16 that she asked, please?
17         (Whereupon, the requested testimony was read back
18 as follows:
19     QUESTION: Did you analyze or direct anyone to
20     analyze which registered voters did not possess
21     one of the required forms of ID identified in
22     Senate Bill 362?)
23     A. Only to the extent that it is a part of the
24 public record and I know that this was discussed
25 extensively in the Committee of the Whole.

## 134

1      Q. (BY MS. RIOS)  Okay.  Did you read any research
2  or analysis of voter ID to assist you in working on
3  Senate Bill 362?
4          MR. SWEETEN: That question would require
5  him to reveal his thoughts, his mental processes,
6  impressions, opinions, motivation about legislation or
7  furtherance of the legislative process.  As such, it
8  would be privileged.
9          You can refer to matters of the public
10 record to the extent you can in answering the question.
11 Otherwise, don't reveal privileged matter.
12     A. I don't think I can answer that question.
13         MS. RIOS: I'm asking which ones.
14         MR. SWEETEN: And in doing so, you're asking
15 him his thought process, his mental impressions,
16 opinions, motivations about legislation.  This is
17 squarely within what is under the umbrella of the
18 legislative privilege.
19         I'm instructing the Senator not to answer
20 the question on that basis.
21     Q. (BY MS. RIOS)  So, you cannot answer me as to why
22 you selected these studies?
23         MR. SWEETEN: Same instruction.
24     A. I don't believe I can answer that with -- I'm
25 going to invoke my legislative privilege.

## 135

1      Q. (BY MS. RIOS)  Did you conduct or instruct anyone
2  to conduct an analysis of 362 as it impacts minority
3  voters?
4          MR. SWEETEN: Same objection.  You're asking
5  for his mental impressions, thought process, opinions
6  and motivations about legislation.  It's subject to the
7  legislative privilege.
8          Instruct not to answer except to the extent
9  you can reveal matters of the public record.
10     A. Well, I would respectfully refer you to the
11 deliberations of the Committee of the Whole when we took
12 this up, and I know this matter was discussed
13 extensively.  Beyond that, there's nothing that I can
14 reveal to you.
15     Q. (BY MS. RIOS)  Okay.  Did you make any attempt to
16 analyze whether Senate Bill 362 had a disproportionate
17 impact on minority voters?
18         MR. SWEETEN: Objection.  Legislative
19 privilege.
20         Instruct not to answer except to the extent
21 you can refer to matters of public record.
22     A. That was -- that topic was specifically discussed
23 at length as a part of the process of the Committee of
24 the Whole, and there really wasn't any deliberation
25 outside of that.

## 136

1      Q. (BY MS. RIOS)  Okay.  If Senate Bill 362 had been
2  passed, would it have been subject to the requirements
3  of Section 5 of the Voting Rights Act?
4      A. I believe it would have been.
5          MR. SWEETEN: It's almost 1:00 o'clock --
6  it's 1:10.  I'm hungry.  Can we take a very short lunch
7  break, maybe 20 minutes, when you get to a logical
8  stopping point?
9          MS. RIOS: We can stop here.
10         (Lunch recess.)
11         MS. RIOS: Okay.  Back on the record.
12     Q. (BY MS. RIOS)  I'm going to ask the last
13 questions that I asked so we can get back on -- in the
14 groove.
15         If SB 362 had been passed, would it have been
16 subject to the requirements of Section 5?
17     A. And I believe my answer was I think it would be.
18     Q. Okay.
19     A. To the best of my knowledge, it would be.
20     Q. Are you familiar with the concept of Spanish
21 surname voter registration?
22     A. Yes.
23     Q. And what do you know about Spanish surname voter
24 registration?
25     A. Not much but just I've heard it talked about.

Senator Thomas D. Williams                                    June 1, 2012

---

## 137

1    Q.  Did you consider, you know, looking into the
2    Spanish surname voter registration database to figure
3    out whether the Hispanic population would be more or
4    less likely to have the necessary photo ID under Senate
5    Bill 362?
6         MR. SWEETEN:  Objection.  Legislative
7    privilege.
8         It asks for your thoughts, mental
9    impressions, opinions, motivations about legislation.
10   Instruct you not to answer except to the extent you
11   refer to matters of the public record.
12   A.  I don't believe I can answer the question based
13   on the advice of counsel.  And what I would say is I
14   don't know anything other than what was discussed in
15   committee or on the floor of the Senate.
16   Q.  (BY MS. RIOS)  Okay.  What is the purpose or
17   purposes of Senate Bill 362?
18        MR. SWEETEN:  You can answer.
19   A.  The purpose of Senate Bill 362 was to ensure that
20   the person who presents themselves to vote is, in fact,
21   the person that they say they are.
22   Q.  (BY MS. RIOS)  Any other purpose?
23   A.  No.
24   Q.  And who introduced Senate Bill 362?
25   A.  Senator Fraser.

---

## 138

1    Q.  And who decided that it would be Senator Fraser
2    the one who would introduce Senate Bill 362?
3         MR. SWEETEN:  Don't reveal any
4    communications you've had with other legislators or
5    state agencies, including with Senator Fraser.  Also, it
6    calls for speculation.
7         To the extent you can answer that without
8    revealing privileged matters, you can.
9    A.  Well, I think Senator Fraser decided when he
10   filed it, I mean.
11   Q.  (BY MS. RIOS)  Okay.  You laid out Senate
12   Resolution 14, adopting the rules of the Senate for the
13   80th legislature as the permanent rules of the 81st
14   legislature with the modification of the two-thirds rule
15   as to voter ID.
16   A.  This is in the '09 session?
17   Q.  Yes, '09.
18   A.  Okay.
19   Q.  Do you know who decided that you would be the one
20   who would lay out Senate Resolution 14?
21        MR. SWEETEN:  I'm sorry, Senate Resolution
22   14?
23        MS. RIOS:  Yes.
24        MR. SWEETEN:  Not Senate Bill 14?
25        MS. RIOS:  No.

---

## 139

1         MR. SWEETEN:  Obviously, don't reveal
2    matters of legislative privilege in answering the
3    question but you can answer.
4    A.  It's the prerogative of the Lieutenant Governor.
5    Q.  (BY MS. RIOS)  So, the Lieutenant Governor was
6    the one who chose you to present this Senate Resolution
7    14?
8         MR. SWEETEN:  Don't reveal privileged
9    communications.
10   A.  I don't think I can answer this without revealing
11   privileged communication.
12   Q.  (BY MS. RIOS)  I'm asking who.
13        MR. SWEETEN:  Read the question again.
14        (Whereupon, the requested testimony was read back
15   as follows:
16        QUESTION:  So, the Lieutenant Governor was the
17   one who chose you to present this Senate
18   Resolution 14?)
19        MR. SWEETEN:  Same objection.
20   A.  He has the power of recognition.  He recognized
21   me to lay out the Senate rules.  It's a matter of public
22   record.
23   Q.  (BY MS. RIOS)  Did you volunteer to lay out
24   Senate Resolution 14?
25        MR. SWEETEN:  Don't reveal communications

---

## 140

1    you had with any legislators or state agencies.
2    A.  I think that it is a matter of public record that
3    Senator Whitmire, who was the dean of the Senate, did
4    not want to carry the resolution.  I was willing to
5    carry it and was a logical person to do it, as Chairman
6    of the Administration Committee.
7    Q.  (BY MS. RIOS)  When you stated earlier that the
8    purpose of Senate Bill 362 is to ensure that the person
9    who presents him or herself to vote is the person they
10   say they are, how does Senate Bill 362 ensure that
11   that's the case?
12        MR. SWEETEN:  Don't reveal your thoughts,
13   mental impressions, opinions, motivations about
14   legislation or the legislative process in answering the
15   question.
16        Objection.  Legislative privilege.  Go
17   ahead.
18   A.  It's been a matter of public record, and I've
19   said publicly that if you -- the only way to prevent
20   in-person voter fraud is to require someone to present a
21   photo ID when they vote.  Otherwise, you can't even
22   begin to know whether they are committing fraud or not.
23   Q.  (BY MS. RIOS)  Okay.  Are nonphoto ID documents
24   allowed under Senate Bill 362 to verify a voter's
25   identity?

Senator Thomas D. Williams                           June 1, 2012

## 141

1   MR. SWEETEN:  You can answer based upon the
2   Texas bill, which is a matter of public record.
3   THE WITNESS:  Could you repeat the question
4   that she asked, please?
5   (Whereupon, the requested testimony was read back
6   as follows:
7   QUESTION:  Okay.  Are nonphoto ID documents
8   allowed under Senate Bill 362 to verify a voter's
9   identity?)
10  A. Let me get the bill in front of me.
11  MR. SWEETEN:  It's right there.
12  A. Yes.
13  Q. (BY MS. RIOS)  And you said earlier that the
14  problems that occur in the system is that it leaves open
15  the possibility that a voter is not who they say they
16  are; is that correct?
17  MR. SWEETEN:  I think you asked him that in
18  the context of a public statement but could you -- if
19  you could give him the context of that.
20  MS. RIOS:  That was something that he said
21  verbatim earlier in the deposition.
22  MR. SWEETEN:  Again, if you want to give him
23  the context of that statement.  I think it was
24  misleading.
25  A. I would like to know what the question was that I

## 142

1   was responding to.
2   Q. (BY MS. RIOS)  Okay.  You said earlier that the
3   problem with the current system is that it leaves open
4   the possibility that a voter is not who she or he says
5   they are.  How does Senate Bill 362 correct this?
6   MR. SWEETEN:  You're asking him about his
7   thoughts, mental impressions, opinions and motivation
8   about legislation or the furtherance of the legislative
9   process.
10  I'm going to instruct you not to answer
11  except to the extent you can reveal matters of public
12  record.
13  A. You know, I don't know that I can answer that
14  without violating my legislative privilege.  I've spoken
15  publicly on it.  I don't have anything beyond my public
16  comments to say.
17  Q. (BY MS. RIOS)  Was Senate Resolution 14 your
18  resolution or did you merely carry it?
19  A. I was the author of Senate Resolution 14.  I
20  asked that it be drafted.
21  Q. And who drafted Senate Resolution 14?
22  A. You know, I don't recall.  It would be possible
23  to find out but I don't remember.
24  Q. And when did you begin to work on Senate
25  Resolution 14?

## 143

1   MR. SWEETEN:  You can answer.
2   A. I -- prior to -- once I was clear that I was
3   going to be the person who carried it, I think I asked
4   that it be drafted.  So, that would have been when I
5   started working on it.  It would have been near the
6   beginning of that legislative session, probably the
7   first or second day.  It could have been earlier.
8   Q. (BY MS. RIOS)  And did you introduce Senate
9   Resolution 14 in part because you were frustrated that
10  House Bill 218 had not passed?
11  MR. SWEETEN:  I'm going to object.  I think
12  you're asking him to reveal his thoughts, mental
13  impressions, opinions, motivation about legislation.
14  Objection.  Legislative privilege.
15  THE WITNESS:  Now, could you repeat the
16  question that she asked me?
17  (Whereupon, the requested testimony was read back
18  as follows:
19  QUESTION:  And did you introduce Senate
20  Resolution 14 in part because you were frustrated
21  that House Bill 218 had not passed?)
22  MR. SWEETEN:  Same objection.  Calls for his
23  mental impressions.  Legislative privilege.
24  A. Other than what was said in the public record on
25  the debate about the Senate Resolution, I don't think

## 144

1   there's anything that I can share with you.  I stated my
2   thoughts pretty clearly in that resolution, I think, or
3   during the debate of the resolution.
4   Q. (BY MS. RIOS)  Okay.  Did anything occur between
5   2007 and 2009, which is when Senate Bill 362 was
6   introduced, that caused you to conclude that there was a
7   continued need for voter ID legislation?
8   MR. SWEETEN:  I'm going to object.  That
9   calls for matters of legislative privilege, asking him
10  to reveal his thoughts, mental impressions.
11  Instruct you not to answer except to the
12  extent you can refer to matters of the public record.
13  A. I don't think that I can answer that question on
14  the advice of counsel.
15  There is a public record in the debate about
16  Senate Resolution 14.  It's a part of the Senate Journal
17  that -- where I outline my reasons for introducing the
18  resolution.  I think they are quite clear.  Is there any
19  part of that you didn't understand?
20  Q. (BY MS. RIOS)  I read the record but we're taking
21  your deposition, so, you can tell us what was it that
22  occurred that caused you to conclude that there was a
23  continued need for such legislation?
24  MR. SWEETEN:  Again, objection.  You're
25  invading the legislative privilege with that question.

## 145

1  He's not going to reveal his mental impressions,
2  thoughts or opinions about legislation.  He can answer
3  based upon matters of the public record.
4         A.  And my answer is beyond what is a part of the
5  public record in the Senate Journal, there are no other
6  reasons.
7         Q.  (BY MS. RIOS)  Did the Lieutenant Governor tell
8  you that you would be the person carrying Senate
9  Resolution 14?
10        MR. SWEETEN:  You're asking about a specific
11 conversation he had with the Lieutenant Governor.
12        I'm going to object to you revealing the
13 substance of the communication.  You can reveal whether
14 you had communications with the Lieutenant Governor but
15 don't reveal the substance.
16        He can give a general purpose description
17 but I think that the question asks for something beyond
18 that, as phrased.
19        A.  It's a matter of record in the Senate Journal
20 that I had a discussion with the Lieutenant Governor
21 about who would carry the rules resolution.  That's what
22 SJR 14 was.  And beyond that, there's nothing that I can
23 add to that.  I think the record -- the public record
24 accurately reflects what happened.
25        Q.  (BY MS. RIOS)  Okay.  And are you aware of any

## 146

1  in-person voter impersonation that happened between 2007
2  and 2008 that caused you to believe that the voter ID
3  bill was still needed in Texas?
4         MR. SWEETEN:  Calls for matters of
5  legislative privilege, including communications he's had
6  with constituents, legislators, legislative staff, state
7  agencies, Texas Legislative Council and also asks for
8  his mental impressions and opinions about a bill.
9         To the extent you can refer to matters of
10 the public record, you are free to do so.  Otherwise, my
11 instruction is not to answer the question as phrased.
12        THE WITNESS:  Could you read the question to
13 me again?
14        Q.  (BY MS. RIOS)  Strike that.
15        A.  Okay.
16        Q.  Besides the public record, did you receive any
17 unsolicited evidence that in-person voter impersonation
18 was still a problem that needed to be addressed by photo
19 ID legislation in Texas between 2007 and 2009?
20        MR. SWEETEN:  You can reveal matters of the
21 public record.
22        A.  I don't believe beyond what I said in the public
23 record, there's anything that I can add.
24        Q.  (BY MS. RIOS)  Okay.  And what were the bases for
25 your concerns about voter fraud in 2009?

## 147

1         MR. SWEETEN:  Objection.  Legislative
2  privilege.  Don't reveal privileged matters.
3         You can answer based on matters in the
4  public record.
5         A.  You know, there's an extensive record on this.
6  There was a six and a half hour debate on the Senate
7  floor about the rule change.  There's really nothing
8  that I can add to that.
9         There was over 20 hours of debate on the bill, on
10 Senate Bill 14.  I mean, I've stated my position very
11 clearly.  There's nothing beyond that that I can add.
12        Q.  (BY MS. RIOS)  Did you or your staff collect
13 evidence of voter impersonation at the polls that was
14 not included in the public record?
15        MR. SWEETEN:  Objection.  Asks for matters
16 subject to the legislative privilege.
17        Don't answer except to the extent you can
18 refer to the matter of the public record.  That is
19 legislatively privileged.
20        A.  I don't think there's anything I can add to what
21 I've already said.  It's a matter of public record.
22        Q.  (BY MS. RIOS)  Okay.  Did you or your staff
23 request evidence of voter impersonation at the polls
24 from the Secretary of State?
25        MR. SWEETEN:  Same objection.  Legislative

## 148

1  privilege.
2         THE WITNESS:  Could you read back the
3  question to me, please?
4         (Whereupon, the requested testimony was read back
5  as follows:
6         QUESTION:  Okay.  Did you or your staff request
7  evidence of voter impersonation at the polls from
8  the Secretary of State?)
9         MR. SWEETEN:  Don't reveal communications
10 you had with the Secretary of State.  You can reveal
11 whether you had communications with the Secretary of
12 State and also reveal matters of the public record.
13        A.  The Secretary of State's office testified about
14 this in the Committee of the Whole, and beyond that, I
15 don't know that there's anything I can add to that.
16        Q.  (BY MS. RIOS)  Okay.  How is Senate Bill 362
17 more effective in preventing in-person voter
18 impersonation than the current practice?
19        MR. SWEETEN:  Don't answer the question.  It
20 asks for you to reveal your mental impressions,
21 opinions, motivations about legislation and, as such, is
22 subject to the legislative privilege.
23        A.  On the advice of counsel, I'm going to refuse to
24 answer that question.
25        Q.  (BY MS. RIOS)  Does Senate Bill 362 solve any

Senator Thomas D. Williams                                    June 1, 2012

## 149

1   problem related to noncitizens voting?
2       A.  I believe that --
3           MR. SWEETEN:  Hold on a minute.  Does it
4   involve any problems of noncitizens voting, once again,
5   you're asking for his thoughts, mental impressions,
6   opinions.  That is subject to legislative privilege.
7           My instruction is do not answer the question
8   as phrased.  You can refer to matters of the public
9   record, however.
10      A.  It's a public matter that this bill -- it says
11  right here that it's a bill to be entitled an act
12  relating to requiring a voter to present proof of
13  identification, and to the extent that someone who was
14  not a citizen can present that ID, then I think it would
15  but it's -- you know, it speaks for itself on the face
16  of it.
17      Q.  (BY MS. RIOS)  Can you identify any noncitizen
18  who has voted, by name?
19          MR. SWEETEN:  Objection.  Legislative
20  privilege.
21          You can refer to matters of the public
22  record.
23      A.  There was extensive testimony about this in the
24  Committee of the Whole when this bill was considered.
25      Q.  (BY MS. RIOS)  Did this testimony in the record

## 150

1   include any information about individuals convicted for
2   voting, meaning noncitizens?
3           MR. SWEETEN:  You can answer as phrased.
4       A.  No, not to my recollection.
5       Q.  (BY MS. RIOS)  Did you have any communications
6   with legislators who opposed 362?
7           MR. SWEETEN:  You can answer whether you had
8   communications.
9       A.  Yes.
10      Q.  (BY MS. RIOS)  Okay.  And who did you communicate
11  with?
12          MR. SWEETEN:  You can answer.
13      A.  I can't recall everyone.  I know that I had a
14  conversation with Senator Whitmire, and I had a
15  conversation with Senator West and Senator Van de Putte.
16  And there were probably others but those are the only
17  ones that I can recall at this time.
18      Q.  (BY MS. RIOS)  Okay.  Did you take any steps with
19  regard to Senate Bill 362 in an attempt to address any
20  concerns that they brought to your attention?
21          MR. SWEETEN:  Don't answer the question.  It
22  calls for matters subject to the legislative privilege.
23  Instruct not to answer.
24      A.  On the advice of counsel, I can't answer that
25  question.

## 151

1       Q.  (BY MS. RIOS)  And who besides you were the main
2   proponents of Senate Bill 362?
3           MR. SWEETEN:  You can answer to the extent
4   it's a matter of public record.  Don't reveal specific
5   communications between legislators.
6       A.  The legislation reflects the members who were
7   joint and co-authors of the bill, and those people were
8   supporters of the bill.  Beyond that, there's nothing
9   that I can add.
10      Q.  (BY MS. RIOS)  Okay.  Was this legislation a
11  priority for the Governor of Texas?  Do you know?
12          MR. SWEETEN:  Objection.  Calls for
13  speculation but you can refer to matters of the public
14  record.
15      A.  The Governor has publicly supported voter
16  identification legislation.  I do not recall
17  specifically on Senate Bill 362 whether he spoke to that
18  publicly or not but I know that he's long supported
19  voter identification laws.
20      Q.  (BY MS. RIOS)  And was this legislation a
21  priority for the Lieutenant Governor?  Are you aware if
22  it is?
23      A.  Only to the extent that he publicly said that it
24  was important to get a voter identification bill passed.
25      Q.  Okay.  Do you know if Senate Bill 362 was a

## 152

1   priority for anyone outside Texas government?  I'm
2   referring to organizations, groups.
3           MR. SWEETEN:  I think -- objection.  Vague.
4   Also, don't reveal matters of privilege but you can
5   answer to the extent you can.
6       A.  It's a matter of public record who came and
7   testified for and against the bill, and I think it's
8   clear in the record that the Republican party strongly
9   favored the bill and there were other groups that did
10  also and there were other groups that did not support
11  the bill.
12      Q.  (BY MS. RIOS)  Okay.
13      A.  But beyond what's in the public record, there's
14  nothing that I can add to that.
15      Q.  Did you meet with any groups or organizations who
16  were opponents of 362?
17          MR. SWEETEN:  You can answer the question as
18  phrased.
19      A.  We heard from the opponents in committee.  I may
20  have met with them outside of committee but I don't have
21  a specific recollection.  I wouldn't have been adverse
22  to meeting with them but I don't have a specific
23  recollection.
24      Q.  (BY MS. RIOS)  And when you say "with them," to
25  whom are you --

## 153

1  A. The opponents, the people you were asking about.
2  Q. Okay. Did you meet with any groups representing
3  minority voters?
4  A. I don't have a specific recollection. I would
5  not have been opposed to meeting. If they had asked for
6  a meeting with me, I would have been happy to meet with
7  them.
8  Q. But you do not recall meeting with them?
9  A. Not -- not sitting here today, I don't recall
10  whether I did or not.
11  Q. What was your role in trying to get SB 362
12  passed?
13  MR. SWEETEN: You can reveal the matters of
14  the public record. Don't reveal matters subject to the
15  privilege.
16  A. Well, it's, I think, a matter of public record
17  that I was a joint author of the bill, that I was a
18  strong proponent of it and, as you have pointed out and
19  as I've already pointed out, I was the sponsor of the
20  rules resolution that allowed us to get this bill to the
21  floor.
22  Q. (BY MS. RIOS) And you were a co-sponsor of 362?
23  A. I think so, the joint author.
24  Q. Okay.
25  A. Or co-sponsor.

## 154

1  Q. What was your strategy for getting 362 passed?
2  MR. SWEETEN: I think that calls for you to
3  reveal your mental impressions, thoughts about
4  legislation, opinions, motivations and communications
5  and would be subject to the privilege, and I instruct
6  you not to answer on that basis but you can refer to
7  matters of the public record.
8  A. And I think there is a very clear record in the
9  Senate Journal that I laid out when I introduced the
10  resolution that gave what my thought process was in how
11  we would get this bill to the floor and why we needed to
12  get it to the floor.
13  Beyond what's in that resolution and what was
14  part of the debate, which is of public record, there's
15  nothing that I can add.
16  Q. (BY MS. RIOS) Okay. Let me give you
17  Exhibit 404.
18  (Exhibit 404 marked.)
19  Q. (BY MS. RIOS) And these are the Senate rules
20  adopted January 14, 2009.
21  A. No, they are not. This is a copy of one rule
22  that was adopted.
23  Q. Okay. It's a copy of one rule. It's an excerpt?
24  A. Yes.
25  Q. And specifically it shows Rule 5.11. What were

## 155

1  the circumstances for adopting this rule?
2  MR. SWEETEN: Objection to the question as
3  vague.
4  A. Would you like to restate the question?
5  Q. (BY MS. RIOS) How was this provision adopted in
6  the 2009 Senate rules?
7  A. Which provision?
8  Q. 5.11 D.
9  A. That was what I amended into the Senate rules at
10  the beginning of the 2009 session. As I recall, it was
11  one of two amendments that I made to the rules that
12  session.
13  Q. Okay. Are you aware of the purpose of the
14  two-thirds rule?
15  MR. SWEETEN: You can testify as to the
16  general purpose of the two-thirds rule.
17  A. Yes, and I testified about it earlier and, as
18  I've said, it's a calendar mechanism, it is the way we
19  control the flow of legislation that comes to the floor.
20  Q. (BY MS. RIOS) Okay. And are you aware of the
21  purpose of carving out voter ID requirements from the
22  general two-thirds rule?
23  A. Yes, I am.
24  Q. What was the purpose?
25  A. They were -- that purpose was clearly stated in

## 156

1  the floor debate over the Senate rules. And beyond
2  what's a matter of that public record, there's nothing
3  else for me to add.
4  Q. So, a bill related to voter identification
5  requirements would not need an affirmative vote of
6  two-thirds of the members present to put it on the
7  calendar?
8  MR. SWEETEN: You're asking him if that's
9  what the bill says?
10  Q. (BY MS. RIOS) Is that what it says?
11  MR. SWEETEN: You can answer.
12  A. Would you restate the question?
13  THE WITNESS: Do you want to read that back
14  to me?
15  A. Or I think you might want to restate it.
16  Q. (BY MS. RIOS) When it comes to voter
17  identification requirement bills, you would only need a
18  majority of the members to vote on it to put it on the
19  calendar, while the usual special order rule is that
20  they would need two-thirds vote?
21  A. That's not correct.
22  Q. Okay. Why did you carve out the voter ID
23  requirements from the two-thirds rule?
24  MR. SWEETEN: He can testify about the
25  general purpose of the bill. I think when you start

## 157

1  asking him about the specific legislation, which is the
2  voter ID, I think you're starting to get into matters
3  that are subject to the legislative privilege.  I will
4  let him testify as to the purpose of Rule 5.11, which
5  he's done twice now today.
6      THE WITNESS:  Would you read her question
7  back to me?
8      (Whereupon, the requested testimony was read back
9  as follows:
10     QUESTION:  Okay.  Why did you carve out the voter
11     ID requirements from the two-thirds rule?)
12 A.  I have -- I spoke publicly about this in the
13 debate on this rule change about us creating a special
14 order for the voter identification bills that are
15 reported favorably from the Committee of the Whole, and
16 so, beyond that, there's really nothing that I can add.
17     Have you not read that?
18 Q.  (BY MS. RIOS)  Yes, sir.
19     And other than voter identification requirements,
20 were there any other bills that were carved out from the
21 two-thirds rule in 2009?
22     MR. SWEETEN:  You can answer the question as
23 phrased.
24 A.  In 2009, there were bills that were passed in the
25 regular order of business that did not require

## 158

1  two-thirds suspension of the rules, and there were bills
2  in many other sessions that did not require a two-thirds
3  suspension of the rules.  It was frequently done.
4  **Q.  (BY MS. RIOS)  I'm not referring to the regular**
5  **call of business.  I'm referring to special orders.  Is**
6  **the voter ID requirement bill the only one that's**
7  **identified in the -- in Rule 5.11 about special orders?**
8  **A.  It is specifically identified in 5.11 D.**
9  Q.  Okay.  And did you try to determine how many
10 senators would support Senate Bill 362 prior to bringing
11 it to the floor?
12 A.  I didn't bring Senate Bill 362 to the floor.
13 Senator Fraser did.  It was his bill.
14 Q.  But as a co-sponsor of the bill, did you try to
15 find out how many senators would support Senate Bill 362
16 prior to bringing it to the floor?
17 A.  The author of the bill would be the one who would
18 determine where the votes were.
19 Q.  Did you talk to your colleagues in the Senate as
20 to whether they would support 362?
21     MR. SWEETEN:  You can answer as to whether
22 you had a conversation.
23 A.  Yes.  As a matter of fact, I have a specific
24 recollection that in the debate on the rule change, it
25 was my hope that we would be able to come up with a

## 159

1  solution that everyone could support.
2  Q.  (BY MS. RIOS)  What is the significance of
3  carving out voter identification requirements from, you
4  know, the rest of Rule 5.11?
5      MR. SWEETEN:  I think because you're asking
6  about the legislation, I think you're asking him to
7  reveal thoughts and mental impressions that would be
8  subject to the legislative privilege.  He can testify
9  about the text of the bill.  He's testified already
10 twice about the general purpose.
11     THE WITNESS:  Could you repeat the question,
12 please?
13     (Whereupon, the requested testimony was read back
14 as follows:
15     QUESTION:  What is the significance of carving
16     out voter identification requirements from, you
17     know, the rest of Rule 5.11?)
18 A.  I spoke specifically about this in the debate
19 over the adoption of the rules resolution at the
20 beginning of that session, and as a matter of public
21 record, I noted that there were several issues, many
22 instances, I think somewhere around 70 instances, where
23 bills had been passed without the suspension of the
24 regular order of business and that specifically three
25 major issues had been passed.

## 160

1  They were, as I recall, workers' compensation,
2  redistricting under both Republicans and Democrats, and
3  a sweeping tax reform legislation known as the Peveto
4  Bill.  So, I've spoken about it publicly, and beyond
5  that, there's nothing that I can add to that.
6  Q.  (BY MS. RIOS)  Okay.  And during the past -- and
7  since you have been a Senator, how many times has that
8  happened?  You mentioned 80, you know, pieces of
9  legislation but since you have been a Senator, how many?
10 A.  I don't recall specifically but we have passed
11 quite a bit of legislation in, I believe, every session
12 that I've been in that we did not suspend the regular
13 order of business.
14 Q.  Okay.
15     (Exhibit 405 marked.)
16 Q.  (BY MS. RIOS)  This is 405.  This is a public
17 statement from you January 15, 2009, and this is comment
18 allowing a majority vote for Senate floor debate on
19 legislation requiring valid photo ID to vote.
20     The last paragraph says that, "In recent times,
21 majority vote rules have been involved in regular
22 special sessions," and it mentions the number of years
23 but during your tenure at -- in the Senate, how many
24 times has the majority vote requirement been invoked?
25 A.  The minority vote requirement, I don't know

## 161

1  what --
2  Q.  Majority vote requirement has been invoked.
3  A.  I don't know what you're referring to.
4  Q.  I'm referring to the very last sentence in the
5  last paragraph.
6  A.  Since I've been -- that last sentence refers to
7  bills that were passed in the regular order of business.
8  They only require a majority vote.
9        I can't tell you, there's been so -- there's been
10  numerous bills every session that I've been in the
11  Senate that have passed in the regular order of
12  business.
13        Without going back and looking specifically, I
14  can't tell you.  And there may have been a session that
15  there wasn't but most sessions, there are and, frankly,
16  many of my colleagues don't understand that.
17  Q.  Okay.  By addressing photo ID with a majority
18  vote special order, did that deviate from the just
19  regular operation in the Senate?
20  A.  No.  Special orders have been used by a number --
21  on a number of pieces of legislation over the years, and
22  I spoke to it in the floor debate about the adoption
23  of the rules.  And as we sit here today, I can't recall
24  every specific instance but it was well researched, and
25  I provided my colleagues with that information, and we

## 162

1  talked about it on the floor.
2  Q.  Okay.  The debate on the floor of Senate
3  Resolution 14 lasted like six hours?
4  A.  Six or six and a half hours, yeah.
5  Q.  Okay.  And was -- were some of your colleagues
6  opposed to Senate Resolution 14?
7  A.  Yes.
8  Q.  And did they bring to your attention that they
9  thought that this was, you know, a deviation from their
10  regular rules?
11        MR. SWEETEN:  You can testify based on
12  matters of the public record.
13  A.  As reflected in the Senate Journal, I believe
14  they did.
15  Q.  (BY MS. RIOS)  Okay.  Would it have been
16  difficult to pass the voter ID bill in 2009 without the
17  rules change?
18        MR. SWEETEN:  I think it calls for
19  speculation and calls for him to reveal his mental
20  thoughts, impressions about legislation.
21        So, don't answer except for to the extent
22  you can refer to matters of the public record.
23  A.  There was a discussion about this that is -- was
24  a part of the rules resolution debate, as I recall.
25  Beyond that, there's nothing that I can add to that.

## 163

1  Q.  (BY MS. RIOS)  Okay.  But did you publicly
2  acknowledge during this debate that it would be
3  difficult to pass a voter ID bill this year without the
4  change of rules?
5  A.  I believe that I did.
6  Q.  Okay.  And did you acknowledge that the voter ID
7  bill in 2009 had been a partisan issue incapable of
8  resolution?
9        MR. SWEETEN:  You can testify about -- are
10  you quoting from somewhere?
11        MS. RIOS:  Yes.
12        (BY MS. RIOS)  I'm going to provide that to you.
13  A.  I think what I said was it was an intractable
14  issue.
15        (Exhibit 406 marked.)
16  Q.  (BY MS. RIOS)  This is an excerpt, and I'm
17  bringing to your attention Page 20, which is the second
18  page.  And you're having an exchange with Senator West.
19  And when he asked you, "It's been a partisan issue
20  incapable of resolution," you answered, "Correct"?
21  A.  Where did I say that?
22        Oh, yes.  Okay.  I see it.  I did say that, yes,
23  and he said that, that is correct.
24  Q.  Okay.  Did you make another amendment to the
25  rules in 2009?

## 164

1  A.  Yes, there was one -- my recollection is there
2  was one other amendment that was included in that rules
3  resolution, and if memory serves me correct, it was a
4  technical correction that was related to a
5  constitutional amendment that was passed by Senator
6  Carona in the previous session regarding the recording
7  of record votes, and the legislation -- or the
8  constitutional amendment that we passed was in conflict
9  with the Senate rules, and we corrected that conflict to
10  reflect the constitutional amendment that had been
11  passed and adopted by the voters.
12  Q.  Okay.  And how was Senate Resolution 14 voted?
13  What was the final tally?
14  A.  I don't remember the final tally.  What I recall
15  is that none of the Democrats voted for it and all of
16  the Republicans voted for it except for Senator Carona.
17  Q.  Okay.
18  A.  That's my recollection.
19  Q.  And part of Rule 5.11 D provides that the bill
20  would go to the Committee of the Whole instead of going
21  to one of the other Senate committees.  Is this the
22  usual -- is it unusual for a bill to go straight to the
23  Committee of the Whole?
24        MR. SWEETEN:  Answer as a general matter.
25  A.  I spoke to it in the floor debate, and my

Senator Thomas D. Williams                                    June 1, 2012

---

### 165

1  recollection of what I said was that I thought it was an
2  important issue, that it needed to be before the entire
3  body so that everyone could hear the same testimony and
4  that I was hopeful that as a result of us all working on
5  it at the same time that we would be able to come up
6  with a bipartisan solution to the problem.
7      Q. (BY MS. RIOS) Okay. Any other bill during your
8  tenure at the Senate being filed in the Committee of the
9  Whole without going to any other committee first?
10     A. We have considered redistricting bills in the
11  Committee of the Whole, as I recall.
12     Q. In addition to restricting bills?
13     A. I don't recall whether any other bills were
14  considered in the Committee of the Whole or not. I know
15  this bill was and I believe one of our redistricting
16  bills was.
17     Q. Okay. The last page of this excerpt of the Texas
18  Journal, Page 61 has some closing remarks by Senator
19  Carona, and towards the middle of the paragraph he
20  states, "I refuse to believe that, in the spirit of
21  goodwill and statesmanship, we couldn't sit down
22  together, given the appropriate amount of time, and work
23  through this issue. I know you say, 'Well, yes, we'll
24  have that now and in the Committee of the Whole,' but we
25  know that's not the same because the leverage changes

### 166

1  entirely. Well, all you need is 16 votes and you
2  already got them."
3      Do you agree that by bringing Senate Bill 362 to
4  the Committee of the Whole instead of to a regular
5  committee the leverage changed?
6      MR. SWEETEN: Don't reveal your thoughts and
7  mental impressions about legislation. You can refer to
8  matters of the public record in answering the question.
9      A. That was certainly Senator Carona's impression.
10  And it was my goal to get this bill, as I stated, before
11  the Committee of the Whole so we could all consider it
12  together.
13     MR. SWEETEN: Maria, I've got to take a
14  quick break. Can we take about a 3-minute time out?
15     MS. RIOS: Yes.
16     (Short recess.)
17     MS. RIOS: Okay. Let's go back on the
18  record.
19     Q. (BY MS. RIOS) Okay. You said -- and this is in
20  the record -- that bringing the issue of in-person voter
21  impersonation to the Committee of the Whole would help,
22  you know, craft a bipartisan solution. What did you --
23  what concerns brought by the opposition were -- were
24  included in the amendments?
25     MR. SWEETEN: One second.

### 167

1      Q. (BY MS. RIOS) Let me strike that. Let me
2  just --
3      During the debate on Senate Resolution 14, some
4  members of the opposition raised issues that were
5  important, you know, to them to see if they could be
6  added to your rules change. Why weren't these
7  amendments incorporated?
8      MR. SWEETEN: Don't answer the question.
9  I'm instructing you not to answer on the basis of
10  legislative privilege.
11     A. On the advice of counsel, I don't believe I can
12  answer that question.
13     Q. (BY MS. RIOS) Okay. And during the debate on
14  362, what concerns of the opposition were incorporated
15  into the bill?
16     MR. SWEETEN: Don't answer the question
17  unless you can do so based upon matters of public
18  record. Don't reveal your thoughts, mental impressions
19  about the bill in answering the question.
20     A. Yeah, you know, there's nothing beyond what's in
21  the public record about amendments that were adopted or
22  not adopted that I know about. So --
23     Q. (BY MS. RIOS) So, do you recall any amendments,
24  you know, proposed by Senators of racial or ethnic
25  origins that were incorporated into Senate Bill 362?

### 168

1      MR. SWEETEN: You can answer. That's based
2  on the public record.
3      A. I don't recall any amendments that were offered
4  during that debate at all. So, not without looking at
5  the record, I have no independent recollection.
6      Q. (BY MS. RIOS) Okay. Do you agree that a key to
7  the effective implementation of -- strike that.
8      Okay. I'm going to give you some excerpts of the
9  floor debate -- well, the Committee of the Whole
10  consideration of SB 362.
11     (Exhibit 407 marked.)
12     Q. (BY MS. RIOS) Let me give you this copy.
13     A. How do I know they are the same as this one?
14  This is bigger than the one you gave me.
15     Q. I eliminated some pages but I am not going to --
16  I will tell you which page number.
17     MR. SWEETEN: This looks like it's
18  double-sided. So, let's just make sure it's the same.
19  I just want to make sure the record is clear. I don't
20  have any doubt it's the same if you say it is. If
21  there's any difference, why don't we just mark --
22     A. This starts with Page 33, this one starts with
23  Page 33. Then it goes to 34 and then to Page 9. It's
24  different.
25     MR. SWEETEN: If this is what you want to

## 169

1  mark, let's just mark it as a new one.
2              MS. RIOS:  Okay.
3         (Exhibit 408 marked.)
4  A.  So, we're looking at 408?
5  Q.  (BY MS. RIOS)  Yes.
6  A.  Okay.
7              MR. SWEETEN:  I'll look on with you, if you
8  don't mind.
9  Q.  (BY MS. RIOS)  Sorry about that.  I'm talking
10 about this one.
11             MR. SWEETEN:  Okay.  So, put 408 aside.
12        (Exhibit 409 marked.)
13             MS. ABUDU:  Maria, do you have extra copies
14 of that?
15             MS. RIOS:  Yes.
16             MS. ABUDU:  This is 409, Committee of the
17 Whole?
18             MS. RIOS:  Yes.
19 Q.  (BY MS. RIOS)  Okay.  SB 362 allowed voters the
20 alternative of presenting nonphoto IDs; is that correct?
21 A.  362 was from the '07 session?
22 Q.  No.  362 is from '09.
23             MR. SWEETEN:  Let's give him the bill.
24             THE WITNESS:  Could you read the question
25 back, please?

## 170

1              (Whereupon, the requested testimony was read back
2         as follows:
3         QUESTION:  Okay.  SB 362 allowed voters the
4         alternative of presenting nonphoto IDs; is that
5         correct?)
6  A.  Yes.
7  Q.  (BY MS. RIOS)  Okay.  And this was not something
8  that was included in Senate Bill 14; is that correct?
9  A.  I believe that's correct.
10 Q.  Okay.  There were allegations in the debate that
11 in order to comply with Senate Bill 362, there would be
12 costs incurred and that it was a poll tax and that was
13 something that Dr. Chandler Davidson spoke about during
14 this debate.  Do you remember discussing the debate with
15 Dr. Davidson?
16 A.  Not specifically but I bet if you've got a copy
17 of the transcript, I might be able to remember it.
18 Q.  If you go to US 4393 --
19             MR. SWEETEN:  Did you say 4393?
20             MS. RIOS:  Yes.
21             MR. SWEETEN:  Is that a page number?
22             MS. RIOS:  On the bottom.
23 A.  Got it.
24 Q.  (BY MS. RIOS)  And if you look at the transcript
25 at Page 536 --

## 171

1  A.  Uh-huh.
2  Q.  -- Mr. Davidson says, "Well, as I have explained
3  to the other senator just a minute ago, it is sometimes
4  expensive to get various forms of photo ID that are
5  required to vote."
6         And later on in that page you state that you can
7  also bring alternate forms, and then you go on to list
8  the forms that don't have a photograph.
9         If you go on to Page 540, you state, "I think
10 it's very inflammatory for you to come before this body
11 and talk about the legislature imposing a poll tax when
12 the bill doesn't provide for that at all."
13        So, my question to you, Senator Williams, is you
14 supported Senate Bill 362; is that correct?
15 A.  I did.
16 Q.  Okay.  And Senate Bill 362 provided for the
17 alternative of bringing two nonphoto IDs to the polls;
18 is that correct?
19 A.  I think what it did is that it provided that if
20 you had your voter registration card and one other form
21 of ID that that would be sufficient.
22 Q.  And was Senate Bill 362 an improvement on the
23 current system?
24             MR. SWEETEN:  Don't answer the question.  It
25 would ask you to reveal thoughts, mental impressions

## 172

1  about the bill.  You can refer to matters of the public
2  record in answering but don't reveal matters that are
3  privileged.
4  A.  What I would say is that this bill was opposed by
5  every Democrat on the floor of the Senate.
6  Q.  (BY MS. RIOS)  Do you believe that identification
7  without a photograph does not verify the identity of a
8  voter?
9              MR. SWEETEN:  Don't answer the question.  It
10 asks for your mental impressions about legislation.
11 A.  On the advice of counsel, I cannot answer that
12 question.
13 Q.  (BY MS. RIOS)  Do you agree that the key to
14 effective implementation of the voter ID bill is
15 adequate poll worker training?
16             MR. SWEETEN:  Don't answer the question to
17 the extent it asks you to reveal your thoughts and
18 mental impressions about the legislation.  That would be
19 legislatively privileged.
20 A.  I don't know whether we're talking about Senate
21 Bill 362 or Senate Bill 14.  Can you tell me?
22 Q.  (BY MS. RIOS)  362.
23 A.  And I --
24             MR. SWEETEN:  My instruction is don't reveal
25 your thoughts and mental impressions about the bill.

### 173

1    A. I think beyond what I said in the public record,
2    there's nothing else that I can add.
3    Q. (BY MS. RIOS) Okay. During the floor debate on
4    Senate Bill 362, did anyone raise concerns about its
5    impact on minority voters?
6        MR. SWEETEN: Talking about the debate, you
7    can answer.
8    A. I think it's a matter of public record.
9    Q. (BY MS. RIOS) And what was your response to
10   these concerns?
11       MR. SWEETEN: On the public record, you can
12   answer to the extent you refer to that.
13    A. I would refer you back to the public record.
14   There's nothing I can add to it.
15    Q. (BY MS. RIOS) Did any racial or ethnic minority
16   Senator vote in favor of SB 362?
17    A. I don't believe so.
18    Q. Okay. Did you place any significance on the
19   united opposition of all minority members of the Senate?
20       MR. SWEETEN: Don't answer the question. It
21   calls for matters of legislative privilege. Instruct
22   not to answer.
23    A. On the advice of counsel, I don't believe I can
24   answer the question.
25    Q. (BY MS. RIOS) Okay. Do you believe that their

### 174

1    concern about the impact of the bill on minority voters
2    was genuine?
3       MR. SWEETEN: Objection. Calls for him to
4    reveal matters of legislative privilege, his mental
5    impressions and it calls for speculation.
6       Do not answer the question as posed.
7    A. I can't answer the question, on the advice of
8    counsel.
9    Q. (BY MS. RIOS) Was it true that some legislators
10   and members of the public stayed up all night during the
11   consideration of SB 362 before the Committee of the
12   Whole?
13    A. Could you repeat the question, please? I'm
14   sorry.
15    Q. Was it true that some legislators and members of
16   the public stayed up all night during the debate on 362?
17    A. Yes.
18    Q. Why do you think there was such strong opposition
19   to Senate Bill 362?
20       MR. SWEETEN: Don't answer the question. It
21   calls for matters of legislative privilege. Instruct
22   not to answer.
23    A. On the advice of counsel, I can't answer your
24   question.
25    Q. (BY MS. RIOS) Okay. When SB 362 was passed --

### 175

1    passed the Senate, what was the vote?
2       MR. SWEETEN: You can answer.
3    A. It's a matter of public record. All the
4    Republicans voted for it and none of the Democrats voted
5    for it.
6    Q. (BY MS. RIOS) Did you place any significance on
7    the united opposition of the minority party to Senate
8    Bill 362?
9       MR. SWEETEN: Objection to legislative
10   privilege.
11       Instruct not to answer.
12    A. On the advice of counsel, I can't answer your
13   question.
14    Q. (BY MS. RIOS) Did you have any role once Senate
15   Bill 362 was referred to the House? Did you have any
16   conversations with any House members on Senate Bill 362
17   after it left the House -- I mean, after it left the
18   Senate?
19       MR. SWEETEN: You can answer.
20    A. I have no specific recollection of a conversation
21   with House members. I'm sure during the course of the
22   session that I visited with my friends and colleagues in
23   the House about this important legislation but I don't
24   have any specific recollection of when, who or what we
25   talked about.

### 176

1    Q. (BY MS. RIOS) Okay. Are you aware of a federal
2    statute called the Help America Vote Act or HAVA?
3    A. I am.
4    Q. And does HAVA implement identification
5    requirements for certain voter registration applicants?
6    A. I don't know the answer to that.
7    Q. Do you know what forms of ID are sufficient under
8    HAVA?
9    A. I do not.
10    Q. Do you know if HAVA allows for registration
11   applicants to show nonphoto ID?
12    A. I don't know the answer to that.
13    Q. Do you have any reason to believe that the
14   requirements under HAVA are insufficient?
15       MR. SWEETEN: Don't reveal matters subject
16   to the legislative privilege.
17    A. I don't know what the requirements of HAVA are,
18   so, I can't tell you.
19       You know, we've got to have some AC in here or
20   I'm leaving. It is too hot.
21       MR. SWEETEN: That's fine. I'll go down and
22   talk to the lady.
23       (Off the record.)
24    Q. (BY MS. RIOS) Let's go to Senate Bill 14. It's
25   the one that the Governor signed.

Senator Thomas D. Williams                           June 1, 2012

## 177

1         (Exhibit 410 marked.)
2     Q. (BY MS. RIOS)  Okay.  So, Senator Williams, did
3  you have a role in the introduction of Senate Bill 14 in
4  2011?
5     A. I was a joint or co-sponsor of the bill.
6     Q. Okay.  And did you have a role in laying the
7  rules for consideration of Senate Bill 14?
8     A. I did not lay out the rules resolution in that
9  session, as I recall.  Senator Eltife did.
10     Q. Okay.
11         (Exhibit 411 marked.)
12     Q. (BY MS. RIOS)  And if you could compare this one
13  to the rule from 2009.
14         MS. ABUDU:  Maria, do you have an extra copy
15  of that one?
16         MS. RIOS:  Yes.
17     Q. (BY MS. RIOS)  Okay.  Who decided who was going
18  to lay the rules for consideration of the voter
19  identification requirements?
20         MR. SWEETEN:  You can reveal matters of
21  public record.  Don't reveal communications you've had.
22  That would be privileged.
23     A. My recollection of this is that Senator -- excuse
24  me -- Lieutenant Governor Dewhurst recognized Senator
25  Eltife, who was the Chair of the Senate Administration

## 178

1  Committee in the 2011 session, and he carried the rules
2  that session.
3     Q. (BY MS. RIOS)  Okay.  Did you have any meetings
4  with the Lieutenant Governor about laying this rule?
5         MR. SWEETEN:  You can answer if you had any
6  meetings.
7     A. Yes, I did.  I don't recall the specific time or
8  who was present in the meeting or what was discussed or
9  how many times we met.  I'm sure I met with him about
10  that.
11     Q. (BY MS. RIOS)  And did you meet before the
12  session started?
13     A. I don't recall.
14     Q. Was SB14 given a designation by the Governor to
15  be emergency legislation?
16     A. My recollection is that he did make voter ID an
17  emergency item.
18     Q. And what are the consequences of a bill to have
19  such designation?
20     A. It can be considered earlier in the session.
21     Q. Okay.  And by giving it emergency designation,
22  does it automatically get considered within the first
23  60 days of the session?
24     A. Not automatically.
25     Q. Would it usually be considered within the first

## 179

1  60 days?
2     A. It could be considered once it was an emergency
3  item.  It could not unless it was an emergency item but
4  it doesn't automatically make it considered.
5     Q. And this emergency designation comes from the
6  Governor, the voter ID as an emergency matter?
7     A. Are you asking me a question?
8     Q. Yes, I'm asking you.
9     A. And what is your question?
10     Q. Okay.  My question is did you request that the
11  Governor designate SB14 as an emergency legislation?
12     A. Not that I recall.
13     Q. Do you know if anyone requested the Governor to
14  designate SB14 as an emergency legislation?
15     A. I don't know who might have done that.  I may
16  have known but I don't know now.  I don't recall.
17     Q. Okay.  Did you have any meetings with the
18  Governor or his staff about SB14?
19     A. Not to the best of my recollection.
20     Q. Okay.  And did you have any meetings with the
21  Lieutenant Governor about SB14?
22     A. I don't have a specific recollection.  I feel
23  certain that I did have a meeting with him but I don't
24  recall the time or place or who was present at the
25  meeting.

## 180

1     Q. Was it one meeting or several meetings?
2     A. I don't recall.
3     Q. Okay.  And the meeting that you had with the
4  Lieutenant Governor and his staff, did you request the
5  meeting or did they request you to attend such meeting?
6     A. I don't recall.
7     Q. And the meeting with the Governor, who invited
8  whom?
9         MR. SWEETEN:  I think he said there wasn't a
10  meeting.
11     A. I didn't meet with the Governor.  I think that
12  was my testimony.  I don't recall that I ever met with
13  him about it.
14     Q. (BY MS. RIOS)  All right.  Do you know what was
15  the need to consider SB14 in the first 60 days of the
16  legislative session?
17         MR. SWEETEN:  You're asking for him to
18  reveal his mental impressions, thoughts, motivations
19  about the legislation, potentially communications with
20  protected individuals and entities.  So, I'm going to
21  instruct him not to answer on that basis.
22         To the extent that you can refer to matters
23  of the public record, you are free to do so.  Don't
24  reveal privilege in the answer.
25         THE WITNESS:  Can you restate her question

## 181

1  for me, please?
2      (Whereupon, the requested testimony was read back
3      as follows:
4      QUESTION:  All right.  Do you know what was the
5      need to consider SB14 in the first 60 days of the
6      legislative session?)
7  A.  The Governor makes that designation, and you
8  would have to ask him what his reasons were.  He spoke
9  publicly about it, and you can look at the public record
10  about it but I know nothing beyond what he said
11  publicly.
12  Q.  (BY MS. RIOS)  Okay.  And looking at the -- at
13  the -- at Rule 5.11 from 2011, is it similar to the
14  rule -- referring to rule 5.11 -- to the version from
15  two years before?
16  A.  I believe that it's the same.  Yeah, I believe
17  it's the same.
18  Q.  And why was this provision adopted in the rules?
19      MR. SWEETEN:  He can testify about the
20  general purpose of 5.11, which I think he has just said
21  it's the same but you can ask him the general purpose.
22  A.  Beyond what I've already said, there's nothing I
23  can add.  It's exactly the same as the '09 rule.
24  Q.  (BY MS. RIOS)  And once again, pursuant to this
25  rule, SB14 would be considered by the Committee of the

## 182

1  Whole?
2  A.  Correct.
3  Q.  Okay.  And how many other bills in this 82nd
4  session were considered by the Committee of the Whole
5  without being considered by another committee
6  previously?
7  A.  I don't recall that there were any other bills
8  that were considered by the Committee of the Whole that
9  session but my memory is imperfect.  That's some time
10  ago.
11  Q.  Okay.  When did you start working on the
12  development of Senate Bill 14?
13  A.  You know, Senator Fraser was the sponsor of this
14  bill, as I recall, and I think he developed the bill,
15  and then probably the first time I would have really
16  considered it would have been in committee because I was
17  on the State Affairs Committee the last session.
18  Q.  Okay.
19  A.  Or it was sent to the Committee of the Whole.
20  So, that would have been just prior to -- it's his bill.
21  He had it drafted.
22  Q.  No, I'm asking you because you identified
23  yourself as a co-sponsor.
24  A.  Right.
25  Q.  And did you have any communications about Senate

## 183

1  Bill 14 with other current or former legislators who had
2  offered past photo ID bills?
3  A.  Yes.
4  Q.  With whom?
5  A.  With Senator Fraser, that I recall.  Beyond that,
6  I'm sure there were other members of the legislature
7  that I talked to but I don't recall specifically, and I
8  don't recall with him when, how often or how many times.
9  Q.  And in drafting Senate Bill 14, did you or your
10  staff review any reports or studies?
11      MR. SWEETEN:  Don't answer that.  That calls
12  for matters of legislative privilege.  You can answer by
13  referring to matters of the public record but don't
14  reveal your thoughts, mental impressions or opinions.
15  A.  I think it's a public record that Senator Fraser
16  drafted the bill.
17  Q.  (BY MS. RIOS)  I'm referring to if you reviewed
18  any reports or any studies that would have helped in
19  drafting Senate Bill 14?
20      MR. SWEETEN:  Same instruction.  Don't
21  answer if it reveals privilege.  You can refer to
22  matters of the public record, however.
23  A.  I didn't draft the bill.
24  Q.  (BY MS. RIOS)  Okay.  And did you ask -- did you
25  or your staff conduct any analysis related to the voter

## 184

1  ID issue?
2      MR. SWEETEN:  Don't answer the question
3  unless -- except for referring to matters of the public
4  record.  That is a matter that is legislatively
5  privileged.  Your analysis, mental impressions,
6  opinions, thoughts about the legislation are privileged.
7      THE WITNESS:  Would you repeat the question,
8  please?
9      (Whereupon, the requested testimony was read back
10  as follows:
11  QUESTION:  Okay.  And did you ask -- did you or
12  your staff conduct any analysis related to the
13  voter ID issue?)
14  A.  My staff would have reviewed Senate Bill 14.
15  Q.  (BY MS. RIOS)  Did you consider including any
16  additional forms of ID in Senate Bill 14 that had not
17  been included in prior pieces of legislation?
18      MR. SWEETEN:  Don't answer the question.  It
19  calls for matters of legislative privilege.  Do not
20  reveal that information.
21  A.  On the advice of counsel, I can't answer your
22  question.
23  Q.  (BY MS. RIOS)  And did you consider allowing
24  expired forms of ID?
25      MR. SWEETEN:  Don't answer the question.  It

Senator Thomas D. Williams                                    June 1, 2012

---

185

1    calls for matters of legislative privilege.  Those are
2    mental impressions, opinions and thoughts.
3        A.  On the advice of counsel, I can't answer your
4    question.
5        Q.  (BY MS. RIOS)  Okay.  If a photo ID is expired
6    but was validly issued, why doesn't that prove that the
7    person is the same person on the ID?
8            MR. SWEETEN:  Don't answer the question to
9    the extent it relates to legislation, including Senate
10   Bill 14.  Your analysis, thoughts and mental impressions
11   about the bill, if it doesn't reveal those, then you can
12   provide an answer.
13       A.  There -- I don't have anything that I can share
14   with you beyond what was part of the public testimony
15   that we took in the Committee of the Whole.
16           MR. SWEETEN:  Can we go ahead and put on
17   record Spencer's --
18           MR. FISHER:  Spencer Fisher for the Attorney
19   General.
20           THE WITNESS:  For which Attorney General?
21           MR. SWEETEN:  The Department of Justice.
22           THE WITNESS:  Eric Holder, Attorney General?
23           MR. SWEETEN:  Yes.
24           MS. ABUDU:  The Attorney General.
25       Q.  (BY MS. RIOS)  You indicated earlier in testimony

---

186

1    that in Texas you can go -- that 12 years can go by
2    without getting a new photograph for your driver's
3    license; is that correct?
4        A.  Yes, I testified to that.
5        Q.  Okay.  So, a recently expired driver's license,
6    wouldn't that prove that the person is the same person
7    on the ID?
8            MR. SWEETEN:  Same objection and instruction
9    as previously.
10       A.  And I think my answer is the same.  Beyond what
11   we talked about in the Committee of the Whole, there's
12   really nothing I can add to that, or the floor debate.
13   That's all part of the public record.
14       Q.  (BY MS. RIOS)  Okay.  Did you or your staff
15   conduct any analysis on how many registered voters
16   possess the forms of ID required by Senate Bill 14?
17           MR. SWEETEN:  Don't answer the question.  It
18   calls for matters that are subject to the legislative
19   privilege.  You can answer as to matters of the public
20   record.
21       A.  And that information was discussed at length
22   during the committee process and in the floor debate on
23   Senate Bill 14.
24           MR. SWEETEN:  I'm also going to object that
25   it's asked and answered.

---

187

1        Q.  (BY MS. RIOS)  Okay.  Did you request the
2    Secretary of State's office to conduct any analysis on
3    how many registered voters lacked a driver's license?
4            MR. SWEETEN:  Same objection.  You're asking
5    him to reveal communications he may or may not have had
6    with the Secretary of State's office.
7            You can refer to matters of the public
8    record.  You can also identify whether or not you had
9    communications with the Secretary of State but, as
10   phrased, she's asking the substance of those questions.
11           Do you understand my instructions?
12           THE WITNESS:  I think so.
13           MR. SWEETEN:  Okay.
14       A.  And what I would say is that, you know, I don't
15   have any specific recollection beyond what was said
16   that's a matter of the public record.  I believe I
17   talked to the Secretary of State.  Whatever, you know, I
18   said in the public record is all that I recall about it.
19       Q.  (BY MS. RIOS)  Did you have any conversations
20   with anyone in the Secretary of State's office about the
21   driver's license records?
22           MR. SWEETEN:  You can answer.  It's a
23   general subject matter.  You can answer whether a
24   conversation occurred.
25       A.  You know, I may have, and I don't -- I really

---

188

1    don't recall without going back and looking at the
2    record.
3        Q.  (BY MS. RIOS)  Okay.  Did you or your staff
4    conduct any analysis to determine if minority voters
5    would be disproportionately less likely to possess the
6    forms of ID required by SB14?
7            MR. SWEETEN:  Objection.  Legislative
8    privilege.
9            Don't answer the question if it would reveal
10   matters of legislative privilege.  You can refer to
11   matters of the public record.
12       A.  I think on the advice of counsel, I can't --
13   there's nothing for me to add.
14       Q.  (BY MS. RIOS)  Okay.  What is a military ID?
15           MR. SWEETEN:  You can answer.
16       A.  It's an identification card issued by the United
17   States government to members of the military.
18       Q.  (BY MS. RIOS)  Okay.  How many forms of military
19   ID are acceptable under SB14?
20       A.  It says in Section 63.010, Subsection 2 that a
21   United States military identification card that contains
22   the person's photograph that has not expired or that has
23   expired no earlier than 60 days before the date of
24   presentation.
25       Q.  Okay.  Did you or your staff research which

Senator Thomas D. Williams                              June 1, 2012

---

### 189

1  agency issued valid military IDs?
2          MR. SWEETEN:  Don't answer the question.
3  Calls for matters of legislative privilege.  You can
4  refer to matters of the public record but don't reveal
5  your thought process or mental impression analysis.
6          A.  On the advice of counsel, I don't think there's
7  anything I can add to your -- or that I can answer your
8  question.
9          Q.  (BY MS. RIOS)  So, you cannot tell me how many
10 different types of military ID there are?
11         A.  No.
12         Q.  Okay.  What is a citizenship certificate?
13         A.  I don't know.
14         Q.  It is one of the --
15         A.  Yeah.
16         Q.  -- acceptable types of ID in Senate Bill 14.
17 Have you seen one?
18         A.  No.
19         Q.  Okay.  And would you know how much it costs to
20 obtain one?
21         A.  No.
22         Q.  Do you know how you would obtain a replacement?
23         A.  No.
24         Q.  Do you know whether all citizenship certificates
25 include a photograph?

---

### 190

1          A.  No.
2          Q.  So, are you saying that a citizenship certificate
3  without a photograph would be an acceptable form of ID
4  under Senate Bill 14?
5          A.  I didn't say that.
6          Q.  Do you know if citizenship certificates have
7  photographs?
8          A.  No.
9          Q.  So, was a citizenship certificate included in
10 SB14 without any investigation as to whether that is a
11 photo ID?
12         A.  I don't see where it's included but -- election
13 identification certificate -- you're going to have to
14 show me where it's in here.
15         Q.  Okay.  It would be on Page 10, and it says that
16 it includes a person's photograph.
17         A.  No.
18         Q.  Okay.
19         A.  What it says is that a United States citizenship
20 certificate issued to the person that contains the
21 person's photograph would be acceptable.  It doesn't say
22 that it does or does not.
23         Q.  Okay.  And are you aware that some children are
24 issued citizenship certificates by the United States?
25         A.  I've already testified that I've never seen one.

---

### 191

1          Q.  Oh, you've never seen one.  So, a person who
2  brings to the polling booth a citizenship certificate
3  that has a picture of him when he was 5 years old, would
4  that verify that person's identity?
5          A.  I have no idea.
6          Q.  How much does it cost to obtain a U.S. passport?
7          A.  I don't know.
8          Q.  Do you have a passport?
9          A.  I do.
10         Q.  Okay.  And do you know what documents you have to
11 provide to obtain one?
12         A.  You know, all I remember -- what I recall is a
13 certified birth certificate and a driver's license but I
14 could be wrong about that.  It's been a long time since
15 I renewed it.
16         Q.  And do you know how many Texan voters hold valid
17 U.S. passports?
18         A.  No.
19         Q.  Did you or your staff do any research into how
20 many Texan voters currently hold U.S. passports?
21         MR. SWEETEN:  Don't answer the question.  It
22 asks to reveal matters subject to the legislative
23 privilege.  Instruct not to answer.  You can reveal
24 matters that are of public record.
25         A.  I can't answer on the advice of counsel.

---

### 192

1          Q.  (BY MS. RIOS)  Did you or your staff perform any
2  analysis on the number of minority voters in Texas who
3  hold valid passports?
4          MR. SWEETEN:  Same objection.  Same
5  instruction.
6          A.  Same answer.  I can't answer, on the advice of
7  counsel.
8          Q.  (BY MS. RIOS)  Are you aware of the purpose for
9  removing from SB14 the option of a voter showing two
10 forms of nonphoto ID?
11         MR. SWEETEN:  Don't answer the question.
12 He will answer questions as to the general
13 purpose of the bill, as set forth in the Court's order.
14 He's not going to answer questions as you phrased it.
15         A.  Only to the extent that matter was discussed on
16 the floor of the Senate or the committee.
17         Q.  (BY MS. RIOS)  Okay.  And can you tell me what
18 changed between 2009 and 2011 that made two forms of
19 nonphoto ID no longer an acceptable option?
20         MR. SWEETEN:  Don't reveal matters of
21 privilege.  You can refer to matters of the public
22 record but don't answer the question as stated
23 otherwise.
24         A.  My recollection is that the Indiana law had
25 passed constitutional muster with the Supreme Court

Senator Thomas D. Williams                                    June 1, 2012

---

## 193

1   during the interim period and there was not a
2   requirement for alternate forms of ID.  So, it had been
3   determined that that wasn't necessary to have a
4   constitutional bill.
5        Q.  (BY MS. RIOS)  Okay.  This is the Indiana bill,
6   which has been marked as Exhibit 60.
7        A.  Okay.  What's your question about it?
8        Q.  Indiana accepts any photo ID issued by Indiana or
9   by a federal agency.  Are these forms of ID included in
10   SB14?
11        MR. SWEETEN:  Assumes facts not in evidence.
12   If he wants to review the statute and --
13        A.  I can read it and see.  I don't recall.
14        Q.  (BY MS. RIOS)  Okay.  Could you take a look at
15   it?
16        A.  Sure.
17             It says in number 4 the document was issued by
18   the United States or by the State of Indiana.  Is that
19   what you're referring to, number 4?
20        Q.  Yes.
21        A.  That provision is not included in Senate Bill 14,
22   to the best of my recollection.
23        Q.  Okay.  In Indiana, if a voter does not have an
24   ID, the voter can cast a provisional ballot that will be
25   counted if the person signs an affidavit to the effect

## 194

1   that he is indigent and cannot procure a photo ID.  You
2   can take a look.
3        A.  And where is that?
4        Q.  That's on Page 2015.
5        A.  Okay.
6        Q.  Okay.  Is that allowed under SB14?
7        A.  There are provisional voting -- there is
8   provisional voting allowed under Senate Bill 14.  It's
9   not worded exactly like this.
10        Q.  But does that -- but does it allow an exception
11   for when a person is indigent?
12        A.  What Senate Bill 14 contemplates is that if
13   someone is unable to afford -- to obtain a state
14   identification card that costs, I think, $10, that the
15   fee would be waived if they signed an affidavit and said
16   that they needed the identification card for the purpose
17   of voting.
18             So, anyone could obtain a state ID card at no
19   cost if they were willing to sign an affidavit that they
20   were indigent, or they could pay the $10 fee.
21        Q.  But that would require a person to go and get
22   this ID that -- this free ID that you're describing; is
23   that correct?
24        A.  Yes.
25        Q.  Okay.  But in Indiana, a voter does not have to

## 195

1   take that extra step, is that your reading from the
2   Indiana statute?
3        A.  The way I read it is the voter would have to go
4   before a circuit court clerk or the county election
5   board and execute the affidavit.
6        Q.  That's subsequent to the election?
7        A.  Correct.
8        Q.  So, the SB14 option that you are referring to,
9   which is the free ID for purposes of voting, is not the
10   same as the Indiana procedure for casting a provisional
11   ballot and then going to the Court to sign an affidavit?
12        MR. SWEETEN:  Based on the text?
13        MS. RIOS:  Based on the text.
14        A.  Based on the text that you've presented and, of
15   course, I have no way of knowing if this is really the
16   Indiana law or not.  I'm taking your word for it.
17        Q.  (BY MS. RIOS)  Okay.  Does Indiana allow
18   individuals to use ID that has expired at some time
19   since the last general election?  That would be on the
20   first page at 3B.
21        A.  It says that the document included an expiration
22   date and that the document expired after the date of the
23   most recent general election.
24        Q.  Is this allowed under Senate Bill 14?
25        A.  No.

## 196

1        Q.  Okay.  Is it fair to say that there are
2   differences between the Indiana photo ID bill -- law and
3   Senate Bill 14?
4        MR. SWEETEN:  Based on the text you've shown
5   him?
6        MS. RIOS:  Based on the text.
7        A.  Yes, based on the text.
8        Q.  (BY MS. RIOS)  Okay.  Is it fair to say that
9   Indiana accepts photo ID options not accepted under
10   SB14?
11        A.  Yes.
12        Q.  Okay.
13        A.  Based on the text that you've shown me.
14        Q.  Okay.  And this has been marked as Exhibit 6, and
15   this is the Georgia photo ID law.
16             (Off the record.)
17        Q.  (BY MS. RIOS)  Okay.  I'm going to ask you a
18   couple of questions about this.  And this we got from
19   LexisNexis.
20        A.  Okay.
21        Q.  Does Georgia accept photo IDs issued by any
22   government entity, meaning federal, Georgia or any other
23   state?
24        A.  Yes, it would appear in Section 2, the text that
25   you've given me, that any valid identification card

Senator Thomas D. Williams                                    June 1, 2012

---

197

1    issued by a branch, department, agency or entity of the
2    State of Georgia, any other state or the United States
3    authorized by law to issue personal identification,
4    provided that the identification contains a photograph
5    of the elector.
6        Q.  And are these forms of photo ID included in SB14?
7        A.  Some are and some are not.
8        Q.  Does SB14 accept identifications from other
9    states, for example?
10       A.  I don't know without looking.  I'll be glad to
11   look as long as we keep the meter running.
12       A.  No.
13           MS. RIOS:  Off the record.
14           (Off the record.)
15       A.  It would appear that Senate Bill 14 does not
16   allow for identification issued by other states.
17       Q.  (BY MS. RIOS)  Okay.  Georgia accepts valid photo
18   tribal identification cards.  Are these forms of photo
19   ID included in SB14?
20       A.  I don't know what that is.
21       Q.  Tribal identification cards.
22       A.  It's not specifically identified in Senate Bill
23   14.
24       Q.  Okay.  Does Georgia accept valid photo employee
25   cards issued by state or federal agencies?

---

198

1        A.  Yes.
2        Q.  Okay.  And are these forms of photo ID included
3    in SB14?
4        A.  No.
5        Q.  Okay.  Is it fair to say that there are
6    differences between SB14 and the Georgia photo ID
7    statute in terms of the acceptable forms of ID?
8        A.  As it's presented here, it would appear there are
9    differences.
10       Q.  And is it fair to say that Georgia accepts more
11   types of photo ID than those listed in SB14?
12       A.  It would appear so based on the text that's in
13   front of me.
14       Q.  Okay.  Are you aware of the purpose of removing
15   from SB14 the option for a voter to show a state or
16   federal issued photo ID?
17           MR. SWEETEN:  Don't answer the question as
18   phrased.  It calls for matters of legislative privilege.
19   I instruct not to answer on that basis except to the
20   extent that you can refer to matters of the public
21   record.
22       A.  On the advice of counsel, I don't believe I can
23   answer your question.
24       Q.  (BY MS. RIOS)  Okay.  You mentioned the election
25   identification certificate when you were talking about

---

199

1    photo ID forms acceptable under SB14.  Did any
2    legislator express concern that an election
3    identification certificate would be difficult for some
4    of their constituents to obtain?
5            MR. SWEETEN:  You can refer to matters in
6    the public record.  Don't reveal those that are
7    privileged communications.
8        A.  I think it's a matter of public record that there
9    were objections.
10       Q.  (BY MS. RIOS)  Okay.  Did you have any private
11   conversations about the election identification
12   certificate?
13           MR. SWEETEN:  You can answer the question as
14   phrased.
15       A.  I may have.  I don't recall specifically but I
16   may have.
17       Q.  (BY MS. RIOS)  Did you have any private
18   conversations about the election identification
19   certificate with Senators of the Democratic party?
20       A.  I may have.
21       Q.  Do you --
22       A.  I don't recall specifically.
23       Q.  Okay.  Do you know the number of voters who
24   reside in counties that do not have a driver's license
25   office?

---

200

1        A.  I don't know.  I know there are voters who reside
2    in counties who don't have a driver's license office but
3    I can't tell you how many there are, if that's what
4    you're asking.
5        Q.  Do you know how many counties don't have a
6    driver's license office?
7            MR. SWEETEN:  And you're asking as he's
8    sitting here?
9            MS. RIOS:  Right.
10       A.  No.
11       Q.  (BY MS. RIOS)  And do you know the number of
12   voters residing in counties with limited driver's
13   license office hours, some are open one day a week, a
14   couple of days a week?
15       A.  As we're sitting here, I can't give you that
16   number.
17       Q.  Okay.  Did you or your staff conduct an analysis
18   on the cost or steps a voter would need to take to
19   obtain an election identification certificate?
20           MR. SWEETEN:  Objection to the question.  It
21   calls for matters that are subject to the legislative
22   privilege.  You can refer to matters of the public
23   record.  Otherwise, I would instruct you not to answer
24   the question.
25       A.  There's nothing that I can add beyond the public

## 201

1  record.
2      Q.  (BY MS. RIOS)  Okay.  And what documents are
3  needed to obtain an election identification certificate
4  under SB14?
5      A.  I believe that it would be the same documents
6  that are required to get a Texas driver's license.  The
7  requirements to receive an election identification
8  certificate, it would appear to me that they are the
9  same as the requirements to get a state ID card.  There
10  are a number of things that would be acceptable but they
11  would include a certified birth certificate and some
12  other form of identification.
13      Q.  Okay.  And how much does it cost to acquire a
14  certified birth certificate?
15      A.  It would depend on what county you're in.
16      Q.  And would it be possible to obtain an election
17  identification certificate without having to pay for the
18  certified birth certificate?
19      A.  I think you have to have the birth certificate.
20      Q.  Okay.  If the documents needed to get the
21  election identification certificate are not free, isn't
22  there a cost to voting for those who lack the necessary
23  documents?
24          MR. SWEETEN:  Can you read the question
25  back, please?

## 202

1          (Whereupon, the requested testimony was read back
2          as follows:
3          QUESTION:  Okay.  If the documents needed to get
4          the election identification certificate are not
5          free, isn't there a cost to voting for those who
6          lack the necessary documents?)
7      A.  And my response would be that yes, there is a
8  cost but I don't believe that that cost is an
9  unreasonable burden based on --
10          MR. SWEETEN:  Just answer the question.
11      A.  -- the testimony that was taken during the debate
12  on this.
13      Q.  (BY MS. RIOS)  Does SB14 require employers to
14  provide paid leave so that employees may obtain an
15  election identification certificate?
16      A.  Not to my recollection.  I can look at it and see
17  but I don't recall that it did that.
18          MS. RIOS:  Off the record.
19          (Off the record.)
20      A.  I don't see where it does.
21      Q.  (BY MS. RIOS)  Okay.  And do you know whether
22  some people in Texas live at least 50 miles from the
23  nearest driver's license office?
24      A.  What is your question?
25      Q.  My question is do you know whether some people in

## 203

1  Texas live at least 50 miles from the nearest driver's
2  license office?
3      A.  I'm sure some do.  Maybe more than that.
4      Q.  And how much would gas cost at a minimum to drive
5  a 100-mile round trip to get the election identification
6  certificate?
7      A.  I have no idea.  It would depend on what kind of
8  car you were driving or whether you were on a motorcycle
9  or riding a bicycle or what it might be.
10      Q.  So, those would be additional costs that voters
11  would have to make in order to get the free election
12  identification certificate?
13          MR. SWEETEN:  Objection.  Argumentative.
14          You can answer.
15      A.  It may or may not be an additional cost that they
16  would have to bear.
17      Q.  (BY MS. RIOS)  Senator Davis proposed Amendment
18  12, which provided that the underlying document needed
19  to obtain an election identification certificate, that
20  is, the birth certificate, would be free for indigent
21  voters.  Did you oppose this amendment?
22          MR. SWEETEN:  You can refer to matters of
23  the public record.  Don't reveal matters that are
24  subject to legislative privilege.
25      A.  You'd have to look at the record.  My

## 204

1  recollection is that I opposed that amendment.
2      Q.  (BY MS. RIOS)  Okay.  Senator Ellis proposed
3  Amendment 19 to add student IDs to the list of
4  acceptable photo IDs, and this would be limited to
5  student IDs issued by Texas public universities.  Did
6  you oppose this amendment?
7          MR. SWEETEN:  You can refer to matters of
8  the public record.  Don't reveal matters of legislative
9  privilege.
10      A.  My recollection is that I voted against that
11  amendment.
12      Q.  (BY MS. RIOS)  Do you recall why you opposed this
13  amendment?
14          MR. SWEETEN:  Don't reveal matters -- your
15  thoughts, opinions, mental impressions about the
16  legislation.  You can refer to matters of the public
17  record.
18      A.  Only to the extent that I discussed it on the
19  floor of the Senate.
20      Q.  (BY MS. RIOS)  Did you gather any evidence that
21  would indicate that there's a problem with forgery with
22  state university IDs?
23          MR. SWEETEN:  Don't answer the question.  It
24  asks for you to reveal matters that are subject to
25  legislative privilege.

## 205

1     To the extent you can refer to matters of
2  the public record, you can do so.
3     A.  I don't believe I can answer the question, on the
4  advice of counsel.
5     Q.  (BY MS. RIOS)  Okay.  And did you have any
6  evidence of charges or convictions for forgery for
7  misusing public university IDs?
8     MR. SWEETEN:  Don't reveal matters that are
9  subject to the legislative privilege, including
10  communications that you've had with other legislators,
11  individuals or groups that are covered by the privilege.
12  Don't reveal your thoughts and mental impressions.  You
13  can refer to matters of the public record.
14     A.  I don't believe I can answer the question, based
15  on advice from my counsel.
16     Q.  (BY MS. RIOS)  Okay.  And are you aware that
17  Senator Ellis based his student ID amendment on the
18  Indiana voter ID statute?
19     MR. SWEETEN:  Objection.  Don't reveal
20  communications with Senator Ellis or his legislative
21  staff.  You can refer to matters of the public record.
22     And objection.  Calls for speculation.
23     A.  Beyond what's reflected in the Senate Journal,
24  there's nothing -- and the record of the proceedings,
25  there's nothing that I can add.

## 206

1     Q.  (BY MS. RIOS)  Are you aware why a student ID
2  issued by a state university would be acceptable in
3  Indiana but not in Texas?
4     MR. SWEETEN:  Don't answer the question.  It
5  calls for matters of legislative privilege.  Instruct
6  not to answer.
7     A.  I cannot answer your question, based on the
8  advice of counsel.
9     Q.  (BY MS. RIOS)  During the floor debate on Senate
10  Bill 14, did anyone raise concerns about its impact on
11  minority voters?
12     MR. SWEETEN:  You can answer the question as
13  phrased.
14     A.  Yes.
15     Q.  (BY MS. RIOS)  Who did?
16     A.  Several Senators did.  I don't recall
17  specifically which ones.  I think every Democratic
18  Senator stood up and voiced some objection to the bill.
19     Q.  What was your -- your response to the
20  legislators' concerns about the bill's impact on
21  minority voters other than what is on the record?
22     MR. SWEETEN:  Objection.  Calls for matters
23  of legislative privilege.  Don't reveal communications
24  you've had.  Don't reveal your thoughts and mental
25  impressions about the legislation.

## 207

1     A.  There's nothing beyond the public record that I
2  can share with you.
3     (Off the record.)
4     (Short recess.)
5     EXAMINATION
6     Q.  (BY MS. ABUDU)  Well, good afternoon, Senator
7  Williams.  My name is Nancy Abudu.  I'm an attorney with
8  the American Civil Liberties Union, and I'm representing
9  several defendant-intervenors in this case, including
10  the Texas Legislative Black Caucus, as well as African
11  American registered voters in Texas.
12     Obviously, you are still under oath.
13     And because you have asserted legislative
14  privilege with a number -- or with respect to a number
15  of questions posed to you today, we're, of course,
16  reserving our right to redepose you if and when the
17  Court fully addresses that issue.  Okay?
18     MS. ABUDU:  And I'll just ask if we can have
19  a 30-minute time check before our time expires.
20     Q.  (BY MS. ABUDU)  All right.  Now, a number of the
21  questions we would have posed to you today have already
22  been asked of you by the Department of Justice.  So, I'm
23  going to try to fill in some areas within that general
24  scope of questioning.  So, I may be jumping around a bit
25  but it's only to avoid redundancy.  All right?

## 208

1     A.  Okay.  I appreciate that.
2     Q.  Could you go ahead and state your race for the
3  record?
4     A.  I'm Anglo.
5     Q.  So, that means that you are white?
6     A.  Yes.
7     Q.  And that means that you do not have any Hispanic
8  heritage, correct?
9     A.  Not to my knowledge.
10     Q.  And as a Senator for the State of Texas, do you
11  consider yourself to be an employee of the State of
12  Texas?
13     A.  I do not.
14     Q.  Okay.  Are you employed anywhere?
15     A.  I am.
16     Q.  And what do you do for a living?
17     A.  I'm the president of Woodforest Financial
18  Services.
19     Q.  Okay.  And what does Woodforest Financial
20  Services do?
21     A.  We provide investment advice and products and
22  services to individuals and businesses and employee
23  benefits to businesses.
24     Q.  And as president of that company, are you the
25  owner of the company?

## 245

1    MR. SWEETEN:  No.  I just instructed him
2  that I don't have an objection to the extent that the
3  question calls for matters on the public record, which I
4  think it was established hours ago that it was but --
5  so, I'm just indicating objection, legislative privilege
6  to the extent it reveals matters outside of the public
7  record but he can freely discuss matters of the public
8  record.
9    Q.  (BY MS. ABUDU)  Now, were you influenced by your
10  brother's testimony when you voted in favor of Senate
11  Bill 14?
12    MR. SWEETEN:  Don't answer the question.  It
13  would call for you to reveal your thoughts, mental
14  impressions, opinions or motivations about legislation
15  and, as such, would be legislatively privileged.
16    A.  On the advice of counsel, I'm not going to answer
17  your question but I would further add that my brother's
18  testimony was in the '09 session, not in the '11
19  session, as I recall.
20    Q.  (BY MS. ABUDU)  Okay.  So, he did not testify in
21  support of Senate Bill 14?
22    A.  I don't believe that he did.
23    Q.  Okay.  But if he did, you would know about it?
24    A.  Yes.
25    Q.  Did any other of your family members testify in

## 246

1  support of the '09 photo ID bill?
2    A.  My brother did, as I said.
3    Q.  No, I said any other family members testify?
4    A.  No.
5    Q.  Okay.  Did any family members testify in
6  favor of Senate Bill 14?
7    A.  No.
8    Q.  Did you solicit your brother's testimony with
9  respect to the '09 photo ID bill?
10    MR. SWEETEN:  I have trouble with the word
11  "solicit."  What do you mean by the word "solicit"?
12    Q.  (BY MS. ABUDU)  Did you ask your brother to come
13  and testify before the legislature in 2009 regarding the
14  photo ID bill?
15    MR. SWEETEN:  You can answer that.
16    A.  I did.
17    Q.  (BY MS. ABUDU)  Why?
18    MR. SWEETEN:  No.  No.  Objection.  That
19  would call for your motivations, mental impressions,
20  opinions about legislation and the legislative process.
21  So, don't answer the why question.
22    A.  On the advice of counsel, I can't answer your
23  question.
24    Q.  (BY MS. ABUDU)  And this question I'm about to
25  ask is only for clarification.  When -- there was never

## 247

1  any statement that someone had voted illegally on behalf
2  of your father, right?
3    MR. SWEETEN:  You can refer to matters of
4  the public record and answer the question.
5    A.  The testimony was about my maternal grandfather.
6    Q.  (BY MS. ABUDU)  Okay.  I just wanted to clarify
7  because I think that there was a misstatement in the
8  public record and instead of saying "grandfather," it
9  just said "father."  So, I wanted to clarify that.
10    A.  Okay.
11    Q.  Now, you testified earlier about a number of
12  individuals who submitted affidavits about an election
13  in Progreso, Texas; is that correct?
14    A.  I believe I submitted -- I testified that I
15  submitted their affidavits into the record.
16    Q.  Okay.  How did you obtain these affidavits?
17    A.  They were given to me.
18    Q.  By whom?
19    A.  You know, I'm not certain who gave them to me.  I
20  believe that it was Melinda Fredricks who gave them to
21  me or she at least made me aware of them.  I'm not sure
22  I obtained them from her.
23    Q.  And I'm sure you explained who Ms. Fredricks is
24  but would you remind me?
25    A.  She's a constituent.

## 248

1    Q.  A constituent in Senate District 4?
2    A.  Yes.
3    Q.  And is Progreso, Texas in Senate District 4?
4    A.  No.
5    Q.  What Senate district is that in?
6    A.  It's in the Rio Grande Valley.  I believe it's in
7  Senator Lucio's district.  It may be in Senator
8  Hinojosa's.  I'm not sure.  It may be in both of their
9  districts.
10    Q.  Have you ever been to Progreso, Texas?
11    A.  I have.
12    Q.  In your legislative capacity?
13    A.  Yes.
14    Q.  And what exactly were you doing while you were
15  there in your legislative capacity?
16    A.  I was there as the Chair of the Transportation
17  and Homeland Security Committee, reviewing homeland
18  security operations in the border region.
19    Q.  And when was that?
20    A.  I've made more than one trip.  I made a trip
21  prior to the 2011 session, after July of 2010 but before
22  January of 2011, and I made a couple of other trips down
23  there, one during the session, one subject -- subsequent
24  to the session, and I don't remember if I went through
25  Progreso then or not but I very well could have.

Senator Thomas D. Williams                                June 1, 2012

## 249

1   Q. Okay. And for the sake of time, I'm just going
2   to ask do you -- have you ever met Simon Torres?
3   A. No.
4   Q. Have you ever met Maricela Infante?
5   A. No.
6   Q. Have you ever met Abigail Infante?
7   A. No.
8   Q. Have you ever met Jessica Rangel?
9   A. No.
10  Q. Jesus Vasquez, have you ever met him?
11  A. No.
12  Q. Have you ever met Andrea Pena?
13  A. No.
14  Q. So, you received these affidavits from
15  individuals who you have never met, correct?
16  A. That's correct.
17  Q. Did you make any attempt to meet with these
18  individuals in person?
19  A. I don't know if they testified before our
20  committee or not. I don't believe that they did.
21  Q. Have you ever spoken with any of these
22  individuals?
23  A. No.
24  Q. Okay. Now, are you originally from East Texas?
25  A. I am.

## 250

1   Q. Now, can you talk to me a little bit about the
2   history of racial discrimination in East Texas?
3   A. In what respect?
4   Q. Well, I'm thinking, for example, Jasper, Texas,
5   where an African American man was tied to a truck and
6   then murdered. Are you familiar with that incident?
7   A. I am.
8   Q. Do you agree that that incident was racially
9   motivated?
10  A. It would appear that it was.
11  Q. And are you aware of other racially motivated
12  incidents in East Texas?
13  A. Not any specific incident but I -- they may have
14  occurred. It's plausible to me that they may have
15  occurred.
16  Q. Do you believe that as a Senator from East Texas
17  that it's your responsibility to know about racially
18  motivated incidents happening in that area of the state?
19  MR. SWEETEN: Objection. Argumentative.
20  A. I would know about them if they had occurred in
21  my district. Jasper is not part of my district. So,
22  when you say "East Texas," that's a very broad area.
23  So, if there have been racially motivated incidents in
24  my district, I think they would have been brought to my
25  attention.

## 251

1   Q. (BY MS. ABUDU) Okay. And so, that means that
2   there have been no racially motivated incidents in your
3   district that have been brought to your attention?
4   MR. SWEETEN: Objection. Argumentative.
5   Objection. Vague.
6   Q. (BY MS. ABUDU) You can answer.
7   THE WITNESS: I'm okay to answer?
8   MR. SWEETEN: Yeah, as long as this doesn't
9   affect your thoughts on legislation.
10  A. I know that there were some issues with the
11  sheriff -- the former sheriff of Chambers County. Those
12  are the racially motivated incidents that I'm aware of
13  that have occurred in my district during the time that
14  I've been in office. And he's no longer the sheriff,
15  and I supported his opponent as a result of those
16  accusations.
17  Q. (BY MS. ABUDU) Okay. And what is the race of
18  his opponent?
19  A. He was Anglo.
20  Q. Okay. Now, for the sake of time, I'm going to
21  try to quickly wrap up.
22  You were asked earlier about the application of
23  Section 5 of the Voting Rights Act to the State of Texas
24  earlier today. Are you aware that under Section 5 of
25  the Voting Rights Act the presumption is that any

## 252

1   election change in Texas is -- will have a racially
2   discriminatory impact?
3   MR. SWEETEN: Objection. You can answer if
4   you know. I think you've already answered voting rights
5   questions but --
6   A. I think that all I -- my recollection of the
7   language is that we have to get any changes in election
8   law precleared.
9   Q. (BY MS. ABUDU) Okay. But are you aware that the
10  presumption under Section 5 --
11  MS. ABUDU: He can answer my question.
12  MR. SWEETEN: I think he's attempting to do
13  that. So, I would object to the side bar but you can go
14  ahead and ask your question.
15  Q. (BY MS. ABUDU) -- the presumption is that Senate
16  Bill 14 is racially discriminatory, are you aware of
17  that?
18  MR. SWEETEN: Objection. Asked and
19  answered.
20  A. I am not aware of that.
21  Q. (BY MS. ABUDU) Okay. Well, by asserting
22  legislative privilege throughout this deposition, you
23  are refusing to share any -- is it true that you are
24  refusing to share any information that would rebut that
25  presumption?

---

### 253

1    MR. SWEETEN:  Objection.
2    Don't answer the question.
3    The question is improper.  He has a right to
4    assert whatever privilege is available to him under the
5    law, and he is asserting the privilege.  I am
6    instructing him as to the boundaries of the privilege.
7    He is asserting the privilege, and he does not have to
8    provide an answer as to the potential effect of that
9    legally.
10    I'm going to instruct you not to answer the
11    question.
12    A. I cannot answer the question, based on the advice
13    of my counsel.
14    Q. (BY MS. ABUDU)  Okay.  Thank you very much,
15    Senator Williams.
16    A. You're welcome.
17    (Short recess.)
18    (Exhibit 412 marked.)
19    FURTHER EXAMINATION
20    Q. (BY MS. RIOS)  What has been marked as
21    Exhibit 412, that's part of the consideration of the
22    Senate Bill 14 in January.  Senator Williams, did you
23    request the Secretary of State to do a comparison
24    between the voter rolls and the driver's license files?
25    MR. SWEETEN:  Don't reveal matters of

---

### 254

1    legislative privilege you can reveal matters that
2    are subject to the public record.
3    Q. (BY MS. RIOS)  If you go to the bottom of the
4    page --
5    A. Clearly, Ms. McGeehan from the Secretary of
6    State's office has indicated that I asked them if they
7    could do some comparisons.
8    Q. And these comparisons were between the registered
9    voters and the driver's license data?
10    A. Correct.  That's what she says.
11    Q. Okay.  Did you have any written communications
12    about this analysis that Ms. McGeehan stated she was
13    going to get for you?
14    MR. SWEETEN:  You can answer if you had
15    written communications.
16    A. Could you repeat the question?  I'm sorry.
17    Q. (BY MS. RIOS)  Sure.  Were there any written
18    communications about this analysis that Ms. McGeehan was
19    going to conduct?
20    A. There may have been.  I did not write anything --
21    Q. Okay.  Did you --
22    A. -- to the best of my recollection.
23    Q. Are you aware whether your office received any
24    written response from her?
25    A. I think that we might have, and I think it was a

---

### 255

1    part of the record but only to that extent.
2    MS. RIOS:  Okay.  Counsel, I have been
3    requested to ask you for any written communications
4    about the analysis conducted by Ms. McGeehan and her
5    office comparing the registered voter list with the
6    driver's license list, and this was an analysis that
7    Ms. McGeehan stated in the deposition yesterday was
8    conducted between February and March of 2011.
9    MR. SWEETEN:  I wasn't in the deposition of
10    Ms. McGeehan.  I'm not sure what you're referring to.
11    My -- you know, we -- so, I can talk to Senator Williams
12    about it at a later time and we can discuss it but as
13    far as your request, there's -- I'm going to have to
14    investigate what was said that you're talking about,
15    which I know nothing about, and I'll meet with Senator
16    Williams on it and we can try to get you your answer if
17    any such thing exists.
18    MS. RIOS:  I was asked to ask you for these
19    documents --
20    MR. SWEETEN:  I understand.
21    MS. RIOS:  -- by lead counsel.
22    MR. SWEETEN:  I understand.
23    Q. (BY MS. RIOS)  Senator Williams, do you know
24    whether Anglos, Hispanics or blacks or any other groups
25    are more likely not to have IDs listed under SB14?

---

### 256

1    MR. SWEETEN:  Don't reveal your thoughts and
2    your mental impressions, opinions, motivations about
3    legislation, including Senate Bill 14, in answering this
4    question but you can refer to matters of the public
5    record.
6    A. I know that it was discussed extensively in the
7    Committee of the Whole and during the floor debate but
8    beyond that, I don't have any knowledge.
9    Q. (BY MS. RIOS)  Okay.  The Senate passed Senate
10    Bill 14 very quickly.  I'm referring to the House floor
11    consideration.  In your experience, how often does the
12    Senate pass legislation in the first two weeks of a
13    session?
14    MR. SWEETEN:  You can answer that.
15    A. Well, it happens.  And I think I've passed bills
16    in the beginning of the session like that in the first
17    couple of weeks.  I know one session, it was the first
18    bill that got to the Governor's desk.
19    So, it happens but it really depends on whether
20    the Governor has called -- if he doesn't treat it as an
21    emergency item, it can't be passed that fast.
22    Q. (BY MS. RIOS)  So, in your experience, can you
23    give me an estimate of how many bills have --
24    A. I have no idea.
25    Q. No idea?

## 257

1    A. Huh-uh.
2    Q. Okay. Were you on the Conference Committee for
3    SB14?
4    A. I probably was but I don't recall specifically
5    that I was. I probably was.
6    Q. And who selected the members of the Conference
7    Committee?
8    A. The Lieutenant Governor does.
9    Q. Do you recall if you requested the Lieutenant
10   Governor to be a member of the Conference Committee?
11   A. I don't recall.
12   Q. And do you recall if it was the Lieutenant
13   Governor who told you, "Senator Williams, I want you in
14   the Conference Committee"?
15   A. It's completely his prerogative.
16   Q. Based on the public record, were there concerns
17   that SB14 might disproportionately impact minority
18   voters?
19       MR. SWEETEN: You can refer to matters of
20   the public record, as the question prefaced.
21   A. It was certainly discussed as a matter of -- in
22   the committee and also in the floor debate.
23   Q. (BY MS. RIOS) Okay. And did you believe that
24   you had an obligation pursuant to Section 5 of the
25   Voting Rights Act to determine whether SB14 might

## 258

1    disproportionately impact minority voters?
2        MR. SWEETEN: Don't reveal your thoughts,
3    mental impressions, opinions, motivation about
4    legislation, including Senate Bill 14, in answering the
5    question.
6        I instruct you not to answer based on
7    legislative privilege.
8    A. And I think based on what counsel has told me,
9    I'm not able to answer your question.
10   Q. (BY MS. RIOS) Are you aware of any legislators
11   making any public statements about illegal aliens
12   voting?
13       MR. SWEETEN: You can answer to the extent
14   she's referring to the public record.
15   A. I'm sure some of my colleagues have made those
16   statements but I can't give you any specific instances.
17   Q. (BY MS. RIOS) Any names?
18   A. No. I just -- I just simply don't recall. I
19   know that that's been part of the dialogue in this.
20   Q. And are you aware of the Lieutenant Governor or
21   the Governor making any public statements about illegal
22   aliens voting?
23   A. I don't recall that specifically, no.
24   Q. And have any of the legislators, the Lieutenant
25   Governor or the Governor made any statements about

## 259

1    illegal aliens voting at fundraisers?
2    A. I don't have any specific recollection.
3    Q. Okay. Have you ever heard at any time from any
4    Texas state legislator who voted in favor of SB14 that
5    it would prevent a legitimately registered voter from
6    voting in Texas?
7        MR. SWEETEN: Hold on a minute. Don't
8    reveal any communications you've had with legislators.
9    That's subject to the legislative privilege.
10   A. And so, repeat the question for me.
11       THE WITNESS: Would you read it back?
12       (Whereupon, the requested testimony was read back
13   as follows:
14   QUESTION: Okay. Have you ever heard at any time
15   from any Texas state legislator who voted in
16   favor of SB14 that it would prevent a
17   legitimately registered voter from voting in
18   Texas?)
19       MR. SWEETEN: Same objection and
20   instruction. You can refer to matters of the public
21   record but don't reveal private conversations with
22   legislators about legislation.
23   A. I don't recall if I ever heard anyone who voted
24   for the bill say that at either -- as a matter of public
25   record.

## 260

1    Q. (BY MS. RIOS) Have you ever heard any Texas
2    state legislator who voted in favor of SB14 say that it
3    would prevent racial or ethnic minorities from voting in
4    Texas?
5        MR. SWEETEN: Objection. Legislative
6    privilege.
7        Don't reveal communications you've had with
8    legislators. That's clearly covered by the legislative
9    privilege. You can refer to matters of the public
10   record, as I've instructed you today.
11   A. I don't believe there's any instance that I can
12   point to in the public record about that.
13   Q. (BY MS. RIOS) Are you aware of any allegations
14   that SB14 attempted to play on people's fears of illegal
15   immigrants voting?
16       MR. SWEETEN: You can refer to matters of
17   the public record. Don't reveal your mental
18   impressions, thoughts or opinions about the bill or
19   communications you've had with the various individuals
20   or entities I've listed today. Those are subject to
21   legislative privilege.
22   A. I know that -- I think it's clear that that's a
23   matter of the public dialogue. It's in the public arena
24   that there were people who were concerned about that.
25   Q. (BY MS. RIOS) Any particulars?

Senator Thomas D. Williams                                June 1, 2012

## 261

```
 1        A.  No.
 2            MR. SWEETEN:  Same instruction.
 3        Q.  (BY MS. RIOS)  What did you want to accomplish
 4   with SB14?
 5            MR. SWEETEN:  Objection.  Legislative
 6   privilege.
 7            Don't answer the question except to the
 8   extent you can refer to matters of public record.
 9        A.  As I've stated publicly, I think that protecting
10   the integrity of the ballot box is fundamental to our
11   way of life and that this is an important step in
12   protecting that integrity.
13        Q.  (BY MS. RIOS)  And how does SB14 protect the
14   integrity of the ballot box?
15            MR. SWEETEN:  Objection.  Legislative
16   privilege.
17            Don't answer the question.
18        A.  Based on advice of counsel, I can't answer your
19   question.
20        Q.  (BY MS. RIOS)  Why is SB14 a better way to
21   protect the integrity of the ballot box than the current
22   practice?
23            MR. SWEETEN:  Objection.  Calls for matters
24   subject to legislative privilege.
25            I'm going to instruct you not to answer the
```

## 262

```
 1   question as phrased.
 2        A.  Based on the advice of counsel, I can't answer
 3   your question.
 4        Q.  (BY MS. RIOS)  Has anyone ever told you that they
 5   did not vote because they are concerned that voter fraud
 6   would cancel out their vote?
 7            MR. SWEETEN:  Objection.  Don't reveal
 8   communications you've had with constituents, Texas
 9   Legislative Council, state agencies, legislative staff,
10   legislators.  Don't reveal your thoughts, mental
11   impressions, opinions and motivations about legislation.
12            You can refer to matters of the public
13   record in answering the question.
14        A.  Based on the advice of counsel, I don't think
15   there's anything that I have to add to that.  So, only
16   what's in the public record.
17        Q.  (BY MS. RIOS)  Was there a time when you learned
18   that Texas has represented in this litigation that
19   795,000 voters do not have driver's licenses?
20            MR. SWEETEN:  Objection.  Misstates the
21   testimony -- or misstates the record.
22            Go ahead and answer, assuming you can.
23        A.  I know that there are registered voters who don't
24   have a driver's license.  I have no idea if that number
25   is correct.
```

## 263

```
 1        Q.  (BY MS. RIOS)  At any time since the passage of
 2   SB14, have you come to believe that it was passed with
 3   any discriminatory purpose?
 4            MR. SWEETEN:  You're saying since passage?
 5            MS. RIOS:  Yes.
 6            MR. SWEETEN:  So, you can answer the
 7   question except to the extent that your answer would
 8   reveal your thoughts, mental impressions, opinions and
 9   motivation about the legislation itself.
10        A.  No.
11        Q.  (BY MS. RIOS)  Okay.  At any time since the
12   passage of SB14, have you come to believe that SB14 will
13   have a greater aggressive effect on minority voters?
14            MR. SWEETEN:  Same instruction.  Same
15   objection.
16        A.  No.
17        Q.  (BY MS. RIOS)  Okay.  If called to trial, will
18   you testify that SB14 has no discriminatory purpose?
19            MR. SWEETEN:  He's already answered the
20   question probably five times today about the general
21   purpose of SB14.  You're now asking once again what the
22   purpose is.  You're also asking about our trial strategy
23   as to whether we will call him.
24            I will let him answer one more time what the
25   general purpose of Senate Bill 14 is.  He can answer
```

## 264

```
 1   that question.
 2        A.  The purpose of the bill is to protect the
 3   integrity of the ballot box by ensuring that the person
 4   who is presenting themselves as a voter is -- that they
 5   are indeed who they say they are.
 6            MS. RIOS:  Patrick, I prefaced my question
 7   by saying "if called to trial."
 8            MR. SWEETEN:  Okay.  Well --
 9            MS. RIOS:  I do not know what your trial
10   strategy is, if there is a trial.
11            MR. SWEETEN:  Okay.  Well, if you take --
12   and I want to work with you on this because I understand
13   you have questions you have to ask but I'm just simply
14   saying that the Senator has sat here all day and
15   answered questions about the general purpose of the
16   bill.  He's now done so again.
17            "If called to trial," you know, when you put
18   that in there, you're asking if we're going to call him
19   to trial or what he would say when asked.  You've
20   already asked him, "What do you think the purpose of the
21   bill is?"  I just don't understand the purpose of your
22   question but I'll tell you what, I'm just going to let
23   you ask the question again and let the Senator answer
24   it.
25        Q.  (BY MS. RIOS)  Okay.  If called to trial, will
```

Ronald Wright                                                    June 20, 2012

1

```
              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,            )

      Plaintiff,           )

                           )

VS.                        )  CASE NO. 1:12-CV-00128

                           )  RMC-DST-RLW

ERIC H. HOLDER, JR., in his )

Official Capacity as       )

Attorney General of the    )

United States,             )

      Defendant.           )


* * * * * * * * * * * * * * * * * * * * * * * * * *

         ORAL AND TELEPHONIC DEPOSITION

                      OF

              REVEREND RONALD WRIGHT

* * * * * * * * * * * * * * * * * * * * * * * * * *


      ANSWERS AND DEPOSITION OF REVEREND RONALD

WRIGHT, produced as a witness at the instance of the

Plaintiff, taken in the above-styled and -numbered cause

on the 20th day of June, A.D., 2012, beginning at

1:27 p.m., before Carrie del Angel, a Certified Shorthand

Reporter in and for the State of Texas, in the offices of

Esquire Solutions, located at 1700 Pacific Avenue, Suite

1000, Dallas, Texas, in accordance with the Federal Rules

of Civil Procedure and the agreement hereinafter set

forth.
```

3

### I N D E X

2  Exhibit List.................................Page 4
3  Examination by Mr. Hayes.....................Page 5
4  Examination by Ms. Abudu.....................Page 51
5  Further Examination by Mr. Hayes.............Page 53
6  Corrections and Signature....................Page 56
7  Reporter's Certificate.......................Page 57

2

```
1            A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3     MR. KEVIN HAYES (via telephone)
      Office of the Attorney General of Texas
4     209 West 14th Street, 8th Floor
      Austin, Texas  78701
5     512.475.4330
      512.370.9077 FAX
6     kevin.hayes@texasattorneygeneral.gov
7   FOR THE DEFENDANT:
8     MS. ANGELA MILLER (via telephone)
      U.S. Department of Justice
9     950 Pennsylvania Avenue, NW
      PHB 4014
10    Washington, DC  20003
      202.616.9750
11    202.514.1005 FAX
      angela.miller5@usdoj.gov
12
    FOR THE WITNESS:
13
      MS. NANCY G. ABUDU
14    American Civil Liberties Union Foundation
      Southern Regional Office
15    230 Peachtree Street
      Atlanta, Georgia  30303-1227
16    404.523.2721
      404.653.0331 FAX
17    nabudu@aclu.org
18
19
20
21
22
23
24
25
```

4

```
1         E X H I B I T   L I S T
2   No. Description              Page   Page
                              Marked  Ident.
3
4   1  Notice of Intention to Take Oral
       Deposition of Intervenor Justice
5      Seekers Under Rule 30(b)(6)    11    10
6   2  Responses to the State of Texas'
       First Set of Interrogatories to the
7      League of Women Voters of Texas,
       Justice Seekers, Southwest Workers
8      Union, and LA Union Del Pueblo
       Entero                         30    29
9
    3  Declaration                    55    54
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                    June 20, 2012

Page 5

```
 1              P R O C E E D I N G S
 2        THE REPORTER:  This is the telephonic
 3   deposition of Reverend Ronald Wright, taken by the
 4   Plaintiff in the matter of Case No. 1:12-CV-00128, State
 5   of Texas versus Eric H. Holder, Jr, held at Esquire
 6   Solutions, located at 1700 Pacific Avenue, Suite 1000,
 7   Dallas, Texas.  Today's date is June 20th, 2012.  The time
 8   is 1:27 p.m.  My name is Carrie del Angel with Esquire
 9   Solutions.
10        Will counsel present please state their
11   agreements, after which the witness will be sworn.
12        MR. HAYES:  Kevin Hayes for the Texas
13   Attorney General's Office representing the plaintiff.
14        MS. ABUDU:  Nancy Abudu with the ACLU,
15   representing Reverend Ronald Wright.
16        MS. MILLER:  Angela Miller with the U.S.
17   Department of Justice representing Attorney General Eric
18   Holder.
19        REVEREND RONALD WRIGHT,
20   having been first duly cautioned and sworn to testify the
21   truth, the whole truth and nothing but the truth,
22   testified on his oath as follows:
23              EXAMINATION
24   BY MR. HAYES:
25   Q.  Will you please state your full name for the
```

Page 6

```
 1   record.
 2   A.  Yes.  My name is Reverend Ronald Wright,
 3   W-r-i-g-h-t.
 4   Q.  Reverend Wright, have you ever been deposed
 5   before?
 6   A.  No, sir, I have not.
 7   Q.  Are you suffering from any illnesses that will
 8   affect your ability to provide accurate answers to my
 9   questions today?
10   A.  No, sir, I am not, unless you go over two hours.
11   Q.  Are you taking any medication that will affect
12   your ability to provide accurate answers to my questions?
13   A.  No, sir.
14   Q.  Are you aware of anything else that might prevent
15   you from accurately answering my questions?
16   A.  No, sir, I'm not.
17   Q.  All right.  Well, I'm going to go over a few
18   ground rules.  I'm going to ask that you please answer
19   audibly so the court reporter can hear.  Please do not
20   shake your head or nod.  This is difficult for her to
21   transcribe.  Do you understand that?
22   A.  Yes, sir.
23   Q.  If you don't understand my question, will you
24   please tell me, and I'll rephrase it?
25   A.  Yes, sir.
```

Page 7

```
 1   Q.  Do you understand that?
 2   A.  Yes, sir.
 3   Q.  Please wait until I finish my question before you
 4   answer, and I will try and do the same.  Do you
 5   understand?
 6   A.  Yes, sir.
 7   Q.  Your lawyer may object to a question I ask.  Even
 8   if she objects, you must answer my question unless she
 9   instructs you not to answer.  Do you understand that?
10   A.  Yes, sir.
11   Q.  I believe you are represented by counsel today;
12   is that correct?
13   A.  That is correct.
14   Q.  And who is your counsel again?
15   A.  Mrs. Nancy Abudu.
16   Q.  When did that representation begin?
17        MS. ABUDU:  And I'm going to object to the
18   extent that question seeks information that's covered
19   by attorney-client privilege.
20        So without revealing the substance of any
21   discussion we've had, you can answer that question,
22   Reverend Wright.
23   A.  We've -- we've been in touch around January,
24   February, March -- March, April, somewhere around there.
25   Not real sure.
```

Page 8

```
 1   Q.  (BY MR. HAYES)  All right.  Do you understand
 2   that you've been designated to provide testimony on behalf
 3   of the Justice Seekers today?
 4   A.  Yes, sir.
 5   Q.  So unless I indicate otherwise, when I use the
 6   term "you" in this deposition, that term includes the
 7   Justice Seekers and anyone acting on its behalf.  Do you
 8   understand that?
 9   A.  Yes, sir.
10   Q.  Now, what did you do to get ready for your
11   deposition today?
12   A.  What did I do to get ready for my deposition
13   today?
14   Q.  Yes.
15   A.  Got up and kind of just do my normal routine,
16   what I do on a daily basis.
17   Q.  Did you meet anyone in preparation for this
18   deposition?
19   A.  No, sir, I did not.
20   Q.  Did you talk to anybody in preparation for this
21   deposition?
22   A.  No, sir.
23   Q.  Did you review any documents?
24   A.  I have been reviewing documents since the very
25   beginning of this -- this bill being -- trying to be
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                          June 20, 2012

13

1     MS. ABUDU:  Again, this is -- Question No. 2
2   is also subject to our objection, which is that the
3   District Court has already granted the Justice Seekers'
4   Motion to Intervene in this case.  So the issue of whether
5   the Department of Justice can adequately represent the
6   Justice Seekers is a moot point that, again, the court has
7   already addressed.
8     MR. HAYES:  It's my understanding that the
9   Court's ruling goes to the fact that -- or, sorry, the
10   granting of intervention, but that does not preclude
11   discovery of information relating to Topic No. 2
12   altogether.
13     MS. ABUDU:  Okay.
14     MR. HAYES:  This is a deposition.  It's an
15   information-seeking practice.  I do not believe you -- I
16   mean, are you instructing him not to answer anything about
17   Topic No. 2.
18     MS. ABUDU:  I'm instructing him to answer all
19   of the questions that you ask to the best of his ability
20   unless there, you know, is an objection that asserts
21   privilege or some other basis that would require or
22   justify him not answering, and I believe your question
23   with respect to what he has done to prepare has already
24   been asked and answered.
25     MR. HAYES:  I asked it regarding Topic No.

14

1   1.  I -- the second question, which I believe you raised
2   the objection to, was whether or not he's been designated
3   to testify on Topic No. 2.
4     MS. ABUDU:  Right.
5     MR. HAYES:  He said no, and then I think you
6   lodged an objection.
7     Q.  (BY MR. HAYES)  I want to be clear on the record
8   that you have not been designated to testify about Topic
9   No. 2?
10     MS. ABUDU:  Again, he has -- he has been
11   instructed to answer these questions to the best of his
12   ability.  The question isn't seeking any other fact other
13   than whether he's been designated to testify on Topic No.
14   2.
15     A.  No.  No, I have not.
16     Q.  (BY MR. HAYES)  Are you prepared to testify about
17   Topic No. 2?
18     A.  To the best of my ability.
19     Q.  All right.  We'll go on to Topic No. 3.  Have you
20   been designated to testify to that topic?
21     MS. ABUDU:  Again, we reassert our objection
22   with respect to membership lists, and that is an issue
23   that's been covered by the Supreme Court, and so we're
24   just reasserting that objection.
25     Q.  (BY MR. HAYES)  Can you answer the question?

15

1     A.  What do you want, a copy of my --
2     MS. ABUDU:  I think you need to restate the
3   question.
4     A.  Re -- restate the question because I'm not
5   understanding what you're wanting.
6     Q.  (BY MR. HAYES)  Have you been designated by the
7   Justice Seekers to testify on Topic No. 3?
8     A.  Memberships including all individuals -- no, I
9   have not.
10     Q.  Are you prepared to testify about Topic No. 3?
11     A.  To the best of my ability.
12     Q.  Well, let's move on.  How about Topics 4 through
13   11?  Have you been designated to testify to those topics?
14     A.  Yes.
15     Q.  Are you prepared to testify about those topics?
16     A.  To the best of my ability.
17     Q.  All right.  Well, if you'll direct your attention
18   to Topic No. 6, does Justice Seekers engage in any
19   policy-related activity regarding voter ID legislation
20   generally?
21     A.  No, sir.
22     Q.  So you do not publish any articles on voter ID
23   legislation?
24     A.  No, we do not.
25     Q.  Would that be the same for academic papers or

16

1   studies?
2     A.  Well, yes.
3     Q.  Do you perform studies?
4     A.  Do I personally perform studies?
5     Q.  You're speaking on behalf of the Justice
6   Seekers.  I --
7     A.  No.
8     Q.  -- my question is whether or not Justice Seekers
9   performs any studies relating to voter ID legislation.
10     A.  I do personally, but the organization as a whole
11   does not.
12     Q.  Has Justice Seekers ever hosted or attended any
13   seminars on voter ID legislation?
14     A.  We've attended some community meetings in regards
15   to it.
16     Q.  When did those meetings take place?
17     A.  Some took place earlier this year, and they were
18   community-type forums that I think the NAACP was the
19   sponsor of them.
20     Q.  Is that while the bill that's the subject of this
21   litigation, was that while that was being debated?  Or was
22   that before?
23     A.  That was while it was being debated.
24     Q.  What was the Justice Seekers' involvement with SB
25   14, if any?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                          June 20, 2012

17

1   A.   As far as the bill itself --
2   Q.   Yes.
3   A.   -- or educating people about the bill?
4   Q.   Well, I would include -- I mean, that -- that is
5   relevant.  Did the Justice Seekers talk to any legislators
6   about SB 14?
7   A.   We've -- we've talked to some state
8   representatives, and we're still talking to some state
9   representatives.
10  Q.   And which state representatives did you speak to?
11  A.   With Eric Johnson and, of course, we just had a
12  new state representative by the name of Toni Rose who just
13  got into office, and so we've placed some calls in to her,
14  but she has not been able to respond back to us because of
15  some other things that have been on her agenda.  But she
16  did want to come in on that.
17  Q.   Okay.  When did those conversations take place?
18  A.   Recently, with Eric Johnson, last week and -- and
19  prior to, but last week, we specifically talked about it
20  again.
21  Q.   Have you -- has the Justice Seekers spoke to any
22  other legislators about SB 14 besides the two you've
23  named?
24  A.   No, sir.
25  Q.   And did the Justice Seekers talk to any lobbyists

18

1   about SB 14?
2   A.   No, sir.
3   Q.   What about any -- I believe you spoke to this a
4   little bit earlier, but did the Justice Seekers talk to
5   any members of the public about SB 14?
6   A.   Yes, we have.
7   Q.   Specifics, please?
8   A.   I beg your pardon?  I didn't hear you.
9   Q.   What specifically --
10  A.   Well, we encourage them to -- we encourage them
11  just like we did, go and look up the bill and -- and
12  research the bill for themselves and compare it to the --
13  the civil rights voters' bill.
14  Q.   For the -- so these individuals, members of the
15  public, are you limiting your answer to members of the
16  Justice Seekers or others as well?
17  A.   These were members of the public.  These were --
18  these were not just members of Justice Seekers.
19  Q.   Has your organization ever given any speeches
20  about SB 14?
21  A.   Not yet.
22  Q.   Has it prepared any articles about SB 14?
23  A.   Not yet.
24  Q.   What about talking points?
25  A.   Well, we've -- when you say "talking points,"

19

1   what do you mean?  In -- in community forums, or what do
2   you -- what do you mean by talking points?  At what level?
3   Q.   I'm talking about talking points prepared in
4   anticipation of giving a speech, a public speech, you
5   know, general outlines of points that you believe should
6   be addressed.
7   A.   We have not yet, but there are some community
8   organizations out there, I believe, that are putting
9   together some forums, and we've been asked to take -- take
10  part in them.
11  Q.   But you have not begun the process yet?
12  A.   Not yet.
13  Q.   Have you conducted any studies about SB 14's
14  impact?
15  A.   I've personally -- I'm sorry.
16        THE REPORTER:  I didn't get the last part of
17  that.
18  Q.   (BY MR. HAYES)  All right.  Let me rephrase
19  that.
20        Did the Justice Seekers conduct any studies
21  about SB 14's impact?
22  A.   On how it would affect the people in the
23  community?
24  Q.   Yes.
25  A.   We haven't done any studies, but we've talked to

20

1   several people in the community.  And, from my experience,
2   I'm familiar with what kind of impact it would probably
3   have on people in the community.
4   Q.   Did the Justice Seekers review any studies about
5   SB 14's impact?
6   A.   I have not yet.
7   Q.   Do you contend that Senate Bill 14 will have the
8   effect of denying or abridging African-American Texans'
9   right to vote?
10  A.   Not just African-Americans but other ethnic --
11  other ethnic groups as well.
12  Q.   Which other groups would that be?
13  A.   Hispanic.
14  Q.   Anyone else?
15  A.   And we -- all the probably immigrants that are
16  coming into this country, Asians as well, but -- but
17  specifically Hispanics.
18  Q.   So what--
19  A.   I think that's what this --
20        MS. ABUDU:  Okay.  I'd just --
21  Q.   (BY MR. HAYES)  I'm sorry.  I cut you off.
22  Please finish.
23        MS. ABUDU:  Go ahead.
24  A.   I specifically think Hispanics.
25  Q.   (BY MR. HAYES)  What is the basis for your



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                        June 20, 2012

21

1  contention?
2       A.   On why it would specifically address the
3  Hispanics?
4       Q.   More generally to the effect of denying or
5  abridging the right to vote of minorities, but, yes, to
6  Hispanics as well.
7       A.   Well --
8            MS. ABUDU:  And, again, I'll just renew my
9  objections in terms of the factual basis.  And that
10 objection is also based on the fact that the attorney
11 general's office asked whether any information that comes
12 out of this deposition be part of any supplemental
13 findings of fact or replies with respect to the findings
14 of fact, so I believe that is a valid objection.
15           But subject to that objection, Reverend
16 Wright, you can answer the question to the best of your
17 ability.
18           MR. HAYES:  Okay.  So to be clear, you're
19 objecting to me asking about factual matters because this
20 deposition itself will become part of the fact record?
21           MS. ABUDU:  I'm objecting --
22           MR. HAYES:  I have --
23           MS. ABUDU:  Okay.  Kevin, again, as you said,
24 fact discovery has ended, but obviously we're doing this
25 deposition today.  Matthew Frederick requested that, you

22

1  know, pursuant to this deposition happening today, that
2  any factual findings that come out of this deposition,
3  even though it's the close of factual discovery, be
4  included in any supplemental findings of fact or replies.
5  So I've instructed my client to answer the question to his
6  -- the best of his ability but subject to that objection.
7           So, again, Reverend Wright, to the best of
8  your ability, you can answer the question.
9       A.   I --
10      Q.   (BY MR. HAYES)  Do you need me to repeat that?
11      A.   Yes.
12      Q.   What is the basis for your contention that Senate
13 Bill 14 will have the effect of denying or abridging
14 Hispanic Texans' right to vote?
15      A.   Well, I think that anything that -- that would
16 prohibit people the right to vote based on -- this is
17 strictly based on ethnicity.  And -- and history says
18 that.  When we passed the Voters Rights Act in 1965, there
19 was no point -- we were not required to have ID -- or two
20 -- two photo IDs to vote.  That was not the purpose of
21 that.  And I thought in that -- in the law being passed,
22 that it would prohibit any state from imposing any kind of
23 voting qualifications or prerequisites to vote.  And I
24 think that's what this State Bill 14 is doing.
25      Q.   My question is more directed to why -- or upon

23

1  what basis you believe that it is a violation of the
2  Voting Rights Act.
3       A.   Because of the prerequisites that are required.
4  That pre -- that prerequisite also said standards or
5  practices that would violate anybody's voting rights.
6       Q.   All right.  Let me rephrase this:  What -- what
7  factual basis are you basing your contention that it will
8  have a disparate impact on?
9       A.   To the best of my knowledge, this would -- it
10 would cause an impact on a specific ethnical group --
11 ethnicity group, and I said Hispanics, and you said what
12 facts are that.  Well, we have voted -- we have been
13 voting over the last 20 or 30 years, and that was not a
14 requirement.  Now it is a requirement.  And -- and that --
15 that -- anything that abridges the right for a taxpaying
16 citizen to vote is a violation of your civil rights.
17      Q.   Are you basing that on any studies, or are you
18 simply basing it on the history of Texas?
19      A.   I'm basing that on the history of Texas, which
20 Texas has a history of trying to stop -- has a long, sad
21 history of making it difficult for certain people to vote
22 in this state.
23      Q.   Any other factual basis underlying your
24 contention?
25      A.   There might be, but not to my knowledge right

24

1  now.
2       Q.   All right.  Are you familiar with the public
3  polls regarding public support for voter ID legislation?
4       A.   The pub -- say it again.  I'm sorry.
5       Q.   Are you familiar with the polls regarding public
6  support for voter ID legislation?
7       A.   No, sir, I'm not.
8       Q.   Are you aware of polls showing that the majority
9  of Texans support a photographic ID requirement to vote
10 regardless of political affiliation?
11           MS. ABUDU:  All right.  Objection to the
12 extent it assumes facts not in evidence.
13           But you can answer to the best of your
14 ability.
15      A.   To the best of my ability, I am not aware of
16 that.  But I am not shocked of that because of what I just
17 said a minute ago.  Texas has a long, sad history of
18 making it difficult for certain people to vote in this
19 state.
20      Q.   (BY MR. HAYES)  So it would not surprise you that
21 polls show that the majority of Texans support photo ID
22 requirements to vote?
23      A.   It would not surprise me.
24      Q.   Are you aware of polls showing that the majority
25 of Texans support a photo ID requirement to vote



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Ronald Wright                                          June 20, 2012

25

1    regardless of race?

2           MS. ABUDU:  Objection, again, to the extent

3    it assumes facts not in evidence.

4           But you can answer.

5    A.  No -- no, I'm not.

6    Q.  (BY MR. HAYES)  Do you believe that elderly

7    voters are more likely than the average voter to lack a

8    form of identification required by Senate Bill 14?

9    A.  That may be a possibility.  There are a few

10   elderly folks who have voted for years who do not have

11   up-to-date ID.  But we know that they made this -- the

12   senate bill may not apply to all elderly folk.

13   Q.  Why would it not apply to all elderly folks?

14   A.  Well, I'm -- I'm just saying there may be -- that

15   it might not apply to all elderly folk, that -- some

16   seniors that it would not apply to.  And if I -- and

17   that's from my understanding.  If I'm not right about

18   that, then you can certainly let me know.

19   Q.  Do you believe that indigent voters are more

20   likely than the average voter to lack a form of

21   identification required by Senate Bill 14?

22   A.  Yes.

23   Q.  Do you believe that disabled voters are more

24   likely than the average voter to lack a form of

25   identification required by Senate Bill 14?

26

1    A.  Yes.

2    Q.  On what do you base your answer?

3    A.  On -- on indigent -- on indigent or on the -- on

4    the second one?

5    Q.  Disabled voters was the one --

6    A.  Well --

7    Q.  -- I was speaking to.

8    A.  -- dis -- transportation-wise, not -- along with

9    the ID, most people who are disabled do not have access to

10   getting around like people who are not disabled.

11   Q.  Do you believe that rural voters are more likely

12   than the average voter to lack a form of ID?

13   A.  No.

14   Q.  Do you believe that voters without a high school

15   diploma are more likely than the average voter to lack a

16   form of ID?

17   A.  Yes.

18   Q.  Why do you believe that?

19   A.  There's the possibility most people without

20   voters -- that didn't finish high school may not have the

21   proper ID that's required.  In the State of Texas, high

22   school diplomas are pretty much required in order to be

23   employed.

24   Q.  Do you believe that young voters are less likely

25   than the average voter to be appropriately educated about

27

1    the change in the ID requirements --

2           MS. ABUDU:  Object --

3    Q.  (BY MR. HAYES)  -- for voting under Senate Bill

4    14?

5           MS. ABUDU:  Okay.  I'm sorry.  Objection,

6    calls for speculation.

7           But you can answer.

8    A.  I believe -- do believe that young people will

9    somewhat be affected by this bill, if passed.

10   Q.  (BY MR. HAYES)  I believe my question was, do you

11   believe that they are less likely than the average voter

12   to be appropriately educated about the change in the ID

13   requirements?

14   A.  Yes.

15   Q.  Why do you believe that?

16   A.  Well, if -- if it's not done in the schools --

17   we're educating our young people -- colleges are not

18   educating them on voters' rights.  And so, chances are, if

19   they're not out here, they won't get educated properly.

20   Q.  I want to ask you a couple of questions about the

21   Justice Seekers' background.  When was Justice Seekers

22   founded?

23   A.  In 2010.  February 2010.

24   Q.  What is the corporate structure -- and by that, I

25   mean are you a nonprofit corporation?

28

1    A.  No, sir.

2    Q.  You are a for-profit corporation?

3    A.  Yes, sir.

4    Q.  How many employees does Justice Seekers have?

5    A.  Four.

6    Q.  What is the mission of the Justice Seekers?

7    A.  We are a 21st century civil rights and social

8    justice organization.  Our -- our goal is to defend those

9    who Jesus considered to be the least of these.

10   Q.  And what types of activities does Justice Seekers

11   undertake to fulfill its mission?

12   A.  We -- we -- we do, like I said, civil rights and

13   social justice.  We deal in education; we deal with

14   veterans; we deal with poverty-stricken people; we deal

15   with seniors.  We help people legally-wise,

16   educational-wise.  We do a variety of things.

17   Q.  Do you conduct voter registration drives?

18   A.  We have worked with people who have conducted

19   voter registration drives.

20   Q.  Justice Seekers itself does not run the drive --

21   A.  No, sir.

22   Q.  -- is that correct?

23   A.  No, sir.

24   Q.  And how do you assist in these voter registration

25   drives?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                           June 20, 2012

29

1      A.  In most cases, people come and ask us if we'll
2   volunteer and help register people to vote.
3      Q.  So if I understand, you get the word out about
4   the registration drive?
5      A.  Absolutely.
6      Q.  So can I assume that you're familiar with the
7   current registration requirements?
8      A.  Somewhat.
9      Q.  Who are the members of the Justice Seekers?  And
10  by that, I mean what is the makeup of your organization
11  generally?
12     A.  When you say "makeup," what do you mean?
13     Q.  Are there individual members?  Is it
14  organizations?
15     A.  There are individual members.
16     Q.  How many members approximately do you have in
17  your organization?
18     A.  Off the top of my head, I would probably say
19  right at 100 or a little more.  I'm not real sure off --
20  right off the bat.
21     Q.  All right.  I'm going to ask that the court
22  reporter hand you -- it's entitled Responses to the State
23  of Texas' First Set of Interrogatories to the League of
24  Women Voters of Texas, Justice Seekers, Southwest Workers
25  Union and La Union Del Pueblo Entero.  I believe it's

30

1   response to -- it's your responses to the State of Texas's
2   interrogatories.
3             THE REPORTER:  Okay.  Give me one second.
4             MR. HAYES:  Sure.
5             (Exhibit No. 2 was marked.)
6             MR. HAYES:  Will you please mark that as
7   Exhibit 2.
8             THE REPORTER:  Okay.  I've marked it.
9      Q.  (BY MR. HAYES)  Reverend, will you please look
10  over the document in front of you.
11     A.  (Witness complies.)
12     Q.  Do you recognize that document?
13     A.  Yes, sir.
14     Q.  And what is that?
15     A.  Our response.
16     Q.  Have you had a second to look that over?
17     A.  Let -- give me a few -- give me a minute here.
18     Q.  Sure.
19     A.  (Witness reviews document.)  Okay, Mr. Hayes.
20     Q.  Let me direct your attention to Page 6.  Look
21  over Interrogatory No. 4 and your response.
22     A.  (Witness complies.)
23     Q.  Have you looked it over?
24     A.  Okay.  I've looked it over now.
25     Q.  Does Justice Seekers possess any supplemental

31

1   information responsive to Interrogatory No. 4?
2      A.  As an organization do we or for public
3   information?
4      Q.  I believe it's talking about your organization.
5      A.  State the name and address of each of -- okay.
6   So now your question is?  I'm sorry.
7      Q.  Well, in your answer, I believe you stated that
8   you reserved the right to supplement your responses.  And
9   my question was, do you possess any supplemental
10  information responsive since you filed this response?
11     A.  Not to my knowledge.
12     Q.  So what information do you main -- do you
13  maintain about your members, if any?
14     A.  When you say what's -- what specific information
15  are you -- you needing?
16     Q.  I mean, do you -- do you maintain any information
17  about -- about your membership --
18     A.  Well --
19     Q.  -- as a general --
20     A.  -- sure we do, but as far as -- as it relates to
21  voting rights, I'm -- I'm sure they've all at one time or
22  another been asked if they're registered to vote.  Have I
23  done it specifically?  I -- I can't say I've done each
24  member like that, but, like I said, that doesn't mean that
25  they haven't been asked or they haven't been given

32

1   information on -- on -- to vote -- or to register to vote.
2      Q.  Do you require persons to fill out an application
3   to join your organization?
4      A.  Yes.
5      Q.  Do you request information from applicants?
6      A.  Yes.
7      Q.  What information do you request?
8      A.  The basic information, name, age.  We don't --
9   when they fill out the application, they -- they --
10  there's a space that requires them to fill out why
11  -- what are they interested -- what interest do they have
12  in joining the organization, or if they're dealing with an
13  issue, what that issue is.
14     Q.  Do you request that they provide a date of birth?
15     A.  They do provide -- let me say that -- no, we
16  don't.
17     Q.  Do you request any form of identification from
18  people applying to become a member?
19     A.  Sure we do.
20     Q.  What -- what do you request?
21     A.  We don't -- it -- it -- we don't ask for their
22  driver's license or anything like that.  Most people that
23  come to see us, Mr. Hayes, are people who are going
24  through and are suffering, and so it's -- it's not logical
25  for them to come and see us and not be who they say they



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                          June 20, 2012

33

1    are.
2        Q.  But you do -- I'm sorry.  Do -- you do say that
3    you request -- I'm sorry.
4            Do you request that they provide a form of
5    identification?
6        A.  Not necessarily, sir.
7        Q.  Some of them do anyways?
8        A.  Well, some of them might show it to you, but we
9    don't say we need to see your ID.  Because we --
10       Q.  Are the member -- I'm sorry.  Go ahead.
11       A.  I'm sorry.  You go ahead.  Go ahead.  You go
12   ahead.
13       Q.  Does an applicant need to pay anything to become
14   a member?
15       A.  Yes, they -- yes, they do.
16       Q.  And would that be an application fee?
17       A.  That would be an application fee and for -- and
18   the fee also goes towards whatever issues that they're
19   dealing with.
20       Q.  How much is the application fee to join?
21       A.  $60 a year.
22       Q.  Do you -- do you require the applicants pay a
23   one-time application fee, or is it only a yearly due?
24       A.  That's a yearly due.
25       Q.  Are members ever asked to make contributions to

34

1    the organization separate from that yearly due?
2        A.  No, sir.
3        Q.  Do you know how many Texas registered voters lack
4    one form -- one of the forms of ID required by Senate Bill
5    14?
6            MS. ABUDU:  Objection, calls for
7    speculation.
8            But you can answer to the best of your
9    ability.
10       A.  To the best of my -- yeah, to -- to the best of
11   my ability, hundreds of thousands probably.
12       Q.  (BY MR. HAYES)  And can I ask what you're basing
13   that -- that knowledge on?
14       A.  Well, I know for a fact on some of the
15   information that I acquired doing some of my studies a
16   while back, there were probably over -- well over 10,000
17   people in Dallas that -- that -- that did not fit -- that
18   did not have all of the requirements for this state bill.
19       Q.  Do you know how many of the members of the
20   Justice Seekers do not have one -- one of the forms of ID
21   that is accessible under Senate Bill 14?
22       A.  No, I sure do not, but we will find out.
23       Q.  So as you sit here today, can you identify any
24   member of the Justice Seekers who does not have one of the
25   types of photo IDs required by Senate Bill 14?

35

1        A.  To the best of my ability, I'm sure there are
2    because there are a couple of -- we have a couple of
3    immigrants who are -- are members of Justice Seekers from
4    Chile, and then there's -- there's a couple of, like, 19-
5    to 20-year-olds.
6        Q.  Do you know their names, by chance?
7        A.  Well, right off the bat, I don't, but I could
8    probably get the information if I needed it.
9        Q.  You don't know as of today?
10       A.  No, sir.
11       Q.  Can you identify any Texas registered voters who
12   do not have one of the types of photo ID required by
13   Senate Bill 14?
14       A.  Yes, sir.
15       Q.  Who would that be?
16       A.  His first name is Jose; his second name is
17   Galuan, G-a-l-u-a-n.
18       Q.  Do you have his address, by any chance?
19           MS. ABUDU:  We -- this is the -- sorry, the
20   declaration that we can introduce as an exhibit if you'd
21   like.
22           MR. HAYES:  I don't know if that's
23   necessary.  I mean, I'm sure you can just read it into the
24   record if that works for you.
25           MS. ABUDU:  Yeah, but I would like to have it

36

1    be one of the exhibits, though.  So, yeah, we can -- we
2    can read the -- since no one is here from your side, we'll
3    be happy to read the address, but we would like it to be
4    included since he's reading from it and referencing it.
5            MR. HAYES:  And would it be all right if --
6    when I'm finished with my questions we enter it into the
7    record then?
8            MS. ABUDU:  That's fine.
9            MR. HAYES:  Okay.
10       Q.  (BY MR. HAYES)  Is there anyone else you can
11   identify?
12       A.  No, that's the one I have today.
13       Q.  So is that all the people that Justice Seekers
14   contends do not have a photo ID?
15       A.  No, sir, there's not.  This is the one that I
16   brought today.
17       Q.  How many of your members do not have documents
18   necessary to get a state-issued photo ID?
19       A.  Not very many, and I'm not real sure.
20       Q.  Can you identify any member of the Justice
21   Seekers who does not have the necessary documents to get a
22   state-issued ID -- photo ID?
23       A.  I'm not sure.  I'm -- I'm not sure.
24       Q.  Can you identify any Texas registered voters who
25   do not have a -- the documents necessary to get a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                                June 20, 2012

41

1    photo ID?
2         MS. ABUDU:  Objection, calls for
3    speculation.  And unless I'm misunderstanding your
4    question, I thought that's been asked and answered.
5         MR. HAYES:  My first question was, are you
6    familiar with the level of photo ID possession?  The one I
7    just asked was, do you know what the percentage of voters
8    who have a photo ID is in Texas?
9         MS. ABUDU:  Right.  And I -- and I thought
10   that, even before those two questions, you had covered
11   that area.  But -- you know, so my objection is asked and
12   answered.
13        But, Reverend Wright, you can answer it to
14   the best of your ability again.
15   A.   To the best of my ability, the numbers are not
16   large.
17   Q.   (BY MR. HAYES)  Do you know the specific
18   percentages?
19   A.   It would be speculative, but --
20   Q.   You don't know?
21   A.   I'm sorry.
22   Q.   That would be a no, you don't know?
23   A.   That would be -- yeah, that would be a no.
24   Q.   Do the Justice Seekers contend that Hispanics and
25   Latinos in Texas are more likely or less likely than

42

1    Anglos to currently possess federally issued photo IDs,
2    such as passports and citizenship certificates?
3    A.   That would be true, more likely.
4    Q.   So they are more likely to possess them than
5    Anglos?
6    A.   Who, Hispanics?
7    Q.   Yes.
8    A.   No.
9    Q.   Are you familiar with Dr. Shaw's survey results
10   submitted in his affidavit in this suit?
11   A.   No, I am not.
12   Q.   Isn't it true that the Justice Seekers have
13   intervened because some of its members strongly oppose
14   Senate Bill 14 rather than because its members lack a
15   photo ID required by Senate Bill 14?
16   A.   Well, that might not necessarily be true.
17   Q.   So are you saying that's not true?
18   A.   It's not -- not exactly true.
19   Q.   Could you explain what you mean by that?
20   A.   Well, some -- restate your question again.
21   Q.   Isn't it true that Justice Seekers have
22   intervened because some of its members strongly oppose
23   Senate Bill 14 rather than because its members lack a
24   photo ID required by Senate Bill 14?
25   A.   Well, that would be -- that would be true on both

43

1    sides.  We oppose it because of what the bill is, and
2    there may be some who do not have the proper ID.
3    Q.   Do you contend that the Texas legislature
4    intended to harm African-American voters by passing Senate
5    Bill 14?
6    A.   I don't think it was specifically for
7    African-Americans.  I think it may have been for the
8    Hispanic communities.  But within that, African-Americans
9    will -- will be -- cover the burden as well.
10   Q.   What do you base that belief on?
11   A.   On the way things are being done in the state of
12   Texas as it relates to the Hispanic community and the
13   African-American community.  We -- we've never had an
14   issue with voting rights up until now.  And when I say "up
15   until now" is that the population of the Hispanic
16   community has grown tremendously.  They would be
17   considered the silent majority.
18        Now, whether they're legal or not legal is a
19   -- is a different issue, but I think this is based on the
20   Hispanic community.  And by -- and because it is, the
21   African-American community will suffer.
22   Q.   So do you believe that the Texas legislature
23   intended to harm the Hispanic voters because of their --
24   their growing numbers; is that --
25   A.   Absolutely.  Absolutely.

44

1    Q.   Okay.
2    A.   I -- I think if the Hispanic population which is
3    now the silent majority was not, we would not be having
4    this discussion.
5    Q.   Can you point me to any facts other than the
6    growing Hispanic population that suggests that the Texas
7    legislature intended to harm Hispanic voters?
8    A.   History.  The only facts I can point you to is
9    history.  Over the last four or five, six, seven, eight --
10   well, since 2005 when they started this and it was -- it
11   did not go.  Prior to that, we never had a issue with --
12   with voters.
13   Q.   Is there anything else that you're basing your
14   belief on?
15   A.   No, sir.  Other than that, that's it.  It's
16   history and facts.  Historical facts, let me say it like
17   that.
18   Q.   Well, I -- I would like to clarify one of your
19   previous answers.  You said you do not believe that the
20   Texas legislature intends to directly harm
21   African-Americans, but I think you said that it will
22   indirectly harm them?  Is that a fair statement of what
23   you testified to?
24   A.   It will indirectly harm the African-American
25   community.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                          June 20, 2012

45

1    Q.   But do you believe that the legislature intended
2  to harm the African-American community?
3    A.   I would have to say yes.
4    Q.   What do you base that on?
5    A.   The -- on -- on the historical facts again.  The
6  constitutional right to vote was based -- was based off
7  the backs of the African-American community.  The Voters
8  Rights Act, and it -- it outlined discrimination in voting
9  practices.
10    Q.   Well, can I clarify by asking, what evidence do
11  you contend supports that the legislature intended to harm
12  African-Americans from this past legislative session?
13    A.   Because African-Americans in the past have always
14  had problems with getting IDs, and there's a lot of
15  African-Americans that are on fixed income who -- who have
16  voted for -- for 30 or 40 years and have never had to face
17  this issue.  As a young African-American many years ago, I
18  was not -- the only issue I had was to take a stand and be
19  a voice and go out and vote.  There was not any particular
20  practices that I had to go through in order to vote.
21    Q.   Do you contend that the Texas legislature
22  intended to harm Asian-American voters by passing Senate
23  Bill 14?
24    A.   I can't speak on behalf of the Asian community.
25    Q.   Do you contend that the legislature intended to

46

1  harm them?
2    A.   Because it is a growing population, they may have
3  been inclusive of what was taking place as well.
4    Q.   Do you contend that the Texas legislature
5  intended to harm poor people by passing Senate Bill 14?
6    A.   Yes.
7    Q.   What are you basing that contention on?
8    A.   On just what you said, on poor people who are on
9  fixed incomes, who -- who live from one poor paycheck to
10  the next poor paycheck who go out and vote because they
11  think that's the last right that they have and now that's
12  going to be violated.  And then people who are on fixed
13  incomes can't all of a sudden create monies to -- to -- to
14  do things -- to be allowed to do things that they've done
15  all of their lives for free.
16    Q.   What evidence do you have supporting that they
17  intended to harm poor people?
18    A.   What would be the -- what would be the basis --
19  what would be the purpose of having two IDs in a state
20  that you've been in all of your life?
21    Q.   Do you contend that the Texas legislature
22  intended to harm young people by the passage of Senate
23  Bill 14?
24    A.   Young people were inclusive of it as well.  It --
25  it -- they -- it affects them -- and it's sad because

47

1  they're allowed to get permits to -- to carry firearms,
2  but they won't be allowed to vote.
3    Q.   Do you believe that they intended to harm young
4  people?
5    A.   Yes.
6    Q.   Do you believe that they intend to harm young
7  people because young people are less likely to have the ID
8  required by Senate Bill 14?
9    A.   And that's true in the fact that young people are
10  the -- the next generation who will vote in the next
11  specific candidates in which we need to put in offices.
12  And, as you know, last -- the last election, and I say
13  this, young people voted at a large number.
14    Q.   I think we touched on this earlier, but do you
15  contend that the Texas legislature intended to harm
16  elderly persons by passing Senate Bill 14?
17    A.   Elderly people indirectly get hit.  It wasn't
18  targeted specifically for them, but indirectly, they're
19  going to suffer from it.
20    Q.   But that wasn't an intentional harm?
21    A.   Well, I -- my opinion, I -- I would not -- I
22  won't say it was or it was not.  But it had to be -- it
23  had to be thought of when they presented this bill, that
24  it would have an effect on the seniors, so I would have to
25  -- let me recant that and say, yeah, they intentionally

48

1  tried to do older folks too.
2    Q.   You're basing that on the fact that it was
3  brought to their attention by certain persons that --
4    A.   Absolutely.
5    Q.   -- it might not have a disparate --
6    A.   Absolutely.
7    Q.   Do you contend that the Texas legislature
8  intended to harm rural voters by passing Senate Bill 14?
9    A.   Yes.
10    Q.   Can you explain why you believe that?
11    A.   People who live in little rural communities don't
12  have access to going out and -- and they don't understand
13  why they're required to have two different IDs when they
14  stay in a little, small rural town, everybody knows them,
15  what would be the issue of them going out and having to
16  get a second ID in order to vote.  Indirectly, rural --
17  most of the people that you're naming are going to be
18  affected, and the state legislature, when they presented
19  this bill, they had to realize and understand and know
20  that.
21    Q.   Let me ask it this way:  Other than the alleged
22  effect of Senate Bill 14, do you have any other evidence
23  to support a contention that it was passed with a
24  discriminatory purpose?
25    A.   No, I do not at this time.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                                    June 20, 2012

49

1    Q.  Are you aware of the Supreme Court's opinion in
2  Crawford v. Marion County?
3    A.  No, I am not.
4    Q.  So I take it that the Justice Seekers did not
5  consider the Crawford decision when it decided to
6  intervene in this lawsuit?
7         MS. ABUDU:  Objection to the extent that
8  calls for information protected by attorney-client
9  privilege.
10        MR. HAYES:  I'm not talking about anything --
11        MS. ABUDU:  Well, I'm just -- I'm making the
12  objection, and, you know, to the extent that it does not
13  -- his answer -- Reverend Wright does not discuss or -- or
14  address issues that he spoke with with me or anyone in my
15  office.
16        You can answer to the best of your ability.
17    A.  Okay.  Can you ask the question again?
18    Q.  (BY MR. HAYES)  Sure.  Did the Justice Seekers
19  consider the Crawford decision at all when they decided to
20  intervene in this lawsuit?
21    A.  No, sir.  I -- I'm not familiar with it, so...
22    Q.  Are you familiar with the Supreme Court's
23  decision in the Northwest Austin case?
24    A.  No, sir.
25    Q.  Are there a large number of noncitizens on

50

1  Texas's voter rolls?
2         MS. ABUDU:  Objection, calls for
3  speculation.
4         You can answer to the best of your ability.
5    A.  To the best of my knowledge, I -- I'm not -- I
6  couldn't give you an answer to that.
7    Q.  (BY MR. HAYES)  Do you believe that Texas should
8  use its resources to attempt to remove noncitizens from its
9  voter rolls?
10    A.  Yes.
11    Q.  Would the Justice Seekers have supported Senate
12  Bill 14 if it had allowed for nonphoto IDs to be used to
13  vote?
14    A.  If -- if -- if -- let me -- let me think about
15  your question because that would be no need for the bill.
16  And so --
17    Q.  Are you familiar with the 2009 voter ID bill that
18  was offered, Senate Bill 362?
19    A.  Yeah, just -- just slightly -- just a little bit
20  about it, not a lot about it because I know it did not go
21  into effect.
22    Q.  Well, let me put it this way:  Are there any
23  circumstances in which the Justice Seekers would support a
24  law requiring presentation of a photo ID in order to vote?
25    A.  No.

51

1    Q.  I thank you for your time.  It's been a long day,
2  and I appreciate your patience.
3         MR. HAYES:  I have no further questions.
4         MS. ABUDU:  All right.  I just have a few
5  follow-up questions.  Do you want to take a break, though,
6  or --
7         THE WITNESS:  Can we take a break?
8         MS. ABUDU:  Okay.  Can we take a five-minute
9  break?
10        MR. HAYES:  Sure.
11        MS. MILLER:  Sure.
12        MS. ABUDU:  Yeah, just a few minutes.
13        (Break was taken from 2:26 p.m. to 2:31 p.m.)
14             EXAMINATION
15  BY MS. ABUDU:
16    Q.  All right.  Reverend Wright, now you are aware
17  that in the lawsuit that Texas filed seeking approval of
18  Senate Bill 14, the State of Texas also made a claim
19  challenging the constitutionality of Section 5 of the
20  Voting Rights Act, correct?
21    A.  That is correct.
22    Q.  And is it true that another motivation for the
23  Justice Seekers to be involved in the lawsuit is to defend
24  the constitutionality of Section 5?
25    A.  That is correct.

52

1    Q.  All right.  Now, earlier Mr. Hayes asked you
2  questions about possible motivations that the legislature
3  had in passing Senate Bill 14, correct?
4    A.  Correct.
5    Q.  And you made reference to historical facts in
6  your response, and would you please be more specific in
7  terms of which historical facts you're relating to?
8    A.  As far as racism and discrimination, it's a
9  concern in -- in the State of Texas?  Because we deal with
10  racism and discrimination on a daily basis.  East Texas,
11  for example -- and he mentioned rural communities -- is
12  like 1950 Mississippi.  We deal with racial issues in --
13  in those part of towns all the time.  As a matter of fact,
14  there's a -- there's a company in Paris, Texas; Port
15  Arthur, Texas; and Houston, Texas that is Turner
16  Industries that has filed the largest racial
17  discrimination lawsuit in the history of America.  And
18  that company is based out of East Texas.  And so racism
19  still is very popular in the state of Texas.
20    Q.  Are there any other historical facts that come to
21  mind at this time?
22    A.  We -- we -- I mean, we delve with some specific
23  cases, racism on jobs, mistreatment of African-American
24  men in rural towns, Linden, Texas.  We deal with it on a
25  daily basis.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Ronald Wright                                        June 20, 2012

53

1  Q.  Okay.  Thank you.
2      MS. ABUDU:  I have no further questions.
3      MR. HAYES:  I have one more follow-up
4  question, if I may.
5          FURTHER EXAMINATION
6  BY MR. HAYES:
7  Q.  Reverend Wright, you testified to your belief
8  that there was -- there are racial issues in South and
9  East Texas.  My question would be, do you impute the
10  actions of individuals to the Texas legislature?
11  A.  Be more specific with that, with --
12      MS. ABUDU:  Can you rephrase your question?
13  A.  Yeah, can you rephrase that question?
14  Q.  (BY MR. HAYES)  I believe you were citing two
15  instances where you are asserting that racial motivations
16  played a part, and I think you were talking about
17  employment and other areas.  My question was, do you
18  impute any kind of racial motivation on the part of a --
19  either a corporation or individual citizen of Texas to the
20  Texas legislature?
21      MS. ABUDU:  And just to clarify, by "impute,"
22  you mean that the Texas legislature in some way is
23  responsible or has a role in what is happening in those
24  areas?
25      MR. HAYES:  Yes.

54

1      MS. ABUDU:  Okay.
2  A.  Not necessarily.
3  Q.  (BY MR. HAYES)  Okay.  That answers my question.
4      MR. HAYES:  I have no further questions.
5      MS. ABUDU:  All right.
6      MS. MILLER:  No questions from us.
7      MS. ABUDU:  Okay.  And we would like to read
8  and sign the -- the deposition transcript.
9      MR. HAYES:  And you wanted to enter an
10  exhibit as well?
11      MS. ABUDU:  That's correct.  We would like to
12  enter -- I mean, it can just be Exhibit 3.  It doesn't
13  have to be defendant, intervenors.  Is Exhibit 3 fine with
14  you, Kevin?
15      MR. HAYES:  Yeah.  I would like to note that
16  the State of Texas is not waiving any objection to either
17  relevance or admissibility, so if -- because I haven't had
18  a chance to look at the document or see its contents.
19      MS. ABUDU:  Yeah.  And I just got this today,
20  and, like I said, unfortunately, no one from your office
21  is here today, so this is the best we could do.  But I'll
22  give it to the court reporter.
23      MR. HAYES:  I'd also like to reserve the
24  right to object to authenticity as well just for the same
25  reasons.

55

1      MS. ABUDU:  That's fine.
2      THE REPORTER:  Is that it?
3      MR. HAYES:  I believe so.
4      MS. MILLER:  Yes.
5      MS. ABUDU:  Yes.
6  (End of Proceedings at 2:35 p.m.)
7  (Exhibit No. 3 was marked.)

56

1          CORRECTIONS AND SIGNATURES
2  PAGE\LINE   CORRECTION        REASON FOR CHANGE
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  I, REVEREND RONALD WRIGHT, have read the foregoing
  deposition and hereby affix my signature that same is true
16  and correct except as noted herein.
     _____
17
         REVEREND RONALD WRIGHT
18       1:12-cv-00128
19
20  STATE OF TEXAS  )
     Subscribed and sworn to before me by the said,
21  witness, REVEREND RONALD WRIGHT, on this the _____
     day of _____, 2012.
22
23       _____
         NOTARY PUBLIC IN AND FOR
24       THE STATE OF TEXAS
  My Commission Expires:  _____
25

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS