IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK VEASEY, JANE                    )   CIVIL ACTION
HAMILTON, SERGIO DELEON,             )
FLOYD J. CARRIER, ANNA               )   NO. 2:13-CV-193 (NGR)
BURNS, MICHAEL MONTEZ,               )   [Lead case]
PENNY POPE, OSCAR ORTIZ, KOBY        )
OZIAS, JOHN MELLOR-CRUMLEY,          )
PEGGY HERMAN, EVELYN                 )
BRICKNER, GORDON BENJAMIN,           )
KEN GANDY, LEAGUE OF UNITED          )
LATIN AMERICAN CITIZENS              )
(LULAC), AND DALLAS COUNTY,          )
TEXAS,                               )
                                     )
        Plaintiffs,                  )
                                     )
V.                                   )
                                     )
RICK PERRY, GOVERNOR OF TEXAS        )
AND JOHN STEEN, TEXAS                )
SECRETARY OF STATE,                  )
                                     )
        Defendants.                  )

Yannis Banks - 6/4/2014

2

```
 1  UNITED STATES OF AMERICA,    )
                                 )  CIVIL ACTION
 2       Plaintiffs,             )
                                 )  NO. 2:13-CV-263 (NGR)
 3  TEXAS LEAGUE OF YOUNG VOTERS )  [Consolidated case]
    EDUCATION FUND, IMANI CLARK, )
 4  AND MICHELLE BESSIAKE,       )
                                 )
 5       Plaintiff-Intervenors,  )
                                 )
 6  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY     )
 7  COMMISSIONERS, HIDALGO       )
    COUNTY, AND MARIA LONGORIA   )
 8  BENAVIDES,                   )
                                 )
 9       Plaintiff-Intervenors,  )
                                 )
10  V.                           )
                                 )
11  STATE OF TEXAS, JOHN STEEN,  )
    in his official capacity as  )
12  Texas Secretary of State; and )
    STEVE McCRAW, in his official )
13  capacity as Director of the  )
    Texas Department of Public   )
14  Safety,                      )
                                 )
15       Defendants.             )
16
17
18
19
20
21
22
23
24
25
```

3

```
 1  TEXAS STATE CONFERENCE OF    )
    NAACP BRANCHES; and the      )  CIVIL ACTION
 2  MEXICAN AMERICAN LEGISLATIVE )
    CAUCUS OF THE TEXAS HOUSE OF )  NO. 2:13-CV-291 (NGR)
 3  REPRESENTATIVES,             )  [Consolidated case]
                                 )
 4       Plaintiffs,             )
                                 )
 5  V.                           )
                                 )
 6  JOHN STEEN, in his official  )
    capacity as Secretary of     )
 7  State of Texas; and STEVE    )
    McCRAW, in his official      )
 8  capacity as Director of the  )
    Texas Department of Public   )
 9  Safety,                      )
                                 )
10       Defendants.             )
11  BELINDA ORTIZ, LENARD TAYLOR, )  CIVIL ACTION
    EULALIO MENDEZ JR., LIONEL   )
12  ESTRADA; ESTELA GARCIA       )  NO. 2:13-CV-348 (NGR)
    ESPINOSA, LYDIA LARA,        )  [Consolidated case]
13  MARGARITO MARTINEZ LARA,     )
    MAXIMINA MARTINEZ LARA, AND  )
14  LA UNION DEL PUEBLO ENTERO,  )
    INC.,                        )
15                               )
         Plaintiffs,             )
16                               )
    V.                           )
17                               )
    STATE OF TEXAS; JOHN STEEN,  )
18  in his official capacity as  )
    Texas Secretary of State; and )
19  STEVE McCRAW, in his official )
    capacity as Director of the  )
20  Texas Department of Public   )
    Safety,                      )
21                               )
         Defendants.             )
22
23
24
25
```

4

```
 1  *********************************************
 2         ORAL REALTIME DEPOSITION OF
 3       THE TEXAS NAACP 30(B)(6) WITNESS
 4                 YANNIS BANKS
 5                  JUNE 4, 2014
 6  *********************************************
 7       ORAL REALTIME DEPOSITION OF YANNIS BANKS, produced
 8  as a witness at the instance of the DEFENDANTS, and duly
 9  sworn, was taken in the above-styled and numbered cause
10  on the 4th day of June, 2014, from 9:35 a.m. to
11  2:41 p.m., before STEVEN STOGEL, CSR in and for the
12  State of Texas, reported by machine shorthand, at the
13  Offices of the Texas Attorney General, 209 West 14th
14  Street, Austin, Texas, pursuant to the Federal Rules of
15  Civil Procedure and the provisions stated on the record
16  or attached hereto.
17
18
19
20
21
22
23
24
25
```

5

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFF TEXAS STATE CONFERENCE OF NAACP
    BRANCHES:
 3
        MS. AMY L. RUDD
 4      DECHERT LLP
        US Bank Tower
 5      633 West 5th Street, 37th Floor
        Los Angeles, California 90071-2013
 6      213.808.5700
        amy.rudd@dechert.com
 7        - and -
        MS. LINDSEY COHAN
 8      DECHERT LLP
        300 West 6th Street, Suite 2010
 9      Austin, Texas 78701-3902
        512.394.3000
10      lindsey.cohan@dechert.com
11
    FOR THE PLAINTIFF UNITED STATES OF AMERICA:
12
        MS. ANGELA J. MILLER
13      (Appearing via speaker phone)
        Trial Attorney
14      Voting Section
        Civil Rights Division
15      U.S. Department of Justice
        202.514.2919
16      angela.miller5@usdoj.gov
17
    FOR THE DEFENDANTS THE STATE OF TEXAS, RICK PERRY, JOHN
18  STEEN AND STEVEN McCRAW:
19      MR. STEPHEN L. TATUM, JR.
        Assistant Attorney General
20      Opinion Committee
        P.O. Box 12548
21      Austin, Texas 78711-2548
        512.463.2110
22      stephen.tatum@texasattorneygeneral.gov
23
    ALSO PRESENT:
24
        Mr. Steven Stogel, Court Reporter
25
```

6

1              I N D E X
2                                    PAGE
3 Appearances.....................     5
4
5 YANNIS BANKS
6      Examination by Mr. Klein...............     9
7      Examination by Ms. Rudd..................   183
8 Reporter's Certificate.........................   187
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1              EXHIBIT INDEX
2                                    PAGE
3 Exhibit No. 1...................................    15
       Notice of Deposition
4
       Exhibit No. 2.................................    19
5      National NAACP Mission Statement
6 Exhibit No. 3.................................    81
       Complaint for Declaratory and Injunctive
7      Relief Filed by the Texas State Conference
       of NAACP Branches
8
       Exhibit No. 4.................................   136
9      Senate Bill 14
10 Exhibit No. 5.............................   142
       Response of Plaintiffs Texas State
11     Conference of NAACP Branches and the
       Mexican American Legislative Caucus to
12     Defendants' Motion to Dismiss
13 Exhibit No. 6.................................   175
       5/25/12 Deposition of Yannis Banks
14
15
16
17
18
19
20
21
22
23
24
25

8

1        MR. TATUM:  Good morning.  My name is
2  Stephen Tatum.  I'm an Assistant Attorney General of the
3  State of Texas representing the defendants in this case.
4  The lead case is styled No. 2:13-CV-193, lead case
5  titled Veasey v. Perry in the Southern District of
6  Texas, Federal Court.
7        This is the deposition of Yannis Banks.
8  Did I pronounce that right?
9        THE WITNESS:  Yes, sir.
10        MR. TATUM:  All right.  It is about 9:35.
11  Today is Wednesday, June 4th, and we are here in Austin,
12  Texas at the Offices of the Attorney General, first
13  floor -- ground floor conference room.  At this point,
14  I've introduced myself.  I figure we can go around the
15  room -- this very large room with not very many people
16  in it -- and make introductions starting with Mr. Banks
17  here.  And we'll go down, and then we'll get the person
18  on the phone.
19        THE WITNESS:  Sure.  Yannis Banks, Texas
20  NAACP.
21        MS. RUDD:  Amy Rudd for the Texas NAACP.
22        MS. COHAN:  Lindsey Cohan for the Texas
23  NAACP.
24        MR. TATUM:  And joining us on the phone?
25        MS. MILLER:  I'm Angela Miller for the

9

1  U.S. Department of Justice.
2        MR. TATUM:  Okay.  Thank you.
3        YANNIS BANKS,
4  having been first duly sworn, testified as follows:
5        EXAMINATION
6  BY MR. TATUM:
7     Q.  All right.  Mr. Banks, would you please state
8  your full name for the record, please?
9     A.  Sure.  Yannis Kereldanladee Banks.
10        THE WITNESS:  And I can spell that if you
11  need me to.
12        THE REPORTER:  Please.
13     A.  Kereldanladee is K-E-R-E-L-D-A-N-L-A-D-E-E.
14     Q.  (By Mr. Tatum)  Thank you.  And, Mr. Banks,
15  where do you reside?
16     A.  Austin, Texas.
17     Q.  All right.  And, Mr. Banks, are you currently
18  employed?
19     A.  I am.
20     Q.  And where are you employed?
21     A.  Technically I'm self-employed, but I work for
22  the Texas NAACP.
23     Q.  Okay.  And the Texas NAACP -- I'm just going
24  to get this out of the way -- that is an affiliate of
25  the National NAACP.  Is that correct?

10

1   A.   Correct.
2   Q.   Okay.  For purposes of this deposition, I'm
3 going to be mostly referring to the Texas NAACP.  There
4 may be times when I just say NAACP, and when I say that,
5 I mean the Texas NAACP.  If I intend to refer to the
6 National NAACP, I will make that clear.
7   A.   Okay.
8   Q.   If at any time it's not clear, just let me
9 know.
10       Mr. Banks, have you ever been deposed
11 before?
12   A.   I have.
13   Q.   And how many times have you been deposed?
14   A.   Once.
15   Q.   Once.  And what was that case about?
16   A.   Voter ID about two years ago.
17   Q.   Was that the preclearance voter ID case?
18   A.   Yes.  The one in 2012, 2011, yes.
19   Q.   Okay.  So you've probably heard this spiel I'm
20 about to go through before, but I'm going to go ahead
21 and ask you a few preliminary questions and then go over
22 some ground rules that will control this deposition.
23   A.   Okay.
24   Q.   Is that okay?
25   A.   That's fine.

11

1   Q.   All right.  Mr. Banks, how are you feeling
2 today?
3   A.   I'm feeling pretty good.
4   Q.   All right.  Are you suffering from any illness
5 that would you affect your ability to provide accurate
6 and truthful answers to my questions?
7   A.   No.
8   Q.   Are you taking any medications that would
9 affect your ability to provide accurate and truthful
10 answers to my questions?
11   A.   No.
12   Q.   Is there anything else this morning that might
13 prevent you from accurately and truthfully answering my
14 questions?
15   A.   No.
16   Q.   Okay.  Those are the preliminary questions.  A
17 few ground rules.  As you remember from your past
18 experience, this is a deposition.  I'm going to be
19 asking you various questions, and I need you to provide
20 audible answers, both for all of us, those joining us on
21 the phone, as well as for the court reporter.  So if
22 it's a yes or no answer, don't nod your head or shake
23 your head.  Please say "yes" or "no."
24       On that note, please wait until I've
25 finished asking my question before you give your answer.

12

1 The idea is we don't want to talk over each other.  We
2 want the court reporter to be able to take an accurate
3 record, so please let me finish my question before
4 answering, and I will do -- or try to do the same for
5 you.  I realize this is a lot easier said than done.
6 There will probably be instances where we talk over each
7 other, in which case we'll just try to stop and speak
8 clearly and make sure everything is on the record.
9       I'm going to try and talk slowly.  There
10 may be times when I start talking fast.  If at any time
11 you need me to slow down, just say so.  If there's a
12 question that you didn't understand or any
13 clarification, say so, and I'll gladly rephrase.
14       There may be instances when your
15 attorneys object to a question I ask.  That's fine.  I
16 still need you to answer the question unless your
17 attorneys specifically instruct you not to answer.  Do
18 you understand?
19   A.   I do.
20   Q.   Okay.  And I didn't go over this beforehand,
21 but I imagine we'll take a break somewhere around 10:30
22 or so, depending on where we are, how we're doing.  If
23 at any time other than that you need to take a break,
24 just let me know, and we'll go off the record and take a
25 break.  Do you understand?

13

1   A.   I do.
2   Q.   Okay.  All right, Mr. Banks.  Are you
3 represented by counsel today?
4   A.   I am.
5   Q.   Okay.  Are they these two people sitting next
6 to you?
7   A.   They are.
8   Q.   Okay.  They made their introductions.  It's on
9 the record.  We know who they are.
10       What did you do to get ready for this
11 deposition today?
12   A.   I met with my attorneys, and we looked over
13 documents that we have submitted and have used, and I
14 have read over my old deposition and over some
15 information we turned over to y'all already.
16   Q.   In this case?
17   A.   In this case, yes.
18   Q.   Okay.  And when were those prep meetings held?
19 When was that?
20   A.   Monday.
21   Q.   Monday.  And about how long was that meeting?
22   A.   Oh, I think about two hours.
23   Q.   Was -- sorry.
24   A.   No, you're good.  Give or take two hours.
25   Q.   Give or take two hours.  Was anyone there

14

1 besides your attorneys?
2   A.  My other attorney, Gary Bledsoe, was there as
3 well.
4   Q.  He was there in person?
5   A.  He was there in person.
6   Q.  Okay.  And Gary Bledsoe, who is he?
7   A.  He is one of the attorneys in the case, as
8 well as the state president for the NAACP.
9   Q.  He's the state president for the NAACP?
10   A.  Yes, the Texas NAACP.
11   Q.  And he's an attorney as well?
12   A.  He is.
13   Q.  Does he represent the Texas NAACP in any other
14 matters?
15   A.  He has, yes.
16   Q.  Is he representing the Texas NAACP in this
17 case?
18   A.  Yes.
19   Q.  Okay.  Did anyone else join in that prep
20 meeting by phone?
21   A.  Another lady was there as well -- I'm sorry --
22 who I think is being deposed also.
23   Q.  Did she join by phone?
24   A.  She did.
25   Q.  Was there anyone else that you spoke to or met

15

1 with in preparation for this deposition?
2   A.  No.
3   Q.  Okay.  You mentioned that you reviewed the
4 documents that have been submitted or produced to the
5 defendants in this case in preparation for this
6 deposition.  Correct?
7   A.  Right.
8   Q.  Were there any other documents that you
9 reviewed that were not -- or that have not been produced
10 to the State in this case?
11   A.  Not that I'm aware of, no.
12   Q.  Okay.  Did you bring any documents with you
13 today?
14   A.  No.
15   Q.  Okay.  Is there anything else you did to
16 prepare for this deposition that you did not already
17 mention?
18   A.  No.
19   Q.  Okay.
20       MR. TATUM:  I'd like to give you a
21 document and mark it as Exhibit 1.
22       (Exhibit No. 1 marked)
23   Q.  (By Mr. Tatum)  I'm giving the same copy of
24 this document to your attorneys.
25   A.  Okay.

16

1   Q.  There you go.  Mr. Banks, do you recognize
2 this document?
3   A.  Let me look at it.
4       MR. TATUM:  And before I go further,
5 Angela, can you hear us okay over the speaker?
6       MS. MILLER:  Yes, I can hear you fine.
7 Thanks.
8       MR. TATUM:  Okay.  I forgot to check
9 that.  Thank you.
10   A.  Yes, I do.
11   Q.  (By Mr. Tatum)  You do recognize this
12 document?
13   A.  Yes.
14   Q.  And what is this document?
15   A.  I believe it's what y'all call a 30(b)(6)
16 or -- yeah, or at least the questions you wanted to ask
17 or something to that effect or --
18   Q.  Okay.  I'll represent to you this is the
19 30(b)(6) notice of this deposition --
20   A.  Okay.
21   Q.  -- for which we're here today.  And you have
22 seen this document before.  Correct?
23   A.  I have.
24   Q.  Okay.  If you would, please, turn to Page 5.
25   A.  Okay.

17

1   Q.  Under the heading titled "Matters"?
2   A.  Uh-huh.
3   Q.  Are you there?
4   A.  I am there.
5   Q.  Okay.  Now, this title "Matters" is followed
6 by a series of numbered paragraphs from 1 to 24.  If you
7 would, please, just take a quick minute to review those.
8 You don't have to read every single one.  Just kind of
9 read over them and make sure that these are the same
10 ones you saw before.
11   A.  Looks about right.
12   Q.  Okay.  Mr. Banks, now that you've had a chance
13 to review these, are you aware that you've been
14 designated by the Texas NAACP to testify on its behalf
15 regarding the topics covered in these numbered
16 paragraphs?
17       MS. RUDD:  And I just want to interpose
18 an objection and just state for the record we submitted
19 some objections -- after talking to Mr. Banks, we became
20 aware that there are certain topics that we just do not
21 have a witness to testify about.
22       MR. TATUM:  Okay.
23       MS. RUDD:  Those topics are Topics 3, 4,
24 and 18, but Mr. Banks is prepared to testify about the
25 remaining topics.

18

1       MR. TATUM:  Okay.  Thank you for bringing
2  that up.  I wasn't sure how I was going to segue into
3  that.  And on the topic of the objections, I just want
4  to clarify real quick, under objection to Matter 4, the
5  last sentence of that -- and this is for your
6  attorneys -- it says, "Texas NAACP states that it does
7  not create or maintain state-based membership lists and
8  cannot produce a witness to testify to Topic 3."
9       That is meant to say Topic 4.  Correct?
10      MS. RUDD:  Correct.
11      MR. TATUM:  Okay.  Just wanted to clarify
12 that.  I'm sure it's a small typo.  Just wanted to
13 clarify.
14      MS. RUDD:  It happens in discovery, as
15 you know.
16      MR. TATUM:  Yes.  Okay.  So Topics 3, 4,
17 and 18?
18      MS. RUDD:  Correct.
19      MR. TATUM:  All right.
20  Q.  (By Mr. Tatum)  Mr. Banks, other than
21 Topics 3, 4, and 18, are you aware that you've been
22 designated by the Texas NAACP to testify on its behalf
23 regarding every matter other than those three?
24  A.  Yes.
25  Q.  Okay.  And do you feel you are adequately

19

1  prepared to testify to those matters?
2  A.  Yes.
3  Q.  Okay.  Other than what you already told me
4  about your preparation for this deposition, is there
5  anything else you did to prepare specifically for your
6  testimony regarding these matters?
7  A.  No.
8  Q.  Okay.  Mr. Banks, are you familiar with the
9  complaint filed by the Texas NAACP in this lawsuit?
10  A.  I am.
11  Q.  Okay.  Do you feel like you are prepared to
12 testify about the factual bases of the Texas NAACP's
13 claims represented in that complaint?
14  A.  I do.
15  Q.  Okay.  Okay, Mr. Banks.  I'd like to take a
16 step back for a second and just talk about the Texas
17 NAACP generally.
18  A.  Sure.
19  Q.  On that note, I have another exhibit.
20      MR. TATUM:  I'd like to mark this as
21 Exhibit 2.
22      (Exhibit No. 2 marked)
23  Q.  (By Mr. Tatum)  Mr. Banks, do you recognize
24 this document?
25  A.  I do.

20

1  Q.  Okay.  Was this document produced to the
2  defendants in this matter?
3  A.  I believe so.
4  Q.  Okay.  What is this document?
5  A.  It's the mission and the vision statement of
6  the NAACP.
7  Q.  And is that the mission and vision statement
8  for the National NAACP?
9  A.  It's from the national website, yes, but it
10 applies to NAACP.
11  Q.  Okay.  So the mission statements and vision
12 statements expressed in this document are shared by the
13 Texas NAACP?
14  A.  Yes.
15  Q.  Okay.  And when I say "the Texas NAACP," I
16 mean the Texas Conference of NAACP branches.
17      MS. RUDD:  That's what we all mean, too.
18      MR. TATUM:  Okay.  Good.
19  Q.  (By Mr. Tatum)  All right.  I mentioned the
20 conference of Texas NAACP branches.
21  A.  Uh-huh.
22  Q.  How many branches in the state of Texas are
23 there, to the best of your knowledge?
24  A.  Oh.
25  Q.  And if you don't know the exact number, you

21

1  can give me a general estimate.
2  A.  A good estimate -- I would guess 80.  Might be
3  more.
4  Q.  Somewhere in the ballpark of 80 branches
5  within the state of Texas?
6  A.  Correct.
7  Q.  Okay.  And how are those individual branches
8  organized?
9  A.  Could you clarify --
10  Q.  Sure.
11  A.  -- I guess, what you mean?
12  Q.  Sure.  So take one of the more or less 80
13 branches.  What does one of those branches look like?
14 How is it organized?  What is its leadership structure?
15  A.  Okay.  So the branches, you will have your --
16 they have their individual local president who will be
17 the president over that branch.  We have the executive
18 committee, which is your secretary, treasurer, vice
19 president.  And depending on the branch size, they may
20 or may not have an assistant treasurer, assistant
21 secretary.  And they will have their executive
22 committee, which is made up of standing committees that
23 the different branches will have, which could be finance
24 and political action and education, et cetera.
25      And then you have your overall membership

Yannis Banks - 6/4/2014

22

1 of the branch as well.
2    Q.   Okay.  So within each branch, there is an
3 executive committee, secretary, et cetera.  Is that --
4    A.   Correct.
5    Q.   I understood you correctly?  Okay.  And are
6 these branches -- are they based centrally around cities
7 and towns, or are they by county or --
8    A.   Both.
9    Q.   Okay.
10    A.   Or I should say all of that.
11    Q.   Okay.
12    A.   I'm sorry.  It could be city.  It could be a
13 county branch.
14    Q.   Are there any cities in Texas, the large ones,
15 say Houston, San Antonio, DFW area that contain multiple
16 branches?
17    A.   Yes.
18    Q.   Okay.
19    A.   Yeah.
20    Q.   Okay.
21    A.   Well, say the question again.  I want to make
22 sure I answer that correctly.  I'm sorry.
23    Q.   Sure.  So within -- you know, I'm kind of
24 envisioning, you know, out in West Texas there are a lot
25 less people concentrated in West Texas than there are,

23

1 say, in central Houston.  I'm just wondering, you know,
2 if within the city limits of Houston, there is more than
3 one branch of the Texas NAACP, whereas in West Texas is
4 there one branch that covers that entire area.
5    A.   Okay.  No.  I'm sorry.  No.
6    Q.   Okay.  So there would be one branch that
7 covers Houston, one branch that covers Waco, one branch
8 that covers maybe multiple cities in West Texas that are
9 very small?
10    A.   Correct.
11    Q.   Okay.  And what is the relationship between an
12 individual branch -- let me back up.
13         Is there -- within the Texas NAACP, is
14 there kind of a central governing body over all the
15 various branches of the Texas NAACP?
16    A.   I don't know if you'd call it central
17 governing body.  We have the state conference, which is
18 what we are.
19    Q.   Okay.
20    A.   And state conference is -- it's comprised of
21 those individual branches.
22    Q.   Okay.
23    A.   So you have your makeup of the state
24 conference of the individual branches, but the branches
25 are able to do what they need to do for that local area.

24

1    Q.   Sure.  Okay.  And so does -- are there
2 meetings between the leaders of the various branches?
3    A.   What do you mean when you say, I guess,
4 "meetings."
5    Q.   I guess I'm just trying to get a sense of the
6 organization of the Texas NAACP.  We have the various
7 branches --
8    A.   Sure.
9    Q.   -- scattered amongst the state.
10    A.   Uh-huh.
11    Q.   And what I'm trying to figure out is if
12 there's kind of a central office that kind of governs
13 all those various branches.  In other words, do all
14 those various branches report to one place?
15    A.   They do.  Okay.  They do.  Which would be the
16 State Conference.
17    Q.   The State Conference?
18    A.   Right.
19    Q.   Okay.  And the State Conference is not its own
20 entity?  It's comprised of the various branches?
21    A.   The various branches and the state elected
22 officials, which -- and -- the Executive Committee of
23 the State Conference.
24    Q.   Okay.  And are you on that Executive Committee
25 of the State Conference?

25

1    A.   I am not.
2    Q.   You're not?  Okay.  About how many people are
3 on the Executive Committee of the State Conference?
4    A.   Rough estimate, probably maybe 15 on the
5 Executive Committee.
6    Q.   15 people on the Executive Committee?
7    A.   A rough estimate.
8    Q.   Okay.
9    A.   Just going through the top of my head, I would
10 say roughly about -- the Executive Committee is made up
11 of about 15.  Actually, no, it's probably going to be
12 more than that.  Let me take that back.
13         Because the Executive Committee would be
14 made up of -- so you have your elected officers, and
15 then you have your appointed committee chairs, and then
16 also the presidents from the local branches would be
17 part of the State Conference and the Executive
18 Committee, if I remember correctly -- and I may have to
19 verify that, but if I remember correctly, that's the
20 makeup.  So it would be a lot more than 15.
21    Q.   Okay.  So there are -- within the Executive
22 Committee of the State Conference there are elected
23 officers and elected chairs of the various committees
24 within the State Conference.  Is that correct?
25    A.   Appointed chairs.

Yannis Banks - 6/4/2014

26

1   Q.  Appointed chairs?
2   A.  Right.  There's elected officers and then just
3   appointed chairs.
4   Q.  And who appoints those chairs?
5   A.  The state president appoints the chairs.
6   Q.  Mr. Bledsoe?
7   A.  Mr. Bledsoe, yes.
8   Q.  Okay.  And who elects the officers?
9   A.  The officers are elected by the branches.  The
10  individual branches elect the officers.
11  Q.  Okay.  So let me just sum this up one more
12  time, and we can move on.
13  A.  Sure.
14  Q.  So the Executive Committee of the State
15  Conference is comprised of the president, Mr. Bledsoe --
16  A.  Uh-huh.
17  Q.  -- officers that are elected by the local
18  branches.  Is that correct?
19  A.  Well, Mr. Bledsoe would be one of the
20  officers.
21  Q.  Sure.
22  A.  So, yes, you have the officers that are
23  elected by the local branches.
24  Q.  And those officers serve on the State
25  Conference, and then when they're not doing that, they

27

1   go back to the local branches and assume their roles
2   there.  Is that correct?
3   A.  Yeah.  They're -- they are always, I guess, in
4   the capacity of -- they're the State Conference
5   whatever.
6   Q.  Sure.
7   A.  No matter whether in a meeting or not.  So
8   whether we're in a meeting or not, Gary is always the
9   state president.
10  Q.  Sure.
11  A.  So there's not really a go back and just be a
12  part of what's -- where you are.  You're going to be
13  representing -- you're with the State Conference no
14  matter where you are.
15  Q.  Okay.  I think I understand.  And then there's
16  the officers and committee chairs that are appointed?
17  A.  Correct.
18  Q.  And then the presidents of all the local
19  branches?
20  A.  Correct, make up the State Conference.
21  Q.  And is there a central office for the State
22  Conference?
23  A.  Yes.
24  Q.  And where is that?
25  A.  That's here in Austin, Texas.

28

1   Q.  Okay.  I want to talk a little bit about the
2   membership of the Texas NAACP.
3   A.  Okay.
4   MR. TATUM:  And I'll be asking my
5   questions with full reference to the agreement that's
6   been reached between Mr. Rosenberg and Ms. Wolf, I
7   believe.
8   MS. RUDD:  Perfect.
9   MR. TATUM:  So if I run afoul of that
10  agreement, please let me know.
11  Q.  (By Mr. Tatum)  I'd first like to ask:  How
12  does the Texas NAACP attract or recruit new members?
13  A.  Well, through the local branches is where the
14  membership things come from.  We may have information up
15  on our website that talks about different work that
16  we've done and why we do what we do, and our local
17  branches will get out and they'll do membership drives
18  in their local communities and recruit members to be a
19  part.  Or they may see -- somebody may know the work I
20  do and may see me and want to join and ask how to join.
21  Whenever they do any activities out in
22  the community, we've encouraged them to always encourage
23  or ask folks if they want to become members as well,
24  so -- and I think when they do just different events,
25  they go out and recruit.

29

1   Q.  Do they send -- as part of this outreach to
2   potential new members, do they send mass mailings or
3   any -- mass emails or any other kind of mass
4   communication?
5   A.  Not that I'm aware of.  They may, but it's
6   nothing that I am particularly aware of.
7   Q.  On a local level, do they visit college
8   campuses?
9   A.  Some of them do, yes.
10  Q.  If there is one in the area?
11  A.  Right.  Correct.
12  Q.  Do they visit high schools?
13  A.  Some of them will have high schools that they
14  work with and youth as well, yes.
15  Q.  Okay.  So if someone wants to become a member
16  of the Texas NAACP, what do they need to do to become
17  one?
18  A.  Fill out an application and pay the membership
19  fee, depending on age.  It ranges.  And then on the type
20  of membership they want as well, the price could range.
21  But that's about it.
22  Q.  So there are different levels of membership?
23  A.  There is.
24  Q.  Okay.  Can you just briefly describe the
25  difference between the different levels of membership?

30

1    A.   Sure.  So you have the youth membership, which
2  is from, you know, infant to I think 25, I believe,
3  which is, like, $15.  You have your adult membership,
4  which I think is 30.  And then you have your lifetime
5  memberships, and you have different levels of lifetime
6  memberships which have their different prices.
7    Q.   So there's no age limitation for becoming a
8  member?  You can become a member the day you're born?
9    A.   Yes.
10    Q.   Okay.  Do you have to be a U.S. citizen to be
11  a member of the Texas NAACP?
12    A.   No.
13    Q.   Do you have to be a Texas resident?
14    A.   I believe -- for the Texas NAACP?
15    Q.   Yes.
16    A.   I would say yes.
17    Q.   You mentioned that you do not have to be a
18  U.S. citizen.  Do you have to have a green card to be a
19  member of the Texas NAACP?
20    A.   We don't ask.  We don't check.
21    Q.   And you mentioned an application fee.  Are
22  there any kind of annual dues that are required?
23    A.   Well, when I said the fee, yeah, that's the
24  annual dues, a fee that you pay.
25    Q.   Okay.

31

1    A.   Unless it's lifetime, then it's -- once you're
2  lifetime, your membership is paid up.
3    Q.   Right.  But if you're not on the lifetime
4  plan, you'll have annual dues?
5    A.   You have annual dues, yes.
6    Q.   Okay.  Are members issued any kind of
7  membership card?
8    A.   They are.
9    Q.   Does that card have a photograph of the member
10  on it?
11    A.   No.
12    Q.   Does the Texas NAACP hold events or activities
13  that are for members only?
14    A.   I think most events are open to the public.  I
15  think that when you do the Executive Committee meeting
16  they can have an executive session when it's just for
17  Executive Committee.
18    Q.   Sure.
19    A.   But I -- nothing I'm recalling has just been a
20  members only event.
21    Q.   Okay.  Does the Texas NAACP offer, as part of
22  its membership, any kind of benefit or service that are
23  available only for members?
24    A.   Yes.
25    Q.   And what are those kinds of services or

32

1  benefits?
2    A.   If I remember the program right, I think we
3  had actually partnered with the State, and there's a
4  prescription card that members can get to get a discount
5  on prescriptions from your local pharmacy.  My brain
6  shut down.  Yeah, from your local pharmacy, so --
7    Q.   And for a service or benefit like that that's
8  offered only to a member, if a member wants to avail
9  themselves of such a benefit or service, how do they
10  prove that they are a member of the Texas NAACP?
11    A.   Their membership card.
12    Q.   They just show their membership card?
13    A.   Yeah.
14    Q.   And that's it?
15    A.   That's all they need.  And I think they
16  have -- and they will get the discount prescription card
17  that they have, but --
18    Q.   And to get a membership and the accompanying
19  membership card, what kind of information does the
20  applicant need to fill out on the application?
21    A.   It was up on our website, and I haven't looked
22  at that in a while.
23    Q.   Okay.  To the best of your knowledge, do you
24  have to enter in an address?
25    A.   I really can't remember, because we have folks

33

1  who will handle that form.  We have the different agents
2  and people that they can talk to, so I don't have to
3  deal with it --
4    Q.   You've never seen the application form?
5    A.   If I've seen it, it's been years.  The program
6  was started maybe in 2011, maybe in 2010-ish area.  So I
7  haven't -- if I've seen it, it's been a while, and I
8  haven't paid it much thought and looked at it much.
9    Q.   Okay.  So you aren't entirely familiar with
10  what kind of information goes on an application to
11  become a member of the Texas NAACP?
12    A.   No, not the Texas -- for that program.  I'm
13  sorry.  Were you talking about something --
14    Q.   Yes.  Let me back up.  I'm referring to the
15  application if one wants to become a member of the Texas
16  NAACP.
17    A.   Okay.
18    Q.   A card carrying member of the Texas NAACP --
19    A.   Got you.
20    Q.   -- they must fill out an application and pay
21  an application fee that you mentioned?
22    A.   Correct.
23    Q.   What I'm asking is what kind of information is
24  required on that application?
25    A.   Oh, okay.

34

1    Q.   Sorry if I didn't make that clear.
2    A.   Not a problem.  Their name, address, date of
3  birth, and that's all I remember.
4    Q.   Are they required to enter a Social Security
5  number?
6    A.   No, not that I recall.
7    Q.   Is there any other information on there that's
8  required to -- anything else you can think of?
9    A.   How you're paying, I guess.
10   Q.   Method of payment?
11   A.   Method of payment, yeah.
12   Q.   Does the Texas NAACP serve only members?
13   A.   What do you mean when you say "serve"?
14   Q.   Are there people that receive the benefit of
15  the Texas NAACP services and activities who are not
16  card-carrying members of the Texas NAACP?
17   A.   Yes.
18   Q.   Would you call those people constituents?
19   A.   Yes, I would.
20   Q.   Okay.  Generally describe the difference
21  between a constituent and a member.
22   A.   A member has paid the dues, fees, to become a
23  part of the organization.  Constituents are those who we
24  serve, whether they're a member or not.  You don't have
25  to be a member to get our services or our help.  If you

35

1  need help with something, it's not something we hold you
2  -- we don't say, "Are you a member?"
3            "No."
4       "Can't help you."
5            It doesn't matter.  If you need our
6  assistance, we assist.
7    Q.   So for one of these people who is not a member
8  who you would call a constituent, if they need your
9  assistance or help, there are ways they can come to you
10  or to their local branch --
11   A.   Correct.
12   Q.   -- whatever, for assistance with whatever
13  they're dealing with?
14   A.   Correct.
15   Q.   Okay.  Can you recall any specific type of
16  services that have been provided to nonmembers by the
17  Texas NAACP?
18   A.   Well, yeah.
19   Q.   Can you give me an example?
20   A.   Sure.  It's not a problem.  Part of doing
21  legislative session, when we're advocating for issues
22  that are important to the African-American community.
23  It's not just for these are the issues that are
24  important to the NAACP membership.  It's saying this is
25  what the concern is of that community.  And that's a

36

1  service that they get from us without saying, "Well,
2  don't worry about that population."  So we want to cover
3  all of them.
4            There has been instances here in Austin
5  where you've had police shootings of citizens, and the
6  local president here doesn't go check with the family
7  and see are you a member before he says, "This is
8  wrong," or what have you.  If it's wrong, it's wrong.
9  There's no checking or do a background check before you
10  see are you a member, put up a membership list --
11  anything.  You go forward.  You act.
12            We did a finance seminar maybe a couple
13  months ago, and it was to the public.  Anybody who wants
14  to come, we'll talk about how -- to get -- help with you
15  getting your credit right or this, that, or the other.
16  There is not screening to see if you're a member on
17  that.  We just do it.
18   Q.   And you advertise events like that on your
19  website and --
20   A.   On the website, Facebook -- I should say
21  social media.
22   Q.   Sure.
23   A.   Word of mouth.
24   Q.   And by social media, you mean Twitter?
25   A.   Twitter, Facebook --

37

1    Q.   Instagram?
2    A.   All that good stuff.  I don't know too
3  much about -- well, maybe not Instagram, but --
4    Q.   Various kinds of social media?
5    A.   Correct.
6    Q.   Okay.  Does the Texas NAACP hold regular
7  meetings?
8    A.   We do.
9    Q.   And how often are those meetings held?
10   A.   Quarterly.
11   Q.   Quarterly.  And where are they held?
12   A.   Various locations around the state.  It's
13  never one specific all the time.
14   Q.   So they can be held at the central offices of
15  various branches?
16   A.   Right.  Any city or county that has an active
17  branch, we can go there for our quarterly meeting.
18   Q.   And that quarterly meeting covers business
19  relating to the entire State Conference?
20   A.   Yes.
21   Q.   Okay.  Where was the last one held, if you
22  recall?
23   A.   Where was it?  It was -- it was in East Texas,
24  but I can't remember the exact city.
25   Q.   And who attends those meetings, generally?

Yannis Banks - 6/4/2014

38

1      A.   Generally it's the elected officers, the
2  Executive Committee chairs, and the branch presidents
3  attend those meetings, generally, and then members of
4  the local committee, local chapters that may be
5  interested in what's happening are welcome to attend as
6  well.
7      Q.   Are there guest speakers or politicians that
8  attend those meetings?
9      A.   At the discretion of I guess the president or
10  the local chapter, there can be, depending on if there
11  is I guess information that needs to be given out.  Of
12  course, sometimes you have mayors or officials who want
13  to come and say welcome to wherever we are.  In that
14  aspect, they'll say -- they'll come out and say,
15  "Welcome.  Glad to have you.  Enjoy the city for the
16  short time that y'all are going to be here, or those
17  that are spending the night," you know, but --
18      Q.   Do Texas legislators ever attend those
19  meetings?
20      A.   Not generally, no.
21      Q.   Not generally, but they have?
22      A.   Not that I recall.
23      Q.   I guess I'll ask, then:  How long have you
24  been involved with the Texas NAACP?
25      A.   Define involvement, I guess.  As --

39

1      Q.   Well, I'll get to that.
2      A.   Okay.
3      Q.   We'll come to that.  I have some other
4  questions first.
5      A.   Not a problem.
6      Q.   At these quarterly meetings, generally what
7  kind of topics are discussed?
8      A.   There could be so many topics.  We will go
9  over of course business of the organization.  We will
10  talk about -- we've talked about redistricting, voter
11  ID, police misconduct.  Since we have the different
12  committee chairs, we've covered health care issues and
13  health issues, economic development in cities, and that
14  can go from having -- having banks in your city or
15  payday lending concerns, issues.  We can talk about the
16  legislative session and what's upcoming.  Just off the
17  top of my head, those are what I remember.  There could
18  be much more.  National convention, state convention,
19  just the business of the organization.
20      Q.   Would any kind of -- let me back up.  At these
21  quarterly meetings, is there ever any discussion of
22  litigation in which the Texas NAACP is involved?
23           MS. RUDD:  And I just want to caution
24  you, Yannis, not to reveal any communications that the
25  Texas NAACP may have had with Mr. Bledsoe or any of the

40

1  attorneys about litigation.  But you can answer
2  generally whether discussions like that took place.
3           THE WITNESS:  Sure.
4      A.   Say the question again, just so I can make
5  sure I --
6      Q.   (By Mr. Tatum)  Sure.  At these quarterly
7  meetings, is the topic of litigation that the Texas
8  NAACP may be involved in at the time ever discussed
9  openly?
10      A.   It is discussed, yes.
11      Q.   Okay.  And are lawyers present during those
12  discussions?
13      A.   Yes.
14      Q.   And is legal advice given during those
15  discussions?
16      A.   Define legal advice, I guess.
17      Q.   That's a great question.  There are varying
18  degrees of legal advice.
19           Is there ever any information given to
20  you by lawyers regarding such litigation topics
21  discussed at these quarterly meetings?
22           And let me -- before you answer that, let
23  me go ahead and narrow it down further.
24      A.   Sure.
25      Q.   I'm being vague.  Take, for instance, this

41

1  case.
2      A.   Uh-huh.
3      Q.   Am I correct in summarizing your testimony
4  that at these quarterly meetings, y'all might discuss
5  this case or this case may have been discussed?
6      A.   I would say that at quarterly meetings we've
7  talked about different cases.  And I've missed, like,
8  the last quarterly meeting, so it's possible, but I
9  wasn't able to attend to hear what was said about this
10  case.
11      Q.   Okay.  And you stated earlier that lawyers do
12  attend these meetings and they are present during the
13  discussions of cases such as this?
14      A.   Correct.
15      Q.   And they may offer their general opinions
16  about such cases.  Is that correct?
17      A.   The lawyers who have been there would give
18  information --
19           MS. RUDD:  Whoa.
20           THE WITNESS:  Oh, sorry.
21           MS. RUDD:  Okay.  Yannis, you can answer
22  as to whether lawyers have been present.  You can answer
23  as to whether lawyers have given legal advice or
24  opinions, but I don't want you to reveal the substance
25  in terms of what they said about legal advice or

Yannis Banks - 6/4/2014

42

1 opinions. Okay?
2        THE WITNESS: Right. Right.
3    A.  Yes, I would say the lawyers would more than
4 likely be giving legal advice.
5    Q.  (By Mr. Tatum) Okay. Now, are there minutes
6 of these meetings kept?
7    A.  There are.
8    Q.  And are those minutes available to the public?
9    A.  I don't know. I'm not sure. I don't --
10   Q.  Are any portions of these meetings broadcast
11 online or on TV?
12   A.  No.
13   Q.  Are these meetings open to the public?
14   A.  Yes.
15   Q.  Are there any portions of the meetings that
16 are not open to the public?
17   A.  I think it's capable of happening, but for the
18 most part, it's been open.
19   Q.  If the Executive Committee wanted to, they
20 could limit a portion of those meetings to only members?
21   A.  Correct.
22   Q.  Okay. Or only to the Executive Committee
23 itself?
24   A.  Right. Correct.
25   Q.  Okay. Now, you touched on this earlier,

43

1 talking about the various activities that local branches
2 of the Texas NAACP engage in in order to fulfill its
3 mission, and I just want to ask you a little bit more
4 about that.
5        Does the Texas NAACP -- and that includes
6 the State Conference -- centrally and any of its local
7 branches -- do they regularly engage in fundraising?
8    A.  Yes.
9    Q.  Do they regularly engage in political action
10 drives?
11   A.  What do you mean when you say "political
12 action drives"?
13   Q.  Do they regularly engage in any kind of
14 community outreach effort in order to drum up support
15 for any kind of political initiative or policy goal?
16   A.  Nonpartisan work. So if anything would inform
17 people who may be running for office, both sides or all
18 sides, depending on how many people, or any policy
19 initiative on the ballot, but it's nonpartisan. It's
20 not saying, "Vote for this candidate over this person,"
21 never. Never that.
22   Q.  The Texas NAACP, they never endorse a specific
23 political candidate?
24   A.  We do not.
25   Q.  At both the state and local levels?

44

1    A.  Correct. We don't get involved in -- when you
2 say "local," you mean local branches. Right?
3    A.  No. I mean like local elections like the
4 District Attorney, county judge --
5    A.  We don't get involved in any of the local
6 elections.
7    Q.  Okay. Is that a stated policy of the Texas
8 NAACP, to the best of your knowledge?
9    A.  Yeah.
10   Q.  Is that shared by the National NAACP?
11   A.  It's jurisdiction wide, so I would say yeah.
12   Q.  Okay. So the National NAACP does not
13 encourage its various state conferences to engage in any
14 kind of political support for individual candidates?
15       MS. RUDD: Objection; calls for
16 speculation.
17   Q.  (By Mr. Tatum) You can answer.
18   A.  Yeah, it's a national standing that we do not
19 endorse any kind of political candidates.
20   Q.  Okay. Does the Texas NAACP regularly engage
21 in phone bank drives in order to get messages out to its
22 membership, its constituent base, any kind of organized
23 phone bank drive where there's a list of phone numbers
24 that people need to call to send messages out or get
25 information out?

45

1    A.  I wouldn't say regularly.
2    Q.  Okay. But they do engage in that kind of
3 activity?
4    A.  It's been done once or twice.
5    A.  Since you've been there?
6    A.  Yes.
7    Q.  And again, we're going to get to that in a
8 second.
9    Okay.
10   Q.  Does the Texas NAACP regularly engage in the
11 monitoring of legislative proposals during each Texas
12 legislative session?
13   A.  How would you define "monitoring"?
14   Q.  Do they track proposed bills and track where
15 they are in the legislative process?
16   A.  Yes.
17   Q.  Are you involved in that process?
18   A.  I am.
19   Q.  Does the Texas NAACP regularly engage in any
20 job fairs, networking events, any kind of professionally
21 tailored events like that for its membership or
22 constituents?
23   A.  No.
24   Q.  Does the Texas NAACP have in-house counsel?
25 You mentioned that Mr. Bledsoe is an attorney who

Yannis Banks - 6/4/2014

46

1  represents the Texas NAACP.  Does he serve as kind of
2  the general counsel for the Texas NAACP?  Are there --
3  sorry.  Answer that question.
4      A.  We have I guess a legal redress committee.
5      Q.  A legal --
6      A.  Legal redress committee.
7      Q.  Redress committee?
8      A.  Uh-huh.  So we have our legal redress chair,
9  but I would say -- when you say "in-house counsel," I
10  guess what do you --
11      Q.  Is there someone who is on the Executive
12  Committee of the Texas NAACP or who otherwise is
13  employed or participates in the governance of the Texas
14  NAACP who serves or who represents the Texas NAACP in
15  any legal matter?
16      A.  Yes.
17      Q.  And you seemed to indicate that there's
18  actually an office of people like that.
19      A.  I wouldn't call it an office, no.
20      Q.  Okay.
21      A.  That was a committee position.  But normally
22  it would be Gary Bledsoe and Robert Notzon.
23      Q.  Robert Dodson?
24      A.  Notzon.  N-O-T-Z-O-N.  I think I spelled his
25  name right.  N-O-T-Z -- that seems right.

47

1      Q.  N-O-T-Z-O-N?
2      A.  Uh-huh.
3      Q.  Are you aware if Mr. Notzon was included on
4  the list of initial disclosures?
5          MR. TATUM:  You might be able to answer
6  that.
7      A.  I think he is one of the attorneys
8  participating in this case.
9          MS. RUDD:  And I don't know the answer to
10  that, but we'll get you the answer --
11          MR. TATUM:  Okay.
12          MS. RUDD:  -- in the course of this
13  deposition.  Okay?
14          MR. TATUM:  Sure.
15          MS. COHAN:  He is listed as counsel in
16  this case.
17          MR. TATUM:  He is?
18          MS. COHAN:  Yes.
19          MR. TATUM:  Okay.  Thank you.
20      Q.  (By Mr. Tatum)  Okay.  Now I want to ask more
21  specific questions to you regarding your role in the
22  Texas NAACP.  What is your official title at the Texas
23  NAACP?
24      A.  So my official title changes from day to day,
25  because I'm one staff person.  So you can call me staff,

48

1  if it works.  I handle so many issues for them.  During
2  the session, I handle the legislative issue, office
3  manager -- master, executive assistant, so it varies.
4      Q.  So you wear many hats within the Texas NAACP?
5      A.  I do.
6      Q.  And just to summarize that, you mentioned
7  office manager, legislative liaison -- would that be an
8  accurate description of one of your hats?
9      A.  Office manager, executive -- legislative
10  liaison, yes.
11      Q.  And executive assistant?
12      A.  Executive assistant, driver.  You know,
13  whatever needs to be done, I kind of do it.
14      Q.  Got you.  When did you become a member of the
15  Texas NAACP?
16      A.  I can't remember.  In 1998.  Feels right,
17  yeah.
18      Q.  And when did you begin your employment with
19  the Texas NAACP?
20      A.  My employment was May of '07.  May or June of
21  '07.
22      Q.  So summer 2007?
23      A.  Yes.
24      Q.  Okay.  To the extent that there is a typical
25  day in your job with the Texas NAACP, can you describe

49

1  what that typical day is like?
2      A.  Sure.  I go to the office.  I will check my
3  emails to see if I've gotten any emails from Gary or
4  anybody about anything they need, check the phones,
5  attend meetings that may have been set up by different
6  people.  And I guess that's about as typical as it --
7  being in contact with Gary or some of the other members
8  about anything that may pop up.  I do some research for
9  them and see if there are any issues or anything they
10  need to be aware of and send out an email or phone call
11  or what have you to them saying, "Hey, FYI, here is
12  something for you."
13          And any information that the local
14  branches may need, shoot that to somebody and say, "This
15  might be a good program for your community," or what
16  have you, so --
17      Q.  So do you regularly interact with Gary
18  Bledsoe?
19      A.  Pretty much, yes.
20      Q.  On a daily basis?
21      A.  Yes.
22      Q.  Do you manage anyone?
23      A.  Just myself.
24      Q.  Just yourself?
25      A.  Just myself.

Yannis Banks - 6/4/2014

50

```
1    Q.  Who would you say you report to?
2    A.  Gary Bledsoe.
3    Q.  Gary Bledsoe.  Do you report to anyone else
4  besides Gary Bledsoe?
5    A.  The state secretary as well.  So I would be in
6  contact with her, Linda Lydia.
7    Q.  Okay.  So more or less, you have one boss?
8    A.  I have multiple bosses.
9    Q.  Multiple bosses?
10   A.  I would say yes.
11   Q.  Okay.  I can relate.
12           What kind of -- to the best that you're
13  able to describe, what kind of decision-making authority
14  do you have within the Texas NAACP?
15   A.  I guess it depends on the level that we're
16  dealing with.
17   Q.  Can you describe something -- some kind of
18  activity, some area over which you would have final
19  decision-making authority?
20   A.  Sure.  Well, I guess -- you know, if I need
21  supplies for the office, I am able to just go ahead and
22  order them.  Nothing too major but, you know, I can do
23  that.  During the legislative session, if there's a --
24  not like a major bill, but a bill we would support, I'm
25  able to go and say, "This is actually a good bill.  Here
```

51

```
1  is why."  Or if there's a bill that would be a concern,
2  say, "This is a bill we would have a concern with, and
3  here is why."  Not if it's anything really, really big
4  or controversial, but small, on that level.
5           And if I need to -- if somebody wants to
6  have a meeting with me, I'm able to say, "Okay.  I can
7  meet you on this date, at this time," and it's fine, as
8  long as it's within the city.  If I need to go out of
9  the city, I need to get clearance, of course.
10          That's about all I can think of right
11  now.
12   Q.  Are you in regular communication with the
13  local branches?
14   A.  Not all of them.
15   Q.  Are you assigned a particular number of local
16  branches that you're in charge of --
17   A.  No.
18   Q.  -- maintaining communication lines with?
19   A.  No.
20   Q.  If one of the local branches calls in and they
21  need to talk to someone and you happen to be there,
22  you'll --
23   A.  Oh, yeah.  I'll talk to them, yes.
24   Q.  Okay.
25          MR. TATUM:  Do you want to stop for a
```

52

```
1  moment?  It's 10:30.
2           MS. RUDD:  Sure.
3           MR. TATUM:  Is everyone doing okay?  Do
4  we need a short break?
5           MS. RUDD:  That would be fine.
6           MR. TATUM:  Okay.  So we'll go off record
7  and take five, ten minutes, if that's okay.
8           MS. RUDD:  Perfect.
9           MR. TATUM:  All right.
10          MS. MILLER:  Okay.  Thanks.
11          (Recess from 10:32 a.m. to 10:44 a.m.)
12   Q.  (By Mr. Tatum)  All right, Mr. Banks.  Before
13  we broke, you mentioned that one of the various hats you
14  wear at the Texas NAACP is that of legislative liaison.
15  Correct?
16   A.  Yes.
17   Q.  Okay.  I want to ask you a little bit more
18  about that.
19   A.  Sure.
20   Q.  And you kind of touched on it briefly, but
21  could you describe again what kind of responsibilities
22  or duties you carry out as legislative liaison for the
23  Texas NAACP?
24   A.  Sure.  So I would go to the Capitol and
25  represent I guess the interest or the position of the
```

53

```
1  thoughts that the Texas NAACP may have on specific bills
2  that come up.  I would reach out to legislators to say,
3  "Hey, I see this bill may be filed.  This is a good
4  idea.  We support it," or, "It's a bad idea.  Could you
5  make a change here or there, because we think that this
6  will cause a problem to the African-American community,
7  and not just the African-American community, but for a
8  lot of other folks in Texas as well."
9           I would watch to see if any harmful bills
10  are being passed and how -- and I find politics to be
11  funny, so a lot of this is humor for me as well to
12  watch -- the Texas House floor debates a lot of times
13  are very interesting and can be intense, so I enjoy
14  sitting and watching those as well and just watching and
15  observing and tell Gary and the political action chairs,
16  committees we have, I'll go back and tell them, "Well,
17  this is what was said by somebody on this bill," or,
18  "This bill came out of one chamber or is being heard.
19  It does this.  What are your thoughts on it?  Do you
20  have any feelings one way or the other?"  And if so, we
21  can let it be known if I need to go and testify on our
22  behalf and say, "Well, you know, real quick, this is why
23  we feel this way or that way.  If you were to change it,
24  we could probably go along with it if you make this
25  change or that," or if it's going to be a bad idea.
```

Yannis Banks - 6/4/2014

54

1    Q.   So you represent the interests of the Texas
2  NAACP at the Capitol during legislative sessions?
3    A.   I should say myself, and Gary will come over
4  from time to time as well.
5    Q.   Does anyone else come with you?
6    A.   It's normally just me.
7    Q.   Or Gary?
8    A.   Or Gary.  And sometimes it's both, especially
9  if it's something big.
10    Q.   And y'all meet individually and in person with
11  various legislators?
12    A.   We have in the past, yes.
13    Q.   You meet in their office?
14    A.   In their office, yes.
15    Q.   Okay.  And are there any materials exchanged?
16  Do you bring summaries of your concerns, recommended
17  changes to proposed bills, proposed new bills, anything
18  like that?
19    A.   I don't think I've proposed any -- had
20  anything written down for new bills.  I may have notes
21  jotted down or things I want to make sure I say.  They
22  only give you, like, three minutes for a lot of those
23  committees, so you have to try to be focused.  So I
24  wouldn't say there's any new bills, but Gary may
25  have -- if he's testifying, he normally has his

55

1  testimony written out that he may submit, but I wouldn't
2  say any, like, new bills that have been brought over
3  to --
4    Q.   Do you ever testify?
5    A.   I do.
6    Q.   When was the last time you testified?
7    A.   Last session, special session.
8    Q.   During the 83rd Legislature, 2013?
9    A.   2013, I'm sorry.  Yes.  I couldn't give you
10  the exact date, but I did testify during the -- I know
11  during the first called special session.  I think maybe
12  during the second, but I'm not 100 percent on that one.
13    Q.   And your testimony was in relation to what
14  kind of bill -- or what bill specifically, if you
15  remember?
16    A.   The last time I testified?
17    Q.   Yes.
18    A.   From what I remember would have been
19  redistricting.
20    Q.   Did you testify in relation to Senate Bill 14
21  during the 2011 Legislature?
22    A.   I want to say yes.
23    Q.   You did?
24    A.   I want to say yes.
25    Q.   How many times did you testify?

56

1    A.   I want to say during the House committee
2  hearing, I believe I testified then.
3    Q.   So again, you said your employment with the
4  Texas NAACP goes back to 2007.
5    A.   Uh-huh.
6    Q.   That would have been the -- the 80th
7  Legislature, did you testify -- or did you serve as
8  legislative liaison for the Texas NAACP during that
9  session?
10    Q.   Was the 80th during '07?
11    Q.   2007, I believe.
12    A.   I interned for them during the 80th.
13    Q.   You were an intern for the Texas NAACP?
14    A.   Right, nonpaying intern.
15    Q.   Okay.  Did you become -- did you serve as
16  legislative liaison during the 2009 Legislature?
17    A.   Yes.
18    Q.   And the 2011 and the 2013?
19    A.   Yes.
20    Q.   Okay.  So in 2007, you started as an intern?
21    A.   Correct.
22    Q.   And how long were you an intern before you got
23  your full-time position?
24    A.   Started in January, I believe.  So I guess
25  that's five, six months, give or take.

57

1    Q.   Okay.  During the legislative session, do you
2  meet with any other organizations or groups?
3    A.   I have, yes.
4    Q.   On behalf of the Texas NAACP?
5    A.   Yes.
6    Q.   And can you give me -- can you name some of
7  those organizations or groups?
8    A.   Over any specific issue, or just in general?
9    Q.   In the normal course of representing the
10  interest of the Texas NAACP during a legislative
11  session, do you have regular meetings or interaction
12  with other groups that might share the interest of the
13  Texas NAACP?
14    A.   I wouldn't always say regular meetings, but we
15  have scheduled meetings with different groups if we see
16  we have like interests on certain topics.
17    Q.   Can you give me examples of some of those
18  other groups?
19    A.   Sure.  In the past, we've actually -- well,
20  did we meet them during this session?  I might have.  I
21  know I've met with actually TAB before.
22    Q.   Say that again.
23    A.   I think it's TAB, Texas Association of
24  Business.  I think I have met with them before I think
25  during the session.  I know I've met with Mr. Hammond

58

1 before, but I think actually it was during the session.
2 MALDEF.  I have met with League of Women Voters.
3 Q.  I'm sorry.  The League of Women Voters?
4 A.  Yes.  ACLU.  I've met with -- those are just
5 some of the organizations I can remember off the top of
6 my head.
7 Q.  Since 2007, have you tracked, monitored or
8 testified in relation to any voter ID requirements bill?
9 A.  Yes.
10 Q.  Do you remember specific bills that you
11 testified to?
12 A.  Well, I would say Senate Bill 14, and I don't
13 remember the other -- I know there have been other, I
14 guess, voter ID bills.
15 Q.  Do you recall if you testified to Senate
16 Bill 362 in 2009, I believe?
17 A.  I would have to see what that bill is.  I
18 don't want to say yea or nay.  I don't remember the
19 numbers.
20 Q.  Okay.  So you track and monitor -- as part of
21 your duty as legislative liaison, you would track and
22 monitor various voter ID requirement bills.  Correct?
23 A.  Yes.
24 Q.  And based on your knowledge gleaned from that
25 tracking and monitoring, do you turn around and educate

59

1 the members of the Texas NAACP regarding various voter
2 ID requirement proposals?
3 A.  Ask the question again.
4 Q.  Sure.  So in the course of your duties as
5 legislative liaison, you learn a lot about the various
6 bills that are being proposed --
7 A.  Right.
8 Q.  -- that relate to voter ID requirements.
9 Correct?
10 A.  Correct.
11 Q.  With that knowledge, do you use it to educate
12 the members of the Texas NAACP or the constituents of
13 the Texas NAACP about those various voter ID
14 requirements that are being proposed?
15 A.  I have informed members in the past about the
16 bills and say, you know, "This is what the bill entails.
17 This is what the bill says."  In that aspect, yes.
18 Q.  Do you compile any of this knowledge that you
19 gain from this role and package it up in any kind of
20 mass communication and send it out amongst the
21 membership?
22 A.  I don't, no.
23 Q.  You don't know if so --
24 A.  No, I'm sorry.  I guess I didn't say it right.
25 I don't compile it in a mass email.  I would send it to

60

1 a few, but it would be a mass package of information.
2 Q.  Okay.  I guess what I'm getting at is how do
3 you update the membership or the Executive Committee of
4 the Texas NAACP about what's going out at the Capitol
5 with regard specifically to voter ID proposals?
6 A.  I guess various ways I do it.  I do it through
7 talking to Gary Bledsoe, who is close by.  So it's easy
8 to go over and talk to him.  Or I would, you know, issue
9 a quick email to him, or later on say, "Here's the bill.
10 Here's what it says," and let them do what they do.
11 Q.  Okay.  Outside of your legislative work, are
12 you involved at the Texas NAACP with any kind of
13 budgeting matters or other kinds of resource allocation?
14 A.  How do you mean?
15 Q.  The Texas NAACP has a budget I assume that
16 they put together every year.  Correct?
17 A.  Correct.
18 Q.  Where they need to decide how to allocate
19 their various resources, both financial and otherwise.
20 Correct?
21 A.  Uh-huh.
22 Q.  Do you have any involvement with that process?
23 A.  That's above my pay grade.
24 Q.  That's above your pay grade?
25 A.  Above my pay grade.

61

1 Q.  Who -- can you name anyone -- who would be
2 kind of in charge of that process?  Is there anyone that
3 heads up that process?
4 A.  Gary would play a role into --
5 Q.  Gary Bledsoe?
6 A.  Gary Bledsoe would play a role into how the
7 budget is decided, as well as the Executive Committee.
8 They would play a role into how financial resources are
9 allocated and spent.
10 Q.  Does that committee consider the input of the
11 membership or constituents in comprising or putting
12 together a budget every year?
13 A.  Say that again.  I'm sorry.
14 Q.  Sure.  You mentioned that Gary Bledsoe and the
15 Executive Committee is in charge of putting together a
16 budget for the Texas NAACP every year.  Correct?
17 A.  Uh-huh.  Correct.
18 Q.  And in the process of putting together that
19 budget, do they consider or receive input from the Texas
20 NAACP membership or constituency regarding how the
21 budget should be planned?
22 A.  I don't know.
23 Q.  You don't know?
24 A.  I don't know.
25 Q.  Last question on this area before moving on.

Yannis Banks - 6/4/2014

62

1  Are you involved in any kind of PR work for the Texas
2  NAACP?  Do you help put on press releases or organize
3  press conferences or handle various social media
4  platforms for the Texas NAACP?
5      A.  Yes.
6      Q.  You do?
7      A.  Yes.
8      Q.  Okay.  Can you briefly describe for me what
9  your duties related to PR are like?
10      A.  Sure.  I would work for our press and
11  publicity chair, and that could be where I would draft
12  the initial press release of something and he would
13  tweak it or do what he's going to do to it and change
14  it.  I can shoot it out to the press or put it up on our
15  website.  I have access to our Twitter account, so I can
16  send out tweets or re-tweet something from somebody.
17          Of course, I handle our website, so I can
18  put whatever needs to -- whatever is asked for me to put
19  on the website, I can do that as well, as well as the
20  Facebook page.  I don't know if it's a group or fan
21  page, but the Facebook page we have, I can put posts on
22  anything on the Facebook page.
23      Q.  So you're proficient in the use of social
24  media and internet websites and coding and all that
25  stuff?

63

1      A.  I wouldn't say proficient in coding, but I've
2  gotten good at social media and what have you, yes.
3      Q.  Sure.  But you manage the website?
4      A.  I do.  We don't have to code for our website,
5  so it's --
6      Q.  Okay.  I don't know anything about how that
7  works is why I'm asking.
8      A.  It's fairly simple.
9      Q.  Okay.  Is there anything else that you do at
10  the NAACP that you didn't already mention?  Any other --
11  let me narrow that down.  Is there any other hat that
12  you wear at the NAACP that's related or might be
13  relevant to this case?
14      A.  That I can remember right now, no.
15      Q.  Okay.  If you do remember by the time we're
16  done here today, you can --
17      A.  Sure.
18      Q.  -- make that clear at the end.
19      A.  No problem.
20      Q.  Okay.  Mr. Banks, do you know what this
21  lawsuit is about?
22      A.  Yes.
23      Q.  And can you tell me what it's about?
24      A.  The lawsuit is challenging the active
25  enforcement of Senate Bill 14, which is the voter ID

64

1  law, that will have harmful impact on minorities and
2  folks in the state of Texas.
3      Q.  And just to be clear, when we talk about
4  Senate Bill 14, we're talking about Senate Bill 14
5  passed during the 82nd Legislature in 2011?
6      A.  Correct.
7      Q.  Okay.  Are you familiar with the requirements
8  of Senate Bill 14?
9      A.  Yes.
10      Q.  And in general, what does Senate Bill 14
11  require?
12      A.  It requires six forms of photo ID.
13      Q.  And do you know what those six forms are?
14      A.  Yes.
15      Q.  Can you tell me what those six forms of photo
16  ID required by Senate Bill 14 are?
17      A.  Sure.  So you have to have a Texas issued
18  driver's license or ID card, the EIC card -- or voter
19  free ID, depending on who you're talking to -- passport,
20  your citizenship card with picture ID on it, and a
21  military ID.
22      Q.  Is a concealed handgun license one of those --
23  I'm sorry.  I lost count.  And your concealed
24  handgun license as well.
25      Q.  Okay.  You mentioned an EIC.  What is an EIC?

65

1      A.  It's a free ID -- or it's labeled as a free ID
2  that you can get from the state, Election Identification
3  Certificate.
4      Q.  And do you know how one obtains an EIC?  We'll
5  call it an EIC for our purposes.
6      A.  Sure.  Similar to how you would get a state ID
7  or driver's license.  You would have to go to the DPS
8  office with the required forms or documents in order to
9  get the ID.
10      Q.  And do you know what those forms or documents
11  are?
12      A.  It's a long list of -- from your primary and
13  secondary documents that you have to have is very -- a
14  very long list of -- I couldn't rattle them all off the
15  top of my head.
16      Q.  Do you know where you could go to find that
17  list?
18      A.  Yes.
19      Q.  And where is that?
20      A.  You can go to the Secretary of State's
21  website, as well as the DPS website, I believe, as well
22  to see what you need to get.
23      Q.  Based your knowledge of Senate Bill 14, have
24  you sought to educate the members of the Texas NAACP
25  regarding its requirements?

Yannis Banks - 6/4/2014

66

1   A.   You mean as an individual or --
2   Q.   Yes, you individually on behalf of the Texas
3   NAACP?
4   A.   Yes.
5   Q.   You have?
6   A.   Yes.
7   Q.   And how did you do that?
8   A.   Through mouth, from conversation with those --
9   when I've sent out emails before as far as the forms of
10  ID that you can use to go and vote saying, "Here is what
11  they are."
12  Q.   Has the NAACP ever held any kind of events or
13  activities specifically tailored to educate its members
14  or constituents regarding the requirements of Senate
15  Bill 14?
16  A.   Yes, we have.
17  Q.   And are those ongoing?  Have any been held
18  recently?
19  A.   Define "recently."
20  Q.   When was the last time such an activity was
21  held?
22  A.   Okay.  The last I can recall, October of last
23  year, the one that comes to my mind.
24  Q.   October of 2013?
25  A.   Yes.

67

1   Q.   And what kind of event, activity --
2   A.   It was at our state convention.  It was
3   workshops at -- I think a couple of workshops, actually,
4   that was geared toward that, informing members, as well
5   as people who were -- general -- our constituents.
6   Q.   It was a workshop at the state convention?
7   A.   Correct.
8   Q.   What is the state convention?
9   A.   The state convention we hold every year to do,
10  I guess, the business of the organization where some
11  decisions are made, and it's a training session as well
12  for our members and our constituents for the general
13  public for different workshops we have where they can
14  come and learn about different things.  We're doing
15  different ways to handle certain situations that may
16  occur in their local environment.  So we did -- or their
17  local community.  So we did have I believe a couple -- I
18  think it was a couple -- I know at least one workshop on
19  voter ID and what they need to do.
20  Q.   Was that workshop -- let me back up.
21       So the state conventions are held every
22  year?
23  A.   Yes.
24  Q.   Are they held in the same place every year?
25  A.   No.

68

1   Q.   Where was the last one held?
2   A.   The Dallas area.
3   Q.   Somewhere --
4   A.   Like Grapevine or Irving.
5   Q.   Somewhere in the DFW area?
6   A.   Somewhere in the DFW area, yes.
7   Q.   Okay.  And before that, where was it held?  Do
8   you remember?
9   A.   I think that was Corpus Christi.
10  Q.   In Corpus?
11  A.   I believe so.
12  Q.   Okay.  So these state conventions are held in
13  addition to the quarterly meetings?
14  A.   Correct.
15  Q.   Okay.  And at these state conventions, there
16  are various workshops that are put on by the Texas
17  NAACP -- when I'm speaking right now, I'm trying to
18  summarize your testimony.  Please correct me if I am not
19  summarizing your testimony accurately.
20       There are various workshops held at these
21  state conventions in which the membership or
22  constituency of the Texas NAACP is educated or made
23  aware of various initiatives or challenges facing the
24  Texas NAACP and the fulfillments of its mission.  Is
25  that correct?

69

1   A.   Not necessarily.  We do have various workshops
2   that are there, and some of them they'll deal with -- so
3   if you do incur this issue, how do you go about
4   assisting or rectifying it.  It could be a financial
5   thing, where you say, "Hey, we're doing a workshop
6   about -- not necessarily budgeting, but why is it
7   important to set up a will," or something to that
8   nature.
9   Q.   Sure.
10  A.   So it's not just that.  The topics can deal
11  with so many different things that we think is good for
12  our membership to know, and our constituency as well to
13  know.  And we try to help them with aiding and assisting
14  people as well.
15  Q.   So these workshops are part of the regular
16  agenda of the state convention every year.  Is that
17  correct?
18  A.   Different kinds of workshops.  It's not the
19  same ones over and over again.
20  Q.   Right.
21  A.   They can vary for -- President Bledsoe sets
22  the agenda for the convention as far as the workshop
23  goes and what he sees is important and what we need to
24  focus on.
25  Q.   So one year the workshops could deal with one

Yannis Banks - 6/4/2014

70

```
1  issue, one year they deal with another issue, just
2  whatever issues are relevant to the Texas NAACP every
3  year.  Correct?
4       A.   Whichever is relevant and pressing, which is
5  important.
6       Q.   Right.
7       A.   Something that needs to be done.
8       Q.   But the fact is that can change year to year,
9  and the Texas NAACP is able to, you know, put on
10 effective workshops based on whatever the pressing
11 issues are that year.  Is that correct?
12      A.   It can change year to year, but if the issue
13 stays the same, similar and pressing is bad, it can keep
14 coming up, which could get in the way of something that
15 might be just as important or as important, but because
16 they're still dealing with the same issue, you have to
17 keep addressing it, which kind of hurts with helping --
18 because you only have X amount of time and X amount of
19 days to do this.  So it's like we want to do this, but
20 we want to make sure we cover this.
21      Q.   Right.
22      A.   So it can get in the way and interfere with
23 what could be just as pressing.
24      Q.   So some years there are pressing issues facing
25 the Texas NAACP that don't necessarily get covered in a
```

71

```
1  workshop at the state convention?
2       A.   It's possible.
3       Q.   It's possible?
4       A.   But we try to make sure we can get to it.
5  But, yes, there are times where -- some issue just don't
6  go away, and you have to make sure it's covered.  So
7  there's issues that will suffer or won't get the
8  attention that they deserve because of that.
9       Q.   And you mentioned that Mr. Bledsoe kind of has
10 the decision-making authority to decide what the
11 pressing matters are for a given year.  Is that correct?
12           MS. RUDD:  Objection; misstates
13 testimony.  You can answer.
14           THE WITNESS:  Okay.  I'm sorry.
15      A.   Yeah, he -- he'll sit down -- I'll sit down
16 with him, and he'll tell me, "Yes.  Here is our ideas
17 that I'm thinking," and we'll go from there.
18      Q.   (By Mr. Tatum)  Sure.  At any of the past --
19 did you attend the past two state conventions?
20      A.   I did.
21      Q.   And how many people usually show up for these?
22      A.   I could not tell you.
23      Q.   Would you say it's a large percentage of the
24 membership?
25           MS. RUDD:  Objection; calls for
```

72

```
1  speculation.
2       A.   I would have a hard time -- I don't know the
3  total number of memberships, so I wouldn't be able to
4  say it's a large percentage or what percentage it would
5  be.
6       Q.   (By Mr. Tatum)  Where are these conventions
7  held?  Like what kind of facility?
8       A.   Typically at hotels.
9       Q.   You rent out a conference room or --
10      A.   Correct.  Yeah, different conference rooms,
11 ballrooms, what have you.  And at different hotels.
12      Q.   In your opinion, on average, how many people
13 show up?  What's the average attendance number?
14      A.   Truthfully, I couldn't even give you a guess
15 because I'm normally running around.  So I couldn't say.
16 I've never seen the final numbers.
17      Q.   Okay.  So you attended the state convention in
18 Corpus two years ago.  Correct?
19      A.   Yes.
20      Q.   Let me rephrase that.  The state convention
21 this past year was in the Dallas area?
22      A.   Correct.
23      Q.   And you attended that one?
24      A.   Yes.
25      Q.   And the year before that in 2012 was in
```

73

```
1  Corpus.  Correct?
2       A.   I believe so.
3       Q.   And you attended that one?
4       A.   Yes.
5       Q.   Do you recall where the one in 2011 was?
6       A.   Hmm.
7       Q.   If you don't, that's okay.
8       A.   Where was that?  I don't recall right now.
9       Q.   Did you attend that one?
10      A.   I did attend it.
11      Q.   Okay.  At either one of those three
12 workshops -- sorry.  At either one of those three
13 conventions, was there a workshop held regarding voter
14 ID requirement bills -- or let me rephrase that.
15           Were there workshops held regarding laws
16 and requirements for -- let me back up again.
17      A.   Okay.
18      Q.   At any of those conventions, was there a
19 workshop held specifically relating to the education
20 of -- specifically geared towards educating people
21 regarding voter ID requirements?
22      A.   I know last year yes, because last year was
23 2013.  And then 2012, we --
24      Q.   Let me ask a more specific question.
25      A.   Sure.
```

74

```
 1    Q.   Were there any workshops specifically held
 2  that were intended to educate members or constituents
 3  about the requirements of Senate Bill 14?
 4    A.   In Dallas, yes.  In Corpus, I'm trying to
 5  remember the agenda, and I --
 6    Q.   To the best of your knowledge.
 7    A.   I'm coming up blank on the agenda in Corpus.
 8  I really don't remember.
 9    Q.   Okay.  Is the agenda for these state
10  conventions, is that something that's mailed out to the
11  membership or posted online on a website?
12    A.   Typically posted online.
13    Q.   Okay.
14    A.   And they get it when they get there as well.
15    Q.   Okay.  Why did the Texas NAACP decide to join
16  this lawsuit?
17        MS. RUDD:  Objection; calls for a legal
18  conclusion.
19    Q.   (By Mr. Tatum)  You can answer.
20        MS. RUDD:  Calls for speculation.
21    A.   Okay.  Well, we realized the harm that it
22  would have on minorities and low income people being
23  able to exercise their right to vote, and we feel that
24  it is important -- it's been the history and the mission
25  of the association to defend them and ensure that all
```

75

```
 1  persons have that right to vote.  And it's important for
 2  us to make sure that, you know, they would be able to
 3  continue to have that -- their God-given right to go out
 4  and access their vote without having any kind of
 5  hindrances that they shouldn't have to -- hurdles they
 6  shouldn't have to jump over.
 7    Q.   (By Mr. Tatum)  So you touched on this
 8  briefly.  Let me just ask you again -- or let me just
 9  ask you for the first time.
10        In joining this lawsuit, is the Texas
11  NAACP representing itself as an organization, or is it
12  representing the rights of its members?
13        MS. RUDD:  Objection; calls for a legal
14  conclusion.
15    A.   We are representing the rights of -- we are
16  defending, I guess, the rights of members and
17  constituents, the people of Texas, so that they can
18  ensure they have the right to vote and make sure that
19  their voices can be heard.
20    Q.   (By Mr. Tatum)  So you're representing the
21  rights of your individual members?
22        MS. RUDD:  Objection; calls for a legal
23  conclusion, calls for speculation.
24    A.   We're representing the rights of members and
25  our constituents.
```

76

```
 1    Q.   (By Mr. Tatum)  And in your opinion, does the
 2  Texas NAACP -- did they join this lawsuit for purposes
 3  of representing its own interests as an organization?
 4        MS. RUDD:  Objection; irrelevant, calls
 5  for speculation.
 6    A.   I guess what do you mean when you say the
 7  interest of the organization?
 8    Q.   (By Mr. Tatum)  Does the Texas NAACP contend
 9  that Senate Bill 14 affects its ability to fulfill its
10  mission as an organization?
11    A.   It's harmful to us, yes.
12    Q.   You contend that SB 14 is harmful to the
13  ability of the Texas NAACP to fulfill its mission?
14    A.   Yes.  I am saying that it is harmful to us to
15  fulfill the mission as stated on the website, yes.
16    Q.   In the time leading up to the filing of the
17  initial -- of the Texas NAACP's initial complaint that
18  initiated this lawsuit -- or that initiated its
19  participation in this lawsuit, were there meetings held
20  to discuss the pros and cons of such an action?
21        MS. RUDD:  And I just want to caution
22  you, Yannis, to not reveal any communications that might
23  have occurred in any of those meetings leading up to the
24  decision to file this lawsuit, whether they happened --
25  the fact that they happened is something you can testify
```

77

```
 1  to, but I don't want you to reveal any conversations
 2  that occurred in those meetings.  Okay?
 3        THE WITNESS:  Sure.
 4    A.   State the question again, please.
 5    Q.   (By Mr. Tatum)  Sure.  In the time leading up
 6  to the filing of the Texas NAACP's initial complaint
 7  which initiated this lawsuit, were there meetings held
 8  to discuss the pros and cons of such an action?
 9    A.   Yes.
10    Q.   So meetings did occur?
11    A.   Conversations did, yes.
12    Q.   Conversations over the phone, conversations --
13  or conversations in person, or both?
14    A.   I don't know.  I wasn't a part of the
15  conversations, but I know conversations were had for the
16  meetings -- or for the lawsuit to go forward.
17    Q.   Okay.  And do you know who was present at
18  these meetings?
19    A.   I'm sure Gary Bledsoe was present as his role
20  that he has.
21    Q.   Were members of the Executive Committee
22  present?
23    A.   We have to get their approval to go forward,
24  so they would be involved.
25    Q.   So they would necessarily be involved in order
```

Yannis Banks - 6/4/2014

78

1  to take an action like this?
2      A.  Yes.
3      Q.  Okay.  Were lawyers of the Texas NAACP present
4  at these meetings?
5          MS. RUDD:  Objection; calls for
6  speculation, but you can answer if you know.
7      A.  I would say yes.
8      Q.  (By Mr. Tatum)  Were outside counsel present
9  at these meetings?
10          MS. RUDD:  Same objection.
11      A.  I don't know.
12      Q.  (By Mr. Tatum)  And you stated that you were
13  not present at these meetings?
14      A.  Not that I recall, no.
15      Q.  Okay.  So you did not participate in any
16  meeting where the initiating of this lawsuit was
17  discussed?
18      A.  In any of the conversations, not that I
19  recall, no.
20      Q.  Okay.  To the best of your knowledge, were any
21  other organizations or groups sharing any interests of
22  the Texas NAACP present at these meetings?
23      A.  I would say no.
24      Q.  Are you familiar with the other parties to
25  this suit?

79

1      A.  Somewhat, yes.
2      Q.  Were any other parties to this suit present at
3  any of these meetings?
4      A.  No.
5      Q.  Are you familiar with the various topics that
6  were discussed at these meetings?
7      A.  Who do you mean "the various topics"?
8      Q.  I mean the general just -- I'm not talking
9  about specific discussions, but the general content --
10  the general topics of these meetings.
11      A.  I'm still confused, I guess, by when you're
12  saying the context of the meetings.  I'm -- I'm not
13  following.
14      Q.  Okay.  Do you -- to the best of your
15  knowledge, do you know if during these meetings at which
16  you weren't present --
17      A.  Right.
18      Q.  -- do you know if there was any discussion
19  about the resources involved in initiating a lawsuit
20  like this?
21          MS. RUDD:  Objection; calls for
22  attorney-client privileged information.  I'm going to
23  instruct the witness not to answer.
24      Q.  (By Mr. Tatum)  Are you going to --
25      A.  I'm going to follow the advice of my attorney.

80

1      Q.  And not answer that question?
2      A.  Correct.
3      Q.  Okay.  Do you know how the ultimate decision
4  was made to initiate this lawsuit?  Was there a vote?
5  Was -- I'm sorry.
6      A.  I'm sorry.
7      Q.  Was there a vote?
8      A.  Yes.
9      Q.  Was that vote taken amongst the Executive
10  Committee?
11      A.  Yes.
12      Q.  Did that process involve any input from the
13  Texas NAACP membership or constituency?
14      A.  No.
15      Q.  So the ultimate decision to initiate this
16  lawsuit -- and I'm summarizing here.  Correct me if I'm
17  saying anything that's not accurate.
18          The ultimate decision to initiate this
19  lawsuit was made by -- at the executive level?
20      A.  The Executive Committee made the decision to
21  initiate the lawsuit, yes.
22      Q.  By a vote?
23      A.  Yes.
24      Q.  Okay.  And you're not on the Executive
25  Committee, so you did not participate in that vote?

81

1      A.  Right.
2      Q.  Okay.  Did you provide any input into that
3  vote?
4      A.  Not that I'm aware of.
5          (Exhibit No. 3 marked)
6      Q.  (By Mr. Tatum)  Now I'm handing you what's
7  been marked as Exhibit 3.
8      A.  Okay.
9      Q.  Mr. Banks, do you recognize this document?
10      A.  Let me take a look.
11      Q.  Okay.  Take as much time as you need.
12      A.  Yeah, I'm familiar with this.
13      Q.  And what is this document?
14      A.  I don't know the exact term that y'all
15  would -- the legal term that it's called.
16      Q.  I'll represent to you that this is the
17  complaint for declaratory and injunctive relief filed by
18  the Texas State Conference of NAACP Branches.  In your
19  opinion, is that an accurate statement?  And I'm getting
20  that from the top of Page 1 on the right there.
21      A.  Oh, the complaint.  Yep.
22      Q.  Okay.
23      A.  Works for me.
24      Q.  So this is the complaint that initiated the
25  Texas NAACP's involvement with this lawsuit.  Correct?

Yannis Banks - 6/4/2014

82

1    A.   Correct.
2    Q.   Okay.  Did you assist at all in the
3  preparation of this document?
4    A.   Not that I'm aware of.  Not that I'm aware of.
5    Q.   Okay.  But you are aware that this document
6  represents the claims and allegations being made by the
7  Texas NAACP in this lawsuit?
8    A.   Correct.
9    Q.   Okay.  I'm looking at Page 2, Paragraph 3(b).
10  Based on that paragraph, in your opinion, is the Texas
11  NAACP contending that Senate Bill 14 is causing and will
12  continue to cause the Texas NAACP to divert a portion of
13  its financial and other organizational resources to
14  educating Texas citizens about the requirements of
15  Senate Bill 14 and assisting voters in casting in-person
16  ballots in compliance with Senate Bill 14?
17    A.   What was your question?  It was just a lot
18  to --
19    Q.   Sorry.  I was reading directly from the
20  complaint.  Is that a contention that the Texas NAACP is
21  making?
22    A.   Yes.
23    Q.   Okay.  What is that contention based on?
24    A.   The fact that it will -- so as far as
25  financial, you know, it would be money that we could use

83

1  towards other programs, other things we could be doing
2  that we would now -- would have to be diverted towards
3  the lawsuit.  And when it comes to organizational
4  resources -- and it could be many other financial
5  resources.  And even just with stuff I may have -- that
6  they have me doing or would have me focused on, it could
7  shift from that and that being able to do or assist --
8  or even just how different programs that we may have
9  intended to do or want to do would now have to be not
10  done because we have to educate, inform, and get the
11  people out there so they understand what they need to
12  do.
13    Q.   But for the enactment of Senate Bill 14, how
14  would the resources that are being -- that are allegedly
15  being diverted to Senate Bill 14 related activities, how
16  would those resources be used outside of -- if Senate
17  Bill 14 had never been enacted?  In other words, you're
18  claiming that these resources, both financial and
19  otherwise, are being diverted towards activities
20  directly related to Senate Bill 14 --
21    A.   Uh-huh.
22    Q.   -- and that they could be more appropriately
23  used somewhere else.  Is that correct?
24    A.   Correct.
25  What other important purposes or functions

84

1  could those resources be put to?
2    A.   Well, it's time and focus.  Whether it's
3  working with -- working more with the economic
4  development committee for economic development projects
5  as far as educating the community about payday lending,
6  alternative forms of -- you know, why they need to bank,
7  why they need to have bank accounts set up, what they
8  can do to increase the financial standing in their
9  community, whether it's focusing more on education
10  issues or when it comes to -- you know, we have the new,
11  I guess, testing that's rolled out for pub ed, and
12  saying, "Okay.  You need to focus a little bit more on
13  this and make sure folks understand these new curriculum
14  changes that were made."
15          And just the different fields we could
16  spend more time focusing on saying, "Here are some
17  really pressing issues," and time and energy and
18  resources behind that.  It has to now go towards the
19  Senate Bill 14 lawsuit.
20    Q.   Does that include the workshops at the state
21  conventions that you previously testified about?
22    A.   It would.
23    Q.   Are there any other -- when you were talking
24  about the state convention, you talked about pressing
25  needs or pressing issues of the Texas NAACP.

85

1    A.   Sure.
2    Q.   Are there any of those pressing needs or
3  issues -- are there any of those that are not receiving
4  the resources, both financial and otherwise, that they
5  deserve because of Senate Bill 14?
6    A.   I would say yes.
7    Q.   And what is that based upon?
8    A.   That's based upon -- when planning for, like,
9  the last convention, because it's one I can remember
10  fairly well, just conversations I've had with Gary,
11  because of people who may want to do our workshop.  I
12  think we did, like, two -- I think we did, like, two
13  Senate Bill 14 related workshops trying to make sure we
14  cover it, which it's a slot that could have been used
15  for, you know, something else.  So, you know, issues
16  that are important in other areas, whether it's been
17  education or veterans in need -- veterans may need and
18  what have you, ignoring -- or not necessarily ignoring,
19  but not able to do those.
20    Q.   Uh-huh.
21    A.   That hinders in making sure that folks are
22  properly trained, or if we need a legal redress workshop
23  and say, "Okay.  If this happens in your community, this
24  is what you need to do to take a person's complaint and
25  the process you want to have done."  You may not be able

86

1  to do those workshops because you have to focus on this.
2  And even -- and, you know, putting the other resources
3  to try to fight this lawsuit.
4      Q.  Now, the Texas NAACP, as well as the National
5  NAACP, that's a nonprofit organization.  Is that
6  correct?
7      A.  Correct.
8      Q.  Okay.  So its resources are necessarily
9  limited and finite every year.  Is that correct?
10      A.  That's correct.
11      Q.  Okay.  So would I be accurate in saying that
12  every year, in compiling a budget for the activities of
13  the Texas NAACP that year, a decision has to be made as
14  to how to allocate those resources?
15          MS. RUDD:  Objection; calls for
16  speculation.
17      A.  Yes.
18      Q.  (By Mr. Tatum)  So is it possible that in any
19  given year there are going to be issues considered
20  pressing to the Texas NAACP that aren't going to receive
21  the allocation of resources that may be necessary?
22      A.  Yes, it would be.  And there would be and
23  there will be times where -- something that keeps
24  recurring or is there and the costs that may be
25  associated, other programs will get less than maybe they

87

1  normally have or normally would get because you have to
2  find the money that you would need to -- or the time or
3  the resources or the energy to focus on this issue that
4  these other issues could suffer.
5      Q.  Outside of Senate Bill 14, can you recall any
6  instances where Texas NAACP resources had to be diverted
7  or reallocated on -- because of any other pressing
8  matter that arises?
9      A.  Yes.
10      Q.  Can you give an example?
11      A.  Redistricting and that ongoing challenge as
12  well.
13      Q.  Any other examples outside of redistricting
14  and voter ID?
15      A.  Not to my knowledge, no.
16      Q.  So to the best of your knowledge, the only
17  times that significant portions of Texas NAACP resources
18  have had to be diverted are in relation to redistricting
19  and voter ID?
20          MS. RUDD:  And I just want to object to
21  the extent it calls for information that may be
22  predating your time at the NAACP.
23          MR. TATUM:  Sure.
24      A.  Right.
25          MS. RUDD:  It calls for speculation to

88

1  that extent.
2      Q.  (By Mr. Tatum)  Let me rephrase.  Within your
3  experience at the Texas NAACP -- so from 2007 onward --
4      A.  Right.
5      Q.  -- do you recall any other instance outside of
6  redistricting and voter ID where resources of the Texas
7  NAACP had to be diverted and allocated to one matter to
8  the detriment of another?
9      A.  During my time, no.
10      Q.  No, you don't?
11      A.  No.
12      Q.  Okay.  Because of Senate Bill 14, is it your
13  opinion that the Texas NAACP is no longer able to
14  fulfill its mission?
15      A.  It hinders the Texas NAACP from being able to
16  fulfill its mission.
17      Q.  It hinders it?
18      A.  It hinders it.  It hurts it -- it hurts us, I
19  guess I should say.  It hurts us from being able to
20  fulfill its mission.
21      Q.  But in your opinion, to date, the Texas NAACP
22  has been able to fulfill its mission despite Senate
23  Bill 14?
24          MS. RUDD:  Objection; calls for
25  speculation, misstates testimony.

89

1      A.  It hinders us from being able to fulfill our
2  mission as it should be done.  So I guess if it's
3  hindered or hurt, you're not able to do it, but it's
4  hindering and hurting us from --
5      Q.  (By Mr. Tatum)  So is it accurate to say that
6  in your opinion Senate Bill 14 has made it -- has made
7  the Texas NAACP unable to fulfill its mission to the
8  degree that it wants to?  Is that what your testimony
9  is?
10          MS. RUDD:  Objection; misstates
11  testimony.
12      A.  I'm saying we are -- the Texas NAACP is not
13  able to do all that we would want to do and need to do
14  and strive to do and is our purpose to do due to Senate
15  Bill 14 and its enactment.
16      Q.  (By Mr. Tatum)  Looking at the complaint
17  again -- turn to Page 3.  You're on Page 3?
18      A.  Yes, sir.
19      Q.  Could you read Paragraph 3(c) for me?
20      A.  Yes.
21      Q.  That's C at the top of the page.
22      A.  "Upon information and belief, the Texas NAACP
23  includes members who are registered voters but do not
24  possess any of the forms of photo identification
25  required by Senate Bill 14 for voting in person on

Yannis Banks - 6/4/2014

90

1  election day or in early voting."
2      Q.   Thank you.  Can you tell me what information
3  and/or belief this contention is based on?
4          MS. RUDD:  Objection; calls for a legal
5  conclusion.  You can answer.
6      A.   Okay.  Well, from -- so I know we've had
7  letters at the Brennan Center, I've done -- you look at
8  different data -- and I think there's been nationwide
9  data and research done that's shown that typically even
10  the information that the state had turned over to the
11  DOJ in 2011, it showed that there would be a great
12  percentage of low income and minority voters who do not
13  hold photo ID -- the required forms, I guess, of ID
14  required, and so I guess looking at that information and
15  that data.
16          MR. TATUM:  I don't seem to have a copy
17  of the objections to the 30(b)(6) notice on me, but at
18  this point I just want to see if I'm clear -- and I'm
19  talking to your attorneys now.
20          THE WITNESS:  Okay.
21          MR. TATUM:  I believe in those objections
22  it was stated that the Texas NAACP does not conduct any
23  studies of its own or something to that effect.
24          MS. RUDD:  Right.  I mean, to our
25  knowledge, there aren't any, you know, formal analyses

91

1  or studies done specifically by the Texas State
2  Conference of the NAACP that would be relevant to this
3  particular issue.
4          MR. TATUM:  Okay.
5          THE WITNESS:  Right.
6      Q.   (By Mr. Tatum)  I was going to ask you that,
7  but I know that was covered in the objection, so I
8  didn't want to --
9      A.   I understand.
10      Q.   -- retread.
11          Okay.  So turning back to this claim
12  which says that the Texas NAACP includes members who are
13  registered voters but do not possess any of the
14  acceptable forms of identification under Senate Bill 14.
15          Do you know how many members of the Texas
16  NAACP do not possess an acceptable form of ID under
17  Senate Bill 14?
18      A.   I would not be able to say, no.
19      Q.   You do not know how many?
20      A.   No.
21      Q.   Are you able to identify one?  I don't want
22  the actual identity, but are you able to identify one
23  member of the Texas NAACP who does not possess an
24  acceptable form of ID under Senate Bill 14?
25      A.   No.

92

1      Q.   Do you know how many constituents at the Texas
2  NAACP do not possess an acceptable form of ID under
3  Senate Bill 14?
4      A.   No.
5      Q.   Are you able to identify any one constituent
6  who does not possess an acceptable form of ID under
7  Senate Bill 14?
8      A.   Yes.
9      Q.   You are able to identify one?
10      A.   Yes.
11      Q.   By the way, from now on I'm just going to say
12  SB 14.
13      A.   Fine with me.
14      Q.   Okay.
15      A.   We're good.
16      Q.   I was just looking at this, and I realized he
17  was typing out Senate Bill 14 every time, so we'll try
18  to limit that.
19          Mr. Banks, do you know how many
20  registered voters in Texas do not possess any acceptable
21  form of ID under SB 14?
22      A.   Off the top of my head, no.
23      Q.   Are you able to identify any registered voter
24  in Texas who does not possess an acceptable form of ID
25  under SB 14?

93

1      A.   Yes.
2      Q.   Do you know how many Texas NAACP members or
3  constituents don't have the documents necessary to
4  obtain an acceptable form of ID under SB 14?
5      A.   No.
6      Q.   Do you know how many Texas registered voters
7  don't have the documents necessary to get an acceptable
8  form of ID under SB 14?
9      A.   Is that the same question?  I'm sorry.
10      Q.   No, it wasn't.
11      A.   Okay.
12      Q.   I asked you first about Texas NAACP members
13  and constituents.  I'm now asking do you know how many
14  registered voters in Texas do not have the documents
15  necessary to obtain --
16      A.   No.  I'm sorry.  I didn't mean to cut you off.
17      Q.   -- to obtain an acceptable form of ID under
18  SB 14?
19      A.   No, I don't.
20      Q.   Do you know how many Texas NAACP members have
21  a driver's license?
22      A.   No.
23      Q.   I can't remember.  Is a driver's license or
24  any kind of ID like that required to apply for
25  membership with the Texas NAACP?

Yannis Banks - 6/4/2014

94

1    A.   No.
2    Q.   Do you know how many Texas NAACP members or
3    constituents have a state-issued personal ID card?
4    A.   No.
5    Q.   A concealed handgun license?
6    A.   Is that the same --
7    Q.   I'll just say the question again.
8    A.   I'm sorry.
9    Q.   Do you know how many Texas NAACP members or
10   constituents have a concealed handgun license?
11   A.   No.
12   Q.   Are you aware of any Texas NAACP members or
13   constituent that has a concealed handgun license?
14   A.   Not that I'm aware of, but --
15   Q.   Do you know how many Texas NAACP members or
16   constituents have a passport?
17   A.   No.
18   Q.   Are you aware that any of them have a
19   passport?
20   A.   Yes.
21   Q.   Do you know how many Texas NAACP members or
22   constituents have a military identification card with a
23   photograph on it?
24   A.   No.
25   Q.   Are you aware that any of them have a military

95

1    identification card with a photograph on it?
2    A.   Yes.
3    Q.   Do you know how many Texas NAACP members or
4    constituents have a citizenship certificate with a
5    photograph on it?
6    A.   No.
7    Q.   Are you aware that any of them have a
8    citizenship certificate with a photograph on it?
9    A.   I am not aware.
10   Q.   In the document you have in front of you,
11   could you please turn to Page 7?  I'm reading from
12   Paragraph 15.  It says, "An EIC" -- which we discussed
13   earlier -- "may be obtained only at DPS offices, may be
14   issued to persons who are already registered to
15   vote or who are registering in conjunction with applying
16   for an EIC."  It continues on, "Although no fee is
17   charged for an EIC, voters who lack the required
18   underlying identification must bear any costs associated
19   with obtaining those documents."
20        Do you think EIC should be issued to
21   people who are not registered to vote?
22        MS. RUDD:  Are you asking him in his
23   personal capacity or as a representative for the Texas
24   NAACP?
25        MR. TATUM:  As a representative of the

96

1    Texas NAACP.
2    A.   Do I think EIC should be issued to persons who
3    aren't registered to vote?
4    Q.   (By Mr. Tatum)  Yes.  The language in this
5    complaint says may be issued only to people who are
6    already registered to vote or who are registering in
7    conjunction with applying for an EIC.
8    A.   Uh-huh.
9    Q.   Is it the Texas NAACP's position that an EIC
10   should be able to be issued to someone who is not
11   registered to vote?  In other words, does the Texas
12   NAACP think you should be registered to vote to get an
13   EIC?
14   A.   Okay.
15   Q.   What I'm getting at is that language seems --
16   the way it's crafted seems to suggest that the Texas
17   NAACP might take issue with the fact that an EIC can
18   only be issued to someone who is registered to vote.
19   And I'm asking is it the Texas NAACP's contention that
20   an EIC should be available to people who are not
21   registered to vote?
22        MS. RUDD:  And I just want to represent
23   for the record, you know, Mr. Banks didn't write this
24   complaint.  So to the extent you know, you can answer
25   the question.  He may just not know the answer.

97

1        MR. TATUM:  Sure.
2    A.   That's not something that we've talked about,
3    so I don't -- I'm not sure -- nothing I've had a
4    conversation about, I should say.
5    Q.   (By Mr. Tatum)  Okay.  In that same paragraph
6    where it says, "voters who lack the required underlying
7    identification must bear any costs associated with
8    obtaining these documents," what associated costs does
9    this claim refer to?
10   A.   Well, to get your birth certificate, there's a
11   cost to obtain that and other documents that you may
12   need to get reproduced in order to get your EIC.
13   Q.   So let's just focus on a birth certificate?
14   A.   Sure.
15   Q.   What kind of costs are associated with getting
16   a copy of your birth certificate?
17   A.   I think it's like $22 is what you would have
18   to go -- if you don't have a copy of your birth
19   certificate -- if you're from Texas.  Now, if you're
20   from elsewhere, it can vary.  It could be more.  It
21   could be less.  But I know if you're from Texas and you
22   need to get a copy of your birth certificate, it's $22.
23   And I think if you were born in the military overseas,
24   it's a whole other cost.  If you have to go that route,
25   it could be more.  So there's that financial burden that

98

1  you're putting on somebody that is supposed to be
2  getting a free document.  It's no longer a free
3  document.
4      Q.  Would the associated costs in that instance --
5  let's say someone is born in Texas and they have a copy
6  of their birth certificate that they need to retrieve in
7  order to get an EIC.  Would the associated costs that
8  you're referring to in this allegation here, would that
9  include the costs of retrieving that document from --
10 that birth certificate from your house or wherever it
11 is?  If you don't actually have to pay for a copy.
12     A.  Right.  It could also include, though, if you
13 have to get to a DPS office as well.  With not every
14 county having a DPS office, not every city having a DPS
15 office, there could be a cost in the burden of getting
16 to that location.
17         Having to travel X amount of miles, and
18 depending where you are, it could be a great deal.  And
19 then depending on even in your urban areas, depending on
20 the side of town you're on, it could still be a great
21 deal of money you have to spend to try to get there.
22         And it also can go with the time off that
23 you may have to take from work because of the hours of
24 the DPS offices not being open on weekends and after
25 6:00.  So if you have to take time off to get there, I

99

1  think the average DPS time -- I think I read somewhere
2  was like three hours or so.  It could be more.  It could
3  be less.  You know how that works.
4          Not to mention if you get there and you
5  think you have everything you need because you looked,
6  and you go and you give it to them, and they say, "Well,
7  no, we can't accept that."
8          Well, now you have to go back home and
9  come back again.  So you look at that cost as well that
10 they would have to incur just so they can go and vote.
11     Q.  So the associated costs you refer to in that
12 claim is not necessarily a financial or monetary cost?
13         MS. RUDD:  Objection; misstates
14 testimony.
15     A.  It encompasses a lot of costs.  There is the
16 financial cost that's going to be there.  And time is,
17 for a lot of them, money.  So there's a great deal
18 amount of cost that a person can incur trying to go and
19 get this ID.
20     Q.  (By Mr. Tatum)  So would you describe that --
21 in addition to the financial and monetary costs that you
22 testified to, would you describe those associated costs
23 as including an opportunity cost?  In other words,
24 you're devoting time towards doing that that could be
25 spent doing something else?

100

1      A.  I would say you're devoting time that could
2  have been done to you being -- even if you're coming
3  from a limited income, in that time you would be making
4  money to help support your family and do what you need
5  to do, you're losing money during that time.
6      Q.  Okay.  On the next page, Page 8, I'm looking
7  at Paragraph 17, which goes on to Page 9.  I want to
8  focus on the language that says -- when discussing a
9  provisional ballot.
10     A.  Okay.
11     Q.  It says, "A voter may complete a provisional
12 ballot at the polls on election day or during early
13 voting, but the voter's ballot will be counted only if
14 the voter subsequently presents one of the six forms of
15 photo identification required by SB 14 to the registrar
16 within six days after the election."
17         Is that an accurate reading of that
18 claim?
19     A.  From where you started, yes.
20     Q.  Okay.  Does the Texas NAACP contend that this
21 six-day requirement or six-day allowance is not enough?
22     A.  Can I read it, the whole thing?
23     A.  Sure.  Take your time.  If I may rephrase the
24 question.
25     A.  Sure.  That's fine.

101

1      Q.  Does the Texas NAACP take issue with the
2  amount of time that SB 14 provides for, I guess,
3  completing a provisional ballot?
4      A.  I would say yes.
5      Q.  The Texas NAACP does take issue with the
6  amount of time that SB 14 provides?
7      A.  Yes.
8      Q.  Okay.  Why?
9      A.  Well, if you're looking at somebody who is
10 already having difficulty with traveling to get the
11 necessary IDs to vote, that six days may not be enough
12 time for them when you have to, once again, take off
13 from work, if you have to travel a long distance to get
14 there.  They have to try to be able to work that within
15 their schedule and within the financial hardship that
16 they may have, because there's nothing in the law that
17 says they will have, I guess, paid time off to go and
18 try to rectify this voting issue, so that they would
19 have to try to figure out in their work schedule, when
20 can I go, because I went and voted.  I wanted to vote.
21 Now I have to go and do this, but I can't afford to miss
22 this money that I need to feed my family or take care of
23 my family.  So I may have six days, but if they're not
24 open on the weekends or open after 6:00, it's running
25 into how I'm able to go and do that.

Yannis Banks - 6/4/2014

102

1    Q.   Does the Texas NAACP have a position on how
2  many days would be more sufficient?
3    A.   Not that I've been told.
4    Q.   Does the Texas NAACP oppose the idea of
5  allowing a provisional ballot?
6    A.   No.
7    Q.   So the Texas NAACP is fine with a provisional
8  ballot.  They would just like more time than six days in
9  order to confirm or complete that provisional ballot.
10  Is that correct?
11    A.   There is not an issue with a provisional
12  ballot, because you might need to -- things happen, and
13  you need to do that for that.  But I think more time --
14  more time and some other structural changes would allow
15  people better opportunity to go and try to fix the issue
16  that they're having.
17    Q.   And is that position of the Texas NAACP based
18  on any kind of empirical studies or other data or other
19  information sources?
20    A.   Not that I'm aware of.
21    Q.   Okay.  If you would, please, skip ahead to
22  Page 13, and take a look at Paragraph 36.  Are you
23  there?
24    A.   I am there.
25    Q.   Okay.  For the record, I'm going to read the

103

1  contents of that paragraph.  It says, "According to
2  2008-2010 ACS," which is the --
3         MS. RUDD:  American Community Survey.
4         MR. TATUM:  Thank you.
5    Q.   (By Mr. Tatum)  -- "72 percent of non-Hispanic
6  white persons reside in an owner-occupied unit compared
7  to 58 percent of Hispanic persons, 45 percent of
8  non-Hispanic black persons, and 62 percent of
9  non-Hispanic Asian persons."
10    A.   Uh-huh.
11    Q.   Is that an accurate reading of that paragraph?
12    A.   I would say yes.
13    Q.   Okay.  Are you familiar with the survey
14  referred to in that allegation?
15    A.   Define "familiar."
16    Q.   Have you read that survey?  Have you seen the
17  2008-2010 American Community Survey yourself?
18    A.   I'm familiar with it, where I've seen it.  I
19  haven't studied it in depth, the whole nine, but I have
20  seen the survey.
21    Q.   Okay.  Based on your knowledge of that survey,
22  do you know if the figures presented in it represent
23  Texas citizens, or is that representative of all
24  Americans?
25    A.   I don't know.

104

1    Q.   You don't know?
2    A.   I don't know.
3    Q.   To the best of your knowledge, do you know
4  what the significance is of a percentage of a certain
5  racial category that lives in an owner-occupied
6  residence with regard to voter ID requirements?
7    A.   Yeah.  I interpret it -- me, my interpretation
8  of when it's owner occupied, the owner owns the unit.
9    Q.   Sure.  And that's how I understand it as well.
10  But what I'm asking is -- the Texas NAACP is presenting
11  this information in its claim.
12    A.   Uh-huh.
13    Q.   And what I'm asking is:  What is the
14  significance of demonstrating the various percentages of
15  various racial categories that live in an owner-occupied
16  unit?
17    A.   Sure.  Well, it shows -- I guess it's a way
18  you can show income, if you will.  If you own the house
19  you live in, you tend to be doing fairly well.  You're
20  probably middle to upper income, so you're doing fairly
21  well.  You're good.  But if you're not -- those who tend
22  to be lower income or tend to rent, move around a lot.
23  So I think you're showing that there's a great chance
24  that these numbers would need assistance -- or may not
25  have necessarily the forms, the ID, or the money to get

105

1  the different things that's required.  So you would be
2  looking at those who probably need some assistance, some
3  help, or it could be a burden on them to get the
4  documents or to get to where they have to go.
5    Q.   Okay.  So is it -- is it a reasonable
6  inference -- let me rephrase that.
7    A.   Sure.
8    Q.   In your opinion, is not owning your residence
9  an indicator of socioeconomic status?
10    A.   State the question again.
11    Q.   In your opinion, is owning -- is the fact of
12  whether you own your residence an indicator of your
13  socioeconomic status?
14    A.   It could be interpreted as one of many
15  indicators.
16    Q.   Is socioeconomic status one of them?
17    A.   I think we might be having two separate
18  conversations.  I'm sorry.  I was saying it could be one
19  of many indicators to show your socioeconomic status.
20    Q.   Okay.  So there are other indicators of
21  socioeconomic status?
22    A.   Right.
23    Q.   And whether or not you own your residence is
24  one such indicator?
25    A.   It can be, yes.

Yannis Banks - 6/4/2014

106

1    Q.   Okay.  Is whether or not you own your
2  residence an indicator of your -- of whether or not you
3  have an acceptable form of ID under SB 14?
4    A.   Say that again.  I'm sorry.
5    Q.   So you previously testified that whether or
6  not you own your residence is an indicator of
7  socioeconomic status.  Correct?
8    A.   Is one of them.
9    Q.   Is one of?
10   A.   Right.
11   Q.   It is an indicator amongst many?
12   A.   Yes.
13   Q.   Is it an indicator of whether or not you have
14  an acceptable form of ID under SB 14?
15        MS. RUDD:  Objection; calls for
16  speculation.
17   A.   Well, whether you own a house or not -- or
18  whether you have an ID or not -- I don't know.  I don't
19  think I'm following -- ask your question one more time.
20   Q.   (By Mr. Tatum)  Sure.
21   A.   See if I can --
22   Q.   Sure.  Let me state it another way.
23   A.   Sure.
24   Q.   Is whether or not you own your residence an
25  indicator of your ability to obtain an acceptable form

107

1  of ID required to vote under current law in the state of
2  Texas?
3        MS. RUDD:  Same objection.
4    Q.   (By Mr. Tatum)  In other words, if you're
5  trying to determine who has the ability to obtain an
6  acceptable form of ID to vote, might you look at whether
7  or not they own their residence --
8        MS. RUDD:  Objection; form.
9    Q.   (By Mr. Tatum)  -- to make that determination?
10       MR. TATUM:  I'm sorry.  I talked over
11  you, Amy.  What was the objection?
12       MS. RUDD:  Just form.
13   A.   Isn't that the same question just asked a
14  different way?
15   Q.   (By Mr. Tatum)  It was.
16   A.   No.  I meant the previous question that you
17  asked me, that --
18   Q.   Okay.  Let me try to bottle this up and move
19  on.
20   A.   Sure.
21   Q.   Okay.  This paragraph presents data about
22  showing the percentage of various racial categories that
23  own the residence that they live in.
24   A.   Uh-huh.
25   Q.   We've already established that it's an

108

1  indicator of socioeconomic status --
2    A.   Right.
3    Q.   -- or you've already testified to that.  What
4  I'm wondering is if it's an indicator of anything else
5  related to SB 14 and the claims made by the Texas NAACP
6  in this lawsuit.
7        MS. RUDD:  Objection; form.
8    A.   Okay.
9    Q.   (By Mr. Tatum)  I'm trying to gauge the
10  significance of this data.
11   A.   Right.
12   Q.   And I'm just asking you to give your opinion
13  as to the significance of this data.
14       MS. RUDD:  And I'm objecting to form.
15   A.   I would say, yeah, I guess you could look at
16  it to say that they would probably have an ID.
17   Q.   (By Mr. Tatum)  That someone who owns their
18  residence is more likely to have an ID -- an acceptable
19  form of ID than someone who doesn't?
20   A.   There's a greater chance.
21   Q.   I'm sorry?
22   A.   There's a greater chance.
23   Q.   Okay.  I think we finally got there.
24   A.   Sorry.
25   Q.   That's okay.  That's on my end.

109

1        Okay.  Do you know if this study took
2  into account students -- college students?
3    A.   I'm not aware.
4    Q.   Do you know if this survey included only
5  voting age citizens?
6    A.   I am not aware.
7    Q.   Do you know if it included citizens of all
8  ages, including infants, minor children, the disabled,
9  or the elderly?
10   A.   I am not aware.
11   Q.   Okay.
12       MR. TATUM:  30 more minutes?
13       MS. RUDD:  That's fine.
14   Q.   (By Mr. Tatum)  Okay.  I'm now going to be
15  asking you some questions related to the number of
16  paragraphs that appear under Subsection E, titled
17  "SB 14's effect on minority citizens in Texas."
18   A.   Sure.
19   Q.   That begins on Page 14 at the bottom.  Does
20  the Texas NAACP contend that minority citizens are less
21  likely than a white citizen to have an acceptable form
22  of ID under SB 14?
23   A.   Yes.
24   Q.   And what is that contention based on?
25   A.   Well, it's based on -- once again, you looked

Yannis Banks - 6/4/2014

110

1  at the data that was turned over in the letter from the
2  Brennan Center, when you look at the ACS data and you
3  see how, in Texas, minorities -- or African-Americans
4  and minorities, they tend to be -- they more likely tend
5  to be lower income.
6          And you look to see how they would be
7  affected most by the bill, be able to get the documents
8  or get to to the locations to get the ID or be able to
9  afford the ID, then they will be impacted more greatly.
10     Q.  So you mentioned that --
11     A.  Or greater.
12     Q.  Sorry.
13     A.  No.  I was correcting my grammar.  I'm sorry.
14     Q.  So you mentioned the data that was included in
15  the letter from the Brennan Center for Justice?
16     A.  Right.
17     Q.  Do you recall specifically what letter that
18  was?  I'm sure it's been produced, but I'm just
19  wondering --
20     A.  I think it was the first one they sent, I
21  think.
22     Q.  Okay.  And you also mentioned the ACS survey
23  that we just talked about?
24     A.  Correct.
25     Q.  Okay.  Is that contention based on any other

111

1  studies or data sources to your knowledge?
2     A.  Besides what's in the complaint?
3     Q.  Yeah.  Is there anything else out there upon
4  which that claim is based?
5          MS. RUDD:  Are you talking about --
6  sorry.  Just to clarify, are you talking about studies
7  or data sources?
8          MR. TATUM:  I'm talking about both.
9          MS. RUDD:  Okay.
10     Q.  (By Mr. Tatum)  I see you're searching through
11  the complaint.  I'm talking about anything that's not in
12  this complaint.
13     A.  Not in the complaint?  Off the top of my head
14  right now, I cannot recall.
15     Q.  Okay.  Focusing now on Paragraph 43 on the
16  next page, Page 14.
17     A.  Right.
18     Q.  Does the Texas NAACP contend that among those
19  who lack the acceptable forms of photo ID required by
20  SB 14, the Latino and African-American citizens who
21  encounter substantial burdens in obtaining the required
22  ID are significantly higher than percentage of white
23  citizens who encounter such burdens?
24     A.  Yes.
25     Q.  Okay.  So am I correct in saying that there

112

1  are people who lack the acceptable ID and who encounter
2  burdens in obtaining the required ID, and among that
3  subset of people, there are more Latinos and
4  African-Americans than there are white citizens?  Is
5  that correct?
6          MS. RUDD:  Objection; form.
7     A.  Could you rephrase it?
8     Q.  (By Mr. Tatum)  Sure.  Is it an accurate
9  summary of the claim made in Paragraph 43 that there are
10  people in Texas who lack acceptable ID to vote, and who
11  encounter burdens in obtaining the required ID, and,
12  among that subset of people, there are more Latinos and
13  African-American citizens than there are white citizens?
14          MS. RUDD:  Same objection.
15     Q.  (By Mr. Tatum)  Is that an accurate summary of
16  that claim?
17     A.  Can I read it?
18     Q.  Sure.
19          MS. RUDD:  I'm also going to object that
20  it mischaracterizes the document.
21     Q.  (By Mr. Tatum)  I'll tell you what.  I'll
22  retract that question.
23     A.  Okay.
24     Q.  Let me present another one.
25     A.  Sure.

113

1     Q.  Does the Texas NAACP contend that minority
2  citizens are less likely to be able to obtain a form of
3  acceptable ID required by SB 14 than white citizens?
4     A.  Yes.
5     Q.  Okay.  What is that contention based upon?
6     A.  Well, once again, from the previous data that
7  has shown that minorities in Texas tend to be lower
8  income, that they will have trouble obtaining the
9  documents or getting to where they need to get the
10  ID.
11     Q.  Has the Texas NAACP conducted any efforts to
12  confirm that data?
13          Let me rephrase that.
14     A.  Sure.
15     Q.  You say that this claim is based upon data,
16  surveys --
17     A.  Right.
18     Q.  -- the universe of information that has been
19  presented in this case.
20     A.  Yes.
21     Q.  And this claim is drawn from that data.
22  Correct?
23     A.  Yes.
24     Q.  Has the Texas NAACP done anything to test that
25  conclusion "in the field," meaning in practice?  Is

Yannis Banks - 6/4/2014

114

1 there anything the Texas NAACP can point to that
2 confirms that minority citizens are less likely to be
3 able to obtain a form of ID required by Senate Bill 14
4 than white citizens?
5     A.  I guess people knowing their communities and
6 knowing the makeup of their communities, and, you know,
7 like here in Austin, where the people are doing well,
8 over on the west side, people are struggling, maybe,
9 more on the east side, northeast, what have you.  You
10 have the people that know their communities and know
11 their -- the makeup of their communities.
12         And so by knowing your population base
13 and knowing where they are, you can get a feel and say,
14 "Yeah, this is -- this is right."
15         But I think the ACS data is pretty solid.
16 It's done by the federal government, the Census Bureau,
17 so you -- it's pretty solid in what they say and know,
18 so there's not much reason to -- not much reason to
19 doubt the data that they're putting out there, saying,
20 "Well, that can't be true."
21         So I guess as far as in the field
22 surveying or anything, no.  But people knowing their
23 community, who have been in their community for a very
24 long time, and you can talk to them and say, "Well, you
25 know, how is your area?  How is your neck of the woods?

115

1 How is your city?"
2         You can know from conversations with
3 them.
4     Q.  So the Texas NAACP, at the branch level
5 or local community level, is able to gauge from
6 conversations with members of the community, from just
7 generally knowing the people within it, they're able to
8 gauge the ability to obtain a proper form of ID under
9 SB 14.  Is that correct?
10    A.  No, that's not what I was saying.
11    Q.  Okay.
12    A.  What I was saying is that as far as you asking
13 if this claim about minorities being more the
14 socioeconomic -- and having those issues, when you know
15 your area and your environment, then you know who --
16 where your lower income areas are and who may need
17 assistance more, who may have difficulties.
18         And, you know, places like I think
19 Presirio -- is that how you say it?  Presirio?  There's
20 a city down in The Valley.  I'm sure I'm messing the
21 name up.
22    Q.  Presidio?
23    A.  Presidio.  Thank you.  You know, they have to
24 travel -- I think it was, like, 60 miles to the nearest
25 DPS -- one way, I think is what it was, to get their.

116

1 You know, these areas -- you know from that, I guess.
2     Q.  All right.  The same page, Page 14, the next
3 paragraph, Paragraph 43, the sentence that starts about
4 midway through that paragraph reads, "As a result of
5 these differential burdens, the racial impact reflected
6 in the current photo ID ownership rates is not being
7 mitigated and will not be mitigated by the possibility
8 that Texas citizens without the required photo ID may
9 obtain such photo ID in the future."
10         Is that an accurate reading of that
11 sentence?
12    A.  Yes.
13    Q.  Okay.  Do you think you can kind of explain to
14 me what that sentence means?
15         MS. RUDD:  Objection; calls for
16 speculation in that he didn't draft this document.
17    Q.  (By Mr. Tatum)  Obviously you didn't write it.
18 I don't necessarily understand what that sentence means,
19 and I'm wondering if you can tell me.
20         And let me start by asking:  What do you
21 think it means by "differential burdens"?
22    A.  Let me read the previous paragraph, since
23 it's --
24    Q.  Sure.  Take your time.
25    A.  Okay.  So your question is, I guess --

117

1     Q.  What my question is -- and maybe I should just
2 move on from this.  Maybe this is something we can
3 address later.
4         Just reading that sentence, to me, I'm
5 not sure I understand what point it's making, and I'm
6 wondering if you do.
7     A.  So your differential burdens, I think, were --
8 or are -- some of them are, one, the cost, the
9 financial cost that's going to be there with getting the
10 documents needed, travel to said location if they have
11 to travel long distances, and they typically may not
12 have a personal car of their own, so they have to
13 either, you know, try to catch a bus or find money to
14 try to maybe pay somebody and carpool there and back.
15    Q.  Right.
16    A.  So you have that significant burden as well.
17 You have -- once again, you have to take time off from
18 work to do this, and not to mention that if they have to
19 go and do a provisional ballot, they now have to try to
20 do this again.
21         I think those are just some of the
22 burdens it's talking about, just --
23    Q.  Okay.  And so does Texas NAACP contend that
24 those burdens impact minority citizens differently than
25 nonminority citizens?

Yannis Banks - 6/4/2014

118

1   A.   It's going to have a greater impact --
2   Q.   Okay.
3   A.   -- is what we're saying, that they will be
4   impacted greater and disproportionally because of, as
5   stated earlier, looking at the ACS data and the
6   different reports, how they tend to be your lower
7   income.
8   Q.   Okay.
9   A.   It's going to have a greater impact on them.
10  Q.   Okay.  The disparate impact --
11  A.   Right.
12  Q.   -- is referenced a lot.
13  A.   Yes.
14  Q.   Okay.  So that disparate impact, still
15  focusing on this sentence --
16  A.   Okay.
17  Q.   -- will not be mitigated by the possibility
18  that citizens without the required ID may obtain that ID
19  in the future.  Is that correct?
20       MS. RUDD:  I'm just going to object that
21  it misstates the document.
22  A.   I guess define "mitigated."
23  Q.   (By Mr. Tatum)  It will lessen the -- it will
24  lessen the differential impact -- the disparate impact.
25  It'll lessen the degree of harm.

119

1        I guess, I should just move on from this,
2   so --
3   A.   Not a problem.
4   Q.   -- we'll move on.
5        The next paragraph is talking about
6   differential burdens again.  I think I understand what
7   that means.  Paragraph 44 says, "The differential
8   burdens, by race, alleged in the previous paragraph
9   arise because Latino and African-American citizens
10  disproportionately have a low socioeconomic status
11  compared to white citizens, and because it is
12  substantially more burdensome for persons with a low
13  socioeconomic status to obtain any of the forms of photo
14  identification required by SB 14."
15       Is that an accurate reading of that
16  claim?
17  A.   That is.
18  Q.   Okay.  Does the Texas NAACP contend that a
19  member of a minority group who is also of low
20  socioeconomic status faces more of a burden in obtaining
21  the acceptable forms of ID under SB 14 than a white
22  person of similar socioeconomic status?
23       And if you like, I can repeat the
24  question.
25  A.   Let me re-read it, and then I'll have you --

120

1   Q.   Okay.
2   A.   Okay.  Could you repeat your question?
3   Q.   Sure.  Does a member of a minority group who
4   is also of low socioeconomic status face more of a
5   burden in obtaining an acceptable form of ID than a
6   white person of similar socioeconomic status?
7        MS. RUDD:  Objection; calls for
8   speculation.
9   A.   My understanding of this is that's not what
10  it's -- what we're saying.  We're saying that the
11  minority groups in terms of the Latino and
12  African-American community tend to be more lower income,
13  and -- lower income compared with their Angelo
14  counterparts.  And then so they -- so that group would
15  tend to have a harder type -- or have a bigger burden, I
16  guess I should say --
17  Q.   (By Mr. Tatum)  Okay.
18  A.   -- in obtaining the ID -- or the documents
19  needed to get the ID.
20  Q.   Okay.  So would the Texas NAACP agree that a
21  minority citizen of low economic status and a white
22  citizen of similarly low socioeconomic status would have
23  the same burden -- would most likely share the same
24  burden in obtaining an acceptable form of ID?
25       MS. RUDD:  Objection; calls for

121

1   speculation.
2   A.   Yes.
3   Q.   (By Mr. Tatum)  Okay.  Do these burdens that
4   we just talked about, do they exist with regard to
5   obtaining a voter registration card?
6   A.   How do you mean?
7   Q.   You talk about the burdens of obtaining an
8   acceptable form of ID under SB 14.
9   A.   Uh-huh.
10  Q.   Do those same burdens exist with regard to
11  getting a voter registration card?
12       MS. RUDD:  Objection; calls for
13  speculation.
14  A.   I guess it would depend on where you live.  A
15  lot of people depend on trying to do it at the DPS or
16  what have you, and you don't have a DPS office in your
17  community, then it would be up to whoever is doing that
18  outreach or to -- I think it would depend on where
19  you're located.
20  Q.   (By Mr. Tatum)  Okay.  Does the Texas NAACP
21  contend that SB 14 amounts to a poll tax?
22  A.   Yes.
23  Q.   Can you tell me why?
24  A.   Fees associated with obtaining the documents
25  or the ID or if -- or getting to where you need to get

122

1  to -- to get your ID if you have to do it -- once again,
2  Presidio.  If you have to travel 60 miles to get the
3  free ID, let alone the one you have to pay for, but you
4  also have to pay for your birth certificate and other
5  forms to get this document to vote, you are having to
6  pay to vote.
7        In order to vote, you have to put the
8  money out there to be able to participate, and that
9  could be considered a poll tax.
10  Q.  So to the extent that the Texas NAACP contends
11  that SB 14 amounts to a poll tax, does it contend that
12  it amounts to a poll tax for all registered voters in
13  Texas?
14  A.  No.  Well --
15        MS. RUDD:  If you know.
16  A.  I'm not sure.  I don't know.
17  Q.  (By Mr. Tatum)  You're not sure?
18  A.  I don't know, I guess, what our stance on that
19  is.
20  Q.  Okay.
21        MR. TATUM:  Just a few more minutes, if
22  that's okay, and then we'll take a break.
23        MS. RUDD:  That's fine.
24  Q.  (By Mr. Tatum)  Now, Paragraph 46, the same
25  page, Page 15 -- maybe it's the next page.  Either way,

123

1  Page 15, Paragraph 46 states, "The actions of Texas
2  election officials to publicize the photo identification
3  requirements of SB 14 do not, and will not, mitigate the
4  racially disparate and negative impact of these
5  requirements."
6        Is that an accurate reading of that
7  claim?
8  A.  Yes.
9  Q.  What actions of Texas election officials does
10  that claim refer to?
11        MS. RUDD:  Objection; calls for
12  speculation.
13  A.  So you can look at, you know, how much money
14  are they putting behind getting the information out
15  there.  Are they properly funding to ensure everybody
16  knows about it or knows what they need?  And the way
17  they are doing it, is it done in a way that people who
18  may not be online or may not have the digital
19  connection, the internet connection that they think most
20  people have -- you know, are they hitting all the
21  sources and all the ways that these people get their
22  information, or are they only going certain ways and
23  saying, "Well, it's cost.  It's cost.  Well, we only
24  have X amount of money.  Here's what we're going to do,"
25  and leave it at that?

124

1  Q.  (By Mr. Tatum)  Okay.  So regarding the Texas
2  NAACP's allegation that SB 14 results in a racially
3  disparate and negative impact, it's the Texas NAACP's
4  contention that Texas election officials are not doing
5  enough to mitigate that impact.  Is that correct?
6  A.  Correct.
7  Q.  Okay.  And you testified that's based on the
8  money that they're spending to educate citizens
9  regarding SB 14.  Is that an accurate summarization of
10  your testimony?
11  A.  No, I wouldn't say it was just the money, but
12  also the means and the ways they get out to inform those
13  who are in the lower income areas.
14  Q.  Okay.
15  A.  It's not just about the money, but it's the
16  outreach --
17  Q.  Okay.  Outreach.
18  A.  -- the access, the communication with them.
19  Q.  Okay.  What would the Texas NAACP contend
20  would be actions that would mitigate such disparate
21  impact?
22        MS. RUDD:  Objection; form, calls for
23  speculation, irrelevant.
24  A.  Could you rephrase the question?
25  Q.  (By Mr. Tatum)  Sure.  In Paragraph 46, the

125

1  Texas NAACP is claiming that the actions of Texas
2  election officials do not and will not mitigate the
3  racially disparate and negative impact of the
4  requirements of SB 14?
5  A.  Uh-huh.
6  Q.  I'm asking if the Texas NAACP knows what
7  actions would mitigate the racially disparate and
8  negative impact of these requirements.  In other words,
9  the Texas NAACP appears to have an opinion of what's not
10  doing enough.  What I want to know is:  What does the
11  Texas NAACP think would be enough, if anything?
12  A.  Sure.
13        MS. RUDD:  Same objection.
14  A.  When you look at outreach, it's the avenues
15  that those in the minority community tend to look at and
16  use a lot -- and I'll stick with the African-American
17  community right now.  And so you have, I guess -- we
18  have the African-American press, which we use a lot for
19  what we -- whenever we do anything, we make sure the
20  African-American press is included.
21        And it's -- for outreach, we make sure
22  it's in their papers, because those are spread out a lot
23  in the communities.  Folks can grab them and read them.
24  I read them all the time.  When I do my radio show, I
25  grab them and read them.

Yannis Banks - 6/4/2014

126

1          So it's using the forms of
2   African-American Publishers Association, the
3   African-American press, whether it's out being in the
4   community itself.  And that just -- you know, so I put a
5   billboard up somewhere, and that's it, or what have you.
6   But actually having people there in the community at
7   community events, churches, what have you, but actually
8   having folks there saying, "Hey, that is what you need
9   to know," and just going out with the outreach.
10  Q.  (By Mr. Tatum)  You mentioned -- did I hear
11  you say that you have a radio show?
12  A.  I do.
13  Q.  You conduct a radio show yourself?
14  A.  Yes.
15  Q.  How long have you been doing that?
16  A.  Years.  I don't remember off the top of my
17  head.
18  Q.  What station is that radio show on?
19  A.  KAZI, 88.7.
20  Q.  FM?
21  A.  Yes.
22  Q.  What kind of things do you talk about on your
23  radio show?
24  A.  Any and everything.  There is no one specific
25  topic or issue.

127

1   Q.  Sports?
2   A.  I've covered sports.
3   Q.  Current events?
4   A.  We've done current events.
5   Q.  Politics?
6   A.  We've covered politics, yes.
7   Q.  Have you ever discussed Senate Bill 14 on your
8   radio show?
9          MS. RUDD:  I'm just going to object to
10  this line of questioning.  It's well outside the
11  30(b)(6) topics.  But you can answer.
12  A.  Yes.
13  Q.  (By Mr. Tatum)  Do a lot of your members and
14  constituents listen to your radio show?
15  A.  I have no idea.  I'm not familiar with the --
16  Q.  Okay.  Is that a daily --
17  A.  No.
18  Q.  Does the Texas NAACP contend that minority
19  citizens are less likely to be appropriately educated
20  about the change in requirements for voting?
21  A.  Yes.
22  Q.  And what is that contention based on?
23  A.  Well, that goes back to -- that's
24  Paragraph 46, when we say, "The actions of Texas
25  election officials to publicize the requirements."

128

1          If you're not outreaching -- or reaching
2   out to that community, the outreach has not been where
3   it needs to be, if you're not properly funding the
4   outreach, properly funding information out there, then
5   that will be a problem.
6          Just saying it's up on, you know, the
7   Secretary of State's website, that's not enough, because
8   not everybody has a computer, and there are people who
9   don't have smartphones, who still use a basic flip
10  phone.  So they don't have that interpret access.  So
11  just saying, "The information is out there on the web,
12  and you can go look it up," it doesn't serve everybody.
13          And whether they see where you put it or
14  not, it could be a problem in itself.
15  Q.  All right.  Last question before we take a
16  break.  Paragraph 48 on Page 16 states, "Upon
17  information and belief, there also are hundreds of
18  thousands of registered voters in Texas who," continuing
19  on, "will not have their name" -- hold on a second.  Let
20  me start over.
21  A.  Sure.
22  Q.  I lost my place here.  Okay.  The last few
23  lines of Paragraph 48 is what I want to focus on.  It
24  says, "Being subject to this discretion by election
25  officials will result in the application of differential

129

1   standards that disproportionately disadvantage Latino
2   and African-American voters as compared to the white
3   voters."
4          Is that an accurate reading of that
5   statement?
6   A.  Of that part, yes.
7   Q.  Okay.  Does the Texas NAACP contend that
8   minority citizens are more likely to fall victim to the
9   discretionary application of existing laws?
10  A.  Can I read the whole thing?
11  A.  Yes.
12  Q.  Okay.  What was your question now?
13  Q.  I'll repeat the question.  The question was:
14  Does the Texas NAACP contend that minority citizens are
15  more likely to fall victim to the discretionary
16  application of existing laws?
17  A.  Yes.
18  Q.  And what is that contention based on?
19  A.  Well, I guess you would look at it as so if
20  they decided their names are not substantially similar
21  for whatever reason and they have to go and I, guess,
22  rectify the issue, go back and -- so they have to do a
23  provisional ballot, and they have to go back to rectify
24  it, if these are the -- still looking at -- it, more
25  than likely, would be the same low-income folks who have

Yannis Banks - 6/4/2014

130

1  to do different kind of travel and take time off from
2  work and move around, it would affect them with could
3  they make it back to where they need to go in that
4  six-day period to cure or rectify that issue to show
5  proof that they are who they said they were.
6          Whether it's once again having to take --
7  find the money to get to where they've got to get to or,
8  you know, take time off from work to go to where they
9  have to go, you know, at what cost -- what burden is now
10 being put on them financially speaking having to
11 rectify this problem?  So would they go back to fix it,
12 or would they say, "Well, I can't afford to take time
13 off again after I just took that time off to go and get
14 the documents that I thought I could use to vote, and
15 somebody decides differently, and now I have to take
16 time off again"?
17         They may not be able to afford to.
18 Q.  Okay.  I think you're talking more about the
19 differential burdens we've gone over before.
20 A.  Uh-huh.
21 Q.  What I'm focusing on with this question is the
22 discretionary application of existing law.  And focusing
23 on Paragraph 48 in the complaint, it talks about how an
24 election official decides whether or not a name is
25 substantially similar to a name that's on a voter

131

1  registration card.
2  A.  Uh-huh.
3  Q.  And I gleaned from this claim -- and I believe
4  you answered affirmatively -- that the Texas NAACP
5  contends that minority citizens are more likely to,
6  quote, fall victim to the discretionary application of
7  these laws than white citizens.
8  A.  Correct.
9  Q.  And what I want to know is why.
10 A.  Well, you can also look at so -- you have
11 instances where the names could be different, I guess,
12 if you will.
13 Q.  Right.
14 A.  And so you're leaving it up to somebody to
15 say, "Well" -- even on my ID, I'm missing an E off my
16 middle name, which, you know, is long.  And so somebody
17 could say, "Hey, you're missing a letter.  I don't think
18 you are who you say you are," or what have you, or you
19 have somebody who has become a citizen, but their name
20 is a little different, and they can decide that, you
21 know, your name doesn't match how -- or you're leaving
22 it up to the discretion of somebody trying to decide and
23 say, "Yeah, this is not who you say you are.  You're not
24 who you're claiming to be," and they can be given a
25 provisional ballot, and they have to go through that

132

1  process.
2  Q.  Right.  But --
3  A.  So you can look at those names or the
4  different names that you will have out there, and you
5  leave it up to somebody to say, "I don't think this
6  matches exactly because it's not a more traditional
7  name," if you will.
8  Q.  Okay.  So this allegation kind of gets toward
9  the kinds of names that minority citizens tend to have
10 as compared with nonminority citizens.  Is that correct?
11         MS. RUDD:  Objection; misstates testimony
12 and misstates the document.
13 A.  I would say that it gets to the spellings and
14 you're leaving it up to somebody to decide, you know,
15 how your name looks or is.  Back in the '09 hearing, we
16 had the State Rep who mentioned to the young Asian man
17 who was testifying, "Why don't you have your people
18 Americanize their names so it's something that we can
19 understand?"
20         You're leaving it up to the discretion of
21 somebody who can turn them away.
22 Q.  (By Mr. Tatum)  So is this claim based on the
23 statement of that Representative in 2009?
24         MS. RUDD:  Objection; misstates
25 testimony.

133

1  A.  I'm not saying it's based off that claim.
2  That's just an example of --
3  Q.  (By Mr. Tatum)  Okay.
4  A.  -- what has been said and what could happen.
5  Q.  So is it more because a minority citizen is
6  more likely to have an "unusual name" than a nonminority
7  citizen?
8          MS. RUDD:  Objection; misstates
9  testimony, form.
10 A.  It's more of issues that they could run into
11 when trying to vote when you leave discretion up to
12 somebody to say, "You know what, I don't think your name
13 matches because you're missing this letter or you don't
14 have this," or -- so it's with the discretion being out
15 there where somebody can decide if it's substantially
16 similar.
17 Q.  (By Mr. Tatum)  Okay.
18 A.  And it's just leaving it up to somebody where
19 there's no guidelines to say, "Hey, is this one
20 substantially similar?"
21         I mean, it's your discretion, your
22 decision of, "I don't think this is what it is," and" --
23 Q.  Okay.  So does Texas NAACP contend that Texas
24 election officials do or will treat minority citizens
25 differently than nonminority citizens when it comes to

134

1 confirming the name that's on a photo identification
2 with the name that's on a voter registration card?
3      A.   State the question again.
4      Q.   Okay.  In the process of confirming whether a
5 name on a photo identification is the same name as the
6 one that's on a voter registration card --
7      A.   Uh-huh.
8      Q.   In that process, if there is a disparity and
9 it's up to the election official to determine whether
10 the names are substantially similar or not --
11      A.   Uh-huh.
12      Q.   -- does the Texas NAACP contend that in that
13 process -- in the exercise of that discretionary
14 process, a Texas election official will treat a minority
15 citizen differently than a nonminority citizen?
16      A.   We are saying that basically what has been
17 written by -- in the complaint by the lawyers that,
18 yeah, if an election official decides the name is
19 substantially similar and upon information and belief
20 being subject to this discretion --
21           THE REPORTER:  I'm sorry, guys.  When you
22 read, you've got to slow down for me.
23           THE WITNESS:  Sorry.
24           THE REPORTER:  I can't keep up with that.
25 Sorry.

135

1      Q.   (By Mr. Tatum)  Let me just -- you would defer
2 to what's written in the complaint?
3      A.   I would.
4           MR. TATUM:  Okay.  I'm hungry.  Can we go
5 off the record?
6           MS. RUDD:  Sure.
7           (Recess from 12:42 p.m. to 1:21 p.m.)
8           MR. TATUM:  We're back on the record.
9      Q.   (By Mr. Tatum)  Mr. Banks, does the Texas
10 NAACP contend that the requirements of SB 14 constitute
11 a prerequisite to voting that will deny and abridge the
12 right to vote on account of race or membership in a
13 language minority group?
14      A.   Yes.
15      Q.   What is that based on?
16      A.   They would have to have the necessary document
17 or ID in order to vote, and the barriers that we
18 discussed earlier will create -- the barrier, I guess,
19 if you will -- create the prerequisite that you're
20 mentioning.  And from the information we've provided in
21 the complaint and other documents showing how they will
22 have trouble and difficulties obtaining voter ID or the
23 documents needed to get the requisite ID or required ID.
24      Q.   Okay.  Does the Texas NAACP contend that the
25 requirements of SB 14 make it impossible for anyone to

136

1 vote?
2      A.   It makes it -- it has the potential to make it
3 impossible for some to vote, yes.
4      Q.   It has the potential?
5      A.   Yes.
6      Q.   Okay.
7           (Exhibit No. 4 marked)
8      Q.   (By Mr. Tatum)  I'm handing you what's been
9 marked as Exhibit 4.  Mr. Banks, do you recognize that
10 document?
11      A.   I do.
12      Q.   And what is it?
13      A.   It is Senate Bill 14.
14      Q.   Have you seen this document before?  Well,
15 obviously you do recognize it.  Have you read this
16 document before?
17      A.   I have.
18      Q.   Okay.  Could you point to me what parts --
19 specific parts of this bill deny or abridge a person's
20 right to vote on account of race or membership in a
21 language minority group?
22           MS. RUDD:  Objection; form.
23      A.   Could you restate the question?
24      Q.   (By Mr. Tatum)  Sure.  You have in front of
25 you the text of Senate Bill 14 enacted during the 2011

137

1 Texas Legislature.  I'm wondering if you could -- you've
2 stated that the Texas NAACP is contending that SB 14
3 constitutes a prerequisite to voting that will deny and
4 abridge the right to vote on account of race or
5 membership in a language minority group.
6      A.   Sure.
7      Q.   What I'm asking is:  With Senate Bill 14 in
8 front of you, can you point to the parts of Senate
9 Bill 14 that deny or abridge the right to vote on
10 account of race or membership in a language minority
11 group?
12           MS. RUDD:  Same objection.
13      A.   Well, you have to look at it -- well, it may
14 not specifically or just flat out outright say it in the
15 bill, but when you look at the data and the information
16 that we've presented that shows the harm that it will
17 have on these groups, then you will have that happen.
18 It doesn't specifically say it in the bill, of course,
19 but when you look at the totality of it all and say,
20 "Well, this will be an issue.  This will be an issue.
21 This will be an issue because of this, that, and the
22 other," then --
23      Q.   (By Mr. Tatum)  And when you refer to the
24 totality of it all, what is encapsulated in the totality
25 of it all?

Yannis Banks - 6/4/2014

138

1    A.   Sure.  When you look at how the data has
2  shown -- the data that we presented shows that racial
3  minorities, language minorities, they tend to be lower
4  socioeconomic areas, the struggles that they will have
5  to, one, travel to get the ID, whether it's having to go
6  to the DPS office or have your -- having to pay for the
7  documents needed to get the ID, then -- and you look at
8  the requirements they have and say, "Well, of the six
9  IDs that you list, you know, there's a great chance they
10  won't have any of the six," and if they try to get the
11  free one -- or they want to go get the free one, do they
12  have the necessary funds, transportation, ability to go
13  and get them?  Then you're setting up the prerequisites
14  for them having trouble to be able to vote.
15    Q.   So does Texas NAACP contend that SB 14 does
16  not, per se, deny or abridge the right to vote, but it
17  results in a denial or abridgment of the right to vote?
18         MS. RUDD:  Objection; misstates the
19  complaint in this case, misstates prior testimony, form.
20    A.   Ask the question again.
21    Q.   (By Mr. Tatum)  Sure.  Is the Texas NAACP
22  contending that SB 14, when considered in the totality
23  of circumstances that you described, leads to or results
24  in a denial or abridgment of the right to vote?
25         MS. RUDD:  Wait.  Go ahead.

139

1    A.   We're saying that Senate Bill 14 will have a
2  harmful impact on minorities by setting up the barriers
3  that it has for them to be able to participate in
4  voting, whether it's from the forms of ID or the
5  documents that they are going to need to have to get the
6  forms of ID, it will be difficult for them to -- make
7  it, for some, impossible to go out and vote.
8    Q.   (By Mr. Tatum)  Does Texas NAACP contend that
9  SB 14 forces eligible voters to choose between voting
10  and other uses of their limited time and resources?
11    A.   Yes.
12    Q.   And I believe you've already covered why and
13  what that contention is based upon.
14    A.   Yes.
15    Q.   My next question is:  Is there a legal
16  requirement to vote?
17    A.   A legal requirement?
18         MS. RUDD:  Objection; vague, calls for a
19  legal conclusion.  I have no idea what that means.
20    Q.   (By Mr. Tatum)  Is there a legal duty to vote?
21  Are you required by law to vote?
22    A.   No.  But it's a right.
23    Q.   It is a right?
24    A.   It is a right.
25    Q.   Is it a right that a person exercises

140

1  voluntarily?
2    A.   Yes.
3    Q.   In other words, there's no punishment if you
4  do not vote?
5    A.   Correct.
6    Q.   Let me clarify that.  There's no punishment
7  imposed by law if you do not vote?
8    A.   Correct.
9    Q.   Okay.  So would you agree that a voter, if
10  it's a voluntary exercise of that right for which
11  there's no punishment if that right is not exercised,
12  would you agree that a voter must always choose between
13  voting and doing something else with their time?
14         MS. RUDD:  Objection; form, calls for
15  speculation, vague and ambiguous.
16    A.   Could you restate your question, please?
17    Q.   (By Mr. Tatum)  Sure.  We've established that
18  voting is voluntary.
19    A.   Yes.
20    Q.   It's a voluntary exercise of a right.
21  Correct?
22    A.   Yes.
23    Q.   Okay.  The Texas NAACP contends that SB 14
24  forces voters to choose between voting and other uses of
25  their limited time and resources.  Correct?

141

1    A.   Yes.
2    Q.   Prior to SB 14, did voters not have to choose
3  between voting and other uses of their limited time and
4  resources?
5         MS. RUDD:  Objection; calls for
6  speculation.
7    A.   No.
8    Q.   (By Mr. Tatum)  They did not?
9    A.   No.
10    Q.   Why didn't they?
11         MS. RUDD:  Objection; calls for
12  speculation.
13    A.   The difference is that, you know, when we look
14  at the limited resources and time.  The voter
15  registration card was free.  You didn't have to spend
16  any money to get your voter registration card.  So you
17  didn't have to choose between having to pay a bill or
18  what have you, or buying this, that, or the other, or
19  being able to go and get your voter registration card
20  and vote.  So you had the ability to not have that
21  worry.
22         And with Senate Bill 14, you now have
23  that -- I won't say ability, but you now have to
24  worry -- some will have to worry about this money and,
25  "My budget is limited or it's fixed.  This is how much

142

1  money I have.  So the money I have to spend for this,
2  where is that going to come from?"
3          And as far as it being no consequences to
4  people who get into office, whether you vote or not can
5  have consequences on your situation that could impact or
6  make it better or make it worse for you.  So you do have
7  consequences for voting or not voting.
8      Q.  (By Mr. Tatum)  Okay.  So we're talking more
9  about the consequences of choosing to vote and not the
10  actual choice to vote.  Is that correct?
11          MS. RUDD:  Objection; vague.
12      A.  I'm confused.  I'm sorry.
13          (Exhibit No. 5 marked)
14      Q.  (By Mr. Tatum)  I'm handing you what's been
15  marked as Exhibit 5.
16      A.  Okay.
17      Q.  Mr. Banks, do you recognize this document?
18  Look at the second page.
19      A.  Response of plaintiffs.
20          MS. RUDD:  And just for the record, just
21  because you can read the second page doesn't mean you
22  necessarily recognize this document.
23          THE WITNESS:  Right.
24      A.  I don't know if I've seen this one.
25      Q.  (By Mr. Tatum)  Okay.  Mr. Banks, I'll

143

1  represent to you that this is the Texas NAACP's response
2  to the defendants' motion to dismiss.
3      A.  Okay.
4      Q.  Okay.  Have you seen this document before?
5      A.  I don't think I have.
6      Q.  Okay.  Are you aware that this document has
7  been filed on behalf of the Texas NAACP?
8      A.  I see that, yes.
9      Q.  Okay.  So you agree that it has?
10      A.  Yes.
11      Q.  This document represents the position of the
12  Texas NAACP in this case?
13          MS. RUDD:  Objection; form.  I mean, this
14  is a legal document written by lawyers.  I don't think
15  he can agree to anything when he hasn't ever seen the
16  document -- anything that's in this document.
17          MR. TATUM:  He's never seen it.  I'm just
18  trying to make sure he understands what it is.
19          MS. RUDD:  That's fine, but that's
20  different from the question you asked.
21          MR. TATUM:  Okay.
22      Q.  (By Mr. Tatum)  Are you aware that the Texas
23  NAACP has filed this document?
24      A.  Yes.
25      Q.  Okay.  Would you please turn to Page 24?

144

1      A.  Okay.
2      Q.  Are you there?
3      A.  I am.
4      Q.  Okay.  In the middle of Page 24, in that
5  paragraph, there's a sentence that reads, "Plaintiffs
6  respectfully urge the Court to keep this 'self
7  disfranchisement' argument in mind as the case proceeds,
8  however, because Texas is conceding that SB 14 may force
9  eligible citizens to choose between voting and other
10  uses of their limited time and resources."
11          You stated a minute ago that the Texas
12  NAACP contends that SB 14 forces eligible voters to
13  choose between voting and other uses of their limited
14  time and resources.  What I'm trying to get at is:  In
15  my opinion, because it is a voluntary right, that choice
16  always exists, in the same way that you choose to go to
17  a movie as opposed to reading a book, and what I am
18  trying to understand is if it is the Texas NAACP's
19  position that that choice did not exist prior to SB 14.
20          MS. RUDD:  Objection; form, compound,
21  convoluted, asked and answered.
22          MR. TATUM:  Fair enough.
23      Q.  (By Mr. Tatum)  Mr. Banks, does the Texas
24  NAACP contend that prior to SB 14, voters did not have
25  to make the choice between voting in an election and

145

1  other uses of their time and limited resources?
2          MS. RUDD:  Objection; asked and answered.
3      Q.  (By Mr. Tatum)  I'm asking again for a
4  clarification.
5      A.  Sure.
6          MS. RUDD:  Same objection.
7      A.  Okay.  It is our stance that -- well, my
8  understanding, I could say.
9      Q.  (By Mr. Tatum)  That's all I'm asking for.
10      A.  You look at before SB 14 and after SB 14.
11  Before, resources that had to be used there wasn't a
12  decision -- because when you mentioned like going to a
13  movie or something, that's privileged, extra income.  If
14  you've got it, you do it.  But I could still go and vote
15  because I wouldn't have to pay for a voter registration
16  card.
17          With SB 14 in place, I have to -- not me,
18  but the person would have to decide, "How is my money
19  going to be spent," or, "Do I have the extra money to
20  get the documents needed to go vote so I can go vote,"
21  or, "Do I have the extra money to get to where I need to
22  go to get this free document to go vote, whether it's
23  traveling 60 miles, having to pay somebody to get me
24  there or buy a bus ticket?"
25          So you have to now make a decision on,

146

1 "If I don't have the money and I want to vote, how can I
2 go vote, or what am I now going to have to cut out, or
3 am I just not going to be able to participate because I
4 don't have the extra money or it's just not there?"
5        Q.   Does the Texas NAACP contend that there is
6 more of a consequence to the choice to vote because of
7 SB 14 than there was prior to SB 14?
8            MS. RUDD:  Objection; vague.
9        A.   What do you mean when you say "consequence"?
10       Q.   (By Mr. Tatum)  You mentioned consequences
11 before.
12       A.   Uh-huh.
13       Q.   I believe you previously testified about the
14 consequences to choosing to vote now.
15       A.   Right.
16       Q.   And I'm asking:  Does Texas NAACP contend that
17 there are more -- or more severe consequences to
18 choosing to vote as a result of SB 14?
19       A.   In the way that I mentioned consequences --
20       Q.   And that's what I'm referring to.
21       A.   Right.  That could be -- I look at it as how
22 you would be represented by -- or not represented by --
23 who ends up in office.  So you can be hurt by -- you
24 know, your vote could have made a difference, or a bunch
25 of y'all with similar views could be -- could have made

147

1 a difference in an election, but because you could not
2 participate due to SB 14, then you -- the person who may
3 have had your best interest or had your like interest in
4 mind may not be able to represent you and your views and
5 what's needed for you and your community.
6        Q.   Okay.  Mr. Banks, are you familiar with any
7 voter ID laws from other states?
8        A.   Somewhat.
9        Q.   Are you familiar with the voter ID law in the
10 state of Indiana that was the subject of a case called
11 Crawford v. Marion County Election Board?
12       A.   Somewhat.
13       Q.   Somewhat?
14       A.   I'm aware of it.
15       Q.   Okay.  Does the Texas NAACP contend that the
16 requirements of that law are less restrictive than
17 SB 14?
18           MS. RUDD:  I'm just going to object to
19 the extent that I think this calls for information
20 outside of the noticed 30(b)(6) topics, but you can
21 answer if you can.
22       A.   Ask the question again.
23       Q.   (By Mr. Tatum)  Sure.  Does the Texas NAACP
24 contend that the requirements of the Indiana voter ID
25 law that were the subject of that case that I previously

148

1 mentioned --
2        A.   Uh-huh.
3        Q.   Does the Texas NAACP contend that the
4 requirements of that law are less restrictive than
5 SB 14?
6            MS. RUDD:  Same objection.
7        A.   From what I remember, yes.  Yes.
8        Q.   (By Mr. Tatum)  And do you remember why?
9            MS. RUDD:  Same objection.
10       A.   I don't remember all the differences between
11 Indiana and Texas' voter ID, so I can't say.
12       Q.   (By Mr. Tatum)  Okay.  You previously talked
13 about the Texas NAACP's involvement in the legislative
14 process when the Legislature is in session.
15       A.   Uh-huh.
16       Q.   I want to ask you a quick question about what
17 happens before a legislative session.
18           With regard to potential voter ID
19 proposals at an upcoming legislative session, how does
20 the Texas NAACP approach or prepare for its
21 participation in that session with regard to voter ID
22 proposals?
23       A.   It's been a while since I've had to deal with
24 a voter ID proposal, but --
25       Q.   That's fine.  To the best of your knowledge

149

1 and memory.
2        A.   From what I remember, whether we know what the
3 bill would look like or not, at -- ask the question
4 again.  I'm sorry.
5        Q.   Sure.  With regard to potential voter ID
6 proposals at an upcoming legislative session, how does
7 the Texas NAACP approach or prepare for its involvement
8 in such a session?
9        A.   Got you.  So in the past, what I remember, I'd
10 have a conversation with Gary from the very beginning
11 saying, you know, "We know it's going to be coming."
12 You know, "What are our thoughts or -- you know, if it
13 does happen, is there anything we would want to be in
14 the bill?  If it's going to have to happen, what would
15 be good to have in the bill that wouldn't disenfranchise
16 anybody?"
17          We'd look and see, okay, if -- you know,
18 can it be stopped, if it's possible for it to be
19 stopped.
20          We would -- at one of the quarterly
21 meetings that would happen before the session starts --
22 either before or slightly after session starts,
23 depending on our schedule, the session schedule, the
24 whole list of stuff we would like to see happen or not
25 happen during legislative session that's talked about as

Yannis Banks - 6/4/2014

150

1  far as goals and hopes and dreams and wishes and
2  aspirations.
3          We would have that conversation and --
4  with Gary and our political action chairs or have that
5  conversation of just what's happening and, you know, do
6  we think we can stop it or what would we like to see or
7  what options do we have available for us?  So we'll just
8  kind of, I guess, lay out a blueprint or plan of action.
9      Q.  Do you begin to compile any data or studies
10  that are relevant to voter ID legislation?
11      A.  If I had seen stuff beforehand, I would -- I
12  probably already sent something to Gary saying, "Here's
13  this.  Here's that," that I may already have stored
14  somewhere and have it to look at and to say, "Well, here
15  is this, that, and the other."
16          And if they know of something or if
17  somebody else knows of something, they would, you know,
18  bring it up, but I don't think there's any -- I don't
19  recall there being any formal process of that.
20      Q.  Do you circuit any polls or surveys to your
21  membership or constituents gauging their opinion of
22  voter ID legislation?
23      A.  That we're conducting?
24      Q.  Sorry.  That the -- sorry.  That the Texas
25  NAACP conducts.

151

1      A.  No.
2      Q.  Okay.  Now, during the session, you testified
3  earlier about various activities that you performed
4  during the session, meetings, et cetera.  With regard to
5  the 2011 session, the session in which SB 14 was
6  enacted, do you recall any specific meetings you had
7  with legislators about SB 14?  Specific meetings with
8  specific legislators.
9      A.  I can't recall.  Staff counts, or just --
10      Q.  Sure.
11      A.  Oh, okay.  From what I can remember, I would
12  say Senator West.  I met with Senator Ellis -- 2011,
13  right?
14      Q.  Yes.
15      A.  -- and I think Representative Anchia.  I'm not
16  100 percent, but I think.
17      Q.  So Senators West, Ellis, and Anchia?
18      A.  And Representative Anchia.
19      Q.  Representative Anchia.  Do you remember any
20  specific concerns or issues regarding SB 14 that were
21  brought up to those Representatives or Senators?
22      A.  It was so long ago.  I think when we met --
23  the lack of forms of ID, the small number, I guess you
24  could say, if you will, that could be used and the harm
25  it would have on the minority community as a concern.

152

1          I think the Senate hearing was such short
2  notice, that's a concern of lack of being able to -- if
3  more people wanted to have input, the lack of being able
4  to -- the changing of the rules of how it was going
5  forward on the Senate side was a concern.  I think
6  that's it.
7      Q.  Okay.  Does the Texas NAACP contend that the
8  process by which SB 14 was enacted was motivated by an
9  intent to discriminate against Latino and
10  African-American voters?
11      A.  Yes.
12      Q.  And what is that contention based on?
13      A.  Well, the process of -- so if you look at how
14  it's done in the Senate, it was short notice of the bill
15  is going to be heard, for folks to be able to get
16  there -- they changed the rules for that process where
17  it wasn't going to go to a committee separate from the
18  Senate.  They did it as a Senate committee as a whole so
19  it could be heard, voted, kicked out, this whole
20  process.
21          They changed the rules specifically for
22  that bill, the way the Senate brings up bills.  I think
23  normally it's a two-thirds, but now they needed
24  basically a simple majority -- I think it was a simple
25  majority in order to get the bill brought up.  So you've

153

1  changed that rule to limit input, say, and control from
2  other groups that if SB 14 was put, I believe, on the --
3  the emergency list, I think is what it's called -- the
4  governor can set up -- I think it's called the
5  emergency.  That seems right -- so that it could be
6  fast-tracked and moved through, you know, quickly
7  without really having an open discussion and debate.
8          You know, the House even created a select
9  committee just for this one bill, which helped with the
10  fast-track process, and -- what's -- say the question
11  again.  I want to make sure I -- could you state the
12  question again?
13      Q.  Sure.  The question was:  Does the Texas NAACP
14  contend that the process by which SB 14 was enacted was
15  motivated by an intent to discriminate against Latino or
16  African-American voters?
17      A.  Okay.  Yeah.  And then they also -- concerns
18  made by different groups that testified -- the issues
19  basically were ignored, and even the concerns stated by
20  the minority Senators and Reps went ignored.  Even the
21  amendments that they proposed to try to make it a little
22  better were, you know, basically just ignored.  That's
23  about all I can remember.
24      Q.  And I think I recall you said you testified
25  personally?

Yannis Banks - 6/4/2014

154

1    A.   On the House side, I believe I did.
2    Q.   On the House side.  On behalf of the Texas
3 NAACP?
4    A.   Well, Gary Bledsoe and I.  We both testified
5 on the House side.
6    Q.   Okay.  Does the Texas NAACP feel that its
7 voice in that process, that its concerns about the
8 effects of SB 14 were not adequately heard during the
9 legislative process?
10    A.   Do we feel our voice wasn't heard.
11    Q.   Does the Texas NAACP feel like their voice was
12 not adequately expressed or heard by the Legislature
13 during the consideration of SB 14?
14    A.   I felt like it was -- we expressed it
15 adequately.  I felt like it wasn't heard or listened to.
16    Q.   Does Texas NAACP feel like it was given a
17 proper opportunity to express its concerns and issues
18 regarding SB 14 during the consideration of SB 14?
19    A.   Does it matter which side of the --
20    Q.   On either side.
21    A.   Either side?  Yes and no.  On the Senate side,
22 I think we were there for -- we got there, like, at
23 10:00 in the morning, because they said the hearing was
24 going to start on -- I don't remember if it was -- it
25 was on, like, a Tuesday or Wednesday or Thursday or

155

1 something -- some day during the week.
2        We got there at 10:00 in the morning,
3 give or take, and I think Gary didn't testify until
4 about 4:00 in the morning the next day, which can be a
5 strain on a person to have to -- I remember -- it might
6 have been close to 5:00 or 6:00, because they were
7 frying bacon when we left, one of the places.  I just
8 remember the smell of bacon.
9        So we were basically there almost 24
10 hours to testify on this bill.  So that could be a toll
11 on a person in itself.  You know, we're fortunate that
12 Gary lives in Austin and I live in Austin, that we're
13 able to be around with short notice, two-day notice that
14 this is going to happen, that we're able to hang around.
15 For that one, I think we had -- I think the hearing for
16 the House side coincided -- it was early February, so it
17 coincided, I think, with some members being up here, I
18 think.  That just happened to work out that way on that
19 day.
20        But it still went ignored from -- the
21 concerns that were laid out, and -- the concerns that we
22 laid out.
23    Q.   Why does the Texas NAACP feel that their
24 concerns and expressed issues were ignored?
25    A.   They weren't implemented, I guess you could

156

1 say, or even -- you know, they just seemed to -- they
2 went forward with the bill as written, no changes, no
3 nothing, just -- you know, there wasn't any lack of
4 concern or worry about it.
5    Q.   Looking back at the complaint -- do you have
6 that handy?
7    A.   Yeah.  That's -- is that 3?
8        MS. RUDD:  Yes.
9    Q.   (By Mr. Tatum)  That was 3, yes.
10    A.   Okay.
11    Q.   And again, I'm going to try to not get as
12 bogged down in the language of it.
13        On Paragraph 57 -- or Paragraph 57, which
14 is on --
15    A.   18?
16    Q.   Correct, on Page 18.  The last sentence there
17 says, "The Texas Legislature did not investigate the
18 concerns regarding the discriminatory nature of voter
19 identification changes."
20        Correct?
21    A.   Uh-huh.
22    Q.   That's what --
23    A.   Correct.
24    Q.   -- that sentence says?  Okay.
25    A.   Yes.

157

1    Q.   Are you aware of any analyses or studies that
2 the Legislature should have relied on or investigated or
3 been aware of that it did not consider in its
4 consideration of SB 14?
5        MS. RUDD:  Objection; calls for
6 speculation.
7    A.   This is from '05 to '09.  I guess this is
8 what's --
9    Q.   (By Mr. Tatum)  That's limited to '05 to '09.
10 In the context of SB 14, is there anything that you feel
11 like the Texas Legislature did not but should have
12 considered or taken into account in its consideration of
13 SB 14?
14    A.   Well, I know that one thing they love to do at
15 the Legislature is do studies.  They love to do them.
16 So when you look at the number of -- the lack thereof, I
17 guess you could say, of in-person voter fraud, you know,
18 saying that this is an issue, and there's no data to
19 show that that is an issue, that becomes a very big
20 concern how you push this forward as a major concern, a
21 major problem that's happening, and there's no data to
22 show otherwise.  That becomes a red flag for a lot of
23 things.
24    Q.   And between your testimony and the testimony
25 of Mr. Bledsoe and anyone else representing the

158

1   interests of the Texas NAACP, were any such studies or
2   data provided to the Legislature during the
3   consideration of SB 14, to the best of your knowledge?
4        A.   Not that I recall.  It might have been stated
5   that no data to show it is a problem, but I can't recall
6   if there were any studies provided by us.
7        Q.   You mentioned the rule changes in the
8   Legislature.
9        A.   Uh-huh.
10       Q.   Do you remember specifically what rules were
11  changed or adopted by the 2011 Legislature?
12       A.   For the Senate, they changed the two-third
13  rule, which has been the Senate tradition for many
14  years, a standing that said, you know, you need
15  two-thirds of a vote before the bill can come up if it's
16  not on one of the Senate days or what have you, the
17  two-thirds rule -- a two-thirds vote of the Senate body.
18  They -- specifically for voter ID.  You know, they
19  didn't get rid of it for everything, but I know
20  specifically for voter ID, they removed that rule so it
21  could be brought up.
22            The ability to be able to do it as a
23  Senate committee as a whole, they changed it for voter
24  ID.  You know, other bills went to the committee, and
25  you had committee hearings, and it went through the

159

1   committee vetting process that the bills tend to
2   normally go through so you can have transparency and
3   participation from people who want to come and
4   participate.
5            Because normally, when it goes through
6   the committee process, there's generally about a week
7   notice for folks, I believe.
8        Q.   What is a week notice?
9        A.   Notice of when a hearing is going to be.
10       Q.   Okay.
11       A.   You normally have about a week notice, if I
12  remember correctly.  It feels like it's about a week
13  notice.  So you have -- you give people proper time
14  to -- if they're really passionate or concerned about
15  it, you have constituents who are able to travel and
16  come and say their piece and properly prepare and study.
17            Like I said, the House formed a -- you
18  know, the Governor called it an emergency issue, and the
19  House formed a special select committee for this bill,
20  and it went straight to committee.  I think the
21  committee was called "Voter ID and Election Fraud," but
22  this was the only bill heard in the voter ID and
23  election fraud committee.
24            There were no other bills sent to even
25  try to cover election fraud, which that committee

160

1   encompassed that.  And it -- you know, for the
2   fast-track so it could -- normally, when the bill is in
3   session, you have to wait 60 days before they can hit
4   the House floor, but once it's an emergency item, they
5   can come up, you know, as soon as they can get them
6   there, so -- I believe that's all I can remember right
7   now.  Just thinking real hard, that's about it right
8   now.
9        Q.   That was it?
10       A.   It's done sometimes.
11       Q.   That was a lot.
12            So amongst all these various rule changes
13  and procedures that you've just described --
14       A.   Uh-huh.
15       Q.   And I'm not going to attempt to summarize
16  them.  Do you -- does the Texas NAACP contend that any
17  of those rule changes or procedures were made outside
18  the permissible bounds of legislative authority?
19       A.   How do you mean?
20       Q.   Does the Texas NAACP contend that the
21  Legislature did not have the authority to make those
22  rule changes or changes in normal or traditional
23  procedures?
24       A.   They have the authority to make these rule
25  changes.  It's just concerning, though, that they

161

1   targeted one specific item.  It wasn't that they changed
2   the rule for everything and anything.  It was this one
3   issue.
4            That becomes a concern when it's only --
5   when it's just this issue.  It was like, "Well, okay.
6   This one we'll change the rule for.  Everything else,
7   it's business as usual."
8        Q.   To the best of your memory, going back to the
9   earliest time of your involvement with the Legislature
10  on behalf of the Texas NAACP -- which I think you said
11  was 2007?
12       A.   Yes.
13       Q.   Okay.  Going back to 2007, do you ever
14  recall -- as we sit here, do you ever recall similar
15  rule changes or procedural moves made by the Legislature
16  for any other kind of bill, not necessarily just voter
17  ID bills?
18       A.   Going back to '07?  I think so.
19       Q.   Do you recall what bill or bills they were
20  made in regards to?
21       A.   I think in '09 they did it for voter ID, the
22  Senate being "they."  I think the Senate did it in '09
23  also.  And then I think the governor did the emergency
24  item for the sonogram bill, which -- was that 2011?
25  That might have been 2011.  So I think the sonogram

162

1  bill, they may have made changes for that bill as well.
2      Q.   Does the Texas NAACP contend some of these
3  procedural changes and rule changes negated tactical
4  options that the Texas NAACP had at their disposal to
5  use in opposition of Senate Bill 14?
6      A.   Ask the question again.
7      Q.   Does the Texas NAACP contend that these
8  various rule changes and procedural changes that you've
9  described --
10     A.   Uh-huh.
11     Q.   -- negated tactical options -- now, I'm
12 borrowing that language directly from one of the
13 pleadings --
14     A.   Okay.
15     Q.   -- tactical options at the disposal of the
16 Texas NAACP for opposing SB 14?
17     A.   Yes.
18     Q.   Okay.  Can you described what those tactical
19 options were or are?
20     A.   Well, yeah.  So the way the rules are
21 normally -- traditionally been set up and followed, the
22 legislators would have to listen to the groups that
23 are -- not necessarily the group, but the legislators
24 themselves, if you look at -- so let's say the Senate
25 body.

163

1          The minority Senators, which I think
2  there was eight of them at the time, they would have to
3  listen to them more and value their input and what they
4  are saying, not just go forth as they want without
5  having to listen or respect or care about the issues
6  they're laying out.
7          But once they change the rules, their
8  issues, their point of views, their concerns to be
9  expressed were kind of invalid and null and void, and
10 the same for what -- like when Gary testified that
11 morning, he laid out the information and concerns and
12 what have you, and I think -- I don't even think all the
13 Senators were there at the time he testified.  I think a
14 lot had, you know, left and went to sleep or what have
15 you, so it wasn't even a full Senate at that point
16 either.
17     Q.   They were out having some of that bacon?
18     A.   Probably so.  They were doing something.  I
19 was struggling to stay awake myself.
20          But they didn't have to listen or didn't
21 have to be there or even if they were there, they didn't
22 have to pay attention because the votes they had.  So
23 they didn't have to pay attention to those concerns.
24          And on the House side, it's safe to --
25 fast-track, select committee, and they didn't have to

164

1  worry about concerns that once again the minority
2  Representatives were stating or laying out those
3  concerns or -- the amendments that they proposed for the
4  Senate and the House side.  They didn't really have to
5  take them serious or to pay them much attention because
6  they had the votes and had it set up.
7      Q.   Mr. Banks, what does the Texas NAACP believe
8  is the purpose for Senate Bill 14?
9      A.   The purpose of Senate Bill 14 is to limit
10 minority participation in the voting process, the --
11 that's the outcome of it.  It limits their ability to
12 express their right to vote.
13     Q.   Does the Texas NAACP contend that SB 14 was
14 enacted with discriminatory intent?
15     A.   Yes.
16     Q.   And why?
17     A.   Well, when you look at the process of how it
18 was passed -- there may not be any direct evidence, but
19 when you look at the process of how they passed it from
20 changing of the rules to not listening to -- in the
21 Senate side, the minority Senators and their concerns
22 and amendments they proposed to make the bill a little
23 bit better.
24          You know, and they ignore that, and then
25 the House side that -- ignored the minority Senators.

165

1  And I think all of the African-Americans and most of the
2  Hispanic Representatives voted against the bill, but
3  they had amendments, had concerns.
4          They had issues -- you look at Gary's
5  testimony and what I've said and you hear -- or you see
6  that process.  Then you look at that evidence, then you
7  can see that.
8      Q.   Does the Texas NAACP contend that any
9  Legislator who voted for SB 14 acted with discriminatory
10 intent?
11     A.   I would say yes, because it goes to the
12 process of, once again, the rule changes and not
13 listening to the concerns.  So I would say yes.
14     Q.   Does the Texas NAACP contend that any citizen
15 who supports SB 14 does so because of discriminatory
16 intent?
17          MS. RUDD:  Objection; irrelevant.
18     A.   I would say, once again, with the process,
19 yes, and how it was done.
20     Q.   (By Mr. Tatum)  Does the Texas NAACP contend
21 that the Texas Legislature intended to harm any minority
22 group with the enactment of SB 14?
23     A.   Yes.
24     Q.   And what is that contention based on?
25     A.   The process of how it was done.  Once again,

166

1  changing the rules, ignoring the concerns of minority
2  Senators and Reps.
3      Q.  All right.  I want to ask you a couple of
4  questions that relate to election crimes and voter
5  fraud.
6      A.  Okay.
7      Q.  And when I do so, I'm incorporating their
8  definitions under the 30(b)(6) notice, I believe.
9          MS. RUDD:  Okay.  I can't be certain that
10 Mr. Banks will have studied those definitions very
11 carefully, so --
12         MR. TATUM:  Sure.  I just want to make
13 sure that when I refer to that, that's what I'm
14 referring to, and --
15     Q.  (By Mr. Tatum)  Do you have that in front of
16 you?
17     A.  Is that Exhibit 1?
18     Q.  Yes, sir.
19     A.  Yes.
20     Q.  Will you just, very quickly, under the
21 definitions tab, just -- I know those are kind of long
22 paragraphs, but just kind of skim them just so you can
23 get a basic idea of what I mean when I say "election
24 crimes" and "voter fraud."
25     A.  Okay.  I think I have somewhat of an

167

1  understanding.
2      Q.  You've got the gist of it?
3      A.  I'm hoping so.
4      Q.  Okay.  In your time with the Texas NAACP --
5      A.  Uh-huh.
6      Q.  -- do you recall any of your -- do you recall
7  any members or constituents of the Texas NAACP
8  expressing concerns to you or anyone else at the Texas
9  NAACP relating to election crimes or voter fraud?
10     A.  I'd say yes.
11     Q.  And do you recall what those concerns were?
12     A.  During my time, we've had --
13     Q.  And I'll just say that goes back to -- we're
14 talking about right now back to 2007.
15     A.  Right.  You've had elderly couples -- well,
16 not elderly couples, but elderly people who -- you know,
17 they've had people approach them asking them --
18 harassing them and saying, "Who assisted you to vote?
19 Who are the people -- or who has been assisting you to
20 vote?"
21         And of course people talking, that scares
22 folks from wanting -- because they're being now asked
23 questions about who was assisting them to vote by, you
24 know, random folks.  We've had calls about people who
25 were outside of election sites, you know, scaring people

168

1  and saying, you know, "You need to have your ID ready.
2  Have your ID out."  And I believe this was before voter
3  ID was enacted, you know, telling folks, "I need to see
4  your ID before you walk in here to vote."
5          We had people in Harris County, members
6  who were trying to assist some of the elderly and make
7  sure they were able to participate in voting and what
8  have you, and they -- those are just some that I can
9  remember off the top of my head.  Yeah, off the top of
10 my head, that's --
11     Q.  Okay.  In your time as a member of the Texas
12 NAACP, have you ever expressed concerns to the Texas
13 NAACP regarding election crimes or voter fraud?  You
14 personally?
15     A.  What do you mean "expressed concerns"?
16     Q.  Have you ever encountered any instances of
17 election crimes and voter fraud and made those
18 encounters known to the Texas NAACP?
19     A.  Let me clarify.  When you say "encountered,"
20 do you mean -- what do you mean when you say that?
21     Q.  Have you witnessed any instance of election
22 crimes or voter fraud?
23     A.  No.  I've received calls, but, no, I haven't
24 witnessed.
25     Q.  You've received calls --

169

1      A.  Right.
2      Q.  -- from -- sorry.  You've received calls
3  regarding election crimes and voter fraud?
4      A.  Yes.
5      Q.  From who?
6      A.  People who have been affected.  Actually, I
7  remember one more.  I forgot one of the voter fraud and
8  crimes.
9          The '08 election, we had the calls of --
10 here in Travis County, there were some machines that
11 actually flipped the vote.  You had people that called
12 and said they voted for President Obama, but it came out
13 showing that they voted for McCain.
14         So there would be people who would
15 call -- and we had a hotline going on at the time.  So
16 they would call and say, "Hey, this is what happened
17 here," or, "This happened to me here," and, "This
18 happened there."
19         So there would be calls from people in
20 the community.
21     Q.  And did the Texas NAACP investigate the calls
22 like that?
23     A.  Yes.
24     Q.  Did they do any kind of follow-up?
25     A.  Yes.

170

1    Q.   And what was the result of those
2  investigations or follow-ups?
3    A.   Like for people -- I guess it depends on --
4  well, I know for Travis, they reached out to the
5  election office to inform them and let them know.  If we
6  hear about somebody is harassing folks in a certain
7  area, we will -- if we have a branch there, we call them
8  to see if they can find either somebody -- if somebody
9  is doing it or somebody who has been accosted and let
10 the proper people know at the location if this is
11 happening.
12   Q.   In your time with the Texas NAACP, have any of
13 your members or constituents expressed concerns to the
14 Texas NAACP relating to voter impersonation?
15   A.   No, not that I'm aware of.
16   Q.   In your time at the Texas NAACP, has the Texas
17 NAACP conducted any studies, surveys, or other kinds of
18 information related to election crimes, voter fraud, or
19 voter impersonation?
20   A.   Not that I'm aware of.
21   Q.   Okay.  To your knowledge, have any members or
22 constituents at the Texas NAACP ever expressed support
23 for voter ID requirements?
24   A.   Not that I'm aware of.
25   Q.   This is kind of encapsulated in that, but to

171

1  your knowledge, have any of your members -- have any
2  members or constituents at the Texas NAACP ever
3  expressed support for SB 14?
4    A.   Not that I'm aware of, no.
5         Can I add one more to the question you
6  asked about have we had election crimes or voter fraud
7  reported to us?
8    Q.   Yes, you may.  And I want to make sure that
9  we're on the same page, actually, now that you bring
10 that up.  I think some of what you were speaking to --
11 you were talking about voter intimidation at the polling
12 place, and I want to make sure that we're talking about
13 election crime or voter fraud as defined in these terms.
14   A.   Sure.
15   Q.   I just want to make that clarification.
16   A.   Right.
17        MS. RUDD:  Okay.  But I think that would
18 be included in your definitions here.
19   Q.   (By Mr. Tatum)  Okay.  And I'm not saying it's
20 not.
21   A.   Right.
22   Q.   I just want to clarify that for my purposes.
23   A.   And then there's Waller County, which there's
24 always a problem in Waller County.
25   Q.   Sorry.  Say that again.

172

1    A.   Waller County.
2    Q.   Waller County?
3    A.   Yes.  There's always a problem in Waller
4  County, home of Prairie View.  They've had voter
5  registration forms -- you know, cards -- the voter
6  registration forms end up missing, just in a box in a
7  room somewhere that just were not processed at all.  The
8  registrar, they didn't do anything.  It seems like every
9  election year we have some kind of issue in Waller
10 County, every election year.
11   Q.   Refresh my memory.  Where is Waller County?
12   A.   Right outside Houston.
13   Q.   Okay.
14   A.   Prairie View, Brenham.  It's off 290.  You
15 drive right through there.
16   Q.   Okay.
17   A.   I'm good with that.
18   Q.   Is there anything else that you might want to
19 mention with regard to concerns expressed by Texas NAACP
20 members or constituents with regard to voter fraud or
21 election crimes?
22   A.   At this moment, no.  That's all I can
23 remember.
24   Q.   Okay.  Are you aware that SB 14 became
25 completely effective on January 1st, 2012?

173

1    A.   The date it became effective, I'm -- I don't
2  recall.
3    Q.   Okay.  But you agree that SB 14 is currently
4  completely effective?
5    A.   Yes.
6    Q.   Okay.  Do you know how many election cycles
7  we've had in the state of Texas since the enactment of
8  SB 14?
9    A.   I believe two.
10   Q.   Do you know -- are you aware if more or less
11 of your members voted in those elections compared to
12 previous ones?
13   A.   I am not aware.
14   Q.   Are you aware if any of the members or
15 constituents of the Texas NAACP were not able to vote in
16 either one of those election cycles because of SB 14?
17   A.   Yes.
18   Q.   You are aware?
19   A.   Yes.
20   Q.   And how were you made aware of that?
21   A.   We received the information that somebody was
22 not able to -- to vote this past election cycle.
23   Q.   You received information?
24   A.   Yes.
25   Q.   What kind of information?  How did you receive

174

1 that information?  Sorry.  That was two questions.
2           How did you receive that information?
3      MS. RUDD:  Okay.  Let me just caution
4 you, Yannis, not to reveal anything that would be
5 communications between yourself and any of the counsel
6 to the Texas NAACP in this case.
7           If you received that information from a
8 phone call from a member, then that's one thing, but I
9 just want to caution you that if you received that
10 information through conversations with counsel, just
11 don't reveal that here, because that's attorney-client
12 privilege.
13      A.  It was attorney-client privilege.
14      Q.  (By Mr. Tatum)  Okay.  Did you receive any
15 information about instances in which a Texas NAACP
16 member and constituent was unable to vote directly from
17 a member or constituent?
18      A.  Not that I'm aware of.
19      Q.  What would be the normal process if a member
20 or constituent was unable to vote because of SB 14 and
21 they wanted to express that concern to the Texas NAACP?
22 What would be the process for them to do so?  Or stated
23 another way:  What avenues are available to them to
24 express those concerns to the Texas NAACP?
25      A.  Sure.  They would -- multiple avenues.  They

175

1 could contact their local branch, and then they could
2 get ahold of us and -- or they could call us directly or
3 email.  I think those are about -- or if they know one
4 of us, they can walk up and have a verbal conversation.
5      Q.  Okay.
6      A.  Or write a letter.  People still write
7 letters.
8      Q.  Has Texas NAACP conducted any kind of field
9 test regarding the -- regarding how SB 14 plays out in
10 practice?
11      A.  What do you mean "field test"?
12      Q.  In other words, has the Texas NAACP conducted
13 any tests to see how one goes about obtaining an EIC,
14 for example?
15      A.  Besides looking up what's required to get one,
16 or --
17      Q.  Yes.
18      A.  Not that I'm aware of.
19           (Exhibit No. 6 marked)
20      Q.  (By Mr. Tatum)  All right.  I'm handing you
21 what's been marked as Exhibit 6.
22      A.  Okay.
23      Q.  There you go.  All right, Mr. Banks.  I'm
24 representing to you that this is a copy of a previous
25 transcript -- a transcript of a previous deposition in

176

1 which you were deposed.  This was a deposition taken on
2 May 25th, 2012, I believe, at -- I don't know exactly
3 where.  But do you recall sitting for this deposition?
4      A.  Right in here.
5      Q.  Right in here?
6      A.  Same room.
7      Q.  Okay.  Will you just turn quickly all the way
8 to the back to Page 160?  And I'm sorry if this is
9 small, but I wanted to save paper.
10      A.  No.  We're good.
11      Q.  Okay.  At the bottom of this page -- and I'll
12 represent to you that these were questions being asked
13 to you by, I believe, your attorney at the time,
14 Mr. Vandewalker.  Is that correct?
15      A.  It could have been.  At that point, it was
16 four hours, five hours in.  I couldn't remember.
17      Q.  Yeah.  On the previous page -- sorry.  On
18 Page 156 of the deposition, it indicates that
19 Mr. Vandewalker was initiating a round of questions to
20 you.
21      A.  Okay.
22      Q.  Okay.  So this is a question from
23 Mr. Vandewalker, who was representing you in that
24 deposition.  Correct?
25      A.  He was one of them, yes.

177

1      Q.  Okay.  At the bottom of Page 160, on Line 19,
2 he asks you, "If Senate Bill 14 goes into effect, will
3 the NAACP have to changes its programming or
4 activities?"
5           And your answer to that question was, "We
6 will have to make some adjustments, yes.  We would -- we
7 would definitely need to get our members and
8 constituents informed of what the new law entails.  And
9 so we'll have to use our resources or divert resources
10 that would be used for other things to inform others,
11 and to whatever extent that we could help get what they
12 need to be able to vote as well."
13           Is that, more or less, a summary of your
14 testimony there?
15      A.  More or less, yes.
16      Q.  Okay.  So that deposition was taken in 2012.
17 We're here almost exactly two years later.  Could you
18 describe what kind of adjustments to your programming
19 activities, if any, the Texas NAACP has had to make --
20      A.  Sure.
21      Q.  -- because of the enactment of SB 14?
22      A.  Yeah.  Well, as we mentioned earlier, when
23 you -- when we -- we have had to do more workshops from
24 it at our state convention, which takes away from
25 training we wanted to do.  Resources that we've had

Yannis Banks - 6/4/2014

178

1 available as far as financial-wise, we had to change and
2 divert from different areas or programs or what you have
3 in order to make sure we could fund the work we have to
4 do.
5         With having more training, it's less
6 focused on different issues, and we can't focus on --
7 even the way I've had to operate for our state
8 convention, a role I would normally play with help
9 planning or getting things mailed out and shipped out --
10 from talking to Linda, the State Secretary, she said
11 about 80 percent of the work I used to do for that,
12 which I noticed I had stopped doing a lot, she's had to
13 pick up and do herself or what have you.  So there was a
14 workload that I used to be able to focus on that had to
15 be -- that was diverted from me.
16         So different -- you know, at times, when
17 you can have -- be focused more on issues that could be
18 pressing or say, "I need to have y'all understand this
19 issue and that issue," whether it's education or
20 financial issues, other issues that are important and
21 impact -- or even working with different organizations
22 where there may be some discriminatory acts happening
23 into a company or a different organization and they want
24 assistance, it could be we're not able to sit down and
25 work with them because we have this going on.  Or it

179

1 could be a group we've worked with on a different issue
2 completely separate from this, and they're having a
3 meeting about it, want to talk about it, and we say, "I
4 can't make it because I have to do this.  I need to do
5 that.  This is going on."
6         So there are times, when I'm working with
7 with some of our allies, I have to either cancel
8 meetings, not attend meetings, or just miss it flat out
9 and tell them, "Yes, I can be there," and something
10 comes up and, "I'm not going to be there."
11         So that aspect of resources.
12     Q.  And has the diversion of resources that you've
13 talked about, has that been ongoing and continuous from
14 the enactment of SB 14 to present day?
15     A.  Yes.
16     Q.  Okay.  Has the percentage of resources, both
17 financial and otherwise that have been diverted because
18 of SB 14 -- has the percentage of those resources
19 changed over the course of the past two years since
20 SB 14 was enacted?
21     A.  When you say "percentage" -- like financial,
22 when you say "percentage," what do you --
23     Q.  Well, the Texas NAACP has contented that
24 because of SB 14, they're having to divert --
25     A.  Uh-huh.

180

1     Q.  -- an amount of financial and other resources
2 to deal with the impacts of SB 14.  Correct?
3     A.  Yes.
4     Q.  Okay.  What I'm asking is:  Has the amount or
5 the percentage of those resources in relation to all the
6 resources available to the Texas NAACP -- has that
7 percentage changed, either increased or decreased,
8 between the enactment of SB 14 and now?
9     A.  I was --
10         MS. RUDD:  Objection; form.
11     A.  I'd say yes.  I couldn't give you
12 percentage-wise as to the changes, but I'd say yes.
13     Q.  (By Mr. Tatum)  Do you think that the Texas
14 NAACP has become better at educating its members about
15 the requirements of SB 14 as time goes along?
16         MS. RUDD:  Objection; vague.
17     A.  When you say "better" --
18     Q.  (By Mr. Tatum)  That was vague.  Has the Texas
19 NAACP become more adept at educating its members about
20 the requirements of SB 14?  Has it had to expend less
21 resources as a result of SB 14 over time?  And that was
22 two questions I put together again.  Let me start over.
23         MS. RUDD:  I think he can probably
24 answer.
25     Q.  (By Mr. Tatum)  If you can answer that

181

1 question, by all means.  If not, I can rephrase.
2     A.  Could you rephrase it?  Because you lost me at
3 a certain point.
4     Q.  Sure.  I'll let you know this is the last
5 point I'm on, so we're almost done here.
6         Since SB 14 has been enacted --
7     A.  Uh-huh.
8     Q.  -- and as a result of that, as you've stated,
9 the Texas NAACP has had to divert resources to purposes
10 directly related to SB 14 that could have otherwise been
11 spent elsewhere.  That's been your testimony here today.
12         I guess what I'm getting at -- I may have
13 already asked this.  If so, please tell me.
14     A.  Sure.
15     Q.  Over time, has the Texas NAACP had to expend
16 or divert less resources to purposes related to SB 14
17 than it did previously?
18     A.  I would say no, we haven't, because it's
19 ongoing, and we want to make sure that people know about
20 it and what's happening and make sure that our members
21 are as informed as they need to be.  And even as you get
22 new members, you want to make sure that they are as
23 informed as they need to be.
24         And there's time when folks have an
25 understanding of it, but they want to make sure they

182

1  have an understanding of it, so they may call me or text
2  me or email me -- those who have my phone number, but
3  most of them have my email if -- or they know how to get
4  my email -- to ask me a question to make sure that this
5  is -- "Am I understanding this right," or, "Am I
6  grasping this right," or, "Do I have this
7  understanding?"
8          So there could be a time when I, you
9  know, was going to go have a meeting with somebody else
10 or was going to head here, so I may be late getting
11 there or may not be able to make it because I want to
12 make sure they're good.
13         You know, you do -- if you have to redo
14 the convention or redo a program or add an extra program
15 to make double sure or to get what you need, you
16 still -- it's not getting any easier or better.  I think
17 people are still having more and more questions, and
18 there's more and more people to reach out to.
19    Q.   Okay.  Mr. Banks, I think that's all I have
20 for you today.
21    A.   You're my best friend.
22    Q.   Before we go off the record, is there any
23 answer that you've given today that you'd like to
24 supplement or change now that you've had time to think
25 about it?

183

1     A.   There's so many answers.  Nothing that's just
2  jumping at me right now.
3          MS. RUDD:  If we could take a quick
4  break, I might have just one question I want to ask him
5  just for clarification purposes, and that will take 20
6  seconds.
7          MR. TATUM:  No problem.
8          MR. MILLER:  Okay.
9          MR. TATUM:  Would you like to go off
10 record?
11         MS. RUDD:  Yes, please.
12         MR. TATUM:  All right.  We'll go off
13 record.
14         (Recess from 2:35 p.m. to 2:40 p.m.)
15         MR. TATUM:  All right.  We're back on the
16 record.  I have no more questions for Mr. Banks, and I
17 pass the witness.
18         MS. MILLER:  No questions from the United
19 States.
20         EXAMINATION
21 BY MS. RUDD:
22    Q.   Mr. Banks, we've talked a lot today about the
23 diversion of resources that has been necessary for the
24 Texas NAACP as a result of SB 14, and I just want to
25 clarify one point for the record.

184

1          Does the Texas NAACP contend that it
2  suffered harm as an organization as a result of SB 14?
3     A.   Yes.
4     Q.   And is that harm continuing today?
5     A.   Yes.
6          MS. RUDD:  No further questions.
7          MR. TATUM:  That's it.  I think we can go
8  off record.
9          (Deposition concluded at 2:41 p.m.)
10         (Signature requested.)
11                 * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

185

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  YANNIS BANKS
3  DATE OF DEPOSITION:  JUNE 4, 2014
4  PAGE/LINE        CHANGE              REASON
5  ___
   _____
6  ___
   _____
7  ___
   _____
8  ___
   _____
9  ___
   _____
10 ___
   _____
11 ___
   _____
12 ___
   _____
13 ___
   _____
14 ___
   _____
15 ___
   _____
16 ___
   _____

186

1      I, YANNIS BANKS, have read the foregoing deposition
2   and hereby affix my signature that same is true and
3   correct, except as noted above.
4
                        _____
5                       YANNIS BANKS
6
7   THE STATE OF _____)
8   COUNTY OF _____)
9
10      Before me, _____, on this day
11  personally appeared YANNIS BANKS, known to me (or proved
12  to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18      Given under my hand and seal of office this the
19  _____ day of _____, 2014.
20
21
                        _____
22                      NOTARY PUBLIC IN AND FOR
                        THE STATE OF _____
23
24
25

187

1   THE STATE OF TEXAS:
    COUNTY OF TRAVIS:
2
        I, Steven Stogel, a Certified Shorthand Reporter in
3   and for the State of Texas, do hereby certify that the
    facts as stated by me in the caption hereto are true;
4   that the above and foregoing answers of the witness,
    YANNIS BANKS, to the interrogatories as indicated were
5   made before me by the said witness after being first
    duly sworn to testify the truth, and same were reduced
6   to typewriting under my direction; that the above and
    foregoing deposition as set forth in typewriting is a
7   full, true, and correct transcript of the proceedings
    had at the time of taking of said deposition.
8
        I further certify that I am not, in any capacity, a
9   regular employee of the party in whose behalf this
    deposition is taken, nor in the regular employ of his
10  attorney; and I certify that I am not interested in the
    cause, nor of kin or counsel to either of the parties.
11  filed with the Clerk.
12      GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this,
13  the _____ day of June, 2014.
14
15
16
17      _____
        Steven Stogel, CSR 6174
18      Expiration Date:  December 31, 2014
        Integrity Legal Support Solutions
19      Firm Registration No. 528
        3100 W. Slaughter Lane, Suite A-101
20      Austin, Texas 78748
        (512) 320-8690
21
22
23
24
25

---
$
---

**$15** 30:3

**$22** 97:17,22

---
0
---

**05** 157:7,9

**07** 48:20,21 56:10
161:18

**08** 169:9

**09** 132:15 157:7,9
161:21,22

---
1
---

**1** 7:3 15:21,22 17:6
81:20 166:17

**1:21** 135:7

**10:00** 154:23 155:2

**10:30** 12:21 52:1

**10:32** 52:11

**10:44** 52:11

**100** 55:12 151:16

**12:42** 135:7

**12548** 5:20

**13** 102:22

**136** 7:8

**14** 7:9 55:20 58:12
63:25 64:4,8,10,16
65:23 66:15 74:3
76:9,12 82:11,15,16
83:13,15,17,20 84:19
85:5,13 87:5
88:12,23 89:6,15,25
91:14,17,24
92:3,7,12,17,21,25
93:4,8,18 100:15
101:2,6 106:3,14
108:5 109:19,22
111:16,20 113:3
114:3 115:9 116:2
119:14,21 121:8,21
122:11 123:3 124:2,9
125:4 127:7
135:10,25 136:13,25

137:2,7,9 138:15,22
139:1,9 140:23
141:2,22
144:8,12,19,24
145:10,17 146:7,18
147:2,17 148:5
151:5,7,20 152:8
153:2,14 154:8,13,18
157:4,10,13 158:3
162:5,16 164:8,9,13
165:9,15,22 171:3
172:24 173:3,8,16
174:20 175:9
177:2,21
179:14,18,20,24
180:2,8,15,20,21
181:6,10,16 183:24
184:2

**142** 7:10

**14's** 109:17

**14th** 4:13

**15** 7:3 25:4,6,11,20
95:12 122:25 123:1

**156** 176:18

**16** 128:16

**160** 176:8 177:1

**17** 100:7

**175** 7:13

**18** 17:24 18:17,21
156:15,16

**183** 6:7

**187** 6:8

**19** 7:4 177:1

**1998** 48:16

**1st** 172:25

---
2
---

**2** 7:4 19:21,22 82:9

**2:13-CV-193** 1:4 8:4

**2:13-CV-263** 2:2

**2:13-CV-291** 3:2

**2:13-CV-348** 3:12

**2:35** 183:14

**2:40** 183:14

**2:41** 4:11 184:9

**20** 183:5

**2007** 48:22 56:4,11,20
58:7 88:3 161:11,13
167:14

**2008-2010** 103:2,17

**2009** 56:16 58:16
132:23

**2010** 5:8

**2010-ish** 33:6

**2011** 10:18 33:6 55:21
56:18 64:5 73:5
90:11 136:25
151:5,12 158:11
161:24,25

**2012** 10:18 72:25
73:23 172:25 176:2
177:16

**2013** 55:8,9 56:18
66:24 73:23

**2014** 4:5,10 185:3
186:19 187:13,18

**202.514.2919** 5:15

**209** 4:13

**213.808.5700** 5:6

**24** 17:6 143:25 144:4
155:9

**25** 30:2

**25th** 176:2

**290** 172:14

---
3
---

**3** 7:6 17:23
18:8,16,21 81:5,7
89:17 156:7,9

**3(b** 82:9

**3(c** 89:19

**30** 30:4 109:12

**30(b)(6** 4:3 16:15,19
90:17 127:11 147:20
166:8

**300** 5:8

**31** 187:18

**3100** 187:19

**320-8690** 187:20

**36** 102:22

**362** 58:16

**37th** 5:5

------------------- 4 -------------------

**4** 4:5 7:8 17:23
18:4,9,16,21 136:7,9
185:3

**4:00** 155:4

**43** 111:15 112:9 116:3

**44** 119:7

**45** 103:7

**46** 122:24 123:1
124:25 127:24

**48** 128:16,23 130:23

**4th** 4:10 8:11

------------------- 5 -------------------

**5** 6:3 7:10 16:24
142:13,15

**5/25/12** 7:13

**5:00** 155:6

**512** 187:20

**512.394.3000** 5:9

**512.463.2110** 5:21

**528** 187:19

**57** 156:13

**58** 103:7

**5th** 5:5

------------------- 6 -------------------

**6** 7:13 175:19,21

**6:00** 98:25 101:24
155:6

**60** 115:24 122:2
145:23 160:3

**6174** 187:17

**62** 103:8

**633** 5:5

**6th** 5:8

------------------- 7 -------------------

**7** 95:11

**72** 103:5

**78701-3902** 5:9

**78711-2548** 5:21

**78748** 187:20

------------------- 8 -------------------

**8** 100:6

**80** 21:2,4,12 178:11

**80th** 56:6,10,12

**81** 7:6

**82nd** 64:5

**83rd** 55:8

**88.7** 126:19

------------------- 9 -------------------

**9** 6:6 100:7

**9:35** 4:10 8:10

**90071-2013** 5:5

------------------- A -------------------

**a.m** 4:10 52:11

**A-101** 187:19

**ability** 11:5,9
76:9,13 106:25 107:5
115:8 138:12
141:20,23 158:22
164:11

**able** 12:2 23:25 41:9

47:5 50:13,21,25
51:6 70:9 72:3 74:23
75:2 83:7 85:19,25
88:13,15,19,22
89:1,3,13
91:18,21,22
92:5,9,23 96:10
101:14,25 110:7,8
113:2 114:3 115:5,7
122:8 130:17 138:14
139:3 141:19 146:3
147:4 152:2,3,15
155:13,14 158:22
159:15 168:7
173:15,22 177:12
178:14,24 182:11

**above-styled** 4:9

**abridge** 135:11 136:19
137:4,9 138:16

**abridgment** 138:17,24

**accept** 99:7

**acceptable**
91:14,16,24
92:2,6,20,24
93:4,7,17
106:3,14,25 107:6
108:18 109:21 111:19
112:1,10 113:3
119:21 120:5,24
121:8

**access** 62:15 75:4
124:18 128:10

**accompanying** 32:18

**According** 103:1

**accosted** 170:9

**account** 62:15 109:2
135:12 136:20
137:4,10 157:12

**accounts** 84:7

**accurate** 11:5,9 12:2
48:8 80:17 81:19
86:11 89:5 100:17
103:11 112:8,15
116:10 119:15 123:6

124:9 129:4

**accurately** 11:13
68:19

**acknowledged** 186:15

**ACLU** 58:4

**ACS** 103:2 110:2,22
114:15 118:5

**act** 36:11

**acted** 165:9

**action** 1:3 2:1 3:1,11
21:24 43:9,12 53:15
76:20 77:8 78:1
150:4,8

**actions** 123:1,9
124:20 125:1,7
127:24

**active** 37:16 63:24

**activities** 28:21
31:12 34:15 43:1
66:13 83:15,19 86:12
151:3 177:4,19

**activity** 45:3 50:18
66:20 67:1

**acts** 178:22

**actual** 91:22 142:10

**actually** 25:11 32:3
46:18 50:25 57:19,21
58:1 67:3 98:11
126:6,7 169:6,11
171:9

**add** 171:5 182:14

**addition** 68:13 99:21

**address** 32:24 34:2
117:3

**addressing** 70:17

**adept** 180:19

**adequately** 18:25
154:8,12,15

**adjustments** 177:6,18

**adopted** 158:11

**adult** 30:3

**advertise** 36:18

**advice** 40:14,16,18
41:23,25 42:4 79:25

**advocating** 35:21

**affect** 11:5,9 130:2

**affected** 110:7 169:6

**affects** 76:9

**affiliate** 9:24

**affirmatively** 131:4

**affix** 186:2

**afford** 101:21 110:9
130:12,17

**afoul** 28:9

**African-American**
35:22 53:6,7 111:20
112:13 119:9 120:12
125:16,18,20 126:2,3
129:2 152:10 153:16

**African-Americans**
110:3 112:4 165:1

**against** 152:9 153:15
165:2

**age** 29:19 30:7 109:5

**agenda** 69:16,22
74:5,7,9

**agents** 33:1

**ages** 109:8

**ago** 10:16 36:13 72:18
144:11 151:22

**agreement** 28:5,10

**ahead** 10:20 40:23
50:21 102:21 138:25

**ahold** 175:2

**aiding** 69:13

**allegation** 98:8
103:14 124:2 132:8

**allegations** 82:6

**alleged** 119:8

**allegedly** 83:14

**allies** 179:7

**allocate** 60:18 86:14

**allocated** 61:9 88:7

**allocation** 60:13
86:21

**allow** 102:14

**allowance** 100:21

**allowing** 102:5

**alone** 122:3

**already** 13:15 15:16
19:3 63:10 95:14
96:6 101:10 107:25
108:3 139:12
150:12,13 181:13

**alternative** 84:6

**am** 9:19 13:4 17:4
19:10 25:1 29:6 41:3
45:18 50:21 68:18
76:14 95:9 102:24
109:6,10 111:25
144:3,17 146:2,3
173:13 182:5
187:8,10

**ambiguous** 140:15

**amendments** 153:21
164:3,22 165:3

**AMERICA** 2:1 5:11

**American** 1:7 3:2 7:11
103:3,17

**Americanize** 132:18

**Americans** 103:24

**among** 111:18 112:2,12

**amongst** 24:9 59:20
80:9 106:11 160:12

**amount** 70:18 98:17
99:18 101:2,6 123:24
180:1,4

**amounts** 121:21
122:11,12

**Amy** 5:3 8:21 107:11

**amy.rudd@dechert.com**
  5:6

**analyses** 90:25 157:1

**Anchia**
  151:15,17,18,19

**and/or** 90:3

**Angela** 5:12 8:25 16:5

**angela.miller5@usdoj.**
  **gov** 5:16

**Angeles** 5:5

**Angelo** 120:13

**ANNA** 1:4

**annual** 30:22,24
  31:4,5

**answer** 11:22,25
  12:16,17 22:22
  40:1,22 41:21,22
  44:17 46:3 47:5,9,10
  71:13 74:19 78:6
  79:23 80:1 90:5
  96:24,25 127:11
  147:21 177:5
  180:24,25 182:23

**answered** 131:4 144:21
  145:2

**answering** 11:13 12:4

**answers** 11:6,10,20
  183:1 187:4

**Antonio** 22:15

**anybody** 36:13 49:4
  149:16

**anyone** 13:25 14:19,25
  49:22 50:3 54:5
  61:1,2 135:25 157:25
  167:8

**anything** 11:12 15:15
  19:5 34:8 36:11
  43:16 49:4,8,9 51:3
  54:17,20 62:22
  63:6,9 80:17 108:4
  111:3,11 113:24

114:1,22 125:11,19
143:15,16 149:13
157:10 161:2
172:8,18 174:4

**appear** 109:16

**Appearances** 6:3

**appeared** 186:11

**Appearing** 5:13

**appears** 125:9

**applicant** 32:20

**application** 29:18
  30:21 32:20
  33:4,10,15,20,21,24
  128:25 129:9,16
  130:22 131:6

**applies** 20:10

**apply** 93:24

**applying** 95:15 96:7

**appointed** 25:15,25
  26:1,3 27:16

**appoints** 26:4,5

**approach** 148:20 149:7
  167:17

**appropriately** 83:22
  127:19

**approval** 77:23

**area** 22:15 23:4,25
  29:10 33:6 50:18
  61:25 68:2,5,6 72:21
  114:25 115:15 170:7

**areas** 85:16 98:19
  115:16 116:1 124:13
  138:4 178:2

**aren't** 33:9 86:20
  90:25 96:3

**argument** 144:7

**arise** 119:9

**arises** 87:8

**Asian** 103:9 132:16

**aspect** 38:14 59:17

179:11

**aspirations** 150:2

**assigned** 51:15

**assist** 35:6 82:2 83:7
  168:6

**assistance** 35:6,9,12
  104:24 105:2 115:17
  178:24

**assistant** 5:19 8:2
  21:20 48:3,11,12

**assisted** 167:18

**assisting** 69:4,13
  82:15 167:19,23

**associated** 86:25
  95:18 97:7,8,15
  98:4,7 99:11,22
  121:24

**association** 2:6 57:23
  74:25 126:2

**assume** 27:1 60:15

**attached** 4:16

**attempt** 160:15

**attend** 38:3,5,8,18
  41:9,12 49:5 71:19
  73:9,10 179:8

**attendance** 72:13

**attended** 72:17,23
  73:3

**attends** 37:25

**attention** 71:8
  163:22,23 164:5

**attorney** 4:13 5:13,19
  8:2,12 14:2,11 44:4
  45:25 79:25 176:13
  187:10

**attorney-client** 79:22
  174:11,13

**attorneys** 12:15,17
  13:12 14:1,7 15:24
  18:6 40:1 47:7 90:19

**attract** 28:12

audible 11:20

Austin 4:14 5:9,21
  8:11 9:16 27:25 36:4
  114:7 155:12 187:20

authority 50:13,19
  71:10 160:18,21,24

avail 32:8

available 31:23 42:8
  96:20 150:7 174:23
  178:1 180:6

avenues 125:14
  174:23,25

average 72:12,13 99:1

awake 163:19

aware 15:11 17:13,20
  18:21 29:5,6 47:3
  49:10 68:23 81:4
  82:4,5
  94:12,14,18,25
  95:7,9 102:20
  109:3,6,10 143:6,22
  147:14 157:1,3
  170:15,20,24 171:4
  172:24
  173:10,13,14,18,20
  174:18 175:18

away 71:6 132:21
  177:24

———————————
           B
———————————
background 36:9

bacon 155:7,8 163:17

bad 53:4,25 70:13

ballot 43:19
  100:9,12,13 101:3
  102:5,8,9,12 117:19
  129:23 131:25

ballots 82:16

ballpark 21:4

ballrooms 72:11

bank 5:4 44:21,23
  84:6,7

banks 4:4,7 6:5 7:13
  8:7,16,19
  9:3,7,9,14,17 10:10
  11:1 13:2 16:1
  17:12,19,24 18:20
  19:8,15,23 39:14
  52:12 63:20 81:9
  92:19 96:23 135:9
  136:9 142:17,25
  144:23 147:6 164:7
  166:10 175:23 182:19
  183:16,22 185:2
  186:1,5,11 187:4

barrier 135:18

barriers 135:17 139:2

base 44:22 114:12

based 22:6 58:24
  65:23 70:10 82:10,23
  85:7,8 90:3 102:17
  103:21 109:24,25
  110:25 111:4
  113:5,15 124:7
  127:22 129:18 132:22
  133:1 135:15 139:13
  152:12 165:24

bases 19:12

basic 128:9 166:23

basically 134:16
  152:24 153:19,22
  155:9

basis 49:20

bear 95:18 97:7

became 17:19 172:24
  173:1

become 28:23 29:15,16
  30:8 33:11,15 34:22
  48:14 56:15 131:19
  180:14,19

becomes 157:19,22
  161:4

becoming 30:7

beforehand 12:20
  150:11

begin 48:18 150:9

beginning 149:10

begins 109:19

behalf 17:14 18:22
  53:22 57:4 66:2
  143:7 154:2 161:10
  187:9

behind 84:18 123:14

belief 89:22 90:3
  128:17 134:19

believe 16:15 20:3
  28:7 30:2,14
  56:2,11,24 58:16
  65:21 67:17 68:11
  73:2 90:21 131:3
  139:12 146:13 153:2
  154:1 159:7 160:6
  164:7 166:8 168:2
  173:9 176:2,13

BELINDA 3:11

BENAVIDES 2:8

benefit 31:22 32:7,9
  34:14

benefits 32:1

BENJAMIN 1:6

besides 14:1 50:4
  111:2 175:15

BESSIAKE 2:4

best 20:23 32:23 44:8
  50:12 74:6 78:20
  79:14 87:16 104:3
  147:3 148:25 158:3
  161:8 182:21

better 102:15 142:6
  153:22 164:23
  180:14,17 182:16

bigger 120:15

bill 7:9 50:24,25
  51:1,2 53:3,17,18
  55:14,20
  58:8,12,16,17
  59:16,17 60:9 63:25
  64:4,8,10,16 65:23

66:15 74:3 76:9
82:11,15,16
83:13,15,17,20 84:19
85:5,13 87:5
88:12,23 89:6,15,25
91:14,17,24
92:3,7,17 110:7
114:3 127:7
136:13,19,25
137:7,9,15,18 139:1
141:17,22
149:3,14,15
152:14,22,25 153:9
155:10 156:2 158:15
159:19,22 160:2
161:16,19,24 162:1,5
164:8,9,22 165:2
177:2

**billboard** 126:5

**bills** 45:14 53:1,9
54:17,20,24 55:2
58:10,14,22 59:6,16
73:14 152:22 158:24
159:1,24 161:17,19

**birth** 34:3
97:10,13,16,18,22
98:6,10 122:4

**bit** 28:1 43:3 52:17
84:12 164:23

**black** 103:8

**blank** 74:7

**Bledsoe** 14:2,6
26:6,7,15,19 39:25
45:25 46:22 49:18
50:2,3,4 60:7
61:5,6,14 69:21 71:9
77:19 154:4 157:25

**blueprint** 150:8

**Board** 147:11

**body** 23:14,17 158:17
162:25

**bogged** 156:12

**book** 144:17

**born** 30:8 97:23 98:5

**borrowing** 162:12

**boss** 50:7

**bosses** 50:8,9

**bottle** 107:18

**bottom** 109:19 176:11
177:1

**bounds** 160:18

**box** 5:20 172:6

**brain** 32:5

**branch** 21:17,19
22:1,2,13
23:3,4,6,7,12 35:10
37:17 38:2 115:4
170:7 175:1

**branches** 3:1 5:2
7:7,11 20:16,20,22
21:4,7,13,15,23
22:6,16 23:15,21,24
24:2,7,13,14,20,21
25:16 26:9,10,18,23
27:1,19 28:13,17
37:15 43:1,7 44:2
49:14 51:13,16,20
81:18

**break** 12:21,23,25
52:4 122:22 128:16
183:4

**Brenham** 172:14

**Brennan** 90:7 110:2,15

**BRICKNER** 1:6

**briefly** 29:24 52:20
62:8 75:8

**bring** 15:12 54:16
150:18 171:9

**bringing** 18:1

**brings** 152:22

**broadcast** 42:10

**broke** 52:13

**brought** 55:2 151:21
152:25 158:21

**budget** 60:15

61:7,12,16,19,21
86:12 141:25

**budgeting** 60:13 69:6

**bunch** 146:24

**burden** 97:25 98:15
105:3 117:16 119:20
120:5,15,23,24 130:9

**burdens** 111:21,23
112:2,11 116:5,21
117:7,22,24 119:6,8
121:3,7,10 130:19

**burdensome** 119:12

**Bureau** 114:16

**BURNS** 1:4

**bus** 117:13 145:24

**business** 37:18
39:9,19 57:24 67:10
161:7

**buy** 145:24

**buying** 141:18

────────────
C
────────────

**California** 5:5

**campuses** 29:8

**cancel** 179:7

**candidate** 43:20,23

**candidates** 44:14,19

**capable** 42:17

**capacity** 2:11,13
3:6,8,18,19 27:4
95:23 187:8

**Capitol** 52:24 54:2
60:4

**caption** 187:3

**car** 117:12

**card** 30:18 31:7,9
32:4,11,12,16,19
33:18 64:18,20
94:3,22 95:1
121:5,11 131:1
134:2,6 141:15,16,19

145:16 186:13

**card-carrying** 34:16

**cards** 172:5

**care** 39:12 101:22
163:5

**carefully** 166:11

**carpool** 117:14

**CARRIER** 1:4

**carry** 52:22

**carrying** 33:18

**case** 1:4 2:3 3:3,12
8:3,4 10:15,17 12:7
13:16,17 14:7,17
15:5,10 41:1,5,10
47:8,16 63:13 113:19
138:19 143:12 144:7
147:10,25 174:6

**cases** 41:7,13,16

**casting** 82:15

**catch** 117:13

**categories** 104:15
107:22

**category** 104:5

**Caucus** 3:2 7:11

**cause** 4:9 53:6 82:12
187:10

**causing** 82:11

**caution** 39:23 76:21
174:3,9

**Census** 114:16

**Center** 90:7 110:2,15

**central** 23:1,14,16
24:12 27:21 37:14

**centrally** 22:6 43:6

**certain** 17:20 57:16
67:15 104:4 123:22
166:9 170:6 181:3

**certificate** 6:8 65:3
95:4,8
97:10,13,16,19,22

98:6,10 122:4

**Certified** 187:2

**certify** 187:3,8,10

**cetera** 21:24 22:3
151:4

**chair** 46:8 62:11

**chairs** 25:15,23,25
26:1,3,4,5 27:16
38:2 39:12 53:15
150:4

**challenge** 87:11

**challenges** 68:23

**challenging** 63:24

**chamber** 53:18

**chance** 17:12 104:23
108:20,22 138:9

**change** 53:5,23,25
62:13 70:8,12 127:20
161:6 163:7 178:1
182:24 185:4

**changed** 152:16,21
153:1 158:11,12,23
161:1 179:19 180:7

**changes** 47:24 54:17
84:14 102:14
156:2,19 158:7
160:12,17,22,25
161:15 162:1,3,8
165:12 177:3 180:12
185:1

**changing** 152:4 164:20
166:1

**chapter** 38:10

**chapters** 38:4

**charge** 51:16 61:2,15

**charged** 95:17

**check** 16:8 30:20
36:6,9 49:2,4

**checking** 36:9

**children** 109:8

**choice** 142:10

144:15,19,25 146:6

**choose** 139:9
140:12,24 141:2,17
144:9,13,16

**choosing** 142:9
146:14,18

**Christi** 1:2 68:9

**churches** 126:7

**circuit** 150:20

**circumstances** 138:23

**cities** 22:6,14 23:8
39:13

**citizen** 30:10,18
109:21 120:21,22
131:19 133:5,7
134:15 165:14

**citizens** 1:7 36:5
82:14 103:23
109:5,7,17,20
111:20,23 112:4,13
113:2,3 114:2,4
116:8 117:24,25
118:18 119:9,11
124:8 127:19
129:8,14 131:5,7
132:9,10 133:24,25
144:9

**citizenship** 64:20
95:4,8

**city** 22:12 23:2
37:16,24 38:15 39:14
51:8,9 98:14
115:1,20

**Civil** 1:3 2:1 3:1,11
4:15 5:14

**claim** 91:11 97:9
99:12 100:18 104:11
111:4 112:9,16
113:15,21 115:13
119:16 123:7,10
131:3 132:22 133:1

**claiming** 83:18 125:1
131:24

claims 19:13 82:6
  108:5

clarification 12:13
  145:4 171:15 183:5

clarify 18:4,11,13
  21:9 111:6 140:6
  168:19 171:22 183:25

CLARK 2:3

clear 10:6,8 34:1
  63:18 64:3 90:18

clearance 51:9

clearly 12:8

Clerk 187:11

close 60:7 155:6

code 63:4

coding 62:24 63:1

Cohan 5:7 8:22
  47:15,18

coincided 155:16,17

college 29:7 109:2

comes 66:23 83:3
  84:10 133:25 179:10

coming 70:14 74:7
  100:2 149:11

COMMISSIONERS 2:7

committee 5:20
  21:18,22 22:3
  24:22,24
  25:3,5,6,10,13,15,18
  ,22 26:14 27:16
  31:15,17 38:2,4
  39:12 42:19,22
  46:4,6,7,12,21 56:1
  60:3 61:7,10,15
  77:21 80:10,20,25
  84:4 152:17,18 153:9
  158:23,24,25
  159:1,6,19,20,21,23,
  25 163:25

committees 21:22
  25:23 53:16 54:23

communication 29:4

51:12,18 59:20
  124:18

communications 39:24
  76:22 174:5

communities 28:18
  114:5,6,10,11 125:23

community 28:22
  35:22,25 43:14 49:15
  53:6,7 67:17 84:5,9
  85:23 103:3,17
  114:23 115:5,6
  120:12 121:17
  125:15,17 126:4,6,7
  128:2 147:5 151:25
  169:20

company 178:23

compared 103:6 119:11
  120:13 129:2 132:10
  173:11

compile 59:18,25
  150:9

compiling 86:12

complaint 7:6 19:9,13
  76:17 77:6
  81:17,21,24 82:20
  85:24 89:16 96:5,24
  111:2,11,12,13
  130:23 134:17
  135:2,21 138:19
  156:5

complete 100:11 102:9

completely 172:25
  173:4 179:2

completing 101:3

compliance 82:16

compound 144:20

comprised 23:20 24:20
  26:15

comprising 61:11

computer 128:8

concealed 64:22,23
  94:5,10,13

conceding 144:8

concentrated 22:25

concern 35:25 51:1,2
  151:25 152:2,5 156:4
  157:20 161:4 174:21

concerned 159:14

concerning 160:25

concerns 39:15 54:16
  151:20 153:17,19
  154:7,17 155:21,24
  156:18 163:8,11,23
  164:1,3,21 165:3,13
  166:1 167:8,11
  168:12,15 170:13
  172:19 174:24

concluded 184:9

conclusion 74:18
  75:14,23 90:5 113:25
  139:19

conduct 90:22 126:13

conducted 113:11
  170:17 175:8,12

conducting 150:23

conducts 150:25

conference 3:1 5:2
  7:7,11 8:13 20:16,20
  23:17,20,24
  24:16,17,19,23,25
  25:3,17,22,24
  26:15,25
  27:4,13,20,22 37:19
  43:6 72:9,10 81:18
  91:2

conferences 44:13
  62:3

confirm 102:9 113:12

confirming 134:1,4

confirms 114:2

confused 79:11 142:12

conjunction 95:15
  96:7

connection 123:19

**cons** 76:20 77:8

**consequence** 146:6,9

**consequences** 142:3,5,7,9 146:10,14,17,19

**consider** 61:10,19 157:3

**consideration** 154:13,18 157:4,12 158:3 186:16

**considered** 86:19 122:9 138:22 157:12

**Consolidated** 2:3 3:3,12

**constituency** 61:20 68:22 69:12 80:13

**constituent** 34:21 35:8 44:22 92:5 94:13 174:16,17,20

**constituents** 34:18,23 45:22 59:12 61:11 66:14 67:5,12 74:2 75:17,25 92:1 93:3,13 94:3,10,16,22 95:4 127:14 150:21 159:15 167:7 170:13,22 171:2 172:20 173:15 177:8

**constitute** 135:10

**constitutes** 137:3

**contact** 49:7 50:6 175:1

**contain** 22:15

**contend** 76:8,12 100:20 109:20 111:18 113:1 117:23 119:18 121:21 122:11 124:19 127:18 129:7,14 133:23 134:12 135:10,24 138:15 139:8 144:24 146:5,16 147:15,24 148:3 152:7 153:14

160:16,20 162:2,7 164:13 165:8,14,20 184:1

**contending** 82:11 137:2 138:22

**contends** 122:10 131:5 140:23 144:12

**content** 79:9

**contented** 179:23

**contention** 82:20,23 90:3 96:19 109:24 110:25 113:5 124:4 127:22 129:18 139:13 152:12 165:24

**contents** 103:1

**context** 79:12 157:10

**continue** 75:3 82:12

**continues** 95:16

**continuing** 128:18 184:4

**continuous** 179:13

**control** 10:22 153:1

**controversial** 51:4

**convention** 39:18 67:2,6,8,9 69:16,22 71:1 72:17,20 84:24 85:9 177:24 178:8 182:14

**conventions** 67:21 68:12,15,21 71:19 72:6 73:13,18 74:10 84:21

**conversation** 66:8 97:4 149:10 150:3,5 175:4

**conversations** 77:1,11,12,13,15 78:18 85:10 105:18 115:2,6 174:10

**convoluted** 144:21

**copy** 15:23 90:16 97:16,18,22 98:5,11

175:24

**Corpus** 1:2 68:9,10 72:18 73:1 74:4,7

**correct** 9:25 10:1 15:6 16:22 18:9,10,18 21:6 22:4 23:10 25:24 26:18 27:2,17,20 29:11 33:22 35:11,14 37:5 41:3,14,16 42:21,24 44:1 52:15 56:21 58:22 59:9,10 60:16,17,20 61:16,17 64:6 67:7 68:14,18,25 69:17 70:3,11 71:11 72:10,18,22 73:1 80:2,16 81:25 82:1,8 83:23,24 86:6,7,9,10 102:10 106:7 110:24 111:25 112:5 113:22 115:9 118:19 124:5,6 131:8 132:10 140:5,8,21,25 142:10 156:16,20,23 176:14,24 180:2 186:3 187:7

**correcting** 110:13

**correctly** 22:5,22 25:18,19 159:12

**cost** 97:11,24 98:15 99:9,12,16,18,23 117:8,9 123:23 130:9

**costs** 86:24 95:18 97:7,8,15 98:4,7,9 99:11,15,21,22

**counsel** 13:3 45:24 46:2,9 47:15 78:8 174:5,10 187:10

**count** 64:23

**counted** 100:13

**counterparts** 120:14

**counts** 151:9

**county** 1:8 2:6,7 22:7,13 37:16 44:4

98:14 147:11 168:5
169:10 171:23,24
172:1,2,4,10,11
186:8 187:1

**couple** 36:12
67:3,17,18 166:3

**couples** 167:15,16

**course** 38:12 39:9
47:12 51:9 57:9 59:4
62:17 137:18 167:21
179:19

**court** 1:1 5:24 8:6
11:21 12:2 144:6

**cover** 36:2 70:20
85:14 159:25

**covered** 17:15 39:12
70:25 71:6 91:7
127:2,6 139:12

**covers** 23:4,7,8 37:18

**crafted** 96:16

**Crawford** 147:11

**create** 18:7 135:18,19

**created** 153:8

**credit** 36:15

**crime** 171:13

**crimes** 166:4,24 167:9
168:13,17,22 169:3,8
170:18 171:6 172:21

**CSR** 4:11 187:17

**cure** 130:4

**current** 107:1 116:6
127:3,4

**currently** 9:17 173:3

**curriculum** 84:13

**cut** 93:16 146:2

**cycle** 173:22

**cycles** 173:6,16

---
D
---

**daily** 49:20 127:16

**Dallas** 1:8 68:2 72:21
74:4

**data** 90:8,9,15 102:18
107:21 108:10,13
110:1,2,14 111:1,7
113:6,12,15,21
114:15,19 118:5
137:15 138:1,2 150:9
157:18,21 158:2,5

**date** 34:2 51:7 55:10
88:21 173:1 185:3
187:18

**day** 4:10 30:8 47:24
48:25 49:1 90:1
100:12 155:1,4,19
179:14 186:10,19
187:13

**days** 70:19 100:16
101:11,23 102:2,8
158:16 160:3

**deal** 33:3 69:2,10,25
70:1 98:18,21 99:17
148:23 180:2

**dealing** 35:13 50:16
70:16

**debate** 153:7

**debates** 53:12

**December** 187:18

**DECHERT** 5:4,8

**decide** 60:18 71:10
74:15 131:20,22
132:14 133:15 145:18

**decided** 61:7 129:20

**decides** 130:15,24
134:18

**decision** 76:24
80:3,15,18,20 86:13
133:22 145:12,25

**decision-making**
50:13,19 71:10

**decisions** 67:11

**declaratory** 7:6 81:17

**decreased** 180:7

**defend** 74:25

**defendants** 1:13 2:15
3:10,21 4:8 5:17
7:12 8:3 15:5 20:2
143:2

**defending** 75:16

**defer** 135:1

**define** 38:25 40:16
45:13 66:19 103:15
118:22

**defined** 171:13

**definitely** 177:7

**definitions**
166:8,10,21 171:18

**degree** 89:8 118:25

**degrees** 40:18

**DEL** 3:14

**DELEON** 1:3

**demonstrating** 104:14

**denial** 138:17,24

**deny** 135:11 136:19
137:3,9 138:16

**Department** 2:13
3:8,20 5:15 9:1

**depend** 121:14,15,18

**depending** 12:22 21:19
29:19 38:10 43:18
64:19 98:18,19
149:23

**depends** 50:15 170:3

**deposed** 10:10,13
14:22 176:1

**deposition** 4:2,7
7:3,13 8:7 10:2,22
11:18 13:11,14
15:1,6,16 16:19 19:4
47:13 175:25
176:1,3,18,24 177:16
184:9 185:3 186:1
187:6,7,9

**depth** 103:19

**describe** 29:24 34:20
  48:25 50:13,17 52:21
  62:8 99:20,22 177:18

**described** 138:23
  160:13 162:9,18

**description** 48:8
  186:13

**deserve** 71:8 85:5

**designated** 17:14
  18:22

**despite** 88:22

**determination** 107:9

**determine** 107:5 134:9

**detriment** 88:8

**development** 39:13
  84:4

**devoting** 99:24 100:1

**DFW** 22:15 68:5,6

**difference** 29:25
  34:20 141:13 146:24
  147:1

**differences** 148:10

**different** 21:23
  28:15,24 29:22,25
  30:5,6 33:1 39:11
  41:7 49:5 57:15
  67:13,14,15 69:11,18
  72:10,11 83:8 84:15
  90:8 105:1 107:14
  118:6 130:1
  131:11,20 132:4
  143:20 153:18
  178:2,6,16,21,23
  179:1

**differential** 116:5,21
  117:7 118:24 119:6,7
  128:25 130:19

**differently** 117:24
  130:15 133:25 134:15

**difficult** 139:6

**difficulties** 115:17

135:22

**difficulty** 101:10

**digital** 123:18

**direct** 164:18

**direction** 187:6

**directly** 82:19 83:20
  162:12 174:16 175:2
  181:10

**Director** 2:13 3:8,19

**disabled** 109:8

**disadvantage** 129:1

**disclosures** 47:4

**discount** 32:4,16

**discovery** 18:14

**discretion** 38:9
  128:24 131:22 132:20
  133:11,14,21 134:20

**discretionary**
  129:9,15 130:22
  131:6 134:13

**discriminate** 152:9
  153:15

**discriminatory** 156:18
  164:14 165:9,15
  178:22

**discuss** 41:4 76:20
  77:8

**discussed** 39:7
  40:8,10,21 41:5
  78:17 79:6 95:12
  127:7 135:18

**discussing** 100:8

**discussion** 39:21
  79:18 153:7

**discussions**
  40:2,12,15 41:13
  79:9

**disenfranchise** 149:15

**disfranchisement**
  144:7

**dismiss** 7:12 143:2

**disparate** 
  118:10,14,24 123:4
  124:3,20 125:3,7

**disparity** 134:8

**disposal** 162:4,15

**disproportionately**
  118:4 119:10 129:1

**distance** 101:13

**distances** 117:11

**District** 1:1 8:5 44:4

**diversion** 179:12
  183:23

**divert** 82:12 177:9
  178:2 179:24
  181:9,16

**diverted** 83:2,15,19
  87:6,18 88:7 178:15
  179:17

**Division** 1:2 5:14

**document** 15:21,24
  16:2,12,14,22 19:24
  20:1,4,12 81:9,13
  82:3,5 95:10
  98:2,3,9 112:20
  116:16 118:21 122:5
  132:12 135:16
  136:10,14,16
  142:17,22
  143:4,6,11,14,16,23
  145:22 186:13

**documents** 13:13
  15:4,8,12 65:8,10,13
  93:3,7,14 95:19
  97:8,11 105:4 110:7
  113:9 117:10 120:18
  121:24 130:14
  135:21,23 138:7
  139:5 145:20

**Dodson** 46:23

**DOJ** 90:11

**done** 12:5 28:16 45:4
  48:13 63:16 70:7

83:10 85:25 89:2
90:7,9 91:1 100:2
113:24 114:16 123:17
127:4 152:14
165:19,25 181:5

**double** 182:15

**doubt** 114:19

**DPS** 65:7,21 95:13
98:13,14,24 99:1
115:25 121:15,16
138:6

**draft** 62:11 116:16

**drawn** 113:21

**dreams** 150:1

**drive** 44:23 172:15

**driver** 48:12

**driver's** 64:18 65:7
93:21,23

**drives** 28:17 43:10,12
44:21

**drum** 43:14

**due** 89:14 147:2

**dues** 30:22,24 31:4,5
34:22

**duly** 4:8 9:4 187:5

**during** 40:11,14 41:12
45:11 48:1 50:23
54:2
55:8,10,11,12,21
56:1,8,10,12,16
57:1,10,20,25 58:1
64:5 79:15 88:9
100:5,12 136:25
149:25 151:2,4
154:8,13,18 155:1
158:2 167:12

**duties** 52:22 59:4
62:9

**duty** 58:21 139:20

---

**E**

---

**earlier** 41:11 42:25

95:13 118:5 135:18
151:3 177:22

**earliest** 161:9

**early** 90:1 100:12
155:16

**easier** 12:5 182:16

**east** 37:23 114:9

**easy** 60:7

**economic** 39:13 84:3,4
120:21

**ed** 84:11

**educate** 58:25 59:11
65:24 66:13 74:2
83:10 124:8

**educated** 68:22 127:19

**educating** 73:20 82:14
84:5 180:14,19

**education** 2:3 21:24
73:19 84:9 85:17
178:19

**effect** 16:17 90:23
109:17 177:2

**effective** 70:10
172:25 173:1,4

**effects** 154:8

**effort** 43:14

**efforts** 113:11

**EIC** 64:18,25 65:4,5
95:12,16,17,20
96:2,7,9,13,17,20
97:12 98:7 175:13

**eight** 163:2

**either** 73:11,12
117:13 122:25 149:22
154:20,21 163:16
170:8 173:16 179:7
180:7 187:10

**elderly** 109:9
167:15,16 168:6

**elect** 26:10

**elected** 24:21

25:14,22,23
26:2,9,17,23 38:1

**election** 65:2 90:1
100:12,16 123:2,9
124:4 125:2 127:25
128:24 130:24 133:24
134:9,14,18 144:25
147:1,11
159:21,23,25
166:4,23 167:9,25
168:13,17,21 169:3,9
170:5,18 171:6,13
172:9,10,21
173:6,16,22

**elections** 44:3,6
173:11

**elects** 26:8

**eligible** 139:9
144:9,12

**Ellis** 151:12,17

**else** 11:12 14:19,25
15:15 19:5 34:8 50:3
54:5 63:9 83:23
85:15 99:25 108:4
111:3 140:13 150:17
157:25 161:6 167:8
172:18 182:9

**elsewhere** 97:20
181:11

**email** 49:10 59:25
60:9 175:3 182:2,3,4

**emails** 29:3 49:3 66:9

**emergency** 153:3,5
159:18 160:4 161:23

**empirical** 102:18

**employ** 187:9

**employed** 9:18,20
46:13

**employee** 187:9

**employment** 48:18,20
56:3

**enacted** 83:17 136:25
151:6 152:8 153:14

164:14 168:3 179:20
181:6

**enactment** 83:13 89:15
165:22 173:7 177:21
179:14 180:8

**encapsulated** 137:24
170:25

**encompassed** 160:1

**encompasses** 99:15

**encounter** 111:21,23
112:1,11

**encountered** 168:16,19

**encounters** 168:18

**encourage** 28:22 44:13

**encouraged** 28:22

**endorse** 43:22 44:19

**energy** 84:17 87:3

**enforcement** 63:25

**engage** 43:2,7,9,13
44:13,20 45:2,10,19

**enjoy** 38:15 53:13

**ensure** 74:25 75:18
123:15

**entails** 59:16 177:8

**enter** 32:24 34:4

**ENTERO** 3:14

**entire** 23:4 37:19

**entirely** 33:9

**entity** 24:20

**environment** 67:16
115:15

**envisioning** 22:24

**especially** 54:8

**ESPINOSA** 3:12

**established** 107:25
140:17

**ESTELA** 3:12

**estimate** 21:1,2

25:4,7

**ESTRADA** 3:12

**et** 21:24 22:3 151:4

**EULALIO** 3:11

**EVELYN** 1:6

**event** 31:20 67:1

**events** 28:24 31:12,14
36:18 45:20,21 66:12
126:7 127:3,4

**everybody** 123:15
128:8,12

**everyone** 52:3

**everything** 12:8 99:5
126:24 158:19
161:2,6

**evidence** 164:18 165:6

**exact** 20:25 37:24
55:10 81:14

**exactly** 132:6 176:2
177:17

**Examination** 6:6,7 9:5
183:20

**example** 35:19 87:10
133:2 175:14

**examples** 57:17 87:13

**except** 186:3

**exchanged** 54:15

**executed** 186:15

**executive** 21:17,21
22:3 24:22,24
25:3,5,6,10,13,17,21
26:14 31:15,16,17
38:2 42:19,22 46:11
48:3,9,11,12 60:3
61:7,15 77:21
80:9,19,20,24

**exercise** 74:23 134:13
140:10,20

**exercised** 140:11

**exercises** 139:25

**exhibit**
7:1,3,4,6,8,10,13
15:21,22 19:19,21,22
81:5,7 136:7,9
142:13,15 166:17
175:19,21

**exist** 121:4,10 144:19

**existing** 129:9,16
130:22

**exists** 144:16

**expend** 180:20 181:15

**experience** 11:18 88:3

**Expiration** 187:18

**explain** 116:13

**express** 154:17 164:12
174:21,24

**expressed** 20:12
154:12,14 155:24
163:9 168:12,15
170:13,22 171:3
172:19 186:17

**expressing** 167:8

**extent** 48:24 87:21
88:1 96:24 122:10
147:19 177:11

**extra** 145:13,19,21
146:4 182:14

---

F

**face** 120:4

**Facebook** 36:20,25
62:20,21,22

**faces** 119:20

**facility** 72:7

**facing** 68:23 70:24

**fact** 70:8 76:25 82:24
96:17 105:11

**facts** 187:3

**factual** 19:12

**Fair** 144:22

**fairly** 63:8 85:10

104:19,20

**fairs** 45:20

**fall** 129:8,15 131:6

**familiar** 19:8 33:9
64:7 78:24 79:5
81:12 103:13,15,18
127:15 147:6,9

**family** 36:6 100:4
101:22,23

**fan** 62:20

**fast** 12:10

**fast-track** 153:10
160:2 163:25

**fast-tracked** 153:6

**February** 155:16

**federal** 4:14 8:6
114:16

**fee** 29:19 30:21,23,24
33:21 95:16

**feed** 101:22

**feel** 18:25 19:11
53:23 74:23 114:13
154:6,10,11,16
155:23 157:10

**feeling** 11:1,3

**feelings** 53:20

**feels** 48:16 159:12

**fees** 34:22 121:24

**felt** 154:14,15

**field** 113:25 114:21
175:8,11

**fields** 84:15

**fight** 86:3

**figure** 8:14 24:11
101:19

**figures** 103:22

**file** 76:24

**filed** 7:7 19:9 53:3
81:17 143:7,23

187:11

**filing** 76:16 77:6

**fill** 29:18 32:20
33:20

**final** 50:18 72:16

**finally** 108:23

**finance** 21:23 36:12

**financial** 60:19 61:8
69:4 82:13,25
83:4,18 84:8 85:4
97:25 99:12,16,21
101:15 117:9 178:20
179:17,21 180:1

**financially** 130:10

**financial-wise** 178:1

**fine** 10:25 12:15 16:6
51:7 52:5 92:13
100:25 102:7 109:13
122:23 143:19 148:25

**finish** 12:3

**finished** 11:25

**finite** 86:9

**Firm** 187:19

**first** 8:12 9:4 28:11
39:4 55:11 75:9
93:12 110:20 187:5

**five** 52:7 56:25
176:16

**fix** 102:15 130:11

**fixed** 141:25

**flag** 157:22

**flat** 137:14 179:8

**flip** 128:9

**flipped** 169:11

**floor** 5:5 8:13 53:12
160:4

**FLOYD** 1:4

**FM** 126:20

**focus** 69:24 84:2,12
86:1 87:3 97:13

100:8 128:23
178:6,14

**focused** 54:23 83:6
178:6,17

**focusing** 84:9,16
111:15 118:15
130:21,22

**folks** 28:23 32:25
53:8 64:2 84:13
85:21 125:23 126:8
129:25 152:15 159:7
167:22,24 168:3
170:6 181:24

**follow-up** 169:24

**follow-ups** 170:2

**force** 144:8

**forces** 139:9 140:24
144:12

**foregoing** 186:1,14
187:4,6

**forgot** 16:8 169:7

**form** 33:1,4 91:16,24
92:2,6,21,24
93:4,8,17
106:3,14,25
107:6,8,12
108:7,14,19 109:21
112:6 113:2 114:3
115:8 120:5,24 121:8
124:22 133:9 136:22
138:19 140:14 143:13
144:20 180:10

**formal** 90:25 150:19

**formed** 159:17,19

**forms** 64:12,13,15
65:8,10 66:9 84:6
89:24 90:13 91:14
100:14 104:25 111:19
119:13,21 122:5
126:1 139:4,6 151:23
172:5,6

**forth** 163:4 187:6

**fortunate** 155:11

forward 36:11
  77:16,23 152:5 156:2
  157:20

fraud 157:17
  159:21,23,25
  166:5,24 167:9
  168:13,17,22 169:3,7
  170:18 171:6,13
  172:20

free 64:19 65:1 98:2
  122:3 138:11 141:15
  145:22

friend 182:21

front 95:10 136:24
  137:8 166:15

frying 155:7

fulfill 43:2
  76:9,13,15
  88:14,16,20,22
  89:1,7

fulfillments 68:24

full 9:8 28:5 163:15
  187:7

full-time 56:23

functions 83:25

fund 2:3 178:3

funding 123:15
  128:3,4

fundraising 43:7

funds 138:12

funny 53:11

future 116:9 118:19

FYI 49:11

─────────────

G

gain 59:19

GANDY 1:7

GARCIA 3:12

Gary 14:2,6 27:8
  46:22 49:3,7,17
  50:2,3,4 53:15

54:3,7,8,24 60:7
  61:4,5,6,14 77:19
  85:10 149:10
  150:4,12 154:4
  155:3,12 163:10

Gary's 165:4

gauge 108:9 115:5,8

gauging 150:21

geared 67:4 73:20

general 4:13 5:19
  8:2,12 21:1 41:15
  46:2 57:8 64:10
  67:5,12 79:8,9,10

generally 19:17 34:20
  37:25 38:1,3,20,21
  39:6 40:2 115:7
  159:6

gets 132:8,13

getting 36:15 60:2
  81:19 96:15 97:15
  98:2,15 113:9 117:9
  121:11,25 123:14
  178:9 181:12
  182:10,16

gist 167:2

given 38:11 40:14,19
  41:23 71:11 86:19
  131:24 154:16 182:23
  186:18 187:12

giving 15:23 42:4

Glad 38:15

gladly 12:13

gleaned 58:24 131:3

goal 43:15

goals 150:1

God-given 75:3

gone 130:19

GORDON 1:6

gotten 49:3 63:2

governance 46:13

governing 23:14,17

government 114:16

governor 1:11 153:4
  159:18 161:23

governs 24:12

grab 125:23,25

grade 60:23,24,25

grammar 110:13

Grapevine 68:4

grasping 182:6

great 40:17 90:11
  98:18,20 99:17
  104:23 138:9

greater 108:20,22
  110:11 118:1,4,9

greatly 110:9

green 30:18

ground 8:13 10:22
  11:17

group 62:20 119:19
  120:3,14 135:13
  136:21 137:5,11
  162:23 165:22 179:1

groups
  57:2,7,12,15,18
  78:21 120:11 137:17
  153:2,18 162:22

guess 21:2,11 24:3,5
  27:3 34:9
  38:9,11,23,25 40:16
  46:4,10 49:6
  50:15,20 52:25 56:24
  58:14 59:24 60:2,6
  67:10 72:14 75:16
  76:6 79:11 84:11
  88:19 89:2 90:13,14
  101:2,17 104:17
  108:15 114:5,21
  116:1,25 118:22
  119:1 120:16 121:14
  122:18 125:17
  129:19,21 131:11
  135:18 150:8 151:23

155:25 157:7,17
170:3 181:12

**guest** 38:7

**guidelines** 133:19

**guys** 134:21

---

H

---

**HAMILTON** 1:3

**Hammond** 57:25

**hand** 186:18 187:12

**handgun** 64:22,24
94:5,10,13

**handing** 81:6 136:8
142:14 175:20

**handle** 33:1 48:1,2
62:3,17 67:15

**handy** 156:6

**hang** 155:14

**happen** 51:21 102:12
133:4 137:17
149:13,14,21,24,25
155:14

**happened** 76:24,25
155:18 169:16,17,18

**happens** 18:14 85:23
148:17

**harassing** 167:18
170:6

**hard** 72:2 160:7

**harder** 120:15

**hardship** 101:15

**harm** 74:21 118:25
137:16 151:24 165:21
184:2,4

**harmful** 53:9 64:1
76:11,12,14 139:2

**Harris** 168:5

**hat** 63:11

**hats** 48:4,8 52:13

**haven't** 32:21 33:7,8

103:19 168:23 181:18

**having** 9:4 39:14 75:4
98:14,17 101:10
102:16 105:17 115:14
122:5 126:6,8 130:6
138:5,6,14 141:17
145:23 153:7
163:5,17 178:5
179:2,24 182:17

**head** 11:22,23 25:9
39:17 58:6 65:15
92:22 111:13 126:17
168:9,10 182:10

**heading** 17:1

**heads** 61:3

**health** 39:12,13

**hear** 16:5,6 41:9
126:10 165:5 170:6

**heard** 10:19 53:18
75:19 152:15,19
154:8,10,12,15
159:22

**hearing** 56:2 132:15
152:1 154:23 155:15
159:9

**hearings** 158:25

**held** 13:18
37:9,11,14,21
66:12,17,21 67:21,24
68:1,7,12,20 72:7
73:13,15,19 74:1
76:19 77:7

**he'll** 71:15,16

**help** 34:25 35:1,4,9
36:14 62:2 69:13
100:4 105:3 177:11
178:8

**helped** 153:9

**helping** 70:17

**hereby** 186:2 187:3

**Here's** 60:9,10 123:24
150:12,13

**hereto** 4:16 187:3

**HERMAN** 1:6

**herself** 178:13

**he's** 14:9,11 54:25
62:13 143:17

**Hey** 49:11 53:3 69:5
126:8 131:17 133:19
169:16

**HIDALGO** 2:7

**high** 29:12,13

**higher** 111:22

**hindered** 89:3

**hindering** 89:4

**hinders** 85:21
88:15,17,18 89:1

**hindrances** 75:5

**Hispanic** 2:6 103:7
165:2

**history** 74:24

**hit** 160:3

**hitting** 123:20

**Hmm** 73:6

**hold** 31:12 35:1 37:6
67:9 90:13 128:19

**home** 99:8 172:4

**hopes** 150:1

**hoping** 167:3

**hotels** 72:8,11

**hotline** 169:15

**hours** 13:22,24,25
98:23 99:2 155:10
176:16

**house** 3:2 53:12 56:1
98:10 104:18 106:17
153:8 154:1,2,5
155:16 159:17,19
160:4 163:24
164:4,25

**Houston** 22:15

23:1,2,7 172:12

**humor** 53:11

**hundreds** 128:17

**hungry** 135:4

**hurdles** 75:5

**hurt** 89:3 146:23

**hurting** 89:4

**hurts** 70:17 88:18,19

——————————
I
——————————

**I'd** 15:20 19:15,20
28:11 149:9 167:10
180:11,12

**ID** 10:16,17 39:11
58:8,14,22 59:2,8,13
60:5 63:25
64:12,16,18,19,20,21
65:1,6,9 66:10 67:19
73:14,21 87:14,19
88:6 90:13 91:16,24
92:2,6,21,24
93:4,8,17,24 94:3
99:19 104:6,25
106:3,14,18 107:1,6
108:16,18,19 109:22
110:8,9 111:19,22
112:1,2,10,11
113:3,10 114:3 115:8
116:6,8,9 118:18
119:21
120:5,18,19,24
121:8,25 122:1,3
131:15 135:17,22,23
138:5,7 139:4,6
147:7,9,24
148:11,18,21,24
149:5 150:10,22
151:23 158:18,20,24
159:21,22 161:17,21
168:1,2,3,4 170:23

**idea** 12:1 53:4,25
102:4 127:15 139:19
166:23

**ideas** 71:16

**identification** 65:2

89:24 91:14 94:22
95:1,18 97:7 100:15
119:14 123:2 134:1,5
156:19

**identify** 91:21,22
92:5,9,23

**identity** 91:22 186:13

**IDs** 101:11 138:9

**ignore** 164:24

**ignored** 153:19,20,22
155:20,24 164:25

**ignoring** 85:18 166:1

**I'll** 12:13 16:18 28:4
38:23 39:1 51:23
53:16 71:15 81:16
94:7 112:21 119:25
125:16 129:13 142:25
167:13 176:11 181:4

**illness** 11:4

**I'm** 8:2,25 9:21,23
10:2,19,20 11:3,18
12:9 14:21 15:11,23
18:12 22:12,22,23
23:1,5 24:5,11 29:5
31:19 33:12,14,23
40:25 42:9 47:25
50:24 51:6 55:9,12
58:3 59:24 60:2
61:13 63:7 64:23
68:17 71:14,17 72:15
74:4,7 77:19
79:8,11,12,22,25
80:5,6,16
81:4,6,12,19 82:4,9
89:12 90:18 92:11
93:9,13,16 94:8,14
95:11 96:15,19 97:3
100:6 101:25
102:20,25 103:18
104:10,13 105:18
106:4,19 107:10
108:4,9,12,14,21
109:3,14 110:13,18
111:8,11 112:19
115:20 116:19
117:4,5 118:20

122:16 125:6
127:9,15 130:21
131:15 133:1 134:21
135:4 136:8 137:1,7
142:12,14 143:17
144:14 145:3,9
146:16,20 147:14,18
149:4 151:15 156:11
160:15 162:11
166:7,13 167:3
170:15,20,24
171:4,19 172:17
173:1 174:18
175:18,20,23 176:8
179:6,10 180:4
181:5,12

**imagine** 12:21

**IMANI** 2:3

**impact** 64:1 116:5
117:24
118:1,9,10,14,24
123:4 124:3,5,21
125:3,8 139:2 142:5
178:21

**impacted** 110:9 118:4

**impacts** 180:2

**impersonation**
170:14,19

**implemented** 155:25

**important** 35:22,24
69:7,23 70:5,15
74:24 75:1 83:25
85:16 178:20

**imposed** 140:7

**impossible** 135:25
136:3 139:7

**INC** 3:14

**include** 84:20 98:9,12

**included** 47:3 109:4,7
110:14 125:20 171:18

**includes** 43:5 89:23
91:12

**including** 99:23 109:8

income 74:22 90:12
  100:3 104:18,20,22
  110:5 113:8 115:16
  118:7 120:12,13
  124:13 145:13

incorporating 166:7

increase 84:8

increased 180:7

incur 69:3 99:10,18

INDEX 7:1

Indiana 147:10,24
  148:11

indicate 46:17

indicated 187:4

indicates 176:18

indicator 105:9,12,24
  106:2,6,11,13,25
  108:1,4

indicators
  105:15,19,20

individual 21:7,16
  23:12,21,24 26:10
  44:14 66:1 75:21

individually 54:10
  66:2

infant 30:2

infants 109:8

inference 105:6

inform 43:16 83:10
  124:12 170:5 177:10

information 13:15
  28:14 32:19 33:10,23
  34:7 38:11 40:19
  41:18 44:25 49:13
  60:1 79:22 87:21
  89:22 90:2,10,14
  102:19 104:11 113:18
  123:14,22
  128:4,11,17 134:19
  135:20 137:15 147:19
  163:11 170:18
  173:21,23,25

174:1,2,7,10,15

informed 59:15 177:8
  181:21,23

informing 67:4

in-house 45:24 46:9

initial 47:4 62:12
  76:17 77:6

initiate
  80:4,15,18,21

initiated 76:18 77:7
  81:24

initiating 78:16
  79:19 176:19

initiative 43:15,19

initiatives 68:23

injunctive 7:6 81:17

in-person 82:15
  157:17

input 61:10,19 80:12
  81:2 152:3 153:1
  163:3

Instagram 37:1,3

instance 4:8 40:25
  88:5 98:4 168:21

instances 12:6,14
  36:4 87:6 131:11
  168:16 174:15

instruct 12:17 79:23

instrument 186:15

Integrity 187:18

intend 10:5

intended 74:2 83:9
  165:21

intense 53:13

intent 152:9 153:15
  164:14 165:10,16

interact 49:17

interaction 57:11

interest 52:25

57:10,12 76:7 147:3

interested 38:5
  187:10

interesting 53:13

interests 54:1 57:16
  76:3 78:21 158:1

interfere 70:22

intern 56:13,14,20,22

interned 56:12

internet 62:24 123:19

interpose 17:17

interpret 104:7
  128:10

interpretation 104:7

interpreted 105:14

interrogatories 187:4

intimidation 171:11

introduced 8:14

introductions 8:16
  13:8

invalid 163:9

investigate 156:17
  169:21

investigated 157:2

investigations 170:2

involve 80:12

involved 38:24 39:22
  40:8 44:1,5 45:17
  60:12 62:1 77:24,25
  79:19

involvement 38:25
  60:22 81:25 148:13
  149:7 161:9

irrelevant 76:4
  124:23 165:17

Irving 68:4

Isn't 107:13

issue 48:2 57:8 60:8
  69:3 70:1,12,16 71:5

87:3 91:3 96:17
101:1,5,18 102:11,15
126:25 129:22 130:4
137:20,21 157:18,19
159:18 161:3,5 172:9
178:19 179:1

**issued** 31:6 64:17
95:14,20
96:2,5,10,18

**issues** 35:21,23
39:12,13,15 48:1
49:9 70:2,11,24 71:7
84:10,17,25 85:3,15
86:19 87:4 115:14
133:10 151:20 153:18
154:17 155:24
163:5,8 165:4
178:6,17,20

**item** 160:4 161:1,24

**It'll** 118:25

**it's** 10:8 11:22 13:8
16:15 18:12 20:5,9
23:20 24:20 25:11
29:5 31:1,16 33:5,7
35:1,20,23,24 36:8
37:12 38:1 41:8
42:17,18 43:19
44:11,18 45:4
51:3,7,8 52:1
53:4,25 54:6,8,9
57:23 60:7 62:20
63:5,8,23 65:1,12
67:11 69:10,18 70:19
71:2,3,6,23 72:4
74:24 75:1 76:11
81:15 84:2,9
85:9,14,16 89:2,3
96:16 97:17,22,24
98:2 101:24 104:8,17
107:25 108:4 109:25
110:18 114:16,17
116:23 117:5,22
118:1,9 120:10
122:25 123:23
124:3,15
125:14,21,22 126:1,3
127:10 128:6 130:6

132:6,18
133:1,10,14,15,18,21
134:9 138:5 139:4,22
140:10,20 141:25
145:22 146:4 148:23
149:11,14,18
152:14,23 153:3,4
158:15 159:12
160:4,10,25
161:4,5,7 163:24
171:19 172:14
178:5,19 181:18
182:16

**I've** 8:14 11:24
33:5,7 41:7 49:3
54:19 57:21,25 58:4
63:1 66:9 72:16
85:10 90:7 97:3
102:3 103:18 127:2
142:24 148:23 165:5
168:23 178:7

---

### J

**JANE** 1:3

**January** 56:24 172:25

**job** 45:20 48:25

**JOHN** 1:5,12 2:11
3:6,17 5:17

**join** 14:19,23 28:20
74:15 76:2

**joining** 8:24 11:20
75:10

**jotted** 54:21

**JR** 3:11 5:19

**judge** 44:4

**JUDGES** 2:6

**jump** 75:6

**jumping** 183:2

**June** 4:5,10 8:11
48:20 185:3 187:13

**jurisdiction** 44:11

**Justice** 5:15 9:1
110:15

---

### K

**KAZI** 126:19

**KEN** 1:7

**Kereldanladee** 9:9,13

**K-E-R-E-L-D-A-N-L-A-
D-E-E** 9:13

**kicked** 152:19

**kin** 187:10

**kinds** 31:25 37:4
60:13 69:18 132:9
170:17

**Klein** 6:6

**knowledge** 20:23 32:23
44:8 58:24 59:11,18
65:23 74:6 78:20
79:15 87:15,16 90:25
103:21 104:3 111:1
148:25 158:3 170:21
171:1

**known** 53:21 168:18
186:11

**KOBY** 1:5

---

### L

**LA** 3:14

**labeled** 65:1

**lack** 95:17 97:6
111:19 112:1,10
151:23 152:2,3 156:3
157:16

**lady** 14:21

**laid** 155:21,22 163:11

**Lane** 187:19

**language** 96:4,15
100:8 135:13 136:21
137:5,10 138:3
156:12 162:12

**LARA** 3:12,13

**large** 8:15 22:14
71:23 72:4

**last** 18:5 37:21 41:8
55:6,7,16 61:25
66:20,22 68:1 73:22
85:9 128:15,22
156:16 181:4

**late** 182:10

**later** 60:9 117:3
177:17

**LATIN** 1:7

**Latino** 111:20 119:9
120:11 129:1 152:9
153:15

**Latinos** 112:3,12

**law** 64:1 101:16 107:1
130:22 139:21 140:7
147:9,16,25 148:4
177:8

**laws** 73:15 129:9,16
131:7 147:7

**lawsuit** 19:9 63:21,24
74:16 75:10
76:2,18,19,24
77:7,16 78:16 79:19
80:4,16,19,21 81:25
82:7 83:3 84:19 86:3
108:6

**lawyers** 40:11,20
41:11,17,22,23 42:3
78:3 134:17 143:14

**lay** 150:8

**laying** 163:6 164:2

**lead** 1:4 8:4

**leaders** 24:2

**leadership** 21:14

**leading** 76:16,23 77:5

**leads** 138:23

**League** 1:7 2:3 58:2,3

**learn** 59:5 67:14

**least** 16:16 67:18

**leave** 123:25 132:5
133:11

**leaving** 131:14,21
132:14,20 133:18

**legal** 40:14,16,18
41:23,25 42:4
46:4,5,6,8,15 74:17
75:13,22 81:15 85:22
90:4 139:15,17,19,20
143:14 187:18

**legislation** 150:10,22

**legislative** 3:2 7:11
35:21 39:16
45:11,12,15 48:2,7,9
50:23 52:14,22 54:2
56:8,16 57:1,10
58:21 59:5 60:11
148:13,17,19
149:6,25 154:9
160:18

**Legislator** 165:9

**legislators** 38:18
53:2 54:11 151:7,8
162:22,23

**Legislature** 55:8,21
56:7,16 64:5 137:1
148:14 154:12 156:17
157:2,11,15
158:2,8,11 160:21
161:9,15 165:21

**LENARD** 3:11

**lending** 39:15 84:5

**less** 21:12 22:25 50:7
86:25 97:21 99:3
109:20 113:2 114:2
127:19 147:16 148:4
173:10 177:13,15
178:5 180:20 181:16

**lessen** 118:23,24,25

**let's** 97:13 98:5
162:24

**letter** 110:1,15,17
131:17 133:13 175:6

**letters** 90:7 175:7

**level** 29:7 50:15 51:4

80:19 115:4,5

**levels** 29:22,25 30:5
43:25

**liaison** 48:7,10
52:14,22 56:8,16
58:21 59:5

**license** 64:18,22,24
65:7 93:21,23
94:5,10,13

**lifetime** 30:4,5
31:1,2,3

**likely** 42:4 108:18
109:21 110:4 113:2
114:2 120:23 127:19
129:8,15,25 131:5
133:6

**limit** 42:20 92:18
153:1 164:9

**limitation** 30:7

**limited** 86:9 100:3
139:10 140:25
141:3,14,25
144:10,13 145:1
157:9

**limits** 23:2 164:11

**Linda** 50:6 178:10

**Lindsey** 5:7 8:22

**lindsey.cohan@dechert
.com** 5:10

**line** 127:10 177:1

**lines** 51:18 128:23

**LIONEL** 3:11

**list** 36:10 44:23 47:4
65:12,14,17 138:9
149:24 153:3

**listed** 47:15

**listen** 127:14 162:22
163:3,5,20

**listened** 154:15

**listening** 164:20
165:13

**lists** 18:7

**litigation** 39:22
40:1,7,20

**little** 28:1 43:3
52:17 84:12 131:20
153:21 164:22

**live** 104:15,19 107:23
121:14 155:12

**lives** 104:5 155:12

**LLP** 5:4,8

**local** 21:16 23:25
25:16 26:17,23
27:1,18 28:13,16,18
29:7 32:5,6 35:10
36:6 38:4,10
43:1,6,25 44:2,3,5
49:13 51:13,15,20
67:16,17 115:4,5
175:1

**located** 121:19

**location** 98:16 117:10
170:10

**locations** 37:12 110:8

**long** 13:21 38:23 51:8
56:22 65:12,14
101:13 114:24 117:11
126:15 131:16 151:22
166:21

**longer** 88:13 98:2

**LONGORIA** 2:7

**Los** 5:5

**losing** 100:5

**lost** 64:23 128:22
181:2

**lot** 12:5 22:24 25:20
53:8,11,12 54:22
59:5 82:17 99:15,17
104:22 118:12 121:15
125:16,18,22 127:13
157:22 160:11 163:14
178:12 183:22

**love** 157:14,15

**low** 74:22 90:12
119:10,12,19
120:4,21,22

**lower** 104:22 110:5
113:7 115:16 118:6
120:12,13 124:13
138:3

**low-income** 129:25

**LULAC** 1:8

**Lydia** 3:12 50:6

---

M

**machine** 4:12

**machines** 169:10

**mailed** 74:10 178:9

**mailings** 29:2

**maintain** 18:7

**maintaining** 51:18

**major** 50:22,24
157:20,21

**majority** 152:24,25

**makeup** 23:23 25:20
114:6,11

**MALDEF** 58:2

**man** 132:16

**manage** 49:22 63:3

**manager** 48:3,7,9

**MARGARITO** 3:13

**MARIA** 2:7

**Marion** 147:11

**mark** 1:3 15:21 19:20

**marked** 15:22 19:22
81:5,7 136:7,9
142:13,15 175:19,21

**MARTINEZ** 3:13

**mass** 29:2,3 59:20,25
60:1

**master** 48:3

**match** 131:21

**matches** 132:6 133:13

**materials** 54:15

**matter** 18:4,23 20:2
27:7,14 35:5 46:15
87:8 88:7 154:19

**matters** 14:14 17:1,5
19:1,6 60:13 71:11

**MAXIMINA** 3:13

**may** 10:4 12:10,14
21:19,20 25:18
28:14,19,20 29:5
38:4 39:25 40:8
41:5,15 43:17 48:20
49:5,8,14 53:1,3
54:20,24 55:1 67:15
83:5,8 85:11,17,25
86:21,24 87:21 95:13
96:5,25 97:11 98:23
100:11,23
101:11,16,23 104:24
115:16,17 116:8
117:11 118:18 123:18
130:17 137:13 144:8
147:2,4 150:13 162:1
164:18 171:8 176:2
178:22 181:12
182:1,10,11

**maybe** 23:8 25:4 33:6
36:12 37:3 55:11
86:25 114:8
117:1,2,14 122:25

**mayors** 38:12

**McCain** 169:13

**McCRAW** 2:12 3:7,19
5:18

**mean** 10:5 20:16,17
21:11 24:3 34:13
36:24 43:11 44:2,3
60:14 66:1 76:6
79:7,8 90:24 93:16
121:6 133:21 142:21
143:13 146:9 160:19
166:23 168:15,20
175:11

**meaning** 113:25

**means** 116:14,18,21
119:7 124:12 139:19
181:1

**meant** 18:9 107:16

**media** 36:21,24 37:4
62:3,24 63:2

**medications** 11:8

**meet** 51:7 54:10,13
57:2,20

**meeting** 13:21 14:20
27:7,8 31:15
37:17,18 41:8 51:6
78:16 179:3 182:9

**meetings** 13:18 24:2,4
37:7,9,25 38:3,8,19
39:6,21 40:7,21
41:4,6,12
42:6,10,13,15,20
49:5 57:11,14,15
68:13 76:19,23
77:2,7,10,16,18
78:4,9,13,22
79:3,6,10,12,15
149:21 151:4,6,7
179:8

**MELLOR-CRUMLEY** 1:5

**member** 29:15
30:8,11,19 31:9
32:8,10 33:11,15,18
34:21,22,24,25
35:2,7 36:7,10,16
48:14 91:23 119:19
120:3 168:11
174:8,16,17,19

**members** 28:12,18,23
29:2 31:6,13,20,23
32:4 34:12,16 38:3
42:20 49:7
59:1,12,15 65:24
66:13 67:4,12 74:2
75:12,16,21,24 77:21
89:23 91:12,15
93:12,12,20
94:2,9,12,15,21 95:3
115:6 127:13 155:17
167:7 168:5

170:13,21 171:1,2
172:20 173:11,14
177:7 180:14,19
181:20,22

**membership** 18:7 21:25
28:2,14,17
29:18,20,22,25
30:1,3 31:2,7,22
32:11,12,18,19 35:24
36:10 44:22 45:21
59:21 60:3 61:11,20
68:21 69:12 71:24
74:11 80:13 93:25
135:12 136:20
137:5,10 150:21

**memberships** 30:5,6
72:3

**memory** 149:1 161:8
172:11

**MENDEZ** 3:11

**mention** 15:17 63:10
99:4 117:18 172:19

**mentioned** 15:3 20:19
30:17,21 33:21 45:25
48:6 52:13 61:14
64:25 71:9
110:10,14,22 126:10
132:16 145:12
146:10,19 148:1
158:7 177:22

**mentioning** 135:20

**messages** 44:21,24

**messing** 115:20

**met** 13:12 14:25
57:21,24,25 58:2,4
151:12,22

**Method** 34:10,11

**Mexican** 3:2 7:11

**MICHAEL** 1:4

**MICHELLE** 2:4

**middle** 104:20 131:16
144:4

**midway** 116:4

**miles** 98:17 115:24
122:2 145:23

**military** 64:21
94:22,25 97:23

**Miller** 5:12 8:25 16:6
52:10 183:8,18

**mind** 66:23 144:7
147:4

**minor** 109:8

**minorities** 64:1 74:22
110:3,4 113:7 115:13
138:3 139:2

**minority** 90:12
109:17,20 113:1
114:2 117:24 119:19
120:3,11,21 125:15
127:18 129:8,14
131:5 132:9 133:5,24
134:14 135:13 136:21
137:5,10 151:25
153:20 163:1
164:1,10,21,25
165:21 166:1

**minute** 17:7 144:11

**minutes** 42:5,8 52:7
54:22 109:12 122:21

**mischaracterizes**
112:20

**misconduct** 39:11

**miss** 101:21 179:8

**missed** 41:7

**missing** 131:15,17
133:13 172:6

**mission** 7:5 20:5,7,11
43:3 68:24 74:24
76:10,13,15
88:14,16,20,22
89:2,7

**misstates** 71:12 88:25
89:10 99:13 118:21
132:11,12,24 133:8
138:18,19

**mitigate** 123:3

124:5,20 125:2,7

**mitigated** 116:7
    118:17,22

**moment** 52:1 172:22

**Monday** 13:20,21

**monetary** 99:12,21

**money** 82:25 87:2
    98:21 99:17 100:4,5
    101:22 104:25 117:13
    122:8 123:13,24
    124:8,11,15 130:7
    141:16,24 142:1
    145:18,19,21 146:1,4

**monitor** 58:20,22

**monitored** 58:7

**monitoring** 45:11,13
    58:25

**MONTEZ** 1:4

**months** 36:13 56:25

**morning** 8:1 11:12
    154:23 155:2,4
    163:11

**mostly** 10:3

**motion** 7:12 143:2

**motivated** 152:8
    153:15

**mouth** 36:23 66:8

**move** 26:12 104:22
    107:18 117:2 119:1,4
    130:2

**moved** 153:6

**moves** 161:15

**movie** 144:17 145:13

**moving** 61:25

**multiple** 22:15 23:8
    50:8,9 174:25

**myself** 8:14 49:23,25
    54:3 163:19

————————————————

————————————————
                N

**NAACP** 3:1 4:3 5:2
    7:5,7,11 8:20,21,23
    9:22,23,25
    10:3,4,5,6
    14:8,9,10,13,16
    17:14 18:6,22
    19:9,17
    20:6,8,10,13,15,16,2
    0 23:3,13,15 24:6
    28:2,12 29:16
    30:11,14,19 31:12,21
    32:10 33:11,16,18
    34:12,15,16 35:17,24
    37:6 38:24 39:22,25
    40:8 43:2,5,22
    44:8,10,12,20
    45:10,19,24
    46:1,2,12,14
    47:22,23
    48:4,15,19,25 50:14
    52:14,23 53:1 54:2
    56:4,8,13 57:4,10,13
    59:1,12,13
    60:4,12,15 61:16,20
    62:2,4 63:10,12
    65:24 66:3,12
    68:17,22,24
    70:2,9,25 74:15
    75:11 76:2,8,13
    78:3,22 80:13 81:18
    82:7,11,12,20 84:25
    86:4,5,13,20
    87:6,17,22
    88:3,7,13,15,21
    89:7,12,22 90:22
    91:2,12,16,23 92:2
    93:2,12,20,25
    94:2,9,12,15,21
    95:3,24 96:1,12,17
    100:20 101:1,5
    102:1,4,7,17 104:10
    108:5 109:20 111:18
    113:1,11,24 114:1
    115:4 117:23 119:18
    120:20 121:20 122:10
    124:19 125:1,6,9,11
    127:18 129:7,14
    131:4 133:23 134:12
    135:10,24 137:2

138:15,21 139:8
    140:23 143:7,12,23
    144:12,24 146:5,16
    147:15,23 148:3,20
    149:7 150:25 152:7
    153:13 154:3,6,11,16
    155:23 158:1
    160:16,20 161:10
    162:2,4,7,16
    164:7,13 165:8,14,20
    167:4,7,9
    168:12,13,18 169:21
    170:12,14,16,17,22
    171:2 172:19 173:15
    174:6,15,21,24
    175:8,12 177:3,19
    179:23 180:6,14,19
    181:9,15 183:24
    184:1

**NAACP's** 19:12 76:17
    77:6 81:25 96:9,19
    124:2,3 143:1 144:18
    148:13

**narrow** 40:23 63:11

**national** 7:5 9:25
    10:6 20:8,9 39:18
    44:10,12,18 86:4

**nationwide** 90:8

**nature** 69:8 156:18

**nay** 58:18

**nearest** 115:24

**necessarily** 69:1,6
    70:25 77:25 85:18
    86:8 99:12 104:25
    116:18 142:22 161:16
    162:23

**necessary** 86:21
    93:3,7,15 101:11
    135:16 138:12 183:23

**neck** 114:25

**negated** 162:3,11

**negative** 123:4 124:3
    125:3,8

**networking** 45:20

NGR 1:4 2:2 3:2,12

night 38:17

nine 103:19

nod 11:22

non-Hispanic
  103:5,8,9

nonmembers 35:16

nonminority 117:25
  132:10 133:6,25
  134:15

nonpartisan 43:16,19

nonpaying 56:14

nonprofit 86:5

nor 187:9,10

normal 57:9 160:22
  174:19

normally 46:21
  54:6,25 72:15 87:1
  152:23 159:2,5,11
  160:2 162:21 178:8

northeast 114:9

NOTARY 186:22

note 11:24 19:19

noted 186:3

notes 54:20

nothing 29:6 31:19
  50:22 97:3 101:16
  156:3 183:1

notice 7:3 16:19
  90:17 152:2,14
  155:13
  159:7,8,9,11,13
  166:8

noticed 147:20 178:12

N-O-T-Z 46:25

Notzon 46:22,24 47:3

N-O-T-Z-O-N 46:24
  47:1

null 163:9

————————————
O
————————————

oath 186:12

Obama 169:12

object 12:15 87:20
  112:19 118:20 127:9
  147:18

objecting 108:14

objection 17:18 18:4
  44:15 71:12,25 74:17
  75:13,22 76:4
  78:5,10 79:21 86:15
  88:24 89:10 90:4
  91:7 99:13 106:15
  107:3,8,11 108:7
  112:6,14 116:15
  120:7,25 121:12
  123:11 124:22 125:13
  132:11,24 133:8
  136:22 137:12 138:18
  139:18 140:14
  141:5,11 142:11
  143:13 144:20
  145:2,6 146:8
  148:6,9 157:5 165:17
  180:10,16

objections 17:19 18:3
  90:17,21

obtain 93:4,15,17
  97:11 106:25 107:5
  113:2 114:3 115:8
  116:9 118:18 119:13

obtained 95:13

obtaining 95:19 97:8
  111:21 112:2,11
  113:8 119:20
  120:5,18,24
  121:5,7,24 135:22
  175:13

obtains 65:4

obviously 116:17
  136:15

occupied 104:8

occur 67:16 77:10

occurred 76:23 77:2

October 66:22,24

offer 31:21 41:15

offered 32:8

office 24:12 27:21
  43:17 46:18,19
  48:2,7,9 49:2 50:21
  54:13,14 65:8
  98:13,14,15 121:16
  138:6 142:4 146:23
  170:5 186:18 187:12

officers 25:14,23
  26:2,8,9,10,17,20,22
  ,24 27:16 38:1

offices 4:13 8:12
  37:14 95:13 98:24

official 2:11,12
  3:6,7,18,19 47:22,24
  130:24 134:9,14,18

officials 24:22 38:12
  123:2,9 124:4 125:2
  127:25 128:25 133:24

Oh 13:22 20:24 33:25
  41:20 51:23 81:21
  151:11

okay 9:2,23
  10:2,7,19,23,24
  11:16 12:20
  13:2,5,8,18 14:6,19
  15:3,12,15,19,25
  16:5,8,18,20,24,25
  17:5,12,22
  18:1,11,16,19,25
  19:3,8,11,15
  20:1,4,11,15,18
  21:7,15
  22:2,5,9,11,18,20
  23:5,6,11,19,22
  24:1,15,19,24
  25:2,8,21 26:8,11
  27:15 28:1,3
  29:15,24 30:10,25
  31:6,21 32:23
  33:9,17,25 34:20
  35:15 37:6,21 39:2

```
40:11 41:11,21
42:1,5,22,25
44:7,12,20 45:2,9
46:20 47:11,13,19,20
48:24 50:7,11
51:6,24
52:3,6,7,10,17 54:15
56:15,20 57:1 58:20
60:2,11 62:8
63:6,9,15,20 64:7,25
66:22 68:7,12,15
71:14 72:17
73:7,11,17
74:9,13,15,21
77:2,17 78:3,15,20
79:14 80:3,24
81:2,8,11,22
82:2,5,9,23 84:12
85:23 86:8,11 88:12
90:6,20 91:4,11
92:14 93:11 96:14
97:5 100:6,10,20
101:8 102:21,25
103:13,21 105:5,20
106:1 107:18,21
108:8,23,25
109:1,11,14
110:22,25
111:9,15,17,25
112:23 113:5 115:11
116:13,25 117:23
118:2,8,10,14,16
119:18 120:1,2,17,20
121:3,20 122:20,22
124:1,7,14,17,19
127:16 128:22
129:7,12 130:18
132:8 133:3,17,23
134:4 135:4,24
136:6,18 140:9,23
142:8,16,25
143:3,4,6,9,21,25
144:1,4 145:7
147:6,15 148:12
149:17 151:2,11
152:7 153:17 154:6
156:10,24 159:10
161:5,13 162:14,18
166:6,9,25 167:4
```

```
168:11 170:21
171:17,19
172:13,16,24 173:3,6
174:3,14 175:5,22
176:7,11,21,22
177:1,16 179:16
180:4 182:19 183:8
```

**old** 13:14

**ones** 17:10 22:14
   69:19 173:12

**ongoing** 66:17 87:11
   179:13 181:19

**online** 42:11 74:11,12
   123:18

**onward** 88:3

**open** 31:14
   42:13,16,18 98:24
   101:24 153:7

**openly** 40:9

**operate** 178:7

**opinion** 5:20 72:12
   76:1 81:19 82:10
   88:13,21 89:6
   105:8,11 108:12
   125:9 144:15 150:21

**opinions** 41:15,24
   42:1

**opportunity** 99:23
   102:15 154:17

**oppose** 102:4

**opposed** 144:17

**opposing** 162:16

**opposition** 162:5

**options** 150:7
   162:4,11,15,19

**ORAL** 4:2,7

**order** 43:2,14 44:21
   50:22 65:8 77:25
   97:12 98:7 102:9
   122:7 135:17 152:25
   178:3

**organization** 24:6

**organizational** 82:13
   83:3

**organizations** 57:2,7
   58:5 78:21 178:21

**organize** 62:2

**organized** 21:8,14
   44:22

**ORTIZ** 1:5 3:11

**OSCAR** 1:5

**others** 177:10

**otherwise** 46:12 60:19
   83:19 85:4 157:22
   179:17 181:10

**outcome** 164:11

**outreach** 29:1 43:14
   121:18 124:16,17
   125:14,21 126:9
   128:2,4

**outreaching** 128:1

**outright** 137:14

**outside** 60:11 78:8
   83:16 87:5,13 88:5
   127:10 147:20 160:17
   167:25 172:12

**overall** 21:25

**overseas** 97:23

**owner** 104:8

**owner-occupied** 103:6
   104:5,15

**ownership** 116:6

**owning** 105:8,11

**owns** 104:8 108:17

**OZIAS** 1:5

---
P
---

**p.m** 4:11 135:7 183:14
   184:9

**organizational** 34:23 39:9,19 67:10
   75:11 76:3,7,10 86:5
   178:23 184:2
```

**P.O** 5:20

**package** 59:19 60:1

**page** 6:2 7:2 16:24
   62:20,21,22 81:20
   82:9 89:17,21 95:11
   100:6,7 102:22
   109:19 111:16 116:2
   122:25 123:1 128:16
   142:18,21 143:25
   144:4 156:16 171:9
   176:8,11,17,18 177:1

**PAGE/LINE** 185:4

**paid** 31:2 33:8 34:22
   101:17

**paper** 176:9

**papers** 125:22

**paragraph** 82:9,10
   89:19 95:12 97:5
   100:7 102:22
   103:1,11 107:21
   111:15 112:9
   116:3,4,22 119:5,7,8
   122:24 123:1 124:25
   127:24 128:16,23
   130:23 144:5 156:13

**paragraphs** 17:6,16
   109:16 166:22

**participate** 78:15
   80:25 122:8 139:3
   146:3 147:2 159:4
   168:7

**participates** 46:13

**participating** 47:8

**participation** 76:19
   148:21 159:3 164:10

**particular** 51:15 91:3

**particularly** 29:6

**parties** 78:24 79:2
   187:10

**partnered** 32:3

**party** 187:9

**pass** 183:17

**passed** 53:10 64:5
   164:18,19

**passionate** 159:14

**passport** 64:19
   94:16,19

**past** 11:17 54:12
   57:19 59:15 71:18,19
   72:21 149:9 173:22
   179:19

**pay** 29:18 30:24 33:20
   60:23,24,25 98:11
   117:14 122:3,4,6
   138:6 141:17
   145:15,23 163:22,23
   164:5

**payday** 39:15 84:5

**paying** 34:9

**payment** 34:10,11

**PEGGY** 1:6

**PENNY** 1:5

**people** 8:15 13:5
   22:25 25:2,6 33:2
   34:14,18 35:7
   43:17,18 44:24 46:18
   49:6 67:5 69:14
   71:21 72:12 73:20
   74:22 75:17 83:11
   85:11 95:21 96:5,20
   102:15 112:1,3,10,12
   114:5,7,8,10,22
   115:7 121:15
   123:17,20,21 126:6
   128:8 132:17 142:4
   152:3 159:3,13
   167:16,17,19,21,24,2
   5 168:5
   169:6,11,14,19
   170:3,10 175:6
   181:19 182:17,18

**per** 138:16

**percent** 55:12
   103:5,7,8 151:16
   178:11

**percentage** 71:23 72:4

**passed** 90:12 104:4 107:22
   111:22
   179:16,18,21,22
   180:5,7

**percentages** 104:14

**percentage-wise**
   180:12

**Perfect** 28:8 52:8

**performed** 151:3

**period** 130:4

**permissible** 160:18

**Perry** 1:11 5:17 8:5

**person** 8:17 14:4,5
   43:20 47:25 54:10
   77:13 89:25 99:18
   119:22 120:6 139:25
   145:18 147:2
   155:5,11 186:14

**personal** 94:3 95:23
   117:12

**personally** 153:25
   168:14 186:11

**persons** 75:1 95:14
   96:2 103:6,7,8,9
   119:12

**person's** 85:24 136:19

**pharmacy** 32:5,6

**phone** 5:13 8:18,24
   11:21 14:20,23
   44:21,23 49:10 77:12
   128:10 174:8 182:2

**phones** 49:4

**photo** 64:12,15 89:24
   90:13 100:15 111:19
   116:6,8,9 119:13
   123:2 134:1,5

**photograph** 31:9 94:23
   95:1,5,8

**pick** 178:13

**picture** 64:20

**piece** 159:16

places 115:18 155:7

PLAINTIFF 5:2,11

Plaintiff-Intervenors
2:5,9

plaintiffs 1:9 2:2
3:4,15 7:10 142:19
144:5

plan 31:4 150:8

planned 61:21

planning 85:8 178:9

platforms 62:4

play 61:4,6,8 178:8

plays 175:9

pleadings 162:13

please 9:7,8,12
11:23,24 12:3 16:24
17:7 28:10 68:18
77:4 95:11 102:21
140:16 143:25 181:13
183:11

point 8:13 90:18
114:1 117:5 136:18
137:8 163:8,15
176:15 181:3,5
183:25

police 36:5 39:11

policy 43:15,18 44:7

political 21:24
43:9,11,15,23
44:14,19 53:15 150:4

politicians 38:7

politics 53:10
127:5,6

poll 121:21
122:9,11,12

polling 171:11

polls 100:12 150:20

pop 49:8

POPE 1:5

population 36:2

114:12

portion 42:20 82:12

portions 42:10,15
87:17

position 46:21 52:25
56:23 96:9 102:1,17
143:11 144:19

possess 89:24
91:13,16,23
92:2,6,20,24

possibility 116:7
118:17

possible 41:8 71:2,3
86:18 149:18

posted 74:11,12

posts 62:21

potential 29:2
136:2,4 148:18 149:5

PR 62:1,9

practice 113:25
175:10

Prairie 172:4,14

preclearance 10:17

predating 87:22

preliminary 10:21
11:16

prep 13:18 14:19

preparation 15:1,5
19:4 82:3

prepare 15:16 19:5
148:20 149:7 159:16

prepared 17:24
19:1,11

prerequisite
135:11,19 137:3

prerequisites 138:13

prescription 32:4,16

prescriptions 32:5

present 5:23 40:11
41:12,22 77:17,19,22

78:3,8,13,22 79:2,16
112:24 179:14

presented 103:22
113:19 137:16 138:2

presenting 104:10

presents 100:14
107:21

president 14:8,9
21:16,17,19 26:5,15
27:9 36:6 38:9 69:21
169:12

presidents 25:16
27:18 38:2

Presidio 115:22,23
122:2

Presirio 115:19

press 62:2,3,10,12,14
125:18,20 126:3

pressing
70:4,10,13,23,24
71:11 84:17,24,25
85:2 86:20 87:7
178:18

pretty 11:3 49:19
114:15,17

prevent 11:13

previous 107:16 113:6
116:22 119:8 173:12
175:24,25 176:17

previously 84:21
106:5 146:13 147:25
148:12 181:17

price 29:20

prices 30:6

primary 65:12

prior 138:19 141:2
144:19,24 146:7

privilege 174:12,13

privileged 79:22
145:13

probably 10:19 12:6
25:4,11 53:24 104:20

105:2 108:16 150:12
163:18 180:23

**problem** 34:2 35:20
39:5 53:6 63:19
119:3 128:5,14
130:11 157:21 158:5
171:24 172:3 183:7

**procedural** 161:15
162:3,8

**Procedure** 4:15

**procedures**
160:13,17,23

**proceedings** 187:7

**proceeds** 144:7

**process** 45:15,17
60:22 61:2,3,18
80:12 85:25 132:1
134:4,8,13,14 148:14
150:19
152:8,13,16,20
153:10,14 154:7,9
159:1,6 164:10,17,19
165:6,12,18,25
174:19,22

**processed** 172:7

**produce** 18:8

**produced** 4:7 15:4,9
20:1 110:18

**professionally** 45:20

**proficient** 62:23 63:1

**program** 32:2 33:5,12
49:15 182:14

**programming** 177:3,18

**programs** 83:1,8 86:25
178:2

**projects** 84:4

**pronounce** 8:8

**proof** 130:5

**proper** 115:8 154:17
159:13 170:10

**properly** 85:22 123:15

128:3,4 159:16

**proposal** 148:24

**proposals** 45:11 59:2
60:5 148:19,22 149:6

**proposed** 45:14
54:17,19 59:6,14
153:21 164:3,22

**pros** 76:20 77:8

**prove** 32:10

**proved** 186:11

**provide** 11:5,9,19
81:2

**provided** 35:16 135:20
158:2,6

**provides** 101:2,6

**provisional** 100:9,11
101:3 102:5,7,9,11
117:19 129:23 131:25

**provisions** 4:15

**pub** 84:11

**public** 2:13 3:8,20
31:14 36:13
42:8,13,16 67:13
186:22

**publicity** 62:11

**publicize** 123:2
127:25

**Publishers** 126:2

**PUEBLO** 3:14

**punishment** 140:3,6,11

**purpose** 89:14 164:8,9

**purposes** 10:2 65:5
76:2 83:25 171:22
181:9,16 183:5
186:16

**pursuant** 4:14

**push** 157:20

**putting** 61:11,15,18
86:2 98:1 114:19
123:14

---
Q
---

**quarterly**
37:10,11,17,18
39:6,21 40:6,21
41:4,6,8 68:13
149:20

**question** 11:25
12:3,12,15,16 22:21
40:4,17 46:3 59:3
61:25 73:24 77:4
80:1 82:17 93:9 94:7
96:25 100:24 105:10
106:19 107:13,16
112:22 116:25 117:1
119:24 120:2 124:24
128:15 129:12,13
130:21 134:3 136:23
138:20 139:15 140:16
143:20 147:22 148:16
149:3 153:10,12,13
162:6 171:5 176:22
177:5 181:1 182:4
183:4

**questioning** 127:10

**questions** 10:21
11:6,10,14,16,19
16:16 28:5 39:4
47:21 109:15 166:4
167:23 174:1
176:12,19 180:22
182:17 183:16,18
184:6

**quick** 17:7 18:4 53:22
60:9 148:16 183:3

**quickly** 153:6 166:20
176:7

**quote** 131:6

---
R
---

**race** 119:8 135:12
136:20 137:4,10

**racial** 104:5,15
107:22 116:5 138:2

**racially** 123:4 124:2

125:3,7

**radio** 125:24
126:11,13,18,23
127:8,14

**random** 167:24

**range** 29:20

**ranges** 29:19

**rates** 116:6

**rattle** 65:14

**reach** 53:2 182:18

**reached** 28:6 170:4

**reaching** 128:1

**reading** 82:19 95:11
100:17 103:11 116:10
117:4 119:15 123:6
129:4 144:17

**reads** 116:4 144:5

**ready** 13:10 168:1

**real** 18:4 53:22 160:7

**realize** 12:5

**realized** 74:21 92:16

**reallocated** 87:7

**really** 27:11 32:25
51:3 74:8 84:17
153:7 159:14 164:4

**REALTIME** 4:2,7

**reason** 114:18 129:21
185:4

**reasonable** 105:5

**recall** 34:6 35:15
37:22 38:22 58:15
66:22 73:5,8
78:14,19 87:5 88:5
110:17 111:14 150:19
151:6,9 153:24
158:4,5 161:14,19
167:6,11 173:2 176:3

**recalling** 31:19

**receive** 34:14 61:19
86:20 173:25

174:2,14

**received** 168:23,25
169:2 173:21,23
174:7,9

**receiving** 85:3

**recently** 66:18,19

**Recess** 52:11 135:7
183:14

**recognize** 16:1,11
19:23 81:9 136:9,15
142:17,22

**recommended** 54:16

**record** 4:15 9:8
12:3,8,24 13:9 17:18
52:6 96:23 102:25
135:5,8 142:20
182:22
183:10,13,16,25
184:8

**recruit** 28:12,18,25

**rectify** 101:18
129:22,23 130:4,11

**rectifying** 69:4

**recurring** 86:24

**red** 157:22

**redistricting** 39:10
55:19 87:11,13,18
88:6

**redo** 182:13,14

**redress** 46:4,6,7,8
85:22

**reduced** 187:5

**refer** 10:5 97:9 99:11
123:10 137:23 166:13

**reference** 28:5

**referenced** 118:12

**referred** 103:14

**referring** 10:3 33:14
98:8 146:20 166:14

**reflected** 116:5

**Refresh** 172:11

**regard** 60:5 104:6
121:4,10 148:18,21
149:5 151:4
172:19,20

**regarding** 17:15 18:23
19:6 40:20 47:21
59:1 61:20 65:25
66:14 73:13,15,21
124:1,9 151:20
154:18 156:18 168:13
169:3 175:9

**regards** 161:20

**registered** 89:23
91:13 92:20,23
93:6,14 95:14,21
96:3,6,11,12,18,21
122:12 128:18

**registering** 95:15
96:6

**registrar** 100:15
172:8

**registration** 121:5,11
131:1 134:2,6
141:15,16,19 145:15
172:5,6 187:19

**regular** 37:6 51:12
57:11,14 69:15 187:9

**regularly** 43:7,9,13
44:20 45:1,10,19
49:17

**relate** 50:11 59:8
166:4

**related** 62:9 63:12
83:15,20 85:13 108:5
109:15 170:18
181:10,16

**relating** 37:19 73:19
167:9 170:14

**relation** 55:13,20
58:8 87:18 180:5

**relationship** 23:11

**release** 62:12

**releases** 62:2

**relevant** 63:13 70:2,4
  91:2 150:10

**relied** 157:2

**relief** 7:7 81:17

**remaining** 17:25

**remember** 11:17
  25:18,19 32:2,25
  34:3 37:24 39:17
  48:16 55:15,18
  58:5,10,13,18
  63:14,15 68:8 74:5,8
  85:9 93:23 126:16
  148:7,8,10 149:2,9
  151:11,19 153:23
  154:24 155:5,8
  158:10 159:12 160:6
  168:9 169:7 172:23
  176:16

**removed** 158:20

**rent** 72:9 104:22

**Rep** 132:16

**repeat** 119:23 120:2
  129:13

**rephrase** 12:13 72:20
  73:14 88:2 100:23
  105:6 112:7 113:13
  124:24 181:1,2

**report** 24:14 50:1,3

**reported** 4:12 171:7

**reporter** 5:24 9:12
  11:21 12:2 134:21,24
  187:2

**Reporter's** 6:8

**reports** 118:6

**represent** 14:13 16:18
  52:25 54:1 81:16
  96:22 103:22 143:1
  147:4 176:12

**representative**
  95:23,25 103:23
  132:23 151:15,18,19

**Representatives** 3:3
  151:21 164:2 165:2

**represented** 13:3
  19:13 146:22

**representing** 8:3
  14:16 27:13 57:9
  75:11,12,15,20,24
  76:3 157:25 175:24
  176:23

**represents** 46:1,14
  82:6 143:11

**reproduced** 97:12

**Reps** 153:20 166:2

**requested** 184:10

**require** 64:11

**required** 30:22 33:24
  34:4,8 64:16 65:8
  89:25 90:13,14 93:24
  95:17 97:6 100:15
  105:1 107:1
  111:19,21 112:2,11
  113:3 114:3 116:8
  118:18 119:14 135:23
  139:21 175:15

**requirement** 58:22
  59:2 73:14 100:21
  139:16,17

**requirements** 58:8
  59:8,14 64:7 65:25
  66:14 73:16,21 74:3
  82:14 104:6 123:3,5
  125:4,8 127:20,25
  135:10,25 138:8
  147:16,24 148:4
  170:23 180:15,20

**requires** 64:12

**requisite** 135:23

**re-read** 119:25

**research** 49:8 90:9

**reside** 9:15 103:6

**residence** 104:6
  105:8,12,23
  106:2,6,24 107:7,23

108:18

**resident** 30:13

**resource** 60:13

**resources** 60:19 61:8
  79:19 82:13
  83:4,5,14,16,18
  84:1,18 85:4
  86:2,8,14,21
  87:3,6,17 88:6
  139:10 140:25
  141:4,14 144:10,14
  145:1,11 177:9,25
  179:11,12,16,18
  180:1,5,6,21
  181:9,16 183:23

**respect** 163:5

**respectfully** 144:6

**response** 7:10 142:19
  143:1

**responsibilities**
  52:21

**restate** 136:23 140:16

**restrictive** 147:16
  148:4

**result** 116:4 128:25
  146:18 170:1 180:21
  181:8 183:24 184:2

**results** 124:2
  138:17,23

**retract** 112:22

**retread** 91:10

**retrieve** 98:6

**retrieving** 98:9

**re-tweet** 62:16

**reveal** 39:24 41:24
  76:22 77:1 174:4,11

**review** 17:7,13

**reviewed** 15:3,9

**RICK** 1:11 5:17

**rid** 158:19

**rights** 5:14

75:12,15,16,21,24

**Robert** 46:22,23

**role** 47:21 59:19
61:4,6,8 77:19 178:8

**roles** 27:1

**rolled** 84:11

**room** 8:13,15 72:9
172:7 176:6

**rooms** 72:10

**Rosenberg** 28:6

**rough** 25:4,7

**roughly** 25:10

**round** 176:19

**route** 97:24

**Rudd** 5:3 6:7 8:21
17:17,23 18:10,14,18
20:17 28:8 39:23
41:19,21 44:15
47:9,12 52:2,5,8
71:12,25 74:17,20
75:13,22 76:4,21
78:5,10 79:21 86:15
87:20,25 88:24 89:10
90:4,24 95:22 96:22
99:13 103:3 106:15
107:3,8,12 108:7,14
109:13 111:5,9
112:6,14,19 116:15
118:20 120:7,25
121:12 122:15,23
123:11 124:22 125:13
127:9 132:11,24
133:8 135:6 136:22
137:12 138:18,25
139:18 140:14
141:5,11 142:11,20
143:13,19 144:20
145:2,6 146:8 147:18
148:6,9 156:8 157:5
165:17 166:9 171:17
174:3 180:10,16,23
183:3,11,21 184:6

**rule** 153:1
158:7,13,17,20

160:12,17,22,24
161:2,6,15 162:3,8
165:12

**rules** 4:14 10:22
11:17 152:4,16,21
158:10 162:20 163:7
164:20 166:1

**run** 28:9 133:10

**running** 43:17 72:15
101:24

———————————

S

**safe** 163:24

**Safety** 2:14 3:9,20

**San** 22:15

**save** 176:9

**saw** 17:10

**SB** 76:12 92:12,21,25
93:4,8,18 100:15
101:2,6 106:3,14
108:5 109:17,22
111:20 113:3 115:9
119:14,21 121:8,21
122:11 123:3 124:2,9
125:4 135:10,25
137:2 138:15,22
139:9 140:23 141:2
144:8,12,19,24
145:10,17 146:7,18
147:2,17 148:5
151:5,7,20 152:8
153:2,14 154:8,13,18
157:4,10,13 158:3
162:16 164:13
165:9,15,22 171:3
172:24 173:3,8,16
174:20 175:9 177:21
179:14,18,20,24
180:2,8,15,20,21
181:6,10,16 183:24
184:2

**scares** 167:21

**scaring** 167:25

**scattered** 24:9

**schedule** 101:15,19
149:23

**scheduled** 57:15

**schools** 29:12,13

**screening** 36:16

**se** 138:16

**seal** 186:18 187:12

**searching** 111:10

**second** 19:16 45:8
55:12 128:19
142:18,21

**secondary** 65:13

**seconds** 183:6

**secretary** 1:12 2:12
3:6,18 21:18,21 22:3
50:5 65:20 128:7
178:10

**Section** 5:14

**Security** 34:4

**seem** 90:16

**seemed** 46:17 156:1

**seems** 46:25 96:15,16
153:5 172:8

**seen** 16:22 33:4,5,7
72:16 103:16,18,20
136:14 142:24
143:4,15,17 150:11

**sees** 69:23

**segue** 18:2

**select** 153:8 159:19
163:25

**self** 144:6

**self-employed** 9:21

**seminar** 36:12

**Senate** 7:9 55:20
58:12,15 63:25
64:4,8,10,16 65:23
66:14 74:3 76:9
82:11,15,16
83:13,15,16,20 84:19

85:5,13 87:5
88:12,22 89:6,14,25
91:14,17,24
92:3,7,17 114:3
127:7 136:13,25
137:7,8 139:1 141:22
152:1,5,14,18,22
154:21
158:12,13,16,17,23
161:22 162:5,24
163:15 164:4,8,9,21
177:2

**Senator** 151:12

**Senators** 151:17,21
153:20 163:1,13
164:21,25 166:2

**send** 29:1,2 44:24
49:10 59:20,25 62:16

**sense** 24:5

**sent** 66:9 110:20
150:12 159:24

**sentence** 18:5
116:3,11,14,18 117:4
118:15 144:5
156:16,24

**separate** 105:17
152:17 179:2

**SERGIO** 1:3

**series** 17:6

**serious** 164:5

**serve** 26:24
34:12,13,24 46:1
56:7,15 128:12

**serves** 46:14

**service** 31:22 32:7,9
36:1

**services** 31:25
34:15,25 35:16

**session** 31:16 35:21
39:16 45:12 48:2
50:23 55:7,11 56:9
57:1,11,20,25 58:1
67:11

148:14,17,19,21
149:6,8,21,22,23,25
151:2,4,5 160:3

**sessions** 54:2

**sets** 69:21

**setting** 138:13 139:2

**severe** 146:17

**shake** 11:22

**share** 57:12 120:23

**shared** 20:12 44:10

**sharing** 78:21

**she's** 178:12

**shift** 83:7

**shipped** 178:9

**shoot** 49:14 62:14

**shootings** 36:5

**short** 38:16 52:4
152:1,14 155:13

**shorthand** 4:12 187:2

**showed** 90:11

**showing** 104:23 107:22
135:21 169:13

**shown** 90:9 113:7
138:2

**shows** 104:17 137:16
138:2

**shut** 32:6

**sides** 43:17,18

**signature** 184:10
185:1 186:2

**significance** 104:4,14
108:10,13

**significant** 87:17
117:16

**significantly** 111:22

**similar** 65:6 70:13
119:22 120:6 129:20
130:25 133:16,20
134:10,19 146:25

161:14

**similarly** 120:22

**simple** 63:8 152:24

**single** 17:8

**sir** 8:9 89:18 166:18

**sit** 71:15 161:14
178:24

**sites** 167:25

**sitting** 13:5 53:14
176:3

**situation** 142:5

**situations** 67:15

**six** 56:25 64:12,13,15
100:14,16 101:11,23
102:8 138:8,10

**six-day** 100:21 130:4

**size** 21:19

**skim** 166:22

**skip** 102:21

**Slaughter** 187:19

**sleep** 163:14

**slightly** 149:22

**slot** 85:14

**slow** 12:11 134:22

**slowly** 12:9

**small** 18:12 23:9 51:4
151:23 176:9

**smartphones** 128:9

**smell** 155:8

**social** 34:4 36:21,24
37:4 62:3,23 63:2

**socioeconomic**
105:9,13,16,19,21
106:7 108:1 115:14
119:10,13,20,22
120:4,6,22 138:4

**solid** 114:15,17

**Solutions** 187:18

**somebody** 28:19 49:14
  51:5 53:17 62:16
  98:1 101:9 117:14
  130:15
  131:14,16,19,22
  132:5,14,21
  133:12,15,18 145:23
  150:17 170:6,8,9
  173:21 182:9

**someone** 29:15 46:11
  51:21 96:10,18 98:5
  108:17,19

**somewhat** 79:1
  147:8,12,13 166:25

**somewhere** 12:21 21:4
  68:3,5,6 83:23 99:1
  126:5 150:14 172:7

**sonogram** 161:24,25

**sorry** 13:23 14:21
  22:12,22 23:5 33:13
  34:1 41:20 46:3 55:9
  58:3 59:24 61:13
  64:23 71:14 73:12
  80:5,6 82:19 93:9,16
  94:8 105:18 106:4
  107:10 108:21,24
  110:12,13 111:6
  134:21,23,25 142:12
  149:4 150:24 169:2
  171:25 174:1
  176:8,17

**sought** 65:24

**sources** 102:19
  111:1,7 123:21

**Southern** 1:1 8:5

**speak** 12:7

**speaker** 5:13 16:5

**speakers** 38:7

**speaking** 68:17 130:10
  171:10

**special** 55:7,11
  159:19

**specific** 35:15 37:13
  43:22 47:21 53:1

57:8 58:10 73:24
  79:9 126:24 136:19
  151:6,7,8,20 161:1

**specifically** 12:17
  19:5 55:14 60:5
  66:13 73:19,20 74:1
  91:1 110:17
  137:14,18 152:21
  158:10,18,20

**speculation** 44:16
  72:1 74:20 75:23
  76:5 78:6 86:16
  87:25 88:25 106:16
  116:16 120:8
  121:1,13 123:12
  124:23 140:15
  141:6,12 157:6

**spell** 9:10

**spelled** 46:24

**spellings** 132:13

**spend** 84:16 98:21
  141:15 142:1

**spending** 38:17 124:8

**spent** 61:9 99:25
  145:19 181:11

**spiel** 10:19

**spoke** 14:25

**sports** 127:1,2

**spread** 125:22

**staff** 47:25 151:9

**stance** 122:18 145:7

**standards** 129:1

**standing** 21:22 44:18
  84:8 158:14

**start** 12:10 116:20
  128:20 154:24 180:22

**started** 33:6 56:20,24
  100:19

**starting** 8:16

**starts** 116:3
  149:21,22

**state** 1:12 2:11,12
  3:1,7,17,18 4:12
  5:2,17 7:7,10 8:3
  9:7 14:8,9 15:10
  17:18 20:22 21:5
  23:17,20,23
  24:9,16,17,19,21,23,
  25 25:3,17,22,24
  26:5,14,24
  27:4,9,13,20,21 32:3
  37:12,19 39:18
  43:6,25 44:13 50:5
  64:2 65:2,6
  67:2,6,8,9,21
  68:12,15,21 69:16
  71:1,19 72:17,20
  74:9 77:4 81:18
  84:20,24 90:10 91:1
  105:10 106:22 107:1
  132:16 134:3 147:10
  153:11 173:7 177:24
  178:7,10 186:7,22
  187:1,3

**state-based** 18:7

**stated** 4:15 41:11
  44:7 76:15 78:12
  90:22 118:5 137:2
  144:11 153:19 158:4
  174:22 181:8 187:3

**state-issued** 94:3

**statement** 7:5 20:5,7
  81:19 129:5 132:23

**statements** 20:11,12

**states** 18:6 123:1
  128:16 147:7 183:19

**State's** 65:20 128:7

**STATES** 1:1 2:1 5:11

**stating** 164:2

**station** 126:18

**status**
  105:9,13,16,19,21
  106:7 108:1
  119:10,13,20,22
  120:4,6,21,22

stay 163:19

stays 70:13

STEEN 1:12 2:11
3:6,17 5:18

step 19:16

Stephen 5:19 8:2

stephen.tatum@texasat
torneygeneral.gov
5:22

STEVE 2:12 3:7,19

Steven 4:11 5:18,24
187:2,17

stick 125:16

Stogel 4:11 5:24
187:2,17

stop 12:7 51:25 150:6

stopped 149:18,19
178:12

stored 150:13

straight 159:20

strain 155:5

Street 4:14 5:5,8

strive 89:14

structural 102:14

structure 21:14

struggles 138:4

struggling 114:8
163:19

students 109:2

studied 103:19 166:10

studies 90:23 91:1
102:18 111:1,6 150:9
157:1,15 158:1,6
170:17

stuff 37:2 62:25 83:5
149:24 150:11

styled 8:4

subject 128:24 134:20
147:10,25

submit 55:1

submitted 13:13 15:4
17:18

subscribed 186:14

Subsection 109:16

subsequently 100:14

subset 112:3,12

substance 41:24

substantial 111:21

substantially 119:12
129:20 130:25
133:15,20 134:10,19

suffer 71:7 87:4

suffered 184:2

suffering 11:4

sufficient 102:2

suggest 96:16

suit 78:25 79:2

Suite 5:8 187:19

sum 26:11

summaries 54:16

summarization 124:9

summarize 48:6 68:18
160:15

summarizing 41:3
68:19 80:16

summary 112:9,15
177:13

summer 48:22

supplement 182:24

supplies 50:21

support 43:14 44:14
50:24 53:4 100:4
170:22 171:3 187:18

supports 165:15

supposed 98:1

sure 8:19 9:9 12:8
17:9 18:2,12 19:18

21:10,12 22:22,23
24:1,8 26:13,21
27:6,10 30:1 31:18
35:20 36:22
40:3,5,6,24 42:9
47:14 49:2 50:20
52:2,19,24 54:21
57:19 59:4 61:14
62:10 63:3,17 64:17
65:6 69:9 70:20
71:4,6,18 73:25
75:2,18 77:3,5,19
84:13 85:1,13,21
87:23 97:1,3,14
100:23,25 104:9,17
105:7 106:20,22,23
107:20 109:18 110:18
112:8,18,25 113:14
115:20 116:24 117:5
120:3 122:16,17
124:25 125:12,19,21
128:21 135:6 136:24
137:6 138:1,21
140:17 143:18 145:5
147:23 149:5 151:10
153:11,13 166:12,13
168:7 171:8,12,14
174:25 177:20 178:3
181:4,14,19,20,22,25
182:4,12,15

survey
103:3,13,16,17,20,21
109:4 110:22

surveying 114:22

surveys 113:16 150:20
170:17

sworn 4:9 9:4 187:5

———————————
T
tab 57:21,23 166:21

tactical
162:3,11,15,18

tailored 45:21 66:13

taking 11:8 187:7

talk 12:1,6,9 19:16
28:1 33:2 36:14

39:10,15 51:21,23
60:8 64:3 114:24
121:7 126:22 179:3

**talked** 39:10 41:7
84:24 97:2 107:10
110:23 121:4 148:12
149:25 179:13 183:22

**talking** 12:10 17:19
33:13 43:1 60:7
64:4,19 79:8 84:23
90:19 111:5,6,8,11
117:22 119:5 130:18
142:8 167:14,21
171:11,12 178:10

**talks** 28:15 130:23

**targeted** 161:1

**Tatum** 5:19
8:1,2,10,24 9:2,6,14
15:20,23 16:4,8,11
17:22
18:1,11,16,19,20
19:20,23 20:18,19
28:4,9,11 40:6 42:5
44:17
47:5,11,14,17,19,20
51:25 52:3,6,9,12
71:18 72:6 74:19
75:7,20 76:1,8 77:5
78:8,12 79:24 81:6
86:18 87:23 88:2
89:5,16 90:16,21
91:4,6 95:25 96:4
97:1,5 99:20 103:4,5
106:20 107:4,9,10,15
108:9,17 109:12,14
111:8,10 112:8,15,21
116:17 118:23 120:17
121:3,20
122:17,21,24
124:1,25 126:10
127:13 132:22
133:3,17 135:1,4,8,9
136:8,24 137:23
138:21 139:8,20
140:17 141:8
142:8,14,25
143:17,21,22

144:22,23 145:3,9
146:10 147:23
148:8,12 156:9 157:9
165:20 166:12,15
171:19 174:14 175:20
180:13,18,25
183:7,9,12,15 184:7

**tax** 121:21
122:9,11,12

**TAYLOR** 3:11

**Technically** 9:21

**ten** 52:7

**tend** 104:19,21,22
110:4 113:7 118:6
120:12,15 125:15
132:9 138:3 159:1

**term** 81:14,15

**terms** 41:25 120:11
171:13

**test** 113:24 175:9,11

**testified** 9:4 55:6,16
56:2 58:8,11,15
84:21 99:22 106:5
108:3 124:7 146:13
151:2 153:18,24
154:4 163:10,13

**testify** 17:14,21,24
18:8,22 19:1,12
53:21 55:4,10,20,25
56:7 76:25 155:3,10
187:5

**testifying** 54:25
132:17

**testimony** 19:6 41:3
55:1,13 68:18,19
71:13 88:25 89:8,11
99:14 124:10
132:11,25 133:9
138:19 157:24 165:5
177:14 181:11

**testing** 84:11

**tests** 175:13

**Texas** 1:1,8,11,12

2:3,6,11,12,13
3:1,2,7,8,17,18,20
4:3,12,13,14
5:2,9,17,21 7:7,10
8:3,6,12,19,21,22
9:16,22,23 10:3,5
14:10,13,16 17:14
18:6,22 19:9,12,16
20:13,15,16,20,22
21:5 22:14,24,25
23:3,8,13,15 24:6
27:25 28:2,12 29:16
30:11,13,14,19
31:12,21 32:10
33:11,12,15,18
34:12,15,16 35:17
37:6,23 38:18,24
39:22,25 40:7
43:2,5,22 44:7,20
45:10,11,19,24
46:1,2,12,13,14
47:22 48:4,15,19,25
50:14 52:14,23
53:1,8,12 54:1
56:4,8,13
57:4,10,13,23
59:1,12,13
60:4,12,15 61:16,19
62:1,4 64:2,17 65:24
66:2 68:16,22,24
70:2,9,25 74:15
75:10,17
76:2,8,13,17 77:6
78:3,22 80:13
81:18,25
82:7,10,12,14,20
84:25 86:4,13,20
87:6,17
88:3,6,13,15,21
89:7,12,22 90:22
91:1,12,15,23
92:1,20,24
93:2,6,12,14,20,25
94:2,9,12,15,21
95:3,23
96:1,9,11,16,19
97:19,21 98:5 100:20
101:1,5 102:1,4,7,17
103:23 104:10 107:2

108:5 109:17,20
110:3 111:18 112:10
113:1,7,11,24 114:1
115:4 116:8 117:23
119:18 120:20 121:20
122:10,13 123:1,9
124:1,3,4,19
125:1,6,9,11
127:18,24 128:18
129:7,14 131:4
133:23 134:12,14
135:9,24 137:1,2
138:15,21 139:8
140:23 143:1,7,12,22
144:8,11,18,23
146:5,16 147:15,23
148:3,11,13,20 149:7
150:24 152:7 153:13
154:2,6,11,16 155:23
156:17 157:11 158:1
160:16,20 161:10
162:2,4,7,16
164:7,13
165:8,14,20,21
167:4,7,8
168:11,12,18 169:21
170:12,14,16,22
171:2 172:19
173:7,15
174:6,15,21,24
175:8,12 177:19
179:23 180:6,13,18
181:9,15 183:24
184:1 187:1,3,20

**text** 136:25 182:1

**Thank** 9:2,14 16:9
18:1 47:19 90:2
103:4 115:23

**Thanks** 16:7 52:10

**that's** 10:25 12:15
20:17 25:19 27:25
28:5 29:21 30:23
32:7,14,15 34:3,7
35:25 40:17 49:6
51:10 52:7 56:25
60:23,24 63:12 73:7
74:10 80:17 84:11
85:8 86:5,10 89:21

90:9 97:2 99:16
100:25 104:9 105:1
108:25 109:13 111:11
115:10 117:9 120:9
122:22,23 124:7
126:5 127:23 128:7
130:25 133:2
134:1,2,6 143:16,19
145:9,13 146:20
148:25 149:25
152:2,6 153:22
156:7,22 157:9,21
160:6,7 164:11
166:13 168:10 172:22
174:8,11 181:11
182:19 183:1 184:7

**themselves** 32:9
162:24

**therein** 186:16

**thereof** 157:16

**there's** 12:11 24:12
26:2 27:11,15 30:7
32:3 36:9 44:23
46:17 50:23 51:1
54:24 71:7 90:8
97:10,25 99:17
101:16 104:23
108:20,22 114:18
115:19 133:19 138:9
140:3,6,11 144:5
150:18 157:18,21
159:6 171:23 172:3
181:24 182:18 183:1

**they'll** 28:17 38:14
69:2

**they're** 26:25 27:3,4
34:24 35:13 70:16
101:23 102:16 114:19
115:7 124:8 159:14
163:6 167:22
179:2,24 182:12

**they've** 130:7 167:17
172:4

**thoughts** 53:1,19
149:12

**thousands** 128:18

**Thursday** 154:25

**ticket** 145:24

**title** 17:5 47:22,24

**titled** 8:5 17:1
109:16

**today** 8:11 11:2
13:3,11 15:13 16:21
63:16 181:11
182:20,23 183:22
184:4

**toll** 155:10

**top** 25:9 39:17 58:5
65:15 81:20 89:21
92:22 111:13 126:16
168:9

**topic** 18:3,8,9 40:7
126:25

**topics** 17:15,20,23,25
18:16,21 39:7,8
40:20 57:16 69:10
79:5,7,10 127:11
147:20

**total** 72:3

**totality** 137:19,24
138:22

**touched** 42:25 52:20
75:7

**toward** 67:4 132:8

**towards** 73:20
83:1,2,19 84:18
99:24

**Tower** 5:4

**town** 98:20

**towns** 22:7

**track** 45:14 58:20,21

**tracked** 58:7

**tracking** 58:25

**tradition** 158:13

**traditional** 132:6

160:22

**traditionally** 162:21

**trained** 85:22

**training** 67:11 177:25
178:5

**transcript** 175:25
187:7

**transparency** 159:2

**transportation** 138:12

**travel** 98:17 101:13
115:24 117:10,11
122:2 130:1 138:5
159:15

**traveling** 101:10
145:23

**Travis** 169:10 170:4
187:1

**treasurer** 21:18,20

**treat** 133:24 134:14

**Trial** 5:13

**trouble** 113:8 135:22
138:14

**true** 114:20 186:2
187:3,7

**truth** 187:5

**truthful** 11:6,9

**truthfully** 11:13
72:14

**try** 12:4,7,9 54:23
69:13 71:4 86:3
92:17 98:21
101:14,18,19 102:15
107:18 117:13,14,19
138:10 153:21 156:11
159:25

**trying** 24:5,11 68:17
74:4 85:13 99:18
107:5 108:9 121:15
131:22 133:11 143:18
144:14,18 168:6

**Tuesday** 154:25

**turn** 16:24 58:25
89:17 95:11 132:21
143:25 176:7

**turned** 13:15 90:10
110:1

**turning** 91:11

**TV** 42:11

**tweak** 62:13

**tweets** 62:16

**twice** 45:4

**Twitter** 36:24,25
62:15

**two-day** 155:13

**two-third** 158:12

**two-thirds** 152:23
158:15,17

**type** 29:19 35:15
120:15

**typewriting** 187:6

**typical** 48:24 49:1,6

**typically** 72:8 74:12
90:9 117:11

**typing** 92:17

**typo** 18:12

---

U

**U.S** 5:15 9:1 30:10,18

**Uh-huh** 17:2 20:21
24:10 26:16 41:2
46:8 47:2 56:5 60:21
61:17 83:21 85:20
96:8 103:10 104:12
107:24 121:9 125:5
130:20 131:2
134:7,11 146:12
148:2,15 156:21
158:9 160:14 162:10
167:5 179:25 181:7

**ultimate** 80:3,15,18

**unable** 89:7 174:16,20

**underlying** 95:18 97:6

**understand**
12:12,18,25 27:15
83:11 84:13 91:9
104:9 116:18 117:5
119:6 132:19 144:18
178:18

**understanding** 120:9
145:8 167:1 181:25
182:1,5,7

**understands** 143:18

**understood** 22:5

**UNION** 3:14

**unit** 103:6 104:8,16

**United** 1:1,7 2:1 5:11
183:18

**universe** 113:18

**unless** 12:16 31:1

**unusual** 133:6

**upcoming** 39:16 148:19
149:6

**update** 60:3

**upon** 85:7,8 89:22
111:3 113:5,15
128:16 134:19 139:13

**upper** 104:20

**urban** 98:19

**urge** 144:6

**usual** 161:7

**usually** 71:21

---

V

**vague** 40:25 139:18
140:15 142:11 146:8
180:16,18

**Valley** 115:20

**value** 163:3

**Vandewalker**
176:14,19,23

**varies** 48:3

**various** 11:19 23:15

24:2,6,13,14,20,21
25:23 37:4,12,15
43:1 44:13 52:13
54:11 58:22
59:1,5,13 60:6,19
62:3 68:16,20,23
69:1 79:5,7
104:14,15 107:22
151:3 160:12 162:8

**vary** 69:21 97:20

**varying** 40:17

**Veasey** 1:3 8:5

**verbal** 175:4

**verify** 25:19

**veterans** 85:17

**vetting** 159:1

**via** 5:13

**vice** 21:18

**victim** 129:8,15 131:6

**View** 172:4,14

**views** 146:25 147:4
163:8

**vision** 20:5,7,11

**visit** 29:7,12

**voice** 154:7,10,11

**voices** 75:19

**void** 163:9

**voluntarily** 140:1

**voluntary**
140:10,18,20 144:15

**vote** 43:20 66:10
74:23 75:1,4,18
80:4,7,9,22,25 81:3
95:15,21
96:3,6,11,12,18,21
99:10 101:11,20
107:1,6 112:10
122:5,6,7 130:14
133:11 135:12,17
136:1,3,20 137:4,9
138:14,16,17,24
139:7,16,20,21

140:4,7 141:20
142:4,9,10
145:14,20,22
146:1,2,6,14,18,24
158:15,17 164:12
167:18,20,23 168:4
169:11 173:15,22
174:16,20 177:12

**voted** 101:20 152:19
165:2,9 169:12,13
173:11

**voter** 10:16,17 39:10
58:8,14,22 59:1,8,13
60:5 63:25 64:18
67:19 73:13,21
87:14,19 88:6 92:23
100:11,14 104:6
121:5,11 130:25
134:2,6 135:22
140:9,12
141:14,16,19 145:15
147:7,9,24
148:11,18,21,24
149:5 150:10,22
156:18 157:17
158:18,20,23
159:21,22 161:16,21
166:4,24 167:9
168:2,13,17,22
169:3,7
170:14,18,19,23
171:6,11,13
172:4,5,20

**voters** 82:15 89:23
90:12 91:13 92:20
93:6,14 95:17 97:6
122:12 128:18
129:2,3 139:9 140:24
141:2 144:12,24
152:10 153:16

**voter's** 100:13

**Voters** 2:3 58:2,3

**votes** 163:22 164:6

**voting** 5:14 89:25
90:1 100:13 101:18
109:5 127:20 135:11
137:3 139:4,9

140:13,18,24 141:3
142:7 144:9,13,25
164:10 168:7

---

W

**Waco** 23:7

**wait** 11:24 138:25
160:3

**walk** 168:4 175:4

**Waller** 171:23,24
172:1,2,3,9,11

**wasn't** 18:2 41:9
77:14 93:10 145:11
152:17 154:10,15
156:3 161:1 163:15

**watch** 53:9,12

**watching** 53:14

**ways** 35:9 60:6 67:15
123:21,22 124:12

**wear** 48:4 52:14 63:12

**web** 128:11

**website** 20:9 28:15
32:21 36:19,20
62:15,17,19 63:3,4
65:21 74:11 76:15
128:7

**websites** 62:24

**We'd** 149:17

**Wednesday** 8:11 154:25

**week** 155:1
159:6,8,11,12

**weekends** 98:24 101:24

**welcome** 38:5,13,15

**we'll** 8:17 12:7,21,24
36:14 39:3 47:10
52:6 65:4 71:17
92:17 119:4 122:22
150:7 161:6 177:9
183:12

**we're** 12:22 16:21
27:8 35:21 45:7
50:15 63:15 64:4

**67:**14 69:5 75:24
92:15 118:3 120:10
123:24 135:8 139:1
142:8 150:23
155:11,12,14 167:13
171:9,12 176:10
177:17 178:24 181:5
183:15

**west** 4:13 5:5,8
22:24,25 23:3,8
114:8 151:12,17

**we've** 28:16,22
39:10,12 41:6 57:19
90:6 97:2 107:25
127:4,6 130:19
135:20 137:16 140:17
167:12,24 173:7
177:25 179:1 183:22

**whatever** 27:5 35:12
48:13 62:18 70:2,10
129:21 177:11

**whenever** 28:21 125:19

**whereas** 23:3

**wherever** 38:13 98:10

**whether** 27:7,8 34:24
40:2 41:22,23 76:24
84:2,9 85:16
105:12,23
106:1,2,5,13,17,18,2
4 107:6 126:3 128:13
130:6,24 134:4,9
138:5 139:4 142:4
145:22 149:2 178:19

**Whichever** 70:4

**white** 103:6 109:21
111:22 112:4,13
113:3 114:4
119:11,21 120:6,21
129:2 131:7

**Whoa** 41:19

**whoever** 121:17

**whole** 97:24 100:22
103:19 129:10 149:24
152:18,19 158:23

**whose** 186:14 187:9

**wide** 44:11

**wishes** 150:1

**witness** 4:3,8 8:9,19
9:10 17:21 18:8 40:3
41:20 42:2 71:14
77:3 79:23 90:20
91:5 134:23 142:23
183:17 185:2 187:4,5

**witnessed** 168:21,24

**Wolf** 28:6

**Women** 58:2,3

**wondering** 23:1 108:4
110:19 116:19 117:6
137:1

**woods** 114:25

**work** 9:21 28:15,19
29:14 43:16 60:11
62:1,10 98:23
101:13,14,19 117:18
130:2,8 155:18
178:3,11,25

**worked** 179:1

**working** 84:3 178:21
179:6

**workload** 178:14

**works** 48:1 63:7 81:23
99:3

**workshop** 67:6,18,20
69:5,22 71:1
73:13,19 85:11,22

**workshops** 67:3,13
68:16,20
69:1,15,18,25 70:10
73:12,15 74:1 84:20
85:13 86:1 177:23

**worry** 36:2 141:21,24
156:4 164:1

**worse** 142:6

**write** 96:23 116:17
175:6

**written** 54:20 55:1

134:17 135:2 143:14
156:2

**wrong** 36:8

————————

Y

**y'all** 13:15 16:15
38:16 41:4 54:10
81:14 146:25 178:18

**Yannis** 4:4,7 6:5 7:13
8:7,19 9:3,9 39:24
41:21 76:22 174:4
185:2 186:1,5,11
187:4

**yea** 58:18

**Yep** 81:21

**you'll** 31:4 51:22

**young** 2:3 132:16

**yourself** 49:24 103:17
126:13 174:5

**youth** 29:14 30:1

**you've** 10:19 17:12,13
18:21 33:4 36:5 45:5
108:3 134:22 137:1
139:12 145:14 152:25
160:13 162:8
167:2,15 168:25
169:2 179:12 181:8
182:23,24