COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3 MARC VEASEY, et al.,      )
                             )
 4        Plaintiff,         )
                             )
 5 VS.                       ) CIVIL ACTION NUMBER:
                             ) 2:13-CV-193 (NGR)
 6 RICK PERRY, et al.,       )
                             )
          Defendants.        )
 7
 8 _____
                             )
   UNITED STATES OF AMERICA, )
 9                           )
          Plaintiff,         )
10                           )
   VS.                       ) CIVIL ACTION NUMBER:
11                           ) 2:13-CV-263 (NGR)
   TEXAS LEAGUE OF YOUNG VOTERS )
12 EDUCATION FUND, et al.,   )
                             )
13   Plaintiff-Intervenors,  )
                             )
14 TEXAS ASSOCIATION OF HISPANIC )
   COUNTY JUDGES AND COUNTY  )
15 COMMISSIONERS, et al.,    )
                             )
16   Plaintiff-Intervenors,  )
                             )
17 VS.                       )
                             )
18 STATE OF TEXAS, et al.,   )
                             )
19        Defendants.        )
                             )
20 _____
   TEXAS STATE CONFERENCE OF )
21 NAACP BRANCHES, et al.,   )
                             )
22        Plaintiffs,        )
                             ) CIVIL ACTION NUMBER:
23 VS.                       ) 2:13-CV-291(NGR)
                             )
24 NANDITA BERRY, et al.,    )
                             )
25        Defendants.        )
```

**Page 2**

```
 1 BELINDA ORTIZ, et al.,    )
                             )
 2    Plaintiffs,            )
                             )
 3 VS.                       ) CIVIL ACTION NUMBER:
                             ) 2:13-CV-348(NGR)
 4 STATE OF TEXAS, et al.,   )
                             )
 5    Defendants.            )
                             )
 6 _____
 7
   ***************************************************
 8
            DEPOSITION OF
 9
            COLBY BEUCK
10
            JUNE 20, 2014
11
   ***************************************************
12
         HIGHLY CONFIDENTIAL
13
14    ORAL DEPOSITION OF COLBY BEUCK, produced as a
15 witness at the instance of the Plaintiff, was duly
16 sworn, was taken in the above-styled and numbered cause
17 on the JUNE 20, 2014 from 9:31 a.m. to 7:00 p.m., before
18 Chris Carpenter, CSR, in and for the State of Texas,
19 reported by machine shorthand, at the Office of the
20 Attorney General, 209 West 14th Street, Austin, TX
21 78701, pursuant to the Federal Rules of Civil Procedure
22 and the provisions stated on the record or attached
23 hereto.
24
25
```

**Page 3**

```
 1        A P P E A R A N C E S
 2 FOR THE UNITED STATES OF AMERICA:
 3    Bruce Geer
      U.S. JUSTICE DEPARTMENT
 4    CIVIL RIGHTS DIVISION
      Room 7254 NWB
 5    950 Pennsylvania Avenue, N.W.
      Washington, D.C. 20530
 6    (202) 514-0828
      bruce.geer@usdoj.gov
 7
   FOR THE TEXAS STATE CONFERENCE OF THE NAACP AND THE
 8 MEXICAN AMERICAN LEGISLATIVE CAUCUS:
 9    Amy L. Rudd
      DECHERT, LLP
10    300 W 6th Street, Suite 2010
      Austin, TX 78701
11    (512) 394-3040
      amy.rudd@dechert.com
12
      Sonia K. Gill
13    LAWYERS' COMMITTEE FOR CIVIL RIGHTS
      1401 New York Avenue, NW
14    Suite 400
      Washington, D.C. 20005-2124
15    (202) 662-8356
      sgill@lawyerscommittee.org
16
   FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
17
      John Scott
18    Assistant Deputy Attorney General
      ATTORNEY GENERAL OF TEXAS
19    209 West 14th Street
      Austin, TX 78701
20    (512) 475-3281
      john.scott@texasattorneygeneral.gov
21
   FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND:
22
      Hasan Ali
23    WILMER HALE
      1875 Pennsylvania Avenue, NW
24    Washington, DC 20006
      (202) 663-6262
25    hasan.ali@wilmerhale.com
```

**Page 4**

```
 1 FOR THE WITNESS:
 2    Linda Halpern
      Manager of Complex Litigation
 3    ATTORNEY GENERAL OF TEXAS
      P.O. Box 12548
 4    Austin, TX 78711-2548 MC109
      (512) 475-1969
 5    linda.halpern@texasattorneygeneral.gov
 6    Brooke Paup
      Deputy Division Chief
 7    Intergovernmental Relations Division
      ATTORNEY GENERAL OF TEXAS
 8    P.O. Box 12548
      Austin, TX 78711-2548
 9    (512) 936-1381
      brooke.paup@oag.state.tx.us
10
   FOR THIRD-PARTY LEGISLATORS:
11
      Arthur D'Andrea
12    Assistant Solicitor General
      ATTORNEY GENERAL OF TEXAS
13    P.O. Box 12548
      Austin, TX 78711-2548
14    (512) 936-2868
      arthur.dandrea@oag.state.tx.us
15
16
17
18
19
20
21
22
23
24
25
```

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

2 (Pages 5 to 8)

---

**Page 5**

INDEX

Appearances..........................................2

COLBY BEUCK
   Examination by Ms. Rudd.....................10
   Examination by Mr. Geer......................175
   Examination by Mr. Ali..........................252
   Examination by Mr. Scott.....................264

Signature and Changes...........................277

Reporter's Certificate............................278

EXHIBITS

NO. DESCRIPTION                          PAGE MARKED

1   E-Mail, Feb. 23, 2011 and Attachments     27

2   E-Mail Chain, Nov. 21, 2011               45

3   HB 112 by Rep. Harless, Signed Version    66

4   SB 14, Signed Version                     75

5   E-Mail, Feb. 25, 2011                     89

6   E-Mail, Feb. 25, 2011                     96

7   E-Mail, Feb. 25, 2011, Advocacy Inc.      109
    Attachment
8   House Journal, 82nd Legislature, March 23,  115
    2011

9   E-Mail Chain, March 22, 2011              121

10  OTB Resolution                            158

11  E-Mail Chain, March 3, 2011               162

12  House Journal, March 21, 2011             183

13  Texas Election Code, Section 32.075. Law  205
    enforcement Duties and Powers
14  House Bill 218                            212

---

**Page 6**

15   House Bill 362                           215

---

**Page 7**

THE REPORTER:  If all Counsel would make their announcements and then I'll swear in the witness.

MS. RUDD:  Amy Rudd of Dechert for the Texas State Conference of the NAACP and the Mexican American Legislative Caucus.

MS. GILL:  Sonia Gill with the Lawyers Committee for Civil Rights Under Law representing MALC and Texas State Conference of the NAACP.

MR. GEER:  Bruce Geer representing the United States.

MR. ALI:  Hasan Ali of WilmerHale, representing the Texas League of Young Voters and Imani Clark.

MR. ANDREA:  Arthur D'Andrea of the Texas Attorney General's Office representing the third party legislators.

MR. SCOTT:  John Scott, Texas AG's Office, representing the Texas defendants.

MS. PAUP:  Brooke Paup, Texas AG's Office, representing the witness.

MS. HALPERN:  Linda Halpern, AG's Office, representing the witness.

(Witness sworn.)

MS. HALPERN:  I'd like to get some clarification for the record.  There are four of you

---

**Page 8**

sitting across the table from this witness.  The rules allow for a seven-hour deposition, and I just want to make it clear at the outset that we understand that to mean that the entire deposition cannot last longer than seven hours.  So to the extent that the four of you have a division of time you've agreed on, that's fine, but I want to give you fair warning now that we will not be running past seven hours.  And so you have that -- you have that head's up to arrange yourselves so that nobody is left short at the end of the deposition.

The other thing is that we will from time to time be asserting legislative privilege.  And in keeping with the judge's direction, for certain types of questions, notwithstanding the assertion of legislative privilege, the witness will be allowed to answer the questions.  Those portions of the deposition will need to be under seal.  We are doing so with reluctance but with the assurance that based on the court's statements, making such statements under seal will not be -- will not constitute a waiver of the privilege.  And that -- that's it for us.

MS. RUDD:  And just to follow up on that, and all of that is understood, we will also be using certain documents designated Highly Confidential, and it's my understanding that testimony about those

COLBY BEUCK                                           6/20/2014
CONFIDENTIAL TRANSCRIPT

---

**9**

1  documents will also be given under seal to the extent
2  testimony is given.
3          MS. HALPERN:  I believe that's correct.
4  That's actually a call of the Defendants in this case
5  rather than the witness.
6          MR. SCOTT:  And that is my understanding
7  of what the judge has agreed is waiting on a workup and
8  an agreed order from all the lawyers, which is being
9  circulated is -- or fixed to be circulated as we speak.
10         MS. RUDD:  Okay.  So what I'll try to do
11  when those documents come up in indicate that to the
12  court reporter.  But if I fail to do so, someone speak
13  up and make sure that we -- we're doing that portion of
14  the deposition under seal.
15         MR. SCOTT:  One of the things that came up
16  with the housekeeping issue, we raised it -- I raised it
17  with Bruce and Ezra, I think at our last deposition with
18  Representative Riddle.  I saw an e-mail exchange today
19  that the court reporter in a deposition that was taken
20  the other day is having some difficulty is -- oh, it's
21  you -- has been asked to pull some of the sections out
22  as a result of -- to put them into a separate bound kind
23  of material.  I think from a practical standpoint,
24  that's nearly impossible for someone to do.  And so I
25  don't know -- again, I've thrown out that we put it

---

**10**

1  under -- the entirety under seal.  And just to the
2  extent somebody is using something that's not sealed,
3  they don't need any permission from anyone.  But to the
4  extent they are, that they would simply make sure --
5  it's going to be under seal, the deposition at that
6  point in time.  Is that okay with everybody, at least
7  until we get an order?
8          MS. RUDD:  That's fine with me.  I think
9  that's a much easier way of doing it.
10         MR. SCOTT:  Okay, great.
11         MS. HALPERN:  So the entire deposition
12  will be under seal.
13         MS. RUDD:  Right.  So we're not going to
14  make that distinction when things come up.
15         MR. SCOTT:  That's right.  And that way,
16  it makes it much easier and smoother, I think.
17         MS. RUDD:  Okay, that's fine.
18              COLBY BEUCK,
19  having been first duly sworn to testify the truth, the
20  whole truth, and nothing but the truth, testified as
21  follows:
22              EXAMINATION
23  BY MR. RUDD:
24     Q.  Good morning, Mr. Beuck, how are you?
25     **A.  Good morning.**

---

**11**

1      Q.  After all of that.
2      **A.  Okay.**
3      Q.  You've been deposed before, correct?
4      **A.  Correct.**
5      Q.  And that was in connection with the Section 5
6  litigation?
7      **A.  In 2011, correct.**
8      Q.  And have you been deposed at any other time
9  since then?
10     **A.  No.**
11     Q.  Have you given testimony in a court of law or
12  any other setting under oath?
13     **A.  No.**
14     Q.  Because you've been deposed before, I don't
15  want to belabor the sort of ground rules of deposition.
16  The most important thing is that we don't talk over each
17  other.  Do you understand that?
18     **A.  Yes.**
19     Q.  And you need to give audible answers so "yes"
20  and "no" instead of "huh-huh" or "nuh-uh."  Do you
21  understand that?
22     **A.  Yes.**
23     Q.  And if you need a break at any time, feel free
24  to ask, and we'll go off the record and take a break,
25  okay?

---

**12**

1      **A.  Okay.**
2      Q.  What did you do to prepare for your deposition
3  today?
4          (Cell phone interruption.)
5          MS. RUDD:  Sorry.
6      Q.  (By Ms. Rudd)  What did you do to prepare for
7  your deposition?
8      **A.  I had a meeting with my attorneys yesterday to**
9  **prepare for today's deposition.  I reviewed my**
10  **deposition from 2011.**
11     Q.  And did you look at any documents in connection
12  with your preparation other than your deposition?
13     **A.  We reviewed documents that were turned over by**
14  **Representative Harless's office in connection with this,**
15  **this current case.**
16     Q.  Okay.  So there are documents that weren't
17  turned over in connection with the Section 5 case but in
18  connection with this particular case, to your knowledge?
19     **A.  No, that's not -- I believe these documents**
20  **were in connection with this case.  I don't know if they**
21  **were in connection with the case from 2011.**
22     Q.  You were asked to produce documents,
23  personally, in connection with this case; is that right?
24     **A.  Yes.**
25     Q.  And did you produce documents when you were

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

4 (Pages 13 to 16)

---

**13**

1  asked to in this case?
2      A.  I did an extensive review of my personal files,
3  my files at work, and I did not have any responsive
4  documents.
5      Q.  When did you perform that search?
6      A.  When I received the notice, the subpoena.
7      Q.  And that subpoena was issued in April of 2014;
8  is that correct?
9      A.  I'd have to see the subpoena to answer that.
10     Q.  Well, it's not that important.  Do you recall
11  about when you performed the search?
12     A.  The spring.
13     Q.  Okay.  And you couldn't find any responsive
14  documents, correct?
15     A.  Correct.
16     Q.  And is that because you were no longer working
17  at Representative Harless's office at the time?
18     A.  Correct.
19     Q.  And so you do didn't retain any files or
20  e-mails from your time working with Representative
21  Harless; is that right?
22     A.  Correct.
23     Q.  And there was nothing in your personal computer
24  that you retained in the way of e-mails or files from
25  the time that you worked with Representative Harless?

---

**14**

1      A.  That's correct.
2      Q.  Talk to me about your use of e-mail at work.  I
3  know during the time you worked for Representative
4  Harless, you used both an official e-mail address and
5  also a personal e-mail address to correspond for work
6  purposes; is that right?
7      A.  That's correct.
8      Q.  And did that continue after you left
9  Representative Harless's office?
10     A.  I'm -- can you -- I'm not sure I
11  understand.  Did my -- can you restate the question?
12  I'm sorry.
13     Q.  Do you continue to use personal and official
14  e-mail addresses to correspond for work purposes today?
15     A.  With -- with who?
16     Q.  Well, anybody that you would be corresponding
17  with in a work capacity.
18     A.  That would depend on who the individual was and
19  which preferred way they would like for me to
20  communicate with them.
21     Q.  Okay.  Let's go back to the time when you were
22  working for Representative Harless.  At that time, would
23  you say you corresponded with Representative Harless
24  primarily using personal e-mail or your official work
25  e-mail?

---

**15**

1      A.  Primarily, I would say it would be her -- her
2  personal e-mail.
3      Q.  And what about your e-mail address that you
4  were sending and receiving e-mails from?
5      A.  My work e-mail.
6      Q.  Okay.  And then today you work for
7  representative -- or sorry, Senator Taylor, correct?
8      A.  Correct.
9      Q.  And how do you primarily correspond with
10  Senator Taylor, using your --
11         MS. HALPERN:  I'm going to object on the
12  grounds of relevance.  This is 2014.  You're talking
13  about events that happened in 2011.  And I do not see
14  any relevance with respect to what he does today.
15         MS. RUDD:  Understood.
16         MS. HALPERN:  Particularly given that he's
17  wearing a counsel hat in his new position.
18     Q.  (By Ms. Rudd)  What is your current title with
19  Senator Taylor?
20     A.  General counsel.
21     Q.  And when did you take that position?
22     A.  I began to work for Taylor in January of 2013.
23     Q.  And that was after he had been elected to the
24  Senate, correct?
25     A.  Yes.  He was elected in November of 2012, and

---

**16**

1  was sworn in, in January of 2013.
2      Q.  And prior to that, he served as a
3  representative?
4      A.  Correct.
5      Q.  Why did you take the job with Senator Taylor?
6      A.  I was interested in returning to the Senate.  I
7  had spent my -- my first year was in the legislature in
8  the Senate, and I was interested in returning back to
9  the Senate and was interested in continuing to grow
10  professionally.  It was a good move for myself
11  professionally to be his general counsel.
12     Q.  And so up until you -- the time you took the
13  job with Senator Taylor in January 2013, you were
14  working for Representative Harless; is that right?
15     A.  That's correct.
16     Q.  You didn't have any other jobs in-between the
17  time you left Representative Harless's office and
18  started working for Senator Taylor?
19     A.  That's correct.
20     Q.  And so you were employed with Representative
21  Harless from 2009 to the end of 2012, correct?
22     A.  Yes.
23     Q.  And I think you previously testified that while
24  you were working for Representative Harless, you served
25  as the chief of staff, correct?

---

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

---

**17**

1  A.  Yes.
2  Q.  And you analyzed policies at her office?
3  A.  Yes.
4  Q.  And you handled issues raised in the State
5  Affairs Committee on which she served?
6  A.  Yes.
7  Q.  And you also handled Voter ID issues for
8  Representative Harless in the 2011 Legislative Session,
9  correct?
10  A.  Yes.
11  Q.  You wouldn't have handled issues related to
12  Voter ID in -- in the 2009 session, is that right?
13  A.  That was not my -- I was not -- that was not a
14  legislative session.  I believe I was still working for
15  the Lieutenant Governor at that point.  And when I was
16  working for the Lieutenant Governor, that was not my job
17  responsibility.
18  Q.  Okay.  Let's talk about -- I'm really going to
19  try not to retread old ground in this deposition, but
20  because of the legislative privilege issues, I have to
21  ask certain questions again just to see if I can get an
22  answer on the record.  So just bear with me.
23       Let's talk first about House Bill 112.
24  That was the bill that was authored by Representative
25  Harless in the 2011 session, correct?

---

**18**

1  A.  Yes.
2  Q.  And that was a piece of Voter ID legislation as
3  well, correct?
4  A.  Yes.
5  Q.  You previously testified that you helped
6  develop House Bill 112; is that correct?
7  A.  Yes.
8  Q.  And when you say you helped develop it, you
9  helped draft it and also researched the bill?
10  A.  Correct.
11  Q.  And when you were drafting and researching the
12  bill, you had contact with a number of people, correct?
13  A.  Yes.
14  Q.  You spoke to Representative Harless about the
15  bill prior to its filing, correct?
16  A.  Yes.
17  Q.  You spoke to -- I believe you said Bryan
18  Hebert -- is that how you pronounce it?
19  A.  Yes.
20  Q.  In the Lieutenant Governor's office, right?
21  A.  Correct.
22  Q.  And you spoke to Janice McCoy in Senator
23  Fraser's office, correct?
24  A.  Yes.
25  Q.  Senator Fraser was one of the authors of SB 14,

---

**19**

1  correct?
2  A.  He was the Senate, Senate author, yes.
3  Q.  Did Representative Harless say why she wanted
4  to file this particular bill, HB 112?
5       MS. HALPERN:  I'm going to object on the
6  grounds of legislative privilege, and I'm going to
7  direct him not to answer that.  You can ask him what he
8  thought, what his thoughts and impressions were, but
9  I don't think he's in a position to testify as to what
10  somebody else was thinking.
11       MS. RUDD:  Well, the question was whether
12  Representative Harless told Mr. Beuck why she wanted to
13  file HB 112.
14       MS. HALPERN:  You can answer that
15  question.  Did she tell you?
16  A.  She was interested in filing Voter ID
17  legislation because of the -- the support for that type
18  of legislation from her constituents.
19  Q.  (By Ms. Rudd)  And did that support predate
20  your coming to work for Representative Harless, if you
21  know?
22  A.  I can't speak to my time prior to
23  representative -- prior to my employment in her office.
24  Q.  And did she describe to you the type of support
25  that she was hearing from constituents about Voter ID

---

**20**

1  legislation?
2  A.  There were -- there were constituents who had
3  been in contact with her as their representative asking
4  for the legislature to move forward with Voter ID
5  legislation.  That's my understanding.
6  Q.  Do you have any sense for how many constituents
7  reached out to Representative Harless with regard to
8  Voter ID legislation?
9  A.  No.  I think that would be an appropriate
10  question for her, but I don't have an idea on that.
11  Q.  Okay.  Do you know the identity of any
12  constituents who reached out to Representative Harless
13  with respect to Voter ID legislation during your tenure
14  in her office.
15       MS. HALPERN:  And I'm going to assert
16  legislative privilege.  Since we're under seal, I'm
17  going to allow the witness to answer the question, but I
18  want to note the objection on the record now.
19       MS. RUDD:  Noted.
20  A.  Individual identities of the constituents?  No.
21  Q.  (By Ms. Rudd)  Did you ever speak to any
22  constituents during your time with Representative
23  Harless's office about Senate Bill 14?
24  A.  Yes.
25  Q.  Can you describe the context in which those

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

21

1 conversations took place?
2   A.  A variety of ways.  E-mails from constituents,
3 phone calls from constituents.
4   Q.  Okay.
5   A.  Office visits from constituents.
6   Q.  Okay.  Let's start with constituents.  Did you
7 speak to constituents personally about their support for
8 Voter ID -- Voter ID legislation?
9   A.  I spoke with constituents on all, a variety of
10 issues:  Support, those for and against.
11   Q.  For those constituents who supported Voter ID
12 legislation, do you recall what the basis for their
13 support of that type of legislation was?
14       MS. HALPERN:  Objection, vague.  You're
15 assuming they all had one?
16   A.  That's -- it would be generalizing my -- any --
17 you know, the answer I would have would be generalizing
18 the constituents' concerns.
19   Q.  (By Ms. Rudd)  Okay.  Let's do it this way.
20 What types of things were constituents telling you about
21 why they might want Voter ID legislation just as a
22 general matter?
23   A.  Concerns about the integrity of the voting
24 process.  That would be the major concern.
25   Q.  Okay.  When you say integrity of the voting

---

22

1 process, what do you mean specifically?
2   A.  People voting who should not be voting.
3   Q.  Did you receive communications from
4 constituents with regard to voting ID legislation where
5 the constituents were expressing some knowledge of
6 problems with the integrity of the voting process?
7   A.  Can you we state that?  I'm sorry.
8   Q.  Did you ever receive any specific reports from
9 constituents who you spoke with about problems at the
10 ballot box in terms of, you know, people voting who
11 shouldn't have been?
12   A.  Okay.  Yes, I believe I did have some
13 constituents report to me their personal accounts of
14 voter misconduct.
15   Q.  When you had conversations like that with
16 constituents, did you log the conversations in any way
17 or make notes of them somewhere?
18   A.  Phone conversations?  Is this regarding phone
19 conversations?
20   Q.  Let's start with that.
21   A.  Okay.  It depended.  It -- sometimes, yes;
22 sometimes, no.
23   Q.  Okay.  When would you actually make a log of a
24 conversation with a constituent typically?
25   A.  If there was a follow-up that needed to be done

---

23

1 with that constituent so we would have a record.
2   Q.  And would a constituent reporting some problem
3 at the ballot box be something that would require a
4 follow-up in your mind?
5   A.  It would entirely depend on the situation that
6 they were describing.  If it was something that they had
7 already reported, that had already gone through the
8 process or -- it really would entirely depend on the
9 situation.
10   Q.  One of the purposes, at least from your
11 office's perspective, sorry, strike that.
12       One of the purposes of HB 112 from
13 Representative Harless's office's perspective was to
14 protect the integrity of the ballot box; is that right?
15   A.  That's correct.
16   Q.  In connection with developing that piece of
17 legislation, was it important for you in her office to
18 keep data about problems with voting at the ballot box?
19   A.  When I was researching the overall issue of
20 voter identification, I tried to gather the information,
21 all information available in my fact-finding research
22 process.
23   Q.  What sources did you turn to, to gather that
24 type of information?
25   A.  Studies, court cases, laws in other states.

---

24

1   Q.  Okay.  I want to focus you just on the issue of
2 problems with people voting who shouldn't have been
3 voting.  So people either committing in-person voter
4 fraud or sending in absentee ballots under a different
5 person's name, things of that nature, what did you do in
6 developing HB 112 to gather information about those
7 types of situations?
8       MS. HALPERN:  Objection, compound.
9   Q.  (By Ms. Rudd)  If anything?
10   A.  Okay, those are two different -- HB 112 was
11 focused on in-person voting.
12   Q.  Okay.  So what did you do to gather
13 information, if anything, about problems within
14 in-person voting?
15   A.  Like I mentioned, the researching studies,
16 court cases, reports, media reports, statistics, the
17 information that was relevant to the purpose of HB 112.
18   Q.  Let's talk about each of those things.  When
19 you say studies, can you remember any specific studies
20 that you referred to that dealt with instances of
21 in-person voter fraud in Texas?
22   A.  In Texas?
23   Q.  Yes.
24   A.  I can't recall.
25   Q.  When you say you can't recall, is it because

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

**25**

1  you don't think you referred to any studies that -- that
2  dealt with in-person voter fraud in Texas or because you
3  just don't know what studies you've looked at, at all?
4      A.  I can't recall because it's been quite some
5  time, so I can't -- I just -- I don't remember.
6      Q.  Okay.  But as you sit here today, you can't
7  point me to any studies discussing in-person voter fraud
8  in Texas that you relied upon in connection with
9  developing HB 112?
10     A.  And you're referring to studies.  Is that -- I
11 don't -- I'm not following the question.
12     Q.  Well, you were the person who told me you
13 relied on studies, so I'm just using your --
14     A.  Not directly related to Texas.  These were
15 studies, nationwide studies.
16     Q.  Of in-person voter fraud, correct?
17     A.  Correct.  Correct.  Your question was limited
18 to Texas, and this would -- these were national studies.
19     Q.  Well, I appreciate the clarification.  The
20 other thing you mentioned was court cases.  What court
21 cases did you look to in gathering information about
22 in-person voter fraud?
23     A.  The -- in my research of the Voter ID issue,
24 the Crawford case was the major case that I referred to.
25     Q.  Did you research whether there were any court

---

**26**

1  cases involving instances of in-person voter fraud in
2  Texas?
3      A.  Could you restate?  Could you restate the
4  question?
5      Q.  I will try to.
6      A.  Okay.
7      Q.  Did you look at whether there were any court
8  cases involving in-person voter fraud in Texas?
9      A.  Yes.
10     Q.  And were there any court cases involving
11 in-person voter fraud in Texas?
12     A.  There were -- I received a summary of court
13 cases, actions that were being taken in voter -- voting
14 -- voting cases, yes.
15     Q.  Do you recall when HB 112 was filed?
16     A.  I can't remember the exact date it was filed.
17 We prefiled the bill in November, I believe.
18     Q.  And do you recall when you received -- so prior
19 to filing, prefiling HB 112, did you receive reports of
20 any court cases involving in-person Voter ID fraud in
21 Texas?
22     A.  I don't recall.
23         MS. RUDD:  Let's go off the record for a
24 second.
25         (Brief discussion off the record.)

---

**27**

1         (Exhibit 1 marked for identification.)
2      Q.  (By Ms. Rudd)  Okay.  You've been handed what's
3  been marked as Beuck Exhibit 1, which is a series of
4  documents containing various Bates numbers, so I'm just
5  going to go through those for the record.  The first is
6  an e-mail Bates numbered TX 91207.  The second is a
7  chart Bates numbered TX 92240.  The third is a chart
8  Bates numbered TX 92241 through 92243.  And the third is
9  a chart Bates numbered TX 92244 through 92254.  Does
10 that sound right?
11     A.  Yes.
12     Q.  Okay.  If you start with the e-mail that's the
13 very first page of that exhibit, this is an e-mail from
14 Jay Dyer to you dated February 23rd, 2011, correct?
15     A.  Yes.
16         MS. HALPERN:  I'm sorry, Counsel.  Let me
17 just note for the record, because somebody needs to,
18 that this stack of documents is marked "Highly
19 Confidential."
20         MS. RUDD:  Thank you for that.  I
21 appreciate that.  It is.
22     Q.  (By Ms. Rudd)  And the subject line of this
23 e-mail is Election Spreadsheets, correct?
24     A.  Yes.
25     Q.  So one of the things you just mentioned was

---

**28**

1  that you received some summaries of court cases
2  regarding voter fraud in Texas, correct?
3      A.  Yes.
4      Q.  Are these the summaries that you were referring
5  to?
6      A.  This is the document -- one of -- yes, this is
7  what I had in mind.
8      Q.  Okay.  So these are things that you requested
9  from the office of Attorney General's Office; is that
10 right?
11     A.  Yes.
12     Q.  And you -- this is in February of 2011, which
13 is after HB 112 was filed, correct?
14     A.  Yes.
15     Q.  And so I believe this is also after Senate Bill
16 14 was filed, correct?
17     A.  I don't know.  I would have to -- I don't know
18 the answer to that.
19     Q.  If I represent to you that Senate Bill 14 was
20 filed in January of 2011, does that sound right to you?
21     A.  That sounds right.
22     Q.  Okay.
23     A.  It had to be early.  It was a -- yeah.
24     Q.  Were you gathering this information in
25 connection with both HB 112 and SB 14, or do you know at

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1  this point?
2      A.  At this point, in February, we -- this would
3  have been for Senate Bill 14.
4      Q.  Okay.  If you look to the first chart in this
5  exhibit, the -- this chart is entitled, "Election Code
6  Referrals to the Office of the Attorney General, Charges
7  Pending Resolution," correct?
8      A.  Yes.
9      Q.  And this is a chart you've seen before, right?
10     A.  Yes.
11     Q.  Can you point me to anything on this chart
12  that's recording incidences of in-person voting fraud?
13         MS. HALPERN:  I'm going to object to the
14  question for lack of foundation and that it calls to
15  some extent for speculation.  He's not the author.
16     Q.  (By Ms. Rudd)  So I'm referring just to the
17  very first one.
18     A.  2240?
19     Q.  Yes, sir.
20     A.  Okay.
21     Q.  You asked for this information from the OAG's
22  Office, correct?
23     A.  Correct.
24     Q.  And when you received this information, did you
25  review it?

---

30

1      A.  Yes.
2      Q.  And did you ask any questions about the
3  information contained in this document of the OAG'S
4  Office?
5      A.  I can't recall.
6      Q.  Did you -- do you have any reason to question
7  whether this is a -- this document is correct or
8  contains accurate information?
9      A.  Yes, well, I'm sorry.  I don't under the
10  question.
11     Q.  Sorry.  Do you have any question to question
12  the accuracy --
13     A.  No reason to question.
14     Q.  -- of the information?  Okay.  Did you do
15  anything to look into any of the seven cases listed on
16  this particular chart?
17         MR. SCOTT:  I'm sorry, did you say seven?
18         MS. RUDD:  One, two, three, four, five,
19  six, seven, on the first chart.
20         MR. SCOTT:  I'm sorry, I was on the wrong
21  page, sorry.
22         MS. HALPERN:  Counsel, would you happen to
23  have a copy of Election Code 64.012 to show the witness?
24         MS. RUDD:  No.
25     A.  I don't recall.  It's been some time.  I

---

31

1  believe I did.  I don't recall.
2      Q.  (By Ms. Rudd)  Okay.  Are you familiar with
3  Election Code 64.012?
4      A.  No, I'm not.
5      Q.  Were you familiar or did you ever familiarize
6  yourself with Election Code 64.012?
7      A.  I would have to -- I believe I did.  I don't
8  recall.  I would have to see the code section to --
9      Q.  Did you ask any follow-up questions of the
10  OAG'S Office with regard to the seven cases listed on
11  this chart of pending resolution chart, that you recall?
12     A.  For these specific ones, I don't recall.
13     Q.  Okay.  In general, when you're looking at the
14  three charts attached to this e-mail, did you go through
15  any of these charts and perform any particular
16  investigation of any of the cases listed on these
17  charts, that you can recall?
18     A.  I don't -- I don't recall.
19     Q.  Do you recall whether you talked to anyone at
20  the OAG'S office about any of the specific cases listed
21  on any of these charts after receiving them?
22     A.  I don't recall.
23     Q.  Do you think it's likely that that's something
24  that you did, or did you just accept this information at
25  face value?

---

32

1          MS. HALPERN:  I'm going to object to that
2  question on grounds of agency pride, but I'll allow the
3  witness to answer it.
4          (Laughing.)
5      A.  I -- did I -- could you repeat it?  Did I
6  question the information on this document?
7      Q.  (By Ms. Rudd)  Well, I just want to know if you
8  asked, if it's likely that you asked, you called someone
9  up and asked follow-up questions about any information
10  on this chart, or did you just take this chart and
11  process it and --
12     A.  Yes, okay, I understand.
13     Q.  -- take it at face value?
14     A.  I understand your question.  The -- I -- I
15  relied on their information that they provided to me.  I
16  believe I looked into some of these on here, these ones
17  that say illegal voting.  And if I'm not mistaken, I
18  believe this section most likely is referring to that
19  voter fraud.
20     Q.  Okay.  Do you know whether that section refers
21  to in-person voter fraud?
22     A.  I believe it does.
23     Q.  Okay.  But you don't know as you sit here
24  today?
25     A.  I would have to have the section.

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 33 to 36)

---

**33**

1    Q.  Okay.  You don't have any way of telling me
2  today what the resolution of any of these cases was, do
3  you?
4    A.  No.
5    Q.  If you look at the second chart, which is the
6  chart that starts with Bates Number 92241 --
7    A.  Yes.
8    Q.  -- can you tell me how many of the cases listed
9  in this chart involved in-person voter fraud?
10    **A.  Without more information on these individual**
11  **cases, I can't speak to that.**
12    Q.  Okay.  If you look to page 92242 of that
13  chart--
14    **A.  Okay.**
15    Q.  -- the fourth row from the bottom contains some
16  information about an incident that occurred in Harris
17  County.  Do you see that?
18    A.  Yes.
19    Q.  And if you look under the column labeled
20  "Charges," it says, "One count illegal voting voter
21  impersonation at polling place," correct?
22    A.  Yes.
23    Q.  Does that indicate to you that that was an
24  incident of in-person Voter ID fraud?
25    **A.  It indicates -- it indicates that, but I would**

---

**34**

1  **have to have more details on the specifics of the case.**
2    Q.  Okay.  So even looking at that designation, you
3  can't tell whether that was an incident of in-person
4  Voter ID fraud from just the information you have here?
5    **A.  The information on here says, "Deceased voter**
6  **voting." I would assume that would be impersonating**
7  **somebody that was deceased.**
8    Q.  I understand that, but I'm trying to
9  distinguish between casting a ballot in someone else's
10  name from, you know, from home by, for example, an
11  absentee ballot, or actually going -- physically going
12  to the polls and voting as someone else.  Can you tell
13  from this designation which of those two things happened
14  here, if either?
15    **A.  For this specific one, it does state this**
16  **occurred, impersonation at the polling place, so I think**
17  **that would --**
18    Q.  Okay.  Are there any other charges listed here
19  that give that type of description of the incident that
20  occurred?  And feel free to look through it.
21    **A.  That appears to be the one you mentioned, the**
22  **one out of Harris County, that appears to be the only**
23  **one that has that designation at the polling place.**
24    Q.  Okay.  If you turn to the third chart that
25  starts at Bates Number 92244, this is a chart entitled,

---

**35**

1  "Election Code Referrals to the Office of the Attorney
2  General, August 2002 to Present," correct?
3    **A.  Yes.**
4    Q.  And this is a list of every case reported to
5  the Office of Attorney General about voter fraud between
6  2002 and 2011; is that correct?  If you look at the
7  bottom of the page there's a date on that document of
8  1-21-2011.
9    **A.  Yes.**
10    Q.  Does that indicate to you that this is a list
11  of referrals for voter irregularities from August 2002
12  to 2011?
13    **A.  Yes.**
14    Q.  And just for the sake of moving us along, if
15  you turn to the very last page of that document, there
16  are two incidents of voter impersonation listed on that
17  page.  One that occurred in Bexar County, and one that
18  occurred in Bryan County.  Do you see that?
19    **A.  Yes.**
20    Q.  Did you do anything to determine whether that
21  incident, these incidents of voter impersonation
22  occurred at the polling place, or not?
23    **A.  Not that I recall.**
24    Q.  I will represent to you that those are the only
25  two incidents on this chart that refer to voter

---

**36**

1  impersonation.  Looking at this chart, can you tell
2  whether any of the other incidences that were referred
3  to the Office of the Attorney General between August
4  2002 and January 2011 involved in-person voter fraud?
5        MS. HALPERN:  I'm going to object.  Calls
6  for speculation.
7    **A.  This -- this document was prepared by the**
8  **Attorney General's Office.  They're the ones with the**
9  **detailed information on the cases.  So I can't speak to**
10  **the facts behind the case.**
11    Q.  (By Ms. Rudd)  And that's why my question was:
12  Can you tell from looking at this chart, what these
13  cases involved or if they involved in-person voter
14  fraud?
15    **A.  The chart documentation doesn't make that**
16  **distinction.**
17    Q.  Did you call anyone up at the Office of the
18  Attorney General to ask about any of these particular
19  cases to determine whether they involved in-person voter
20  fraud?
21    **A.  I don't recall.**
22    Q.  Did it matter to you whether these were cases
23  of in-person voter fraud?
24    **A.  The information mattered to me.  I was --**
25  **that's why it was requested.  I was doing my research**

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

**37**

1  into the -- the issue, and these were cases that were
2  being investigated by the Attorney General's Office, and
3  so I thought it was important information, so yes.
4     Q.  Okay.  So that was a long answer.
5     A.  Okay.
6     Q.  Let me just make sure we're on the same page.
7     A.  Okay.
8     Q.  My question is -- I understand you were doing
9  research in connection with SB 14 when you received this
10 information, correct?
11    A.  Yes.
12    Q.  And one of the things you were researching was
13 whether there were incidents of in-person voter fraud in
14 Texas, correct?
15    A.  Correct.
16    Q.  Because SB 14 was intended to combat in-person
17 voter fraud as opposed to other types of voter fraud,
18 correct?
19    A.  Correct.
20    Q.  So did it matter to you, when you received this
21 particular chart, whether any of the reported incidents
22 on this chart actually involved in-person voter fraud as
23 opposed to other types of voter fraud?
24    A.  Yes.
25    Q.  Okay.  It did matter to you?

---

**38**

1     A.  Yes.
2     Q.  Is there anything that you did to determine
3  which incidents on this list involved in-person voter
4  fraud as opposed to other types of voter fraud at any
5  point?
6     A.  I did research -- and I don't know how it
7  related to this list, but reports of in-person voter
8  fraud around the state of Texas.  I don't know how it
9  relates to this list.  There were other cases that are
10 outside of this list that are not referred to the
11 Attorney General's Office.
12    Q.  Okay.  Let's talk about that.  What other cases
13 did you research in connection with SB 14 about
14 in-person voter fraud?
15    A.  There were cases that were being handled by
16 local district attorneys.  I remember researching news
17 reports regarding those cases.
18    Q.  Okay.  So was your research confined to news
19 reports of those cases, or did you do any additional
20 research?
21    A.  I would say primarily confined to news reports.
22    Q.  Okay.  After looking at those news reports, did
23 you do any follow-up research to determine what the
24 outcome of those particular cases was?
25    A.  The news reports -- it would depend on the

---

**39**

1  case.  I believe there were some that were -- had been
2  concluded.  There was a resolution.  So it would depend
3  on the individual case.
4     Q.  Did you produce these news reports in
5  connection with this case?
6     A.  I don't recall.
7     Q.  Do you know whether you produced those news
8  reports in connection with the Section 5 case?
9     A.  I don't recall.
10    Q.  I think you testified earlier that you didn't
11 find anything relevant when you were searching for
12 documents in connection with this case, correct?
13    A.  Correct, yes.
14    Q.  So you wouldn't have produced these in
15 connection with this case?
16    A.  No, no, I was -- Representative Harless, their
17 office produced the documents.  I was not the custodian
18 of those documents, so I can't testify to what they
19 turned over.  So that's why I said that I don't recall.
20    Q.  About how many news reports do you think you
21 read regarding in-person voter fraud in Texas?
22    A.  I don't recall an exact number.
23    Q.  Would it be less than ten?
24    A.  Yes.
25    Q.  Do you have a sense for in all of your research

---

**40**

1  how many cases of in-person voter fraud were actually
2  prosecuted to conclusion in Texas?
3     A.  I did not have a good number, and that was part
4  of the issue that we were trying to resolve with Senate
5  Bill 14 --
6     Q.  Okay.  Were --
7     A.  -- that it was difficult to prove these cases,
8  and we were trying to give another tool to election
9  workers to have to enforce, to ensure people were voting
10 who should be voting.
11    Q.  All right.  You said a number of things there,
12 so let me try to break that down.  One of the things you
13 said was that it was difficult to enforce.  Is one of
14 the issues that you were dealing with was the difficulty
15 of detecting in-person voter fraud in Texas?
16    A.  Yes.
17    Q.  And why -- why do you think it was difficult to
18 detect incidences of in-person voter fraud in Texas?
19    A.  I feel there's underreporting of some of this
20 illegal voting happening.  This is my opinion.
21 Underreporting, it's being left up to -- it was being
22 left to the -- the poll workers to -- they didn't have
23 the tools they would need to enforce this, so it was
24 being underreported.
25    Q.  Okay.  When you say voter fraud, in-person

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

41

1  voter fraud was being underreported, is that just based
2  on assumption that -- what is that based on?  Is there
3  any source of information you're relying on to make that
4  determination or to come to that opinion?
5      **A.  Through my research.**
6      Q.  Okay.  What research led you to conclude that
7  in-person voter fraud was being underreported in Texas?
8      **A.  I can't -- I can't speak to any individual one**
9  **piece of research I found.  I think it was the**
10  **culmination of the research that I was performing.**
11      Q.  Was anything ever put into the public record in
12  connection with the hearings on Senate Bill 14 about to
13  what extent in-person Voter ID fraud is underreported in
14  Texas?
15          MS. HALPERN:  In the entire record?
16          MS. RUDD:  Sure.  I mean, it wasn't -- I
17  mean, I've read most of the record.
18          MS. HALPERN:  So just so we're clear,
19  you're asking him as he sits here today to tell you what
20  was in the entire record three years ago?
21          MS. RUDD:  I'm asking him to point me to
22  one piece of information about underreporting of vote --
23  in-person Voter ID fraud, based on any formal research
24  that was in the record regarding SB 14 that you know
25  of.  If there's none, that's fine.  That's the answer.

42

1      **A.  I can't recall.**
2      Q.  (By Ms. Rudd)  Okay.
3      **A.  I know it was an issue that was brought up.**
4      Q.  One of the criticisms of SB 14 was that there
5  weren't a significant number of in-person Voter ID fraud
6  cases in Texas; is that right?
7      **A.  I believe that was one of the issues brought up**
8  **during the debate.**
9      Q.  And so one of the things that you did in
10  connection with SB 14 was to try to find out exactly or
11  roughly how many in-person voter fraud instances had
12  been reported in Texas; is that right?
13          MS. HALPERN:  Objection, assumes facts not
14  in evidence.
15      **A.  Could you restate your question, please?**
16      Q.  (By Ms. Rudd)  Sure.  Was it important in
17  connection with your work on SB 14 to try to respond to
18  the criticism that there are not a significant number of
19  in-person voter fraud cases in Texas?
20          MS. HALPERN:  Objection, compound.
21      **A.  It was -- it was part of my research, yes.**
22      Q.  (By Ms. Rudd)  And did you feel satisfied with
23  the research that you performed that you uncovered
24  enough in-person Voter ID fraud in Texas to justify the
25  measures implemented under SB 14?

43

1          MS. HALPERN:  Objection, compound.
2      **A.  My role as -- to prepare Representative Harless**
3  **for the debate was to pull all the information together.**
4  **It really wasn't my role to weigh whether it was**
5  **satisfactory or not.  It wasn't -- what was the**
6  **information available from the Attorney General's**
7  **Office, from other sources that I could find.**
8      Q.  (By Ms. Rudd)  I understand that.  I care
9  really more about your opinion.  In your opinion, is
10  there a rampant in-person Voter ID fraud problem in
11  Texas?
12          MR. SCOTT:  Objection, form, foundation.
13      **A.  I believe there is voter fraud.  I believe it's**
14  **underreported.**
15      Q.  (By Ms. Rudd)  That's a different answer.
16  That's an answer to a different question.  My question
17  was:  Do you believe there is a significant amount of
18  in-person -- I mean, after researching everything that
19  you've researched and knowing what you know and having
20  been involved in this legislation, do you believe that
21  there is a significant in-person voter fraud problem in
22  Texas?
23          MS. HALPERN:  Objection, asked and
24  answered.
25          MS. RUDD:  I don't think it has been.

44

1          MR. SCOTT:  And objection, form, the time
2  period is vague.
3      **A.  Okay, let's -- if -- I believe there is voter**
4  **fraud in Texas.  The level of significance, I believe**
5  **it's out there, I think that's enough to -- to harm**
6  **voter confidence in the election process.**
7      Q.  (By Ms. Rudd)  Would you characterize the level
8  of in-person voter fraud that you know about in Texas as
9  significant?
10          MS. HALPERN:  Objection, relevance.
11          MR. SCOTT:  Objection, form, vague
12  timeframe.
13      **A.  I think any amount of voter fraud would be**
14  **considered significant.  There have been elections that**
15  **have swung on just a handful of votes.**
16      Q.  (By Ms. Rudd)  Okay.  Well, let's talk about
17  that.  One of the things that -- one of the pieces of
18  information that Representative Harless's office put out
19  on a regular basis was that Donna Howard's election was
20  won by only three votes, correct?
21      **A.  The question is?  I'm sorry, the question is --**
22  **could you repeat the question?**
23      Q.  Sure.  One of the pieces of information that
24  Representative Harless's office put out pretty regularly
25  while you were working there was that Donna Howard's --

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

---

45

1  Donna Howard won her office by a margin of just three
2  votes, correct?
3      **A.  Yes.**
4      Q.  And let's just look at that document because
5  Donna Howard is my rep, actually, and I voted for her,
6  so I found this really kind of entertaining.
7          MR. SCOTT:  Objection, form, sidebar.
8          MS. RUDD:  Total sidebar.  Makes
9  depositions more interesting.
10         MR. SCOTT:  I didn't want somebody to use
11 that against you in the future.  Trying to protect the
12 record.
13         (Exhibit 2 marked for identification.)
14     Q.  (By Ms. Rudd)  You've been handed what's been
15 marked as Beuck Exhibit 2, which has been designated
16 highly confidential.  And it's Bates numbered TX 91736
17 through 91737.  And feel free to look though
18 document.  I assume you recognize it.
19     **A.  Yes.**
20     Q.  And when you're ready, I want to start with the
21 first e-mail in the string, which is on the second page.
22     **A.  Okay.**
23         MS. HALPERN:  I'm also going to enter an
24 objection to questions on this document as violating the
25 deliberative process privilege.  This is not the final.

---

46

1      **A.  You wanted to talk about this --**
2          MS. HALPERN:  Is there a question pending?
3          MS. RUDD:  Oh, I just wanted to give him
4  an opportunity to read it over.
5          MS. HALPERN:  There's no question pending
6  so you don't need to say anything.
7          THE WITNESS:  Okay.  Okay.
8          MS. HALPERN:  After you answer this
9  question, I'm going to ask for a break, because we've
10 been going for an hour and I need one.
11         MS. RUDD:  Okay.
12     Q.  (By Ms. Rudd)  So if you look at the first
13 e-mail in the string on this document, there is an
14 e-mail from a person named Jacqueline Clark to Patricia
15 Harless on November 15, 2011, correct?
16     **A.  Yes.**
17     Q.  And the subject line is, "Op-Ed in Defense of
18 Photo Voter ID in Today's Chronicle," correct?
19     **A.  Yes.**
20     Q.  Do you recall the Op-Ed article that
21 Representative Harless authored in the Chronicle?
22     **A.  Yes.  I don't recall the details of the**
23 **article, but I do remember there was an Op-Ed by her in**
24 **the Chronicle.**
25     Q.  Okay.  That's fine.  I just wanted to make sure

---

47

1  we were on the same page.
2      **A.  Okay.**
3      Q.  And this is -- one of the things you did in
4  Representative Harless's office was handle constituent
5  e-mail, correct?
6      **A.  Correct.**
7      Q.  And this is an e-mail that you dealt with in
8  particular, correct?
9      **A.  Yes.**
10     Q.  And Jacqueline Clark was one of these
11 constituents of Representative Harless, correct?
12     **A.  I don't know.**
13     Q.  Okay.  Do you know Jacqueline Clark personally?
14     **A.  No.**
15     Q.  And this is just an e-mail you fielded because
16 you were the chief of staff for Representative Harless
17 at the time; is that right?
18     **A.  Yes.  I was tasked with responding to --**
19 **helping respond to constituents.**
20     Q.  And what Ms. Clark says in her e-mail here is
21 that she's disappointed in Representative Harless's
22 support of Photo Voter ID, correct?
23     **A.  Correct.**
24     Q.  And she says, "It's sadly reminiscent of things
25 like poll taxes and literacy tests," correct?

---

48

1      **A.  That is what she states in the e-mail, yes.**
2      Q.  And you know that poll taxes were historically
3  used to disenfranchise certain voters, correct?
4      **A.  Yes.**
5      Q.  Okay.  And then if you turn to the first page
6  of this document, there is an e-mail from you to the
7  Representative Harless, copying Julie Scott, correct?
8      **A.  Yes.**
9      Q.  Who is Julie Scott?
10     **A.  She is an employee of Representative Harless.**
11     Q.  Okay.  And what was her title at the time, if
12 you know?
13     **A.  I don't know.**
14     Q.  What was her job with Representative Harless?
15     **A.  She also helped with handling constituent work**
16 **in the representative's schedule.**
17     Q.  Okay.
18     **A.  I believe her title was director of operations.**
19     Q.  At the top of your e-mail here you say, "Going
20 to use this as a base for other anti-SB 14 responses;"
21 is that right?
22     **A.  Yes.**
23     Q.  And so what you were saying to Representative
24 Harless is this was your suggestion for dealing with
25 other types of constituent mail like Ms. Clark's e-mail,

---

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

49

1  correct?
2      **A.  Correct.**
3      Q.  And the first paragraph of your e-mail said,
4  "Thank you for your e-mail."  You go on to sort of deal
5  with the major issues in SB 14, and there's some
6  highlighting in this paragraph, correct?
7      **A.  Yes.**
8      Q.  Would that have been highlighting inserted by
9  Representative Harless?
10     **A.  Yes.**
11     Q.  And then below that first paragraph is a
12 paragraph in smaller type.  Is that language inserted by
13 Representative Harless?
14     **A.  I believe so.**
15     Q.  So Representative Harless was suggesting a
16 revision to your draft e-mail; is that right?
17     **A.  That's how it appears, yes.**
18     Q.  And in the paragraph below that, we come to
19 this Donna Howard issue, and the paragraph reads,
20 "Witness testimony in committee over the last several
21 sessions has been that voter fraud exists."  And that's
22 something that you knew about from listening in to
23 committee hearings, is that right, or reading committee
24 testimony?
25     **A.  Yes, from previous sessions?**

50

1      Q.  Correct.
2      **A.  Yes.**
3      Q.  And you go on to say, "Our elections are too
4  important not to safeguard, because even a few
5  fraudulent votes could swing an election."  And did you
6  believe that when you wrote that?
7      **A.  That fraudulent votes can swing an election?**
8      Q.  Yes.
9      **A.  Yes.**
10     Q.  Do you know of any elections that have been
11 swung by fraudulent votes in Texas?
12     **A.  No, not to my personal knowledge.**
13     Q.  Okay.  Have you ever researched that issue?
14     **A.  I know there are examples from history on**
15 **that, but I can't speak on any specifics.**
16     Q.  Okay.  As you sit here today, you're not aware
17 of any elections in Texas that were swung by a few
18 fraudulent votes, are you?
19     **A.  Not any specifics.**
20     Q.  Okay.  And then you go on to say, "For example,
21 Representative Donna Howard's last election won her seat
22 in the Texas House by three votes;" is that right?
23     **A.  Yes.**
24     Q.  Are you suggesting here that Donna Howard won
25 her election by three fraudulent votes?

51

1      **A.  No.**
2      Q.  It's kind of what it sounds like here, though,
3  isn't it?
4      **A.  That was not --**
5          MS. HALPERN:  Objection, argumentative.
6  The document speaks for itself.  It's pretty clear.
7      **A.  That was not my intent writing that.  That was**
8  **not what I was trying to suggest.**
9      Q.  (By Ms. Rudd)  Okay.  And to your knowledge,
10 the three votes that were cast by which Donna Howard won
11 were not fraudulent votes?
12     **A.  No.**
13         MR. SCOTT:  Objection, form, speculation.
14         MS. HALPERN:  I'd like to take a break
15 right now.  There's no question pending.
16         MS. RUDD:  Okay.
17         (Recess at 10:40 a.m. to 10:59)
18     Q.  (By Ms. Rudd)  So before we went off the record,
19 we were talking about this e-mail exchange that you had
20 with representative Harless about a particular
21 constituent's e-mail regarding Photo Voter ID.  Do you
22 recall that?
23     **A.  Yes.**
24     Q.  Okay.  And when we were looking at this string
25 of e-mails.  I think we were -- we had stopped at sort

52

1  of the last paragraph on the first page of this
2  document.  And in that paragraph you talk about
3  witnesses who testified about voter registration cards
4  being stolen and falsely cast in other people's names;
5  is that right?
6      **A.  This last paragraph?**
7      Q.  Yes.
8      **A.  Yes.**
9      Q.  And do you know whether that testimony that
10 you're referring to involved in-person Voter ID fraud?
11     **A.  Which portion?  Are you --**
12     Q.  Well, just in general, you're referring to
13 testimony from many witnesses over the last couple of
14 sessions about stolen voter registration cards, casting
15 votes in other people's names.  Do you know whether the
16 instances of voter fraud that were testified to, that
17 you're referring to in this paragraph, were instances of
18 in-person Voter ID fraud?
19     **A.  I don't know.**
20     Q.  Okay.  If you turn to the -- if you look
21 actually at the top of this first page --
22     **A.  Yes.**
23     Q.  -- there's a response from Representative
24 Harless to you on November 21, 2011, correct?
25     **A.  Yes.**

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

53

1    Q.  Had she says, "This needs more work.  All you
2  are going to do is make them more angry with that
3  response."  Do you have a sense for what she's talking
4  about when she says that?
5    A.  I think out of context, if you read the rest of
6  her -- you know, it probably makes a little bit more
7  sense in what she was trying to get across.
8    Q.  So one of the things that she sort of
9  highlighted in the e-mail that you sent was this notion
10  of disenfranchising voters, right?
11    A.  Yes.  That's highlighted.
12    Q.  And she wanted you to remove that language,
13  correct?
14    A.  I can't tell within the context of this
15  without -- this is a rough draft, and so.
16    Q.  I understand.  And she came back as a result of
17  your draft and made some comments, she highlighted
18  some language and she suggested other language, correct?
19    A.  Yes, that's what's occurring in this e-mail.
20    Q.  And then in the second sentence of her e-mail
21  to you, she says, "Look at it and tell me the words you
22  shouldn't use."  Do you have a sense of what words you
23  shouldn't use?
24    A.  I might have at the time.  I can't recall right
25  now.

---

54

1    Q.  Would "disenfranchise" be a word not to use?
2    A.  I can't recall.  Out of context, it's hard to
3  say.
4    Q.  Okay.  And then she goes on to say, "Right is
5  from the positive position and not the negative, just
6  like we framed the debate."  I confess, I have no idea
7  what that means.  Do you have know what that means?
8        MS. HALPERN:  Objection.  Are you serious,
9  Counsel?
10        MS. RUDD:  I don't what it means.  And he
11  received the e-mail, so I'd like to know what his
12  interpretation is.
13    A.  You know, I think that's probably an
14  appropriate question for Representative Harless.
15    Q.  (By Ms. Rudd) When you receive this e-mail from
16  Representative Harless, did you understand it?
17    A.  I understood that she wanted me to make some
18  corrections.
19    Q.  Did you find this e-mail condescending?
20        MS. HALPERN:  Objection, relevance.
21    A.  My -- this was a rough draft process.  It's the
22  back and forth on -- on how editing happens.  I-- I
23  didn't take it personally.
24    Q.  (By Ms. Rudd) One of the things we were talking
25  about before the break was your effort to gather

---

55

1  information about instances of voter fraud in Texas,
2  correct?
3    A.  Yes.
4    Q.  And we looked at several charts that you
5  received from the OAG'S office talking about reports of
6  types of voter fraud, correct?
7    A.  Yes.
8    Q.  And that information was received by you in
9  February of 2011, right?
10    A.  Yes.
11    Q.  HB 112 was prefiled I think you said in
12  November of 2010, correct?
13    A.  Yes.
14    Q.  Did you do anything to gather information about
15  instances of in-person Voter ID fraud prior to the
16  prefiling of HB 112?
17    A.  I was researching the issue as a whole.  I
18  can't -- it was -- I was researching all Voter ID issues
19  prior to prefiles, post prefiling the bill.  When we
20  picked up Senate Bill 14, it was -- I don't recall when
21  the specific research happened.
22    Q.  Was it important to determine whether there was
23  in-person Voter ID fraud in Texas prior to filing HB
24  112?
25    A.  I think my research -- it was -- part of my

---

56

1  research was looking into allegations of voter fraud.
2    Q.  Was it important to you whether in-person voter
3  fraud had actually happened in Texas prior to filing HB
4  112?
5    A.  Yes, those cases would be important.
6    Q.  As you sit here today, can you point me to any
7  statistics or information that you gathered regarding
8  the rate of in-person Voter ID fraud in Texas prior to
9  filing HB 112?
10    A.  I don't have that information with me.
11    Q.  Do you know if it exists?
12    A.  I do not.
13    Q.  Just to clarify for the record, one of the
14  purposes of HB 112 was also to combat in-person voter ID
15  fraud, correct?
16    A.  Yes.
17    Q.  And that was the specific type of voter fraud
18  that was targeted by HB 112?
19        MR. SCOTT:  Objection, form.
20    Q.  (By Ms. Rudd) Correct?
21        MR. SCOTT:  Mischaracterization.
22    A.  There were multiple purposes for the
23  legislation.  That was one of the purposes.
24    Q.  (By Ms. Rudd) I understand.  But the type of
25  voter ID fraud that you were concerned with, with HB

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

15 (Pages 57 to 60)

57

1  112, was in-person voter ID fraud?
2         MR. SCOTT:  Objection, form,
3  mischaracterization.
4     **A.  Yes, that is the -- the bill seeks to improve**
5  **the in-person voting process.**
6     Q.  (By Ms. Rudd) Did you discuss HB 112 with
7  Representative Harless prior to filing that particular
8  piece of legislation?
9     **A.  Yes.**
10        MS. HALPERN:  Objection, states facts not
11 in evidence.
12        MS. RUDD:  Well, I asked him for the
13 facts.
14        MS. HALPERN:  No.  Your question implies
15 that he filed the bill.
16        MS. RUDD:  Okay.  Well, let me restate it
17 just to make it very clear.
18    Q.  (By Ms. Rudd) Did you speak to Representative
19 Harless about HB 112 prior to it being filed?
20    **A.  Yes, we had conversations about HB 112.**
21    Q.  And can you describe generally for me what
22 those conversations involved?
23        MS. HALPERN:  All right.  I'm going to
24 object on the basis of legislative privilege.  I'm going
25 allow the witness to answer the questions because this

58

1  entire deposition is under seal and we do so with the
2  understanding that answer in this fashion is consistent
3  with the court's direction and does not in fact waive
4  privilege.
5     **A.  The -- could you repeat your question?**
6     Q.  (By Ms. Rudd) Sure.  Could you just describe
7  generally for me the kinds of things that you discussed
8  with Representative Harless about Voter ID issues prior
9  to the filing of HB 112?
10    **A.  The issue was of importance to her.  She wanted**
11 **to file a bill on the issue.  She had been hearing from**
12 **her constituents about the importance of -- of the**
13 **issue.**
14    Q.  Did you ask her about any particular instances
15 of in-person voter ID fraud that she knew about prior to
16 filing HB 112?
17    **A.  I don't recall.**
18    Q.  Did you discuss with her any concerns that you
19 had about the impact of HB 112 on any particular groups
20 of voters?  Let me -- actually, strike that.  Let me ask
21 -- let me break it down.
22    **A.  Okay.**
23    Q.  One of the things you knew with any kind of
24 Voter ID legislation in Texas is that at that time you
25 would have had to obtain preclearance for the

59

1  legislation, correct?
2     **A.  Yes.**
3     Q.  And one of the things -- well, let me just ask
4  you:  Was one of the things that you were supposed to do
5  is to make sure that the bill was drafted in a way that
6  would meet the requirements of the Voting Rights Act,
7  Section 5?
8     **A.  Which bill are we referring to right now?**
9     Q.  HB 112.
10    **A.  112.  Part of my role as -- in her office was**
11 **to prepare the legislation and to ensure that the**
12 **constitutional -- it met the legal requirements.**
13    Q.  And one of the legal requirements is that it
14 meet the requirements of the Voting Rights Act, correct?
15    **A.  Yes.**
16    Q.  And you know that the Voting Rights Act was
17 enacted to safeguard the rights of certain historically
18 disenfranchised voters, correct?
19    **A.  That's my understanding, yes.**
20    Q.  And Texas is one of the states that was
21 required to obtain preclearance for any changes to its
22 voting law under Section 5 of that Act, correct?
23    **A.  Yes.**
24    Q.  Did you discuss with Representative Harless any
25 of the issues that arose as a result of the Voting

60

1  Rights Act in connection with HB 112?
2         MS. HALPERN:  I'm sorry, could I have that
3  read back?
4         (Requested portion was read back by the
5  court reporter.)
6         MS. HALPERN:  Thank you.
7         I need to assert the legislative privilege
8  with respect to this question as well.  I'm going to
9  allow the witness to answer it with the understanding
10 that, based on court's direction, doing so does not
11 waive the privilege.
12    **A.  Yes, I recall the -- a -- I knew that there was**
13 **-- the standards within the Voting Rights Act and that**
14 **was communicated to Representative Harless.**
15    Q.  (By Ms. Rudd) Did you vocalize any concerns in
16 your conversations with Representative Harless about HB
17 112 when it came to complying with the Voting Rights
18 Act?
19    **A.  I felt that it did comply or that it would**
20 **comply with the Voting Rights Act.**
21    Q.  While you were working in Representative
22 Harless's office, did you receive any calls from
23 constituents regarding Voter ID where the constituents
24 were concerned with Voter ID measures like HB 112?
25    **A.  Specifically to 112?**

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

61

1    Q.  Or in general.  Any kind of Voter -- let me
2  just ask it a different way.
3          During the time that HB 112 and SB 14 were
4  pending, did you receive any communications from
5  constituents that they believed that those types of
6  Voter ID measures were inconsistent with the Voter
7  Rights Act?
8          MS. HALPERN:  Object on the basis of
9  legislative privilege if it involves communications with
10  constituents.  And again I'm allowing him to answer it
11  because we're under seal.
12          MR. GEER:  And are you asserting
13  legislative privilege for communications with
14  constituents?
15          MS. HALPERN:  Yes.
16          MR. GEER:  Is that your position?
17          MS. HALPERN:  Yes.
18      **A.  We spoke with a number of constituents.  I**
19  **cannot recall a specific conversation regarding the**
20  **Voting Rights Act but we heard from constituents for and**
21  **against.**
22      Q.  (By Ms. Rudd) Were you aware when you were
23  developing HB 112, that there was going be opposition
24  from minority groups about any type of Voter ID
25  legislation that was more restrictive than current law?

62

1      **A.  Yes.  I was aware the previous sessions there**
2  **was opposition from minority interest groups.**
3      Q.  Voter ID legislation in Texas over the course
4  of those sessions and up until the passage of SB 14 was
5  pretty controversial, right?
6          MS. HALPERN:  Objection, calls for --
7  assumes facts not in evidence.
8      **A.  The bills were contentious.**
9      Q.  (By Ms. Rudd) So the answer to my question is
10  yes?
11      **A.  Controversial?  I would say contentious.**
12      Q.  Okay.  And there were a fair number of groups
13  who were against passing any Voter ID legislation in
14  2011, correct?
15      **A.  Yes.**
16      Q.  And one of the things you were aware of is that
17  you were going to face -- or Representative Harless was
18  going to face opposition to her Voter ID legislation,
19  correct?
20      **A.  Yes.**
21      Q.  Did you talk to Representative Harless about
22  any concerns you had with the legislation, if any?
23          MS. HALPERN:  Objection.  Time out.  I'm
24  going to caution the witness that to the extent that he
25  is an attorney and that any of these communications are

63

1  subject to the attorney-client privilege.  For those,
2  I'm going to direct you not to answer.  To the extent
3  that your communications were not in an attorney-client
4  capacity and come within the legislative privilege, I'm
5  going to note an objection based on the legislative
6  privilege, but you can go ahead and answer as long as
7  you're not evading the attorney-client privilege.
8      Q.  (By Ms. Rudd) Okay.  Let's just back up for a
9  second.
10          Did you represent Representative Harless
11  in an attorney-client capacity?
12      **A.  That is my understanding.**
13      Q.  Okay.  And for -- on what issues did you
14  represent Representative Harless as her attorney?
15      **A.  When legal questions arise specific to my**
16  **experience and expertise as an attorney.**
17      Q.  Okay.  But you were not her general counsel,
18  correct?
19      **A.  That was not my title, but I am an attorney and**
20  **she was well aware of that and would seek my counsel on**
21  **legal issues.**
22      Q.  Okay, fair enough.  But you don't always act as
23  an attorney just because you are an attorney, correct?
24      **A.  No, no.**
25      Q.  And when you were developing HB 112 and SB 14,

64

1  you were acting in a chief of staff capacity; is that
2  correct?
3      **A.  It -- being in a Representative's office, you**
4  **wear many hats, and I would be doing my policy work, I**
5  **would also have my legal opinions on certain actions, so**
6  **it's hard to sometimes differentiate.**
7      Q.  Okay.  Well, that's a fair point.  How -- do
8  you have any way of differentiating between the times
9  you were acting as a chief of staff and the times you
10  were acting as an attorney rendering legal advice?
11      **A.  I think when there are, say, specific legal**
12  **issues she was asking me about.  And the majority of my**
13  **work was as a policy legislative director, chief of**
14  **staff.  But there were instances where I was -- my legal**
15  **advice was sought.**
16      Q.  Did you have any concerns yourself about the
17  voting rights implications of HB 112?
18          MS. HALPERN:  I'm going to object on the
19  basis of legislative privilege along the lines
20  previously stated.  Based on the court's direction and
21  with the understanding that the privilege is not waived
22  by him answering under seal, I'm going to permit him to
23  answer.
24      **A.  I believe that HB 112 was within the Voting**
25  **Rights Act.**

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

17 (Pages 65 to 68)

---

65

1    Q.  (By Ms. Rudd) What did you do to satisfy
2  yourself of that?
3    **A.  Researched the issue, researched the Voting**
4  **Rights Act and the court cases.**
5    Q.  When you say court cases, what are you
6  referring to?
7    **A.  The Crawford.**
8    Q.  Okay.  Is there any other court cases that you
9  looked at?
10    **A.  I can't recall a specific court case.**
11    Q.  Did you perform any research about which
12  constituents, if any, in Representative Harless's
13  district had the requisite forms of ID listed in HB 112?
14    **A.  Could you restate it?  Was it specific to**
15  **Representative Harless's district?**
16    Q.  Yes.
17    **A.  No, not that I recall.**
18    Q.  Did you perform any research to determine
19  whether any minority groups would be more significantly
20  impacted by HB 112 than non-minority groups?
21    **A.  In my overall study of the Voter ID issue, that**
22  **was a concern that had been raised in the past and that**
23  **was information that I came across in my research.**
24    Q.  Okay.  Did you do anything personally in
25  connection with your development and drafting of HB 112

---

66

1  to satisfy yourself that HB 112 would not
2  disproportionately impact minority groups?
3    MS. HALPERN:  Objection, compound.
4    **A.  It's been some time since I've looked at HB**
5  **112, so I would have to look at the specific bill**
6  **language to see what was done within the bill.**
7    Q.  (By Ms. Rudd) Okay.  Well, what I'm really
8  trying to get at is that other than looking at what the
9  Supreme Court said in Crawford, did you do anything to
10  ensure that the way that HB 112 would work in practice
11  would not disenfranchise minority groups?
12    **A.  There were protections within the bill.  I**
13  **would have to see the bill language to work through**
14  **that.**
15    **(Exhibit 3 marked for identification.)**
16    Q.  (By Ms. Rudd) Okay.  Well, that's a good idea.
17  Let's look at it.
18    Do you recognize what's been marked as
19  Beuck Exhibit 3?
20    **A.  Yes.**
21    Q.  What is this document?
22    **A.  This is House Bill 112 by Representative**
23  **Harless.**
24    Q.  Okay.  And you just testified that there were
25  safeguards put into HB 112 to protect minority voters,

---

67

1  correct, or to protect against the disenfranchisement of
2  voters; is that right?
3    **A.  Yes.**
4    Q.  Feel free look through this.  Can you just
5  point me to what safeguards you're referring to.
6    MS. HALPERN:  I direct the witness to look
7  at the bill carefully before answering.
8    **A.  The provisions in the bill that I think address**
9  **those issues would be the notice requirements, education**
10  **outreach, increased notice of the changes in the bill,**
11  **increased voter education, increased training for**
12  **people, election officers and provisional ballot**
13  **process, pre-identification.**
14    Q.  (By Ms. Rudd) Did HB 112 specify any particular
15  budget for voter outreach efforts?
16    **A.  I don't recall.**
17    Q.  I want to just briefly go through some of the
18  ID requirements of HB 112.  If you will look with me to
19  Page 3, Section 6 of that legislation.  Section 6(b)
20  says, "On offering to vote, a voter must present to an
21  election officer at the polling place either:  Number 1,
22  one form of identification listed in Section 63.0101(a),
23  or Number 2, two different forms of identification
24  listed in 63.0101(b)."  Did I read that correctly?
25    **A.  Yes.**

---

68

1    Q.  And then if you'll flip with me to Page 5, the
2  bottom of that page, Section 10 contains Section
3  63.0101 (a) and (b) listing those types of documentation
4  or ID.  And in (a), there are -- I'm just counting here
5  -- six different types of photo identification that
6  would be acceptable under HB 112, correct?
7    **A.  That's correct.**
8    Q.  And the very first acceptable form of photo
9  identification listed here is a driver's license or
10  personal identification card expired -- or that expired
11  no earlier -- I'm sorry, that's probably not expired --
12  or expired no earlier than two years before the date of
13  presentation, correct?
14    **A.  Yes.**
15    Q.  And do you know where that two-year expiration
16  period came from?
17    **A.  I don't recall.**
18    Q.  But at the time that HB 112 was filed
19  prescribing that photo identification not expired more
20  than two years, was an acceptable limitation for
21  Representative Harless?
22    **A.  The language from House Bill 112 was from the**
23  **Senate Bill which had passed in 2009.**
24    Q.  Okay.  And so this language was acceptable to
25  Representative Harless at the time?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

---

69

1      A.   I would say it was a starting point.
2      Q.   Did you have any conversations with
3  Representative Harless about the period by which a photo
4  identification could be expired and still be acceptable
5  for purposes of voting?
6      A.   In regards to 112?
7      Q.   Yes.
8      A.   Not that I recall.
9      Q.   The second form of ID listed here is a United
10 States military identification card that contains a
11 person's photograph, correct?
12     A.   I'm sorry, what page?
13     Q.   I'm sorry, I'm on Page 6.
14     A.   Okay.
15     Q.   Number 2.
16     A.   Yes.
17     Q.   And there is no specification of whether that
18 military identification card had to be unexpired,
19 correct?
20     A.   There is -- correct.
21     Q.   And if you skip down -- and at the time, that
22 form of photo ID was acceptable to Representative
23 Harless, correct?
24     A.   That -- that's what's in the bill.
25     Q.   She approved the bill before it was filed,

---

70

1  right?
2      A.   Correct.
3      Q.   The sixth form of ID listed there is a valid
4  identification card that contains the person's
5  photograph and is issued by an agency or institution of
6  the federal government or an agency, institution or
7  political subdivision of the State, correct?
8      A.   Yes.
9      Q.   Did you have any discussions with
10 Representative Harless about that form of photo
11 identification prior to filing HB 112?
12     A.   Not that I recall.
13     Q.   But at the time that this bill was filed, that
14 form of photo identification was acceptable to
15 Representative Harless?
16          MS. HALPERN:  Objection, calls for
17 speculation.
18     A.   It's -- it's part of the bill that was filed by
19 her.
20     Q.   (By Ms. Rudd) And it was approved by her,
21 right?
22     A.   Yes.
23     Q.   And then Subsection B, at the very bottom of
24 that page, lists forms of documentation that are
25 non-photo forms of identification that were acceptable

---

71

1  under HB 112, correct?
2      A.   Correct.
3      Q.   And you had to present two forms of this type
4  of documentation to vote under HB 112; is that right?
5      A.   Yes.
6      Q.   And there are 11 different forms of non-photo
7  identification listed here, correct?
8      A.   Yes.
9      Q.   At the time that HB 112 was being developed,
10 did you discuss the concept of allowing certain forms of
11 non-photo ID to be presented for voting purposes with
12 representative Harless?
13     A.   That was -- that is part of the bill, and yes,
14 that was discussed.
15     Q.   What caused -- if you know, what caused
16 Representative Harless to include forms of non-photo ID
17 in HB 112?
18          MS. HALPERN:  I'm going to object on the
19 basis of legislative privilege.  With the understanding
20 based on the court's ruling and guidance that testimony
21 could be given under seal which would not waive
22 privilege, the witness is going to be permitted to
23 answer.
24     A.   This was the language that was contained in the
25 Senate Bill that had passed in the prior session, and it

---

72

1  was my understanding that she wanted the -- our bill to
2  look similar to the Senate Bill that had passed out of
3  the Senate in 2009.
4      Q.   (By Ms. Rudd) Did you have any discussions with
5  Representative Harless prior to filing HB 112 about
6  whether photo identification was superior to forms of
7  non-photo identification for voting purposes?
8      A.   The --
9          MS. HALPERN:  Objection on the basis of
10 legislative privilege.  Shortened objection.  The
11 witness can answer.
12     A.   My understanding was that photo ID was the --
13 what the constituents were asking for her to carry, for
14 her to help pass.  They wanted to see a photo ID
15 requirement.  This bill was what passed out of the
16 Senate in 2009 and we saw this as a starting point to
17 begin the debate.
18     Q.   (By Ms. Rudd) Okay.  Because it passed out of
19 the Senate in 2009, did Representative Harless believe
20 that it would be easier to get consensus on HB 112 if it
21 sort of mirrored what -- what was contained and what
22 passed out of the Senate in 2009?
23          MS. HALPERN:  Objection, calls for
24 speculation, legislative privilege.  You can go ahead
25 and answer because we're under seal.

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

73

1     **A.  You know, I can't speak to her -- her thought**
2  **process behind that.**
3     Q.  (By Ms. Rudd) Okay.  But you discussed this
4  bill with her?
5     **A.  Yes.**
6     Q.  Did -- was it -- was, you know, the goal of
7  obtaining consensus between the House and Senate
8  discussed on Voter ID legislation?
9     **A.  As with all legislation, I think that's the**
10 **goal, is to pass what you file.  So yes, consensus, a --**
11 **something that would work.**
12    Q.  At the time that you filed HB or HB 112 was
13 filed, did Representative Harless support the idea of
14 allowing voters to present two forms of non-photo ID in
15 order to vote?
16    **A.  It's my belief -- I'm not going to speak for**
17 **her -- but my belief that she -- the end goal was to**
18 **have a photo identification requirement and if this was**
19 **what we could get, this was what we could get.**
20    Q.  Okay.
21       MS. HALPERN:  Let the record reflect when
22 the witness says "this is what we could get, this is
23 what we could get," he was pointing to --
24    **A.  I'm sorry.**
25       MS. HALPERN:  -- that's fine.

74

1        He was pointing to House Bill 112 --
2     **A.  Yes.**
3        MS. HALPERN:  -- at the time.
4     **A.  Yes.**
5        MS. HALPERN:  Counsel, this version of SB
6  14 is not signed.  Are you going to make a
7  representation because there's so many copies and drafts
8  floating around as to which version this is.
9        MS. RUDD:  No, because I have no idea.
10       MS. HALPERN:  Well, there's the version
11 that was filed, there's the final version --
12       MR. GEER:  Do want the same version?
13       MS. RUDD:  Yeah, that's fine.  I mean, I
14 don't have copies of it but I don't think it's any
15 different.
16       MS. HALPERN:  And I'm not saying that it
17 necessarily is, I just want to be sure because --
18       MS. RUDD:  I don't think there will be any
19 controversy about what I'm asking.  Well, I shouldn't
20 speak too soon.
21       MS. HALPERN:  No, I wouldn't.
22       MR. GEER:  Do you want to substitute that
23 with the signed version?
24       MS. RUDD:  No, because it's just too
25 complicated with copies.

75

1        MS. HALPERN:  Do you have copies of it?
2        MR. GEER:  I do.
3        MS. HALPERN:  He's got copies.
4        MS. RUDD:  Okay.  Well, let's just mark
5  those.  That's fine.  If you don't mind, Bruce.
6        MR. GEER:  No, not at all.
7        MS. RUDD:  Obviously, you can refer back
8  to it.
9        MS. HALPERN:  I personally get messed up
10 because I looked at something and thought I was looking
11 at the final version of a bill and found out I wasn't,
12 so I don't...
13       MS. RUDD:  Put that sticker on top of that
14 sticker to avoid confusion.
15       (Exhibit 3 exchanged for signed version.)
16       (Exhibit 4 marked for identification.)
17    Q.  (By Ms. Rudd) Okay.  Do you recognize what's
18 been marked as Beuck Exhibit 4?
19    **A.  It appears to be a copy of Senate Bill 14.**
20    Q.  And this is a piece of legislation that you
21 worked on, correct?
22    **A.  Yes.**
23    Q.  And Representative Harless sponsored this
24 legislation in the House, correct?
25    **A.  Yes.**

76

1     Q.  Turn with me if you will to Page 9 of that
2  legislation.  And I'm looking at Section 63.0101, which
3  is the same section we were looking at with HB 112,
4  correct?
5     **A.  Yes.**
6     Q.  In Senate Bill 14, 63.0101 has listed five
7  forms of photo identification that are acceptable in
8  order to vote, correct?
9     **A.  Yes.**
10    Q.  And the first form of identification listed
11 there is a driver's license, election identification
12 certificate or personal identification card that has not
13 expired or that expired no earlier than 60 days before
14 the date of presentation, correct?
15    **A.  Yes.**
16    Q.  So 60 days is obviously less than the two years
17 prescribed under HB 112, correct?
18    **A.  Yes.**
19    Q.  Do you know why that change was made to the
20 legislation?
21    **A.  From the debate, there were increased security**
22 **of the form of identification.  If it's two years old**
23 **versus 60 days past expiration, there's increased**
24 **security with the 60 days.**
25    Q.  Can you explain that to me in a little bit more

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

77

1  detail.  Is there some reason to believe that a photo ID
2  card or a driver's license issued by the Department of
3  Public Safety would be less secure after two years than
4  60 days?
5      **A.  There are scenarios that I can think of that**
6  **could create an issue with the person's identity.  I**
7  **can't speak to specifics on that.**
8      Q.  Okay.  Well, let's make this easier:  Did you
9  have any conversations about this particular expiration
10 period in connection with SB 14?
11     **A.  It was an issue brought up during debate, I**
12 **believe.  I just -- I can't recall the conversations.**
13     Q.  Okay.  So you just don't know whether you
14 personally had any conversations with anyone in
15 connection with developing SB 14 about the expiration
16 period that would be permissible?
17     **A.  I don't recall.**
18     Q.  Okay.  The second form of identification listed
19 here is a United States military identification card
20 that contains the person's photograph that is not
21 expired or that expired no earlier than 60 days before
22 the date of presentation, correct?
23     **A.  Yes.**
24     Q.  And as we saw in HB 112, there was no
25 expiration period listed for military photo ID, correct?

78

1      **A.  Correct.**
2      Q.  So this is a change from HB 112 in terms of
3  what would be acceptable under SB 14, correct?
4      **A.  The two provisions are different, yes.**
5      Q.  And the two provisions in SB 14 are more
6  restrictive than what was in HB 112, correct?
7      **A.  Yes.  There's an expired provision in 14 and**
8  **that is not in 112.**
9      Q.  And the expired provision is shorter than what
10 was in 112 for driver's licenses and ID cards, right,
11 two years versus six months?  I'm sorry, I'm probably
12 confusing you.  I went back to -- in general, when we're
13 talking, we're talking about the first two forms of ID
14 listed in SB 14.
15     **A.  Okay.**
16     Q.  There are more restrictions on those two forms
17 of ID in SB 14 than there were in HB 112?
18         MS. HALPERN:  Objection, misstates the
19 document.
20     **A.  The provisions are different.  I would say the**
21 **-- there is an expiration no earlier than 60 days for**
22 **both the driver's license and military identification in**
23 **SB 14.**
24     Q.  (By Ms. Rudd) And that represents a greater
25 restriction than what was listed in HB 112 for those

79

1  forms of ID, right?  60 days is less than two years, and
2  60 days expiration when there's no expiration, that's a
3  more restrictive bill, would you say?
4      **A.  The time frame is less.**
5      Q.  Is there some reason you're having difficulty
6  with the concept of it being more restrictive?  There
7  are less forms of ID that qualify under SB 14 than under
8  HB 112 for these two forms, correct?
9          MS. HALPERN:  Two forms?
10         MS. RUDD:  I'm just focusing on Number 1
11 and Number 2.
12         MS. HALPERN:  Counsel, Number 1 talks
13 about a driver's license, an election identification
14 certificate or a personal identification card.  That's
15 what this version of SB 14 has.
16     Q.  (By Ms. Rudd) Okay.  Let's just start all over
17 again.  In talking about the first two categories of
18 photo ID listed in SB 14 --
19     **A.  Okay.**
20     Q.  -- there is a smaller universe of photo ID
21 that's acceptable under SB 14 than what was acceptable
22 under HB 112, correct?
23         MS. HALPERN:  Objection, misstates the
24 document.
25     **A.  My statement is that there is a 60 days**

80

1  **expiration in SB 14.**
2      Q.  (By Ms. Rudd) I know.  We can all read the
3  document.  So look, this is a pretty easy question:  In
4  your view is SB 14, when it comes to the first two
5  categories of identification, more restrictive than HB
6  112 was?
7          MR. SCOTT:  Objection, argumentative.
8          MS. HALPERN:  Objection, asked and
9  answered.
10         MS. RUDD:  Not answered.  Not once.  It's
11 not a hard question.
12         MS. HALPERN:  Actually, Counsel, it is.
13 If you want to go off the record, I could tell you why.
14     **A.  I feel like I've answered the question.  I**
15 **don't know how else to say it differently.**
16     Q.  (By Ms. Rudd) Do you know what the word
17 restrictive means?
18         MS. HALPERN:  Objection, argumentative.
19     **A.  Yes.**
20     Q.  (By Ms. Rudd) Can you -- are you capable of
21 comparing one bill to another to determine which one
22 might be more restrictive in the forms of photo
23 identification that it allows?
24     **A.  I've tried to contrast the differences between**
25 **the two.**

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

81

1    Q.  And you're having difficulty with this, the way
2  I'm characterizing it, is that right, as more
3  restrictive?
4    **A.  It's a shorter time frame.  I don't know how**
5  **else to say it differently.  I'm sorry.**
6    Q.  Okay.  Is the only way a person can verify
7  their identity is by presenting a photo identification,
8  in your view?
9    MS. HALPERN:  Your asking him just like
10  today as he sits here?
11    Q.  (By Ms. Rudd) Yeah.  Are there any -- do you
12  think the photo identification is the only way you can
13  identify yourself to anyone?
14    **A.  In what context?**
15    MR. SCOTT:  Objection form, vague.
16    Q.  (By Ms. Rudd) Do you have to show a driver's
17  license or a form the photo ID in order to get on a
18  plane?
19    **A.  That's my understanding.**
20    Q.  Do you think there's any context in which photo
21  ID would not be required in order to identify yourself?
22    **A.  I'm not -- I'm not sure I'm following.  I'm**
23  **sorry.**
24    Q.  In connection with SB 14 --
25    **A.  Okay.**

82

1    Q.  -- did you research context in which photo
2  identification are required in order for a person to
3  identify themselves outside of the voting context?
4    **A.  In life?  In general?**
5    Q.  Yes.
6    **A.  I don't -- I don't understand.**
7    Q.  Well, we've seen testimony in connection with
8  SB 14 about how people have to present photo ID to get
9  on a plane, correct?
10    **A.  Yes.**
11    Q.  And there were examples given of situations in
12  which people would have to present photo ID when people
13  were testifying about SB 14, correct?
14    **A.  Yes.**
15    Q.  And the analogy was made:  Look, it shouldn't
16  be easier to vote than it is to get on a plane, correct?
17    MS. HALPERN:  Objection, misstates the
18  record.
19    **A.  There was -- I believe there was testimony**
20  **regarding that at some point during the debate.**
21    Q.  (By Ms. Rudd) Did you ever look into situations
22  where photo ID -- well, strike that.
23    One of the things that is eliminated in SB
24  14 that was included in HB 112 is a listing of forms of
25  non-photo ID that you could present in order to vote,

83

1  correct?
2    **A.  That would be the -- yes, correct.**
3    Q.  And so there is a smaller universe of
4  identification that's permitted under SB 14 than was
5  permitted under HB 112, correct?
6    **A.  Senate Bill 14 requires a photo identification.**
7    Q.  Right, which is -- and HB 112 allowed a number
8  of non-photo IDs, correct?
9    **A.  Correct.**
10    Q.  So there's a smaller universe of identification
11  that is permitted under SB 14 than was permitted under
12  HB 112?
13    **A.  Correct.**
14    Q.  And I think you previously testified that when
15  Representative Harless authored HB 112, even though that
16  contained some forms of non-photo ID, the end goal
17  really was to get to a bill that permitted just photo
18  ID; is that right?
19    **A.  That is my understanding of what her -- the**
20  **plan was.  Her constituents were asking for that.**
21    Q.  And SB 14 accomplished that, right?
22    **A.  Accomplished the -- could you -- I'm sorry,**
23  **restate the question?**
24    Q.  SB 14 was limited to just photo ID?
25    **A.  Yes.**

84

1    Q.  Okay.  Let's go back briefly because I just
2  don't want to -- I want to close the loop on this.
3    In connection with HB 112, you spoke with
4  Bryan Hebert in Lieutenant Governor Dewhurst's office,
5  correct?
6    MR. SCOTT:  Objection, form.
7    Q.  (By Ms. Rudd) This is something you previously
8  testified to.
9    **A.  Yes.**
10    Q.  And I think you also previously testified that
11  Mr. Hebert was in charge of Voter ID issues with
12  Lieutenant Governor; is that right?
13    **A.  Yes.**
14    Q.  Do you recall what the -- what those
15  conversations with Mr. Hebert were about?
16    MS. HALPERN:  I'm going to direct -- I'm
17  going assert the legislative privilege.  Can we stop for
18  a minute?  I want to confer with one of my colleagues.
19  We may instruct him not to answer entirely.  Before we
20  do that, I want to consult.
21    MS. RUDD:  Sure.  Let's go off the record.
22    (Recess 11:52 a.m. to 11:54 a.m.)
23    MS. HALPERN:  I want the last question
24  read back and then I want to put something on the record
25  and get out of your way.

COLBY BEUCK                                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

22 (Pages 85 to 88)

85

1    THE COURT REPORTER:  You want it read
2  back?
3    MS. HALPERN.  Back on the record.  And I
4  want the last question read back and -- yeah.
5    (Requested portion was read back by the
6  court reporter.)
7    MS. HALPERN:  I'm going to object on the
8  basis of legislative privilege.  Because Mr. Hebert has
9  already testified and himself waived the privilege as to
10  himself, I'm going to allow the witness to answer your
11  questions about his communications with Mr. Hebert.  The
12  line I'm drawing here is communications with other
13  legislators or their staffs who have not yet waived the
14  privilege.  We're not going to waive it for them and
15  deprive them of the opportunity to assert it.  So that's
16  -- that's my dividing line.  He can answer this question
17  because Bryan Hebert was deposed on Monday and himself
18  agreed to testify as to matters for which he could have
19  claimed privilege.
20    MR. RUDD:  Okay.  Thank you for that.  I
21  appreciate that.
22    Q.  (By Ms. Rudd) So do you recall what your
23  discussions with Mr. Hebert were about?
24    **A.  I contacted Bryan and informed him that we were**
25  **filing a Voter ID legislation and they were -- our**

86

1  **conversation was in regards to our intent to file Voter**
2  **ID legislation.**
3    Q.  Is there a reason that you reached out to
4  Mr. Hebert in particular?
5    **A.  I knew that he was covering this issue for the**
6  **Lieutenant Governor and had knowledge of -- of the**
7  **issue.**
8    Q.  And so was your conversation with Mr. Hebert
9  confined to letting him know that you were filing HB 112
10  or did you discuss other things involving that
11  legislation?
12    **A.  I believe we discussed other things involving**
13  **the legislation.**
14    Q.  And can you describe for me what other things
15  you might have discussed?
16    **A.  I don't recall specifics of what we discussed,**
17  **but the gist of the conversation was that we were**
18  **interested in filing Voter ID legislation.**
19    Q.  Did you discuss any potential concerns with the
20  legislation voiced either by other interest groups or
21  constituents?
22    **A.  I don't recall.**
23    Q.  Did you discuss potential opposition to the
24  legislation and how you might address that?
25    **A.  I don't recall specifics of our conversation.**

87

1    Q.  Okay.  So if -- I could ask you a series of
2  questions but it's your testimony today that you just
3  don't recall any of the specifics of conversations you
4  had with Mr. Hebert or is there something that you do
5  recall that you can tell me today?
6    **A.  I don't recall the specifics of the**
7  **conversation.**
8    Q.  Okay.  Rather than go through a whole litany of
9  questions, let's just get that out of the way.
10    And this may run into what you were just
11  talking about, but you also testified previously that
12  you spoke with Janice McCoy in Senator Fraser's office
13  about Voter ID, Voter ID legislation, correct?
14    **A.  Correct.**
15    Q.  And can you tell me what you discussed with
16  Ms. McCoy?
17    MS. HALPERN:  And again, I'm going have to
18  assert the legislative privilege.  And on this one I'm
19  going to direct him not to answer because they have not
20  had the opportunity yet to assert or to waive.  I
21  understand that their depositions are in the process of
22  being rescheduled for some time in July at the request
23  of the Department of Justice and that they will go
24  forward and you will have the opportunity to ask those
25  questions then.

88

1    Q.  (By Ms. Rudd) Okay.  I'm getting rid of that
2  page.
3    MS. HALPERN:  I told you I'd help you get
4  it out of the way.
5    MS. RUDD:  I appreciate it.
6    Q.  (By Ms. Rudd) We've talked a lot about the
7  research that you did in connection with HB 112 and SB
8  14.  I want to just focus on SB 14 for a second.
9    **A.  Okay.**
10    Q.  Is there any particular data about in-person
11  Voter ID fraud that you gathered in connection with your
12  development of SB 14, other than the things we already
13  discussed?
14    **A.  My research was done in a general sense, so not**
15  **specific, not -- I've mentioned the research done that**
16  **was relevant to SB 14.**
17    Q.  Okay, fair enough.  You were dealing with
18  numerous pieces of Voter ID legislation during the 2011
19  session, correct?
20    **A.  Correct.**
21    Q.  And your research applied generally to all of
22  that legislation?
23    **A.  Yes.**
24    Q.  In connection with SB 14, did you reach out to
25  the Secretary of State's Office for any information

COLBY BEUCK                                             6/20/2014
CONFIDENTIAL TRANSCRIPT

89

1  relating to Voter ID legislation for -- that would help
2  you in assessing Voter ID legislation?
3      **A. Yes.**
4      Q. What did you reach out to the Secretary of
5  State's Office for?
6      **A. There was information that the Secretary of**
7  **State's Office had regarding their voter roll**
8  **information.**
9      Q. Okay. Can you be more specific about that?
10 When you say voter roll information, what specific type
11 of the information were you seeking?
12     **A. Who had registered to vote and had supplied a**
13 **driver's license number or a -- they also collected**
14 **information on social security numbers.**
15     Q. Okay. Did you receive information back from
16 the Secretary of State's Office in response to that
17 request?
18     **A. Yes.**
19         **(Exhibit 5 marked for identification.)**
20     MS. HALPERN: Let the record reflect that
21 this Exhibit 5 is also marked highly confidential, so we
22 would be in an under seal portion of the deposition even
23 if we weren't already under seal.
24     MS. RUDD: Thank you.
25     MR. GEER: Could I just clarify one point

90

1  on the under seal just so the record is clear: I
2  believe -- and correct me if I'm wrong -- we agreed to
3  put the entire deposition under seal for administrative
4  purposes because it would be difficult to separate the
5  under seal and the not under seal. And I also believe
6  that we agreed that portions of testimony that don't
7  relate specifically to the highly confidential
8  documents, attorneys are free to do or use in a manner
9  that they would like to use it as it complies with this
10 case.
11     MS. HALPERN: Not the legislative
12 privilege objections.
13     MR. GEER: Legislative -- you have the
14 right to assert legislative privilege.
15     MS. HALPERN: Yeah, and every time we have
16 objected on the basis of legislative privilege, if we
17 were not already on -- under seal, we would be going
18 under seal.
19     MR. SCOTT: Well, from a practical
20 standpoint --
21     MR. GEER: And that's his right --
22     MS. HALPERN: Yes.
23     MR. GEER: -- to assert legislative
24 privilege but agree to testify under seal, correct?
25     MS. HALPERN: Well, the only reason he's

91

1  -- let's stay on the record. The only reason he's
2  agreeing to testify under seal is because the court, as
3  I understand it -- and again, I represent the witness, I
4  do not represent the State of Texas in this instance.
5  My understanding is that the judge basically gave two
6  options: Either the witness can refuse to answer and
7  then come back or the witness can essentially answer
8  under protest, the answer will be under seal and it will
9  be as if he hadn't answered, and if y'all want to use
10 that testimony, you then have to move affirmative to
11 unseal it and the privilege is not thereby waived.
12     MS. RUDD: That's my understanding as
13 well.
14     MS. HALPERN: And just as a concession to
15 expediency and because we're all busy people and nobody
16 wants to come back and do this over again, we're making
17 the legislative privilege objections, we're allowing the
18 answers to be made with the understanding that if this
19 whole deposition were not under seal, those pieces where
20 he answers and divulges legislatively privileged
21 material would themselves be under seal.
22         And given that, you know, we had a
23 deposition on Tuesday and we sort of played the game of
24 being under seal, not under seal, under seal, not
25 underseal, and then Elizabeth, your co-counsel, asked

92

1  the reporter to try to unscramble the egg, and he's
2  having understandable problems, that's why the whole
3  thing is under seal today, but that doesn't mean that at
4  some point y'all won't try to unscramble the egg again,
5  which is why I, to do my job, need to make sure that
6  every time I'm saying on the record that it's
7  legislatively privileged, and that is code for "and we
8  would be going under seal if we weren't already under
9  seal," which is a completely separate thing from these
10 highly confidential documents, and that's an issue y'all
11 have with defendants and not with the witness. Does
12 that help?
13     MR. GEER: Somewhat.
14     Q. (By Ms. Rudd) Okay. So, turning to what's been
15 marked as Beuck Exhibit 5, which is Bates numbered TX
16 92224 to 92225, this is an e-mail from Ann McGeehan to
17 you dated February 25, 2011, correct?
18     **A. Yes.**
19     Q. And you received this e-mail, right?
20     **A. I did.**
21     Q. And is this the response from the Secretary of
22 State's Office that you were just referring to in your
23 testimony?
24     **A. Yes.**
25     Q. And if you look down to the -- sort of last

COLBY BEUCK                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

93

1   section of this e-mail, there's a paragraph with the
2   header All Voters in the State, and the first category
3   with Number of Voters with a TDL/ID, which I take to be
4   Texas driver's license or Texas ID card, correct?
5       **A.   Yes, that's my understanding.**
6       Q.   And that is -- that number is roughly 5.2
7   million, right?
8       **A.   Yes.**
9       Q.   And the second category is the Number of Voters
10  with a SSN, social security number, right?
11      **A.   Yes.**
12      Q.   And the number listed there is 2.1 million,
13  roughly?
14      **A.   Correct.**
15      Q.   And then there's a Number of Voters with Both
16  forms of those identifications.
17          And then the last category there is Number
18  of Voters with Neither Number, which is 690,887,
19  correct?
20      **A.   Yes.**
21      Q.   And what does that number represent to you; was
22  that the number you were trying to get at in making this
23  request?
24      **A.   That's the number that -- yes, that is the**
25  **number that we were trying to determine through the**

94

1   **Secretary of State's records.**
2       Q.   Was the 690,000 voter number concerning to you
3   at all?
4       **A.   The number -- the number concerned me because**
5   **we did not have confidence that that was an accurate**
6   **number because we did not have confidence in that**
7   **number.**
8       Q.   And why is that?
9       **A.   Because Representative Harless was included in**
10  **that number as one the ones without a -- that was**
11  **registered to vote that did not register with her**
12  **driver's license number or social security number.**
13      Q.   How did you make that determination?
14      **A.   That is what she -- that is what she had**
15  **determined.   She had been living in her residence for --**
16  **since before 2006 and so had not registered to vote with**
17  **a driver's license number or social security number, so**
18  **we had -- we did not have confidence -- we felt that**
19  **number was inflated.**
20      Q.   Okay.   Do you have any sense for how much you
21  felt that number was inflated by?
22      **A.   No.   And that's what was concerning.**
23      Q.   You didn't receive a list of voters of these
24  690,887 voters that are categorized here, right, by name
25  or anything else?

95

1       **A.   I don't recall.**
2       Q.   Did you ask for any identifying information
3   about the 690,000 voters referenced here?
4       **A.   Identifying information meaning?**
5       Q.   By name?
6       **A.   By name, I don't recall.**
7       Q.   Did you make any effort to determine whether
8   any of the 690,887 voters were minorities?
9       **A.   The Secretary of State's Office did -- doesn't**
10  **-- did not collect racial data with their voting**
11  **records.   That information was not available.**
12      Q.   Okay.   So the answer to my question is no?
13      **A.   Correct.**
14      Q.   Did you make any effort of any kind to
15  determine the demographics of any of the 690,000 voters
16  referenced here in terms of where they live or anything
17  else?
18      **A.   I don't recall.**
19      Q.   Okay.
20          MS. RUDD:  Can we go off the record for
21  just a second?
22          MS. HALPERN:  Uh-huh.
23          (Brief discussion off the record.)
24          (Recess 12:09 p.m. to 12:13 p.m.)
25          MS. RUDD:  Back on the record.

96

1          (Exhibit 6 marked for identification.)
2       Q.   (By Ms. Rudd) Beuck Exhibit 6 is Bates Number
3   TX 92226, and this is an e-mail from Ann McGeehan at the
4   Secretary of State's Office to Representative Harless
5   and you on February 25, 2011, correct?
6       **A.   Yes.**
7       Q.   And this e-mail, in the first paragraph, talks
8   about the availability of federal HAVA dollars for a
9   state-wide voter education effort on a new ID
10  requirement, correct?
11      **A.   Yes.**
12      Q.   And it also talks about the number of
13  complaints the Secretary of State's Office has received
14  about possible voter fraud, right?
15      **A.   Yes.**
16      Q.   Is this information that you requested from the
17  Secretary of State's Office?
18      **A.   I believe so, yes.**
19      Q.   And what was the purpose of your request for
20  this information?
21      **A.   To find a funding source for some of the voter**
22  **outreach efforts contained in Senate Bill 14.**
23      Q.   Were you concerned that there wouldn't be
24  sufficient funds for voter education and outreach
25  efforts in connection with SB 14?

COLBY BEUCK                                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

97

1    A.  I think concerned is probably -- we were
2  looking for funding methods for the voter outreach
3  efforts.  Concerned?  You know, I don't know.  But we
4  definitely were looking for available funds.  It was a
5  tight budget session in 2011 and the State had a
6  significant shortfall, so any available funds that were
7  out there, we were definitely searching for.
8    Q.  Did you perform any analysis of what level of
9  funding you thought it would take to adequately educate
10 voters on the new requirements of SB 14?
11   A.  We asked the Secretary of State's Office to
12 perform those voter outreach services and we -- I left
13 that up to their discretion on what would be an
14 appropriate level.
15   Q.  Okay.  The second paragraph of this e-mail
16 discusses the number of complaints of voter fraud
17 referred to the Secretary of State's Office since 2007,
18 correct?
19   A.  Yes.
20   Q.  And we're in 2011, so that would be for the
21 last four years of seeing this e-mail, correct?
22   A.  Yes.
23   Q.  And in the middle of that second paragraph,
24 Ms. McGeehan says, "We can tell that you since 2007,
25 this office has referred 72 complaints to OAG.  Of those

98

1  referrals, nine involved potential voter
2  impersonations," correct?
3    A.  Yes.
4    Q.  Did you follow up with Ms. McGeehan or anyone
5  at the Secretary of State's Office regarding the nine
6  voter impersonation referrals that she referred to here?
7    A.  The Secretary of State's Office, from my
8  recollection, is more of a clearinghouse for these
9  complaints, so they did not have the information on the
10 specifics.  Those -- once they're referred to the
11 Attorney General's Office, that then is their -- they
12 didn't have the information, so no, I didn't.
13   Q.  Did you follow up with the OAG'S office about
14 those nine particular referrals?
15   A.  I believe that is when I received the e-mail
16 from the Attorney General's Office with the list.
17   Q.  Okay.  That was actually going to be my next
18 question.
19   A.  Okay.
20   Q.  So you believe that after receiving this
21 communication, you went to the OAG'S office and
22 requested the information that's contained in those
23 charts that we looked at earlier?
24   A.  I can't -- I'm not going to say the timeline
25 went exactly that way.  I was working on these all at

99

1  the same time, so I don't know if that's exactly how the
2  timeline went, but that was -- if -- after seeing this
3  in this e-mail, I went to go look at the Attorney
4  General's information.
5    Q.  Did nine referrals involving voter
6  impersonations in four years strike you as a high
7  number?
8    A.  I don't think I had an opinion on that.  It
9  really -- it was the number.  I don't have an opinion on
10 whether it was high, low, or.  Taken out of context,
11 there's a -- you know -- I didn't have an opinion.
12   Q.  Did you ever form an opinion personally about
13 whether Voter ID fraud, in-person Voter ID fraud was a
14 big problem in Texas?
15         MS. HALPERN:  We will object and assert
16 the legislative privilege.  I'm going to allow the
17 witness to answer under seal.
18   A.  I think I might have already answered this
19 earlier, and I believe it was a problem and I -- the
20 level of which I don't know.  If there is voter fraud in
21 Texas, I think that's a problem that needs to be
22 addressed.
23   Q.  (By Ms. Rudd) And I think your testimony
24 earlier -- I'm remembering this now -- was that any
25 amount of in-person Voter ID fraud is a problem, in your

100

1  opinion?
2    A.  I think that's what I said, yes.
3    Q.  Okay.  Did you have communications with any
4  lobbyists regarding Senate Bill 14?
5         MS. HALPERN:  Object on the basis of
6  legislative privilege.  Based on the court's ruling, as
7  I understand it, I'm going to allow the witness to
8  answer under seal with the understanding that we are not
9  waiving privilege by so doing.
10   A.  Can I ask you to clarify lobbyist?  Is that
11 register lobbyists or people advocating on behalf of a
12 group?
13   Q.  (By Ms. Rudd) The way I would make that
14 distinction, and it may or may not be a fair
15 distinction, but for purposes of my questioning --
16   A.  Okay.
17   Q.  -- when I say lobbyist, I mean registered
18 lobbyist.
19   A.  Okay.
20   Q.  I'll also talk about other interests groups --
21   A.  Okay.
22   Q.  -- who might have been advocating for a
23 position.
24   A.  Okay.
25   Q.  So for now let's stick with registered

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

26 (Pages 101 to 104)

101

1  lobbyist.
2          Did you talk with any registered lobbyists
3  about SB 14?
4          MS. HALPERN:  Same objection.
5     A.  Not that I recall.
6     Q.  (By Ms. Rudd) Did you get visits with lobbyists
7  from time to time in Representative Harless's office
8  when you were chief of staff there?
9     A.  Yes.
10    Q.  And so is it your testimony that you just don't
11 recall any particular visits that involved SB 14?
12    A.  The lobby community was well aware that our
13 office was carrying SB 14, and the issue might have come
14 up.  I can't remember any specific conversation.
15    Q.  Did you -- do you recall receiving visits from
16 any lobbyists representing interests that were adverse
17 to SB 14?
18    A.  I'm sorry.  I'm -- lobbyists, registered
19 lobbyists or is or a?
20    Q.  For any -- you know, any company or group that
21 was --
22    A.  Interest like a -- like a special interest
23 group --
24    Q.  Exactly.
25    A.  -- for minority interests?  That type of --

102

1     Q.  Well, let's do it -- let's make it easier, okay
2  --
3     A.  In my mind --
4     Q.  -- because lobbyist, I mean, it really doesn't
5  matter so much whether a lobbyist was involved.  Let's
6  talk about communications that you had with groups who
7  were advocating for a particular interest --
8     A.  Okay.
9     Q.  -- a minority interest.
10    A.  Okay.
11    Q.  You met with several groups like that during
12 the legislative session about Senate Bill 14, correct?
13    A.  Correct.
14    Q.  You met with the Texas NAACP, correct?
15        MS. HALPERN:  Objection on the basis of
16 legislative privilege.  I'm going to let the witness
17 answer because we're under seal without waiving that
18 privilege.
19    A.  I don't recall a meeting with the NAACP.
20    Q.  (By Ms. Rudd) Okay.  Do you recall a meeting
21 with MALDEF?
22    A.  I believe I did.  It's been -- been quite some
23 time.  I believe there was a representative from a group
24 representing Hispanic interests.
25    Q.  And do you recall who that person was?  I

103

1  realize it's been a number of years.
2     A.  I don't.
3     Q.  Do you recall what those conversations might
4  have been about?
5         MS. HALPERN:  Objection, legislative
6  privilege.  Allowing because it's under seal, not
7  waiving privilege.
8     A.  I imagine they were expressing their -- their
9  concerns with the bill.
10    Q.  (By Ms. Rudd) Is it fair to say that you
11 received visits from various interest groups
12 representing interests that, you know, were opposed to
13 Senate Bill 14 during the 2011 legislative session?
14    A.  Yes.
15    Q.  And did any of those interest groups express
16 their concern that Senate Bill 14 would disenfranchise
17 voters and their constituencies?
18        MS. HALPERN:  Objection, legislative
19 privilege.  Allowing the witness to answer because we're
20 under seal, not waiving the privilege.
21    A.  I can't remember the specifics of their
22 communications, but I know that was a -- one of the
23 issues that came up in the debate, so I would believe
24 that was something that was communicated to our office.
25    Q.  (By Ms. Rudd) Do you recall receiving -- or

104

1  visiting with anybody representing racial minority
2  groups during the 2011 legislative session about Senate
3  Bill 14?
4         MS. HALPERN:  And when you use the word
5  "visit," you mean in person?
6         MS. RUDD:  I do.
7         MS. HALPERN:  Okay.  This is Texas after
8  all.
9         MS. RUDD:  Fair point.
10    A.  Other than the meeting that we discussed
11 earlier?
12    Q.  (By Ms. Rudd) Yes.
13    A.  With MALDEF.  I remember -- there was -- that's
14 the meeting I remember.  I don't recall other meetings.
15    Q.  You were aware during the 2011 legislative
16 session that there were a number of racial minority
17 groups who were opposed to SB 14, correct?
18    A.  There was testimony in the committee, so yes, I
19 was aware.
20    Q.  And during your meeting with MALDEF, there were
21 some concerns expressed by that group about Senate Bill
22 14, correct?
23    A.  I don't remember the specifics of that
24 conversation, so I'm -- I'm -- but I believe it had to
25 do with their concerns; otherwise, they wouldn't have

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

105

1  been coming by my office.
2  Q.  Right.  MALDEF didn't support SB 14, correct?
3  A.  I do not believe they did.
4  Q.  Okay.  Did you do anything to address the
5  concerns of those minority interest groups in connection
6  with Senate Bill 14?
7  A.  We felt that the bill had protections in place
8  to address their concerns.
9  Q.  Were those protections in place from the
10 beginning of the introduction of Senate Bill 14 in the
11 House or did you add additional protections as the bill
12 progressed through the House?
13 A.  There were amendments added in the -- on the
14 Senate -- on the House floor.  I would have to look at
15 the list of amendments to tell you which ones did what,
16 but there were changes made in the House, yes.
17 Q.  Okay.  We'll go through those amendments later
18 this afternoon.  I won't belabor those before lunch.
19 A.  Okay.
20 Q.  But can you tell me just as a general matter
21 whether you and your office, in conjunction with
22 Representative Harless, proactively pursued any
23 amendments or changes to SB 14 that would have addressed
24 some of the concerns that you were hearing from minority
25 interest groups?

---

106

1  A.  Can you go back on the time frame on that?  Was
2  it while the bill was in Committee?
3  Q.  Well, yeah.  I'm really talking about the time
4  frame after SB 14 was filed because that was the point
5  at which you had a lot of people coming in and, you
6  know, objecting to the bill --
7  A.  Okay.
8  Q.  -- and wanting to offer testimony in committee.
9  I assume that would have been the time that people
10 started visiting you in your offices about the bill.
11     So, to go back to my question, with that
12 sort of background, did you in conjunction with
13 Representative Harless, do anything to proactively
14 either, you know, amend the bill or make changes to the
15 bill to address some of the concerns you were hearing
16 from minority interest groups?
17 A.  When the bill was in committee, I know there
18 were changes made by a committee substitute.  I don't
19 have a copy of that document, so I don't -- probably
20 would need to see that to be able to tell you what the
21 changes were.
22 Q.  Did you ever discuss with Representative
23 Harless ways in which you could amend or change SB 14 to
24 address some of the concerns that were being voiced by
25 minority groups?

---

107

1      MS. HALPERN:  I'm going to assert
2  legislative privilege.  I'm going to allow the witness
3  to answer because we're under seal with the
4  understanding based on the court's direction that this
5  does not waive the privilege.
6  A.  We believed that the bill had protections in
7  place that would -- that would address the concerns that
8  were being raised.
9  Q.  Okay.  So is it fair to say that you didn't do
10 anything additional, I mean, you and your office, with
11 Representative Harless, given that you believe that
12 safeguards were in place in SB 14, Representative
13 Harless didn't pursue anything additional to deal with
14 some of the concerns being raised by minority interest
15 groups; is that right?
16 A.  In -- during the Floor debate, she accepted
17 amendments that I believe were seeking to address some
18 of those concerns.  So if -- when we get to that point,
19 I can go through those amendments, but without having
20 them in front of me, I can't say one way the other.
21     MS. HALPERN:  Counsel, is this a good time
22 break?
23     MS. RUDD:  It is.
24     MS. HALPERN:  And can you tell us how much
25 time she's used up?

---

108

1      THE COURT REPORTER:  2 hours and 33
2  minutes used thus far.
3      (Recess 12:33 p.m. to 1:45 p.m.)
4  Q.  (By Ms. Rudd)  Okay.  So before we took the
5  lunch break --
6  A.  Yes.
7  Q.  -- we were talking about various communications
8  that you had with interest groups about SB 14.  Do you
9  recall that?
10 A.  Yes.
11 Q.  And I just want to circle back on that briefly
12 to ask you about one particular interest group.  One
13 group you that you spoke to about SB 14 was Advocacy,
14 Inc.; is that right?
15 A.  Yes.
16 Q.  And that later became Disability Rights Texas,
17 correct?
18 A.  There was a name change there at some point.  I
19 think that's -- I've always worked with them as
20 Advocacy, Inc., but I do believe they changed their
21 name.
22 Q.  And the person you spoke with there was Jessica
23 Gomez.  Do you recall that?
24 A.  I don't recall her name but that sounds
25 familiar.

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

---

109

1    Q.  Do you recall anybody else in particular that
2  you spoke to at Advocacy, Inc.?
3    A.  No.
4         (Exhibit 7 marked for identification).
5    Q.  (By Ms. Rudd) Exhibit 7 is Bates numbered TX
6  7207, and this as an e-mail from Jessica Gomez to you on
7  February 25, 2011, correct?
8    A.  Yes.
9    Q.  And the subject line is 50 Percent VA
10  Disability and Social Security Disability, right?
11    A.  Yes.
12    Q.  Can you explain to me what was going on that
13  led to Mrs. Gomez sending you this e-mail?  And feel
14  free to read it over before you answer.
15    A.  Okay.
16         MS. HALPERN:  Please do.
17    A.  (Reading document.)
18         Okay.  This was an e-mail -- Ms. Gomez had
19  **visited my office as we were preparing for the committee**
20  **hearing on SB 14 with some -- she initially dropped by**
21  **my office as a resource and as -- offering herself as a**
22  **resource and as -- for those that are disabled.  We were**
23  **looking at one of the amendments which was added in the**
24  **Senate that had to do with an exemption for those that**
25  **are disabled, and I was asking for her help in -- in**

---

110

1  **suggestions on a standard for that exemption.**
2    Q.  Is having a disability exemption in Voter ID
3  legislation something that Representative Harless was
4  supportive of?
5    A.  Yes.
6    Q.  And do you know why that is?
7         MS. HALPERN:  Objection on the basis on
8  legislative privilege, notwithstanding that I will allow
9  the witness to answer because we're under seal and we've
10  been given guidance by court that that will not waive
11  the privilege.
12    A.  I -- I can't speak for her thoughts on the
13  **importance of that provision.**
14    Q.  (By Ms. Rudd) Did you have discussions with
15  Representative Harless about the disability exemption
16  under Senate Bill 14 at all?
17    A.  Yes.
18    Q.  What were this those discussions about?
19    A.  **The discussions at this point in time prior to**
20  **the committee hearing had to do with finding a standard**
21  **for that exemption.**
22    Q.  A --
23    A.  **A standard that could be used -- a standard way**
24  **to determine that somebody was in fact disabled.**
25    Q.  Okay.  So a standard way to identify a disabled

---

111

1  person who comes within the exemption?
2    A.  Yes.
3    Q.  And did you end up adopting the suggestions
4  that Ms. Gomez recommended with respect to the
5  disability -- the -- how to define someone as disabled?
6  And just to be clear, I don't know the answer because I
7  haven't looked that the particular exemption in detail
8  in SB 14.  If you don't recall off the top of your head,
9  that's fine.
10         MS. HALPERN:  You might refer to the bill
11  in the stack right in front of you.
12    A.  Yeah, let me.  **It appears that the suggestion**
13  **by Ms. Gomez was incorporated into the language of**
14  **Senate Bill 14.  It might not be exact but the basic**
15  **suggestion she had does appear to be within Senate Bill**
16  **14.**
17    Q.  And can you refer to me what section of Senate
18  Bill 14 you're referring to specifically?
19    A.  **It would be Section 1, Page 1.  Section 1 of**
20  **the bill.**
21    Q.  Okay.  And that would be Section 1 A and B?
22    A.  **Yes.  Section 13.002, the election code.  1 A**
23  **and B.**
24    Q.  Okay.  And if you look down to the last
25  paragraph of Ms. Gomez's e-mail, she says, "I'm also a

---

112

1  little worried that some members might have a problem in
2  the affidavit in place of providing documentation."  Do
3  you know what she's talking about there?
4    A.  **I don't recall what that was referring to.**
5    Q.  Does the -- does SB 14 provide that a voter can
6  provide an affidavit of disability in lieu of providing
7  the documents that you've just pointed out, that you
8  know of?
9    A.  **Not that I'm aware of.  The disability**
10  **exemption requires the written documentation described**
11  **in the Sections 1 A and B.**
12    Q.  Okay.  She goes on to ask if you've talked to
13  other committee members about the disability exemption.
14  Did you talk to other committee members about the
15  exemption at this time?
16    A.  **Not that I recall.**
17    Q.  And then finally she says, "I have a little bit
18  of a sense of where the opposition might come from since
19  I talked with many members' offices about the exemption
20  this week.  Call me if you'd like to discuss."
21    A.  **Uh-huh.**
22    Q.  Did you ever discuss with Ms. Gomez what kind
23  of opposition might be lodged against a disability
24  exemption?
25    A.  **I believe we did have a conversation about the**

---

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

---

113

1  opposition to the disability exemption.
2      Q.  And what opposition was there to that
3  exemption?
4          MS. HALPERN:  I'm going to object on the
5  basis of legislative privilege, which also extends to
6  conversations by legislators and their staffs with
7  interest groups.  I'm going to allow the witness to
8  answer the question under seal with the understanding
9  based on guidance from the court that doing so does not
10 waive the privilege.
11     A.  This -- the disability exemption that was
12 placed on the Senate floor through an amendment, there
13 were -- we were receiving feedback from constituents and
14 others who had concerns about the exemption, mainly the
15 language as the bill came over from the Senate was too
16 broad and would create a loophole in the bill.
17     Q.  (By Ms. Rudd)  And so you received commentary
18 from constituents that this billing which needs to be
19 narrowed so that people couldn't take advantage of the
20 exemptions that weren't really disabled?  Is that sort
21 of a gist of the commentary that you were receiving?
22     A.  That's correct.
23     Q.  Okay.  This is an example of you working with
24 one interest group to craft language in SB 14 that would
25 address some of the concerns of that interest group,

---

114

1  correct?
2      A.  Yes.  This -- this disability exemption,
3  because it was placed on -- through a floor amendment,
4  needed to be corrected, and I sought Ms. Gomez's
5  assistance in that.
6      Q.  To your recollection, did other interest groups
7  like, for example, the Texas NAACP or MALC, come to you
8  with similar suggestions about language for SB 14 at any
9  time during the consideration of that legislation?
10     A.  I cannot recall a specific language suggestion
11 that was brought to me.  I can't recall.
12     Q.  Did you personally reach out to any other
13 interest groups besides Advocacy, Inc. to ask for their
14 input regarding SB 14?
15     A.  Not that I can recall.
16     Q.  Let's talk about amendments.  There were quite
17 a few amendments that were proposed for SB 14, correct?
18     A.  Correct.
19     Q.  More than 60, as I recall; is that about right?
20     A.  That sounds correct.
21     Q.  Did you speak to Representative Harless about
22 any of those amendments?
23         MS. HALPERN:  Objection, vague time frame.
24     Q.  (By Ms. Rudd)  During the time that SB 14 was
25 being considered by the House.

---

115

1      A.  I was not present on the -- the -- I was not
2  present during the debate on the House floor.  I did --
3  believe I had a conversation with her when there was a
4  break over some of the amendments that were offered.
5      Q.  Do you recall, just generally speaking, what
6  those amendments dealt with or proposed?
7      A.  Can you clarify?  The conversations I had with
8  Representative Harless and the amendments?
9      Q.  Yeah.  I mean, look, there were a ton of
10 amendments --
11     A.  Yes.
12     Q.  -- and we'll go through a lot of them
13 specifically, but just as you sit here today, are there
14 certain amendments that you remember discussing with
15 Representative Harless in particular just in terms of
16 subject matter.  I don't expect you to remember
17 amendment numbers.
18     A.  I can't recall without seeing the amendments.
19         (Exhibit 8 marked for identification.)
20     Q.  (By Ms. Rudd)  Do you recognize what's been
21 marked as Beuck Exhibit 8?
22     A.  Yes.
23     Q.  What is that document?
24     A.  This appears to be the House Journal from March
25 23rd, I believe the day that Senate Bill 14 was debated.

---

116

1      Q.  If you will turn with me to -- I'm looking in
2  the upper right-hand corner -- well, the upper corner of
3  these pages, Page 959.  I want to look at Amendment
4  Number 3.
5      A.  Yes.
6      Q.  Amendment Number 3 was proposed by
7  Representative Giddings and Bonnen, correct?
8      A.  Correct.
9      Q.  Giddings is a Democrat; is that right?
10     A.  Yes.
11     Q.  And Bonnen is a Republican?
12     A.  Yes.
13     Q.  And if you look down to Subsection 1 of
14 Amendment 3 -- I'm just going to summarize, but feel
15 free to read it.  This amendment would have allowed a
16 voter to execute an affidavit under penalty of perjury
17 asserting that their proof of identification had been
18 stolen and to present an official copy of the police
19 report in order to vote, correct?
20     A.  Yes.
21     Q.  And it says below -- at the bottom of that
22 page -- that Amendment Number 3 was adopted; is that
23 right?
24     A.  That's -- yes, it says Amendment Number 3 was
25 adopted, correct.

---

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

---

117

1    Q.  Did you have any discussions with
2  Representative Harless about this particular amendment?
3    **A.  Can you specify the time frame on that?**
4  **Discussions --**
5    Q.  Well, I --
6    **A.  -- while the debate -- go ahead.**
7    Q.  Sorry.  I want to go broad at this point.
8    **A.  Okay.**
9    Q.  Did you discuss at any time an amendment
10 involving allowing a person to execute an affidavit that
11 their ID was stolen and being able to vote with the
12 preface of that affidavit and a police report?
13        MS. HALPERN:  Let me just clarify:  Is
14 your question broad enough to encompass after the bill
15 was already passed?  I mean, if four months after the
16 bill was over with and he still worked for her and they
17 had such a conversation, are you trying to capture that?
18        MS. RUDD:  No.  I'll go to that next.  Up
19 until the time of the bill's passage is what I'm talking
20 about now.
21        MS. HALPERN:  Okay.
22        MS. RUDD:  But thank you for that.
23    **A.  Yes, we did have a discussion about this.**
24    Q.  (By Ms. Rudd) And can you tell me what that
25 discussion was?

---

118

1        MS. HALPERN:  Object on the grounds of
2  legislative privilege.  Allow the witness to answer
3  because we're under seal and the privilege is not being
4  waived thereby.
5    **A.  I don't remember the substance of the**
6  **conversation, but all the amendments that were adopted**
7  **would have been most likely discussed.**
8    Q.  (By Ms. Rudd) And do you remember discussing
9  this particular amendment with Representative Harless as
10 opposed to other amendments generally?
11        MS. HALPERN:  Same objection.
12    **A.  Amendment Number 3?**
13    Q.  (By Ms. Rudd) Yes.
14    **A.  I don't remember my conversation regarding**
15 **Amendment Number 3.**
16    Q.  Do you remember whether Representative Harless
17 voted in favor of adopting Amendment Number 3?
18    **A.  I do not.**
19    Q.  Amendment Number 3 was not included in the
20 legislation that ultimately passed.  Do you have any
21 idea why that was or when it was removed?
22    **A.  I don't remember the reasoning why it --**
23        MS. HALPERN:  The question is not
24 reasoning, it's when.
25    **A.  When?**

---

119

1    Q.  (By Ms. Rudd) Well, I did ask why.  Let's go
2  with why first.  Do you know why it was removed?
3    **A.  No, I do not.**
4    Q.  Do you have any knowledge of when the amendment
5  was removed from the bill that ultimately passed?
6    **A.  If the amendment was adopted by the House, the**
7  **Conference Committee would have removed the amendment.**
8    Q.  Okay.  That's what I would have assumed.  I
9  just wanted to make sure that we were on the same page.
10        And did you have any discussions with
11 Representative Harless prior to the Conference Committee
12 meeting about removing this particular amendment from SB
13 14?
14    **A.  I don't recall specifics on this amendment.**
15    Q.  Okay.  If you'll turn with me to Page 966 of
16 that exhibit, I want to look at Amendment Number 11.
17 Amendment Number 11 was proposed by Representative
18 Veasey, correct?
19    **A.  Correct.**
20    Q.  And he's a Democrat as well, correct?
21    **A.  Correct.**
22    Q.  And that amendment -- I'm looking over at the
23 next page, 967 -- would have allowed a person to vote
24 who didn't have an ID by executing an affidavit under
25 penalty of perjury stating that the voter is the same

---

120

1  person named on the list of registered voters for the
2  precinct, correct?
3    **A.  Yes.**
4    Q.  And Representative Harless moved to table
5  Amendment Number 11, correct?
6    **A.  Yes.**
7    Q.  And to table an amendment means to suspend its
8  consideration, correct?
9    **A.  Yes.**
10    Q.  And that has the effect of really just killing
11 the amendment, correct?
12    **A.  Yes.**
13    Q.  Do you know why Representative Harless wanted
14 to table Amendment Number 11?
15        MS. HALPERN:  Objection, invades the
16 legislative privilege.  I'll allow the witness to answer
17 because we're under seal and not waving the privilege.
18    **A.  I do not know why Representative Harless moved**
19 **to table.**
20    Q.  (By Ms. Rudd) Do you recall any conversations
21 that you had with Representative Harless about the
22 subject of this particular amendment prior to SB 14
23 passage?
24    **A.  No, I do not recall conversations.**
25    Q.  Don't get rid of that document.  I want to go

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

121

1  back to one point very quickly.
2      A.  Okay.
3          (Exhibit 9 marked for identification.)
4      Q.  (By Ms. Rudd) Exhibit 9 is a document Bates
5  numbered TX 4912 through 4913, and this an e-mail string
6  between you and someone at DPS Government Relations,
7  correct?
8      A.  Yes.
9      Q.  The bottom e-mail from you on March 22, 2011 --
10 so just one day before SB 1 was heard, you sent a e-mail
11 to DPS Government Relations --
12     A.  Uh-huh.
13     Q.  -- asking about how long it would take to get a
14 DPS photo ID if your driver's license is stolen,
15 correct?
16     A.  Yes.
17     Q.  Why did you send that e-mail?  It was Amendment
18 3 that we were looking at.
19     A.  Okay.  I don't know what the context of this
20 e-mail, if it was referring to the amendment that was
21 indeed offered by Representative Giddings or a potential
22 amendment that was going to be offered by Representative
23 Giddings.  So, but I think the subject matter would be a
24 concern about having a stolen identification, so I was
25 looking into the -- the possibility of the situation

---

122

1  where somebody's identification was stolen.  A concern
2  that was raised by Representative Giddings.
3      Q.  Okay.  And that was something -- is that
4  something that you took on independently or were you
5  asked by Representative Harless to look into that issue,
6  if you recall?
7      A.  I don't recall.
8      Q.  In any event, the response that you get from
9  DPS Government Relations is that they do issue temporary
10 driver's license or ID immediately to an individual that
11 visits the driver's license office and presents the
12 required documents, but that that temporary ID doesn't
13 have the security attributes that an actual card would
14 have, correct?
15         MS. HALPERN:  Counsel, the language you
16 were reading says "temporary receipt."
17         MS. RUDD:  Sorry.
18         MS. HALPERN:  I think it's a piece of
19 paper.
20     Q.  (By Ms. Rudd) I think you do receive a piece of
21 paper when you get temporary ID, and that wouldn't be
22 the same thing as having physical card, is that your
23 understanding from this e-mail?
24     A.  Yes.
25     Q.  And then in the last paragraph, it says, "As to

---

123

1  whether a temporary driver's license or ID would be
2  acceptable for voting purposes, that will depend on the
3  legislative intent."  Did this give you the answer that
4  you were looking for in sending your initial e-mail to
5  the DPS Government Relations office?
6      A.  The context of my original e-mail, I don't
7  remember if it was this amendment or a different
8  language, but it appears they did answer my question,
9  and.
10     Q.  Well, you follow up here and ask whether the
11 temporary ID or driver's license would have a photo,
12 correct?
13     A.  Yes.
14     Q.  Did you get an answer to that question?
15     A.  I don't recall.  I don't recall.
16     Q.  And ultimately with Amendment 3, that amendment
17 was taken off of Senate Bill 14, correct?  In Conference
18 Committee is what we just discussed.
19     A.  I believe so.
20     Q.  And was it the position of the office you
21 worked in, Representative Harless's office, that unless
22 a temporary form of ID had a photo on it, that it
23 shouldn't meet the prerequisites of Senate Bill 14?
24     A.  The intent behind the bill was for photo
25 identification, so I had -- I don't remember the

---

124

1  specifics but that would -- to my personal knowledge,
2  that does seem to be -- if the temporary ID does not
3  have a photo, then that...
4      Q.  Then that wouldn't have been something that
5  comported with what your office was trying to do --
6      A.  Correct.
7      Q.  -- with respect to the legislation?
8      A.  (Witness nods head yes.)
9      Q.  Okay.  Okay.  So back to Amendment Number 11,
10 which was on Page 966 and 967 of that House Journal.
11 Ultimately Representative Harless's motion to table
12 Amendment Number 11 prevailed, correct?
13     A.  Yes.
14     Q.  And that was not made part of the final SB 14,
15 correct?
16     A.  Correct.
17     Q.  If you turn to Page 978, on the top of Page
18 978, there's an Amendment Number 21.  Do you see that?
19     A.  I do.
20     Q.  And Amendment Number 21 would have allowed a
21 person seeking to vote to present a valid employee
22 identification card that contains the person's
23 photograph and was issued by an employer of the person
24 in the ordinary course of the employer's business,
25 correct?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

---

125

1   A.  Yes.
2   Q.  And again, Representative Harless moved to
3   table that amendment, correct?
4   A.  Correct.
5   Q.  Which had the effect of killing that amendment,
6   correct?
7   A.  Yes.
8   Q.  And the motion to table prevailed, correct?
9   A.  Correct.
10   Q.  Representative Harless voted for her own
11   motion, yes?
12   A.  Yes.
13   Q.  Did you have any discussions with
14   representative Harless about this particular amendment
15   or the subject matter of this particular amendment?
16   **A.  This was an issue that had been brought up in**
17   **committee and I believe on the Senate floor, so it was**
18   **an issue out there in the debate, so yes, we did have a**
19   **conversation about this.**
20   Q.  Okay.  Aside from the public debate, you had a
21   conversation with Representative Harless about this
22   amendment?
23   **A.  Not this particular amendment, the issue.  The**
24   **issue of employer's identification was something we had**
25   **discussed, but I don't believe I had a conversation**

---

126

1   regarding this particular amendment.
2   Q.  Okay, fair enough.  What did you and
3   Representative Harless discuss with respect to employer
4   photo identification?
5         MS. HALPERN:  Object on the basis of
6   legislative privilege and will allow -- we will allow
7   the witness to answer the question under seal with the
8   understanding from the advisory by the court that that
9   will not constitute a waiver of the privilege.
10   **A.  The -- generally speaking, the conversation**
11   **would have been around the security of employer's**
12   **identification cards, the security features and various**
13   **forms of these cards, and would they be easily**
14   **recognized by election workers.**
15   Q.  And was it -- did Representative Harless
16   express to you her belief that employee identification
17   cards of this type wouldn't be particularly secure or
18   easily recognizable as you mentioned?
19   **A.  I don't recall the specific statement by her**
20   **regarding that.  She moved to table the amendment so**
21   **that would lead me to believe that they didn't**
22   **believe they were.**
23   Q.  So you anticipated my next question.  She moved
24   to table the amendment and that motion prevailed,
25   correct?

---

127

1   A.  Yes.
2   Q.  And she voted for that motion, in favor of that
3   motion, correct?
4   A.  Yes.
5   Q.  And then if you look at the next page, 979.
6   I'm trying to go through these pretty quickly.  979
7   contains Amendment Number 23.  Do you see that?
8   A.  Yes.
9   Q.  Representative Dutton, was Representative
10   Dutton a Democrat or a Republican?
11   A.  He's a Democrat.
12   Q.  Okay.  Amendment Number 23 would have allowed a
13   voter to present a student identification card issued by
14   a public or private high school or institution of higher
15   education that contained the person's photograph,
16   correct?
17   A.  Correct.
18   Q.  Did you discuss the subject matter of this
19   amendment, that is, student IDs being an acceptable form
20   of ID with Representative Harless at any time prior to
21   SB 14's passage?
22   **A.  Yes.  Along the same lines of employer's**
23   **identification, this was an issue that was being**
24   **discussed during the debate in the Senate and in the**
25   **House.  And yes, we did have a conversation.**

---

128

1   Q.  And was Representative Harless in favor of
2   allowing student IDs to be used as a form of photo
3   indication for voting purposes?
4         MS. HALPERN:  Object on the basis of
5   legislative privilege.
6   **A.  It appears that she does not support it because**
7   **she's voting in favor of the motion to table the**
8   **amendment, so.**
9   Q.  (By Ms. Rudd) Do you know whether she testified
10   about any of these forms of ID that we've discussed so
11   far, on the public record, and whether she supported or
12   didn't support those forms of ID?
13   A.  I don't recall.
14   Q.  Okay.  So Representative Phillips is a
15   Republican, correct?
16   A.  Yes.
17   Q.  Moved to table this amendment, right?
18   A.  Yes.
19   Q.  And as you just pointed out, Representative
20   Harless voted to table the amendment and that motion
21   carried, correct?
22   A.  Correct.
23   Q.  Okay.  If you turn to the next page, Amendment
24   24.  Amendment 24 is an amendment offered by
25   Representative Martinez Fischer, also a Democrat,

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

129

1  correct?
2  **A.  That's correct.**
3  Q.  And that amendment would have allowed a voter
4  to present a valid identification card that contains a
5  person's photograph and is issued by the State, correct?
6  **A.  Correct.**
7  Q.  Did you have any particular discussions with
8  Representative Harless about the subject matter of this
9  amendment?
10       MS. HALPERN:  Objection, legislative
11 privilege.
12  **A.  I don't recall a specific conversation -- I**
13 **don't recall a conversation on this specific amendment.**
14  Q.  (By Ms. Rudd) Representative Phillips moved to
15 table that amendment, correct?
16  **A.  Yes.**
17  Q.  And again, representative Phillips was a
18 Republican, right?
19  **A.  Correct.**
20  Q.  And Representative Harless voted in favor of
21 that motion, correct?
22  **A.  Yes.**
23  Q.  And the motion was tabled, right?
24  **A.  Correct.**
25  Q.  If you look down at the bottom of that page,

---

130

1  Amendment Number 25, is an amendment offered by
2  Representative Hernandez Luna, who is Democrat, correct?
3  **A.  Yes.**
4  Q.  And if you turn to the next page, Amendment
5  Number 25 would have allowed a voter to present a valid
6  identification card containing the person's photograph
7  issued by an agency or institution of the federal
8  government or an agency, institution or political
9  subdivision of the State, correct?
10  **A.  Yes.**
11  Q.  Again, Republican Representative Phillips moved
12 to table that amendment, correct?
13  **A.  Yes.**
14  Q.  And Representative Harless voted in favor of
15 the motion?
16  **A.  Yes.**
17  Q.  And the motion was tabled, right?
18  **A.  Right.**
19  Q.  Did you have any discussions with
20 Representative Harless's about the subject matter of
21 this particular amendment?
22  **A.  I'm not -- I did not have a conversation about**
23 **this particular amendment.  The issue on -- in a broader**
24 **sense, yes.  This was an issue that was part of the**
25 **debate, a government issued ID.**

---

131

1  Q.  And what discussions did you have with
2  Representative Harless about the use of government
3  issued ID as a form of photo ID?
4  **A.  I don't recall a specific conversation.  The**
5  **debate around these and the argument had to do with the**
6  **security and readily identifiable nature of these forms**
7  **of identification, just in a general sense.  I don't**
8  **recall a specific conversation.**
9  Q.  Okay.  Most of these amendments that we've been
10 going through deal with amendments -- deal with
11 proposals to allow additional forms of photo ID under
12 the -- under Senate Bill 14, correct?
13  **A.  Yes.**
14  Q.  And I've heard you say a couple of times, so
15 I'm hoping I can just summarize it and we can move on
16 that:  Most of the conversation you would have had with
17 Representative Harless would have had to do with how
18 secure these various forms of proposed IDs would have
19 been in terms of identifying a person; is that correct?
20  **A.  Yes.  And in addition to the security of the**
21 **form of identification and how standard --**
22 **standardization of that form of identification, how**
23 **easily recognizable that piece of identification would**
24 **be to an election worker.  Those were the concerns with**
25 **the other forms that were proposed.**

---

132

1  Q.  And those were concerns that -- that
2  Representative Harless had sort of across the board with
3  the alternative forms of ID; is that fair to say?
4  **A.  Yes.**
5  Q.  Other than those two concerns that you've just
6  talked about, so security and how easily recognizable
7  because of standardization issues these forms of ID
8  were, were there any other issues that you discussed
9  with Representative Harless regarding any of the forms
10 of ID we've just gone through?
11  **A.  I can't recall a specific conversation other**
12 **than -- than those I mentioned.**
13  Q.  Okay.  Do you have in your mind any other
14 concern that might have been aired or that you had in
15 your mind regarding these alternative forms of ID, other
16 than the two things you mentioned?
17       MS. HALPERN:  Let me just make sure I
18 understand your question.  You're asking about student
19 IDs and employer IDs -- you're asking him about any
20 concerns he has about any kind of ID essentially?
21  Q.  (By Ms. Rudd) Well, I just want to know if
22 there were other things that, you know, either you
23 raised as concerns or that were discussed, other than
24 this whole notion of security and standardization,
25 easily recognizable IDs at the polling place.  If there

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

133

1  were any other concerns about all these alternate forms
2  of IDs --
3        MS. HALPERN:  That they discussed?
4  Because I thought I heard you say that he has in his
5  mind --
6        MS. RUDD:  Well, I think I --
7        MS. HALPERN:  -- you know, and that's
8  telling him to give you a laundry list.  That's why I
9  want to know.
10       MS. RUDD:  Well -- no, no, no.  No, that's
11 fine.
12       Q.  (By Ms. Rudd) Okay.  Let's start with had --
13 did you have any discussions about any other concerns
14 regarding these forms of ID other than the two things
15 you mentioned?
16       **A.  The standardization of the form and the**
17 **security of the -- sorry, excuse me.**
18           **The standardization of the identification**
19 **and the security of the identification, that was the**
20 **general concern with these alternate identification**
21 **proposals.  On a -- on a case-by-case basis with these**
22 **other ones, there might have been other concerns, I**
23 **can't speak to that though without getting into the**
24 **individual forms of identification.**
25       Q.  Okay.  So what we'll do going forward is I'm

134

1  going to assume two main concerns that you vocalized
2  apply across the board to all these other kinds of IDs
3  and you can correct me if that isn't the case.
4        **A.  Correct.**
5        Q.  But from now on I'm just going to ask you if
6  there's anything else that, you know, was discussed or
7  that you were concerned about with the forms of ID going
8  forward.  We're just going to try to truncate the
9  process a little bit.
10       **A.  Okay.**
11       Q.  So if you'll look with me now at Amendment
12 Number 30 on Page 984, the very bottom of that page.  At
13 the bottom of that page, it says Representative Gonzalez
14 proposed Amendment Number 30, correct?
15       **A.  Yes.**
16       Q.  Do you know which Representative Gonzalez that
17 would have been?
18       **A.  That was the representative from the El Paso**
19 **area.**
20       Q.  Would that be Naomi?
21       **A.  Yes, correct.**
22       Q.  And she was a Democrat as well, correct?
23       **A.  Correct.**
24       Q.  And that amendment would have allowed a voter
25 to present a valid identification card containing the

135

1  person's photograph issued by a tribal organization,
2  correct?
3        **A.  Yes.**
4        Q.  Did you look into, at any point, the issue of
5  allowing tribal IDs to be presented at the polls?
6        **A.  That was an issue that we did look into after**
7  **the -- the amendment was adopted on the House floor and**
8  **we -- we did look into that issue.**
9        Q.  Do you know whether Representative Harless
10 voted in favor of that particular amendment?  It's not
11 here on the record.
12       **A.  I don't recall the vote.  If there was not a**
13 **roll call vote made, then it was done by a voice vote,**
14 **so.  I can't tell from the record if she voted in favor**
15 **of it or not.**
16       Q.  Do you recall discussing this particular
17 amendment with Representative Harless at any point prior
18 to the passage of SB 14?
19       **A.  Yes.**
20       Q.  What were those discussions about?
21           MS. HALPERN:  Object on the basis of
22 legislative privilege.  Direct the witness to answer
23 under seal with the understanding that based on the
24 admonition by the court, this will not constitute a
25 waiver of the privilege.

136

1           Can I have the question read back, please.
2           MS. RUDD:  That I too?
3           (Requested portion was read back by the
4  court reporter.)
5           MS. HALPERN:  Thank you.
6        **A.  I believe the discussions centered around the**
7  **standardization of that form of identification and the**
8  **numbers in which that identification was -- was an issue**
9  **for, the population of tribal -- tribal residents or**
10 **voters who were within a tribal area.**
11       Q.  (By Ms. Rudd) Okay.  So you were looking into
12 how many people in the State of Texas actually would
13 have a form of tribal ID; is that correct?
14       **A.  Correct.**
15       Q.  Okay.  What was the -- did you actually
16 research that issue?
17       **A.  Yes.**
18       Q.  And how did you research that issue?
19       **A.  I believe I researched what an actual tribal**
20 **identification card looked like and if those were indeed**
21 **a standard form.  In addition, I researched the tribal**
22 **populations within -- within Texas.**
23       Q.  Okay.  With respect to researching what a
24 tribal ID looks like, did you conclude that there was or
25 wasn't a standard form of tribal ID?

COLBY BEUCK                                            6/20/2014
CONFIDENTIAL TRANSCRIPT

---

137

1    A.   The research that I conducted, I was not -- I
2  did not conclude that there was -- sorry -- I did not
3  find that there was a standard identification for a
4  tribal -- tribal identification.
5    Q.   There are three federally recognized tribes in
6  Texas; is that correct, do you know?  Google.
7    A.   I -- I don't know.  I'll take your word for it.
8    Q.   Okay.  I mean, you don't know.  Did you
9  research how many federally recognized tribes --
10    A.   Yes, yes.
11    Q.   Okay.  You just don't recall a number?
12    A.   I don't recall right now, correct.
13    Q.   And did the forms of ID used by those tribes
14  differ from tribe to tribe, if you recall?
15    A.   I don't recall the specifics with that
16  research.
17    Q.   Okay.  But in any event, you concluded that
18  there wasn't a standardized form of tribal ID in Texas;
19  is that correct?
20        MR. SCOTT:  Objection, form, vague.  I
21  just -- for clarification:  There may be three home
22  tribes Like the Alabama-Coushatta, Tigua, but I think
23  when you talk about the Apache or the Comanche or the
24  Cherokee, I think there's -- any recognized tribe, there
25  may be members of those tribes in our state.

---

138

1        MS. RUDD:  That's a fair point, John.
2        MR. SCOTT:  Given that my wife's one, I
3  throw that out.
4    Q.   (By Ms. Rudd) Okay.  Let me ask you this then
5  and I will back up just slightly.  When you researched
6  the issue of whether there were tribal IDs that came in
7  a standardized form, were you looking at just residence
8  of Texas with tribal ID or were you looking broader than
9  that at any tribes exiting in the United States that
10  might have membership in Texas?
11    A.   My search was beyond Texas to other -- other
12  tribes outside of Texas.
13    Q.   How did you go about researching that issue,
14  more specifically?  Did you go and ask tribe members to
15  look at their IDs?  I mean, what did you do, if you
16  recall?  I know it's been several years now.
17    A.   I recall asking Representative Gonzalez's
18  office for information on -- on the issue.  I recall
19  contacting a State agency for information on the
20  populations of the tribes in Texas.
21    Q.   Did Representative Gonzalez provide you with
22  any information about the types of tribal IDs that
23  residents of Texas might carry?
24    A.   I believe they did.  I cannot recall the
25  specifics of that information though.

---

139

1    Q.   And then in terms of the tribal population of
2  Texas, did you get any sort of definitive idea of what
3  the tribal population in Texas is?
4    A.   I did receive information from the agency that
5  I requested population information from.  I don't recall
6  specifics of that information.
7    Q.   Why was population data important to you in
8  your research about the possibility of using tribal IDs?
9    A.   In an attempt to determine how big of a
10  population this would affect.
11    Q.   So let me ask you this:  If it turned out the
12  population was extremely large, would that have swayed
13  you in one direction or another about whether this was a
14  good amendment?
15    A.   It would have an impact on the decision, I
16  believe so.  I can't speak for how Representative
17  Harless would feel, but yes.
18        MS. HALPERN:  Counsel, before you ask the
19  next question, we've been going again for an hour and I
20  would like to take a break.
21        MS. RUDD:  Okay.  Let me ask two more
22  questions and then we'll go off the record.
23        MS. HALPERN:  Okay.
24    Q.   (By Ms. Rudd) Did you conclude that the tribal
25  population of Texas is a small population, a big

---

140

1  population?  Do you have any sense of kind of what your
2  view of the size of that population in Texas was after
3  doing this research?
4    A.   I don't recall my conclusion.  The information
5  that I gathered I remember that the forms did not have a
6  standard.  They were not standard -- I did not feel that
7  they were standardized, and -- but I don't remember the
8  conclusion on the population.
9    Q.   Okay.  Was the standardization of the form more
10  important than how many people it might effect?
11    A.   I didn't have an opinion either way on that.  I
12  was gathering the information.
13    Q.   Okay.  So you didn't formulate an opinion about
14  how Representative Harless might view the particular
15  amendment after doing your research?
16    A.   Not that I recall.
17    Q.   Okay.
18        MS. RUDD:  We can go off the record.
19        (Recess from 2:35 p.m. to 2:51 p.m.)
20    Q.   (By Ms. Rudd) So we're going speed through this
21  now.
22    A.   Okay.
23    Q.   Ready?
24    A.   Let's do it.
25    Q.   Okay.  Before the break we were talking about

---

COLBY BEUCK                                             6/20/2014
CONFIDENTIAL TRANSCRIPT

141

1   some of the concerns that Representative Harless had
2   about the various forms of alternate photo ID proposed
3   through some of the amendments we've been looking at.
4   Do you recall that?
5       A.  Yes.
6       Q.  And you mentioned two things:  One is that
7   there was a concern that some of these forms of ID
8   weren't standardized correct?
9       A.  Correct.
10      Q.  Can you tell me what you mean by that,
11  specifically?  Standardized can have a lot of meanings,
12  so do you have a sense of what you mean by the term
13  standardized?
14      A.  Readily identifiable by someone, a uniform
15  appearance in the identification, easily recognized.
16      Q.  Okay.  So just to give an example, I have a
17  form of Texas ID, a driver's license, that I don't think
18  looks like anybody's driver's license anymore because I
19  for some reason have retained the old form of the Texas
20  driver's license.  Would a difference like that, just
21  looking at the face of a photo ID make it not
22  standardized, in your opinion?
23          MR. SCOTT:  Objection, form, vague.
24          MS. HALPERN:  Do want you to show us your
25  driver's license?  ]

142

1           MS. RUDD:  It's really old, not expired.
2       A.  Because all driver's licenses were issued that
3   way at the time, I would consider that a standard form,
4   even though it might not look like the one that is
5   currently being -- being issued, but.
6       Q.  (By Ms. Rudd) Okay.  So facial discrepancies
7   don't necessarily make something nonstandardized, in
8   your mind?
9       A.  It would kind of depend on a case-by-case kind
10  of situation with each -- each form of identification.
11      Q.  Okay.  Well, let's use an example something
12  that's not part of Senate Bill 14, which is student ID.
13      A.  Yes.
14      Q.  Student populations tend to be centered around
15  a particular institution of learning, correct?  So U.T.
16  students are all kind of, you know -- U.T. is in the
17  middle of Austin, people go to the U.T., get a U.T. ID,
18  correct?
19      A.  Yes.
20      Q.  Do you know whether U.T. IDs change from year
21  to year in terms of their appearance?
22      A.  I don't know.
23      Q.  I don't either.  Would a change in appearance
24  from year to year when it comes to a student ID of the
25  University of Texas make that ID nonstandardized, in

143

1   your mind?
2       A.  Nonstandarized student ID, in my mind, would
3   be a difference between University of Texas, the
4   University of Texas-El Paso, the University of -- across
5   various campuses, you're going to have different
6   identifications.  In my mind, that would be a
7   nonstandard form of identification.
8       Q.  Most of the students who live in Austin and go
9   to U.T. are going to be going to polling places near
10  where they live, correct?
11      A.  Yes.
12      Q.  And one of the things you mentioned is that the
13  problem with standardization is that IDs might not be
14  easily recognizable to poll workers, correct?  Election
15  workers?
16      A.  Yes.
17      Q.  Is it your view that in a city like Austin,
18  where U.T. is the predominant institution of higher
19  learning, poll workers would have difficulty recognizing
20  a U.T. student ID?
21          MS. HALPERN:  Objection, assumes facts not
22  in evidence.
23          MR. SCOTT:  Objection, form, foundation.
24          MS. RUDD:  Arthur, you want to jump in?
25          MR. SCOTT:  He doesn't have anybody

144

1   separate he represents.  (Laughing.)
2       A.  The students in Austin would use -- would -- an
3   election worker in Austin might recognize a student ID,
4   but what we were trying do is craft legislation for the
5   entire state.  So while that might be the case here in
6   Austin, it wouldn't be the case in Dalhart, Texas, or
7   elsewhere, where they might not recognize that form of
8   identification.
9       Q.  (By Ms. Rudd) Did you actually interview any
10  election workers anywhere in the state of Texas about
11  what forms of identification would be easily
12  recognizable to them, prior to passage of SB 14?
13      A.  I don't believe I did personally.  There was
14  testimony I believe in committee either in the House or
15  Senate regarding that issue.
16      Q.  Do you recall what specific forms of ID that
17  testimony dealt with?
18      A.  No, I do not recall.
19      Q.  Did you personally formulate in your mind any
20  criteria for determining whether a particular form of ID
21  would be standard for purposes of being acceptable under
22  SB 14?
23      A.  The forms contained in the bill I believe met
24  that criteria.  The proposed ones on a case-by-case
25  basis were deemed not have been acceptable standardized

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

145

1  forms.
2      Q.  I understand that.  What I want to know is
3  whether in your mind you came up with any form of
4  criteria for evaluating for purposes of talking to
5  Representative Harless or formulating a position on some
6  of these amendments, whether you ever formulated -- let
7  me just strike that whole thing.  I just got jibberish.
8          MS. HALPERN:  Thank you.
9      Q.  (By Ms. Rudd) Did you formulate any form of the
10 criteria yourself in evaluating the various forms of
11 proposed ID to determine whether those IDs were
12 standardized?
13     A.  Not that I can recall.
14     Q.  Okay.  Did you ever discuss any criteria for
15 making that judgment with Representative Harless?
16     A.  Those decisions I believe were made on an
17 identification-by-identification basis, so I -- I don't
18 recall any specific criteria.
19     Q.  Okay.  Going back to the House Journal we were
20 talking before the break about, Amendment 30 on Page
21 984, that amendment although adopted on this date, was
22 ultimately removed from the bill, correct?
23     A.  Yes.
24     Q.  And I may have asked this, so I'm sorry if I'm
25 repeating myself, but do you know whether Representative

146

1  Harless supported the use of tribal ID as form of photo
2  identification for voting purposes?
3      A.  I don't recall what her vote was on that
4  specific amendment.
5      Q.  Did you have discussions with her where she
6  vocalized an opinion about the use of tribal IDs?
7      A.  I don't recall.
8      Q.  In any event, Amendment 30 didn't carry with
9  the final version of SB 14, correct?
10     A.  That's correct.
11     Q.  Okay.  Let's turn to Page 1015.  I want to look
12 at Amendment Number 54.  Amendment Number 54 was offered
13 -- are you with me?
14     A.  I'm trying to find it here.  Yes.
15     Q.  Okay.  Amendment 54 was offered by
16 Representative Alvarado, correct?
17     A.  Yes.
18     Q.  And Representative Alvarado is a Democratic --
19     A.  Yes, she is.
20     Q.  And this amendment would have required the
21 Secretary of State to keep detailed records of eligible
22 voters who were prevented from voting, eligible voters
23 who were required to file provisional ballots and record
24 the number of provisional ballots that were not counted,
25 correct?  I'm summarizing.

147

1      A.  Yes.
2      Q.  And that amendment would have enabled the State
3  to gauge how this -- how this Voter ID legislation was
4  impacting voters without the required forms of photo ID,
5  correct?
6          MS. HALPERN:  Objection, states facts not
7  in evidence, no foundation.
8      A.  The amendment does appear to give the Secretary
9  of State -- it requests the Secretary of State collect
10 data on -- on, yeah, the precinct and demographic
11 information, but that's as much as I can tell from
12 reading the amendment.
13     Q.  (By Ms. Rudd) Okay.  Let me ask you this
14 question:  Is there any way to track the type of
15 information that's the subject matter of Amendment 14
16 right now?  Is there any centralized place where records
17 of provisional voting or eligible voters turned away
18 from the ballot box is kept?
19     A.  I -- I don't know.
20     Q.  Prior to the passage of SB 14, was there any
21 centralized way to determine whether voters were being
22 turned away or casting provisional ballots, that you
23 know of?
24     A.  I don't know.  That information might be kept
25 at the local level by the local -- local election clerks

148

1  but I'm not aware.
2      Q.  Did you reach out to any local election clerks
3  or any local precincts in your research regarding Voter
4  ID legislation to determine how many voters were turned
5  away from the polls in each individual precinct prior
6  the passage of SB 14?
7      A.  I don't recall.
8      Q.  Most of the information you gathered in your
9  research was from centralized offices of the State,
10 correct?
11     A.  The Secretary of State's Office, yes.
12     Q.  And the Office of the Attorney General?
13     A.  Yes.
14     Q.  And the Department of Public Safety?  I think
15 you sought information from the DPS as well; is that
16 correct?
17     A.  Correct.
18     Q.  So you weren't in general looking to local
19 precincts for information in connection with your
20 research regarding Voter ID legislation; is that right?
21     A.  We did have some communications with local
22 officials on the broad issue of voter identification.  I
23 don't recall the specifics of those conversations.
24     Q.  Do you know which local officials you had
25 discussions with about Voter ID legislation?

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

38 (Pages 149 to 152)

---

149

1    **A.  Harris County election officials.**
2    Q.  Why Harris County?
3    **A.  Representative Harless's district is contained**
4    **within Harris County.**
5    Q.  And do you recall in general what the subject
6    matter of those conversations was?
7    **A.  Not that I can recall.**
8    Q.  Turning back to Amendment Number 54,
9    Representative Harless moved to table that amendment,
10   correct?
11   **A.  Correct.**
12   Q.  And that motion carried with Representative
13   Harless voting in favor of it, correct?
14   **A.  Yes.**
15   Q.  If you turn to Page 1021, I want to look at
16   Amendment Number 58.  Amendment 58 was proposed by
17   Representative Anchia, correct?
18   **A.  Yes.**
19   Q.  And Representative Anchia is a Democrat,
20   correct?
21   **A.  Yes, he is.**
22   Q.  And Amendment 58 would have postponed the
23   effect of SB 14 into the later of January 1, 2012, or
24   the date on which the Secretary of State completed a
25   study that provided an analysis of the access to photo

---

150

1    identification by state residents and the cost of
2    obtaining certain forms of photo identification,
3    correct?
4    **A.  Yes, that appears to be what the amendment is.**
5    Q.  And did you have any discussions with
6    Representative Harless about the subject matter of this
7    amendment prior to the passage of SB 14?
8    **A.  Not that I can recall.**
9    Q.  But this amendment would have called for the
10   Secretary of State to sort of study how many state
11   residents actually would be impacted in terms of lacking
12   the form of ID required by SB 14, correct?
13   **A.  I'm sorry, could you state that again?**
14   Q.  Sure.  This amendment called for the Secretary
15   of State to actually study which Texas residents might
16   not have the forms of photo required by SB 14, correct?
17   **A.  Yes.**
18   Q.  And did you, in Representative Harless's
19   office, perform any analysis of -- other than what we've
20   seen?  I know you've reached out to the Secretary of
21   State's office regarding the sort of database of people
22   who registered without certain forms of identification,
23   but beyond that, did you perform any analysis in your
24   office about which voters in Representative Harless's
25   district might not have the forms of required ID under

---

151

1    SB 14?
2    **A.  Because the Secretary of State is the official**
3    **record keeper for those, that information, that's who we**
4    **approached with -- with that inquiry.  I don't recall**
5    **any other inquiries beyond that.**
6    Q.  Okay.  The study called for in Amendment 58
7    would have disaggregated the data collected by ethnicity
8    and county, correct, if you look at Section 2 A there?
9    **A.  Yes.**
10   Q.  I think you testified earlier that when you
11   reached out to the Secretary of State, you couldn't
12   determine from the numbers provided to you what
13   ethnicity the particular people who lacked the form of
14   photo ID was, correct?
15   **A.  That's correct.**
16   Q.  Was there any other way, prior to the passage
17   of SB 14, for you to determine what population or
18   whether particular populations by racial or ethnic
19   minorities lacked the form of photo required by SB 14?
20   **A.  Not that I can recall.**
21   Q.  Did you attempt to perform any analysis of any
22   kind prior to the passage of SB 14 about whether certain
23   racial minorities lacked the forms of photo ID that were
24   required under the bill?
25   **A.  Because that information was not collected with**

---

152

1    voter registration information, not that I can recall.
2    Q.  Representative Harless then moved to table
3    Amendment 58, correct?
4    **A.  Yes.**
5    Q.  Did you have any discussions with
6    Representative Harless about tabling this particular
7    amendment?
8    **A.  Not that I can recall.**
9    Q.  And then that motion carried with
10   Representative Harless voting in its favor, correct?
11   **A.  Yes.**
12   Q.  Last one.  If you turn to the Page 1025, I want
13   to look at Amendment Number 62.  Amendment 62 was
14   proposed by Representative Strama, correct?
15   **A.  Yes.**
16   Q.  Is Strama a Democrat or Republican?
17   **A.  He is a Democrat.**
18   Q.  Okay.  And this amendment would have required a
19   number of things but I'm just going stick with the
20   headings here:  It would have required an Election
21   Integrity Training.  Turning to the next page, the
22   creation of an Election Integrity Task Force --
23   **A.  Uh-huh.**
24   Q.  -- and a Post-Election Integrity Audit,
25   correct?

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

153

1  **A. Yes.**
2  Q. And those measures would have provided some
3  training for election officers and law enforcement
4  personnel in detecting voter fraud, correct?  If you
5  look back to section -- the first -- 31.012?
6  **A. Yes.**
7  Q. And if you look to 27 -- 273.005, the Election
8  Integrity Task Force would have investigated and
9  prosecuted instances of voter fraud where there was
10 in-person -- or impersonation of a voter, correct?
11 **A. Yes.**
12 Q. And then the Post-Election Integrity Audit
13 would have allowed counties to conduct audits to examine
14 and investigate evidence of voter fraud in their county,
15 correct?
16 **A. Yes.**
17 Q. And would you agree with me that those measures
18 are designed to protect the integrity of the ballot box
19 or would have, you know, in some way protected the
20 integrity of the ballot box?
21 **A. Reading the amendment, it does seem that this**
22 **-- those issues are addressed in his amendment, yes.**
23 Q. Did you discuss the subject matter of this
24 amendment with Representative Harless at all?
25 **A. Not that I remember.**

154

1  Q. One of the things that you testified to earlier
2  is that in-person Voter ID fraud is difficult to detect;
3  is that correct?
4  **A. Correct.**
5  Q. Do you believe that some of these measures
6  would increase election officials or counties' ability
7  to detect in-person voter fraud?
8  **A. Without nothing more about this amendment, I**
9  **don't know if I can say that entirely.  I does appear**
10 **that this is aimed at voter fraud.  And I just don't**
11 **remember the debate on this amendment and Representative**
12 **Strama's -- I don't remember the debate on it, but it**
13 **does appear to address some of those issues.**
14 Q. While you were working for Representative
15 Harless, did her office propose any measures to increase
16 the detection of in-person voter fraud in Texas?
17 **A. I would say that Senate Bill 14 would increase**
18 **the detection of in-person voter fraud.**
19 Q. How does Senate Bill 14 do that?
20 **A. By providing an additional tool for election**
21 **workers to determine if who was voting is who they say**
22 **they are.**
23 Q. Other than requiring photo ID under Senate Bill
24 14, did Representative Harless undertake any measures or
25 draft any legislation while you were working for her

155

1  that would have enhanced local election officials'
2  ability to detection in-person voter fraud?
3  **A. I don't remember.**
4  Q. One of the other forms of voter fraud that I've
5  seen come up a lot is absentee ballot voter fraud.  Are
6  you aware of that type of voter fraud?
7  **A. Yes.**
8  Q. While you were working for Representative
9  Harless, did you undertake any measures or propose any
10 legislation that would have addressed absentee ballot
11 voter fraud?
12 **A. I know she was supportive of other legislation**
13 **during that session that addressed the issue of mail-in**
14 **ballot fraud, absentee ballot fraud.  I can't speak to**
15 **the specific pieces of legislation.  I do know that**
16 **there were several filed that session regarding that**
17 **issue and I know she was supportive of that.**
18 Q. None of that legislation passed, correct?
19     MS. HALPERN:  Object to -- objection,
20 vague; objection, mischaracterizes the legislative
21 process.
22 **A. Because there was several bills filed and I**
23 **don't know the end result of those proposals, they could**
24 **have been on in another form in another bill and I**
25 **wasn't aware of, so I can't speak to the final**

156

1  **disposition of those bills.**
2  Q. (By Ms. Rudd) Is that because the focus in
3  Representative Harless's office during the legislative
4  session in 2011 was on SB 14 and photo voter ID?
5  **A. We had our hands full with this bill.**
6  Q. Okay.  And if you look back, Amendment Number
7  62, ultimately, Representative Phillips raised a point
8  of order, correct, which was withdrawn?
9  **A. I'm sorry.**
10 Q. Sorry, we're on page 1026.
11 **A. Okay.  Correct, Representative Phillips raised**
12 **a point of order.**
13 Q. And then ultimately, Representative Harless
14 moved to table that amendment and that motion prevailed,
15 correct?
16 **A. Yes.**
17 Q. With Representative Harless voting in favor of
18 her own motion, correct?
19 **A. Yes.**
20 Q. Okay.  With all of these amendments we've just
21 looked at -- and I realize there are a number of others
22 we didn't look at -- for the most part, you had
23 Democrats suggesting amendments to SB 14 and then
24 Republicans killing those amendments; is that a fair
25 characterization?

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

40 (Pages 157 to 160)

---

157

1    A.  There were a number of -- a great number of
2 amendments that were offered that day.  The majority of
3 which were offered by Democratic Representatives.  There
4 were ones that were offered by Democratic
5 Representatives that were acceptable, I believe that
6 were adopted.  There were ones also by Republican
7 Representatives.  So the majority of which, yes, were --
8 were -- the Democratic Representatives did offer the
9 majority of the amendments and the majority of them were
10 tabled.
11    Q.  And is it fair to say that in terms of the
12 amendment process with Senate Bill 14, the voting on
13 amendments was relatively politically polarized?
14    A.  I'd have to go back and look on the majority of
15 them.  There were -- it was mostly along party lines.
16 That was not always the case.  From my memory, there
17 were sometimes Democratic Representatives who were
18 voting along with the Republicans and vice versa.
19    Q.  I understand that.  And there's always one
20 person on one side of the aisle that was voting with the
21 opposite party, but for the most part, SB 14 was one of
22 these bills that divided along party lines when it came
23 to voting on a bill, correct?
24    A.  Correct.
25    Q.  Is it your opinion that minority groups

---

158

1 concerns about the impact of SB 14 were addressed during
2 the legislative process surrounding SB 14?
3    MS. HALPERN:  Compound -- objection,
4 compound.
5    A.  I believe that their concerns were addressed in
6 Senate Bill 14, and there were several members of the
7 legislature who are minorities who are -- who identified
8 themselves as Republicans who voted in favor of the bill
9 who felt similar.
10    Q.  (By Ms. Rudd) Again, that was along party lines
11 though, correct?
12    A.  Yes.
13    Q.  Let's do this really quickly.  We're done with
14 that exhibit.
15    (Exhibit 10 marked for identification.)
16    Q.  (By Ms. Rudd) This could be a really quick line
17 of questioning:  Do you recognize what's been marked as
18 Beuck Exhibit 10?  And feel free to thumb through it.
19    A.  Okay.
20    Q.  I'm just trying to place what this document
21 is.  And for the record it's Bates numbered TX 6959
22 through 6974.
23    MR. SCOTT:  And that's highly
24 confidential?
25    MS. RUDD:  It is a highly confidential

---

159

1 document.
2    MR. SCOTT:  Have they all been except for
3 Exhibit Number 9?
4    MS. HALPERN:  8 was not.
5    MR. SCOTT:  And Exhibit 8?
6    MS. RUDD:  I believe that's right.
7    MR. SCOTT:  Okay.
8    MR. GEER:  While he's looking for that if
9 you don't mind, just for the record, even though some of
10 these, Exhibit 3, for example, I don't believe that was
11 marked as highly confidential, but some of these things
12 are part of the Legislative Record which were produced
13 in the previous case which were not marked as highly
14 confidential, so.
15    MR. SCOTT:  Okay.  Thank you.
16    MS. HALPERN:  If you have a version of it
17 with a Bates number that doesn't have a highly
18 confidential on it, then you probably have an argument.
19    MR. SCOTT:  Well, no, I think -- I think
20 in the last case there were some documents that were --
21 there were no legislative -- the court ruled that Leg
22 priv didn't apply to the documents and so, were those
23 turned over, those don't have highly confidential
24 stamped on them.
25    MR. GEER:  And it was a joint motion where

---

160

1 we introduced the Legislative history.
2    MR. SCOTT:  Yeah.  Okay.
3    A.  This appears to be the information prepared for
4 the final passage of Senate Bill 14, the Conference
5 Committee report to Senate Bill 14.
6    Q.  (By Ms. Rudd) Okay.  Were you involved at all
7 with the compilation of this document or the information
8 that went into this document?
9    A.  Yes, I believe so.
10    Q.  Do you recognize the handwriting on this
11 document?
12    A.  That is not my handwriting.
13    Q.  And you don't recognize it?
14    A.  I believe that's Representative Harless's
15 handwriting.
16    Q.  Okay.  We'll come back to that.
17    I want to circle back to one issue and
18 then I have one quick line of questions and then we
19 should be done, as least with me.
20    You had communications with other States'
21 officials in connection with the consideration of SB 14;
22 is that correct?
23    A.  Yes.
24    Q.  You spoke with the Secretary of State from
25 Georgia, Brian Kemp; is that right?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

161

1    A.  Correct.
2    Q.  Did you also speak with the Secretary of State
3  for Indiana or any officials from Indiana?
4    A.  I don't remember if he was an official with the
5  State of Indiana.  I do believe he was at some point
6  involved within the Indiana government.  But yes, there
7  was an individual from Indiana that I spoke with.
8    Q.  And did you reach out to those individuals?  Is
9  that how --
10   A.  Yes.
11   Q.  Okay.  What were those conversations about?
12 Let's start with your conversation with Secretary Kemp.
13   A.  We reached out to the Georgia Secretary of
14 State's Office in our attempt to bring in witnesses for
15 the testimony on Senate Bill 14 in the committee.
16   Q.  And you wanted that testimony because Georgia
17 had been successful in passing photo ID legislation?
18   A.  Correct.
19   Q.  And you actually helped prepare Secretary Kemp
20 for his testimony before the committee on SB 14,
21 correct?
22   A.  I don't recall if I prepared him for the
23 testimony.  I don't recall.
24   Q.  Okay.  He did provide testimony; is that
25 correct?

162

1    A.  Yes, he did provide testimony and his accounts
2  of the experience in Georgia with photo ID.
3    Q.  Outside of what he put into the public record,
4  did you have any conversations with him about Georgia's
5  experience in trying to get photo ID legislation passed?
6    A.  I don't recall.
7        (Exhibit 11 marked for identification.)
8        MS. HALPERN:  Are we through with Exhibit
9  10?
10       MS. RUDD:  Yes, for now.
11   Q.  (By Ms. Rudd) Exhibit 11 is a document.  I'm
12 going to look at the very bottom Bates number, Bates
13 Number TX 91245.  And this is an e-mail string between
14 you and a person named Vincent Russo and Matthew
15 Carrothers, correct?
16   A.  Yes, yes.
17   Q.  Were Mr. Russo and Mr. Carrothers staffers of
18 Secretary Kemp's?
19   A.  I believe so.
20   Q.  If you look at the top e-mail, it looks like
21 Mr. Russo was the Secretary Kemp's general counsel; is
22 that right?
23   A.  Yes.
24   Q.  Do you recall what Mr. Carrother's position was
25 to Secretary Kemp?

163

1    A.  I do not.
2    Q.  The bottom e-mail says -- from you says, "Matt
3  and Vincent, here is a link to a story on some of the
4  Capitol news from yesterday with an interview from
5  Secretary Kemp.  He did a really great job representing
6  your State and the benefits of photo ID.  Thank you for
7  your help in setting things up in such a short time."
8  So that's basically your thank-you to them for helping
9  you get Senate Kemp to testify, correct?
10   A.  Yes.
11   Q.  And then Mr. Russo responds to you on March 3,
12 2011, and says, "Thanks, Colby.  Please let us know if
13 there's anything else we can assist with and thanks for
14 all your help and preparation for Secretary Kemp's
15 testimony."  Does that refresh your recollection that
16 you helped prepare Secretary Kemp or his office in
17 connection with his testimony?
18   A.  I don't know what that -- what his statement is
19 referring to in that context.  We did help with his
20 coordinating on how he was going to come to Austin and
21 the details of the committee and preparing him with --
22 with what the Senate Bill 14 -- I believe I did send him
23 a copy of Senate Bill 14.  I do not recall an
24 involvement in his testimony before the committee.
25   Q.  Okay.  Well, you've anticipate my

164

1  question.  Did you provide him any talking points or in
2  any way tell what the committee might be looking for in
3  the way of testimony?
4    A.  I don't recall anything specific.  I do believe
5  I did send them a copy of the bill that was being
6  proposed.  I just don't recall anything specific at this
7  time.
8    Q.  Okay.  The other person -- you said you also
9  spoke with an official from Indiana, correct?
10   A.  Yes.
11   Q.  And what did that conversation involve?  Was
12 that one conversation or more than one, if you recall?
13   A.  I believe there was -- there were -- there was
14 more than one conversation.
15   Q.  And do you recall what those conversations
16 involved?
17   A.  Similar to the -- my conversations with the
18 officials from Georgia.  We were looking to bring in
19 experts from other states who have had experience with
20 photo identification, and the gentleman that I was
21 speaking with in Indiana did have experience with
22 Indiana's photo identification law.
23   Q.  Do you know the types of ID that are
24 permissible under the Georgia and Indiana laws?
25   A.  I did at the time.  I don't recall right now.

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

42 (Pages 165 to 168)

---

165

1    Q.  Fair enough.  Do you recall generally whether
2  Georgia and Indiana allow for more forms of photo ID
3  than is permitted under SB 14?
4    A.  I don't recall without looking at their
5  specific statutes.
6    Q.  Do you know whether Georgia and Indiana permit
7  tribal ID as a form of photo identification at the
8  polls?
9    A.  I don't recall.
10    Q.  Okay.  Last line of questioning and then I'm
11  through.  And this is just by way of summary:  You were
12  aware that a number of racial minority groups were
13  opposed to SB 14, correct?
14        MS. HALPERN:  Objection, misstates the
15  record.
16        MS. RUDD:  Just asking for his awareness.
17        MS. HALPERN:  Objection, no foundation.
18        Can I have the question read back?
19        (Requested portion was read back by the
20  court reporter.)
21        MR. SCOTT:  I'll join the objections.
22        MS. HALPERN:  And I'm going to say the
23  question is vague too.
24        MS. RUDD:  Okay.
25        MS. HALPERN:  Do you mean groups as in

---

166

1  organizations or do you mean entire ethic groups?
2        MS. RUDD:  If he can answer my question,
3  he can answer it.  If he has problems answering it, I'll
4  clarify it for him.
5    A.  I was aware that there were minority interest
6  groups that were opposed to Senate Bill 14 and had
7  concerns.
8    Q.  Texas NAACP was one of those groups, correct?
9    A.  I believe so.
10    Q.  And MALC was one of those groups, correct?
11    A.  Yes.
12    Q.  And those, Texas NAACP and MALC, in particular,
13  had Representatives provide testimony against SB 14
14  during the hearing on SB 14, correct, if you recall?
15    A.  I believe so.
16    Q.  And as we've discussed, there were a variety of
17  amendments offered by Democratic Representatives on the
18  House side that would have allowed additional forms of
19  photo ID under SB 14?
20    A.  Yes.
21    Q.  The majority of those amendments were rejected,
22  as we've just seen, correct?
23    A.  Yes.
24    Q.  You're aware that there is a history of
25  voting-related discrimination in Texas, right?

---

167

1        MS. HALPERN:  Object --
2        MR. SCOTT:  Objection.  They're all
3  Democrat.
4        MS. RUDD:  Probably, once upon a time.
5  Democratic party has changed quite a bit.
6        MS. HALPERN:  Are you referring to Lyndon
7  Johnson?
8    Q.  (By Ms. Rudd) There is a history of
9  voting-related discrimination in Texas, right?
10        MR. SCOTT:  Objection, form.
11    A.  The --
12        MS. HALPERN:  Objection, foundation.
13        MS. RUDD:  Are you kidding?
14    Q.  (By Ms. Rudd) Section 5 of the Voting Rights
15  Act was specifically targeted at ameliorating the
16  effects of historical discrimination at polls, correct?
17    A.  I believe that is the reason that Texas was
18  placed within Section 5.
19    Q.  Right.  Texas was required to get preclearance
20  under Section 5 because there's a history of
21  voting-related discrimination in Texas, correct?
22        MR. SCOTT:  Objection, form.
23    Q.  (By Ms. Rudd) Are you going to dispute that
24  there's that history in Texas --
25    A.  I --

---

168

1    Q.  -- notwithstanding the objection through your
2  counsel?
3    A.  -- I -- I understand.  I'm not an expert on
4  Texas history with -- with voting rights.  I don't know.
5    Q.  You don't know whether racial minorities were
6  ever disenfranchised in Texas in history; is that your
7  testimony?
8        MR. SCOTT:  Objection, form, vague.
9    Q.  (By Ms. Rudd) Did you ever look into that issue
10  in connection with SB 14?
11        MS. HALPERN:  Objection, relevance.
12        MS. RUDD:  Now that's an interesting one.
13        MS. HALPERN:  He's already testified about
14  the need for preclearance, so.  What he -- what his
15  understanding was of why we were at that place doesn't
16  matter.  We were at that place.
17        MS. RUDD:  Thank you for your
18  testimony.  Your testimony isn't what I'm after in this
19  case.
20    A.  Can you -- can you restate the question.  I'm
21  sorry.
22    Q.  (By Ms. Rudd) I have no idea what it was at
23  this point.
24        Are you going dispute that there is a
25  history of voting-related discrimination in Texas?  Do

---

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

---

169

1 you personally have knowledge of that?
2 **A. Of a history? I --**
3     MR. SCOTT: Objection, form, vague.
4 **A. The -- I am not an expert on Texas voting**
5 **rights history. It has been placed under Section 5 for**
6 **that reason. It's the law of the land and that is what**
7 **we live under, so.**
8 Q. (By Ms. Rudd) Okay. Did you look --
9     MR. SCOTT: Objection, nonresponsive.
10 Q. (By Ms. Rudd) -- into, in connection with SB
11 14, whether there is a history of voting-related
12 discrimination in Texas or in connection with any Voter
13 ID legislation proposed during the 2011 session?
14 **A. I don't recall looking into historical**
15 **information on that.**
16 Q. Was that important to you at all in connection
17 with getting Voter ID legislation passed?
18 **A. Compliance with Section 5 was certainly a**
19 **consideration when I was working on this bill.**
20 Q. Do you believe that voting in Texas is
21 traditionally divided along racial lines? And if you
22 don't know what I mean by that, I can -- I can break
23 that down for you.
24     MS. HALPERN: I don't, so I'm going to
25 object on the basis of foundation and vague.

---

170

1     MS. RUDD: I'm asking about his belief.
2 **A. Can you -- can you break it down for me?**
3 Q. (By Ms. Rudd) Sure. Is it your view that there
4 is a greater proportion of African American voters who
5 vote for Democrats regularly in Texas than Republican?
6 **A. Yes. It's my understanding that statistically**
7 **African American are more likely to vote Democratic than**
8 **Republican.**
9 Q. Does the same thing hold true for Hispanic
10 voters in Texas, to your knowledge?
11 **A. I would -- I don't have that information, but.**
12 **I don't know the statistics on how Hispanics vote in**
13 **Texas, but the -- I imagine that has changed over the**
14 **years and it just depends on the candidate and the --**
15 **and what's going on with that election, as well for**
16 **African Americans.**
17 Q. Would you agree with me that the minority
18 population in Texas -- and here I'm talking about racial
19 minority. We'll just confine it to that because there
20 are lots of different minority groups -- tends to be
21 more economically disadvantaged on the whole than White
22 population in Texas?
23     MS. HALPERN: Objection, foundation.
24 **A. Can you restate the question? I'm sorry.**
25 Q. (By Ms. Rudd) Sure. Would you agree with me

---

171

1 that racial minorities in Texas tend to be, as a whole,
2 more economically disadvantaged than the White
3 population of Texas? If we're just comparing, for
4 example, the number the African Americans living below
5 the poverty line versus the number of Caucasians?
6     MR. SCOTT: Objection, form, vague, time.
7 **A. I don't have the statistics in front of me and**
8 **the census data on that, but that would be my -- my**
9 **understanding.**
10 Q. (By Ms. Rudd) Have you ever heard that
11 minorities disproportionately lack access to motor
12 vehicles?
13     MR. SCOTT: Objection, form.
14 Q. (By Ms. Rudd) As compared to Whites?
15 **A. I -- I don't remember that issue coming up or**
16 **that -- I don't recall.**
17 Q. You don't recall hearing testimony that African
18 American voters tend to have motor vehicles in lesser
19 numbers than White voters?
20 **A. I don't recall.**
21 Q. Okay. Have you ever heard that there's a
22 higher rate of racial minorities living below the
23 poverty line in Texas as compared the Whites?
24     MR. SCOTT: Objection, form, vague time.
25 **A. Have I heard over my lifetime that that's the**

---

172

1 **case? I'm --**
2 Q. (By Ms. Rudd) Well, let's take since 2011 when
3 -- the relevant time period that we're talking about.
4 **A. Okay.**
5 Q. Did you hear testimony during the consideration
6 of SB 14 that there's a higher proportion of racial
7 minorities living below the poverty line in Texas than
8 there is Whites?
9 **A. I don't recall that information during the**
10 **debate but that is my understanding.**
11 Q. Did you hear claims during the debate over SB
12 14 that the justification for the bill was not a
13 legitimate justification? And when I'm talking about
14 the justification, I'm talking about combating in-person
15 voter ID fraud. Did you hear opposition on that basis?
16 **A. The -- that -- I'm sorry, could you restate the**
17 **question?**
18 Q. Sure. There were claims, were there not,
19 during the debate about SB 14 that the in-person voter
20 fraud justification for the bill was not a legitimate
21 concern?
22 **A. Yes, I think that was one of the -- one of the**
23 **points during the debate.**
24 Q. Do you know what the number of registered
25 voters is in Texas today?

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

173

1    **A.  No, I do not.**
2    Q.  Did you know what the number of registered
3    voters was in Texas during 2011?
4    **A.  I'm sure I probably did, but I don't have that**
5    **information right now.**
6    Q.  Would it surprise you to hear that there are
7    approximately 14 million people registered to vote in
8    Texas?
9    **A.  Okay.  If that's the number, then --**
10   Q.  It doesn't surprise you?
11   **A.  It doesn't surprise me.**
12   MS. HALPERN:  What's the source for your
13   number, Counsel?
14   MS. RUDD:  Well, I have good researchers
15   working for me.
16   MS. HALPERN:  If you're just -- you're
17   just throwing out a number and said, "Would it surprise
18   you," and you've offered that number as a fact, I'm just
19   asking.
20   MS. RUDD:  You know what, these are my
21   questions.  My questions are my questions.  If you want
22   to redirect this witness, there -- you can do that.
23   That's your option.
24   Q.  (By Ms. Rudd) Do you know how many cases of
25   potential in-person voter fraud you were able to

174

1    identify in your research of voter ID legislation?
2    **A.  I don't recall that number.**
3    Q.  Was it less than twenty?
4    **A.  I don't recall that number.**
5    Q.  Okay.  You have no general sense of the
6    ballpark of how many cases of in-person voter ID fraud
7    have been determined in Texas?
8    **A.  That I identified?**
9    Q.  Would you say it's a big number or a small
10   number?
11   **A.  The number I -- my research as we discussed was**
12   **with the Office of Attorney General and researching the**
13   **local District Attorneys and their efforts, and I just**
14   **don't recall the number, the final.  There wasn't a**
15   **final number that I came up with.  There were pending**
16   **cases out there when I was doing this research.**
17   Q.  Prior to the passage of SB 14, did you form any
18   opinion about the number of -- of cases of in-person
19   voter ID fraud relative to the population of registered
20   voters in Texas?
21   **A.  I don't recall making that comparison.**
22   MR. SCOTT:  Linda, may I have some
23   follow-up to some of the questions she asked.
24   MS. HALPERN:  That's fine.
25   MS. RUDD:  Okay.  I'm done.

175

1    MS. HALPERN:  Do want to take a break
2    before you switch places?
3    MR. GEER:  You'd like to take a break?
4    THE WITNESS:  If that's okay.
5    (Recess from 3:45 p.m. to 3:59 p.m.)
6    EXAMINATION
7    BY MR. GEER:
8    Q.  All right.  Back on the record.  Before we get
9    started, this is essentially Round 2.
10   **A.  Okay.**
11   Q.  I wanted to just lay out some of the ground
12   rules.  You understand that you're continuing to be
13   under oath?
14   **A.  Yes.**
15   Q.  And that you're expected to give a full,
16   complete and truthful answer?
17   **A.  Yes.**
18   Q.  And that if there's anytime during the
19   deposition that you have -- you don't understand a
20   question that I'm asking you, you're always -- it's
21   always okay to ask me to clarify or repeat the question.
22   Do you understand that?
23   **A.  Yes.**
24   Q.  During the course of the deposition, I'll be
25   asking questions and you'll be answering, so it's

176

1    important that you, you know, you give a verbal
2    response, no shaking of the head, and you've done very
3    well with that aspect of the deposition, but you
4    understand that continues on?
5    **A.  Yes.**
6    Q.  Okay.  I wanted to go back to a line of
7    questions that were asked of you during the first part
8    of the deposition regarding history of discrimination in
9    Texas.  And I want to go much broader and leave
10   Republicans and Democrats out of it because none of that
11   matters.
12   Would you agree that there is a history of
13   discrimination in voting in the state of Texas?  And I'm
14   talking in as far as time period is concerned, I just
15   want to know what your knowledge is of history of
16   discrimination in Texas.
17   **A.  It's my understanding that the Voting Rights**
18   **Act came about -- Texas was placed under Section 5 of**
19   **the Voting Rights Act.  I don't know the reasoning**
20   **behind Texas being placed under -- under that section.**
21   Q.  And the Voting Rights Act was put in place with
22   -- with the purpose of defending against discrimination
23   in voting?
24   **A.  I believe that's one of the purposes,**
25   **generally.  I don't know every provision that's in the**

COLBY BEUCK                                                  6/20/2014
CONFIDENTIAL TRANSCRIPT

177

1  Voting Rights Act but I believe that is one of the
2  purposes.
3      Q.  So tying this whole discussion about history of
4  discrimination into the relevance of SB 14, isn't it
5  fair to say that during the public debate regarding SB
6  14, there was discussion that SB 14 may amount to a poll
7  tax?  Do you recall that public debate?
8      A.  That, I believe was an issue.  Those words,
9  "poll tax" were I believe used at some point during the
10  debate.  I can't remember when or how that came about,
11  but I do remember hearing those words.
12      Q.  What is a poll tax, do you know?
13      A.  Those -- this is my understanding from history,
14  that it was a fee or -- in order to vote, you had to pay
15  a fee to vote, and --
16      Q.  Go ahead.
17      A.  -- that's my understanding.  It's been quite
18  some time since I've studied that.
19      Q.  And did you understand that at some point in
20  Texas's history, Texas had a poll tax at the voting --
21  at the polling place.  Do you understand that?
22      A.  Okay.
23      Q.  No, I'm asking you, do you understand that?
24      A.  Okay.  That is -- I haven't -- it's been quite
25  some time since I've studied that but I understand.

178

1      Q.  You also testified that one of your -- one of
2  your tasks in looking at SB 14 was to look at Crawford,
3  correct?
4      A.  Correct.
5      Q.  And you also said that you looked at some local
6  cases; am I misstating that?
7      A.  Legal cases?
8      Q.  Yes.
9      A.  Crawford was my primary focus.  It seemed to be
10  the most relevant to what we were trying to accomplish.
11      Q.  But you looked at legal cases, local?  Let me
12  restate that.
13          You looked at cases that were relevant to
14  Texas?
15      A.  I recall reviewing a case that had to do with a
16  -- it was a voting rights case involving a local -- I
17  believe it was a municipal utility district here in the
18  Austin area.
19      Q.  And why did you look at that particular case?
20      A.  There was -- I don't recall the specifics of
21  that case.  It had something to do with the -- with
22  preclearance issues.
23      Q.  And was that a voting discrimination case by
24  any chance?
25      A.  I don't recall.

179

1      Q.  Turning your attention to Exhibit 1 and I
2  believe you gave some extensive testimony on this.
3      A.  Okay.
4      Q.  And I'll give you a chance to get that in front
5  of you.
6      A.  Okay.
7      Q.  Who is Jay Dyer?
8      A.  Mr. Dyer works for the attorney -- Office of
9  the Attorney General, General Greg Abbott's office.
10      Q.  And just so I'm clear, you reviewed this
11  document during your consideration of photo ID
12  legislation, correct?
13      A.  Correct.
14      Q.  And you received this document according to the
15  dates on this particular document, and I'm referring to
16  Beuck Exhibit 1, January 21, 2011?  First page.
17      A.  The date on the e-mail is February 23rd.
18      Q.  I stand corrected, I do see that.  And I just
19  want to understand your testimony on this particular
20  document.  Other than this document from Jay Dyer who is
21  with the Texas AG's Office, did you receive any other
22  analysis or research from any State agency regarding
23  voter fraud?
24      A.  The other information I would refer to would be
25  the Secretary of State's information in the e-mail

180

1  exhibit from earlier as far as State agency information
2  goes.
3      Q.  And what -- generally, what was the information
4  at the Secretary of State's Office provided you?  And if
5  you need to look at that exhibit, feel free.
6          What exhibit are you referring to?
7      A.  This would be Exhibit Number 6.
8      Q.  And what were you referring to in Exhibit 6?
9      A.  Their -- Ms. McGeehan gives information on the
10  complaints received by the Secretary of State's Office
11  and that would be the other information that I received
12  from State agency on voting irregularity complaints.
13      Q.  So was it the -- referring to Exhibit 6, was it
14  the Secretary of State's Office or the Texas Attorney
15  General's Office that was indicating that they -- "We
16  cannot meaningfully draw any conclusions from our
17  referrals because election fraud may be reported
18  directly to local prosecutorial authorities or the AG."
19  Who was it that was making that statement?
20      A.  That would have -- that appears to be
21  information -- that's the conclusion from Ms. McGeehan
22  with the Secretary of State's Office.
23      Q.  So then just summarizing, is it fair to say
24  that the information you received from the Secretary of
25  State's Office was unable to draw any conclusion on

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

46 (Pages 181 to 184)

---

181

1   in-person voter fraud?
2           MS. HALPERN:  Objection, misstatements the
3   document.  Mischaracterizes the document.
4       Q.  (By Mr. Geer) Well, let me just say it again.
5           "We cannot meaningfully drawn any
6   conclusions."  What did you take from that?
7       A.  That the Secretary of State is more of a
8   clearinghouse, they're not the ones that -- they do not
9   receive local referrals from -- I'm sorry.  They do not
10  receive reports that are reported directly to the
11  District Attorneys in -- where this activity might
12  occur, and they -- they do not investigate the
13  complaints individually, they refer them along to the
14  OAG.  My take from this was that the Secretary of
15  State's Office was not the place to find this
16  information.
17      Q.  And were you able to draw any conclusions from
18  the Secretary of State's information that was provided
19  to you in Exhibit 6 or otherwise?
20      A.  I'm sorry, can you restate that?
21      Q.  Were you able to draw any conclusions from the
22  information you received from the Secretary of State's
23  Office?
24      A.  Their information was helpful in that voter
25  irregularity cases have two different paths where they

---

182

1   can go:  They can go to the Office of the Attorney
2   General or they can be investigated at the local level,
3   so that -- that was what I concluded from their
4   information.
5       Q.  Did you attempt to determine whether there were
6   any in-person voter fraud cases prosecuted at the local
7   level?
8       A.  That was my research into the -- trying to
9   determine cases that were prosecuted at the local level
10  through media reports.
11      Q.  And other than media reports, did you take any
12  other -- make any other attempts to determine if there
13  was in-person voter fraud being prosecuted at the local
14  level?
15      A.  Not that I recall.
16      Q.  So turning your attention back to Exhibit 1,
17  what is your understanding of the term "illegal voting"?
18          And what exhibit are you referring to?
19      A.  I'm sorry, I should -- I'm trying to reference
20  what Election Code 64.012 is referring to.
21      Q.  And you're referring to --
22      A.  This is Senate Bill 14.
23      Q.  Okay.
24      A.  And we -- Senate Bill 14 increased the
25  penalties for illegal voting and I was trying to get a

---

183

1   definition of what -- 64.012.  My recollection is, that
2   is in-person voting fraud.
3       Q.  And I believe you indicated that you were
4   present during the March 20 -- strike that.
5           I believe you indicated you were present
6   when Representative Harless presented SB 14?
7       A.  Yes.
8       Q.  And do you recall Representative Harless
9   indicating that SB 14 dealt with one specific form of
10  fraud?
11      A.  I -- I don't recall that statement.
12      Q.  If I was to show you the legislative history on
13  that, would that help refresh your recollection?
14      A.  Yes.
15          MR. GEER:  I'm not sure what exhibit we're
16  up to right now.
17          COURT REPORTER:  12.
18          (Exhibit 12 marked for identification.)
19      A.  Thank you.
20      Q.  (By Mr. Geer) First of all, for the record, can
21  you tell me what this is?
22      A.  This is the House Journal from Monday, March
23  21st of 2011.
24      Q.  Would this be considered the legislative
25  history of -- for the House?

---

184

1       A.  Yes.  This is the official legislative history
2   for House action.
3       Q.  And as part of your duties or when you were
4   chief of staff for Representative Harless, did you
5   review the legislative history?
6       A.  Can you be more specific?
7       Q.  Have you reviewed the legislative history as it
8   relates to photo identification law?
9       A.  At that time, yes, I did.
10      Q.  Okay.  So turning your attention to Page 910.
11      A.  Yes.
12      Q.  And the reason I gave you this is to help
13  refresh your recollection, so I'll give you a chance to
14  look at it.
15      A.  Okay.
16      Q.  So the question I had previously before I
17  handed you this document to refresh your recollection
18  was, do you recall during the time period where
19  Representative Harless presented SB 14, that there was
20  discussion regarding whether or not SB 14 dealt with one
21  specific type of voter fraud, and do you recall what her
22  response to that was?
23      A.  According to the House Journal that you
24  provided, yes, she states that they're -- this bill
25  deals with one specific type of voter fraud, voter

---

COLBY BEUCK                                           6/20/2014
CONFIDENTIAL TRANSCRIPT

185

1   **impersonation.**
2       Q.  Thank you.  And so going back to your -- to the
3   question about illegal voting and I asked you what is
4   your understanding of the term illegal voting, do you
5   know what types of fraud are encompassed in that?
6       **A.  In the context of the information that Mr. Dyer**
7   **provided to me or just generally when somebody says**
8   **illegal voting?**
9       Q.  Well, I'm trying to understand -- I'm trying to
10  get a sense of what your understanding is.  And your
11  testimony previously was you conducted some research
12  into voter fraud, correct?
13      **A.  Yes.**
14      Q.  And I'm trying to understand if that's
15  something you considered, so.  Let me just ask it
16  directly:  Did you consider what was encompassed by the
17  term illegal voting when you reviewed SB 14 and other
18  pieces of photo identification legislation?
19      **A.  Yes.  I was aware of that there are in-person**
20  **voting, irregularities.  There are irregularities with**
21  **mail-in ballot.**
22      Q.  And it's interesting that you mention mail-in
23  ballot.  Does SB 14 deal with any form of by-mail ballot
24  fraud?
25      **A.  No, it does not.**

186

1       Q.  And in fact, SB 14 only deals with in-person
2   voter impersonation and would that be at the polls?
3       **A.  Correct.**
4       Q.  Okay.  And so I also want to understand why --
5   why did you spend the time to review this information?
6   What was the purpose of reviewing this information?  And
7   I'm referring to Exhibit 1.
8       **A.  In a general sense, my job as -- working for**
9   **Representative Harless was to prepare her for the debate**
10  **in committee and debate on the floor, to provide the**
11  **information to her so that she would be able to have all**
12  **of the information available.**
13      Q.  And did you provide information to her
14  regarding voter impersonation fraud?
15      **A.  These -- this information, yes, I did provide**
16  **to her.**
17      Q.  And what information did you provide to
18  Representative Harless regarding in-person voter fraud?
19      **A.  The information provided by Mr. Dyer as well as**
20  **the information that I found from local prosecutions of**
21  **voter fraud.**
22      Q.  And you've said that several times about local
23  prosecution of voter fraud.
24      **A.  Uh-huh.**
25      Q.  What did you find regarding local prosecution

187

1   of voter fraud?
2       **A.  I -- I don't recall the specifics, the specific**
3   **cases.  They -- there were media reports from reporting**
4   **on prosecutions.  I don't recall the specifics of those**
5   **cases.**
6       Q.  So you're referring to media reports --
7       **A.  Correct.**
8       Q.  -- when you talk about local prosecution?
9       **A.  Correct.**
10      Q.  And you described the Secretary of State's
11  Office as being a clearinghouse.  What does
12  clearinghouse mean?
13      **A.  They receive the complaints, voter irregularity**
14  **complaints.  They do not have an enforcement -- it is my**
15  **understanding they do not have an enforcement function**
16  **within that agency so they have to refer that to the**
17  **Attorney General's Office who does have an enforcement**
18  **function who can look into those allegations.**
19      Q.  Which takes us back to Exhibit 1, correct?
20      **A.  Yes.**
21      Q.  And so were you able to draw any conclusion as
22  to the existence of in-person voter fraud in the state
23  of Texas by looking at Exhibit 1?
24      **A.  I viewed Exhibit 1 as part of the picture of**
25  **the whole, including the other cases that are referred**

188

1   **locally, the cases that are not reported, the cases that**
2   **go unnoticed.  It was part of the picture.**
3       Q.  Well, let's go back to the local prosecution.
4       **A.  Okay.**
5       Q.  You looked at media reports.  As you sit here
6   today, are you aware of any of those local prosecutions
7   that resulted in the conviction of in-person voter
8   fraud?
9       **A.  I don't recall the specifics of those cases.**
10      Q.  And so other than Exhibit 1, did you receive
11  any other information from the Attorney General's
12  Office?
13      **A.  I don't recall.  I don't recall if there was an**
14  **update to this information.**
15      Q.  Do you recall if you requested any additional
16  information?
17      **A.  I don't recall.**
18      Q.  In any event, you don't recall reviewing any
19  additional information?
20      **A.  That's correct.**
21      Q.  So I also was interested in understanding the
22  process.  Once a bill is passed in the Senate --
23  representative Harless was the sponsor of SB 14,
24  correct?
25      **A.  Yes.**

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

---

189

1    Q.   Which -- and you were her chief of staff?
2    A.   Yes.
3    Q.   And can you describe for me what the process --
4  I guess, generally, what the process of receiving a bill
5  from the Senate would include?
6    A.   In regard to how --
7    Q.   A bill that has passed in the Senate, received
8  in the House.
9         MS. HALPERN:  He's asking about any bill,
10  not SB 14 specifically.  Just the process.
11   A.   Generally how the process of a -- how a Senate
12  Bill gets referred to committee, that general process
13  or?  Can you be?
14   Q.   (By Mr. Geer)  Sure.  That's a fair
15  question.  Let's -- let's start first with SB 14.
16   A.   Okay.
17   Q.   As you've already established, Representative
18  Harless was the sponsor.  Were you involved in any
19  communications with Representative Harless regarding why
20  she was identified as a sponsor of SB 14?
21        MS. HALPERN:  Objection to assert the
22  legislative privilege.  Since we're under seal, the
23  witness will be allowed to answer the question with the
24  understanding that the court has determined that that
25  does not constitute a waiver of the privilege.

---

190

1    Q.   (By Mr. Geer)  And I just want to -- one step
2  for the record:  Are you asserting your legislative
3  privilege on this and are you following the advice of
4  your counsel?
5         MS. HALPERN:  He's responding in any
6  event, so.
7         MR. GEER:  I know.
8    A.   Okay.
9    Q.   (By Mr. Geer)  But the question is, are you
10  asserting your legislative privilege and are you
11  agreeing to testify under seal?
12   A.   Yes, yes, yes.
13   Q.   And I don't remember the last question I asked
14  you.
15        MR. GEER:  Is it possible to read back the
16  last question?
17        MR. D'ANDREA:  It was why Harless.
18   Q.   (By Mr. Geer)  Oh.  Why -- were you involved in
19  any communications with Representative Harless as to why
20  she was selected to be the sponsor of SB 14?
21   A.   I recall conversations with Representative
22  Harless regarding that -- the issue of her interest in
23  receiving the bill and being the House sponsor of that
24  legislation.  I was not -- I was not involved with the
25  process of her being selected the House sponsor.

---

191

1    Q.   Were you involved in any communications where
2  it was discussed that she would be the House sponsor?
3    A.   No.
4    Q.   And when did you first come to understand that
5  she would be the House sponsor of the bill?
6    A.   I found out through a press release, I believe,
7  from Chairman Bonham.
8    Q.   And once you understood she was the sponsor of
9  SB 14 and moving forward, even -- actually, when did you
10  understand -- when did you get this press release?  Had
11  the bill already been passed in the Senate?
12   A.   Yes.
13   Q.   Okay.
14   A.   Yes.
15   Q.   So once you understood that she was the House
16  sponsor, is there a process in place where the bill from
17  the Senate that's passed in the Senate would actually be
18  received by the House?
19   A.   The bill comes over to the -- the bill is
20  reported to the House, the House then refers that bill
21  to a committee.  Once it's been referred to the
22  committee, it is then assigned a House sponsor.  That
23  typically is how the process goes.
24   Q.   So was she -- did she know she would be the
25  House sponsor prior to the bill being referred to the

---

192

1  committee?
2    A.   We -- we did not know.  I did not know.  I
3  can't speak for her.  But I did not know that we were
4  going to be the sponsor of SB 14 until I received the --
5  the press release from Chairman Bonham.
6    Q.   And so as her chief of staff, it was your job
7  to help prepare SB 14 for her presentation and its
8  passage, correct?
9    A.   Correct.
10   Q.   And as her chief of staff, do you receive the
11  compiled information from the Senate related to SB 14?
12   A.   Could you be more specific with "information"?
13   Q.   SB -- SB 14 was publicly debated --
14   A.   Yes.
15   Q.   -- and passed in the Senate, correct?
16   A.   Yes.
17   Q.   Did you receive any analysis related to SB 14
18  from the Senate?
19   A.   The information that is transmitted with the
20  bill would be the bill analysis, the fiscal note
21  information that comes along with the bill and that type
22  of information.
23   Q.   Specifically, did you receive any analysis from
24  the Senate that related to SB 14 that considered the
25  impact of SB 14 on minority voters?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

193

1    A.   Not that I recall.
2    Q.   Did you make any requests to anyone in the
3  Senate to the determine if that analysis had been
4  conducted?
5    A.   We followed -- in preparation for the committee
6  hearing, we watched the Senate debate, followed the --
7  what was going on in the Senate closely.  I believe that
8  was an issue that was -- that was brought up during the
9  Senate debate.  I don't remember the specifics of that,
10 those arguments, but we certainly did pay attention to
11 what was going on in the Senate in preparation for our
12 hearing in the House.
13   Q.   That was a little different than my actual
14 question.
15   A.   Okay.
16   Q.   And let me narrow it down.  Did you receive any
17 written analysis from the Senate related to SB 14 that
18 considered the impact on minority voters?
19   A.   Not that I recall.
20   Q.   Did you receive any written analysis from the
21 Senate related to SB 14 that looked at the issue of
22 in-person voter impersonation at the polls?
23   A.   Not that I recall.
24   Q.   Did you receive any analysis from the Senate
25 that looked at the impact of SB 14 on low income voters?

194

1    A.   No, not that I recall.
2    Q.   How about elderly voters, same question:  Did
3  you receive any analysis from the Senate that considered
4  the impact of SB 14 on elderly voters?
5    A.   Not that I recall.
6    Q.   And when you say, "Not that I recall," do you
7  recall producing any of that information in response to
8  the Texas v. Holder case, which you testified in --
9    A.   Yes.
10   Q.   -- gave a deposition in or the current
11 litigation United States v. Texas?
12   A.   That information -- I don't recall that
13 information being transmitted from the Senate.
14   Q.   So I just want to I guess close the loop on --
15 on what your understanding of in-person voter
16 impersonation is.  What, beyond what we've discussed,
17 the Texas Attorney General's report, Exhibit 6, which
18 references the -- some information from the Secretary of
19 State's Office and the local -- your review of local
20 media reports, is there anything else that you did to
21 determine the existence of in-person voter fraud in the
22 state of Texas?
23   A.   There were -- there was testimony in committee
24 regarding some of those issues.  That would be another
25 source of information.  And I know there was one Senator

195

1  who -- who had a personal experience with some of these,
2  some of this in-person voter impersonation.
3    Q.   So, testimony and -- where did that testimony
4  occur?  Did you say the Senate?  I'm sorry.
5    A.   There was a Senator who had a personal
6  experience with some of that.
7    Q.   Do you recall what Senator that was?
8    A.   Senator Williams.
9    Q.   And do you recall what Senator Williams
10 testified to or spoke about publicly?
11   A.   I don't recall the specifics.  It had to do
12 with a family member, a deceased family member who was
13 continuing to vote.
14   Q.   Do you know if that allegation by Senator
15 Williams was actually prosecuted in any form?
16   A.   I don't know the specifics on that.
17   Q.   Do you know if there was an official
18 investigation into the allegations of Senator Williams?
19   A.   No, sir.
20   Q.   Did you ever attempt to determine whether or
21 not there was either an investigation or prosecution of
22 Senator Williams' allegations?
23   A.   No.  I don't know the disposition of that
24 case.  It was one of the examples that I remember from
25 the testimony.  There were -- there was testimony about

196

1  the House and Senate regarding people's personal
2  experience with witnessing voter impersonation.
3    Q.   And you sat in on the public hearings in the
4  House as well?
5    A.   I was there for the hearing, the majority of
6  the hearing.  I was not there for the full hearing, but
7  yes, I was there for the majority of the hearing.
8    Q.   Do you recall what information Representative
9  Harless shared specifically regarding in-person voter
10 fraud?
11        MS. HALPERN:  Objection, vague.
12   Q.   (By Mr. Geer) Let me see if I can clarify that
13 for you.  Do you recall during the March 21, 2011,
14 hearing -- and I'm referring to -- what did we mark this
15 as?
16   A.   12.
17   Q.   Exhibit 12.  Do you recall if she was asked
18 about in-person voter fraud or voter impersonation at
19 the polls?
20   A.   I don't recall that specific conversation.  If
21 it's contained in the exhibit, I'll read through it,
22 and...
23   Q.   Well, without reading through it, do you recall
24 whether she presented any documented cases of in-person
25 voter impersonation during these public hearings?

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

197

1    **A.  I don't.  I don't recall the specifics of that.**
2    Q.  So turning your attention to Exhibit 2, you
3    were asked -- and I'll give a chance to find it.  And
4    just for the record, Exhibit 2, who is this from?
5    **A.  This is an e-mail from Representative Harless.**
6    Q.  And that e-mail -- or this e-mail is to you?
7    **A.  Correct.**
8    Q.  And it's dated what?
9    **A.  November 21, 2011.**
10   Q.  And the subject of this e-mail is an Op-Ed in
11   Defense of Photo ID in Today's Chronicle.  Do you see
12   that subject line?
13   **A.  Yes.**
14   Q.  The section that's highlighted near the top of
15   the document, is that information that you wrote?  And
16   if you need me to be more specific, I will be.
17   **A.  From the e-mail, it appears that that first**
18   **paragraph is information I had placed in the rough draft**
19   **for the response to the constituent.**
20   Q.  In the highlighted section it says, in fact, I
21   believe was -- strike that.
22        In Exhibit 2, it indicates that the
23   purpose of the Senate Bill 14 was not to disenfranchise
24   anyone.  Did you -- and my question on that is:  What,
25   if any, analysis did you conduct to determine whether or

198

1    not SB 14 would disenfranchise Texas voters?
2    **A.  The protections that we had placed in Senate**
3    **Bill 14, we felt would address the issues, the concerns**
4    **raised about individuals being disenfranchised.**
5    Q.  And you testified to the protections that were
6    placed in Senate Bill 14, and I'm sorry, I don't recall
7    the protections that you're referring to.
8    **A.  Okay.  The increased voter education efforts by**
9    **the Secretary of State and local -- local election**
10   **officials, the free ID provisions for those without**
11   **another acceptable form of identification, provisional**
12   **ballot provisions, the provision that was placed in --**
13   **in regarding the substantially similar name on the**
14   **identification, the other exemptions that were placed in**
15   **the bill, disability exemptions, and -- that's not the**
16   **total inclusive, but that's...**
17   Q.  I'm sorry, I'm trying to be real organized and
18   work my way through these.
19        Referring to I believe it's Exhibit 8,
20   which is the House Amendment --
21   **A.  Yes.**
22   Q.  -- I refer your attention to exhibit --
23   Amendment 27.
24        MS. HALPERN:  What page, Counsel?
25        MR. GEER:  Give me one second.  I believe

199

1    that's 982.
2         MS. HALPERN:  9?
3         MR. GEER:  982.
4         MS. HALPERN:  982, okay.
5    Q.  (By Mr. Geer) And I'll give you a chance to
6    look at that amendment.
7         MS. HALPERN:  27?  Amendment 27?
8         MR. GEER:  Amendment 27, correct.
9    **A.  Yes.**
10   Q.  (By Mr. Geer) Amendment 27 appears to add that
11   the statewide effort shall include education targeted at
12   low income voters and minority voters; is that correct?
13   **A.  Yes.**
14   Q.  And how did Representative Harless vote on this
15   amendment?
16   **A.  I don't recall how she voted on the amendment.**
17   **It appears that the amendment was adopted via voice**
18   **vote, which the -- a roll call vote was not taken.  So**
19   **without that information, I don't know how she voted.**
20   Q.  Did you discuss this amendment with
21   Representative Harless?
22   **A.  I believe we did.  I don't recall the specifics**
23   **of that discussion.**
24   Q.  Do you agree that adopting an amendment that
25   targets a statewide effort to include education

200

1    targeting low income and minority voters would have
2    increased the protection against disenfranchising
3    minority voters and low income voters?
4    **A.  I would say that the efforts contained in the**
5    **bill without this amendment -- the education efforts,**
6    **the voter outreach efforts in the bill covered what this**
7    **amendment was trying to accomplish.**
8    Q.  Does SB 14 specifically target low income and
9    minority voters?
10   **A.  The education efforts I believe were statewide.**
11   **There was -- they were not targeted to any individuals.**
12   **I think that was left up to the Secretary of State to**
13   **determine the best way to get out the information.  And**
14   **I don't know the -- the Secretary of State had the**
15   **ability to draft rules to accomplish that.**
16   Q.  And so my question was:  Do you have -- do you
17   believe that an amendment, if adopted, that specifically
18   targeted statewide minority voters and low income
19   voters, do you believe that that would have an effect of
20   mitigating some of the concerns of the opponents of SB
21   14?
22        MR. SCOTT:  Objection, form, calls for
23   speculation.
24        MS. HALPERN:  Yeah.  Thank you.
25   **A.  I believe the goal of this amendment was**

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

51 (Pages 201 to 204)

---

201

1  accomplished in the protections that we had placed in
2  Senate Bill 14.  The Secretary of State had the ability
3  to focus their education efforts on the populations that
4  they felt would benefit from that information.
5      Q.  (By Mr. Geer) Did -- did they not believe that
6  the low income voters and minority voters would benefit
7  from this information?
8          MS. HALPERN:  Objection, misstates the
9  testimony.
10         MR. SCOTT:  Objection.
11     Q.  (By Mr. Geer) Sir, I'm asking you:  Did they
12 not believe that?  Was there an opinion that they would
13 not benefit from an amendment like this?
14         MS. HALPERN:  Objection, vague.
15         MR. SCOTT:  Objection.
16         MS. HALPERN:  Whose opinion?
17     Q.  (By Mr. Geer) Well, we have talking about the
18 Secretary of the State.  And I want to be clear for the
19 record, we're talking about the Secretary of the State,
20 which you just testified to.
21     A.  Yeah.
22     Q.  And we're talking specifically about Amendment
23 27 and whether or not -- strike that.
24         Did you have any discussions with the
25 Secretary of State's Office regarding Amendment 27?

---

202

1      A.  Not that I recall.
2      Q.  Did you have any discussions with any other
3  State agency regarding Amendment 27?
4      A.  I don't recall.
5      Q.  Did you make any determination in the form of
6  an analysis or research to determine whether or not
7  Amendment 27 would have had a impact on -- a positive
8  impact on minority voters and low income voters?
9      A.  Not -- not that I recall.
10     Q.  And just so I'm clear, do you recall conducting
11 any written analysis related to Amendment 27?
12     A.  No, I do not.
13     Q.  Turning your attention back to Exhibit 2, at
14 the bottom it says, "We do not have the tools necessary
15 to stop in-person voter fraud."  What do you mean by
16 that?  And I'm making the assumption, you can correct me
17 if I'm wrong, but you wrote that language?
18     A.  Out of context, it's hard to tell who wrote
19 what in this e-mail, but I think the argument there is
20 that in-person voter fraud is difficult to prove and
21 that a photo requirement would -- would create a tool
22 for enforcing the laws on in-person voter fraud.
23         MS. HALPERN:  Counsel, can we take a
24 break?
25         MR. GEER:  We certainly can.

---

203

1      (Recess 4:48 p.m. to 4:57 p.m.)
2          MR. GEER:  Back on the record.
3      A.  Yes.
4      Q.  (By Mr. Geer) I'll just pose a new question.  I
5  think there was a question pending which I don't
6  remember anymore.
7          In Exhibit 2, it indicates "we do not have
8  the tools necessary to stop in-person voter fraud."
9  What is the basis for that statement?
10     A.  Prior -- prior to Senate Bill 14 passing, the
11 required -- the required documents would not show that
12 that person was who they say they were.  There was not a
13 photo ID to verify that a person showing up with their
14 voter registration card was indeed that person.  Senate
15 Bill 14 provided that tool to election workers.
16     Q.  So when you're talking about necessary tools,
17 you're talking about documentation, you're talking about
18 ID at the polls; is that correct?
19     A.  A photo -- a photo ID so that the election
20 workers could verify that person was who they said they
21 were.
22     Q.  And so you're talking about photo ID at the
23 polls, correct?
24     A.  Yes.
25     Q.  Did you consider the existing laws, the laws

---

204

1  that were in place prior to SB 14, during your review of
2  SB 14?
3          MS. HALPERN:  Objection, asked and
4  answered.  That's what he just told you.
5          MR. GEER:  I don't know if I asked him
6  that specific question.
7      Q.  (By Mr. Geer) My question was, did you consider
8  the existing laws that were in place prior to SB 14 and
9  you talked about photo ID.  So let me just expand that
10 question.  Did you consider anything else other than the
11 photo ID itself?
12         MS. HALPERN:  Objection, vague.
13         MR. GEER:  I was trying to respond to your
14 objection.
15     Q.  (By Mr. Geer) Do you understand the question?
16     A.  No.  If -- which laws -- which laws are you
17 referring to?
18     Q.  Well, we're talking about SB 14.
19     A.  Okay.
20     Q.  And we're talking about election laws that were
21 in place prior to SB 14.  Did you consider the election
22 laws that were in place prior to SB 14, whether or not
23 they gave the necessary tools to election workers?
24     A.  It was our opinion that they did not.  The
25 rules in place at the time did not require somebody to

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

---

205

1  show that they -- a photo identification and that --
2  that tool we felt was beneficial to election workers
3  because people could show up with a voter certificate
4  and there was no way to verify that person was the
5  person on the voter certificate.
6      Q. Would you agree that prior to the
7  implementation of SB 14, that election laws allowed
8  election judges -- strike that.
9          Would you agree that election judges have
10 the power of district judges to preserve peace and order
11 at the polling place prior to the implementation of SB
12 14?
13     A. I -- I don't have that law in front of me, but
14 I'll take -- unless you have a document.
15     Q. You don't have to take my word. I'm going to
16 put in it front of you.
17     A. Okay. Thank you.
18        MR. GEER: And this is Exhibit 13.
19        (Exhibit 13 marked for identification.)
20     Q. (By Mr. Geer) So I'm putting in front of you
21 what's been now labeled as Exhibit 13. I'll give you a
22 chance to look at that.
23     A. Okay.
24     Q. So my question was, would you agree that prior
25 to SB 14, election judges had the power of a district

---

206

1  judge to preserve peace and order at the polling place?
2      A. Yes.
3      Q. Would you also agree, based on Exhibit 13, that
4  that power included the power to arrest?
5      A. Yes.
6      Q. That that power also included the power to
7  appoint one or more persons to act as special peace
8  officers at the polling place? And you can refer to
9  Section 32.075.
10     A. Yes.
11     Q. And did you consider that power that election
12 judges already had during your review of SB 14?
13     A. Because there was not a photo ID requirement to
14 accompany these powers, the -- it was our feeling, my
15 belief, that this relies on the election worker having
16 some personal knowledge that that person was not who
17 they said they were. They would have to know the person
18 coming in to vote in order to be able to enforce illegal
19 voting laws.
20     Q. It's your belief, as you testified. Did you
21 conduct any analysis to support your belief?
22     A. That would seem to be intuitive that the person
23 would have to have some -- would have -- the election
24 worker would have to know the person coming in to vote
25 in order to -- to know that the voter certificate that

---

207

1  they were showing was not for that person.
2      Q. So the answer to my question about did you
3  conduct actual analysis or research to support your
4  belief, is that a yes or no?
5      A. There was testimony I believe also in
6  committee on that issue in the House committee, but.
7      Q. Testimony by whom?
8      A. I don't recall.
9      Q. Do you recall the specifics of that testimony?
10     A. No, I don't recall.
11     Q. Were you aware that prior to SB 14, candidates
12 had the ability to place poll watchers at polling
13 places?
14     A. Yes. Yes, I'm aware of the poll watchers.
15     Q. That each candidate had the ability to place
16 poll watchers at a polling place?
17     A. I'm not familiar with the specifics of the poll
18 watcher provisions, but --
19     Q. Fair enough.
20     A. -- okay.
21     Q. Are you aware of a Houston-based group that
22 has -- prior to SB 14, that made significant efforts to
23 recruit and place poll watchers in polling places in the
24 state of Texas?
25     A. Can you be more specific on the --

---

208

1      Q. Certainly. Are you aware -- are you familiar
2  with organizations such as the True the Vote, King
3  Street Patriots?
4      A. Yes.
5      Q. Have you communicated with these organizations
6  regarding voter identification legislation?
7      A. Yes.
8      Q. When did you communicate with these particular
9  groups?
10     A. Prior to the committee hearing on SB 14 in the
11 House.
12     Q. And who was present during that communication
13 -- how many times did you communicate with them?
14     A. Once, maybe twice.
15     Q. And I indicated two different groups, King
16 Street Patriots, True the Vote. Do you understand them
17 as being the same organization or did you have separate
18 communications with these groups?
19     A. My -- at that time, they -- I believe they were
20 -- I understand that they have -- they are no longer
21 King Street Patriots, they are True the Vote. That's my
22 understanding. At that time I believe they were King
23 Street Patriots.
24     Q. And was that communication with
25 Ms. Englebrecht? Are you familiar with her?

---

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

53 (Pages 209 to 212)

---

209

1    A.  Yes.
2    Q.  And I -- as I sit here I forget her first name.
3  Do you recall her first name, is it Catherine?
4    A.  I believe that's correct.
5    Q.  And what was the substance of that
6  communication?
7        MS. HALPERN:  I'm going to object on the
8  basis of legislative privilege.  Notwithstanding that,
9  based on the guidance from the court, the witness is
10  going to go ahead and answer under seal.
11   A.  My communication with her prior to the
12  committee hearing was in regards to -- she was
13  interested in coming to testify at the committee
14  hearing, and I was giving her details on when I felt the
15  committee hearing would occur and scheduling-type
16  details.
17   Q.  (By Mr. Geer) Did she testify?
18   A.  She was not one of the invited testimony -- she
19  was not one of the invited witnesses.  I do not recall
20  if she voted -- if she showed up as a public testimony
21  during that hearing.
22   Q.  Is it Representative Harless who decides who
23  the invited witnesses would be?
24   A.  Ultimately, yes.
25   Q.  Do you know why she was not an invited witness?

---

210

1    A.  No, I don't know.
2    Q.  Do you know what she was intending on
3  testifying about?
4    A.  I don't recall.
5    Q.  Did it have to do with the photo ID
6  legislation?
7    A.  That would be my understanding.  I don't
8  remember if she ended up coming to the hearing and
9  testifying but she was interested in testifying on
10  Senate Bill 14.
11   Q.  And that's a Houston-based organization,
12  correct?
13   A.  Yes.
14   Q.  And going back to my original question:  At any
15  time during your consideration of SB 14, were you aware
16  of True the Vote's efforts to recruit and train poll
17  watchers to place in the poll -- polling places
18  specifically to look for the issue of voter fraud?
19   A.  What was the -- could you repeat your question?
20   Q.  Probably not the same but I can try.
21   A.  Well, I can --
22   Q.  First of all, I asked were you aware of True
23  the Vote's efforts to recruit and train poll watchers in
24  the state of Texas?
25   A.  At that time during the --

---

211

1    Q.  Yes.
2    A.  I don't recall at that time if I was aware of
3  their efforts.  Subsequent to that, I have learned of
4  the -- of those efforts.
5    Q.  Would it be fair to say that their efforts drew
6  some controversy in the media?
7    A.  Yes.
8    Q.  And that True the Vote publicly stated that
9  they were training these poll watchers to look for
10  in-person voter fraud?  Do you recall that?
11   A.  I don't recall that aspect of it.
12   Q.  Do you recall a public statement that they were
13  training poll workers to monitor for voter fraud in the
14  polls?
15   A.  I don't recall that.
16   Q.  In any event, did Catherine Englebrecht or True
17  the Vote present any evidence to Representative Harless
18  or yourself regarding in-person voter fraud at the
19  polls?
20   A.  I don't recall any information from that
21  organization being presented to myself.
22   Q.  Do you recall if True the Vote or Catherine
23  Englebrecht raised concerns about noncitizens or illegal
24  aliens voting at the polls?
25   A.  I don't -- I don't remember.  I don't recall

---

212

1  that testimony.
2    Q.  And as a follow up to that question, did they
3  present any documented cases to either you or to
4  Representative Harless regarding noncitizens or illegal
5  aliens voting at the polls?
6        MS. HALPERN:  Objection, asked and
7  answered.  He told you there was one communication and
8  he told you what it was about.
9    A.  I don't recall.
10   Q.  (By Mr. Geer) During your review of photo ID
11  legislation, did you review HB 218, which was a piece of
12  photo ID legislation in the House?
13   A.  I'm not familiar with 218 without having --
14  having it in front of me.
15       (Exhibit 14 marked for identification.)
16   Q.  (By Mr. Geer) Sir, I've handed you what's been
17  marked as Exhibit Number 14, and I'll give you a chance
18  to look at that.
19   A.  Okay.
20       MR. SCOTT:  I'm not going to look.
21   Q.  (By Mr. Geer) And my question is:  Have you
22  ever reviewed this piece of legislation before?
23   A.  This appears to be from the 80th Legislative
24  Session and it's -- that would put this in 2007?
25   Q.  Correct.

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

---

213

1    **A.  At the time, I was familiar with it.  Yes, I**
2    **have reviewed it.**
3        Q.  And is it your understanding that HB 218
4    allowed both photo and non-photo ID?
5    **A.  Yes.**
6        Q.  And is it your understanding that the non-photo
7    ID that's proposed in HB 218 was sufficient to identify
8    a person at the polls?
9            MS. HALPERN:  Objection, foundation.
10       Q.  (By Mr. Geer) Well, let me clarify that
11   question then.
12           HB 218 offered non-photo ID, correct?
13   **A.  Yes.**
14       Q.  Number 10 on Page 5, it offered a library card
15   that contains the person's name issued to the person by
16   public library located in this state, correct?
17   **A.  Yes.**
18       Q.  It offered things like pilot's license --
19   licenses, correct?
20   **A.  Correct.**
21       Q.  Temporary driving permit to the person by the
22   Department of Public Safety, correct?
23   **A.  Yes.**
24       Q.  Identification card issued by the person -- to
25   the person by a governmental entity of this state or the

---

214

1    United States for the purpose of obtaining public
2    benefits, correct?
3    **A.  Correct.**
4        Q.  And is it -- do you have an understanding as to
5    at the time HB 218 was presented, whether there was an
6    opinion that this type of identification was sufficient
7    to identify a voter at the poll?
8            MS. HALPERN:  I'm sorry, could you read
9    the last part of that question back?
10           (Requested portion was read back by the
11   court reporter.)
12           MS. HALPERN:  Objection, no foundation.
13   Objection, calls for speculation.  Whose opinion?
14           MR. GEER:  I actually believe I asked, "Do
15   you have an opinion?"
16   **A.  If at the time this was sufficient?**
17       Q.  (By Mr. Geer) Yes.
18   **A.  I don't have an opinion.  I don't -- I was not**
19   **following this issue in 2007.  I know this was the bill**
20   **that Betty Brown, Representative Betty Brown offered.  I**
21   **can't speak to the sufficiency in 2007 on this issue.**
22       Q.  I believe you gave some testimony regarding SB
23   -- actually, you didn't.  I believe that you testified
24   that HB 112 was patterned after a specific bill?
25   **A.  Yes.**

---

215

1        Q.  And was that bill that you were referring to SB
2    362?
3    **A.  I believe so, if...**
4            (Exhibit 15 marked for identification.)
5        Q.  (By Mr. Geer) And I'm putting in front of you
6    what's been labeled Exhibit 15.
7    **A.  Yes.**
8        Q.  I'll give you a chance to look at that
9    quickly.  Who was this bill authored by?
10   **A.  That is a Senator Fraser.**
11       Q.  This is SB 362?
12   **A.  Correct.**
13       Q.  And do you recall the time period in which this
14   bill was filed?
15   **A.  This bill was from the 81st regular session,**
16   **which would have been in 2009.**
17       Q.  And this bill allows both photo and non-photo
18   ID; is that correct?
19   **A.  Correct.**
20       Q.  And Representative Harless patterned her bill,
21   HB 112 after SB 362?
22   **A.  Yes.**
23       Q.  Was that your testimony?
24   **A.  (Witness nods head yes.)**
25       Q.  And in fact, Representative Harless filed HB

---

216

1    112 in 2011?  I'm sorry, that is actually not correct.
2            She prefiled HB 112 in --
3    **A.  2010.**
4        Q.  -- 2010.  That would be correct?
5    **A.  Yes.**
6        Q.  And HB 112, which patterned after SB 362, also
7    allowed for both photo and non-photo ID, correct?
8            MS. HALPERN:  Objection, asked and
9    answered this morning at length.
10   **A.  Correct.**
11       Q.  (By Mr. Geer) And she never withdrew HB 112
12   from consideration, did she?
13   **A.  The bill was filed and was referred to**
14   **committee.**
15       Q.  But if that bill would have been -- if that
16   bill would have moved forward, and would have been --
17   would have passed, that would have been the law of the
18   state of Texas, correct?
19           MS. HALPERN:  Objection, calls for
20   speculation, no foundation.
21       Q.  (By Mr. Geer) Let me strike that.
22           She supported HB 112, correct?
23           MS. HALPERN:  Objection, asked and
24   answered this morning.
25           MR. GEER:  And the answer was yes?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

217

1          MS. HALPERN:  No.
2          **A.  HB 112 was, in my opinion -- I don't know how**
3    **Representative Harless felt -- was the -- I can't speak**
4    **for her, but it was a placeholder, a starting point for**
5    **the debate to begin.  It --**
6          Q.  (By Mr. Geer) And is that -- I'm sorry, were
7    you were finished?
8          **A.  It was -- it was the starting point for the**
9    **debate.**
10         Q.  And if that bill was voted on and passed as is,
11   it would have allowed both photo and non-photo ID,
12   correct?
13         **A.  Had it remained the same as -- as -- yes,**
14   **correct.**
15         Q.  And she -- HB 112 expanded the forms of ID as
16   opposed to SB 14 which restricted the forms of photo ID,
17   correct?
18         MS. HALPERN:  Objection, misstates the
19   record, no foundation.
20         MR. GEER:  Well, I mean we can go through
21   --
22         MS. HALPERN:  Expanded and compared to
23   what?  The beginning was nothing.  It was a piece of
24   paper, a certificate.  362 --
25         MR. GEER:  I believe I said as compared to

218

1    SB 14.
2          MS. HALPERN:  It predated it.  No
3    foundation, calls for speculation, misstates the record.
4          Q.  (By Mr. Geer) You can answer.
5          MS. HALPERN:  You can try.
6          **A.  Can you -- can you restate -- can I get the**
7    **question restated?**
8          MR. GEER:  Read it back, please.
9          (Requested portion was read back by the
10   court reporter.)
11         MS. HALPERN:  Objection, vague.
12         **A.  SB 14, I believe is different than HB 112.**
13   **Comparing them, it -- I don't -- I can't -- your answer**
14   **-- your question is difficult to answer.  I don't agree**
15   **with the -- it's difficult to compare the two because**
16   **Senate Bill 14 is requiring a photo identification and**
17   **112 was -- was based upon legislation prior that we had**
18   **prefiled as a starting point for the debate.**
19         Q.  (By Mr. Geer) You testified several times about
20   starting point.  Did you have a communication with
21   Representative Harless where she identified this bill as
22   a starting point for the debate?
23         **A.  The -- it was my understanding.**
24         MR. D'ANDREA:  Objection, legislative
25   privilege.  You may answer under seal.

219

1          **A.  It was my understanding that photo**
2    **identification -- a photo identification requirement was**
3    **a goal, a goal of Representative Harless's because the**
4    **constituents were requesting this.  The information we**
5    **were seeing on the support for the issue was showing**
6    **that it had a great deal of support in the public and**
7    **that is what the goal was, was for a photo**
8    **identification requirement.**
9          Q.  (By Mr. Geer) So what changed between the
10   filing of SB 362 and the filing of SB 14 in the --
11   regarding her constituency and their requests for photo
12   ID legislation?
13         MS. HALPERN:  Objection, assumes facts not
14   in evidence, no foundation.
15         Q.  (By Mr. Geer) Well, I believe you testified
16   this morning that you had communications with
17   constituents, that Representative Harless had
18   communication with constituents; is that a yes?
19         **A.  Yes.**
20         Q.  And that that communication involved photo ID
21   legislation, correct?
22         **A.  Correct.**
23         Q.  That involved HB 112, I believe you testified
24   to?
25         **A.  Yes.  The -- we received communications from**

220

1    **our constituents on Voter ID in general.  I don't**
2    **remember if it was specific to HB 112 or SB 14 but the**
3    **broad issue of photo identification.**
4          Q.  When she prefiled HB 112 in 2010, was that in
5    response to her constituents?
6          **A.  Yes.**
7          Q.  Turning your attention to Exhibit 7.  And
8    you've testified about this morning.  This is the e-mail
9    from Jessica Gonzalez to you dealing with the disability
10   and social security disability ratings, I
11   believe.  There's a -- at the bottom of this, it
12   indicates, "Call me if you'd like to discuss," and
13   that's referencing opposition might come -- let me
14   strike that.
15         The document indicates that, "I have a
16   little bit of sense of where the opposition might come
17   from since I talked with many members' office --
18   members' office about the exemption this week."  What
19   opposition was there to -- to this type of exemption?
20         MS. HALPERN:  Objection, asked and
21   answered this afternoon.
22         **A.  The opposition that we were aware of was that**
23   **the language that was placed on in the Senate was needed**
24   **-- needed work in order to find an identifiable standard**
25   **to show that someone was in fact disabled.**

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

221

1   Q.   (By Mr. Geer) And the turning your attention to
2   Page 2, does this identify the standard that was part of
3   the Senate Bill?
4   A.   Yes.
5   Q.   And that must include a certification from a
6   physician that the person has a disability as defined by
7   Section 21.02, Labor Code, with the person's
8   application?
9   A.   Yes.
10  Q.   What, if any, analysis did you or
11  Representative Harless conduct to determine whether or
12  not this particular provision, I believe you testified
13  this morning, had loopholes?
14  A.   This section of the Labor Code, I don't recall
15  what that is referring to, so without that context, I
16  can't -- I don't recall where that section is referring
17  to in the Labor Code.  But I remember the concerns were
18  that this was a -- this standard was too broad.
19  Q.   Why was it too broad?
20  A.   The concerns we were hearing was that the
21  physician's note, that that would create loophole in the
22  law.  I don't know what this Labor Code section refers
23  to so I can't get into specifics, but that was the
24  general.
25  Q.   And what was the loophole you're referring to?

222

1   Can you help me understand that?
2   A.   The physician's note that the person has a
3   disability.
4   Q.   And why is that, as you testified, a loophole?
5   A.   The concerns we were hearing was a disability,
6   would that include someone who -- what would that --
7   would that prevent them from going to go get a photo
8   identification.  What, at what level is the
9   disability -- is it -- what is the word disability.  And
10  that's why I don't know what this Labor Code section is
11  referring to.  So without knowing that definition, I
12  can't speak to these individual's concerns.
13  Q.   Would you agree that SB 14, as passed, limits
14  the types of voters with disabilities that can actually
15  claim this exemption?
16  A.   Without having the information on this
17  exemption, it's hard to conduct a comparison between the
18  two.  We -- that's why we approached the individuals who
19  represent the disabled in Texas for their input on a
20  standard that would be acceptable to them.
21  Q.   SB 14, as passed, deals with the Veterans
22  Administration I believe.  Actually, I should do this
23  the right way.
24       SB 14, as passed, what exemption for
25  disabilities is included in that?

223

1   A.   (Looking in Exhibit 4.) "An applicant who
2   wishes to receive..."  It's in Section 1 of the bill.
3   Q.   And the disability exemption that was passed by
4   the Senate called for a certification from a physician
5   that a person has a disability as defined.  What, if
6   any, analysis, written analysis, did you conduct to
7   determine that A, this was a loophole and B, it was too
8   broad?
9   A.   At the time the definition contained in that
10  Labor Code -- and without having that in front of me,
11  it's difficult to answer because I don't know what that
12  definition looked like.  The concerns that we were
13  hearing from individuals, and as Ms. Gomez stated, she
14  was hearing those concerns as well, were that that
15  definition was too broad and there needed to be a more
16  -- a more defined standard for that exemption.
17  Q.   So is it fair to say as you sit here today
18  you're not aware of any written analysis that you
19  conducted regarding this issue?
20  A.   I'm sorry, I don't understand the question.  If
21  -- can you?
22  Q.   Well, I've asked and I don't believe that
23  you've answered at this point.
24  A.   Okay.
25  Q.   What, if any, written analysis did you or

224

1   Representative Harless conduct specifically regarding
2   this issue?  This issue being the disability exemption.
3   A.   I don't recall -- I don't recall that issue --
4   that issue with regards to this Senate language.  We did
5   analysis on the language that was offered to us by
6   Advocacy, Inc. and that's what's contained in this
7   e-mail and -- and I don't recall the information on the
8   Senate amendment.
9   Q.   So beyond communicating with Advocacy, Inc.,
10  did you communicate with any other groups?
11  A.   Can you be more specific?  On this issue?
12  Q.   Yes.  And we're referencing Exhibit Number 7.
13       MS. HALPERN:  He's asking I think if you
14  talked to any other handicapped representing groups --
15  with disability representing groups.
16  A.   Okay.  They -- they were who our office worked
17  with on this issue.  I don't recall any other groups
18  that we -- that we worked with.
19  Q.   (By Mr. Geer) Referring your attention to
20  Exhibit Number 8.
21       MS. HALPERN:  Is 8 the House Journal?
22       MR. GEER:  Yes.
23  Q.   (By Mr. Geer) You testified earlier this
24  morning that the intent for SB 14 was for photo ID.  Do
25  you recall that testimony?

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

57 (Pages 225 to 228)

225

1    A.  Yes.
2    Q.  Is it fair to say that the amendments, as you
3  testified, that were offered by Democrats were also
4  offered by opponents of SB 14?
5    A.  I'm not sure if I'm clear on that question.
6  The amendments offered were all by opponents?  Or all
7  amendments offered by Democrats were opponents?  Can
8  you --
9    Q.  Personally, I don't care if they were offered
10  by Democrats.  Specifically, were they offered by
11  opponents of SB 14?
12    A.  Not all amendments offered were offered by
13  opponents of the legislation.
14    Q.  Was Amendment 3 offered by an opponent of SB 14
15  and that was Representative Giddings and Bonnen?
16    A.  Representative Bonnen.  Representing Giddings,
17  I'd have to look at the final vote, but I would say that
18  she -- she was not in favor of SB 14.  Representative
19  Bonnen was most likely in favor of SB 14.
20    Q.  And that amendment was tabled?
21    A.  Amendment Number 3 was adopted.
22    Q.  And did this amendment make it out of
23  committee, is it included in the final passage of the
24  bill?  And I'm talking about SB 14.
25    A.  I do not believe this was included in the final

226

1  version of the bill.
2    Q.  Do you know why it was not included in the
3  final version of the bill?  Did you have any discussions
4  with Representative Harless regarding why it was not
5  included?
6    A.  It would have been discussed.  I don't remember
7  the specifics of that discussion.
8    Q.  So as you sit here today, you don't recall why
9  Amendment Number 3 was not included in the final passage
10  of SB 14?
11    A.  I don't recall the specifics of that
12  discussion.
13    Q.  Regarding Amendment Number 30, you testified
14  earlier this morning regarding standardization of ID
15  cards.  Do you recall that testimony?
16    A.  Yes.
17    Q.  What, if any, written analysis did either you
18  or Representative Harless conduct to determine if
19  Amendment Number 30 offered standard tribal ID cards?
20    A.  We researched the issue.  Written analysis, I'm
21  not clear on what you're meaning is behind that.
22    Q.  I'm mean written analysis.  Did you -- did you
23  research and reduce your research to a written form?
24    A.  Not that I recall.  It was researched but I
25  don't remember reducing it --

227

1    Q.  What was the form of the research?  I'm sorry
2  to cut you off.
3    A.  That's okay.
4    Q.  What was the form of the research?
5    A.  The information we requested of Representative
6  Gonzalez, the search of other tribal identifications,
7  the requirements for tribal identifications.
8    Q.  And as you sit here today, do you know how many
9  different types of tribal identification cards there are
10  in the state of Texas?
11    A.  I don't -- I don't recall that information.
12    Q.  Did you determine that during your review of SB
13  14?
14    A.  I believe so.
15    Q.  And was that a matter of public debate, the
16  number of different types of tribal ID cards?
17    A.  I don't recall the debate on that issue.
18      MS. HALPERN:  How much time is left?
19      (Brief discussion off record about time
20  left.)
21    Q.  (By Mr. Geer) So referring your attention to
22  Exhibit Number 5, the question that was asked, was that
23  a question that was asked by you to Ann McGeehan?
24    A.  This specific question language, I don't recall
25  if that was from me.  That was the information we were

228

1  trying to determine.  But this specific language, I
2  don't know the origin of that.
3    Q.  Why were you trying to determine this language
4  or this information?
5    A.  As part of my preparation, as part of my
6  efforts the prepare Representative Harless for the
7  debate and committee, we were trying to determine the
8  number of voters who, according to the Secretary of
9  State, did not register with a driver's license number.
10    Q.  Is it fair to say that during the course of the
11  public debate for SB 14 and previous photo ID
12  legislation that you were -- that you participated in,
13  that one of the concerns was that minority voters
14  disproportionately lacked the type of ID that's the
15  subject of the question in this exhibit and specifically
16  a Texas driver's license personal identification number?
17    A.  The information in the e-mail is not -- is
18  for -- it's not broken down by racial information so
19  that --
20    Q.  Which -- sorry -- which is not actually my
21  question.
22      During the public debate, was there
23  concern raised by the opponents of SB 14 that racial
24  minorities and ethnic language minorities lacked the
25  required types of ID as indicated in SB 14?

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

58 (Pages 229 to 232)

229

1    A.  That was an issue that was discussed in the
2  committee and on the Senate floor, on the House and
3  Senate floor, yes.
4    Q.  So was this an effort by you and Representative
5  Harless to respond to those concerns?
6    A.  I don't know if it was in direct response to
7  those concerns.  We felt this information was -- would
8  be valuable for the debate.  I don't know if it was in
9  direct response to those concerns.
10   Q.  And at the end of the day, as indicated in
11 Exhibit 5, the number of voters with -- that lacked the
12 specific type of ID as requested in this exhibit was
13 600,900 --690,887?
14        MS. HALPERN:  Objection, mischaracterizes
15 the document.  It says nothing of the sort.  Objection.
16   Q.  (By Mr. Geer)  Well, and let me respond to that
17 objection.
18        The question was:  "What is the number of
19 voters that do not have a Texas driver's license,
20 personal identification number, or social security
21 number in the statewide voter database"?  Did I read
22 that correctly?  Did I read that correctly?
23   A.  That was the question.  This number is the
24 number -- this -- where the asterisk begins, "This
25 number represents all voters that do not have a TDL or

230

1  social security number associated with their record."  It
2  is possible that these persons do not have a TDL -- that
3  they do in fact have a driver's license and they just
4  did not provide it.
5    Q.  Well --
6    A.  So it -- it -- this number is explained in this
7  asterisk portion, so it doesn't answer this question up
8  here directly.
9    Q.  Exhibit 5 doesn't say that -- that these people
10 have one of these forms of ID, does it?
11   A.  This 690 number --
12        MS. HALPERN:  Objection, the document
13 speaks for itself.  We can argue about it for another
14 two hours, but the document speaks for itself and it's
15 very clear.
16        MR. GEER:  I'm not arguing, I'm asking.
17   Q.  (By Mr. Geer)  Does this document, Exhibit
18 Number 5, indicate that these people as identified by
19 this 690,887 have these forms of ID?
20   A.  A number is not associated with their voter
21 registration record.
22   Q.  What was Representative Harless's response to
23 this document?
24   A.  It was our belief that this number was
25 overstated and we -- we -- let me correct that.  This

231

1  number is a -- this number did not answer the question
2  above because it is from 2006 onward, and it is possible
3  that these people had driver's license but did not place
4  it on their voter registration card.  So we did not have
5  a -- this did not answer directly our question.  It was
6  an approximation.  It was as good as the Secretary of
7  State could get a number to us.
8    Q.  What, if anything else, did you do to attempt
9  to answer the question whether or not this number
10 represents individuals who do not have one of the
11 required forms of SB 14 ID?
12   A.  This was the information we had at the time.  I
13 understand that there was a significant amount of data
14 analysis after the fact, but this was the information
15 that we were -- that was available to us at the time.
16   Q.  You communicated with DPS regarding -- I
17 believe you testified to this morning, I'm not trying
18 put words in your mouth, but you also communicated with
19 DPS regarding this particular issue?
20   A.  I don't recall a conversation with DPS
21 regarding this specific information.  I don't recall
22 that happening.
23   Q.  Does DPS maintain data by race?
24   A.  I believe they do.  I don't know the specifics
25 on that, when they started collecting that data and how

232

1  extensive that data is.
2    Q.  During your consideration of SB 14, did you
3  attempt to determine the type of data that DPS
4  maintained?
5    A.  Because DPS didn't have the voter information,
6  we sought that information from the Secretary of State's
7  Office; they were the ones that had the voter database
8  information.  That was not maintained at DPS.
9    Q.  So the answer is no?
10   A.  We did not seek voter information from DPS.
11   Q.  Did you seek to compare the information that
12 DPS maintained with the information that the Secretary
13 of State's Office maintained?  Did you conduct any
14 analysis to determine what voters in the state of Texas
15 may not possess one of the required forms of SB 14 ID?
16   A.  Merging --
17   Q.  Yes.
18   A.  Merging those databases was not within our
19 resources in Representative Harless's office.
20   Q.  So the answer is no?
21   A.  No.
22        MR. GEER:  Can we take quick break?
23        MS. HALPERN:  Sure.
24        (Recess 5:53 p.m. to 5:56 p.m.)
25        MR. GEER:  Back on the record.

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

233

1    Q.  (By Mr. Geer) You've testified several times
2    that you considered the Crawford case.  What information
3    did you draw from the Crawford case that was relevant to
4    your consideration of SB 14?
5        **A.  It's been some time since I've reviewed the**
6    **details within the case.  There were so -- without a**
7    **copy of that, I can't really get into the details of the**
8    **standard that was set forth in Crawford, but there was a**
9    **standard that they -- they set out in that opinion that**
10   **was a model for states to follow.**
11       Q.  Would you agree that the demographics in
12   Indiana are different than the demographics in the state
13   of Texas?
14       **A.  Texas is unique so yes, I would say we have a**
15   **-- probably a unique population compared to Indiana.**
16       Q.  Would you agree that the demographics in
17   Georgia are different from the demographics in the state
18   of Texas.
19       **A.  Yes.**
20       Q.  Did you consider population trends as it
21   relates to the state of Georgia when considering -- when
22   considering your comparison of SB 14?
23           MS. HALPERN:  Objection, vague.
24       Q.  (By Mr. Geer) That was vague and I apologize
25   for that.

234

1           Did you consider population trends in any
2    of these other states during your consideration of SB
3    14?
4           MS. HALPERN:  Objection, vague.  Can you
5    explain population trends?
6        Q.  (By Mr. Geer) Do you understand population
7    trends?
8        **A.  Not entirely.**
9        Q.  Did Rep Harless, Representative Harless state
10   publicly that SB 14 would increase turnout for minority
11   voters?
12       **A.  I don't know the answer to that.  I --**
13   **without -- I can't remember on that issue.**
14       Q.  Did you conduct any analysis regarding turnout
15   as it relates to SB 14?
16       **A.  We looked at the other states that implemented**
17   **voter identification.**
18       Q.  And what other states did you look at?
19       **A.  The testimony from the Georgia witness from the**
20   **Secretary -- the Georgia Secretary of State, his**
21   **information on turnout was information that we looked**
22   **at.**
23       Q.  And do you recall specifically what that
24   information was?
25       **A.  That there was a positive correlation, voter**

235

1    **turnout increased.**
2        Q.  When was Georgia's photo ID law implemented, do
3    you know?
4        **A.  I knew at the time.  I don't recall now.**
5        Q.  If I said 2005, would that refresh your
6    recollection?
7        **A.  I believe that's correct.**
8        Q.  And am I correct that the law was not
9    implemented until 2007?
10       **A.  I -- I don't remember when the law was**
11   **implemented.**
12       Q.  Do you recall that it was a subject of legal
13   hearings?
14       **A.  Yes.**
15       Q.  So are you familiar with the population growth
16   in the state of Georgia?  Did you consider that while
17   comparing the photo ID legislation of Georgia and Texas?
18       **A.  I don't recall the specifics of that analysis**
19   **done by the Secretary of State's Office, the Georgia**
20   **Secretary of State's Office.**
21       Q.  What analysis did you conduct?  Did you
22   consider population growth?
23       **A.  I don't recall the specifics of the analysis**
24   **done.**
25       Q.  And you don't recall anything in writing

236

1    regarding relating to SB 14 and population growth?
2        **A.  No.**
3        Q.  Do you know if the population growth in the
4    state of Georgia is the same as the population growth in
5    the state of Texas?
6        **A.  I don't think so.**
7        Q.  Did you consider that during your review of
8    both state laws as it relates to photo identification
9    law -- legislation?  I'm sorry.
10       **A.  I don't recall the specifics of that issue.**
11       Q.  And is it fair to say that you don't recall
12   reviewing any written analysis regarding population
13   growth in either state?
14       **A.  I don't recall.**
15       Q.  Do you recall if the photo ID law that was
16   implemented in the state of Georgia includes the same
17   types of photo ID that was implemented in the state of
18   Texas?  Was there any difference?
19       **A.  I don't recall the specifics of the Georgia**
20   **photo identification law.  There certainly are**
21   **differences between the two laws.**
22       Q.  Would you agree that the majority of the
23   amendments proposed by opponents of SB 14 were tabled
24   during the consideration of SB 14?
25       **A.  Yes.**

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

237

1    Q.  Would you agree that there was public debate
2  regarding those amendments and they were offered in --
3  to address the concerns of the opponents of SB 14?
4        MS. HALPERN:  Objection, no foundation.
5    Q.  (By Mr. Geer) Well, we could go through the
6  amendments again if you want to.  But realizing you've
7  testified about the amendments this morning --
8    **A.  Yes.**
9    Q.  -- I'm asking you that question.
10   **A.  The amendments I think would stand on their**
11 **own.  It would be on a case by case and amendment by**
12 **amendment what the motivation was for each amendment.**
13 **It's -- I can't say whether an amendment was addressing**
14 **concerns unless I was looking at -- through each**
15 **amendment.**
16   Q.  And we won't do that again.
17        MS. HALPERN:  Thank you.
18   Q.  (By Mr. Geer) Turning your attention to Exhibit
19 10 and specifically the document that has the indicator
20 TX 00006971.
21        MS. HALPERN:  I'm sorry, what page, 69?
22        MR. GEER:  -71.
23        MS. HALPERN:  This document is marked
24 highly confidential; therefore if it weren't already
25 under seal, we would be asking to be under seal.

238

1    Q.  (By Mr. Geer) Can you tell me what this
2  document is, please?
3    **A.  This -- Exhibit 10, this was in preparation for**
4  **the debate on the Conference Committee Report adoption.**
5    Q.  And who is this document from?  It's an e-mail,
6  correct?  Who is that from, Exhibit 10?
7    **A.  Okay.  Sorry.  I lost --**
8    Q.  6971 --
9    **A.  Okay.**
10   Q.  -- is the Bates number, the Texas Bates number.
11        MS. HALPERN:  Let the record also reflect
12 that this appears to be a printout from the private
13 e-mail of Representative Harless.
14        MR. GEER:  Are we looking at the same
15 thing?
16        MS. HALPERN:  Page 1 of 1?
17   **A.  Yes, I've got it.**
18        MS. HALPERN:  Yeah, it's a printout from
19 her private e-mail.
20   Q.  (By Mr. Geer) Well, actually, let me just go
21 through it so the record is clear.  Do you see the top
22 of it, this is an e-mail, correct?
23   **A.  Yes.**
24   Q.  Who is the e-mail from?
25   **A.  It is from myself to Representative Harless.**

239

1    Q.  And what's the subject line?
2    **A.  Conference Committee Report, Senate Bill 14.**
3    Q.  And did you prepare this e-mail?
4    **A.  I believe so.  I don't know if all the language**
5  **was mine but I believe so.**
6    Q.  And what's the date of this e-mail?
7    **A.  This is April 20th.**
8    Q.  And it discusses the difference between CCR SB
9  14 and House passage SB 14, correct?
10   **A.  Yes.**
11   Q.  And what does CCR stand for?
12   **A.  Conference Committee Report.**
13   Q.  The very first section indicates that, "CCR
14 adds back religious exemption but with tightened
15 language."  Do you see that?
16   **A.  Yes.**
17   Q.  What the tightened language that was added back
18 into the religious exemption?
19   **A.  I don't remember.  I don't remember that**
20 **issuing.**
21   Q.  Were you involved in communications regarding
22 tightening the language of the religious exemptions?
23   **A.  I don't recall that issue.  I don't remember.**
24   Q.  Did -- were you involved in communications
25 regarding why the word "consistently" was added into the

240

1  language of religious exemption?
2        MS. HALPERN:  You're referring to the
3  languages that says, "The voter has consistently refused
4  to be photographed for any government purpose"?
5        MR. GEER:  Correct, and consistently is
6  underlined.
7    **A.  I don't recall that discussion.**
8    Q.  (By Mr. Geer) The second paragraph says, "CCR
9  removes requirement that SOS education efforts target
10 low income minority voters," and it has "Miles."  Who is
11 Miles?
12   **A.  That would be -- I believe that was Borris**
13 **Miles who offered that amendment, Representative Miles.**
14   Q.  And that amendment was removed and it indicates
15 that -- the OAG and SOS concerns.  What concerns did the
16 OAG and SOS have regarding this particular amendment?
17   **A.  I don't recall that --**
18   Q.  Did you --
19   **A.  -- information.**
20   Q.  I'm sorry, were you finished?
21   **A.  I don't recall that discussion.**
22   Q.  Did you have a discussion with the Office of
23 the Attorney General regarding this amendment targeting
24 low income and minority voters?
25   **A.  I -- I don't recall that conversation.**

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

---

**241**

Q.  Did you have a conversation with the Secretary of State regarding targeting low income and minority voters?

A.  I don't recall that information -- that conversation.

MS. HALPERN:  Let me ask for a clarification of my own witness.  When you say, "I don't recall," does that mean it didn't happen or you don't remember --

THE WITNESS:  I don't remember.

MS. HALPERN:  You don't remember whether they had it at all?

THE WITNESS:  Yes.

Q.  (By Mr. Geer) So as you sit here today, you don't know what if any concerns the Office of the Attorney General or the SOS --

A.  I don't --

Q.  -- Secretary of State's Office had?

A.  I don't remember their specific concerns with that.  Yeah, I don't remember their concerns regarding that amendment.

Q.  Did you receive anything in writing expressing the concerns of the Office of the Office of the Attorney General or the Secretary of State's Office regarding this amendment?

---

**242**

A.  Not that I remember.

Q.  Paragraph 5, "CCR removes tribal ID as an acceptable form of ID," and it has "Naomi Gonzalez."  Naomi Gonzalez is Representative Gonzalez?

A.  Correct.

Q.  And it goes on to say that, "Tribal IDs have no standardized form."  We've talked with that?

A.  Yes.

Q.  "No evidence that this small number of voters do not already have other forms of ID."  What research did you conduct to determine whether or not this specific group had other forms of ID?

A.  When we requested information from Representative Gonzalez's office, I believe this was one of the issues that we asked for.  They did not present us any evidence of this, that these individuals in tribal areas would not have a driver's license.

Q.  Did they present you any evidence that they did have a driver's license?

A.  I --

Q.  And we're speaking about Representative Gonzalez who you made the request to.

A.  Correct.  I don't recall.  I just -- I don't remember any evidence on that issue from their office.

Q.  Did it concern you or Representative Harless

---

**243**

that they may not possess the necessary forms of ID?

A.  The concern was -- was addressed in the bill with the other provision with the free IDs, all the other issues that we've discussed, all the provisions in the bill that provide protections for that.

Q.  Well, this was an amendment specific to tribal IDs, correct?

A.  Yes.

Q.  And SB 14 removes any language referring directly to tribal IDs, correct?

A.  Yes.

Q.  And so the question was:  Were you or Representative Harless concerned that this specific group may not possess any others form of ID?  Did you consider that?

A.  That was considered but we determined that this was a small number of voters and that there was not a standardized form so this would not be an acceptable form of identification for voter ID purposes.

Q.  "CCR removes ID approved by State as an acceptable form of ID.  Language was too broad."  Do you see that?

A.  Yes.

Q.  And that was by Representative Alonzo?

A.  Correct.

---

**244**

Q.  The amendment?

A.  Correct.

Q.  What, if any, research did you conduct to support the position that the language was too broad?

MS. HALPERN:  Objection, no foundation.

Q.  (By Mr. Geer) Well, let me add a little foundation then.  You understand that we're discussing amendments that were offered on the House floor?

A.  Yes.

Q.  You understand that this particular amendment was offered by Representative Alonzo?

A.  Yes.

Q.  And that the amendment attempted to include language that would allow IDs approved by State -- by the State of Texas as an acceptable form of ID in SB 14?

A.  I don't remember the exact language of the amendment?

Q.  Well, generally --

A.  Yes.

Q.  -- I mean, you're looking at --

A.  The summary states that it was a State acceptable form approved by the State.  I think the "approved by the State" language was what -- where the "too broad" issue was coming from.

Q.  And what did you understand --

COLBY BEUCK                                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

---

245

1    **A.  What is approved.**
2    Q.  -- approved by the State to mean?
3    **A.  "What does approved by the State mean?" was the**
4    **question.**
5    Q.  All right.  What did you understand that to
6    mean?
7    **A.  That was our question.  We did not know what**
8    **that meant.**
9    Q.  Did you attempt to elicit that knowledge from
10   Representative Alonzo?
11   **A.  I don't recall.**
12   Q.  Did you receive anything in writing or did you
13   send anything in writing that shows that you attempted
14   to elicit that kind of information from Representative
15   Alonzo?
16   **A.  I don't recall the discussion on that issue**
17   **with Representative Alonzo.**
18   Q.  And I'm almost done.
19       Turning your attention to TX -- subsequent
20   page on Exhibit 10, the Bates stamp number is TX
21   00006973 and the document is titled Voter ID
22   Differences.  Have you seen this document before?
23   **A.  I do recall this document.**
24   Q.  Did you prepare this document?
25       MS. HALPERN:  Let the record reflect this

---

246

1    is noted Highly Confidential on the bottom and so it's
2    one of the apparently disputed documents.
3        MR. GEER:  And I should have said that.
4    Thank you.
5    Q.  (By Mr. Geer) Did you prepare this document?
6    **A.  Not that I recall.**
7    Q.  But you reviewed this document previously?
8    **A.  I have seen this document before.**
9    Q.  The second paragraph, "Section 5, Voter ID
10   Identification, target at low-income voters, OAG
11   dislikes."  Do you know what the Office the Attorney
12   General disliked about this particular amendment?
13       MR. SCOTT:  Objection, form, speculation.
14   **A.  I didn't prepare this document so I can't speak**
15   **to that issue.  I don't know.**
16   Q.  (By Mr. Geer) Do you know who prepared this
17   document?
18   **A.  I don't recall.**
19   Q.  "Section 9, Over 70 as of 1-1-12 exemption, two
20   classes of voters."  Do you see that?
21   **A.  Yes.**
22   Q.  What does -- what does that mean, two classes
23   of voters?
24       MR. SCOTT:  Objection, form, speculation.
25   Q.  (By Mr. Geer) Well, let me clarify that.  Did

---

247

1    you have a discussion with Representative Harless where
2    you -- did you participate in any communication where
3    you talked about the over 70 exemption and the
4    possibility that this created two classes of voters?
5    **A.  I -- I don't remember that discussion.**
6    Q.  "Section 17, Senate exemption for indigent:  Is
7    this Necessary?"  What, if any, research did you or
8    Representative Harless conduct to determine whether or
9    not an exemption for indigent voters was necessary?
10   **A.  This was not my language so I don't know.**
11   Q.  You don't even have to look at the language --
12   **A.  Okay.**
13   Q.  -- I'm asking you what --
14   **A.  Separate from this document?**
15   Q.  Correct.
16   **A.  Okay.  I'm sorry, can you repeat the question?**
17   Q.  What, if any, research did you or
18   Representative Harless conduct to determine if an
19   exemption for indigent voters was necessary?
20   **A.  I don't recall on that issue.**
21   Q.  Do you recall any written analysis regarding
22   the exemption for indigent voters?
23   **A.  I don't recall.**
24   Q.  Do you recall any written analysis considering
25   indigent voters and the impact of SB 14 on that

---

248

1    population?
2    **A.  SB 14 provided a free ID provision, which would**
3    **address the indigent population.**
4    Q.  Is it fair to say that the underlying documents
5    for the free IDs are not free?
6        MR. SCOTT:  Objection, form.  Contradicts
7    previous evidence developed at the deposition of Stan
8    Stanart earlier this week.
9    Q.  (By Mr. Geer) Do you have an understanding that
10   underlying documents for an election identification
11   certificate have a cost?
12   **A.  It's my understanding that that cost is nominal**
13   **if not totally eliminated.**
14   Q.  And nominal, do you know the price of a birth
15   certificate, the cost?
16       MR. SCOTT:  Objection, form, vague.  Are
17   y'all talking about for ID purposes or just in general?
18   I think there's two -- there's --
19       MR. GEER:  In general.
20       MS. HALPERN:  Objection, relevance.
21   Q.  (By Mr. Geer) You can answer.
22   **A.  Birth certificates for non-election purposes, I**
23   **believe are in the range of $20.  For election purposes,**
24   **I believe those -- those are provided at no cost for**
25   **those seeking a birth certificate for an election**

---

COLBY BEUCK                                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

63 (Pages 249 to 252)

249

1  purpose.
2      Q.  What's the process for that, for obtaining a
3  birth certificate at no cost?
4      **A.  I don't know the details on that process.**
5      Q.  Does the voter -- is the voter required or the
6  applicant required to affirmatively ask for a birth
7  certificate at no cost, do you know?
8      **A.  I'm not informed of the details about how a**
9  **voter goes about that process.**
10     Q.  If a voter went to the Vital Statistics office
11 in the state of Texas and did not affirmatively ask for
12 the birth certificate for voting purposes and was
13 charged, would you agree that there was a cost for that
14 underlying document?
15     **A.  In that scenario, if --**
16     Q.  In that scenario.
17     **A.  If somebody had to pay for a birth certificate,**
18 **yes, there would be a cost.**
19     Q.  And do you -- did you conduct any analysis,
20 research to determine what was nominal as far as cost
21 for people, specifically voters that lived below the
22 poverty line, indigent voters?
23     **A.  I'm sorry, but can you -- the question again**
24 **because it --**
25     Q.  You testified that the cost for underlying

250

1  documents would be nominal, correct?
2      **A.  Yes, for election purposes.**
3      Q.  What area you based that on?
4      **A.  That birth certificates are offered at no cost**
5  **for those who are seeking a birth certificate for the**
6  **purposes of obtaining an election identification**
7  **certificate.**
8      Q.  As you sit here today, can you -- do you know
9  whether or not in the implementation of that particular
10 provision as SB 14, whether it's followed by all
11 counties?
12     **A.  I don't know.**
13     Q.  And on Section 17, which we were just
14 discussing in Exhibit 10, it says "OAG dislikes." Did
15 you or Representative Harless have any discussions with
16 the office of the Attorney General regarding what they
17 disliked about this particular amendment, exemption for
18 indigent or religious exemptions?
19     **A.  I'm reading it that the OAG liked the religious**
20 **portion of that.  I don't think it's speaking to the**
21 **OAG's opinion on the indigent provision.**
22     Q.  How do you know?
23     **A.  Just from this document.**
24     Q.  What did they dislike about the religious
25 exemption?

251

1      **A.  According to this document, the OAG liked that**
2  **provision.  I don't recall that discussion.**
3      Q.  And I'll correct the record.  I read it wrong.
4  Thank you for pointing that out.  I apologize for that.
5          MS. HALPERN:  Let me state for the record
6  on behalf of the Office the Attorney General that we
7  don't hate the indigent exemption.
8          MR. GEER:  Well, actually --
9          MS. HALPERN:  Your characterization is a
10 slur on this office.
11         MR. SCOTT:  Not the first.
12         (Laughing.)
13         MR. GEER:  If I was trying to elicit your
14 testimony, that would be perfect, but since I'm not I'd
15 appreciate it if you would let the witness answer.
16         I believe at this point, I am done with my
17 questioning.
18         And I am going to hold this deposition
19 open for the purposes of dealing with the outstanding
20 issue of legislative privilege.  I believe that the
21 court is -- that that issue is still pending before the
22 court.  And the witness has exercised his right to claim
23 legislative privilege throughout the deposition.  And if
24 the court -- once the court rules, it may be appropriate
25 to come back and revisit the issues of legislative

252

1  privilege.
2          MS. HALPERN:  And I understand that, but
3  since in fact he's gone ahead and answered your
4  questions, albeit under seal, I don't know what there
5  would be to reopen.  You have the answers.  The Court
6  will simply rule on whether you can use them or not.
7  But it's not like he refused to answer.  He did answer.
8  He just answered with that objection pending.  And if
9  the Court chooses to accredit it, then the testimony is
10 not usable.  And if the Court doesn't choose to accredit
11 it, then you already have your testimony.  So do we
12 really need to keep this witness on the hook when he's
13 answered the questions?
14         MR. GEER:  I'm going to leave it open.
15         MS. HALPERN:  Well, over my -- over my
16 screaming objection.
17         And your counsel -- your co-counsel now
18 has 23 minutes.
19         MR. ALI:  We can continue going,
20 Mr. Beuck, unless you need a break.
21         THE WITNESS:  It's okay, let's go.
22         MR. ALI:  Great.  I only have a few
23 questions.
24         THE WITNESS:  Okay.
25             EXAMINATION

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

253

BY MR. ALI:

Q. I'm just going to reintroduce myself. My name is Hasan Ali, I represent the Texas League of Young Voters and Imani Clark in this litigation.

A. Okay.

Q. So, earlier today Ms. Rudd and Mr. Geer gave some ground rules for the deposition. We're going to be operating under the same ground rules.

I'm just going to ask you a few questions and hopefully we can run through this pretty quickly.

A. Okay.

Q. And I apologize in advance if some of my questions restate some of your earlier testimony. It's just to go through it really quickly, so this is not meant to trip you up in any way.

Would you agree that prior to SB 14, student IDs were an acceptable form of identification to vote in Texas?

A. I don't have the statute before Senate Bill 14 before me so I don't remember if they were considered a form of identification or not.

Q. If I represent to you that you could vote with a student ID prior to SB 14 --

A. Okay.

Q. -- would you accept that, my representation on

254

that?

A. Okay.

Q. Great. Would you mind looking at exhibit number -- Exhibit 3, which is HB 112.

A. What exhibit was that?

Q. Number 3.

A. Okay.

Q. Representative Harless authored this Bill; is that right?

A. Correct.

Q. Do you mind looking at Page 6, which sets forth the acceptable forms of identification under this bill. I'll give you a second to review these provisions, but would student IDs be an acceptable form of identification under each -- any of these provisions?

MS. HALPERN: Counsel, just -- forgive me, and I don't mean to be difficult but I just want to be sure that what's happening in my brain is not in fact what you're doing.

MR. ALI: Sure.

MS. HALPERN: Your representation about student IDs being an acceptable form of identification was not based on any language in House Bill 112, was it?

MR. ALI: No. No, I'm asking simply, you know, based off of Mr. Beuck's drafting and research of

255

this bill if student IDs would be acceptable under any of these provisions.

MS. HALPERN: Under 112?

MR. ALI: Under 112.

MS. HALPERN: Okay, so we're not talking about existing law anymore?

MR. ALI: We're looking now at 112.

MS. HALPERN: All right. Thank you.

MR. ALI: I think Mr. Beuck's accepted my representation that you could vote under a student ID under prior versions of -- or existing law prior to SB 14.

MS. HALPERN: Well, he accepted it, but that doesn't mean we accepted it.

MR. ALI: That's fine.

THE WITNESS: I'll take your word for it.

MR. ALI: For purposes of moving this along.

MS. HALPERN: All right.

Go ahead and answer his questions.

A. Okay. The -- are you referring to the six forms of identification listed in 112?

Q. (By Mr. Ali) Yes.

A. "A valid identification card that contains a person's photograph issued by an agency, institution or

256

political subdivision of the State." I -- you know, I don't know enough about the issue to determine whether that would include a state school or not, so I'm not sure I understand the question.

Q. Well, my question was intended to be a simple one, which is based off of -- you know, you had testified earlier that you drafted HB 112; is that right?

A. Yes. This was a draft that I requested from legislative counsel.

Q. And during the drafting of HB 112, you gave no consideration to whether or not student ID would be acceptable form of identification under HB 112?

A. I don't recall. I don't recall that issue coming up.

Q. Did you conduct any studies or analysis of instance of voter fraud using student IDs?

MS. HALPERN: That's a yes or no.

A. Not that I recall.

Q. (By Mr. Ali) Did you conduct any studies or analysis on the difficulty of forging student IDs?

A. Not that I recall.

Q. And I also assume you didn't conduct any studies or analysis on the number of minority student voters who used student IDs to vote?

257

1      A.   Not that I recall.
2      Q.   Take a look at Exhibit Number 8, please.  And
3  this, for the record, is the House Journal dated March
4  23, 2011.  I'd specifically like to ask you to look at
5  Page 979.  Can you please look at Amendment Number 23.
6      A.   Yes.
7      Q.   What is your understanding of this amendment?
8      A.   This is an amendment offered by Representative
9  Dutton, which would have added to Senate Bill 14 a
10 student identification card issued by a public or
11 private institution of higher education that contains a
12 person's photograph.
13     Q.   Does this exhibit indicate that Representative
14 Phillips moved to table this amendment?
15     A.   Yes.
16     Q.   And how did Representative Harless vote on that
17 motion?
18     A.   She motioned to table.
19     Q.   Did you have any discussions with
20 Representative Harless regarding this amendment?
21     A.   Not that I recall.
22     Q.   Did you have any discussions with any other
23 legislative staff regarding this amendment?
24          MS. HALPERN:  Answer yes or no before you
25 give any content of any such communication.

258

1      A.   No.
2      Q.   (By Mr. Ali) Do you know why Representative
3  Harless voted to table this amendment?
4      A.   No.
5      Q.   Have --
6          MS. HALPERN:  Let the record reflect that
7  Senator -- that Representative Harless, if I'm not
8  mistaken, was deposed today and was available to answer
9  all of these kinds of questions.
10         MR. ALI:  I'm specifically asking the
11 deponent of his knowledge.
12     Q.   (By Mr. Ali) Prior to the working for
13 Representative Harless, you worked for Lieutenant
14 Governor Dewhurst; is that right?
15     A.   Yes.
16     Q.   In what capacity?  I know we're restating.  I
17 just want to go through this quickly for my own
18 knowledge.
19     A.   I worked for the Lieutenant Governor as a
20 policy analyst.
21     Q.   And you now work for the Senator Taylor; is
22 that right?
23     A.   Correct.
24     Q.   How long would you say you've been working with
25 the Texas legislator -- the legislative branch, in or

259

1  with?
2      A.   I began employment in 2003.
3      Q.   2003.  So about 11 years; is that right?
4      A.   Yes.
5      Q.   During your time -- during those 11 years, have
6  you ever known of an instance where a legislator has
7  authored a bill that they did not support?
8      A.   I'm sorry.  They authored a bill that they did
9  not support?
10     Q.   That's right.
11     A.   That's -- I'm going to need a little bit more
12 specific -- support, what do you mean by support?
13     Q.   That they would not like to see passed.  They
14 would not vote for it.
15          MR. SCOTT:  Let me object, it's vague.  Do
16 you include amendments to bills as being -- that --
17 making that person part of an author of a bill?
18          MR. ALI:  No.  For the purposes of this
19 question, I'm specifically asking if they're the author
20 of the original bill?  Yes or no question.
21     A.   It's not that easy because there's a variety of
22 things that can come up in the legislative process that
23 would -- that would change that -- that issue.  I don't
24 know if I can answer that question.
25     Q.   (By Mr. Ali) Okay.  When -- let's restrict the

260

1  time frame a little bit.  So, do you know of an instance
2  during your 11 years working in or with the Texas
3  legislature in which a legislature -- legislator has
4  authored a bill that they did not support when they
5  authored it?  And the purpose of that clarification is
6  to understand that at certain times things change or may
7  change later down the road.
8      A.   There are bills filed that don't end up
9  passing, that don't get moved by legislatures -- by
10 members of the legislature.  That happens often.
11     Q.   I understand that, but that's not the question
12 I asked.
13     A.   Then I don't understand the question.
14          MR. ALI:  Do you mind repeating the
15 question as I asked it.
16          (Requested portion was read back by the
17 court reporter.)
18     A.   Members of the legislature file bills that they
19 don't end up supporting for a variety of reasons.  I'm
20 sure that's happened before.
21     Q.   (By Mr. Ali) I don't want to argue with you.
22 So the purpose of this is not to argue with you, but --
23     A.   I understand.  I just don't --
24     Q.   -- the response that you gave me is not the
25 question I asked and I explicitly excluded that by the

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

66 (Pages 261 to 264)

261

1 basis of my clarification, which is, I understand that
2 later on they may not support it. But when they
3 authored it, have you ever witnessed an incident where,
4 or an instance in which a legislator has authored a bill
5 that they did not support when they offered it?
6         MS. HALPERN: Objection, calls for
7 speculation.
8    **A. I'm attempting to answer your question. I**
9 **don't understand --**
10   Q. (By Mr. Ali) I appreciate that.
11   **A. -- the -- the premise that the question is**
12 **based upon. But I can tell you that, in my experience,**
13 **there's been members that that happens often. There's**
14 **bills that are filed that don't move forward and there's**
15 **a variety of reasons for that.**
16   Q. You testified earlier that you reviewed
17 Crawford when drafting and researching Voter ID laws in
18 the fall of 2010 and through the passage of SB 14; is
19 that right?
20   **A. That's correct.**
21   Q. Mr. Geer asked you a question of what you
22 gleaned from Crawford at the time. Would you mind just
23 giving me that answer again.
24       So what did you learn from Crawford, what
25 did it tell you?

262

1       MS. HALPERN: I think his answer was he
2 needed a copy of the case in front of him so he could
3 remember.
4    **A. My recollection of Crawford was general in**
5 **terms of the -- there was a standard set out in the**
6 **opinion. And I would have to have -- it's been some**
7 **time since I've looked at the case so I would need to**
8 **have that in order to --**
9    Q. (By Mr. Ali) I understand.
10   **A. -- glean the standard that was set out in**
11 **Crawford.**
12   Q. Do you know what you did to comply with that
13 standard?
14   **A. In regards to?**
15   Q. In regards to Crawford. You identified that
16 there was a standard. Did you take any actions to
17 comply with the standard?
18   **A. We felt that Senate Bill 14 was in compliance**
19 **with the Crawford decision as the Supreme Court ruled**
20 **it.**
21   Q. Did you conduct any studies or analysis or
22 research to determine the burden of HB 12 or SB 14 on
23 minority voters?
24       MS. HALPERN: Objection, asked and
25 answered repeatedly today.

263

1    **A. I believe I have answered that before. I**
2 **don't...**
3    Q. (By Mr. Ali) And you may have, I just don't
4 remember your answer.
5    **A. Okay.**
6         MS. HALPERN: Counsel, by my watch, you've
7 got 8 minutes left before we're out of time in this
8 deposition. Do you have any new questions to ask? I
9 invite you to ask them.
10        MR. ALI: I'm still waiting for a response
11 to this one.
12   Q. (By Mr. Ali) If you've asked and answered it, I
13 assume it should be pretty quick.
14   **A. Well, it's been a long day, so I'm trying to --**
15   Q. No, I understand that. Absolutely.
16   **A. I'm trying to remember. I know I've said this**
17 **a number of times and been asked in many different ways.**
18 **So, if you could repeat your questions, I'd appreciate**
19 **it.**
20   Q. Sure. Did you conduct any studies or analysis
21 or research to determine the burden of SB 14 or HB 112
22 on minority voters?
23   **A. The analysis that we conducted was a variety**
24 **of -- it was widespread and the protections that we had**
25 **in the bill we felt addressed those issues. We**

264

1 **attempted to get information from the Secretary of**
2 **State's Office on those without a driver's license. I**
3 **believe that's the research I've discussed earlier**
4 **today.**
5         MR. ALI: All right. I'm done.
6         MS. HALPERN: Let's go off the record.
7         (Discussion off the record.)
8              EXAMINATION
9 BY MR. SCOTT:
10   Q. I want to make sure I understand a little more
11 about your personal situation. You work in Austin,
12 Texas, correct?
13   **A. Correct.**
14   Q. You work nowhere but Austin, Texas, correct?
15   **A. Correct.**
16   Q. You live in what city?
17   **A. Austin.**
18   Q. Okay. And no plans to move anywhere?
19   **A. That's correct.**
20   Q. All right. Now, you've got about 11 years of
21 experience I think you told Mr. Ali as far as working
22 for the Texas Legislature in various roles, correct?
23   **A. That's correct.**
24   Q. And you are currently employed still to this
25 day by the State of Texas through the -- in the

COLBY BEUCK                                                         6/20/2014
CONFIDENTIAL TRANSCRIPT

67 (Pages 265 to 268)

---

265

1  Legislature?
2      A.  Yes.
3      Q.  You work as general counsel for Senator Larry
4  Taylor?
5      A.  Yes.
6      Q.  Okay.  Now, back in 2011, you worked for
7  Representative Patricia Harless, correct?
8      A.  Correct.
9      Q.  Her district, home district, is in Harris
10  County, correct?
11      A.  Yes.
12      Q.  And Harris County is the most populace county
13  in the state of Texas, correct?
14      A.  I believe so, yes.
15      Q.  And was that true back in 2011?
16      A.  I believe so.
17      Q.  With regard to information that you were
18  provided to use and disseminate amongst the House
19  members in support and carrying -- for Representative
20  Harless carrying SB 14 in the House, were you provided
21  any information or analysis of the -- any potential
22  adverse effects or impact of SB 14 on minority groups?
23      A.  No.
24      Q.  As we sit here today, do you know whether the
25  Department of Justice during 2011 ever contacted you or

---

266

1  Representative Harless or the Senate sponsor, Senator
2  Fraser , about any concerns that they had about SB 14
3  back in 2011 before it was passed?
4      A.  Not that I recall.
5      Q.  Do you know who Representative Sheila Jackson
6  Lee is?
7      A.  Yes.
8      Q.  And she's a Houston area Representative in the
9  United States Congress; is that correct?
10      A.  Correct.
11      Q.  And from somewhere in the Houston area?
12      A.  Yes.
13      Q.  Did she provide any type of research, analysis
14  or other evidence of any potential adverse effect that
15  SB 14 might have on any of her constituents?
16      A.  No.
17      Q.  As we sit here today, do you recall whether
18  there was any information about polling that was done of
19  Texas voters back in 2011 before the passage of SB 14
20  with regard to their favor or opposition to potential
21  Voter ID requirements to vote?
22          MR. GEER:  Objection, compound.
23      Q.  (By Mr. Scott) You can answer if you can.
24      A.  We were aware of polling data during the
25  discussion that showed a majority of Texans supported a

---

267

1  photo voter ID requirement.
2      Q.  Do you recall whether the favor -- when asked
3  whether they favor or oppose requiring a valid photo ID
4  before a person is allowed to vote, that 86 percent of
5  Whites were in favor of it?  Does that number ring a
6  bell?
7      A.  That's sounds correct.
8      Q.  Do you recall that 82 percent of persons
9  identifying themselves as Black were in favor of it?
10      A.  That's correct.
11          MR. GEER:  Objection, foundation.  I'm not
12  sure what poll we're even talking about.
13      Q.  (By Mr. Scott) And do you recall whether the
14  information before the Legislature back in 2011
15  regarding polling, relayed that 83 percent of Hispanics
16  were in favor of a valid photo ID before a person is
17  allowed to vote?
18      A.  That's sounds correct.
19      Q.  Based on a split of Republicans and Democrats,
20  do you recall a number of about 94 percent of
21  Republicans in favor of a valid photo ID before a person
22  is allowed to vote back in 2011?
23      A.  I remember, yes, overwhelming support.
24      Q.  And do you remember that about 75 percent of
25  Democrats voiced that they were favor -- in favor of a

---

268

1  valid photo ID before a person is allowed to vote?
2      A.  Yes, I remember the number for Democrats was a
3  majority of them.
4      Q.  Did -- was there any talk or communication that
5  you recall back in the 2011 period -- and if this is
6  getting into the legislative privilege, please feel free
7  to assert it, whatever you need to, to preserve your
8  position.  But regarding why, when a bill, potential
9  bill such as SB 14 was overwhelmingly supported by both
10  Republicans and Democrats, why anyone would be opposed
11  to the bill in the Legislature?
12          MR. D'ANDREA:  Objection, privilege
13          MR. GEER:  Objection --
14          MR. D'ANDREA:  You may answer under seal.
15          MR. GEER:  -- no foundation.
16      Q.  (By Mr. Scott) You may answer.
17      A.  Okay.  I'm sorry, I didn't follow the question.
18  If you could -- I'm sorry.
19          MR. SCOTT:  Could you read it back?  I
20  want to hear what it sounds like.
21          (Requested portion was read back by the
22  court reporter.)
23          MR. GEER:  And calls for speculation.
24      Q.  (By Mr. Scott) And again, I'm just curious
25  about what you heard back then.  And with all the

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

269

1  objections preserved, do you recall hearing anything or
2  any of the potential proponents or opponents of SB 14
3  articulating why there was such opposition from a
4  polarized group?
5         MS. HALPERN:  And we will assert the
6  legislative privilege to that question.
7         But you go ahead and answer under seal.
8    A.  Okay.  Why anybody would oppose SB 14 with the
9  overwhelming support in the polls?  I remember that was
10 an issue that was brought up in some of the debates,
11 yes.
12    Q.  (By Mr. Scott) And what was the basis that
13 y'all had heard?
14    A.  That --
15        MR. GEER:  Asked and answered also.
16    A.  There -- it was a partisan political issue.
17    Q.  (By Mr. Scott) Well, was it a political --
18 partisan political issue in 2011 with regard to SB 14
19 with special interest groups that were opposed to the
20 bill's passage, if you recall?
21        MR. GEER:  Objection, foundation, vague.
22    A.  I would say so.
23    Q.  (By Mr. Scott) Now, were all legislators given
24 an opportunity to present evidence at SB 14 hearings?
25    A.  Yes.

270

1    Q.  And were those hearings also open to the
2  public?
3    A.  Yes.
4    Q.  Were -- was any member of the public, including
5  the special interest groups who opposed it, available --
6  or able to present any evidence they had in opposition
7  to SB 14?
8    A.  Yes.
9    Q.  Were you aware of any research, reports,
10 studies that were provided to the House during any of
11 the hearings on SB 14 in -- that supported the position
12 that there would be an adverse on minority groups or
13 special language groups or religious groups?
14    A.  I was not aware of any studies to that issue.
15    Q.  And for the benefit of the judge, what would
16 have been your role as -- with Representative Harless
17 and from a position of being aware or not aware of any
18 presentation of studies that would represent such
19 negative impacts or potential negative impacts as a
20 result of the passage of SB 14 back the 2011?
21        MR. GEER:  And for the benefit of the
22 judge, asked and answered.
23    A.  My -- my role in her office was to research and
24 gather the information that was available on that issue,
25 and I do not recall that information being provided.

271

1    Q.  (By Mr. Scott) Now, Mr. Geer works for a
2  division within the Department of Justice known as the
3  Civil Rights Section, and --
4         MS. HALPERN:  Division.
5    Q.  (By Mr. Scott) -- Division.  Are you aware of
6  any communication which -- that Representative Harless
7  or Senator Fraser received from the Civil Rights
8  Division of the Department of Justice about any
9  potential adverse effect that SB 14 might have on any
10 group of citizens in the State of Texas?
11    A.  No.  I'm not aware of any.
12    Q.  And prior to its passage?  I'm sorry.
13    A.  I'm not aware of any communication.
14    Q.  Did they provide -- did the Department of
15 Justice Civil Rights Division provide any research on
16 any potential adverse effects that the passage of such a
17 bill as SB 14 would have on any class of citizens in the
18 state of Texas, voters in the state of Texas, to the
19 Legislature, the Texas Legislature, prior to the passage
20 of SB 14, to your knowledge?
21    A.  Not to my knowledge.
22    Q.  Do you believe that one of the purposes of SB
23 14 was to instill confidence in the election process
24 system in Texas?
25        MR. GEER:  Objection, asked and answered

272

1  multiple times.
2    A.  Yes.  That was one of the purposes of Senate
3  Bill 14.
4    Q.  (By Mr. Scott) And do you believe that it
5  accomplished its purpose?
6    A.  Yes, I believe so.
7    Q.  Do you have an opinion as to whether the Texas
8  Legislature needs to have a prevalent widespread voter
9  fraud before it enacts statutes to try and address
10 potential voter fraud?
11        MR. GEER:  Objection, calls for
12 speculation, vague.
13    Q.  (By Mr. Scott) I'm asking whether you have an
14 opinion.
15    A.  I believe the presence of voter fraud was a --
16 reason enough to -- there was a lack of confidence in
17 voting; that was a reason to move forward with Voter ID
18 legislation.
19    Q.  Were you aware if other Representatives in the
20 House, Representative Harless and other Representatives
21 were made aware of the polling information that we
22 discussed earlier in your deposition, prior to the
23 passage of SB 14?
24    A.  Yes.  That was an issue discussed during the
25 debate.

COLBY BEUCK                                               6/20/2014
CONFIDENTIAL TRANSCRIPT

273

1    Q.  Would that also have been true on the Senate
2    side?
3        A.  I believe that was discussed on the Senate side
4    as well.
5        Q.  Following up on one of the earlier questions,
6    were you aware of any occasion where people offer
7    amendments even though they know they don't have the
8    votes to get it adopted?
9        A.  Yes.
10       Q.  And do you believe that happened during the SB
11   14 debate?
12       A.  Yes.
13       Q.  Are you aware of any legislator who -- let's --
14   are you aware of an amendment about similar names with
15   regard to SB 14 on how they were to be handled?  An
16   amendment?
17       A.  That was an amendment that was added in the
18   Senate.
19       Q.  And it was an amendment -- do you know who
20   proposed the amendment?
21       A.  Senator Davis, Senator Wendy Davis.
22       Q.  And she's a Democrat?
23       A.  Correct.
24       Q.  And her amendment was adopted?
25       A.  Yes.

274

1    Q.  And it is now a part of the Voter ID law that
2    relates to similar names and how they are to be handled
3    at polling places, correct?
4        A.  Yes.  That language remained in the bill
5    throughout the process.
6        Q.  And did she end up voting for the bill --
7        A.  No.
8        Q.  -- after her amendment was adopted?
9        A.  I do not believe she did.
10       Q.  Do you recall if there was amendment on the
11   concealed handgun license -- ability of a voter to use
12   their concealed handgun license for purposes of
13   qualifying as a proper voter ID?
14       A.  Yes.  I believe there also was an amendment
15   offered in the Senate.
16       Q.  And do you recall who made that amendment?
17       A.  I believe that amendment was offered by Senator
18   Hinojosa.
19       Q.  And do you recall whether Senator Van de Putte
20   was also co-sponsor of that?
21       A.  I don't recall.
22       Q.  And do you recall if that amendment was
23   adopted?
24       A.  That amendment was adopted.
25       Q.  And Senator Hinojosa is a Democrat?

275

1    A.  Yes.
2    Q.  And did Senator Hinojosa then vote for the
3    passage of the bill after his amendment was adopted?
4        A.  I don't recall how he voted on that issue.
5        MR. SCOTT:  Mercifully, I reserve any
6    further questions until time of trial, but I don't think
7    we're going to ask you many.
8        Thank you for your time.
9        THE WITNESS:  Thank you.
10       MR. SCOTT:  That's it.
11       THE WITNESS:  Thank y'all.
12       MR. GEER:  If you'll allow me, I actually
13   need to ask one follow-up question.
14       MS. HALPERN:  You have no more time.  I'm
15   so sorry.
16       MR. GEER:  Aren't we entitled to --
17       MS. HALPERN:  Not if -- not if the time is
18   gone.
19       MR. GEER:  -- follow up on your follow-up?
20       MS. HALPERN:  He was supposed to leave
21   time in case you had questions.
22       MR. GEER:  Fair enough.
23       MR. SCOTT:  But just -- just so we don't
24   end up in a problem in the future  --
25       MR. GEER:  There is no problem --

276

1        MR. SCOTT:  -- if there's truly a
2    question, we beg of you, Counsel, please.  I beg,
3    please.
4        MS. HALPERN:  He hasn't even closed the
5    record.  I mean, I'd give him one question but he
6    wouldn't --
7        Would you close the record if I give you
8    your one question?
9        MR. GEER:  No.  I withdraw my attempt to
10   ask an additional question.
11       MS. HALPERN:  Okay.  It's withdrawn.  I
12   haven't denied it.
13       All right.  We're done.
14       MR. GEER:  But I hold the deposition open.
15       MS. HALPERN:  Well, that's fine.
16       We're going to read and sign.
17       (Deposition concluded at 7 p.m.)
18
19
20
21
22
23
24
25

COLBY BEUCK                                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

70 (Pages 277 to 280)

---

277

1   CHANGES AND SIGNATURE
2       RE: VEASEY, ET AL. VS. PERRY, ET AL.
3   PAGE  LINE  CHANGE          REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20      I, COLBY BEUCK, have read the foregoing deposition
21  and hereby affix my signature that same is true and
22  correct, except as noted above.
23
24                    _____
25                    COLBY BEUCK

---

278

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2           CORPUS CHRISTI DIVISION
3   MARC VEASEY, et al.,       )
4       Plaintiff,      )
                        )
5   VS.                 ) CIVIL ACTION NUMBER:
                        ) 2:13-CV-193 (NGR)
6   RICK PERRY, et al.,        )
7       Defendants.      )
    _____)
                        )
8   UNITED STATES OF AMERICA,   )
9       Plaintiff,      )
                        )
10  VS.                 ) CIVIL ACTION NUMBER:
11                      ) 2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS  )
12  EDUCATION FUND, et al.,     )
13      Plaintiff-Intervenors,   )
14  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY    )
15  COMMISSIONERS, et al.,      )
16      Plaintiff-Intervenors,   )
                        )
17  VS.                 )
                        )
18  STATE OF TEXAS, et al.,     )
19      Defendants.      )
    _____)
                        )
20  TEXAS STATE CONFERENCE OF   )
21  NAACP BRANCHES, et al.,     )
22      Plaintiffs,      )
                        ) CIVIL ACTION NUMBER:
23  VS.                 ) 2:13-CV-291 (NGR)
24  NANDITA BERRY, et al.,      )
25      Defendants.      )

---

279

1   BELINDA ORTIZ, et al.,     )
                        )
2       Plaintiffs,      )
                        )
3   VS.                 ) CIVIL ACTION NUMBER:
                        ) 2:13-CV-348 (NGR)
4   STATE OF TEXAS, et al.,     )
                        )
5       Defendants.      )
    _____)
6
            REPORTER'S CERTIFICATION
7              DEPOSITION OF
               COLBY BEUCK
8             JUNE 20, 2014
9       I, Chris Carpenter, Certified Shorthand Reporter in
10  and for the State of Texas, hereby certify to the
11  following:
12      That the witness, COLBY BEUCK, was duly sworn by the
13  officer and that the transcript of the oral deposition
14  is a true record of the testimony given by the witness;
15      That the deposition transcript was submitted on the
16  _____day of _____, 2014, to the witness or to the
17  attorney for the witness for examination, signature and
18  return to _____,
19  by _____, 2014, and if returned,
20  the original transcript will forwarded to Amy Rudd, the
21  custodial attorney;
22      That the amount of time used by each party at the
23  deposition is as follows:
24  Ms. Rudd:  4 hours, 19 minutes
    Mr. Geer:  2 hours, 13 minutes
25  Mr. Ali:  18 minutes

---

280

1       Mr. Scott:  17 minutes
2       I further certify that I am neither counsel for,
3   related to, nor employed by any of the parties or
4   attorneys in the action in which this proceeding was
5   taken, and further that I am not financially or
6   otherwise interested in the outcome of the action.
7       Certified to by me this 23rd of June, 2014.
8
9
10                    _____
11  Chris Carpenter, Texas CSR 1151
        Expiration Date:  12/31/2014
12      701 Brazos, Suite 380
        Austin, TX  78701
13      (512)292-4249
14  Firm Registration No. 344
15
16
17
18
19
20
21
22
23
24
25

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

1

---

**A**

**$20** 248:23
**a.m** 2:17 51:17 84:22
  84:22
**Abbott's** 179:9
**ability** 154:6 155:2
  200:15 201:2
  207:12,15 274:11
**able** 106:20 117:11
  173:25 181:17,21
  186:11 187:21
  206:18 270:6
**above-styled** 2:16
**absentee** 24:4 34:11
  155:5,10,14
**Absolutely** 263:15
**accept** 31:24 253:25
**acceptable** 68:6,8,20
  68:24 69:4,22 70:14
  70:25 76:7 78:3
  79:21,21 123:2
  127:19 144:21,25
  157:5 198:11
  222:20 242:3
  243:18,21 244:15
  244:22 253:17
  254:12,14,22 255:1
  256:13
**accepted** 107:16
  255:9,13,14
**access** 149:25 171:11
**accompany** 206:14
**accomplish** 178:10
  200:7,15
**accomplished** 83:21
  83:22 201:1 272:5
**accounts** 22:13 162:1
**accredit** 252:9,10
**accuracy** 30:12
**accurate** 30:8 94:5
**act** 59:6,14,16,22
  60:1,13,18,20 61:7
  61:20 63:22 64:25

65:4 167:15 176:18
  176:19,21 177:1
  206:7
**acting** 64:1,9,10
**action** 1:5,10,22 2:3
  184:2 278:5,10,22
  279:3 280:4,6
**actions** 26:13 64:5
  262:16
**activity** 181:11
**actual** 122:13 136:19
  193:13 207:3
**add** 105:11 199:10
  244:6
**added** 105:13 109:23
  239:17,25 257:9
  273:17
**addition** 131:20
  136:21
**additional** 38:19
  105:11 107:10,13
  131:11 154:20
  166:18 188:15,19
  276:10
**address** 14:4,5 15:3
  67:8 86:24 105:4,8
  106:15,24 107:7,17
  113:25 154:13
  198:3 237:3 248:3
  272:9
**addressed** 99:22
  105:23 153:22
  155:10,13 158:1,5
  243:2 263:25
**addresses** 14:14
**addressing** 237:13
**adds** 239:14
**adequately** 97:9
**Administration**
  222:22
**administrative** 90:3
**admonition** 135:24
**adopted** 116:22,25
  118:6 119:6 135:7

145:21 157:6
  199:17 200:17
  225:21 273:8,24
  274:8,23,24 275:3
**adopting** 111:3
  118:17 199:24
**adoption** 238:4
**advance** 253:12
**advantage** 113:19
**adverse** 101:16
  265:22 266:14
  270:12 271:9,16
**advice** 64:10,15
  190:3
**advisory** 126:8
**Advocacy** 5:16
  108:13,20 109:2
  114:13 224:6,9
**advocating** 100:11,22
  102:7
**Affairs** 17:5
**affect** 139:10
**affidavit** 112:2,6
  116:16 117:10,12
  119:24
**affirmative** 91:10
**affirmatively** 249:6
  249:11
**affix** 277:21
**African** 170:4,7,16
  171:4,17
**afternoon** 105:18
  220:21
**AG** 180:18
**AG's** 7:17,19,21
  179:21
**agency** 32:2 70:5,6
  130:7,8 138:19
  139:4 179:22 180:1
  180:12 187:16
  202:3 255:25
**ago** 41:20
**agree** 90:24 153:17
  170:17,25 176:12

199:24 205:6,9,24
  206:3 218:14
  222:13 233:11,16
  236:22 237:1
  249:13 253:16
**agreed** 8:6 9:7,8
  85:18 90:2,6
**agreeing** 91:2 190:11
**ahead** 63:6 72:24
  117:6 177:16
  209:10 252:3
  255:20 269:7
**aimed** 154:10
**aired** 132:14
**aisle** 157:20
**al** 1:3,6,12,15,18,21
  1:24 2:1,4 3:16
  277:2,2 278:3,6,12
  278:15,18,21,24
  279:1,4
**Alabama-Coushatta**
  137:22
**albeit** 252:4
**Ali** 3:22 5:5 7:11,11
  252:19,22 253:1,3
  254:20,24 255:4,7,9
  255:15,17,23
  256:20 258:2,10,12
  259:18,25 260:14
  260:21 261:10
  262:9 263:3,10,12
  264:5,21 279:25
**aliens** 211:24 212:5
**allegation** 195:14
**allegations** 56:1
  187:18 195:18,22
**allow** 8:2 20:17 32:2
  57:25 60:9 85:10
  99:16 100:7 107:2
  110:8 113:7 118:2
  120:16 126:6,6
  131:11 165:2
  244:14 275:12
**allowed** 8:15 83:7

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

2

116:15 119:23
124:20 127:12
129:3 130:5 134:24
153:13 166:18
189:23 205:7 213:4
216:7 217:11 267:4
267:17,22 268:1
**allowing** 61:10 71:10
73:14 91:17 103:6
103:19 117:10
128:2 135:5
**allows** 80:23 215:17
**Alonzo** 243:24
244:11 245:10,15
245:17
**alternate** 133:1,20
141:2
**alternative** 132:3,15
**Alvarado** 146:16,18
**ameliorating** 167:15
**amend** 106:14,23
**amendment** 113:12
114:3 115:17 116:3
116:6,14,15,22,24
117:2,9 118:9,12,15
118:17,19 119:4,6,7
119:12,14,16,17,22
120:5,7,11,14,22
121:17,20,22 123:7
123:16,16 124:9,12
124:18,20 125:3,5
125:14,15,22,23
126:1,20,24 127:7
127:12,19 128:8,17
128:20,23,24,24
129:3,9,13,15 130:1
130:1,4,12,21,23
134:11,14,24 135:7
135:10,17 139:14
140:15 145:20,21
146:4,8,12,12,15,20
147:2,8,12,15 149:8
149:9,16,16,22
150:4,7,9,14 151:6

152:3,7,13,13,18
153:21,22,24 154:8
154:11 156:6,14
157:12 198:20,23
199:6,7,8,10,15,16
199:17,20,24 200:5
200:7,17,25 201:13
201:22,25 202:3,7
202:11 224:8
225:14,20,21,22
226:9,13,19 237:11
237:12,12,13,15
240:13,14,16,23
241:21,25 243:6
244:1,10,13,17
246:12 250:17
257:5,7,8,14,20,23
258:3 273:14,16,17
273:19,20,24 274:8
274:10,14,16,17,22
274:24 275:3
**amendments** 105:13
105:15,17,23
107:17,19 109:23
114:16,17,22 115:4
115:6,8,10,14,18
118:6,10 131:9,10
141:3 145:6 156:20
156:23,24 157:2,9
157:13 166:17,21
225:2,6,7,12 236:23
237:2,6,7,10 244:8
259:16 273:7
**AMERICA** 1:8 3:2
278:8
**American** 3:8 7:5
170:4,7 171:18
**Americans** 170:16
171:4
**amount** 43:17 44:13
99:25 177:6 231:13
279:22
**Amy** 3:9 7:3 279:20
**amy.rudd@decher...**

3:11
**analogy** 82:15
**analysis** 97:8 149:25
150:19,23 151:21
179:22 192:17,20
192:23 193:3,17,20
193:24 194:3
197:25 202:6,11
206:21 207:3
221:10 223:6,6,18
223:25 224:5
226:17,20,22
231:14 232:14
234:14 235:18,21
235:23 236:12
247:21,24 249:19
256:16,21,24
262:21 263:20,23
265:21 266:13
**analyst** 258:20
**analyzed** 17:2
**Anchia** 149:17,19
**ANDREA** 7:14
**angry** 53:2
**Ann** 92:16 96:3
227:23
**announcements** 7:2
**answer** 8:15 13:9
17:22 19:7,14 20:17
21:17 28:18 32:3
37:4 41:25 43:15,16
46:8 57:25 58:2
60:9 61:10 62:9
63:2,6 64:23 71:23
72:11,25 84:19
85:10,16 87:19 91:6
91:7,8 95:12 99:17
100:8 102:17
103:19 107:3
109:14 110:9 111:6
113:8 118:2 120:16
123:3,8,14 126:7
135:22 166:2,3
175:16 189:23

207:2 209:10
216:25 218:4,13,14
218:25 223:11
230:7 231:1,5,9
232:9,20 234:12
248:21 251:15
252:7,7 255:20
257:24 258:8
259:24 261:8,23
262:1 263:4 266:23
268:14,16 269:7
**answered** 43:24 80:9
80:10,14 91:9 99:18
204:4 212:7 216:9
216:24 220:21
223:23 252:3,8,13
262:25 263:1,12
269:15 270:22
271:25
**answering** 64:22 67:7
166:3 175:25
**answers** 11:19 91:18
91:20 252:5
**anti-SB** 48:20
**anticipate** 163:25
**anticipated** 126:23
**anybody** 14:16 104:1
109:1 143:25 269:8
**anybody's** 141:18
**anymore** 141:18
203:6 255:6
**anytime** 175:18
**Apache** 137:23
**apologize** 233:24
251:4 253:12
**apparently** 246:2
**appear** 111:15 147:8
154:9,13
**appearance** 141:15
142:21,23
**Appearances** 5:2
**appears** 34:21,22
49:17 75:19 111:12
115:24 123:8 128:6

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

3

150:4 160:3 180:20
197:17 199:10,17
212:23 238:12
**applicant** 223:1
249:6
**application** 221:8
**applied** 88:21
**apply** 134:2 159:22
**appoint** 206:7
**appreciate** 25:19
27:21 85:21 88:5
251:15 261:10
263:18
**approached** 151:4
222:18
**appropriate** 20:9
54:14 97:14 251:24
**approved** 69:25
70:20 243:20
244:14,22,23 245:1
245:2,3
**approximately** 173:7
**approximation** 231:6
**April** 13:7 239:7
**area** 134:19 136:10
178:18 266:8,11
**areas** 242:17
**argue** 230:13 260:21
260:22
**arguing** 230:16
**argument** 131:5
159:18 202:19
**argumentative** 51:5
80:7,18
**arguments** 193:10
**arose** 59:25
**arrange** 8:9
**arrest** 206:4
**Arthur** 4:11 7:14
143:24
**arthur.dandrea@o...**
4:14
**article** 46:20,23
**articulating** 269:3

**Aside** 125:20
**asked** 9:21 12:22
13:1 29:21 32:8,8,9
43:23 57:12 80:8
91:25 97:11 122:5
145:24 174:23
176:7 185:3 190:13
196:17 197:3 204:3
204:5 210:22 212:6
214:14 216:8,23
220:20 223:22
227:22,23 242:15
260:12,15,25
261:21 262:24
263:12,17 267:2
269:15 270:22
271:25
**asking** 20:3 41:19,21
64:12 72:13 74:19
81:9 83:20 109:25
121:13 132:18,19
138:17 165:16
170:1 173:19
175:20,25 177:23
189:9 201:11
224:13 230:16
237:9,25 247:13
254:24 258:10
259:19 272:13
**aspect** 176:3 211:11
**assert** 20:15 60:7
84:17 85:15 87:18
87:20 90:14,23
99:15 107:1 189:21
268:7 269:5
**asserting** 8:12 61:12
116:17 190:2,10
**assertion** 8:14
**assessing** 89:2
**assigned** 191:22
**assist** 163:13
**assistance** 114:5
**Assistant** 3:18 4:12
**associated** 230:1,20

**ASSOCIATION**
1:14 278:14
**assume** 34:6 45:18
106:9 134:1 256:23
263:13
**assumed** 119:8
**assumes** 42:13 62:7
143:21 219:13
**assuming** 21:15
**assumption** 41:2
202:16
**assurance** 8:18
**asterisk** 229:24 230:7
**attached** 2:22 31:14
**Attachment** 5:17
**Attachments** 5:10
**attempt** 139:9 151:21
161:14 182:5
195:20 231:8 232:3
245:9 276:9
**attempted** 244:13
245:13 264:1
**attempting** 261:8
**attempts** 182:12
**attention** 179:1
182:16 184:10
193:10 197:2
198:22 202:13
220:7 221:1 224:19
227:21 237:18
245:19
**attorney** 2:20 3:18,18
4:3,7,12 7:15 28:9
29:6 35:1,5 36:3,8
36:18 37:2 38:11
43:6 62:25 63:14,16
63:19,23,23 64:10
98:11,16 99:3
148:12 174:12
179:8,9 180:14
182:1 187:17
188:11 194:17
240:23 241:16,23
246:11 250:16

251:6 279:17,21
**attorney-client** 63:1
63:3,7,11
**attorneys** 12:8 38:16
90:8 174:13 181:11
280:4
**attributes** 122:13
**audible** 11:19
**Audit** 152:24 153:12
**audits** 153:13
**August** 35:2,11 36:3
**Austin** 2:20 3:10,19
4:4,8,13 142:17
143:8,17 144:2,3,6
163:20 178:18
264:11,14,17
280:12
**author** 19:2 29:15
259:17,19
**authored** 17:24 46:21
83:15 215:9 254:8
259:7,8 260:4,5
261:3,4
**authorities** 180:18
**authors** 18:25
**availability** 96:8
**available** 23:21 43:6
95:11 97:4,6 186:12
231:15 258:8 270:5
270:24
**Avenue** 3:5,13,23
**avoid** 75:14
**aware** 50:16 61:22
62:1,16 63:20
101:12 104:15,19
112:9 148:1 155:6
155:25 165:12
166:5,24 185:19
188:6 207:11,14,21
208:1 210:15,22
211:2 220:22
223:18 266:24
270:9,14,17,17
271:5,11,13 272:19

COLBY BEUCK                                6/20/2014
CONFIDENTIAL TRANSCRIPT

4

272:21 273:6,13,14
**awareness** 165:16

_____

**B**

**b** 68:3 70:23 111:21
  111:23 112:11
  223:7
**back** 14:21 16:8
  53:16 54:22 60:3,4
  63:8 75:7 78:12
  84:1,24 85:2,3,4,5
  89:15 91:7,16 95:25
  106:1,11 108:11
  121:1 124:9 136:1,3
  138:5 145:19 149:8
  153:5 156:6 157:14
  160:16,17 165:18
  165:19 175:8 176:6
  182:16 185:2
  187:19 188:3
  190:15 202:13
  203:2 210:14 214:9
  214:10 218:8,9
  232:25 239:14,17
  251:25 260:16
  265:6,15 266:3,19
  267:14,22 268:5,19
  268:21,25 270:20
**background** 106:12
**ballot** 22:10 23:3,14
  23:18 34:9,11 67:12
  147:18 153:18,20
  155:5,10,14,14
  185:21,23,23
  198:12
**ballots** 24:4 146:23
  146:24 147:22
**ballpark** 174:6
**base** 48:20
**based** 8:18 41:1,2,23
  60:10 63:5 64:20
  71:20 100:6 107:4
  113:9 135:23 206:3
  209:9 218:17

254:23,25 256:6
  261:12 267:19
**basic** 111:14
**basically** 91:5 163:8
**basing** 250:3
**basis** 21:12 44:19
  57:24 61:8 64:19
  71:19 72:9 85:8
  90:16 100:5 102:15
  110:7 113:5 126:5
  128:4 133:21
  135:21 144:25
  145:17 169:25
  172:15 203:9 209:8
  261:1 269:12
**Bates** 27:4,6,7,8,9
  33:6 34:25 45:16
  92:15 96:2 109:5
  121:4 158:21
  159:17 162:12,12
  238:10,10 245:20
**bear** 17:22
**beg** 276:2,2
**began** 15:22 259:2
**beginning** 105:10
  217:23
**begins** 229:24
**behalf** 100:11 251:6
**belabor** 11:15 105:18
**belief** 73:16,17
  126:16 170:1
  206:15,20,21 207:4
  230:24
**believe** 9:3 12:19
  17:14 18:17 22:12
  26:17 28:15 31:1,7
  32:16,18,22 39:1
  42:7 43:13,13,17,20
  44:3,4 48:18 49:14
  50:6 64:24 72:19
  77:1,12 82:19 86:12
  90:2,5 96:18 98:15
  98:20 99:19 102:22
  102:23 103:23

104:24 105:3
  107:11,17 108:20
  112:25 115:3,25
  123:19 125:17,25
  126:21,22 136:6,19
  138:24 139:16
  144:13,14,23
  145:16 154:5 157:5
  158:5 159:6,10
  160:9,14 161:5
  162:19 163:22
  164:4,13 166:9,15
  167:17 169:20
  176:24 177:1,8,9
  178:17 179:2 183:3
  183:5 191:6 193:7
  197:21 198:19,25
  199:22 200:10,17
  200:19,25 201:5,12
  207:5 208:19,22
  209:4 214:14,22,23
  215:3 217:25
  218:12 219:15,23
  220:11 221:12
  222:22 223:22
  225:25 227:14
  231:17,24 235:7
  239:4,5 240:12
  242:14 248:23,24
  251:16,20 263:1
  264:3 265:14,16
  271:22 272:4,6,15
  273:3,10 274:9,14
  274:17
**believed** 61:5 107:6
**BELINDA** 2:1 279:1
**bell** 267:6
**beneficial** 205:2
**benefit** 201:4,6,13
  270:15,21
**benefits** 163:6 214:2
**BERRY** 1:24 278:24
**best** 200:13
**Betty** 214:20,20

**Beuck** 2:9,14 5:3
  10:18,24 19:12 27:3
  45:15 66:19 75:18
  92:15 96:2 115:21
  158:18 179:16
  252:20 277:20,25
  279:7,12
**Beuck's** 254:25 255:9
**Bexar** 35:17
**beyond** 138:11
  150:23 151:5
  194:16 224:9
**big** 99:14 139:9,25
  174:9
**bill** 5:25 6:1 17:23,24
  18:6,9,12,15 19:4
  20:23 26:17 28:15
  28:19 29:3 40:5
  41:12 55:19,20 57:4
  57:15 58:11 59:5,8
  66:5,6,12,13,22
  67:7,8,10 68:22,23
  69:24,25 70:13,18
  71:13,25 72:1,2,15
  73:4 74:1 75:11,19
  76:6 79:3 80:21
  83:6,17 96:22 100:4
  102:12 103:9,13,16
  104:3,21 105:6,7,10
  105:11 106:2,6,10
  106:14,15,17 107:6
  110:16 111:10,14
  111:15,18,20
  113:15,16 115:25
  117:14,16 119:5
  123:17,23,24
  131:12 142:12
  144:23 145:22
  151:24 154:17,19
  154:23 155:24
  156:5 157:12,23
  158:6,8 160:4,5
  161:15 163:22,23
  164:5 166:6 169:19

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

5

172:12,20 182:22
182:24 184:24
188:22 189:4,7,9,12
190:23 191:5,11,16
191:19,19,20,25
192:20,20,21
197:23 198:3,6,15
200:5,6 201:2
203:10,15 210:10
214:19,24 215:1,9
215:14,15,17,20
216:13,15,16
217:10 218:16,21
221:3 223:2 225:24
226:1,3 239:2 243:2
243:5 253:19 254:8
254:13,23 255:1
257:9 259:7,8,17,20
260:4 261:4 262:18
263:25 268:8,9,11
271:17 272:3 274:4
274:6 275:3
**bill's** 117:19 269:20
**billing** 113:18
**bills** 62:8 155:22
156:1 157:22
259:16 260:8,18
261:14
**birth** 248:14,22,25
249:3,6,12,17 250:4
250:5
**bit** 53:6 76:25 112:17
134:9 167:5 220:16
259:11 260:1
**Black** 267:9
**board** 132:2 134:2
**Bonham** 191:7 192:5
**Bonnen** 116:7,11
225:15,16,19
**Borris** 240:12
**bottom** 33:15 35:7
68:2 70:23 116:21
121:9 129:25
134:12,13 162:12

163:2 202:14
220:11 246:1
**bound** 9:22
**box** 4:3,8,13 22:10
23:3,14,18 147:18
153:18,20
**brain** 254:18
**branch** 258:25
**BRANCHES** 1:21
278:21
**Brazos** 280:11
**break** 11:23,24 40:12
46:9 51:14 54:25
58:21 107:22 108:5
115:4 139:20
140:25 145:20
169:22 170:2 175:1
175:3 202:24
232:22 252:20
**Brian** 160:25
**Brief** 26:25 95:23
227:19
**briefly** 67:17 84:1
108:11
**bring** 161:14 164:18
**broad** 113:16 117:7
117:14 148:22
220:3 221:18,19
223:8,15 243:21
244:4,24
**broader** 130:23
138:8 176:9
**broken** 228:18
**Brooke** 4:6 7:19
**brooke.paup@oag....**
4:9
**brought** 42:3,7 77:11
114:11 125:16
193:8 269:10
**Brown** 214:20,20
**Bruce** 3:3 7:9 9:17
75:5
**bruce.geer@usdoj....**
3:6

**Bryan** 18:17 35:18
84:4 85:17,24
**budget** 67:15 97:5
**burden** 262:22
263:21
**business** 124:24
**busy** 91:15
**by-mail** 185:23

---

## C

**C** 3:1
**call** 9:4 36:17 112:20
135:13 199:18
220:12
**called** 32:8 150:9,14
151:6 223:4
**calls** 21:3 29:14 36:5
60:22 62:6 70:16
72:23 200:22
214:13 216:19
218:3 261:6 268:23
272:11
**campuses** 143:5
**candidate** 170:14
207:15
**candidates** 207:11
**capable** 80:20
**capacity** 14:17 63:4
63:11 64:1 258:16
**Capitol** 163:4
**capture** 117:17
**card** 68:10 69:10,18
70:4 76:12 77:2,19
79:14 93:4 122:13
122:22 124:22
127:13 129:4 130:6
134:25 136:20
203:14 213:14,24
231:4 255:24
257:10
**cards** 52:3,14 78:10
126:12,13,17
226:15,19 227:9,16
**care** 43:8 225:9

**carefully** 67:7
**Carpenter** 2:18
279:9 280:10
**carried** 128:21
149:12 152:9
**Carrother's** 162:24
**Carrothers** 162:15
162:17
**carry** 72:13 138:23
146:8
**carrying** 101:13
265:19,20
**case** 9:4 12:15,17,18
12:20,21,23 13:1
25:24,24 34:1 35:4
36:10 39:1,3,5,8,12
39:15 65:10 90:10
134:3 144:5,6
157:16 159:13,20
168:19 172:1
178:15,16,19,21,23
194:8 195:24 233:2
233:3,6 237:11,11
262:2,7 275:21
**case-by-case** 133:21
142:9 144:24
**cases** 23:25 24:16
25:20,21 26:1,8,10
26:13,14,20 28:1
30:15 31:10,16,20
33:2,8,11 36:9,13
36:19,22 37:1 38:9
38:12,15,17,19,24
40:1,7 42:6,19 56:5
65:4,5,8 173:24
174:6,16,18 178:6,7
178:11,13 181:25
182:6,9 187:3,5,25
188:1,1,9 196:24
212:3
**cast** 51:10 52:4
**casting** 34:9 52:14
147:22
**categories** 79:17 80:5

COLBY BEUCK                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

6

categorized 94:24
category 93:2,9,17
Catherine 209:3
    211:16,22
Caucasians 171:5
Caucus 3:8 7:5
cause 2:16
caused 71:15,15
caution 62:24
CCR 239:8,11,13
    240:8 242:2 243:20
Cell 12:4
census 171:8
centered 136:6
    142:14
centralized 147:16
    147:21 148:9
certain 8:13,24 17:21
    48:3 59:17 64:5
    71:10 115:14 150:2
    150:22 151:22
    260:6
certainly 169:18
    193:10 202:25
    208:1 236:20
certificate 5:7 76:12
    79:14 205:3,5
    206:25 217:24
    248:11,15,25 249:3
    249:7,12,17 250:5,7
certificates 248:22
    250:4
certification 221:5
    223:4 279:6
Certified 279:9 280:7
certify 279:10 280:2
Chain 5:11,19,21
Chairman 191:7
    192:5
chance 178:24 179:4
    184:13 197:3 199:5
    205:22 212:17
    215:8
change 76:19 78:2

106:23 108:18
    142:10,23 259:23
    260:6,7 277:3
changed 108:20
    167:5 170:13 219:9
changes 5:6 59:21
    67:10 105:16,23
    106:14,18,21 277:1
characterization
    156:25 251:9
characterize 44:7
characterizing 81:2
charge 84:11
charged 249:13
charges 29:6 33:20
    34:18
chart 27:7,7,9 29:4,5
    29:9,11 30:16,19
    31:11,11 32:10,10
    33:5,6,9,13 34:24
    34:25 35:25 36:1,12
    36:15 37:21,22
charts 31:14,15,17,21
    55:4 98:23
Cherokee 137:24
chief 4:6 16:25 47:16
    64:1,9,13 101:8
    184:4 189:1 192:6
    192:10
choose 252:10
chooses 252:9
Chris 2:18 279:9
    280:10
CHRISTI 1:2 278:2
Chronicle 46:18,21
    46:24 197:11
circle 108:11 160:17
circulated 9:9,9
citizens 271:10,17
city 143:17 264:16
Civil 1:5,10,22 2:3,21
    3:4,13 7:7 271:3,7
    271:15 278:5,10,22
    279:3

claim 222:15 251:22
claimed 85:19
claims 172:11,18
clarification 7:25
    25:19 137:21 241:7
    260:5 261:1
clarify 56:13 89:25
    100:10 115:7
    117:13 166:4
    175:21 196:12
    213:10 246:25
Clark 7:13 46:14
    47:10,13,20 253:4
Clark's 48:25
class 271:17
classes 246:20,22
    247:4
clear 8:3 41:18 51:6
    57:17 90:1 111:6
    179:10 201:18
    202:10 225:5
    226:21 230:15
    238:21
clearinghouse 98:8
    181:8 187:11,12
clerks 147:25 148:2
close 84:2 194:14
    276:7
closed 276:4
closely 193:7
co-counsel 91:25
    252:17
co-sponsor 274:20
code 5:23 29:5 30:23
    31:3,6,8 35:1 92:7
    111:22 182:20
    221:7,14,17,22
    222:10 223:10
Colby 2:9,14 5:3
    10:18 163:12
    277:20,25 279:7,12
colleagues 84:18
collect 95:10 147:9
collected 89:13 151:7

151:25
collecting 231:25
column 33:19
Comanche 137:23
combat 37:16 56:14
combating 172:14
come 9:11 10:14 41:4
    49:18 63:4 91:7,16
    101:13 112:18
    114:7 155:5 160:16
    163:20 191:4
    220:13,16 251:25
    259:22
comes 80:4 111:1
    142:24 191:19
    192:21
coming 19:20 105:1
    106:5 171:15
    206:18,24 209:13
    210:8 244:24
    256:15
commentary 113:17
    113:21
comments 53:17
COMMISSIONERS
    1:15 278:15
committee 3:13 7:7
    17:5 49:20,23,23
    104:18 106:2,8,17
    106:18 109:19
    110:20 112:13,14
    119:7,11 123:18
    125:17 144:14
    160:5 161:15,20
    163:21,24 164:2
    186:10 189:12
    191:21,22 192:1
    193:5 194:23 207:6
    207:6 208:10
    209:12,13,15
    216:14 225:23
    228:7 229:2 238:4
    239:2,12
committing 24:3

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

7

communicate 14:20
    208:8,13 224:10
communicated 60:14
    103:24 208:5
    231:16,18
communicating
    224:9
communication
    98:21 208:12,24
    209:6,11 212:7
    218:20 219:18,20
    247:2 257:25 268:4
    271:6,13
communications
    22:3 61:4,9,13
    62:25 63:3 85:11,12
    100:3 102:6 103:22
    108:7 148:21
    160:20 189:19
    190:19 191:1
    208:18 219:16,25
    239:21,24
community 101:12
company 101:20
compare 218:15
    232:11
compared 171:14,23
    217:22,25 233:15
comparing 80:21
    171:3 218:13
    235:17
comparison 174:21
    222:17 233:22
compilation 160:7
compiled 192:11
complaints 96:13
    97:16,25 98:9
    180:10,12 181:13
    187:13,14
complete 175:16
completed 149:24
completely 92:9
Complex 4:2
compliance 169:18

262:18
complicated 74:25
complies 90:9
comply 60:19,20
    262:12,17
complying 60:17
comported 124:5
compound 24:8
    42:20 43:1 66:3
    158:3,4 266:22
computer 13:23
concealed 274:11,12
concept 71:10 79:6
concern 21:24 65:22
    103:16 121:24
    122:1 132:14
    133:20 141:7
    172:21 228:23
    242:25 243:2
concerned 56:25
    60:24 94:4 96:23
    97:1,3 134:7 176:14
    243:13
concerning 94:2,22
concerns 21:18,23
    58:18 60:15 62:22
    64:16 86:19 103:9
    104:21,25 105:5,8
    105:24 106:15,24
    107:7,14,18 113:14
    113:25 131:24
    132:1,5,20,23 133:1
    133:13,22 134:1
    141:1 158:1,5 166:7
    198:3 200:20
    211:23 221:17,20
    222:5,12 223:12,14
    228:13 229:5,7,9
    237:3,14 240:15,15
    241:15,19,20,23
    266:2
concession 91:14
conclude 41:6 136:24
    137:2 139:24

concluded 39:2
    137:17 182:3
    276:17
conclusion 40:2
    140:4,8 180:21,25
    187:21
conclusions 180:16
    181:6,17,21
condescending 54:19
conduct 153:13
    197:25 206:21
    207:3 221:11
    222:17 223:6 224:1
    226:18 232:13
    234:14 235:21
    242:11 244:3 247:8
    247:18 249:19
    256:16,20,23
    262:21 263:20
conducted 137:1
    185:11 193:4
    223:19 263:23
conducting 202:10
confer 84:18
Conference 1:20 3:7
    7:4,8 119:7,11
    123:17 160:4 238:4
    239:2,12 278:20
confess 54:6
confidence 44:6 94:5
    94:6,18 271:23
    272:16
confidential 2:12
    8:24 27:19 45:16
    89:21 90:7 92:10
    158:24,25 159:11
    159:14,18,23
    237:24 246:1
confine 170:19
confined 38:18,21
    86:9
confusing 78:12
confusion 75:14
Congress 266:9

conjunction 105:21
    106:12
connection 11:5
    12:11,14,17,18,20
    12:21,23 23:16 25:8
    28:25 37:9 38:13
    39:5,8,12,15 41:12
    42:10,17 60:1 65:25
    77:10,15 81:24 82:7
    84:3 88:7,11,24
    96:25 105:5 148:19
    160:21 163:17
    168:10 169:10,12
    169:16
consensus 72:20 73:7
    73:10
consider 142:3
    185:16 203:25
    204:7,10,21 206:11
    233:20 234:1
    235:16,22 236:7
    243:15
consideration 114:9
    120:8 160:21
    169:19 172:5
    179:11 210:15
    216:12 232:2 233:4
    234:2 236:24
    256:12
considered 44:14
    114:25 183:24
    185:15 192:24
    193:18 194:3 233:2
    243:16 253:20
considering 233:21
    233:22 247:24
consistent 58:2
consistently 239:25
    240:3,5
constituencies
    103:17
constituency 219:11
constituent 22:24
    23:1,2 47:4 48:15

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

8

48:25 197:19
**constituent's** 51:21
**constituents** 19:18,25
  20:2,6,12,20,22
  21:2,3,5,6,7,9,11,18
  21:20 22:4,5,9,13
  22:16 47:11,19
  58:12 60:23,23 61:5
  61:10,14,18,20
  65:12 72:13 83:20
  86:21 113:13,18
  219:4,17,18 220:1,5
  266:15
**constitute** 8:20 126:9
  135:24 189:25
**constitutional** 59:12
**consult** 84:20
**contact** 18:12 20:3
**contacted** 85:24
  265:25
**contacting** 138:19
**contained** 30:3 71:24
  72:21 83:16 96:22
  98:22 127:15
  144:23 149:3
  196:21 200:4 223:9
  224:6
**containing** 27:4
  130:6 134:25
**contains** 30:8 33:15
  68:2 69:10 70:4
  77:20 124:22 127:7
  129:4 213:15
  255:24 257:11
**content** 257:25
**contentious** 62:8,11
**context** 20:25 53:5,14
  54:2 81:14,20 82:1
  82:3 99:10 121:19
  123:6 163:19 185:6
  202:18 221:15
**continue** 14:8,13
  252:19
**continues** 176:4

**continuing** 16:9
  175:12 195:13
**Contradicts** 248:6
**contrast** 80:24
**controversial** 62:5,11
**controversy** 74:19
  211:6
**conversation** 22:24
  61:19 86:1,8,17,25
  87:7 101:14 104:24
  112:25 115:3
  117:17 118:6,14
  125:19,21,25
  126:10 127:25
  129:12,13 130:22
  131:4,8,16 132:11
  161:12 164:11,12
  164:14 196:20
  231:20 240:25
  241:1,5
**conversations** 21:1
  22:15,16,18,19
  57:20,22 60:16 69:2
  77:9,12,14 84:15
  87:3 103:3 113:6
  115:7 120:20,24
  148:23 149:6
  161:11 162:4
  164:15,17 190:21
**conviction** 188:7
**coordinating** 163:20
**copies** 74:7,14,25
  75:1,3
**copy** 30:23 75:19
  106:19 116:18
  163:23 164:5 233:7
  262:2
**copying** 48:7
**corner** 116:2,2
**CORPUS** 1:2 278:2
**correct** 9:3 11:3,4,7
  13:8,14,15,18,22
  14:1,7 15:7,8,24
  16:4,15,19,21,25

17:9,25 18:3,6,10
18:12,15,21,23 19:1
23:15 25:16,17,17
27:14,23 28:2,13,16
29:7,22,23 30:7
33:21 35:2,6 37:10
37:14,15,18,19
39:12,13 44:20 45:2
46:15,18 47:5,6,8
47:11,22,23,25 48:3
48:7 49:1,2,6 50:1
52:24 53:13,18 55:2
55:6,12 56:15,20
59:1,14,18,22 62:14
62:19 63:18,23 64:2
67:1 68:6,7,13
69:11,19,20,23 70:2
70:7 71:1,2,7 75:21
75:24 76:4,8,14,17
77:22,25 78:1,3,6
79:8,22 82:9,13,16
83:1,2,5,8,9,13 84:5
87:13,14 88:19,20
90:2,24 92:17 93:4
93:14,19,19 95:13 96:5
96:10 97:18,21 98:2
102:12,13,14
104:17,22 105:2
108:17 109:7
113:22 114:1,17,18
114:20 116:7,8,19
116:25 119:18,19
119:20,21 120:2,5,8
120:11 121:7,15
122:14 123:12,17
124:6,12,15,16,25
125:3,4,6,8,9
126:25 127:3,16,17
128:15,21,22 129:1
129:2,5,6,15,19,21
129:24 130:2,9,12
131:12,19 134:3,4
134:14,21,22,23
135:2 136:13,14

137:6,12,19 141:8,9
142:15,18 143:10
143:14 145:22
146:9,10,16,25
147:5 148:10,16,17
149:10,11,13,17,20
150:3,12,16 151:8
151:14,15 152:3,10
152:14,25 153:4,10
153:15 154:3,4
155:18 156:8,11,15
156:18 157:23,24
158:11 160:22
161:1,18,21,25
162:15 163:9 164:9
165:13 166:8,10,14
166:22 167:16,21
178:3,4 179:12,13
185:12 186:3 187:7
187:9,19 188:20,24
192:8,9,15 197:7
199:8,12 202:16
203:18,23 209:4
210:12 212:25
213:12,16,19,20,22
214:2,3 215:12,18
215:19 216:1,4,7,10
216:18,22 217:12
217:14,17 219:21
219:22 230:25
235:7,8 238:6,22
239:9 240:5 242:5
242:23 243:7,10,25
244:2 247:15 250:1
251:3 254:10
258:23 261:20
264:12,13,14,15,19
264:22,23 265:7,8
265:10,13 266:9,10
267:7,10,18 273:23
274:3 277:22
**corrected** 114:4
  179:18
**corrections** 54:18

COLBY BEUCK                                                      6/20/2014
CONFIDENTIAL TRANSCRIPT

9

correctly 67:24
  229:22,22
correlation 234:25
correspond 14:5,14
  15:9
corresponded 14:23
corresponding 14:16
cost 150:1 248:11,12
  248:15,24 249:3,7
  249:13,18,20,25
  250:4
counsel 7:1 15:17,20
  16:11 27:16 30:22
  54:9 63:17,20 74:5
  79:12 80:12 107:21
  122:15 139:18
  162:21 168:2
  173:13 190:4
  198:24 202:23
  252:17 254:16
  256:10 263:6 265:3
  276:2 280:2
count 33:20
counted 146:24
counties 153:13
  154:6 250:11
counting 68:4
county 1:14,14 33:17
  34:22 35:17,18
  149:1,2,4 151:8
  153:14 265:10,12
  265:12 278:14,14
couple 52:13 131:14
course 62:3 124:24
  175:24 228:10
court 1:1 9:12,19
  11:11 23:25 24:16
  25:20,20,25 26:7,10
  26:12,20 28:1 60:5
  65:4,5,8,10 66:9
  85:1,6 91:2 108:1
  110:10 113:9 126:8
  135:24 136:4
  159:21 165:20

183:17 189:24
  209:9 214:11
  218:10 251:21,22
  251:24,24 252:5,9
  252:10 260:17
  262:19 268:22
  278:1
court's 8:18 58:3
  60:10 64:20 71:20
  100:6 107:4
covered 200:6
covering 86:5
craft 113:24 144:4
Crawford 25:24 65:7
  66:9 178:2,9 233:2
  233:3,8 261:17,22
  261:24 262:4,11,15
  262:19
create 77:6 113:16
  202:21 221:21
created 247:4
creation 152:22
criteria 144:20,24
  145:4,10,14,18
criticism 42:18
criticisms 42:4
CSR 2:18 280:10
culmination 41:10
curious 268:24
current 12:15 15:18
  61:25 194:10
currently 142:5
  264:24
custodial 279:21
custodian 39:17
cut 227:2

                D
D'Andrea 4:11 7:14
  190:17 218:24
  268:12,14
D.C 3:5
Dalhart 144:6
data 23:18 88:10

95:10 139:7 147:10
  151:7 171:8 231:13
  231:23,25 232:1,3
  266:24
database 150:21
  229:21 232:7
databases 232:18
date 26:16 35:7 68:12
  76:14 77:22 145:21
  149:24 179:17
  239:6 280:11
dated 27:14 92:17
  197:8 257:3
dates 179:15
Davis 273:21,21
day 9:20 115:25
  121:10 157:2
  229:10 263:14
  264:25 279:16
days 76:13,16,23,24
  77:4,21 78:21 79:1
  79:2,25
DC 3:14,24
de 274:19
deal 49:4 107:13
  131:10,10 185:23
  219:6
dealing 40:14 48:24
  88:17 220:9 251:19
deals 184:25 186:1
  222:21
dealt 24:20 25:2 47:7
  115:6 144:17 183:9
  184:20
debate 42:8 43:3 54:6
  72:17 76:21 77:11
  82:20 103:23
  107:16 115:2 117:6
  125:18,20 127:24
  130:25 131:5
  154:11,12 172:10
  172:11,19,23 177:5
  177:7,10 186:9,10
  193:6,9 217:5,9

218:18,22 227:15
  227:17 228:7,11,22
  229:8 237:1 238:4
  272:25 273:11
debated 115:25
  192:13
debates 269:10
deceased 34:5,7
  195:12
Dechert 3:9 7:3
decides 209:22
decision 139:15
  262:19
decisions 145:16
deemed 144:25
defendants 1:7,19,25
  2:5 3:16 7:18 9:4
  92:11 278:7,19,25
  279:5
defending 176:22
Defense 46:17 197:11
define 111:5
defined 221:6 223:5
  223:16
definitely 97:4,7
definition 183:1
  222:11 223:9,12,15
definitive 139:2
deliberative 45:25
Democrat 116:9
  119:20 127:10,11
  128:25 130:2
  134:22 149:19
  152:16,17 167:3
  273:22 274:25
Democratic 146:18
  157:3,4,8,17 166:17
  167:5 170:7
Democrats 156:23
  170:5 176:10 225:3
  225:7,10 267:19,25
  268:2,10
demographic 147:10
demographics 95:15

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

10

233:11,12,16,17
denied 276:12
Department 3:3 77:2
  87:23 148:14
  213:22 265:25
  271:2,8,14
depend 14:18 23:5,8
  38:25 39:2 123:2
  142:9
depended 22:21
depends 170:14
deponent 258:11
deposed 11:3,8,14
  85:17 258:8
deposition 2:8,14 8:2
  8:4,10,16 9:14,17
  9:19 10:5,11 11:15
  12:2,7,9,10,12
  17:19 58:1 89:22
  90:3 91:19,23
  175:19,24 176:3,8
  194:10 248:7
  251:18,23 253:7
  263:8 272:22
  276:14,17 277:20
  279:7,13,15,23
depositions 45:9
  87:21
deprive 85:15
Deputy 3:18 4:6
describe 19:24 20:25
  57:21 58:6 86:14
  189:3
described 112:10
  187:10
describing 23:6
description 5:9 34:19
designated 8:24
  45:15
designation 34:2,13
  34:23
designed 153:18
detail 77:1 111:7
detailed 36:9 146:21

details 34:1 46:22
  163:21 209:14,16
  233:6,7 249:4,8
detect 40:18 154:2,7
detecting 40:15 153:4
detection 154:16,18
  155:2
determination 41:4
  94:13 202:5
determine 35:20
  36:19 38:2,23 55:22
  65:18 80:21 93:25
  95:7,15 110:24
  139:9 145:11
  147:21 148:4
  151:12,17 154:21
  182:5,9,12 193:3
  194:21 195:20
  197:25 200:13
  202:6 221:11 223:7
  226:18 227:12
  228:1,3,7 232:3,14
  242:11 247:8,18
  249:20 256:2
  262:22 263:21
determined 94:15
  174:7 189:24
  243:16
determining 144:20
develop 18:6,8
developed 71:9 248:7
developing 23:16
  24:6 25:9 61:23
  63:25 77:15
development 65:25
  88:12
Dewhurst 258:14
Dewhurst's 84:4
differ 137:14
difference 141:20
  143:3 236:18 239:8
differences 80:24
  236:21 245:22
different 24:4,10

43:15,16 61:2 67:23
  68:5 71:6 74:15
  78:4,20 123:7 143:5
  170:20 181:25
  193:13 208:15
  218:12 227:9,16
  233:12,17 263:17
differentiate 64:6
differentiating 64:8
differently 80:15
  81:5
difficult 40:7,13,17
  90:4 154:2 202:20
  218:14,15 223:11
  254:17
difficulty 9:20 40:14
  79:5 81:1 143:19
  256:21
direct 19:7 63:2 67:6
  84:16 87:19 135:22
  229:6,9
direction 8:13 58:3
  60:10 64:20 107:4
  139:13
directly 25:14 180:18
  181:10 185:16
  230:8 231:5 243:10
director 48:18 64:13
disabilities 222:14,25
disability 108:16
  109:10,10 110:2,15
  111:5 112:6,9,13,23
  113:1,11 114:2
  198:15 220:9,10
  221:6 222:3,5,9,9
  223:3,5 224:2,15
disabled 109:22,25
  110:24,25 111:5
  113:20 220:25
  222:19
disadvantaged
  170:21 171:2
disaggregated 151:7
disappointed 47:21

discrepancies 142:6
discretion 97:13
discrimination
  166:25 167:9,16,21
  168:25 169:12
  176:8,13,16,22
  177:4 178:23
discuss 57:6 58:18
  59:24 71:10 86:10
  86:19,23 106:22
  112:20,22 117:9
  126:3 127:18
  145:14 153:23
  199:20 220:12
discussed 58:7 71:14
  73:3,8 86:12,15,16
  87:15 88:13 104:10
  118:7 123:18
  125:25 127:24
  128:10 132:8,23
  133:3 134:6 166:16
  174:11 191:2
  194:16 226:6 229:1
  243:4 264:3 272:22
  272:24 273:3
discusses 97:16 239:8
discussing 25:7
  115:14 118:8
  135:16 244:7
  250:14
discussion 26:25
  95:23 117:23,25
  177:3,6 184:20
  199:23 226:7,12
  227:19 240:7,21,22
  245:16 247:1,5
  251:2 264:7 266:25
discussions 70:9 72:4
  85:23 110:14,18,19
  117:1,4 119:10
  125:13 129:7
  130:19 131:1
  133:13 135:20
  136:6 146:5 148:25

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

150:5 152:5 201:24
202:2 226:3 250:15
257:19,22
**disenfranchise** 48:3
54:1 66:11 103:16
197:23 198:1
**disenfranchised**
59:18 168:6 198:4
**disenfranchisement**
67:1
**disenfranchising**
53:10 200:2
**dislike** 250:24
**disliked** 246:12
250:17
**dislikes** 246:11
250:14
**disposition** 156:1
195:23
**disproportionately**
66:2 171:11 228:14
**dispute** 167:23
168:24
**disputed** 246:2
**disseminate** 265:18
**distinction** 10:14
36:16 100:14,15
**distinguish** 34:9
**district** 1:1,1 38:16
65:13,15 149:3
150:25 174:13
178:17 181:11
205:10,25 265:9,9
278:1,1
**divided** 157:22
169:21
**dividing** 85:16
**division** 1:2 3:4 4:6,7
8:6 271:2,4,5,8,15
278:2
**divulges** 91:20
**document** 28:6 30:3
30:7 32:6 35:7,15
36:7 45:4,18,24

46:13 48:6 51:6
52:2 66:21 78:19
79:24 80:3 106:19
109:17 115:23
120:25 121:4
158:20 159:1 160:7
160:8,11 162:11
179:11,14,15,20,20
181:3,3 184:17
197:15 205:14
220:15 229:15
230:12,14,17,23
237:19,23 238:2,5
245:21,22,23,24
246:5,7,8,14,17
247:14 249:14
250:23 251:1
**documentation** 36:15
68:3 70:24 71:4
112:2,10 203:17
**documented** 196:24
212:3
**documents** 8:24 9:1
9:11 12:11,13,16,19
12:22,25 13:4,14
27:4,18 39:12,17,18
90:8 92:10 112:7
122:12 159:20,22
203:11 246:2 248:4
248:10 250:1
**doing** 8:17 9:13 10:9
36:25 37:8 60:10
64:4 100:9 113:9
140:3,15 174:16
254:19
**dollars** 96:8
**Donna** 44:19,25 45:1
45:5 49:19 50:21,24
51:10
**DPS** 121:6,11,14
122:9 123:5 148:15
231:16,19,20,23
232:3,5,8,10,12
**draft** 18:9 49:16

53:15,17 54:21
154:25 197:18
200:15 256:9
**drafted** 59:5 256:7
**drafting** 18:11 65:25
254:25 256:11
261:17
**drafts** 74:7
**draw** 180:16,25
181:17,21 187:21
233:3
**drawing** 85:12
**drawn** 181:5
**drew** 211:5
**driver's** 68:9 76:11
77:2 78:10,22 79:13
81:16 89:13 93:4
94:12,17 121:14
122:10,11 123:1,11
141:17,18,20,25
142:2 228:9,16
229:19 230:3 231:3
242:17,19 264:2
**driving** 213:21
**dropped** 109:20
**duly** 2:15 10:19
279:12
**duties** 5:24 184:3
**Dutton** 127:9,10
257:9
**Dyer** 27:14 179:7,8
179:20 185:6
186:19

_____
          E
_____
**E** 3:1,1
**e-mail** 5:10,11,14,15
5:16,19,21 9:18
14:2,4,5,14,24,25
15:2,3,5 27:6,12,13
27:23 31:14 45:21
46:13,14 47:5,7,15
47:20 48:1,6,19,25
49:3,4,16 51:19,21

53:9,19,20 54:11,15
54:19 92:16,19 93:1
96:3,7 97:15,21
98:15 99:3 109:6,13
109:18 111:25
121:5,9,10,17,20
122:23 123:4,6
162:13,20 163:2
179:17,25 197:5,6,6
197:10,17 202:19
220:8 224:7 228:17
238:5,13,19,22,24
239:3,6
**e-mails** 13:20,24 15:4
21:2 51:25
**earlier** 39:10 68:11
68:12 76:13 77:21
78:21 98:23 99:19
99:24 104:11
151:10 154:1 180:1
224:23 226:14
248:8 253:6,13
256:7 261:16 264:3
272:22 273:5
**early** 28:23
**easier** 10:9,16 72:20
77:8 82:16 102:1
**easily** 126:13,18
131:23 132:6,25
141:15 143:14
144:11
**easy** 80:3 259:21
**economically** 170:21
171:2
**editing** 54:22
**educate** 97:9
**education** 1:12 3:21
67:9,11 96:9,24
127:15 198:8
199:11,25 200:5,10
201:3 240:9 257:11
278:12
**effect** 120:10 125:5
140:10 149:23

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

12

200:19 266:14
271:9
**effects** 167:16 265:22
271:16
**effort** 54:25 95:7,14
96:9 199:11,25
229:4
**efforts** 67:15 96:22
96:25 97:3 174:13
198:8 200:4,5,6,10
201:3 207:22
210:16,23 211:3,4,5
228:6 240:9
**egg** 92:1,4
**either** 24:3 34:14
67:21 86:20 91:6
106:14 132:22
140:11 142:23
144:14 195:21
212:3 226:17
236:13
**El** 134:18
**elderly** 194:2,4
**elected** 15:23,25
**election** 5:23 27:23
29:5 30:23 31:3,6
35:1 40:8 44:6,19
50:5,7,21,25 67:12
67:21 76:11 79:13
111:22 126:14
131:24 143:14
144:3,10 147:25
148:2 149:1 152:20
152:22 153:3,7
154:6,20 155:1
170:15 180:17
182:20 198:9
203:15,19 204:20
204:21,23 205:2,7,8
205:9,25 206:11,15
206:23 248:10,23
248:25 250:2,6
271:23
**elections** 44:14 50:3

50:10,17
**elicit** 245:9,14 251:13
**eligible** 146:21,22
147:17
**eliminated** 82:23
248:13
**Elizabeth** 91:25
**else's** 34:9
**employed** 16:20
264:24 280:3
**employee** 48:10
124:21 126:16
**employer** 124:23
126:3 132:19
**employer's** 124:24
125:24 126:11
127:22
**employment** 19:23
259:2
**enabled** 147:2
**enacted** 59:17
**enacts** 272:9
**encompass** 117:14
**encompassed** 185:5
185:16
**ended** 210:8
**enforce** 40:9,13,23
206:18
**enforcement** 5:24
153:3 187:14,15,17
**enforcing** 202:22
**Englebrecht** 208:25
211:16,23
**enhanced** 155:1
**ensure** 40:9 59:11
66:10
**enter** 45:23
**entertaining** 45:6
**entire** 8:4 10:11
41:15,20 58:1 90:3
144:5 166:1
**entirely** 23:5,8 84:19
154:9 234:8
**entirety** 10:1

**entitled** 29:5 34:25
275:16
**entity** 213:25
**essentially** 91:7
132:20 175:9
**established** 189:17
**et** 1:3,6,12,15,18,21
1:24 2:1,4 3:16
277:2,2 278:3,6,12
278:15,18,21,24
279:1,4
**ethic** 166:1
**ethnic** 151:18 228:24
**ethnicity** 151:7,13
**evading** 63:7
**evaluating** 145:4,10
**event** 122:8 137:17
146:8 188:18 190:6
211:16
**events** 15:13
**everybody** 10:6
**evidence** 42:14 57:11
62:7 143:22 147:7
153:14 211:17
219:14 242:9,16,18
242:24 248:7
266:14 269:24
270:6
**exact** 26:16 39:22
111:14 244:16
**exactly** 42:10 98:25
99:1 101:24
**examination** 5:4,4,5
5:5 10:22 175:6
252:25 264:8
279:17
**examine** 153:13
**example** 34:10 50:20
113:23 114:7
141:16 142:11
159:10 171:4
**examples** 50:14
82:11 195:24
**exchange** 9:18 51:19

**exchanged** 75:15
**excluded** 260:25
**excuse** 133:17
**execute** 116:16
117:10
**executing** 119:24
**exemption** 109:24
110:1,2,15,21 111:1
111:7 112:10,13,15
112:19,24 113:1,3
113:11,14 114:2
220:18,19 222:15
222:17,24 223:3,16
224:2 239:14,18
240:1 246:19 247:3
247:6,9,19,22
250:17,25 251:7
**exemptions** 113:20
198:14,15 239:22
250:18
**exercised** 251:22
**exhibit** 27:1,3,13
29:5 45:13,15 66:15
66:19 75:15,16,18
89:19,21 92:15 96:1
96:2 109:4,5 115:19
115:21 119:16
121:3,4 158:14,15
158:18 159:3,5,10
162:7,8,11 179:1,16
180:1,5,6,7,8,13
181:19 182:16,18
183:15,18 186:7
187:19,23,24
188:10 194:17
196:17,21 197:2,4
197:22 198:19,22
202:13 203:7
205:18,19,21 206:3
212:15,17 215:4,6
220:7 223:1 224:12
224:20 227:22
228:15 229:11,12
230:9,17 237:18

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

13

238:3,6 245:20
250:14 254:4,4,5
257:2,13
**EXHIBITS** 5:8
**existence** 187:22
194:21
**existing** 203:25 204:8
255:6,11
**exists** 49:21 56:11
**exiting** 138:9
**expand** 204:9
**expanded** 217:15,22
**expect** 115:16
**expected** 175:15
**expediency** 91:15
**experience** 63:16
162:2,5 164:19,21
195:1,6 196:2
261:12 264:21
**expert** 168:3 169:4
**expertise** 63:16
**experts** 164:19
**expiration** 68:15
76:23 77:9,15,25
78:21 79:2,2 80:1
280:11
**expired** 68:10,10,11
68:12,19 69:4 76:13
76:13 77:21,21 78:7
78:9 142:1
**explain** 76:25 109:12
234:5
**explained** 230:6
**explicitly** 260:25
**express** 103:15
126:16
**expressed** 104:21
**expressing** 22:5
103:8 241:22
**extends** 113:5
**extensive** 13:2 179:2
232:1
**extent** 8:5 9:1 10:2,4
29:15 41:13 62:24

63:2
**extremely** 139:12
**Ezra** 9:17

**F**

**face** 31:25 32:13
62:17,18 141:21
**facial** 142:6
**fact** 58:3 110:24
173:18 186:1
197:20 215:25
220:25 230:3
231:14 252:3
254:18
**fact-finding** 23:21
**facts** 36:10 42:13
57:10,13 62:7
143:21 147:6
219:13
**fail** 9:12
**fair** 8:7 62:12 63:22
64:7 88:17 100:14
103:10 104:9 107:9
126:2 132:3 138:1
156:24 157:11
165:1 177:5 180:23
189:14 207:19
211:5 223:17 225:2
228:10 236:11
248:4 275:22
**fall** 261:18
**falsely** 52:4
**familiar** 31:2,5
108:25 207:17
208:1,25 212:13
213:1 235:15
**familiarize** 31:5
**family** 195:12,12
**far** 108:2 128:11
176:14 180:1
249:20 264:21
**fashion** 58:2
**favor** 118:17 127:2
128:1,7 129:20

130:14 135:10,14
149:13 152:10
156:17 158:8
225:18,19 266:20
267:2,3,5,9,16,21
267:25,25
**features** 126:12
**Feb** 5:10,14,15,16
**February** 27:14
28:12 29:2 55:9
92:17 96:5 109:7
179:17
**federal** 2:21 70:6
96:8 130:7
**federally** 137:5,9
**fee** 177:14,15
**feedback** 113:13
**feel** 11:23 34:20
40:19 42:22 45:17
67:4 80:14 109:13
116:14 139:17
140:6 158:18 180:5
268:6
**feeling** 206:14
**felt** 60:19 94:18,21
105:7 158:9 198:3
201:4 205:2 209:14
217:3 229:7 262:18
263:25
**fielded** 47:15
**file** 19:4,13 58:11
73:10 86:1 146:23
260:18
**filed** 26:15,16 28:13
28:16,20 57:15,19
68:18 69:25 70:13
70:18 73:12,13
74:11 106:4 155:16
155:22 215:14,25
216:13 260:8
261:14
**files** 13:2,3,19,24
**filing** 18:15 19:16
26:19 55:23 56:3,9

57:7 58:9,16 70:11
72:5 85:25 86:9,18
219:10,10
**final** 45:25 74:11
75:11 124:14 146:9
155:25 160:4
174:14,15 225:17
225:23,25 226:3,9
**finally** 112:17
**financially** 280:5
**find** 13:13 39:11
42:10 43:7 54:19
96:21 137:3 146:14
181:15 186:25
197:3 220:24
**finding** 110:20
**fine** 8:6 10:8,17 41:25
46:25 73:25 74:13
75:5 111:9 133:11
174:24 255:15
276:15
**finished** 217:7 240:20
**Firm** 280:14
**first** 10:19 16:7 17:23
27:5,13 29:4,17
30:19 45:21 46:12
48:5 49:3,11 52:1
52:21 68:8 76:10
78:13 79:17 80:4
93:2 96:7 119:2
153:5 176:7 179:16
183:20 189:15
191:4 197:17 209:2
209:3 210:22
239:13 251:11
**fiscal** 192:20
**Fischer** 128:25
**five** 30:18 76:6
**fixed** 9:9
**flip** 68:1
**floating** 74:8
**floor** 105:14 107:16
113:12 114:3 115:2
125:17 135:7

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

14

186:10 229:2,3
244:8
**focus** 24:1 88:8 156:2
178:9 201:3
**focused** 24:11
**focusing** 79:10
**follow** 8:22 98:4,13
123:10 212:2
233:10 268:17
275:19
**follow-up** 22:25 23:4
31:9 32:9 38:23
174:23 275:13,19
**followed** 193:5,6
250:10
**following** 25:11
81:22 190:3 214:19
273:5 279:11
**follows** 10:21 279:23
**Force** 152:22 153:8
**foregoing** 277:20
**forget** 209:2
**forging** 256:21
**forgive** 254:16
**form** 43:12 44:1,11
45:7 51:13 56:19
57:2 67:22 68:8
69:9,22 70:3,10,14
76:10,22 77:18
81:15,17 84:6 99:12
123:22 127:19
128:2 131:3,21,22
133:16 136:7,13,21
136:25 137:18,20
138:7 140:9 141:17
141:19,23 142:3,10
143:7,23 144:7,20
145:3,9 146:1
150:12 151:13,19
155:24 165:7
167:10,22 168:8
169:3 171:6,13,24
174:17 183:9
185:23 195:15

198:11 200:22
202:5 226:23 227:1
227:4 242:3,7
243:14,18,19,21
244:15,22 246:13
246:24 248:6,16
253:17,21 254:14
254:22 256:13
**formal** 41:23
**forms** 65:13 67:23
70:24,25 71:3,6,10
71:16 72:6 73:14
76:7 78:13,16 79:1
79:7,8,9 80:22
82:24 83:16 93:16
126:13 128:10,12
131:6,11,18,25
132:3,7,9,15 133:1
133:14,24 134:7
137:13 140:5 141:2
141:7 144:11,16,23
145:1,10 147:4
150:2,16,22,25
151:23 155:4 165:2
166:18 217:15,16
230:10,19 231:11
232:15 242:10,12
243:1 254:12
255:22
**formulate** 140:13
144:19 145:9
**formulated** 145:6
**formulating** 145:5
**forth** 54:22 233:8
254:11
**forward** 20:4 87:24
133:25 134:8 191:9
216:16 261:14
272:17
**forwarded** 279:20
**found** 41:9 45:6
75:11 186:20 191:6
**foundation** 29:14
43:12 143:23 147:7

165:17 167:12
169:25 170:23
213:9 214:12
216:20 217:19
218:3 219:14 237:4
244:5,7 267:11
268:15 269:21
**four** 7:25 8:5 30:18
97:21 99:6 117:15
**fourth** 33:15
**frame** 79:4 81:4
106:1,4 114:23
117:3 260:1
**framed** 54:6
**Fraser** 18:25 215:10
266:2 271:7
**Fraser's** 18:23 87:12
**fraud** 24:4,21 25:2,7
25:16,22 26:1,8,11
26:20 28:2 29:12
32:19,21 33:9,24
34:4 35:5 36:4,14
36:20,23 37:13,17
37:17,22,23 38:4,4
38:8,14 39:21 40:1
40:15,18,25 41:1,7
41:13,23 42:5,11,19
42:24 43:10,13,21
44:4,8,13 49:21
52:10,16,18 55:1,6
55:15,23 56:1,3,8
56:15,17,25 57:1
58:15 88:11 96:14
97:16 99:13,13,20
99:25 153:4,9,14
154:2,7,10,16,18
155:2,4,5,6,11,14
155:14 172:15,20
173:25 174:6,19
179:23 180:17
181:1 182:6,13
183:2,10 184:21,25
185:5,12,24 186:14
186:18,21,23 187:1

187:22 188:8
194:21 196:10,18
202:15,20,22 203:8
210:18 211:10,13
211:18 256:17
272:9,10,15
**fraudulent** 50:5,7,11
50:18,25 51:11
**free** 11:23 34:20
45:17 67:4 90:8
109:14 116:15
158:18 180:5
198:10 243:3 248:2
248:5,5 268:6
**front** 107:20 111:11
171:7 179:4 205:13
205:16,20 212:14
215:5 223:10 262:2
**full** 156:5 175:15
196:6
**function** 187:15,18
**FUND** 1:12 3:21
278:12
**funding** 96:21 97:2,9
**funds** 96:24 97:4,6
**further** 275:6 280:2,5
**future** 45:11 275:24

_____
G
**game** 91:23
**gather** 23:20,23 24:6
24:12 54:25 55:14
270:24
**gathered** 56:7 88:11
140:5 148:8
**gathering** 25:21
28:24 140:12
**gauge** 147:3
**Geer** 3:3 5:4 7:9,9
61:12,16 74:12,22
75:2,6 89:25 90:13
90:21,23 92:13
159:8,25 175:3,7
181:4 183:15,20

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

15

189:14 190:1,7,9,15
190:18 196:12
198:25 199:3,5,8,10
201:5,11,17 202:25
203:2,4 204:5,7,13
204:15 205:18,20
209:17 212:10,16
212:21 213:10
214:14,17 215:5
216:11,21,25 217:6
217:20,25 218:4,8
218:19 219:9,15
221:1 224:19,22,23
227:21 229:16
230:16,17 232:22
232:25 233:1,24
234:6 237:5,18,22
238:1,14,20 240:5,8
241:14 244:6 246:3
246:5,16,25 248:9
248:19,21 251:8,13
252:14 253:6
261:21 266:22
267:11 268:13,15
268:23 269:15,21
270:21 271:1,25
272:11 275:12,16
275:19,22,25 276:9
276:14 279:24
**general** 2:20 3:18,18
4:3,7,12,12 15:20
16:11 21:22 29:6
31:13 35:2,5 36:3
36:18 52:12 61:1
63:17 78:12 82:4
88:14 105:20 131:7
133:20 148:12,18
149:5 162:21 174:5
174:12 179:9,9
182:2 186:8 189:12
220:1 221:24
240:23 241:16,23
246:12 248:17,19
250:16 251:6 262:4

265:3
**General's** 7:15 28:9
36:8 37:2 38:11
43:6 98:11,16 99:4
180:15 187:17
188:11 194:17
**generalizing** 21:16
21:17
**generally** 57:21 58:7
88:21 115:5 118:10
126:10 165:1
176:25 180:3 185:7
189:4,11 244:18
**gentleman** 164:20
**Georgia** 160:25
161:13,16 162:2
164:18,24 165:2,6
233:17,21 234:19
234:20 235:16,17
235:19 236:4,16,19
**Georgia's** 162:4
235:2
**getting** 88:1 133:23
169:17 268:6
**Giddings** 116:7,9
121:21,23 122:2
225:15,16
**Gill** 3:12 7:6,6
**gist** 86:17 113:21
**give** 8:7 11:19 34:19
40:8 46:3 123:3
133:8 141:16 147:8
175:15 176:1 179:4
184:13 197:3
198:25 199:5
205:21 212:17
215:8 254:13
257:25 276:5,7
**given** 9:1,2 11:11
15:16 71:21 82:11
91:22 107:11
110:10 138:2
269:23 279:14
**gives** 180:9

**giving** 209:14 261:23
**glean** 262:10
**gleaned** 261:22
**go** 11:24 14:21 26:23
27:5 31:14 49:4
50:3,20 63:6 67:17
72:24 80:13 84:1,21
87:8,23 95:20 99:3
105:17 106:1,11
107:19 115:12
117:6,7,18 119:1
120:25 127:6
138:13,14 139:22
140:18 142:17
143:8 157:14 176:6
176:9 177:16 182:1
182:1 188:2,3
209:10 217:20
222:7 237:5 238:20
252:21 253:14
255:20 258:17
264:6 269:7
**goal** 73:6,10,17 83:16
200:25 219:3,3,7
**goes** 54:4 112:12
180:2 191:23 242:6
249:9
**going** 10:5,13 15:11
17:18 19:5,6 20:15
20:17 27:5 29:13
32:1 34:11,11 36:5
45:23 46:9,10 48:19
53:2 57:23,24 60:8
61:23 62:17,18,24
63:2,5 64:18,22
71:18,22 73:16 74:6
84:16,17 85:7,10,14
87:17,19 90:17 92:8
98:17,24 99:16
100:7 102:16 107:1
107:2 109:12 113:4
113:7 116:14
121:22 131:10
133:25 134:1,5,7,8

139:19 140:20
143:5,9,9 145:19
152:19 162:12
163:20 165:22
167:23 168:24
169:24 170:15
185:2 192:4 193:7
193:11 205:15
209:7,10 210:14
212:20 222:7
251:18 252:14,19
253:2,7,9 259:11
275:7 276:16
**Gomez** 108:23 109:6
109:13,18 111:4,13
112:22 223:13
**Gomez's** 111:25
114:4
**Gonzalez** 134:13,16
138:21 220:9 227:6
242:3,4,4,22
**Gonzalez's** 138:17
242:14
**good** 10:24,25 16:10
40:3 66:16 107:21
139:14 173:14
231:6
**Google** 137:6
**government** 70:6
121:6,11 122:9
123:5 130:8,25
131:2 161:6 240:4
**governmental** 213:25
**Governor** 17:15,16
84:4,12 86:6 258:14
258:19
**Governor's** 18:20
**great** 10:10 157:1
163:5 219:6 252:22
254:3
**greater** 78:24 170:4
**Greg** 179:9
**ground** 11:15 17:19
175:11 253:7,8

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

16

**grounds** 15:12 19:6
    32:2 118:1
**group** 100:12 101:20
    101:23 102:23
    104:21 108:12,13
    113:24,25 207:21
    242:12 243:14
    269:4 271:10
**groups** 58:19 61:24
    62:2,12 65:19,20
    66:2,11 86:20
    100:20 102:6,11
    103:11,15 104:2,17
    105:5,25 106:16,25
    107:15 108:8 113:7
    114:6,13 157:25
    165:12,25 166:1,6,8
    166:10 170:20
    208:9,15,18 224:10
    224:14,15,17
    265:22 269:19
    270:5,12,13,13
**grow** 16:9
**growth** 235:15,22
    236:1,3,4,13
**guess** 189:4 194:14
**guidance** 71:20
    110:10 113:9 209:9

_____

**H**

**HALE** 3:23
**Halpern** 4:2 7:21,21
    7:24 9:3 10:11
    15:11,16 19:5,14
    20:15 21:14 24:8
    27:16 29:13 30:22
    32:1 36:5 41:15,18
    42:13,20 43:1,23
    44:10 45:23 46:2,5
    46:8 51:5,14 54:8
    54:20 57:10,14,23
    60:2,6 61:8,15,17
    62:6,23 64:18 66:3
    67:6 70:16 71:18

72:9,23 73:21,25
74:3,5,10,16,21
75:1,3,9 78:18 79:9
79:12,23 80:8,12,18
81:9 82:17 84:16,23
85:3,7 87:17 88:3
89:20 90:11,15,22
90:25 91:14 95:22
99:15 100:5 101:4
102:15 103:5,18
104:4,7 107:1,21,24
109:16 110:7
111:10 113:4
114:23 117:13,21
118:1,11,23 120:15
122:15,18 126:5
128:4 129:10
132:17 133:3,7
135:21 136:5
139:18,23 141:24
143:21 145:8 147:6
155:19 158:3 159:4
159:16 162:8
165:14,17,22,25
167:1,6,12 168:11
168:13 169:24
170:23 173:12,16
174:24 175:1 181:2
189:9,21 190:5
196:11 198:24
199:2,4,7 200:24
201:8,14,16 202:23
204:3,12 209:7
212:6 213:9 214:8
214:12 216:8,19,23
217:1,18,22 218:2,5
218:11 219:13
220:20 224:13,21
227:18 229:14
230:12 232:23
233:23 234:4 237:4
237:17,21,23
238:11,16,18 240:2
241:6,11 244:5

245:25 248:20
251:5,9 252:2,15
254:16,21 255:3,5,8
255:13,19 256:18
257:24 258:6 261:6
262:1,24 263:6
264:6 269:5 271:4
275:14,17,20 276:4
276:11,15
**handed** 27:2 45:14
    184:17 212:16
**handful** 44:15
**handgun** 274:11,12
**handicapped** 224:14
**handle** 47:4
**handled** 17:4,7,11
    38:15 273:15 274:2
**handling** 48:15
**hands** 156:5
**handwriting** 160:10
    160:12,15
**happen** 30:22 241:8
**happened** 15:13
    34:13 55:21 56:3
    260:20 273:10
**happening** 40:20
    231:22 254:18
**happens** 54:22
    260:10 261:13
**hard** 54:2 64:6 80:11
    202:18 222:17
**Harless** 5:12 13:21
    13:25 14:4,22,23
    16:14,21,24 17:8,25
    18:14 19:3,12,20
    20:7,12 39:16 43:2
    46:15,21 47:11,16
    48:7,10,14,24 49:9
    49:13,15 51:20
    52:24 54:14,16 57:7
    57:19 58:8 59:24
    60:14,16 62:17,21
    63:10,14 66:23
    68:21,25 69:3,23

70:10,15 71:12,16
72:5,19 73:13 75:23
83:15 94:9 96:4
105:22 106:13,23
107:11,13 110:3,15
114:21 115:8,15
117:2 118:9,16
119:11 120:4,13,18
120:21 122:5 125:2
125:10,14,21 126:3
126:15 127:20
128:1,20 129:8,20
130:14 131:2,17
132:2,9 135:9,17
139:17 140:14
141:1 145:5,15
146:1 149:9,13
150:6 152:2,6,10
153:24 154:15,24
155:9 156:13,17
183:6,8 184:4,19
186:9,18 188:23
189:18,19 190:17
190:19,22 196:9
197:5 199:14,21
209:22 211:17
212:4 215:20,25
217:3 218:21
219:17 221:11
224:1 226:4,18
228:6 229:5 234:9,9
238:13,25 242:25
243:13 247:1,8,18
250:15 254:8
257:16,20 258:3,7
258:13 265:7,20
266:1 270:16 271:6
272:20
**Harless's** 12:14 13:17
    14:9 16:17 20:23
    23:13 44:18,24 47:4
    47:21 60:22 65:12
    65:15 101:7 123:21
    124:11 130:20

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

17

149:3 150:18,24
156:3 160:14 219:3
230:22 232:19
**harm** 44:5
**Harris** 33:16 34:22
149:1,2,4 265:9,12
**Hasan** 3:22 7:11
253:3
**hasan.ali@wilmer...**
3:25
**hat** 15:17
**hate** 251:7
**hats** 64:4
**HAVA** 96:8
**HB** 5:12 19:4,13
23:12 24:6,10,17
25:9 26:15,19 28:13
28:25 55:11,16,23
56:3,9,14,18,25
57:6,19,20 58:9,16
58:19 59:9 60:1,16
60:24 61:3,23 63:25
64:17,24 65:13,20
65:25 66:1,4,10,25
67:14,18 68:6,18
70:11 71:1,4,9,17
72:5,20 73:12,12
76:3,17 77:24 78:2
78:6,17,25 79:8,22
80:5 82:24 83:5,7
83:12,15 84:3 86:9
88:7 212:11 213:3,7
213:12 214:5,24
215:21,25 216:2,6
216:11,22 217:2,15
218:12 219:23
220:2,4 254:4 256:7
256:11,13 262:22
263:21
**head** 111:8 124:8
176:2 215:24
**head's** 8:9
**header** 93:2
**headings** 152:20

**hear** 172:5,11,15
173:6 268:20
**heard** 61:20 121:10
131:14 133:4
171:10,21,25
268:25 269:13
**hearing** 19:25 58:11
105:24 106:15
109:20 110:20
166:14 171:17
177:11 193:6,12
196:5,6,6,7,14
208:10 209:12,14
209:15,21 210:8
221:20 222:5
223:13,14 269:1
**hearings** 41:12 49:23
196:3,25 235:13
269:24 270:1,11
**Hebert** 18:18 84:4,11
84:15 85:8,11,17,23
86:4,8 87:4
**help** 72:14 88:3 89:1
92:12 109:25 163:7
163:14,19 183:13
184:12 192:7 222:1
**helped** 18:5,8,9 48:15
161:19 163:16
**helpful** 181:24
**helping** 47:19 163:8
**hereto** 2:23
**Hernandez** 130:2
**high** 99:6,10 127:14
**higher** 127:14 143:18
171:22 172:6
257:11
**highlighted** 53:9,11
53:17 197:14,20
**highlighting** 49:6,8
**highly** 2:12 8:24
27:18 45:16 89:21
90:7 92:10 158:23
158:25 159:11,13
159:17,23 237:24

246:1
**Hinojosa** 274:18,25
275:2
**Hispanic** 1:14 102:24
170:9 278:14
**Hispanics** 170:12
267:15
**historical** 167:16
169:14
**historically** 48:2
59:17
**history** 50:14 160:1
166:24 167:8,20,24
168:4,6,25 169:2,5
169:11 176:8,12,15
177:3,13,20 183:12
183:25 184:1,5,7
**hold** 170:9 251:18
276:14
**Holder** 194:8
**home** 34:10 137:21
265:9
**hook** 252:12
**hopefully** 253:10
**hoping** 131:15
**hour** 46:10 139:19
**hours** 8:5,8 108:1
230:14 279:24,24
**House** 5:18,22,25 6:1
17:23 18:6 50:22
66:22 68:22 73:7
74:1 75:24 105:11
105:12,14,16
114:25 115:2,24
119:6 124:10
127:25 135:7
144:14 145:19
166:18 183:22,25
184:2,23 189:8
190:23,25 191:2,5
191:15,18,20,20,22
191:25 193:12
196:1,4 198:20
207:6 208:11

212:12 224:21
229:2 239:9 244:8
254:23 257:3
265:18,20 270:10
272:20
**housekeeping** 9:16
**Houston** 266:8,11
**Houston-based**
207:21 210:11
**Howard** 45:1,5 49:19
50:24 51:10
**Howard's** 44:19,25
50:21
**huh-huh** 11:20

**I**

**ID** 17:7,12 18:2 19:16
19:25 20:4,8,13
21:8,8,11,21 22:4
25:23 26:20 33:24
34:4 41:13,23 42:5
42:24 43:10 46:18
47:22 51:21 52:10
52:18 55:15,18,23
56:8,14,25 57:1
58:8,15,24 60:23,24
61:6,24 62:3,13,18
65:13,21 67:18 68:4
69:9,22 70:3 71:11
71:16 72:12,14 73:8
73:14 77:1,25 78:10
78:13,17 79:1,7,18
79:20 81:17,21 82:8
82:12,22,25 83:16
83:18,24 84:11
85:25 86:2,18 87:13
87:13 88:11,18 89:1
89:2 93:4 96:9
99:13,13,25 110:2
117:11 119:24
121:14 122:10,12
122:21 123:1,11,22
124:2 127:20
128:10,12 130:25

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

18

131:3,3,11 132:3,7
132:10,15,20
133:14 134:7
136:13,24,25
137:13,18 138:8
141:2,7,17,21
142:12,17,24,25
143:2,20 144:3,16
144:20 145:11
146:1 147:3,4 148:4
148:20,25 150:12
150:25 151:14,23
154:2,23 156:4
161:17 162:2,5
163:6 164:23 165:2
165:7 166:19
169:13,17 172:15
174:1,6,19 179:11
197:11 198:10
203:13,18,19,22
204:9,11 206:13
210:5 212:10,12
213:4,7,12 215:18
216:7 217:11,15,16
219:12,20 220:1
224:24 226:14,19
227:16 228:11,14
228:25 229:12
230:10,19 231:11
232:15 235:2,17
236:15,17 242:2,3
242:10,12 243:1,14
243:19,20,21
244:15 245:21
246:9 248:2,17
253:23 255:10
256:12 261:17
266:21 267:1,3,16
267:21 268:1
272:17 274:1,13
**idea** 20:10 54:6 66:16
73:13 74:9 118:21
139:2 168:22
**identifiable** 131:6

141:14 220:24
**identification** 23:20
27:1 45:13 66:15
67:22,23 68:5,9,10
68:19 69:4,10,18
70:4,11,14,25 71:7
72:6,7 73:18 75:16
76:7,10,11,12,22
77:18,19 78:22
79:13,14 80:5,23
81:7,12 82:2 83:4,6
83:10 89:19 96:1
109:4 115:19
116:17 121:3,24
122:1 123:25
124:22 125:24
126:4,12,16 127:13
127:23 129:4 130:6
131:7,21,22,23
133:18,19,20,24
134:25 136:7,8,20
137:3,4 141:15
142:10 143:7 144:8
144:11 146:2
148:22 150:1,2,22
158:15 162:7
164:20,22 165:7
183:18 184:8
185:18 198:11,14
205:1,19 208:6
212:15 213:24
214:6 215:4 218:16
219:2,2,8 220:3
222:8 227:9 228:16
229:20 234:17
236:8,20 243:19
246:10 248:10
250:6 253:17,21
254:12,15,22
255:22,24 256:13
257:10
**identification-by-i...**
145:17
**identifications** 93:16

143:6 227:6,7
**identified** 158:7
174:8 189:20
218:21 230:18
262:15
**identify** 81:13,21
82:3 110:25 174:1
213:7 214:7 221:2
**identifying** 95:2,4
131:19 267:9
**identities** 20:20
**identity** 20:11 77:6
81:7
**IDs** 83:8 127:19
128:2 131:18
132:19,19,25 133:2
134:2 135:5 138:6
138:15,22 139:8
142:20 143:13
145:11 146:6 242:6
243:3,7,10 244:14
248:5 253:17
254:14,22 255:1
256:17,21,25
**illegal** 32:17 33:20
40:20 182:17,25
185:3,4,8,17 206:18
211:23 212:4
**imagine** 103:8 170:13
**Imani** 7:12 253:4
**immediately** 122:10
**impact** 58:19 66:2
139:15 158:1
192:25 193:18,25
194:4 202:7,8
247:25 265:22
**impacted** 65:20
150:11
**impacting** 147:4
**impacts** 270:19,19
**impersonating** 34:6
**impersonation** 33:21
34:16 35:16,21 36:1
98:6 153:10 185:1

186:2,14 193:22
194:16 195:2 196:2
196:18,25
**impersonations** 98:2
99:6
**implementation**
205:7,11 250:9
**implemented** 42:25
234:16 235:2,9,11
236:16,17
**implications** 64:17
**implies** 57:14
**importance** 58:10,12
110:13
**important** 11:16
13:10 23:17 37:3
42:16 50:4 55:22
56:2,5 139:7 140:10
169:16 176:1
**impossible** 9:24
**impressions** 19:8
**improve** 57:4
**in-between** 16:16
**in-person** 24:3,11,14
24:21 25:2,7,16,22
26:1,8,11,20 29:12
32:21 33:9,24 34:3
36:4,13,19,23 37:13
37:16,22 38:3,7,14
39:21 40:1,15,18,25
41:7,13,23 42:5,11
42:19,24 43:10,18
43:21 44:8 52:10,18
55:15,23 56:2,8,14
57:1,5 58:15 88:10
99:13,25 153:10
154:2,7,16,18 155:2
172:14,19 173:25
174:6,18 181:1
182:6,13 183:2
185:19 186:1,18
187:22 188:7
193:22 194:15,21
195:2 196:9,18,24

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

19

202:15,20,22 203:8
  211:10,18
**incidences** 29:12 36:2
  40:18
**incident** 33:16,24
  34:3,19 35:21 261:3
**incidents** 35:16,21,25
  37:13,21 38:3
**include** 71:16 189:5
  199:11,25 221:5
  222:6 244:13 256:3
  259:16
**included** 82:24 94:9
  118:19 206:4,6
  222:25 225:23,25
  226:2,5,9
**includes** 236:16
**including** 187:25
  270:4
**inclusive** 198:16
**income** 193:25
  199:12 200:1,3,8,18
  201:6 202:8 240:10
  240:24 241:2
**inconsistent** 61:6
**incorporated** 111:13
**increase** 154:6,15,17
  234:10
**increased** 67:10,11
  67:11 76:21,23
  182:24 198:8 200:2
  235:1
**independently** 122:4
**INDEX** 5:1
**Indiana** 161:3,3,5,6,7
  164:9,21,24 165:2,6
  233:12,15
**Indiana's** 164:22
**indicate** 9:11 33:23
  35:10 230:18
  257:13
**indicated** 183:3,5
  208:15 228:25
  229:10

**indicates** 33:25,25
  197:22 203:7
  220:12,15 239:13
  240:14
**indicating** 180:15
  183:9
**indication** 128:3
**indicator** 237:19
**indigent** 247:6,9,19
  247:22,25 248:3
  249:22 250:18,21
  251:7
**individual** 14:18
  20:20 33:10 39:3
  41:8 122:10 133:24
  148:5 161:7
**individual's** 222:12
**individually** 181:13
**individuals** 161:8
  198:4 200:11
  222:18 223:13
  231:10 242:16
**inflated** 94:19,21
**information** 23:20,21
  23:24 24:6,13,17
  25:21 28:24 29:21
  29:24 30:3,8,14
  31:24 32:6,9,15
  33:10,16 34:4,5
  36:9,24 37:3,10
  41:3,22 43:3,6
  44:18,23 55:1,8,14
  56:7,10 65:23 88:25
  89:6,8,10,11,14,15
  95:2,4,11 96:16,20
  98:9,12,22 99:4
  138:18,19,22,25
  139:4,5,6 140:4,12
  147:11,15,24 148:8
  148:15,19 151:3,25
  152:1 160:3,7
  169:15 170:11
  172:9 173:5 179:24
  179:25 180:1,3,9,11

180:21,24 181:16
  181:18,22,24 182:4
  185:6 186:5,6,11,12
  186:13,15,17,19,20
  188:11,14,16,19
  192:11,12,19,21,22
  194:7,12,13,18,25
  196:8 197:15,18
  199:19 200:13
  201:4,7 211:20
  219:4 222:16 224:7
  227:5,11,25 228:4
  228:17,18 229:7
  231:12,14,21 232:5
  232:6,8,10,11,12
  233:2 234:21,21,24
  240:19 241:4
  242:13 245:14
  264:1 265:17,21
  266:18 267:14
  270:24,25 272:21
**informed** 85:24
  249:8
**initial** 123:4
**initially** 109:20
**input** 114:14 222:19
**inquiries** 151:5
**inquiry** 151:4
**inserted** 49:8,12
**instance** 2:15 91:4
  256:17 259:6 260:1
  261:4
**instances** 24:20 26:1
  42:11 52:16,17 55:1
  55:15 58:14 64:14
  153:9
**instill** 271:23
**institution** 70:5,6
  127:14 130:7,8
  142:15 143:18
  255:25 257:11
**instruct** 84:19
**integrity** 21:23,25
  22:6 23:14 152:21

152:22,24 153:8,12
  153:18,20
**intended** 37:16 256:5
**intending** 210:2
**intent** 51:7 86:1
  123:3,24 224:24
**interest** 62:2 86:20
  101:22,22 102:7,9
  103:11,15 105:5,25
  106:16 107:14
  108:8,12 113:7,24
  113:25 114:6,13
  166:5 190:22
  269:19 270:5
**interested** 16:6,8,9
  19:16 86:18 188:21
  209:13 210:9 280:6
**interesting** 45:9
  168:12 185:22
**interests** 100:20
  101:16,25 102:24
  103:12
**Intergovernmental**
  4:7
**interpretation** 54:12
**interruption** 12:4
**interview** 144:9
  163:4
**introduced** 160:1
**introduction** 105:10
**intuitive** 206:22
**invades** 120:15
**investigate** 153:14
  181:12
**investigated** 37:2
  153:8 182:2
**investigation** 31:16
  195:18,21
**invite** 263:9
**invited** 209:18,19,23
  209:25
**involve** 164:11
**involved** 33:9 36:4,13
  36:13,19 37:22 38:3

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

20

43:20 52:10 57:22
98:1 101:11 102:5
160:6 161:6 164:16
189:18 190:18,24
191:1 219:20,23
239:21,24
**involvement** 163:24
**involves** 61:9
**involving** 26:1,8,10
26:20 86:10,12 99:5
117:10 178:16
**irregularities** 35:11
185:20,20
**irregularity** 180:12
181:25 187:13
**issue** 9:16 23:19 24:1
25:23 37:1 40:4
42:3 49:19 50:13
55:17 58:10,11,13
65:3,21 77:6,11
86:5,7 92:10 101:13
122:5,9 125:16,18
125:23,24 127:23
130:23,24 135:4,6,8
136:8,16,18 138:6
138:13,18 144:15
148:22 155:13,17
160:17 168:9
171:15 177:8
190:22 193:8,21
207:6 210:18
214:19,21 219:5
220:3 223:19 224:2
224:2,3,4,11,17
226:20 227:17
229:1 231:19
234:13 236:10
239:23 242:24
244:24 245:16
246:15 247:20
251:20,21 256:2,14
259:23 269:10,16
269:18 270:14,24
272:24 275:4

**issued** 13:7 70:5 77:2
124:23 127:13
129:5 130:7,25
131:3 135:1 142:2,5
213:15,24 255:25
257:10
**issues** 17:4,7,11,20
21:10 40:14 42:7
49:5 55:18 58:8
59:25 63:13,21
64:12 67:9 84:11
103:23 132:7,8
153:22 154:13
178:22 194:24
198:3 242:15 243:4
251:25 263:25
**issuing** 239:20

**J**

**Jackson** 266:5
**Jacqueline** 46:14
47:10,13
**Janice** 18:22 87:12
**January** 15:22 16:1
16:13 28:20 36:4
149:23 179:16
**Jay** 27:14 179:7,20
**Jessica** 108:22 109:6
220:9
**jibberish** 145:7
**job** 16:5,13 17:16
48:14 92:5 163:5
186:8 192:6
**jobs** 16:16
**John** 3:17 7:17 138:1
**john.scott@texasat...**
3:20
**Johnson** 167:7
**join** 165:21
**joint** 159:25
**Journal** 5:18,22
115:24 124:10
145:19 183:22
184:23 224:21

257:3
**judge** 9:7 91:5 206:1
270:15,22
**judge's** 8:13
**judges** 1:14 205:8,9
205:10,25 206:12
278:14
**judgment** 145:15
**Julie** 48:7,9
**July** 87:22
**jump** 143:24
**June** 2:10,17 279:8
280:7
**Justice** 3:3 87:23
265:25 271:2,8,15
**justification** 172:12
172:13,14,20
**justify** 42:24

**K**

**K** 3:12
**keep** 23:18 146:21
252:12
**keeper** 151:3
**keeping** 8:13
**Kemp** 160:25 161:12
161:19 162:25
163:5,9,16
**Kemp's** 162:18,21
163:14
**kept** 147:18,24
**kidding** 167:13
**killing** 120:10 125:5
156:24
**kind** 9:22 45:6 51:2
58:23 61:1 95:14
112:22 132:20
140:1 142:9,9,16
151:22 245:14
**kinds** 58:7 134:2
258:9
**King** 208:2,15,21,22
**knew** 49:22 58:15,23
60:12 86:5 235:4

**know** 9:25 12:20 14:3
19:21 20:11 21:17
22:10 25:3 28:17,17
28:25 32:7,20,23
34:10 38:6,8 39:7
41:24 42:3 43:19
44:8 47:12,13 48:2
48:12,13 50:10,14
52:9,15,19 53:6
54:7,11,13 56:11
59:16 68:15 71:15
73:1,6 76:19 77:13
80:2,15,16 81:4
86:9 91:22 97:3,3
99:1,11,20 101:20
103:12,22 106:6,14
106:17 110:6 111:6
112:3,8 119:2
120:13,18 121:19
128:9 132:21,22
133:7,9 134:6,16
135:9 137:6,7,8
138:16 142:16,20
142:22 145:2,25
147:19,23,24
148:24 150:20
153:19 154:9
155:12,15,17,23
163:12,18 164:23
165:6 168:4,5
169:22 170:12
172:24 173:2,20,24
176:1,15,19,25
177:12 185:5 190:7
191:24 192:2,2,3
194:25 195:14,16
195:17,23 199:19
200:14 204:5
206:17,24,25
209:25 210:1,2
214:19 217:2
221:22 222:10
223:11 226:2 227:8
228:2 229:6,8

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

21

231:24 234:12
235:3 236:3 239:4
241:15 245:7
246:11,15,16
247:10 248:14
249:4,7 250:8,12,22
252:4 254:25 256:1
256:2,6 258:2,16
259:24 260:1
262:12 263:16
265:24 266:5 273:7
273:19
**knowing** 43:19
222:11
**knowledge** 12:18
22:5 50:12 51:9
86:6 119:4 124:1
169:1 170:10
176:15 206:16
245:9 258:11,18
271:20,21
**known** 259:6 271:2

_____
**L**

**L** 3:9
**labeled** 33:19 205:21
215:6
**Labor** 221:7,14,17,22
222:10 223:10
**lack** 29:14 171:11
272:16
**lacked** 151:13,19,23
228:14,24 229:11
**lacking** 150:11
**land** 169:6
**language** 49:12 53:12
53:18,18 66:6,13
68:22,24 71:24
111:13 113:15,24
114:8,10 122:15
123:8 202:17
220:23 224:4,5
227:24 228:1,3,24
239:4,15,17,22

240:1 243:9,21
244:4,14,16,23
247:10,11 254:23
270:13 274:4
**languages** 240:3
**large** 139:12
**Larry** 265:3
**Laughing** 32:4 144:1
251:12
**laundry** 133:8
**law** 5:23 7:7 11:11
59:22 61:25 153:3
164:22 169:6 184:8
205:13 216:17
221:22 235:2,8,10
236:9,15,20 255:6
255:11 274:1
**laws** 23:25 164:24
202:22 203:25,25
204:8,16,16,20,22
205:7 206:19 236:8
236:21 261:17
**lawyers** 3:13 7:6 9:8
**lay** 175:11
**lead** 126:21
**League** 1:11 3:21
7:12 253:3 278:11
**learn** 261:24
**learned** 211:3
**learning** 142:15
143:19
**leave** 176:9 252:14
275:20
**led** 41:6 109:13
**Lee** 266:6
**left** 8:10 14:8 16:17
40:21,22 97:12
200:12 227:18,20
263:7
**Leg** 159:21
**legal** 59:12,13 63:15
63:21 64:5,10,11,14
178:7,11 235:12
**legislation** 18:2 19:17

19:18 20:1,5,8,13
21:8,12,13,21 22:4
23:17 43:20 56:23
57:8 58:24 59:1,11
61:25 62:3,13,18,22
67:19 73:8,9 75:20
75:24 76:2,20 85:25
86:2,11,13,18,20,24
87:13 88:18,22 89:1
89:2 110:3 114:9
118:20 124:7 144:4
147:3 148:4,20,25
154:25 155:10,12
155:15,18 161:17
162:5 169:13,17
174:1 179:12
185:18 190:24
208:6 210:6 212:11
212:12,22 218:17
219:12,21 225:13
228:12 235:17
236:9 272:18
**legislative** 3:8 7:5
8:12,14 17:8,14,20
19:6 20:16 57:24
60:7 61:9,13 63:4,5
64:13,19 71:19
72:10,24 84:17 85:8
87:18 90:11,13,14
90:16,23 91:17
99:16 100:6 102:12
102:16 103:5,13,18
104:2,15 107:2
110:8 113:5 118:2
120:16 123:3 126:6
128:5 129:10
135:22 155:20
156:3 158:2 159:12
159:21 160:1
183:12,24 184:1,5,7
189:22 190:2,10
209:8 212:23
218:24 251:20,23
251:25 256:10

257:23 258:25
259:22 268:6 269:6
**legislatively** 91:20
92:7
**legislator** 258:25
259:6 260:3 261:4
273:13
**legislators** 4:10 7:16
85:13 113:6 269:23
**legislature** 5:18 16:7
20:4 158:7 260:3,3
260:10,18 264:22
265:1 267:14
268:11 271:19,19
272:8
**legislatures** 260:9
**legitimate** 172:13,20
**length** 216:9
**lesser** 171:18
**let's** 14:21 17:18,23
21:6,19 22:20 24:18
26:23 38:12 44:3,16
45:4 63:8 66:17
75:4 77:8 79:16
84:1,21 87:9 91:1
100:25 102:1,1,5
114:16 119:1
133:12 140:24
142:11 146:11
158:13 161:12
172:2 188:3 189:15
189:15 252:21
259:25 264:6
273:13
**letting** 86:9
**level** 44:4,7 97:8,14
99:20 147:25 182:2
182:7,9,14 222:8
**library** 213:14,16
**license** 68:9 76:11
77:2 78:22 79:13
81:17 89:13 93:4
94:12,17 121:14
122:10,11 123:1,11

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

22

141:17,18,20,25
213:18 228:9,16
229:19 230:3 231:3
242:17,19 264:2
274:11,12
**licenses** 78:10 142:2
213:19
**lieu** 112:6
**Lieutenant** 17:15,16
18:20 84:4,12 86:6
258:13,19
**life** 82:4
**lifetime** 171:25
**liked** 250:19 251:1
**limitation** 68:20
**limited** 25:17 83:24
**limits** 222:13
**Linda** 4:2 7:21
174:22
**linda.halpern@tex...**
4:5
**line** 27:22 46:17
85:12,16 109:9
158:16 160:18
165:10 171:5,23
172:7 176:6 197:12
239:1 249:22 277:3
**lines** 64:19 127:22
157:15,22 158:10
169:21
**link** 163:3
**list** 35:4,10 38:3,7,9
38:10 94:23 98:16
105:15 120:1 133:8
**listed** 30:15 31:10,16
31:20 33:8 34:18
35:16 65:13 67:22
67:24 68:9 69:9
70:3 71:7 76:6,10
77:18,25 78:14,25
79:18 93:12 255:22
**listening** 49:22
**listing** 68:3 82:24
**lists** 70:24

**litany** 87:8
**literacy** 47:25
**litigation** 4:2 11:6
194:11 253:4
**little** 53:6 76:25
112:1,17 134:9
193:13 220:16
244:6 259:11 260:1
264:10
**live** 95:16 143:8,10
169:7 264:16
**lived** 249:21
**living** 94:15 171:4,22
172:7
**LLP** 3:9
**lobby** 101:12
**lobbyist** 100:10,17,18
101:1 102:4,5
**lobbyists** 100:4,11
101:2,6,16,18,19
**local** 38:16 147:25,25
147:25 148:2,3,18
148:21,24 155:1
174:13 178:5,11,16
180:18 181:9 182:2
182:6,9,13 186:20
186:22,25 187:8
188:3,6 194:19,19
198:9,9
**locally** 188:1
**located** 213:16
**lodged** 112:23
**log** 22:16,23
**long** 37:4 63:6 121:13
258:24 263:14
**longer** 8:4 13:16
208:20
**look** 12:11 25:21 26:7
29:4 30:15 33:5,12
33:19 34:20 35:6
45:4,17 46:12 52:20
53:21 66:5,17 67:4
67:6,18 72:2 80:3
82:15,21 92:25 99:3

105:14 111:24
115:9 116:3,13
119:16 122:5 127:5
129:25 134:11
135:4,6,8 138:15
142:4 146:11
149:15 151:8
152:13 153:5,7
156:6,22 157:14
162:12,20 168:9
169:8 178:2,19
180:5 184:14
187:18 199:6
205:22 210:18
211:9 212:18,20
215:8 225:17
234:18 247:11
257:2,4,5
**looked** 25:3 32:16
55:4 65:9 66:4
75:10 98:23 111:7
136:20 156:21
178:5,11,13 188:5
193:21,25 223:12
234:16,21 262:7
**looking** 31:13 34:2
36:1,12 38:22 51:24
56:1 66:8 75:10
76:2,3 97:2,4
109:23 116:1
119:22 121:18,25
123:4 136:11 138:7
138:8 141:3,21
148:18 159:8 164:2
164:18 165:4
169:14 178:2
187:23 223:1
237:14 238:14
244:20 254:3,11
255:7
**looks** 136:24 141:18
162:20
**loop** 84:2 194:14
**loophole** 113:16

221:21,25 222:4
223:7
**loopholes** 221:13
**lost** 238:7
**lot** 88:6 106:5 115:12
141:11 155:5
**lots** 170:20
**low** 99:10 193:25
199:12 200:1,3,8,18
201:6 202:8 240:10
240:24 241:2
**low-income** 246:10
**Luna** 130:2
**lunch** 105:18 108:5
**Lyndon** 167:6

**M**

**machine** 2:19
**mail** 48:25
**mail-in** 155:13
185:21,22
**main** 134:1
**maintain** 231:23
**maintained** 232:4,8
232:12,13
**major** 21:24 25:24
49:5
**majority** 64:12 157:2
157:7,9,9,14 166:21
196:5,7 236:22
266:25 268:3
**making** 8:19 91:16
93:22 145:15
174:21 180:19
202:16 259:17
**MALC** 7:7 114:7
166:10,12
**MALDEF** 102:21
104:13,20 105:2
**Manager** 4:2
**manner** 90:8
**MARC** 1:3 278:3
**March** 5:18,19,21,22
115:24 121:9

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

23

163:11 183:4,22
196:13 257:3
**margin** 45:1
**mark** 75:4 196:14
**marked** 5:9 27:1,3,18
45:13,15 66:15,18
75:16,18 89:19,21
92:15 96:1 109:4
115:19,21 121:3
158:15,17 159:11
159:13 162:7
183:18 205:19
212:15,17 215:4
237:23
**Martinez** 128:25
**material** 9:23 91:21
**Matt** 163:2
**matter** 21:22 36:22
37:20,25 102:5
105:20 115:16
121:23 125:15
127:18 129:8
130:20 147:15
149:6 150:6 153:23
168:16 227:15
**mattered** 36:24
**matters** 85:18 176:11
**Matthew** 162:14
**MC109** 4:4
**McCoy** 18:22 87:12
87:16
**McGeehan** 92:16
96:3 97:24 98:4
180:9,21 227:23
**mean** 8:4 22:1 41:16
41:17 43:18 74:13
92:3 100:17 102:4
104:5 107:10 115:9
117:15 137:8
138:15 141:10,12
165:25 166:1
169:22 187:12
202:15 217:20
226:22 241:8

244:20 245:2,3,6
246:22 254:17
255:14 259:12
276:5
**meaning** 95:4 226:21
**meaningfully** 180:16
181:5
**meanings** 141:11
**means** 54:7,7,10
80:17 120:7
**meant** 245:8 253:15
**measures** 42:25
60:24 61:6 153:2,17
154:5,15,24 155:9
**media** 24:16 182:10
182:11 187:3,6
188:5 194:20 211:6
**meet** 59:6,14 123:23
**meeting** 12:8 102:19
102:20 104:10,14
104:20 119:12
**meetings** 104:14
**member** 195:12,12
270:4
**members** 112:1,13
112:14,19 137:25
138:14 158:6
220:17,18 260:10
260:18 261:13
265:19
**membership** 138:10
**memory** 157:16
**mention** 185:22
**mentioned** 24:15
25:20 27:25 34:21
88:15 126:18
132:12,16 133:15
141:6 143:12
**Mercifully** 275:5
**Merging** 232:16,18
**messed** 75:9
**met** 59:12 102:11,14
144:23
**methods** 97:2

**Mexican** 3:8 7:4
**middle** 97:23 142:17
**Miles** 240:10,11,13
240:13
**military** 69:10,18
77:19,25 78:22
**million** 93:7,12 173:7
**mind** 23:4 28:7 75:5
102:3 132:13,15
133:5 142:8 143:1,2
143:6 144:19 145:3
159:9 254:3,11
260:14 261:22
**mine** 239:5
**minorities** 95:8
151:19,23 158:7
168:5 171:1,11,22
172:7 228:24,24
**minority** 61:24 62:2
65:19 66:2,11,25
101:25 102:9 104:1
104:16 105:5,24
106:16,25 107:14
157:25 165:12
166:5 170:17,19,20
192:25 193:18
199:12 200:1,3,9,18
201:6 202:8 228:13
234:10 240:10,24
241:2 256:24
262:23 263:22
265:22 270:12
**minute** 84:18
**minutes** 108:2 252:18
263:7 279:24,24,25
280:1
**mirrored** 72:21
**mischaracterization**
56:21 57:3
**mischaracterizes**
155:20 181:3
229:14
**misconduct** 22:14
**misstatements** 181:2

**misstates** 78:18 79:23
82:17 165:14 201:8
217:18 218:3
**misstating** 178:6
**mistaken** 32:17 258:8
**mitigating** 200:20
**model** 233:10
**Monday** 85:17
183:22
**monitor** 211:13
**months** 78:11 117:15
**morning** 10:24,25
216:9,24 219:16
220:8 221:13
224:24 226:14
231:17 237:7
**motion** 124:11 125:8
125:11 126:24
127:2,3 128:7,20
129:21,23 130:15
130:17 149:12
152:9 156:14,18
159:25 257:17
**motioned** 257:18
**motivation** 237:12
**motor** 171:11,18
**mouth** 231:18
**move** 16:10 20:4
91:10 131:15
261:14 264:18
272:17
**moved** 120:4,18
125:2 126:20,23
128:17 129:14
130:11 149:9 152:2
156:14 216:16
257:14 260:9
**moving** 35:14 191:9
255:17
**multiple** 56:22 272:1
**municipal** 178:17

**N**

**N** 3:1

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

24

**N.W** 3:5
**NAACP** 1:21 3:7 7:4
7:8 102:14,19 114:7
166:8,12 278:21
**name** 24:5 34:10
94:24 95:5,6 108:18
108:21,24 198:13
209:2,3 213:15
253:2
**named** 3:16 46:14
120:1 162:14
**names** 52:4,15
273:14 274:2
**NANDITA** 1:24
278:24
**Naomi** 134:20 242:3
242:4
**narrow** 193:16
**narrowed** 113:19
**national** 25:18
**nationwide** 25:15
**nature** 24:5 131:6
**near** 143:9 197:14
**nearly** 9:24
**necessarily** 74:17
142:7
**necessary** 202:14
203:8,16 204:23
243:1 247:7,9,19
**need** 8:16 10:3 11:19
11:23 40:23 46:6,10
60:7 92:5 106:20
168:14 180:5
197:16 252:12,20
259:11 262:7 268:7
275:13
**needed** 22:25 114:4
220:23,24 223:15
262:2
**needs** 27:17 53:1
99:21 113:18 272:8
**negative** 54:5 270:19
270:19
**neither** 93:18 280:2

**never** 216:11
**new** 3:13 15:17 96:9
97:10 203:4 263:8
**news** 38:16,18,21,22
38:25 39:4,7,20
163:4
**NGR** 1:5,11 278:5,11
**nine** 98:1,5,14 99:5
**nods** 124:8 215:24
**nominal** 248:12,14
249:20 250:1
**non-election** 248:22
**non-minority** 65:20
**non-photo** 70:25 71:6
71:11,16 72:7 73:14
82:25 83:8,16 213:4
213:6,12 215:17
216:7 217:11
**noncitizens** 211:23
212:4
**nonresponsive** 169:9
**nonstandard** 143:7
**nonstandardized**
142:7,25 143:2
**note** 20:18 27:17 63:5
192:20 221:21
222:2
**noted** 20:19 246:1
277:22
**notes** 22:17
**notice** 13:6 67:9,10
**notion** 53:9 132:24
**notwithstanding**
8:14 110:8 168:1
209:8
**Nov** 5:11
**November** 15:25
26:17 46:15 52:24
55:12 197:9
**nuh-uh** 11:20
**number** 1:5,10,22 2:3
18:12 33:6 34:25
39:22 40:3,11 42:5
42:18 61:18 62:12

67:21,23 69:15
79:10,11,12 83:7
89:13 93:3,6,9,10
93:12,15,17,18,21
93:22,24,25 94:2,4
94:4,6,7,10,12,12
94:17,17,19,21 96:2
96:12 97:16 99:7,9
103:1 104:16 116:4
116:6,22,24 118:12
118:15,17,19
119:16,17 120:5,14
124:9,12,18,20
127:7,12 130:1,5
134:12,14 137:11
146:12,12,24 149:8
149:16 152:13,19
156:6,21 157:1,1
159:3,17 162:12,13
165:12 171:4,5
172:24 173:2,9,13
173:17,18 174:2,4,9
174:10,11,14,15,18
180:7 212:17
213:14 224:12,20
225:21 226:9,13,19
227:16,22 228:8,9
228:16 229:11,18
229:20,21,23,24,25
230:1,6,11,18,20,24
231:1,1,7,9 238:10
238:10 242:9
243:17 245:20
254:4,6 256:24
257:2,5 263:17
267:5,20 268:2
278:5,10,22 279:3
**numbered** 2:16 27:6
27:7,8,9 45:16
92:15 109:5 121:5
158:21
**numbers** 27:4 89:14
115:17 136:8
151:12 171:19

**numerous** 88:18
**NW** 3:13,23
**NWB** 3:4

---

**O**

**OAG** 97:25 181:14
240:15,16 246:10
250:14,19 251:1
**OAG's** 29:21 30:3
31:10,20 55:5 98:13
98:21 250:21
**oath** 11:12 175:13
**object** 15:11 19:5
29:13 32:1 36:5
57:24 61:8 64:18
71:18 85:7 99:15
100:5 113:4 118:1
126:5 128:4 135:21
155:19 167:1
169:25 209:7
259:15
**objected** 90:16
**objecting** 106:6
**objection** 20:18
21:14 24:8 42:13,20
43:1,12,23 44:1,10
44:11 45:7,24 51:5
51:13 54:8,20 56:19
57:2,10 62:6,23
63:5 66:3 70:16
72:9,10,23 78:18
79:23 80:7,8,18
81:15 82:17 84:6
101:4 102:15 103:5
103:18 110:7
114:23 118:11
120:15 129:10
137:20 141:23
143:21,23 147:6
155:19,20 158:3
165:14,17 167:2,10
167:12,22 168:1,8
168:11 169:3,9
170:23 171:6,13,24

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

25

| | | | |
|---|---|---|---|
| 181:2 189:21 | **office** 2:19 7:15,17,19 | 116:18 151:2 161:4 | 119:8,15 121:2,19 |
| 196:11 200:22 | 7:21 12:14 13:17 | 164:9 184:1 195:17 | 122:3 124:9,9 |
| 201:8,10,14,15 | 14:9 16:17 17:2 | **officials** 148:22,24 | 125:20 126:2 |
| 204:3,12,14 212:6 | 18:20,23 19:23 | 149:1 154:6 155:1 | 127:12 128:14,23 |
| 213:9 214:12,13 | 20:14,23 21:5 23:17 | 160:21 161:3 | 131:9 132:13 |
| 216:8,19,23 217:18 | 28:9,9 29:6,22 30:4 | 164:18 198:10 | 133:12,25 134:10 |
| 218:11,24 219:13 | 31:10,20 35:1,5 | **oh** 9:20 46:3 190:18 | 136:11,15,23 137:8 |
| 220:20 229:14,15 | 36:3,8,17 37:2 | **okay** 9:10 10:6,10,17 | 137:11,17 138:4 |
| 229:17 230:12 | 38:11 39:17 43:7 | 11:2,25 12:1,16 | 139:21,23 140:9,13 |
| 233:23 234:4 237:4 | 44:18,24 45:1 47:4 | 13:13 14:21 15:6 | 140:17,22,25 |
| 244:5 246:13,24 | 55:5 59:10 60:22 | 17:18 20:11 21:4,6 | 141:16 142:6,11 |
| 248:6,16,20 252:8 | 64:3 84:4 87:12 | 21:19,25 22:12,21 | 145:14,19 146:11 |
| 252:16 261:6 | 88:25 89:5,7,16 | 22:23 24:1,10,12 | 146:15 147:13 |
| 262:24 266:22 | 92:22 95:9 96:4,13 | 25:6 26:6 27:2,12 | 151:6 152:18 156:6 |
| 267:11 268:12,13 | 96:17 97:11,17,25 | 28:8,22 29:4,20 | 156:11,20 158:19 |
| 269:21 271:25 | 98:5,7,11,13,16,21 | 30:14 31:2,13 32:12 | 159:7,15 160:2,6,16 |
| 272:11 | 101:7,13 103:24 | 32:20,23 33:1,12,14 | 161:11,24 163:25 |
| **objections** 90:12 | 105:1,21 107:10 | 34:2,18,24 37:4,5,7 | 164:8 165:10,24 |
| 91:17 165:21 269:1 | 109:19,21 122:11 | 37:25 38:12,18,22 | 169:8 171:21 172:4 |
| **obtain** 58:25 59:21 | 123:5,20,21 124:5 | 40:6,25 41:6 42:2 | 173:9 174:5,25 |
| **obtaining** 73:7 150:2 | 138:18 148:11,12 | 44:3,16 45:22 46:7 | 175:4,10,21 176:6 |
| 214:1 249:2 250:6 | 150:19,21,24 | 46:7,11,25 47:2,13 | 177:22,24 179:3,6 |
| **obviously** 75:7 76:16 | 154:15 156:3 | 48:5,11,17 50:13,16 | 182:23 184:10,15 |
| **occasion** 273:6 | 161:14 163:16 | 50:20 51:9,16,24 | 186:4 188:4 189:16 |
| **occur** 181:12 195:4 | 174:12 179:8,9,21 | 52:20 54:4 57:16 | 190:8 191:13 |
| 209:15 | 180:4,10,14,15,22 | 58:22 62:12 63:8,13 | 193:15 198:8 199:4 |
| **occurred** 33:16 34:16 | 180:25 181:15,23 | 63:17,22 64:7 65:8 | 204:19 205:17,23 |
| 34:20 35:17,18,22 | 182:1 187:11,17 | 65:24 66:7,16,24 | 207:20 212:19 |
| **occurring** 53:19 | 188:12 194:19 | 68:24 69:14 72:18 | 223:24 224:16 |
| **offer** 106:8 157:8 | 201:25 220:17,18 | 73:3,20 75:4,17 | 227:3 238:7,9 |
| 273:6 | 224:16 232:7,13,19 | 77:8,13,18 78:15 | 247:12,16 252:21 |
| **offered** 115:4 121:21 | 235:19,20 240:22 | 79:16,19 81:6,25 | 252:24 253:5,11,24 |
| 121:22 128:24 | 241:15,18,23,24 | 84:1 85:20 87:1,8 | 254:2,7 255:5,21 |
| 130:1 146:12,15 | 242:14,24 246:11 | 88:1,9,17 89:9,15 | 259:25 263:5 |
| 157:2,3,4 166:17 | 249:10 250:16 | 92:14 94:20 95:12 | 264:18 265:6 |
| 173:18 213:12,14 | 251:6,10 264:2 | 95:19 97:15 98:17 | 268:17 269:8 |
| 213:18 214:20 | 270:23 | 98:19 100:3,16,19 | 276:11 |
| 224:5 225:3,4,6,7,9 | **office's** 23:11,13 | 100:21,24 102:1,8 | **old** 17:19 76:22 |
| 225:10,12,12,14 | **officer** 67:21 279:13 | 102:10,20 104:7 | 141:19 142:1 |
| 226:19 237:2 | **officers** 67:12 153:3 | 105:4,17,19 106:7 | **once** 80:10 98:10 |
| 240:13 244:8,11 | 206:8 | 107:9 108:4 109:15 | 167:4 188:22 191:8 |
| 250:4 257:8 261:5 | **offices** 106:10 112:19 | 109:17,18 110:25 | 191:15,21 208:14 |
| 274:15,17 | 148:9 | 111:21,24 112:12 | 251:24 |
| **offering** 67:20 109:21 | **official** 14:4,13,24 | 113:23 117:8,21 | **ones** 31:12 32:16 |

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

26

36:8 94:10 105:15
133:22 144:24
157:4,6 181:8 232:7
**onward** 231:2
**Op-Ed** 46:17,20,23
197:10
**open** 251:19 252:14
270:1 276:14
**operating** 253:8
**operations** 48:18
**opinion** 40:20 41:4
43:9,9 99:8,9,11,12
100:1 140:11,13
141:22 146:6
157:25 174:18
201:12,16 204:24
214:6,13,15,18
217:2 233:9 250:21
262:6 272:7,14
**opinions** 64:5
**opponent** 225:14
**opponents** 200:20
225:4,6,7,11,13
228:23 236:23
237:3 269:2
**opportunity** 46:4
85:15 87:20,24
269:24
**oppose** 267:3 269:8
**opposed** 37:17,23
38:4 103:12 104:17
118:10 165:13
166:6 217:16
268:10 269:19
270:5
**opposite** 157:21
**opposition** 61:23
62:2,18 86:23
112:18,23 113:1,2
172:15 220:13,16
220:19,22 266:20
269:3 270:6
**option** 173:23
**options** 91:6

**oral** 2:14 279:13
**order** 9:8 10:7 73:15
76:8 81:17,21 82:2
82:25 116:19 156:8
156:12 177:14
205:10 206:1,18,25
220:24 262:8
**ordinary** 124:24
**organization** 135:1
208:17 210:11
211:21
**organizations** 166:1
208:2,5
**organized** 198:17
**origin** 228:2
**original** 123:6 210:14
259:20 279:20
**ORTIZ** 2:1 279:1
**OTB** 5:20
**outcome** 38:24 280:6
**outreach** 67:10,15
96:22,24 97:2,12
200:6
**outset** 8:3
**outside** 38:10 82:3
138:12 162:3
**outstanding** 251:19
**overall** 23:19 65:21
**overstated** 230:25
**overwhelming**
267:23 269:9
**overwhelmingly**
268:9

---

**P**

**P** 3:1,1
**p.m** 2:17 95:24,24
108:3,3 140:19,19
175:5,5 203:1,1
232:24,24 276:17
**P.O** 4:3,8,13
**page** 5:9 27:13 30:21
33:12 35:7,15,17
37:6 45:21 47:1

48:5 52:1,21 67:19
68:1,2 69:12,13
70:24 76:1 88:2
111:19 116:3,22
119:9,15,23 124:10
124:17,17 127:5
128:23 129:25
130:4 134:12,12,13
145:20 146:11
149:15 152:12,21
156:10 179:16
184:10 198:24
213:14 221:2
237:21 238:16
245:20 254:11
257:5 277:3
**pages** 116:3
**paper** 122:19,21
217:24
**paragraph** 49:3,6,11
49:12,18,19 52:1,2
52:6,17 93:1 96:7
97:15,23 111:25
122:25 197:18
240:8 242:2 246:9
**part** 40:3 42:21 55:25
59:10 70:18 71:13
124:14 130:24
142:12 156:22
157:21 159:12
176:7 184:3 187:24
188:2 214:9 221:2
228:5,5 259:17
274:1
**participate** 247:2
**participated** 228:12
**particular** 12:18 19:4
30:16 31:15 36:18
37:21 38:24 47:8
51:20 57:7 58:14,19
67:14 77:9 86:4
88:10 98:14 101:11
102:7 108:12 109:1
111:7 115:15 117:2

118:9 119:12
120:22 125:14,15
125:23 126:1 129:7
130:21,23 135:10
135:16 140:14
142:15 144:20
151:13,18 152:6
166:12 178:19
179:15,19 208:8
221:12 231:19
240:16 244:10
246:12 250:9,17
**particularly** 15:16
126:17
**parties** 280:3
**partisan** 269:16,18
**party** 7:15 157:15,21
157:22 158:10
167:5 279:22
**Paso** 134:18 143:4
**pass** 72:14 73:10
**passage** 62:4 117:19
120:23 127:21
135:18 144:12
147:20 148:6 150:7
151:16,22 160:4
174:17 192:8
225:23 226:9 239:9
261:18 266:19
269:20 270:20
271:12,16,19
272:23 275:3
**passed** 68:23 71:25
72:2,15,18,22
117:15 118:20
119:5 155:18 162:5
169:17 188:22
189:7 191:11,17
192:15 216:17
217:10 222:13,21
222:24 223:3
259:13 266:3
**passing** 62:13 161:17
203:10 260:9

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

27

paths 181:25
Patricia 46:14 265:7
Patriots 208:3,16,21
  208:23
patterned 214:24
  215:20 216:6
Paup 4:6 7:19,19
pay 177:14 193:10
  249:17
peace 205:10 206:1,7
penalties 182:25
penalty 116:16
  119:25
pending 29:7 31:11
  46:2,5 51:15 61:4
  174:15 203:5
  251:21 252:8
Pennsylvania 3:5,23
people 18:12 22:2,10
  24:2,3 40:9 67:12
  82:8,12,12 91:15
  100:11 106:5,9
  113:19 136:12
  140:10 142:17
  150:21 151:13
  173:7 205:3 230:9
  230:18 231:3
  249:21 273:6
people's 52:4,15
  196:1
percent 109:9 267:4
  267:8,15,20,24
perfect 251:14
perform 13:5 31:15
  65:11,18 97:8,12
  150:19,23 151:21
performed 13:11
  42:23
performing 41:10
period 44:2 68:16
  69:3 77:10,16,25
  172:3 176:14
  184:18 215:13
  268:5

perjury 116:16
  119:25
permissible 77:16
  164:24
permission 10:3
permit 64:22 165:6
  213:21
permitted 71:22 83:4
  83:5,11,11,17 165:3
PERRY 1:6 3:16
  277:2 278:6
person 25:12 46:14
  81:6 82:2 102:25
  104:5 108:22 111:1
  117:10 119:23
  120:1 124:21,23
  131:19 157:20
  162:14 164:8
  203:12,13,14,20
  205:4,5 206:16,17
  206:22,24 207:1
  213:8,15,21,24,25
  221:6 222:2 223:5
  259:17 267:4,16,21
  268:1
person's 24:5 69:11
  70:4 77:6,20 124:22
  127:15 129:5 130:6
  135:1 213:15 221:7
  255:25 257:12
personal 13:2,23
  14:5,13,24 15:2
  22:13 50:12 68:10
  76:12 79:14 124:1
  195:1,5 196:1
  206:16 228:16
  229:20 264:11
personally 12:23
  21:7 47:13 54:23
  65:24 75:9 77:14
  99:12 114:12
  144:13,19 169:1
  225:9
personnel 153:4

persons 206:7 230:2
  267:8
perspective 23:11,13
Phillips 128:14
  129:14,17 130:11
  156:7,11 257:14
phone 12:4 21:3
  22:18,18
photo 46:18 47:22
  51:21 68:5,8,19
  69:3,22 70:10,14
  72:6,12,14 73:18
  76:7 77:1,25 79:18
  79:20 80:22 81:7,12
  81:17,20 82:1,8,12
  82:22 83:6,17,24
  121:14 123:11,22
  123:24 124:3 126:4
  128:2 131:3,11
  141:2,21 146:1
  147:4 149:25 150:2
  150:16 151:14,19
  151:23 154:23
  156:4 161:17 162:2
  162:5 163:6 164:20
  164:22 165:2,7
  166:19 179:11
  184:8 185:18
  197:11 202:21
  203:13,19,19,22
  204:9,11 205:1
  206:13 210:5
  212:10,12 213:4
  215:17 216:7
  217:11,16 218:16
  219:1,2,7,11,20
  220:3 222:7 224:24
  228:11 235:2,17
  236:8,15,17,20
  267:1,3,16,21 268:1
photograph 69:11
  70:5 77:20 124:23
  127:15 129:5 130:6
  135:1 255:25

  257:12
photographed 240:4
physical 122:22
physically 34:11
physician 221:6
  223:4
physician's 221:21
  222:2
picked 55:20
picture 187:24 188:2
piece 18:2 23:16 41:9
  41:22 57:8 75:20
  122:18,20 131:23
  212:11,22 217:23
pieces 44:17,23 88:18
  91:19 155:15
  185:18
pilot's 213:18
place 21:1 33:21
  34:16,23 35:22
  67:21 105:7,9 107:7
  107:12 112:2
  132:25 147:16
  158:20 168:15,16
  176:21 177:21
  181:15 191:16
  204:1,8,21,22,25
  205:11 206:1,8
  207:12,15,16,23
  210:17 231:3
placed 113:12 114:3
  167:18 169:5
  176:18,20 197:18
  198:2,6,12,14 201:1
  220:23
placeholder 217:4
places 143:9 175:2
  207:13,23 210:17
  274:3
Plaintiff 1:4,9 2:15
  278:4,9
Plaintiff-Intervenors
  1:13,16 278:13,16
Plaintiffs 1:22 2:2

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

28

278:22 279:2
**plan** 83:20
**plane** 81:18 82:9,16
**plans** 264:18
**played** 91:23
**please** 42:15 109:16
   136:1 163:12 218:8
   238:2 257:2,5 268:6
   276:2,3
**point** 10:6 17:15 25:7
   29:1,2,11 38:5
   41:21 56:6 64:7
   67:5 69:1 72:16
   82:20 89:25 92:4
   104:9 106:4 107:18
   108:18 110:19
   117:7 121:1 135:4
   135:17 138:1 156:7
   156:12 161:5
   168:23 177:9,19
   217:4,8 218:18,20
   218:22 223:23
   251:16
**pointed** 112:7 128:19
**pointing** 73:23 74:1
   251:4
**points** 164:1 172:23
**polarized** 157:13
   269:4
**police** 116:18 117:12
**policies** 17:2
**policy** 64:4,13 258:20
**political** 70:7 130:8
   256:1 269:16,17,18
**politically** 157:13
**poll** 40:22 47:25 48:2
   143:14,19 177:6,9
   177:12,20 207:12
   207:14,16,17,23
   210:16,17,23 211:9
   211:13 214:7
   267:12
**polling** 33:21 34:16
   34:23 35:22 67:21

132:25 143:9
   177:21 205:11
   206:1,8 207:12,16
   207:23 210:17
   266:18,24 267:15
   272:21 274:3
**polls** 34:12 135:5
   148:5 165:8 167:16
   186:2 193:22
   196:19 203:18,23
   211:14,19,24 212:5
   213:8 269:9
**populace** 265:12
**population** 136:9
   139:1,3,5,7,10,12
   139:25,25 140:1,2,8
   151:17 170:18,22
   171:3 174:19
   233:15,20 234:1,5,6
   235:15,22 236:1,3,4
   236:12 248:1,3
**populations** 136:22
   138:20 142:14
   151:18 201:3
**portion** 9:13 52:11
   60:4 85:5 89:22
   136:3 165:19
   214:10 218:9 230:7
   250:20 260:16
   268:21
**portions** 8:16 90:6
**pose** 203:4
**position** 15:17,21
   19:9 54:5 61:16
   100:23 123:20
   145:5 162:24 244:4
   268:8 270:11,17
**positive** 54:5 202:7
   234:25
**possess** 232:15 243:1
   243:14
**possibility** 121:25
   139:8 247:4
**possible** 96:14 190:15

230:2 231:2
**post** 55:19
**Post-Election** 152:24
   153:12
**postponed** 149:22
**potential** 86:19,23
   98:1 121:21 173:25
   265:21 266:14,20
   268:8 269:2 270:19
   271:9,16 272:10
**poverty** 171:5,23
   172:7 249:22
**power** 205:10,25
   206:4,4,6,6,11
**powers** 5:24 206:14
**practical** 9:23 90:19
**practice** 66:10
**pre-identification**
   67:13
**precinct** 120:2
   147:10 148:5
**precincts** 148:3,19
**preclearance** 58:25
   59:21 167:19
   168:14 178:22
**predate** 19:19
**predated** 218:2
**predominant** 143:18
**preface** 117:12
**preferred** 14:19
**prefiled** 26:17 55:11
   216:2 218:18 220:4
**prefiles** 55:19
**prefiling** 26:19 55:16
   55:19
**premise** 261:11
**preparation** 12:12
   163:14 193:5,11
   228:5 238:3
**prepare** 12:2,6,9 43:2
   59:11 161:19
   163:16 186:9 192:7
   228:6 239:3 245:24
   246:5,14

**prepared** 36:7 160:3
   161:22 246:16
**preparing** 109:19
   163:21
**prerequisites** 123:23
**prescribed** 76:17
**prescribing** 68:19
**presence** 272:15
**present** 35:2 67:20
   71:3 73:14 82:8,12
   82:25 115:1,2
   116:18 124:21
   127:13 129:4 130:5
   134:25 183:4,5
   208:12 211:17
   212:3 242:15,18
   269:24 270:6
**presentation** 68:13
   76:14 77:22 192:7
   270:18
**presented** 71:11
   135:5 183:6 184:19
   196:24 211:21
   214:5
**presenting** 81:7
**presents** 122:11
**preserve** 205:10
   206:1 268:7
**preserved** 269:1
**press** 191:6,10 192:5
**pretty** 44:24 51:6
   62:5 80:3 127:6
   253:10 263:13
**prevailed** 124:12
   125:8 126:24
   156:14
**prevalent** 272:8
**prevent** 222:7
**prevented** 146:22
**previous** 49:25 62:1
   159:13 228:11
   248:7
**previously** 16:23
   18:5 64:20 83:14

COLBY BEUCK                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

84:7,10 87:11
184:16 185:11
246:7
**price** 248:14
**pride** 32:2
**primarily** 14:24 15:1
15:9 38:21
**primary** 178:9
**printout** 238:12,18
**prior** 16:2 18:15
19:22,23 26:18
55:15,19,23 56:3,8
57:7,19 58:8,15
70:11 71:25 72:5
110:19 119:11
120:22 127:20
135:17 144:12
147:20 148:5 150:7
151:16,22 174:17
191:25 203:10,10
204:1,8,21,22 205:6
205:11,24 207:11
207:22 208:10
209:11 218:17
253:16,23 255:11
255:11 258:12
271:12,19 272:22
**priv** 159:22
**private** 127:14
238:12,19 257:11
**privilege** 8:12,15,20
17:20 19:6 20:16
45:25 57:24 58:4
60:7,11 61:9,13
63:1,4,6,7 64:19,21
71:19,22 72:10,24
84:17 85:8,9,14,19
87:18 90:12,14,16
90:24 91:11,17
99:16 100:6,9
102:16,18 103:6,7
103:19,20 107:2,5
110:8,11 113:5,10
118:2,3 120:16,17

126:6,9 128:5
129:11 135:22,25
189:22,25 190:3,10
209:8 218:25
251:20,23 252:1
268:6,12 269:6
**privileged** 91:20 92:7
**proactively** 105:22
106:13
**probably** 53:6 54:13
68:11 78:11 97:1
106:19 159:18
167:4 173:4 174:22
210:20 233:15
**problem** 23:2 43:10
43:21 99:14,19,21
99:25 112:1 143:13
275:24,25
**problems** 22:6,9
23:18 24:2,13 92:2
166:3
**Procedure** 2:21
**proceeding** 280:4
**process** 21:24 22:1,6
23:8,22 32:11 44:6
45:25 54:21 57:5
67:13 73:2 87:21
134:9 155:21
157:12 158:2
188:22 189:3,4,10
189:11,12 190:25
191:16,23 249:2,4,9
259:22 271:23
274:5
**produce** 12:22,25
39:4
**produced** 2:14 39:7
39:14,17 159:12
**producing** 194:7
**professionally** 16:10
16:11
**progressed** 105:12
**pronounce** 18:18
**proof** 116:17

**proper** 274:13
**proponents** 269:2
**proportion** 170:4
172:6
**proposals** 131:11
133:21 155:23
**propose** 154:15 155:9
**proposed** 114:17
115:6 116:6 119:17
131:18,25 134:14
141:2 144:24
145:11 149:16
152:14 164:6
169:13 213:7
236:23 273:20
**prosecuted** 40:2
153:9 182:6,9,13
195:15
**prosecution** 186:23
186:25 187:8 188:3
195:21
**prosecutions** 186:20
187:4 188:6
**prosecutorial** 180:18
**protect** 23:14 45:11
66:25 67:1 153:18
**protected** 153:19
**protection** 200:2
**protections** 66:12
105:7,9,11 107:6
198:2,5,7 201:1
243:5 263:24
**protest** 91:8
**prove** 40:7 202:20
**provide** 112:5,6
138:21 161:24
162:1 164:1 166:13
186:10,13,15,17
230:4 243:5 266:13
271:14,15
**provided** 32:15
149:25 151:12
153:2 180:4 181:18
184:24 185:7

186:19 203:15
248:2,24 265:18,20
270:10,25
**providing** 112:2,6
154:20
**provision** 78:7,9
110:13 176:25
198:12 221:12
243:3 248:2 250:10
250:21 251:2
**provisional** 67:12
146:23,24 147:17
147:22 198:11
**provisions** 2:22 67:8
78:4,5,20 198:10,12
207:18 243:4
254:14,15 255:2
**public** 41:11 77:3
125:20 127:14
128:11 148:14
162:3 177:5,7 196:3
196:25 209:20
211:12 213:16,22
214:1 219:6 227:15
228:11,22 237:1
257:10 270:2,4
**publicly** 192:13
195:10 211:8
234:10
**pull** 9:21 43:3
**purpose** 24:17 96:19
176:22 186:6
197:23 214:1 240:4
249:1 260:5,22
272:5
**purposes** 14:6,14
23:10,12 56:14,22
56:23 69:5 71:11
72:7 90:4 100:15
123:2 128:3 144:21
145:4 146:2 176:24
177:2 243:19
248:17,22,23
249:12 250:2,6

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

30

251:19 255:17
259:18 271:22
272:2 274:12
**pursuant** 2:21
**pursue** 107:13
**pursued** 105:22
**put** 9:22,25 41:11
44:18,24 66:25
75:13 84:24 90:3
162:3 176:21
205:16 212:24
231:18
**Putte** 274:19
**putting** 205:20 215:5

_____

**Q**

**qualify** 79:7
**qualifying** 274:13
**question** 14:11 19:11
19:15 20:10,17
25:11,17 26:4 29:14
30:6,10,11,11,13
32:2,6,14 36:11
37:8 42:15 43:16,16
44:21,21,22 46:2,5
46:9 51:15 54:14
57:14 58:5 60:8
62:9 80:3,11,14
83:23 84:23 85:4,16
95:12 98:18 106:11
113:8 117:14
118:23 123:8,14
126:7,23 132:18
136:1 139:19
147:14 164:1
165:18,23 166:2
168:20 170:24
172:17 175:20,21
184:16 185:3
189:15,23 190:9,13
190:16 193:14
194:2 197:24
200:16 203:4,5
204:6,7,10,15

205:24 207:2
210:14,19 212:2,21
213:11 214:9 218:7
218:14 223:20
225:5 227:22,23,24
228:15,21 229:18
229:23 230:7 231:1
231:5,9 237:9
243:12 245:4,7
247:16 249:23
256:4,5 259:19,20
259:24 260:11,13
260:15,25 261:8,11
261:21 268:17
269:6 275:13 276:2
276:5,8,10
**questioning** 100:15
158:17 165:10
251:17
**questions** 8:14,16
17:21 30:2 31:9
32:9 45:24 57:25
63:15 85:11 87:2,9
87:25 139:22
160:18 173:21,21
173:21 174:23
175:25 176:7 252:4
252:13,23 253:9,13
255:20 258:9 263:8
263:18 273:5 275:6
275:21
**quick** 158:16 160:18
232:22 263:13
**quickly** 121:1 127:6
158:13 215:9
253:10,14 258:17
**quite** 25:4 102:22
114:16 167:5
177:17,24

_____

**R**

**R** 3:1
**race** 231:23
**racial** 95:10 104:1,16

151:18,23 165:12
168:5 169:21
170:18 171:1,22
172:6 228:18,23
**raised** 9:16,16 17:4
65:22 107:8,14
122:2 132:23 156:7
156:11 198:4
211:23 228:23
**rampant** 43:10
**range** 248:23
**rate** 56:8 171:22
**ratings** 220:10
**reach** 88:24 89:4
114:12 148:2 161:8
**reached** 20:7,12 86:3
150:20 151:11
161:13
**read** 39:21 41:17
46:4 53:5 60:3,4
67:24 80:2 84:24
85:1,4,5 109:14
116:15 136:1,3
165:18,19 190:15
196:21 214:8,10
218:8,9 229:21,22
251:3 260:16
268:19,21 276:16
277:20
**readily** 131:6 141:14
**reading** 49:23 109:17
122:16 147:12
153:21 196:23
250:19
**reads** 49:19
**ready** 45:20 140:23
**real** 198:17
**realize** 103:1 156:21
**realizing** 237:6
**really** 17:18 23:8
43:4,9 45:6 66:7
83:17 99:9 102:4
106:3 113:20
120:10 142:1

158:13,16 163:5
233:7 252:12
253:14
**reason** 30:6,13 77:1
79:5 86:3 90:25
91:1 141:19 167:17
169:6 184:12
272:16,17 277:3
**reasoning** 118:22,24
176:19
**reasons** 260:19
261:15
**recall** 13:10 21:12
24:24,25 25:4 26:15
26:18,22 30:5,25
31:1,8,11,12,17,18
31:19,22 35:23
36:21 39:6,9,19,22
42:1 46:20,22 51:22
53:24 54:2 55:20
58:17 60:12 61:19
65:10,17 67:16
68:17 69:8 70:12
77:12,17 84:14
85:22 86:16,22,25
87:3,5,6 95:1,6,18
101:5,11,15 102:19
102:20,25 103:3,25
104:14 108:9,23,24
109:1 111:8 112:4
112:16 114:10,11
114:15,19 115:5,18
119:14 120:20,24
122:6,7 123:15,15
126:19 128:13
129:12,13 131:4,8
132:11 135:12,16
137:11,12,14,15
138:16,17,18,24
139:5 140:4,16
141:4 144:16,18
145:13,18 146:3,7
148:7,23 149:5,7
150:8 151:4,20

COLBY BEUCK                                6/20/2014
CONFIDENTIAL TRANSCRIPT

31

152:1,8 161:22,23
162:6,24 163:23
164:4,6,12,15,25
165:1,4,9 166:14
169:14 171:16,17
171:20 172:9 174:2
174:4,14,21 177:7
178:15,20,25
182:15 183:8,11
184:18,21 187:2,4
188:9,13,13,15,17
188:18 190:21
193:1,19,23 194:1,5
194:6,7,12 195:7,9
195:11 196:8,13,17
196:20,23 197:1
198:6 199:16,22
202:1,4,9,10 207:8
207:9,10 209:3,19
210:4 211:2,10,11
211:12,15,20,22,25
212:9 215:13
221:14,16 224:3,3,7
224:17,25 226:8,11
226:15,24 227:11
227:17,24 231:20
231:21 234:23
235:4,12,18,23,25
236:10,11,14,15,19
239:23 240:7,17,21
240:25 241:4,8
242:23 245:11,16
245:23 246:6,18
247:20,21,23,24
251:2 256:14,14,19
256:22 257:1,21
266:4,17 267:2,8,13
267:20 268:5 269:1
269:20 270:25
274:10,16,19,21,22
275:4
**receipt** 122:16
**receive** 22:3,8 26:19
54:15 60:22 61:4

89:15 94:23 122:20
139:4 179:21 181:9
181:10 187:13
188:10 192:10,17
192:23 193:16,20
193:24 194:3 223:2
241:22 245:12
**received** 13:6 26:12
26:18 28:1 29:24
37:9,20 54:11 55:5
55:8 92:19 96:13
98:15 103:11
113:17 179:14
180:10,11,24
181:22 189:7
191:18 192:4
219:25 271:7
**receiving** 15:4 31:21
98:20 101:15
103:25 113:13,21
189:4 190:23
**Recess** 51:17 84:22
95:24 108:3 140:19
175:5 203:1 232:24
**recognizable** 126:18
131:23 132:6,25
143:14 144:12
**recognize** 45:18
66:18 75:17 115:20
144:3,7 158:17
160:10,13
**recognized** 126:14
137:5,9,24 141:15
**recognizing** 143:19
**recollection** 98:8
114:6 163:15 183:1
183:13 184:13,17
235:6 262:4
**recommended** 111:4
**record** 2:22 7:25
11:24 17:22 20:18
23:1 26:23,25 27:5
27:17 41:11,15,17
41:20,24 45:12

51:18 56:13 73:21
80:13 82:18 84:21
84:24 85:3 89:20
90:1 91:1 92:6
95:20,23,25 128:11
135:11,14 139:22
140:18 146:23
151:3 158:21 159:9
159:12 162:3
165:15 175:8
183:20 190:2 197:4
201:19 203:2
217:19 218:3
227:19 230:1,21
232:25 238:11,21
245:25 251:3,5
257:3 258:6 264:6,7
276:5,7 279:14
**recording** 29:12
**records** 94:1 95:11
146:21 147:16
**recruit** 207:23
210:16,23
**redirect** 173:22
**reduce** 226:23
**reducing** 226:25
**refer** 35:25 75:7
111:10,17 179:24
181:13 187:16
198:22 206:8
**reference** 182:19
**referenced** 95:3,16
**references** 194:18
**referencing** 220:13
224:12
**referrals** 29:6 35:1
35:11 98:1,6,14
99:5 180:17 181:9
**referred** 24:20 25:1
25:24 36:2 38:10
97:17,25 98:6,10
187:25 189:12
191:21,25 216:13
**referring** 25:10 28:4

29:16 32:18 52:10
52:12,17 59:8 65:6
67:5 92:22 111:18
112:4 121:20
163:19 167:6
179:15 180:6,8,13
182:18,20,21 186:7
187:6 196:14 198:7
198:19 204:17
215:1 221:15,16,25
222:11 224:19
227:21 240:2 243:9
255:21
**refers** 32:20 191:20
221:22
**reflect** 73:21 89:20
238:11 245:25
258:6
**refresh** 163:15
183:13 184:13,17
235:5
**refuse** 91:6
**refused** 240:3 252:7
**regard** 20:7 22:4
31:10 189:6 265:17
266:20 269:18
273:15
**regarding** 22:18 28:2
38:17 39:21 41:24
51:21 56:7 60:23
61:19 82:20 89:7
98:5 100:4 114:14
118:14 126:1,20
132:9,15 133:14
144:15 148:3,20
150:21 155:16
176:8 177:5 179:22
184:20 186:14,18
186:25 189:19
190:22 194:24
196:1,9 198:13
201:25 202:3 208:6
211:18 212:4
214:22 219:11

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

32

223:19 224:1 226:4
226:13,14 231:16
231:19,21 234:14
236:1,12 237:2
239:21,25 240:16
240:23 241:2,20,24
247:21 250:16
257:20,23 267:15
268:8
**regards** 69:6 86:1
209:12 224:4
262:14,15
**register** 94:11 100:11
228:9
**registered** 89:12
94:11,16 100:17,25
101:2,18 120:1
150:22 172:24
173:2,7 174:19
**registration** 52:3,14
152:1 203:14
230:21 231:4
280:14
**regular** 44:19 215:15
**regularly** 44:24
170:5
**reintroduce** 253:2
**rejected** 166:21
**relate** 90:7
**related** 17:11 25:14
38:7 192:11,17,24
193:17,21 202:11
280:3
**relates** 38:9 184:8
233:21 234:15
236:8 274:2
**relating** 89:1 236:1
**Relations** 4:7 121:6
121:11 122:9 123:5
**relative** 174:19
**relatively** 157:13
**relayed** 267:15
**release** 191:6,10
192:5

**relevance** 15:12,14
44:10 54:20 168:11
177:4 248:20
**relevant** 24:17 39:11
88:16 172:3 178:10
178:13 233:3
**relied** 25:8,13 32:15
**relies** 206:15
**religious** 239:14,18
239:22 240:1
250:18,19,24
270:13
**reluctance** 8:17
**relying** 41:3
**remained** 217:13
274:4
**remember** 24:19
25:5 26:16 38:16
46:23 101:14
103:21 104:13,14
104:23 115:14,16
118:5,8,14,16,22
123:7,25 140:5,7
153:25 154:11,12
155:3 161:4 171:15
177:10,11 190:13
193:9 195:24 203:6
210:8 211:25 220:2
221:17 226:6,25
234:13 235:10
239:19,19,23 241:9
241:10,11,19,20
242:1,24 244:16
247:5 253:20 262:3
263:4,16 267:23,24
268:2 269:9
**remembering** 99:24
**reminiscent** 47:24
**remove** 53:12
**removed** 118:21
119:2,5,7 145:22
240:14
**removes** 240:9 242:2
243:9,20

**removing** 119:12
**rendering** 64:10
**reopen** 252:5
**rep** 5:12 45:5 234:9
**repeat** 32:5 44:22
58:5 175:21 210:19
247:16 263:18
**repeatedly** 262:25
**repeating** 145:25
260:14
**report** 22:13 116:19
117:12 160:5
194:17 238:4 239:2
239:12
**reported** 2:19 23:7
35:4 37:21 42:12
180:17 181:10
188:1 191:20
**reporter** 7:1 9:12,19
60:5 85:1,6 92:1
108:1 136:4 165:20
183:17 214:11
218:10 260:17
268:22 279:9
**Reporter's** 5:7 279:6
**reporting** 23:2 187:3
**reports** 22:8 24:16,16
26:19 38:7,17,19,21
38:22,25 39:4,8,20
55:5 181:10 182:10
182:11 187:3,6
188:5 194:20 270:9
**represent** 28:19
35:24 63:10,14 91:3
91:4 93:21 222:19
253:3,22 270:18
**representation** 74:7
253:25 254:21
255:10
**representative** 9:18
12:14 13:17,20,25
14:3,9,22,23 15:7
16:3,14,17,20,24
17:8,24 18:14 19:3

19:12,20,23 20:3,7
20:12,22 23:13
39:16 43:2 44:18,24
46:21 47:4,11,16,21
48:7,10,14,23 49:9
49:13,15 50:21
51:20 52:23 54:14
54:16 57:7,18 58:8
59:24 60:14,16,21
62:17,21 63:10,14
65:12,15 66:22
68:21,25 69:3,22
70:10,15 71:12,16
72:5,19 73:13 75:23
83:15 94:9 96:4
101:7 102:23
105:22 106:13,22
107:11,12 110:3,15
114:21 115:8,15
116:7 117:2 118:9
118:16 119:11,17
120:4,13,18,21
121:21,22 122:2,5
123:21 124:11
125:2,10,14,21
126:3,15 127:9,9,20
128:1,14,19,25
129:8,14,17,20
130:2,11,14,20
131:2,17 132:2,9
134:13,16,18 135:9
135:17 138:17,21
139:16 140:14
141:1 145:5,15,25
146:16,18 149:3,9
149:12,17,19 150:6
150:18,24 152:2,6
152:10,14 153:24
154:11,14,24 155:8
156:3,7,11,13,17
160:14 183:6,8
184:4,19 186:9,18
188:23 189:17,19
190:19,21 196:8

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

33

197:5 199:14,21
209:22 211:17
212:4 214:20
215:20,25 217:3
218:21 219:3,17
221:11 224:1
225:15,16,18 226:4
226:18 227:5 228:6
229:4 230:22
232:19 234:9
238:13,25 240:13
242:4,14,21,25
243:13,24 244:11
245:10,14,17 247:1
247:8,18 250:15
254:8 257:8,13,16
257:20 258:2,7,13
265:7,19 266:1,5,8
270:16 271:6
272:20
**representative's**
48:16 64:3
**Representatives**
157:3,5,7,8,17
166:13,17 272:19
272:20
**representing** 7:7,9,12
7:15,18,20,22
101:16 102:24
103:12 104:1 163:5
224:14,15 225:16
**represents** 78:24
144:1 229:25
231:10
**Republican** 116:11
127:10 128:15
129:18 130:11
152:16 157:6 170:5
170:8
**Republicans** 156:24
157:18 158:8
176:10 267:19,21
268:10
**request** 87:22 89:17

93:23 96:19 242:22
**requested** 28:8 36:25
60:4 85:5 96:16
98:22 136:3 139:5
165:19 188:15
214:10 218:9 227:5
229:12 242:13
256:9 260:16
268:21
**requesting** 219:4
**requests** 147:9 193:2
219:11
**require** 23:3 204:25
**required** 59:21 81:21
82:2 122:12 146:20
146:23 147:4
150:12,16,25
151:19,24 152:18
152:20 167:19
203:11,11 228:25
231:11 232:15
249:5,6
**requirement** 72:15
73:18 96:10 202:21
206:13 219:2,8
240:9 267:1
**requirements** 59:6
59:12,13,14 67:9,18
97:10 227:7 266:21
**requires** 83:6 112:10
**requiring** 154:23
218:16 267:3
**requisite** 65:13
**rescheduled** 87:22
**research** 23:21 25:23
25:25 36:25 37:9
38:6,13,18,20,23
39:25 41:5,6,9,10
41:23 42:21,23
55:21,25 56:1 65:11
65:18,23 82:1 88:7
88:14,15,21 136:16
136:18 137:1,9,16
139:8 140:3,15

148:3,9,20 174:1,11
174:16 179:22
182:8 185:11 202:6
207:3 226:23,23
227:1,4 242:10
244:3 247:7,17
249:20 254:25
262:22 263:21
264:3 266:13 270:9
270:23 271:15
**researched** 18:9
43:19 50:13 65:3,3
136:19,21 138:5
226:20,24
**researchers** 173:14
**researching** 18:11
23:19 24:15 37:12
38:16 43:18 55:17
55:18 136:23
138:13 174:12
261:17
**reserve** 275:5
**residence** 94:15
138:7
**residents** 136:9
138:23 150:1,11,15
**resolution** 5:20 29:7
31:11 33:2 39:2
**resolve** 40:4
**resource** 109:21,22
**resources** 232:19
**respect** 15:14 20:13
60:8 111:4 124:7
126:3 136:23
**respond** 42:17 47:19
204:13 229:5,16
**responding** 47:18
190:5
**responds** 163:11
**response** 52:23 53:3
89:16 92:21 122:8
176:2 184:22 194:7
197:19 220:5 229:6
229:9 230:22

260:24 263:10
**responses** 48:20
**responsibility** 17:17
**responsive** 13:3,13
**rest** 53:5
**restate** 14:11 26:3,3
42:15 57:16 65:14
83:23 168:20
170:24 172:16
178:12 181:20
218:6 253:13
**restated** 218:7
**restating** 258:16
**restrict** 259:25
**restricted** 217:16
**restriction** 78:25
**restrictions** 78:16
**restrictive** 61:25 78:6
79:3,6 80:5,17,22
81:3
**result** 9:22 53:16
59:25 155:23
270:20
**resulted** 188:7
**retain** 13:19
**retained** 13:24
141:19
**retread** 17:19
**return** 279:18
**returned** 279:19
**returning** 16:6,8
**review** 13:2 29:25
184:5 186:5 194:19
204:1 206:12
212:10,11 227:12
236:7 254:13
**reviewed** 12:9,13
179:10 184:7
185:17 212:22
213:2 233:5 246:7
261:16
**reviewing** 178:15
186:6 188:18
236:12

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

34

**revision** 49:16
**revisit** 251:25
**RICK** 1:6 3:16 278:6
**rid** 88:1 120:25
**Riddle** 9:18
**right** 10:13,15 12:23
    13:21 14:6 16:14
    17:12 18:20 23:14
    27:10 28:10,20,21
    29:9 40:11 42:6,12
    47:17 48:21 49:16
    49:23 50:22 51:15
    52:5 53:10,24 54:4
    55:9 57:23 59:8
    62:5 67:2 70:1,21
    71:4 78:10 79:1
    81:2 83:7,18,21
    84:12 90:14,21
    92:19 93:7,10 94:24
    96:14 105:2 107:15
    108:14 109:10
    111:11 114:19
    116:9,23 128:17
    129:18,23 130:17
    130:18 137:12
    147:16 148:20
    159:6 160:25
    162:22 164:25
    166:25 167:9,19
    173:5 175:8 183:16
    222:23 245:5
    251:22 254:9 255:8
    255:19 256:8
    258:14,22 259:3,10
    261:19 264:5,20
    276:13
**right-hand** 116:2
**rights** 3:4,13 7:7 59:6
    59:14,16,17 60:1,13
    60:17,20 61:7,20
    64:17,25 65:4
    108:16 167:14
    168:4 169:5 176:17
    176:19,21 177:1

    178:16 271:3,7,15
**ring** 267:5
**road** 260:7
**role** 43:2,4 59:10
    270:16,23
**roles** 264:22
**roll** 89:7,10 135:13
    199:18
**Room** 3:4
**rough** 53:15 54:21
    197:18
**roughly** 42:11 93:6
    93:13
**Round** 175:9
**row** 33:15
**Rudd** 3:9 5:4 7:3,3
    8:22 9:10 10:8,13
    10:17,23 12:5,6
    15:15,18 19:11,19
    20:19,21 21:19 24:9
    26:23 27:2,20,22
    29:16 30:18,24 31:2
    32:7 36:11 41:16,21
    42:2,16,22 43:8,15
    43:25 44:7,16 45:8
    45:14 46:3,11,12
    51:9,16,18 54:10,15
    54:24 56:20,24 57:6
    57:12,16,18 58:6
    60:15 61:22 62:9
    63:8 65:1 66:7,16
    67:14 70:20 72:4,18
    73:3 74:9,13,18,24
    75:4,7,13,17 78:24
    79:10,16 80:2,10,16
    80:20 81:11,16
    82:21 84:7,21 85:20
    85:22 88:1,5,6
    89:24 91:12 92:14
    95:20,25 96:2 99:23
    100:13 101:6
    102:20 103:10,25
    104:6,9,12 107:23
    108:4 109:5 110:14

    113:17 114:24
    115:20 117:18,22
    117:24 118:8,13
    119:1 120:20 121:4
    122:17,20 128:9
    129:14 132:21
    133:6,10,12 136:2
    136:11 138:1,4
    139:21,24 140:18
    140:20 142:1,6
    143:24 144:9 145:9
    147:13 156:2
    158:10,16,25 159:6
    160:6 162:10,11
    165:16,24 166:2
    167:4,8,13,14,23
    168:9,12,17,22
    169:8,10 170:1,3,25
    171:10,14 172:2
    173:14,20,24
    174:25 253:6
    279:20,24
**rule** 252:6
**ruled** 159:21 262:19
**rules** 2:21 8:1 11:15
    175:12 200:15
    204:25 251:24
    253:7,8
**ruling** 71:20 100:6
**run** 87:10 253:10
**running** 8:8
**Russo** 162:14,17,21
    163:11

_____
        **S**
_____

**S** 3:1
**sadly** 47:24
**safeguard** 50:4 59:17
**safeguards** 66:25
    67:5 107:12
**Safety** 77:3 148:14
    213:22
**sake** 35:14
**sat** 196:3

**satisfactory** 43:5
**satisfied** 42:22
**satisfy** 65:1 66:1
**saw** 9:18 72:16 77:24
**saying** 48:23 74:16
    92:6
**says** 33:20 34:5 47:20
    47:24 53:1,4,21
    67:20 73:22 97:24
    111:25 112:17
    116:21,24 122:16
    122:25 134:13
    163:2,2,12 185:7
    197:20 202:14
    229:15 240:3,8
    250:14
**SB** 5:13 18:25 28:25
    37:9,16 38:13 41:24
    42:4,10,17,25 49:5
    61:3 62:4 63:25
    74:5 77:10,15 78:3
    78:5,14,17,23 79:7
    79:15,18,21 80:1,4
    81:24 82:8,13,23
    83:4,11,21,24 88:7
    88:8,12,16,24 96:25
    97:10 101:3,11,13
    101:17 104:17
    105:2,23 106:4,23
    107:12 108:8,13
    109:20 111:8 112:5
    113:24 114:8,14,17
    114:24 119:12
    120:22 121:10
    124:14 127:21
    135:18 144:12,22
    146:9 147:20 148:6
    149:23 150:7,12,16
    151:1,17,19,22
    156:4,23 157:21
    158:1,2 160:21
    161:20 165:3,13
    166:13,14,19
    168:10 169:10

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

35

172:6,11,19 174:17
177:4,5,6 178:2
183:6,9 184:19,20
185:17,23 186:1
188:23 189:10,15
189:20 190:20
191:9 192:4,7,11,13
192:13,17,24,25
193:17,21,25 194:4
198:1 200:8,20
204:1,2,8,18,21,22
205:7,11,25 206:12
207:11,22 208:10
210:15 214:22
215:1,11,21 216:6
217:16 218:1,12
219:10,10 220:2
222:13,21,24
224:24 225:4,11,14
225:18,19,24
226:10 227:12
228:11,23,25
231:11 232:2,15
233:4,22 234:2,10
234:15 236:1,23,24
237:3 239:8,9 243:9
244:15 247:25
248:2 250:10
253:16,23 255:11
261:18 262:22
263:21 265:20,22
266:2,15,19 268:9
269:2,8,18,24 270:7
270:11,20 271:9,17
271:20,22 272:23
273:10,15
**scenario** 249:15,16
**scenarios** 77:5
**schedule** 48:16
**scheduling-type**
  209:15
**school** 127:14 256:3
**Scott** 3:17 5:5 7:17
  7:17 9:6,15 10:10

10:15 30:17,20
43:12 44:1,11 45:7
45:10 48:7,9 51:13
56:19,21 57:2 80:7
81:15 84:6 90:19
137:20 138:2
141:23 143:23,25
158:23 159:2,5,7,15
159:19 160:2
165:21 167:2,10,22
168:8 169:3,9 171:6
171:13,24 174:22
200:22 201:10,15
212:20 246:13,24
248:6,16 251:11
259:15 264:9
266:23 267:13
268:16,19,24
269:12,17,23 271:1
271:5 272:4,13
275:5,10,23 276:1
280:1
**screaming** 252:16
**seal** 8:17,19 9:1,14
  10:1,5,12 20:16
58:1 61:11 64:22
71:21 72:25 89:22
89:23 90:1,3,5,5,17
90:18,24 91:2,8,19
91:21,24,24,24 92:3
92:8,9 99:17 100:8
102:17 103:6,20
107:3 110:9 113:8
118:3 120:17 126:7
135:23 189:22
190:11 209:10
218:25 237:25,25
252:4 268:14 269:7
**sealed** 10:2
**search** 13:5,11
  138:11 227:6
**searching** 39:11 97:7
**seat** 50:21
**second** 26:24 27:6

33:5 45:21 53:20
63:9 69:9 77:18
88:8 93:9 95:21
97:15,23 198:25
240:8 246:9 254:13
**Secretary** 88:25 89:4
89:6,16 92:21 94:1
95:9 96:4,13,17
97:11,17 98:5,7
146:21 147:8,9
148:11 149:24
150:10,14,20 151:2
151:11 160:24
161:2,12,13,19
162:18,21,25 163:5
163:9,14,16 179:25
180:4,10,14,22,24
181:7,14,18,22
187:10 194:18
198:9 200:12,14
201:2,18,19,25
228:8 231:6 232:6
232:12 234:20,20
235:19,20 241:1,18
241:24 264:1
**section** 5:23 11:5
12:17 31:8 32:18,20
32:25 39:8 59:7,22
67:19,19,22 68:2,2
76:2,3 93:1 111:17
111:19,19,21,22
151:8 153:5 167:14
167:18,20 169:5,18
176:18,20 197:14
197:20 206:9 221:7
221:14,16,22
222:10 223:2
239:13 246:9,19
247:6 250:13 271:3
**sections** 9:21 112:11
**secure** 77:3 126:17
  131:18
**security** 76:21,24
  89:14 93:10 94:12

94:17 109:10
122:13 126:11,12
131:6,20 132:6,24
133:17,19 220:10
229:20 230:1
**see** 13:9 15:13 17:21
31:8 33:17 35:18
66:6,13 72:14
106:20 124:18
127:7 179:18
196:12 197:11
238:21 239:15
243:22 246:20
259:13
**seeing** 97:21 99:2
115:18 219:5
**seek** 63:20 232:10,11
**seeking** 89:11 107:17
124:21 248:25
250:5
**seeks** 57:4
**seen** 29:9 82:7 150:20
155:5 166:22
245:22 246:8
**selected** 190:20,25
**Senate** 15:24 16:6,8,9
19:2,2 20:23 28:15
28:19 29:3 40:4
41:12 55:20 68:23
71:25 72:2,3,16,19
72:22 73:7 75:19
76:6 83:6 96:22
100:4 102:12
103:13,16 104:2,21
105:6,10,14 109:24
110:16 111:14,15
111:17 113:12,15
115:25 123:17,23
125:17 127:24
131:12 142:12
144:15 154:17,19
154:23 157:12
158:6 160:4,5
161:15 163:22,23

COLBY BEUCK                                6/20/2014
CONFIDENTIAL TRANSCRIPT

36

166:6 182:22,24
188:22 189:5,7,11
191:11,17,17
192:11,15,18,24
193:3,6,7,9,11,17
193:21,24 194:3,13
195:4 196:1 197:23
198:2,6 201:2
203:10,14 210:10
218:16 220:23
221:3 223:4 224:4,8
229:2,3 239:2 247:6
253:19 257:9
262:18 266:1 272:2
273:1,3,18 274:15
**Senator** 15:7,10,19
16:5,13,18 18:22,25
87:12 194:25 195:5
195:7,8,9,14,18,22
215:10 258:7,21
265:3 266:1 271:7
273:21,21 274:17
274:19,25 275:2
**send** 121:17 163:22
164:5 245:13
**sending** 15:4 24:4
109:13 123:4
**sense** 20:6 39:25 53:3
53:7,22 88:14 94:20
112:18 130:24
131:7 140:1 141:12
174:5 185:10 186:8
220:16
**sent** 53:9 121:10
**sentence** 53:20
**separate** 9:22 90:4
92:9 144:1 208:17
247:14
**series** 27:3 87:1
**serious** 54:8
**served** 16:2,24 17:5
**services** 97:12
**session** 17:8,12,14,25
71:25 88:19 97:5

102:12 103:13
104:2,16 155:13,16
156:4 169:13
212:24 215:15
**sessions** 49:21,25
52:14 62:1,4
**set** 233:8,9 262:5,10
**sets** 254:11
**setting** 11:12 163:7
**seven** 8:5,8 30:15,17
30:19 31:10
**seven-hour** 8:2
**sgill@lawyerscom...**
3:15
**shaking** 176:2
**shared** 196:9
**Sheila** 266:5
**short** 8:10 163:7
**Shortened** 72:10
**shorter** 78:9 81:4
**shortfall** 97:6
**shorthand** 2:19 279:9
**show** 30:23 81:16
141:24 183:12
203:11 205:1,3
220:25
**showed** 209:20
266:25
**showing** 203:13
207:1 219:5
**shows** 245:13
**side** 157:20 166:18
273:2,3
**sidebar** 45:7,8
**sign** 276:16
**signature** 5:6 277:1
277:21 279:17
**signed** 5:12,13 74:6
74:23 75:15
**significance** 44:4
**significant** 42:5,18
43:17,21 44:9,14
97:6 207:22 231:13
**significantly** 65:19

**similar** 72:2 114:8
158:9 164:17
198:13 273:14
274:2
**simple** 256:5
**simply** 10:4 252:6
254:24
**sir** 29:19 195:19
201:11 212:16
**sit** 25:6 32:23 50:16
56:6 115:13 188:5
209:2 223:17 226:8
227:8 241:14 250:8
265:24 266:17
**sits** 41:19 81:10
**sitting** 8:1
**situation** 23:5,9
121:25 142:10
264:11
**situations** 24:7 82:11
82:21
**six** 30:19 68:5 78:11
255:21
**sixth** 70:3
**size** 140:2
**skip** 69:21
**slightly** 138:5
**slur** 251:10
**small** 139:25 174:9
242:9 243:17
**smaller** 49:12 79:20
83:3,10
**smoother** 10:16
**social** 89:14 93:10
94:12,17 109:10
220:10 229:20
230:1
**Solicitor** 4:12
**somebody** 10:2 19:10
27:17 34:7 45:10
110:24 185:7
204:25 249:17
**somebody's** 122:1
**Somewhat** 92:13

**Sonia** 3:12 7:6
**soon** 74:20
**sorry** 12:5 14:12 15:7
22:7 23:11 27:16
30:9,11,17,20,21
44:21 60:2 68:11
69:12,13 73:24
78:11 81:5,23 83:22
101:18 117:7
122:17 133:17
137:2 145:24
150:13 156:9,10
168:21 170:24
172:16 181:9,20
182:19 195:4 198:6
198:17 214:8 216:1
217:6 223:20 227:1
228:20 236:9
237:21 238:7
240:20 247:16
249:23 259:8
268:17,18 271:12
275:15
**sort** 11:15 49:4 51:25
53:8 72:21 91:23
92:25 106:12
113:20 132:2 139:2
150:10,21 229:15
**SOS** 240:9,15,16
241:16
**sought** 64:15 114:4
148:15 232:6
**sound** 27:10 28:20
**sounds** 28:21 51:2
108:24 114:20
267:7,18 268:20
**source** 41:3 96:21
173:12 194:25
**sources** 23:23 43:7
**SOUTHERN** 1:1
278:1
**speak** 9:9,12 19:22
20:21 21:7 33:11
36:9 41:8 50:15

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

37

57:18 73:1,16 74:20
77:7 110:12 114:21
133:23 139:16
155:14,25 161:2
192:3 214:21 217:3
222:12 246:14
**speaking** 115:5
126:10 164:21
242:21 250:20
**speaks** 51:6 230:13
230:14
**special** 101:22 206:7
269:19 270:5,13
**specific** 22:8 24:19
31:12,20 34:15
55:21 56:17 61:19
63:15 64:11 65:10
65:14 66:5 88:15
89:9,10 101:14
114:10 126:19
129:12,13 131:4,8
132:11 144:16
145:18 146:4
155:15 164:4,6
165:5 183:9 184:6
184:21,25 187:2
192:12 196:20
197:16 204:6
207:25 214:24
220:2 224:11
227:24 228:1
229:12 231:21
241:19 242:12
243:6,13 259:12
**specifically** 22:1
60:25 90:7 111:18
115:13 138:14
141:11 167:15
189:10 192:23
196:9 200:8,17
201:22 210:18
224:1 225:10
228:15 234:23
237:19 249:21

257:4 258:10
259:19
**specification** 69:17
**specifics** 34:1 50:15
50:19 77:7 86:16,25
87:3,6 98:10 103:21
104:23 119:14
124:1 137:15
138:25 139:6
148:23 178:20
187:2,4 188:9 193:9
195:11,16 197:1
199:22 207:9,17
221:23 226:7,11
231:24 235:18,23
236:10,19
**specify** 67:14 117:3
**speculation** 29:15
36:6 51:13 70:17
72:24 200:23
214:13 216:20
218:3 246:13,24
261:7 268:23
272:12
**speed** 140:20
**spend** 186:5
**spent** 16:7
**split** 267:19
**spoke** 18:14,17,22
21:9 22:9 61:18
84:3 87:12 108:13
108:22 109:2
160:24 161:7 164:9
195:10
**sponsor** 188:23
189:18,20 190:20
190:23,25 191:2,5,8
191:16,22,25 192:4
266:1
**sponsored** 75:23
**Spreadsheets** 27:23
**spring** 13:12
**SSN** 93:10
**stack** 27:18 111:11

**staff** 16:25 47:16
64:1,9,14 101:8
184:4 189:1 192:6
192:10 257:23
**staffers** 162:17
**staffs** 85:13 113:6
**stamp** 159:17 245:20
**stamped** 159:24
**Stan** 248:7
**Stanart** 248:8
**stand** 179:18 237:10
239:11
**standard** 110:1,20,23
110:23,25 131:21
136:21,25 137:3
140:6,6 142:3
144:21 220:24
221:2,18 222:20
223:16 226:19
233:8,9 262:5,10,13
262:16,17
**standardization**
131:22 132:7,24
133:16,18 136:7
140:9 143:13
226:14
**standardized** 137:18
138:7 140:7 141:8
141:11,13,22
144:25 145:12
242:7 243:18
**standards** 60:13
**standpoint** 9:23
90:20
**start** 21:6 22:20
27:12 45:20 79:16
133:12 161:12
189:15
**started** 16:18 106:10
175:9 231:25
**starting** 69:1 72:16
217:4,8 218:18,20
218:22
**starts** 33:6 34:25

**state** 1:18,20 2:4,18
3:7 7:4,8 17:4 22:7
34:15 38:8 70:7
91:4 93:2 97:5
129:5 130:9 136:12
137:25 138:19
144:5,10 146:21
147:2,9,9 148:9
149:24 150:1,10,10
150:13,15 151:2,11
160:24 161:2,5
163:6 176:13
179:22 180:1,12
181:7 187:22
194:22 198:9
200:12,14 201:2,18
201:19 202:3
207:24 210:24
213:16,25 216:18
227:10 228:9 231:7
232:14 233:12,17
233:21 234:9,20
235:16 236:4,5,8,13
236:16,17 241:2
243:20 244:14,15
244:21,22,23 245:2
245:3 249:11 251:5
256:1,3 264:25
265:13 271:10,18
271:18 278:18,20
279:4,10
**State's** 88:25 89:5,7
89:16 92:22 94:1
95:9 96:4,13,17
97:11,17 98:5,7
148:11 150:21
161:14 179:25
180:4,10,14,22,25
181:15,18,22
187:10 194:19
201:25 232:6,13
235:19,20 241:18
241:24 264:2
**state-wide** 96:9

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

38

**stated** 2:22 64:20
211:8 223:13
**statement** 79:25
126:19 163:18
180:19 183:11
203:9 211:12
**statements** 8:18,19
**states** 1:1,8 3:2 7:10
23:25 48:1 57:10
59:20 69:10 77:19
138:9 147:6 160:20
164:19 184:24
194:11 214:1
233:10 234:2,16,18
244:21 266:9 278:1
278:8
**statewide** 199:11,25
200:10,18 229:21
**stating** 119:25
**statistically** 170:6
**statistics** 24:16 56:7
170:12 171:7
249:10
**statute** 253:19
**statutes** 165:5 272:9
**stay** 91:1
**step** 190:1
**stick** 100:25 152:19
**sticker** 75:13,14
**stolen** 52:4,14 116:18
117:11 121:14,24
122:1
**stop** 84:17 202:15
203:8
**stopped** 51:25
**story** 163:3
**Strama** 152:14,16
**Strama's** 154:12
**Street** 2:20 3:10,19
208:3,16,21,23
**strike** 23:11 58:20
82:22 99:6 145:7
183:4 197:21
201:23 205:8

216:21 220:14
**string** 45:21 46:13
51:24 121:5 162:13
**student** 127:13,19
128:2 132:18
142:12,14,24 143:2
143:20 144:3
253:17,23 254:14
254:22 255:1,10
256:12,17,21,24,25
257:10
**students** 142:16
143:8 144:2
**studied** 177:18,25
**studies** 23:25 24:15
24:19,19 25:1,3,7
25:10,13,15,15,18
256:16,20,24
262:21 263:20
270:10,14,18
**study** 65:21 149:25
150:10,15 151:6
**subdivision** 70:7
130:9 256:1
**subject** 27:22 46:17
63:1 109:9 115:16
120:22 121:23
125:15 127:18
129:8 130:20
147:15 149:5 150:6
153:23 197:10,12
228:15 235:12
239:1
**submitted** 279:15
**subpoena** 13:6,7,9
**Subsection** 70:23
116:13
**subsequent** 211:3
245:19
**substance** 118:5
209:5
**substantially** 198:13
**substitute** 74:22
106:18

**successful** 161:17
**sufficiency** 214:21
**sufficient** 96:24
213:7 214:6,16
**suggest** 51:8
**suggested** 53:18
**suggesting** 49:15
50:24 156:23
**suggestion** 48:24
111:12,15 114:10
**suggestions** 110:1
111:3 114:8
**Suite** 3:10,14 280:11
**summaries** 28:1,4
**summarize** 116:14
131:15
**summarizing** 146:25
180:23
**summary** 26:12
165:11 244:21
**superior** 72:6
**supplied** 89:12
**support** 19:17,19,24
21:7,10,13 47:22
73:13 105:2 128:6
128:12 206:21
207:3 219:5,6 244:4
259:7,9,12,12 260:4
261:2,5 265:19
267:23 269:9
**supported** 21:11
128:11 146:1
216:22 266:25
268:9 270:11
**supporting** 260:19
**supportive** 110:4
155:12,17
**supposed** 59:4
275:20
**Supreme** 66:9 262:19
**sure** 9:13 10:4 14:10
37:6 41:16 42:16
44:23 46:25 58:6
59:5 74:17 81:22

84:21 92:5 119:9
132:17 150:14
170:3,25 172:18
173:4 183:15
189:14 225:5
232:23 254:18,20
256:4 260:20
263:20 264:10
267:12
**surprise** 173:6,10,11
173:17
**surrounding** 158:2
**suspend** 120:7
**swayed** 139:12
**swear** 7:2
**swing** 50:5,7
**switch** 175:2
**sworn** 2:16 7:23
10:19 16:1 279:12
**swung** 44:15 50:11
50:17
**system** 271:24

**T**

**table** 8:1 120:4,7,14
120:19 124:11
125:3,8 126:20,24
128:7,17,20 129:15
130:12 149:9 152:2
156:14 257:14,18
258:3
**tabled** 129:23 130:17
157:10 225:20
236:23
**tabling** 152:6
**take** 11:24 15:21 16:5
32:10,13 51:14
54:23 93:3 97:9
113:19 121:13
137:7 139:20 172:2
175:1,3 181:6,14
182:11 202:23
205:14,15 232:22
255:16 257:2

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

39

262:16
**taken** 2:16 9:19
  26:13 99:10 123:17
  199:18 280:5
**takes** 187:19
**talk** 11:16 14:2 17:18
  17:23 24:18 38:12
  44:16 46:1 52:2
  62:21 100:20 101:2
  102:6 112:14
  114:16 137:23
  187:8 268:4
**talked** 31:19 88:6
  112:12,19 132:6
  204:9 220:17
  224:14 242:7 247:3
**talking** 15:12 51:19
  53:3 54:24 55:5
  78:13,13 79:17
  87:11 106:3 108:7
  112:3 117:19
  140:25 145:4,20
  164:1 170:18 172:3
  172:13,14 176:14
  201:17,19,22
  203:16,17,17,22
  204:18,20 225:24
  248:17 255:5
  267:12
**talks** 79:12 96:7,12
**target** 200:8 240:9
  246:10
**targeted** 56:18
  167:15 199:11
  200:11,18
**targeting** 200:1
  240:23 241:2
**targets** 199:25
**Task** 152:22 153:8
**tasked** 47:18
**tasks** 178:2
**tax** 177:7,9,12,20
**taxes** 47:25 48:2
**Taylor** 15:7,10,19,22

16:5,13,18 258:21
  265:4
**TDL** 229:25 230:2
**TDL/ID** 93:3
**tell** 19:15 33:8 34:3
  34:12 36:1,12 41:19
  53:14,21 80:13 87:5
  87:15 97:24 105:15
  105:20 106:20
  107:24 117:24
  135:14 141:10
  147:11 164:2
  183:21 202:18
  238:1 261:12,25
**telling** 21:20 33:1
  133:8
**temporary** 122:9,12
  122:16,21 123:1,11
  123:22 124:2
  213:21
**ten** 39:23
**tend** 142:14 171:1,18
**tends** 170:20
**tenure** 20:13
**term** 141:12 182:17
  185:4,17
**terms** 22:10 78:2
  95:16 115:15
  131:19 139:1
  142:21 150:11
  157:11 262:5
**testified** 10:20 16:23
  18:5 39:10 52:3,16
  66:24 83:14 84:8,10
  85:9 87:11 128:9
  151:10 154:1
  168:13 178:1 194:8
  195:10 198:5
  201:20 206:20
  214:23 218:19
  219:15,23 220:8
  221:12 222:4
  224:23 225:3
  226:13 231:17

233:1 237:7 249:25
  256:7 261:16
**testify** 10:19 19:9
  39:18 85:18 90:24
  91:2 163:9 190:11
  209:13,17
**testifying** 82:13
  210:3,9,9
**testimony** 8:25 9:2
  11:11 49:20,24 52:9
  52:13 71:20 82:7,19
  87:2 90:6 91:10
  92:23 99:23 101:10
  104:18 106:8
  144:14,17 161:15
  161:16,20,23,24
  162:1 163:15,17,24
  164:3 166:13 168:7
  168:18,18 171:17
  172:5 179:2,19
  185:11 194:23
  195:3,3,25,25 201:9
  207:5,7,9 209:18,20
  212:1 214:22
  215:23 224:25
  226:15 234:19
  251:14 252:9,11
  253:13 279:14
**tests** 47:25
**Texans** 266:25
**Texas** 1:1,11,14,18
  1:20 2:4,18 3:7,18
  3:21 4:3,7,12 5:23
  7:4,8,12,14,17,18
  7:19 24:21,22 25:2
  25:8,14,18 26:2,8
  26:11,21 28:2 37:14
  38:8 39:21 40:2,15
  40:18 41:7,14 42:6
  42:12,19,24 43:11
  43:22 44:4,8 50:11
  50:17,22 55:1,23
  56:3,8 58:24 59:20
  62:3 91:4 93:4,4

99:14,21 102:14
  104:7 108:16 114:7
  136:12,22 137:6,18
  138:8,10,11,12,20
  138:23 139:2,3,25
  140:2 141:17,19
  142:25 143:3 144:6
  144:10 150:15
  154:16 166:8,12,25
  167:9,17,19,21,24
  168:4,6,25 169:4,12
  169:20 170:5,10,13
  170:18,22 171:1,3
  171:23 172:7,25
  173:3,8 174:7,20
  176:9,13,16,18,20
  177:20 178:14
  179:21 180:14
  187:23 194:8,11,17
  194:22 198:1
  207:24 210:24
  216:18 222:19
  227:10 228:16
  229:19 232:14
  233:13,14,18
  235:17 236:5,18
  238:10 244:15
  249:11 253:3,18
  258:25 260:2
  264:12,14,22,25
  265:13 266:19
  271:10,18,18,19,24
  272:7 278:1,11,14
  278:18,20 279:4,10
  280:10
**Texas's** 177:20
**Texas-El** 143:4
**thank** 27:20 49:4
  60:6 85:20 89:24
  117:22 136:5 145:8
  159:15 163:6
  168:17 183:19
  185:2 200:24
  205:17 237:17

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

40

246:4 251:4 255:8
275:8,9,11
**thank-you** 163:8
**thanks** 163:12,13
**thing** 8:11 11:16
25:20 92:3,9 122:22
145:7 170:9 238:15
**things** 9:15 10:14
21:20 24:5,18 27:25
28:8 34:13 37:12
40:11,12 42:9 44:17
47:3,24 53:8 54:24
58:7,23 59:3,4
62:16 82:23 86:10
86:12,14 88:12
132:16,22 133:14
141:6 143:12
152:19 154:1
159:11 163:7
213:18 259:22
260:6
**think** 9:17,23 10:8,16
16:23 19:9 20:9
25:1 31:23 34:16
39:10,20 40:17 41:9
43:25 44:5,13 51:25
53:5 54:13 55:11,25
64:11 67:8 73:9
74:14,18 77:5 81:12
81:20 83:14 84:10
97:1 99:8,18,21,23
100:2 108:19
121:23 122:18,20
133:6 137:22,24
141:17 148:14
151:10 159:19,19
172:22 200:12
202:19 203:5
224:13 236:6
237:10 244:22
248:18 250:20
255:9 262:1 264:21
275:6
**thinking** 19:10

**third** 7:15 27:7,8
34:24
**THIRD-PARTY**
4:10
**thought** 19:8 37:3
73:1 75:10 97:9
133:4
**thoughts** 19:8 110:12
**three** 30:18 31:14
41:20 44:20 45:1
50:22,25 51:10
137:5,21
**throw** 138:3
**throwing** 173:17
**thrown** 9:25
**thumb** 158:18
**tight** 97:5
**tightened** 239:14,17
**tightening** 239:22
**Tigua** 137:22
**time** 8:6,11,12 10:6
11:8,23 13:17,20,25
14:3,21,22 16:12,17
19:22 20:22 25:5
30:25 44:1 47:17
48:11 53:24 58:24
61:3 62:23 66:4
68:18,25 69:21
70:13 71:9 73:12
74:3 79:4 81:4
87:22 90:15 92:6
99:1 101:7,7 102:23
106:1,3,9 107:21,25
110:19 112:15
114:9,23,24 117:3,9
117:19 127:20
142:3 163:7 164:7
164:25 167:4 171:6
171:24 172:3
176:14 177:18,25
184:9,18 186:5
204:25 208:19,22
210:15,25 211:2
213:1 214:5,16

215:13 223:9
227:18,19 231:12
231:15 233:5 235:4
259:5 260:1 261:22
262:7 263:7 275:6,8
275:14,17,21
279:22
**timeframe** 44:12
**timeline** 98:24 99:2
**times** 64:8,9 131:14
186:22 208:13
218:19 233:1 260:6
263:17 272:1
**title** 15:18 48:11,18
63:19
**titled** 245:21
**today** 9:18 12:3
14:14 15:6,14 25:6
32:24 33:2 41:19
50:16 56:6 81:10
87:2,5 92:3 115:13
172:25 188:6
223:17 226:8 227:8
241:14 250:8 253:6
258:8 262:25 264:4
265:24 266:17
**today's** 12:9 46:18
197:11
**told** 19:12 25:12 88:3
204:4 212:7,8
264:21
**ton** 115:9
**tool** 40:8 154:20
202:21 203:15
205:2
**tools** 40:23 202:14
203:8,16 204:23
**top** 48:19 52:21
75:13 111:8 124:17
162:20 197:14
238:21
**total** 45:8 198:16
**totally** 248:13
**track** 147:14

**traditionally** 169:21
**train** 210:16,23
**training** 67:11
152:21 153:3 211:9
211:13
**transcript** 279:13,15
279:20
**transmitted** 192:19
194:13
**trends** 233:20 234:1
234:5,7
**trial** 275:6
**tribal** 135:1,5 136:9,9
136:10,13,19,21,24
136:25 137:4,4,18
138:6,8,22 139:1,3
139:8,24 146:1,6
165:7 226:19 227:6
227:7,9,16 242:2,6
242:17 243:6,10
**tribe** 137:14,14,24
138:14
**tribes** 137:5,9,13,22
137:25 138:9,12,20
**tried** 23:20 80:24
**trip** 253:15
**true** 170:9 208:2,16
208:21 210:16,22
211:8,16,22 265:15
273:1 277:21
279:14
**truly** 276:1
**truncate** 134:8
**truth** 10:19,20,20
**truthful** 175:16
**try** 9:10 17:19 26:5
40:12 42:10,17 92:1
92:4 134:8 210:20
218:5 272:9
**trying** 34:8 40:4,8
45:11 51:8 53:7
66:8 93:22,25
117:17 124:5 127:6
144:4 146:14

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

41

158:20 162:5
178:10 182:8,19,25
185:9,9,14 198:17
200:7 204:13 228:1
228:3,7 231:17
251:13 263:14,16
**Tuesday** 91:23
**turn** 23:23 34:24
35:15 48:5 52:20
76:1 116:1 119:15
124:17 128:23
130:4 146:11
149:15 152:12
**turned** 12:13,17
39:19 139:11
147:17,22 148:4
159:23
**turning** 92:14 149:8
152:21 179:1
182:16 184:10
197:2 202:13 220:7
221:1 237:18
245:19
**turnout** 234:10,14,21
235:1
**twenty** 174:3
**twice** 208:14
**two** 24:10 30:18
34:13 35:16,25
67:23 68:12,20 71:3
73:14 76:16,22 77:3
78:4,5,11,13,16
79:1,8,9,17 80:4,25
91:5 132:5,16
133:14 134:1
139:21 141:6
181:25 208:15
218:15 222:18
230:14 236:21
246:19,22 247:4
248:18
**two-year** 68:15
**TX** 2:20 3:10,19 4:4
4:8,13 27:6,7,8,9

45:16 92:15 96:3
109:5 121:5 158:21
162:13 237:20
245:19,20 280:12
**tying** 177:3
**type** 19:17,24 21:13
23:24 34:19 49:12
56:17,24 61:24 71:3
89:10 101:25
126:17 147:14
155:6 184:21,25
192:21 214:6
220:19 228:14
229:12 232:3
266:13
**types** 8:13 21:20 24:7
37:17,23 38:4 48:25
55:6 61:5 68:3,5
138:22 164:23
185:5 222:14 227:9
227:16 228:25
236:17
**typically** 22:24
191:23

_____

**U**

**U.S** 3:3
**U.T** 142:15,16,17,17
142:20 143:9,18,20
**Uh-huh** 95:22 112:21
121:12 152:23
186:24
**ultimately** 118:20
119:5 123:16
124:11 145:22
156:7,13 209:24
**unable** 180:25
**uncovered** 42:23
**underlined** 240:6
**underlying** 248:4,10
249:14,25
**underreported** 40:24
41:1,7,13 43:14
**underreporting**

40:19,21 41:22
**underseal** 91:25
**understand** 8:3 11:17
11:21 14:11 32:12
32:14 34:8 37:8
43:8 53:16 54:16
56:24 82:6 87:21
91:3 100:7 132:18
145:2 157:19 168:3
175:12,19,22 176:4
177:19,21,23,25
179:19 185:9,14
186:4 191:4,10
204:15 208:16,20
222:1 223:20
231:13 234:6 244:7
244:10,25 245:5
252:2 256:4 260:6
260:11,13,23 261:1
261:9 262:9 263:15
264:10
**understandable** 92:2
**understanding** 8:25
9:6 20:5 58:2 59:19
60:9 63:12 64:21
71:19 72:1,12 81:19
83:19 91:5,12,18
93:5 100:8 107:4
113:8 122:23 126:8
135:23 168:15
170:6 171:9 172:10
176:17 177:13,17
182:17 185:4,10
187:15 188:21
189:24 194:15
208:22 210:7 213:3
213:6 214:4 218:23
219:1 248:9,12
257:7
**understood** 8:23
15:15 54:17 191:8
191:15
**undertake** 154:24
155:9

**unexpired** 69:18
**uniform** 141:14
**unique** 233:14,15
**United** 1:1,8 3:2 7:10
69:9 77:19 138:9
194:11 214:1 266:9
278:1,8
**universe** 79:20 83:3
83:10
**University** 142:25
143:3,4,4
**unnoticed** 188:2
**unscramble** 92:1,4
**unseal** 91:11
**update** 188:14
**upper** 116:2,2
**usable** 252:10
**use** 14:2,13 45:10
48:20 53:22,23 54:1
90:8,9 91:9 104:4
131:2 142:11 144:2
146:1,6 252:6
265:18 274:11
**utility** 178:17

_____

**V**

**v** 194:8,11
**VA** 109:9
**vague** 21:14 44:2,11
81:15 114:23
137:20 141:23
155:20 165:23
168:8 169:3,25
171:6,24 196:11
201:14 204:12
218:11 233:23,24
234:4 248:16
259:15 269:21
272:12
**valid** 70:3 124:21
129:4 130:5 134:25
255:24 267:3,16,21
268:1
**valuable** 229:8

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

42

| | | | |
|---|---|---|---|
| **value** 31:25 32:13 | 267:25 | 56:8,14,17,25 57:1 | **voters** 1:11 3:21 7:12 |
| **Van** 274:19 | **vote** 41:22 67:20 71:4 | 58:8,15,24 60:23,24 | 48:3 53:10 58:20 |
| **variety** 21:2,9 166:16 | 73:15 76:8 82:16,25 | 61:1,6,6,24 62:3,13 | 59:18 66:25 67:2 |
| 259:21 260:19 | 89:12 94:11,16 | 62:18 65:21 67:11 | 73:14 93:2,3,9,15 |
| 261:15 263:23 | 116:19 117:11 | 67:15,20 73:8 84:11 | 93:18 94:23,24 95:3 |
| **various** 27:4 103:11 | 119:23 124:21 | 85:25 86:1,18 87:13 | 95:8,15 97:10 |
| 108:7 126:12 | 135:12,13,13 146:3 | 87:13 88:11,18 89:1 | 103:17 120:1 |
| 131:18 141:2 143:5 | 170:5,7,12 173:7 | 89:2,7,10 94:2 96:9 | 136:10 146:22,22 |
| 145:10 264:22 | 177:14,15 195:13 | 96:14,21,24 97:2,12 | 147:4,17,21 148:4 |
| **Veasey** 1:3 119:18 | 199:14,18,18 | 97:16 98:1,6 99:5 | 150:24 170:4,10 |
| 277:2 278:3 | 206:18,24 208:2,16 | 99:13,13,20,25 | 171:18,19 172:25 |
| **vehicles** 171:12,18 | 208:21 211:8,17,22 | 110:2 112:5 116:16 | 173:3 174:20 |
| **verbal** 176:1 | 225:17 253:18,22 | 119:25 127:13 | 192:25 193:18,25 |
| **verify** 81:6 203:13,20 | 255:10 256:25 | 129:3 130:5 134:24 | 194:2,4 198:1 |
| 205:4 | 257:16 259:14 | 147:3 148:3,20,22 | 199:12,12 200:1,3,3 |
| **versa** 157:18 | 266:21 267:4,17,22 | 148:25 152:1 153:4 | 200:9,18,19 201:6,6 |
| **version** 5:12,13 74:5 | 268:1 275:2 | 153:9,10,14 154:2,7 | 202:8,8 222:14 |
| 74:8,10,11,12,23 | **Vote's** 210:16,23 | 154:10,16,18 155:2 | 228:8,13 229:11,19 |
| 75:11,15 79:15 | **voted** 45:5 118:17 | 155:4,5,6,11 156:4 | 229:25 232:14 |
| 146:9 159:16 226:1 | 125:10 127:2 | 169:12,17 172:15 | 234:11 240:10,24 |
| 226:3 | 128:20 129:20 | 172:19 173:25 | 241:3 242:9 243:17 |
| **versions** 255:11 | 130:14 135:10,14 | 174:1,6,19 179:23 | 246:10,20,23 247:4 |
| **versus** 76:23 78:11 | 158:8 199:16,19 | 181:1,24 182:6,13 | 247:9,19,22,25 |
| 171:5 | 209:20 217:10 | 184:21,25,25 | 249:21,22 253:4 |
| **Veterans** 222:21 | 258:3 275:4 | 185:12 186:2,14,18 | 256:25 262:23 |
| **vice** 157:18 | **voter** 17:7,12 18:2 | 186:21,23 187:1,13 | 263:22 266:19 |
| **view** 80:4 81:8 140:2 | 19:16,25 20:4,8,13 | 187:22 188:7 | 271:18 278:11 |
| 140:14 143:17 | 21:8,8,11,21 22:14 | 193:22 194:15,21 | **votes** 44:15,20 45:2 |
| 170:3 | 23:20 24:3,21 25:2 | 195:2 196:2,9,18,18 | 50:5,7,11,18,22,25 |
| **viewed** 187:24 | 25:7,16,22,23 26:1 | 196:25 198:8 200:6 | 51:10,11 52:15 |
| **Vincent** 162:14 163:3 | 26:8,11,13,20 28:2 | 202:15,20,22 203:8 | 273:8 |
| **violating** 45:24 | 32:19,21 33:9,20,24 | 203:14 205:3,5 | **voting** 21:23,25 22:2 |
| **visit** 104:5 | 34:4,5 35:5,11,16 | 206:25 208:6 | 22:2,4,6,10 23:18 |
| **visited** 109:19 | 35:21,25 36:4,13,19 | 210:18 211:10,13 | 24:2,3,11,14 26:13 |
| **visiting** 104:1 106:10 | 36:23 37:13,17,17 | 211:18 214:7 220:1 | 26:14 29:12 32:17 |
| **visits** 21:5 101:6,11 | 37:22,23 38:3,4,7 | 229:21 230:20 | 33:20 34:6,12 40:9 |
| 101:15 103:11 | 38:14 39:21 40:1,15 | 231:4 232:5,7,10 | 40:10,20 57:5 59:6 |
| 122:11 | 40:18,25 41:1,7,13 | 234:17,25 240:3 | 59:14,16,22,25 |
| **Vital** 249:10 | 41:23 42:5,11,19,24 | 243:19 245:21 | 60:13,17,20 61:20 |
| **vocalize** 60:15 | 43:10,13,21 44:3,6 | 246:9 249:5,5,9,10 | 64:17,24 65:3 69:5 |
| **vocalized** 134:1 | 44:8,13 46:18 47:22 | 256:17 261:17 | 71:11 72:7 82:3 |
| 146:6 | 49:21 51:21 52:3,10 | 266:21 267:1 272:8 | 95:10 123:2 128:3,7 |
| **voice** 135:13 199:17 | 52:14,16,18 55:1,6 | 272:10,15,17 274:1 | 146:2,22 147:17 |
| **voiced** 86:20 106:24 | 55:15,18,23 56:1,2 | 274:11,13 | 149:13 152:10 |

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

43

154:21 156:17
157:12,18,20,23
167:14 168:4 169:4
169:20 176:13,17
176:19,21,23 177:1
177:20 178:16,23
180:12 182:17,25
183:2 185:3,4,8,17
185:20 206:19
211:24 212:5
249:12 272:17
274:6
**voting-related**
166:25 167:9,21
168:25 169:11
**VS** 1:5,10,17,23 2:3
277:2 278:5,10,17
278:23 279:3

**W**

**W** 3:10
**waiting** 9:7 263:10
**waive** 58:3 60:11
71:21 85:14 87:20
107:5 110:10
113:10
**waived** 64:21 85:9,13
91:11 118:4
**waiver** 8:20 126:9
135:25 189:25
**waiving** 100:9 102:17
103:7,20
**want** 8:2,7 11:15
20:18 21:21 24:1
32:7 45:10,20 67:17
74:12,17,22 80:13
84:2,2,18,20,23,24
85:1,4 88:8 91:9
108:11 116:3 117:7
119:16 120:25
132:21 133:9
141:24 143:24
145:2 146:11
149:15 152:12

160:17 173:21
175:1 176:9,15
179:19 186:4 190:1
194:14 201:18
237:6 254:17
258:17 260:21
264:10 268:20
**wanted** 19:3,12 46:1
46:3,25 53:12 54:17
58:10 72:1,14 119:9
120:13 161:16
175:11 176:6
**wanting** 106:8
**wants** 91:16
**warning** 8:7
**Washington** 3:5,14
3:24
**wasn't** 41:16 43:4,5
75:11 136:25
137:18 155:25
174:14
**watch** 263:6
**watched** 193:6
**watcher** 207:18
**watchers** 207:12,14
207:16,23 210:17
210:23 211:9
**waving** 120:17
**way** 10:9,15 13:24
14:19 21:19 22:16
33:1 59:5 61:2 64:8
66:10 81:1,6,12
84:25 87:9 88:4
98:25 100:13
107:20 110:23,25
140:11 142:3
147:14,21 151:16
153:19 164:2,3
165:11 198:18
200:13 205:4
222:23 253:15
**ways** 21:2 106:23
263:17
**we'll** 11:24 105:17

115:12 133:25
139:22 160:16
170:19
**we're** 9:13 10:13
20:16 37:6 41:18
61:11 72:25 78:12
78:13 85:14 91:15
91:16,17 97:20
102:17 103:19
107:3 110:9 118:3
120:17 134:8
140:20 156:10
158:13 171:3 172:3
183:15 189:22
201:19,22 204:18
204:20 224:12
242:21 244:7 253:7
255:5,7 258:16
263:7 267:12 275:7
276:13,16
**we've** 46:9 82:7 88:6
110:9 128:10 131:9
132:10 139:19
141:3 150:19
156:20 166:16,22
194:16 242:7 243:4
**wear** 64:4
**wearing** 15:17
**week** 112:20 220:18
248:8
**weigh** 43:4
**Wendy** 273:21
**went** 51:18 78:12
98:21,25 99:2,3
160:8 249:10
**weren't** 12:16 42:5
89:23 92:8 113:20
141:8 148:18
237:24
**West** 2:20 3:19
**White** 170:21 171:2
171:19
**Whites** 171:14,23
172:8 267:5

**widespread** 263:24
272:8
**wife's** 138:2
**Williams** 195:8,9,15
195:18,22
**WILMER** 3:23
**WilmerHale** 7:11
**wishes** 223:2
**withdraw** 276:9
**withdrawn** 156:8
276:11
**withdrew** 216:11
**witness** 2:15 4:1 7:2
7:20,22,23 8:1,15
9:5 20:17 30:23
32:3 46:7 49:20
57:25 60:9 62:24
67:6 71:22 72:11
73:22 85:10 91:3,6
91:7 92:11 99:17
100:7 102:16
103:19 107:2 110:9
113:7 118:2 120:16
124:8 126:7 135:22
173:22 175:4
189:23 209:9,25
215:24 234:19
241:7,10,13 251:15
251:22 252:12,21
252:24 255:16
275:9,11 279:12,14
279:16,17
**witnessed** 261:3
**witnesses** 52:3,13
161:14 209:19,23
**witnessing** 196:2
**won** 44:20 45:1 50:21
50:24 51:10
**word** 54:1 80:16
104:4 137:7 205:15
222:9 239:25
255:16
**words** 53:21,22 177:8
177:11 231:18

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

44

**work** 13:3 14:2,5,14
  14:17,24 15:5,6,22
  19:20 42:17 48:15
  53:1 64:4,13 66:10
  66:13 73:11 198:18
  220:24 258:21
  264:11,14 265:3
**worked** 13:25 14:3
  75:21 108:19
  117:16 123:21
  224:16,18 258:13
  258:19 265:6
**worker** 40:22 131:24
  144:3 206:15,24
**workers** 40:9 126:14
  143:14,15,19
  144:10 154:21
  203:15,20 204:23
  205:2 211:13
**working** 13:16,20
  14:22 16:14,18,24
  17:14,16 44:25
  60:21 98:25 113:23
  154:14,25 155:8
  169:19 173:15
  186:8 258:12,24
  260:2 264:21
**works** 179:8 271:1
**workup** 9:7
**worried** 112:1
**wouldn't** 17:11 39:14
  74:21 96:23 104:25
  122:21 124:4
  126:17 144:6 276:6
**writing** 51:7 235:25
  241:22 245:12,13
**written** 112:10
  193:17,20 202:11
  223:6,18,25 226:17
  226:20,22,23
  236:12 247:21,24
**wrong** 30:20 90:2
  202:17 251:3
**wrote** 50:6 197:15

202:17,18

**X**

**Y**

**y'all** 91:9 92:4,10
  248:17 269:13
  275:11
**yeah** 28:23 74:13
  81:11 85:4 90:15
  106:3 111:12 115:9
  147:10 160:2
  200:24 201:21
  238:18 241:20
**year** 16:7 142:20,21
  142:24,24
**years** 41:20 68:12,20
  76:16,22 77:3 78:11
  79:1 97:21 99:6
  103:1 138:16
  170:14 259:3,5
  260:2 264:20
**yesterday** 12:8 163:4
**York** 3:13
**Young** 1:11 3:21 7:12
  253:3 278:11

**Z**

**00006971** 237:20
**00006973** 245:21

**1**

**1** 5:10 27:1,3 67:21
  79:10,12 111:19,19
  111:19,21,22
  112:11 116:13
  121:10 149:23
  179:1,16 182:16
  186:7 187:19,23,24
  188:10 223:2
  238:16,16
**1-1-12** 246:19

**1-21-2011** 35:8
**1:45** 108:3
**10** 5:4,20 68:2 158:15
  158:18 162:9
  213:14 237:19
  238:3,6 245:20
  250:14
**10:40** 51:17
**10:59** 51:17
**1015** 146:11
**1021** 149:15
**1025** 152:12
**1026** 156:10
**109** 5:16
**11** 5:21 71:6 119:16
  119:17 120:5,14
  124:9,12 162:7,11
  259:3,5 260:2
  264:20
**11:52** 84:22
**11:54** 84:22
**112** 5:12 17:23 18:6
  19:4,13 23:12 24:6
  24:10,17 25:9 26:15
  26:19 28:13,25
  55:11,16,24 56:4,9
  56:14,18 57:1,6,19
  57:20 58:9,16,19
  59:9,10 60:1,17,24
  60:25 61:3,23 63:25
  64:17,24 65:13,20
  65:25 66:1,5,10,22
  66:25 67:14,18 68:6
  68:18,22 69:6 70:11
  71:1,4,9,17 72:5,20
  73:12 74:1 76:3,17
  77:24 78:2,6,8,10
  78:17,25 79:8,22
  80:6 82:24 83:5,7
  83:12,15 84:3 86:9
  88:7 214:24 215:21
  216:1,2,6,11,22
  217:2,15 218:12,17
  219:23 220:2,4

254:4,23 255:3,4,7
  255:22 256:7,11,13
  263:21
**115** 5:18
**1151** 280:10
**12** 5:22 183:17,18
  196:16,17 262:22
**12/31/2014** 280:11
**12:09** 95:24
**12:13** 95:24
**12:33** 108:3
**121** 5:19
**12548** 4:3,8,13
**13** 5:23 205:18,19,21
  206:3 279:24
**13.002** 111:22
**14** 5:13,25 18:25
  20:23 28:16,19,25
  29:3 37:9,16 38:13
  40:5 41:12,24 42:4
  42:10,17,25 48:20
  49:5 55:20 61:3
  62:4 63:25 74:6
  75:19 76:6 77:10,15
  78:3,5,7,14,17,23
  79:7,15,18,21 80:1
  80:4 81:24 82:8,13
  82:24 83:4,6,11,21
  83:24 88:8,8,12,16
  88:24 96:22,25
  97:10 100:4 101:3
  101:11,13,17
  102:12 103:13,16
  104:3,17,22 105:2,6
  105:10,23 106:4,23
  107:12 108:8,13
  109:20 110:16
  111:8,14,16,18
  112:5 113:24 114:8
  114:14,17,24
  115:25 119:13
  120:22 123:17,23
  124:14 131:12
  135:18 142:12

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

45

144:12,22 146:9
147:15,20 148:6
149:23 150:7,12,16
151:1,17,19,22
154:17,19,24 156:4
156:23 157:12,21
158:1,2,6 160:4,5
160:21 161:15,20
163:22,23 165:3,13
166:6,13,14,19
168:10 169:11
172:6,12,19 173:7
174:17 177:4,6,6
178:2 182:22,24
183:6,9 184:19,20
185:17,23 186:1
188:23 189:10,15
189:20 190:20
191:9 192:4,7,11,13
192:17,24,25
193:17,21,25 194:4
197:23 198:1,3,6
200:8,21 201:2
203:10,15 204:1,2,8
204:18,21,22 205:7
205:12,25 206:12
207:11,22 208:10
210:10,15 212:15
212:17 217:16
218:1,12,16 219:10
220:2 222:13,21,24
224:24 225:4,11,14
225:18,19,24
226:10 227:13
228:11,23,25
231:11 232:2,15
233:4,22 234:3,10
234:15 236:1,23,24
237:3 239:2,9,9
243:9 244:15
247:25 248:2
250:10 253:16,19
253:23 255:12
257:9 261:18

262:18,22 263:21
265:20,22 266:2,15
266:19 268:9 269:2
269:8,18,24 270:7
270:11,20 271:9,17
271:20,23 272:3,23
273:11,15
**14's** 127:21
**1401** 3:13
**14th** 2:20 3:19
**15** 6:1 46:15 215:4,6
**158** 5:20
**162** 5:21
**17** 247:6 250:13
280:1
**175** 5:4
**18** 279:25
**183** 5:22
**1875** 3:23
**19** 279:24

---

**2**

**2** 5:2,11 45:13,15
67:23 69:15 79:11
108:1 151:8 175:9
197:2,4,22 202:13
203:7 221:2 279:24
**2.1** 93:12
**2:13-CV-193** 1:5
278:5
**2:13-CV-263** 1:11
278:11
**2:13-CV-291(NGR)**
1:23 278:23
**2:13-CV-348(NGR)**
2:3 279:3
**2:35** 140:19
**2:51** 140:19
**20** 2:10,17 183:4
279:8
**20005-2124** 3:14
**20006** 3:24
**2002** 35:2,6,11 36:4
**2003** 259:2,3

**2005** 235:5
**2006** 94:16 231:2
**2007** 97:17,24 212:24
214:19,21 235:9
**2009** 16:21 17:12
68:23 72:3,16,19,22
215:16
**2010** 3:10 55:12
216:3,4 220:4
261:18
**2011** 5:10,11,14,15
5:16,18,19,21,22
11:7 12:10,21 15:13
17:8,25 27:14 28:12
28:20 35:6,12 36:4
46:15 52:24 55:9
62:14 88:18 92:17
96:5 97:5,20 103:13
104:2,15 109:7
121:9 156:4 163:12
169:13 172:2 173:3
179:16 183:23
196:13 197:9 216:1
257:4 265:6,15,25
266:3,19 267:14,22
268:5 269:18
270:20
**2012** 15:25 16:21
149:23
**2013** 15:22 16:1,13
**2014** 2:10,17 13:7
15:12 279:8,16,19
280:7
**202** 3:6,15,24
**205** 5:23
**20530** 3:5
**209** 2:20 3:19
**20th** 239:7
**21** 5:11,22 52:24
124:18,20 179:16
196:13 197:9
**21.02** 221:7
**212** 5:25
**215** 6:1

**218** 5:25 212:11,13
213:3,7,12 214:5
**21st** 183:23
**22** 5:19 121:9
**2240** 29:18
**23** 5:10,18 127:7,12
252:18 257:4,5
**23rd** 27:14 115:25
179:17 280:7
**24** 128:24,24
**25** 5:14,15,16 92:17
96:5 109:7 130:1,5
**252** 5:5
**264** 5:5
**27** 5:10 153:7 198:23
199:7,7,8,10 201:23
201:25 202:3,7,11
**273.005** 153:7
**277** 5:6
**278** 5:7

---

**3**

**3** 5:12,21 66:15,19
67:19 75:15 116:4,6
116:14,22,24
118:12,15,17,19
121:18 123:16
159:10 163:11
225:14,21 226:9
254:4,6
**3:45** 175:5
**3:59** 175:5
**30** 134:12,14 145:20
146:8 226:13,19
**300** 3:10
**31.012** 153:5
**32.075** 5:23 206:9
**33** 108:1
**344** 280:14
**362** 6:1 215:2,11,21
216:6 217:24
219:10
**380** 280:11
**394-3040** 3:11

COLBY BEUCK                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

46

**4**

**4** 5:13 75:16,18 223:1
 279:24
**4:48** 203:1
**4:57** 203:1
**400** 3:14
**45** 5:11
**475-1969** 4:4
**475-3281** 3:20
**4912** 121:5
**4913** 121:5

**5**

**5** 5:14 11:5 12:17
 39:8 59:7,22 68:1
 89:19,21 92:15
 167:14,18,20 169:5
 169:18 176:18
 213:14 227:22
 229:11 230:9,18
 242:2 246:9
**5.2** 93:6
**5:53** 232:24
**5:56** 232:24
**50** 109:9
**512** 3:11,20 4:4,9,14
**512)292-4249** 280:12
**514-0828** 3:6
**54** 146:12,12,15
 149:8
**58** 149:16,16,22
 151:6 152:3

**6**

**6** 5:15 67:19 69:13
 96:1,2 180:7,8,13
 181:19 194:17
 254:11
**6(b)** 67:19
**60** 76:13,16,23,24
 77:4,21 78:21 79:1
 79:2,25 114:19
**600,900** 229:13
**62** 152:13,13 156:7

**63.0101** 68:3 76:2,6
**63.0101(a)** 67:22
**63.0101(b)** 67:24
**64.012** 30:23 31:3,6
 182:20 183:1
**66** 5:12
**662-8356** 3:15
**663-6262** 3:24
**69** 237:21
**690** 230:11
**690,000** 94:2 95:3,15
**690,887** 93:18 94:24
 95:8 229:13 230:19
**6959** 158:21
**6971** 238:8
**6974** 158:22
**6th** 3:10

**7**

**7** 5:16 109:4,5 220:7
 224:12 276:17
**7:00** 2:17
**70** 246:19 247:3
**701** 280:11
**71** 237:22
**72** 97:25
**7207** 109:6
**7254** 3:4
**75** 5:13 267:24
**78701** 2:21 3:10,19
 280:12
**78711-2548** 4:4,8,13

**8**

**8** 5:18 115:19,21
 159:4,5 198:19
 224:20,21 257:2
 263:7
**80th** 212:23
**81st** 215:15
**82** 267:8
**82nd** 5:18
**83** 267:15
**86** 267:4

**89** 5:14

**9**

**9** 5:19 76:1 121:3,4
 159:3 199:2 246:19
**9:31** 2:17
**910** 184:10
**91207** 27:6
**91245** 162:13
**91736** 45:16
**91737** 45:17
**92224** 92:16
**92225** 92:16
**92226** 96:3
**92240** 27:7
**92241** 27:8 33:6
**92242** 33:12
**92243** 27:8
**92244** 27:9 34:25
**92254** 27:9
**936-1381** 4:9
**936-2868** 4:14
**94** 267:20
**950** 3:5
**959** 116:3
**96** 5:15
**966** 119:15 124:10
**967** 119:23 124:10
**978** 124:17,18
**979** 127:5,6 257:5
**982** 199:1,3,4
**984** 134:12 145:21