Page 1

```
1         IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                CORPUS CHRISTI DIVISION

3   MARC VEASEY, et al.,          )
                                  )
4         Plaintiff,              )
                                  )
5   VS.                           ) CIVIL ACTION NUMBER:
                                  ) 2:13-CV-193 (NGR)
6   RICK PERRY, et al.,           )
                                  )
7         Defendants.             )
                                  )
8   _____  )
    UNITED STATES OF AMERICA,     )
9                                 )
          Plaintiff,              )
10                                )
    VS.                           ) CIVIL ACTION NUMBER:
11                                ) 2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS  )
12  EDUCATION FUND, et al.,       )
                                  )
13     Plaintiff-Intervenors,     )
                                  )
14  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY      )
15  COMMISSIONERS, et al.,        )
                                  )
16     Plaintiff-Intervenors,     )
                                  )
17  VS.                           )
                                  )
18  STATE OF TEXAS, et al.,       )
                                  )
19        Defendants.             )
                                  )
20  _____  )
    TEXAS STATE CONFERENCE OF     )
21  NAACP BRANCHES, et al.,       )
                                  )
22        Plaintiffs,             )
                                  ) CIVIL ACTION NUMBER:
23  VS.                           ) 2:13-CV-291(NGR)
                                  )
24  NANDITA BERRY, et al.,        )
                                  )
25        Defendants.             )
```

Page 2

```
1   BELINDA ORTIZ, et al.,        )
                                  )
2         Plaintiffs,             )
                                  )
3   VS.                           ) CIVIL ACTION NUMBER:
                                  ) 2:13-CV-348(NGR)
4   STATE OF TEXAS, et al.,       )
                                  )
5         Defendants.             )
                                  )
6   _____  )

7

8      *********************************************

9          ORAL 30(b)(6) DEPOSITION OF

10     THE TEXAS DEPARTMENT OF PUBLIC SAFETY

11              KATHERINE CESINGER

12               MAY 20, 2014

13     *********************************************

14

15     ORAL DEPOSITION OF KATHERINE CESINGER, produced as

16  a witness at the instance of the Plaintiff, was duly

17  sworn, was taken in the above-styled and numbered cause

18  on the MAY 20, 2014, from 1:56 p.m. to 5:18 p.m., before

19  Chris Carpenter, CSR, in and for the State of Texas,

20  reported by machine shorthand, at the offices of

21  Dechert, LLP, 300 W. 6th, Suite 2010, Austin, TX 78701,

22  pursuant to the Federal Rules of Civil Procedure and the

23  provisions stated on the record or attached hereto.

24

25
```

Page 3

```
1               A P P E A R A N C E S

2   FOR THE VEASEY PLAINTIFFS:

3            Scott Brazil
             BRAZIL & DUNN, LLP
4            4208 Cypress Creek Parkway,
             Suite 530
5            Houston, TX  77068
             (281) 580-6310
6            scott@BrazilAndDunn.com

7            J. Gerald Hebert
             THE CAMPAIGN LEGAL CENTER
8            215 E. Street, NE
             Washington, D.C. 20002
9            (202) 736-2200
             ghebert@campaignlegalcenter.org

10  FOR THE ORTIZ PLAINTIFFS:

11           Robert W. Doggett
12           TEXAS RIO GRANDE LEGAL AID, INC.
             4920 N. IH-35
13           Austin, TX  78751
             (512) 374-2725
14           rdoggett@trla.org

15  FOR DEFENDANTS RICK PERRY, STATE OF TEXAS, THE WITNESS:

16           Ronald Keister
             ATTORNEY GENERAL OF TEXAS
17           TORT LITIGATION DIVISION
             300 W. 15th Street
18           Austin, TX  78701
             (512) 463-2197
19           ronny.keister@oag.state.tx.us

20           Kathleen T. Murphy-Darveau
             TEXAS DEPARTMENT OF PUBLIC SAFETY
21           5805 N. Lamar Blvd.
             Austin, TX  78752
22           (512) 424-2420
             kathleen.murphy@dps.texas.gov

23

24

25
```

Page 4

```
1   FOR NAACP/MALC:

2            Vishal Agraharkar (by telphone)
             Myrna Perez (by telephone)
3            Jennifer Clark (by telephone)
             Emma Simpson (by telephone)
4            Brennan Center For Justice
             161 Avenue of The Americas Fl 12
5            New York, NY 10013
             (832) 385-1628

6

7            Lindsey Cohan
             Amy L. Rudd
8            DECHERT, LLP
             300 W. 6th, Suite 2010
9            Austin, TX  78701
             (512) 394-3000
10           lindsey.cohan@dechert.com

11  FOR THE UNITED STATES OF AMERICA:

12           Daniel J. Freeman (by telephone)
             U.S. JUSTICE DEPARTMENT
13           CIVIL RIGHTS DIVISION
             Room 7254 NWB
14           950 Pennsylvania Avenue, N.W.
             Washington, D.C. 20530
15           (202) 514-0828
             daniel.freeman@usdoj.gov

16

17

18

19

20

21

22

23

24

25
```



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
5–8

---

Page 5

```
1              INDEX
2  Appearances.....................................2
3  KATHERINE CESINGER
4      Examination by Mr. Agraharkar..............7
       Examination by Mr. Freeman................80
5      Examination by Mr. Brazil................101
       Further Examination by Mr. Freeman.......123
6
   Signature and Changes..........................125
7
   Reporter's Certificate.........................127
8
9                 EXHIBITS
10  NO. DESCRIPTION                     PAGE MARKED
11  121  Amended Notice                      17
12  122  Press release                       23
13  123  E-Mail Chain, June 27, 2013         33
14  124  Media/Public Outreach : Election
         Identification Certificates , Aug. 30  41
15       2012--May 19, 2014
16  125  County Locations Issuing Election    51
         Identification Certificates
17
18  126  Counties Processing Election Identification  60
         Certificates
19  127  Texas Department of Public Safety, Front   65
         Page of Website
20
21  128  DPS Website, Election Identification   67
         Certificate
22  129  DPS Website, Election Identification   68
         Certificate (Spanish Version)
23
24  130  DPS Website, Election Identification   70
         Certification Documentation Requirements
25  131  DPS Website, Contact Us Page          78
```

Page 6

```
1  132  Schedule of Mobile Locations          94
2  133  EIC Messages, Sept. 13, 2013 thru May 16,  120
        2014
3
4  134  Twitter Messages, June 25, 2013 thru  121
        May 16, 2014
5  135  Statewide Press Releases Regarding EICs  121
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

1            KATHERINE CESINGER,
2  having been first duly sworn to testify the truth, the
3  whole truth, and nothing but the truth, testified as
4  follows:
5            EXAMINATION
6  BY MR. AGRAHARKAR:
7      Q.  Good afternoon, Ms. Cesinger, my name is Vishal
8  Agraharkar, and I represent Plaintiffs Texas NAACP and
9  the Mexican American Legislative Caucus in this matter.
10 I want to thank you for coming to appear for the
11 deposition today and also to thank you for your patience
12 given that we're speaking to you over the phone. So we
13 unfortunately weren't able to make it to Austin but
14 hopefully this won't present too many communication
15 problems.
16         Are you able to hear me okay right now?
17     A.  Yes, I am.
18     Q.  Great. Thank you. Please state and spell out
19 your full name for the record.
20     A.  Sure. Katherine Cesinger, K-A-T-H-E-R-I-N-E,
21 C-E-S-I-N-G-E-R.
22     Q.  Thank you. And are you represented by counsel
23 today?
24     A.  Yes, I am.
25     Q.  And who is your attorney or attorneys?

Page 8

1      A.  Ronny Keister with the Attorney General's
2  Office in Texas and Kathleen Murphy is here from the
3  Department of Public Safety.
4      Q.  Thank you. Are you employed?
5      A.  Yes.
6      Q.  And who is your current employer?
7      A.  The Texas Department of Public Safety.
8      Q.  And what is your official title?
9      A.  Deputy assistant director for the media and
10 communications office.
11     Q.  Thank you. Have you ever been deposed before?
12     A.  I have not.
13     Q.  Okay. Well, I'll just go over a few basic
14 rules. In the deposition I will be asking you questions
15 and you'll be answering those questions and the court
16 reporter will be recording the answers. Please speak up
17 and answer all questions verbally which you would
18 probably do anyway since I'm speaking to you over the
19 phone and also so that we can hear you clearly and for
20 the court reporter to clearly record your answers. Will
21 you do that for us?
22     A.  Yes, sir.
23     Q.  Thank you. And on occasion I may ask you a
24 question that I don't state very well or that you don't
25 understand or hear for some reason. If that happens,



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
9–12

Page 9

1 will you please let me know that you do not understand
2 and I will try to ask a better question?
3    A.   Yes, I will.
4    Q.   Okay.  And if you don't fully hear a question,
5 please ask me to repeat it.  Will you do that?
6    A.   Yes, I will.
7    Q.   Okay.  And please wait for me to complete any
8 question that I ask before you start to answer and
9 that's particularly important today because I'm over the
10 phone.  Will you do that?
11    A.   Yes.
12    Q.   And if you need a break at any time, please let
13 me or your attorney know and we can finish the current
14 question and then see about a break.  Is that okay?
15    A.   Thank you.  Yes I will do that.
16    Q.   Okay.  Do you understand that you are under
17 oath and are required to answer all questions truthfully
18 and completely to the best of your knowledge?
19    A.   Yes, sir.
20    Q.   Great.  And how are you feeling today?
21    A.   Good.
22    Q.   Are you taking any medication that would
23 prevent you from giving true and accurate answers to my
24 questions?
25    A.   No, I'm not.

Page 10

1    Q.   Is there any other circumstance that would
2 prevent you from giving true and accurate answers to my
3 questions?
4    A.   No, there isn't.
5    Q.   Great.  Did you do anything to prepare for
6 today's deposition?
7    A.   Yes, I spoke with Ronny Keister and Kathleen
8 Murphy.
9    Q.   Okay.  And on how many occasions?
10    A.   Two.
11    Q.   Did you speak with anyone else to prepare for
12 today's deposition?
13    A.   Yes, some members of my staff, to gather some
14 additional information.
15    Q.   And which members of your staff did you speak
16 with?
17    A.   Tom Vinger, our press secretary; Summer
18 Blackwell, our senior writer; Elliot Weeks, our social
19 media -- or excuse me, social and online media
20 specialist; and Aidee Trottier, our media specialist.
21    Q.   Great.  And how many times did you speak with
22 them?
23    A.   Twice as well.
24    Q.   Okay.  Did you review any documents in advance
25 of today's deposition?

Page 11

1    A.   Several e-mails that we -- were turned over for
2 this -- for this case.
3    Q.   Thank you.  And did you review any documents
4 that have not been turned over for this case in
5 preparation for the deposition?
6    A.   Not that I can recall, no.  And just to add to
7 that, I did also briefly review the deposition materials
8 from Assistant Director Joe Peters.
9    Q.   Okay.  And did you bring any additional
10 documents with you to the deposition?
11    A.   Yes, I did.
12    Q.   Okay.  And what documents did you bring?
13    A.   I brought four sets of documents.  The first is
14 essentially the media public outreach timeline by the
15 Department of Public Safety on election identification
16 certificates, followed by EIC -- election identification
17 certificate messages that were posted to Facebook on the
18 DPS account, followed by Twitter messages on the DPS
19 account, and the fourth set of documents is the press
20 releases issued through the media and communications
21 office at headquarters.
22    Q.   Okay.  And how many press releases did you
23 bring?
24    A.   I apologize, I don't have the exact number.  I
25 can count them.

Page 12

1    Q.   Please do that.
2    A.   Okay.  There are nine total.
3    Q.   Okay.  And thank you.  And had all of those
4 been turned over to the plaintiff --
5    A.   I believe so.
6    Q.   -- previously?  Okay.  Thank you.
7        Okay.  Let's go over some common terms I
8 might use today.  When I refer to the term "minority
9 voters," I will mean voters who are racial minorities,
10 who are not White and not Anglo; is that okay?
11    A.   I understand, yes.
12    Q.   Okay.  And when I refer to DPS, I'm referring
13 to the Department of Public Safety; is that all right?
14    A.   Yes, sir.
15    Q.   Now, are you familiar with the term "election
16 identification certificates"?
17    A.   Yes, sir.
18    Q.   And what is that?
19    A.   That is a document that meets the requirements
20 for voting in an election that -- it's one of the
21 documents that can be presented at the time of voting to
22 qualify someone to vote.
23    Q.   Okay.  And what does that look like?
24    A.   Essentially it's a card about the size of a
25 driver license or personal ID card with a photo on it of



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
13–16

---

Page 13

1 the individual who qualifies and applies and receives
2 one of those documents.
3    Q.   Okay.  Thank you.  And if I refer to an "EIC,"
4 I will be referring to an election identification
5 certificate; is that okay?
6    A.   Yes.
7    Q.   Okay.  And are you familiar with the term "EIC
8 mobile unit" or "EIC mobile station"?
9    A.   Yes, I am.
10    Q.   And what are those?
11    A.   Those are essentially stations that are
12 deployed to areas that do not have a driver license
13 present in a particular county that issue EICs to those
14 who are eligible.
15    Q.   Okay.  And are those terms interchangeable?
16    A.   Are what term interchangeable?
17    Q.   I'm sorry.  EIC mobile unit and EIC mobile
18 station?
19    A.   In the media office, we typically refer to them
20 as the mobile station, but if --
21    Q.   Okay.
22    A.   Okay.  Go ahead.
23    Q.   And I think you mentioned that these are mobile
24 units or stations that are deployed in counties that do
25 not have a driver license office.  Would that -- was

Page 14

1 that your testimony?
2    A.   Yes.
3    Q.   Okay.  And is my understanding correct that
4 some of these mobile units are owned and run by the
5 Secretary of State and others have been run primarily by
6 DPS employees and there are a third category that are
7 run by county officials?
8        MR. KEISTER:  Counsel, this is Ronny
9 Keister.  Do you understand this witness is here for a
10 Rule 30(b)(6) depo and there are two specific issues
11 she's here on, which is the media aspect of this case?
12 I think your straying from those areas.
13        MR. AGRAHARKAR:  Yes.  This -- the media
14 is around the availability of EIC and EIC mobile units,
15 and at this point I'm just trying to get an
16 understanding of her knowledge of the subject of what
17 the media communications does.
18        MR. KEISTER:  Okay.
19        MR. AGRAHARKAR:  I think it's perfectly
20 relevant.
21        MR. KEISTER:  Well, it's relevant to the
22 extent that she's aware of it, but you're going kind of
23 below the media issue.  Let me just represent to you
24 that her knowledge is with respect to the media
25 information that's put out on these issues and not with

Page 15

1 respect to the underlying issues themselves, the policy
2 issues or who's involved with the mobile units and that
3 type of thing.  That's beyond what she's here designated
4 for.  So to the extent she can answer, I'm not going to
5 tell her not to, but I'm going to object to those
6 questions.  The question you have on the table is
7 outside of the area she's designated on today.
8        MR. AGRAHARKAR:  Thank you, Counsel.
9    Q.   (By Mr. Agraharkar) Ms. Cesinger, could you
10 please answer to the extent that you have knowledge, and
11 that goes with respect to any question that I ask today?
12    A.   Yes, I will.  Can you repeat the last question?
13    Q.   Sure.  So my understanding is that some of
14 these EIC mobile units are DPS run and owned mobile
15 units, others are owned and run by the Secretary of
16 State and there are a third category that are run by
17 county officials.  Is that your understanding to the
18 best of your knowledge?
19    A.   To the best of my knowledge, yes.
20    Q.   Okay.  Thank you.  So if I wanted to
21 distinguish between them today, is it okay if I simply
22 say county run EIC mobile units, DPS run EIC mobile
23 units and Secretary of State run EIC mobile units?  And
24 if I simply say EIC mobile stations, I'm just speaking
25 generally with respect to any of them; is that all

Page 16

1 right?
2        MR. KEISTER:  Counsel, I don't think
3 that's all right.  I think with this witness you're
4 going to have to be specific on these questions.  Once
5 again, she's not here for the underlying issues, she's
6 here for the media aspect of it.  So I'm going to object
7 to that.  And you're going to have to specify to her
8 those specific issues.  She's not a policy person, she's
9 a media person.
10        MR. AGRAHARKAR:  Right.  And I'm simply
11 trying to get the terminology clear so that I can
12 specify.
13        MR. KEISTER:  Okay, I understand.  I just
14 want you to understand where we are on this.  That's
15 fine, but you're going to have to specify these specific
16 issues when you want to designate these questions.  I'm
17 not going to -- I'm not going to allow her to generalize
18 these because she doesn't have the knowledge to do that.
19        MR. AGRAHARKAR:  Okay, Counsel, to the
20 extent that the terminology I use isn't specific enough,
21 you're welcome to object.
22        MR. KEISTER:  I certainly will.
23    Q.   (By Mr. Agraharkar) Okay.  Can I ask
24 Ms. Stelson or Ms. Rudd to find a document marked the
25 notice of 30(b)(6) to the Texas Department of Public



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
17–20

Page 17

1 Safety and to have it marked by the court reporter,
2 please. That will be marked as Exhibit 1.
3       THE COURT REPORTER: Okay.
4       MS. COHAN: Vishal, would you prefer to
5 have it marked as Exhibit 1 or to continue the exhibits
6 that we've been doing in the depositions?
7       MR. AGRAHARKAR: I'd have you continue it
8 or whichever is most convenient.
9       MS. COHAN: Okay. So I'll just instruct
10 the court reporter that we'll be starting at Exhibit
11 121. All right.
12       MR. AGRAHARKAR: Okay. Thank you. Can
13 you hand that over --
14       THE COURT REPORTER: Just a second. I
15 need to mark this here. Just a minute.
16       MS. COHAN: Hold on one second.
17       MR. AGRAHARKAR: Okay.
18       (Exhibit 121 marked for identification.)
19       (Handed to witness and counsel.)
20       THE COURT REPORTER: Okay. All right.
21       MR. AGRAHARKAR: Okay. Thank you.
22    Q.   (By Mr. Agraharkar) Ms. Cesinger, could you
23 please flip to Page 9 of this document and review the
24 items marked Number 11 and Number 12.
25    A.   Yes.

Page 18

1    Q.   Thank you. Are you prepared to testify on
2 behalf of the DPS as to both of these topics today?
3    A.   Yes, I'm prepared to testify on behalf of DPS
4 with respect to the media and communications office on
5 both Numbers 11 and 12.
6    Q.   Okay. Thank you. So I want to switch topics
7 now to your educational background. Can you please just
8 tell me about your educational background.
9    A.   Yes, I received a bachelor of arts degree from
10 Louisiana State University in 2004.
11    Q.   Thank you. And what was your major?
12    A.   Political science.
13    Q.   And did you do any course work in
14 communications --
15    A.   I did take some --
16    Q.   -- while there?
17    A.   -- communications course, yes.
18    Q.   Okay. And do you remember what course that
19 was?
20    A.   I don't recall specifically, but it did relate
21 to the -- to media operations and public relations.
22    Q.   Okay. And did you take any course work in
23 public education or public awareness?
24    A.   I did not.
25    Q.   Okay. Can you speak Spanish?

Page 19

1    A.   Very limited.
2    Q.   Okay. And did you attend graduate school?
3    A.   I did not.
4    Q.   Okay. And what did you do after college?
5    A.   I worked in the Sergeant in Arms Office for the
6 House of Representatives in Louisiana --
7    Q.   Okay. And how --
8    A.   -- doing -- oh, go ahead.
9    Q.   I'm sorry, go ahead.
10    A.   Just doing some clerical work.
11    Q.   Okay. And how long were you there?
12    A.   After college until September of 2004.
13    Q.   Okay. And what did you do after that?
14    A.   I began working for the State of Texas.
15    Q.   In which office?
16    A.   In the Office of the Governor.
17    Q.   And that was in September of 2004?
18    A.   In October.
19    Q.   In October. Okay. And how long were you in
20 that position?
21    A.   Until -- let's see, I began working for the
22 Texas Workforce Commission in 2008.
23    Q.   Okay. And what were your responsibilities with
24 the Office of the Governor in your job between 2004 and
25 2008?

Page 20

1    A.   I held a number of positions in the legislative
2 office and the press office and the policy office before
3 moving to the workforce commission for a short period.
4    Q.   Okay. And what was your responsibility with
5 respect to policy making?
6    A.   My responsibilities were essentially meeting
7 with regulatory -- I was in a position of a -- in the
8 policy office for three months. It was a year-short
9 stint in which I thought I was interested in being a
10 policy wonk and it turns out I wasn't.
11    Q.   Okay. And did you touch on -- in that role did
12 you touch on voter ID or elections in any capacity?
13    A.   No, not at all.
14    Q.   Okay. And you said that in 2008 you went to
15 the workforce commission?
16    A.   I was employed with the workforce commission as
17 a communications director for the Governor's
18 Competitiveness Council.
19    Q.   Okay. And what were your responsibilities
20 there?
21    A.   To help coordinate meetings among the -- it was
22 a panel of industry, education and other officials to
23 assess ways that the State could become more competitive
24 with respect to workforce, education and a number of
25 other issues. And I helped to coordinate --

ESQUIRE
S O L U T I O N S

KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
21–24

Page 21

1    Q.  For a --
2    A.  -- oh, go ahead.
3    Q.  No, I'm sorry, go ahead.
4    A.  I just assisted in coordinating those meetings
5  and producing a report at the end of that -- the tenure
6  of that council.
7    Q.  Okay.  And after that position, where did you
8  end up?
9    A.  Back in the Governor's Office.
10   Q.  And what was your position at that point?
11   A.  Deputy press secretary.
12   Q.  Okay.  And what were the dates in which you
13  were in that position?
14   A.  From 2008 until -- August of 2008 until I
15  believe it was November of 2010 or December of 2010.
16   Q.  And what were you -- thank you.  And what were
17  your responsibilities in that position?
18   A.  To produce press releases, to serve as a
19  spokesperson to the media on behalf of the Office, and a
20  number of other duties dealing with the media.
21   Q.  Okay.  And did any of those responsibilities or
22  any of the tasks that you had as a press secretary, or
23  deputy press secretary rather, touch on voter ID or
24  elections?
25   A.  It's possible.  And I say that because in that

Page 22

1  capacity I talked on any number of issues at any given
2  time, so it's possible but I don't recall specifically.
3    Q.  Okay.  And did you play a role in establishing
4  policy or developing policy during that time?
5    A.  No.
6    Q.  Okay.  Where did you go to next?
7    A.  I was promoted to press secretary.
8    Q.  Okay.  And were your responsibilities similar
9  to those that you mentioned as the deputy press
10  secretary?
11   A.  Yes, very similar.
12   Q.  So you were the spokesman -- or sorry,
13  spokesperson for the governor?
14   A.  For the Governor's Office, yes.
15   Q.  Okay.  And do you recall if any of your
16  responsibilities there touched on voter ID or election?
17   A.  That was during the 2011 session that I served
18  in that role, and I very vaguely recall speaking about
19  the legislation that was there at the time.
20   Q.  What were the dates during which you were the
21  press secretary at the Office of the Governor?
22   A.  I was officially named press secretary in
23  December of 2010, and then through 2011.
24   Q.  Okay.  Thank you --
25   A.  Or through the -- I'm sorry, through the

Page 23

1  session of 2011.
2    Q.  Thank you.  I'd like to mark as exhibit -- I
3  guess it's 122, a document titled -- well, a press
4  release from the Office of the Governor.  And please let
5  me know when that's done.
6        (Exhibit 122 marked for identification.)
7        (Handed to witness and counsel.)
8        THE COURT REPORTER:  Done.
9        MR. AGRAHARKAR:  Thank you.
10   Q.  (By Mr. Agraharkar)  Ms. Cesinger, can you take
11  a look at the press release.
12   A.  Yes.
13   Q.  Do you recognize this?
14       MR. KEISTER:  Take your time to read it.
15   A.  Yeah, let me take a minute.
16       MR. KEISTER:  Let her have a minute to
17  read it, Counsel.
18       MR. AGRAHARKAR:  Sure.
19   A.  Okay.
20   Q.  (By Mr. Agraharkar)  Okay.  You were working as
21  the governor's press secretary when this was released;
22  is that right?
23       MR. KEISTER:  Counsel, for the record,
24  once again, Ms. Cesinger is here pursuant to the
25  30(b)(6) deposition to testify with respect to limited

Page 24

1  issues on the media aspects of the DPS.  This is nowhere
2  close to that.  So I'm going to object; this is outside
3  the proper grounds of this deposition.  To the extent
4  she can answer this, I'll allow her to do it.  But if
5  we're going to get too far into it, I'll let you know
6  ahead of time that I'm going to shut it down.  But to
7  the extent she can answer, she may.
8    Q.  (By Mr. Agraharkar)  You can answer to the
9  extent you can.
10   A.  Can you repeat the question?
11   Q.  Yes.  You were working for the governor when
12  this press release was drafted, right?
13   A.  Yes.
14       MR. KEISTER:  Same objections.
15   A.  Yes.
16   Q.  (By Mr. Agraharkar)  Did you draft it?
17       MR. KEISTER:  Same objections.
18   A.  I don't recall.
19   Q.  (By Mr. Agraharkar)  Did you usually draft press
20  releases that came out of his office?
21   A.  There were a number of people in the office who
22  drafted press releases.
23   Q.  Do you remember who reviewed press releases
24  when they were drafted?
25   A.  Yes.  I was one of them.



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
25–28

Page 25

1 Q. So would you have reviewed this press release
2 before it was released?
3 A. Yes.
4 Q. Do you remember if anyone else provided input
5 or talking points to draft this press release outside of
6 the Governor's Office?
7 A. I don't recall.
8 Q. Was that something that often happened?
9 A. Can you describe the situation you're asking
10 about?
11 Q. Well, I'm asking if, as a member of the
12 communications office, you often released -- or received
13 talking points or messaging points from groups
14 outside -- or groups or individuals outside the
15 Governor's Office in drafting press releases such as
16 this one?
17 MR. KEISTER: Objection, vague, ambiguous
18 and plus it's outside the scope of the 30(b)(6)
19 designation.
20 But to the extent you can answer it, go
21 ahead.
22 A. Typically in the process for drafting a press
23 release, as a member of the Governor's media office or
24 press office, we would contact the subject matter expert
25 within the office to get the information necessary to

Page 26

1 put into a press release.
2 Q. (By Mr. Agraharkar) Thank you. Do you remember
3 who the subject matter expert was in the Governor's
4 Office with respect to voter ID?
5 A. I do not.
6 Q. Thank you. Do you know what messages you were
7 trying to -- or your office was trying to convey in
8 releasing this press release?
9 MR. KEISTER: Objection. Counsel, this is
10 outside the scope of the designated topics of the
11 30(b)(6). And I'm going to allow her to answer this,
12 but if it keeps going, I'm going to shut it down.
13 MR. DOGGETT: Excuse me, Counsel, I just
14 want for clarification purposes, what's your authority
15 for that objection?
16 MR. KEISTER: My authority is I'm
17 representing this witness and I designated her or we
18 designated her for these limited issues and that's what
19 we're here to testify on.
20 MR. DOGGETT: Are you suggesting that she
21 cannot answer these questions?
22 MR. KEISTER: I'm suggesting what I just
23 stated.
24 MR. DOGGETT: So --
25 MR. FREEMAN: Mr. Keister, this is Dan

Page 27

1 Freeman on behalf of the United States, and Rule 30
2 specifically states that counsel may only instruct a
3 witness not to answer a question in order to preserve a
4 privilege, and so to the extent that you intend -- I
5 believe we have discussed this issue at length before
6 and I provided you with a substantial number of cases
7 that establish that counsel may not instruct a 30(b)(6)
8 witness not to answer a question that is within the
9 scope of that witness's knowledge purely on the basis
10 that that question is outside the scope of the
11 designated topics.
12 Now, if you have some sort of legal basis
13 on which to instruct the witness not to answer, that
14 basis has to be within the scope of Rule 30, and if
15 you're going to continue to do this in subsequent
16 30(b)(6) depositions, this one or any other, we will
17 take this to the court because it was our understanding
18 that this issue had been fully resolved.
19 MR. KEISTER: Mr. Freeman, if you want to
20 take this to the court, you're welcome to take this to
21 the court. This witness is here on limited issues. You
22 noticed -- or the plaintiffs noticed this deposition for
23 a 30(b)(6) depo, not for general knowledge of this
24 witness, and I said I'm to going allow this to go on for
25 a short period of time, but we're not going to sit here

Page 28

1 all day talking about the Governor's Office. And if you
2 want to call the court, you're welcome to call the
3 court. But if you want to get on with it, we'll get on
4 with it, but it's going to be short.
5 Sorry. All right. Can we continue?
6 MR. AGRAHARKAR: Yes. Thank you.
7 Q. (By Mr. Agraharkar) Ms. Cesinger, you can
8 continue to answer the question. Do you recall what it
9 is?
10 A. Can you repeat the question, please?
11 MR. AGRAHARKAR: Court reporter, would you
12 mind repeating the question?
13 (Requested portion was read back by the
14 court reporter.)
15 MR. KEISTER: Objection, same objections.
16 A. I don't recall. This was in 2011, and as I
17 mentioned previously, in the capacity as a spokesperson
18 in the Governor's Office, I talked on a number of issues
19 at any given time, so again, this was one of many, many,
20 many press releases that went out. What I -- I can read
21 the press release here and, you know, tell you what I
22 read, but as far as, you know, big picture messaging, I
23 just don't recall.
24 Q. (By Mr. Agraharkar) Thank you. Do you remember
25 if Governor Perry reviewed this press release?



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
29–32

Page 29

1        MR. KEISTER:  Objection, same objections.

2    A.   I don't recall that.

3    Q.   (By Mr. Agraharkar) Did Governor Perry usually
4 review press releases issued by his office before they
5 were released?

6    A.   No.

7        MR. KEISTER:  Same objections.

8    Q.   (By Mr. Agraharkar) Thank you.  Were you
9 involved with Voter ID or elections in any other way
10 while working for the Governor's Office?

11    A.   No, not that I recall.

12    Q.   Okay.  So moving on, after that position, where
13 did you go?

14    A.   I left the Governor's Office to go work on the
15 Rick Perry presidential campaign.

16    Q.   Okay.  And were you involved with Voter ID or
17 elections issues in any other ways in that position?

18    A.   Not specifically that I recall.

19    Q.   Okay.  Thank you.  So the only job experience,
20 if I hear -- strike that.

21        So the only job experience you've had with
22 respect to voting and elections prior to coming to the
23 DPS, if I understand your testimony correctly, was to
24 review and possibly draft press releases in support of
25 Voter ID legislation; is that correct?

Page 30

1        MR. KEISTER:  Objection, vague, ambiguous
2 and misstates previous testimony.

3        You can answer to the extent you can.

4    Q.   (By Mr. Agraharkar) You can answer it.

5    A.   Can you say that question again?  I'm sorry.

6    Q.   Sure.  If I understand you correctly, the only
7 job experience you have with respect to voting and
8 elections prior to coming to the DPS was to write and
9 review press releases in support of Voter ID
10 legislation; is that accurate?

11        MR. KEISTER:  Same objections.

12    A.   I believe that's right.

13    Q.   (By Mr. Agraharkar) Thank you.

14        Where did you go after working on the
15 presidential campaign?

16    A.   I began working for the Department of Public
17 Safety.

18    Q.   Okay.  And when was that?

19    A.   March of 2012.

20    Q.   And what position were you hired?

21    A.   Deputy assistant director for the media and
22 communications office.

23    Q.   And how long did you have that position?

24    A.   I'm still currently in that position.

25    Q.   Thank you.  And how did you come to be employed

Page 31

1 at DPS?

2    A.   I applied for the job.

3    Q.   Thank you.  And what are your job duties?

4    A.   To coordinate the media outreach regarding the
5 department's services as well as the accomplishments,
6 goals and activities.

7    Q.   To coordinate its -- I'm sorry, I didn't catch
8 that.  Could you please repeat that?

9    A.   Sure.  To coordinate the public -- the media
10 outreach on the department's services as well as the
11 department's goals and activities.

12    Q.   Outreach with respect to its goals and
13 activities; is that right?

14    A.   And services, yes.

15    Q.   Got it.  And is one of your duties to be the
16 spokesperson for DPS?

17    A.   At times I will speak to the media, but that is
18 not a primary responsibility.  We have a press secretary
19 who -- whose primary responsibility is to speak to the
20 media.

21    Q.   And who is that?

22    A.   Tom Vinger.

23    Q.   How do you assist in Tom Vinger's role as press
24 secretary?

25        MR. KEISTER:  Objection, vague.

Page 32

1        If you understand the question, you can
2 answer it.

3    A.   Yeah, I'm not sure I understand your question.
4 Is there a way to specify that?

5    Q.   (By Mr. Agraharkar) Sure.  You said that -- you
6 said that being the spokesperson for the DPS is part of
7 your job but is not your primary responsibility.  I'm
8 wondering how -- if you could elaborate on that, I -- in
9 what ways are you the spokesperson or do you assist Tom
10 Vinger?

11    A.   As I mentioned, at times I will speak to the
12 media but Tom Vinger's the primary spokesperson for the
13 department.  So when he gets, you know, questions or
14 inquiries from the media, you know, he'll -- he'll bring
15 those to me and if there's a need to review those, I'll
16 do that prior to it being released to the media.

17    Q.   Okay.  And in that capacity, does your role
18 involve publicizing the EIC program?

19    A.   The department's media and communications
20 office does publicize the EIC program, yes.

21    Q.   Do you tout its successes?

22    A.   We essentially make sure that through the media
23 the public knows how to obtain an EIC, who is eligible,
24 where, for instance, the mobile locations that we
25 discussed earlier are, that sort of thing.



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
33—36

Page 33

1   Q.   Okay.  I'd like to mark an e-mail chain from --
2   an e-mail chain that begins where the subject matter is
3   "Media Question on EIC:  Please Advise," as Exhibit 123.
4         (Exhibit 123 marked for identification.)
5         (Handed to witness and counsel.)
6   Q.   (By Mr. Agraharkar) Ms. Cesinger, have you had
7   a chance to review it?
8   A.   I'm still reviewing it.
9   Q.   I'm sorry.
10   A.   That's okay.
11        Okay.  I reviewed it.
12   Q.   Thank you.  And this is an e-mail chain between
13   you and Tony Rodriguez regarding a question from a
14   reporter, correct?
15   A.   Correct.
16   Q.   Have you seen this before?
17   A.   I recall this.
18   Q.   And who is Tony Rodriguez again?
19   A.   He works in the Driver License division at the
20   Department of Public Safety.
21   Q.   Thank you.  And at the bottom of the e-mail
22   chain, a reporter who has seen the press release asked
23   the questions about how many counties in Texas have
24   driver's license offices; is that right?
25   A.   That's right.

Page 34

1   Q.   Okay.  And you forwarded the request to
2   Mr. Rodriguez and asked him for a specific that you
3   could send back to the reporter; is that right?
4   A.   That's correct.
5   Q.   And you asked for statistics that would allow
6   you to, quote, "squash the presumption he is likely
7   trying to make, which is that DL offices are not
8   accessible to many Texans."  Is that right?
9   A.   That's written, yes.
10   Q.   Okay.  Is it fair to say that part of your job
11   and part of the job of the media and communications
12   office is to put a positive spin on the EIC program?
13   A.   Our job in the media office is to relay
14   information to the public about the services available,
15   yes.
16   Q.   And that information that you relay -- strike
17   that.
18        And you attempt to relay information that
19   paints the EIC program in a positive way; is that right?
20   A.   Can you say that again?
21   Q.   Yes.  You attempt to relay information that
22   paints the EIC program in a positive light, that's part
23   of your job; is that right?
24   A.   No.
25   Q.   Okay.  Then what did you mean when you said you

Page 35

1   were looking for information that would allow you to
2   squash a presumption?
3   A.   I don't recall specifically the conversation I
4   had with this reporter, but I do recall talking to this
5   reporter outside of the e-mail chain we have here, and
6   that was the basis I believe for this comment to
7   Mr. Rodriguez.
8         MR. AGRAHARKAR:  I'm sorry.  Objection,
9   nonresponsive.
10   Q.   (By Mr. Agraharkar)  My -- the question is:
11   What did you mean when you wrote that you wanted to
12   "squash the presumption that DL offices are not
13   accessible to many Texans"?
14   A.   Again, that was based on a conversation that I
15   had with the reporter that that was the direction he was
16   going.
17   Q.   And why did you want to reverse the direction
18   that he was going in?
19   A.   Because as I recall, there was information that
20   we wanted to relay, the accessibility and the proximity
21   that individuals in Texas did have access to the driver
22   license office.  The -- the direction that the reporter
23   was going, from our perspective, was going to misinform
24   the public.
25   Q.   Okay.  Thank you.  Your office is primarily

Page 36

1   responsible -- I believe you testified earlier that one
2   of your primary responsibilities is to develop the
3   policy with respect to educating the public about EIC;
4   is that fair to say?
5   A.   No.  We don't develop policy.
6   Q.   About educating the public?
7   A.   Can you rephrase that?  I'm sorry.  I just want
8   to make sure I answer you accurately.
9   Q.   Sure.  Do you develop the policy regarding
10   outreach and education of the public regarding the EIC
11   program?
12   A.   We develop strategies to inform the public
13   through the media, traditional media, social media, yes.
14   Q.   Okay.  And so to the extent that there are
15   people who are not aware of EIC or what they need to do
16   to get one, is one of your responsibilities to develop
17   these strategies to educate them, correct?
18   A.   We do develop those strategies to education the
19   public on the EIC as well as a number of other issues
20   that the department provides, whether it's services to
21   the public or, you know, different types of access to
22   the public that comes from the department, yes, we do
23   develop strategies to inform them.
24   Q.   Okay.  And do you find that there is any
25   tension between the job of promoting the view that



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
37–40

Page 37

1 driver license offices are accessible, on the one hand,
2 and the other job of developing strategies to educate
3 people who don't have the EIC?
4        MR. KEISTER:  Objection, vague.
5    A.   Can you say that again?  I'm sorry.
6    Q.   (By Mr. Agraharkar) Would you find that there's
7 any tension between the job of promoting the view, as I
8 believe as you said, of -- that -- strike that.
9        Do you find tension between the job of
10 promoting the view that driver license offices are
11 accessible on the one hand and educating people who
12 don't have ID on the other?
13       MR. KEISTER:  Objection, vague.
14   A.   And I'm not following the question either, and
15 I apologize.
16   Q.   (By Mr. Agraharkar) That's okay.  I'll move on.
17       I want to speak a bit about voter
18 education initiatives or efforts that you took.  Did the
19 Department of Public Safety have a plan or a campaign to
20 educate the public about election identification
21 certificates?
22   A.   We did develop a plan, yes.
23   Q.   Okay.  And what were your responsibilities and
24 the involvement with respect to that plan?
25   A.   Essentially to develop press releases and work

Page 38

1 with the driver license division to review materials
2 that would be posted to the website, as that's a place
3 where all of the information about the department
4 resides and is easily accessible via computer.  Also, to
5 develop social media plan to further push out the
6 message of the EIC information, whether it's, you know,
7 requirements or eligibility and access.
8    Q.   Okay.  And did you determine what efforts were
9 taken to educate the public about EIC?
10       MR. KEISTER:  Objection, vague.
11   A.   Again, we did develop a plan, a media plan, a
12 media outreach plan related to the election
13 identification certificate.
14   Q.   (By Mr. Agraharkar) And did you decide on which
15 components -- or what would be the components of that
16 plan?
17   A.   We did identify which components were going to
18 be part of that plan, yes.
19   Q.   Okay.  And have you ever put together a public
20 education plan before?
21   A.   We, on a very regular basis, issue information
22 about services related to the department and as I
23 mentioned earlier activities, goals, accomplishments on
24 a very regular basis.  And that's through traditional
25 media as well as social media.

Page 39

1    Q.   Okay.  And I'm speaking specifically with
2 respect to public education plans, other public
3 education plans.  Have you developed a separate plan in
4 an another context other than outreach regarding EIC?
5    A.   I guess I wouldn't characterize almost
6 everything we do as a public outreach effort, so, yes, I
7 believe we do have experience in the media office and on
8 a very regular basis pushing out messages, whether its
9 one time or repeated messages to ensure that the public
10 knows about important issues or even one-time issues.
11   Q.   Okay.  And could you give me an example of
12 another plan that you put together in other contexts?
13       MR. KEISTER:  Objection, form, vague.
14   A.   We're entering hurricane season right now, and
15 through hurricane season we push a number of messages to
16 ensure that Texans are prepared should the worst happen.
17 So we start out, you know, issuing a press release a
18 couple of weeks prior to the start of hurricane season,
19 we hold an event and reissue those types of messages
20 related to that event, there's a social media effort
21 that's behind all of that, and there are common messages
22 that are reiterated throughout hurricane season, which
23 last through November 1st.  So that's one example of a
24 lengthy, you know, type of message that isn't going to
25 be that one-time message that goes out through a press

Page 40

1 release and social media.
2    Q.   (By Mr. Agraharkar) Okay.  Thank you.  And was
3 there a budget for that plan?
4    A.   No.
5    Q.   Okay.  Thank you.  Pushing back to the EIC plan
6 that you mentioned, did the Secretary of State's Office
7 contribute towards developing that plan?
8        MR. KEISTER:  Objection, form,
9 mischaracterizes the testimony.
10       But go ahead.
11   Q.   (By Mr. Agraharkar) You can answer.
12   A.   Right.  We shared with the Secretary of State's
13 communications office what we were going to be doing.
14   Q.   Okay.  So they didn't direct the effort but you
15 did share information with them?
16   A.   Correct.
17   Q.   Is that accurate?
18   A.   Yes, that's accurate.
19   Q.   Okay.  Did you receive any directions about
20 what the plan should look like from others outside of
21 the Secretary of State's office and outside of DPS?
22   A.   No.
23   Q.   Thank you.  And what efforts did the DPS take
24 to educate the public about EIC?
25   A.   As I mentioned we -- and what might be helpful



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
41–44

Page 41

1  is this -- this document, the timeline that -- that goes
2  through those efforts.  We issued press releases, we
3  sent messages through our Twitter account, through our
4  Facebook account, and we conducted interviews, we
5  fielded media calls on the issue.
6      Q.  Okay.  And I think I know which document you're
7  referring to.  Can I mark as Exhibit 124, I believe, the
8  document entitled Media Public Outreach Election
9  Identification Certificates?
10     A.  Yes, that's the document.
11         (Exhibit 124 marked for identification.)
12         (Handed to witness and counsel.)
13     Q.  (By Mr. Agraharkar) Thank you.  Just let me
14  know when you have it and have reviewed it.
15     A.  Okay.
16     Q.  Thank you.  So who prepared this document?
17     A.  I did.
18     Q.  Okay.  And it covers the period between August
19  30, 2012, and February 14, 2014, correct?
20     A.  We actually have an updated document that
21  covers through -- okay.
22         MR. KEISTER:  She marked the one we
23  produced today, Counsel, which goes through what?  Which
24  goes through what?
25         THE WITNESS:  May 19th.

Page 42

1          MR. KEISTER:  May 19th.  It's an updated
2  version of the one that I think you're handing over.
3          MR. AGRAHARKAR:  Okay, thank you.  And I
4  will get a copy of that.
5      Q.  (By Mr. Agraharkar)  Does this represent the
6  entirety of DPS's public education and outreach effort
7  regarding EIC during that time period?
8          MS. COHAN:  Vishal, if I could interrupt
9  for a moment.  Do you want to mark as the exhibit the
10 updated version that Ms. Cesinger brought here today or
11 do you want to use the version that you've provided?
12         MS. SIMPSON:  Can we go off the record for
13 one moment, please?
14         MR. AGRAHARKAR:  Yes, we'll go off the
15 record.
16         (Recess from 2:48 to 2:52 p.m.)
17     Q.  (By Mr. Agraharkar) Ms. Cesinger, does this
18 represent the entirety of the DPS public education and
19 outreach efforts regarding EIC during the periods August
20 '12 until May 27, 2014?
21     A.  It represents --
22     Q.  Obviously I meant --
23     A.  Oh, go ahead.
24     Q.  No, I said August '12 instead of August 2012,
25 but you get my drift.

Page 43

1      A.  Copy that.  Yes, this -- well, I say, yes.  Let
2  me clarify that, please.  This represents a good
3  overview of our outreach efforts.
4      Q.  Okay.  And are there any major components of
5  the outreach campaign plan that are left off of this
6  document?
7      A.  I think I mentioned this before:  For instance,
8  the interviews that were conducted are not cited on
9  here.  Any media responses to inquiries will not be
10 cited on here.  And I would characterize those as
11 outreach efforts as well.
12     Q.  Okay.  And which interviews are you referring
13 to?
14     A.  Any interviews that were conducted by the
15 department on the EICs, and there are any number of
16 those -- and I apologize, I don't have an exact number,
17 but we have -- we've definitely conducted a number of
18 interviews and certainly responded to a number of media
19 inquiries as well.
20     Q.  Okay.  And was it you who conducted those
21 interviews or was it any number of people at the DPS?
22     A.  Any number of people at the DPS.
23     Q.  Do you have a ballpark figure of how many
24 interviews were conducted?
25     A.  I don't, I apologize.

Page 44

1      Q.  And do you know who those were with generally?
2      A.  Generally, they would be with the spokespeople
3  for the department while -- (court reporter distracted
4  by counsel whispering to each other.)
5          THE COURT REPORTER:  I'm sorry, repeat
6  your answer, please.
7      A.  I'm sorry, I don't know specifically but
8  generally they would be spokespeople for the department.
9  While Tom Vinger is the --
10     Q.  (By Mr. Agraharkar) I'm sorry.  I meant who did
11 they interview with outside of DPS?
12     A.  Oh, I'm sorry, I misunderstood.
13     Q.  Who did they do the interview with?  Right.
14 I'm sorry.
15     A.  That's okay.  Members of the media.  It would
16 vary from print to radio to television within the state
17 of Texas.
18     Q.  Thank you.  And were there any key messages
19 that you wanted to communicate to the public through
20 those interviews and other components of the education
21 plan?
22     A.  Yes.  In all of those key messages --
23     Q.  What are those?
24     A.  All of those key messages are in our -- the
25 press releases that were distributed through the media



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                         45–48

Page 45

1 and communications office, essentially what are the
2 requirements for the EIC, who may be eligible, what
3 other documents a Texan might already have that would
4 meet the photo ID requirements to vote.  Because not
5 only do we want folks to know what they might need in
6 order to be eligible for an EIC but we also wanted them
7 to know if they didn't need an EIC -- you know, we
8 wanted them to know that if they already had one of
9 other documents that sufficed for the voting
10 requirements that related to the photo ID, that they did
11 not have to come into the office or spend time trying to
12 acquire one of these EICs.
13     Q.   Okay.  So I thought I heard one of the key
14 messages as being that many people already had IDs so
15 they may not need to come in and also eligibility
16 requirements --
17     A.   Yes.
18     Q.   -- for getting ID, right?  Okay.
19          And I don't think you mentioned what
20 documents you need to demonstrate eligibility or did
21 you?
22     A.   I did not mention that to you, but that is
23 listed on our outreach materials.
24     Q.   Okay.  And so all the press releases contain
25 information about the documents, the underlying

Page 46

1 documents that one needs to demonstrate eligibility; is
2 that accurate?
3     A.   Right.  All the documents that we released from
4 the media and communications office do have the list of
5 requirements that an individual would need, one, to be
6 eligible and, two, to bring into the office.
7     Q.   Okay.  What research did your office do, if
8 any, to determine which Texans needed education about
9 EIC?
10     A.   We did not do that research as it is not a
11 responsibility of our office.
12     Q.   Okay.  And so you did no research to determine
13 which Texans needed education about EIC.  Did you do any
14 research on what information Texans needed about EICs?
15     A.   We gathered information --
16     Q.   Did you get that?  I'm sorry.  Go ahead.
17     A.   We gathered information from the appropriate
18 folks at the Department of Public Safety on information
19 that is required to obtain an EIC and felt that that was
20 important to relay to the public.  There were -- as I
21 mentioned, I haven't covered all the points that are in
22 the news release; however, the information that is in
23 the news release was gathered from those subject matter
24 experts so that we could relay as much information as
25 possible in an easy to understand and succinct way

Page 47

1 through a press release or, as I mentioned, through
2 social media efforts as well.
3     Q.   Okay.  But you did not do any research to
4 determine what the Texas public did not know about what
5 they needed to get EICs; is that accurate?
6          MR. KEISTER:  Objection, form, vague and
7 ambiguous.
8     A.   We didn't do research, but what we knew at the
9 media office was this is a new requirement, so we were
10 going to send as much information as the subject matter
11 experts were able to provide us in a way that was easily
12 relayed to the -- through the media to the public.
13     Q.   (By Mr. Agraharkar) Okay.  You mentioned
14 earlier that it wasn't your responsibility to determine
15 which Texans needed education about the EIC.  Whose
16 responsibility do you believe that is?
17     A.   I don't know.
18     Q.   Thank you.
19          Ultimately did you decide to target your
20 outreach effort in any way to certain populations or
21 groups?
22     A.   The only targeted outreach related to the DPS
23 mobile stations and that was by location.
24     Q.   And how did you determine which locations to
25 target?

Page 48

1     A.   We sent it to -- we sent the localized press
2 release to the media in the area in which the mobile
3 station would be located.
4     Q.   Okay.  So this was just to locations that had a
5 mobile EIC unit stationed; is that right?
6     A.   Correct.
7     Q.   And it was, correct, to local media in those
8 areas?
9     A.   I'm sorry, I didn't hear the first part of
10 that.
11     Q.   This was a press release to local media in
12 those areas; is that right?
13     A.   Yes.
14     Q.   Okay.  Do you have a way to determine how many
15 of those releases were picked up?
16     A.   Through the media coverage of that, yes.
17     Q.   I'm sorry, my question was, did you have a way
18 to determine how many news outlets picked up your local
19 press releases, and I think I maybe just didn't
20 understand your answer.
21     A.   Yes, through the media coverage that resulted
22 from the distribution of those press releases.
23     Q.   Okay.  And who tracked that media coverage?
24     A.   Specifically tracking it, we don't, but we
25 monitor that to make sure that there's -- there is a



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                           49–52

Page 49

1 connection there.
2    Q.   Okay.  And how do you monitor those -- that
3 coverage?
4    A.   By searching news articles, by looking at
5 various news entities in those areas in which we sent
6 out the press releases to.
7    Q.   Is there someone designated in the office
8 (noise obliterating words) charge of that type of
9 monitoring?
10        THE COURT REPORTER:  I'm sorry?
11        MS. COHAN:  Vishal, can you repeat that?
12 There's some paper shuffling on your end.
13        MR. AGRAHARKAR:  I apologize.
14    Q.   (By Mr. Agraharkar) Is there someone in your
15 office who's in charge of that monitoring?
16    A.   No one in particular.  We do have, in the media
17 and communications office in Austin, Aidee Trottier, our
18 media specialist and Elliott Weeks, our social and
19 online media specialist, do go over the various articles
20 that are produced each morning on a number of issues to
21 see what stories have been produced related to the
22 department and our activities.
23    Q.   Okay.  And were there any plans to specifically
24 target education efforts to African-American voters?
25    A.   There were not any specific plan, no.

Page 50

1    Q.   Okay.  Were there plans to specifically target
2 limited English proficiency voters?
3    A.   There were no specific plans to target a
4 particular audience other than the locations of the
5 mobile station.  Those are the only times that we
6 targeted a certain area of media outlets.
7    Q.   Okay.  I want to move on to the budget a bit.
8 How much money was budget to -- budgeted to publicize
9 the EIC program?
10    A.   None.
11    Q.   Okay.  And is that true of -- well, strike
12 that.
13        Is anything going to be budgeted in the
14 future to publicize the EIC program?
15        MR. KEISTER:  Objection, calls for
16 speculation.
17        To the extent you know, you can answer.
18    A.   Not that I'm aware of.  And I would like to add
19 that there's no budget for any of our outreach efforts.
20 All of our outreach efforts of the department are
21 through earned media because we don't have a budget for
22 marketing.
23    Q.   (By Mr. Agraharkar) Okay.  Thank you.
24        I want to move on to a different topic
25 now.  Did you play a role in choosing the locations of

Page 51

1 the EIC mobile units?
2    A.   I did not, no.
3    Q.   Okay.  Did you play a role in choosing the days
4 and hours during which EIC mobile units would be open
5 for business?
6    A.   No, sir.
7    Q.   Okay.  I want to talk specifically about the
8 county run mobile EIC units or the counties that don't
9 have a DPS driver license office and have to process EIC
10 themselves.  Do you know which ones I'm referring to?
11    A.   I understand who you're referring to.  If
12 those are the ones in which DPS employees are not
13 manning those stations, but instead --
14    Q.   Yes.
15    A.   -- some entity of the county in the county is
16 running those.
17    Q.   Yes, that is what I'm referring to.  I'd like
18 to mark as Exhibit 124 --
19        MR. KEISTER:  5
20    Q.   (By Mr. Agraharkar) Or -5, whatever the next
21 number is, a document titled County Locations Issuing
22 Election Identification Certificates.  And please let me
23 know when you've had a chance to look at that.
24        (Exhibit 125 marked for identification.)
25        (Handed to witness and counsel.)

Page 52

1    A.   Okay.
2    Q.   (By Mr. Agraharkar) Have you seen this document
3 before?
4    A.   Yes, I have.
5    Q.   This document lists the counties that decided
6 to issue EICs on their own without a DPS personnel; is
7 that right?
8    A.   That's right.
9    Q.   Okay.  And this document is available on the
10 DPS website; is that correct?
11    A.   That's correct.
12    Q.   Okay.  And is this the primary way in which
13 voters are informed by DPS of which counties process
14 EICs themselves?
15    A.   We send out a press release prior to the
16 elections essentially saying this -- go to this link on
17 the -- let me clarify that.  I'm sorry.
18        On the press release that explains the
19 different ways to obtain an EIC, one of those is listed
20 as "select locations" -- or "locations in select
21 counties" will also be issuing EICs.  For a list of
22 those locations -- or "For a list of those counties,"
23 you know, "Click here."  And that is one way to get to
24 it.  You can also go to this document by going directly
25 to our website.  You don't necessarily have to go



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                            53—56

Page 53

1  through the press release.
2        Also, prior to the November and primary
3  election, in our efforts to educate the public about
4  these locations -- or excuse me, about these counties
5  and their contact information, we also sent out those
6  localized press releases that essentially went to that
7  -- that targeted media group and to these areas that
8  provided the county contact information for more
9  information on when and where these would be available.
10 So there are a number of --
11    Q.  Thank you.  You mentioned --
12    A.  I'm sorry.
13    Q.  Thank you.  And so you mentioned the press
14 releases that had links to this document, that you could
15 go to this document directly on your website and local
16 press releases with the name of the actual county person
17 who is handling the EICs; is that right?
18    A.  Yes, that's correct.
19    Q.  Okay.  And in that first category, the press
20 releases that had a link, how -- so if someone is not
21 viewing that press release on the Internet, how would
22 they find out about this document?
23        MR. KEISTER:  Objection, vague, ambiguous
24 and I think also asked and answered.
25        But go ahead, you can answer it.

Page 54

1    A.  Again, the effort to make these county contact
2  -- the information about these county contacts available
3  to the public was through media efforts and outreach
4  efforts.  So certainly the big blast out to the hundreds
5  of media outlets that we have, as well as posting this
6  on the website, and then through the targeted media
7  outreach for each of these counties were the ways that
8  the public would have access to that.
9    Q.  (By Mr. Agraharkar) Okay.  With respect to this
10 document, is it accurate that this document does not
11 advertise when or where EICs will be available except to
12 tell readers to contact the counties themselves for that
13 information?
14        MR. KEISTER:  Objection, vague.
15    A.  This document says, "For locations, dates and
16 times that EICs will be available, contact any of the
17 following counties," and then it lists the contact name
18 and contact information for each of the different
19 counties.
20    Q.  (By Mr. Agraharkar) Okay.  So does DPS track --
21 or does your office within DPS track or otherwise
22 advertise what those hours or locations would be other
23 than to provide that information?
24        MR. KEISTER:  Objection, vague and
25 compound.

Page 55

1    A.  The department --
2    Q.  (By Mr. Agraharkar) You can answer.
3    A.  Sure.  The department provides the county
4  contact information who will then be able to provide the
5  locations, dates and times for the EIC availability.
6    Q.  Okay.  Thank you.  Does this document exist in
7  Spanish?
8        MR. KEISTER:  Objection, vague.
9    A.  I don't know.
10    Q.  (By Mr. Agraharkar) All right.  To your
11 knowledge, does it exist in Spanish?
12    A.  I don't know.
13    Q.  Right.  Have you seen a Spanish version of this
14 document?
15    A.  Not that I recall.
16    Q.  And I recall you don't remember -- I'm sorry.
17 I assume you don't recall seeing it in any other
18 languages other than Spanish?
19    A.  I don't recall seeing it in Spanish or another
20 language.
21    Q.  Thank you.  Do you know how many people in
22 Texas speak only Spanish?
23    A.  I don't.
24    Q.  Thanks.
25        I want to switch topics to publicizing the

Page 56

1  other EIC mobile units.  The DPS was responsible for
2  publicizing units other than the ones that counties
3  process themselves; is that correct?
4        MR. KEISTER:  Objection, vague.
5    A.  We did publicize the DPS run mobile stations,
6  EIC mobile stations.
7    Q.  (By Mr. Agraharkar) Okay.  And that was done
8  through the same avenues you mentioned earlier:  Press
9  releases and -- well, what other ways do you use to
10 publicize those?
11    A.  Statewide press releases, information on our
12 website, social media and localized press releases as
13 well as interviews and responses to media inquiries.
14    Q.  Okay.  And has DPS conducted any community
15 meetings or town halls or other community trainings on
16 how to find those?
17    A.  The media office has not, but I can't speak to
18 the other offices.
19    Q.  Okay.  And has DPS conducted any outreach to
20 specific people who the DPS might have reason to believe
21 do not have ID?
22    A.  Through our website, I would say that the
23 purpose of posting that information, all of this
24 information on our website, as well as through the press
25 releases, the goal was to make sure that anyone who is



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
57—60

Page 57

1  eligible for one of these EICs knows about it and knows
2  about the availability.
3     Q.   Okay.  And when you say through your website,
4  how do you conduct outreach to specific people through
5  your website?
6     A.   By making that information available on the
7  website.  There are -- you know, a significant amount of
8  information that's on our website for the main goal of
9  informing the public about what services we provide.
10    Q.   Okay.  Thank you.
11         And are you aware that the Secretary of
12 State has compared a database of registered voters to a
13 database of people who have a DPS ID record and has a
14 list of names of people who did not match?
15         MR. KEISTER:  Objection, form, outside the
16 scope of this designated witness for this deposition.
17         But to the extent you can answer.
18    A.   I don't -- I'm not familiar with that
19 information.
20    Q.   (By Mr. Agraharkar) Okay.  No one has told the
21 media office that information; is that right?
22         MR. KEISTER:  Same objection.
23    A.   It's possible that that information, you know,
24 was -- may have been shared with us, but I'm not
25 familiar with it and can't recall it specifically as we

Page 58

1  didn't deal with any of that information.
2     Q.   (By Mr. Agraharkar) Okay.  Thank you.
3         I'm going to ask one more question about
4  press releases.  What is the process they use when you
5  issue a statewide press release?
6     A.   Well, we send it through two groups.  We'll
7  send it through our -- essentially it's a ListServ that
8  we've collected over the years and has hundreds of media
9  outlets on it, and I apologize, I don't have the exact
10 number but it's hundreds of media outlets that are, you
11 know, either local press, weeklys, you know, when we're
12 talking about print, weeklys, editorials.  We'll have
13 radio.  We'll also have television stations on there.
14 The Associated Press, of course, you know, a number of
15 national members of the media who typically receive our
16 information, beat reporters that cover, you know, any
17 number of issues that are related to the department.  So
18 that's one way.
19         And then secondly, we have a subscription
20 to the Texas Media Directory so we will send to the
21 hundreds of media outlets on there, and I would -- I
22 would venture to say there's close to 2000 that we send
23 when we send it to statewide media outlets, and again
24 that includes those same types of categories with
25 different outlets on it.

Page 59

1     Q.   Thank you.
2         And do you send is it out in Spanish as
3  well?
4     A.   We do not.
5     Q.   Okay.  I'd like to mark another exhibit, it's a
6  document titled County Processing Election
7  Identification Certificates.
8         THE COURT REPORTER:  I'm sorry?
9         MS. COHAN:  Can you repeat the title,
10 Vishal?
11    Q.   (By Mr. Agraharkar) Sure.  It's "County
12 Processing Election Identification Certificates" and it
13 references San Augustine County.
14    A.   And may I add something to the last question?
15    Q.   Sure.
16    A.   While we don't issue information in Spanish, I
17 will -- I can confirm that we do have a number of
18 Spanish language media outlets on our distribution list
19 that we work with regularly.
20    Q.   Okay.  So you rely on them to translate the
21 information in your press releases; is that right?
22    A.   We send it over to them.  We send all of our
23 news releases that go statewide to those Spanish
24 language media outlets in English.
25    Q.   Thank you.  Have you had a chance to look at

Page 60

1  the document that's been marked I believe as 126?
2     A.   Not just yet.  Sorry.
3     Q.   Take your time.
4         MR. KEISTER:  You've got to stop talking
5  so the court reporter can mark it.  He's looking at us.
6         THE COURT REPORTER:  Thank you.
7         (Exhibit 126 marked for identification.)
8         (Handed to witness and counsel.)
9     A.   Okay, I reviewed it.
10    Q.   (By Mr. Agraharkar) Thanks.  And have you seen
11 this before?
12    A.   Yes.
13    Q.   Okay.  And is this a typical press release
14 issued from the DPS to publicize EIC to people in the
15 county where the counties agree to offer EIC?
16    A.   Yes.
17    Q.   Okay.  And am I right that there's no DPS phone
18 number or hotline listed on here to people who want to
19 speak to a DPS customer service representative directly?
20    A.   Specifically on this, no, there is not;
21 however, the link below does send you to our website
22 which does have all of our contact information on it and
23 additional and detailed information about the EIC.
24    Q.   Okay.  So someone had would have to have
25 Internet access in order to access the information from



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
61–64

Page 61

1   this press release to get to a phone number --
2   A.   Yes.
3   Q.   -- is that right?  Okay.
4        So a Spanish speaker who received this
5   press release or translated version of this, they would
6   be directed -- they would be directed by this press
7   release to contact the San Augustine elections
8   administrator; is that right?
9   A.   Yes.
10  Q.   And to your knowledge, is that local contact
11  required to be able to speak Spanish?
12  A.   I don't have knowledge of that.
13  Q.   Okay.  And this is a typical press release
14  issued for county run EICs, all of them with all the
15  same template; isn't that right?
16  A.   Yes, that's correct.
17  Q.   Okay.  Thank you.  We'll move on to social
18  media.  You mentioned that DPS also uses social media to
19  do outreach; is that correct?
20  A.   Yes, that's correct.
21  Q.   And I believe you testified that you use
22  Twitter and Facebook; is that right?
23  A.   That's right, yes.
24  Q.   Okay.  And no other forms of social media; is
25  that correct?

Page 62

1   A.   That's correct.
2   Q.   Okay.  And DPS doesn't purchase any sponsored
3   Tweets or Facebook content to advertise EIC; is that
4   correct?
5   A.   Right.  As we don't -- again, we don't have a
6   budget for those types of activities.
7   Q.   Okay.
8   A.   For any issue.
9   Q.   And was there -- I'm sorry.  Was there any
10  research done to determine whether the people who
11  followed DPS on Facebook and Twitter were the people who
12  need education with respect to EIC?
13  A.   We don't conduct that type of research for any
14  of our outreach efforts.
15  Q.   Okay.  And DPS's primary mission is law
16  enforcement, would you say that's accurate?
17  A.   No.
18  Q.   What would you say is their primary mission?
19  A.   To serve and protect Texans.
20  Q.   Okay.  Prior to the creation of EIC, did DPS
21  play a role with respect to voter education?
22  A.   I'm not aware of that.
23  Q.   Okay.  So is there any reason to believe that
24  people follow DPS on social media to obtain information
25  about elections?

Page 63

1   A.   I -- I would be speculating if I answered that.
2   Q.   Okay.  Thanks.  And moving on to the
3   website.  Are you familiar with the DPS website?
4   A.   Yes.
5   Q.   Have you had any involvement in how its
6   designed or laid out?
7   A.   That is a -- I guess that's a purview of the IT
8   department, although I do have some involvement with the
9   approval or review of content that's posted on some
10  issues.
11  Q.   Okay.  So to the extent it can help in voter
12  outreach, you might provide some input; is that fair to
13  say?
14  A.   Sure.
15  Q.   Okay.  Is information about the EIC available
16  on the front page of the DPS website?
17  A.   Through the driver license portal, you can
18  access that and at various times when the EIC message is
19  being featured, yes, you can access that from the home
20  page.
21  Q.   Okay.  And so to do so, you would have to click
22  on "driver licenses" and not something that says "EIC"
23  or anything with respect to voting; is that correct?
24  A.   From time to time, we do feature the EIC on the
25  home page so can you read the words Electronic

Page 64

1   Identification Certificate -- or excuse me, Election
2   Identification Certificate on the home page and click on
3   that to access additional information.
4   Q.   When you say -- thank you.  And when you say
5   time to time, when has it been featured in the past?
6   A.   Anytime we put out a press release about the
7   EIC and sometimes -- and I apologize, I don't have the
8   exact dates that we did this, but at times we have held
9   that message as the primary home page featured press
10  release and we'll do that on a number of issues.  As I
11  mentioned earlier, hurricane season, we'll hold that as
12  the primary feature even though we'll continue to put
13  out additional news releases throughout the week.  If
14  there's something, you know, that from time to time is
15  relevant time-wise, we'll just keep that as a feature,
16  and we've done that with EIC.
17  Q.   Okay.  But it's not on the front page of the
18  website as you stand -- as you sit here today?
19  A.   I don't think so because I think we put out a
20  press release today.
21  Q.   Okay.  Okay.  I'd like to introduce another
22  exhibit.
23       MR. KEISTER:  Counsel, we've been going
24  about an hour and a half.  If you're at a convenient
25  spot, can we take a break?



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
65–68

Page 65

1          MR. AGRAHARKAR:  Sure.  That's fine.
2          MR. KEISTER:  Okay.
3          THE WITNESS:  Thanks.
4          (Recess.)
5     Q.   (By Mr. Agraharkar) I believe I was asking for
6   the -- to mark the exhibit that is titled Texas
7   Department of Public Safety.  It's an image of the front
8   page of the website.  I'd like to mark that I guess as
9   127.  Let me know when you've had a chance to look at
10  it.
11          (Exhibit 127 marked for identification.)
12          (Handed to witness and counsel.)
13    A.   Okay.
14    Q.   (By Mr. Agraharkar) Okay.  And this is the
15  front page of the DPS website, correct?
16    A.   Correct.
17    Q.   Okay.  And if I tell you that I printed this
18  out on May 19th, would that -- does that sound accurate
19  to you?  Would you believe me?
20    A.   We've only just met.
21    Q.   And you can't see me in person.  But
22  okay.  I'll represent to you that I printed this out on
23  May 19th.  Is it true that there's no link on this front
24  page to EIC currently?
25    A.   Directly to EIC from the front page, no.

Page 66

1     Q.   Okay.  Thank you.  And do you know whether
2   currently mobile stations are offering Saturday hours to
3   get an EIC event occurring in the State right now?
4     A.   Yes.
5     Q.   Okay.  And why is that?
6     A.   That might be a better question for the driver
7   license division on the why.  But we have promoted that
8   it -- that is available.
9     Q.   Okay.  So there's some outreach effort to get
10  people EICs that's currently going on but there's no
11  link to EIC on the front page currently; is that
12  accurate?
13    A.   Currently on the front page, correct.
14    Q.   Okay.  Is this page available in Spanish?
15    A.   I'm not sure.
16    Q.   Okay.  Do you see somewhere on the page where
17  you can view it in Spanish if you so wanted?
18    A.   It looks like down below there is an option to
19  click on "Spanish."
20    Q.   Okay.  And where is that?
21    A.   The bottom right.  There's a number of texts
22  that's centered just above the copyright 2000 to 2011,
23  Texas Department of Public Safety.  It's on the far
24  right.
25    Q.   Okay.  And if you click on that link, do you

Page 67

1   know how the page is translated into Spanish?
2     A.   I don't.
3     Q.   Do you know whether someone at DPS translated
4   all the text and put it onto the website?
5     A.   I don't know how that feature works.
6     Q.   Okay.  Thank you.
7          I'd like to introduce another document,
8   another page from the website that's titled Election
9   Identification Certificates.  It's --
10          (Exhibit 128 marked for identification.)
11          (Handed to witness and counsel.)
12    Q.   (By Mr. Agraharkar) Is the court reporter
13  finished and have you had a chance to look at it?
14    A.   Just a moment, please.
15    Q.   Okay.
16    A.   Yes, I have had a chance to look at that, and
17  it's been numbered.
18    Q.   Okay.  Thank you.  And have you seen this
19  before?
20    A.   Yes.
21    Q.   Is this the page of the DPS website that
22  informs people about the requirements of obtaining EICs,
23  correct?
24    A.   Correct.
25    Q.   And is this page available in Spanish?

Page 68

1     A.   I believe so, yes.  There's an option to click
2   on the Spanish version.
3     Q.   Okay.  Thank you.  And I'd like to introduce
4   one more document, it's the Spanish version of that
5   page.
6          (Exhibit 129 marked for identification.)
7          (Handed to witness and counsel.)
8     A.   Okay.  I've had an opportunity to look at it.
9     Q.   (By Mr. Agraharkar) Okay.  If I tell you that
10  this is a screen print of what one sees when someone
11  clicks on the word "Espanol" on the top left corner of
12  the previous page we were looking at, would that sound
13  accurate to you?
14          MR. KEISTER:  Objection, calls for
15  speculation.
16    Q.   (By Mr. Agraharkar) You can answer.
17    A.   I understand that that's what you've relayed to
18  me.
19    Q.   Have you ever clicked on the word "Espanol" on
20  the top left-hand corner of the previous page that I
21  showed you?
22    A.   Yes.
23    Q.   Did you see something different than what this
24  looks like?
25    A.   I don't recall specifically but it does look



Page 69

1 similar, yes.
2    Q.   Okay.  And do you use Google translate to
3 translate your Web pages to Spanish?
4    A.   The media office is not involved in any
5 translation of our Web page or of our website.
6    Q.   Okay.  So was there any pressings done to
7 determine if this was accurate and comprehensible in
8 Spanish?
9    A.   The media office is not involved in
10 translations on our website, so I would not have
11 knowledge of that.
12   Q.   Okay.  So the media office does not do any
13 translation to determine if its website was accessible
14 to the Spanish speakers; is that accurate?
15   A.   The media office does not partake in that type
16 of activity, no.
17   Q.   Okay.  And was it tested -- or did the media
18 office test it or anyone else in media office test it to
19 see if the hyperlink on the page still worked when it
20 had been translated by Google?
21   A.   The media office was not involved in that
22 process.  But I can't speak to another division.
23   Q.   Okay.  Thank you.
24   A.   Sure.
25   Q.   I'd like to introducing one more document.  And

Page 70

1 I imagine this is the on that was wrongly given to the
2 court reporter before entitled "Election Identification
3 Certificate Documentation Requirements."  And please let
4 me know when you've had a chance to look at it.
5            (Exhibit 130 marked for identification.)
6            (Handed to witness and counsel.)
7    A.   Okay.
8    Q.   (By Mr. Agraharkar) Have you seen this before?
9    A.   Yes, I have.
10   Q.   Okay.  And this is a page from the DPS website
11 that shows what documents are necessary to obtain an
12 EIC; is that right?
13   A.   Yes.
14   Q.   Do you know whether this page is available in
15 Spanish?
16   A.   I don't know that.
17   Q.   Okay.  And there's no link on the top left-hand
18 corner of this page like there was on the EIC landing
19 page that said "Espanol"; is that accurate?
20   A.   That's accurate.
21   Q.   Okay.  Thank you.  And switching topics, are
22 you familiar with the application form for obtaining an
23 EIC?
24   A.   I'm not familiar with the content of the
25 application form, but I am familiar with the link to the

Page 71

1 form which we provide on our -- on the Web pages that do
2 describe the information related to EICs.  And if I'm --
3    Q.   And that link --
4    A.   I'm sorry.
5    Q.   I'm sorry.
6    A.   If I'm not mistaken, we may actually have a
7 link in our news releases to that application as well.
8    Q.   Okay.  Thank you.  So are you aware whether
9 that form is available in Spanish?
10   A.   I'm not aware.
11   Q.   Okay.  I'd like to switch topics once more.
12 Did DPS use any posters to educate the public about EIC?
13   A.   The media office did not; but as I understand
14 it, the driver license division did.
15   Q.   Okay.  And so --
16   A.   I'm not sure if -- I'm not sure if it's
17 assistant director Joe Peters or anyone else from driver
18 license spoke to that, but the media office was not part
19 of that production.
20   Q.   Okay.  Thank you.  Do you play a role in
21 developing the content or were you consulted about the
22 content of those posters as all?
23   A.   It's possible, but I don't recall specifically.
24   Q.   Okay.  And did the driver license division --
25 strike that.

Page 72

1            Did you play a role in disseminating the
2 posters in any way?
3    A.   No.
4    Q.   Okay.  Thank you.
5    A.   Sure.
6    Q.   Does the voter education plan include any
7 effort to educate people on how to obtain underlying
8 documents needed to obtain an EIC, such as a birth
9 certificate?
10   A.   The outreach effort that we were involved in
11 did refer to those documents on the website.  And by
12 those document, I mean, you know, there's different
13 requirements for the EIC, and all of those documents are
14 listed on the website.
15   Q.   Okay.  And is there anything -- going back to
16 Exhibit 126.  I'm sorry for skipping back and forth.
17   A.   That's okay.
18   Q.   But this was the -- this was the press release
19 sent to San Augustine County in particular about the
20 mobile EIC at that location.  Is there any information
21 on this press release regarding the underlying documents
22 that are noted to vote?
23   A.   There is a link at the bottom that takes you to
24 the place that has that information, and that
25 information is accessible on that link.



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
73–76

1  Q.  Okay.  So the primary means of educating people
2  through press releases about the underlying documents
3  needed to vote are through hyperlinks; is that accurate?
4  A.  No.  The -- Exhibit 126 is a message to the
5  members of the media about the information related to
6  the EIC, and as, you know, we've all seen in the media,
7  they write their stories based on information that they
8  gather about a particular topic.  So for the most part,
9  in my practical experience, typically, media outlets
10  will not produce or distribute or print or publish press
11  releases, they'll take pertinent information and pieces
12  of information and relay that to the public in whatever
13  form they deem appropriate.  So this was an outreach
14  effort to media equiping them with all the information
15  that we have about EICs in a -- in an efficient way.
16  Q.  Okay.  Thank you.
17      To your knowledge, if someone cannot
18  afford to pay for their birth certificate, can they
19  obtain one for free or at a discount?
20      MR. KEISTER:  Objection, form.  This is
21  outside the scope of the designated issues for this
22  witness.  That would call for this witness to speculate.
23      But at that point, you can answer if you
24  can.
25  A.  I don't know the answer to that question.

1  Q.  (By Mr. Agraharkar) Okay.  To your knowledge,
2  has your office done any education on -- assuming that
3  discounted birth certificates are available, to your
4  knowledge, has your office done any education with
5  respect to that fact?
6      MR. KEISTER:  Objection, form, outside the
7  scope of the issues which this witness is designated.
8  Further, it calls for speculation.  Further, it
9  mischaracterizes previous testimony and states facts
10  that are not in evidence.
11      But beyond that, you can answer if you
12  can.
13  A.  The media office produced information to the
14  media about EICs, so, you know, we -- my knowledge is
15  that the department does not issue birth certificates
16  and we did not do any outreach on that.
17  Q.  (By Mr. Agraharkar) Okay.  Thank you.  To your
18  knowledge has the DPS done -- what outreach or education
19  has the DPS done regarding assistance for people who are
20  homebound in obtaining an EIC?
21  A.  I'm not sure if this -- can you specify that a
22  little bit more?  I want to make sure I'm answering the
23  right question.
24  Q.  Okay.  To your knowledge does DPS assist people
25  who are homebound in obtaining an ID -- an EIC?

1  A.  I don't know specifically that category, but I
2  do know in our press releases we do mention, you know,
3  for additional information about -- about exceptions to
4  this requirement an individual can contact the
5  department or the Secretary of State's office.
6  Q.  Okay.  Thank you.  But nothing specifically to
7  your knowledge with respect to people who are homebound?
8  A.  I believe our outreach effort is a bit more
9  general to anyone who might have an exception.
10  Q.  Okay.  Thank you.  At some point in 2013, DPS
11  had a policy that would check EIC applicants for
12  outstanding warrants, correct?
13      MR. KEISTER:  Objection, form, states --
14  states facts that are not in evidence and
15  mischaracterizes previous testimony in previous
16  depositions.  It's also outside of the issues which this
17  witness has been designated to testify.
18      To that extent, you can answer.
19  A.  I can't speak to policy.  I can just speak to
20  the media outreach efforts on EIC.
21  Q.  (By Mr. Agraharkar) Okay.  Did you do any
22  education with respect to whether EIC applicants are
23  checked for outstanding warrants?
24  A.  We answered some media inquiries about that --
25  about that issue.

1  Q.  Okay.  And what were the inquiries?
2  A.  There were only a couple and they generally
3  were centered around some misinformation that I believe
4  the assumption was that warrants were being checked in
5  relation to EICs.  However, that was misinformation that
6  we clarified with those particular entities.
7  Q.  Okay.  And you said that you responded to a
8  couple of inquiries, am I characterizing your testimony
9  correctly?
10  A.  That's correct.
11  Q.  Okay.  And beyond that, did you do any
12  affirmative outreach to the public about that issue in
13  particular?
14  A.  No.  Because again, there were only a couple of
15  inquiries and we addressed those directly and
16  immediately when we had the -- when we were able to
17  clarify the issue.
18  Q.  Okay.  Thank you.  I want to switch topics once
19  again.
20      Has Texas -- I'm sorry.  Has the DPS
21  conducted any research to evaluate the effectiveness of
22  your education plan with respect to the EIC?
23  A.  Again, I'd like to just make sure that we're
24  characterizing it the same way or maybe I can just
25  clarify my characterization of this outreach



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
77—80

Page 77

1 effort.  You know, we saw this, again, as an outreach
2 effort in which, you know, we utilized all the resources
3 that we have to gain earned media on this -- on this
4 effort, including such things at news releases.  Every
5 time we put out a news release we put out a message
6 through our Twitter account, we put out a message
7 through Facebook, that reiterated those messages in
8 between the times that we were issuing those statewide
9 media press releases to, you know, the thousands of
10 outlets that are on our system, we were reminding folks
11 of the availability of EICs, the location of mobile
12 stations, the Saturday hours, the different
13 requirements, all of those elements that were part of
14 that -- that public message so that folks did know when
15 and where they could get these and how they could get
16 them and who was eligible.  So through that
17 comprehensive outreach effort, we were able to see the
18 different media coverage that resulted from those
19 efforts.
20         So while we do not have -- and I think I
21 mentioned that before, we don't -- there wasn't a
22 research element or an analytics element to it, there
23 was absolutely the practical aspect of what we know to
24 be effective and that's using these different earned
25 media efforts to push those messages, and we saw the

Page 78

1 return on that.
2     Q.  Okay.  Thank you.  I'd like to introduce one
3 more document.  It's the Contact Us page of the website.
4 Just let me know when you've had a chance to look at it.
5     A.  Okay.  Just a moment, please.
6     Q.  Sure.
7         (Exhibit 131 marked for identification.)
8         (Handed to witness and counsel.)
9     A.  Okay.
10     Q.  (By Mr. Agraharkar) Thanks.  Can you tell me
11 what this is?
12     A.  The contact page for the Department of Public
13 Safety.
14     Q.  Thanks.  Do you have a hotline for people who
15 have questions or complaints about EIC?
16     A.  I don't have any knowledge of that as it does
17 not relate to the media and communications office
18 operation.
19     Q.  Okay.  And if people have questions about how
20 to obtain EIC, that doesn't go -- that's not within the
21 media and communications purview?
22     A.  Correct.  We deal with members of the media as
23 our primary customers in the media office.
24     Q.  Okay.  And are you aware, if you were to
25 advertise a hotline or phone number for people to call

Page 79

1 in outreach, is there a number that you would use?
2     A.  We don't have -- we're not doing that at the
3 moment because, again, this isn't in the media and
4 communication office knowledge that -- however, if an
5 individual were to mistakenly call our office, we would
6 refer them over to the driver license division.
7     Q.  Okay.  And there's nothing on this page to --
8 that would tell someone what number they might call if
9 they had a question with obtaining -- about obtaining
10 EIC, to your knowledge?
11     A.  The -- well, there are a lot of numbers on
12 here.  I think that anyone could call certainly the
13 Austin headquarters number if they needed some
14 assistance.  However, I do not see the term "EIC" on
15 here.
16     Q.  Okay.  And the Austin headquarters number, is
17 that is a 800 number or a toll free number?
18     A.  I see a 512 area code.
19     Q.  Okay.  And the driver license customer service
20 number that's listed on there, is that an 800 number?
21     A.  I see a 512 area code listed.  I'm not -- I
22 can't speak to the -- what happens when you call that
23 number, if that's routed to an 800 number or not.  I'm
24 just not aware.
25     Q.  Okay.  Thank you.

Page 80

1     A.  But listed on here, I see a 512 area code.
2     Q.  Okay.  Thank you.  I think that's all the
3 questions we have right now.
4         We'll pass the witness.
5         MR. KEISTER:  Guys, I hate to do this but
6 I've got to run down the hall.
7         MS. COHAN:  It's all right.  We have to
8 grab the next set of documents anyway.
9         We'll go off the record for five minutes.
10         (Recess taken from 4:07 p.m. to 4:15 p.m.)
11             EXAMINATION
12 BY MR. FREEMAN:
13     Q.  Thank you, Ms. Cesinger, for taking the
14 time.  If we could actually pull back up Exhibit 124 --
15     A.  Okay.
16     Q.  -- which I believe is the Media Plan.  Am I
17 correct that Exhibit 124 states that on September 24,
18 2013, you issued a statewide press release indicating
19 that DPS mobile stations would issue EICs across Texas
20 beginning October 1, 2013?
21     A.  That is what that says on the outreach effort
22 timeline, yes.
23     Q.  Did this include DPS mobile stations in
24 counties that do have driver license offices, the
25 subject of this press release?



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
81—84

Page 81

1   A.  Can you say that again?  I'm sorry.
2   Q.  Does the subject of this press release include
3  DPS mobile stations in counties that do have permanent
4  driver license offices?
5   A.  I don't recall.
6   Q.  Do you know as of September 24, 2013, the
7  temporary locations and the hours that those locations
8  would be open had been established for the period from
9  October 1 until November 2013?
10   A.  I don't recall specifically.
11   Q.  Do you know if that press release included the
12  location and hours of those temporary locations?
13   A.  I have -- as I mentioned at the beginning of
14  the deposition, I do have a copy of those press releases
15  here.
16   Q.  If you can take a moment to take a look at that
17  very quickly and refresh your recollection, I would
18  appreciate it.
19   A.  Great.  Thank you.  Okay.
20   Q.  Ms. Cesinger, now that your recollection has
21  been refreshed, did the September 24, 2013, press
22  release include the locations and hours of temporary DPS
23  locations that would be established from October 1st
24  through the November 2013 election?
25   A.  The September 24th press release includes a

Page 82

1  link to a schedule for the 25 EIC mobile stations whose
2  locations and times were going to be determined by the
3  Secretary of State's office.
4   Q.  Do you know if those were the DPS mobile
5  locations that would be in counties that did not
6  otherwise have driver license offices or do you know if
7  it linked to those DPS mobile locations that would be in
8  counties that already did have driver's license offices?
9   A.  The DPS mobile stations that were being -- that
10  are now run by DPS employees and deployed to counties in
11  which there are not current driver license offices in
12  them, I do not believe were referenced in this press
13  release.
14   Q.  They were not?
15   A.  I don't -- I don't believe so because these are
16  referenced -- this references those determined by the
17  Secretary of State's office.
18   Q.  And the ones that were run by the Secretary of
19  State's office, those were ones that were in counties
20  that did not have a driver's license office; is that
21  correct?
22   A.  I don't recall exactly where those were located
23  as they were determined be the Secretary of State's
24  office but we did refer folks over to the Secretary of
25  State office website for the schedule of those

Page 83

1  locations.
2   Q.  Okay.  When you issue a statewide press
3  release, do you reach out directly to any non-media
4  organizations?
5   A.  Not that I can think of.
6   Q.  So you don't send your press releases to any
7  churches?
8   A.  Not to my knowledge.
9   Q.  And you don't send press releases to chapters
10  of the NAACP?
11   A.  Not to my knowledge.
12   Q.  You don't send press releases to chapters of
13  LULAC?
14   A.  Not to my knowledge.  We send our press
15  releases to members of the media.
16   Q.  Okay.  Do you know if the September 24, 2013,
17  press release included instruction regarding the
18  materials that a voter would have to bring to a DPS
19  mobile station in order to obtain an EIC?
20   A.  Just a moment, please.  There is reference in
21  that September 24, 2013, press release on the second
22  page that begins to talk about the requirements of an
23  applicant.  The paragraph starts, "To apply for an EIC,
24  applicants must visit a driver license office or EIC
25  mobile station and complete an application for Texas

Page 84

1  Election Certificate, DL-14C."  And then below that, it
2  says, "To qualify for an EIC, an applicant must bring
3  documentation to verify U.S. citizenship, bring
4  documentation to verify identity, be eligible to vote in
5  Texas, bring a valid voter registration card or submit a
6  voter registration application through DPS, be a Texas
7  resident, be 17-years-and-10-months old or older."  And
8  then below that, the sentence reads, "To avoid delays or
9  complications, DPS urges potential applicants to make
10  sure they have the necessary documentation before
11  arriving at the office or mobile station."
12   Q.  Does the press release state what types of
13  documents are necessary to fulfill those requirements?
14   A.  There is, I believe -- and I'm sorry, I don't
15  have that press release pulled up in front of me, but I
16  believe those -- those either bolded or underlined words
17  are hyperlinked.
18   Q.  I see.  So someone just reading the press
19  release would not know, but if they were on a computer,
20  they could take the initiative to follow up and find
21  out; is that correct?
22   A.  Correct.
23   Q.  Okay.  Going back to --
24   A.  And --
25   Q.  -- to -- well, actually -- I'm sorry, one more



KATHERINE CESINGER                                          May 20, 2014
VEASEY VS. PERRY                                            85—88

Page 85

1  question:  If an individual goes to a mobile station
2  that's only on location for one day and they don't have
3  their underlying documents, they can't come back the
4  next day with their documents and get an EIC, right?
5      MR. KEISTER:  Objection, form, calls for
6  speculation.  In addition, it's beyond the issues this
7  witness is designated to testify for today.
8          To the extent you can, answer the
9  question.
10     Q.  (By Mr. Freeman) You may answer.
11     A.  We -- we have knowledge of the schedules for
12  the DPS run mobile station as well as these Secretary of
13  State's office mobile station location schedules, and
14  that's what we promoted.
15     Q.  But if an individual comes to a mobile location
16  that's only there for one day and they don't have their
17  documents, they can't come back the next day and get an
18  EIC even if they bring their documents, correct?
19         MR. KEISTER:  Objection, form, calls for
20  speculation.  In addition, it's beyond the issues for
21  which this witness has been designated to testify today.
22         But to the extent you understood the
23  question, you may answer.
24     Q.  (By Mr. Freeman) You may answer.
25     A.  I suppose that would be correct.

Page 86

1      Q.  Thank you.  Going back to Exhibit 124, the
2  outreach campaign plan states that from October 25,
3  2013, to November 5, 2013, DPS issued local press
4  releases, and that's in 25 mobile station locations and
5  their schedules in select areas of the state, correct?
6      A.  Correct.
7      Q.  During the period from October 25, 2013, to
8  November 5, 2013, how far in advance of a particular
9  mobile location operating would you issue a local press
10  release?
11     A.  It varied but on average I would -- I would say
12  several days.
13     Q.  Several days.  So three to five?
14     A.  I think that's a good summary.
15     Q.  Okay.  Would you monitor whether your local
16  press release had been picked up in the local media?
17     A.  Yes, in the same way that we monitor all our
18  messages.  I think I may have mentioned before but, yes,
19  we would -- as we push out press releases, we monitor
20  media coverage of that through various websites and
21  different media entities.
22     Q.  And if -- if a particular press release didn't
23  get any attraction, would you follow up at all with
24  individual reporters or publications to make sure that
25  they published something?

Page 87

1      A.  As I said, we don't have -- we didn't do any
2  analytics on which particular entities covered it,
3  covered the press release that we sent out, but what we
4  did monitor was, when we were sending out these
5  messages, was there coverage about election
6  identification certificates.  And again, in our
7  practical experience, although we don't have analytical
8  information to point to, we did see that when there was
9  an uptick in the release of that information, there was
10  an uptick in the coverage of that information as well.
11     Q.  That didn't quite answer my question.  My
12  question was:  If you saw that a particular press
13  release had not been picked up in, say, let's say, the
14  Corpus Christi Caller, if you sent out a local press
15  release to Corpus Christi, would you follow up with a
16  particular newspaper or with any writers of that
17  newspaper to make sure that they did write about
18  temporary EIC locations?
19     A.  That's why I was trying to clarify or explain
20  how we do monitor the press coverage of that, because
21  the way that we monitor it is generally to see when
22  we're putting out press releases is the media covering
23  that.  And when we saw the uptick in release, we did see
24  the uptick in coverage.  We were not specifically -- and
25  -- you know, I don't know that -- we haven't done this

Page 88

1  for any messages that we send out.  We don't -- we don't
2  confirm that every single media outlet that we've sent a
3  press release to covers the -- whatever that -- the
4  message of that press release was.  But we do feel
5  there's an obligation for us to monitor the messages
6  that we send out to make sure that the press is covering
7  that in a general sense; otherwise, you know, clearly
8  the connection is not being made.
9      Q.  I see.
10     A.  So I hope that --
11     Q.  So with regard to any individual local press
12  release, you have no basis to know whether any
13  particular local press release was picked up and that
14  the location were publicized, correct?
15     A.  Sitting here today, I cannot tell you
16  that.  However, you know, I could certainly do, you
17  know, a search and confirm that, but we don't have any
18  -- any system where we have tracked that.
19     Q.  Okay.  To your knowledge are individuals who
20  would need an EIC more -- more or less likely than the
21  general population to be poor?
22         MR. KEISTER:  Objection, form, calls for
23  speculation of this witness.  In addition, it's beyond
24  the scope the issues she had been designated to testify
25  for.



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
89–92

Page 89

1       But to the extent you understand and can
2 answer it, you may.
3    A.  I don't have any knowledge of that.
4    Q.  (By Mr. Freeman) Did you tailor your media
5 campaign at all to the likely audience of individuals
6 who might need an EIC?
7    A.  Again, I don't have knowledge of those
8 individuals who might likely need an EIC, and because
9 this is such a broad issue, you know, similar to a lot
10 of the issues that we deal with at the department and
11 the services that we provide, we sent this to all media
12 contacts that we had in an effort to have the widest
13 reach possible.
14    Q.  So, no, you did not tailor your media campaign
15 to the specific likely audience of individuals who would
16 need -- who might need an EIC, correct?
17       MR. KEISTER:  Objection, form, calls for
18 speculation, mischaracterizes the testimony.  Further,
19 there's no evidence as to what the likely population is
20 that would need an EIC to be targeted to.
21    Q.  (By Mr. Freeman) I'm questioning solely whether
22 DPS's media campaign was specifically targeted -- this
23 media campaign was specifically targeted to a particular
24 likely audience that you believe might be more likely to
25 need an EIC?

Page 90

1       MR. KEISTER:  Once again, object, it would
2 call for speculation.  There's been no identified group
3 that would need to be targeted.  There's been no
4 testimony so there's no foundation for that assumption.
5       But to the extent you understand the
6 question, you can answer it.
7    A.  Again, we distributed our press releases
8 statewide to the thousands of media outlets that we had
9 in our distribution lists so that we could reach as many
10 people as possible.  And there was no -- the media and
11 communications office had no knowledge of any particular
12 group that -- that would specifically need to be
13 targeted.  And, you know, this isn't uncommon of the
14 types of press releases where there's a service the
15 department is providing and we want to make sure that
16 anyone knows about that service so we send it statewide
17 to all of our contacts.
18    Q.  (By Mr. Freeman) Okay.  Tweets and Facebook
19 posts are only going to reach individuals who have
20 access to computers, correct?
21    A.  The actual tweets -- I would venture to say the
22 message in those tweets will be further reaching than
23 the actual followers on our accounts.
24    Q.  My question was whether Tweets and Facebook
25 posts would be visible directly to individuals -- only

Page 91

1 to individuals who have access to computers, correct?
2    A.  I had -- I would say yes and no only because
3 I've seen photos of Tweets that news reporters have
4 published on television, for instance.  If they say, you
5 know, just today this entity has issued a Tweet related
6 to this issue, I've -- in practical experience, I've
7 seen that.  And that kind of qualifies my comment
8 earlier, that it may extend beyond that.  But for the
9 general public, yes, you would need to go --
10    Q.  How many people follow DPS on Twitter?
11    A.  I'm sorry?
12    Q.  How many people follow DPS on Twitter?
13    A.  Approximately 30,000 accounts.
14    Q.  Would why would an individual follow DPS on
15 Twitter?
16       MR. KEISTER:  Objection, calls for
17 speculation.
18       But to the extent, you can answer.
19    Q.  (By Mr. Freeman) To the extent of your
20 knowledge.
21    A.  To gather more information about the department
22 and our activities.
23    Q.  Do you have any knowledge of any individual who
24 has not had yet been issued ID following DPS on Twitter?
25    A.  I don't have any knowledge about that

Page 92

1 information.
2    Q.  How many people "like" DPS on Facebook?
3       MR. KEISTER:  Objection, form, calls for
4 speculation.
5    Q.  (By Mr. Freeman) To the extent of your
6 knowledge, how many "likes" does DPS on Facebook?
7       MR. KEISTER:  Objection, form, calls for
8 speculation.
9    Q.  (By Mr. Freeman) To the -- your knowledge,
10 let's -- sorry, let me start over.
11       Does DPS have a Facebook page?
12    A.  Yes.
13    Q.  When you post items on your Facebook page,
14 that's seen by individuals who "like" DPS on Facebook,
15 correct?
16    A.  Yes.
17    Q.  How many individuals have "liked" DPS on
18 Facebook?
19    A.  I believe it's more than 7,000.  And just so
20 that we're saying the same thing, as far as the "likes,"
21 that's the individuals -- it would be comparable to the
22 followers on Twitter?
23    Q.  Yes.
24    A.  Yes.  I believe it's more than 7,000.
25    Q.  Do you have any knowledge of any individual who



Page 93

1 does not even have a DPS-issued ID "liking" DPS on
2 Facebook?
3         MR. KEISTER:  Objection, form, that's
4 vague and ambiguous and calls for speculation.
5     A.  I don't have any information about that.
6     Q.  (By Mr. Freeman) Other than Tweets and Facebook
7 posts, were there -- and the releases we discussed, were
8 there any other efforts by DPS to publicize the
9 locations and schedules for DPS mobile units in counties
10 that also have permanent DPS offices, prior to the
11 November 2013 election?
12     A.  I believe we responded to some media inquiries,
13 and it's also possible that we did some interviews about
14 those locations.
15     Q.  Anything else?
16     A.  Ensuring that there was the accessibility on
17 the website to access that information.
18     Q.  Anything else?
19     A.  I believe that covers it, to my knowledge.
20     Q.  Am I correct that you only relied on earned
21 media to promote these temporary locations in counties
22 that have also driver's license offices, correct?
23     A.  That's correct.
24     Q.  And you had no budget to inform voters that
25 EICs would be available from these temporary locations

Page 94

1 in counties that also have driver's license offices?
2     A.  That's correct, we don't have a budget for
3 promoting any of our -- any of our media efforts.
4         MR. FREEMAN:  Okay.  Lindsay, would you
5 mind putting the 2013  document in front of
6 Ms. Cesinger.
7         MS. COHAN:  Sure.
8         MR. FREEMAN:  If we could have this
9 marked.
10         (Exhibit 132 marked for identification.)
11         (Handed to witness and counsel.)
12     A.  Okay.
13     Q.  (By Mr. Freeman) Ms. Cesinger, have you seen
14 this document before?
15         MR. KEISTER:  Can we identify this for the
16 record?  I don't think anybody said a number.
17         MR. BRAZIL:  132.
18     Q.  (By Mr. Freeman) Ms. Cesinger, have you seen
19 the Exhibit 132 before?
20     A.  I believe so, yes.
21     Q.  What is this document?
22     A.  It appears to be the Schedule of Mobile
23 Locations.
24     Q.  And are these only mobile locations that are in
25 counties that already have permanent driver's license

Page 95

1 offices or are they all the mobile locations?
2     A.  That, I don't know.  It's -- that, I'm not
3 sure.  This is not housed on the DPS website, so I'm not
4 actually familiar with the make up of it.
5     Q.  Did you have any role in preparing this
6 document?
7     A.  I don't recall.
8     Q.  And do you know how far in advance of the dates
9 that a mobile station would be out in the field that the
10 location and time of that mobile location would be
11 posted on this website?
12         MR. KEISTER:  Objection, form, that's
13 vague and confusing.  And to the extent that this is a
14 Secretary of State document as opposed to a DPS
15 document, I'm going to object as it's beyond the scope
16 of the issues for which this witness is designated, and
17 would call for speculation for this witness.
18         But you may answer to the extent you can.
19     Q.  (By Mr. Freeman) You may answer.
20     A.  I'm sorry, could you repeat the question,
21 please?
22     Q.  My pleasure.  How far in advance of the date
23 that a mobile station would be in the field would this
24 page be updated to let people know the date and time
25 that the EIC mobile station would be out in the field?

Page 96

1         MR. KEISTER:  Same objections.
2     A.  I don't have knowledge of that specifically.
3     Q.  (By Mr. Freeman) And do you know if a version
4 of this document is available in Spanish?
5     A.  I don't have knowledge of that.
6     Q.  Okay.  If we can bounce back to Exhibit
7 124.  Are you ready?
8     A.  Yes.
9     Q.  On February 3, 2014, you issued a statewide
10 press release indicating that the DPS mobile stations
11 would issue EICs across Texas again; is that correct?
12     A.  That's correct.
13     Q.  And did this press release address DPS mobile
14 stations in counties that do have driver's license
15 offices?
16     A.  There was a link -- there was a link in that
17 press release to the Secretary of State's website and I
18 -- is that what you're talking about, the Secretary of
19 State mobile stations?
20     Q.  I'm talking about the mobile stations that were
21 going to be functioning in counties that also have
22 driver's license offices.  I'm -- it doesn't really
23 matter to me who was running the particular station,
24 either -- whether it's DPS or SOS run.
25     A.  It matters for purposes of this question I



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                            97–100

1  think because DPS was not deploying DPS run mobile
2  station locations to my knowledge in counties that
3  already had a driver license office.
4      Q.   So those were only being deployed by the office
5  of Secretary of State?
6      A.   To my knowledge.
7      Q.   Okay.  To your knowledge as of February 3,
8  2014, had the temporary location and hours been
9  established when these locations would be -- when these
10  temporary driver's license -- excuse me, temporary ID
11  stations would be open -- sorry.  Let me just start
12  over.
13     A.   Okay.
14     Q.   As of February 3, 2013, do you know if the --
15     A.   February --
16     Q.   -- if the locations and hours of the mobile
17  units had been established for the period from February
18  3, 2014, through the March 14th statewide primary?
19     A.   Had the locations and schedules for which
20  mobile stations?
21     Q.   For all categories of mobile stations.
22     A.   I can't speak to the Secretary of State mobile
23  locations, but with respect to the DPS mobile locations,
24  there was a link to the -- to a document in that press
25  release that went to a page that essentially told folks

1  if there was -- if there was a schedule for those
2  locations, it was on that document.
3      Q.   Okay.  Just a few more questions.
4      A.   Okay.
5      Q.   On February 18th, you issued another statewide
6  press release indicating that DPS mobile stations would
7  issue EICs, correct?
8      A.   That's correct.
9      Q.   Did this press release address the SOS mobile
10  station that would function in counties that do have
11  permanent driver's license offices?
12     A.   Just a moment.  If I may turn to that press
13  release?
14     Q.   Sure.
15         MR. KEISTER:  What date was that, Dan?
16         MR. FREEMAN:  That was February 18, 2014.
17         MR. KEISTER:  Okay.
18     A.   I see that press release and there is a
19  hyperlink to the VoteTexas.gov website.
20     Q.   (By Mr. Freeman) So this distinction between
21  the SOS and the DPS mobile stations made me think of
22  something that makes me need to jump back, and I
23  apologize for that:  But with regard to the localized
24  press releases between October 25, 2013, and November 5,
25  2013, did those only address the DPS mobile units or did

1  they address the SOS mobile units as well?
2      A.   I don't recall.  Let me look at the timeline
3  again, please.
4      Q.   Sure.
5      A.   So those localized press releases as I recall
6  address -- that were from DPS, addressed the DPS run
7  mobile stations and locations.
8      Q.   Okay.  So they did not address the SOS run
9  mobile stations regarding mobile stations in counties
10  that do have a driver's license office?
11     A.   The ones run by the Secretary of State's office
12  in any location around the state, again, and that's
13  determined by the Secretary of State's office, you'll
14  see in that timeline, 10-25-13 through 11-05-13, what we
15  did do was essentially echo as a courtesy their press
16  releases.  What we had offered to them was when they put
17  their press releases out, if they -- if we happened to
18  get a copy of it, that we would also send that out as a
19  more of an "In case you missed it," just as an extra way
20  the get that message out.  But that's -- that's really
21  the only extent that we did that with them.
22     Q.   Did you do the same "In case you missed it"
23  press releases for local SOS mobile units in 2014 at any
24  time?
25     A.   It's possible that we did.  I know that that's

1  -- that offer was still extended.  And I just don't
2  recall specifically.
3      Q.   Okay.  And none of the other communications on
4  Exhibit 124 relate to those SOS mobile locations; is
5  that correct?
6      A.   I'm sorry, none of the other what relate to it?
7      Q.   None of the other communications on Exhibit 124
8  relate to those SOS run mobile locations in counties
9  that do have a driver's license offices, correct?
10     A.   Well, in the statewide press releases, we do
11  have a link to the VoteTexas.gov, which is run by the
12  Secretary of State's office, so in those cases there was
13  a reference to that.
14     Q.   Okay.  So outside of statewide press releases
15  and the echoing press releases in the fall of 2013,
16  nothing else relates to those SOS run mobile locations;
17  is that correct?
18     A.   There may have also been some Tweets and
19  Facebook messages where we pointed to the VoteTexas.gov
20  site.
21     Q.   But you have no specific knowledge of any
22  particular Tweets or Facebook messages that did that on
23  any of these particular listed dates on Exhibit 124?
24     A.   I -- I believe there was a Facebook message on
25  October 29, 2013, where we posted a link to



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                      101—104

Page 101

1  VoteTexas.gov mentioning DPS -- let's see, DPS postal
2  link, the mobile stations are available in a certain
3  number of counties, it looks like four counties are
4  listed here.  And that's just one that I turned to.
5     Q.   Okay.
6     A.   So there may be -- there may be others.
7     Q.   Okay.  That's all that I have.
8          I pass the witness.
9              EXAMINATION
10 BY MR. BRAZIL:
11    Q.   Good afternoon.
12    A.   Good afternoon.
13    Q.   I know it's late.  I'm going to try to put my
14 questions in categories and boxes for you so we can wrap
15 this up.
16         As I understand from your testimony, you
17 have talked about this, you've termed it "outreach
18 program" or "outreach campaign"?
19    A.   "Effort," yes, sir.
20    Q.   And as I understand it, DPS, their
21 communications office, your office, people under you, it
22 was limited to the press releases and the website; is
23 that correct?
24    A.   And social media.
25    Q.   Okay.  And social media.  Other than those four

Page 102

1  areas, did DPS or the communications office do any
2  outreach or educational programs in any other form that
3  we haven't spoken of?
4     A.   To the -- we do have a number of spokespeople
5  in the field, they're safety education troopers and
6  there's about 35 of them, and so essentially they would
7  take, you know, the message of the press release and
8  either pass that on to their local media, which is how
9  these were -- these localized press releases were
10 relayed or they would conduct interviews in their areas,
11 or, you know, respond to basic questions about EICs with
12 the information that's in those news releases?
13    Q.   When you said they would conduct interviews,
14 are you talking about with the press?
15    A.   Yes, yeah.
16    Q.   Would they conduct town hall meetings or go to
17 churches or go to schools or any community centers to
18 talk about the new photo ID bill or EICs, anything of
19 that sort?
20    A.   Not to my knowledge.
21    Q.   And so when you say they would give interviews,
22 would that be something they would seek out or just
23 respond to?
24    A.   Both.
25    Q.   Okay.  So --

Page 103

1     A.   I'm sorry.
2     Q.   -- if you had an officer in the Valley, he
3  might go to the newspapers there and give an interview?
4     A.   Yes.
5     Q.   Okay.  And just do that on his own because he
6  was a PR officer?
7     A.   Yes.
8     Q.   And would there be a record kept of that?  I
9  mean, what type of recordkeeping was there that we would
10 see about giving interviews, about responding to
11 inquiries?
12    A.   I don't know that there would be a record
13 similar to how we conduct business out of the media and
14 communications office.  Typically, we'll get inquiries
15 on any number of issues either that we've promoted or
16 that the press is just interested in and we'll conduct
17 those interviews that way.  For something like this,
18 we'll send out a press release and lot of times we'll
19 get phone calls from reporters back to the office, and
20 that similar dynamic happens out in the field as well.
21 When something goes out, they'll call in -- reporters
22 will call that point of contact with the department and
23 request either something on the record, for instance, if
24 it's radio or television, or -- you know, they could
25 just ask additional information about one of those

Page 104

1  topics.
2     Q.   But does your office or does DPS keep a record
3  of those inquiries?
4     A.   No.
5     Q.   Okay.  So if you got a call from the Lubbock
6  Free Press or the Dallas Morning News or anything like
7  that, there would not be a record kept by someone that
8  said, "We got this inquiry, we responded in this manner,
9  we're going to follow up or we're going to do this"?
10    A.   Let me clarify that --
11    Q.   Okay.
12    A.   -- I'm sorry.  We do at headquarters have
13 information about that but as far as the folks in the
14 field, we don't keep a record of the interviews that
15 they conduct out in the field.
16    Q.   Okay.  If one of the PR officers responded to
17 something, there would not be a record maintained?
18    A.   No, not to my knowledge.
19    Q.   But if someone called your offices or the
20 communications office, there would be a record?
21    A.   We do collect that information.
22    Q.   Okay.  And how is that maintained, what would
23 we see?  If you showed me those records, what would I be
24 looking at?
25    A.   We have a -- essentially it's like a



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                      105–108

Page 105

1  spreadsheet that -- that has information about inquiries
2  and, you know, who it is that made that inquiry.
3      Q.   And do you know if that has been produced in
4  the discovery in that case?  Do you know one way or the
5  other?
6      A.   I'm not sure.
7      Q.   Okay.  And do you know how large or how
8  voluminous this record would be if I located it?  I
9  mean, are we talking about an Excel spreadsheet of ten
10 pages or a thousand pages or?
11     A.   It's a living document so it's every day added
12 on to it.
13     Q.   Okay.  In what type of format, an Excel
14 spreadsheet or just e-mails or?
15     A.   I'm not exactly sure if it's Excel or what the
16 program is that it's in, but it's a type of document
17 similar to an Excel.
18     Q.   And are there categories, for example, 12
19 inquires that -- from people that do not really need an
20 EIC or 12 inquiries from the media, how is it -- how is
21 it categorized?
22     A.   By members of the media who called and, you
23 know, what their contact information is and if there's a
24 generic request that they're seeking.
25     Q.   And the response by your office, I assume?

Page 106

1      A.   Sometimes, yeah.  Sometimes if it's generic
2  enough, that if they called about the hurricane press
3  release, we won't have information -- detailed
4  information in there.
5      Q.   Is -- do you have a separate -- you said this
6  is a living document.  Is it for all inquiries or just
7  for EIC?
8      A.   All inquiries into the office.
9      Q.   So we would have to mine through that to
10 determine what inquiries were for the EIC or photo ID?
11     A.   Sure.
12     Q.   Okay.  Who determined what the DPS or what the
13 communications office would do with regard to this
14 outreach campaign versus what the Secretary of State's
15 office would do?
16     A.   Well, again, since -- we were aware that the
17 Secretary of State's office had a paid media effort
18 related to EIC -- well, I guess related to voting and
19 the new voting requirements.  And as I mentioned before,
20 we don't have a budget for any type of paid media so we
21 knew that we would be utilizing our earned media
22 strategies that we typically employ for any type of
23 outreach effort.
24     Q.   Okay.  I think I understood your answer but let
25 me make my question more simple.

Page 107

1      A.   Okay.
2      Q.   If someone at the Secretary of State's office
3  and/or at DPS say, "We're going to handle the EICs, you
4  handle the rest of the Senate Bill 14," was there any
5  coordination in that regard?
6      A.   Not -- from my knowledge not in that
7  form.  Essentially what DPS was responsible for was
8  issuing this card, issuing this election identification
9  certificate.  So from that aspect, that's what we
10 educated the public through the media about.
11     Q.   And was that because of a coordinated effort
12 between DPS and the Secretary of State or just because
13 you were issuing a card, if you know?
14     A.   We were aware that the Secretary of State's
15 office would be doing an outreach effort on -- I was
16 aware that they were going to be doing outreach effort
17 on the voting -- the new voting requirements, the photo
18 ID aspect of it.  And again, because the part that
19 pertained to DPS was issuing these cards, that's what we
20 focused our outreach effort on.
21     Q.   Was there a coordinate effort on the press
22 releases?  For example, was there ever a coordination
23 between the Secretary of State's office and DPS on
24 issuing press releases?
25     A.   From our perspective, as a courtesy to any

Page 108

1  entity that we cite in our press release, whether it's
2  another organization or agency, we always send them a
3  copy of it before we send it out.  So to that degree,
4  yes.
5      Q.   And would you keep records of what input the
6  Secretary of State had into the press releases that came
7  from the DPS?
8      A.   If there was any and that would just be through
9  an e-mail, a response, "Good to go," or something.
10     Q.   "Change this" or "This number's wrong," or
11 something --
12     A.   Yes, sir.
13     Q.   -- of that sort?  Okay.
14          Was there a contact person at the
15 Secretary of State's office that would receive these
16 press releases?
17     A.   Yes.  Alicia --
18     Q.   And who was that?
19     A.   Alicia Pierce.  She's the communications
20 director.
21     Q.   Was she the contact person from the summer of
22 last year until now?
23     A.   I believe that's right, yes.
24     Q.   Okay.  Now it's my understanding -- have we
25 covered all of the media outlets that DPS used in this



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
109–112

Page 109

1 outreach campaign?

2   A.   I believe so, yes.

3   Q.   So I take it from your previous testimony there
4 was no paid advertising for the EICs or that aspect of
5 the campaign that DPS handles; is that correct?

6   A.   Correct.

7   Q.   Okay.  And that's because there was no budget,
8 right?

9   A.   Correct.

10   Q.   Was there ever a promise or ever any indication
11 that there would be extra funds given to or provided to
12 the DPS for the EICs or any aspect of the photo ID bill?

13   A.   Not to my knowledge.

14   Q.   Has DPS requested extra funding from either the
15 Governor's Office, Secretary of State, Legislature for
16 what is done in this regard?

17       MR. KEISTER:  Let me just interject, and
18 this is beyond the scope of the issues she's designated
19 for.

20       But to the extent you know that.

21   Q.   (By Mr. Brazil)  Do you know?

22   A.   Related to the media outreach effort, not to my
23 knowledge.

24   Q.   Was there ever an outreach to someone, some
25 famous Texan, so to speak, to help with the campaign to

Page 110

1 volunteer their time like we see ads on TV by people
2 from Texas helping -- you know, don't litter the
3 highways, for example.  They volunteer their name and
4 their face.  Was there ever that requests by DPS to get
5 someone to do that?

6   A.   With respect to EICs and the media outreach,
7 not to my knowledge.

8   Q.   Okay.  You said earlier that you had reviewed
9 something from Mr. Peters' deposition?

10   A.   Yes.

11   Q.   What exactly was that, that you reviewed?

12   A.   The documents of his deposition.

13   Q.   I'm sorry?  The exhibits attached to his
14 deposition?

15   A.   I'm not sure.

16   Q.   Okay.  Did you read his deposition?

17   A.   I just reviewed it briefly.

18   Q.   Okay.  And the documents, were they attached to
19 his deposition?

20   A.   I didn't see any attached documents.

21   Q.   Okay.  So you just read his deposition, you
22 didn't read any documents that were attached to it?

23   A.   Right.

24   Q.   Okay.  All right.  Also --

25   A.   Yeah.

Page 111

1   Q.   -- if I understand your previous testimony,
2 there was nothing like a focus group or post studies or
3 any market research by the DPS to determine how
4 effective or how ineffective their outreach campaign
5 was; is that correct?

6   A.   Right.  We don't do research or analytics for
7 any of our outreach efforts, but we do have, you know,
8 methods and different ways of determining the
9 effectiveness.  As I mentioned, you know, as we push out
10 messages, we do monitor, you know, what's being picked
11 up in the media, the different types of coverage that
12 we're seeing out there.

13   Q.   What about a complaint file or a gripe file,
14 does -- if you get complaints from somebody, whether it
15 be somebody in the media, you know, a member of the
16 public, public official that has a complaint, do you
17 keep those in a separate file?

18   A.   We only correspond with members of the media in
19 our course of business.  You know, once in a while we'll
20 get a wrong number and we'll refer that on.  But as far
21 as complaints, you know, we get inquiries, I guess is
22 how I would characterize them, from the media.

23   Q.   Does all that, in this live file, is all of
24 that in the live file?  Do you -- or this live --

25   A.   Well, I don't -- I guess I don't understand

Page 112

1 the --

2   Q.   Sure.

3   A.   -- the characterization of complaints.

4   Q.   Okay.  A member of the Legislature calls and
5 says, "Nobody is sending press releases to X county, why
6 not?"  What would happen with that?

7   A.   We didn't receive anything like that, and
8 typically when the -- when lawmakers will contact the
9 department, they'll go through the government relations
10 office, so we don't typically have visibility on that.

11   Q.   Would there be a record maintained by your
12 office of someone who made contact in that regard?

13   A.   If they're not contacting our office, then no,
14 we wouldn't have a record of that.

15   Q.   So even if it went through another office and
16 it ended up to the communications office, there would or
17 would not be a record?

18   A.   If a lawmaker called the department that
19 typically -- I mean, I don't know any time where that
20 individual would be referred to the media office because
21 we only deal with the media.  Typically -- and it -- for
22 practical purposes, there are different divisions within
23 the department so that when somebody calls, if it's a
24 lawmaker, that will go to the government relations
25 office.  If it's a customer wanting to ask questions



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
113–116

Page 113

1  about, you know, a particular issue, it will go to
2  whoever that subject matter expert is.  If it's a member
3  of the media, they come to our office.  That -- that's
4  our customers then.
5     Q.   Okay.  So that's my next question.
6     A.   Okay.
7     Q.   Your office just deals with the media?
8     A.   Essentially, yes.
9     Q.   And if there's a reporter out there who has an
10 inquiry, they go to your office --
11    A.   Yes, sir.
12    Q.   -- and you respond?
13    A.   Yes, sir.
14    Q.   If I'm a member of the public and I have a
15 complaint at the DPS office in Dallas, who would I
16 contact?  Would it come to your office?
17    A.   It would not come to my office if you're a
18 member of the public.
19    Q.   Okay.  If I was a member of the public and I
20 had a complaint about something that happened at the
21 Dallas DPS office with my EIC and I contacted the Dallas
22 Morning News and they contacted you, then what would
23 happen?
24    A.   Then we would answer any questions that the
25 Dallas Morning News might have, and we would also -- and

Page 114

1  just depending on what the issue might be, whether they
2  have a complaint about anything that the department
3  provides a service on, we would do our best to answer
4  the question of the reporter.  But then just as a matter
5  of protocol, and we've got an obligation to serve
6  whoever it is that they're representing through calling
7  us, we make our best effort to connect that individual
8  with whoever that subject matter expert or division
9  might be within the department.
10    Q.   Okay.  So if someone had -- if a member of the
11 public had a complaint to the Dallas Morning News and
12 they contacted your office, you would answer the
13 reporter's questions and also put that member of the
14 public in touch with someone who could handle that
15 problem.
16    A.   Yes, sir.  Typically that's how we handle those
17 types of issues.
18    Q.   Okay.  And would a record be maintained by your
19 office of that transaction or that discussion?
20    A.   If it was in an e-mail.  If the reporter
21 contacted us in an e-mail and we were able to go back
22 and forth and get their information, then it would be
23 something that we would have.  Otherwise, if it was all
24 over the phone, we might not have a record of that
25 unless, of course, we e-mailed the subject matter expert

Page 115

1  within the department to relay the individual's
2  information.
3     Q.   Okay.  So if I'm a reporter for the Dallas
4  Morning News and I contact you over the telephone and
5  say, "This lady contacted me, she went down there,
6  couldn't get her EIC, had all her documents, you know,
7  and had some questions," there may not be a record of
8  that?
9     A.   There may not be a back and forth directly but
10 there may -- there may also be a record in the living
11 document we discussed earlier.  If there's some sort of
12 a -- you know, Joe Blow from Dallas Morning News called
13 to notify the department of an individual who had a
14 complaint about a driver license or an EIC issue or
15 whatever that issue might be --
16    Q.   Okay.  So someone --
17    A.   -- we may have it in that capacity.
18    Q.   Because someone would enter that information
19 into that document?
20    A.   Right.
21    Q.   Okay.
22    A.   So that's possible.
23    Q.   All right.  So there's not a set formula, I
24 assume, for my questions about when it would -- when a
25 complaint or when a concern or when something was

Page 116

1  addressed would end up in that document and when it
2  would not?
3     A.   If it came through the media, correct.
4     Q.   Okay.  It has to come through the media?
5     A.   It -- well, anything that comes to our
6  department is typically coming from the media.  So --
7  but the reason I qualify that is, if there's a complaint
8  made by an individual directly to the department in some
9  other form, there may be records of that, but if it's
10 coming through the media office and member of the media
11 is representing a complaint of some member of the
12 public, then that's when it would come through our
13 office and it could be documented in a couple of
14 different ways, either as I mentioned, through e-mail
15 correspondence between us and the reporter or us and the
16 subject matter expert or entered into the living
17 document.
18    Q.   This living document, do you have a name for it
19 other than "living document"?
20    A.   No, and I don't think I've ever called it
21 anything besides that.
22    Q.   Okay.  So, all right.  Who is your immediate
23 superior or boss?
24    A.   Robert Bodisch, deputy director of Homeland
25 Security.



Page 117

1   Q.  I assume no outside media, consultant,
2 advertising agency, et cetera, was utilized by DPS in
3 this outreach campaign; is that correct?
4   A.  That's correct.
5   Q.  Okay.  Do you maintain a record of the number
6 of hits on the website?
7   A.  The media and communications office does not --
8   Q.  Does anybody --
9   A.  -- have participation in that.
10   Q.  -- at DPS?
11   A.  I don't -- I'm not sure.
12   Q.  Okay.  So you're not sure whether or not
13 someone clicks on EIC, whether or not that's recorded?
14   A.  I don't know.
15   Q.  The plan or the strategy of this outreach
16 campaign, was that ever put into a written form?  Did
17 anybody in the DPS or communications office come up with
18 a written plan or media plan or communications plan?
19   A.  This is the -- extent of that -- of that
20 outreach effort -- and again, you know, we do a number
21 of outreach efforts that may have recurring
22 messages.  As I mentioned before, the hurricane ones,
23 we'll see that gearing up here pretty soon and there
24 will be a lot of recurring messages.  So, you know, we
25 have a process for pushing those out and, you know, we

Page 118

1 typically -- we don't need to develop a written document
2 in order to implement that, that effort.
3   Q.  So in other words, no?  Was that your long --
4   A.  Correct.  No.
5   Q.  Okay.  No.  All right.  What about when
6 someone, some person or group sends a Freedom of
7 Information Request to your office, is a record made of
8 that?
9   A.  That goes to that -- we don't handle those
10 requests.  That goes to the Office of General Counsel.
11   Q.  But eventually it gets to you if it has a
12 request for documents that generate -- that are
13 generated by the communications office?
14   A.  Sure.  Sure.
15   Q.  Would a written record be made of that request
16 on this living document or anywhere?
17   A.  No, that living document is specific to media
18 inquiries.
19   Q.  Okay.
20   A.  And I'm just thinking to your other question.
21 I think, internally, we refer to that as a "call log."
22 I'm calling it a living document.
23   Q.  Okay.  A call log, okay, that will help me find
24 it.
25       Do -- are you aware of or did your office

Page 119

1 participate in designing any of the signage or the print
2 media that may exist in the driver's license offices?
3   A.  I don't recall.  As I mentioned before, it's
4 possible that we may have seen it at some point in the
5 process but I don't recall being a part of that.
6   Q.  Okay.  Is it outside your area of knowledge to
7 tell me what type of print media there is in a driver's
8 license office?
9   A.  Yes.
10   Q.  Okay.  What about the lines in the driver's
11 license office.  Do you know whether or not one is
12 designated EICs versus driver's license versus CHL or
13 whatever?
14   A.  I don't, sorry.
15   Q.  What about toll free numbers or anything like
16 that, do you know whether they're designated for EICs or
17 it's just across the board?
18   A.  That's not in our area of expertise either, I
19 apologize.
20   Q.  Did you ever develop any recordings for the DPS
21 or any of the offices if somebody wanted to get
22 after-hours information?  Did you ever help develop any
23 of the information for EICs that someone might listen to
24 over the telephone?
25   A.  We didn't generate it but it's possible that we

Page 120

1 reviewed that.  I just don't recall specifically.
2   Q.  Do any -- did your office do any studies on the
3 wait time or the hold time for somebody trying to get
4 information on EICs?
5   A.  That's outside of the purview of the media and
6 communications office, so no.
7   Q.  Okay.  Let me take about -- I want to take a
8 quick break.  Let me get you to identify these documents
9 and I will attach these to your deposition.
10       We did not attach these, did we?
11       MR. KEISTER:  I think the -- only 124 I
12 think has been.  I think there's four documents total.
13       MR. BRAZIL:  What number are we on?
14       MS. COHAN:  133 is next?  Yes.
15       MR. BRAZIL:  133.
16       (Exhibit 133 marked for identification.)
17       (Handed to witness and counsel.)
18   A.  Thank you.
19   Q.  (By Mr. Brazil) Would you identify 133 for the
20 record.
21   A.  Yes.  These are EIC messages posted to the DPS
22 Facebook account between September 13, 2013, and May 16,
23 2014.
24   Q.  That's a document you brought with you this
25 morning?



Page 121

1    A.  Yes, sir.
2         (Exhibits 134 and 135 marked for
3  identification.)
4         (Handed to witness and counsel.)
5    Q.  (By Mr. Brazil) Okay.  Would you also identify
6  134.
7    A.  Yes, sir.  These are the Twitter messages
8  issued by the Texas DPS Twitter account between June 25,
9  2013, and May 16, 2014.
10   Q.  And 135 as well?
11   A.  These are the statewide press releases issued
12 regarding the EICs.
13   Q.  Do you maintain any file that we haven't talked
14 about that would have press information about -- about
15 an inquiry from a reporter or a press story or media
16 story about someone who had a problem at a DPS office
17 with an EIC or a mobile unit, anything of that sort?
18   A.  No.  An individual who had an issue at an
19 EIC --
20   Q.  That made it into the press.  There have been
21 some stories as you're aware of, I think we talked about
22 one earlier --
23   A.  Right.
24   Q.  -- where someone had a problem and it made --
25 it made the media, some form in the media.  Do you

Page 122

1  maintain some type of file in that regard?
2    A.  No.  And I only recall receiving those types of
3  inquiries on a couple of occasions, so there wouldn't be
4  any need for that.  But that -- that type of information
5  could be captured in the call log.
6    Q.  Okay.  So the only files maintained by your
7  office that has anything to do with EICs, whether it's a
8  complaint, a media inquiry, a response by your office,
9  it's going be in this call log/living document?
10   A.  Right, which is not EIC specific but it would
11 be captured, yes, sir.
12   Q.  Okay.  And do you know how long this has been
13 maintained?
14   A.  A while.
15   Q.  Before -- before June of 2013?
16   A.  Yes.
17   Q.  Okay.
18   A.  Yes.
19   Q.  So if we started in June of 2013, and we could
20 come forward and see EIC related complaints?
21   A.  Yes, sir.
22   Q.  And we wouldn't have to look anywhere else in
23 any other file anywhere in your office other than --
24   A.  Yes, sir.
25   Q.  Is that correct?

Page 123

1    A.  Yes, sir.
2         MR. BRAZIL:  Okay.  Pass the witness.
3         MR. KEISTER:  Anyone else?
4         MR. DOGGETT:  No.
5         MR. KEISTER:  Anyone on the telephone?
6         MR. FREEMAN:  I have one quick cleanup
7  question if that's all right.
8         MR. KEISTER:  Sure.
9              FURTHER EXAMINATION
10 BY MR. FREEMAN:
11   Q.  Sorry about that.  This is Dan Freeman again
12 and I'll be keeping you for just another two minutes or
13 so, Ms. Cesinger.
14        I just wanted to know where there were DPS
15 mobile units that were run by counties in coordination
16 with the DPS, was DPS in charge of the publicity for
17 those?
18   A.  I don't know that I would say "in charge."  We
19 did publish the contact information for the counties in
20 which the counties -- essentially there was someone in
21 the county running those locations.
22   Q.  So the press releases that you put out
23 regarding temporary locations run by DPS, would those
24 types of location have been included in those press
25 releases?

Page 124

1    A.  The -- both instances were included in the
2  statewide press releases, if that's what you're asking.
3  I'm sorry.
4    Q.  So specifically with regard to those DPS mobile
5  units that were run by local county officials, when you
6  did local press releases, did you include those types of
7  mobile units in your local press releases?
8    A.  Yes.
9    Q.  Okay.  That was the extent of my questions.
10   A.  Okay.
11        MR. KEISTER:  Anyone else?
12        MR. BRAZIL:  No.
13        MR. AGRAHARKAR:  No.  Thank you.
14        MR. KEISTER:  All right.  We'll reserve
15 ours to the time of trial.  Thank y'all.
16        THE WITNESS:  Thank you.
17        MR. FREEMAN:  Thank you.
18        MR. AGRAHARKAR:  Thank you.
19        (Off the record 5:18 p.m.)
20
21
22
23
24
25



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
125–128

Page 125

1  CHANGES AND SIGNATURE
2      RE: Veasey, et al., vs. Perry, et al.
3  PAGE  LINE  CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20     I, KATHERINE CESINGER, have read the foregoing
21 deposition and hereby affix my signature that same is
22 true and correct, except as noted above.
23
24         _____
25              KATHERINE CESINGER

Page 126

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4          Before me,_____, on this day
5  personally appeared KATHERINE CESINGER, known to me (or
6  proved to me under oath or through_____
7  (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
9  instrument and acknowledged to me that they executed the
10 same for the purposes and consideration therein
11 expressed.
12         Given under my hand and seal of office
13 this_____day of _____, 2014.
14
15
16         _____
17              NOTARY PUBLIC IN AND FOR
                THE STATE OF _____
18
19
20
21
22
23
24
25

Page 127

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2            CORPUS CHRISTI DIVISION

3  MARC VEASEY, et al.,         )
                                )
4        Plaintiff,             )
                                )
5  VS.                          )  CIVIL ACTION NUMBER:
                                )  2:13-CV-193 (NGR)
6  RICK PERRY, et al.,          )
                                )
7        Defendants.            )
   _____)
8
   UNITED STATES OF AMERICA,    )
                                )
9        Plaintiff,             )
                                )
10 VS.                          )  CIVIL ACTION NUMBER:
                                )  2:13-CV-263 (NGR)
11 TEXAS LEAGUE OF YOUNG VOTERS )
12 EDUCATION FUND et al.,       )
                                )
13    Plaintiff-Intervenors,    )
                                )
14 TEXAS ASSOCIATION OF HISPANIC )
   COUNTY JUDGES AND COUNTY     )
15 COMMISSIONERS, et al.,       )
                                )
16    Plaintiff-Intervenors,    )
                                )
17 VS.                          )
                                )
18 STATE OF TEXAS, et al.,      )
                                )
19       Defendants.            )
                                )
20 TEXAS STATE CONFERENCE OF    )
21 NAACP BRANCHES, et al.,      )
                                )
22       Plaintiffs,            )
                                )  CIVIL ACTION NUMBER:
23 VS.                          )  2:13-CV-291(NGR)
                                )
24 NANDITA BERRY, et al.,       )
                                )
25       Defendants.            )

Page 128

1  BELINDA ORTIZ, et al.,       )
                                )
2        Plaintiffs,            )
                                )
3  VS.                          )  CIVIL ACTION NUMBER:
                                )  2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,      )
                                )
5        Defendants.            )
   _____)
6
             REPORTER'S CERTIFICATION
7  DEPOSITION OF TEXAS DEPARTMENT OF PUBLIC SAFETY
                KATHERINE CESINGER
8                 MAY 20, 2014
9      I, Chris Carpenter, Certified Shorthand Reporter in
10 and for the State of Texas, hereby certify to the
11 following:
12     That the witness, KATHERINE CESINGER, was duly sworn
13 by the officer and that the transcript of the oral
14 deposition is a true record of the testimony given by
15 the witness;
16     That the deposition transcript was submitted on the
17 _____day of _____, 2014, to the witness or to the
18 attorney for the witness for examination, signature and
19 return to_____, by
20 _____, 2014; and if returned, the original
21 transcript will forwarded to Vishal Agraharkar, the
22 custodial attorney;
23     That the amount of time used by each party at the
24 deposition is as follows:
25     Mr. Agraharkar:  1 hour, 55 minutes



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
129

Page 129

1     Mr. Freeman:  36 minutes

2     Mr. Brazil:  27 minutes

3     I further certify that I am neither counsel for,

4  related to, nor employed by any of the parties or

5  attorneys in the action in which this proceeding was

6  taken, and further that I am not financially or

7  otherwise interested in the outcome of the action.

8     Certified to by me this 27th day of May, 2014.

9

10                    Chris Carpenter, Texas CSR 1151

11                    Expiration Date:  12/31/2014
                     100 Congress Avenue, Suite 2020
12                    Austin, TX  78701
                     (512)328-5557
13

14  Firm Registration No. 283

15

16

17

18

19

20

21

22

23

24

25

