IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

```
                              )
MARC VEASEY, ET AL,           ) CIVIL ACTION
                              )
     Plaintiffs,              ) NO. 2:13-CV-00193
                              )
V.                            )
                              )
RICK PERRY, ET AL,            )
                              )
     Defendants.              )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

THOM RANSOM CORNISH, C.P.A.

AUGUST 7, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF THOM RANSOM CORNISH, C.P.A.,

produced as a witness at the instance of the

DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on the 7th of August,

2014, from 10:03 a.m. to 4:01 p.m., before Tamara

Vinson, CSR in and for the State of Texas, reported by

machine shorthand, at 808 Travis, Suite 1520, Houston,

Texas, 77002, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Thom Cornish, C.P.A. - 8/7/2014

---

2

```
 1        A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3    MR. SCOTT BRAZIL
      Brazil & Dunn
 4    4201 FM 1960 West, Suite 530
      Houston, Texas  77068
 5    281.580.6310 Fax 281.580.6362
      scott@brazilanddunn.com
 6
 7  FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 8    MR. J. ERIC RICH (Via speaker phone)
      U.S. Department of Justice
 9    Voting Section, Civil Rights Division
      Room 7254 - NWB
10    1800 G Street, N.W.
      Washington, D.C.  20006
11    202.305.4355 Fax 202.307.3961
      j.rich@usdoj.gov
12
13  FOR THE DEFENDANTS:
14    MR. S. RONALD KEISTER
      Assistant Attorney General
15    General Litigation Division
      P.O. Box 12548
16    Austin, Texas  78711-2548
      512.463.2197 Fax 512.463.2224
17    ronny.keister@oag.state.tx.us
18
19  ALSO PRESENT:
20    Ms. Tamara Vinson, Court Reporter
21
22
23
24
25
```

---

4

```
 1           EXHIBIT INDEX
                                PAGE
 2
    Exhibit No. 1................................7
 3    Mr. Cornish's report with attached
      documents
 4
    Exhibit No. 2................................8
 5    In-Person Voting with Photo
      Identification:  Background
 6
    Exhibit No. 3...............................10
 7    e-mail string
 8  Exhibit No. 4...............................15
      Defendants' Amended Notice of Deposition
 9    Duces Tecum to T. Ransom Cornish, J.D.
10  Exhibit No. 5...............................12
      Secretary of State State of Texas
11    Purchase Order
12  Exhibit No. 6...............................12
      HAVA Texas Campaign Tracking Poll
13
    Exhibit No. 7..............................231
14    Box of documents produced by Mr. Cornish
15
16
17
18
19
20
21
22
23
24
25
```

---

3

```
 1            INDEX
 2                              PAGE
 3  Appearances....................................2
 4
 5  THOM RANSOM CORNISH, C.P.A.
 6
       Examination by Mr. Keister................6
 7
 8  Signature requested.........................234
 9  Reporter's Certificate......................236
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

5

```
 1        MR. BRAZIL:  This is Scott Brazil for
 2  the VC Plaintiffs.  Before we begin the deposition of
 3  Ransom Cornish, I wanted to put something on the
 4  record regarding late document production by the State
 5  of Texas.
 6        It's come to our attention that there were
 7  many documents produced after the expert reports were
 8  due from the Plaintiffs.  There have been several
 9  document productions or document dumps since the
10  experts produced their reports.
11        I want to make sure that the Plaintiffs are
12  not waiving their right to object to the introduction
13  of documents that were produced after the experts were
14  -- after the expert reports were written.
15        I want to make sure that we're not waiving
16  our objection to any document produced to one of your
17  experts that was not produced before the reports were
18  due.
19        I'm not blaming anybody for this.  I just
20  want to make sure that we preserve the record that we
21  may have objections to the introduction of documents
22  to our experts or at trial that were not produced in
23  the original request for production of documents from
24  the State that have to do with the opinions,
25  conclusions, or impressions that our experts may have.
```

Thom Cornish, C.P.A. - 8/7/2014

6

1       We've produced a couple of documents here
2  today that we notice came in in July that may have
3  some bearing on Mr. Cornish's testimony.  There may be
4  others that we haven't found or located yet.  So we
5  reserve the right to supplement or amend his report or
6  those of other experts based on a late production of
7  documents.
8       We're here in good faith to present
9  Mr. Cornish and we'll with that understanding go
10  forward.
11       Thank you.
12           THOM RANSOM CORNISH, C.P.A.,
13  having been first duly sworn, testified as follows:
14               EXAMINATION
15  QUESTIONS BY MR. KEISTER:
16   Q.  Good morning.
17   A.  Good morning.
18   Q.  Would you please state your full name for the
19  Court, please?
20   A.  First name is Thom -- and that is spelled
21  T-H-O-M -- Ransom, R-A-N-S-O-M, Cornish.
22   Q.  Okay.
23   A.  C-O-R-N-I-S-H.
24   Q.  Okay.  Thank you.  Mr. Cornish, you've been
25  retained as an expert witness in this case?

7

1   A.  Yes, sir.
2   Q.  Okay.  And you have prepared an expert report
3  in this case?
4   A.  Yes, sir.
5           (Exhibit No. 1 marked.)
6   Q.  Okay.  Let me hand to you what I've marked as
7  Exhibit No. 1 and ask to you look through that, sir,
8  and tell us if you recognize it and identify it for
9  the record, please.
10   A.  (Complying.)  I've briefly scanned it and it
11  appears to be a copy of my report, yes, sir.
12   Q.  Okay.  So, just for the record, that's your
13  report which you had marked as Exhibit A.  Correct?
14   A.  (No response.)
15   Q.  On the actual report, itself, just so we make
16  sure we've got everything.
17   A.  Yes, I believe I marked it Exhibit A, yes,
18  sir.
19   Q.  And then Exhibit B is your curriculum vitae.
20  Correct?
21   A.  Yes, sir, I believe so.
22   Q.  Exhibit C is the list of cases?
23   A.  Yes, sir.
24   Q.  Okay.  Exhibit 1 is a TKO Advertising memo?
25   A.  Yes, sir.

8

1   Q.  Exhibit 2 is DLD charts?
2   A.  Yes, sir.
3   Q.  Okay.  Exhibit 3 is four pages of Keith
4  Ingram's deposition?
5   A.  I believe that's correct, yes.
6   Q.  Okay.  Exhibit 4 is an e-mail concerning
7  camera cost from a Mr. Derfner?
8   A.  Yes.
9   Q.  Okay.  Exhibit 5 is -- is a series of e-mails
10  related to a Bloomberg inquiry?
11   A.  Correct.
12   Q.  Exhibit 6 is a DPS Government Relations
13  Action Sheet?
14   A.  Yes, sir.
15   Q.  Then Exhibit 7 is some documents that you've
16  identified, but did not actually include with the
17  report.  Correct?
18   A.  That is correct.
19           (Exhibit No. 2 marked.)
20   Q.  Okay.  Let me show you -- hand to you what
21  I've marked as Exhibit No. 2.  And please look at
22  Exhibit No. 2 and see if you can identify that.  Oh, I
23  should have told you to hold onto your place.  I'm
24  sorry about that.
25   A.  Oh, I'll go back to it.

9

1   Q.  Okay.
2   A.  Exhibit 7 appears to be what is my Exhibit --
3  what your Exhibit 2 appears to be my Exhibit 7, except
4  I think on my somewhere it was marked highly
5  confidential and that's the reason I didn't included
6  it in my report.
7   Q.  Okay.
8   A.  But that is correct, yes, sir.
9   Q.  Okay.  So what you have in your report, which
10  is just a page with the numbers --
11   A.  Yes.
12   A.  -- listed --
13   A.  Yes, sir.
14   A.  -- Exhibit 2 appears to be those numbers?
15   A.  Yes, sir.
16   Q.  And you recall something in here being marked
17  as highly confidential and that's why you didn't
18  include it in your report?
19   A.  That is correct.
20   Q.  Okay.  That makes sense.  Okay.  Okay.  Then
21  Exhibit No. 8 in your report is TKO Advertising
22  invoices?
23   A.  Yes, they are.
24   Q.  Exhibit 9 is a request for proposal?
25   A.  Correct.

Thom Cornish, C.P.A. - 8/7/2014

10

1    Q.   Exhibit 10 is another page where you have
2    Texas Bates stamped numbers on it, but no actual
3    documents attached.  Correct?
4    A.   Correct.
5         (Exhibit No. 3 marked.)
6    Q.   Let me show you what I've marked as Exhibit
7    No. 3 and ask you if you recognize that and can
8    identify it, please.
9    A.   That is correct.  That is -- that's my
10   Exhibit 10 and you have it marked as Exhibit 3.
11   Q.   Okay.  So Exhibit No. 3 are the page numbers
12   that correspond in your Exhibit No. 10.
13   A.   Yes, sir.
14   Q.   Okay.  Thank you.  Exhibit No. 11 is
15   documents related to Georgia voter ID cards?
16   A.   Correct.
17   Q.   Exhibit 12 is a fiscal note?
18   A.   Correct.
19   Q.   Okay.  Exhibit 13 is documents related to Voter
20   Education Campaign?
21   A.   Correct.
22   Q.   Exhibit 14 is documents related to the DPS
23   media?
24   A.   That's correct.
25   Q.   Okay.  Exhibit 15 is a transcript of the

11

1    Committee of the Whole?
2    A.   That is correct.
3    Q.   Then Exhibit 16 is a Proposed Activity Plan?
4    A.   Correct.
5    Q.   Okay.  All right.  Thank you.  Okay.  All
6    right.  Does Exhibit 1 contain all of your opinions
7    that you have formulated in this case as of today?
8    A.   They contain all the opinions that I had as
9    of this date.
10   Q.   As of the date of the completion of the
11   report?
12   A.   Of the completion of the report, that's
13   correct.
14   Q.   And what day was the report completed?
15   A.   June 26th.
16   Q.   Okay.  After June 26th, have you formulated
17   additional opinions that you intend to present to the
18   Court in this case?
19   A.   Only to the -- I think the extent of the
20   documents which I just saw yesterday relating to --
21   somewhat relating to my opinions expressed in Exhibit
22   1.
23   Q.   Okay.  And -- okay.
24        MR. KEISTER:  Let's go ahead.  We'll
25   just go out of order.  Okay.  If you would mark these

12

1    as Exhibit No. 5 and this one as Exhibit No. 6.
2         MR. BRAZIL:  The purchase order is 5?
3         MR. KEISTER:  Right.
4         MR. BRAZIL:  Okay.  I'll let you get
5    that on the record.
6         (Exhibit Nos. 5 and 6 marked.)
7    Q.   (By Mr. Keister)  All right.  Mr. Cornish,
8    let me show you a couple documents that your attorney
9    presented to us just before the deposition.  Let me
10   show you Exhibit No. 5.
11   A.   Okay.
12   Q.   Is that one of the documents you were
13   referring to that you had not seen at the time you
14   prepared your report?
15   A.   That is correct.
16   Q.   Okay.  And is that -- have you formulated new
17   opinions in this case based upon Exhibit No. 5?
18   A.   No, sir, I have not.
19   Q.   Do you expect to formulate new
20   opinions based upon Exhibit No. 5?
21   A.   I would have to say maybe not new opinions,
22   but an amended opinion.
23   A.   Okay.
24   A.   Because my report specifically says I've seen
25   no document to support a 2014 advertising campaign.  I

13

1    think this document would support that, so I may amend
2    that.
3    Q.   Okay.
4    A.   But it may lead to more discussion of it, but
5    specifically I think that would change or amend my
6    opinion.
7    Q.   Okay.  As we get into that part of the
8    deposition later on, we'll discuss that in more --
9    A.   Okay.
10   Q.   -- more detail.
11   A.   Yes, sir.
12   Q.   I think that would be the easiest way to do
13   it.  Let me show you what's also been marked as
14   Exhibit No. 6 --
15   A.   Uh-huh.
16   Q.   -- that your attorney also presented to us a
17   few minutes ago.  And is that one of the documents you
18   were saying you just saw?
19   A.   Yes, sir.
20   Q.   Or you saw after you prepared your report?
21   A.   I just saw it last night.
22   Q.   And what is Exhibit No. 6?
23   A.   It seems to be a follow-up tracking-type
24   report to evaluate the advertising campaign that the
25   State of Texas did relating to voter education and

Thom Cornish, C.P.A. - 8/7/2014

14

1 photo ID.
2 Q. Okay. And who prepared Exhibit No. 6?
3 A. It appears to be Burson-Marsteller.
4 Q. Okay. And I don't think I asked you to
5 identify or state on the record what Exhibit No. 5
6 was. What is Exhibit No. 5 specifically?
7 A. Purchase order by the Secretary of State
8 relating to advertising for a voter education program
9 2014.
10 Q. Okay. And we'll get into this more in detail
11 later on in the depo, but both Exhibit No. 5 and
12 Exhibit No. 6 are documents that you referenced in
13 your report as not being present or being documents
14 you had not seen produced. Correct?
15 A. That's correct.
16 Q. Okay. All right. All right. Other than
17 additional opinions or supplemented opinions, however
18 you want to call it --
19 A. Right.
20 Q. -- based upon these documents that you've
21 seen today, are there any other opinions that you
22 formulated after the production of your report in this
23 case?
24 A. Not that I can recall.
25 Q. Okay. As we sit here today, do you have --

15

1 other than information concerning Exhibit 5 and 6, as
2 we sit here today, do you have any intentions to do
3 any additional work in formulating opinions in this
4 case?
5 A. No, sir, not unless I'm asked to address some
6 other document that I'm not aware of.
7 Q. Okay. But as we sit here today, the opinions
8 in your report you think are complete as to what you
9 intend to present to the Court?
10 A. Correct.
11 (Exhibit No. 4 marked.)
12 Q. Okay. All right. Let me show you, sir, what
13 I've marked as Exhibit No. 4 and ask you to identify
14 that for the record, please.
15 A. Yes, sir.
16 Q. Okay. And what is Exhibit No. 4?
17 A. It's my -- the amended notice of my
18 deposition for 10:00 o'clock today, 808 Travis.
19 Q. Okay. And if you turn to the back -- back
20 page of Exhibit No. 4 you'll see a document request.
21 Correct?
22 A. That is correct.
23 Q. Okay. And the first document request asks
24 for all documents and tangible things that you relied
25 on to prepare for your testimony at the deposition.

16

1 Correct?
2 A. Yes, sir.
3 Q. All right. Did you bring any documents
4 pursuant to Request No. 1?
5 A. Yes, sir.
6 Q. Okay. And can you identify those documents
7 for the record, please?
8 A. They're in the box that I brought.
9 Q. Okay. Are you able -- as you see, we have a
10 document request No. 1, No. 2, No. 3, No. 4. The
11 documents you brought, you brought two boxes, I
12 believe?
13 A. A box and a half.
14 Q. A box and a half. Are you able to articulate
15 on the record which documents would apply to each
16 request today?
17 A. No.
18 Q. Or do just have your total file here?
19 A. I have my entire file here.
20 Q. Okay. I hate to ask you to do this, but
21 could we just briefly -- I'm not going to ask you to
22 go through in any detail at this point, but just
23 briefly go through the file and identify the general
24 categories of documents that you brought today?
25 A. You do you want me to bring them up here and

17

1 --
2 Q. Yes, please.
3 A. -- kind of go through them?
4 Q. Yes.
5 A. Okay.
6 Q. I'm not going to ask you to do a bunch of
7 reading. I'm just going to ask you to generally tell
8 us what we're looking at.
9 A. Okay.
10 MR. BRAZIL: Do you want him to name
11 each deposition or just say depositions?
12 Q. (By Mr. Keister) Well, yeah, why don't we
13 start with the depositions and just tell us which ones
14 you brought.
15 A. Okay.
16 Q. And if you reviewed them completely, indicate
17 that for us.
18 (Discussion off the record.)
19 A. I guess the group one documents which are in
20 a brown folder --
21 Q. Okay.
22 A. -- they primarily relate to the 2012
23 litigation. And I reviewed these documents, reviewed
24 these depositions. I cannot, at this time,
25 specifically say which ones I read in total and which

18

1 ones I just reviewed, but they were -- they were
2 reviewed to gain an understanding of the issues.
3    Q.   Okay.  So --
4    A.   So Dennis --
5    Q.   So each of these documents --
6    A.   I'm sorry.
7    Q.   So each of these depositions were depositions
8 that were taken in the Section 5 case in D.C.?
9    A.   And for two thousand and --
10    Q.   Okay.
11    A.   They were all, like, June of 2012.
12    Q.   Okay.  Okay.  So why don't we just go
13 through, and let me ask you this:  Are these just the
14 -- just the depositions or have you made notes on any
15 of these?
16    A.   No.  I have -- in here, I didn't make any --
17        MR. BRAZIL:  Let him finish.  Let him
18 finish the question.
19    A.   I'm sorry.  I'm sorry.  I'm sorry.
20    Q.   (By Mr. Keister) I finished.  Go ahead.
21    A.   I apologize.
22    Q.   Okay.  Have you made any notes on these
23 depositions?
24    A.   No, sir, I did not.
25    Q.   Okay.  So these are just clean copies of the

19

1 depositions?
2    A.   Yes, sir.
3    Q.   Okay.  And, if you would, just identify each
4 one for the record as the depositions that you brought
5 today.
6    A.   Dennis Leopold.
7    Q.   Okay.
8    A.   Lee Guyette.
9    Q.   You may want to spell these.
10    A.   G-U-Y-E-T-T-E.  Walter Brandt, B-R-A-N-D-T.
11 Forrest Mitchell.  Rebecca Davio, D-A-V-I-O, Davio.
12 James Abshier, A-B-S-H-I-E-R.  Leticia Salazar.
13 Richard Parsons.  Ann McGeehan.  Thomas Sager.
14    Q.   Okay.  And did you rely upon these
15 depositions in preparing your reports or your opinions
16 in this case?
17    A.   I did not specifically rely on them, no, sir.
18    Q.   Okay.  Are there any particular depositions
19 that you did rely on, the ones that you just named?
20    A.   No, sir, not that I can recall.
21    Q.   Okay.  All right.  Very good.  And what are
22 you looking at now?
23    A.   These are additional depositions.
24    Q.   Okay.  And are these also from the 2012 case?
25    A.   Yes, sir.

20

1    Q.   Okay.  Can you just -- and once again, let me
2 ask you, do any of these transcripts have notes
3 written on them?
4    A.   No, sir, they shouldn't have notes on them.
5    Q.   Okay.
6    A.   Brian Ingram.
7    Q.   Okay.
8    A.   That's it for the depositions.
9    Q.   Okay.  And that was Mr. Ingram's 2012
10 deposition?
11    A.   Yes, sir.
12    Q.   Okay.  And did you rely upon that deposition
13 in preparing your opinions in this case?
14    A.   Not that I can recall.
15    Q.   Okay.  What's the next group of documents?
16    A.   These are -- this is trial testimony.
17    Q.   Okay.  From the 2012 case?
18    A.   I believe so.
19    Q.   Okay.  And let me ask you the same question:
20 Do those transcripts have any handwritten notes that
21 you've made or any markings of any type?
22    A.   Well, there may be some circles on here as
23 to, for example, who was doing the questioning, for
24 example.
25    Q.   Okay.

21

1    A.   On the first one, the trial testimony of Jose
2 Aliseda.
3    Q.   Okay.
4    A.   I circled Mr. Freeman because he was going to
5 examination.
6    Q.   Okay.
7    A.   So that's the first trial testimony.
8    Q.   And is there an identifying date on the front
9 of that just so we know what you're looking at?
10    A.   No identifying date that I can see.
11    Q.   Okay.  I don't see it either, but in a
12 percent to be the cross-examination of Mr. Freeman of
13 a Jose Aliseda.  Is that what we're looking at?
14    A.   Yes, sir, I believe.
15    Q.   Okay.  All right.  Okay.  What's the next
16 document we have?
17    A.   The trial testimony of a Thomas Sager.
18    Q.   Okay.  I believe.
19    A.   That's the direct examination.
20    Q.   Okay.  Any notes that you've written on that
21 particular transcript?
22    A.   I don't believe so, no.
23    Q.   Okay.  Thank you.
24    A.   The trial testimony of Mr. Shaw.
25    Q.   Okay.  And, once again, would you flip

Thom Cornish, C.P.A. - 8/7/2014

22

1 through and see if there's any writing on that
2 particular transcript?
3   A.  (Complying.)  No, sir.
4   Q.  Okay.  Thank you.  And the next document?
5   A.  It's the trial testimony of Mr. Ingram.
6   Q.  And, once again, is that Brian Keith Ingram?
7   A.  Yes, it is.
8   Q.  Okay.  Any -- any handwriting on that
9 transcript?
10   A.  No, sir.
11   Q.  Okay.  And the last document you have?
12   A.  Bell-Platts.  It's a Ms. Bell-Platts.
13   Q.  Okay.  And does that appear to be --
14   A.  No.  It's by her, but it's the direct
15 examination of Steven D. --
16       MR. BRAZIL:  Just spell it.
17   A.  The last named is spelled
18 A-N-S-O-L-A-B-E-H-E-R-E.
19   Q.  (By Mr. Keister)  I'm calling it
20 Ansolabehere.
21   A.  Ansolabehere.
22   Q.  I'm not sure that's correct or not, but
23 that's what I decided to name him, so we'll go with
24 it.  Did you make any markings on that transcript?
25   A.  No, sir, I did not.

23

1   Q.  Okay.  Did you utilize these transcripts in
2 formulating the opinions that you have in this case?
3   A.  Well, I reviewed them, I read them, just to
4 try to get a basic understanding of the issues.
5   Q.  Okay.  But anything of particular interest
6 that you've noted in your report or that you have
7 formulated your opinions?
8   A.  No, sir.
9   Q.  Okay.
10       MR. BRAZIL:  I was trying to do all the
11 depos and testimony first.  Have we done all that?
12       THE WITNESS:  Uh-huh.
13       MR. BRAZIL:  We have?  Okay.
14       THE WITNESS:  I believe so.
15       MR. BRAZIL:  Okay.  So what would be
16 next in your stack?
17       THE WITNESS:  This right here.
18       MR. BRAZIL:  Right here?
19       THE WITNESS:  Uh-huh.
20       MR. BRAZIL:  Okay.
21   Q.  (By Mr. Keister)  And you have in front of
22 you now a large notebook?
23   A.  It's a black binder.
24   Q.  A black binder.  And what does that binder
25 contain?

24

1   A.  This contains my work in attempting to review
2 the provisional ballots for approximately 17 counties
3 in the State of Texas.
4   Q.  Okay.  And are these the provisional ballots
5 that you actually received from the various counties?
6   A.  No.
7   Q.  Okay.  Why don't you just tell me what's in
8 the notebook?  It will be easier.
9   A.  Well, various counties provided -- some of
10 them just provided basic information.  Some of the
11 counties, I was able to go to their website and get
12 some basic information on the number of provisional
13 ballots for various elections.  The tabs contain
14 correspondence with the county election office
15 requesting provisional ballot information.  And in
16 some instances, some of the counties provided
17 provisional ballots.
18   Q.  Okay.
19   A.  And so each county is under a specific tab
20 with the correspondence to the county to request the
21 information, and then their replies, if any.
22   Q.  Okay.  So did you personally have contact
23 with these counties?
24   A.  I would say of the contact with the counties,
25 I had contact with the majority of them, but not all

25

1 of them.
2   Q.  Okay.
3   A.  I have an assistant who sent the e-mails out
4 for me.
5   Q.  Okay.  And who's your assistant?
6   A.  Her name is Kim Adams.
7   Q.  Okay.  So either you or Ms. Adams or someone
8 else in your office had contact with each of the
9 counties that you contacted?
10   A.  Yes, sir.
11   Q.  Okay.  All right.  And I see also there is
12 some computer disk.
13   A.  On the left side of the binder --
14   Q.  Okay.
15   A.  -- are some provisional ballots, which I did
16 not place into the -- into the binder under the tab.
17 So that's -- it does have a paper clip on them.
18   Q.  Okay.
19   A.  And the rest of -- the rest of these disks
20 are disks that I obtained from Harris County.
21   Q.  Okay.  And what are each one of those disks?
22 Are they labeled in some manner?
23   A.  The disks are labeled with voter history.
24 For example, one of them is voter history November 6,
25 2012 election, March 2014.  That was the republican

Thom Cornish, C.P.A. - 8/7/2014

**26**

1  and democratic primaries.
2      Q.   Okay.
3      A.   And then the 2010 general election.
4      Q.   Okay.
5      A.   Information on that.  And there's one
6  additional, the 2013 joint election.  I think that was
7  the constitutional election is what people called it.
8      Q.   Okay.  So does everything in that black
9  binder constitute the information you collected when
10  you were attempting to make an analysis of the
11  provisional ballots?
12      A.   That's correct.
13      Q.   All right.  Very good.  Let's keep that one
14  on the table.  We'll refer to that later, but we may
15  want to put it out of the way.  All right.  What's
16  next group of documents?
17          MR. BRAZIL:  Go through those.
18      A.   The next is, I guess --
19          MR. BRAZIL:  Wait.  Here's some more.
20      A.   Agency --
21      Q.   (By Mr. Keister)  Hold on --
22      A.   Oh, okay.  I'm sorry.
23      Q.   -- just a second, Mr. Cornish?
24          MR. KEISTER:  Off the record for a
25  minute.

**27**

1          (Discussion off the record.)
2          MR. KEISTER:  All right.  Back on the
3  record.
4      Q.   (By Mr. Keister)  All right.  Mr. Cornish,
5  what's the next group of documents that you have?
6      A.   They're just paper clipped and binder clipped
7  additional provisional ballots.  These are -- these
8  are actual copies of the provisional ballots which I
9  printed out.  And these relate to the Harris County.
10      Q.   Okay.  So both of those groups of documents
11  are provisional ballots from Harris County.  Correct?
12      A.   Yes, sir.
13      Q.   All right.  Let's keep those on the table,
14  too, along with the binder.  We'll refer to those
15  later.  All right.  What's the next group of documents
16  that you have?
17      A.   Texas ID No. 237026 through 020 -- 030.
18      Q.   Okay.  Those are Bates stamp numbers?
19      A.   Bates stamp numbers.  It's just a document
20  that I thought was going to be, at the time, relevant.
21  And I didn't use this.  I reviewed it, but did not
22  rely upon it.
23      Q.   Okay.  And this is a bill summary and fiscal
24  analysis for House Bill 2513.  Is that correct?
25      A.   Yes, sir.

**28**

1      Q.   Okay.  All right.  Okay.  Let's keep that on
2  the table, too, just for -- all right.  What's the
3  next document that you have?
4      A.   Texas Bates stamp No. 242714, cost to
5  implement SB14.
6      Q.   Okay.  Okay.  What's the next document that
7  you have?
8      A.   Two thousand and -- two thousand and -- 2013
9  Tweets from the Texas Secretary of State's office.
10      Q.   Okay.  And what do these Tweets relate to?
11      A.   Voter education.
12      Q.   Okay.  And these are all from 2013?
13      A.   Two thousand -- I'm sorry.  2014.  I
14  misspoke.
15      Q.   Okay.  And have you utilized these Tweets and
16  formulated your opinions in this case?
17      A.   I reviewed them and discussed them, but did
18  not -- I don't know if they formed my opinion or not.
19  I'd have to see what the context of it is.
20          MR. KEISTER:  Okay.  All right.  Let's
21  keep those out for the time being, Scott.
22      Q.   (By Mr. Keister)  What's the next set of
23  documents?
24      A.   Texas 312578.  These are all information from
25  Burson-Marsteller.

**29**

1      Q.   Okay.  All right.
2      A.   It's their documents.
3      Q.   e-mail log list.
4      A.   The next set of documents is the request for
5  an intent to submit a proposal.  This is -- was done
6  by the same people.
7      Q.   Burson-Marsteller?
8      A.   That's correct.
9      Q.   Okay.  Can you give us the Bates stamp --
10  Bates stamp numbers?
11      A.   It starts at 00298794 and goes through
12  00298842.
13      Q.   Okay.  And is there a date on that particular
14  document?  It would probably be at the end, I would
15  think, if there is.
16      A.   I don't see a date.
17      Q.   Okay.  Do you know what year that's --
18      A.   This is two thousand -- I think it was 2013.
19      Q.   Okay.
20      A.   Because the contract started in January.  No.
21  The proposal was due no later than October the 17th,
22  2011.
23      Q.   Okay.
24      A.   So this had to be late 2011.
25      Q.   Okay.  Thank you.  Just hold onto it.  And

Thom Cornish, C.P.A. - 8/7/2014

30

1  what's the next group of documents?
2     A.  It's just the two-page request for proposal
3  issued by the State of Texas.
4     Q.  Okay.  And is there a Bates stamp number on
5  it?
6     A.  00298765 and 66.  It's not complete.  It's
7  just the first two pages.
8     Q.  Okay.  All right.  Thank you.
9     A.  Something I printed out, the Minnesota
10  elections statistics.
11     Q.  Okay.  And this shows Minnesota election
12  statistics 1950 to 2012.  Did this play a part in your
13  opinions that you formulated in this case?
14     A.  I believe it did, yes, sir.
15     Q.  Okay.  All right.  Let's keep that out.
16  Okay.
17     A.  Next is the script or information relating to
18  a mobile EIC event held September the 24th, 2013,
19  Bates stamp number Texas 0524723 and 4735.
20     Q.  Okay.  And does that relate to Harris County?
21     A.  This relates to -- yes, it was in Harris
22  County.
23     Q.  Okay.
24     A.  The event happened in Harris County.
25     Q.  Okay.  Thank you.

31

1     A.  I guess the next group of documents are
2  announcements by the Texas Department of Public Safety
3  and relating to the EIC event which were going to
4  happen on various days and requesting that -- the
5  media press release.
6     Q.  Okay.  Can you give us the dates and the
7  Bates stamp number on each of those?
8     A.  The first one, Bates stamp number is 504601.
9  Relates to a -- the EIC units are now available and
10  asking for a press distribution.
11     The next one is April 23rd, 2014.  This one
12  does not have a Bates stamp number on it.
13     Q.  Okay.  Let me see that.
14     A.  (Tendering document to Mr. Keister.)  April
15  17th, 2014.  No Bates stamp number on that one.
16     February 18th, 2014.  No Bates stamp number.
17     Q.  Okay.
18     A.  February 3rd, 2014.  No Bates stamp number.
19     January 29th, 2014.  No Bates stamp number.
20     October 25th, 2013.  No Bates stamp number.
21     September 24th, 2013.  No Bates stamp number.
22     September 13th, 2013.  No Bates stamp number.
23     Q.  Okay.  So each one of these documents are
24  press releases by the DPS related to either select
25  driver's license offices open on Saturdays or EIC

32

1  mobile station notifications.  Correct?
2     A.  I believe so, yes.
3     Q.  Okay.  And where did you obtain those paper
4  documents, do you know?
5     A.  I don't remember where these came from.
6     Q.  Okay.  Okay.  Thank you.
7     A.  Next is a -- information from the Secretary
8  of State that contains the 2014 events for Secretary
9  Berry, photo ID events.  And behind them are various
10  additional press releases issued by the Department
11  of Public Safety as previous, but issued by the
12  Secretary of State notifying various events in various
13  locations.
14     Q.  Okay.  And it appears those documents do not
15  have Bates stamp numbers.  Correct?
16     A.  That is correct.
17     Q.  Do you know where you obtained those
18  documents?
19     A.  I can't recall where these came from.
20     Q.  Okay.  All right.  And we'll keep all these
21  on the table.
22     A.  Okay.
23     Q.  I think some of these we may talk about later
24  in the deposition, so. . .
25        MR. BRAZIL:  I'm keeping them in order.

33

1        MR. KEISTER:  Okay.
2     A.  The next is a -- it's from the Houston
3  Chronicle.  It's just a press release by Ms. Berry on
4  February the 28th, 2014.  I printed that out.
5     Q.  (By Mr. Keister)  Okay.  And what does it
6  relate to just generally?
7     A.  It relates to elections and voting and
8  election certificates.
9     Q.  Okay.  Thank you.  And the next group of
10  documents?
11     A.  The next group are Tweets for 2014 by the
12  Texas Department of Public Safety from June 25th, 2013
13  through May 16th, 2014.
14     Q.  Okay.  And are those Tweets related to EIC --
15     A.  It's -- it's --
16     Q.  -- and mobile stations?
17     A.  Yes, sir.  I'm sorry.  It was under their
18  voter Tweet string, I guess.  I've never Tweeted, so I
19  wouldn't --
20     Q.  Okay.
21     A.  I couldn't tell you how to do it.
22     Q.  I have, but I couldn't tell you how either,
23  so we'll -- we'll -- we'll rely on the paper today.
24     A.  There you go.  Facebook also now.  This is
25  under the Texas Department of Public Safety.  This is

Thom Cornish, C.P.A. - 8/7/2014

34

1  Facebook postings.
2    Q.  Okay.
3    A.  I don't even have a Facebook account, but
4  that's what these are, this little group that's
5  stapled together.
6    Q.  Okay.  Very good.
7    A.  This is a -- the next document is a second
8  set of Interrogatories.  These are responses by, I
9  think, the State of Texas to request for
10  Interrogatories.
11    Q.  Okay.
12    A.  These were in my file.
13    Q.  Okay.
14    A.  I looked at those.  The legislative budget
15  for advertising, 2,024,000.
16    Q.  Okay.
17    A.  That's Texas 7314.
18    Q.  Okay.  That's the fiscal note?
19    A.  Yes, sir.
20    Q.  Okay.  And this one is marked highly
21  confidential, so I'm not sure why.  That came from the
22  legislator, I guess.
23    A.  Well, there's a lot of those.
24    Q.  Okay.
25    A.  I'd say there's probably three of them in my

35

1  file.  This one was mark highly confidential, but the
2  other ones were not.
3    Q.  All right.  The next document?
4    A.  The next is -- I think it's an exhibit.  It's
5  an exhibit to the deposition.
6       (Brief interruption.)
7    Q.  Okay.  And the next document?
8    A.  Exhibit 29 and 30.  It's an exhibit -- it
9  says KI, which I would assume to be Keith Ingram.  And
10  I think it was his deposition, which occurred on April
11  the 23rd, 2014.  It's Voter Education Campaign Phase
12  I.  I think this is an exhibit in my -- our report.
13    Q.  I believe it is.
14    A.  And Phase II.
15    Q.  Okay.  Very good.
16    A.  Okay.  The next is an e-mail string that
17  starts Texas 48354 and goes on 48362 from the
18  Secretary of State's office of Texas relating to an
19  error in the Spanish notice of required ID.
20    Q.  And what are the dates, generally, of those
21  e-mails?
22    A.  September the 19th, 2011.
23    Q.  Okay.  And do those have Bates stamp numbers?
24    A.  Yes.
25    Q.  Can you tell us what those are?

36

1    A.  Texas 48354 through 48362.
2    Q.  Okay.  Thank you.
3    A.  The next is Texas 420 -- sorry -- Texas
4  246255-246258.
5    Q.  Okay.
6    A.  And they're e-mails from the DPS government
7  relations February 13th, 2012 and some of the e-mail
8  string which predecease -- pre -- before it.  Before
9  it.
10    Q.  Good enough.  I gotcha.
11    A.  I'll use "before."  I'll try to keep it
12  simple.  And I think the last e-mail string, I think
13  it started January the 19th, 2012 and ended February
14  3rd, 2012 and had to do with wait times and cueing
15  systems and ID certificates being issued at the DPS
16  offices.
17    Q.  Okay.  Thank you.
18    A.  That's part of this exhibit.  Texas 215502
19  through 6 -- 563, same type of thing.  E-mail string
20  beginning July 8th of 2011 and ending July 11th, 2011.
21  Really, fiscal notes, what they were going to do and
22  any information related to what the DPS was going to
23  do, I assume, what the DPS responsibility was going to
24  be for SB14.
25    Q.  Okay.  Thank you.

37

1    A.  DPS Election Identification Certificate
2  website information.
3    Q.  Okay.
4    A.  No Bates stamp.  Printed April 3rd, 2014.
5    Q.  Okay.  So it appeared kind of off the Web
6  page?
7    A.  I believe so.
8    Q.  Okay.  Very good.  Any other documents?
9    A.  Sure.  29 pages of the location of the mobile
10  stations for 2013 as detailed by the -- this was on
11  the -- this was a link from the Texas Department of
12  Public Safety.  It shows all the locations of all of
13  the mobile EIC units for 2013.
14    Q.  Okay.  And is there Bates stamp numbers?
15    A.  No, no Bates stamp.  I printed this out.
16    Q.  Off of the --
17    A.  Off the Internet.
18    Q.  -- website?
19    A.  Yes, sir.
20    Q.  Okay.  And that's for 2013?
21    A.  Yes, sir.
22    Q.  Okay.
23    A.  Texas 306416, Exhibit 31.  Secretary of State
24  -- the title is Secretary of State Paid Media Wrap-Up.
25  It appears to be information relating to the

Thom Cornish, C.P.A. - 8/7/2014

38

1 advertising which occurred in September and October of
2 2013.
3    Q.   Okay.  Okay.
4    A.   This, I believe, exhibit is Exhibit D to the
5 proposal made on the $3 million 2012 advertising
6 campaign.  This is their proposed activity plan.
7    Q.   Okay.
8    A.   This is just another copy of it.
9    Q.   And there is no Bates stamp number on it?
10   A.   No Bates stamp number on this, no, sir.
11   Q.   Okay.  Okay.
12   A.   I think this is already a portion of my
13 report.
14   Q.   Okay.  One of the exhibits -- part of the
15 exhibits in your report?
16   A.   It's the last exhibit, Exhibit 16.
17   Q.   Okay.  Great.
18   A.   Texas 460790, e-mail from Melanie Huff to
19 Electoral Legal April -- I mean, August 2013 --
20   Q.   Okay.
21   A.   -- dealing with notification of provisional
22 ballots.
23   Q.   Okay.  Is there a Bates stamp number on it?
24   A.   Texas 460790.
25   Q.   Okay.

39

1    A.   e-mail Texas Bates stamp 193970.  Appears to
2 be an e-mail to county election officials relating to
3 names -- similar name standards.
4    Q.   Okay.
5    A.   Texas 0524739 and 38.  It's a Secretary of
6 State John Steen before Mrs. Berry appears.  Form
7 letter to members of the House of Representatives
8 indicating major help on getting the word out.  That's
9 what the gist of this letter is, I believe.
10   Q.   Okay.  Related to photo identification?
11   A.   Relating to the photo ID, yes, sir.
12   Q.   Okay.  Thank you.
13   A.   Non-Bates stamped document, four pages,
14 relating to SB14 fiscal note requirements, high level
15 requirements.  It looks like it's a letter to
16 determine the cost of issuing Election Identification
17 Certificates with a total on the last page.
18   Q.   Okay.  May I see that?
19   A.   Yes, sir.  (Tendering document to
20 Mr. Keister.)
21   Q.   All right.  This particular document does not
22 have any identifying information, correct, as to who
23 created it?
24   A.   That's correct.
25   Q.   Okay.  And there's no Bates stamp numbers.

40

1    Q.   Do you know where you obtained this document?
2    A.   I don't.
3    Q.   Okay.
4    A.   e-mail from a Jackson to a MacGregor
5 Stephenson at Texas.  It appears to be an e-mail
6 listing the counties that have declined having to do
7 the EIC.  This is Texas No. 3005 something.  It's
8 Exhibit 8.  It appears to be Exhibit 8 to Keith
9 Ingram's deposition.
10   A.   Okay.
11   A.   The next document is Dallas County election
12 results.  This document should have gone with the
13 provisional ballots.
14   Q.   Okay.
15   A.   It just came off the website.
16   Q.   Very good.  What particular election is that
17 related to or is it?
18   A.   November 6, 2012, November 2nd 2004.  That
19 appears to be it.
20   Q.   Okay.
21   A.   Those two elections.
22   Q.   Great.
23        MR. KEISTER:  Why don't we keep that one
24 with the provisional ballots stack there, Scott?
25        MR. BRAZIL:  (Complying.)

41

1    A.   Purchase order.  Well, Texas Bates Stamp
2 298763.  Purchase order by the State of Texas dated
3 January 3rd, 2012 issued to Burson-Marsteller, $3
4 million.
5    Q.   Okay.  Great.  Thank you.
6    A.   Two-page document.
7    Q.   Okay.
8    A.   The submission by, I'll call them "BM," if
9 you don't mind.
10   Q.   Okay.  That will work.
11   A.   Response of BM to the request --
12   Q.   And just for the record, Burson-Marsteller is
13 what we're referring to as "BM"?
14   A.   That's correct.
15   Q.   Okay.
16   A.   Texas -- it's document Texas 312556.  It's
17 their -- what they submitted to attempt to comply with
18 the request of the Texas request for proposal.  Just
19 another copy of it.
20   Q.   Okay.
21   A.   Another copy of the legislative note for
22 $2,024,000.  Texas 7314.  Another copy of Exhibit 28
23 to Keith Ingram's deposition relating to the fall
24 campaign $400,000.  And another copy of the sheets
25 which we just talked about a few minutes ago, which

Thom Cornish, C.P.A. - 8/7/2014

42

1  were not dated and not numbered relating to the cost
2  implement SB14.
3      Q.  Okay.  Can you tell if that was the
4  deposition in the current case or does that appear to
5  be the -- let me look at it.
6      A.  (Tendering document to Mr. Keister.)
7      Q.  All right.  Gotcha.  Thanks.
8      A.  Okay.  I need --
9      Q.  That would be the deposition taken in this
10  case, as opposed to the 2012 case?
11      A.  I believe so, yes.
12      Q.  All right.  Okay.
13          THE WITNESS:  Could we turn this down,
14  the fan?
15          MR. KEISTER:  Sure.
16          THE WITNESS:  Or reverse it, so it blows
17  up?
18          MR. KEISTER:  Off the record.
19          (Break.)
20          MR. KEISTER:  Back on the record.
21      A.  It appears to be another press release by the
22  Secretary of State's office.  Bates stamp number is
23  Texas 524740 relating to the November 5th,
24  constitutional election, which according to this first
25  election which required photo ID.

43

1      Q.  Okay.
2      A.  Printout of CBS news article.  I think this
3  is for Dallas.  No Bates stamp.  Four pages long.
4  Dealing with issues of similar named problems.
5      Q.  Okay.  And what was the date on that one?
6      A.  I think the date of this is January the 28th,
7  2014.
8      Q.  Okay.  Okay.  And this particular article
9  from Dallas relates to Dallas -- the Dallas County's
10  efforts to send notifications to Dallas County
11  residents related to possible similar name issues.
12  Correct?
13      A.  I don't -- I don't know what they were doing
14  here.  It just has some anecdotal stuff about similar
15  names.
16      Q.  Okay.
17      A.  The last document is numerous pages, a few
18  hundred pages.
19      Q.  Okay.  Are there Bates stamp numbers?
20      A.  It starts at Texas 301352 and it goes through
21  301472.  No.  I'm sorry.  474.
22      Q.  Okay.  And what --
23      A.  This is a BM, Burson-Marsteller, December
24  14th, 2012 wrap-up report.  It's titled 2012 General
25  Election Wrap-Up Report.

44

1      Q.  Okay.  Thank you.  Any other documents?
2      A.  Well, there's three miscellaneous documents
3  here.  The first one is a proposed activity timeline,
4  which is only partially there.  This is the timeline
5  which is contained in the proposal of Burson, which
6  has the Phase I and Phase II broken out by month.  I
7  think when I tried to print it out, I only got
8  January, February, and part of March.
9      Q.  Okay.  And what year does that relate to?
10      A.  This is 2012.
11      Q.  Okay.
12      A.  This is their advertising campaign.
13      Q.  Okay.
14      A.  This is just the signature page.  For some
15  reason, it came out again.  It's Texas 12 -- 312576.
16  Texas 312577, Attachment A to their intent to submit a
17  proposal.  That's BM's --
18      Q.  Okay.
19      A.  -- intent.
20      Q.  Very good.  All right.  Have we touched on
21  all the documents that you've brought today?
22      A.  That's it, sir.
23      Q.  All right.
24      A.  Except for my report and the exhibits to my
25  report.

45

1      Q.  Right.  Okay.  All right.  Other than what
2  you've brought and we've talked about today, are there
3  any other documents that you have reviewed in
4  preparation of your opinions in this case?
5      A.  Well, there may be other documents, but I did
6  not print them out.  I -- for example, I read almost
7  all of the deposition of Keith Ingram, printed out
8  selected pages of that deposition and put them with my
9  report, but I didn't print out all 400 and something
10  pages of it.
11      Q.  Okay.
12      A.  I guess the same thing would go for Joe
13  Peters.  And there may be some more documents that I
14  looked at on the discovery website, but I didn't print
15  them out.
16      Q.  Okay.  So you've had access to all of the
17  discovery in this particular case?
18      A.  The part that -- the discovery that I was --
19  I got access to on the Crivella West website, yes.
20      Q.  Okay.  And can you tell us just generally
21  what type of discovery was on that particular website
22  or what categories of discovery?
23      A.  Well, you could do all discovery or you could
24  limit it to discovery that was produced by the State
25  of Texas, discovery that was produced by the

Thom Cornish, C.P.A. - 8/7/2014

46

1  Plaintiff.  You could limit it to the specific time
2  and you could research it or you could massage the
3  information.  Not massage it, but could you search it
4  and find information by using various key words.
5      Q.   Okay.  So you had access to a large amount of
6  the discovery in this case --
7      A.   Yes.
8      Q.   -- for lack of a better way to put it?
9      A.   Yes, sir.
10     Q.   All right.  But with respect the information
11 that specifically went into the formulation of your
12 opinions, the documents you brought today you think
13 would fairly -- fairly be documents that would cover
14 that?
15     A.   I think they would cover the majority of
16 them.  There may be some instances where I reviewed
17 something and got an -- formulated an opinion based
18 upon a review of something, but not printed it out and
19 kept a copy of it.
20     Q.   Okay.  Have you or did you review any
21 published articles, texts, treatises, anything of that
22 nature, in formulating your opinions in this case?
23     A.   Not that I can recall.
24     Q.   Okay.  Okay.  Have you reviewed the reports
25 of the other experts in this case?

47

1      A.   No.
2      Q.   Okay.
3      A.   No, sir.
4      Q.   All right.  Do you know who -- who the
5  Plaintiffs in this case have designated as experts,
6  other than yourself?
7      A.   I know that they have designated the guy --
8  the guy that's got a real long name.  It starts with
9  an "A."
10     Q.   Ansolabehere.
11     A.   Ansolabehere.
12     Q.   I think.
13     A.   And then there's one whose last name starts
14 with a "B."  I believe he's Hispanic, but I can't pull
15 his name out of the air right now.
16     Q.   Okay.  But you haven't reviewed their
17 reports?
18     A.   No, sir.
19     Q.   Okay.  Have you had any discussions with any
20 of the experts?
21     A.   No, sir, I have not.
22     Q.   Okay.  Have you reviewed the reports of the
23 Defendants' experts in this case?
24     A.   I have not reviewed the reports.  I've
25 briefly scanned one.  And that was -- I just got it a

48

1  couple of days ago.
2      Q.   Okay.  Okay.  All right.  Let's talk a little
3  bit about your background.  We kind of --
4      A.   Okay.
5      Q.   -- jumped ahead there a little bit.  Where do
6  you currently reside?
7      A.   Sugar Land, Texas.
8      Q.   Okay.  And I don't need your specific
9  address, but do you also office in Sugar Land?
10     A.   Yes, I do.
11     Q.   Okay.  And how long have you resided in Sugar
12 Land?
13     A.   Since about '86, '87.
14     Q.   Okay.  The same residence?
15     A.   No.  I've been through a marriage
16 dissolution --
17     Q.   Okay.
18     A.   -- I guess would be a proper term for it.
19 And I moved back into Houston for about a year and a
20 half to two years at various apartments that would
21 give me free rent.
22     Q.   Okay.  Very good.  All right.  What's your
23 birth date?
24     A.   September 2nd, 1954.
25     Q.   Okay.  And where were you born?

49

1      A.   Houston.
2      Q.   Okay.  Did you grow up here in Houston?
3      A.   Absolutely.
4      Q.   Attended grade school and high school here?
5      A.   Every school, yes, sir.
6      Q.   Okay.  What schools did you go to?
7      A.   Red Elementary, Johnston Junior High,
8  Westbury for one day, Madison for the rest of high
9  school.
10     Q.   Okay.  Are your parents still alive?
11     A.   My mother is still alive.
12     Q.   Okay.  Does she live here in Houston?
13     A.   She lives in Telfair in Sugar Land.
14     Q.   Okay.  Very good.  All right.  You mentioned
15 that you have been married.  Are you currently
16 married?
17     A.   Yes, sir, I am.
18     Q.   Okay.  Who's your current wife?
19     A.   Olga Kayotkina, K-A-Y-O-T-K-I-N-A.
20     Q.   Okay.  And how long have you been married to
21 her?
22     A.   Eight years.
23     Q.   Okay.  And then you indicated that you had a
24 previous marriage?
25     A.   That is correct.

Thom Cornish, C.P.A. - 8/7/2014

50

1  Q.  Okay.  And what was her name?
2  A.  Debra McBride.
3  Q.  All right.  And how long were you married to
4  Ms. McBride?
5  A.  Twenty something years.
6  Q.  Okay.  And when did that marriage end?
7  A.  July '02.
8  Q.  Okay.  And did you and Ms. McBride have
9  children?
10  A.  Two.
11  Q.  Okay.  And what are their names?
12  A.  Bridgett Brittany.
13  Q.  Okay.  And how long is Bridgett Brittany?
14  A.  It's horrible to forget how old your kids
15  are, isn't it?  She was born in '79, so she's
16  thirty-five.
17  Q.  Okay.  And where does she live?
18  A.  Help lives in Greatwood, which is south of
19  bayou.
20  Q.  Okay.  And is she married?
21  A.  She is married to Mr. John Shank.
22  Q.  All right.  And you indicated you had
23  another child with the first marriage?
24  A.  Brittany Smith.
25  Q.  Okay.

51

1  A.  She's married to Mr. Smith.
2  Q.  Okay.  Very good.  And how old is Brittany?
3  A.  Thirty.
4  Q.  Okay.  And do you have any children with your
5  second wife?
6  A.  No.  I have a stepdaughter.
7  Q.  Okay.  And what is her name?
8  A.  Natasha.
9  Q.  Okay.  And how old is Natasha?
10  A.  Almost twenty.
11  Q.  Okay.  Does she still live at home?
12  A.  She is away at college, A&M.
13  Q.  Okay.  Very good.  Do you have a driver's
14  license?
15  A.  I sure do.
16  Q.  Is it current?
17  A.  It better be.
18  Q.  Okay.  Do you have a passport?
19  A.  Yes, I do.
20  Q.  Okay.  How long have you had a driver's
21  license?
22  A.  Since I was a few days younger than sixteen
23  years of age.
24  Q.  Okay.  I assume you -- you look like about my
25  age, so I assume you took driver's ed in school and

52

1  got it as quickly as you could?
2  A.  That is a true statement.
3  Q.  All right.  Very good.  And how long have you
4  had your passport?
5  A.  I got my first passport in the first part of
6  2003.
7  Q.  Okay.  So it's still current.  Correct?
8  A.  No.
9  Q.  No?
10  A.  It expired and I renewed it.
11  Q.  Okay.  All right.  But you have a current
12  passport?
13  A.  Yes, sir, I do.
14  Q.  Okay.  Do you have a concealed handgun
15  license?
16  A.  I had at one time.
17  Q.  Okay.  And -- but you do not today?
18  A.  It has expired.
19  Q.  Okay.  Are you planning to renew it?
20  A.  Not that I plan on, but you never know.
21  Q.  Okay.  Decide you just didn't need it?
22  A.  Well, the problem went away, so. . .
23  Q.  Okay.  Okay.  All right.  That sounds like
24  something we won't go into.
25  A.  That dealt with the marriage dissolution.

53

1  Q.  Okay.  All right.  We definitely won't go
2  into it then.  All right.  Speaking of the marriage
3  dissolution, that was Ms. McBride.  Correct?
4  A.  That's correct.
5  Q.  All right.  Do you know if Ms. McBride has a
6  current driver's license?
7  A.  She probably does.
8  Q.  Okay.  And when you were married to her, did
9  she have a driver's license?
10  A.  Yes, sir, she did.
11  Q.  Okay.  Do you know if she had a passport?
12  A.  No, never got a passport.
13  Q.  Okay.  How about a concealed handgun license?
14  A.  No, sir.
15  Q.  All right.  Do you have a copy of the divorce
16  records?
17  A.  I sure do.
18  Q.  The divorce decree?
19  A.  Yes, I do.
20  Q.  Is that something that you feel compelled to
21  hold onto?
22  A.  I paid enough for it.  I'm going to keep a
23  copy of it.
24  Q.  I understand.  Okay.  All right.  Now, your
25  current -- well, let's talk about your children --

Thom Cornish, C.P.A. - 8/7/2014

54

1  A.  Okay.
2  Q.  -- with the first marriage.  One -- the first
3  -- the oldest was Bridgett.  Is that correct?
4  A.  Bridgett, that's correct.
5  Q.  All right.  Does Bridgett have a driver's
6  license?
7  A.  She sure does.
8  Q.  Do you know when she first obtained her
9  driver's license?
10  A.  The day before she got her yellow Mustang.
11  Q.  Okay.
12  A.  Which would have been when she turned
13  sixteen.
14  Q.  Okay.  And to your knowledge, her driver's
15  license is still current?
16  A.  That's correct.
17  Q.  All right.  Do you know if Bridgett has a
18  passport?
19  A.  She sure does.
20  Q.  Do you know if she has a concealed handgun
21  license?
22  A.  I don't think she does.
23  Q.  Okay.  And what is Bridgett's husband's name?
24  A.  John Shank.
25  Q.  Okay.  Do you know if Mr. Shank has a

55

1  driver's license?
2  A.  I've never seen it, but I assume he does.
3  Q.  Okay.  He drives a vehicle?
4  A.  He drives all the time.
5  Q.  All right.  Do you know if he has a passport?
6  A.  I know he does.
7  Q.  Okay.  Very good.  Do you know if he has a
8  concealed handgun license?
9  A.  I don't believe so.
10  Q.  Okay.  Do they have children?
11  A.  They've got little Jack and little JR.
12  Q.  Okay.  And how old are they?
13  A.  Little Jack is seven, going on eight.  Little
14  JR is two and a half, three, going on about one.
15  Q.  Okay.
16  A.  He's the terror.
17  Q.  All right.  So I assume neither one of them
18  has gotten their driver's license.  Correct?
19  A.  No.
20  Q.  Okay.  All right.  And then the other
21  daughter was Brittany?
22  A.  Brittany.
23  Q.  All right.  And you said she is thirty?
24  A.  She's thirty, yes, sir.
25  Q.  All right.  Does Brittany have a driver's

56

1  license?
2  A.  Yes, she does.
3  Q.  Do you know when she obtained her driver's
4  license?
5  A.  She was about sixteen and a half before she
6  got hers.
7  Q.  Okay.  So she was -- she was late then.
8  A.  She was -- she wanted to be chauffeured
9  around.
10  Q.  Okay.  And do you know if Brittany has a
11  passport?
12  A.  I think she may, because I think they went to
13  Costa Rica.
14  Q.  Okay.  Do you know if she has a concealed
15  handgun license?
16  A.  She's not into guns.
17  Q.  Okay.  And her husband's name is?
18  A.  Brian.
19  Q.  Brian.  Brian Smith?
20  A.  Uh-huh.
21  Q.  And does Mr. Smith, to your knowledge, have a
22  driver's license?
23  A.  Yes.
24  Q.  Do you know if he has a passport?
25  A.  I think he would, because he went -- he went

57

1  on the trip.
2  Q.  Okay.  Do you know if he has a concealed
3  handgun license?
4  A.  I don't know.
5  Q.  Okay.  All right.  So that's -- those are
6  your children from the first marriage?
7  A.  Right.
8  Q.  And your current wife, her name is Olga?
9  A.  Olga.
10  Q.  Okay.  Does Olga have a driver's license?
11  A.  Sure.
12  Q.  Okay.  Does she drive?
13  A.  Nope.
14  Q.  She doesn't?
15  A.  Nope.  She really likes to be chauffeured
16  around.
17  Q.  All right.  But she can drive if she wants
18  to?
19  A.  If she had to.
20  Q.  Okay.  Why does she have a driver's license
21  if she doesn't drive?
22  A.  Because she didn't want to not have one if
23  her daughter had one, so. . .
24  Q.  Okay.  All right.  Does Olga have a passport?
25  A.  She sure does.

Thom Cornish, C.P.A. - 8/7/2014

58

1  Q.  Okay.  How long has Olga had her driver's
2  license, do you know?
3  A.  Four years.
4  Q.  Okay.  Oh, so she's recently obtained her
5  driver's license?
6  A.  That's correct.
7  Q.  All right.  And does Olga have a
8  passport?
9  A.  Uh-huh.
10  Q.  Okay.  And that's a "yes"?
11  A.  That is correct.
12  Q.  Okay.
13  A.  She has a U.S. passport.
14  Q.  All right.  Does she have a concealed handgun
15  license?
16  A.  She better not, no.
17  Q.  Okay.  Any reason why Olga just obtained her
18  driver's license four years ago?
19  A.  When she came to this country eight years
20  ago, she had never driven a car.  And like the old
21  saying, it's hard to teach old dogs new tricks, she
22  wanted to be very perfect at what she did.  So she
23  studied the Texas driver's handbook for a number of
24  years taking the practice test and all that kind of
25  stuff before she decided to do the, okay, I want to

59

1  practice driving.  So that lasted about a year
2  studying for the test, taking the test.  That lasted
3  for another year.  So it was a very long process.  She
4  was not in a hurry to get a driver's license.
5  Q.  What country is Olga from originally?
6  A.  Ukraine.
7  Q.  Okay.  And is she now a U.S. citizen?
8  A.  Yes, she is.
9  Q.  Okay.  What type of documents does Olga have
10  that shows that she's a U.S. citizen, if you know?
11  A.  She's got her citizenship papers that she
12  received here in Harris County back -- I don't know --
13  six years ago, something like that, seven years ago.
14  Q.  All right.  Very good.  And Olga's
15  daughter, your stepdaughter, what was her name?
16  A.  Natasha.
17  Q.  And you say she's in College Station?
18  A.  That's correct.
19  Q.  Going to Texas A&M?
20  A.  Well, she's enrolling.  She went to Blinn for
21  one year and now she's transferred over to A&M.
22  Q.  Okay.  And does she have a driver's license?
23  A.  Yes.
24  Q.  When did she obtain her driver's license?
25  A.  Pretty much when she was a little over

60

1  sixteen, sixteen and a half, something like that.
2  Q.  Okay.  All right.  Do you know if she has a
3  passport?
4  A.  Yes, she does.
5  Q.  Okay.  And concealed handgun license?
6  A.  I don't think so.
7  Q.  Okay.  And I'm saying "her" because I forgot
8  her name.  What was her name again?
9  A.  Natasha.
10  Q.  Natasha.  Okay.  Very good.  You indicated
11  your mother is still alive and lives here in Houston?
12  A.  That is correct.
13  Q.  Okay.  Does your mother have a driver's
14  license?
15  A.  Yes, she does.
16  Q.  Okay.  How old is your mother, do you know?
17  A.  Ninety-two.
18  Q.  Ninety-two.  Congratulations.
19  A.  Yes.
20  Q.  Does she still drive?
21  A.  Yes, she still drives.
22  Q.  Okay.  So her driver's license is current?
23  A.  It's current for a while longer, because when
24  you get that age, they don't last long.  They expires
25  every two years --

61

1  Q.  Right.
2  A.  -- or something like that, I think.
3  Q.  Okay.
4  A.  I don't know the exact time, but she
5  complains.
6  Q.  Okay.  She has to go back every couple years?
7  A.  She complains.
8  Q.  Okay.  Does your mother have a passport?
9  A.  No.  She's never flown.
10  Q.  Okay.  All right.  So -- okay.  Does your
11  mother vote?
12  A.  I don't know.
13  Q.  Okay.
14  A.  I have no clue.
15  Q.  Okay.  Y'all don't get into political
16  discussions?
17  A.  No.  I don't think she likes anybody, so I
18  don't think she's going to vote for anybody.
19  Q.  Okay.  All right.  All right.  So it sounds
20  like everyone in your immediate family has a driver's
21  license.  Correct?
22  A.  Correct.
23  Q.  So everyone in your immediate family, if they
24  wished to vote, would meet the criteria to vote under
25  SB14.  Correct?

Thom Cornish, C.P.A. - 8/7/2014

62

1    A.  Yes, sir.
2    Q.  All right.  Do you know anyone in your
3  extended family that does not have a driver's license
4  who is -- who is of the age and qualified to obtain a
5  driver's license?
6    A.  No, I do not.
7    Q.  Okay.  Do you know any of your friends or
8  neighbors who do not have a driver's license?
9    A.  I do not.
10    Q.  Okay.  Do you know if any of your business
11  associates or -- or -- well, business associates that
12  do not have a driver's license?
13    A.  No.
14    Q.  Okay.  Do you know of any of your clients --
15  which I'm assuming you hopefully have a large number
16  -- any of your clients that do not have drivers
17  licenses?
18    A.  Well, I've never -- I don't really ask them
19  that, because that's not a required, you know,
20  document that I have to get, but not that I know of,
21  no.
22    Q.  Okay.  Okay.  Do you belong to any civic
23  organizations, social clubs, things of that nature?
24    A.  Golf club.
25    Q.  Okay.  Do you golf with a regular group of

63

1  people on a regular basis -- not a regular group of
2  people, but the same group of people on a regular
3  basis?
4    A.  Yes, I do.
5    Q.  Okay.  How many people belong to the golf
6  club?
7    A.  In my group, eight to ten.
8    Q.  Okay.  All right.  While y'all are playing
9  golf, do you occasionally get into political
10  discussions?
11    A.  Golf is not a social event.  We do not.
12    Q.  Okay.  What about after the golf round is
13  over and you're at the club, do you --
14    A.  No.  That's where you pay money or collect
15  money.
16    Q.  Okay.
17    A.  That's not a social event either.  That's
18  a --
19    Q.  Okay.
20    A.  That's a monetary event.
21    Q.  All right.  Anybody in your golf club you
22  know of that does not have a driver's license?
23    A.  Not that I know of.
24    Q.  Okay.  All right.
25    A.  I have a lot that shouldn't have a driver's

64

1  license, but I don't -- I don't know of any that don't
2  have a driver's license.
3    Q.  Okay.  Do you attend a church?
4    A.  Not regularly, no, sir.
5    Q.  Okay.  All right.  I guess, just the long and
6  short of my question is:  Do you know anybody that
7  does not have a driver's license or some form of ID
8  that would allow them to vote under SB14?
9    A.  Never really thought about it, but I don't
10  think so.
11    Q.  Okay.  Have you ever had anyone come up and
12  tell you that they have not been able to vote because
13  of the photo ID requirements of SB14?
14    A.  No, sir.
15    Q.  Okay.  Have --
16      MR. BRAZIL:  Hold that thought.  Let me
17  get her to order lunch.
18      MR. KEISTER:  Okay.  Why don't we take a
19  break?
20      MR. BRAZIL:  Okay.
21      MR. KEISTER:  We've been going for
22  almost an hour and a half.
23      MR. BRAZIL:  Okay.
24      (Break.)
25      MR. KEISTER:  Back on the record.

65

1    Q.  (By Mr. Keister)  All right.  Mr. Cornish,
2  before we broke, we were talking about people that you
3  know or don't know, but the fact that you don't know
4  anyone that does not have an ID that would not qualify
5  -- well, let me start over.
6      You do not know anyone that would not have an
7  ID under SB14 that would allow them to vote.  Correct?
8    A.  That is the correct.
9    Q.  All right.  Now, in formulating your opinions
10  in this case and in your review of this case, have you
11  interviewed anyone that claims not to have an ID that
12  would allow them to vote under SB14?
13    A.  No, I do not.
14    Q.  Okay.
15    A.  I have not.
16    Q.  All right.  Have you been provided a list of
17  people who claim that they do not have a photo ID that
18  would allow them to vote under SB14?
19    A.  No, sir.
20    Q.  Okay.  So, as we sit here today, you know no
21  one personally, nor do you know anyone as a result of
22  your participation in this case that do not have a
23  photo ID that would allow them to vote under SB14?
24    A.  Well, let me clarify.
25    Q.  Okay.

Thom Cornish, C.P.A. - 8/7/2014

66

1   A.   In the performance of my investigation and
2   analysis, I printed out and looked at various
3   provisional ballots, specifically Harris County and, I
4   think, a couple of other counties of affidavits
5   prepared by people who claimed that they did not have
6   proper photo ID to vote.   I don't know these people,
7   but I saw the pieces of paper with their name on them.
8   So, to the extent that your question asked, did I know
9   anybody, I don't know those people, but I saw their
10  names and they claimed to not have a photo ID.
11       Q.   Okay.
12       A.   So that would qualify my answer that I don't
13  know anybody.
14       Q.   Right.   You don't know anyone personally and
15  you have not interviewed or met with anyone as a
16  result of this case that have told you they do not
17  have an ID that would allow them to vote under SB14.
18  Correct?
19       A.   That's correct.
20       Q.   All right.   And we'll get into the
21  provisional ballots a little bit more later, but are
22  you talking about the forms that people would sign at
23  the polling place, itself?
24       A.   Yes, sir.
25       Q.   Okay.   And when they would obtain the

67

1   provisional ballot.   Correct?
2       A.   Yes, sir.
3       Q.   All right.   Now, those particular forms only
4   indicate that the person does not have a photo ID with
5   them at the time they're voting.   Correct?
6       A.   The form indicates that in one place, but
7   that's not consistent.   Sometimes they write on there
8   no photo ID.
9       Q.   Right.
10       A.   So I don't know whether the form is
11  indicating that or the person that's writing it is
12  indicating it.
13       Q.   Okay.
14       A.   But that's a true statement.
15       Q.   All right.   And we'll look at those more,
16  right.   What happens at the polling place is a form
17  indicates that the person who comes in to vote does
18  not have a photo ID with them at the time?
19       A.   Correct.
20       Q.   Right.   Now, whether or not that person has a
21  photo ID at home or some other place, that provisional
22  ballot does not indicate that.   Correct?
23       A.   That is correct.
24       Q.   Right.   So with respect to those provisional
25  ballots where people indicate they do not have a photo

68

1   ID, we can not say, in and of itself, that means they
2   do not have a photo ID somewhere other than with them
3   at the polling place?
4       A.   Correct.
5       Q.   And, in fact, some of those people who did
6   not have photo IDs at the polling place did come in
7   and cure the lack of a photo ID later.   Correct?
8       A.   I don't have personal knowledge of it, but I
9   -- based upon the representations of the county
10  election officials, they did come in and cure it.
11       Q.   Right, right.   Okay.   All right.   And like I
12  say, we'll get into that more.
13       A.   Correct.
14       Q.   Okay.   All right.   Anything -- any other
15  information that you have, other than provisional
16  ballots, that would give you some information that
17  there are people out there who do not have photo IDs
18  that would allow them to vote under SB14?
19       A.   Not that I personally know of.
20       Q.   Okay.   Do you have a copy of your birth
21  certificate?
22       A.   Yes.
23       Q.   Okay.   You indicated you kept a copy of your
24  divorce decree.   Do you keep copies of your marriage
25  records, your marriage licenses?

69

1       A.   I probably have a copy of it.
2       Q.   Okay.   I bet your wife does if you don't.
3   Correct?
4       A.   I don't know.   I don't know what she keeps.
5   She keeps a lot of stuff.
6       Q.   Okay.   How about your kids, do you think --
7   do they have copies of their birth certificates?
8       A.   I gave them copies of their birth
9   certificates.   Now, whether they kept them or not, I
10  don't know.
11       Q.   Okay.   All right.   Very good.   All right.
12  Have you ever been in the military?
13       A.   No, sir.
14       Q.   Okay.   Have you been asked in this case to
15  try and do any calculations or formulate an opinion as
16  to the number of people in Texas that would not have a
17  photo ID that would allow them to vote under SB14?
18       A.   The total number?
19       Q.   Yes.
20       A.   No, sir.
21       Q.   Okay.   Have you been asked to formulate any
22  opinions with respect to the number of people in Texas
23  that do not have photo IDs?
24       A.   That's the same question, the total number of
25  people that don't have a photo ID.

Thom Cornish, C.P.A. - 8/7/2014

70

1   Q.   Well, yes.  And you said no.  Well, let me
2   ask you.
3   A.   Okay.
4   Q.   Have you been asked to do any type of
5   formulation with respect to the numbers of people that
6   do not have photo IDs in Texas?
7   A.   Only to the extent that it relates to the
8   requirement to cast a provisional ballot because of
9   lack of photo ID.
10   Q.   Okay.  Right.
11   A.   That would be the only computation.
12   Q.   Okay.  In other words, you haven't been asked
13   to identify or formulate the number of his Hispanics
14   that do not have a photo ID.  Correct?
15   A.   That's correct.
16   Q.   And you haven't been asked to formulate or
17   calculate the number of African Americans that do not
18   have an ID.  Correct?
19   A.   Correct.
20   Q.   All right.  And with respect to those
21   numbers, you have no opinion, one way or the other, as
22   to how many do or do not have a photo ID that would
23   allow them to vote under SB14.  Correct?
24   A.   I think that's correct.
25   Q.   Okay.  All right.  So you went to high school

71

1   in Houston.  When did you -- where did you go to
2   undergraduate school and college?
3   A.   I went to -- back then it was called
4   Southwest Texas State in San Marcos.  Went there for
5   one year.
6   Q.   Okay.  And what year was that?
7   A.   In 1973, I would think.
8   Q.   And stayed in San Marcos for a year.
9   And then what did you do?
10   A.   One year.
11   Q.   Okay.  Where did you go after San Marcos?
12   A.   Went to the University of Houston.
13   Q.   Okay.  And how long did you attend the
14   University of Houston?
15   A.   For an additional three years.
16   Q.   Okay.  And you obtained your degree at U of
17   H?
18   A.   Correct.
19   Q.   What year did you obtain your degree?
20   A.   '77.
21   Q.   1977?
22   A.   1977.
23   Q.   Okay.  And what was your degree in?
24   A.   Accounting.
25   Q.   Okay.  And any honors or awards during your

72

1   time in undergraduate school?
2   A.   I don't know that -- you know, all the real
3   smart people are the magna cum laude, I guess.  I
4   don't know.  I don't speak Latin.  Then there's summa
5   cum laude and there's cum laude.  I think I was kind
6   of in the middle there, I think.
7   Q.   Okay.  Do you have something on your diploma
8   that says honors?
9   A.   Something.
10   Q.   All right.  During your time in
11   college, did you -- did you have any published works
12   of any type?
13   A.   No.
14   Q.   All right.  Did anything in your
15   undergraduate career deal with election process in
16   Texas?
17   A.   Undergraduate?
18   Q.   Yes, sir.
19   A.   No, sir.
20   Q.   Okay.  Or the process of voting or the
21   political system?
22   A.   Other than political science courses you
23   take, that everybody takes, to understand voting and
24   general knowledge of it.
25   Q.   Okay.  Just the required government course

73

1   and required history, but you didn't -- that was not
2   your major.  Your major was business.  Correct?
3   A.   That's correct.
4   Q.   All right.  After you graduated
5   in '77, you became a certified public accountant?
6   A.   Correct.
7   Q.   All right.  And what do you have to do in
8   order to become a certified public accountant?
9   A.   Back then, you had a four-part exam.  And you
10   have to pass all four parts with a score that exceeds
11   75.  You can pass -- you can't pass just one part at a
12   time.  You have to pass at least two parts each time
13   you sit.  And at that -- then after that, you work the
14   required number of hours.  I think back then it was
15   2000 hours or something like that.  Then you can apply
16   for and pay a fee and get your CPA certificate.
17   Q.   Okay.  And what year did you become a
18   licensed CPA?
19   A.   It was 1979.
20   Q.   Okay.  And has your license been current ever
21   since 1979?
22   A.   Yes, sir.
23   Q.   Okay.  And current today?
24   A.   Yes, sir.
25   Q.   Okay.  Are there any specialty certifications

Thom Cornish, C.P.A. - 8/7/2014

74

1  with respect to a CPA?
2      A.   There are various specialties, but none that
3  I'm -- that I -- that I have.
4      Q.   Okay.  Okay.  All right.  Are you licensed in
5  any other states other than Texas?
6      A.   No, sir.
7      Q.   Okay.  With your CPA license, can you
8  practice in other states?
9      A.   I don't know how many states have
10  reciprocity, but there are a few.  Most of them in the
11  southern part of the United States.  Some of them,
12  I've never even thought about that, so I've never --
13     Q.   Okay.
14     A.   -- delved into it.
15     Q.   Like your -- like your state bar license, it
16  has to be state to state?
17     A.   Right.
18     Q.   The CPA license does.  Okay.
19     A.   Yes, sir.
20     Q.   All right.  Are you a member of any
21  associations with respect to CPAs?
22     A.   Well, the typical, the Texas Society of CPAs,
23  the Houston Chapter of CPAs, and the AICPA, the
24  American Institute of CPAs.
25     Q.   Okay.  Do those organizations put on

75

1  continuing education programs like we do in the state
2  bar?
3      A.   That is correct, they do.
4      Q.   Okay.  And is there a certain number of hours
5  you have to obtain each year, in order to maintain
6  your license?
7      A.   CPAs have to maintain 40 hours of continuing
8  education a year.
9      Q.   All right.  Have you published any articles,
10  any treatise, articles or had any presentations that
11  you've made with respect to any of these CPA
12  organizations?
13     A.   No, sir.
14     Q.   Okay.  Have you published any articles or
15  treatises dealing with public accountancy?
16     A.   No.
17     Q.   Okay.  Have you ever been disciplined by the
18  -- is there a board of CPAs?
19     A.   Yes, there is.  Texas State Board of Public
20  Accountancy.
21     Q.   Okay.  Have you ever had any disciplinary
22  actions taken against you?
23     A.   No, sir.
24     Q.   Okay.  Have you ever been sued for
25  malpractice with respect to CPA?

76

1      A.   No, sir.  (Indicating knocking on wood.)
2      Q.   Very good.  All right.  I believe in Exhibit
3  1 we have a copy of your CV.  Correct?
4      A.   I believe so.
5      Q.   Okay.  And if you want to take it out or if
6  you prefer to get your own copy, you're welcome,
7  whichever one is easiest for you to use.  And let me
8  ask you this:  Are the -- are the opinions that you're
9  expressing in this case in any way based upon accepted
10  standards of practice by certified public accountants?
11     A.   That one -- I don't understand that.  I mean,
12  can we talk about that one for a second, so I can see
13  what you're asking on that specifically?
14     Q.   Sure.  You're testifying in this case and
15  have prepared a report as an expert.  And just, I
16  guess, to make it simple:  My question is:  Is your
17  expertise in public accountancy what you're relying
18  upon to formulate your opinions -- expert opinions in
19  this case?
20     A.   Well, it's a difficult answer because my
21  experience in a CPA and -- has been, you know, varied
22  over 30 something years of doing this.  And so, you
23  know, the basic understanding of budgets and how
24  people spend money and spreadsheets and fiscal notes
25  and things like that, you know, I've become familiar

77

1  with in my career as a CPA and as an accountant.  But
2  to be able to point in any specific issue, I may not.
3  But from a generalized knowledge and understanding of
4  budgetary processes and monetary transactions, then
5  the CPA definitely provides more understanding and
6  ability than just a layperson that would not --
7      Q.   Okay.
8      A.   -- not have that type of certification.
9      Q.   Okay.  But is there a specific opinion that
10  you've expressed in this case in which that opinion is
11  based upon accepted standards of practice or
12  principles in public accountancy?
13     A.   I can't point to any specific principle that
14  my report would be based upon.
15     Q.   Okay.  And we'll go through a little more in
16  detail when we go through the report, but I just
17  wanted to kind of find that out that here.  All right.
18  Now, what -- looking at your CV, can you tell us what
19  your first position was after you graduated from
20  undergraduate school from the University of Houston?
21  And I believe that's Exhibit B.
22     A.   Okay.
23     Q.   Okay.
24     A.   Out of school in November of '77, I was hired
25  as a staff auditor for -- it wasn't one of the big

Thom Cornish, C.P.A. - 8/7/2014

78

1  eight back then, but I guess it was within the big 14.
2  The name of company was Main Lafrance & Company.
3      Q.   Okay.  And as a staff accountant -- now, was
4  this before you actually obtained your CPA?
5      A.   Correct.
6      Q.   Okay.  As a staff accountant, what were your
7  duties back then?
8      A.   Primarily auditing, looking at transactions,
9  building workpapers, analyzing data, doing -- doing --
10  I guess it would be more of, like, checklists where
11  you interview people, you talk to them, you gather
12  information about accounting systems, whether there
13  was proper controls, things like that.
14     Q.   Okay.
15     A.   Staff auditor standpoint.
16     Q.   And what type of clientele do you
17  recall working for during that position?
18     A.   Well, the large ones were American General
19  Mutual Funds.  They're over on Allen Parkway.  They
20  had 20 something funds, I think.  And this firm
21  audited 14 of them, so that was, like, an ongoing --
22  ongoing job.  So you would do this one, you would take
23  off, and then would you go to another one.  Because
24  everybody rotated through those.  El Paso Natural Gas,
25  that was one that I worked on.  Three or four banks.

79

1  I kind of got into banking, auditing banks.  Anchor
2  Tank.  There was a large construction company that I
3  worked out, but I forget the name of it.
4      Q.   Okay.  Any governmental entities?
5      A.   At Main Lafrance, no.
6      Q.   Okay.  All right.  Okay.  So you were there
7  until 1979?
8      A.   Yes, sir.
9      Q.   Okay.
10     A.   About two years.
11     Q.   Okay.  And then where did you go in 1979?
12     A.   It's an accounting firm in Clear Lake,
13  Lafrance, Walker, Jackley & Seville.  It was just a
14  large national firm that was made up of smaller
15  offices around the country.
16     Q.   Okay.  And was that a breakaway firm from the
17  one --
18     A.   No.
19     Q.   -- you were originally with?
20     A.   No.  That was -- that was a firm that my
21  father was the managing partner in, along with his
22  long-term partner, Tom McElhinney.
23     Q.   Okay.  And, now, I'm looking at staff
24  accounting for Lafrance, Walker, Jackley & Seville.
25     A.   That's correct.

80

1      Q.   Is that the one we're talking about?
2      A.   Yes, sir.
3      Q.   All right.  Okay.  And what type -- what type
4  of duties did you have doing that position?  And by
5  that time, had you received your CPA?
6      A.   Yes, sir.
7      Q.   Okay.  And what were your job duties in that
8  position?
9      A.   Well, that was preparing tax returns and
10  auditing.  The firm had, I'd say, a couple of
11  significant audits and then a lot of little, small
12  audits --
13     Q.   Okay.
14     A.   -- down in Clear Lake.
15     Q.   For private companies and private persons?
16     A.   One large audit was a semi-governmental --
17  quasi-governmental agency down in Clear Lake and a --
18  in '82, '83, a large nonprofit in Dallas.
19     Q.   Okay.  What was the quasi-governmental
20  agency?
21     A.   Gulf Coast Waste Disposal Authority.
22     Q.   Okay.  Okay.  All right.  So you were with
23  that firm until '81.  Is that correct?
24     A.   Correct.  That firm -- my dad stopped
25  practicing.  He broke off from the Lafrance, Walker

81

1  Jackley & Seville and went out on his own with
2  Mr. McElhinney.  And shortly thereafter, I came in as
3  the partner --
4      Q.   Okay.
5      A.   -- and my dad left the firm.
6      Q.   Okay.  So you were the Cornish in McElhinney,
7  Cornish & Reynolds?
8      A.   That's correct.
9      Q.   All right.  Very good.  And it looks like you
10  were with that firm for seven years?
11     A.   Yes.
12     Q.   What type of clientele did you have during
13  that time period?
14     A.   Same clients.
15     Q.   Okay.  Any governmental entities?
16     A.   Gulf Coast Waste Disposal Authority.
17     Q.   Okay.  Is that the only one you recall?
18     A.   That's the only large one of any
19  significance.  Maybe a couple cities, like the City of
20  Seabrook or the City of Nassau Bay.  We were the
21  largest accounting firm in the area, so we did a
22  lot of the little smaller entities around there, but
23  the one that I worked on was Gulf Coast Waste Disposal
24  Authority.
25     Q.   Okay.  And what type of accounting work would

82

1  you do for Gulf Coast?
2     A.  Their audit.
3     Q.  Okay.
4     A.  Annual audit.
5     Q.  Okay.  Very good.  And what about for the
6  cities?
7     A.  Just their annual -- whatever they wanted to
8  pay for, you know, their -- the audit, their
9  agreed-upon procedures.  You know, we want a budget
10  analysis.  So whatever they wanted.
11    Q.  Okay.  All right.  So you were a partner with
12  McElhinney Cornish until 1988.  Correct?
13    A.  That's correct.  That's correct.
14    Q.  And then you beam a sole practitioner?
15    A.  That is correct.
16    Q.  Okay.  And it appears that you were a sole
17  practitioner as a CPA for, what, two years before you
18  obtained your law degree.  Correct?
19    A.  Just about.
20    Q.  Okay.  All right.  All right.  Now, as a CPA,
21  what type of clientele have you represented or have
22  you had during your time in solo practice?
23    A.  Individuals, corporations, partnerships, the
24  large audit in Dallas.  The nonprofit college up there
25  audited them for a number of years.

83

1     Q.  And who was that?  Remind me of that again.
2     A.  Parker College of Chiropractic.
3     Q.  Okay.  Okay.
4     A.  And, you know, there may have been another
5  audit along the way, but I think I did a school, you
6  know, some type of school, but I forget.
7     Q.  Okay.  Was it public or private?
8     A.  Private school.
9     Q.  Okay.  Have you represented any governmental
10  entities during your time in solo practice?
11    A.  You mean as a lawyer?
12    Q.  No.  As a CPA.
13    A.  Represented them --
14    Q.  What's the correct?
15    A.  -- or worked for --
16    Q.  What's the correct language for --
17    A.  Worked for them.
18    Q.  Worked for.  Okay.
19    A.  A governmental --
20    Q.  A governmental entity, state, local,
21  counties, federal.
22    A.  Not that I can recall, no.
23    Q.  All right.  Very good.  And you're still
24  practicing as a CPA today.  Correct?
25    A.  That's correct.

84

1     Q.  Okay.  In addition to being an attorney?
2     A.  That's correct.
3     Q.  All right.  Is there any particular division
4  in your work between being an attorney and being a CPA
5  or do they go pretty much hand in hand?
6     A.  Well, I think that, you know, I have to
7  segregate them, because being a CPA, anything I do is
8  confidential, but not privileged.  But if it's a legal
9  engagement, then, you know, it's confidential and I
10  try -- I bill it separately.  I don't send -- I don't
11  send out one bill for professional services and mix
12  the legal and the accounting.
13    Q.  Okay.  So you still perform the same type of
14  accounting work you were doing before you became an
15  attorney, you still perform that type of accounting
16  work for clients.  Correct?
17    A.  That's correct.
18    Q.  And then, in addition to that, you also
19  perform legal services for clients --
20    A.  Correct.
21    Q.  -- separately from the accounting?
22    A.  Yes, sir.
23    Q.  Correct?  All right.  What type of legal
24  services do you generally provide?
25    A.  Review documents, handle -- excuse me --

85

1  business-type litigation, drafting of documents,
2  primarily trusts and wills.  I guess that's about it.
3     Q.  Okay.  Do you have a litigation practice?
4     A.  Very small.
5     Q.  Okay.  Okay.  We'll get into that a little
6  bit more as we go on.  Where is your -- where is your
7  office currently?
8     A.  Sugar Land, Texas.
9     Q.  Okay.  And what's your address there?
10    A.  One Sugar Creek Center Boulevard, Suite 340.
11    Q.  Okay.  And do you have a website?
12    A.  No, I do not.
13    Q.  Okay.  Do you utilize any type of a social
14  media in advertising or promoting your practice?
15    A.  No, sir.
16    Q.  Okay.  You don't Tweet?
17    A.  I don't Tweet.
18    Q.  Or Facebook or Instagram?
19    A.  I don't do any of that.
20    Q.  Okay.  Did you utilize any traditional media
21  in promoting your practice, either as a CPA or as an
22  attorney?
23    A.  No, sir, I don't.
24    Q.  And by traditional media, I mean, newspapers,
25  television, any type of print advertising.

Thom Cornish, C.P.A. - 8/7/2014

86

1   A.  No, I don't.
2   Q.  Okay.  Do you have e-mail addresses?
3   A.  Yes, I do.
4   Q.  Okay.  Can you tell us your e-mail addresses?
5   A.  cornish@pdq.net.
6   Q.  Okay.  And that is that your business e-mail
7   address?
8   A.  I try to separate these, but they've all been
9   commingled.
10  Q.  Okay.
11  A.  jdcpa --
12  Q.  Okay.
13  A.  -- @pdq.net.
14  Q.  Okay.
15  A.  And rcornish@pdq.net.
16  Q.  Okay.  All right.  And those kind of
17  intermingle your personal and business?
18  A.  Yes, sir.
19  Q.  Okay.  All right.  Now, have you provided
20  services as an expert witness with respect to being a
21  CPA?
22  A.  Yes, sir.
23  Q.  Okay.  And how often have you served as an
24  expert witness in certified public accountancy?
25  A.  I mean, expert witness in certified public

87

1   accounting or as a -- as a CPA?
2   Q.  Well, as a CPA.
3   A.  Okay.
4   Q.  I'm trying to -- I'm trying to separate the
5   legal from the CPA here for a minute, if that's
6   possible.
7   A.  Twice per year, maybe.
8   Q.  Okay.  And what -- what type of cases do you
9   generally offer your services or expert services as a
10  CPA?
11  A.  I could look at the list.
12  Q.  Yeah.
13  A.  Bankruptcy.  Banking litigation.  Litigation
14  against HISD.
15  Q.  Okay.
16  A.  Contract litigation.
17  Q.  When you said the list, you're
18  referring to Exhibit C.  Correct?
19  A.  That's correct.
20  Q.  Okay.  Well, then we'll get into that a
21  little bit more.
22  A.  Okay.
23  Q.  We'll move on.  How do you -- how have you
24  obtain clients with respect to offering expert
25  services as a CPA, expert witness services?

88

1   A.  Just word of mouth.
2   Q.  Okay.  Do you do any type of advertising with
3   respect to your services as an expert witness as a
4   CPA?
5   A.  No, sir, I don't.
6   Q.  Okay.  Do you belong to any expert witness
7   databases or any type of expert witness services that
8   offer or that give referrals for expert witnesses?
9   A.  No, sir.
10  Q.  Okay.  So strictly by word of mouth is how
11  you've obtained your clients?
12  A.  Correct.
13  Q.  Okay.  All right.  Okay.  Is there any
14  specialty areas that you tend to gravitate towards
15  with respect to being an expert witness as a CPA?
16  A.  No, sir.
17  Q.  Okay.  All right.  All right.  Let's switch
18  gears here quickly to your -- to your other
19  profession.
20  A.  Okay.
21  Q.  All right.  Where did you go to law school?
22  A.  University of Houston.
23  Q.  Okay.  And what year did you graduate?
24  A.  Around '91, I think.
25  Q.  Okay.  And are you licensed in Texas?

89

1   A.  Yes, sir.
2   Q.  Okay.  Are you licensed in any state other
3   than Texas?
4   A.  No, sir.
5   Q.  All right.  Are you board certified in any
6   specialties?
7   A.  No, sir.
8   Q.  Okay.  Are you licensed to practice in the
9   Southern District of Texas Federal Court?
10  A.  No, sir.
11  Q.  Are you licensed to practice in the Western
12  District of Texas Federal Court?
13  A.  No, sir.
14  Q.  Or the Northern District of Texas Federal
15  Court?
16  A.  No, sir.
17  Q.  Or Eastern District?
18  A.  We've covered them all.  No, sir.
19  Q.  I think we have, as far as I can remember.
20  Are you licensed in any Federal Courts in any state.
21  A.  Yes.
22  Q.  Okay.  Where would they -- those be?
23  A.  Tax court.
24  Q.  Okay.  All right.  And in Texas?
25  A.  No.  Washington.

Thom Cornish, C.P.A. - 8/7/2014

90

1   Q.   Washington, D.C. or --
2   A.   Yes, sir.
3   Q.   -- Washington State?
4   A.   Washington, D.C.
5   Q.   And tell me about that.  How do -- do you
6   frequently practice in Washington, D.C.?
7   A.   No.
8   Q.   Okay.
9   A.   That is primarily for clients that it's their
10  last alternative to trying to get the IRS to
11  understand their tax position.  So it's cheaper to pay
12  the $65 than it is to go through all of the appeals
13  processes which are left to the taxpayer.  It's easier
14  just to file a petition in tax court and let the tax
15  court and the IRS work it out.
16  Q.   Okay.  Is that like an administrative-type
17  court?
18  A.   It's administrative, yes, sir.
19  Q.   Okay.
20  A.   No juries.
21  Q.   Okay.  How long have you been a member of
22  that tax court in Washington, D.C.?
23  A.   I don't know.  Probably 15 years or so, I
24  guess.
25  Q.   Okay.  And how many times do you think you've

91

1   actually appeared in tax court in Washington, D.C.?
2   A.   I've never appeared.  It's just petitions I
3   filed there.  Maybe three times, four times.
4   Q.   Okay.  So, basically, you have a case or a
5   dispute, you prepare the petition here, the petition
6   and whatever supporting documentation, and send it to
7   the tax court.  Is that how it works?
8   A.   No, there is no documentation.
9   Q.   Okay.
10  A.   It's a one-page -- it's a one-page petition.
11  Q.   Okay.  Saying help?
12  A.   Saying that this ain't right, this is the
13  basic facts.  And then if they want documents, they
14  ask you for them.
15  Q.   Okay.  Okay.  But it's not -- you don't
16  appear in court --
17  A.   No.
18  Q.   -- and argue to the judge?
19  A.   No.
20  Q.   Okay.  All right.
21  A.   You can, but I never have.
22  Q.   Okay.  Are you a member of the Fifth Circuit
23  Court of Appeals?
24  A.   No, sir.
25  Q.   Are you a member of ant Federal Appellate

92

1   Court?
2   A.   No, sir.
3   Q.   Okay.  Are you a member of the United States
4   Supreme Court?
5   A.   No, sir.
6   Q.   Okay.  Have you published any legal articles?
7   A.   No, sir.
8   Q.   Okay.  Or written any legal books or legal
9   treatises or anything of that nature?
10  A.   No, sir.
11  Q.   Okay.  All right.  And what is your -- what
12  is your area of practice, generally speaking?
13  A.   From a legal standpoint?
14  Q.   Yes, sir.
15  A.   Contracts, partnership agreements, corporate
16  bylaws, Wills, estates, trusts, litigation, small
17  litigation for clients.  That's all I can think of
18  right now.
19  Q.   With respect to litigation, what type
20  of litigation, generally, would you be involved in?
21  A.   County Court at Law type stuff, evictions,
22  small collections, debt, those type of items.  I've
23  been in District Court in my career maybe 15 times,
24  but that's. . .
25  Q.   Okay.  All right.

93

1        MR. KEISTER:  Off the record, please.
2        (Brief interruption.)
3   Q.   (By Mr. Keister)  Okay.  Let's see.  So,
4   generally, you have pretty much an office practice,
5   but occasionally you'll do litigation for clients?
6   A.   That's correct.
7   Q.   Okay.  All right.  Have you ever represented
8   a client in a Voting Rights Act case?
9   A.   No, sir.
10  Q.   Have you ever represented a client in a Civil
11  Rights Act case?
12  A.   No, sir.
13  Q.   Okay.  Have you ever been disciplined by the
14  State Bar of Texas?
15  A.   No, sir.
16  Q.   Okay.  Do you belong to any professional
17  associations, legal professional associations?
18  A.   No, sir.
19  Q.   Okay.  I ask you this on CPA and I'm going to
20  ask you again, do you promote your practice by
21  website?
22  A.   No, sir.
23  Q.   Or by social media of any type?
24  A.   No, sir.
25  Q.   Okay.  Or traditional media in radio,

Thom Cornish, C.P.A. - 8/7/2014

94

1  television or print?
2   A.  No, sir.
3   Q.  Okay.  The e-mail addresses you gave me
4  earlier, do you use those same e-mail addresses for
5  your legal practice as you do for your CPA practice?
6   A.  Yes, sir.
7   Q.  Okay.  How often do you provide services as a
8  legal expert witness as divided from the CPA or
9  separate from the CPA?
10   A.  Well, if it's a -- if it's a question a
11  matter of law, I can't recall.  There may have been
12  one or two in there where I was asked to express an
13  opinion on the ultimate issue of, as a matter of law,
14  what my opinion was, but primarily it's been, I guess,
15  as a CPA and then the law degree just helped analyze
16  legal issues surrounding the case.
17   Q.  Okay.
18   A.  Assisted, let's put it that way.
19   Q.  Okay.  So, generally -- and we'll go through
20  the list in a little more detail after lunch, but,
21  generally speaking, most of your expert work is
22  involving more of your CPA, as opposed to your law
23  license.  Would that be fair to say?
24   A.  I'd say most, but not all.  I mean, the law
25  degree definitely helps.

95

1   Q.  All right.  Okay.  And I agree.  I'm not
2  trying. . .
3   A.  We don't want to be slandering no lawyers.
4   Q.  That's right, exactly.  All right.  In this
5  particular case, are you expressing any opinions in
6  this case that are based upon legal standards,
7  accepted legal standards?
8   A.  No, sir.
9   Q.  Okay.  And is your role in this case to be a
10  witness offering legal opinions in this case?
11   A.  I don't believe so, no.
12   Q.  Okay.
13       MR. KEISTER:  Okay.  All right.  Why
14  don't we go ahead and take a break?  Off the record.
15       (Lunch recess.)
16       MR. KEISTER:  All right.  Back on the
17  record.
18   Q.  (By Mr. Keister)  Mr. Cornish, have you ever
19  been disciplined by the State Bar?
20   A.  No, sir.
21   Q.  Okay.  Do you do any appellate practice?
22   A.  I've done one appeal.  I've argued one
23  appeal.
24   Q.  Okay.  Any published opinions out there with
25  your name on them as the lawyer?

96

1   A.  No, sir.
2   Q.  Okay.  All right.  What type of appeal did
3  you work on?
4   A.  It was a banking -- back then, it was Texas
5  Commerce Bank, I think.  It was in the Court of
6  Appeals here in Harris County.
7   Q.  Okay.
8   A.  14th, I think.
9   Q.  14th Court.  But you don't think it was a
10  published opinion?
11   A.  I don't think so.
12   Q.  Okay.  Let's talk about your -- the cases
13  you've worked on as an expert.  And I believe there's
14  a list that came with your report, which is Exhibit C.
15  And if you need to take the clip off, feel welcome to
16  do it.  Just try and keep it in the same order.
17   Q.  Okay.
18   A.  All right.  So with respect to Exhibit C, is
19  this all the cases in which you have served as an
20  expert witness?
21   A.  It's all the ones that I recall, yes, sir.
22   Q.  Okay.  Why don't we just start at the top up
23  here.  The first one is in re:  Glenn and Cindy
24  Wilson.
25   A.  Yes.

97

1   Q.  Can you tell us what kind of case that was?
2   A.  That was a -- it's my recollection now -- it
3  was a Turn Two Baseball Academy where they had a
4  business and a piece of property.  And the business
5  was on the piece of property.  And it went into
6  bankruptcy court.  And I was an expert hired by the
7  debtor and opined on the valuation and the operations
8  of the Turn Two Baseball Academy which was on the
9  piece of property.  That's my recollection.
10   Q.  Okay.  And what year was that?
11   A.  It looks like that was 2005, it looks like.
12   Q.  Okay.
13   A.  I think.
14   Q.  Okay.  Any issues of that case or any
15  opinions that you expressed of that case that would
16  relate to anything in the case we're here today on?
17   A.  Other than just relating the facts and the --
18  my considerations based upon my interpretation of the
19  Bankruptcy Code and the statutes of the bankruptcy
20  code.
21   Q.  Okay.  But -- yes.  But the opinions you
22  expressed had to do with bankruptcy.  Is that correct?
23   A.  That's correct.
24   Q.  Nothing with respect to the Voting Rights
25  Act?

Thom Cornish, C.P.A. - 8/7/2014

98

```
 1    A.  That's correct.
 2    Q.  Or any of the issues related to provisional
 3  ballots or SB14?
 4    A.  Nothing specific.
 5    Q.  Okay.  All right.  All right.  The second
 6  case is Adrienne Perry Verse Deutsche Bank National
 7  Trust Company?
 8    A.  Correct.
 9    Q.  What type of case was that?
10    A.  That was a collection of a debt.
11    Q.  Okay.  And do you recall what -- well, I
12  guess that was 2011?
13    A.  Yes, sir.
14    Q.  Okay.  And what type of issues did you work
15  on as an expert witness in that case?
16    A.  The balances related to the amount owed on
17  the debt.
18    Q.  Okay.  And so, basically, you did some
19  accounting work and came up with the numbers,
20  basically?
21    A.  Analysis of documents, charges on the
22  documents.  This is my recollection.  And then why the
23  bank had a different number than Ms. Perry had.
24    Q.  Okay.  Did you offer legal opinions in either
25  the first case or this case?
```

99

```
 1    A.  Legal opinion, possibly on Wilson, whether or
 2  not there was -- whether or not they were bankrupt --
 3    Q.  Okay.
 4    A.  -- pursuant to the bankruptcy code.  So a
 5  quasi legal opinion there.
 6    Q.  With respect to the bankruptcy code?
 7    A.  Yes, sir.
 8    Q.  Okay.
 9    A.  And the Perry, probably not.  I think that
10  was just the balance of the debt.
11    Q.  Okay.
12    A.  And, well, an interpretation of the loan
13  documents, what they could charge, what they couldn't
14  charge.
15    Q.  Okay.  Any opinions in the Perry case that
16  would relate to the issues we are here on today?
17    A.  Nothing specific.
18    Q.  Okay.  Did you testify in the Perry case?
19    A.  No, sir.
20    Q.  Okay.  Did you give a deposition?
21    A.  No, sir.
22    Q.  Write a report?
23    A.  Yes, sir.
24    Q.  Okay.  Okay.  And what about the first case,
25  the Wilson case, did you testify in that case?
```

100

```
 1    A.  I think I did in that case.  I failed to put
 2  that on there, but that's my recollection.
 3    Q.  Before the bankruptcy court?
 4    A.  Yes, sir.
 5    Q.  Okay.  Did you write a report in that case?
 6    A.  Yes, sir.
 7    Q.  Okay.  All right.  The third case you have on
 8  here is Christine Skagerberg --
 9    A.  Yes.
10    Q.  -- if I said that right versus Wells Fargo
11  Bank.  And it looks like that was a 2011 case.  What
12  type of case was that?
13    A.  That was also a collection on a home
14  mortgage.
15    Q.  Okay.  And what type of opinions do you
16  recall offering in the Skagerberg case?
17    A.  Interpretation of the Wells Fargo loan
18  agreement.  It was a -- I think in that case it was,
19  like, a buyout.  It was a different -- it was a
20  different mortgage company.  And Wells Fargo got it.
21  And then Wells Fargo, you know, put all these fees and
22  you gotta do this and you gotta do that, and what the
23  true value of the balance of the loan was.
24    Q.  Okay.  Did you offer any opinions, legal
25  opinions, in the Skagerberg case?
```

101

```
 1    A.  Not that I can recall.
 2    Q.  Okay.  Any issues of the Skagerberg case that
 3  would relate to any issues that you're testifying on
 4  in the case we're here on today?
 5    A.  Nothing specific.
 6    Q.  Okay.  All right.  And the fourth case is
 7  Rocky and Julie Emery versus Wachovia Bank.  And it
 8  looks like that was a 2010 case?
 9    A.  I believe it is, yes.
10    Q.  In bankruptcy court.  Correct?
11    A.  Yes, sir.
12    Q.  Okay.  Do you recall what type of opinions
13  you gave in the Emery case?
14    A.  Loan -- loan modification agreement and the
15  balance of the loan and the effects on the -- whether
16  or not loan modification agreement was complied with.
17    Q.  Okay.  So that would rely, basically, upon
18  your expertise as a CPA more than expertise as a
19  lawyer.  Correct?
20    A.  Somewhat lawyer.
21    Q.  Okay.
22    A.  I'm able to read a document and understand
23  what they're really getting to.
24    Q.  Did you offer legal opinions in that case --
25    A.  I can't --
```

Thom Cornish, C.P.A. - 8/7/2014

102

1  Q.  -- as an expert?
2  A.  I can't -- no.  On that one, that was just a
3  written report.  There was no testimony.
4  Q.  Oh, okay.  Okay.  Okay.  And then the next
5  case is Tracy -- Tracy Knight versus -- was is that,
6  Tagt, LP?
7  A.  Right.
8  Q.  Okay.  And that was a 2006 case.  What do you
9  recall about that case?
10  A.  Very little.  I think I just wrote a report
11  on that one.
12  Q.  Okay.  And do you recall what type of case it
13  was?
14  A.  I do not recall.
15  Q.  Do you recall what type of opinions you gave?
16  A.  No recollection.
17  Q.  Okay.  Anything in that case that would
18  relate to the issues we're here on today?
19  A.  No, sir.
20  Q.  Okay.  All right.  The next case is William
21  Altstaetter --
22  A.  Uh-huh.
23  Q.  -- versus Dawn Jackson.  It looks like that
24  was a 2006 case.  Can you tell us what that case was
25  about?

103

1  A.  It was ownership of property --
2  Q.  Okay.
3  A.  -- to my recollection.
4  Q.  Okay.  And what type of opinions did you
5  offer in that case?
6  A.  I don't recall specifically the opinions on
7  that one.
8  Q.  Okay.  Would there be any opinions of the
9  Altstaetter case, if I'm saying that correctly, that
10  would relate to any issues we're here on today?
11  A.  No, sir.
12  Q.  Okay.  Then the seventh case on the list is
13  In re:  Port Arthur Interest Development, which looks
14  like it was in Bankruptcy Court.  Let's see.  Depo
15  taken in 2012, and it appears it may have been a 2010
16  case.  Would that be right?
17  A.  It looks about right.
18  Q.  Okay.  What type of opinions did you offer in
19  the Port Arthur case?
20  A.  Damages.
21  Q.  Okay.  Tell us about the case.  What was it
22  about?
23  A.  Development of a -- development of a little
24  -- one of these little strip motel/hotel drive-up
25  things and the funding for it and the expectancy

104

1  damages and investment, who owned what percentage of
2  it.  Fairly involved when it comes to reviewing all
3  the documents and understanding division of the
4  properties, the division of the parties, the due
5  to/froms, the different parties, money flowing in and
6  out, spending.  That was a pretty -- pretty in-depth
7  case.
8  Q.  Okay.  And you say damages.  You gave
9  opinions related to damages.  Was that legal opinions
10  or accounting opinions?
11  A.  Well, the -- my opinions were legal in a
12  sense there was liability established pursuant to the
13  documents and the actions of the party, breach -- you
14  know -- whether or not it was a breach was a legal
15  opinion.
16  Q.  Okay.
17  A.  Damages would have been an accounting
18  opinion.
19  Q.  Okay.  So you gave a mix in that one on the
20  legal end --
21  A.  Yes.
22  Q.  -- accounting?
23  A.  Yes, sir.
24  Q.  Okay.  And who retained you in that case, do
25  you recall?

105

1  A.  Reese Baker.
2  Q.  Okay.  And who was the victorious party in
3  that case, if there was one?
4  A.  Well, my recollection is there was a
5  settlement in that case.
6  Q.  Okay.  Okay.  So you gave a deposition, but
7  the case never went to trial?
8  A.  Correct.
9  Q.  And it was settled?
10  A.  That's my recollection.
11  Q.  Okay.  All right.  No. 8 is Taurus -- and let
12  me -- with respect to the Port Arthur case, any issues
13  in that case that would relate to the issues we're
14  here on today?
15  A.  No voting issue, no, sir.
16  Q.  Okay.  All right.  Any other issues that you
17  think would be related to the issues we're here on
18  today?
19  A.  Not that I can specifically point to.
20  Q.  Okay.  No. 8 is Taurus Manufacturing Company
21  versus Pei Zhous and Shaun White.  It looks like a two
22  -- well, it's in Harris County.  Does it look like
23  2005?
24  A.  Correct.
25  Q.  Okay.

Thom Cornish, C.P.A. - 8/7/2014

106

1  A.  Yeah, that's a mis-digit.
2  Q.  What type of case was the Taurus
3  Manufacturing Company case?
4  A.  It's a breach of contract.  And I have very
5  little or no recollection of that one --
6  Q.  Okay.
7  A.  -- as we sit here.
8  Q.  You don't recall what opinions you gave in
9  that case?
10  A.  I'd have to get the file out and review it,
11  but that's been -- that case is dead as far as I'm
12  concerned.
13  Q.  Okay.
14  A.  I don't know whatever happened.
15  Q.  Okay.  And no opinions in that case that
16  would relate to the issues we're here on today.
17  Correct?
18  A.  Correct.
19  Q.  Okay.  All right.  It looks like No. 9 is
20  Jackson versus Jackson, which appears to be a 2007
21  case.  What was that case about?
22  A.  It was a -- it was a divorce issue and -- I
23  think it was a divorce issue and the -- all the
24  implications of the ownership of property up in that
25  area, up in the Travis County area.

107

1  Q.  Okay.  And were you giving legal opinions in
2  that case or accounting opinions?
3  A.  I think that was a mix, legal and accounting,
4  because there was the effect of various documents that
5  were signed between the parties and whether or not
6  people actually had -- I think they had -- I forget
7  what the issue was.  It might have been a right of
8  reimbursement or recoupment in a family law situation.
9  I can't remember specifically, but I remember the
10  depositions.
11  Q.  Okay.  Any opinions that you expressed in the
12  Jackson case that would relate to any issues in the
13  case we're here on today?
14  A.  Not that I know of.
15  Q.  Okay.  All right.  No. 10 is Fernando Garza
16  Rodriguez versus Lionel Garza.  It looks like that's a
17  2011 case in Harris County.  What was that case about?
18  A.  I don't remember.  I did a -- I did a
19  preliminary report on that and that was the last of
20  it.
21  Q.  Okay.
22  A.  But I was engaged for it, so I put that on
23  the list.  And I don't know anything that's happened
24  with that case.
25  Q.  Okay.  And you don't recall what type of case

108

1  it was?
2  A.  I don't recall.  It's been a -- no, sir, I
3  don't recall.
4  Q.  Okay.  Did you -- did you write a report in
5  that case?
6  A.  My recollection is I did a preliminary
7  report.
8  Q.  Okay.  Any opinions in that case that would
9  relate to any issue we're here on today?
10  A.  No, sir.
11  Q.  Okay.  It looks like No. 11 on the list is
12  GRG Ramirez Group versus -- is that Houston
13  Independent School District?
14  A.  Yes, it is.
15  Q.  Okay.  And that's in the United States
16  District Court for the Southern District.  Was that a
17  2010 case?
18  A.  I believe so.
19  Q.  Okay.  And what was that case about?
20  A.  Well, as an expert, I'm covered by a
21  confidentiality agreement, but I guess I can disclose.
22  Q.  Is that an ongoing case?
23  A.  Yes, it is.
24  Q.  Okay.
25  A.  But I can discuss basically what the case is.

109

1  Q.  Yeah.  Without getting into details, just
2  tell me generally what type of case it is?
3  A.  Ramirez Group alleges that HISD, along with
4  some of their board members, have developed a strategy
5  to prevent certain contractors who do not want to pay
6  money from obtaining government contracts.
7  Q.  Okay.  And what type of opinions are you
8  offering in that case without disclosing anything
9  that's confidential?
10  A.  Damages, expectancy damages, contingent,
11  actual damages for past performance.  And I don't
12  think I got into whether or not the actions of the
13  defendants violated any specific legal laws, but I
14  think I did opine on whether or not their actions
15  violated the local rules adopted by the Harris -- by
16  Houston Independent School District.
17  Q.  Okay.
18  A.  That's my -- that's my recollection.  I
19  haven't really done anything on that in, what, a year
20  and a half or something like that.
21  Q.  Okay.
22  A.  I think the last -- the last thing on that
23  was just writing a report and that's about it.
24  Q.  Okay.  You haven't given a deposition or
25  testified?

Thom Cornish, C.P.A. - 8/7/2014

110

1   A.   No, sir.
2   Q.   Okay.  Who retained you in that case?  Which
3   party?
4   A.   Ramirez Group retained me in that case.
5   Q.   Okay.  Is there anything in that case that
6   relates or any opinions you've given in that case that
7   would relate to any of the issues that we're here on
8   today in this case?
9   A.   No, sir.
10  Q.   Okay.  Any discrimination issues or anything
11  like that?
12  A.   Discrimination only from the sense that
13  they're Hispanic and Mr. Marshall is black.
14  Q.   Okay.
15  A.   That would be the underlying inference.
16  Q.   Okay.
17  A.   But I didn't express any kind of opinion on
18  that.
19  Q.   Okay.  Are there any civil rights allegations
20  in that case?
21  A.   There may be.
22  Q.   Okay.
23  A.   I think there is, but I'm not -- I wasn't
24  asked to express an opinion on that.
25  Q.   Okay.  Any voting rights issues in that case?

111

1   A.   No, sir.
2   Q.   Okay.  All right.  No. 12 is Quality Infusion
3   Care.  It looks like that's in Bankruptcy Court in the
4   Southern District of Texas.  It looks like it's a 2010
5   case?
6   A.   I believe so, yes.
7   Q.   Okay.  What can you tell us about that case?
8   A.   A cause of action by the Chapter 7 trustee to
9   have Woodlake Imaging return in excess of $300,000 for
10  an allegation that it was a preferential payment.
11  Q.   Okay.  And what opinions have you expressed
12  in that case or did you express in that case?
13  A.   I expressed an opinion as to whether or not
14  Quality Infusion Care was bankrupt at any time from
15  2008 or '9, I believe, up until when they actually did
16  file their bankruptcy, whether or not they were ever
17  technically actual or in technical bankruptcy pursuant
18  to my interpretation of the Bankruptcy Code, the
19  extent, manner, and amounts of credits given on the
20  books and records of Quality Infusion Care for the
21  payment of money, and whether or not the author of the
22  -- or the CPA hired by the Chapter 7 trustee, whether
23  or not his report was or met the standards for
24  admission as a report by an expert.
25  Q.   Okay.  So that would be a legal issue?

112

1   A.   That would be a legal opinion as to whether
2   or not he did his job.
3   Q.   Okay.  All right.  Anything in that case, any
4   issue or opinion in that case that would relate to any
5   issues or opinions we're here on today in this case?
6   A.   Not that I can think of right now.
7   Q.   Okay.  No civil rights actions or voting
8   rights actions in that case?
9   A.   No, sir.
10  Q.   Okay.  All right.  Then No. 13 is Honorable
11  Terry Petteway, et al versus Galveston County.  And
12  that appears to be a 2013 case.  And according to the
13  list, you gave deposition and trial testimony?
14  A.   That is correct.
15  Q.   Okay.  Can you tell us what that case -- is
16  that case completed?
17  A.   The trial has been had and I believe that
18  they are awaiting the decision of the Trial Court --
19  Q.   Okay.
20  A.   -- in Galveston County.
21  Q.   Okay.  When was the case tried?
22  A.   Last year, I think, in -- I think it was this
23  year.  I think it was February, because the weather
24  was -- when I testified, the weather was kind of okay,
25  but still you had to have a jacket.

113

1   Q.   Okay.
2   A.   I think it was probably -- or maybe March.
3   Q.   Okay.  All right.  All right.  And what was
4   that case about?
5   A.   Galveston County wanted to reduce the number
6   of JP Courts from nine to four.  And I was asked to
7   give an opinion on the -- on whether or not the county
8   was going to realize the huge savings that were
9   projected based upon their plan.
10  Q.   Okay.  The huge financial savings?
11  A.   Financial savings.  I should have said
12  financial.  I'm sorry.
13  Q.   Okay.  All right.  And was this a
14  redistricting case?
15  A.   Yes, yes.
16  Q.   Okay.
17  A.   To redistrict the JP Courts into four
18  different districts, instead of nine.
19  Q.   Okay.  Was this a case under the Voting
20  Rights Act?
21  A.   I believe so.
22  Q.   Okay.  Did you offer any legal opinions with
23  respect to the Voting Rights Act in that case?
24  A.   You mean on whether or not the plan affected
25  the voting rights of various minorities that lived in

Thom Cornish, C.P.A. - 8/7/2014

114

1  Galveston County?
2      Q.  Okay.
3      A.  No, I did not express an opinion, but I was
4  -- but I reviewed them, let's say, to get a better
5  understanding what the case was.
6      Q.  Okay.  So the opinions that you offered --
7  did you write a report in that case?
8      A.  Yes, sir.
9      Q.  Okay.  So the opinions you offered in your
10  report and deposition and trial testimony, however,
11  was limited to the financial -- whether or not there
12  was or was not a financial savings by the county in
13  reducing the number of courts?
14      A.  Financial savings and, to a minor degree,
15  access to the courts, where the people lived, how far
16  they were from the new courts, Bolivar Peninsula was
17  not going to have a court, and how were they going to
18  get to their court, things like that, just from a
19  demographics standpoint I guess.
20      Q.  Okay.  What type of demographics testimony or
21  what qualifies you to give testimony with respect to
22  the demographics?  That seems kind of far afield from
23  the county.
24      A.  No, not demographics from saying they're
25  minorities, but, you know, Bolivar Peninsula had --

115

1  after the hurricane, had 3,000 people.  Now, it's got
2  6,000 people.
3      Q.  Right.
4      A.  How many of those people, on average, would
5  have access to a JP Court.  Let's say they would --
6  let's say there were 600 cases a year in JP Court out
7  there.  And if you double the number of people, then
8  you're going to double the required access to the
9  Court and basic information like that, not an opinion
10  as to whether or not they were being discriminated,
11  but just monetary computations --
12      Q.  Okay.  All right.
13      A.  -- of how many people lived on the island and
14  the island was going to have to go to the mainland
15  under the plan and how many cases there were and
16  issues like that.
17      Q.  Okay.  For lack of a better word, you were
18  the numbers expert, as opposed to a legal expert in
19  giving up --
20      A.  No, no legal issues, correct.
21      Q.  Okay.  All right.  No legal issues?
22      A.  I don't like to use the word "none," but. . .
23      Q.  And I don't know anything about this case, so
24  I'm trying to -- I'm trying to get my hands around it.
25      A.  I did not express a legal opinion as to

116

1  whether or not the county had a right to do what they
2  did, but I did comparisons to other counties.  And I
3  guess I'll leave it at that.
4      Q.  Okay.  So you were, basically, testifying as
5  to what would be the effect of a county's actions in
6  terms of financial considerations of the county, as
7  well as the numbers of people that would be affected
8  by that county's decision?
9      A.  That's a fair statement, yes, sir.
10      Q.  Okay.  All right.  Okay.  Anything in that
11  case, issues of that case that would relate --
12  opinions or issues in that case that would relate to
13  the opinions or issues you're giving in this case?
14      A.  Nothing specific, no, sir.
15      Q.  Okay.  All right.  So is our case that we're
16  here on today the first case in which you have been
17  retained to offer expert opinions with respect to
18  Voting Rights Act issues?
19      A.  It's the first case that included voting
20  right issues.
21      Q.  Okay.
22      A.  But I can't agree with you saying that I've
23  been asked to express an opinion on those voting right
24  issues.
25      Q.  Okay.  Is there any other case that you've

117

1  been an expert witness on that dealt with issues under
2  the Voting Rights Act in which you've offered
3  opinions?
4      A.  Other than Galveston County, that was it.
5      Q.  Okay.  Okay.  Has there been any case, other
6  than the case we're here on today, in which you have
7  been called upon to express opinions with respect to
8  election issues in the State of Texas?
9      A.  No, sir.
10      Q.  Okay.  Is there any case that you've been
11  called upon to testify or give opinions as an expert
12  with respect to issues related to voting by
13  provisional ballots, other than the case we're here on
14  today?
15      A.  No, sir.
16      Q.  Okay.  Is there any case in which you've been
17  called upon to express opinions as an expert witness
18  with respect to a state's advertising or education
19  campaign with respect to elections and voting issues?
20      A.  No, sir.
21      Q.  Okay.  Okay.  Have we covered all the cases
22  that you have been called upon to serve as an expert
23  witness?
24      A.  All the ones that I recall.
25      Q.  Okay.  Do you think we've covered all of them

Thom Cornish, C.P.A. - 8/7/2014

118

1  that would have occurred within the last ten years?
2     A.  I believe so.
3     Q.  Okay.
4     A.  I'm just. . .
5     Q.  Do you need to take that?
6     A.  No, no.  I just wanted to make sure I turned
7  it off.
8     Q.  Oh, okay.  Okay.  In any of the cases that we
9  talked about on your Exhibit C, do any of those have a
10  published opinion or a published order that you're
11  aware of?
12     A.  No, sir.
13     Q.  Okay.  We're moving through the stack.
14     A.  Good.
15     Q.  All right.  Have you ever been employed with
16  the Secretary of State?
17     A.  No, sir.
18     Q.  Have you ever been retained to provide any
19  legal or accounting services for the Secretary of
20  State of Texas?
21     A.  No, sir.
22     Q.  And my first question was to Texas, as well.
23  Have you ever been employed by the Department of
24  Public Safety?
25     A.  No, sir.

119

1     Q.  Texas Department of Public Safety?
2     A.  Correct.  No, sir.
3     Q.  Okay.  Have you ever provided any legal or
4  accounting services for the Texas Department of Public
5  Safety?
6     A.  No, sir.
7     Q.  Okay.  Have you ever been employed by any
8  Texas State agency?
9     A.  Other than Gulf Coast Waste Disposal
10  Authority.
11     Q.  Okay.  But anything on the State level, such
12  as the Secretary of State or Department of Public
13  Safety, those type of agencies?
14     A.  No, sir.
15     Q.  All right.  Have you ever been
16  employed by the Texas legislature?
17     A.  No, sir.
18     Q.  Have you ever been retained to offer any
19  legal or accounting opinions on behalf of the Texas
20  legislature or for the Texas legislature?
21     A.  No, sir.
22     Q.  Okay.  Have you ever been employed by any
23  elected official?
24     A.  No, sir.
25     Q.  Have you ever been retained to provide either

120

1  legal or accounting services for an elected official
2  in their capacity as elected official?
3     A.  I may have down in Clear Lake, but I do not
4  remember specifically.  I remember -- we're talking
5  about 30 years ago.  I remember there was a -- there
6  was a -- there was a candidate for office down there
7  and I remember doing some campaign type forms, but
8  that was a long time ago.
9     Q.  Okay.  Excuse me.  You think that would have
10  been for him in his campaign, he or her --
11     A.  Correct.
12     Q.  -- his or her campaign, as opposed to the
13  official capacity as a public servant?
14     A.  It would have been more of a campaign-type
15  financial -- I mean, campaign reporting information.
16     Q.  Okay.  And you think that was about 30 years
17  ago?
18     A.  Could be.
19     Q.  Do you recall who it was for?
20     A.  No.
21     Q.  Okay.  Because that was my next question,
22  was, have you ever been employed by a political
23  campaign?
24     A.  That would be it.
25     Q.  That would be it.  Okay.  Have you ever

121

1  volunteered services for a political campaign?
2     A.  High school, about it.
3     Q.  Okay.  And who did you volunteer for in high
4  school?
5     A.  I don't want to say.  Do I have to?  Do I
6  have to say that I was appointed to help Mr. --
7  Governor Wallace run?  We all had to go pick somebody
8  in the class, in the government class.  And so, okay,
9  all you people over here, you're going to do Nixon.
10  You people over here, you're going to do Kennedy, I
11  guess.  You people in the middle, you're going to do
12  Wallace.
13     Q.  Okay.  So it was more of a school project?
14     A.  It was a school project to go to the -- go to
15  their campaign headquarters, get paraphernalia, see
16  what their platform was, see what they thought about
17  it, come back and give a report.
18     Q.  Okay.
19     A.  So it wasn't -- that was it.
20     Q.  So, other than that, you've had no -- as an
21  adult, you've had no volunteer --
22     A.  No volunteer, that's right.
23     Q.  Okay.  All right.  Have you ever worked as an
24  election judge at a polling place?
25     A.  I guess I did years ago first, but I wasn't

Thom Cornish, C.P.A. - 8/7/2014

122

1  the judge.  I was just -- I was just helping.
2  Q.   One of the poll workers?
3  A.   Just a poll worker.  They asked me to show up
4  there and do it.  It's out in Missouri City, first
5  little place, and stand there and do this type stuff.
6  That was it.
7  Q.   Okay.  And how long ago was that.
8  A.   80.
9  Q.   Okay.
10  A.   1980, something like that, I guess.
11  Q.   Yeah.  34 years ago?
12  A.   Uh-huh.
13  Q.   Okay.  All right.  Other than that one
14  occasion working as a poll worker, any other
15  experience as an election judge or a poll worker
16  during an election?
17  A.   No, sir.
18  Q.   Okay.  Do you vote?
19  A.   Sure.
20  Q.   Okay.  Are you a frequent voter?
21  A.   I guess you would say frequent --
22  Q.   Okay.
23  A.   -- yes.
24  Q.   And by that, I mean, do you vote every time
25  an election comes up or do you pick and choose your --

123

1  A.   Pick and choose.
2  Q.   All right.  Do you consider yourself a
3  democrat or a republican?
4  A.   I consider myself a republican, sir.
5  Q.   Okay.  And how long have you considered
6  yourself a republican?
7  A.   I guess since I cast my first vote when I
8  turned eighteen years of age.
9  Q.   Okay.
10  A.   I've been voting that way since then.
11  Q.   So you were one of the first in Texas.
12  A.   One of the --
13  Q.   One of the early ones, let's put it that way.
14  A.   Let's see.  My first was at Annie's Hamburger
15  Joint on the corner of Willow Bend and South Post Oak.
16  Q.   Okay.  Do you consider yourself to be an
17  expert in the legislative process in Texas?
18  A.   Well, let's just say this, I know a lot about
19  the legislative process in Texas because I'm involved
20  with it constantly as a CPA that does a lot of
21  franchise returns.  That's a huge part of the
22  legislative process is collecting money from a legal,
23  from a lawyer's standpoint.  I'm involved with trying
24  to understand how they're regulating lawyers, CPAs,
25  all the regulations on CPAs.  The State doesn't really

124

1  regulate CPAs' opinions, but they sure regulate CPAs
2  and what they have to do.  I understand the Texas
3  legislator meets every two years.  I understand they
4  have budgets and appropriations.  So I may not be an
5  expert, but I know a lot about it.
6  Q.   Okay.  And I mean specifically with the
7  processes of the legislature, not the -- you know --
8  not the agencies after the fact.  With respect to how
9  a bill is formulated and how it works its way through
10  the legislature.
11  A.   I know a lot about that, not everything, but
12  a significant portion of it.
13  Q.   Okay.  Have you ever worked in the
14  legislature and try to shepherd a bill through the
15  political process or through the legislature?
16  A.   No, sir.
17  Q.   Okay.  All right.  Are you ever called upon
18  to act as a lobbyist for -- in the legislature?
19  A.   No, sir.
20  Q.   Okay.  Do you ever provide any lobbying
21  services of any type for your clients, either legal or
22  accounting?
23  A.   No, sir.
24  Q.   By "lobbying services," I mean lobbying the
25  legislature, as well as state agencies, governor's

125

1  office, that type of thing?
2  A.   No, sir.
3  Q.   Okay.  Prior to being retained to conduct or
4  review and offer opinions in this case, did you have
5  any expertise with respect to provisional ballots in
6  Texas?
7  A.   Expertise?
8  Q.   Yes, sir.
9  A.   Well, I knew provisional ballots existed.  I
10  knew what they were for, but I didn't have an
11  expertise, I never formulated an opinion or done
12  research.
13  Q.   Right.  Okay.  So this would be the first
14  case in which you have at least attempted to do
15  research with respect to provisional ballots in a
16  legal setting?
17  A.   Correct.
18  Q.   Okay.  All right.  Prior to -- and I may have
19  already asked you this, but prior to this case, had
20  you done any work as an expert witness with respect to
21  doing an analysis of how -- how a state agency would
22  promote voter issues, election issues?
23  A.   I don't understand that question.
24  Q.   Yeah.  That was a bad question.
25  A.   You gotta put that in the bottom ten of your

Thom Cornish, C.P.A. - 8/7/2014

126

1  questions.
2     Q.  They're getting worse as the day goes on, I
3  agree.
4     A.  I'll give you a reading on that one.  In
5  golf, we call that a mulligan, so. . .
6     Q.  Okay.  There you go.
7     A.  I'll give you a mulligan on it.
8     Q.  All right.  Prior to your work in this
9  case --
10    A.  Yes, sir.
11    Q.  -- have you ever done any work in which
12 you've been called upon to express opinions with
13 respect to a state agency's efforts to advertise or
14 educate the public with respect to issues in an
15 election?
16    A.  No, sir.
17    Q.  Okay.  Was that a better question?
18    A.  It was long and compound and my -- the
19 attorney didn't object, so I went ahead and said no,
20 sir.
21    Q.  Okay.
22    A.  Because I think I knew where you were going.
23    Q.  Thank you.  Have you ever been called upon to
24 do a financial analysis of a state agency's spending
25 with respect to its attempt to advertise to the public

127

1  or educate the public with respect to issues in an
2  election?
3     A.  It's pretty narrow.  That's pretty narrow.
4  Maybe there's, like, two or three of them, but, no, I
5  have not done that.
6     Q.  Okay.
7     A.  That's a fairly narrow question.
8     Q.  Yeah, it is.  I agree.  So this would be the
9  first case in which you've attempted to make such an
10 analysis?
11    A.  This might be the first case ever of that --
12    Q.  Okay.
13    A.  -- in Texas.
14    Q.  Okay.
15    A.  Yes.
16    Q.  All right.  Okay.  Okay.  How did you become
17 involved in the lawsuit we're here on today?
18    A.  Chad Dunn called me and indicated that he was
19 getting -- he was involved in this case and would I be
20 interested in working on it.  I said, What does it
21 involve?  He kind of indicated what it was about.  And
22 I said, Well, probably.  What's the -- what's the time
23 frame?  What's the budget?  When do I have to do this?
24 And he kind of said -- kind of told me what -- it
25 would be sometime in June that I'd have to -- May/June

128

1  would be the time frame that I'd have to work.  And I
2  said, Sure, let's sit down and talk about it.
3     Q.  Okay.  When do you recall Mr. Dunn contacting
4  you, approximately?
5     A.  In January, I guess.
6     Q.  Of this year?
7     A.  Of this year.  Maybe last December or
8  something like that.  And I don't recall when we
9  actually met and discussed, you know, what my role
10 would be in the case.
11    Q.  Okay.  Did you know Mr. Dunn prior to him
12 contacting you in this case?
13    A.  I worked for Mr. Dunn on one of these cases
14 here.  I think it was the Ramirez case.
15    Q.  The Galveston County case?
16    A.  No.  Ramirez, which was the case against
17 HISD.
18    Q.  Oh, okay.  Okay.  So that was back in --
19    A.  2012, approximately, '11, '12.
20    Q.  Yeah.  Okay.  All right.  All right.  And any
21 other cases that you've worked with Mr. Dunn on prior
22 to -- other than Ramirez?
23    A.  I think one or two more.  I don't recall
24 which ones specifically.  I think the case in Travis
25 County, the Jackson V Jackson case, because I remember

129

1  going to a deposition with him in Austin.  I can't
2  remember where it was in Austin.
3     Q.  Okay.
4     A.  And I think he was the lawyer on that case.
5     Q.  Okay.  And, of course, Mr. Brazil is
6  Mr. Dunn's partner.  Correct?
7     A.  That's correct.
8     Q.  And had you worked with him on the earlier
9  cases, also?
10    A.  You know, my recollection is, is that even
11 though Scott was around and ancillary to a lot of
12 these, I don't -- this is the first case where I think
13 that -- where I have been working or my contact has
14 been Scott.
15    Q.  Okay.
16    A.  Maybe one of the earlier cases, but I don't
17 -- I don't recall.
18    Q.  Okay.
19    A.  But this is the one that I think is the
20 biggest one or the only one.
21    Q.  Okay.  So you recall talking to Mr. Dunn.
22 Was that by telephone initially?
23    A.  Telephone initially, and then I met him.
24    Q.  Okay.  When you met him, what type of issues
25 did Mr. Dunn indicate he wanted you to explore?

Thom Cornish, C.P.A. - 8/7/2014

130

1    A.  It was provisional ballots and the effect of
2   the SB14, the requirement to show photo ID, the effect
3   that it had on provisional ballots.  And, also, the
4   monetary spending of the State of Texas as indicated
5   in the 2012 trial.  I think he said they had indicated
6   that there was going to be $5 million in spending,
7   somewhere in that range.  He didn't know a specific
8   number, but he wanted me to investigate that and make
9   that a part of my analysis, how much was spent and
10  what it was spent on.
11    Q.  Okay.  Did Mr. Dunn give you anything in
12  writing setting out the issues he wanted you to work
13  on?
14    A.  Not that I recall.
15    Q.  Okay.  At any point, have you received
16  anything in writing from either Mr. Dunn or Scott
17  indicating the issues that they want you to focus on?
18    A.  Like a scope?
19    Q.  Yes.
20    A.  No, sir.
21    Q.  Okay.  All right.  Did you enter into a
22  contract with Mr. Dunn on this case?
23    A.  I do not have a written fee agreement, other
24  than a -- I think I drafted a letter and mailed it to
25  him saying what my fee would be in this case.

131

1    Q.  Okay.  And your fee in this case is what?
2    A.  $15,000.
3    Q.  Okay.  Is that a flat fee?
4    A.  Flat fee.
5    Q.  Okay.  All right.  When did you begin
6   reviewing the documents in this case?
7    A.  I think I started about the first part of
8   March with the depositions from the 2012 trial.  Those
9   were sent to me by Scott's office, Mr. Brazil's
10  office.
11    Q.  Okay.
12    A.  And I printed them out and I guess my -- I
13  started reading them.
14    Q.  Okay.
15    A.  I'd take a deposition home, get my little,
16  hot tea and my cat and I would start reading one, go
17  through, try to get a sense of what the person was
18  saying, what the issues were.
19    Q.  Okay.
20    A.  I think that was in February/March is my
21  recollection.
22    Q.  Okay.  And those are the depositions you
23  brought today and that we talked about earlier?
24    A.  Yes, sir.
25    Q.  Okay.  Did you keep notes as you worked

132

1   through this case?
2    A.  I did not keep notes on the -- on that
3   because reading the depositions only gave me the --
4   what the case was about and what the parties were
5   saying.  I was formulating what I was going to do when
6   it came to the provisional ballots, getting some
7   information on that.  And I think I started the
8   provisional ballots sometime in the first part of May,
9   started identifying which counties I was going to
10  contact and began the initial, you know, primarily
11  just called them up and said, I need this information.
12  I think I started about the first part of May.
13    Q.  Okay.  Other than the report that you
14  produced and that we've made Exhibit 1, did you
15  prepare any preliminary reports?
16    A.  I think I prepared a preliminary report, but
17  I don't want to use the word "report," because as
18  you're looking at these.  You know, it's not like -- I
19  don't want to get too wordy here.  It's not like it's
20  just one document.  It's a lot of different documents,
21  a lot of different depositions.  So what I would do
22  is, I would just make notes as if it was a report, you
23  know, Keith Ingram testifies, so and so and so and so,
24  and then eventually that would just be flowed into the
25  final report.

133

1    Q.  Okay.
2    A.  So it wasn't a preliminary.  It was just a
3   continuous revision of the report.
4    Q.  Okay.  Did you keep that on paper or on
5   computer?
6    A.  On my computer.
7    Q.  Okay.  And have you retained those notes or
8   report, whatever is the best way to put it?
9    A.  No.  I just -- I just -- online revisions and
10  reading it and saying, okay, well this actually goes
11  up here and this really didn't go anywhere, so I just
12  deleted it.
13    Q.  Okay.  All right.  Prior to Mr. Dunn
14  contacting you either in January of this year or
15  December of last year, had you had any involvement
16  with any issues related to photo voter identification
17  in the State of Texas?
18    A.  No, sir.
19    Q.  Okay.  Had you -- during the time it was
20  being debated in the legislature, did you -- did you
21  follow those debates in the Texas legislature?
22    A.  Did not follow the debates, no.
23    Q.  Okay.  And you never had any contact with any
24  of the legislatures -- the legislators, either senate
25  or representatives, concerning your opinions with

Thom Cornish, C.P.A. - 8/7/2014

134

1  respect to photo voter identification?
2  A.  No, sir.
3  Q.  Okay.  Prior to your entry in this case, had
4  you formulated any opinions with respect to your
5  feelings of photo voter identification?
6  A.  I think, in theory, it's a good idea.
7  Q.  Okay.  Okay.  And why do you say "in theory"?
8  A.  I think people want honest elections.  People
9  that should be voting should be voting.  I think
10  that's what most people want.
11  Q.  Okay.
12  A.  They don't want to end up like other
13  countries.
14  Q.  Okay.  And you think it's reasonable to ask a
15  person -- when they appear to vote, it's reasonable to
16  ask that person to identify who you are before you
17  cast votes?
18  A.  I think -- I think that it's reasonable to
19  ask the person who they are before they vote, so that
20  their vote can be properly lodged, yes.
21  Q.  Okay.  And do you think it's reasonable to
22  ask somebody to show a piece of identification, such
23  as their driver's license or a passport or some other
24  photographic identification to identify themselves
25  before they vote?

135

1  A.  I think it's reasonable to say, if you want
2  to vote without going through other steps, show me a
3  driver's license, but you shouldn't say, you're not
4  voting, your vote is not going to count unless you
5  have a driver's license or you have this.
6  Q.  Right.
7  A.  I think that's where it becomes unreasonable
8  is denying the people the right to vote.
9  Q.  Okay.  And, of course, you understand under
10  SB14 nobody is denied the right to vote at a polling
11  place, that if they do not have the appropriate ID,
12  then they cast or are given the opportunity to cast a
13  provisional ballot.  Correct?
14  A.  Well, but they're told your vote is not going
15  to count, which, you know, kind of somewhat tells
16  them, you do what you want to do, but your vote is not
17  going to be counted, so. . .
18  Q.  Unless they go and cure --
19  A.  Yeah, unless you jump through a bunch of more
20  hoops do this and do that.  In six days, you got this
21  and you come in yeah.
22  Q.  All right.
23  A.  Which I think that's where, in my opinion, it
24  crosses the threshold of being reasonable, because you
25  asked reasonable.

136

1  Q.  Yes, right, yes.
2  A.  Yeah.
3  Q.  But you think it's reasonable to expect
4  somebody -- or in this day and time, it's reasonable
5  for anybody to expect when you go to do some daily
6  function in your life that you might have to show an
7  ID, such as banking, airport, whatever?
8  A.  If you choose to do that.
9  Q.  Okay.  All right.  Now -- but -- but prior to
10  being retained in this case, you have not actively
11  participated in any legislative discussions or -- or
12  other discussions about voter ID in Texas?
13  A.  I had not formulated any specific opinions,
14  no.
15  Q.  Okay.  All right.  What is your understanding
16  of what a provisional ballot was prior to the
17  enactment of SB14?
18  A.  Provisional ballot was used for identifying
19  voters who wish to vote that there may be a clerical
20  error on the voter rolls, so we're going to do a
21  provisional ballot and then we will investigate to see
22  whether or not, you know, you voted at the wrong
23  precinct or whether we made a mistake or whether there
24  was an issue with you not being on the voter rolls and
25  we're going to let you fill out a provisional ballot

137

1  and then we'll investigate that.
2  Q.  Okay.
3  A.  That was my understanding of the original use
4  of provisional ballots.
5  Q.  Okay.  And in your review in this case, have
6  you determined how frequently provisional ballots were
7  used prior to SB14 coming into effect?
8  A.  No, sir.
9  Q.  Okay.  Do you have -- have you formulated an
10  opinion as to whether or not there are more
11  provisional ballots being used after SB14 went into
12  effect than were being used prior to SB14 going into
13  effect?
14  A.  I did not express an opinion on that.
15  Q.  Okay.
16  A.  Could not reach a conclusion on that.
17  Q.  Okay.  And why could you not reach a
18  conclusion on that?
19  A.  Because the information available to me on
20  the counties that I started looking at -- I guess I
21  started looking at them in May.  The information is,
22  one, it's not consistent between the counties.  Each
23  county has their own format, their own different
24  websites, different way of compiling the data,
25  different length of archiving the data, different ways

Thom Cornish, C.P.A. - 8/7/2014

138

1 of denoting whether -- what type of original ballot it
2 was, whether it was a real provisional ballot or
3 whether it was an early voting provisional ballot.
4         And so it was very difficult to go back to,
5 let's say, 2006, 2008, and just have a, this is how
6 many there were in Dallas county and this -- because
7 their website's changed.  Their websites were not
8 existent for more than, some of them, two years.  They
9 just -- it's gone.  You can't even get it.
10        Current, we want to -- it's already March and
11 you wanted to look at what happened back in November
12 in the constitutional election.  It's not even there
13 yet.  So it was definitely a challenge to start even
14 getting a baseline on what the provisional ballots
15 looked like even initially.
16     Q.  Okay.  All right.  So, as we sit here today,
17 you cannot express an opinion as to whether or not
18 there have been more provisional ballots utilized
19 after SB14 came into effect than there were prior to
20 SB14.  Is that correct?
21     A.  Well, that really wasn't the scope of my
22 examination, but if that was a specific scope, I
23 possibly could do some research to find that out, but
24 I did not.
25     Q.  Okay.  All right.  So, as we sit here today,

139

1 you cannot express an opinion?
2     A.  I'm not going to express an opinion on that.
3     Q.  Okay.  Do you know what the cure process was
4 for provisional ballots before SB14 came into effect?
5     A.  Not offhand, no, sir.
6     Q.  Okay.  Do you know, did you do any research
7 or review to try and determine what the cure process
8 was for provisional ballots prior to SB14?
9     A.  I don't recall.
10    Q.  Okay.  Was that something you were asked to
11 do in this case?
12    A.  No, sir.
13    Q.  Okay.  Okay.  In your report -- and if you
14 want to refer to it on Page 6.
15    A.  Okay.
16    Q.  -- you state --
17    A.  Which line?
18    Q.  The first full paragraph.
19    A.  Okay.
20    Q.  You say, I was retained to review and analyze
21 issues related to the number of provisional ballots
22 cast in the State of Texas.
23    A.  Uh-huh.
24    Q.  Okay.  And then the second part of that
25 sentence does not relate to provisional ballots.

140

1 Correct?
2     A.  Correct.
3     Q.  All right.  So what issues specifically were
4 you retained to review and analyze with respect to
5 provisional ballots?
6     A.  The number of provisional ballots required
7 and to the extent that those provisional ballots
8 related to lack of photo ID.
9     Q.  Okay.  And were you able to make a
10 determination after your review and analysis in this
11 case of either one of those issues or able to reach a
12 determination on --
13    A.  Of?
14    Q.  -- either one of those issues?
15    A.  The number of provisional ballots?
16    A.  Correct.
17    A.  Partially on the number of provisional
18 ballots.
19    Q.  Okay.  Well, it says cast in the State of
20 Texas.  Were you ever able to reach an opinion or
21 determination of the number of provisional ballots
22 cast in the State of Texas after SB14 came into
23 effect?
24    A.  Somewhat.  I was -- I was able to get
25 quantities of provisional ballots for a significant

141

1 number of the counties that I identified as counties
2 that I wanted to analyze.
3     Q.  Okay.  But you were not able to come up with
4 a number, the statewide number of provisional ballots?
5     A.  I did not come up with a statewide number --
6     Q.  Okay.
7     A.  -- that's correct.
8     Q.  All right.  And then what was the other
9 issue, in addition to the number of provisional
10 ballots?  The ones that were related to SB14?
11    A.  Correct.
12    Q.  Okay.  And were you able to come up with an
13 analysis of the number of provisional ballots
14 statewide that have been cast -- that were cast due to
15 SB14 identification issues after SB14 became
16 implemented?
17    A.  No.
18    Q.  Okay.  Now, on that same -- in that same
19 paragraph, you state, Because the State of Texas did
20 not collect statewide data on provisional ballots, and
21 because I was only able to obtain data for a small
22 number of counties, I present only limited findings on
23 provisional ballot issues.  Correct?
24    A.  Correct.
25    Q.  Okay.  What findings are you able to present

Thom Cornish, C.P.A. - 8/7/2014

142

```
1   with respect to the provisional ballot issues?
2      A.  Harris County.
3      Q.  Okay.  Only Harris County?
4      A.  Yes, sir.
5      Q.  Okay.  All right.  When you went -- when you
6   began this case, was it your expectation that the
7   State of Texas collected statewide data on provisional
8   ballots?
9      A.  I would have hoped.
10     Q.  But was it your expectation?
11     A.  Yes, sir, it was.
12     Q.  And what did you base that expectation on?
13     A.  That provisional ballots are a -- are a
14  significant portion of SB14, in that if you don't have
15  an ID, you're going to fill out a provisional ballot
16  and we're going to give you six days to come in and
17  cure it.  I would have thought that the State of Texas
18  would want to know how many people were unable to
19  vote, have their right to vote because of lack of a
20  photo ID, and then be able to do something about it,
21  but I was sadly mistaken in what I thought the State
22  of Texas was going to do.
23     Q.  Okay.  Prior to being retained in this case,
24  had you studied or acquired any expertise with respect
25  to the Texas Election Code?
```

143

```
1      A.  No.
2      Q.  Okay.  During your review of this case, have
3   you now acquired some knowledge of the Texas Election
4   Code?
5      A.  Yes, sir, I have.
6      Q.  Okay.  And in reviewing the Texas Election
7   Code, did you find any statutory authority that would
8   require or permit the Secretary of State to collect
9   statewide data on provisional ballots?
10     A.  I think they -- the Secretary of State can
11  request the information.
12     Q.  Okay.
13     A.  And I didn't see anywhere where they
14  requested the information.
15     Q.  Okay.  In your review of the Election Code,
16  in your review of this case, did you determine from
17  the Election Code who is the custodian of records for
18  elections and for -- and as part of the elections of
19  provisional ballots?
20     A.  The local election officials are.
21     Q.  Okay.  The Secretary of State is not the
22  custodian of records, correct, according to the
23  Election Code?
24     A.  They're not the custodian of the ballots,
25  that's correct.
```

144

```
1      Q.  Okay.  Were you surprised when you -- when
2   you studied the Election Code and determined that, in
3   fact, it was not the Secretary of State that was --
4      A.  No.
5      Q.  -- the custodian of the election records?
6      A.  No.
7      Q.  Okay.
8      A.  Well, I have to clarify that.  Records are
9   one thing.  The actual ballots are something else.
10  There's plenty of records.  You know, records are
11  everywhere.  Data is everywhere.  So, yes, I was
12  surprised that the Secretary of State doesn't have
13  records of various issues surrounding the elections.
14     Q.  Okay.  Okay.  On Page 7 -- and I'm just
15  trying to hit the points where you're talking about
16  provisional ballots from this section --
17     A.  Okay.
18     Q.  -- to try and help us move along a little bit
19  quicker.  On Page 7, the last sentence of the first
20  full paragraph, you state, In addition, no information
21  was noted which detailed the number -- the actual
22  number of provisional ballots, nor was there a
23  determination as to why such ballots occurred.
24  Correct?
25     A.  I don't see where you are.
```

145

```
1      Q.  Okay.  At the -- at the last sentence of the
2   first full paragraph where it starts, the State of
3   Texas failed to perform.
4      A.  What page are you on?
5      Q.  Page 7.
6      A.  Oh, okay.
7      Q.  Okay.  So you state, In addition -- the last
8   sentence, In addition, no information was noted which
9   detailed the actual number of provisional ballots, nor
10  was there a determination as to why such ballots
11  occurred.  Did I read that correctly?
12     A.  I'm looking right at it.  I was leading it.
13     Q.  I'm sorry.
14     A.  Yes, that's what I wrote.
15     Q.  Okay.  And when you went into this case or
16  when you were retained to review this case, was it
17  your expectation that that type of information would
18  be in the custody of the Secretary of State?
19     A.  Whether the information would have -- would
20  have been gathered by the Secretary of State or
21  whether the ballots would have been in custody?  I
22  don't understand, really, what you're asking there.
23     Q.  Well, I'm just asking you:  When you were
24  retained to review this case and started making your
25  plans as to how you were going to review this case,
```

Thom Cornish, C.P.A. - 8/7/2014

146

1  were you of the impression that you would be able to
2  obtain the information you're describing or talking
3  about on Page 7 of your report, was it your
4  expectation that that information would be in the
5  possession of the Secretary of State?
6      A.  I don't recall whether or not I thought the
7  Secretary of State would have it or the local election
8  officials would have it.  I don't recall.
9      Q.  Okay.  But after reviewing this case and
10 reviewing the Election Code, you now are aware that
11 that type of information is in the possession of the
12 local counties, as opposed to the Secretary of State.
13 Correct?
14     A.  The determination of that information is at
15 the local level, correct.
16     Q.  Okay.  Turn to Page 20, if you would, of your
17 report.  I want to talk specifically about your
18 provisional ballot portion.
19     A.  (Complying.)  Okay.
20     Q.  Okay.  All right.  In the first paragraph,
21 you state, As mentioned previously, I was asked to
22 analyze a number of provisional ballots cast as a
23 result of an ID issue.  And as we -- as you previously
24 testified, you were not able to make that
25 determination statewide.  Correct?

147

1      A.  Correct.
2      Q.  Okay.  And then you say, Seventeen of the
3  larger Texas counties were initially contacted about
4  information related to provisional ballots cast in
5  four elections; the general elections of 2010, 2012,
6  and 2013 and the primary election of March 2014.
7          Did I read that correctly?
8      A.  Yes, sir.
9      Q.  Okay.  What seventeen counties were
10 contacted?
11     A.  In that binder, I think they -- Harris,
12 Dallas, Denton, Tarrant, El Paso, Bexar, Neches,
13 Collin.  Maybe I got Harris County -- I don't know --
14 in there.  I'll go down -- do you want me to go down
15 the list of them?
16     Q.  If you can.
17     A.  Okay.  Okay.  Collin County.  I think that's
18 where Denton is.
19     Q.  Yeah, I believe Denton is in Collin.
20     A.  The largest city there.  The next one is
21 El Paso County.  Lubbock County.  Neches County,
22 Corpus Christi.  Hildalgo County.  Montgomery County,
23 Brazoria County.  Galveston County.  Fort Bend County.
24 Tarrant County.  Harris County.  Bexar County.  Denton
25 County.  Jefferson County.  Dallas County.  Travis

148

1  County.  Midland County.
2      Q.  Okay.  So of each of those counties you made
3  contact and received some response from each of those
4  counties.  Correct?
5      A.  I can't recall.  Two or three of them, I got
6  no response at all.  And from the other 14, I got
7  varying degrees of response.
8      Q.  Okay.  Why did you limit your inquiry to 17
9  counties?
10     A.  Well, one, I only had so much money.  Second,
11 I only had so much time.  And, third, those counties
12 represented a significant percentage of the population
13 in Texas.  I think my recollection is somewhere over
14 70 percent of the population in Texas was those
15 counties.
16     Q.  Okay.  When you would receive a negative
17 response or a limited response or a no response in one
18 of those counties, did you consider maybe trying --
19     A.  Following up?
20     Q.  Follow-up, number one.  And then, number two,
21 doing an alternative county.
22     A.  Alternative county was not in the picture,
23 because I didn't think the significance of it was --
24 was -- would be as great to pick up a county that had
25 5,000 people in it versus, you know, Fort Bend County

149

1  that's got maybe 200,000 people in it.  So I followed
2  up, had my assistant, Ms. Adams, contact them again,
3  call them, or I called them.  I guess I did probably
4  more than half the calling, talking to the local
5  election office.
6      Q.  Okay.  You didn't feel like contacting
7  smaller counties would also give a representative
8  picture of what other counties or smaller counties
9  were doing with respect to provisional ballots?
10     A.  I did not contact smaller counties and I
11 guess I'll leave my answer at that.
12     Q.  Okay.
13     A.  I didn't --
14     Q.  You were focusing on the larger counties
15 because it was a larger population area.  Is that
16 basically what it amounted to?
17     A.  Larger population.  And I think that -- I
18 don't know what I was thinking at the time.  When I
19 stopped getting responses from these counties and
20 there was no more information to be had, I guess I got
21 to the point where it was, I'm not going to go down
22 this because there's no systematic reporting of these
23 provisional ballots and so why spend more time and
24 more energy focusing on other counties when the
25 results are probably going to be the same.

Thom Cornish, C.P.A. - 8/7/2014

150

1   Q.   Okay.  All right.  On the second paragraph on
2   Page 20, you state, The analysis originally
3   anticipated was not ultimately possible, however, due
4   to a lack of data.  Correct?
5   A.   Yes, sir.
6   Q.   So, in essence, you abandoned the original
7   analysis and have no opinion as to what the answer
8   would be to the original analysis?
9   A.   Correct.
10   Q.   Okay.  And then you state, Of the counties
11   that were canvassed, only two provided information as
12   to the number of provisional ballots cast on their
13   website.  Which two counties were those?
14   A.   I don't recall.  I mean, I. . .
15   Q.   Okay.  Would there be documentation in your
16   binder?
17   A.   Oh, in here, they'll show you, because I
18   printed out, you know, their -- county's website
19   historically that showed the number of ballots and the
20   number of provisional ballots.
21   Q.   Okay.  Each of the counties, the seventeen
22   counties that you canvassed, did each one of those
23   counties have a website?
24   A.   To varying degrees, yes.
25   Q.   Okay.  But you were finding different --

151

1   different information from website to website?
2   A.   Absolutely.
3   Q.   Okay.  And with respect to the two websites
4   -- counties with websites that did have provisional
5   ballots -- number of provisional ballots listed, how
6   many provisional ballots did they list?
7   A.   No.  That's -- I don't understand that
8   question at all.
9   Q.   Okay.  All right.  Now, I'm going to ask you,
10   if you can --
11   A.   Okay.
12   Q.   -- to find those two --
13   A.   Okay.
14   Q.   -- in your -- in your notebook.  What I want
15   to know is:  You went to the website of whatever
16   county it was and somehow you found on that website a
17   list -- not a list or -- was it a list or a number of
18   provisional ballots?
19   A.   A column.
20   Q.   Okay.
21   A.   And the column had the word, I think,
22   P-R-O-E-V, I assumed was early voting.
23   Q.   Okay.
24   A.   There was no legend at the bottom to tell you
25   what it was.  P-R-L, I assume, was provisional,

152

1   because they were relatively 80, 20, 10, something
2   like that.  And it showed per precinct the number of
3   provisional votes in that precinct.
4   Q.   Okay.  And did it have it broken down by
5   elections or was it just one election or how did --
6   A.   It was by -- most of the counties, the
7   information was by election.
8   Q.   Okay.  But there were only two that had it on
9   the websites?
10   A.   Correct.
11   Q.   Okay.  And you don't recall which two that
12   was, but it's in your binder somewhere?
13   A.   It's in the binder.
14   Q.   Okay.  With respect to those two, were
15   provisional ballots in any way identified as being
16   related to SB14 or any other issue?
17   A.   No.
18   Q.   Okay.  So all you knew was a provisional
19   ballot, you didn't have any -- there was nothing on
20   the website to indicate why the person was given a
21   provisional ballot.  Correct?
22   A.   No, sir.
23   Q.   Okay.  Then the next -- next sentence says,
24   Only three other counties were able to provide scanned
25   PDF copies of each provisional ballot affidavit for

153

1   the 2013 and 2014 elections.
2        Which three counties was that?
3   A.   Well, I know Harris County and, I think, Fort
4   Bend County.  And I can't recall where McKinney is,
5   which is Collin County.
6   Q.   Okay.
7   A.   Collin, Harris, and Fort Bend, I think those
8   were the three where I actually got the PDF copies --
9   eventually got the PDF copies.
10   Q.   Okay.  We'll talk about Harris, because you
11   have quite a bit of information on it, but with
12   respect to the other two counties, can you find the
13   number of provisional ballots that those two counties
14   had gave you PDFs on?
15   A.   I could if you want me to do some work,
16   because I think I had already abandoned my effort by
17   the time that the Collin County came in.  I had the
18   outstanding, hey, I would like to have the documents.
19        Okay.  We'll get them to you.  Okay.  We'll
20   get them to you.
21        And then after -- after I said this not
22   going anywhere, I'm not going to be able to analyze
23   these, they may have come in.
24   Q.   Okay.  So, as you sit here today, you don't
25   know how many provisional ballots Collin County had?

Thom Cornish, C.P.A. - 8/7/2014

154

1    A.   Oh, I know how many Collin County had, but
2    how many were related to photo ID, I don't know.
3    Q.   Okay.
4    A.   I didn't go back in and add up the
5    provisional ballots relate to no ID.
6    Q.   Okay.  How many did Collin County have, in
7    general, on provisional ballots?  And if you have it
8    broken down by election, that would be helpful.
9    A.   This is a response by Micki Meinecke.  She's
10   from Collin County.  Kim.  That's the person who works
11   for me, Ms. Adams.  The number of provisional ballots
12   cast in Collin County in the following elections was
13   March 4th, '14, 208.  Accepted/rejected.  Okay.  The
14   total, 95/113.
15   Q.   All right.  I'm sorry.  Back up.  I lost you
16   a sec.  Give me that number again.  What was the
17   number of provisional, total number of provisionals?
18   A.   208.
19   Q.   Okay.  And that was in 2013?
20   A.   '14, March.
21   Q.   March 2014.  All right.  And then --
22   A.   Collin --
23   Q.   And then what were the two other numbers that
24   you --
25   A.   The number that were accepted and the number

155

1    that were rejected.
2    Q.   Okay.  And how many were accepted?
3    A.   95.  Rejected, 113.
4    Q.   Okay.  All right.  And that's the only
5    information you had at this point with respect to
6    those?
7    A.   Well, then I end up getting some of the
8    provisional ballots right here.  And I don't -- I
9    never went through and analyzed them after that point
10   in time.
11   Q.   Okay.  All right.  What are the other numbers
12   that Collin County has?
13   A.   This is from Sharon Rowe, R-O-W-E, on
14   Wednesday, May 28th.  The number of provisional
15   ballots cast in Collin County in the following
16   elections:  November 2nd 2010, 764.  November 6, two
17   thousand --
18   Q.   764?
19   A.   Yes, sir.
20   Q.   In 2010?
21   A.   November 2010.
22   Q.   Okay.
23   A.   November 6th, 2012, 4,068.
24   Q.   Okay.
25   A.   November 5th, 2013, that's the constitutional

156

1    election, 98.
2    Q.   Okay.  Okay.  Anything else?
3    A.   That's what I got.  You know, a lot of it was
4    done by e-mail.  When Ms. Adams would say, you know, I
5    haven't heard from these three counties, then she did
6    all the schmoozing she could.  I'd call up and I'd
7    give her the names of the people.  I called up and
8    say, Look, I really need some information.  What's --
9    what do I have -- what do I need to do?  And that's --
10   that was -- no consistency.  No -- no, we got the
11   documents.  We'll take a week.  I mean, it varied from
12   -- I guess I'm getting off track here.
13   Q.   That's fine.
14   A.   I'll let you ask the questions.
15   Q.   Okay.  You're doing -- you're doing good.
16   A.   I don't want to -- I don't want to volunteer
17   anything.  No.  I want to do it your way, not my way.
18   Q.   Okay.  So fair to say, without going through
19   county by county, the numbers are going to be fairly
20   apparent when I go through your notebook as to what
21   the provisional --
22   A.   I think --
23   Q.   -- counts were?
24   A.   I think what you'll see is that I did a lot
25   of work.  I tried.  And I was met with numerous,

157

1    various types of, We can't do that for you.
2    Q.   Okay.  So, I guess, to not beat a dead horse,
3    you just -- you just considered your analysis
4    unsuccessful with respect to provisional ballots as
5    requested?
6    A.   When I was told that I have to go get a court
7    order to get this information, I finally said forget
8    it.
9    Q.   Okay.  Okay.  If you are called to testify in
10   this case at trial, do you have any expectation of, at
11   trial, you will have the ability to express an opinion
12   as to the number of provisional ballots that have been
13   cast, either statewide or in the various counties, due
14   to identification issues under SB14?
15   A.   I think my testimony would be limited that
16   I'm not able to because of the lack of information
17   which the counties would or would not provide relating
18   to that information.
19   Q.   Okay.  And you said that some of the counties
20   told you they were unable to complete the data because
21   of Texas Election Code, Section 66.058.  Correct?
22   A.   Three -- I think two or three of them said
23   that.
24   Q.   Okay.  And prior to you beginning your
25   investigation in this case or your analysis in this

158

1  case, were you aware of Texas Election Code, Section
2  66.058?
3      A.  I was basically not aware that people would
4  say, They're locked up, we're not going to give them
5  to you.
6      Q.  Okay.  And you made -- when -- when these
7  particular counties said you needed a court order, you
8  made no attempt to get a court order?
9      A.  No.
10     Q.  Okay.
11     A.  I made no attempt to get a court order to ask
12 them to do something that -- provide information that
13 should be readily available.
14     Q.  Did you consider doing a public information
15 request?
16     A.  All these things were under public
17 information request.
18     Q.  Okay.
19     A.  I sent each one of them a little public
20 information request.
21     Q.  Okay.  All right.  And you haven't taken any
22 action to challenge their failure to comply with the
23 Public Information Act?
24     A.  No, sir, I have not.
25     Q.  Okay.  Just asking.  Did you discuss with

159

1  Mr. Dunn the fact that some of these counties told you
2  you needed a court order?
3      A.  I believe that conversation was had with
4  Mr. Brazil.
5      Q.  Okay.  And was a determination made just not
6  to pursue it any further at that point?
7      A.  I think I ran out of time.
8      Q.  Okay.  I know the feeling.  Did you contact
9  Jasper County?
10     A.  I don't want to offend anybody, but I don't
11 know where Jasper County is.
12     Q.  Okay.
13     A.  Where is Jasper County?  Can I ask a
14 question?
15     Q.  It's down somewhere past Jefferson County, in
16 that area.
17     A.  No, I did not.
18     Q.  Okay.
19     A.  I didn't contact Jasper County, sir.
20     Q.  Okay.  Haven't read the deposition of the
21 Jasper County clerk?
22     A.  No.
23     Q.  Have you read the deposition of the Jefferson
24 County clerk?
25     A.  No, sir, I have not.

160

1      Q.  Okay.
2      A.  Do I need to?
3      Q.  It's up to you.  Depends on you how much time
4  you have.
5      A.  How much budget I have, you mean?
6      Q.  Well, yes.  Are you aware -- I take it you're
7  not aware that Jasper County reported they've had no
8  provisional ballots following implementation of SB14?
9      A.  Is that one of the smaller counties?
10     Q.  35,000 people, I think.
11     A.  I'm not aware of that.
12     Q.  All right.  On Page 22 of your report, you
13 state, Of the nine counties that responded with
14 information related to provisional ballots passed in
15 the March 4th primaries, the ratio of provisional
16 ballots cast increased out of the November 5th, 2013
17 general election in seven counties.
18         Did I read that correctly?
19     A.  Where are you now?
20     Q.  At the very top of Page 22.
21     A.  Right.  That's where I was able to just get
22 information on how many provisional ballots were cast.
23 Of the 19 -- of the 17 counties, on nine counties, I
24 was able to find out how many provision names were
25 cast.  Now, why they were cast, I don't know.

161

1      Q.  Okay.
2      A.  That's over my head.  And then I was just
3  able to say, you know, on -- they increased in seven
4  of them.
5      Q.  Okay.
6      A.  I don't think I even gave a ratio of
7  increase.  I just -- that was just anecdotal.  Just
8  increased.
9      Q.  Okay.  On all the counties that you renewed
10 and received information from, on any of those were
11 you able to determine the number of provisional
12 ballots cast because of SB14 identification issues?
13     A.  Well, I was able to, on Harris County, do a
14 lot more work on Harris County, because they gave --
15 they gave actual redacted copies of the -- of the --
16 of the provisional ballots.
17     Q.  Okay.  So was Harris County the only one?
18     A.  Harris County would have been the only one.
19     Q.  Okay.  And then you address Harris County in
20 the last paragraph on Page 22.  Correct?
21     A.  Yes, sir.
22     Q.  Okay.  And you say, An analysis of the actual
23 provisional ballot affidavits in Harris County, one of
24 the counties I was able to acquire actual copies of
25 the redacted provisional affidavits, indicated there

162

1  were significant numbers of provisional ballots cast
2  because of the lack of photo ID.
3       Can you tell us by each election following
4  the implementation of SB14 the number of provisional
5  ballots cast due to SB14 issues in Harris County?
6       A.  I think that what I have in my report is what
7  you got, which is the number of rejected provisional
8  ballots was 579.  The election held on November the
9  5th, '13, the constitutional election, 22 percent of
10  the rejected provisional ballots were due to photo ID.
11  So take 579 times 22.5 percent and that will give you
12  the number of them.
13       Q.  Okay.  Do you have the actual numbers?  I'm
14  not good with percents.
15       A.  Right over there.  (Indicating.)
16       Q.  Okay.  They're in the numbers?
17       A.  The numbers are there.  (Indicating.)
18       Q.  Okay.  So you're saying there were a total of
19  579 provisional ballots rejected for the November 5th,
20  2013 election and the March 4th primary, 2014?
21       A.  Okay.
22       Q.  Yeah.  Help me here.  I'm getting confused on
23  this.  Tell me -- tell me how you did your numbers.
24  From my understanding is there's a 2013 constitutional
25  election in Harris County.  There's a March 4th

163

1  primary in Harris County.
2       A.  Right.
3       Q.  There was the runoff election.
4       A.  Forget runoff election.
5       Q.  You didn't do runoff.  So you only focused on
6  the -- on the 2013 constitutional election and the
7  March 4th primary?
8       A.  Right.
9       Q.  Okay.  All right.  And for both of those
10  together you're saying there was a total of 579
11  rejected provisional ballots for all reasons across
12  the board.  Right?
13       A.  I don't think so.  I think that -- I think
14  there -- I think you're -- I think there may be a
15  misreading on that.
16       Q.  Okay.
17       A.  All I can say about that is that right here
18  on these disks, Harris County, I didn't see any -- I
19  didn't see any published numbers that I can say, okay,
20  there's my baseline, 4,900.  There's -- I don't know
21  how many total provisional ballots there were.
22  Somewhere, I think, there's a number.
23       Q.  Okay.
24       A.  Then the lady down there at the election
25  office, very nice young lady -- I said, I'm here to

164

1  try to get some information.  Can you help me out?
2       Sure.
3       Very helpful, very nice.
4       Q.  Okay.
5       A.  She put the information on these disks, the
6  provisional ballots.
7       Q.  Okay.
8       A.  Now, whether or not these are all the
9  provisional ballots, I don't know.  I have not run a
10  test of this.  There's been no confidence level,
11  whatever it is.  All I could do on this is see how
12  many files there were on here.  And when you run the
13  number of files, there were accepted and rejected
14  files on here.  I figured if they -- if the file name
15  is rejected, I would assume that that's the total
16  number of rejected ballots on this disk.
17  (Indicating.)
18       Same thing for this one right here, March
19  2014.  (Indicating.)  This is the republican and
20  democratic primary.  They're on this.  So there's four
21  different files on here, two republican, two democrat,
22  two accepted, two rejected.
23       Q.  Okay.  How did you determine the number that
24  was accepted or rejected SB14 provisional ballots?
25       A.  Looking at them, I didn't do accepted.  I

165

1  just did rejected.  And on there, on the affidavit, it
2  said -- they have the little boxes checked or there's
3  a handwritten note, no photo ID.
4       Q.  Okay.  In your -- in the documentation you
5  have in front of you and that you've reviewed in this
6  case and that we will make an exhibit here shortly, do
7  you have calculations you did with respect to what
8  we're talking about, determining the number of
9  provisional ballots cast in the two elections, and
10  then determining the number that were related to SB14,
11  and then determining the number of those that were
12  rejected or accepted?
13       A.  On here, there's a number.  For example, I
14  think on here it says -- if you open this file up
15  right here, there's going to be two files on here,
16  accepted, rejected.
17       Q.  Okay.
18       A.  These are PDF copies of the actual
19  provisional ballots.
20       Q.  Okay.
21       A.  Each provisional ballot is one PDF file.  So
22  if you open this up, you get a huge page.  So if you
23  widen it, you'll have -- you could widen it to where
24  you got 20 across and you have "X" number of rows.
25  579 rejected.  And then you start looking at each one,

166

1  look at each one, look at each one.
2    Q.   Okay.
3    A.   And I think I printed out each one of the
4  rejected provisional ballots no photo ID.  I think
5  they're printed out over there.
6    Q.   Okay.
7    A.   And those totaled 22.5 percent --
8    Q.   Okay.
9    A.   -- of the rejected ones.  But whether this
10 was all of them, I don't know.
11   Q.   Okay.  Have you read the deposition of Stan
12 Stanart, the Harris County voter registrar?
13   A.   No, sir.
14   Q.   Okay.  So you don't know whether or not the
15 numbers you're giving today comports with the numbers
16 he testified to in his deposition.  Correct?
17   A.   I do not know.
18   Q.   Okay.  And do you know, of the ones that were
19 rejected, how many of these people came in to try to
20 cure their provisional ballot?
21   A.   Well, if they came in and cured, they would
22 be under the accepted.  So I didn't analyze the
23 accepted, because the accepted were a different -- if
24 they came in and accepted, I don't know if that would
25 have been a relevant anecdotal piece of information.

167

1    Q.   Okay.
2    A.   So I scanned the rejected ones for a photo ID
3  issue.
4    Q.   Okay.  And with respect to the rejected ones,
5  you have no way to know whether or not those people
6  actually made the attempt to come in and cure?  That's
7  really my question.
8    A.   Oh, whether they came in within six days --
9    Q.   Right.
10   A.   -- and said, My driver's license is --
11   Q.   Here -- you know.
12   A.   Here it is.
13   Q.   Right.
14   A.   And you're not listening to me and that's
15 really me.
16   Q.   Right.
17   A.   No, I don't have any information on that.
18   Q.   Okay.  And you have -- do you have any
19 knowledge as to the number of provisional ballots in
20 Harris County that were rejected, but, yet, the
21 records show that those people do, in fact, have
22 driver's licenses?
23   A.   No, sir.
24   Q.   Okay.  All right.  So your -- your testimony,
25 Mr. Cornish, with respect to the -- with respect to

168

1  the numbers of provisional ballots in Harris County
2  and the percentage of rejected provisional ballots and
3  the percentage that were based on SB14 is strictly
4  numbers or information you took from the information
5  Harris County gave you.  Correct?
6    A.   Correct.
7    Q.   Okay.  You did no deeper investigation or
8  analysis, other than looking at the ballots,
9  themselves, and trying to determine which ones
10 indicated a photo issue.  Correct?
11   A.   The affidavits.
12   Q.   Okay.
13       MR. KEISTER:  Okay.  All right.  Let's
14 take a short break.
15       (Break.)
16   Q.   (By Mr. Keister)  Mr. Cornish, before the
17 break we were finishing up our discussion of the
18 provisional ballot portion of your report.  What
19 expertise -- what legal expertise did you employ in
20 your attempt to make an analysis of the provisional
21 ballots?
22   A.   Well, I guess I'm generally familiar with the
23 Election Code, like the Government Code or any other
24 code that State of Texas passes and maintains.  I
25 understand how to read a provisional ballot.  I

169

1  understand the rationale and the statute, and I read
2  SB14, and I read a significant portion of the record
3  surrounding SB14.  I guess that would be the legal
4  aspects of it, understanding what the law was, what
5  the intent was, how the -- how the voting -- how the
6  voting offices in each one of the counties interpreted
7  it as to what the seven forms of identification would
8  be, how they implemented it, how they notified people
9  as to the effects of a provisional ballot.  And then,
10 I guess, from a legal standpoint, I can't think of
11 anything else right now as we sit here, but there may
12 be.
13   Q.   Okay.  Did you reach any opinions that are
14 based upon legal standards, accepted legal standards
15 with respect to provisional ballots?
16   A.   Well, what legal standards would you be
17 pointing to there?
18   Q.   I'm just asking you if you reached any
19 opinions in your review of provisional ballots that
20 are based upon legal standards that you, as a legal
21 practitioner, recognized?
22   A.   Not that I know of right now, no, sir.
23   Q.   Okay.  Did you reach any opinions with
24 respect to provisional ballots that were based upon
25 your expertise as a certified public accountant?

Thom Cornish, C.P.A. - 8/7/2014

170

1  A.  I guess, really, the opinions that I express
2  concerning provisional ballots is, is that there are
3  -- there's no systematic methodology standardized by
4  the various 250 counties or whatever it is that
5  administer the election law in this state as to how
6  they implement, analyze, observe, tabulate and provide
7  for a fair vote concerning provisional ballots, that
8  everybody -- all the counties, the 17 counties that I
9  contacted are all different.  There are different
10  standards.  I was told significantly different things.
11      And as an accountant, I think that -- in my
12  training, I guess, as an accountant would be that, to
13  have a result that is uniform, you have to have
14  policies and procedures to achieve the result which is
15  a fair analysis and computation of the provisional
16  ballots.  And I found that to be severely lacking in
17  the 17 counties that I analyzed.
18  Q.  Okay.  Are there any generally accepted or
19  commonly accepted standards or principles of public
20  accountancy that apply to elections?
21  A.  Specifically to elections?
22  Q.  Yes, sir.
23  A.  I don't think the rules promulgated by the
24  AICPA or any governmental accounting standard board
25  specifically relate to elections.

171

1  Q.  Okay.
2  A.  I think that they relate to the general
3  controls over transactions.
4  Q.  Okay.  Are there any generally accepted
5  standards or principles of public accountancy that
6  would apply to provisional ballots?
7  A.  No, sir.
8  Q.  Okay.  Have you -- in reaching your opinions
9  or the lack of opinions with respect to your analysis
10  of the provisional ballots, are there any specific
11  standards or principles of public accountancy that you
12  applied in reaching your opinions or lack of opinions?
13  A.  I think that they would be limited or they
14  would be based upon my experience as a CPA where you
15  want to do a particular analysis and you get an idea
16  of how you're going to analyze something, whether it's
17  a general ledger account or the number of feet out in
18  a pipe yard and you try to devise a plan to come up
19  with -- so you can obtain information that's organized
20  and is capable of being analyzed and compiled.
21  Q.  Okay.
22  A.  And in this case, I thought that I would be
23  able to do that using the experience and the expertise
24  that I have as an accountant in analyzing these
25  counties and their recordkeeping, and I was unable to

172

1  do that.
2  Q.  Okay.  Did you find any literature or studies
3  by public accountants that would guide you in the way
4  in which you conducted your analysis in this case?
5  A.  No, sir.
6  Q.  Are you aware of whether or not there
7  are any studies or guidelines or publications by
8  public accountants that would relate to the type of
9  analysis you were doing in this case with respect to
10  the provisional ballots?
11  A.  No.
12  Q.  Okay.  If one wanted to determine whether or
13  not what you did in this case would be commonly
14  accepted by other public accountants is the
15  appropriate way to conduct this investigation, how
16  would one go about doing that?
17  A.  I don't want to guess on that question, so
18  you're going to have to ask that a little bit
19  different, I think.
20  Q.  Okay.  Is there any way I can determine
21  whether or not your procedures in this analysis would
22  be commonly accepted by other accountants or do
23  I simply have to take your word for the fact that you
24  think you did this the right way?
25  A.  I think you'd have to get your own expert or

173

1  your own CPA to give you an opinion as to whether or
2  not they thought that I was fair in my methodology in
3  determining the provisional ballot rate --
4  Q.  Okay.
5  A.  -- for photo -- as related to photo ID.
6  Q.  Okay.  And, basically, what I'm saying or
7  asking is:  Is there any published methodology as to
8  how a public accountant would perform this analysis or
9  is this -- and this isn't meant as a criticism.  I'm
10  just asking.  -- or is this something that you simply
11  looked at and said, okay, here's the issues, here's
12  how I'm going to try and determine these issues?
13  A.  I think you're overanalyzing published
14  procedures when it comes to the myriad of issues in
15  which a CPA may become involved.
16  Q.  Okay.
17  A.  There are some specific ones, but I don't
18  know of any specific guidance provided by the AICPA as
19  related to the determination of a provisional ballot
20  rejection rate for photo ID.
21  Q.  Okay.  And in this case, you did not have
22  another public accountant look at your work or look at
23  your methodology and say, yes, that's a good way to do
24  it, let's, you know, proceed that path?
25  A.  No.

Thom Cornish, C.P.A. - 8/7/2014

174

1    Q.   Okay.  And to your knowledge, there is no
2  published methodologies about how to perform the
3  analysis you were performing in this case with respect
4  to provisional ballots by public accountants?
5    A.   There is none.
6    Q.   Okay.  All right.  Let's proceed quickly
7  through the rest of your report.
8    A.   Okay.
9    Q.   Okay.  So, if you would, turn to Page 3 of
10  your report.
11    A.   Okay.
12    Q.   Do you see the bottom paragraph, Line 2, you
13  list the counties that you received information from.
14  Correct?
15    A.   Yes.
16    Q.   And I think you said you originally
17  contacted 17?
18    A.   Yes, sir.
19    Q.   I think I'm showing a count of 16 here.  So
20  was there only one county you didn't receive any
21  information from?
22    A.   Well, if they sent me an e-mail that said,
23  see you in court, that was something I got back from
24  them, so they're on the list.
25    Q.   Okay.  All right.

175

1    A.   I think one county, I got -- like, I got
2  nothing.
3    Q.   Okay.  Which would account for the missing
4  17?
5    A.   That's right.
6    Q.   But with respect to the counties you have
7  listed under No. 2, the information you received from
8  those counties are going to be contained in your
9  binders and the other materials that we're going to
10  make an exhibit here today.  Correct?
11    A.   Yes, sir.
12    Q.   Okay.  All right.  Page 4, you'll see No. 6
13  refers to PDF copies of provisional ballots from
14  Collin County?
15    A.   Yes.
16    Q.   No. 7, PDF copies of provisional ballots from
17  Harris County.  All of that information is going to be
18  contained within the documents you brought today and
19  that we're going to make an exhibit.  Correct?
20    A.   Yes, sir.
21    Q.   Okay.  All right.  No. 10 you say, J. Grious
22  discovery.  Can you educate me as to what the J.
23  Grious discovery was that you looked at?
24    A.   I think it's --
25    Q.   No. 10.

176

1    A.   I think it's that piece of paper that was
2  right here.  It was the Defendants' answers and
3  responses or objections to the first set of
4  Interrogatories.
5    Q.   Okay.  All right.  And I'm just asking.  I'm
6  not familiar with -- --
7    A.   I think that's what it is.
8    Q.   -- J. Grious.  Okay.  You think it was the
9  information you brought with you today, the
10  interrogatories --
11    A.   Yes, sir.
12    Q.   -- information?
13    A.   Yes, sir.
14    Q.   Okay.  All right.  There are a lot of people
15  I don't know in this case --
16    A.   Yeah.
17    Q.   -- and you'll have to help me.  All right.
18  Let's see.  All right.  Down the first full paragraph,
19  you say, Although others directed my attention to
20  particular evidence in some instances, I have made my
21  own judgment about the significance of any particular
22  evidence.
23       What particular evidence did someone direct
24  your attention to in this case?  And without going
25  back through everything, you can just tell me

177

1  generally.
2    A.   Generally, it would have been the
3  depositions.
4    Q.   Okay.
5    A.   Hey, you need to look at Keith Ingram's
6  deposition.
7    Q.   Okay.
8    A.   It's obvious, I think, but, I mean, that was
9  kind of it.  Joe Peters, DPS, look at his.
10    Q.   Okay.
11    A.   Read Ann McGeehan's deposition from 2012.
12    Q.   Okay.
13    A.   It was primarily depositions.  The rest of
14  the stuff, I did my own searches.
15    Q.   Okay.  And when they directed you, whoever it
16  was, to particular evidence, did they also give
17  commentary on it, look at so and so, it says so and so
18  or look at such and such, we need it to show, that
19  type of information?
20    A.   No.
21    Q.   Okay.  All right.  You state, I understand
22  discovery is ongoing.  You are correct, unfortunately.
23  And then you state, There are also deposition
24  transcripts which are not yet available to me.  I
25  reserve the right to amend, expand, adjust, or

Thom Cornish, C.P.A. - 8/7/2014

178

1 withdraw any of my opinions herein.
2       I think I asked you this earlier:  Do you
3 intend to do additional work in this case between now
4 and September the 2nd, I think it is?
5     A.   As I sit here right now, the only thing would
6 be the information that we've already talked about,
7 the --
8     Q.   The --
9     A.   -- the B&M report.
10     Q.   Right.  Okay.  Which we'll get to that
11 shortly.
12     A.   Yeah.
13     Q.   Do you intend to go back and review any of
14 the deposition transcripts and use those to try and
15 supplement or amend your report?
16     A.   As I sit here right now, no, sir.
17     Q.   Okay.  Has anyone asked you to do that?
18     A.   No one has asked me to.
19     Q.   Okay.  All right.  Page 5, at the very top,
20 you state, It should be noted that oftentimes the
21 information provided by the State through depositions
22 and discovery was sparse and sometimes contradictory.
23     A.   Yes.
24     Q.   What specifically are you referring to when
25 you say the information was sometimes contradictory?

179

1     A.   Primarily the spending, how much we spent,
2 how much we're going to spend, where we're going to
3 spend it, how we're going to spend it.  That was the
4 primary.
5     Q.   Okay.  And you mean just -- and we'll get
6 into this a little bit later on, but you're talking
7 about the amount of money spent for re-education
8 programs and --
9     A.   What kind of programs?
10     Q.   Education.
11     A.   Okay.
12     Q.   And -- sorry.  I'm starting to mumble.
13     A.   I got it.
14     Q.   -- and the advertising and that type of
15 thing?
16     A.   Primarily, yes, sir.
17     Q.   Yeah.  And you're referring to the fact that
18 there was numbers made or testimony given in the
19 legislature and the committee of the whole that maybe
20 is different from what was actually done later.  Is
21 that what you're referring to?
22     A.   No.  That's primarily a timeline issue.  What
23 I'm talking about is somebody says we spent $400,000.
24 And then, well, where is the information on the
25 $400,000?  Well, it's on this little piece of paper

180

1 here, you know.
2     Q.   Got it.
3     A.   So it's -- if someone says I spent $400,00,
4 then I think they have an obligation to say, okay,
5 here's where I spent it.
6     Q.   Okay.  All right.  But what I -- what I --
7 and maybe it's the definition.  What I see as
8 contradictory, it would be if somebody says I spent
9 $400,000 and something else says, No, you spent
10 $200,000.  Is there information like that that you're
11 referring to when you say there's contradictory
12 information?
13     A.   Nothing specific that I can recall right now.
14     Q.   Okay.  All right.  What about when you say
15 that it's sparse, what -- what -- what specific
16 information did you consider sparse that was provided
17 by the State that you think would have been helpful to
18 you in your analysis?
19     A.   Spending.
20     Q.   Okay.  Spending with respect to the education
21 and advertising, that type of thing?
22     A.   How much was spent on the EIC units, how much
23 was spent on the EIC events, things like that.  I
24 mean, sparse.
25     Q.   Okay.  All right.  Any other issues, other

181

1 than the spending that you -- that you were focusing
2 on that you thought the information was sparse and you
3 needed more information?
4     A.   Well, we've covered at length sparse or total
5 lack of information when it comes to the provisional
6 ballots.
7     Q.   Right.
8     Q.   So the only thing left would be the spending.
9     Q.   Right.  But, of course, you understand the
10 State did not give you discovery or did not provide
11 discovery with respect to the provisional ballots.
12 That information was in the possession of the
13 counties.  Correct?
14     A.   Yes.
15     Q.   Okay.  So what you got from the state was --
16     A.   Nothing.
17     A.   Yeah, because we didn't have it.
18     A.   Yes.
19     Q.   Okay.  All right.  Okay.  Next paragraph, you
20 said, I have attached hereto some of the documentation
21 I reviewed that assisted me in forming the
22 conclusion --
23         MR. BRAZIL:  Hold on one second.
24         MR. KEISTER:  Okay.
25         MR. BRAZIL:  Rich, are you still there?

Thom Cornish, C.P.A. - 8/7/2014

182

1  Eric?  Mr. Rich?  Somebody sent an e-mail asking us to
2  call back in.
3          MR. KEISTER:  All right.  Off the
4  record, please.
5          (Brief interruption.)
6          MR. KEISTER:  All right.  Back on the
7  record.
8      Q.   (By Mr. Keister)  All right.  Mr. Cornish, on
9  Page 5 of your report, you state, I have attached
10 hereto some of the documentation I reviewed that
11 assisted me in forming the conclusion and opinions
12 contained therein.  And then you -- then you list 15
13 items.
14        Is all of that information even contained in
15 the exhibits to your report or in the documentation
16 that we have on the table that we're going to make an
17 exhibit to your deposition today?  And if you want to
18 look at each just to make sure, that's fine.
19     A.   You mean 1 through 15 or the statement which
20 is, I've attached some of the documentation?
21     Q.   No.  1 through 15.  These specific items, are
22 they --
23     A.   Yes.
24     Q.   Are they either attached an answer exhibit or
25 are they in this information on the table that we're

183

1  going to make an exhibit?
2      A.   Yes, sir.
3      Q.   Okay.  All right.  All right.  Then turning
4  to Page 6, the first full paragraph, you say, I was
5  retained to review and analyze issues related to the
6  number of provisional ballots cast in the State of
7  Texas and various fiscal considerations related to the
8  monies promised, budgeted, allocated and/or spent on
9  outreach, education, and implementation of the new
10 photo ID by the State of Texas.
11        Did I read that correctly?
12     A.   Yes, sir.
13     Q.   Okay.  Was that what -- what Mr. Dunn -- one
14 of the issues Mr. Dunn asked you to look into when he
15 retained you?
16     A.   Yes, sir.
17     Q.   Okay.  And tell me what fiscal considerations
18 specifically you have analyzed in your investigation
19 in this case.
20     A.   The amount of money that has been spent by
21 the State of Texas beginning with the $3 million
22 request for proposal submitted at the end of 2011 and
23 contracted in 2012, I think it was.
24     Q.   Okay.  Anything else?
25     A.   (No response.)

184

1      Q.   I'm just asking you to list the fiscal
2  considerations that you were considering, and then
3  we'll go through them in detail or to the extent we
4  need to as we go through the report.
5      A.   And the amount of other monies alleged to
6  have been spent by the State of Texas on various
7  electronic identification devices.
8      Q.   Election --
9      A.   Device.
10     Q.   Election identification mobile -- certificate
11 mobile units?
12     A.   Mobile -- mobile stations that prepared EIC
13 units.
14     Q.   All right.
15     A.   And I guess there are some other monetary
16 issues relating to advertising that came out of both
17 the $3 million, the $400,000 emergency appropriation,
18 and the $400,00 appropriation, and the second, the
19 Phase I and Phase II.
20     Q.   Okay.
21     A.   $400,000 each.
22     Q.   Okay.  How did you determine or did you
23 determine what would be the appropriate amount of
24 money for the State to spend on each of the issues
25 that you have considered in this case?

185

1      A.   Well, I was not asked to express an opinion
2  on whether or not the $3 million of federal money and
3  the $2 million fiscal note were sufficient to meet the
4  needs of voter education.
5      Q.   Okay.
6      A.   And --
7      Q.   Okay.  In a nutshell then, what were you
8  asked to do?
9      A.   How much was spent --
10     Q.   Okay.
11     A.   -- actually.
12     Q.   Okay.
13     A.   And what it was spent on.
14     Q.   Okay.
15     A.   And when it was spent.
16     Q.   Okay.  So you have not attempted or were not
17 asked to make any determinations as to whether or not
18 the amounts that were spent, when they were spent, and
19 what they were spent on was appropriate pursuant to
20 some standard that states are required to spend on
21 such issues?
22     A.   No, but I did compare the spending by the
23 State of Texas with other states that have enacted
24 photo ID laws and how much they spent on voter
25 education related to photo ID.

Thom Cornish, C.P.A. - 8/7/2014

186

1   Q.   Okay.  Okay.  But as you sit here today, do
2   you know whether or not there's any standard or any
3   way that a public accountant would determine whether
4   or not one state -- the amount one state spends is
5   pursuant to some appropriate standard?  Does that make
6   sense?
7   A.   Well, up until you -- up until the last few
8   words.
9   Q.   Okay.
10  A.   Let's try that one again.
11  Q.   All right.  All right.  My question is this:
12  Were you retained just simply to look at the amount of
13  money the State spent and determine what it was spent
14  for or were you in any way asked to determine whether
15  or not the amount that was spent was appropriate for
16  that particular issue?
17  A.   I think it's -- that's really a two-part, how
18  much did they spend.
19  Q.   Right.
20  A.   Did they spend what they promised they were
21  going to spend and was their spending -- as compared
22  to other states, was it less, more, indifferent, not
23  to -- not to make a value judgment.
24  Q.   Okay.  All right.  So, really, then you're
25  looking at the numbers and you're saying here's the

187

1   numbers for issue one, here's the numbers for issue
2   two, here's what Georgia spent, here's what some other
3   state spent, but you're not expressing an opinion that
4   the amount that Georgia spent is the appropriate
5   amount or the amount that North Carolina spent is the
6   appropriate amount.  You were just saying here's the
7   numbers that I've determined they spent.  Correct?
8   A.   Well, I would -- I would like to analyze it
9   more by saying that what was spent had an impact.  So
10  if they spent $100,000 on their Tweeters and their
11  Facebooking, then if there were baseline numbers as to
12  the amount of people that had learned about voter ID
13  on Tweeting or Facebook or by visiting the website,
14  then that would be an analysis that I think would be
15  appropriate, that significant people heard about photo
16  ID by using these social media.
17       But my understanding and the lack of
18  information that I was -- that was made available to
19  me, I'm not able to go further with my evaluation as
20  to whether or not it was not sufficient, but whether
21  it was helpful.
22  Q.   Okay.  And as you sit here today, you're not
23  able to express that opinion, that it was sufficient
24  or helpful.  Correct?
25  A.   As I sit here right now, I'm not, but after I

188

1   saw what I saw last night, there's a possibility that
2   I may be able to.
3   Q.   Okay.  And by what you saw last night, you're
4   talking about the Burson-Marsteller information in
5   Exhibit 5 and 6?
6   A.   Not as much Exhibit 5.  More exhibit --
7   Q.   6?
8   A.   6.
9   Q.   Okay.  All right.  All right.  Now, when you
10  say the various fiscal considerations related to the
11  monies promised, what do you mean, "monies promised"?
12  A.   It's going to be Exhibit 15, which is the
13  testimony of Ann McGeehan, director of elections,
14  Secretary of State, and the monies that she testified
15  at the hearings, the State of Texas, as to we're going
16  to educate people about this and we're going to spend
17  this and we're going to spend this, and so we think
18  that's sufficient to educate the population.
19  Q.   Okay.  So when you say "monies promised,"
20  that's not a term of art for public accountancy.
21  That's your interpretation of Ms. McGeehan's
22  testimony.  Correct?
23  A.   I believe she was under oath and she said
24  we're going to spend $5 million.
25  Q.   I understand that's what you understand.

189

1   A.   Okay.
2   Q.   But my question is this:  When you use the
3   words "monies promised," you're not saying promised in
4   some -- as some official -- not official, but some
5   professional terminology of public accountancy, you're
6   just simply stating that, in your opinion, the
7   testimony of Ms. McGeehan was a promise that that
8   money was going to be spent?
9   A.   I think that would be a good -- a good
10  statement.
11  Q.   Okay.  And do you know whether or not
12  Ms. McGeehan, in her position, had the authority to
13  bind the Secretary of State, if that's the appropriate
14  term, to spend the amount of monies she was talking
15  about in her testimony?
16  A.   Well, if she didn't, she shouldn't be
17  testifying.  Let's put it that way.  She was up there
18  with the authority to provide information to people
19  who were passing a law, voting on it, subject all the
20  citizens to that law.  And so I assume that somehow
21  she persuaded them to pass this law and vote for it.
22  And perhaps some of those people voted for this law
23  based upon that representation she made.
24  Q.   Okay.  Do you understand or do you know in
25  what capacity Ms. McGeehan was testifying before the

Thom Cornish, C.P.A. - 8/7/2014

190

1  committee?
2      A.  I forget that.
3      Q.  Have you heard the term "resource witness"?
4      A.  In this scenario, no, sir.
5      Q.  Okay.  With respect to people who testify
6  before the legislature when they're in session and
7  when they're before committees, have you ever heard
8  anyone referred to as a recourse witness, as opposed
9  to a witness that's there to advocate for a particular
10  bill?
11      A.  Uh-huh.
12      Q.  Do you understand that Ms. McGeehan was
13  testifying as a resource witness when she testified --
14          MR. BRAZIL:  Object to the form of the
15  question.
16      Q.  (By Mr. Keister)  -- before the committee?
17      A.  I didn't understand that she was up there
18  just as a resource person.
19      Q.  Okay.  All right.  Would it surprise you, if
20  you were to check the records, that you would find
21  that she's listed and called as a resource witness?
22      A.  No.
23      Q.  Okay.  Do you understand that one person in
24  the Secretary of State's office does not have the
25  authority to bind that agency simply by testifying as

191

1  to what they estimate could be done or -- out of the
2  budget?
3      A.  (No response.)
4      Q.  In other words -- if you need "in other
5  words."
6      A.  Give me the "in other words" --
7      Q.  Okay.
8      A.  -- so I can --
9      Q.  If I were to appear before the legislature,
10  God forbid, in my capacity as an Assistant Attorney
11  General and the legislature asked me, you know, how
12  much money will it take for your division to prosecute
13  a certain type or a certain number of cases and I was
14  to say, well, you know, we would need or it could take
15  such and such dollars, you understand I'm simply
16  giving information as to what my opinion or projection
17  would be, but I certainly am not binding the Attorney
18  General's office to that amount of money?
19      A.  Fair statement, yes.
20      Q.  Okay.  In other words, it's ultimately the
21  legislature that appropriates the money for any action
22  taken by the agencies?
23      A.  Correct.
24      Q.  The Secretary of State does not generate its
25  own money?

192

1      A.  They don't print their own money, I agree
2  with that.
3      Q.  It comes from appropriations.  So when
4  Ms. McGeehan was testifying, she could have said $5
5  million dollars, she could have said $10 million, but
6  that does not bind the Secretary of State to spend an
7  amount of money that they may or may not have?
8      A.  Well, I'd have to disagree with that
9  statement.
10      Q.  Okay.  Why?
11      A.  Why?  Because what I found out was, is that
12  they had 40 something million dollars of federal money
13  that they could spend on voter education.  So when you
14  say they may or may not have the $3 million, they had
15  the $3 million.
16      Q.  All right.
17      A.  So I have to disagree with your statement
18  and say, well, it's true in part and needs to be
19  clarified in part.
20      Q.  Okay.  And I was speaking in general terms.
21  I wasn't speaking to the specific testimony.
22      A.  Right.
23      Q.  But with respect to the specific testimony,
24  have you found anything legally, as a legal expert,
25  which you can point to that says that when a resource

193

1  witness, as was Ms. McGeehan, testifies before a
2  senate committee as to the amount of monies that may
3  be available for certain projects, that that somehow
4  binds the agency to utilize that amount of money?
5      A.  Well, I don't -- I don't understand why
6  you're using the words "binds them," because the
7  senate appropriated over $2 million.  So I guess the
8  Secretary of State could just say we're not going to
9  spend any money implementing SB14.  We're not going to
10  spend a dime doing it.  We don't care.  We're just
11  gonna -- this law is gonna pass and then we're just
12  gonna let the chips fall where they may.
13      Q.  Right.
14      A.  I guess they could do that without any type
15  of financial obligation on their part to spend the $2
16  dollars that the senate appropriated.
17      Q.  Okay.  But I'm trying to understand your use
18  of the words "promised" or "monies promised" and tying
19  that to Ms. McGeehan.  My question is:  As a legal
20  expert, have you found anything legally that says that
21  when a resource witness, such as Ms. McGeehan, gives
22  testimony before a senate committee as to the amounts
23  of monies that may -- maybe could be used, that that
24  somehow makes a binding obligation legally upon the
25  agency to spend that amount of monies?

Thom Cornish, C.P.A. - 8/7/2014

194

1    A.   I don't think there's a binding legal
2  obligation.
3    Q.   Okay.
4    A.   I don't think anybody would have standing to
5  sue the Secretary of State for not spending the money.
6    Q.   Okay.  All right.  Thank you.  That's all I
7  was trying to get to in a not --
8    A.   Okay.
9    Q.   -- very artful way.
10   A.   Okay.
11   Q.   Okay.  All right.  Then you say -- all
12 right -- The various fiscal considerations related to
13 the monies promised, budgeted, allocated and/or spent.
14       All right.  What monies budgeted are you
15 referring to?
16   A.   Which line are we on again?  I took my
17 glasses off.
18   Q.   I'm sorry.
19   A.   I apologize.
20   Q.   That same line, fiscal considerations related
21 to the monies promised, budgeted, allocated and/or
22 spent.  I want to know what you mean by "budgeted,"
23 what you mean by "allocated."  I know what you meant
24 by "spent," but when you say "budgeted," what are you
25 referring to?  I think we're missing a comma after

195

1  "budgeted," but I think that's intended to be.
2    A.   "Budgeted" would be, I guess, the $2,024,000.
3  That would be budget allocation on the bill, fiscal
4  note on the bill.
5    Q.   Okay.
6    A.   "Allocated" would be, I guess, the Secretary
7  of State saying, We got a lot of federal money.  Let's
8  use up $3 million of it during this election cycle,
9  which is exactly what they did.
10   Q.   Okay.  All right.  With respect to budgeted,
11 did you see a budget that somewhere set out the amount
12 of money you're referring to in saying this amount of
13 money is going to be spent for 2013, this amount of
14 money is going to be spend for 2014, do you know a
15 budget or are you simply using "budget" in a generic
16 term?
17   A.   It would be generic --
18   Q.   Okay.
19   A.   -- based upon the fiscal note attached to the
20 bill.
21   Q.   Okay.  So you haven't actually seen a budget,
22 you've only seen the fiscal analysis to the bill?
23   A.   Correct.
24   Q.   Okay.  All right.  Now, when you say
25 "allocated," what are you -- allocated to what?  What

196

1  are you referring to?
2    A.   (No response.)
3    Q.   If you have specific allocations you're
4  referring to.
5    A.   Well, "allocated" would be how much is going
6  to be spent on a particular election cycle, how much
7  is allocated to various requests for proposals and the
8  nature of those -- of those proposals.
9    Q.   Okay.  Have you seen any allocations of
10 monies intended for outreach, education, and
11 implementation of the new voter photo ID law, other
12 than the allocations that have been in the documents
13 we've talked about today, being either the documents
14 attached to your -- to your report or the documents
15 that you brought, were going to make exhibits, or the
16 two documents you hadn't seen, which were Exhibit 5
17 and six?  Are there any other documents that you
18 contend show allocations of monies for those issues?
19   A.   I think everything is in the documents that I
20 brought.
21   Q.   Okay.  And have you seen any monies allocated
22 for certain issues related to outreach, education, and
23 implementation of a new voter photo ID law that was
24 not spent?
25   A.   Well, back on June the 25th, yes, but now

197

1  Exhibit 5 is sitting there, which indicates that
2  $1,675,000 is to be spent pursuant to another contract
3  with BM.
4    Q.   Okay.  And that's the document that you talk
5  about later in your report that you had not seen.
6  Correct?
7    A.   Correct.
8    Q.   All right.  But now having seen that
9  document, are you -- is it still your opinion that
10 there are monies allocated that were not spent?
11   A.   Well, as we sit here today on August the 7th,
12 that money hadn't been spent yet.  That money has been
13 allocated.  It's been encumbered.  So that's -- that's
14 a contract that's going to be fulfilled over the next
15 few months.  I think very little or -- very little of
16 that money has been spent.  So I don't know.  I mean,
17 you're hitting me with new information that is a
18 surprise to me and I haven't had time to digest it.  I
19 mean, I just looked at the first page of it --
20   Q.   Okay.
21   A.   -- but I haven't seen -- I haven't seen the
22 response.  I haven't seen the contract.  I haven't
23 seen anything other than that piece of paper.
24   Q.   Okay.  And I understanding your position on
25 that --

Thom Cornish, C.P.A. - 8/7/2014

198

```
1    A.   Yeah.
2    Q.   -- which I do, but if the numbers are as
3    they're represented on Exhibit 5 and that amount of
4    money is, in fact -- has, in fact, been contracted to
5    Burson-Marsteller, are there other monies, other
6    allocations that you're asserting have not been spent?
7    A.   Yes.
8    Q.   Okay.  And what would those be?
9    A.   I think that's -- Keith Ingram's deposition
10   testimony was that of the $2 million, one million six,
11   Exhibit 5, is going to be spent in the current
12   election cycle and they were holding back $400,000 for
13   more equipment.  I believe that's in my report.
14   Q.   Okay.
15   A.   Is his testimony.
16   Q.   And if that money has been used or is
17   intended to be used for the purpose of outreach,
18   education, and implementation of the new voter photo
19   ID law, is there any other monies -- assuming that's
20   what Mr. Ingram's representation was, is there any
21   other monies that you're asserting were allocated, but
22   has not been spent?  I mean, is that the sum total of
23   all the monies you're referring to on allocations, the
24   $2 million?
25   A.   Well, you know, it's not as clear as that.
```

199

```
1    Q.   Okay.
2    A.   Because if we go back to the $5 million
3    number as a -- not a contractual obligation by the
4    Secretary of State or a -- you gotta spend it
5    promised because she was only a resource witness and
6    she had no authority to say we're going to spend $5
7    million, but if, in fact, the $5 million was a
8    reasonable number to spend, not a promise, but a
9    reasonable number to spend on educating Texas voters
10   on photo ID, this is what you're gonna have to do,
11   this is how you get your certificate, then, no, the
12   State of Texas has not spent $5 million on educating
13   Texas on photo ID.
14   Q.   Okay.  And you understand that the $3 million
15   Ms. McGeehan was referring to was HAVA money.
16   Correct?
17   A.   Yes.
18   Q.   Okay.
19   A.   That was HAVA money, but it was not spent on
20   educating next voters on photo ID.
21   Q.   Okay.  What is your understanding of what
22   HAVA, H-A-V-A, is?
23   A.   Help America Vote Act --
24   Q.   Okay.
25   A.   -- 2002.
```

200

```
1    Q.   Right.
2    A.   Two hundred and something million dollars to
3    the State of Texas to clear up the debacle that
4    happened in Florida in Bush V Gore.
5    Q.   Okay.  And other states?
6    A.   And other states.
7    Q.   Right.  In other words, this is money that,
8    pursuant to this act, has been distributed to
9    different states to update election issues -- or not
10   issues, but education, machinery, et cetera, et
11   cetera.  Correct?
12   A.   Yes, sir.
13   Q.   Do you have any understanding of the
14   limitations that states are under with respect to how
15   the HAVA money can be used?
16   A.   The deposition testimony and my understanding
17   of what I've read and I've learned is that it cannot
18   be to a specific issue.  It has to be on general voter
19   education.
20   Q.   Okay.  And do you have any understanding of
21   the type of elections in which HAVA money can be used
22   on?
23   A.   I would assume it would be federal elections.
24   Q.   Okay.  Okay.  And knowing those two issues,
25   do you have an opinion as to whether or not the money
```

201

```
1    Ms. McGeehan was talking about, $3 million HAVA money,
2    could be spent for the voter ID issues specifically?
3    A.   Specifically, no.  In part, yes.
4    Q.   Okay.  And is it your understanding that
5    Mr. Ingram's testimony was that, in fact, some HAVA
6    money was going to be spent with respect to voter ID,
7    but it had to be done in conjunction with the general
8    election education?
9    A.   That's correct.
10   Q.   In other words, there might be an
11   advertisement about registering to vote that as part
12   of that advertisement would also be incorporated
13   therein some information about voter ID.  Correct?
14   A.   I believe so.
15   Q.   Okay.  Is it your belief that that's not an
16   appropriate way or that cannot be an appropriate way
17   to educate the public about voter ID, to do it in
18   conjunction with other issues?
19   A.   Well, I think it's reasonable.
20   Q.   Okay.  So if the State is, in fact, spending
21   State funds, in addition to HAVA funds, are you taking
22   that into account in your allocation analysis?
23   A.   My analysis ended on June the 26th, 2014.
24   Q.   Okay.
25   A.   So as I sat there writing my report, the $3
```

Thom Cornish, C.P.A. - 8/7/2014

202

1  million, 2012, that was not spent on voter ID
2  education because they were precluded because they
3  could not implement SB14.  The $1.6 million, which I
4  just learned about yesterday, August the 6th, I knew
5  nothing about that.  The only thing that I knew about
6  were the two $400,000 monies spent, which were far
7  short of the $5 million promise.
8      Q.  But that's not totally correct now, is it?
9  Because you did read Mr. Ingram's deposition.
10 Correct?
11     A.  Yes.
12     Q.  And Mr. Ingram did testify about the Burson
13 -- Burson-Marsteller contract or proposal for, what
14 was it, $1.65 million?
15     A.  He did testify to that.
16     A.  All right.
17     A.  But I had not seen any --
18     Q.  Okay.
19     A.  -- document, any spending.  So my opinion was
20 as to monies spent --
21     Q.  Okay.
22     A.  -- not monies promised --
23     Q.  Okay.
24     A.  -- by Mr. Ingram.
25     Q.  Okay.

203

1      A.  Because, again, does he have a right to bind
2  the Secretary of State by spending the money?
3      Q.  Okay.
4      A.  I don't know.
5      Q.  Yeah.  So assuming that, as you will find
6  when you review the documents, that they -- that they
7  corroborate the information Mr. Ingram related during
8  his deposition about the monies spent and you find
9  that, in fact, the monies Mr. Ingram said were spent
10 were spent or contracted, what criticisms then do you
11 have of the spending and the allocation related to
12 outreach, education, and implementation of the new
13 voter ID law?
14     A.  Well, I think you put me in a very difficult
15 position to suggest an answer to a question that I
16 have no answer -- no access to any documents.  But,
17 now, if you want to give me some time, two weeks,
18 three weeks, whatever it is, to look at that, Exhibit
19 5, look at the contract that was signed with B&M, look
20 at their proposed activity plan and see exactly how
21 much money is going to be spent, then I assume that
22 that would change my opinion.
23     Q.  Okay.  And, in fairness, your opinion is just
24 not the adequacy of the amounts, your opinion is just
25 the amounts.  Correct?  Is that what you the testified

204

1  to earlier?  Not adequacy or sufficiency of the
2  amounts, but just the amounts that were spent.  That's
3  what you were determining in your analysis?
4      A.  I think it's really two part.  It's was the
5  money spent and was it effective.  Now, we got -- we
6  got Exhibit 6, which I think goes to the effectiveness
7  of the advertising campaign designed by B&M and paid
8  for by the State of Texas.
9      Q.  Okay.
10     A.  So that would be a second part of some type
11 of analysis.
12     Q.  Okay.  What qualifications do you have,
13 Mr. Cornish, to make a determination of effectiveness
14 of the Burson-Marsteller advertising campaign?
15     A.  Well, they have quantified now the effect of
16 the advertising campaign, which was the $3 million and
17 the $400,000 and the $400,000.  So that's $3.8
18 million.  Just looking at the cover sheet last night,
19 this was done in March.  And so I think that I'm
20 qualified to look at this and provide an analysis of
21 what the -- whether or not the advertising was
22 effective and the amount of money spent on those
23 aspects of advertising.
24     Q.  Okay.  And have you ever done such an
25 analysis before?

205

1      A.  Specifically advertising, but I've -- not to
2  advertising, no.
3      Q.  Okay.  So have you ever specifically taken a
4  document, such as Exhibit No. 6, which was put out of
5  Burson-Marsteller, which is their analysis, I guess,
6  of the effectiveness of their campaign and applied
7  either legal expertise or standards of public
8  accountancy and tried to make a determination as to
9  whether or not that campaign was sufficient to reach
10 the voters?
11     A.  It's my opinion that if -- if, based upon the
12 spending, the State of Texas spent -- I'll give you
13 example -- $500,000 on the Tweeting page, in setting
14 up the Facebook page, and the social media aspect of
15 this -- and I think these proposed action plans of B&M
16 and TKO Advertising all contained an allocation of
17 funds to various earned media and things like that --
18 that I would be able to express an opinion or not
19 whether or not that spending was effective if, based
20 upon that report, it says that 96 percent of the
21 people or respondents never heard -- never Tweeted,
22 never heard of a Tweet, never saw the Tweet, never
23 went to the website.  So I think that I would be able
24 to provide correlation analysis between money spent
25 and the results.  I think a CPA can definitely provide

Thom Cornish, C.P.A. - 8/7/2014

206

```
1   assistance in that aspect of analysis --
2      Q.   Okay.
3      A.   -- greater than a layperson would be able to
4   review these documents and those documents and provide
5   meaningful analysis of them.
6      Q.   Well, who would be the typical person that
7   you think would -- or the typical profession that
8   would engage in poll tracking?  This indicates HAVA
9   Texas campaign tracking poll.
10     A.   I don't know.  I haven't seen that whole
11  thing.  I just --
12     Q.   Yeah.  And, you know, I'm --
13     A.   Do you want me to review this?  Do you want
14  me to give you an opinion on it right now?
15     Q.   No.  Just -- I'm just trying to ask you.  I
16  mean, did they not have one of those in the earlier
17  proposals?  Did they not do one of those for the 2013
18  analysis?
19     A.   I think my report specifically says that
20  their request that their contract with State of Texas
21  said that they were supposed to do this.  The big fee
22  was to provide a 2012 general wrap-up report.  And as
23  pursuant to that report, they were going to go through
24  this exact analysis to track whether or not their
25  advertising campaign worked.  Never saw that.
```

207

```
1      Q.   All right.  Okay.  All right.  And I'm not
2   trying to pick at you.  I'm just asking, would it be
3   typical for a certified public accountant to engage in
4   what was engaged in in Exhibit 6, which is -- appears
5   to me just from the face of it to be poll tracking in
6   which they evidently tried to track and determine the
7   adequacy of their -- of what the services they
8   performed under the contract?  And "their" being
9   Burson-Marsteller.
10     A.   No.
11     Q.   Okay.
12     A.   That's -- that's an incorrect statement on
13  your part.
14     Q.   Okay.
15     A.   I'm not going to agree with it at all.
16     Q.   All right.  Well, correct me on it.  What --
17  what are you going to do with this, I guess, is my
18  question?
19     A.   What am I going to do with this?
20     Q.   Yes.  I mean, I can look at it and I can say,
21  wow, this is great.  I mean, are you going to look at
22  it --
23     A.   Well, yeah.
24     Q.   Okay.
25     A.   See, you work -- you work for the State of
```

208

```
1   Texas.  You'd think this is like gold, baby.
2      Q.   I mean, are there some general accounting
3   principles that you can apply --
4      A.   Sure.
5      Q.   -- to get -- that's going to enable you to
6   reach an opinion about the sufficiency of this private
7   firm's advertising campaign?  And I'm not trying to be
8   critical of you.  I'm just asking, is that something
9   that an accountant would normally do or is that not
10  something that someone in advertising or someone who
11  as a professional does poll work would do?
12     A.   Well, see, you're getting into -- you're
13  getting into a lot of stuff dealing with, you know,
14  CPAs and --
15     Q.   Okay.
16     A.   -- integrity and conflict of interest and
17  stuff like that.  So, I mean, it would be a big
18  analysis.  I mean, it's not just, oh, yeah, here's --
19  here's my four paragraphs on this, on this thing.
20     Q.   Okay.
21     A.   But, first of all, it has nothing to do with
22  the $3 million or the $400,000 or the $400,000,
23  nothing to do with it.  Because this is March 2014.
24     Q.   Okay.
25     A.   It had nothing to do with what was done in
```

209

```
1   2012 or 2013.
2      Q.   Okay.
3      A.   This is a follow-up report.  See, I'm just
4   critiquing it just so we can --
5      Q.   No.  I'm with you.
6      A.   -- we can talk about it.
7      Q.   Right.  I'm with you.
8      A.   This was done by the people that did it.
9      Q.   Right.  Exactly.
10     A.   So, first of all, it's very suspect to begin
11  with.  Okay.
12     Q.   Yeah.
13     A.   Second of all, it's an online pole.  First
14  thing is, it's online.  Online.  What's an online
15  interview?  There's no notes as to what the
16  methodology was.  There's nothing about, you know, we
17  contacted 900 people random.  I mean, what do they do?
18  They put an ad on Google and say, Here, do you want to
19  take a poll?  There's no, we took their voter
20  registration number for the State of Texas.  But this
21  is Georgia voters.  Who knows what this is.  It could
22  be general voters.
23     Q.   Okay.
24     A.   All right.  So initially in the first, like,
25  five minutes, I've got a couple problems with it, but
```

Thom Cornish, C.P.A. - 8/7/2014

210

1  I just want -- it's the basis of my analysis, because
2  you go through a logical. . .
3      Q.  .right?
4      A.  And then the other stuff, looking at the
5  numbers, how effective was this ad, do you like this
6  ad, how do you feel about this ad?  But the numbers
7  that would be relevant, I think, would be how many
8  people have heard of the Tweeting, how many people
9  have heard of the Facebooking, how much money -- how
10  many people have heard of the social media stuff and
11  the money spent on it.  I mean that's an analysis I'd
12  like to do.
13      Q.  Okay.
14      A.  And I think it's relevant.  And I think a CPA
15  would be the perfect person to do it because of the --
16  I mean, you're comparing numbers and numbers.
17      Q.  Okay.  The numbers that you're going to
18  compare to other numbers, are those all contained in
19  Exhibit 6?
20      A.  Well, I guess the basic number is, there's --
21  the first number is zero, because they didn't have
22  Tweeting.  So nobody that's a Texas vote, you know,
23  before the Tweeting.  So how many people heard about
24  it now?  So that's just something that I'd be curious
25  about and that I would detail, provide information to

211

1  the Court, let the Court decide whether it's relevant
2  or not.
3      Q.  Right.  Okay.  And I'm not --
4      A.  Yeah.
5      Q.  You know, I'm not saying you can't do it.
6      A.  Yeah.
7      Q.  But I'm simply asking, is that something
8  that you, as a CPA and as an attorney, have the
9  qualifications to do, as opposed to some of the other
10  experts in this case who actually did the poll
11  tracking survey-type work?
12      A.  Well, maybe they could, also.
13      Q.  Okay.  And that's -- that's all I'm trying to
14  get to.
15      A.  No.  I'm not saying I'm the only person --
16      Q.  Right.
17      A.  -- that could do this.  But I feel that I'm
18  well qualified, you know, over and above the lay
19  person to take governmental spending and how it was
20  allocated and look at the allocation of it and then
21  try to relate that to this document.
22      Q.  Okay.  All right.  So let's just break this
23  down into two areas and try and just summarize.  With
24  respect to the allocation of the monies, assuming what
25  Keith Ingram testified to in his deposition is

212

1  correct, as reflected by Exhibit 5, the $1.65
2  million --
3      Q.  Uh-huh.
4      Q.  -- from the second Burson-Marsteller contract
5  and the other monies he testified that were spent, is
6  there now -- in your opinion, is there any discrepancy
7  now as to the monies that were allocated and the
8  monies spent?  That was kind of the first issue you
9  were on.  Right?
10      A.  Which -- what money allocated -- okay.  What
11  money are you talking about, the money allocated?
12      Q.  The monies you were talking about in your
13  report.
14      A.  $5 million?
15      Q.  Yes.
16      A.  There's a discrepancy.
17      Q.  Okay.  And what is that discrepancy?
18      A.  The $3 million.
19      Q.  Okay.  Which was spent in 2012.  Correct?
20      A.  Yes.
21      Q.  All right.  So that money was spent.  Now,
22  with respect to the monies that Keith Ingram testified
23  to in his deposition and the $2 million that we've
24  been talking about that you say was discussed by
25  Ms. McGeehan in the committee of the whole, is there

213

1  any discrepancy now that you've seen the $1.65 million
2  figure in Exhibit 5, which is what Mr. Ingram
3  testified to in his deposition, is there any
4  discrepancy now in your mind with respect to the
5  allocation of that $2 million?
6      A.  To the extent that this money will be spent
7  -- and Mr. Ingram, although he was rather coy as to
8  what the $400,000, was, if that is spent, then I guess
9  the State has spent their $2,024,000 that was
10  earmarked --
11      Q.  Okay.
12      A.  -- for this.
13      Q.  All right.  And that -- and that's just a
14  matter of you looking at this and confirming in your
15  mind, yes, this was or, no, it wasn't spent, that part
16  of the equation.  Correct?
17      A.  I think that's going to be more of where it
18  was spent, when it was spent.
19      Q.  Okay.  And then the second part now, you're
20  now talking about the sufficiency or the adequacy of
21  the Burson-Marsteller work.  Correct?
22      A.  No.
23      Q.  Okay.  What are you talking about then?
24      A.  I'm not using -- I'm not going to testify
25  that it was sufficient.  I'm just going to stay the

Thom Cornish, C.P.A. - 8/7/2014

214

1  results of it --
2  Q.  Okay.
3  A.  -- indicate this.
4  Q.  Okay.  And when you say "indicate this," what
5  is the "this" you're referring to, sufficiency
6  adequacy, or what?  I understand --
7  A.  Indicating.
8  Q.  I understand we're talking about this
9  document, Exhibit 6, but when you say -- when you say
10 you're going to determine -- are you saying you're
11 going to determine the sufficiency of this -- of the
12 program in Exhibit No. 6?
13 A.  I don't -- I don't know if I'm going to give
14 an ultimate opinion as to whether or not there was a
15 big waste of money.
16 Q.  Yeah, right.
17 A.  I think it's going to be more -- and this is
18 just speculation, of course.  I think it will be more,
19 this much money was spent by the State of Texas on
20 promoting social media advertising.  The results of
21 the BM study conducted in March of 2014 indicate this.
22 Q.  Okay.
23 A.  It's for the trier of fact to sit there and
24 say, I don't know if that money was really spent on
25 education about the photo ID, which is what we're here

215

1  for --
2  Q.  Right.
3  A.  -- I would assume.
4  Q.  Okay.  Yeah.  So it's just a matter of
5  whether or not -- well, it's not even that.  All
6  right.  I think I gotcha.  All right.  Okay.  And then
7  the last sentence on that first paragraph, you say,
8  The bulk of this report therefore focuses on the
9  second issue:  The comparison between the money budget
10 -- promised/budgeted and the money actually spent.
11      And that's what we've just been hashing out.
12 Correct?
13 A.  Yes, sir.
14 Q.  Okay.  All right.  The next paragraph reads,
15 In addition to the analysis and conclusions described
16 below, I intend to describe in my testimony at trial
17 the various events and monetary transactions of which
18 I am aware.
19      What do you mean by that sentence?
20 A.  I guess what we just through talking about,
21 which is they spent $400,000 on Tweeting and
22 Facebooking and having a little social event, go
23 around Texas to all the counties with their EIC units
24 and drag the Secretary of State around.
25 Q.  Okay.

216

1  A.  That is just what I gleaned from what they
2  did with the money.
3  Q.  Okay.  And my only question was -- because a
4  lot of that, what you just said, is later --
5  A.  Uh-huh.
6  Q.  -- just discussed in this report.  And so
7  what -- how I was reading this was you were indicating
8  that there was something in addition to what's in the
9  report.
10 A.  I don't believe --
11 Q.  Is that correct?
12 A.  I don't believe so.
13 Q.  Okay.  So this was kind of the catchall
14 phrase for you?
15 A.  Yeah.
16 Q.  I mean, you weren't -- you weren't indicating
17 there's something I haven't put in the report that I'm
18 not going to tell you about until I testify at trial?
19 A.  I wouldn't do that.  CPAs wouldn't do that to
20 you.
21 Q.  I hope not.  All right.  Then you say, The
22 source from these events and transactions are the
23 document production, depositions, and publicly
24 available documents and information.  And that would
25 be the documents you've produced today, as well as the

217

1  documents made exhibits to your report.  Correct.  Is
2  that what you're referring to?
3  A.  Yes, sir.
4  Q.  Okay.  You say, Overall, it is my opinion
5  that the State of Texas has failed to effectively
6  budget, allocate, and spend sufficient money for voter
7  education, outreach, and registration.
8      Do you have any support for that beyond what
9  we've talked about today already?
10 A.  Well, I did until you guys laid behind the
11 log and dropped this Exhibit 5 on me at the last
12 minute making me look out to be a fool.
13 Q.  All right.
14 A.  Is that the way y'all do it?  Is that the
15 way?  I gotta learn this the next time I do a lawsuit.
16      MR. KEISTER:  Object to nonresponsive.
17 A.  Okay.
18 Q.  (By Mr. Keister)  Mr. Ingram told you in his
19 deposition.
20 A.  Oh, well, everything he says is true.
21 Q.  Okay.  I know.  But is there anything --
22 anything else that -- any other issues that we haven't
23 already talked about in that statement?
24 A.  No, sir.
25 Q.  All right.

Thom Cornish, C.P.A. - 8/7/2014

218

1    A.   No, sir.
2    Q.   And you state, Further, it is clear that the
3    State did not spend all the money it promised to
4    allocate.  It further my opinion the State did not
5    work effectively with the counties.
6         All right.  Well, with respect to the State
7    did not spend all the money it promised to allocate,
8    once again, that goes back to our discussion
9    concerning the Burson-Marsteller contract in Exhibit
10   5, the $1.65 million.  Correct?
11   A.   Yes, sir.
12   Q.   Okay.  And there's no other monies you're
13   referring to there, other than what we previously
14   discussed?
15   A.   The $400,000.
16   Q.   Right.  Okay.
17   A.   And the $3 million.
18   Q.   Okay.  HAVA money?
19   A.   Yes.
20   Q.   Okay.  Okay.  Then you state, It is my
21   opinion that the State did not work effectively with
22   the counties to assist them in educational outreach
23   and registration issues.  What do you base that
24   statement upon?
25   A.   Fact.

219

1    Q.   Okay.  And what facts?
2    A.   That these mobile EIC units helping them on
3    their -- we're gonna show up and we're gonna show up
4    at Joe's Bar, whatever it is.  And then how the
5    counties interacted.  We don't want you to come here.
6    Oh, you want us to man these things.  You want us to
7    spend the money.  You're not giving us any money.  I
8    mean, they're all relevant to whether or not the
9    counties effectively communicated with the State and
10   whether the State effectively provided voter education
11   within the counties.
12   Q.   Okay.  So that statement is limited to the
13   issue of the use of the mobile units or the EICs?
14   A.   The mobile EIC units and. .
15   Q.   Okay.
16   A.   I believe so.
17   Q.   In your review and analysis, were you able to
18   determine what other educational outreach issues the
19   Secretary of State 's office engages in with the
20   counties, other than the mobile units or the EICs?
21   A.   I don't understand that.  Now, you're saying
22   that the EIC units to educate people that you gotta
23   have photo ID and we're here to give you a photo ID
24   was not educational or --
25   Q.   No.

220

1    A.   -- is that a limit of the education?
2    Q.   Yeah.  No.  I thought you said that your
3    statement, the State did not work effectively with the
4    counties to assist them in educational outreach and
5    registration issues, I thought you said that was
6    limited to your analysis of the use of the mobile
7    units for the Election Identification Certificates.
8    A.   I believe I did, yes, sir.
9    Q.   All right.  And I asked, are you aware of any
10   other work the Secretary of State does with the
11   counties, in order to help the counties educate
12   voters, other than the limited issue of the mobile EIC
13   units?
14   A.   Well, to the extent that my opinion is that
15   the mobile EIC units were a waste of money and that
16   they could effectively just set up each county with
17   their own election, you know, device where they could
18   have the people come to the county and get their EIC
19   there if they needed one, that would have been a
20   better use of the process than to take this thing
21   around to 400 locations around Texas.
22   Q.   Okay.  And that's my question.  So your only
23   -- your only understanding of the Secretary of State's
24   work with the counties in assisting the counties to
25   education voters is limited to the mobile EIC units?

221

1    A.   I believe so.
2    Q.   Okay.  And you haven't done any investigation
3    to determine whether or not the Secretary of State has
4    other outreach programs to the counties in which it
5    assists the counties with education of voters?
6    A.   No, sir.
7    Q.   Okay.  Okay.  On the next paragraph, you say,
8    The State of Texas failed to perform any meaningful
9    analysis of the effect of the little amount of
10   spending which has -- which has done to educate voters
11   regarding the need for proper photo ID.
12        Was that statement made before you were aware
13   of Exhibit 6, which was -- which is the
14   Burson-Marsteller analysis?
15   A.   Well, I'm not going to give you the fact that
16   they did -- that doing something in March of 2014 is a
17   meaningful analysis of what was done in the first $3
18   million that was spend.
19   Q.   Okay.
20   A.   So I would have to disagree with that
21   statement to that extent.
22   Q.   Okay.  And I'm not trying to put you on the
23   spot, but now that you're aware of Exhibit 6, which is
24   an analysis done by Burson-Marsteller, does that to
25   some extent change your statement?

Thom Cornish, C.P.A. - 8/7/2014

222

1    A.   It ameliorates this statement a little bit,
2    yes.
3    Q.   Okay.
4    A.   It ameliorates, lessons.  It makes it a
5    little softer.
6    Q.   Okay.  And then the next sentence, It appears
7    that the resources which the State had were spent on
8    ferreting the Secretary of State across Texas to
9    events which had dubious results.
10        How did you determine that the Secretary of
11   it State's visits to various locations had dubious
12   results with respect to educating the public?
13   A.   Well, as it relates to the Election
14   Identification Certificates, what, there were 230 of
15   them issued in about the two-year period, I think.  A
16   lot of money was spent on these little shows to issue
17   200 and something certificates.  So it appears that
18   the money was spent on -- a lot of money was spent on
19   per certificate, instead of general education of the
20   population when it comes to the photo ID issue.
21   Q.   Okay.  But do you have any factual basis --
22   other than your question as to whether or not the
23   number of EICs are sufficient, do you have any factual
24   information that says that the Secretary of State's
25   visits to local community to promote elections -- and

223

1    I don't think it was limited to the photo ID issue.
2    It may be.  -- but do you have any factual basis to
3    say that the results of his and her trips were
4    dubious?
5    A.   Dubious?
6    Q.   Yes.
7    A.   Well, I would -- I -- there's no information.
8    Q.   Okay.  And that's all I'm asking.  I
9    mean. . .
10   A.   There's nothing that says we went to -- we
11   went to Hidalgo --
12   Q.   Okay.
13   A.   -- and we had a community outreach at a
14   faith-based church and 210 people showed up.
15   Q.   Okay.
16   A.   There's no statistical information that I was
17   aware of which indicated the results of this
18   year-and-a-half-long get out the vote little thing
19   that went around Texas.
20   Q.   All right.  But you, obviously, could review
21   newspaper articles about her trips to various
22   communities, I assume.  You had the opportunity to
23   review local newscasts about the visit of the
24   Secretary of State, those type of things that occur
25   when the Secretary of State travels to local

224

1    communities.  Did you do any factual analysis to say
2    that that attempt by the Secretary of State to educate
3    voters by making those appearances was dubious?
4    A.   Disagree with the premise to your question --
5    Q.   Okay.
6    A.   -- because I wasn't even engaged until
7    February.
8    Q.   Okay.
9    A.   January.  A lot of this happened in 2013, so
10   it was difficult for me to watch TV --
11   Q.   Okay.
12   A.   -- and follow her around the State.
13   Q.   Okay.  All right.  And let me just put it a
14   little more plain.  Did you do any research to
15   determine effectiveness of the Secretary of State's
16   visits to the various communities around the State?
17   A.   No, sir.
18   Q.   Okay.  All right.  So when you say they were
19   dubious, that's your opinion, but you have no factual
20   support for that?
21   A.   There is no factual support to say what
22   happened.
23   Q.   Okay.  Okay.
24   A.   Unless there's something else you haven't
25   produced and you're going to produce it next week and

225

1    make me look to really look by a fool, so. . .  Here,
2    Mr. Cornish, look at this.
3         MR. KEISTER:  Object to nonresponsive.
4    A.   That's fine.
5    Q.   (By Mr. Keister)  Okay.  Then you state, The
6    State did not perform any analysis of the results of
7    the significant amount of money wasted in 2012.  What
8    is the significant amount of money wasted in 2012?
9    A.   $3 million.
10   Q.   Okay.  And that was $3 million in HAVA funds?
11   A.   The contract required B&M to do analysis of
12   the effectiveness of their advertising.  I think they
13   budgeted -- I can't remember what the proposed
14   activity plan said, but that was never done.
15   Q.   You agree, of course, that HAVA money can
16   only be spent according to the federal guidelines.
17   Correct?
18   A.   Correct.
19   Q.   Okay.  And assuming that the money spent in
20   2012, which was HAVA money, was spent according to
21   federal guidelines, what is your basis for saying it
22   was wasted?
23   A.   This deals with voter ID, photo ID.  This
24   case deals with photo ID.  $3 million.  What effect
25   did the $3 million have on recognition of photo ID.

Thom Cornish, C.P.A. - 8/7/2014

226

1   Q.   Okay.
2   A.   No report.  No investigation.  Now, you can
3   say, well, photo ID wasn't the law, so we really
4   couldn't do that, but it doesn't relieve them of the
5   obligation to say, is Tweeting effective, is
6   Facebooking effective, is a website effective, are the
7   commercials effective, are earned media when it comes
8   to voting, is that effective, do newspapers care about
9   it.  So, from a standpoint of learning $3 million
10  spent, how can we do a better job, no analysis.
11  Q.   So is it not truly your criticism, not that
12  $3 million was wasted, but that $3 million was not
13  spent on photo ID education?
14  A.   No, that's not my opinion.
15  Q.   Well, you say that later in your report.
16  A.   That the $3 million, even though it was not
17  spent on photo ID, it could have been used to
18  determine whether or not the scheme design used by B&M
19  in their advertising campaign, whether or not it was
20  effective.  And I'm going to -- I guess I'll find out
21  when I review Exhibit 6 here, you know their document.
22  But the $3 million was not used to educate the general
23  public on photo ID.
24  Q.   Okay.  And what was it used to educate the
25  public on?

227

1   A.   Voting.
2   Q.   Okay.
3   A.   Get out the vote.
4   Q.   Right.
5   A.   It's your obligation to vote, et cetera.
6   Q.   So you think that means it was wasted?
7   A.   Wasted when it comes to -- when it comes
8   to --
9   Q.   Okay.
10  A.   -- SB14 photo ID.
11  Q.   Okay.  Not spent on photo ID?
12  A.   Not spent on photo ID.
13  Q.   Okay.  Okay.  The next sentence is
14  provisional ballots.  We've covered that.  The last
15  paragraph -- or next paragraph, Even though the State
16  has had in excess of $46 million of HAVA fund to use
17  after initial capital costs, no amount of such funds
18  have been spent on voter education after the State
19  began the photo ID requirement.
20       Is that still your statement after becoming
21  aware of Exhibit 5?
22  A.   Sure.
23  Q.   Okay.
24  A.   Well, let me clarify that.  I don't know what
25  the source of this one million six is.  I assume

228

1   that's the appropriation that was attached as a fiscal
2   note, the $2,024,000.  That's what I'm assuming.
3   Q.   Okay.  So that's still your statement?
4   A.   This is non-HAVA funds --
5   Q.   Okay.
6   A.   -- I assume.
7   Q.   Okay.  So that's your still your statement
8   after reviewing Exhibit 4?  That's all I'm asking.
9   A.   (No response.)
10  Q.   Is that a "yes"?
11  A.   To the extent that the -- that $400,000 of
12  HAVA funds were used on photo ID.  I don't know the
13  extent of that.
14  Q.   You agree that the State has undertaken a
15  statewide effort to educate the public on the
16  requirements of SB14, photo voter ID?
17  A.   An effort?
18  Q.   Yes.
19  A.   Yes, sir.
20  Q.   Okay.  And that's what the statute calls for,
21  correct, is for an effort?
22  A.   An effort.
23  Q.   Yes.  The statute does not quantify an amount
24  of money to be spent or anything of that nature.
25  Correct?

229

1   A.   The statute?
2   Q.   Yes.
3   A.   Correct.
4   Q.   Okay.  You understand, or do you, that county
5   websites do contain information related to photo ID
6   requirements?
7   A.   They do.
8   Q.   Is that a "yes"?
9   A.   That's a "they do."
10  Q.   Okay.  Okay.  And do you understand that the
11  counties sent out in 2011 on the back of every voter
12  registration card a notice concerning the requirements
13  of SB14?
14  A.   I got my voter registration card and I don't
15  remember looking on the back of the voter registration
16  card.  I put it right where I put all that other
17  stuff.
18  Q.   Okay.  So you're not aware that that would be
19  on the back of your card?
20  A.   I'll go home and look.
21  Q.   Okay.  And are you aware that two years later
22  -- and I'll represent to you that 2011 card indicated
23  that it had to be pre-cleared, that it was not yet in
24  effect.
25  A.   Okay.

230

1    Q.   And I'll ask you:  Are you aware that when it
2    did become pre-cleared -- or not pre-cleared, but when
3    it came into effect in 2013, that those voter
4    registration cards mailed to every voter, every
5    registered voter, also has on the back of each card
6    the information concerning SB14, photo identification
7    required?
8    A.   Okay.
9    Q.   You weren't aware of that prior to today?
10   A.   No.
11   Q.   Okay.  Were you aware that those cards are
12   actually mailed out by the counties, not by the
13   Secretary of State?
14   A.   Yes.
15   Q.   Okay.  Do you have any knowledge today of the
16   amount of HAVA funds that remains for the State to
17   use?  The amount of remaining HAVA funds, I should
18   say.
19   A.   I think that in my report and the testimony
20   of the witness before the senate indicated that they
21   had $46 million left.  They were going to spend $24
22   million on some new equipment for some counties.  And
23   that after that there would be very little or no HAVA
24   funds left.  So what the exact number is, I don't
25   know.

231

1    Q.   Okay.  And you understand that's not a
2    renewable fund, once that money is gone, it's gone,
3    it's not renewed by the federal government?
4    A.   Correct.
5    Q.   Okay.  In your report on Page 10 you refer to
6    a review of the 2012 general election wrap-up report
7    provides detail for the activities promoted by B&M
8    from January of 2012 through November of 2012.  Is
9    that the same type of document as Exhibit No. 6 or is
10   that a different type of document?
11   A.   Totally different.
12   Q.   Okay.  And is that one of the exhibits in --
13   to your report?
14   A.   It's over there.
15   Q.   Okay.
16   A.   It's the big, thick binder.
17   Q.   Okay.
18   A.   Keep turning.
19   Q.   I am.
20        MR. KEISTER:  In fact, why don't we go
21   off the record for a minute?
22        THE WITNESS:  Okay.
23        (Break.)
24        (Exhibit No. 7 marked.)
25   Q.   (By Mr. Keister)  Mr. Cornish, I'm going to

232

1    show you what's been marked as Exhibit No. 7, which is
2    the box there to your left and that's --
3    A.   To my right.
4    Q.   To your right, my left.  Which is the
5    documents we've been talking about that you have
6    produced here at the deposition today.  Correct?
7    A.   That is the correct.
8    Q.   Okay.  And the only other documents behind
9    you are the depositions and court transcripts, and
10   we're not going to make those exhibits.  Okay?
11   A.   That's correct.
12   Q.   All right.  With respect to your analysis of
13   other states, which begins on Page 15, once again, I
14   think you have already testified to this, but you're
15   not giving any opinions as to appropriateness of their
16   spending compared to the spending by Texas on these
17   issues.  Correct?
18   A.   I agree.  Only that they spent significantly
19   more.
20   Q.   Okay.  Other than the issues that we've
21   talked about with respect to the documents which you
22   contend you hadn't seen prior to yesterday, Exhibit
23   No. 5 and No. 6, are there any other issues or
24   opinions that you intend to offer that we have not
25   talked about today?

233

1    A.   Not that I know of.  To the extent that I
2    have other documents, I may.  If I'm provided more,
3    then I'll -- I may.  But as I sit here, no, there's no
4    more.
5        MR. KEISTER:  Okay.  All right.
6    Mr. Cornish, I appreciate your testimony and your
7    patience.  Thank you.
8        MR. BRAZIL:  Mr. Rich, you?
9        MR. RICH:  No questions.  I just want
10   the record to reflect we lost connection for about
11   half an hour starting at 2:15 Central time.
12        MR. BRAZIL:  Okay.  We will reserve our
13   questions until the time of trial.
14        MR. KEISTER:  All right.  All right,
15   guys.  Thanks.
16        THE WITNESS:  Thank you, sir.
17        (Deposition concluded at 4:01 p.m.)
18        (Signature requested.)
19             * * * * *
20
21
22
23
24
25

234

```
1              CHANGES AND SIGNATURE
2   WITNESS NAME:  THOM RANSOM CORNISH, C.P.A.
3   DATE OF DEPOSITION:  AUGUST 7, 2014
4   PAGE/LINE          CHANGE          REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

236

```
1   THE STATE OF TEXAS:
    COUNTY OF FT. BEND:
2
        I, Tamara Vinson, a Certified Shorthand
3   Reporter and Notary Public in and for the State of
    Texas, do hereby certify that the facts as stated by
4   me in the caption hereto are true; that the above and
    foregoing answers of the witness, THOM RANSOM CORNISH,
5   C.P.A., to the interrogatories as indicated were made
    before me by the said witness after being first duly
6   sworn to testify the truth, and same were reduced to
    typewriting under my direction; that the above and
7   foregoing deposition as set forth in typewriting is a
    full, true, and correct transcript of the proceedings
8   had at the time of taking of said deposition.
9       I further certify that I am not, in any
    capacity, a regular employee of the party in whose
10  behalf this deposition is taken, nor in the regular
    employ of his attorney; and I certify that I am not
11  interested in the cause, nor of kin or counsel to
    either of the parties.
12
        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
13  this, the _____ day of August, 2014.
14
15
16  _____
17
18  Tamara Vinson, CSR
    Integrity Legal Support Solutions
19  3100 W. Slaughter Lane, Suite 101
    Austin, Texas  78748
20  (512) 320-8690
21
22
23
24
25
```

235

```
1       I, THOM RANSOM CORNISH, C.P.A., have read the
    foregoing deposition and hereby affix my signature
2   that same is true and correct, except as noted above.
3
4
5   _____
        THOM RANSOM CORNISH, C.P.A.
6
7
    THE STATE OF _____)
8   COUNTY OF _____)
9       Before me, _____, on this
    day personally appeared THOM RANSOM CORNISH, C.P.A.,
10  known to me (or proved to me under oath or through
    _____) (description of identity
11  card or other document) to be the person whose name is
    subscribed to the foregoing instrument and
12  acknowledged to me that they executed the same for the
    purposes and consideration therein expressed.
13      Given under my hand and seal of office this
    _____ day of _____,
14  _____.
15
16
17  _____
    NOTARY PUBLIC IN AND FOR
18  THE STATE OF _____
    COMMISSION EXPIRES: _____
19
20
21
22
23
24
25
```

---
$
---

**$1,675,000** 197:2

**$1.6** 202:3

**$1.65** 202:14 212:1
  213:1 218:10

**$10** 192:5

**$100,000** 187:10

**$15,000** 131:2

**$2** 185:3 193:7,15
  198:10,24 212:23
  213:5

**$2,024,000** 41:22
  195:2 213:9 228:2

**$200,000** 180:10

**$24** 230:21

**$3** 38:5 41:3 183:21
  184:17 185:2
  192:14,15 195:8
  199:14 201:1,25
  204:16 208:22 212:18
  218:17 221:17
  225:9,10,24,25
  226:9,12,16,22

**$3.8** 204:17

**$300,000** 111:9

**$400,00** 180:3 184:18

**$400,000** 41:24
  179:23,25 180:9
  184:17,21 198:12
  202:6 204:17 208:22
  213:8 215:21 218:15
  228:11

**$46** 227:16 230:21

**$5** 130:6 188:24 192:4
  199:2,6,7,12 202:7
  212:14

**$500,000** 205:13

**$65** 90:12

---
@
---

**@pdq.net** 86:13

---
0
---

**00298765** 30:6

**00298794** 29:11

**00298842** 29:12

**02** 50:7

**020** 27:17

**030** 27:17

**0524723** 30:19

**0524739** 39:5

---
1
---

**1** 7:5,7,24 11:6,22
  16:4,10 76:3 132:14
  182:19,21

**1.....................
............7** 4:2

**10** 10:1,10,12 107:15
  152:1 175:21,25
  231:5

**10:00** 15:18

**10:03** 1:17

**101** 236:19

**11** 10:14 108:11
  128:19

**113** 155:3

**11th** 36:20

**12** 10:17 44:15 111:2
  128:19

**12548** 2:15

**13** 10:19 112:10 162:9

**13th** 31:22 36:7

**14** 10:22 78:1,21
  148:6 154:13,20

**14th** 43:24 96:8,9

**15** 10:25 90:23 92:23
  182:12,19,21 188:12
  232:13

**1520** 1:19

---

**16** 11:3 38:16 174:19

**16th** 33:13

**17** 24:2 148:8 160:23
  170:8,17 174:17
  175:4

**17th** 29:21 31:15

**1800** 2:10

**18th** 31:16

**19** 160:23

**193970** 39:1

**1950** 30:12

**1954** 48:24

**1960** 2:4

**1973** 71:7

**1977** 71:21,22

**1979** 73:19,21 79:7,11

**1980** 122:10

**1988** 82:12

**19th** 35:22 36:13

---
2
---

**2** 8:1,19,21,22 9:3,14
  16:10 174:12 175:7

**2,024,000** 34:15

**2.....................
............8** 4:4

**2:13-CV-00193** 1:4

**2:15** 233:11

**20** 78:20 146:16 150:2
  152:1 165:24

**200** 222:17

**200,000** 149:1

**2000** 73:15

**20006** 2:10

**2002** 199:25

**2003** 52:6

**2004** 40:18

**2005** 97:11 105:23

**2006** 102:8,24 138:5

**2007** 106:20

**2008** 111:15 138:5

**2010** 26:3 101:8
  103:15 108:17 111:4
  147:5 155:16,20,21

**2011** 29:22,24 35:22
  36:20 98:12 100:11
  107:17 183:22
  229:11,22

**2012** 17:22 18:11
  19:24 20:9,17 25:25
  30:12 36:7,13,14
  38:5 40:18 41:3
  42:10 43:24 44:10
  103:15 128:19 130:5
  131:8 147:5 155:23
  177:11 183:23 202:1
  206:22 209:1 212:19
  225:7,8,20 231:6,8

**2013** 26:6 28:8,12
  29:18 30:18
  31:20,21,22 33:12
  37:10,13,20 38:2,19
  112:12 147:6 153:1
  154:19 155:25 160:16
  162:20,24 163:6
  195:13 206:17 209:1
  224:9 230:3

**2014** 1:11,17 12:25
  14:9 25:25 28:13
  31:11,15,16,18,19
  32:8 33:4,11,13
  35:11 37:4 43:7
  147:6 153:1 154:21
  162:20 164:19 195:14
  201:23 208:23 214:21
  221:16 234:3 236:13

**202.305.4355** 2:11

**202.307.3961** 2:11

**208** 154:13,18

**210** 223:14

**215502** 36:18

**22** 160:12,20 161:20
  162:9

**22.5** 162:11 166:7

**230** 222:14

**237026** 27:17

**23rd** 31:11 35:11

**242714** 28:4

**246255-246258** 36:4

**24th** 30:18 31:21

**250** 170:4

**2513** 27:24

**25th** 31:20 33:12
  196:25

**26th** 11:15,16 201:23

**28** 41:22

**281.580.6310** 2:5

**281.580.6362** 2:5

**28th** 33:4 43:6 155:14

**29** 35:8 37:9

**298763** 41:2

**29th** 31:19

**2nd** 40:18 48:24
  155:16 178:4

--------

**3** 8:3 10:5,7,10,11
  16:10 174:9

**3,000** 115:1

**3.....................
............10** 4:6

**30** 35:8 76:22
  120:5,16

**3005** 40:7

**301352** 43:20

**301472** 43:21

**306416** 37:23

**31** 37:23

**3100** 236:19

**312556** 41:16

**312576** 44:15

**312577** 44:16

**312578** 28:24

**320-8690** 236:20

**34** 122:11

**340** 85:10

**35,000** 160:10

**38** 39:5

**3rd** 31:18 36:14 37:4
  41:3

--------
                4

**4** 8:6 15:11,13,16,20
  16:10 175:12 228:8

**4,068** 155:23

**4,900** 163:20

**4.....................
............15** 4:8

**4:01** 1:17 233:17

**40** 75:7 192:12

**400** 45:9 220:21

**420** 36:3

**4201** 2:4

**460790** 38:18,24

**4735** 30:19

**474** 43:21

**48354** 35:17 36:1

**48362** 35:17 36:1

**4th** 154:13 160:15
  162:20,25 163:7

--------
                5

**5** 8:9
  12:1,2,6,10,17,20
  14:5,6,11 15:1 18:8
  178:19 182:9 188:5,6
  196:16 197:1
  198:3,11 203:19
  212:1 213:2 217:11

218:10 227:21 232:23

**5,000** 148:25

**5**....................
............**12** 4:10

**504601** 31:8

**512** 236:20

**512.463.2197** 2:16

**512.463.2224** 2:16

**524740** 42:23

**530** 2:4

**563** 36:19

**579** 162:8,11,19
163:10 165:25

**5th** 42:23 155:25
160:16 162:9,19

───────────────
6
**6** 8:12 12:1,6
13:14,22 14:2,12
15:1 25:24 36:19
40:18 139:14 155:16
175:12 183:4
188:5,7,8 204:6
205:4 207:4 210:19
214:9,12 221:13,23
226:21 231:9 232:23

**6,000** 115:2

**6**....................
............**12** 4:12

**600** 115:6

**66** 30:6

**66.058** 157:21 158:2

**6th** 155:23 202:4

───────────────
7
**7** 1:11 8:15 9:2,3
111:8,22 144:14,19
145:5 146:3 175:16
231:24 232:1 234:3

**7**....................
............**231** 4:13

**70** 148:14

**7254** 2:9

**7314** 34:17 41:22

**75** 73:11

**764** 155:16,18

**77** 71:20 73:5 77:24

**77002** 1:20

**77068** 2:4

**78711-2548** 2:16

**78748** 236:19

**79** 50:15

**7th** 1:16 197:11

───────────────
8
**8** 9:21 40:8 105:11,20

**80** 122:8 152:1

**808** 1:19 15:18

**81** 80:23

**82** 80:18

**83** 80:18

**86** 48:13

**87** 48:13

**8th** 36:20

───────────────
9
**9** 9:24 106:19 111:15

**900** 209:17

**91** 88:24

**95** 155:3

**95/113** 154:14

**96** 205:20

**98** 156:1

───────────────
A
**A&M** 51:12 59:19,21

**a.m** 1:17

**abandoned** 150:6

153:16

**ability** 77:6 157:11

**able** 16:9,14 24:11
64:12 77:2 101:22
140:9,11,20,24
141:3,12,21,25
142:20 146:1,24
152:24 153:22 157:16
160:21,24
161:3,11,13,24
171:23 187:19,23
188:2 205:18,23
206:3 219:17

**above-styled** 1:16

**Abshier** 19:12

**A-B-S-H-I-E-R** 19:12

**Absolutely** 49:3 151:2

**Academy** 97:3,8

**accepted** 76:9 77:11
95:7 154:25 155:2
164:13,22,24,25
165:12,16
166:22,23,24 169:14
170:18,19 171:4
172:14,22

**Accepted/rejected**
154:13

**access** 45:16,19 46:5
114:15 115:5,8
203:16

**according** 42:24
112:12 143:22
225:16,20

**account** 34:3 171:17
175:3 201:22

**accountancy** 75:15,20
76:17 77:12 86:24
170:20 171:5,11
188:20 189:5 205:8

**accountant** 73:5,8
77:1 78:3,6 169:25
170:11,12 171:24
173:8,22 186:3 207:3
208:9

**accountants**
172:3,8,14,22  174:4

**accounting** 71:24
78:12  79:12,24
81:21,25
84:12,14,15,21  87:1
98:19  104:10,17,22
107:2,3  118:19
119:4,19  120:1
124:22  170:20  208:2

**accounts** 76:10

**achieve** 170:14

**acknowledged** 235:12

**acquire** 161:24

**acquired** 142:24  143:3

**across** 163:11  165:24
222:8

**act** 93:8,11  97:25
113:20,23  116:18
117:2  124:18  158:23
199:23  200:8

**action** 1:3  8:13  111:8
158:22  191:21  205:15

**actions** 75:22  104:13
109:12,14  112:7,8
116:5

**actively** 136:10

**activities** 231:7

**activity** 11:3  38:6
44:3  203:20  225:14

**actual** 7:15  10:2  27:8
109:11  111:17
144:9,21  145:9
161:15,22,24  162:13
165:18

**actually** 8:16  24:5
78:4  91:1  107:6
111:15  128:9  133:10
153:8  167:6  179:20
185:11  195:21  211:10
215:10  230:12

**ad** 209:18  210:5,6

**Adams** 25:6,7  149:2

154:11  156:4

**add** 154:4

**addition** 84:1,18
141:9  144:20  145:7,8
201:21  215:15  216:8

**additional** 11:17
14:17  15:3  19:23
26:6  27:7  32:10
71:15  178:3

**address** 15:5  48:9
85:9  86:7  161:19

**addresses** 86:2,4
94:3,4

**adequacy** 203:24  204:1
207:7  213:20  214:6

**adjust** 177:25

**administer** 170:5

**administrative** 90:18

**administrative-type**
90:16

**admission** 111:24

**adopted** 109:15

**Adrienne** 98:6

**adult** 121:21

**advertise** 126:13,25

**advertisement**
201:11,12

**advertising** 7:24  9:21
12:25  13:24  14:8
34:15  38:1,5  44:12
85:14,25  88:2  117:18
179:14  180:21  184:16
204:7,14,16,21,23
205:1,2,16  206:25
208:7,10  214:20
225:12  226:19

**advocate** 190:9

**affected** 113:24  116:7

**affidavit** 152:25
165:1

**affidavits** 66:4

161:23,25  168:11

**affix** 235:1

**afield** 114:22

**African** 70:17

**against** 75:22  87:14
128:16

**age** 51:23,25  60:24
62:4  123:8

**agencies** 119:13
124:8,25  191:22

**agency** 26:20  80:17,20
119:8  125:21  190:25
193:4,25

**agency's** 126:13,24

**ago** 13:17  41:25  48:1
58:18,20  59:13
120:5,8,17  121:25
122:7,11

**agreed-upon** 82:9

**agreement** 100:18
101:14,16  108:21
130:23

**agreements** 92:15

**ahead** 11:24  18:20
48:5  95:14  126:19

**AICPA** 74:23  170:24
173:18

**ain't** 91:12

**air** 47:15

**airport** 136:7

**al** 1:3,6  112:11

**Aliseda** 21:2,13

**alive** 49:10,11  60:11

**allegation** 111:10

**allegations** 110:19

**alleged** 184:5

**alleges** 109:3

**Allen** 78:19

**allocate** 217:6

218:4,7

**allocated** 183:8
194:13,21,23
195:6,25 196:5,7,21
197:10,13 198:21
211:20 212:7,10,11

**allocation** 195:3
201:22 203:11 205:16
211:20,24 213:5

**allocations**
196:3,9,12,18
198:6,23

**allow** 64:8
65:7,12,18,23 66:17
68:18 69:17 70:23

**already** 38:12 125:19
138:10 153:16 178:6
217:9,23 232:14

**alternative** 90:10
148:21,22

**Altstaetter** 102:21
103:9

**am** 49:17 191:17
207:19 215:18 231:19
236:9,10

**ameliorates** 222:1,4

**amend** 6:5 13:1,5
177:25 178:15

**amended** 4:8 12:22
15:17

**America** 2:7 199:23

**American** 74:24 78:18

**Americans** 70:17

**amount** 46:5 98:16
179:7 183:20
184:5,23 186:4,12,15
187:4,5,6,12 189:14
191:18 192:7
193:2,4,25
195:11,12,13 198:3
204:22 221:9 225:7,8
227:17 228:23
230:16,17

**amounted** 149:16

**amounts** 111:19 185:18
193:22 203:24,25
204:2

**analysis** 26:10 27:24
66:2 82:10 98:21
125:21 126:24 127:10
130:9 140:10 141:13
150:2,7,8 157:3,25
161:22 168:8,20
170:15 171:9,15
172:4,9,21 173:8
174:3 180:18 187:14
195:22 201:22,23
204:3,11,20,25
205:5,24
206:1,5,18,24 208:18
210:1,11 215:15
219:17 220:6
221:9,14,17,24 224:1
225:6,11 226:10
232:12

**analyze** 94:15 139:20
140:4 141:2 146:22
153:22 166:22 170:6
171:16 183:5 187:8

**analyzed** 155:9 170:17
171:20 183:18

**analyzing** 78:9 171:24

**Anchor** 79:1

**ancillary** 129:11

**and/or** 183:8
194:13,21

**anecdotal** 43:14 161:7
166:25

**Ann** 19:13 177:11
188:13

**Annie's** 123:14

**announcements** 31:2

**annual** 82:4,7

**Ansolabehere** 22:20,21
47:10,11

**A-N-S-O-L-A-B-E-H-E-**

**R-E** 22:18

**answer** 66:12 76:20
149:11 150:7 182:24
203:15,16

**answers** 176:2 236:4

**ant** 91:25

**anticipated** 150:3

**anybody** 5:19 61:17,18
63:21 64:6 66:9,13
136:5 159:10 194:4

**anyone** 62:2 64:11
65:4,6,11,21
66:14,15 178:17
190:8

**anything** 23:5 46:21
68:14 72:14 84:7
92:9 97:16 102:17
107:23 109:8,19
110:5,10 112:3
115:23 116:10 119:11
130:11,16 156:2,17
169:11 183:24 192:24
193:20 197:23
217:21,22 228:24

**anywhere** 133:11
143:13 153:22

**apartments** 48:20

**apologize** 18:21
194:19

**apparent** 156:20

**appeal** 95:22,23 96:2

**appeals** 90:12 91:23
96:6

**appear** 22:13 42:4
91:16 134:15 191:9

**appearances** 224:3

**Appearances**..........
.....................
......**2** 3:3

**appeared** 37:5 91:1,2
235:9

**appears** 7:11 9:2,3,14

14:3 32:14 37:25
39:1,6 40:5,8,19
42:21 82:16 103:15
106:20 112:12 207:4
222:6,17

**appellate** 91:25 95:21

**applied** 171:12 205:6

**apply** 16:15 73:15
170:20 171:6 208:3

**appointed** 121:6

**appreciate** 233:6

**appropriate** 135:11
172:15 184:23 185:19
186:5,15 187:4,6,15
189:13 201:16

**appropriated** 193:7,16

**appropriateness**
232:15

**appropriates** 191:21

**appropriation**
184:17,18 228:1

**appropriations** 124:4
192:3

**approximately** 24:2
128:4,19

**April** 31:11,14 35:10
37:4 38:19

**archiving** 137:25

**area** 81:21 92:12
106:25 149:15 159:16

**areas** 88:14 211:23

**argue** 91:18

**argued** 95:22

**art** 188:20

**artful** 194:9

**Arthur** 103:13,19
105:12

**article** 43:2,8

**articles** 46:21
75:9,10,14 92:6

223:21

**articulate** 16:14

**aspect** 205:14 206:1

**aspects** 169:4 204:23

**asserting** 198:6,21

**assist** 218:22 220:4

**assistance** 206:1

**assistant** 2:14 25:3,5
149:2 191:10

**assisted** 94:18 181:21
182:11

**assisting** 220:24

**assists** 221:5

**associates** 62:11

**associations** 74:21
93:17

**assume** 35:9 36:23
51:24,25 55:2,17
151:25 164:15 189:20
200:23 203:21 215:3
223:22 227:25 228:6

**assumed** 151:22

**assuming** 62:15 198:19
203:5 211:24 225:19
228:2

**attached** 1:22 4:3
10:3 181:20
182:9,20,24 195:19
196:14 228:1

**Attachment** 44:16

**attempt** 41:17 126:25
158:8,11 167:6
168:20 224:2

**attempted** 125:14
127:9 185:16

**attempting** 24:1 26:10

**attend** 64:3 71:13

**Attended** 49:4

**attention** 5:6
176:19,24

**attorney** 2:14 12:8
13:16 84:1,4,15
85:22 126:19
191:10,17 211:8
236:10

**audit** 80:16
82:2,4,8,24 83:5

**audited** 78:21 82:25

**auditing** 78:8 79:1
80:10

**auditor** 77:25 78:15

**audits** 80:11,12

**August** 1:11,16 38:19
197:11 202:4 234:3
236:13

**Austin** 2:16 129:1,2
236:19

**author** 111:21

**authority** 80:21
81:16,24 119:10
143:7 189:12,18
190:25 199:6

**available** 31:9 137:19
158:13 177:24 187:18
193:3 216:24

**average** 115:4

**awaiting** 112:18

**awards** 71:25

**aware** 15:6 118:11
146:10 158:1,3
160:6,7,11 172:6
215:18 220:9
221:12,23 223:17
227:21 229:18,21
230:1,9,11

**away** 51:12 52:22

---
B
---

**B&M** 178:9 203:19
204:7 205:15 225:11
226:18 231:7

**baby** 208:1

**background** 4:5 48:3

**bad** 125:24

**Baker** 105:1

**balance** 99:10 100:23
 101:15

**balances** 98:16

**ballot** 24:15 67:1,22
 70:8 135:13
 136:16,18,21,25
 138:1,2,3 141:23
 142:1,15 146:18
 152:19,21,25 161:23
 165:21 166:20
 168:18,25 169:9
 173:3,19

**ballots** 24:2,4,13,17
 25:15 26:11
 27:7,8,11 38:22
 40:13,24 66:3,21
 67:25 68:16 98:3
 117:13 125:5,9,15
 130:1,3 132:6,8
 137:4,6,11 138:14,18
 139:4,8,21,25
 140:5,6,7,15,18,21,2
 5 141:4,10,13,20
 142:8,13 143:9,19,24
 144:9,16,22,23
 145:9,10,21 146:22
 147:4 149:9,23
 150:12,19,20
 151:5,6,18 152:15
 153:13,25 154:5,7,11
 155:8,15 157:4,12
 160:8,14,16,22
 161:12,16
 162:1,5,8,10,19
 163:11,21
 164:6,9,16,24
 165:9,19 166:4
 167:19 168:1,2,8,21
 169:15,19,24
 170:2,7,16 171:6,10
 172:10 174:4
 175:13,16 181:6,11
 183:6 227:14

**bank** 96:5 98:6,23
 100:11 101:7

**banking** 79:1 87:13
 96:4 136:7

**bankrupt** 99:2 111:14

**bankruptcy** 87:13
 97:6,19,22 99:4,6
 100:3 101:10 103:14
 111:3,16,17,18

**banks** 78:25 79:1

**bar** 74:15 75:2 93:14
 95:19 219:4

**base** 142:12 218:23

**Baseball** 97:3,8

**based** 6:6 12:17,20
 14:20 46:17 68:9
 76:9 77:11,14 95:6
 97:18 113:9 168:3
 169:14,20,24 171:14
 189:23 195:19
 205:11,19

**baseline** 138:14
 163:20 187:11

**basic** 23:4 24:10,12
 76:23 91:13 115:9
 210:20

**basically** 91:4
 98:18,20 101:17
 108:25 116:4 149:16
 158:3 173:6

**basis** 63:1,3 210:1
 222:21 223:2 225:21

**Bates** 10:2 27:18,19
 28:4 29:9,10 30:4,19
 31:7,8,12,15,16,18,1
 9,20,21,22 32:15
 35:23 37:4,14,15
 38:9,10,23 39:1,25
 41:1 42:22 43:3,19

**Bay** 81:20

**bayou** 50:19

**beam** 82:14

**bearing** 6:3

**beat** 157:2

**became** 73:5 84:14
 141:15

**become** 73:8,17 76:25
 127:16 173:15 230:2

**becomes** 135:7

**becoming** 227:20

**begin** 5:2 131:5
 209:10

**beginning** 36:20
 157:24 183:21

**begins** 232:13

**behalf** 119:19 236:10

**behind** 32:9 217:10
 232:8

**belief** 201:15

**believe** 7:17,21 8:5
 16:12 20:18 21:14,22
 23:14 30:14 32:2
 35:13 37:7 38:4 39:9
 42:11 47:14 55:9
 76:2,4 77:21 95:11
 96:13 101:9 108:18
 111:6,15 112:17
 113:21 118:2 147:19
 159:3 188:23 198:13
 201:14 216:10,12
 219:16 220:8 221:1

**Bell-Platts** 22:12

**belong** 62:22 63:5
 88:6 93:16

**Bend** 123:15 147:23
 148:25 153:4,7 236:1

**Berry** 32:9 33:3 39:6

**best** 133:8

**bet** 69:2

**better** 46:8 51:17
 58:16 114:4 115:17
 126:17 220:20 226:10

**Bexar** 147:12,24

**beyond** 217:8

**biggest** 129:20

**bill** 27:23,24
  84:10,11 124:9,14
  190:10 195:3,4,20,22

**bind** 189:13 190:25
  192:6 203:1

**binder** 23:23,24
  25:13,16 26:9
  27:6,14 147:11
  150:16 152:12,13
  231:16

**binders** 175:9

**binding** 191:17 193:24
  194:1

**binds** 193:4,6

**birth** 48:23 68:20
  69:7,8

**bit** 48:3,5 66:21 85:6
  87:21 144:18 153:11
  172:18 179:6 222:1

**black** 23:23,24 26:8
  110:13

**blaming** 5:19

**Blinn** 59:20

**Bloomberg** 8:10

**blows** 42:16

**BM** 41:8,11,13 43:23
  197:3 214:21

**BM's** 44:17

**board** 75:18,19 89:5
  109:4 163:12 170:24

**Bolivar** 114:16,25

**books** 92:8 111:20

**born** 48:25 50:15

**bottom** 125:25 151:24
  174:12

**Boulevard** 85:10

**box** 2:15 4:14
  16:8,13,14 232:2

**boxes** 16:11 165:2

**Brandt** 19:10

**B-R-A-N-D-T** 19:10

**Brazil** 2:3 5:1 12:2,4
  17:10 18:17 22:16
  23:10,13,15,18,20
  26:17,19 32:25 40:25
  64:16,20,23 129:5
  159:4 181:23,25
  190:14 233:8,12

**Brazil's** 131:9

**Brazoria** 147:23

**breach** 104:13,14
  106:4

**break** 42:19 64:19,24
  95:14 168:14,15,17
  211:22 231:23

**breakaway** 79:16

**Brian** 20:6 22:6
  56:18,19

**Bridgett** 50:12,13
  54:3,4,5,17

**Bridgett's** 54:23

**Brief** 35:6 93:2 182:5

**briefly** 7:10 16:21,23
  47:25

**bring** 16:3,25

**Brittany** 50:12,13,24
  51:2 55:21,22,25
  56:10

**broke** 65:2 80:25

**broken** 44:6 152:4
  154:8

**brought** 16:8,11,24
  17:14 19:4 44:21
  45:2 46:12 131:23
  175:18 176:9
  196:15,20

**brown** 17:20

**budget** 34:14 82:9
  127:23 160:5 191:2

  195:3,11,15,21 215:9
  217:6

**budgetary** 77:4

**budgeted** 183:8
  194:13,14,21,22,24
  195:1,2,10 225:13

**budgets** 76:23 124:4

**building** 78:9

**bulk** 215:8

**bunch** 17:6 135:19

**Burson** 44:5 202:12

**Burson-Marsteller**
  14:3 28:25 29:7
  41:3,12 43:23 188:4
  198:5 202:13 204:14
  205:5 207:9 212:4
  213:21 218:9
  221:14,24

**Bush** 200:4

**business** 62:10,11
  73:2 86:6,17 97:4

**business-type** 85:1

**buyout** 100:19

**bylaws** 92:16

─────────────
          C
─────────────

**C.P.A** 1:10,13 3:5
  6:12 234:2 235:1,5,9
  236:5

**calculate** 70:17

**calculations** 69:15
  165:7

**camera** 8:7

**campaign** 4:12 10:20
  12:25 13:24 35:11
  38:6 41:24 44:12
  117:19
  120:7,10,12,15,23
  121:1,15 204:7,14,16
  205:6,9 206:9,25
  208:7 226:19

**campaign-type** 120:14

**candidate** 120:6

**canvassed** 150:11,22

**capable** 171:20

**capacity** 120:2,13
189:25 191:10 236:9

**capital** 227:17

**caption** 236:4

**car** 58:20

**card**
229:12,14,16,19,22
230:5 235:11

**cards** 10:15 230:4,11

**care** 111:3,14,20
193:10 226:8

**career** 72:15 77:1
92:23

**Carolina** 187:5

**case** 6:25 7:3 11:7,18
12:17 14:23 15:4
18:8 19:16,24
20:13,17 23:2 28:16
30:13 42:4,10
45:4,17 46:6,22,25
47:5,23 65:10,22
66:16 69:14
76:9,14,19 77:10
91:4 93:8,11 94:16
95:5,6,9,10
97:1,14,15,16
98:6,9,15,25
99:15,18,24,25
100:1,5,7,11,12,16,1
8,25
101:2,4,6,8,13,24
102:5,8,9,12,17,20,2
4
103:5,9,12,16,19,21
104:7,24
105:3,5,7,12,13
106:2,3,9,11,15,21
107:2,12,13,17,24,25
108:5,8,17,19,22,25
109:2,8
110:2,4,5,6,8,20,25
111:5,7,12

112:3,4,5,8,12,15,16
,21 113:4,14,19,23
114:5,7 115:23
116:11,12,13,15,16,1
9,25
117:5,6,10,13,16
125:4,14,19 126:9
127:9,11,19
128:10,12,14,15,16,2
4,25 129:4,12
130:22,25 131:1,6
132:1,4 134:3 136:10
137:5 139:11 140:11
142:6,23 143:2,16
145:15,16,24,25
146:9 157:10,25
158:1 165:6 171:22
172:4,9,13 173:21
174:3 176:15,24
178:3 183:19 184:25
211:10 225:24

**cases** 7:22 87:8
96:12,19 115:6,15
117:21 118:8
128:13,21 129:9,16
191:13

**cast** 70:8 123:7
134:17 135:12 139:22
140:19,22 141:14
146:22 147:4 150:12
154:12 155:15 157:13
160:16,22,25 161:12
162:1,5 165:9 183:6

**cat** 131:16

**catchall** 216:13

**categories** 16:24
45:22

**cause** 1:16 111:8
236:11

**CBS** 43:2

**Center** 85:10

**Central** 233:11

**certain** 75:4 109:5
191:13 193:3 196:22

**certainly** 191:17

**certificate** 37:1
68:21 73:16 184:10
199:11 222:19

**Certificate..........
............236** 3:9

**certificates** 33:8
36:15 39:17 69:7,9
220:7 222:14,17

**certification** 77:8

**certifications** 73:25

**certified** 73:5,8
76:10 86:24,25 89:5
169:25 207:3 236:2

**certify** 236:3,9,10

**cetera** 200:10,11
227:5

**Chad** 127:18

**challenge** 138:13
158:22

**change** 13:5 203:22
221:25 234:4

**changed** 138:7

**CHANGES** 234:1

**Chapter** 74:23
111:8,22

**charge** 99:13,14

**charges** 98:21

**charts** 8:1

**chauffeured** 56:8
57:15

**cheaper** 90:11

**check** 190:20

**checked** 165:2

**checklists** 78:10

**child** 50:23

**children** 50:9 51:4
53:25 55:10 57:6

**chips** 193:12

**Chiropractic** 83:2

**choose** 122:25 123:1
  136:8

**Christi** 1:2 147:22

**Christine** 100:8

**Chronicle** 33:3

**church** 64:3 223:14

**Cindy** 96:23

**circled** 21:4

**circles** 20:22

**Circuit** 91:22

**cities** 81:19 82:6

**citizen** 59:7,10

**citizens** 189:20

**citizenship** 59:11

**city** 81:19,20 122:4
  147:20

**civic** 62:22

**civil** 1:3,20 2:9
  93:10 110:19 112:7

**claim** 65:17

**claimed** 66:5,10

**claims** 65:11

**clarified** 192:19

**clarify** 65:24 144:8
  227:24

**class** 121:8

**clean** 18:25

**clear** 79:12 80:14,17
  120:3 198:25 200:3
  218:2

**clerical** 136:19

**clerk** 159:21,24

**client** 93:8,10

**clientele** 78:16 81:12
  82:21

**clients** 62:14,16
  81:14 84:16,19 87:24
  88:11 90:9 92:17

93:5 124:21

**clip** 25:17 96:15

**clipped** 27:6

**club** 62:24 63:6,13,21

**clubs** 62:23

**clue** 61:14

**Coast** 80:21 81:16,23
  82:1 119:9

**code** 97:19,20 99:4,6
  111:18 142:25
  143:4,7,15,17,23
  144:2 146:10 157:21
  158:1 168:23,24

**collect** 63:14 141:20
  143:8

**collected** 26:9 142:7

**collecting** 123:22

**collection** 98:10
  100:13

**collections** 92:22

**college** 51:12 59:17
  71:2 72:11 82:24
  83:2

**Collin** 147:13,17,19
  153:5,7,17,25
  154:1,6,10,12,22
  155:12,15 175:14

**column** 151:19,21

**comes** 67:17 104:2
  122:25 173:14 181:5
  192:3 222:20 226:7
  227:7

**coming** 137:7

**comma** 194:25

**commentary** 177:17

**Commerce** 96:5

**commercials** 226:7

**commingled** 86:9

**COMMISSION** 235:18

**committee** 11:1 179:19

190:1,16 193:2,22
  212:25

**committees** 190:7

**commonly** 170:19
  172:13,22

**communicated** 219:9

**communities** 223:22
  224:1,16

**community** 222:25
  223:13

**companies** 80:15

**company** 78:2 79:2
  98:7 100:20 105:20
  106:3

**compare** 185:22 210:18

**compared** 186:21
  232:16

**comparing** 210:16

**comparison** 215:9

**comparisons** 116:2

**compelled** 53:20

**compiled** 171:20

**compiling** 137:24

**complains** 61:5,7

**complete** 15:8 30:6
  157:20

**completed** 11:14
  112:16

**completely** 17:16

**completion** 11:10,12

**complied** 101:16

**comply** 41:17 158:22

**Complying** 7:10 22:3
  40:25 146:19

**comports** 166:15

**compound** 126:18

**computation** 70:11
  170:15

computations 115:11

computer 25:12
 133:5,6

concealed 52:14 53:13
 54:20 55:8 56:14
 57:2 58:14 60:5

concerned 106:12

concerning 8:6 15:1
 133:25 170:2,7 218:9
 229:12 230:6

concluded 233:17

conclusion 137:16,18
 181:22 182:11

conclusions 5:25
 215:15

conduct 125:3 172:15

conducted 172:4
 214:21

confidence 164:10

confidential 9:5,17
 34:21 35:1 84:8,9
 109:9

confidentiality
 108:21

confirming 213:14

conflict 208:16

confused 162:22

Congratulations 60:18

conjunction 201:7,18

connection 233:10

consider 123:2,4,16
 148:18 158:14 180:16

consideration 235:12

considerations 97:18
 116:6 183:7,17 184:2
 188:10 194:12,20

considered 123:5
 157:3 184:25

considering 184:2

consistency 156:10

consistent 67:7
 137:22

constantly 123:20

constitute 26:9

constitutional 26:7
 42:24 138:12 155:25
 162:9,24 163:6

construction 79:2

contact 24:22,24,25
 25:8 129:13 132:10
 133:23 148:3
 149:2,10 159:8,19

contacted 25:9
 147:3,10 170:9
 174:17 209:17

contacting 128:3,12
 133:14 149:6

contain 11:6,8 23:25
 24:13 229:5

contained 44:5
 175:8,18 182:12,14
 205:16 210:18

contains 24:1 32:8

contend 196:18 232:22

context 28:19

contingent 109:10

continuing 75:1,7

continuous 133:3

contract 29:20 87:16
 106:4 130:22
 197:2,14,22 202:13
 203:19 206:20 207:8
 212:4 218:9 225:11

contracted 183:23
 198:4 203:10

contractors 109:5

contracts 92:15 109:6

contractual 199:3

contradictory
 178:22,25 180:8,11

controls 78:13 171:3

conversation 159:3

copies 18:25 27:8
 68:24 69:7,8 152:25
 153:8,9 161:15,24
 165:18 175:13,16

copy 7:11 38:8
 41:19,21,22,24 46:19
 53:15,23 68:20,23
 69:1 76:3,6

corner 123:15

Cornish 1:10,13 3:5
 4:9,14 5:3
 6:9,12,21,24 12:7
 26:23 27:4 65:1
 81:6,7 82:12 95:18
 167:25 168:16 182:8
 204:13 225:2 231:25
 233:6 234:2
 235:1,5,9 236:4

C-O-R-N-I-S-H 6:23

cornish@pdq.net 86:5

Cornish's 4:3 6:3

corporate 92:15

corporations 82:23

Corpus 1:2 147:22

correct 7:13,20
 8:5,11,17,18
 9:8,19,25
 10:3,4,9,16,18,21,24
 11:2,4,13 12:15
 14:14,15 15:10,21,22
 16:1 22:22 26:12
 27:11,24 29:8
 32:1,15,16 39:22,24
 41:14 43:12 49:25
 52:7 53:3,4
 54:3,4,16 55:18
 58:6,11 59:18 60:12
 61:21,22,25 65:7,8
 66:18,19
 67:1,5,19,22,23
 68:4,7 69:3
 70:14,15,18,19,23,24
 71:18 73:2,3,6 75:3

76:3 78:5 79:25
80:23,24 81:8
82:12,13,15,18
83:14,16,24,25
84:2,16,17,20,23
87:18,19 88:12 93:6
97:22,23 98:1,8
101:10,19 105:8,24
106:17,18 112:14
115:20 119:2 120:11
125:17 129:6,7
135:13 138:20
140:1,2,16
141:7,11,23,24
143:22,25 144:24
146:13,15,25 147:1
148:4 150:4,9
152:10,21 157:21
161:20 166:16
168:5,6,10 174:14
175:10,19 177:22
181:13 187:7,24
188:22 191:23 195:23
197:6,7 199:16
200:11 201:9,13
202:8,10 203:25
207:16 212:1,19
213:16,21 215:12
216:11 217:1 218:10
225:17,18 228:21,25
229:3 231:4
232:6,7,11,17 235:2
236:7

**correctly** 103:9
145:11 147:7 160:18
183:11

**correlation** 205:24

**correspond** 10:12

**correspondence**
24:14,20

**corroborate** 203:7

**cost** 8:7 28:4 39:16
42:1

**Costa** 56:13

**costs** 227:17

**counsel** 236:11

**count** 135:4,15 174:19

**counted** 135:17

**counties**
24:2,5,9,11,16,23,24
25:9 40:6 66:4 83:21
116:2 132:9
137:20,22 141:1,22
146:12 147:3,9
148:2,4,9,11,15,18
149:7,8,10,14,19,24
150:10,13,21,22,23
151:4 152:6,24
153:2,12,13 156:5
157:13,17,19 158:7
159:1 160:9,13,17,23
161:9,24 169:6
170:4,8,17 171:25
174:13 175:6,8
181:13 215:23
218:5,22
219:5,9,11,20
220:4,11,24 221:4,5
229:11 230:12,22

**countries** 134:13

**country** 58:19 59:5
79:15

**counts** 156:23

**county** 24:14,19,20
25:20 27:9,11
30:20,22,24 39:2
40:11 43:10 59:12
66:3 68:9 92:21 96:6
105:22 106:25 107:17
112:11,20 113:5,7
114:1,12,23 116:1,6
117:4 128:15,25
137:23 138:6 142:2,3
147:13,17,21,22,23,2
4,25
148:1,21,22,24,25
151:16
153:3,4,5,17,25
154:1,6,10,12
155:12,15 156:19
159:9,11,13,15,19,21

,24 160:7
161:13,14,17,18,19,2
3 162:5,25 163:1,18
166:12 167:20
168:1,5 174:20
175:1,14,17
220:16,18 229:4
235:8 236:1

**county's** 43:9 116:5,8
150:18

**couple** 6:1 12:8 48:1
61:6 66:4 80:10
81:19 209:25

**course** 72:25 129:5
135:9 181:9 214:18
225:15

**courses** 72:22

**court** 1:1 2:20 6:19
11:18 15:9
89:9,12,15,23
90:14,15,17,22
91:1,7,16,23
92:1,4,21,23 96:5,9
97:6 100:3 101:10
103:14 108:16 111:3
112:18 114:17,18
115:5,6,9 157:6
158:7,8,11 159:2
174:23 211:1 232:9

**courts** 89:20 113:6,17
114:13,15,16

**cover** 46:13,15 204:18

**covered** 89:18 108:20
117:21,25 181:4
227:14

**coy** 213:7

**CPA** 73:16,18
74:1,7,18 75:11,25
76:21 77:1,5 78:4
80:5 82:17,20
83:12,24 84:4,7
85:21 86:21
87:1,2,5,10,25
88:4,15 93:19
94:5,8,9,15,22

101:18 111:22 123:20
171:14 173:1,15
205:25 210:14 211:8

**CPAs** 74:21,22,23,24
75:7,18 123:24,25
124:1 208:14 216:19

**created** 39:23

**credits** 111:19

**Creek** 85:10

**criteria** 61:24

**critical** 208:8

**criticism** 173:9
226:11

**criticisms** 203:10

**critiquing** 209:4

**Crivella** 45:19

**crosses** 135:24

**cross-examination**
21:12

**CSR** 1:18 236:18

**cueing** 36:14

**cum** 72:3,5

**cure** 68:7,10 135:18
139:3,7 142:17
166:20 167:6

**cured** 166:21

**curious** 210:24

**current** 42:4 49:18
51:16 52:7,11
53:6,25 54:15 57:8
60:22,23 73:20,23
138:10 198:11

**currently** 48:6 49:15
85:7

**curriculum** 7:19

**custodian**
143:17,22,24 144:5

**custody** 145:18,21

**CV** 76:3 77:18

**cycle** 195:8 196:6

198:12

─────────────
              D
─────────────

**D.C** 2:10 18:8
90:1,4,6,22 91:1

**dad** 80:24 81:5

**daily** 136:5

**Dallas** 40:11
43:3,9,10 80:18
82:24 138:6
147:12,25

**damages** 103:20
104:1,8,9,17
109:10,11

**data** 78:9 137:24,25
141:20,21 142:7
143:9 144:11 150:4
157:20

**databases** 88:7

**date** 11:9,10 21:8,10
29:13,16 43:5,6
48:23 234:3

**dated** 41:2 42:1

**dates** 31:6 35:20

**daughter** 55:21 57:23
59:15

**Davio** 19:11

**D-A-V-I-O** 19:11

**Dawn** 102:23

**day** 11:14 49:8 54:10
126:2 136:4 235:9,13
236:13

**days** 31:4 48:1 51:22
135:20 142:16 167:8

**dead** 106:11 157:2

**deal** 72:15

**dealing** 38:21 43:4
75:15 208:13

**deals** 225:23,24

**dealt** 52:25 117:1

**debacle** 200:3

**debated** 133:20

**debates** 133:21,22

**Debra** 50:2

**debt** 92:22 98:10,17
99:10

**debtor** 97:7

**December** 43:23 128:7
133:15

**decide** 52:21 211:1

**decided** 22:23 58:25

**decision** 112:18 116:8

**declined** 40:6

**decree** 53:18 68:24

**deeper** 168:7

**defendants** 1:7,15
2:13 4:8 47:23
109:13 176:2

**definitely** 53:1 77:5
94:25 138:13 205:25

**definition** 180:7

**degree** 71:16,19,23
82:18 94:15,25
114:14

**degrees** 148:7 150:24

**deleted** 133:12

**delved** 74:14

**democrat** 123:3 164:21

**democratic** 26:1
164:20

**demographics**
114:19,20,22,24

**denied** 135:10

**Dennis** 18:4 19:6

**denoting** 138:1

**Denton**
147:12,18,19,24

**denying** 135:8

**Department** 2:8 31:2
32:10 33:12,25 37:11
118:23 119:1,4,12

**Depends** 160:3

**depo** 14:11 103:14

**depos** 23:11

**deposition** 1:9,13 4:8
5:2 8:4 12:9 13:8
15:18,25 17:11
20:10,12 32:24
35:5,10 40:9 41:23
42:4,9 45:7,8 99:20
105:6 109:24 112:13
114:10 129:1 131:15
159:20,23 166:11,16
177:6,11,23 178:14
182:17 198:9 200:16
202:9 203:8 211:25
212:23 213:3 217:19
232:6 233:17 234:3
235:1 236:7,8,10

**depositions** 
17:11,13,24
18:7,14,23
19:1,4,15,18,23 20:8
107:10 131:8,22
132:3,21 177:3,13
178:21 216:23 232:9

**Derfner** 8:7

**describe** 215:16

**described** 215:15

**describing** 146:2

**description** 235:10

**design** 226:18

**designated** 47:5,7

**designed** 204:7

**detail** 13:10 14:10
16:22 77:16 94:20
184:3 210:25 231:7

**detailed** 37:10 144:21
145:9

**details** 109:1

**determination**

140:10,12,21 144:23
145:10 146:14,25
159:5 173:19 204:13
205:8

**determinations** 185:17

**determine** 39:16 139:7
143:16 161:11 164:23
168:9 172:12,20
173:12 184:22,23
186:3,13,14 207:6
214:10,11 219:18
221:3 222:10 224:15
226:18

**determined** 137:6
144:2 187:7

**determining**
165:8,10,11 173:3
204:3

**Deutsche** 98:6

**developed** 109:4

**development** 103:13,23

**device** 184:9 220:17

**devices** 184:7

**devise** 171:18

**different** 98:23
100:19,20 104:5
113:18 132:20,21
137:23,24,25 150:25
151:1 164:21 166:23
170:9,10 172:19
179:20 200:9
231:10,11

**difficult** 76:20 138:4
203:14 224:10

**digest** 197:18

**dime** 193:10

**diploma** 72:7

**direct** 21:19 22:14
176:23

**directed** 176:19
177:15

**direction** 236:6

**director** 188:13

**disagree** 192:8,17
221:20 224:4

**disciplinary** 75:21

**disciplined** 75:17
93:13 95:19

**disclose** 108:21

**disclosing** 109:8

**discovery**
45:14,17,18,21,22,23
,24,25 46:6
175:22,23 177:22
178:22 181:10,11

**discrepancy**
212:6,16,17 213:1,4

**discriminated** 115:10

**discrimination**
110:10,12

**discuss** 13:8 108:25
158:25

**discussed** 28:17 128:9
212:24 216:6 218:14

**discussion** 13:4 17:18
27:1 168:17 218:8

**discussions** 47:19
61:16 63:10
136:11,12

**disk** 25:12 164:16

**disks** 25:19,20,21,23
163:18 164:5

**Disposal** 80:21
81:16,23 119:9

**dispute** 91:5

**dissolution** 48:16
52:25 53:3

**distributed** 200:8

**distribution** 31:10

**District** 1:1
89:9,12,14,17 92:23
108:13,16 109:16
111:4

**districts** 113:18

**divided** 94:8

**division** 1:2 2:9,15
  84:3 104:3,4 191:12

**divorce** 53:15,18
  68:24 106:22,23

**DLD** 8:1

**document** 5:4,9,16
  12:25 13:1
  15:6,20,23 16:10
  21:16 22:4,11 27:19
  28:3,6 29:14 31:14
  34:7 35:3,7
  39:13,19,21
  40:1,11,12 41:6,16
  42:6 43:17 62:20
  101:22 132:20
  197:4,9 202:19 205:4
  211:21 214:9 216:23
  226:21 231:9,10
  235:11

**documentation** 91:6,8
  150:15 165:4 181:20
  182:10,15,20

**documents** 4:3,14
  5:7,13,21,23 6:1,7
  8:15 10:3,15,19,22
  11:20 12:8,12 13:17
  14:12,13,20 15:24
  16:3,6,11,15,24
  17:19,23 18:5 20:15
  26:16 27:5,10,15
  28:23 29:2,4 30:1
  31:1,23 32:4,14,18
  33:10 37:8 44:1,2,21
  45:3,5,13 46:12,13
  59:9 84:25 85:1
  91:5,13 98:21,22
  99:13 104:3,13 107:4
  131:6 132:20 153:18
  156:11 175:18
  196:12,13,14,16,17,1
  9 203:6,16 206:4
  216:24,25 217:1
  232:5,8,21 233:2

**dogs** 58:21

**dollars** 191:15
  192:5,12 193:16
  200:2

**done** 23:11 29:5 95:22
  109:19 125:11,20
  126:11 127:5 156:4
  179:20 191:1 201:7
  204:19,24 208:25
  209:8 221:2,10,17,24
  225:14

**double** 115:7,8

**DPS** 8:12 10:22 31:24
  36:6,15,22,23 37:1
  177:9

**drafted** 130:24

**drafting** 85:1

**drag** 215:24

**drive** 57:12,17,21
  60:20

**driven** 58:20

**drivers** 62:16

**driver's** 31:25
  51:13,20,25 53:6,9
  54:5,9,14 55:1,18,25
  56:3,22 57:10,20
  58:1,5,18,23
  59:4,22,24 60:13,22
  61:20 62:3,5,8,12
  63:22,25 64:2,7
  134:23 135:3,5
  167:10,22

**drives** 55:3,4 60:21

**drive-up** 103:24

**driving** 59:1

**dropped** 217:11

**dubious** 222:9,11
  223:4,5 224:3,19

**Duces** 4:9

**due** 5:8,18 29:21
  104:4 141:14 150:3
  157:13 162:5,10

**duly** 1:15 6:13 236:5

**dumps** 5:9

**Dunn** 2:3 127:18
  128:3,11,13,21
  129:21,25
  130:11,16,22 133:13
  159:1 183:13,14

**Dunn's** 129:6

**during** 71:25 72:10
  78:17 81:12 82:22
  83:10 122:16 133:19
  143:2 195:8 203:7

**duties** 78:7 80:4,7

---

E

**earlier** 94:4 129:8,16
  131:23 178:2 204:1
  206:16

**early** 123:13 138:3
  151:22

**earmarked** 213:10

**earned** 205:17 226:7

**easier** 24:8 90:13

**easiest** 13:12 76:7

**Eastern** 89:17

**ed** 51:25

**educate** 126:14 127:1
  175:22 188:16,18
  201:17 219:22 220:11
  221:10 224:2
  226:22,24 228:15

**educating** 199:9,12,20
  222:12

**education** 10:20 13:25
  14:8 28:11 35:11
  75:1,8 117:18 179:10
  180:20 183:9
  185:4,25 192:13
  196:10,22 198:18
  200:10,19 201:8
  202:2 203:12 214:25
  217:7 219:10
  220:1,25 221:5
  222:19 226:13 227:18

**educational** 218:22
  219:18,24 220:4

**effect** 107:4 116:5
  130:1,2 137:7,12,13
  138:19 139:4 140:23
  204:15 221:9 225:24
  229:24 230:3

**effective** 204:5,22
  205:19 210:5
  226:5,6,7,8,20

**effectively** 217:5
  218:5,21 219:9,10
  220:3,16

**effectiveness**
  204:6,13 205:6
  224:15 225:12

**effects** 101:15 169:9

**effort** 153:16
  228:15,17,21,22

**efforts** 43:10 126:13

**EIC** 30:18 31:3,9,25
  33:14 37:13 40:7
  180:22,23 184:12
  215:23 219:2,14,22
  220:12,15,18,25

**EICs** 219:13,20 222:23

**eight** 49:22 55:13
  58:19 63:7 78:1

**eighteen** 123:8

**either** 21:11 25:7
  31:24 33:22 63:17
  85:21 98:24 119:25
  124:21 130:16
  133:14,24 140:11,14
  157:13 182:24 196:13
  205:7 236:11

**El** 78:24 147:12,21

**elected** 119:23
  120:1,2

**election** 24:14 25:25
  26:3,6,7 30:11 33:8
  37:1 39:2,16
  40:11,16 42:24,25

43:25 68:10 72:15
  117:8 121:24
  122:15,16,25 125:22
  126:15 127:2 138:12
  142:25
  143:3,6,15,17,20,23
  144:2,5 146:7,10
  147:6 149:5 152:5,7
  154:8 156:1 157:21
  158:1 160:17
  162:3,8,9,20,25
  163:3,4,6,24 168:23
  170:5 184:8,10 195:8
  196:6 198:12 200:9
  201:8 220:7,17
  222:13 231:6

**elections** 24:13 30:10
  33:7 40:21 117:19
  134:8 143:18 144:13
  147:5 152:5 153:1
  154:12 155:16 165:9
  170:20,21,25 188:13
  200:21,23 222:25

**Electoral** 38:19

**electronic** 184:7

**Elementary** 49:7

**else** 25:8 144:9 156:2
  169:11 180:9 183:24
  217:22 224:24

**e-mail** 4:7 8:6 29:3
  35:16 36:7,12,19
  38:18 39:1,2 40:4,5
  86:2,4,6 94:3,4
  156:4 174:22 182:1

**e-mails** 8:9 25:3
  35:21 36:6

**emergency** 184:17

**Emery** 101:7,13

**employ** 168:19 236:10

**employed** 118:15,23
  119:7,16,22 120:22

**employee** 236:9

**enable** 208:5

**enacted** 185:23

**enactment** 136:17

**encumbered** 197:13

**energy** 149:24

**engage** 206:8 207:3

**engaged** 107:22 207:4
  224:6

**engagement** 84:9

**engages** 219:19

**enrolling** 59:20

**enter** 130:21

**entire** 16:19

**entities** 79:4
  81:15,22 83:10

**entity** 83:20

**entry** 134:3

**equation** 213:16

**equipment** 198:13
  230:22

**Eric** 2:8 182:1

**error** 35:19 136:20

**essence** 150:6

**established** 104:12

**estates** 92:16

**estimate** 191:1

**et** 1:3,6 112:11
  200:10 227:5

**evaluate** 13:24

**evaluation** 187:19

**event** 30:18,24 31:3
  63:11,17,20 215:22

**events** 32:8,9,12
  180:23 215:17 216:22
  222:9

**eventually** 132:24
  153:9

**everybody** 72:23 78:24
  170:8

**everyone** 61:20,23

**everything** 7:16 26:8
  124:11 176:25 196:19
  217:20

**everywhere** 144:11

**evictions** 92:21

**evidence** 176:20,22,23
  177:16

**evidently** 207:6

**exact** 61:4 206:24
  230:24

**exactly** 95:4 195:9
  203:20 209:9

**exam** 73:9

**examination** 3:6 6:14
  21:5,19 22:15 138:22

**example** 20:23,24
  25:24 45:6 165:13
  205:13

**exceeds** 73:10

**except** 9:3 44:24
  235:2

**excess** 111:9 227:16

**excuse** 84:25 120:9

**executed** 235:12

**exhibit**
  4:1,2,4,6,8,10,12,13
  7:5,7,13,17,19,22,24
  8:1,3,6,9,12,15,19,2
  1,22 9:2,3,14,21,24
  10:1,5,6,10,11,12,14
  ,17,19,22,25
  11:3,6,21
  12:1,6,10,17,20
  13:14,22
  14:2,5,6,11,12
  15:1,11,13,16,20
  35:4,5,8,12 36:18
  37:23 38:4,16 40:8
  41:22 76:2 77:21
  87:18 96:14,18 118:9
  132:14 165:6
  175:10,19 182:17,24
  183:1 188:5,6,12

196:16 197:1
  198:3,11 203:18
  204:6 205:4 207:4
  210:19 212:1 213:2
  214:9,12 217:11
  218:9 221:13,23
  226:21 227:21 228:8
  231:9,24 232:1,22

**exhibits** 38:14,15
  44:24 182:15 196:15
  217:1 231:12 232:10

**existed** 125:9

**existent** 138:8

**expand** 177:25

**expect** 12:19 136:3,5

**expectancy** 103:25
  109:10

**expectation**
  142:6,10,12 145:17
  146:4 157:10

**experience** 76:21
  122:15 171:14,23

**expert** 5:7,14 6:25
  7:2 76:15,18
  86:20,24,25
  87:9,24,25
  88:3,6,7,8,15
  94:8,21 96:13,20
  97:6 98:15 102:1
  108:20 111:24 115:18
  116:17
  117:1,11,17,22
  123:17 124:5 125:20
  172:25 192:24 193:20

**expertise** 76:17
  101:18 125:5,7,11
  142:24 168:19 169:25
  171:23 205:7

**experts**
  5:10,13,17,22,25 6:6
  46:25 47:5,20,23
  211:10

**expired** 52:10,18

**expires** 60:24 235:18

**explore** 129:25

**express** 94:12
  110:17,24 111:12
  114:3 115:25 116:23
  117:7,17 126:12
  137:14 138:17
  139:1,2 157:11 170:1
  185:1 187:23 205:18

**expressed** 11:21 77:10
  97:15,22 107:11
  111:11,13 235:12

**expressing** 76:9 95:5
  187:3

**extended** 62:3

**extent** 11:19 66:8
  70:7 111:19 140:7
  184:3 213:6 220:14
  221:21,25 228:11,13
  233:1

---

F

**face** 207:5

**Facebook** 33:24 34:1,3
  85:18 187:13 205:14

**Facebooking** 187:11
  210:9 215:22 226:6

**fact** 65:3 68:5 124:8
  144:3 159:1 167:21
  172:23 179:17 198:4
  199:7 201:5,20 203:9
  214:23 218:25 221:15
  231:20

**facts** 91:13 97:17
  219:1 236:3

**factual** 222:21,23
  223:2 224:1,19,21

**failed** 100:1 145:3
  217:5 221:8

**failure** 158:22

**fair** 94:23 116:9
  156:18 170:7,15
  173:2 191:19

**fairly** 46:13 104:2

**filed** 91:3

**files** 164:12,13,14,21
165:15

**fill** 136:25 142:15

**final** 132:25

**finally** 157:7

**financial**
113:10,11,12
114:11,12,14 116:6
120:15 126:24 193:15

**finding** 150:25

**findings** 141:22,25

**fine** 156:13 182:18
225:4

**finish** 18:17,18

**finished** 18:20

**finishing** 168:17

**firm** 78:20
79:12,14,16,20
80:10,23,24
81:5,10,21

**firm's** 208:7

**first** 6:13,20 15:23
21:1,7 23:11 30:7
31:8 42:24 44:3
50:23 52:5 54:2,8
57:6 77:19 96:23
98:25 99:24
116:16,19 118:22
121:25 122:4
123:7,11,14 125:13
127:9,11 129:12
131:7 132:8,12
139:18 144:19 145:2
146:20 176:3,18
183:4 197:19 208:21
209:10,13,24 210:21
212:8 215:7 221:17
236:5

**fiscal** 10:17 27:23
34:18 36:21 39:14
76:24 183:7,17 184:1
185:3 188:10

**fairness** 203:23

**faith** 6:8

**faith-based** 223:14

**fall** 41:23 193:12

**familiar** 76:25 168:22
176:6

**family** 61:20,23 62:3
107:8

**fan** 42:14

**Fargo** 100:10,17,20,21

**father** 79:21

**Fax** 2:5,11,16

**February** 31:16,18
33:4 36:7,13 44:8
112:23 224:7

**February/March** 131:20

**federal** 1:20 83:21
89:9,12,14,20 91:25
185:2 192:12 195:7
200:23 225:16,21
231:3

**fee** 73:16 130:23,25
131:1,3,4 206:21

**feel** 53:20 96:15
149:6 210:6 211:17

**feeling** 159:8

**feelings** 134:5

**fees** 100:21

**feet** 171:17

**Fernando** 107:15

**ferreting** 222:8

**Fifth** 91:22

**figure** 213:2

**figured** 164:14

**file** 16:18,19,23
34:12 35:1 90:14
106:10 111:16 164:14
165:14,21

127:7 156:19

**194:12,20**
195:3,19,22 228:1

**five** 209:25

**flat** 131:3,4

**flip** 21:25

**Florida** 200:4

**flowed** 132:24

**flowing** 104:5

**flown** 61:9

**FM** 2:4

**focus** 130:17

**focused** 163:5

**focuses** 215:8

**focusing** 149:14,24
181:1

**folder** 17:20

**follow-up** 13:23
148:20 209:3

**fool** 217:12 225:1

**forbid** 191:10

**foregoing** 235:1,11
236:4,7

**forget** 50:14 79:3
83:6 107:6 157:7
163:4 190:2

**forgot** 60:7

**form** 39:6 64:7
67:6,10,16 190:14

**format** 137:23

**formed** 28:18

**forming** 181:21 182:11

**forms** 66:22 67:3
120:7 169:7

**formulate** 12:19
69:15,21 70:13,16
76:18

**formulated** 11:7,16
12:16 14:22 23:7
28:16 30:13 46:17

124:9 125:11 134:4
136:13 137:9

**formulating** 15:3 23:2
46:22 65:9 132:5

**formulation** 46:11
70:5

**Forrest** 19:11

**Fort** 147:23 148:25
153:3,7

**forth** 236:7

**forward** 6:10

**four-part** 73:9

**fourth** 101:6

**frame** 127:23 128:1

**franchise** 123:21

**free** 48:21

**Freeman** 21:4,12

**frequent** 122:20,21

**frequently** 90:6 137:6

**friends** 62:7

**front** 21:8 23:21
165:5

**FT** 236:1

**fulfilled** 197:14

**full** 6:18 139:18
144:20 145:2 176:18
183:4 236:7

**function** 136:6

**fund** 227:16 231:2

**funding** 103:25

**funds** 78:19,20 201:21
205:17 225:10 227:17
228:4,12
230:16,17,24

―――――――――
G
―――――――――

**gain** 18:2

**Galveston** 112:11,20
113:5 114:1 117:4

128:15 147:23

**Garza** 107:15,16

**Gas** 78:24

**gather** 78:11

**gathered** 145:20

**gears** 88:18

**general** 2:14,15 16:23
26:3 43:24 72:24
78:18 147:5 154:7
160:17 171:2,17
191:11 192:20 200:18
201:7 206:22 208:2
209:22 222:19 226:22
231:6

**generalized** 77:3

**generally** 17:7 33:6
35:20 45:20 84:24
87:9 92:12,20 93:4
94:19,21 109:2
168:22 170:18 171:4
177:1,2

**General's** 191:18

**generate** 191:24

**generic** 195:15,17

**Georgia** 10:15 187:2,4
209:21

**getting** 39:8 101:23
109:1 126:2 127:19
132:6 138:14 149:19
155:7 156:12 162:22
208:12,13

**gist** 39:9

**given** 109:24 110:6
111:19 135:12 152:20
179:18 235:13 236:12

**gives** 193:21

**giving** 107:1 115:19
116:13 166:15 191:16
219:7 232:15

**glasses** 194:17

**gleaned** 216:1

**Glenn** 96:23

**God** 191:10

**gold** 208:1

**golf** 62:24,25
63:5,9,11,12,21
126:5

**gone** 40:12 138:9
231:2

**gonna** 193:11,12
199:10 219:3

**Google** 209:18

**Gore** 200:4

**gotcha** 36:10 42:7
215:6

**gotta** 100:22 125:25
199:4 217:15 219:22

**gotten** 55:18

**government** 8:12 36:6
72:25 109:6 121:8
168:23 231:3

**governmental** 79:4
81:15 83:9,19,20
170:24 211:19

**Governor** 121:7

**governor's** 124:25

**grade** 49:4

**graduate** 88:23

**graduated** 73:4 77:19

**gravitate** 88:14

**great** 38:17 40:22
41:5 148:24 207:21

**greater** 206:3

**Greatwood** 50:18

**GRG** 108:12

**Grious** 175:21,23
176:8

**group** 17:19 20:15
26:16 27:5,15 30:1
31:1 33:9,11 34:4
62:25 63:1,2,7

108:12 109:3 110:4

**groups** 27:10

**grow** 49:2

**guess** 17:19 26:18
31:1 33:18 34:22
45:12 48:18 64:5
72:3 76:16 78:1,10
85:2 90:24 94:14
98:12 108:21 114:19
116:3 121:11,25
122:10,21 123:7
128:5 131:12 137:20
149:3,11,20 156:12
157:2 168:22
169:3,10 170:1,12
172:17 184:15
193:7,14 195:2,6
205:5 207:17 210:20
213:8 215:20 226:20

**guidance** 173:18

**guide** 172:3

**guidelines** 172:7
225:16,21

**Gulf** 80:21 81:16,23
82:1 119:9

**guns** 56:16

**guy** 47:7,8

**Guyette** 19:8

**G-U-Y-E-T-T-E** 19:10

**guys** 217:10 233:15

----

H

**half** 16:13,14 48:20
55:14 56:5 60:1
64:22 109:20 149:4
233:11

**Hamburger** 123:14

**hand** 7:6 8:20 84:5
235:13 236:12

**handbook** 58:23

**handgun** 52:14 53:13
54:20 55:8 56:15

57:3 58:14 60:5

**handle** 84:25

**hands** 115:24

**handwriting** 22:8

**handwritten** 20:20
165:3

**happen** 31:4

**happened** 30:24 106:14
107:23 138:11 200:4
224:9,22

**happens** 67:16

**hard** 58:21

**Harris** 25:20 27:9,11
30:20,21,24 59:12
66:3 96:6 105:22
107:17 109:15
142:2,3 147:11,13,24
153:3,7,10
161:13,14,17,18,19,2
3 162:5,25 163:1,18
166:12 167:20
168:1,5 175:17

**hashing** 215:11

**hate** 16:20

**HAVA** 4:12
199:15,19,22
200:15,21 201:1,5,21
206:8 218:18
225:10,15,20 227:16
228:12 230:16,17,23

**H-A-V-A** 199:22

**haven't** 6:4 47:16
70:12,16 109:19,24
156:5 158:21 159:20
195:21 197:18,21,22
206:10 216:17 217:22
221:2 224:24

**having** 6:13 40:6
197:8 215:22

**head** 161:2

**headquarters** 121:15

**heard** 156:5 187:15

190:3,7 205:21,22
210:8,9,10,22,23

**hearings** 188:15

**held** 30:18 162:8

**help** 39:8 50:18 91:11
121:6 144:18 162:22
164:1 176:17 199:23
220:11

**helped** 94:15

**helpful** 154:8 164:3
180:17 187:21,24

**helping** 122:1 219:2

**helps** 94:25

**hereby** 235:1 236:3

**herein** 178:1

**here's** 26:19 173:11
180:5 186:25
187:1,2,6 208:18,19

**hereto** 1:22 181:20
182:10 236:4

**hers** 56:6

**he's** 47:14 55:16

**hey** 153:18 177:5

**Hidalgo** 223:11

**high** 39:14 49:4,7,8
70:25 121:2,3

**highly** 9:4,17 34:20
35:1

**Hildalgo** 147:22

**hired** 77:24 97:6
111:22

**HISD** 87:14 109:3
128:17

**Hispanic** 47:14 110:13

**Hispanics** 70:13

**historically** 150:19

**history** 25:23,24 73:1

**hit** 144:15

**hitting** 197:17

**hold** 8:23 26:21 29:25
53:21 64:16 181:23

**holding** 198:12

**home** 51:11 67:21
100:13 131:15 229:20

**honest** 134:8

**Honorable** 112:10

**honors** 71:25 72:8

**hoops** 135:20

**hope** 216:21

**hoped** 142:9

**hopefully** 62:15

**horrible** 50:14

**horse** 157:2

**hot** 131:16

**hour** 64:22 233:11

**hours** 73:14,15 75:4,7

**House** 27:24 39:7

**Houston** 1:19 2:4 33:2
48:19 49:1,2,12
60:11 71:1,12,14
74:23 77:20 88:22
108:12 109:16

**Huff** 38:18

**huge** 113:8,10 123:21
165:22

**hundred** 43:18 200:2

**hurricane** 115:1

**hurry** 59:4

**husband's** 54:23 56:17

───────── I ─────────

**I'd** 28:19 34:25 80:10
94:24 106:10 127:25
128:1 131:15 156:6
192:8,17 210:11,24

**ID** 10:15 14:1 27:17
32:9 35:19 36:15
39:11 42:25 64:7,13
65:4,7,11,17,23

66:6,10,17
67:4,8,18,21
68:1,2,7 69:17,25
70:9,14,18,22 130:2
135:11 136:7,12
140:8 142:15,20
146:23 154:2,5
162:2,10 165:3 166:4
167:2 173:5,20
183:10 185:24,25
187:12,16 196:11,23
198:19 199:10,13,20
201:2,6,13,17 202:1
203:13 214:25 219:23
221:11 222:20 223:1
225:23,24,25
226:3,13,17,23
227:10,11,12,19
228:12,16 229:5

**idea** 134:6 171:15

**identification** 4:5
37:1 39:10,16 133:16
134:1,5,22,24 141:15
157:14 161:12 169:7
184:7,10 220:7
222:14 230:6

**identified** 8:16 141:1
152:15

**identify** 7:8 8:22
10:8 14:5 15:13
16:6,23 19:3 70:13
134:16,24

**identifying** 21:8,10
39:22 132:9 136:18

**identity** 235:10

**IDs** 68:6,17 69:23
70:6

**II** 35:14 44:6 184:19

**I'll** 8:25 12:4 36:11
41:8 116:3 126:4,7
147:14 149:11 156:14
205:12 226:20
229:20,22 230:1
233:3

**I'm** 5:19 8:23 15:5,6

16:21 17:6,7 18:6,19
22:19,22 26:22 28:13
32:25 33:17 34:21
43:21 53:22 60:7
62:15 74:3 79:23
87:4 93:19 95:1
101:22 103:9 106:11
108:20 110:23 113:12
115:24 118:4
123:19,23 139:2
144:14 145:12,13,23
149:21 151:9 153:22
154:15 156:12 157:16
160:11 162:13,22
163:25 168:22 169:18
173:6,9,12 174:19
176:5 179:12,23
184:1 187:19,25
191:15 193:17 194:18
204:19 206:12,15
207:1,2,15 208:7,8
209:3,5,7
211:3,5,7,13,15,17
213:24,25 214:13
216:17 221:15,22
223:8 226:20 228:2,8
231:25 233:2

**Imaging** 111:9

**immediate** 61:20,23

**impact** 187:9

**implement** 28:5 42:2
170:6 202:3

**implementation** 160:8
162:4 183:9
196:11,23 198:18
203:12

**implemented** 141:16
169:8

**implementing** 193:9

**implications** 106:24

**impression** 146:1

**impressions** 5:25

**include** 8:16 9:18

**included** 9:5 116:19

incorporated 201:12

incorrect 207:12

increase 161:7

increased 160:16
  161:3,8

Independent 108:13
  109:16

in-depth 104:6

INDEX 3:1 4:1

indicate 17:16
  67:4,22,25 129:25
  152:20 214:3,4,21

indicated 49:23 50:22
  60:10 68:23
  127:18,21 130:4,5
  161:25 168:10 223:17
  229:22 230:20 236:5

indicates 67:6,17
  197:1 206:8

indicating 39:8
  67:11,12 76:1 130:17
  162:15,17 164:17,19
  214:7 216:7,16

indifferent 186:22

Individuals 82:23

inference 110:15

information 15:1
  24:10,12,15,21
  26:5,9 28:24 30:17
  32:7 36:22 37:2,25
  39:22 46:3,4,10
  68:15,16 78:12 115:9
  120:15 132:7,11
  137:19,21 143:11,14
  144:20 145:8,17,19
  146:2,4,11,14 147:4
  149:20 150:11 151:1
  152:7 153:11 155:5
  156:8 157:7,16,18
  158:12,14,17,20,23
  160:14,22 161:10
  164:1,5 166:25
  167:17 168:4 171:19
  174:13,21 175:7,17

176:9,12 177:19
178:6,21,25 179:24
180:10,12,16
181:2,3,5,12
182:14,25 187:18
188:4 189:18 191:16
197:17 201:13 203:7
210:25 216:24 222:24
223:7,16 229:5 230:6

Infusion 111:2,14,20

Ingram 20:6 22:5,6
  35:9 45:7 132:23
  202:12,24 203:7,9
  211:25 212:22
  213:2,7 217:18

Ingram's 8:4 20:9
  40:9 41:23 177:5
  198:9,20 201:5 202:9

initial 132:10 227:17

initially 129:22,23
  138:15 147:3 209:24

In-Person 4:5

inquiry 8:10 148:8

Instagram 85:18

instance 1:14

instances 24:16 46:16
  176:20

instead 113:18 222:19

Institute 74:24

instrument 235:11

integrity 208:16
  236:18

intend 11:17 15:9
  178:3,13 215:16
  232:24

intended 195:1 196:10
  198:17

intent 29:5 44:16,19
  169:5

intentions 15:2

interacted 219:5

interest 23:5 103:13

208:16

interested 127:20
  236:11

intermingle 86:17

Internet 37:17

interpretation 97:18
  99:12 100:17 111:18
  188:21

interpreted 169:6

interrogatories
  34:8,10 176:4,10
  236:5

interruption 35:6
  93:2 182:5

interview 78:11
  209:15

interviewed 65:11
  66:15

introduction 5:12,21

investigate 130:8
  136:21 137:1

investigation 66:1
  157:25 168:7 172:15
  183:18 221:2 226:2

investment 104:1

invoices 9:22

involve 127:21

involved 92:20 104:2
  123:19,23 127:17,19
  173:15

involvement 133:15

involving 94:22

IRS 90:10,15

island 115:13,14

isn't 50:15 173:9

issue 77:2 94:13
  105:15 106:22,23
  107:7 108:9 111:25
  112:4 136:24 141:9
  146:23 152:16 167:3
  168:10 179:22 186:16

187:1 200:18 212:8
215:9 219:13 220:12
222:16,20 223:1

**issued** 30:3 32:10,11
36:15 41:3 222:15

**issues** 18:2 23:4
43:4,11 94:16 97:14
98:2,14 99:16
101:2,3 102:18
103:10
105:12,13,16,17
106:16 107:12
110:7,10,25 112:5
115:16,20,21
116:11,12,13,18,20,2
4 117:1,8,12,19
125:22 126:14 127:1
129:24 130:12,17
131:18 133:16 139:21
140:3,11,14
141:15,23 142:1
144:13 157:14 161:12
162:5 173:11,12,14
180:25 183:5,14
184:16,24 185:21
196:18,22
200:9,10,24 201:2,18
217:22 218:23 219:18
220:5 232:17,20,23

**issuing** 39:16

**items** 92:22 182:13,21

**it's** 5:6 15:17
22:5,12,14 23:23
27:19 29:2 30:2,6
33:2,3,15 35:4,8,11
38:16 39:5,15 40:7
41:16 43:24 44:15
50:14 52:7 58:21
60:23 76:20 79:12
84:8,9 90:9,11,13,18
91:2,10,15 94:10,14
96:21 97:2 105:22
106:4 108:2 111:4
115:1 116:19 122:4
127:3 132:18,19,20
134:6,14,15,18,21
135:1 136:3,4 137:22

138:9,10,12
152:12,13 159:15
160:3 171:16 175:24
176:1 177:8 179:25
180:3,7,15 186:17
188:12 191:20 192:18
197:13 198:25 201:19
204:4 205:11 208:18
209:10,13,14
210:1,14 211:1
214:17,23 215:4,5
227:5 231:2,3,14,16

**I've** 7:6,10 8:21 10:6
12:24 15:13 33:18
47:24 48:15 55:2
62:18 74:12 76:25
91:2 92:22 95:22
116:22 123:10 182:20
187:7 200:17 205:1
209:25

---

J

**J.D** 4:9

**j.rich@usdoj.gov** 2:11

**Jack** 55:11,13

**jacket** 112:25

**Jackley** 79:13,24 81:1

**Jackson** 40:4 102:23
106:20 107:12 128:25

**James** 19:12

**January** 29:20 31:19
36:13 41:3 43:6 44:8
128:5 133:14 224:9
231:8

**Jasper**
159:9,11,13,19,21
160:7

**jdcpa** 86:11

**Jefferson** 147:25
159:15,23

**job** 78:22 80:7 112:2
226:10

**Joe** 45:12 177:9

**Joe's** 219:4

**John** 39:6 50:21 54:24

**Johnston** 49:7

**joint** 26:6 123:15

**Jose** 21:1,13

**JP** 113:6,17 115:5,6

**JR** 55:11,14

**judge** 91:18 121:24
122:1,15

**judgment** 176:21
186:23

**Julie** 101:7

**July** 6:2 36:20 50:7

**jump** 135:19

**jumped** 48:5

**June** 11:15,16 18:11
33:12 127:25 196:25
201:23

**Junior** 49:7

**juries** 90:20

**Justice** 2:8

---

K

**Kayotkina** 49:19

**K-A-Y-O-T-K-I-N-A**
49:19

**Keister** 2:14 6:15
11:24 12:3,7 17:12
18:20 22:19 23:21
26:21,24 27:2,4
28:20,22 31:14
33:1,5 39:20 40:23
42:6,15,18,20
64:18,21,25 65:1
93:1,3 95:13,16,18
168:13,16 181:24
182:3,6,8 190:16
217:16,18 225:3,5
231:20,25 233:5,14

**Keister..............
..6** 3:6

**Keith** 8:3 22:6 35:9
    40:8 41:23 45:7
    132:23 177:5 198:9
    211:25 212:22

**Kennedy** 121:10

**key** 46:4

**KI** 35:9

**kids** 50:14 69:6

**Kim** 25:6 154:10

**kin** 236:11

**knew** 125:9,10 126:22
    152:18 202:4,5

**Knight** 102:5

**knocking** 76:1

**knowledge** 54:14 56:21
    68:8 72:24 77:3
    143:3 167:19 174:1
    230:15

**known** 235:10

————————————
                L
————————————
**labeled** 25:22,23

**lack** 46:8 68:7 70:9
    115:17 140:8 142:19
    150:4 157:16 162:2
    171:9,12 181:5
    187:17

**lacking** 170:16

**lady** 163:24,25

**Lafrance** 78:2
    79:5,13,24 80:25

**laid** 217:10

**Lake** 79:12 80:14,17
    120:3

**Land** 48:7,9,12 49:13
    85:8

**Lane** 236:19

**language** 83:16

**large** 23:22 46:5
    62:15 78:18 79:2,14

80:16,18 81:18 82:24

**larger** 147:3
    149:14,15,17

**largest** 81:21 147:20

**last** 13:21 22:11,17
    36:12 38:16 39:17
    43:17 47:13 60:24
    90:10 107:19 109:22
    112:22 118:1 128:7
    133:15 144:19
    145:1,7 161:20 186:7
    188:1,3 204:18 215:7
    217:11 227:14

**lasted** 59:1,2

**late** 5:4 6:6 29:24
    56:7

**later** 13:8 14:11
    26:14 27:15 29:21
    32:23 66:21 68:7
    179:6,20 197:5 216:4
    226:15 229:21

**Latin** 72:4

**laude** 72:3,5

**law** 82:18 88:21 92:21
    94:11,13,15,22,24
    107:8 169:4 170:5
    189:19,20,21,22
    193:11 196:11,23
    198:19 203:13 226:3

**laws** 109:13 185:24

**lawsuit** 127:17 217:15

**lawyer** 83:11 95:25
    101:19,20 129:4

**lawyers** 95:3 123:24

**lawyer's** 123:23

**lay** 211:18

**layperson** 77:6 206:3

**lead** 13:4

**leading** 145:12

**learn** 217:15

**learned** 187:12 200:17

202:4

**learning** 226:9

**least** 73:12 125:14

**leave** 116:3 149:11

**ledger** 171:17

**Lee** 19:8

**legal** 38:19
    84:8,12,19,23 87:5
    92:6,8,13 93:17
    94:5,8,16 95:6,7,10
    98:24 99:1,5 100:24
    101:24
    104:9,11,14,20
    107:1,3 109:13
    111:25 112:1 113:22
    115:18,20,21,25
    118:19 119:3,19
    120:1 123:22 124:21
    125:16 168:19
    169:3,10,14,16,20
    192:24 193:19 194:1
    205:7 236:18

**legally** 192:24
    193:20,24

**legend** 151:24

**legislative** 34:14
    41:21 123:17,19,22
    136:11

**legislator** 34:22
    124:3

**legislators** 133:24

**legislature** 119:16,20
    124:7,10,14,15,18,25
    133:20,21 179:19
    190:6 191:9,11,25

**legislatures** 133:24

**length** 137:25 181:4

**Leopold** 19:6

**less** 186:22

**lessons** 222:4

**Leticia** 19:12

**let's** 11:24 26:13

27:13 28:1,20 30:15
48:2 53:25 88:17
93:3 94:18 96:12
103:14 114:4 115:5,6
123:13,14,18 128:2
138:5 168:13 173:24
174:6 176:18 186:10
189:17 195:7 211:22

**letter** 39:7,9,15
130:24

**level** 39:14 119:11
146:15 164:10

**liability** 104:12

**license** 31:25
51:14,21 52:15
53:6,9,13
54:6,9,15,21
55:1,8,18
56:1,4,15,22
57:3,10,20
58:2,5,15,18
59:4,22,24
60:5,14,22 61:21
62:3,5,8,12 63:22
64:1,2,7 73:20
74:7,15,18 75:6
94:23 134:23 135:3,5
167:10

**licensed** 73:18 74:4
88:25 89:2,8,11,20

**licenses** 62:17 68:25
167:22

**life** 136:6

**limit** 45:24 46:1
148:8 220:1

**limitations** 200:14

**limited** 114:11 141:22
148:17 157:15 171:13
219:12 220:6,12,25
223:1

**line** 139:17 174:12
194:16,20

**link** 37:11

**Lionel** 107:16

**list** 7:22 29:3 65:16
87:11,17 94:20 96:14
103:12 107:23 108:11
112:13 147:15
151:6,17 174:13,24
182:12 184:1

**listed** 9:12 151:5
175:7 190:21

**listening** 167:14

**listing** 40:6

**literature** 172:2

**litigation** 2:15 17:23
85:1,3 87:13,16
92:16,17,19,20 93:5

**little** 34:4 48:2,5
55:11,13 59:25 66:21
77:15 80:11 81:22
85:5 87:21 94:20
102:10 103:23,24
106:5 122:5 131:15
144:18 158:19 165:2
172:18 179:6,25
197:15 215:22 221:9
222:1,5,16 223:18
224:14 230:23

**live** 49:12 50:17
51:11

**lived** 113:25 114:15
115:13

**lives** 49:13 50:18
60:11

**loan** 99:12 100:17,23
101:14,15,16

**lobbying** 124:20,24

**lobbyist** 124:18

**local** 83:20 109:15
143:20 146:7,12,15
149:4 222:25
223:23,25

**located** 6:4

**location** 37:9

**locations** 32:13 37:12
220:21 222:11

**locked** 158:4

**lodged** 134:20

**log** 29:3 217:11

**logical** 210:2

**long** 43:3 47:8 48:11
49:20 50:3,13 51:20
52:3 58:1 59:3 60:24
64:5 71:13 90:21
120:8 122:7 123:5
126:18

**longer** 60:23

**long-term** 79:22

**lost** 154:15 233:10

**lot** 34:23 63:25 69:5
80:11 81:22
123:18,20 124:5,11
129:11 132:20,21
156:3,24 161:14
176:14 195:7 208:13
216:4 222:16,18
224:9

**LP** 102:6

**Lubbock** 147:21

**lunch** 64:17 94:20
95:15

---

M

**MacGregor** 40:4

**machine** 1:19

**machinery** 200:10

**Madison** 49:8

**magna** 72:3

**mailed** 130:24
230:4,12

**Main** 78:2 79:5

**mainland** 115:14

**maintain** 75:5,7

**maintains** 168:24

**major** 39:8 73:2

**majority** 24:25 46:15

malpractice 75:25

man 219:6

managing 79:21

manner 25:22 111:19

Manufacturing 105:20
  106:3

MARC 1:3

March 25:25 44:8
  113:2 131:8 138:10
  147:6 154:13,20,21
  160:15 162:20,25
  163:7 164:18 204:19
  208:23 214:21 221:16

Marcos 71:4,8,11

mark 11:25 35:1

marked 7:5,6,13,17
  8:19,21 9:4,16
  10:5,6,10 12:6 13:13
  15:11,13 34:20
  231:24 232:1

markings 20:21 22:24

marriage 48:15 49:24
  50:6,23 52:25 53:2
  54:2 57:6 68:24,25

married 49:15,16,20
  50:3,20,21 51:1 53:8

Marshall 110:13

massage 46:2,3

materials 175:9

matter 94:11,13
  213:14 215:4

may 5:21,25 6:2,3
  13:1,4 19:9 20:22
  26:14 32:23 33:13
  39:18 45:5,13 46:16
  56:12 77:2 83:4
  94:11 103:15 110:21
  120:3 124:4 125:18
  132:8,12 136:19
  137:21 153:23 155:14
  163:14 169:11 173:15
  188:2 192:7,14
  193:2,12,23 223:2

233:2,3

May/June 127:25

maybe 12:21 81:19
  87:7 91:3 92:23
  113:2 127:4 128:7
  129:16 147:13 148:18
  149:1 179:19 180:7
  193:23 211:12

McBride 50:2,4,8
  53:3,5

McElhinney 79:22
  81:2,6 82:12

McGeehan 19:13 188:13
  189:7,12,25 190:12
  192:4 193:1,19,21
  199:15 201:1 212:25

McGeehan's 177:11
  188:21

McKinney 153:4

mean 38:19 76:11
  83:11 85:24 86:25
  94:24 113:24 120:15
  122:24 124:6,24
  150:14 156:11 160:5
  177:8 179:5 180:24
  182:19 188:11
  194:22,23 197:16,19
  198:22 206:16
  207:20,21
  208:2,17,18 209:17
  210:11,16 215:19
  216:16 219:8 223:9

meaningful 206:5
  221:8,17

means 68:1 227:6

meant 173:9 194:23

media 10:23 31:5
  37:24 85:14,20,24
  93:23,25 187:16
  205:14,17 210:10
  214:20 226:7

meet 61:24 185:3

meets 124:3

Meinecke 154:9

Melanie 38:18

member 74:20 90:21
  91:22,25 92:3

members 39:7 109:4

memo 7:24

mentioned 49:14
  146:21

met 66:15 111:23
  128:9 129:23,24
  156:25

methodologies 174:2

methodology 170:3
  173:2,7,23 209:16

Micki 154:9

middle 72:6 121:11

Midland 148:1

military 69:12

million 38:5 41:4
  130:6 183:21 184:17
  185:2,3 188:24
  192:5,12,14,15 193:7
  195:8 198:10,24
  199:2,7,12,14 200:2
  201:1 202:1,3,7,14
  204:16,18 208:22
  212:2,14,18,23
  213:1,5 218:10,17
  221:18
  225:9,10,24,25
  226:9,12,16,22
  227:16,25 230:21,22

mind 41:9 213:4,15

Minnesota 30:9,11

minor 114:14

minorities 113:25
  114:25

minute 26:25 87:5
  217:12 231:21

minutes 13:17 41:25
  209:25

miscellaneous 44:2

mis-digit 106:1

misreading 163:15

missing 175:3 194:25

Missouri 122:4

misspoke 28:14

mistake 136:23

mistaken 142:21

Mitchell 19:11

mix 84:11 104:19
  107:3

mobile 30:18 32:1
  33:16 37:9,13
  184:10,11,12
  219:2,13,14,20
  220:6,12,15,25

modification
  101:14,16

monetary 63:20 77:4
  115:11 130:4 184:15
  215:17

money 63:14,15 76:24
  104:5 109:6 111:21
  123:22 148:10 179:7
  183:20 184:24 185:2
  186:13 189:8
  191:12,18,21,25
  192:1,7,12 193:4,9
  194:5 195:7,12,13,14
  197:12,16 198:4,16
  199:15,19
  200:7,15,21,25
  201:1,6 203:2,21
  204:5,22 205:24
  210:9,11
  212:10,11,21 213:6
  214:15,19,24
  215:9,10 216:2 217:6
  218:3,7,18 219:7
  220:15 222:16,18
  225:7,8,15,19,20
  228:24 231:2

monies 183:8 184:5
  188:11,14,19

189:3,14
193:2,18,23,25
194:13,14,21
196:10,18,21 197:10
198:5,19,21,23
202:6,20,22 203:8,9
211:24
212:5,7,8,12,22
218:12

Montgomery 147:22

month 44:6

months 197:15

morning 6:16,17

mortgage 100:14,20

motel/hotel 103:24

mother 49:11
  60:11,13,16 61:8,11

mouth 88:1,10

move 87:23 144:18

moved 48:19

moving 118:13

mulligan 126:5,7

mumble 179:12

Mustang 54:10

Mutual 78:19

myriad 173:14

myself 123:4

─────────────
          N
─────────────

N.W 2:10

narrow 127:3,7

Nassau 81:20

Natasha 51:8,9 59:16
  60:9,10

national 79:14 98:6

Natural 78:24

nature 46:22 62:23
  92:9 196:8 228:24

Neches 147:12,21

negative 148:16

neighbors 62:8

neither 55:17

news 43:2

newscasts 223:23

newspaper 223:21

newspapers 85:24
  226:8

nice 163:25 164:3

night 13:21 188:1,3
  204:18

nine 113:6,18
  160:13,23

Ninety-two 60:17,18

Nixon 121:9

nobody 135:10 210:22

Non-Bates 39:13

none 74:2 115:22
  174:5

non-HAVA 228:4

nonprofit 80:18 82:24

nonresponsive 217:16
  225:3

Nope 57:13,15

nor 65:21 144:22
  145:9 236:10,11

normally 208:9

North 187:5

Northern 89:14

Nos 12:6

Notary 235:17 236:3

note 10:17 34:18
  39:14 41:21 165:3
  185:3 195:4,19 228:2

notebook 23:22 24:8
  151:14 156:20

noted 23:6 144:21
  145:8 178:20 235:2

notes 18:14,22
  20:2,4,20 21:20
  36:21 76:24 131:25
  132:2,22 133:7
  209:15

nothing 97:24 98:4
  99:17 101:5 116:14
  152:19 175:2 180:13
  181:16 202:5
  208:21,23,25 209:16
  223:10

notice 4:8 6:2 15:17
  35:19 229:12

notification 38:21

notifications 32:1
  43:10

notified 169:8

notifying 32:12

November 25:24 40:18
  42:23 77:24 138:11
  155:16,21,23,25
  160:16 162:8,19
  231:8

numerous 43:17 156:25

nutshell 185:7

NWB 2:9

_____
          O
_____

Oak 123:15

oath 188:23 235:10

object 5:12 126:19
  190:14 217:16 225:3

objection 5:16

objections 5:21 176:3

obligation 180:4
  193:15,24 194:2
  199:3 226:5 227:5

obtain 32:3 59:24
  62:4 66:25 71:19
  75:5 87:24 141:21
  146:2 171:19

obtained 25:20 32:17

40:1 54:8 56:3
  58:4,17 71:16 78:4
  82:18 88:11

obtaining 109:6

obvious 177:8

obviously 223:20

occasion 122:14

occasionally 63:9
  93:5

occur 223:24

occurred 35:10 38:1
  118:1 144:23 145:11

o'clock 15:18

October 29:21 31:20
  38:1

offend 159:10

offer 87:9 88:8 98:24
  100:24 101:24
  103:5,18 113:22
  116:17 119:18 125:4
  232:24

offered 114:6,9 117:2

offering 87:24 95:10
  100:16 109:8

offhand 139:5

office 24:14 25:8
  28:9 35:18 42:22
  48:9 85:7 93:4 120:6
  125:1 131:9,10 149:5
  163:25 190:24 191:18
  219:19 235:13 236:12

offices 31:25 36:16
  79:15 169:6

official 119:23
  120:1,2,13 189:4

officials 39:2 68:10
  143:20 146:8

oftentimes 178:20

oh 8:22,25 26:22 58:4
  102:4 118:8 128:18
  145:6 150:17 154:1
  167:8 208:18 217:20

219:6

okay 6:22,24
  7:2,6,12,24
  8:3,6,9,20
  9:1,7,9,20
  10:11,14,25
  11:5,16,23,25
  12:4,11,16,19,23
  13:3,7,9
  14:2,4,10,16,25
  15:7,12,16,19,23
  16:6,9,20
  17:5,9,15,21
  18:3,10,12,22,25
  19:3,7,14,18,21,24
  20:1,5,7,9,12,15,17,
  19,25
  21:3,6,11,15,18,20,2
  3,25 22:4,8,11,13
  23:1,5,9,13,15,20
  24:4,7,18,22
  25:2,5,7,11,14,18,21
  26:2,4,8,22
  27:10,18,23
  28:1,6,10,12,15,20
  29:1,9,13,17,19,23,2
  5
  30:4,8,11,15,16,20,2
  3,25 31:6,13,17,23
  32:3,6,14,20,22
  33:1,5,9,14,20
  34:2,6,11,13,16,18,2
  0,24
  35:7,15,16,23,25
  36:2,5,17,25
  37:3,5,8,14,20,22
  38:3,7,11,14,17,20,2
  3,25
  39:4,10,12,18,25
  40:3,10,14,20
  41:5,7,10,15,20
  42:3,8,12
  43:1,5,8,16,19,22
  44:1,9,11,13,18
  45:1,11,16,20
  46:5,20,24
  47:2,16,19,22
  48:2,4,8,11,14,17,22
  ,25

49:2,6,10,12,14,18,20,23
50:1,6,8,11,13,17,20,22,25
51:2,4,7,9,11,13,18,20,24
52:7,11,14,17,19,21,23 53:1,8,11,13,24
54:1,11,14,23,25
55:3,7,10,12,15,20
56:7,10,14,17
57:2,5,10,12,20,24
58:1,4,7,10,12,17,25
59:7,9,14,22
60:2,5,7,10,13,16,22
61:3,6,8,10,13,15,19
62:7,10,14,22,25
63:5,8,12,16,19,24
64:3,5,11,15,18,20,23 65:14,20,25
66:11,25 67:13
68:11,14,20,23
69:2,6,11,14,21
70:3,10,12,25
71:6,8,11,13,16,23,25 72:7,10,20,25
73:17,20,23,25
74:4,7,13,18,25
75:4,14,17,21,24
76:5 77:7,9,15,22,23
78:3,6,14,16
79:4,6,9,11,16,23
80:3,7,13,19,22
81:4,6,15,17,25
82:3,5,11,16,20
83:3,7,9,18 84:1,13
85:3,5,9,11,13,16,20
86:2,4,6,10,12,14,16,19,23
87:3,8,15,17,20,22
88:2,6,10,13,17,20,23,25 89:2,8,22,24
90:8,16,19,21,25
91:4,9,11,15,20,22
92:3,6,8,11,19,25
93:3,7,13,16,19,25
94:3,7,17,19
95:1,9,12,13,21,24
96:2,7,12,17,22

97:10,12,14,21
98:5,11,14,18,24
99:3,8,11,15,18,20,24 100:5,7,15,24
101:2,6,12,17,21
102:4,8,12,17,20
103:2,4,8,12,18,21
104:8,16,19,24
105:2,6,11,16,20,25
106:6,13,15,19
107:1,11,15,21,25
108:4,8,11,15,19,24
109:7,17,21,24
110:2,5,10,14,16,19,22,25 111:2,7,11,25
112:3,7,10,15,19,21,24
113:1,3,10,13,16,19,22 114:2,6,9,20
115:12,17,21
116:4,10,15,21,25
117:5,10,16,21,25
118:3,8,13
119:3,7,11,15,22
120:9,16,21,25
121:3,8,13,18,23
122:7,9,13,18,20,22
123:5,9,16
124:6,13,17,20
125:3,13,18
126:6,17,21
127:6,12,14,16
128:3,11,18,20
129:3,5,15,18,21,24
130:11,15,21
131:1,3,5,11,14,19,22,25 132:13
133:1,4,7,10,13,19,23 134:3,7,11,14,21
135:9 136:9,15
137:2,5,9,15,17
138:16,25
139:3,6,10,13,15,19,24 140:9,19
141:3,6,12,18,25
142:3,5,23
143:2,6,12,15,21
144:1,7,14,17
145:1,6,7,15

146:9,16,19,20
147:2,9,17
148:2,8,16 149:6,12
150:1,10,15,21,25
151:3,9,11,13,20,23
152:4,8,11,14,18,23
153:6,10,19,24
154:3,6,13,19
155:2,4,11,22,24
156:2,15,18
157:2,9,19,24
158:6,10,18,21,25
159:5,8,12,18,20
160:1
161:1,5,9,17,19,22
162:13,16,18,21
163:9,16,19,23
164:4,7,23
165:4,17,20
166:2,6,8,11,14,18
167:1,4,18,24
168:7,12,13
169:13,23 170:18
171:1,4,8,21
172:2,6,12,20
173:4,8,11,16,21
174:1,6,8,9,11,16,25
175:3,12,21
176:5,8,14
177:4,7,10,12,15,21
178:10,17,19
179:5,11,17
180:4,6,14,20,25
181:15,19,24
183:3,13,17,24
184:20,22
185:5,7,10,12,14,16
186:1,9,24 187:22
188:3,9,19
189:1,11,24
190:5,19,23 191:7,20
192:10,20 193:17
194:3,6,8,10,11
195:5,10,18,21,24
196:9,21 197:4,20,24
198:8,14
199:1,14,18,21,24
200:5,20,24
201:4,15,20,24

202:18,21,23,25
203:3,23 204:9,12,24
205:3 206:2
207:1,11,14,24
208:15,20,24
209:2,11,23
210:13,17
211:3,13,22
212:10,17,19
213:11,19,23
214:2,4,22
215:4,6,14,25
216:3,13 217:4,17,21
218:12,16,18,20
219:1,12,15 220:22
221:2,7,19,22
222:3,6,21
223:8,12,15
224:5,8,11,13,18,23
225:5,10,19 226:1,24
227:2,9,11,13,23
228:3,5,7,20
229:4,10,18,21,25
230:8,11,15
231:1,5,12,15,17,22
232:8,10,20 233:5,12

old 50:14 51:2,9
  55:12 58:20,21 60:16

oldest 54:3

Olga 49:19
  57:8,9,10,24
  58:1,7,17 59:5,9

Olga's 59:14

one-page 91:10

ones 17:13,25 18:1
  19:19 35:2 78:18
  96:21 117:24 123:13
  128:24 141:10
  166:9,18 167:2,4
  168:9 173:17

ongoing 78:21,22
  108:22 177:22

online 133:9
  209:13,14

onto 8:23 29:25 53:21

open 31:25 165:14,22

operations 97:7

opine 109:14

opined 97:7

opinion 12:22 13:6
  28:18 46:17 69:15
  70:21 77:9,10
  94:13,14 96:10
  99:1,5 104:15,18
  110:17,24 111:13
  112:1,4 113:7 114:3
  115:9,25 116:23
  118:10 125:11 135:23
  137:10,14 138:17
  139:1,2 140:20 150:7
  157:11 173:1 185:1
  187:3,23 189:6
  191:16 197:9 200:25
  202:19 203:22,23,24
  205:11,18 206:14
  208:6 212:6 214:14
  217:4 218:4,21
  220:14 224:19 226:14

opinions 5:24
  11:6,8,17,21
  12:17,20,21 14:17,21
  15:3,7 19:15 20:13
  23:2,7 28:16 30:13
  45:4 46:12,22 65:9
  69:22 76:8,18
  95:5,10,24 97:15,21
  98:24 99:15
  100:15,24,25
  101:12,24 102:15
  103:4,6,8,18
  104:9,10,11 106:8,15
  107:1,2,11 108:8
  109:7 110:6 111:11
  112:5 113:22 114:6,9
  116:12,13,17
  117:3,7,11,17 119:19
  124:1 125:4 126:12
  133:25 134:4 136:13
  169:13,19,23 170:1
  171:8,9,12 178:1
  182:11 232:15,24

opportunity 135:12

223:22

opposed 42:10 94:22
  115:18 120:12 146:12
  190:8 211:9

ORAL 1:9,13

order 4:11 11:25 12:2
  14:7 32:25 41:1,2
  64:17 73:8 75:5
  96:16 118:10 157:7
  158:7,8,11 159:2
  220:11

organizations 62:23
  74:25 75:12

organized 171:19

original 5:23 137:3
  138:1 150:6,8

originally 59:5 79:19
  150:2 174:16

others 6:4 176:19

outreach 183:9
  196:10,22 198:17
  203:12 217:7 218:22
  219:18 220:4 221:4
  223:13

outstanding 153:18

Overall 217:4

overanalyzing 173:13

owed 98:16

owned 104:1

ownership 103:1
  106:24

─────────────
          P
─────────────

p.m 1:17 233:17

P.O 2:15

page 3:2 4:1 9:10
  10:1,11 15:20 37:6
  39:17 44:14 139:14
  144:14,19 145:4,5
  146:3,16 150:2
  160:12,20 161:20
  165:22 174:9 175:12

178:19 182:9 183:4
197:19 205:13,14
231:5 232:13

**PAGE/LINE** 234:4

**pages** 8:3 30:7 37:9
39:13 43:3,17,18
45:8,10

**paid** 37:24 53:22
204:7

**paper** 25:17 27:6 32:3
33:23 66:7 133:4
176:1 179:25 197:23

**papers** 59:11

**paragraph** 139:18
141:19 144:20 145:2
146:20 150:1 161:20
174:12 176:18 181:19
183:4 215:7,14 221:7
227:15

**paragraphs** 208:19

**paraphernalia** 121:15

**parents** 49:10

**Parker** 83:2

**Parkway** 78:19

**Parsons** 19:13

**partially** 44:4 140:17

**participated** 136:11

**participation** 65:22

**particular** 19:18
21:21 22:2 23:5
29:13 39:21 40:16
43:8 45:17,21 67:3
84:3 95:5 158:7
171:15 176:20,21,23
177:16 186:16 190:9
196:6

**parties** 104:4,5 107:5
132:4 236:11

**partner** 79:21,22 81:3
82:11 129:6

**partnership** 92:15

**partnerships** 82:23

**party** 104:13 105:2
110:3 236:9

**Paso** 78:24 147:12,21

**pass** 73:10,11,12
189:21 193:11

**passed** 160:14

**passes** 168:24

**passing** 189:19

**passport** 51:18
52:4,5,12 53:11,12
54:18 55:5 56:11,24
57:24 58:8,13 60:3
61:8 134:23

**past** 109:11 159:15

**path** 173:24

**patience** 233:7

**pay** 63:14 73:16 82:8
90:11 109:5

**payment** 111:10,21

**PDF** 152:25 153:8,9
165:18,21 175:13,16

**PDFs** 153:14

**Pei** 105:21

**Peninsula** 114:16,25

**people** 26:7 29:6
63:1,2,5 65:2,17
66:5,6,9,22 67:25
68:5,17 69:16,22,25
70:5 72:3 76:24
78:11 107:6 114:15
115:1,2,4,7,13 116:7
121:9,10,11 134:8,10
135:8 142:18 148:25
149:1 156:7 158:3
160:10 166:19
167:5,21 169:8
176:14 187:12,15
188:16 189:18,22
190:5 205:21
209:8,17 210:8,10,23
219:22 220:18 223:14

**per** 87:7 152:2 222:19

**percent** 21:12 148:14
162:9,11 166:7
205:20

**percentage** 104:1
148:12 168:2,3

**percents** 162:14

**perfect** 58:22 210:15

**perform** 84:13,15,19
145:3 173:8 174:2
221:8 225:6

**performance** 66:1
109:11

**performed** 207:8

**performing** 174:3

**perhaps** 189:22

**period** 81:13 222:15

**permit** 143:8

**Perry** 1:6 98:6,23
99:9,15,18

**person** 67:4,11,17,20
131:17 134:15,16,19
152:20 154:10
190:18,23 206:6
210:15 211:15,19
235:11

**personal** 68:8 86:17

**personally** 24:22
65:21 66:14 68:19
235:9

**persons** 80:15

**persuaded** 189:21

**Peters** 45:13 177:9

**petition** 90:14
91:5,10

**petitions** 91:2

**Petteway** 112:11

**Phase** 35:11,14 44:6
184:19

**phone** 2:8

**photo** 4:5 14:1 32:9
39:10,11 42:25 64:13
65:17,23 66:6,10
67:4,8,18,21,25
68:2,6,7,17
69:17,23,25
70:6,9,14,22 130:2
133:16 134:1,5 140:8
142:20 154:2
162:2,10 165:3 166:4
167:2 168:10
173:5,20 183:10
185:24,25 187:15
196:11,23 198:18
199:10,13,20 214:25
219:23 221:11 222:20
223:1 225:23,24,25
226:3,13,17,23
227:10,11,12,19
228:12,16 229:5
230:6

**photographic** 134:24

**phrase** 216:14

**pick** 121:7 122:25
123:1 148:24 207:2

**picture** 148:22 149:8

**piece** 97:4,5,9 134:22
166:25 176:1 179:25
197:23

**pieces** 66:7

**pipe** 171:18

**plain** 224:14

**Plaintiff** 2:7 46:1

**Plaintiffs** 1:4 2:2
5:2,8,11 47:5

**plan** 11:3 38:6 52:20
113:9,24 115:15
171:18 203:20 225:14

**planning** 52:19

**plans** 145:25 205:15

**platform** 121:16

**play** 30:12

**playing** 63:8

**please** 6:18,19 7:9
8:21 10:8 15:14 16:7
17:2 93:1 182:4

**plenty** 144:10

**point** 16:22 77:2,13
105:19 130:15 149:21
155:5,9 159:6 192:25

**pointing** 169:17

**points** 144:15

**pole** 209:13

**policies** 170:14

**political** 61:15 63:9
72:21,22 120:22
121:1 124:15

**poll** 4:12
122:2,3,14,15
206:8,9 207:5 208:11
209:19 211:10

**polling** 66:23 67:16
68:3,6 121:24 135:10

**population** 148:12,14
149:15,17 188:18
222:20

**Port** 103:13,19 105:12

**portion** 38:12 124:12
142:14 146:18 168:18
169:2

**position** 77:19 78:17
80:4,8 90:11 189:12
197:24 203:15

**possession** 146:5,11
181:12

**possibility** 188:1

**possible** 43:11 87:6
150:3

**possibly** 99:1 138:23

**Post** 123:15

**postings** 34:1

**practice** 58:24 59:1
74:8 76:10 77:11
82:22 83:10

85:3,14,21 89:8,11
90:6 92:12 93:4,20
94:5 95:21

**practicing** 80:25
83:24

**practitioner** 82:14,17
169:21

**pre** 36:8

**precinct** 136:23
152:2,3

**pre-cleared** 229:23
230:2

**precluded** 202:2

**predecease** 36:8

**prefer** 76:6

**preferential** 111:10

**preliminary** 107:19
108:6 132:15,16
133:2

**premise** 224:4

**preparation** 45:4

**prepare** 15:25 91:5
132:15

**prepared** 7:2 12:14
13:20 14:2 66:5
76:15 132:16 184:12

**preparing** 19:15 20:13
80:9

**present** 2:19 6:8
11:17 14:13 15:9
141:22,25

**presentations** 75:10

**presented** 12:9 13:16

**preserve** 5:20

**press** 31:5,10,24
32:10 33:3 42:21

**pretty** 59:25 84:5
93:4 104:6 127:3

**prevent** 109:5

**previous** 32:11 49:24

**previously** 146:21,23
218:13

**primaries** 26:1 160:15

**primarily** 17:22 78:8
85:2 90:9 94:14
132:10 177:13
179:1,16,22

**primary** 147:6 162:20
163:1,7 164:20 179:4

**principle** 77:13

**principles** 77:12
170:19 171:5,11
208:3

**print** 44:7 45:6,9,14
85:25 94:1 192:1

**printed** 27:9 30:9
33:4 37:4,15 45:7
46:18 66:2 131:12
150:18 166:3,5

**Printout** 43:2

**prior** 125:3,18,19
126:8 128:11,21
133:13 134:3
136:9,16 137:7,12
138:19 139:8 142:23
157:24 230:9 232:22

**private** 80:15 83:7,8
208:6

**privileged** 84:8

**P-R-L** 151:25

**probably** 29:14 34:25
53:7 69:1 90:23 99:9
113:2 127:22
149:3,25

**problem** 52:22

**problems** 43:4 209:25

**Procedure** 1:21

**procedures** 82:9
170:14 172:21 173:14

**proceed** 173:24 174:6

**proceedings** 236:7

**process** 59:3 72:15,20
123:17,19,22 124:15
139:3,7 220:20

**processes** 77:4 90:13
124:7

**produce** 224:25

**produced** 1:14 4:14
5:7,10,13,16,17,22
6:1 14:14 45:24,25
132:14 216:25 224:25
232:6

**production** 5:4,23 6:6
14:22 216:23

**productions** 5:9

**P-R-O-E-V** 151:22

**profession** 88:19
206:7

**professional** 84:11
93:16,17 189:5
208:11

**program** 14:8 214:12

**programs** 75:1 179:8,9
221:4

**project** 121:13,14

**projected** 113:9

**projection** 191:16

**projects** 193:3

**promise** 189:7 199:8
202:7

**promised** 183:8 186:20
188:11,19 189:3
193:18 194:13,21
199:5 202:22 218:3,7

**promised/budgeted**
215:10

**promote** 93:20 125:22
222:25

**promoted** 231:7

**promoting** 85:14,21
214:20

**promulgated** 170:23

**proper** 48:18 66:6
78:13 221:11

**properly** 134:20

**properties** 104:4

**property** 97:4,5,9
103:1 106:24

**proposal** 9:24 29:5,21
30:2 38:5 41:18
44:5,17 183:22
202:13

**proposals** 196:7,8
206:17

**proposed** 11:3 38:6
44:3 203:20 205:15
225:13

**prosecute** 191:12

**proved** 235:10

**provide** 84:24 94:7
118:18 119:25 124:20
152:24 157:17 158:12
170:6 181:10 189:18
204:20 205:24,25
206:4,22 210:25

**provided** 24:9,10,16
65:16 86:19 119:3
150:11 173:18 178:21
180:16 219:10 233:2

**provides** 77:5 231:7

**provision** 160:24

**provisional**
24:2,4,12,15,17
25:15 26:11
27:7,8,11 38:21
40:13,24 66:3,21
67:1,21,24 68:15
70:8 98:2 117:13
125:5,9,15 130:1,3
132:6,8 135:13
136:16,18,21,25
137:4,6,11
138:2,3,14,18
139:4,8,21,25
140:5,6,7,15,17,21,2
5 141:4,9,13,20,23

142:1,7,13,15
143:9,19 144:16,22
145:9 146:18,22
147:4 149:9,23
150:12,20
151:4,5,6,18,25
152:3,15,18,21,25
153:13,25
154:5,7,11,17
155:8,14 156:21
157:4,12
160:8,14,15,22
161:11,16,23,25
162:1,4,7,10,19
163:11,21 164:6,9,24
165:9,19,21 166:4,20
167:19
168:1,2,18,20,25
169:9,15,19,24
170:2,7,15 171:6,10
172:10 173:3,19
174:4 175:13,16
181:5,11 183:6
227:14

**provisionals** 154:17

**provisions** 1:21

**public** 31:2 32:11
33:12,25 37:12
73:5,8 75:15,19
76:10,17 77:12 83:7
86:24,25 118:24
119:1,4,12 120:13
126:14,25 127:1
158:14,16,19,23
169:25 170:19
171:5,11
172:3,8,14,22
173:8,22 174:4 186:3
188:20 189:5 201:17
205:7 207:3 222:12
226:23,25 228:15
235:17 236:3

**publications** 172:7

**publicly** 216:23

**published** 46:21 72:11
75:9,14 92:6 95:24
96:10 118:10 163:19

173:7,13 174:2

**pull** 47:14

**purchase** 4:11 12:2
14:7 41:1,2

**purpose** 198:17

**purposes** 235:12

**pursuant** 1:20 16:4
99:4 104:12 111:17
185:19 186:5 197:2
200:8 206:23

**pursue** 159:6

_____

Q

**qualifications** 204:12
211:9

**qualified** 62:4 204:20
211:18

**qualifies** 114:21

**qualify** 65:4 66:12

**Quality** 111:2,14,20

**quantified** 204:15

**quantify** 228:23

**quantities** 140:25

**quasi** 99:5

**quasi-governmental**
80:17,19

**question** 18:18 20:19
64:6 66:8 69:24
76:16 94:10 118:22
120:21 125:23,24
126:17 127:7 151:8
159:14 167:7 172:17
186:11 189:2 190:15
193:19 203:15 207:18
216:3 220:22 222:22
224:4

**questioning** 20:23

**questions** 6:15 126:1
156:14 233:9,13

**quicker** 144:19

**quickly** 52:1 88:18

174:6

**quite** 153:11

_____

R

**radio** 93:25

**Ramirez** 108:12 109:3
110:4 128:14,16,22

**ran** 159:7

**random** 209:17

**range** 130:7

**Ransom** 1:10,13 3:5
4:9 5:3 6:12,21
234:2 235:1,5,9
236:4

**R-A-N-S-O-M** 6:21

**rate** 173:3,20

**rather** 213:7

**ratio** 160:15 161:6

**rationale** 169:1

**rcornish@pdq.net**
86:15

**re** 96:23 103:13

**reach** 137:16,17
140:11,20 169:13,23
205:9 208:6

**reached** 169:18

**reaching** 171:8,12

**readily** 158:13

**reading** 17:7 126:4
131:13,16 132:3
133:10 216:7

**reads** 215:14

**real** 47:8 72:2 138:2

**realize** 113:8

**really** 36:21 57:15
62:18 64:9 101:23
109:19 123:25 133:11
138:21 145:22 156:8
167:7,15 170:1
186:17,24 203:23

204:4 214:24 225:1
226:3

**reason** 9:5 44:15
58:17 234:4

**reasonable**
134:14,15,18,21
135:1,24,25 136:3,4
199:8,9 201:19

**reasons** 163:11

**Rebecca** 19:11

**recall** 9:16 14:24
19:20 20:14 32:19
46:23 78:17 81:17
83:22 94:11 96:21
98:11 100:16
101:1,12
102:9,12,14,15 103:6
104:25 106:8 107:25
108:2,3 117:24
120:19 128:3,8,23
129:17,21 130:14
139:9 146:6,8 148:5
150:14 152:11 153:4
180:13

**receive** 148:16 174:20

**received** 24:5 59:12
80:5 130:15 148:3
161:10 174:13 175:7

**recently** 58:4

**recess** 95:15

**reciprocity** 74:10

**recognition** 225:25

**recognize** 7:8 10:7

**recognized** 169:21

**recollection** 97:2,9
98:22 100:2 102:16
103:3 105:4,10 106:5
108:6 109:18 129:10
131:21 148:13

**record** 1:21 5:4,20
7:9,12 12:5 14:5
15:14 16:7,15 17:18
19:4 26:24 27:1,3

41:12 42:18,20 64:25
93:1 95:14,17 169:2
182:4,7 231:21
233:10

**recordkeeping** 171:25

**records** 53:16 68:25
111:20 143:17,22
144:5,8,10,13 167:21
190:20

**recoupment** 107:8

**recourse** 190:8

**Red** 49:7

**redacted** 161:15,25

**redistrict** 113:17

**redistricting** 113:14

**reduce** 113:5

**reduced** 236:6

**reducing** 114:13

**re-education** 179:7

**Reese** 105:1

**refer** 26:14 27:14
139:14 231:5

**referenced** 14:12

**referrals** 88:8

**referred** 190:8

**referring** 12:13 41:13
87:18 178:24
179:17,21 180:11
194:15,25 195:12
196:1,4 198:23
199:15 214:5 217:2
218:13

**refers** 175:13

**reflect** 233:10

**reflected** 212:1

**regarding** 5:4 221:11

**registered** 230:5

**registering** 201:11

**registrar** 166:12

**registration** 209:20
217:7 218:23 220:5
229:12,14,15 230:4

**regular** 62:25 63:1,2
236:9,10

**regularly** 64:4

**regulate** 124:1

**regulating** 123:24

**regulations** 123:25

**reimbursement** 107:8

**rejected** 155:1,3
162:7,10,19 163:11
164:13,15,16,22,24
165:1,12,16,25
166:4,9,19
167:2,4,20 168:2

**rejection** 173:20

**relate** 17:22 27:9
28:10 30:20 33:6
44:9 97:16 99:16
101:3 102:18 103:10
105:13 106:16 107:12
108:9 110:7 112:4
116:11,12 139:25
154:5 170:25 171:2
172:8 211:21

**related** 8:10
10:15,19,22 31:24
33:14 36:22 39:10
40:17 43:11 98:2,16
104:9 105:17 117:12
133:16 139:21 140:8
141:10 147:4 152:16
154:2 160:14 165:10
173:5,19 183:5,7
185:25 188:10
194:12,20 196:22
203:7,11 229:5

**relates** 30:21 31:9
33:7 43:9 70:7 110:6
222:13

**relating** 11:20,21
13:25 14:8 30:17
31:3 35:18 37:25
39:2,11,14 41:23

42:1,23 97:17 157:17
184:16

**relations** 8:12 36:7

**relatively** 152:1

**release** 31:5 33:3
42:21

**releases** 31:24 32:10

**relevant** 27:20 166:25
210:7,14 211:1 219:8

**relied** 15:24

**relieve** 226:4

**rely** 19:14,17,19
20:12 27:22 33:23
101:17

**relying** 76:17

**remaining** 230:17

**remains** 230:16

**remember** 32:5 89:19
107:9,18 120:4,5,7
128:25 129:2 225:13
229:15

**Remind** 83:1

**renew** 52:19

**renewable** 231:2

**renewed** 52:10 161:9
231:3

**rent** 48:21

**replies** 24:21

**report** 4:3 6:5
7:2,11,13,15 8:17
9:6,9,18,21
11:11,12,14 12:14,24
13:20,24 14:13,22
15:8 23:6 35:12
38:13,15 43:24,25
44:24,25 45:9 76:15
77:14,16 96:14 99:22
100:5 102:3,10
107:19 108:4,7
109:23 111:23,24
114:7,10 121:17
132:13,16,17,22,25

133:3,8 139:13
146:3,17 160:12
162:6 168:18
174:7,10 178:9,15
182:9,15 184:4
196:14 197:5 198:13
201:25 205:20
206:19,22,23 209:3
212:13 215:8
216:6,9,17 217:1
226:2,15 230:19
231:5,6,13

**reported** 1:18 160:7

**Reporter** 2:20 236:3

**Reporter's** 3:9

**reporting** 120:15
149:22

**reports** 5:7,10,14,17
19:15 46:24
47:17,22,24 132:15

**represent** 229:22

**representation** 189:23
198:20

**representations** 68:9

**representative** 149:7

**representatives** 39:7
133:25

**represented** 82:21
83:9,13 93:7,10
148:12 198:3

**republican** 25:25
123:3,4,6 164:19,21

**request** 5:23 9:24
15:20,23 16:4,10,16
24:20 29:4 30:2 34:9
41:11,18 143:11
158:15,17,20 183:22
206:20

**requested** 143:14
157:5 233:18

**requested............
.............234**
3:8

**requesting** 24:15 31:4

**requests** 196:7

**require** 143:8

**required** 35:19 42:25
62:19 72:25 73:1,14
115:8 140:6 185:20
225:11 230:7

**requirement** 70:8
130:2 227:19

**requirements** 39:14,15
64:13 228:16
229:6,12

**research** 46:2
125:12,15 138:23
139:6 224:14

**reserve** 6:5 177:25
233:12

**reside** 48:6

**resided** 48:11

**residence** 48:14

**residents** 43:11

**resource**
190:3,13,18,21
192:25 193:21 199:5

**resources** 222:7

**respect** 46:10 67:24
69:22 70:5,20
74:1,21 75:11,25
86:20 87:24 88:3,15
92:19 96:18 97:24
99:6 105:12 113:23
114:21 116:17
117:7,12,18,19 124:8
125:5,15,20
126:13,14,25 127:1
134:1,4 140:4
142:1,24 149:9 151:3
152:14 153:12 155:5
157:4 165:7 167:4,25
169:15,24 171:9
172:9 174:3 175:6
180:20 181:11 190:5
192:23 195:10 200:14
201:6 211:24 212:22

213:4 218:6 222:12
232:12,21

**responded** 160:13

**respondents** 205:21

**response** 7:14 41:11
148:3,6,7,17 154:9
183:25 191:3 196:2
197:22 228:9

**responses** 34:8 149:19
176:3

**responsibility** 36:23

**rest** 25:19 49:8 174:7
177:13

**result** 65:21 66:16
146:23 170:13,14

**results** 40:12 149:25
205:25 214:1,20
222:9,12 223:3,17
225:6

**retained** 6:25 104:24
110:2,4 116:17
118:18 119:18,25
125:3 133:7 136:10
139:20 140:4 142:23
145:16,24 183:5,15
186:12

**return** 111:9

**returns** 80:9 123:21

**reverse** 42:16

**review** 24:1 46:18,20
65:10 84:25 106:10
125:4 137:5 139:7,20
140:4,10 143:2,15,16
145:16,24,25 169:19
178:13 183:5 203:6
206:4,13 219:17
223:20,23 226:21
231:6

**reviewed** 17:16,23
18:1,2 23:3 27:21
28:17 45:3 46:16,24
47:16,22,24 114:4
165:5 181:21 182:10

**reviewing** 104:2 131:6
143:6 146:9,10 228:8

**revision** 133:3

**revisions** 133:9

**Reynolds** 81:7

**Rica** 56:13

**Rich** 2:8 181:25 182:1
233:8,9

**Richard** 19:13

**RICK** 1:6

**rights** 2:9 93:8,11
97:24 110:19,25
112:7,8 113:20,23,25
116:18 117:2

**Rocky** 101:7

**Rodriguez** 107:16

**role** 95:9 128:9

**rolls** 136:20,24

**RONALD** 2:14

**ronny.keister@oag.sta
te.tx.us** 2:17

**Room** 2:9

**rotated** 78:24

**round** 63:12

**Rowe** 155:13

**R-O-W-E** 155:13

**rows** 165:24

**rules** 1:20 109:15
170:23

**run** 121:7 164:9,12

**runoff** 163:3,4,5

---

S

**sadly** 142:21

**Safety** 31:2 32:11
33:12,25 37:12
118:24 119:1,5,13

**Sager** 19:13 21:17

**Salazar** 19:12

**San** 71:4,8,11

**sat** 201:25

**Saturdays** 31:25

**savings** 113:8,10,11
114:12,14

**saw** 11:20 13:18,20,21
66:7,9 188:1,3
205:22 206:25

**SB14** 28:5 36:24 39:14
42:2 61:25 64:8,13
65:7,12,18,23 66:17
68:18 69:17 70:23
98:3 130:2 135:10
136:17 137:7,11,12
138:19,20 139:4,8
140:22 141:10,15
142:14 152:16 157:14
160:8 161:12 162:4,5
164:24 165:10 168:3
169:2,3 193:9 202:3
227:10 228:16 229:13
230:6

**scanned** 7:10 47:25
152:24 167:2

**scenario** 190:4

**scheme** 226:18

**schmoozing** 156:6

**school** 49:4,5,9 51:25
70:25 71:2 72:1
77:20,24 83:5,6,8
88:21 108:13 109:16
121:2,4,13,14

**schools** 49:6

**science** 72:22

**scope** 130:18
138:21,22

**score** 73:10

**Scott** 2:3 5:1 28:21
40:24 129:11,14
130:16

**scott@brazilanddunn.c**

om 2:5

**Scott's** 131:9

**script** 30:17

**Seabrook** 81:20

**seal** 235:13 236:12

**search** 46:3

**searches** 177:14

**sec** 154:16

**second** 26:23 34:7
51:5 76:12 98:5
139:24 148:10 150:1
181:23 184:18 204:10
209:13 212:4 213:19
215:9

**Secretary** 4:10 14:7
28:9 32:7,8,12 35:18
37:23,24 39:5 42:22
118:16,19 119:12
143:8,10,21 144:3,12
145:18,20 146:5,7,12
188:14 189:13 190:24
191:24 192:6 193:8
194:5 195:6 199:4
203:2 215:24 219:19
220:10,23 221:3
222:8,10,24
223:24,25 224:2,15
230:13

**section** 2:9 18:8
144:16 157:21 158:1

**seems** 13:23 114:22

**seen** 12:13,24
14:14,21 55:2
195:21,22
196:9,16,21
197:5,8,21,22,23
202:17 206:10 213:1
232:22

**segregate** 84:7

**select** 31:24

**selected** 45:8

**semi-governmental**
80:16

**senate** 133:24
193:2,7,16,22 230:20

**send** 43:10 84:10,11
91:6

**sense** 9:20 104:12
110:12 131:17 186:6

**sent** 25:3 131:9
158:19 174:22 182:1
229:11

**sentence** 139:25
144:19 145:1,8
152:23 215:7,19
222:6 227:13

**separate** 86:8 87:4
94:9

**separately** 84:10,21

**September** 30:18
31:21,22 35:22 38:1
48:24 178:4

**series** 8:9

**servant** 120:13

**serve** 117:22

**served** 86:23 96:19

**services** 84:11,19,24
86:20 87:9,25 88:3,7
94:7 118:19 119:4
120:1 121:1
124:21,24 207:7

**session** 190:6

**setting** 125:16 130:12
205:13

**settled** 105:9

**settlement** 105:5

**seven** 55:13 59:13
81:10 160:17 161:3
169:7

**seventeen** 147:2,9
150:21

**seventh** 103:12

**several** 5:8

**severely** 170:16

**Seville** 79:13,24 81:1

**Shank** 50:21 54:24,25

**Sharon** 155:13

**Shaun** 105:21

**Shaw** 21:24

**sheet** 8:13 204:18

**sheets** 41:24

**shepherd** 124:14

**she's** 50:15 51:1
55:24 56:16 58:4
59:10,11,17,20,21
61:9,18 154:9 190:21

**short** 64:6 168:14
202:7

**shorthand** 1:19 236:2

**shortly** 81:2 165:6
178:11

**showed** 150:19 152:2
223:14

**showing** 174:19

**shows** 30:11 37:12
59:10 222:16

**sign** 66:22

**signature** 3:8 44:14
233:18 234:1 235:1

**signed** 107:5 203:19

**significance** 81:19
148:23 176:21

**significant** 80:11
124:12 140:25 142:14
148:12 162:1 169:2
187:15 225:7,8

**significantly** 170:10
232:18

**similar** 39:3
43:4,11,14

**simple** 36:12 76:16

**simply** 172:23 173:10
186:12 189:6 190:25
191:15 195:15 211:7

**sir**
  7:1,4,7,11,18,21,23,
  25 8:2,14 9:8,13,15
  10:13 12:18 13:11,19
  15:5,12,15 16:2,5
  18:24 19:2,17,20,25
  20:4,11 21:14
  22:3,10,25 23:8
  25:10 27:12,25 30:14
  33:17 34:19 37:19,21
  38:10 39:11,19 44:22
  46:9 47:3,18,21
  49:5,17 52:13
  53:10,14 55:24 62:1
  64:4,14 65:19 66:24
  67:2 69:13,20
  72:18,19 73:22,24
  74:6,19 75:13,23
  76:1 79:8 80:2,6
  84:22 85:15,23
  86:18,22 88:5,9,16
  89:1,4,7,10,13,16,18
  90:2,18 91:24
  92:2,5,7,10,14
  93:9,12,15,18,22,24
  94:2,6 95:8,20
  96:1,21 98:13
  99:7,19,21,23
  100:4,6 101:11
  102:19 103:11 104:23
  105:15 108:2,10
  110:1,9 111:1 112:9
  114:8 116:9,14
  117:9,15,20
  118:12,17,21,25
  119:2,6,14,17,21,24
  122:17 123:4
  124:16,19,23 125:2,8
  126:10,16,20 130:20
  131:24 133:18 134:2
  137:8 139:5,12
  142:4,11 143:5 147:8
  150:5 152:22 155:19
  158:24 159:19,25
  161:21 166:13 167:23
  169:22 170:22 171:7
  172:5 174:18
  175:11,20 176:11,13
  178:16 179:16

183:2,12,16 190:4
  200:12 215:13
  217:3,24 218:1,11
  220:8 221:6 224:17
  228:19 233:16

**sit** 14:25 15:2,7
  65:20 73:13 106:7
  128:2 138:16,25
  153:24 169:11
  178:5,16 186:1
  187:22,25 197:11
  214:23 233:3

**sitting** 197:1

**situation** 107:8

**six** 59:13 135:20
  142:16 167:8 196:17
  198:10 227:25

**sixteen** 51:22 54:13
  56:5 60:1

**Skagerberg**
  100:8,16,25 101:2

**slandering** 95:3

**Slaughter** 236:19

**small** 80:11 85:4
  92:16,22 141:21

**smaller** 79:14 81:22
  149:7,8,10 160:9

**smart** 72:3

**Smith** 50:24 51:1
  56:19,21

**social** 62:23 63:11,17
  85:13 93:23 187:16
  205:14 210:10 214:20
  215:22

**Society** 74:22

**softer** 222:5

**sole** 82:14,16

**solo** 82:22 83:10

**Solutions** 236:18

**somebody** 121:7 134:22
  136:4 179:23 180:8
  182:1

**somehow** 151:16 189:20
  193:3,24

**someone** 25:7 176:23
  180:3 208:10

**sometime** 127:25 132:8

**somewhat** 11:21 101:20
  135:15 140:24

**somewhere** 9:4 68:2
  130:7 148:13 152:12
  159:15 163:22 195:11

**sorry** 8:24 18:6,19
  26:22 28:13 33:17
  36:3 43:21 113:12
  145:13 154:15 179:12
  194:18

**sounds** 52:23 61:19

**source** 216:22 227:25

**south** 50:18 123:15

**southern** 1:1 74:11
  89:9 108:16 111:4

**Southwest** 71:4

**Spanish** 35:19

**sparse** 178:22
  180:15,16,24 181:2,4

**speak** 72:4

**speaker** 2:8

**speaking** 53:2 92:12
  94:21 192:20,21

**specialties** 74:2 89:6

**specialty** 73:25 88:14

**specific** 24:19 46:1
  48:8 77:2,9,13 98:4
  99:17 101:5 109:13
  116:14 130:7 136:13
  138:22 171:10
  173:17,18 180:13,15
  182:21 192:21,23
  196:3 200:18

**specifically** 12:24
  13:5 14:6 17:25
  19:17 46:11 66:3
  76:13 103:6 105:19

107:9 120:4 124:6
128:24 140:3 146:17
170:21,25 178:24
183:18 201:2,3
205:1,3 206:19

**speculation** 214:18

**spell** 19:9 22:16

**spelled** 6:20 22:17

**spend** 76:24 149:23
179:2,3 184:24
185:20 186:18,20,21
188:16,17,24 189:14
192:6,13
193:9,10,15,25
195:14 199:4,6,8,9
217:6 218:3,7 219:7
221:18 230:21

**spending** 104:6 126:24
130:4,6 179:1
180:19,20 181:1,8
185:22 186:21 194:5
201:20 202:19
203:2,11 205:12,19
211:19 221:10 232:16

**spends** 186:4

**spent** 130:9,10
179:1,7,23
180:3,5,8,9,22,23
183:8,20 184:6
185:9,13,15,18,19,24
186:13,15
187:2,3,4,5,7,9,10
189:8 194:13,22,24
195:13 196:6,24
197:2,10,12,16
198:6,11,22
199:12,19 201:2,6
202:1,6,20
203:8,9,10,21
204:2,5,22 205:12,24
210:11 212:5,8,19,21
213:6,8,9,15,18
214:19,24 215:10,21
222:7,16,18
225:16,19,20
226:10,13,17
227:11,12,18 228:24

232:18

**spot** 221:23

**spreadsheets** 76:24

**stack** 23:16 40:24
118:13

**staff** 77:25 78:3,6,15
79:23

**stamp** 27:18,19 28:4
29:9,10 30:4,19
31:7,8,12,15,16,18,1
9,20,21,22 32:15
35:23 37:4,14,15
38:9,10,23 39:1,25
41:1 42:22 43:3,19

**stamped** 10:2 39:13

**Stan** 166:11

**Stanart** 166:12

**stand** 122:5

**standard** 170:24
185:20 186:2,5

**standardized** 170:3

**standards** 39:3 76:10
77:11 95:6,7 111:23
169:14,16,20
170:10,19 171:5,11
205:7

**standing** 194:4

**standpoint** 78:15
92:13 114:19 123:23
169:10 226:9

**stapled** 34:5

**start** 17:13 65:5
96:22 131:16 138:13
165:25

**started** 29:20 36:13
131:7,13 132:7,9,12
137:20,21 145:24

**starting** 179:12
233:11

**starts** 29:11 35:17
43:20 47:8,13 145:2

**state** 1:18 4:10

5:4,24 6:18 13:25
14:5,7 24:3 30:3
32:8,12 34:9
37:23,24 39:6 41:2
45:24 71:4 74:15,16
75:1,19 83:20
89:2,20 90:3 93:14
95:19 117:8
118:16,20
119:8,11,12 123:25
124:25 125:21
126:13,24 130:4
133:17 139:16,22
140:19,22 141:19
142:7,17,21
143:8,10,21
144:3,12,20
145:2,7,18,20
146:5,7,12,21
150:2,10 160:13
168:24 170:5
177:21,23 178:20,21
180:17 181:10,15
182:9 183:6,10,21
184:6,24 185:23
186:4,13 187:3
188:14,15 189:13
191:24 192:6 193:8
194:5 195:7 199:4,12
200:3 201:20,21
203:2 204:8 205:12
206:20 207:25 209:20
213:9 214:19 215:24
217:5
218:2,3,4,6,20,21
219:9,10,19 220:3,10
221:3,8 222:7,8
223:24,25
224:2,12,16 225:5,6
227:15,18 228:14
230:13,16 235:7,18
236:1,3

**stated** 1:21 236:3

**statement** 52:2 67:14
116:9 182:19 189:10
191:19 192:9,17
207:12 217:23 218:24
219:12 220:3

221:12,21,25 222:1
227:20 228:3,7

**states** 74:5,8,9
185:20,23 186:22
200:5,6,9,14 232:13

**state's** 117:18

**States** 74:11 92:3
108:15

**State's** 28:9 35:18
42:22 190:24 220:23
222:11,24 224:15

**STATES** 1:1 2:7

**statewide**
141:4,5,14,20 142:7
143:9 146:25 157:13
228:15

**stating** 189:6

**station** 32:1 59:17

**stations** 33:16 37:10
184:12

**statistical** 223:16

**statistics** 30:10,12

**statute** 169:1
228:20,23 229:1

**statutes** 97:19

**statutory** 143:7

**stay** 213:25

**stayed** 71:8

**Steen** 39:6

**stepdaughter** 51:6
59:15

**Stephenson** 40:5

**steps** 135:2

**Steven** 22:15

**stopped** 80:24 149:19

**strategy** 109:4

**Street** 2:10

**strictly** 88:10 168:3

**string** 4:7 33:18

35:16 36:8,12,19

**strip** 103:24

**studied** 58:23 142:24
144:2

**studies** 172:2,7

**studying** 59:2

**stuff** 43:14 58:25
69:5 92:21 122:5
177:14 208:13,17
210:4,10 229:17

**subject** 189:19

**submission** 41:8

**submit** 29:5 44:16

**submitted** 41:17
183:22

**subscribed** 235:11

**sue** 194:5

**sued** 75:24

**sufficiency** 204:1
208:6 213:20
214:5,11

**sufficient** 185:3
187:20,23 188:18
205:9 213:25 217:6
222:23

**Sugar** 48:7,9,11 49:13
85:8,10

**suggest** 203:15

**Suite** 1:19 2:4 85:10
236:19

**sum** 198:22

**summa** 72:4

**summarize** 211:23

**summary** 27:23

**supplement** 6:5 178:15

**supplemented** 14:17

**support** 12:25 13:1
217:8 224:20,21
236:18

**supporting** 91:6

**supposed** 206:21

**Supreme** 92:4

**sure** 5:11,15,20 7:16
22:22 34:21 37:9
42:15 51:15 53:17
54:7,19 57:11,25
76:14 118:6 122:19
124:1 128:2 164:2
182:18 208:4 227:22

**surprise** 190:19
197:18

**surprised** 144:1,12

**surrounding** 94:16
144:13 169:3

**survey-type** 211:11

**suspect** 209:10

**switch** 88:17

**sworn** 1:15 6:13 236:6

**system** 72:21

**systematic** 149:22
170:3

**systems** 36:15 78:12

---

T

**tab** 24:19 25:16

**table** 26:14 27:13
28:2 32:21 182:16,25

**tabs** 24:13

**tabulate** 170:6

**Tagt** 102:6

**taking** 58:24 59:2
201:21 236:8

**talk** 32:23 48:2 53:25
76:12 78:11 96:12
128:2 146:17 153:10
197:4 209:6

**talked** 41:25 45:2
118:9 131:23 178:6
196:13 217:9,23
232:21,25

talking 65:2 66:22
  80:1 120:4 129:21
  144:15 146:2 149:4
  165:8 179:6,23 188:4
  189:14 201:1
  212:11,12,24
  213:20,23 214:8
  215:20 232:5

Tamara 1:17 2:20
  236:2,18

tangible 15:24

Tank 79:2

Tarrant 147:12,24

Taurus 105:11,20
  106:2

tax 80:9 89:23
  90:11,14,22 91:1,7

taxpayer 90:13

tea 131:16

teach 58:21

technical 111:17

technically 111:17

Tecum 4:9

telephone 129:22,23

television 85:25 94:1

Telfair 49:13

ten 63:7 118:1 125:25

tend 88:14

Tendering 31:14 39:19
  42:6

term 48:18 188:20
  189:14 190:3 195:16

terminology 189:5

terms 116:6 192:20

terror 55:16

Terry 112:11

test 58:24 59:2
  164:10

testified 6:13 109:25
  112:24 146:24 166:16

188:14 190:13 203:25
  211:25 212:5,22
  213:3 232:14

testifies 132:23
  193:1

testify 99:18,25
  117:11 157:9 190:5
  202:12,15 213:24
  216:18 236:6

testifying 76:14
  101:3 116:4
  189:17,25 190:13,25
  192:4

testimony 6:3 15:25
  20:16 21:1,7,17,24
  22:5 23:11 102:3
  112:13 114:10,20,21
  157:15 167:24 179:18
  188:13,22 189:7,15
  192:21,23 193:22
  198:10,15 200:16
  201:5 215:16 230:19
  233:6

Texas 1:1,18,20
  2:4,16 4:10,12 5:5
  10:2 13:25 24:3
  27:17 28:4,9,24
  30:3,19 31:2
  33:12,25 34:9,17
  35:17,18 36:1,3,18
  37:11,23 38:18,24
  39:1,5 40:5,7
  41:1,2,16,18,22
  42:23 43:20 44:15,16
  45:25 48:7 58:23
  59:19 69:16,22 70:6
  71:4 72:16 74:5,22
  75:19 85:8 88:25
  89:3,9,12,14,24
  93:14 96:4 111:4
  117:8 118:20,22
  119:1,4,8,16,19,20
  123:11,17,19 124:2
  125:6 127:13 130:4
  133:17,21 136:12
  139:22 140:20,22
  141:19

142:7,17,22,25
  143:3,6 145:3 147:3
  148:13,14 157:21
  158:1 168:24
  183:7,10,21 184:6
  185:23 188:15
  199:9,12,13 200:3
  204:8 205:12
  206:9,20 208:1
  209:20 210:22 214:19
  215:23 217:5 220:21
  221:8 222:8 223:19
  232:16 236:1,3,19

texts 46:21

Thank 6:11,24 10:14
  11:5 21:23 22:4
  29:25 30:8,25 32:6
  33:9 36:2,17,25
  39:12 41:5 44:1
  126:23 194:6
  233:7,16

Thanks 42:7 233:15

that's 7:12 8:5
  9:5,17 10:9,24 11:12
  14:15 20:8 21:7,19
  22:22,23 25:17 26:12
  29:8,17 34:4,17,18
  36:18 37:20 39:8,24
  41:14 44:17,22 47:8
  53:4 54:4,16 57:5
  58:6,10 59:18 62:19
  63:14,17,20 66:19
  67:7,11,14 69:24
  70:15,24 73:3 77:21
  79:25 81:8,18 82:13
  83:25 84:2,17 85:2
  87:5,19 92:17,24
  93:6 95:4 97:9,23
  98:1 100:2 105:10
  106:1,11 107:16,23
  108:15 109:9,18,23
  111:3 116:9 121:22
  123:21 127:3,7 129:7
  134:10 135:7,23
  141:7 143:25 145:14
  147:17 149:1 151:7
  154:10 155:4,25
  156:3,9,13 160:21

161:2 164:15
167:6,14 171:19
173:23 175:5 176:7
179:22 182:18 186:17
188:18,20,21,25
189:13 190:9 194:6
195:1 197:4,13,14
198:9,13,19 201:9,15
202:8 204:2,17
207:12 208:5
210:11,24 211:13
213:13,17 215:11
220:22 223:8 224:19
225:4 226:14
228:1,2,3,7,8,20
229:9 231:1 232:2,11

**themselves** 134:24
168:9

**theory** 134:6,7

**thereafter** 81:2

**therefore** 215:8

**therein** 182:12 201:13
235:12

**there's** 22:1 26:5
34:23,25 39:25 44:2
47:13 72:4,5 96:13
127:4 144:10 149:22
162:24,25 163:20,22
164:10,20
165:2,13,15 170:3
180:11 186:2 188:1
194:1 209:15,16,19
210:20 212:16 216:17
218:12 223:7,10,16
224:24 233:3

**they'll** 150:17

**they're** 16:8 27:6
36:6 67:5 78:19
101:23 110:13 114:24
123:24 126:2 135:14
143:24 158:4 162:16
164:20 166:5 174:24
190:6,7 198:3 219:8

**they've** 55:11 86:8
160:7

**thick** 231:16

**third** 100:7 148:11

**thirty** 51:3 55:23,24

**thirty-five** 50:16

**Thom** 1:10,13 3:5
6:12,20 234:2
235:1,5,9 236:4

**T-H-O-M** 6:21

**Thomas** 19:13 21:17

**thousand** 18:9 28:8,13
29:18 155:17

**threshold** 135:24

**timeline** 44:3,4
179:22

**title** 37:24

**titled** 43:24

**TKO** 7:24 9:21 205:16

**to/froms** 104:5

**today** 6:2 11:7
14:21,25 15:2,7,18
16:16,24 19:5 33:23
44:21 45:2 46:12
52:17 65:20 73:23
83:24 97:16 99:16
101:4 102:18 103:10
105:14,18 106:16
107:13 108:9 110:8
112:5 116:16
117:6,14 127:17
131:23 138:16,25
153:24 166:15
175:10,18 176:9
182:17 186:1 187:22
196:13 197:11 216:25
217:9 230:9,15
232:6,25

**Tom** 79:22

**top** 96:22 160:20
178:19

**total** 16:18 17:25
39:17 69:18,24
154:14,17 162:18
163:10,21 164:15

181:4 198:22

**totaled** 166:7

**totally** 202:8 231:11

**touched** 44:20

**towards** 88:14

**track** 156:12 206:24
207:6

**tracking** 4:12 206:8,9
207:5 211:11

**tracking-type** 13:23

**Tracy** 102:5

**traditional** 85:20,24
93:25

**training** 170:12

**transactions** 77:4
78:8 171:3 215:17
216:22

**transcript** 10:25
21:21 22:2,9,24
236:7

**transcripts** 20:2,20
23:1 177:24 178:14
232:9

**transferred** 59:21

**travels** 223:25

**Travis** 1:19 15:18
106:25 128:24 147:25

**treatise** 75:10

**treatises** 46:21 75:15
92:9

**trial** 5:22 20:16
21:1,7,17,24 22:5
105:7 112:13,17,18
114:10 130:5 131:8
157:10,11 215:16
216:18 233:13

**tricks** 58:21

**tried** 44:7 112:21
156:25 205:8 207:6

**trier** 214:23

**trip** 57:1

**trips** 223:3,21

**true** 52:2 67:14
100:23 192:18 217:20
235:2 236:4,7

**truly** 226:11

**Trust** 98:7

**trustee** 111:8,22

**trusts** 85:2 92:16

**truth** 236:6

**try** 23:4 36:11 69:15
84:10 86:8 96:16
124:14 131:17 139:7
144:18 164:1 166:19
171:18 173:12 178:14
186:10 211:21,23

**trying** 23:10 87:4
90:10 95:2 115:24
123:23 144:15 148:18
168:9 193:17 194:7
206:15 207:2 208:7
211:13 221:22

**turn** 15:19 42:13
97:3,8 146:16 174:9

**turned** 54:12 118:6
123:8

**turning** 183:3 231:18

**TV** 224:10

**Tweet** 33:18 85:16,17
205:22

**Tweeted** 33:18 205:21

**Tweeters** 187:10

**Tweeting** 187:13
205:13 210:8,22,23
215:21 226:5

**Tweets** 28:9,10,15
33:11,14

**twenty** 50:5 51:10

**Twice** 87:7

**two-page** 30:2 41:6

**two-part** 186:17

**two-year** 222:15

**tying** 193:18

**type** 20:21 36:19
45:21 59:9 70:4
72:12 77:8 78:16
80:3 81:12,25 82:21
83:6 84:13,15,23
85:13,25 87:8 88:2,7
92:19,21,22 93:23
96:2 98:9,14
100:12,15 101:12
102:12,15 103:4,18
106:2 107:25 109:2,7
114:20 119:13 120:7
122:5 124:21 125:1
129:24 138:1 145:17
146:11 172:8 177:19
179:14 180:21 191:13
193:14 200:21 204:10
223:24 231:9,10

**types** 157:1

**typewriting** 236:6,7

**typical** 74:22 206:6,7
207:3

------

U

**U.S** 2:8 58:13 59:7,10

**Uh-huh** 13:15 23:12,19
56:20 58:9 102:22
122:12 139:23 190:11
212:3 216:5

**Ukraine** 59:6

**ultimate** 94:13 214:14

**ultimately** 150:3
191:20

**unable** 142:18 157:20
171:25

**undergraduate** 71:2
72:1,15,17 77:20

**underlying** 110:15

**understand** 53:24
72:23 76:11 90:11

101:22 123:24
124:2,3 125:23 135:9
145:22 151:7 168:25
169:1 177:21 181:9
188:25 189:24
190:12,17,23 191:15
193:5,17 199:14
214:6,8 219:21
229:4,10 231:1

**understanding** 6:9
18:2 23:4 76:23
77:3,5 104:3 114:5
136:15 137:3 162:24
169:4 187:17 197:24
199:21 200:13,16,20
201:4 220:23

**undertaken** 228:14

**unfortunately** 177:22

**uniform** 170:13

**United** 1:1 2:7 74:11
92:3 108:15

**units** 31:9 37:13
180:22 184:11,13
215:23
219:2,13,14,20,22
220:7,13,15,25

**University** 71:12,14
77:20 88:22

**unless** 15:5
135:4,18,19 224:24

**unreasonable** 135:7

**unsuccessful** 157:4

**update** 200:9

**upon** 12:17,20 14:20
19:14 20:12 27:22
46:18 68:9 76:9,18
77:11,14 95:6 97:18
101:17 113:9
117:7,11,17,22
124:17 126:12,23
169:14,20,24 171:14
189:23 193:24 195:19
205:11,20 218:24

**utilize** 23:1 85:13,20

193:4

**utilized** 28:15 138:18

---

V

**valuation** 97:7

**value** 100:23 186:23

**varied** 76:21 156:11

**various** 24:5,9,13
31:4 32:9,12 46:4
48:20 66:2 74:2
107:4 113:25 144:13
157:1,13 170:4 183:7
184:6 188:10 194:12
196:7 205:17 215:17
222:11 223:21 224:16

**varying** 148:7 150:24

**VC** 5:2

**VEASEY** 1:3

**vehicle** 55:3

**Verse** 98:6

**versus** 100:10 101:7
102:5,23 105:21
106:20 107:16 108:12
112:11 148:25

**Via** 2:8

**victorious** 105:2

**Vinson** 1:18 2:20
236:2,18

**violated** 109:13,15

**visit** 223:23

**visiting** 187:13

**visits** 222:11,25
224:16

**vitae** 7:19

**volunteer** 121:3,21,22
156:16

**volunteered** 121:1

**vote** 61:11,18,24
64:8,12
65:7,12,18,23
66:6,17 67:17 68:18

69:17 70:23
122:18,24 123:7
134:15,19,20,25
135:2,4,8,10,14,16
136:19 142:19 170:7
189:21 199:23 201:11
210:22 223:18
227:3,5

**voted** 136:22 189:22

**voter** 10:15,19 13:25
14:8 25:23,24 28:11
33:18 35:11 122:20
125:22 133:16
134:1,5 136:12,20,24
166:12 185:4,24
187:12 192:13
196:11,23 198:18
200:18 201:2,6,13,17
202:1 203:13 209:19
217:6 219:10 225:23
227:18 228:16
229:11,14,15
230:3,4,5

**voters** 136:19
199:9,20 205:10
209:21,22 220:12,25
221:5,10 224:3

**votes** 134:17 152:3

**voting** 2:9 4:5 33:7
67:5 72:20,23 93:8
97:24 105:15 110:25
112:7 113:19,23,25
116:18,19,23
117:2,12,19 123:10
134:9 135:4 138:3
151:22 169:5,6
189:19 226:8 227:1

---

W

**Wachovia** 101:7

**wait** 26:19 36:14

**waiving** 5:12,15

**Walker** 79:13,24 80:25

**Wallace** 121:7,12

**Walter** 19:10

**Washington** 2:10 89:25
90:1,3,4,6,22 91:1

**wasn't** 77:25 110:23
121:19,25 133:2
138:21 192:21 213:15
224:6 226:3

**waste** 80:21 81:16,23
119:9 214:15 220:15

**wasted** 225:7,8,22
226:12 227:6,7

**watch** 224:10

**ways** 137:25

**weather** 112:23,24

**Web** 37:5

**website** 24:11 37:2,18
40:15 45:14,19,21
85:11 93:21
150:13,18,23
151:1,15,16 152:20
187:13 205:23 226:6

**websites** 137:24 138:7
151:3,4 152:9 229:5

**website's** 138:7

**Wednesday** 155:14

**week** 156:11 224:25

**weeks** 203:17,18

**welcome** 76:6 96:15

**we'll** 6:9 11:24 13:8
14:10 22:23 26:14
27:14 32:20 33:23
66:20 67:15 68:12
77:15 85:5 87:20,23
94:19 137:1
153:10,19 156:11
178:10 179:5 184:3

**Wells** 100:10,17,20,21

**we're** 5:15 6:8 17:8
21:13 41:13 80:1
97:16 101:4 102:18
103:10 105:13,17
106:16 107:13 108:9
110:7 112:5 116:15
117:6,13 118:13

120:4 127:17
136:20,25 142:16
158:4 165:8 175:9,19
179:2,3 182:16,25
188:15,16,17,24
193:8,9,10,11 194:25
199:6 214:8,25
219:3,23 232:10

**West** 2:4 45:19

**Westbury** 49:8

**Western** 89:11

**we've** 6:1 7:16 45:2
64:21 89:18 117:25
132:14 178:6 181:4
196:13 212:23 215:11
217:9 227:14
232:5,20

**whatever** 82:7,10 91:6
106:14 133:8 136:7
151:15 164:11 170:4
203:18 219:4

**whether** 67:10,20 69:9
78:12 99:1,2 101:15
104:14 107:5
109:12,14
111:13,16,21,22
112:1 113:7,24
114:11 115:10 116:1
136:22,23 137:10
138:1,2,3,17
145:19,21 146:6
164:8 166:9,14
167:5,8 171:16
172:6,12,21 173:1
185:2,17 186:2,3,14
187:20 189:11 200:25
204:21 205:9,19
206:24 211:1 214:14
215:5 219:8,10 221:3
222:22 226:18,19

**whichever** 76:7

**White** 105:21

**whoever** 177:15

**whole** 11:1 179:19
206:10 212:25

**who's** 25:5 49:18

**whose** 47:13 235:11
236:9

**widen** 165:23

**wife** 49:18 51:5 57:8
69:2

**William** 102:20

**Willow** 123:15

**wills** 85:2 92:16

**Wilson** 96:24 99:1,25

**wish** 136:19

**wished** 61:24

**withdraw** 178:1

**witness** 1:14 6:25
23:12,14,17,19
42:13,16 86:20,24,25
87:25 88:3,6,7,15
94:8 95:10 96:20
98:15 117:1,17,23
125:20
190:3,8,9,13,21
193:1,21 199:5
230:20 231:22 233:16
234:2 236:4,5

**witnesses** 88:8

**wood** 76:1

**Woodlake** 111:9

**wordy** 132:19

**work** 15:3 24:1 41:10
73:13 81:25
84:4,14,16 90:15
94:21 96:3 98:14,19
125:20 126:8,11
128:1 130:12 153:15
156:25 161:14 173:22
178:3 207:25 208:11
211:11 213:21
218:5,21 220:3,10,24

**worked** 78:25 79:3
81:23 83:15,17,18
96:13 121:23 124:13
128:13,21 129:8

131:25 206:25

**worker** 122:3,14,15

**workers** 122:2

**working** 78:17 122:14
127:20 129:13

**workpapers** 78:9

**works** 72:11 91:7
124:9 154:10

**worse** 126:2

**wow** 207:21

**wrap-up** 37:24
43:24,25 206:22
231:6

**write** 67:7 99:22
100:5 108:4 114:7

**writing** 22:1 67:11
109:23 130:12,16
201:25

**written** 5:14 20:3
21:20 92:8 102:3
130:23

**wrong** 136:22

**wrote** 102:10 145:14

———————————

Y

**y'all** 61:15 63:8
217:14

**yard** 171:18

**year-and-a-half-long**
223:18

**yellow** 54:10

**yesterday** 11:20 202:4
232:22

**yet** 6:4 138:13 167:20
177:24 197:12 229:23

**you'll** 15:20 93:5
156:24 165:23 175:12
176:17

**young** 163:25

**younger** 51:22

**yourself** 47:6
  123:2,6,16

**you've** 6:24 8:15
  14:20 20:21 21:20
  23:6 44:21 45:2,16
  75:11 77:10 88:11
  90:25 96:13 110:6
  116:25 117:2,10,16
  121:20,21 126:12
  127:9 128:21 165:5
  195:22 213:1 216:25

---

Z

---

**zero** 210:21

**Zhous** 105:21