IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

--------------------------

IN THE MATTER OF:        :

MARC VEASEY, et al.,     :

           Plaintiffs,  : CIVIL ACTION NO.

     v.                  : 2:13-CV-00193

RICK PERRY, et al.,      :

          Defendants.  :

--------------------------

         Tuesday,

         August 19, 2014


         Washington, D.C.

DEPOSITION OF:

       FRANKLIN CHANDLER DAVIDSON

called for examination by Counsel for the State

of Texas, pursuant to Notice of Deposition, in

the law offices of Dechert, LLP, located at

1900 K Street, N.W., Suite 1200, when were

present on behalf of the respective parties:

2

```
 1  APPEARANCES:

 2        On Behalf of the United States of America:

 3              ELIZABETH S. WESTFALL, ESQ.

 4              U.S. Department of Justice

 5              Civil Rights Division

 6              950 Pennsylvania Avenue, N.W.

 7              Washington, D.C.  20530

 8              Tel: (202) 305-4278

 9        On Behalf of the Veasey-LULAC Plaintiffs:

10              J. GERALD HEBERT, ESQ.

11              JOSHUA BONE, ESQ.

12              The Campaign Legal Center

13              215 E Street, N.E.

14              Washington, D.C.  20002

15              Tel: (202) 736-2200

16        On Behalf of the State of Texas:

17              S. RONALD KEISTER, ESQ.

18              Texas Office of the Attorney General

19              Tort Litigation Division

20              P.O. Box 12548

21              Austin, Texas  78711

22              Tel: (512) 463-2197

23  ALSO PRESENT:

24        PEYTON McCRARY, Historian, U.S. DOJ,

25              Civil Rights Division, Voting Section
```

1                    TABLE OF CONTENTS

2   WITNESS:                 DIRECT CROSS REDIRECT

3   Dr. Chandler Davidson     4          228

4   By Mr. Herbert                  226

5   By Ms. Westfall                 227

6   EXHIBITS:                              MARKED

7   1     Expert Report of Chandler Davidson       5

8   2     Supplemental Declaration of

9         Chandler Davidson, August 15, 2014       14

10  3     Amended Notice of Deposition             21

11  4     Notice Accompanying the Correct Expert

12        Report of Chandler Davidson               7

13  5     Legislative Library Document

14        Listing Governors of Texas               82

15  6     Legislative Library Document             88

16        Listing Lieutenant Governors of Texas

17  7     Legislative Library Document             90

18        Listing Speakers of the

19        House of Texas

20  8     Legislative Library Document             95

21        Listing Attorney Generals of Texas

22  9     History of the Party                     98

23        Affiliation of the Texas Legislature

24  10    Wikipedia List of all                   102

25        Texas Supreme Court Judges

Franklin Davidson - 8/19/2014

4

1                    P-R-O-C-E-E-D-I-N-G-S

2                                      (9:04 a.m.)

3    WHEREUPON,

4                    FRANKLIN CHANDLER DAVIDSON

5    was called for examination by Counsel for the

6    State of Texas and, having been first duly sworn,

7    was examined and testified as follows:

8                    DIRECT EXAMINATION

9              **BY MR. KEISTER:**

10       **Q        Would you please state and spell your**

11   **full name for the Court, please?**

12       A        Franklin, F-R-A-N-K-L-I-N, Chandler,

13   C-H-A-N-D-L-E-R, Davidson, D-A-V-I-D-S-O-N.

14       **Q        And you've been retained to be an**

15   **expert witness in this case, correct?**

16       A        That's correct.

17       **Q        And who have you been retained by?**

18       A        The Department of Justice.

19       **Q        Okay.  Thank you.  And you prepared a**

20   **report in this case, and the original report you**

21   **prepared was dated June 27th, 2014?**

22       A        That's correct.

23       **Q        All right.  And thereafter you**

24   **prepared a corrected report, correct?**

25       A        That's correct.

Franklin Davidson - 8/19/2014

5

1      Q     Okay.  And let me show you what I've

2   marked as Exhibit Number 1 and ask you, sir, just

3   to look through that.  And after you look through

4   it, tell us what it is.

5              (Whereupon, the above-referred to

6              document was marked as Davidson

7              Deposition Exhibit No. 1 for

8              identification.)

9      A     I'm trying to ascertain that this is

10  the updated version.

11     Q     Right.  You've got to -- if you look

12  all the way to the -- about the middle before

13  your CV, you'll see the dated copy, or the date

14  when you signed that particular copy.

15     A     9th day of July, yes.

16     Q     Okay.  So that was a report that you

17  corrected and signed on July 9th, 2014, correct?

18     A     That's correct.

19     Q     Okay.  And along with the report,

20  there is a copy of your curriculum vitae?

21     A     That's correct.

22     Q     Okay.  And is your curriculum vitae up

23  to date as of today?

24     A     Yes it is.

25     Q     Okay.  Now, with respect to the

Franklin Davidson - 8/19/2014

6

 1  **differences between Exhibit Number 1 and the**

 2  **original report that you prepared in this case,**

 3  **can you tell us basically what was the**

 4  **difference?**

 5          MS. WESTFALL:  Objection.  Could you

 6  hand the witness his original report, so he can

 7  review that report?

 8          MR. KEISTER:  I do not, but I can hand

 9  you -- off the record for a moment.

10  (Whereupon, the above-entitled matter went off

11  the record briefly at 9:07 a.m.)

12          **BY MR. KEISTER:**

13      **Q    Dr. Chandler, I'm not going to mark**

14  **this as an exhibit, but this is a copy of a**

15  **report that's dated June 27th, 2014.  We're not**

16  **going to spend a whole lot of time on this, but**

17  **can you just -- if you can look at that and just**

18  **tell us what the difference was between your**

19  **original report on June 27th and the corrected**

20  **report that you filed, which is Exhibit 1?**

21          MS. WESTFALL:  I'd like to object.

22  Are you asking him to review and compare these

23  two entire reports?  Is there a certain paragraph

24  you want to direct him to and examine him on,

25  counsel?

7

1              MR. KEISTER:  No.  I would like to

2 know what the difference is between the two

3 reports.

4              THE WITNESS:  Okay.  This is going to

5 take a long time.

6              MS. WESTFALL:  Dr. Davidson, take your

7 time reviewing, as much as you need.

8              MR. KEISTER:  And while you're

9 reviewing, I'll see if I can find what I thought

10 I had.

11              (Pause)

12              **BY MR. KEISTER:**

13      **Q    Dr. Chandler, I've found something**

14 **that may help.  One second.  Let me show you**

15 **Exhibit Number 4.**

16              (Whereupon, the above-referred to

17 document was marked as Davidson Deposition

18 Exhibit No. 4 for identification.)

19              MS. WESTFALL:  Counsel, for the

20 record, I just wanted to direct your attention to

21 the fact that it's Dr. Davidson, not Dr.

22 Chandler.

23              MR. KEISTER:  I'm sorry.  Thank you.

24 Dr. Davidson, excuse me.  If I do that, you feel

25 free to correct me, okay?

Franklin Davidson - 8/19/2014

8

```
 1              THE WITNESS:  You're not the first
 2   person to do that.
 3              BY MR. KEISTER:
 4        Q     All right.  If you'll look on
 5   Exhibit 4, you'll see that that particular
 6   document states that the corrections concern
 7   paragraph 69 of the report on page 40.  Does that
 8   help?
 9        A     Yes.  And now what was the question
10   again?
11        Q     What was the differences between your
12   original report and the corrected report, which
13   is Exhibit Number 1?
14        A     It concerned the report by the United
15   States expert, Professor Stephen Ansolabehere,
16   who was asked to determine the number of Texas
17   registered voters who lack acceptable SB-14
18   identification, as well as to identify any racial
19   disparities in rates of ID possession between
20   Anglos, African Americans, and Hispanics.
21              And that report that Professor
22   Ansolabehere had written was changed between the
23   first version and the second version, and I
24   wanted to make note of that fact.
25        Q     Okay.  And as we sit here today, did
```

Franklin Davidson - 8/19/2014

9

1  **you note in your report what the change was to**

2  **Dr. Ansolabehere's report?**

3      **A**    It had to do with a change, I believe,

4  in the number of Texas registered voters who

5  lacked an acceptable form of SB-14 ID.

6      **Q    Okay.  And just looking at the two**

7  **side by side, can you tell what the differences**

8  **were?**

9              MS. WESTFALL:  Objection.  Documents

10  speak for themselves.  Go ahead.

11              THE WITNESS:  Do I go ahead?

12              MS. WESTFALL:  Go ahead.

13              THE WITNESS:  Oh, okay.

14              **BY MR. KEISTER:**

15      **Q    From time to time, you may hear one of**

16  **us object.  But unless we instruct you not to**

17  **answer, unless your counsel instructs you --**

18      A    Oh, okay.

19      **Q    -- not to answer --**

20      A    Okay.

21      **Q    -- feel free to answer.**

22      **A**    I think the simplest way to do this

23  would simply be to read the two into the record.

24      **Q    Okay.  That's fine.  I don't want you**

25  **to --**

Franklin Davidson - 8/19/2014

10

1          MS. WESTFALL:  May I turn the page to

2    make sure that we're on the correct --

3          THE WITNESS:  This is 69.  In the

4    earlier version I say, one of the United States

5    experts, Professor Stephen Ansolabehere, was

6    asked to determine the number of Texas registered

7    voters who lack acceptable SB-14 identification,

8    as well as to identify any racial disparities in

9    rates of ID possession between Anglos, African

10   Americans, and Hispanics.  He found that

11   approximately 1.2 million Texas registered voters

12   lack an accepted form of SB-14 ID, and that black

13   and Hispanic voters were much more likely to lack

14   ID than Anglo voters.

15          Through database matching and

16   individual and aggregate level estimates of the

17   race of those without acceptable ID, he estimated

18   that five to seven percent of registered Anglos

19   lacked ID, as compared to 15 percent of

20   registered blacks and 10 to 11 percent of

21   registered Hispanics.

22          In other words, black registered

23   voters are roughly 100 to 200 percent more likely

24   to lack ID as compared with Anglo voters.

25   Hispanic registered voters are roughly 50 to 100

Franklin Davidson - 8/19/2014

11

1    percent more likely to lack ID as compared with

2    Anglo voters.

3                    Professor Ansolabehere's findings

4    indicate that registered voters without necessary

5    photo ID are disproportionately African American

6    or Hispanic.

7                    And the revised version reads, one of

8    the United States experts, Professor Stephen

9    Ansolabehere, was asked to determine the number

10   of Texas registered voters who lack acceptable

11   SB-14 identification, as well as to identify any

12   racial disparities in rates of ID possession

13   between Anglos, African Americans, and Hispanics.

14   He found that approximately 1.2 million Texas

15   registered voters lack an acceptable form of SB-

16   14 ID, and that black and Hispanic voters were

17   much more likely to lack ID than Anglo voters.

18                   Through database matching and

19   individual and aggregate level estimates of the

20   race of those without acceptable ID, he estimated

21   that five to seven percent of registered Anglos

22   lack IDs, as compared to 13 to 15 percent of

23   registered blacks and nine to 11 percent of

24   registered Hispanics.

25                   In other words, black registered

Franklin Davidson - 8/19/2014

12

1   voters are roughly 100 to 150 percent more likely

2   to lack ID as compared with Anglo voters.

3   Hispanic registered voters are roughly 50 to 100

4   percent more likely to lack ID as compared with

5   Anglo voters.

6           Dr. Ansolabehere's findings indicate

7   that registered voters without necessary photo ID

8   are disproportionately African American or

9   Hispanic.

10          BY MR. KEISTER:

11      Q     Okay.  Now, I heard 1.2 million in

12   both of those, and I heard some percentages that

13   didn't sound a whole lot different to me, but I

14   don't have it in front of me.  Can you look at

15   the percentages on your original --

16      A     Yes.

17      Q     -- as compared to your corrected

18   report, Exhibit 1, and just tell us where the

19   differences in the numbers lie?

20      A     Okay.

21          MS. WESTFALL:  Objection.  Document

22   speaks for itself.  Asked and answered.

23          THE WITNESS:  He estimated that five

24   to seven percent of registered Anglos lack ID, as

25   compared to 15 percent of registered blacks and

Franklin Davidson - 8/19/2014

13

1   10 to 11 percent of registered Hispanics.  And

2   that changes --

3                  BY MR. KEISTER:

4          Q       If you want to just tell me the ones

5   that change, that will be fine.

6          A       Okay.  Instead of 15 percent of

7   registered blacks, it's 13 to 15 percent of

8   registered blacks.  And instead of 10 to 11

9   percent registered Hispanics, it's nine to 11

10  percent of registered Hispanics.

11         Q       Okay.  Does that appear to be the main

12  difference?

13         A       It seems to be.

14         Q       Okay.  So from what I'm hearing in

15  your corrected report, Exhibit 1, it sounds as if

16  Dr. Ansolabehere reduced the percentages slightly

17  with respect to the African Americans and the

18  Hispanics, correct?

19         A       I think that's all.

20         Q       Okay.  Did you have any conversations

21  with Professor Ansolabehere as to why he revised

22  his report in that regard?

23         A       No, sir.

24         Q       Okay.  Do you have any basis for

25  knowing why he revised his report?

Franklin Davidson - 8/19/2014

14

1      A      It's my understanding that the

2   information that he was given by the State of

3   Texas was not fully accurate the first time and

4   he needed to get more accurate data.

5      Q      Okay.  And you believe that's correct

6   with respect to the change that you reflect in

7   Exhibit Number 1?

8      A      I have no reason to doubt it.

9      Q      Okay.  All right.  If you'll hand me

10  back my copy of your original, so we don't get

11  things messed up, because I don't intend to use

12  this.

13     A      Okay.

14     Q      Okay.  Sir, let me show you what I've

15  marked as Exhibit Number 2, and ask you to take a

16  look at Exhibit Number 2 and just tell us what

17  that is, please.

18            (Whereupon, the above-referred to

19  document was marked as Davidson Deposition

20  Exhibit No. 2 for identification.)

21            MS. WESTFALL:  Counsel, are you going

22  to be examining Dr. Davidson on these other

23  exhibits, or can we put them aside?  So we

24  don't --

25            MR. KEISTER:  I think we can put --

1 let's put them aside.

2          MS. WESTFALL:  -- get them all messed

3 up.

4          THE WITNESS:  This is the supplemental

5 declaration of Dr. Chandler Davidson.

6          **BY MR. KEISTER:**

7     **Q     Okay.  And when did you prepare the**

8 **supplemental declaration?**

9     A     It was in the early part of August

10 2014.

11    **Q     Okay.  And I believe the -- according**

12 **to my copy, you signed Exhibit Number 2 on**

13 **August 15th, 2014?**

14    A     That's correct.

15    **Q     Okay.  Why did you prepare Exhibit**

16 **Number 2?**

17    A     There were various changes in facts

18 that came to my attention.

19    **Q     Okay.  And if you turn to page 2, the**

20 **first full paragraph, if you look at the last**

21 **sentence of the first full paragraph it sets out**

22 **-- well, tell us what that sets out.**

23          MS. WESTFALL:  Counsel, what page are

24 you on?

25          MR. KEISTER:  Page 2.

1              THE WITNESS:  Would you repeat the

2   question?

3              **BY MR. KEISTER:**

4      **Q      Page 2, the first paragraph, I said**

5   **full paragraph, but actually I guess it's not. If**

6   **you look on page 2, your first paragraph, you'll**

7   **see there at the last sentence.**

8      A      The last sentence of the first

9   paragraph.

10     **Q      First paragraph on that page.**

11     A      And you want me to read that?

12     **Q      Well, just tell us -- just tell us,**

13  **number one, what is that -- what is that**

14  **sentence?**

15             MS. WESTFALL:  Objection.  Vague.

16             THE WITNESS:  It tells where the

17  paragraphs are where minor errors, including

18  typographical errors, have been corrected.

19             **BY MR. KEISTER:**

20     **Q      Okay.  And does that sentence reflect**

21  **throughout your report the areas where you**

22  **believe you have made corrections in Exhibit**

23  **Number 2?**

24     A      Yes.

25     **Q      Okay.  Now, that's not referring only**

1  to typographical errors, though, is it?  That's

2  referring to all of the corrections you made.

3      A    That's correct.

4      Q    All right.  Now, with respect to the

5  substantive portions of the change, what was the

6  major factual issues that caused you to correct

7  this report, or led you to correct this report?

8      A    I'm not going to be able to answer

9  that without looking --

10     Q    Okay.

11     A    -- at these paragraphs.

12     Q    Okay.

13     A    That may take a little time.

14     Q    Well, perhaps if you would look back

15 on page 1 and just review your first paragraph on

16 page 1.  Perhaps that will help.

17     A    Well, as I said, the Ansolabehere

18 information, and then I wanted to, as I say,

19 supplement the evidence in my report,

20 incorporating information obtained by the United

21 States, and then to correct these typographical

22 errors.  But I'm trying to remember precisely

23 what those were --

24     Q    Okay.

25     A    -- and I'm having difficulty.

Franklin Davidson - 8/19/2014

18

1    Q    Okay.  And we're going to go through

2  your report in some detail, so we'll get there.

3  But let me just ask you just generally, what was

4  the information from Professor Ansolabehere that

5  led you to decide you wanted to revise your

6  report or supplement your report?

7    A    Well, it wasn't so much the

8  information as the fact that he had just updated

9  it, and I felt the need to mention the fact that

10  he had updated it and changed slightly the

11  information therein.

12    Q    Okay.  Did you have any conversations

13  with Professor Ansolabehere concerning the

14  changes he made to his report?

15    A    No, sir.

16    Q    Okay.  Have you obtained any

17  information concerning the changes Professor

18  Ansolabehere made to his report other than just

19  when reviewing the report?

20         MS. WESTFALL:  Objection.  Confusing

21  question.

22         THE WITNESS:  I may have discussed

23  this with somebody in the Justice Department, but

24  I'm trying to remember who that would be.

25         MS. WESTFALL:  And I'm going to

1   counsel you not to discuss any of your

2   discussions with counsel during this deposition.

3              **BY MR. KEISTER:**

4       **Q      When approximately was that**

5   **discussion?**

6       A      I believe it was sometime in early

7   August.

8       **Q      Okay.  And do you recall the nature of**

9   **that conversation?**

10             MS. WESTFALL:  I'm going to, again,

11  counsel you not to discuss the details of any

12  discussions you had with the Justice Department.

13  You may describe generally when you had that

14  discussion and the general subject matter of that

15  discussion.

16             THE WITNESS:  Well, it was, as I said,

17  in early August.  And the general nature of it

18  concerned the slight changes that Dr.

19  Ansolabehere made as a result of having gotten a

20  different data set from the state.

21             **BY MR. KEISTER:**

22      **Q      Okay.  Had you reviewed Professor**

23  **Ansolabehere's -- that's a hard one, I'm sorry.**

24      A      I'm with you on that, sir.

25             MS. WESTFALL:  Ansolabehere.

Franklin Davidson - 8/19/2014

20

```
 1              MR. KEISTER:  Ansolabehere.

 2              MS. WESTFALL:  Let's go with that.

 3              BY MR. KEISTER:

 4      Q      Okay.  Had you reviewed Professor

 5   Ansolabehere's corrected report or corrections

 6   prior to discussing -- prior to your discussing

 7   with the Department of Justice that led you to

 8   correct your -- or supplement your report?

 9      A      No, I don't believe so.

10      Q      Okay.  With respect to Exhibit

11   Number 2, your supplemental declaration in this

12   case, does it contain all of your findings,

13   opinions, and conclusions that you formulated in

14   this case?

15      A      Yes.

16      Q      Does it contain all of your findings,

17   opinions, and conclusions that you intend to

18   testify to to the Court?

19      A      Yes.

20      Q      Okay.  While we're not too far away

21   from trial in this case, do you have any

22   intentions to formulate any new findings,

23   opinions, or conclusions prior to trial?

24      A      No, sir.

25      Q      Do you have any intentions to do any
```

Franklin Davidson - 8/19/2014

21

1  additional work on this case with respect to new

2  findings or opinions or conclusions prior to this

3  case going to trial?

4           MS. WESTFALL:  Objection.  Calls for

5  speculation.

6           THE WITNESS:  No, sir.

7           BY MR. KEISTER:

8       Q     Okay.  And as we sit here today,

9  obviously, if someone asks you to do something

10 else, you might do it, but as we sit here today,

11 you have no intentions of doing additional work

12 to develop opinions, conclusions, or findings in

13 the case.

14      A     That's correct.

15      Q     Okay.  Let me show you, sir, what I've

16 marked as Exhibit Number 3 and ask you to take a

17 look at that, please.  And I'm going to represent

18 to you, sir, that this is the amended notice of

19 deposition, along with a duces tecum in this

20 case.  Have you seen that document before?

21           (Whereupon, the above-referred to

22 document was marked as Davidson Deposition

23 Exhibit No. 3 for identification.)

24      A     I'm pretty sure that I was given this.

25      Q     Okay.  All right.

Franklin Davidson - 8/19/2014

22

```
 1        A     I'm going --
 2        Q     It appears just simply to be the
 3   notice letting you know that today is the day and
 4   this is the place to be, right?
 5        A     Yes.
 6        Q     All right.  If you would look on
 7   page 6 of this notice, you'll see a document
 8   request.
 9        A     Yes.
10        Q     Which requested you bring certain
11   documents to the deposition today.
12        A     Yes.
13        Q     Have you brought any documents today
14   to the deposition pursuant to this request?
15              MS. WESTFALL:  Counsel, I would like
16   to advise you that we have produced voluminous
17   documents in response to this request, as you
18   know.
19              THE WITNESS:  Yes.  Well --
20              BY MR. KEISTER:
21        Q     Well, the question simply is, have you
22   brought any documents to the deposition?
23        A     No.  No, I have not brought any today.
24        Q     All right.  Have you provided
25   documents pursuant to this request to your
```

23

1  counsel?

2       A    Yes.

3       Q    Okay.  And without going through each

4  of these -- each of these items one by one, are

5  there any documents that you have that would be

6  responsive to any one of these requests, one,

7  two, three, four, or five, that you have not

8  produced to your counsel?

9       A    Billing records would be the records

10 that -- with regard to the Justice Department --

11      Q    Right.  Your work on this case, any

12 bills you sent, updates, that type of thing.

13      A    Now, repeat the question once more,

14 please.

15      Q    Okay.  Do you have, in your

16 possession, either here or back at home, any

17 documents that would be responsive to the request

18 on page number 6 that you have not provided to

19 your counsel --

20      A    No.

21      Q    -- for presentation today?

22      A    No.

23      Q    Okay.  Thank you.  Can you tell us

24 where you were born?

25      A    I was born on a cattle ranch between

Franklin Davidson - 8/19/2014

24

1  Alpine and Fort Davis, Texas.

2      Q      Okay.  And what was your birth date?

3      A      May 13th, 1936.

4      Q      Okay.  Do you have a copy of your

5  birth certificate?

6      A      Not with me.

7      Q      But have you seen a copy of your birth

8  certificate?

9      A      Yes, I have.

10      Q      Okay.  And if you needed a copy of

11  your birth certificate for some reason today, if

12  you wanted to get a passport or something like

13  that, would you have access to your birth

14  certificate?

15      A      Yes, sir.

16      Q      Okay.  Did you grow up out there in

17  the same area where you were born?

18      A      I spent only the first five years of

19  my life there.

20      Q      Okay.  And then where did you go?

21      A      I moved to a little town in southern

22  New Mexico, Lawrenceburg, New Mexico.

23      Q      Okay.  And how long did you live in

24  Lawrenceburg?

25      A      Until I was a sophomore in high

Franklin Davidson - 8/19/2014

25

1  school.

2      Q     Okay.  So you went to your -- to grade

3  school and two years of high school in

4  Lawrenceburg?

5      A     That's correct.

6      Q     Okay.  And then where did you go?

7      A     Ysleta, Texas.

8      Q     East Letta?

9      A     Y-S-L-E-T-A.

10     Q     Good.  Thank you.

11     A     Ysleta.

12     Q     That's helpful for those of us not

13  from Texas, and those of us who are.

14           Okay.  And what took you to Ysleta?

15     A     My father, who was a U.S. Border

16  Patrolman, was transferred from Lawrenceburg to

17  El Paso, and we lived in the suburb of Ysleta and

18  I went to Ysleta High School there.

19     Q     Okay.  So Ysleta is close to El Paso?

20     A     Yes.

21     Q     Is it a suburb of El Paso?

22     A     Yes.

23     Q     Okay.  And so you graduated high

24  school in Ysleta?

25     A     Yes, sir.

Franklin Davidson - 8/19/2014

1        Q      Okay.  What year did you graduate high

2   school?

3        A      1954.

4        Q      Okay.  And your father was a Border

5   Patrol Agent?

6        A      Yes, sir.

7        Q      Okay.  How long was he with the Border

8   Patrol?

9        A      From approximately 1942 into the

10  1970s.

11       Q      Okay.  And did he spend all of his

12  career in the New Mexico/Texas region?

13       A      Yes.

14              MS. WESTFALL:  Objection.  Relevance.

15              BY MR. KEISTER:

16       Q      You can answer.

17       A      Yes.

18       Q      Okay.  And after you moved to Ysleta,

19  did he spend the rest of his career in El Paso?

20       A      No.

21       Q      Okay.  What other parts of the state

22  did he spend his career?

23       A      I think he --

24              MS. WESTFALL:  Objection.  Objection.

25  Relevance to this line of questions about

Franklin Davidson - 8/19/2014

27

1   Professor Davidson's father's career.  It seems a

2   little far afield.

3              THE WITNESS:  Fort Hancock, Texas.

4              **BY MR. KEISTER:**

5       **Q      Okay.  And where is Fort Hancock**

6   **located with respect to El Paso?**

7       A      It's I think 50 to 100 miles east of

8   El Paso.

9       **Q      Okay.  So it's not directly on the Rio**

10  **Grande?**

11      A      No.

12      **Q      Okay.  Okay.  So you graduated from**

13  **Ysleta High School, did you say in 1954?**

14      A      Yes, sir.

15      **Q      Okay.  And did you go into the**

16  **military?**

17      A      Not directly, no.

18      **Q      Okay.  What did you do after you**

19  **graduated from high school?**

20      A      I enrolled at the University of Texas

21  in Austin.

22      **Q      Okay.  And what year was that?**

23      A      That would have been 1954.

24      **Q      Okay.  And did you graduate from UT-**

25  **Austin?**

Franklin Davidson - 8/19/2014

28

```
 1        A        Yes.

 2        Q        What year did you graduate?

 3        A        Either 1961 or 1962.

 4        Q        Okay.  So did you take a break in

 5   those years to do something else?

 6        A        Yes.

 7        Q        Okay.  What was the break?

 8        A        I joined the Navy and spent two years

 9   in the Pacific Fleet, a landing ship dock.

10        Q        Okay.

11        A        Amphibious ship, an LSD.

12        Q        Okay.

13        A        Landing ship dock.

14        Q        What years was that?

15        A        That must have been from 1955 to 1957.

16        Q        Okay.  So you're a veteran, correct?

17        A        That's correct.

18        Q        Do you have a Veterans Administration

19   ID?

20        A        Not on me.

21        Q        But you do have one?

22        A        Almost certainly I do.

23        Q        Okay.  Do you have occasion to use it,

24   or is it something you received in the past and

25   you know that you have?
```

Franklin Davidson - 8/19/2014

29

```
 1      A      I don't have occasion to use it.
 2      Q      Okay.  Do you know whether or not your
 3 photograph is on that ID?
 4      A      No.
 5      Q      No, it's not or --
 6      A      No, I don't know.
 7      Q      Okay.
 8      A      I'm sorry.
 9      Q      No, that's fine.  All right.
10 Appreciate it.  All right.  So you were in the
11 Navy for two years?
12      A      Yes, sir.
13      Q      And then you came back to UT?
14      A      Well, I needed some money, so I went
15 to work in the Texas and Louisiana oilfields.
16      Q      Okay.  And how long did you do that?
17      A      Well, I spent one year to get enough
18 money to get started back to UT, and then I took
19 a little bit of time off from UT again to go back
20 into the oilfields I think the following summer.
21      Q      Okay.  All right.  But ultimately you
22 returned to UT.
23      A      That's correct.
24      Q      And you received your degree in '61?
25      A      '61 or '62.
```

Franklin Davidson - 8/19/2014

30

1        Q      Okay.  And what was your degree in?

2        A      It was in philosophy.

3        Q      Okay.  All right.  And what did you do

4   after you graduated from the University of Texas

5   with a degree in philosophy?

6        A      I had a Fulbright scholarship and

7   spent a year at the University of Poitiers in

8   France.

9        Q      Okay.  And what was your studies in

10  France?

11       A      The philosophy of aesthetics.

12       Q      Okay.  Sounds like an interesting

13  topic.

14              (Laughter)

15              So you spent a year, and what did you

16  do?

17       A      Well, I went to classes and learned a

18  great deal about French culture from a wonderful

19  professor by the name of Monsieur Leaud.  By that

20  time, I was married and my wife and I had some

21  good times on several trips to Paris, made many

22  good friends in Poitiers.

23       Q      Okay.

24       A      Before I came back.

25       Q      All right.  When did you return to the

```
 1  U.S.?

 2       A    I think it was -- I think it was 1962.

 3       Q    Okay.  And upon your return to the

 4  U.S., what did you do?

 5       A    I worked briefly as an Associate

 6  Editor of the Texas Observer Magazine in Austin.

 7       Q    Okay.  And at that point, I assume the

 8  Observer was a fairly new magazine?

 9       A    Indeed, it was.

10       Q    All right.  Okay.  And how long did

11  you work for the Observer?

12       A    Just a few months.

13       Q    Okay.  And from there, what did you

14  do?

15       A    I sold real estate in south Austin.

16       Q    Okay.  And did there come a time when

17  you returned to school?

18       A    That's correct.

19       Q    All right.  Let's talk about when you

20  returned to school.  Where did you -- what was

21  your next educational experience?

22       A    I went to Princeton University,

23  pursuing a graduate degree in philosophy.

24       Q    Okay.  And what year did you go to

25  Princeton?
```

Franklin Davidson - 8/19/2014

32

```
 1      A     1963.

 2      Q     Okay.  And how long did you attend

 3  Princeton?

 4      A     Well, I was there three years.  I had

 5  not yet obtained my Ph.D., but I was -- I was

 6  there for three years.

 7      Q     Okay.  And did you obtain a master's

 8  while you were at Princeton?

 9      A     I guess I did, yes.

10      Q     Okay.

11      A     As part of the stepping stone towards

12  a Ph.D.

13      Q     Okay.  Some people would consider that

14  a high stepping stone, but I guess once you get

15  there.  What was your master's in?

16      A     Well, it was in philosophy.

17      Q     Okay.  All right.  But you did not

18  obtain your Ph.D. while you were at Princeton?

19      A     Not while I was living there, no.

20      Q     Okay.  After you left Princeton, where

21  did you go?

22      A     I went to Rice University.

23      Q     Okay.  And was that for employment?

24      A     Yes.

25      Q     Okay.  And what year did you go to
```

Franklin Davidson - 8/19/2014

33

1  Rice?

2       A     1966.

3       **Q     Okay.  And how were you employed by**

4  **Rice University?**

5       A     I was -- I can't remember the exact

6  title, but it was the bottom stepping stone,

7  actually below an Assistant Professor.  I didn't

8  have my Ph.D. degree yet, and my being able to

9  stay at Rice was contingent upon getting that

10 Ph.D. degree within a couple of years.

11      **Q     Okay.  Would that have been Associate**

12 **Professor?**

13      A     Oh, no, no.  That's up the scale.  I

14 was below an Assistant Professor and living on

15 $1,375 a year.  I'm sorry, $3,900.  I'm sorry.

16 Wife and two kids.

17            MS. WESTFALL:  Counsel, you're not to

18 volunteer any more information about your salary

19 on the record.

20            (Laughter)

21            MR. KEISTER:  Well, that's a long time

22 ago, so --

23            **BY MR. KEISTER:**

24      **Q     So you came in teaching classes at**

25 **Rice?**

Franklin Davidson - 8/19/2014

34

1      A      That's correct.

2      Q      Okay.  And what type of classes were

3  you teaching?

4      A      Sociology classes.  While I was at

5  Princeton, I switched majors from philosophy to

6  sociology.

7      Q      Okay.

8      A      And ended up getting my Ph.D.

9  eventually in sociology.

10     Q      Okay.  But your master's was in

11 philosophy.

12     A      I'm not sure.

13     Q      Okay.  Okay.  All right.  So while you

14 were at Rice, you finished up your work on the

15 Ph.D. and obtained a Ph.D. in sociology.

16     A      That's correct.

17     Q      Okay.  And just tell us briefly, or I

18 guess you've got to give us a fundamental sketch

19 of how your career developed at Rice over the

20 years.

21     A      Well, it's fairly simple.  I just

22 taught, I published research, I sat on a number

23 of committees and did all of the mundane sorts of

24 things a professor is expected to do, and was

25 promoted from Assistant Professor to Associate

Franklin Davidson - 8/19/2014

35

1  Professor to Full Professor, and continued

2  teaching and doing research until I retired in

3  2003.

4        Q     Okay.  And during your time period

5  before you retired, what type of classes did you

6  continue or did you teach to the students?

7        A     I taught -- and by the way, I should

8  add that for a number of years I was also

9  connected to the Political Science Department as

10  well, and I taught some political science

11  courses.  My specialty was political sociology.

12  And so I continued to teach throughout my career

13  political sociology, which is in many respects

14  very similar to political science.

15             I taught a number of other courses,

16  taught courses on poverty, taught courses on race

17  relations.  I had some courses that I taught on

18  Texas politics and the culture of Texas.

19        Q     Did you teach any history courses?

20        A     Not per se, although history certainly

21  was melded into both my research and my classroom

22  lectures.

23        Q     Okay.  With respect to your classes on

24  Texas politics, did the history of Texas politics

25  play a part in those?

Franklin Davidson - 8/19/2014

36

1      A      Absolutely.

2      Q      Okay.  And over the course of the

3  years, have you come an expert in the history of

4  Texas politics?  Or do you consider yourself an

5  expert in the history of Texas politics?

6      A      I know a good deal about Texas

7  politics.  I knew more about it when I was a

8  little bit younger.  As I say, I have read books

9  on the subject and have assigned reading

10  materials in the history of Texas politics, have

11  colleagues on the Rice faculty whose specialty is

12  Texas politics or southern politics, and have sat

13  on dissertation committees in the History

14  Department where Texas politics and Texas

15  history, more generally, have been addressed.

16      Q      Okay.  And just basically why I'm

17  asking, Doctor, is in your report -- and we'll

18  get into it in detail later on, but in your

19  report you outline some aspects of Texas history

20  with respect to the discriminatory racial

21  history.  Did you rely upon your expertise with

22  respect to knowledge of Texas history in your

23  drafting of that part of the report?

24      A      Yes, I think so.

25      Q      Okay.  And you feel qualified to

Franklin Davidson - 8/19/2014

37

1   express the opinions on Texas history that you

2   have expressed in your report?

3        A    Yes.

4        Q    Okay.  Now, you mentioned that you

5   were married at the time you went to France, I

6   believe?

7        A    That's correct.

8        Q    Okay.  And are you still married

9   today?

10       A    I'm still married, but not to the same

11  woman.

12       Q    Okay.  And was there a divorce at some

13  point in the past?

14       A    Yes.

15       Q    Okay.  When did that occur?

16       A    I think in the 1970s.

17       Q    Okay.  And what was your former wife's

18  name?

19       A    Virginia Turner.

20       Q    Okay.  And so there was a divorce and

21  then you remarried.  When did you remarry?

22       A    I want to say in 1980.

23       Q    Okay.  Who did you marry in 1980?

24       A    Sharon Plummer, P-L-U-M-M-E-R.

25       Q    Okay.  And are you still married to

Franklin Davidson - 8/19/2014

38

1  Sharon Plummer?

2       A      Yes.

3       Q      Okay.  Did you have any children from

4  your first marriage?

5       A      Yes.

6       Q      Okay.  How many children?

7       A      Two.

8       Q      Okay.  And what are their names?

9       A      Well, the one who is still living is

10  named Seth, and the one who died is named Ian.

11       Q      Okay.  And what about your second

12  marriage, any children from your second marriage?

13       A      No.

14       Q      Okay.  So you have one son, Seth.

15  Okay.  Where does Seth live?

16       A      He lives outside of Los Angeles in

17  Palos Verdes --

18       Q      Okay.

19       A      -- Estates.

20       Q      Okay.  How long has he lived out

21  there?

22       A      I want to say about a decade.

23       Q      Okay.  Do you operate an automobile?

24  Do you drive?

25       A      I do drive.

Franklin Davidson - 8/19/2014

```
 1        Q      Okay.  Do you have a driver's license?

 2        A      Yes, I do.

 3        Q      Is it current?

 4        A      Yes.

 5        Q      Okay.  How long have you had a

 6  driver's license?

 7        A      Not my current one, but just a

 8  driver's license?

 9        Q      A Texas driver's license.

10        A      Oh, I think since my early twenties.

11        Q      Okay.  All right.

12        A      At least.

13        Q      Okay.  And does your wife drive?

14        A      Yes.

15        Q      Does she have a current driver's

16  license?

17        A      Yes.

18        Q      Okay.  Do you know how long she has

19  had her current driver's license?

20        A      No.

21        Q      Do you have a passport?

22        A      Yes.

23        Q      Does your wife have a passport?

24        A      Yes.

25        Q      Do you have a concealed handgun
```

Franklin Davidson - 8/19/2014

40

1  license?

2      A      No.

3      Q      Okay.  Does your wife?

4      A      No.

5      Q      Okay.  All right.  During the course

6  of your work on this case, have you interviewed

7  any witnesses in the case?

8             MS. WESTFALL:  Objection.  Unclear,

9  vague.

10             BY MR. KEISTER:

11     Q      You can answer.

12             MS. WESTFALL:  Calls for a legal

13  conclusion also.

14             BY MR. KEISTER:

15     Q      You can still answer.

16     A      I'm virtually certain, no.

17     Q      Okay.  Have you interviewed any of the

18  Plaintiffs in this case?

19     A      No.

20     Q      Okay.

21             MR. KEISTER:  I'm sorry?

22             MS. WESTFALL:  I was just going to

23  object.  Calls for a legal conclusion.  You

24  haven't identified all the Plaintiffs in this

25  case.

Franklin Davidson - 8/19/2014

41

```
1              BY MR. KEISTER:

2        Q      Okay.  But to your knowledge, you

3  haven't.

4              MS. WESTFALL:  Foundation.

5              BY MR. KEISTER:

6        Q      Okay.  To your knowledge, you haven't

7  interviewed any of the known Plaintiffs in this

8  case?

9        A      No.

10       Q      Okay.  Have you interviewed anyone who

11 has told you that they do not have a photo

12 identification that would allow them to vote in

13 the state of Texas?

14       A      No.

15       Q      Okay.  Have you spoken to any friends

16 or neighbors that have told you that they do not

17 have a photo identification that would allow them

18 to vote in the state of Texas?

19       A      No.

20       Q      Okay.  Do you personally know anyone

21 that does not have a photo identification that

22 would allow them to vote in the state of Texas?

23             MS. WESTFALL:  Objection.  Foundation.

24             THE WITNESS:  No.

25             BY MR. KEISTER:
```

Franklin Davidson - 8/19/2014

42

1      Q      Okay.   And I don't believe we covered

2  this, but you currently reside in Texas?

3      A      Yes.

4      Q      Okay.   Where do you reside in Texas?

5      A      Houston.

6      Q      Okay.   And how long have you resided

7  in Houston?

8      A      Since 1966.

9      Q      Okay.

10     A      But I had been in Houston earlier than

11  that.  When I was working in the oilfields, the

12  company that I worked for was based in Houston.

13  And so I spent some time in the late  50s and

14  early  60s where Houston was my -- my home base,

15  but I have lived continuously in Houston since

16  1966 when I was hired by Rice.

17     Q      Okay.   As we sit here today, do you

18  have any personal knowledge of anyone in the city

19  of Houston that does not have a photo ID that

20  would allow them to vote in Texas?

21             MS. WESTFALL:  Objection.  Calls for

22  a legal conclusion.

23             THE WITNESS:  No.

24             BY MR. KEISTER:

25     Q      Okay.   During your course of working

Franklin Davidson - 8/19/2014

43

1    on this case, has anyone identified for you the

2    names of anyone that does not have a photo ID

3    that would allow them to vote in the state of

4    Texas?

5                    MS. WESTFALL:  Objection.  Calls for

6    a legal conclusion.

7                    THE WITNESS:  No.

8                    BY MR. KEISTER:

9         Q        As we sit here today, have you ever

10   seen a list of people that claim not to be able

11   to vote in Texas because of the lack of a photo

12   ID?

13        A        No.

14        Q        Do you belong to any social

15   organizations or civic organizations in Houston?

16        A        Yes.

17        Q        Okay.  What do you belong to?

18        A        The only ones I can think of off the

19   top of my head are political organizations.

20        Q        Okay.  And which ones would those be?

21        A        A little organization called Braeswood

22   Place Democrats.  It's a Democratic club.

23        Q        Okay.

24        A        And another Democratic organization

25   called ROAD Women, River Oaks Area Democrats --

Franklin Davidson - 8/19/2014

44

 1 | Democratic Women.  They allow men to belong as

 2 | well.

 3 |        **Q      Okay.**

 4 |        A      I may belong to a few other

 5 | organizations, but those are two that come to

 6 | mind.

 7 |        **Q      Okay.  With respect to the two that**

 8 | **you just mentioned, do you attend meetings on an**

 9 | **occasional basis?**

10 |        A      Occasionally, yes.

11 |        **Q      Okay.  During the meetings that you**

12 | **have attended at those two organizations, have**

13 | **you learned of anyone who is unable to vote in**

14 | **Texas because they do not have a photo**

15 | **identification?**

16 |        **A      No.**

17 |        **Q      Okay.  Have you heard anyone discuss**

18 | **at those meetings the fact that there is any**

19 | **specific people in Houston, or specific persons,**

20 | **that you are aware of, or members of that**

21 | **organization are aware of, that do not have a**

22 | **photo ID that would allow them to vote in a Texas**

23 | **election?**

24 |        A      No, sir.

25 |        **Q      Okay.  Do you attend a church?**

Franklin Davidson - 8/19/2014

45

```
 1        A    No, sir.
 2        Q    Okay.  So as we sit here today, you
 3   cannot tell me anyone specifically that does not
 4   have a photo ID that would -- sufficient to allow
 5   them to vote in Texas?
 6             MS. WESTFALL:  Objection.  Calls for
 7   a legal conclusion.  Objection.  Foundation.
 8             THE WITNESS:  No.
 9             BY MR. KEISTER:
10        Q    Okay.  You've been married twice.  Do
11   you have copies of your marriage certificates?
12        A    I've certainly got a copy of my second
13   marriage.  I -- I'm not sure that I have copies
14   of my first one.
15        Q    Okay.  What about with respect to the
16   divorce?  I know it has been quite a while back,
17   but do you still have copies of the final divorce
18   decree?
19        A    I think so.
20        Q    Okay.  Why did you keep copies of your
21   final divorce decree?
22             MS. WESTFALL:  Objection.  Relevance.
23             THE WITNESS:  I just tend to keep
24   official documents that relate to me.
25             BY MR. KEISTER:
```

Franklin Davidson - 8/19/2014

46

1      Q      Okay.  And what about with respect to

2  your marriage certificate, why did you keep a

3  copy of your marriage certificate?

4      A      Same reason.

5      Q      Just because they're documents that

6  are important to you?

7      A      Yes.

8      Q      Okay.  And I believe I already asked

9  you about your birth certificate, correct?  If

10  you had a copy of it?

11      A      I think you did.

12      Q      Okay.

13      A      And I do.

14      Q      Okay.  Have you ever been employed by

15  the Texas Secretary of State?

16      A      No.

17      Q      Have you ever done any consulting work

18  for the Texas Secretary of State?

19      A      No.

20      Q      Have you ever been employed by the

21  Texas Department of Public Safety?

22      A      No.

23      Q      Have you ever done any consulting work

24  for the Texas Department of Public Safety?

25      A      No.

47

1      Q      Okay.  Have you ever been employed by

2  the Texas legislature?

3      A      No.

4      Q      Okay.  I know you have given some

5  testimony before the legislature on occasion,

6  correct?

7      A      Yes.

8      Q      Have you ever been retained by the

9  legislature to do some consulting work for the

10  legislature?

11      A      No.

12      Q      Okay.  Have you ever been employed by

13  any Texas state agency?

14      A      No.

15      Q      Have you ever done any consulting work

16  for any Texas state agency?

17      A      No.

18      Q      Okay.  Have you ever acted as an

19  election judge in an election?

20      A      No.

21      Q      Okay.  Have you ever participated as

22  a poll worker of any sort in an election?

23      A      No.

24      Q      Okay.  Do you vote on a regular basis?

25      A      Yes.

Franklin Davidson - 8/19/2014

48

1    Q    Okay.  And do you consider yourself a

2 Democrat?

3    A    Yes.

4    Q    Okay.  And have you considered

5 yourself a Democrat for the bulk of your life?

6    A    Yes.

7    Q    Okay.  When were you first approached

8 about participating in this case as an expert

9 witness?

10    A    I believe it was July of 2013.

11    Q    Okay.  And by whom were you

12 approached?

13    A    I think it was by this lady here.

14    Q    Okay.  And by this lady here, we're

15 talking about Ms. Westfall?

16    A    Ms. Westfall, yes.  Westfall.  I'm

17 sorry.

18    Q    And without going into specific

19 details, what was the nature of the conversation

20 you had with Ms. Westfall?

21         MS. WESTFALL:  And I will counsel you

22 again not to get into specifics of our

23 conversation.

24         THE WITNESS:  All right.  She wanted

25 to know whether I would be interested in writing

Franklin Davidson - 8/19/2014

49

1  a report for the Department of Justice with

2  regard to SB-14 and events surrounding it.

3                BY MR. KEISTER:

4        Q        Okay.  And at that point in time, were

5  you familiar with SB-14, prior to Mr. Westfall

6  contacting you?

7        A        Roughly familiar with it, yes.

8        Q        Okay.  And how were you familiar with

9  SB-14?

10       A        Having read about it in the

11  newspapers.

12       Q        And prior to Ms. Westfall approaching

13  you in July of 2013, had you been retained by

14  anyone else prior to that time to work as a

15  consultant or an expert with respect to any

16  aspect of an SB-14?

17       A        No.

18       Q        Okay.  Did you testify before the

19  legislature concerning SB-14?

20       A        No.

21       Q        Okay.  At some point, did you give

22  testimony before the legislature on one of the

23  photo --

24       A        Yes.

25       Q        -- ID -- which one was that?

Franklin Davidson - 8/19/2014

50

```
 1      A      The 2009 bill.

 2      Q      Okay.  All right.  So Ms. Westfall

 3  approached you in July of 2014 -- '13, and did

 4  she give you a written scope of the assignment

 5  she wanted you to prepare?

 6      A      Did she send me a written document, is

 7  that what you're asking?

 8      Q      Yes.

 9      A      I don't believe so.

10      Q      Okay.  And what was your understanding

11  of the scope of the assignment that you were

12  undertaking?

13      A      As I recollect, I was asked to --

14      Q      Without going into the specifics.

15             MS. WESTFALL:  Without going into the

16  specifics.  Do you want to direct him to the

17  report where he describes his undertaking or --

18  as to avoid any work product privilege

19  communications, counsel?

20             MR. KEISTER:  Well, I don't intend to

21  dwell on this a lot.

22             BY MR. KEISTER:

23      Q      But if you can just tell me generally

24  just what you recall the scope of your assignment

25  being.  And if you need to refer to your report,
```

1    it's in front of you, you certainly may.

2         A    I was asked to write a brief account

3    of the events leading up to passage of SB-14,

4    which would include the legislative sessions of

5    2005, 2007, 2009, and 2011.

6         Q    Okay.  All right.  And any other

7    assignments or requests in addition to just

8    writing the history?

9         A    I don't think so.

10        Q    Okay.

11        A    No.  The answer is no.

12        Q    Were you asked to draw any conclusions

13   or reach any opinions at that point, or were you

14   simply asked to write a history?

15        A    I was simply asked to write a history.

16        Q    Okay.  Did there come a point at which

17   you were requested to express opinions for this

18   case, in addition to writing a brief history,

19   which you described?

20             MS. WESTFALL:  I would object.

21   Clearly -- and refer Dr. Davidson to his

22   supplemental declaration where he sets forth the

23   scope of what he has been asked to provide in

24   this case, and not communications with counsel.

25             BY MR. KEISTER:

Franklin Davidson - 8/19/2014

52

1      Q      And you are certainly welcome to

2   review or refer to -- if you need to -- to your

3   report, Doctor.  I'm not rushing you, so --

4      A      Okay.  Repeat the question, please.

5      Q      I think my question was, you initially

6   were retained to review and do a brief history

7   related to SB-14, correct?

8      A      Right.

9      Q      All right.  Then, my question was, did

10  there come a time when you were requested to go

11  deeper and to develop opinions and conclusions

12  and findings in this case that you are going to

13  present to the Court?

14     A      No.

15     Q      Okay.  But you have, in fact, in your

16  report expressed opinions in this case, correct?

17     A      Yes.

18     Q      Okay.  Did you do that on your own, or

19  at some point did somebody ask you to do it?

20            MS. WESTFALL:  And I'm going to

21  object.  The report speaks for itself in that

22  regard.

23            THE WITNESS:  I did it on my own.

24            BY MR. KEISTER:

25     Q      Okay.  Okay.  Now, before accepting

53

1  **Ms. Westfall's assignment in this case, did you**

2  **do any research or do any review to try and**

3  **determine whether or not this was a project you**

4  **were comfortable doing?**

5         A     Before when?  Before she --

6         **Q     When Ms. Westfall spoke to you, before**

7  **you actually accepted --**

8         A     Oh.

9         **Q     -- the assignment, did you do any**

10 **review or research to determine if this was a**

11 **project you were comfortable participating in?**

12        A     No.

13        **Q     Okay.  How long after Ms. Westfall**

14 **contacted you did you accept her request for you**

15 **to participate in this litigation?**

16        A     I can't remember that.

17        **Q     Okay.  Was it a lengthy period of**

18 **time?**

19        A     No.

20        **Q     Okay.  Did you enter into a contract**

21 **in this case, a written contract?**

22        A     I'm pretty sure that I did.

23        **Q     Okay.  Do you know what the terms of**

24 **that contract call for?**

25               MS. WESTFALL:  Objection.  Dr.

Franklin Davidson - 8/19/2014

54

```
1   Davidson sets forth his hourly rate in the

2   report.  Speaks for itself.

3               BY MR. KEISTER:

4       Q     In terms of the work requested, do you

5   know what the contract calls for?

6               MS. WESTFALL:  And objection.  That is

7   privileged work product.  I'm going to instruct

8   him not to answer as to the scope of the

9   contract.

10              BY MR. KEISTER:

11      Q     Are you going to follow counsel's

12  advice and not answer what you were requested to

13  do?

14              MS. WESTFALL:  Dr. Davidson, in terms

15  of -- I believe that is -- I believe that is

16  privileged.  Do you have any -- do you want to

17  set forth your basis for seeking this

18  information?

19              MR. KEISTER:  Well, I'm seeking this

20  information, so I think I'm entitled to know what

21  the scope of his assignment was that he received

22  from this case and to question him on that scope

23  of the assignment.

24              MS. WESTFALL:  I will --

25              MR. KEISTER:  But, certainly, if
```

1  you're going to instruct him not to answer, I

2  will --

3            MS. WESTFALL:  I will allow you to

4  generally ask him about the general nature of his

5  assignment, but I would refer you, counsel, to

6  his report where he sets forth what the

7  Department of Justice has requested that he do in

8  this action.

9            MR. KEISTER:  And I appreciate that,

10  but I'm going to ask him some questions about it.

11            **BY MR. KEISTER:**

12      **Q     Generally speaking, do you recall what**

13  **the contract called for with respect to the scope**

14  **of your assignment in this case?**

15      A     At the most general level, write a

16  report on the history leading up to passage of

17  SB-14.

18      **Q     And at no point did it request that**

19  **you formulate opinions in this case?**

20      A     No.  I don't recall anyone saying, you

21  must come up with this conclusion.

22      **Q     Okay.  All right.  Have you**

23  **communicated with anyone else at the Department**

24  **of Justice with respect to this case, other than**

25  **Ms. Westfall?**

Franklin Davidson - 8/19/2014

56

1       A       Yes.

2       Q       Okay.  Who else have you communicated

3  with?

4       A       Professor McCrary.

5       Q       Okay.  And who is Professor McCrary?

6       A       He is a historian in the Voting

7  Section of the Department of Justice.

8       Q       Okay.  Is he an attorney?

9       A       No.

10      Q       Okay.  All right.  And without going

11  into specifics, what was the nature of your

12  conversations with Professor McCrary?

13      A       We talked about a number of things,

14  the overall scope of the project, where some of

15  the data might be obtained.  He read a draft of

16  the report and gave me some comments on his

17  thoughts on the matter.

18      Q       Okay.  How many drafts of the report

19  do you think you shared with Professor McCrary?

20      A       Several.  Virtually all of the drafts.

21      Q       Okay.  When do you think you prepared

22  your first draft of the report in this case?

23      A       Well, using the term draft rather

24  loosely, I guess some time in early -- fairly

25  early in the current year, 2014.

Franklin Davidson - 8/19/2014

1       Q      Okay.  And did you submit that draft

2   to anyone else other than Professor McCrary?

3       A      I'm pretty sure that it was submitted

4   to Ms. Westfall and other attorneys perhaps in

5   the Voting Section or at least they saw it.

6       Q      Okay.  Was Professor McCrary your

7   primary contact with respect to working on the

8   report?

9       A      I think so, yes.

10      Q      Okay.  And how would the process work?

11  Would you draft a report and email it to

12  Professor McCrary?

13      A      Yes.

14      Q      And then would he email you back

15  comments or suggestions, that type of thing?

16      A      I think that's the way it worked, yes.

17      Q      Okay.  And did you -- as the report

18  progressed, did you accept Professor McCrary's

19  suggestions and comments, incorporate those into

20  your report?

21      A      Some of them.

22      Q      Okay.  And so you think from early

23  January 2014 up until you presented your first

24  report in this case, which was dated I believe

25  January -- June 27th, 2014, during that time

Franklin Davidson - 8/19/2014

58

1 period, how many drafts of the report do you

2 think you and Dr. McCrary shared?

3           MS. WESTFALL:  An objection.  I think

4 this is vague because of the use of the word

5 draft, which is a little unclear and may be being

6 used in different ways by the witness and

7 counsel.

8           BY MR. KEISTER:

9      Q    Okay.  Well, before we -- let's just

10 clear that up before we answer that question.

11 When you talk about a draft of the report that

12 you shared with Dr. McCrary, what are you

13 referring to?

14     A    I'm referring to several pages of a

15 version of the document as I envisaged it

16 ultimately being.

17     Q    Okay.

18     A    And many of these drafts were very

19 incomplete.

20     Q    Okay.

21     A    But I guess had a sufficient number of

22 words in them to constitute a draft rather than

23 simply a paragraph here and there.

24     Q    Okay.  So I think we're on the same

25 page.

Franklin Davidson - 8/19/2014

59

1      A      Okay.

2      Q      Between the time you began drafting

3  the report in January of 2014 and June of 2014,

4  how many times do you think you shared drafts

5  back and forth with Professor McCrary?

6      A      Oh, at least a dozen.

7      Q      Okay.  All right.  So Professor

8  McCrary had substantial input into your final

9  product?

10             MS. WESTFALL:  Objection.  Assumes

11  facts not in evidence.  Foundation.

12             BY MR. KEISTER:

13      Q      Would you agree that Professor McCrary

14  had substantial input into the final report that

15  you produced in this case?

16             MS. WESTFALL:  Objection.

17  Mischaracterizes the witness' testimony.

18             THE WITNESS:  He gave me several

19  useful suggestions, most of which I made use of

20  in the next draft that I wrote.

21             BY MR. KEISTER:

22      Q      Okay.  And then you produced your

23  report on June 27th.  Between June 27th and the

24  preparation of your supplemental report, which is

25  Exhibit Number 2 in this case, did you continue

Franklin Davidson - 8/19/2014

60

```
 1  to confer with Professor McCrary concerning the
 2  changes of your report from June 27th up until
 3  the supplemental report?
 4        A    Yes, sir.
 5        Q    Okay.  And did Professor McCrary
 6  suggest to you any of the changes that needed to
 7  be made in the report?
 8        A    Yes.
 9        Q    Okay.  Do you recall what those
10  changes were?
11        A    No.
12        Q    Okay.  But those changes are -- some
13  of those changes are reflected in your
14  supplemental report?
15        A    Yes.
16             MR. KEISTER:  Okay.  All right.  We've
17  been going about an hour and 15.  Why don't we
18  take a break?
19        (Whereupon, the above-entitled matter went
20  off the record at 10:16 a.m. and resumed at 10:33
21  a.m.)
22             MR. KEISTER:  Back on the record.
23             THE WITNESS:  I would like to make a
24  correction with regard to a question you asked me
25  about I believe the first person in the Justice
```

Franklin Davidson - 8/19/2014

61

1  Department who contacted me.

2              MR. KEISTER:  Yes, sir.

3              THE WITNESS:  And it was not Ms.

4  Westfall, but it was Meredith Bell-Platts.

5              MR. KEISTER:  Okay.

6              THE WITNESS:  And she asked me if I

7  would be interested, and I eventually told her

8  yes, and she has had medical problems and is not

9  involved.

10             **BY MR. KEISTER:**

11        **Q     Okay.  When approximately do you**

12  **recall Ms. Platts contacting you?**

13        A     It was the time I gave --

14        **Q     July of --**

15        A     -- for Ms. Westfall, yes.

16        **Q     July of 2013.**

17        A     Yes.

18        **Q     And then, at some point after that,**

19  **then you began communicating with Ms. Westfall as**

20  **opposed --**

21        A     Yes.

22        **Q     -- to Ms. Platts?**

23        A     Yes.

24        **Q     Okay.  All right.  Now, you are being**

25  **compensated in this case, correct?**

Franklin Davidson - 8/19/2014

62

1       A       That's correct.

2       Q       And how much are you being compensated

3   per hour?

4       A       $350.

5       Q       Okay.  And as of today, do you know

6   how many hours you have put into this case?

7       A       No, I haven't tallied it up.

8       Q       Okay.  And do you have an

9   approximation?

10      A       This may sound strange, but I don't.

11      Q       Okay.

12      A       I have not submitted a bill in some

13  time.

14      Q       Okay.  Have you submitted some bills

15  as this case has progressed?

16      A       Yes.

17      Q       Okay.  And how much have you actually

18  been compensated up until today?

19      A       I believe it's in the neighborhood of

20  $130,000.

21      Q       Okay.  And when do you think your last

22  bill was presented to the DOJ?

23      A       End of December of 2013.

24      Q       Okay.  And do you have an estimate as

25  to how much your bill will be -- I'm not going to

1    say at the completion of this case, because none

2    of us know when it's going to conclude, but as of

3    through trial, do you have an estimate as to how

4    much you think your final bill will be?

5                MS. WESTFALL:  Objection.  Calls for

6    speculation.

7                THE WITNESS:  I really don't know.

8                BY MR. KEISTER:

9        Q     Okay.  As of today, how much would

10   your bill be?

11       A     I don't -- I don't know.  I haven't --

12   I've got at home written down how many hours I

13   have spent in -- I have put in, but I haven't

14   tallied those hours up, and I haven't submitted

15   them to the Department.

16       Q     Okay.  So as of last December 2013,

17   you said it was $130,000?

18       A     Roughly that, yes.

19       Q     Okay.  And you began work in July, so

20   for approximately five months.

21       A     Yes.

22       Q     So do you think you put in as much

23   work after -- in the new year, in 2014, as you

24   put in prior in 2013?

25       A     Probably so.

Franklin Davidson - 8/19/2014

64

1      Q      Okay.  So do you expect the billing,

2  then, to be roughly the same as 2013, up until

3  today?

4      A      Probably somewhere in that

5  neighborhood, but it's just speculation.

6      Q      Okay.  Okay.  And I'm just trying to

7  get a rough idea.  I understand that none of us

8  can tell how long we will be continuing on this

9  activity.  When did you actually begin working on

10  the case in terms of starting to do research,

11  that type of thing?

12          MS. WESTFALL:  Objection.  Asked and

13  answered.

14          THE WITNESS:  Virtually as soon as it

15  was determined that I was going to be an expert

16  in this case.  That would have been back in July

17  or early August.

18          BY MR. KEISTER:

19      Q      Okay.  Tell me what you did with

20  respect to your research.  How did you conduct

21  the research that you ultimately used to

22  formulate your opinions in this case?

23      A      I began with newspaper accounts of the

24  various sessions, and I asked the Justice

25  Department for information that might be of use

Franklin Davidson - 8/19/2014

65

1  and they responded with other kinds of data.

2       Q     So you began researching newspaper

3  articles?

4       A     Yes.

5       Q     On the internet, I assume?

6       A     Yes.

7       Q     Okay.  And then you requested

8  information from the Department of Justice,

9  correct?

10      A     Yes.

11      Q     And what type of information did the

12 Department of Justice provide you?  And,

13 certainly, at any time if you need to refer to

14 your report, Doctor, you're welcome to.  This

15 isn't necessarily a memory test.

16      A     They gave me depositions.  They gave

17 me such things as a copy of Ansolabehere's

18 research.  Information such as House debate,

19 March 21st, 2011, various things of that sort.

20 Some legal cases, citations primarily, that I

21 followed up on.  I think I mentioned depositions.

22      Q     You did.  Were these materials

23 provided to you all at once, or was this

24 something that was provided over a period of

25 time?

1      A     It was over a period of time, yes.

2      **Q     Okay.  And were these items that you**

3  **requested, or were these items that simply the**

4  **Department of Justice sent to you?**

5      A     I think some of them I requested and

6  some of them they just sent to me.

7      **Q     Okay.  Now, in your report you cite a**

8  **considerable number of published books and**

9  **articles and treaties, and that type of thing.**

10 **With respect to those type of references, did you**

11 **have knowledge of those references before you**

12 **took on this case?  Or did you learn everything**

13 **from scratch that is --**

14     A     No, I had knowledge of a good bit of

15 the material that I cite here, especially the

16 academic journals and books, things of that sort.

17     **Q     Okay.  The material or the information**

18 **that is contained in your report, particularly**

19 **with respect to the historical aspects and the**

20 **other issues that aren't directly related to SB-**

21 **14, have you utilized that information in**

22 **previous reports in other cases?**

23            MS. WESTFALL:  Objection.  Vague.

24            MR. KEISTER:  Well, I'm talking

25 about --

1          MS. WESTFALL:  Lack of foundation.

2          **BY MR. KEISTER:**

3     **Q     I'm talking about your section on the**

4  **history of Texas with respect to discrimination.**

5  **I'm talking about the history with respect to**

6  **Voting Rights Act and those type of issues,**

7  **because I understand you said that you had not**

8  **previously worked on SB-14, correct?**

9     A     Yes, that's correct.

10    **Q     Okay.  So what I'm asking is the stuff**

11 **that's not specifically on SB-14.  Have you**

12 **utilized that information in other reports and**

13 **other cases?**

14    A     I think that I have used some of it,

15 yes.

16    **Q     Okay.  And we'll get into the other**

17 **cases here in a minute, so I don't want to get**

18 **too far off on a tangent.  But you mentioned that**

19 **one of the first things you started doing when**

20 **you started researching was looking at newspaper**

21 **articles, correct?**

22    A     Yes, sir.

23    **Q     How do you go about validating the**

24 **accuracy of information that you review in things**

25 **such as newspaper articles, magazine articles,**

1  **internet articles, those type of items?  How do**

2  **you validate the information in those articles**

3  **are accurate?**

4       A     Well, one typically takes into account

5  the type of newspaper or magazine that one is

6  reading.  Some have a fairly high degree of what

7  I would call reputation in terms of your being

8  able to accept the work that is done, and then

9  there are certain journalists as well who are

10 well known to be accurate and fair in their

11 reportage of the news.

12            And so I do the same thing as

13 virtually all scholars who cite the printed page

14 or I guess today the media, and so forth, you go

15 to some lengths to ensure that you are getting a

16 balanced account from people who are respected in

17 their field as journalists.

18       Q     Okay.  Throughout your work on this

19 **case, did you do anything to go behind the**

20 **printed word?  Because I know you cited the many**

21 **articles in your paper.  Did you do anything to**

22 **go behind the printed word and to check on the**

23 **sources or check on the accuracy of the**

24 **information that is in the articles that you**

25 **refer to in --**

Franklin Davidson - 8/19/2014

69

```
 1        A     No.

 2        Q     Okay.  So other than you being

 3  comfortable that the sources that you've cited to

 4  are reputable, you are really simply taking for

 5  face value what is on the printed page.

 6              MS. WESTFALL:  Objection.

 7  Mischaracterizes the witness' testimony.

 8              BY MR. KEISTER:

 9        Q     Is that correct?

10        A     To the extent possible, I try to

11  supplement data in newspaper articles with other

12  sources, but that's not always possible.  And

13  what I'm doing here is essentially what virtually

14  all scholars do is make some kind of judgments

15  based upon their scholarship and training as to

16  which kinds of articles, which kinds of

17  newspapers, which kinds of magazines are more

18  reputable and trustworthy than others.

19        Q     Okay.  But my question is really more

20  basic than that, not with respect to your

21  process, but just the fact is that with respect

22  to the newspaper articles you cite, you've taken

23  them on face value as to what is on the printed

24  word, correct?

25              MS. WESTFALL:  Objection.  Is there a
```

1 particular article that you want to point the

2 witness to?  Are you talking about all of the

3 articles?  In which case I would ask the witness,

4 Dr. Davidson, to review the footnotes, so we can

5 talk about specifics instead of a general overall

6 assessment.

7                MR. KEISTER:  You can answer my

8 question.

9                MS. WESTFALL:  If you can.

10               THE WITNESS:  Repeat the question.

11               **BY MR. KEISTER:**

12      **Q     Okay.  My question was simply this.**

13 **You've already testified that you have not talked**

14 **-- or maybe you have -- on the newspaper articles**

15 **you've cited in your paper, have you gone back**

16 **and spoken to any of the writers about the --**

17      A     No.

18      **Q     Let me get this out.**

19      A     Oh, I'm sorry.

20      **Q     That's okay.  I'm doing it, too, so --**

21 **but he's going to get mad at us.  Have you gone**

22 **back and spoken to any of the writers of the**

23 **articles to talk to them about the accuracy of**

24 **what they put in their articles?**

25      A     No, sir.

Franklin Davidson - 8/19/2014

71

1      **Q      Okay.  And have you gone beneath**

2   **what's on the printed page and tried to interview**

3   **any of the people or sources that are quoted in**

4   **any of those newspaper articles?**

5      A      No.

6      **Q      Okay.  And other than your opinion**

7   **that the articles are from reputable sources and**

8   **reputable writers, have you done anything else to**

9   **confirm the accuracy of what's in those articles,**

10  **or are you simply relying upon what's printed on**

11  **the face of the article as being correct?**

12            MS. WESTFALL:  Objection.  Vague,

13  calls for speculation, not clear what article the

14  question is directed to.

15            **BY MR. KEISTER:**

16     **Q      You can answer.**

17     A      Well, to the extent possible -- and

18  this is just a general statement -- I have tried

19  to keep an eye out for information in other

20  sources, whether they be depositions or what have

21  you, that might contradict what I read in journal

22  articles.

23     **Q      Okay.  But other than --**

24     A      Other newspaper articles.

25     **Q      But other than checking what some one**

1  **printed page in the newspaper articles you've**

2  **cited -- other than checking them against another**

3  **printed page from another article, you haven't**

4  **gone beyond that until you confirm the accuracy**

5  **of those articles, correct?**

6  　　　　　MS. WESTFALL:  Objection.

7  Mischaracterizes the witness' testimony.

8  　　　　　THE WITNESS:  Yes.  I think -- I mean,

9  I -- not yes, but in answer to your question, I

10  have tried, where possible, to -- where I have

11  had, for example, access to, say, the Senate

12  Journal or things like that, official documents

13  of one sort or another, Texas Legislative

14  Reference Library, or so forth, I have tried to

15  measure what I have read in the newspapers

16  against those kinds of official documents.  But I

17  can't give you specific examples of what those

18  are.

19  　　　　　**BY MR. KEISTER:**

20  　　**Q**　　**Okay.  Do you consider the Texas**

21  **Legislative Reference Library a credible source?**

22  　　A　　Yes.

23  　　**Q**　　**Okay.  Okay.  All right.  Just to wrap**

24  **this up, other than checking the references in**

25  **the articles, or the statements in the articles,**

Franklin Davidson - 8/19/2014

73

1   against what you may have read in other

2   documents, you have done nothing else to confirm

3   the accuracy of what is in those statements and

4   those articles, correct?

5               MS. WESTFALL:  Objection.  Vague.

6               THE WITNESS:  Yes.

7               BY MR. KEISTER:

8        Q    Okay.  Thank you.  And I'm only

9   smiling because we've completed it.

10              MS. WESTFALL:  Turning the page.

11              (Laughter.)

12              BY MR. KEISTER:

13       Q    All right.  Did you conduct any

14   interviews during your work on this case of any

15   legislators?

16       A    No.

17       Q    Okay.  And that would be the

18   legislators that were in support of SB-14 as well

19   as legislators that opposed SB-14.

20       A    None whatsoever.

21       Q    Okay.  Did you conduct any interviews

22   of any government officials with respect to your

23   work in this case?

24       A    Absolutely not.

25       Q    Okay.  Did you perform any type of

Franklin Davidson - 8/19/2014

74

1   original surveys, polling, things of that nature

2   in this case?

3       A     No, sir.

4       Q     Okay.  Did you conduct any type of

5   original research in this case, other than your

6   search of the internet for newspaper articles and

7   treaties and that type of thing?

8               MS. WESTFALL:  Objection.  Not clear

9   what original research is referred to.

10              THE WITNESS:  Well, I have gone

11  through, as I say, some of the official

12  documents, and so forth.  But I -- I have not

13  done original research of the sort that I guess a

14  scholar would interpret as original research of

15  having gone into the field and observed or, as I

16  said, conducted an opinion poll or a poll trying

17  to get information about the extent to which

18  people don't have the necessary photo IDs or what

19  have you.

20              BY MR. KEISTER:

21      Q     Okay.  So the extent of your research

22  and work in this case has been your research with

23  respect to the internet and finding articles and

24  treaties and publications that relate -- that you

25  thought related to the issues in this case, and

1  then reviewing the information that the

2  Department of Justice has given you in this case?

3          MS. WESTFALL:  Objection.

4  Mischaracterizes the witness' testimony.

5          BY MR. KEISTER:

6      Q      You may answer.

7      A      Could you repeat the question?

8      Q      Yes, let me try again.  So if I'm

9  understanding you correctly, your work in this

10 case has been, number one, conducting internet

11 searches with respect to SB-14 and looking for

12 newspaper articles, magazine articles, written

13 publications, and that type of thing, correct?

14 That's number one, correct?

15     A      Well, that's part of it, yes.

16     Q      Okay.  Is there anything else you've

17 done on the internet looking for articles other

18 than what I just said?  I'm breaking the question

19 down a little bit here.

20     A      Yes.

21     Q      Okay.

22     A      I guess that's correct.

23     Q      Okay.  And then, if I understood you

24 correctly, in addition to the internet searches,

25 you have been provided information by the

Franklin Davidson - 8/19/2014

76

1    Department of Justice, correct?

2         A    Yes.

3         Q    And you've reviewed that information

4    and utilized that information along with the

5    information you obtained from the internet in

6    order to come to your opinions in this case,

7    correct?

8              MS. WESTFALL:  Objection.

9    Mischaracterizes the witness' testimony.  Is that

10   the full list?  I don't understand the question.

11             MR. KEISTER:  Well, he does.

12             BY MR. KEISTER:

13        Q    You can answer the question.  Do you

14   want me to ask it again?

15        A    I need you to ask it again.

16        Q    And that's fine.  I don't mind.

17   Believe me, any time you need me to clarify, just

18   ask.

19        A    Okay.

20        Q    Because I'm -- I do get rambly.  All

21   right.  You testified that you began your

22   research in this case by conducting an internet

23   search, correct?

24        A    Yes.

25        Q    And from that internet search, you

Franklin Davidson - 8/19/2014

77

```
 1   obtained various newspaper articles, magazine
 2   articles, things of that nature, correct?
 3         A     Yes.
 4         Q     Okay.  And in addition to that, you've
 5   been provided documents by the Department of
 6   Justice, correct?
 7         A     That's correct.
 8         Q     And you've reviewed the documents the
 9   Department of Justice provided you, correct?
10         A     That's correct.
11         Q     And the information that you've
12   gleaned from the Department of Justice documents
13   you've utilized in your report, correct?
14         A     Yes.
15         Q     As well as the information you
16   obtained in your internet search, correct?
17         A     Yes.
18         Q     All right.  Now, is there anything
19   else that you have reviewed, researched or done,
20   other than what we just discussed, in order to
21   assist you to reach your opinions in this case?
22               MS. WESTFALL:  I'm going to object to
23   the use of the term DOJ materials as vague,
24   undefined.
25               THE WITNESS:  I looked at a good many
```

Franklin Davidson - 8/19/2014

78

1    depositions.

2              **BY MR. KEISTER:**

3         **Q     Were those provided to you by the**

4    **Department of Justice?**

5         A     Yes.

6         **Q     Okay.**

7         A     And, as I said, the House research

8    organization.

9         **Q     Okay.**

10        A     Senate Journal.

11        **Q     Were those provided to you by the**

12   **Department of Justice?**

13        A     I think some of them may have been,

14   but others weren't.

15        **Q     Okay.  How did you obtain the ones**

16   **that weren't?**

17        A     I can't give you an answer to that

18   question.

19        **Q     Possibly from the internet?**

20        A     That's entirely possible, yes.  I

21   think that primarily covers it.

22        **Q     Okay.  All right.  Before you prepared**

23   **your original report in this case on June 27th,**

24   **did you consult with any of the other expert**

25   **witnesses that had been retained by the**

Franklin Davidson - 8/19/2014

79

1  Plaintiffs and Plaintiff-Intervenors in this case

2  before you prepared your report?

3        A     No.

4        Q     Okay.  Did you review any reports from

5  the other Plaintiff expert witnesses and

6  Plaintiff-Intervenor expert witnesses prior to

7  preparing your report in this case?

8              MS. WESTFALL:  Objection.  Foundation.

9              THE WITNESS:  I'm sorry.  Could you

10 repeat that question?

11             BY MR. KEISTER:

12       Q     Sure.  Prior to preparing your report,

13 the original copy on June 27th --

14       A     No, wait.  Just to interrupt, I didn't

15 prepare a report on June 27th.  That's when I

16 began my research.

17       Q     I believe your -- your report you

18 submitted in this case originally was on

19 June 27th, 2014, correct?

20       A     Oh.  Oh, 2014.  I'm sorry.  I'm sorry.

21 That's the --

22       Q     We kind of jumped years here.  So

23 before preparing your original report on

24 June 27th, 2014, in this case, had you reviewed

25 any reports prepared by the other expert

Integrity Legal Support Solutions
www.integrity-texas.com

Franklin Davidson - 8/19/2014

80

1    witnesses in this case?

2              MS. WESTFALL:  Objection.  Foundation.

3              THE WITNESS:  I think I had.

4              BY MR. KEISTER:

5        Q      Okay.  Do you recall which ones you

6    had reviewed?

7        A      I think Vernon Burton, another one

8    whose name I can't think of right off the bat.

9    He teaches at American University, a political

10   scientist.  His name will come to me, but I can't

11   think of it right now.

12       Q      Okay.  Are those the only two you

13   recall having reviewed prior to preparing your

14   report?

15       A      Right off the top of my head, but

16   there may be others.

17       Q      Okay.  All right.  Did you consult

18   with any of the other attorneys in this case,

19   other than the Department of Justice attorneys,

20   prior to preparing your report in this case?

21       A      No.

22       Q      Okay.  Other than Professor McCrary

23   and the attorneys at the Department of Justice,

24   did anyone else review your report before you

25   submitted it in this case?

Franklin Davidson - 8/19/2014

81

```
 1        A     No.

 2        Q     Okay.  Other than Dr. McCrary with the

 3  Department of Justice, did you consult with any

 4  other professionals outside of the Department of

 5  Justice, or within the Department of Justice,

 6  concerning the issues in your report?

 7        A     No.

 8              MR. KEISTER:  Okay.  I hate to do

 9  this, but I'm going to invoke my rule and call a

10  break.

11              MS. WESTFALL:  Oh, good, a break.

12              (Whereupon, the above-entitled matter

13  went off the record at 11:00 a.m. and resumed at

14  11:06 a.m.)

15              THE WITNESS:  One correction I wanted

16  to make --

17              MR. KEISTER:  Yes, sir.

18              THE WITNESS:  -- is that, in addition

19  to newspaper articles and the other things that I

20  mentioned, were academic books and journals that

21  I relied on.

22              BY MR. KEISTER:

23        Q     Okay.  Thank you.

24        A     I included in my footnotes.

25        Q     Okay.  Thank you.  Okay.  Got it.
```

Franklin Davidson - 8/19/2014

82

1           All right.  Doctor, in your report you

2    address a considerable amount of Texas history,

3    correct?

4           A    Yes, sir.

5           Q    And you consider yourself to have

6    sufficient expertise to set forth the historical

7    aspects of your report, correct?

8           A    Yes, sir.

9           Q    Okay.  You also mentioned earlier that

10   you consider the Texas Legislative Reference

11   Library to be a credible source?

12          A    Yes, sir.

13                         (Whereupon, the document was

14                         marked as Davidson Exhibit

15                         No. 5 for identification.)

16          BY MR. KEISTER:

17          Q    Okay.  I'm going to show you, Doctor,

18   what I have marked as Exhibit No. 5.  And I'll

19   represent to you that this is a document that I

20   took off the internet from the Legislative

21   Reference Library of Texas that sets out a list

22   of the Governors of Texas, correct?  Does that

23   appear to be correct?

24          A    What page are we on here?  Oh, page 2?

25   Yes.

Franklin Davidson - 8/19/2014

83

1      Q      Yes, sir.  Yes, sir, page 2.

2      A      Uh-hum, okay.

3      Q      We start from recent; Governor Perry

4 is, of course, the current Governor.  And then,

5 you will see that it goes back in time --

6      A      Yes.

7      Q      -- all the way back to J. Pinckney

8 Henderson, a Democrat, in 1846, correct?

9      A      Yes.

10      Q      Okay.  And looking up the list from

11 the second page upward, we'll see that the first

12 four Governors of Texas were Democrat, correct?

13      A      Well, yes, beginning with Pinckney

14 Henderson.  Is that --

15      Q      Correct, right.  And then, going up.

16 And I had to put my glasses on, too.  So, it's a

17 little small print.

18      A      Okay.

19      Q      So, we had four Democrat Governors up

20 until November the 23rd, 1853, or, actually,

21 December 21st, 1853.  And then, we had a

22 Republican Unionist who was Governor in 1867,

23 correct?

24      A      Yes.

25             MS. WESTFALL:  And I want to object.

Franklin Davidson - 8/19/2014

84

1    The document speaks for itself.  I have a

2    standing objection to the use of this document.

3              MR. KEISTER:  Okay.

4              **BY MR. KEISTER:**

5         **Q     And then, if you look at from Hardin**

6    **Runnels, who is a Democrat, he left office in**

7    **1859, correct?**

8              **And then, you go up the list to Edmund**

9    **J. Davis in 1870 --**

10        A     Yes.

11        **Q     Edmund J. Davis was a Republican,**

12   **correct?**

13        A     That's correct.

14        **Q     Okay.  But, other than the Republican**

15   **Unionist that we saw earlier, Edmund J. Davis was**

16   **the only Republican Governor up to that point,**

17   **correct?**

18        A     That's correct.

19        **Q     And Edmund J. Davis was a Republican**

20   **Governor during the Reconstruction Period,**

21   **correct?**

22        A     That's correct.

23        **Q     And you tell the Court briefly what**

24   **we're talking about when we talk about the**

25   **Reconstruction Period in Texas?**

Franklin Davidson - 8/19/2014

1          MS. WESTFALL:  Objection.  Calls for

2    a narrative response.

3               **BY MR. KEISTER:**

4          **Q      You may answer.**

5          A      That was the period after the Civil

6    War when some changes were made in the

7    relationship, among other things, between Blacks

8    and Whites and the ability of Black citizens to

9    vote, that sort of thing.

10         **Q      Okay.  And during the Reconstruction,**

11   **that was basically the period of time in which**

12   **Texas was becoming again part of a United States,**

13   **correct?**

14         A      That's correct.

15         **Q      Okay.  And during that time period**

16   **there was federal control of the State, correct?**

17         A      There was what?

18         **Q      Federal --**

19         A      Yes, uh-hum.

20         **Q      -- control of the State.  All right.**

21   **And then, up in 1874 Edmund Davis left office,**

22   **correct?**

23         A      That's correct.

24         **Q      All right.  And then, from 1874, if**

25   **you go up the list -- well, you have to go all**

Franklin Davidson - 8/19/2014

86

1   the way to 1987 before we find a Republican

2   Governor, correct?

3        A    That's correct.

4        Q    And that Republican Governor was

5   Governor Clements, correct?

6        A    Correct.

7        Q    And then, he served --

8             MS. WESTFALL:  Objection.  Misstating

9   the document.

10            BY MR. KEISTER:

11       Q    And then, he served on term.  And

12  then, Mark White became Governor in 1983,

13  correct?

14       A    It looks to me like Clements served

15  two terms, both '79 to '83 and '87 to '91.

16       Q    Oh, that's correct.  I apologize.

17  We've got both of them here.

18       A    And I believe he may have originally

19  run as a Democrat, but I'm not certain about

20  that.  But, at any rate, he ended -- he was

21  certainly Republican his second term --

22       Q    Okay.

23       A    -- in office.

24       Q    And if we read this in order, it was

25  Bill Clements in '79, you're correct.  And then,

Franklin Davidson - 8/19/2014

87

1   **Mark White served from '83 to '87, correct?**

2        A     Well, he did, but I think he may have

3   served another term as well, '68 through '70.

4   Oh, that's -- okay, all right, yes.

5        **Q     Okay?  And then, Mark White was a**

6   **Democrat, correct?**

7        A     That's right.

8        **Q     And isn't it correct that, after Mark**

9   **White served, that Clements ran against him**

10  **again, and Clements won his second term?  Is that**

11  **--**

12       A     I believe that's correct.

13       **Q     Okay.  And then, after Bill Clements'**

14  **second term, then Ann Richards, who is a**

15  **Democrat, became Governor, correct?**

16       A     Yes.

17       **Q     And then, we had, of course, George W.**

18  **Bush, who is a Republican, became Governor,**

19  **correct?**

20       A     Yes.

21       **Q     And then, we have Rick Perry became**

22  **Governor and is Governor today, correct?**

23       A     That's correct.

24       **Q     All right.  So, basically, throughout**

25  **this history, from the time of Reconstruction,**

Franklin Davidson - 8/19/2014

88

1   when Edmund J. Davis, the last Republican left

2   office, we had approximately 105 years of

3   Democratic Governors in the State of Texas,

4   correct?

5        A       Yes.

6        Q       Up until the time that Bill Clements

7   broke that string?

8               And throughout your report, you talk

9   about the history of discrimination, racial

10  discrimination, in Texas politics with issues

11  like poll tax, White primary, those things.

12  Isn't it true that throughout that history the

13  State of Texas was under the control of the

14  Democratic Party?

15       A       Yes, sir.

16                      (Whereupon, the document was

17                      marked as Davidson Exhibit

18                      No. 6 for identification.)

19              BY MR. KEISTER:

20       Q      Okay.  Let me show you, sir, what I've

21  marked as Exhibit No. 6.  And I'll represent to

22  you, sir, this is another document that I took

23  from the internet, from the Legislative Reference

24  Library of Texas.  And like the list of

25  Governors, this is a list of the Lieutenant

Franklin Davidson - 8/19/2014

89

1   Governors of Texas, correct?

2          A      Yes.

3          Q      And before we go there, with respect

4   to the list of Governors in Exhibit 5, did you

5   see anything on that list that you thought was

6   out of place or incorrect, other than the double

7   listing of Governor Clements' two terms?

8          A      Not just at a glance, no.

9          Q      Okay.  All right.  Thank you.

10          Then, back to Exhibit No. 6, this is

11   the list of Lieutenant Governors in Texas,

12   correct?

13          A      Yes.

14          Q      And once again, if we start at the

15   bottom, we see the first Lieutenant Governor was

16   Albert Clinton Horton.  He served back in 1846 to

17   1847.  He was a Democrat, correct?

18          A      Yes.

19          Q      And then, from that point going

20   upwards, we have an unbroken string of Democrats

21   up until Edward Clark.  He is noted to be an

22   Independent, correct?

23          A      Yes.

24          Q      And then, from Edward Clark going all

25   the way up 1991 -- no, I'll take that back -- up

Franklin Davidson - 8/19/2014

90

1  to 1999, when Rick Perry was elected Lieutenant

2  Governor as a Republican, there's an unbroken

3  string of Democrats of Lieutenant Governors,

4  correct?

5       A     Yes, sir.

6       Q     And then, the only Republican

7  Lieutenant Governors on this list are those that

8  began with Rick Perry, beginning 1999.  Then, we

9  had Bill Ratliff to take over in 2000, and then,

10  David Dewhurst who took over in 2003 and has

11  served until the present, correct?

12      A     That's correct.

13      Q     Yes.  So, with respect to the list of

14  Lieutenant Governors, if my math is correct,

15  we've got a 126-year string of Democrat

16  Lieutenant Governors, correct?

17      A     That's correct.

18      Q     Okay.  Do you know when the

19  Republicans finally were able to have a majority

20  of Republicans in the State Senate?

21      A     Not offhand, no.

22      Q     Okay.  It was 1996.  Sound familiar to

23  you?

24      A     Okay.

25                      (Whereupon, the document was

 1                    marked as Davidson Exhibit

 2                    No. 7 for identification.)

 3          **BY MR. KEISTER:**

 4     **Q**     Let me show you what I've marked as

 5  **Exhibit 7, sir.  And once again, this is another**

 6  **document taken from the internet, from the**

 7  **Legislative Reference Library.  And this is a**

 8  **list of the Speakers of the Texas House of**

 9  **Representatives, correct?**

10     A     Yes, sir.

11     **Q**     And it sets out their parties as well

12  **as their terms in office, correct?**

13     A     Yes, sir.

14     **Q**     Okay.  And if we look at the very

15  **bottom, apparently, the first Speaker was William**

16  **Bourland, who is a Democrat, 1846 to 1847,**

17  **correct?**

18     A     Yes, sir.

19     **Q**     And are you aware, sir, that the

20  **Speaker of the House is chosen by a vote of the**

21  **Members of the House, correct?**

22     A     That's correct.

23     **Q**     And typically speaking, when the

24  **majority in the House is Democrats, then the**

25  **Speaker is Democratic, correct?**

92

1       A       I would say, typically speaking, yes.

2       Q       And typically speaking, when the

3  majority is Republican, the Speaker is

4  Republican, correct?  Correct?

5       A       Yes.

6       Q       Okay.  Thank you.

7               All right.  So, if look from William

8  Bourland and we go upwards, we had an unbroken

9  string of Democrats up until the end of the Civil

10 War, correct, which was 18-- -- we have such last

11 Democrat at the end of the Civil War --

12      A       Yes.

13      Q       -- which is Marion DeKalb Taylor,

14 Democrat, 1863 to 1866, correct?

15      A       Yes.

16      Q       And at the end of the Civil War, we

17 went into Reconstruction, correct?

18      A       Yes.

19      Q       And it looks like we had a Unionist

20 who was the Speaker.  That was Nathaniel Macon

21 Burford, correct?

22      A       Yes.

23      Q       And then, we had two Republican

24 Speakers, Ira Hobart Evans and William Henry

25 Sinclair, correct?

Franklin Davidson - 8/19/2014

93

1       A     Yes.

2       **Q     Sinclair left office in 1873, correct?**

3             MS. WESTFALL:  I just want to make an

4    objection.  The document speaks for itself.

5    You're just asking him to confirm his reading of

6    the document, correct?

7             **BY MR. KEISTER:**

8       **Q     Is that correct?**

9       A     That's my understanding, yes.

10      **Q     From --**

11            MS. WESTFALL:  Based on the review of

12   Exhibit 7.

13            **BY MR. KEISTER:**

14      **Q     And then, after the last Republican,**

15   **William Henry Sinclair, left office in 1873, we**

16   **see an unbroken string of Democrats all the way**

17   **up to the second from the top, which is Tom**

18   **Craddick, who is a Republican and took office in**

19   **2003, correct?**

20      A     Yes.

21      **Q     And so, Tom Craddick served as Speaker**

22   **from 2003 to 2009, correct?**

23      A     Yes.

24      **Q     And then, the next Speaker is Joe**

25   **Straus.  He's a Republican, correct?**

Franklin Davidson - 8/19/2014

94

1    A    Yes.

2    Q    And he came into office in 2009 and is

3 still presently in office, correct?

4    A    Yes.

5    Q    Okay.  So, just looking at the list of

6 the Speakers, if my math is correct, we had a

7 130-year string of Democrat Speakers of the

8 House.  Does that sound correct?

9    A    Yes.

10    Q    Okay.  Do you when, looking at this

11 list, when the Republican Party finally gained a

12 majority of Representatives in the House?

13            MS. WESTFALL:  Objection.  Since

14 that's not into evidence, foundation.

15            THE WITNESS:  Well, assuming that you

16 need a Republican majority in the House to elect

17 a Republican Speaker, that would have been in

18 2003 and continuing to the present.

19            BY MR. KEISTER:

20    Q    From your expertise from a historian

21 and someone with knowledge of Texas politics, do

22 you see anything on this list that you think is

23 incorrect?

24    A    No.  Given my quick reading of a great

25 deal of data here.

1     Q     But nothing jumps out at you as being

2  incorrect?

3     A     I'm sorry?

4     Q     Nothing jumps out at you on that page

5  as --

6     A     No.

7     Q     -- being incorrect?

8                    (Whereupon, the document was

9                    marked as Davidson Exhibit

10                    No. 8 for identification.)

11           BY MR. KEISTER:

12     Q     Let me show you, sir, what I'm marking

13  as Exhibit 8, which is also a document taken from

14  the Legislative Reference Library of Texas.  And

15  this information sets out the former Attorney

16  Generals of the State of Texas.

17           MS. WESTFALL:  Is there a question

18  pending?

19           MR. KEISTER:  There is as soon as I

20  think of it.

21           BY MR. KEISTER:

22     Q     Okay.  The first category is actually

23  the Attorney Generals of the Republic of Texas,

24  correct?

25     A     Yes.

1      Q      And then, we come down to the second

2   category which is the Attorney Generals of the

3   State, correct?

4      A      Yes.

5      Q      And then, we see in that first

6   category, pre-Civil War, we see the Attorney

7   Generals listed, correct?

8      A      Yes.

9      Q      And over to the right, not all of the

10  Attorney Generals prior to the Civil War are

11  listed by party, correct?

12     A      That's correct.

13     Q      Okay.  However, the last Attorney

14  General before the Civil War was a Democrat.

15  That was Malcolm Dr. Graham, correct?

16     A      Yes.

17     Q      And then, during the Confederacy,

18  there's two Attorney Generals listed as

19  Democrats, correct?

20     A      Yes.

21     Q      George M. Flourney and N. G. Shelley,

22  correct?

23     A      Yes.

24     Q      And then, we had B. E. Tarver.  He

25  doesn't have a party designation listed, correct?

Franklin Davidson - 8/19/2014

97

1        A     Yes.

2        Q     All right.  And then, we come down to

3  the Reconstruction Period and we see William

4  Alexander, who was a Unionist, served as Attorney

5  General up until 1866, correct?

6        A     Yes.

7        Q     And then, W. M. Walton, who was a

8  Democrat, served up until 1867, correct?

9        A     Yes.

10       Q     And then, we have a mixture.  We have

11  a Republican, an Independent, and then, a

12  Republican again, correct?

13       A     Yes.

14       Q     And the last Republican at the end of

15  Reconstruction was William Alexander, correct?

16       A     Yes.

17       Q     All right.  And then, looking down the

18  list, following Reconstruction, the first

19  Attorney General is George Clark, who is a

20  Democrat, correct?

21       A     Yes.

22       Q     And then, there is a George McCormick

23  two down who doesn't have a party listed,

24  correct?

25       A     Yes.

Franklin Davidson - 8/19/2014

98

1     Q     And McCormick was 1878 to 1880,

2  correct?

3     A     Yes.

4     Q     And then, from that period forward, we

5  see an unbroken stream of Democrats down to 1999,

6  when John Cornyn, who is a Republican, was

7  elected Attorney General, correct?

8     A     Yes.

9     Q     And then, below that, we see Greg

10  Abbott, who was elected in 2002, a Republican, as

11  Attorney General, correct?

12     A     Yes.

13     Q     So, there was an approximate 125-year

14  string of Democrat Attorney Generals before a

15  Republican is elected in 1999, correct?

16     A     Yes.

17                    (Whereupon, the document was

18                    marked as Davidson Exhibit

19                    No. 9 for identification.)

20          BY MR. KEISTER:

21     Q     I show you now a document, sir, which

22  is marked as Exhibit 9, which is another document

23  from the Legislative Reference Library of Texas.

24  And this particular document shows the party

25  affiliation on the first day of the legislative

Franklin Davidson - 8/19/2014

99

1  session throughout the history of Texas, correct?

2  And you can take a moment and look at it.

3       A     Yes.

4       Q     And if you turn to the last page,

5  looking upward from the end of Reconstruction,

6  which was 1874, approximately --

7                 MS. WESTFALL:  Objection.  Question

8  pending?

9                 BY MR. KEISTER:

10      Q     Then, we begin to see that in 1876 the

11  Legislature of the House was made up of 81

12  Democrats and 7 Republicans, correct?

13      A     Yes.

14      Q     And the Senate had 26 Democrats and 3

15  Republicans, correct?

16      A     Yes.

17      Q     And one "other" --

18      A     Yes.

19      Q     -- correct?

20                 And then, as we proceed through the

21  years upwards, up the page, we see in every

22  legislative session that both the House and the

23  Senate were overwhelming dominated by Republican

24  Members, correct?

25      A     I believe that's not true.

Franklin Davidson - 8/19/2014

100

1    Q    Okay.

2    A    It was by Democratic.

3    Q    Did I say "Republican"?

4    A    Yes.

5    Q    Well, thank you.

6         (Laughter.)

7         Thanks for that correction.

8         Going up the list -- we'll get up

9    there soon -- going up the list from the

10   beginning, we see that the House and Senate were

11   overwhelming populated by Democrats, correct?

12   A    Correct.

13   Q    And, in fact, the Republicans had very

14   small numbers, on this page mainly like one

15   Member, two Members, three Members, that type of

16   thing, correct?

17   A    Yes.  And finally, no Members.

18   Q    Finally, no Members.

19        And then, going to the first page,

20   continuing up the list, we see the same thing;

21   many of these no Republican Members.  Then, all

22   the way up until approximately 1971, then we see

23   the Republicans had ten Members in the House and

24   two in the Senate, correct?

25   A    Yes.

1      Q      And then, they gradually picked up

2  little by little by little, all the way until

3  1999, when the Republicans -- I'll take that back

4  -- 1997, when the Republicans took a slight

5  majority in the Senate, which was 16 Republicans

6  and 14 Democrats, correct?

7      A      Yes.

8      Q      And then, the House remained under

9  Democratic control that year, correct?

10     A      Yes.

11     Q      And then, the Republicans stayed in

12  control by the Senate, correct?

13     A      Yes.

14     Q      And then, all the way up until, it was

15  all the way up 'til 2003, when the Republicans

16  first took a majority in the House, correct?

17     A      Yes.

18     Q      And in that same year, they also had

19  a majority in the Senate, correct?

20     A      Yes.

21     Q      And from 2003 forward, both the House

22  and the Senate have been under Republican

23  control, correct?

24     A      Yes.

25     Q      Okay.  And with respect to Exhibit No.

1   9, sir, based upon your expertise in history and

2   the history of politics in Texas, does anything

3   on that list appear to be inaccurate to you?

4           A      No.

5                           (Whereupon, the document was

6                           marked as Davidson Exhibit

7                           No. 10 for identification.)

8           BY MR. KEISTER:

9      Q    Okay.  Let me show you, sir, what I am

10  marking as Exhibit No. 10.  And I will represent

11  to you that this is not from the Legislative

12  Reference Library, but I did find this off the

13  internet on Wikipedia.

14           And Exhibit No. 10 is a list of the

15  Supreme Court Justices in Texas throughout

16  history.

17           MS. WESTFALL:  I would like a standing

18  objection to this exhibit on the basis of

19  relevance.

20           MR. KEISTER:  Okay.

21           BY MR. KEISTER:

22      Q    And if you turn to page 3 of the

23  exhibit, you will see that it starts to show each

24  place on the Supreme Court and the members of the

25  Supreme Court and the party to which they

Franklin Davidson - 8/19/2014

1    belonged.  And that continues all the way through

2    to the third page of the document, correct?  I

3    will take that back to the one, two, three, to

4    the fifth page of the document.

5         A    Yes.

6         Q    Okay.  Now just reviewing this briefly

7    -- we are not going to spend a whole lot of time

8    on it -- but, with respect to each Supreme Court

9    place or seat on the Texas Supreme Court, that

10   each was dominated by Democratic members all the

11   way down to the 1980s, correct?

12        A    Yes.

13        Q    And then, in the late 1980s we began

14   to see a Republican breaking in here and there,

15   correct?

16        A    Yes.

17        Q    And there, of course, was a mixture of

18   Republicans and Democrats.  And then, we get down

19   to the present-day Court, which is all

20   Republicans, correct?

21             MS. WESTFALL:  Objection.  Vague.

22             THE WITNESS:  That's on the first or

23   the second page.  Yes, I think you're right.

24             BY MR. KEISTER:

25        Q    Yes.

Franklin Davidson - 8/19/2014

104

```
 1      A      That's right; they're all Republicans.

 2      Q      Okay.  Thank you.

 3             Just based upon your expertise as a

 4   historian and a person with expertise in the

 5   history of Texas politics, do you see anything

 6   with respect to the list of the members of the

 7   Supreme Court that seems incorrect to you?

 8      A      No.

 9      Q      In your report you talk about or

10   discuss election fraud/voter fraud in Texas,

11   correct?

12      A      Yes.

13      Q      And is it your contention in your

14   report that there is no in-person voter fraud in

15   Texas?

16             MS. WESTFALL:  Objection.  Would you

17   like to direct the witness to particular

18   paragraphs?

19             BY MR. KEISTER:

20      Q      Is it your contention that there is no

21   in-person voter fraud in Texas?

22      A      If I my memory serves me, I say that

23   there is virtually none, and in terms of, at

24   least in terms of such fraud as has been

25   identified, less than ten cases, perhaps less
```

Franklin Davidson - 8/19/2014

105

1  than two -- I mean no more than two cases out of

2  millions and millions of vote cast --

3      Q    Okay.

4      A    -- votes cast.

5      Q    Okay.  So, regardless of the numbers

6  of votes cast, you would agree that there have

7  been documented cases of in-person voter fraud in

8  Texas over the years, correct?

9      A    That there has --

10         MS. WESTFALL:  Objection.

11  Mischaracterizes his testimony.

12         BY MR. KEISTER:

13     Q    That there has been documented cases

14  of in-person voter fraud in Texas --

15     A    There --

16         MS. WESTFALL:  Objection.  Unclear.

17  What do you mean by "documented".

18         MR. KEISTER:  All right.  Let's start

19  over.

20         BY MR. KEISTER:

21     Q    You would agree, would you not, that

22  throughout the years there have been cases of in-

23  person voter fraud in the State of Texas?

24         MS. WESTFALL:  Objection.  Vague.  Not

25  clear what is meant by "cases".

1            THE WITNESS:  In terms of cases of in-

2    person vote fraud that have been successfully

3    prosecuted, I would hold that the evidence

4    indicates that there have been virtually no

5    cases.

6            BY MR. KEISTER:

7        Q    Okay.  And why do you state there have

8    been virtually no cases?

9        A    Because since Greg Abbott's statement

10   on his website in 2006 that there was an epidemic

11   of vote fraud in the State of Texas, a great deal

12   of effort on the part of his office and that of

13   many other proponents of a photo ID requirement,

14   there have been virtually no cases of in-person

15   vote fraud, which is the only kind of vote fraud

16   that would have been prevented by photo IDs.

17   There have been virtually no cases of this

18   successfully prosecuted.

19       Q    Virtually no cases or no cases?

20           MS. WESTFALL:  Objection.  Asked and

21   answered.

22           THE WITNESS:  Perhaps as many as two

23   cases, but I think some people say, no, none;

24   some people say two, and I'll leave it at that.

25           BY MR. KEISTER:

Franklin Davidson - 8/19/2014

107

1     Q     Okay.  So, based upon that statement,

2  from your perspective, there have been some in-

3  person voter fraud cases prosecuted in the State

4  of Texas?

5          MS. WESTFALL:  Objection.  Asked and

6  answered.  Objection.  Outside of the expert's

7  expertise, except to the extent of what the

8  Legislature heard about this topic.

9          THE WITNESS:  Possibly.

10         BY MR. KEISTER:

11    Q     Okay.  Possibly or probably?  Do you

12 know, sir?

13    A     I don't --

14         MS. WESTFALL:  Objection.  Asked and

15 answered.

16         BY MR. KEISTER:

17    Q     Okay.  During your research, have you

18 found any documentation that demonstrates that

19 there have been cases of in-person voter fraud

20 that have been prosecuted in the State of Texas?

21    A     Not that I can recollect.

22    Q     Okay.  Did you search for any

23 documentation of cases of in-person voter fraud

24 that have been prosecuted in the State of Texas

25 when you were doing your research for this

Franklin Davidson - 8/19/2014

108

1  report?

2       A       In the sense that I looked carefully

3  at the mass media in this regard and looked at

4  some of the legislative records, and that's the

5  extent.  I did not do a personal search of it for

6  in-person voter fraud.

7       Q       Okay.  When you did your search for

8  in-person voter fraud or any voter fraud, did you

9  concentrate only on the Attorney General's

10  Office?

11             MS. WESTFALL:  Objection.  Misstates

12  the witness' testimony.

13             THE WITNESS:  No.

14             BY MR. KEISTER:

15       Q       Okay.  Did you search for cases of

16  voter fraud prosecuted by the Department of

17  Justice in the State of Texas?

18             MS. WESTFALL:  Objection.  Relevance.

19             THE WITNESS:  No.

20             BY MR. KEISTER:

21       Q       Did you search for cases of voter

22  fraud prosecuted by District Attorneys in the

23  State of Texas?

24       A       It depends on what you mean by

25  "search".  I kept an eye out in the media for any

 1  evidence to that effect and was very eager to

 2  find those cases, given the importance of this

 3  sort of information, and was unable to come up

 4  with any.

 5      **Q    Okay.  So, as we sit here today, your**

 6  **research turned up no documentation of voter**

 7  **fraud cases prosecuted by District Attorneys in**

 8  **the State of Texas, is that correct?**

 9          MS. WESTFALL:  Objection.  Misstates

10  the witness' testimony.

11          THE WITNESS:  In-person.

12          **BY MR. KEISTER:**

13      **Q    Okay.**

14      A    We are talking about in-person --

15      **Q    Well, we can talk about --**

16      A    -- voter fraud.

17      **Q    Okay.  In-person or any other voter**

18  **fraud?**

19      A    Well, that's a whole different subject

20  matter.

21      **Q    Okay.  We'll come back to it.  Just**

22  **keep it, so there's no confusion.**

23          **Have you, in your research, have you**

24  **determined how many cases of in-person voter**

25  **fraud have been prosecuted by County Attorneys in**

1   the State of Texas?

2        A     I've come across no evidence of such.

3        Q     Okay.  Now you brought up a correct

4   point, and I'm glad you did, and that's in

5   addition to in-person voter fraud.  You agree, do

6   you not, that in addition to in-person voter

7   fraud, there are various other types of voter

8   fraud that have occurred in the State of Texas,

9   correct?

10            MS. WESTFALL:  Objection.  Form.

11   Leading.

12            THE WITNESS:  Well, when you say "in

13   addition to," that implies that I think there is

14   in-person voter fraud, and I'm not sure there is.

15   But, with regard to the other kinds, I do believe

16   that there are some other kinds of voter fraud

17   that do occur in the State of Texas.

18            BY MR. KEISTER:

19        Q     And what type of voter fraud have you

20   come across in your research?

21        A     The primary one is mail fraud, mail

22   imbalance.

23        Q     Okay.  Okay.  Anything else?

24        A     That's the only one that comes to

25   mind.

Franklin Davidson - 8/19/2014

111

1       Q      Okay.  Have you found any references

2   to voter fraud with respect to registration of

3   voters?

4              MS. WESTFALL:  Objection.  Vague.  And

5   objection.  Irrelevant.

6              THE WITNESS:  Would you repeat the

7   question?

8              BY MR. KEISTER:

9       Q      Yes.  During your research and

10  preparation and report in this case, did you come

11  across any documentation of cases that were

12  prosecuted based upon illegal registration of

13  voters in the State of Texas?

14             MS. WESTFALL:  Objection.  Relevance.

15             THE WITNESS:  I don't recall.

16             BY MR. KEISTER:

17      Q      Did you come across any evidence of

18  persons in the State of Texas being convicted for

19  voting in more than one state?

20             MS. WESTFALL:  Objection.  Relevance.

21             THE WITNESS:  I don't recall.

22             BY MR. KEISTER:

23      Q      You're from Houston, correct?

24      A      I'm sorry?

25      Q      You're from Houston?  You live in

1  Houston?

2       A     I live in Houston, yes.

3       Q     You don't recall a recent case in

4  Galveston where a person was convicted for voting

5  in two states?

6             MS. WESTFALL:  Objection.  Assumes

7  facts.

8             THE WITNESS:  I don't recall that.

9             BY MR. KEISTER:

10      Q     Okay.  All right.  But, as we sit here

11  today, you acknowledge that, while you may or may

12  not agree that there is in-person voter fraud in

13  Texas, you agree that there have been other forms

14  of voter fraud in Texas, correct?

15      A     Yes, indeed.

16      Q     And you agree that, even during the

17  debates on the S.B. 14 and the earlier debates in

18  the Texas House and Senate, that the persons, the

19  Members who were opposed to photo ID also

20  acknowledged that there were other forms of voter

21  fraud in Texas, correct?

22      A     That's correct.

23      Q     Okay.  So, whether or not a person

24  wants to acknowledge the existence of in-person

25  voter fraud in Texas, one cannot disclaim the

Franklin Davidson - 8/19/2014

113

1  fact that voter fraud in Texas has and does

2  occur, correct?

3              MS. WESTFALL:  Objection.

4  Argumentative.  Objection.  Assumes facts.

5  Objection.  Foundation.

6              BY MR. KEISTER:

7      Q      Correct?

8      A      That's correct.

9      Q      Okay.  And one cannot dispute the fact

10 that the public is aware of the fact that voter

11 fraud in its various forms has occurred in the

12 State of Texas, correct?

13             MS. WESTFALL: Objection.  Calls for

14 speculation.  Objection.  Form.  Objection.

15 Leading.

16             THE WITNESS:  Could you repeat the

17 question?

18             BY MR. KEISTER:

19     Q      Yes.  You, yourself, are a member of

20 the population of the State of Texas, correct?

21     A      That's true.

22     Q      And as someone who lives in the State

23 of Texas, you are aware that the press has

24 publicized the fact that there are various forms

25 of voter fraud that have occurred throughout the

114

1  years in Texas, correct?

2      A     Yes.

3      Q     And therefore, and in your research

4  you have found numerous articles that talk about

5  those other forms of voter fraud, correct?

6      A     Yes.

7      Q     So, isn't it fair saying that the

8  population of the State of Texas has knowledge of

9  the fact that voter fraud, in whatever form it

10  takes, occurs, has occurred in the State of

11  Texas, correct?

12           MS. WESTFALL:  Objection.  Calls for

13  speculation.  Form.  Relevance.

14           THE WITNESS:  It goes to your

15  definition of "the public," which consists of

16  every member of the State, every person who lives

17  in the State of Texas.

18           BY MR. KEISTER:

19      Q     Right.  Well, let me make it more

20  general.  Generally speaking, hasn't it been

21  publicized to the public, the fact that there are

22  various forms of voter fraud that have occurred

23  in the State of Texas over the years?

24      A     Yes.

25           MS. WESTFALL:  Objection.  Vague.

Franklin Davidson - 8/19/2014

115

1           **BY MR. KEISTER:**

2       **Q      And so, anything that would encourage**

3   **the public to -- or scratch that.**

4               **Whatever conduct can be taken to**

5   **alleviate the public of Texas of that concern**

6   **that voter fraud is no longer occurring in Texas**

7   **would be a beneficial thing to the public of**

8   **Texas, correct?**

9               MS. WESTFALL:  Objection.  Calls for

10  speculation.

11              THE WITNESS:  If you're asking me, if

12  voter fraud were to be abolished, that would

13  allay the public's concern with voter fraud,

14  perhaps it would; perhaps it wouldn't.  I think

15  some people would continue to speculate that

16  there was fraud, simply by virtue of their

17  candidates having lost in a narrow election.

18              **BY MR. KEISTER:**

19      **Q      But efforts undertaken by the State to**

20  **make it less likely that the various forms of**

21  **voter fraud is going to occur would alleviate,**

22  **hopefully, the fears of the public of Texas that**

23  **voter fraud is occurring, correct?**

24              MS. WESTFALL:  Objection.  Calls for

25  speculation.  Objection.  Unclear use of the term

1    "voter fraud".

2                    THE WITNESS:  Well, again, your term

3    "hopefully" there is what I would say.  Yes, one

4    would hope that would occur.

5                    BY MR. KEISTER:

6         Q    Because here in Texas there has been

7    a long, long history of documented voter fraud,

8    correct?

9                    MS. WESTFALL:  Objection.  Assumes

10   facts.  Objection.  Mischaracterizes the

11   testimony.

12                   THE WITNESS:  There has been knowledge

13   of voter fraud in Texas.

14                   BY MR. KEISTER:

15        Q    You grew up in Texas, as did I,

16   correct?

17        A    Yes.

18        Q    And you're aware, as I am, of the

19   documented incidents of voter fraud that occurred

20   in the early elections when Lyndon Baines Johnson

21   was running for Senator, correct?

22        A    Certain -- Box 13.

23        Q    Right.  And even before Box 13, when

24   Lyndon Johnson first ran for Senator, he was

25   defeated by Pappy O'Daniel, correct?

Franklin Davidson - 8/19/2014

117

1        A        Yes.

2        Q        And wasn't it quietly accepted that

3    Pappy O'Daniel defeated Lyndon Johnson by the use

4    of voter fraud?

5        A        Yes.

6        Q        And then, on the next opportunity to

7    run, Lyndon Johnson ran against Coke Stevenson,

8    correct?

9        A        Correct.

10       Q        And that was a very heated election,

11   correct?

12       A        Yes, sir.

13       Q        And during that election, it took

14   several weeks to decide who was the winner of

15   that election, correct?

16       A        I believe that's so.

17       Q        Okay.  And ultimately, Lyndon Johnson

18   defeated Coke Stevenson, correct?

19       A        In one sense or another.

20       Q        In one sense or another.  And the big

21   sense was the Box 13 you mentioned, correct?

22       A        Yes.

23       Q        And can you tell the Court what the

24   Box 13 you're referring to is or was?

25       A        Well, it was a box into which ballots

Franklin Davidson - 8/19/2014

118

1  had been stuffed, as I recollect, and they were

2  illegally-cast ballots that essentially enabled

3  Lyndon Johnson to be elected Senator.

4      Q    Okay.  And you're familiar with who

5  the Parra family was down on the border, correct?

6      A    Jack Parra's family.

7      Q    Yes, Jack and Archie Parra and all

8  that group.  And you're familiar with the

9  history, at least the history that the Parra

10 family are the ones who assisted Lyndon Johnson

11 with Box 13 --

12           MS. WESTFALL:  Objection.  Vague.

13 Unclear.  Relevance.

14           THE WITNESS:  I believe so.

15           BY MR. KEISTER:

16     Q    Okay.  And you're aware that the

17 people of Texas, particularly the people my age

18 up to your age, fairly look at that election with

19 a wink and a grin, correct?

20           MS. WESTFALL:  Objection.  Unclear.

21 Vague.  Calls for speculation.

22           THE WITNESS:  I'm not quite sure what

23 you mean there.

24           BY MR. KEISTER:

25     Q    Well, we all hold -- not all of us,

Franklin Davidson - 8/19/2014

119

1  but most of us -- hold President Johnson with

2  some esteem in Texas, correct?

3       A    I think that's probably so.

4       Q    And even though we all know that his

5  first election to the Senate was not necessarily

6  there, most of us still hold him in high regard,

7  correct?

8            MS. WESTFALL:  I'm going to object to

9  this continued long line of leading questions and

10  the form of the questions.  I want a standing

11  objection.  This has been going on for half-an-

12  hour.

13            MR. KEISTER:  You may have your

14  standing objection.

15            BY MR. KEISTER:

16       Q    Correct?

17       A    Repeat the question, please?

18       Q    Most of us in Texas still hold Lyndon

19  Johnson in high regard, even though we know that

20  he may or may not have actually defeated Coke

21  Stevenson in the primary election when he was

22  running for Senator the second time, correct?

23       A    I guess I'm not aware of any recent

24  survey of the adult population as to how they

25  view Lyndon Johnson.

Franklin Davidson - 8/19/2014

120

1       Q      You're aware of what we're talking

2  about here?

3       A      Well, I'm aware of the Box 13 incident

4  and --

5       Q      Right.

6       A      -- his having essentially won

7  illegally.

8       Q      And I'm aware of it.  Wouldn't you

9  agree that most people my age up to your age

10  would be aware of this situation?

11              MS. WESTFALL:  Objection.  Calls for

12  speculation.  Asked and answered.

13              THE WITNESS:  We could assume, for

14  sake of argument.

15              BY MR. KEISTER:

16       Q      Okay.  And wouldn't you agree that

17  most of us from our generation or generations,

18  when we talk about this event, then it's like,

19  "Yeah, that happened, but that's just the way it

20  was."?

21              MS. WESTFALL:  Objection.  Vague.

22  Unclear.  Wholly unclear.

23              THE WITNESS:  I just, to repeat

24  myself, I really don't know what even people our

25  age think about Lyndon Johnson and whether they

Franklin Davidson - 8/19/2014

121

1  do believe that he, that all things considered,

2  he should have been elected President.  I just

3  don't know that, and it would take a public

4  opinion poll to enlighten me on that subject.

5       BY MR. KEISTER:

6       Q     Okay.  And I'm trying to speak to you

7  more about history than I am at this point about

8  public opinion polls.  You recall from your study

9  of history that Lyndon Johnson did not deny the

10 fact that there were some shenanigans that went

11 on in that election, correct?

12      A     Yes.

13            MS. WESTFALL:  Objection.  Vague.

14            BY MR. KEISTER:

15      Q     At the same time, Coke Stevenson was

16 engaged in the same type of shenanigans, correct?

17            MS. WESTFALL:  Objection.  Vague.

18            THE WITNESS:  Generally speaking.

19            BY MR. KEISTER:

20      Q     And the reason why Coke Stevenson did

21 not contest the election was because he knew that

22 his conduct was essentially the same as Lyndon B.

23 Johnson's conduct during that election, correct?

24            MS. WESTFALL:  Objection.

25            THE WITNESS:  I think some people feel

1    that way, yes.

2                    BY MR. KEISTER:

3        Q     Okay.  Now the interesting thing about

4    those elections, LBJ's first Senate run and

5    second Senate run, is those were all Democrats

6    running against each other, correct?

7        A     Yes.

8        Q     LBJ was a Democrat?

9        A     Yes.

10       Q     Pappy O'Daniel was a Democrat?

11       A     Yes.  Coke Stevenson.

12       Q     Coke Stevenson was a Democrat.

13             And the importance of that is because

14   that was the Republican was kind of -- that had

15   to be run, but everybody knew that the Democrat,

16   whoever won the Democratic Primary won the

17   election, correct?

18             MS. WESTFALL:  Objection.

19   Argumentative.  Assumes facts.  Irrelevant.

20             THE WITNESS:  I think that's possibly

21   probably true.

22             BY MR. KEISTER:

23       Q     Yes.  And from your knowledge of Texas

24   history and Texas politics, you know that, even

25   though, obviously, to everybody in the LBJ

Franklin Davidson - 8/19/2014

123

1 **elections were the most notable or the most**

2 **widely-know, but you know from your study of**

3 **history that, even before those elections, the**

4 **Democratic Primaries in Texas was notorious for**

5 **election fraud, correct?**

6 　　　　　　MS. WESTFALL:  Objection.  Calls for

7 speculation.  Unclear terms, "election fraud".

8 　　　　　　THE WITNESS:  I didn't hear your

9 complete sentence there.  There was a word or two

10 that I didn't get.

11 　　　　　　**BY MR. KEISTER:**

12 　　**Q**　　**Okay.  I was just saying, most people**

13 **are aware of the fact that the LBJ Senate**

14 **elections had some unusual events occur.  But,**

15 **even before those elections, from your knowledge**

16 **as a historian and an expert in this case, you**

17 **are aware that Texas elections, Democrat Primary**

18 **elections, even before the LBJ elections,**

19 **typically involved voter fraud issues or**

20 **allegations of voter fraud?**

21 　　　　　　MS. WESTFALL:  Objection.  Extremely

22 confusing question.  Assumes facts.  Foundation.

23 　　　　　　THE WITNESS:  Prior to 1944, there

24 were some people in the State of Texas who

25 believed that there was illegal voting going on.

Franklin Davidson - 8/19/2014

124

 1  And whether more in Texas than elsewhere, I don't

 2  know.  More then than today, I don't know.

 3  Again, polls would help answer that question, but

 4  we can't poll people back in the 1930s and '40s.

 5            BY MR. KEISTER:

 6       Q      Okay.  But you would certainly agree,

 7  without polling people, just based on history,

 8  that there has been a long history of voter fraud

 9  of different forms in the State of Texas,

10  correct?

11            MS. WESTFALL:  Objection.

12  Mischaracterizes his testimony.  Assumes facts.

13  Foundation.  Relevance.

14            THE WITNESS:  There has been voter

15  fraud in the State of Texas that goes back quite

16  a while, as is true in many states of the Union,

17  yes.

18            BY MR. KEISTER:

19       Q    And based upon that historical

20  knowledge, it is not -- it wouldn't be unusual

21  that the people of Texas, particularly the ones

22  that have been there for a while, have an

23  ingrained suspicion that voter fraud occurs in

24  elections, correct?

25            MS. WESTFALL:  Objection.  Calls for

```
 1  speculation.  Objection.  Asked and answered.

 2             THE WITNESS:  Again, I would want to

 3  see polling data.  We do know certainly that

 4  there are some people who have that suspicion,

 5  and there are politicians who play on that

 6  suspicion.  But here, as in so many other things

 7  regarding this particular case, what is really

 8  lacking is good, solid, scientific polling data

 9  to tell you what you really need to know about

10  how people think and who the people are who think

11  which way and with regard to what set of

12  elections or candidates.

13             BY MR. KEISTER:

14      Q     But, with respect to history and going

15  up to -- well, I am not going to say "going up to

16  debate" because I -- going up to the 2011 debates

17  on S.B. 14, even the opponents of S.B. 14 during

18  the debates of 2011 referenced the existence of

19  voter fraud in the State of Texas, correct?

20             MS. WESTFALL:  Objection.

21             BY MR. KEISTER:

22      Q     Of all kinds, not just in-person?

23             MS. WESTFALL: Objection. Form.

24  Assumes facts. Calls for speculation.

25  Foundation.
```

Franklin Davidson - 8/19/2014

126

```
 1            THE WITNESS:  I'm sorry, ask me that
 2   question once more.
 3            BY MR. KEISTER:
 4       Q      Okay.  I'll try to, although I'll just
 5   make it short.
 6              Isn't it fact that in your paper you
 7   report statements made by various people, Members
 8   of the House and possibly the Senate, who during
 9   their debates on the Floor referenced forms of
10   voter fraud that they believed were occurring in
11   Texas?  Correct?
12       A      Yes.
13       Q      So, as we sit, up until 2011, people
14   in Texas recognized that there was and had been
15   various forms of voter fraud occur in the State,
16   correct?
17            MS. WESTFALL:  Objection.  Calls for
18   speculation.  "People" unclear.
19            THE WITNESS:  Some people.
20            BY MR. KEISTER:
21       Q      Okay.
22       A      Some people.
23       Q      Did you, yourself, recognize that
24   there had been, and possibly continue to be,
25   voter fraud in the State of Texas up until the
```

1    **debates of 2011?**

2           MS. WESTFALL:  Asked and answered.

3           THE WITNESS:  Yes.

4           **BY MR. KEISTER:**

5      **Q    Okay.**

6      A    Any chance of a break here sometime?

7      **Q    All you've got to do is ask.**

8           (Laughter.)

9           I'll give you the same courtesy I

10   invoked.  Yes, please.

11          MS. WESTFALL:  It's 12:00.  Do you

12   want to take a quick break and come back or do

13   you want to keep going?  Or lunch?  What is your

14   preference?

15          MR. KEISTER:  Why don't we --

16          MS. WESTFALL: What is your preference?

17   You're in charge.  Are you hungry for lunch?

18          THE WITNESS:  I would not mind a

19   little lunch --

20          MR. KEISTER:  Yes.

21          THE WITNESS:  -- but I would defer to

22   others.

23          (Whereupon, the foregoing matter went

24   off the record for lunch at 12:01 p.m. and went

25   back on the record at 12:43 p.m.)

1              A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N

2                                        12:43 p.m.

3              MR. KEISTER:  Back on the record.

4              **BY MR. KEISTER:**

5        **Q        Dr. Davidson, before the break we were**

6  **discussing voter fraud in Texas.  And I want to**

7  **ask you, during your review and research in this**

8  **case, have you found that since 2005 up until**

9  **today the voter fraud has been an ongoing**

10 **discussion nationally?**

11              MS. WESTFALL:  Objection.  Outside the

12 scope of the report.

13              THE WITNESS:  Yes, I think it has

14 been.

15              **BY MR. KEISTER:**

16       **Q        Okay.  And would you agree that voter**

17 **fraud, just for a point in time, from 2005 up**

18 **until today, has been a part of the national**

19 **consciousness?**

20       **A        Yes.**

21       Q        And would you agree that among the

22 issues that has spurred discussions concerning

23 voter fraud is misconduct of some organizations

24 with respect to registration of voters?

25              MS. WESTFALL:  Objection.  Vague.

Franklin Davidson - 8/19/2014

129

1                THE WITNESS:  I'm trying to think of

2   particular cases that have been in the news in

3   that regard.

4                **BY MR. KEISTER:**

5        **Q      May I suggest one?  Are you aware of**

6   **the conduct of an organization called ACORN --**

7                MS. WESTFALL:  Objection.  Vague.

8                **BY MR. KEISTER:**

9        **Q      -- that instigated a considerable**

10  **amount of --**

11       A      Yes.

12       **Q      -- press with respect to --**

13       A      Yes.

14       **Q      -- with respect -- let me start this**

15  **over because --**

16       A      Oh, I'm sorry.

17       **Q      She interrupted.  Let's just start**

18  **over.**

19                **Are you aware of an organization named**

20  **ACORN?**

21       A      Yes.

22       **Q      Are you aware of ACORN having been**

23  **convicted for engaging in conduct related to**

24  **voter registration?**

25       A      Yes.

Franklin Davidson - 8/19/2014

130

1     Q     Do you recall approximately when that

2  was?

3     A     I want to say it was the 2008

4  election.

5     Q     And I believe you are right, the 2008

6  election is the election from which the conduct

7  occurred, but the actual convictions, I believe,

8  are after 2008, correct?

9     A     I think that's correct.

10    Q     Yes.  And ACORN was an association

11 that was associated to some extent with the

12 Democratic Party?

13          MS. WESTFALL:  Objection.  Standing

14 objection to relevance on this line related to

15 ACORN.

16          THE WITNESS:  Some relationship, yes.

17 I'm not sure what it was.

18          BY MR. KEISTER:

19    Q     Okay.  And there was some

20 relationship, at least it was talked about in the

21 news that there was some relationship between

22 ACORN and President Obama?

23          MS. WESTFALL:  Objection.  Relevance.

24          THE WITNESS:  It was certainly talked

25 about in the news.

Franklin Davidson - 8/19/2014

131

1                 BY MR. KEISTER:

2        Q      Okay.  And, in fact, there was some

3  circles which felt like the conduct of ACORN and

4  some events could have swayed the election of

5  2008, correct?

6        A      I'm sure there are some people who

7  believe that.

8        Q      Okay.  And my point is, during the

9  time period after the 2008 elections, voter fraud

10  became an issue that was highly debated

11  throughout the country, correct?

12                 MS. WESTFALL:  Objection.  Asked and

13  answered.

14                 THE WITNESS:  Pretty highly debated,

15  yes.

16                 BY MR. KEISTER:

17        Q      So, the fact that people in Texas, and

18  political people in Texas would have voter fraud

19  issues on their mind really isn't that unusual

20  compared to the rest of this country, is it?

21                 MS. WESTFALL:  Objection.

22  Argumentative.  Objection.  Vague.  Calls for

23  speculation.

24                 THE WITNESS:  Would you repeat that,

25  please?

Franklin Davidson - 8/19/2014

132

1        BY MR. KEISTER:

2        Q      Right.  The fact that nationally voter

3   fraud is being discussed in various forms, and

4   voter registration was one which comes to mind,

5   and I would suggest continues, the discussion

6   continues up until today, is the fact that after

7   2008 and going on up into 2011, the fact that

8   voter fraud was nationally discussed on a fairly

9   common, regular basis, is it unusual that it

10  would be discussed in Texas, No. 1?

11              MS. WESTFALL:  Objection.  Extremely

12  confusing question.  Assumes facts.  Lack of

13  foundation.  Calls for speculation and

14  irrelevant.

15              THE WITNESS:  There has been

16  discussion of voter fraud in Texas and it

17  reflects, I suppose, concern among some people

18  outside of the State as well.

19              BY MR. KEISTER:

20       Q      Okay.  And the discussion that was

21  going on nationally with respect to voter fraud

22  during that time period reflects the discussions

23  that were going on in Texas also, correct?

24              MS. WESTFALL:  Objection.  Assumes

25  facts.  Form.  Foundation.  Leading.

1          THE WITNESS:  Well, there is voter

2  fraud discussions that have been going on, both

3  in Texas and nationally.

4          BY MR. KEISTER:

5     Q    Okay.  And the fact that people in

6  Texas from 2005 up until 2011 believe there was

7  voter fraud occurring in Texas as well as

8  nationally did not make Texas different from the

9  rest of the country in that regard, correct?

10          MS. WESTFALL:  Objection.  Assumes

11  facts.  Foundation.  Argumentative.  Leading.

12          THE WITNESS:  We're part of the

13  nation, and there are people in the State who are

14  concerned, as people outside of the State are.

15          BY MR. KEISTER:

16     Q    Okay.  And is Texas the only state

17  that has passed legislation or that passed

18  legislation during that time period 2005 up until

19  2011, that passed legislation with respect to

20  voter photo ID?

21          MS. WESTFALL:  Objection.  Calls for

22  a legal conclusion.  Outside of the expert's

23  expertise.

24          THE WITNESS:  There are other states

25  that have passed legislation.

Franklin Davidson - 8/19/2014

1              **BY MR. KEISTER:**

2        **Q      Okay.  As we sit here today, do you**

3  **know how many states have passed photo voter ID**

4  **legislation?**

5              MS. WESTFALL:  Objection.  Calls for

6  a legal conclusion.

7              THE WITNESS:  Several.  I don't know

8  how many.

9              **BY MR. KEISTER:**

10       **Q      Okay.  In your research and review for**

11 **the preparation of your report, did you come**

12 **across the number of the states and the**

13 **particular states that have, in fact, enacted**

14 **voter photo ID legislation?**

15             MS. WESTFALL:  Objection.  Asked and

16 answered.

17             THE WITNESS:  I remember the names of

18 some of the states, but I don't remember how

19 many.

20             **BY MR. KEISTER:**

21       **Q      Okay.  Do you recall how they're**

22 **dispersed around the nation in terms of are some**

23 **East Coast, West Coast, et cetera, et cetera?**

24       A      Well, there are various states around

25 the country.  That's kind of spread out

Franklin Davidson - 8/19/2014

135

1  geographically.

2       Q     Okay.  And the states that have

3  enacted photo voter ID laws are not limited to

4  the South, correct?

5       A     No, they're not.

6       Q     Okay.

7       A     By the way, I just want to mention one

8  thing.  Going back to an earlier question, and I

9  am thinking about ACORN, and when that first

10 became an issue in 2005, and I'm not sure that it

11 was an issue at the time that the first

12 predecessor of the bill, of S.B. 14, was actually

13 begun.  I just don't know that for a fact.

14      Q     Okay.  But those discussions

15 nationally are going on even today with respect

16 to voter fraud, correct?

17            MS. WESTFALL:  Objection.  Vague as to

18 time period.

19            THE WITNESS:  They are going on, yes,

20 in the current year.

21            BY MR. KEISTER:

22      Q     Okay.  Do you have your report in

23 front of you --

24      A     Yes, I do, sir.

25      Q     -- which I think is in Exhibit 1.

1        A      Exhibit 2 I think.

2        Q      Or it's in 2.  Okay.

3               Can you turn to page 41 of your

4    report, please?

5        A      Okay.

6        Q      Let me get there.

7               On page 41 of your report, down at the

8    bottom, you have a section that is titled "Likely

9    Effect of S.B. 14," correct?

10       A      Yes.

11       Q      And then, under that first paragraph,

12   you state, "The starting point of the Court's

13   analysis of a purpose behind a legislative

14   decision is often the likely expected effect of

15   the decision.  Assessing the likely effect of

16   S.B. 14 is the task in this case.  I have,

17   however, been provided with findings which I

18   summarize here."

19              Now why did you choose to summarize

20   the findings of other experts in your report?

21       A      Under this section?  These were both

22   reports that were provided to me by the Justice

23   Department.

24       Q      And are you, in fact, using these

25   other reports to present your own opinions,

1   despite the fact that that was not your mission

2   in this case?

3           MS. WESTFALL:  Objection.  Unclear,

4   vague question as to mission.

5           THE WITNESS:  What I am simply doing

6   here is taking a look at information that was

7   provided to me by the Justice Department, and

8   that's why I looked at that.

9           BY MR. KEISTER:

10      Q    Okay.  And you understand that the

11  information that you're summarizing here is

12  information that was generated by expert

13  witnesses who were retained by other Plaintiffs

14  in this case, correct.

15      A    That's correct.

16          MS. WESTFALL:  Objection.  Incorrect.

17  Assumes facts.

18          BY MR. KEISTER:

19      Q    Plaintiffs and Plaintiff-Intervenors?

20          MS. WESTFALL:  We can go off the

21  record if you would like.

22          MR. KEISTER:  Well, okay, let's go off

23  the record.

24          (Whereupon, the foregoing matter went

25  off the record at 12:55 p.m. and went back on the

Franklin Davidson - 8/19/2014

138

 1  record at 12:56 p.m.)

 2            MR. KEISTER:  All right, back on the

 3  record.

 4            **BY MR. KEISTER:**

 5       **Q      All right.  So, Dr. Davidson, this**

 6  **portion of your report is being based upon the**

 7  **expert reports of other expert witnesses that**

 8  **were retained by the Department of Justice,**

 9  **correct?**

10       **A      Yes.**

11       **Q      Okay.  Did you do any analysis**

12  **yourself of the information that was presented by**

13  **either Dr. Ansolabehere or Gerald Webster other**

14  **than simply reading their reports?**

15       **A      No.**

16       **Q      Okay.  Do you have any factual basis**

17  **for believing or for determining that their**

18  **information is correct?**

19            MS. WESTFALL:  Objection.  Vague.

20            MR. KEISTER:  Yes.  Let me do that

21  again.

22            **BY MR. KEISTER:**

23       **Q      Do you have any factual basis, outside**

24  **of the fact that these expert witnesses were**

25  **retained by the Department of Justice, do you**

1  **have any factual basis to say that their analysis**

2  **was done incorrectly?**

3  　　　　　MS. WESTFALL:  Outside of their

4  reports?

5  　　　　　MR. KEISTER:  Outside of their

6  reports.

7  　　　　　MS. WESTFALL:  Outside of their

8  reports.

9  　　　　　THE WITNESS:  I know that Professor

10  Ansolabehere is very well-known and highly-

11  respected in the field of political science.  I

12  do not know him personally.  And I am not

13  qualified to judge some of the mathematical

14  techniques that he used, but I do know that he is

15  a highly-respected person in the field.

16  　　　　　**BY MR. KEISTER:**

17  　　**Q    Okay.  And that's my question.  You do**

18  **not claim to be qualified to give an assessment**

19  **as to the accuracy of Dr. -- of, actually,**

20  **Professor Ansolabehere's report, correct?**

21  　　A    That's correct.

22  　　**Q    All right.  And does that hold true**

23  **for Gerald Webster also?**

24  　　A    Yes.

25  　　**Q    That you do not claim the expertise**

Franklin Davidson - 8/19/2014

140

1    to --

2        A    Yes.

3        Q    Okay.  All right.  So, basically, what

4    you are reporting here is simply what you have

5    taken off the face of those two reports, correct?

6        A    Yes.

7        Q    Okay.

8        A    I've read them carefully.

9        Q    Okay.

10       A    There are some aspects of their

11   techniques that I don't fully understand, but I

12   have read them very carefully to make sure that,

13   at least in terms of the logic of presentation

14   and the standards of academic presentation, they

15   meet my criteria for good academic work.  But,

16   beyond that, I can't speak to some of the

17   techniques they make use of.

18       Q    Okay.  So, with respect to the numbers

19   Professor Ansolabehere gives, those are simply

20   the numbers that he gave in the report that you

21   are copying here, correct?

22       A    That's correct.

23       Q    All right.  Do you know the total

24   number of registered voters in the State of

25   Texas?

1        A      No.

2        Q      Okay.  Have you ever learned that

3   number in your research in this case?

4        A      Not in my research in this case, and

5   I can't remember about previously to that.  But I

6   don't know the exact number of registered voters,

7   though.

8        Q      Okay.  So, if I ask you the number of

9   Anglo registered voters or the number of African-

10  American registered voters or the number of

11  Hispanic registered voters in the State of Texas,

12  is your answer going to be the same, that as we

13  sit here today you don't know?

14       A      Yes.

15       Q      Okay.  As we sit here today, do you

16  know a rough percentage as between Anglos,

17  African-Americans, and Hispanics, the rough

18  percentage of the registered voters that each one

19  of those constitute?

20            MS. WESTFALL:  Objection.  Asked and

21  answered.

22            THE WITNESS:  I don't.

23            BY MR. KEISTER:

24       Q      Okay.  Now, according to your report

25  -- I'm on page 42 -- you state here that Dr.

1    Ansolabehere was provided some additional

2    information related to the Texas drivers'

3    licenses, and that based on that additional

4    information, he reduced the number of Texas

5    registered voters who lagged any of the photo

6    identification documents required in S.B. 14 down

7    from 1.2 million to 786,727, correct?

8         A    That is correct.

9         Q    Okay.  And based upon that change in

10   his numbers, it is one of the changes that

11   spurred you to provide your supplemental report

12   in this case, correct?

13        A    That's correct.

14        Q    Okay.  Do you know, as we sit here

15   today, what the discrepancies were that led

16   Professor Ansolabehere to making that amount of

17   reduction?

18             MS. WESTFALL:  Objection.  Vague.

19             THE WITNESS:  I'm not remembering.  I

20   did earlier, but I don't now.

21             BY MR. KEISTER:

22        Q    Okay.  That's okay.  When it comes to

23   numbers, that's totally understandable.

24             Well, we see here that, with respect

25   to that number, 786,727, in parentheses you state

Franklin Davidson - 8/19/2014

143

1   that that is 5.8 percent of the State's

2   registered voters, correct?

3        A     Yes.

4        Q     Now did that percentage, did you take

5   that strictly from Professor Ansolabehere's

6   report?

7        A     Yes.

8        Q     Okay.  You didn't try to make that

9   determination on your own?

10       A     That's correct.

11       Q     Okay.  Now, so 5.8 percent of the

12   State's registered voters, according to the

13   Professor, do not have an S.B.-14-sufficient ID,

14   correct?

15       A     Yes.

16       Q     Which would mean that 94.2 percent of

17   registered voters in the State do have an S.B.-

18   14-compliant ID, correct?

19       A     Yes.

20       Q     And wouldn't you agree that, based

21   upon that number, the vast, vast majority of

22   registered voters in Texas do have an S.B.-14-

23   compliant photo ID?

24       A     Yes.

25       Q     Okay.  Now, out of that 786,727

Franklin Davidson - 8/19/2014

144

1  **people, how many of those people did Professor**

2  **Ansolabehere conclude were Anglo?**

3  　　　　　　MS. WESTFALL:  Objection.  This

4  witness has testified he has not done anything

5  beyond take Dr. Ansolabehere's findings and put

6  them in his report.  He is not familiar.  He's

7  just testified he's not familiar with anything

8  beyond the four squares of the document which you

9  have just read into the record.

10  　　　　　　MR. KEISTER:  Well, this one seems

11  like a pretty simple question.

12  　　　　　　**BY MR. KEISTER:**

13  　　**Q**　　**We've got 786,727 people that**

14  **Professor Ansolabehere says may not have a**

15  **driver's license or S.B. 14 photo IDs.  How many**

16  **of those did he say were Anglos?**

17  　　　　　　MS. WESTFALL:  Objection.  The

18  document speaks for itself.

19  　　　　　　THE WITNESS:  Three point six percent.

20  　　　　　　**BY MR. KEISTER:**

21  　　**Q**　　**Did he say 3.6 percent of 786,727 were**

22  **Anglo?**

23  　　　　　　MS. WESTFALL:  Objection.  The

24  document speaks for itself.

25  　　　　　　**BY MR. KEISTER:**

1     Q     If you want to take a minute and read

2  that?

3     A     Okay.

4           (Witness looks at document.)

5           Yes, 3 percent of Anglo voters lack a

6  required photo ID.  And was that the answer to

7  your question?

8     Q     Well, I think that may be the answer

9  to what Professor Ansolabehere is answering, but

10 my question is this:  I think or my

11 interpretation of what I'm seeing here is that

12 we're jumping from that number if 786,727 people

13 who allegedly don't have photo IDs.  They are a

14 percentage of the population as opposed to a

15 percentage of that number, is that correct?

16    A     Yes.

17    Q     Okay.  Now my question is, how many of

18 that 786,727 people are Anglo?

19          MS. WESTFALL:  Objection.  Asked and

20 answered.  This witness has testified he's not

21 familiar with Dr. Ansolabehere's findings beyond

22 what is within this exhibit on paragraph 69.

23          THE WITNESS:  I'm not familiar.

24          BY MR. KEISTER:

25    Q     Did you ever, did you read all of the

1    Professor's report?

2        A    Yes.

3        Q    Okay.  Did you see any place in the

4    Professor's report where he gave us a very simple

5    number out of the 786,727 people that he claims

6    do not have S.B.-14-compliant IDs, how many of

7    those people are Anglos?  Did he ever make that

8    statement, to your knowledge?

9              MS. WESTFALL:  Objection.  Compound.

10   Form.  Foundation.  Outside of this witness'

11   expertise.

12              THE WITNESS:  I don't remember.

13              BY MR. KEISTER:

14       Q    Okay.  Do you remember if the

15   Professor ever in his report stated, out of that

16   number 786,727 people that he believes do not

17   have S.B.-14-compliant IDs, how many of those

18   people are African-Americans?

19              MS. WESTFALL:  Compound.  Foundation.

20   Form.

21              THE WITNESS:  I want to say that he

22   does.

23              BY MR. KEISTER:

24       Q    By looking at your report, can you

25   make that determination, Doctor, as to how many

1   of that 786,727 people are African-American?

2        A    No, not aside from citing his numbers.

3        Q    Okay.  And can you tell how many of

4   that number, the 786,727, are Hispanic voters?

5        A    Well, I mean, using his figures, I

6   can.

7        Q    Okay.  And do you think the figures

8   that he is reflecting here are his figures with

9   respect to the percentages of that 786,000 or are

10  those -- has he reverted back to population

11  percentages?

12       A    My understanding is that those are his

13  figures.

14       Q    Okay.  Now do you understand what the

15  difference is between the Professor's ecological

16  regression figures are as compared to his

17  Catalyst, LLC figures?

18       A    No, I don't.

19       Q    Okay.  Would that be something that

20  should be important in making an opinion to this

21  case, to understand what it is the Professor is

22  trying to relate by those percentages?

23       A    I'm sorry, could you repeat that

24  question?

25       Q    Yes, sir.  Do you think that, in

1  making an opinion in this case based upon those

2  numbers, it would be helpful to understand what

3  the Professor's intentions were in stating those

4  separate calculations?

5      A    It would figure into it, certainly.

6  As I have said all along, however, that I am

7  simply basing my decision to cite his figures on

8  his reputation in the field.  And I make no

9  representation of my being able to do the kind of

10  work that he is doing to arrive at these numbers.

11      Q    Okay.  Can you define for us the word

12  "significant"?

13      A    Important.

14      Q    Okay.  And in relation to racial

15  disparity, what numbers qualify as being

16  significant disparities between the races?

17      A    Well --

18          MS. WESTFALL:  Objection.  Outside of

19  his opinions in this case.

20          BY MR. KEISTER:

21      Q    Well, if we look at the last sentence,

22  Doctor, on page 42 of paragraph 69, you state

23  that, "In short, the corrected database-matching

24  process, like the estimates provided in Dr.

25  Ansolabehere's initial report, and referenced in

Franklin Davidson - 8/19/2014

149

1  paragraph 69 of my initial report, demonstrate

2  that there is a significant racial disparity in

3  possession of photo identification required by

4  S.B. 14."

5          Did I read that correctly?

6      A    Yes.

7      Q    And my question is, what numbers, what

8  percentage numbers qualify as significant racial

9  disparity?

10      A    Well, there's two senses of

11 significant I think here that enter into this

12 issue.  And one is the common-sense term,

13 "significant" meaning noteworthy, important,

14 worth taking a look at, and then, what

15 statisticians refer to as statistical

16 significance.  Those are two different things.

17      Q    What's your --

18      A    And mine is the former.  I'm speaking

19 as a non-statistician, saying that, to me, those

20 seem like important differences in terms of how

21 this law might impact the ability of people in

22 the different ethnic groups to make their

23 opinions heard.

24      Q    Okay.  So, as we sit here today, you

25 are not claiming to be able to say that the

Franklin Davidson - 8/19/2014

150

1  difference, if we look at the Catalyst, LLC

2  numbers from the Professor, he says 5.1 percent

3  of Anglo voters lack the required photo ID as

4  compared to 6.4 percent of Hispanic voters.  Now

5  that's not a very big difference between Anglo

6  and Hispanic, is it?

7       A     It could be a significant difference

8  in terms of how an election turns out, for

9  example.

10       Q     And I guess what I'm trying to get a

11  handle on is, is it your contention that any

12  difference between those percentages is going to

13  be significant or is there a finite point where

14  you say, you know, 5.1 to 9.2 is significance?

15       A     I guess I --

16                MS. WESTFALL:  Objection.  Outside the

17  scope of his opinions in this case.

18                THE WITNESS:  If we're talking about

19  statistical significance here, I simply can't

20  answer that question.

21                BY MR. KEISTER:

22       Q     Okay.  So, and this may be the answer

23  to my question, with respect to your last

24  sentence concerning significant racial disparity,

25  you're not basing that upon the differences in

Franklin Davidson - 8/19/2014

151

1  the percentages that you have related above, is

2  that correct?

3             MS. WESTFALL:  Objection.  Compound.

4  Foundation.  Misstates his testimony.

5             THE WITNESS:  No, I am.  I am basing

6  it on those numbers.  And I guess, again,

7  significance in the common vernacular has a

8  number of different meanings.  And even a small

9  difference could be important in a close race.

10 So, I guess I don't want to say much more about

11 it than that.

12            BY MR. KEISTER:

13      Q    Well, and I appreciate that.  Let me

14 probe a little deeper because what we are talking

15 about here is not a race, an election race.  What

16 we're talking about here is evidently the

17 Professor's analysis as to the statistical

18 differences between the percentages of Anglos,

19 Hispanic, and African-American voters who do not

20 have S.B. 14 ID, correct?

21      A    I'm not sure that's true.  Let me just

22 read through this once more.

23      Q    Okay.

24            (Witness looks at document.)

25      A    I guess really all I want to say is

Franklin Davidson - 8/19/2014

152

1  that the larger the difference in percentages,

2  the more significant they are, not -- well,

3  certainly statistically, but also in terms of the

4  common vernacular, and in some cases having a

5  very small percentage point difference, as, for

6  example, the difference between 9.2 Black voters

7  and 5.1 of Anglo voters, and even in some cases

8  the 5.1 percent of Anglo voters and 6. Percent of

9  Hispanic voters can make a significant difference

10 in the turnout of an election.

11      **Q      Okay.  But, once again, we're not**

12 **talking about turnout of the election in this**

13 **paragraph, are we?**

14      A     Well --

15      **Q      Isn't the Professor talking about the**

16 **differences in the possession or the lack of**

17 **possession by the various groups of S.B.-14-**

18 **compliant ID?**

19            MS. WESTFALL:  Objection.

20 Argumentative.  Objection.  Calls for speculation

21 as to another expert's opinion.

22            THE WITNESS:  I guess I would have to

23 go back and look at his report to see whether he

24 has both of those meanings of significance in

25 mind here.

Franklin Davidson - 8/19/2014

153

1              BY MR. KEISTER:

2        Q      Okay.  As we sit here today, can you

3   tell me a gap in the percentages wherein the term

4   "significant" would come into play?

5              MS. WESTFALL:  Objection.  Calls for

6   speculation.

7              BY MR. KEISTER:

8        Q      I mean, obviously, we don't always

9   expect the percentages to be equal on every issue

10  --

11       A      Right.

12       Q      -- for Anglos, African-Americans, and

13  Hispanics, correct?

14       A      Right.

15       Q      So, where with respect to this issue,

16  wherein does the percentage gap become

17  significant?

18             MS. WESTFALL:  Objection.  Calls

19  for --

20             BY MR. KEISTER:

21       Q      If you know it.  If you don't know,

22  that's fine.

23             MS. WESTFALL:  Calls for speculation

24  and outside of his expertise.  Asked and

25  answered.

Franklin Davidson - 8/19/2014

154

1          THE WITNESS:  I really don't know.

2          BY MR. KEISTER:

3     Q    Okay.  So, with respect to this part
4  of the report, would you suggest that it's really
5  Professor Ansolabehere who should be testifying
6  about this issue and not yourself?

7          MS. WESTFALL:  Objection.
8  Argumentative and irrelevant.

9          THE WITNESS:  Well, I'm willing to
10  stick with what I said in the report about the
11  differences between those numbers and the fact
12  that they could be non-statistical as well as
13  statistical sense.

14          BY MR. KEISTER:

15     Q    Right.  But, as we sit here today, you
16  cannot tell the Court a finite place in the gap
17  between the percentages wherein you can tell the
18  Court at this point is where the percentage
19  difference becomes significant?

20          MS. WESTFALL:  Objection.
21  Argumentative.  Asked and answered.  Outside of
22  the scope of this expert's expertise.

23          THE WITNESS:  No, I don't think so.

24          BY MR. KEISTER:

25     Q    Okay.  In your review of Professor

1  Ansolabehere's report -- I'm going to start

2  calling him "Ansa" for convenience (laughter) --

3  report, did he make any determination as to the

4  number of people, this number 786,727 -- let me

5  start over.

6           Of the 786,727 people that the

7  Professor contends may not have S.B.-14-compliant

8  ID, did you see in his report where he made any

9  determination as to the number of people that do

10 not have an ID but can obtain one?

11           MS. WESTFALL:  Objection.  You're

12 asking him to testify based on his memory of the

13 expert report and not putting the expert report

14 before him.  Is that your question?

15           THE WITNESS:  I can't answer that.

16           BY MR. KEISTER:

17      Q     Okay.  You don't know?

18      A     I don't know.

19      Q     Okay.  As we sit here today, do you

20 know the number of people that do not have an

21 S.B.-14-compliant ID but can, in fact, obtain one

22 if they desired a visa?

23      A     No, sir.

24      Q     Okay.  All we've been relying upon are

25 the population numbers that the Professor puts in

1   his report.  Have you done any other analysis in

2   this case to try to determine any numbers with

3   respect to voting-age populations and people that

4   do or do not have photo IDs?

5        A    No, sir.

6        Q    Okay.  Looking on page 42, down under

7   paragraph 70, you go into the report prepared by

8   Geographer Gerald Webster, correct?

9        A    Yes.

10        Q    Okay.  And have you discussed Gerald

11   Webster's report with him?

12        A    No.

13        Q    Okay.  And is the information that

14   you're providing on page 42 and 43 with respect

15   to Gerald Webster, is that information taken

16   strictly from his expert report?

17        A    Yes.

18        Q    Have you made any independent

19   investigations at all with respect to drive times

20   and that type of information that's related in

21   Gerald Webster's report?

22        A    Nothing that I would count as

23   scientific evidence.

24        Q    Okay.  Now you'll notice that in your

25   report you utilize the word "access" with respect

 1    to motor vehicles, correct?

 2         A     Yes.

 3         Q     When you use the word "access" to a

 4    motor vehicle in this portion of the report, is

 5    that your language or is that language that

 6    Gerald Webster used in his report?

 7         A     Can you point to me --

 8         Q     Sure.

 9         A     -- an example of where I use it that

10    is --

11         Q     Right.  Look on page 43, and, let's

12    see, see the sentence starting, "Professor

13    Webster" in the second sentence up there on top?

14    It starts, "Professor" --

15         A     Uh-hum, uh-hum.

16         Q     -- "Professor Webster's data"?  Just

17    read that sentence, please.

18         A     "Professor Webster's data show that

19    the Cities of Houston, San Antonio, and Dallas

20    contain more than half of the Census tracts in

21    Texas in which more than 25 percent of households

22    do not have access to a motor vehicle."

23         Q     Okay.

24         A     I'm using his language there.

25         Q     Okay.  Do you know when Gerald Webster

Franklin Davidson - 8/19/2014

158

```
 1   used the word "access" to a motor vehicle how he

 2   determined the number of households that do or do

 3   not have access to a motor vehicle?  Did you

 4   learn that when you read his report?

 5               MS. WESTFALL:  Objection.  Compound.

 6               THE WITNESS:  I can't remember.

 7               BY MR. KEISTER:

 8        Q        Okay.  Do you know whether or not

 9   Gerald Webster, when he talked about access,

10   related that to ownership of vehicles?

11        A        I don't.

12        Q        Okay.  So, as we sit here today, you

13   cannot opine as to the number of households that

14   do not own a motor vehicle, yet may have access

15   to a motor vehicle?

16        A        I do not.  I can't opine that.

17        Q        Okay.  In other words, if one person

18   doesn't own a vehicle, but has a family member

19   that allows him to use the vehicle, they would

20   have access to a vehicle, correct?

21        A        Yes.

22        Q        But, if the standard that Gerald

23   Webster is using is ownership, while they may

24   deny ownership, that doesn't mean they wouldn't

25   have access to it?
```

Franklin Davidson - 8/19/2014

159

1        A       That's correct.

2        Q       Now in this particular report Gerald

3  Webster talks about travel time to Department of

4  Public Safety offices, correct?

5        A       Yes.  Yes, correct.

6        Q       And he talks about various methods of

7  going, be it personal vehicle, be it public

8  transportation, correct?

9        A       Yes.

10       Q       And he comes out with a number or with

11 numbers that he considers to be higher minority

12 populations, correct?

13       A       Yes.

14       Q       Okay.  Did you do anything to

15 determine whether or not the travel times that

16 Gerald Webster calculated are, in fact, travel

17 times that would be considered out of the

18 ordinary for people in these particular locations

19 that he has listed in his report?

20              MS. WESTFALL:  Objection.  Unclear use

21 of term "out of the ordinary".

22              BY MR. KEISTER:

23       Q       Do you understand "out of the

24 ordinary"?

25       A       Could you give me a better --

1    Q    Yes.

2    A    -- a better definition of it?

3    Q    All right.  You understand that in

4  Gerald Webster's report he comes to a

5  determination as to an amount of time that it

6  takes for people to travel to the DPS office,

7  correct?

8    A    Yes.

9    Q    Be it by vehicle, be it by public

10  transportation, or --

11    A    Yes.

12    Q    -- some other means?

13         And then, he makes a determination

14  that he believes that minority persons have a

15  greater travel time than Anglos, correct?

16         MS. WESTFALL:  Objection.  Misstates

17  conclusions of Dr. Webster.

18         (Witness nods head in the

19  affirmative.)

20         BY MR. KEISTER:

21    Q    You need to try to say yes.

22    A    Oh.

23    Q    If yes is the answer.  You were

24  shaking your head yes, but we have to get it on

25  the record.

1      A      As best that I can recollect.

2      Q      Okay.  All right.  Now my question is

3 this, Gerald Webster came up with these numbers.

4 My question to you is, did you do anything to

5 determine whether or not the numbers that Gerald

6 Webster came up with, and that he says are high

7 for minority voters, whether or not those travel

8 times in the State of Texas would actually be

9 considered high travel times?

10              MS. WESTFALL:  Objection.  Compound.

11 Vague.

12              THE WITNESS:  Well, I guess the State

13 of Texas, it would depend to some extent on the

14 people that you asked in a random sample whether

15 they would consider it to be an inordinate amount

16 of time or not.

17              BY MR. KEISTER:

18      Q      Exactly.  And did you see anything in

19 Gerald Webster's report where he compared the

20 amount of time that people travel to work as

21 compared to the amount of time it would take to

22 travel to the DPS office?

23      A      I can't remember that.

24      Q      Okay.  Did you see anywhere in his

25 report where he compared the amount of time it

1  takes people to go shopping for groceries, and

2  that type of thing, as compared to the amount of

3  time it would take them to travel to the DPS

4  office?

5      A     I don't think so, but I'm not

6  absolutely certain.

7      Q     Okay.  Do you recall seeing anything

8  in Webster's report where he compared the amount

9  of time it would take people to travel for

10  entertainment in these locations compared to the

11  amount of time it would take them to travel to

12  the DPS office?

13     A     I don't believe so.

14     Q     Okay.  Did you see any comparisons at

15  all that Mr. Webster made with respect to the

16  amount of time he asserts it will take these

17  people in the report to travel to the DPS as

18  compared to any other activity in their daily

19  life?

20         MS. WESTFALL:  Objection.  Compound.

21  Vague.

22         THE WITNESS:  I don't believe so.

23         BY MR. KEISTER:

24     Q     Okay.  Wouldn't you agree that that's

25  important in determining whether or not a travel

Franklin Davidson - 8/19/2014

163

**time to the DPS is a deterrent?  Don't you think**

**it's important to compare that travel time to**

**what people ordinarily are used to making with**

**respect to other aspects of their life for travel**

**time?**

          MS. WESTFALL:  Objection.  Narrative,

confusing, vague question.  Calls for information

outside this expert's expertise.  And

argumentative.

          THE WITNESS:  I'm trying to think

about that.

          (Pause.)

          Suppose it were a very poor family and

you needed to go somewhere to get groceries, and

that it took a good deal of travel time to get

there, and it took you less time to vote.  But

you don't place voting at quite the same priority

level as you do feeding your family.

          I'm not quite sure how that plays out

with regard to your question.

          **BY MR. KEISTER:**

    **Q**    **Well, let me ask you this:  let's say**

**I travel every day 30 miles from my home to my**

**office.**

          A    Uh-hum.

Franklin Davidson - 8/19/2014

164

1      Q      Okay?  Now some people would gasp and

2  think that's an extraordinary amount of time and

3  distance.  However, I do it every day; I don't.

4              Likewise, the local DPS office closest

5  to me, at least one I would go to, is also

6  approximately 30 miles.  Now would the fact that

7  I have to travel 30 miles, would you consider

8  that to be a deterrent if I wanted to an EIC, but

9  the fact is I travel 30 miles every day to go to

10 work?

11     A      Well, for you --

12              MS. WESTFALL:  Calls for --

13              THE WITNESS:  I'm sorry.

14              For you, I would say the answer is,

15 would be different from somebody who was

16 extremely poor.

17              BY MR. KEISTER:

18     Q      Yes.  Well, I'm not going to get into

19 my finances.

20              (Laughter.)

21              You had a shot.

22              But my point is, don't you have to

23 make a comparison to determine whether or not the

24 time it takes somebody to get to the DPS is going

25 to be a deterrent?  Don't you have to compare

Franklin Davidson - 8/19/2014

1  that time to what they are used to doing in their

2  daily life?

3      A    Perhaps --

4          MS. WESTFALL:  Objection.  Calls for

5  speculation.  Outside of this, Dr. Davidson's

6  expertise.

7          THE WITNESS:  Perhaps you do, but, as

8  I think about it, I really do think that you have

9  to include in this the relative importance in a

10 person's own mind with regard to various places

11 one is going and the amount of time and the

12 amount of money it takes you to get there.

13          **BY MR. KEISTER:**

14     **Q    And did Mr. Webster do any analysis as**

15 **to whether or not this would have to be a**

16 **standalone trip for people traveling to the DPS?**

17          MS. WESTFALL:  Objection.

18          **BY MR. KEISTER:**

19     **Q    In other words, do people from time to**

20 **time tend to do more than one errand at a time?**

21          MS. WESTFALL:  Objection.  Compound.

22 Vague.  Confusing.

23          THE WITNESS:  I don't believe so.

24          **BY MR. KEISTER:**

25     **Q    You don't believe people do?**

```
 1      A      No, I don't believe he --

 2      Q      That he --

 3      A      -- looked at that issue.

 4      Q      Okay.

 5      A      But that's just my recollection.

 6      Q      Right.  And, I mean, we can't take

 7  this analysis from the standpoint of people do

 8  not leave their house, correct?

 9              MS. WESTFALL:  Objection.  Unclear.

10              THE WITNESS:  I don't understand your

11  question.

12              BY MR. KEISTER:

13      Q      Well, I mean, it appears to me that

14  some of the travel reports in this would indicate

15  that people stay in their house 24 hours a day.

16  And then, they have to make the effort to get off

17  the couch, walk out the door, find some way, you

18  know, to find some transportation, and then, go

19  down to the DPS office.  The fact is people, for

20  the most part, do not stay in their house 24

21  hours a day, correct?

22              MS. WESTFALL:  Objection.  Form.

23  Argumentative.  Lacks foundation.  Assumes facts.

24              THE WITNESS:  I guess I would want a

25  lot more evidence about a group of people before
```

Franklin Davidson - 8/19/2014

167

1  I agreed with you on that.  People just have a

2  lot of different burdens.  They have a lot of

3  different concerns.  They have a lot of different

4  priorities in terms of places they need to go.

5         **BY MR. KEISTER:**

6         **Q      Well, if a person works a block away**

7  **from a DPS office, for instance, and the person**

8  **has to take public transportation to work, it is**

9  **not going to be as onerous for that person to**

10 **walk a block after taking public transportation**

11 **to work than it would be if they had to do a**

12 **standalone trip the whole way to DPS, correct?**

13         MS. WESTFALL:  Objection.  Assumes

14 facts.  Calls for speculation.  Form.

15 Foundation.

16         THE WITNESS:  I suppose that's true.

17         **BY MR. KEISTER:**

18         **Q      And those type of determinations**

19 **really have to made on an individual basis,**

20 **right?  You have to consider the circumstances of**

21 **each person as to what they are going to have to**

22 **do, correct?**

23         MS. WESTFALL:  Objection.  Vague.

24         THE WITNESS:  In the best case, you

25 would want to do that, given the amount of  or

Franklin Davidson - 8/19/2014

168

1   all that you have to carry out an investigation

2   of this sort; you make use of the data that you

3   can gather and lay it out.  And if you had

4   unlimited amounts of money, you could make it a

5   much more defined range kind of report.  But one

6   has to go with what one has.  And to my

7   knowledge, this is the only report that takes a

8   look at it in an empirical way.  And so, you have

9   to give some credence to that over mere

10  speculation.

11              BY MR. KEISTER:

12      Q    Okay.  But isn't true that this is

13  also speculation?

14              MS. WESTFALL:  Objection.  What is

15  speculation?

16              BY MR. KEISTER:

17      Q    Mr. Webster's report, to some extent,

18  not completely, but to some extent.

19              MS. WESTFALL:  Objection.

20              THE WITNESS:  And what is the

21  speculation now?

22              BY MR. KEISTER:

23      Q    The travel times that these people

24  have to make.

25      A    Are you saying the travel times

1  themselves or the importance involved in going to

2  one place rather than another?

3       **Q      No, the travel times themselves.**

4       A      The travel time?

5            MS. WESTFALL:  Objection.  Outside of

6  Dr. Davidson's expertise.  He is not a

7  geographer.

8            THE WITNESS:  I don't guess I know the

9  answer to that question.

10           **BY MR. KEISTER:**

11      **Q      Did you see anywhere in Gerald**

12 **Webster's report where he made any factual**

13 **determination with respect to a specific person**

14 **or persons as opposed to his general**

15 **determination of statistics?**

16      A      No.

17      **Q      I want to just try and work through**

18 **your report, if you want to turn to the front**

19 **page, and ask you some questions about it.  And**

20 **maybe we can wrap this up.**

21           (Pounding noise.)

22           And most of this we have already

23 talked about.  So, I am going to kind of skim it.

24      A      Sure.

25           MR. KEISTER:  And Liz with the

```
 1  slamming papers, I know she's getting impatient.

 2           (Laughter.)

 3           MS. WESTFALL:  No, no, I was cleaning.

 4  I didn't mean to suggest impatience.  I am very

 5  tidy.

 6           BY MR. KEISTER:

 7       Q       All right.  On page 3 of the report,

 8  on the very first sentence, full sentence, you

 9  state, "I have been invited to testify on voting

10  issues before the Texas Senate meeting as a

11  whole."  When did you testify before the Texas

12  Senate?

13       A       It was 2009.

14       Q       Okay.  And do you recall what your

15  testimony was in regard to?

16       A       Well, it was in regard to whatever the

17  photo ID bill was in 2009.  I can't remember the

18  number of it right offhand.

19       Q       Okay, but do you remember more

20  specifically what areas of expertise you were

21  opining on or the subjects?  I understand S.B.

22  14, that's kind of broad, but --

23       A       Right offhand, I'm having difficulty.

24       Q       Okay.  Well, let's talk about it a

25  little bit and maybe it will come --
```

Franklin Davidson - 8/19/2014

171

1       A       Okay.

2       Q       -- come back to you.

3               How did it happen that you came to

4    testify before the Texas Senate?  Did somebody

5    invite or what occurred?

6       A       I believe I was invited.

7       Q       Okay.  Do you recall who invited you?

8       A       No, but I want to say it was a Senator

9    or a staff member of a Senator.

10      Q       Okay.  Do you remember if it was a

11   Senator who was supportive of that particular

12   bill or been opposed to that particular bill?

13      A       I think one who was opposed.

14      Q       Okay.  And I assume, then, you took --

15   or I shouldn't assume.

16               (Laughter.)

17               Did you take a position opposed to the

18   passage of the bill?

19      A       Yes.

20      Q       Okay.  And do you recall what

21   arguments you gave to the Senate as to why they

22   should not pass the bill?

23      A       They were somewhat the same arguments

24   that I make in my report here.

25      Q       Okay.  Okay.

1      A      That it would have more of an impact

2   on lower-income people and minorities, in

3   particular.  That's my recollection.  And it has

4   been a while.

5           **Q      Okay.  Yes, it has.**

6              **Did you produce a copy of your**

7   **testimony in front of the Senate?**

8       A      You say, did I produce?

9           **Q      To us, in response to --**

10             MS. WESTFALL:  No, but it's part of

11  the public record.

12             MR. KEISTER:  Okay.  Okay.

13             **BY MR. KEISTER:**

14             MR. KEISTER:  Did you --

15             MS. WESTFALL:  I don't believe we

16  have.

17             MR. KEISTER:  Okay.

18             MS. WESTFALL:  I can't confirm that

19  100 percent, but it is part of the public record

20  that has been produced in this litigation since

21  2012.

22             MR. KEISTER:  Okay.  I'm not sure,

23  either.  That's why I'm asking.

24             **BY MR. KEISTER:**

25          **Q      Did you review your testimony before**

1  **you prepared this report?**

2          A       I'm pretty sure that I did.

3          **Q       Okay.**

4          A       That would have been -- yes, okay.

5  Yes.

6          **Q       Yes.  Well, the next sentence says,**

7  **"as well as before the U.S. Senate and House**

8  **committees".  Now what testimony -- well, let me**

9  **ask you first, when did you testify before the**

10 **United States Senate with respect to photo ID**

11 **litigation?**

12                 MS. WESTFALL:  Objection.  Compound.

13                 THE WITNESS:  It was with regard to

14 the renewal of Section 5 of the -- renewal of the

15 Voting Rights Act in 2005, I think is when I was

16 there.

17                 As I mention in my report, I was the

18 primary author of a research report that was paid

19 for by the Lawyers' Committee for Civil Rights

20 Under Law.  I was on a 10-member citizens'

21 commission which was formed by the Lawyers'

22 Committee to take testimony around the country

23 with regard to voting problems.

24                 And then, on the basis of that

25 testimony and other research that was conducted

Franklin Davidson - 8/19/2014

174

1  by me and by staff members of the Lawyers'

2  Committee, a report and, then, a summary report

3  were published and presented at the time that the

4  Senate hearings were being held on the subject.

5          And it was in that capacity that I

6  testified before, I think it was Senator Leahy's

7  committee in the Senate.

8          **BY MR. KEISTER:**

9     **Q     In 2005?**

10    A     I believe it was 2005, yes.

11    **Q     Okay.  Now what type of voting issues**

12 **were you exploring with the committee?  What was**

13 **the Lawyers' committee you mentioned?**

14    A     The Lawyers' Committee for Civil

15 Rights Under Law.

16    **Q     Right, right.  What was the issues**

17 **that you were exploring given that time period?**

18    A     Looking at any impediments to voting

19 with regard to minority citizens that would have

20 been covered under the Voting Rights Act.

21    **Q     Okay.  Did any of that in any way**

22 **involve the issue of photo identification?**

23    A     I'm blocking on that.  My tendency,

24 off the top of my head, is to say no, but I'm not

25 absolutely certain that that's the case.

Franklin Davidson - 8/19/2014

175

1      Q     Because the Carter-Baker report would

2 have been published during that time period,

3 correct?

4      A     I think it may have been published

5 before.  I'm not sure.  But about the same time

6 certainly.  I think Carter-Baker came out in

7 2005, didn't it, or -- I want to say either '04

8 or '05.

9      Q     Okay.  Have you ever taken a position

10 in support of some type of photo identification

11 for voting purposes?

12      A     I don't believe so.

13      Q     Okay.  Have you ever thought to

14 yourself it would be a good idea in some

15 circumstances?

16      A     Well, in some circumstances, but I'm

17 not, I mean, I'm not sure whether you're talking

18 about going to the polls or not.  But I'm just --

19 in the whole world of voting and registration,

20 and so forth, and the kinds of problems that -- I

21 just -- I hadn't -- no, I don't think I've been

22 involved in that.

23      Q     Okay.  Well, for instance, did you

24 read the Carter-Baker report?

25      A     (Witness laughs.)  I did back when it

Franklin Davidson - 8/19/2014

176

 1  came out.  Don't ask me any questions about it.

 2            (Laughter.)

 3       **Q     You recall there was a discussion in**

 4  **that report concerning photo identification**

 5  **bills?**

 6       A    Yes, yes.

 7       **Q     During that time period did you think**

 8  **that made sense, at least what was in the**

 9  **original Carter-Baker report?**

10       A    Well, I had some serious difficulties

11  with it, and, in particular, because of a very

12  sharp dissent by one member of the committee,

13  Spencer Overton, claiming that the requirement of

14  a photo ID had real problems connected with it of

15  the sort that have been discussed in Senate Bill

16  11.

17            And then, there were also people who

18  more recently have pointed out with regard to

19  that report that it is requiring, along with its

20  urging a requirement of a photo ID, that there be

21  a certain number of years after the law was

22  passed where there would be a good deal of effort

23  made on the part of the government to inform

24  people about the specifics of getting a photo ID

25  and what that would consist of, and making sure

1   that they were able to get it without difficulty.

2          Q     Okay.  You mentioned there was one

3   member of the Carter-Baker committee, or whatever

4   you call it, commission I guess --

5          A     Commission.

6          Q     -- that issued the dissenting -- I

7   don't know if it's an opinion, but a non-legal

8   dissenting opinion with respect to that report.

9                (Laughter.)

10               How many members were on that

11  commission?  Do you remember?

12         A     I want to say nine, but that's just a

13  rough guess.

14         Q     Okay.  And out of that nine, there was

15  only one that you recall doing a dissenting

16  statement on this --

17         A     Yes, yes.

18         Q     Okay.  All right.  And then, it also

19  references House committees.  Was that the same

20  time period you were testifying, 2005?

21         A     That was a little, no, that was a

22  little while later.  And it also had to do with

23  voting, but I'm trying -- oh, it was a committee

24  that Senator Feinstein was heading up, or a

25  subcommittee.

1        I can't remember the exact focus of

2  it, but it had to do with voting problems, voting

3  difficulties --

4        **Q      Okay.**

5        A     -- that I think, in particular,

6  minorities would face.

7        **Q      Any issues related to photo ID that**

8  **you recall in that, in those committee hearings?**

9        A     My tendency is to say no.

10        **Q      Okay.  Then, I'm going to take your**

11  **tendency at this point.**

12              (Laughter.)

13        A     Okay.

14        **Q      And in that sentence you say, "In the**

15  **course of my career, I have testified as an**

16  **expert or served as a consultant in over 30**

17  **lawsuits in nine states, mostly on behalf of**

18  **plaintiffs in voting rights cases.  In this case,**

19  **I'm being compensated for my work, my standard**

20  **rate at $350 per hour."**

21              **Now you said in mostly Voting Rights**

22  **Act cases.  Are there any other type cases that**

23  **you served as an expert witness in?**

24        A     There was an African-American woman in

25  a death penalty case a number of years ago, and

Franklin Davidson - 8/19/2014

179

```
1  she was the alleged perpetrator.  And I gave some
2  kind of information.  It was very minor.  I don't
3  think I even appeared in the courtroom.  I may
4  just have given this to a lawyer or something.
5       Q     Okay.
6       A     Let me think a minute.
7             (Pause.)
8             Repeat the question one more time.
9       Q     You say here that you've served as a
10 consultant in over 30 lawsuits.  And you say most
11 of them were Voting Rights Act cases.
12      A     Well, one had to do with a situation
13 in a little town north of Houston where, when
14 desegregation of a school system was required,
15 all of the Black teachers were fired.  And I gave
16 some kind of testimony in that case, but I can't
17 -- on behalf of the teachers -- but I can't
18 remember what the nature of the testimony was.
19      Q     Yes.  It might have been an employment
20 discrimination case or something of that nature?
21      A     Yes, I think that's what it was.
22      Q     Okay.
23      A     I was probably testifying as to the
24 racial atmosphere of the city --
25      Q     Okay.
```

Franklin Davidson - 8/19/2014

180

```
 1        A       -- and the area in east Texas.

 2        Q       Okay.  Any others that you can

 3   remember that weren't Voting Rights Act --

 4        A       Could I just --

 5        Q       Sure, if you want to.

 6        A       My vitae is here somewhere.

 7        Q       I think it would be with Exhibit 1, I

 8   believe.

 9                MS. WESTFALL:  With your indulgence,

10   I have a standalone.

11                THE WITNESS:  Oh, thank you very much.

12                (Witness looks at document.)

13                This is going to take a minute here.

14                Okay.  Here we go.

15                BY MR. KEISTER:

16        Q       And you can just glance quickly,

17   Doctor.  I'm not going to --

18        A       Okay.

19        Q       I'm not going to pounce on you too

20   much on this one.

21        A       Consultant to defendants in their

22   efforts to demonstrate that the jury selection

23   procedure in Florida was unfair.

24        Q       Okay.

25        A       Consultant to plaintiffs in a class
```

Franklin Davidson - 8/19/2014

181

1   action employment discrimination suit.

2            Consultant -- oh, I mentioned this --

3   to Defendant Dee Dee Martin indicted on capital

4   murder charges who claimed the jury selection

5   system discriminated against Blacks.

6        **Q      Okay.**

7        A      I think that's basically it.

8        **Q      Okay.  So, five or six?  I didn't keep**

9   **an exact count, but --**

10       A      Somewhere in there --

11       **Q      Okay.**

12       A      -- as opposed to 20 or 30-some-odd

13   others.

14       **Q      Okay.  Yes.  So, somewhere in the**

15   **neighborhood of 25 that you've consulted on have**

16   **been Voting Rights Act cases?**

17       A      I think so.

18       **Q      Have there been any particular clients**

19   **that have dominated that number?  Any particular**

20   **clients you have worked for more than other**

21   **clients, out of the 25 Voting Rights Act cases?**

22       A      When you say "clients," you mean

23   lawyers or do you mean --

24       **Q      It can be if --**

25       A      -- the parties themselves?

1    Q    It can be lawyers or parties,

2  whichever way is easiest to break it down.  For

3  instance, the Department of Justice, I don't know

4  how many times you've worked for them, but --

5    A    Well, I don't remember, either.  Have

6  I worked for the Department of Justice?

7         (Laughter.)

8    Q    I thought you said you had, but that

9  was early this morning.

10   A    It's mostly been just individuals or

11 class action.

12         Once more the question?

13   Q    Okay.  And I was just asking, out of

14 that 25 or so Voting Rights Act cases that you've

15 worked on, has there been one client that's been

16 your predominant client or there's various

17 clients through the years?

18   A    No, it's been just a wide variety of

19 clients.  I've worked with one lawyer on probably

20 three or four cases.

21   Q    And who would that lawyer be?

22   A    Oh, boy.  That would be, I think his

23 name is -- oh, boy, I just was in email

24 communication with him a few days ago for the

25 first time in about 15 years.

Franklin Davidson - 8/19/2014

183

1                   MS. WESTFALL:  Take your time, Dr.

2    Davidson.  If you want to look at your CV to

3    refresh --

4                   MR. KEISTER:  Yes.

5                   THE WITNESS:  It's not going to be in

6    my CV here.

7                   MS. WESTFALL:  But it may refresh.

8                   THE WITNESS:  I want to say Bill

9    Garrett, I think is his name.  Bill Garrett.

10                  MR. KEISTER:  Okay.

11                  THE WITNESS:  Now retired, as have

12   most of my clients.

13                  (Laughter.)

14                  **BY MR. KEISTER:**

15       **Q     That's a long time to be doing it.**

16   **You started doing this when?  What year did**

17   **you --**

18       A     I think in the late sixties.

19                  (Laughter.)

20                  MR. KEISTER:  All right.  Well, let's

21   see if we can keep moving here.  All right.

22                  MS. WESTFALL:  Counsel, if there's a

23   convenient time -- I don't know how much longer

24   you have -- do you want to take a break?

25                  MR. KEISTER:  This is a convenient

 1 | time now.

 2 |           MS. WESTFALL:  Yes.  Great.  Super.

 3 | Thank you.

 4 |           (Whereupon, the foregoing matter went

 5 | off the record at 1:56 p.m. and went back on the

 6 | record at 2:06 p.m.)

 7 |           **BY MR. KEISTER:**

 8 |      **Q     Doctor, just back up just for a moment**

 9 | **on Page 3 when you were talking about over 30**

10 | **lawsuits that you've had in your career and you**

11 | **mentioned in nine states, can you tell us which**

12 | **states those are?**

13 |      A     I would have to just look here at my

14 | CV.  I'm going to just read them off here.

15 |      **Q     Yeah.**

16 |      A     Texas -

17 |      **Q     Okay.**

18 |      A     - Florida, Texas, Texas, Texas, Texas,

19 | Texas, Texas, Texas, Texas, Alabama, Alabama,

20 | Texas, Texas, Texas, Virginia, Mississippi,

21 | Alabama, Alabama, Florida, Alabama, Texas,

22 | Alabama, Mississippi, Illinois, Mississippi,

23 | Pennsylvania, California, Alabama, Texas, Texas,

24 | Texas.

25 |      **Q     Okay.  I counted ten, but my fingers**

Franklin Davidson - 8/19/2014

185

 1  are slow.

 2            MS. WESTFALL:  You're not testifying

 3  now.

 4            DR. DAVIDSON:  Oh, no.  New Jersey is

 5  the last one, not Texas.

 6            MR. KEISTER:  Okay.

 7            DR. DAVIDSON:  Okay.

 8            BY MR. KEISTER:

 9       Q    Regardless of the count, we've got to

10  say so it's on the record.  All right.  And

11  before you put it up, let me ask you this, with

12  respect to the lawsuits in Texas, how many of

13  those lawsuits involved the actual State of Texas

14  as opposed to a local jurisdiction?  If you want

15  to just read the ones that are against the State

16  of Texas itself.

17       A    Okay.  I'm not sure about this one.

18  It's League of United Latin American Citizens v.

19  Clements.  U.S. District Court, Western District

20  of Texas consulted the plaintiffs alleging vote

21  dilution in multimember district state judicial

22  elections.

23       Q    What year was that?

24       A    That was 1988 and '89.

25       Q    So that would have been -

Franklin Davidson - 8/19/2014

1      A      I'm just - That could have been

2   statewide, I'm just not sure.  And then the next

3   one, Vera v. Richards, expert for State of Texas,

4   which was alleged to have violated the U.S.

5   Constitution in creating majority minority

6   districts in the 1990s round of Congressional

7   redistricting, and that's for sure.

8      **Q      Okay, so you worked on behalf of the**

9   **State in that one?  Is that -**

10     A      I believe I - Well, come to think of

11  it - yeah, expert for the State, yes.

12     **Q      Okay.**

13     A      Yeah.

14     **Q      And that was in what year?**

15     A      1994.

16     **Q      Okay.  And so, before you close up let**

17  **me just confirm, I think, if my memory is**

18  **correct, that you only - out of all the Texas**

19  **cases you mentioned, there were only two that**

20  **involved the actual state?**

21     A      At most, two.

22     **Q      Okay.  And both of those dealt with**

23  **redistricting?**

24     A      Yes.

25     **Q      Okay.  And both of those would have**

1  been, if my memory is correct, would have been

2  during the time period that the Democrats were

3  still in control of the state, correct?

4        A     For Vera v. Richards, yes, and then -

5  yeah, yes.

6        Q     Okay.  Okay, thank you.

7        A     Okay.

8        Q     I think we're done with your CV.

9        A     Okay.

10        Q     All right.  So back to your report on

11  Page 3 under executive summary, and maybe we can

12  knock some of this stuff out in the executive

13  summary instead of going back through the history

14  because I think we've covered it.

15        A     Okay.

16        Q     You state, "The history of Texas

17  politics from statehood to 1965 is one of

18  perpetual discrimination, targeting and affecting

19  the state's two largest minority ethnic groups,

20  Latinos and blacks."  Did I read that correctly?

21        A     Yes.

22        Q     And you would agree that during that

23  time period that you set forth here that the

24  State of Texas was controlled by the Democratic

25  Party?

Franklin Davidson - 8/19/2014

188

1      A      That is correct.

2      Q      Okay.  Now, and then the next sentence

3  you mention, "the poll tax, the white primary,

4  laws restricting voter registration to a brief

5  time period, action, brutality and lethal

6  violence, efforts to intimidate minorities at the

7  polls, misinformation given to minorities about

8  the election process, and minority voting

9  deletion through racial gerrymandering, and the

10  imposition of at large elections inter alia have

11  depressed the black and Latino vote throughout

12  Texas's existence as a state."  Now, with respect

13  to the poll tax, I think later on in the reports

14  you're going to talk about that, correct?

15      A      That's correct.

16      Q      And I think you point out that that

17  was instituted in 1902, correct?

18      A      I believe that's right.

19      Q      All right.  And at the time that was

20  instituted, Texas was under the control of the

21  Democratic Party, correct?

22      A      Yes.

23      Q      And up until the day it was ruled

24  unconstitutional by the U.S. Supreme Court, Texas

25  was under the control of the Democratic Party,

Franklin Davidson - 8/19/2014

189

1    correct?

2         A      Yes.

3               MR. KEISTER:  Okay.

4               MS. WESTFALL:  Wait for him to ask him

5    questions, otherwise there will be problems with

6    the transcript.

7               DR. DAVIDSON:  I'm sorry.

8               MR. KEISTER:  I'll try to speak

9    quickly now, but you need to let me pause.

10              BY MR. KEISTER:

11        Q      And then the next one you talk about

12   is the white primary.  And the white primary

13   basically allowed no one to vote except white

14   people in the Democratic primaries, correct?

15        A      Correct.

16        Q      And that was an official law passed by

17   the State of Texas, correct?

18        A      That's correct.

19        Q      And during that time period when that

20   law was passed, Texas was solidly controlled by

21   the Democratic Party, correct?

22        A      That's correct.

23        Q      Okay.  And then there came a time

24   period when the white primary was outlawed or

25   ruled unconstitutional, correct?

Franklin Davidson - 8/19/2014

190

1        A        That's correct.

2        **Q        And that's when the Democrats began**

3    **implementing restrictive registration, voter**

4    **registration time periods, correct?**

5        A        Yes.

6        **Q        Okay.  And that occurred during the**

7    **time when Texas was solidly controlled by the**

8    **Democratic Party, correct?**

9        A        Yes, sir.

10       **Q        Okay.  Under Paragraph 5, you state,**

11   **"The claims of lawmakers and top state government**

12   **officials, almost all of whom were white, Voter**

13   **and SB 14, and its predecessors, in 2005, 2007,**

14   **and 2009, refers that there was significant voter**

15   **fraud in Texas, of the kind a photo ID law would**

16   **prevent."**

17              **With respect to significant vote fraud**

18   **in Texas, as we discussed earlier, while it may**

19   **not be a significant number, do you - with**

20   **respect to in-person voter fraud, the fact is**

21   **there had been significant voter fraud in Texas,**

22   **correct?**

23              MS. WESTFALL:  Objection, compound,

24   vague, assumes facts.

25              DR. DAVIDSON:  It says - What I say

Franklin Davidson - 8/19/2014

191

1   here is the claims of lawmakers and top state

2   government officials were that there was

3   significant vote fraud in Texas of the kind a

4   photo ID law would prevent.

5               **BY MR. KEISTER:**

6        **Q     Okay.  And my question is, regardless**

7   **of whether or not a photo ID law would prevent**

8   **the fraud, the fact is during the time photo ID**

9   **was being debated in the Texas legislature, there**

10  **was significant voter fraud in the state,**

11  **correct?**

12              MS. WESTFALL:  Objection,

13  mischaracterizes his testimony.

14              DR. DAVIDSON:  I'm not saying that.

15              **BY MR. KEISTER:**

16       **Q     I didn't ask you if you were saying**

17  **that.  I'm asking you - I'm asking you - I'm just**

18  **simply asking you that during the time that photo**

19  **voter ID was being debated in the Texas**

20  **legislature, putting aside categories, and**

21  **putting aside in-person voter fraud, there was**

22  **voter fraud in the State of Texas, correct, of**

23  **other types, be it ballot - mail-in ballot fraud,**

24  **be it registration issues?**

25       A     Yes.

1              MS. WESTFALL:  Objection.

2              MR. KEISTER:  Okay.

3              MS. WESTFALL:  Outside the scope of

4  his expertise and his report.

5              **BY MR. KEISTER:**

6       **Q     And then the second part, you state,**

7  **"And second, when the first claim was shown to be**

8  **highly devious, that such a law would reassure**

9  **the public that election results were correct."**

10 **Isn't it a fact, Doctor, that since there is and**

11 **was voter fraud in the State of Texas, that any**

12 **efforts by the legislature to reduce any type of**

13 **voter fraud would help to assure confidence of**

14 **the citizens of Texas with respect to the**

15 **elections?**

16             MS. WESTFALL:  Objection, calls for

17 speculation, compound, form, foundation.

18             DR. DAVIDSON:  I just - I really don't

19 - I really don't know about that.

20             **BY MR. KEISTER:**

21      **Q     Well, doesn't it give the public more**

22 **confidence if they see the legislature trying to**

23 **do something about some voter fraud, than if they**

24 **don't see anything at all?**

25             MS. WESTFALL:  Objection, calls for

1  speculation.

2          DR. DAVIDSON:  I suppose if it would

3  deal with, you know, the kind of vote fraud that

4  the state was going after.  If it was a kind that

5  virtually didn't exist, it might not give people

6  too much - too much confidence.

7          **BY MR. KEISTER:**

8      **Q    Okay.  But I think as you state going**

9  **on through the report, there was overwhelming**

10 **support in the State of Texas for the passage of**

11 **a photo ID law, correct?**

12          MS. WESTFALL:  Objection, misstates

13 the report, assumes facts.

14          DR. DAVIDSON:  No, there was not - I

15 don't believe I say anywhere in my report that

16 there was overwhelming support for that.

17          **BY MR. KEISTER:**

18     **Q    Overwhelming, maybe I'm strong.  There**

19 **was majority support among the citizens of Texas**

20 **for photo ID -**

21          MS. WESTFALL:  Objection -

22          **BY MR. KEISTER:**

23     **Q    - legislation?**

24     A    I certainly don't -

25          MS. WESTFALL:  Misstates.

Franklin Davidson - 8/19/2014

194

```
 1              DR. DAVIDSON:  - remember having said
 2  that.
 3              BY MR. KEISTER:
 4      Q     Okay.  Do you recall some of the polls
 5  that you referenced as we go through here
 6  forward?
 7              MS. WESTFALL:  Objection.  If you want
 8  to point him to certain paragraphs of the report,
 9  otherwise, assumes facts.
10              DR. DAVIDSON:  I don't recall.  I
11  don't -
12              BY MR. KEISTER:
13      Q     Okay.  And then you say, "Opponents
14  argue that the law was not necessary given the
15  strangely small amount of fraud of the kind that
16  the law would prevent," correct?
17      A     That's correct.
18      Q     So according to your statement, the
19  opponents were not saying there was no voter
20  fraud of the kind that the law would prevent.
21  According to your statement, they were saying
22  there was a small amount?
23              MS. WESTFALL:  Objection.
24              MR. KEISTER:  And then you need to
25  read that paragraph -
```

Franklin Davidson - 8/19/2014

195

1           DR. DAVIDSON:  Well, let me -

2           MR. KEISTER:  Okay.

3           DR. DAVIDSON:  Which paragraph is that

4  now?

5           MR. KEISTER:  That's - I was reading

6  the last sentence under Paragraph 5 -

7           DR. DAVIDSON:  Okay.

8           MR. KEISTER:  - on Page 4.

9           DR. DAVIDSON:  "Opponents argued that

10  the law was not necessary given the extremely

11  small amount of fraud of the kind the law would

12  prevent, that is voter impersonation at the

13  polls.  That despite the political debate about

14  suspected fraud, there was little evidence of

15  public concern about the integrity of the

16  electoral process in Texas.

17           The likely effect of such a law would

18  be to place a heavier burden on blacks and

19  Hispanics that do not have one of the required

20  photo IDs compared with Anglos given that the two

21  minority groups are disproportionately poor.  And

22  that the goal of a strict photo ID requirement

23  was to skew elections in favor of Anglos who vote

24  overwhelmingly Republican."

25           I don't - I guess either I'm

Franklin Davidson - 8/19/2014

196

1    mishearing what you're saying, or I don't see

2    where I've written exactly what you're

3    attributing to me.

4              BY MR. KEISTER:

5         Q    Okay.  Well, let me just read to you

6    again the part I'm concentrating on, and this is

7    the last sentence on Page 4.  "Opponents argue

8    that the law was not necessary given the

9    extremely small amount of fraud of the kind the

10   law would prevent, i.e., voter impersonation at

11   the polls."  Now, you did not say, or the

12   opponents did not say that there was no fraud of

13   the kind that the law would prevent, correct?

14        A    I think that's correct.

15        Q    It said there was an extremely small

16   amount.

17        A    Yes.

18        Q    Okay.  Page 5, go down to Paragraph 6,

19   the last sentence of Paragraph 6.

20        A    Just one moment, please.

21        Q    Oh, I'm sorry.

22        A    Okay.

23        Q    You state, "Looming over the

24   legislative debates over voter ID laws however,

25   was the change in the demography of Texas."

Franklin Davidson - 8/19/2014

197

 1  There, are you referring to the increase in the

 2  Hispanic population in Texas?

 3       A     Yes.

 4       Q     Okay.  And Texas having become a

 5  minority majority state?

 6       A     Would you repeat the question?  Did

 7  you say it had or had not?

 8       Q     Had, according to the 2000 census.

 9  2000 or - yeah, 2000 census, had become a

10  minority majority state.

11       A     No, I didn't say it according to the

12  2000 census.  I don't believe I did.

13       Q     Okay.  Well, what's your support for

14  stating that Texas has become a minority majority

15  state?

16       A     Well, I do say that at some point, but

17  I didn't say it right at -

18       Q     Oh, I didn't mean right at that point.

19  I'm sorry.

20       A     Oh, okay.  Okay, repeat the question,

21  please.

22       Q     All right.  All right, you state,

23  "Looming over the legislative debates over voter

24  ID laws however, was the change in the demography

25  of Texas," correct?

1      A      Right.

2      **Q      In there, you're referring to the**

3 **increase of the Hispanic population in Texas?**

4      A      That's correct.

5      **Q      All right.  And your support for the**

6 **statement, or the statement that the Hispanic**

7 **population is increasing was the 2000 census,**

8 **correct?**

9      A      No, it was the - it was information

10 that came from the census in 2005.

11      **Q      Okay, all right.  Since the year 2000,**

12 **how many statewide elections in Texas have**

13 **Republicans lost?**

14      A      I don't believe they've lost any.

15      **Q      Okay.  And when you talk about, or**

16 **when the census, or people interpreting the**

17 **census talk about Texas becoming a minority**

18 **majority state, does that take into consideration**

19 **the number of citizen voting age population?**

20      A      It takes it into account.  I don't

21 think it's limited -

22      **Q      Okay.**

23      A      - to them.

24      **Q      With respect to the citizen of voting**

25 **age population, would Texas be a minority**

 1  majority state with respect to that limited

 2  population?

 3       A     I'm not sure that it would have quite

 4  reached that.  Let me just double-check on this.

 5  Right, this is just referring to the population

 6  in general.

 7       Q     Okay.  And if you haven't done that

 8  calculation, you can just tell me, but have you

 9  tried to make a determination with respect to the

10  citizen voting age population as to whether or

11  not Texas was a minority majority state in that

12  population during the time period Texas was

13  debating photo voter ID?

14            MS. WESTFALL:  Objection, confusing.

15            DR. DAVIDSON:  I don't believe so.

16            MR. KEISTER:  Okay.

17            BY MR. KEISTER:

18       Q     Wouldn't that be an important number

19  to know if you're going to make an argument that

20  Texas legislature was motivated by the minority

21  majority status, to know whether or not the

22  voting age population was minority majority?

23       A     No.

24       Q     Why not?

25       A     First of all, this is happening fast.

1  This changed from 2000 when the state's majority

2  population was 52 percent Anglo to 2005 when it

3  was - when it had dropped considerably, and there

4  was a great deal of discussion at that point.

5           A point made widely known to political

6  insiders by the former head of the U.S. Census

7  Bureau, Steve Murdock, that the population, the

8  Hispanic population, given current trends, would

9  be rising even at a faster rate given the

10  increasing number of children that they were

11  reproducing, and especially in comparison with

12  the percentage of children that were being

13  reproduced by Anglos.

14           So, very quickly, in a very short

15  period of time, a good deal of information came

16  to the fore which made it clear to the policy

17  makers, I think, that this expansion was

18  happening in a hurry, and it was going to be a

19  major expansion.

20      **Q     But you would agree that during the**

21  **time period that the voter ID was being debated,**

22  **the Republicans were, in fact, increasing their**

23  **electoral victories in the State of Texas,**

24  **correct?**

25           A     They were increasing their electoral

1  victories?

2        Q      Right.  And even -

3        A      Wait a minute.  That's a question.

4  I'm not -

5        Q      I'm sorry, I thought you were -

6        A      No, no, no, I was asking exactly what

7  you meant by that.

8        Q      Well, I mean, we didn't see suddenly

9  a switch and Democrats suddenly starting to win

10 the statewide races, or even start suddenly

11 winning, you know, the majority of Congressional

12 seats or that type of thing, correct?

13       A      That's correct.

14       Q      That's what I mean.

15       A      Okay.

16       Q      So it wasn't a panic point where you

17 would think, you know, somebody in the Republican

18 Party said, "Oh, no, look, we just lost, you

19 know, ten seats in the last election, and that's

20 because the Hispanic population has increased,"

21 right?

22       A      No.

23       Q      Okay.  So, what do you see as a point

24 during the debate in which there became a panic

25 amongst the Republicans in the legislature and

1  **statewide office to suddenly say, "We've got to**

2  **do something to reduce the number of blacks and**

3  **Hispanics voting in this state"?**

4      A     I don't think that anybody could point

5  to a point.  One thing that I don't mention in

6  this report at all is that there was a

7  significant, and I'm using that in a

8  nonstatistical sense here, there was a

9  significant increase in the Latino population

10  according to the Census between 1990 and 2000.

11          I mean, that was clearly obvious, and

12  people were aware of that fact.  And then, what

13  made it much more dramatic was in 2005, the same

14  year that the bill was - the predecessor of this

15  bill was first considered, was that the Census

16  comes out with the fact that we are now a

17  minority majority state.

18          And the Republican Comptroller makes

19  this fact well known on her website at the same

20  time the newspaper accounts are making it quite

21  clear that there is a change a coming, and it's

22  probably going to be a big change, and it's

23  probably going to be very soon.  In fact, it's

24  already underway.

25      **Q     Well, but in fact, the only thing**

Franklin Davidson - 8/19/2014

203

1  that's been underway is that Republicans have

2  continued to win statewide office and continued

3  to control the legislature, correct?

4         MS. WESTFALL:  Objection, asked and

5  answered.

6         DR. DAVIDSON:  I would want to look at

7  a lot of different venues.  I'm not sure exactly

8  what is going on in all the states, counties, and

9  other political venues.  But, it's certainly true

10  that the Republicans remain in control at this

11  point.

12         MR. KEISTER:  Okay.

13         BY MR. KEISTER:

14      Q     Now, who was the Comptroller that

15  you're referring to that publicized on the

16  website?  Was that Carole Keeton Strayhorn?

17      A     No, this is a, I'm pretty sure, a

18  Latino.  I want to say a Latina.  Or is it an

19  Indian-American?  Not a Native American, but a -

20  it's not an Anglo person.  It's a woman who is a

21  non-Anglo woman, and I'm just blanking on her

22  name.

23      Q     I'm blanking too on 2005.

24         (Laughter)

25      Q     Whoever the Comptroller was at that

1  time, what was it that was said on the website?

2       A     She just repeated the Census Bureau's

3  findings that the state is now a minority

4  majority state.

5       Q     Okay.  And was that like an

6  informational part of the website just talking

7  about the state?

8       A     Mm-hmm.

9       Q     Okay.  It wasn't a call to arms to the

10  Republican party?

11       A     Not in a straightforward way.

12             (Laughter)

13             MR. KEISTER:  Okay.  All right.

14             MS. WESTFALL:  Can we go off the

15  record for one second?

16             (Whereupon, the above-entitled matter

17  went off the record at 2:35 p.m. and resumed at

18  2:36 p.m.)

19             BY MR. KEISTER:

20       Q     The next several pages of the report

21  deal with the various attempts to pass voter

22  legislation from 2005 up through 2011 when it

23  ultimately passed, correct?

24       A     That's correct.

25       Q     Okay.  And without going through each

Franklin Davidson - 8/19/2014

205

1    one in detail, have you in your mind sufficiently

2    set out in your report the details of those

3    issues or those events that you intend to testify

4    about in the trial of this case?

5         A    Yes, sir.

6         Q    Okay.  Do you agree that it's better

7    to have a photo ID in Texas in order to

8    participate in daily activities of life than it

9    is not to have a photo ID?

10             MS. WESTFALL:  Objection.  Calls for

11   speculation.  Relevance.  Vague.

12             THE WITNESS:  I really haven't thought

13   too much about that.

14             BY MR. KEISTER:

15        Q    Okay.  Do you find that you have more

16   access to more places in today's society if you

17   have a photo ID?

18             MS. WESTFALL:  Objection.  Vague.

19             THE WITNESS:  Well, given the fact

20   that a lot of places do require an ID, it

21   certainly makes it easier for those people who

22   have IDs to access it, yes.

23             BY MR. KEISTER:

24        Q    I mean, just on a daily occurrence, I

25   mean, the bulk of us show an ID maybe daily,

Franklin Davidson - 8/19/2014

206

1  correct?

2          MS. WESTFALL:  Objection.  Calls for

3  speculation.

4          THE WITNESS:  I think a lot of people

5  do certainly.

6          BY MR. KEISTER:

7      Q    And those who don't have IDs or who

8  don't want to show IDs find themselves

9  confronting difficulties functioning in today's

10 society, do they not?

11         MS. WESTFALL:  Objection.  Confusing.

12 Calls for speculation.  Assumes facts.

13 Foundation.

14         THE WITNESS:  Some of them undoubtedly

15 do, yes.

16         BY MR. KEISTER:

17     Q    For instance opening a bank account is

18 difficult without some type of photo ID, correct?

19         MS. WESTFALL:  Objection.  Calls for

20 speculation.

21         THE WITNESS:  I think that's probably

22 the case.

23         BY MR. KEISTER:

24     Q    Boarding an aircraft is difficult --

25 at least through an airport is difficult without

Franklin Davidson - 8/19/2014

207

```
 1  having some type of photo ID, correct?

 2              MS. WESTFALL:  Objection.  Assumes

 3  facts.

 4              THE WITNESS:  I think that's the case.

 5              BY MR. KEISTER:

 6      Q      Getting medical care and other daily

 7  necessities of life often require a photo ID,

 8  correct?

 9              MS. WESTFALL:  Objection.  Calls for

10  speculation.  Relevance.

11              THE WITNESS:  I think there's some

12  truth to that.

13              BY MR. KEISTER:

14      Q      Isn't there some benefit to

15  encouraging people, the small number of people in

16  the state, or that state, that don't have photo

17  ID -- isn't there some benefit to encouraging

18  those people to obtain a photo ID?

19              MS. WESTFALL:  Objection.

20              BY MR. KEISTER:

21      Q      Voting aside for a moment, just for

22  the benefit of their daily life and improvement

23  of their social status and daily life?

24              MS. WESTFALL:  Objection.  Relevance.

25  Outside the scope of this expert's expertise.
```

Franklin Davidson - 8/19/2014

208

1          THE WITNESS:  I would assume that all

2    things considered, yes.

3          BY MR. KEISTER:

4      Q     And certainly considering the small

5    number of people that have been identified as

6    possibly not having photo ID, isn't there that

7    ways most people could be reached out to and

8    encouraged to obtain some type of photo ID for

9    their own benefit to improve their lot in life?

10          MS. WESTFALL:  Objection.  Mis-

11    characterizes the evidence.  Calls for

12    speculation.  Compound.  Vague.

13          THE WITNESS:  Would you repeat that

14    question, please?

15          BY MR. KEISTER:

16      Q     Maybe.

17          (Laughter)

18          BY MR. KEISTER:

19      Q     Wouldn't you agree that considering

20    the small number of people that may not have a

21    photo ID that there could be a benefit in society

22    trying to reach out to those people and trying to

23    encourage those people to obtain a photo ID for

24    their own benefit in their own life?

25          MS. WESTFALL:  Objection.  Relevance

Franklin Davidson - 8/19/2014

209

1  and mis-characterizes evidence.  Calls for

2  speculation.  Not relevant.

3          THE WITNESS:  Well, I -- I -- I would

4  speculate that it -- it would be worth -- well,

5  depending exactly on what you mean by -- by -- by

6  reaching out, you know, and the costs of it and

7  so forth and who would be paying for that and so

8  forth.

9          **BY MR. KEISTER:**

10     **Q     In your reviews of this case have you**

11 **found any of the parties in this case other than**

12 **the State of Texas reaching out to people in**

13 **Texas that do not have a photo ID and encouraging**

14 **them to obtain one?**

15          MS. WESTFALL:  Objection.  Unclear.

16          THE WITNESS:  I'm -- I'm just not

17 aware.

18          **BY MR. KEISTER:**

19     **Q     Okay.  And in fact on page 13 of your**

20 **report, four sentences above paragraph 17 you**

21 **state, "The bills for comments also argued from**

22 **2005 through the 2011 session that so many**

23 **everyday events, whether cashing checks or**

24 **traveling by plane or renting a movie at**

25 **Blockbuster;" I don't think that happens anymore,**

1  "require a photo ID, that it was unreasonable to

2  believe many people lacked it."

3           Whether or not many people lacked a

4  photo ID, isn't it a fact that for most people an

5  ID is necessary for those type of events, if they

6  want to participate in those type of events?

7           MS. WESTFALL:  Objection.  Calls for

8  speculation.  Assumes facts.  Foundation.

9           THE WITNESS:  I think it's true that

10 -- that it's true that a lot of people have it.

11 There's a question of what you mean by "many

12 people lack it."  It might be a relatively small

13 percentage of the total adult population and yet

14 be a significant number of people who don't.

15           BY MR. KEISTER:

16     Q     Before SB-14 became law and before

17 2005 when the photo ID laws began to be debated,

18 people did have the opportunity to utilize photo

19 ID at the polling place, if they so desired,

20 correct?

21     A     I believe that's true, yes.

22     Q     And if you forgot your registration

23 certificate, voter registration certificate, or

24 if it's many people you lost your voter

25 registration certificate, all you had to do was

Franklin Davidson - 8/19/2014

211

1  take your driver's license out and you could use

2  that at the polling place?

3       A    A driver's license or a number of non-

4  photo ID documents as well, yes.

5       Q    And have you done any studies or in

6  your review of the other experts seen any

7  analysis as to how many people prior to 2005 took

8  advantage of the opportunity to use their

9  driver's license or some other photo ID at the

10  polling place as opposed to carrying around their

11  voter registration card?

12       A    No, sir.

13       Q    Okay.  On page 21 of your report under

14  paragraph 30 --

15       A    Yes.

16       Q    -- first full sentence you state,

17  "During a meeting of the Senate Committee of the

18  Whole Adam Skaggs of the Brennan Center presented

19  data collected by the center showing that

20  nationally 8 percent of whites and 25 percent of

21  blacks lack photo ID."  Did I read that

22  correctly?

23       A    Yes.

24       Q    Okay.  And that certainly would not

25  comport with Professor Ansolabehere's report that

1    we've been talking about today, correct?

2        A        That's correct.

3        Q        Okay.  Do you have any reason to

4    believe that -- I guess this was between 2011 and

5    today -- that there's been a drastic increase in

6    the number of African-Americans in Texas that

7    have obtained a photo ID?

8        A        I wouldn't have any way of knowing

9    that.

10       Q        Okay.  So either Mr. Skaggs'

11   percentages was wrong or there's been a dramatic

12   increase in the number of African-Americans

13   obtaining photo ID, correct?

14               MS. WESTFALL:  Objection.  Assumes

15   facts.  Lack of foundation.  Form.

16               THE WITNESS:  I'm -- I'm sorry, I'm

17   going to have to ask you to repeat that one

18   again.  I'm -- I'm just --

19               BY MR. KEISTER:

20       Q        I know, it's getting late.  So Mr.

21   Skaggs said that -- and he did say

22   nationally --

23       A        Nationally.

24       Q        -- that 25 percent of blacks lacked

25   the photo IDs.  And we know from our

Franklin Davidson - 8/19/2014

213

1   conversations today that the numbers Professor

2   Ansolabehere gave, at least in Texas, were

3   significantly lower than that, correct?

4         A     Yes.

5         Q     All right.

6         A     That's right.

7         Q     And my question is is there any way to

8   determine if Mr. Skaggs was incorrect in his

9   percentage or has there been a dramatic increase

10  in the number of African-Americans that have

11  obtained a photo ID after 2011?

12        A     I don't think there's any way to

13  determine that.

14        Q     But one or the other would have to be

15  correct, right?

16        A     Yes.

17        Q     Okay.

18        A     Well, but one of them is -- one of

19  them is national and we're talking the other one

20  statewide, right?  Were you --

21        Q     It does say national.

22        A     Yes, but you -- you wouldn't expect

23  the same percentage statewide as you would

24  nationally.  I -- I -- what am I missing here?

25        Q     Well, are there other states you're

Franklin Davidson - 8/19/2014

214

1  aware of that have a population of 25 percent

2  African-American that do not have a photo ID?

3          A    Don't have any clue.

4          Q    Okay.  Whereas Texas, according to

5  Professor Ansolabehere only had I think between 9

6  and 11 percent in his report, if I remember

7  correctly, correct?

8          A    I -- I don't remember that figure.

9          Q    Okay.  You would agree that in 2005,

10 2007 and 2009 the opponents to the photo

11 identification laws successfully utilized

12 maneuvers based upon Senate and House rules in

13 order to defeat those particular pieces of

14 legislation, correct?

15               MS. WESTFALL:  Objection.  Compound.

16               THE WITNESS:  It -- it would be

17 helpful to go one step at a time, but --

18               BY MR. KEISTER:

19          Q    I was trying to avoid that.

20          A    There are certainly some cases.

21          Q    Okay.  Well, we just do it quickly.

22 In 2005, how did the Democrats defeat the photo

23 voter ID in 2005?

24               MS. WESTFALL:  Objection.  Misstates

25 the report.

1           THE WITNESS:  The Senate majority

2    leader, Senator Van de Putte, successfully

3    challenged the Senate's right to debate the bill

4    to invoke the state constitution.  And then the

5    supporters tried one more option.  They sent it

6    to the House Senate Conference Committee and the

7    session was almost over and there were several

8    important bills still in the process being

9    finalized.  And so, the session ended before

10   further action on voter ID could be taken given

11   the governing rules.

12           BY MR. KEISTER:

13      Q       Okay.  So essentially Senator Van de

14   Putte successfully utilized the rules to prevent

15   a vote on photo voter ID in 2005?

16      A       Yes.

17      Q       Okay.  And we could go through 2007

18   and 2009, but in each of those the end result was

19   the Democrats, either in the House or the Senate,

20   successfully utilized rules, legislative rules to

21   prevent final votes on the legislation, correct?

22      A       That's correct, sir.

23      Q       And would you agree that in each one

24   of those sessions, 2005, 2007 and 2009, that a

25   majority of the members in both houses of the

Franklin Davidson - 8/19/2014

216

1  legislature were in support of those photo voter

2  ID models?

3            MS. WESTFALL:  Objection.  Misstates

4  the legislation.

5            THE WITNESS:  Well, in each one of

6  those years the Democrats were successful in

7  keeping photo ID law from coming into effect.

8            BY MR. KEISTER:

9      Q    By preventing a final vote from one

10  house or the other?

11     A    Yes, correct.

12     Q    And you would agree that if the

13  Democrats had not used those rules to prevent

14  that final vote in either the House or the Senate

15  that in fact any one of those photo ID laws would

16  have passed, correct?

17     A    I think --

18            MS. WESTFALL:  Objection.  Calls for

19  speculation.

20            THE WITNESS:  I think that's probably

21  right.

22            BY MR. KEISTER:

23     Q    And I'm not casting stones.  It just

24  is what it is.

25            Now given the fact that that's what

Franklin Davidson - 8/19/2014

217

1    occurred in 2005, 2007 and 2009, is there any

2    reason you can see of as to why the Republican

3    members of the legislature in 2011 would have

4    expected the Democrats to be any more cooperative

5    in passing a photo voter ID law in 2011 than they

6    had been in the previous sessions?

7                    MS. WESTFALL:  Objection.  Calls for

8    speculation.

9                    THE WITNESS:  I'm just, I'm not sure

10   on that one.  I would have to think about that a

11   little while.  I'm just -- more time than we've

12   got here.

13                   BY MR. KEISTER:

14        Q        Have you seen any evidence or come

15   across anything that indicated to you -- and I

16   don't think I've seen anything in the report, but

17   anything that indicated to you that, yes, in fact

18   in 2011 there were more Democrats who were

19   willing to go along with a photo voter ID law

20   than had been in the previous three sessions?

21        A        No.  No.

22        Q        Okay.  Texas became a solidly

23   Republican state with the House becoming

24   Republican in 2003?

25        A        Somewhere in there.

1      Q      Okay.  Now and before that I believe

2  that Republicans had taken the Senate in 1986.

3      A      I'll take your word for it.

4      Q      Okay.  And then from that period

5  forward all the major state offices were held by

6  Republicans, correct, from 1996 up until today,

7  with the exception maybe of Bob Bullock?  I'll

8  take that back.

9      A      I think I would want to look at that.

10     Q      Yes, because Bob Bullock was actually

11  was the lieutenant governor while George Bush was

12  governor.

13     A      I think that's --

14     Q      Yes.  But from 2000 up until today

15  basically for the most part it's going to -- the

16  Republicans, correct?

17     A      That would be correct.

18     Q      Now with respect to that period of

19  time, from 2000 up until today, how many laws are

20  you aware of that the Texas Legislature has

21  passed, other than the case that we're here on

22  today, in which the United States Supreme Court,

23  or any other court, has ruled them to be

24  unconstitutional based upon racial

25  discrimination?

Franklin Davidson - 8/19/2014

219

```
1       A    I don't know the answer to that.

2       Q    Okay.  Did you know of any?

3       A    Pardon?

4       Q    Do you know if there's any --

5            (Simultaneous speaking)

6            MS. WESTFALL:  Objection.  Calls for

7    a legal conclusion.

8            THE WITNESS:  No.

9            BY MR. KEISTER:

10      Q    Okay.  Well, now you did have a

11   section in your report about the Voting Rights

12   Act.

13      A    Well, now repeat -- repeat the

14   question once more.

15      Q    Okay.  All right.  From the year 2000

16   up until today do you know of any statutes passed

17   by the Texas Legislature dealing with the

18   elections and voting in which a court of ultimate

19   decision has found to be in violation of the

20   Voting Rights Act?

21           MS. WESTFALL:  Objection.  Calls for

22   a legal conclusion.  Outside of Dr. Davidson's

23   expertise.

24           THE WITNESS:  I believe there have

25   been, but don't quote me on this.  No, that was
```

220

1  my answer.  I don't believe so, but I'm not sure.

2              **BY MR. KEISTER:**

3      **Q      Okay.  All right.  And in your**

4  **research for the preparation of your paper you**

5  **didn't come across any cases where a Texas**

6  **statute has been ruled -- since the year 2000 has**

7  **been ruled to be in violation of the Voting**

8  **Rights Act?**

9      A      Oh, no, that's not so.  I --

10     Q      Okay.

11     A      There -- I'm pretty sure there have

12  been

13     Q      Okay.

14     A      -- but I can't name them.

15     **Q      Did you look for them?**

16     A      Yes, I'm -- in which the State of

17  Texas --

18     **Q      The State of Texas.  Not local**

19  **subdivisions, but the State of Texas.**

20     A      For example, the legislature in a

21  redistricting case or something or --

22     **Q      A redistricting?  The case we're here**

23  **on today, although the court of ultimate**

24  **jurisdiction tossed the lower court opinion?**

25     A      The what?

Franklin Davidson - 8/19/2014

221

1      Q      That's the type of law I'm talking

2  about, laws where the Texas Legislature actually

3  enacted a law like the Voting Act of the photo ID

4  law.

5      A      Yes.

6      Q      Are you aware of any laws like that,

7  or like the poll tax in the history or the white

8  primaries?  Are you aware of any law like that

9  that has been in Texas since the year 2000 and

10  ruled to be either unconstitutional based upon

11  the 14th or 15th Amendments, or a violation of

12  the Voting Rights Act?

13      A      I'm pretty there's been some in which

14  the State of Texas has violated the Voting Rights

15  Act.  I can't tell you which ones.

16      Q      Wouldn't you have put those in your

17  paper if you had come across those in your

18  research?

19              MS. WESTFALL:  Objection.  Is there a

20  paragraph you want to direct Dr. Davidson to?

21              MR. KEISTER:  I don't think it's  in

22  here.  That's why I'm asking.

23              THE WITNESS:  I'm not sure.

24              MS. WESTFALL:  Would you like Dr.

25  Davidson to review the report to see whether he

Franklin Davidson - 8/19/2014

222

1  included it?  It's a lengthy report.

2            MR. KEISTER:  If he needs to, but I'll

3  leave that up to him.

4            THE WITNESS:  The question one more

5  time.

6            **BY MR. KEISTER:**

7       **Q     Yes, since the year 2000 -- okay, now**

8  **we -- let me just preface it.  We know that in**

9  **the past the legislature has enacted laws that**

10 **were later found to be discriminatory such as the**

11 **white primary, such as the poll tax, and those**

12 **laws were struck out.  Now, and we know that's**

13 **occurred all the way from Texas history all the**

14 **way up until the Republicans came into power in**

15 **the 2000s.  My question is, since the Republicans**

16 **came to power in the 2000s have you found any**

17 **cases in which the court has stricken --**

18       A     The supreme court.

19       **Q     Ultimately it would be the supreme**

20 **court, but has stricken a Texas state law that**

21 **dealt with elections or voting based upon that**

22 **statute by --**

23       A     The Voting Rights Act.

24       **Q     -- violated the Voting Right Act, or**

25 **being unconstitutional under the 14th and 15th**

Franklin Davidson - 8/19/2014

223

 1  **Amendments.**

 2       A     It's unconstitutional that you're

 3  asking about?

 4       **Q     Either in violation of the Voter**

 5  **Rights Act or unconstitutional in violation of**

 6  **the 14th and 15th Amendments.  And I focused it**

 7  **on after the year 2000, 2000 and up.**

 8       A     Okay.  In addition, Texas led all nine

 9  states governed by Section 5 in the number of

10  successful Section 2 cases, reported and

11  unreported, filed between 1982 and 2005.  There

12  were a total of 653 cases, and 206 were in Texas.

13  Most of these were cases settled through a court

14  ordered consent decree without trial.

15            In recent decades courts did not often

16  make findings that a law was adopted with a

17  racially discriminatory intent because the

18  Section 5 effects and Section 2 results test have

19  been available.  Even so, as recently as August

20  2012 a federal court ruled that Texas had failed

21  to meet its burden under Section 5 of providing

22  that its state and senate congressional

23  redistricting plans were not intentionally

24  racially discriminatory.  The same legislature

25  enacted intentionally discriminatory

1  redistricting plans in 2011.  According to this

2  court finding, it provides a strong indicator

3  that the same decision makers were acting with a

4  racial purpose in adopting SB-14.

5          That's essentially what I have to say

6  about it.

7      Q    Okay.  So did -- where you pointed out

8  to be redistricting cases?

9      A    No, I don't see the redistricting

10  cases.

11      Q    Okay.  And I'm sorry, I wasn't asking

12  you to read your report into the record.

13          (Laughter)

14          BY MR. KEISTER:

15      Q    I should have stopped you.

16      A    Okay.

17      Q    Yes, the answer is you're not aware of

18  any?

19      A    Not aware.

20      Q    Okay.  All right.  Thank you.  You are

21  aware that there are many minorities in elected

22  positions in the State of Texas, correct?

23      A    That's correct.

24      Q    Okay.  You are aware that one of the

25  highest federal positions, elected positions in

Franklin Davidson - 8/19/2014

225

1    the State of Texas is a seat that's held by a

2    minority, correct?

3         A     That's correct.

4         Q     And that would be Senator Ted Cruz,

5    right?

6         A     That's correct.

7         Q     And who supported Senator Ted Cruz in

8    his election for Senate?

9         A     Well, disproportionate under

10   Republicans.

11               (Laughter)

12               BY MR. KEISTER:

13        Q     Disproportionate?  A considerable

14   number of Republicans, correct?

15        A     Quite a few.

16        Q     I think he was touted as the Tea Party

17   candidate, correct?

18        A     Yes.

19        Q     Okay.  And he is as we sit here today

20   still, and probably more, the most popular

21   elected political official in the State of Texas

22   today, isn't he?

23        A     I don't know that to be the case, but

24   he certainly has a lot of grassroots support.

25        Q     Okay.  Amongst some Republicans and

1  certainly amongst the Tea Party Republicans he's

2  the most popular elected political official in

3  the State of Texas today, isn't he?

4       A    I think that's correct.

5       Q    All right.  Doctor, you've been

6  extremely patient.  I appreciate that.  And I'm

7  going to pass the witness.

8            MS. WESTFALL:  I think I will take a

9  little bit of a break.

10            (Whereupon, the above-entitled matter

11  went off the record at 3:08 p.m. and resumed at

12  3:18 p.m.)

13                  CROSS-EXAMINATION

14            BY MR. HEBERT:

15       Q    Dr. Davidson, in response to Mr.

16  Keister's questions about ACORN, he asked you if

17  you were aware that ACORN had been convicted of

18  voter fraud, but in fact the organization ACORN

19  was never convicted of anything, was it?

20       A    That's correct.

21       Q    All right.  And in fact, the

22  controversy about ACORN related to voter

23  registration applications and the press as to

24  voter registration and didn't involve really

25  voter impersonation, did it?

Franklin Davidson - 8/19/2014

227

1        A     No, absolutely not.

2        **Q     Okay.  That's all I have.  I just**

3   **wanted to clarify.**

4                      CROSS-EXAMINATION

5                **BY MS. WESTFALL:**

6        **Q     Great.  I just have a couple follow-up**

7   **questions.  I'd like, Dr. Davidson, for you to**

8   **turn your attention back to your report at**

9   **paragraph 30.**

10       A     You said page 30?

11       **Q     Paragraph 30 at page 21.**

12       A     Okay.  Hold on.

13       **Q     Sorry.  And turn your attention to the**

14  **Brennan Center study that you testified about**

15  **earlier.  Do you see that you indicated in**

16  **paragraph 30 that the study related to overall**

17  **population and not registered voters?  Is that**

18  **right?**

19       A     I'm going to change my glasses here.

20  Just one second.  Yes.

21       **Q     Are you aware of whether Dr.**

22  **Ansolabehere in this case studied the population**

23  **of registered voters in Texas as opposed to**

24  **population as a whole?**

25       A     I think he focused on registered

1  voters.

2       Q    Do you know whether Dr. Ansolabehere

3  looked at all forms of acceptable ID under Senate

4  Bill-14, federal and state?

5       A    I believe he did, but I'm not sure.

6       Q    Thank you.  I have no further

7  questions.

8             REDIRECT EXAMINATION

9             BY MR. KEISTER:

10      Q    Okay.  Just a couple.  With respect to

11  page 21 and the Brennan Center study, is it your

12  belief that Mr. Skaggs was testifying or was

13  presenting data to the committee that 25 percent

14  of the total blacks did not have photo IDs?  Did

15  he represent to the Senate Committee that was

16  voting age population, or did he represent that

17  that was people including non-citizens and

18  underage, or people too young to vote?

19      A    I don't know.

20      Q    Okay.  That's an important

21  distinction, isn't it?

22      A    That would have some importance.

23      Q    Okay.  Now Mr. Hebert asked you about

24  whether or not the ACORN organization had been

25  convicted, is that correct?

Franklin Davidson - 8/19/2014

229

1      A     That's correct.

2      Q     And is that your belief that the ACORN

3  organization has not been convicted of any crimes

4  related to voter registration?

5      A     Yes.

6      Q     Okay.  Do you have any understanding

7  that certain members of ACORN were convicted for

8  violation of voter registration laws?

9      A     I can't remember that.

10     Q     Okay.  If you thought about it real

11  hard, could you remember that?

12             MS. WESTFALL:  Objection.  Asked and

13  answered and relevance.

14             THE WITNESS:  No.

15             BY MR. KEISTER:

16     Q     Okay.  You understand that following

17  those trials of ACORN and/or ACORN people that

18  the ACORN organization was severely limited in

19  its activities after that time period?

20     A     Yes.

21     Q     Okay.  And do you think by the time we

22  go to trial in this case you might have me an

23  answer as to who got convicted, ACORN or the

24  individuals?

25     A     Yes.

Franklin Davidson - 8/19/2014

230

1       Q      Okay.   Thank you.   I have no more

2   questions, unless somebody else does.

3              MS. WESTFALL:  I have no other

4   questions.

5              MR. HEBERT:  No.

6              MS. WESTFALL:  We're done.

7              (Whereupon, the taking of deposition

8   in the above-entitled matter was concluded at

9   3:22 p.m., signature having not been waived.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Franklin Davidson - 8/19/2014

231

1  C E R T I F I C A T E

2  This is to certify that the foregoing transcript

3  Deposition of: Franklin Chandler Davidson

4  In the matter of: Veasy, et al. V Perry, et al.

5  Before: US District Court

6  Date: 08-19-14

7  Place: Washington, DC

8  were duly recorded and accurately transcribed

9  under my direction; further, that said transcript

10 is a true and accurate record of the proceedings;

11 and that I am neither counsel for, related to,

12 nor employed by any of the parties to this action

13 in which this deposition was taken; and further

14 that I am not a relative nor an employee of any

15 of the parties nor counsel employed by the

16 parties, and I am not financially or otherwise

17 interested in the outcome of the action.

18

19

20 ------------------------

21 Dan Michon, Court Reporter

22

23

24

25