UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION

MARC VEASEY, et al,              )
                                 )
          Plaintiffs,            )
                                 ) CIVIL ACTION NO.
VS.                              ) 2:13-CV-00193
                                 )
RICK PERRY, et al,               )
                                 )
          Defendants.            )


              ------------------------------------

                      ORAL DEPOSITION OF

                        HAZEL DAVIS

                       JULY 16, 2014

                        VOLUME 1

              ------------------------------------



     ORAL DEPOSITION OF HAZEL DAVIS, produced as a

witness at the instance of the DEFENDANT, and duly

sworn, was taken in the above-styled and numbered cause

on July 16, 2014, from 9:31 a.m. to 11:23 a.m., before

Arden Stanberry, CSR in and for the State of Texas,

reported by machine shorthand, at the law offices of the

Texas Attorney General, 1412 Main Street, suite 810,

Dallas, Texas 75202, pursuant to the Texas Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

2

```
1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4     Avner Shapiro
      U.S. DEPARTMENT OF JUSTICE,
5     CIVIL RIGHTS DIVISION
      950 Pennsylvania Ave,
6     NWB-7200
      Washington, DC 20530
7     202.305.1840
      202.307.3962
8     Avner.shapiro@usdoj.gov
9  FOR THE DEFENDANTS RICK PERRY, et al:
10    John B. Scott
      DEPUTY ATTORNEY GENERAL
11    FOR CIVIL LITIGATION
      P.O Box 12548,
12    Austin, Texas 78711
      Southern District of Texas No. 10418
13    john.scott@texasattorneygeneral.gov
14 FOR CITY SQUARE/TRAC:
15    Ken Koonce
      Attorney at Law
16    511 North Akard
      Suite 300
17    Dallas, Texas  75201
      214.303.2122
18    214.827.1000
19
   ALSO PRESENT:
20    Matt Lueders, Attorney General Office Intern
      Kristine Cruz, Attorney General Office Intern
21
22
23
24
25
```

3

```
1               INDEX
2                           PAGE
3  Appearances                    2
4  HAZEL DAVIS
        Examination by Mr. Scott        4
5
   Portion marked CONFIDENTIAL         63
6
   Signature and Changes               78
7
   Reporter's Certificate              80
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1          P R O C E E D I N G S
2              HAZEL DAVIS,
3  having been first duly sworn, testified as follows:
4              EXAMINATION
5  BY MR. SCOTT:
6     Q.  Would you state your full of the ma'am?
7     A.  Hazel Irene *** Davis.
8     Q.  Ms. Davis, my name is John Scott.
9     A.  Yes.
10    Q.  I'm an attorney that represents the State of
11 Texas and a number of other individuals who have been
12 sued in a lawsuit brought by the Department of Justice
13 on behalf of the United States of America or the United
14 States of America by the Department of Justice and other
15 party plaintiffs.  Do you know that?  Do you understand
16 that?
17    A.  I do.
18    Q.  And during the course of the deposition, I'm
19 going to be asking you questions.  You have been sworn
20 in just as though you would have at the courthouse.  You
21 understand that?
22    A.  I do understand that.
23    Q.  If during the course of the deposition you
24 would agree to give a verbal response:  Yes, no,
25 something that the court reporter can take down without
```

5

```
1  any ambiguity as to what your answer is.
2     A.  Yes.
3     Q.  Second thing is:  If at any course of -- during
4  the course of the deposition you don't understand my
5  question, for whatever reason, if you'll agree with me
6  you won't answer and let me know that, so I can re-ask
7  it, and we can get on the same wavelength; is that
8  agreeable?
9     A.  It's agreeable.
10    Q.  With that, have you ever given a deposition
11 before?
12    A.  No, I haven't.
13    Q.  Have you ever given testimony at the courthouse
14 before?
15    A.  No, I haven't.
16    Q.  Have you ever been a party to a civil lawsuit
17 before?
18    A.  No, I haven't.
19    Q.  Okay.  And where do you currently work?
20    A.  I work for City Square.
21    Q.  And what is City Square?
22    A.  City Square is an organization -- it's a
23 nonprofit organization that works to fight the root
24 causes of hunger or poverty.
25    Q.  And what are the root causes of hunger or
```

6

1 poverty?
2     A.  There are a number of them.
3     Q.  Which ones are you fighting?
4     A.  Youth that age out of foster care.  So we help
5 them to find work; that's one of the things that we do.
6     Q.  And what age does someone age out of foster
7 care?
8     A.  They can age out after 17-and-a-half years of
9 age.
10     Q.  And what are the effects of ageing out of
11 foster care?
12     A.  There are numerous.  Homelessness.  A lot of
13 individuals we work with are homeless.  They have high
14 rates of unemployment, about 65 to 70 percent
15 unemployment.  They have a greater -- more encounters
16 with the criminal justice system.  And so, of course,
17 parenting.  They end up -- a lot of girls end up
18 pregnant within a year of ageing out.  A lot of negative
19 statistics.
20     Q.  Anything else?
21     A.  Goodness gracious.  Did I say homelessness?
22     Q.  Yes, ma'am.
23     A.  Okay.  Those are the main ones.
24     Q.  With regard to foster care, would you briefly
25 describe what it is that you're -- when you're dealing

7

1 with an individual that's ageing out of foster care,
2 what are the issues in foster care, I guess?  What are
3 the benefits of foster care at 17 versus when they age
4 out at 17 and a half?
5     A.  When you say, "What are the benefits," what do
6 you mean?
7     Q.  What are the differences?  I guess, so there's
8 foster care that gives them a foster family to live
9 with; is that correct?
10     A.  That is correct.
11     Q.  So when we talk about foster care, we are not
12 talking about someone who is in any kind of group home?
13     A.  Some of them are in group homes.
14     Q.  Okay.  I'm trying to understand the population
15 --
16     A.  Yes.
17     Q.  -- on average of what you -- the kids that you
18 deal with.
19     A.  I wouldn't know the percentages or the
20 distribution of youth who grew up in foster homes versus
21 those that grew up in group homes.  So I don't know.
22     Q.  That's not a metric y'all try and capture, from
23 your standpoint?
24     A.  From my standpoint, no.
25     Q.  Whether somebody else does in fact catch that

8

1 within the organization, you don't know that,
2 specifically?
3     A.  I'm not aware of that.
4     Q.  So getting back a little bit, did you have an
5 opportunity to visit with Mr. Shapiro or someone else
6 from the Department of Justice today?
7     A.  Yes.
8     Q.  And how many times have you visited with
9 Mr. Shapiro or anyone else from the Department of
10 Justice?
11     A.  Three times.
12     Q.  And all three occasions have been related to
13 this case and what you are here to testify about today?
14     A.  Yes.
15     Q.  And when was the first time that you met with
16 someone from the Department of Justice?
17     A.  I'm not quite sure of the date; I'd say
18 possibly about two months ago.
19     Q.  And who was that that you met?
20     A.  It was Mr. Shapiro.
21     Q.  And how was it that you came about that
22 meeting?
23     A.  Actually, I was invited to attend the meeting.
24 And we've been dealing with issues of youth who age out
25 or are aging out who don't have their identifying

9

1 documents.  And so I was invited just to talk to an
2 attorney who was dealing with issues related to
3 documents; that's how I came about to attending the
4 meeting.
5     Q.  And who did the invitation?
6     A.  A coworker through another individual.
7     Q.  And who were those folks?
8     A.  Names?
9     Q.  The coworkers, yes, ma'am.
10     A.  Carla Cleeton.
11     Q.  And she heard about it through?
12     A.  Mary Christine Reed.
13     Q.  R-E-E-D?
14     A.  I believe so.
15     Q.  And so Carla Cleeton works with you?
16     A.  Carla works with me, yes.
17     Q.  And she's employed at City Square?
18     A.  She cis.
19     Q.  And what's her job at City Square?
20     A.  She works with individuals, she managers the
21 transitional housing program.
22     Q.  And Mary Christine Reed, how do you know her?
23     A.  I don't know her personally.
24     Q.  Okay.  Do you know what she does for a living?
25     A.  She's an attorney.

10

1    Q.  And do you know where she's an attorney at?
2    A.  No.
3    Q.  Do you know if she works for Department of
4  Justice?
5    A.  I don't believe so.
6    Q.  Does she live here in Dallas?
7    A.  I don't know.
8    Q.  Do you know if she lives in Texas?
9    A.  I do.
10   Q.  And does she?
11   A.  She does.
12   Q.  Okay.  Do you know if she practices in Dallas
13 or Fort Worth or one of surrounding areas?
14   A.  I believe so; I'm not sure.
15   Q.  Okay.  Have you ever had any professional
16 involvement with Ms. Reed prior to this case?
17   A.  What do you mean by "professional"?
18   Q.  Sought advice -- legal advice on issues
19 relating to homeless or any other matter?
20   A.  No.
21   Q.  Have you ever met Ms. Reed prior to the
22 involvement in this case?
23   A.  Yes.
24   Q.  Okay.  And what were the circumstances by which
25 you met her?

11

1    A.  I expressed a concern about youth who are
2  ageing out of the foster care system who don't have
3  their identifying documents.
4    Q.  And when did you express this?
5    A.  It would have been about maybe three months
6  ago.
7    Q.  And what was it that brought about that meeting
8  with her?
9    A.  She was working with the youth who were having
10 difficulty obtaining documents, and we've been trying to
11 get documents for this person for several years.
12   Q.  For several years?
13   A.  Yes.
14   Q.  And who was the youth that you were working
15 with?
16   A.  We are not privy to give out that type of
17 information, I think.
18   Q.  Well, I mean if it's confidential information,
19 we have a confidentiality order that's been executed by
20 the Department of Justice, State of Texas, and it's been
21 ratified or executed by the Federal Court and we can
22 mark it as confidential information and put that portion
23 under seal.
24       MR. KOONCE:  Our problem is we have a
25 contractual obligation to keep this information

12

1  confidential, and we have to actually go up to chain and
2  ask for permission to disclose individual names.  We get
3  these names from Child Protective Services and we agree
4  we won't disclose them without their consent or
5  authorization.  At least they're in the know and can
6  object to that disclosure.
7        MR. SCOTT:  So let's do something for a
8  second here.  And what we can do is we can go off the
9  record.
10       (Short break from 9:39 to 9:40 a.m.)
11   Q.  (BY MR. SCOTT)  And I'm going to leave a little
12 blank in my side notes to get the name of the person
13 trying get ID for.
14       So where was it that y'all -- that you
15 encountered Ms. Reed and had this discussion about this
16 person?
17   A.  It was in the foyer of my office.
18   Q.  And does Ms. Reed work in the same building?
19   A.  No.
20   Q.  She was over visiting y'all about this person?
21   A.  I believe so; I'm not sure.
22   Q.  Now, so take me through, if you would, the
23 process of -- let's start with what your job title is at
24 City Square.
25   A.  I'm the work force services manager.

13

1    Q.  Okay.  And work force services manager, and who
2  do you manage?
3    A.  I manage -- in terms of the staff?
4    Q.  Yes.
5    A.  Or -- I manage individuals that do job coaching
6  for our participants or -- yeah.
7    Q.  And how many people do y'all have that do
8  participant -- I should say, do job coaching?
9    A.  So we have, at any given time, we have three
10 individuals.
11   Q.  And are those paid positions or volunteer
12 positions?
13   A.  They're paid position.
14   Q.  Have they always been paid positions as long as
15 you have been at City Square?
16   A.  Yes.
17   Q.  How long have you been at City Square?
18   A.  Four years.
19   Q.  And during the time at City Square, have you
20 held the same positions?
21   A.  No.
22   Q.  Tell me all the positions you've had, and let's
23 go reverse chronological order.
24   A.  Absolutely.  I started as work force services
25 manager and was job coach prior to that.

Hazel Davis - 7/16/2014

14

1  Q.  And how long have you served in your current
2  capacity?
3  A.  Maybe three years.
4  Q.  And prior to going to work for City Square,
5  what did you do?
6  A.  I -- go backwards on the resume.  I worked with
7  a nonprofit.  No, I worked for Urban League.
8  Q.  How long did you do that?
9  A.  I was there for, I believe, three years.  I'm
10  not sure, but I believe three years.
11  Q.  And what did you do while you were there?
12  A.  I worked with -- I was coordinating a program
13  to introduce individuals to the world of work and to --
14  to prepare them for college readiness.  So worked with
15  young professionals to help youth -- at-risk youth to
16  prepare for the world of work, work shops, and things
17  like that.
18  MR. SCOTT:  So let's time out here.  Take a
19  phone call here.
20  (Short break from 9:43 to 9:51 a.m.)
21  MR. SCOTT:  So back on the record.  Where
22  were we?
23  (A portion of the transcript was read back.)
24  Q.  So you were -- I think we were at the Urban
25  League.

15

1  A.  I was Urban League for about three years.
2  Q.  And what were your job requirements while you
3  were at Urban League?
4  A.  So pretty much doing workshops for at-risk
5  youth, to prepare them for success in life.
6  Q.  Would you -- the folks that were -- that y'all
7  identified -- let me rephrase that.  How did you figure
8  out if somebody was an at-risk youth?
9  A.  Actually, the criteria was broad.  We weren't
10  contracted to have any -- any specific criteria to
11  identify those individuals.  We tended to focus on
12  certain zip codes that had high crime rates, low
13  graduation rates, those types of things.  However, we
14  went outside of those zip codes, as well.  For the most
15  part, that was our focus.
16  Q.  Okay.  And was that also here in Dallas, Texas?
17  A.  It was.
18  Q.  Have you worked the entirety of your adult life
19  in Dallas?
20  A.  Yes.
21  Q.  Okay.  And so prior to going work at Urban
22  League, what did you do?
23  A.  I worked for a nonprofit that -- I'm sorry.  It
24  was a missionary organization that works with -- that
25  works in the intercity.

16

1  Q.  What was the name of that?
2  A.  Urban Action.
3  Q.  And how long did you work for Urban Action?
4  A.  I believe it was about two years.
5  Q.  And your job there?
6  A.  I was a liaison, public relations public
7  liaison for them.
8  Q.  With the community?
9  A.  With the community, yes.
10  Q.  And how long were you there?
11  A.  About two-and-a-half years.
12  Q.  And what did you do prior to that?
13  A.  Prior to that, I worked -- I was in
14  recruitment.  So I was -- I forget what the title was,
15  but I think I was director of a staffing agency
16  recruiting medical personnel for hospitals.
17  Q.  How long did you do that?
18  A.  I think it was two years; I'm not sure.
19  Q.  And what did you do prior to that?
20  A.  I was a marketing and recruiting manager for
21  another agency, Supplemental Health Care.
22  Q.  And what was the name of the prior employer
23  where you were doing the recruiting for staffing?
24  A.  I think it was Mint.
25  Q.  M-I-T-T?

17

1  A.  M-I-N-T.
2  Q.  And then prior to working for Supplemental
3  Health Care?
4  A.  I worked for Adecco, A-D-E-C-C-O, and
5  recruiting administrating staff and account management.
6  Q.  And how long did you work there?
7  A.  Adecco?  I think two years, three years.  I'm
8  not sure.  I don't remember.
9  Q.  And prior to that?
10  A.  Prior to Adecco, I worked for the State of
11  Texas.  I worked as an area office manager and then a
12  case manager for Community Care for the Aged and
13  Disabled Services.  CCAD.  It was for the Health and
14  Human Services.
15  Q.  I call them DADS, Department of Aging and
16  Disabled Services; is that the correct name of them?
17  A.  I don't know.
18  Q.  Okay.  Speaking of which, let's go off the
19  record.
20  (Short break taken from 9:56 to 9:57 a.m.)
21  Q.  (BY MR. SCOTT)  Back on the record.  Now how
22  long did you work for the State?
23  A.  Three years.
24  Q.  Okay.  And why did you leave working for the
25  State?

Hazel Davis - 7/16/2014

18

1    A. Why did I leave working for the State?
2    Q. Other than more money working for another job.
3    A. I wanted to go back to the private sector.
4    Q. And where did you work for the private sector?
5    A. UPS.
6    Q. And what did you do for UPS?
7    A. I was supervisor in industrial engineering.
8    Q. How long did you work for them?
9    A. I worked for UPS 10 years -- about 10 years.
10   Q. And before that, you were in college?
11   A. Yes. Well, I was in college while I was at UPS
12   but before that, it was just odd jobs.
13   Q. And do you have a degree in industrial
14   engineering?
15   A. No, I have a degree in Sociology.
16   Q. And what year did you graduate?
17   A. '95.
18   Q. And your degree was in what?
19   A. Sociology.
20   Q. And where did you go to school?
21   A. I went to UTA.
22   Q. Is that a B.A.?
23   A. Yes.
24   Q. So let's go back, if we could, to the present.
25   And what's the address for City Square where you

19

1    currently work?
2    A. Where I currently work is 3108 Live Oak, 75204.
3    Q. And you have worked at that address for the
4    entire time that you have been at City Square?
5    A. I have, yes.
6    Q. When did you first become aware of City Square
7    as an organization?
8    A. Actually, I was working with the youth when I
9    was at Urban League and she had expressed that she had
10   been in foster care. And she started looking at City
11   Square, that's how I became aware of it.
12   Q. Okay.
13   A. Yes.
14   Q. During the time that -- when you started at
15   City Square, let's start from that point.
16   A. Yes.
17   Q. Were you -- during that time -- from that time
18   to today, have your work duties principally been related
19   to dealing with the issue of individuals who age out of
20   foster care and the associated problems?
21   A. Yes.
22   Q. And, at least with regard to what the
23   Department of Justice and principally what we are going
24   to be dealing with today about is dealing with the issue
25   of identification and it's role for those kids, some

20

1    type of photo ID.
2    A. Yes.
3    Q. And my assumption is, is that photo ID process
4    has an impact on their outcomes of those individuals?
5    A. Yes.
6    Q. At least it's been your experience?
7    A. That's been my experience.
8    Q. And so let's walk through that a little bit, of
9    the types of IDs that you set out to try and get the
10   average child that walks in. And I understand there may
11   be some outliers, and we'll try to cover every one of
12   those. But let's take care of whatever -- the
13   80 percent or 90 percent of the population and what's
14   your goals are.
15       So as manager today, you attempt to ensure
16   that the people you manage effectuate the goals as you
17   see proper, correct?
18   A. Yes.
19   Q. And so what are the goals that you have for the
20   individuals you manage, as far as obtaining what type of
21   IDs for -- do you call them clients?
22   A. We can say "participant." But we refer to them
23   as "youths," though.
24   Q. For the youth that you-all work with --
25   A. Okay.

21

1    Q. -- what type of photo ID do you try -- hope
2    that one of the youth that you are working, with or the
3    folks that you manage or are working with, obtain as
4    part of y'all's efforts?
5    A. Those would be IDs that are relevant to the
6    I-9, for employment purposes.
7    Q. And what is the I-9?
8    A. That's the document that you complete when
9    you -- when you apply -- obtain a job. It's proof --
10   well, yeah, that's a document that you complete for
11   employability.
12   Q. And what are the requirements for someone to be
13   able to complete an I-9 in order to be properly -- be
14   employed by someone?
15   A. What do you mean "requirements"?
16   Q. Well, photo ID requirements.
17   A. So those documents are either a birth
18   certificate. Okay. And so there's primary documents
19   and then there's secondary documents. You can provide a
20   passport or a certificate of naturalization and I think
21   that that would suffice as a primary document and you
22   don't need to provide anything else.
23       Or you can provide two identifying
24   documents -- identity documents like a Social Security
25   card and a -- an ID, picture ID, or driver's license and

Hazel Davis - 7/16/2014

22

1 that would suffice.  Or you can have a birth
2 certificate, I believe, and a picture ID.  I'm not sure.
3       But one of those three basic documents, a
4 combination of them is necessary to obtain employment.
5    Q.  Okay.  And don't shoot me, we are taking
6 another break because we have a conference call about
7 something in this lawsuit.  So off the record.
8       (Short break taken at 10:02 to 10:14 a.m.)
9    Q.  (BY MR. SCOTT)  While we are off the record --
10 and thank you for your, I guess courtesy, in allow me to
11 break the deposition.  I apologize to you for that -- we
12 were able to get a confirmation e-mail that I have
13 provided to City Square, relaying to the contractual
14 issues dealing with the identity of the individuals --
15 the youth that you have worked with in the past that may
16 have encountered problems with IDs that y'all have
17 attempted to help with those things.
18    A.  Okay.
19    Q.  If you want to confirm with your coworker, I'm
20 happen for that to take place.  But if you have any
21 questions about that at all, we will stop and allow you
22 the comfort or to feel good that it's okay to release
23 those.  With Mr. Shapiro's permission, we will place
24 that parcel and any of that information, we'll mark as
25 confidential.

23

1    A.  Okay.
2    Q.  Those names and this deposition and it's
3 entirety, even though the only portions that will need
4 to be unsealed will be those that deal with confidential
5 information.  It is from a housekeeping manner, seems to
6 be the best way, is to have the whole deposition placed
7 under seal and to the extent a party wishes to use some
8 subpart of that that is information that is
9 confidential, they need to put everyone on alert.  Are
10 you agreeable to that?
11       Mr. Shapiro:  We are in agreement.
12    Q.  (BY MR. SCOTT)  With that, we'll press forward.
13    A.  Sounds good.
14    Q.  Let's go again to what documents a person needs
15 for their I-9?  I think that's where we were when we
16 last left off.
17    A.  Okay.
18    Q.  You had identified the birth certificate,
19 passport, certificate of naturalization, anything else?
20    A.  Yes, Social Security card document or driver's
21 license, a picture ID.
22    Q.  And do you -- just sitting here, is there a
23 preference when you're dealing with the youth to
24 encourage them to get a driver's license or only getting
25 a photo ID or Texas identification card?

24

1    A.  Well, they need a combination of those
2 documents.  So they essentially need all of them for the
3 I-9.  Well, at least they need their picture ID or
4 driver's license, Social Security card, for employment.
5 And -- yes.  So they need a -- I mean, a driver's
6 license, ID, or driver's license and Social Security
7 card, in order to obtain employment.  So we prefer --
8 they need those.
9    Q.  And that's what you request, if possible, the
10 folks that are reporting up to you, that work for you,
11 try and get accomplished with the youth they're working
12 with?
13    A.  Yes.
14    Q.  And so with regard to obtaining a driver's
15 license or a Texas identification card issued by the
16 Texas Department of Public Safety --
17    A.  Yes.
18    Q.  -- what are the requirements needed in order
19 for that youth to obtain such a thing?
20    A.  Okay.  So there are three levels of required
21 documents.  The first level, the primarily level,
22 actually require that an individual has an ID or
23 driver's license in order to get one of those.
24       The second level would be that they
25 provide, I believe, it's a passport and/or birth

25

1 certificate.  And I think it's certificate of
2 naturalization, I'm not sure.  But you have to provide
3 two of those documents.  So our youth don't have
4 passports and of course their weren't naturalized; they
5 were citizens.  They were born here, most of them were
6 born here.  So they don't have those two -- those other
7 documents, to meet the criteria of having two of those
8 secondary documents.  And there's a provision where they
9 could provide some supporting documents.
10       So it would be one of the secondary
11 documents, plus two of the supporting documents.  And
12 it's a long list.  Most of which our youth would not
13 have, which would be a passport, I believe, some
14 documents that an individual who is working -- who is a
15 citizen of another country working in the United States
16 would have or would be required to have, a long list of
17 those.  And then school transcripts, or school ID.  In
18 addition to that, they would have -- let's see, Social
19 Security card, immunization records.  And those are the
20 ones that come to mind right now.
21    Q.  If you think of any others that you have left
22 out during the course of your deposition, just tell me,
23 Hey, I remember another one, and we'll throw it in
24 there.
25    A.  I will.

26

1    Q.  So typically, what type of identification or
2  forms of identification do the youth have with them when
3  they age out of foster care?  For instance, do they have
4  a birth certificate?
5    A.  Not all youth have their documents when they
6  age out of foster care.
7    Q.  And so part of the triage you encounter with
8  the youth -- let's back up a step.  How does it -- how
9  do you encounter the youth?
10   A.  They come to us in a number of ways.  In many
11 cases, CPS refers them to us.  They're 17 and a half, go
12 to them, they'll help you transition into adulthood.
13 Sometimes it's word of mouth, another youth will tell
14 them about TRAC or our program.  Many cases, they'll
15 hear about us through other programs that know about our
16 services.
17   Q.  Any other forms of -- kind of or conduits that
18 the youth might find themselves in order to get to
19 y'all?
20   A.  Those are the three that come to mind.
21   Q.  So at 17 and a half, someone may age out of
22 foster care, why is it that somebody that 17 and half --
23 why sit "may" and not dead-set rule that someone is out
24 of foster care at a certain date?
25   A.  There's a new provision they that may elect to

27

1  stay in extended care.
2    Q.  Okay.  So that's up to the youth to determine
3  whether they want to stay in foster care past 17 and a
4  half?
5    A.  Yes.
6    Q.  But I guess from the State's position or
7  government's position, they have reached an age of being
8  able to make that decision for themselves?
9    A.  Yes.
10   Q.  And some -- what we're dealing with is a group
11 of people currently -- though in the past it may have
12 changed -- though currently that have self-determined
13 that they want to age out of foster care at 17 and a
14 half?
15   A.  Yes.
16   Q.  And whether that's a good decision or not, we
17 won't get into that debate, but that's the fact we find
18 ourselves in and the youth y'all are working with and
19 try the help?
20   A.  And I would like to make a correction.
21   Q.  Yes.
22   A.  I believe they age out at 18, but they can
23 start to access our services at 17 and a half.
24   Q.  You're clairvoyant.  That's kind of where I was
25 curious.  It seems like the majority is still 18, still

28

1  in the State?
2    A.  Right.
3    Q.  But why wouldn't we start this process early
4  while they do that?
5    A.  Yes.
6    Q.  Do you know how it is that somebody came up
7  with 17 and a half is good number for trying to
8  facilitate allowing someone to age out of the foster
9  care process?
10   A.  No, I don't.
11   Q.  Have you ever done any investigation to find
12 out how it is that somebody came up with that date?
13   A.  No.
14   Q.  Versus 16, or 15, or whatever?
15   A.  I haven't.
16   Q.  Has part of being a foster child and a minor in
17 a guardianship situation with foster parents does the --
18 do the youth have to attend school if they're still
19 school age and don't have a GED?
20   A.  I don't know what foster parents are required
21 to do.
22   Q.  Okay.  And do you know what type of
23 documentation the foster families are required to
24 maintain on behalf of the foster children?
25   A.  No, I don't.

29

1    Q.  Tell me what TRAC stands for?
2    A.  Transition Resource Action Center.
3    Q.  So there's no K. on the end of it?
4    A.  No, it's a C.
5    Q.  And it is a separate entity or is it a subpart
6  of City Square?
7    A.  A subpart.
8    Q.  And how long has it been in existence, to your
9  knowledge?
10   A.  About 10 -- a little over 10 years.
11   Q.  And that is the area in which you work?
12   A.  Yes.
13   Q.  Now, one of issues that came upper earlier in
14 this deposition was a contract with the CPS?
15   A.  Yes.
16   Q.  Do you know about that terms of that contract?
17   A.  No.
18   Q.  And do you know how long the contract has been
19 in existence?
20   A.  No.
21   Q.  But do you -- I guess, do you know what the
22 role of City Square is, with regard to the services you
23 provide under that contract for youth, what those areas
24 are?  That's a horrible question.  I can't even
25 understand what the question is.  Don't answer that.

30

1    A.  Okay.
2    Q.  What parts of the contract, to your knowledge,
3    relate to the activities that you do on a day-to-day
4    basis?
5    A.  The work that we do is not contracted by --
6    it's not -- it's not funded by that contract.  However,
7    we are to assist youth in finding work.  We are to play
8    a role in assisting youth to find work.
9    Q.  So part of the contract and part of City Square
10   is to get youth, who are transitioning out of foster
11   care, the ability to get a job?
12   A.  Yes.
13   Q.  And provide for themselves?
14   A.  Yes.
15   Q.  But what y'all encounter, in order to get to
16   that point, you got to get them this information?
17   A.  Yes.
18   Q.  And the ability to get a job?
19   A.  Yes.
20   Q.  And part of that would be photo IDs?
21   A.  Yes.
22   Q.  And that's where your role comes in, at least
23   with regard to the photo ID part?
24   A.  Yes.
25   Q.  So as a percentage of youth that y'all

31

1    encounter, what percent do not have any form of photo ID
2    that would be acceptable for purposes of an I-9?
3    A.  When you say "y'all encounter"?
4    Q.  I'm sorry.  So the -- poor, poor English on my
5    part.  City Square encounters youth in the process of
6    attempting to get them a job.  What percentage of those
7    youth have photo IDs already that would be acceptable
8    for an I-9?
9    A.  I don't know.  For the entire population of
10   TRAC, I don't know.
11   Q.  And do you recall seeing any kind of metrics
12   relating to that?
13   A.  For the entire population at TRAC, I have not.
14   Q.  What is the "entire population at TRAC," when
15   you use that term?
16   A.  Well, in a year's time, we could work with as
17   many as, I think, about 800 individuals.
18   Q.  And when you say y'all work with up to 800
19   individuals in TRAC, would all those 800 individuals
20   would be within TRAC for the process of getting them
21   photo IDs?
22   A.  No.
23   Q.  As we sit here today, do you have a guess or
24   estimate, a good-faith estimate, as to what number of
25   those individuals do not have photo ID?  Is it

32

1    50 percent?  75 percent?
2    A.  I don't know.
3    Q.  And as we sit here today, you don't recall any
4    kind of memos, documents, or any other written material
5    that identify the percentage of individuals that y'all
6    help obtain or successfully obtain photo ID for in any
7    calendar year?
8    A.  No.
9    Q.  You mean, that is correct?
10   A.  That is correct.
11   Q.  As far as working with evaluating the three
12   people that work for you, do you attempt to understand
13   or process and rate their employment?  I guess, first of
14   all, do you do an employee assessment on a periodic
15   basis of your employees?
16   A.  Yes.
17   Q.  How often do you do one?
18   A.  We do one annually.
19   Q.  And during the annual review of those employees
20   that you manage, is part of the evaluation -- does it
21   relate to how many youth that they have helped obtain
22   photo IDs?
23   A.  No.
24   Q.  Does it have any metric that you look to on how
25   many birth certificates or other acceptable documents,

33

1    for an I-9 purpose, that they help youth obtain?
2    A.  No.
3    Q.  What's the average caseload for each of your
4    employees that works under you?
5    A.  They don't have a caseload.  They're required
6    by the -- our contract -- our contract with the Texas
7    Workforce requires that we enroll, in Dallas, 150
8    individuals.  And then in Fort Worth, 75.
9    Q.  And "enroll," what does that mean?
10   A.  That means, start to work with them on jobs.
11   Q.  How -- what's the success rate?  So of the 150
12   in Dallas, how many in a given year will actually get a
13   job?
14   A.  Goodness gracious.  Our goal is to have
15   65 percent employed.
16   Q.  Who set that goal?
17   A.  We did.
18   Q.  And how was it that y'all came to that number?
19   A.  We talked to the people at TWC and what they're
20   goal was for their participants, for individuals at the
21   Workforce centers.
22   Q.  And do you know -- were you involved in those
23   communications on -- or those discussions?
24   A.  Yes.
25   Q.  And did you raise the issue that there's a

34

1 percentage of those kids you deal, with some segment of
2 the youth that y'all have in TRAC, that do not have
3 proper ID to go get a job?
4     A.  To TWC?
5     Q.  Yes.
6     A.  Yes.  Yes.
7     Q.  And was that part of the reason it was not 100
8 percent?  As the goal versus -- I mean, y'all came up
9 with a number, was that one of the factors, the lack of
10 photo ID?
11     A.  No.
12     Q.  Why not?
13     A.  Because we requested funding for just the
14 system of photo IDs.
15     Q.  And you requested the funding from?
16     A.  TWC.
17     Q.  And they provided?
18     A.  Yes.
19     Q.  And how much did they provide?
20     A.  They provided -- I don't know.
21     Q.  Would the terms of whatever funding -- let me
22 rephrase that.  The terms of whatever funding from the
23 Workforce Commission is, are contained in the documents?
24     A.  Yes.
25     Q.  The agreements between the two organizations,

35

1 City Square and TWC?
2     A.  Yes.
3     Q.  And that's one source of funds for obtaining
4 photo IDs for the youth.  Are there other funds that
5 City Square uses for that purposes?
6     A.  I'm not sure.
7     Q.  The accounting of where the funds come from to
8 accomplish the goal, that's not in your area of control,
9 correct?
10     A.  I'm not sure if I understand the question.
11     Q.  Sure.  You're not in charge of accounting for
12 City Square?
13     A.  No.
14     Q.  And if -- so let's walk -- it's a good time to
15 switch over to that subject.
16         How is it that you obtain a photo ID for
17 one of the youth?  What is the process you need to go
18 through?
19     A.  For attaining a photo ID?
20     Q.  Yes.
21     A.  Well, it depends.  If the youth -- we would
22 take an individual to one of the DMV locations, and
23 attempt to get an ID, depending on whether or not they
24 have the supporting documents for attaining an ID.  And
25 then attain the affidavit for residency that you would

36

1 now have to have that would substantiate that they're a
2 Texas resident, get that notarized, and then submit that
3 to the DMV for an ID.
4     Q.  And by DMV, you mean, the Department of Public
5 Safety?
6     A.  Yes, Department of Public Safety.
7     Q.  And these would be the license locations?
8     A.  Yes.
9     Q.  And in working with the youth, do you direct
10 them to any specific DPS locations or do you look to
11 where the youth lives and tell them to go to them, or do
12 you take them?
13     A.  We have to take them if we have to provide the
14 funding for, if we have to pay if.
15     Q.  So someone from City Square will likely
16 transport the youth down to the Department of Public
17 Safety location and sit with them and go through the
18 process?
19     A.  Either transport them or meet them there, yes.
20     Q.  And now, have you participated in that process
21 in the last year?
22     A.  I have not.
23     Q.  When is the last time you participated in that
24 process?
25     A.  I have not participated in that process.

37

1     Q.  You, personally?
2     A.  Personally, no.
3     Q.  So anything you have got, information-wise
4 about that process, you obtained from your employees?
5         MR. SHAPIRO:  Objection, ambiguous.  What
6 do you mean by "that process"?
7         MR. SCOTT:  The process we have been
8 talking about in obtaining a license.  Here, I'll say
9 that.
10     Q.  (BY MR. SCOTT)  So the process of either giving
11 a ride to an individual, a youth, or meeting them at the
12 DPS office and walking them through and paying for the
13 photo ID, is information that you receive from one of
14 your employees, to the extent you have that
15 investigation?
16     A.  Yes.
17     Q.  It's not done firsthand by you?
18     A.  It's not done firsthand by me.
19     Q.  Okay.  What type of documents or information
20 does -- do the youth need in order to get their photo ID
21 from the Department of Public Safety?
22     A.  Okay.  I've listed the -- three tiers of IDs
23 that are required, and so it would be one of those
24 items.
25     Q.  Okay.  And we spoke earlier about documents, on

38

1  average, that the youth have or are missing when they
2  first come to y'all at City Square.  Do -- other than --
3  do most of them have a Social Security card?
4      A.  Coming into City Square, I don't know.  Coming
5  into the jobs program, that's a different story.  And so
6  those would be the individuals that we work with.
7      Q.  So let's talk about the individuals you work
8  with.  How about that subgroup of that population, do
9  they have, for the most part, have Social Security
10  cards, or is that another effort or document that y'all
11  go set out and try to get for them?
12     A.  It's another document we set out to get them.
13     Q.  And y'all do that per a request from the Social
14  Security Administration?
15     A.  Yes.
16     Q.  Is there any cost associated to that?
17     A.  No.
18     Q.  So is that the first step, or second step, or
19  are all of these kind of simultaneously -- when someone
20  is trying to obtain documents -- sufficient documents
21  for someone to be able to get a job.
22     A.  It's simultaneous; it depends on what documents
23  they have.
24     Q.  And birth certificates.  So some of the youth
25  don't have birth certificates in the population you work

39

1  with?
2      A.  That's correct.
3      Q.  What is the process you do in order to obtain a
4  birth certificate for that youth?
5      A.  Well, we have to get an ID in order to get a
6  birth certificate.
7      Q.  And what ID do you obtain in order to obtain a
8  birth certificate?
9      A.  It's your identity document or your driver's
10  license from the Department of Motor Vehicles or -- yes.
11     Q.  And so y'all are able to obtain those identity
12  -- those photo IDs from the Department of Public Safety
13  before you get the birth certificate?
14     A.  Well, we attempt to obtain them.
15     Q.  You don't need a birth certificate to get you
16  photo ID from the Department of Public Safety?
17     A.  You do.
18     Q.  But you know that, so you wouldn't go try to
19  get the photo ID before you get the birth certificate,
20  right?
21     A.  It depends.
22     Q.  What on?
23     A.  On what documents we can attain that would --
24  because the -- the attaining of all three of those
25  crucial documents is pretty much cyclical; one depends

40

1  on the other.  And so you try to figure out what you can
2  get the quickest.
3          And so if you have none of them, you would
4  start with the birth certificate, and you would try to
5  request those -- find the birth certificate and go back
6  to CPS for that.
7      Q.  Does CPS have birth certificates on all these
8  youth?
9      A.  They should.
10     Q.  And if y'all -- to your knowledge, have you run
11  into a situations where you have made a request to CPS
12  for a copy of a birth certificate or the original of the
13  birth certificate and not been able -- been successful?
14     A.  The youth has to make the request.
15     Q.  Are you aware of situations in dealing with the
16  youth where one of the youths have identified that they
17  have made the request to CPS, and CPS has told them they
18  don't have it?
19     A.  I don't know what the CPS has told them, but
20  they have not been able to obtain it from CPS.
21     Q.  Do y'all follow up with the CPS and the youth
22  so you can make sure the youth has actually put in the
23  request and they're not just kind of --
24     A.  We have asked staff to follow up, yes, on CPS.
25     Q.  Okay.  And have there been situations when that

41

1  subset -- where you have asked staff to follow up with
2  CPS to confirm that CPS does not have those birth
3  certificates?
4      A.  It's not a matter of not having them.  So I
5  don't know whether they have them or not.
6      Q.  Okay.  Well -- I'm missing something.  It seems
7  like -- so at some point in time, City Square goes back
8  on behalf of the youth, or has the youth go back to CPS
9  and ask for their birth certificate?
10     A.  Yes.
11     Q.  And sometimes, that's successful?
12     A.  Sometimes.
13     Q.  And sometimes, it's not?
14     A.  Absolutely.
15     Q.  And so in the situations where it's not
16  successful, does City Square -- does City Square then
17  attempt to do a follow up to find out why it was not
18  successful?
19     A.  We have.
20     Q.  And in those situations, what have you found?
21     A.  It's just taken a long, long time to attain
22  those documents in some cases.  In some cases, there
23  eventually able to attain those documents.
24     Q.  So on the cases CPS refers over, are there
25  situations in those referrals where a request is made by

Hazel Davis - 7/16/2014

42

1 those -- that group of youths, where they cannot
2 identify -- where they do not end up with their birth
3 certificates?
4     A. Yes.
5     Q. And again, you have had staff follow up with
6 CPS to find out what the issues were relating to those
7 specific cases?
8     A. Yes.
9     Q. Have y'all -- have you reached out to CPS and
10 ask that they forward over a copy with the youth of the
11 birth certificate when they're referred over to City
12 Square?
13     A. I have not personally dealt with that, but my
14 staff, yes.
15     Q. And who have they dealt with?
16     A. I don't know.
17     Q. Have you dealt with anybody with a name at CPS?
18     A. I've dealt with some people at CPS, yes.
19     Q. And have you raised the issue with those
20 people?
21     A. Personally, no.
22     Q. Who are your contacts within CPS that you work
23 with regard to your jobs?
24     A. I don't have a direct contact at CPS.
25     Q. And do you have someone that works for you at

43

1 City Square that is kind of the point person for those
2 communications with CPS about the birth certificate
3 issue, or is does that just arise based upon when one of
4 the youth -- one of the folks you're working with, ends
5 up not having them or not getting them?
6     A. Yes.
7     Q. So it's the latter?
8     A. It's the latter.
9     Q. So in that situation y'all don't -- City Square
10 does not have a formal process or a point person to deal
11 with issues that arise within CPS-referred youth?
12     A. We do have processes.
13     Q. What are those?
14     A. We have an entire department that works
15 directly with CPS.
16     Q. Okay. What's that department called?
17     A. It's just case management.
18     Q. And tell me what case management does?
19     A. They actually implement the contract with CPS.
20     Q. Does the contract have a provision that CPS
21 will provide supporting documents about the youth?
22     A. I'm not sure if our contract has that
23 provision.
24     Q. Are you aware of a contract that does or terms
25 that do?

44

1     A. I know that they're required to. A law was
2 passed, and I forgot what the name of it was, that they
3 should.
4     Q. So the State of Texas pass a law that said CPS
5 should provide -- must provide these documents?
6     A. Yes.
7     Q. Supporting documents?
8     A. Yes.
9     Q. And one of those supporting documents is the
10 birth certificate?
11     A. Yes.
12     Q. And do you know when that came into effect?
13     A. No, I don't.
14     Q. Do you believe it was of recent origin or been
15 around for a while?
16     A. What do you mean by "recent"?
17     Q. Last legislature, '13?
18     A. I think it's prior to that.
19     Q. '11?
20     A. Perhaps.
21     Q. Has there been a change in the documents you
22 have received at -- or that City Square has received
23 from youth referrals or -- strike all that.
24         Has there been an increase in the number of
25 youth with proper documentation and compliance with that

45

1 statute since the past?
2     A. I have not encountered that.
3     Q. Have you attempted to do a followup with the
4 case management people who are in charge of contact with
5 CPS about why these documents are not being provided?
6     A. Yes.
7     Q. And what were the results of that encounter,
8 that follow up by you?
9     A. They don't know why they're not being provided.
10 They understand the law, but they're not being provided.
11     Q. Did you ask if they're doing a follow up with
12 CPS to ask why they're not getting the documents to
13 y'all?
14     A. I've had conversations about them requesting
15 those documents and them, on occasion, receiving -- the
16 youth receiving those documents. And on some occasions,
17 it doesn't happen.
18     Q. And when that youth does not receive a
19 document, do y'all have a formal process that you're
20 supposed to follow in notifying case management, that
21 the youth does not have a birth certificate or a formal
22 document?
23     A. It's not a formal process; we just do it.
24     Q. What is that?
25     A. We just let them know the youth doesn't have

46

1 documents.
2   Q.  Do you send them an e-mail?
3   A.  So we're in same office; so many cases, it's a
4 verbal conversation.
5   Q.  You might scream across the room like we do at
6 our office --
7   A.  Yes.
8   Q.  -- and say, Hey, so-and-so is on the phone.
9 I'm having a problem, you need to answer this.
10   A.  In some cases the case manager ask us to help
11 them with the documents when they refer the youth for
12 employment assistance to us.
13   Q.  So in my disjointed mind, I bounce around a
14 lot.  So let's bound back, if we could.
15   A.  Okay.
16   Q.  As a youth, they walk in the door.  They come
17 to you through one of the referral processes or some
18 other conduit?
19   A.  Yes.
20   Q.  And they arrive at the door and what happens?
21   A.  They have a case manager.
22   Q.  Okay.  How does -- is the case manager
23 assigned?
24   A.  By many cases, there's a zip code they cover,
25 there is a territory they cover.

47

1   Q.  And what does a case manager do, to your
2 knowledge?
3   A.  They assist them to access some of the benefits
4 that are -- that come to them from CPS because they have
5 aged out.  And they assist them to navigate through,
6 just basic challenges of obtaining a house, housing.
7 They refer them to us for assistance with employment.
8 They help them with the education.  A lot of them don't
9 have their high school diplomas.  Or help them to
10 navigate their way to getting into college.  Yes.
11   Q.  And how late -- if a youth chooses not to age
12 out of CPS, how long can they stay under the protection
13 of CPS?
14   A.  I don't know.
15   Q.  Do y'all attempt to tell the child that may be
16 ageing out of CPS is maybe a bad idea?
17   A.  Yes.  Well I have, I should say.
18   Q.  Is that kind of -- is that on an individual
19 basis, based upon the youth you're encountering or is it
20 really, across the board, there are benefits of staying
21 in the system than there is for those kids in getting
22 out?
23   A.  It's my opinion that it's better they that stay
24 in.
25   Q.  But as we sit here today, you don't recall what

48

1 timeline you get to stay to in to?
2   A.  For our services that are contracted, they stay
3 until they're 21.
4   Q.  And by ageing out, at age 18, they are
5 completely on their own?
6   A.  Yes.
7   Q.  All right.  That would seem on the surface to
8 be an easy sell, but there's a lot of kids that make a
9 different decision, even though you're advising them to
10 stay in the system?
11   A.  Yeah.
12   Q.  And do you know why?
13   A.  Yes.
14   Q.  In general?
15   A.  Well, the reason they give us are -- well, they
16 were removed from their homes, so CPS probably is the
17 bad guy.  Many of our youth encounter a lot of
18 placements while they're in CPS.  I think the statistics
19 say that the average stay in CPS, for most individuals,
20 is four years, but they can move around as many as 15
21 times.  And so, for whatever reason, it can be a
22 challenging experience for those kids.
23   Q.  Okay.
24   A.  And they often want to go back home.  And so
25 that's why -- that's the reason that they want to get

49

1 out of the system.
2   Q.  Does -- do you know if City Square works with
3 other similar-type agencies in other metropolitan areas?
4   A.  When you say "agencies"?
5   Q.  What do y'all call yourself, a not-for-profit?
6   A.  When you say "similar type"?
7   Q.  Organizations that attempt to work with
8 children aging out of foster care process.
9   A.  Yes.
10   Q.  And assisting them?
11   A.  We do.
12   Q.  And you mention your contract at City Square
13 encompasses Dallas and Fort Worth, you gave me the
14 numbers earlier.  I believe in your contract with
15 Workforce Commission, 150 in Dallas, 75 in Fort Worth?
16   A.  In our Fort Worth office and Dallas office,
17 yes.
18   Q.  And does City Square actually have offices in
19 other cities besides Fort Worth and Dallas?
20   A.  No.  We cover a large territory, but the
21 offices are in Dallas and Fort Worth.
22   Q.  And do you know if an organization, similar to
23 City Square for instance, in the Houston area?
24   A.  Yes.
25   Q.  What is that?

50

1    A.  I believe it's Faith Works.
2    Q.  Same question around San Antonio and Austin?
3    A.  Yes.
4    Q.  What are those?
5    A.  I believe in Austin, it's -- I forgot,
6  actually.  San Antonio, it's BCFS and I'm not sure what
7  that acronym stands for.  I should know the one in
8  Austin, but I can't remember it.  I can't recall it
9  right now.  I'm not sure if they have the same programs
10  that we have.
11    Q.  And so when a youth is with the case manager,
12  and the case manager at some point in time will make a
13  referral to your group?
14    A.  Yes.
15    Q.  And your group is known as TRAC?
16    A.  The entire transition center is TRAC.
17    Q.  Okay.
18    A.  Yes.
19    Q.  What is your specific area called again?
20    A.  It's Workforce Services.
21    Q.  And so the referral, the youth goes from a case
22  manager over to Workforce Services?
23    A.  Yes.
24    Q.  What other areas might a youth be referred over
25  to?

51

1    A.  Housing.
2    Q.  Okay.  Any others?
3    A.  Those are the -- the three branches that we
4  have or clusters.
5    Q.  Who is in charge?  Who has your similar
6  position in housing?
7    A.  Carla Cleeton.
8    Q.  How about for case managers.
9    A.  It's Kathy Bush.
10    Q.  How long, on average, does it take to obtain --
11  for one of the youth to obtain a photo ID or through
12  that process?  So you get a referral today -- let's
13  assume the youth has no documentation of any kind,
14  what's the typical turnaround for the youth?  80
15  percent?  Not the outliers.
16    A.  I don't have a typical turnaround because it
17  varies so much.  I don't have that number.
18    Q.  So we were talking about birth certificates and
19  the acquisition of birth certificate for youth.  Where
20  do -- where does City Square take the youth to get a
21  birth certificate or replacement birth certificate?
22    A.  I believe it's at the courthouse, I believe,
23  yes.
24    Q.  And that's through the City of Dallas?
25    A.  Yes.

52

1    Q.  And they're Vital Statistics section?
2    A.  Yes, exactly.
3    Q.  And how much are the birth certificate in the
4  City of Dallas?
5    A.  I believe they have gone up to $23.
6    Q.  And is that something City Square pays for on
7  behalf of the youth?
8    A.  Yes.
9    Q.  And since that's something you pay for, you
10  meet the youth at the Vital Statistics facility?
11    A.  Yes.
12    Q.  And have you done that process of going through
13  Vital Statistics in Dallas for the purposes of obtaining
14  a birth certificate?
15    A.  I have not.
16    Q.  With regards to information you have learned --
17  well, have you heard of any problems with regards to the
18  youth -- the ability of the youth to attain replacement
19  birth certificates through the City of Dallas Vital
20  Statistics Bureau?
21    A.  Only because they don't have an ID.
22    Q.  What type of -- will they accept photo ID,
23  other than something issued by the Department of Public
24  Safety?
25    A.  I don't think so.  I'm not sure, but I don't

53

1  think so.
2    Q.  Do you work at all or have you in the past
3  worked with anyone from Stewpot?
4    A.  We have.
5    Q.  And who have you worked with over there?
6    A.  I don't have a name.  We have referred youth to
7  the Stewpot.
8    Q.  And what situations have you made referrals?
9    A.  When I say "we," not my department.  TRAC does
10  refer you to Stewpot.  When they need an ID, for
11  whatever purpose.  But we've not -- I don't believe any
12  of my staff have ever referred them to Stewpot, I don't
13  believe.
14    Q.  Do you know if anybody from your staff has
15  notified you that Vital Statistics will accept a Stewpot
16  ID in order for the purpose of obtaining a birth
17  certificate?
18    A.  I have not heard that.
19    Q.  Does -- do you know if Vital Statistics will
20  accept a school photo ID, high school?
21    A.  I have not heard that, as well.
22    Q.  School records, is that also an item that is --
23  CPS maintains on behalf of the youth?
24    A.  I don't believe so.
25    Q.  Most of the youth, it sounds like, are from --

54

1  may have attended the Dallas Independent School District
2  that you work with from the Dallas area.
3      A.  No, they're from all over the state.
4      Q.  So y'all work with kids anywhere in the borders
5  of the State of Texas?
6      A.  Some of them are from different parts of the
7  country, just individuals who have aged out of the
8  foster care system.
9      Q.  Well, do you -- if a youth is located in
10 Marshall, Texas --
11     A.  Yes.
12     Q.  -- is it possible that y'all would work with
13 that youth if they're aging out of system?
14     A.  If they age out of foster care and come to our
15 area, we would be working with them.
16     Q.  Wherever they may have been from, they still
17 would be in the metroplex when y'all would work with
18 them?
19     A.  Well -- there's a qualifier.  We have a
20 17-county region, but physically, yes.  In terms of our
21 office, yes.  But we work with individuals in a
22 17-county region, and it's called Region Three.  CPS is
23 region three.
24     Q.  And that would generally be known to people
25 around here as the metroplex?

55

1      A.  No, it's broader than that.
2      Q.  What other counties would it cover?
3      A.  Let's see.
4      Q.  How about far western?
5      A.  We'd go as far as probably -- west, maybe
6  Cleburne.
7      Q.  That's Johnson County, that's a little
8  southwest.  Okay.
9      A.  Yeah.  And go to Waxahachie, Corsicana.  So
10 that's what?
11     Q.  Navarro?
12     A.  Navarro, yes.  And then east, it's only as far
13 as Greenville.  Is that still Dallas?  No, it's not --
14 is it Rockwall County?
15     Q.  Rockwall is the county, City of Rockwall
16 County?
17     A.  So we go as far as Greenville, going east.
18 North, we go as far as Gainesville.
19     Q.  Gainesville, is that Grayson?
20     A.  I believe so.
21     Q.  Okay.  So --
22     A.  So further than Collin.
23     Q.  And almost if we drew -- could draw a circle
24 around that area, everyone inside that region is Region
25 Three?

56

1      A.  Yes.
2      Q.  Just generally speaking?
3      A.  Yes.
4      Q.  And with regard to youth -- let's say someone
5  is in Gainesville, they're almost at the border of
6  Oklahoma, will y'all require that youth to come down to
7  your office to get those services?
8      A.  No.  No.
9      Q.  Do the case workers actually go out to visit
10 with the individuals?
11     A.  Yes, they do.
12     Q.  And so the case managers would be the ones that
13 would to the traveling on that or would that also be the
14 individuals that work with you?
15     A.  On occasion, the individuals that work for
16 Workforce Services also go out to assist with job
17 obtainment.
18     Q.  And do you -- is that done at the youth's home,
19 or is that another location, where the meeting is set
20 up?
21     A.  It depends what's convenient for the youth or
22 what's doable.
23     Q.  Now, earlier in your deposition you identified
24 approximately 800 children a year is what y'all will
25 work with at Workforce Services.

57

1      A.  No, at TRAC in general.
2      Q.  At TRAC, in general?
3      A.  Uh-huh.
4      Q.  How many youth, in general, during an average
5  year would your group work for in Workforce Services?
6      A.  Probably, about 250.
7      Q.  And those 250 would be at any point along the
8  way of getting them into the workforce correct?
9      A.  Yes.
10     Q.  So you do not worry about trying to get them a
11 job between the time their 17 and a half and 18, I'm
12 assuming.
13     A.  No, we work with individuals -- okay.  So the
14 CPS contract says 17 and a half to 21.  Our contract
15 says anywhere from 16, I believe, to 24 years of age.
16 And our contract would be from TWC to work with this
17 population.
18     Q.  You may encounter a youth who has run away and
19 is living on the -- is homeless --
20     A.  Uh-huh.
21     Q.  -- is 16 and a half --
22     A.  Uh-huh.
23     Q.  -- is trying to find a way to make a better
24 life for themselves?
25     A.  Yes.

Hazel Davis - 7/16/2014

58

1    Q.  And part of that process is -- your information
2  would be to help him get a job, or your task would be to
3  try to help him find a job and getting him the proper
4  documentation he's going to need?
5    A.  Any youth that's 16 and is or has been in
6  foster care, we would help.  And if -- yeah.
7    Q.  How do they document if they have been in
8  foster care?
9    A.  There's a Document 2054 that states that they
10  have been in foster care.
11    Q.  So if a homeless child comes to y'all, that's
12  under 18, and has not been in foster care, that's not a
13  service y'all would be able to provide that child?
14    A.  Not for those services, no.
15    Q.  That might be somebody you would refer to
16  another community organization?
17    A.  Absolutely.
18    Q.  Of the 250 people, on average, that y'all are
19  working with at any given time in the Workforce Services
20  or over the course of the year --
21    A.  Yeah.
22    Q.  -- how many of those would be at the stage of
23  securing those -- we'll call them primary identification
24  documents, the Social Security card, the birth
25  certificate, the photo ID?

59

1    A.  About 100.  Ask that question again, I'm sorry.
2    Q.  Sure.  Out of that group of 250 individuals --
3    A.  Uh-huh.
4    Q.  -- how many of those would y'all be working
5  with to attain the primary documents, the Social
6  Security card, the birth certificate, the photo ID?
7        MR. SHAPIRO:  Objection, confusing and
8  ambiguous.  Could you define --
9        MR. SCOTT:  I'm sorry?
10       MR. SHAPIRO:  You may want to rephrase,
11  because you have used the term "primary documents" and
12  listed other documents.
13    Q.  (BY MR. SCOTT)  Let's strike primary out of
14  that question.  I'm trying to understand how many you're
15  working with on obtaining documents for purposes of
16  employment.  And I think you have said it's about 100
17  youths that y'all would be working with over an average
18  calendar year in order to obtain those documents related
19  to a Social Security or photo ID -- and/or.
20    A.  No, I would say that 100 youths don't have
21  those documents when they come to work with us.
22    Q.  And I think we are saying the same thing.  I'm
23  sorry, you're doing it much clearer, which is that your
24  group, within City Square, attempts to obtain those
25  documents for those youth, about 100 per calendar year?

60

1    A.  No.  I would say 100 of them don't have the
2  documents.  Some of them can attain them for themselves.
3    Q.  How many of those 100 that don't have them do
4  y'all help, does City Square help obtain those
5  documents?
6    A.  I would say -- I don't know the exact number.
7  I would say the majority of those individuals we have to
8  assist in some capacity.
9    Q.  Okay.  With one or all three?
10    A.  With one or all three?
11    Q.  Social Security, birth certificate, or photo
12  ID?
13    A.  Yes.
14    Q.  Does City Square attempt to get the youth to
15  register to vote?
16    A.  We make it available, for the youth.
17    Q.  And is that done as -- in order to -- what's
18  the reason that's done for?
19    A.  Just as a service.
20    Q.  And do you let the youth know that voter
21  registration cards are also a form of identification?
22    A.  No, not necessarily.
23    Q.  Okay.  Any other reason other than just as a
24  general service that y'all attempt to get them to
25  register to vote?

61

1    A.  Just as a service.
2    Q.  But nothing with regards to helping them obtain
3  a job?
4    A.  No.
5    Q.  Correct?
6    A.  No.
7    Q.  So that's not done through the Workforce
8  Services section?
9    A.  No.
10    Q.  That would be done by one of the other areas?
11    A.  Yes.
12    Q.  Do you know whether housing -- the folks in the
13  housing section, do the youth who are attempting to
14  obtain some type of public assisted -- public assisted
15  housing, need some form of identification?
16    A.  I don't know.
17    Q.  So let's get back to the first time that you
18  came across Department of Justice.  I think you
19  testified it was a couple of months ago?
20    A.  Uh-huh, yes.
21    Q.  And it was Mr. Shapiro?
22    A.  Yes.
23    Q.  And tell me about what you recall from that
24  conversation.
25    A.  Well, I recall him basically asking us about --

62

1 asking us what issues we were having with individuals on
2 attaining identity documents.
3    Q.  And what did you tell him?
4    A.  What I shared with you today.  Basically
5 that -- that the process for attaining documents is
6 cyclical.  So you typically have to have one document in
7 order to obtain another.  But you have to have that
8 document in order to attain a document that you need to
9 attain the other document.  So it's very cyclical; so
10 it's very challenging.
11    Q.  Anything else?
12    A.  Let's see.  Told them it can be a lengthy
13 process and that some individuals end up giving up.
14    Q.  Anything else?
15    A.  Not that I can recall.
16    Q.  So with regard to the cyclical, I think we have
17 kind of covered a lot of that.
18    A.  Yes.
19    Q.  Anything about the cyclical process or kind of
20 the circuitous process it appears to be that these
21 documents all relate to, that you haven't addressed
22 during your deposition, that you can recall?
23         MR. SHAPIRO:  Objection, asking for a
24 narrative.
25    A.  Not that I can recall.

64

1    A.  I know TRAC -- I believe that's it's been over
2 a year.
3    Q.  And what efforts have been made to help
4 Mr. Hobbs obtain an ID?
5    A.  I don't know, because I haven't worked on that
6 directly.
7    Q.  And who has worked with Mr. Hobbs?
8    A.  Mary Christine Reed.
9    Q.  Anyone at y'all -- at City Square?
10    A.  Yes, Carla Cleeton.
11    Q.  How do you spell her last name?
12    A.  C-L-E-E-T-O-N.
13    Q.  And do you -- are you aware of what steps they
14 have undertaken on Mr. Hobbs's behalf or with Mr. Hobbs
15 in order to acquire a photo ID?
16    A.  I know that they have attempted to -- one of
17 their documents -- two of their -- well, they have tried
18 to get their birth certificate, and I believe their
19 Social Security to match up.  He has two different
20 names -- he has names that don't match up, adoption and
21 all that sort of thing.  And so I think that that's one
22 of the things they're working on.
23    Q.  And at least as I have understood it, one of
24 his issues is, he has a birth certificate and Social
25 Security card but the names do not match?

63

1    Q.  (BY MR. SCOTT)  Let's go to the lengthy
2 process.
3    A.  Okay.
4    Q.  Earlier in the deposition, there was an
5 individual that you believe you identified that you had
6 been working with or helping work with in attempting to
7 get that individual a photo ID.  And I think it's been
8 taking over a year to get that process and still is not
9 complete?
10    A.  This individual wasn't enrolled in Workforce
11 Services, but they were part of TRAC.  And so TRAC had
12 been assisting him with trying to attain those
13 documents, I believe.
14    Q.  So --
15    A.  I believe that he wasn't part of Workforce
16 Services.  I'm not sure, but I know he's a TRAC youth.
17    Q.  So this portion is going to be marked as
18 confidential please.
19 (FOLLOWING PORTION OF TRANSCRIPT MARKED CONFIDENTIAL.)
20    Q.  (BY MR. SCOTT)  What was the individual's name?
21    A.  His name is Patrick Hobbs.
22    Q.  How old is Mr. Hobbs?
23    A.  I don't know.
24    Q.  And how long have you been working with someone
25 or Mr. Hobbs to help him obtain a photo ID?

65

1    A.  As I understand it.
2    Q.  And is it your understanding that those need to
3 match in order for him to obtain a DPS license?
4    A.  I believe that there's provisions with DPS
5 whereby if you provide another document that -- that
6 states that you have -- that there was an official name
7 change, I believe that you can attain a DPS document.
8 But I don't know how that impacts the Social Security or
9 birth certificate.
10    Q.  And with regard to Mr. Hobbs, are you aware --
11 well, let me strike that.
12         Do you have a contact within the Department
13 of Public Safety that you turn to?
14    A.  No.
15    Q.  Do you know if anybody at the Workforce section
16 of City Square has a contact within the Department of
17 Public Safety?
18    A.  No, I don't know that.
19    Q.  Do you know the last time that Mr. Hobbs or
20 anyone on his behalf has met with anyone at the
21 Department of Public Safety about trying to get his ID?
22    A.  I don't know.
23    Q.  Do you know how many times he has met with
24 Department of Public Safety about obtaining that ID?
25    A.  I don't know that either.

66

1   Q. What were they asking you as far as ways to
2   assist them with Mr. Hobbs?
3      A. Who is "they"?
4      Q. Ms. Reed or Ms. Cleeton?
5      A. I just happen to know about Patrick's specific
6   case.
7      Q. Okay. But not -- not anything specifically
8   from your -- what you have worked with them on?
9      A. No.
10     Q. Are you aware of any other cases where someone
11  has taken over a year to be able to get some type of
12  photo ID.
13     A. I'm not certain of -- no, I'm not certain.
14     Q. No one comes to mind as we sit here today?
15     A. I don't know of one with certainty.
16     Q. Any you think?
17     A. Perhaps. There may have been one, yes.
18     Q. Who is that?
19     A. Cory. I forget what Cory's last name is.
20     Q. And --
21        MR. SHAPIRO: I'm going to object to the
22  last question. And you may not have intended this
23  ambiguity. I wasn't clear if you were asking if she
24  knows the name of the person or if she's -- or if you
25  worded generally if there's a possibly others out there.

67

1      Q. (BY MR. SCOTT)  Yeah, no. To be clear, there
2   were two different issues. One is, are you aware of any
3   other individuals out there that have, in fact, taken
4   more than a year to get photo ID? And I understood you
5   to say you don't know for sure; is that correct?
6      A. That is correct.
7      Q. And I said it sounds like there maybe somebody
8   you may think falls into that category. And you said --
9   I thought you said, yes, to that. And I understood that
10  to be Cory.
11     A. Right.
12     Q. And that was Cory?
13     A. Yes.
14     Q. I just wanted to make sure we were all on the
15  same page?
16     A. I can't remember his last name.
17     Q. And was that somebody you came in contact with
18  through City Square?
19     A. Yes.
20     Q. Okay. Other than Cory and Mr. Hobbs, are you
21  aware of any other individuals who have taken up to a
22  year to get -- to obtain a photo --
23     A. No, I'm not.
24     Q. -- ID. Are there -- have your employees or any
25  of the youth raised an issue with you during the last

68

1   four years that you have been at City Square, the
2   difficulty of obtaining transportation to get a photo
3   ID?
4      A. There is some instances where it is a
5   challenge.
6      Q. Tell me about those specific instances.
7      A. Because I only have two individuals in Dallas
8   and Fort Worth that are working directly with youth to
9   attain identifying documents, they can't possibly --
10  it's challenging for them to -- to transported these
11  individuals, these 250 people or 100 individuals to
12  getting their ID and still do their work.
13        And so many of our youth ride the bus and
14  are met there or will even meet with their case manager
15  to do that. Some youths are outside of the public
16  transportation system. So that can be a challenge as
17  well for them, in terms of getting there.
18        So the process is extended because they
19  have to wait for a time when the job coach or the
20  Workforce advocate can go and pick them up to bring them
21  to the -- to the Department of Public Safety. Yes.
22     Q. And so can you name any individuals, as we sit
23  here today, who have encountered that issue that you
24  have just described?
25     A. I don't have any names.

69

1      Q. In the last month, has anybody raised this as
2   an issue to you?
3      A. No.
4      Q. In the last year, how many times has anyone
5   raised that as an issue?
6      A. I don't know. It's an ongoing state of
7   affairs. So there's no need to keep bringing it up as
8   an issue; it's just part of how we do business and it's
9   one of the challenges of our jobs.
10     Q. But as we sit here today, do you recall where
11  one of your youths raised that as an issue?
12     A. It could have happened.
13     Q. But as we site here today, you don't recall it
14  happening in the last year?
15     A. Specifically, I don't recall a specific
16  instance. I recall a general conversations on a
17  day-to-day basis about things like that.
18     Q. Yes. And transportation is an issue for anyone
19  -- strike that. The youth that Workforce Services are
20  working with, if they're located in Gainesville for
21  instance, is that something that the Workforce Services
22  people attempt to find a solution for, I mean --
23     A. Yes.
24     Q. Okay. I mean, transportation, whether it's for
25  a photo ID or job interviews, seems likes it's at the

Hazel Davis - 7/16/2014

70

1  core.
2      A.  It is.
3      Q.  One of the problems you're going to have to
4  address for the youth?
5      A.  Yes.
6      Q.  Or come up -- help them come up with a
7  solution?
8      A.  Yes.
9      Q.  And so do y'all find yourselves coming up with
10  a solution for the vast majority of those kids?
11      A.  We have a standard solution.
12      Q.  What's that?
13      A.  We're saying with regards to attaining IDs or
14  for jobs?
15      Q.  Just jobs.
16      A.  Okay.  For jobs, it's generally -- if they
17  don't have any transportation -- is to assist them in
18  finding work within walking distance of their homes.  If
19  that's not the case, it's to work with case managers to
20  help them find housing where there's a plethora of
21  opportunities to work in their local -- in their
22  neighborhoods.
23      Q.  Has anyone that you have been -- any of the
24  youth you have been working with, identified to you,
25  personally, that they have had difficulty obtaining

71

1  identification for the purpose of voting?
2      A.  No.
3      Q.  Have you heard of anyone who has had difficulty
4  complying and obtaining an ID for the purpose of voting?
5      A.  No.
6      Q.  With regard to transportation services and
7  jobs, Workforce Services feels that it is -- provides
8  viable options or solutions for these youth that you
9  work with before you turn them out there into the
10  system?  I mean, after you have obtained -- let's ask it
11  a better way.  After your services make sure that the
12  youth have proper identification for getting a job --
13      A.  Uh-huh.
14      Q.  -- has reasonable training in order to --
15  having a chance at getting the job, and giving the child
16  a -- or the youth a potential solution to transportation
17  issues, that's when you put them into the Workforce,
18  right?
19      A.  That's when we put them into the workforce.
20  I'd like to make a correction or add some information.
21  You said are there any issues that are related to the
22  transportation that may inhibit their ability to obtain
23  an ID.  So I talked about people in outlying areas or
24  areas they can't access public transportation.
25              Another issue is that we take them as a

72

1  group the Department of Public Safety, but they have to
2  come get to us.  And so an issue is, how do you get
3  there if you don't have any money?
4      Q.  Yes.
5      A.  And so that can be problematic, as well.
6  Trying to maneuver that.  So that also be -- if we're
7  picking up some Timbuktu and others are in completely
8  different locations, some have to come to the center in
9  order for us to transport them.
10              So an issue could be just getting to us so
11  that we can transport them to get them there.  In some
12  cases -- so transportation can be a challenge as well as
13  funds -- funds in order to be transported, for a bus
14  token.
15      Q.  Do you know of a set budget that you have
16  limitations on how many photo IDs, birth certificate
17  replacements, in any calendar year that your group,
18  Workforce Services, can provide?
19      A.  We have a set budget for the amount -- the
20  funds that we can allocate for that.
21      Q.  And what is that?
22      A.  I don't know what it is.  I don't recall.  And
23  we have two difference contracts.  So they're different.
24      Q.  Have you -- to your knowledge, have you ever
25  run out of funding in any year that you have been there

73

1  for being able to obtain the IDs?
2      A.  We have not run out of funding.
3      Q.  I have no earthly idea how many kids age out of
4  foster care, and I apologize for not knowing that
5  number.  But my assumption is it's more than the 250
6  that you work with.  Do you have any estimate how many
7  kids in the metroplex age out of foster care?
8      A.  I don't.  And it actually may be irrelevant in
9  that, as soon as they age out, they go back to -- they
10  tend to go back to their original location.  And so them
11  aging out doesn't necessarily impact the number of
12  aged-out youth in the metroplex.
13              And so they could go back to wherever they
14  come from.  But the metroplex, as I understand it, has
15  the greatest number of youth that age out.  Of the other
16  Metro -- metropolitan areas in Texas, I believe.
17      Q.  Okay.  Let me check my notes for a second here.
18  So we talked about -- anything else you recall from your
19  first meeting with Mr. Shapiro that you have not already
20  told us?
21      A.  We did talk about how economics could be a
22  factor and it was just more so related to
23  transportation, to get to -- I think.  Let's see.  First
24  meeting, I think that's about it.  I'm not sure, but I
25  think that's probably what we covered.

Hazel Davis - 7/16/2014

74

1   Q.  And then there was a second meeting or was it a
2   call?
3   A.  It was a call, yes.
4   Q.  And was it just Mr. Shapiro on the line from
5   his standpoint?
6   A.  Yes.
7   Q.  And from his standpoint, you were the only one
8   on the other side?
9   A.  From what I know, yes.
10  Q.  And what do you recall from that call?
11  A.  He was basically just confirming the
12  information, the discussion that we had.
13  Q.  And anything else?
14  A.  On my end, it was more so asking him to talk to
15  the powers that be at City Square to just inform them as
16  to what conversations we are having.
17  Q.  Okay.  And do you know whether he actually did
18  that or not?
19  A.  He did.
20  Q.  And do you know when those conversations took
21  place?
22  A.  I don't know.
23  Q.  You weren't involved in those conversations?
24  A.  I wasn't.
25  Q.  Anything else you recall from the second call?

75

1   A.  No, I don't.
2   Q.  How long a call was it?
3   A.  A good -- maybe 15-minute conversation.
4   Q.  How about the first interaction you had with
5   Mr. Shapiro?
6   A.  Maybe 25-minute.
7   Q.  It sounds like there was a third time you have
8   met him?
9   A.  Yes.
10  Q.  When was that?
11  A.  I met him -- well, actually you said
12  "physically" met him.  I think I said the first time, I
13  met him two days ago.
14  Q.  Okay.
15  A.  Yeah.
16  Q.  And where did y'all meet?
17  A.  At City Square.
18  Q.  And how long did that meeting take place?
19  A.  Maybe 30 minutes or so.
20  Q.  And what did y'all discuss during that meeting?
21  A.  It was just him talking to basically -- talking
22  to Ken and confirming that -- what our concerns were
23  regarding the contract that we have with CPS and Ken
24  pretty much reassured me -- let me say, my concern was
25  with regards to the contract we have with CPS and if

76

1   anything would be impacted.  And I spoke with Ken and
2   Ken says, it's a go, Mr. Shapiro came on board.  Because
3   I think I expressed that to him, I'm not sure.  So he
4   came onboard to have a conversation with Ken.  Ken said
5   he informed me that all systems are go, and I think that
6   was the gist of the conversation.
7   Q.  Anything else you recall from that
8   conversation?
9   A.  Our CEO -- Ken called our CEO just to -- or
10  asked the CEO to meet Mr. Shapiro just to kind of give
11  verification that City Square is okay with me doing it
12  and that was it.
13  Q.  How did you find out about this deposition
14  today?
15  A.  I was subpoenaed.
16  Q.  Okay.  So you were -- did you call Mr. Shapiro
17  after you were subpoenaed?
18  A.  No.
19  Q.  Had you ever been subpoenaed before?
20  A.  No.
21  Q.  Did you contact anybody else?
22  A.  My director.
23  Q.  Did you -- were you expected to be subpoenaed?
24  A.  I was.
25  Q.  And why is that?

77

1   A.  Mr. Shapiro said I may be subpoenaed.
2   Q.  Okay.  Yeah.  And just as a side note --
3   A.  Yes.
4   Q.  -- before we leave today, I want to make sure
5   y'all have my information, I'd like to act as a conduit
6   to help you get a good contact person with CPS.  To the
7   extent we can facilitate a number of those birth
8   certificates, we'll do our best to.  I'll let me be the
9   conduit for that on that one.
10      To the extent, you have got other issues
11  trying to get records from them, please, y'all are going
12  to have my number and stuff, please feel free and
13  contact me.  We'll get that done.
14  A.  Okay.
15  Q.  Ma'am, I thank you for your courtesy.  Have I
16  been courteous with you today?
17  A.  You have.
18  Q.  And I thank you for your time.
19      MR. SHAPIRO:  Thank you.  I have no
20  questions for this witness.
21      (End of Proceedings.)
22
23
24
25

78

1          CHANGES AND SIGNATURE
2 WITNESS NAME: HAZEL DAVIS   DATE: JULY 16, 2014
3 PAGE LINE     CHANGE       REASON
4
5  1. *** Proper Spelling of Maiden
6  Name:_____
   __
7  _____
   _
8  _____
   _
9  _____
   _
10 _____
   _
11 _____
   _
12 _____
   _
13 _____
   _
14 _____
   _
15 _____
   _
16 _____
   _
17 _____

79

1       I, HAZEL DAVIS, have read the foregoing
  deposition and hereby affix my signature that same is
2 true and correct, except as noted above.
3
4
         _____
5              HAZEL DAVIS
6
7 THE STATE OF _____)
8 COUNTY OF _____)
9
10     Before me, _____, on this day
11 personally appeared HAZEL DAVIS, known to me (or proved
12 to me under oath or through _____)
13 (description of identity card or other document)) to be
14 the person whose name is subscribed to the foregoing
15 instrument and acknowledged to me that they executed the
16 same for the purposes and consideration therein
17 expressed.
18     Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21
22
        _____
23      NOTARY PUBLIC IN AND FOR
        THE STATE OF _____
        COMMISSION EXPIRES: _____
24
25

80

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF TEXAS
2          CORPUS CHRISTI DIVISION
3 MARC VEASEY, et al,        )
                             )
4     Plaintiffs,       )
                        ) CIVIL ACTION NO.
5 VS.                   ) 2:13-CV-00193
                        )
6 RICK PERRY, et al,         )
                             )
7     Defendants.       )
8
9          REPORTER'S CERTIFICATION
           DEPOSITION OF HAZEL DAVIS
10              JULY 16, 2014
11
12     I, Arden Stanberry, Certified Shorthand Reporter in
13 and for the State of Texas, hereby certify to the
14 following:
15     That the witness, HAZEL DAVIS, was duly sworn by
16 the officer and that the transcript of the oral
17 deposition is a true record of the testimony given by
18 the witness;
19     That the deposition transcript was submitted on
20 _____ to the witness or to the attorney
21 for the witness for examination, signature and return to
22 me by _____;
23     That the amount of time used by each party at the
24 deposition is as follows:
25     Mr. Scott -  01 HOURS:31 MINUTE(S)

81

1     That pursuant to information given to the
2 Deposition officer at the time said testimony was taken,
3 the following includes counsel for all parties of
4 record:
5     Mr. Shapiro, Attorney for Plaintiff
      Mr. Scott, Attorney for Defendant
6
7     I further certify that I am neither counsel for,
8 related to, nor employed by any of the parties or
9 attorneys in the action in which this proceeding was
10 taken, and further that I am not financially or
11 otherwise interested in the outcome of the action.
12
13     Certified to by me this _____ day of
14 _____, 2014.
15
16
17
        _____
18      Arden Stanberry, CSR 8987
19      Expiration Date:  12/31/14
        Integrity Legal Support Solutions
        Firm Registration # 528
20      3100 W. Slaughter Ln., Suite 101
        Austin, Texas 78748
21      (512) 320-8690
22
23
24
25

**$**

**$23** 52:5

---

**0**

**01** 80:25

---

**1**

**1** 1:12 78:5

**10** 18:9 29:10

**10:02** 22:8

**10:14** 22:8

**100** 34:7
  59:1,16,20,25 60:1,3
  68:11

**101** 81:20

**10418** 2:12

**11** 44:19

**11:23** 1:19

**12/31/14** 81:18

**12548** 2:11

**13** 44:17

**1412** 1:22

**15** 28:14 48:20

**150** 33:7,11 49:15

**15-minute** 75:3

**16** 1:11,19 28:14
  57:15,21 58:5 78:2
  80:10

**17** 7:3,4 26:11,21,22
  27:3,13,23 28:7
  57:11,14

**17-and-a-half** 6:8

**17-county** 54:20,22

**18** 27:22,25 48:4
  57:11 58:12

---

**2**

**2** 3:3

**2:13-CV-00193** 1:5
  80:5

**2014** 1:11,19 78:2
  80:10 81:14

**202.305.1840** 2:7

**202.307.3962** 2:7

**20530** 2:6

**2054** 58:9

**21** 48:3 57:14

**214.303.2122** 2:17

**214.827.1000** 2:18

**24** 57:15

**250** 57:6,7 58:18 59:2
  68:11 73:5

**25-minute** 75:6

---

**3**

**30** 75:19

**300** 2:16

**3100** 81:20

**3108** 19:2

**320-8690** 81:21

---

**4**

**4** 3:4

---

**5**

**50** 32:1

**511** 2:16

**512** 81:21

**528** 81:19

---

**6**

**63** 3:5

**65** 6:14 33:15

---

**7**

**70** 6:14

**75** 32:1 33:8 49:15

**75201** 2:17

**75202** 1:23

**75204** 19:2

**78** 3:6

**78711** 2:12

**78748** 81:20

---

**8**

**80** 3:7 20:13 51:14

**800** 31:17,18,19 56:24

**810** 1:22

**8987** 81:18

---

**9**

**9:31** 1:19

**9:39** 12:10

**9:40** 12:10

**9:43** 14:20

**9:51** 14:20

**9:56** 17:20

**9:57** 17:20

**90** 20:13

**95** 18:17

**950** 2:5

---

**A**

**a.m** 1:19 12:10 14:20
  17:20 22:8

**ability** 30:11,18
  52:18 71:22

**able** 21:13 22:12 27:8
  38:21 39:11 40:13,20
  41:23 58:13 66:11
  73:1

**above-styled** 1:18

**Absolutely** 13:24
  41:14 58:17

**accept** 52:22 53:15,20

**acceptable** 31:2,7
  32:25

**access** 27:23 47:3

71:24

**accomplish** 35:8

**accomplished** 24:11

**account** 17:5

**accounting** 35:7,11

**acknowledged** 79:15

**acquire** 64:15

**acquisition** 51:19

**acronym** 50:7

**across** 46:5 47:20
  61:18

**act** 77:5

**action** 1:4 16:2,3
  29:2 80:4 81:9,11

**activities** 30:3

**actually** 8:23 12:1
  15:9 19:8 24:22
  33:12 40:22 43:19
  49:18 50:6 56:9 73:8
  74:17 75:11

**add** 71:20

**addition** 25:18

**address** 18:25 19:3
  70:4

**addressed** 62:21

**Adecco** 17:4,7,10

**A-D-E-C-C-O** 17:4

**administrating** 17:5

**Administration** 38:14

**adoption** 64:20

**adult** 15:18

**adulthood** 26:12

**advice** 10:18

**advising** 48:9

**advocate** 68:20

**affairs** 69:7

**affidavit** 35:25

**affix** 79:1

**age** 6:4,6,8,9 7:3
  8:24 19:19 26:3,6,21
  27:7,13,22 28:8,19
  47:11 48:4 54:14
  57:15 73:3,7,9,15

**aged** 17:12 47:5 54:7

**aged-out** 73:12

**ageing** 6:10,18 7:1
  11:2 47:16 48:4

**agencies** 49:3,4

**agency** 16:15,21

**aging** 8:25 17:15 49:8
  54:13 73:11

**ago** 8:18 11:6 61:19
  75:13

**agreeable** 5:8,9 23:10

**agreement** 23:11

**agreements** 34:25

**Akard** 2:16

**al** 1:3,6 2:9 80:3,6

**alert** 23:9

**allocate** 72:20

**allow** 22:10,21

**allowing** 28:8

**already** 31:7 73:19

**am** 81:7,10

**ambiguity** 5:1 66:23

**ambiguous** 37:5 59:8

**America** 4:13,14

**amount** 72:19 80:23

**and/or** 24:25 59:19

**annual** 32:19

**annually** 32:18

**answer** 5:1,6 29:25
  46:9

**Antonio** 50:2,6

**anybody** 42:17 53:14

65:15 69:1 76:21

**anyone** 8:9 53:3 64:9
  65:20 69:4,18 70:23
  71:3

**anything** 6:20 21:22
  23:19 37:3
  62:11,14,19 66:7
  73:18 74:13,25
  76:1,7

**anywhere** 54:4 57:15

**apologize** 22:11 73:4

**Appearances** 3:3

**appeared** 79:11

**appears** 62:20

**apply** 21:9

**approximately** 56:24

**Arden** 1:20 80:12
  81:18

**area** 17:11 29:11 35:8
  49:23 50:19 54:2,15
  55:24

**areas** 10:13 29:23
  49:3 50:24 61:10
  71:23,24 73:16

**arise** 43:3,11

**arrive** 46:20

**assessment** 32:14

**assigned** 46:23

**assist** 30:7 47:3,5
  56:16 60:8 66:2
  70:17

**assistance** 46:12 47:7

**assisted** 61:14

**assisting** 30:8 49:10
  63:12

**associated** 19:20
  38:16

**assume** 51:13

**assuming** 57:12

**assumption** 20:3 73:5

**at-risk** 14:15 15:4,8

**attached** 1:25

**attain** 35:25 39:23
41:21,23 52:18 59:5
60:2 62:8,9 63:12
65:7 68:9

**attaining** 35:19,24
39:24 62:2,5 70:13

**attempt** 20:15 32:12
35:23 39:14 41:17
47:15 49:7 60:14,24
69:22

**attempted** 22:17 45:3
64:16

**attempting** 31:6 61:13
63:6

**attempts** 59:24

**attend** 8:23 28:18

**attended** 54:1

**attending** 9:3

**attorney** 1:22
2:10,15,20 4:10
9:2,25 10:1 80:20
81:5

**attorneys** 81:9

**Austin** 2:12 50:2,5,8
81:20

**authorization** 12:5

**available** 60:16

**Ave** 2:5

**average** 7:17 20:10
33:3 38:1 48:19
51:10 57:4 58:18
59:17

**Avner** 2:4

**Avner.shapiro@usdoj.g
ov** 2:8

**aware** 8:3 19:6,11
40:15 43:24 64:13
65:10 66:10 67:2,21

**away** 57:18

---
B
---

**B.A** 18:22

**backwards** 14:6

**bad** 47:16 48:17

**based** 43:3 47:19

**basic** 22:3 47:6

**basically** 61:25 62:4
74:11 75:21

**basis** 30:4 32:15
47:19 69:17

**BCFS** 50:6

**became** 19:11

**become** 19:6

**behalf** 4:13 28:24
41:8 52:7 53:23
64:14 65:20

**believe** 9:14 10:5,14
12:21 14:9,10 16:4
22:2 24:25 25:13
27:22 44:14 49:14
50:1,5 51:22 52:5
53:11,13,24 55:20
57:15 63:5,13,15
64:1,18 65:4,7 73:16

**benefits** 7:3,5
47:3,20

**besides** 49:19

**best** 23:6 77:8

**better** 47:23 57:23
71:11

**birth** 21:17 22:1
23:18 24:25 26:4
32:25 38:24,25
39:4,6,8,13,15,19
40:4,5,7,12,13
41:2,9 42:2,11 43:2
44:10 45:21
51:18,19,21
52:3,14,19 53:16
58:24 59:6 60:11
64:18,24 65:9 72:16
77:7

**bit** 8:4 20:8

**blank** 12:12

**board** 47:20 76:2

**border** 56:5

**borders** 54:4

**born** 25:5,6

**bounce** 46:13

**bound** 46:14

**Box** 2:11

**branches** 51:3

**break** 12:10 14:20
17:20 22:6,8,11

**briefly** 6:24

**bring** 68:20

**bringing** 69:7

**broad** 15:9

**broader** 55:1

**brought** 4:12 11:7

**budget** 72:15,19

**building** 12:18

**Bureau** 52:20

**bus** 68:13 72:13

**Bush** 51:9

**business** 69:8

---
C
---

**calendar** 32:7
59:18,25 72:17

**capacity** 14:2 60:8

**capture** 7:22

**card** 21:25 23:20,25
24:4,7,15 25:19 38:3
58:24 59:6 64:25
79:13

**cards** 38:10 60:21

**care** 6:4,7,11,24
7:1,2,3,8,11 11:2
16:21 17:3,12

19:10,20 20:12
26:3,6,22,24
27:1,3,13 28:9 30:11
49:8 54:8,14
58:6,8,10,12 73:4,7

**Carla** 9:10,15,16 51:7
64:10

**case** 8:13 10:16,22
17:12 43:17,18
45:4,20 46:10,21,22
47:1 50:11,12,21
51:8 56:9,12 66:6
68:14 70:19

**caseload** 33:3,5

**cases** 26:11,14
41:22,24 42:7
46:3,10,24 66:10
72:12

**catch** 7:25

**category** 67:8

**cause** 1:18

**causes** 5:24,25

**CCAD** 17:13

**center** 29:2 50:16
72:8

**centers** 33:21

**CEO** 76:9,10

**certain** 15:12 26:24
66:13

**certainty** 66:15

**certificate** 3:7
21:18,20 22:2
23:18,19 25:1 26:4
39:4,6,8,13,15,19
40:4,5,12,13 41:9
42:11 43:2 44:10
45:21 51:19,21
52:3,14 53:17 58:25
59:6 60:11 64:18,24
65:9 72:16

**certificates** 32:25
38:24,25 40:7 41:3
42:3 51:18 52:19

77:8

**CERTIFICATION** 80:9

**Certified** 80:12 81:13

**certify** 80:13 81:7

**chain** 12:1

**challenge** 68:5,16
72:12

**challenges** 47:6 69:9

**challenging** 48:22
62:10 68:10

**chance** 71:15

**change** 44:21 65:7
78:3

**changed** 27:12

**Changes** 3:6 78:1

**charge** 35:11 45:4
51:5

**check** 73:17

**child** 12:3 20:10
28:16 47:15 58:11,13
71:15

**children** 28:24 49:8
56:24

**chooses** 47:11

**CHRISTI** 1:2 80:2

**Christine** 9:12,22
64:8

**chronological** 13:23

**circle** 55:23

**circuitous** 62:20

**circumstances** 10:24

**cis** 9:18

**cities** 49:19

**citizen** 25:15

**citizens** 25:5

**City** 2:14 5:20,21,22
9:17,19 12:24
13:15,17,19 14:4
18:25 19:4,6,10,15

22:13 29:6,22 30:9
31:5 35:1,5,12 36:15
38:2,4 41:7,16 42:11
43:1,9 44:22
49:2,12,18,23
51:20,24 52:4,6,19
55:15 59:24 60:4,14
64:9 65:16 67:18
68:1 74:15 75:17
76:11

**civil** 1:4,24 2:5,11
5:16 80:4

**clairvoyant** 27:24

**clear** 66:23 67:1

**clearer** 59:23

**Cleburne** 55:6

**Cleeton** 9:10,15 51:7
64:10 66:4

**C-L-E-E-T-O-N** 64:12

**clients** 20:21

**clusters** 51:4

**coach** 13:25 68:19

**coaching** 13:5,8

**code** 46:24

**codes** 15:12,14

**college** 14:14
18:10,11 47:10

**Collin** 55:22

**combination** 22:4 24:1

**comes** 30:22 58:11
66:14

**comfort** 22:22

**coming** 38:4 70:9

**Commission** 34:23
49:15 79:23

**communications** 33:23
43:2

**community** 16:8,9
17:12 58:16

**complete** 21:8,10,13

63:9

**completely** 48:5 72:7

**compliance** 44:25

**complying** 71:4

**concern** 11:1 75:24

**concerns** 75:22

**conduit** 46:18 77:5,9

**conduits** 26:17

**conference** 22:6

**confidential** 3:5
11:18,22 12:1 22:25
23:4,9 63:18,19

**confidentiality** 11:19

**confirm** 22:19 41:2

**confirmation** 22:12

**confirming** 74:11
75:22

**confusing** 59:7

**consent** 12:4

**consideration** 79:16

**contact** 42:24 45:4
65:12,16 67:17 76:21
77:6,13

**contacts** 42:22

**contained** 34:23

**contract**
29:14,16,18,23
30:2,6,9 33:6
43:19,20,22,24
49:12,14 57:14,16
75:23,25

**contracted** 15:10 30:5
48:2

**contracts** 72:23

**contractual** 11:25
22:13

**control** 35:8

**convenient** 56:21

**conversation** 46:4

61:24 75:3 76:4,6,8

**conversations** 45:14
69:16 74:16,20,23

**coordinating** 14:12

**copy** 40:12 42:10

**core** 70:1

**CORPUS** 1:2 80:2

**correct** 7:9,10 17:16
20:17 32:9,10 35:9
39:2 57:8 61:5
67:5,6 79:2

**correction** 27:20
71:20

**Corsicana** 55:9

**Cory** 66:19
67:10,12,20

**Cory's** 66:19

**cost** 38:16

**counsel** 81:3,7

**counties** 55:2

**country** 25:15 54:7

**county** 55:7,14,15,16
79:8

**couple** 61:19

**course** 4:18,23 5:3,4
6:16 25:4,22 58:20

**court** 1:1 4:25 11:21
80:1

**courteous** 77:16

**courtesy** 22:10 77:15

**courthouse** 4:20 5:13
51:22

**cover** 20:11 46:24,25
49:20 55:2

**covered** 62:17 73:25

**coworker** 9:6 22:19

**coworkers** 9:9

**CPS** 26:11 29:14
40:6,7,11,17,19,20,2

1,24 41:2,8,24
42:6,9,17,18,22,24
43:2,15,19,20 44:4
45:5,12
47:4,12,13,16
48:16,18,19 53:23
54:22 57:14 75:23,25
77:6

**CPS-referred** 43:11

**crime** 15:12

**criminal** 6:16

**criteria** 15:9,10 25:7

**crucial** 39:25

**Cruz** 2:20

**CSR** 1:20 81:18

**curious** 27:25

**current** 14:1

**currently** 5:19 19:1,2
27:11,12

**cyclical** 39:25
62:6,9,16,19

---

D

**DADS** 17:15

**Dallas** 1:23 2:17
10:6,12 15:16,19
33:7,12
49:13,15,16,19,21
51:24 52:4,13,19
54:1,2 55:13 68:7

**date** 8:17 26:24 28:12
78:2 81:18

**Davis** 1:10,16 3:4
4:2,7,8 78:2
79:1,5,11 80:9,15

**day** 79:10,19 81:13

**days** 75:13

**day-to-day** 30:3 69:17

**DC** 2:6

**dead-set** 26:23

**deal** 7:18 23:4 34:1

43:10

**dealing** 6:25 8:24 9:2
19:19,24 22:14 23:23
27:10 40:15

**dealt** 42:13,15,17,18

**debate** 27:17

**decision** 27:8,16 48:9

**Defendant** 1:17 81:5

**Defendants** 1:7 2:9
80:7

**define** 59:8

**degree** 18:13,15,18

**department** 2:4
4:12,14 8:6,9,16
10:3 11:20 17:15
19:23 24:16
36:4,6,16 37:21
39:10,12,16 43:14,16
52:23 53:9 61:18
65:12,16,21,24 68:21
72:1

**depending** 35:23

**depends** 35:21 38:22
39:21,25 56:21

**deposition** 1:9,16
4:18,23 5:4,10 22:11
23:2,6 25:22 29:14
56:23 62:22 63:4
76:13 79:1
80:9,17,19,24 81:2

**DEPUTY** 2:10

**describe** 6:25

**described** 68:24

**description** 79:13

**determine** 27:2

**difference** 72:23

**differences** 7:7

**different** 38:5 48:9
54:6 64:19 67:2
72:8,23

**difficulty** 11:10 68:2

70:25 71:3

**diplomas** 47:9

**direct** 36:9 42:24

**directly** 43:15 64:6
68:8

**director** 16:15 76:22

**Disabled** 17:13,16

**disclose** 12:2,4

**disclosure** 12:6

**discuss** 75:20

**discussion** 12:15
74:12

**discussions** 33:23

**disjointed** 46:13

**distance** 70:18

**distribution** 7:20

**District** 1:1 2:12
54:1 80:1

**DIVISION** 1:2 2:5 80:2

**DMV** 35:22 36:3,4

**doable** 56:22

**document** 21:8,10,21
23:20 38:10,12 39:9
45:19,22 58:7,9
62:6,8,9 65:5,7
79:13

**documentation** 28:23
44:25 51:13 58:4

**documents** 9:1,3
11:3,10,11
21:17,18,19,24 22:3
23:14 24:2,21
25:3,7,8,9,11,14
26:5 32:4,25 34:23
35:24 37:19,25
38:20,22 39:23,25
41:22,23 43:21
44:5,7,9,21
45:5,12,15,16
46:1,11 58:24
59:5,11,12,15,18,21,
25 60:2,5 62:2,5,21

63:13 64:17 68:9

**done** 28:11 37:17,18
52:12 56:18 60:17,18
61:7,10 77:13

**door** 46:16,20

**DPS** 36:10 37:12
65:3,4,7

**draw** 55:23

**drew** 55:23

**driver's** 21:25
23:20,24
24:4,5,6,14,23 39:9

**duly** 1:17 4:3 80:15

**during** 4:18,23 5:3
13:19 19:14,17 25:22
32:19 57:4 62:22
67:25 75:20

**duties** 19:18

---

**E**

**earlier** 29:13 37:25
49:14 56:23 63:4

**early** 28:3

**earthly** 73:3

**east** 55:12,17

**easy** 48:8

**economics** 73:21

**education** 47:8

**effect** 44:12

**effects** 6:10

**effectuate** 20:16

**effort** 38:10

**efforts** 21:4 64:3

**either** 21:17 36:19
37:10 65:25

**elect** 26:25

**else** 6:20 7:25 8:5,9
21:22 23:19 62:11,14
73:18 74:13,25
76:7,21

**e-mail** 22:12 46:2

**employability** 21:11

**employed** 9:17 21:14
  33:15 81:8

**employee** 32:14

**employees** 32:15,19
  33:4 37:4,14 67:24

**employer** 16:22

**employment** 21:6 22:4
  24:4,7 32:13 46:12
  47:7 59:16

**encompasses** 49:13

**encounter** 26:7,9
  30:15 31:1,3 45:7
  48:17 57:18

**encountered** 12:15
  22:16 45:2 68:23

**encountering** 47:19

**encounters** 6:15 31:5

**encourage** 23:24

**engineering** 18:7,14

**English** 31:4

**enroll** 33:7,9

**enrolled** 63:10

**ensure** 20:15

**entire** 19:4
  31:9,13,14 43:14
  50:16

**entirety** 15:18 23:3

**entity** 29:5

**essentially** 24:2

**estimate** 31:24 73:6

**et** 1:3,6 2:9 80:3,6

**evaluating** 32:11

**evaluation** 32:20

**eventually** 41:23

**everyone** 23:9 55:24

**exact** 60:6

**exactly** 52:2

**examination** 3:4 4:4
  80:21

**except** 79:2

**executed** 11:19,21
  79:15

**existence** 29:8,19

**expected** 76:23

**experience** 20:6,7
  48:22

**Expiration** 81:18

**EXPIRES** 79:23

**express** 11:4

**expressed** 11:1 19:9
  76:3 79:17

**extended** 27:1 68:18

**extent** 23:7 37:14
  77:7,10

---

F

**facilitate** 28:8 77:7

**facility** 52:10

**fact** 7:25 27:17 67:3

**factor** 73:22

**factors** 34:9

**Faith** 50:1

**falls** 67:8

**families** 28:23

**family** 7:8

**Federal** 11:21

**feel** 22:22 77:12

**feels** 71:7

**fight** 5:23

**fighting** 6:3

**figure** 15:7 40:1

**financially** 81:10

**finding** 30:7 70:18

**Firm** 81:19

**first** 4:3 8:15 19:6
  24:21 32:13 38:2,18
  61:17 73:19,23
  75:4,12

**firsthand** 37:17,18

**focus** 15:11,15

**folks** 9:7 15:6 21:3
  24:10 43:4 61:12

**followup** 45:3

**force** 12:25 13:1,24

**foregoing** 79:1,14

**forget** 16:14 66:19

**forgot** 44:2 50:5

**form** 31:1 60:21 61:15

**formal** 43:10
  45:19,21,23

**forms** 26:2,17

**Fort** 10:13 33:8
  49:13,15,16,19,21
  68:8

**forward** 23:12 42:10

**foster** 6:4,6,11,24
  7:1,2,3,8,11,20 11:2
  19:10,20
  26:3,6,22,24 27:3,13
  28:8,16,17,20,23,24
  30:10 49:8 54:8,14
  58:6,8,10,12 73:4,7

**foyer** 12:17

**free** 77:12

**full** 4:6

**funded** 30:6

**funding**
  34:13,15,21,22 36:14
  72:25 73:2

**funds** 35:3,4,7
  72:13,20

---

G

**Gainesville** 55:18,19

56:5 69:20

**GED** 28:19

**general** 1:22 2:10,20
48:14 57:1,2,4 60:24
69:16

**generally** 54:24 56:2
66:25 70:16

**getting** 8:4 23:24
31:20 43:5 45:12
47:10,21 57:8 58:3
68:12,17 71:12,15
72:10

**girls** 6:17

**gist** 76:6

**given** 5:10,13 13:9
33:12 58:19 79:18
80:17 81:1

**gives** 7:8

**giving** 37:10 62:13
71:15

**goal** 33:14,16,20 34:8
35:8

**goals** 20:14,16,19

**gone** 52:5

**good-faith** 31:24

**Goodness** 6:21 33:14

**government's** 27:7

**gracious** 6:21 33:14

**graduate** 18:16

**graduation** 15:13

**Grayson** 55:19

**greater** 6:15

**greatest** 73:15

**Greenville** 55:13,17

**grew** 7:20,21

**group** 7:12,13,21
27:10 42:1 50:13,15
57:5 59:2,24 72:1,17

**guardianship** 28:17

**guess** 7:2,7 22:10
27:6 29:21 31:23
32:13

**guy** 48:17

---
### H

**half** 7:4 26:11,21,22
27:4,14,23 28:7
57:11,14,21

**hand** 79:18

**happen** 22:20 45:17
66:5

**happened** 69:12

**happens** 46:20

**haven't** 5:12,15,18
28:15 62:21 64:5

**having** 4:3 11:9 25:7
41:4 43:5 46:9 62:1
71:15 74:16

**Hazel** 1:10,16 3:4
4:2,7 78:2 79:1,5,11
80:9,15

**Health** 16:21 17:3,13

**hear** 26:15

**heard** 9:11 52:17
53:18,21 71:3

**held** 13:20

**help** 6:4 14:15 22:17
26:12 27:19 32:6
33:1 46:10 47:8,9
58:2,3,6 60:4 63:25
64:3 70:6,20 77:6

**helped** 32:21

**helping** 61:2 63:6

**hereby** 79:1 80:13

**hereto** 1:25

**he's** 58:4 63:16

**Hey** 25:23 46:8

**high** 6:13 15:12 47:9
53:20

**Hobbs** 63:21,22,25

64:4,7,14 65:10,19
66:2 67:20

**Hobbs's** 64:14

**home** 7:12 48:24 56:18

**homeless** 6:13 10:19
57:19 58:11

**homelessness** 6:12,21

**homes** 7:13,20,21
48:16 70:18

**hope** 21:1

**horrible** 29:24

**hospitals** 16:16

**HOURS:31** 80:25

**house** 47:6

**housekeeping** 23:5

**housing** 9:21 47:6
51:1,6 61:12,13,15
70:20

**Houston** 49:23

**Human** 17:14

**hunger** 5:24,25

---
### I

**I-9** 21:6,7,13 23:15
24:3 31:2,8 33:1

**I'd** 8:17 71:20 77:5

**ID** 12:13 20:1,3
21:1,16,25 22:2
23:21,25 24:3,6,22
25:17 30:23 31:1,25
32:6 34:3,10
35:16,19,23,24 36:3
37:13,20
39:5,7,16,19 51:11
52:21,22 53:10,16,20
58:25 59:6,19 60:12
63:7,25 64:4,15
65:21,24 66:12
67:4,24 68:3,12
69:25 71:4,23

**idea** 47:16 73:3

**identification** 19:25

23:25 24:15 26:1,2
58:23 60:21 61:15
71:1,12

**identified** 15:7 23:18
40:16 56:23 63:5
70:24

**identify** 15:11 32:5
42:2

**identifying** 8:25 11:3
21:23 68:9

**identity** 21:24 22:14
39:9,11 62:2 79:13

**IDs** 20:9,21 21:5
22:16 30:20 31:7,21
32:22 34:14 35:4
37:22 39:12 70:13
72:16 73:1

**I'll** 37:8 77:8

**I'm** 4:10,18 7:14
8:3,17 10:14
12:11,21,25 14:9
15:23 16:18 17:7
22:2,19 25:2 31:4
35:6,10 41:6 43:22
46:9 50:6,9 52:25
57:11 59:1,9,14,22
63:16 66:13,21 67:23
73:24 76:3

**immunization** 25:19

**impact** 20:4 73:11

**impacted** 76:1

**impacts** 65:8

**implement** 43:19

**includes** 81:3

**increase** 44:24

**Independent** 54:1

**INDEX** 3:1

**individual** 7:1 9:6
12:2 24:22 25:14
35:22 37:11 47:18
63:5,7,10

**individuals** 4:11 6:13

9:20 13:5,10 14:13
15:11 19:19 20:4,20
22:14 31:17,19,25
32:5 33:8,20 38:6,7
48:19 54:7,21
56:10,14,15 57:13
59:2 60:7 62:1,13
67:3,21 68:7,11,22

**individual's** 63:20

**industrial** 18:7,13

**inform** 74:15

**information**
11:17,18,22,25 22:24
23:5,8 30:16
37:13,19 52:16 58:1
71:20 74:12 77:5
81:1

**information-wise** 37:3

**informed** 76:5

**inhibit** 71:22

**inside** 55:24

**instance** 1:17 26:3
49:23 69:16,21

**instances** 68:4,6

**instrument** 79:15

**Integrity** 81:19

**intended** 66:22

**interaction** 75:4

**intercity** 15:25

**interested** 81:11

**Intern** 2:20

**interviews** 69:25

**introduce** 14:13

**investigation** 28:11
37:15

**invitation** 9:5

**invited** 8:23 9:1

**involved** 33:22 74:23

**involvement** 10:16,22

**Irene** 4:7

**irrelevant** 73:8

**issue** 19:19,24 33:25
42:19 43:3 67:25
68:23 69:2,5,8,11,18
71:25 72:2,10

**issued** 24:15 52:23

**issues** 7:2 8:24 9:2
10:18 22:14 29:13
42:6 43:11 62:1
64:24 67:2 71:17,21
77:10

**item** 53:22

**items** 37:24

**it's** 5:9,22 11:18,20
19:25 20:6 21:9
22:22 23:2 24:25
25:1,12 26:13 29:4
30:6 35:14 37:17,18
38:12,22 39:9
41:4,13,15,21
43:7,8,17 44:18
45:23 46:3 47:23
50:1,5,6,20 51:9,22
54:22 55:1,12,13
59:16 62:9,10 63:7
64:1 68:10
69:6,8,24,25
70:16,19 73:5 76:2

**I've** 37:22 42:18
45:14

_____

J

**job** 9:19 12:23
13:5,8,25 15:2 16:5
18:2 21:9 30:11,18
31:6 33:13 34:3
38:21 56:16 57:11
58:2,3 61:3 68:19
69:25 71:12,15

**jobs** 18:12 33:10 38:5
42:23 69:9
70:14,15,16 71:7

**John** 2:10 4:8

**john.scott@texasattor**

neygeneral.gov 2:13

**Johnson** 55:7

**July** 1:11,19 78:2
80:10

**justice** 2:4 4:12,14
6:16 8:6,10,16 10:4
11:20 19:23 61:18

---
K
---

**Kathy** 51:9

**Ken** 2:15 75:22,23
76:1,2,4,9

**kids** 7:17 19:25 34:1
47:21 48:8,22 54:4
70:10 73:3,7

**knowledge** 29:9 30:2
40:10 47:2 72:24

**known** 50:15 54:24
79:11

**Koonce** 2:15 11:24

**Kristine** 2:20

---
L
---

**lack** 34:9

**large** 49:20

**last** 23:16 36:21,23
44:17 64:11 65:19
66:19,22 67:16,25
69:1,4,14

**late** 47:11

**latter** 43:7,8

**law** 1:21 2:15 44:1,4
45:10

**lawsuit** 4:12 5:16
22:7

**League** 14:7,25
15:1,3,22 19:9

**learned** 52:16

**least** 12:5 19:22 20:6
24:3 30:22 64:23

**leave** 12:11 17:24

18:1 77:4

**legal** 10:18 81:19

**legislature** 44:17

**lengthy** 62:12 63:1

**let's** 12:7,23 13:22
14:18 17:18 18:24
19:15 20:8,12 23:14
25:18 26:8 35:14
38:7 46:14 51:12
55:3 56:4 59:13
61:17 62:12 63:1
71:10 73:23

**level** 24:21,24

**levels** 24:20

**liaison** 16:6,7

**license** 21:25
23:21,24
24:4,6,15,23 36:7
37:8 39:10 65:3

**life** 15:5,18 57:24

**likely** 36:15

**limitations** 72:16

**line** 74:4 78:3

**list** 25:12,16

**listed** 37:22 59:12

**LITIGATION** 2:11

**little** 8:4 12:11 20:8
29:10 55:7

**live** 7:8 10:6 19:2

**lives** 10:8 36:11

**living** 9:24 57:19

**Ln** 81:20

**local** 70:21

**located** 54:9 69:20

**location** 36:17 56:19
73:10

**locations** 35:22
36:7,10 72:8

**long** 13:14,17 14:1,8
16:3,10,17 17:6,22

18:8 25:12,16
29:8,18 41:21 47:12
51:10 63:24 75:2,18

**lot** 6:12,17,18 46:14
47:8 48:8,17 62:17

**low** 15:12

**Lueders** 2:20

---
M
---

**ma'am** 4:6 6:22 9:9
77:15

**machine** 1:21

**Maiden** 78:5

**main** 1:22 6:23

**maintain** 28:24

**maintains** 53:23

**majority** 27:25 60:7
70:10

**manage** 13:2,3,5
20:16,20 21:3 32:20

**management** 17:5
43:17,18 45:4,20

**manager** 12:25 13:1,25
16:20 17:11,12 20:15
46:10,21,22 47:1
50:11,12,22 68:14

**managers** 9:20 51:8
56:12 70:19

**maneuver** 72:6

**manner** 23:5

**MARC** 1:3 80:3

**mark** 11:22 22:24

**marked** 3:5 63:17,19

**marketing** 16:20

**Marshall** 54:10

**Mary** 9:12,22 64:8

**match** 64:19,20,25
65:3

**material** 32:4

**Matt** 2:20

**matter** 10:19 41:4

**may** 20:10 22:15
26:21,23,25 27:11
47:15 54:1,16 57:18
59:10 66:17,22 67:8
71:22 73:8 77:1

**maybe** 11:5 14:3 47:16
55:5 67:7 75:3,6,19

**mean** 7:6 10:17 11:18
21:15 24:5 32:9 33:9
34:8 36:4 37:6 44:16
69:22,24 71:10

**means** 33:10

**medical** 16:16

**meet** 25:7 36:19 52:10
68:14 75:16 76:10

**meeting** 8:22,23 9:4
11:7 37:11 56:19
73:19,24 74:1
75:18,20

**memos** 32:4

**mention** 49:12

**met** 8:15,19 10:21,25
65:20,23 68:14
75:8,11,12,13

**metric** 7:22 32:24

**metrics** 31:11

**Metro** 73:16

**metroplex** 54:17,25
73:7,12,14

**metropolitan** 49:3
73:16

**mind** 25:20 26:20
46:13 66:14

**minor** 28:16

**Mint** 16:24

**M-I-N-T** 17:1

**MINUTE(S** 80:25

**minutes** 75:19

**missing** 38:1 41:6

**missionary** 15:24

**M-I-T-T** 16:25

**money** 18:2 72:3

**month** 69:1

**months** 8:18 11:5
61:19

**Motor** 39:10

**mouth** 26:13

**move** 48:20

**N**

**narrative** 62:24

**naturalization** 21:20
23:19 25:2

**naturalized** 25:4

**Navarro** 55:11,12

**navigate** 47:5,10

**necessarily** 60:22
73:11

**necessary** 22:4

**negative** 6:18

**neighborhoods** 70:22

**neither** 81:7

**none** 40:3

**nonprofit** 5:23 14:7
15:23

**nor** 81:8

**North** 2:16 55:18

**notarized** 36:2

**NOTARY** 79:22

**note** 77:2

**noted** 79:2

**notes** 12:12 73:17

**not-for-profit** 49:5

**nothing** 61:2

**notified** 53:15

**notifying** 45:20

**numerous** 6:12

**NWB-7200** 2:6

**O**

**Oak** 19:2

**oath** 79:12

**object** 12:6 66:21

**Objection** 37:5 59:7
62:23

**obligation** 11:25

**obtain** 21:3,9 22:4
24:7,19 32:6,21 33:1
35:16 38:20
39:3,7,11,14 40:20
51:10,11 59:18,24
60:4 61:2,14 62:7
63:25 64:4 65:3
67:22 71:22 73:1

**obtained** 37:4 71:10

**obtaining** 11:10 20:20
24:14 35:3 37:8 47:6
52:13 53:16 59:15
65:24 68:2 70:25
71:4

**obtainment** 56:17

**occasion** 45:15 56:15

**occasions** 8:12 45:16

**odd** 18:12

**office** 2:20 12:17
17:11 37:12 46:3,6
49:16 54:21 56:7
79:18

**officer** 80:16 81:2

**offices** 1:21 49:18,21

**official** 65:6

**okay** 5:19 6:23 7:14
9:24 10:12,15,24
13:1 15:16,21
17:18,24 19:12 20:25
21:18 22:5,18,22
23:1,17 24:20 27:2

28:22 30:1 37:19,22,25 40:25 41:6 43:16 46:15,22 48:23 50:17 51:2 55:8,21 57:13 60:9,23 63:3 66:7 67:20 69:24 70:16 73:17 74:17 75:14 76:11,16 77:2,14

**Oklahoma** 56:6

**old** 63:22

**onboard** 76:4

**ones** 6:3,23 25:20 56:12

**ongoing** 69:6

**opinion** 47:23

**opportunities** 70:21

**opportunity** 8:5

**options** 71:8

**oral** 1:9,16 80:16

**order** 11:19 13:23 21:13 24:7,18,23 26:18 30:15 37:20 39:3,5,7 53:16 59:18 60:17 62:7,8 64:15 65:3 71:14 72:9,13

**organization** 5:22,23 8:1 15:24 19:7 49:22 58:16

**organizations** 34:25 49:7

**origin** 44:14

**original** 40:12 73:10

**others** 25:21 51:2 66:25 72:7

**otherwise** 81:11

**ourselves** 27:18

**outcome** 81:11

**outcomes** 20:4

**outliers** 20:11 51:15

**outlying** 71:23

**outside** 15:14 68:15

---

P

**P.O** 2:11

**page** 3:2 67:15 78:3

**paid** 13:11,13,14

**parcel** 22:24

**parenting** 6:17

**parents** 28:17,20

**participant** 13:8 20:22

**participants** 13:6 33:20

**participated** 36:20,23,25

**parties** 81:3,8

**party** 4:15 5:16 23:7 80:23

**pass** 44:4

**passed** 44:2

**passport** 21:20 23:19 24:25 25:13

**passports** 25:4

**past** 22:15 27:3,11 45:1 53:2

**Patrick** 63:21

**Patrick's** 66:5

**pay** 36:14 52:9

**paying** 37:12

**pays** 52:6

**Pennsylvania** 2:5

**people** 13:7 20:16 27:11 32:12 33:19 42:18,20 45:4 54:24 58:18 68:11 69:22 71:23

**per** 38:13 59:25

**percent** 6:14 20:13

31:1 32:1 33:15 34:8 51:15

**percentage** 30:25 31:6 32:5 34:1

**percentages** 7:19

**Perhaps** 44:20 66:17

**periodic** 32:14

**permission** 12:2 22:23

**PERRY** 1:6 2:9 80:6

**person** 11:11 12:12,16,20 23:14 43:1,10 66:24 77:6 79:14

**personally** 9:23 37:1,2 42:13,21 70:25 79:11

**personnel** 16:16

**phone** 14:19 46:8

**photo** 20:1,3 21:1,16 23:25 30:20,23 31:1,7,21,25 32:6,22 34:10,14 35:4,16,19 37:13,20 39:12,16,19 51:11 52:22 53:20 58:25 59:6,19 60:11 63:7,25 64:15 66:12 67:4,22 68:2 69:25 72:16

**physically** 54:20 75:12

**pick** 68:20

**picking** 72:7

**picture** 21:25 22:2 23:21 24:3

**placed** 23:6

**placements** 48:18

**Plaintiff** 81:5

**plaintiffs** 1:4 2:3 4:15 80:4

**play** 30:7

**please** 63:18 77:11,12

**plethora** 70:20

**plus** 25:11

**point** 19:15 30:16
   41:7 43:1,10 50:12
   57:7

**poor** 31:4

**population** 7:14 20:13
   31:9,13,14 38:8,25
   57:17

**portion** 3:5 11:22
   14:23 63:17,19

**portions** 23:3

**position** 13:13 27:6,7
   51:6

**positions**
   13:11,12,14,20,22

**possible** 24:9 54:12

**possibly** 8:18 66:25
   68:9

**potential** 71:16

**poverty** 5:24 6:1

**powers** 74:15

**practices** 10:12

**prefer** 24:7

**preference** 23:23

**pregnant** 6:18

**prepare** 14:14,16 15:5

**present** 2:19 18:24

**press** 23:12

**pretty** 15:4 39:25
   75:24

**primarily** 24:21

**primary** 21:18,21
   58:23 59:5,11,13

**principally** 19:18,23

**prior** 10:16,21 13:25
   14:4 15:21
   16:12,13,19,22
   17:2,9,10 44:18

**private** 18:3,4

**privy** 11:16

**probably** 48:16 55:5
   57:6 73:25

**problem** 11:24 46:9

**problematic** 72:5

**problems** 19:20 22:16
   52:17 70:3

**Procedure** 1:24

**proceeding** 81:9

**Proceedings** 77:21

**process** 12:23 20:3
   28:3,9 31:5,20 32:13
   35:17 36:18,20,24,25
   37:4,6,7,10 39:3
   43:10 45:19,23 49:8
   51:12 52:12 58:1
   62:5,13,19,20 63:2,8
   68:18

**processes** 43:12 46:17

**produced** 1:16

**professional** 10:15,17

**professionals** 14:15

**program** 9:21 14:12
   26:14 38:5

**programs** 26:15 50:9

**proof** 21:9

**proper** 20:17 34:3
   44:25 58:3 71:12
   78:5

**properly** 21:13

**protection** 47:12

**Protective** 12:3

**proved** 79:11

**provide** 21:19,22,23
   24:25 25:2,9 29:23
   30:13 34:19 36:13
   43:21 44:5 58:13
   65:5 72:18

**provided** 22:13

34:17,20 45:5,9,10

**provides** 71:7

**provision** 25:8 26:25
   43:20,23

**provisions** 1:24 65:4

**public** 16:6 24:16
   36:4,6,16 37:21
   39:12,16 52:23 61:14
   65:13,17,21,24
   68:15,21 71:24 72:1
   79:22

**purpose** 33:1 53:11,16
   71:1,4

**purposes** 21:6 31:2
   35:5 52:13 59:15
   79:16

**pursuant** 1:23 81:1

---

Q

**qualifier** 54:19

**question** 5:5 29:24,25
   35:10 50:2 59:1,14
   66:22

**questions** 4:19 22:21
   77:20

**quickest** 40:2

**quite** 8:17

---

R

**raise** 33:25

**raised** 42:19 67:25
   69:1,5,11

**rate** 32:13 33:11

**rates** 6:14 15:12,13

**ratified** 11:21

**reached** 27:7 42:9

**readiness** 14:14

**really** 47:20

**re-ask** 5:6

**reason** 5:5 34:7
   48:15,21,25 60:18,23

78:3

**reasonable** 71:14

**reassured** 75:24

**recall** 31:11 32:3
47:25 50:8 61:23,25
62:15,22,25
69:10,13,15,16 72:22
73:18 74:10,25 76:7

**receive** 37:13 45:18

**received** 44:22

**receiving** 45:15,16

**recent** 44:14,16

**record** 1:24 12:9
14:21 17:19,21
22:7,9 80:17 81:4

**records** 25:19 53:22
77:11

**recruiting**
16:16,20,23 17:5

**recruitment** 16:14

**Reed** 9:12,22 10:16,21
12:15,18 64:8 66:4

**R-E-E-D** 9:13

**refer** 20:22 46:11
47:7 53:10 58:15

**referral** 46:17
50:13,21 51:12

**referrals** 41:25 44:23
53:8

**referred** 42:11 50:24
53:6,12

**refers** 26:11 41:24

**regard** 6:24 19:22
24:14 29:22 30:23
42:23 56:4 62:16
65:10 71:6

**regarding** 75:23

**regards** 52:16,17 61:2
70:13 75:25

**region** 54:20,22,23

55:24

**register** 60:15,25

**registration** 60:21
81:19

**relate** 30:3 32:21
62:21

**related** 8:12 9:2
19:18 59:18 71:21
73:22 81:8

**relating** 10:19 31:12
42:6

**relations** 16:6

**relaying** 22:13

**release** 22:22

**relevant** 21:5

**remember** 17:8 25:23
50:8 67:16

**removed** 48:16

**rephrase** 15:7 34:22
59:10

**replacement** 51:21
52:18

**replacements** 72:17

**reported** 1:21

**reporter** 4:25 80:12

**Reporter's** 3:7 80:9

**reporting** 24:10

**represents** 4:10

**request** 24:9 38:13
40:5,11,14,17,23
41:25

**requested** 34:13,15

**requesting** 45:14

**require** 24:22 56:6

**required** 24:20 25:16
28:20,23 33:5 37:23
44:1

**requirements** 15:2
21:12,15,16 24:18

**requires** 33:7

**residency** 35:25

**resident** 36:2

**Resource** 29:2

**response** 4:24

**results** 45:7

**resume** 14:6

**return** 80:21

**reverse** 13:23

**review** 32:19

**RICK** 1:6 2:9 80:6

**ride** 37:11 68:13

**RIGHTS** 2:5

**Rockwall** 55:14,15

**role** 19:25 29:22
30:8,22

**room** 46:5

**root** 5:23,25

**rule** 26:23

**Rules** 1:23

**run** 40:10 57:18 72:25
73:2

---

S

**Safety** 24:16
36:5,6,17 37:21
39:12,16 52:24
65:13,17,21,24 68:21
72:1

**San** 50:2,6

**school** 18:20 25:17
28:18,19 47:9
53:20,22 54:1

**Scott** 2:10 3:4 4:5,8
12:7,11 14:18,21
17:21 22:9 23:12
37:7,10 59:9,13
63:1,20 67:1 80:25
81:5

**scream** 46:5

seal 11:23 23:7 79:18

second 5:3 12:8 24:24
  38:18 73:17 74:1,25

secondary 21:19
  25:8,10

section 52:1 61:8,13
  65:15

sector 18:3,4

securing 58:23

Security 21:24 23:20
  24:4,6 25:19
  38:3,9,14 58:24
  59:6,19 60:11
  64:19,25 65:8

seeing 31:11

seem 48:7

seems 23:5 27:25 41:6
  69:25

segment 34:1

self-determined 27:12

sell 48:8

send 46:2

separate 29:5

served 14:1

service 58:13
  60:19,24 61:1

services 12:3,25
  13:1,24 17:13,14,16
  26:16 27:23 29:22
  48:2 50:20,22
  56:7,16,25 57:5
  58:14,19 61:8
  63:11,16 69:19,21
  71:6,7,11 72:18

several 11:11,12

Shapiro 2:4 8:5,9,20
  23:11 37:5 59:7,10
  61:21 62:23 66:21
  73:19 74:4 75:5
  76:2,10,16 77:1,19
  81:5

Shapiro's 22:23

shared 62:4

she's 9:17,25 10:1
  66:24

shoot 22:5

shops 14:16

Short 12:10 14:20
  17:20 22:8

shorthand 1:21 80:12

signature 3:6 78:1
  79:1 80:21

similar 49:6,22 51:5

similar-type 49:3

simultaneous 38:22

simultaneously 38:19

sit 26:23 31:23 32:3
  36:17 47:25 66:14
  68:22 69:10

site 69:13

sitting 23:22

situation 28:17 43:9

situations
  40:11,15,25
  41:15,20,25 53:8

Slaughter 81:20

so-and-so 46:8

Social 21:24 23:20
  24:4,6 25:18
  38:3,9,13 58:24
  59:5,19 60:11
  64:19,24 65:8

Sociology 18:15,19

solution 69:22
  70:7,10,11 71:16

solutions 71:8 81:19

somebody 7:25 15:8
  26:22 28:6,12 58:15
  67:7,17

someone 6:6 7:12
  8:5,16 21:12,14

26:21,23 28:8 36:15
  38:19,21 42:25 56:4
  63:24 66:10

sorry 15:23 31:4
  59:1,9,23

sort 64:21

Sought 10:18

sounds 23:13 53:25
  67:7 75:7

source 35:3

Southern 1:1 2:12
  80:1

southwest 55:8

speaking 17:18 56:2

specific 15:10 36:10
  42:7 50:19 66:5 68:6
  69:15

specifically 8:2 66:7
  69:15

spell 64:11

Spelling 78:5

spoke 37:25 76:1

Square 5:20,21,22
  9:17,19 12:24
  13:15,17,19 14:4
  18:25 19:4,6,11,15
  22:13 29:6,22 30:9
  31:5 35:1,5,12 36:15
  38:2,4 41:7,16 42:12
  43:1,9 44:22
  49:2,12,18,23 51:20
  52:6 59:24 60:4,14
  64:9 65:16 67:18
  68:1 74:15 75:17
  76:11

SQUARE/TRAC 2:14

staff 13:3 17:5 40:24
  41:1 42:5,14
  53:12,14

staffing 16:15,23

stage 58:22

Stanberry 1:20 80:12

81:18

**standard** 70:11

**standpoint** 7:23,24
74:5,7

**stands** 29:1 50:7

**start** 12:23 19:15
27:23 28:3 33:10
40:4

**started** 13:24
19:10,14

**state** 1:20 4:6,10
11:20 17:10,22,25
18:1 28:1 44:4
54:3,5 69:6 79:7,23
80:13

**stated** 1:24

**states** 4:13,14 25:15
58:9 65:6

**State's** 27:6

**STATES** 1:1 80:1

**statistics** 6:19 48:18
52:1,10,13,20
53:15,19

**statute** 45:1

**stay** 27:1,3 47:12,23
48:1,2,10,19

**staying** 47:20

**step** 26:8 38:18

**steps** 64:13

**Stewpot**
53:3,7,10,12,15

**stop** 22:21

**story** 38:5

**Street** 1:22

**strike** 44:23 59:13
65:11 69:19

**stuff** 77:12

**subgroup** 38:8

**subject** 35:15

**submit** 36:2

**submitted** 80:19

**subpart** 23:8 29:5,7

**subpoenaed**
76:15,17,19,23 77:1

**subscribed** 79:14

**subset** 41:1

**substantiate** 36:1

**success** 15:5 33:11

**successful** 40:13
41:11,16,18

**successfully** 32:6

**sued** 4:12

**suffice** 21:21 22:1

**sufficient** 38:20

**suite** 1:22 2:16 81:20

**supervisor** 18:7

**Supplemental** 16:21
17:2

**Support** 81:19

**supporting** 25:9,11
35:24 43:21 44:7,9

**supposed** 45:20

**sure** 8:17 10:14 12:21
14:10 16:18 17:8
22:2 25:2 35:6,10,11
40:22 43:22 50:6,9
52:25 59:2 63:16
67:5,14 71:11 73:24
76:3 77:4

**surface** 48:7

**surrounding** 10:13

**switch** 35:15

**sworn** 1:18 4:3,19
80:15

**system** 6:16 11:2
34:14 47:21 48:10
49:1 54:8,13 68:16
71:10

**systems** 76:5

---

T

**taking** 22:5 63:8

**talk** 7:11 9:1 38:7
73:21 74:14

**talked** 33:19 71:23
73:18

**talking** 7:12 37:8
51:18 75:21

**task** 58:2

**tend** 73:10

**tended** 15:11

**term** 31:15 59:11

**terms** 13:3 29:16
34:21,22 43:24 54:20
68:17

**territory** 46:25 49:20

**testified** 4:3 61:19

**testify** 8:13

**testimony** 5:13 80:17
81:2

**Texas** 1:1,20,22,23
2:12,17 4:11 10:8
11:20 15:16 17:11
23:25 24:15,16 33:6
36:2 44:4 54:5,10
73:16 80:1,13 81:20

**thank** 22:10
77:15,18,19

**that's** 6:5 7:1,22 9:3
11:19 19:11 20:7
21:8,10 23:15 24:9
27:2,16,17,24 29:24
30:22 35:3,8 38:5
39:2 41:11 48:25
51:24 52:9 55:7,10
58:5,11,12 60:18
61:7 64:1,21 70:19
71:17,19 73:24,25

**themselves** 26:18 27:8
30:13 57:24 60:2

therein 79:16

there's 7:7 21:18,19
25:8 26:25 29:3
33:25 46:24 48:8
54:19 58:9 65:4
66:25 69:7 70:20

they'll 26:12,14

they're 12:5 13:13
24:11 26:11 28:18
33:5,19 36:1 40:23
42:11 44:1
45:9,10,11,12
48:3,18 52:1 54:3,13
56:5 64:22 69:20
72:23

third 75:7

throw 25:23

tiers 37:22

Timbuktu 72:7

timeline 48:1

title 12:23 16:14

today 8:6,13 19:18,24
20:15 31:23 32:3
47:25 51:12 62:4
66:14 68:23 69:10,13
76:14 77:4,16

token 72:14

TRAC 26:14 29:1
31:10,13,14,19,20
34:2 50:15,16 53:9
57:1,2 63:11,16 64:1

training 71:14

transcript 14:23
63:19 80:16,19

transcripts 25:17

transition 26:12 29:2
50:16

transitional 9:21

transitioning 30:10

transport 36:16,19
72:9,11

transportation
68:2,16 69:18,24
70:17 71:6,16,22,24
72:12 73:23

transported 68:10
72:13

traveling 56:13

triage 26:7

tried 64:17

true 79:2 80:17

try 7:22 20:9,11 21:1
24:11 27:19 38:11
39:18 40:1,4 58:3

trying 7:14 11:10
12:13 28:7 38:20
57:10,23 59:14 63:12
65:21 72:6 77:11

turn 65:13 71:9

turnaround 51:14,16

TWC 33:19 34:4,16
35:1 57:16

two-and-a-half 16:11

type 11:16 20:1,20
21:1 26:1 28:22
37:19 49:6 52:22
61:14 66:11

types 15:13 20:9

typical 51:14,16

typically 26:1 62:6

---
U
---

U.S 2:4

Uh-huh 57:3,20,22
59:3 61:20 71:13

understand 4:15,21,22
5:4 7:14 20:10 29:25
32:12 35:10 45:10
59:14 65:1 73:14

understanding 65:2

understood 64:23
67:4,9

undertaken 64:14

unemployment 6:14,15

United 1:1 4:13 25:15
80:1

unsealed 23:4

upon 43:3 47:19

upper 29:13

UPS 18:5,6,9,11

Urban 14:7,24
15:1,3,21 16:2,3
19:9

UTA 18:21

---
V
---

varies 51:17

vast 70:10

VEASEY 1:3 80:3

Vehicles 39:10

verbal 4:24 46:4

verification 76:11

versus 7:3,20 28:14
34:8

viable 71:8

visit 8:5 56:9

visited 8:8

visiting 12:20

Vital 52:1,10,13,19
53:15,19

VOLUME 1:12

volunteer 13:11

vote 60:15,25

voter 60:20

voting 71:1,4

VS 1:5 80:5

---
W
---

wait 68:19

walk 20:8 35:14 46:16

**walking** 37:12 70:18

**walks** 20:10

**Washington** 2:6

**wasn't** 63:10,15 66:23
74:24

**wavelength** 5:7

**Waxahachie** 55:9

**ways** 26:10 66:1

**We'd** 55:5

**we'll** 20:11 22:24
23:12 25:23 58:23
77:8,13

**we're** 27:10 46:3
70:13 72:6

**west** 55:5

**western** 55:4

**we've** 8:24 11:10
53:11

**whatever** 5:5 20:12
28:14 34:21,22 48:21
53:11

**whereby** 65:5

**wherever** 54:16 73:13

**whether** 7:25 27:3,16
35:23 41:5 61:12
69:24 74:17

**whole** 23:6

**whose** 79:14

**wishes** 23:7

**witness** 1:17 77:20
78:2 80:15,18,20,21

**worded** 66:25

**work** 5:19,20 6:5,13
12:18,25 13:1,24
14:4,13,16 15:21
16:3 17:6,22 18:4,8
19:1,2,18 20:24
24:10 29:11 30:5,7,8
31:16,18 32:12 33:10
38:6,7,25 42:22 49:7
53:2 54:2,4,12,17,21

56:14,15,25
57:5,13,16 59:21
63:6 68:12
70:18,19,21 71:9
73:6

**worked** 14:6,7,12,14
15:18,23 16:13
17:4,10,11 18:9 19:3
22:15 53:3,5 64:5,7
66:8

**workers** 56:9

**workforce** 33:7,21
34:23 49:15 50:20,22
56:16,25 57:5,8
58:19 61:7 63:10,15
65:15 68:20 69:19,21
71:7,17,19 72:18

**working** 11:9,14
17:2,24 18:1,2 19:8
21:2,3 24:11
25:14,15 27:18 32:11
36:9 43:4 54:15
58:19 59:4,15,17
63:6,24 64:22 68:8
69:20 70:24

**works** 5:23 9:15,16,20
10:3 15:24,25 33:4
42:25 43:14 49:2
50:1

**workshops** 15:4

**world** 14:13,16

**worry** 57:10

**Worth** 10:13 33:8
49:13,15,16,19,21
68:8

**written** 32:4

─────────────
         Y
─────────────
**y'all** 7:22 12:14,20
13:7 15:6 22:16
26:19 27:18 30:15,25
31:3,18 32:5 33:18
34:2,8 38:2,10,13
39:11 40:10,21 42:9
43:9 45:13,19 47:15

49:5 54:4,12,17
56:6,24 58:11,13,18
59:4,17 60:4,24 64:9
70:9 75:16,20
77:5,11

**y'all's** 21:4

**year's** 31:16

**you-all** 20:24

**you'll** 5:5

**young** 14:15

**yourself** 49:5

**yourselves** 70:9

**youth** 6:4 7:20 8:24
11:1,9,14 14:15
15:5,8 19:8 20:24
21:2 22:15 23:23
24:11,19 25:3,12
26:2,5,8,9,13,18
27:2,18 28:18 29:23
30:7,8,10,25 31:5,7
32:21 33:1 34:2
35:4,17,21
36:9,11,16 37:11,20
38:1,24 39:4
40:8,14,16,21,22
41:8 42:10
43:4,11,21 44:23,25
45:16,18,21,25
46:11,16 47:11,19
48:17 50:11,21,24
51:11,13,14,19,20
52:7,10,18
53:6,23,25 54:9,13
56:4,6,21 57:4,18
58:5 59:25
60:14,16,20 61:13
63:16 67:25 68:8,13
69:19 70:4,24
71:8,12,16 73:12,15

**youths** 20:23 40:16
42:1 59:17,20 68:15
69:11

**youth's** 56:18

**you've** 13:22

Z

**zip** 15:12,14 46:24