**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS


CORPUS CHRISTI DIVISION


MARC VEASEY, et al.,            )
                               )
          Plaintiffs,           )
                               )
vs.                             )   CIVIL ACTION NO.
                               )   2:13-CV-193 (NGR)
RICK PERRY, et al.,             )
                               )
          Defendants            )


ORAL DEPOSITION


SENATOR ROBERT L. DUNCAN


AUGUST 28, 2014


     ORAL DEPOSITION OF SENATOR ROBERT L. DUNCAN,
produced as a witness at the instance of the Plaintiffs,
and duly sworn, was taken in the above-styled and
numbered cause on August 28, 2014, from 9:04 a.m. to
5:34 p.m., by Susan Myatt, Certified Court Reporter for
the States of Texas and New Mexico, reported by
computerized stenotype machine at the Embassy Suites,
Executive Board Conference Room, 5215 South Loop 289,
Lubbock, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

CONFIDENTIAL

[Page 2]

1                          APPEARANCES
2

   FOR PLAINTIFFS:
3

           MR.  BRUCE GEAR
4          DEPARTMENT OF JUSTICE
           1800 G Street NW
5          Washington, DC 20006
           (802) 353-0419
6
7          MR. DEUEL ROSS
           NAACP LEGAL DEFENSE FUND
8          40 Rector, 5th Floor
           New York, NY 10006
9          (212) 965-2200
10   FOR DEFENDANTS:
11         MR. PATRICK SWEETEN
           OFFICE OF ATTORNEY GENERAL
12         P. O. Box 12548
           Austin, TX 78711-2548
13         (512) 463-2007
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

[Page 3]

1                          I N D E X

2                                                PAGE

3    Appearances                                   2

4    WITNESS:  SENATOR ROBERT L. DUNCAN

5            Examination by Mr. Gear               5

6            Examination by Mr. Ross             206

7    Deposition Concluded                        287

8    Reporter's Certification                    288

9

10                     E X H I B I T S

11   DUNCAN DEPOSITION EXHIBIT NUMBER             PAGE

12   RD-1, 2012 Deposition of Senator Duncan       10

13   RD-2, 5/16/2007 Texas Legislature Online History   20

14   RD-3, HB No. 218                              26

15   RD-4, 2/28/2007 Hearing on Elections          32

16   RD-5, 5/15/2007 Senate Journal                61

17   RD-6, 5/23/2009 Texas Legislature Online History   72

18   RD-7, 1/14/2009 Senate Rules                  81

19   RD-8, 1/14/2009 Senate Journal                82

20   RD-9, 3/3/2009 Memo to Chairman Duncan from

21        Senator Van de Putte                     88

22   RD-10, Reasons to Support SB 362 as Filed     94

23   RD-11, SB No. 362                            105

24   RD-12, 3/5/2009 Memo to Senator Van de Putte

25        from Senator Duncan                     114

CONFIDENTIAL

1                    E X H I B I T S  (CONTINUED)

2      DUNCAN DEPOSITION EXHIBIT NUMBER                 PAGE

3      RD-13, 3/18/2009 Senate Journal                 147

4      RD-14, 1/24/2011 E-mail to Jennifer Fagan from

5             Ann McGeehan                              153

6      RD-15, 3/29/2012 Various E-mails from

7             Senator Patrick                           166

8      RD-16, 5/27/2011 Texas Legislature Online History 171

9      RD-17, SB No. 14                                 181

10     RD-18, 1/27/2011 E-mail to Jonathan Stinson and

11            others from Bryan Hebert                  193

12     RD-19, 1/20/2011 Various E-mails RE: Announcement 208

13     RD-20, 1/24/2011 E-mail to Debby Hansard and

14            others from Megan LaVoie                  215

15     RD-21, 1/24/2011 Senate Notice of Public Hearing  223

16     RD-22, 1/21/2011 E-mail to Jennifer Fagan from

17            opie@cdmlaw.com                           227

18     RD-23, 1/21/2011 Various E-mails SB 14           237

19     RD-24, 1/26/2011 Senate Journal                 252

20     RD-25, 8/26/2014 News Report from Lubbock

21            Avalanche-Journal                         261

22

23

24

25

**CONFIDENTIAL**

[Page 5]

1          (Witness sworn by court reporter.)

2          MR. GEAR:  Senator Duncan, my name is Bruce

3   Gear.  I am from the Department of Justice.  I am here on

4   behalf of the United States in the current litigation.  I

5   just wanted to start by going over some ground rules with

6   you regarding the deposition.

7          But, maybe before we do that, we can put on

8   the record what you want to put on the record.

9          MR. SWEETEN:  Okay.  And, Bruce, we had a

10  short discussion just before we went on the record.

11          Senator Duncan will be asserting legislative

12  privilege today.  Pursuant to an order of the Court, we are

13  going to ask that the portions -- that the deposition be

14  kept under seal based upon the assertion of legislative

15  privilege.

16          At this point, it is not our intention to

17  instruct him not to answer on the basis of a legislative

18  privilege, but instead to provide the response -- yet

19  it's -- even though we will maintain the objection, you

20  know, as the deposition continues.

21          So I think that is a fair rendition of what

22  we have discussed and how we want to proceed, so -- and it's

23  my understanding there is no objection to putting the

24  deposition under seal; is that correct?

25          MR. GEAR:  I think we've done that in the

CONFIDENTIAL

[Page 6]

1    past, yes.

2                    SENATOR ROBERT L. DUNCAN,

3    having been previously duly sworn by the court reporter,

4    testified on Examination by Mr. Gear, as follows:

5        Q    And just a couple of points of clarification.

6    My understanding is that you are no longer a senator --

7        A    That's correct.

8        Q    -- for the State of Texas.  And when did you

9    leave the Senate?

10       A    July 3rd of this year, 2014.

11                   MR. GEAR:  So any discussions regarding

12   SB 14 after July 3rd would not be covered by legislative

13   privilege; am I correct on that?

14                   MR. SWEETEN:  I believe that to be the

15   case.  I mean, I guess it could come up that if he were

16   expressing something that related to his mental

17   impressions that occurred during the process, that it

18   possibly could implicate legislative privilege.

19   Obviously, other privileges could be up for debate that

20   he discussed something.

21                   These are clearly attorney-client

22   privilege.  Other privileges could apply.  But I think,

23   as a general matter, if he has had discussions after the

24   date of his service with other legislators, I don't think

25   that that would be covered by legislative privilege

CONFIDENTIAL

[Page 7]

1   because he's not -- he wasn't a senator at the time.

2               MR. GEAR:  All right.  I just wanted to

3   make sure that was clear on the record.

4               MR. SWEETEN:  Okay.

5       Q    (By Mr. Gear:)  So let me start with some ground

6   rules, Senator Duncan.

7               You understand that you have been sworn in

8   by the court reporter, and that you are expected to

9   testify truthfully, completely, and as accurately as you

10  can, correct?

11      A    Correct.

12      Q    And the court reporter today is taking a

13  transcript, and that means a number of things.  I know

14  that you've been deposed previously, but if you'll allow

15  me to ask the complete question, I will give you a

16  complete opportunity to answer; do you understand?

17      A    Yes.

18      Q    And when I ask you a question, because she's

19  taking a written record, it's necessary for you to answer

20  "yes" or "no."  Do you understand that?

21      A    I do.

22      Q    Or to give a complete answer, as you deem

23  necessary.

24      A    Yes, sir.

25      Q    So, if there's a time where I say, "Is that a

CONFIDENTIAL

[Page 8]

1   'yes,'" "Is that a 'no,'" or "Could you explain that

2   further," it may be because you have nodded your head

3   instead of providing an answer on the record.  Do you

4   understand that?

5        A    Yes, sir.

6        Q    So, hopefully, all of my questions will be

7   clear.

8        A    I'm sure they will be.

9        Q    If they are not clear at any point, you can ask

10  me to rephrase the question, you can ask me -- you can

11  basically say you didn't understand, and I will try to

12  rephrase it in a way that you understand it completely.

13  Do you understand that?

14       A    Yes, sir.

15       Q    If you wish to take a break, you know, I will

16  accommodate you on that.  I will likely finish the line of

17  questioning that I'm going through, and at that point, if

18  you still want to take a break, I will allow you to do

19  that.  Do you understand?

20       A    Yes.

21       Q    Is there any reason why you are unable to

22  testify truthfully today, such as have you taken any

23  medication which would affect your deposition testimony?

24       A    No.

25       Q    Have you had any alcohol within the last 24

CONFIDENTIAL

[Page 9]

1    hours?

2         A    No.

3         Q    Do you understand the instructions that I have

4    stated to you?  If you have any questions, I would be

5    happy to try to answer those.  Do you understand?

6         A    Fine.

7         Q    So, during the course of this deposition, I may

8    ask -- I may state the word "photo ID" or "voter ID."  Do

9    you understand that I am using those interchangeably for

10   the purpose of this deposition?

11        A    Yes.

12        Q    And that depending on the particular legislation

13   we are talking about, it may include both photo and

14   non-photo ID; do you understand that?

15        A    I am sure you will delineate what you are

16   talking about --

17        Q    I will.

18        A    -- as you go through the questions.

19        Q    I will.

20        A    Okay.

21        Q    And, again, do you have any questions about the

22   instructions that I have laid out for you today?

23        A    No.

24        Q    Now, you have testified previously in Texas v.

25   Holder, correct?

CONFIDENTIAL

[Page 10]

1      A     Yes, sir.

2                  (Duncan Deposition Exhibit Number RD-1

3      marked.)

4      Q     (By Mr. Gear:)  And I am just going to show you

5      what's marked as RD-1, and I will give you a copy also, if

6      you would like it.  I would just ask you to identify that

7      document for me, please.

8      A     It appears to be the transcript of the oral

9      deposition of Robert Duncan, as you have previously

10     described.

11     Q     And although it's very small print, is it

12     accurate that you have previously testified in Texas v.

13     Holder on June 7th, 2012?

14     A     Yes, sir.

15     Q     And I just want to you ask generally:  Is there

16     anything within your previous deposition testimony related

17     to Texas v. Holder that you believed was incorrect?

18                  MR. SWEETEN:  Objection; compound.  You

19     can answer.

20     A     I think that -- I can't remember if I signed

21     this or not.  I'm sure I did.  I don't know if you-all

22     had my signature on it.

23                  MR. SWEETEN:  I don't know if it has the

24     errata on it or not.

25                  MR. GEAR:  I don't think it did.

CONFIDENTIAL

[Page 11]

1      A    I don't think -- I don't recall if there were

2  any errors.  I think I had forgotten a couple of things I

3  was reminded of.  Those were all cleared up, corrected in

4  the deposition.

5      Q    (By Mr. Gear:)  Thank you.

6      A    I think it's fine.

7      Q    Thank you.  And did you review this deposition

8  after you provided the deposition testimony --

9      A    Yes, sir.

10      Q    -- as written?  And that was a "yes"?

11      A    Yes, sir.  Sorry.  I overrode you there a

12  little bit.

13      Q    That's okay.  And that is just another point

14  that I will raise regarding the deposition.  As I'm

15  speaking, allow me to complete the question --

16      A    You bet.

17      Q    -- and, again, I will allow you to complete your

18  answer.

19           So one last question on the deposition.  I

20  believe you've testified that there was nothing in here

21  that you believed was inaccurate, so let me put that in

22  the positive.

23           Do you believe that your testimony on

24  June 7th, 2012, was accurate?

25           MR. SWEETEN:  Objection; compound.  Go

CONFIDENTIAL

[Page 12]

1   ahead.

2       A    I believe it was accurate, to the best of my

3   memory, yes.

4       Q    (By Mr. Gear:)   So I believe, while we were off

5   the record, I asked you whether you were still a senator

6   in the State of Texas, and how did you answer that?

7       A    I resigned as of July the 3rd, 2014.

8       Q    And as of July 3rd, 2014, did you take up any

9   other position within the State?

10      A    Well, I am now the Chancellor for the Texas

11  Tech University system.

12      Q    And you began that position on what date?

13      A    July the 7th, 2014.

14      Q    So you got very little vacation time in between,

15  right?

16      A    None at all.

17      Q    Let me ask you a few questions regarding your

18  preparation for this deposition.

19             Did you read your previous deposition

20  testimony prior to coming in for this deposition?

21      A    Yes, sir.

22      Q    Did you review any other documentation prior to

23  coming in for this deposition today?

24      A    I reviewed the exhibits that were attached to

25  the deposition and a couple of other documents that

CONFIDENTIAL

[Page 13]

1   Mr. Sweeten showed me this morning.

2       Q    And regarding the couple of other documents, can

3   you describe those documents for me?

4       A    I think one set was some notes that appeared to

5   be taken from handwritten notes that appeared to be --

6   were not in my handwriting.  So I don't know what they

7   said.  I didn't read them, other than just to determine

8   whether or not I wrote them.

9            There was a spreadsheet that we -- I am

10  not sure exactly where the source of that was.  And

11  then there was an e-mail that my staff sent out to a

12  different -- or to my district staff.

13           And that's about it.  That's all I

14  remember on that.

15      Q    Can you tell me, related to the spreadsheet,

16  what that -- what the subject matter of that spreadsheet

17  is?

18      A    I really don't know.  Mr. Sweeten had asked me

19  if I had ever seen it or had seen it.

20           MR. SWEETEN:  Yeah.  Don't reveal any

21  communications that you and I had.

22      A    I don't know what it -- I do not know what

23  it -- what it is or how it -- how it was prepared.

24      Q    (By Mr. Gear:)  And I should have asked you this

25  question before we got into any detail.  Are you

CONFIDENTIAL

[Page 14]

1    represented today?

2         A    Yes.

3         Q    And who are you represented by?

4         A    Mr. Sweeten with the Attorney General's Office.

5         Q    And as I ask you questions, I just want to

6    clarify that I am not asking you to reveal specific

7    conversations with your attorney.  I will do my best to

8    understand who was present during the discussions so that

9    we can speak appropriately.

10                 But if there is a time where your -- you

11   had a discussion with your attorney, then you can let me

12   know that, and I will attempt to avoid those types of

13   questions.  Do you understand?

14        A    Yes, sir.

15        Q    So you also discussed that you reviewed an

16   e-mail to your district staff.  Can you tell me what the

17   subject matter of that e-mail was?

18        A    I think it was just basically information

19   concerning what was happening with regard to the process

20   for the voter ID legislation.

21        Q    Was it in regard to any particular piece of

22   photo ID legislation?

23        A    Well, I don't remember if it was 2009 or

24   2000 -- probably 2011.

25        Q    Do you know if you produced that particular

CONFIDENTIAL

[Page 15]

1    document to your attorney, or do you know how --

2                    MR. GEAR:  Strike that.

3         Q    (By Mr. Gear:)  Do you know if you produced that

4    particular document to your attorney?

5         A    I am sure we did.

6         Q    And regarding production of documents, did you

7    produce personal and work-related e-mails that deal with

8    photo ID legislation?

9         A    We --

10                   MR. SWEETEN:  I may need to -- we have

11   obviously -- as I understand, as sort of the arc of this

12   case, we produced -- as you know, Bruce, we have

13   produced, on behalf of Senator Duncan, documents in the

14   2012 litigation.  That was reproduced in this case, as I

15   understand it.

16                   And then I think, in addition, this Court

17   has, you know, required certain documents -- additional

18   documents from all the legislators that were subject to

19   legislative privilege, and I think those were all

20   produced.

21                   So I think the answer -- I mean, he is

22   not under -- this isn't a subpoena duces tecum as to

23   this Notice of Deposition.

24                   MR. GEAR:  That is correct.

25                   MR. SWEETEN:  There is not an additional

CONFIDENTIAL

[Page 16]

1   request, but I think that is -- having not been involved

2   in the production in the second case at all, I think

3   that is a rendition of kind of how -- the documents that

4   he has produced on this.

5       Q   (By Mr. Gear:)  So I still want to go into the

6   types of documents that you produced.

7               Do you recall producing personal e-mails

8   or work-related e-mails related to photo ID legislation?

9       A   We have produced everything that was requested

10  of us by the Secretary -- by whatever document, in

11  accordance with the Secretary of State's instructions, I

12  think -- or not the Secretary of State, but the Secretary

13  of the Senate, if I recall.  I am not sure.  I didn't

14  personally do that.

15              It was a process that I think -- I am

16  sure, like many other offices, we get requests like that

17  all the time, and so we have a process for putting that

18  information together and getting it to the proper

19  authorities, in accordance with the Attorney General's

20  instructions, as well as the Secretary of the Senate

21  sometimes gets involved in the Freedom of Information

22  Act or the Open Records Act, documents that are

23  frequently requested in our offices.

24      Q   So, if I understood your testimony correctly, it

25  was the Secretary of the Senate that made a document

**CONFIDENTIAL**

[Page 17]

1    request of your office?

2        A    I don't know.  I can't tell you, because it was

3    handled by my staff.

4        Q    Okay.

5        A    I am just giving you a general -- an estimate

6    or general idea of how that normally works.

7        Q    Do you recall when that request was made?

8        A    No.

9        Q    Do you recall who on your staff searched for

10   those documents?

11       A    I would imagine that it was Jennifer Fagan

12   who -- to the best of my knowledge, it would be Jennifer

13   Fagan, who was the Committee Director for State Affairs,

14   and then perhaps my Chief of Staff, for anything that we

15   might have had in the office, in the Senate office.

16       Q    And who on your staff worked on photo ID

17   legislation?

18       A    Jennifer Fagan was the director of the

19   committee -- or the State Affairs Committee, and she was

20   primarily the staff person in charge of that.

21       Q    And as the director of the State Affairs

22   Committee, can you tell me what her responsibilities were?

23       A    Well, she basically made sure that -- she was

24   in charge of making sure that the process that we have in

25   our committee for scheduling bills, vetting bills, and

CONFIDENTIAL

[Page 18]

1  researching bills, she made sure those things were done

2  and often.  She is an attorney as well, and she provided

3  some analysis, as well, on different types of things in

4  the committee.  That would be her general role.

5           We had different staff persons who would

6  do things as well.

7      Q    And can you tell me the time period in which

8  Jennifer Fagan worked for you?

9      A    I think she started working for us in the

10  committee -- she always worked in the committee for -- in

11  jurisprudence in 2003.

12           And then, when we were named Chair of the

13  State Affairs Committee in 2004, I think she was then

14  General Counsel, and then later promoted to director of

15  the committee.

16      Q    So, by 2005, was she the director of the State

17  Affairs Committee?

18      A    I think so, but I don't know for sure.  I think

19  she was.  I don't know about 2005.  I think Lizzie

20  Coffman was by that point in time, but when Lizzie left,

21  we promoted Jennifer to director at that point.

22      Q    So between --

23      A    But I don't remember when that was.  I can't

24  remember.

25      Q    So, between 2005 and 2011, was it Jennifer Fagan

CONFIDENTIAL

[Page 19]

1    that handled photo ID legislation issues for you?

2        A    Most likely.

3        Q    Would there have been anyone else specifically

4    tasked to handle photo ID legislation?

5        A    Other than -- no, just -- I mean, as far as the

6    specific issues, she may have had -- she may have

7    assigned tasks to others, but she was the one primarily

8    in charge of that.

9        Q    And so, during the legislative session, how did

10   you communicate with Jennifer Fagan?

11       A    She would come to my office.

12       Q    How often would she come to your office?

13       A    Daily.  Or I would go over to the State Affairs

14   Office, you know, but we communicated in person.

15       Q    So, other than meeting with you daily, would you

16   communicate by e-mail?

17       A    No.

18       Q    Would you communicate by text messaging?

19       A    No.

20       Q    Telephone?

21       A    You know, maybe, if there were -- if there was

22   a quick question, but, you know, you're not by a phone

23   very much when you are in legislative session, quite

24   frankly.  It's hard to communicate by phone, so we always

25   had daily meetings.

CONFIDENTIAL

```
                                              [Page 20]
 1       Q    Would you -- During your daily meetings, would
 2   you reduce the subject matter of the meetings to writing?
 3       A    Not -- I didn't, and I don't think she did
 4   either.
 5       Q    So I want to turn to 2007 and ask you:  Do you
 6   recall that HB 218 photo ID legislation passed from the
 7   House and was received by the Senate?
 8       A    Yes.
 9       Q    And did you follow the progress of HB 218
10   through the House?
11       A    Probably not.
12       Q    Would you have had any of your staff members
13   follow the progress of HB 218 through the House?
14       A    Probably not.
15              (Duncan Deposition Exhibit Number RD-2
16   marked.)
17       Q    (By Mr. Gear:)  I am going to show you what has
18   been previously marked as Duncan Exhibit 523.  I would
19   just ask you to take a look at this, and we will discuss
20   it.
21       A    (Witness reviewing document.)
22       Q    Do you recognize this document?
23       A    Yes.
24       Q    And what is this document?
25       A    This is a legislative history or a procedural
```

CONFIDENTIAL

[Page 21]

1    history or calendar or timeline showing action taken on

2    House Bill 218.

3         Q    And that would have been the 80th Legislative

4    Session?

5         A    Yes, sir, regular session.

6         Q    And do you see the e-mail address up in the

7    right-hand corner?

8         A    No -- oh, right up here?

9         Q    Yes, top right-hand corner.  I'm sorry.

10        A    Right.  Yes, sir.

11        Q    And do you recognize that e-mail address?

12        A    Capitol.state.tx.us/BillLookup.  Yeah, not

13   really, but, you know, I mean, it's -- it looks like it's

14   something that was e-mailed to somebody, or from, or

15   somebody went to a service and got it.

16        Q    Do you recognize the capitol.state.tx.us as

17   being the Senate's website?

18        A    It's the Capitol's website.  I don't know if

19   it's the Senate's website.

20        Q    And is it fair to say that the Texas Legislature

21   Online History is a detailed representation of what

22   occurred in the House and the Senate regarding HB 218?

23        A    It's simply a record of action taken on the

24   bill as it moves through the process.

25        Q    And do you have any reason to dispute that the

CONFIDENTIAL

[Page 22]

1    Texas Legislature Online History for HB 218 is inaccurate?

2          A    No.

3          Q    So, just to put the bill into context, if you

4    look at what has been Bates-stamped as USA 00033653, which

5    is the last page of this document, can you tell me the

6    date that HB 218 was filed?

7          A    Well, according to this document, it was filed

8    on November the 14th of 2006.

9          Q    In looking at Exhibit 2, can you tell me when it

10   was actually received by the Senate?

11         A    It was received on April 25th of 2007,

12   according to the document.

13         Q    It also appears that there was a first-time read

14   in the Senate on April 26th, 2007?

15         A    Correct.

16         Q    And it was then referred to the State Affairs;

17   do you see that?

18         A    Yes, sir.

19         Q    And that would have been April 26th, 2007?

20         A    Yes, sir.

21         Q    And during the consideration of HB 218, did you

22   hold any chairs within the Senate?

23         A    Yes.  I was Chairman of the State Affairs.

24         Q    And prior to HB 218 being referred to the Senate

25   or being received by the Senate, were you involved in any

CONFIDENTIAL

[Page 23]

1    communications regarding HB 218 with House

2    representatives?

3         A    I don't remember if I was.  During that period

4    of the session, if I was, it was -- they came over to

5    the -- you know, it would have been a very informal

6    conversation, but I don't recall any.

7         Q    Do you recall the names of any House

8    representatives that you may have spoken to?

9         A    No.

10        Q    Do you recall who --

11             MR. GEAR:  Strike that.

12        Q    (By Mr. Gear:)  When HB 218 came over from the

13   House, do you recall who sponsored HB 218?

14        A    No.  I would have to look.  It seemed like,

15   reading the deposition, I recall maybe it was Rick or

16   Betty, Betty Brown.  I think Betty Brown is the --

17   according to this document, Betty Brown was the primary

18   author in the House.

19        Q    And does this document refresh your recollection

20   on that?

21        A    Well, I would rely on the document.  And I

22   don't have any reason to doubt it.

23        Q    So, just to be clear, Betty Brown was the author

24   of HB 218, correct?

25        A    That is what this document reflects.

CONFIDENTIAL

[Page 24]

1      Q    And Senator Fraser was the sponsor of HB 218 in

2  the Senate?

3      A    That is what this reflects, and I recall that.

4  Yes, sir.

5      Q    And do you recall any discussions with any

6  senators regarding your being the sponsor of HB 218?

7      A    No.

8      Q    Did you consider sponsoring HB 218?

9      A    Probably not.

10             MR. SWEETEN:  Objection; privileged.

11  Let's say privilege on that, and you can answer.

12      A    Probably not.

13      Q    (By Mr. Gear:)  And when you say "probably not,"

14  what do you mean?

15      A    Well, I probably didn't consider it.  I didn't

16  generally do that.  Sometimes I did, but not generally.

17             It was not a -- It was not a general

18  political decision -- or political tact that I would use

19  or do.  A lot of people do, and sometimes you do, but I

20  just typically don't sign onto something unless I am a

21  primary sponsor.  I do sometimes in joint authors, but,

22  typically, I don't just for the sake of it.

23      Q    So, just for the sake of clarity on the record,

24  when you say "political tact," what do you mean?

25      A    Well, I mean, some people want to have their

CONFIDENTIAL

[Page 25]

1  name on the bill.  I mean, it's important that they are

2  active, and they want to be able to reflect publicly that

3  they are in support of certain concepts, and they do

4  that, but --

5      Q    So did you support HB 218?

6      A    I believe I voted for it.

7      Q    So that would be a "yes"?

8      A    Yes, sir.

9      Q    Do you recall being involved in any discussions

10  or communications with any legislator regarding the types

11  of ID that would be included in HB 218?

12      A    Do I have independent recollection of that?

13  No.

14      Q    Is it possible that you engaged in that type of

15  discussion?

16      A    The record would reflect that, and I think it

17  probably does.

18      Q    And as you sit here today, what, if any, memory

19  do you have regarding what that record may reflect?

20      A    Well, as chairman of the committee, you lay

21  out -- you recognize the layout of the bill, and you

22  engage in the discussion, and I am sure that I did on

23  this one.

24      Q    And, again, so I am clear on your testimony,

25  prior to HB 218 coming -- being received by the Senate,

CONFIDENTIAL

[Page 26]

1    were you engaged in any communication regarding the types

2    of ID that would be included in HB 218?

3         A    I have no independent recollection of informal

4    conversations about that.  If there are conversations

5    about that, it would be in the record.

6         Q    And, again, is it possible that you engaged in

7    those types of communications?

8         A    Anything is possible.

9              MR. SWEETEN:  Object to speculation.

10             (Duncan Deposition Exhibit Number RD-3

11   marked.)

12        Q    (By Mr. Gear:)  So I'm showing you what's been

13   previously marked as Duncan Exhibit 28, and I will give

14   you a chance to take a look at that briefly.  Let me know

15   when you're ready.

16        A    (Witness reviewing document.)  I'm ready.

17        Q    Do you recognize this document?

18        A    Yes, sir.

19        Q    And what is this document?

20        A    This is House Bill 218.

21        Q    And do you recall testifying to this during your

22   previous deposition testimony?

23        A    I recall, from reading the record yesterday,

24   that this was brought up and attached as an exhibit.

25        Q    And this is a --

CONFIDENTIAL

```
                                              [Page 27]
 1              MR. GEAR:  For the record, this is marked

 2      as USA 00033583.

 3         Q    (By Mr. Gear:)  Do you see that on the bottom

 4      firsthand -- bottom right corner of this document?

 5         A    Yes, sir.

 6              MR. GEAR:  And, again, for the record,

 7      this was previously marked as Duncan Exhibit 28, and it

 8      is now marked as RD-3 for Robert Duncan.

 9         Q    (By Mr. Gear:)  Sir, I want to direct your

10      attention to Page 9, specifically Section 63.0101.  Do you

11      see that?

12         A    Yes, sir.

13         Q    Is it accurate to say that HB 218 would have

14      allowed a driver's license or personal identification card

15      issued to the person by the Department of Public Safety

16      that is not expired or that has expired no earlier than

17      two years before the date of presentation?

18         A    That is the language on Line 17 through 20, I

19      believe.

20         Q    And do you recall HB 218 allowing that type of

21      documentation?

22         A    That is what it -- it appears in the bill; yes.

23         Q    Okay.  And if it appears in the bill, you

24      believe that that language would be accurate?

25         A    I'm not sure I understand.  It's the
```

CONFIDENTIAL

[Page 28]

1    language -- you know, I'm reading it.  It's in the bill.

2    It says it's in House Bill 218, and it says what it says.

3        Q    And House Bill 218, under Section 63.0101,

4    Number 2, also would have allowed for a United States

5    military identification card that contains the person's

6    photograph, correct?

7        A    Correct.

8        Q    Number 3, it would have allowed a valid employee

9    identification card that contains the person's photograph,

10   is issued by an employer of the person in the ordinary

11   course of the employer's business, correct?

12       A    Yes, sir.

13       Q    It would have allowed a United States

14   citizenship certificate issued by -- to the person that

15   contains the person's photograph, correct?

16       A    Yes, sir.

17       Q    It would have also allowed a United States

18   passport issued to the person?  And, again, I'm

19   referencing HB 218.

20       A    Well, I think the current law allowed that,

21   apparently.

22       Q    And HB 218 would have also allowed that,

23   correct?

24       A    Right.

25       Q    It would have allowed a student identification

CONFIDENTIAL

[Page 29]

1    card issued by a public or private institution of higher

2    education located in the United States that contains the

3    person's photograph, correct?

4         A    Yes, sir.

5         Q    It would have also allowed a license to carry a

6    concealed handgun issued to the person by the Department

7    of Public Safety or, as Number 8 indicates, a valid

8    identification card that contains the person's photograph

9    and is issued by an agency or institution of the Federal

10   Government.  Do you see that?

11        A    Yes, sir.

12        Q    Or an agency, institution, or political

13   subdivision of the State.  Do you see that?

14        A    Yes, sir.

15        Q    Is it also accurate to say that HB 218 would

16   have allowed a number of non-photo identifications?

17        A    Yes, sir.

18        Q    And I believe your previous testimony was that

19   you voted in favor of HB 218, correct?

20        A    Yes, sir.

21        Q    And in voting in favor of HB 218, you also voted

22   in favor of the employee ID with photo?

23        A    I voted in favor of the language that was in

24   House Bill 218.

25        Q    And that is the language that we've just

CONFIDENTIAL

[Page 30]

1    discussed previously, correct?

2        A    I would just rely on the language in the bill,

3    because that is what I voted for.

4        Q    And you voted in favor of the language that was

5    included in the provisions of HB 218, correct?

6        A    Yes, sir.

7        Q    And, again, that would have included the use of

8    a student photo ID card issued by a public or private

9    institution of higher education in the U.S. that contains

10   a photo ID, correct?

11               MR. SWEETEN:   Objection; asked and

12   answered.   You can answer.

13       A    If that is the direct language out of the bill

14   that you are reading, yes.   I voted for the provisions of

15   House Bill 218.

16       Q    (By Mr. Gear:)   Can you tell me what the

17   publicly stated legislative purpose of HB 218 was?

18               MR. SWEETEN:   Objection; vague, as it's

19   publicly stated.   I'm not sure whose public statement

20   you're asking about.   You can answer.

21       Q    (By Mr. Gear:)   Let me --

22       A    There were 31 different public statements about

23   it, so, you know, it would be difficult.   I'm sure

24   everybody had their own public statement about it.   I

25   think the -- so I don't really know how to answer that

**CONFIDENTIAL**

[Page 31]

1    question accurately.

2         Q    So, when you say there were 31 different public

3    statements, do you recall the public statement made by

4    Representative Brown regarding HB 218?

5         A    No, sir, I do not.

6         Q    Did you -- At any point, did you review the

7    legislative record regarding the purpose of HB 218?

8         A    No, sir, I really didn't.  Or at least I don't

9    recall that I would have reviewed the House -- anything

10   that came out of the House necessarily.  Sometimes we do.

11                   But this was in, what, 2006?  So there

12   has been a lot of legislation I've looked at since then,

13   including a lot of voter ID issues as well, as we have

14   gone through 2009 and 2011.  So I don't have specific

15   recollection back that far as to what people said or who

16   I talked to specifically.

17                   The record would reflect -- The only

18   thing that I can tell you is that the record would

19   reflect what public statements were made by persons as

20   this bill worked its way through the process.

21        Q    And would there be any reason for you to dispute

22   what is contained within the legislative public record?

23        A    You know, I don't have any knowledge to dispute

24   or not dispute it.  I just don't know what it is.  And I

25   haven't, you know, gone through and looked at everything,

CONFIDENTIAL

[Page 32]

1    I guess, on the public record --

2        Q    So, if I was to tell you that Representative

3    Brown indicated that the intent of HB 218 was to prevent

4    illegal and noncitizen citizens from voting, would you

5    have any reason to dispute that?

6        A    I don't know whether she said that or not.

7        Q    Would you have any reason to dispute it, if it

8    was a public record?

9             MR. SWEETEN:  Objection; foundation.

10   Objection; calls for speculation.  You can answer.

11       A    I haven't seen it in the public record, so I

12   don't know.  You know, I don't know if she disputes it.

13   So I would have no way of accurately giving you a

14   response to that question.

15       Q    (By Mr. Gear:)  Well, let's look at the public

16   record real quick.

17             (Duncan Deposition Exhibit Number RD-4

18   marked.)

19       Q    (By Mr. Gear:)  I am showing you what has been

20   marked as RD-4, and I would just ask you to identify this

21   document.

22             MR. GEAR:  And for the record, this is an

23   excerpt.  It's not the complete legislative record.

24             MR. SWEETEN:  Yes, sir.

25       A    (Witness reviewing document.)  Okay.

CONFIDENTIAL

[Page 33]

1          Q     (By Mr. Gear:)  Okay.

2          A     So that -- I'm not answering your question, but

3     I've finished reading it.

4          Q     Sure.

5          A     So you might repeat your question.  I'm sorry.

6          Q     So let's identify this document for the record.

7     Can you tell me what this is?

8          A     Well, it's a document that you have handed me

9     that is entitled "Texas House of Representatives

10    Committee on Elections, February 28, 2007, Excerpt of

11    Hearing Regarding House Bill" -- there's several bills,

12    but including House Bill 218.

13         Q     And on the bottom middle, it's identified as

14    JA 007340.  Do you see that?

15         A     Yes, sir.  Yes, sir.

16         Q     It's also Bates-stamped TX 00205011?

17         A     Correct.

18         Q     And also Bates-stamped USA 00022222, correct?

19         A     Yes, sir.

20         Q     And I would just direct your attention to

21    Page 57 at the bottom.  And to be clear --

22         A     Fifty-seven --

23         Q     Actually, I'm sorry.

24         A     Which are you talking about?

25         Q     Turn to Page --

CONFIDENTIAL

[Page 34]

1        A     The transcript, Page --

2        Q     Yes.  Turn to Page 56, please.  I'm sorry.

3        A     Okay.

4        Q     On Page 56, do you see that there is a

5    discussion between Chairman Berman and Representative

6    Brown?

7        A     Yes, sir.

8        Q     And do you see that Representative Brown asks a

9    question of -- I'm sorry -- Representative Berman asks the

10   question of Representative Brown.  Do you see that?

11       A     I do.

12       Q     And do you see, at the bottom of Page 56, where

13   Representative Brown begins to answer Representative

14   Berman's question?

15       A     Yes, sir.

16       Q     And turning to Page 57, bottom paragraph, do you

17   see where it says, "The government requires voters to

18   register before receiving a ballot.  Therefore, verifying

19   the information they provided on their registration

20   application is not a measure designed to prevent any

21   citizen from voting"?  Do you see that?

22       A     That is what the language -- That is what the

23   transcript says; yes, sir.

24       Q     And do you see where Representative Brown

25   states, during the Texas House of Representatives

[Page 35]

1    Committee on Elections, February 28, 2007, that HB 218 is

2    intended as a "measure designed to keep illegal aliens,

3    noncitizens, and people otherwise not qualified from

4    voting and diluting legitimate votes cast by citizens"?

5    Do you see that?

6         A    That is what the transcript reflects.

7         Q    And do you have any reason to dispute the

8    accuracy of this transcript from the House?

9         A    I have no basis to dispute or not dispute it.

10        Q    Turning to the Senate, do you recall any

11   discussion in the Senate regarding HB 218 that -- where

12   constituents expressed concerns regarding noncitizens

13   voting?

14        A    I do not have independent specific recollection

15   of any testimony or statements.  The record would reflect

16   that we had a hearing.  So the record would reflect those

17   citizens and constituents who actually testified at the

18   hearing.

19             And so I don't have specific recollection

20   back to 2007 about what we heard at that point in time

21   in April, I guess, or May -- I guess it was in April of

22   2007.

23        Q    Let me ask you specifically regarding

24   constituent mail that you may have received.  Do you

25   recall receiving constituent mail that expressed concerns

CONFIDENTIAL

[Page 36]

1    about illegal aliens or noncitizens voting?

2                    MR. SWEETEN:  2007, you're asking?

3                    MR. GEAR:  In 2007.

4        A    I don't recall receiving that.

5        Q    (By Mr. Gear:)  And let me expand that question.

6                    Do you recall receiving constituent mail

7    regarding constituents expressing concerns that

8    noncitizens or illegal aliens were voting at any time

9    related to the photo ID legislation?

10       A    No, sir, I really don't.  I just really don't

11   remember that.

12       Q    Do you recall senators discussing the concern

13   that noncitizens or illegal aliens may be voting in the

14   State of Texas?

15       A    I have no independent recollection of that

16   specific discussion.  It would have to be in the record.

17   I don't have an independent recollection of that.

18       Q    Do you recall if there is a --

19       A    Are you talking about in 2007?

20       Q    I am talking about in 2007.

21       A    Yeah.  I don't have any recollection of that.

22       Q    Do you recall having any communications with

23   Senator Fraser regarding illegal aliens or noncitizens

24   voting at the polls?

25                    MR. SWEETEN:  Objection; legislative

CONFIDENTIAL

[Page 37]

1    privilege.  Go ahead.

2        A    No, sir.

3        Q    (By Mr. Gear:)  Do you recall having any

4    discussions with the Lieutenant Governor or the Governor

5    regarding illegal aliens and noncitizens voting?

6                MR. SWEETEN:  Objection; legislative

7    privilege.

8        A    No, sir.

9        Q    (By Mr. Gear:)  And just so we are clear, you

10   are --

11               MR. SWEETEN:  Do you want to give me a

12   running -- go ahead.  What were you going to say?  I

13   interrupted.

14               MR. GEAR:  Just so we are clear, I thought

15   we had put on the record that you would be asserting

16   legislative privilege and asking that it be maintained

17   under seal.  I am not sure how we would actually do that.

18               MR. SWEETEN:  Yeah.  All -- As I

19   understand the Court's order, they're saying --

20   suggesting that we assert it, and then he can go ahead

21   and testify with respect to the legislatively privileged

22   matter.

23               So, when I'm making the objection to

24   legislative privilege, I am letting him answer,

25   obviously, and so -- and as part of -- because we believe

CONFIDENTIAL

[Page 38]

1    that information is legislatively privileged.  And I

2    think you've also said that this has been done throughout

3    the case.

4                    But we are asking that it be maintained

5    under seal, the deposition.  I think we have agreed to

6    that early in the deposition, because we are discussing

7    what we believe to be legislatively privileged matters.

8    I think that is --

9                    MR. GEAR:  That's the Court's --

10                   MR. SWEETEN:  -- at the point where I will

11   object to legislative privilege.

12                   MR. GEAR:  Yes.

13                   MR. SWEETEN:  I think, yes, with respect

14   to any matter where legislative privilege is asserted, we

15   want, obviously, that material to be kept under seal.  I

16   also understood you to say this entire deposition, the

17   way it has been done, is that it has been kept under

18   seal.  Is that not accurate?

19                   MR. GEAR:  Well, I think you are objecting

20   a little bit differently.  So I want to make sure the

21   record is clear.

22                   Essentially, in other depositions that I

23   have participated in, they have asserted the legislative

24   privilege and then agreed to not waive legislative

25   privilege, but maintain the deposition under seal.  And

**CONFIDENTIAL**

[Page 39]

1    the legislative privilege objection wasn't asserted each

2    and every time.

3                    MR. SWEETEN:  Okay.  Well, I'm fine.  I

4    mean, Bruce, if you will give me a running objection on

5    legislative privilege as to all, you know, matters that

6    you are going to be discussing with respect to 2007 to

7    2011, I do not need to keep asserting legislative

8    privilege as to each question.

9                    Where I don't want to be in a situation is

10   where I haven't asserted it or where there is some

11   argument that I haven't asserted it.  So I guess we can

12   do it one of two ways.

13                   Either I'll keep just making the

14   assertions, again, letting him answer the question with

15   my objection, or if you will give me a running objection

16   between, you know, now and through the discussion of

17   legislative privilege -- I assume we are going to go

18   through '09 and '11 -- and then we can do it either way.

19   It's, you know, whatever, you are comfortable with.

20                   I just don't want to be in a situation

21   where it's argued that I didn't assert legislative

22   privilege.  So that's why I am having to maintain the

23   objection.

24                   MR. GEAR:  And would you agree that

25   legislative privilege is not -- the assertion of

**CONFIDENTIAL**

[Page 40]

1    legislative privilege is not appropriate when dealing

2    with issues of constituents or interest groups?

3                    MR. SWEETEN:  Well, I don't know that that

4    is -- I don't know that that is the case.

5                    If you are talking about now his

6    discussions with constituent communications, I think

7    there is the argument -- we argue certainly, you and I,

8    back and forth, as to the D.C. Court as to whether

9    constituent communications would be covered by that.

10                   So I would assert legislative privilege as

11   to constituent communications as well.

12                   MR. GEAR:  And I would say that that's an

13   improper assertion.  I understand your position, and so

14   we can just move forward.  So I wouldn't give you just a

15   running objection --

16                   MR. SWEETEN:  Okay.  I will just assert

17   it.  I will just assert it when appropriate.  Again, I am

18   not trying to be an obstructionist, but I have got to

19   maintain the record so that it is clear where we are

20   asserting it, in the absence of a running objection,

21   so --

22       Q    (By Mr. Gear:)  So we were -- we were discussing

23   constituent mail, and I believe your testimony was that

24   you don't have any independent recollection of receiving

25   constituent mail regarding constituents who may have

CONFIDENTIAL

[Page 41]

1   expressed concern that illegal aliens or noncitizens were

2   voting.  Is that a fair representation?

3        A    I think that is a fair representation.

4        Q    Do you have any recollection as to whether your

5   staff would have received any type of constituent mail

6   along those lines?

7        A    I do not.

8        Q    Who would be responsible in your office for

9   responding to constituent mail?

10       A    2007, it would be various members of the staff

11  they spread that responsibility on.

12       Q    Would Jennifer Fagan be responsible for

13  responding to constituent mail?

14       A    Probably not.

15       Q    And do you recall the name of the staff member

16  who would be responsible for that?

17       A    In 2007?  Probably not.  I mean, there's

18  several.  It wouldn't be just one person.  There would be

19  several persons who respond with the processes that are

20  available to us.

21       Q    Do you recall what --

22            MR. GEAR:  Strike that.

23       Q    (By Mr. Gear:)  Do you recall that HB 218 was

24  intended to address voter fraud?

25       A    I recall the integrity of the ballot box was

[Page 42]

1   one of the major issues and reasons stated for House Bill

2   218 and other bills that came up later in other sessions.

3       Q    Anything else that you recall related to voter

4   fraud regarding 2007 HB 218?

5                MR. SWEETEN:  Objection; vague.  Go ahead.

6       Q    (By Mr. Gear:)  Let me clarify that.

7       A    You know --

8       Q    Let me clarify that.  I'm sorry.  Any other

9   types of fraud that you recall on the legislative record

10  that relate to HB 218 that were discussed?

11      A    Well, generally, what I have said.  I think the

12  record, especially going back to 2007, would be the best

13  recollection I would have.  And I would not want to

14  venture or be inaccurate about what was said or what I

15  perceived back in 2007, you know, in 2014.  I just --

16  It's just not -- It's not a -- It's not realistic that I

17  could be accurate in that.

18      Q    Well, let me explore that for a second.  Would

19  you agree that HB 218 did not address the issue of by-mail

20  ballot fraud?

21      A    I don't know.

22      Q    And, again, it's your testimony that that would

23  be contained within the public record?

24      A    If I understand your question correctly, I

25  don't know whether House Bill 218, without looking at it,

CONFIDENTIAL

[Page 43]

1    dealt with voter mail fraud.  I don't know.  I know those

2    were issues that were more generally discussed a lot of

3    times and dealt with -- you know, I think with different

4    legislation throughout the years.

5              But, in particular, I don't know whether

6    or not House Bill 218 dealt with it or not, without

7    looking at it.

8        Q    Fair enough.  You have HB 218 in front of you,

9    the House bill?

10       A    Somewhere here, yes, sir.

11       Q    And that has been marked as RD-2, correct --

12       A    3.

13       Q    -- or RD-3, correct?

14       A    Correct.

15       Q    In looking at House Bill 218, do you see any

16   provision within the bill that would address the issue of

17   by-mail ballot fraud?

18             MR. SWEETEN:  Object to the extent the

19   question would call for legislative privilege in the

20   answer.

21       A    (Witness reviewing document.) You know, a brief

22   45-second reading tells me that I don't see anything

23   about mail fraud, but -- wait.  I'm not through yet.

24       Q    (By Mr. Gear:)  And I will give you a chance to

25   complete it.

**CONFIDENTIAL**

[Page 44]

1      A      Wait a minute.  There is something here.  No.

2  I'm sorry.  There is not.  It doesn't appear -- I mean,

3  it's 12 pages here.

4              I'm looking at it, and I don't see -- if

5  there is something in here, you might point it out to

6  me, because I don't see it in the quick reading.

7      Q      If I were to tell you that there is nothing in

8  there that addresses the issue of by-mail ballots

9  generally or by-mail ballot fraud, would you have any

10  reason to dispute that?

11      A      No, sir.

12      Q      And, again, looking at RD-3, which is again

13  Bates-stamped as USA 00033583, is it fair to say that HB

14  218 deals specifically with in-person voting at the

15  polling place?

16      A      The caption said, "related to requiring a voter

17  to present proof of identification," so -- and then I

18  think that language in there deals with in-person voting;

19  yes, sir.

20      Q      Looking at the language, do you see any

21  provisions that would deal with anything else other than

22  in-person voting?

23      A      Again, I am -- you know, a brief read of this

24  would indicate that you're correct; that there is nothing

25  in here other than in-person voting -- or nothing

CONFIDENTIAL

[Page 45]

1   addressed in this bill other than in-person voting.

2       Q   Are you aware of any communication with the

3   Senate regarding an analysis conducted to determine if

4   noncitizens or illegal aliens were voting at the polls

5   related to HB 218, the 2007 bill?

6       A   I don't recall whether or not there was.

7       Q   So HB 218 was referred to the --

8       A   Senate State Affairs.

9       Q   -- Senate State Affairs Committee?

10      A   Yes, sir.

11      Q   And you were the chair of that committee?

12      A   Yes, sir.

13      Q   Why did -- Why was HB 218 referred to the

14  committee that you chaired?

15      A   Well, you know, the Lieutenant Governor has the

16  discretion to do that, but, generally, our committee

17  handled all election matters, among a lot of other

18  things.  But, generally, the election bills, all bills

19  dealing with voting and elections went to the State

20  Affairs.

21      Q   And is there a reason why all bills dealing with

22  voting and elections go to State Affairs?

23      A   Well, you know, generally, it's like any

24  committee, you want uniformity, you want people that you

25  have -- you want people that develop knowledge, a general

[Page 46]

1   overall knowledge of that area of the law so that

2   legislation, when it comes through, is consistent.

3                   And you don't -- it's just -- that is not

4   true just in election law; it's true in tort, health and

5   human services, other things.  So you want to keep the

6   same people looking at the same issues to maintain

7   continuity at the committee level.

8       Q    And is it fair to say that up to 2007, HB 218,

9   all of the photo ID legislation was referred to the State

10  Affairs Committee?

11      A    That is my recollection.  Plus a lot of other

12  bills.

13      Q    Are you aware of any facts -- and, again, I'm

14  referencing specifically HB 218.  Are you aware of any

15  facts that would support that noncitizens or illegal

16  aliens were voting at the polls in 2007?

17                  MR. SWEETEN:  Objection; legislative

18  privilege.  You can answer.

19      A    I am -- you know, again, I don't have

20  independent recollection of anything along that line.

21  Generally, I think there was concern about that.  I think

22  we addressed it in the report.  I think, you know, but,

23  generally and/or specifically, I have no independent

24  recollection of that.

25      Q    (By Mr. Gear:)  And can you identify a little

CONFIDENTIAL

[Page 47]

1   more detail regarding the report that you believe you

2   addressed --

3        A    Well, we did an interim study on that issue

4   that reflected, I think, what I felt was a fairly good

5   recollection of those issues.

6        Q    And was that an interim study in 2007?

7        A    '06.

8        Q    2006.  And was that through the State Affairs

9   Committee?

10       A    Yes, sir.

11       Q    And in 2006, did you chair the State Affairs

12   Committee?

13       A    Yes.

14       Q    Did you call for this interim study --

15       A    No.

16       Q    -- report to be conducted?

17       A    No.

18       Q    Do you know who called for this interim report

19   and study to be conducted?

20       A    It was part of general charges of the

21   Legislature that the Lieutenant Governor gives the

22   committee for a study.

23       Q    And can you tell me the process that was

24   followed regarding the interim report?

25       A    2006 was a long time ago.  I think probably the

CONFIDENTIAL

[Page 48]

1    record reflects the hearings and the -- and the report

2    itself.

3        Q    So, related to the 2006 report, do you recall

4    what the results of the -- is it fair to say that it was

5    an analysis of noncitizens and illegal aliens voting at

6    the polls?

7        A    No.  I don't think -- I don't know.  You would

8    just have to read the report.  The report speaks for

9    itself.  I don't -- I'm not going to have independent

10   recollection of things other than in the report.

11       Q    As you sit here today, was there any evidence of

12   noncitizens or illegal aliens being prosecuted for voting

13   at the polls in 2006 or 2007?

14       A    I don't recall that.

15       Q    Was there any evidence identified within the

16   2006 report that noncitizens or illegal aliens had

17   committed voter impersonation at the polling place?

18       A    You would just have to -- the report will

19   indicate what the findings were.

20       Q    And, again, I don't mean to --

21       A    I know you don't.

22       Q    -- drill down too deep on this, but I just want

23   to understand what you know, as you sit here today.

24                And, again, referencing the 2006 report,

25   do you have any recollection that there was any evidence

**CONFIDENTIAL**

[Page 49]

1   of noncitizens or illegal aliens voting at the polls in

2   2006 or 2007?

3       A    I have no recollection, just because it's eight

4   years ago or however -- whatever the math is for that.

5   I'm not trying to be coy with you.

6       Q    Sure.

7       A    It's just I want to be accurate --

8       Q    Sure.

9       A    -- and that's a long time ago.

10      Q    So let me expand that question then.  During

11  the course of consideration for any of the photo ID

12  legislation, do you have any recollection that there

13  were -- there was any evidence produced during the

14  consideration of photo ID legislation that would support

15  that noncitizens or illegal aliens were prosecuted for

16  voting at the polls?

17              MR. SWEETEN:  Objection; legislative

18  privilege.  You can answer.

19      A    I don't have independent recollection of that.

20  The record may or may not speak to that.  I don't have

21  independent recollection.

22      Q    (By Mr. Gear:)  But is it fair to say, as you

23  sit here today, you don't have any specific recollection

24  of that evidence being produced on the public record for

25  any of the photo ID legislation?

[Page 50]

1          MR. SWEETEN:  Objection; asked and

2     answered.  Go ahead.

3       A     No, I don't.  We had several hearings, and one

4     of them went 24 hours, so I -- you know, I'm not going to

5     be -- you know, the record will reflect what was said,

6     and we accept the record -- a record of what was said in

7     each of those hearings.

8               So, you know, I will rely on that record

9     as to what was said, but I don't have independent

10    recollection, one way or the other, as we sit here in

11    August of 2014.

12      Q     (By Mr. Gear:)  Sure.  And just to focus again

13    on the record, which you testified that you would rely on,

14    do you have any reason to dispute what the record would

15    reflect related to that issue?

16      A     I wouldn't be in a position to dispute it or

17    affirm it either.  I mean, it's just -- the record is the

18    record, and I am sure you-all -- whatever you-all --

19    however you-all have preserved the record is not my -- a

20    matter that I would be able to evaluate.

21      Q     So, related to any photo ID legislation that was

22    considered in the House or the Senate, are you aware of

23    any prosecutions of noncitizens for voter impersonation at

24    the polls?

25               MR. SWEETEN:  Same objection; legislative

CONFIDENTIAL

[Page 51]

1    privilege.  Go ahead.

2        A    I will stay with my answer.  I do not, but

3    there may be something in the record, and I'm going to

4    refer you to the record, because, again, I don't have

5    independent recollection of that particular fact coming

6    out, whether or not it did.

7        Q    (By Mr. Gear:)  Do you have any recollection of

8    the Texas Attorney General's Office providing testimony in

9    2007 regarding the prosecution of voter fraud?

10       A    I believe there was -- there was information

11   provided by the Attorney General's Office at that time.

12       Q    And based on that testimony, do you have any

13   recollection that the Texas Attorney General's Office in

14   2007 presented any evidence of prosecution of voter fraud?

15       A    The record will speak to that.  I don't have

16   independent recollection other than what the record might

17   show.  I would refer you to the record.

18       Q    Looking at RD-3, is there any provision in

19   there, that you are aware of, that would have prevented

20   noncitizens or illegal aliens from voting at the polling

21   place?

22              MR. SWEETEN:  Objection; legislative

23   privilege.  Go ahead.  You can answer.

24       A    That is an analysis that I don't know that I

25   can make, sitting here in a deposition, I mean.  So I

CONFIDENTIAL

[Page 52]

1    don't know -- I can't answer that accurately.

2        Q    (By Mr. Gear:)  Fair enough.  Are you aware of

3    an analysis related to HB 218 that was conducted to

4    determine whether or not HB 218 would be effective in

5    preventing illegal aliens or noncitizens from voting at

6    the polling place?

7                MR. SWEETEN:  Objection; legislative

8    privilege.

9        A    If there was such an analysis, it would be in

10   the record.

11       Q    (By Mr. Gear:)  Are you aware of such an

12   analysis?

13       A    No.

14       Q    And I apologize if I've asked you this, but are

15   you aware of an analysis regarding voter fraud as it

16   relates to photo ID legislation in 2007 related to HB 218?

17                MR. SWEETEN:  Same objection.

18       A    I have no independent recollection today.  The

19   record would reflect that.

20       Q    (By Mr. Gear:)  Regarding HB 218, are you aware

21   of any analysis related to how the types of ID in HB 218

22   would impact minority voters?

23                MR. SWEETEN:  Same objection; legislative

24   privilege.  Go ahead.

25       A    I do not have independent recollection of that

CONFIDENTIAL

[Page 53]

1    today.  The record would reflect that information, that

2    particular -- either objection or analysis, objection to

3    the legislation or analysis offered.

4         Q    (By Mr. Gear:)  Do you recall opponents of Bill

5    HB 218 expressing concern, during the consideration of the

6    bill, that the types of photo ID required in HB 218 may

7    have a negative impact on minority, elderly, or poor

8    voters?

9         A    I believe the record reflects that there was

10   debate and discussion along those issues.

11        Q    And as the Chair of the State Affairs Committee,

12   did you have authority to conduct any specific analysis to

13   address those types of concerns?

14        A    Well, I think every member of the Senate has

15   that authority.  We, in the committee, basically try to

16   resolve issues, if there are issues.  We have hearings,

17   and members vote their -- vote their beliefs and their

18   positions on the bills, and members lay out the reasons

19   for opposing bills and not opposing -- or in supporting

20   bills.

21             So there is a lot of analysis that goes

22   on there, as well, but as far as any analysis other than

23   what we do generally on the four or five hundred bills

24   that go through the committee, we do what we normally

25   do.

CONFIDENTIAL

[Page 54]

1      Q    So I just want to break that out and understand

2   your answer here.

3                  Regarding HB 218, is it your testimony

4   that there was no analysis related to what the impact may

5   be on minority voters?

6                  MR. SWEETEN:  Objection; misstates

7   testimony.

8      Q    (By Mr. Gear:)  And, again, I just -- I am not

9   trying to trick you in any way.  I just want to understand

10   what the testimony is.

11      A    I don't know what you mean by "analysis."  Each

12   member looks at each bill, and they analyze those bills

13   in their own -- with their own process.  In the

14   committee, we hear from -- before the bill is heard, we

15   hear from people objecting or not objecting, and we try

16   to relay information to other members.

17                  We develop a record, and then the members

18   and the sponsors of the bill bring forth witnesses and

19   evidence in support.  The opponents bring forth

20   witnesses and evidence in opposition.  This happens on

21   every bill that we do.

22                  And voter ID was, you know, really no

23   different, other than it was in 2007.  Actually, it was

24   a bill that was considered like every other bill.

25      Q    Would it be fair to say that photo ID

CONFIDENTIAL

[Page 55]

1    legislation was controversial in the Senate?

2         A    It was.   It's not the only bill that was

3    controversial either, but it certainly was.

4         Q    You've indicated -- You've testified that

5    senators conduct -- follow their own process -- and

6    forgive me if I am misstating this; I am just trying to

7    understand the testimony again -- that there's -- they

8    follow a process when working their way through the bill.

9    Is that fair to say?

10        A    Yes, sir.

11        Q    So, related to HB 218 and the concerns that were

12   expressed on the Senate floor, regarding the impact to

13   minority voters, as the Chair of the State Affairs

14   Committee, did you follow any process to determine if

15   those concerns were valid?

16             MR. SWEETEN:   Objection; legislative

17   privilege.   You can answer.

18        A    You know, the answer to that question is yes.

19   We always try to listen to concerns in the committee and

20   determine whether or not they are valid.

21             Did we commission a study that would take

22   five weeks or six weeks or two years?   No.   We don't

23   have time to do that.   When you get a bill in the Senate

24   in April -- which what was the date that we received

25   this bill?   We received this bill -- it was April --

CONFIDENTIAL

[Page 56]

1    Q    (By Mr. Gear:)  We can look back at the

2   legislative online history and roll.

3    A    April 26th.  There was literally 30 days left

4   in the session and probably less than two weeks to be

5   able to process the bill, have a hearing in committee,

6   and have a hearing on the floor.  So we rely on a lot of

7   different evidence, and the Legislature is different from

8   Congress, in that we operate on very strict deadlines.

9           And when you are in the Senate and you

10   receive a House bill later in the session, you don't

11   have time to commission studies or that sort of thing,

12   but people bring evidence and put evidence in the

13   record.  And as the committee, we encourage that, we

14   invite that, and we make sure that we have a hearing

15   that allows for that.

16           And then the members can conduct their

17   analysis of whether or not they believe differently or

18   what weight -- let's put it like this -- the members, on

19   their own, decide what weight they are going to give to

20   the evidence that comes before them in the committee.

21           And so that is the process that happened

22   in House Bill 218, and that is the same process that

23   would go on for any bill that went through State

24   Affairs, Jurisprudence, Health and Human Services, or

25   any other committee.

CONFIDENTIAL

```
                                          [Page 57]
 1       Q    So is it fair to say that there was testimony by

 2  opponents of the bill regarding the negative impact on

 3  minority voters related to HB 218?

 4       A    I would refer you to the record.

 5            MR. SWEETEN:  Objection; asked and

 6  answered on that question.

 7       Q    (By Mr. Gear:)  Do you recall any testimony that

 8  was presented by supporters of HB 218 that would have

 9  supported the fact that there would have been no negative

10  impact to minority voters?

11       A    I would have to refer to the record on that.

12       Q    And as you sit here today, I would like to

13  understand your testimony.

14            Do you have any independent recollection

15  of that type of testimony being presented by supporters

16  of HB 218?

17       A    You know, I really don't, but if you look --

18  I'm sure that there was testimony for and against the

19  bill.  I mean, this was a bill that had a lot of -- it

20  was controversial, as you said.  And so we have hearings

21  about that, and we talk about it, and our committee was

22  very good about debating issues in the committee and on

23  the floor.

24            This bill went to the floor, and it was

25  debated on the floor as well, so -- but I don't have
```

CONFIDENTIAL

[Page 58]

1   any -- you know, just to sit here today, six or seven

2   years later, you know, I would be -- I am very hesitant,

3   because I would be only speculating and be inaccurate

4   about specific things, but the record will reflect the

5   specific things.

6                   Generally, I'm sure there was testimony

7   in opposition and in favor of the bill.

8       Q    Well, let's talk specifically about you and your

9   role as the committee chair.

10                  Do you -- Do you have any recollection of

11  how you responded to these concerns?

12                  MR. SWEETEN:  Objection; legislative

13  privilege.

14      Q    (By Mr. Gear:)  Just so I'm clear, the concerns

15  that HB 218 would have a negative impact on minority

16  voters.

17                  MR. SWEETEN:  Objection; legislative

18  privilege.

19      A    I supported the bill.  I listened closely to

20  the testimony.  And as far as what my thought processes

21  were seven years ago, no, I don't, but, generally, I

22  listened to the testimony, and I felt that the --

23  weighing the evidence, I weighed in favor of supporting

24  the bill.

25      Q    (By Mr. Gear:)  Do you have any recollection of

**CONFIDENTIAL**

[Page 59]

1    whether you were concerned about the testimony by the bill

2    opponents related to the impact on minority voters?

3                    MR. SWEETEN:  Objection; legislative

4    privilege.

5        A    No, I really don't.  I mean, it's not saying I

6    dissent.  I mean, I don't.  As it goes back to 2007, it

7    was a long time ago.  So I do know I supported the bill.

8                    I really don't have any independent

9    recollection of that particular hearing, other than what

10   I am reminded of in the record.  That's how I have to

11   process this, is what is in the record.

12       Q    (By Mr. Gear:)  Do you have any independent

13   recollection of taking any steps, as the committee chair,

14   or directing your staff to look into the possibility that

15   HB 218 may have a negative impact on minority voters?

16                   MR. SWEETEN:  Objection; privilege.

17       A    You know, I don't recall.  I do know that we --

18   we hear objections.  We try to follow through with

19   understanding those objections and present them to the

20   committee.  It's not our -- It's not our job to pass

21   judgment along those lines.  It's our job as the

22   committee to make sure that the members have the evidence

23   before them so they can make informed decisions.

24                   And to the extent we have these

25   compressed timelines in the, you know, legislative

**CONFIDENTIAL**

[Page 60]

1    process, you know, sometimes we are -- we are moving

2    fairly quickly but efficiently.

3                    And I think this bill had -- 218, I'm

4    sure the record reflects, had a lot of -- a lot of

5    people weighed in on the issue, and the members made

6    their decision, for whatever reason, in their judgment.

7    They either supported or opposed the bill.

8        Q    (By Mr. Gear:)  Do you recall any of the

9    communication by Senator Fraser on the Senate related to

10   HB 218?

11       A    No, sir.

12       Q    Would it be fair to say his statements related

13   to HB 218 would be contained in the public record?

14       A    I think that is a fair statement.

15                    MR. SWEETEN:  Let's take a break.

16                    (Short break taken.)

17                    MR. GEAR:  So, back on the record after

18   taking a brief break.

19       Q    (By Mr. Gear:)  We were talking about HB 218.  I

20   wanted to ask you some questions about the process of

21   considering HB 218.

22                    Do you recall a point, when it was being

23   considered by the Senate, where Senator Fraser was

24   recognized for a motion to suspend the regular order of

25   business for HB -- to take up HB 218?

CONFIDENTIAL

[Page 61]

1          A     Sitting here today, do I remember that?  No,

2    but I know it happened.

3          Q     If I showed you the legislative record on that,

4    would that help refresh your recollection?

5          A     Sure.

6                     (Duncan Deposition Exhibit Number RD-5

7    marked.)

8          Q     (By Mr. Gear:)  So I'm showing you what's been

9    marked as RD-5, which is Bates-stamped USA 00023200, and

10   it's also identified as JA 008318.  Now, I will just give

11   you a chance to take a look at that.

12                     And so it's also clear, I believe this is

13   the excerpt of this legislative record.  And my first

14   question will be:  Can you identify this for me?

15         A     Well, this appears to be an excerpt from the

16   Senate Journal for Tuesday, May the 15th of 2007.

17         Q     And that is during the 80th Legislative Session,

18   2007?

19         A     If you say so.  I don't think it says it on

20   this document that I'm looking on.  I don't see it,

21   but -- it's the 80th, yeah.  Here it is.  It's spelled

22   out.  I'm sorry.  It does say "Eightieth."

23         Q     Well, let's just turn to the last page, which

24   has an indication of Page 38, and it is JA 008320.  It

25   also has a Bates-stamp of USA 00023202.  And I would just

CONFIDENTIAL

[Page 62]

1    call your attention to the bottom of the last page, where

2    it indicates, "Committee Substitute, House Bill 218 on

3    Second Reading."  Do you see that?

4         A    Yes, sir.

5         Q    And in this legislative record, it indicates

6    that Senator Fraser moved to suspend the regular order of

7    business to take up for consideration CS HB 218, and at

8    this time, on its second reading.  Do you see that?

9         A    Yes, sir.

10        Q    And do you also see what happened with the

11   motion based on this record?

12        A    According to the record, the motion prevailed.

13        Q    And what did it prevail by?

14        A    Nineteen yeas, nine nays.

15        Q    And do you see an indication of who voted

16   against suspending the regular order of business to take

17   up consideration of HB 218?

18        A    Yes, sir.

19        Q    And Senator Ellis would be one of the people

20   that voted against it?

21        A    That is correct.

22        Q    And how do you pronounce --

23        A    Gallegos.

24        Q    Gallegos?

25        A    Yes, sir.

CONFIDENTIAL

[Page 63]

1     Q    Hinojosa?

2     A    Hinojosa.

3     Q    Hinojosa.  Maybe if you just pronounced the

4  names for me, that might go faster.

5     A    Lucio, Shapleigh, Van de Putte, Watson, West,

6  and Zaffirini.

7     Q    And as to the discussion as to why they were

8  voting against suspending the regular order of business,

9  do you have any independent recollection of that?

10    A    I have independent recollection that there was

11  a discussion.  I don't remember what each member said, as

12  it relates to their position on the bill.

13    Q    Let's focus specifically on Van de Putte.  Do

14  you recall receiving a letter from Senator Van de Putte

15  regarding HB 218?

16    A    Not specifically, but I wouldn't doubt that I

17  did.  I don't know.  I would just have to see.

18    Q    Do you recall Senator Van de Putte expressing

19  concerns that related to HB 218 that this photo ID

20  legislation may result in a negative impact to minority

21  voters?

22    A    I know that Senator Van de Putte had taken that

23  position before, and so I don't have independent

24  recollection at this time of 218, but, you know, if you

25  have something in the record, I'm sure I wouldn't -- I

CONFIDENTIAL

[Page 64]

1    wouldn't doubt that.

2        Q    Okay.  Do you see also on the Senate Journal,

3    last page, JA 008320, that two senators were counted

4    absent when the vote to suspend the regular order of

5    business to take up HB 218 was considered?

6        A    I think actually three members were absent.

7        Q    And what three members were those?

8        A    Senator Hegar, Uresti, and Whitmire.

9        Q    Was Senator Hegar an opponent or supporter of HB

10   218; do you recall?

11       A    Well, I believe that he supported the bill.  I

12   guess you would have to ask him, but --

13       Q    Based on your recollection.

14       A    Generally, I think he was a supporter.

15       Q    Do you know if Senator Uresti was a supporter or

16   opponent of HB 218?

17       A    I believe he was an opponent.

18       Q    What about Senator Whitmire?

19       A    I believe he was an opponent.

20       Q    Do you recall the circumstances surrounding

21   Senator Uresti being counted absent on this particular

22   day?  And we're talking about May 15, 2007.

23       A    I have a general recollection that he was

24   absent, but I don't -- the record would reflect the

25   details on that.  I don't have an independent

**CONFIDENTIAL**

[Page 65]

1    recollection of that.  To be accurate, I remember there

2    was an issue about his absence.  That is what I remember.

3        Q    If I were to represent to you he was ill on that

4    day, would that help refresh your recollection as to

5    Senator Uresti's absence?

6             MR. SWEETEN:  Objection, assumes facts not

7    in evidence.  You can answer to the best of your

8    knowledge.

9        A    You know, whatever the record reflects on that,

10   you know, would be -- I don't know if he had an excused

11   absence or an absence or what.  I do not know.  I just --

12   I just remember vaguely there was an issue about him not

13   being there.

14       Q    (By Mr. Gear:)  Do you recall the circumstances

15   surrounding Senator Whitmire being counted as absent

16   during the vote to suspend the regular order of business

17   to take up HB 218?

18       A    I do recall that.

19       Q    And can you tell me the circumstances --

20       A    I think he was off the floor.  I don't think he

21   was actually absent at the time of the vote.

22       Q    And can you tell me what the process is for

23   counting a senator present once he checks in on the floor?

24       A    The -- Say that again.

25       Q    I will do my best to restate that.

CONFIDENTIAL

[Page 66]

1          A     Okay.

2          Q     I'm trying to understand.  Is there a procedure

3   or a process in place, once a senator checks in on the

4   floor, related to whether or not they would be counted as

5   present during votes.  Does that make sense?

6          A     I think so.

7          Q     Okay.

8          A     At the beginning of the day, the secretary

9   calls the roll.

10         Q     Secretary of the Senate?

11         A     Secretary of the Senate.  Patsy Spaugh, in this

12  case.  And if you are -- if you are absent, typically,

13  you cannot be there because of illness or business, then

14  you report that you are -- report that -- the president

15  of the Senate will then entertain a motion to provide an

16  excused absence.

17         Q     And do you recall if Senator Whitmire was

18  present during the initial roll call by the Secretary of

19  the Senate?

20         A     I don't recall that.

21         Q     Do you recall discussion by Senator Whitmire

22  related to this particular issue; that he was present when

23  the motion to suspend the regular order of business was

24  taken up to consider HB 218?

25         A     I don't remember the details of anything

**CONFIDENTIAL**

[Page 67]

1  Senator Whitmire said, but I do recall that he was

2  temporarily off the floor at the time the vote was taken,

3  and I think he objected to the fact that he was

4  temporarily off the floor and wasn't counted, for

5  whatever reason.

6      Q    And so, if a senator was on the floor, would it

7  be unusual for him to be counted as absent once he has

8  checked in with the Secretary of the Senate?

9      A    No, but if he doesn't register a vote -- and I

10  think that's if you are temporarily off the floor and a

11  vote is called -- then the secretary calls your name, and

12  if you're not there, then she can't record your vote.

13  And so I think that's what happened here.

14      Q    Do you recall Senator Whitmire stating that he

15  was present during the vote?

16      A    No, I don't.  He was -- I think he was off the

17  floor, is my recollection.  I don't know if the record

18  reflects anything different, but that's what I recall.

19      Q    Based on that discussion, do you recall if there

20  was a request to verify the vote related to the motion to

21  suspend --

22      A    Yeah.

23      Q    -- the regular order of business?

24      A    Yes, according to the -- according to the

25  record here, there was --

CONFIDENTIAL

[Page 68]

1      Q    And which document are you referring to?  I'm

2  sorry.

3      A    The Senate Journal or Exhibit RD-5.

4      Q    And who made that request to verify the vote?

5      A    Senator Shapleigh.

6      Q    And, specifically, Senator Shapleigh called for

7  a verification of the vote by which the regular order of

8  business was suspended for HB 218?

9      A    Yes, sir.

10     Q    And do you recall what happened when he called

11  for a verification of the vote?

12     A    No.

13     Q    Do you recall there being a second vote to

14  consider suspending the regular order of business to take

15  up HB 218?

16     A    You know, I don't recall exactly what happened.

17  I recall that -- Let me see the record.  I recall that

18  there was -- there was additional activity after this,

19  but I don't recall exactly what happened.

20          So, if you will show me the record, I

21  will -- that will refresh my memory.

22     Q    Well, actually, I only have one copy of this.

23  Let me just see what your independent recollection is --

24     A    I have told you that -- you have got everything

25  I can tell you, you know.

CONFIDENTIAL

[Page 69]

1       Q     Let me try this.  Do you recall a discussion

2    between Senator Fraser and Senator -- is it Shapleigh?  Is

3    that --

4       A     That's how you pronounce the name, Shapleigh;

5    yes, sir.

6       Q     Do you recall if there was a discussion

7    regarding the verification of the vote?

8       A     No, sir.  There may have been.  I just --

9    again, I would have to refer to the record.

10      Q     I will see if I can -- Do you believe the record

11   would reflect what happened in that particular

12   circumstance?

13      A     It should.

14      Q     Do you recall if there was a second vote

15   regarding HB 218 to suspend the regular order of business?

16      A     I do not recall.

17      Q     Do you recall if HB 218 passed out of the

18   Senate?

19      A     I know it didn't.

20      Q     And do you recall why it did not pass --

21      A     That's what I am trying to ask -- the record

22   would reflect that.

23            I know there were general discussions,

24   and it primarily related around Whitmire's temporary

25   absence from the floor, but I don't recall what -- I

CONFIDENTIAL

[Page 70]

1   don't recall exactly how -- what procedural activity

2   took place that caused the bill to fail.  I just recall

3   that it did fail.

4        Q    So, if you look at RD-5 -- and I'm sorry.  If

5   you look at RD-5, last page, JA 008321, do you see that?

6        A    I don't know.  I know why -- I don't have

7   the -- mine stops with 320; RD-5 does.  Well, I guess

8   maybe I'm in the dark here.  I don't have the last page.

9        Q    I apologize for that.  I have marked on this, so

10  I don't want to introduce it as an exhibit, but --

11       A    You have notes on there?

12       Q    Not really.  I will show you what has already

13  been marked as RD-5 --

14       A    I see.

15       Q    -- correct, and just direct you to the last

16  page.  And can you identify the Bates-stamped numbers on

17  that?

18       A    Well, this -- what you have handed me, which is

19  I guess an auxiliary exhibit, but it's JA 008321, which

20  would seem to follow the Bates stamp on RD-5.

21       Q    Okay.  And just so the record is clear, turning

22  to the first page of this exhibit, would you agree that it

23  is the same document minus the 21 Bates stamp?

24       A    I will accept your representation of that.

25       Q    Okay.  So then looking at -- looking at JA

CONFIDENTIAL

[Page 71]

1   008321, which is also Bates-stamped USA 00023203 -- I've

2   been asking you:  Do you recall if there was a second vote

3   to suspend the regular order of business.

4           And if I showed you the last page, would

5   that refresh your recollection as to what happened

6   regarding HB 218?

7       A   Can I look back in this?

8       Q   Sure.  You certainly can.  I don't think I have

9   any notes in there.

10      A   (Witness reviewing document.) The record

11  reflects that when the roll call occurred on Senator

12  Shapleigh's motion for verification, that Uresti and

13  Whitmire were on the floor and registered to vote, along

14  with Ellis, Gallegos, Shapleigh, Van de Putte, Watson,

15  West, and Zaffirini, and that Senator Hegar was also on

16  the floor for the verification.

17          And so the motion, which required 21

18  votes, failed on a vote of 20 yeas and 11 nays.

19      Q   So, just so the record is clear, the -- I will

20  take that back.  Thank you.

21          The motion to suspend the regular order of

22  business was lost by the -- by a vote of 20 to -- 20 yeas

23  to 11 nays?

24      A   Right.

25      Q   And the same senators who voted to -- who

CONFIDENTIAL

[Page 72]

1    opposed the suspension of the regular order of business on

2    the first vote also voted to oppose the regular order of

3    business on the second vote, but it also included Senator

4    Uresti and Senator Whitmire.  Was that your testimony?

5         A    Apparently, they were on the floor whenever the

6    vote roll call was taken.

7         Q    And what, if any other consideration, was there

8    of HB 218 by the Senate after this particular vote?

9         A    I don't -- I don't know.  The record would

10   reflect that.  I don't know if there was another motion

11   to suspend.  I don't think there was, but I don't know

12   that for sure.

13        Q    So, as you sit here today, are you aware of any

14   additional action taken on HB 218?

15        A    No, sir.

16        Q    And I apologize for that confusion.  I was

17   missing a page.

18        A    That's all right.

19        Q    In 2009, do you recall that SB 362 of photo ID

20   legislation was introduced by Senator Fraser in the

21   Senate?

22        A    Yes, sir.

23             (Duncan Deposition Exhibit Number RD-6

24   marked.)

25        Q    (By Mr. Gear:)  And just to put the bill into

[Page 73]

1  context, again, I'm going to hand you what has been marked

2  as RD-6.  I'll give you an opportunity to look at that

3  document, and if you could, identify that for me, please.

4      A    (Witness reviewing document.) RD-6 appears to

5  be a Texas online history of Senate Bill 362 in the 81st

6  regular session.

7      Q    And do you recognize this as the legislative

8  history of SB 362?

9      A    That would appear to be what this is.

10     Q    And based on RD-6, can you tell me when SB 362

11  was filed?  And I will direct your attention to Page 2

12  of 3.

13     A    Yeah.  I'm not sure what this is.  I don't

14  understand this first entry on -- received by the

15  Secretary of the Senate.  I guess it seems out of order.

16  It looks like it was filed on December 15th of 2008.

17     Q    And it was read for the first time on

18  February 17th of 2009, based on the record?

19     A    That is what the record reflects.

20     Q    Now, it appears that on February 17th, 2009,

21  SB 362 was referred to the committee of the whole.  Do you

22  see that?

23     A    Yes, sir.

24     Q    Can you tell me the circumstances surrounding

25  the decision to refer SB 362 to the committee of the

CONFIDENTIAL

[Page 74]

1    whole?

2         A     Prior to February 17th of 2009, the Senate

3    debated or made an addition to the Senate rules that

4    would allow for a special order or for voter legislation

5    dealing with voter identification that would be handled

6    as a special order, under the rules, with a referral to

7    the committee of the whole.

8               And so that was the procedural step, that

9    the Senate voted on, that resulted in the legislation

10   being referred to the committee of the whole.

11        Q     And are you -- are you referring to Senate

12   Resolution 14?

13        A     I don't recall the number of it, but it was --

14        Q     Well, let's back up a second.  So I would like

15   to understand your testimony.

16               You said that the Senate considered a

17   special order regarding SB 362.  Were you involved in any

18   communications regarding the decision to refer SB 362

19   directly to the committee of the whole?

20        A     I'm sure I was at some point in time.

21        Q     And do you recall when these discussions took

22   place?

23        A     Are you talking about after the -- what period

24   of time are you talking about?

25        Q     I am talking about:  Prior to the special order

**CONFIDENTIAL**

[Page 75]

1    being introduced to the Senate, were you involved --

2        A    Prior to the rule change?

3        Q    Prior to the rule change.  Thank you.  Were you

4    involved in discussions or communications regarding the

5    rule change itself?

6        A    Yes.

7        Q    And when were you involved in these discussions?

8    Do you have an idea --

9        A    Probably right before the legislation session

10   started, because during that period of time, you adopt

11   the rules usually on the first two or three days of the

12   legislative session.

13              And so I know that the special order

14   process, which had been in the rules before and used

15   before, I think by Bullock and some others, other

16   Lieutenant Governors, was discussed, and it was

17   presented to me as, you know, a way to try to resolve

18   the voter ID issue and also -- but that it would require

19   going to the committee of the whole.

20              That is what I recall hearing about

21   it.  There was a lot of discussion about it on the

22   Senate floor, whenever we debated it, and I remember

23   very clearly that -- my mother died that day, so I

24   remember --

25       Q    I'm sorry to hear that.

CONFIDENTIAL

[Page 76]

1    A    -- I remember the discussions.  And it was a

2    very heated debate.  It took a -- It took a while, but

3    the Senate voted to amend its rule to allow the special

4    order process to apply to specific legislation dealing

5    with voter identification, but it had to go to the

6    committee of the whole.

7    Q    So you've said a lot of things in that

8    statement, and I would like to try to break that out a

9    little bit.

10             Prior to the rule change, you were

11   involved in communications regarding the determination to

12   make this rule change.  Can you tell me who was present

13   during those communications?

14   A    No.  I recall the author, Senator Williams,

15   was, and I'm sure he did this -- you know, he explained

16   the research that his staff had done, what he had

17   concluded would be consistent methodology for going to

18   consider this.

19             And that's basically what we -- that's

20   what I recall.  That's about it.

21   Q    Did he share the research that was done

22   regarding this rule change?

23             MR. SWEETEN:  One second.  With respect to

24   the communications, we are asserting legislative

25   privilege on that.  Go ahead.  You can go ahead and

[Page 77]

1    respond.

2        A    He probably would have if I had asked, but I --

3    no, I didn't.   I didn't.

4        Q    (By Mr. Gear:)   Do you know the reason for this

5    rule change?

6            MR. SWEETEN:   Same; legislative privilege.

7        A    Well, I think the reason for this was:   This is

8    an issue that certainly was controversial, and it

9    certainly was a process that allowed us to, I think,

10   explore this very deeply and for the members to be able

11   to vote fairly efficiently on the bill, so -- and for all

12   members to have the opportunity to be involved in the

13   committee process.

14       Q    (By Mr. Gear:)   I'm not sure I understand that

15   testimony.

16            Would you consider it unique that photo ID

17   legislation was being required to be heard by the

18   committee of the whole?

19            MR. SWEETEN:   Objection; legislative

20   privilege.

21       A    No.

22       Q    (By Mr. Gear:)   Had any photo ID legislation

23   been heard by the committee of the whole prior to 2009,

24   SB 362?

25       A    There are -- It's my understanding -- and,

**CONFIDENTIAL**

[Page 78]

1   again, you would have to go to the record on this or go

2   to the records and do the research -- but that the --

3   that the special order process had been used before --

4   which actually was a -- was in the rules.  It was a

5   provision that was in the rules, and this voter ID was

6   added to that.

7       Q    Well, we haven't discussed this in any detail,

8   but do you recall that there was photo ID legislation in

9   2005?  I believe that was HB 1706.

10      A    No.

11      Q    We talked in detail about HB 218.  That was

12  referred directly to the State Affairs Committee, correct?

13      A    Right.

14      Q    Prior to -- and that was in 2007, correct?

15      A    Right.

16      Q    Prior to 2007, specifically, are you aware of

17  any photo ID legislation that had been referred directly

18  to the committee of the whole?

19      A    No.  No, I'm not aware of that.

20      Q    So can you tell me each and every reason you are

21  aware of why SB 362 -- why the rules were changed so that

22  SB 362 was referred directly to the committee of the

23  whole?

24              MR. SWEETEN:  Objection; legislative

25  privilege.  Objection; asked and answered.  You can

CONFIDENTIAL

[Page 79]

1  answer.

2      A     The provisions or the special order rule was

3  debated for eight or nine hours on the Senate floor.  The

4  reasons and the -- I will rely on the record as the

5  reasons for the passage of Senate Resolution -- what did

6  you say, 14 -- amending the rules; that those -- this

7  Senate acts as a body, and there are 31 members, and

8  there are 31 different reasons why people vote for

9  certain things.

10             And one person's reasons may be another

11  person's opposition.  Who knows.  I will rely on the

12  record of the debate where members stated their reasons

13  on the Senate floor.

14      Q     (By Mr. Gear:)  There may have been 31 different

15  reasons, based on your testimony, but you were involved in

16  communications, I believe you've stated, with Senator

17  Williams regarding the reasons why SB 362 -- the rules

18  were amended to refer this directly to the committee of

19  the whole.  Did I understand your testimony correctly?

20      A     Right.

21      Q     What reasons did Senator Williams provide as to

22  why SB 362 was required to be referred directly to the

23  committee of the whole?

24             MR. SWEETEN:  Objection; legislative

25  privilege.  You can answer.

CONFIDENTIAL

[Page 80]

1      A    I don't recall specifically what he said.  I

2  think there are a number of considerations one could look

3  at.

4              One was, as I said earlier, a committee

5  of the whole would allow all members of the Legislature

6  to participate in the committee process and the in-depth

7  analysis and the -- and the listening to witnesses.

8              I think another reason -- you know, a

9  special order means that it doesn't come up in the

10  regular order of business, and that it could be taken

11  out of order without -- and be within the rules.

12      Q    (By Mr. Gear:)  When HB 218 was referred to the

13  State Affairs Committee, there were hearings on HB 218,

14  correct?

15      A    Right.

16      Q    And all senators are welcome to attend those

17  particular hearings?

18      A    Well, as a practical matter?

19      Q    Yes.

20      A    They are welcome, but they can't -- if you've

21  ever been in the Capitol during the session, you will see

22  that there are multiple committee meetings going on all

23  at the same time, and members don't have the ability to

24  monitor other committees.

25              And so one of the advantages to this

CONFIDENTIAL

[Page 81]

1   special order process was:  It allowed all members of

2   the Senate to participate in the debate and listening

3   and hearing the witnesses and examining -- you know,

4   taking examination, cross-examination of the witnesses,

5   as well as presenting evidence themselves or presenting

6   their debate at the committee level.

7                   And as you will recall and you may know,

8   we spent 24 solid hours in the committee of the whole,

9   taking testimony and debating the issue in the committee

10  of the whole.

11                  (Duncan Deposition Exhibit Number RD-7

12  marked.)

13      Q    (By Mr. Gear:)  I want to show you what has been

14  marked as RD-7.  We have been discussing a change in the

15  Senate rules.

16                  Does this help refresh your recollection

17  as to Senate Rule -- or Senate Resolution Number 14?

18      A    Yes, sir.

19      Q    And, specifically, that is Rule 5.11.

20      A    Correct.

21      Q    And that is the special order that you have been

22  discussing here today on the record?

23      A    That's what you've been asking me about; yes,

24  sir.

25      Q    Looking at Page 2 of the exhibit I've just

CONFIDENTIAL

[Page 82]

1   handed you, which is Bates Stamp Number USA 00025500, it

2   references Rule 5.11, correct?

3        A    Would you say that again?  I'm sorry.

4        Q    And I apologize.  Looking at Page Number 2 of

5   the exhibit that I've handed you, which is Bates Stamp

6   USA 00025500, it references the special order and

7   Rule 5.11, correct?

8        A    Yes, sir.

9        Q    And what did -- what did Resolution -- Senate

10  Resolution 14 allow in the Senate?  What did it allow to

11  happen?

12       A    Do you have it?  I mean, I would like -- if you

13  will give me the resolution, I will testify from that, as

14  opposed to just -- I think you've got it somewhere.

15       Q    I should.  I only have one copy of this, but

16  I will show you what has been previously marked as

17  Exhibit 168, Duncan Exhibit 168.

18       A    Is that out of the earlier deposition?

19       Q    Yes.

20            (Duncan Deposition Exhibit Number RD-8

21  marked.)

22       Q    (By Mr. Gear:)  And I will mark this as RD

23  Exhibit Number 8 and give you an opportunity to look at

24  this.

25       A    (Witness reviewing document.)

CONFIDENTIAL

[Page 83]

1      Q     Can you identify that for me when you get a

2   chance?

3      A     (Witness reviewing document.)  Okay.   Your

4   question?

5      Q     For the record, this is part of the Senate

6   Journal?

7      A     Yes, sir.

8      Q     And the date of the Senate Journal was the

9   second day, Wednesday, January 14th, 2009.  Do you see

10  that?

11     A     Yes, sir.

12     Q     And this is dealing with the 81st Legislature

13  regular session?

14     A     Yes, sir.

15     Q     And we have been discussing Senate

16  Resolution 14.  If you will turn to the second page,

17  which is about -- it has two Bates stamps on it, TX

18  0000890 and USA 0027620.  Do you see the Senate

19  Resolution 14?

20     A     Yes, sir.

21     Q     And you've indicated that if you were able to

22  see Senate Resolution 14, you would be able to answer my

23  question?

24     A     Yes, sir.

25     Q     And does this help refresh your recollection?

**CONFIDENTIAL**

[Page 84]

1      A      Yes, sir.

2      Q      And so my question was:  What did Senate

3  Resolution 14 allow to happen within the Senate related to

4  SB 362?

5      A      As it relates to voter identification

6  legislation, it added Subsection (d) to Rule 5.11

7  entitled "Special Orders," and it added a specific

8  paragraph dealing with a bill or resolution related to

9  voter identification requirements that are reported

10 favorably from the committee of the whole.

11     Q      And again, my question would be:  Has

12 Subsection (d) ever been added to amended rules to allow

13 photo ID legislation specifically to be heard by the

14 committee of the whole?

15     A      I don't know the answer to that.  I have no

16 information that -- no reason to believe that it was

17 before, but I haven't done that research.

18     Q      Well, at the time SB 362 was considered, you

19 were the chair of the committee of the whole?

20     A      I was appointed to serve as chair of the

21 committee of the whole when it was considered; yes, sir.

22     Q      And who were you appointed by?

23     A      The Lieutenant Governor.

24     Q      That would be David Dewhurst?

25     A      Correct.

CONFIDENTIAL

[Page 85]

1     Q    And why were you appointed to the --

2     A    Or, actually, the President of the Senate would

3  be a better way to say that, but right, correct, yes,

4  sir.

5     Q    So it would be more appropriate to refer to

6  Senator Dewhurst as the president?

7     A    Well, he wasn't a senator either, but -- he was

8  Lieutenant Governor, but --

9     Q    I'm sorry.

10    A    -- President of the Senate.

11    Q    Of the Senate?

12    A    Right.

13    Q    So the President of the Senate --

14    A    Right.

15    Q    -- David Dewhurst, appointed you to the

16  committee of the whole, correct?

17    A    Correct.

18    Q    And why did the president of the Senate appoint

19  you to the committee of the whole in 2009?

20             MR. SWEETEN:   Objection; calls for

21  speculation.   Objection; legislative privilege.   You can

22  answer.

23    A    I don't know.   You know, I guess it's more

24  likely --

25    Q    (By Mr. Gear:)   Let me --

CONFIDENTIAL

[Page 86]

1      A    -- than not -- this is speculation on my part,

2   but more likely than not, it is because I chaired the

3   Senate State Affairs Committee, and I served as a

4   president pro tem in that session, as well.  So it was a

5   natural -- for those two reasons, it was a -- probably a

6   fairly natural appointment.

7      Q    Did you have any specific communications with

8   the President of the Senate --

9      A    I'm sure I did.

10     Q    -- David Dewhurst, regarding your appointment to

11  the committee of the whole?

12     A    I'm sure I did.

13     Q    During those communications, did you have

14  any -- if you recall, do you have any recollection of

15  communications related to photo ID legislation and it

16  being heard by the committee of the whole?

17     A    I'm going -- I don't have any specific

18  recollection of detailed communications other than, you

19  know, would you do this, and then, you know, instructions

20  to work with the members to come up with a process to

21  efficiently hear the legislation in the committee of the

22  whole.  Those were my instructions.

23     Q    And your instructions were to come up with a

24  process.  What process did you come up with?

25     A    Well, it's -- there is -- you know, we had a

CONFIDENTIAL

[Page 87]

1  procedure for -- and I worked with Senator Van de Putte,

2  who was the chairman of the Democratic caucus, and the

3  author of the bill, Senator Fraser, and the secretary of

4  the Senate and the sergeant at arms, about how we can do

5  this efficiently and allow citizens an opportunity to be

6  heard and members an opportunity to debate the bill in an

7  efficient way.

8                  And I think we came up with a set of

9  procedures that actually I read in the -- they're in the

10  record, and so I don't want to try to guess at what they

11  were, but I think you have those in the record.

12                  And I talked to Senator Van de Putte

13  about the requests that she had and other things that

14  we -- she and I worked through.

15      Q    Do you recall receiving any e-mails, letters

16  from the president of the Senate, related to your

17  appointment as the chair of the committee of the whole?

18      A    I don't know if I did or not, quite frankly.

19      Q    You've testified --

20      A    There may be something.  I don't know.

21      Q    You've testified that you had communication with

22  Senator Van de Putte regarding 362 and attempting to come

23  up with the procedures --

24      A    Uh-huh.

25      Q    -- as to how it would be handled in the

CONFIDENTIAL

[Page 88]

1    committee of the whole; --

2        A    Correct.

3        Q    -- is that correct?

4            (Duncan Deposition Exhibit Number RD-9

5    marked.)

6        Q    (By Mr. Gear:)  I'm going to show you what has

7    been marked as RD-9.  It was previously marked as Duncan

8    Exhibit 526 in the Texas v. Holder deposition that you

9    gave.  And I will give you a chance to take a look at

10   that.

11       A    (Witness reviewing document.)

12       Q    I think you had testified previously that you

13   recalled seeing this letter from Senator Van de Putte in

14   2009?

15       A    Yes, sir.

16       Q    Focusing in on Number 2 on Page 1, which is

17   Bates-stamped USA 00033763, Senator Van de Putte is asking

18   you to conduct a detailed analysis on the effects on

19   minority voters protected under the Voting Rights Act.  Do

20   you see that?

21       A    (No verbal response.)

22       Q    More appropriately, let me just add that she is

23   requesting that the Senate conduct a detailed analysis on

24   the effects of minority voters protected under the Voting

25   Rights Act.

**CONFIDENTIAL**

[Page 89]

1     A    I see that she, among other -- kind of a list

2 of things that's in the list that she had requested.

3     Q    So, again, similar to 2007, when HB 218 was

4 being considered, Senator Van de Putte requested that, you

5 know, there be some type of analysis conducted to

6 determine the impact on minority voters as it relates to

7 photo ID legislation; is that correct?

8     A    Yes.  It's -- I mean, she requested a detailed

9 analysis.  And I'm not sure.  She wasn't specific in what

10 she wanted that to be, but she did request something

11 along that line in Paragraph 2.

12     Q    Well, specifically, she requested that a

13 detailed analysis on the effects on minority voters

14 protected under the Voting Rights Act be conducted.  Do

15 you recall --

16     A    I don't think she really says that.

17     Q    Do you recall --

18     A    I don't want to argue, but I don't think --

19 that's not what she said.

20     Q    I'm sorry.  I'm talking over you.  Were you

21 finished with your answer?

22     A    I think she just -- she asked for a detailed

23 analysis.  She doesn't say -- and I think you implied

24 that the Senate should conduct that analysis.  I don't

25 think that's what she's saying here.

CONFIDENTIAL

[Page 90]

1              I think she says there should be some,

2    you know, evidence or whatever, but she doesn't, I

3    think, call for the Senate to conduct a detailed

4    analysis.  I think -- I don't read it that way.  Maybe

5    you do, but I just don't read it that way.

6         Q    Well, let's be clear for the record.  This

7    letter is from Senator Van de Putte; is that correct?

8         A    That's right.

9         Q    And it's dated March 3rd, 2009?

10        A    Yes, sir.

11        Q    And it's to you, the chair of the committee of

12   the whole?

13        A    Yes, sir.

14        Q    And it specifically says to "Chairman Duncan"?

15        A    Right.

16        Q    And, again, this is from Senator Leticia Van de

17   Putte, and the subject here indicates "Ground rules,

18   Committee of the Whole Public Hearing"?

19        A    Right.

20        Q    And so is it fair to say that she's addressing

21   these concerns directly to you?

22        A    She was.

23        Q    And so, based on the concerns raised by Senator

24   Van de Putte that the detailed analysis on the effects on

25   minority voters protected under the Voting Rights Act

CONFIDENTIAL

[Page 91]

1   should be conducted, did you, as the chairman, take any

2   steps to address her concerns?

3              MR. SWEETEN:   Objection; it assumes facts

4   not in evidence.   Objection; argumentative.   You can

5   answer.

6       A    We did.   We set up a process for each side of

7   the issue, proponents and opponents, to invite the expert

8   witnesses that they felt were most appropriate for the

9   issues that are involved in this debate.

10             And so that was a response, and I know

11  she and I worked with that, to try to accommodate each

12  other on that, as well, as much as we can, and given the

13  time frames and the different demands on everybody's

14  schedule.

15             So, yes, we -- I believe we did -- we did

16  address those issues in her request.

17      Q    (By Mr. Gear:)   Do you recall expert testimony

18  from the opponents of SB 362 that there would be a

19  negative impact on minority voters?

20      A    I don't recall that.   I don't recall the

21  details of either side, as we sit here today, but the

22  record would reflect it.   And we kept a -- we put a court

23  reporter out there, and we made sure that an accurate

24  record was made for that.

25             And we basically, I think, gave

CONFIDENTIAL

[Page 92]

1   members -- the experts plenty of time to testify, and we

2   allowed members, you know, unfettered time in

3   questioning those witnesses.  So I believe that there

4   was a -- the record will reflect what that information

5   was, what that testimony was, though.

6                   And there was -- in addition to oral

7   testimony, there was exhibits -- there were exhibits

8   that were introduced and catalogued as they went into

9   the record.

10       Q    And, in fact, her letter was catalogued as

11   Exhibit --

12       A    I'm sure it was.

13       Q    -- 1A based on the --

14       A    Yeah.

15       Q    -- exhibit that I've just handed to you?

16       A    That's correct.

17       Q    So I'm trying to understand your testimony, and

18   I don't want to --

19       A    I don't know if it was -- let me -- okay.

20   Maybe it was -- right.  I'm sorry.  I'm just trying to be

21   clear.  You're correct.

22       Q    I'm trying to understand your testimony.  As the

23   chair of the committee of the whole, did you direct anyone

24   within the Senate to conduct an analysis, a detailed

25   analysis, on the effects on minority voters protected

CONFIDENTIAL

[Page 93]

1    under the Voting Rights Act?

2         A    No.

3         Q    As the chair of the committee of the whole, are

4    you aware if any senator conducted a detailed analysis on

5    the effects of photo ID legislation related to minority

6    voters?

7              MR. SWEETEN:  Objection; vague as to what

8    the analysis would be.  But you can answer.

9         A    As we would do with any bill, the proponents

10   and opponents of the legislation would bring the evidence

11   to the Senate, to allow us to weigh that evidence and

12   make our decisions.

13             We do not have a specific -- well, I'll

14   just stay with that.  I mean, that's what we -- that's

15   how we do it.  That's how we did it on this bill.

16        Q    So you've said that Senate Resolution 14 was

17   controversial, and it was discussed for a number of hours

18   on the Senate floor, correct?

19        A    Yes, sir.

20        Q    Why was that bill controversial, or why was that

21   resolution controversial?

22             MR. SWEETEN:  Objection; legislative

23   privilege.  You can answer.

24        A    I will go, again, with:  There are 31 members.

25   So there were 31 reasons why it was controversial.

CONFIDENTIAL

[Page 94]

1    Q    (By Mr. Gear:)  And what concerns were being

2  expressed by the opponents of SB 362?

3    A    I think the primary concern was the -- being a

4  special order of business, that it would not require

5  suspension to take up on the Senate floor.

6    Q    And why was that a concern to opponents of SB

7  362?

8    A    You will have to go to the record for that.

9  I'm not going to speak for 31 members of the Senate.

10    Q    And just so the record is clear, I'm not asking

11  you to speak for 31 members.  I'm asking you to speak for

12  opponents, and there weren't 31 opponents --

13    A    No.

14    Q    -- to HB -- or SB 362.

15    A    I really can't speak to them.  It wouldn't be

16  appropriate nor would it be accurate.  I think it would

17  be better to go to the record on that.

18              (Duncan Deposition Exhibit Number RD-10

19  marked.)

20    Q    (By Mr. Gear:)  I'm showing you what's marked as

21  RD-10, and I'll give you a chance to take a look at that.

22              MR. GEAR:  I'll note for the record that

23  this document is marked as highly confidential.

24    A    (Witness reviewing document.)

25    Q    (By Mr. Gear:)  Do you recognize this document?

CONFIDENTIAL

[Page 95]

1      A    No.

2      Q    Have you seen this document before?

3      A    No, I don't recall seeing it.  I certainly

4  haven't seen it.  I don't recall seeing this.

5      Q    Do you recognize that this document deals with

6  reasons to support SB 362 as filed?

7      A    Why don't you lay a foundation so I can

8  understand who prepared it and where it came from, and

9  then maybe that will refresh my recollection.

10     Q    Do you know who prepared this or where this

11  document came from?

12     A    No, no.  I couldn't tell you, sitting here

13  today.

14     Q    So, looking at Number 3 in Exhibit RD-10, which

15  is highly confidential and Bates-stamped TX 00087008, it

16  indicates that "Senators Fraser, Williams, and Duncan

17  support this version of the bill."  Did you support

18  SB 362?

19     A    I did.

20     Q    And you voted in favor of SB 362?

21     A    I did.

22     Q    And you voted in favor of the provisions

23  contained within that SB 362?

24     A    I did.

25     Q    And it also indicates that you were explaining

**CONFIDENTIAL**

[Page 96]

1    SB 362 to members of the Senate and the House.

2                  Putting the exhibit aside, do you have --

3    do you recall explaining SB 362 to members of the Senate

4    and the House?

5        A    I don't recall explaining it to the House.  I

6    do recall -- if people ask questions of me about a bill,

7    I'll explain it.  I didn't -- I don't think I scheduled

8    meetings to go around and talk to people.  I didn't.

9                  But if someone had a question about a

10   bill, you know, I would try to answer the question.  If

11   not, I would get them to the right resource that would

12   answer their question.  If I didn't have the answer or

13   if I didn't understand their question, I would.

14                  Basically, that's pretty typical.  It's

15   not just this bill.  That's pretty typical of what we do

16   on any bill that comes through the Senate.  That's what

17   the Chairman of Jurisprudence does on bills that come

18   through.  That's a pretty typical thing that occurs.

19       Q    Were you involved in any communications with any

20   legislators or with the Lieutenant Governor that

21   specifically requested that you explain the provisions of

22   SB 362 to the Senate?

23                  MR. SWEETEN:  Objection; legislative

24   privilege.  You can answer.

25       A    I probably was, but I don't have any specific

[Page 97]

1   recollection of anything.  But I'm sure -- it's just what

2   I did in the regular course of any bill that I'm going

3   through.

4                This was a rather significantly debated

5   bill, and so, obviously, people had questions and wanted

6   to know, you know, what does this mean or what does that

7   mean.  And I'm sure I was involved in some of those

8   discussions, but not primarily.

9                I was basically more involved in the

10  process of setting up the hearing and conducting the

11  hearing as opposed to crafting the legislation.

12      Q    Do you recall who would have approached you to

13  discuss SB 362 with the Senate?

14      A    No.

15      Q    Specifically, do you recall if the Lieutenant

16  Governor approached you and asked you to explain SB 362 to

17  the Senate?

18      A    No, he didn't.

19      Q    Do you recall if the sponsor or the author of SB

20  362 approached you -- and that would have been Senator

21  Fraser, right?

22      A    Right.

23      Q    Do you recall if Senator Fraser approached you

24  and asked you to explain the provisions of SB 362 to the

25  Senate?

CONFIDENTIAL

[Page 98]

1      A     I'm pretty sure that he didn't.  It was his

2   bill, and he developed the language and, you know, it was

3   his legislation.  So I don't think he would have called

4   on me to explain it to him.

5                  And, primarily, my job was to basically

6   make sure the process -- to preside over the hearing and

7   the process for hearing the bill in the committee of the

8   whole.

9      Q     And I think we established that, in 2007, you

10  were the Chair of the State Affairs Committee, correct?

11     A     That's right.

12     Q     And do you agree with the proposition in

13  Number 2 that SB 362 was a compromise bill that was

14  basically the same bill that passed the House and the

15  Senate State Affairs Committee last session?  That would

16  have been in 2007.

17     A     I don't -- I don't know who authored this, and

18  I don't know what they're talking about.  So I'm not

19  going to be able to answer any question with regard to

20  anything that's on this document, because I don't think I

21  prepared it, and I don't think I've ever seen it before.

22     Q     Fair enough.  Do you -- Would it be fair to say

23  that SB 362 was patterned after HB 218?

24                  MR. SWEETEN:  Objection; privilege.  Go

25  ahead.  You can answer.

CONFIDENTIAL

[Page 99]

1      A     Conceptually, it was similar.  I think it had

2   different provisions in it.

3      Q     (By Mr. Gear:)  It was similar conceptually,

4   because it allowed for both photo and non-photo

5   identification, correct?

6      A     I think -- which one?

7      Q     I'm talking about SB 362, --

8      A     Right.

9      Q     -- as compared to 218.

10     A     Yes, I think it was similar.  It was similar

11  conceptually to that, but I don't know whether word for

12  word -- whether it was or not.

13     Q     Do you have any recollection of having

14  communication with anyone in the Senate regarding SB 362

15  improving security in the election process, but not being

16  as restrictive as Indiana or Georgia?

17             MR. SWEETEN:  Objection; privilege.  You

18  can answer.

19     A     No.  But I don't recall any conversation like

20  that.

21     Q     (By Mr. Gear:)  Do you recall --

22     A     And that was in 2011?

23     Q     SB 362.  We're still in 2009.

24             MR. SWEETEN:  2009.

25     A     Or 2009?  I'm sorry.

**CONFIDENTIAL**

[Page 100]

1       Q    (By Mr. Gear:)  Do you recall communications

2   related to the Indiana photo ID legislation in 2009?

3       A    Not in 2009.

4       Q    Do you recall communications related to the

5   Georgia --

6       A    And let me just say:  I don't recall them.

7   There may be.  I'm just saying, in 2009, I did not recall

8   having any conversations regarding that.  There may have

9   been, if it was out there at that point in time, because

10  we always see how other states are doing things.

11              But I don't recall a specific discussion

12  along those lines.

13      Q    Do you recall reviewing the Indiana photo ID

14  legislation?

15              MR. SWEETEN:  In 2009, Bruce, is that what

16  you're saying, or at any time?

17              MR. GEAR:  In 2009.

18              MR. SWEETEN:  Okay.

19      A    In 2009, I don't recall.  I may have, but I

20  don't recall.

21      Q    (By Mr. Gear:)  Do you recall reviewing the

22  Georgia photo ID legislation in 2009?

23      A    I probably did look at that, but I don't recall

24  exactly how I -- what analysis I made.  I may have read

25  it, but I don't think I did an analysis or a breakdown as

CONFIDENTIAL

[Page 101]

1    if it were a bill that I was interested in like that.

2        Q    Would you agree that SB 362 was less restrictive

3    in Georgia with regard to photo ID legislation?

4                MR. SWEETEN:  Objection; legislative

5    privilege.  You can answer.

6        A    Sitting here today, I couldn't give you an

7    accurate answer on that.

8        Q    (By Mr. Gear:)  Was there communication in the

9    Senate in 2009 related to possible support by conservative

10   House Democrats?

11               MR. SWEETEN:  Read that question back.

12               (Court reporter read last question.)

13               MR. SWEETEN:  Objection; legislative

14   privilege.

15       A    I'm not aware one way or the other.  I don't

16   recall if there was.  There may have been.  I don't know.

17       Q    (By Mr. Gear:)  Is it possible that you engaged

18   in such communication?

19       A    Anything is possible, but I don't recall

20   engaging in those conversations.

21       Q    Do you recall a discussion in 2009 related to SB

22   362 regarding Federal preclearance of the photo ID

23   legislation?

24               MR. SWEETEN:  Objection; legislative

25   privilege.  You can answer.

**CONFIDENTIAL**

[Page 102]

1        A    I'm sure there was something on the record with

2    regard to that, and I'm sure there were discussions with

3    regard to making attempts to pass legislation that would

4    satisfy the requirements of preclearance under Section 5.

5        Q    And in supporting SB 362, did you believe that

6    it would have passed requirements for Federal

7    preclearance?

8        A    Yes.

9        Q    And why did you believe --

10            MR. SWEETEN:  Objection; legislative

11    privilege on the last question as to his analysis.  So go

12    ahead.

13        Q    (By Mr. Gear:)  Why do you believe SB 362 would

14    have passed Federal preclearance in 2009?

15            MR. SWEETEN: Objection; legislative

16    privilege as to his mental impressions of the legislation

17    session.  Go ahead.  You can answer.

18        A    Well, you know, I'm going back several years,

19    but I think the analysis was the testimony that I heard

20    and the discussions that, you know, we had on the Senate

21    floor and in the committee of the whole.

22            You know, I felt the work done by my

23    staff and others -- I felt like that we had -- this bill

24    was appropriately crafted to be in conformance with the

25    requirements of the Voting Rights Act, and so I had that

**CONFIDENTIAL**

[Page 103]

1   general confidence that it would pass a Federal

2   preclearance examination.

3        Q     And when you say crafted in a way that would

4   pass Federal preclearance, what did you mean by that?

5                    MR. SWEETEN:  Objection; legislative

6   privilege.  You can answer.

7        A     Design.

8        Q     (By Mr. Gear:)  Design?  What do you mean by

9   that?

10       A     The provisions of the bill were appropriate in

11  satisfying the requirements of the Voting Rights Act.

12       Q     Do you believe the provisions of the bill were

13  crafted in a way to require voters who were voting at the

14  polling place to prove who they say they are?

15                   MR. SWEETEN:  Objection; privilege.  Go

16  ahead.

17       A     I thought the requirements were fair, and I

18  thought that they were appropriate to protect the

19  integrity of the ballot box, which was my goal with

20  regard to voter ID registration.  And so I looked at it

21  through that prism in my mind.

22                   Is it fair?  Will it address the problem?

23  And I believe that it did, and I believe that it would

24  do it within the requirements of the Voting Rights Act.

25       Q     (By Mr. Gear:)  And when you say fair -- and I'm

CONFIDENTIAL

[Page 104]

1    sorry I keep going back to this -- but when you say fair,

2    is it fair to say that you believed it was fair?

3        A    It would be fair to say it was fair.

4        Q    Was it fair --

5        A    I'm sorry.

6        Q    -- because it allowed for both photo and

7    non-photo identification?

8                MR. SWEETEN:  Objection; legislative

9    privilege.

10       A    I think it had opportunities in there for

11   people to -- and I think we also appropriated funds, and

12   Senator Ogden had indicated that we would appropriate

13   funds to provide for voter ID or free voter ID or free

14   identifications.

15                And I think, holistically, with all of

16   the things that were involved, that it was fair to

17   require a photo ID, given all of the accommodations that

18   we were trying to make to address the concerns that

19   people were raising.  And that's with 362.

20       Q    And 362 also allowed for non-photo ID?

21       A    It did, but that wasn't the equation in my --

22   or that wasn't a variable in my equation of fair.

23                I believed that, in my view, the

24   opportunity to acquire ID, in this day and age, was made

25   available through the legislative process, and I believe

CONFIDENTIAL

[Page 105]

1    the photo process was fair in 362, and I felt like it

2    was in 218, as well, which were the two bills that we've

3    talked about.

4        Q    So that begs the question:  Do you believe that

5    the non-photo ID provisions of both 218 and 362 were fair?

6                MR. SWEETEN:  Objection; asked and

7    answered.

8        A    Well, I'm not saying they're not fair.  I think

9    the non-photo ID provisions were fair, as well, but I

10   believe, standing alone, independently, the photo ID

11   options were also fair.

12               (Duncan Deposition Exhibit Number RD-11

13   marked.)

14       Q    (By Mr. Gear:)  I'm showing you what has been

15   marked as RD-11.  I believe you've previously testified to

16   this as Duncan Exhibit 29 in your previous deposition

17   testimony.  Can you identify this document for me?

18       A    This appears to be Senate Bill 362.

19       Q    Which was authored by Senator Fraser and others,

20   correct?

21       A    Correct.

22       Q    In turning your attention to page -- turn your

23   attention to Page 5.  I just want to go through briefly

24   what SB 362 allowed.

25               Is it accurate that SB 362 allowed a

CONFIDENTIAL

[Page 106]

1  driver's license or personal identification card issued

2  to the person by the Department of Public Safety that has

3  not expired or that expired no earlier than two years

4  before the date of presentation?

5      A    Yes, sir.

6      Q    Is it accurate to say that SB 362 allowed for a

7  United States military identification card that contains

8  the person's photograph?  And I'm referring to Page 6,

9  Number 2.

10     A    Yes, sir.

11     Q    Is it accurate to say that SB 362 allowed for a

12  United States citizenship certification issued to the

13  person that contains the person's photograph?

14     A    Yes, sir.

15     Q    Looking at Number 5, is it accurate that SB 362

16  allowed for a license to carry a concealed handgun issued

17  to the person by the Department of Public Safety or a

18  valid identification card that contains the person's

19  photograph and is issued by an agency or institution of

20  the Federal Government or an agency, institution, or

21  political subdivision of the State?

22     A    Yes, sir.

23     Q    And is it your understanding that Provision 5 of

24  SB 362 would have allowed for student IDs issued by a

25  state institution within Texas?

CONFIDENTIAL

[Page 107]

1        A     Where is that?

2        Q     I'm asking you to look at Section 5 of SB 362

3   and --

4        A     What page would that be on?

5        Q     I'm referring to Page 6, Section 6 -- Page 6,

6   Section 6 -- I'm sorry; I said Section 5 before --

7   Page 6, Section 6 of SB 362 would have allowed for a

8   valid identification card that contains the person's

9   photograph and is issued by an agency or institution of

10  the Federal Government, correct?

11       A     Right.

12       Q     And it would have allowed, under Section (b), an

13  agency -- a valid identification card that contains the

14  person's photograph and is issued by an agency,

15  institution, or political subdivision of the State,

16  correct?

17       A     Yes, sir.

18       Q     And that would have included student IDs issued

19  by a subdivision of the State?

20       A     I think that's a reasonable interpretation.

21  Are you talking about a higher institution or something

22  like that?

23       Q     Yes.  And do you -- comparing that to HB 218 --

24  and you can certainly look at the exhibit, if you need

25  to -- but comparing that to HB 218, do you know the reason

CONFIDENTIAL

[Page 108]

1   why the use of student ID cards was narrowed between 2007

2   and 2009?

3                   And just to refresh your recollection, in

4   2009, it allowed for -- in 2007, it allowed for the use

5   of any student ID card.  In 2009, it only allows for the

6   use of student ID cards issued by a state institution.

7                   Do you have any understanding as to why

8   that use of student ID cards was narrowed?

9        A    No.

10       Q    Did you engage in any communications regarding

11  Provision 6 of SB 362 related to student ID cards?

12       A    No.  I believe there was probably some

13  discussion about that on the Senate floor with regard

14  to the committee of the whole testimony and in Senate

15  Bill 362.

16       Q    Do you recall what that discussion was?

17       A    I recall there was discussion, but I don't

18  recall what it was.  The record would probably reflect it

19  more accurately than I could recall it.

20       Q    Do you recall any reason given, during the

21  consideration of SB 362, regarding why student IDs were

22  narrowed to only being issued by a state institutions?

23       A    I would have to refer to the record.  I had no

24  part in that issue, in making that decision or drafting

25  that provision.

CONFIDENTIAL

[Page 109]

1    Q    So it's your testimony that you were not

2  involved in any communications related to the decision to

3  narrow that type of ID to State institutions?

4    A    My testimony is that if I was, I don't remember

5  them, and if there was recollection -- my recollection is

6  more along the lines of there was discussion among the

7  members in the debate, which would be reflected in the

8  record.

9    Q    Are you aware of any analysis -- and I'll use

10  that in the same term that I've used it in our discussions

11  with HB 218 and HB -- or SB 362.  Are you aware of any

12  analysis that was conducted related to student IDs by the

13  Senate?

14    A    Well, I'm trying to understand what you mean by

15  "analysis," because I don't think we've ever really

16  clearly defined what that means, because an analysis

17  could mean 15 different things to each person when

18  they're -- and so give me your definition that you want

19  me to try to give you an answer around, and I'll see what

20  I can do with it.

21    Q    Let's see if we can do that.

22    A    Okay.

23    Q    For HB -- Actually, in 2006, you indicated that

24  there was an interim report --

25    A    Right.

CONFIDENTIAL

[Page 110]

1      Q      -- that was conducted.  And would you consider

2  that an analysis?

3      A      To an extent, it was more of a -- it was a

4  report.  It was designed to provide information to help

5  members understand the issues that are involved in voter

6  ID.

7                    It reported different studies and

8  analyses that were done by the Carter-Baker Commission

9  and other things that were considered or other studies,

10  Court opinions that had an analysis in them.  It

11  referred members to different resources that they could

12  use in performing an analysis of the issues.

13                    And that was the primary purpose of that

14  report and the primary purpose of any report that I

15  authored as chairman of the committee, but, in

16  particular, I recall on that one, because we did have a

17  hearing on it, and I recall there was -- there were a

18  lot of questions and issues raised on voter ID at that

19  time.

20                    Initially, that was when it appeared to

21  me that it was -- you know, there was certainly people

22  that needed information about what other analyses that

23  were out there, and that is what we tried to provide in

24  that report --

25      Q      So --

CONFIDENTIAL

[Page 111]

1       A    -- on both sides of the issue.

2       Q    I'm trying to define the issue of analysis.

3       A    Uh-huh.

4       Q    If I rephrased it and asked you, were there any

5  reports specifically completed by the Senate, designed to

6  assist the legislator in understanding student IDs, would

7  you understand what I'm asking you?

8       A    Yeah.

9       Q    Were there any reports completed by the Senate

10 designed to assist legislators in understanding student

11 IDs -- the issues related to student IDs in 2009?

12      A    Not that I'm aware of.

13      Q    Were there any reports designed to assist

14 senators in understanding whether there were prosecutions

15 of individuals who used student IDs and attempted to

16 impersonate someone else at the polls in 2009?

17           MR. SWEETEN:   Objection; legislative

18 privilege.  You can answer.

19      A    As it relates specifically --

20      Q    (By Mr. Gear:)  To student IDs.

21      A    -- to student IDs?  I'm not aware of any.

22      Q    And the answer is:  No, you're not aware of any?

23      A    Correct.

24      Q    Were there any reports designed to assist

25 senators in understanding whether or not there were any

CONFIDENTIAL

[Page 112]

1    noncitizens that were prosecuted for using a student ID at

2    the polling place in 2009 related to SB 362?

3                    MR. SWEETEN:  Same objection.

4         A    I'm not aware that that specific issue was the

5    subject of any report.

6         Q    (By Mr. Gear:)  And that specific issue being

7    noncitizens voting at the polls, correct, --

8         A    Right.

9         Q    -- and using student IDs?

10        A    Right.

11                   THE WITNESS:  I'm getting about to that

12   range again whenever you're ready.

13                   MR. GEAR:  That range?

14                   MR. SWEETEN:  Break range.

15                   MR. GEAR:  Let's go off the record.

16                   (Short break taken.)

17        Q    (By Mr. Gear:)  So I would like to return

18   briefly to Senator Van de Putte's March 3rd, 2009 record,

19   which we identified as exhibit -- is it RD-9?

20        A    RD-9.

21        Q    Focusing again on Number 2, with our

22   understanding of what I mean when I reference the term

23   "analysis," I want to ask you:  Were there any reports --

24   Are you aware of any reports that were created within the

25   Senate to assist senators in understanding the effect on

**CONFIDENTIAL**

[Page 113]

1    minority voters protected under the Voting Rights Act?

2         A    I don't think that was anything that was

3    generated as the work of the Senate.  As the author of

4    the analysis, I assume that there was evidence put in by

5    expert witnesses at the hearing that they touted as an

6    analysis, but I don't remember specifically about that.

7                   I know there was a lot of discussion.

8    The record would reflect the details on that.

9         Q    Do you recall if the testimony by the experts

10   was by opponents or supporters of the SB -- I'm sorry --

11   of SB 362?

12        A    I would assume the opponents, and perhaps the

13   proponent experts, as well.  I don't recall.  The record

14   would probably reflect that better.

15        Q    As you sit here today, do you recall any

16   testimony by supporters of SB 362 that would have

17   supported that there would not be an impact on the

18   minority voters as it relates to the Voting Rights Act --

19   protected under the Voting Rights Act?

20                   MR. SWEETEN:  Objection; vague.  Go ahead.

21        A    I believe the record would reflect that there

22   were proponents of the bill that supported -- there were

23   witnesses who were proponents of the bill that

24   reflected -- would you repeat your question?  I've lost

25   my train of thought in the question.

CONFIDENTIAL

[Page 114]

1      Q    (By Mr. Gear:)  We were specifically -- We were

2   speaking specifically of the effects on minority voters

3   protected under the Voting Rights Act.

4      A    Right.

5      Q    My question previously was:  Are you aware of

6   any testimony by supporters of SB 362 that would support

7   facts that SB 362 would not have any effect on minority

8   voters protected under the Voting Rights Act?

9      A    Sitting here today, I don't recall specific

10  testimony.  I seem to be impressed that there was a

11  record, and it would reflect whether or not there was.

12     Q    And do you recall responding to Senator Van de

13  Putte's March 3rd, 2009 letter?

14     A    Yes, sir.  Yes, sir.

15     Q    Do you recall whether you addressed the issue

16  that she raised regarding her request for a detailed

17  analysis on the effects on minority voters protected under

18  the Civil Rights Act?

19     A    I would have to see the response.  I think I've

20  got it here.

21     Q    Did I hand it to you?

22     A    Yes.

23     Q    Okay.  Is that one page or two?  I've handed you

24  the wrong document.

25                  (Duncan Deposition Exhibit Number RD-12

CONFIDENTIAL

[Page 115]

1    marked.)

2        Q    (By Mr. Gear:)  Let me hand you what has been

3    marked as RD-12.

4                MR. GEAR:  And for the record, this was

5    previously identified as Senator Duncan Exhibit 527.

6    It's also identified as Exhibit 13 on the bottom and

7    Bates-stamped USA 00033765.

8        Q    (By Mr. Gear:)  Can you identify that document

9    for me, please?

10       A    It is a memorandum to Leticia Van de Putte,

11   Senator Van de Putte, from me, with a copy to Senator

12   Fraser dated March 5th, 2009.

13       Q    And so, specifically, my question to you was:

14   Did you respond within that memorandum, as you have

15   described it, to Senator Van de Putte's concern that there

16   be a detailed analysis to determine the effect on minority

17   voters protected under the Civil Rights Act?

18       A    Let me review it.

19       Q    Sure.  Take your time.

20       A    (Witness reviewing document.)  I don't believe

21   that this letter says -- dissects her letter to the

22   extent of any analysis that -- you know, or any

23   requirement, and I don't believe her letter asks for the

24   Senate to do a detailed analysis.

25                I believe her letter basically indicates

**CONFIDENTIAL**

[Page 116]

1    that it needs to consider a detailed analysis, but it

2    doesn't require or call for us to do that, at least the

3    way I read it.

4              And it may be just a grammatical

5    interpretation on my part, but I don't think so.  I

6    think, basically, she's saying that the Texas Senate

7    should be as clear of any identifiable problems, to be

8    clear of the perils, and have a detailed analysis, which

9    is grammatically kind of basically a little bit

10   improper, I guess.

11             But it does not -- that sentence does not

12   call for the Texas Senate to do the detailed analysis.

13   And so the way I look at these things is like I look at

14   any other bill.

15             It's that the person who wants to pass

16   the bill needs to bring its proponents and its detailed

17   analysis in support, and those who are opposed, they

18   need to bring their witnesses and their detailed

19   analysis in opposition.

20             And so I believe that what this indicates

21   happened here was that, as chairman, I would rely upon

22   her to bring whatever witnesses that she believed would

23   be compelling witnesses and whatever evidence, including

24   evidence of the detailed analysis, that would be

25   important to support any complaint that she or any other

**CONFIDENTIAL**

[Page 117]

1    member had that might -- that would indicate -- or any

2    complaint relative to minority voter impact.

3                    And I think the record reflects that

4    there were witnesses that were brought --

5         Q    By the opponents?

6         A    -- by the opponents, that laid that out.  And I

7    can't recall whether or not -- the specific details of

8    what the proponents brought or what that evidence was.

9         Q    But, as you sit here today, you're not aware of

10   any specific testimony by the supporters or the proponents

11   of SB 362?

12        A    I would phrase it this way:  The record will

13   reflect that.  I don't -- I'm not pulling -- recalling

14   anything, just merely because I haven't reviewed the

15   record in whole, and it's a long record.

16        Q    Sure.

17        A    And I have not reviewed it in preparation for

18   today.

19        Q    So I want to go back to SB 362, the actual

20   provisions, which are still in front of you, I believe.

21        A    Yes.

22        Q    And we are on Page 6.  And I believe it was your

23   testimony that you did interpret SB 362, Paragraph 6(b),

24   to include student IDs issued by state institutions,

25   correct?

**CONFIDENTIAL**

[Page 118]

1       A     I think I said that was a reasonable

2    interpretation.

3       Q     Do you agree with that interpretation?

4       A     I don't disagree with it.

5       Q     And you voted in favor of all of the provisions

6    under SB 362, correct?

7       A     Yes.

8       Q     Are you aware of any reason why this provision

9    narrowed from -- as compared to SB 218 -- narrowed the

10   types of student IDs that would be allowed under photo ID

11   legislation?

12      A     No, sir.

13      Q     Are you aware of any communications related to

14   that issue outside of the public record?  And I'm

15   referring to --

16      A     No.

17      Q     I'm referring to legislation.

18      A     I'm sure there was discussion on the record.  I

19   remember there was discussion on the record, but I don't

20   remember what the details of it were.  But I know it was

21   brought up, and I know it was discussed.  I just don't

22   know who did it and who discussed it or who raised the

23   issue and how it was handled with regard to the

24   discussion or justification for the change.

25      Q     And, again, under Paragraph 6(a), it allowed --

**CONFIDENTIAL**

[Page 119]

1   it being SB 362 -- allowed for an agency or institution of

2   the Federal Government -- a photo ID from an agency or

3   institution of the Federal Government, correct?

4        A    Right.

5        Q    Are you aware of any reports designed to assist

6   the Senate in understanding issues as it relates to a

7   valid identification card that contains a photograph

8   that's issued by an agency or institution of the Federal

9   Government as it relates to photo ID legislation?

10       A    I lost you.  I'm sorry.

11       Q    And I'm sorry.  That was terribly garbled.  I

12  guess what I'm trying to ask you is:  As we understand

13  analysis now, in the way that you characterize it, as

14  reports designed to assist legislators in understanding

15  various issues related to photo ID legislation, I'm

16  specifically asking you if there were any reports designed

17  to address the concerns and assist senators in

18  understanding the concerns related to photo ID issued by

19  an agency or institution of the Federal Government.

20       A    I don't want to split hairs with you on the

21  definition of analysis, but I will say this:  I'm not

22  aware of any reports that were prepared in the Senate or

23  by any member or presented that dealt specifically with

24  the issue of student IDs.  There may have been, but I

25  certainly don't recall, and I doubt that there was.

CONFIDENTIAL

[Page 120]

1              And the record may prove me wrong on

2   that, but --

3       Q    And would that also be true for reports that

4   dealt specifically with the issue of photo IDs issued by

5   an agency or institution of the Federal Government?

6       A    Right.

7       Q    Would you see any problem including within photo

8   ID legislation with student IDs issued by a private or

9   state institution within the State of Texas?

10              MR. SWEETEN:  Objection, vague and

11   legislative privilege.  You can answer.

12       Q    (By Mr. Gear:)  Let me rephrase that so it's

13   clear.

14              Would you have supported a provision in

15   photo ID legislation that would have allowed for photo

16   identification -- student photo identification issued by

17   either a state or private institution within the State of

18   Texas had it been included in SB 14?

19              MR. SWEETEN:  Objection, incomplete

20   hypothetical; and objection, legislative privilege.  You

21   can answer.

22       Q    (By Mr. Gear:)  Do you understand my question?

23       A    Yeah.  As one of 31, you know, it provided

24   the -- it provided that the authenticity of the ID could

25   be self-proved, I guess is the way to put it.  I mean, as

CONFIDENTIAL

[Page 121]

1   long as it was -- had that -- the ID would be a valid --

2   one that would be regularly recognized as authentic, you

3   know, as one of 31, I probably would have objected to

4   that.

5        Q    So you would not have supported that?

6        A    I would --

7             MR. SWEETEN:  Same objection.

8        A    I said I would not have been -- I would have

9   supported that if that -- as long as it was --

10       Q    (By Mr. Gear:)  Thank you for that

11  clarification.

12       A    -- something that can be authenticated, not

13  just open-ended.

14       Q    Would that also be true for Federal

15  identification issued by -- let me get the language

16  correct here.

17             Referring specifically to SB 362, would

18  you have supported a valid identification card that

19  contains a person's photograph and issued by an agency or

20  institution of the Federal Government had it been

21  included in SB 14 --

22             MR. SWEETEN:  Objection.

23       Q    (By Mr. Gear:)  -- as provided in this

24  Provision 14?

25             MR. SWEETEN:  Objection; legislative

CONFIDENTIAL

[Page 122]

1  privilege.

2      A      As one of 31, I probably would have

3  supported -- I would have supported that legislation that

4  would have required that.

5      Q     (By Mr. Gear:)  Do you have any -- As you sit

6  here today, do you have any facts that would support

7  removing or excluding these provisions from SB 14?

8             MR. SWEETEN:  Objection, vague; objection,

9  legislative privilege.  You can answer.

10     Q     (By Mr. Gear:)  Well, let me clarify, because I

11  don't want this to be vague.

12             SB 14 does not include photo IDs issued by

13  an agency --

14             MR. GEAR:  Let me strike that.

15     Q     (By Mr. Gear:)  SB 14 does not include a valid

16  identification card that contains the person's photograph

17  and issued by an agency or institution of the Federal

18  Government, correct?

19     A      I believe that's correct.

20     Q      Do you have any facts that support why photo

21  identification issued by an agency or institution of the

22  Federal Government was excluded in SB 14?

23             MR. SWEETEN:  Objection; privilege.  You

24  can answer.

25     A      I wasn't involved in the decision to exclude

CONFIDENTIAL

[Page 123]

1   it.  There may be something on the record.  So I couldn't

2   give you an accurate answer on that.

3        Q    (By Mr. Gear:)  Were you involved in any

4   communications related to concerns pertaining to valid

5   identification cards that contain a person's photograph

6   that were issued by an agency or institution of the

7   Federal Government?

8             MR. SWEETEN:  Objection; legislative

9   privilege.  You can answer.

10       A    Not that I recall, other than what discussions

11  and communications that occurred in debate on the Senate

12  floor, either in the committee as a whole or as

13  reconvened by the Senate.

14       Q    (By Mr. Gear:)  So, as you sit here today, are

15  you aware of any facts that support a reason why it should

16  be included or why it was excluded from SB 14?

17            MR. SWEETEN:  Objection, asked and

18  answered; objection, legislative privilege.  You can

19  answer.

20       A    I'll refer to the record on that.

21       Q    (By Mr. Gear:)  And I'm not necessarily asking

22  about the record.  I'm asking, as you sit here today, do

23  you -- are you aware of any reason why --

24       A    You're talking about my own opinion?

25       Q    Yes.

CONFIDENTIAL

[Page 124]

```
 1        A    You know, --

 2                  MR. SWEETEN:  Objection to privilege.  Go

 3    ahead.  I'm sorry.

 4        A    I haven't thought about it until today.  So I

 5    don't -- you know, I don't know.  I mean, my answer would

 6    be purely assumption as to the ability to verify whether

 7    or not the ID was authentic or not.  That's my

 8    assumption, pure swag, whatever you want to call it, as

 9    to the reasons behind it.

10                  But I think it probably is developed in

11    the record, and my opinion didn't weigh in on that, one

12    way or the other, so --

13        Q    (By Mr. Gear:)  As you sit here today, are you

14    aware of any information that would have supported

15    excluding student IDs from a private institution from the

16    provisions of SB 362?

17                  MR. SWEETEN:  Objection --

18        A    No.

19                  MR. SWEETEN:  -- legislative privilege;

20    objection, asked and answered.  You can answer.

21        A    No.

22        Q    (By Mr. Gear:)  And I believe I asked you if

23    you were aware of any facts that supported exclusion from

24    SB 14, but now I'm asking you specifically about SB 362.

25                  And prior to the institution of IDs with
```

CONFIDENTIAL

[Page 125]

1    the photo -- student IDs, with the photo, are you aware

2    of any facts that support why private student IDs with a

3    photo were excluded from SB 362?

4              MR. SWEETEN:  Same objection.

5    A    Students from private institutions?

6    Q    (By Mr. Gear:)  Yes.

7    A    No, I'm not aware of those reasons.

8    Q    And it's fair to say that there was no

9    report designed to assist legislators in the Senate to

10   determine --

11             MR. GEAR:  Strike that.

12   Q    (By Mr. Gear:)  Is it fair to say that there

13   were no reports designed to assist legislators in the

14   Senate to understand concerns related to student IDs --

15             MR. SWEETEN:  Objection; vague.  I'm

16   sorry.  Go ahead, Bruce, finish.  I didn't want to

17   interrupt your question.  Go ahead.

18   Q    (By Mr. Gear:)  -- related to SB 362?

19             MR. SWEETEN:  Objection, legislative

20   privilege; objection, vague.  You can answer.

21   A    Not that I'm aware of.

22   Q    (By Mr. Gear:)  Do you recall, during the

23   consideration of SB 362, that the issue of illegal aliens

24   and noncitizens was raised on the Senate floor?

25   A    You would have to refer to the record on that.

**CONFIDENTIAL**

[Page 126]

1    Q   Well, specifically, I would like to know if you

2 have any recollection of Senator Fraser raising the issue

3 of noncitizens or illegal aliens voting?

4    A   As I sit here today, in August of 2014, I do

5 not have specific independent recollection.  I would have

6 to refer to the record with regard to that.

7    Q   Were you or your staff involved in any

8 communications related to SB 362 regarding the issue of

9 insuring that illegal aliens or noncitizens were not

10 voting at the polling place?

11    A   You know, I'm going to be -- I'm not trying to

12 be coy.  I do not remember specific conversations about

13 that issue among my staff.

14           We were primarily concerned with process

15 at that point in time.  I didn't design the bill.  And

16 if there were conversations about that, they were

17 certainly on the record, and I don't recall specifically

18 any of those internally.

19    Q   And just to round that out, is it also your

20 testimony that you don't recall any specific testimony

21 with other legislators related to the issue of noncitizens

22 and illegals voting at the poll?

23    A   No, I don't, but, I mean, it has been seven

24 years ago or six or five or however many years.  So, you

25 know, if that issue came up, I don't recall discussing

CONFIDENTIAL

[Page 127]

1    that.

2                   I recall other reasons for being

3    concerned about the ballot integrity.  And so that's my

4    frame of reference.

5        Q    What reasons do you recall related to SB 362 --

6                   MR. GEAR:  Strike that.

7        Q    (By Mr. Gear:)  Do you recall what the purpose

8    of SB 362 was?

9        A    The purpose of the bill was to preserve ballot

10   integrity and to prevent people from just basically

11   harvesting voter ID cards or voter registration cards and

12   using them to influence primary and general elections,

13   because -- under the provisions of the law.

14                  Before we changed it, all a person had to

15   do was present a voter registration card that entitled

16   them to vote.  There was no way to verify whether that

17   person was the person represented on the card.

18                  Likewise, there's no way to prove or

19   provide any sort of enforcement with regard to whether

20   or not the person who is presenting the voter

21   registration card, representing that they are the person

22   entitled to vote, was, in fact, that person.

23                  And so the concerns that I was honed in

24   on was to stop that type of voter fraud that is almost

25   impossible to enforce against.

CONFIDENTIAL

[Page 128]

1       Q    So you've said a number of things in that

2    statement.

3                    THE WITNESS:  Can I get a glass of water?

4                    MR. SWEETEN:  I'll get it.

5       Q    (By Mr. Gear:)  So you've talked about vote --

6    in your testimony, you've discussed vote harvesting of

7    voter registration cards, correct?

8       A    (Witness nods head.)

9       Q    Are you aware of any facts that will support

10   that there was vote harvesting -- prosecution of voter

11   impersonation at the polls of a person who was involved in

12   harvesting voter registration cards?

13                   MR. SWEETEN:  Objection; compound, asked

14   and answered.  You can answer.

15      A    I don't know how you prove it, because you

16   can't -- if you can't require identification, then you

17   can't -- you can't develop evidence sufficient to

18   prosecute.  And the volunteers or the minimum wage

19   workers that work at the polls are certainly not law

20   enforcement and capable to enforce it.

21                   And in politics, you get aware of people

22   that do those kinds of things.  History tells us that

23   those things are done.  If you have -- If you read

24   history, you read Box 13, Stevenson and LBJ, and you

25   know that it happens.

CONFIDENTIAL

[Page 129]

1    And until you have the ability to -- and
2    the simplest way to avoid that from happening is to
3    require that the person who presents themselves to vote
4    verify that they are the person on that card or that
5    they're able to do it.

6    That is my simple, sole reason for
7    supporting Senate Bill 218 -- or House Bill 218, 362,
8    Senate Bill 362, and Senate Bill 14, I think.

9    Q    (By Mr. Gear:)  SB 14.
10   A    SB 14.
11   Q    And I understand your answer, and I understand
12   that you're concerned that there is difficulty in proving
13   voter fraud at the polls.

14   But my specific question was:  Are you
15   aware of any prosecutions related to voter impersonation
16   as a result of vote harvesting at the polling places in
17   Texas?

18   A    I believe that -- there are prosecutions, I
19   know.  I don't -- I can't drill down and have not drilled
20   down into those to be able to give an answer to that, but
21   I do know there have been prosecutions.

22   I don't know if they had the vote
23   harvesting components to it, but, in my view, that
24   was -- in my view, that's a risk that we have with the
25   current system of -- or the old system where you were

CONFIDENTIAL

[Page 130]

1   not required to verify that you were the person; that

2   the voting person was the person that was registered on

3   that card.

4       Q   So, as you sit here today, and as you debated SB

5   362 or --

6               MR. GEAR:  Strike that.

7       Q   (By Mr. Gear:)  Any voter photo ID

8   legislation -- are you aware of a measurable number of

9   prosecutions for voter impersonation at the polling

10  places --

11              MR. SWEETEN:  Same objection.

12      Q   (By Mr. Gear:)  -- in Texas?

13      A   I think I've just answered it.  I think the

14  Attorney General -- I think, in the record that you have,

15  that was presented either in our report in 2006 or in the

16  legislative record on Senate Bill 362, maybe 14 -- I

17  don't know -- I think there was evidence that there was

18  prosecutions of voter fraud, and I assume that's voter

19  impersonation.

20              Probably, mail fraud is an area where it

21  seems like there was a lot of concern as well, you know,

22  mail-in ballots as well.  But, again, that's my

23  recollection.

24      Q   So let's just address the issue of mail fraud.

25  Looking at SB 362, the provisions of SB 362, is it fair to

**CONFIDENTIAL**

[Page 131]

1    say that there is nothing within SB 362 which would have

2    addressed the issue of by-mail voter fraud?

3                    MR. SWEETEN:  And feel free to review.

4        Q    (By Mr. Gear:)  Feel free to review and take

5    your time.

6        A    (Witness reviewing document.)

7                    MR. GEAR:  And for the record, Senator

8    Duncan is referring to the provisions of SB 362, --

9                    THE WITNESS:  Yes, sir.

10                   MR. GEAR:  -- which is identified as

11   RD --

12                   THE WITNESS:  11.

13                   MR. GEAR:  -- 11.

14       A    (Witness reviewing document.)  You know, I

15   don't think there is anything in here that specifically

16   deals with -- directly deals with mail fraud.  I think

17   there may be some general things about voter education

18   and things like that, but I don't know if that applies to

19   mail fraud or not.

20                   It's more like -- I think the bill is

21   primarily focused here on, as we discussed earlier, the

22   personal voter --

23       Q    Impersonation?

24       A    -- voter presentation at the ballot box and not

25   as to mail fraud.

CONFIDENTIAL

[Page 132]

1      Q    I spoke over you, and I want to make sure that

2 it's clear.

3               Do you agree that SB 362 deals with

4 in-person voting at the polling place?

5      A    Yes, sir.

6      Q    And do you agree that SB 362 deals with voter

7 impersonation at the polling place?

8      A    Yes.

9      Q    Do you know if there is any --

10               MR. GEAR:  Strike that.

11      Q    (By Mr. Gear:)  Can you tell me what, if

12 anything else, SB 362 deals with related to voter fraud?

13      A    I think primarily voter impersonation is the

14 issue.

15      Q    Are you aware of any elections in the State of

16 Texas that were altered or were altered as a result of

17 voter impersonation at the polls?

18      A    I'll be consistent with what I said earlier.  I

19 don't know how you know, because you would have no

20 enforcement mechanism under the old law, because now the

21 new law requires that the voter verify his identity,

22 consistent with his voter registration.  You know, you

23 would be able to show that.

24               It's a deterrent to that occurring, as

25 well.  And so I just don't know how you would -- you

CONFIDENTIAL

[Page 133]

1    know, it would be very difficult to prove.  And so, you

2    know, I'm saying I can't -- I can't tell you that I'm

3    familiar with a specific instance of that.

4         Q    And in 2009, during the consideration of SB 362,

5    was there a measurable number that you recall regarding

6    the number of prosecutions of in-person voter

7    impersonation at the polls?

8         A    There was a number of in-person prosecutions.

9    I can't classify them as to what the violations were, but

10   I think the record would have that.

11        Q    And if I were to tell you that record reflected

12   that there were zero prosecutions of voter impersonation

13   at the polls, as of 2009, would you have any reason to

14   dispute that?

15        A    I --

16             MR. SWEETEN:  Objection; assumes facts

17   not in evidence.

18        A    I don't know what -- I couldn't dispute it or

19   not dispute it.  I wouldn't surprise me, because I know

20   it's something that would be difficult to prove.

21        Q    (By Mr. Gear:)  And in voting for SB 362, did

22   you believe that the provisions within that SB 362 were

23   sufficient to identify a person at the polling place?

24        A    Yes, I thought they were.  You know, I think

25   the Senate bill I voted for, I supported it.  So, yes, I

CONFIDENTIAL

[Page 134]

1  did.

2              MR. GEAR:  Do you want to take a lunch

3  break now?

4              (Off the record discussion ensued; lunch

5  break taken.)

6      Q    (By Mr. Gear:)  We're back on the record.  So,

7  before we went off the record, you were discussing some of

8  the difficulties of identifying voter impersonation at the

9  polls.  Do you recall that?

10     A    Yes.

11     Q    And one of the points that you raised was:  It

12  would be difficult for poll workers to identify

13  impersonation at the polls.  Do you recall that testimony?

14     A    I do.

15     Q    What steps or what reports or analysis did you

16  or your staff conduct to determine if that position was

17  actually based in fact?

18     A    Well, I think, just anecdotally, you know, you

19  think through issues.  When you represent a big district

20  like I do, you go around, and you talk to people.  And I

21  had 51 counties.  At that time, I think I had 46.

22              And voter ID and that sort of thing was a

23  big issue, and people would talk about that.  They

24  wouldn't talk about it in specific, "I saw this, or I

25  heard that, and you can do this."

CONFIDENTIAL

[Page 135]

1          And one example that was given was if

2   somebody presented their wife's -- to vote with their

3   wife's card, that even they couldn't be turned down to

4   vote.  I don't know if that's true or not, but it kind

5   of registers the fact that how would we expect the poll

6   workers to really know whether John Doe is John Doe and

7   whether or not there is fraudulent activity going on

8   with that.

9          And then we heard -- at least off the

10  record -- but I heard of anectodal testimony where

11  people would harvest cards -- harvest cards and actually

12  market them, and that was a concern that I had, but,

13  generally, that was a common sense concern that I had.

14          And it seemed to me that requiring

15  identification to vote was a fairly -- was a fair way to

16  go about enforcing the requirement that you be

17  registered, and that you be the person that's on the

18  registration before you're allowed to vote.

19     Q    As you sit here today, do you recall the names

20  of any election judges you may have spoken to?

21     A    No, no.  I don't think I talked to election

22  judges.  I think I talked -- it may have been I didn't

23  talk to them in that capacity, just generally, when you

24  go out and you represent a district and you're doing your

25  job and you're speaking with your constitutients.

CONFIDENTIAL

[Page 136]

1          And, you know, you also look and see --

2   we were also -- I was aware of the polls that basically

3   reflect very strong support among our constituents for

4   some way to enforce our -- you know, some sort of voter

5   identification.

6          Q    And you said "polls."  I'm sorry?

7          A    Right.  Just general polls that we were aware

8   of.  I didn't do any in my district, but things that were

9   done generally.

10         Q    Do you legislate based on polls?

11         A    Not normally.

12         Q    Now, were you aware that election judges at the

13   polling places actually do have certain law enforcement

14   privileges?  They have the power to arrest if they believe

15   that fraud had been committed?

16         A    Well, taking that as true, I've been to the

17   polls.

18         Q    Okay.

19         A    And I see that reality is different, and that's

20   never going to happen or not going to happen unless --

21   and if it does happen, it's going to be very -- it's

22   going to be a very difficult situation for someone who

23   probably is not trained in law enforcement or the ability

24   to do -- to safely detain someone who they suspect is a

25   fraudulent voter.

CONFIDENTIAL

[Page 137]

1          And that's a pretty risky thing anyway if

2  you look at a lot of the -- you know, persons are

3  exposed when they do that, and if they're wrong, to a

4  liability.  So I would say that that would be a very --

5  I don't see that as a -- or I see that as a real issue

6  and a problem.

7          And I see that based on my own experience

8  of voting of seeing that there would be no way, at least

9  no practical way, reasonable way, or a reasonable

10  expectation that a poll worker or an election judge

11  would be able to effectively enforce the voter laws.

12          And the easiest nonintrusive way to do

13  that is just basically to say, "Identify yourself."

14     Q    Are you also aware that candidates are allowed

15  to have poll watchers in the polling place?

16     A    I am.

17     Q    And have you -- as an elected official, have you

18  ever used poll watchers in a polling place?

19     A    No.

20     Q    Are you aware that there was an effort by the

21  Texas Attorney General's Office to identify voting fraud

22  in the polling place?

23     A    No.

24     Q    Are you aware that the Texas Attorney General's

25  Office expended money in an effort to identify voter fraud

CONFIDENTIAL

[Page 138]

1    in the State of Texas?

2        A    I don't know exactly in what context you're

3    talking about.

4        Q    Well, let me clarify that.

5        A    I need a foundation.

6        Q    Are you aware that the Attorney General's Office

7    created a special investigations unit?

8        A    I'm aware of that.

9        Q    And that one of the tasks of the special

10   investigations unit was to receive referrals from the

11   Secretary of State's office and other local prosecutors,

12   and in some cases, citizens regarding voter fraud?

13       A    Well, I'm not familiar with the specific

14   details of the task force.

15       Q    But you are familiar with the task force?

16       A    Generally, their existence.

17       Q    Are you aware that poll watchers have the

18   ability to challenge a voter's -- a voter in the polling

19   place, and that challenge would be issued directly to the

20   election judge?

21       A    Yes.

22       Q    Are you aware of -- and you indicated that you

23   had been at the polls before.  I suspect you had been

24   there to vote, correct?

25       A    Yes.

CONFIDENTIAL

[Page 139]

1      Q     Have you ever worked as a --

2      A     No.

3      Q     -- poll official?

4      A     No.

5      Q     Have you ever spent any significant time in the

6   polling place, to observe polling place activities?

7      A     Yes.

8      Q     And in what capacity?

9      A     Standing in line, waiting to vote.

10     Q     So, other than standing in line, you haven't

11  worked at the poll --

12     A     No.

13     Q     -- as a poll watcher; you have not worked as an

14  election judge; you have not worked at the poll --

15     A     Correct.

16     Q     -- as a poll worker?

17     A     That's right.

18     Q     And you have not, based on your recollection,

19  spoken directly to any election judges regarding their

20  ability to identify in-person voter fraud at the polling

21  place?

22     A     I think we had some testimony to that effect.

23  I can't recall specifically.  The record would reflect

24  that, if we did.

25     Q     But, as you sit here today, you don't recall

CONFIDENTIAL

[Page 140]

1    that testimony?

2        A    Right.

3        Q    I want to show you what has been previously

4    marked as RD-10 in this deposition, and I'll direct your

5    attention to Number 1.  And I understand that you do not

6    recall seeing this document.

7               So I would like you to just focus on the

8    last sentence of Number 1.

9        A    Could you tell me who prepared it?

10       Q    I don't know.  If you could tell me --

11       A    I don't know.  I don't know what the source is.

12       Q    So --

13       A    I guess what source -- what is the source of

14    RD-10?

15       Q    It's marked as highly confidential, and it was

16    produced by the State of Texas as TX 00087008.  But, I

17    mean, I can accept your testimony if you don't know who

18    authored this document.

19       A    Okay.

20       Q    And you don't know -- if you don't know who

21    authored the document, I understand that testimony.

22               So, not introducing this for the

23    authenticity of the document, I would like to explore

24    your knowledge about concerns related to SB 362, possibly

25    disenfranchising elderly, poor, or minority voters.

CONFIDENTIAL

[Page 141]

1          Were you involved in any communications

2     with any legislators that expressed concern that SB 362

3     may possibly result in the disenfranchisement of elderly,

4     poor, or minority voters.

5          A    Generally, as the bill was debated on the

6     Senate floor, and I would assume as the special order

7     provision was also debated on the Senate floor, in

8     2009 -- are we talking about that 2009?

9          Q    SB 362.  Correct.

10         A    So I would assume that that was -- I know those

11     discussions took place on the Senate floor.  I don't

12     recall specifically what they were, but the record will

13     reflect that.

14         Q    And what, if any, reports or analyses or steps

15     did you or your staff take specifically to address the

16     concerns that SB 362 may result in the disenfranchisement

17     for elderly, poor, or minority voters?

18         A    We followed up with our role, to make sure we

19     had a hearing that allowed the opponents and proponents

20     of the legislation to bring evidence before the body, so

21     the body could deliberate on that evidence, weigh it, and

22     make a decision.

23          Each individual member of the Senate

24     could make that decision if that was appropriate for its

25     constitutients in its own judgment.

CONFIDENTIAL

[Page 142]

1      Q     So, other than the hearing itself and the

2    ability to bring witnesses from either side, is it your

3    testimony that you're not aware of any specific reports

4    that address this issue?

5      A     Other than what's in the record.

6      Q     So I'm not -- I can't remember if we have

7    discussed this on the record, but do you recall that

8    SB 362 -- that there was a motion during the consideration

9    of SB 362 to suspend the regular order of business to

10   take up SB 362?

11     A     No, I don't.  Are you asking me:  Do I remember

12   or --

13     Q     Do you recall?  Do you remember?

14     A     No, I don't.

15     Q     Do you remember if SB 362 was heard in the

16   State Affairs Committee or in the committee of the whole?

17     A     362 was the committee of the whole.

18     Q     And I may have asked you this already.

19     A     All right.

20     Q     Do you know who proposed the motion to suspend

21   the regular order of business to take up 362?

22     A     I don't know that it would have required

23   suspending the regular order of business, because it was

24   a special order.

25     Q     And who introduced the special order?

CONFIDENTIAL

[Page 143]

1          A      I think that that was Senate Joint

2     Resolution 14.

3                      MR. GEAR:  Let's go off the record for a

4     second.

5                      (Off the record discussion ensued.)

6                      MR. GEAR:  Back on the record.

7          Q      (By Mr. Gear:)  We had a brief conversation, and

8     there was a clarification, and thank you for that.

9                      Can you tell me why SB 362 was considered

10    by the committee of the whole?

11                      MR. SWEETEN:  Objection; legislative

12    privilege.  You can answer.

13         A      The special order -- The rule that was --

14    Rule 5.11(d) allowed for the -- called for or required

15    a committee of the whole's consideration of voter

16    identification and legislation, if it was to be

17    considered as a special order under that rule.

18                      And so I assume that the Lieutenant

19    Governor then referred it to the committee of the whole

20    in accordance with Rule 5.11(d).  I think that's the

21    rule.

22         Q      And other than SB 362 and SB 14, are you aware

23    of any other photo ID legislation that was referred

24    directly to the committee as a whole?

25         A      I don't know that there was.  I don't think

CONFIDENTIAL

[Page 144]

1   there was.

2        Q    Are you aware of any other specific legislation

3   that was referred directly to the committee of the whole?

4                  MR. SWEETEN:  I want to be clear, Bruce.

5   You're talking about '09; in '09?

6                  MR. GEAR:  I am talking about '09.

7                  MR. SWEETEN:  All right.

8                  MR. GEAR:  Thank you for that

9   clarification.

10       A    Not that I recall.

11       Q    (By Mr. Gear:)  What about in 2011 during the

12  consideration of SB 14?  Do you recall any other --

13       A    I do not recall that there was any.  There may

14  have been, but I don't recall if there was.

15       Q    Did you --

16                  MR. GEAR:  Strike that.

17       Q    (By Mr. Gear:)  Are you aware if the Secretary

18  of State's office conducted an analysis or prepared a

19  report to determine the number of Spanish surname

20  registered voters who lacked the required SB 14

21  identification?

22       A    If they did, it would probably be in the

23  record.  I don't have independent recollection of it, but

24  they may have.  I know they did testify at the hearing.

25       Q    Did you or your staff engage in any

CONFIDENTIAL

[Page 145]

1   communications with the Secretary of State's office to

2   determine if they maintained voter registration by Spanish

3   surname?

4       A    I didn't personally.  It would not surprise me

5   if my staff did, in the regular course of preparing bills

6   or following up on requests from other members to have

7   information brought before the committee of the whole --

8       Q    Would you --

9       A    -- or even in 218.

10      Q    Would you direct your staff to seek that type of

11  information?

12               MR. SWEETEN:  Objection; calls for

13  speculation.

14      Q    (By Mr. Gear:)  Well, let me clarify.  I'm

15  asking you specifically:  Would you have directed your

16  staff to seek information specific to voter registration

17  Spanish surname data?

18               MR. SWEETEN:  I'm still going to object on

19  speculation, because you're asking him to say if -- it's

20  a hypothetical.  Would you have -- I mean, the

21  question -- if the question --

22      Q    (By Mr. Gear:)  Did you --

23               MR. SWEETEN:  "Did you," I think, that's

24  fair.

25      Q    (By Mr. Gear:)  Let me restate the question.

**CONFIDENTIAL**

[Page 146]

1    Did you direct your staff to seek information related to

2    voter registration information based on Spanish surname

3    data?

4        A    I don't remember if I did specifically.  That's

5    something that -- you know, I have a very competent

6    staff -- that they probably did that on their own without

7    asking, I mean, if they needed it or if it was requested.

8              You know, I could have, but I don't

9    recall doing it specifically.

10       Q    Do you recall if Jennifer Fagan sought that

11   information?

12       A    I do not.  I cannot speak for that.  I do not

13   know, sitting here today.

14       Q    Do you recall reviewing information related to

15   voter registration based on Spanish surname data?

16       A    It seems to me that in the hearing of the

17   committee as a whole, that evidence was brought forth,

18   but I can't accurately testify to that.  It would be in

19   the record, if it was.

20       Q    And just so the record is clear, do you recall

21   that being brought forth in 2009?

22       A    I think, if it was -- you know, it would occur

23   to me that it was, but, you know, again, I'm having a

24   vague recollection that there was -- that that was a

25   discussion that took place.

CONFIDENTIAL

[Page 147]

1           And it was in 2008.  And the record will

2    reflect more accurately than what my memory would serve.

3                MR. GEAR:  I only have one copy of this,

4    but let me mark this for the record.  I'm going to mark

5    this as RD-13.

6                (Duncan Deposition Exhibit Number RD-13

7    marked.)

8        Q    (By Mr. Gear:)  I'll give you a chance to look

9    at this and ask you to identify this document.

10       A    (Witness reviewing document.)

11       Q    And can you identify that document for the

12   record, please?

13       A    Looking at the first page, it appears to me to

14   be the Senate Journal record of proceedings on Wednesday,

15   March 18th, 2009.

16       Q    And that's part of the Senate Journal?

17       A    Yes, sir.

18       Q    And if I could just look at that briefly.

19                MR. GEAR:  For the record, I will just

20   identify that this is Bates-stamped as USA 00013425.  It

21   also was presented as a Defendant's exhibit in Texas v.

22   Holder as DE 006358.

23       Q    (By Mr. Gear:)  And I would direct your

24   attention to -- I would direct your attention to Page 589

25   in the Senate Journal, which is Bates-stamped as USA

**CONFIDENTIAL**

[Page 148]

1   0013431 at the bottom.

2              And I'll ask you questions about that,

3   once you've had a chance to look at it.

4       A    (Witness reviewing document.)

5       Q    So my question is:  Was there a point in time

6   during the hearing where Senator Van de Putte read into

7   the record a letter from Coby Shorter?

8       A    I don't know if she read it or placed it.

9   Often, members will place something in the record, and

10  it's in the record.  It doesn't mean that anybody else

11  saw it.  But I don't know if this was placed in the

12  record or whether it -- the journal probably would not

13  reflect that, one way or the other.

14      Q    And who is Coby Shorter, III?

15      A    Coby Shorter was the Deputy Secretary of State.

16      Q    And he was Deputy Secretary of State in 2009?

17      A    I believe so.  I think he testified at the

18  hearing.

19      Q    I'm going to direct your attention to Page USA

20  00013433, also Bates-stamped as DE 006366, and that's

21  Page 591.  And I'll ask you to take a look at the top.

22      A    (Witness reviewing document.)

23      Q    Does that help refresh your recollection in 2009

24  whether the issue of voter registration based on Spanish

25  surname was raised during -- in the Senate on the public

CONFIDENTIAL

[Page 149]

1    record or legislative record?

2         A    Well, all it does is tell me that this

3    letter -- let me read it --

4         Q    Sure.

5         A    -- so that I can understand what it is.

6         Q    Please.

7         A    (Witness reviewing document.)

8         Q    So, when you're done, let me just for the record

9    ask you to identify what that is that has been placed or

10   read into the record.  And if you can determine which,

11   that would be great, when you're done.

12        A    (Witness reviewing document.)  Okay.  So what

13   do you want me to do?

14        Q    So you were trying to determine what that was.

15   So, for the record, can you identify what exactly you're

16   reading for the record?

17        A    Okay.  This is a letter from Coby Shorter, who

18   was Deputy Secretary of State, dated March 11th, 2009.

19   That was apparently placed in the record on March 18th,

20   2009, following the vote on Senate Bill 362.

21        Q    And that was placed in the record by Senator

22   Van de Putte?

23        A    Yes, according to the record.

24        Q    And, again, directly your attention to --

25        A    The third --

**CONFIDENTIAL**

[Page 150]

1      Q    Yes.  My question was:  In 2009, were you made

2   aware that there was voter registration data available

3   based on Spanish surnames?

4      A    I believe that this letter indicates at

5   least -- and I don't know when this -- if this was in the

6   record before the committee of the whole or not.

7      Q    And in looking at the first page of this

8   document --

9      A    I mean, it could have been --

10     Q    Okay.

11     A    -- because it's dated --

12     Q    But, in any event, that's --

13     A    March 11th, 2009.

14     Q    That is the 2009 record, correct?

15     A    Right.  March 11th, 2009.

16     Q    Sorry about that.

17     A    So the meeting of the committee of the whole

18   began on March 17th, if I remember right, and concluded

19   on the 18th.  And this was placed in the record on the

20   18th after the Senate reconvened as the Senate, as the

21   full Senate, out of the committee of the whole, and voted

22   on 362.

23              So this is -- I don't know how this was

24   presented.  Often, members will place something in the

25   record, and for whatever purpose, for their legislative

CONFIDENTIAL

[Page 151]

1   intent or whatever they want to do.  Other members

2   usually don't see it unless they read the journal every

3   day, which I'll say probably most people don't have time

4   to do that.  But the bottom line is:  That's what this

5   is.

6       Q    And so, specifically, there was a question posed

7   to Coby Shorter, who responds.  Actually, the question

8   was:  "Does the Secretary of State track the racial status

9   of registered voters?"

10            And are you aware of whether or not the

11  Secretary of State tracks the racial status of registered

12  voters?

13      A    According to Mr. Shorter's letter, they do not.

14      Q    Do you have any independent recollection of

15  whether or not the Secretary of State tracks the racial

16  status of registered voters?

17      A    No.

18      Q    And the question goes on to say, "If not, how

19  well the State prove that SB -- Senate Bill 362 does not

20  have an adverse impact on minority voters when the State

21  submits the bill for preclearance?"

22            And based on Page 591, USA 00013433, is

23  there an answer provided by Mr. Shorter?

24      A    Well, I think he basically -- maybe this is

25  where the confusion is.

**CONFIDENTIAL**

[Page 152]

1          The Legislative Counsel assists your

2    office, DOJ, I guess, in basically compiling data on

3    race and ethnicity for the purpose of redistricting, and

4    I think he's suggesting that, you know, a similar effort

5    could be -- what he says -- I'm not going to paraphrase.

6    I'll just read it.

7          Q    Sure.

8          A    "A similar effort to obtain such demographics

9    may be required for a voter identification bill.

10   Historically, we have worked with legislators to ensure

11   the best data available is included in the submissions."

12   That was his answer.

13         Q    Was there any effort to compile such data by the

14   Senate?

15         A    If there was, it would have been in the record.

16         Q    Are you aware of any -- As you sit here today,

17   are you aware of any attempt to compile data -- and let me

18   see if I can get this right -- to compile data in an

19   effort to prove that Senate Bill SB 362 does not have an

20   adverse impact on minority voters when the State submits

21   the bill for preclearance?  Are you aware of any efforts

22   to do that?

23         A    It never was submitted for preclearance,

24   because it didn't pass.  So I assume that because it

25   didn't pass, as it relates to Senate Bill 362, that

CONFIDENTIAL

[Page 153]

1    wasn't done.

2         Q    So --

3         A    But I'm assuming.  I mean, somebody may have,

4    postmortem that bill, done something along that line.  I

5    do not know.  If they did, I'm sure it's in the record

6    somewhere.

7         Q    And just so I'm clear on your testimony, are you

8    aware of any --

9         A    No.

10        Q    -- steps taken to compile this data?

11        A    No.

12                  (Duncan Deposition Exhibit Number RD-14

13   marked.)

14        Q    (By Mr. Gear:)  I'm going to show you what has

15   been marked as RD-14.  I would note for the record that

16   this has a Texas Bates-stamp of TX 00204754, and it was

17   produced as a highly confidential document.

18                  And I would just ask you to identify what

19   this is for me, please.

20        A    That appears to be correspondence between

21   Jennifer Fagan and Ann McGeehan in January of 2011.

22        Q    And that would have been during the

23   consideration of SB 14?

24        A    Right.

25        Q    And in the e-mail from Ann McGeehan to Jennifer

**CONFIDENTIAL**

[Page 154]

1  Fagan, subject titled, "Data," Jennifer Fagan -- who is

2  your staff, correct, --

3       A    Correct.

4       Q    -- asks Ms. McGeehan:  "Does the SOS or any of

5  the local election officials collect ethnicity information

6  on voters?"  Do you see that?

7       A    Yes.

8       Q    Did you direct Jennifer Fagan to seek this type

9  of information from the Secretary of State's office?

10      A    I don't recall if I did or not, but if she did,

11 she was operating in her normal functions as director of

12 the committee.  So I may have directed her, I may not, or

13 she may have done it on her own.

14      Q    Do you recall if she communicated her findings

15 related to this e-mail?

16      A    She usually does, but I don't recall

17 specifically getting that information.

18      Q    And regarding the answer from Ann McGeehan, it

19 indicates that "The only ethnic data SOS or any county

20 voter registrar has is the number of voters that have

21 Hispanic surnames, because ethnicity is not requested on

22 the voter registration application."  Do you see that?

23      A    Yes, sir.

24      Q    And she goes on to say:  "We obtain a list of

25 Hispanic surnames from the U.S. Census and then run it

CONFIDENTIAL

[Page 155]

1    against the state-wide list of voters.  Do you see that?

2        A    Yes, sir.

3        Q    "It is not a perfect indicator, as some folks

4    may have Hispanic surnames that are not Hispanic and

5    vice-versa."  It indicates that she can get the -- get

6    Jennifer Fagan -- "to get you the current number of

7    Hispanic surname voters in the morning, if you need it."

8    Do you see that?

9        A    Yes, sir.

10       Q    And do you know if Ann McGeehan provided

11   Jennifer Fagan the number of the current number of

12   Hispanic surname voters in the morning?  And that would

13   have been on January 25th.

14       A    I don't recall, one way or the other, whether

15   that occurred.  If they did, we would probably put that

16   in the record for Senate Bill 14.

17       Q    Do you know why this information was being

18   sought from the Secretary of State's office by your staff

19   member?

20       A    I don't have specific recollection.  I would

21   assume -- my only answer on that would be either assuming

22   that she was following up on issues that were raised by

23   debate or questions asked by other members of the Senate

24   with regard to the legislation that we were going to

25   consider in 2011.

**CONFIDENTIAL**

[Page 156]

1      Q     Considering the concerns that photo ID

2  legislation may result in the disenfranchisement of

3  minority voters, would this type of information have been

4  helpful to obtain from the Secretary of State's office?

5                 MR. SWEETEN:  Objection, calls for

6  speculation; objection, legislative privilege.  You can

7  answer.

8      A     You know, I don't know if it would have or not.

9  I don't know if we had it.  I don't know what it says.

10  So I can't tell you if it would have been helpful or not,

11  without seeing the information.

12     Q     And, again, so I'm clear, do you recall seeing

13  any data that was compiled by the Secretary of State's

14  office related to a list of Hispanic surnames from -- run

15  against the state-wide list of voters?

16     A     As I sit here today, I don't remember anything.

17  I could have, but I don't remember it.

18     Q     As you sit here today, do you know of any other

19  more reliable method to determine whether or not photo ID

20  legislation would have had a -- would have resulted in the

21  disenfranchisement of minority voters or had a negative

22  impact on minority voters?

23                 MR. SWEETEN:  Objection, foundation;

24  objection, legislative privilege.  You can answer.

25     Q     (By Mr. Gear:)  Well, let me hash that out,

**CONFIDENTIAL**

[Page 157]

1    because I want you to understand my question.

2                    It's clear from the January 24th 2011

3    e-mail from Ann McGeehan to Jennifer Fagan -- and just to

4    be clear Ann McGeehan -- who is Ann McGeehan?

5       A    She was the, I think, Deputy Secretary of State

6    in charge of elections.

7       Q    So it's clear, from the e-mail from Ann McGeehan

8    to Jennifer Fagan, that there was data available.

9                    MR. SWEETEN:   Is that a question?

10                   MR. GEAR:   That's not a question.

11                   MR. SWEETEN:   Okay.

12      Q    (By Mr. Gear:)   While it may not have been a

13   perfect indicator, as indicated in the e-mail, were there

14   any other -- was there any other way to determine what the

15   impact of photo ID legislation would have been on Hispanic

16   voters?

17                   MR. SWEETEN:   Objection; foundation.

18      A    First, I don't know of any -- the raw data

19   alone, suggested by Ms. McGeehan, in her response,

20   wouldn't have given the Legislature any meaningful

21   analytical evidence with regard to voter identification

22   legislation.

23                   Secondly, I don't -- your question then

24   is -- I'm trying to -- it's kind of a long question.

25      Q    (By Mr. Gear:)   Sure.  And I'm trying to work

CONFIDENTIAL

[Page 158]

1    through it, as best I can.

2              MR. GEAR:  And I understand the foundation

3    objection.  I said "would have."

4        Q    (By Mr. Gear:)  So it's my understanding that

5    you are not aware of data that was compiled related to

6    Spanish surnames as run against the state-wide database;

7    is that correct?

8        A    No.  It's a confusing issue, because we do get

9    that information with regard to redistricting.

10       Q    Okay.

11       A    And so, unless Counsel prepares that, I don't

12   know, or I can't recall whether that was used.

13             All we're talking about here, with

14   Mr. McGeehan's e-mail, was just a list of Spanish

15   surname voters.

16       Q    As run against the state-wide database.

17       A    Well, okay.  So it's raw data.  And so raw data

18   alone does not give you any analytical ability to predict

19   what any legislation would do along those lines.

20       Q    Well, you obtained --

21       A    The raw data especially is raw -- it's just

22   Hispanic surname individuals.

23       Q    And you indicated that you obtained similar

24   information for redistricting.  Why do you obtain the

25   information for redistricting?

CONFIDENTIAL

[Page 159]

1            MR. SWEETEN:  Objection.  I think that

2    misstates facts.

3        Q    (By Mr. Gear:)  And, again, I'm not trying to

4    misstate your testimony.

5            You've testified that similar information

6    was obtained --

7        A    Right.

8        Q    -- for redistricting, correct?

9        A    Right.

10           MR. SWEETEN:  So I'm -- as to what she's

11   saying or similar to --

12           MR. GEAR:  Well, if you want to go into

13   the details of it, we can.

14           MR. SWEETEN:  Okay.

15       Q    (By Mr. Gear:)  You've testified that

16   information related to Hispanic surnames, as run against

17   the state-wide list of voters, was obtained for

18   redistricting, correct?

19       A    It's obtained in a different format for a

20   different purpose.

21       Q    And what is the purpose?

22       A    The purpose is for -- to draw for

23   reapportioning voter or legislative or congressional

24   districts.

25           And so the identification of Hispanic

CONFIDENTIAL

[Page 160]

1  surname persons for ethnicity is certainly relevant to

2  requirements under the Voting Rights Act.  And so for

3  that purpose is why we would be getting that

4  information.

5           With regard to the voter ID, just making

6  a point, the raw data would not be -- would not offer

7  any evidence of the impact of any voter ID legislation.

8  Without drawing wide assumptions, that would not be

9  statically valid.

10     Q    And how would you know that?

11     A    Well, it's just common sense.  It doesn't take

12  a rocket scientist to figure that out.  You know, the

13  data that she would provide would be gross data, meaning

14  bulk data, or it would provide no analytical information.

15           It just would be who has Hispanic

16  surnames, and that doesn't necessarily translate to any

17  useful information with regard to the impact of voter

18  identification legislation.

19     Q    Would it have been -- Could it have possibly

20  been useful in determining the number of Spanish surname

21  registered voters that may not have one of the necessary

22  SB 14 identifications?

23     A    No.

24           MR. SWEETEN:  Objection, foundation;

25  calls for speculation.  Go ahead and answer.

**CONFIDENTIAL**

[Page 161]

1       A     No.  It's just raw data.  It's just names.

2       Q     (By Mr. Gear:)  That's the -- Part of this that

3   is missing -- and I'm sorry if you've said this, but it's

4   Spanish surnames from the census, correct?  And those

5   Spanish surnames would be run against the state-wide list

6   of voters.

7                 So, with that understanding, why are you

8   now saying that it would only be raw -- it would only be

9   names and raw data?

10                MR. SWEETEN:  Objection, foundation;

11  assumes facts not in evidence.  You can answer.

12      A     There is no other demographic information

13  provided.  It's just that raw data.

14      Q     (By Mr. Gear:)  Just to complete this and close

15  the circle, is it your testimony that you don't believe

16  that type of data would have been helpful in assisting the

17  Senate to understand the impact of photo ID legislation on

18  Hispanic voters?

19      A     I do not.

20      Q     And it's your testimony, as I understand it,

21  that you -- that it's your understanding that that would

22  just simply have been raw data?

23      A     My testimony is that raw data alone, as

24  proposed by Ms. McGeehan, could certainly be obtained,

25  and we probably may have obtained it.  I don't know.

**CONFIDENTIAL**

[Page 162]

1        But without -- that alone and without

2   much more data and information on demographics and other

3   statistical analysis, this data would not be -- alone

4   would not be helpful.

5        Q    So, when you're talking about demographics and

6   other statistical analysis, what are you referring to?

7        A    Well, I'm just saying here that's -- all you're

8   doing here is just assuming that somebody with an

9   Hispanic surname is going to be impacted by Senate

10  Bill 362.

11            And I think that is an -- that is an

12  assumption that is not supported by any valid

13  statistical evidence or studies or anything else.  It

14  just -- It's just information.

15            And so, you know, I don't -- I'm not

16  following your point, but, again, that's pretty clear

17  and plain, in my view, from what she -- what is the

18  information she said she could provide.  It's just names

19  of people.

20       Q    And I believe I've asked you, and I'll just ask

21  you again.

22       A    Okay.

23       Q    Would that type of data have assisted in --

24  would that type of data --

25            MR. GEAR:  Strike that.

**CONFIDENTIAL**

[Page 163]

1      Q    (By Mr. Gear:)  Would that type of data have

2  been helpful in assisting legislators in the Senate in

3  understanding what Hispanic registered voters may not

4  possess the necessary forms of ID under SB 14?

5                MR. SWEETEN:  Objection, foundation;

6  objection, asked and answered.

7      A    I think I've answered it in about as many

8  ways -- in my belief, of the value of that data.

9      Q    (By Mr. Gear:)  Do you have any recollection as

10  to whether or not --

11                MR. GEAR:  Strike that.

12      Q    (By Mr. Gear:)  Did Jennifer Fagan respond to

13  Ann McGeehan's offer to be provided the Spanish surname

14  voters' data?

15      A    You know, I don't recall if she did or not.  It

16  would be in the record if she did.

17      Q    Well, and, again, I would like to understand

18  what you know, as you sit here today.

19                Do you recall seeing any response sent by

20  Jennifer Fagan to Ann McGeehan?

21      A    No.

22      Q    Do you recall seeing any response, as a

23  follow-up to Ann McGeehan's offer to provide current --

24  the current number of Hispanic surname voters to Jennifer

25  Fagan -- do you recall seeing a response to that?

**CONFIDENTIAL**

[Page 164]

1          A     No.

2          Q     Do you ever seek to determine what the number of

3    registered voters with Spanish surnames was that may have

4    lacked the required SB 14 identification?

5          A     I don't know.  I don't know if there's any.  I

6    don't recall any independently of what we did or what

7    other members of the Senate did or presented as evidence

8    at the hearing.  It would be reflected in the record.

9          Q     I want to, at last, turn to SB 14.  SB 14 was

10   the photo ID legislation that passed in the Senate in

11   2011, correct?

12         A     Yes, sir.

13         Q     Prior to the consideration of SB 14, were you

14   involved in any communications with other legislators

15   during which a comparison between photo ID legislation and

16   immigration was made?

17         A     I think, similar to other pieces of legislation

18   that we've talked about over the years, I don't have

19   specific recollection of any discussions about the issue

20   of illegal immigration with any specific member.  You

21   know, that's my recollection.

22         Q     Let me see if I can be a little more specific on

23   that question.

24               Do you recall engaging in communication

25   with Senator Patrick regarding photo ID legislation --

CONFIDENTIAL

[Page 165]

1          MR. GEAR:  Strike that.

2     Q    (By Mr. Gear)  Do you recall engaging in

3  communication with Senator Patrick during which a

4  comparison between photo ID legislation and immigration

5  was made?

6     A    Senator Patrick is a member who has expressed

7  concerns about that issue before.  So I don't know what

8  we discussed about that or not -- discussed that issue or

9  not.

10    Q    And what concerns did Senator Patrick raise?

11    A    Well, he has always had a concern about those

12  issues, but I don't know specifically.  He may have asked

13  somebody or me about that.  I don't know.

14    Q    And I'm trying to understand specifically what

15  the concerns regarding photo ID legislation and

16  immigration with Senator Patrick were?

17    A    I'm not sure.  I think I'm more relating it to

18  current -- to current things.  But back then I don't

19  recall exactly what -- I don't recall having a discussion

20  with him about that.  I'm not saying it didn't happen,

21  but I don't recall it.

22    Q    Do you recall having a discussion with Senator

23  Fraser regarding photo ID legislation and immigration

24  being one and the same?

25    A    Are you talking about on the record or off the

**CONFIDENTIAL**

[Page 166]

1   record or what?

2       Q    I'm just talking generally about discussions or

3   communications.

4       A    I don't recall.

5       Q    Then the answer was "no"?

6       A    Right.

7       Q    You don't recall.  Do you recall having

8   communications with any legislator, either in the House or

9   the Senate, regarding photo ID legislation and immigration

10  being connected?

11      A    No, I don't recall having that conversation.

12               (Duncan Deposition Exhibit Number RD-15

13  marked.)

14      Q    (By Mr. Gear:)  I'm showing you what has been

15  marked as RD-15, and I will give you a chance to look at

16  that.

17               MR. GEAR:  And for the record, I would

18  indicate that this document has been marked as highly

19  confidential and was produced by Texas -- that's TX

20  00009987.

21      Q    (By Mr. Gear:)  And when you've had a chance to

22  look at that, we can talk about it.

23      A    (Witness reviewing document.)

24      Q    Have you had a chance to look at RD-15?

25               MR. SWEETEN:  I would caution the witness

**CONFIDENTIAL**

[Page 167]

1    to take the time you need to review it.

2         A    Well, I've never seen this before.  I'm not

3    sure what it is.  But I guess I have seen it.  It came to

4    me.

5         Q    (By Mr. Gear:)  I'm sorry.  I didn't hear you.

6         A    Never mind.  I'm thinking about what this is.

7         Q    Okay.

8         A    And I haven't read the second part.  I don't

9    know if it's relevant.  I have read the first information

10   from Dan Patrick to several members of, it looks like,

11   the Republican caucus.

12              MR. GEAR:  So let's just identify this

13   for the record.  The first page is identified as TX

14   00009987.

15        Q    (By Mr. Gear:)  Do you see that there is an

16   indication "Forward, Follow up on meeting in Georgia, a

17   victory for citizenship verification."  Do you see that?

18        A    That's the subject line that Patrick was --

19   Senator Patrick assigned to this message, apparently.

20        Q    And do you see that this is from Senator

21   Patrick, and it's got a "danpatrick700@gmail.com" e-mail?

22        A    Yes.

23        Q    And that this was sent to various senators and,

24   as you've described, Republican senators on March 29th,

25   2012 --

CONFIDENTIAL

[Page 168]

1    A    Yes.

2    Q    -- at 12:55 a.m.?

3    A    Yes, sir.

4    Q    And looking down at the forward message, again,

5   it's from Dan Patrick.  Who is "brianandmelbirdwell"?

6    A    He's a -- Brian is a member of the Senate.

7    Q    And Dan Patrick is a member of the Senate, also?

8    A    Yes, sir.

9    Q    And do you see that "Deuell"?

10   A    Bob Deuell.

11   Q    And do you know who that is?

12   A    Yes.  Senator Deuell.

13   Q    And Estes?

14   A    Craig Estes.

15   Q    And Estes is a senator?

16   A    Correct.

17   Q    And he is a Republican senator?

18   A    Correct.

19   Q    And Florence Shapiro?

20   A    Correct.

21   Q    Florence Shapiro is a senator?

22   A    At that time, yes.

23   Q    There's a Glenn Hegar -- Hegar?

24   A    Hegar.

25   Q    And Glenn Hegar, I believe we've discussed

**CONFIDENTIAL**

[Page 169]

1    before, is a senator?

2         A    Correct.

3         Q    A Republican senator?

4         A    Yes.

5         Q    Jane Nelson?

6         A    Yes.

7         Q    And who is Jane Nelson?

8         A    A senator.

9         Q    Jeff Wentworth?

10        A    Senator.

11        Q    Is it JoAnn Huff?

12        A    Joan Huffman.

13        Q    Joan Huffman.  Senator?

14        A    Yes.

15        Q    John Cardona?

16        A    Carona.

17        Q    Carona.  Senator?

18        A    Yes.

19        Q    Kyle Slager?

20        A    Kel Seliger.

21        Q    I was close.

22        A    Not too close.

23        Q    Senator?

24        A    Senator.

25        Q    Why don't you just pronounce the next one?

CONFIDENTIAL

[Page 170]

1          A     I'll let you take a stab at it.

2          Q     Kevin --

3          A     Kevin Eltife.

4          Q     -- Eltife.   Senator?

5          A     Correct.

6          Q     And there are a number of other people here.

7     Mike Jackson; do you know who that is?

8          A     Yes.   Senator.

9          Q     There's an e-mail to Opie, "opie@cdmlaw.com."

10    Do you know who that is?

11         A     That's me.

12         Q     And you recognize that e-mail --

13         A     Yes.

14         Q     -- as being your e-mail?

15         A     (Witness nods head.)

16         Q     Robert Nichols; do you know who Robert Nichols

17    is?

18         A     Yes.

19         Q     Senator?

20         A     Yes.

21         Q     So does this refresh your recollection as to

22    whether you received this document?   Have you seen this

23    document before?

24         A     Well, again, it's addressed to me.   I don't

25    recall seeing it.

CONFIDENTIAL

[Page 171]

1           But, again, during legislative session,

2    three years ago, you see a lot of things.  That wouldn't

3    have been something that I would have necessarily zoned

4    in on.

5        Q    August 29th, 2010, would there have been any

6    photo ID legislation pending at the time?

7                MR. GEAR:  Strike that.

8        Q    (By Mr. Gear:)  Do you know when SB 14 was

9    filed?

10       A    January of -- apparently, we've got a record

11   here, if you want to go --

12       Q    Let's just put this into context.  We're going

13   to mark this.

14       A    I don't have -- I don't have the record for 14,

15   I don't believe.

16                (Duncan Deposition Exhibit Number RD-16

17   marked.)

18       Q    (By Mr. Gear:)  I'm giving you what has been

19   marked as RD-16.  And the question was when was -- first

20   of all, let's identify the document.

21                Is it fair to say RD-16 is the Texas

22   Legislature Online History for SB 14?

23       A    That's what it appears to be.

24       Q    And that's for the 82nd Legislature?

25       A    Yes, sir.

CONFIDENTIAL

[Page 172]

1      Q    And it identifies authors of that bill, correct?

2      A    Yes.

3      Q    And it identifies you as being an author of that

4  bill, --

5      A    Yes.

6      Q    -- along with a number of other --

7      A    Coauthors.

8      Q    -- senators?

9      A    Yes.

10     Q    Senator Fraser, Senator Birdwell, Carona --

11  well, why don't I let you read the authors of the bill?

12     A    Fraser, Birdwell, Carona --

13          COURT REPORTER:  Could you slow down a

14  little?

15          THE WITNESS:  Oh, I'm sorry.

16     A    Fraser, F-R-A-S-E-R, Birdwell, Carona, Deuell,

17  D-E-U-E-L-L, Duncan, Eltife, E-L-T-I-F-E, Estes, Harris,

18  two "Rs," Hegar, H-E-G-A-R, Huffman, two "Fs," Jackson,

19  Nelson, Nichols, Ogden, O-G-D-E-N, Patrick, Seliger,

20  S-E-L-I-G-E-R, Shapiro, Wentworth, and Williams.  Those

21  are the Senate sponsors or senate coauthors.

22     Q    (By Mr. Gear:)  And it appears that most, if not

23  all, of the authors of the bill appear on the e-mail

24  that's dated March 29th of 2012 -- I'm sorry -- March 29th

25  of 2010; is that correct?

**CONFIDENTIAL**

[Page 173]

1       A    Your foundation is incorrect.

2       Q    Which ones -- Which senator is not listed on the

3   e-mail that is listed on the bill?

4       A    RD-15 is the first e-mail dated August the

5   29th, 2010.

6       Q    Correct.

7       A    And so that's what you're referring to.  I

8   think you said March, but I just was correcting that.

9       Q    Thank you.

10      A    And this appears to be the same -- these appear

11  to be -- the recipients of the e-mail dated August 29th,

12  2010, are the same persons who appear as authors of

13  Senate Bill 14.

14      Q    Okay.  Thank you for that.  So, turning your

15  attention to the March -- I'm sorry -- the August 29th,

16  2010 e-mail, it indicates that -- from Dan Patrick, it

17  indicates, "Senators, I thought our two days was very

18  beneficial and look forward to the next meeting."

19               Do you recall what meeting is being

20  referenced in this e-mail?

21      A    No, I don't.  I think, you know, typically it

22  may have been a general caucus meeting, where we discuss

23  a lot of issues, not just single issues, but it looks

24  like, from reading this e-mail, I would only be

25  speculating as to what other issues were discussed.

**CONFIDENTIAL**

[Page 174]

1       Q    And when you say a "general caucus meeting," I'm

2   not sure I understand that.

3       A    Well, just a Republican caucus like a Democrat

4   caucus.  From time to time, you get together and discuss

5   issues and other matters.

6       Q    So, apparently, there was a discussion at

7   breakfast about an independent conservative group?

8       A    Yes.

9       Q    Do you know which independent or what --

10      A    No.

11      Q    -- what the name of the independent conservative

12  groups are?

13      A    No.

14      Q    Are you a member of independent conservator

15  groups, along with the other members listed on this

16  e-mail?

17      A    The Republican party.  That's it.  I'm not --

18  I'm not a member of any of the other organizations that

19  are associated with --

20      Q    Were you a member of any other organizations

21  associated with all of these individuals?

22      A    No, I don't think so.  I'm not sure all of

23  these different individuals were a member of that either.

24  So I don't know.  I don't know what he's talking about

25  when it's just a nondescript independent conservative

CONFIDENTIAL

[Page 175]

1    group.

2        Q    So, looking at the beginning of the third

3    paragraph, Page 1 of this e-mail, --

4        A    Uh-huh.

5        Q    -- it says, "In view of our discussion on voter

6    ID and immigration, several of you mentioned you thought

7    that the two issues were one and the same."  Do you see

8    that?

9        A    I do.

10       Q    And does this help refresh your recollection as

11   to whether or not you engaged in communication regarding

12   voter ID legislation and immigration being one and the

13   same?

14       A    No.

15       Q    On Page 2, which is Bates-stamped TX 00009988 --

16   and I'm not sure if part of the Bates-stamp was cut off.

17   It also indicates that "Or at a minimum connected."

18            Does that help refresh your recollection

19   of whether or not you engaged in communications with

20   other senators related to photo ID legislation and it

21   being connected to immigration issues?

22       A    No.

23       Q    Do you have any recollection regarding photo ID

24   and immigration being an issue during the consideration of

25   SB 14?

CONFIDENTIAL

[Page 176]

1      A     Well, you know, you just have to go to the

2   records and see if it was on the record.  You know, I

3   don't remember it being -- I don't remember whether or

4   not it was discussed in the debates on SB 14 in the

5   committee of the whole or otherwise.

6                 This e-mail reflects that at some point

7   in time, Senator Patrick discussed it, but I don't know,

8   you know, whether it was a part of a larger meeting.  My

9   sense is that this was a micro -- a topic that was

10  brought up in conjunction with a number of policy

11  issues, not related to voter ID, not related to any sort

12  of issue relating to election politics, but related to

13  other policy issues that we get involved in.

14     Q    And just so I'm clear, and I want the record to

15  be clear that in the exhibit that you're now reviewing,

16  it says, "In view of our discussion" -- and you've

17  identified that this is an e-mail that is at least

18  addressed to you -- "on our voter ID and immigration,

19  several of you mentioned you thought that the two issues

20  were one and the same."

21                 Do you have a belief that immigration and

22  photo ID are one and the same?

23                 MR. SWEETEN:  You're asking him if he

24  believes that?  Is that what you're saying?

25                 MR. GEAR:  That's correct.

CONFIDENTIAL

[Page 177]

1          MR. SWEETEN:  Okay.

2     A     You know, I take a -- you know, I don't really

3   know the answer to that.

4                I think the best way that I can respond

5   to it:  I think that immigration really is an issue of

6   Federal concern, and I have long held that belief.

7                And so the only thing that I've ever --

8   the only thing that I believe is the State's appropriate

9   role in immigration is with regard to protecting the

10  border, as we have done on -- against drug cartels and

11  those sorts of criminal violations of the border.

12  It's not -- Immigration is a Federal issue, and I don't

13  see necessarily that either one of them -- that voter ID

14  is connected.

15               I told you earlier the policy reason that

16  compelled me to support voter ID is the notion of voter

17  harvesting, and I do believe that that -- or voter

18  registration card harvesting -- I do believe that that

19  occurs, and I do believe that there is abuse of the old

20  current system because of the lack of ability to verify

21  whether or not the voter presenting the card is the

22  authentic voter, and the room for abuse that that lends

23  itself to.

24               Immigration was never a part of my

25  consideration with regard to voter ID.

**CONFIDENTIAL**

[Page 178]

1    Q    And based on the e-mail, is it fair to say that

2    immigration was a part of at least some of the senators'

3    consideration as it relates to photo ID legislation?

4        A    The only thing, I think, that you can draw

5    conclusively from this is that at least the senators --

6    one senator -- I don't know.  I can't tell you whether

7    that verifies that other senators agreed with him or not.

8    It's only what he says.

9        Q    Continuing to focus on this document, it says,

10   as to the discussion at breakfast about the independent

11   conservative group, "I thought the idea suggested by

12   Fraser, Duncan" -- I'm having trouble with that name -- is

13   it Eltife --

14       A    Estes, Estes.

15       Q    -- "and Huffman and others and accepted by me

16   will only make the group stronger."

17                What ideas were suggested during the

18   breakfast, if you know?

19       A    I have no idea.  I don't recall that

20   discussion.

21       Q    Do you recall any communications from

22   constituents who supported SB 14 that expressed a belief

23   that voter ID legislation would prevent illegal immigrant

24   from voting at the polls?  And I'm referencing

25   specifically SB 14.

**CONFIDENTIAL**

[Page 179]

1        A     Would you repeat that?

2        Q     Do you recall any communications from

3  constituents who supported SB 14 that expressed a belief

4  or opinion that voter ID legislation would prevent illegal

5  immigrants from voting at the polls?

6        A     Not particularly -- Well, not -- No, I don't.

7        Q     Do you recall specifying any written

8  communications related to that issue?

9        A     I don't recall.  We may have.  I don't see all

10  of the written communications that we have.

11        Q     Do you recall responding to any communications

12  related to that issue?

13        A     I do not.  I'm not saying we didn't respond,

14  but I'm saying I do not remember it.  We may have.  I

15  don't know.

16        Q     Do you recall having any communications from any

17  interest groups who supported SB 14 that expressed a

18  belief or opinion that voter ID legislation would prevent

19  illegal immigrants from voting at the polls?

20        A     Sitting here today, I don't have any

21  recollection of that.

22        Q     Prior to the filing of SB 14, were you or your

23  staff involved in any communications regarding the types

24  of ID that would be included in the provisions of SB 14?

25              MR. SWEETEN:  Objection; legislative

**CONFIDENTIAL**

[Page 180]

1    privilege.

2          A    I don't believe that I was.  I do not know

3    whether or not my staff was.

4          Q    (By Mr. Gear:)  Were you aware that Senator

5    Fraser's original bill was numbered as SB 178 and later

6    refiled to identify it as SB 14?  Were you aware of that?

7          A    I don't recall being aware of that.

8          Q    Do you recall any communications related to the

9    refiling of SB 178?

10          A    No, I do not.

11          Q    Would you agree that SB 14 is a stricter bill

12    than HB 218 and SB 362?

13               MR. SWEETEN:  Objection; legislative

14    privilege.

15          A    What do you mean by "strict"?

16          Q    (By Mr. Gear:)  What I mean by "strict" is that

17    HB 218 and SB 362 would have allowed for government-issued

18    photo IDs, as well as student photo IDs issued by state

19    institutions.  SB 14 does not, correct?

20          A    I agree that SB 14 does not provide some of the

21    non-photo ID exceptions that 362 or 218 did.

22          Q    Well, does SB 14 provide any non-photo ID

23    exceptions?

24          A    I don't think it -- I think it -- I don't think

25    it does.  I don't think it does.

CONFIDENTIAL

[Page 181]

1       Q    So would you agree that SB 14 is a stricter bill

2   than HB 218 and SB 362?

3               MR. SWEETEN:   Objection; privilege.

4       A    I do not know if strict applies.   It's

5   different, and it's more confined to require -- committed

6   to the notion that photo ID should be required, as

7   opposed to other alternative forms.

8               (Duncan Deposition Exhibit Number RD-17

9   marked.)

10      Q    (By Mr. Gear:)   I'm showing you what has been

11  marked as SB 14.   Do you recognize this as the bill, SB

12  14?

13      A    (Witness reviewing document.)   Sure, yes.

14              MR. GEAR:   And for the record, this was

15  previously marked as Duncan Exhibit 530.

16      Q    (By Mr. Gear:)   And turning your attention to

17  the last page of SB 14, do you see that it has been signed

18  by the Governor?

19      A    I do.

20      Q    And what would that indicate, as far as the

21  status of the bill?

22      A    Passed.

23      Q    So this would be the final bill related to

24  SB 14?

25      A    Yes, sir.

CONFIDENTIAL

[Page 182]

1      Q    Turning your attention to Page 9, Section

2    63.0101, "Documentation of proof of identification," I

3    just want to walk through these quickly with you.

4                 Do you agree, based on the final -- based

5    on this exhibit, that SB 14 allowed for a driver's

6    license, election identification certificate, or personal

7    identification card issued to the person by the

8    Department of Public Safety that has not expired or that

9    expired no earlier than 60 days before the date of

10   presentation?

11     A    Yes, sir.

12     Q    Do you agree that SB 14 allows for a United

13   States military identification card that contains the

14   person's photograph that has not expired or that expired

15   no earlier than 60 days before the date of presentation?

16     A    Yes, I agree that that's a part of the bill.

17     Q    Do you agree that SB 14 allows for United States

18   citizenship certificates issued to the person that

19   contains the person's photograph?

20     A    Yes.

21     Q    It also allows for the United States -- for a

22   United States passport issued to the person that has not

23   expired or that expired no earlier than 60 days before the

24   date of the presentation, correct?

25     A    That's correct.

CONFIDENTIAL

[Page 183]

1      Q    And it allows for a license to carry a concealed

2    handgun issued to the person by the Department of Public

3    Safety that has not expired or that expired no earlier

4    than 60 days before the date of presentation, correct?

5      A    Correct.

6      Q    Does it allow for any other type of photo

7    identification based on your review of this bill?

8      A    Well, let me read a little more here.

9    (Witness reviewing document.)

10              There are other exceptions that are

11    included in Section 17 of the bill, but --

12     Q    And what are those?  Are you referencing the

13    exemptions?

14     A    Right.  Exemptions with regard to provisional

15    ballotS.

16     Q    So my question was:  Under SB 14, are there any

17    other acceptable forms of photo ID that are allowed?

18     A    Well, that and the ones that are in 17, the

19    provisions for the provisional ballot.

20     Q    And that's the process by which a voter

21    provisionally can cure within a 60-day period?

22     A    Right.

23     Q    And does that process, the six-day cure period,

24    allow a voter to present anything other than the types of

25    ID that we've just described in SB 14?

CONFIDENTIAL

[Page 184]

1      A     I think there's one narrow exception with

2  regard to the --

3      Q     Religious exemptions?

4      A     Maybe the religious exemptions.  I'm not -- I

5  don't know if that's -- I'm thinking more about the --

6  let me read the exemptions.

7      Q     Sure.

8      A     (Witness reviewing document.)  Religious

9  objections being photograph exemptions.  There is the

10  exemption for the person who lost their identification as

11  a result of a natural disaster.  Those are two of the

12  exemptions.

13      Q     There's also a disability exemption, correct?

14      A     I think you're right.  There is one.  I

15  remember us discussing that.

16      Q     But those aren't specifically photo ID -- those

17  are exemptions, correct?

18      A     Well, they're exceptions to the required photo

19  ID.

20      Q     Fair enough.  Can you identify any facts that

21  support why forms of non-photo IDs are exceptional options

22  in 2009, but not acceptable options in 2011 under SB 14?

23              MR. SWEETEN:  Objection; legislative

24  privilege.

25      A     Not as we sit here today.

CONFIDENTIAL

[Page 185]

1      Q    (By Mr. Gear:)  Can you identify any facts to

2  support why all State and Federal Government photo IDs

3  were acceptable in 2009, under SB 362, but not in 2011,

4  during the consideration of SB 14?

5                MR. SWEETEN:  Objection; legislative

6  privilege.

7      A    Not as we sit here today.  The record may

8  reflect some discussion of that.

9      Q    (By Mr. Gear:)  Can you identify any facts to

10  support why all State and Federal Government photo IDs

11  were acceptable in 2009, under SB 362, but not in 2011,

12  during the consideration of SB 14?

13                MR. SWEETEN:  Objection to foundation; and

14  objection, legislative privilege.

15      Q    (By Mr. Gear:)  Well then, if you're not -- if

16  you don't understand my question, we can go back to --

17      A    No.  I understand it.  I just understand the

18  foundation objection, too, and agree with it.

19                But the question that you've asked me is

20  today, as we sit here today.  I don't have any

21  independent recollection of any specific facts that were

22  forwarded by the author or the primary author of the

23  bill for that -- for removing those different options.

24                The record does reflect discussion of

25  that, and I would refer you to the record.  I think it

CONFIDENTIAL

[Page 186]

1    does.  If I remember correctly, there was some debate

2    about that.  I don't remember specifically what the

3    debate was, but I do recall that there was discussion

4    about that at the committee of the whole level and

5    perhaps at the -- I can't remember if there was a

6    significant debate when the bill was laid out on the

7    floor as a vote for endorsement.

8         Q    And I want to be clear.  My question was:  Can

9    you identify any facts to support why all State and

10   Federal Government photo IDs were acceptable in 2009,

11   under SB 362, but not in 2011, during the consideration of

12   SB 14?

13              And I believe you've stated that you

14   understood my question to ask:  As you sit here today?

15        A    Right.

16        Q    But it was:  Can you identify any facts?

17              MR. SWEETEN:  Objection; legislative

18   privilege.

19        A    The facts that I would identify would be those

20   facts stated in the record.

21        Q    (By Mr. Gear:)  But, as you sit here today,

22   you're not aware of what the facts stated in the record

23   are related to this issue?

24        A    As I'm sitting here --

25              MR. SWEETEN:  Same objection.

**CONFIDENTIAL**

[Page 187]

1      A    As I'm sitting here today, I'm not prepared to

2  articulate the facts, because I don't recall exactly

3  what -- I don't recall the specific reasons for removing

4  those issues.

5           I do recall them being discussed and

6  debated on the Senate floor at the committee of the

7  whole or on the second reading of the bill.

8      Q    (By Mr. Gear:)  Were you involved -- Were you or

9  your staff involved in communications related to excluding

10  State and Federal IDs from SB 14?

11      A    I don't believe I was.  I don't know if my

12  staff was or not.  "My staff" meaning the committee staff

13  or my internal staff, either one.

14      Q    Between 2009 and 2011, are you aware of any

15  facts that support that a Texas voter was prosecuted for

16  voter impersonation while using a State or Federal

17  Government photo ID?

18      A    I think we've discussed that at length before.

19  I think there's some information in the record.  I don't

20  know if this was for 362.  I think there was information

21  in the record from 2006.  I don't know if there was for

22  218 or 362 or 14.

23           I know there's some record.  There's some

24  information in the record that people were prosecuted

25  for voter fraud, and I don't think that the -- at least

CONFIDENTIAL

[Page 188]

1    I did not delineate what type of voter fraud.  I don't

2    know that the records that we have before us indicate

3    exactly the nature of the fraud or infraction that was

4    alleged.

5         Q    Just so I'm clear, as you sit here today, you

6    can't delineate what type of fraud may have been testified

7    to --

8         A    That's right.

9         Q    -- related to photo ID legislation anyway?

10        A    Correct.

11        Q    Related to SB 14, are you aware of any reports

12   that were prepared for the Senate to assist the

13   Legislature in understanding the impact of SB 14 on

14   minority voters?

15             MR. SWEETEN:  Objection; legislative

16   privilege.

17        A    I think, again, I would answer with regard to

18   the record, and I do recall we did bring forward the

19   record on Senate Bill 362 and made it a part of the

20   record for Senate Bill 14.

21             So all of that information that was

22   developed in 2009 and then the additional information

23   and testimony that was developed and the evidence that

24   was developed in 2011 were available to the members in

25   their deliberations on Senate Bill 14.

CONFIDENTIAL

[Page 189]

1       Q    (By Mr. Gear:)  And are you aware of any facts

2    in either the record of SB 362 or SB 14 that would --

3       A    No.

4       Q    -- support that those photo ID legislations

5    could not have an impact on minority voters?

6       A    As I --

7            MR. SWEETEN:  Same objection.

8       A    As we sit here today, I can't point to you any

9    specific facts.  I do believe the record supports the --

10   or provides information in regard to the facts that

11   you're requesting.

12      Q    (By Mr. Gear:)  Do you have any facts to support

13   why student IDs were excluded from SB 14?

14      A    I think we've discussed that.  No.

15           MR. SWEETEN:  I object to legislative

16   privilege on that question.

17      Q    (By Mr. Gear:)  Are you aware of any incident or

18   fact that occurred between 2009 and 2011 that would

19   have -- that would support the need to remove student IDs

20   from SB 14?

21      A    No, I'm not.  I'm getting closer to the --

22           MR. GEAR:  Now is a good time to take a

23   break.

24           (Short break taken.)

25           MR. GEAR:  Let's go back on the record.

CONFIDENTIAL

[Page 190]

1        Q    (By Mr. Gear:)  I believe we've talked about

2   this, so I'm just going to touch on it briefly.

3                SB 14 was referred to the committee of the

4   whole, correct?

5        A    Yes, sir.

6        Q    And was that done by special order or

7   resolution?

8        A    I believe it was done by motion to resolve by

9   the committee as a whole.  I don't know if that was a

10  motion in writing or just an oral motion.

11       Q    Do you recall Resolution 36, by any chance?

12       A    That may have been the writing or the -- I

13  think you probably have to do that by resolution, now

14  that I think about it.

15       Q    Do you recall Senator Van de Putte objecting to

16  that resolution?

17       A    I don't -- I'm sure she did.  I don't know.  I

18  don't recall.  I don't recall the debate, but I know

19  she's -- she was vocal on that issue.

20       Q    And as we have gone through the testimony,

21  Senator Van de Putte, it appears, was consistent in her

22  objection to photo ID legislation, correct?

23       A    Exactly.

24       Q    And, in fact, it appears that in our discussion

25  of HB 218, SB 362, and now SB 14 that she raised the

CONFIDENTIAL

[Page 191]

1    concern that photo ID legislation may have a

2    disenfranchising impact on minority voters, correct?

3         A    You know, I would let the record characterize

4    her debate or her objection.

5         Q    Fair enough.

6         A    I would refer to that.

7         Q    And so, thinking about photo ID legislation, in

8    total, again, we didn't speak much about it, but SB 1706,

9    HB 218, HB -- SB 362, and SB 14 -- are you aware of any

10   reports that were prepared to assist the Senate in

11   identifying whether or not photo ID legislation would have

12   an impact on minority voters?

13        A    Well, I think the interim community report that

14   we did, in 2006, was a pretty fair analysis of the issue,

15   with resources for members to be able to begin their

16   research.  It wasn't certainly exhaustive, but I think

17   there was -- an effort was made to provide resources for

18   people to review, and, again, the hearing process that we

19   designed for the committee as a whole.

20             And, for example, in 218, we were at the

21   end of a legislative session when we heard that House

22   bill, and so there was really little or no time to

23   develop anything, other than what the House had

24   developed, probably, the way the legislative process

25   works.

CONFIDENTIAL

[Page 192]

1          The committee of the whole process did

2     allow us, in 2009, to allow for expert testimony and lay

3     testimony before the entire Senate assembled, as the

4     committee of the whole, to provide a normal legislative

5     analysis, where members hear evidence, they deliberate

6     on the evidence, they individually weigh the evidence,

7     and make their decision, and that --

8          Q    So that --

9          A    That's how the legislative process works.  And

10    so I believe that the committee of the whole process

11    actually was a complement to allowing more -- or allowing

12    for a more in-depth deliberation on the issue and allowed

13    all members to input evidence into the record, or to the

14    body, to make compelling arguments for their side,

15    whichever -- whether they were an opponent or a proponent

16    of the legislation.

17         Q    So, specifically, other than the 2006 interim

18    report, were there any reports prepared by the committee

19    of the whole or the State Affairs Committee or -- I'm

20    sorry.  That's compound.  I will withdraw the question.

21         A    Okay.

22         Q    Other than the 2006 interim report, are you

23    aware of any other reports that were prepared to assist

24    the Senate in identifying whether or not SB 14 would have

25    a --

**CONFIDENTIAL**

[Page 193]

1            MR. GEAR:  Strike that.  It's getting

2     late.

3        Q    (By Mr. Gear:)  Other than the 2006 interim

4     report, are you aware of any other reports that were

5     prepared to assist senators in understanding the impact of

6     photo ID legislative on minority voters?

7        A    I don't know if we did an interim report in two

8     thousand -- between the -- prior to the 2009 legislation

9     or not.

10       Q    You're not aware of it, as you sit here today?

11       A    I don't remember.  That's all I can say on

12    that.  But I'm not -- other than the 2006, you know, I

13    don't have a specific memory of any other reports that

14    were generated by the Senate, other than the data

15    analysis and evidence that we received from witnesses

16    testifying for and against the bills in the various

17    committees of the whole hearings or the committee of the

18    whole hearings.

19            (Duncan Deposition Exhibit Number RD-18

20    marked.)

21       Q    (By Mr. Gear:)  I'm going to show you what has

22    been marked as RD-18.  I will give you a chance to take a

23    look at that.

24       A    (Witness reviewing document.)

25            MR. SWEETEN:  Can I see a copy of that?

CONFIDENTIAL

[Page 194]

1          MR. GEAR:  Yes.

2          MR. SWEETEN:  Thank you, sir.

3          MR. GEAR:  For the record, RD-18 is

4    identified as highly confidential.  It was produced by

5    Texas as TX 00021328.

6          Q    (By Mr. Gear:)  Can you identify what this --

7    the first page of this document is, please?

8          A    It's an e-mail from Bryan Hebert dated

9    January 27th.

10         Q    To Jennifer Fagan?

11         A    To Jonathan Stinson, Ryan LaRue, Amanda

12   Montagne, Wroe Jackson, Janice McCoy, and Jennifer Fagan.

13         Q    And just so I know, who is Jonathan Stinson, if

14   you know?

15         A    I don't know.

16         Q    Do you know who Ryan LaRue is?

17         A    No.

18         Q    Do you know who Amanda Montagne is?

19         A    No.

20         Q    Is that Wroe Jackson?

21         A    That's what it looks like.

22         Q    Do you know who Wroe Jackson is?

23         A    No.

24         Q    Janice McCoy?

25         A    I think Janice may be -- and I'm not -- maybe a

CONFIDENTIAL

[Page 195]

1    staff person for Senator Fraser.

2        Q    And you obviously know who Jennifer Fagan is.

3        A    Yes.

4        Q    She's your staff person.  And this is entitled:

5    "SB 14 floor amendments."

6        A    Yes.

7        Q    Do you see that?  The body of the e-mail

8    identifies -- or it indicates that "Attached is a summary

9    of all the SB 14 amendments (I used a list from the

10   Houston Chronicle, corrected it and cleaned it up), 41

11   amendments were proposed and nine were adopted -- eight of

12   which were sponsored or cosponsored by Democrats.  So I'd

13   say they had significant input into the bill."  Do you see

14   that?

15       A    Yes, sir.

16       Q    It also indicates that "I'm working on a summary

17   of the substantive provisions of the bill (i.e., 'What the

18   hell did we just pass?')"  Do you see that?

19       A    Yes.

20       Q    Have you seen this document before?

21       A    No, sir.

22       Q    Did you see the document that follows up on this

23   particular e-mail?

24            MR. GEAR:  I'm sorry.  I'll strike that.

25       Q    (By Mr. Gear:)  If you haven't seen it, then you

CONFIDENTIAL

[Page 196]

1   wouldn't know what follows up.

2                But let's turn to Page 2, which was

3   also -- which is also identified as highly confidential,

4   TX 00021329.  And I would just ask you to identify this

5   document for me.

6        A    It appears to be a list that somebody has

7   prepared related to amendments that were offered on

8   Senate Bill 14.

9        Q    And you were present during the offering of

10  amendments on Senate Bill 14?

11       A    Yes.  I don't know -- these are floor

12  amendments, so I assume that this is not -- these are not

13  amendments that were offered at that time at the

14  committee level.

15       Q    So let's talk about the floor amendments for a

16  minute -- for a minute.  I'm sorry.

17                Number 12, Wendy Davis -- I assume "W.

18  Davis" is Wendy Davis --

19       A    Yes.

20       Q    -- "would provide for a free state ID to those

21  who ask."  Do you see how that particular amendment was

22  handled?

23       A    Number 12?

24       Q    Yes.

25       A    It was tabled.

**CONFIDENTIAL**

[Page 197]

1     Q    And it was tabled by a vote of 19 to 12?

2     A    Yes, sir.

3     Q    Do you believe that if SB 14 included a

4  provision that would have provided free -- for free state

5  IDs to those who asked, it would have assisted in

6  minimizing the impact to minority voters?

7     A    I may be wrong on this, but I believe we did

8  appropriate, and we did provide those IDs.

9     Q    And I believe SB 14 provides for EICs, correct,

10  election identification certificates?

11     A    Right.  I guess that's -- I'm not --

12  technically, I can't remember exactly, but I do remember

13  conceptually that we -- that, you know, we appropriated

14  money to do that, and I know the bill provided -- the

15  bill authorized the expenditure, and we appropriated

16  that.

17     Q    And I guess I was interpreting her amendment --

18     A    That's my recollection.

19     Q    I was interpreting her amendment to at least

20  request a consideration that free Texas state IDs were

21  provided to those who asked, and SB 14 did not do that,

22  correct?

23     A    I haven't correlated that.  So I can't answer

24  that accurately, other than I believe we did provide

25  authority and appropriations to provide identification --

CONFIDENTIAL

[Page 198]

1   free identification sufficient to satisfy the

2   requirements of Senate Bill 14.

3        Q    Number 13 --

4        A    But correct me if I'm wrong.  I'm pretty sure

5   we did, though.

6        Q    And, again, I'll take your interpretation of

7   this amendment --

8        A    Sure.

9        Q    -- as referencing election identification

10  certificates, correct?

11       A    Seeing it for the first time today, I'll go --

12  I'm fine with understanding that.

13       Q    Number 13, "Wendy Davis, would allow for the use

14  of expired IDs."

15            And do you see how that particular

16  amendment was handled --

17       A    It was tabled.

18       Q    -- in the Senate?

19       A    It was tabled.

20       Q    And it was tabled by a vote of 19 to 11?

21       A    Yes.

22       Q    And if SB 14 would have allowed for the use of

23  expired IDs without limitation, do you believe that that

24  may have had a positive impact on avoiding

25  disenfranchisement of minority voters?

**CONFIDENTIAL**

[Page 199]

1        A      I don't see how it would.  I would disagree

2   with that statement.

3        Q      Do you believe it would be easier for --

4               MR. GEAR:  Strike that.

5        Q      (By Mr. Gear:)  Are you aware of the number of

6   registered voters in the State of Texas, during the

7   consideration of SB 14, that lacked either a state ID or a

8   Texas driver's license?  And that's a Texas state ID.

9        A      I do not know the -- I don't recall that there

10  was accurate testimony on that.

11       Q      And I'm sorry.  You don't --

12       A      I do not recall that there was any evidence on

13  that, but there may have been.  I don't recall it.  If

14  there was, it was certainly an estimate.

15       Q      And if you don't recall the testimony, you don't

16  recall if it was an estimate or an accurate projection?

17       A      Well, the record would reflect that.

18       Q      Turning your attention to Number 20, which was

19  offered by Senator West, he offered to use a Medicare card

20  as a form of identification.

21              If that particular amendment would have

22  been included in SB 14, would you have supported it?

23       A      I probably would have supported the amendment.

24  I mean, you know, it's not -- I think, to get a Medicare

25  card, you probably have to -- I imagine you may have to

CONFIDENTIAL

[Page 200]

1    submit an ID.  I don't know.

2              But I would -- we're arguing policy here.

3    Again, it's hypothetical, or at least it didn't pass.

4    But bottom line is:  I think, on a Medicare card, it

5    would be like any other benefit.  You would have to show

6    some sort of ID to be able to qualify or meet the

7    various Federal qualifications for Medicare.

8       Q    And you would have supported it if it was

9    included in SB 14?

10      A    Sure, yes.

11      Q    And do you see how that particular amendment was

12   handled in the Senate?

13      A    It was tabled.

14      Q    And it was tabled by a vote of --

15      A    Nineteen to 11.

16      Q    Number 21, an amendment offered by Wendy Davis,

17   would have allowed any photo ID issued by the Federal

18   Government, subentity of Texas, or higher education

19   amendments -- I'm sorry.  I didn't read that right.  I did

20   read it right.

21              MR. GEAR:  Strike that.

22      Q    (By Mr. Gear:)  21 would have allowed any photo

23   ID issued by the Federal Government, sub-Texas --

24   subentity of Texas, or higher education.

25              And I believe your prior testimony is that

**CONFIDENTIAL**

[Page 201]

1    if it was included in SB 14, you would have supported

2    such provisions, correct?

3         A    I would have voted -- I would not have -- I

4    would have supported the bill with that in there.

5         Q    Turning your attention to Number 30, an

6    amendment offered by Senator Ellis would have required the

7    Secretary of State to examine whether or not the bill has

8    an adverse effect on district population groups.  Do you

9    see that?

10        A    Yes.

11        Q    And based on your prior testimony and our

12   discussion regarding concerns that SB 14 and other photo

13   ID legislation would have a disenfranchising impact on

14   minority voters, do you believe that if included in SB 14,

15   this might have minimized some of those concerns or

16   mitigated some of those concerns?

17        A    I don't know the answer to that.  It would be

18   pure speculation on my part.

19        Q    Well, if the Secretary of State were allowed to

20   examine whether or not the bill had an adverse impact on

21   district population groups, do you believe -- do you have

22   any opinion as to whether or not that would have resolved

23   some of the concerns expressed during consideration of the

24   photo ID legislation?

25                  MR. SWEETEN:  Objection to speculation,

**CONFIDENTIAL**

[Page 202]

1    asked and answered; objection, legislative privilege.  Go

2    ahead.

3         A    The Secretary of State does not have resources,

4    the expertise, or the jurisdiction to make, in my view,

5    that type of judicial determination.  So I just don't see

6    that that would have improved the bill or at least made

7    the bill -- I don't see where that would have a positive

8    impact with regard to affecting or improving the bill.

9              The Secretary of State's office typically

10   does not make those types of determinations on behalf of

11   the State of Texas.

12        Q    And do you see how this particular amendment was

13   handled?

14        A    It was tabled.

15        Q    And it was tabled by a vote of --

16        A    Nineteen to 11.

17        Q    Number 39 was an amendment offered by you,

18   Senator Davis, Senator Ogden, and Senator Patrick,

19   correct?

20        A    Correct.

21        Q    And that amendment would have allowed for the

22   exemption from photo ID for indigent and religious

23   objections -- objectors.  And do you see that that was

24   passed by a vote of 30 to zero?

25        A    Yes.

**CONFIDENTIAL**

[Page 203]

1    Q    And in reviewing SB 14, the signed version of

2    the bill, is it fair to say that the exemption from photo

3    ID for indigent voters is no longer included in the

4    provisions of SB 14?

5    A    That's a fair statement.

6    Q    It was passed by a vote of 30 to zero.  Can you

7    tell me where that particular provision was removed from

8    your consideration of SB 14?

9    A    Generally, it appears that it was removed

10   during the deliberations in the House.

11   Q    If SB 14 would have included an exemption from

12   photo IDs for indigent voters, would you have supported

13   it?

14   A    Yes.

15   Q    And, in fact, you did support it?

16   A    Yes.

17   Q    And, in fact, the Senate supported it

18   unanimously by a vote of 30 to zero, correct?

19   A    That's correct.

20   Q    And why do you think that --

21        MR. GEAR:  Strike that.

22   Q    (By Mr. Gear:)  Can you identify the facts for

23   me of why you believed that the exemption from photo ID

24   for indigent voters was important to be included in the

25   provisions of SB 14?

CONFIDENTIAL

[Page 204]

1     MR. SWEETEN: Objection; legislative

2 privilege. You can answer.

3   A Well, there were several issues that were

4 raised with regard to the indigencies, and in addition to

5 the fact that that provision was also included in the

6 Indiana law, and I thought that it would be an

7 appropriate measure to be included in this bill.

8     Senator Davis originally had an

9 amendment. I don't think the amendment was -- I can't

10 remember why I thought there was a flaw in it, but she

11 and I worked on it, I made a change in it, and we agreed

12 to go with it, as other members did, too.

13     But, primarily, because it tracked the

14 Indiana law, we felt like that was -- or at least I felt

15 like -- I can't speak for everybody but myself, but I

16 felt like that was a provision in the Indiana law that

17 was appropriate, and I didn't have any objections to

18 that.

19   Q And, in fact, it appears, based on a vote of 30

20 to zero, that none of the senators in the House had an

21 objection to that. In fact, they supported that?

22   A None of the senators in the Senate.

23   Q The Senate. Thank you. And the exemption that

24 you drafted, was that similar to the exemption from photo

25 IDs for indigent voters in the Indiana law?

CONFIDENTIAL

[Page 205]

1       A    Yes, sir.

2       Q    And did you have any communications with the

3  House, during their considerations of SB 14, regarding

4  leaving that particular exemption in SB 14?

5       A    No, I did not.  I did -- I was on the finance

6  committee, and we started working on the budget.

7       Q    Would you have preferred that that particular

8  exemption had been left in SB 14?

9       A    Well I offered it, and so -- I offered it.

10      Q    I'm sorry?  You --

11      A    I offered it as an amendment.

12      Q    Okay.  And so the answer is "yes"?

13      A    Well, I would -- I was fine with that being in

14  there.

15      Q    Okay.  Are you aware of any discussion from the

16 Secretary of State's office regarding the exemption from

17 photo IDs for indigent voters?  Was there any concern

18 expressed by the Secretary of State's office?

19      A    Not that I'm aware of.

20      Q    Was there any concern that you're aware of that

21 was expressed by the Texas Attorney General's Office

22 related to that particular exemption?

23      A    No.

24      Q    Do you know what the concern was that was

25 expressed in the House related to that particular

CONFIDENTIAL

[Page 206]

1    exemption?

2        A     No.  I haven't gone back and looked at that.

3        Q     Did you know, in 2011, what that concern was?

4        A     No.

5              MR. GEAR:  If you could give me a

6    five-minute break, --

7              MR. SWEETEN:  Sure.

8              MR. GEAR:  -- I may be passing the

9    witness.

10             MR. SWEETEN:  Okay.  Great.

11             (Short break taken.)

12             MR. GEAR:  I'll pass the witness.

13             MR. DUNCAN:  I'll never pass up a chance

14   to take a break.

15             (Short break taken.)

16                    EXAMINATION

17   BY MR. ROSS:

18       Q     Good afternoon, Mr. Duncan -- or Senator Duncan.

19   Excuse me.

20             I'm Deuel Ross.  I'm the attorney

21   representing the Plaintiff-Intervenors, Texas League of

22   Young Voters, and the individual Plaintiff, Imani Clark,

23   Plaintiff -- Plaintiff-Intervenor.  Excuse me.

24             I'm going to ask you a couple of follow-up

25   questions based on what Mr. Gear has already asked you

CONFIDENTIAL

[Page 207]

1    this morning, as well as maybe go back over a couple of

2    things just, you know, to make sure we've exhausted

3    everything.

4              Just starting with SB 14, are you aware

5    that it was designated an emergency legislation?

6         A    Yes.

7         Q    Okay.  Do you know who designated it so?

8         A    Only the Governor can designate that.

9         Q    Okay.  Do you have a sense of why he did that?

10        A    You would have to read his proclamation.

11        Q    Okay.  What's your -- you don't have an

12   understanding of his reason?

13        A    It's speculation.  I'm not going to speculate

14   on what the Governor was thinking at the time he does

15   something.

16        Q    Do you know the process for designating

17   something as an emergency legislation?

18        A    I think he basically must have -- he enters

19   into a -- he just signs a proclamation, declaring

20   something an emergency and presents it --

21        Q    Okay.

22        A    -- to the presiding officers of both Houses.

23        Q    I want to introduce -- did you have any

24   communication with the Governor about designating it an

25   emergency legislation?

**CONFIDENTIAL**

[Page 208]

1      A    No.

2      Q    No phone calls, e-mails?

3      A    Not that I recall.

4      Q    Just as an exhibit, I was making sure it gets in

5    there.  I'm sorry.  I'm going to mark this as --

6      A    The last one was RD-18.

7      Q    The last one was 18.

8      A    That's what I have.  I've tried to keep them in

9    order here.

10              (Duncan Deposition Exhibit Number RD-19

11    marked.)

12      Q    (By Mr. Ross:)  Okay.  Can you take a look at

13    that document for me?

14      A    (Witness reviewing document.)

15      Q    Are you familiar with this document?

16      A    No.

17      Q    Can you tell me who it was sent from?

18      A    This is from Julia Rathgeber on January 20th,

19    2011.

20              MR. SWEETEN:  Do you have another copy of

21    that?

22              MR. ROSS:  I gave it to you.  It's right

23    there.

24              MR. SWEETEN:  Oh, I have it.

25      Q    (By Mr. Ross:)  Sorry.  It was from who?

CONFIDENTIAL

[Page 209]

1      A     Julia Rathgeber.

2      Q     Okay.  And that was January 20th, 2011?

3      A     Yes.

4      Q     To Jennifer Fagan?

5      A     Yes.

6      Q     Okay.  Can you take a look at the bottom of that

7  e-mail?

8      A     Yes.

9      Q     Do you see who that e-mail was from?

10      A     Blaine Brunson.

11      Q     Do you know who Blaine Brunson is?

12      A     He was on the executive staff for the

13  Lieutenant Governor.

14      Q     Do you see who it was to?

15      A     It was to Julie Rathgeber, Karina Davis, Josh

16  Robinson -- I don't know who that is -- Mike Walz,

17  Jennifer Fagan, Porter Wilson, and Janice McCoy,

18  "Subject:  Announcement."

19      Q     Do you know who Julia Rathgeber is?

20      A     She was a legislative director for

21  Lieutenant Governor Dewhurst.  She is now the Insurance

22  Commissioner.

23      Q     Karina Davis?

24      A     She was the parliamentarian for the Senate.

25      Q     You said you don't know who Josh Robinson was?

CONFIDENTIAL

[Page 210]

1      A      No.

2      Q      Mike Walz?

3      A      I don't know he is.

4      Q      And Jennifer Fagan worked in your office?

5      A      Yes.

6      Q      Porter Wilson?

7      A      He was in my office.

8      Q      And Janice McCoy?

9      A      She was -- I believe she was Senator Fraser's

10     staff member.

11     Q      Do you see the second line -- or excuse me --

12     the second paragraph at the bottom of that e-mail?

13     A      Yes.

14     Q      Can you read that for me?

15     A      "Met with Senator Duncan.  He will chair COW,"

16     which is the committee of the whole, "and asked Jennifer

17     to meet with Karina on a draft plan, and then for them to

18     come meet with him in a few hours."

19     Q      Do you know what -- can you tell me what "COW"

20     stands for?

21     A      Committee of the whole is what I'm assuming.

22     Q      Okay.  Do you know what draft plan they're

23     referring to?

24     A      No.  Other than, you know, I'm speculating, but

25     more likely than not, coming from Karina, it would be the

CONFIDENTIAL

[Page 211]

1  same type of plan that we had in 2009 for the committee

2  of the whole.  We're talking logistics here.  We're not

3  talking about a bill.

4      Q    So, to your understanding, you're not talking

5  about the bill in this particular incident?

6      A    I would not have been talking about it with

7  Karina.  I would have been talking about -- Jennifer and

8  Karina were basically helping us to navigate the process

9  and make sure that we thought through all of the

10 logistics of the hearing of the committee of the whole.

11     Q    Okay.  This says Mr. Brunson met with you; is

12 that right?

13     A    Probably.

14     Q    Well, it says, "Met with Senator Duncan.  He

15 will chair the committee of the whole."

16     A    Right.  That's what I just -- I guess I was

17 advised by the Lieutenant Governor's office that there

18 would be a committee of the whole, and I would chair it.

19     Q    And it's your position that you didn't volunteer

20 for that; is that right?

21     A    Well, you know, being -- I don't know if I

22 volunteered for it or not.  I mean, it was -- it's just

23 part of the things I do in the Senate.  So, if they

24 wanted me to do it, I would be happy to.

25     Q    So the Lieutenant Governor asked you?

CONFIDENTIAL

[Page 212]

1      A     Yes.  Well, his staff did, but I assume that he

2  asked them to ask me.

3      Q     Okay.  Do you recall that conversation --

4      A     No.

5      Q     -- in which they asked you?

6      A     No.

7      Q     Do you recall if there were any e-mails

8  exchanged other than that?

9      A     Other than this, I haven't seen any.

10     Q     Okay.  We can move up to the next line.

11     A     Move up?

12     Q     Yes.  It's the e-mail from Karina Davis.

13     A     Oh, yes.

14     Q     January 20th, 2011, at 12:27.

15     A     Yes, sir.

16     Q     Was that also sent to the same --

17     A     Same string of everyone, it says.

18     Q     Including Jennifer Fagan in your office?

19     A     Yes.

20     Q     Do you see where it says, "We have a potential

21  game plan"?

22     A     Yes.

23     Q     "And Jennifer is going to run it by Duncan and

24  circle back"?

25     A     Right.

**CONFIDENTIAL**

[Page 213]

1     Q   Do you know what she was referring to there on a

2  potential game plan?

3     A   Coming from Karina Davis, the parliamentarian,

4  it would have been a game plan for the process and the

5  logistics of conducting a committee of the whole.

6     Q   Do you recall a conversation where the next line

7  says, "Jennifer is going to run it by Duncan and circle

8  back"?  Do you recall that conversation?

9     A   Jennifer and I had many, many conversations

10  about how to make this work smoothly, efficiently, and

11  correctly.  So I don't recall that specific conversation,

12  but I'm sure we had it.

13     Q   Okay.  And these were conversations about just

14  running the committee of the whole?

15     A   You know, there are a lot of things that you

16  do, just procedural steps and logistical steps of people

17  that are involved in that sort of an event.  So we

18  made -- there were -- this is a lot of planning --

19     Q   Yeah.

20     A   -- to make sure that each of the 31 members and

21  their staffs have the ability to have input into this

22  process.

23     Q   Okay.  So, moving right along, the line above

24  that, do you see an e-mail from Jennifer Fagan on

25  January 20th, 2011, at 1:41, --

CONFIDENTIAL

[Page 214]

1      A    Yes.

2      Q    -- to others on that previous string?

3      A    Yes.

4      Q    Okay.  It says, "Duncan wants to give Dewhurst a

5  call.  What's the best way to reach him in the next 20 to

6  30 minutes?"

7            Do you recall that conversation with him,

8  or did you, in fact, call Senator Dewhurst -- or

9  Lieutenant Governor Dewhurst?

10     A    I'm sure I did.

11     Q    Do you recall that conversation?

12     A    No, I don't.

13     Q    Okay.  Do you know whether it related to voter

14  ID?

15     A    Well, I assume that, since it's coming through

16  the string, it probably had to do with the process of

17  what we -- you know, the committee of the whole -- what

18  did he expect from the process and things like that.

19     Q    Okay.

20     A    So, more likely than not, that was the subject

21  of the conversation.

22     Q    Well, do you recall the specifics at all?

23     A    No, I don't.

24            MR. ROSS:  I'm going to be going to the

25  next one.

CONFIDENTIAL

[Page 215]

1           COURT REPORTER:  20.

2           MR. ROSS:  This is 20.

3           (Duncan Deposition Exhibit Number RD-20

4    marked.)

5       Q   (By Mr. Ross)  Okay.  Take a minute to look

6    at this document.  It's marked highly confidential.  It's

7    LEG 00005004.  Have you ever seen this document?

8       A   I saw it yesterday.

9       Q   Okay.  This was -- You saw it yesterday?

10      A   And I may have seen it before, because it went

11   to my staff members, and typically I would sign off on

12   something before I do that.

13      Q   Who is this e-mail from?

14      A   Megan LaVoie.

15      Q   Who is she?

16      A   She was a staff person on my Senate staff --

17      Q   Okay.

18      A   -- or for the committee staff.

19      Q   What was her role on the Senate staff?

20      A   At that time, she was generally in charge of

21   communications.  She was a law student.

22      Q   Okay.  This is from January 24th, 2011, at

23   11:25 a.m.  Had the committee of the whole occurred yet?

24      A   I don't think so.  I don't recall what date.

25      Q   Do you see the other people who this e-mail was

**CONFIDENTIAL**

[Page 216]

1    to?

2         A    Yes.

3         Q    Can you read their names and tell me whether

4    you're familiar with them, please?

5         A    Do you want me to read them out loud?

6         Q    Yes.

7         A    Debby Hansard, she was my district director in

8    the Lubbock office; Janis McCutchin, she works as a

9    district employee in the Lubbock office; Jennifer Foster

10   was the district director in Childress; John Stokes was

11   the district director in San Angelo; and Sarah Clifton

12   was a -- at that time she was a district -- she was a

13   natural resource person, but also had a territory out of

14   the Lubbock district.

15              Most of these or all of these employees

16   were employees who interfaced on a daily and regular

17   basis with constituents in the district as opposed to in

18   the Austin Capitol office.

19        Q    Okay.  Can you read silently -- take a review of

20   this e-mail for just a moment?

21        A    (Witness reviewing document.)

22        Q    Well, can you read the subject of this e-mail?

23        A    I haven't finished reading the whole thing.

24        Q    Oh, sorry.

25        A    (Witness reviewing document.)  Okay.  I'm

CONFIDENTIAL

[Page 217]

1    through.

2         Q    Can you read the subject of this e-mail just for

3    a minute?

4         A    "Subject:  Voter ID talking points."

5         Q    Okay.  Do you regularly have communications with

6    folks like Megan LaVoie who write talking points for you?

7         A    I think on different issues.  These are not my

8    talking points, though.

9         Q    Oh, okay.  Whose talking points are they?

10        A    These are -- This is information given to the

11   district staff to respond -- who will be responding to

12   questions that may come in from constituents with regard

13   to a voter ID.

14        Q    Okay.

15        A    And so we do this typically with major

16   legislation that we carry, TRS reform, retirement system

17   reform, different issues with regard to the budget, to

18   make sure that the people in my big old district -- I

19   have 51 counties basically -- have information consistent

20   with where we are in Austin.

21             So we keep them up so that when they

22   interface with constituents in the district,  that

23   they're getting correct information to the people in the

24   district.

25        Q    In case that a constituent might call in to one

CONFIDENTIAL

[Page 218]

1    of the district offices?

2         A    Right.

3         Q    Okay.

4         A    And our folks are very active in getting out in

5    the community, as opposed to just sitting in the office.

6    In fact, I don't like them to sit in the office.  I would

7    rather them be in the car and going to the different

8    counties and answering questions and being proactive, as

9    opposed to reactive.

10        Q    Okay.  Just a couple of quick questions as we've

11   gone on to that a little bit.

12              When you -- When someone calls your

13   office, a constituent calls your office, does your staff

14   generally keep a record of that?

15        A    It depends.  You know, we don't keep an exact

16   log.  I think there is a legislative service where you

17   can track calls if you want to.  But I think, on TRS

18   reform, we tracked them probably at that point in time.

19        Q    Okay.

20        A    And this, I don't know if we did or not.

21        Q    Okay.  If you did, do you know whether that

22   would have been produced to --

23        A    If we did, it would have been.

24        Q    Okay.

25        A    It would have been produced to the AG.

CONFIDENTIAL

[Page 219]

1      Q    Okay.  It would have been produced, and

2  presumably they would have produced it to the Plaintiffs?

3      A    It's out of my hands.

4      Q    Okay.  Great.  Going back to these talking

5  points quickly -- sorry.  I've missed my spot.

6              So it says that "Lieutenant Governor

7  Dewhurst asks Duncan to chair the committee of the whole

8  so the Senate can take up this issue this week.  Moving

9  voter ID this fast isn't Duncan's doing, although he

10  believes it is an important issue and will vote for it."

11              Can you explain why the voter ID

12  legislation was moving so fast?

13      A    Well, I'll give you some basics --

14      Q    Sure.

15      A    -- on it.  With regard to whenever an issue is

16  designated as an emergency by the Governor, then that

17  basically allows the Senate to take it up earlier in the

18  session.

19              The Constitution generally says that

20  you've got to wait 60 days before you can bring up a

21  bill without a suspension of two-thirds of the Senate or

22  four-fifths of the House.  So, by declaring legislation

23  an emergency, it simply allows you to bring the

24  legislation up earlier in the session.

25      Q    Okay.

CONFIDENTIAL

[Page 220]

1     A     So given -- 2011 was a fairly significant year.

2  I don't know if you recall in your state, but in our

3  state, we were facing a $27 billion short-fall.  We were

4  dealing with a lot of redistricting issues.  We were

5  dealing with a lot of different issues that were very

6  time-consuming.

7               And so moving legislation quickly was --

8  you know, it was an important priority for any bill, not

9  just this bill but any bill.

10    Q     Okay.  Well, it also says that you believe that

11 this was an important issue, right?

12    A     Yes, sir.

13    Q     And that's consistent with what you've just

14 said, right?

15    A     Yes, sir.

16    Q     Is the way in which this document describes your

17 role in the committee of the whole accurate?

18    A     And point me to what you're referring to,

19 please.

20    Q     Well, that Lieutenant Governor Dewhurst asked

21 you to chair the committee of the whole?

22    A     Yes, he did.

23    Q     And if you look at the next paragraph, "While

24 voter ID is a crucial issue, there are many major issues

25 the Legislature has to vote on this session, including

CONFIDENTIAL

[Page 221]

1    redistricting and the budget."

2         A    Yes, sir.

3         Q    Is that what you were just referring to?

4    "Resolving this well-debated issue at the beginning of the

5    session will help legislators turn their focus to those

6    major issues."

7         A    Yes, sir.

8         Q    If you look towards the third paragraph, at the

9    bottom, the last line, "If you are 70 or over, photo ID is

10   not required (this will be phased out; you have to be 70

11   when the law is enacted)."  Do you see that?

12        A    Yes.

13        Q    Why was the provision for voters over 70 going

14   to be phased out?

15        A    I don't know.

16             MR. SWEETEN:  I will just assert a

17   legislative privilege.  Go ahead, Senator.

18        A    I don't recall what that was about.

19        Q    (By Mr. Ross:)  Okay.  Do you recall whether

20   there was -- as enacted, that SB 14 included an exemption

21   for people over 70?

22        A    I don't remember.  I would have to look, to be

23   accurate.

24        Q    Okay.  I'm going to show you -- oh, let me cover

25   this real quick.

CONFIDENTIAL

[Page 222]

1              There's also, at the bottom, the last

2     paragraph:  "There will be education and notice of the

3     new law before the" -- is that before the bill takes

4     effect?

5          A    I guess so.

6          Q    Do you know whether that was included in the

7     final bill?

8          A    I think it was.

9          Q    Do you see, "As the bill is written now, the

10    first election using this new law will be the 2014 primary

11    election"?

12              MR. SWEETEN:  I think it's 2012.

13              MR. ROSS:  Oh, excuse me.  2012.  Yes.

14    I'm sorry.

15          A    That's what it says.

16          Q    (By Mr. Ross:)  Do you know if that provision

17    was ultimately included in the law?

18          A    Well, I think there were various delays that

19    occurred in the final implementation.  So I would assume

20    that that was the -- that was probably in the original

21    file version.  I don't know what ended up in the final

22    bill.

23          Q    I'll ask you a little bit --

24          A    I think that's what -- I believe that's what

25    started as the final bill.

CONFIDENTIAL

[Page 223]

1     Q     I'll ask you a couple of questions about that.

2               MR. ROSS:  I want to mark RD-21.

3               (Duncan Deposition Exhibit Number RD-21

4     marked.)

5     Q     (By Mr. Ross:)  Have you seen this document

6     before?

7     A     I don't normally see them.  It's just a -- It's

8     the notice which is posted down in the -- it's the

9     official posting of a hearing of a committee, which, of

10    course, we would do every week for the State Affairs

11    Committee.

12              And so I didn't always -- I didn't see

13    these routinely.

14    Q     Okay.  And what is this notice of a public

15    hearing for?

16    A     This was the notice of the public hearing for

17    Senate Bill 14 relating to "the requirements to vote,

18    including presenting proof of identification, providing

19    criminal penalties."

20    Q     And can you tell me what time and date it was

21    set for?

22    A     The committee of the whole was scheduled for

23    1:30 p.m. on Monday, January 24th, 2011.

24    Q     And is that your understanding of when it took

25    place?

CONFIDENTIAL

[Page 224]

1        A      Well, that's -- I don't recall any delays.  It

2  might not have started exactly at 1:30, but I believe it

3  started generally in that time frame.

4        Q      Great.  Do you see sort of in the middle of the

5  page, where it says, "The committee will hear invited

6  testimony only on SB 14"?

7        A      Yes.

8        Q      Do you recall whether you invited anyone to

9  testify at that hearing?

10       A      I don't know that I did or not.  I know usually

11  I rely on the author of the bill, but sometimes we would

12  do it on different bills.  I don't recall on this one

13  that we invited our committee-appointed experts.  No.

14       Q      Okay.  Do you remember who was invited to speak

15  at that committee?

16       A      The record would have to reflect that.

17       Q      Do you recall whether or not -- well, let's

18  start with this.

19              Have you ever heard of an organization

20  called "True the Vote"?

21       A      I have heard of them.

22       Q      What have you heard?  What do you know about

23  them?

24       A      I was asked about them in my last deposition,

25  and that's about as much as I know of that organization.

**CONFIDENTIAL**

[Page 225]

1  It seems like maybe in later days, in the news, I think

2  I've seen them.  They may be involved in the income tax

3  issue that's going on in the Federal Government, denial

4  of 501.  I'm not sure if they are.  I think that's -- but

5  I do not know that individual -- that organization

6  generally.

7       Q    Have you heard of the King Street Patriots?

8       A    I have.

9       Q    What do you know about that organization?

10      A    Nothing other than they are a -- I would say an

11  organization -- a fairly -- a very conservative

12  organization.

13      Q    Okay.  Do you know whether -- Do you know who

14  Catherine Englebrecht is?

15      A    No.  I've heard of her name, but I don't know

16  her.

17      Q    Do you remember what you heard?

18      A    Relating to one of these committees.

19      Q    Okay.  She --

20      A    They may have testified at the first hearing a

21  long time ago.  I don't know.  I don't know for sure.

22      Q    You don't know whether or not they testified?

23      A    I just don't know them.  So it wouldn't be in

24  my memory bank, whether they testified or not, unless I

25  saw the name.

CONFIDENTIAL

[Page 226]

1    Q    Okay.  And it's your understanding that if they

2  did testify at the committee of the whole on SB 14, based

3  on this notice, it would have been by invitation?

4    A    If they did testify, I think so.

5    Q    Do you remember whether you heard from True the

6  Vote --

7    A    No, sir.

8    Q    -- in regards to SB 14?

9    A    I don't remember if I did or not.

10   Q    Do you remember if you heard from the King

11 Street Patriots?

12   A    I don't know.

13   Q    Do you remember hearing from any sort of

14 organization constituent about SB 14?

15   A    There were a lot of generally partisan

16 organizations that, you know, take interest in these

17 types of issues.  Anything involving elections, you're

18 going to have organizations that evolve around Republican

19 politics and organizations that revolve around Democratic

20 politics that take an interest in these types of

21 legislation, as they did in 2007 and 2009, and I assume

22 they did here at this time, too.

23   Q    Okay.  Great.  But are you aware of whether you

24 received any e-mails from True Vote?

25   A    I don't know.

CONFIDENTIAL

[Page 227]

1        Q    Any letters?

2        A    I don't know.

3        Q    Phone calls?

4        A    They would be in the records.

5        Q    Okay.  Let me turn to --

6             MR. ROSS:  This is 21?

7             COURT REPORTER:  22.

8             MR. ROSS:  We're on a roll.

9             (Duncan Deposition Exhibit Number RD-22

10   marked.)

11       Q    (By Mr. Ross:)  Then I will hand you 22, if you

12   want to take that.  Are you familiar with this document?

13       A    I was at the time I received it.

14       Q    Can you take a look at the bottom of the

15   document, where it says -- from the one that's dated

16   January 21st, 2011, at 17:41.  So it was 5:41 p.m.

17       A    Are you talking about who signed it?

18       Q    No, no.  I'm actually looking on the cover page,

19   the e-mail.

20       A    Okay.

21       Q    Yes, sir.

22       A    Okay.  I'm sorry.

23       Q    It was from --

24       A    Leticia Van de Putte, Senator Van de Putte.

25       Q    To --

CONFIDENTIAL

[Page 228]

1      A     To me -- no -- for Jennifer Fagan.  I'm sorry.

2      Q     Oh, at the bottom, it says to "opie," O-P-I-E?

3      A     That's me.

4      Q     That's you.  Okay.  And then we're turning to

5  the second page, and this is marked highly confidential.

6  It's Bates-stamped TX 00204742 to 44.  Can you tell me

7  what this is?

8      A     The one that begins with 743 --

9      Q     Yes.  743.

10     A     -- dated January 21st?  It's a letter from

11  Leticia Van de Putte to me.

12     Q     Okay.  And you're familiar with this document?

13     A     I was at the time.

14     Q     Okay.  Will you take a moment briefly to just

15  flip through it real quickly?

16     A     (Witness reviewing document.)

17     Q     Do you see --

18     A     I am not that fast.  (Witness reviewing

19  document.)  Okay.

20     Q     Okay.  Do you see the first paragraph, it says,

21  "I want to reiterate our deep concern for the timing of

22  the public hearing on voter ID legislation"?

23     A     Yes.

24     Q     Do you recall what her concerns were regarding

25  the timing of the public hearing on the voter ID

CONFIDENTIAL

[Page 229]

1    legislation?

2         A    They were stated in the letter.

3         Q    And reviewing this letter now, do you know --

4    based on the letter and your memory, do you recall what

5    those concerns were?

6         A    I would just rely on the letter.

7         Q    So, I guess, if you look at the second

8    paragraph, where Senator Van de Putte says that

9    "Lieutenant Governor, fully aware that most, if not all,

10   of the senators had left town on Thursday (if not

11   Wednesday afternoon), waited until very late in the day

12   Thursday to deliver a letter to Senators, literally

13   slipping it under most office doors after hours," do you

14   recall that?

15        A    That's stated in the letter.  I don't know how

16   they delivered it.

17        Q    Okay.  But are you -- you're not familiar with

18   that having occurred?

19        A    I'm saying she stated that, and that I do not

20   know when they delivered letters to all 31 members.  So,

21   you know, I would -- I don't doubt that that's what

22   happened to her.  I don't know what happened to the other

23   members.

24        Q    Okay.  Do you recall that your earlier testimony

25   was that the purpose of the committee of the whole was so

CONFIDENTIAL

[Page 230]

1    that all members had an opportunity --

2         A    Right.

3         Q    -- to address this?   Is it fair to say, given

4    the concerns raised by Senator Van de Putte, that some

5    senators felt that they did not have enough time to

6    address the concerns around SB 14?

7         A    I think one of the things that we did -- and I

8    will say that Senator Van de Putte expressed that

9    concern.

10        Q    And are you -- you are aware that Senator Van de

11   Putte expressed that concern?

12        A    Right.   She sent me the letter.

13        Q    Okay.   And I guess, looking at the next

14   paragraph then, it says, "Please understand the stark

15   contrast to the previous session two years ago, when

16   Senators knew a month or more in advance that a full

17   hearing on this legislation would take place."

18             Does that reflect your recollection of

19   what happened in the previous session in the 2009?

20        A    Well, I thought we had a fairly robust hearing,

21   and at that time, there were also all sorts of -- a week

22   wasn't long enough, but typically our rules require we

23   post for 24 hours, and many times, that what we do at the

24   end of the session.   Especially in the beginning, maybe

25   we post -- you know, typically, generally, on the

CONFIDENTIAL

[Page 231]

1    standing committee, we would post a little bit more than

2    that.

3              But this is not -- this time period is

4    not out of the ordinary for when we were going to post

5    the bill, but I think we also used the record from 2009,

6    and everyone agreed to make that a part of the record

7    for the 2013 hearing.

8         Q    Okay.

9         A    We had -- you know, I think there was -- well,

10   that's all.

11        Q    Go ahead.

12        A    I think she said we had a candid discussion.

13   She and I did talk about these sorts of things.

14        Q    And do you recall that conversation?

15        A    No, but I have a good relationship with Senator

16   Van de Putte.  I have a lot of respect for her.

17        Q    Do you have any reason to believe that the

18   concerns that she expressed in the letter were inaccurate

19   or --

20        A    Well, I mean, they were her concerns.  I'm not

21   going to challenge her belief, just like I'm sure she

22   wouldn't challenge mine, but I think, I mean, it's

23   just -- that was her concern, and we certainly had

24   discussions about it.

25        Q    Do you see the next Page 744, which is the

**CONFIDENTIAL**

[Page 232]

1    ending numbers for the Bates, there is a second paragraph,

2    towards the last sentence, where it says, "In previous

3    legislative sessions in which we have preserved the

4    two-thirds rule, all the senators representing districts

5    in which minority voters are playing a determinative role

6    in electing the Senator of their choice did indeed block

7    legislation designed to achieve the same result, blocking

8    the bill."

9         A    I'm sorry.  I was -- I didn't find that.  Right

10   here, I see now.

11        Q    Yeah.  The second paragraph, the last sentence

12   there, where she says -- can you read that to yourself?

13        A    Yes, I see that.

14        Q    Okay.  Is that an accurate -- here -- an

15   accurate statement in terms of which senators voted

16   against getting rid of -- suspending -- excuse me -- the

17   two-thirds rule?

18        A    I'm not going to adopt anything in there with

19   regard to anything, other than there was -- there was a

20   voter ID bill.  We've talked about House Bill 218, and

21   that didn't pass because of the two-thirds rule.  And so

22   I recognized that.

23        Q    And are you aware of who voted against that?

24        A    I think we've talked about that earlier in the

25   day.

CONFIDENTIAL

[Page 233]

1       Q    Okay.  And is it fair --

2       A    The record reflects that very clearly.

3       Q    Is it fair to say that senators who were from

4  majority/minority districts voted against SB -- or excuse

5  me -- the 2009 voter ID legislation?

6       A    I'm not prepared to agree with that statement.

7       Q    Okay.

8       A    I don't have enough information to agree with

9  that statement.

10      Q    Do you have any reason to believe that convening

11 the committee of the whole was called to circumvent the

12 concerns raised by Senator Van de Putte about the

13 two-thirds rule?

14      A    I don't believe it was.  I believe that the --

15 well, let me go back.  I believe the special order allows

16 a bill to be brought up out of the regular order of

17 business.  That does not require suspension.

18           So, to the extent the committee of the

19 whole process, as it relates to voter identification

20 bills, complies with that rule, it can be brought up out

21 of order.

22      Q    Okay.

23      A    And it does not require 21 votes.

24      Q    Do you remember --

25           MR. ROSS:  Strike that.

CONFIDENTIAL

[Page 234]

1    Q   (By Mr. Ross:)  Do you remember how many times
2  the committee of the whole has been called in the last
3  five years?
4    A   In the last five years?
5    Q   Yes.
6    A   I've been in the Senate for -- I was in the
7  Senate for 16 or 17.  I can't remember.  Time flies,
8  but --
9    Q   Well, in the 16 or 17 years --
10   A   -- I recall typically on issues like
11 redistricting or something like this, that is a very
12 controversial type of -- sometimes even a partisan-type
13 issue -- that those would be committee of the whole
14 issues.
15         I think a long time ago worker's comp was
16 heard as a -- it was a very controversial party lines
17 sort of issue, well, back in '89, and I think -- if I
18 remember correctly -- and I might could be corrected,
19 but I was working in the Senate at that time.  But I
20 remember that there was a committee of the whole
21 convened to hear that issue.
22         And there may have been others.  But, in
23 the last five years, probably, if you want to confine it
24 to that period --
25   Q   Just the last five years, do you remember the

CONFIDENTIAL

[Page 235]

1    committee of the whole --

2        A    Probably -- It's probably these two bills.   It

3    may have been a redistricting bill.   I don't remember.

4        Q    And the last ten years?

5        A    Well, I'm saying redistricting -- I remember

6    some committees of the whole.   They're not all that

7    exciting.   But there have been more than just for this.

8        Q    Okay.   Would it be fair to say that in the

9    last -- well, in the last five years, you only recall the

10   photo ID related committee of the whole?

11       A    Right.

12       Q    Okay.

13       A    But, remember, five years in the legislative

14   cycle is pretty short, really.

15       Q    Well, in the last ten years, you only recall

16   photo ID and perhaps redistricting?

17       A    Yeah.   Perhaps workers' comp.   I don't know.   I

18   mean, there have been -- there may have been other

19   committees of the whole.

20       Q    Okay.

21       A    It's not -- It's not that unusual.

22       Q    Do you recall if you responded to this letter

23   from Senator Van de Putte?

24       A    I don't know if I responded in writing or

25   whether I just called her, and we talked about it.

CONFIDENTIAL

[Page 236]

1          Q    Do you remember, if you had a conversation, what

2    that conversation might have been?

3          A    No.

4          Q    Do you recall when you might have had it?

5          A    We had -- I know we had a conversation

6    immediately prior to the letter, because she refers to

7    it.

8          Q    Do you recall that conversation at all?

9          A    No.

10          Q    Did you take her concerns seriously?

11          A    I always take Senator Van de Putte's concerns

12    seriously.

13          Q    Do you recall if you tried to address them in

14    any way?

15          A    I'm sure I did in some ways.  I couldn't

16    address them 100 percent.  Chairman can't -- you just

17    can't do that sometimes.  Sometimes you've got different

18    perimeters that you have to try to move within.

19                And so there is -- and so -- but I

20    listened to Senator Van de Putte, I think, a lot of her

21    judgments and opinions, and I tried to accommodate her

22    probably in more ways than I could recall here.

23                But I do believe there were discussions

24    about how we could bring the record forward with regard

25    to the invited testimony and that sort of thing.  The

CONFIDENTIAL

[Page 237]

1    members were really -- at that point in time, you know,

2    we pretty well -- there wasn't a lot of turnover between

3    2009 and 2011, and the members were very familiar with

4    this issue.

5         Q    Okay.

6         A    So it wasn't like -- if there was new evidence

7    that needed to come forward, that we wanted to allow it,

8    and that's why we had invited testimony to allow that to

9    happen.

10        Q    Okay.

11               MR. ROSS:  We'll do 23, which is marked

12   highly confidential, TX 00204747.

13               (Duncan Deposition Exhibit Number RD-23

14   marked.)

15        Q    (By Mr. Ross:)  Are you familiar with this

16   document?

17        A    (Witness reviewing document.)  Okay.

18        Q    Are you familiar with this document?

19        A    Okay.  No, I'm not, but this is the first time

20   I've seen it, other than, I guess, maybe the one from

21   Leticia to me that starts the string out, or thread, or

22   whatever you want to call it.  But I don't think I got

23   the rest of it.

24        Q    Do you see sort of the second e-mail from the

25   bottom from Jennifer Fagan to Blaine Brunson, Julia

CONFIDENTIAL

[Page 238]

1   Rathgeber, and Janice McCoy, sent at 18:05 on

2   January 21st, 2011, --

3       A    Uh-huh, yes, sir.

4       Q    -- where she says, "Duncan and I are still

5   discussing it"?

6       A    Right.

7       Q    Do you recall what you discussed with her?

8       A    No, but I received a letter from Senator Van de

9   Putte, raising concerns and issues, and I was discussing

10  them, I'm sure, with Jennifer, "How do we address those

11  concerns?"

12      Q    But you don't recall the specifics of any

13  conversation?

14      A    No.

15      Q    Okay.  Do you see it's where -- the e-mail at

16  18:48, on the 21st, where it says, "Left it that they

17  would talk again over the weekend -- probably on Sunday"?

18      A    Yes.

19      Q    Do you recall what conversations Ms. Fagan is

20  referring to?

21      A    More likely than not, a conversation that I

22  would have had with the Senator; that she expected that I

23  would have with Senator Van de Putte over the weekend.

24      Q    Do you recall -- Do you remember if you had that

25  conversation?

CONFIDENTIAL

[Page 239]

1      A    No.  I probably did.  I just don't remember the

2  conversation.

3      Q    Do you see how it says, "As of now, he wants to

4  move ahead as planned"?

5      A    Right.

6      Q    Does that sound familiar to you?

7      A    Yes, sir.

8      Q    And do you see -- well, do you recall why he

9  wanted to move ahead as planned?

10     A    I don't recall today.  I mean, I typically like

11 to move things on, because it's a matter of managing --

12 the legislative process is primarily a matter of managing

13 large complex issues, and the more you wait, the issues

14 all converge.

15              And when you take on an issue like voter

16 ID up front, especially in January, the members are not

17 as occupied with other issues as they are when you get

18 into February, March, April, or May.

19              So it was my view -- and there were

20 several things that were put on the emergency agenda

21 that session.  I don't remember all of them.

22              But the last session before, there was

23 controversy.  The House stalled the bill, killed a lot

24 of legislation in the process of doing that.  And so

25 there was, I think, an interest in moving forward to try

CONFIDENTIAL

[Page 240]

1    to give the House plenty of time to debate this issue,

2    because they never really got to debate that issue on

3    the House floor that year.   I think that year, in 2009,

4    it never reached the floor.

5                    And so my process, thought process, was

6    generally, "Let's get -- Let's move this.   We've heard

7    this."   We had a good -- We had a good, long, heavy

8    robust debate on this issue in the Senate in 2009.

9                    And by moving the record forward and

10   allowing invited testimony to augment that record, if

11   necessary, would have -- in my view, was a reasonable

12   and legitimate way to move this bill forward and to

13   allow the process to work.

14       Q    And it was your prior testimony that this robust

15   discussion in 2009 was over SB 362?

16       A    Right.

17       Q    And SB 362 included non-voter ID?

18       A    Right.

19       Q    Do you see, at the top of this e-mail chain,

20   from Julia Rathgeber to Jennifer Fagan at 7:20 p.m., --

21       A    Right.

22       Q    -- January 21st, where it says, "It doesn't

23   leave much room for negotiation"?

24       A    Yes, I see that.

25       Q    Do you know what that means?

CONFIDENTIAL

[Page 241]

1      A    I have no idea.

2      Q    Do you know why there was no room for

3   negotiation?

4      A    I have no idea what that means or why that

5   would have been a thought that she had.

6      Q    Okay.  Could it have been negotiations between

7   you and Senator Van de Putte?

8      A    I have no idea.

9      Q    Okay.

10      A    Typically, Van de Putte and I negotiate well.

11      Q    Okay.  Do you recall any conversation -- any

12   negotiations between you and Senator Van de Putte over the

13   weekend?

14      A    I don't recall, but the process, you know,

15   ended up -- we came up with a process.  And, you know,

16   I'm sure that -- you know, in the legislative body,

17   people don't always agree, believe it or not.  And so,

18   you know, we may or may not have agreed, but we tried to

19   reach some sort of consensus, at least, about going

20   forward.

21            I don't know what her position is on

22   that.  I know that, at least in my mind, I felt

23   comfortable in moving forward, based on my conversations

24   with various members of the Senate and an informal --

25   you know, basically, an understanding of:  We want to

CONFIDENTIAL

[Page 242]

1    move this -- this is a divisive issue.  We have many

2    other divisive issues.  We have been through this one

3    before, and we pretty well know what these issues are.

4                 To the extent we need additional invited

5    testimony, we'll have it.  And so we did that.  And I

6    don't recall exactly -- this was a much shorter hearing

7    than the one that we had in 2009, but I don't think

8    there was much -- I don't recall much objection about

9    that being done more efficiently.  There may have been

10   some objection about the timing, but not efficiency of

11   the hearing.

12        Q    Okay.  I just want to very quickly go back to

13   the prior exhibit that we entered in these piles of

14   exhibits.  Let me have a quick second on this.

15                 MR. ROSS:  Sorry.  Can we go off the

16   record for just a minute?  Thank you.

17                 (Short break taken.)

18                 MR. ROSS:  We're back on the record.

19        Q    (By Mr. Ross:)  We're looking at RD-14.  Do you

20   recall talking about this e-mail earlier --

21        A    Yes, sir.

22        Q    -- regarding the request from Jennifer Fagan to

23   Ann McGeehan --

24        A    Yes.

25        Q    -- and the Secretary of State's office for

**CONFIDENTIAL**

[Page 243]

1    Hispanic surname voters?

2        A    Yes.

3        Q    So it was your testimony earlier that the raw

4    data on Latino registered voters would not be helpful in

5    determining the impact of SB 14; is that correct?

6        A    I think that summarizes what I said.

7        Q    Okay.  Would it have been helpful to know -- to

8    have a comparison between the DPS database and the

9    registered voters with Latino surnames who did not have

10   photo IDs?

11       A    Well, if you knew that, if you had some way to

12   know that.  I don't know that this information that's

13   being requested asks for that information.  It just

14   basically said, "We can identify voters with Hispanic

15   surnames, but that's all we can do."

16            So, you know, I'm not sure -- I don't

17   know whether or not we got that information, but even if

18   we got that information, my testimony is:  I'm not sure

19   that raw data alone would be beneficial.

20       Q    So it's your testimony that it would not be

21   helpful to know the number of Spanish surname voters who

22   did not have photo IDs -- DPS-issued photo ID?

23       A    Well, this does not ask for that information.

24   It does not ask for information related to that.  It only

25   asked for raw data, and she says the raw data is not

CONFIDENTIAL

[Page 244]

1    complete.

2         Q    Okay.  And by -- I'm sorry.

3         A    So that's what I read that as saying to me.

4         Q    And just to clarify, what do you mean by raw

5    data?

6         A    Just the names of voters with Hispanic

7    surnames.

8         Q    So you're saying just the list of registered

9    voters with Spanish surnames would not be helpful; is that

10   your testimony?

11        A    Right.  It's raw data.

12        Q    Is it your understanding of whether or not a

13   comparison between voters with Spanish surnames and people

14   who have DPS-issued photo IDs was ever conducted.

15        A    That's not what -- I don't know if it was or

16   not, but that's not what this request for information --

17        Q    Yeah.

18        A    -- asks for.

19        Q    Well, regardless of what this asks for, are you

20   aware of whether or not that analysis was ever done?

21        A    I don't know if any of the proponents or

22   opponents of the bill asked for that analysis.

23        Q    Do you know if an analysis might have been done

24   in connection with seeking preclearance for SB 14?

25        A    You know, I do not know.  I was not involved in

CONFIDENTIAL

[Page 245]

1    the preclearance process.  So it may have been, but I

2    don't know.

3         Q    Okay.  Just very quickly, are you familiar with

4    what I'm referencing when I talk about preclearance?

5         A    Yes.

6         Q    Okay.  And is it your understanding I'm talking

7    about preclearance under Section 5 of the Voting Rights

8    Act?

9         A    Exactly.  Yes, sir.

10        Q    And are you familiar with the retrogression

11   standard under Section 5 of the Voting Rights Act?

12        A    I know there is a standard.  I am not an expert

13   on that area of the law.

14        Q    Okay.  But you are -- generally, you are

15   generally familiar with the standard?

16        A    I'm generally familiar that there are

17   standards.

18        Q    Okay.  Fair enough.  So, before SB 14 was filed,

19   are you aware of any analysis of the likely impact on

20   voters was conducted?

21        A    Again, you know, whether or not the proponents

22   or opponents of the bill conducted that, it would be --

23   if they did and they presented it, it would be in the

24   records.

25        Q    If it had shown that Spanish surname voters were

CONFIDENTIAL

[Page 246]

1   less likely to have SB 14 -- or excuse me -- DPS-issued

2   IDs, would that affect your view of the bill?

3       A    I don't know that that was ever determined, so

4   it's so hypothetical.  Yeah.  And the degree and the

5   statistical relevance of that, I would have to see that.

6   I don't know or recall ever seeing that information --

7       Q    Okay.

8       A    -- to the extent it was presented at the

9   hearing.

10      Q    Do you know if there was any analysis conducted

11  for specific voters, for minority voters, African-American

12  voters, in particular?

13      A    Again, I'll say I don't know if the proponents

14  or opponents of the bill -- I can't recall whether or not

15  they presented evidence in the record to that effect.

16  The record will speak for itself on that.

17      Q    Do you know, at the time the SB 14 was passed,

18  what portion of the public is least likely to own photo ID

19  documents?

20      A    I don't know that I have that specific

21  knowledge.  I don't recall whether someone put it in the

22  record or not.  It may have been, but I don't recall

23  specifically that data.

24      Q    Okay.  Are you aware of whether or not poor

25  voters are less likely to have photo ID documents?

CONFIDENTIAL

[Page 247]

1        A     No, I'm not.

2        Q     Okay.

3        A     No, I'm not.

4        Q     Do you know whether minority voters -- and by

5   that, I mean black and Latino voters, in Texas, are more

6   likely to be poor?

7        A     I don't recall -- that may have been anectodal,

8   or there may have been testimony to that effect in the

9   record.   I don't recall that specific testimony in the

10  record.

11       Q     Well, outside of the record, are you aware of --

12       A     I don't --

13       Q     -- whether African-American voters are more

14  likely to be poor?

15       A     I have not conducted any individual studies or

16  asked -- or commissioned any on my own for that type of

17  work.

18       Q     Are you aware whether the Latino voters might be

19  more likely to be poor in Texas?

20       A     Same answer.

21       Q     Was that relevant to your consideration of

22  SB 14?

23             MR. SWEETEN:   Objection; legislative

24  privilege.

25       A     The relevance was the evidence that we received

CONFIDENTIAL

[Page 248]

1    in the record, and, generally, my independent judgment as

2    to whether or not this was good policy for the State of

3    Texas.

4        Q    Okay.  And what was your judgment of that?

5        A    Well, my judgment was that the requirement of a

6    voter ID for the purpose of preventing voter fraud was

7    good policy and policy that should be implemented in the

8    State of Texas.

9        Q    And it was your previous testimony that it was

10   good policy because it prevented vote harvesting, is that

11   right, --

12       A    Well, I think --

13       Q    -- or voter registration card harvesting?

14       A    Well, it was my testimony -- and the record

15   will speak for -- what I said is in the record, --

16       Q    Okay.

17       A    -- and I stand by it.

18       Q    I mean, earlier today.

19       A    Right.  That's what I'm saying.

20       Q    That's fair enough.

21       A    That's what I'm saying.

22       Q    Do you know whether or not -- well, is it your

23   opinion that requiring someone to show non-photo ID would

24   have prevented this kind of vote registration card

25   harvesting that you're concerned about?

CONFIDENTIAL

[Page 249]

1      A     I don't really know the answer to that.   I
2  would take the position that a photo ID would be probably
3  the best way to provide a -- provide for integrity of the
4  ballot box.
5      Q     And your previous testimony was that you
6  supported SB 362 for the same reason that you supported
7  SB 14 for these concerns about voter registration card
8  harvesting, right?
9      A     The primary concern I had was that under the
10  old law, a person could present a voter registration
11  card, and it would not matter -- there was no
12  enforcement -- no effective enforcement of being able to
13  ensure that the person who held that card and presented
14  the vote was the person that actually was able to vote,
15  and what I would call rather informal enforcement
16  processes that we have, with election judges and non-law
17  enforcement people at polling places, and that sort of
18  enforcement was inadequate.
19                And, anecdotally, understanding that
20  there are situations where people do gather up voter
21  registration cards and can easily gather voter
22  registration cards and use those for purposes of voter
23  fraud, in my view, is a real problem, a real threat as
24  to the integrity of the ballot box, and one that can be
25  very easily, and with common sense, and I think with

CONFIDENTIAL

[Page 250]

1    support of most people, with the requirement of a -- you

2    know, it's not -- it's appropriate, and I think an

3    effective way to provide an effective and efficient way

4    to provide integrity at the ballot box to prevent those

5    types of -- that type of fraud.

6         Q    Okay.  Do you think allowing --

7         A    And I'm sorry for the long answer.  There's

8    probably a lot of fragmented sentences in that.

9         Q    No.  I appreciate that.

10        A    I was trying to recollect and pull together

11   what I had earlier testified to.

12        Q    No.  I appreciate that, too.  And you support --

13   your position supporting SB 362 was to address those

14   concerns, correct?

15        A    That was my position.

16        Q    Okay.  And you supported SB 362 to include a

17   non-Federal ID, correct?

18        A    I did.

19        Q    So is it your position now that SB 362 would

20   have addressed those concerns -- would have adequately

21   addressed those concerns?

22        A    It would have addressed those concerns.

23        Q    Do you know -- what about -- sorry.  I don't

24   want to waste time, so I'm just going to ask you quickly.

25                 Are you aware of whether prior photo ID

CONFIDENTIAL

[Page 251]

1     laws or bills -- excuse me -- permitted Texas -- excuse

2     me -- driver's licenses from outside of Texas?

3         A     I don't remember that.

4         Q     Would you have supported a bill that permitted

5     the use of non-Texas driver's licenses?

6         A     I don't know.  I would have to think about

7     that.

8         Q     Okay.

9         A     I would have to think about that.

10        Q     We'll come back to that if we have time.  I have

11    a couple of more questions.

12                    Were you aware of any instances of a

13    in-person voter impersonation in 2009?

14        A     I recall some discussion about a person who

15    had -- actually, someone testified on the record that

16    they had a stack of voter registration cards, and

17    basically, they were passing them out at some point.  And

18    so -- And I think that's easily done.

19                    And, again, looking at history in Texas,

20    there has been voter fraud in Texas before, and you

21    can't -- it's difficult to prove, and the best way to

22    avoid it is to provide a process or a system that deters

23    that by, in my view, a simple requirement of providing a

24    voter photo ID, which most people have, for whatever

25    reason.  It is the most reasonable way to deter voter

CONFIDENTIAL

[Page 252]

1    fraud.

2        Q    Just one second.

3                 (Off the record discussion ensued.)

4                 MR. ROSS:  Back on the record.

5        Q    (By Mr. Ross:)  So it's on the record about this

6    person who brought the stack --

7        A    It should be.  You know, it's easy if you think

8    about it.

9        Q    Do you know what happened to the person?

10       A    No.

11                MR. ROSS:  I'm going to mark --

12                COURT REPORTER:  24.

13                MR. ROSS -- RD-24.

14                (Duncan Deposition Exhibit Number RD-24

15   marked.)

16       Q    (By Mr. Ross:)  This RD-24, the Senate Journal

17   on the 26th of January, 2011, I believe that was marked as

18   536 in your prior deposition.  Turn to Page 123.  Do you

19   see Section Floor Amendment Number 19?

20                (Off the record discussion ensued after

21   power outage.)

22                MR. ROSS:  Back on the record.

23                COURT REPORTER:  You may need to ask that

24   last question again.

25       Q    (By Mr. Ross:)  So, looking at Page 23 of the

CONFIDENTIAL

[Page 253]

1    Senate Journal, if you will look in about the middle of

2    the page, it's Section Floor Amendment 19, Number (1)

3    there?

4         A    Yes, sir.

5         Q    It says, "Amend SB 14, as follows, to allow "for

6    a person who is a student at an accredited public

7    university located in the State of Texas, a student

8    identification card that contains the person's photograph

9    that has not expired issued to the person by the

10   institution of higher learning."  Do you see that?

11        A    Yes.

12        Q    Do you see right below that, where it says,

13   "Amendment to 14 was read," and on motion of Senator

14   Fraser, it was tabled?

15        A    Right.

16        Q    Do you see the yeas and nays in there?

17        A    I do.

18        Q    Do you see your name?

19        A    Yes.

20        Q    Do you recall why you voted --

21             MR. SWEETEN:  Objection; legislative

22   privilege.  You can answer.

23        A    No.

24        Q    (By Mr. Ross:)  Do you recall voting to table

25   other amendments as to SB 14?

**CONFIDENTIAL**

[Page 254]

1       A    I will go on the record on that.

2       Q    Do you recall why you voted to table any other

3  amendments?

4       A    No.

5       Q    Let's move on from this document unless --

6       A    I see -- what page are you looking at?

7       Q    I'm on 123.  Okay.  I think we're done with this

8  document.  Oh, actually -- excuse me.

9            Can we go to page -- I think it's the next

10  Page 124.  Do you see 124, where Senator Davis offered

11  Amendment 21?

12       A    Yes.

13       Q    Do you see where it says, Paragraph (5), "a

14  valid" -- amending SB 14 to allow for "a valid

15  identification card, including an employee identification

16  card, that contains the person's photograph and is issued

17  by an agency or institution of the Federal Government"?

18       A    Yes, I see that.

19       Q    "And an agency, institution, or political

20  subdivision of this state, or an institution of higher

21  learning in the state."  Do you see that?

22       A    "Higher education in the state."  Yes, sir.

23       Q    Excuse me.  "Institution of higher education in

24  the state."

25            Do you see that the amendment to SB 14 is

CONFIDENTIAL

[Page 255]

1    read, and on a motion from Senator Fraser, Amendment 21

2    was tabled by a vote of 19 yeas and 11 nays?

3         A    Yes.

4         Q    Do you see the yeas list?

5         A    Yes.

6         Q    Do you see your name?

7         A    Yes.

8         Q    Do you recall why you voted yea to table that

9    amendment?

10              MR. SWEETEN:   Objection; legislative

11   privilege.

12        A    No.

13        Q    (By Mr. Ross:)  Do you see amendment -- excuse

14   me.  Turn to Page 30, please.

15        A    Page 30?

16        Q    Yes, sir.

17        A    Go back to Page 30?

18        Q    Oh, 130.  So you were at 124, I think.

19        A    Okay.  130.  Okay.

20        Q    I believe this was Duncan Exhibit 536 on the

21   prior deposition.  We had mentioned that earlier on Floor

22   Amendment Number 30.  Do you see that?

23        A    Yes.

24        Q    Can you look for me, Senator Duncan, where it

25   says -- I'm sorry -- Paragraph (7) of that amendment, "an

CONFIDENTIAL

[Page 256]

1    analysis by a subgroup of whether the enhanced

2    identification requirements for being accepted to vote

3    produce a disparate impact on women, the elderly, persons

4    with disabilities, students, or racial and ethnic

5    minorities."

6         A    I see that.

7         Q    Do you see how Amended 14 was read, and on a

8    motion from Senator Fraser --

9         A    Right.

10        Q    -- the amendment was tabled --

11        A    Yes, sir.

12        Q    -- by 19 yeas and 11 nays?  Do you see the yeas

13   on the next top of 131?

14        A    Yes, sir.

15        Q    Do you see your name --

16        A    Yes, sir.

17        Q    -- in that list of yeas?

18        A    Yes, sir.

19        Q    Do you recall why your name was -- why you voted

20   to table that amendment?

21        A    You know, again, when you're at a --

22             MR. SWEETEN:  Objection; privilege.  Go

23   ahead.

24        A    There are numerous amendments that are voted on

25   in committee, but this one, I don't remember the reasons

**CONFIDENTIAL**

[Page 257]

1  why particular -- I've already stated, though, the

2  reasons why, on many of those amendments, I would vote no

3  or just go with the author of the bill and trust his

4  judgment on whether or not that meets the bill.  On this

5  particular amendment, I've previously testified.

6              And I want to be clear that I do not

7  believe that the Secretary of State's office is the

8  right -- the right agency to be able to make a State

9  finding on whether or not -- which would be a judicial

10  finding, more or less, with regard to disparity impact.

11              Now, as far as reporting data and things

12  like that -- but part of this requires them to be -- to,

13  more or less, make a determination that would require

14  some discretion with regard to a quasi-judicial

15  function.  To me, it would have been the inappropriate

16  agency to do this.

17      Q    If an appropriate agency, whether in conjunction

18  with the Secretary of State or other Texas agencies was

19  asked to produce a report showing the number of women who

20  didn't have SB 14 required ID, would you have supported

21  that amendment?

22      A    The data -- The data does not bother me.  I

23  mean, the data would be -- it's just not a -- that's not

24  an issue.  The issue is:  How do you analyze the data and

25  what judgment is passed on that data?

**CONFIDENTIAL**

[Page 258]

1               And so data can be produced and actually

2    acquired, but the issue is:  What do you do with that

3    data?  What is the integrity of the process that it goes

4    through, becoming the analysis of the data, and that's a

5    matter of deliberation.

6               And you have the bill, and you have one

7    side that says, "This does have an impact," and one

8    expert will say it doesn't.  And so it's up to the

9    legislative body, as designed by the Constitution, to

10   deliberate on those issues and make that determination,

11   or a Court to do that, make those determinations.

12               But the Secretary of State's office is

13   not staffed nor appropriated with sufficient funds to

14   conduct this type of study.  So that would be a reason

15   why that amendment would have been inappropriate.

16      Q    Okay.  Do you include in that data having data

17   on a number of people who did not have SB 14 ID?  Do you

18   believe that's helpful data to have at that time?

19               MR. SWEETEN:  Objection to legislative

20   privilege.  I'm going to object to the incomplete

21   foundation, and objection to speculation.  Go ahead.

22      A    I don't know that it would be helpful or not.

23      Q    (By Mr. Ross:)  Okay.  Fair enough.  We'll move

24   on from that.  Let me go briefly back to student IDs.

25               You're presently the Chancellor of the

**CONFIDENTIAL**

[Page 259]

1    Texas Tech University system; is that correct?

2         A    Yes.

3         Q    Do you know how students get student IDs at

4    Texas Tech; how a person would get a student ID?

5         A    They go over to the ID office, and they check

6    their matriculation number, and then they issue the ID.

7         Q    Okay.  Do you know -- So you would have to be a

8    student at Texas Tech in order to get a student ID; is

9    that correct?

10        A    At the time you applied for it.

11        Q    And do you know whether someone would have to go

12   through the process in order to confirm that they are a

13   student in order to -- excuse me.

14        A    The lady looks it up on the record.

15        Q    Uh-huh.  And they just look through the record?

16        A    Here is your -- can you show me your ID?  And

17   the lady looks it up on the record, and basically she

18   takes a picture, and then gives you the ID.

19        Q    Okay.  Do you know how you get on this registry

20   that you're talking about?

21        A    No.  I've only been here six weeks.

22        Q    Okay.  Fair enough.  Are you aware of what

23   student IDs may be used for at Texas Tech?

24        A    Admission to certain events and probably other

25   aspects of benefits and things like that, scholarships

CONFIDENTIAL

[Page 260]

1    and financial aid.  And in an account like that, they

2    need probably identification numbers.  I'm speculating a

3    little bit here, but having not been a student for

4    several years --

5        Q    Do you know whether the students can use their

6    ID to access money, like financial information?

7        A    Well, I think, more likely than not, they have

8    to have an ID to access student financial aid, and they

9    have certain electronic identification primarily for

10   that.

11              And, in fact, the old card, as we had it,

12   when we were in school, when you were in school, is

13   probably less important today than the internet or

14   computer ID numbers that students receive to access --

15   or their parents -- to receive access of their academic

16   record or to access their financial aid records.  So

17   this little card that you get is probably less important

18   today than it was 10 or 15 years ago.

19       Q    Okay.

20       A    In fact, I don't even -- I got one, but I don't

21   know where it is.

22       Q    Do you know whether -- Are you aware of how many

23   out-of-state students there are at Texas Tech University?

24       A    How many -- I'm sorry.  I didn't hear you.

25       Q    How many students who are not from Texas, at

CONFIDENTIAL

[Page 261]

1    least not prior to --

2         A    Quite a bit of international students, as well

3    as students who come in from other states.

4         Q    And do you know whether those students are

5    allowed to -- are allowed to vote while they live here in

6    Texas as long as they're citizens and over the age of 18?

7         A    As long as they register and they are -- and

8    they establish proper residency in accordance with the

9    Election Code.

10        Q    Let me show you what I would like to mark as RD

11   Number 25.

12                  (Duncan Deposition Exhibit Number RD-25

13   marked.)

14        Q    (By Mr. Ross:)  Are you familiar with this

15   document?

16        A    Yes.  Well, I remember the story.

17        Q    Is that -- This look like, at the top, that you

18   were -- excuse me -- the Web site address for this is

19   lubbockonline.com; is that right?

20        A    Yes, sir.

21        Q    And is it fair to say this is a Tuesday,

22   August 26th, 2014, Lubbock Avalanche-Journal article?

23        A    Yes.

24        Q    And what is the title of this article?  It looks

25   like it might have been cut off a little bit, but --

CONFIDENTIAL

[Page 262]

1      A    Yeah, it's kind of cut off.

2      Q    Okay.  Is it fair to say that is about the Texas

3  Secretary of State, Nandita Berry, visiting Texas Tech?

4      A    And Lubbock Christian University.

5      Q    And you said that you recall this visit?

6      A    I recall reading about it in the paper.

7      Q    Did you ask her to visit?

8      A    No.

9      Q    Did you speak to her when she visited?

10     A    No.

11     Q    Do you know why she visited?

12     A    For the -- The article would be the best

13  evidence of that --

14     Q    Okay.

15     A    -- before us today.

16     Q    And the article says -- well, can you tell me --

17  let me start over --

18          MR. ROSS:  Scratch that.  Sorry.  Strike

19  that.

20     Q    (By Mr. Ross:)  It looks like part of the

21  article was cut off a little bit, but is it accurate to

22  say that the article says that the Secretary of State

23  visited Texas Tech and Lubbock Christian University in

24  order to urge students to vote?

25     A    I think that's accurate.

CONFIDENTIAL

[Page 263]

1        Q     And do you know -- does the article also make

2    mention of the voter ID law?

3        A     Right.  Well, it says, "Berry's office holds a

4    neutral stance on any political controversy regarding

5    voter ID" -- something -- "enforcing the law."

6        Q     Okay.

7        A     I don't know what's cut off here.

8        Q     Yeah.  Do you know whether -- well, are you

9    familiar with the mobile EIC program?

10       A     Mobile what?

11       Q     Mobile IEC-issued program, election

12   identification certificate.

13       A     No.

14       Q     Are you familiar with where someone can get an

15   election identification certificate?

16       A     Well, I think at the DPS offices.

17       Q     Do you know where the closest DPS office is to

18   Texas Tech University?

19       A     Yes.  It's out on the -- in the Lubbock

20   Business Park.

21       Q     Do you know about how far away that is from

22   Texas Tech?

23       A     Probably ten minutes.

24       Q     How many miles?

25       A     Well, it would be probably 10 or 15 miles --

CONFIDENTIAL

[Page 264]

1        Q    Do you know if there is --

2        A    -- if that many.  It's pretty close.

3        Q    Do you know -- Well, do you know what percentage

4   of the student population at Texas Tech owns a vehicle?

5        A    No, I don't.

6        Q    Moving on.  So it's your understanding that

7   SB 14 requires that photo ID be provided free of charge

8   and made widely available?

9        A    I'm sorry?

10       Q    Excuse me.

11       A    Would you repeat that?

12       Q    Is it your understanding that SB 14 requires

13  photo IDs to be provided free of charge and made widely

14  available?

15       A    I think that's -- I think that's correct.  We

16  can go to the legislation specifically if you would like

17  to.

18       Q    But it's your understanding generally on that?

19       A    I think so.

20       Q    And you're aware of the election identification

21  certificate, correct?

22       A    I'm aware of the requirements in the statute,

23  but I would probably want to refresh myself on those, if

24  you ask me questions about them.

25       Q    Okay.  Well, what is your understanding of what

CONFIDENTIAL

[Page 265]

1   an election identification certificate is?

2       A    Well, let's go to the bill.  You can help me,

3   because you've probably looked at it a lot more than I

4   have.

5       Q    Go for it.

6       A    This is RD-17.  I would say -- I'll look for

7   it.  I believe, starting at Section 11, it provides

8   notice of identification requirements to voters, and

9   that --

10      Q    Well, is it your understanding that the EIC is

11  provided by the Department of Public Safety?

12      A    I believe that's my understanding.  I believe

13  that's true here.  It's Section 20 of the bill.

14      Q    Which page are you on?  I'm sorry.

15      A    Page 13 of the legislation.

16      Q    All right.  So it says, "The department shall

17  issue an election identification certificate to a person

18  who states that the person" -- excuse me -- "who states

19  that the person is obtaining the certificate for the

20  purpose of satisfying Section 63.0101(b), and does not

21  have another form of identification, described by Section

22  63.0101."

23      A    It has several different subsections or --

24      Q    Subsections.  Right.

25      A    -- subparagraphs that deal with the details of

CONFIDENTIAL

[Page 266]

1    that.

2        Q    But it's your general understanding that the

3    election identification certificate is provided by the

4    Department of Public Safety, right?

5        A    Yes.

6        Q    And are you aware of -- well, excuse me.  At the

7    time that SB 14 was being considered, did you know that

8    80 counties did not have DPS offices, 80 Texas counties?

9        A    I know that there was -- I recall testimony

10   that there was some concern that there were not -- that

11   every county didn't have a full-time active DPS presence

12   with regard to licensing persons.

13       Q    And did you have concerns regarding the lack of

14   the DPS in the 80 counties in Texas at the time?

15       A    Well, let me tell you --

16            MR. SWEETEN:   Objection; legislative

17   privilege.

18       A    I thought it was an issue that we should try to

19   address, because we went through the process.

20       Q    (By Mr. Ross:)  Do you believe SB 14 addresses

21   those concerns?

22       A    I believe other initiatives do.  I think we

23   have worked hard to try to get more driver's licenses --

24   to do more -- we've tried to fill in those gaps more.

25       Q    Do you know if SB 14 requires additional DPS

CONFIDENTIAL

[Page 267]

1  offices?

2           MR. SWEETEN:  The bill itself?

3           MR. ROSS:  Yes.

4       A   I don't think it required more.  I think that

5  we made a conscious effort to improve the availability of

6  the driver's license process in different counties in

7  rural counties.

8       Q   (By Mr. Ross:)  But the bill itself did not

9  require it?

10      A   The bill did not require it, but, obviously, I

11  think we heard those issues and started trying to address

12  them.

13      Q   Okay.  Are you aware of the mobile election

14  identification certificate program?

15      A   Only that I've heard about it, but I haven't

16  studied it or touched it, felt it, you know, been

17  thoroughly briefed on it.

18      Q   Do you know if that was required by SB 14?

19      A   I don't know that it was required by SB 14,

20  but it was done.

21      Q   It was done in response to SB 14?

22      A   It was done in response to and a need for

23  more accessibility for that sort of processing in rural

24  areas.

25      Q   And do you know whether that was done after

CONFIDENTIAL

[Page 268]

1    SB 14 was passed or those --

2        A    Yes, it was.

3        Q    -- those plans -- after it was signed into law?

4        A    Right.

5        Q    What's the demographic makeup of your district?

6        A    It varies.  You know, I've had -- since we

7    began the voter ID, I've had two different districts.  I

8    would say, roughly, the district is at least 30 percent

9    Hispanic and probably between 55 and 60 percent,

10   somewhere in that range, of Anglo, and the other is

11   African-American and other.

12       Q    How much are African-American?

13       A    Less than 10 percent or in that area,

14   African-American or other ethnic groups.

15       Q    So probably about 35 percent nonwhite, is that

16   fair, nonwhite, non-Anglo?

17       A    Well, 40 to 45 percent.

18       Q    Forty to 45 percent Latino, black, and other?

19       A    Roughly.  These are real guesses here.

20       Q    No.  Fair enough.

21       A    But it's familiarity.  I was always out in the

22   district quite a bit, and so that would be my sense.  And

23   I think, at some point in time, we've looked at that and

24   made sure that we understand the demographics.

25       Q    Is it fair to say that your black and Latino

CONFIDENTIAL

[Page 269]

1    constituents were important to you?

2        A    They sure are, or still were, and still are, I

3    guess, but yes.

4        Q    So you had earlier testified that it would be

5    problematic if people were using voter registration cards

6    illegally then; is that right?

7        A    Right.

8        Q    It's hard to see on the registration cards?

9        A    Right.

10       Q    Would it be problematic to you if

11   African-Americans were unable to vote, valid

12   African-American voters were unable to vote because of

13   SB 14?

14       A    I would not reach the conclusion that they were

15   unable to vote because of Senate Bill 14, because Senate

16   Bill 14 provides mechanisms to allow that to occur.   In

17   my experience -- let me rephrase that.   I'll stop there.

18            I do not believe that Senate Bill 14

19   would restrict their right to vote.

20       Q    Well, let me back up.   Would it be problematic

21   if SB 14 diminished the Latinos being able to vote?

22       A    I would disagree with the proposition that

23   Senate Bill 14 diminishes the right of anyone to vote in

24   the State of Texas.

25       Q    What is your factual basis for that?

CONFIDENTIAL

[Page 270]

1          A      Well, --

2                      MR. SWEETEN:   Objection; legislative

3      privilege.

4          A      Well, common sense.   I'm familiar with the law.

5      Most -- to function in the society today, people have a

6      need for IDs.   The bill provides a free ID for those who,

7      for whatever reason, don't have one.

8                      And so it allows a way, and we've worked

9      to try to make sure that there are available DPS places

10     to -- making sure that that happens.   There have been

11     two elections, I guess now, where voter ID will actually

12     occur -- or was used, and we're fixing to have another

13     one here in this district, in my district, on September

14     the 9th.

15                      I haven't heard any significant issues;

16     that people were denied the right to vote.   I think

17     there were some issues with regard to married names and

18     maiden names and things like that, but I think those

19     were resolved.

20                      So I haven't heard the -- it's like a lot

21     of things.   I haven't heard the -- I haven't seen in the

22     news that there is a substantial, significant, if any,

23     issue or problem caused by the requirements of Senate

24     Bill 14.

25          Q      Do you know how many provisional ballots did not

CONFIDENTIAL

[Page 271]

1    get counted in the last two elections --

2         A    No.

3         Q    -- because of SB 14, because someone did not

4    provide a photo ID?

5         A    I don't know that.

6         Q    Do you have any factual basis for your -- other

7    than news reports, that people were not allowed to vote in

8    this last election?

9         A    That's my basis for that.

10        Q    Just news reports or the lack of news reports?

11        A    Well, the lack of -- you know, I was a member

12   of the Senate until July the 3rd, and I certainly didn't

13   hear any complaints.  I'm not aware of any complaints in

14   our district that were -- that were coming into our

15   office.

16                     And I've had an Hispanic -- a very

17   active, robust Hispanic community and African-American

18   community, especially in Lubbock.  And I haven't really

19   heard complaints.  At least no one complained to me.

20        Q    Do you know whether your constituents -- or

21   Latino constituents, did they raise any concerns to you

22   that SB 14, prior to its passing, disenfranchised Latino

23   voters?

24        A    I do not recall.  If they did, that was

25   something that -- there may have been some written

CONFIDENTIAL

[Page 272]

1   communication that I do not recall today, but I do not

2   recall getting addressed verbally about that issue.

3       Q    Do you recall African-American voters bringing

4   that issue to your attention?

5       A    No.

6       Q    At any time, since the passage of SB 14, have

7   you come to believe that SB 14 has a disproportionate

8   impact on the voters as compared to the Anglo voters?

9       A    I have not.

10      Q    Was SB 14 enacted, in part, to reduce Latino

11  voter participation?

12      A    No, it was not.

13      Q    Was it enacted to reduce African-American voter

14  participation?

15      A    No, it was not.

16      Q    Let me ask you about Texas v. Holder.  Are you

17  familiar with that decision from 2012?

18      A    There's so many Texas v. Holders.

19      Q    From 2012, the case in which SB 14 was denied

20  judicial preclearance under Section 5 of the Voting Rights

21  Act --

22      A    I recall reading that.  Yes.

23      Q    -- did you read that decision?

24      A    I think I probably did.

25      Q    How did you react to that?

CONFIDENTIAL

[Page 273]

1          A     I disagreed with it.

2          Q     Why did you disagree with it?

3          A      Well, because I was there.  I mean, I believe

4    we provided fair process.  We heard the evidence.  And I

5    was never convinced that there was any sort of -- that

6    Senate Bill 14 -- I was very clear.  I said it earlier.

7                   I don't believe the provisions of this

8    bill denied anybody, Anglo, Hispanic, African-American,

9    the right to vote.  They provide a process for doing

10   that, just like voter registration.  You know, the

11   voter -- everyone has to go register to vote, and

12   everyone now, you know, needs to have an ID.

13                  And these are just requirements that we

14   had to protect the integrity of the ballot box.  And

15   that's the sole purpose of this bill, and that's why I

16   supported it and voted for it.

17         Q     Do you know how the Senate, as a whole, reacted

18   to the Texas v. Holder decision?

19         A     No.

20         Q     Do you recall?

21         A     No.

22         Q     Do you know -- Did you take any action to

23   address the Texas v. Holder decision?

24         A     What?

25         Q     Did you take any action to address the Texas v.

**CONFIDENTIAL**

[Page 274]

1    Holder position in the Senate?

2         A    No.  I don't think we've done anything.  I

3    think, shortly thereafter, the Supreme Court took action,

4    but as far as -- not on Section 5 of the Voting Rights

5    Act.  So I think that that issue became moot.

6         Q    Well, in the time between -- I believe you're

7    referring to --

8         A    The legal issue.

9         Q    -- Shelby County versus Holder; is that correct?

10        A    Yes, sir.

11        Q    Are you aware that an election took place

12   between the three-judge panel's decision denying

13   preclearance on SB 14 in 2014 and the Shelby County

14   decision in June of 2013?

15        A    The timeline is getting a little fuzzy to me

16   here.  So I am not following that.  So you might

17   rephrase.

18        Q    Well --

19             MR. SWEETEN:  It's really hard to hear.

20   I'm sorry.

21             MR. ROSS:  This is rain right above you.

22        Q    (By Mr. Ross:)  I'm sorry.

23             (Off the record discussion ensued.)

24        Q    (By Mr. Ross:)  SB 14, to your understanding, do

25   you know whether Texas v. Holder -- when the decision came

CONFIDENTIAL

[Page 275]

1    down?

2        A    No.

3        Q    Would it be accurate if I -- or would it be

4    accurate to say that it occurred prior to the November of

5    2012 Presidential election, to your knowledge?

6        A    I don't remember.  I don't have a good timeline

7    on it.  I guess that's why I'm not following your

8    question, because I don't have my own timeline as to the

9    dates.

10       Q    You don't recall when that decision was issued?

11       A    I don't recall.

12       Q    I will submit that it was August of 2012.

13       A    Okay.

14       Q    How many times did the Legislature meet after --

15   well, sorry.

16            How many times did the Legislature meet

17   after August 2012?

18       A    We met in the regular session within 2013, and

19   then we met in a -- I think we had two-special sessions

20   in June of 2013 that I'm aware of.

21       Q    Are you aware of any committee hearings held

22   related to voter ID after Texas v. Holder was issued?

23       A    I don't think we did.  I'm not -- I don't

24   remember any.  It was in the Senate.

25       Q    Did you seek any analysis after Texas v. Holder

CONFIDENTIAL

[Page 276]

1    to address the concerns raised in that opinion?

2         A    No.

3         Q    Do you know if there were any reports created by

4    that in the Senate?

5         A    I do not know.

6         Q    Were there any reports requested or considered

7    by your office?

8         A    I don't believe so.

9         Q    Do you know if there was any communication

10   between yourself and other senators regarding Texas v.

11   Holder?

12              MR. SWEETEN:  Objection; legislative

13   privilege.

14        A    I'm not -- I don't recall any, but -- you know,

15   I don't recall.  It was not an issue that we were -- at

16   least that I was involved in, because I don't believe

17   there was any legislation submitted to the State Affairs

18   Committee on that issue or any other committee.

19        Q    (By Mr. Ross:)  Do you recall any conversations

20   between you and other senators about Texas v. Holder?

21        A    No, no, not -- no.

22        Q    Do you recall -- well, in your request for

23   opponents of the bill, did you request any analysis?

24        A    I don't know.  That's a good question.  I don't

25   know.  I do not know.  I'm not aware of any, and there

CONFIDENTIAL

[Page 277]

1    may be.  I don't know if there was or not.

2        Q    So, earlier, you testified you're familiar with

3    the Supreme Court case of Shelby County v. Holder?

4        A    Yes.

5        Q    Do you recall when that decision came down?

6        A    No.

7        Q    I will submit that it was June 2013.  Does that

8    sound about right to you?

9        A    It doesn't -- I don't have a timeline on it.

10       Q    Okay.  Did you read that decision?

11       A    You know, I didn't -- it was long, and I don't

12   think I read -- I read the syllabus, probably.  I didn't

13   read the whole opinion.

14       Q    And are you aware that that decision suspended

15   preclearance under Section 5?

16       A    That's what I'm aware of.

17       Q    Okay.  Were there any interim session committees

18   convened between August 2013 and June -- or excuse me --

19   August of 2012 and June of 2013 to address SB 14 or voter

20   ID, that you're aware of?

21       A    I'm not aware of any.

22       Q    Okay.

23       A    I don't know for sure about that.  I think -- I

24   don't believe there was any charged to the committee to

25   do that.

CONFIDENTIAL

[Page 278]

1      Q    Okay.  And you were still in the Senate at that

2   time; is that right?

3      A    Right.

4      Q    And you were still the chair of the --

5      A    Right.  We typically studied issues when they

6   were charged to us from the Lieutenant Governor's office.

7   And I don't believe that there was an interim charge

8   between '11 and '13, 2011 and 2013, to do a voter ID

9   study.

10               But you could refresh my memory.  There

11   may have been something, and I just don't recall it.

12      Q    But you do not recall -- well, I'm submitting

13   that between Texas v. Holder and Shelby County v. Holder,

14   there was the 2012 Presidential election.

15               Does that -- I'm submitting that that's

16   true, based on the dates --

17      A    Well, remind me --

18      Q    -- of the decisions.

19      A    I guess that's correct.

20      Q    In August 2012, the Texas v. Holder --

21      A    I'm going to be in layman's mode here, and you

22   can tell me this --

23      Q    Sure.

24      A    -- and maybe we will understand each other

25   better.

CONFIDENTIAL

[Page 279]

1      Q     Sure.

2      A     I do not -- Voter ID was in the last

3  Presidential election.   Texas did not use the voter ID

4  statute; is that correct?

5      Q     Yes, because of Texas v. Holder.

6      A     Right.

7      Q     Yes.

8      A     But, after that, we've had a primary season,

9  and I think a Constitutional amendment election, I

10  believe, where the voter ID was implemented.

11      Q     Yes, that's my understanding.

12      A     Post-Holder and Shelby County.

13      Q     Yes.

14      A     That's my timeline on it.

15      Q     Yes.  And that's the correct timeline.  We're

16  understanding each other.

17              Were there any efforts made on the part of

18  the Legislature to hold hearings or task force to

19  otherwise examine the administration of the 2014

20  election?

21      A     I don't know.

22      Q     Do you recall?

23      A     I don't recall any.  I don't believe we were

24  charged with that.  We've been a little bit -- We've had

25  elections going on in the State, as well.

CONFIDENTIAL

[Page 280]

1            After 2013, we began kind of a

2  generational aspect in our legislative process, where

3  you had a Governor announcing that he wasn't going to

4  run.  So we've had a lot of different election issues

5  going on, not related to voter ID, that has delayed the

6  interim process of the Senate.

7            So I think that's one reason why you

8  haven't seen a lot of -- you haven't seen priorities set

9  on any issues at this point in time.

10     Q    Okay.

11     A    And there's some uncertainty as to where the

12  leadership is.

13     Q    Are you aware of any in-person voter

14  impersonation that occurred in Texas during the 2012

15  Presidential election?

16     A    I'm not -- I can't give you a personal -- no,

17  I'm not aware of any specific anectodal evidence on that.

18     Q    Are you aware of any in-personal voter

19  impersonation that occurred in Texas during any election

20  between August 2012 and November 2013?

21     A    I'll stick with my former testimony.  I don't

22  know how you could prove it unless you just had, you

23  know, some sort of super effort that, in and of itself,

24  would be oppressive, to try to shake down people every

25  time that they came to vote.

CONFIDENTIAL

[Page 281]

1          The only way to avoid that kind of, what

2   I would call, oppressive enforcement is just to simply

3   say, "Present your ID."  And that's what Senate Bill 14

4   does.  And it provides processes.  If you don't have an

5   ID, the State of Texas will give you one for free.

6          So, to me, in my legislative and

7   political judgment, that was an appropriate policy

8   decision laid out in Senate Bill 14.

9      Q   Okay.  As of June 26th, 2013, Texas has enforced

10  SB 14; is that correct?  As of June 26th, 2013, SB 14 has

11  been in effect; is that your understanding?

12     A   Post-Shelby County?

13     Q   Yes.

14     A   Yes, sir.

15     Q   Okay.  Immediately after the Shelby County

16  decision, the Texas Attorney General announced that he

17  would begin enforcing SB 14 immediately.  Do you recall

18  hearing that?

19     A   I recall reading it in the newspaper.

20     Q   Did you have any communication with him about

21  that?

22     A   No.

23     Q   Did you have any communication with anyone about

24  that announcement?

25     A   No.

**CONFIDENTIAL**

[Page 282]

1    Q    Is it your understanding, then, that SB 14 is

2  now being enforced?

3    A    Yes.

4    Q    Are you aware of what documents you need to

5  produce in order to obtain an election identification

6  certificate?

7    A    It's stated in the legislation.  We can look it

8  up.

9    Q    Well, let's pull -- go back to SB 14.  Let's do

10  this then.

11         MR. ROSS:  We might take a quick break.

12    Q    (By Mr. Ross:)  So I'll submit that you're

13  required -- well, let me say:  Is it your understanding

14  that you're required to present a birth certificate in

15  order to get an election identification certificate?

16    A    (Witness reviewing document.)  I'm reading the

17  statute.  So it's okay.  I may not be able to --

18    Q    Well, do you know?

19    A    It's probably not in the bill.  I think there's

20  another -- there's another statutory reference here that,

21  I think, cross-references it.  I don't think it's

22  actually included in the bill.

23    Q    Well, do you know whether SB 14 requires the

24  documents needed to show -- to get an election -- excuse

25  me --

**CONFIDENTIAL**

[Page 283]

1          MR. ROSS:  Strike that.

2      Q    (By Mr. Ross)  Do you know whether SB 14

3  requires that the underlying documents that one would need

4  to show, in order to get an election identification

5  certificate, be provided for free?

6      A    I don't believe it does.  I believe it provides

7  that the certificate, though, must be provided for free.

8      Q    Okay.  Do you know whether there were any

9  amendments offered to require that?

10     A    Yes.  I believe there was.  In reviewing the

11  testimony -- reviewing something that you showed me -- I

12  think that the other Counsel showed me today -- I saw an

13  amendment by, I think, Davis that covered that.

14     Q    Do you recall how you voted on that amendment?

15     A    I think I recall, from that document, that I

16  voted either to table or in opposition.

17     Q    And do you recall why?

18          MR. SWEETEN:  Objection; legislative

19  privilege.

20     A    No, I really don't, other than -- you know, I

21  guess we can reconstruct it -- the counties, I think,

22  basically, are charged with those vital statistics or the

23  local health departments.  I'm not sure exactly how

24  complex that would be, to be able to provide those.

25          So it might be fleshed out to understand

**CONFIDENTIAL**

[Page 284]

1    whether or not it worked -- or whether we even had

2    jurisdiction to mandate that.  So there was some

3    confusion in my mind about how that would really work.

4    And so that was one of the reason I would have voted

5    against that.

6        Q    (By Mr. Ross:)  Do you have any concern about --

7    in order to get an EIC -- requiring an underlying

8    document, but not making the underlying document free --

9    would prevent voters from obtaining that form of ID?

10       A    I heard those concerns in the testimony, and I

11   weighed them.  And, in fact, to me, the weight was not

12   sufficient to cause me to have judgment against the bill.

13       Q    Do you recall -- if we move to --

14               MR. ROSS:  Well, let me take a break here.

15               (Short break taken.)

16               MR. ROSS:  So we're back on the record.  I

17   think I just have a couple of more questions, and we'll

18   let you-all go.

19       Q    (By Mr. Ross:)  Thank you, Senator, again, --

20       A    Sure.

21       Q    -- for taking the time to do this one more time.

22   So you said you were familiar with Texas v. Holder, right;

23   that you had read the opinion?

24       A    Yeah, I read it one time.

25       Q    Okay.  Do you recall -- Well, would it bother

CONFIDENTIAL

[Page 285]

1   you to learn that some voters had to travel between 150 --

2   or 150 miles round trip in order to obtain an SB 14 ID?

3       A    You know, I think there's nothing we can do

4   that's ever perfect.  I do think that we've tried to

5   address that issue.

6                I know I even had legislation in the last

7   session, I think, to work some issues out with Senator

8   Nichols and others to try to make sure that we had more

9   processing and accessibility in the rural areas.  I

10  think that Representative King was big on that, as well,

11  up in the Panhandle.

12               And so, you know, you can't solve every

13  problem that a piece of legislation presents, but when

14  you're recognizing -- when you start trying to address

15  them, and I think we have, I don't think that it's --

16  you know, in my view, we did work to try to address

17  those issues.

18      Q    Do you think it would be burdensome for someone

19  to have to drive 100 miles in order to get SB 14 required

20  ID.

21               MR. SWEETEN:  Objection, foundation;

22  assumes facts not in evidence.  You can answer.

23      A    You know, I don't want to venture -- if someone

24  has to drive 100 miles to get an ID, they probably have

25  to drive 100 miles to shop, as well.

CONFIDENTIAL

[Page 286]

1          So, generally, I don't know that it's --

2   that it would be burdensome if it's 150 miles.  If you

3   live 150 miles -- if you live in rural remote areas,

4   you're used to driving 150 miles.  I grew up in a rural

5   area.  So driving 150 in West Texas is not -- most

6   people don't consider that over the top or a long way.

7       Q    (By Mr. Ross)  Well, --

8       A    I say most people.  Those of us out here are

9   used to driving 150 miles.  They may not true in New

10  York.  That may sound like a long way, but in West Texas,

11  we're -- you know, we do that, and, you know, you

12  would -- but, again, we've tried -- we've made efforts

13  for those of us who live in rural counties.

14          And I've represented rural counties for

15  28 years -- 20 years in the Legislature, and we've tried

16  to make -- we always try to address those issues and

17  make sure that we improve them, and I think we have.

18      Q    Would it be burdensome, if someone did not

19  have a car, to drive 100 miles in order to get to a DPS

20  office --

21          MR. SWEETEN:  Same objection.

22      Q    (By Mr. Ross)  -- with SB 14 required ID?

23          MR. SWEETEN:  Objection.

24      A    It depends on each individual case.  I don't

25  think you can say a blanket statement in the deposition

CONFIDENTIAL

[Page 287]

1    at the seventh hour --

2         Q    (By Mr. Ross:)  Fair enough.

3         A    -- that it would be burdensome or not.  It

4    would just depend on each individual case.

5         Q    Okay.

6                   MR. ROSS:  I think that's it.

7                   MR. SWEETEN:  No questions.  Thank you.

8                   MR. ROSS:  Thank you very much.

9                   (Deposition concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SENATOR DUNCAN - AUGUST 28, 2014*

1    STATE OF TEXAS

2    COUNTY OF LUBBOCK

3                    **REPORTER'S CERTIFICATE**

4           **ORAL DEPOSITION OF SENATOR ROBERT L. DUNCAN**

5                        AUGUST 28, 2014

6         I, the undersigned Certified Shorthand Reporter for

7    the States of Texas and New Mexico and Registered

8    Professional Reporter, certify that the facts stated in

9    the foregoing pages are true and correct.

10        I further certify that I am neither attorney or

11   counsel for, related to, nor employed by any parties to

12   the action in which this testimony is taken and, further,

13   that I am not a relative or employee of any counsel

14   employed by the parties hereto or financially interested

15   in the action.

16        SUBSCRIBED AND SWORN TO under my hand and seal of

17   office on this the 31st day of August, 2014.

18

19                    *Susan Myatt*

20                    Susan Myatt, CSR
                      Texas CSR #3927
21                    Expiration:  12/31/15
                      CAPROCK COURT REPORTING
22                    Firm Certification Number:  374
                      U. S. Legal Support
23                    425 Park Avenue, 5th Floor
                      New York, NY  10022
24                    (866) 876-8757

25

**CONFIDENTIAL**

## A

**$27** 220:3

**a.m** 1:16 168:2 215:23

**ability** 80:23 124:6 129:1 136:23 138:18 139:20 142:2 158:18 177:20 213:21

**able** 25:2 50:20 56:5 77:10 83:21,22 98:19 129:5,20 132:23 137:11 191:15 200:6 249:12,14 257:8 269:21 282:17 283:24

**above-styled** 1:15

**absence** 40:20 65:2,5,11,11 66:16 69:25

**absent** 64:4,6,21,24 65:15,21 66:12 67:7

**abuse** 177:19,22

**academic** 260:15

**accept** 50:6 70:24 140:17

**acceptable** 183:17 184:22 185:3,11 186:10

**accepted** 178:15 256:2

**access** 260:6,8,14,15,16

**accessibility** 267:23 285:9

**accommodate** 8:16 91:11 236:21

**accommodations** 104:17

**account** 260:1

**accredited** 253:6

**accuracy** 35:8

**accurate** 10:12 11:24 12:2 27:13,24 29:15 38:18 42:17 49:7 65:1 91:23 94:16 101:7 105:25 106:6,11,15 123:2 199:10,16 220:17 221:23 232:14,15 262:21,25 275:3,4

**accurately** 7:9 31:1 32:13 52:1 108:19 146:18 147:2 197:24

**achieve** 232:7

**acquire** 104:24

**acquired** 258:2

**Act** 16:22,22 88:19,25 89:14 90:25 93:1 102:25 103:11 103:24 113:1,18,19 114:3,8

114:18 115:17 160:2 245:8 245:11 272:21 274:5

**action** 1:6 21:1,23 72:14 273:22,25 274:3 288:12,15

**active** 25:2 218:4 266:11 271:17

**activities** 139:6

**activity** 68:18 70:1 135:7

**acts** 79:7

**actual** 117:19

**add** 88:22

**added** 78:6 84:6,7,12

**addition** 15:16 74:3 92:6 204:4

**additional** 15:17,25 68:18 72:14 188:22 242:4 266:25

**address** 21:6,11 41:24 42:19 43:16 53:13 91:2,16 103:22 104:18 119:17 130:24 141:15 142:4 230:3,6 236:13,16 238:10 250:13 261:18 266:19 267:11 273:23,25 276:1 277:19 285:5,14,16 286:16

**addressed** 45:1 46:22 47:2 114:15 131:2 170:24 176:18 250:20,21,22 272:2

**addresses** 44:8 266:20

**addressing** 90:20

**adequately** 250:20

**administration** 279:19

**Admission** 259:24

**adopt** 75:10 232:18

**adopted** 195:11

**advance** 230:16

**advantages** 80:25

**adverse** 151:20 152:20 201:8 201:20

**advised** 211:17

**Affairs** 17:13,19,21 18:13,17 19:13 22:16,23 45:8,9,20,22 46:10 47:8,11 53:11 55:13 56:24 78:12 80:13 86:3 98:10,15 142:16 192:19 223:10 276:17

**affect** 8:23 246:2

**affirm** 50:17

**African-American** 246:11

247:13 268:11,12,14 269:12 271:17 272:3,13 273:8

**African-Americans** 269:11

**afternoon** 206:18 229:11

**AG** 218:25

**age** 104:24 261:6

**agencies** 257:18

**agency** 29:9,12 106:19,20 107:9,13,14 119:1,2,8,19 120:5 121:19 122:13,17,21 123:6 254:17,19 257:8,16 257:17

**agenda** 239:20

**ago** 47:25 49:4,9 58:21 59:7 126:24 171:2 225:21 230:15 234:15 260:18

**agree** 39:24 42:19 70:22 98:12 101:2 118:3 132:3,6 180:11,20 181:1 182:4,12 182:16,17 185:18 233:6,8 241:17

**agreed** 38:5,24 178:7 204:11 231:6 241:18

**ahead** 12:1 37:1,12,20 42:5 50:2 51:1,23 52:24 76:25 76:25 98:25 102:12,17 103:16 113:20 124:3 125:16,17 160:25 202:2 221:17 231:11 239:4,9 256:23 258:21

**aid** 260:1,8,16

**al** 1:4,7

**alcohol** 8:25

**aliens** 35:2 36:1,8,13,23 37:5 41:1 45:4 46:16 48:5,12,16 49:1,15 51:20 52:5 125:23 126:3,9

**alleged** 188:4

**allow** 7:14 8:18 11:15,17 74:4 76:3 80:5 82:10,10 84:3,12 87:5 93:11 183:6,24 192:2 192:2 198:13 237:7,8 240:13 253:5 254:14 269:16

**allowed** 27:14 28:4,8,13,17 28:20,22,25 29:5,16 77:9 81:1 92:2 99:4 104:6,20 105:24,25 106:6,11,16,24

107:7,12 108:4,4 118:10,25
119:1 120:15 135:18
137:14 141:19 143:14
180:17 182:5 183:17
192:12 198:22 200:17,22
201:19 202:21 261:5,5
271:7
**allowing** 27:20 192:11,11
240:10 250:6
**allows** 56:15 108:5 182:12,17
182:21 183:1 219:17,23
233:15 270:8
**altered** 132:16,16
**alternative** 181:7
**Amanda** 194:11,18
**amend** 76:3 253:5
**amended** 79:18 84:12 256:7
**amending** 79:6 254:14
**amendment** 196:21 197:17
197:19 198:7,16 199:21,23
200:11,16 201:6 202:12,17
202:21 204:9,9 205:11
252:19 253:2,13 254:11,25
255:1,9,13,22,25 256:10,20
257:5,21 258:15 279:9
283:13,14
**amendments** 195:5,9,11
196:7,10,12,13,15 200:19
253:25 254:3 256:24 257:2
283:9
**analyses** 110:8,22 141:14
**analysis** 18:3 45:3 48:5 51:24
52:3,9,12,15,21 53:2,3,12
53:21,22 54:4,11 56:17
80:7 88:18,23 89:5,9,13,23
89:24 90:4,24 92:24,25
93:4,8 100:24,25 102:11,19
109:9,12,15,16 110:2,10,12
111:2 112:23 113:4,6
114:17 115:16,22,24 116:1
116:8,12,17,19,24 119:13
119:21 134:15 144:18
162:3,6 191:14 192:5
193:15 244:20,22,23 245:19
246:10 256:1 258:4 275:25
276:23
**analytical** 157:21 158:18
160:14

**analyze** 54:12 257:24
**and/or** 46:23
**anecdotally** 249:19
**anectodal** 135:10 247:7
280:17
**anectodally** 134:18
**Angelo** 216:11
**Anglo** 268:10 272:8 273:8
**Ann** 4:5 153:21,25 154:18
155:10 157:3,4,4,7 163:13
163:20,23 242:23
**announced** 281:16
**announcement** 4:12 209:18
281:24
**announcing** 280:3
**answer** 5:17 7:16,19,22 8:3
9:5 10:19 11:18 12:6 15:21
24:11 30:12,20,25 32:10
34:13 37:24 39:14 43:20
46:18 49:18 51:2,23 52:1
54:2 55:17,18 65:7 79:1,25
83:22 84:15 85:22 89:21
91:5 93:8,23 96:10,12,12,24
98:19,25 99:18 101:5,7,25
102:17 103:6 109:19
111:18,22 120:11,21 122:9
122:24 123:2,9,19 124:5,20
125:20 128:14 129:11,20
143:12 151:23 152:12
154:18 155:21 156:7,24
160:25 161:11 166:5 177:3
188:17 197:23 201:17
204:2 205:12 247:20 249:1
250:7 253:22 285:22
**answered** 30:12 50:2 57:6
78:25 105:7 123:18 124:20
128:14 130:13 163:6,7
202:1
**answering** 33:2 218:8
**anybody** 148:10 273:8
**anyway** 137:1 188:9
**apologize** 52:14 70:9 72:16
82:4
**apparently** 28:21 72:5
149:19 167:19 171:10
174:6
**appear** 44:2 73:9 172:23
173:10,12

**Appearances** 2:1 3:3
**appeared** 13:4,5 110:20
**appears** 10:8 22:13 27:22,23
61:15 73:4,20 105:18
147:13 153:20 171:23
172:22 173:10 190:21,24
196:6 203:9 204:19
**application** 34:20 154:22
**applied** 259:10
**applies** 131:18 181:4
**apply** 6:22 76:4
**appoint** 85:18
**appointed** 84:20,22 85:1,15
**appointment** 86:6,10 87:17
**appreciate** 250:9,12
**approached** 97:12,16,20,23
**appropriate** 40:1,17 85:5
91:8 94:16 103:10,18
104:12 141:24 177:8 197:8
204:7,17 250:2 257:17
281:7
**appropriated** 104:11 197:13
197:15 258:13
**appropriately** 14:9 88:22
102:24
**appropriations** 197:25
**April** 22:11,14,19 35:21,21
55:24,25 56:3 239:18
**arc** 15:11
**area** 46:1 130:20 245:13
268:13 286:5
**areas** 267:24 285:9 286:3
**argue** 40:7 89:18
**argued** 39:21
**arguing** 200:2
**argument** 39:11 40:7
**argumentative** 91:4
**arguments** 192:14
**arms** 87:4
**arrest** 136:14
**article** 261:22,24 262:12,16
262:21,22 263:1
**articulate** 187:2
**aside** 96:2
**asked** 12:5 13:18,24 30:11
50:1 52:14 57:5 77:2 78:25
89:22 97:16,24 105:6 111:4
123:17 124:20,22 128:13

142:18 155:23 162:20
163:6 165:12 185:19 197:5
197:21 202:1 206:25
210:16 211:25 212:2,5
220:20 224:24 243:25
244:22 247:16 257:19
**asking** 14:6 30:20 36:2 37:16
38:4 71:2 81:23 88:17
94:10,11 107:2 111:7
119:16 123:21,22 124:24
142:11 145:15,19 146:7
176:23
**asks** 34:8,9 115:23 154:4
219:7 243:13 244:18,19
**aspect** 280:2
**aspects** 259:25
**assembled** 192:3
**assert** 37:20 39:21 40:10,16
40:17 221:16
**asserted** 38:14,23 39:1,10,11
**asserting** 5:11 37:15 39:7
40:20 76:24
**assertion** 5:14 39:25 40:13
**assertions** 39:14
**assigned** 19:7 167:19
**assist** 111:6,10,13,24 112:25
119:5,14,17 125:9,13
188:12 191:10 192:23
193:5
**assisted** 162:23 197:5
**assisting** 161:16 163:2
**assists** 152:1
**associated** 174:19,21
**assume** 39:17 113:4,12
130:18 141:6,10 143:18
152:24 155:21 196:12,17
212:1 214:15 222:19
226:21
**assumes** 65:6 91:3 133:16
161:11 285:22
**assuming** 153:3 155:21 162:8
210:21
**assumption** 124:6,8 162:12
**assumptions** 160:8
**attached** 1:23 12:24 26:24
195:8
**attempt** 14:12 152:17
**attempted** 111:15

**attempting** 87:22
**attempts** 102:3
**attend** 80:16
**attention** 27:10 33:20 62:1
73:11 105:22,23 140:5
147:24,24 148:19 149:24
173:15 181:16 182:1
199:18 201:5 272:4
**attorney** 2:11 14:4,7,11 15:1
15:4 16:19 18:2 51:8,11,13
130:14 137:21,24 138:6
205:21 206:20 281:16
288:10
**attorney-client** 6:21
**augment** 240:10
**August** 1:11,16 50:11 126:4
171:5 173:4,11,15 261:22
275:12,17 277:18,19 278:20
280:20 288:5,17
**Austin** 2:12 216:18 217:20
**authentic** 121:2 124:7 177:22
**authenticated** 121:12
**authenticity** 120:24 140:23
**author** 23:18,23 76:14 87:3
97:19 113:3 172:3 185:22
185:22 224:11 257:3
**authored** 98:17 105:19
110:15 140:18,21
**authorities** 16:19
**authority** 53:12,15 197:25
**authorized** 197:15
**authors** 24:21 172:1,11,23
173:12
**auxiliary** 70:19
**availability** 267:5
**available** 41:20 104:25 150:2
152:11 157:8 188:24 264:8
264:14 270:9
**Avalanche-Journal** 4:21
261:22
**Avenue** 288:22
**avoid** 14:12 129:2 251:22
281:1
**avoiding** 198:24
**aware** 45:2 46:13,14 50:22
51:19 52:2,11,15,20 72:13
78:16,19,21 93:4 101:15
109:9,11 111:12,21,22

112:4,24 114:5 117:9 118:8
118:13 119:5,22 123:15,23
124:14,23 125:1,7,21 128:9
128:21 129:15 130:8
132:15 136:2,7,12 137:14
137:20,24 138:6,8,17,22
142:3 143:22 144:2,17
150:2 151:10 152:16,17,21
153:8 158:5 180:4,6,7
186:22 187:14 188:11
189:1,17 191:9 192:23
193:4,10 199:5 205:15,19
205:20 207:4 226:23 229:9
230:10 232:23 244:20
245:19 246:24 247:11,18
250:25 251:12 259:22
260:22 264:20,22 266:6
267:13 271:13 274:11
275:20,21 276:25 277:14,16
277:20,21 280:13,17,18
282:4

**B**

**b** 3:10 4:1 107:12
**back** 31:15 35:20 40:8 42:12
42:15 56:1 59:6 60:17 71:7
71:20 74:14 101:11 102:18
104:1 117:19 134:6 143:6
165:18 185:16 189:25
206:2 207:1 212:24 213:8
219:4 233:15 234:17
242:12,18 251:10 252:4,22
255:17 258:24 269:20
282:9 284:16
**ballot** 34:18 41:25 42:20
43:17 44:9 103:19 127:3,9
131:24 183:19 249:4,24
250:4 273:14
**ballots** 44:8 130:22 183:15
270:25
**bank** 225:24
**based** 5:14 51:12 62:11 64:13
67:19 73:10,18 79:15 90:23
92:13 134:17 136:10 137:7
139:18 146:2,15 148:24
150:3 151:22 178:1 182:4,4
183:7 201:11 204:19
206:25 226:2 229:4 241:23

278:16
**basically** 8:11 14:18 17:23
  53:15 76:19 91:25 96:14
  97:9 98:5,14 115:25 116:6
  116:9 127:10 136:2 137:13
  151:24 152:2 207:18 211:8
  217:19 219:17 241:25
  243:14 251:17 259:17
  283:22
**basics** 219:13
**basis** 5:17 35:9 216:17
  269:25 271:6,9
**Bates** 70:20,23 82:1,5 83:17
  232:1
**Bates-stamp** 61:25 153:16
  175:16
**Bates-stamped** 22:4 33:16,18
  44:13 61:9 70:16 71:1
  88:17 95:15 115:7 147:20
  147:25 148:20 175:15
  228:6
**becoming** 258:4
**began** 12:12 150:18 268:7
  280:1
**beginning** 66:8 175:2 221:4
  230:24
**begins** 34:13 228:8
**begs** 105:4
**behalf** 5:4 15:13 202:10
**belief** 163:8 176:21 177:6
  178:22 179:3,18 231:21
**beliefs** 53:17
**believe** 6:14 11:20,23 12:2,4
  25:6 27:19,24 29:18 37:25
  38:7 40:23 47:1 51:10 53:9
  56:17 61:12 64:11,17,19
  69:10 78:9 79:16 84:16
  91:15 92:3 102:5,9,13
  103:12,23,23 104:25 105:4
  105:10,15 108:12 113:21
  115:20,23,25 116:20 117:20
  117:22 122:19 124:22
  129:18 133:22 136:14
  148:17 150:4 161:15
  162:20 168:25 171:15
  177:8,17,18,19 180:2
  186:13 187:11 189:9 190:1
  190:8 192:10 197:3,7,9,24

198:23 199:3 200:25
  201:14,21 210:9 220:10
  222:24 224:2 231:17
  233:10,14,14,15 236:23
  241:17 252:17 255:20
  257:7 258:18 265:7,12,12
  266:20,22 269:18 272:7
  273:3,7 274:6 276:8,16
  277:24 278:7 279:10,23
  283:6,6,10
**believed** 10:17 11:21 104:2
  104:23 116:22 203:23
**believes** 176:24 219:10
**beneficial** 173:18 243:19
**benefit** 200:5
**benefits** 259:25
**Berman** 34:5,9
**Berman's** 34:14
**Berry** 262:3
**Berry's** 263:3
**best** 12:2 14:7 17:12 42:12
  65:7,25 152:11 158:1 177:4
  214:5 249:3 251:21 262:12
**bet** 11:16
**better** 85:3 94:17 113:14
  278:25
**Betty** 23:16,16,16,17,23
**big** 134:19,23 217:18 285:10
**bill** 21:2,24 22:3 25:1,21
  26:20 27:22,23 28:1,2,3
  29:24 30:2,13,15 31:20
  33:11,12 42:1,25 43:6,9,15
  43:16 45:1,5 53:4,6 54:12
  54:14,18,21,24,24 55:2,8,23
  55:25,25 56:5,10,22,23 57:2
  57:19,19,24 58:7,19,24 59:1
  59:7 60:3,7 62:2 63:12
  64:11 70:2 72:25 73:5
  77:11 84:8 87:3,6 93:9,15
  93:20 95:17 96:6,10,15,16
  97:2,5 98:2,7,13,14 101:1
  102:23 103:10,12 105:18
  108:15 113:22,23 116:14,16
  126:15 127:9 129:7,7,8,8
  130:16 131:20 133:25
  141:5 149:20 151:19,21
  152:9,19,21,25 153:4
  155:16 162:10 172:1,4,11

172:23 173:3,13 180:5,11
  181:1,11,21,23 182:16
  183:7,11 185:23 186:6
  187:7 188:19,20,25 191:22
  195:13,17 196:8,10 197:14
  197:15 198:2 201:4,7,20
  202:6,7,8 203:2 204:7
  211:3,5 219:21 220:8,9,9
  222:3,7,9,22,25 223:17
  224:11 231:5 232:8,20,20
  233:16 235:3 239:23
  240:12 244:22 245:22
  246:2,14 251:4 257:3,4
  258:6 265:2,13 267:2,8,10
  269:15,16,18,25 270:6,24
  273:6,8,15 276:23 281:3,8
  282:19,22 284:12
**billion** 220:3
**bills** 17:25,25 18:1 33:11 42:2
  45:18,18,21 46:12 53:18,19
  53:20,23 54:12 96:17 105:2
  145:5 193:16 224:12
  233:20 235:2 251:1
**Birdwell** 172:10,12,16
**birth** 282:14
**bit** 11:12 38:20 76:9 116:9
  218:11 222:23 231:1 260:3
  261:2,25 262:21 268:22
  279:24
**black** 247:5 268:18,25
**Blaine** 209:10,11 237:25
**blanket** 286:25
**block** 232:6
**blocking** 232:7
**Board** 1:20
**Bob** 168:10
**body** 79:7 141:20,21 192:14
  195:7 241:16 258:9
**border** 177:10,11
**bother** 257:22 284:25
**bottom** 27:3,4 33:13,21 34:12
  34:16 62:1 115:6 148:1
  151:4 200:4 209:6 210:12
  221:9 222:1 227:14 228:2
  237:25
**box** 2:12 41:25 103:19 128:24
  131:24 249:4,24 250:4
  273:14

**break** 8:15,18 54:1 60:15,16
60:18 76:8 112:14,16 134:3
134:5 189:23,24 206:6,11
206:14,15 242:17 282:11
284:14,15
**breakdown** 100:25
**breakfast** 174:7 178:10,18
**Brian** 168:6
**brianandmelbirdwell** 168:5
**brief** 43:21 44:23 60:18
143:7
**briefed** 267:17
**briefly** 26:14 105:23 112:18
147:18 190:2 228:14
258:24
**bring** 54:18,19 56:12 93:10
116:16,18,22 141:20 142:2
188:18 219:20,23 236:24
**bringing** 272:3
**brought** 26:24 117:4,8
118:21 145:7 146:17,21
176:10 233:16,20 252:6
**Brown** 23:16,16,17,23 31:4
32:3 34:6,8,10,13,24
**Bruce** 2:3 5:2,9 15:12 39:4
100:15 125:16 144:4
**Brunson** 209:10,11 211:11
237:25
**Bryan** 4:11 194:8
**budget** 205:6 217:17 221:1
**bulk** 160:14
**Bullock** 75:15
**burdensome** 285:18 286:2,18
287:3
**business** 28:11 60:25 62:7,16
63:8 64:5 65:16 66:13,23
67:23 68:8,14 69:15 71:3
71:22 72:1,3 80:10 94:4
142:9,21,23 233:17 263:20
**by-mail** 42:19 43:17 44:8,9
131:2

**C**

**calendar** 21:1
**call** 43:19 47:14 62:1 66:18
71:11 72:6 90:3 116:2,12
124:8 214:5,8 217:25
237:22 249:15 281:2

**called** 47:18 67:11 68:6,10
98:3 143:14 224:20 233:11
234:2 235:25
**calls** 32:10 66:9 67:11 85:20
145:12 156:5 160:25 208:2
218:12,13,17 227:3
**candid** 231:12
**candidates** 137:14
**capable** 128:20
**capacity** 135:23 139:8
**Capitol** 80:21 216:18
**Capitol's** 21:18
**capitol.state.tx.us** 21:16
**Capitol.state.tx.us/BillLoo...**
21:12
**CAPROCK** 288:21
**caption** 44:16
**car** 218:7 286:19
**card** 27:14 28:5,9 29:1,8 30:8
106:1,7,18 107:8,13 108:5
119:7 121:18 122:16
127:15,17,21 129:4 130:3
135:3 177:18,21 182:7,13
199:19,25 200:4 248:13,24
249:7,11,13 253:8 254:15
254:16 260:11,17
**Cardona** 169:15
**cards** 108:1,6,8,11 123:5
127:11,11 128:7,12 135:11
135:11 249:21,22 251:16
269:5,8
**Carona** 169:16,17 172:10,12
172:16
**carry** 29:5 106:16 183:1
217:16
**cartels** 177:10
**Carter-Baker** 110:8
**case** 6:15 15:12,14 16:2 38:3
40:4 66:12 217:25 272:19
277:3 286:24 287:4
**cases** 138:12
**cast** 35:4
**catalogued** 92:8,10
**Catherine** 225:14
**caucus** 87:2 167:11 173:22
174:1,3,4
**cause** 1:16 284:12
**caused** 70:2 270:23

**caution** 166:25
**census** 154:25 161:4
**certain** 15:17 25:3 79:9
136:13 259:24 260:9
**certainly** 40:7 55:3 71:8 77:8
77:9 95:3 107:24 110:21
119:25 126:17 128:19
160:1 161:24 191:16
199:14 231:23 271:12
**certificate** 28:14 182:6
263:12,15 264:21 265:1,17
265:19 266:3 267:14 282:6
282:14,15 283:5,7 288:3
**certificates** 182:18 197:10
198:10
**certification** 3:8 106:12
288:21
**Certified** 1:17 288:6
**certify** 288:8,10
**chain** 240:19
**chair** 18:12 45:11 47:11
53:11 55:13 58:9 59:13
84:19,20 87:17 90:11 92:23
93:3 98:10 210:15 211:15
211:18 219:7 220:21 278:4
**chaired** 45:14 86:2
**chairman** 3:20 22:23 25:20
34:5 87:2 90:14 91:1 96:17
110:15 116:21 236:16
**chairs** 22:22
**challenge** 138:18,19 231:21
231:22
**chance** 26:14 43:24 61:11
83:2 88:9 94:21 147:8
148:3 166:15,21,24 190:11
193:22 206:13
**Chancellor** 12:10 258:25
**change** 75:2,3,5 76:10,12,22
77:5 81:14 118:24 204:11
**changed** 78:21 127:14
**characterize** 119:13 191:3
**charge** 17:20,24 19:8 157:6
215:20 264:7,13 278:7
**charged** 277:24 278:6 279:24
283:22
**charges** 47:20
**check** 259:5
**checked** 67:8

**CONFIDENTIAL**

**checks** 65:23 66:3
**Chief** 17:14
**Childress** 216:10
**choice** 232:6
**CHRISTI** 1:2
**Christian** 262:4,23
**Chronicle** 195:10
**circle** 161:15 212:24 213:7
**circumstance** 69:12
**circumstances** 64:20 65:14
  65:19 73:24
**circumvent** 233:11
**citizen** 34:21
**citizens** 32:4 35:4,17 87:5
  138:12 261:6
**citizenship** 28:14 106:12
  167:17 182:18
**Civil** 1:6,21 114:18 115:17
**clarification** 6:5 121:11
  143:8 144:9
**clarify** 14:6 42:6,8 122:10
  138:4 145:14 244:4
**clarity** 24:23
**Clark** 206:22
**classify** 133:9
**cleaned** 195:10
**clear** 7:3 8:7,9 23:23 25:24
  33:21 37:9,14 38:21 40:19
  58:14 61:12 70:21 71:19
  90:6 92:21 94:10 116:7,8
  120:13 132:2 144:4 146:20
  153:7 156:12 157:2,4,7
  162:16 176:14,15 186:8
  188:5 257:6 273:6
**cleared** 11:3
**clearly** 6:21 75:23 109:16
  233:2
**Clifton** 216:11
**close** 161:14 169:21,22 264:2
**closely** 58:19
**closer** 189:21
**closest** 263:17
**coauthors** 172:7,21
**Coby** 148:7,14,15 149:17
  151:7
**Code** 261:9
**Coffman** 18:20
**collect** 154:5

**come** 6:15 19:11,12 80:9
  86:20,23,24 87:22 96:17
  210:18 217:12 237:7
  251:10 261:3 272:7
**comes** 46:2 56:20 96:16
**comfortable** 39:19 241:23
**coming** 12:20,23 25:25 51:5
  210:25 213:3 214:15
  271:14
**commission** 55:21 56:11
  110:8
**commissioned** 247:16
**Commissioner** 209:22
**committed** 48:17 136:15
  181:5
**committee** 17:13,19,22,25
  18:4,10,10,13,15,17 25:20
  33:10 35:1 45:9,11,14,16,24
  46:7,10 47:9,12,22 53:11,15
  53:24 54:14 55:14,19 56:5
  56:13,20,25 57:21,22 58:9
  59:13,20,22 62:2 73:21,25
  74:7,10,19 75:19 76:6
  77:13,18,23 78:12,18,22
  79:18,23 80:4,6,13,22 81:6
  81:8,9 84:10,14,19,21 85:16
  85:19 86:3,11,16,21 87:17
  88:1 90:11,18 92:23 93:3
  98:7,10,15 102:21 108:14
  110:15 123:12 142:16,16,17
  143:10,15,19,24 144:3
  145:7 146:17 150:6,17,21
  154:12 176:5 186:4 187:6
  187:12 190:3,9 191:19
  192:1,4,10,18,19 193:17
  196:14 205:6 210:16,21
  211:1,10,15,18 213:5,14
  214:17 215:18,23 219:7
  220:17,21 223:9,11,22
  224:5,15 226:2 229:25
  231:1 233:11,18 234:2,13
  234:20 235:1,10 256:25
  275:21 276:18,18 277:24
**committee-appointed** 224:13
**committees** 80:24 193:17
  225:18 235:6,19 277:17
**common** 135:13 160:11
  249:25 270:4

**communicate** 19:10,16,18,24
**communicated** 19:14 154:14
**communication** 26:1 45:2
  60:9 87:21 99:14 101:8,18
  164:24 165:3 175:11
  207:24 272:1 276:9 281:20
  281:23
**communications** 13:21 23:1
  25:10 26:7 36:22 40:6,9,11
  74:18 75:4 76:11,13,24
  79:16 86:7,13,15,18 96:19
  100:1,4 108:10 109:2
  118:13 123:4,11 126:8
  141:1 145:1 164:14 166:3,8
  175:19 178:21 179:2,8,10
  179:11,16,23 180:8 187:9
  205:2 215:21 217:5
**community** 191:13 218:5
  271:17,18
**comp** 234:15 235:17
**compared** 99:9 118:9 272:8
**comparing** 107:23,25
**comparison** 164:15 165:4
  243:8 244:13
**compelled** 177:16
**compelling** 116:23 192:14
**competent** 146:5
**compile** 152:13,17,18 153:10
**compiled** 156:13 158:5
**compiling** 152:2
**complained** 271:19
**complaint** 116:25 117:2
**complaints** 271:13,13,19
**complement** 192:11
**complete** 7:15,16,22 11:15,17
  32:23 43:25 161:14 244:1
**completed** 111:5,9
**completely** 7:9 8:12
**complex** 239:13 283:24
**complies** 233:20
**components** 129:23
**compound** 10:18 11:25
  128:13 192:20
**compressed** 59:25
**compromise** 98:13
**computer** 260:14
**computerized** 1:19
**concealed** 29:6 106:16 183:1

concepts 25:3
conceptually 99:1,3,11
    197:13
concern 36:12 41:1 46:21
    53:5 94:3,6 115:15 130:21
    135:12,13 141:2 165:11
    177:6 191:1 205:17,20,24
    206:3 228:21 230:9,11
    231:23 249:9 266:10 284:6
concerned 59:1 126:14 127:3
    129:12 248:25
concerning 14:19
concerns 35:12,25 36:7 53:13
    55:11,15,19 58:11,14 63:19
    90:21,23 91:2 94:1 104:18
    119:17,18 123:4 125:14
    127:23 140:24 141:16
    156:1 165:7,10,15 201:12
    201:15,16,23 228:24 229:5
    230:4,6 231:18,20 233:12
    236:10,11 238:9,11 249:7
    250:14,20,21,22 266:13,21
    271:21 276:1 284:10
concluded 3:7 76:17 150:18
    287:9
conclusion 269:14
conclusively 178:5
conduct 53:12 55:5 56:16
    88:18,23 89:24 90:3 92:24
    134:16 258:14
conducted 45:3 47:16,19
    52:3 89:5,14 91:1 93:4
    109:12 110:1 144:18
    244:14 245:20,22 246:10
    247:15
conducting 97:10 213:5
Conference 1:20
confidence 103:1
confidential 94:23 95:15
    140:15 153:17 166:19
    194:4 196:3 215:6 228:5
    237:12
confine 234:23
confined 181:5
confirm 259:12
conformance 102:24
confusing 158:8
confusion 72:16 151:25

284:3
Congress 56:8
congressional 159:23
conjunction 176:10 257:17
connected 166:10 175:17,21
    177:14
connection 244:24
conscious 267:5
consensus 241:19
conservative 101:9 174:7,11
    174:25 178:11 225:11
conservator 174:14
consider 24:8,15 66:24 68:14
    76:18 77:16 110:1 116:1
    155:25 286:6
consideration 22:21 49:11,14
    53:5 62:7,17 72:7 108:21
    125:23 133:4 142:8 143:15
    144:12 153:23 164:13
    175:24 177:25 178:3 185:4
    185:12 186:11 197:20
    199:7 201:23 203:8 247:21
considerations 80:2 205:3
considered 50:22 54:24
    60:23 64:5 74:16 84:18,21
    89:4 110:9 143:9,17 266:7
    276:6
considering 60:21 156:1
consistent 46:2 76:17 132:18
    132:22 190:21 217:19
    220:13
constituent 35:24,25 36:6
    40:6,9,11,23,25 41:5,9,13
    217:25 218:13 226:14
constituents 35:12,17 36:7
    40:2,25 136:3 178:22 179:3
    216:17 217:12,22 269:1
    271:20,21
constituents 135:25 141:25
Constitution 219:19 258:9
Constitutional 279:9
contain 123:5
contained 31:22 42:23 60:13
    95:23
contains 28:5,9,15 29:2,8
    30:9 106:7,13,18 107:8,13
    119:7 121:19 122:16
    182:13,19 253:8 254:16

context 22:3 73:1 138:2
    171:12
CONTINUED 4:1
continues 5:20
Continuing 178:9
continuity 46:7
contrast 230:15
controversial 55:1,3 57:20
    77:8 93:17,20,21,25 234:12
    234:16
controversy 239:23 263:4
convened 234:21 277:18
convening 233:10
converge 239:14
conversation 23:6 99:19
    143:7 166:11 212:3 213:6,8
    213:11 214:7,11,21 231:14
    236:1,2,5,8 238:13,21,25
    239:2 241:11
conversations 14:7 26:4,4
    100:8 101:20 126:12,16
    213:9,13 238:19 241:23
    276:19
convinced 273:5
copy 10:5 68:22 82:15 115:11
    147:3 193:25 208:20
corner 21:7,9 27:4
CORPUS 1:2
correct 5:24 6:7,13 7:10,11
    9:25 15:24 22:15 23:24
    28:6,7,11,15,23 29:3,19
    30:1,5,10 33:17,18 43:11,13
    43:14 44:24 62:21 70:15
    78:12,14 80:14 81:20 82:2
    82:7 84:25 85:3,16,17 88:2
    88:3 89:7 90:7 92:16,21
    93:18 98:10 99:5 105:20,21
    107:10,16 111:23 112:7
    117:25 118:6 119:3 121:16
    122:18,19 128:7 138:24
    139:15 141:9 150:14 154:2
    154:3 158:7 159:8,18 161:4
    164:11 168:16,18,20 169:2
    170:5 172:1,25 173:6
    176:25 180:19 182:24,25
    183:4,5 184:13,17 188:10
    190:4,22 191:2 197:9,22
    198:4,10 201:2 202:19,20

203:18,19 217:23 243:5
250:14,17 259:1,9 264:15
264:21 274:9 278:19 279:4
279:15 281:10 288:9
**corrected** 11:3 195:10 234:18
**correcting** 173:8
**correctly** 16:24 42:24 79:19
186:1 213:11 234:18
**correlated** 197:23
**correspondence** 153:20
**cosponsored** 195:12
**counsel** 18:14 152:1 158:11
283:12 288:11,13
**counted** 64:3,21 65:15 66:4
67:4,7 271:1
**counties** 134:21 217:19 218:8
266:8,8,14 267:6,7 283:21
286:13,14
**counting** 65:23
**county** 154:19 266:11 274:9
274:13 277:3 278:13
279:12 281:12,15 288:2
**couple** 6:5 11:2 12:25 13:2
206:24 207:1 218:10 223:1
251:11 284:17
**course** 9:7 28:11 49:11 97:2
145:5 223:10
**court** 1:1,17 5:1,12 6:3 7:8,12
15:16 40:8 91:22 101:12
110:10 172:13 215:1 227:7
252:12,23 258:11 274:3
277:3 288:21
**Court's** 37:19 38:9
**cover** 221:24 227:18
**covered** 6:12,25 40:9 283:13
**COW** 210:15,19
**coy** 49:5 126:12
**crafted** 102:24 103:3,13
**crafting** 97:11
**Craig** 168:14
**created** 112:24 138:7 276:3
**criminal** 177:11 223:19
**cross-examination** 81:4
**cross-references** 282:21
**crucial** 220:24
**CS** 62:7
**CSR** 288:19,20
**cure** 183:21,23

**current** 5:4 28:20 129:25
155:6,11 163:23,24 165:18
165:18 177:20
**cut** 175:16 261:25 262:1,21
263:7
**cycle** 235:14

---

**D**

**d** 3:1 84:6,12
**D-E-U-E-L-L** 172:17
**D.C** 40:8
**daily** 19:13,15,25 20:1
216:16
**Dan** 167:10 168:5,7 173:16
**danpatrick700@gmail.com**
167:21
**dark** 70:8
**data** 145:17 146:3,15 150:2
152:2,11,13,17,18 153:10
154:1,19 156:13 157:8,18
158:5,17,17,21 160:6,13,13
160:14 161:1,9,13,16,22,23
162:2,3,23,24 163:1,8,14
193:14 243:4,19,25,25
244:5,11 246:23 257:11,22
257:22,23,24,25 258:1,3,4
258:16,16,18
**database** 158:6,16 243:8
**date** 6:24 12:12 22:6 27:17
55:24 83:8 106:4 182:9,15
182:24 183:4 215:24
223:20
**dated** 90:9 115:12 149:18
150:11 172:24 173:4,11
194:8 227:15 228:10
**dates** 275:9 278:16
**David** 84:24 85:15 86:10
**Davis** 196:17,18,18 198:13
200:16 202:18 204:8
209:15,23 212:12 213:3
254:10 283:13
**day** 64:22 65:4 66:8 75:23
83:9 104:24 151:3 229:11
232:25 288:17
**days** 56:3 75:11 173:17 182:9
182:15,23 183:4 219:20
225:1
**DC** 2:5

**de** 3:21,24 63:5,13,14,18,22
71:14 87:1,12,22 88:13,17
89:4 90:7,16,24 112:18
114:12 115:10,11,15 147:22
148:6,20 149:22 190:15,21
227:24,24 228:11 229:8
230:4,8,10 231:16 233:12
235:23 236:11,20 238:8,23
241:7,10,12
**deadlines** 56:8
**deal** 15:7 44:21 265:25
**dealing** 40:1 45:19,21 74:5
76:4 83:12 84:8 220:4,5
**deals** 44:14,18 95:5 131:16
131:16 132:3,6,12
**dealt** 43:1,3,6 119:23 120:4
**debate** 6:19 53:10 76:2 79:12
81:2,6 87:6 91:9 109:7
123:11 155:23 186:1,3,6
190:18 191:4 240:1,2,8
**debated** 57:25 74:3 75:22
79:3 97:4 130:4 141:5,7
187:6
**debates** 176:4
**debating** 57:22 81:9
**Debby** 4:13 216:7
**December** 73:16
**decide** 56:19
**decision** 24:18 60:6 73:25
74:18 108:24 109:2 122:25
141:22,24 192:7 272:17,23
273:18,23 274:12,14,25
275:10 277:5,10,14 281:8
281:16
**decisions** 59:23 93:12 278:18
**declaring** 207:19 219:22
**deem** 7:22
**deep** 48:22 228:21
**deeply** 77:10
**Defendant's** 147:21
**Defendants** 1:8 2:10
**DEFENSE** 2:7
**define** 111:2
**defined** 109:16
**definition** 109:18 119:21
**degree** 246:4
**delayed** 280:5
**delays** 222:18 224:1

**deliberate** 141:21 192:5
  258:10
**deliberation** 192:12 258:5
**deliberations** 188:25 203:10
**delineate** 9:15 188:1,6
**deliver** 229:12
**delivered** 229:16,20
**demands** 91:13
**Democrat** 174:3
**Democratic** 87:2 226:19
**Democrats** 101:10 195:12
**demographic** 161:12 268:5
**demographics** 152:8 162:2,5
  268:24
**denial** 225:3
**denied** 270:16 272:19 273:8
**denying** 274:12
**department** 2:4 5:3 27:15
  29:6 106:2,17 182:8 183:2
  265:11,16 266:4
**departments** 283:23
**depend** 287:4
**depending** 9:12
**depends** 218:15 286:24
**deposed** 7:14
**deposition** 1:9,13 3:7,11,12
  4:2 5:6,13,20,24 8:23 9:7
  9:10 10:2,9,16 11:4,7,8,14
  11:19 12:18,19,20,23,25
  15:23 20:15 23:15 26:10,22
  32:17 38:5,6,16,25 51:25
  61:6 72:23 81:11 82:18,20
  88:4,8 94:18 105:12,16
  114:25 140:4 147:6 153:12
  166:12 171:16 181:8
  193:19 208:10 215:3 223:3
  224:24 227:9 237:13
  252:14,18 255:21 261:12
  286:25 287:9 288:4
**depositions** 38:22
**Deputy** 148:15,16 149:18
  157:5
**describe** 13:3
**described** 10:10 115:15
  167:24 183:25 265:21
**describes** 220:16
**design** 103:7,8 126:15
**designate** 207:8

**designated** 207:5,7 219:16
**designating** 207:16,24
**designed** 34:20 35:2 110:4
  111:5,10,13,24 119:5,14,16
  125:9,13 191:19 232:7
  258:9
**detail** 13:25 47:1 78:7,11
**detailed** 21:21 86:18 88:18
  88:23 89:8,13,22 90:3,24
  92:24 93:4 114:16 115:16
  115:24 116:1,8,12,16,18,24
**details** 64:25 66:25 91:21
  113:8 117:7 118:20 138:14
  159:13 265:25
**detain** 136:24
**deter** 251:25
**determination** 76:11 202:5
  257:13 258:10
**determinations** 202:10
  258:11
**determinative** 232:5
**determine** 13:7 45:3 52:4
  55:14,20 89:6 115:16
  125:10 134:16 144:19
  145:2 149:10,14 156:19
  157:14 164:2
**determined** 246:3
**determining** 160:20 243:5
**deterrent** 132:24
**deters** 251:22
**Deuel** 2:7 206:20
**Deuell** 168:9,10,12 172:16
**develop** 45:25 54:17 128:17
  191:23
**developed** 98:2 124:10
  188:22,23,24 191:24
**Dewhurst** 84:24 85:6,15
  86:10 209:21 214:4,8,9
  219:7 220:20
**died** 75:23
**different** 13:12 18:3,5 30:22
  31:2 43:3 54:23 56:7,7
  67:18 79:8,14 91:13 99:2
  109:17 110:7,11 136:19
  159:19,20 174:23 181:5
  185:23 217:7,17 218:7
  220:5 224:12 236:17
  265:23 267:6 268:7 280:4

**differently** 38:20 56:17
**difficult** 30:23 133:1,20
  134:12 136:22 251:21
**difficulties** 134:8
**difficulty** 129:12
**diluting** 35:4
**diminished** 269:21
**diminishes** 269:23
**direct** 27:9 30:13 33:20 70:15
  73:11 92:23 140:4 145:10
  146:1 147:23,24 148:19
  154:8
**directed** 145:15 154:12
**directing** 59:14
**directly** 74:19 78:12,17,22
  79:18,22 90:21 131:16
  138:19 139:19 143:24
  144:3 149:24
**director** 17:13,18,21 18:14
  18:16,21 154:11 209:20
  216:7,10,11
**disabilities** 256:4
**disability** 184:13
**disagree** 118:4 199:1 269:22
  273:2
**disagreed** 273:1
**disaster** 184:11
**discretion** 45:16 257:14
**discuss** 20:19 97:13 173:22
  174:4
**discussed** 5:22 6:20 14:15
  30:1 42:10 43:2 75:16 78:7
  93:17 118:21,22 128:6
  131:21 142:7 165:8,8
  168:25 173:25 176:4,7
  187:5,18 189:14 238:7
**discussing** 36:12 38:6 39:6
  40:22 81:14,22 83:15
  126:25 134:7 184:15 238:5
  238:9
**discussion** 5:10 14:11 25:15
  25:22 34:5 35:11 36:16
  39:16 53:10 63:7,11 66:21
  67:19 69:1,6 75:21 100:11
  101:21 108:13,16,17 109:6
  113:7 118:18,19,24 134:4
  143:5 146:25 165:19,22
  174:6 175:5 176:16 178:10

178:20 185:8,24 186:3
190:24 201:12 205:15
231:12 240:15 251:14
252:3,20 274:23
**discussions** 6:11,23 14:8 24:5
25:9 37:4 40:6 69:23 74:21
75:4,7 76:1 97:8 102:2,20
109:10 123:10 141:11
164:19 166:2 231:24
236:23
**disenfranchised** 271:22
**disenfranchisement** 141:3,16
156:2,21 198:25
**disenfranchising** 140:25
191:2 201:13
**disparate** 256:3
**disparity** 257:10
**disproportionate** 272:7
**dispute** 21:25 31:21,23,24
32:5,7 35:7,9,9 44:10 50:14
50:16 133:14,18,19
**disputes** 32:12
**dissects** 115:21
**dissent** 59:6
**district** 1:1,1 13:12 14:16
134:19 135:24 136:8 201:8
201:21 216:7,9,10,11,12,14
216:17 217:11,18,22,24
218:1 268:5,8,22 270:13,13
271:14
**districts** 159:24 232:4 233:4
268:7
**DIVISION** 1:2
**divisive** 242:1,2
**document** 10:7 15:1,4 16:10
16:25 20:21,22,24 22:5,7,12
23:17,19,21,25 26:16,17,19
27:4 32:21,25 33:6,8 43:21
61:20 68:1 70:23 71:10
73:3,4 82:25 83:3 88:11
94:23,24,25 95:2,5,11 98:20
105:17 114:24 115:8,20
131:6,14 140:6,18,21,23
147:9,10,11 148:4,22 149:7
149:12 150:8 153:17
166:18,23 170:22,23 171:20
178:9 181:13 183:9 184:8
193:24 194:7 195:20,22

196:5 208:13,14,15 215:6,7
216:21,25 220:16 223:5
227:12,15 228:12,16,19
237:16,17,18 254:5,8
261:15 282:16 283:15
284:8,8
**documentation** 12:22 27:21
182:2
**documents** 12:25 13:2,3 15:6
15:13,17,18 16:3,6,22 17:10
246:19,25 282:4,24 283:3
**Doe** 135:6,6
**doing** 100:10 135:24 146:9
162:8 219:9 239:24 273:9
**DOJ** 152:2
**doors** 229:13
**doubt** 23:22 63:16 64:1
119:25 229:21
**DPS** 243:8 263:16,17 266:8
266:11,14,25 270:9 286:19
**DPS-issued** 243:22 244:14
246:1
**draft** 210:17,22
**drafted** 204:24
**drafting** 108:24
**draw** 159:22 178:4
**drawing** 160:8
**drill** 48:22 129:19
**drilled** 129:19
**drive** 285:19,24,25 286:19
**driver's** 27:14 106:1 182:5
199:8 251:2,5 266:23 267:6
**driving** 286:4,5,9
**drug** 177:10
**duces** 15:22
**duly** 1:15 6:3
**Duncan** 1:10,13 3:4,11,12,20
3:25 4:2 5:2,11 6:2 7:6 10:2
10:9 15:13 20:15,18 26:10
26:13 27:7,8 32:17 61:6
72:23 81:11 82:17,20 88:4
88:7 90:14 94:18 95:16
105:12,16 114:25 115:5
131:8 147:6 153:12 166:12
171:16 172:17 178:12
181:8,15 193:19 206:13,18
206:18 208:10 210:15
211:14 212:23 213:7 214:4

215:3 219:7 223:3 227:9
237:13 238:4 252:14
255:20,24 261:12 288:4
**Duncan's** 219:9

_____

**E**

**E** 3:1,10 4:1
**E-L-T-I-F-E** 172:17
**e-mail** 4:4,10,13,16 13:11
14:16,17 19:16 21:6,11
153:25 154:15 157:3,7,13
158:14 167:21 170:9,12,14
172:23 173:3,4,11,16,20,24
174:16 175:3 176:6,17
178:1 194:8 195:7,23 209:7
209:9 210:12 212:12
213:24 215:13,25 216:20,22
217:2 227:19 237:24
238:15 240:19 242:20
**e-mailed** 21:14
**e-mails** 4:6,12,18 15:7 16:7,8
87:15 208:2 212:7 226:24
**earlier** 27:16 80:4 82:18
106:3 131:21 132:18
177:15 182:9,15,23 183:3
219:17,24 229:24 232:24
242:20 243:3 248:18
250:11 255:21 269:4 273:6
277:2
**early** 38:6
**easier** 199:3
**easiest** 137:12
**easily** 249:21,25 251:18
**easy** 252:7
**education** 29:2 30:9 131:17
200:18,24 222:2 254:22,23
**effect** 112:25 114:7 115:16
139:22 201:8 222:4 246:15
247:8 281:11
**effective** 52:4 249:12 250:3,3
**effectively** 137:11
**effects** 88:18,24 89:13 90:24
92:25 93:5 114:2,17
**efficiency** 242:10
**efficient** 87:7 250:3
**efficiently** 60:2 77:11 86:21
87:5 213:10 242:9
**effort** 137:20,25 152:4,8,13

152:19 191:17 267:5
280:23
**efforts** 152:21 279:17 286:12
**EIC** 263:9 265:10 284:7
**EICs** 197:9
**eight** 49:3 79:3 195:11
**Eightieth** 61:22
**either** 20:4 39:13,18 50:17
53:2 55:3 60:7 85:7 91:21
120:17 123:12 130:15
142:2 155:21 166:8 174:23
177:13 187:13 189:2 199:7
283:16
**elderly** 53:7 140:25 141:3,17
256:3
**elected** 137:17
**electing** 232:6
**election** 45:17,18 46:4 99:15
135:20,21 136:12 137:10
138:20 139:14,19 154:5
176:12 182:6 197:10 198:9
222:10,11 249:16 261:9
263:11,15 264:20 265:1,17
266:3 267:13 271:8 274:11
275:5 278:14 279:3,9,20
280:4,15,19 282:5,15,24
283:4
**elections** 3:15 33:10 35:1
45:19,22 127:12 132:15
157:6 226:17 270:11 271:1
279:25
**electronic** 260:9
**Ellis** 62:19 71:14 201:6
**Eltife** 170:3,4 172:17 178:13
**Embassy** 1:19
**emergency** 207:5,17,20,25
219:16,23 239:20
**employed** 288:11,14
**employee** 28:8 29:22 216:9
254:15 288:13
**employees** 216:15,16
**employer** 28:10
**employer's** 28:11
**enacted** 221:11,20 272:10,13
**encourage** 56:13
**ended** 222:21 241:15
**endorsement** 186:7
**enforce** 127:25 128:20 136:4

137:11
**enforced** 281:9 282:2
**enforcement** 127:19 128:20
132:20 136:13,23 249:12,12
249:15,17,18 281:2
**enforcing** 135:16 263:5
281:17
**engage** 25:22 108:10 144:25
**engaged** 25:14 26:1,6 101:17
175:11,19
**engaging** 101:20 164:24
165:2
**Englebrecht** 225:14
**enhanced** 256:1
**ensued** 134:4 143:5 252:3,20
274:23
**ensure** 152:10 249:13
**entered** 242:13
**enters** 207:18
**entertain** 66:15
**entire** 38:16 192:3
**entitled** 33:9 84:7 127:15,22
195:4
**entry** 73:14
**equation** 104:21,22
**errata** 10:24
**errors** 11:2
**especially** 42:12 158:21
230:24 239:16 271:18
**Essentially** 38:22
**establish** 261:8
**established** 98:9
**Estes** 168:13,14,15 172:17
178:14,14
**estimate** 17:5 199:14,16
**et** 1:4,7
**ethnic** 154:19 256:4 268:14
**ethnicity** 152:3 154:5,21
160:1
**evaluate** 50:20
**event** 150:12 213:17
**events** 259:24
**everybody** 30:24 204:15
**everybody's** 91:13
**evidence** 48:11,15,25 49:13
49:24 51:14 54:19,20 56:7
56:12,12,20 58:23 59:22
65:7 81:5 90:2 91:4 93:10

93:11 113:4 116:23,24
117:8 128:17 130:17
133:17 141:20,21 146:17
157:21 160:7 161:11
162:13 164:7 188:23 192:5
192:6,6,13 193:15 199:12
237:6 246:15 247:25
262:13 273:4 280:17
285:22
**evolve** 226:18
**exact** 218:15
**exactly** 13:10 68:16,19 70:1
100:24 138:2 149:15
165:19 187:2 188:3 190:23
197:12 224:2 242:6 245:9
283:23
**examination** 3:5,6 6:4 81:4
103:2 206:16
**examine** 201:7,20 279:19
**examining** 81:3
**example** 135:1 191:20
**exception** 184:1
**exceptional** 184:21
**exceptions** 180:21,23 183:10
184:18
**excerpt** 32:23 33:10 61:13,15
**exchanged** 212:8
**exciting** 235:7
**exclude** 122:25
**excluded** 122:22 123:16
125:3 189:13
**excluding** 122:7 124:15
187:9
**exclusion** 124:23
**excuse** 206:19,23 210:11
222:13 232:16 233:4 246:1
251:1,1 254:8,23 255:13
259:13 261:18 264:10
265:18 266:6 277:18
282:24
**excused** 65:10 66:16
**executive** 1:20 209:12
**exemption** 184:10,13 202:22
203:2,11,23 204:23,24
205:4,8,16,22 206:1 221:20
**exemptions** 183:13,14 184:3
184:4,6,9,12,17
**exhausted** 207:2

**exhaustive** 191:16
**exhibit** 3:11 4:2 10:2 20:15
  20:18 22:9 26:10,13,24
  27:7 32:17 61:6 68:3 70:10
  70:19,22 72:23 81:11,25
  82:5,17,17,20,23 88:4,8
  92:11,15 94:18 95:14 96:2
  105:12,16 107:24 112:19
  114:25 115:5,6 147:6,21
  153:12 166:12 171:16
  176:15 181:8,15 182:5
  193:19 208:4,10 215:3
  223:3 227:9 237:13 242:13
  252:14 255:20 261:12
**exhibits** 12:24 92:7,7 242:14
**existence** 138:16
**expand** 36:5 49:10
**expect** 135:5 214:18
**expectation** 137:10
**expected** 7:8 238:22
**expended** 137:25
**expenditure** 197:15
**experience** 137:7 269:17
**expert** 91:7,17 113:5 192:2
  245:12 258:8
**expertise** 202:4
**experts** 92:1 113:9,13 224:13
**Expiration** 288:20
**expired** 27:16,16 106:3,3
  182:8,9,14,14,23,23 183:3,3
  198:14,23 253:9
**explain** 8:1 96:7,21 97:16,24
  98:4 219:11
**explained** 76:15
**explaining** 95:25 96:3,5
**explore** 42:18 77:10 140:23
**exposed** 137:3
**expressed** 35:12,25 41:1
  55:12 94:2 141:2 165:6
  178:22 179:3,17 201:23
  205:18,21,25 230:8,11
  231:18
**expressing** 6:16 36:7 53:5
  63:18
**extent** 43:18 59:24 110:3
  115:22 233:18 242:4 246:8

**F**

**F-R-A-S-E-R** 172:16
**facing** 220:3
**fact** 51:5 57:9 67:3 92:10
  127:22 134:17 135:5
  189:18 190:24 203:15,17
  204:5,19,21 214:8 218:6
  260:11,20 284:11
**facts** 46:13,15 65:6 91:3
  114:7 122:6,20 123:15
  124:23 125:2 128:9 133:16
  159:2 161:11 184:20 185:1
  185:9,21 186:9,16,19,20,22
  187:2,15 189:1,9,10,12
  203:22 285:22 288:8
**factual** 269:25 271:6
**Fagan** 4:4,16 17:11,13,18
  18:8,25 19:10 41:12 146:10
  153:21 154:1,1,8 155:6,11
  157:3,8 163:12,20,25
  194:10,12 195:2 209:4,17
  210:4 212:18 213:24 228:1
  237:25 238:19 240:20
  242:22
**fail** 70:2,3
**failed** 71:18
**fair** 5:21 21:20 41:2,3 43:8
  44:13 46:8 48:4 49:22 52:2
  54:25 55:9 57:1 60:12,14
  90:20 98:22,22 103:17,22
  103:25 104:1,2,2,3,3,4,16
  104:22 105:1,5,8,9,11 125:8
  125:12 130:25 135:15
  145:24 171:21 178:1
  184:20 191:5,14 203:2,5
  230:3 233:1,3 235:8 245:18
  248:20 258:23 259:22
  261:21 262:2 268:16,20,25
  273:4 287:2
**fairly** 47:4 60:2 77:11 86:6
  135:15 220:1 225:11
  230:20
**familiar** 133:3 138:13,15
  208:15 216:4 227:12
  228:12 229:17 237:3,15,18
  239:6 245:3,10,15,16
  261:14 263:9,14 270:4
  272:17 277:2 284:22
**familiarity** 268:21

**far** 19:5 31:15 53:22 58:20
  181:20 257:11 263:21
  274:4
**fast** 219:9,12 228:18
**faster** 63:4
**favor** 29:19,21,22,23 30:4
  58:7,23 95:20,22 118:5
**favorably** 84:10
**February** 33:10 35:1 73:18
  73:20 74:2 239:18
**Federal** 1:21 29:9 101:22
  102:6,14 103:1,4 106:20
  107:10 119:2,3,8,19 120:5
  121:14,20 122:17,22 123:7
  177:6,12 185:2,10 186:10
  187:10,16 200:7,17,23
  225:3 254:17
**feel** 131:3,4
**felt** 47:4 58:22 91:8 102:22
  102:23 105:1 204:14,14,16
  230:5 241:22 267:16
**Fifty-seven** 33:22
**figure** 160:12
**file** 222:21
**filed** 3:22 22:6,7 73:11,16
  95:6 171:9 245:18
**filing** 179:22
**fill** 266:24
**final** 181:23 182:4 222:7,19
  222:21,25
**finance** 205:5
**financial** 260:1,6,8,16
**financially** 288:14
**find** 232:9
**finding** 257:9,10
**findings** 48:19 154:14
**fine** 9:6 11:6 39:3 198:12
  205:13
**finish** 8:16 125:16
**finished** 33:3 89:21 216:23
**Firm** 288:21
**first** 61:13 70:22 72:2 73:14
  73:17 75:11 147:13 150:7
  157:18 167:9,13 171:19
  173:4 194:7 198:11 222:10
  225:20 228:20 237:19
**first-time** 22:13
**firsthand** 27:4

**five** 53:23 55:22 126:24
   234:3,4,23,25 235:9,13
**five-minute** 206:6
**fixing** 270:12
**flaw** 204:10
**fleshed** 283:25
**flies** 234:7
**flip** 228:15
**floor** 2:8 55:12 56:6 57:23,24
   57:25 65:20,23 66:4 67:2,4
   67:6,10,17 69:25 71:13,16
   72:5 75:22 79:3,13 93:18
   94:5 102:21 108:13 123:12
   125:24 141:6,7,11 186:7
   187:6 195:5 196:11,15
   240:3,4 252:19 253:2
   255:21 288:22
**Florence** 168:19,21
**focus** 50:12 63:13 140:7
   178:9 221:5
**focused** 131:21
**Focusing** 88:16 112:21
**folks** 155:3 217:6 218:4
**follow** 20:9,13 55:5,8,14
   59:18 70:20 167:16
**follow-up** 163:23 206:24
**followed** 47:24 141:18
**following** 145:6 149:20
   155:22 162:16 274:16
   275:7
**follows** 6:4 195:22 196:1
   253:5
**force** 138:14,15 279:18
**foregoing** 288:9
**forgive** 55:6
**forgotten** 11:2
**form** 199:20 265:21 284:9
**format** 159:19
**former** 280:21
**forms** 163:4 181:7 183:17
   184:21
**forth** 40:8 54:18,19 146:17
   146:21
**Forty** 268:18
**forward** 40:14 167:16 168:4
   173:18 188:18 236:24
   237:7 239:25 240:9,12
   241:20,23

**forwarded** 185:22
**Foster** 216:9
**foundation** 32:9 95:7 138:5
   156:23 157:17 158:2
   160:24 161:10 163:5 173:1
   185:13,18 258:21 285:21
**four** 53:23
**four-fifths** 219:22
**fragmented** 250:8
**frame** 127:4 224:3
**frames** 91:13
**frankly** 19:24 87:18
**Fraser** 24:1 36:23 60:9,23
   62:6 69:2 72:20 87:3 95:16
   97:21,23 105:19 115:12
   126:2 165:23 172:10,12,16
   178:12 195:1 253:14 255:1
   256:8
**Fraser's** 180:5 210:9
**fraud** 41:24 42:4,9,20 43:1
   43:17,23 44:9 51:9,14
   52:15 127:24 129:13
   130:18,20,24 131:2,16,19
   131:25 132:12 136:15
   137:21,25 138:12 139:20
   187:25 188:1,3,6 248:6
   249:23 250:5 251:20 252:1
**fraudulent** 135:7 136:25
**free** 104:13,13 131:3,4
   196:20 197:4,4,20 198:1
   264:7,13 270:6 281:5 283:5
   283:7 284:8
**Freedom** 16:21
**frequently** 16:23
**front** 43:8 117:20 239:16
**Fs** 172:18
**full** 150:21 230:16
**full-time** 266:11
**fully** 229:9
**function** 257:15 270:5
**functions** 154:11
**FUND** 2:7
**funds** 104:11,13 258:13
**further** 8:2 288:10,12
**fuzzy** 274:15

**G**

**G** 2:4

**Gallegos** 62:23,24 71:14
**game** 212:21 213:2,4
**gaps** 266:24
**garbled** 119:11
**gather** 249:20,21
**Gear** 2:3 3:5 5:2,3,25 6:4,11
   7:2,5 10:4,25 11:5 12:4
   13:24 15:2,3,24 16:5 20:17
   23:11,12 24:13 26:12 27:1
   27:3,6,9 30:16,21 32:15,19
   32:22 33:1 36:3,5 37:3,9,14
   38:9,12,19 39:24 40:12,22
   41:22,23 42:6 43:24 46:25
   49:22 50:12 51:7 52:2,11
   52:20 53:4 54:8 56:1 57:7
   58:14,25 59:12 60:8,17,19
   61:8 65:14 72:25 77:4,14
   77:22 79:14 80:12 81:13
   82:22 85:25 88:6 91:17
   94:1,20,22,25 99:3,21 100:1
   100:17,21 101:8,17 102:13
   103:8,25 105:14 111:20
   112:6,13,15,17 114:1 115:2
   115:4,8 120:12,22 121:10
   121:23 122:5,10,14,15
   123:3,14,21 124:13,22
   125:6,11,12,18,22 127:6,7
   128:5 129:9 130:6,7,12
   131:4,7,10,13 132:10,11
   133:21 134:2,6 143:3,6,7
   144:6,8,11,16,17 145:14,22
   145:25 147:3,8,19,23
   153:14 156:25 157:10,12,25
   158:2,4 159:3,12,15 161:2
   161:14 162:25 163:1,9,11
   163:12 165:1,2 166:14,17
   166:21 167:5,12,15 171:7,8
   171:18 172:22 176:25
   180:4,16 181:10,14,16
   185:1,9,15 186:21 187:8
   189:1,12,17,22,25 190:1
   193:1,3,21 194:1,3,6 195:24
   195:25 199:4,5 200:21,22
   203:21,22 206:5,8,12,25
**general** 2:11 6:23 17:5,6 18:4
   18:14 24:17 45:25 47:20
   64:23 69:23 103:1 127:12
   130:14 131:17 136:7

173:22 174:1 266:2 281:16
**General's** 14:4 16:19 51:8,11
51:13 137:21,24 138:6
205:21
**generally** 10:15 24:16,16
42:11 43:2 44:9 45:16,18
45:23 46:21,23 53:23 58:6
58:21 64:14 135:13,23
136:9 138:16 141:5 166:2
203:9 215:20 218:14
219:19 224:3 225:6 226:15
230:25 240:6 245:14,15,16
248:1 264:18 286:1
**generated** 113:3 193:14
**generational** 280:2
**Georgia** 99:16 100:5,22
101:3 167:16
**getting** 16:18 112:11 154:17
160:3 189:21 193:1 217:23
218:4 232:16 272:2 274:15
**give** 7:15,22 10:5 26:13 37:11
39:4,15 40:14 43:24 56:19
61:10 73:2 82:13,23 88:9
94:21 101:6 109:18,19
123:2 129:20 147:8 158:18
166:15 193:22 206:5 214:4
219:13 240:1 280:16 281:5
**given** 91:12 104:17 108:20
135:1 157:20 217:10 220:1
230:3
**gives** 47:21 259:18
**giving** 17:5 32:13 171:18
**glass** 128:3
**Glenn** 168:23,25
**go** 9:18 11:25 16:5 19:13 37:1
37:12,20 39:17 42:5 45:22
50:2 51:1,23 52:24 53:24
56:23 63:4 76:5,25,25 78:1
78:1 93:24 94:8,17 96:8
98:24 102:11,17 103:15
105:23 112:15 113:20
117:19 124:2 125:16,17
134:20 135:16,24 143:3
159:12 160:25 171:11
176:1 185:16 189:25
198:11 202:1 204:12 207:1
221:17 231:11 233:15
242:12,15 254:1,9 255:17

256:22 257:3 258:21,24
259:5,11 264:16 265:2,5
273:11 282:9 284:18
**goal** 103:19
**goes** 53:21 59:6 151:18
154:24 258:3
**going** 5:5,13 8:17 10:4 20:17
37:12 39:6,17 42:12 48:9
50:4 51:3 56:19 73:1 75:19
76:17 80:22 86:17 88:6
94:9 97:2 98:19 102:18
104:1 126:11 135:7 136:20
136:20,21,22 145:18 147:4
148:19 152:5 153:14
155:24 162:9 171:12 190:2
193:21 206:24 207:13
208:5 212:23 213:7 214:24
214:24 218:7 219:4 221:13
221:24 225:3 226:18 231:4
231:21 232:18 241:19
250:24 252:11 258:20
278:21 279:25 280:3,5
**good** 47:4 57:22 189:22
206:18 231:15 240:7,7
248:2,7,10 275:6 276:24
**government** 29:10 34:17
106:20 107:10 119:2,3,9,19
120:5 121:20 122:18,22
123:7 185:2,10 186:10
187:17 200:18,23 225:3
254:17
**government-issued** 180:17
**Governor** 37:4,4 45:15 47:21
84:23 85:8 96:20 97:16
143:19 181:18 207:8,14,24
209:13,21 211:25 214:9
219:6,16 220:20 229:9
280:3
**Governor's** 211:17 278:6
**Governors** 75:16
**grammatical** 116:4
**grammatically** 116:9
**great** 149:11 206:10 219:4
224:4 226:23
**grew** 286:4
**gross** 160:13
**ground** 5:5 7:5 90:17
**group** 174:7 175:1 178:11,16

**groups** 40:2 174:12,15
179:17 201:8,21 268:14
**guess** 6:15 32:1 35:21,21
39:11 64:12 70:7,19 73:15
85:23 87:10 116:10 119:12
120:25 140:13 152:2 167:3
197:11,17 211:16 222:5
229:7 230:13 237:20 269:3
270:11 275:7 278:19
283:21
**guesses** 268:19

---

## H

**H** 3:10 4:1
**H-E-G-A-R** 172:18
**hairs** 119:20
**hand** 73:1 114:21 115:2
227:11 288:16
**handed** 33:8 70:18 82:1,5
92:15 114:23
**handgun** 29:6 106:16 183:2
**handle** 19:4
**handled** 17:3 19:1 45:17 74:5
87:25 118:23 196:22
198:16 200:12 202:13
**hands** 219:3
**handwriting** 13:6
**handwritten** 13:5
**Hansard** 4:13 216:7
**happen** 82:11 84:3 136:20,20
136:21 165:20 237:9
**happened** 56:21 61:2 62:10
67:13 68:10,16,19 69:11
71:5 116:21 229:22,22
230:19 252:9
**happening** 14:19 129:2
**happens** 54:20 128:25 270:10
**happy** 9:5 211:24
**hard** 19:24 266:23 269:8
274:19
**Harris** 172:17
**harvest** 135:11,11
**harvesting** 127:11 128:6,10
128:12 129:16,23 177:17,18
248:10,13,25 249:8
**hash** 156:25
**HB** 3:14 20:6,9,13 21:22 22:1
22:6,21,24 23:1,12,13,24

24:1,6,8 25:5,11,25 26:2
27:13,20 28:19,22 29:15,19
29:21 30:5,17 31:4,7 32:3
35:1,11 41:23 42:4,10,19
43:8 44:13 45:5,7,13 46:8
46:14 52:3,4,16,20,21 53:5
53:6 54:3 55:11 57:3,8,16
58:15 59:15 60:10,13,19,21
60:25,25 62:7,17 63:15,19
64:5,9,16 65:17 66:24 68:8
68:15 69:15,17 71:6 72:8
72:14 78:9,11 80:12,13
89:3 94:14 98:23 107:23,25
109:11,11,23 180:12,17
181:2 190:25 191:9,9
**head** 8:2 128:8 170:15
**health** 46:4 56:24 283:23
**hear** 54:14,15 59:18 75:25
86:21 167:5 192:5 224:5
234:21 260:24 271:13
274:19
**heard** 35:20 54:14 77:17,23
84:13 86:16 87:6 102:19
134:25 135:9,10 142:15
191:21 224:19,21,22 225:7
225:15,17 226:5,10 234:16
240:6 267:11,15 270:15,20
270:21 271:19 273:4
284:10
**hearing** 3:15 4:15 33:11
35:16,18 56:5,6,14 59:9
75:20 81:3 90:18 97:10,11
98:6,7 110:17 113:5 141:19
142:1 144:24 146:16 148:6
148:18 164:8 191:18
211:10 223:9,15,16 224:9
225:20 226:13 228:22,25
230:17,20 231:7 242:6,11
246:9 281:18
**hearings** 48:1 50:3,7 53:16
57:20 80:13,17 193:17,18
275:21 279:18
**heated** 76:2
**heavy** 240:7
**Hebert** 4:11 194:8
**Hegar** 64:8,9 71:15 168:23
168:23,24,25 172:18
**held** 177:6 249:13 275:21

**hell** 195:18
**help** 61:4 65:4 81:16 83:25
110:4 148:23 175:10,18
221:5 265:2
**helpful** 156:4,10 161:16
162:4 163:2 243:4,7,21
244:9 258:18,22
**helping** 211:8
**hereto** 1:23 288:14
**hesitant** 58:2
**higher** 29:1 30:9 107:21
200:18,24 253:10 254:20,22
254:23
**highly** 94:23 95:15 140:15
153:17 166:18 194:4 196:3
215:6 228:5 237:12
**Hinojosa** 63:1,2,3
**Hispanic** 154:21,25 155:4,4,7
155:12 156:14 157:15
158:22 159:16,25 160:15
161:18 162:9 163:3,24
243:1,14 244:6 268:9
271:16,17 273:8
**Historically** 152:10
**history** 3:13,17 4:8 20:25
21:1,21 22:1 56:2 73:5,8
128:22,24 171:22 251:19
**hold** 22:22 279:18
**Holder** 9:25 10:13,17 88:8
147:22 272:16 273:18,23
274:1,9,25 275:22,25
276:11,20 277:3 278:13,13
278:20 279:5 284:22
**Holders** 272:18
**holds** 263:3
**holistically** 104:15
**honed** 127:23
**hopefully** 8:6
**hour** 287:1
**hours** 9:1 50:4 79:3 81:8
93:17 210:18 229:13
230:23
**House** 20:7,10,13 21:2,22
23:1,7,13,18 26:20 28:2,3
29:24 30:15 31:9,10 33:9
33:11,12 34:25 35:8 42:1
42:25 43:6,9,15 50:22
56:10,22 62:2 96:1,4,5

98:14 101:10 129:7 166:8
191:21,23 203:10 204:20
205:3,25 219:22 232:20
239:23 240:1,3
**Houses** 207:22
**Houston** 195:10
**Huff** 169:11
**Huffman** 169:12,13 172:18
178:15
**human** 46:5 56:24
**hundred** 53:23
**hypothetical** 120:20 145:20
200:3 246:4

---

**I**

**i.e** 195:17
**ID** 9:8,8,14 14:20,22 15:8
16:8 17:16 19:1,4 20:6
25:11 26:2 29:22 30:8,10
31:13 36:9 46:9 49:11,14
49:25 50:21 52:16,21 53:6
54:22,25 63:19 72:19 75:18
77:16,22 78:5,8,17 84:13
86:15 89:7 93:5 100:2,13
100:22 101:3,22 103:20
104:13,13,17,20,24 105:5,9
105:10 108:1,5,6,8,11 109:3
110:6,18 112:1 118:10
119:2,9,15,18 120:8,15,24
121:1 124:7 127:11 130:7
134:22 143:23 156:1,19
157:15 160:5,7 161:17
163:4 164:10,15,25 165:4
165:15,23 166:9 171:6
175:6,12,20,23 176:11,18
176:22 177:13,16,25 178:3
178:23 179:4,18,24 180:21
180:22 181:6 183:17,25
184:16,19 187:17 188:9
189:4 190:22 191:1,7,11
193:6 196:20 199:7,8 200:1
200:6,17,23 201:13,24
202:22 203:3,23 214:14
217:4,13 219:9,11 220:24
221:9 228:22,25 232:20
233:5 235:10,16 239:16
240:17 243:22 246:18,25
248:6,23 249:2 250:17,25

251:24 257:20 258:17
259:4,5,6,8,16,18 260:6,8
260:14 263:2,5 264:7 268:7
270:6,11 271:4 273:12
275:22 277:20 278:8 279:2
279:3,10 280:5 281:3,5
284:9 285:2,20,24 286:22
**idea** 17:6 75:8 178:11,19
241:1,4,8
**ideas** 178:17
**identifiable** 116:7
**identification** 27:14 28:5,9
28:25 29:8 44:17 74:5 76:5
84:5,9 99:5 104:7 106:1,7
106:18 107:8,13 119:7
120:16,16 121:15,18 122:16
122:21 123:5 128:16
135:15 136:5 143:16
144:21 152:9 157:21
159:25 160:18 164:4 182:2
182:6,7,13 183:7 184:10
197:10,25 198:1,9 199:20
223:18 233:19 253:8
254:15,15 256:2 260:2,9
263:12,15 264:20 265:1,8
265:17,21 266:3 267:14
282:5,15 283:4
**identifications** 29:16 104:14
160:22
**identified** 33:13 48:15 61:10
112:19 115:5,6 131:10
167:13 176:17 194:4 196:3
**identifies** 172:1,3 195:8
**identify** 10:6 32:20 33:6
46:25 61:14 70:16 73:3
83:1 105:17 115:8 133:23
134:12 137:13,21,25 139:20
147:9,11,20 149:9,15
153:18 167:12 171:20
180:6 184:20 185:1,9 186:9
186:16,19 194:6 196:4
203:22 243:14
**identifying** 134:8 191:11
192:24
**identity** 132:21
**IDs** 106:24 107:18 108:21
109:12 111:6,11,11,15,20
111:21 112:9 117:24

118:10 119:24 120:4,8
122:12 124:15,25 125:1,2
125:14 180:18,18 184:21
185:2,10 186:10 187:10
189:13,19 197:5,8,20
198:14,23 203:12 204:25
205:17 243:10,22 244:14
246:2 258:24 259:3,23
264:13 270:6
**IEC-issued** 263:11
**III** 148:14
**ill** 65:3
**illegal** 32:4 35:2 36:1,8,13,23
37:5 41:1 45:4 46:15 48:5
48:12,16 49:1,15 51:20
52:5 125:23 126:3,9 164:20
178:23 179:4,19
**illegally** 269:6
**illegals** 126:22
**illness** 66:13
**imagine** 17:11 199:25
**Imani** 206:22
**immediately** 236:6 281:15,17
**immigrant** 178:23
**immigrants** 179:5,19
**immigration** 164:16,20 165:4
165:16,23 166:9 175:6,12
175:21,24 176:18,21 177:5
177:9,12,24 178:2
**impact** 52:22 53:7 54:4 55:12
57:2,10 58:15 59:2,15
63:20 89:6 91:19 113:17
117:2 151:20 152:20
156:22 157:15 160:7,17
161:17 188:13 189:5 191:2
191:12 193:5 197:6 198:24
201:13,20 202:8 243:5
245:19 256:3 257:10 258:7
272:8
**impacted** 162:9
**impersonate** 111:16
**impersonation** 48:17 50:23
128:11 129:15 130:9,19
131:23 132:7,13,17 133:7
133:12 134:8,13 187:16
251:13 280:14,19
**implementation** 222:19
**implemented** 248:7 279:10

**implicate** 6:18
**implied** 89:23
**important** 25:1 116:25
203:24 219:10 220:8,11
260:13,17 269:1
**impossible** 127:25
**impressed** 114:10
**impressions** 6:17 102:16
**improper** 40:13 116:10
**improve** 267:5 286:17
**improved** 202:6
**improving** 99:15 202:8
**in-depth** 80:6 192:12
**in-person** 44:14,18,22,25
45:1 132:4 133:6,8 139:20
251:13 280:13
**in-personal** 280:18
**inaccurate** 11:21 22:1 42:14
58:3 231:18
**inadequate** 249:18
**inappropriate** 257:15 258:15
**incident** 189:17 211:5
**include** 9:13 117:24 122:12
122:15 250:16 258:16
**included** 25:11 26:2 30:5,7
72:3 107:18 120:18 121:21
123:16 152:11 179:24
183:11 197:3 199:22 200:9
201:1,14 203:3,11,24 204:5
204:7 221:20 222:6,17
240:17 282:22
**including** 31:13 33:12 116:23
120:7 212:18 220:25
223:18 254:15
**income** 225:2
**incomplete** 120:19 258:20
**incorrect** 10:17 173:1
**independent** 25:12 26:3
35:14 36:15,17 40:24 46:20
46:23 48:9 49:19,21 50:9
51:5,16 52:18,25 57:14
59:8,12 63:9,10,23 64:25
68:23 126:5 144:23 151:14
174:7,9,11,14,25 178:10
185:21 248:1
**independently** 105:10 164:6
**Indiana** 99:16 100:2,13 204:6
204:14,16,25

**indicate** 44:24 48:19 117:1
166:18 181:20 188:2
**indicated** 32:3 55:4 83:21
104:12 109:23 138:22
157:13 158:23
**indicates** 29:7 62:2,5 90:17
95:16,25 115:25 116:20
150:4 154:19 155:5 173:16
173:17 175:17 195:8,16
**indication** 61:24 62:15
167:16
**indicator** 155:3 157:13
**indigencies** 204:4
**indigent** 202:22 203:3,12,24
204:25 205:17
**individual** 141:23 206:22
225:5 247:15 286:24 287:4
**individually** 192:6
**individuals** 111:15 158:22
174:21,23
**influence** 127:12
**informal** 23:5 26:3 241:24
249:15
**information** 14:18 16:18,21
34:19 38:1 51:10 53:1
54:16 84:16 92:4 110:4,22
124:14 145:7,11,16 146:1,2
146:11,14 154:5,9,17
155:17 156:3,11 158:9,24
158:25 159:5,16 160:4,14
160:17 161:12 162:2,14,18
167:9 187:19,20,24 188:21
188:22 189:10 217:10,19,23
233:8 243:12,13,17,18,23
243:24 244:16 246:6 260:6
**informed** 59:23
**infraction** 188:3
**initial** 66:18
**Initially** 110:20
**initiatives** 266:22
**input** 192:13 195:13 213:21
**instance** 1:14 133:3
**instances** 251:12
**institution** 29:1,9,12 30:9
106:19,20,25 107:9,15,21
108:6 119:1,3,8,19 120:5,9
120:17 121:20 122:17,21
123:6 124:15,25 253:10

254:17,19,20,23
**institutions** 108:22 109:3
117:24 125:5 180:19
**instruct** 5:17
**instructions** 9:3,22 16:11,20
86:19,22,23
**Insurance** 209:21
**insuring** 126:9
**integrity** 41:25 103:19 127:3
127:10 249:3,24 250:4
258:3 273:14
**intended** 35:2 41:24
**intent** 32:3 151:1
**intention** 5:16
**interchangeably** 9:9
**interest** 40:2 179:17 226:16
226:20 239:25
**interested** 101:1 288:14
**interface** 217:22
**interfaced** 216:16
**interim** 47:3,6,14,18,24
109:24 191:13 192:17,22
193:3,7 277:17 278:7 280:6
**internal** 187:13
**internally** 126:18
**international** 261:2
**internet** 260:13
**interpret** 117:23
**interpretation** 107:20 116:5
118:2,3 198:6
**interpreting** 197:17,19
**interrupt** 125:17
**interrupted** 37:13
**introduce** 70:10 207:23
**introduced** 72:20 75:1 92:8
142:25
**introducing** 140:22
**investigations** 138:7,10
**invitation** 226:3
**invite** 56:14 91:7
**invited** 224:5,8,13,14 236:25
237:8 240:10 242:4
**involved** 16:1,21 22:25 25:9
74:17 75:1,4,7 76:11 77:12
79:15 91:9 96:19 97:7,9
104:16 109:2 110:5 122:25
123:3 126:7 128:11 141:1
164:14 176:13 179:23

187:8,9 213:17 225:2
244:25 276:16
**involving** 226:17
**issue** 42:19 43:16 44:8 47:3
50:15 60:5 65:2,12 66:22
75:18 77:8 81:9 91:7
108:24 111:1,2 112:4,6
114:15 118:14,23 119:24
120:4 125:23 126:2,8,13,21
126:25 130:24 131:2
132:14 134:23 137:5 142:4
148:24 158:8 164:19 165:7
165:8 175:24 176:12 177:5
177:12 179:8,12 186:23
190:19 191:14 192:12
219:8,10,15 220:11,24
221:4 225:3 234:13,17,21
237:4 239:15 240:1,2,8
242:1 257:24,24 258:2
259:6 265:17 266:18
270:23 272:2,4 274:5,8
276:15,18 285:5
**issued** 27:15 28:10,14,18
29:1,6,9 30:8 106:1,12,16
106:19,24 107:9,14,18
108:6,22 117:24 119:8,18
120:4,8,16 121:15,19
122:12,17,21 123:6 138:19
180:18 182:7,18,22 183:2
200:17,23 253:9 254:16
275:10,22
**issues** 19:1,6 31:13 40:2 42:1
43:2 46:6 47:5 53:10,16,16
57:22 91:9,16 110:5,12,18
111:11 119:6,15 134:19
155:22 165:12 173:23,23,25
174:5 175:7,21 176:11,13
176:19 187:4 204:3 217:7
217:17 220:4,5,24 221:6
226:17 234:10,14 238:9
239:13,13,17 242:2,3
258:10 267:11 270:15,17
278:5 280:4,9 285:7,17
286:16

---

**J**

**JA** 33:14 61:10,24 64:3 70:5
70:19,25

**Jackson** 170:7 172:18 194:12
   194:20,22
**Jane** 169:5,7
**Janice** 194:12,24,25 209:17
   210:8 238:1
**Janis** 216:8
**January** 83:9 153:21 155:13
   157:2 171:10 194:9 208:18
   209:2 212:14 213:25
   215:22 223:23 227:16
   228:10 238:2 239:16
   240:22 252:17
**Jeff** 169:9
**Jennifer** 4:4,16 17:11,12,18
   18:8,21,25 19:10 41:12
   146:10 153:21,25 154:1,8
   155:6,11 157:3,8 163:12,20
   163:24 194:10,12 195:2
   209:4,17 210:4,16 211:7
   212:18,23 213:7,9,24 216:9
   228:1 237:25 238:10
   240:20 242:22
**Joan** 169:12,13
**JoAnn** 169:11
**job** 59:20,21 98:5 135:25
**John** 135:6,6 169:15 216:10
**joint** 24:21 143:1
**Jonathan** 4:10 194:11,13
**Josh** 209:15,25
**journal** 3:16,19 4:3,19 61:16
   64:2 68:3 83:6,8 147:14,16
   147:25 148:12 151:2
   252:16 253:1
**judge** 137:10 138:20 139:14
**judges** 135:20,22 136:12
   139:19 249:16
**judgment** 59:21 60:6 141:25
   248:1,4,5 257:4,25 281:7
   284:12
**judgments** 236:21
**judicial** 202:5 257:9 272:20
**Julia** 208:18 209:1,19 237:25
   240:20
**Julie** 209:15
**July** 6:10,12 12:7,8,13 271:12
**June** 10:13 11:24 274:14
   275:20 277:7,18,19 281:9
   281:10

**jurisdiction** 202:4 284:2
**jurisprudence** 18:11 56:24
   96:17
**Justice** 2:4 5:3
**justification** 118:24

**K**

**Karina** 209:15,23 210:17,25
   211:7,8 212:12 213:3
**keep** 35:2 39:7,13 46:5 104:1
   208:8 217:21 218:14,15
**Kel** 169:20
**kept** 5:14 38:15,17 91:22
**Kevin** 170:2,3
**killed** 239:23
**kind** 16:3 89:1 116:9 135:4
   157:24 248:24 262:1 280:1
   281:1
**kinds** 128:22
**King** 225:7 226:10 285:10
**knew** 230:16 243:11
**know** 5:20 7:13 8:15 10:21
   10:23 13:6,18,22,22 14:12
   14:25 15:1,3,12,17 17:2
   18:18,19 19:14,21,22 21:13
   21:18 23:5 26:14 28:1
   30:23,25 31:23,24,25 32:6
   32:12,12,12 39:5,16,19 40:3
   40:4 42:7,15,21,25 43:1,1,3
   43:5,21 44:23 45:15,23
   46:19,22 47:18 48:7,21,23
   50:4,5,8 51:24 52:1 54:11
   54:22 55:18 57:17 58:1,2
   59:7,17,17,25 60:1 61:2
   63:17,22,24 64:15 65:9,10
   65:10,11 67:17 68:16,25
   69:19,23 70:6,6 72:9,10,11
   75:13,17 76:15 77:4 80:8
   81:3,7 84:15 85:23,23
   86:19,19,25 87:18,20 89:5
   90:2 91:10 92:2,19 95:10
   96:10 97:6,6 98:2,17,18
   99:11 101:16 102:18,20,22
   107:25 110:21 113:7
   115:22 118:20,21,22 120:23
   121:3 124:1,5,5 126:1,11,25
   128:15,25 129:19,21,22
   130:17,21 131:14,18 132:9

132:19,19,22,25 133:1,2,18
133:19,24 134:18 135:4,6
136:1,4 137:2 138:2 140:10
140:11,11,17,20,20 141:10
142:20,22 143:25 144:24
146:5,8,13,22,23 148:8,11
150:5,23 152:4 153:5
155:10,17 156:8,8,9,9,18
157:18 158:12 160:10,12
161:25 162:15 163:15,18
164:5,5,21 165:7,12,13
167:9 168:11 170:7,10,16
171:8 173:21 174:9,24,24
176:1,2,7,8 177:2,2,3 178:6
178:18 179:15 180:2 181:4
184:5 187:11,20,21,23
188:2 190:9,17,18 191:3
193:7,12 194:13,14,15,16
194:18,22 195:2 196:1,11
197:13,14 199:9,24 200:1
201:17 205:24 206:3 207:2
207:7,16 209:11,16,19,25
210:3,19,22,24 211:21,21
213:1,15 214:13,17 218:15
218:20,21 220:2,8 221:15
222:6,16,21 224:10,10,22
224:25 225:5,9,13,13,15,21
225:21,22,23 226:12,16,25
227:2 229:3,15,20,21,22
230:25 231:9 235:17,24
236:5 237:1 240:25 241:2
241:14,15,16,18,21,22,25
242:3 243:7,12,12,16,17,21
244:15,21,23,25,25 245:2
245:12,21 246:3,6,10,13,17
246:20 247:4 248:22 249:1
250:2,23 251:6 252:7,9
256:21 258:22 259:3,7,11
259:19 260:5,21,22 261:4
262:11 263:1,7,8,17,21
264:1,3,3 266:7,9,25 267:16
267:18,19,25 268:6 270:25
271:5,11,20 273:10,12,17
273:22 274:25 276:3,5,9,14
276:24,25,25 277:1,11,23
279:21 280:22,23 282:18,23
283:2,8,20 285:3,6,12,16,23
286:1,11,11

**knowledge** 17:12 31:23 45:25
  46:1 65:8 140:24 246:21
  275:5
**knows** 79:11
**Kyle** 169:19

**L**

**L** 1:10,13 3:4 6:2 288:4
**lack** 177:20 266:13 271:10,11
**lacked** 144:20 164:4 199:7
**lady** 259:14,17
**laid** 9:22 117:6 186:6 281:8
**language** 27:18,24 28:1 29:23
  29:25 30:2,4,13 34:22
  44:18,20 98:2 121:15
**large** 239:13
**larger** 176:8
**LaRue** 194:11,16
**late** 193:2 229:11
**Latino** 243:4,9 247:5,18
  268:18,25 271:21,22 272:10
**Latinos** 269:21
**LaVoie** 4:14 215:14 217:6
**law** 28:20 46:1,4 127:13
  128:19 132:20,21 136:13,23
  204:6,14,16,25 215:21
  221:11 222:3,10,17 245:13
  249:10 263:2,5 268:3 270:4
**laws** 137:11 251:1
**lay** 25:20 53:18 95:7 192:2
**layman's** 278:21
**layout** 25:21
**LBJ** 128:24
**leadership** 280:12
**League** 206:21
**learn** 285:1
**learning** 253:10 254:21
**leave** 6:9 240:23
**leaving** 205:4
**left** 18:20 56:3 205:8 229:10
  238:16
**LEG** 215:7
**legal** 2:7 274:8 288:22
**legislate** 136:10
**legislation** 9:12 14:20,22
  15:8 16:8 17:17 19:1,4 20:6
  31:12 36:9 43:4 46:2,9
  49:12,14,25 50:21 52:16

53:3 55:1 63:20 72:20 74:4
  74:9 75:9 76:4 77:17,22
  78:8,17 84:6,13 86:15,21
  89:7 93:5,10 97:11 98:3
  100:2,14,22 101:3,23 102:3
  102:16 118:11,17 119:9,15
  120:8,15 122:3 130:8
  141:20 143:16,23 144:2
  155:24 156:2,20 157:15,22
  158:19 160:7,18 161:17
  164:10,15,17,25 165:4,15
  165:23 166:9 171:6 175:12
  175:20 178:3,23 179:4,18
  188:9 190:22 191:1,7,11
  192:16 193:8 201:13,24
  207:5,17,25 217:16 219:12
  219:22,24 220:7 226:21
  228:22 229:1 230:17 232:7
  233:5 239:24 264:16
  265:15 276:17 282:7 285:6
  285:13
**legislations** 189:4
**legislative** 5:11,14,17 6:12,18
  6:25 15:19 19:9,23 20:25
  21:3 30:17 31:7,22 32:23
  36:25 37:6,16,24 38:11,14
  38:23,24 39:1,5,7,17,21,25
  40:1,10 42:9 43:19 46:17
  49:17 50:25 51:22 52:7,23
  55:16 56:2 58:12,17 59:3
  59:25 61:3,13,17 62:5 73:7
  75:12 76:24 77:6,19 78:24
  79:24 85:21 93:22 96:23
  101:4,13,24 102:10,15
  103:5 104:8,25 111:17
  120:11,20 121:25 122:9
  123:8,18 124:19 125:19
  130:16 143:11 149:1
  150:25 152:1 156:6,24
  159:23 171:1 179:25
  180:13 184:23 185:5,14
  186:17 188:15 189:15
  191:21,24 192:4,9 193:6
  202:1 204:1 209:20 218:16
  221:17 232:3 235:13
  239:12 241:16 247:23
  253:21 255:10 258:9,19
  266:16 270:2 276:12 280:2

281:6 283:18
**legislatively** 37:21 38:1,7
**legislator** 25:10 111:6 166:8
**legislators** 6:24 15:18 96:20
  111:10 119:14 125:9,13
  126:21 141:2 152:10 163:2
  164:14 221:5
**Legislature** 3:13,17 4:8
  21:20 22:1 47:21 56:7 80:5
  83:12 157:20 171:22,24
  188:13 220:25 275:14,16
  279:18 286:15
**legitimate** 35:4 240:12
**lends** 177:22
**length** 187:18
**let's** 24:11 32:15 33:6 56:18
  58:8 60:15 61:23 63:13
  74:14 90:6 109:21 112:15
  130:24 143:3 167:12
  171:12,20 189:25 196:2,15
  224:17 240:6,6 254:5 265:2
  282:9,9
**Leticia** 90:16 115:10 227:24
  228:11 237:21
**letter** 63:14 88:13 90:7 92:10
  114:13 115:21,21,23,25
  148:7 149:3,17 150:4
  151:13 228:10 229:2,3,4,6
  229:12,15 230:12 231:18
  235:22 236:6 238:8
**letters** 87:15 227:1 229:20
**letting** 37:24 39:14
**level** 46:7 81:6 186:4 196:14
**liability** 137:4
**license** 27:14 29:5 106:1,16
  182:6 183:1 199:8 267:6
**licenses** 251:2,5 266:23
**licensing** 266:12
**Lieutenant** 37:4 45:15 47:21
  75:16 84:23 85:8 96:20
  97:15 143:18 209:13,21
  211:17,25 214:9 219:6
  220:20 229:9 278:6
**Likewise** 127:18
**limitation** 198:23
**line** 8:16 27:18 46:20 89:11
  139:9,10 151:4 153:4
  167:18 200:4 210:11

212:10 213:6,23 221:9
**lines** 41:6 59:21 100:12 109:6
  158:19 234:16
**list** 89:1,2 154:24 155:1
  156:14,15 158:14 159:17
  161:5 195:9 196:6 244:8
  255:4 256:17
**listed** 173:2,3 174:15
**listen** 55:19
**listened** 58:19,22 236:20
**listening** 80:7 81:2
**literally** 56:3 229:12
**litigation** 5:4 15:14
**little** 11:12 12:14 38:20 46:25
  76:9 116:9 164:22 172:14
  183:8 191:22 218:11
  222:23 231:1 260:3,17
  261:25 262:21 274:15
  279:24
**live** 261:5 286:3,3,13
**Lizzie** 18:19,20
**local** 138:11 154:5 283:23
**located** 29:2 253:7
**log** 218:16
**logistical** 213:16
**logistics** 211:2,10 213:5
**long** 47:25 49:9 59:7 117:15
  121:1,9 157:24 177:6
  225:21 230:22 234:15
  240:7 250:7 261:6,7 277:11
  286:6,10
**longer** 6:6 203:3
**look** 20:19 22:4 23:14 26:14
  32:15 56:1 57:17 59:14
  61:11 70:4,5 71:7 73:2 80:2
  82:23 88:9 94:21 100:23
  107:2,24 116:13,13 136:1
  137:2 147:8,18 148:3,21
  166:15,22,24 173:18 193:23
  208:12 209:6 215:5 220:23
  221:8,22 227:14 229:7
  253:1 255:24 259:15
  261:17 265:6 282:7
**looked** 31:12,25 103:20
  206:2 265:3 268:23
**looking** 22:9 42:25 43:7,15
  44:4,12,20 46:6 51:18
  61:20 70:25,25 81:25 82:4

95:14 106:15 130:25
  147:13 150:7 168:4 175:2
  227:18 230:13 242:19
  251:19 252:25 254:6
**looks** 21:13 54:12 73:16
  167:10 173:23 194:21
  259:14,17 261:24 262:20
**Loop** 1:20
**lost** 71:22 113:24 119:10
  184:10
**lot** 24:19 31:12,13 43:2 45:17
  46:11 53:21 56:6 57:19
  60:4,4 75:21 76:7 110:18
  113:7 130:21 137:2 171:2
  173:23 213:15,18 220:4,5
  226:15 231:16 236:20
  237:2 239:23 250:8 265:3
  270:20 280:4,8
**loud** 216:5
**Lubbock** 1:21 4:20 216:8,9
  216:14 261:22 262:4,23
  263:19 271:18 288:2
**lubbockonline.com** 261:19
**Lucio** 63:5
**lunch** 134:2,4

---

**M**

**machine** 1:19
**maiden** 270:18
**mail** 35:24,25 36:6 40:23,25
  41:5,9,13 43:1,23 130:20,24
  131:16,19,25
**mail-in** 130:22
**maintain** 5:19 38:25 39:22
  40:19 46:6
**maintained** 37:16 38:4 145:2
**major** 42:1 217:15 220:24
  221:6
**majority/minority** 233:4
**makeup** 268:5
**making** 17:24 37:23 39:13
  102:3 108:24 160:5 208:4
  270:10 284:8
**managing** 239:11,12
**mandate** 284:2
**MARC** 1:4
**March** 90:9 112:18 114:13
  115:12 147:15 149:18,19

150:13,15,18 167:24 172:24
  172:24 173:8,15 239:18
**mark** 82:22 147:4,4 171:13
  208:5 223:2 252:11 261:10
**marked** 10:3,5 20:16,18
  26:11,13 27:1,7,8 32:18,20
  43:11 61:7,9 70:9,13 72:24
  73:1 81:12,14 82:16,21
  88:5,7,7 94:19,20,23 105:13
  105:15 115:1,3 140:4,15
  147:7 153:13,15 166:13,15
  166:18 171:17,19 181:9,11
  181:15 193:20,22 208:11
  215:4,6 223:4 227:10 228:5
  237:11,14 252:15,17 261:13
**market** 135:12
**married** 270:17
**material** 38:15
**math** 49:4
**matriculation** 259:6
**matter** 6:23 13:16 14:17 20:2
  37:22 38:14 50:20 80:18
  239:11,12 249:11 258:5
**matters** 38:7 39:5 45:17
  174:5
**McCoy** 194:12,24 209:17
  210:8 238:1
**McCutchin** 216:8
**McGeehan** 4:5 153:21,25
  154:4,18 155:10 157:3,4,4,7
  157:19 161:24 163:20
  242:23
**McGeehan's** 158:14 163:13
  163:23
**mean** 6:15 15:21 19:5 21:13
  24:14,24,25 25:1 39:4
  41:17 44:2 48:20 50:17
  51:25 54:11 57:19 59:5,6
  82:12 89:8 93:14 97:6,7
  103:4,8 109:14,17 112:22
  120:25 124:5 126:23
  140:17 145:20 146:7
  148:10 150:9 153:3 180:15
  180:16 199:24 211:22
  231:20,22 235:18 239:10
  244:4 247:5 248:18 257:23
  273:3
**meaning** 160:13 187:12

**meaningful** 157:20
**means** 7:13 80:9 109:16
    240:25 241:4
**measurable** 130:8 133:5
**measure** 34:20 35:2 204:7
**mechanism** 132:20
**mechanisms** 269:16
**Medicare** 199:19,24 200:4,7
**medication** 8:23
**meet** 200:6 210:17,18 275:14
    275:16
**meeting** 19:15 150:17 167:16
    173:18,19,22 174:1 176:8
**meetings** 19:25 20:1,2 80:22
    96:8
**meets** 257:4
**Megan** 4:14 215:14 217:6
**member** 41:15 53:14 54:12
    63:11 117:1 119:23 141:23
    155:19 164:20 165:6 168:6
    168:7 174:14,18,20,23
    210:10 271:11
**members** 20:12 41:10 53:17
    53:18 54:16,17 56:16,18
    59:22 60:5 64:6,7 77:10,12
    79:7,12 80:5,23 81:1 86:20
    87:6 92:1,2 93:24 94:9,11
    96:1,3 109:7 110:5,11
    145:6 148:9 150:24 151:1
    155:23 164:7 167:10
    174:15 188:24 191:15
    192:5,13 204:12 213:20
    215:11 229:20,23 230:1
    237:1,3 239:16 241:24
**Memo** 3:20,24
**memorandum** 115:10,14
**memory** 12:3 25:18 68:21
    147:2 193:13 225:24 229:4
    278:10
**mental** 6:16 102:16
**mention** 263:2
**mentioned** 175:6 176:19
    255:21
**merely** 117:14
**message** 167:19 168:4
**messaging** 19:18
**met** 210:15 211:11,14 275:18
    275:19

**method** 156:19
**methodology** 76:17
**Mexico** 1:18 288:7
**micro** 176:9
**middle** 33:13 224:4 253:1
**Mike** 170:7 209:16 210:2
**miles** 263:24,25 285:2,19,24
    285:25 286:2,3,4,9,19
**military** 28:5 106:7 182:13
**mind** 103:21 167:6 241:22
    284:3
**mine** 70:7 231:22
**minimized** 201:15
**minimizing** 197:6
**minimum** 128:18 175:17
**minorities** 256:5
**minority** 52:22 53:7 54:5
    55:13 57:3,10 58:15 59:2
    59:15 63:20 88:19,24 89:6
    89:13 90:25 91:19 92:25
    93:5 113:1,18 114:2,7,17
    115:16 117:2 140:25 141:4
    141:17 151:20 152:20
    156:3,21,22 188:14 189:5
    191:2,12 193:6 197:6
    198:25 201:14 232:5
    246:11 247:4
**minus** 70:23
**minute** 44:1 196:16,16 215:5
    217:3 242:16
**minutes** 214:6 263:23
**missed** 219:5
**missing** 72:17 161:3
**misstate** 159:4
**misstates** 54:6 159:2
**misstating** 55:6
**mitigated** 201:16
**mobile** 263:9,10,11 267:13
**mode** 278:21
**moment** 216:20 228:14
**Monday** 223:23
**money** 137:25 197:14 260:6
**monitor** 80:24
**Montagne** 194:12,18
**month** 230:16
**moot** 274:5
**morning** 13:1 155:7,12 207:1
**mother** 75:23

**motion** 60:24 62:11,12 66:15
    66:23 67:20 71:12,17,21
    72:10 142:8,20 190:8,10,10
    253:13 255:1 256:8
**move** 40:14 212:10,11 236:18
    239:4,9,11 240:6,12 242:1
    254:5 258:23 284:13
**moved** 62:6
**moves** 21:24
**moving** 60:1 213:23 219:8,12
    220:7 239:25 240:9 241:23
    264:6
**multiple** 80:22
**Myatt** 1:17 288:19

---

### N

**N** 3:1
**NAACP** 2:7
**name** 5:2 25:1 41:15 67:11
    69:4 174:11 178:12 225:15
    225:25 253:18 255:6
    256:15,19
**named** 18:12
**names** 23:7 63:4 135:19
    161:1,9 162:18 216:3 244:6
    270:17,18
**Nandita** 262:3
**narrow** 109:3 184:1
**narrowed** 108:1,8,22 118:9,9
**natural** 86:5,6 184:11 216:13
**nature** 188:3
**navigate** 211:8
**nays** 62:14 71:18,23 253:16
    255:2 256:12
**necessarily** 31:10 123:21
    160:16 171:3 177:13
**necessary** 7:19,23 160:21
    163:4 240:11
**need** 15:10 39:7 107:24
    116:18 138:5 155:7 167:1
    189:19 242:4 252:23 260:2
    267:22 270:6 282:4 283:3
**needed** 110:22 146:7 237:7
    282:24
**needs** 116:1,16 273:12
**negative** 53:7 57:2,9 58:15
    59:15 63:20 91:19 156:21
**negotiate** 241:10

negotiation 240:23 241:3
negotiations 241:6,12
neither 288:10
Nelson 169:5,7 172:19
neutral 263:4
never 136:20 152:23 167:2,6
  177:24 206:13 240:2,4
  273:5
new 1:18 2:8 132:21 222:3,10
  237:6 286:9 288:7,23
news 4:20 225:1 270:22
  271:7,10,10
newspaper 281:19
NGR 1:6
Nichols 170:16,16 172:19
  285:8
nine 62:14 79:3 195:11
Nineteen 62:14 200:15
  202:16
nodded 8:2
nods 128:8 170:15
non-Anglo 268:16
non-Federal 250:17
non-law 249:16
non-photo 9:14 29:16 99:4
  104:7,20 105:5,9 180:21,22
  184:21 248:23
non-Texas 251:5
non-voter 240:17
noncitizen 32:4
noncitizens 35:3,12 36:1,8,13
  36:23 37:5 41:1 45:4 46:15
  48:5,12,16 49:1,15 50:23
  51:20 52:5 112:1,7 125:24
  126:3,9,21
nondescript 174:25
nonintrusive 137:12
nonwhite 268:15,16
normal 154:11 192:4
normally 17:6 53:24 136:11
  223:7
note 94:22 153:15
notes 13:4,5 70:11 71:9
notice 4:15 15:23 222:2
  223:8,14,16 226:3 265:8
notion 177:16 181:6
November 22:8 275:4 280:20
number 3:11 4:2 7:13 10:2

20:15 26:10 28:4,8 29:7,16
32:17 61:6 72:23 74:13
80:2 81:11,17 82:1,4,20,23
88:4,16 93:17 94:18 95:14
98:13 105:12 106:9,15
112:21 114:25 128:1 130:8
133:5,6,8 140:5,8 144:19
147:6 153:12 154:20 155:6
155:11,11 160:20 163:24
164:2 166:12 170:6 171:16
172:6 176:10 181:8 193:19
196:17,23 198:3,13 199:5
199:18 200:16 201:5
202:17 208:10 215:3 223:3
227:9 237:13 243:21
252:14,19 253:2 255:22
257:19 258:17 259:6
261:11,12 288:21
numbered 1:16 180:5
numbers 70:16 232:1 260:2
  260:14
numerous 256:24
NW 2:4
NY 2:8 288:23

---

## O

O 2:12
O-G-D-E-N 172:19
O-P-I-E 228:2
object 26:9 38:11 43:18
  145:18 189:15 258:20
objected 67:3 121:3
objecting 38:19 54:15,15
  190:15
objection 5:19,23 10:18
  11:25 24:10 30:11,18 32:9
  32:10 36:25 37:6,23 39:1,4
  39:15,15,23 40:15,20 42:5
  46:17 49:17 50:1,25 51:22
  52:7,17,23 53:2,2 54:6
  55:16 57:5 58:12,17 59:3
  59:16 65:6 77:19 78:24,25
  79:24 85:20,21 91:3,4 93:7
  93:22 96:23 98:24 99:17
  101:4,13,24 102:10,15
  103:5,15 104:8 105:6
  111:17 112:3 113:20
  120:10,19,20 121:7,22,25

122:8,8,23 123:8,17,18
124:2,17,20 125:4,15,19,20
128:13 130:11 133:16
143:11 145:12 156:5,6,23
156:24 157:17 158:3 159:1
160:24 161:10 163:5,6
179:25 180:13 181:3
184:23 185:5,13,14,18
186:17,25 188:15 189:7
190:22 191:4 201:25 202:1
204:1,21 242:8,10 247:23
253:21 255:10 256:22
258:19,21 266:16 270:2
276:12 283:18 285:21
286:21,23
objections 59:18,19 184:9
  202:23 204:17
objectors 202:23
observe 139:6
obstructionist 40:18
obtain 152:8 154:24 156:4
  158:24 282:5 285:2
obtained 158:20,23 159:6,17
  159:19 161:24,25
obtaining 265:19 284:9
obviously 6:19 15:11 37:25
  38:15 97:5 195:2 267:10
occupied 239:17
occur 146:22 269:16 270:12
occurred 6:17 21:22 71:11
  123:11 155:15 189:18
  215:23 222:19 229:18
  275:4 280:14,19
occurring 132:24
occurs 96:18 177:19
offer 160:6 163:13,23
offered 53:3 196:7,13 199:19
  199:19 200:16 201:6
  202:17 205:9,9,11 254:10
  283:9
offering 196:9
office 2:11 14:4 17:1,15,15
  19:11,12,14 41:8 51:8,11,13
  137:21,25 138:6,11 144:18
  145:1 152:2 154:9 155:18
  156:4,14 202:9 205:16,18
  205:21 210:4,7 211:17
  212:18 216:8,9,18 218:5,6

218:13,13 229:13 242:25
257:7 258:12 259:5 263:3
263:17 271:15 276:7 278:6
286:20 288:17
**officers** 207:22
**offices** 16:16,23 218:1 263:16
266:8 267:1
**official** 137:17 139:3 223:9
**officials** 154:5
**Ogden** 104:12 172:19 202:18
**oh** 21:8 172:15 208:24 212:13
216:24 217:9 221:24
222:13 228:2 254:8 255:18
**okay** 5:9 7:4 9:20 11:13 17:4
27:23 32:25 33:1 34:3 39:3
40:16 64:2 66:1,7 70:21,25
83:3 92:19 100:18 109:22
114:23 136:18 140:19
149:12,17 150:10 157:11
158:10,17 159:14 162:22
167:7 173:14 177:1 192:21
205:12,15 206:10 207:7,9
207:11,21 208:12 209:2,6
210:22 211:11 212:3,10
213:13,23 214:4,13,19
215:5,9,17,22 216:19,25
217:5,9,14 218:3,10,19,21
218:24 219:1,4,25 220:10
221:19,24 223:14 224:14
225:13,19 226:1,23 227:5
227:20,22 228:4,12,14,19
228:20 229:17,24 230:13
231:8 232:14 233:1,7,22
235:8,12,20 237:5,10,17,19
238:15 241:6,9,11 242:12
243:7 244:2 245:3,6,14,18
246:7,24 247:2 248:4,16
250:6,16 251:8 254:7
255:19,19 258:16,23 259:7
259:19,22 260:19 262:2,14
263:6 264:25 267:13
275:13 277:10,17,22 278:1
280:10 281:9,15 282:17
283:8 284:25 287:5
**old** 129:25 132:20 177:19
217:18 249:10 260:11
**once** 65:23 66:3 67:7 148:3
**ones** 173:2 183:18

**online** 3:13,17 4:8 21:21 22:1
56:2 73:5 171:22
**Open** 16:22
**open-ended** 121:13
**operate** 56:8
**operating** 154:11
**opie** 170:9 228:2
**opie@cdmlaw.com** 4:17
170:9
**opinion** 123:24 124:11 179:4
179:18 201:22 248:23
276:1 277:13 284:23
**opinions** 110:10 236:21
**opponent** 64:9,16,17,19
192:15
**opponents** 53:4 54:19 57:2
59:2 91:7,18 93:10 94:2,6
94:12,12 113:10,12 117:5,6
141:19 244:22 245:22
246:14 276:23
**opportunities** 104:10
**opportunity** 7:16 73:2 77:12
82:23 87:5,6 104:24 230:1
**oppose** 72:2
**opposed** 60:7 72:1 82:14
97:11 116:17 181:7 216:17
218:5,9
**opposing** 53:19,19
**opposition** 54:20 58:7 79:11
116:19 283:16
**oppressive** 280:24 281:2
**options** 105:11 184:21,22
185:23
**oral** 1:9,13 10:8 92:6 190:10
288:4
**order** 5:12 37:19 60:24 62:6
62:16 63:8 64:4 65:16
66:23 67:23 68:7,14 69:15
71:3,21 72:1,2 73:15 74:4,6
74:17,25 75:13 76:4 78:3
79:2 80:9,10,11 81:1,21
82:6 94:4 141:6 142:9,21
142:23,24,25 143:13,17
190:6 208:9 233:15,16,21
259:8,12,13 262:24 282:5
282:15 283:4 284:7 285:2
285:19 286:19
**Orders** 84:7

**ordinary** 28:10 231:4
**organization** 224:19,25
225:5,9,11,12 226:14
**organizations** 174:18,20
226:16,18,19
**original** 180:5 222:20
**originally** 204:8
**out-of-state** 260:23
**outage** 252:21
**outside** 118:14 247:11 251:2
**overall** 46:1
**overrode** 11:11
**owns** 264:4

**P**

**P** 2:12
**p.m** 1:17 223:23 227:16
240:20
**page** 3:2,11 4:2 22:5 27:10
33:21,25 34:1,2,4,12,16
61:23,24 62:1 64:3 70:5,8
70:16,22 71:4 72:17 73:11
81:25 82:4 83:16 88:16
105:22,23 106:8 107:4,5,5,7
114:23 117:22 147:13,24
148:19,21 150:7 151:22
167:13 175:3,15 181:17
182:1 194:7 196:2 224:5
227:18 228:5 231:25
252:18,25 253:2 254:6,9,10
255:14,15,17 265:14,15
**pages** 44:3 288:9
**panel's** 274:12
**Panhandle** 285:11
**paper** 262:6
**paragraph** 34:16 84:8 89:11
117:23 118:25 175:3
210:12 220:23 221:8 222:2
228:20 229:8 230:14 232:1
232:11 254:13 255:25
**paraphrase** 152:5
**parents** 260:15
**Park** 263:20 288:22
**parliamentarian** 209:24
213:3
**part** 37:25 47:20 83:5 86:1
108:24 116:5 147:16 161:2
167:8 175:16 176:8 177:24

178:2 182:16 188:19
201:18 211:23 231:6
257:12 262:20 272:10
279:17
**participate** 80:6 81:2
**participated** 38:23
**participation** 272:11,14
**particular** 9:12 14:21,25
15:4 43:5 51:5 53:2 59:9
64:21 66:22 69:11 72:8
80:17 110:16 195:23
196:21 198:15 199:21
200:11 202:12 203:7 205:4
205:7,22,25 211:5 246:12
257:1,5
**particularly** 179:6
**parties** 288:11,14
**partisan** 226:15
**partisan-type** 234:12
**party** 174:17 234:16
**pass** 59:20 69:20 102:3 103:1
103:4 116:15 152:24,25
195:18 200:3 206:12,13
232:21
**passage** 79:5 272:6
**passed** 20:6 69:17 98:14
102:6,14 164:10 181:22
202:24 203:6 246:17
257:25 268:1
**passing** 206:8 251:17 271:22
**passport** 28:18 182:22
**Patrick** 2:11 4:7 164:25
165:3,6,10,16 167:10,18,19
167:21 168:5,7 172:19
173:16 176:7 202:18
**Patriots** 225:7 226:11
**Patsy** 66:11
**patterned** 98:23
**penalties** 223:19
**pending** 171:6
**people** 24:19,25 31:15 35:3
45:24,25 46:6 54:15 56:12
60:5 62:19 79:8 96:6,8 97:5
104:11,19 110:21 127:10
128:21 134:20,23 135:11
151:3 162:19 170:6 187:24
191:18 213:16 215:25
217:18,23 221:21 241:17

244:13 249:17,20 250:1
251:24 258:17 269:5 270:5
270:16 271:7 280:24 286:6
286:8
**perceived** 42:15
**percent** 236:16 268:8,9,13,15
268:17,18
**percentage** 264:3
**perfect** 155:3 157:13 285:4
**performing** 110:12
**perils** 116:8
**perimeters** 236:18
**period** 18:7 23:3 74:23 75:10
183:21,23 231:3 234:24
**permitted** 251:1,4
**PERRY** 1:7
**person** 17:20 19:14 27:15
28:10,14,18 29:6 41:18
106:2,13,17 109:17 116:15
127:14,17,17,20,21,22
128:11 129:3,4 130:1,2,2
133:23 135:17 182:7,18,22
183:2 184:10 195:1,4
215:16 216:13 249:10,13,14
251:14 252:6,9 253:6,9
259:4 265:17,18,19
**person's** 28:5,9,15 29:3,8
79:10,11 106:8,13,18 107:8
107:14 121:19 122:16
123:5 182:14,19 253:8
254:16
**personal** 15:7 16:7 27:14
106:1 131:22 182:6 280:16
**personally** 16:14 145:4
**persons** 18:5 31:19 41:19
137:2 160:1 173:12 256:3
266:12
**pertaining** 123:4
**phased** 221:10,14
**phone** 19:22,24 208:2 227:3
**photo** 9:8,13 14:22 15:8 16:8
17:16 19:1,4 20:6 29:22
30:8,10 36:9 46:9 49:11,14
49:25 50:21 52:16 53:6
54:25 63:19 72:19 77:16,22
78:8,17 84:13 86:15 89:7
93:5 99:4 100:2,13,22
101:3,22 104:6,17 105:1,10

118:10 119:2,9,15,18 120:4
120:7,15,15,16 122:12,20
125:1,1,3 130:7 143:23
156:1,19 157:15 161:17
164:10,15,25 165:4,15,23
166:9 171:6 175:20,23
176:22 178:3 180:18,18
181:6 183:6,17 184:16,18
185:2,10 186:10 187:17
188:9 189:4 190:22 191:1,7
191:11 193:6 200:17,22
201:12,24 202:22 203:2,12
203:23 204:24 205:17
221:9 235:10,16 243:10,22
243:22 244:14 246:18,25
249:2 250:25 251:24 264:7
264:13 271:4
**photograph** 28:6,9,15 29:3,8
106:8,13,19 107:9,14 119:7
121:19 122:16 123:5
182:14,19 184:9 253:8
254:16
**phrase** 117:12
**picture** 259:18
**piece** 14:21 285:13
**pieces** 164:17
**piles** 242:13
**place** 44:15 48:17 51:21 52:6
66:3 70:2 74:22 103:14
112:2 126:10 132:4,7
133:23 137:15,18,22 138:19
139:6,6,21 141:11 146:25
148:9 150:24 223:25
230:17 274:11
**placed** 148:8,11 149:9,19,21
150:19
**places** 129:16 130:10 136:13
249:17 270:9
**plain** 162:17
**Plaintiff** 206:22,23
**Plaintiff-Intervenor** 206:23
**Plaintiff-Intervenors** 206:21
**Plaintiffs** 1:5,14 2:2 219:2
**plan** 210:17,22 211:1 212:21
213:2,4
**planned** 239:4,9
**planning** 213:18
**plans** 268:3

**playing** 232:5
**please** 10:7 34:2 73:3 115:9
  147:12 149:6 153:19 194:7
  216:4 220:19 230:14
  255:14
**plenty** 92:1 240:1
**Plus** 46:11
**point** 5:16 8:9,17 11:13 18:20
  18:21 31:6 35:20 38:10
  44:5 60:22 74:20 100:9
  126:15 148:5 160:6 162:16
  176:6 189:8 218:18 220:18
  237:1 251:17 268:23 280:9
**points** 6:5 134:11 217:4,6,8,9
  219:5
**policy** 176:10,13 177:15
  200:2 248:2,7,7,10 281:7
**political** 24:18,18,24 29:12
  106:21 107:15 254:19
  263:4 281:7
**politics** 128:21 176:12 226:19
  226:20
**poll** 126:22 134:12 135:5
  137:10,15,18 138:17 139:3
  139:11,13,14,16
**polling** 44:15 48:17 51:20
  52:6 103:14 112:2 126:10
  129:16 130:9 132:4,7
  133:23 136:13 137:15,18,22
  138:18 139:6,6,20 249:17
**polls** 36:24 45:4 46:16 48:6
  48:13 49:1,16 50:24 111:16
  112:7 128:11,19 129:13
  132:17 133:7,13 134:9,13
  136:2,6,7,10,17 138:23
  178:24 179:5,19
**poor** 53:7 140:25 141:4,17
  246:24 247:6,14,19
**population** 201:8,21 264:4
**Porter** 209:17 210:6
**portion** 246:18
**portions** 5:13
**posed** 151:6
**position** 12:9,12 40:13 50:16
  63:12,23 134:16 211:19
  241:21 249:2 250:13,15,19
  274:1
**positions** 53:18

**positive** 11:22 198:24 202:7
**possess** 163:4
**possibility** 59:14
**possible** 25:14 26:6,8 101:9
  101:17,19
**possibly** 6:18 140:24 141:3
  160:19
**post** 230:23,25 231:1,4
**Post-Holder** 279:12
**Post-Shelby** 281:12
**posted** 223:8
**posting** 223:9
**postmortem** 153:4
**potential** 212:20 213:2
**power** 136:14 252:21
**practical** 80:18 137:9
**preclearance** 101:22 102:4,7
  102:14 103:2,4 151:21
  152:21,23 244:24 245:1,4,7
  272:20 274:13 277:15
**predict** 158:18
**preferred** 205:7
**preparation** 12:18 117:17
**prepared** 13:23 95:8,10
  98:21 119:22 140:9 144:18
  187:1 188:12 191:10
  192:18,23 193:5 196:7
  233:6
**prepares** 158:11
**preparing** 145:5
**presence** 266:11
**present** 14:8 44:17 59:19
  65:23 66:5,18,22 67:15
  76:12 127:15 183:24 196:9
  249:10 281:3 282:14
**presentation** 27:17 106:4
  131:24 182:10,15,24 183:4
**presented** 51:14 57:8,15
  75:17 119:23 130:15 135:2
  147:21 150:24 164:7
  245:23 246:8,15 249:13
**presenting** 81:5,5 127:20
  177:21 223:18
**presently** 258:25
**presents** 129:3 207:20 285:13
**preserve** 127:9
**preserved** 50:19 232:3
**preside** 98:6

**president** 66:14 85:2,6,10,13
  85:18 86:4,8 87:16
**Presidential** 275:5 278:14
  279:3 280:15
**presiding** 207:22
**presumably** 219:2
**pretty** 96:14,15,18 98:1
  137:1 162:16 191:14 198:4
  235:14 237:2 242:3 264:2
**prevail** 62:13
**prevailed** 62:12
**prevent** 32:3 34:20 127:10
  178:23 179:4,18 250:4
  284:9
**prevented** 51:19 248:10,24
**preventing** 52:5 248:6
**previous** 10:16 12:19 26:22
  29:18 105:16 214:2 230:15
  230:19 232:2 248:9 249:5
**previously** 6:3 7:14 9:24 10:9
  10:12 20:18 26:13 27:7
  30:1 82:16 88:7,12 105:15
  114:5 115:5 140:3 181:15
  257:5
**primarily** 17:20 19:7 69:24
  97:8 98:5 126:14 131:21
  132:13 204:13 239:12
  260:9
**primary** 23:17 24:21 94:3
  110:13,14 127:12 185:22
  222:10 249:9 279:8
**print** 10:11
**prior** 12:20,22 22:24 25:25
  74:2,25 75:2,3 76:10 77:23
  78:14,16 124:25 164:13
  179:22 193:8 200:25
  201:11 236:6 240:14
  242:13 250:25 252:18
  255:21 261:1 271:22 275:4
**priorities** 280:8
**priority** 220:8
**prism** 103:21
**private** 29:1 30:8 120:8,17
  124:15 125:2,5
**privilege** 5:12,15,18 6:13,18
  6:22,25 15:19 24:11 37:1,7
  37:16,24 38:11,14,24,25
  39:1,5,8,17,22,25 40:1,10

43:19 46:18 49:18 51:1,23
52:8,24 55:17 58:13,18
59:4,16 76:25 77:6,20
78:25 79:25 85:21 93:23
96:24 98:24 99:17 101:5,14
101:25 102:11,16 103:6,15
104:9 111:18 120:11,20
122:1,9,23 123:9,18 124:2
124:19 125:20 143:12
156:6,24 180:1,14 181:3
184:24 185:6,14 186:18
188:16 189:16 202:1 204:2
221:17 247:24 253:22
255:11 256:22 258:20
266:17 270:3 276:13
283:19
**privileged** 24:10 37:21 38:1,7
**privileges** 6:19,22 136:14
**pro** 86:4
**proactive** 218:8
**probably** 14:24 20:11,14
24:9,12,13,15 25:17 41:14
41:17 47:25 56:4 75:9 77:2
86:5 96:25 100:23 108:12
108:18 113:14 121:3 122:2
124:10 130:20 136:23
144:22 146:6 148:12 151:3
155:15 161:25 190:13
191:24 199:23,25 211:13
214:16 218:18 222:20
234:23 235:2,2 236:22
238:17 239:1 249:2 250:8
259:24 260:2,13,17 263:23
263:25 264:23 265:3 268:9
268:15 272:24 277:12
282:19 285:24
**problem** 103:22 120:7 137:6
249:23 270:23 285:13
**problematic** 269:5,10,20
**problems** 116:7
**procedural** 20:25 70:1 74:8
213:16
**procedure** 1:22 66:2 87:1
**procedures** 87:9,23
**proceed** 5:22
**proceedings** 147:14
**process** 6:17 14:19 16:15,17
17:24 21:24 31:20 47:23

54:13 55:5,8,14 56:5,21,22
59:11 60:1,20 65:22 66:3
75:14 76:4 77:9,13 78:3
80:6 81:1 86:20,24,24 91:6
97:10 98:6,7 99:15 104:25
105:1 126:14 183:20,23
191:18,24 192:1,9,10
207:16 211:8 213:4,22
214:16,18 233:19 239:12,24
240:5,5,13 241:14,15 245:1
251:22 258:3 259:12
266:19 267:6 273:4,9 280:2
280:6
**processes** 41:19 58:20 249:16
281:4
**processing** 267:23 285:9
**proclamation** 207:10,19
**produce** 15:7 256:3 257:19
282:5
**produced** 1:14 14:25 15:3,12
15:13,20 16:4,6,9 49:13,24
140:16 153:17 166:19
194:4 218:22,25 219:1,2
258:1
**producing** 16:7
**production** 15:6 16:2
**Professional** 288:8
**program** 263:9,11 267:14
**progress** 20:9,13
**projection** 199:16
**promoted** 18:14,21
**pronounce** 62:22 69:4 169:25
**pronounced** 63:3
**proof** 44:17 182:2 223:18
**proper** 16:18 261:8
**proponent** 113:13 192:15
**proponents** 91:7 93:9 113:22
113:23 116:16 117:8,10
141:19 244:21 245:21
246:13
**proposed** 142:20 161:24
195:11
**proposition** 98:12 269:22
**prosecute** 128:18
**prosecuted** 48:12 49:15
112:1 187:15,24
**prosecution** 51:9,14 128:10
**prosecutions** 50:23 111:14

129:15,18,21 130:9,18
133:6,8,12
**prosecutors** 138:11
**protect** 103:18 273:14
**protected** 88:19,24 89:14
90:25 92:25 113:1,19 114:3
114:8,17 115:17
**protecting** 177:9
**prove** 103:14 120:1 127:18
128:15 133:1,20 151:19
152:19 251:21 280:22
**provide** 5:18 66:15 79:21
104:13 110:4,23 127:19
160:13,14 162:18 163:23
180:20,22 191:17 192:4
196:20 197:8,24,25 249:3,3
250:3,4 251:22 271:4 273:9
283:24
**provided** 11:8 18:2 34:19
51:11 120:23,24 121:23
151:23 155:10 161:13
163:13 197:4,14,21 264:7
264:13 265:11 266:3 273:4
283:5,7
**provides** 189:10 197:9 265:7
269:16 270:6 281:4 283:6
**providing** 8:3 51:8 223:18
251:23
**proving** 129:12
**provision** 43:16 51:18 78:5
106:23 108:11,25 118:8
120:14 121:24 141:7 197:4
203:7 204:5,16 221:13
222:16
**provisional** 183:14,19 270:25
**provisionally** 183:21
**provisions** 1:22 30:5,14
44:21 79:2 95:22 96:21
97:24 99:2 103:10,12 105:5
105:9 117:20 118:5 122:7
124:16 127:13 130:25
131:8 133:22 179:24
183:19 195:17 201:2 203:4
203:25 273:7
**public** 4:15 27:15 29:1,7 30:8
30:19,22,24 31:2,3,19,22
32:1,8,11,15 42:23 49:24
60:13 90:18 106:2,17

118:14 148:25 182:8 183:2
223:14,16 228:22,25 246:18
253:6 265:11 266:4
**publicly** 25:2 30:17,19
**pull** 250:10 282:9
**pulling** 117:13
**pure** 124:8 201:18
**purely** 124:6
**purpose** 9:10 30:17 31:7
110:13,14 127:7,9 150:25
152:3 159:20,21,22 160:3
229:25 248:6 265:20
273:15
**purposes** 249:22
**pursuant** 1:21 5:12
**put** 5:7,8 11:21 22:3 37:15
56:12,18 72:25 91:22 113:4
120:25 155:15 171:12
239:20 246:21
**Putte** 3:21,24 63:5,13,14,18
63:22 71:14 87:1,12,22
88:13,17 89:4 90:7,17,24
115:10,11 148:6 149:22
190:15,21 227:24,24 228:11
229:8 230:4,8,11 231:16
233:12 235:23 236:20
238:9,23 241:7,10,12
**Putte's** 112:18 114:13 115:15
236:11
**putting** 5:23 16:17 96:2

**Q**

**qualifications** 200:7
**qualified** 35:3
**qualify** 200:6
**quasi-judicial** 257:14
**question** 7:15,18 8:10 11:15
11:19 13:25 19:22 31:1
32:14 33:2,5 34:9,10,14
36:5 39:8,14 42:24 43:19
49:10 55:18 57:6 61:14
83:4,23 84:2,11 96:9,10,12
96:13 98:19 101:11,12
102:11 105:4 113:24,25
114:5 115:13 120:22
125:17 129:14 145:21,21,25
148:5 150:1 151:6,7,18
157:1,9,10,23,24 164:23

171:19 183:16 185:16,19
186:8,14 189:16 192:20
252:24 275:8 276:24
**questioning** 8:17 92:3
**questions** 8:6 9:4,18,21 12:17
14:5,13 60:20 96:6 97:5
110:18 148:2 155:23
206:25 217:12 218:8,10
223:1 251:11 264:24
284:17 287:7
**quick** 19:22 32:16 44:6
218:10 221:25 242:14
282:11
**quickly** 60:2 182:3 219:5
220:7 228:15 242:12 245:3
250:24
**quite** 19:23 87:18 261:2
268:22

**R**

**race** 152:3
**racial** 151:8,11,15 256:4
**rain** 274:21
**raise** 11:14 165:10 271:21
**raised** 90:23 110:18 114:16
118:22 125:24 134:11
148:25 155:22 190:25
204:4 230:4 233:12 276:1
**raising** 104:19 126:2 238:9
**range** 112:12,13,14 268:10
**Rathgeber** 208:18 209:1,15
209:19 238:1 240:20
**raw** 157:18 158:17,17,21,21
160:6 161:1,8,9,13,22,23
243:3,19,25,25 244:4,11
**RD** 82:22 131:11 261:10
**RD-1** 3:12 10:2,5
**RD-10** 3:22 94:18,21 95:14
140:4,14
**RD-11** 3:23 105:12,15
**RD-12** 3:24 114:25 115:3
**RD-13** 4:3 147:5,6
**RD-14** 4:4 153:12,15 242:19
**RD-15** 4:6 166:12,15,24
173:4
**RD-16** 4:8 171:16,19,21
**RD-17** 4:9 181:8 265:6
**RD-18** 4:10 193:19,22 194:3

208:6
**RD-19** 4:12 208:10
**RD-2** 3:13 20:15 43:11
**RD-20** 4:13 215:3
**RD-21** 4:15 223:2,3
**RD-22** 4:16 227:9
**RD-23** 4:18 237:13
**RD-24** 4:19 252:13,14,16
**RD-25** 4:20 261:12
**RD-3** 3:14 26:10 27:8 43:13
44:12 51:18
**RD-4** 3:15 32:17,20
**RD-5** 3:16 61:6,9 68:3 70:4,5
70:7,13,20
**RD-6** 3:17 72:23 73:2,4,10
**RD-7** 3:18 81:11,14
**RD-8** 3:19 82:20
**RD-9** 3:20 88:4,7 112:19,20
**reach** 214:5 241:19 269:14
**reached** 240:4
**react** 272:25
**reacted** 273:17
**reactive** 218:9
**read** 12:19 13:7 22:13 44:23
48:8 73:17 87:9 90:4,5
100:24 101:11,12 116:3
128:23,24 148:6,8 149:3,10
151:2 152:6 167:8,9 172:11
183:8 184:6 200:19,20
207:10 210:14 216:3,5,19
216:22 217:2 232:12 244:3
253:13 255:1 256:7 272:23
277:10,12,12,13 284:23,24
**reading** 23:15 26:23 28:1
30:14 33:3 43:22 44:6 62:3
62:8 149:16 173:24 187:7
216:23 262:6 272:22
281:19 282:16
**ready** 26:15,16 112:12
**real** 32:16 137:5 221:25
228:15 249:23,23 268:19
**realistic** 42:16
**reality** 136:19
**really** 13:18 21:13 30:25 31:8
36:10,10 54:22 57:17 59:5
59:8 70:12 89:16 94:15
109:15 135:6 177:2,5
191:22 235:14 237:1 240:2

249:1 271:18 274:19
283:20 284:3
**reapportioning** 159:23
**reason** 8:21 21:25 23:22
31:21 32:5,7 35:7 44:10
45:21 50:14 60:6 67:5 77:4
77:7 78:20 80:8 84:16
107:25 108:20 118:8
123:15,23 129:6 133:13
177:15 207:12 231:17
233:10 249:6 251:25
258:14 270:7 280:7 284:4
**reasonable** 107:20 118:1
137:9,9 240:11 251:25
**reasons** 3:22 42:1 53:18 79:4
79:5,8,10,12,15,17,21 86:5
93:25 95:6 124:9 125:7
127:2,5 187:3 256:25 257:2
**recall** 11:1 16:7,13 17:7,9
20:6 23:6,7,10,13,15 24:3,5
25:9 26:21,23 27:20 31:3,9
35:10,25 36:4,6,12,18,22
37:3 41:15,21,23,25 42:3,9
45:6 48:3,14 53:4 57:7
59:17 60:8,22 63:14,18
64:10,20 65:14,18 66:17,20
66:21 67:1,14,18,19 68:10
68:13,16,17,17,19 69:1,6,14
69:16,17,20,25 70:1,2 71:2
72:19 74:13,21 75:20 76:14
76:20 78:8 80:1 81:7 86:14
87:15 89:15,17 91:17,20,20
95:3,4 96:3,5,6 97:12,15,19
97:23 99:19,21 100:1,4,6,7
100:11,13,19,20,21,23
101:16,19,21 108:16,17,18
108:19,20 110:16,17 113:9
113:13,15 114:9,12,15
117:7 119:25 123:10
125:22 126:17,20,25 127:2
127:5,7 133:5 134:9,13
135:19 139:23,25 140:6
141:12 142:7,13 144:10,12
144:13,14 146:9,10,14,20
154:10,14,16 155:14 156:12
158:12 163:15,19,22,25
164:6,24 165:2,19,19,21,22
166:4,7,7,11 170:25 173:19

178:19,21 179:2,7,9,11,16
180:7,8 186:3 187:2,3,5
188:18 190:11,15,18,18
199:9,12,13,15,16 208:3
212:3,7 213:6,8,11 214:7,11
214:22 215:24 220:2
221:18,19 224:1,8,12,17
228:24 229:4,14,24 231:14
234:10 235:9,15,22 236:4,8
236:13,22 238:7,12,19,24
239:8,10 241:11,14 242:6,8
242:20 246:6,14,21,22
247:7,9 251:14 253:20,24
254:2 255:8 256:19 262:5,6
266:9 271:24 272:1,2,3,22
273:20 275:10,11 276:14,15
276:19,22 277:5 278:11,12
279:22,23 281:17,19 283:14
283:15,17 284:13,25
**recalled** 88:13
**recalling** 117:13
**receive** 56:10 138:10 260:14
260:15
**received** 20:7 22:10,11,25
25:25 35:24 41:5 55:24,25
73:14 170:22 193:15
226:24 227:13 238:8
247:25
**receiving** 34:18 35:25 36:4,6
40:24 63:14 87:15
**recipients** 173:11
**recognize** 20:22 21:11,16
25:21 26:17 73:7 94:25
95:5 170:12 181:11
**recognized** 60:24 121:2
232:22
**recognizing** 285:14
**recollect** 250:10
**recollection** 23:19 25:12 26:3
31:15 35:14,19 36:15,17,21
40:24 41:4 42:13 46:11,20
46:24 47:5 48:10,25 49:3
49:12,19,21,23 50:10 51:5,7
51:13,16 52:18,25 57:14
58:10,25 59:9,13 61:4 63:9
63:10,24 64:13,23 65:1,4
67:17 68:23 71:5 81:16
83:25 86:14,18 95:9 97:1

99:13 108:3 109:5,5 126:2
126:5 130:23 139:18
144:23 146:24 148:23
151:14 155:20 163:9
164:19,21 170:21 175:10,18
175:23 179:21 185:21
197:18 230:18
**reconstruct** 283:21
**reconvened** 123:13 150:20
**record** 1:22 5:8,8,10 7:3,19
8:3 12:5 21:23 24:23 25:16
25:19 26:5,23 27:1,6 31:7
31:17,18,22 32:1,8,11,16,22
32:23 33:6 35:15,16 36:16
37:15 38:21 40:19 42:9,12
42:23 48:1 49:20,24 50:5,6
50:6,8,13,14,17,18,19 51:3
51:4,15,16,17 52:10,19 53:1
53:9 54:17 56:13 57:4,11
58:4 59:10,11 60:4,13,17
61:3,13 62:5,11,12 63:25
64:24 65:9 67:12,17,25
68:17,20 69:9,10,21 70:21
71:10,19 72:9 73:18,19
78:1 79:4,12 81:22 83:5
87:10,11 90:6 91:22,24
92:4,9 94:8,10,17,22 102:1
108:18,23 109:8 112:15,18
113:8,13,21 114:11 115:4
117:3,12,15,15 118:14,18
118:19 120:1 123:1,20,22
124:11 125:25 126:6,17
130:14,16 131:7 133:10,11
134:4,6,7 135:10 139:23
141:12 142:5,7 143:3,5,6
144:23 146:19,20 147:1,4
147:12,14,19 148:7,9,10,12
149:1,1,8,10,15,16,19,21,23
150:6,14,19,25 152:15
153:5,15 155:16 163:16
164:8 165:25 166:1,17
167:13 171:10,14 176:2,14
181:14 185:7,24,25 186:20
186:22 187:19,21,23,24
188:18,19,20 189:2,9,25
191:3 192:13 194:3 199:17
218:14 224:16 231:5,6
233:2 236:24 240:9,10

**CONFIDENTIAL**

242:16,18 246:15,16,22
247:9,10,11 248:1,14,15
251:15 252:3,4,5,20,22
254:1 259:14,15,17 260:16
274:23 284:16
**records** 16:22 78:2 176:2
188:2 227:4 245:24 260:16
**Rector** 2:8
**redistricting** 152:3 158:9,24
158:25 159:8,18 220:4
221:1 234:11 235:3,5,16
**reduce** 20:2 272:10,13
**refer** 51:4,17 57:4,11 69:9
73:25 74:18 79:18 85:5
108:23 123:20 125:25
126:6 185:25 191:6
**reference** 112:22 127:4
282:20
**referenced** 173:20
**references** 82:2,6
**referencing** 28:19 46:14
48:24 178:24 183:12 198:9
245:4
**referral** 74:6
**referrals** 138:10
**referred** 22:16,24 45:7,13
46:9 73:21 74:10 78:12,17
78:22 79:22 80:12 110:11
143:19,23 144:3 190:3
**referring** 68:1 74:11 106:8
107:5 118:15,17 121:17
131:8 162:6 173:7 210:23
213:1 220:18 221:3 238:20
274:7
**refers** 236:6
**refiled** 180:6
**refiling** 180:9
**reflect** 25:2,16,19 31:17,19
35:15,16 50:5,15 52:19
53:1 58:4 64:24 69:11,22
72:10 91:22 92:4 108:18
113:8,14,21 114:11 117:13
136:3 139:23 141:13 147:2
148:13 185:8,24 199:17
224:16 230:18
**reflected** 47:4 109:7 113:24
133:11 164:8
**reflects** 23:25 24:3 35:6 48:1

53:9 60:4 65:9 67:18 71:11
73:19 117:3 176:6 233:2
**reform** 217:16,17 218:18
**refresh** 23:19 61:4 65:4
68:21 71:5 81:16 83:25
95:9 108:3 148:23 170:21
175:10,18 264:23 278:10
**regard** 14:19,21 98:19 101:3
102:2,3 103:20 108:13
118:23 126:6 127:19
155:24 157:21 158:9 160:5
160:17 177:9,25 183:14
184:2 188:17 189:10 202:8
204:4 217:12,17 219:15
232:19 236:24 257:10,14
266:12 270:17
**regarding** 5:6 6:11 11:14
12:17 13:2 15:6 21:22 23:1
24:6 25:10,19 26:1 31:4,7
33:11 35:11,12,23 36:7,23
37:5 40:25 42:4 45:3 47:1
47:24 51:9 52:15,20 54:3
55:12 57:2 63:15 69:7,15
71:6 74:17,18 75:4 76:11
76:22 79:17 86:10 87:22
99:14 100:8 101:22 108:10
108:21 114:16 126:8 133:5
138:12 139:19 154:18
164:25 165:15,23 166:9
175:11,23 179:23 201:12
205:3,16 228:24 242:22
263:4 266:13 276:10
**regardless** 244:19
**regards** 226:8
**register** 34:18 67:9 261:7
273:11
**registered** 71:13 130:2
135:17 144:20 151:9,11,16
160:21 163:3 164:3 199:6
243:4,9 244:8 288:7
**registers** 135:5
**registrar** 154:20
**registration** 34:19 103:20
127:11,15,21 128:7,12
132:22 135:18 145:2,16
146:2,15 148:24 150:2
154:22 177:18 248:13,24
249:7,10,21,22 251:16

269:5,8 273:10
**registry** 259:19
**regular** 21:5 60:24 62:6,16
63:8 64:4 65:16 66:23
67:23 68:7,14 69:15 71:3
71:21 72:1,2 73:6 80:10
83:13 97:2 142:9,21,23
145:5 216:16 233:16
275:18
**regularly** 121:2 217:5
**reiterate** 228:21
**relate** 42:10
**related** 6:16 10:16 13:15 16:8
36:9 42:3 44:16 45:5 48:3
50:15,21 52:3,16,21 54:4
55:11 57:3 59:2 60:9,12
63:19 66:4,22 67:20 69:24
84:3,8 86:15 87:16 93:5
100:2,4 101:9,21 108:11
109:2,12 111:11 112:2
118:13 119:15,18 123:4
125:14,18 126:8,21 127:5
129:15 132:12 140:24
146:1,14 154:15 156:14
158:5 159:16 175:20
176:11,11,12 179:8,12
180:8 181:23 186:23 187:9
188:9,11 196:7 205:22,25
214:13 235:10 243:24
275:22 280:5 288:11
**relates** 52:16 63:12 84:5 89:6
111:19 113:18 119:6,9
152:25 178:3 233:19
**relating** 165:17 176:12
223:17 225:18
**relationship** 231:15
**relative** 117:2 288:13
**relay** 54:16
**relevance** 246:5 247:25
**relevant** 160:1 167:9 247:21
**reliable** 156:19
**religious** 184:3,4,8 202:22
**rely** 23:21 30:2 50:8,13 56:6
79:4,11 116:21 224:11
229:6
**remember** 10:20 13:14 14:23
18:23,24 23:3 36:11 61:1
63:11 65:1,2,12 66:25

75:22,24 76:1 109:4 113:6
118:19,20 126:12 142:6,11
142:13,15 146:4 150:18
156:16,17 176:3,3 179:14
184:15 186:1,2,5 193:11
197:12,12 204:10 221:22
224:14 225:17 226:5,9,10
226:13 233:24 234:1,7,18
234:20,25 235:3,5,13 236:1
238:24 239:1,21 251:3
256:25 261:16 275:6,24
**remind** 278:17
**reminded** 11:3 59:10
**remote** 286:3
**remove** 189:19
**removed** 203:7,9
**removing** 122:7 185:23 187:3
**rendition** 5:21 16:3
**repeat** 33:5 113:24 179:1
  264:11
**rephrase** 8:10,12 120:12
  269:17 274:17
**rephrased** 111:4
**report** 4:20 46:22 47:1,16,18
  47:24 48:1,3,8,8,10,16,18
  48:24 66:14,14 109:24
  110:4,14,14,24 112:5 125:9
  130:15 144:19 191:13
  192:18,22 193:4,7 257:19
**reported** 1:18 84:9 110:7
**reporter** 1:17 5:1 6:3 7:8,12
  91:23 101:12 172:13 215:1
  227:7 252:12,23 288:6,8
**Reporter's** 3:8 288:3
**reporting** 257:11 288:21
**reports** 111:5,9,13,24 112:23
  112:24 119:5,14,16,22
  120:3 125:13 134:15
  141:14 142:3 188:11
  191:10 192:18,23 193:4,13
  271:7,10,10 276:3,6
**represent** 65:3 134:19 135:24
**representation** 21:21 41:2,3
  70:24
**Representative** 31:4 32:2
  34:5,8,9,10,13,13,24 285:10
**representatives** 23:2,8 33:9
  34:25

**represented** 14:1,3 127:17
  286:14
**representing** 127:21 206:21
  232:4
**reproduced** 15:14
**Republican** 167:11,24
  168:17 169:3 174:3,17
  226:18
**request** 16:1 17:1,7 67:20
  68:4 89:10 91:16 114:16
  197:20 242:22 244:16
  276:22,23
**requested** 16:9,23 89:2,4,8
  89:12 96:21 146:7 154:21
  243:13 276:6
**requesting** 88:23 189:11
**requests** 16:16 87:13 145:6
**require** 75:18 94:4 103:13
  104:17 116:2 128:16 129:3
  181:5 230:22 233:17,23
  257:13 267:9,10 283:9
**required** 15:17 53:6 71:17
  77:17 79:22 122:4 130:1
  142:22 143:14 144:20
  152:9 164:4 181:6 184:18
  201:6 221:10 257:20 267:4
  267:18,19 282:13,14 285:19
  286:22
**requirement** 115:23 135:16
  248:5 250:1 251:23
**requirements** 84:9 102:4,6
  102:25 103:11,17,24 160:2
  198:2 223:17 256:2 264:22
  265:8 270:23 273:13
**requires** 34:17 132:21 257:12
  264:7,12 266:25 282:23
  283:3
**requiring** 44:16 135:14
  248:23 284:7
**research** 76:16,21 78:2 84:17
  191:16
**researching** 18:1
**residency** 261:8
**resigned** 12:7
**resolution** 74:12 79:5 81:17
  82:9,10,13 83:16,19,22 84:3
  84:8 93:16,21 143:2 190:7
  190:11,13,16

**resolve** 53:16 75:17 190:8
**resolved** 201:22 270:19
**Resolving** 221:4
**resource** 96:11 216:13
**resources** 110:11 191:15,17
  202:3
**respect** 37:21 38:13 39:6
  76:23 231:16
**respond** 41:19 77:1 115:14
  163:12 177:4 179:13
  217:11
**responded** 58:11 235:22,24
**responding** 41:9,13 114:12
  179:11 217:11
**responds** 151:7
**response** 5:18 32:14 88:21
  91:10 114:19 157:19
  163:19,22,25 267:21,22
**responsibilities** 17:22
**responsibility** 41:11
**responsible** 41:8,12,16
**rest** 237:23
**restate** 65:25 145:25
**restrict** 269:19
**restrictive** 99:16 101:2
**result** 63:20 129:16 132:16
  141:3,16 156:2 184:11
  232:7
**resulted** 74:9 156:20
**results** 48:4
**retirement** 217:16
**retrogression** 245:10
**return** 112:17
**reveal** 13:20 14:6
**review** 11:7 12:22 31:6
  115:18 131:3,4 167:1 183:7
  191:18 216:19
**reviewed** 12:24 14:15 31:9
  117:14,17
**reviewing** 20:21 26:16 32:25
  43:21 71:10 73:4 82:25
  83:3 88:11 94:24 100:13,21
  115:20 131:6,14 146:14
  147:10 148:4,22 149:7,12
  166:23 176:15 181:13
  183:9 184:8 193:24 203:1
  208:14 216:21,25 228:16,18
  229:3 237:17 282:16

283:10,11
**revolve** 226:19
**Rick** 1:7 23:15
**rid** 232:16
**right** 7:2 12:15 21:8,10 27:4
28:24 71:24 72:18 75:9
78:13,15 79:20 80:15 85:3
85:12,14 90:8,15,19 92:20
96:11 97:21,22 98:11 99:8
107:11 109:25 112:8,10
114:4 119:4 120:6 136:7
139:17 140:2 142:19 144:7
150:15,18 152:18 153:24
159:7,9 166:6 183:14,22
184:14 186:15 188:8
197:11 200:19,20 208:22
211:12,16,20 212:25 213:23
218:2 220:11,14 230:2,12
232:9 235:11 238:6 239:5
240:16,18,21 244:11 248:11
248:19 249:8 253:12,15
256:9 257:8,8 261:19 263:3
265:16,24 266:4 268:4
269:6,7,9,19,23 270:16
273:9 274:21 277:8 278:2,3
278:5 279:6 284:22
**right-hand** 21:7,9
**Rights** 88:19,25 89:14 90:25
93:1 102:25 103:11,24
113:1,18,19 114:3,8,18
115:17 160:2 245:7,11
272:20 274:4
**risk** 129:24
**risky** 137:1
**Robert** 1:10,13 3:4 6:2 10:9
27:8 170:16,16 288:4
**Robinson** 209:16,25
**robust** 230:20 240:8,14
271:17
**rocket** 160:12
**role** 18:4 58:9 141:18 177:9
215:19 220:17 232:5
**roll** 56:2 66:9,18 71:11 72:6
227:8
**room** 1:20 177:22 240:23
241:2
**Ross** 2:7 3:6 206:17,20
208:12,22,25 214:24 215:2

215:5 221:19 222:13,16
223:2,5 227:6,8,11 233:25
234:1 237:11,15 242:15,18
242:19 252:4,5,11,13,16,22
252:25 253:24 255:13
258:23 261:14 262:18,20
266:20 267:3,8 274:21,22
274:24 276:19 282:11,12
283:1,2 284:6,14,16,19
286:7,22 287:2,6,8
**roughly** 268:8,19
**round** 126:19 285:2
**routinely** 223:13
**Rs** 172:18
**rule** 75:2,3,5 76:3,10,12,22
77:5 79:2 81:17,19 82:2,7
84:6 143:13,14,17,20,21
232:4,17,21 233:13,20
**rules** 1:21 3:18 5:5 7:6 74:3,6
75:11,14 78:4,5,21 79:6,17
80:11 81:15 84:12 90:17
230:22
**run** 154:25 156:14 158:6,16
159:16 161:5 212:23 213:7
280:4
**running** 37:12 39:4,15 40:15
40:20 213:14
**rural** 267:7,23 285:9 286:3,4
286:13,14
**Ryan** 194:11,16

---

**S**

**S** 3:10 4:1 288:22
**S-E-L-I-G-E-R** 172:20
**safely** 136:24
**Safety** 27:15 29:7 106:2,17
182:8 183:3 265:11 266:4
**sake** 24:22,23
**San** 216:11
**Sarah** 216:11
**satisfy** 102:4 198:1
**satisfying** 103:11 265:20
**saw** 134:24 148:11 215:8,9
225:25 283:12
**saying** 37:19 59:5 89:25
100:7,16 105:8 116:6 133:2
159:11 161:8 162:7 165:20
176:24 179:13,14 229:19

235:5 244:3,8 248:19,21
**says** 28:2,2,2 34:17,23 61:19
89:16 90:1,14 115:21 152:5
156:9 175:5 176:16 178:8,9
211:11,14 212:17,20 213:7
214:4 219:6,19 220:10
222:15 224:5 227:15 228:2
228:20 229:8 230:14 232:2
232:12 238:4,16 239:3
240:22 243:25 253:5,12
254:13 255:25 258:7
262:16,22 263:3 265:16
**SB** 3:22,23 4:9,18 6:12 72:19
73:8,10,21,25 74:17,18
77:24 78:21,22 79:17,22
84:4,18 91:18 94:2,6,14
95:6,18,20,23 96:1,3,22
97:13,16,19,24 98:13,23
99:7,14,23 101:2,21 102:5
102:13 105:24,25 106:6,11
106:15,24 107:2,7 108:11
108:21 109:11 112:2
113:10,11,16 114:6,7
117:11,19,23 118:6,9 119:1
120:18 121:17,21 122:7,12
122:15,22 123:16 124:16,24
124:24 125:3,18,23 126:8
127:5,8 129:9,10 130:4,25
130:25 131:1,8 132:3,6,12
133:4,21,22 140:24 141:2,9
141:16 142:8,9,10,15 143:9
143:22,22 144:12,20 151:19
152:19 153:23 160:22
163:4 164:4,9,9,13 171:8,22
175:25 176:4 178:22,25
179:3,17,22,24 180:5,6,9,11
180:12,17,19,20,22 181:1,2
181:11,11,17,24 182:5,12
182:17 183:16,25 184:22
185:3,4,11,12 186:11,12
187:10 188:11,13 189:2,2
189:13,20 190:3,25,25
191:8,9,9 192:24 195:5,9
197:3,9,21 198:22 199:7,22
200:9 201:1,12,14 203:1,4,8
203:11,25 205:3,4,8 207:4
221:20 224:6 226:2,8,14
230:6 233:4 240:15,17

243:5 244:24 245:18 246:1
246:17 247:22 249:6,7
250:13,16,19 253:5,25
254:14,25 257:20 258:17
264:7,12 266:7,20,25
267:18,19,21 268:1 269:13
269:21 271:3,22 272:6,7,10
272:19 274:13,24 277:19
281:10,10,17 282:1,9,23
283:2 285:2,19 286:22
**schedule** 91:14
**scheduled** 96:7 223:22
**scheduling** 17:25
**scholarships** 259:25
**school** 260:12,12
**scientist** 160:12
**Scratch** 262:18
**seal** 5:14,24 37:17 38:5,15,18
38:25 288:16
**searched** 17:9
**season** 279:8
**second** 16:2 42:18 62:3,8
68:13 69:14 71:2 72:3
74:14 76:23 83:9,16 143:4
167:8 187:7 210:11,12
228:5 229:7 232:1,11
237:24 242:14 252:2
**Secondly** 157:23
**secretary** 16:10,11,12,12,20
16:25 66:8,10,11,18 67:8,11
73:15 87:3 138:11 144:17
145:1 148:15,16 149:18
151:8,11,15 154:9 155:18
156:4,13 157:5 201:7,19
202:3,9 205:16,18 242:25
257:7,18 258:12 262:3,22
**Section** 27:10 28:3 102:4
107:2,5,6,6,7,12 182:1
183:11 245:7,11 252:19
253:2 265:7,13,20,21
272:20 274:4 277:15
**security** 99:15
**see** 21:6 22:17 27:3,11 29:10
29:13 33:14 34:4,8,10,12,17
34:21,24 35:5 43:15,22
44:4,6,20 61:20 62:3,8,10
62:15 63:17 64:2 68:17,23
69:10 70:5,14 73:22 80:21

83:9,18,22 88:20 89:1
100:10 109:19,21 114:19
120:7 136:1,19 137:5,5,7
151:2 152:18 154:6,22
155:1,8 164:22 167:15,17
167:20 168:9 171:2 175:7
176:2 177:13 179:9 181:17
193:25 195:7,13,18,22
196:21 198:15 199:1
200:11 201:9 202:5,7,12,23
209:9,14 210:11 212:20
213:24 215:25 221:11
222:9 223:7,12 224:4
228:17,20 231:25 232:10,13
237:24 238:15 239:3,8
240:19,24 246:5 252:19
253:10,12,16,18 254:6,10
254:13,18,21,25 255:4,6,13
255:22 256:6,7,12,15 269:8
**seeing** 88:13 95:3,4 137:8
140:6 156:11,12 163:19,22
163:25 170:25 198:11
246:6
**seek** 145:10,16 146:1 154:8
164:2 275:25
**seeking** 244:24
**seen** 13:19,19 32:11 95:2,4
98:21 167:2,3 170:22
195:20,25 212:9 215:7,10
223:5 225:2 237:20 270:21
280:8,8
**self-proved** 120:25
**Seliger** 169:20 172:19
**senate** 3:16,18,19 4:3,15,19
6:9 16:13,20,25 17:15 20:7
21:22 22:10,14,22,24,25
24:2 25:25 35:10,11 45:3,8
45:9 50:22 53:14 55:1,12
55:23 56:9 60:9,23 61:16
64:2 66:10,11,15,19 67:8
68:3 69:18 72:8,21 73:5,15
74:2,3,9,11,16 75:1,22 76:3
79:3,5,7,13 81:2,15,17,17
82:9,10 83:5,8,15,18,22
84:2,3 85:2,10,11,13,18
86:3,8 87:4,16 88:23 89:24
90:3 92:24 93:11,16,18
94:5,9 96:1,3,16,22 97:13

97:17,25 98:15 99:14 101:9
102:20 105:18 108:13,14
109:13 111:5,9 112:25
113:3 115:24 116:6,12
119:6,22 123:11,13 125:9
125:14,24 129:7,8,8 130:16
133:25 141:6,7,11,23 143:1
147:14,16,25 148:25 149:20
150:20,20,21 151:19 152:14
152:19,25 155:16,23 161:17
162:9 163:2 164:7,10 166:9
168:6,7 172:21,21 173:13
187:6 188:12,19,20,25
191:10 192:3,24 193:14
196:8,10 198:2,18 200:12
203:17 204:22,23 209:24
211:23 215:16,19 219:8,17
219:21 223:17 234:6,7,19
240:8 241:24 252:16 253:1
269:15,15,18,23 270:23
271:12 273:6,17 274:1
275:24 276:4 278:1 280:6
281:3,8
**Senate's** 21:17,19
**senator** 1:10,13 3:4,12,21,24
3:25 4:7 5:2,11 6:2,6 7:1,6
12:5 15:13 24:1 36:23 60:9
60:23 62:6,19 63:14,18,22
64:8,9,15,18,21 65:5,15,23
66:3,17,21 67:1,6,14 68:5,6
69:2,2 71:11,15 72:3,4,20
76:14 79:16,21 85:6,7 87:1
87:3,12,22 88:13,17 89:4
90:7,16,23 93:4 97:20,23
104:12 105:19 112:18
114:12 115:5,11,11,15
126:2 131:7 148:6 149:21
164:25 165:3,6,10,16,22
167:19,20 168:5,12,15,17,21
169:1,3,8,10,13,17,23,24
170:4,8,19 172:10,10 173:2
176:7 178:6 180:4 190:15
190:21 195:1 199:19 201:6
202:18,18,18 204:8 206:18
210:9,15 211:14 214:8
221:17 227:24 229:8 230:4
230:8,10 231:15 232:6
233:12 235:23 236:11,20

238:8,22,23 241:7,12
253:13 254:10 255:1,24
256:8 284:19 285:7 288:4
**senators** 24:6 36:12 55:5
64:3 71:25 80:16 95:16
111:14,25 112:25 119:17
167:23,24 172:8 173:17
175:20 178:2,5,7 193:5
204:20,22 229:10,12 230:5
230:16 232:4,15 233:3
276:10,20
**sense** 66:5 135:13 160:11
176:9 207:9 249:25 268:22
270:4
**sent** 13:11 163:19 167:23
208:17 212:16 230:12
238:1
**sentence** 116:11 140:8 232:2
232:11
**sentences** 250:8
**September** 270:13
**sergeant** 87:4
**seriously** 236:10,12
**serve** 84:20 147:2
**served** 86:3
**service** 6:24 21:15 218:16
**services** 46:5 56:24
**session** 19:9,23 21:4,5 23:4
56:4,10 61:17 73:6 75:9,12
80:21 83:13 86:4 98:15
102:17 171:1 191:21
219:18,24 220:25 221:5
230:15,19,24 239:21,22
275:18 277:17 285:7
**sessions** 42:2 232:3 275:19
**set** 13:4 87:8 91:6 223:21
280:8
**setting** 97:10
**seven** 58:1,21 126:23
**seventh** 287:1
**shake** 280:24
**Shapiro** 168:19,21 172:20
**Shapleigh** 63:5 68:5,6 69:2,4
71:14
**Shapleigh's** 71:12
**share** 76:21
**Shelby** 274:9,13 277:3
278:13 279:12 281:15

**shop** 285:25
**short** 5:10 60:16 112:16
189:24 206:11,15 235:14
242:17 284:15
**short-fall** 220:3
**shorter** 148:7,14,15 149:17
151:7,23 242:6
**Shorter's** 151:13
**Shorthand** 288:6
**shortly** 274:3
**show** 10:4 20:17 51:17 68:20
70:12 81:13 82:16 88:6
132:23 140:3 153:14
193:21 200:5 221:24
248:23 259:16 261:10
282:24 283:4
**showed** 13:1 61:3 71:4
283:11,12
**showing** 21:1 26:12 32:19
61:8 94:20 105:14 166:14
181:10 257:19
**shown** 245:25
**side** 91:6,21 142:2 192:14
258:7
**sides** 111:1
**sign** 24:20 215:11
**signature** 10:22
**signed** 10:20 181:17 203:1
227:17 268:3
**significant** 139:5 186:6
195:13 220:1 270:15,22
**significantly** 97:4
**signs** 207:19
**silently** 216:19
**similar** 89:3 99:1,3,10,10
152:4,8 158:23 159:5,11
164:17 204:24
**simple** 129:6 251:23
**simplest** 129:2
**simply** 21:23 161:22 219:23
281:2
**single** 173:23
**sir** 7:24 8:5,14 10:1,14 11:9
11:11 12:21 14:14 21:5,10
22:18,20 24:4 25:8 26:18
27:5,9,12 28:12,16 29:4,11
29:14,17,20 30:6 31:5,8
32:24 33:15,15,19 34:7,15

34:23 36:10 37:2,8 43:10
44:11,19 45:10,12 47:10
55:10 60:11 62:4,9,18,25
68:9 69:5,8 72:15,22 73:23
81:18,24 82:8 83:7,11,14,20
83:24 84:1,21 85:4 88:15
90:10,13 93:19 106:5,10,14
106:22 107:17 114:14,14
118:12 131:9 132:5 147:17
154:23 155:2,9 164:12
168:3,8 171:25 181:25
182:11 190:5 194:2 195:15
195:21 197:2 205:1 212:15
220:12,15 221:2,7 226:7
227:21 238:3 239:7 242:21
245:9 253:4 254:22 255:16
256:11,14,16,18 261:20
274:10 281:14
**sit** 35:18 48:11,23 49:23
50:10 57:12 58:1 72:13
91:21 113:15 117:9 122:5
123:14,22 124:13 126:4
130:4 135:19 139:25
152:16 156:16,18 163:18
184:25 185:7,20 186:14,21
188:5 189:8 193:10 218:6
**site** 261:18
**sitting** 51:25 61:1 95:12
101:6 114:9 146:13 179:20
186:24 187:1 218:5
**situation** 39:9,20 136:22
**situations** 249:20
**six** 55:22 58:1 126:24 259:21
**six-day** 183:23
**Slager** 169:19
**slipping** 229:13
**slow** 172:13
**small** 10:11
**smoothly** 213:10
**society** 270:5
**sole** 129:6 273:15
**solid** 81:8
**solve** 285:12
**somebody** 21:14,15 135:2
153:3 162:8 165:13 196:6
**sorry** 11:11 21:9 33:5,23 34:2
34:9 42:8 44:2 61:22 68:2
70:4 75:25 82:3 85:9 89:20

92:20 99:25 104:1,5 107:6
113:10 119:10,11 124:3
125:16 136:6 150:16 161:3
167:5 172:15,24 173:15
192:20 195:24 196:16
199:11 200:19 205:10
208:5,25 216:24 219:5
222:14 227:22 228:1 232:9
242:15 244:2 250:7,23
255:25 260:24 262:18
264:9 265:14 274:20,22
275:15
**sort** 15:11 56:11 127:19
134:22 136:4 176:11 200:6
213:17 224:4 226:13
234:17 236:25 237:24
241:19 249:17 267:23
273:5 280:23
**sorts** 177:11 230:21 231:13
**SOS** 154:4,19
**sought** 146:10 155:18
**sound** 239:6 277:8 286:10
**source** 13:10 140:11,13,13
**South** 1:20
**SOUTHERN** 1:1
**Spanish** 144:19 145:2,17
146:2,15 148:24 150:3
158:6,14 160:20 161:4,5
163:13 164:3 243:21 244:9
244:13 245:25
**Spaugh** 66:11
**speak** 14:9 49:20 51:15 94:9
94:11,11,15 146:12 191:8
204:15 224:14 246:16
248:15 262:9
**speaking** 11:15 114:2 135:25
**speaks** 48:8
**special** 74:4,6,17,25 75:13
76:3 78:3 79:2 80:9 81:1,21
82:6 84:7 94:4 138:7,9
141:6 142:24,25 143:13,17
190:6 233:15
**specific** 14:6 19:6 31:14
35:14,19 36:16 49:23 53:12
58:4,5 76:4 84:7 86:7,17
89:9 93:13 96:25 100:11
112:4,6 114:9 117:7,10
126:5,12,20 129:14 133:3

134:24 138:13 142:3 144:2
145:16 155:20 164:19,20,22
185:21 187:3 189:9 193:13
213:11 246:11,20 247:9
280:17
**specifically** 19:3 27:10 31:16
35:23 44:14 46:14,23 58:8
63:13,16 68:6 78:16 80:1
81:19 84:13 89:12 90:14
96:21 97:15 111:5,19 113:6
114:1,2 115:13 119:16,23
120:4 121:17 124:24 126:1
126:17 131:15 139:23
141:12,15 145:15 146:4,9
151:6 154:17 165:12,14
178:25 184:16 186:2
192:17 246:23 264:16
**specifics** 214:22 238:12
**specifying** 179:7
**speculate** 207:13
**speculating** 58:3 173:25
210:24 260:2
**speculation** 26:9 32:10 85:21
86:1 145:13,19 156:6
160:25 201:18,25 207:13
258:21
**spelled** 61:21
**spent** 81:8 139:5
**split** 119:20
**spoke** 132:1
**spoken** 23:8 135:20 139:19
**sponsor** 24:1,6,21 97:19
**sponsored** 23:13 195:12
**sponsoring** 24:8
**sponsors** 54:18 172:21
**spot** 219:5
**spread** 41:11
**spreadsheet** 13:9,15,16
**stab** 170:1
**stack** 251:16 252:6
**staff** 13:11,12 14:16 17:3,9
17:14,16,20 18:5 20:12
41:5,10,15 59:14 76:16
102:23 126:7,13 134:16
141:15 144:25 145:5,10,16
146:1,6 154:2 155:18
179:23 180:3 187:9,12,12
187:12,13 195:1,4 209:12

210:10 212:1 215:11,16,16
215:18,19 217:11 218:13
**staffed** 258:13
**staffs** 213:21
**stalled** 239:23
**stamp** 70:20,23 82:1,5
**stamps** 83:17
**stance** 263:4
**stand** 248:17
**standard** 245:11,12,15
**standards** 245:17
**standing** 105:10 139:9,10
231:1
**stands** 210:20
**stark** 230:14
**start** 5:5 7:5 224:18 262:17
285:14
**started** 18:9 75:10 205:6
222:25 224:2,3 267:11
**starting** 207:4 265:7
**starts** 237:21
**state** 6:8 9:8 12:6,9 16:12
17:13,19,21 18:13,16 19:13
22:16,23 29:13 36:14 45:8
45:9,19,22 46:9 47:8,11
53:11 55:13 56:23 78:12
80:13 86:3 98:10,15 106:21
106:25 107:15,19 108:6,22
109:3 117:24 120:9,9,17,17
132:15 138:1 140:16
142:16 148:15,16 149:18
151:8,11,15,19,20 152:20
157:5 180:18 185:2,10
186:9 187:10,16 192:19
196:20 197:4,20 199:6,7,8
201:7,19 202:3,11 220:2,3
223:10 248:2,8 253:7
254:20,21,22,24 257:8,18
262:3,22 269:24 276:17
279:25 281:5 288:1
**State's** 16:11 138:11 144:18
145:1 154:9 155:18 156:4
156:13 177:8 202:9 205:16
205:18 242:25 257:7
258:12
**state-wide** 155:1 156:15
158:6,16 159:17 161:5
**stated** 1:22 9:4 30:17,19 42:1

79:12,16 186:13,20,22
229:2,15,19 257:1 282:7
288:8
**statement** 30:19,24 31:3
60:14 76:8 128:2 199:2
203:5 232:15 233:6,9
286:25
**statements** 30:22 31:3,19
35:15 60:12
**states** 1:1,18 5:4 28:4,13,17
29:2 34:25 100:10 106:7,12
182:13,17,21,22 261:3
265:18,18 288:7
**statically** 160:9
**stating** 67:14
**statistical** 162:3,6,13 246:5
**statistics** 283:22
**status** 151:8,11,16 181:21
**statute** 264:22 279:4 282:17
**statutory** 282:20
**stay** 51:2 93:14
**stenotype** 1:19
**step** 74:8
**steps** 59:13 91:2 134:15
141:14 153:10 213:16,16
**Stevenson** 128:24
**stick** 280:21
**Stinson** 4:10 194:11,13
**Stokes** 216:10
**stop** 127:24 269:17
**stops** 70:7
**story** 261:16
**Street** 2:4 225:7 226:11
**strict** 56:8 180:15,16 181:4
**stricter** 180:11 181:1
**strike** 15:2 23:11 41:22
122:14 125:11 127:6 130:6
132:10 144:16 162:25
163:11 165:1 171:7 193:1
195:24 199:4 200:21
203:21 233:25 262:18
283:1
**string** 212:17 214:2,16
237:21
**strong** 136:3
**stronger** 178:16
**student** 28:25 30:8 106:24
107:18 108:1,5,6,8,11,21

109:12 111:6,10,11,15,20
111:21 112:1,9 117:24
118:10 119:24 120:8,16
124:15 125:1,2,14 180:18
189:13,19 215:21 253:6,7
258:24 259:3,4,8,8,13,23
260:3,8 264:4
**students** 125:5 256:4 259:3
260:5,14,23,25 261:2,3,4
262:24
**studied** 267:16 278:5
**studies** 56:11 110:7,9 162:13
247:15
**study** 47:3,6,14,19,22 55:21
258:14 278:9
**sub-Texas** 200:23
**subdivision** 29:13 106:21
107:15,19 254:20
**subentity** 200:18,24
**subgroup** 256:1
**subject** 13:16 14:17 15:18
20:2 90:17 112:5 154:1
167:18 209:18 214:20
216:22 217:2,4
**submissions** 152:11
**submit** 200:1 275:12 277:7
282:12
**submits** 151:21 152:20
**submitted** 152:23 276:17
**submitting** 278:12,15
**subparagraphs** 265:25
**subpoena** 15:22
**SUBSCRIBED** 288:16
**Subsection** 84:6,12
**subsections** 265:23,24
**substantial** 270:22
**substantive** 195:17
**Substitute** 62:2
**sufficient** 128:17 133:23
198:1 258:13 284:12
**suggested** 157:19 178:11,17
**suggesting** 37:20 152:4
**Suites** 1:19
**summarizes** 243:6
**summary** 195:8,16
**Sunday** 238:17
**super** 280:23
**support** 3:22 25:3,5 46:15

49:14 54:19 95:6,17,17
101:9 114:6 116:17,25
122:6,20 123:15 125:2
128:9 136:3 177:16 184:21
185:2,10 186:9 187:15
189:4,12,19 203:15 250:1
250:12 288:22
**supported** 57:9 58:19 59:7
60:7 64:11 113:17,22
120:14 121:5,9,18 122:3,3
124:14,23 133:25 162:12
178:22 179:3,17 199:22,23
200:8 201:1,4 203:12,17
204:21 249:6,6 250:16
251:4 257:20 273:16
**supporter** 64:9,14,15
**supporters** 57:8,15 113:10,16
114:6 117:10
**supporting** 53:19 58:23
102:5 129:7 250:13
**supports** 189:9
**Supreme** 274:3 277:3
**sure** 7:3 8:8 9:15 10:21 13:10
15:5 16:13,16 17:23,24
18:1,18 25:22 27:25 30:19
30:23 33:4 37:17 38:20
49:6,8 50:12,18 56:14
57:18 58:6 59:22 60:4 61:5
63:25 71:8 72:12 73:13
74:20 76:15 77:14 86:9,12
89:9 91:23 92:12 97:1,7
98:1,6 102:1,2 115:19
117:16 118:18 132:1
141:18 149:4 152:7 153:5
157:25 165:17 167:3 174:2
174:22 175:16 181:13
184:7 190:17 198:4,8
200:10 206:7 207:2 208:4
211:9 213:12,20 214:10
217:18 219:14 225:4,21
231:21 236:15 238:10
241:16 243:16,18 268:24
269:2 270:9,10 277:23
278:23 279:1 283:23
284:20 285:8 286:17
**surname** 144:19 145:3,17
146:2,15 148:25 155:7,12
158:15,22 160:1,20 162:9

163:13,24 243:1,21 245:25
**surnames** 150:3 154:21,25
155:4 156:14 158:6 159:16
160:16 161:4,5 164:3 243:9
243:15 244:7,9,13
**surprise** 133:19 145:4
**surrounding** 64:20 65:15
73:24
**Susan** 1:17 288:19
**suspect** 136:24 138:23
**suspend** 60:24 62:6 64:4
65:16 66:23 67:21 69:15
71:3,21 72:11 142:9,20
**suspended** 68:8 277:14
**suspending** 62:16 63:8 68:14
142:23 232:16
**suspension** 72:1 94:5 219:21
233:17
**swag** 124:8
**Sweeten** 2:11 5:9 6:14 7:4
10:18,23 11:25 13:1,18,20
14:4 15:10,25 24:10 26:9
30:11,18 32:9,24 36:2,25
37:6,11,18 38:10,13 39:3
40:3,16 42:5 43:18 46:17
49:17 50:1,25 51:22 52:7
52:17,23 54:6 55:16 57:5
58:12,17 59:3,16 60:15
65:6 76:23 77:6,19 78:24
79:24 85:20 91:3 93:7,22
96:23 98:24 99:17,24
100:15,18 101:4,11,13,24
102:10,15 103:5,15 104:8
105:6 111:17 112:3,14
113:20 120:10,19 121:7,22
121:25 122:8,23 123:8,17
124:2,17,19 125:4,15,19
128:4,13 130:11 131:3
133:16 143:11 144:4,7
145:12,18,23 156:5,23
157:9,11,17 159:1,10,14
160:24 161:10 163:5
166:25 176:23 177:1
179:25 180:13 181:3
184:23 185:5,13 186:17,25
188:15 189:7,15 193:25
194:2 201:25 204:1 206:7
206:10 208:20,24 221:16

222:12 247:23 253:21
255:10 256:22 258:19
266:16 267:2 270:2 274:19
276:12 283:18 285:21
286:21,23 287:7
**sworn** 1:15 5:1 6:3 7:7
288:16
**syllabus** 277:12
**system** 12:11 129:25,25
177:20 217:16 251:22
259:1

---

**T**

**T** 3:10 4:1
**table** 253:24 254:2 255:8
256:20 283:16
**tabled** 196:25 197:1 198:17
198:19,20 200:13,14 202:14
202:15 253:14 255:2
256:10
**tact** 24:18,24
**take** 8:15,18 12:8 20:19
26:14 55:21 60:15,25 61:11
62:7,16 64:5 65:17 68:14
71:20 88:9 91:1 94:5,21
115:19 131:4 134:2 141:15
142:10,21 148:21 160:11
167:1 170:1 177:2 189:22
193:22 198:6 206:14
208:12 209:6 215:5 216:19
219:8,17 226:16,20 227:12
227:14 228:14 230:17
236:10,11 239:15 249:2
273:22,25 282:11 284:14
**taken** 1:15 8:22 13:5 21:1,23
60:16 63:22 66:24 67:2
72:6,14 80:10 112:16 134:5
153:10 189:24 206:11,15
242:17 284:15 288:12
**takes** 222:3 259:18
**talk** 57:21 58:8 96:8 134:20
134:23,24 135:23 166:22
196:15 231:13 238:17
245:4
**talked** 31:16 78:11 87:12
105:3 128:5 135:21,22
164:18 190:1 232:20,24
235:25

**talking** 9:13,16 33:24 36:19
36:20 40:5 60:19 64:22
74:23,24,25 89:20 98:18
99:7 107:21 123:24 138:3
141:8 144:5,6 158:13 162:5
165:25 166:2 174:24 211:2
211:3,4,6,7 217:4,6,8,9
219:4 227:17 242:20 245:6
259:20
**task** 138:14,15 279:18
**tasked** 19:4
**tasks** 19:7 138:9
**tax** 225:2
**Tech** 12:11 259:1,4,8,23
260:23 262:3,23 263:18,22
264:4
**technically** 197:12
**tecum** 15:22
**Telephone** 19:20
**tell** 13:15 14:16 17:2,22 18:7
22:5,9 30:16 31:18 32:2
33:7 44:7 47:23 65:19,22
68:25 73:10,24 76:12 78:20
95:12 132:11 133:2,11
140:9,10 143:9 149:2
156:10 178:6 203:7 208:17
210:19 216:3 223:20 228:6
262:16 266:15 278:22
**tells** 43:22 128:22
**tem** 86:4
**temporarily** 67:2,4,10
**temporary** 69:24
**ten** 235:4,15 263:23
**term** 109:10 112:22
**terms** 232:15
**terribly** 119:11
**territory** 216:13
**testified** 6:4 9:24 10:12 11:20
35:17 50:13 55:4 87:19,21
88:12 105:15 148:17 159:5
159:15 188:6 225:20,22,24
250:11 251:15 257:5 269:4
277:2
**testify** 7:9 8:22 37:21 82:13
92:1 144:24 146:18 224:9
226:2,4
**testifying** 26:21 193:16
**testimony** 8:23 10:16 11:8,23

12:20 16:24 25:24 26:22
29:18 35:15 40:23 42:22
51:8,12 54:3,7,10 55:7 57:1
57:7,13,15,18 58:6,20,22
59:1 72:4 74:15 77:15
79:15,19 81:9 91:17 92:5,7
92:17,22 102:19 105:17
108:14 109:1,4 113:9,16
114:6,10 117:10,23 126:20
126:20 128:6 134:13
135:10 139:22 140:1,17,21
142:3 153:7 159:4 161:15
161:20,23 188:23 190:20
192:2,3 199:10,15 200:25
201:11 224:6 229:24
236:25 237:8 240:10,14
242:5 243:3,18,20 244:10
247:8,9 248:9,14 249:5
266:9 280:21 283:11
284:10 288:12
**Texas** 1:1,18,21 3:13,17 4:8
6:8 9:24 10:12,17 12:6,10
21:20 22:1 33:9 34:25
36:14 51:8,13 73:5 88:8
106:25 116:6,12 120:9,18
129:17 130:12 132:16
137:21,24 138:1 140:16
147:21 153:16 166:19
171:21 187:15 194:5
197:20 199:6,8,8 200:18,24
202:11 205:21 206:21
247:5,19 248:3,8 251:1,2,19
251:20 253:7 257:18 259:1
259:4,8,23 260:23,25 261:6
262:2,3,23 263:18,22 264:4
266:8,14 269:24 272:16,18
273:18,23,25 274:25 275:22
275:25 276:10,20 278:13,20
279:3,5 280:14,19 281:5,9
281:16 284:22 286:5,10
288:1,7,20
**text** 19:18
**thank** 11:5,7 71:20 75:3
121:10 143:8 144:8 173:9
173:14 194:2 204:23
242:16 284:19 287:7,8
**thing** 31:18 56:11 96:18
134:22 137:1 177:7,8 178:4

216:23 236:25
**things** 7:13 11:2 18:1,3,6
45:18 46:5 48:10 58:4,5
76:7 79:9 87:13 89:2
100:10 104:16 109:17
110:9 116:13 128:1,22,23
131:17,18 136:8 165:18
171:2 207:2 211:23 213:15
214:18 230:7 231:13
239:11,20 257:11 259:25
270:18,21
**think** 5:21,25 6:22,24 10:20
10:25 11:1,2,6 13:4 14:18
15:16,19,21 16:1,2,12,15
18:9,13,18,18,19 20:3 23:16
25:16 28:20 30:25 38:2,5,8
38:13,19 40:6 41:3 42:11
43:3 44:18 46:21,21,22
47:4,25 48:7 53:14 60:3,14
61:19 64:6,14 65:20,20
66:6 67:3,10,13,16 71:8
72:11 75:15 77:7,9 80:2,8
82:14 87:8,11 88:12 89:16
89:18,22,23,25 90:1,3,4
91:25 94:3,16 96:7 98:3,9
98:20,21 99:1,6,10 100:25
102:19 104:10,11,15 105:8
107:20 109:15 113:2
114:19 116:5,6 117:3 118:1
124:10 129:8 130:13,13,14
130:17 131:15,16,20 132:13
133:10,24 134:18,19,21
135:21,22 139:22 143:1,20
143:25 145:23 146:22
148:17 151:24 152:4 157:5
159:1 162:11 163:7 164:17
165:17 173:8,21 174:22
177:4,5 178:4 180:24,24,24
180:25 184:1,14 185:25
187:18,19,20,25 188:17
189:14 190:13,14 191:13,16
194:25 199:24 200:4
203:20 204:9 207:18
215:24 217:7 218:16,17
222:8,12,18,24 225:1,4
226:4 230:7 231:5,9,12,22
232:24 234:15,17 236:20
237:22 239:25 240:3 242:7

243:6 248:12 249:25 250:2
250:6 251:6,9,18 252:7
254:7,9 255:18 260:7
262:25 263:16 264:15,15,19
266:22 267:4,4,11 268:23
270:16,18 272:24 274:2,3,5
275:19,23 277:12,23 279:9
280:7 282:19,21,21 283:12
283:13,15,21 284:17 285:3
285:4,7,10,15,15,18 286:17
286:25 287:6
**thinking** 167:6 184:5 191:7
207:14
**third** 149:25 175:2 221:8
**thoroughly** 267:17
**thought** 37:14 58:20 103:17
103:18 113:25 124:4
133:24 173:17 175:6
176:19 178:11 204:6,10
211:9 230:20 240:5 241:5
266:18
**thousand** 193:8
**thread** 237:21
**threat** 249:23
**three** 64:6,7 75:11 171:2
**three-judge** 274:12
**Thursday** 229:10,12
**time** 7:1,25 12:14 14:10
16:17 18:7,20 35:20 36:8
39:2 47:25 49:9 51:11
55:23 56:11 59:7 62:8
63:24 65:21 67:2 73:17
74:20,24 75:10 80:23 84:18
91:13 92:1,2 100:9,16
110:19 115:19 126:15
131:5 134:21 139:5 148:5
151:3 167:1 168:22 171:6
174:4,4 176:7 189:22
191:22 196:13 198:11
207:14 215:20 216:12
218:18 223:20 224:3
225:21 226:22 227:13
228:13 230:5,21 231:3
234:7,15,19 237:1,19 240:1
246:17 250:24 251:10
258:18 259:10 266:7,14
268:23 272:6 274:6 278:2
280:9,25 284:21,21,24

**time-consuming** 220:6
**timeline** 21:1 274:15 275:6,8
  277:9 279:14,15
**timelines** 59:25
**times** 43:3 230:23 234:1
  275:14,16
**timing** 228:21,25 242:10
**title** 261:24
**titled** 154:1
**today** 5:12 7:12 8:22 9:22
  12:23 14:1 25:18 48:11,23
  49:23 52:18 53:1 57:12
  58:1 61:1 72:13 81:22
  91:21 95:13 101:6 113:15
  114:9 117:9,18 122:6
  123:14,22 124:4,13 126:4
  130:4 135:19 139:25
  146:13 152:16 156:16,18
  163:18 179:20 184:25
  185:7,20,20 186:14,21
  187:1 188:5 189:8 193:10
  198:11 239:10 248:18
  260:13,18 262:15 270:5
  272:1 283:12
**told** 68:24 177:15
**top** 21:9 148:21 240:19
  256:13 261:17 286:6
**topic** 176:9
**tort** 46:4
**total** 191:8
**touch** 190:2
**touched** 267:16
**touted** 113:5
**town** 229:10
**track** 151:8 218:17
**tracked** 204:13 218:18
**tracks** 151:11,15
**train** 113:25
**trained** 136:23
**transcript** 7:13 10:8 34:1,23
  35:6,8
**translate** 160:16
**travel** 285:1
**trick** 54:9
**tried** 110:23 208:8 236:13,21
  241:18 266:24 285:4
  286:12,15
**trip** 285:2

**trouble** 178:12
**TRS** 217:16 218:17
**true** 46:4,4 120:3 121:14
  135:4 136:16 224:20 226:5
  226:24 265:13 278:16
  286:9 288:9
**trust** 257:3
**truthfully** 7:9 8:22
**try** 8:11 9:5 53:15 54:15
  55:19 59:18 69:1 75:17
  76:8 87:10 91:11 96:10
  109:19 236:18 239:25
  266:18,23 270:9 280:24
  285:8,16 286:16
**trying** 40:18 49:5 54:9 55:6
  66:2 69:21 92:17,20,22
  104:18 109:14 111:2
  119:12 126:11 149:14
  157:24,25 159:3 165:14
  250:10 267:11 285:14
**Tuesday** 61:16 261:21
**turn** 20:5 33:25 34:2 61:23
  83:16 105:22 164:9 196:2
  221:5 227:5 252:18 255:14
**turned** 135:3
**turning** 34:16 35:10 70:21
  105:22 173:14 181:16
  182:1 199:18 201:5 228:4
**turnover** 237:2
**two** 27:17 39:12 55:22 56:4
  64:3 75:11 83:17 86:5
  105:2 106:3 114:23 172:18
  172:18 173:17 175:7
  176:19 184:11 193:7
  230:15 235:2 268:7 270:11
  271:1
**two-special** 275:19
**two-thirds** 219:21 232:4,17
  232:21 233:13
**TX** 2:12 33:16 83:17 95:15
  140:16 153:16 166:19
  167:13 175:15 194:5 196:4
  228:6 237:12
**type** 25:14 27:20 41:5 57:15
  89:5 109:3 127:24 145:10
  154:8 156:3 161:16 162:23
  162:24 163:1 183:6 188:1,6
  202:5 211:1 234:12 247:16

  250:5 258:14
**types** 14:12 16:6 18:3 25:10
  26:1,7 42:9 52:21 53:6,13
  118:10 179:23 183:24
  202:10 226:17,20 250:5
**typical** 96:14,15,18
**typically** 24:20,22 66:12
  173:21 202:9 215:11
  217:15 230:22,25 234:10
  239:10 241:10 278:5

---

**U**

**U** 288:22
**U.S** 30:9 154:25
**Uh-huh** 87:24 111:3 175:4
  238:3 259:15
**ultimately** 222:17
**unable** 8:21 269:11,12,15
**unanimously** 203:18
**uncertainty** 280:11
**underlying** 283:3 284:7,8
**undersigned** 288:6
**understand** 7:7,16,20 8:4,11
  8:12,13,19 9:3,5,9,14 14:8
  14:13 15:11,15 27:25 37:19
  40:13 42:24 48:23 54:1,9
  55:7 57:13 66:2 73:14
  74:15 77:14 79:19 92:17,22
  95:8 96:13 109:14 110:5
  111:7 119:12 120:22
  125:14 129:11,11 140:5,21
  149:5 157:1 158:2 161:17
  161:20 163:17 165:14
  174:2 185:16,17,17 230:14
  268:24 278:24 283:25
**understanding** 5:23 6:6
  59:19 77:25 106:23 108:7
  111:6,10,14,25 112:22,25
  119:6,14,18 158:4 161:7,21
  163:3 188:13 193:5 198:12
  207:12 211:4 223:24 226:1
  241:25 244:12 245:6
  249:19 264:6,12,18,25
  265:10,12 266:2 274:24
  279:11,16 281:11 282:1,13
**understood** 16:24 38:16
  186:14
**unfettered** 92:2

**uniformity** 45:24
**unique** 77:16
**unit** 138:7,10
**United** 1:1 5:4 28:4,13,17
  29:2 106:7,12 182:12,17,21
  182:22
**university** 12:11 253:7 259:1
  260:23 262:4,23 263:18
**unusual** 67:7 235:21
**Uresti** 64:8,15,21 71:12 72:4
**Uresti's** 65:5
**urge** 262:24
**USA** 22:4 27:2 33:18 44:13
  61:9,25 71:1 82:1,6 83:18
  88:17 115:7 147:20,25
  148:19 151:22
**use** 24:18 30:7 108:1,4,6,8
  109:9 110:12 198:13,22
  199:19 249:22 251:5 260:5
  279:3
**useful** 160:17,20
**usually** 75:11 151:2 154:16
  224:10

———————— **V** ————————

**v** 9:24 10:12,17 88:8 147:21
  272:16,18 273:18,23,25
  274:25 275:22,25 276:10,20
  277:3 278:13,13,20 279:5
  284:22
**vacation** 12:14
**vague** 30:18 42:5 93:7 113:20
  120:10 122:8,11 125:15,20
  146:24
**vaguely** 65:12
**valid** 28:8 29:7 55:15,20
  106:18 107:8,13 119:7
  121:1,18 122:15 123:4
  160:9 162:12 254:14,14
  269:11
**value** 163:8
**Van** 3:21,24 63:5,13,14,18,22
  71:14 87:1,12,22 88:13,17
  89:4 90:7,16,24 112:18
  114:12 115:10,11,15 148:6
  149:22 190:15,21 227:24,24
  228:11 229:8 230:4,8,10
  231:16 233:12 235:23

**variable** 104:22
**varies** 268:6
**various** 4:6,12,18 41:10
  119:15 167:23 193:16
  200:7 222:18 241:24
**VEASEY** 1:4
**vehicle** 264:4
**venture** 42:14 285:23
**verbal** 88:21
**verbally** 272:2
**verification** 68:7,11 69:7
  71:12,16 167:17
**verifies** 178:7
**verify** 67:20 68:4 124:6
  127:16 129:4 130:1 132:21
  177:20
**verifying** 34:18
**version** 95:17 203:1 222:21
**versus** 274:9
**vetting** 17:25
**vice-versa** 155:5
**victory** 167:17
**view** 104:23 129:23,24
  162:17 175:5 176:16 202:4
  239:19 240:11 246:2
  249:23 251:23 285:16
**violations** 133:9 177:11
**visit** 262:5,7
**visited** 262:9,11,23
**visiting** 262:3
**vital** 283:22
**vocal** 190:19
**volunteer** 211:19
**volunteered** 211:22
**volunteers** 128:18
**vote** 53:17,17 64:4 65:16,21
  67:2,9,11,12,15,20 68:4,7
  68:11,13 69:7,14 71:2,13,18
  71:22 72:2,3,6,8 77:11 79:8
  127:16,22 128:5,6,10 129:3
  129:16,22 135:2,4,15,18
  138:24 139:9 149:20 186:7
  197:1 198:20 200:14
  202:15,24 203:6,18 204:19
  219:10 220:25 223:17
  224:20 226:6,24 248:10,24

**236**:11,20 238:8,23 241:7
  241:10,12
**voted** 25:6 29:19,21,23 30:3,4
  30:14 62:15,20 71:25 72:2
  74:9 76:3 95:20,22 118:5
  133:25 150:21 201:3
  232:15,23 233:4 253:20
  254:2 255:8 256:19,24
  273:16 283:14,16 284:4
**voter** 9:8 14:20 31:13 41:24
  42:3 43:1 44:16 48:17
  50:23 51:9,14 52:15 54:22
  74:4,5 75:18 76:5 78:5 84:5
  84:9 103:20 104:13,13
  110:5,18 117:2 127:11,11
  127:15,20,24 128:7,10,12
  129:13,15 130:7,9,18,18
  131:2,17,22,24 132:6,12,13
  132:17,21,22 133:6,12
  134:8,22 136:4,25 137:11
  137:25 138:12,18 139:20
  143:15 145:2,16 146:2,15
  148:24 150:2 152:9 154:20
  154:22 157:21 159:23
  160:5,7,17 175:5,12 176:11
  176:18 177:13,16,16,17,21
  177:22,25 178:23 179:4,18
  183:20,24 187:15,16,25
  188:1 214:13 217:4,13
  219:9,11 220:24 228:22,25
  232:20 233:5,19 239:15
  248:6,6,13 249:7,10,20,21
  249:22 251:13,16,20,24,25
  263:2,5 268:7 269:5 270:11
  272:11,13 273:10,11 275:22
  277:19 278:8 279:2,3,10
  280:5,13,18
**voter's** 138:18
**voters** 34:17 52:22 53:8 54:5
  55:13 57:3,10 58:16 59:2
  59:15 63:21 88:19,24 89:6
  89:13 90:25 91:19 92:25
  93:6 103:13 113:1,18 114:2
  114:8,17 115:17 140:25
  141:4,17 144:20 151:9,12
  151:16,20 152:20 154:6,20

155:1,7,12 156:3,15,21,22
157:16 158:15 159:17
160:21 161:6,18 163:3,14
163:24 164:3 188:14 189:5
191:2,12 193:6 197:6
198:25 199:6 201:14 203:3
203:12,24 204:25 205:17
206:22 221:13 232:5 243:1
243:4,9,14,21 244:6,9,13
245:20,25 246:11,11,12,25
247:4,5,13,18 265:8 269:12
271:23 272:3,8,8 284:9
285:1
**votes** 35:4 66:5 71:18 233:23
**voting** 29:21 32:4 34:21 35:4
35:13 36:1,8,13,24 37:5
41:2 44:14,18,22,25 45:1,4
45:19,22 46:16 48:5,12
49:1,16 51:20 52:5 63:8
88:19,24 89:14 90:25 93:1
102:25 103:11,13,24 112:7
113:1,18,19 114:3,8 126:3
126:10,22 130:2 132:4
133:21 137:8,21 160:2
178:24 179:5,19 245:7,11
253:24 272:20 274:4
**vs** 1:6

---

## W

**W** 196:17
**wage** 128:18
**wait** 43:23 44:1 219:20
239:13
**waited** 229:11
**waiting** 139:9
**waive** 38:24
**walk** 182:3
**Walz** 209:16 210:2
**want** 5:8,22 8:18 10:15 14:5
16:5 20:5 24:25 25:2 27:9
37:11 38:15,20 39:9,20
42:13 45:24,24,25 46:5
48:22 49:7 54:1,9 70:10
81:13 87:10 89:18 92:18
105:23 109:18 112:23
117:19 119:20 122:11
124:8 125:16 132:1 134:2
140:3 144:4 149:13 151:1

157:1 159:12 164:9 171:11
176:14 182:3 186:8 207:23
216:5 218:17 223:2 227:12
228:21 234:23 237:22
241:25 242:12 250:24
257:6 264:23 285:23
**wanted** 5:5 7:2 60:20 89:10
97:5 211:24 237:7 239:9
**wants** 116:15 214:4 239:3
**Washington** 2:5
**wasn't** 7:1 39:1 67:4 85:7
89:9 104:21,22 122:25
153:1 191:16 230:22 237:2
237:6 280:3
**waste** 250:24
**watcher** 139:13
**watchers** 137:15,18 138:17
**water** 128:3
**Watson** 63:5 71:14
**way** 8:12 31:20 32:13 38:17
39:18 50:10 54:9 55:8
75:17 85:3 87:7 90:4,5
101:15 103:3,13 116:3,13
117:12 119:13 120:25
124:12 127:16,18 129:2
135:15 136:4 137:8,9,9,12
148:13 155:14 157:14
177:4 191:24 214:5 220:16
236:14 240:12 243:11
249:3 250:3,3 251:21,25
270:8 281:1 286:6,10
**ways** 39:12 163:8 236:15,22
**we'll** 237:11 242:5 251:10
258:23 284:17
**we're** 64:22 99:23 134:6
158:13 171:12 200:2 211:2
211:2 227:8 228:4 242:18
242:19 254:7 270:12
279:15 284:16 286:11
**we've** 5:25 29:25 105:2
109:15 164:18 168:25
171:10 183:25 187:18
189:14 190:1 207:2 218:10
232:20,24 240:6 266:24
268:23 270:8 274:2 279:8
279:24,24 280:4 285:4
286:12,12,15
**Web** 261:18

**website** 21:17,18,19
**Wednesday** 83:9 147:14
229:11
**week** 219:8 223:10 230:21
**weekend** 238:17,23 241:13
**weeks** 55:22,22 56:4 259:21
**weigh** 93:11 124:11 141:21
192:6
**weighed** 58:23 60:5 284:11
**weighing** 58:23
**weight** 56:18,19 284:11
**welcome** 80:16,20
**well-debated** 221:4
**Wendy** 196:17,18 198:13
200:16
**went** 5:10 21:15 45:19 50:4
56:23 57:24 92:8 134:7
215:10 266:19
**Wentworth** 169:9 172:20
**weren't** 94:12
**West** 63:5 71:15 199:19
286:5,10
**whichever** 192:15
**Whitmire** 64:8,18 65:15
66:17,21 67:1,14 71:13
72:4
**Whitmire's** 69:24
**whole's** 143:15
**wide** 160:8
**widely** 264:8,13
**wife's** 135:2,3
**Williams** 76:14 79:17,21
95:16 172:20
**Wilson** 209:17 210:6
**wish** 8:15
**withdraw** 192:20
**witness** 1:14 3:4 5:1 20:21
26:16 32:25 43:21 71:10
73:4 82:25 83:3 88:11
94:24 112:11 115:20 128:3
128:8 131:6,9,12,14 147:10
148:4,22 149:7,12 166:23
166:25 170:15 172:15
181:13 183:9 184:8 193:24
206:9,12 208:14 216:21,25
228:16,18 237:17 282:16
**witnesses** 54:18,20 80:7 81:3
81:4 91:8 92:3 113:5,23

**CONFIDENTIAL**

116:18,22,23 117:4 142:2
  193:15
**women** 256:3 257:19
**word** 9:8 99:11,12
**work** 86:20 102:22 113:3
  128:19 157:25 213:10
  240:13 247:17 284:3 285:7
  285:16
**work-related** 15:7 16:8
**worked** 17:16 18:8,10 31:20
  87:1,14 91:11 139:1,11,13
  139:14 152:10 204:11
  210:4 266:23 270:8 284:1
**worker** 137:10 139:16
**worker's** 234:15
**workers** 128:19 134:12 135:6
  235:17
**working** 18:9 55:8 195:16
  205:6 234:19
**works** 17:6 191:25 192:9
  216:8
**wouldn't** 40:14 41:18 50:16
  63:16,25 64:1 94:15 133:19
  134:24 157:20 171:2 196:1
  225:23 231:22
**write** 217:6
**writing** 20:2 190:10,12
  235:24
**written** 7:19 11:10 179:7,10
  222:9 271:25
**Wroe** 194:12,20,22
**wrong** 114:24 120:1 137:3
  197:7 198:4
**wrote** 13:8

### X

**X** 3:1,10 4:1

### Y

**yea** 255:8
**yeah** 13:20 21:12 36:21 37:18
  61:21 67:22 73:13 92:14
  111:8 120:23 213:19
  232:11 235:17 244:17
  246:4 262:1 263:8 284:24
**year** 6:10 220:1 240:3,3
**years** 27:17 43:4 49:4 55:22
  58:2,21 102:18 106:3

126:24,24 164:18 171:2
  230:15 234:3,4,9,23,25
  235:4,9,13,15 260:4,18
  286:15,15
**yeas** 62:14 71:18,22 253:16
  255:2,4 256:12,12,17
**yesterday** 26:23 215:8,9
**York** 2:8 286:10 288:23
**you-all** 10:21 50:18,18,19
  284:18
**Young** 206:22

### Z

**Zaffirini** 63:6 71:15
**zero** 133:12 202:24 203:6,18
  204:20
**zoned** 171:3

### 0

**00005004** 215:7
**0000890** 83:18
**00009987** 166:20 167:14
**00009988** 175:15
**00013425** 147:20
**00013433** 148:20 151:22
**00021328** 194:5
**00021329** 196:4
**00022222** 33:18
**00023200** 61:9
**00023202** 61:25
**00023203** 71:1
**00025500** 82:1,6
**00033583** 27:2 44:13
**00033653** 22:4
**00033763** 88:17
**00033765** 115:7
**00087008** 95:15 140:16
**0013431** 148:1
**00204742** 228:6
**00204747** 237:12
**00204754** 153:16
**00205011** 33:16
**0027620** 83:18
**006358** 147:22
**006366** 148:20
**007340** 33:14
**008318** 61:10
**008320** 61:24 64:3

**008321** 70:5,19 71:1
**06** 47:7
**09** 39:18 144:5,5,6

### 1

**1** 88:16 140:5,8 175:3 253:2
**1/14/2009** 3:18,19
**1/20/2011** 4:12
**1/21/2011** 4:16,18
**1/24/2011** 4:4,13,15
**1/26/2011** 4:19
**1/27/2011** 4:10
**1:30** 223:23 224:2
**1:41** 213:25
**10** 3:12 260:18 263:25 268:13
**100** 236:16 285:19,24,25
  286:19
**10006** 2:8
**10022** 288:23
**105** 3:23
**11** 39:18 71:18,23 131:12,13
  198:20 200:15 202:16
  255:2 256:12 265:7 278:8
**11:25** 215:23
**114** 3:25
**11th** 149:18 150:13,15
**12** 44:3 196:17,23 197:1
**12/31/15** 288:20
**12:27** 212:14
**12:55** 168:2
**123** 252:18 254:7
**124** 254:10,10 255:18
**12548** 2:12
**13** 115:6 128:24 198:3,13
  265:15 278:8
**130** 255:18,19
**131** 256:13
**14** 4:9,18 6:12 74:12 79:6
  81:17 82:10 83:16,19,22
  84:3 93:16 120:18 121:21
  121:24 122:7,12,15,22
  123:16 124:24 129:8,9,10
  130:16 143:2,22 144:12,20
  153:23 155:16 160:22
  163:4 164:4,9,9,13 171:8,14
  171:22 173:13 175:25
  176:4 178:22,25 179:3,17
  179:22,24 180:6,11,19,20

180:22 181:1,11,12,17,24
182:5,12,17 183:16,25
184:22 185:4,12 186:12
187:10,22 188:11,13,20,25
189:2,13,20 190:3,25 191:9
192:24 195:5,9 196:8,10
197:3,9,21 198:2,22 199:7
199:22 200:9 201:1,12,14
203:1,4,8,11,25 205:3,4,8
207:4 221:20 223:17 224:6
226:2,8,14 230:6 243:5
244:24 245:18 246:1,17
247:22 249:7 253:5,13,25
254:14,25 256:7 257:20
258:17 264:7,12 266:7,20
266:25 267:18,19,21 268:1
269:13,15,16,18,21,23
270:24 271:3,22 272:6,7,10
272:19 273:6 274:13,24
277:19 281:3,8,10,10,17
282:1,9,23 283:2 285:2,19
286:22
**147** 4:3
**14th** 22:8 83:9
**15** 64:22 109:17 260:18
263:25
**150** 285:1,2 286:2,3,4,5,9
**153** 4:5
**15th** 61:16 73:16
**16** 234:7,9
**166** 4:7
**168** 82:17,17
**17** 27:18 183:11,18 234:7,9
**17:41** 227:16
**1706** 78:9 191:8
**171** 4:8
**178** 180:5,9
**17th** 73:18,20 74:2 150:18
**18** 208:7 261:6
**18:05** 238:1
**18:48** 238:16
**1800** 2:4
**181** 4:9
**18th** 147:15 149:19 150:19
150:20
**19** 197:1 198:20 252:19 253:2
255:2 256:12
**193** 4:11

**1A** 92:13

---

**2**

**2** 3:3 22:9 28:4 73:11 81:25
82:4 88:16 89:11 98:13
106:9 112:21 175:15 196:2
**2/28/2007** 3:15
**2:13-CV-193** 1:6
**20** 3:13 27:18 71:18,22,22
199:18 214:5 215:1,2
265:13 286:15
**2000** 14:24
**20006** 2:5
**2003** 18:11
**2004** 18:13
**2005** 18:16,19,25 78:9
**2006** 22:8 31:11 47:8,11,25
48:3,13,16,24 49:2 109:23
130:15 187:21 191:14
192:17,22 193:3,12
**2007** 20:5 22:11,14,19 33:10
35:1,20,22 36:2,3,19,20
39:6 41:10,17 42:4,12,15
45:5 46:8,16 47:6 48:13
49:2 51:9,14 52:16 54:23
59:6 61:16,18 64:22 78:14
78:16 89:3 98:9,16 108:1,4
226:21
**2008** 73:16 147:1
**2009** 14:23 31:14 72:19 73:18
73:20 74:2 77:23 83:9
85:19 88:14 90:9 99:23,24
99:25 100:2,3,7,15,17,19,22
101:9,21 102:14 108:2,4,5
111:11,16 112:2,18 114:13
115:12 133:4,13 141:8,8
146:21 147:15 148:16,23
149:18,20 150:1,13,14,15
184:22 185:3,11 186:10
187:14 188:22 189:18
192:2 193:8 211:1 226:21
230:19 231:5 233:5 237:3
240:3,8,15 242:7 251:13
**2010** 171:5 172:25 173:5,12
173:16
**2011** 14:24 18:25 31:14 39:7
99:22 144:11 153:21
155:25 157:2 164:11

184:22 185:3,11 186:11
187:14 188:24 189:18
206:3 208:19 209:2 212:14
213:25 215:22 220:1
223:23 227:16 237:3 238:2
252:17 278:8
**2012** 3:12 10:13 11:24 15:14
167:25 172:24 222:12,13
272:17,19 275:5,12,17
277:19 278:14,20 280:14,20
**2013** 231:7 274:14 275:18,20
277:7,18,19 278:8 280:1,20
281:9,10
**2014** 1:11,16 6:10 12:7,8,13
42:15 50:11 126:4 222:10
261:22 274:13 279:19
288:5,17
**206** 3:6
**208** 4:12
**20th** 208:18 209:2 212:14
213:25
**21** 70:23 71:17 200:16,22
227:6 233:23 254:11 255:1
**212** 2:9
**215** 4:14
**218** 3:14 20:6,9,13 21:2,22
22:1,6,21,24 23:1,12,13,24
24:1,6,8 25:5,11,25 26:2,20
27:13,20 28:2,3,19,22 29:15
29:19,21,24 30:5,15,17 31:4
31:7 32:3 33:12 35:1,11
41:23 42:2,4,10,19,25 43:6
43:8,15 44:14 45:5,7,13
46:8,14 52:3,4,16,20,21
53:5,6 54:3 55:11 56:22
57:3,8,16 58:15 59:15 60:3
60:10,13,19,21,25 62:2,7,17
63:15,19,24 64:5,10,16
65:17 66:24 68:8,15 69:15
69:17 71:6 72:8,14 78:11
80:12,13 89:3 98:23 99:9
105:2,5 107:23,25 109:11
118:9 129:7,7 145:9 180:12
180:17,21 181:2 187:22
190:25 191:9,20 232:20
**21st** 227:16 228:10 238:2,16
240:22
**22** 227:7,11

**CONFIDENTIAL**

**223** 4:15
**227** 4:17
**23** 237:11 252:25
**237** 4:18
**24** 8:25 50:4 81:8 230:23
  252:12
**24th** 157:2 215:22 223:23
**25** 261:11
**252** 4:19
**25th** 22:11 155:13
**26** 3:14
**261** 4:21
**26th** 22:14,19 56:3 252:17
  261:22 281:9,10
**27th** 194:9
**28** 1:11,16 26:13 27:7 33:10
  35:1 286:15 288:5
**287** 3:7
**288** 3:8
**289** 1:20
**29** 105:16
**29th** 167:24 171:5 172:24,24
  173:5,11,15

---
**3**
---

**3** 28:8 43:12 73:12 95:14
**3/18/2009** 4:3
**3/29/2012** 4:6
**3/3/2009** 3:20
**3/5/2009** 3:24
**30** 56:3 201:5 202:24 203:6
  203:18 204:19 214:6
  255:14,15,17,22 268:8
**31** 30:22 31:2 79:7,8,14 93:24
  93:25 94:9,11,12 120:23
  121:3 122:2 213:20 229:20
**31st** 288:17
**32** 3:15
**320** 70:7
**35** 268:15
**353-0419** 2:5
**36** 190:11
**362** 3:22,23 72:19 73:5,8,10
  73:21,25 74:17,18 77:24
  78:21,22 79:17,22 84:4,18
  87:22 91:18 94:2,7,14 95:6
  95:18,20,23 96:1,3,22 97:13
  97:16,20,24 98:13,23 99:7

99:14,23 101:2,22 102:5,13
  104:19,20 105:1,5,18,24,25
  106:6,11,15,24 107:2,7
  108:11,15,21 109:11 112:2
  113:11,16 114:6,7 117:11
  117:19,23 118:6 119:1
  121:17 124:16,24 125:3,18
  125:23 126:8 127:5,8 129:7
  129:8 130:5,16,25,25 131:1
  131:8 132:3,6,12 133:4,21
  133:22 140:24 141:2,9,16
  142:8,9,10,15,17,21 143:9
  143:22 149:20 150:22
  151:19 152:19,25 162:10
  180:12,17,21 181:2 185:3
  185:11 186:11 187:20,22
  188:19 189:2 190:25 191:9
  240:15,17 249:6 250:13,16
  250:19
**374** 288:21
**38** 61:24
**39** 202:17
**3927** 288:20
**3rd** 6:10,12 12:7,8 90:9
  112:18 114:13 271:12

---
**4**
---

**40** 2:8 268:17
**41** 195:10
**425** 288:22
**44** 228:6
**45** 268:17,18
**45-second** 43:22
**46** 134:21
**463-2007** 2:13

---
**5**
---

**5** 3:5 102:4 105:23 106:15,23
  107:2,6 245:7,11 254:13
  272:20 274:4 277:15
**5.11** 81:19 82:2,7 84:6
**5.11(d)** 143:14,20
**5/15/2007** 3:16
**5/16/2007** 3:13
**5/23/2009** 3:17
**5/27/2011** 4:8
**5:34** 1:17
**5:41** 227:16

**501** 225:4
**51** 134:21 217:19
**512** 2:13
**5215** 1:20
**523** 20:18
**526** 88:8
**527** 115:5
**530** 181:15
**536** 252:18 255:20
**55** 268:9
**56** 34:2,4,12
**57** 33:21 34:16
**589** 147:24
**591** 148:21 151:22
**5th** 2:8 115:12 288:22

---
**6**
---

**6** 106:8 107:5,5,5,6,7,7
  108:11 117:22
**6(a)** 118:25
**6(b)** 117:23
**60** 182:9,15,23 183:4 219:20
  268:9
**60-day** 183:21
**61** 3:16
**63.0101** 27:10 28:3 182:2
  265:22
**63.0101(b)** 265:20

---
**7**
---

**7** 255:25
**7:20** 240:20
**70** 221:9,10,13,21
**72** 3:17
**743** 228:8,9
**744** 231:25
**78711-2548** 2:12
**7th** 10:13 11:24 12:13

---
**8**
---

**8** 29:7 82:23
**8/26/2014** 4:20
**80** 266:8,8,14
**802** 2:5
**80th** 21:3 61:17,21
**81** 3:18
**81st** 73:5 83:12
**82** 3:19

CONFIDENTIAL

**82nd** 171:24
**866** 288:23
**876-8757** 288:23
**88** 3:21
**89** 234:17

---
**9**
---

**9** 27:10 182:1
**9:04** 1:16
**94** 3:22
**965-2200** 2:9
**9th** 270:14