```
               IN THE UNITED STATES DISTRICT COURT FOR THE
                       SOUTHERN DISTRICT OF TEXAS
                        CORPUS CHRISTI DIVISION

MARK VEASEY, JANE              )   CIVIL ACTION
HAMILTON, SERGIO DELEON,       )
FLOYD J. CARRIER, ANNA         )   NO. 2:13-CV-193 (NGR)
BURNS, MICHAEL MONTEZ,         )   [Lead case]
PENNY POPE, OSCAR ORTIZ, KOBY  )
OZIAS, JOHN MELLOR-CRUMLEY,    )
PEGGY HERMAN, EVELYN           )
BRICKNER, GORDON BENJAMIN,     )
KEN GANDY, LEAGUE OF UNITED    )
LATIN AMERICAN CITIZENS        )
(LULAC), AND DALLAS COUNTY,    )
TEXAS,                         )
                               )
       Plaintiffs,             )
                               )
V.                             )
                               )
RICK PERRY, GOVERNOR OF TEXAS  )
AND JOHN STEEN, TEXAS          )
SECRETARY OF STATE,            )
                               )
       Defendants.             )
```

4

```
1    ************************************************

2              ORAL REALTIME DEPOSITION OF

3         THE TEXAS NAACP 30(B)(6) WITNESS

4                    YANNIS BANKS

5                   JUNE 4, 2014

6    ************************************************
```

7         ORAL REALTIME DEPOSITION OF YANNIS BANKS, produced

8    as a witness at the instance of the DEFENDANTS, and duly

9    sworn, was taken in the above-styled and numbered cause

10   on the 4th day of June, 2014, from 9:35 a.m. to

11   2:41 p.m., before STEVEN STOGEL, CSR in and for the

12   State of Texas, reported by machine shorthand, at the

13   Offices of the Texas Attorney General, 209 West 14th

14   Street, Austin, Texas, pursuant to the Federal Rules of

15   Civil Procedure and the provisions stated on the record

16   or attached hereto.

17

18

19

20

21

22

23

24

25

Yannis Banks - 6/4/2014

9

1  U.S. Department of Justice.

2           MR. TATUM:  Okay.  Thank you.

3                YANNIS BANKS,

4  having been first duly sworn, testified as follows:

5                EXAMINATION

6  BY MR. TATUM:

7       Q.   All right.  Mr. Banks, would you please state

8  your full name for the record, please?

9       A.   Sure.  Yannis Kereldanladee Banks.

10            THE WITNESS:  And I can spell that if you

11  need me to.

12            THE REPORTER:  Please.

13       A.   Kereldanladee is K-E-R-E-L-D-A-N-L-A-D-E-E.

14       Q.   (By Mr. Tatum)  Thank you.  And, Mr. Banks,

15  where do you reside?

16       A.   Austin, Texas.

17       Q.   All right.  And, Mr. Banks, are you currently

18  employed?

19       A.   I am.

20       Q.   And where are you employed?

21       A.   Technically I'm self-employed, but I work for

22  the Texas NAACP.

23       Q.   Okay.  And the Texas NAACP -- I'm just going

24  to get this out of the way -- that is an affiliate of

25  the National NAACP.  Is that correct?

Yannis Banks - 6/4/2014

19

1  prepared to testify to those matters?

2      A.   Yes.

3      Q.   Okay.   Other than what you already told me

4  about your preparation for this deposition, is there

5  anything else you did to prepare specifically for your

6  testimony regarding these matters?

7      A.   No.

8      Q.   Okay.   Mr. Banks, are you familiar with the

9  complaint filed by the Texas NAACP in this lawsuit?

10      A.   I am.

11      Q.   Okay.   Do you feel like you are prepared to

12  testify about the factual bases of the Texas NAACP's

13  claims represented in that complaint?

14      A.   I do.

15      Q.   Okay.   Okay, Mr. Banks.   I'd like to take a

16  step back for a second and just talk about the Texas

17  NAACP generally.

18      A.   Sure.

19      Q.   On that note, I have another exhibit.

20              MR. TATUM:   I'd like to mark this as

21  Exhibit 2.

22              (Exhibit No. 2 marked)

23      Q.   (By Mr. Tatum)   Mr. Banks, do you recognize

24  this document?

25      A.   I do.

Yannis Banks - 6/4/2014

20

1    Q.    Okay.  Was this document produced to the

2   defendants in this matter?

3    A.    I believe so.

4    Q.    Okay.  What is this document?

5    A.    It's the mission and the vision statement of

6   the NAACP.

7    Q.    And is that the mission and vision statement

8   for the National NAACP?

9    A.    It's from the national website, yes, but it

10  applies to NAACP.

11   Q.    Okay.  So the mission statements and vision

12  statements expressed in this document are shared by the

13  Texas NAACP?

14   A.    Yes.

15   Q.    Okay.  And when I say "the Texas NAACP," I

16  mean the Texas Conference of NAACP branches.

17             MS. RUDD:  That's what we all mean, too.

18             MR. TATUM:  Okay.  Good.

19   Q.   (By Mr. Tatum)  All right.  I mentioned the

20  conference of Texas NAACP branches.

21   A.    Uh-huh.

22   Q.    How many branches in the state of Texas are

23  there, to the best of your knowledge?

24   A.    Oh.

25   Q.    And if you don't know the exact number, you

Yannis Banks - 6/4/2014

74

1      Q.    Were there any workshops specifically held

2    that were intended to educate members or constituents

3    about the requirements of Senate Bill 14?

4      A.    In Dallas, yes.  In Corpus, I'm trying to

5    remember the agenda, and I --

6      Q.    To the best of your knowledge.

7      A.    I'm coming up blank on the agenda in Corpus.

8    I really don't remember.

9      Q.    Okay.  Is the agenda for these state

10   conventions, is that something that's mailed out to the

11   membership or posted online on a website?

12     A.    Typically posted online.

13     Q.    Okay.

14     A.    And they get it when they get there as well.

15     Q.    Okay.  Why did the Texas NAACP decide to join

16   this lawsuit?

17           MS. RUDD:  Objection; calls for a legal

18   conclusion.

19     Q.    (By Mr. Tatum)  You can answer.

20           MS. RUDD:  Calls for speculation.

21     A.    Okay.  Well, we realized the harm that it

22   would have on minorities and low income people being

23   able to exercise their right to vote, and we feel that

24   it is important -- it's been the history and the mission

25   of the association to defend them and ensure that all

Yannis Banks - 6/4/2014

75

1    persons have that right to vote.  And it's important for

2    us to make sure that, you know, they would be able to

3    continue to have that -- their God-given right to go out

4    and access their vote without having any kind of

5    hindrances that they shouldn't have to -- hurdles they

6    shouldn't have to jump over.

7         Q.    (By Mr. Tatum)  So you touched on this

8    briefly.  Let me just ask you again -- or let me just

9    ask you for the first time.

10              In joining this lawsuit, is the Texas

11   NAACP representing itself as an organization, or is it

12   representing the rights of its members?

13              MS. RUDD:  Objection; calls for a legal

14   conclusion.

15        A.   We are representing the rights of -- we are

16   defending, I guess, the rights of members and

17   constituents, the people of Texas, so that they can

18   ensure they have the right to vote and make sure that

19   their voices can be heard.

20        Q.   (By Mr. Tatum)  So you're representing the

21   rights of your individual members?

22              MS. RUDD:  Objection; calls for a legal

23   conclusion, calls for speculation.

24        A.   We're representing the rights of members and

25   our constituents.

Yannis Banks - 6/4/2014

76

1    Q.    (By Mr. Tatum)   And in your opinion, does the

2    Texas NAACP -- did they join this lawsuit for purposes

3    of representing its own interests as an organization?

4              MS. RUDD:   Objection; irrelevant, calls

5    for speculation.

6    A.    I guess what do you mean when you say the

7    interest of the organization?

8    Q.    (By Mr. Tatum)   Does the Texas NAACP contend

9    that Senate Bill 14 affects its ability to fulfill its

10   mission as an organization?

11   A.    It's harmful to us, yes.

12   Q.    You contend that SB 14 is harmful to the

13   ability of the Texas NAACP to fulfill its mission?

14   A.    Yes.   I am saying that it is harmful to us to

15   fulfill the mission as stated on the website, yes.

16   Q.    In the time leading up to the filing of the

17   initial -- of the Texas NAACP's initial complaint that

18   initiated this lawsuit -- or that initiated its

19   participation in this lawsuit, were there meetings held

20   to discuss the pros and cons of such an action?

21             MS. RUDD:   And I just want to caution

22   you, Yannis, to not reveal any communications that might

23   have occurred in any of those meetings leading up to the

24   decision to file this lawsuit, whether they happened --

25   the fact that they happened is something you can testify

Yannis Banks - 6/4/2014

82

1    A.   Correct.

2    Q.   Okay.  Did you assist at all in the

3 preparation of this document?

4    A.   Not that I'm aware of.  Not that I'm aware of.

5    Q.   Okay.  But you are aware that this document

6 represents the claims and allegations being made by the

7 Texas NAACP in this lawsuit?

8    A.   Correct.

9    Q.   Okay.  I'm looking at Page 2, Paragraph 3(b).

10 Based on that paragraph, in your opinion, is the Texas

11 NAACP contending that Senate Bill 14 is causing and will

12 continue to cause the Texas NAACP to divert a portion of

13 its financial and other organizational resources to

14 educating Texas citizens about the requirements of

15 Senate Bill 14 and assisting voters in casting in-person

16 ballots in compliance with Senate Bill 14?

17    A.   What was your question?  It was just a lot

18 to --

19    Q.   Sorry.  I was reading directly from the

20 complaint.  Is that a contention that the Texas NAACP is

21 making?

22    A.   Yes.

23    Q.   Okay.  What is that contention based on?

24    A.   The fact that it will -- so as far as

25 financial, you know, it would be money that we could use

Yannis Banks - 6/4/2014

83

1   towards other programs, other things we could be doing

2   that we would now -- would have to be diverted towards

3   the lawsuit.  And when it comes to organizational

4   resources -- and it could be many other financial

5   resources.  And even just with stuff I may have -- that

6   they have me doing or would have me focused on, it could

7   shift from that and that being able to do or assist --

8   or even just how different programs that we may have

9   intended to do or want to do would now have to be not

10  done because we have to educate, inform, and get the

11  people out there so they understand what they need to

12  do.

13      Q.   But for the enactment of Senate Bill 14, how

14  would the resources that are being -- that are allegedly

15  being diverted to Senate Bill 14 related activities, how

16  would those resources be used outside of -- if Senate

17  Bill 14 had never been enacted?  In other words, you're

18  claiming that these resources, both financial and

19  otherwise, are being diverted towards activities

20  directly related to Senate Bill 14 --

21      A.   Uh-huh.

22      Q.   -- and that they could be more appropriately

23  used somewhere else.  Is that correct?

24      A.   Correct.

25      Q.   What other important purposes or functions

Yannis Banks - 6/4/2014

88

1  that extent.

2      Q.   (By Mr. Tatum)  Let me rephrase.  Within your

3  experience at the Texas NAACP -- so from 2007 onward --

4      A.   Right.

5      Q.   -- do you recall any other instance outside of

6  redistricting and voter ID where resources of the Texas

7  NAACP had to be diverted and allocated to one matter to

8  the detriment of another?

9      A.   During my time, no.

10     Q.   No, you don't?

11     A.   No.

12     Q.   Okay.  Because of Senate Bill 14, is it your

13  opinion that the Texas NAACP is no longer able to

14  fulfill its mission?

15     A.   It hinders the Texas NAACP from being able to

16  fulfill its mission.

17     Q.   It hinders it?

18     A.   It hinders it.  It hurts it -- it hurts us, I

19  guess I should say.  It hurts us from being able to

20  fulfill its mission.

21     Q.   But in your opinion, to date, the Texas NAACP

22  has been able to fulfill its mission despite Senate

23  Bill 14?

24          MS. RUDD:  Objection; calls for

25  speculation, misstates testimony.

Yannis Banks - 6/4/2014

89

1      A.   It hinders us from being able to fulfill our

2   mission as it should be done.  So I guess if it's

3   hindered or hurt, you're not able to do it, but it's

4   hindering and hurting us from --

5      Q.   (By Mr. Tatum)  So is it accurate to say that

6   in your opinion Senate Bill 14 has made it -- has made

7   the Texas NAACP unable to fulfill its mission to the

8   degree that it wants to?  Is that what your testimony

9   is?

10          MS. RUDD:  Objection; misstates

11   testimony.

12      A.   I'm saying we are -- the Texas NAACP is not

13   able to do all that we would want to do and need to do

14   and strive to do and is our purpose to do due to Senate

15   Bill 14 and its enactment.

16      Q.   (By Mr. Tatum)  Looking at the complaint

17   again -- turn to Page 3.  You're on Page 3?

18      A.   Yes, sir.

19      Q.   Could you read Paragraph 3(c) for me?

20      A.   Yes.

21      Q.   That's C at the top of the page.

22      A.   "Upon information and belief, the Texas NAACP

23   includes members who are registered voters but do not

24   possess any of the forms of photo identification

25   required by Senate Bill 14 for voting in person on

1 election day or in early voting."

2      Q.    Thank you.  Can you tell me what information

3 and/or belief this contention is based on?

4           MS. RUDD:  Objection; calls for a legal

5 conclusion.  You can answer.

6      A.    Okay.  Well, from -- so I know we've had

7 letters at the Brennan Center, I've done -- you look at

8 different data -- and I think there's been nationwide

9 data and research done that's shown that typically even

10 the information that the state had turned over to the

11 DOJ in 2011, it showed that there would be a great

12 percentage of low income and minority voters who do not

13 hold photo ID -- the required forms, I guess, of ID

14 required, and so I guess looking at that information and

15 that data.

16           MR. TATUM:  I don't seem to have a copy

17 of the objections to the 30(b)(6) notice on me, but at

18 this point I just want to see if I'm clear -- and I'm

19 talking to your attorneys now.

20           THE WITNESS:  Okay.

21           MR. TATUM:  I believe in those objections

22 it was stated that the Texas NAACP does not conduct any

23 studies of its own or something to that effect.

24           MS. RUDD:  Right.  I mean, to our

25 knowledge, there aren't any, you know, formal analyses

Yannis Banks - 6/4/2014

97

```
 1              MR. TATUM:  Sure.

 2        A.   That's not something that we've talked about,

 3   so I don't -- I'm not sure -- nothing I've had a

 4   conversation about, I should say.

 5        Q.   (By Mr. Tatum)  Okay.  In that same paragraph

 6   where it says, "voters who lack the required underlying

 7   identification must bear any costs associated with

 8   obtaining these documents," what associated costs does

 9   this claim refer to?

10        A.   Well, to get your birth certificate, there's a

11   cost to obtain that and other documents that you may

12   need to get reproduced in order to get your EIC.

13        Q.   So let's just focus on a birth certificate?

14        A.   Sure.

15        Q.   What kind of costs are associated with getting

16   a copy of your birth certificate?

17        A.   I think it's like $22 is what you would have

18   to go -- if you don't have a copy of your birth

19   certificate -- if you're from Texas.  Now, if you're

20   from elsewhere, it can vary.  It could be more.  It

21   could be less.  But I know if you're from Texas and you

22   need to get a copy of your birth certificate, it's $22.

23   And I think if you were born in the military overseas,

24   it's a whole other cost.  If you have to go that route,

25   it could be more.  So there's that financial burden that
```

Yannis Banks - 6/4/2014

98

1   you're putting on somebody that is supposed to be

2   getting a free document.  It's no longer a free

3   document.

4        Q.   Would the associated costs in that instance --

5   let's say someone is born in Texas and they have a copy

6   of their birth certificate that they need to retrieve in

7   order to get an EIC.  Would the associated costs that

8   you're referring to in this allegation here, would that

9   include the costs of retrieving that document from --

10   that birth certificate from your house or wherever it

11   is?  If you don't actually have to pay for a copy.

12        A.   Right.  It could also include, though, if you

13   have to get to a DPS office as well.  With not every

14   county having a DPS office, not every city having a DPS

15   office, there could be a cost in the burden of getting

16   to that location.

17            Having to travel X amount of miles, and

18   depending where you are, it could be a great deal.  And

19   then depending on even in your urban areas, depending on

20   the side of town you're on, it could still be a great

21   deal of money you have to spend to try to get there.

22            And it also can go with the time off that

23   you may have to take from work because of the hours of

24   the DPS offices not being open on weekends and after

25   6:00.  So if you have to take time off to get there, I

Yannis Banks - 6/4/2014

99

1  think the average DPS time -- I think I read somewhere

2  was like three hours or so.  It could be more.  It could

3  be less.  You know how that works.

4              Not to mention if you get there and you

5  think you have everything you need because you looked,

6  and you go and you give it to them, and they say, "Well,

7  no, we can't accept that."

8              Well, now you have to go back home and

9  come back again.  So you look at that cost as well that

10 they would have to incur just so they can go and vote.

11     Q.   So the associated costs you refer to in that

12 claim is not necessarily a financial or monetary cost?

13              MS. RUDD:  Objection; misstates

14 testimony.

15     A.   It encompasses a lot of costs.  There is the

16 financial cost that's going to be there.  And time is,

17 for a lot of them, money.  So there's a great deal

18 amount of cost that a person can incur trying to go and

19 get this ID.

20     Q.   (By Mr. Tatum)  So would you describe that --

21 in addition to the financial and monetary costs that you

22 testified to, would you describe those associated costs

23 as including an opportunity cost?  In other words,

24 you're devoting time towards doing that that could be

25 spent doing something else?

Yannis Banks - 6/4/2014

101

1      Q.      Does the Texas NAACP take issue with the

2    amount of time that SB 14 provides for, I guess,

3    completing a provisional ballot?

4      A.      I would say yes.

5      Q.      The Texas NAACP does take issue with the

6    amount of time that SB 14 provides?

7      A.      Yes.

8      Q.      Okay.   Why?

9      A.      Well, if you're looking at somebody who is

10   already having difficulty with traveling to get the

11   necessary IDs to vote, that six days may not be enough

12   time for them when you have to, once again, take off

13   from work, if you have to travel a long distance to get

14   there.   They have to try to be able to work that within

15   their schedule and within the financial hardship that

16   they may have, because there's nothing in the law that

17   says they will have, I guess, paid time off to go and

18   try to rectify this voting issue, so that they would

19   have to try to figure out in their work schedule, when

20   can I go, because I went and voted.   I wanted to vote.

21   Now I have to go and do this, but I can't afford to miss

22   this money that I need to feed my family or take care of

23   my family.   So I may have six days, but if they're not

24   open on the weekends or open after 6:00, it's running

25   into how I'm able to go and do that.

Yannis Banks - 6/4/2014

109

1                    Okay.  Do you know if this study took

2    into account students -- college students?

3         A.   I'm not aware.

4         Q.   Do you know if this survey included only

5    voting age citizens?

6         A.   I am not aware.

7         Q.   Do you know if it included citizens of all

8    ages, including infants, minor children, the disabled,

9    or the elderly?

10        A.   I am not aware.

11        Q.   Okay.

12                  MR. TATUM:  30 more minutes?

13                  MS. RUDD:  That's fine.

14        Q.   (By Mr. Tatum)  Okay.  I'm now going to be

15   asking you some questions related to the number of

16   paragraphs that appear under Subsection E, titled

17   "SB 14's effect on minority citizens in Texas."

18        A.   Sure.

19        Q.   That begins on Page 14 at the bottom.  Does

20   the Texas NAACP contend that minority citizens are less

21   likely than a white citizen to have an acceptable form

22   of ID under SB 14?

23        A.   Yes.

24        Q.   And what is that contention based on?

25        A.   Well, it's based on -- once again, you looked

1  studies or data sources to your knowledge?

2      A.   Besides what's in the complaint?

3      Q.   Yeah.  Is there anything else out there upon

4  which that claim is based?

5              MS. RUDD:  Are you talking about --

6  sorry.  Just to clarify, are you talking about studies

7  or data sources?

8              MR. TATUM:  I'm talking about both.

9              MS. RUDD:  Okay.

10     Q.   (By Mr. Tatum)  I see you're searching through

11  the complaint.  I'm talking about anything that's not in

12  this complaint.

13     A.   Not in the complaint?  Off the top of my head

14  right now, I cannot recall.

15     Q.   Okay.  Focusing now on Paragraph 43 on the

16  next page, Page 14.

17     A.   Okay.

18     Q.   Does the Texas NAACP contend that among those

19  who lack the acceptable forms of photo ID required by

20  SB 14, the Latino and African-American citizens who

21  encounter substantial burdens in obtaining the required

22  ID are significantly higher than percentage of white

23  citizens who encounter such burdens?

24     A.   Yes.

25     Q.   Okay.  So am I correct in saying that there

Yannis Banks - 6/4/2014

113

1      Q.   **Does the Texas NAACP contend that minority**

2   **citizens are less likely to be able to obtain a form of**

3   **acceptable ID required by SB 14 than white citizens?**

4      A.   Yes.

5      Q.   Okay.  What is that contention based upon?

6      A.   Well, once again, from the previous data that

7   has shown that minorities in Texas tend to be lower

8   income, that they will have trouble obtaining the

9   documents or getting to where they need to to get the

10  ID.

11     Q.   Has the Texas NAACP conducted any efforts to

12  confirm that data?

13               Let me rephrase that.

14     A.   Sure.

15     Q.   You say that this claim is based upon data,

16  surveys --

17     A.   Right.

18     Q.   -- the universe of information that has been

19  presented in this case.

20     A.   Yes.

21     Q.   And this claim is drawn from that data.

22  Correct?

23     A.   Yes.

24     Q.   Has the Texas NAACP done anything to test that

25  conclusion "in the field," meaning in practice?  Is

Yannis Banks - 6/4/2014

121

1   speculation.

2       A.   Yes.

3       Q.   **(By Mr. Tatum)   Okay.   Do these burdens that**

4   **we just talked about, do they exist with regard to**

5   **obtaining a voter registration card?**

6       A.   How do you mean?

7       Q.   **You talk about the burdens of obtaining an**

8   **acceptable form of ID under SB 14.**

9       A.   Uh-huh.

10      Q.   **Do those same burdens exist with regard to**

11  **getting a voter registration card?**

12              MS. RUDD:   Objection; calls for

13  speculation.

14      A.   I guess it would depend on where you live.   A

15  lot of people depend on trying to do it at the DPS or

16  what have you, and you don't have a DPS office in your

17  community, then it would be up to whoever is doing that

18  outreach or to -- I think it would depend on where

19  you're located.

20      Q.   **(By Mr. Tatum)   Okay.   Does the Texas NAACP**

21  **contend that SB 14 amounts to a poll tax?**

22      A.   Yes.

23      Q.   **Can you tell me why?**

24      A.   Fees associated with obtaining the documents

25  or the ID or if -- or getting to where you need to get

Yannis Banks - 6/4/2014

122

1   to -- to get your ID if you have to do it -- once again,

2   Presidio.  If you have to travel 60 miles to get the

3   free ID, let alone the one you have to pay for, but you

4   also have to pay for your birth certificate and other

5   forms to go get this document to vote, you are having to

6   pay to vote.

7                    In order to vote, you have to put the

8   money out there to be able to participate, and that

9   could be considered a poll tax.

10       Q.   So to the extent that the Texas NAACP contends

11   that SB 14 amounts to a poll tax, does it contend that

12   it amounts to a poll tax for all registered voters in

13   Texas?

14       A.   No.  Well --

15            MS. RUDD:  If you know.

16       A.   I'm not sure.  I don't know.

17       Q.   (By Mr. Tatum)  You're not sure?

18       A.   I don't know, I guess, what our stance on that

19   is.

20       Q.   Okay.

21            MR. TATUM:  Just a few more minutes, if

22   that's okay, and then we'll take a break.

23            MS. RUDD:  That's fine.

24       Q.   (By Mr. Tatum)  Now, Paragraph 46, the same

25   page, Page 15 -- maybe it's the next page.  Either way,

Yannis Banks - 6/4/2014

124

1      Q.     (By Mr. Tatum)  Okay.  So regarding the Texas

2  NAACP's allegation that SB 14 results in a racially

3  disparate and negative impact, it's the Texas NAACP's

4  contention that Texas election officials are not doing

5  enough to mitigate that impact.  Is that correct?

6      A.     Correct.

7      Q.     Okay.  And you testified that's based on the

8  money that they're spending to educate citizens

9  regarding SB 14.  Is that an accurate summarization of

10  your testimony?

11      A.     No, I wouldn't say it was just the money, but

12  also the means and the ways they get out to inform those

13  who are in the lower income areas.

14      Q.     Okay.

15      A.     It's not just about the money, but it's the

16  outreach --

17      Q.     Okay.  Outreach.

18      A.     -- the access, the communication with them.

19      Q.     Okay.  What would the Texas NAACP contend

20  would be actions that would mitigate such disparate

21  impact?

22            MS. RUDD:  Objection; form, calls for

23  speculation, irrelevant.

24      A.     Could you rephrase the question?

25      Q.     (By Mr. Tatum)  Sure.  In Paragraph 46, the

Yannis Banks - 6/4/2014

125

1  Texas NAACP is claiming that the actions of Texas

2  election officials do not and will not mitigate the

3  racially disparate and negative impact of the

4  requirements of SB 14?

5      A.   Uh-huh.

6      Q.   I'm asking if the Texas NAACP knows what

7  actions would mitigate the racially disparate and

8  negative impact of these requirements.  In other words,

9  the Texas NAACP appears to have an opinion of what's not

10 doing enough.  What I want to know is:  What does the

11 Texas NAACP think would be enough, if anything?

12     A.   Sure.

13            MS. RUDD:  Same objection.

14     A.    When you look at outreach, it's the avenues

15 that those in the minority community tend to look at and

16 use a lot -- and I'll stick with the African-American

17 community right now.  And so you have, I guess -- we

18 have the African-American press, which we use a lot for

19 what we -- whenever we do anything, we make sure the

20 African-American press is included.

21            And it's -- for outreach, we make sure

22 it's in their papers, because those are spread out a lot

23 in the communities.  Folks can grab them and read them.

24 I read them all the time.  When I do my radio show, I

25 grab them and read them.

1            So it's using the forms of

2    African-American Publishers Association, the

3    African-American press, whether it's out being in the

4    community itself.  And that just -- you know, so I put a

5    billboard up somewhere, and that's it, or what have you.

6    But actually having people there in the community at

7    community events, churches, what have you, but actually

8    having folks there saying, "Hey, that is what you need

9    to know," and just going out with the outreach.

10        Q.   (By Mr. Tatum)  You mentioned -- did I hear

11   you say that you have a radio show?

12        A.   I do.

13        Q.   You conduct a radio show yourself?

14        A.   Yes.

15        Q.   How long have you been doing that?

16        A.   Years.  I don't remember off the top of my

17   head.

18        Q.   What station is that radio show on?

19        A.   KAZI, 88.7.

20        Q.   FM?

21        A.   Yes.

22        Q.   What kind of things do you talk about on your

23   radio show?

24        A.   Any and everything.  There is no one specific

25   topic or issue.

Yannis Banks - 6/4/2014

127

1      Q.    Sports?

2      A.    I've covered sports.

3      Q.    Current events?

4      A.    We've done current events.

5      Q.    Politics?

6      A.    We've covered politics, yes.

7      Q.    Have you ever discussed Senate Bill 14 on your

8  radio show?

9            MS. RUDD:  I'm just going to object to

10  this line of questioning.  It's well outside the

11  30(b)(6) topics.  But you can answer.

12     A.    Yes.

13     Q.    (By Mr. Tatum)  Do a lot of your members and

14  constituents listen to your radio show?

15     A.    I have no idea.  I'm not familiar with the --

16     Q.    Okay.  Is that a daily --

17     A.    No.

18     Q.    Does the Texas NAACP contend that minority

19  citizens are less likely to be appropriately educated

20  about the change in requirements for voting?

21     A.    Yes.

22     Q.    And what is that contention based on?

23     A.    Well, that goes back to -- that's

24  Paragraph 46, when we say, "The actions of Texas

25  election officials to publicize the requirements."

Yannis Banks - 6/4/2014

128

1          If you're not outreaching -- or reaching

2    out to that community, the outreach has not been where

3    it needs to be, if you're not properly funding the

4    outreach, properly funding information out there, then

5    that will be a problem.

6          Just saying it's up on, you know, the

7    Secretary of State's website, that's not enough, because

8    not everybody has a computer, and there are people who

9    don't have smartphones, who still use a basic flip

10   phone.  So they don't have that interpret access.  So

11   just saying, "The information is out there on the web,

12   and you can go look it up," it doesn't serve everybody.

13         And whether they see where you put it or

14   not, it could be a problem in itself.

15        Q.   All right.  Last question before we take a

16   break.  Paragraph 48 on Page 16 states, "Upon

17   information and belief, there also are hundreds of

18   thousands of registered voters in Texas who," continuing

19   on, "will not have their name" -- hold on a second.  Let

20   me start over.

21        A.   Sure.

22        Q.   I lost my place here.  Okay.  The last few

23   lines of Paragraph 48 is what I want to focus on.  It

24   says, "Being subject to this discretion by election

25   officials will result in the application of differential

129

1  standards that disproportionately disadvantage Latino

2  and African-American voters as compared to the white

3  voters."

4           Is that an accurate reading of that

5  statement?

6      A.   Of that part, yes.

7      Q.   Okay.  Does the Texas NAACP contend that

8  minority citizens are more likely to fall victim to the

9  discretionary application of existing laws?

10     A.   Can I read the whole thing?

11     Q.   Yes.

12     A.   Okay.  What was your question now?

13     Q.   I'll repeat the question.  The question was:

14  Does the Texas NAACP contend that minority citizens are

15  more likely to fall victim to the discretionary

16  application of existing laws?

17     A.   Yes.

18     Q.   And what is that contention based on?

19     A.   Well, I guess you would look at it as so if

20  they decided their names are not substantially similar

21  for whatever reason and they have to go and, I guess,

22  rectify the issue, go back and -- so they have to do a

23  provisional ballot, and they have to go back to rectify

24  it, if these are the -- still looking at -- it, more

25  than likely, would be the same low-income folks who have

1      Q.   (By Mr. Tatum)  Let me just -- you would defer

2  to what's written in the complaint?

3      A.   I would.

4           MR. TATUM:  Okay.  I'm hungry.  Can we go

5  off the record?

6           MS. RUDD:  Sure.

7           (Recess from 12:42 p.m. to 1:21 p.m.)

8           MR. TATUM:  We're back on the record.

9      Q.   (By Mr. Tatum)  Mr. Banks, does the Texas

10  NAACP contend that the requirements of SB 14 constitute

11  a prerequisite to voting that will deny and abridge the

12  right to vote on account of race or membership in a

13  language minority group?

14      A.   Yes.

15      Q.   What is that based on?

16      A.   They would have to have the necessary document

17  or ID in order to vote, and the barriers that we

18  discussed earlier will create -- the barrier, I guess,

19  if you will -- create the prerequisite that you're

20  mentioning.  And from the information we've provided in

21  the complaint and other documents showing how they will

22  have trouble and difficulties obtaining voter ID or the

23  documents needed to get the requisite ID or required ID.

24      Q.   Okay.  Does the Texas NAACP contend that the

25  requirements of SB 14 make it impossible for anyone to

Yannis Banks - 6/4/2014

138

1     A.   Sure.  When you look at how the data has

2  shown -- the data that we presented shows that racial

3  minorities, language minorities, they tend to be lower

4  socioeconomic areas, the struggles that they will have

5  to, one, travel to get the ID, whether it's having to go

6  to the DPS office or have your -- having to pay for the

7  documents needed to get the ID, then -- and you look at

8  the requirements they have and say, "Well, of the six

9  IDs that you list, you know, there's a great chance they

10  won't have any of the six," and if they try to get the

11  free one -- or they want to go get the free one, do they

12  have the necessary funds, transportation, ability to go

13  and get them?  Then you're setting up the prerequisites

14  for them having trouble to be able to vote.

15     **Q.   So does Texas NAACP contend that SB 14 does**

16  **not, per se, deny or abridge the right to vote, but it**

17  **results in a denial or abridgment of the right to vote?**

18              MS. RUDD:  Objection; misstates the

19  complaint in this case, misstates prior testimony, form.

20     A.   Ask the question again.

21     **Q.   (By Mr. Tatum)  Sure.  Is the Texas NAACP**

22  **contending that SB 14, when considered in the totality**

23  **of circumstances that you described, leads to or results**

24  **in a denial or abridgment of the right to vote?**

25              MS. RUDD:  Wait.  Go ahead.

Yannis Banks - 6/4/2014

139

1       A.    We're saying that Senate Bill 14 will have a

2  harmful impact on minorities by setting up the barriers

3  that it has for them to be able to participate in

4  voting, whether it's from the forms of ID or the

5  documents that they are going to need to have to get the

6  forms of ID, it will be difficult for them to -- make

7  it, for some, impossible to go out and vote.

8       Q.    (By Mr. Tatum)   Does Texas NAACP contend that

9  SB 14 forces eligible voters to choose between voting

10 and other uses of their limited time and resources?

11      A.    Yes.

12      Q.    And I believe you've already covered why and

13 what that contention is based upon.

14      A.    Yes.

15      Q.    My next question is:  Is there a legal

16 requirement to vote?

17      A.    A legal requirement?

18            MS. RUDD:  Objection; vague, calls for a

19 legal conclusion.  I have no idea what that means.

20      Q.    (By Mr. Tatum)   Is there a legal duty to vote?

21 Are you required by law to vote?

22      A.    No.  But it's a right.

23      Q.    It is a right?

24      A.    It is a right.

25      Q.    Is it a right that a person exercises

Yannis Banks - 6/4/2014

152

1              I think the Senate hearing was such short

2    notice, that's a concern of lack of being able to -- if

3    more people wanted to have input, the lack of being able

4    to -- the changing of the rules of how it was going

5    forward on the Senate side was a concern.  I think

6    that's it.

7         Q.   Okay.  Does the Texas NAACP contend that the

8    process by which SB 14 was enacted was motivated by an

9    intent to discriminate against Latino and

10   African-American voters?

11        A.   Yes.

12        Q.   And what is that contention based on?

13        A.   Well, the process of -- so if you look at how

14   it's done in the Senate, it was short notice of the bill

15   is going to be heard, for folks to be able to get

16   there -- they changed the rules for that process where

17   it wasn't going to go to a committee separate from the

18   Senate.  They did it as a Senate committee as a whole so

19   it could be heard, voted, kicked out, this whole

20   process.

21              They changed the rules specifically for

22   that bill, the way the Senate brings up bills.  I think

23   normally it's a two-thirds, but now they needed

24   basically a simple majority -- I think it was a simple

25   majority in order to get the bill brought up.  So you've

1  changed that rule to limit input, say, and control from

2  other groups that if SB 14 was put, I believe, on the --

3  the emergency list, I think is what it's called -- the

4  governor can set up -- I think it's called the

5  emergency.  That seems right -- so that it could be

6  fast-tracked and moved through, you know, quickly

7  without really having an open discussion and debate.

8           You know, the House even created a select

9  committee just for this one bill, which helped with the

10 fast-track process, and -- what's -- say the question

11 again.  I want to make sure I -- could you state the

12 question again?

13      Q.     Sure.  The question was:  Does the Texas NAACP

14 contend that the process by which SB 14 was enacted was

15 motivated by an intent to discriminate against Latino or

16 African-American voters?

17      A.     Okay.  Yeah.  And then they also -- concerns

18 made by different groups that testified -- the issues

19 basically were ignored, and even the concerns stated by

20 the minority Senators and Reps went ignored.  Even the

21 amendments that they proposed to try to make it a little

22 better were, you know, basically just ignored.  That's

23 about all I can remember.

24      Q.     And I think I recall you said you testified

25 personally?

Yannis Banks - 6/4/2014

154

1    A.    On the House side, I believe I did.

2    Q.    On the House side.  On behalf of the Texas

3 NAACP?

4    A.    Well, Gary Bledsoe and I.  We both testified

5 on the House side.

6    Q.    Okay.  Does the Texas NAACP feel that its

7 voice in that process, that its concerns about the

8 effects of SB 14 were not adequately heard during the

9 legislative process?

10    A.    Do we feel our voice wasn't heard.

11    Q.    Does the Texas NAACP feel like their voice was

12 not adequately expressed or heard by the Legislature

13 during the consideration of SB 14?

14    A.    I felt like it was -- we expressed it

15 adequately.  I felt like it wasn't heard or listened to.

16    Q.    Does Texas NAACP feel like it was given a

17 proper opportunity to express its concerns and issues

18 regarding SB 14 during the consideration of SB 14?

19    A.    Does it matter which side of the --

20    Q.    On either side.

21    A.    Either side?  Yes and no.  On the Senate side,

22 I think we were there for -- we got there, like, at

23 10:00 in the morning, because they said the hearing was

24 going to start on -- I don't remember if it was -- it

25 was on, like, a Tuesday or Wednesday or Thursday or

Yannis Banks - 6/4/2014

155

1  something -- some day during the week.

2                     We got there at 10:00 in the morning,

3  give or take, and I think Gary didn't testify until

4  about 4:00 in the morning the next day, which can be a

5  strain on a person to have to -- I remember -- it might

6  have been close to 5:00 or 6:00, because they were

7  frying bacon when we left, one of the places.  I just

8  remember the smell of bacon.

9                     So we were basically there almost 24

10 hours to testify on this bill.  So that could be a toll

11 on a person in itself.  You know, we're fortunate that

12 Gary lives in Austin and I live in Austin, that we're

13 able to be around with short notice, two-day notice that

14 this is going to happen, that we're able to hang around.

15 For that one, I think we had -- I think the hearing for

16 the House side coincided -- it was early February, so it

17 coincided, I think, with some members being up here, I

18 think.  That just happened to work out that way on that

19 day.

20                     But it still went ignored from -- the

21 concerns that were laid out, and -- the concerns that we

22 laid out.

23      Q.   **Why does the Texas NAACP feel that their**

24 **concerns and expressed issues were ignored?**

25      A.   They weren't implemented, I guess you could

Yannis Banks - 6/4/2014

156

1   say, or even -- you know, they just seemed to -- they

2   went forward with the bill as written, no changes, no

3   nothing, just -- you know, there wasn't any lack of

4   concern or worry about it.

5       Q.   Looking back at the complaint -- do you have

6   that handy?

7       A.   Yeah.  That's -- is that 3?

8            MS. RUDD:  Yes.

9       Q.   (By Mr. Tatum)  That was 3, yes.

10      A.   Okay.

11      Q.   And again, I'm going to try to not get as

12  bogged down in the language of it.

13           On Paragraph 57 -- or Paragraph 57, which

14  is on --

15      A.   18?

16      Q.   Correct, on Page 18.  The last sentence there

17  says, "The Texas Legislature did not investigate the

18  concerns regarding the discriminatory nature of voter

19  identification changes."

20           Correct?

21      A.   Uh-huh.

22      Q.   That's what --

23      A.   Correct.

24      Q.   -- that sentence says?  Okay.

25      A.   Yes.

Yannis Banks - 6/4/2014

164

1  worry about concerns that once again the minority

2  Representatives were stating or laying out those

3  concerns or -- the amendments that they proposed for the

4  Senate and the House side.  They didn't really have to

5  take them serious or to pay them much attention because

6  they had the votes and had it set up.

7       Q.   **Mr. Banks, what does the Texas NAACP believe**

8  **is the purpose for Senate Bill 14?**

9       A.   The purpose of Senate Bill 14 is to limit

10 minority participation in the voting process, the --

11 that's the outcome of it.  It limits their ability to

12 express their right to vote.

13      Q.   **Does the Texas NAACP contend that SB 14 was**

14 **enacted with discriminatory intent?**

15      A.   Yes.

16      Q.   **And why?**

17      A.   Well, when you look at the process of how it

18 was passed -- there may not be any direct evidence, but

19 when you look at the process of how they passed it from

20 changing of the rules to not listening to -- in the

21 Senate side, the minority Senators and their concerns

22 and amendments they proposed to make the bill a little

23 bit better.

24           You know, and they ignore that, and then

25 the House side that -- ignored the minority Senators.

Yannis Banks - 6/4/2014

165

1  And I think all of the African-Americans and most of the

2  Hispanic Representatives voted against the bill, but

3  they had amendments, had concerns.

4              They had issues -- you look at Gary's

5  testimony and what I've said and you hear -- or you see

6  that process.  Then you look at that evidence, then you

7  can see that.

8      Q.   Does the Texas NAACP contend that any

9  Legislator who voted for SB 14 acted with discriminatory

10  intent?

11      A.   I would say yes, because it goes to the

12  process of, once again, the rule changes and not

13  listening to the concerns.  So I would say yes.

14      Q.   Does the Texas NAACP contend that any citizen

15  who supports SB 14 does so because of discriminatory

16  intent?

17              MS. RUDD:  Objection; irrelevant.

18      A.   I would say, once again, with the process,

19  yes, and how it was done.

20      Q.   (By Mr. Tatum)  Does the Texas NAACP contend

21  that the Texas Legislature intended to harm any minority

22  group with the enactment of SB 14?

23      A.   Yes.

24      Q.   And what is that contention based on?

25      A.   The process of how it was done.  Once again,

1      Q.   Okay.  At the bottom of Page 160, on Line 19,

2  he asks you, "If Senate Bill 14 goes into effect, will

3  the NAACP have to changes its programming or

4  activities?"

5             And your answer to that question was, "We

6  will have to make some adjustments, yes.  We would -- we

7  would definitely need to get our members and

8  constituents informed of what the new law entails.  And

9  so we'll have to use our resources or divert resources

10 that would be used for other things to inform others,

11 and to whatever extent that we could help get what they

12 need to be able to vote as well."

13             Is that, more or less, a summary of your

14 testimony there?

15     A.   More or less, yes.

16     Q.   Okay.  So that deposition was taken in 2012.

17 We're here almost exactly two years later.  Could you

18 describe what kind of adjustments to your programming

19 activities, if any, the Texas NAACP has had to make --

20     A.   Sure.

21     Q.   -- because of the enactment of SB 14?

22     A.   Yeah.  Well, as we mentioned earlier, when

23 you -- when we -- we have had to do more workshops from

24 it at our state convention, which takes away from

25 training we wanted to do.  Resources that we've had

Yannis Banks - 6/4/2014

178

1  available as far as financial-wise, we had to change and

2  divert from different areas or programs or what have you

3  in order to make sure we could fund the work we have to

4  do.

5              With having more training, it's less

6  focused on different issues, and we can't focus on --

7  even the way I've had to operate for our state

8  convention, a role I would normally play with help

9  planning or getting things mailed out and shipped out --

10  from talking to Linda, the State Secretary, she said

11  about 80 percent of the work I used to do for that,

12  which I noticed I had stopped doing a lot, she's had to

13  pick up and do herself or what have you.  So there was a

14  workload that I used to be able to focus on that had to

15  be -- that was diverted from me.

16              So different -- you know, at times, when

17  you can have -- be focused more on issues that could be

18  pressing or say, "I need to have y'all understand this

19  issue and that issue," whether it's education or

20  financial issues, other issues that are important and

21  impact -- or even working with different organizations

22  where there may be some discriminatory acts happening

23  into a company or a different organization and they want

24  assistance, it could be we're not able to sit down and

25  work with them because we have this going on.  Or it

Yannis Banks - 6/4/2014

179

1  could be a group we've worked with on a different issue

2  completely separate from this, and they're having a

3  meeting about it, want to talk about it, and we say, "I

4  can't make it because I have to do this.  I need to do

5  that.  This is going on."

6              So there are times, when I'm working with

7  with some of our allies, I have to either cancel

8  meetings, not attend meetings, or just miss it flat out

9  and tell them, "Yes, I can be there," and something

10  comes up and, "I'm not going to be there."

11              So that aspect of resources.

12      Q.   And has the diversion of resources that you've

13  talked about, has that been ongoing and continuous from

14  the enactment of SB 14 to present day?

15      A.   Yes.

16      Q.   Okay.  Has the percentage of resources, both

17  financial and otherwise that have been diverted because

18  of SB 14 -- has the percentage of those resources

19  changed over the course of the past two years since

20  SB 14 was enacted?

21      A.   When you say "percentage" -- like financial,

22  when you say "percentage," what do you --

23      Q.   Well, the Texas NAACP has contented that

24  because of SB 14, they're having to divert --

25      A.   Uh-huh.

Yannis Banks - 6/4/2014

180

1    Q.   -- an amount of financial and other resources

2    to deal with the impacts of SB 14.   Correct?

3    A.   Yes.

4    Q.   Okay.   What I'm asking is:   Has the amount or

5    the percentage of those resources in relation to all the

6    resources available to the Texas NAACP -- has that

7    percentage changed, either increased or decreased,

8    between the enactment of SB 14 and now?

9    A.   I was --

10            MS. RUDD:   Objection; form.

11   A.   I'd say yes.   I couldn't give you

12   percentage-wise as to the changes, but I'd say yes.

13   Q.   (By Mr. Tatum)  Do you think that the Texas

14   NAACP has become better at educating its members about

15   the requirements of SB 14 as time goes along?

16            MS. RUDD:   Objection; vague.

17   A.   When you say "better" --

18   Q.   (By Mr. Tatum)  That was vague.  Has the Texas

19   NAACP become more adept at educating its members about

20   the requirements of SB 14?  Has it had to expend less

21   resources as a result of SB 14 over time?  And that was

22   two questions I put together again.  Let me start over.

23            MS. RUDD:   I think he can probably

24   answer.

25   Q.   (By Mr. Tatum)  If you can answer that

Yannis Banks - 6/4/2014

184

1          **Does the Texas NAACP contend that it**
2  **suffered harm as an organization as a result of SB 14?**
3      A.    Yes.
4      **Q.    And is that harm continuing today?**
5      A.    Yes.
6                MS. RUDD:  No further questions.
7                MR. TATUM:  That's it.  I think we can go
8  off record.
9                (Deposition concluded at 2:41 p.m.)
10               (Signature requested.)
11               *  *  *  *  *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

1 (Pages 1 to 4)

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                   CORPUS CHRISTI DIVISION
3  MARC VEASEY, et al.,        )
4        Plaintiff,            )
5  VS.                         )  CIVIL ACTION NUMBER:
                               )  2:13-CV-193 (NGR)
6  RICK PERRY, et al.,         )
                               )
7        Defendants.           )
8  _____      )
   UNITED STATES OF AMERICA,   )
9                              )
         Plaintiff,            )
10                             )
   VS.                         )  CIVIL ACTION NUMBER:
11                             )  2:13-CV-263 (NGR)
   TEXAS LEAGUE OF YOUNG VOTERS)
12 EDUCATION FUND, et al.,     )
13    Plaintiff-Intervenors,   )
14 TEXAS ASSOCIATION OF HISPANIC)
   COUNTY JUDGES AND COUNTY     )
15 COMMISSIONERS, et al.,       )
16    Plaintiff-Intervenors,   )
17 VS.                          )
18 STATE OF TEXAS, et al.,      )
19        Defendants.           )
20 _____       )
   TEXAS STATE CONFERENCE OF    )
21 NAACP BRANCHES, et al.,      )
22      Plaintiffs,            )
                               )  CIVIL ACTION NUMBER:
23 VS.                          )  2:13-CV-291(NGR)
24 NANDITA BERRY, et al.,      )
                               )
25      Defendants.            )
```

**Page 2**

```
1  BELINDA ORTIZ, et al.,    )
                             )
2      Plaintiffs,           )
                             )
3  VS.                       )  CIVIL ACTION NUMBER:
                             )  2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,   )
                             )
5      Defendants.           )
                             )
6  _____    )
7
   ******************************************
8
              DEPOSITION OF
9
            COLBY BEUCK
10
            JUNE 20, 2014
11
   ******************************************
12
          HIGHLY CONFIDENTIAL
13
14     ORAL DEPOSITION OF COLBY BEUCK, produced as a
15 witness at the instance of the Plaintiff, was duly
16 sworn, was taken in the above-styled and numbered cause
17 on the JUNE 20, 2014 from 9:31 a.m. to 7:00 p.m., before
18 Chris Carpenter, CSR, in and for the State of Texas,
19 reported by machine shorthand, at the Office of the
20 Attorney General, 209 West 14th Street, Austin, TX
21 78701, pursuant to the Federal Rules of Civil Procedure
22 and the provisions stated on the record or attached
23 hereto.
24
25
```

**Page 3**

```
1              A P P E A R A N C E S
2  FOR THE UNITED STATES OF AMERICA:
3       Bruce Geer
        U.S. JUSTICE DEPARTMENT
4       CIVIL RIGHTS DIVISION
        Room 7254 NWB
5       950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
6       (202) 514-0828
        bruce.geer@usdoj.gov
7
   FOR THE TEXAS STATE CONFERENCE OF THE NAACP AND THE
8  MEXICAN AMERICAN LEGISLATIVE CAUCUS:
9       Amy L. Rudd
        DECHERT, LLP
10      300 W 6th Street, Suite 2010
        Austin, TX 78701
11      (512) 394-3040
        amy.rudd@dechert.com
12
        Sonia K. Gill
13      LAWYERS' COMMITTEE FOR CIVIL RIGHTS
        1401 New York Avenue, NW
14      Suite 400
        Washington, D.C. 20005-2124
15      (202) 662-8356
        sgill@lawyerscommittee.org
16
   FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
17      John Scott
18      Assistant Deputy Attorney General
        ATTORNEY GENERAL OF TEXAS
19      209 West 14th Street
        Austin, TX 78701
20      (512) 475-3281
        john.scott@texasattorneygeneral.gov
21
   FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND:
22
        Hasan Ali
23      WILMER HALE
        1875 Pennsylvania Avenue, NW
24      Washington, DC 20006
        (202) 663-6262
25      hasan.ali@wilmerhale.com
```

**Page 4**

```
1  FOR THE WITNESS:
2       Linda Halpern
        Manager of Complex Litigation
3       ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
4       Austin, TX 78711-2548 MC109
        (512) 475-1969
5       linda.halpern@texasattorneygeneral.gov
6       Brooke Paup
        Deputy Division Chief
7       Intergovernmental Relations Division
        ATTORNEY GENERAL OF TEXAS
8       P.O. Box 12548
        Austin, TX 78711-2548
9       (512) 936-1381
        brooke.paup@oag.state.tx.us
10
   FOR THIRD-PARTY LEGISLATORS:
11
        Arthur D'Andrea
12      Assistant Solicitor General
        ATTORNEY GENERAL OF TEXAS
13      P.O. Box 12548
        Austin, TX 78711-2548
14      (512) 936-2868
        arthur.dandrea@oag.state.tx.us
15
16
17
18
19
20
21
22
23
24
25
```

COLBY BEUCK                                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

4 (Pages 13 to 16)

---

13

1  asked to in this case?
2      A.  I did an extensive review of my personal files,
3  my files at work, and I did not have any responsive
4  documents.
5      Q.  When did you perform that search?
6      A.  When I received the notice, the subpoena.
7      Q.  And that subpoena was issued in April of 2014;
8  is that correct?
9      A.  I'd have to see the subpoena to answer that.
10     Q.  Well, it's not that important.  Do you recall
11  about when you performed the search?
12     A.  The spring.
13     Q.  Okay.  And you couldn't find any responsive
14  documents, correct?
15     A.  Correct.
16     Q.  And is that because you were no longer working
17  at Representative Harless's office at the time?
18     A.  Correct.
19     Q.  And so you do didn't retain any files or
20  e-mails from your time working with Representative
21  Harless; is that right?
22     A.  Correct.
23     Q.  And there was nothing in your personal computer
24  that you retained in the way of e-mails or files from
25  the time that you worked with Representative Harless?

---

14

1      A.  That's correct.
2      Q.  Talk to me about your use of e-mail at work.  I
3  know during the time you worked for Representative
4  Harless, you used both an official e-mail address and
5  also a personal e-mail address to correspond for work
6  purposes; is that right?
7      A.  That's correct.
8      Q.  And did that continue after you left
9  Representative Harless's office?
10     A.  I'm -- can you -- I'm not sure I
11  understand.  Did my -- can you restate the question?
12  I'm sorry.
13     Q.  Do you continue to use personal and official
14  e-mail addresses to correspond for work purposes today?
15     A.  With -- with who?
16     Q.  Well, anybody that you would be corresponding
17  with in a work capacity.
18     A.  That would depend on who the individual was and
19  which preferred way they would like for me to
20  communicate with them.
21     Q.  Okay.  Let's go back to the time when you were
22  working for Representative Harless.  At that time, would
23  you say you corresponded with Representative Harless
24  primarily using personal e-mail or your official work
25  e-mail?

---

15

1      A.  Primarily, I would say it would be her -- her
2  personal e-mail.
3      Q.  And what about your e-mail address that you
4  were sending and receiving e-mails from?
5      A.  My work e-mail.
6      Q.  Okay.  And then today you work for
7  representative -- or sorry, Senator Taylor, correct?
8      A.  Correct.
9      Q.  And how do you primarily correspond with
10  Senator Taylor, using your --
11         MS. HALPERN:  I'm going to object on the
12  grounds of relevance.  This is 2014.  You're talking
13  about events that happened in 2011.  And I do not see
14  any relevance with respect to what he does today.
15         MS. RUDD:  Understood.
16         MS. HALPERN:  Particularly given that he's
17  wearing a counsel hat in his new position.
18     Q.  (By Ms. Rudd)  What is your current title with
19  Senator Taylor?
20     A.  General counsel.
21     Q.  And when did you take that position?
22     A.  I began to work for Taylor in January of 2013.
23     Q.  And that was after he had been elected to the
24  Senate, correct?
25     A.  Yes.  He was elected in November of 2012, and

---

16

1  was sworn in, in January of 2013.
2      Q.  And prior to that, he served as a
3  representative?
4      A.  Correct.
5      Q.  Why did you take the job with Senator Taylor?
6      A.  I was interested in returning to the Senate.  I
7  had spent my -- my first year was in the legislature in
8  the Senate, and I was interested in returning back to
9  the Senate and was interested in continuing to grow
10  professionally.  It was a good move for myself
11  professionally to be his general counsel.
12     Q.  And so up until you -- the time you took the
13  job with Senator Taylor in January 2013, you were
14  working for Representative Harless; is that right?
15     A.  That's correct.
16     Q.  You didn't have any other jobs in-between the
17  time you left Representative Harless's office and
18  started working for Senator Taylor?
19     A.  That's correct.
20     Q.  And so you were employed with Representative
21  Harless from 2009 to the end of 2012, correct?
22     A.  Yes.
23     Q.  And I think you previously testified that while
24  you were working for Representative Harless, you served
25  as the chief of staff, correct?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

---

17

1    A.  Yes.
2    Q.  And you analyzed policies at her office?
3    A.  Yes.
4    Q.  And you handled issues raised in the State
5    Affairs Committee on which she served?
6    A.  Yes.
7    Q.  And you also handled Voter ID issues for
8    Representative Harless in the 2011 Legislative Session,
9    correct?
10   A.  Yes.
11   Q.  You wouldn't have handled issues related to
12   Voter ID in -- in the 2009 session; is that right?
13   A.  That was not my -- I was not -- that was not a
14   legislative session.  I believe I was still working for
15   the Lieutenant Governor at that point.  And when I was
16   working for the Lieutenant Governor, that was not my job
17   responsibility.
18   Q.  Okay.  Let's talk about -- I'm really going to
19   try not to retread old ground in this deposition, but
20   because of the legislative privilege issues, I have to
21   ask certain questions again just to see if I can get an
22   answer on the record.  So just bear with me.
23       Let's talk first about House Bill 112.
24   That was the bill that was authored by Representative
25   Harless in the 2011 session, correct?

---

18

1    A.  Yes.
2    Q.  And that was a piece of Voter ID legislation as
3    well, correct?
4    A.  Yes.
5    Q.  You previously testified that you helped
6    develop House Bill 112; is that correct?
7    A.  Yes.
8    Q.  And when you say you helped develop it, you
9    helped draft it and also researched the bill?
10   A.  Correct.
11   Q.  And when you were drafting and researching the
12   bill, you had contact with a number of people, correct?
13   A.  Yes.
14   Q.  You spoke to Representative Harless about the
15   bill prior to its filing, correct?
16   A.  Yes.
17   Q.  You spoke to -- I believe you said Bryan
18   Hebert -- is that how you pronounce it?
19   A.  Yes.
20   Q.  In the Lieutenant Governor's office, right?
21   A.  Correct.
22   Q.  And you spoke to Janice McCoy in Senator
23   Fraser's office, correct?
24   A.  Yes.
25   Q.  Senator Fraser was one of the authors of SB 14,

---

19

1    correct?
2    A.  He was the Senate, Senate author, yes.
3    Q.  Did Representative Harless say why she wanted
4    to file this particular bill, HB 112?
5        MS. HALPERN:  I'm going to object on the
6    grounds of legislative privilege, and I'm going to
7    direct him not to answer that.  You can ask him what he
8    thought, what his thoughts and impressions were, but
9    I don't think he's in a position to testify as to what
10   somebody else was thinking.
11       MS. RUDD:  Well, the question was whether
12   Representative Harless told Mr. Beuck why she wanted to
13   file HB 112.
14       MS. HALPERN:  You can answer that
15   question.  Did she tell you?
16   A.  She was interested in filing Voter ID
17   legislation because of the -- the support for that type
18   of legislation from her constituents.
19   Q.  (By Ms. Rudd)  And did that support predate
20   your coming to work for Representative Harless, if you
21   know?
22   A.  I can't speak to my time prior to
23   representative -- prior to my employment in her office.
24   Q.  And did she describe to you the type of support
25   that she was hearing from constituents about Voter ID

---

20

1    legislation?
2    A.  There were -- there were constituents who had
3    been in contact with her as their representative asking
4    for the legislature to move forward with Voter ID
5    legislation.  That's my understanding.
6    Q.  Do you have any sense for how many constituents
7    reached out to Representative Harless with regard to
8    Voter ID legislation?
9    A.  No.  I think that would be an appropriate
10   question for her, but I don't have an idea on that.
11   Q.  Okay.  Do you know the identity of any
12   constituents who reached out to Representative Harless
13   with respect to Voter ID legislation during your tenure
14   in her office.
15       MS. HALPERN:  And I'm going to assert
16   legislative privilege.  Since we're under seal, I'm
17   going to allow the witness to answer the question, but I
18   want to note the objection on the record now.
19       MS. RUDD:  Noted.
20   A.  Individual identities of the constituents?  No.
21   Q.  (By Ms. Rudd)  Did you ever speak to any
22   constituents during your time with Representative
23   Harless's office about Senate Bill 14?
24   A.  Yes.
25   Q.  Can you describe the context in which those

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

**21**

1    conversations took place?
2       **A.  A variety of ways.  E-mails from constituents,**
3    **phone calls from constituents.**
4       Q.  Okay.
5       **A.  Office visits from constituents.**
6       Q.  Okay.  Let's start with constituents.  Did you
7    speak to constituents personally about their support for
8    Voter ID -- Voter ID legislation?
9       **A.  I spoke with constituents on all, a variety of**
10   **issues:  Support, those for and against.**
11      Q.  For those constituents who supported Voter ID
12   legislation, do you recall what the basis for their
13   support of that type of legislation was?
14          MS. HALPERN:  Objection, vague.  You're
15   assuming they all had one?
16      **A.  That's -- it would be generalizing my -- any --**
17   **you know, the answer I would have would be generalizing**
18   **the constituents' concerns.**
19      Q.  (By Ms. Rudd)  Okay.  Let's do it this way.
20   What types of things were constituents telling you about
21   why they might want Voter ID legislation just as a
22   general matter?
23      **A.  Concerns about the integrity of the voting**
24   **process.  That would be the major concern.**
25      Q.  Okay.  When you say integrity of the voting

---

**22**

1    process, what do you mean specifically?
2       **A.  People voting who should not be voting.**
3       Q.  Did you receive communications from
4    constituents with regard to voting ID legislation where
5    the constituents were expressing some knowledge of
6    problems with the integrity of the voting process?
7       **A.  Can you we state that?  I'm sorry.**
8       Q.  Did you ever receive any specific reports from
9    constituents who you spoke with about problems at the
10   ballot box in terms of, you know, people voting who
11   shouldn't have been?
12      **A.  Okay.  Yes, I believe I did have some**
13   **constituents report to me their personal accounts of**
14   **voter misconduct.**
15      Q.  When you had conversations like that with
16   constituents, did you log the conversations in any way
17   or make notes of them somewhere?
18      **A.  Phone conversations?  Is this regarding phone**
19   **conversations?**
20      Q.  Let's start with that.
21      **A.  Okay.  It depended.  It -- sometimes, yes;**
22   **sometimes, no.**
23      Q.  Okay.  When would you actually make a log of a
24   conversation with a constituent typically?
25      **A.  If there was a follow-up that needed to be done**

---

**23**

1    **with that constituent so we would have a record.**
2       Q.  And would a constituent reporting some problem
3    at the ballot box be something that would require a
4    follow-up in your mind?
5       **A.  It would entirely depend on the situation that**
6    **they were describing.  If it was something that they had**
7    **already reported, that had already gone through the**
8    **process or -- it really would entirely depend on the**
9    **situation.**
10      Q.  One of the purposes, at least from your
11   office's perspective, sorry, strike that.
12          One of the purposes of HB 112 from
13   Representative Harless's office's perspective was to
14   protect the integrity of the ballot box; is that right?
15      **A.  That's correct.**
16      Q.  In connection with developing that piece of
17   legislation, was it important for you in her office to
18   keep data about problems with voting at the ballot box?
19      **A.  When I was researching the overall issue of**
20   **voter identification, I tried to gather the information,**
21   **all information available in my fact-finding research**
22   **process.**
23      Q.  What sources did you turn to, to gather that
24   type of information?
25      **A.  Studies, court cases, laws in other states.**

---

**24**

1       Q.  Okay.  I want to focus you just on the issue of
2    problems with people voting who shouldn't have been
3    voting.  So people either committing in-person voter
4    fraud or sending in absentee ballots under a different
5    person's name, things of that nature, what did you do in
6    developing HB 112 to gather information about those
7    types of situations?
8          MS. HALPERN:  Objection, compound.
9       Q.  (By Ms. Rudd)  If anything?
10      **A.  Okay, those are two different -- HB 112 was**
11   **focused on in-person voting.**
12      Q.  Okay.  So what did you do to gather
13   information, if anything, about problems within
14   in-person voting?
15      **A.  Like I mentioned, the researching studies,**
16   **court cases, reports, media reports, statistics, the**
17   **information that was relevant to the purpose of HB 112.**
18      Q.  Let's talk about each of those things.  When
19   you say studies, can you remember any specific studies
20   that you referred to that dealt with instances of
21   in-person voter fraud in Texas?
22      **A.  In Texas?**
23      Q.  Yes.
24      **A.  I can't recall.**
25      Q.  When you say you can't recall, is it because

---

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

7 (Pages 25 to 28)

25

1  you don't think you referred to any studies that -- that
2  dealt with in-person voter fraud in Texas or because you
3  just don't know what studies you've looked at, at all?
4      A.  I can't recall because it's been quite some
5  time, so I can't -- I just -- I don't remember.
6      Q.  Okay.  But as you sit here today, you can't
7  point me to any studies discussing in-person voter fraud
8  in Texas that you relied upon in connection with
9  developing HB 112?
10      A.  And you're referring to studies.  Is that -- I
11  don't -- I'm not following the question.
12      Q.  Well, you were the person who told me you
13  relied on studies, so I'm just using your --
14      A.  Not directly related to Texas.  These were
15  studies, nationwide studies.
16      Q.  Of in-person voter fraud, correct?
17      A.  Correct.  Correct.  Your question was limited
18  to Texas, and this would -- these were national studies.
19      Q.  Well, I appreciate the clarification.  The
20  other thing you mentioned was court cases.  What court
21  cases did you look to in gathering information about
22  in-person voter fraud?
23      A.  In -- in my research of the Voter ID issue,
24  the Crawford case was the major case that I referred to.
25      Q.  Did you research whether there were any court

26

1  cases involving instances of in-person voter fraud in
2  Texas?
3      A.  Could you restate?  Could you restate the
4  question?
5      Q.  I will try to.
6      A.  Okay.
7      Q.  Did you look at whether there were any court
8  cases involving in-person voter fraud in Texas?
9      A.  Yes.
10      Q.  And were there any court cases involving
11  in-person voter fraud in Texas?
12      A.  There were -- I received a summary of court
13  cases, actions that were being taken in voter -- voting
14  -- voting cases, yes.
15      Q.  Do you recall when HB 112 was filed?
16      A.  I can't remember the exact date it was filed.
17  We prefiled the bill in November, I believe.
18      Q.  And do you recall when you received -- so prior
19  to filing, prefiling HB 112, did you receive reports of
20  any court cases involving in-person Voter ID fraud in
21  Texas?
22      A.  I don't recall.
23          MS. RUDD:  Let's go off the record for a
24  second.
25          (Brief discussion off the record.)

27

1          (Exhibit 1 marked for identification.)
2      Q.  (By Ms. Rudd)  Okay.  You've been handed what's
3  been marked as Beuck Exhibit 1, which is a series of
4  documents containing various Bates numbers, so I'm just
5  going to go through those for the record.  The first is
6  an e-mail Bates numbered TX 91207.  The second is a
7  chart Bates numbered TX 92240.  The third is a chart
8  Bates numbered TX 92241 through 92243.  And the third is
9  a chart Bates numbered TX 92244 through 92254.  Does
10  that sound right?
11      A.  Yes.
12      Q.  Okay.  If you start with the e-mail that's the
13  very first page of that exhibit, this is an e-mail from
14  Jay Dyer to you dated February 23rd, 2011, correct?
15      A.  Yes.
16          MS. HALPERN:  I'm sorry, Counsel.  Let me
17  just note for the record, because somebody needs to,
18  that this stack of documents is marked "Highly
19  Confidential."
20          MS. RUDD:  Thank you for that.  I
21  appreciate that.  It is.
22      Q.  (By Ms. Rudd)  And the subject line of this
23  e-mail is Election Spreadsheets, correct?
24      A.  Yes.
25      Q.  So one of the things you just mentioned was

28

1  that you received some summaries of court cases
2  regarding voter fraud in Texas, correct?
3      A.  Yes.
4      Q.  Are these the summaries that you were referring
5  to?
6      A.  This is the document -- one of -- yes, this is
7  what I had in mind.
8      Q.  Okay.  So these are things that you requested
9  from the office of Attorney General's Office; is that
10  right?
11      A.  Yes.
12      Q.  And you -- this is in February of 2011, which
13  is after HB 112 was filed, correct?
14      A.  Yes.
15      Q.  And so I believe this is also after Senate Bill
16  14 was filed, correct?
17      A.  I don't know.  I would have to -- I don't know
18  the answer to that.
19      Q.  If I represent to you that Senate Bill 14 was
20  filed in January of 2011, does that sound right to you?
21      A.  That sounds right.
22      Q.  Okay.
23      A.  It had to be early.  It was a -- yeah.
24      Q.  Were you gathering this information in
25  connection with both HB 112 and SB 14, or do you know at

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1  this point?
2      A.  At this point, in February, we -- this would
3  have been for Senate Bill 14.
4      Q.  Okay.  If you look to the first chart in this
5  exhibit, the -- this chart is entitled, "Election Code
6  Referrals to the Office of the Attorney General, Charges
7  Pending Resolution," correct?
8      A.  Yes.
9      Q.  And this is a chart you've seen before, right?
10     A.  Yes.
11     Q.  Can you point me to anything on this chart
12  that's recording incidences of in-person voting fraud?
13         MS. HALPERN:  I'm going to object to the
14  question for lack of foundation and that it calls to
15  some extent for speculation.  He's not the author.
16     Q.  (By Ms. Rudd)  So I'm referring just to the
17  very first one.
18     A.  2240?
19     Q.  Yes, sir.
20     A.  Okay.
21     Q.  You asked for this information from the OAG's
22  Office, correct?
23     A.  Correct.
24     Q.  And when you received this information, did you
25  review it?

---

30

1      A.  Yes.
2      Q.  And did you ask any questions about the
3  information contained in this document of the OAG'S
4  Office?
5      A.  I can't recall.
6      Q.  Did you -- do you have any reason to question
7  whether this is a -- this document is correct or
8  contains accurate information?
9      A.  Yes, well, I'm sorry.  I don't under the
10  question.
11     Q.  Sorry.  Do you have any question to question
12  the accuracy --
13     A.  No reason to question.
14     Q.  -- of the information?  Okay.  Did you do
15  anything to look into any of the seven cases listed on
16  this particular chart?
17         MR. SCOTT:  I'm sorry, did you say seven?
18         MS. RUDD:  One, two, three, four, five,
19  six, seven, on the first chart.
20         MR. SCOTT:  I'm sorry, I was on the wrong
21  page, sorry.
22         MS. HALPERN:  Counsel, would you happen to
23  have a copy of Election Code 64.012 to show the witness?
24         MS. RUDD:  No.
25     A.  I don't recall.  It's been some time.  I

---

31

1  believe I did.  I don't recall.
2      Q.  (By Ms. Rudd)  Okay.  Are you familiar with
3  Election Code 64.012?
4      A.  No, I'm not.
5      Q.  Were you familiar or did you ever familiarize
6  yourself with Election Code 64.012?
7      A.  I would have to -- I believe I did.  I don't
8  recall.  I would have to see the code section to --
9      Q.  Did you ask any follow-up questions of the
10  OAG'S Office with regard to the seven cases listed on
11  this chart of pending resolution chart, that you recall?
12     A.  For these specific ones, I don't recall.
13     Q.  Okay.  In general, when you're looking at the
14  three charts attached to this e-mail, did you go through
15  any of these charts and perform any particular
16  investigation of any of the cases listed on these
17  charts, that you can recall?
18     A.  I don't -- I don't recall.
19     Q.  Do you recall whether you talked to anyone at
20  the OAG's office about any of the specific cases listed
21  on any of these charts after receiving them?
22     A.  I don't recall.
23     Q.  Do you think it's likely that that's something
24  that you did, or did you just accept this information at
25  face value?

---

32

1          MS. HALPERN:  I'm going to object to that
2  question on grounds of agency pride, but I'll allow the
3  witness to answer it.
4          (Laughing.)
5      A.  I -- did I -- could you repeat it?  Did I
6  question the information on this document?
7      Q.  (By Ms. Rudd)  Well, I just want to know if you
8  asked, if it's likely that you asked, you called someone
9  up and asked follow-up questions about any information
10  on this chart, or did you just take this chart and
11  process it and --
12     A.  Yes, okay, I understand.
13     Q.  -- take it at face value?
14     A.  I understand your question.  The -- I -- I
15  relied on their information that they provided to me.  I
16  believe I looked into some of these on here, these ones
17  that say illegal voting.  And if I'm not mistaken, I
18  believe this section most likely is referring to that
19  voter fraud.
20     Q.  Okay.  Do you know whether that section refers
21  to in-person voter fraud?
22     A.  I believe it does.
23     Q.  Okay.  But you don't know as you sit here
24  today?
25     A.  I would have to have the section.

---

COLBY BEUCK                                           6/20/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 33 to 36)

---

**33**

1   Q.   Okay.  You don't have any way of telling me
2   today what the resolution of any of these cases was, do
3   you?
4        A.   No.
5        Q.   If you look at the second chart, which is the
6   chart that starts with Bates Number 92241 --
7        A.   Yes.
8        Q.   -- can you tell me how many of the cases listed
9   in this chart involved in-person voter fraud?
10       A.   Without more information on these individual
11   cases, I can't speak to that.
12       Q.   Okay.  If you look to page 92242 of that
13   chart--
14       A.   Okay.
15       Q.   -- the fourth row from the bottom contains some
16   information about an incident that occurred in Harris
17   County.  Do you see that?
18       A.   Yes.
19       Q.   And if you look under the column labeled
20   "Charges," it says, "One count illegal voting voter
21   impersonation at polling place," correct?
22       A.   Yes.
23       Q.   Does that indicate to you that that was an
24   incident of in-person Voter ID fraud?
25       A.   It indicates -- it indicates that, but I would

---

**34**

1   have to have more details on the specifics of the case.
2        Q.   Okay.  So even looking at that designation, you
3   can't tell whether that was an incident of in-person
4   Voter ID fraud from just the information you have here?
5        A.   The information on here says, "Deceased voter
6   voting."  I would assume that would be impersonating
7   somebody that was deceased.
8        Q.   I understand that, but I'm trying to
9   distinguish between casting a ballot in someone else's
10   name from, you know, from home by, for example, an
11   absentee ballot, or actually going -- physically going
12   to the polls and voting as someone else.  Can you tell
13   from this designation which of those two things happened
14   here, if either?
15       A.   For this specific one, it does state this
16   occurred, impersonation at the polling place, so I think
17   that would --
18       Q.   Okay.  Are there any other charges listed here
19   that give that type of description of the incident that
20   occurred?  And feel free to look through it.
21       A.   That appears to be the one you mentioned, the
22   one out of Harris County, that appears to be the only
23   one that has that designation at the polling place.
24       Q.   Okay.  If you turn to the third chart that
25   starts at Bates Number 92244, this is a chart entitled,

---

**35**

1   "Election Code Referrals to the Office of the Attorney
2   General, August 2002 to Present," correct?
3        A.   Yes.
4        Q.   And this is a list of every case reported to
5   the Office of Attorney General about voter fraud between
6   2002 and 2011; is that correct?  If you look at the
7   bottom of the page there's a date on that document of
8   1-21-2011.
9        Q.   Does that indicate to you that this is a list
10   of referrals for voter irregularities from August 2002
11   to 2011?
12       A.   Yes.
13       Q.   And just for the sake of moving us along, if
14   you turn to the very last page of that document, there
15   are two incidents of voter impersonation listed on that
16   page.  One that occurred in Bexar County, and one that
17   occurred in Bryan County.  Do you see that?
18       A.   Yes.
19       Q.   Did you do anything to determine whether that
20   incident, these incidents of voter impersonation
21   occurred at the polling place, or not?
22       A.   Not that I recall.
23       Q.   I will represent to you that those are the only
24   two incidents on this chart that refer to voter

---

**36**

1   impersonation.  Looking at this chart, can you tell
2   whether any of the other incidences that were referred
3   to the Office of the Attorney General between August
4   2002 and January 2011 involved in-person voter fraud?
5            MS. HALPERN:  I'm going to object.  Calls
6   for speculation.
7        A.   This -- this document was prepared by the
8   Attorney General's Office.  They're the ones with the
9   detailed information on the cases.  So I can't speak to
10   the facts behind the case.
11       Q.   (By Ms. Rudd)  And that's why my question was:
12   Can you tell from looking at this chart, what these
13   cases involved or if they involved in-person voter
14   fraud?
15       A.   The chart documentation doesn't make that
16   distinction.
17       Q.   Did you call anyone up at the Office of the
18   Attorney General to ask about any of these particular
19   cases to determine whether they involved in-person voter
20   fraud?
21       A.   I don't recall.
22       Q.   Did it matter to you whether these were cases
23   of in-person voter fraud?
24       A.   The information mattered to me.  I was --
25   that's why it was requested.  I was doing my research

---

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

10 (Pages 37 to 40)

37

1  into the -- the issue, and these were cases that were
2  being investigated by the Attorney General's Office, and
3  so I thought it was important information, so yes.
4     Q.  Okay.  So that was a long answer.
5     A.  Okay.
6     Q.  Let me just make sure we're on the same page.
7     A.  Okay.
8     Q.  My question is -- I understand you were doing
9  research in connection with SB 14 when you received this
10 information, correct?
11    A.  Yes.
12    Q.  And one of the things you were researching was
13 whether there were incidents of in-person voter fraud in
14 Texas, correct?
15    A.  Correct.
16    Q.  Because SB 14 was intended to combat in-person
17 voter fraud as opposed to other types of voter fraud,
18 correct?
19    A.  Correct.
20    Q.  So did it matter to you, when you received this
21 particular chart, whether any of the reported incidents
22 on this chart actually involved in-person voter fraud as
23 opposed to other types of voter fraud?
24    A.  Yes.
25    Q.  Okay.  It did matter to you?

38

1     A.  Yes.
2     Q.  Is there anything that you did to determine
3  which incidents on this list involved in-person voter
4  fraud as opposed to other types of voter fraud at any
5  point?
6     A.  I did research -- and I don't know how it
7  related to this list, but reports of in-person voter
8  fraud around the state of Texas.  I don't know how it
9  relates to this list.  There were other cases that are
10 outside of this list that are not referred to the
11 Attorney General's Office.
12    Q.  Okay.  Let's talk about that.  What other cases
13 did you research in connection with SB 14 about
14 in-person voter fraud?
15    A.  There were cases that were being handled by
16 local district attorneys.  I remember researching news
17 reports regarding those cases.
18    Q.  Okay.  So was your research confined to news
19 reports of those cases, or did you do any additional
20 research?
21    A.  I would say primarily confined to news reports.
22    Q.  Okay.  After looking at those news reports, did
23 you do any follow-up research to determine what the
24 outcome of those particular cases was?
25    A.  The news reports -- it would depend on the

39

1  case.  I believe there were some that were -- had been
2  concluded.  There was a resolution.  So it would depend
3  on the individual case.
4     Q.  Did you produce these news reports in
5  connection with this case?
6     A.  I don't recall.
7     Q.  Do you know whether you produced those news
8  reports in connection with the Section 5 case?
9     A.  I don't recall.
10    Q.  I think you testified earlier that you didn't
11 find anything relevant when you were searching for
12 documents in connection with this case, correct?
13    A.  Correct, yes.
14    Q.  So you wouldn't have produced these in
15 connection with this case?
16    A.  No, no, I was -- Representative Harless, their
17 office produced the documents.  I was not the custodian
18 of those documents, so I can't testify to what they
19 turned over.  So that's why I said that I don't recall.
20    Q.  About how many news reports do you think you
21 read regarding in-person voter fraud in Texas?
22    A.  I don't recall an exact number.
23    Q.  Would it be less than ten?
24    A.  Yes.
25    Q.  Do you have a sense for in all of your research

40

1  how many cases of in-person voter fraud were actually
2  prosecuted to conclusion in Texas?
3     A.  I did not have a good number, and that was part
4  of the issue that we were trying to resolve with Senate
5  Bill 14 --
6     Q.  Okay.  Were --
7     A.  -- that it was difficult to prove these cases,
8  and we were trying to give another tool to election
9  workers to have to enforce, to ensure people were voting
10 who should be voting.
11    Q.  All right.  You said a number of things there,
12 so let me try to break that down.  One of the things you
13 said was that it was difficult to enforce.  Is one of
14 the issues that you were dealing with was the difficulty
15 of detecting in-person voter fraud in Texas?
16    A.  Yes.
17    Q.  And why -- why do you think it was difficult to
18 detect incidences of in-person voter fraud in Texas?
19    A.  I feel there's underreporting of some of this
20 illegal voting happening.  This is my opinion.
21 Underreporting, it's being left up to -- it was being
22 left to the -- the poll workers to -- they didn't have
23 the tools they would need to enforce this, so it was
24 being underreported.
25    Q.  Okay.  When you say voter fraud, in-person

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

45

1  Donna Howard won her office by a margin of just three
2  votes, correct?
3      A.  Yes.
4      Q.  And let's just look at that document because
5  Donna Howard is my rep, actually, and I voted for her,
6  so I found this really kind of entertaining.
7          MR. SCOTT:  Objection, form, sidebar.
8          MS. RUDD:  Total sidebar.  Makes
9  depositions more interesting.
10         MR. SCOTT:  I didn't want somebody to use
11 that against you in the future.  Trying to protect the
12 record.
13         (Exhibit 2 marked for identification.)
14     Q.  (By Ms. Rudd)  You've been handed what's been
15 marked as Beuck Exhibit 2, which has been designated
16 highly confidential.  And it's Bates numbered TX 91736
17 through 91737.  And feel free to look though
18 document.  I assume you recognize it.
19     A.  Yes.
20     Q.  And when you're ready, I want to start with the
21 first e-mail in the string, which is on the second page.
22     A.  Okay.
23         MS. HALPERN:  I'm also going to enter an
24 objection to questions on this document as violating the
25 deliberative process privilege.  This is not the final.

---

46

1      A.  You wanted to talk about this --
2          MS. HALPERN:  Is there a question pending?
3          MS. RUDD:  Oh, I just wanted to give him
4  an opportunity to read it over.
5          MS. HALPERN:  There's no question pending
6  so you don't need to say anything.
7          THE WITNESS:  Okay.  Okay.
8          MS. HALPERN:  After you answer this
9  question, I'm going to ask for a break, because we've
10 been going for an hour and I need one.
11         MS. RUDD:  Okay.
12     Q.  (By Ms. Rudd)  So if you look at the first
13 e-mail in the string on this document, there is an
14 e-mail from a person named Jacqueline Clark to Patricia
15 Harless on November 15, 2011, correct?
16     A.  Yes.
17     Q.  And the subject line is, "Op-Ed in Defense of
18 Photo Voter ID in Today's Chronicle," correct?
19     A.  Yes.
20     Q.  Do you recall the Op-Ed article that
21 Representative Harless authored in the Chronicle?
22     A.  Yes.  I don't recall the details of the
23 article, but I do remember there was an Op-Ed by her in
24 the Chronicle.
25     Q.  Okay.  That's fine.  I just wanted to make sure

---

47

1  we were on the same page.
2      A.  Okay.
3      Q.  And this is -- one of the things you did in
4  Representative Harless's office was handle constituent
5  e-mail, correct?
6      A.  Correct.
7      Q.  And this is an e-mail that you dealt with in
8  particular, correct?
9      A.  Yes.
10     Q.  And Jacqueline Clark was one of these
11 constituents of Representative Harless, correct?
12     A.  I don't know.
13     Q.  Okay.  Do you know Jacqueline Clark personally?
14     A.  No.
15     Q.  And this is just an e-mail you fielded because
16 you were the chief of staff for Representative Harless
17 at the time; is that right?
18     A.  Yes.  I was tasked with responding to --
19 helping respond to constituents.
20     Q.  And what Ms. Clark says in her e-mail here is
21 that she's disappointed in Representative Harless's
22 support of Photo Voter ID, correct?
23     A.  Correct.
24     Q.  And she says, "It's sadly reminiscent of things
25 like poll taxes and literacy tests," correct?

---

48

1      A.  That is what she states in the e-mail, yes.
2      Q.  And you know that poll taxes were historically
3  used to disenfranchise certain voters, correct?
4      A.  Yes.
5      Q.  Okay.  And then if you turn to the first page
6  of this document, there is an e-mail from you to the
7  Representative Harless, copying Julie Scott, correct?
8      A.  Yes.
9      Q.  Who is Julie Scott?
10     A.  She is an employee of Representative Harless.
11     Q.  Okay.  And what was her title at the time, if
12 you know?
13     A.  I don't know.
14     Q.  What was her job with Representative Harless?
15     A.  She also helped with handling constituent work
16 in the representative's schedule.
17     Q.  Okay.
18     A.  I believe her title was director of operations.
19     Q.  At the top of your e-mail here you say, "Going
20 to use this as a base for other anti-SB 14 responses;"
21 is that right?
22     A.  Yes.
23     Q.  And so what you were saying to Representative
24 Harless is this was your suggestion for dealing with
25 other types of constituent mail like Ms. Clark's e-mail,

---

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

13 (Pages 49 to 52)

---

**49**

1  correct?
2  **A. Correct.**
3  Q.  And the first paragraph of your e-mail said,
4  "Thank you for your e-mail."  You go on to sort of deal
5  with the major issues in SB 14, and there's some
6  highlighting in this paragraph, correct?
7  **A. Yes.**
8  Q.  Would that have been highlighting inserted by
9  Representative Harless?
10  **A. Yes.**
11  Q.  And then below that first paragraph is a
12  paragraph in smaller type.  Is that language inserted by
13  Representative Harless?
14  **A. I believe so.**
15  Q.  So Representative Harless was suggesting a
16  revision to your draft e-mail; is that right?
17  **A. That's how it appears, yes.**
18  Q.  And in the paragraph below that, we come to
19  this Donna Howard issue, and the paragraph reads,
20  "Witness testimony in committee over the last several
21  sessions has been that voter fraud exists."  And that's
22  something that you knew about from listening in to
23  committee hearings, is that right, or reading committee
24  testimony?
25  **A. Yes, from previous sessions?**

---

**50**

1  Q.  Correct.
2  **A. Yes.**
3  Q.  And you go on to say, "Our elections are too
4  important not to safeguard, because even a few
5  fraudulent votes could swing an election."  And did you
6  believe that when you wrote that?
7  **A. That fraudulent votes can swing an election?**
8  Q.  Yes.
9  **A. Yes.**
10  Q.  Do you know of any elections that have been
11  swung by fraudulent votes in Texas?
12  **A. No, not to my personal knowledge.**
13  Q.  Okay.  Have you ever researched that issue?
14  **A. I know there are examples and from history on**
15  **that, but I can't speak on any specifics.**
16  Q.  Okay.  As you sit here today, you're not aware
17  of any elections in Texas that were swung by a few
18  fraudulent votes, are you?
19  **A. Not any specifics.**
20  Q.  Okay.  And then you go on to say, "For example,
21  Representative Donna Howard's last election won her seat
22  in the Texas House by three votes;" is that right?
23  **A. Yes.**
24  Q.  Are you suggesting here that Donna Howard won
25  her election by three fraudulent votes?

---

**51**

1  **A. No.**
2  Q.  It's kind of what it sounds like here, though,
3  isn't it?
4  **A. That was not --**
5  MS. HALPERN:  Objection, argumentative.
6  The document speaks for itself.  It's pretty clear.
7  **A. That was not my intent writing that.  That was**
8  **not what I was trying to suggest.**
9  Q.  (By Ms. Rudd)  And to your knowledge,
10  the three votes that were cast by which Donna Howard won
11  were not fraudulent votes?
12  **A. No.**
13  MR. SCOTT:  Objection, form, speculation.
14  MS. HALPERN:  I'd like to take a break
15  right now.  There's no question pending.
16  MR. RUDD:  Okay.
17  (Recess at 10:40 a.m. to 10:59)
18  Q.  (By Ms. Rudd) So before we went off the record,
19  we were talking about this e-mail exchange that you had
20  with representative Harless about a particular
21  constituent's e-mail regarding Photo Voter ID.  Do you
22  recall that?
23  **A. Yes.**
24  Q.  Okay.  And when we were looking at this string
25  of e-mails.  I think we were -- we had stopped at sort

---

**52**

1  of the last paragraph on the first page of this
2  document.  And in that paragraph you talk about
3  witnesses who testified about voter registration cards
4  being stolen and falsely cast in other people's names;
5  is that right?
6  **A. This last paragraph?**
7  Q.  Yes.
8  **A. Yes.**
9  Q.  And do you know whether that testimony that
10  you're referring to involved in-person Voter ID fraud?
11  **A. Which portion?  Are you --**
12  Q.  Well, just in general, you're referring to
13  testimony from many witnesses over the last couple of
14  sessions about stolen voter registration cards, casting
15  votes in other people's names.  Do you know whether the
16  instances of voter fraud that were testified to, that
17  you're referring to in this paragraph, were instances of
18  in-person Voter ID fraud?
19  **A. I don't know.**
20  Q.  Okay.  If you turn to the -- if you look
21  actually at the top of this first page --
22  **A. Yes.**
23  Q.  -- there's a response from Representative
24  Harless to you on November 21, 2011, correct?
25  **A. Yes.**

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

14 (Pages 53 to 56)

53

1    Q.  Had she says, "This needs more work.  All you
2  are going to do is make them more angry with that
3  response."  Do you have a sense for what she's talking
4  about when she says that?
5    **A.  I think out of context, if you read the rest of**
6  **her -- you know, it probably makes a little bit more**
7  **sense in what she was trying to get across.**
8    Q.  So one of the things that she sort of
9  highlighted in the e-mail that you sent was this notion
10 of disenfranchising voters, right?
11   **A.  Yes.  That's highlighted.**
12   Q.  And she wanted you to remove that language,
13 correct?
14   **A.  I can't tell within the context of this**
15 **without -- this is a rough draft, and so.**
16   Q.  I understand.  And she came back as a result of
17 your draft and made some comments, she highlighted
18 some language and she suggested other language, correct?
19   **A.  Yes, that's what's occurring in this e-mail.**
20   Q.  And then in the second sentence of her e-mail
21 to you, she says, "Look at it and tell me the words you
22 shouldn't use."  Do you have a sense of what words you
23 shouldn't use?
24   **A.  I might have at the time.  I can't recall right**
25 **now.**

54

1    Q.  Would "disenfranchise" be a word not to use?
2    **A.  I can't recall.  Out of context, it's hard to**
3  **say.**
4    Q.  Okay.  And then she goes on to say, "Right is
5  from the positive position and not the negative, just
6  like we framed the debate."  I confess, I have no idea
7  what that means.  Do you have know what that means?
8    MS. HALPERN:  Objection.  Are you serious,
9  Counsel?
10       MS. RUDD:  I don't what it means.  And he
11 received the e-mail, so I'd like to know what his
12 interpretation is.
13   **A.  You know, I think that's probably an**
14 **appropriate question for Representative Harless.**
15   Q.  (By Ms. Rudd) When you receive this e-mail from
16 Representative Harless, did you understand it?
17   **A.  I understood that she wanted me to make some**
18 **corrections.**
19   Q.  Did you find this e-mail condescending?
20       MS. HALPERN:  Objection, relevance.
21   **A.  My -- this was a rough draft process.  It's the**
22 **back and forth on -- on how editing happens.  I-- I**
23 **didn't take it personally.**
24   Q.  (By Ms. Rudd) One of the things we were talking
25 about before the break was your effort to gather

55

1  information about instances of voter fraud in Texas,
2  correct?
3    **A.  Yes.**
4    Q.  And we looked at several charts that you
5  received from the OAG'S office talking about reports of
6  types of voter fraud, correct?
7    **A.  Yes.**
8    Q.  And that information was received by you in
9  February of 2011, right?
10   **A.  Yes.**
11   Q.  HB 112 was prefiled I think you said in
12 November of 2010, correct?
13   **A.  Yes.**
14   Q.  Did you do anything to gather information about
15 instances of in-person Voter ID fraud prior to the
16 prefiling of HB 112?
17   **A.  I was researching the issue as a whole.  I**
18 **can't -- it was -- I was researching all Voter ID issues**
19 **prior to prefiles, post prefiling the bill.  When we**
20 **picked up Senate Bill 14, it was -- I don't recall when**
21 **the specific research happened.**
22   Q.  Was it important to determine whether there was
23 in-person Voter ID fraud in Texas prior to filing HB
24 112?
25   **A.  I think my research -- it was -- part of my**

56

1  research was looking into allegations of voter fraud.
2    Q.  Was it important to you whether in-person voter
3  fraud had actually happened in Texas prior to filing HB
4  112?
5    **A.  Yes, those cases would be important.**
6    Q.  As you sit here today, can you point me to any
7  statistics or information that you gathered regarding
8  the rate of in-person Voter ID fraud in Texas prior to
9  filing HB 112?
10   **A.  I don't have that information with me.**
11   Q.  Do you know if it exists?
12   **A.  I do not.**
13   Q.  Just to clarify for the record, one of the
14 purposes of HB 112 was also to combat in-person voter ID
15 fraud, correct?
16   **A.  Yes.**
17   Q.  And that was the specific type of voter fraud
18 that was targeted by HB 112?
19       MR. SCOTT:  Objection, form.
20   Q.  (By Ms. Rudd) Correct?
21       MR. SCOTT:  Mischaracterization.
22   **A.  There were multiple purposes for the**
23 **legislation.  That was one of the purposes.**
24   Q.  (By Ms. Rudd) I understand.  But the type of
25 voter ID fraud that you were concerned with, with HB

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

15 (Pages 57 to 60)

---

57

1  112, was in-person voter ID fraud?
2         MR. SCOTT:  Objection, form,
3  mischaracterization.
4       **A.  Yes, that is the -- the bill seeks to improve**
5  **the in-person voting process.**
6       Q.  (By Ms. Rudd) Did you discuss HB 112 with
7  Representative Harless prior to filing that particular
8  piece of legislation?
9       **A.  Yes.**
10        MS. HALPERN:  Objection, states facts not
11  in evidence.
12        MS. RUDD:  Well, I asked him for the
13  facts.
14        MS. HALPERN:  No.  Your question implies
15  that he filed the bill.
16        MS. RUDD:  Okay.  Well, let me restate it
17  just to make it very clear.
18       Q.  (By Ms. Rudd) Did you speak to Representative
19  Harless about HB 112 prior to it being filed?
20       **A.  Yes, we had conversations about HB 112.**
21       Q.  And can you describe generally for me what
22  those conversations involved?
23        MS. HALPERN:  All right.  I'm going to
24  object on the basis of legislative privilege.  I'm going
25  allow the witness to answer the questions because this

---

58

1  entire deposition is under seal and we do so with the
2  understanding that answer in this fashion is consistent
3  with the court's direction and does not in fact waive
4  privilege.
5       **A.  The -- could you repeat your question?**
6       Q.  (By Ms. Rudd) Sure.  Could you just describe
7  generally for me the kinds of things that you discussed
8  with Representative Harless about Voter ID issues prior
9  to the filing of HB 112?
10       **A.  The issue was of importance to her.  She wanted**
11  **to file a bill on the issue.  She had been hearing from**
12  **her constituents about the importance of -- of the**
13  **issue.**
14       Q.  Did you ask her about any particular instances
15  of in-person voter ID fraud that she knew about prior to
16  filing HB 112?
17       **A.  I don't recall.**
18       Q.  Did you discuss with her any concerns that you
19  had about the impact of HB 112 on any particular groups
20  of voters?  Let me -- actually, strike that.  Let me ask
21  -- let me break it down.
22       **A.  Okay.**
23       Q.  One of the things you knew with any kind of
24  Voter ID legislation in Texas is that at that time you
25  would have had to obtain preclearance for the

---

59

1  legislation, correct?
2       **A.  Yes.**
3       Q.  And one of the things -- well, let me just ask
4  you:  Was one of the things that you were supposed to do
5  is to make sure that the bill was drafted in a way that
6  would meet the requirements of the Voting Rights Act,
7  Section 5?
8       **A.  Which bill are we referring to right now?**
9       Q.  HB 112.
10       **A.  112.  Part of my role as -- in her office was**
11  **to prepare the legislation and to ensure that the**
12  **constitutional -- it met the legal requirements.**
13       Q.  And one of the legal requirements is that it
14  meet the requirements of the Voting Rights Act, correct?
15       **A.  Yes.**
16       Q.  And you know that the Voting Rights Act was
17  enacted to safeguard the rights of certain historically
18  disenfranchised voters, correct?
19       **A.  That's my understanding, yes.**
20       Q.  And Texas is one of the states that was
21  required to obtain preclearance for any changes to its
22  voting law under Section 5 of that Act, correct?
23       **A.  Yes.**
24       Q.  Did you discuss with Representative Harless any
25  of the issues that arose as a result of the Voting

---

60

1  Rights Act in connection with HB 112?
2         MS. HALPERN:  I'm sorry, could I have that
3  read back?
4         (Requested portion was read back by the
5  court reporter.)
6         MS. HALPERN:  Thank you.
7         I need to assert the legislative privilege
8  with respect to this question as well.  I'm going to
9  allow the witness to answer it with the understanding
10  that, based on court's direction, doing so does not
11  waive the privilege.
12       **A.  Yes, I recall the -- a -- I knew that there was**
13  **-- the standards within the Voting Rights Act and that**
14  **was communicated to Representative Harless.**
15       Q.  (By Ms. Rudd) Did you vocalize any concerns in
16  your conversations with Representative Harless about HB
17  112 when it came to complying with the Voting Rights
18  Act?
19       **A.  I felt that it did comply or that it would**
20  **comply with the Voting Rights Act.**
21       Q.  While you were working in Representative
22  Harless's office, did you receive any calls from
23  constituents regarding Voter ID where the constituents
24  were concerned with Voter ID measures like HB 112?
25       **A.  Specifically to 112?**

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

---

61

1    Q.  Or in general.  Any kind of Voter -- let me
2  just ask it a different way.
3        During the time that HB 112 and SB 14 were
4  pending, did you receive any communications from
5  constituents that they believed that those types of
6  Voter ID measures were inconsistent with the Voter
7  Rights Act?
8        MS. HALPERN:  Object on the basis of
9  legislative privilege if it involves communications with
10  constituents.  And again I'm allowing him to answer it
11  because we're under seal.
12        MR. GEER:  And are you asserting
13  legislative privilege for communications with
14  constituents?
15        MS. HALPERN:  Yes.
16        MR. GEER:  Is that your position?
17        MS. HALPERN:  Yes.
18    A.  We spoke with a number of constituents.  I
19  cannot recall a specific conversation regarding the
20  Voting Rights Act but we heard from constituents for and
21  against.
22    Q.  (By Ms. Rudd)  Were you aware when you were
23  developing HB 112, that there was going be opposition
24  from minority groups about any type of Voter ID
25  legislation that was more restrictive than current law?

---

62

1    A.  Yes.  I was aware the previous sessions there
2  was opposition from minority interest groups.
3    Q.  Voter ID legislation in Texas over the course
4  of those sessions and up until the passage of SB 14 was
5  pretty controversial, right?
6        MS. HALPERN:  Objection, calls for --
7  assumes facts not in evidence.
8    A.  The bills were contentious.
9    Q.  (By Ms. Rudd) So the answer to my question is
10  yes?
11    A.  Controversial?  I would say contentious.
12    Q.  Okay.  And there were a fair number of groups
13  who were against passing any Voter ID legislation in
14  2011, correct?
15    A.  Yes.
16    Q.  And one of the things you were aware of is that
17  you were going to face -- or Representative Harless was
18  going to face opposition to her Voter ID legislation,
19  correct?
20    A.  Yes.
21    Q.  Did you talk to Representative Harless about
22  any concerns you had with the legislation, if any?
23        MS. HALPERN:  Objection.  Time out.  I'm
24  going to caution the witness that to the extent that he
25  is an attorney and that any of these communications are

---

63

1  subject to the attorney-client privilege.  For those,
2  I'm going to direct you not to answer.  To the extent
3  that your communications were not in an attorney-client
4  capacity and come within the legislative privilege, I'm
5  going to note an objection based on the legislative
6  privilege, but you can go ahead and answer as long as
7  you're not evading the attorney-client privilege.
8    Q.  (By Ms. Rudd) Okay.  Let's just back up for a
9  second.
10        Did you represent Representative Harless
11  in an attorney-client capacity?
12    A.  That is my understanding.
13    Q.  Okay.  And for -- on what issues did you
14  represent Representative Harless as her attorney?
15    A.  When legal questions arise specific to my
16  experience and expertise as an attorney.
17    Q.  Okay.  But you were not her general counsel,
18  correct?
19    A.  That was not my title, but I am an attorney and
20  she was well aware of that and would seek my counsel on
21  legal issues.
22    Q.  Okay, fair enough.  But you don't always act as
23  an attorney just because you are an attorney, correct?
24    A.  No, no.
25    Q.  And when you were developing HB 112 and SB 14,

---

64

1  you were acting in a chief of staff capacity; is that
2  correct?
3    A.  It -- being in a Representative's office, you
4  wear many hats, and I would be doing my policy work, I
5  would also have my legal opinions on certain actions, so
6  it's hard to sometimes differentiate.
7    Q.  Okay.  Well, that's a fair point.  How -- do
8  you have any way of differentiating between the times
9  you were acting as a chief of staff and the times you
10  were acting as an attorney rendering legal advice?
11    A.  I think when there are, say, specific legal
12  issues she was asking me about.  And the majority of my
13  work was as a policy legislative director, chief of
14  staff.  But there were instances where I was -- my legal
15  advice was sought.
16    Q.  Did you have any concerns yourself about the
17  voting rights implications of HB 112?
18        MS. HALPERN:  I'm going to object on the
19  basis of legislative privilege along the lines
20  previously stated.  Based on the court's direction and
21  with the understanding that the privilege is not waived
22  by him answering under seal, I'm going to permit him to
23  answer.
24    A.  I believe that HB 112 was within the Voting
25  Rights Act.

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

17 (Pages 65 to 68)

---

**65**

1  Q.  (By Ms. Rudd) What did you do to satisfy
2  yourself of that?
3      A.  Researched the issue, researched the Voting
4  Rights Act and the court cases.
5      Q.  When you say court cases, what are you
6  referring to?
7      A.  The Crawford.
8      Q.  Okay.  Is there any other court cases that you
9  looked at?
10     A.  I can't recall a specific court case.
11     Q.  Did you perform any research about which
12 constituents, if any, in Representative Harless's
13 district had the requisite forms of ID listed in HB 112?
14     A.  Could you restate it?  Was it specific to
15 Representative Harless's district?
16     Q.  Yes.
17     A.  No, not that I recall.
18     Q.  Did you perform any research to determine
19 whether any minority groups would be more significantly
20 impacted by HB 112 than non-minority groups?
21     A.  In my overall study of the Voter ID issue, that
22 was a concern that had been raised in the past and that
23 was information that I came across in my research.
24     Q.  Okay.  Did you do anything personally in
25 connection with your development and drafting of HB 112

---

**66**

1  to satisfy yourself that HB 112 would not
2  disproportionately impact minority groups?
3      MS. HALPERN:  Objection, compound.
4      A.  It's been some time since I've looked at HB
5  112, so I would have to look at the specific bill
6  language to see what was done within the bill.
7      Q.  (By Ms. Rudd) Okay.  Well, what I'm really
8  trying to get at is that other than looking at what the
9  Supreme Court said in Crawford, did you do anything to
10 ensure that the way that HB 112 would work in practice
11 would not disenfranchise minority groups?
12     A.  There were protections within the bill.  I
13 would have to see the bill language to work through
14 that.
15         (Exhibit 3 marked for identification.)
16     Q.  (By Ms. Rudd) Okay.  Well, that's a good idea.
17 Let's look at it.
18         Do you recognize what's been marked as
19 Beuck Exhibit 3?
20     A.  Yes.
21     Q.  What is this document?
22     A.  This is House Bill 112 by Representative
23 Harless.
24     Q.  Okay.  And you just testified that there were
25 safeguards put into HB 112 to protect minority voters,

---

**67**

1  correct, or to protect against the disenfranchisement of
2  voters; is that right?
3      A.  Yes.
4      Q.  Feel free look through this.  Can you just
5  point me to what safeguards you're referring to.
6          MS. HALPERN:  I direct the witness to look
7  at the bill carefully before answering.
8      A.  The provisions in the bill that I think address
9  those issues would be the notice requirements, education
10 outreach, increased notice of the changes in the bill,
11 increased voter education, increased training for
12 people, election officers and provisional ballot
13 process, pre-identification.
14     Q.  (By Ms. Rudd) Did HB 112 specify any particular
15 budget for voter outreach efforts?
16     A.  I don't recall.
17     Q.  I want to just briefly go through some of the
18 ID requirements of HB 112.  If you will look with me to
19 Page 3, Section 6 of that legislation.  Section 6(b)
20 says, "On offering to vote, a voter must present to an
21 election officer at the polling place either:  Number 1,
22 one form of identification listed in Section 63.0101(a),
23 or Number 2, two different forms of identification
24 listed in 63.0101(b)."  Did I read that correctly?
25     A.  Yes.

---

**68**

1  Q.  And then if you'll flip with me to Page 5, the
2  bottom of that page, Section 10 contains Section
3  63.0101 (a) and (b) listing those types of documentation
4  or ID.  And in (a), there are -- I'm just counting here
5  -- six different types of photo identification that
6  would be acceptable under HB 112, correct?
7      A.  That's correct.
8      Q.  And the very first acceptable form of photo
9  identification listed here is a driver's license or
10 personal identification card expired -- or that expired
11 no earlier -- I'm sorry, that's probably not expired --
12 or expired no earlier than two years before the date of
13 presentation, correct?
14     A.  Yes.
15     Q.  And do you know where that two-year expiration
16 period came from?
17     A.  I don't recall.
18     Q.  But at the time that HB 112 was filed
19 prescribing that photo identification not expired more
20 than two years, was an acceptable limitation for
21 Representative Harless?
22     A.  The language from House Bill 112 was from the
23 Senate Bill which had passed in 2009.
24     Q.  Okay.  And so this language was acceptable to
25 Representative Harless at the time?

---

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

---

**69**

1   A.  I would say it was a starting point.
2   Q.  Did you have any conversations with
3   Representative Harless about the period by which a photo
4   identification could be expired and still be acceptable
5   for purposes of voting?
6   A.  In regards to 112?
7   Q.  Yes.
8   A.  Not that I recall.
9   Q.  The second form of ID listed here is a United
10  States military identification card that contains a
11  person's photograph, correct?
12  A.  I'm sorry, what page?
13  Q.  I'm sorry, I'm on Page 6.
14  A.  Okay.
15  Q.  Number 2.
16  A.  Yes.
17  Q.  And there is no specification of whether that
18  military identification card had to be unexpired,
19  correct?
20  A.  There is -- correct.
21  Q.  And if you skip down -- and at the time, that
22  form of photo ID was acceptable to Representative
23  Harless, correct?
24  A.  That -- that's what's in the bill.
25  Q.  She approved the bill before it was filed,

---

**70**

1   right?
2   A.  Correct.
3   Q.  The sixth form of ID listed there is a valid
4   identification card that contains the person's
5   photograph and is issued by an agency or institution of
6   the federal government or an agency, institution or
7   political subdivision of the State, correct?
8   A.  Yes.
9   Q.  Did you have any discussions with
10  Representative Harless about that form of photo
11  identification prior to filing HB 112?
12  A.  Not that I recall.
13  Q.  But at the time that this bill was filed, that
14  form of photo identification was acceptable to
15  Representative Harless?
16      MS. HALPERN:  Objection, calls for
17  speculation.
18      A.  It's -- it's part of the bill that was filed by
19  her.
20  Q.  (By Ms. Rudd) And it approved by her,
21  right?
22  A.  Yes.
23  Q.  And then Subsection B, at the very bottom of
24  that page, lists forms of documentation that are
25  non-photo forms of identification that were acceptable

---

**71**

1   under HB 112, correct?
2   A.  Correct.
3   Q.  And you had to present two forms of this type
4   of documentation to vote under HB 112; is that right?
5   A.  Yes.
6   Q.  And there are 11 different forms of non-photo
7   identification listed here, correct?
8   A.  Yes.
9   Q.  At the time that HB 112 was being developed,
10  did you discuss the concept of allowing certain forms of
11  non-photo ID to be presented for voting purposes with
12  representative Harless?
13  A.  That was -- that is part of the bill, and yes,
14  that was discussed.
15  Q.  What caused -- if you know, what caused
16  Representative Harless to include forms of non-photo ID
17  in HB 112?
18      MS. HALPERN:  I'm going to object on the
19  basis of legislative privilege.  With the understanding
20  based on the court's ruling and guidance that testimony
21  could be given under seal which would not waive
22  privilege, the witness is going to be permitted to
23  answer.
24      A.  This was the language that was contained in the
25  Senate Bill that had passed in the prior session, and it

---

**72**

1   was my understanding that she wanted the -- our bill to
2   look similar to the Senate Bill that had passed out of
3   the Senate in 2009.
4   Q.  (By Ms. Rudd) Did you have any discussions with
5   Representative Harless prior to filing HB 112 about
6   whether photo identification was superior to forms of
7   non-photo identification for voting purposes?
8   A.  The --
9      MS. HALPERN:  Objection on the basis of
10  legislative privilege.  Shortened objection.  The
11  witness can answer.
12  A.  My understanding was that photo ID was the --
13  what the constituents were asking for her to carry, for
14  her to help pass.  They wanted to see a photo ID
15  requirement.  This bill was what passed out of the
16  Senate in 2009 and we saw this as a starting point to
17  begin the debate.
18  Q.  (By Ms. Rudd) Okay.  Because it passed out of
19  the Senate in 2009, did Representative Harless believe
20  that it would be easier to get consensus on HB 112 if it
21  sort of mirrored what -- what was contained and what
22  passed out of the Senate in 2009?
23      MS. HALPERN:  Objection, calls for
24  speculation, legislative privilege.  You can go ahead
25  and answer because we're under seal.

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

19 (Pages 73 to 76)

---

73

1    **A. You know, I can't speak to her -- her thought**
2    **process behind that.**
3        Q. (By Ms. Rudd) Okay. But you discussed this
4    bill with her?
5        **A. Yes.**
6        Q. Did -- was it -- was, you know, the goal of
7    obtaining consensus between the House and Senate
8    discussed on Voter ID legislation?
9        **A. As with all legislation, I think that's the**
10   **goal, is to pass what you file. So yes, consensus, a --**
11   **something that would work.**
12       Q. At the time that you filed HB or HB 112 was
13   filed, did Representative Harless support the idea of
14   allowing voters to present two forms of non-photo ID in
15   order to vote?
16       **A. It's my belief -- I'm not going to speak for**
17   **her -- but my belief that she -- the end goal was to**
18   **have a photo identification requirement and if this was**
19   **what we could get, this was what we could get.**
20       Q. Okay.
21           MS. HALPERN: Let the record reflect when
22   the witness says "this is what we could get, this is
23   what we could get," he was pointing to --
24       **A. I'm sorry.**
25           MS. HALPERN: -- that's fine.

---

74

1            He was pointing to House Bill 112 --
2        **A. Yes.**
3            MS. HALPERN: -- at the time.
4        **A. Yes.**
5            MS. HALPERN: Counsel, this version of SB
6    14 is not signed. Are you going to make a
7    representation because there's so many copies and drafts
8    floating around as to which version this is.
9            MS. RUDD: No, because I have no idea.
10           MS. HALPERN: Well, there's the version
11   that was filed, there's the final version --
12           MR. GEER: Do want the same version?
13           MS. RUDD: Yeah, that's fine. I mean, I
14   don't have copies of it but I don't think it's any
15   different.
16           MS. HALPERN: And I'm not saying that it
17   necessarily is, I just want to be sure because --
18           MS. RUDD: I don't think there will be any
19   controversy about what I'm asking. Well, I shouldn't
20   speak too soon.
21           MS. HALPERN: No, I wouldn't.
22           MR. GEER: Do you want to substitute that
23   with the signed version?
24           MS. RUDD: No, because it's just too
25   complicated with copies.

---

75

1            MS. HALPERN: Do you have copies of it?
2            MR. GEER: I do.
3            MS. HALPERN: He's got copies.
4            MS. RUDD: Okay. Well, let's just mark
5    those. That's fine. If you don't mind, Bruce.
6            MR. GEER: No, not at all.
7            MS. RUDD: Obviously, you can refer back
8    to it.
9            MS. HALPERN: I personally get messed up
10   because I looked at something and thought I was looking
11   at the final version of a bill and found out I wasn't,
12   so I don't...
13           MS. RUDD: Put that sticker on top of that
14   sticker to avoid confusion.
15           (Exhibit 3 exchanged for signed version.)
16           (Exhibit 4 marked for identification.)
17       Q. (By Ms. Rudd) Okay. Do you recognize what's
18   been marked as Beuck Exhibit 4?
19       **A. It appears to be a copy of Senate Bill 14.**
20       Q. And this is a piece of legislation that you
21   worked on, correct?
22       **A. Yes.**
23       Q. And Representative Harless sponsored this
24   legislation in the House, correct?
25       **A. Yes.**

---

76

1        Q. Turn with me if you will to Page 9 of that
2    legislation. And I'm looking at Section 63.0101, which
3    is the same section we were looking at with HB 112,
4    correct?
5        **A. Yes.**
6        Q. In Senate Bill 14, 63.0101 has listed five
7    forms of photo identification that are acceptable in
8    order to vote, correct?
9        **A. Yes.**
10       Q. And the first form of identification listed
11   there is a driver's license, election identification
12   certificate or personal identification card that has not
13   expired or that expired no earlier than 60 days before
14   the date of presentation, correct?
15       **A. Yes.**
16       Q. So 60 days is obviously less than the two years
17   prescribed under HB 112, correct?
18       **A. Yes.**
19       Q. Do you know why that change was made to the
20   legislation?
21       **A. From the debate, there were increased security**
22   **of the form of identification. If it's two years old**
23   **versus 60 days past expiration, there's increased**
24   **security with the 60 days.**
25       Q. Can you explain that to me in a little bit more

---

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

20 (Pages 77 to 80)

---

77

1  detail.  Is there some reason to believe that a photo ID
2  card or a driver's license issued by the Department of
3  Public Safety would be less secure after two years than
4  60 days?
5       A.  There are scenarios that I can think of that
6  could create an issue with the person's identity.  I
7  can't speak to specifics on that.
8       Q.  Okay.  Well, let's make this easier:  Did you
9  have any conversations about this particular expiration
10 period in connection with SB 14?
11      A.  It was an issue brought up during debate, I
12 believe.  I just -- I can't recall the conversations.
13      Q.  Okay.  So you just don't know whether you
14 personally had any conversations with anyone in
15 connection with developing SB 14 about the expiration
16 period that would be permissible?
17      A.  I don't recall.
18      Q.  Okay.  The second form of identification listed
19 here is a United States military identification card
20 that contains the person's photograph that is not
21 expired or that expired no earlier than 60 days before
22 the date of presentation, correct?
23      A.  Yes.
24      Q.  And as we saw in HB 112, there was no
25 expiration period listed for military photo ID, correct?

---

78

1       A.  Correct.
2       Q.  So this is a change from HB 112 in terms of
3  what would be acceptable under SB 14, correct?
4       A.  The two provisions are different, yes.
5       Q.  And the two provisions in SB 14 are more
6  restrictive than what was in HB 112, correct?
7       A.  Yes.  There's an expired provision in 14 and
8  that is not in 112.
9       Q.  And the expired provision is shorter than what
10 was in 112 for driver's licenses and ID cards, right,
11 two years versus six months?  I'm sorry, I'm probably
12 confusing you.  I went back to -- in general, when we're
13 talking, we're talking about the first two forms of ID
14 listed in SB 14.
15      A.  Okay.
16      Q.  There are more restrictions on those two forms
17 of ID in SB 14 than there were in HB 112?
18          MS. HALPERN:  Objection, misstates the
19 document.
20      A.  The provisions are different.  I would say the
21 -- there is an expiration no earlier than 60 days for
22 both the driver's license and military identification in
23 SB 14.
24      Q.  (By Ms. Rudd) And that represents a greater
25 restriction than what was listed in HB 112 for those

---

79

1  forms of ID, right?  60 days is less than two years, and
2  60 days expiration when there's no expiration, that's a
3  more restrictive bill, would you say?
4       A.  The time frame is less.
5       Q.  Is there some reason you're having difficulty
6  with the concept of it being more restrictive?  There
7  are less forms of ID that qualify under SB 14 than under
8  HB 112 for these two forms, correct?
9          MS. HALPERN:  Two forms?
10         MS. RUDD:  I'm just focusing on Number 1
11 and Number 2.
12         MS. HALPERN:  Counsel, Number 1 talks
13 about a driver's license, an election identification
14 certificate or a personal identification card.  That's
15 what this version of SB 14 has.
16      Q.  (By Ms. Rudd) Okay.  Let's just start all over
17 again.  In talking about the first two categories of
18 photo ID listed in SB 14 --
19      A.  Okay.
20      Q.  -- there is a smaller universe of photo ID
21 that's acceptable under SB 14 than what was acceptable
22 under HB 112, correct?
23         MS. HALPERN:  Objection, misstates the
24 document.
25      A.  My statement is that there is a 60 days

---

80

1  expiration in SB 14.
2       Q.  (By Ms. Rudd) I know.  We can all read the
3  document.  So look, this is a pretty easy question:  In
4  your view is SB 14, when it comes to the first two
5  categories of identification, more restrictive than HB
6  112 was?
7          MR. SCOTT:  Objection, argumentative.
8          MS. HALPERN:  Objection, asked and
9  answered.
10         MS. RUDD:  Not answered.  Not once.  It's
11 not a hard question.
12         MS. HALPERN:  Actually, Counsel, it is.
13 If you want to go off the record, I could tell you why.
14      A.  I feel like I've answered the question.  I
15 don't know how else to say it differently.
16      Q.  (By Ms. Rudd) Do you know what the word
17 restrictive means?
18         MS. HALPERN:  Objection, argumentative.
19      A.  Yes.
20      Q.  (By Ms. Rudd) Can you -- are you capable of
21 comparing one bill to another to determine which one
22 might be more restrictive in the forms of photo
23 identification that it allows?
24      A.  I've tried to contrast the differences between
25 the two.

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

---

81

1    Q.  And you're having difficulty with this, the way
2  I'm characterizing it, is that right, as more
3  restrictive?
4    A.  It's a shorter time frame.  I don't know how
5  else to say it differently.  I'm sorry.
6    Q.  Okay.  Is the only way a person can verify
7  their identity is by presenting a photo identification,
8  in your view?
9        MS. HALPERN:  Your asking him just like
10  today as he sits here?
11   Q.  (By Ms. Rudd) Yeah.  Are there any -- do you
12  think the photo identification is the only way you can
13  identify yourself to anyone?
14   A.  In what context?
15       MR. SCOTT:  Objection form, vague.
16   Q.  (By Ms. Rudd) Do you have to show a driver's
17  license or a form the photo ID in order to get on a
18  plane?
19   A.  That's my understanding.
20   Q.  Do you think there's any context in which photo
21  ID would not be required in order to identify yourself?
22   A.  I'm not -- I'm not sure I'm following.  I'm
23  sorry.
24   Q.  In connection with SB 14 --
25   A.  Okay.

---

82

1    Q.  -- did you research context in which photo
2  identification are required in order for a person to
3  identify themselves outside of the voting context?
4    A.  In life?  In general?
5    Q.  Yes.
6    A.  I don't -- I don't understand.
7    Q.  Well, we've seen testimony in connection with
8  SB 14 about how people have to present photo ID to get
9  on a plane, correct?
10   A.  Yes.
11   Q.  And there were examples given of situations in
12  which people would have to present photo ID when people
13  were testifying about SB 14, correct?
14   A.  Yes.
15   Q.  And the analogy was made:  Look, it shouldn't
16  be easier to vote than it is to get on a plane, correct?
17       MS. HALPERN:  Objection, misstates the
18  record.
19   A.  There was -- I believe there was testimony
20  regarding that at some point during the debate.
21   Q.  (By Ms. Rudd) Did you ever look into situations
22  where photo ID -- well, strike that.
23       One of the things that is eliminated in SB
24  14 that was included in HB 112 is a listing of forms of
25  non-photo ID that you could present in order to vote,

---

83

1  correct?
2    A.  That would be the -- yes, correct.
3    Q.  And so there is a smaller universe of
4  identification that's permitted under SB 14 than was
5  permitted under HB 112, correct?
6    A.  Senate Bill 14 requires a photo identification.
7    Q.  Right, which is -- and HB 112 allowed a number
8  of non-photo IDs, correct?
9    A.  Correct.
10   Q.  So there's a smaller universe of identification
11  that is permitted under SB 14 than was permitted under
12  HB 112?
13   A.  Correct.
14   Q.  And I think you previously testified that when
15  Representative Harless authored HB 112, even though that
16  contained some forms of non-photo ID, the end goal
17  really was to get to a bill that permitted just photo
18  ID; is that right?
19   A.  That is my understanding of what her -- the
20  plan was.  Her constituents were asking for that.
21   Q.  And SB 14 accomplished that, right?
22   A.  Accomplished the -- could you -- I'm sorry,
23  restate the question?
24   Q.  SB 14 was limited to just photo ID?
25   A.  Yes.

---

84

1    Q.  Okay.  Let's go back briefly because I just
2  don't want to -- I want to close the loop on this.
3        In connection with HB 112, you spoke with
4  Bryan Hebert in Lieutenant Governor Dewhurst's office,
5  correct?
6        MR. SCOTT:  Objection, form.
7    Q.  (By Ms. Rudd) This is something you previously
8  testified to.
9    A.  Yes.
10   Q.  And I think you also previously testified that
11  Mr. Hebert was in charge of Voter ID issues with
12  Lieutenant Governor; is that right?
13   A.  Yes.
14   Q.  Do you recall what the -- what those
15  conversations with Mr. Hebert were about?
16       MS. HALPERN:  I'm going to direct -- I'm
17  going assert the legislative privilege.  Can we stop for
18  a minute?  I want to confer with one of my colleagues.
19  We may instruct him not to answer entirely.  Before we
20  do that, I want to consult.
21       MS. RUDD:  Sure.  Let's go off the record.
22       (Recess 11:52 a.m. to 11:54 a.m.)
23       MS. HALPERN:  I want the last question
24  read back and then I want to put something on the record
25  and get out of your way.

---

COLBY BEUCK                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

109

1    Q.  Do you recall anybody else in particular that
2  you spoke to at Advocacy, Inc.?
3    A.  No.
4        (Exhibit 7 marked for identification.)
5    Q.  (By Ms. Rudd) Exhibit 7 is Bates numbered TX
6  7207, and this as an e-mail from Jessica Gomez to you on
7  February 25, 2011, correct?
8    A.  Yes.
9    Q.  And the subject line is 50 Percent VA
10 Disability and Social Security Disability, right?
11   A.  Yes.
12   Q.  Can you explain to me what was going on that
13 led to Mrs. Gomez sending you this e-mail?  And feel
14 free to read it over before you answer.
15   A.  Okay.
16       MS. HALPERN:  Please do.
17   A.  Okay.  (Reading document.)
18       Okay.  This was an e-mail -- Ms. Gomez had
19 visited my office as we were preparing for the committee
20 hearing on SB 14 with some -- she initially dropped by
21 my office as a resource and as -- offering herself as a
22 resource and as -- for those that are disabled.  We were
23 looking at one of the amendments which was added in the
24 Senate that had to do with an exemption for those that
25 are disabled, and I was asking for her help in -- in

110

1  suggestions on a standard for that exemption.
2    Q.  Is having a disability exemption in Voter ID
3  legislation something that Representative Harless was
4  supportive of?
5    A.  Yes.
6    Q.  And do you know why that is?
7        MS. HALPERN:  Objection on the basis on
8  legislative privilege, notwithstanding that I will allow
9  the witness to answer because we're under seal and we've
10 been given guidance by court that that will not waive
11 the privilege.
12   A.  I -- I can't speak for her thoughts on the
13 importance of that provision.
14   Q.  (By Ms. Rudd) Did you have discussions with
15 Representative Harless about the disability exemption
16 under Senate Bill 14 at all?
17   A.  Yes.
18   Q.  What were this those discussions about?
19   A.  The discussions at this point in time prior to
20 the committee hearing had to do with finding a standard
21 for that exemption.
22   Q.  A --
23   A.  A standard that could be used -- a standard way
24 to determine that somebody was in fact disabled.
25   Q.  Okay.  So a standard way to identify a disabled

111

1  person who comes within the exemption?
2    A.  Yes.
3    Q.  And did you end up adopting the suggestions
4  that Ms. Gomez recommended with respect to the
5  disability -- the -- how to define someone as disabled?
6  And just to be clear, I don't know the answer because I
7  haven't looked that the particular exemption in detail
8  in SB 14.  If you don't recall off the top of your head,
9  that's fine.
10       MS. HALPERN:  You might refer to the bill
11 in the stack right in front of you.
12   A.  Yeah, let me.  It appears that the suggestion
13 by Ms. Gomez was incorporated into the language of
14 Senate Bill 14.  It might not be exact but the basic
15 suggestion she had does appear to be within Senate Bill
16 14.
17   Q.  And can you refer to me what section of Senate
18 Bill 14 you're referring to specifically?
19   A.  It would be Section 1, Page 1.  Section 1 of
20 the bill.
21   Q.  Okay.  And that would be Section 1 A and B?
22   A.  Yes.  Section 13.002, the election code.  1 A
23 and B.
24   Q.  Okay.  And if you look down to the last
25 paragraph of Ms. Gomez's e-mail, she says, "I'm also a

112

1  little worried that some members might have a problem in
2  the affidavit in place of providing documentation."  Do
3  you know what she's talking about there?
4    A.  I don't recall what that was referring to.
5    Q.  Does the -- does SB 14 provide that a voter can
6  provide an affidavit of disability in lieu of providing
7  the documents that you've just pointed out, that you
8  know of?
9    A.  Not that I'm aware of.  The disability
10 exemption requires the written documentation described
11 in the Sections 1 A and B.
12   Q.  Okay.  She goes on to ask if you've talked to
13 other committee members about the disability exemption.
14 Did you talk to other committee members about the
15 exemption at this time?
16   A.  Not that I recall.
17   Q.  And then finally she says, "I have a little bit
18 of a sense of where the opposition might come from since
19 I talked with many members' offices about the exemption
20 this week.  Call me if you'd like to discuss."
21   A.  Uh-huh.
22   Q.  Did you ever discuss with Ms. Gomez what kind
23 of opposition might be lodged against a disability
24 exemption?
25   A.  I believe we did have a conversation about the

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

29 (Pages 113 to 116)

---

**113**

1  opposition to the disability exemption.
2      Q.  And what opposition was there to that
3  exemption?
4          MS. HALPERN:  I'm going to object on the
5  basis of legislative privilege, which also extends to
6  conversations by legislators and their staffs with
7  interest groups.  I'm going to allow the witness to
8  answer the question under seal with the understanding
9  based on guidance from the court that doing so does not
10 waive the privilege.
11     A.  This -- the disability exemption that was
12 placed on the Senate floor through an amendment, there
13 were -- we were receiving feedback from constituents and
14 others who had concerns about the exemption, mainly the
15 language as the bill came over from the Senate was too
16 broad and would create a loophole in the bill.
17     Q.  (By Ms. Rudd) And so you received commentary
18 from constituents that this billing which needs to be
19 narrowed so that people couldn't take advantage of the
20 exemptions that weren't really disabled?  Is that sort
21 of a gist of the commentary that you were receiving?
22     A.  That's correct.
23     Q.  Okay.  This is an example of you working with
24 one interest group to craft language in SB 14 that would
25 address some of the concerns of that interest group,

---

**114**

1  correct?
2      A.  Yes.  This -- this disability exemption,
3  because it was placed on -- through a floor amendment,
4  needed to be corrected, and I sought Ms. Gomez's
5  assistance in that.
6      Q.  To your recollection, did other interest groups
7  like, for example, the Texas NAACP or MALC, come to you
8  with similar suggestions about language for SB 14 at any
9  time during the consideration of that legislation?
10     A.  I cannot recall a specific language suggestion
11 that was brought to me.  I can't recall.
12     Q.  Did you personally reach out to any other
13 interest groups besides Advocacy, Inc. to ask for their
14 input regarding SB 14?
15     A.  Not that I can recall.
16     Q.  Let's talk about amendments.  There were quite
17 a few amendments that were proposed for SB 14, correct?
18     A.  Correct.
19     Q.  More than 60, as I recall; is that about right?
20     A.  That sounds correct.
21     Q.  Did you speak to Representative Harless about
22 any of those amendments?
23         MS. HALPERN:  Objection, vague time frame.
24     Q.  (By Ms. Rudd) During the time that SB 14 was
25 being considered by the House.

---

**115**

1      A.  I was not present on the -- the -- I was not
2  present during the debate on the House floor.  I did --
3  believe I had a conversation with her when there was a
4  break over some of the amendments that were offered.
5      Q.  Do you recall, just generally speaking, what
6  those amendments dealt with or proposed?
7      A.  Can you clarify?  The conversations I had with
8  Representative Harless and the amendments?
9      Q.  Yeah.  I mean, look, there were a ton of
10 amendments --
11     A.  Yes.
12     Q.  -- and we'll go through a lot of them
13 specifically, but just as you sit here today, are there
14 certain amendments that you remember discussing with
15 Representative Harless in particular just in terms of
16 subject matter.  I don't expect you to remember
17 amendment numbers.
18     A.  I can't recall without seeing the amendments.
19         (Exhibit 8 marked for identification.)
20     Q.  (By Ms. Rudd) Do you recognize what's been
21 marked as Beuck Exhibit 8?
22     A.  Yes.
23     Q.  What is that document?
24     A.  This appears to be the House Journal from March
25 23rd, I believe the day that Senate Bill 14 was debated.

---

**116**

1      Q.  If you will turn with me to -- I'm looking in
2  the upper right-hand corner -- well, the upper corner of
3  these pages, Page 959.  I want to look at Amendment
4  Number 3.
5      A.  Yes.
6      Q.  Amendment Number 3 was proposed by
7  Representative Giddings and Bonnen, correct?
8      A.  Correct.
9      Q.  Giddings is a Democrat; is that right?
10     A.  Yes.
11     Q.  And Bonnen is a Republican?
12     A.  Yes.
13     Q.  And if you look down to Subsection 1 of
14 Amendment 3 -- I'm just going to summarize, but feel
15 free to read it.  This amendment would have allowed a
16 voter to execute an affidavit under penalty of perjury
17 asserting that their proof of identification had been
18 stolen and to present an official copy of the police
19 report in order to vote, correct?
20     A.  Yes.
21     Q.  And it says below -- at the bottom of that
22 page -- that Amendment Number 3 was adopted; is that
23 right?
24     A.  That's -- yes, it says Amendment Number 3 was
25 adopted, correct.

COLBY BEUCK                                         6/20/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

---

**117**

1    Q.  Did you have any discussions with
2  Representative Harless about this particular amendment?
3    **A.  Can you specify the time frame on that?**
4  **Discussions --**
5    Q.  Well, I --
6    **A.  -- while the debate -- go ahead.**
7    Q.  Sorry.  I want to go broad at this point.
8    **A.  Okay.**
9    Q.  Did you discuss at any time an amendment
10  involving allowing a person to execute an affidavit that
11  their ID was stolen and being able to vote with the
12  preface of that affidavit and a police report?
13         MS. HALPERN:  Let me just clarify:  Is
14  your question broad enough to encompass after the bill
15  was already passed?  I mean, if four months after the
16  bill was over with and he still worked for her and they
17  had such a conversation, are you trying to capture that?
18         MS. RUDD:  No.  I'll go to that next.  Up
19  until the time of the bill's passage is what I'm talking
20  about now.
21         MS. HALPERN:  Okay.
22         MS. RUDD:  But thank you for that.
23    **A.  Yes, we did have a discussion about this.**
24    Q.  (By Ms. Rudd) And can you tell me what that
25  discussion was?

---

**118**

1         MS. HALPERN:  Object on the grounds of
2  legislative privilege.  Allow the witness to answer
3  because we're under seal and the privilege is not being
4  waived thereby.
5    **A.  I don't remember the substance of the**
6  **conversation, but all the amendments that were adopted**
7  **would have been most likely discussed.**
8    Q.  (By Ms. Rudd) And do you remember discussing
9  this particular amendment with Representative Harless as
10  opposed to other amendments generally?
11         MS. HALPERN:  Same objection.
12    **A.  Amendment Number 3?**
13    Q.  (By Ms. Rudd) Yes.
14    **A.  I don't remember my conversation regarding**
15  **Amendment Number 3.**
16    Q.  Do you remember whether Representative Harless
17  voted in favor of adopting Amendment Number 3?
18    **A.  I do not.**
19    Q.  Amendment Number 3 was not included in the
20  legislation that ultimately passed.  Do you have any
21  idea why that was or when it was removed?
22    **A.  I don't remember the reasoning why it --**
23         MS. HALPERN:  The question is not
24  reasoning, it's when.
25    **A.  When?**

---

**119**

1    Q.  (By Ms. Rudd) Well, I did ask why.  Let's go
2  with why first.  Do you know why it was removed?
3    **A.  No, I do not.**
4    Q.  Do you have any knowledge of when the amendment
5  was removed from the bill that ultimately passed?
6    **A.  If the amendment was adopted by the House, the**
7  **Conference Committee would have removed the amendment.**
8    Q.  Okay.  That's what I would have assumed.  I
9  just wanted to make sure that we were on the same page.
10         And did you have any discussions with
11  Representative Harless prior to the Conference Committee
12  meeting about removing this particular amendment from SB
13  14?
14    **A.  I don't recall specifics on this amendment.**
15    Q.  Okay.  If you'll turn with me to Page 966 of
16  that exhibit, I want to look at Amendment Number 11.
17  Amendment Number 11 was proposed by Representative
18  Veasey, correct?
19    **A.  Correct.**
20    Q.  And he's a Democrat as well, correct?
21    **A.  Correct.**
22    Q.  And that amendment -- I'm looking over at the
23  next page, 967 -- would have allowed a person to vote
24  who didn't have an ID by executing an affidavit under
25  penalty of perjury stating that the voter is the same

---

**120**

1  person named on the list of registered voters for the
2  precinct, correct?
3    **A.  Yes.**
4    Q.  And Representative Harless moved to table
5  Amendment Number 11, correct?
6    **A.  Yes.**
7    Q.  And to table an amendment means to suspend its
8  consideration, correct?
9    **A.  Yes.**
10    Q.  And that has the effect of really just killing
11  the amendment, correct?
12    **A.  Yes.**
13    Q.  Do you know why Representative Harless wanted
14  to table Amendment Number 11?
15         MS. HALPERN:  Objection, invades the
16  legislative privilege.  I'll allow the witness to answer
17  because we're under seal and not waving the privilege.
18    **A.  I do not know why Representative Harless moved**
19  **to table.**
20    Q.  (By Ms. Rudd) Do you recall any conversations
21  that you had with Representative Harless about the
22  subject of this particular amendment prior to SB 14
23  passage?
24    **A.  No, I do not recall conversations.**
25    Q.  Don't get rid of that document.  I want to go

---

COLBY BEUCK                                                      6/20/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

---

121

1 back to one point very quickly.
2     A.  Okay.
3         **(Exhibit 9 marked for identification.)**
4     Q.  (By Ms. Rudd) Exhibit 9 is a document Bates
5 numbered TX 4912 through 4913, and this an e-mail string
6 between you and someone at DPS Government Relations,
7 correct?
8     A.  Yes.
9     Q.  The bottom e-mail from you on March 22, 2011 --
10 so just one day before SB 1 was heard, you sent a e-mail
11 to DPS Government Relations --
12     A.  Uh-huh.
13     Q.  -- asking about how long it would take to get a
14 DPS photo ID if your driver's license is stolen,
15 correct?
16     A.  Yes.
17     Q.  Why did you send that e-mail?  It was Amendment
18 3 that we were looking at.
19     **A.  Okay.  I don't know what the context of this**
20 **e-mail, if it was referring to the amendment that was**
21 **indeed offered by Representative Giddings or a potential**
22 **amendment that was going to be offered by Representative**
23 **Giddings.  So, but I think the subject matter would be a**
24 **concern about having a stolen identification, so I was**
25 **looking into the -- the possibility of the situation**

---

122

1 **where somebody's identification was stolen.  A concern**
2 **that was raised by Representative Giddings.**
3     Q.  Okay.  And that was something -- is that
4 something that you took on independently or were you
5 asked by Representative Harless to look into that issue,
6 if you recall?
7     A.  I don't recall.
8     Q.  In any event, the response that you get from
9 DPS Government Relations is that they do issue temporary
10 driver's license or ID immediately to an individual that
11 visits the driver's license office and presents the
12 required documents, but that that temporary ID doesn't
13 have the security attributes that an actual card would
14 have, correct?
15         MS. HALPERN:  Counsel, the language you
16 were reading says "temporary receipt."
17         MS. RUDD:  Sorry.
18         MS. HALPERN:  I think it's a piece of
19 paper.
20     Q.  (By Ms. Rudd) I think you do receive a piece of
21 paper when you get temporary ID, and that wouldn't be
22 the same thing as having physical card, is that your
23 understanding from this e-mail?
24     A.  Yes.
25     Q.  And then in the last paragraph, it says, "As to

---

123

1 whether a temporary driver's license or ID would be
2 acceptable for voting purposes, that will depend on the
3 legislative intent."  Did this give you the answer that
4 you were looking for in sending your initial e-mail to
5 the DPS Government Relations office?
6     **A.  The context of my original e-mail, I don't**
7 **remember if it was this amendment or a different**
8 **language, but it appears they did answer my question,**
9 **and.**
10     Q.  Well, you follow up here and ask whether the
11 temporary ID or driver's license would have a photo,
12 correct?
13     A.  Yes.
14     Q.  Did you get an answer to that question?
15     A.  I don't recall.  I don't recall.
16     Q.  And ultimately with Amendment 3, that amendment
17 was taken off of Senate Bill 14, correct?  In Conference
18 Committee is what we just discussed.
19     A.  I believe so.
20     Q.  And was it the position of the office you
21 worked in, Representative Harless's office, that unless
22 a temporary form of ID had a photo on it, that it
23 shouldn't meet the prerequisites of Senate Bill 14?
24     **A.  The intent behind the bill was for photo**
25 **identification, so I had -- I don't remember the**

---

124

1 **specifics but that would -- to my personal knowledge,**
2 **that does seem to be -- if the temporary ID does not**
3 **have a photo, then that...**
4     Q.  Then that wouldn't have been something that
5 comported with what your office was trying to do --
6     A.  Correct.
7     Q.  -- with respect to the legislation?
8     A.  (Witness nods head yes.)
9     Q.  Okay.  Okay.  So back to Amendment Number 11,
10 which was on Page 966 and 967 of that House Journal.
11 Ultimately Representative Harless's motion to table
12 Amendment Number 11 prevailed, correct?
13     A.  Yes.
14     Q.  And that was not made part of the final SB 14,
15 correct?
16     A.  Correct.
17     Q.  If you turn to Page 978, on the top of Page
18 978, there's an Amendment Number 21.  Do you see that?
19     A.  I do.
20     Q.  And Amendment Number 21 would have allowed a
21 person seeking to vote to present a valid employee
22 identification card that contains the person's
23 photograph and was issued by an employer of the person
24 in the ordinary course of the employer's business,
25 correct?

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

125

1    A.  Yes.
2    Q.  And again, Representative Harless moved to
3  table that amendment, correct?
4    A.  Correct.
5    Q.  Which had the effect of killing that amendment,
6  correct?
7    A.  Yes.
8    Q.  And the motion to table prevailed, correct?
9    A.  Correct.
10    Q.  Representative Harless voted for her own
11  motion, yes?
12    A.  Yes.
13    Q.  Did you have any discussions with
14  representative Harless about this particular amendment
15  or the subject matter of this particular amendment?
16    A.  This was an issue that had been brought up in
17  committee and I believe on the Senate floor, so this was
18  an issue out there in the debate, so yes, we did have a
19  conversation about this.
20    Q.  Okay.  Aside from the public debate, you had a
21  conversation with Representative Harless about this
22  amendment?
23    A.  Not this particular amendment, the issue.  The
24  issue of employer's identification was something we had
25  discussed, but I don't believe I had a conversation

126

1  regarding this particular amendment.
2    Q.  Okay, fair enough.  What did you and
3  Representative Harless discuss with respect to employer
4  photo identification?
5        MS. HALPERN:  Object on the basis of
6  legislative privilege and will allow -- we will allow
7  the witness to answer the question under seal with the
8  understanding from the advisory by the court that that
9  will not constitute a waiver of the privilege.
10    A.  The -- generally speaking, the conversation
11  would have been around the security of employer's
12  identification cards, the security features and various
13  forms of these cards, and would they be easily
14  recognized by election workers.
15    Q.  And was it -- did Representative Harless
16  express to you her belief that employee identification
17  cards of this type wouldn't be particularly secure or
18  easily recognizable as you mentioned?
19    A.  I don't recall the specific statement by her
20  regarding that.  She moved to table the amendment so
21  that would lead me to believe that they didn't
22  believe they were.
23    Q.  So you anticipated my next question.  She moved
24  to table the amendment and that motion prevailed,
25  correct?

127

1    A.  Yes.
2    Q.  And she voted for that motion, in favor of that
3  motion, correct?
4    A.  Yes.
5    Q.  And then if you look at the next page, 979.
6  I'm trying to go through these pretty quickly.  979
7  contains Amendment Number 23.  Do you see that?
8    A.  Yes.
9    Q.  Representative Dutton, was Representative
10  Dutton a Democrat or a Republican?
11    A.  He's a Democrat.
12    Q.  Okay.  Amendment Number 23 would have allowed a
13  voter to present a student identification card issued by
14  a public or private high school or institution of higher
15  education that contained the person's photograph,
16  correct?
17    A.  Correct.
18    Q.  Did you discuss the subject matter of this
19  amendment, that is, student IDs being an acceptable form
20  of ID with Representative Harless at any time prior to
21  SB 14's passage?
22    A.  Yes.  Along the same lines of employer's
23  identification, this was an issue that was being
24  discussed during the debate in the Senate and in the
25  House.  And yes, we did have a conversation.

128

1    Q.  And was Representative Harless in favor of
2  allowing student IDs to be used as a form of photo
3  indication for voting purposes?
4        MS. HALPERN:  Object on the basis of
5  legislative privilege.
6    A.  It appears that she does not support it because
7  she's voting in favor of the motion to table the
8  amendment, so.
9    Q.  (By Ms. Rudd) Do you know whether she testified
10  about any of these forms of ID that we've discussed so
11  far, on the public record, and whether she supported or
12  didn't support those forms of ID?
13    A.  I don't recall.
14    Q.  Okay.  So Representative Phillips is a
15  Republican, correct?
16    A.  Yes.
17    Q.  Moved to table this amendment, right?
18    A.  Yes.
19    Q.  And as you just pointed out, Representative
20  Harless voted to table the amendment and that motion
21  carried, correct?
22    A.  Correct.
23    Q.  Okay.  If you turn to the next page, Amendment
24  24.  Amendment 24 is an amendment offered by
25  Representative Martinez Fischer, also a Democrat,

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

33 (Pages 129 to 132)

129

1  correct?
2      A.  That's correct.
3      Q.  And that amendment would have allowed a voter
4  to present a valid identification card that contains a
5  person's photograph and is issued by the State, correct?
6      A.  Correct.
7      Q.  Did you have any particular discussions with
8  Representative Harless about the subject matter of this
9  amendment?
10         MS. HALPERN:  Objection, legislative
11  privilege.
12      A.  I don't recall a specific conversation -- I
13  don't recall a conversation on this specific amendment.
14      Q.  (By Ms. Rudd) Representative Phillips moved to
15  table that amendment, correct?
16      A.  Yes.
17      Q.  And again, representative Phillips was a
18  Republican, right?
19      A.  Correct.
20      Q.  And Representative Harless voted in favor of
21  that motion, correct?
22      A.  Yes.
23      Q.  And the motion was tabled, right?
24      A.  Correct.
25      Q.  If you look down at the bottom of that page,

130

1  Amendment Number 25, is an amendment offered by
2  Representative Hernandez Luna, who is Democrat, correct?
3      A.  Yes.
4      Q.  And if you turn to the next page, Amendment
5  Number 25 would have allowed a voter to present a valid
6  identification card containing the person's photograph
7  issued by an agency or institution of the federal
8  government or an agency, institution or political
9  subdivision of the State, correct?
10      A.  Yes.
11      Q.  Again, Republican Representative Phillips moved
12  to table that amendment, correct?
13      A.  Yes.
14      Q.  And Representative Harless voted in favor of
15  the motion?
16      A.  Yes.
17      Q.  And the motion was tabled, right?
18      A.  Right.
19      Q.  Did you have any discussions with
20  Representative Harless's about the subject matter of
21  this particular amendment?
22      A.  I'm not -- I did not have a conversation about
23  this particular amendment.  The issue on -- in a broader
24  sense, yes.  This was an issue that was part of the
25  debate, a government issued ID.

131

1      Q.  And what discussions did you have with
2  Representative Harless about the use of government
3  issued ID as a form of photo ID?
4      A.  I don't recall a specific conversation.  The
5  debate around these and the argument had to do with the
6  security and readily identifiable nature of these forms
7  of identification, just in a general sense.  I don't
8  recall a specific conversation.
9      Q.  Okay.  Most of these amendments that we've been
10  going through deal with amendments -- deal with
11  proposals to allow additional forms of photo ID under
12  the -- under Senate Bill 14, correct?
13      A.  Yes.
14      Q.  And I've heard you say a couple of times, so
15  I'm hoping I can just summarize it and we can move on
16  that:  Most of the conversation you would have had with
17  Representative Harless would have had to do with how
18  secure these various forms of proposed IDs would have
19  been in terms of identifying a person; is that correct?
20      A.  Yes.  And in addition to the security of the
21  form of identification and how standard --
22  standardization of that form of identification, how
23  easily recognizable that piece of identification would
24  be to an election worker.  Those were the concerns with
25  the other forms that were proposed.

132

1      Q.  And those were concerns that -- that
2  Representative Harless had sort of across the board with
3  the alternative forms of ID; is that fair to say?
4      A.  Yes.
5      Q.  Other than those two concerns that you've just
6  talked about, so security and how easily recognizable
7  because of standardization issues these forms of ID
8  were, were there any other issues that you discussed
9  with Representative Harless regarding any of the forms
10  of ID we've just gone through?
11      A.  I can't recall a specific conversation other
12  than -- than those I mentioned.
13      Q.  Okay.  Do you have in your mind any other
14  concern that might have been aired or that you had in
15  your mind regarding these alternative forms of ID, other
16  than the two things you mentioned?
17         MS. HALPERN:  Let me just make sure I
18  understand your question.  You're asking about student
19  IDs and employer IDs -- you're asking him about any
20  concerns he has about any kind of ID essentially?
21      Q.  (By Ms. Rudd) Well, I just want to know if
22  there were other things that, you know, either you
23  raised as concerns or that were discussed, other than
24  this whole notion of security and standardization,
25  easily recognizable IDs at the polling place.  If there

133

1    were any other concerns about all these alternate forms
2    of IDs --
3            MS. HALPERN:  That they discussed?
4    Because I thought I heard you say that he has in his
5    mind --
6            MS. RUDD:  Well, I think I --
7            MS. HALPERN:  -- you know, and that's
8    telling him to give you a laundry list.  That's why I
9    want to know.
10           MS. RUDD:  Well -- no, no, no.  No, that's
11   fine.
12       Q.  (By Ms. Rudd) Okay.  Let's start with had --
13   did you have any discussions about any other concerns
14   regarding these forms of ID other than the two things
15   you mentioned?
16       **A.  The standardization of the form and the**
17   **security of the -- sorry, excuse me.**
18           **The standardization of the identification**
19   **and the security of the identification, that was the**
20   **general concern with these alternate identification**
21   **proposals.  On a -- on a case-by-case basis with these**
22   **other ones, there might have been other concerns, I**
23   **can't speak to that though without getting into the**
24   **individual forms of identification.**
25       Q.  Okay.  So what we'll do going forward is I'm

134

1    going to assume two main concerns that you vocalized
2    apply across the board to all these other kinds of IDs
3    and you can correct me if that isn't the case.
4        **A.  Correct.**
5        Q.  But from now on I'm just going to ask you if
6    there's anything else that, you know, was discussed or
7    that you were concerned about with the forms of ID going
8    forward.  We're just going to try to truncate the
9    process a little bit.
10       **A.  Okay.**
11       Q.  So if you'll look with me now at Amendment
12   Number 30 on Page 984, the very bottom of that page.  At
13   the bottom of that page, it says Representative Gonzalez
14   proposed Amendment Number 30, correct?
15       **A.  Yes.**
16       Q.  Do you know which Representative Gonzalez that
17   would have been?
18       **A.  That was the representative from the El Paso**
19   **area.**
20       Q.  Would that be Naomi?
21       **A.  Yes, correct.**
22       Q.  And she was a Democrat as well, correct?
23       **A.  Correct.**
24       Q.  And that amendment would have allowed a voter
25   to present a valid identification card containing the

135

1    person's photograph issued by a tribal organization,
2    correct?
3        **A.  Yes.**
4        Q.  Did you look into, at any point, the issue of
5    allowing tribal IDs to be presented at the polls?
6        **A.  That was an issue that we did look into after**
7    **the -- the amendment was adopted on the House floor and**
8    **we -- we did look into that issue.**
9        Q.  Do you know whether Representative Harless
10   voted in favor of that particular amendment?  It's not
11   here on the record.
12       **A.  I don't recall the vote.  If there was not a**
13   **roll call vote made, then it was done by a voice vote,**
14   **so.  I can't tell from the record if she voted in favor**
15   **of it or not.**
16       Q.  Do you recall discussing this particular
17   amendment with Representative Harless at any point prior
18   to the passage of SB 14?
19       **A.  Yes.**
20       Q.  What were those discussions about?
21           MS. HALPERN:  Object on the basis of
22   legislative privilege.  Direct the witness to answer
23   under seal with the understanding that based on the
24   admonition by the court, this will not constitute a
25   waiver of the privilege.

136

1            Can I have the question read back, please.
2            MS. RUDD:  That I too?
3            (Requested portion was read back by the
4    court reporter.)
5            MS. HALPERN:  Thank you.
6        **A.  I believe the discussions centered around the**
7    **standardization of that form of identification and the**
8    **numbers in which that identification was -- was an issue**
9    **for, the population of tribal -- tribal residents or**
10   **voters who were within a tribal area.**
11       Q.  (By Ms. Rudd) Okay.  So you were looking into
12   how many people in the State of Texas actually would
13   have a form of tribal ID; is that correct?
14       **A.  Correct.**
15       Q.  Okay.  What was the -- did you actually
16   research that issue?
17       **A.  Yes.**
18       Q.  And how did you research that issue?
19       **A.  I believe I researched what an actual tribal**
20   **identification card looked like and if those were indeed**
21   **a standard form.  In addition, I researched the tribal**
22   **populations within -- within Texas.**
23       Q.  Okay.  With respect to researching what a
24   tribal ID looks like, did you conclude that there was or
25   wasn't a standard form of tribal ID?

COLBY BEUCK                                                      6/20/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

**137**

1    A.  The research that I conducted, I was not -- I
2  did not conclude that there was -- sorry -- I did not
3  find that there was a standard identification for a
4  tribal ID identification.
5    Q.  There are three federally recognized tribes in
6  Texas; is that correct, do you know?  Google.
7    A.  I -- I don't know.  I'll take your word for it.
8    Q.  Okay.  I mean, you don't know.  Did you
9  research how many federally recognized tribes --
10   A.  Yes, yes.
11   Q.  Okay.  You just don't recall a number?
12   A.  I don't recall right now, correct.
13   Q.  And did the forms of ID used by those tribes
14  differ from tribe to tribe, if you recall?
15   A.  I don't recall the specifics with that
16  research.
17   Q.  But in any event, you concluded that
18  there wasn't a standardized form of tribal ID in Texas;
19  is that correct?
20       MR. SCOTT:  Objection, form, vague.  I
21  just -- for clarification:  There may be three home
22  tribes Like the Alabama-Coushatta, Tigua, but I think
23  when you talk about the Apache or the Comanche or the
24  Cherokee, I think there's -- any recognized tribe, there
25  may be members of those tribes in our state.

---

**138**

1       MS. RUDD:  That's a fair point, John.
2       MR. SCOTT:  Given that my wife's one, I
3  throw that out.
4    Q.  (By Ms. Rudd) Okay.  Let me ask you this then
5  and I will back up just slightly.  When you researched
6  the issue of whether there were tribal IDs that came in
7  a standardized form, were you looking at just residence
8  of Texas with tribal ID or were you looking broader than
9  that at any tribes exiting in the United States that
10  might have membership in Texas?
11   A.  My search was beyond Texas to other -- other
12  tribes outside of Texas.
13   Q.  How did you go about researching that issue,
14  more specifically?  Did you go and ask tribe members to
15  look at their IDs?  I mean, what did you do, if you
16  recall?  I know it's been several years now.
17   A.  I recall asking Representative Gonzalez's
18  office for information on -- on the issue.  I recall
19  contacting a State agency for information on the
20  populations of the tribes in Texas.
21   Q.  Did Representative Gonzalez provide you with
22  any information about the types of tribal IDs that
23  residents of Texas might carry?
24   A.  I believe they did.  I cannot recall the
25  specifics of that information though.

---

**139**

1    Q.  And then in terms of the tribal population of
2  Texas, did you get any sort of definitive idea of what
3  the tribal population in Texas is?
4    A.  I did receive information from the agency that
5  I requested population information from.  I don't recall
6  specifics of that information.
7    Q.  Why was population data important to you in
8  your research about the possibility of using tribal IDs?
9    A.  In an attempt to determine how big of a
10  population this would affect.
11   Q.  So let me ask you this:  If it turned out the
12  population was extremely large, would that have swayed
13  you in one direction or another about whether this was a
14  good amendment?
15   A.  It would have an impact on the decision, I
16  believe so.  I can't speak for how Representative
17  Harless would feel, but yes.
18       MS. HALPERN:  Counsel, before you ask the
19  next question, we've been going again for an hour and I
20  would like to take a break.
21       MS. RUDD:  Okay.  Let me ask two more
22  questions and then we'll go off the record.
23       MS. HALPERN:  Okay.
24   Q.  (By Ms. Rudd) Did you conclude that the tribal
25  population of Texas is a small population, a big

---

**140**

1  population?  Do you have any sense of kind of what your
2  view of the size of that population in Texas was after
3  doing this research?
4    A.  I don't recall my conclusion.  The information
5  that I gathered I remember that the forms did not have a
6  standard.  They were not standard -- I did not feel that
7  they were standardized, and -- but I don't remember the
8  conclusion on the population.
9    Q.  Okay.  Was the standardization of the form more
10  important than how many people it might effect?
11   A.  I didn't have an opinion either way on that.  I
12  was gathering the information.
13   Q.  Okay.  So you didn't formulate an opinion about
14  how Representative Harless might view the particular
15  amendment after doing your research?
16   A.  Not that I recall.
17   Q.  Okay.
18       MS. RUDD:  We can go off the record.
19       (Recess from 2:35 p.m. to 2:51 p.m.)
20   Q.  (By Ms. Rudd) So we're going speed through this
21  now.
22   A.  Okay.
23   Q.  Ready?
24   A.  Let's do it.
25   Q.  Okay.  Before the break we were talking about

---

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

---

**145**

1  forms.
2      Q.  I understand that.  What I want to know is
3  whether in your mind you came up with any form of
4  criteria for evaluating for purposes of talking to
5  Representative Harless or formulating a position on some
6  of these amendments, whether you ever formulated -- let
7  me just strike that whole thing.  I just got jibberish.
8          MS. HALPERN:  Thank you.
9      Q.  (By Ms. Rudd) Did you formulate any form of the
10  criteria yourself in evaluating the various forms of
11  proposed ID to determine whether those IDs were
12  standardized?
13      A.  Not that I can recall.
14      Q.  Okay.  Did you ever discuss any criteria for
15  making that judgment with Representative Harless?
16      A.  Those decisions I believe were made on an
17  identification-by-identification basis, so I -- I don't
18  recall any specific criteria.
19      Q.  Okay.  Going back to the House Journal we were
20  talking before the break about, Amendment 30 on Page
21  984, that amendment although adopted on this date, was
22  ultimately removed from the bill, correct?
23      A.  Yes.
24      Q.  And I may have asked this, so I'm sorry if I'm
25  repeating myself, but do you know whether Representative

---

**146**

1  Harless supported the use of tribal ID as form of photo
2  identification for voting purposes?
3      A.  I don't recall what her vote was on that
4  specific amendment.
5      Q.  Did you have discussions with her where she
6  vocalized an opinion about the use of tribal IDs?
7      A.  I don't recall.
8      Q.  In any event, Amendment 30 didn't carry with
9  the final version of SB 14, correct?
10      A.  That's correct.
11      Q.  Okay.  Let's turn to Page 1015.  I want to look
12  at Amendment Number 54.  Amendment Number 54 was offered
13  -- are you with me?
14      A.  I'm trying to find it here.  Yes.
15      Q.  Okay.  Amendment 54 was offered by
16  Representative Alvarado, correct?
17      A.  Yes.
18      Q.  And Representative Alvarado is a Democratic --
19      A.  Yes, she is.
20      Q.  And this amendment would have required the
21  Secretary of State to keep detailed records of eligible
22  voters who were prevented from voting, eligible voters
23  who were required to file provisional ballots and record
24  the number of provisional ballots that were not counted,
25  correct?  I'm summarizing.

---

**147**

1      A.  Yes.
2      Q.  And that amendment would have enabled the State
3  to gauge how this -- how this Voter ID legislation was
4  impacting voters without the required forms of photo ID,
5  correct?
6          MS. HALPERN:  Objection, states facts not
7  in evidence, no foundation.
8      A.  The amendment does appear to give the Secretary
9  of State -- it requests the Secretary of State collect
10  data on -- on, yeah, the precinct and demographic
11  information, but that's as much as I can tell from
12  reading the amendment.
13      Q.  (By Ms. Rudd) Okay.  Let me ask you this
14  question:  Is there any way to track the type of
15  information that's the subject matter of Amendment 14
16  right now?  Is there any centralized place where records
17  of provisional voting or eligible voters turned away
18  from the ballot box is kept?
19      A.  I -- I don't know.
20      Q.  Prior to the passage of SB 14, was there any
21  centralized way to determine whether voters were being
22  turned away or casting provisional ballots, that you
23  know of?
24      A.  I don't know.  That information might be kept
25  at the local level by the local -- local election clerks

---

**148**

1  but I'm not aware.
2      Q.  Did you reach out to any local election clerks
3  or any local precincts in your research regarding Voter
4  ID legislation to determine how many voters were turned
5  away from the polls in each individual precinct prior
6  the passage of SB 14?
7      A.  I don't recall.
8      Q.  Most of the information you gathered in your
9  research was from centralized offices of the State,
10  correct?
11      A.  The Secretary of State's Office, yes.
12      Q.  And the Office of the Attorney General?
13      A.  Yes.
14      Q.  And the Department of Public Safety?  I think
15  you sought information from the DPS as well; is that
16  correct?
17      A.  Correct.
18      Q.  So you weren't in general looking to local
19  precincts for information in connection with your
20  research regarding Voter ID legislation; is that right?
21      A.  We did have some communications with local
22  officials on the broad issue of voter identification.  I
23  don't recall the specifics of those conversations.
24      Q.  Do you know which local officials you had
25  discussions with about Voter ID legislation?

---

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

38 (Pages 149 to 152)

---

149

1    A.  Harris County election officials.
2    Q.  Why Harris County?
3    A.  Representative Harless's district is contained
4  within Harris County.
5    Q.  And do you recall in general what the subject
6  matter of those conversations was?
7    A.  Not that I can recall.
8    Q.  Turning back to Amendment Number 54,
9  Representative Harless moved to table that amendment,
10  correct?
11    A.  Correct.
12    Q.  And that motion carried with Representative
13  Harless voting in favor of it, correct?
14    A.  Yes.
15    Q.  If you turn to Page 1021, I want to look at
16  Amendment Number 58.  Amendment 58 was proposed by
17  Representative Anchia, correct?
18    A.  Yes.
19    Q.  And Representative Anchia is a Democrat,
20  correct?
21    A.  Yes, he is.
22    Q.  And Amendment 58 would have postponed the
23  effect of SB 14 into the later of January 1, 2012, or
24  the date on which the Secretary of State completed a
25  study that provided an analysis of the access to photo

---

150

1  identification by state residents and the cost of
2  obtaining certain forms of photo identification,
3  correct?
4    A.  Yes, that appears to be what the amendment is.
5    Q.  And did you have any discussions with
6  Representative Harless about the subject matter of this
7  amendment prior to the passage of SB 14?
8    A.  Not that I can recall.
9    Q.  But this amendment would have called for the
10  Secretary of State to sort of study how many state
11  residents actually would be impacted in terms of lacking
12  the form of ID required by SB 14, correct?
13    A.  I'm sorry, could you state that again?
14    Q.  Sure.  This amendment called for the Secretary
15  of State to actually study which Texas residents might
16  not have the forms of photo required by SB 14, correct?
17    A.  Yes.
18    Q.  And did you, in Representative Harless's
19  office, perform any analysis of -- other than what we've
20  seen?  I know you've reached out to the Secretary of
21  State's office regarding the sort of database of people
22  who registered without certain forms of identification,
23  but beyond that, did you perform any analysis in your
24  office about which voters in Representative Harless's
25  district might not have the forms of required ID under

---

151

1  SB 14?
2    A.  Because the Secretary of State is the official
3  record keeper for those, that information, that's who we
4  approached with -- with that inquiry.  I don't recall
5  any other inquiries beyond that.
6    Q.  Okay.  The study called for in Amendment 58
7  would have disaggregated the data collected by ethnicity
8  and county, correct, if you look at Section 2 A there?
9    A.  Yes.
10    Q.  I think you testified earlier that when you
11  reached out to the Secretary of State, you couldn't
12  determine from the numbers provided to you what
13  ethnicity the particular people who lacked the form of
14  photo ID was, correct?
15    A.  That's correct.
16    Q.  Was there any other way, prior to the passage
17  of SB 14, for you to determine what population or
18  whether particular populations by racial or ethnic
19  minorities lacked the form of photo required by SB 14?
20    A.  Not that I can recall.
21    Q.  Did you attempt to perform any analysis of any
22  kind prior to the passage of SB 14 about whether certain
23  racial minorities lacked the forms of photo ID that were
24  required under the bill?
25    A.  Because that information was not collected with

---

152

1  voter registration information, not that I can recall.
2    Q.  Representative Harless then moved to table
3  Amendment 58, correct?
4    A.  Yes.
5    Q.  Did you have any discussions with
6  Representative Harless about tabling this particular
7  amendment?
8    A.  Not that I can recall.
9    Q.  And then that motion carried with
10  Representative Harless voting in its favor, correct?
11    A.  Yes.
12    Q.  Last one.  If you turn to the Page 1025, I want
13  to look at Amendment Number 62.  Amendment 62 was
14  proposed by Representative Strama, correct?
15    A.  Yes.
16    Q.  Is Strama a Democrat or Republican?
17    A.  He is a Democrat.
18    Q.  Okay.  And this amendment would have required a
19  number of things but I'm just going stick with the
20  headings here:  It would have required an Election
21  Integrity Training.  Turning to the next page, the
22  creation of an Election Integrity Task Force --
23    A.  Uh-huh.
24    Q.  -- and a Post-Election Integrity Audit,
25  correct?

---

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

39 (Pages 153 to 156)

---

153

1    A.  Yes.
2    Q.  And those measures would have provided some
3 training for election officers and law enforcement
4 personnel in detecting voter fraud, correct?  If you
5 look back to section -- the first -- 31.012?
6    A.  Yes.
7    Q.  And if you look to 27 -- 273.005, the Election
8 Integrity Task Force would have investigated and
9 prosecuted instances of voter fraud where there was
10 in-person -- or impersonation of a voter, correct?
11    A.  Yes.
12    Q.  And then the Post-Election Integrity Audit
13 would have allowed counties to conduct audits to examine
14 and investigate evidence of voter fraud in their county,
15 correct?
16    A.  Yes.
17    Q.  And would you agree with me that those measures
18 are designed to protect the integrity of the ballot box
19 or would have, you know, in some way protected the
20 integrity of the ballot box?
21    A.  Reading the amendment, it does seem that this
22 -- those issues are addressed in his amendment, yes.
23    Q.  Did you discuss the subject matter of this
24 amendment with Representative Harless at all?
25    A.  Not that I remember.

---

154

1    Q.  One of the things that you testified to earlier
2 is that in-person Voter ID fraud is difficult to detect;
3 is that correct?
4    A.  Correct.
5    Q.  Do you believe that some of these measures
6 would increase election officials or counties' ability
7 to detect in-person voter fraud?
8    A.  Without nothing more about this amendment, I
9 don't know if I can say that entirely.  I does appear
10 that this is aimed at voter fraud.  And I just don't
11 remember the debate on this amendment and Representative
12 Strama's -- I don't remember the debate on it, but it
13 does appear to address some of those issues.
14    Q.  While you were working for Representative
15 Harless, did her office propose any measures to increase
16 the detection of in-person voter fraud in Texas?
17    A.  I would say that Senate Bill 14 would increase
18 the detection of in-person voter fraud.
19    Q.  How does Senate Bill 14 do that?
20    A.  By providing an additional tool for election
21 workers to determine if who was voting is who they say
22 they are.
23    Q.  Other than requiring photo ID under Senate Bill
24 14, did Representative Harless undertake any measures or
25 draft any legislation while you were working for her

---

155

1 that would have enhanced local election officials'
2 ability to detection in-person voter fraud?
3    A.  I don't remember.
4    Q.  One of the other forms of voter fraud that I've
5 seen come up a lot is absentee ballot voter fraud.  Are
6 you aware of that type of voter fraud?
7    A.  Yes.
8    Q.  While you were working for Representative
9 Harless, did you undertake any measures or propose any
10 legislation that would have addressed absentee ballot
11 voter fraud?
12    A.  I know she was supportive of other legislation
13 during that session that addressed the issue of mail-in
14 ballot fraud, absentee ballot fraud.  I can't speak to
15 the specific pieces of legislation.  I do know that
16 there were several filed that session regarding that
17 issue and I know she was supportive of that.
18    Q.  None of that legislation passed, correct?
19       MS. HALPERN:  Object to -- objection,
20 vague; objection, mischaracterizes the legislative
21 process.
22    A.  Because there was several bills filed and I
23 don't know the end result of those proposals, they could
24 have been on in another form in another bill and I
25 wasn't aware of, so I can't speak to the final

---

156

1 disposition of those bills.
2    Q.  (By Ms. Rudd) Is that because the focus in
3 Representative Harless's office during the legislative
4 session in 2011 was on SB 14 and photo voter ID?
5    A.  We had our hands full with this bill.
6    Q.  Okay.  And if you look back, Amendment Number
7 62, ultimately, Representative Phillips raised a point
8 of order, correct, which was withdrawn?
9    A.  I'm sorry.
10    Q.  Sorry, we're on page 1026.
11    A.  Okay.  Correct, Representative Phillips raised
12 a point of order.
13    Q.  And then ultimately, Representative Harless
14 moved to table that amendment and that motion prevailed,
15 correct?
16    A.  Yes.
17    Q.  With Representative Harless voting in favor of
18 her own motion, correct?
19    A.  Yes.
20    Q.  Okay.  With all of these amendments we've just
21 looked at -- and I realize there are a number of others
22 we didn't look at -- for the most part, you had
23 Democrats suggesting amendments to SB 14 and then
24 Republicans killing those amendments; is that a fair
25 characterization?

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

173

1    A.  No, I do not.
2    Q.  Did you know what the number of registered
3  voters was in Texas during 2011?
4    A.  I'm sure I probably did, but I don't have that
5  information right now.
6    Q.  Would it surprise you to hear that there are
7  approximately 14 million people registered to vote in
8  Texas?
9    A.  Okay.  If that's the number, then --
10   Q.  It doesn't surprise you?
11   A.  It doesn't surprise me.
12       MS. HALPERN:  What's the source for your
13  number, Counsel?
14       MS. RUDD:  Well, I have good researchers
15  working for me.
16       MS. HALPERN:  If you're just -- you're
17  just throwing out a number and said, "Would it surprise
18  you," and you've offered that number as a fact, I'm just
19  asking.
20       MS. RUDD:  You know what, these are my
21  questions.  My questions are my questions.  If you want
22  to redirect this witness, there -- you can do that.
23  That's your option.
24   Q.  (By Ms. Rudd) Do you know how many cases of
25  potential in-person voter fraud you were able to

174

1  identify in your research of voter ID legislation?
2    A.  I don't recall that number.
3    Q.  Was it less than twenty?
4    A.  I don't recall that number.
5    Q.  Okay.  You have no general sense of the
6  ballpark of how many cases of in-person voter ID fraud
7  have been determined in Texas?
8    A.  That I identified?
9    Q.  Would you say it's a big number or a small
10  number?
11   A.  The number I -- my research as we discussed was
12  with the Office of Attorney General and researching the
13  local District Attorneys and their efforts, and I just
14  don't recall the number, the final.  There wasn't a
15  final number that I came up with.  There were pending
16  cases out there when I was doing this research.
17   Q.  Prior to the passage of SB 14, did you form any
18  opinion about the number of -- of cases of in-person
19  voter ID fraud relative to the population of registered
20  voters in Texas?
21   A.  I don't recall making that comparison.
22       MR. SCOTT:  Linda, I may have some
23  follow-up to some of the questions she asked.
24       MS. HALPERN:  That's fine.
25       MS. RUDD:  Okay.  I'm done.

175

1       MS. HALPERN:  Do want to take a break
2  before you switch places?
3       MR. GEER:  You'd like to take a break?
4       THE WITNESS:  If that's okay.
5       (Recess from 3:45 p.m. to 3:59 p.m.)
6           EXAMINATION
7  BY MR. GEER:
8    Q.  All right.  Back on the record.  Before we get
9  started, this is essentially Round 2.
10   A.  Okay.
11   Q.  I wanted to just lay out some of the ground
12  rules.  You understand that you're continuing to be
13  under oath?
14   A.  Yes.
15   Q.  And that you're expected to give a full,
16  complete and truthful answer?
17   A.  Yes.
18   Q.  And that if there's anytime during the
19  deposition that you have -- you don't understand a
20  question that I'm asking you, you're always -- it's
21  always okay to ask me to clarify or repeat the question.
22  Do you understand that?
23   A.  Yes.
24   Q.  During the course of the deposition, I'll be
25  asking questions and you'll be answering, so it's

176

1  important that you, you know, you give a verbal
2  response, no shaking of the head, and you've done very
3  well with that aspect of the deposition, but you
4  understand that continues on?
5    A.  Yes.
6    Q.  Okay.  I wanted to go back to a line of
7  questions that were asked of you during the first part
8  of the deposition regarding history of discrimination in
9  Texas.  And I want to go much broader and leave
10  Republicans and Democrats out of it because none of that
11  matters.
12       Would you agree that there is a history of
13  discrimination in voting in the state of Texas?  And I'm
14  talking in as far as time period is concerned, I just
15  want to know what your knowledge is of history of
16  discrimination in Texas.
17   A.  It's my understanding that the Voting Rights
18  Act came about -- Texas was placed under Section 5 of
19  the Voting Rights Act.  I don't know the reasoning
20  behind Texas being placed under -- under that section.
21   Q.  And the Voting Rights Act was put in place with
22  -- with the purpose of defending against discrimination
23  in voting?
24   A.  I believe that's one of the purposes,
25  generally.  I don't know every provision that's in the

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

47 (Pages 185 to 188)

---

**185**

1   impersonation.
2      Q.   Thank you.  And so going back to your -- to the
3   question about illegal voting and I asked you what is
4   your understanding of the term illegal voting, do you
5   know what types of fraud are encompassed in that?
6      A.   In the context of the information that Mr. Dyer
7   provided to me or just generally when somebody says
8   illegal voting?
9      Q.   Well, I'm trying to understand -- I'm trying to
10  get a sense of what your understanding is.  And your
11  testimony previously was you conducted some research
12  into voter fraud, correct?
13     A.   Yes.
14     Q.   And I'm trying to understand if that's
15  something you considered, so.  Let me just ask it
16  directly:  Did you consider what was encompassed by the
17  term illegal voting when you reviewed SB 14 and other
18  pieces of photo identification legislation?
19     A.   Yes.  I was aware of that there are in-person
20  voting, irregularities.  There are irregularities with
21  mail-in ballot.
22     Q.   And it's interesting that you mention mail-in
23  ballot.  Does SB 14 deal with any form of by-mail ballot
24  fraud?
25     A.   No, it does not.

---

**186**

1      Q.   And in fact, SB 14 only deals with in-person
2   voter impersonation and would that be at the polls?
3      A.   Correct.
4      Q.   Okay.  And so I also want to understand why --
5   why did you spend the time to review this information?
6   What was the purpose of reviewing this information?  And
7   I'm referring to Exhibit 1.
8      A.   In a general sense, my job as -- working for
9   Representative Harless was to prepare her for the debate
10  in committee and debate on the floor, to provide the
11  information to her so that she would be able to have all
12  of the information available.
13     Q.   And did you provide information to her
14  regarding voter impersonation fraud?
15     A.   These -- this information, yes, I did provide
16  to her.
17     Q.   And what information did you provide to
18  Representative Harless regarding in-person voter fraud?
19     A.   The information provided by Mr. Dyer as well as
20  the information that I found from local prosecutions of
21  voter fraud.
22     Q.   And you've said that several times about local
23  prosecution of voter fraud.
24     A.   Uh-huh.
25     Q.   What did you find regarding local prosecution

---

**187**

1   of voter fraud?
2      A.   I -- I don't recall the specifics, the specific
3   cases.  They -- there were media reports from reporting
4   on prosecutions.  I don't recall the specifics of those
5   cases.
6      Q.   So you're referring to media reports --
7      A.   Correct.
8      Q.   -- when you talk about local prosecution?
9      A.   Correct.
10     Q.   And you described the Secretary of State's
11  Office as being a clearinghouse.  What does
12  clearinghouse mean?
13     A.   They receive the complaints, voter irregularity
14  complaints.  They do not have an enforcement -- it is my
15  understanding they do not have an enforcement function
16  within that agency so they have to refer that to the
17  Attorney General's Office who does have an enforcement
18  function who can look into those allegations.
19     Q.   Which takes us back to Exhibit 1, correct?
20     A.   Yes.
21     Q.   And so were you able to draw any conclusion as
22  to the existence of in-person voter fraud in the state
23  of Texas by looking at Exhibit 1?
24     A.   I viewed Exhibit 1 as part of the picture of
25  the whole, including the other cases that are referred

---

**188**

1   locally, the cases that are not reported, the cases that
2   go unnoticed.  It was part of the picture.
3      Q.   Well, let's go back to the local prosecution.
4      A.   Okay.
5      Q.   You looked at media reports.  As you sit here
6   today, are you aware of any of those local prosecutions
7   that resulted in the conviction of in-person voter
8   fraud?
9      A.   I don't recall the specifics of those cases.
10     Q.   And so other than Exhibit 1, did you receive
11  any other information from the Attorney General's
12  Office?
13     A.   I don't recall.  I don't recall if there was an
14  update to this information.
15     Q.   Do you recall if you requested any additional
16  information?
17     A.   I don't recall.
18     Q.   In any event, you don't recall reviewing any
19  additional information?
20     A.   That's correct.
21     Q.   So I also was interested in understanding the
22  process.  Once a bill is passed in the Senate -- the
23  representative Harless was the sponsor of SB 14,
24  correct?
25     A.   Yes.

---

COLBY BEUCK                                         6/20/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 196)

193

1    A.  Not that I recall.
2    Q.  Did you make any requests to anyone in the
3  Senate to the determine if that analysis had been
4  conducted?
5    A.  We followed -- in preparation for the committee
6  hearing, we watched the Senate debate, followed the --
7  what was going on in the Senate closely.  I believe that
8  was an issue that was -- that was brought up during the
9  Senate debate.  I don't remember the specifics of that,
10  those arguments, but we certainly did pay attention to
11  what was going on in the Senate in preparation for our
12  hearing in the House.
13    Q.  That was a little different than my actual
14  question.
15    A.  Okay.
16    Q.  And let me narrow it down.  Did you receive any
17  written analysis from the Senate related to SB 14 that
18  considered the impact on minority voters?
19    A.  Not that I recall.
20    Q.  Did you receive any written analysis from the
21  Senate related to SB 14 that looked at the issue of
22  in-person voter impersonation at the polls?
23    A.  Not that I recall.
24    Q.  Did you receive any analysis from the Senate
25  that looked at the impact of SB 14 on low income voters?

194

1    A.  No, not that I recall.
2    Q.  How about elderly voters, same question:  Did
3  you receive any analysis from the Senate that considered
4  the impact of SB 14 on elderly voters?
5    A.  Not that I recall.
6    Q.  And when you say, "Not that I recall," do you
7  recall producing any of that information in response to
8  the Texas v. Holder case, which you testified in --
9    A.  Yes.
10    Q.  -- gave a deposition in or the current
11  litigation United States v. Texas?
12    A.  That information -- I don't recall that
13  information being transmitted from the Senate.
14    Q.  So I just want to I guess close the loop on --
15  on what your understanding of in-person voter
16  impersonation is.  What, beyond what we've discussed,
17  the Texas Attorney General's report, Exhibit 6, which
18  references the -- some information from the Secretary of
19  State's Office and the local -- your review of local
20  media reports, is there anything else that you did to
21  determine the existence of in-person voter fraud in the
22  state of Texas?
23    A.  There were -- there was testimony in committee
24  regarding some of those issues.  That would be another
25  source of information.  And I know there was one Senator

195

1  who -- who had a personal experience with some of these,
2  some of this in-person voter impersonation.
3    Q.  So, testimony and -- where did that testimony
4  occur?  Did you say the Senate?  I'm sorry.
5    A.  There was a Senator who had a personal
6  experience with some of that.
7    Q.  Do you recall what Senator that was?
8    A.  Senator Williams.
9    Q.  And do you recall what Senator Williams
10  testified to or spoke about publicly?
11    A.  I don't recall the specifics.  It had to do
12  with a family member, a deceased family member who was
13  continuing to vote.
14    Q.  Do you know if that allegation by Senator
15  Williams was actually prosecuted in any form?
16    A.  I don't know the specifics on that.
17    Q.  Do you know if there was an official
18  investigation into the allegations of Senator Williams?
19    A.  No, sir.
20    Q.  Did you ever attempt to determine whether or
21  not there was either an investigation or prosecution of
22  Senator Williams' allegations?
23    A.  No.  I don't know the disposition of that
24  case.  It was one of the examples that I remember from
25  the testimony.  There were -- there was testimony about

196

1  the House and Senate regarding people's personal
2  experience with witnessing voter impersonation.
3    Q.  And you sat in on the public hearings in the
4  House as well?
5    A.  I was there for the hearing, the majority of
6  the hearing.  I was not there for the full hearing, but
7  yes, I was there for the majority of the hearing.
8    Q.  Do you recall what information Representative
9  Harless shared specifically regarding in-person voter
10  fraud?
11    MS. HALPERN:  Objection, vague.
12    Q.  (By Mr. Geer) Let me see if I can clarify that
13  for you.  Do you recall during the March 21, 2011,
14  hearing -- and I'm referring to -- what did we mark this
15  as?
16    A.  12.
17    Q.  Exhibit 12.  Do you recall if she was asked
18  about in-person voter fraud or voter impersonation at
19  the polls?
20    A.  I don't recall that specific conversation.  If
21  it's contained in the exhibit, I'll read through it,
22  and...
23    Q.  Well, without reading through it, do you recall
24  whether she presented any documented cases of in-person
25  voter impersonation during these public hearings?

COLBY BEUCK                                          6/20/2014
CONFIDENTIAL TRANSCRIPT

50 (Pages 197 to 200)

197

1    A.  I don't.  I don't recall the specifics of that.
2    Q.  So turning your attention to Exhibit 2, you
3   were asked -- and I'll give a chance to find it.  And
4   just for the record, Exhibit 2, who is this from?
5    A.  This is an e-mail from Representative Harless.
6    Q.  And that e-mail -- or this e-mail is to you?
7    A.  Correct.
8    Q.  And it's dated what?
9    A.  November 21, 2011.
10   Q.  And the subject of this e-mail is an Op-Ed in
11  Defense of Photo ID in Today's Chronicle.  Do you see
12  that subject line?
13   A.  Yes.
14   Q.  The section that's highlighted near the top of
15  the document, is that information that you wrote?  And
16  if you need me to be more specific, I will be.
17   A.  From the e-mail, it appears that that first
18  paragraph is information I had placed in the rough draft
19  for the response to the constituent.
20   Q.  In the highlighted section it says, in fact, I
21  believe was -- strike that.
22       In Exhibit 2, it indicates that the
23  purpose of the Senate Bill 14 was not to disenfranchise
24  anyone.  Did you -- and my question on that is:  What,
25  if any, analysis did you conduct to determine whether or

198

1   not SB 14 would disenfranchise Texas voters?
2    A.  The protections that we had placed in Senate
3   Bill 14, we felt would address the issues, the concerns
4   raised about individuals being disenfranchised.
5    Q.  And you testified to the protections that were
6   placed in Senate Bill 14, and I'm sorry, I don't recall
7   the protections that you're referring to.
8    A.  Okay.  The increased voter education efforts by
9   the Secretary of State and local -- local election
10  officials, the free ID provisions for those without
11  another acceptable form of identification, provisional
12  ballot provisions, the provision that was placed in --
13  in regarding the substantially similar name on the
14  identification, the other exemptions that were placed in
15  the bill, disability exemptions, and -- that's not the
16  total inclusive, but that's...
17   Q.  I'm sorry, I'm trying to be real organized and
18  work my way through these.
19       Referring to I believe it's Exhibit 8,
20  which is the House Amendment --
21   A.  Yes.
22   Q.  -- I refer your attention to exhibit --
23  Amendment 27.
24       MS. HALPERN:  What page, Counsel?
25       MR. GEER:  Give me one second.  I believe

199

1   that's 982.
2        MS. HALPERN:  9?
3        MR. GEER:  982.
4        MS. HALPERN:  982, okay.
5    Q.  (By Mr. Geer) And I'll give you a chance to
6   look at that amendment.
7        MS. HALPERN:  27?  Amendment 27?
8        MR. GEER:  Amendment 27, correct.
9    A.  Yes.
10   Q.  (By Mr. Geer) Amendment 27 appears to add that
11  the statewide effort shall include education targeted at
12  low income voters and minority voters; is that correct?
13   A.  Yes.
14   Q.  And how did Representative Harless vote on this
15  amendment?
16   A.  I don't recall how she voted on the amendment.
17  It appears that the amendment was adopted via voice
18  vote, which the -- a roll call vote was not taken.  So
19  without that information, I don't know how she voted.
20   Q.  Did you discuss this amendment with
21  Representative Harless?
22   A.  I believe we did.  I don't recall the specifics
23  of that discussion.
24   Q.  Do you agree that adopting an amendment that
25  targets a statewide effort to include education

200

1   targeting low income and minority voters would have
2   increased the protection against disenfranchising
3   minority voters and low income voters?
4    A.  I would say that the efforts contained in the
5   bill without this amendment -- the education efforts,
6   the voter outreach efforts in the bill covered what this
7   amendment was trying to accomplish.
8    Q.  Does SB 14 specifically target low income and
9   minority voters?
10   A.  The education efforts I believe were statewide.
11  There was -- they were not targeted to any individuals.
12  I think that was left up to the Secretary of State to
13  determine the best way to get out the information.  And
14  I don't know the -- the Secretary of State had the
15  ability to draft rules to accomplish that.
16   Q.  And so my question was:  Do you have -- do you
17  believe that an amendment, if adopted, that specifically
18  targeted statewide minority voters and low income
19  voters, do you believe that that would have an effect of
20  mitigating some of the concerns of the opponents of SB
21  14?
22       MR. SCOTT:  Objection, form, calls for
23  speculation.
24       MS. HALPERN:  Yeah.  Thank you.
25   A.  I believe the goal of this amendment was

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

51 (Pages 201 to 204)

---

201

1  **accomplished in the protections that we had placed in**
2  **Senate Bill 14.  The Secretary of State had the ability**
3  **to focus their education efforts on the populations that**
4  **they felt would benefit from that information.**
5      Q.  (By Mr. Geer) Did -- did they not believe that
6  the low income voters and minority voters would benefit
7  from this information?
8          MS. HALPERN:  Objection, misstates the
9  testimony.
10         MR. SCOTT:  Objection.
11     Q.  (By Mr. Geer) Sir, I'm asking you:  Did they
12 not believe that?  Was there an opinion that they would
13 not benefit from an amendment like this?
14         MS. HALPERN:  Objection, vague.
15         MR. SCOTT:  Objection.
16         MS. HALPERN:  Whose opinion?
17     Q.  (By Mr. Geer) Well, we were talking about the
18 Secretary of the State.  And I want to be clear for the
19 record, we're talking about the Secretary of the State,
20 which you just testified to.
21     A.  Yeah.
22     Q.  And we're talking specifically about Amendment
23 27 and whether or not -- strike that.
24         **Did you have any discussions with the**
25 **Secretary of State's Office regarding Amendment 27?**

---

202

1      **A.  Not that I recall.**
2      **Q.  Did you have any discussions with any other**
3  **State agency regarding Amendment 27?**
4      **A.  I don't recall.**
5      **Q.  Did you make any determination in the form of**
6  **an analysis or research to determine whether or not**
7  **Amendment 27 would have had a impact on -- a positive**
8  **impact on minority voters and low income voters?**
9      **A.  Not -- not that I recall.**
10     **Q.  And just so I'm clear, do you recall conducting**
11 **any written analysis related to Amendment 27?**
12     **A.  No, I do not.**
13     Q.  Turning your attention back to Exhibit 2, at
14 the bottom it says, "We do not have the tools necessary
15 to stop in-person voter fraud."  What do you mean by
16 that?  And I'm making the assumption, you can correct me
17 if I'm wrong, but you wrote that language?
18     A.  Out of context, it's hard to tell who wrote
19 what in this e-mail, but I think the argument there is
20 that in-person voter fraud is difficult to prove and
21 that a photo requirement would -- would create a tool
22 for enforcing the laws on in-person voter fraud.
23         MS. HALPERN:  Counsel, can we take a
24 break?
25         MR. GEER:  We certainly can.

---

203

1          (Recess 4:48 p.m. to 4:57 p.m.)
2          MR. GEER:  Back on the record.
3      A.  Yes.
4      Q.  (By Mr. Geer) I'll just pose a new question.  I
5  think there was a question pending which I don't
6  remember anymore.
7          In Exhibit 2, it indicates "we do not have
8  the tools necessary to stop in-person voter fraud."
9  What is the basis for that statement?
10     **A.  Prior -- prior to Senate Bill 14 passing, the**
11 **required -- the required documents would not show that**
12 **that person was who they say they were.  There was not a**
13 **photo ID to verify that a person showing up with their**
14 **voter registration card was indeed that person.  Senate**
15 **Bill 14 provided that tool to election workers.**
16     Q.  So when you're talking about necessary tools,
17 you're talking about documentation, you're talking about
18 ID at the polls; is that correct?
19     **A.  A photo -- a photo ID so that the election**
20 **workers could verify that person was who they said they**
21 **were.**
22     Q.  And so you're talking about photo ID at the
23 polls, correct?
24     A.  Yes.
25     Q.  Did you consider the existing laws, the laws

---

204

1  that were in place prior to SB 14, during your review of
2  SB 14?
3          MS. HALPERN:  Objection, asked and
4  answered.  That's what he just told you.
5          MR. GEER:  I don't know if I asked him
6  that specific question.
7      Q.  (By Mr. Geer) My question was, did you consider
8  the existing laws that were in place prior to SB 14 and
9  you talked about photo ID.  So let me just expand that
10 question.  Did you consider anything else other than the
11 photo ID itself?
12         MS. HALPERN:  Objection, vague.
13         MR. GEER:  I was trying to respond to your
14 objection.
15     Q.  (By Mr. Geer) Do you understand the question?
16     A.  No.  If -- which laws -- which laws are you
17 referring to?
18     Q.  Well, we're talking about SB 14.
19     A.  Okay.
20     Q.  And we're talking about election laws that were
21 in place prior to SB 14.  Did you consider the election
22 laws that were in place prior to SB 14, whether or not
23 they gave the necessary tools to election workers?
24     A.  It was our opinion that they did not.  The
25 rules in place at the time did not require somebody to

---

COLBY BEUCK
CONFIDENTIAL TRANSCRIPT

6/20/2014

54 (Pages 213 to 216)

213

1    A.  At the time, I was familiar with it.  Yes, I
2  have reviewed it.
3    Q.  And is it your understanding that HB 218
4  allowed both photo and non-photo ID?
5    A.  Yes.
6    Q.  And is it your understanding that the non-photo
7  ID that's proposed in HB 218 was sufficient to identify
8  a person at the polls?
9        MS. HALPERN:  Objection, foundation.
10   Q.  (By Mr. Geer) Well, let me clarify that
11  question then.
12       HB 218 offered non-photo ID, correct?
13   A.  Yes.
14   Q.  Number 10 on Page 5, it offered a library card
15  that contains the person's name issued to the person by
16  public library located in this state, correct?
17   A.  Yes.
18   Q.  It offered things like pilot's license --
19  licenses, correct?
20   A.  Correct.
21   Q.  Temporary driving permit to the person by the
22  Department of Public Safety, correct?
23   A.  Yes.
24   Q.  Identification card issued by the person -- to
25  the person by a governmental entity of this state or the

215

1    Q.  And was that bill that you were referring to SB
2  362?
3    A.  I believe so, if...
4        (Exhibit 15 marked for identification.)
5    Q.  (By Mr. Geer) And I'm putting in front of you
6  what's been labeled Exhibit 15.
7    A.  Yes.
8    Q.  I'll give you a chance to look at that
9  quickly.  Who was this bill authored by?
10   A.  That is a Senator Fraser.
11   Q.  This is SB 362?
12   A.  Correct.
13   Q.  And do you recall the time period in which this
14  bill was filed?
15   A.  This bill was from the 81st regular session,
16  which would have been in 2009.
17   Q.  And this bill allows both photo and non-photo
18  ID; is that correct?
19   A.  Correct.
20   Q.  And Representative Harless patterned her bill,
21  HB 112 after SB 362?
22   A.  Yes.
23   Q.  Was that your testimony?
24   A.  (Witness nods head yes.)
25   Q.  And in fact, Representative Harless filed HB

214

1  United States for the purpose of obtaining public
2  benefits, correct?
3    A.  Correct.
4    Q.  And is it -- do you have an understanding as to
5  at the time HB 218 was presented, whether there was an
6  opinion that this type of identification was sufficient
7  to identify a voter at the poll?
8        MS. HALPERN:  I'm sorry, could you read
9  the last part of that question back?
10       (Requested portion was read back by the
11  court reporter.)
12       MS. HALPERN:  Objection, no foundation.
13  Objection, calls for speculation.  Whose opinion?
14       MR. GEER:  I actually believe I asked, "Do
15  you have an opinion?"
16   A.  If at the time this was sufficient?
17   Q.  (By Mr. Geer) Yes.
18   A.  I don't have an opinion.  I don't -- I was not
19  following this issue in 2007.  I know this was the bill
20  that Betty Brown, Representative Betty Brown offered.  I
21  can't speak to the sufficiency in 2007 on this issue.
22   Q.  I believe you gave some testimony regarding SB
23  -- actually, you didn't.  I believe that you testified
24  that HB 112 was patterned after a specific bill?
25   A.  Yes.

216

1  112 in 2011?  I'm sorry, that is actually not correct.
2       She prefiled HB 112 in --
3    A.  2010.
4    Q.  -- 2010.  That would be correct?
5    A.  Yes.
6    Q.  And HB 112, which patterned after SB 362, also
7  allowed for both photo and non-photo ID, correct?
8        MS. HALPERN:  Objection, asked and
9  answered this morning at length.
10   A.  Correct.
11   Q.  (By Mr. Geer) And she never withdrew HB 112
12  from consideration, did she?
13   A.  The bill was filed and was referred to
14  committee.
15   Q.  But if that bill would have been -- if that
16  bill would have moved forward, and would have been --
17  would have passed, that would have been the law of the
18  state of Texas, correct?
19       MS. HALPERN:  Objection, calls for
20  speculation, no foundation.
21   Q.  (By Mr. Geer) Let me strike that.
22       She supported HB 112, correct?
23       MS. HALPERN:  Objection, asked and
24  answered this morning.
25       MR. GEER:  And the answer was yes?

COLBY BEUCK                                              6/20/2014
CONFIDENTIAL TRANSCRIPT

55 (Pages 217 to 220)

---

217

1        MS. HALPERN:  No.
2        A.  HB 112 was, in my opinion -- I don't know how
3    Representative Harless felt -- was the -- I can't speak
4    for her, but it was a placeholder, a starting point for
5    the debate to begin.  It --
6        Q.  (By Mr. Geer) And is that -- I'm sorry, were
7    you were finished?
8        A.  It was -- it was the starting point for the
9    debate.
10       Q.  And if that bill was voted on and passed as is,
11   it would have allowed both photo and non-photo ID,
12   correct?
13       A.  Had it remained the same as -- as -- yes,
14   correct.
15       Q.  And she -- HB 112 expanded the forms of ID as
16   opposed to SB 14 which restricted the forms of photo ID,
17   correct?
18       MS. HALPERN:  Objection, misstates the
19   record, no foundation.
20       MR. GEER:  Well, I mean we can go through
21   --
22       MS. HALPERN:  Expanded and compared to
23   what?  The beginning was nothing.  It was a piece of
24   paper, a certificate.  362 --
25       MR. GEER:  I believe I said as compared to

---

218

1    SB 14.
2        MS. HALPERN:  It predated it.  No
3    foundation, calls for speculation, misstates the record.
4        Q.  (By Mr. Geer) You can answer.
5        MS. HALPERN:  You can try.
6        A.  Can you -- can you restate -- can I get the
7    question restated?
8        MR. GEER:  Read it back, please.
9        (Requested portion was read back by the
10   court reporter.)
11       MS. HALPERN:  Objection, vague.
12       A.  SB 14, I believe is different than HB 112.
13   Comparing them, it -- I don't -- I can't -- your answer
14   -- your question is difficult to answer.  I don't agree
15   with the -- it's difficult to compare the two because
16   Senate Bill 14 is requiring a photo identification and
17   112 was -- was based upon legislation prior that we had
18   prefiled as a starting point for the debate.
19       Q.  (By Mr. Geer) You testified several times about
20   starting point.  Did you have a communication with
21   Representative Harless where she identified this bill as
22   a starting point for the debate?
23       A.  The -- it was my understanding.
24       MR. D'ANDREA:  Objection, legislative
25   privilege.  You may answer under seal.

---

219

1        A.  It was my understanding that photo
2    identification -- a photo identification requirement was
3    a goal, a goal of Representative Harless's because the
4    constituents were requesting this.  The information we
5    were seeing on the support for the issue was showing
6    that it had a great deal of support in the public and
7    that is what the goal was, was for a photo
8    identification requirement.
9        Q.  (By Mr. Geer) So what changed between the
10   filing of SB 362 and the filing of SB 14 in the --
11   regarding her constituency and their requests for photo
12   ID legislation?
13       MS. HALPERN:  Objection, assumes facts not
14   in evidence, no foundation.
15       Q.  (By Mr. Geer) Well, I believe you testified
16   this morning that you had communications with
17   constituents, that Representative Harless had
18   communication with constituents; is that a yes?
19       A.  Yes.
20       Q.  And that that communication involved photo ID
21   legislation, correct?
22       A.  Correct.
23       Q.  That involved HB 112, I believe you testified
24   to?
25       A.  Yes.  The -- we received communications from

---

220

1    our constituents on Voter ID in general.  I don't
2    remember if it was specific to HB 112 or SB 14 but the
3    broad issue of photo identification.
4        Q.  When she prefiled HB 112 in 2010, was that in
5    response to her constituents?
6        A.  Yes.
7        Q.  Turning your attention to Exhibit 7.  And
8    you've testified about this morning.  This is the e-mail
9    from Jessica Gonzalez to you dealing with the disability
10   and social security disability ratings, I
11   believe.  There's a -- at the bottom of this, it
12   indicates, "Call me if you'd like to discuss," and
13   that's referencing opposition might come -- let me
14   strike that.
15       The document indicates that, "I have a
16   little bit of sense of where the opposition might come
17   from since I talked with many members' office --
18   members' office about the exemption this week."  What
19   opposition was there to -- to this type of exemption?
20       MS. HALPERN:  Objection, asked and
21   answered this afternoon.
22       A.  The opposition that we were aware of was that
23   the language that was placed on in the Senate was needed
24   -- needed work in order to find an identifiable standard
25   to show that someone was in fact disabled.

---

COLBY BEUCK                                           6/20/2014
CONFIDENTIAL TRANSCRIPT

59 (Pages 233 to 236)

---

233

1    Q.  (By Mr. Geer) You've testified several times
2    that you considered the Crawford case.  What information
3    did you draw from the Crawford case that was relevant to
4    your consideration of SB 14?
5    **A.  It's been some time since I've reviewed the**
6    **details within the case.  There were so -- without a**
7    **copy of that, I can't really get into the details of the**
8    **standard that was set forth in Crawford, but there was a**
9    **standard that they -- they set out in that opinion that**
10   **was a model for states to follow.**
11   Q.  Would you agree that the demographics in
12   Indiana are different than the demographics in the state
13   of Texas?
14   **A.  Texas is unique so yes, I would say we have a**
15   **-- probably a unique population compared to Indiana.**
16   Q.  Would you agree that the demographics in
17   Georgia are different from the demographics in the state
18   of Texas.
19   **A.  Yes.**
20   Q.  Did you consider population trends as it
21   relates to the state of Georgia when considering -- when
22   considering your comparison of SB 14?
23        MS. HALPERN:  Objection, vague.
24   Q.  (By Mr. Geer) That was vague and I apologize
25   for that.

---

234

1        Did you consider population trends in any
2    of these other states during your consideration of SB
3    14?
4        MS. HALPERN:  Objection, vague.  Can you
5    explain population trends?
6    Q.  (By Mr. Geer) Do you understand population
7    trends?
8    **A.  Not entirely.**
9    Q.  Did Rep Harless, Representative Harless state
10   publicly that SB 14 would increase turnout for minority
11   voters?
12   **A.  I don't know the answer to that.  I --**
13   **without -- I can't remember on that issue.**
14   Q.  Did you conduct any analysis regarding turnout
15   as it relates to SB 14?
16   **A.  We looked at the other states that implemented**
17   **voter identification.**
18   Q.  And what other states did you look at?
19   **A.  The testimony from the Georgia witness from the**
20   **Secretary -- the Georgia Secretary of State, his**
21   **information on turnout was information that we looked**
22   **at.**
23   Q.  And do you recall specifically what that
24   information was?
25   **A.  That there was a positive correlation, voter**

---

235

1    turnout increased.
2    Q.  When was Georgia's photo ID law implemented, do
3    you know?
4    **A.  I knew at the time.  I don't recall now.**
5    Q.  If I said 2005, would that refresh your
6    recollection?
7    **A.  I believe that's correct.**
8    Q.  And am I correct that the law was not
9    implemented until 2007?
10   **A.  I -- I don't remember when the law was**
11   **implemented.**
12   Q.  Do you recall that it was a subject of legal
13   hearings?
14   **A.  Yes.**
15   Q.  So are you familiar with the population growth
16   in the state of Georgia?  Did you consider that while
17   comparing the photo ID legislation of Georgia and Texas?
18   **A.  I don't recall the specifics of that analysis**
19   **done by the Secretary of State's Office, the Georgia**
20   **Secretary of State's Office.**
21   Q.  What analysis did you conduct?  Did you
22   consider population growth?
23   **A.  I don't recall the specifics of the analysis**
24   **done.**
25   Q.  And you don't recall anything in writing

---

236

1    regarding relating to SB 14 and population growth?
2    **A.  No.**
3    Q.  Do you know if the population growth in the
4    state of Georgia is the same as the population growth in
5    the state of Texas?
6    **A.  I don't think so.**
7    Q.  Did you consider that during your review of
8    both state laws as it relates to photo identification
9    law -- legislation?  I'm sorry.
10   **A.  I don't recall the specifics of that issue.**
11   Q.  And is it fair to say that you don't recall
12   reviewing any written analysis regarding population
13   growth in either state?
14   **A.  I don't recall.**
15   Q.  Do you recall if the photo ID law that was
16   implemented in the state of Georgia includes the same
17   types of photo ID that was implemented in the state of
18   Texas?  Was there any difference?
19   **A.  I don't recall the specifics of the Georgia**
20   **photo identification law.  There certainly are**
21   **differences between the two laws.**
22   Q.  Would you agree that the majority of the
23   amendments proposed by opponents of SB 14 were tabled
24   during the consideration of SB 14?
25   **A.  Yes.**

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

237

1    Q.  Would you agree that there was public debate
2  regarding those amendments and they were offered in --
3  to address the concerns of the opponents of SB 14?
4        MS. HALPERN:  Objection, no foundation.
5    Q.  (By Mr. Geer) Well, we could go through the
6  amendments again if you want to.  But realizing you've
7  testified about the amendments this morning --
8    A.  Yes.
9    Q.  -- I'm asking you that question.
10   A.  The amendments I think would stand on their
11  own.  It would be on a case by case and amendment by
12  amendment what the motivation was for each amendment.
13  It's -- I can't say whether an amendment was addressing
14  concerns unless I was looking at -- through each
15  amendment.
16   Q.  And we won't do that again.
17       MS. HALPERN:  Thank you.
18   Q.  (By Mr. Geer) Turning your attention to Exhibit
19  10 and specifically the document that has the indicator
20  TX 00006971.
21       MS. HALPERN:  I'm sorry, what page, 69?
22       MR. GEER:  -71.
23       MS. HALPERN:  This document is marked
24  highly confidential; therefore if it weren't already
25  under seal, we would be asking to be under seal.

238

1    Q.  (By Mr. Geer) Can you tell me what this
2  document is, please?
3    A.  This -- Exhibit 10, this was in preparation for
4  the debate on the Conference Committee Report adoption.
5    Q.  And who is this document from?  It's an e-mail,
6  correct?  Who is that from, Exhibit 10?
7    A.  Okay.  Sorry.  I lost --
8    Q.  6971 --
9    A.  Okay.
10   Q.  -- is the Bates number, the Texas Bates number.
11       MS. HALPERN:  Let the record also reflect
12  that this appears to be a printout from the private
13  e-mail of Representative Harless.
14       MR. GEER:  Are we looking at the same
15  thing?
16       MS. HALPERN:  Page 1 of 1?
17   A.  Yes, I've got it.
18       MS. HALPERN:  Yeah, it's a printout from
19  her private e-mail.
20   Q.  (By Mr. Geer) Well, actually, let me just go
21  through it so the record is clear.  Do you see the top
22  of it, this is an e-mail, correct?
23   A.  Yes.
24   Q.  Who is the e-mail from?
25   A.  It is from myself to Representative Harless.

239

1    Q.  And what's the subject line?
2    A.  Conference Committee Report, Senate Bill 14.
3    Q.  And did you prepare this e-mail?
4    A.  I believe so.  I don't know if all the language
5  was mine but I believe so.
6    Q.  And what's the date of this e-mail?
7    A.  This is April 20th.
8    Q.  And it discusses the difference between CCR SB
9  14 and House passage SB 14, correct?
10   A.  Yes.
11   Q.  And what does CCR stand for?
12   A.  Conference Committee Report.
13   Q.  The very first section indicates that, "CCR
14  adds back religious exemption but with tightened
15  language."  Do you see that?
16   A.  Yes.
17   Q.  What the tightened language that was added back
18  into the religious exemption?
19   A.  I don't remember.  I don't remember that
20  issuing.
21   Q.  Were you involved in communications regarding
22  tightening the language of the religious exemptions?
23   A.  I don't recall that issue.  I don't remember.
24   Q.  Did -- were you involved in communications
25  regarding why the word "consistently" was added into the

240

1  language of religious exemption?
2        MS. HALPERN:  You're referring to the
3  languages that says, "The voter has consistently refused
4  to be photographed for any government purpose"?
5        MR. GEER:  Correct, and consistently is
6  underlined.
7    A.  I don't recall that discussion.
8    Q.  (By Mr. Geer) The second paragraph says, "CCR
9  removes requirement that SOS education efforts target
10  low income minority voters," and it has "Miles."  Who is
11  Miles?
12   A.  That would be -- I believe that was Borris
13  Miles who offered that amendment, Representative Miles.
14   Q.  And that amendment was removed and it indicates
15  that -- the OAG and SOS concerns.  What concerns did the
16  OAG and SOS have regarding this particular amendment?
17   A.  I don't recall that --
18   Q.  Did you --
19   A.  -- information.
20   Q.  I'm sorry, were you finished?
21   A.  I don't recall that discussion.
22   Q.  Did you have a discussion with the Office of
23  the Attorney General regarding this amendment targeting
24  low income and minority voters?
25   A.  I -- I don't recall that conversation.

COLBY BEUCK                                                        6/20/2014
CONFIDENTIAL TRANSCRIPT

61 (Pages 241 to 244)

241

1    Q.  Did you have a conversation with the Secretary
2   of State regarding targeting low income and minority
3   voters?
4    A.  I don't recall that information -- that
5   conversation.
6        MS. HALPERN:  Let me ask for a
7   clarification of my own witness.  When you say, "I don't
8   recall," does that mean it didn't happen or you don't
9   remember --
10       THE WITNESS:  I don't remember.
11       MS. HALPERN:  You don't remember whether
12  they had it at all?
13       THE WITNESS:  Yes.
14   Q.  (By Mr. Geer) So as you sit here today, you
15  don't know what if any concerns the Office of the
16  Attorney General or the SOS --
17   A.  I don't --
18   Q.  -- Secretary of State's Office had?
19   A.  I don't remember their specific concerns with
20  that.  Yeah, I don't remember their concerns regarding
21  that amendment.
22   Q.  Did you receive anything in writing expressing
23  the concerns of the Office of the Attorney General or
24  the Secretary of State's Office regarding this
25  amendment?

242

1    A.  Not that I remember.
2    Q.  Paragraph 5, "CCR removes tribal ID as an
3   acceptable form of ID," and it has "Naomi Gonzalez."
4   Naomi Gonzalez is Representative Gonzalez?
5    A.  Correct.
6    Q.  And it goes on to say that, "Tribal IDs have no
7   standardized form."  We've talked with that?
8    A.  Yes.
9    Q.  "No evidence that this small number of voters
10  do not already have other forms of ID."  What research
11  did you conduct to determine whether or not this
12  specific group had other forms of ID?
13   A.  When we requested information from
14  Representative Gonzalez's office, I believe this was one
15  of the issues that we asked for.  They did not present
16  us any evidence of this, that these individuals in
17  tribal areas would not have a driver's license.
18   Q.  Did they present you any evidence that they did
19  have a driver's license?
20   A.  I --
21   Q.  And we're speaking about Representative
22  Gonzalez who you made the request to.
23   A.  Correct.  I don't recall.  I just -- I don't
24  remember any evidence on that issue from their office.
25   Q.  Did it concern you or Representative Harless

243

1   that they may not possess the necessary forms of ID?
2    A.  The concern was -- was addressed in the bill
3   with the other provision with the free IDs, all the
4   other issues that we've discussed, all the provisions in
5   the bill that provide protections for that.
6    Q.  Well, this was an amendment specific to tribal
7   IDs, correct?
8    A.  Yes.
9    Q.  And SB 14 removes any language referring
10  directly to tribal IDs, correct?
11   A.  Yes.
12   Q.  And so the question was:  Were you or
13  Representative Harless concerned that this specific
14  group may not possess any others form of ID?  Did you
15  consider that?
16   A.  That was considered but we determined that this
17  was a small number of voters and that there was not a
18  standardized form so this would not be an acceptable
19  form of identification for voter ID purposes.
20   Q.  "CCR removes ID approved by State as an
21  acceptable form of ID.  Language was too broad."  Do you
22  see that?
23   A.  Yes.
24   Q.  And that was by Representative Alonzo?
25   A.  Correct.

244

1    Q.  The amendment?
2    A.  Correct.
3    Q.  What, if any, research did you conduct to
4   support the position that the language was too broad?
5        MS. HALPERN:  Objection, no foundation.
6    Q.  (By Mr. Geer) Well, let me add a little
7   foundation then.  You understand that we're discussing
8   amendments that were offered on the House floor?
9    A.  Yes.
10   Q.  You understand that this particular amendment
11  was offered by Representative Alonzo?
12   A.  Yes.
13   Q.  And that the amendment attempted to include
14  language that would allow IDs approved by State -- by
15  the State of Texas as an acceptable form of ID in SB 14?
16   A.  I don't remember the exact language of the
17  amendment?
18   Q.  Well, generally --
19   A.  Yes.
20   Q.  -- I mean, you're looking at --
21   A.  The summary states that it was a State
22  acceptable form approved by the State.  I think the
23  "approved by the State" language was what -- where the
24  "too broad" issue was coming from.
25   Q.  And what did you understand --

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

62 (Pages 245 to 248)

---

245

1    **A.   What is approved.**
2    Q.   -- approved by the State to mean?
3    **A.   "What does approved by the State mean?" was the**
4    **question.**
5    Q.   All right.  What did you understand that to
6    mean?
7    **A.   That was our question.  We did not know what**
8    **that meant.**
9    Q.   Did you attempt to elicit that knowledge from
10   Representative Alonzo?
11   **A.   I don't recall.**
12   Q.   Did you receive anything in writing or did you
13   send anything in writing that shows that you attempted
14   to elicit that kind of information from Representative
15   Alonzo?
16   **A.   I don't recall the discussion on that issue**
17   **with Representative Alonzo.**
18   Q.   And I'm almost done.
19           Turning your attention to TX -- subsequent
20   page on Exhibit 10, the Bates stamp number is TX
21   00006973 and the document is titled Voter ID
22   Differences.  Have you seen this document before?
23   **A.   I do recall this document.**
24   Q.   Did you prepare this document?
25           MS. HALPERN:  Let the record reflect this

---

246

1    is noted Highly Confidential on the bottom and so it's
2    one of the apparently disputed documents.
3            MR. GEER:  And I should have said that.
4    Thank you.
5    Q.   (By Mr. Geer) Did you prepare this document?
6    **A.   Not that I recall.**
7    Q.   But you reviewed this document previously?
8    **A.   I have seen this document before.**
9    Q.   The second paragraph, "Section 5, Voter ID
10   Identification, target at low-income voters, OAG
11   dislikes."  Do you know what the Office the Attorney
12   General disliked about this particular amendment?
13           MR. SCOTT:  Objection, form, speculation.
14   **A.   I didn't prepare this document so I can't speak**
15   **to that issue.  I don't know.**
16   Q.   (By Mr. Geer) Do you know who prepared this
17   document?
18   **A.   I don't recall.**
19   Q.   "Section 9, Over 70 as of 1-1-12 exemption, two
20   classes of voters."  Do you see that?
21   **A.   Yes.**
22   Q.   What does -- what does that mean, two classes
23   of voters?
24           MR. SCOTT:  Objection, form, speculation.
25   Q.   (By Mr. Geer) Well, let me clarify that.  Did

---

247

1    you have a discussion with Representative Harless where
2    you -- did you participate in any communication where
3    you talked about the over 70 exemption and the
4    possibility that this created two classes of voters?
5    **A.   I -- I don't remember that discussion.**
6    Q.   "Section 17, Senate exemption for indigent:  Is
7    this Necessary?"  What, if any, research did you or
8    Representative Harless conduct to determine whether or
9    not an exemption for indigent voters was necessary?
10   **A.   This was not my language so I don't know.**
11   Q.   You don't even have to look at the language --
12   **A.   Okay.**
13   Q.   -- I'm asking you what --
14   **A.   Separate from this document?**
15   Q.   Correct.
16   **A.   Okay.  I'm sorry, can you repeat the question?**
17   Q.   What, if any, research did you or
18   Representative Harless conduct to determine if an
19   exemption for indigent voters was necessary?
20   **A.   I don't recall on that issue.**
21   Q.   Do you recall any written analysis regarding
22   the exemption for indigent voters?
23   **A.   I don't recall.**
24   Q.   Do you recall any written analysis considering
25   indigent voters and the impact of SB 14 on that

---

248

1    population?
2    **A.   SB 14 provided a free ID provision, which would**
3    **address the indigent population.**
4    Q.   Is it fair to say that the underlying documents
5    for the free IDs are not free?
6            MR. SCOTT:  Objection, form.  Contradicts
7    previous evidence developed at the deposition of Stan
8    Stanart earlier this week.
9    Q.   (By Mr. Geer) Do you have an understanding that
10   underlying documents for an election identification
11   certificate have a cost?
12   **A.   It's my understanding that that cost is nominal**
13   **if not totally eliminated.**
14   Q.   And nominal, do you know the price of a birth
15   certificate, the cost?
16           MR. SCOTT:  Objection, form, vague.  Are
17   y'all talking about for ID purposes or just in general?
18   I think there's two -- there's --
19           MR. GEER:  In general.
20           MS. HALPERN:  Objection, relevance.
21   Q.   (By Mr. Geer) You can answer.
22   **A.   Birth certificates for non-election purposes, I**
23   **believe are in the range of $20.  For election purposes,**
24   **I believe those -- those are provided at no cost for**
25   **those seeking a birth certificate for an election**

---

COLBY BEUCK                                                    6/20/2014
CONFIDENTIAL TRANSCRIPT

---

253

BY MR. ALI:
Q.  I'm just going to reintroduce myself.  My name
is Hasan Ali, I represent the Texas League of Young
Voters and Imani Clark in this litigation.
A.  Okay.
Q.  So, earlier today Ms. Rudd and Mr. Geer gave
some ground rules for the deposition.  We're going to be
operating under the same ground rules.
         I'm just going to ask you a few questions
and hopefully we can run through this pretty quickly.
A.  Okay.
Q.  And I apologize in advance if some of my
questions restate some of your earlier testimony.  It's
just to go through it really quickly, so this is not
meant to trip you up in any way.
         Would you agree that prior to SB 14,
student IDs were an acceptable form of identification to
vote in Texas?
A.  I don't have the statute before Senate Bill 14
before me so I don't remember if they were considered a
form of identification or not.
Q.  If I represent to you that you could vote with
a student ID prior to SB 14 --
A.  Okay.
Q.  -- would you accept that, my representation on

---

254

that?
A.  Okay.
Q.  Great.  Would you mind looking at
exhibit number -- Exhibit 3, which is HB 112.
A.  What exhibit was that?
Q.  Number 3.
A.  Okay.
Q.  Representative Harless authored this Bill; is
that right?
A.  Correct.
Q.  Do you mind looking at Page 6, which sets forth
the acceptable forms of identification under this
bill.  I'll give you a second to review these
provisions, but would student IDs be an acceptable form
of identification under each -- any of these provisions?
         MS. HALPERN:  Counsel, just -- forgive me,
and I don't mean to be difficult but I just want to be
sure that what's happening in my brain is not in fact
what you're doing.
         MR. ALI:  Sure.
         MS. HALPERN:  Your representation about
student IDs being an acceptable form of identification
was not based on any language in House Bill 112, was it?
         MR. ALI:  No.  No, I'm asking simply, you
know, based off of Mr. Beuck's drafting and research of

---

255

this bill if student IDs would be acceptable under any
of these provisions.
         MS. HALPERN:  Under 112?
         MR. ALI:  Under 112.
         MS. HALPERN:  Okay, so we're not talking
about existing law anymore?
         MR. ALI:  We're looking now at 112.
         MS. HALPERN:  All right.  Thank you.
         MR. ALI:  I think Mr. Beuck's accepted my
representation that you could vote under a student ID
under prior versions of -- or existing law prior to SB
14.
         MS. HALPERN:  Well, he accepted it, but
that doesn't mean we accepted it.
         MR. ALI:  That's fine.
         THE WITNESS:  I'll take your word for it.
         MR. ALI:  For purposes of moving this
along.
         MS. HALPERN:  All right.
         Go ahead and answer his questions.
A.  Okay.  The -- are you referring to the six
forms of identification listed in 112?
Q.  (By Mr. Ali) Yes.
A.  "A valid identification card that contains a
person's photograph issued by an agency, institution or

---

256

political subdivision of the State."  I -- you know, I
don't know enough about the issue to determine whether
that would include a state school or not, so I'm not
sure I understand the question.
Q.  Well, my question was intended to be a simple
one, which is based off of -- you know, you had
testified earlier that you drafted HB 112; is that
right?
A.  Yes.  This was a draft that I requested from
legislative counsel.
Q.  And during the drafting of HB 112, you gave no
consideration to whether or not student ID would be
acceptable form of identification under HB 112?
A.  I don't recall.  I don't recall that issue
coming up.
Q.  Did you conduct any studies or analysis of
instance of voter fraud using student IDs?
         MS. HALPERN:  That's a yes or no.
A.  Not that I recall.
Q.  (By Mr. Ali) Did you conduct any studies or
analysis on the difficulty of forging student IDs?
A.  Not that I recall.
Q.  And I also assume you didn't conduct any
studies or analysis on the number of minority student
voters who used student IDs to vote?

---

COLBY BEUCK                                                6/20/2014
CONFIDENTIAL TRANSCRIPT

65 (Pages 257 to 260)

257

1   **A.  Not that I recall.**
2   Q.  Take a look at Exhibit Number 8, please.  And
3   this, for the record, is the House Journal dated March
4   23, 2011.  I'd specifically like to ask you to look at
5   Page 979.  Can you please look at Amendment Number 23.
6   **A.  Yes.**
7   Q.  What is your understanding of this amendment?
8   **A.  This is an amendment offered by Representative**
9   **Dutton, which would have added to Senate Bill 14 a**
10  **student identification card issued by a public or**
11  **private institution of higher education that contains a**
12  **person's photograph.**
13  Q.  Does this exhibit indicate that Representative
14  Phillips moved to table this amendment?
15  **A.  Yes.**
16  Q.  And how did Representative Harless vote on that
17  motion?
18  **A.  She motioned to table.**
19  Q.  Did you have any discussions with
20  Representative Harless regarding this amendment?
21  **A.  Not that I recall.**
22  Q.  Did you have any discussions with any other
23  legislative staff regarding this amendment?
24      MS. HALPERN:  Answer yes or no before you
25  give any content of any such communication.

258

1   **A.  No.**
2   Q.  (By Mr. Ali) Do you know why Representative
3   Harless voted to table this amendment?
4   **A.  No.**
5   Q.  Have --
6       MS. HALPERN:  Let the record reflect that
7   Senator -- that Representative Harless, if I'm not
8   mistaken, was deposed today and was available to answer
9   all of these kinds of questions.
10      MR. ALI:  I'm specifically asking the
11  deponent of his knowledge.
12  Q.  (By Mr. Ali) Prior to the working for
13  Representative Harless, you worked for Lieutenant
14  Governor Dewhurst; is that right?
15  **A.  Yes.**
16  Q.  In what capacity?  I know we're restating.  I
17  just want to go through this quickly for my own
18  knowledge.
19  **A.  I worked for the Lieutenant Governor as a**
20  **policy analyst.**
21  Q.  And you now work for the Senator Taylor; is
22  that right?
23  **A.  Correct.**
24  Q.  How long would you say you've been working with
25  the Texas legislator -- the legislative branch, in or

259

1   with?
2   **A.  I began employment in 2003.**
3   Q.  2003.  So about 11 years; is that right?
4   **A.  Yes.**
5   Q.  During your time -- during those 11 years, have
6   you ever known of an instance where a legislator has
7   authored a bill that they did not support?
8   **A.  I'm sorry.  They authored a bill that they did**
9   **not support?**
10  Q.  That's right.
11  **A.  That's -- I'm going to need a little bit more**
12  **specific -- support, what do you mean by support?**
13  Q.  That they would not like to see passed.  They
14  would not vote for it.
15      MR. SCOTT:  Let me object, it's vague.  Do
16  you include amendments to bills as being -- that --
17  making that person part of an author of a bill?
18      MR. ALI:  No.  For the purposes of this
19  question, I'm specifically asking if they're the author
20  of the original bill?  Yes or no question.
21  **A.  It's not that easy because there's a variety of**
22  **things that can come up in the legislative process that**
23  **would -- that would change that -- that issue.  I don't**
24  **know if I can answer that question.**
25  Q.  (By Mr. Ali) Okay.  When -- let's restrict the

260

1   time frame a little bit.  So, do you know of an instance
2   during your 11 years working in or with the Texas
3   legislature in which a legislator -- legislator has
4   authored a bill that they did not support when they
5   authored it?  And the purpose of that clarification is
6   to understand that at certain times things change or may
7   change later down the road.
8   **A.  There are bills filed that don't end up**
9   **passing, that don't get moved by legislatures -- by**
10  **members of the legislature.  That happens often.**
11  Q.  I understand that, but that's not the question
12  I asked.
13  **A.  Then I don't understand the question.**
14      MR. ALI:  Do you mind repeating the
15  question as I asked it.
16      (Requested portion was read back by the
17  court reporter.)
18  **A.  Members of the legislature file bills that they**
19  **don't end up supporting for a variety of reasons.  I'm**
20  **sure that's happened before.**
21  Q.  (By Mr. Ali) I don't want to argue with you.
22  So the purpose of this is not to argue with you, but --
23  **A.  I understand.  I just don't --**
24  Q.  -- the response that you gave me is not the
25  question I asked and I explicitly excluded that by the

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2              CORPUS CHRISTI DIVISION

3   MARC VEASEY, et al.,           )
                                   )
4          Plaintiff,              )
                                   )
5   VS.                            ) CIVIL ACTION NUMBER:
                                   ) 2:13-CV-193 (NGR)
6   RICK PERRY, et al.,            )
                                   )
7          Defendants.             )
    _____        )
8                                  )
    UNITED STATES OF AMERICA,      )
9                                  )
           Plaintiff,              )
                                   )
10                                 )
    VS.                            ) CIVIL ACTION NUMBER:
11                                 ) 2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS   )
12  EDUCATION FUND, et al.,        )
                                   )
13      Plaintiff-Intervenors,     )
                                   )
14  TEXAS ASSOCIATION OF HISPANIC  )
    COUNTY JUDGES AND COUNTY       )
15  COMMISSIONERS, et al.,         )
                                   )
16      Plaintiff-Intervenors,     )
                                   )
17  VS.                            )
                                   )
18  STATE OF TEXAS, et al.,        )
                                   )
19          Defendants.            )
    _____        )
20                                 )
    TEXAS STATE CONFERENCE OF      )
21  NAACP BRANCHES, et al.,        )
                                   )
22          Plaintiffs,            )
                                   ) CIVIL ACTION NUMBER:
23  VS.                            ) 2:13-CV-291(NGR)
                                   )
24  NANDITA BERRY, et al.,         )
                                   )
25          Defendants.            )
```

Page 2

```
1   BELINDA ORTIZ, et al.,         )
                                   )
2          Plaintiffs,             )
                                   )
3   VS.                            ) CIVIL ACTION NUMBER:
                                   ) 2:13-CV-348(NGR)
4   STATE OF TEXAS, et al.,        )
                                   )
5          Defendants.             )
    _____        )
6

7

8       *********************************************

9          ORAL 30(b)(6) DEPOSITION OF

10       THE TEXAS DEPARTMENT OF PUBLIC SAFETY

11                KATHERINE CESINGER

12                   MAY 20, 2014

13       *********************************************

14

15      ORAL DEPOSITION OF KATHERINE CESINGER, produced as

16   a witness at the instance of the Plaintiff, was duly

17   sworn, was taken in the above-styled and numbered cause

18   on the MAY 20, 2014, from 1:56 p.m. to 5:18 p.m., before

19   Chris Carpenter, CSR, in and for the State of Texas,

20   reported by machine shorthand, at the offices of

21   Dechert, LLP, 300 W. 6th, Suite 2010, Austin, TX  78701,

22   pursuant to the Federal Rules of Civil Procedure and the

23   provisions stated on the record or attached hereto.

24

25
```

Page 3

```
1              A P P E A R A N C E S

2   FOR THE VEASEY PLAINTIFFS:

3          Scott Brazil
           BRAZIL & DUNN, LLP
4          4208 Cypress Creek Parkway,
           Suite 530
5          Houston, TX  77068
           (281) 580-6310
6          scott@BrazilAndDunn.com

7          J. Gerald Hebert
           THE CAMPAIGN LEGAL CENTER
8          215 E. Street, NE
           Washington, D.C. 20002
9          (202) 736-2200
           ghebert@campaignlegalcenter.org

10
    FOR THE ORTIZ PLAINTIFFS:
11
           Robert W. Doggett
12         TEXAS RIO GRANDE LEGAL AID, INC.
           4920 N. IH-35
13         Austin, TX  78751
           (512) 374-2725
14         rdoggett@trla.org

15  FOR DEFENDANTS RICK PERRY, STATE OF TEXAS, THE WITNESS:

16         Ronald Keister
           ATTORNEY GENERAL OF TEXAS
17         TORT LITIGATION DIVISION
           300 W. 15th Street
18         Austin, TX  78701
           (512) 463-2197
19         ronny.keister@oag.state.tx.us

20         Kathleen T. Murphy-Darveau
           TEXAS DEPARTMENT OF PUBLIC SAFETY
21         5805 N. Lamar Blvd.
           Austin, TX  78752
22         (512) 424-2420
           kathleen.murphy@dps.texas.gov

23

24

25
```

Page 4

```
1   FOR NAACP/MALC:

2          Vishal Agraharkar (by telphone)
           Myrna Perez (by telephone)
3          Jennifer Clark (by telephone)
           Emma Simpson (by telephone)
4          Brennan Center For Justice
           161 Avenue of The Americas Fl 12
5          New York, NY 10013
           (832) 385-1628
6
           Lindsey Cohan
7          Amy L. Rudd
           DECHERT, LLP
8          300 W. 6th, Suite 2010
           Austin, TX  78701
9          (512) 394-3000
           lindsey.cohan@dechert.com

10

11  FOR THE UNITED STATES OF AMERICA:

12         Daniel J. Freeman (by telephone)
           U.S. JUSTICE DEPARTMENT
13         CIVIL RIGHTS DIVISION
           Room 7254 NWB
14         950 Pennsylvania Avenue, N.W.
           Washington, D.C. 20530
15         (202) 514-0828
           daniel.freeman@usdoj.gov

16

17

18

19

20

21

22

23

24

25
```



KATHERINE CESINGER                                      May 20, 2014
VEASEY VS. PERRY                                           29–32

Page 29

1          MR. KEISTER:  Objection, same objections.
2    A.   I don't recall that.
3    Q.   (By Mr. Agraharkar) Did Governor Perry usually
4  review press releases issued by his office before they
5  were released?
6    A.   No.
7          MR. KEISTER:  Same objections.
8    Q.   (By Mr. Agraharkar) Thank you.  Were you
9  involved with Voter ID or elections in any other way
10  while working for the Governor's Office?
11    A.   No, not that I recall.
12    Q.   Okay.  So moving on, after that position, where
13  did you go?
14    A.   I left the Governor's Office to go work on the
15  Rick Perry presidential campaign.
16    Q.   Okay.  And were you involved with Voter ID or
17  elections issues in any other ways in that position?
18    A.   Not specifically that I recall.
19    Q.   Okay.  Thank you.  So the only job experience,
20  if I hear -- strike that.
21          So the only job experience you've had with
22  respect to voting and elections prior to coming to the
23  DPS, if I understand your testimony correctly, was to
24  review and possibly draft press releases in support of
25  Voter ID legislation; is that correct?

Page 30

1          MR. KEISTER:  Objection, vague, ambiguous
2  and misstates previous testimony.
3          You can answer to the extent you can.
4    Q.   (By Mr. Agraharkar) You can answer it.
5    A.   Can you say that question again?  I'm sorry.
6    Q.   Sure.  If I understand you correctly, the only
7  job experience you have with respect to voting and
8  elections prior to coming to the DPS was to write and
9  review press releases in support of Voter ID
10  legislation; is that accurate?
11          MR. KEISTER:  Same objections.
12    A.   I believe that's right.
13    Q.   (By Mr. Agraharkar) Thank you.
14          Where did you go after working on the
15  presidential campaign?
16    A.   I began working for the Department of Public
17  Safety.
18    Q.   Okay.  And when was that?
19    A.   March of 2012.
20    Q.   And what position were you hired?
21    A.   Deputy assistant director for the media and
22  communications office.
23    Q.   And how long did you have that position?
24    A.   I'm still currently in that position.
25    Q.   Thank you.  And how did you come to be employed

Page 31

1  at DPS?
2    A.   I applied for the job.
3    Q.   Thank you.  And what are your job duties?
4    A.   To coordinate the media outreach regarding the
5  department's services as well as the accomplishments,
6  goals and activities.
7    Q.   To coordinate its -- I'm sorry, I didn't catch
8  that.  Could you please repeat that?
9    A.   Sure.  To coordinate the public -- the media
10  outreach on the department's services as well as the
11  department's goals and activities.
12    Q.   Outreach with respect to its goals and
13  activities; is that right?
14    A.   And services, yes.
15    Q.   Got it.  And is one of your duties to be the
16  spokesperson for DPS?
17    A.   At times I will speak to the media, but that is
18  not a primary responsibility.  We have a press secretary
19  who -- whose primary responsibility is to speak to the
20  media.
21    Q.   And who is that?
22    A.   Tom Vinger.
23    Q.   How do you assist in Tom Vinger's role as press
24  secretary?
25          MR. KEISTER:  Objection, vague.

Page 32

1          If you understand the question, you can
2  answer it.
3    A.   Yeah, I'm not sure I understand your question.
4  Is there a way to specify that?
5    Q.   (By Mr. Agraharkar) Sure.  You said that -- you
6  said that being the spokesperson for the DPS is part of
7  your job but is not your primary responsibility.  I'm
8  wondering how -- if you could elaborate on that, I -- in
9  what ways are you the spokesperson or do you assist Tom
10  Vinger?
11    A.   As I mentioned, at times I will speak to the
12  media but Tom Vinger's the primary spokesperson for the
13  department.  So when he gets, you know, questions or
14  inquiries from the media, you know, he'll -- he'll bring
15  those to me and if there's a need to review those, I'll
16  do that prior to it being released to the media.
17    Q.   Okay.  And in that capacity, does your role
18  involve publicizing the EIC program?
19    A.   The department's media and communications
20  office does publicize the EIC program, yes.
21    Q.   Do you tout its successes?
22    A.   We essentially make sure that through the media
23  the public knows how to obtain an EIC, who is eligible,
24  where, for instance, the mobile locations that we
25  discussed earlier are, that sort of thing.



KATHERINE CESINGER                                          May 20, 2014
VEASEY VS. PERRY                                                   37–40

Page 37

1  driver license offices are accessible, on the one hand,
2  and the other job of developing strategies to educate
3  people who don't have the EIC?
4        MR. KEISTER:  Objection, vague.
5     A.   Can you say that again?  I'm sorry.
6     Q.   (By Mr. Agraharkar) Would you find that there's
7  any tension between the job of promoting the view, as I
8  believe as you said, of -- that -- strike that.
9          Do you find tension between the job of
10  promoting the view that driver license offices are
11  accessible on the one hand and educating people who
12  don't have ID on the other?
13         MR. KEISTER:  Objection, vague.
14     A.   And I'm not following the question either, and
15  I apologize.
16     Q.   (By Mr. Agraharkar) That's okay.  I'll move on.
17          I want to speak a bit about voter
18  education initiatives or efforts that you took.  Did the
19  Department of Public Safety have a plan or a campaign to
20  educate the public about election identification
21  certificates?
22     A.   We did develop a plan, yes.
23     Q.   Okay.  And what were your responsibilities and
24  the involvement with respect to that plan?
25     A.   Essentially to develop press releases and work

Page 38

1  with the driver license division to review materials
2  that would be posted to the website, as that's a place
3  where all of the information about the department
4  resides and is easily accessible via computer.  Also, to
5  develop social media plan to further push out the
6  message of the EIC information, whether it's, you know,
7  requirements or eligibility and access.
8     Q.   Okay.  And did you determine what efforts were
9  taken to educate the public about EIC?
10         MR. KEISTER:  Objection, vague.
11     A.   Again, we did develop a plan, a media plan, a
12  media outreach plan related to the election
13  identification certificate.
14     Q.   (By Mr. Agraharkar) And did you decide on which
15  components -- or what would be the components of that
16  plan?
17     A.   We did identify which components were going to
18  be part of that plan, yes.
19     Q.   Okay.  And have you ever put together a public
20  education plan before?
21     A.   We, on a very regular basis, issue information
22  about services related to the department and as I
23  mentioned earlier activities, goals, accomplishments on
24  a very regular basis.  And that's through traditional
25  media as well as social media.

Page 39

1     Q.   Okay.  And I'm speaking specifically with
2  respect to public education plans, other public
3  education plans.  Have you developed a separate plan in
4  an another context other than outreach regarding EIC?
5     A.   I guess I wouldn't characterize almost
6  everything we do as a public outreach effort, so, yes, I
7  believe we do have experience in the media office and on
8  a very regular basis pushing out messages, whether its
9  one time or repeated messages to ensure that the public
10  knows about important issues or even one-time issues.
11     Q.   Okay.  And could you give me an example of
12  another plan that you put together in other contexts?
13         MR. KEISTER:  Objection, form, vague.
14     A.   We're entering hurricane season right now, and
15  through hurricane season we push a number of messages to
16  ensure that Texans are prepared should the worst happen.
17  So we start out, you know, issuing a press release a
18  couple of weeks prior to the start of hurricane season,
19  we hold an event and reissue those types of messages
20  related to that event, there's a social media effort
21  that's behind all of that, and there are common messages
22  that are reiterated throughout hurricane season, which
23  last through November 1st.  So that's one example of a
24  lengthy, you know, type of message that isn't going to
25  be that one-time message that goes out through a press

Page 40

1  release and social media.
2     Q.   (By Mr. Agraharkar) Okay.  Thank you.  And was
3  there a budget for that plan?
4     A.   No.
5     Q.   Okay.  Thank you.  Pushing back to the EIC plan
6  that you mentioned, did the Secretary of State's Office
7  contribute towards developing that plan?
8         MR. KEISTER:  Objection, form,
9  mischaracterizes the testimony.
10         But go ahead.
11     Q.   (By Mr. Agraharkar) You can answer.
12     A.   Right.  We shared with the Secretary of State's
13  communications office what we were going to be doing.
14     Q.   Okay.  So they didn't direct the effort but you
15  did share information with them?
16     A.   Correct.
17     Q.   Is that accurate?
18     A.   Yes, that's accurate.
19     Q.   Okay.  Did you receive any directions about
20  what the plan should look like from others outside of
21  the Secretary of State's office and outside of DPS?
22     A.   No.
23     Q.   Thank you.  And what efforts did the DPS take
24  to educate the public about EIC?
25     A.   As I mentioned we -- and what might be helpful



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
41–44

Page 41

1  is this -- this document, the timeline that -- that goes
2  through those efforts.  We issued press releases, we
3  sent messages through our Twitter account, through our
4  Facebook account, and we conducted interviews, we
5  fielded media calls on the issue.
6      Q.   Okay.  And I think I know which document you're
7  referring to.  Can I mark as Exhibit 124, I believe, the
8  document entitled Media Public Outreach Election
9  Identification Certificates?
10     A.   Yes, that's the document.
11          (Exhibit 124 marked for identification.)
12          (Handed to witness and counsel.)
13     Q.   (By Mr. Agraharkar) Thank you.  Just let me
14  know when you have it and have reviewed it.
15     A.   Okay.
16     Q.   Thank you.  So who prepared this document?
17     A.   I did.
18     Q.   Okay.  And it covers the period between August
19  30, 2012, and February 14, 2014, correct?
20     A.   We actually have an updated document that
21  covers through -- okay.
22          MR. KEISTER:  She marked the one we
23  produced today, Counsel, which goes through what?  Which
24  goes through what?
25          THE WITNESS:  May 19th.

Page 42

1          MR. KEISTER:  May 19th.  It's an updated
2  version of the one that I think you're handing over.
3          MR. AGRAHARKAR:  Okay, thank you.  And I
4  will get a copy of that.
5      Q.   (By Mr. Agraharkar)  Does this represent the
6  entirety of DPS's public education and outreach effort
7  regarding EIC during that time period?
8          MS. COHAN:  Vishal, if I could interrupt
9  for a moment.  Do you want to mark as the exhibit the
10  updated version that Ms. Cesinger brought here today or
11  do you want to use the version that you've provided?
12          MS. SIMPSON:  Can we go off the record for
13  one moment, please?
14          MR. AGRAHARKAR:  Yes, we'll go off the
15  record.
16          (Recess from 2:48 to 2:52 p.m.)
17     Q.   (By Mr. Agraharkar) Ms. Cesinger, does this
18  represent the entirety of the DPS public education and
19  outreach efforts regarding EIC during the periods August
20  '12 until May 27, 2014?
21     A.   It represents --
22     Q.   Obviously I meant --
23     A.   Oh, go ahead.
24     Q.   No, I said August '12 instead of August 2012,
25  but you get my drift.

Page 43

1      A.   Copy that.  Yes, this -- well, I say, yes.  Let
2  me clarify that, please.  This represents a good
3  overview of our outreach efforts.
4      Q.   Okay.  And are there any major components of
5  the outreach campaign plan that are left off of this
6  document?
7      A.   I think I mentioned this before:  For instance,
8  the interviews that were conducted are not cited on
9  here.  Any media responses to inquiries will not be
10  cited on here.  And I would characterize those as
11  outreach efforts as well.
12     Q.   Okay.  And which interviews are you referring
13  to?
14     A.   Any interviews that were conducted by the
15  department on the EICs, and there are any number of
16  those -- and I apologize, I don't have an exact number,
17  but we have -- we've definitely conducted a number of
18  interviews and certainly responded to a number of media
19  inquiries as well.
20     Q.   Okay.  And was it you who conducted those
21  interviews or was it any number of people at the DPS?
22     A.   Any number of people at the DPS.
23     Q.   Do you have a ballpark figure of how many
24  interviews were conducted?
25     A.   I don't, I apologize.

Page 44

1      Q.   And do you know who those were with generally?
2      A.   Generally, they would be with the spokespeople
3  for the department while -- (court reporter distracted
4  by counsel whispering to each other.)
5          THE COURT REPORTER:  I'm sorry, repeat
6  your answer, please.
7      A.   I'm sorry, I don't know specifically but
8  generally they would be spokespeople for the department.
9  While Tom Vinger is the --
10     Q.   (By Mr. Agraharkar) I'm sorry.  I meant who did
11  they interview with outside of DPS?
12     A.   Oh, I'm sorry, I misunderstood.
13     Q.   Who did they do the interview with?  Right.
14  I'm sorry.
15     A.   That's okay.  Members of the media.  It would
16  vary from print to radio to television within the state
17  of Texas.
18     Q.   Thank you.  And were there any key messages
19  that you wanted to communicate to the public through
20  those interviews and other components of the education
21  plan?
22     A.   Yes.  In all of those key messages --
23     Q.   What are those?
24     A.   All of those key messages are in our -- the
25  press releases that were distributed through the media



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
45–48

Page 45

1  and communications office, essentially what are the
2  requirements for the EIC, who may be eligible, what
3  other documents a Texan might already have that would
4  meet the photo ID requirements to vote.  Because not
5  only do we want folks to know what they might need in
6  order to be eligible for an EIC but we also wanted them
7  to know if they didn't need an EIC -- you know, we
8  wanted them to know that if they already had one of
9  other documents that sufficed for the voting
10  requirements that related to the photo ID, that they did
11  not have to come into the office or spend time trying to
12  acquire one of these EICs.
13      Q.  Okay.  So I thought I heard one of the key
14  messages as being that many people already had IDs so
15  they may not need to come in and also eligibility
16  requirements --
17      A.  Yes.
18      Q.  -- for getting ID, right?  Okay.
19          And I don't think you mentioned what
20  documents you need to demonstrate eligibility or did
21  you?
22      A.  I did not mention that to you, but that is
23  listed on our outreach materials.
24      Q.  Okay.  And so all the press releases contain
25  information about the documents, the underlying

Page 46

1  documents that one needs to demonstrate eligibility; is
2  that accurate?
3      A.  Right.  All the documents that we released from
4  the media and communications office do have the list of
5  requirements that an individual would need, one, to be
6  eligible and, two, to bring into the office.
7      Q.  Okay.  What research did your office do, if
8  any, to determine which Texans needed education about
9  EIC?
10      A.  We did not do that research as it is not a
11  responsibility of our office.
12      Q.  Okay.  And so you did no research to determine
13  which Texans needed education about EIC.  Did you do any
14  research on what information Texans needed about EICs?
15      A.  We gathered information --
16      Q.  Did you get that?  I'm sorry.  Go ahead.
17      A.  We gathered information from the appropriate
18  folks at the Department of Public Safety on information
19  that is required to obtain an EIC and felt that that was
20  important to relay to the public.  There were -- as I
21  mentioned, I haven't covered all the points that are in
22  the news release; however, the information that is in
23  the news release was gathered from those subject matter
24  experts so that we could relay as much information as
25  possible in an easy to understand and succinct way

Page 47

1  through a press release or, as I mentioned, through
2  social media efforts as well.
3      Q.  Okay.  But you did not do any research to
4  determine what the Texas public did not know about what
5  they needed to get EICs; is that accurate?
6          MR. KEISTER:  Objection, form, vague and
7  ambiguous.
8      A.  We didn't do research, but what we knew at the
9  media office was this is a new requirement, so we were
10  going to send as much information as the subject matter
11  experts were able to provide us in a way that was easily
12  relayed to the -- through the media to the public.
13      Q.  (By Mr. Agraharkar) Okay.  You mentioned
14  earlier that it wasn't your responsibility to determine
15  which Texans needed education about the EIC.  Whose
16  responsibility do you believe that is?
17      A.  I don't know.
18      Q.  Thank you.
19          Ultimately did you decide to target your
20  outreach effort in any way to certain populations or
21  groups?
22      A.  The only targeted outreach related to the DPS
23  mobile stations and that was by location.
24      Q.  And how did you determine which locations to
25  target?

Page 48

1      A.  We sent it to -- we sent the localized press
2  release to the media in the area in which the mobile
3  station would be located.
4      Q.  Okay.  So this was just to locations that had a
5  mobile EIC unit stationed; is that right?
6      A.  Correct.
7      Q.  And it was, correct, to local media in those
8  areas?
9      A.  I'm sorry, I didn't hear the first part of
10  that.
11      Q.  This was a press release to local media in
12  those areas; is that right?
13      A.  Yes.
14      Q.  Okay.  Do you have a way to determine how many
15  of those releases were picked up?
16      A.  Through the media coverage of that, yes.
17      Q.  I'm sorry, my question was, did you have a way
18  to determine how many news outlets picked up your local
19  press releases, and I think I maybe just didn't
20  understand your answer.
21      A.  Yes, through the media coverage that resulted
22  from the distribution of those press releases.
23      Q.  Okay.  And who tracked that media coverage?
24      A.  Specifically tracking it, we don't, but we
25  monitor that to make sure that there's -- there is a



KATHERINE CESINGER                                                  May 20, 2014
VEASEY VS. PERRY                                                        49—52

Page 49

1 connection there.
2    Q.   Okay.  And how do you monitor those -- that
3 coverage?
4    A.   By searching news articles, by looking at
5 various news entities in those areas in which we sent
6 out the press releases to.
7    Q.   Is there someone designated in the office
8 (noise obliterating words) charge of that type of
9 monitoring?
10          THE COURT REPORTER:  I'm sorry?
11          MS. COHAN:  Vishal, can you repeat that?
12 There's some paper shuffling on your end.
13          MR. AGRAHARKAR:  I apologize.
14    Q.   (By Mr. Agraharkar) Is there someone in your
15 office who's in charge of that monitoring?
16    A.   No one in particular.  We do have, in the media
17 and communications office in Austin, Aidee Trottier, our
18 media specialist and Elliott Weeks, our social and
19 online media specialist, do go over the various articles
20 that are produced each morning on a number of issues to
21 see what stories have been produced related to the
22 department and our activities.
23    Q.   Okay.  And were there any plans to specifically
24 target education efforts to African-American voters?
25    A.   There were not any specific plan, no.

Page 50

1    Q.   Okay.  Were there plans to specifically target
2 limited English proficiency voters?
3    A.   There were no specific plans to target a
4 particular audience other than the locations of the
5 mobile station.  Those are the only times that we
6 targeted a certain area of media outlets.
7    Q.   Okay.  I want to move on to the budget a bit.
8 How much money was budget to -- budgeted to publicize
9 the EIC program?
10    A.   None.
11    Q.   Okay.  And is that true of -- well, strike
12 that.
13          Is anything going to be budgeted in the
14 future to publicize the EIC program?
15          MR. KEISTER:  Objection, calls for
16 speculation.
17          To the extent you know, you can answer.
18    A.   Not that I'm aware of.  And I would like to add
19 that there's no budget for any of our outreach efforts.
20 All of our outreach efforts of the department are
21 through earned media because we don't have a budget for
22 marketing.
23    Q.   (By Mr. Agraharkar) Okay.  Thank you.
24          I want to move on to a different topic
25 now.  Did you play a role in choosing the locations of

Page 51

1 the EIC mobile units?
2    A.   I did not, no.
3    Q.   Okay.  Did you play a role in choosing the days
4 and hours during which EIC mobile units would be open
5 for business?
6    A.   No, sir.
7    Q.   Okay.  I want to talk specifically about the
8 county run mobile EIC units or the counties that don't
9 have a DPS driver license office and have to process EIC
10 themselves.  Do you know which ones I'm referring to?
11    A.   I understand what you're referring to.  If
12 those are the ones in which DPS employees are not
13 manning those stations, but instead --
14    Q.   Yes.
15    A.   -- some entity of the county in the county is
16 running those.
17    Q.   Yes, that is what I'm referring to.  I'd like
18 to mark as Exhibit 124 --
19          MR. KEISTER:  5
20    Q.   (By Mr. Agraharkar) Or -5, whatever the next
21 number is, a document titled County Locations Issuing
22 Election Identification Certificates.  And please let me
23 know when you've had a chance to look at that.
24          (Exhibit 125 marked for identification.)
25          (Handed to witness and counsel.)

Page 52

1    A.   Okay.
2    Q.   (By Mr. Agraharkar) Have you seen this document
3 before?
4    A.   Yes, I have.
5    Q.   This document lists the counties that decided
6 to issue EICs on their own without a DPS personnel; is
7 that right?
8    A.   That's right.
9    Q.   Okay.  And this document is available on the
10 DPS website; is that correct?
11    A.   That's correct.
12    Q.   Okay.  And is this the primary way in which
13 voters are informed by DPS of which counties process
14 EICs themselves?
15    A.   We send out a press release prior to the
16 elections essentially saying this -- go to this link on
17 the -- let me clarify that.  I'm sorry.
18          On the press release that explains the
19 different ways to obtain an EIC, one of those is listed
20 as "select locations" -- or "locations in select
21 counties" will also be issuing EICs.  For a list of
22 those locations -- or "For a list of those counties,"
23 you know, "Click here."  And that is one way to get to
24 it.  You can also go to this document by going directly
25 to our website.  You don't necessarily have to go



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                           53–56

Page 53

1 through the press release.
2        Also, prior to the November and primary
3 election, in our efforts to educate the public about
4 these locations -- or excuse me, about these counties
5 and their contact information, we also sent out those
6 localized press releases that essentially went to that
7 -- that targeted media group and to these areas that
8 provided the county contact information for more
9 information on when and where these would be available.
10 So there are a number of --
11    Q.   Thank you.  You mentioned --
12    A.   I'm sorry.
13    Q.   Thank you.  And so you mentioned the press
14 releases that had links to this document, that you could
15 go to this document directly on your website and local
16 press releases with the name of the actual county person
17 who is handling the EICs; is that right?
18    A.   Yes, that's correct.
19    Q.   Okay.  And in that first category, the press
20 releases that had a link, how -- so if someone is not
21 viewing that press release on the Internet, how would
22 they find out about this document?
23        MR. KEISTER:  Objection, vague, ambiguous
24 and I think also asked and answered.
25        But go ahead, you can answer it.

Page 54

1    A.   Again, the effort to make these county contact
2 -- the information about these county contacts available
3 to the public was through media efforts and outreach
4 efforts.  So certainly the big blast out to the hundreds
5 of media outlets that we have, as well as posting this
6 on the website, and then through the targeted media
7 outreach for each of these counties were the ways that
8 the public would have access to that.
9    Q.   (By Mr. Agraharkar) Okay.  With respect to this
10 document, is it accurate that this document does not
11 advertise when or where EICs will be available except to
12 tell readers to contact the counties themselves for that
13 information?
14        MR. KEISTER:  Objection, vague.
15    A.   This document says, "For locations, dates and
16 times that EICs will be available, contact any of the
17 following counties," and then it lists the contact name
18 and contact information for each of the different
19 counties.
20    Q.   (By Mr. Agraharkar) Okay.  So does DPS track --
21 or does your office within DPS track or otherwise
22 advertise what those hours or locations would be other
23 than to provide that information?
24        MR. KEISTER:  Objection, vague and
25 compound.

Page 55

1    A.   The department --
2    Q.   (By Mr. Agraharkar) You can answer.
3    A.   Sure.  The department provides the county
4 contact information who will then be able to provide the
5 locations, dates and times for the EIC availability.
6    Q.   Okay.  Thank you.  Does this document exist in
7 Spanish?
8        MR. KEISTER:  Objection, vague.
9    A.   I don't know.
10    Q.   (By Mr. Agraharkar) All right.  To your
11 knowledge, does it exist in Spanish?
12    A.   I don't know.
13    Q.   Right.  Have you seen a Spanish version of this
14 document?
15    A.   Not that I recall.
16    Q.   And I recall you don't remember -- I'm sorry.
17 I assume you don't recall seeing it in any other
18 languages other than Spanish?
19    A.   I don't recall seeing it in Spanish or another
20 language.
21    Q.   Thank you.  Do you know how many people in
22 Texas speak only Spanish?
23    A.   I don't.
24    Q.   Thanks.
25        I want to switch topics to publicizing the

Page 56

1 other EIC mobile units.  The DPS was responsible for
2 publicizing units other than the ones that counties
3 process themselves; is that correct?
4        MR. KEISTER:  Objection, vague.
5    A.   We did publicize the DPS run mobile stations,
6 EIC mobile stations.
7    Q.   (By Mr. Agraharkar) Okay.  And that was done
8 through the same avenues you mentioned earlier:  Press
9 releases and -- well, what other ways do you use to
10 publicize those?
11    A.   Statewide press releases, information on our
12 website, social media and localized press releases as
13 well as interviews and responses to media inquiries.
14    Q.   Okay.  And has DPS conducted any community
15 meetings or town halls or other community trainings on
16 how to find those?
17    A.   The media office has not, but I can't speak to
18 the other offices.
19    Q.   Okay.  And has DPS conducted any outreach to
20 specific people who the DPS might have reason to believe
21 do not have ID?
22    A.   Through our website, I would say that the
23 purpose of posting that information, all of this
24 information on our website, as well as through the press
25 releases, the goal was to make sure that anyone who is



KATHERINE CESINGER                                          May 20, 2014
VEASEY VS. PERRY                                            57–60

Page 57

1 eligible for one of these EICs knows about it and knows
2 about the availability.
3     Q.   Okay.  And when you say through your website,
4 how do you conduct outreach to specific people through
5 your website?
6     A.   By making that information available on the
7 website.  There are -- you know, a significant amount of
8 information that's on our website for the main goal of
9 informing the public about what services we provide.
10    Q.   Okay.  Thank you.
11         And are you aware that the Secretary of
12 State has compared a database of registered voters to a
13 database of people who have a DPS ID record and has a
14 list of names of people who did not match?
15         MR. KEISTER:  Objection, form, outside the
16 scope of this designated witness for this deposition.
17         But to the extent you can answer.
18    A.   I don't -- I'm not familiar with that
19 information.
20    Q.   (By Mr. Agraharkar) Okay.  No one has told the
21 media office that information; is that right?
22         MR. KEISTER:  Same objection.
23    A.   It's possible that that information, you know,
24 was -- may have been shared with us, but I'm not
25 familiar with it and can't recall it specifically as we

Page 58

1 didn't deal with any of that information.
2     Q.   (By Mr. Agraharkar) Okay.  Thank you.
3          I'm going to ask one more question about
4 press releases.  What is the process they use when you
5 issue a statewide press release?
6     A.   Well, we send it through two groups.  We'll
7 send it through our -- essentially it's a ListServ that
8 we've collected over the years and has hundreds of media
9 outlets on it, and I apologize, I don't have the exact
10 number but it's hundreds of media outlets that are, you
11 know, either local press, weeklys, you know, when we're
12 talking about print, weeklys, editorials.  We'll have
13 radio.  We'll also have television stations on there.
14 The Associated Press, of course, you know, a number of
15 national members of the media who typically receive our
16 information, beat reporters that cover, you know, any
17 number of issues that are related to the department.  So
18 that's one way.
19         And then secondly, we have a subscription
20 to the Texas Media Directory so we will send to the
21 hundreds of media outlets on there, and I would -- I
22 would venture to say there's close to 2000 that we send
23 when we send it to statewide media outlets, and again
24 that includes those same types of categories with
25 different outlets on it.

Page 59

1     Q.   Thank you.
2          And do you send is it out in Spanish as
3 well?
4     A.   We do not.
5     Q.   Okay.  I'd like to mark another exhibit, it's a
6 document titled County Processing Election
7 Identification Certificates.
8          THE COURT REPORTER:  I'm sorry?
9          MS. COHAN:  Can you repeat the title,
10 Vishal?
11    Q.   (By Mr. Agraharkar) Sure.  It's "County
12 Processing Election Identification Certificates" and it
13 references San Augustine County.
14    A.   And may I add something to the last question?
15    Q.   Sure.
16    A.   While we don't issue information in Spanish, I
17 will -- I can confirm that we do have a number of
18 Spanish language media outlets on our distribution list
19 that we work with regularly.
20    Q.   Okay.  So you rely on them to translate the
21 information in your press releases; is that right?
22    A.   We send it over to them.  We send all of our
23 news releases that go statewide to those Spanish
24 language media outlets in English.
25    Q.   Thank you.  Have you had a chance to look at

Page 60

1 the document that's been marked I believe as 126?
2     A.   Not just yet.  Sorry.
3     Q.   Take your time.
4          MR. KEISTER:  You've got to stop talking
5 so the court reporter can mark it.  He's looking at us.
6          THE COURT REPORTER:  Thank you.
7          (Exhibit 126 marked for identification.)
8          (Handed to witness and counsel.)
9     A.   Okay, I reviewed it.
10    Q.   (By Mr. Agraharkar) Thanks.  And have you seen
11 this before?
12    A.   Yes.
13    Q.   Okay.  And is this a typical press release
14 issued from the DPS to publicize EIC to people in the
15 county where the counties agree to offer EIC?
16    A.   Yes.
17    Q.   Okay.  And am I right that there's no DPS phone
18 number or hotline listed on here to people who want to
19 speak to a DPS customer service representative directly?
20    A.   Specifically on this, no, there is not;
21 however, the link below does send you to our website
22 which does have all of our contact information on it and
23 additional and detailed information about the EIC.
24    Q.   Okay.  So someone had would have to have
25 Internet access in order to access the information from



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
61–64

Page 61

1 this press release to get to a phone number --
2    A.   Yes.
3    Q.   -- is that right?  Okay.
4         So a Spanish speaker who received this
5 press release or translated version of this, they would
6 be directed -- they would be directed by this press
7 release to contact the San Augustine elections
8 administrator; is that right?
9    A.   Yes.
10    Q.   And to your knowledge, is that local contact
11 required to be able to speak Spanish?
12    A.   I don't have knowledge of that.
13    Q.   Okay.  And this is a typical press release
14 issued for county run EICs, all of them with all the
15 same template; isn't that right?
16    A.   Yes, that's correct.
17    Q.   Okay.  Thank you.  We'll move on to social
18 media.  You mentioned that DPS also uses social media to
19 do outreach; is that correct?
20    A.   Yes, that's correct.
21    Q.   And I believe you testified that you use
22 Twitter and Facebook; is that right?
23    A.   That's right, yes.
24    Q.   Okay.  And no other forms of social media; is
25 that correct?

Page 62

1    A.   That's correct.
2    Q.   Okay.  And DPS doesn't purchase any sponsored
3 Tweets or Facebook content to advertise EIC; is that
4 correct?
5    A.   Right.  As we don't -- again, we don't have a
6 budget for those types of activities.
7    Q.   Okay.
8    A.   For any issue.
9    Q.   And was there -- I'm sorry.  Was there any
10 research done to determine whether the people who
11 followed DPS on Facebook and Twitter were the people who
12 need education with respect to EIC?
13    A.   We don't conduct that type of research for any
14 of our outreach efforts.
15    Q.   Okay.  And DPS's primary mission is law
16 enforcement, would you say that's accurate?
17    A.   No.
18    Q.   What would you say is their primary mission?
19    A.   To serve and protect Texans.
20    Q.   Okay.  Prior to the creation of EIC, did DPS
21 play a role with respect to voter education?
22    A.   I'm not aware of that.
23    Q.   So is there any reason to believe that
24 people follow DPS on social media to obtain information
25 about elections?

Page 63

1    A.   I -- I would be speculating if I answered that.
2    Q.   Okay.  Thanks.  And moving on to the
3 website.  Are you familiar with the DPS website?
4    A.   Yes.
5    Q.   Have you had any involvement in how its
6 designed or laid out?
7    A.   That is a -- I guess that's a purview of the IT
8 department, although I do have some involvement with the
9 approval or review of content that's posted on some
10 issues.
11    Q.   Okay.  So to the extent it can help in voter
12 outreach, you might provide some input; is that fair to
13 say?
14    A.   Sure.
15    Q.   Okay.  Is information about the EIC available
16 on the front page of the DPS website?
17    A.   Through the driver license portal, you can
18 access that and at various times when the EIC message is
19 being featured, yes, you can access that from the home
20 page.
21    Q.   Okay.  And so to do so, you would have to click
22 on "driver licenses" and not something that says "EIC"
23 or anything with respect to voting; is that correct?
24    A.   From time to time, we do feature the EIC on the
25 home page so can you read the words Electronic

Page 64

1 Identification Certificate -- or excuse me, Election
2 Identification Certificate on the home page and click on
3 that to access additional information.
4    Q.   When you say -- thank you.  And when you say
5 time to time, when has it been featured in the past?
6    A.   Anytime we put out a press release about the
7 EIC and sometimes -- and I apologize, I don't have the
8 exact dates that we did this, but at times we have held
9 that message as the primary home page featured press
10 release and we'll do that on a number of issues.  As I
11 mentioned earlier, hurricane season, we'll hold that as
12 the primary feature even though we'll continue to put
13 out additional news releases throughout the week.  If
14 there's something, you know, that from time to time is
15 relevant time-wise, we'll just keep that as a feature,
16 and we've done that with EIC.
17    Q.   Okay.  But it's not on the front page of the
18 website as you stand -- as you sit here today?
19    A.   I don't think so because I think we put out a
20 press release today.
21    Q.   Okay.  Okay.  I'd like to introduce another
22 exhibit.
23         MR. KEISTER:  Counsel, we've been going
24 about an hour and a half.  If you're at a convenient
25 spot, can we take a break?



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
65–68

Page 65

1        MR. AGRAHARKAR:  Sure.  That's fine.
2        MR. KEISTER:  Okay.
3        THE WITNESS:  Thanks.
4        (Recess.)
5    Q.  (By Mr. Agraharkar) I believe I was asking for
6    the -- to mark the exhibit that is titled Texas
7    Department of Public Safety.  It's an image of the front
8    page of the website.  I'd like to mark that I guess as
9    127.  Let me know when you've had a chance to look at
10   it.
11       (Exhibit 127 marked for identification.)
12       (Handed to witness and counsel.)
13   A.  Okay.
14   Q.  (By Mr. Agraharkar) Okay.  And this is the
15   front page of the DPS website, correct?
16   A.  Correct.
17   Q.  Okay.  And if I tell you that I printed this
18   out on May 19th, would that -- does that sound accurate
19   to you?  Would you believe me?
20   A.  We've only just met.
21   Q.  And you can't see me in person.  But
22   okay.  I'll represent to you that I printed this out on
23   May 19th.  Is it true that there's no link on this front
24   page to EIC currently?
25   A.  Directly to EIC from the front page, no.

Page 66

1    Q.  Okay.  Thank you.  And do you know whether
2    currently mobile stations are offering Saturday hours to
3    get an EIC event occurring in the State right now?
4    A.  Yes.
5    Q.  Okay.  And why is that?
6    A.  That might be a better question for the driver
7    license division on the why.  But we have promoted that
8    it -- that is available.
9    Q.  Okay.  So there's some outreach effort to get
10   people EICs that's currently going on but there's no
11   link to EIC on the front page currently; is that
12   accurate?
13   A.  Currently on the front page, correct.
14   Q.  Okay.  Is this page available in Spanish?
15   A.  I'm not sure.
16   Q.  Okay.  Do you see somewhere on the page where
17   you can view it in Spanish if you so wanted?
18   A.  It looks like down below there is an option to
19   click on "Spanish."
20   Q.  Okay.  And where is that?
21   A.  The bottom right.  There's a number of texts
22   that's centered just above the copyright 2000 to 2011,
23   Texas Department of Public Safety.  It's on the far
24   right.
25   Q.  Okay.  And if you click on that link, do you

Page 67

1    know how the page is translated into Spanish?
2    A.  I don't.
3    Q.  Do you know whether someone at DPS translated
4    all the text and put it onto the website?
5    A.  I don't know how that feature works.
6    Q.  Okay.  Thank you.
7        I'd like to introduce another document,
8    another page from the website that's titled Election
9    Identification Certificates.  It's --
10       (Exhibit 128 marked for identification.)
11       (Handed to witness and counsel.)
12   Q.  (By Mr. Agraharkar)  Is the court reporter
13   finished and have you had a chance to look at it?
14   A.  Just a moment, please.
15   Q.  Okay.
16   A.  Yes, I have had a chance to look at that, and
17   it's been numbered.
18   Q.  Okay.  Thank you.  And have you seen this
19   before?
20   A.  Yes.
21   Q.  Is this the page of the DPS website that
22   informs people about the requirements of obtaining EICs,
23   correct?
24   A.  Correct.
25   Q.  And is this page available in Spanish?

Page 68

1    A.  I believe so, yes.  There's an option to click
2    on the Spanish version.
3    Q.  Okay.  Thank you.  And I'd like to introduce
4    one more document, it's the Spanish version of that
5    page.
6        (Exhibit 129 marked for identification.)
7        (Handed to witness and counsel.)
8    A.  Okay.  I've had an opportunity to look at it.
9    Q.  (By Mr. Agraharkar)  Okay.  If I tell you that
10   this is a screen print of what one sees when someone
11   clicks on the word "Espanol" on the top left corner of
12   the previous page we were looking at, would that sound
13   accurate to you?
14       MR. KEISTER:  Objection, calls for
15   speculation.
16   Q.  (By Mr. Agraharkar) You can answer.
17   A.  I understand that that's what you've relayed to
18   me.
19   Q.  Have you ever clicked on the word "Espanol" on
20   the top left-hand corner of the previous page that I
21   showed you?
22   A.  Yes.
23   Q.  Did you see something different than what this
24   looks like?
25   A.  I don't recall specifically but it does look



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                          69–72

Page 69

1  similar, yes.
2      Q.   Okay.  And do you use Google translate to
3  translate your Web pages to Spanish?
4      A.   The media office is not involved in any
5  translation of our Web page or of our website.
6      Q.   Okay.  So was there any pressings done to
7  determine if this was accurate and comprehensible in
8  Spanish?
9      A.   The media office is not involved in
10  translations on our website, so I would not have
11  knowledge of that.
12      Q.   Okay.  So the media office does not do any
13  translation to determine if its website was accessible
14  to the Spanish speakers; is that accurate?
15      A.   The media office does not partake in that type
16  of activity, no.
17      Q.   Okay.  And was it tested -- or did the media
18  office test it or anyone else in media office test it to
19  see if the hyperlink on the page still worked when it
20  had been translated by Google?
21      A.   The media office was not involved in that
22  process.  But I can't speak to another division.
23      Q.   Okay.  Thank you.
24      A.   Sure.
25      Q.   I'd like to introducing one more document.  And

Page 70

1  I imagine this is the on that was wrongly given to the
2  court reporter before entitled "Election Identification
3  Certificate Documentation Requirements."  And please let
4  me know when you've had a chance to look at it.
5          (Exhibit 130 marked for identification.)
6          (Handed to witness and counsel.)
7      A.   Okay.
8      Q.   (By Mr. Agraharkar) Have you seen this before?
9      A.   Yes, I have.
10      Q.   Okay.  And this is a page from the DPS website
11  that shows what documents are necessary to obtain an
12  EIC; is that right?
13      A.   Yes.
14      Q.   Do you know whether this page is available in
15  Spanish?
16      A.   I don't know that.
17      Q.   Okay.  And there's no link on the top left-hand
18  corner of this page like there was on the EIC landing
19  page that said "Espanol"; is that accurate?
20      A.   That's accurate.
21      Q.   Okay.  Thank you.  And switching topics, are
22  you familiar with the application form for obtaining an
23  EIC?
24      A.   I'm not familiar with the content of the
25  application form, but I am familiar with the link to the

Page 71

1  form which we provide on our -- on the Web pages that do
2  describe the information related to EICs.  And if I'm --
3      Q.   And that link --
4      A.   I'm sorry.
5      Q.   I'm sorry.
6      A.   If I'm not mistaken, we may actually have a
7  link in our news releases to that application as well.
8      Q.   Okay.  Thank you.  So are you aware whether
9  that form is available in Spanish?
10      A.   I'm not aware.
11      Q.   Okay.  I'd like to switch topics once more.
12  Did DPS use any posters to educate the public about EIC?
13      A.   The media office did not; but as I understand
14  it, the driver license division did.
15      Q.   Okay.  And so --
16      A.   I'm not sure if -- I'm not sure if it's
17  assistant director Joe Peters or anyone else from driver
18  license spoke to that, but the media office was not part
19  of that production.
20      Q.   Okay.  Thank you.  Do you play a role in
21  developing the content or were you consulted about the
22  content of those posters as all?
23      A.   It's possible, but I don't recall specifically.
24      Q.   Okay.  And did the driver license division --
25  strike that.

Page 72

1          Did you play a role in disseminating the
2  posters in any way?
3      A.   No.
4      Q.   Okay.  Thank you.
5      A.   Sure.
6      Q.   Does the voter education plan include any
7  effort to educate people on how to obtain underlying
8  documents needed to obtain an EIC, such as a birth
9  certificate?
10      A.   The outreach effort that we were involved in
11  did refer to those documents on the website.  And by
12  those document, I mean, you know, there's different
13  requirements for the EIC, and all of those documents are
14  listed on the website.
15      Q.   Okay.  And is there anything -- going back to
16  Exhibit 126.  I'm sorry for skipping back and forth.
17      A.   That's okay.
18      Q.   But this was the -- this was the press release
19  sent to San Augustine County in particular about the
20  mobile EIC at that location.  Is there any information
21  on this press release regarding the underlying documents
22  that are noted to vote?
23      A.   There is a link at the bottom that takes you to
24  the place that has that information, and that
25  information is accessible on that link.



KATHERINE CESINGER                                    May 20, 2014
VEASEY VS. PERRY                                        73–76

Page 73

1   Q.   Okay.  So the primary means of educating people
2  through press releases about the underlying documents
3  needed to vote are through hyperlinks; is that accurate?
4   A.   No.  The -- Exhibit 126 is a message to the
5  members of the media about the information related to
6  the EIC, and as, you know, we've all seen in the media,
7  they write their stories based on information that they
8  gather about a particular topic.  So for the most part,
9  in my practical experience, typically, media outlets
10 will not produce or distribute or print or publish press
11 releases, they'll take pertinent information and pieces
12 of information and relay that to the public in whatever
13 form they deem appropriate.  So this was an outreach
14 effort to media equiping them with all the information
15 that we have about EICs in a -- in an efficient way.
16  Q.   Okay.  Thank you.
17      To your knowledge, if someone cannot
18 afford to pay for their birth certificate, can they
19 obtain one for free or at a discount?
20      MR. KEISTER:  Objection, form.  This is
21 outside the scope of the designated issues for this
22 witness.  That would call for this witness to speculate.
23      But at that point, you can answer if you
24 can.
25  A.   I don't know the answer to that question.

Page 74

1   Q.   (By Mr. Agraharkar) Okay.  To your knowledge,
2  has your office done any education on -- assuming that
3  discounted birth certificates are available, to your
4  knowledge, has your office done any education with
5  respect to that fact?
6      MR. KEISTER:  Objection, form, outside the
7  scope of the issues which this witness is designated.
8  Further, it calls for speculation.  Further, it
9  mischaracterizes previous testimony and states facts
10 that are not in evidence.
11      But beyond that, you can answer if you
12 can.
13  A.   The media office produced information to the
14 media about EICs, so, you know, we -- my knowledge is
15 that the department does not issue birth certificates
16 and we did not do any outreach on that.
17  Q.   (By Mr. Agraharkar) Okay.  Thank you.  To your
18 knowledge has the DPS done -- what outreach or education
19 has the DPS done regarding assistance for people who are
20 homebound in obtaining an EIC?
21  A.   I'm not sure if this -- can you specify that a
22 little bit more?  I want to make sure I'm answering the
23 right question.
24  Q.   Okay.  To your knowledge does DPS assist people
25 who are homebound in obtaining an ID -- an EIC?

Page 75

1   A.   I don't know specifically that category, but I
2  do know in our press releases we do mention, you know,
3  for additional information about -- about exceptions to
4  this requirement an individual can contact the
5  department or the Secretary of State's office.
6   Q.   Okay.  Thank you.  But nothing specifically to
7  your knowledge with respect to people who are homebound?
8   A.   I believe our outreach effort is a bit more
9  general to anyone who might have an exception.
10  Q.   Okay.  Thank you.  At some point in 2013, DPS
11 had a policy that would check EIC applicants for
12 outstanding warrants, correct?
13      MR. KEISTER:  Objection, form, states --
14 states facts that are not in evidence and
15 mischaracterizes previous testimony in previous
16 depositions.  It's also outside of the issues which this
17 witness has been designated to testify.
18      To that extent, you can answer.
19  A.   I can't speak to policy.  I can just speak to
20 the media outreach efforts on EIC.
21  Q.   (By Mr. Agraharkar) Okay.  Did you do any
22 education with respect to whether EIC applicants are
23 checked for outstanding warrants?
24  A.   We answered some media inquiries about that --
25 about that issue.

Page 76

1   Q.   Okay.  And what were the inquiries?
2   A.   There were only a couple and they generally
3  were centered around some misinformation that I believe
4  the assumption was that warrants were being checked in
5  relation to EICs.  However, that was misinformation that
6  we clarified with those particular entities.
7   Q.   Okay.  And you said that you responded to a
8  couple of inquiries, am I characterizing your testimony
9  correctly?
10  A.   That's correct.
11  Q.   Okay.  And beyond that, did you do any
12 affirmative outreach to the public about that issue in
13 particular?
14  A.   No.  Because again, there were only a couple of
15 inquiries and we addressed those directly and
16 immediately when we had the -- when we were able to
17 clarify the issue.
18  Q.   Okay.  Thank you.  I want to switch topics once
19 again.
20      Has Texas -- I'm sorry.  Has the DPS
21 conducted any research to evaluate the effectiveness of
22 your education plan with respect to the EIC?
23  A.   Again, I'd like to just make sure that we're
24 characterizing it the same way or maybe I can just
25 clarify my characterization of this outreach



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
77—80

Page 77

1  effort.  You know, we saw this, again, as an outreach
2  effort in which, you know, we utilized all the resources
3  that we have to gain earned media on this -- on this
4  effort, including such things at news releases.  Every
5  time we put out a news release we put out a message
6  through our Twitter account, we put out a message
7  through Facebook, that reiterated those messages in
8  between the times that we were issuing those statewide
9  media press releases to, you know, the thousands of
10  outlets that are on our system, we were reminding folks
11  of the availability of EICs, the location of mobile
12  stations, the Saturday hours, the different
13  requirements, all of those elements that were part of
14  that -- that public message so that folks did know when
15  and where they could get these and how they could get
16  them and who was eligible.  So through that
17  comprehensive outreach effort, we were able to see the
18  different media coverage that resulted from those
19  efforts.
20         So while we do not have -- and I think I
21  mentioned that before, we don't -- there wasn't a
22  research element or an analytics element to it, there
23  was absolutely the practical aspect of what we know to
24  be effective and that's using these different earned
25  media efforts to push those messages, and we saw the

Page 78

1  return on that.
2  Q.  Okay.  Thank you.  I'd like to introduce one
3  more document.  It's the Contact Us page of the website.
4  Just let me know when you've had a chance to look at it.
5  A.  Okay.  Just a moment, please.
6  Q.  Sure.
7        (Exhibit 131 marked for identification.)
8        (Handed to witness and counsel.)
9  A.  Okay.
10  Q.  (By Mr. Agraharkar) Thanks.  Can you tell me
11  what this is?
12  A.  The contact page for the Department of Public
13  Safety.
14  Q.  Thanks.  Do you have a hotline for people who
15  have questions or complaints about EIC?
16  A.  I don't have any knowledge of that as it does
17  not relate to the media and communications office
18  operation.
19  Q.  Okay.  And if people have questions about how
20  to obtain EIC, that doesn't go -- that's not within the
21  media and communications purview?
22  A.  Correct.  We deal with members of the media as
23  our primary customers in the media office.
24  Q.  Okay.  And are you aware, if you were to
25  advertise a hotline or phone number for people to call

Page 79

1  in outreach, is there a number that you would use?
2  A.  We don't have -- we're not doing that at the
3  moment because, again, this isn't in the media and
4  communication office knowledge that -- however, if an
5  individual were to mistakenly call our office, we would
6  refer them over to the driver license division.
7  Q.  Okay.  And there's nothing on this page to --
8  that would tell someone what number they might call if
9  they had a question with obtaining -- about obtaining
10  EIC, to your knowledge?
11  A.  The -- well, there are a lot of numbers on
12  here.  I think that anyone could call certainly the
13  Austin headquarters number if they needed some
14  assistance.  However, I do not see the term "EIC" on
15  here.
16  Q.  Okay.  And the Austin headquarters number, is
17  that is a 800 number or a toll free number?
18  A.  I see a 512 area code.
19  Q.  Okay.  And the driver license customer service
20  number that's listed on there, is that an 800 number?
21  A.  I see a 512 area code listed.  I'm not -- I
22  can't speak to the -- what happens when you call that
23  number, if that's routed to an 800 number or not.  I'm
24  just not aware.
25  Q.  Okay.  Thank you.

Page 80

1  A.  But listed on here, I see a 512 area code.
2  Q.  Okay.  Thank you.  I think that's all the
3  questions we have right now.
4        We'll pass the witness.
5        MR. KEISTER:  Guys, I hate to do this but
6  I've got to run down the hall.
7        MS. COHAN:  It's all right.  We have to
8  grab the next set of documents anyway.
9        We'll go off the record for five minutes.
10        (Recess taken from 4:07 p.m. to 4:15 p.m.)
11        EXAMINATION
12  BY MR. FREEMAN:
13  Q.  Thank you, Ms. Cesinger, for taking the
14  time.  If we could actually pull back up Exhibit 124 --
15  A.  Okay.
16  Q.  -- which I believe is the Media Plan.  Am I
17  correct that Exhibit 124 states that on September 24,
18  2013, you issued a statewide press release indicating
19  that DPS mobile stations would issue EICs across Texas
20  beginning October 1, 2013?
21  A.  That is what that says on the outreach effort
22  timeline, yes.
23  Q.  Did this include DPS mobile stations in
24  counties that do have driver license offices, the
25  subject of this press release?



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
81–84

Page 81

1    A.  Can you say that again?  I'm sorry.
2    Q.  Does the subject of this press release include
3  DPS mobile stations in counties that do have permanent
4  driver license offices?
5    A.  I don't recall.
6    Q.  Do you know as of September 24, 2013, the
7  temporary locations and the hours that those locations
8  would be open had been established for the period from
9  October 1 until November 2013?
10    A.  I don't recall specifically.
11    Q.  Do you know if that press release included the
12  location and hours of those temporary locations?
13    A.  I have -- as I mentioned at the beginning of
14  the deposition, I do have a copy of those press releases
15  here.
16    Q.  If you can take a moment to take a look at that
17  very quickly and refresh your recollection, I would
18  appreciate it.
19    A.  Great.  Thank you.  Okay.
20    Q.  Ms. Cesinger, now that your recollection has
21  been refreshed, did the September 24, 2013, press
22  release include the locations and hours of temporary DPS
23  locations that would be established from October 1st
24  through the November 2013 election?
25    A.  The September 24th press release includes a

Page 82

1  link to a schedule for the 25 EIC mobile stations whose
2  locations and times were going to be determined by the
3  Secretary of State's office.
4    Q.  Do you know if those were the DPS mobile
5  locations that would be in counties that did not
6  otherwise have driver license offices or do you know if
7  it linked to those DPS mobile locations that would be in
8  counties that already did have driver's license offices?
9    A.  The DPS mobile stations that were being -- that
10  are now run by DPS employees and deployed to counties in
11  which there are not current driver license offices in
12  them, I do not believe were referenced in this press
13  release.
14    Q.  They were not?
15    A.  I don't -- I don't believe so because these are
16  referenced -- this references those determined by the
17  Secretary of State's office.
18    Q.  And the ones that were run by the Secretary of
19  State's office, those were ones that were in counties
20  that did not have a driver's license office; is that
21  correct?
22    A.  I don't recall exactly where those were located
23  as they were determined be the Secretary of State's
24  office but we did refer folks over to the Secretary of
25  State office website for the schedule of those

Page 83

1  locations.
2    Q.  Okay.  When you issue a statewide press
3  release, do you reach out directly to any non-media
4  organizations?
5    A.  Not that I can think of.
6    Q.  So you don't send your press releases to any
7  churches?
8    A.  Not to my knowledge.
9    Q.  And you don't send press releases to chapters
10  of the NAACP?
11    A.  Not to my knowledge.
12    Q.  You don't send press releases to chapters of
13  LULAC?
14    A.  Not to my knowledge.  We send our press
15  releases to members of the media.
16    Q.  Okay.  Do you know if the September 24, 2013,
17  press release included instruction regarding the
18  materials that a voter would have to bring to a DPS
19  mobile station in order to obtain an EIC?
20    A.  Just a moment, please.  There is reference in
21  that September 24, 2013, press release on the second
22  page that begins to talk about the requirements of an
23  applicant.  The paragraph starts, "To apply for an EIC,
24  applicants must visit a driver license office or EIC
25  mobile station and complete an application for Texas

Page 84

1  Election Certificate, DL-14C."  And then below that, it
2  says, "To qualify for an EIC, an applicant must bring
3  documentation to verify U.S. citizenship, bring
4  documentation to verify identity, be eligible to vote in
5  Texas, bring a valid voter registration card or submit a
6  voter registration application through DPS, be a Texas
7  resident, be 17-years-and-10-months old or older."  And
8  then below that, the sentence reads, "To avoid delays or
9  complications, DPS urges potential applicants to make
10  sure they have the necessary documentation before
11  arriving at the office or mobile station."
12    Q.  Does the press release state what types of
13  documents are necessary to fulfill those requirements?
14    A.  There is, I believe -- and I'm sorry, I don't
15  have that press release pulled up in front of me, but I
16  believe those -- those either bolded or underlined words
17  are hyperlinked.
18    Q.  I see.  So someone just reading the press
19  release would not know, but if they were on a computer,
20  they could take the initiative to follow up and find
21  out; is that correct?
22    A.  Correct.
23    Q.  Okay.  Going back to --
24    A.  And --
25    Q.  -- to -- well, actually -- I'm sorry, one more



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
85—88

Page 85

1    question:  If an individual goes to a mobile station
2    that's only on location for one day and they don't have
3    their underlying documents, they can't come back the
4    next day with their documents and get an EIC, right?
5        MR. KEISTER:  Objection, form, calls for
6    speculation.  In addition, it's beyond the issues this
7    witness is designated to testify for today.
8        To the extent you can, answer the
9    question.
10   Q.  (By Mr. Freeman) You may answer.
11   A.  We -- we have knowledge of the schedules for
12   the DPS run mobile station as well as these Secretary of
13   State's office mobile station location schedules, and
14   that's what we promoted.
15   Q.  But if an individual comes to a mobile location
16   that's only there for one day and they don't have their
17   documents, they can't come back the next day and get an
18   EIC even if they bring their documents, correct?
19       MR. KEISTER:  Objection, form, calls for
20   speculation.  In addition, it's beyond the issues for
21   which this witness has been designated to testify today.
22       But to the extent you understood the
23   question, you may answer.
24   Q.  (By Mr. Freeman) You may answer.
25   A.  I suppose that would be correct.

Page 86

1    Q.  Thank you.  Going back to Exhibit 124, the
2    outreach campaign plan states that from October 25,
3    2013, to November 5, 2013, DPS issued local press
4    releases, and that's in 25 mobile station locations and
5    their schedules in select areas of the state, correct?
6    A.  Correct.
7    Q.  During the period from October 25, 2013, to
8    November 5, 2013, how far in advance of a particular
9    mobile location operating would you issue a local press
10   release?
11   A.  It varied but on average I would -- I would say
12   several days.
13   Q.  Several days.  So three to five?
14   A.  I think that's a good summary.
15   Q.  Okay.  Would you monitor whether your local
16   press release had been picked up in the local media?
17   A.  Yes, in the same way that we monitor all our
18   messages.  I think I may have mentioned before but, yes,
19   we would -- as we push out press releases, we monitor
20   media coverage of that through various websites and
21   different media entities.
22   Q.  And if -- if a particular press release didn't
23   get any attraction, would you follow up at all with
24   individual reporters or publications to make sure that
25   they published something?

Page 87

1    A.  As I said, we don't have -- we didn't do any
2    analytics on which particular entities covered it,
3    covered the press release that we sent out, but what we
4    did monitor was, when we were sending out these
5    messages, was there coverage about election
6    identification certificates.  And again, in our
7    practical experience, although we don't have analytical
8    information to point to, we did see that when there was
9    an uptick in the release of that information, there was
10   an uptick in the coverage of that information as well.
11   Q.  That didn't quite answer my question.  My
12   question was:  If you saw that a particular press
13   release had not been picked up in, say, let's say, the
14   Corpus Christi Caller, if you sent out a local press
15   release to Corpus Christi, would you follow up with a
16   particular newspaper or with any writers of that
17   newspaper to make sure that they did write about
18   temporary EIC locations?
19   A.  That's why I was trying to clarify or explain
20   how we do monitor the press coverage of that, because
21   the way that we monitor it is generally to see when
22   we're putting out press releases is the media covering
23   that.  And when we saw the uptick in release, we did see
24   the uptick in coverage.  We were not specifically -- and
25   -- you know, I don't know that -- we haven't done this

Page 88

1    for any messages that we send out.  We don't -- we don't
2    confirm that every single media outlet that we've sent a
3    press release to covers the -- whatever that -- the
4    message of that press release was.  But we do feel
5    there's an obligation for us to monitor the messages
6    that we send out to make sure that the press is covering
7    that in a general sense; otherwise, you know, clearly
8    the connection is not being made.
9    Q.  I see.
10   A.  So I hope that --
11   Q.  So with regard to any individual local press
12   release, you have no basis to know whether any
13   particular local press release was picked up and that
14   the location were publicized, correct?
15   A.  Sitting here today, I cannot tell you
16   that.  However, you know, I could certainly do, you
17   know, a search and confirm that, but we don't have any
18   -- any system where we have tracked that.
19   Q.  Okay.  To your knowledge are individuals who
20   would need an EIC more -- more or less likely than the
21   general population to be poor?
22       MR. KEISTER:  Objection, form, calls for
23   speculation of this witness.  In addition, it's beyond
24   the scope the issues she had been designated to testify
25   for.



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
89—92

Page 89

1       But to the extent you understand and can
2   answer it, you may.
3       A.   I don't have any knowledge of that.
4       Q.   (By Mr. Freeman) Did you tailor your media
5   campaign at all to the likely audience of individuals
6   who might need an EIC?
7       A.   Again, I don't have knowledge of those
8   individuals who might likely need an EIC, and because
9   this is such a broad issue, you know, similar to a lot
10   of the issues that we deal with at the department and
11   the services that we provide, we sent this to all media
12   contacts that we had in an effort to have the widest
13   reach possible.
14       Q.   So, no, you did not tailor your media campaign
15   to the specific likely audience of individuals who would
16   need -- who might need an EIC, correct?
17           MR. KEISTER:   Objection, form, calls for
18   speculation, mischaracterizes the testimony.  Further,
19   there's no evidence as to what the likely population is
20   that would need an EIC to be targeted to.
21       Q.   (By Mr. Freeman) I'm questioning solely whether
22   DPS's media campaign was specifically targeted -- this
23   media campaign was specifically targeted to a particular
24   likely audience that you believe might be more likely to
25   need an EIC?

Page 90

1           MR. KEISTER:   Once again, object, it would
2   call for speculation.  There's been no identified group
3   that would need to be targeted.  There's been no
4   testimony so there's no foundation for that assumption.
5           But to the extent you understand the
6   question, you can answer it.
7       A.   Again, we distributed our press releases
8   statewide to the thousands of media outlets that we had
9   in our distribution lists so that we could reach as many
10   people as possible.  And there was no -- the media and
11   communications office had no knowledge of any particular
12   group that -- that would specifically need to be
13   targeted.  And, you know, this isn't uncommon of the
14   types of press releases where there's a service the
15   department is providing and we want to make sure that
16   anyone knows about that service so we send it statewide
17   to all of our contacts.
18       Q.   (By Mr. Freeman) Okay.  Tweets and Facebook
19   posts are only going to reach individuals who have
20   access to computers, correct?
21       A.   The actual tweets -- I would venture to say the
22   message in those tweets will be further reaching than
23   the actual followers on our accounts.
24       Q.   My question was whether Tweets and Facebook
25   posts would be visible directly to individuals -- only

Page 91

1   to individuals who have access to computers, correct?
2       A.   I had -- I would say yes and no only because
3   I've seen photos of Tweets that news reporters have
4   published on television, for instance.  If they say, you
5   know, just today this entity has issued a Tweet related
6   to this issue, I've -- in practical experience, I've
7   seen that.  And that kind of qualifies my comment
8   earlier, that it may extend beyond that.  But for the
9   general public, yes, you would need to go --
10       Q.   How many people follow DPS on Twitter?
11       A.   I'm sorry?
12       Q.   How many people follow DPS on Twitter?
13       A.   Approximately 30,000 accounts.
14       Q.   Would why would an individual follow DPS on
15   Twitter?
16           MR. KEISTER:   Objection, calls for
17   speculation.
18           But to the extent, you can answer.
19       Q.   (By Mr. Freeman) To the extent of your
20   knowledge.
21       A.   To gather more information about the department
22   and our activities.
23       Q.   Do you have any knowledge of any individual who
24   has not had yet been issued ID following DPS on Twitter?
25       A.   I don't have any knowledge about that

Page 92

1   information.
2       Q.   How many people "like" DPS on Facebook?
3           MR. KEISTER:   Objection, form, calls for
4   speculation.
5       Q.   (By Mr. Freeman) To the extent of your
6   knowledge, how many "likes" does DPS have on Facebook?
7           MR. KEISTER:  Objection, form, calls for
8   speculation.
9       Q.   (By Mr. Freeman) To the -- your knowledge,
10   let's -- sorry, let me start over.
11           Does DPS have a Facebook page?
12       A.   Yes.
13       Q.   When you post items on your Facebook page,
14   that's seen by individuals who "like" DPS on Facebook,
15   correct?
16       A.   Yes.
17       Q.   How many individuals have "liked" DPS on
18   Facebook?
19       A.   I believe it's more than 7,000.  And just so
20   that we're saying the same thing, as far as the "likes,"
21   that's the individuals -- it would be comparable to the
22   followers on Twitter?
23       Q.   Yes.
24       A.   Yes.  I believe it's more than 7,000.
25       Q.   Do you have any knowledge of any individual who



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
93—96

Page 93

1 does not even have a DPS-issued ID "liking" DPS on
2 Facebook?
3         MR. KEISTER:  Objection, form, that's
4 vague and ambiguous and calls for speculation.
5     A.  I don't have any information about that.
6     Q.  (By Mr. Freeman) Other than Tweets and Facebook
7 posts, were there -- and the releases we discussed, were
8 there any other efforts by DPS to publicize the
9 locations and schedules for DPS mobile units in counties
10 that also have permanent DPS offices, prior to the
11 November 2013 election?
12     A.  I believe we responded to some media inquiries,
13 and it's also possible that we did some interviews about
14 those locations.
15     Q.  Anything else?
16     A.  Ensuring that there was the accessibility on
17 the website to access that information.
18     Q.  Anything else?
19     A.  I believe that covers it, to my knowledge.
20     Q.  Am I correct that you only relied on earned
21 media to promote these temporary locations in counties
22 that have also driver's license offices, correct?
23     A.  That's correct.
24     Q.  And you had no budget to inform voters that
25 EICs would be available from these temporary locations

Page 94

1 in counties that also have driver's license offices?
2     A.  That's correct, we don't have a budget for
3 promoting any of our -- any of our media efforts.
4         MR. FREEMAN:  Okay.  Lindsay, would you
5 mind putting the 2013  document in front of
6 Ms. Cesinger.
7         MS. COHAN:  Sure.
8         MR. FREEMAN:  If we could have this
9 marked.
10         (Exhibit 132 marked for identification.)
11         (Handed to witness and counsel.)
12     A.  Okay.
13     Q.  (By Mr. Freeman) Ms. Cesinger, have you seen
14 this document before?
15         MR. KEISTER:  Can we identify this for the
16 record?  I don't think anybody said a number.
17         MR. BRAZIL:  132.
18     Q.  (By Mr. Freeman) Ms. Cesinger, have you seen
19 the Exhibit 132 before?
20     A.  I believe so, yes.
21     Q.  What is this document?
22     A.  It appears to be the Schedule of Mobile
23 Locations.
24     Q.  And are these only mobile locations that are in
25 counties that already have permanent driver's license

Page 95

1 offices or are they all the mobile locations?
2     A.  That, I don't know.  It's -- that, I'm not
3 sure.  This is not housed on the DPS website, so I'm not
4 actually familiar with the make up of it.
5     Q.  Did you have any role in preparing this
6 document?
7     A.  I don't recall.
8     Q.  And do you know how far in advance of the dates
9 that a mobile station would be out in the field that the
10 location and time of that mobile location would be
11 posted on this website?
12         MR. KEISTER:  Objection, form, that's
13 vague and confusing.  And to the extent that this is a
14 Secretary of State document as opposed to a DPS
15 document, I'm going to object as it's beyond the scope
16 of the issues for which this witness is designated, and
17 would call for speculation for this witness.
18         But you may answer to the extent you can.
19     Q.  (By Mr. Freeman) You may answer.
20     A.  I'm sorry, could you repeat the question,
21 please?
22     Q.  My pleasure.  How far in advance of the date
23 that a mobile station would be in the field would this
24 page be updated to let people know the date and time
25 that the EIC mobile station would be out in the field?

Page 96

1         MR. KEISTER:  Same objections.
2     A.  I don't have knowledge of that specifically.
3     Q.  (By Mr. Freeman) And do you know if a version
4 of this document is available in Spanish?
5     A.  I don't have knowledge of that.
6     Q.  Okay.  If we can bounce back to Exhibit
7 124.  Are you ready?
8     A.  Yes.
9     Q.  On February 3, 2014, you issued a statewide
10 press release indicating that the DPS mobile stations
11 would issue EICs across Texas again; is that correct?
12     A.  That's correct.
13     Q.  And did this press release address DPS mobile
14 stations in counties that do have driver's license
15 offices?
16     A.  There was a link -- there was a link in that
17 press release to the Secretary of State's website and I
18 -- is that what you're talking about, the Secretary of
19 State mobile stations?
20     Q.  I'm talking about the mobile stations that were
21 going to be functioning in counties that also have
22 driver's license offices.  I'm -- it doesn't really
23 matter to me who was running the particular station,
24 either -- whether it's DPS or SOS run.
25     A.  It matters for purposes of this question I



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
101–104

Page 101

1  VoteTexas.gov mentioning DPS -- let's see, DPS postal
2  link, the mobile stations are available in a certain
3  number of counties, it looks like four counties are
4  listed here.  And that's just one that I turned to.
5      Q.  Okay.
6      A.  So there may be -- there may be others.
7      Q.  Okay.  That's all that I have.
8          I pass the witness.
9              EXAMINATION
10 BY MR. BRAZIL:
11     Q.  Good afternoon.
12     A.  Good afternoon.
13     Q.  I know it's late.  I'm going to try to put my
14 questions in categories and boxes for you so we can wrap
15 this up.
16         As I understand from your testimony, you
17 have talked about this, you've termed it "outreach
18 program" or "outreach campaign"?
19     A.  "Effort," yes, sir.
20     Q.  And as I understand it, DPS, their
21 communications office, your office, people under you, it
22 was limited to the press releases and the website; is
23 that correct?
24     A.  And social media.
25     Q.  Okay.  And social media.  Other than those four

Page 102

1  areas, did DPS or the communications office do any
2  outreach or educational programs in any other form that
3  we haven't spoken of?
4      A.  To the -- we do have a number of spokespeople
5  in the field, they're safety education troopers and
6  there's about 35 of them, and so essentially they would
7  take, you know, the message of the press release and
8  either pass that on to their local media, which is how
9  these were -- these localized press releases were
10 relayed or they would conduct interviews in their areas,
11 or, you know, respond to basic questions about EICs with
12 the information that's in those news releases?
13     Q.  When you said they would conduct interviews,
14 are you talking about with the press?
15     A.  Yes, yeah.
16     Q.  Would they conduct town hall meetings or go to
17 churches or go to schools or any community centers to
18 talk about the new photo ID bill or EICs, anything of
19 that sort?
20     A.  Not to my knowledge.
21     Q.  And so when you say they would give interviews,
22 would that be something they would seek out or just
23 respond to?
24     A.  Both.
25     Q.  Okay.  So --

Page 103

1      A.  I'm sorry.
2      Q.  -- if you had an officer in the Valley, he
3  might go to the newspapers there and give an interview?
4      A.  Yes.
5      Q.  Okay.  And just do that on his own because he
6  was a PR officer?
7      A.  Yes.
8      Q.  And would there be a record kept of that?  I
9  mean, what type of recordkeeping was there that we would
10 see about giving interviews, about responding to
11 inquiries?
12     A.  I don't know that there would be a record
13 similar to how we conduct business out of the media and
14 communications office.  Typically, we'll get inquiries
15 on any number of issues either that we've promoted or
16 that the press is just interested in and we'll conduct
17 those interviews that way.  For something like this,
18 we'll send out a press release and lot of times we'll
19 get phone calls from reporters back to the office, and
20 that similar dynamic happens out in the field as well.
21 When something goes out, they'll call in -- reporters
22 will call that point of contact with the department and
23 request either something on the record, for instance, if
24 it's radio or television, or -- you know, they could
25 just ask additional information about one of those

Page 104

1  topics.
2      Q.  But does your office or does DPS keep a record
3  of those inquiries?
4      A.  No.
5      Q.  Okay.  So if you got a call from the Lubbock
6  Free Press or the Dallas Morning News or anything like
7  that, there would not be a record kept by someone that
8  said, "We got this inquiry, we responded in this manner,
9  we're going to follow up or we're going to do this"?
10     A.  Let me clarify that --
11     Q.  Okay.
12     A.  -- I'm sorry.  We do at headquarters have
13 information about that but as far as the folks in the
14 field, we don't keep a record of the interviews that
15 they conduct out in the field.
16     Q.  Okay.  If one of the PR officers responded to
17 something, there would not be a record maintained?
18     A.  No, not to my knowledge.
19     Q.  But if someone called your offices or the
20 communications office, there would be a record?
21     A.  We do collect that information.
22     Q.  Okay.  And how is that maintained, what would
23 we see?  If you showed me those records, what would I be
24 looking at?
25     A.  We have a -- essentially it's like a



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
105–108

Page 105

1 spreadsheet that -- that has information about inquiries
2 and, you know, who it is that made that inquiry.
3    Q.   And do you know if that has been produced in
4 the discovery in that case?  Do you know one way or the
5 other?
6    A.   I'm not sure.
7    Q.   Okay.  And do you know how large or how
8 voluminous this record would be if I located it?  I
9 mean, are we talking about an Excel spreadsheet of ten
10 pages or a thousand pages or?
11    A.   It's a living document so it's every day added
12 on to it.
13    Q.   Okay.  In what type of format, an Excel
14 spreadsheet or just e-mails or?
15    A.   I'm not exactly sure if it's Excel or what the
16 program is that it's in, but it's a type of document
17 similar to an Excel.
18    Q.   And are there categories, for example, 12
19 inquires that -- from people that do not really need an
20 EIC or 12 inquiries from the media, how is it -- how is
21 it categorized?
22    A.   By members of the media who called and, you
23 know, what their contact information is and if there's a
24 generic request that they're seeking.
25    Q.   And the response by your office, I assume?

Page 106

1    A.   Sometimes, yeah.  Sometimes if it's generic
2 enough, that if they called about the hurricane press
3 release, we won't have information -- detailed
4 information in there.
5    Q.   Is -- do you have a separate -- you said this
6 is a living document.  Is it for all inquiries or just
7 for EIC?
8    A.   All inquiries into the office.
9    Q.   So we would have to mine through that to
10 determine what inquiries were for the EIC or photo ID?
11    A.   Sure.
12    Q.   Okay.  Who determined what the DPS or what the
13 communications office would do with regard to this
14 outreach campaign versus what the Secretary of State's
15 office would do?
16    A.   Well, again, since -- we were aware that the
17 Secretary of State's office had a paid media effort
18 related to EIC -- well, I guess related to voting and
19 the new voting requirements.  And as I mentioned before,
20 we don't have a budget for any type of paid media so we
21 knew that we would be utilizing our earned media
22 strategies that we typically employ for any type of
23 outreach effort.
24    Q.   Okay.  I think I understood your answer but let
25 me make my question more simple.

Page 107

1    A.   Okay.
2    Q.   If someone at the Secretary of State's office
3 and/or at DPS say, "We're going to handle the EICs, you
4 handle the rest of the Senate Bill 14," was there any
5 coordination in that regard?
6    A.   Not -- from my knowledge not in that
7 form.  Essentially what DPS was responsible for was
8 issuing this card, issuing this election identification
9 certificate.  So from that aspect, that's what we
10 educated the public through the media about.
11    Q.   And was that because of a coordinated effort
12 between DPS and the Secretary of State or just because
13 you were issuing a card, if you know?
14    A.   We were aware that the Secretary of State's
15 office would be doing an outreach effort on -- I was
16 aware that they were going to be doing outreach effort
17 on the voting -- the new voting requirements, the photo
18 ID aspect of it.  And again, because the part that
19 pertained to DPS was issuing these cards, that's what we
20 focused our outreach effort on.
21    Q.   Was there a coordinate effort on the press
22 releases?  For example, was there ever a coordination
23 between the Secretary of State's office and DPS on
24 issuing press releases?
25    A.   From our perspective, as a courtesy to any

Page 108

1 entity that we cite in our press release, whether it's
2 another organization or agency, we always send them a
3 copy of it before we send it out.  So to that degree,
4 yes.
5    Q.   And would you keep records of what input the
6 Secretary of State had into the press releases that came
7 from the DPS?
8    A.   If there was any and that would just be through
9 an e-mail, a response, "Good to go," or something.
10    Q.   "Change this" or "This number's wrong," or
11 something --
12    A.   Yes, sir.
13    Q.   -- of that sort?  Okay.
14         Was there a contact person at the
15 Secretary of State's office that would receive these
16 press releases?
17    A.   Yes.  Alicia --
18    Q.   And who was that?
19    A.   Alicia Pierce.  She's the communications
20 director.
21    Q.   Was she the contact person from the summer of
22 last year until now?
23    A.   I believe that's right, yes.
24    Q.   Okay.  Now it's my understanding -- have we
25 covered all of the media outlets that DPS used in this



KATHERINE CESINGER
VEASEY VS. PERRY

May 20, 2014
109–112

Page 109

1 outreach campaign?

2   A.  I believe so, yes.

3   Q.  So I take it from your previous testimony there

4 was no paid advertising for the EICs or that aspect of

5 the campaign that DPS handles; is that correct?

6   A.  Correct.

7   Q.  Okay.  And that's because there was no budget,

8 right?

9   A.  Correct.

10   Q.  Was there ever a promise or ever any indication

11 that there would be extra funds given to or provided to

12 the DPS for the EICs or any aspect of the photo ID bill?

13   A.  Not to my knowledge.

14   Q.  Has DPS requested extra funding from either the

15 Governor's Office, Secretary of State, Legislature for

16 what is done in this regard?

17        MR. KEISTER:  Let me just interject, and

18 this is beyond the scope of the issues she's designated

19 for.

20        But to the extent you know that.

21   Q.  (By Mr. Brazil)  Do you know?

22   A.  Related to the media outreach effort, not to my

23 knowledge.

24   Q.  Was there ever an outreach to someone, some

25 famous Texan, so to speak, to help with the campaign to

Page 110

1 volunteer their time like we see ads on TV by people

2 from Texas helping -- you know, don't litter the

3 highways, for example.  They volunteer their name and

4 their face.  Was there ever that requests by DPS to get

5 someone to do that?

6   A.  With respect to EICs and the media outreach,

7 not to my knowledge.

8   Q.  Okay.  You said earlier that you had reviewed

9 something from Mr. Peters' deposition?

10   A.  Yes.

11   Q.  What exactly was that, that you reviewed?

12   A.  The documents of his deposition.

13   Q.  I'm sorry?  The exhibits attached to his

14 deposition?

15   A.  I'm not sure.

16   Q.  Okay.  Did you read his deposition?

17   A.  I just reviewed it briefly.

18   Q.  Okay.  And the documents, were they attached to

19 his deposition?

20   A.  I didn't see any attached documents.

21   Q.  Okay.  So you just read his deposition, you

22 didn't read any documents that were attached to it?

23   A.  Right.

24   Q.  Okay.  All right.  Also --

25   A.  Yeah.

Page 111

1   Q.  -- if I understand your previous testimony,

2 there was nothing like a focus group or post studies or

3 any market research by the DPS to determine how

4 effective or how ineffective their outreach campaign

5 was; is that correct?

6   A.  Right.  We don't do research or analytics for

7 any of our outreach efforts, but we do have, you know,

8 methods and different ways of determining the

9 effectiveness.  As I mentioned, you know, as we push out

10 messages, we do monitor, you know, what's being picked

11 up in the media, the different types of coverage that

12 we're seeing out there.

13   Q.  What about a complaint file or a gripe file,

14 does -- if you get complaints from somebody, whether it

15 be somebody in the media, you know, a member of the

16 public, public official that has a complaint, do you

17 keep those in a separate file?

18   A.  We only correspond with members of the media in

19 our course of business.  You know, once in a while we'll

20 get a wrong number and we'll refer that on.  But as far

21 as complaints, you know, we get inquiries, I guess is

22 how I would characterize them, from the media.

23   Q.  Does all that, in this live file, is all of

24 that in the live file?  Do you -- or this live --

25   A.  Well, I don't -- I guess I don't understand

Page 112

1 the --

2   Q.  Sure.

3   A.  -- the characterization of complaints.

4   Q.  Okay.  A member of the Legislature calls and

5 says, "Nobody is sending press releases to X county, why

6 not?"  What would happen with that?

7   A.  We didn't receive anything like that, and

8 typically when the -- when lawmakers will contact the

9 department, they'll go through the government relations

10 office, so we don't typically have visibility on that.

11   Q.  Would there be a record maintained by your

12 office of someone who made contact in that regard?

13   A.  If they're not contacting our office, then no,

14 we wouldn't have a record of that.

15   Q.  So even if it went through another office and

16 it ended up to the communications office, there would or

17 would not be a record?

18   A.  If a lawmaker called the department that

19 typically -- I mean, I don't know any time where that

20 individual would be referred to the media office because

21 we only deal with the media.  Typically -- and it -- for

22 practical purposes, there are different divisions within

23 the department so that when somebody calls, if it's a

24 lawmaker, that will go to the government relations

25 office.  If it's a customer wanting to ask questions



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, et al,                )
                                   )
          Plaintiffs,              )
                                   ) CIVIL ACTION NO.
VS.                                ) 2:13-CV-00193
                                   )
RICK PERRY, et al,                 )
                                   )
          Defendants.              )


-----------------------------------

ORAL DEPOSITION OF

HAZEL DAVIS

JULY 16, 2014

VOLUME 1

-----------------------------------


     ORAL DEPOSITION OF HAZEL DAVIS, produced as a

witness at the instance of the DEFENDANT, and duly

sworn, was taken in the above-styled and numbered cause

on July 16, 2014, from 9:31 a.m. to 11:23 a.m., before

Arden Stanberry, CSR in and for the State of Texas,

reported by machine shorthand, at the law offices of the

Texas Attorney General, 1412 Main Street, suite 810,

Dallas, Texas 75202, pursuant to the Texas Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

Hazel Davis - 7/16/2014



**Page 2**

```
 1          A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
 4      Avner Shapiro
        U.S. DEPARTMENT OF JUSTICE,
 5      CIVIL RIGHTS DIVISION
        950 Pennsylvania Ave,
 6      NWB-7200
        Washington, DC 20530
 7      202.305.1840
        202.307.3962
 8      Avner.shapiro@usdoj.gov
 9  FOR THE DEFENDANTS RICK PERRY, et al:
10      John B. Scott
        DEPUTY ATTORNEY GENERAL
11      FOR CIVIL LITIGATION
        P.O Box 12548,
12      Austin, Texas 78711
        Southern District of Texas No. 10418
13      john.scott@texasattorneygeneral.gov
14  FOR CITY SQUARE/TRAC:
15      Ken Koonce
        Attorney at Law
16      511 North Akard
        Suite 300
17      Dallas, Texas  75201
        214.303.2122
18      214.827.1000
19
    ALSO PRESENT:
20      Matt Lueders, Attorney General Office Intern
        Kristine Cruz, Attorney General Office Intern
21
22
23
24
25
```

**Page 3**

```
 1              INDEX
 2                            PAGE
 3  Appearances                 2
 4  HAZEL DAVIS
        Examination by Mr. Scott      4
 5
    Portion marked CONFIDENTIAL          63
 6
    Signature and Changes           78
 7
    Reporter's Certificate          80
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          P R O C E E D I N G S
 2              HAZEL DAVIS,
 3  having been first duly sworn, testified as follows:
 4              EXAMINATION
 5  BY MR. SCOTT:
 6      Q.  Would you state your full of the ma'am?
 7      A.  Hazel Irene *** Davis.
 8      Q.  Ms. Davis, my name is John Scott.
 9      A.  Yes.
10      Q.  I'm an attorney that represents the State of
11  Texas and a number of other individuals who have been
12  sued in a lawsuit brought by the Department of Justice
13  on behalf of the United States of America or the United
14  States of America by the Department of Justice and other
15  party plaintiffs.  Do you know that?  Do you understand
16  that?
17      A.  I do.
18      Q.  And during the course of the deposition, I'm
19  going to be asking you questions.  You have been sworn
20  in just as though you would have at the courthouse.  You
21  understand that?
22      A.  I do understand that.
23      Q.  If during the course of the deposition you
24  would agree to give a verbal response:  Yes, no,
25  something that the court reporter can take down without
```

**Page 5**

```
 1  any ambiguity as to what your answer is.
 2      A.  Yes.
 3      Q.  Second thing is:  If at any course of -- during
 4  the course of the deposition you don't understand my
 5  question, for whatever reason, if you'll agree with me
 6  you won't answer and let me know that, so I can re-ask
 7  it, and we can get on the same wavelength; is that
 8  agreeable?
 9      A.  It's agreeable.
10      Q.  With that, have you ever given a deposition
11  before?
12      A.  No, I haven't.
13      Q.  Have you ever given testimony at the courthouse
14  before?
15      A.  No, I haven't.
16      Q.  Have you ever been a party to a civil lawsuit
17  before?
18      A.  No, I haven't.
19      Q.  Okay.  And where do you currently work?
20      A.  I work for City Square.
21      Q.  And what is City Square?
22      A.  City Square is an organization -- it's a
23  nonprofit organization that works to fight the root
24  causes of hunger or poverty.
25      Q.  And what are the root causes of hunger or
```

Hazel Davis - 7/16/2014

6

1  poverty?
2      A.  There are a number of them.
3      Q.  Which ones are you fighting?
4      A.  Youth that age out of foster care.  So we help
5  them to find work; that's one of the things that we do.
6      Q.  And what age does someone age out of foster
7  care?
8      A.  They can age out after 17-and-a-half years of
9  age.
10      Q.  And what are the effects of ageing out of
11  foster care?
12      A.  There are numerous.  Homelessness.  A lot of
13  individuals we work with are homeless.  They have high
14  rates of unemployment, about 65 to 70 percent
15  unemployment.  They have a greater -- more encounters
16  with the criminal justice system.  And so, of course,
17  parenting.  They end up -- a lot of girls end up
18  pregnant within a year of ageing out.  A lot of negative
19  statistics.
20      Q.  Anything else?
21      A.  Goodness gracious.  Did I say homelessness?
22      Q.  Yes, ma'am.
23      A.  Okay.  Those are the main ones.
24      Q.  With regard to foster care, would you briefly
25  describe what it is that you're -- when you're dealing

7

1  with an individual that's ageing out of foster care,
2  what are the issues in foster care, I guess?  What are
3  the benefits of foster care at 17 versus when they age
4  out at 17 and a half?
5      A.  When you say, "What are the benefits," what do
6  you mean?
7      Q.  What are the differences?  I guess, so there's
8  foster care that gives them a foster family to live
9  with; is that correct?
10      A.  That is correct.
11      Q.  So when we talk about foster care, we are not
12  talking about someone who is in any kind of group home?
13      A.  Some of them are in group homes.
14      Q.  Okay.  I'm trying to understand the population
15  --
16      A.  Yes.
17      Q.  -- on average of what you -- the kids that you
18  deal with.
19      A.  I wouldn't know the percentages or the
20  distribution of youth who grew up in foster homes versus
21  those that grew up in group homes.  So I don't know.
22      Q.  That's not a metric y'all try and capture, from
23  your standpoint?
24      A.  From my standpoint, no.
25      Q.  Whether somebody else does in fact catch that

8

1  within the organization, you don't know that,
2  specifically?
3      A.  I'm not aware of that.
4      Q.  So getting back a little bit, did you have an
5  opportunity to visit with Mr. Shapiro or someone else
6  from the Department of Justice today?
7      A.  Yes.
8      Q.  And how many times have you visited with
9  Mr. Shapiro or anyone else from the Department of
10  Justice?
11      A.  Three times.
12      Q.  And all three occasions have been related to
13  this case and what you are here to testify about today?
14      A.  Yes.
15      Q.  And when was the first time that you met with
16  someone from the Department of Justice?
17      A.  I'm not quite sure of the date; I'd say
18  possibly about two months ago.
19      Q.  And who was that that you met?
20      A.  It was Mr. Shapiro.
21      Q.  And how was it that you came about that
22  meeting?
23      A.  Actually, I was invited to attend the meeting.
24  And we've been dealing with issues of youth who age out
25  or are aging out who don't have their identifying

9

1  documents.  And so I was invited just to talk to an
2  attorney who was dealing with issues related to
3  documents; that's how I came about to attending the
4  meeting.
5      Q.  And who did the invitation?
6      A.  A coworker through another individual.
7      Q.  And who were those folks?
8      A.  Names?
9      Q.  The coworkers, yes, ma'am.
10      A.  Carla Cleeton.
11      Q.  And she heard about it through?
12      A.  Mary Christine Reed.
13      Q.  R-E-E-D?
14      A.  I believe so.
15      Q.  And so Carla Cleeton works with you?
16      A.  Carla works with me, yes.
17      Q.  And she's employed at City Square?
18      A.  She cis.
19      Q.  And what's her job at City Square?
20      A.  She works with individuals, she manages the
21  transitional housing program.
22      Q.  And Mary Christine Reed, how do you know her?
23      A.  I don't know her personally.
24      Q.  Okay.  Do you know what she does for a living?
25      A.  She's an attorney.

10

```
1    Q.  And do you know where she's an attorney at?
2    A.  No.
3    Q.  Do you know if she works for Department of
4  Justice?
5    A.  I don't believe so.
6    Q.  Does she live here in Dallas?
7    A.  I don't know.
8    Q.  Do you know if she lives in Texas?
9    A.  I do.
10   Q.  And does she?
11   A.  She does.
12   Q.  Okay.  Do you know if she practices in Dallas
13  or Fort Worth or one of surrounding areas?
14   A.  I believe so; I'm not sure.
15   Q.  Okay.  Have you ever had any professional
16  involvement with Ms. Reed prior to this case?
17   A.  What do you mean by "professional"?
18   Q.  Sought advice -- legal advice on issues
19  relating to homeless or any other matter?
20   A.  No.
21   Q.  Have you ever met Ms. Reed prior to the
22  involvement in this case?
23   A.  Yes.
24   Q.  Okay.  And what were the circumstances by which
25  you met her?
```

11

```
1    A.  I expressed a concern about youth who are
2  ageing out of the foster care system who don't have
3  their identifying documents.
4    Q.  And when did you express this?
5    A.  It would have been about maybe three months
6  ago.
7    Q.  And what was it that brought about that meeting
8  with her?
9    A.  She was working with the youth who were having
10  difficulty obtaining documents, and we've been trying to
11  get documents for this person for several years.
12   Q.  For several years?
13   A.  Yes.
14   Q.  And who was the youth that you were working
15  with?
16   A.  We are not privy to give out that type of
17  information, I think.
18   Q.  Well, I mean if it's confidential information,
19  we have a confidentiality order that's been executed by
20  the Department of Justice, State of Texas, and it's been
21  ratified or executed by the Federal Court and we can
22  mark it as confidential information and put that portion
23  under seal.
24       MR. KOONCE:  Our problem is we have a
25  contractual obligation to keep this information
```

12

```
1  confidential, and we have to actually go up to chain and
2  ask for permission to disclose individual names.  We get
3  these names from Child Protective Services and we agree
4  we won't disclose them without their consent or
5  authorization.  At least they're in the know and can
6  object to that disclosure.
7       MR. SCOTT:  So let's do something for a
8  second here.  And what we can do is we can go off the
9  record.
10       (Short break from 9:39 to 9:40 a.m.)
11   Q.  (BY MR. SCOTT)  And I'm going to leave a little
12  blank in my side notes to get the name of the person
13  trying get ID for.
14       So where was it that y'all -- that you
15  encountered Ms. Reed and had this discussion about this
16  person?
17   A.  It was in the foyer of my office.
18   Q.  And does Ms. Reed work in the same building?
19   A.  No.
20   Q.  She was over visiting y'all about this person?
21   A.  I believe so; I'm not sure.
22   Q.  Now, so take me through, if you would, the
23  process of -- let's start with what your job title is at
24  City Square.
25   A.  I'm the work force services manager.
```

13

```
1    Q.  Okay.  And work force services manager, and who
2  do you manage?
3    A.  I manage -- in terms of the staff?
4    Q.  Yes.
5    A.  Or -- I manage individuals that do job coaching
6  for our participants or -- yeah.
7    Q.  And how many people do y'all have that do
8  participant -- I should say, do job coaching?
9    A.  So we have, at any given time, we have three
10  individuals.
11   Q.  And are those paid positions or volunteer
12  positions?
13   A.  They're paid position.
14   Q.  Have they always been paid positions as long as
15  you have been at City Square?
16   A.  Yes.
17   Q.  How long have you been at City Square?
18   A.  Four years.
19   Q.  And during the time at City Square, have you
20  held the same positions?
21   A.  No.
22   Q.  Tell me all the positions you've had, and let's
23  go reverse chronological order.
24   A.  Absolutely.  I started as work force services
25  manager and was job coach prior to that.
```

Hazel Davis - 7/16/2014

14

1    Q. And how long have you served in your current
2 capacity?
3    A. Maybe three years.
4    Q. And prior to going to work for City Square,
5 what did you do?
6    A. I -- go backwards on the resume. I worked with
7 a nonprofit. No, I worked for Urban League.
8    Q. How long did you do that?
9    A. I was there for, I believe, three years. I'm
10 not sure, but I believe three years.
11    Q. And what did you do while you were there?
12    A. I worked with -- I was coordinating a program
13 to introduce individuals to the world of work and to --
14 to prepare them for college readiness. So worked with
15 young professionals to help youth -- at-risk youth to
16 prepare for the world of work, work shops, and things
17 like that.
18        MR. SCOTT: So let's time out here. Take a
19 phone call here.
20        (Short break from 9:43 to 9:51 a.m.)
21        MR. SCOTT: So back on the record. Where
22 were we?
23        (A portion of the transcript was read back.)
24    Q. So you were -- I think we were at the Urban
25 League.

15

1    A. I was Urban League for about three years.
2    Q. And what were your job requirements while you
3 were at Urban League?
4    A. So pretty much doing workshops for at-risk
5 youth, to prepare them for success in life.
6    Q. Would you -- the folks that were -- that y'all
7 identified -- let me rephrase that. How did you figure
8 out if somebody was an at-risk youth?
9    A. Actually, the criteria was broad. We weren't
10 contracted to have any -- any specific criteria to
11 identify those individuals. We tended to focus on
12 certain zip codes that had high crime rates, low
13 graduation rates, those types of things. However, we
14 went outside of those zip codes, as well. For the most
15 part, that was our focus.
16    Q. Okay. And was that also here in Dallas, Texas?
17    A. It was.
18    Q. Have you worked the entirety of your adult life
19 in Dallas?
20    A. Yes.
21    Q. Okay. And so prior to going work at Urban
22 League, what did you do?
23    A. I worked for a nonprofit that -- I'm sorry. It
24 was a missionary organization that works with -- that
25 works in the intercity.

16

1    Q. What was the name of that?
2    A. Urban Action.
3    Q. And how long did you work for Urban Action?
4    A. I believe it was about two years.
5    Q. And your job there?
6    A. I was a liaison, public relations public
7 liaison for them.
8    Q. With the community?
9    A. With the community, yes.
10    Q. And how long were you there?
11    A. About two-and-a-half years.
12    Q. And what did you do prior to that?
13    A. Prior to that, I worked -- I was in
14 recruitment. So I was -- I forget what the title was,
15 but I think I was director of a staffing agency
16 recruiting medical personnel for hospitals.
17    Q. How long did you do that?
18    A. I think it was two years; I'm not sure.
19    Q. And what did you do prior to that?
20    A. I was a marketing and recruiting manager for
21 another agency, Supplemental Health Care.
22    Q. And what was the name of the prior employer
23 where you were doing the recruiting for staffing?
24    A. I think it was Mint.
25    Q. M-I-T-T?

17

1    A. M-I-N-T.
2    Q. And then prior to working for Supplemental
3 Health Care?
4    A. I worked for Adecco, A-D-E-C-C-O, and
5 recruiting administrating staff and account management.
6    Q. And how long did you work there?
7    A. Adecco? I think two years, three years. I'm
8 not sure. I don't remember.
9    Q. And prior to that?
10    A. Prior to Adecco, I worked for the State of
11 Texas. I worked as an area office manager and then a
12 case manager for Community Care for the Aged and
13 Disabled Services. CCAD. It was for the Health and
14 Human Services.
15    Q. I call them DADS, Department of Aging and
16 Disabled Services; is that the correct name of them?
17    A. I don't know.
18    Q. Okay. Speaking of which, let's go off the
19 record.
20        (Short break taken from 9:56 to 9:57 a.m.)
21    Q. (BY MR. SCOTT) Back on the record. Now how
22 long did you work for the State?
23    A. Three years.
24    Q. Okay. And why did you leave working for the
25 State?

18

1    A.  Why did I leave working for the State?
2    Q.  Other than more money working for another job.
3    A.  I wanted to go back to the private sector.
4    Q.  And where did you work for the private sector?
5    A.  UPS.
6    Q.  And what did you do for UPS?
7    A.  I was supervisor in industrial engineering.
8    Q.  How long did you work for them?
9    A.  I worked for UPS 10 years -- about 10 years.
10   Q.  And before that, you were in college?
11   A.  Yes.  Well, I was in college while I was at UPS
12   but before that, it was just odd jobs.
13   Q.  And do you have a degree in industrial
14   engineering?
15   A.  No, I have a degree in Sociology.
16   Q.  And what year did you graduate?
17   A.  '95.
18   Q.  And your degree was in what?
19   A.  Sociology.
20   Q.  And where did you go to school?
21   A.  I went to UTA.
22   Q.  Is that a B.A.?
23   A.  Yes.
24   Q.  So let's go back, if we could, to the present.
25   And what's the address for City Square where you

19

1    currently work?
2    A.  Where I currently work is 3108 Live Oak, 75204.
3    Q.  And you have worked at that address for the
4    entire time that you have been at City Square?
5    A.  I have, yes.
6    Q.  When did you first become aware of City Square
7    as an organization?
8    A.  Actually, I was working with the youth when I
9    was at Urban League and she had expressed that she had
10   been in foster care.  And she started looking at City
11   Square, that's how I became aware of it.
12   Q.  Okay.
13   A.  Yes.
14   Q.  During the time that -- when you started at
15   City Square, let's start from that point.
16   A.  Yes.
17   Q.  Were you -- during that time -- from that time
18   to today, have your work duties principally been related
19   to dealing with the issue of individuals who age out of
20   foster care and the associated problems?
21   A.  Yes.
22   Q.  And, at least with regard to what the
23   Department of Justice and principally what we are going
24   to be dealing with today about is dealing with the issue
25   of identification and it's role for those kids, some

20

1    type of photo ID.
2    A.  Yes.
3    Q.  And my assumption is, is that photo ID process
4    has an impact on their outcomes of those individuals?
5    A.  Yes.
6    Q.  At least it's been your experience?
7    A.  That's been my experience.
8    Q.  And so let's walk through that a little bit, of
9    the types of IDs that you set out to try and get the
10   average child that walks in.  And I understand there may
11   be some outliers, and we'll try to cover every one of
12   those.  But let's take care of whatever -- the
13   80 percent or 90 percent of the population and what's
14   your goals are.
15        So as manager today, you attempt to ensure
16   that the people that you manage effectuate the goals as you
17   see proper, correct?
18   A.  Yes.
19   Q.  And so what are the goals that you have for the
20   individuals you manage, as far as obtaining what type of
21   IDs for -- do you call them clients?
22   A.  We can say "participant."  But we refer to them
23   as "youths," though.
24   Q.  For the youth that you-all work with --
25   A.  Okay.

21

1    Q.  -- what type of photo ID do you try -- hope
2    that one of the youth that you are working, with or the
3    folks that you manage or are working with, obtain as
4    part of y'all's efforts?
5    A.  Those would be IDs that are relevant to the
6    I-9, for employment purposes.
7    Q.  And what is the I-9?
8    A.  That's the document that you complete when
9    you -- when you apply -- obtain a job.  It's proof --
10   well, yeah, that's a document that you complete for
11   employability.
12   Q.  And what are the requirements for someone to be
13   able to complete an I-9 in order to be properly -- be
14   employed by someone?
15   A.  What do you mean "requirements"?
16   Q.  Well, photo ID requirements.
17   A.  So those documents are either a birth
18   certificate.  Okay.  And so there's primary documents
19   and then there's secondary documents.  You can provide a
20   passport or a certificate of naturalization and I think
21   that that would suffice as a primary document and you
22   don't need to provide anything else.
23        Or you can provide two identifying
24   documents -- identity documents like a Social Security
25   card and a -- an ID, picture ID, or driver's license and

Hazel Davis - 7/16/2014

## 22

1  that would suffice.  Or you can have a birth
2  certificate, I believe, and a picture ID.  I'm not sure.
3          But one of those three basic documents, a
4  combination of them is necessary to obtain employment.
5      Q.  Okay.  And don't shoot me, we are taking
6  another break because we have a conference call about
7  something in this lawsuit.  So off the record.
8          (Short break taken at 10:02 to 10:14 a.m.)
9      Q.  (BY MR. SCOTT)  While we are off the record --
10  and thank you for your, I guess courtesy, in allow me to
11  break the deposition.  I apologize to you for that -- we
12  were able to get a confirmation e-mail that I have
13  provided to City Square, relaying to the contractual
14  issues dealing with the identity of the individuals --
15  the youth that you have worked with in the past that may
16  have encountered problems with IDs that y'all have
17  attempted to help with those things.
18      A.  Okay.
19      Q.  If you want to confirm with your coworker, I'm
20  happen for that to take place.  But if you have any
21  questions about that at all, we will stop and allow you
22  the comfort or to feel good that it's okay to release
23  those.  With Mr. Shapiro's permission, we will place
24  that parcel and any of that information, we'll mark as
25  confidential.

## 23

1      A.  Okay.
2      Q.  Those names and this deposition and it's
3  entirety, even though the only portions that will need
4  to be unsealed will be those that deal with confidential
5  information.  It is from a housekeeping manner, seems to
6  be the best way, is to have the whole deposition placed
7  under seal and to the extent a party wishes to use some
8  subpart of that that is information that is
9  confidential, they need to put everyone on alert.  Are
10  you agreeable to that?
11          Mr. Shapiro:  We are in agreement.
12      Q.  (BY MR. SCOTT)  With that, we'll press forward.
13      A.  Sounds good.
14      Q.  Let's go again to what documents a person needs
15  for their I-9?  I think that's where we were when we
16  last left off.
17      A.  Okay.
18      Q.  You had identified the birth certificate,
19  passport, certificate of naturalization, anything else?
20      A.  Yes, Social Security card document or driver's
21  license, a picture ID.
22      Q.  And do you -- just sitting here, is there a
23  preference when you're dealing with the youth to
24  encourage them to get a driver's license or only getting
25  a photo ID or Texas identification card?

## 24

1      A.  Well, they need a combination of those
2  documents.  So they essentially need all of them for the
3  I-9.  Well, at least they need their picture ID or
4  driver's license, Social Security card, for employment.
5  And -- yes.  So they need a -- I mean, a driver's
6  license, ID, or driver's license and Social Security
7  card, in order to obtain employment.  So we prefer --
8  they need those.
9      Q.  And that's what you request, if possible, the
10  folks that are reporting up to you, that work for you,
11  try and get accomplished with the youth they're working
12  with?
13      A.  Yes.
14      Q.  And so with regard to obtaining a driver's
15  license or a Texas identification card issued by the
16  Texas Department of Public Safety --
17      A.  Yes.
18      Q.  -- what are the requirements needed in order
19  for that youth to obtain such a thing?
20      A.  Okay.  So there are three levels of required
21  documents.  The first level, the primarily level,
22  actually require that an individual has an ID or
23  driver's license in order to get one of those.
24          The second level would be that they
25  provide, I believe, it's a passport and/or birth

## 25

1  certificate.  And I think it's certificate of
2  naturalization, I'm not sure.  But you have to provide
3  two of those documents.  So our youth don't have
4  passports and of course their weren't naturalized; they
5  were citizens.  They were born here, most of them were
6  born here.  So they don't have those two -- those other
7  documents, to meet the criteria of having two of those
8  secondary documents.  And there's a provision where they
9  could provide some supporting documents.
10          So it would be one of the secondary
11  documents, plus two of the supporting documents.  And
12  it's a long list.  Most of which our youth would not
13  have, which would be a passport, I believe, some
14  documents that an individual who is working -- who is a
15  citizen of another country working in the United States
16  would have or would be required to have, a long list of
17  those.  And then school transcripts, or school ID.  In
18  addition to that, they would have -- let's see, Social
19  Security card, immunization records.  And those are the
20  ones that come to mind right now.
21      Q.  If you think of any others that you have left
22  out during the course of your deposition, just tell me,
23  Hey, I remember another one, and we'll throw it in
24  there.
25      A.  I will.

Hazel Davis - 7/16/2014

**26**

1    Q.  So typically, what type of identification or
2    forms of identification do the youth have with them when
3    they age out of foster care?  For instance, do they have
4    a birth certificate?
5    A.  Not all youth have their documents when they
6    age out of foster care.
7    Q.  And so part of the triage you encounter with
8    the youth -- let's back up a step.  How does it -- how
9    do you encounter the youth?
10   A.  They come to us in a number of ways.  In many
11   cases, CPS refers them to us.  They're 17 and a half, go
12   to them, they'll help you transition into adulthood.
13   Sometimes it's word of mouth, another youth will tell
14   them about TRAC or our program.  Many cases, they'll
15   hear about us through other programs that know about our
16   services.
17   Q.  Any other forms of -- kind of or conduits that
18   the youth might find themselves in order to get to
19   y'all?
20   A.  Those are the three that come to mind.
21   Q.  So at 17 and a half, someone may age out of
22   foster care, why is it that somebody that 17 and half --
23   why sit "may" and not dead-set rule that someone is out
24   of foster care at a certain date?
25   A.  There's a new provision they that may elect to

**27**

1    stay in extended care.
2    Q.  Okay.  So that's up to the youth to determine
3    whether they want to stay in foster care past 17 and a
4    half?
5    A.  Yes.
6    Q.  But I guess from the State's position or
7    government's position, they have reached an age of being
8    able to make that decision for themselves?
9    A.  Yes.
10   Q.  And some -- what we're dealing with is a group
11   of people currently -- though in the past it may have
12   changed -- though currently that have self-determined
13   that they want to age out of foster care at 17 and a
14   half?
15   A.  Yes.
16   Q.  And whether that's a good decision or not, we
17   won't get into that debate, but that's the fact we find
18   ourselves in and the youth y'all are working with and
19   try the help?
20   A.  And I would like to make a correction.
21   Q.  Yes.
22   A.  I believe they age out at 18, but they can
23   start to access our services at 17 and a half.
24   Q.  You're clairvoyant.  That's kind of where I was
25   curious.  It seems like the majority is still 18, still

**28**

1    in the State?
2    A.  Right.
3    Q.  But why wouldn't we start this process early
4    while they do that?
5    A.  Yes.
6    Q.  Do you know how it is that somebody came up
7    with 17 and a half is good number for trying to
8    facilitate allowing someone to age out of the foster
9    care process?
10   A.  No, I don't.
11   Q.  Have you ever done any investigation to find
12   out how it is that somebody came up with that date?
13   A.  No.
14   Q.  Versus 16, or 15, or whatever?
15   A.  I haven't.
16   Q.  Has part of being a foster child and a minor in
17   a guardianship situation with foster parents does the --
18   do the youth have to attend school if they're still
19   school age and don't have a GED?
20   A.  I don't know what foster parents are required
21   to do.
22   Q.  Okay.  And do you know what type of
23   documentation the foster families are required to
24   maintain on behalf of the foster children?
25   A.  No, I don't.

**29**

1    Q.  Tell me what TRAC stands for?
2    A.  Transition Resource Action Center.
3    Q.  So there's no K. on the end of it?
4    A.  No, it's a C.
5    Q.  And it is a separate entity or is it a subpart
6    of City Square?
7    A.  A subpart.
8    Q.  And how long has it been in existence, to your
9    knowledge?
10   A.  About 10 -- a little over 10 years.
11   Q.  And that is the area in which you work?
12   A.  Yes.
13   Q.  Now, one of issues that came upper earlier in
14   this deposition was a contract with the CPS?
15   A.  Yes.
16   Q.  Do you know about that terms of that contract?
17   A.  No.
18   Q.  And do you know how long the contract has been
19   in existence?
20   A.  No.
21   Q.  But do you -- I guess, do you know what the
22   role of City Square is, with regard to the services you
23   provide under that contract for youth, what those areas
24   are?  That's a horrible question.  I can't even
25   understand what the question is.  Don't answer that.

Hazel Davis - 7/16/2014

30

1    A.  Okay.
2    Q.  What parts of the contract, to your knowledge,
3  relate to the activities that you do on a day-to-day
4  basis?
5    A.  The work that we do is not contracted by --
6  it's not -- it's not funded by that contract.  However,
7  we are to assist youth in finding work.  We are to play
8  a role in assisting youth to find work.
9    Q.  So part of the contract and part of City Square
10 is to get youth, who are transitioning out of foster
11 care, the ability to get a job?
12   A.  Yes.
13   Q.  And provide for themselves?
14   A.  Yes.
15   Q.  But what y'all encounter, in order to get to
16 that point, you got to get them this information?
17   A.  Yes.
18   Q.  And the ability to get a job?
19   A.  Yes.
20   Q.  And part of that would be photo IDs?
21   A.  Yes.
22   Q.  And that's where your role comes in, at least
23 with regard to the photo ID part?
24   A.  Yes.
25   Q.  So as a percentage of youth that y'all

31

1  encounter, what percent do not have any form of photo ID
2  that would be acceptable for purposes of an I-9?
3    A.  When you say "y'all encounter"?
4    Q.  I'm sorry.  So the -- poor, poor English on my
5  part.  City Square encounters youth in the process of
6  attempting to get them a job.  What percentage of those
7  youth have photo IDs already that would be acceptable
8  for an I-9?
9    A.  I don't know.  For the entire population of
10 TRAC, I don't know.
11   Q.  And do you recall seeing any kind of metrics
12 relating to that?
13   A.  For the entire population at TRAC, I have not.
14   Q.  What is the "entire population at TRAC," when
15 you use that term?
16   A.  Well, in a year's time, we could work with as
17 many as, I think, about 800 individuals.
18   Q.  And when you say y'all work with up to 800
19 individuals in TRAC, would all those 800 individuals
20 would be within TRAC for the process of getting them
21 photo IDs?
22   A.  No.
23   Q.  As we sit here today, do you have a guess or
24 estimate, a good-faith estimate, as to what number of
25 those individuals do not have photo ID?  Is it

32

1  50 percent?  75 percent?
2    A.  I don't know.
3    Q.  And as we sit here today, you don't recall any
4  kind of memos, documents, or any other written material
5  that identify the percentage of individuals that y'all
6  help obtain or successfully obtain photo ID for in any
7  calendar year?
8    A.  No.
9    Q.  You mean, that is correct?
10   A.  That is correct.
11   Q.  As far as working with evaluating the three
12 people that work for you, do you attempt to understand
13 or process and rate their employment?  I guess, first of
14 all, do you do an employee assessment on a periodic
15 basis of your employees?
16   A.  Yes.
17   Q.  How often do you do one?
18   A.  We do one annually.
19   Q.  And during the annual review of those employees
20 that you manage, is part of the evaluation -- does it
21 relate to how many youth that they have helped obtain
22 photo IDs?
23   A.  No.
24   Q.  Does it have any metric that you look to on how
25 many birth certificates or other acceptable documents,

33

1  for an I-9 purpose, that they help youth obtain?
2    A.  No.
3    Q.  What's the average caseload for each of your
4  employees that works under you?
5    A.  They don't have a caseload.  They're required
6  by the -- our contract -- our contract with the Texas
7  Workforce requires that we enroll, in Dallas, 150
8  individuals.  And then in Fort Worth, 75.
9    Q.  And "enroll," what does that mean?
10   A.  That means, start to work with them on jobs.
11   Q.  How -- what's the success rate?  So of the 150
12 in Dallas, how many in a given year will actually get a
13 job?
14   A.  Goodness gracious.  Our goal is to have
15 65 percent employed.
16   Q.  Who set that goal?
17   A.  We did.
18   Q.  And how was it that y'all came to that number?
19   A.  We talked to the people at TWC and what they're
20 goal was for their participants, for individuals at the
21 Workforce centers.
22   Q.  And do you know -- were you involved in those
23 communications on -- or those discussions?
24   A.  Yes.
25   Q.  And did you raise the issue that there's a

34

1  percentage of those kids you deal, with some segment of
2  the youth that y'all have in TRAC, that do not have
3  proper ID to go get a job?
4      A.  To TWC?
5      Q.  Yes.
6      A.  Yes.  Yes.
7      Q.  And was that part of the reason it was not 100
8  percent?  As the goal versus -- I mean, y'all came up
9  with a number, was that one of the factors, the lack of
10  photo ID?
11     A.  No.
12     Q.  Why not?
13     A.  Because we requested funding for just the
14  system of photo IDs.
15     Q.  And you requested the funding from?
16     A.  TWC.
17     Q.  And they provided?
18     A.  Yes.
19     Q.  And how much did they provide?
20     A.  They provided -- I don't know.
21     Q.  Would the terms of whatever funding -- let me
22  rephrase that.  The terms of whatever funding from the
23  Workforce Commission is, are contained in the documents?
24     A.  Yes.
25     Q.  The agreements between the two organizations,

35

1  City Square and TWC?
2      A.  Yes.
3      Q.  And that's one source of funds for obtaining
4  photo IDs for the youth.  Are there other funds that
5  City Square uses for that purposes?
6      A.  I'm not sure.
7      Q.  The accounting of where the funds come from to
8  accomplish the goal, that's not in your area of control,
9  correct?
10     A.  I'm not sure if I understand the question.
11     Q.  Sure.  You're not in charge of accounting for
12  City Square?
13     A.  No.
14     Q.  And if -- so let's walk -- it's a good time to
15  switch over to that subject.
16         How is it that you obtain a photo ID for
17  one of the youth?  What is the process you need to go
18  through?
19     A.  For attaining a photo ID?
20     Q.  Yes.
21     A.  Well, it depends.  If the youth -- we would
22  take an individual to one of the DMV locations, and
23  attempt to get an ID, depending on whether or not they
24  have the supporting documents for attaining an ID.  And
25  then attain the affidavit for residency that you would

36

1  now have to have that would substantiate that they're a
2  Texas resident, get that notarized, and then submit that
3  to the DMV for an ID.
4      A.  And by DMV, you mean, the Department of Public
5  Safety?
6      A.  Yes, Department of Public Safety.
7      Q.  And these would be the license locations?
8      A.  Yes.
9      Q.  And in working with the youth, do you direct
10  them to any specific DPS locations or do you look to
11  where the youth lives and tell them to go to them, or do
12  you take them?
13     A.  We have to take them if we have to provide the
14  funding for, if we have to pay if.
15     Q.  So someone from City Square will likely
16  transport the youth down to the Department of Public
17  Safety location and sit with them and go through the
18  process?
19     A.  Either transport them or meet them there, yes.
20     Q.  And now, have you participated in that process
21  in the last year?
22     A.  I have not.
23     Q.  When is the last time you participated in that
24  process?
25     A.  I have not participated in that process.

37

1      Q.  You, personally?
2      A.  Personally, no.
3      Q.  So anything you have got, information-wise
4  about that process, you obtained from your employees?
5          MR. SHAPIRO:  Objection, ambiguous.  What
6  do you mean by "that process"?
7          MR. SCOTT:  The process we have been
8  talking about in obtaining a license.  Here, I'll say
9  that.
10     Q.  (BY MR. SCOTT)  So the process of either giving
11  a ride to an individual, a youth, or meeting them at the
12  DPS office and walking them through and paying for the
13  photo ID, is information that you receive from one of
14  your employees, to the extent you have that
15  investigation?
16     A.  Yes.
17     Q.  It's not done firsthand by you?
18     A.  It's not done firsthand by me.
19     Q.  Okay.  What type of documents or information
20  does -- do the youth need in order to get their photo ID
21  from the Department of Public Safety?
22     A.  Okay.  I've listed the -- three tiers of IDs
23  that are required, and so it would be one of those
24  items.
25     Q.  Okay.  And we spoke earlier about documents, on

38

1  average, that the youth have or are missing when they
2  first come to y'all at City Square.  Do -- other than --
3  do most of them have a Social Security card?
4      A.  Coming into City Square, I don't know.  Coming
5  into the jobs program, that's different story.  And so
6  those would be the individuals that we work with.
7      Q.  So let's talk about the individuals you work
8  with.  How about that subgroup of that population, do
9  they have, for the most part, have Social Security
10  cards, or is that another effort or document that y'all
11  go set out and try to get for them?
12      A.  It's another document we set out to get them.
13      Q.  And y'all do that per a request from the Social
14  Security Administration?
15      A.  Yes.
16      Q.  Is there any cost associated to that?
17      A.  No.
18      Q.  So is that the first step, or second step, or
19  are all of these kind of simultaneously -- when someone
20  is trying to obtain documents -- sufficient documents
21  for someone to be able to get a job.
22      A.  It's simultaneous; it depends on what documents
23  they have.
24      Q.  And birth certificates.  So some of the youth
25  don't have birth certificates in the population you work

39

1  with?
2      A.  That's correct.
3      Q.  What is the process you do in order to obtain a
4  birth certificate for that youth?
5      A.  Well, we have to get an ID in order to get a
6  birth certificate.
7      Q.  And what ID do you obtain in order to obtain a
8  birth certificate?
9      A.  It's your identity document or your driver's
10  license from the Department of Motor Vehicles or -- yes.
11      Q.  And so y'all are able to obtain those identity
12  -- those photo IDs from the Department of Public Safety
13  before you get the birth certificate?
14      A.  Well, we attempt to obtain them.
15      Q.  You don't need a birth certificate to get you
16  photo ID from the Department of Public Safety?
17      A.  You do.
18      Q.  But you know that, so you wouldn't go try to
19  get the photo ID before you get the birth certificate,
20  right?
21      A.  It depends.
22      Q.  What on?
23      A.  On what documents we can attain that would --
24  because the -- the attaining of all three of those
25  crucial documents is pretty much cyclical; one depends

40

1  on the other.  And so you try to figure out what you can
2  get the quickest.
3              And so if you have none of them, you would
4  start with the birth certificate, and you would try to
5  request those -- find the birth certificate and go back
6  to CPS for that.
7      Q.  Does CPS have birth certificates on all these
8  youth?
9      A.  They should.
10      Q.  And if y'all -- to your knowledge, have you run
11  into a situations where you have made a request to CPS
12  for a copy of a birth certificate or the original of the
13  birth certificate and not been able -- been successful?
14      A.  The youth has to make the request.
15      Q.  Are you aware of situations in dealing with the
16  youth where one of the youths have identified that they
17  have made the request to CPS, and CPS has told them they
18  don't have it?
19      A.  I don't know what the CPS has told them, but
20  they have not been able to obtain it from CPS.
21      Q.  Do y'all follow up with the CPS and the youth
22  so you can make sure they have actually put in the
23  request and they're not just kind of --
24      A.  We have asked staff to follow up, yes, on CPS.
25      Q.  Okay.  And have there been situations when that

41

1  subset -- where you have asked staff to follow up with
2  CPS to confirm that CPS does not have those birth
3  certificates?
4      A.  It's not a matter of not having them.  So I
5  don't know whether they have them or not.
6      Q.  Okay.  Well -- I'm missing something.  It seems
7  like -- so at some point in time, City Square goes back
8  on behalf of the youth, or has the youth go back to CPS
9  and ask for their birth certificate?
10      A.  Yes.
11      Q.  And sometimes, that's successful?
12      A.  Sometimes.
13      Q.  And sometimes, it's not?
14      A.  Absolutely.
15      Q.  And so in the situations where it's not
16  successful, does City Square -- does City Square then
17  attempt to do a follow up to find out why it was not
18  successful?
19      A.  We have.
20      Q.  And in those situations, what have you found?
21      A.  It's just taken a long, long time to attain
22  those documents in some cases.  In some cases, there
23  eventually able to attain those documents.
24      Q.  So on the cases CPS refers over, are there
25  situations in those referrals where a request is made by

Hazel Davis - 7/16/2014

42

```
 1  those -- that group of youths, where they cannot
 2  identify -- where they do not end up with their birth
 3  certificates?
 4      A.  Yes.
 5      Q.  And again, you have had staff follow up with
 6  CPS to find out what the issues were relating to those
 7  specific cases?
 8      A.  Yes.
 9      Q.  Have y'all -- have you reached out to CPS and
10  ask that they forward over a copy with the copy of the
11  birth certificate when they're referred over to City
12  Square?
13      A.  I have not personally dealt with that, but my
14  staff, yes.
15      Q.  And who have they dealt with?
16      A.  I don't know.
17      Q.  Have you dealt with anybody with a name at CPS?
18      A.  I've dealt with some people at CPS, yes.
19      Q.  And have you raised the issue with those
20  people?
21      A.  Personally, no.
22      Q.  Who are your contacts within CPS that you work
23  with regard to your jobs?
24      A.  I don't have a direct contact at CPS.
25      Q.  And do you have someone that works for you at
```

43

```
 1  City Square that is kind of the point person for those
 2  communications with CPS about the birth certificate
 3  issue, or is does that just arise based upon when one of
 4  the youth -- one of the folks you're working with, ends
 5  up not having them or not getting them?
 6      A.  Yes.
 7      Q.  So it's the latter?
 8      A.  It's the latter.
 9      Q.  So in that situation y'all don't -- City Square
10  does not have a formal process or a point person to deal
11  with issues that arise within CPS-referred youth?
12      A.  We do have processes.
13      Q.  What are those?
14      A.  We have an entire department that works
15  directly with CPS.
16      Q.  Okay.  What's that department called?
17      A.  It's just case management.
18      Q.  And tell me what case management does?
19      A.  They actually implement the contract with CPS.
20      Q.  Does the contract have a provision that CPS
21  will provide supporting documents about the youth?
22      A.  I'm not sure if our contract has that
23  provision.
24      Q.  Are you aware of a contract that does or terms
25  that do?
```

44

```
 1      A.  I know that they're required to.  A law was
 2  passed, and I forgot what the name of it was, that they
 3  should.
 4      Q.  So the State of Texas pass a law that said CPS
 5  should provide -- must provide these documents?
 6      A.  Yes.
 7      Q.  Supporting documents?
 8      A.  Yes.
 9      Q.  And one of those supporting documents is the
10  birth certificate?
11      A.  Yes.
12      Q.  And do you know when that came into effect?
13      A.  No, I don't.
14      Q.  Do you believe it was of recent origin or been
15  around for a while?
16      A.  What do you mean by "recent"?
17      Q.  Last legislature, '13?
18      A.  I think it's prior to that.
19      Q.  '11?
20      A.  Perhaps.
21      Q.  Has there been a change in the documents you
22  have received at -- or that City Square has received
23  from youth referrals or -- strike all that.
24          Has there been an increase in the number of
25  youth with proper documentation and compliance with that
```

45

```
 1  statute since the past?
 2      A.  I have not encountered that.
 3      Q.  Have you attempted to do a followup with the
 4  case management people who are in charge of contact with
 5  CPS about why these documents are not being provided?
 6      A.  Yes.
 7      Q.  And what were the results of that encounter,
 8  that follow up by you?
 9      A.  They don't know why they're not being provided.
10  They understand the law, but they're not being provided.
11      Q.  Did you ask if they're doing a follow up with
12  CPS to ask why they're not getting the documents to
13  y'all?
14      A.  I've had conversations about them requesting
15  those documents and them, on occasion, receiving -- the
16  youth receiving those documents.  And on some occasions,
17  it doesn't happen.
18      Q.  And when that youth does not receive a
19  document, do y'all have a formal process that you're
20  supposed to follow in notifying case management, that
21  the youth does not have a birth certificate or a formal
22  document?
23      A.  It's not a formal process; we just do it.
24      Q.  What is that?
25      A.  We just let them know the youth doesn't have
```

Hazel Davis - 7/16/2014

46

1  documents.
2      Q.  Do you send them an e-mail?
3      A.  So we're in same office; so many cases, it's a
4  verbal conversation.
5      Q.  You might scream across the room like we do at
6  our office --
7      A.  Yes.
8      Q.  -- and say, Hey, so-and-so is on the phone.
9  I'm having a problem, you need to answer this.
10     A.  In some cases the case manager ask us to help
11  them with the documents when they refer the youth for
12  employment assistance to us.
13     Q.  So in my disjointed mind, I bounce around a
14  lot.  So let's bound back, if we could.
15     A.  Okay.
16     Q.  As a youth, they walk in the door.  They come
17  to you through one of the referral processes or some
18  other conduit?
19     A.  Yes.
20     Q.  And they arrive at the door and what happens?
21     A.  They have a case manager.
22     Q.  Okay.  How does -- is the case manager
23  assigned?
24     A.  By many cases, there's a zip code they cover,
25  there is a territory they cover.

47

1      Q.  And what does a case manager do, to your
2  knowledge?
3      A.  They assist them to access some of the benefits
4  that are -- that come to them from CPS because they have
5  aged out.  And they assist them to navigate through,
6  just basic challenges of obtaining a house, housing.
7  They refer them to us for assistance with employment.
8  They help them with the education.  A lot of them don't
9  have their high school diplomas.  Or help them to
10  navigate their way to getting into college.  Yes.
11     Q.  And how late -- if a youth chooses not to age
12  out of CPS, how long can they stay under the protection
13  of CPS?
14     A.  I don't know.
15     Q.  Do y'all attempt to tell the child that may be
16  ageing out of CPS is maybe a bad idea?
17     A.  Yes.  Well I have, I should say.
18     Q.  Is that kind of -- is that on an individual
19  basis, based upon the youth you're encountering or is it
20  really, across the board, there are benefits of staying
21  in the system than there is for those kids in getting
22  out?
23     A.  It's my opinion that it's better they that stay
24  in.
25     Q.  But as we sit here today, you don't recall what

48

1  timeline you get to stay to in in to?
2      A.  For our services that are contracted, they stay
3  until they're 21.
4      Q.  And by ageing out, at age 18, they are
5  completely on their own?
6      A.  Yes.
7      Q.  All right.  That would seem on the surface to
8  be an easy sell, but there's a lot of kids that make a
9  different decision, even though you're advising them to
10  stay in the system?
11     A.  Yeah.
12     Q.  And do you know why?
13     A.  Yes.
14     Q.  In general?
15     A.  Well, the reason they give us are -- well, they
16  were removed from their homes, so CPS probably is the
17  bad guy.  Many of our youth encounter a lot of
18  placements while they're in CPS.  I think the statistics
19  say that the average stay in CPS, for most individuals,
20  is four years, but they can move around as many as 15
21  times.  And so, for whatever reason, it can be a
22  challenging experience for those kids.
23     Q.  Okay.
24     A.  And they often want to go back home.  And so
25  that's why -- that's the reason that they want to get

49

1  out of the system.
2      Q.  Does -- do you know if City Square works with
3  other similar-type agencies in other metropolitan areas?
4      A.  When you say "agencies"?
5      Q.  What do y'all call yourself, a not-for-profit?
6      A.  When you say "similar type"?
7      Q.  Organizations that attempt to work with
8  children aging out of foster care process.
9      A.  Yes.
10     Q.  And assisting them?
11     A.  We do.
12     Q.  And you mention your contract at City Square
13  encompasses Dallas and Fort Worth, you gave me the
14  numbers earlier.  I believe in your contract with
15  Workforce Commission, 150 in Dallas, 75 in Fort Worth?
16     A.  In our Fort Worth office and Dallas office,
17  yes.
18     Q.  And does City Square actually have offices in
19  other cities besides Fort Worth and Dallas?
20     A.  No.  We cover a large territory, but the
21  offices are in Dallas and Fort Worth.
22     Q.  And do you know if an organization, similar to
23  City Square for instance, in the Houston area?
24     A.  Yes.
25     Q.  What is that?

Hazel Davis - 7/16/2014

50

1    A.  I believe it's Faith Works.
2    Q.  Same question around San Antonio and Austin?
3    A.  Yes.
4    Q.  What are those?
5    A.  I believe in Austin, it's -- I forgot,
6    actually.  San Antonio, it's BCFS and I'm not sure what
7    that acronym stands for.  I should know the one in
8    Austin, but I can't remember it.  I can't recall it
9    right now.  I'm not sure if they have the same programs
10   that we have.
11   Q.  And so when a youth is with the case manager,
12   and the case manager at some point in time will make a
13   referral to your group?
14   A.  Yes.
15   Q.  And your group is known as TRAC?
16   A.  The entire transition center is TRAC.
17   Q.  Okay.
18   A.  Yes.
19   Q.  What is your specific area called again?
20   A.  It's Workforce Services.
21   Q.  And so the referral, the youth goes from a case
22   manager over to Workforce Services?
23   A.  Yes.
24   Q.  What other areas might a youth be referred over
25   to?

51

1    A.  Housing.
2    Q.  Okay.  Any others?
3    A.  Those are the -- the three branches that we
4    have or clusters.
5    Q.  Who is in charge?  Who has your similar
6    position in housing?
7    A.  Carla Cleeton.
8    Q.  How about for case managers.
9    A.  It's Kathy Bush.
10   Q.  How long, on average, does it take to obtain --
11   for one of the youth to obtain a photo ID or through
12   that process?  So you get a referral today -- let's
13   assume the youth has no documentation of any kind,
14   what's the typical turnaround for the youth?  80
15   percent?  Not the outliers.
16   A.  I don't have a typical turnaround because it
17   varies so much.  I don't have that number.
18   Q.  So we were talking about birth certificates and
19   the acquisition of birth certificate for youth.  Where
20   do -- where does City Square take the youth to get a
21   birth certificate or replacement birth certificate?
22   A.  I believe it's at the courthouse, I believe,
23   yes.
24   Q.  And that's through the City of Dallas?
25   A.  Yes.

52

1    Q.  And they're Vital Statistics section?
2    A.  Yes, exactly.
3    Q.  And how much are the birth certificate in the
4    City of Dallas?
5    A.  I believe they have gone up to $23.
6    Q.  And is that something City Square pays for on
7    behalf of the youth?
8    A.  Yes.
9    Q.  And since that's something you pay for, you
10   meet the youth at the Vital Statistics facility?
11   A.  Yes.
12   Q.  And have you done that process of going through
13   Vital Statistics in Dallas for the purposes of obtaining
14   a birth certificate?
15   A.  I have not.
16   Q.  With regards to information you have learned --
17   well, have you heard of any problems with regards to the
18   youth -- the ability of the youth to attain replacement
19   birth certificates through the City of Dallas Vital
20   Statistics Bureau?
21   A.  Only because they don't have an ID.
22   Q.  What type of -- will they accept photo ID,
23   other than something issued by the Department of Public
24   Safety?
25   A.  I don't think so.  I'm not sure, but I don't

53

1    think so.
2    Q.  Do you work at all or have you in the past
3    worked with anyone from Stewpot?
4    A.  We have.
5    Q.  And how have you worked with over there?
6    A.  I don't have a name.  We have referred youth to
7    the Stewpot.
8    Q.  And what situations have you made referrals?
9    A.  When I say "we," not my department.  TRAC does
10   refer you to Stewpot.  When they need an ID, for
11   whatever purpose.  But we've not -- I don't believe any
12   of my staff have ever referred them to Stewpot, I don't
13   believe.
14   Q.  Do you know if anybody from your staff has
15   notified you that Vital Statistics will accept a Stewpot
16   ID in order for the purpose of obtaining a birth
17   certificate?
18   A.  I have not heard that.
19   Q.  Does -- do you know if Vital Statistics will
20   accept a school photo ID, high school?
21   A.  I have not heard that, as well.
22   Q.  School records, is that also an item that is --
23   CPS maintains on behalf of the youth?
24   A.  I don't believe so.
25   Q.  Most of the youth, it sounds like, are from --

Hazel Davis - 7/16/2014

54

1  may have attended the Dallas Independent School District
2  that you work with from the Dallas area.
3     A.  No, they're from all over the state.
4     Q.  So y'all work with kids anywhere in the borders
5  of the State of Texas?
6     A.  Some of them are from different parts of the
7  country, just individuals who have aged out of the
8  foster care system.
9     Q.  Well, do you -- if a youth is located in
10  Marshall, Texas --
11     A.  Yes.
12     Q.  -- is it possible that y'all would work with
13  that youth if they're aging out of system?
14     A.  If they age out of foster care and come to our
15  area, we would be working with them.
16     Q.  Wherever they may have been from, they still
17  would be in the metroplex when y'all would work with
18  them?
19     A.  Well -- there's a qualifier.  We have a
20  17-county region, but physically, yes.  In terms of our
21  office, yes.  But we work with individuals in a
22  17-county region, and it's called Region Three.  CPS is
23  region three.
24     Q.  And that would generally be known to people
25  around here as the metroplex?

55

1     A.  No, it's broader than that.
2     Q.  What other counties would it cover?
3     A.  Let's see.
4     Q.  How about far western?
5     A.  We'd go as far as probably -- west, maybe
6  Cleburne.
7     Q.  That's Johnson County, that's a little
8  southwest.  Okay.
9     A.  Yeah.  And go to Waxahachie, Corsicana.  So
10  that's what?
11     Q.  Navarro?
12     A.  Navarro, yes.  And then east, it's only as far
13  as Greenville.  Is that still Dallas?  No, it's not --
14  is it Rockwall County?
15     Q.  Rockwall is the county, City of Rockwall
16  County?
17     A.  So we go as far as Greenville, going east.
18  North, we go as far as Gainesville.
19     Q.  Gainesville, is that Grayson?
20     A.  I believe so.
21     Q.  Okay.  So --
22     A.  So further than Collin.
23     Q.  And almost if we drew -- could draw a circle
24  around that area, everyone inside that region is Region
25  Three?

56

1     A.  Yes.
2     Q.  Just generally speaking?
3     A.  Yes.
4     Q.  And with regard to youth -- let's say someone
5  is in Gainesville, they're almost at the border of
6  Oklahoma, will y'all require that youth to come down to
7  your office to get those services?
8     A.  No.  No.
9     Q.  Do the case workers actually go out to visit
10  with the individuals?
11     A.  Yes, they do.
12     Q.  And so the case managers would be the ones that
13  would to the traveling on that or would that also be the
14  individuals that work with you?
15     A.  On occasion, the individuals that work for
16  Workforce Services also go out to assist with job
17  obtainment.
18     Q.  And do you -- is that done at the youth's home,
19  or is that another location, where the meeting is set
20  up?
21     A.  It depends what's convenient for the youth or
22  what's doable.
23     Q.  Now, earlier in your deposition you identified
24  approximately 800 children a year is what y'all will
25  work with at Workforce Services.

57

1     A.  No, at TRAC in general.
2     Q.  At TRAC, in general?
3     A.  Uh-huh.
4     Q.  How many youth, in general, during an average
5  year would your group work for in Workforce Services?
6     A.  Probably, about 250.
7     Q.  And those 250 would be at any point along the
8  way of getting them into the workforce correct?
9     A.  Yes.
10     Q.  So you do not worry about trying to get them a
11  job between the time their 17 and a half and 18, I'm
12  assuming.
13     A.  No, we work with individuals -- okay.  So the
14  CPS contract says 17 and a half to 21.  Our contract
15  says anywhere from 16, I believe, to 24 years of age.
16  And our contract would be from TWC to work with this
17  population.
18     Q.  You may encounter a youth who has run away and
19  is living on the -- is homeless --
20     A.  Uh-huh.
21     Q.  -- is 16 and a half --
22     A.  Uh-huh.
23     Q.  -- is trying to find a way to make a better
24  life for themselves?
25     A.  Yes.

Hazel Davis - 7/16/2014

58

1    Q.  And part of that process is -- your information
2  would be to help him get a job, or your task would be to
3  try to help him find a job and getting him the proper
4  documentation he's going to need?
5    A.  Any youth that's 16 and is or has been in
6  foster care, we would help.  And if -- yeah.
7    Q.  How do they document if they have been in
8  foster care?
9    A.  There's a Document 2054 that states that they
10  have been in foster care.
11    Q.  So if a homeless child comes to y'all, that's
12  under 18, and has not been in foster care, that's not a
13  service y'all would be able to provide that child?
14    A.  Not for those services, no.
15    Q.  That might be somebody you would refer to
16  another community organization?
17    A.  Absolutely.
18    Q.  Of the 250 people, on average, that y'all are
19  working with at any given time in the Workforce Services
20  or over the course of the year --
21    A.  Yeah.
22    Q.  -- how many of those would be at the stage of
23  securing those -- we'll call them primary identification
24  documents, the Social Security card, the birth
25  certificate, the photo ID?

59

1    A.  About 100.  Ask that question again, I'm sorry.
2    Q.  Sure.  Out of that group of 250 individuals --
3    A.  Uh-huh.
4    Q.  -- how many of those would y'all be working
5  with to attain the primary documents, the Social
6  Security card, the birth certificate, the photo ID?
7        MR. SHAPIRO:  Objection, confusing and
8  ambiguous.  Could you define --
9        MR. SCOTT:  I'm sorry?
10        MR. SHAPIRO:  You may want to rephrase,
11  because you have used the term "primary documents" and
12  listed other documents.
13    Q.  (BY MR. SCOTT)  Let's strike primary out of
14  that question.  I'm trying to understand how many you're
15  working with on obtaining documents for purposes of
16  employment.  And I think you have said it's about 100
17  youths that y'all would be working with over an average
18  calendar year in order to obtain those documents related
19  to a Social Security or photo ID -- and/or.
20    A.  No, I would say that 100 youths don't have
21  those documents when they come to work with us.
22    Q.  And I think we are saying the same thing.  I'm
23  sorry, you're doing it much clearer, which is that your
24  group, within City Square, attempts to obtain those
25  documents for those youth, about 100 per calendar year?

60

1    A.  No.  I would say 100 of them don't have the
2  documents.  Some of them can attain them for themselves.
3    Q.  How many of those 100 that don't have them do
4  y'all help, does City Square help obtain those
5  documents?
6    A.  I would say -- I don't know the exact number.
7  I would say the majority of those individuals we have to
8  assist in some capacity.
9    Q.  Okay.  With one or all three?
10    A.  With one or all three?
11    Q.  Social Security, birth certificate, or photo
12  ID?
13    A.  Yes.
14    Q.  Does City Square attempt to get the youth to
15  register to vote?
16    A.  We make it available, for the youth.
17    Q.  And is that done as -- in order to -- what's
18  the reason that's done for?
19    A.  Just as a service.
20    Q.  And do you let the youth know that voter
21  registration cards are also a form of identification?
22    A.  No, not necessarily.
23    Q.  Okay.  Any other reason other than just as a
24  general service that y'all attempt to get them to
25  register to vote?

61

1    A.  Just as a service.
2    Q.  But nothing with regards to helping them obtain
3  a job?
4    A.  No.
5    Q.  Correct?
6    A.  No.
7    Q.  So that's not done through the Workforce
8  Services section?
9    A.  No.
10    Q.  That would be done by one of the other areas?
11    A.  Yes.
12    Q.  Do you know whether housing -- the folks in the
13  housing section, do the youth who are attempting to
14  obtain some type of public assisted -- public assisted
15  housing, need some form of identification?
16    A.  I don't know.
17    Q.  So let's get back to the first time that you
18  came across Department of Justice.  I think you
19  testified it was a couple of months ago?
20    A.  Uh-huh, yes.
21    Q.  And it was Mr. Shapiro?
22    A.  Yes.
23    Q.  And tell me about what you recall from that
24  conversation.
25    A.  Well, I recall him basically asking us about --

Hazel Davis - 7/16/2014

62

1  asking us what issues we were having with individuals on
2  attaining identity documents.
3      Q.  And what did you tell him?
4      A.  What I shared with you today.  Basically
5  that -- that the process for attaining documents is
6  cyclical.  So you typically have to have one document in
7  order to obtain another.  But you have to have that
8  document in order to attain a document that you need to
9  attain the other document.  So it's very cyclical; so
10 it's very challenging.
11     Q.  Anything else?
12     A.  Let's see.  Told them it can be a lengthy
13 process and that some individuals end up giving up.
14     Q.  Anything else?
15     A.  Not that I can recall.
16     Q.  So with regard to the cyclical, I think we have
17 kind of covered a lot of that.
18     A.  Yes.
19     Q.  Anything about the cyclical process or kind of
20 the circuitous process it appears to be that these
21 documents all relate to, that you haven't addressed
22 during your deposition, that you recall?
23         MR. SHAPIRO:  Objection, asking for a
24 narrative.
25     A.  Not that I can recall.

63

1      Q.  (BY MR. SCOTT)  Let's go to the lengthy
2  process.
3      A.  Okay.
4      Q.  Earlier in the deposition, there was an
5  individual that you believe you identified that you had
6  been working with or helping work with in attempting to
7  get that individual a photo ID.  And I think it's been
8  taking over a year to get that process and still is not
9  complete?
10     A.  This individual wasn't enrolled in Workforce
11 Services, but they were part of TRAC.  And so TRAC had
12 been assisting him with trying to attain those
13 documents, I believe.
14     Q.  So --
15     A.  I believe that he wasn't part of Workforce
16 Services.  I'm not sure, but I know he's a TRAC youth.
17     Q.  So this portion is going to be marked as
18 confidential please.
19 (FOLLOWING PORTION OF TRANSCRIPT MARKED CONFIDENTIAL.)
20     Q.  (BY MR. SCOTT)  What was the individual's name?
21     A.  His name is Patrick Hobbs.
22     Q.  How old is Mr. Hobbs?
23     A.  I don't know.
24     Q.  And how long have you been working with someone
25 or Mr. Hobbs to help him obtain a photo ID?

64

1      A.  I know TRAC -- I believe that's it's been over
2  a year.
3      Q.  And what efforts have been made to help
4  Mr. Hobbs obtain an ID?
5      A.  I don't know, because I haven't worked on that
6  directly.
7      Q.  And who has worked with Mr. Hobbs?
8      A.  Mary Christine Reed.
9      Q.  Anyone at y'all -- at City Square?
10     A.  Yes, Carla Cleeton.
11     Q.  How do you spell her last name?
12     A.  C-L-E-E-T-O-N.
13     Q.  And do you -- are you aware of what steps they
14 have undertaken on Mr. Hobbs's behalf or with Mr. Hobbs
15 in order to acquire a photo ID?
16     A.  I know that they have attempted to -- one of
17 their documents -- two of their -- well, they have tried
18 to get their birth certificate, and I believe their
19 Social Security to match up.  He has two different
20 names -- he has names that don't match up, adoption and
21 all that sort of thing.  And so I think that that's one
22 of the things they're working on.
23     Q.  And at least as you have understood it, one of
24 his issues is, he has a birth certificate and Social
25 Security card but the names do not match?

65

1      A.  As I understand it.
2      Q.  And is it your understanding that those need to
3  match in order for him to obtain a DPS license?
4      A.  I believe that there's provisions with DPS
5  whereby if you provide another document that -- that
6  states that you have -- that there was an official name
7  change, I believe that you can attain a DPS document.
8  But I don't know how that impacts the Social Security or
9  birth certificate.
10     Q.  And with regard to Mr. Hobbs, are you aware --
11 well, let me strike that.
12         Do you have a contact within the Department
13 of Public Safety that you turn to?
14     A.  No.
15     Q.  Do you know if anybody at the Workforce section
16 of City Square has a contact within the Department of
17 Public Safety?
18     A.  No, I don't know that.
19     Q.  Do you know the last time that Mr. Hobbs or
20 anyone on his behalf has met with anyone at the
21 Department of Public Safety about trying to get his ID?
22     A.  I don't know.
23     Q.  Do you know how many times he has met with
24 Department of Public Safety about obtaining that ID?
25     A.  I don't know that either.

Hazel Davis - 7/16/2014

66

1    Q.  What were they asking you as far as ways to
2  assist them with Mr. Hobbs?
3    A.  Who is "they"?
4    Q.  Ms. Reed or Ms. Cleeton?
5    A.  I just happen to know about Patrick's specific
6  case.
7    Q.  Okay.  But not -- not anything specifically
8  from your -- what you have worked with them on?
9    A.  No.
10   Q.  Are you aware of any other cases where someone
11 has taken over a year to be able to get some type of
12 photo ID.
13   A.  I'm not certain of -- no, I'm not certain.
14   Q.  No one comes to mind as we sit here today?
15   A.  I don't know of one with certainty.
16   Q.  Any you think?
17   A.  Perhaps.  There may have been one, yes.
18   Q.  Who is that?
19   A.  Cory.  I forget what Cory's last name is.
20   Q.  And --
21       MR. SHAPIRO:  I'm going to object to the
22 last question.  And you may not have intended this
23 ambiguity.  I wasn't clear if you were asking if she
24 knows the name of the person or if she's -- or if you
25 worded generally if there's a possibly others out there.

67

1    Q.  (BY MR. SCOTT)  Yeah, no.  To be clear, there
2  were two different issues.  One is, are you aware of any
3  other individuals out there that have, in fact, taken
4  more than a year to get photo ID?  And I understood you
5  to say you don't know for sure; is that correct?
6    A.  That is correct.
7    Q.  And I said it sounds like there maybe somebody
8  you may think falls into that category.  And you said --
9  I thought you said, yes, to that.  And I understood that
10 to be Cory.
11   A.  Right.
12   Q.  And that was Cory?
13   A.  Yes.
14   Q.  I just wanted to make sure we were all on the
15 same page?
16   A.  I can't remember his last name.
17   Q.  And was that somebody you came in contact with
18 through City Square?
19   A.  Yes.
20   Q.  Okay.  Other than Cory and Mr. Hobbs, are you
21 aware of any other individuals who have taken up to a
22 year to get -- to obtain a photo --
23   A.  No, I'm not.
24   Q.  -- ID.  Are there -- have your employees or any
25 of the youth raised an issue with you during the last

68

1    four years that you have been at City Square, the
2  difficulty of obtaining transportation to get a photo
3  ID?
4    A.  There is some instances where it is a
5  challenge.
6    Q.  Tell me about those specific instances.
7    A.  Because I only have two individuals in Dallas
8  and Fort Worth that are working directly with youth to
9  attain identifying documents, they can't possibly --
10 it's challenging for them to -- to transported these
11 individuals, these 250 people or 100 individuals to
12 getting their ID and still do their work.
13       And so many of our youth ride the bus and
14 are met there or will even meet with their case manager
15 to do that.  Some youths are outside of the public
16 transportation system.  So that can be a challenge as
17 well for them, in terms of getting there.
18       So the process is extended because they
19 have to wait for a time when the job coach or the
20 Workforce advocate can go and pick them up to bring them
21 to the -- to the Department of Public Safety.  Yes.
22   Q.  And so can you name any individuals, as we sit
23 here today, who have encountered that issue that you
24 have just described?
25   A.  I don't have any names.

69

1    Q.  In the last month, has anybody raised this as
2  an issue to you?
3    A.  No.
4    Q.  In the last year, how many times has anyone
5  raised that as an issue?
6    A.  I don't know.  It's an ongoing state of
7  affairs.  So there's no need to keep bringing it up as
8  an issue; it's just part of how we do business and it's
9  one of the challenges of our jobs.
10   Q.  But as we sit here today, do you recall where
11 one of your youths raised that as an issue?
12   A.  It could have happened.
13   Q.  But as we site here today, you don't recall it
14 happening in the last year?
15   A.  Specifically, I don't recall a specific
16 instance.  I recall a general conversations on a
17 day-to-day basis about things like that.
18   Q.  Yes.  And transportation is an issue for anyone
19 -- strike that.  The youth that Workforce Services are
20 working with, if they're located in Gainesville for
21 instance, is that something that the Workforce Services
22 people attempt to find a solution for, I mean --
23   A.  Yes.
24   Q.  Okay.  I mean, transportation, whether it's for
25 a photo ID or job interviews, seems likes it's at the

70

1 core.
2      A.  It is.
3      Q.  One of the problems you're going to have to
4 address for the youth?
5      A.  Yes.
6      Q.  Or come up -- help them come up with a
7 solution?
8      A.  Yes.
9      Q.  And so do y'all find yourselves coming up with
10 a solution for the vast majority of those kids?
11      A.  We have a standard solution.
12      Q.  What's that?
13      A.  We're saying with regards to attaining IDs or
14 for jobs?
15      Q.  Just jobs.
16      A.  Okay.  For jobs, it's generally -- if they
17 don't have any transportation -- is to assist them in
18 finding work within walking distance of their homes.  If
19 that's not the case, it's to work with case managers to
20 help them find housing where there's a plethora of
21 opportunities to work in their local -- in their
22 neighborhoods.
23      Q.  Has anyone that you have been -- any of the
24 youth you have been working with, identified to you,
25 personally, that they have had difficulty obtaining

71

1 identification for the purpose of voting?
2      A.  No.
3      Q.  Have you heard of anyone who has had difficulty
4 complying and obtaining an ID for the purpose of voting?
5      A.  No.
6      Q.  With regard to transportation services and
7 jobs, Workforce Services feels that it is -- provides
8 viable options or solutions for these youth that you
9 work with before you turn them out there into the
10 system?  I mean, after you have obtained -- let's ask it
11 a better way.  After your services make sure that the
12 youth have proper identification for getting a job --
13      A.  Uh-huh.
14      Q.  -- has reasonable training in order to --
15 having a chance at getting the job, and giving the child
16 a -- or the youth a potential solution to transportation
17 issues, that's when you put them into the Workforce,
18 right?
19      A.  That's when we put them into the workforce.
20 I'd like to make a correction or add some information.
21 You said are there any issues that are related to
22 transportation that may inhibit their ability to obtain
23 an ID.  So I talked about people in outlying areas or
24 areas they can't access public transportation.
25      Another issue is that we take them as a

72

1 group the Department of Public Safety, but they have to
2 come get to us.  And so an issue is, how do you get
3 there if you don't have any money?
4      A.  Yes.
5      A.  And so that can be problematic, as well.
6 Trying to maneuver that.  So that also be -- if we're
7 picking up some Timbuktu and others are in completely
8 different locations, some have to come to the center in
9 order for us to transport them.
10      So an issue could be just getting to us so
11 that we can transport them to get them there.  In some
12 cases -- so transportation can be a challenge as well as
13 funds -- funds in order to be transported, for a bus
14 token.
15      Q.  Do you know of a set budget that you have
16 limitations on how many photo IDs, birth certificate
17 replacements, in any calendar year that your group,
18 Workforce Services, can provide?
19      A.  We have a set budget for the amount -- the
20 funds that we can allocate for that.
21      Q.  And what is that?
22      A.  I don't know what it is.  I don't recall.  And
23 we have two difference contracts.  So they're different.
24      Q.  Have you -- to your knowledge, have you ever
25 run out of funding in any year that you have been there

73

1 for being able to obtain the IDs?
2      A.  We have not run out of funding.
3      Q.  I have no earthly idea how many kids age out of
4 foster care, and I apologize for not knowing that
5 number.  But my assumption is it's more than the 250
6 that you work with.  Do you have any estimate how many
7 kids in the metroplex age out of foster care?
8      A.  I don't.  And it actually may be irrelevant in
9 that, as soon as they age out, they go back to -- they
10 tend to go back to their original location.  And so them
11 aging out doesn't necessarily impact the number of
12 aged-out youth in the metroplex.
13      And so they could go back to wherever they
14 come from.  But the metroplex, as I understand it, has
15 the greatest number of youth that age out.  Of the other
16 Metro -- metropolitan areas in Texas, I believe.
17      Q.  Okay.  Let me check my notes for a second here.
18 So we talked about -- anything else you recall from your
19 first meeting with Mr. Shapiro that you have not already
20 told us?
21      A.  We did talk about how economics could be a
22 factor and it was just more so related to
23 transportation, to get to -- I think.  Let's see.  First
24 meeting, I think that's about it.  I'm not sure, but I
25 think that that's probably what we covered.

LIEUTENANT GOVERNOR DAVID DEWHURST                        7/29/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

## 1

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,        )
                                )
 4       Plaintiff,             )
                                )
 5  VS.                         )  CIVIL ACTION NUMBER:
                                )  2:13-CV-193 (NGR)
 6  RICK PERRY, et al.,         )
                                )
 7       Defendants.            )
    _____)
 8                              )
    UNITED STATES OF AMERICA,   )
 9                              )
         Plaintiff,             )
10                              )
    VS.                         )  CIVIL ACTION NUMBER:
11                              )  2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS )
12  EDUCATION FUND, et al.,     )
                                )
13    Plaintiff-Intervenors,    )
                                )
14  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY    )
15  COMMISSIONERS, et al.,      )
                                )
16    Plaintiff-Intervenors,    )
                                )
17  VS.                         )
                                )
18  STATE OF TEXAS, et al.,     )
                                )
19       Defendants.            )
    _____)
20                              )
    TEXAS STATE CONFERENCE OF   )
21  NAACP BRANCHES, et al.,     )
                                )
22       Plaintiffs,            )
                                )  CIVIL ACTION NUMBER:
23  VS.                         )  2:13-CV-291(NGR)
                                )
24  NANDITA BERRY, et al.,      )
                                )
25       Defendants.            )
```

## 2

```
 1  BELINDA ORTIZ, et al.,      )
                                )
 2       Plaintiffs,            )
                                )
 3  VS.                         )  CIVIL ACTION NUMBER:
                                )  2:13-CV-348(NGR)
 4  STATE OF TEXAS, et al.,     )
                                )
 5       Defendants.            )
                                )
 6  _____)
 7
    ******************************************
 8
              DEPOSITION OF
 9
    LIEUTENANT GOVERNOR DAVID DEWHURST
10
              JULY 29, 2014
11
    ******************************************
12
            HIGHLY CONFIDENTIAL
13
14     ORAL DEPOSITION OF LIEUTENANT GOVERNOR DAVID
15  DEWHURST, produced as a witness at the instance of the
    Plaintiff, was duly sworn, was taken in the above-styled
16  and numbered cause on the JULY 29, 2014 from 9:16 a.m.
17  to 7:23 p.m., before Chris Carpenter, CSR, in and for
18  the State of Texas, reported by machine shorthand, at
19  the Office of the Attorney General, 209 West 14th
20  Street, Austin, TX 78701, pursuant to the Federal Rules
21  of Civil Procedure and the provisions stated on the
22  record or attached hereto.
23
24
25
```

## 3

```
 1
 2
 3              A P P E A R A N C E S
 4  FOR THE UNITED STATES OF AMERICA:
        Elizabeth Westfall
 5      U.S. JUSTICE DEPARTMENT
        CIVIL RIGHTS DIVISION
 6      Room 7254 NWB
        950 Pennsylvania Avenue, N.W.
 7      Washington, D.C. 20530
        (202) 514-0828
 8      elizabeth.westfall@usdoj.gov
 9
10  FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
11      Reynolds Brissenden
        John Scott
        J. Reed Clay, Jr.
12      Assistant Deputy Attorney General
        ATTORNEY GENERAL OF TEXAS
13      P.O. Box 12548
        Austin, TX  78711-2548
14      (512) 475-3281
        reynolds.brissenden@texasattorneygeneral.gov
15
16  FOR THE WITNESS:
17      Linda Halpern
        Manager of Complex Litigation
18      ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
19      Austin, TX  78711-2548 MC109
        (512) 475-1969
20      linda.halpern@texasattorneygeneral.gov
21      Brooke Paup
        Jay Dyer
22      Deputy Division Chief
        Intergovernmental Relations Division
23      ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
24      Austin, TX  78711-2548
        (512) 936-1381
25      brooke.paup@oag.state.tx.us
```

## 4

```
 1      Constance Allison
        LIEUTENANT GOVERNOR'S OFFICE
 2
 3  FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND AND
    IMANI CLARK:
 4
 5      Tania Faransso
        WILMER HALE
 6      1875 Pennsylvania Avenue, NW
        Washington, DC 20006
        (202) 663-6262
 7      tania.faransso@wilmerhale.com
 8      Natasha M. Korgaonkar
        NAACP LEGAL DEFENSE AND
 9      EDUCATIONAL FUND, INC.
        40 Rector Street, 5th Floor
10      New York, NY 10006-1738
        (212) 965-2236
11      nkorgaonkar@naacpldf.org
12  FOR TEXAS STATE CONFERENCE OF NAACP BRANCHES:
13      Ezra Rosenberg (appearing by phone)
        DECHERT, LLP
14      ezra.rosenberg@dechert.com
15  COUNSEL FOR THE ORTIZ PLAINTIFFS:
16      Marinda van Dalen (appearing by phone)
        TEXAS RIO GRANDE LEGAL AID, INC.
17      mvandalen@trla.org
18
19
20
21
22
23
24
25
```

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

---

17

1    A.  I --
2         MS. HALPERN:  "Yes" or "no" question.
3    A.  Yes.
4    Q.  (By Ms. Westfall)  Which documents?
5    A.  I looked at depositions by Mr. Hebert.
6    Q.  Anything else?
7         MS. HALPERN:  I'm going to object on the
8 grounds that it invades the attorney work product.
9         MS. WESTFALL:  General categories of
10 documents, may I examine him on the general categories?
11        MS. HALPERN:  No, I'm going to say that
12 invades attorney work product.
13   Q.  (By Ms. Westfall)  In addition to the
14 deposition transcript of Mr. Hebert, did you review any
15 exhibits to that deposition transcript?
16   A.  No.
17   Q.  Other than your attorney, did you speak to
18 anyone about your deposition today?
19   A.  No.
20   Q.  Did you speak to Julia Rathgaber?
21   A.  No.
22   Q.  Did you speak to Mr. Hebert?
23   A.  Yes.
24   Q.  Is he representing you in this action as your
25 counsel?  Do you know?

---

18

1    A.  Mr. Hebert is my general counsel so I rely on
2 Mr. Hebert.  I'm not sure how to answer your question.
3    Q.  Could you tell me the general nature of that
4 conversation?
5         MS. HALPERN:  I'm going to object to the
6 extent that -- to the extent that Mr. Hebert is his
7 general counsel, I think you are invading the attorney-
8 client privilege.  I'm going to direct him not to answer
9 questions about conversations he's had with Bryan
10 Hebert.
11        MS. WESTFALL:  Mr. Hebert is also a fact
12 witness in this action, Counsel.
13   Q.  (By Ms. Westfall)  Did you discuss his
14 testimony in his deposition?
15   A.  No.
16   Q.  Did you speak with Senator Fraser about his
17 deposition?
18   A.  No.
19   Q.  Did you speak with Representative Harless about
20 her deposition?
21   A.  No.
22   Q.  Did you bring any notes or documents with you
23 today?
24   A.  No.
25   Q.  I'm going to briefly go over a little bit of

---

19

1 your educational background.  Could you tell me what
2 your educational background is.  Where did you go to
3 college?
4    A.  I graduated from the University of Arizona.
5    Q.  Were you awarded a degree?
6    A.  Yes.
7    Q.  What year?
8    A.  In 1967.
9    Q.  Did you --
10   A.  A Bachelor of Arts.
11   Q.  Did you obtain any postgraduate education?
12   A.  Yes.  I attended Georgetown Law School.
13   Q.  Did you obtain a degree?
14   A.  No, ran out of money.
15   Q.  Was there a time when you first became elected
16 to an elected office in the state of the Texas?
17   A.  Yes.
18   Q.  When was that?
19   A.  I took office as Texas land commissioner in
20 January 1999.
21   Q.  How many terms did you serve as land
22 commissioner?
23   A.  One term.
24   Q.  Were you elected to a different position after
25 that term?

---

20

1    A.  Yes.
2    Q.  What was that position?
3    A.  Lieutenant Governor of the State of Texas.
4    Q.  When were you elected to that position?
5    A.  I was elected in November 2002.
6    Q.  Were you reelected to that position?
7    A.  Yes.
8    Q.  What year was that?
9    A.  2006 and 2010.
10   Q.  Earlier this year, did you run for reelection
11 again?
12   A.  I did.
13   Q.  And what was the outcome of that election?
14   A.  I lost the runoff election.
15   Q.  When do you complete your current term?
16   A.  Mid-January 2015.
17   Q.  How many employees do you have in your office
18 currently?
19   A.  Currently, approximately 35.
20   Q.  Since 2005, who in your office has been
21 responsible for handling Voter ID issues?
22   A.  Since I became Lieutenant Governor initially in
23 2003, when I came in, Spencer Reid, who was our general
24 counsel.  But subsequent to that, Bryan Hebert, when he
25 joined us as a staff attorney in the mid-2000s.

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

21

1  Q.  Anyone else?
2  A.  If memory serves, the subsequent general
3  counsel, Frank Battle, was involved on some matters
4  involving election laws and perhaps Voter ID.
5  Q.  Was it -- is it fair to say that Bryan Hebert
6  primarily handled all of your Voter ID issues?
7  A.  That is my current recollection.
8  Q.  Did Ms. Rathgaber handle any of those issues?
9  A.  I don't know what you mean by handle those
10  issues.
11  Q.  Was she responsible for providing you advice
12  and counsel on Voter ID?
13  A.  No.
14  Q.  Did Blaine Brunson provide you with any advice
15  or support on Voter ID issues?
16  A.  I don't know how to answer that question,
17  because it's not really responsive to the way a
18  legislative office works.  Want to rephrase that?
19  Q.  Certainly.  Is there anyone else on staff who
20  -- well, let me strike that.
21        How is your office organized in terms of
22  issues?
23  A.  Julia Rathgaber was our deputy chief of staff
24  and director of policy.  And during the period in
25  question, I had three chief of staffs, Bruce Gibson, Rob

---

22

1  Johnson and Blaine Brunson.  Having the responsibility
2  as Lieutenant Governor to move legislation, some 6,000
3  bills that are presented each year, of which I normally
4  designate in January, early January of each year, 20 to
5  40 priorities, which normally increases during the
6  session, I have to rely on my policy director, deputy
7  chief of staff and my chief of staff to move bills
8  through the process.  So that's why I was asking you
9  what you meant.  Although Julia Rathgaber is a lawyer,
10  she, to the best of my memory, never gave me legal
11  advice, but we would talk about, over any session, a
12  thousand different bills and how to move them to
13  committee, out of committee and on to the Floor.
14  Q.  Who was the staff person who handled Voter ID
15  issues for you in 2007?
16  A.  I don't remember when -- when Bryan Hebert
17  joined us, but if he was on staff in 2007, my memory is
18  that it would have been Bryan Hebert.
19  Q.  And when you -- when you refer to the period in
20  question, what period are you referring to?
21  A.  You asked me who was -- who was handling Voter
22  ID in 2007.  I see.  I'm speaking of the Legislative
23  session in 2007, from early January 2007 to the end of
24  May, early June 2007.  Excuse me.
25  Q.  Very good.  Prior to Bryan Hebert being hired

---

23

1  by your office, who was handling Voter ID for you?
2  A.  I don't remember.
3  Q.  Could you describe Mr. Hebert's role for you in
4  handling Voter ID when he did arrive?
5        MS. HALPERN:  And let me caution the
6  witness that in answering this question, do not reveal
7  any attorney-client privilege that you have with
8  Mr. Hebert.
9  A.  The way I organized my office since I first
10  came in as Lieutenant Governor, I had nonlawyers as
11  policy analysts with responsibilities for different
12  committees, and I assigned the different members of my
13  legal staff to different committees.  And so if -- if my
14  memory is correct on this, Bryan Hebert was assigned to
15  State Affairs to follow the legislation in that
16  committee.  And that would include over a period of
17  January to early June 2007, 400 to 600 bills.
18  Q.  (By Ms. Westfall)  Those were all election
19  bills that went through?
20  A.  No, no, no.  It would be election bills, it
21  would be insurance bills, it would be tort reform bills,
22  whatever fell under the jurisdiction of State Affairs,
23  and I referred to that committee.
24  Q.  Did Mr. Hebert provide you with legal advice?
25  A.  From time to time, I would ask Mr. Hebert what

---

24

1  he thought on certain issues, and he would tell me what
2  he thought.
3  Q.  And did you consider that to be confidential
4  legal advice?
5  A.  Yes.
6  Q.  Did he also provide you with policy advice?
7  A.  From time to time.
8  Q.  Can you describe the subject matter areas in
9  which Mr. Hebert would provide you with policy advice?
10  A.  The -- the way to structure our -- a piece of
11  legislation so that it was consistent with other state
12  laws.  The options that were available -- and for some
13  reason I have in mind eminent domain, but I don't
14  remember what committee that went to.  But there were
15  numbered -- even in an eminent domain bill, which is to
16  protect private property rights, there were legal
17  considerations, and to make sure that we were consistent
18  with current state law and we achieved the goal of what
19  we wanted was to protect the private property rights of
20  landowners.
21  Q.  Are you familiar with Senate Bill 14 enacted in
22  2011?
23  A.  We passed Senate Bill 14 in 2011.  That was
24  three years ago.
25  Q.  Could you describe that bill generally?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

7 (Pages 25 to 28)

---

**25**

1    A.  If you'd like for me to take a look at Senate
2  Bill 14, I'd be glad to, but it was a Photo Voter ID
3  bill.
4    Q.  Could you mark this?
5       (Exhibit 3 marked for identification.)
6    Q.  (By Ms. Westfall)  You've been handed what's
7  been marked as Exhibit 3.  Do you recognize this
8  document?
9    A.  No, I've never seen it before.
10   Q.  Is this -- do you not recognize this as from
11  your campaign website?
12   A.  It looks to be, but I've never seen it before.
13   Q.  Do you see that on Exhibit 3, it indicates that
14  one of your top accomplishments was passing Voter ID
15  legislation?
16   A.  Yes.
17   Q.  Do you believe that passing Voter ID
18  legislation was one of your top accomplishments?
19   A.  I think it was one of my top accomplishments
20  and one of the top accomplishments that voters all
21  around the state of Texas, whether they be Anglo,
22  African American or Hispanic wanted.
23   Q.  Do you continue to believe that today?
24   A.  I believe that passing Voter ID among probably
25  a hundred other bills is one of my top accomplishments.

---

**26**

1    Q.  As Lieutenant Governor, do you serve as
2  president and presiding officer of the Senate?
3    A.  Yes.
4    Q.  What executive powers does the Lieutenant
5  Governor have?
6    A.  What do you mean by executive powers?
7    Q.  As opposed to legislative powers.
8       MS. HALPERN:  I'm going to object on the
9  grounds it calls for a legal conclusion.
10   Q.  (By Ms. Westfall)  You may answer.
11   A.  When Governor Perry is out of state, I serve as
12  the acting Governor of the state and have done so for --
13  I don't remember the amount of time now, but over six or
14  seven months, over the last number of years.
15   Q.  What legislative powers does the Lieutenant
16  Governor have?
17   A.  Those granted by the Texas Constitution and the
18  rules of the Senators.
19   Q.  Do those include the ability to name a member
20  to perform duties of a chair of a committee?
21   A.  Yes.
22   Q.  Do you have the sole -- does the Lieutenant
23  Governor have the sole responsibility for referring
24  bills to committee?
25   A.  Yes.

---

**27**

1    Q.  Does the Lieutenant Governor have sole
2  responsibility for appointing committees and
3  subcommittees?
4    A.  Yes.
5    Q.  Does the Lieutenant Governor have sole
6  responsibility for selecting and appointing Senate
7  conferees to conference committees?
8    A.  Yes.
9    Q.  Does the Lieutenant Governor have the duty and
10  the right to rule on points of order?
11   A.  Yes.
12   Q.  Does the Lieutenant Governor --
13   A.  Subject to appeal by the Senators.
14   Q.  And that is appealed to whom?
15   A.  To the senator -- subject to a appeal by the
16  Senate -- subject to an appeal to all the Senators for a
17  vote.
18   Q.  Does the Lieutenant Governor have any powers
19  concerning legislation?
20       MS. HALPERN:  Objection, vague.
21   Q.  (By Ms. Westfall)  You may answer.
22   A.  I'm not -- I'm not sure what you meant.  We
23  just went through a list of -- of enumerated duties in
24  the Constitution or in the Senate rules, which describes
25  the role the Lieutenant Governor plays in handling

---

**28**

1  legislation, so if you could rephrase your question.
2    Q.  Certainly.  Are you -- is the Lieutenant
3  Governor able to introduce legislation in the Senate?
4    A.  No.
5    Q.  Is the Lieutenant Governor able to develop and
6  advocate with Senators to introduce legislation?
7    A.  Yes.
8    Q.  Could you describe how that works generally?
9    A.  On an ongoing basis, whether we're in session
10  or not, I am constantly reaching out and talking to
11  voters around the state of Texas, all voters.  And as --
12  as I develop my thoughts on changes that need to be made
13  in legislation and/or ideas that are brought to me as I
14  travel the state on a continuing basis, I'll ask my
15  staff.  If we are in agreement, then -- then I'll ask
16  that -- that we start to research the issue.  If I
17  still -- then if I feel strongly about the
18  issue, I'll ask that it be drafted.  I'll review the
19  draft, see if it says what I intended it for it to say.
20  And then I'll start to talking to Senators, Republicans
21  and Democrats, to see their reaction and to be able to
22  reach a consensus so the bill can be passed.
23   Q.  In addition to Senators' powers and abilities
24  to introduce legislation, which the Lieutenant Governor
25  does not have, are there other powers that members of

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1  the Senate have that you do not have?
2      A.  Except in the case of a tie or when I am
3  sitting in a Committee of the Whole, Senators can vote,
4  the Lieutenant Governor does not vote.
5      Q.  You just anticipated some of my questions.
6  When is the Lieutenant Governor permitted to vote?
7      A.  In the case of a tie when he is -- he or she is
8  presiding over the Texas Senate or when the Lieutenant
9  Governor is a member of a Committee of the Whole.
10     Q.  Are there any other circumstances?
11     A.  Not that I'm aware of.
12     Q.  What is the Committee of the Whole?
13     A.  A Committee of the Whole is a legislative
14  process in which I've used a number of times on a number
15  of different subjects in order to provide all the
16  Senators voluminous information, pro and con, on an
17  issue at one time.
18     Q.  How is it convened?
19     A.  It is convened by my asking a member of the
20  Senate to call for a Committee of the Whole.  And -- and
21  the Committee of the Whole is activated, and I am -- I
22  step down temporarily as the presiding officer and I
23  appoint a chair of the Committee of the Whole.  And
24  traditionally, the Lieutenant Governor takes the chair
25  of the Senator that has been appointed to be the Chair

---

30

1  of the Committee of the Whole.
2      Q.  Is it accurate that the Lieutenant Governor
3  does not convene, does not have the power to convene the
4  Committee of the Whole, another senator does?
5      A.  That is true.
6      Q.  What types of legislation does the Committee of
7  the Whole typically consider?
8      A.  There's no typical legislation the Committee of
9  the Whole considers.  It can be whatever subject that
10  the Lieutenant Governor chooses.  We have had Committee
11  of the Whole on redistricting issues.  We've had
12  Committee of the Whole on school finance.  And we've had
13  Committee of the Whole on Voter ID.  It is a relatively
14  common tool where you have a lot of information that
15  would not be disseminated to two-thirds of your Senate
16  if it just went through a committee hearing.
17     Q.  Does the Lieutenant Governor have the right to
18  debate and vote on all questions in the Committee of the
19  Whole?
20     A.  Yes.
21     Q.  When Voter ID was referred to Committee of the
22  Whole in 2009 and 2011, did you vote in the Committee of
23  the Whole in favor of those bills?
24     A.  Yes.
25     Q.  On both bills?  Senate Bill 362 and Senate Bill

---

31

1  14?
2      A.  It is my recollection, but I have to go back
3  and check.
4      Q.  In addition to the Committee of the Whole, does
5  the Senate have other committees that handle areas of
6  legislation?
7      A.  Yes, the -- a Senate pursuant to the -- to the
8  direction of the Lieutenant Governor has standing
9  committees and special committees.
10     Q.  Where do election bills usually get referred
11  to?
12     A.  Well, all bills are referred at the discretion
13  of the Lieutenant Governor.
14     Q.  Where do you usually refer election bills?
15     A.  Historically, I refer them to State Affairs.
16     Q.  Any other committees besides State Affairs?
17     A.  I don't recall.
18     Q.  After a bill is assigned to the Committee of
19  the Whole, does the Committee of the Whole function in
20  the same way that other committees do?
21     A.  Yes.
22     Q.  Is there any way in which it differs from other
23  committees?
24     A.  I'm not advised.
25     Q.  Does it operate under any other different rules

---

32

1  or procedures from other committees?
2      A.  I'm not aware of any.
3      Q.  Does the Lieutenant Governor's role, other than
4  what you testified to in terms of being able to vote,
5  differ in any way when the Committee of the Whole is
6  convened?
7          MS. HALPERN:  Objection, vague.  You said
8  compared to how another committee operates?
9          MS. WESTFALL:  Yes.
10     Q.  (By Ms. Westfall)  You may answer.
11     A.  No, other than the Lieutenant Governor is
12  normally not a member of a committee -- excuse me, let
13  me rephrase that.  That -- that other than in the
14  Committee of the Whole, the Lieutenant Governor is not a
15  member of the committee.
16     Q.  During your tenure as Lieutenant Governor, how
17  many times have you referred bills to the Committee of
18  the Whole?
19     A.  I think I've already answered that.
20     Q.  And that was redistricting, school finance and
21  Voter ID?
22     A.  Yes.
23     Q.  When did you refer redistricting?
24     A.  In, if memory serves, in 2003, but it could
25  have been in 2004.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 33 to 36)

---

33

1      MS. WESTFALL:  Could you mark this?
2      (Exhibit 4 marked for identification.)
3      Q.  (By Ms. Westfall)  You've been handed what's
4   been marked as Exhibit 4.  Do you recognize this
5   document?
6      A.  No.
7      Q.  I will represent to you that this is a printout
8   of bills referred to the Committee of the Whole from the
9   Texas Legislature Online for the regular sessions in
10  2003, 2005, 2007, 2009, 2011 and 2013.  Turning your
11  attention now --
12     A.  Well, hold on just a moment.
13     Q.  Oh, certainly.  Certainly.  Certainly, take
14  your time.  Let me know when you've had a chance to
15  review it.
16     A.  Are you saying that according to this
17  Exhibit 4, which is to refresh my memory, in 2003, there
18  were three bills referred to the Committee of the Whole,
19  and one in 2009 and one in 2011, is that what you're
20  saying?
21     Q.  And sir, I'll represent to you that this is the
22  Texas Legislature Online Report that indicates just that
23  with regard to regular sessions, and I'm going to ask
24  you some questions about these bills.  Have you had a
25  chance to review Exhibit 4?

---

34

1      A.  Yes, I looked at it.
2      Q.  Certainly, great.  Did you in 2003 refer House
3   Bill 5, Senate Bill 2 and SJR 1 related to school
4   finance to the Committee of the Whole?
5      A.  Exhibit 4 indicates that I did.
6      Q.  Do you recall doing that, sir?
7      A.  I recall referring school finance.  I don't
8   recall which bill.  I haven't -- I didn't have a chance
9   to go back and look at these issues before.
10     Q.  Do you recall, sitting here today, why you
11  referred those legislations to the Committee of the
12  Whole?
13     A.  Because the Committee of the Whole generally is
14  the best place to provide lengthy public testimony,
15  either for or against a bill, so that all members, all
16  31 hear the public testimony rather than just the 7 or 8
17  of the 31 who are assigned to the committee that is
18  hearing the bill.
19     Q.  Was there any need to consider school finance
20  bills on an expedited basis?
21     A.  Yes.
22     Q.  Was there -- and could you describe those
23  circumstances that caused the need for the Legislature
24  to consider it in an expedited basis?
25     A.  When I came into the Legislature in January of

---

35

1   2003, it -- I knew that there was a strong demand to
2   reduce property taxes, whether local school property
3   taxes or property taxes in general, and these bills were
4   related to that subject.
5      Q.  Was -- were these bills controversial or
6   supported by the entire Senate?
7      A.  At the beginning of the process, I had a number
8   of Senators who were objecting to what I wanted to do,
9   but we were able to pass -- pass SJR 1 to the -- to the
10  House with a unanimous vote.
11     Q.  Are any amendments allowed to be made in the
12  Committee of the Whole?
13     A.  Yes.
14     Q.  And how quickly do you recall these bills on
15  public finance were voted out of the Committee of the
16  Whole?
17     A.  I have -- this was -- this was 2003, 11 years
18  ago, I'm afraid I don't remember.
19     Q.  Thank you.
20     A.  So you've refreshed my memory and we didn't
21  take up redistricting but we did take up school
22  financing.  And on three bills and twice, we had a
23  Committee of the Whole on Voter ID.
24     Q.  Sir, do you recall whether there were any
25  special sessions in which, in the intervening years,

---

36

1   when you took up redistricting and you referred it to
2   the Committee of the Whole?
3      A.  It is my recollection that we referred
4   redistricting to the Committee of the Whole, but there
5   were three special sessions in 2003 and an additional
6   special sessions in 2011, which we considered
7   redistricting.  I'd have to go back and check the
8   records.
9      Q.  Turning back to Exhibit 4, is it your belief
10  that this printout, Exhibit 4, is accurate as to the sum
11  total of the bills that you referred to the Committee of
12  the Whole in regular session between 2003 and 2013?
13     A.  I would have no reason to believe it's not
14  accurate.
15     Q.  Thank you, sir.  Was there a photo ID bill
16  introduced in the House in 2007 legislative session?
17     A.  In the 2007 legislative session?
18     Q.  Yes.
19     A.  I do not recall.
20     MS. WESTFALL:  Could you please mark this?
21     (Exhibit 5 marked for identification.)
22     Q.  (By Ms. Westfall)  You've been handed what's
23  been marked as Exhibit 5.
24     A.  Uh-huh.
25     Q.  Could you just glance at the first page and let

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

10 (Pages 37 to 40)

---

**37**

1  me know when you've had a chance to take a quick glance.
2  I'm not going to ask you detailed questions about the
3  text.
4      A.  Yes, I have glanced at the first page, and this
5  is -- yes, I've glanced at it.
6      Q.  And does this -- what is this document, sir?
7      A.  This is a document, and I don't know whether
8  it's in a filed bill or in an enacted engrossed bill,
9  but this is a copy of House Bill 218.  So thank you, you
10 refreshed my memory.  There was a Voter ID bill passed
11 or that was presented in the House in the 2007 session.
12     Q.  I will represent to you that this Exhibit 5 was
13 pulled from the Texas legislative website.  It is the
14 House Bill 218 as engrossed by the House.  Did the House
15 pass House Bill 218, is that what -- is that what you
16 just testified to?
17          MS. HALPERN:  That's what you just
18 testified to, Counsel.
19     Q.  (By Ms. Westfall)  Did the House pass House
20 Bill 218?
21     A.  I believe so, yes.
22     Q.  Engrossed, correct?
23          MS. WESTFALL:  I get it now.  Thank you,
24 Counsel.
25     Q.  (By Ms. Westfall)  Do you know when they passed

---

**38**

1  the bill?
2      A.  No, but you may have a legislative record which
3  would refresh my memory.
4      Q.  Indeed I do.
5      A.  I was hoping for that.
6          (Exhibit 6 marked for identification.)
7          MS. WESTFALL:  Let's go off the record for
8  one second.
9          (Discussion off the record.)
10         MS. WESTFALL:  Let's go back on the
11 record.  Could you hand him Exhibit 6?
12     Q.  (By Ms. Westfall)  Sir, you've been handed
13 Exhibit 6.
14     A.  Uh-huh.
15     Q.  What is this document?
16     A.  This is a legislative history of -- I'm just
17 looking to make sure that it's -- of House Bill 218.
18     Q.  And do you see that it indicates that the House
19 passed 218 on the second page, top of the second page?
20     A.  Yes.
21     Q.  When did it pass House Bill 218?
22     A.  On April 24, 2007.
23     Q.  Was that relatively late in the session?
24     A.  Yes.
25     Q.  Do you recall, turning back to Exhibit 5,

---

**39**

1  the -- generally, the types of ID that were permissible
2  under House Bill 218?
3      A.  If you'll permit me to refresh my memory and
4  look.
5      Q.  Certainly, and I may direct your attention to
6  Page 9 of Exhibit 5, in the middle of the page --
7      A.  Yes.
8      Q.  -- where it starts, "Documentation of Proof of
9  Identification."  Do you see that?
10     A.  Yes, I do.
11     Q.  And then it continues on to Page 10?
12     A.  Yes.
13     Q.  If you could -- and actually on to Page 11.  If
14 you could take a look at those pages and let me know
15 when you've had a chance to review them.
16     A.  All right.  I've had a chance to take a look at
17 them.
18     Q.  Great.  Could you describe generally what types
19 of ID are permitted under House Bill 218?
20     A.  Well, other than reading what it says, it's
21 photo identification.  Under A or under B, it is
22 additional ID.
23     Q.  Does that include nonphoto ID?
24     A.  Yes.
25     Q.  What was the purpose, to your knowledge, of

---

**40**

1  House Bill 218?
2          MS. HALPERN:  Objection, vague.
3      Q.  (By Ms. Westfall)  You may answer.
4      A.  To pass a bill that the House felt --
5          MS. HALPERN:  Objection, nonresponsive to
6  the question she asked you.
7      A.  Could you repeat your question?
8      Q.  (By Ms. Westfall)  Certainly.  What was the
9  intent of the House in passing House Bill 218?
10         MS. HALPERN:  Objection, no foundation.
11 Objection, calls for speculation.
12     Q.  (By Ms. Westfall)  You may answer.
13     A.  To pass a Voter ID bill that -- that reduced or
14 eliminated fraud.
15     Q.  Was that fraud pertaining to in-person voter
16 impersonation at the polls?
17     A.  You're asking me to speculate on what was in
18 the mind of the House?
19     Q.  I'm asking you what did House Bill 218 seek to
20 accomplish?
21     A.  I believe that House Bill 218 was an attempt to
22 -- to reduce fraud in in-person voting, in mail-in fraud
23 and in registration fraud.  A predisposition to fraud in
24 any one of the categories would make that person liable
25 to commit fraud in other areas.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

11 (Pages 41 to 44)

41

1  Q.  How do you know that?
2  A.  If someone has the intent to commit fraud, then
3  -- then one has to worry whether registration is
4  fraudulent and one has to be concerned about mail-in as
5  well as in-person fraud.  This particular bill, I
6  believe, only addresses in-person fraud.
7  Q.  We'll get back to some of those other purposes
8  a little bit later.
9  Was House Bill 218 once it was passed by
10  the House referred to the Senate?
11  A.  Yes.
12  Q.  Did you refer that bill to the State Affairs
13  Committee?
14  A.  Yes, two days after it was received.
15  Q.  Did you ordinarily refer bills that amend the
16  election code to the State Affairs Committee?
17  MS. HALPERN:  Objection, asked and
18  answered.
19  Q.  (By Ms. Westfall)  You may answer.
20  A.  I would have to go back, Counsel, and look at
21  what I did in 2005, but absent having my memory
22  refreshed about the 2005 session and looking at this for
23  the first time, this was the first Voter ID bill, absent
24  a review of 2005, that I had referred anywhere, and I
25  referred it to the State Affairs.

42

1  Q.  Ordinarily for other bills not related to Voter
2  ID that amended the state election code, would you
3  ordinarily refer them to the State Affairs Committee?
4  A.  Yes.
5  MR. BRISSENDEN:  Objection, form.
6  Q.  (By Ms. Westfall)  Did any Senator indicate
7  interest in sponsoring House Bill 18?
8  MS. HALPERN:  I'm going to object on the
9  grounds of legislative privilege.
10  Q.  (By Ms. Westfall)  You may answer.
11  MS. HALPERN:  And I would ask you to
12  answer the question "yes" or "no" without divulging the
13  name of anybody, and then we'll take it from there.
14  THE WITNESS:  Is there a third choice?
15  MS. HALPERN:  No.
16  A.  I don't remember.
17  Q.  (By Ms. Westfall)  Did Senator Fraser indicate
18  interest in sponsoring House Bill 218?
19  A.  I don't remember.
20  Q.  Did your office meet with Senator Fraser or his
21  staff concerning his sponsorship of House Bill 18?
22  MS. HALPERN:  218.
23  Q.  (By Ms. Westfall)  218.
24  A.  Well, I'm going to answer it this way, Counsel:
25  If, in fact, Senator Fraser was a sponsor, then I know

43

1  as a matter of course that we met with him.
2  Q.  When you --
3  A.  That I know as a matter of course that we would
4  want to meet with him.
5  Q.  Thank you.  When you meet with senators to
6  discuss their interest in sponsoring a House bill, what
7  topics do you generally cover in those meetings?
8  MS. HALPERN:  And let me caution the
9  witness.  She's asking you topics, not specific
10  conversations.  Because if she asked you specific
11  conversations, that would invade the legislative
12  privilege.  So you can answer the question she's asked,
13  just in answering it, don't refer to specific
14  conversations with specific senators.
15  A.  If I can be a little broader than that and say
16  that -- that on specific legislation, whether I'm -- in
17  the past reached out to talk to a Senator about carrying
18  a bill or the Senator came to me and wanted to talk
19  about carrying a bill, we would inevitably have a
20  conversation on what their goal was with the bill, what
21  they wanted to accomplish and how they proposed to move
22  the bill through the Senate.  Would you also provide your
23  Q.  (By Ms. Westfall)  Would you also provide your
24  input as to how to accomplish moving the bill through
25  the Senate?

44

1  A.  To the extent that the proposed bill sponsor
2  had a view different than -- than that which I thought
3  was most appropriate to moving the ball -- the bill
4  forward, then I would share my opinion with them.
5  Q.  Do you recall any meetings between Mr. Hebert
6  and Ms. McCoy about Senator Fraser's sponsorship of
7  House Bill 218?
8  A.  None whatsoever.
9  Q.  Do you recall any of your -- your strategies
10  or Senator Fraser's strategies to move House Bill 218
11  through the Senate?
12  A.  No, it was a long time ago.
13  Q.  I understand.
14  A.  Seven years ago.
15  Q.  Was there a time when Senator Fraser moved to
16  suspend the regular order of business to bring House
17  Bill 218 to the Floor?
18  A.  If you'll permit me just for a moment.
19  Q.  Certainly.
20  MS. WESTFALL:  And let the record reflect
21  that the Lieutenant Governor is consulting with Exhibit
22  6.
23  A.  Yes, upon referring to the legislative history
24  of House Bill 12, I see that a motion to suspend the
25  regular order of business, which is entitled here,

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

---

**45**

1  "Rules Suspended, Regular Order of Business," occurred
2  on May 15.
3      Q.  (By Ms. Westfall)  And so just so the record is
4  clear, you're referring to House Bill 218?
5      A.  Yes, I am.
6      Q.  Thank you.  Had there been -- does Exhibit 6
7  refresh your recollection as to whether there had been
8  any discussions with Senator Fraser's office about the
9  timing of when he was to make this motion to suspend?
10     A.  Referring to the legislative history, it
11 doesn't -- it doesn't talk in terms of -- of when
12 Senator Fraser was to make a motion to suspend the
13 regular order of business, but now that we're talking
14 about this, I'm remembering some of the details
15 involving that.
16     Q.  Do you recall -- well, strike that.  Let me
17 hand you another exhibit.
18         MS. WESTFALL:  Could you mark this,
19 please?
20         (Exhibit 7 marked for identification.)
21     Q.  (By Ms. Westfall)  You've been handed what's
22 been marked as Exhibit 7.
23     A.  Uh-huh.
24     Q.  Do you recognize this document?
25     A.  I'm not aware that I've seen it before, but it

---

**46**

1  represents to be the journal of the Senate for May 15,
2  2007.
3      Q.  And could you take a look at Exhibit 7 at pages
4  2063 of the journal?
5      A.  Yes.
6      Q.  Does this refresh your recollection as to the
7  timing of when Senator Fraser moved to suspend the
8  regular order of business and seek to have the Senate
9  hear House Bill 218?
10     A.  Yes.
11     Q.  Was there any discussion prior to the motion
12 being made as to -- as to when Senator Fraser would make
13 this motion?
14     A.  Could you repeat your question?
15     Q.  It was a confusing question.  Let me withdraw
16 that question.
17         Did you discuss with Senator Fraser's
18 office before May 15, 2007, that it might be a good time
19 to -- for him to make that motion?
20         MS. HALPERN:  Objection on the grounds of
21 legislative privilege.  In accordance with our statement
22 earlier, we're going to permit the witness to answer the
23 question with the understanding that we do object.  And
24 this should, therefore, be sealed.
25     A.  As I recall, as result of your showing me this

---

**47**

1  journal and our talking about House Bill 218, according
2  to the exhibit, the bill was brought on a motion to
3  suspend the regular order of business on May 15th, which
4  is traditionally a fairly late date to pass a bill out
5  of the Senate.  By that time or one or two days later,
6  the House shuts down as far as considering and passing
7  legislation which has not then been passed.  And I
8  remember having one or more conversations with Senator
9  Fraser to try and move the bill if and when there -- we
10 had the votes on the Floor, which is a common
11 legislative practice that if members are marked present
12 and they're not on the Floor, on a roll call vote, one
13 has to have two-thirds of the Senators present and
14 voting.
15     Q.  (By Ms. Westfall)  Were you on the Floor that
16 day?
17     A.  Yes.
18     Q.  Had you had any discussion with Senator Fraser
19 before he made the motion to suggest that he should make
20 the motion?
21         MS. HALPERN:  Objection, legislative
22 privilege.
23     Q.  (By Ms. Westfall)  You may answer.
24     A.  I think I just answered that.
25     Q.  Could you answer it again?

---

**48**

1      A.  I had spoken with Senator Fraser one or more
2  times about -- about the use of the common practice to
3  call for a motion to suspend the regular order of
4  business, in this case, bring up House Bill 218 when he
5  had his votes on the Floor.  In other words, two-thirds
6  of the Senators present and voting would vote for the
7  bill.
8      Q.  Did that arise on May 15, 2007, because Senator
9  Uresti and Whitmire were not on the Floor?
10     A.  Yes, and Senator Hegar.
11     Q.  So did -- what was the outcome of the motion to
12 suspend the regular order of business, with the first --
13     A.  It passed.
14     Q.  It passed.  Then was -- was there a request to
15 verify the vote?
16     A.  Yes.
17     Q.  Who was that made by?
18     A.  According to Exhibit 7, Senator Eliot
19 Shapleigh.
20     Q.  Had you opposed -- had you anticipated the bill
21 opponents of House Bill 218 would oppose any efforts to
22 -- actually, strike that.
23         Did you permit the vote to occur,
24 verification of the vote to occur?
25     A.  Yes.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                           7/29/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

---

**49**

1   Q.  Why did you do that?

2          MS. HALPERN:  Objection, legislative

3   privilege.  Under seal.

4       A.  Senator Whitmire claimed, contrary to -- to --

5   to what had happened, that he was on the Floor, which

6   was impossible since I called on him numerous times and

7   could not visually see him anywhere on the Floor.  But

8   knowing that this is an important bill to the Democrats

9   and to the Republicans, I didn't want controversy.  And

10  but for Senator Whitmire making the allegation that he

11  was on the Floor, I bent over backwards to respect him

12  and his statement, and I permitted the -- the roll

13  call vote to be made a second time.

14      Q.  (By Ms. Westfall)  And what happened with the

15  verification of the vote?  What was the outcome?

16      A.  The -- instead of being a 19 to 9 vote where

17  two-thirds of those voting had voted for the bill, the

18  vote was 20 to 11, which meant that there -- it failed

19  by one vote.

20      Q.  Did you anticipate the bill supporters would

21  oppose your decision to permit a verification of the

22  vote to occur?

23          MS. HALPERN:  Objection, legislative

24  privilege.

25      A.  Could you say that again?

---

**50**

1       Q.  (By Ms. Westfall)  Did you anticipate that the

2   Senators who supported the bill would not be pleased

3   with your decision to permit the verification of the

4   vote to occur?

5          MS. HALPERN:  Objection, vague.

6   Objection, assumes facts not in evidence.  Objection, no

7   predicate.

8       Q.  (By Ms. Westfall)  You may answer.

9          MS. HALPERN:  If you can.

10      A.  I knew that some of the -- of the Senators who

11  were in favor of House Bill 218 would be unhappy that I

12  allowed a verification vote.

13      Q.  (By Ms. Westfall)  Did you have any concerns

14  about -- about legal challenges to House Bill 218 if the

15  motion to suspend was permitted to stand, the initial

16  vote?

17      A.  No.

18      Q.  Did you have any other concerns that caused you

19  to permit the verification of the vote to occur other

20  than what you just testified to?

21      A.  Again, I don't --

22          MS. HALPERN:  Objection, legislative

23  privilege.

24      Q.  (By Ms. Westfall)  You may answer.

25      A.  My concern was in -- in respecting the

---

**51**

1   integrity of the Senate and the Senators, that Senator

2   Whitmire had claimed, contrary to what I believed, that

3   he was on the Floor, and -- and as the Dean of the

4   Senate, I gave that some import and allowed a

5   verification vote to be made.

6       Q.  I believe you testified earlier that --

7       A.  I testified -- oh, I'm sorry.

8       Q.  That you just testified -- you just testified

9   that it was fairly common that bill supporters would

10  wait for their supporters to be present on the Floor

11  such that they had two-thirds and then they would seek

12  to move to suspend.  Do you recall when that happened

13  before, a specific instance?

14      A.  The only thing I can remember on a number of

15  different bills that that occurred.  It's a fairly

16  common legislative practice.  You try and move your bill

17  when you have the votes on the floor.

18      Q.  How often does that happen in the session?

19      A.  Monthly.

20      Q.  But it happens every session to your knowledge?

21      A.  Yes.

22      Q.  Did the Senate after the verification of the

23  vote take any further action on House Bill 218?

24      A.  No.

25      Q.  Why not?

---

**52**

1       A.  Because time was running out and -- and we

2   didn't see another opportunity where the votes -- where

3   we would have the votes on the Floor to pass it.

4       Q.  Did you have any conversations or your staff

5   have any conversations with Senator Fraser's office

6   about House Bill 18 after it failed in the Senate?

7          MS. HALPERN:  Objection, legislative

8   privilege.

9       A.  I don't remember.

10      Q.  (By Ms. Westfall)  Did you discuss after the

11  failure of House Bill 18 in the House -- I mean in the

12  Senate, strategies for advancing Voter ID in the

13  following session?

14          MS. HALPERN:  Objection, legislative

15  privilege.

16      A.  I -- I very well may have, which would have

17  been typical of me to, as a problem solver, but I don't

18  remember any specific conversation.

19      Q.  (By Ms. Westfall)  Changing topics a little

20  bit.  Could you tell me what the Texas Election

21  Administration Management system is, otherwise known as

22  TEAM?

23      A.  You may have to refresh my memory.

24      Q.  Is it the voter registration database of the

25  state?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                          7/29/2014
CONFIDENTIAL TRANSCRIPT

14 (Pages 53 to 56)

53

1    A.  Yes, thank you so much.
2    Q.  Was it created in response to the federal Help
3  America Vote Act?
4    A.  If you represent that, I'll agree with you.
5       MS. HALPERN:  Don't do that.
6    A.  Sorry.
7       MS. HALPERN:  She's not on your side.
8    A.  I understand that.  But I don't -- I don't know
9  what was the -- I don't -- I don't remember what -- what
10 was the precursor to it being formed.
11   Q.  (By Ms. Westfall)  Okay, that's fine.  Did you
12 serve on a legislative audit committee that reviewed
13 TEAM in 2007?
14   A.  I don't remember.  But if you will refresh my
15 memory.
16   Q.  And I will do so.
17      MS. WESTFALL:  Could you mark this?
18      (Exhibit 8 marked for identification.)
19   Q.  (By Ms. Westfall)  Sir, you've been handed
20 what's been marked as Exhibit 8.
21   A.  Yes.
22   Q.  And you don't need to review this entire
23 document, just the cover page and the second to last
24 page, which indicates members of the Legislative Audit
25 Committee.  When you're done looking at those two pages,

54

1  could you let me know?
2    A.  I'm through.
3    Q.  And do you see that the last page indicates
4  that you were on the Legislative Audit Committee?
5    A.  Yes.
6    Q.  Do you remember anything about this audit
7  sitting here today without looking at Exhibit 8?
8    A.  No, but I'd be glad to read the document.
9    Q.  I think at this time you don't need to -- to
10 look at Exhibit 8.  We may talk about that a little bit
11 later.
12      MS. HALPERN:  How long have we been going,
13 Mr. Reporter?
14      THE REPORTER:  About an hour.
15      MS. WESTFALL:  Let's take a break.
16      (Recess taken from 10:20 to 10:36 a.m)
17      (Exhibits 9 and 10 marked for
18 identification.)
19   Q.  (By Ms. Westfall)  Sir, you've been handed
20 what's been marked Exhibits 9 and 10.  Do you recognize
21 Exhibit 9?
22   A.  Yes.
23   Q.  What is it?
24   A.  It is a copy of Senate Bill 362.  I'm not
25 advised as to whether it's a filed copy or an engrossed

55

1  copy, but.
2    Q.  And I will represent to you that it is taken
3  from the Texas Legislative website, and it is Senate
4  Bill 362 as introduced in the Senate.
5    A.  As introduced.
6    Q.  As introduced, yes.
7    A.  Yes.
8    Q.  And do you recognize Exhibit 10?
9    A.  I've not seen Exhibit 10 before but it appears
10 to be the Texas legislative history on Senate Bill 362.
11   Q.  Very good.  And following the failure of House
12 Bill 218 in the Senate, did you believe the Senate
13 should pass the Voter ID bill in the following session?
14      MR. HALPERN:  Objection, legislative
15 privilege.
16   A.  I -- I continued to believe, based upon my
17 traveling around the State of Texas and talking with
18 hundreds and hundreds and hundreds of people and looking
19 at third-party polling, whether it's Rasmussen, whether
20 it was the University of Texas polling, that -- that a
21 super majority of Texans, both Hispanic, African-
22 American and Anglo were in favor of a Voter ID.
23   Q.  (By Ms. Westfall)  Was there any other set of
24 circumstances or facts that caused you to conclude in
25 2008 that it was a good idea to press forward with Voter

56

1  ID in 2009?
2       MR. BRISSENDEN:  Objection, form.
3    Q.  (By Ms. Westfall)  You may answer.
4    A.  Well, beginning in 2005, when we first looked
5  at passing Voter ID, the reason I did that was because I
6  had been concerned for many, many years about low voter
7  turnout in Texas, and I have heard consistently over the
8  last 10 to 12 years that -- that many Texans either
9  hesitate to vote or don't vote because they don't think
10 their vote will count because they're concerned about
11 voter fraud.
12   Q.  Were there any organizations that contacted you
13 in 2008 to ask that you support Voter ID in 2009?
14   A.  None that come to mind.
15   Q.  Were there any other facts, other than the ones
16 you just described, that would support moving forward
17 with Voter ID in 2009?
18   A.  Well, Texas has had a history of voter fraud
19 since 1948 in the allegations of the stuffing the ballot
20 box when former President Lyndon Johnson was elected.
21 And that's continued:  People are always -- have always
22 been talking to me about voter fraud and in-person fraud
23 as I travel to different jurisdictions around the state.
24 It was probably one of the primary issues that were on
25 the minds of Texas voters, particularly Texas

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

15 (Pages 57 to 60)

---

**57**

1  conservatives, of which simply referring to third-party
2  polling, a super majority of Texans fit into that
3  category.
4      Q.  Did you have any desire to enact a Voter ID --
5  voter fraud legislation concerning other types of voter
6  fraud besides voter impersonations in 2009?
7      A.  Yes.
8      Q.  What other types of fraud did you seek to
9  address?
10      A.  Well, that's not what you asked me.  You asked
11  me a different question.  You asked me did I have other
12  --
13      Q.  Did you have --
14      A.  Did I want, did I want.
15      Q.  Yes.
16      A.  And the answer to your first question was, yes,
17  I wanted to.  I wanted to address all three of the
18  forms, and there may be a fourth that -- in which voter
19  fraud was involved, both in-person fraud, mail-in fraud
20  and registration fraud.  I don't remember which session,
21  maybe the 2009 or 2011, we attempted to address the
22  registration component in that session's Voter ID bill,
23  but on advice of counsel, I believe Mr. Hebert, because
24  of a concern of a two-subject rule, we took the
25  registration out.  But no, I've been very concerned

---

**58**

1  about addressing voter fraud across the board:
2  In-person, mail-in, and registration.
3      Q.  And to be clear, Senate Bill 362 addressed
4  in-person voter fraud; is that correct?
5      A.  Let me look at it again.
6      Q.  Certainly.
7      A.  On a quick look at Senate Bill 362, I don't see
8  the registration part that I had in mind.  That may have
9  been contained in the 2011 Senate Bill 14 draft as
10  filed.
11      Q.  So Senate Bill 362 addressed in-person voter
12  impersonation solely; is that correct?
13      A.  That is my understanding of the bill.
14      Q.  And you had an interest in addressing, through
15  other legislation, voter fraud related to registration
16  and mail-in ballots; is that correct?
17      A.  Yes.
18      Q.  Did any Senator approach you to express
19  interest in filing a Voter ID bill?
20          MR. HALPERN:  Objection, legislative
21  privilege.
22      A.  Yes.
23      Q.  (By Ms. Westfall) Who was that Senator?
24      A.  Senator Fraser.
25      Q.  Did any other Senator approach you about

---

**59**

1  sponsoring Voter ID bill?
2          MR. HALPERN:  Objection, legislative
3  privilege.  Just answer yes or no.
4      A.  Yes.
5      Q.  (By Ms. Westfall) More than one other person?
6      A.  Could you rephrase your question?
7      Q.  Certainly.  More than one other Senator?
8      A.  Other than Senator Fraser?
9      Q.  Yes.
10      A.  Yes.
11      Q.  How many Senators all together?
12      A.  If memory serves, one or more.  I'm trying to
13  remember which ones.  But I know I had conversations
14  about this.
15      Q.  Did Senator Fraser file a Voter ID bill in
16  2008?
17      A.  Let me look at Exhibit 10.  Yes.
18      Q.  Was it Senate Bill 362?
19      A.  Yes.
20      Q.  Who was involved in developing the substance of
21  Senate Bill 362?
22          MR. HALPERN:  Objection, legislative
23  privilege.
24      A.  Principally, Senator Fraser's office with
25  general coordination with the appropriate parties in my

---

**60**

1  office.
2      Q.  (By Ms. Westfall) Would that be Mr. Hebert?
3      A.  I believe so.
4      Q.  Was anyone else from your office involved?
5      A.  Again, going back to my earlier testimony, on
6  our passing 1,500 or so of the 6,000 bills as filed each
7  legislative session, from time to time I was intimately
8  involved in our schedule, when are we going to bring the
9  bill up, as well as my then Chief of Staff, Bryan --
10  excuse me, Blaine Brunson and my Deputy Chief of Staff
11  and Policy Director, Julia Rathgeber.
12      Q.  How would you characterize the extent of your
13  office's involvement in developing Senate Bill 362?
14      A.  Going back to my earlier testimony,
15  conversations with the bill sponsor and his staff as to
16  what they intended with the bill and -- and their
17  proposed timing, and where I disagreed, I would share my
18  thoughts with them.
19      Q.  Were you involved in the substance of the bill
20  at all or just the procedure and timing of how to move
21  it?
22      A.  Both.
23      Q.  Was there a particular aspect of Senate Bill
24  362 that you were involved in?
25      A.  It was my desire to model a Voter ID bill as

---

LIEUTENANT GOVERNOR DAVID DEWHURST                          7/29/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

**61**

1  close as we could after what had passed in Indiana and
2  been approved by the U.S. Supreme Court, and I don't
3  remember when Georgia received their preclearance, but
4  -- but at a later date, the Georgia bill.
5      Q.  So you were following the Indiana photo ID
6  bill, the Georgia ID bill.  Were there any other models
7  that you were following in developing Senate Bill 362?
8      A.  In all my conversations with Senator Fraser, in
9  all my conversations with Democrat Senators and
10 Republican Senators, I stressed that I wanted the bill
11 to be constitutional, meet all of the guidelines and
12 that those two bills -- and now I may be getting ahead
13 of myself several months because I don't remember when
14 the Georgia bill was precleared, but I think that the
15 Indiana bill was approved by the Supreme Court in 2008,
16 which would have preceded this by at least six months --
17 that these were good examples of bills that we could
18 model our legislation after to make sure that we met all
19 of the constitutional requirements and protected all of
20 our citizens, because again, my goal was increasing
21 turnout by everyone.
22     Q.  Before Senator Fraser filed Senate Bill 362,
23 did you discuss with him or any other Senator what types
24 of IDs to include in the bill?
25     A.  Yes.

**62**

1      Q.  Who did you have discussions with?
2      A.  Senator Fraser.
3      Q.  And what -- what was your opinion about what
4  should be included in the bill?
5      A.  I thought the bill should focus, pursuant to
6  the Indiana bill that was approved by the U.S. Supreme
7  Court, on photo ID in order to increase confidence by
8  the voting public in the integrity of our election
9  system, and therefore, increase voter turnout among
10 Texans.
11     Q.  As you sit here today, do you know whether
12 Senate Bill 362 permitted only the use of photo ID or
13 did it is allow the use of non-photo ID?
14     A.  If you will permit me a moment --
15     Q.  Yes.  And, sir, I would direct your attention
16 to Page 5, of Exhibit 9, and 6.
17         THE REPORTER:  Excuse me, I need to go off
18 the record a minute.  My sound stopped recording.
19         (Recess from 10:54 to 10:55 a.m.)
20     Q.  (By Ms. Westfall) Sir, now that you've had a
21 chance to look at Exhibit 9, at the list of ID, does
22 this refresh your recollection as to whether Senate Bill
23 362 allowed for the use of non-photo ID?
24     A.  Yes.
25     Q.  And does it?

**63**

1      A.  Yes.
2      Q.  Did you have any discussions with Senator
3  Fraser about including non-photo ID in Senate Bill 362?
4      A.  Yes.
5      Q.  What was your opinion as to whether non-photo
6  ID should be included in the bill?
7          MR. HALPERN:  Objection, legislative
8  privilege.
9      A.  You're misrepresenting my answer "yes".
10     Q.  (By Ms. Westfall) You did -- did you have a
11 conversation with Senator Fraser?
12     A.  Yes.
13     Q.  And you expressed an opinion about whether
14 non-photo ID should be included?
15     A.  Yes.
16     Q.  What was that opinion?
17     A.  That it was a start.  I did not -- I had
18 concerns that -- where was I -- where was I just looking
19 -- official mail addressed to a person may -- may not
20 prove that person is who they are.  Did I see an
21 electric bill in here somewhere?  No, I didn't see an
22 electric bill. (Witness reading.)
23     Q.  What was your concerns about the non-photo ID
24 in particular?
25     A.  Yes.

**64**

1      Q.  Did you have concerns about non-photo ID?
2      A.  Yes.
3      Q.  What were those concerns?
4      A.  That they would not -- that they were a start.
5  They were a start in the process to reduce fraud, but I
6  could not evaluate whether or not they alone would
7  permit the integrity of the election process to be
8  protected, how much fraud they would reduce of in-person
9  and/or other frauds, mail-in and registration.  And I
10 expressed that to -- to Senator Fraser.
11     Q.  Were you aware of any particular instances in
12 which non-photo ID had been used in the past
13 fraudulently by voters in Texas?
14         MR. BRISSENDEN:  Objection, form.
15     A.  Are you asking me about a specific timeline or
16 anytime prior to and including the regular session 2009?
17     Q.  (By Ms. Westfall) The latter.  Anytime prior to
18 2009, were you aware --
19     A.  Prior to 2009 or including 2009?
20     Q.  Including 2009.  Were you aware --
21     A.  Yes.
22     Q.  And what -- when did that occur?
23     A.  During -- during my conversations to voters
24 around the state for the -- for the four years prior to
25 2009, I was frequently told of -- by people, including

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

17 (Pages 65 to 68)

---

**65**

1  election officials, of in-person fraud that had been
2  committed.  During the 2009 session, during the 24 --
3  was it 24 hours -- was it the 2009 -- 24 was in 2011?
4  No, it was in 2009.
5           During the 2009 session, in which we had a
6  26- or 27-hour non-stop session, it was replete with
7  examples of in-person fraud.
8       Q.   Outside of what you heard from voters and
9  Texans through traveling the state, and the hearing in
10  2009, are you aware of any other instances of persons
11  using non-photo ID to commitment in-person voter
12  impersonations?
13       A.   Yes.
14       Q.   Could you tell me about those instances?
15       A.   Well, I'll just share one with you and that is
16  that Senator Tommy Williams told me that his -- and I
17  may be getting this wrong, it was either his father or
18  his brother had died in the mid-1990s and it wasn't
19  until -- until the late 2000s that he discovered that
20  his deceased father or brother had voted almost every
21  election, and not surprising, in the Democrat Primary.
22       Q.   Are you aware of any other instances, other
23  than the ones you just testified to, concerning voters
24  using non-photo ID to impersonate other voters at the
25  polls?

---

**66**

1       A.   Counsel, I just shared with you that I had had
2  hundreds of conversations over the previous four years
3  with people around the state of Texas, not only regular
4  citizens who were standing in line and told me
5  anecdotally about someone they felt was impersonating a
6  different person, as well as poll watchers, election
7  judges telling me the same thing.  So it wasn't just one
8  person, it was many people.
9       Q.   Thank you.  I just wanted to make sure I
10  understood all -- all of your testimony on that topic.
11       A.   All right.
12       Q.   Did you have any discussions with Senator
13  Fraser about the treatment of provisional ballots in
14  Senate Bill 362?
15           MR. HALPERN:  Objection, legislative
16  privilege.
17       A.   I don't remember.
18       Q.   (By Ms. Westfall) Did you support Senate Bill
19  362?
20       A.   I did.
21       Q.   And you voted for it in the Committee of the
22  Whole; is that correct?
23       A.   Yes.
24       Q.   And you supported Senate Bill 362
25  notwithstanding that it included non-photo ID as a

---

**67**

1  permissible form of ID; is that correct?
2       A.   Yes.  Because I felt like it was a start, a
3  start on the goal of reducing fraud.
4       Q.   Turning your attention back to Exhibit 10 -- 9,
5  pardon me, and the forms of ID listed at Page 5.  Do you
6  know how this list of acceptable IDs in Senate Bill 362
7  was developed?
8           MR. HALPERN:  Objection, vague.  Are you
9  asking him who developed the list?
10           MS. WESTFALL:  That -- could you read back
11  the question.
12           (Requested portion was read back by the
13  court reporter.)
14       A.   Yes.
15       Q.   (By Ms. Westfall) How was it developed?
16       A.   By Senator Fraser and a collaborative effort
17  with -- with offices and I believe Bryan Hebert.
18       Q.   Which other offices, if you know?
19       A.   I don't -- I don't specifically recall, but I
20  remember that Senator Fraser consulted other Senators.
21       Q.   Did he consult with Senator Duncan's staff?
22       A.   I believe he did.
23       Q.   Did he consult with Senator Williams' staff?
24       A.   I believe he did.
25       Q.   Do you know -- are you aware of the criteria

---

**68**

1  that Senator Fraser used to determine whether to include
2  a particular form of ID in Senate Bill 362?
3           MR. BRISSENDEN:  Objection, form.
4           MS. HALPERN:  Counsel -- vague.  Are you
5  asking only about the photo or are you asking about the
6  electric bills too?
7           MS. WESTFALL:  No.  I'm asking about the
8  forms of ID.
9           MR. HALPERN:  So.  You said no.  You mean
10  all forms --
11           MS. WESTFALL:  All.  All.
12           MR. HALPERN:  The electric bills and any?
13           MS. WESTFALL:  Any.  Right.
14       Q.   (By Ms Westfall) Do you know the criteria for
15  including any forms of ID --
16       A.   I don't --
17       Q.   -- in Senate Bill 362?
18       A.   I don't recall what Senator Fraser said
19  concerning his criteria.
20       Q.   Do you know whether Senate Bill 362 was modeled
21  after House Bill 218?
22       A.   My memory is that it was.
23       Q.   Did you or Bryan Hebert advise Senator Fraser
24  to make changes -- any changes to Texas House Bill 218
25  before filing the bill?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                          7/29/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

---

**69**

1    MR. HALPERN:  Objection, legislative
2  privilege.
3    A.  Counsel, I shared with you a few moments ago in
4  my testimony my conversation with Senator Fraser on --
5  on my desire to maximize our attempts to defeat voter
6  fraud in all forms and to provide the maximum confidence
7  by voters in Texas in our election process so we would
8  increase voting across the board.
9    Q.  (By Ms. Westfall) So that was your desire --
10   A.  Yes.
11   Q.  -- in terms of the bill?
12       Turning back to my question, are you aware
13  of any consideration that Senator Fraser gave to making
14  changes to House Bill 218 --
15       MR. HALPERN:  Objection --
16   Q.  (By Ms. Westfall) -- before he filed Senate
17  Bill 362, or are you not aware?
18       MR. HALPERN:  Objection, calls for
19  speculation.
20   Q.  (By Ms. Westfall) You may answer.
21   A.  It is my memory that Senator Fraser wanted to
22  base Senate Bill 362 on the previous sessions' House
23  Bill 218, which had -- because it had passed the House,
24  and therefore, was a good starting point.
25   Q.  Do you recall any particular IDs that he wanted

---

**70**

1  to remove from House Bill 218?
2    A.  No.
3    Q.  You alluded earlier to the Supreme Court
4  decision Crawford related to the Indiana Voter ID law;
5  is that correct?
6    A.  Yes.
7    Q.  And it was issued in April 2008; is that right?
8    A.  I don't know when it was issued but I remember
9  it was issued in 2008.
10   Q.  Therefore, Senate Bill 362 was filed after the
11  Crawford decision; is that correct?
12   A.  Yes.
13   Q.  Did the Crawford decision have any impact on
14  the development of Voter ID legislation in Texas?
15   A.  Yes.
16   Q.  How did it impact the development of
17  legislation in Texas?
18   A.  Over time, certainly by 2011 in Senate Bill 14,
19  I felt that it was important, and Senator Fraser agreed,
20  that we focus on a model that had been approved by the
21  U.S. Supreme Court and, in the case of Georgia, had
22  reached preclearance.
23   Q.  The Indiana law at issue in Crawford only
24  permitted the use of photo ID, correct, and not
25  non-photo ID?

---

**71**

1    A.  That's my understanding.
2    Q.  Why did -- why did Senate Bill 362, therefore,
3  not follow the Indiana model and it did include
4  non-photo ID?
5        MS. HALPERN:  Objection, asked and
6  answered.
7    Q.  (By Ms. Westfall) You may answer.
8    A.  Senator Fraser recommended that we file a bill
9  in Senate Bill 362 that was based upon House Bill 218,
10  which had passed the House.  And even though it had
11  non-photo ID, he felt -- and I could understand his
12  position -- it was a good starting point.
13   Q.  Are you familiar, under Senate Bill 362, what
14  the procedure is if a voter appeared at the polls
15  without any of the photo necessary, what kind of a
16  ballot that would cast?
17   A.  I believe the voter would -- could vote a
18  provisional ballot.
19   Q.  And did -- do you recall whether Senate Bill
20  362 allowed provisional voter -- provisional ballots
21  cast by voters without necessary ID to be counted
22  without further action on the part of the voter?
23       MR. HALPERN:  Is there a section of the
24  bill you want to direct him to, Counsel?
25       MS. WESTFALL:  I'm asking based on his

---

**72**

1  memory, Counsel.
2    A.  Well, Counsel, I'm looking to see where this is
3  addressed in my memory.
4    Q.  (By Ms. Westfall) Let the record reflect that
5  the witness is looking at Exhibit 9.
6        Let me withdraw that question and ask you
7  another question.
8        Sir, before Senate Bill 14 was enacted, do
9  you know what the procedure was when a voter appeared
10  without necessary registration card or other non-photo
11  ID that was previously required, how that voter would
12  vote?
13   A.  I believe that the procedure was that an
14  affidavit be signed and the voter voted a provisional
15  ballot.  And I'm unclear whether or not that would be
16  counted or not and the methodology on how it would be
17  counted.
18   Q.  Is it your recollection that the ballot board
19  would subsequently determine whether that voter was
20  eligible and registered, and determine whether to count
21  that ballot?
22   A.  I believe that's correct.
23   Q.  And is it your recollection that the voter
24  would not have to go to the election board to provide
25  further proof in order to ensure that that provisional

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

19 (Pages 73 to 76)

---

73

1  ballot would be counted?
2      A.  Prior to the passage of Senate Bill 14, I
3  believe that's correct.
4      Q.  And do you recall whether Senate Bill 362, in
5  essence, retained current law with regard to provisional
6  ballots, and that's why there isn't much in the way of
7  changes in Senate Bill 362 to the provisional ballot
8  procedure?
9          MR. BRISSENDEN:  Objection, form.
10  Q.  (By Ms. Westfall) You may answer.
11      A.  I am looking at Exhibit 9 and I do not see a
12  provision in Exhibit 9 that changed the way that
13  provisional ballots were handled.
14      Q.  Is it your recollection that Senate Bill 362
15  essentially maintained the status quo for provisional
16  balloting?
17      A.  Since Exhibit 9 did not address changes to the
18  treatment of provisional ballots, then I can only deduce
19  that the handling, in state law, in state election code,
20  provisional ballots has not changed -- did not change.
21      Q.  Do you recall whether the Indiana photo ID law
22  required voters who cast a provisional ballot due to
23  lack of ID, to return to the election office with photo
24  ID to ensure that ballot would be counted?
25      A.  It is my recollection that it did.

---

74

1      Q.  Do you know why Senate Bill 362 did not follow
2  that procedure under Indiana law?
3      A.  I do not know.
4      Q.  Is it fair to say that the provisional ballot
5  procedure under Senate Bill 362 was more lenient than
6  the Indiana provisional ballot procedure?
7          MR. BRISSENDEN:  Objection, form.
8  Q.  (By Ms. Westfall) You may answer.
9          MS. HALPERN:  Objection, vague.
10  Q.  (By Ms. Westfall) You may answer.
11      A.  It depends upon your definition of lenient, but
12  to the extent that it contained non-photo ID, it was
13  more vulnerable to fraud.
14      Q.  And actually I was asking with regard to the
15  provisional ballot procedure?
16      A.  Oh, I'm sorry.
17      Q.  That's okay.  Was it more -- was Senate Bill
18  362 more lenient to voters than the Indiana law was?
19      A.  Vis-a-vis the provisional ballot?
20      Q.  The provisional ballot.
21      A.  Yes.
22      Q.  Were you aware of any analysis that was
23  conducted concerning the likely impact of Senate Bill
24  362 on voters?
25          MR. HALPERN:  Objection, vague.

---

75

1      Q.  (By Ms. Westfall) You may answer.
2      A.  During what time period?
3      Q.  2009, 2008.
4      A.  No.  But it would have been virtually
5  impossible to do that.  We didn't -- we weren't
6  established where we could -- where we could pull up
7  data.
8      Q.  Are you familiar with Section 5 the Voting
9  Rights Act?  And just a general familiarity, not a
10  legal, technical familiarity.
11      A.  I have a general familiarity with Section 5.
12      Q.  What is your understanding of what Texas used
13  to have to undergo under Section 5 of the Voting Rights
14  Act?
15      A.  It had to go through preclearance with either
16  the Department of Justice or the Courts in Washington,
17  D.C.
18      Q.  And what -- that was before the State could
19  enforce any changes to the election code; is that right?
20      A.  Yes.
21      Q.  Did you want to -- when you -- when Senate Bill
22  362 had been filed, did you want to ensure that Texas
23  could enforce Senate Bill 362 had it been enacted?
24      A.  My intent from day one in 2005 through today is
25  make sure that any election legislation is

---

76

1  constitutional, protects all parties and increases the
2  amount of turnout.
3      Q.  And you wanted to be able to enforce Senate
4  Bill 362 by getting it precleared under Section 5 of the
5  Voting Rights Act; is that right?
6      A.  Yes.
7      Q.  Did you -- and what did Texas have to do to
8  show that it was entitled to preclearance?
9          MR. HALPERN:  Objection, calls --
10  Q.  (By Ms. Westfall) When it was in effect?
11          MR. HALPERN:  Calls, for a legal opinion.
12      A.  I don't remember.
13      Q.  (By Ms. Westfall) Did you anticipate that the
14  State was going to need to provide either the Department
15  of Justice or a court with information about the effect
16  of Senate Bill 362 on minority voters?
17      A.  I'm not advised.
18      Q.  Did you consider whether it was advisable to
19  determine the impact of Senate Bill 362 on minority
20  voters and make any adjustments in the bill, if
21  necessary, to increase the likelihood of preclearance?
22      A.  During the time period of 2008 and 2009, we
23  looked at and were able to find evidence both in -- in
24  Indiana's case as well as several studies that were done
25  by universities and think tanks that showed that there

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

20 (Pages 77 to 80)

---

**77**

1    were no reduction in minority voter turnout in states
2    with a photo Voter ID or Voter ID.
3        Q.   And those states would include Indiana -- or
4    only included Indiana and Georgia; is that correct?
5        A.   Those were the two states that we had empirical
6    data from their Secretary of State's Office.  But we
7    also searched and found studies -- empirical studies
8    that were done by a couple of universities and by one
9    think tank.
10       Q.   Did all of these studies relate to voters
11   outside of the state of Texas?
12       A.   Yes.
13       Q.   At any time did you become aware of analysis
14   conducted by Representative Todd Smith in 2009 about the
15   number of voters who lacked a driver license?
16       A.   No.
17       Q.   What was the purpose of Senate Bill 362?
18       A.   Purpose of 362 -- Senate Bill 362 was, like I
19   testified on House Bill 218, to reduce voter fraud.
20       Q.   Was it only aimed at ensuring that voters who
21   appeared in the polls were who they said they were?
22       A.   Yes.  And you'll remember that I had testified
23   earlier, it was my desire to address ultimately at some
24   point, not only in-person voting, mail-in ballots and
25   also registration, but Exhibit 9 addressed only

---

**78**

1    in-person voting.
2        Q.   Did you believe that in-person voter fraud was
3    the most important priority for the state of Texas at
4    that time?
5            MS. HALPERN:  Objection --
6        Q.   (By Ms. Westfall) Of all -- of all voter frauds
7    that you just testified to?
8        A.   No.
9        Q.   Which voter fraud did you believe was the most
10   important?
11       A.   I believe fraud is a bad, bad, bad problem
12   for -- in any area; in this case, our election laws.
13   And that's why in starting this process, we addressed
14   what we could.  And in Senate Bill 362, it was in-person
15   fraud.
16           MS. WESTFALL:  Could you mark this.
17           (Exhibit 11 marked for identification.)
18       Q.   (By Ms. Westfall) You've been handed what's
19   been marked as Exhibit 11.  Do you recognize this
20   document?
21       A.   Yes.
22       Q.   What is it?
23       A.   It's a press release from my office.
24       Q.   What does it pertain to?
25       A.   Voter ID.

---

**79**

1        Q.   Did you approve of this language before it was
2    released?
3        A.   Let me read it.
4        Q.   Certainly.
5        A.   I believe I did.
6        Q.   Do you see that you indicate that Senate Bill
7    362 will -- focuses on verifying voters' identity at the
8    polls; is that correct?
9        A.   That is correct.
10       Q.   And the purpose that is expressed in this press
11   release -- actually, strike that.
12           Are there any other purposes of Senate
13   Bill 362 that are not set forth in this press release?
14           MR. HALPERN:  Objection, asked and
15   answered.
16       Q.   (By Ms. Westfall) You may answer.
17       A.   No, the purpose of Senate Bill 362 is to reduce
18   in-person voter fraud which will, in my judgment, after
19   talking to thousands of people, increase the confidence
20   of the voters in Texas of the integrity of our voting
21   system and result in a higher voter turnout as we've
22   seen in the case of Indiana and Georgia.
23       Q.   Okay.  We can put aside Exhibit 11.
24           How does the Senate adopt rules for the
25   regular session?

---

**80**

1        A.   The Senate adopts rules by meeting among the
2    members exclusively, closed door, I believe, and agree
3    on rules.
4        Q.   And is this accomplished in the first one or
5    two days of session?
6        A.   Yes.
7        Q.   Is it -- are they voted on by a majority vote?
8        A.   Yes.
9        Q.   Before this Senate adopts rules, what rules
10   govern the Senate?
11       A.   The previous rules.
12       Q.   From the previous regular session?
13       A.   Yes, unless those rules are changed during
14   special sessions.
15       Q.   I see.  So the rules, for the most, part carry
16   over from one session to another; is that correct?
17       A.   For the most part, but there's inevitably small
18   changes made each session.
19       Q.   To your knowledge, have resolutions changing
20   the Senate rules ever been referred to a committee?
21       A.   I'm not following your question.
22       Q.   When a Senate resolution amending the rules at
23   the beginning of a session is introduced, is that
24   resolution referred to a committee for consideration or
25   is it considered by the whole Senate, typically?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

---

81

1   A.  I'm still not -- I'm confused as to what you're
2   asking.
3   Q.  I'm sure -- I'm sure you're confused because
4   you know the procedures better than I do, but let me try
5   again.
6         At the beginning of a regular session when
7   there is a resolution, a Senate resolution to modify a
8   rule and to -- for all the rules for the regular session
9   to be adopted, is that resolution referred to a
10  committee or is it considered by the entire Senate?
11       A.  For clarity purposes, let me say that my
12  understanding, because I've never been to nor have I
13  attended a Senate members' closed-caucus in which they
14  discuss the rules, that's the prerogative of the
15  Senators.  But following that meeting, traditionally, a
16  resolution is drafted and it's presented as all
17  resolutions are, on the Floor of the Senate.
18       Q.  Put differently:  That Senate resolution --
19  thank you for that clarification -- is not referred to a
20  committee?
21       A.  That is correct.  Never is.
22       Q.  Are you aware of research that was conducted
23  before the 2009 session to determine a procedure to
24  increase the likelihood of Senate passage of a Voter ID
25  bill?

---

82

1         MR. HALPERN:  Objection, vague.
2       Q.  (By Ms. Westfall) You may answer.
3       A.  Could you repeat your question?
4         MS. WESTFALL:  Counsel, please refrain
5   from the comments and coaching.
6       Q.  (By Ms. Westfall) Are you aware of any research
7   that was conducted by Senators before the 2009 session
8   to determine a procedure to increase the likelihood of
9   the Senate's passage of a Voter ID bill?
10      A.  No.
11      Q.  Did Senator Williams look into any possible
12  changes to the rules in order to ensure that the Senate
13  would pass a Voter ID bill as opposed to what happened
14  with House Bill 218?
15      A.  I'm not advised.
16      Q.  What do you mean by "I'm not advised"?  Does
17  that mean you don't know?
18      A.  I don't know what Senator Williams did or
19  didn't do.
20      Q.  Do you recall that Senate Resolution 14 was
21  introduced at the beginning of 2009 session by Senator
22  Williams?
23      A.  I'm sorry, say that again.
24      Q.  Do you recall that Senate Resolution 14 was
25  introduced by Senator Williams at the beginning of the

---

83

1   2009 session?
2       A.  Senate Resolution 14 --
3       Q.  Yes.
4       A.  -- you said?
5       Q.  Yes.
6       A.  What does Senate Resolution --
7       Q.  Pertaining to the rules.
8       A.  Yes.
9       Q.  And I think it might be helpful if we mark a
10  document.
11        MS. WESTFALL:  Could you mark this.  Thank
12  you.
13        (Exhibit 12 marked for identification.)
14      Q.  (By Ms. Westfall) You've been handed what's
15  been marked as Exhibit 12.  Do you recognize this
16  document?
17      A.  I'm not aware that I've seen it before, but it
18  represents the Senate Journal for January 14, 2009.
19      Q.  If you could, turn your attention to Page 23 of
20  the Senate Journal.
21      A.  Yes.
22      Q.  It will -- it sets forth Senate Resolution 14,
23  which I just asked you about.  Could you take a moment
24  just to take a look at that resolution and let me know
25  when you've a chance to the review it.

---

84

1       A.  Yes.
2       Q.  Do you recall this Senate resolution?
3       A.  Yes.
4       Q.  What was it designed to accomplish?
5       A.  Several things:  One of which, under D, that
6   bill of -- and I'm reading from Exhibit 12, in Rule
7   5.11D, "Notwithstanding Subsection A, a  bill or
8   resolution relating to voter identification requirements
9   reported favorably from the Committee of the Whole
10  Senate may be set as a special order for a time at least
11  24 hours after the motion is adopted by a majority of
12  the members of the Senate."
13      Q.  What practical effect does that provision have,
14  in your own words?
15      A.  It permits, as a practical matter, photo voter
16  ID -- either photo voter ID or voter ID to be passed
17  with a majority vote instead of a two-thirds vote.
18      Q.  Are you aware of any other Senate rule where a
19  particular type of legislation was subject to this type
20  of procedure?
21        MR. HALPERN:  Objection, vague, time
22  period.
23      Q.  (By Ms. Westfall) You may answer.
24      A.  I'm not aware of a similar rule change.
25      Q.  When this resolution was introduced, were the

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

22 (Pages 85 to 88)

---

85

1  rules of the previous -- previous Senate in effect?
2      A.  Yes.
3      Q.  Did Senator Shapleigh raise --
4      A.  Until this -- until this resolution was
5  adopted.
6      Q.  Thank you.  Did Senator Shapleigh raise a point
7  of order against further consideration of Senate
8  Resolution 14 in so far as it should be referred to a
9  committee?
10      A.  I don't know.  I'll have to read to see.
11      Q.  Certainly.  And I would --
12      A.  Page 25?
13      Q.  Exactly.  Thank you.
14          So, yes, a point of order was made by
15  Senator Shapleigh in that regard?
16      A.  Yes.
17      Q.  Did you rule on that point of order?
18      A.  I did.
19      Q.  How did you rule?
20      A.  I overruled it.
21      Q.  Why did you overrule it?
22      A.  Because the rules of the Senate permitted a
23  majority of the Senators to change Senate rules, so
24  therefore, this resolution was entirely within the
25  tradition and rules of the Senate.

---

86

1      Q.  Did Senator Shapleigh raise a second point of
2  order, on Page 27 and 28 of Exhibit 12?
3      A.  You want to ask that again?
4      Q.  Sure.  Did he raise a second point of order
5  related to the scope of your authority under what was
6  then the current existing rules?
7      A.  Yes.
8      Q.  How did you rule on that point of order?
9      A.  For the same grounds that I shared with you a
10  moment ago, I overruled.
11      Q.  Did you have any concerns that it was a
12  conflict of interest to be ruling on your own scope of
13  authority in that -- in that context?
14          MR. HALPERN:  Objection, no foundation,
15  assumes facts not in evidence.
16      Q.  (By Ms. Westfall)  You may answer.
17          MS. HALPERN:  Calls for a legal opinion.
18      A.  In the opinion of both myself and the
19  Parliamentarian, I was -- there was no conflict of
20  interest nor was I ruling on rules that affected me.
21  Instead, I was ruling on whether or not -- irrespective
22  of the argument that Senator Shapleigh made, which I
23  found to be bogus, that the Senators have the rights
24  under the rules of the Senate to -- to make changes to
25  the rules whenever a majority chooses.

---

87

1      Q.  (By Ms. Westfall)  So now that you have had a
2  chance to look at Exhibit 12 and Senate Resolution 14,
3  and in particular Rule 5.11D and Rule 16.07(7).
4      A.  16.07?
5      Q.  Which relates back to -- which also relates to
6  Voter ID requirements.  Do you see that?
7          MR. HALPERN:  What page?
8          MS. WESTFALL:  Page 25.
9      A.  Yes.
10      Q.  (By Ms. Westfall)  Do you know where the idea to
11  put this rule into place came from?
12      A.  Yes.
13      Q.  Where did it come from?
14      A.  Senator Williams had indicated to me that he
15  was planning on suggesting this rule change.
16      Q.  How did he come up with this idea?
17          MR. HALPERN:  Objection, legislative
18  privilege.  Objection, calls for speculation.
19      Q.  (By Ms. Westfall)  You may answer.
20      A.  I have no idea.
21      Q.  So do you have -- do you have any idea, apart
22  from what Senator Williams intended, as to where this
23  provision came from?
24      A.  No.
25      Q.  And is it your testimony that there was no

---

88

1  precedent for this rule change of this nature?
2      A.  That's not my testimony at all.
3      Q.  Then where -- do you know where it came from?
4      A.  I have no idea where it came from, other than
5  this is an established rule that is used in -- from time
6  to time, not only in Texas but in other legislative
7  bodies.
8      Q.  And the established rule is -- could you
9  describe the established rule you just testified to?
10      A.  We have -- we have -- we recognize in Texas, in
11  our parliamentary proceedings, special items.  And all
12  Senator Williams told me was that he was considering a
13  -- adding a special item to the rules.
14      Q.  Had you ever seen a special item added to the
15  rules by subject matter as Senate Resolution 14, Rule
16  5.11D does?
17      A.  I don't remember ever seeing a special item
18  added in the Senate, the Senator's own rules, while I've
19  been Lieutenant Governor.
20          MR. HALPERN:  Have we been going an hour
21  yet?
22          THE REPORTER:  Yes.
23          MS. HALPERN:  Let's take a break.
24          MS. WESTFALL:  What time is it?
25          MS. HALPERN:  It's 11:35.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1         MS. WESTFALL:  Okay.  Do you want to take
2  a quick break and then -- what time is good for lunch
3  for you all?
4         THE WITNESS:  You tell me.
5         MS. WESTFALL:  Oh, no, you're the witness,
6  you're in charge of lunch.
7         THE WITNESS:  I'm in charge of lunch?
8         MS. WESTFALL:  Yes.
9         THE WITNESS:  Well, let's do a quick
10 break, come back and do another hour.
11        MS. WESTFALL:  Super.  That sounds very
12 good.  But let's try to be quick.
13        (Recess from 11:33 a.m. to 11:47 a.m.)
14    Q.  (By Ms. Westfall)  Turning back to Exhibit 12,
15 why did Rule 5.11D state that voter ID bills have to be
16 reported favorably from the Committee of the Whole may
17 be set for special order as opposed to the State Affairs
18 Committee?
19    A.  I'm not -- I don't know.  I didn't write the
20 rule.
21    Q.  Did you have any involvement in the text of
22 5.11D whatsoever?
23    A.  No.
24    Q.  What was the effect of the Senate Resolution 14
25 section on Rule 16.07(7)?

90

1    A.  16.07(7)?
2    Q.  Yes, and I would direct your attention to page
3  25 of Exhibit 12.
4         MS. HALPERN:  Actually starts at the
5  bottom of page 24.
6         MS. WESTFALL:  Thank you, yes.
7    A.  The effect of the new provision provided in
8  Rule 16.07(7) was to include voter ID and the special
9  order in the list of matters requiring a vote of a
10 majority of the members of the Senate.
11    Q.  (By Ms. Westfall)  Had you ever in any previous
12 rule of a regular session seen a particular issue area
13 carved out or set for approval by a majority in Rule 16?
14    A.  Yes.
15    Q.  What rule was that?
16    A.  All the rules were subject to a simple majority
17 vote.
18    Q.  I see.
19    A.  All of them.
20    Q.  I see.  On February 17, turning your attention
21 back to Exhibit 10, on February 17, 2009, was Senate
22 Bill 362 referred to the Committee of the Whole?
23    A.  Yes.
24    Q.  Were you the person to make this referral?
25    A.  Yes.

91

1    Q.  Why did you refer Senate Bill 362 to the
2  Committee of the Whole?
3    A.  Because pursuant to Exhibit 12, the Senators
4  had changed the Senate rules to require that a bill on
5  Voter ID be referred to the Committee of the Whole.
6    Q.  Was that how you interpreted Senate Resolution
7  14?
8    A.  Yes.
9    Q.  That it obligated you to make that referral?
10    A.  Yes.
11    Q.  It was not within your discretion; is that
12 correct?
13    A.  Yes, if you look at 5.11D, it's clear.
14    Q.  And you interpreted that rule to require you to
15 refer this bill to the Committee of the Whole?
16    A.  Yes.
17    Q.  Did it have to be -- did the referral of the
18 bill to the Committee of the Whole have the effect of
19 expediting its consideration?
20    A.  No.
21    Q.  Are members prohibited from offering amendments
22 to bills while they're being considered by the Committee
23 of the Whole?
24    A.  No.
25    Q.  If an opponent of a bill wants to slow down

92

1  consideration of a bill in a committee, other than the
2  Committee of the Whole, what procedures would the bill
3  opponent employ?
4         MS. HALPERN:  Objection, calls for
5  speculation.
6    A.  Well, I'm going to have to think for a moment,
7  because there's a limited number of ways that an
8  opponent of the bill could slow down consideration in a
9  committee.  One that quickly comes to mind is to try and
10 talk the chair of the committee into waiting on
11 consideration of the bill.  Perhaps another option, as
12 was done in this case by the Democrats, and that is to
13 extend, by X amount of time, the consideration of the
14 bill by having a lot of public testimony.
15    Q.  (By Ms. Westfall)  Are there any other ways you
16 can think of that would be employed in another
17 committee?
18    A.  No.
19    Q.  In 2009, do you recall advocating for including
20 in Voter ID legislation a grace period of two to four
21 years between the date of enactment and the date of
22 enforcement of the law?
23         MS. HALPERN:  Objection, no foundation.
24    A.  Could you repeat your question?
25    Q.  (By Ms. Westfall)  Certainly.  In 2009, did you

LIEUTENANT GOVERNOR DAVID DEWHURST                           7/29/2014
CONFIDENTIAL TRANSCRIPT

24 (Pages 93 to 96)

---

93

1  advocate for including in Voter ID legislation a grace
2  period of two to four years between the date of
3  enactment and enforcing of the ID requirements in order
4  to educate voters?
5          MS. HALPERN:  Objection, legislative
6  privilege.
7      A.  I don't remember whether I did or didn't.
8          (Exhibit 13 marked for identification.)
9      Q.  (By Ms. Westfall)  You've been handed what's
10  been marked as Exhibit 13.  Do you recognize this
11  document?
12     A.  No.
13     Q.  Do you see that there's a quote that is
14  attributed to you in the second paragraph?
15     A.  I see a paragraph that is attributed to me in
16  the second paragraph.
17     Q.  Do you believe that this is an accurate
18  quotation?
19     A.  I don't -- I don't believe so in light of your
20  question.
21     Q.  Do you believe that -- you did at this time --
22  actually, what's the date of the article, Exhibit 13?
23     A.  If you look above the caption in bold it says
24  March 4, 2009.
25     Q.  Does this refresh your recollection as to

---

94

1  whether you were advocating for a grace period of two to
2  four years in 2009?
3      A.  You're going to have to define grace period for
4  what?
5      Q.  What did you -- what did you mean when you were
6  advocating for a grace period of two to four years?
7          MS. HALPERN:  Objection, no foundation,
8  assumes facts not in evidence.
9      A.  (By Ms. Westfall)  You may answer.
10     A.  I was not advocating for a postponement of the
11  -- the validity of the bill for two to four years.
12     Q.  What were you advocating for?
13          MS. HALPERN:  Objection, assumes facts not
14  in evidence.
15     A.  A phase-in on elderly voters without ID,
16  principally voters in their 70s.  Although increasingly
17  voters in their 70s don't strike me as elderly anymore.
18     Q.  (By Ms. Westfall)  Were you advocating for a
19  phase-in for any other classes of voters in 2009?
20     A.  No.
21          MS. WESTFALL:  Could you mark this?
22          (Exhibit 14 marked for identification.)
23     Q.  (By Ms. Westfall)  You've been handed what's
24  been marked as Exhibit 14.  Do you -- and this document,
25  I should add, is highly confidential, and questions

---

95

1  related to this document will be designated as highly
2  confidential under the protective ECF 105 in this
3  action.  This is TX87007 through TX87014.  Do you
4  recognize this document?
5      A.  No.
6      Q.  Have you ever seen any of the attachments to
7  the e-mail to this document at 87008 through 87014?
8      A.  No.
9      Q.  Do you see the first page of this document,
10  87007, is an e-mail from Bryan Hebert to Janice McCoy?
11     A.  Yes.
12     Q.  Do you know whether Mr. Hebert had this e-mail
13  and attachments approved by anyone in your office before
14  it was circulated to Ms. McCoy?
15     A.  No.
16          MS. HALPERN:  Objection, no foundation.
17     A.  No.
18     Q.  (By Ms. Westfall)  Okay.  Do you see that at
19  Texas 00087008 lists reasons to support Senate Bill 362
20  as filed?
21     A.  Yes.
22     Q.  And could you take a look at list 1 through 5
23  and let me know when you've had a chance to review them?
24     A.  Yes.
25     Q.  Did you discuss any of these reasons to support

---

96

1  Senate Bill 362 as filed with Mr. Hebert?
2      A.  No.
3          MS. HALPERN:  Objection, attorney-client
4  privilege.
5      A.  Sorry.
6          MS. HALPERN:  Legislative privilege.
7          MS. WESTFALL:  I would object to your
8  objection on the basis of attorney-client privilege as
9  Mr. Hebert circulated these documents to someone who is
10  not his client, Ms. McCoy.
11          MS. HALPERN:  But any discussions about
12  that would be a verbal discussion which would be
13  attorney-client.
14     Q.  (By Ms. Westfall)  Turning back to Reasons To
15  Support Senate Bill 362 as Filed.  Do you see that it
16  indicates there is -- Mr. Hebert writes, "There's less
17  of a chance of disenfranchising elderly, poor or
18  minority voters," under 1?
19     A.  Yes.
20     Q.  Did you agree with that statement?
21     A.  No.
22     Q.  Do you know why he wrote that statement?
23          MS. HALPERN:  Objection, calls for
24  speculation.
25     Q.  (By Ms. Westfall)  You may answer.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

25 (Pages 97 to 100)

Page 97

1    A.   Not to hurt your feelings, but the Department
2  of Justice has a very partisan reputation, and I have
3  had conversations with Mr. Hebert in which we have to
4  dot our I's and cross our T's to make sure that we get
5  preclearance on the bill.
6    Q.   So I guess turning back to my question, I
7  believe your testimony was you did not agree with this
8  assessment in 1 that it had less chance of
9  disenfranchising elderly, poor or minority voters?
10   A.   Oh, I'm so glad you asked me that question.
11 Thank you very much.  Thank you.  Thank you very
12 much.  I may have left, for history, an impression.  I
13 don't agree that there was any chance that it
14 disenfranchised elderly, poor or minority voters.  All
15 of the empirical data has shown just the opposite.
16   Q.   Okay.
17   A.   And my -- and my -- pardon me, but my cute
18 comment was to say that there is a healthy respect
19 and -- of the Department of Justice, as we should, and
20 also a feeling that under this administration, it
21 doesn't like Texas.
22   Q.   Okay.  Getting back -- let's see -- I guess I
23 wanted to ask you, as to 1, whether you believed that
24 Senate Bill 362 was less likely to disenfranchise
25 elderly, poor or minority voters because it permitted

Page 98

1  the use of nonphoto ID?
2    A.   Well, first of all, I don't believe that Senate
3  Bill 362 disenfranchises elderly, poor or minority
4  voters.  And all the empirical data that I've seen shows
5  just the opposite.
6    Q.   Is it fair to say that Voter ID legislation
7  that did not allow for the use of nonphoto ID would have
8  a greater chance of disenfranchising elderly, poor or
9  minority voters?
10       MR. BRISSENDEN:  Objection, form.
11   Q.   (By Ms. Westfall)  You may answer.
12   A.   Could you repeat your question?
13   Q.   Certainly.  Would you agree that photo ID
14 legislation that did not include the use of nonphoto ID
15 would have a greater chance of disenfranchising elderly,
16 poor or minority voters?
17   A.   I categorically oppose that statement.  It is
18 not true.  All the empirical data I've seen has shown
19 that there is no -- no example that I'm aware of where
20 in any jurisdiction with a photo voter ID requirement
21 that individuals have not been able to obtain access to
22 acceptable documents.
23   Q.   Did Mr. Hebert circulate legal analysis and
24 policy advice to other staff people without people in
25 your office reviewing it before it went out?

Page 99

1    A.   I don't know.
2    Q.   Would it be contrary to the policies of your
3  office to allow staff to set forth positions on bills
4  and policy on law that were contrary to the position of
5  your office?
6       MS. HALPERN:  Objection.
7    A.   I consider my office, and I still do, a
8  resource for the other Senators.  To the extent that any
9  one of our staff thought it was helpful, whether we're
10 talking about policy matter and working with different
11 Senators and their staffs or providing some guidelines
12 in discussing a bill, that is something that I
13 encouraged.
14   Q.   (By Ms. Westfall)  And you would not permit
15 your staff to send out analysis that you didn't agree
16 with; isn't that right?
17   A.   You are putting words in my mouth.  I've never
18 said that.
19   Q.   You can -- you can disagree.
20   A.   I just got through saying I think twice, two or
21 three times, Counsel, that I do not agree with this
22 statement.  I do not believe that there's -- that under
23 Senate Bill 362, or for that matter, Senate Bill 14,
24 that there's a disenfranchisement of elderly, poor or
25 minority voters.

Page 100

1    Q.   So does -- does an ID law that does include
2  nonphoto ID make it harder or easier for elderly, poor
3  or minority voters to participate in elections?
4       MR. BRISSENDEN:  Objection, form,
5  compound.
6    Q.   (By Ms. Westfall)  You may answer.
7       MS. HALPERN:  Objection, assumes --
8  objection, compound.
9    A.   You're asking whether it would make it easier
10 for elderly, poor or minority voters to obtain access to
11 the documents required?
12   Q.   (By Ms. Westfall)  Well, to vote by including
13 nonvoter -- nonphoto ID among acceptable forms of ID.
14       MR. BRISSENDEN:  Objection, form.
15   Q.   (By Ms. Westfall)  Does it make it easier or
16 harder for those classes of voters to participate in an
17 election?
18   A.   Since I'm not aware of any empirical data that
19 shows that there's been a -- individuals in states that
20 require photo voter ID that have not been able to obtain
21 access to documents, I'm really reluctant to speculate,
22 purely speculate on that.
23   Q.   Do you see that it explains that Senators
24 Fraser, Williams and Duncan supported this version of
25 the bill?

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

26 (Pages 101 to 104)

---

101

1   A.  Yes.
2   Q.  Did -- was that your understanding?
3   A.  Yes.
4   Q.  Why was it a reason to support Senate Bill 362
5   that those members were supporting the bill?
6       MS. HALPERN:  Objection, calls for
7   speculation.
8   Q.  (By Ms. Westfall)  You may answer.
9   A.  Senator Fraser, Senator Williams and Duncan
10  were three Senators who were widely respected and had
11  worked in this area before.
12  Q.  Okay.  Turning your attention now to the
13  Talking Points at 87009 on the following page, and --
14  you've never seen these talking points before; is that
15  correct?
16  A.  That's correct.
17  Q.  Do you see that under Roman II, it argues that
18  this bill, Senate Bill 362, protects Texas voters and
19  lists a number of ways in which it does that?
20  A.  Yes.
21  Q.  Do you agree with that assessment?
22  A.  Yes.
23  Q.  Turning your attention now to the last page of
24  this document, Texas 00087014, concerning the process of
25  obtaining a birth certificate, do you see that?  Had you

---

102

1   seen this document or a summary of this information
2   previous to today's deposition?
3   A.  No.
4   Q.  Did you have any discussion with any senator
5   about the cost of obtaining a Texas birth certificate or
6   a DPS ID card in 2009?
7   A.  Yes.
8   Q.  Who did you discuss this with?
9   A.  I discussed with Senator Fraser and several
10  other Senators that, as the rules were promulgated by
11  the DPS and/or other agencies, that we wanted to -- to
12  reduce any cost of obtaining documents required to vote.
13  Q.  Was this in 2009 --
14  A.  Yes.
15  Q.  -- to your recollection?  Did you take any
16  steps to make that happen in the bill?
17  A.  Counsel, I'm -- pardon me, but a lot of times
18  the implementation of bills are handled by agencies that
19  have the responsibility and so that was -- that was my
20  conversation with several Senators, including Senator
21  Fraser, and I believe I communicated it to the agencies.
22  Q.  Was this left to the agencies to implement?
23  A.  Yes.
24  Q.  The reduction of cost, was it left to the
25  agencies?

---

103

1   A.  Yes.
2   Q.  It was not in the text to Senate Bill 362,
3   correct?
4   A.  No.
5   Q.  Is it fair to say that you were aware of the
6   cost of obtaining a Texas birth certificate in 2009?
7   A.  I was aware that there may be some cost.  I'm
8   not -- I don't remember whether I knew, as Exhibit 14
9   points out, that -- that it was a cost of $22.  That
10  surprises me.  But I knew there was a cost for obtaining
11  some of the documents, and I wanted to get that down to
12  zero.
13  Q.  What steps --
14  A.  Because my goals were to increase voter
15  turnout.
16  Q.  What steps did you take to get that, get that
17  cost to zero, besides telling the birth certificate
18  issuance people that they needed to fix that?
19      MS. HALPERN:  Objection, Counsel, during
20  what time frame?
21      MS. WESTFALL:  During 2009.  We're
22  testifying about 2009.
23  A.  But Counsel, the -- I've answered your question
24  before by saying that my first priority was to get the
25  bill passed.  Then the implementation of the rules --

---

104

1   the implementation of the bill through rules to be
2   issued by the agencies is -- is always done.  And in
3   during that process, I told them it was my intent to
4   have the cost reduced as I have done subsequent in
5   Senate Bill 14.
6   Q.  (By Ms. Westfall)  We'll talk about that a
7   little bit later.  Thank you for your testimony.
8       Were you present -- strike that.
9       Did you believe in 2009 that any of the
10  costs associated with the documents -- of the underlying
11  documents necessary to obtain photo ID would be costly
12  for some voters?
13  A.  No, because it was my intent during the
14  implementation, once the bill had passed during the
15  implementation of the bill by the agencies to reduce
16  that cost.
17  Q.  Were you present during the Committee of the
18  Whole's consideration of Senate Bill 362?
19  A.  Yes.
20  Q.  Do you recall hearing concerns raised by some
21  bill opponents about the impact of Senate Bill 362 on
22  minority voters?
23  A.  Yes.
24  Q.  Did supporters, to your knowledge, of Senate
25  Bill 362 take any steps to investigate those concerns?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

27 (Pages 105 to 108)

---

105

1    A.  Yes.
2    Q.  What were those steps?
3    A.  The location of a number of different studies
4    that had been made in other states on the effect on
5    minority voters, particularly elderly voters, minority
6    voters, to see if there was a reduction in minority and
7    elderly voter turnout, and we found that there was not.
8    Q.  Was there any other way that bill supporters
9    responded to those concerns other than what you just
10   testified to?
11   A.  I'm not sure of the dates, but there was an
12   attempt to go back into DPS and find out how many
13   driver's licenses were issued, but it was impossible at
14   that time to be able to correlate between the number of
15   driver's licenses issued and who were voters, and so
16   that effort which we made was -- was unsuccessful.
17   Q.  Senate Bill 362 was not passed by the House; is
18   that correct?
19   A.  That is correct.  We passed it in the Senate.
20   Q.  Did it pass with a majority of the Senators in
21   the Senate?
22   A.  Yes.
23   Q.  And not two-thirds; is that correct?
24   A.  That is correct because of the rule change.
25   Q.  Do you know why Senate Bill 362 failed to pass

---

106

1    in the House?
2    A.  If you will permit me to take a look at the
3    legislative history on 362.
4    Q.  Of course.
5    MS. WESTFALL:  And for the record, the
6    witness is referring to Exhibit 10, the legislative
7    history of Senate Bill 362.
8    A.  Yes.
9    Q.  (By Ms. Westfall)  Why did it fail to pass the
10   House?
11   A.  With no criticism intended, the House let the
12   bill sit from the day it was received from the Senate on
13   March 19th for almost two weeks until March 31st, and
14   then after a -- taking testimony in the House on April
15   7th, it sat for almost five weeks.
16   Q.  And so there was not sufficient time in the
17   session to get it passed in the House?
18   A.  It was -- it was placed on major state
19   calendar, and if I recall correctly, the Democrats
20   chubbed it to death, meaning, they talked and talked and
21   talked on routine matters, killing routine bills in
22   order to kill the bill.
23   Q.  Did you want the Senate to pass the Voter ID
24   bill in 2011?
25   A.  Yes.

---

107

1    Q.  What did you believe could be done differently
2    to ensure passage of Voter ID legislation in the 2011
3    session than had been done in 2009?
4    MS. HALPERN:  Objection, legislative
5    privilege.
6    A.  Well, one, take the bill up earlier and pass it
7    earlier to make it more difficult for the opponents of
8    the bill to chub it in the House.
9    Q.  (By Ms. Westfall)  Did you take any other --
10   any other -- or think of any other steps that should be
11   taken to ensure its passage in the Legislature other
12   than what you just described?
13   MS. HALPERN:  Objection, legislative
14   privilege.
15   Q.  (By Ms. Westfall)  You may answer.
16   A.  Not that I recall.
17   Q.  Did you play a role in developing the strategy
18   to ensure that the Legislature would pass Voter ID in
19   2011?
20   A.  As I do on any of our important bills, several
21   hundred per session, I discussed with staff the optimum
22   times to pass Voter ID as well as other bills.
23   Q.  What was your conclusion about the optimum time
24   to pass Voter ID in 2011?
25   MS. HALPERN:  Objection, legislative

---

108

1    privilege.
2    A.  That it was better for the final passage of
3    Voter ID if we could pass it within the 60-day
4    prohibition of where no legislation can be passed.
5    Under the Texas Constitution, the first 60 days, one is
6    prohibited from passing any legislation unless it's
7    placed on emergency call by Governor Perry.
8    Q.  (By Ms. Westfall)  Did you think of any other
9    measures that needed to be taken to ensure enactment of
10   Voter ID in 2011?
11   A.  Not that I recall.
12   Q.  Did you consider it important to readopt the
13   rules in the 2009 rules?
14   A.  Counsel, you're leading again.  You've been
15   doing that repeatedly.  You're leading.  You -- it is --
16   I didn't -- I didn't adopt the Senate rules.  I thought
17   I had been very, very clear.  The Senate rules are
18   adopted solely by the Senators.
19   Q.  Did you believe the Senators, not you, but the
20   Senators should adopt the same rule that had been
21   adopted in 2009?
22   MS. HALPERN:  Objection, legislative
23   privilege.
24   A.  Yes.  However, it's a matter of timing.
25   Because I don't know if I said earlier, I don't

---

LIEUTENANT GOVERNOR DAVID DEWHURST                7/29/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

109

1  remember, but I frequently did not recognize the
2  two-thirds rule during special sessions.  So what -- in
3  a special session involving redistricting, as we had in
4  a number of cases, and again, in June of 2011, I did not
5  have a blocker bill, meaning, we passed all the
6  legislation on the call with a simple majority.
7      Q.  (By Ms. Westfall)  That was in regular
8  session --
9      A.  Special session.
10     Q.  -- or special?  Is special session always
11 subject to majority rule?  And special session -- I'm
12 sorry, go ahead.
13         MS. HALPERN:  There's no question pending.
14         MS. WESTFALL:  I just -- can you read back
15 the question and then.
16         (Requested portion read back by the court
17 reporter.)
18     Q.  (By Ms. Westfall)  Is special session always
19 subject to majority votes to pass legislation and not
20 two-thirds?
21     A.  It's up to the -- to the Lieutenant Governor.
22     Q.  Had the special sessions while you have been
23 Lieutenant Governor only pertained to redistricting or
24 other topics?
25     A.  Both.

110

1      Q.  What years have they pertained to
2  redistricting?
3      A.  2003 and 2011.
4      Q.  Have there been other special sessions during
5  the time that you've been Lieutenant Governor other than
6  2003 and 2011?
7      A.  Yes.
8      Q.  What years have those been?
9      A.  2004, 2005, 2009, 2011 and 2013.
10     Q.  Do you -- for 2003, did it only pertain to
11 redistricting or other legislation?
12     A.  Only redistricting.
13     Q.  2004, what did it pertain to?
14     A.  School finance.
15     Q.  And 2005, what did it pertain to?
16     A.  School finance.
17     Q.  2009, what did it pertain to?
18     A.  Three -- three bills concerning eminent domain
19 and transportation -- strike eminent domain.
20 Transportation and two others bills.
21     Q.  In 2011, was it only redistricting?
22     A.  No, it was redistricting, sanctuary cities,
23 school finance, TSA antigroping bill, and others.
24     Q.  In 2013, what did it pertain to?  That was --
25 there was a special session in addition to the regular

111

1  session in 2013?
2      A.  Yes.
3      Q.  What did the special session pertain to?
4      A.  Redistricting in that we had a change in law
5  on -- on one of our terms that we were using -- I'm
6  sorry.  Strike redistricting.  We had a change in -- in
7  a -- in one of our statutes to comply with a change in
8  federal law.  We took up Senate Bill 5 and -- I'm sorry,
9  a House Bill 5 and House Bill 2 on -- on the health of
10 women and changing the term on abortion.  We took up a
11 huge transportation bill in a constitutional amendment
12 and others.
13     Q.  Did you prior to the 2011 session discuss with
14 Senator Fraser filing another Voter ID bill?
15         MS. HALPERN:  Objection, legislative
16 privilege.
17     A.  Yes.
18     Q.  (By Ms. Westfall)  When did you talk to him
19 about that?
20     A.  Sometime during the fall of 2012 -- I'm sorry,
21 sometime during the fall of 2010, excuse me.
22     Q.  Did part of that discussion -- actually, strike
23 that.
24         What -- what did the discussion involve --
25         MS. HALPERN:  Objection.

112

1      Q.  (By Ms. Westfall)  -- subject-wise?
2          MS. HALPERN:  Objection, legislative
3  privilege.
4      A.  What I remember is a discussion with Senator
5  Fraser to inquire whether he was willing to carry a
6  Voter ID bill again.
7      Q.  (By Ms. Westfall)  Did you discuss any other
8  provisions of the bill?
9      A.  Yes.
10     Q.  What were the provisions you discussed?
11     A.  I reminded Senator Fraser that for then -- for
12 then six long years, I had been meeting regularly with
13 the Democrat Senators to agree on a bipartisan bill,
14 because the Democrat Senators recognized that they were
15 on the wrong side of the majority of the voters of
16 Texas.  They recognized that a super majority of, not
17 only Anglo, but Hispanic and African American voters,
18 during that time period from 2008 through 2011, were in
19 favor of a Voter ID, and that we really ought to work
20 together and come up with a bill.
21         All of the flexibility afforded in 218 and
22 362 was voted against time after time by -- by the
23 Democrat voters.  While in the House, a number of
24 minority voters voted for those bills.  And I discussed
25 with Senator Fraser that maybe it's time to focus

LIEUTENANT GOVERNOR DAVID DEWHURST                          7/29/2014
CONFIDENTIAL TRANSCRIPT

---

### 113

1  inclusively on a bill that is -- that is clearly
2  constitutional by modeling this after the Indiana and
3  Georgia bills.
4      Q.  And therefore, you were -- as part of that
5  discussion, did you discuss whether to include or
6  exclude nonphoto ID from the bill?
7      A.  I don't remember the detail that we went into,
8  but I shared with you the main objective, which I shared
9  with Senator Fraser.
10     Q.  Were you or your staff involved in developing
11  the language for the bill, Senate Bill 14?
12     A.  I don't remember.
13     Q.  Do you know whether Mr. Hebert was involved in
14  developing the language?
15     A.  I don't remember.
16     Q.  What was Mr. Hebert's degree of involvement in
17  kind of the prefiling discussions?
18     A.  There you go again, Counsel.  We have --
19  there's no testimony that he was involved in the first
20  place.  Come on.
21     Q.  I'm trying to make sure I understand your
22  testimony --
23     A.  Then ask me a question.
24     Q.  -- by asking a complete question.  Was
25  Mr. Hebert involved at all in the development of Senate

---

### 114

1  Bill 14?
2      A.  I don't remember.  Again, again, again, to be
3  -- to be as open as I possibly can be, the -- Mr. Hebert
4  had been a resource for some of the staff members with
5  Senator Fraser and -- but I don't know whether that
6  continued or not continued.  I'm sure it did.
7      Q.  During the Senate's consideration of Senate
8  Bill 14, how often did you communicate with Mr. Hebert
9  about Voter ID?
10     A.  When I had a question.
11     Q.  Was that daily?
12     A.  No.
13     Q.  Weekly?
14     A.  I don't think so.
15     Q.  About how frequently was it?  Do you recall?
16     A.  Couple of times a month.
17     Q.  Do you know whether any other Senators were
18  involved in developing the bill language for Senate Bill
19  14?  And strike that.
20         Were Senator's staff, not other Senators,
21  Senator's staff involved in developing the bill language
22  for Senate Bill 14?
23     A.  I believe that there was a working group that
24  -- that involved Senator Duncan.  Again, not only was he
25  a senior member and well respected, but he was a Chair

---

### 115

1  of State Affairs where election bills go to but for the
2  change in the Senate rules, in which I was directed to
3  send this to the Committee of the Whole.  And Senator
4  Williams was a key lieutenant on the Floor during --
5  during Senate Bill 362 of -- of Senator Fraser in
6  carrying part of the physical load of -- of discussing
7  and asking questions during a 26, 27-hour session.
8      Q.  Do you know what sources were consulted when
9  Senate Bill 14 was being developed?
10     A.  What do you mean by sources?
11     Q.  Was Senate Bill 362 a starting point in any
12  way --
13         MS. HALPERN:  Objection.
14     Q.  (By Ms. Westfall)  -- or no?
15         MS. HALPERN:  Calls for speculation.
16     Q.  (By Ms. Westfall)  You may answer.
17     A.  Well, I know that Senate Bill 218 was the
18  starting point for Senate Bill 362, and although not
19  perfect, it was a start to reduce fraud.  And I've
20  talked about my objective of addressing all three forms
21  or maybe a fourth of fraud.  But as a starting point.
22  And I don't remember exactly the transition between the
23  language in 362 and Senate Bill 2 -- and Senate Bill 14.
24     Q.  Thank you.
25         MS. HALPERN:  It is 12:30.

---

### 116

1          MS. WESTFALL:  Do you want a break?
2          (Brief discussion off the record.)
3          MS. WESTFALL:  We'll mark an exhibit.
4          (Exhibit 15 marked for identification.)
5      Q.  (By Ms. Westfall)  You've been handed what's
6  been marked as Exhibit 15.  Do you recognize this
7  document?
8      A.  It is entitled "Senate Bill 14."
9      Q.  Turning your attention to the bottom of the
10  document, do you see the date?
11     A.  It shows January 12, 2011.
12     Q.  And I will represent to you that this came off
13  the Texas Legislature Online website, and it is the
14  Senate Bill 14 as filed --
15     A.  As filed?
16     Q.  -- in the Senate.
17         Turning your attention to Page 8 of
18  Exhibit 15, do you see that it lists the documentation
19  of proof of ID?
20     A.  I do.
21     Q.  And do you see that it lists two forms of state
22  IDs, driver's license and personal ID cards, and three
23  forms of federally issued forms of ID, a U.S. passport,
24  a military ID and a U.S. citizenship certificate?
25     A.  Yes.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                7/29/2014
CONFIDENTIAL TRANSCRIPT

                                          30 (Pages 117 to 120)

---

117

1    Q.   And is it true that under Senate Bill 14, as
2    introduced, that that was the sum total of the IDs
3    permitted?
4    A.   That appears to be the case.
5    Q.   Are you aware of the criteria used for
6    determining which photo IDs to include in Senate Bill
7    14?
8    A.   Only generally repeating my testimony of a
9    moment ago that there had been a discussion in the fall
10   of 2010 about modeling our -- the next bill that was
11   introduced in 2011 on the Indiana bill and the Georgia
12   bill, principally because I wanted to make sure that
13   after years of trying to pass a fair bill, that we got
14   one passed that was imminently constitutional and met
15   all of the tests.
16   Q.   Did you give any consideration as to whether
17   these forms of ID would indicate whether the voter was
18   eligible to vote under Texas law, or was that not a
19   criteria?
20   A.   To -- to reduce voter fraud, we wanted to limit
21   voters who are eligible to vote and residents of the
22   state of Texas and voting in the county in which they
23   lived.  And so I remember that there was some
24   conversation that these -- these items of identification
25   would -- would ensure that eligible voters voted, which

---

118

1    was our goal.
2    Q.   Okay.  So is it your testimony that these forms
3    of ID do indicate and do confirm that the voter is
4    eligible in addition to proving that the voter is who
5    she says she is at the polls?
6         MS. HALPERN:  Objection, vague.
7    A.   I want to start from the bottom, because that's
8    where I'm looking.  Section 63.0101, Subsection 4, would
9    indicate that the -- that the presentation of a U.S.
10   passport that's not expired would be an indication that
11   the person, as long as they're -- that they're a Texas
12   resident residing in the county that they vote in an
13   eligible voter.  As would Subsection 3 above.  I'm not
14   advised on Number 2, a military ID.
15   Q.   (By Ms. Westfall)  Is it true that permanent
16   residents are allowed to serve in the U.S. military area
17   and permanent residents of the U.S. would be able to
18   obtain a military photo ID, to your knowledge?
19   A.   If that's -- if you represent that, if you
20   warrant that to be the case, I'll agree, but I don't --
21   I don't -- I don't know whether permanent residents
22   and/or nonresidents are allowed to serve in the United
23   States military.  I don't know that off the top of my
24   head.  Number 1, I believe that -- I believe that Number
25   1, would limit -- the use of Number 1 would limit this

---

119

1    to -- to eligible voters, because if memory serves, I'm
2    looking for any heads to nod or not, but if memory
3    serves, at this time, the Department of Public Safety
4    had a practice of issuing a different type of -- of
5    driver's license to people that were visiting here,
6    student visas, things of that nature.
7    Q.   Is it true that -- and I think you've testified
8    about this earlier, but as to the passport, the passport
9    does not indicate the address where the person resides;
10   is that correct?
11   A.   That is correct.
12   Q.   So it's possible that someone who did not
13   reside in the county or the state of Texas could use a
14   passport and that person would not be eligible to
15   participate in the election; is that correct?
16   A.   With the exception that a person who is using a
17   United States passport to vote has, by definition,
18   already signed an affidavit under perjury under law that
19   they are a resident of X County, and although they would
20   be -- the only thing that would disqualify them is if in
21   fact they were not a resident of the state of Texas in
22   the county in which they're voting.
23   Q.   Are you aware that there are a number of
24   eligibility requirements to be -- to become registered
25   in the state of Texas in addition to being a U.S.

---

120

1    citizen and being a resident of the county of Texas in
2    which you are registering?
3    A.   I'm presupposing you're going to clarify this
4    for me and refresh my memory.
5    Q.   I'm happy to.
6         MS. WESTFALL:  Could you mark this?
7         (Exhibit 16 marked for identification.)
8    Q.   (By Ms. Westfall)  You've been handed what's
9    been marked as Exhibit 16.  Do you recognize this
10   document?
11   A.   It looks to be a -- a voter registration form
12   from the -- from the Dallas County Registrar of Voters.
13   Q.   And turning your attention to the second page
14   of Exhibit 16, do you see that it lists a number of
15   items that voters must attest to in order to become
16   registered to vote?
17   A.   Yes, I -- a moment ago -- and I plead being a
18   little tired from traveling the last several days,
19   Counsel, but yes, you must be a citizen of the United
20   States.  You must be registered to vote in the county in
21   which you reside.  You must be at least 18 years old as
22   of the date of the election.  You must not have been
23   convicted of a felony.  Et cetera.  And you must not
24   have been determined by a court to be mentally
25   incapacitated without the right to vote.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

---

**121**

1   Q.  So comparing these requirements in a Texas
2   voter registration application and the documents that
3   you -- with which you can prove identification under
4   Senate Bill 14, as introduced, do these forms of
5   identification listed under Senate Bill 14 necessarily
6   show that you are eligible in every aspect to be
7   registered to vote under Texas law?
8          MR. BRISSENDEN:  Objection, form.
9   Q.  (By Ms. Westfall)  You may answer.
10  **A.  Well, when you used the word every, I'm**
11  **reluctant to agree in a carte blanche.  The United**
12  **States passport does and the driver's license does,**
13  **particularly on the age.  And it does not -- it does not**
14  **list on the U.S. passport where you live, but assume --**
15  **I assume that you -- that you would not be listed on the**
16  **voter rolls unless you had filed an affidavit and said**
17  **you were a citizen and said you reside at a certain**
18  **address and in a certain county.**
19  Q.  So is it fair to say that the forms of ID do
20  not indicate full eligibility to register to vote?
21  **A.  You know, I would look at it half full.  I**
22  **would think that the forms of ID substantially show that**
23  **someone is eligible to vote.**
24  Q.  But they do not --
25  **A.  In all cases.**

---

**122**

1   Q.  They do not perfectly show that you are
2   eligible --
3   **A.  Perfectly?**
4   Q.  -- under all -- under all -- under all criteria
5   to be eligible; is that right?
6   **A.  They -- I'm not aware that a U.S. military ID**
7   **shows whether you're a citizen or not or eligible to**
8   **vote.  It's been a long time since I looked at one.  I**
9   **was in the military a long time ago.**
10  Q.  So is it -- I guess in summary, is it fair to
11  say that presenting a form of photo ID allowed by Senate
12  Bill 14 does not prove that the cardholder is
13  necessarily eligible to vote in Texas?
14  **A.  You're trying to put words in my mouth.  What I**
15  **would say is that presenting the ID listed in Senate**
16  **Bill 14 is a substantial improvement towards the goals**
17  **that most people have, and that is to fight voter fraud,**
18  **because all of these four points will show who the**
19  **person is, divert voter fraud and to provide more**
20  **confidence in the election process and result in a**
21  **larger voter turnout.  I do quickly agree with you that**
22  **Number 1, a military ID does not necessarily show**
23  **whether or not you're an eligible voter or not.**
24  Q.  Do you recall whether at the time Senate Bill
25  14 was enacted that a driver license or personal ID card

---

**123**

1   did have a distinguishing feature on it as between U.S.
2   citizens and non-U.S. citizens or were they
3   indistinguishable at that time?
4   **A.  What my memory is, that which I testified to**
5   **just a moment ago, that there were -- that there was a**
6   **separate driver's license form for people that were here**
7   **on visas, and I don't know if that included green cards,**
8   **permanent resident alien status or not, but there was --**
9   **there was a different driver's license, and that changed**
10  **sometime later.**
11  Q.  That was sub -- after Senate Bill 14 --
12  **A.  Yes.**
13  Q.  -- was enacted?
14  **A.  Yes.**
15        MS. HALPERN:  Have we gone the extra 15
16  minutes now?
17        THE REPORTER:  We're within one minute.
18        MS. WESTFALL:  I have one minute worth of
19  questions, Counsel.  Bear with me.  And we'll finish
20  this set of bullet points, then we can be complete and
21  have lunch.
22  Q.  (By Ms. Westfall)  Do you know whether persons
23  who are mentally incapacitated can obtain a passport?
24  **A.  Thank you, Counsel.  You have given me a copy**
25  **of the -- of the voter application so that -- no, people**

---

**124**

1   **who have been judged to be totally mentally**
2   **incapacitated or partially mentally capacitated without**
3   **the right -- cannot vote.**
4   Q.  Can they obtain a passport, to your knowledge?
5   **A.  I don't know.**
6   Q.  Do you know if they can obtain a personal ID
7   card?
8   **A.  I don't know.**
9   Q.  Do you know whether a Texan who is on a
10  probation for a felony conviction can lawfully possess a
11  driver license in Texas?
12  **A.  I don't know.  I know reading from Exhibit 16**
13  **that you can't vote.**
14  Q.  Thank you.
15        MS. WESTFALL:  I think we should break on
16  that note.
17        MS. HALPERN:  All right.
18        (Lunch recess from 12:44 to 1:55 p.m.)
19  Q.  (By Ms. Westfall)  Before the lunch break, we
20  were discussing the types of IDs in Senate Bill 14.
21        Why did Senate Bill 14 not allow the use
22  of non-photo IDs?
23        MR. HALPERN:  Objection, legislative
24  privilege.
25  **A.  Well, I think our intent was to model the bill**

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

---

**125**

1  after the Indiana bill that had -- that had been cleared
2  by the U.S. Supreme Court, and the Georgia bill.
3        And just to go back on one question you
4  asked me before we broke for lunch.
5        The qualifications that are stated here in
6  the application to a county registrar to vote are those
7  things such as you have to reside in the county in which
8  you vote, you've got to be at least 18 years old, not
9  convicted of a felony, and you haven't been adjudicated
10  to be either totally mentally incapacitated or partially
11  mentally incapacitated.  Those are all elements that we
12  haven't had in either 218, 3 --
13     Q.  (By Ms. Westfall) 362.
14     A.  -- 362 or 14, but which we all understand are
15  common characteristics of the right to vote.
16     Q.  So are -- is it -- I'm not sure I understood
17  what you just explained.  Are you indicating that those
18  bills don't address all the eligibility requirements?
19     A.  There are certain eligibility requirements that
20  I believe are commonly thought of to exist in addition
21  to the photo ID or the Voter ID.
22     Q.  So photo ID, again though, is a requirement
23  when you come to the polls to show who you are?
24     A.  That's right.
25     Q.  And voter eligibility and registration

---

**126**

1  requirements are a different part of the election
2  process; is that correct?
3     A.  I think that's what I'm saying, yes.
4     Q.  Thank you.  So I believe you just testified
5  that Senate Bill 14 did not allow the use of non-photo
6  ID because it was modeled on the Georgia and Indiana
7  photo ID laws, which also did not include photo ID?
8        MR. HALPERN:  Did not include photo ID?
9     Q.  (By Ms. Westfall) Did -- I'm sorry.  Did not
10  include non-photo ID.
11     A.  My conversations with Senator Fraser were that
12  since -- since we had started the process with 218 and
13  362, in the 2005, 2007 and 2009 sessions, and the
14  Democrats were, in the Texas Senate, were chubbing us, I
15  was having critical conversations with them in which
16  they would say one thing and then on the Floor they were
17  saying something else.  In other words, saying that we
18  could work this out, we could reach an agreement.  They
19  were voting against all our efforts, that I thought that
20  after all this effort, culminating six years of work,
21  that the only absolute that we had and the most logical
22  safe harbor for us was to model our legislation after
23  the Indiana bill, which had already been approved by the
24  U.S. Supreme Court and/or the Georgia bill.
25        As we sit here at this moment, you have

---

**127**

1  made a representation that the Indiana bill had no
2  non-photo ID, and I don't remember as I sit here whether
3  or not Georgia bill included some or not.
4        But that general overview was what I
5  communicated, not only to Senator Fraser as a -- and I'm
6  not using the word correctly, but a "safe place to be"
7  in order to meet the Constitution of the United States
8  and make sure we increase voter turnout.
9     Q.  Was it Senator Fraser who made the decision as
10  to which ID to include in Senate Bill 14?
11     A.  You're going -- I'll be forced to speculate.  I
12  don't remember exactly.
13     Q.  Did anything occur, besides what you just
14  testified, that you had waited six years and you wanted
15  to model the bill after Georgia and Indian, was there
16  anything else that occurred between 2009 and 2011 that
17  made the use of non-photo ID an acceptable option in
18  2009 but not in 2011?
19        MR. HALPERN:  Objection, no foundation,
20  misstates prior testimony.
21     Q.  (By Ms. Westfall) You may answer.
22     A.  The testimony on Senate Bill 362 in 2009, which
23  took some 24, 27 hours, was so extensive and I listened
24  to it so carefully and I had a chance after the hearing
25  to talk briefly, only ever so briefly, with the

---

**128**

1  Secretary of State's Office from -- from Indiana and
2  Georgia, but it was so replete with examples of both
3  registration fraud and in-person fraud, and the studies
4  we had undertaken, since there wasn't data available in
5  Texas, showed that in states with voter IDs, Indiana and
6  Georgia specifically, there was no decrease in minority
7  voting.  As a matter of fact, there was an increase.
8  That based on all those factors put together, it looked
9  like the safest approach to have a bill that was
10  constitutional, protected all parties and yet increased
11  voter turnout, was to focus our legislation on the
12  Indiana and the Georgia models.
13     Q.  Did you ever consider hiring any entity to
14  research how SB 14 and the requirements therein would
15  impact voters in the state of Texas?
16        MR. HALPERN:  Objection, legislative
17  privilege.
18     A.  I directed staff to make inquiries as to how to
19  determine -- let me reword this.
20        I instructed staffed to try and determine
21  what effect the bill would have.
22     Q.  (By Ms. Westfall) On voters in Texas?
23     A.  Yes.
24     Q.  And was that inquiry or request on your part
25  directed to Mr. Hebert?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

33 (Pages 129 to 132)

---

129

1    A.  Yes.
2    Q.  Anyone else on your staff or just Mr. Hebert?
3    A.  That's who I remember.
4    Q.  Did Mr. Hebert come back to you with any
5  analysis pursuant to your request?
6        MS. HALPERN:  Objection, legislative
7  privilege.  Attorney-client privilege.
8        I'll leave that one to you.
9    Q.  (By Ms. Westfall) Was he providing you with
10  policy advice or --
11    A.  Counsel, I'm referring -- no, Counsel, I'm
12  referring to -- I asked that Mr. Hebert -- and I may
13  have asked others -- but Mr. Hebert to look into what
14  effect a Senate Bill 14 would have on voters in Texas,
15  all voters, including minority voters.  As I recall, he
16  undertook conversations and -- with the Secretary of
17  State's Office, with the DPS, and was frustrated at his
18  attempts because those two silos kept -- kept driver
19  license and kept registered voters separate, and -- and
20  it's been difficult to put them together.
21    Q.  Do you recall when you made the request to
22  Mr. Hebert to conduct this investigation?
23    A.  No.
24    Q.  Was it before the filing of Senate Bill 14 or
25  after?

---

130

1    A.  I don't remember, but I believe it was before
2  the passage of the bill.
3    Q.  Is it your recollection that he was not able to
4  bring back any information to you because of the
5  problems you just described about the separation of DPS
6  and the Secretary of State's Office?
7    A.  Yes.
8    Q.  Did you press him further to get information
9  about the number of registered voters without a driver
10  license?
11        MR. HALPERN:  Objection.
12    A.  I think I've already answered that, that it was
13  impossible to calculate at the time, was his report to
14  me.
15    Q.  (By Ms. Westfall) Was it your understanding
16  that it was impossible to match the two databases,
17  driver license and registered voters?
18    A.  Yes.  And the -- and the information was not
19  complete.  As a matter of fact -- I may be wrong on
20  this, on when I discovered this, but recently another
21  two million driver's license records were found.
22        MS. HALPERN:  You're now getting into
23  attorney-client communications --
24        THE WITNESS:  Okay.
25        MS. HALPERN:  So I'm going to instruct you

---

131

1  to stop there.
2        THE WITNESS:  Okay.
3    Q.  (By Ms. Westfall) But just to clarify in the
4  terms of the timing, do you believe that you made this
5  inquiry of Mr. Hebert during --
6    A.  During 2009 --
7    Q.  During 2009 or '11?
8    A.  I'm sorry, during 2011.
9    Q.  Okay.  Were you aware when you made that
10  inquiry, that the Secretary of State has a list of
11  Spanish surname registered voters that it maintains
12  based on the last name of the voter?
13    A.  I don't remember.
14    Q.  Put differently, did you have any recollection
15  that the Secretary -- any awareness that the Secretary
16  of State had a list of Hispanic voters?
17        MR. HALPERN:  Objection, misstates the
18  evidence, mischaracterizes the evidence.
19    Q.  (By Ms. Westfall) You may answer.
20    A.  I'm -- I don't remember whether I knew that or
21  not, although, logically, if you have a list of
22  registered voters, you can run a sort and see who -- who
23  are -- who have Spanish surnames.
24    Q.  And had you known that fact or had that
25  inference in your head during consideration of photo ID

---

132

1  legislation in Texas since 2005?
2        MR. HALPERN:  Objection, compound, asked
3  and answered.
4    Q.  (By Ms. Westfall) You may answer.
5    A.  I had known that to the extent that someone was
6  a registered voter that -- and it was on the Secretary
7  of State's rolls, that by running a sort, they could
8  come up with a list of Spanish surnames.
9        That didn't address the problem at all,
10  Counsel, because we didn't know whether every one of
11  them had multiple sources of photo ID or not, and we
12  couldn't cross -- marry, cross-compare the DPS list with
13  the Secretary of State's list, as I recall Mr. Hebert
14  shared with me.
15    Q.  And just putting aside that process of
16  matching, though, I just want to ask you a question:
17  When did you first know that you could sort the voter
18  registration list by last name of the voter to identify
19  Spanish surname voters?
20    A.  It's logical.
21    Q.  Have you known that since you've been in your
22  office as Lieutenant Governor?
23    A.  Yes.
24    Q.  Do you know why Senate Bill 14 as introduced
25  did not permit the use of employee photo IDs?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

34 (Pages 133 to 136)

---

**133**

1          MR. HALPERN:  Objection, calls for
2 speculation.
3      Q.  (By Ms. Westfall) You may answer.
4      A.  I have to ask Senator Fraser.
5      Q.  So you do not know?
6      A.  No.
7      Q.  Given the difference between Senate Bill 362
8 and Senate Bill 14, is it fair to say that Senate Bill
9 14 was quite different from Senate Bill 362 in terms of
10 permissible forms of ID?
11     A.  As far as I understand, the difference between
12 Senate Bill 362 and Senate Bill 14 is that Senate Bill
13 362 had several non-photo IDs that were permissible,
14 Senate Bill 14 did not.
15     Q.  And that is -- that is a difference, is it not?
16     A.  That is a difference.
17     Q.  Aside --
18     A.  Perhaps without materiality, but it is a
19 difference.
20     Q.  Why would you say it's not material difference?
21     A.  Because as I've said to you, Counsel, for four
22 or five or six times already, we have not been able to
23 find any example in other jurisdictions or in Texas, and
24 we've already run four elections here in Texas since
25 the, you know, the implementation of Senate Bill 14,

---

**134**

1 where people could not get ID.  Now there may be 1 or 2
2 or 10 or 15, I don't know.  But I'm not aware of anyone
3 that -- that hasn't had access to identification.
4 Again, there may be and few, but I'm not aware of it.
5     Q.  Other than the attempted analysis that you just
6 testified to that you asked Mr. Hebert to conduct
7 between registered voters and people who had driver
8 licenses, were you aware of any other analysis of the
9 number of registered voters who possessed any of the
10 required IDs under Senate Bill 14?
11     A.  I'm not aware because that type of analysis was
12 difficult based upon the problems I described to you a
13 few minutes ago.
14     Q.  And are you aware of any analysis that
15 determine if minority -- other than what you just
16 testified to, to determine if minority voters would be
17 disproportionately less likely to possess the forms of
18 ID under Senate Bill 14?
19         MR. HALPERN:  Objection, vague.
20     Q.  (By Ms. Westfall) You may answer.
21     A.  To the extent that there are economically
22 disadvantaged eligible voters, there's bound to be a
23 subset of those voters who are minority voters.  And
24 that's one of the reasons why I pushed for eliminating
25 the cost to obtain the ID required under Senate Bill 14.

---

**135**

1     Q.  Are you referring to the Election
2 Identification Certificate?
3     A.  And the -- and -- yes, and the underlying cost
4 on a birth certificate.
5     Q.  We'll talk about that a little bit later in the
6 process.
7         How did the exception for voters over the
8 age of 70 come to be included in Senate Bill 14 as it
9 was introduced?
10        MS. HALPERN:  Objection, calls for
11 speculation.
12     Q.  (By Ms. Westfall) You may answer.
13     A.  It was due to my -- and you need to put a
14 legislative -- you need to object for legislative
15 purposes.
16        MR. HALPERN:  Okay.  Objection,
17 legislative privilege.
18     A.  Because we're about to go in to it.
19        And that is for -- at this point in time
20 for the previous four years, I have been -- and the word
21 "negotiating" may be too formal of a word but certainly
22 talking, twisting arms among Republicans and principally
23 Democrats to find common ground to pass a Voter ID bill.
24 And as I've testified several times already, the
25 Democrats were telling me one thing in person and

---

**136**

1 something else when they were pontificating on the Floor
2 of the Senate.  I was led to believe and was telling
3 Republicans as late as going into the 2009 session that
4 I thought we could work out a mutually agreeable bill,
5 but that turned not to be the case.  I don't mean this
6 in any way a criticism other than it became, obviously,
7 to them, a wedge issue, and regardless of what they may
8 share with me as a friend, they could not publicly vote
9 for a Voter ID bill.  And so that -- that frustration,
10 again, led me to recommend that we go to the only known
11 constitutional safe harbor which was, which was to model
12 Senate Bill 14 after the Indiana and Georgia bills.
13        MS. HALPERN:  Could we have the question
14 read back.
15        THE WITNESS:  Yes.  Because I think I
16 answered a different question, I'm embarrassed to say.
17        MS. HALPERN:  (Laughing.) It's possible.
18 Well, why don't I simply -- why don't I simply --
19        THE WITNESS:  Why don't you read the
20 question back.
21        MS. HALPERN:  Okay.
22        (Requested portion was read back by the
23 court reporter.)
24        MS. HALPERN:  Okay.  Would you like him to
25 answer that?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

137

1    Q.  (By Ms. Westfall) I would.
2        A.  It is substantially the same answer that I just
3    gave.  Over a four-plus year time period and in talking,
4    if not negotiating with the Democrat Senators, one of
5    the requests that they repeatedly made was, "How about
6    Grandma?"  In fact, Senator Mario Gallegos frequently
7    talked in private with me and on the Floor about,
8    "Grandmother doesn't have a driver's license."  And so,
9    trying to be responsive to that concern, I pushed for
10   the exception of people -- I can't remember now whether
11   it was over 75 or over 70.
12       Q.  Were you also pressed by bill opponents to
13   include additional forms of ID or relief for racial
14   minority voters?
15            MS. HALPERN:  Objection, vague.
16       Q.  (By Ms. Westfall) You may answer.
17       A.  You're going to have to help me on this,
18   Counsel.  What type of identification do you have in
19   mind?
20       Q.  My question stands:  Weren't you requested by
21   bill opponents, relief and accommodations, to make sure
22   that racial minorities would be able to have access to
23   IDs and participate in elections?
24       A.  I don't know that it was worded quite like that
25   to me, but -- but to be responsive to the public

---

138

1    testimony that I heard, not only in 2005 and 2007 and
2    2009, we made an effort to -- to eliminate the cost on
3    the underlying documents that were required in order to
4    be able to vote.
5        Q.  That reduction in the cost of the underlying
6    documents, that was not within the text of Senate Bill
7    14, was it?
8        A.  It was not because, as we talked a few moments
9    ago, and I hope I didn't sound like I was preaching, but
10   in the Texas legislative example, we frequently don't
11   spell out every single detail, but it was left to the
12   implementing agencies to -- to reduce the cost, as was
13   done by the Health and Human Services on the question of
14   birth certificates and DPS on the cost behind the
15   election identification card.
16       Q.  With regard to the -- actually, strike that.
17            How does the Legislature ensure that the
18   agencies will do what the Legislature wants the agencies
19   to do as a general matter?
20       A.  The agencies are well advised to do what the
21   Legislature wants them to do and what the leadership in
22   the Legislature wants them to do because they're all
23   subject to the next appropriation.
24       Q.  Don't you sometimes -- doesn't the Legislature
25   sometimes put language in statutes directing agencies to

---

139

1    do things?
2        A.  Yes.
3        Q.  Don't statute sometimes provide rule-making
4    authority or administrative authority to agencies so
5    that they may do things and must do things?
6        A.  Sometimes, but it was unlikely -- but it was
7    unlikely that Senator Fraser and David Dewhurst were
8    going to be able to think through how to solve and
9    eliminate the cost on the driver's license and -- and
10   spend the time necessary to eliminate the cost behind
11   the election identification card.  So that is something
12   that -- that the agencies were told just as the
13   Secretary of State's Office was told and had agreed
14   prior to -- I may be confusing again.  I think I
15   confused a little bit in earlier testimony 2009 and
16   2011.  But at some point in either 2009 or 2011, I
17   remember the Secretary of State's Office agreed to spend
18   up to $2 million on voter identification and training.
19       Q.  Turning back to the filing of Senate Bill 14,
20   was it initially filed in Received Bill Number 178?
21       A.  I believe that's right.
22       Q.  Did you request that Senator Fraser refile the
23   bill in order to be assigned a lower bill number?
24       A.  Yes.
25            MR. HALPERN:  Objection, legislative

---

140

1    privilege.
2        Q.  (By Ms. Westfall) What is the significance of a
3    bill receiving a low bill number?
4        A.  The significance is that the rest of the
5    Legislature knows that it's a priority bill for the
6    Lieutenant Governor.
7        Q.  Does --
8        A.  Or in the case of the House, for the Speaker.
9        Q.  Does a lower bill number expedite consideration
10   of the bill in any way except for putting members on
11   notice that it's one of your priorities?
12       A.  No.
13       Q.  Are there other instances you can recall in
14   which you have requested that a Senator refile a bill to
15   receive a lower bill number?
16       A.  Yes, many times.
17       Q.  How often does that happen?
18       A.  One or two times a session.  Perhaps a total of
19   -- well, a number of times.
20       Q.  So one or two bills, typically, you'll ask the
21   member to refile per session; is that correct?
22       A.  Memory serves -- if memory serves.
23            MS. WESTFALL:  Would you mark this.
24            (Exhibit 17 marked for identification.)
25       Q.  (By Ms. Westfall) You've been handed what's

---

LIEUTENANT GOVERNOR DAVID DEWHURST                     7/29/2014
CONFIDENTIAL TRANSCRIPT

36 (Pages 141 to 144)

---

141

1  been marked as Exhibit 17.  This has been designated and
2  produced in this litigation as highly confidential.  It
3  is TX 00034.  Do you recognize this document?
4      **A.  I've not seen it before.**
5      Q.  Do you see at the top right-hand corner, it's
6  labeled Draft 11-18-10?
7      **A.  Yes.**
8      Q.  Do you know whether someone in this -- in your
9  office drafted this?
10     **A.  No.**
11     Q.  Do you believe, looking at Exhibit 17, that
12  someone in your office drafted this?
13     **A.  That calls for speculation on my part.**
14     Q.  Would you -- in other words, you do not know
15  whether someone in your office drafted this?
16     **A.  That is correct, otherwise, I would have said**
17  **someone in my office drafted it.**
18     Q.  Does this document reflect, in your view, the
19  major legislation in the Senate, to be taken up in the
20  Senate in 2011?
21     **A.  I'm sorry, I missed --**
22     Q.  Does this reflect your legislative priorities
23  for the 2011 session?
24     **A.  No.**
25     Q.  Okay.  You can put that aside.

---

142

1        Are you familiar with a staff person
2  named --
3      **A.  Some -- some but not all.**
4      Q.  Okay.  Turning back to Exhibit 17.  Which ones,
5  can you recall, looking at Exhibit 17, which of your
6  major legislative priorities were not included on this
7  list?
8      **A.  Senate Bill 7, Senate Bill 8.**
9      Q.  What did those bills pertain to?
10     **A.  Health care initiatives, which were an**
11  **alternative to Obamacare.**
12     Q.  Did you agree that --
13     **A.  And --**
14         MS. HALPERN:  Hang on.  Hang on.
15     **A.  And I had never -- I'd never used the words**
16  **"Virginia law on Obamacare" or "Arizona law on**
17  **immigration."**
18     Q.  (By Ms. Westfall) Okay.  Let's put this exhibit
19  aside.
20         Are you familiar with a staff person named
21  Noe Barrios?
22     **A.  Can you refresh my memory who she worked for?**
23     Q.  Certainly.
24         MS. WESTFALL:  Could you mark this,
25  please.

---

143

1        (Exhibit 18 marked for identification.)
2      Q.  (By Ms. Westfall) You've been handed what's
3  been marked as Exhibit 18.  This has been marked as
4  highly confidential.  It is TX 0034442.  Do you
5  recognize this document?
6      **A.  No, I've never seen it before.**
7      Q.  Are you aware that Noe Barrios was a staff
8  person to Senator Estes?
9      **A.  No, but if you represent that, I'll take your**
10  **word for it.**
11     Q.  I will represent that to you.
12         Sir, were you aware that Senator Estes had
13  concerns about Senate Bill 14's compliance with the
14  Voting Rights Act?
15     **A.  No, I was not.**
16     Q.  Had you heard of the concerns from any other
17  Senators who voted or supported Voter ID about Senate
18  Bill 14's compliance with the Voting Rights Act?
19     **A.  I don't recall if there were any concerns from**
20  **Senators who had voted for Senate Bill 14 with its -- in**
21  **compliance with the Voting Rights Act.**
22     Q.  Did Mr. Hebert ever share any of the contents
23  of this e-mail with you?
24     **A.  I believe he talked with me on one or more**
25  **occasions about Roman Numeral I.**

---

144

1      Q.  Okay.  Did he ever share with you the concerns
2  of Senator Estes?
3      **A.  No, he didn't.  And Senator Estes, to the**
4  **extent he had concerns, this was not an area that he**
5  **spent much time in.  I don't -- I would have obviously**
6  **wanted to make sure that his concerns were allayed, but**
7  **this is not something that I personally got involved**
8  **in.  Since this was not his field, if someone else that**
9  **had worked in this field had concerns, I would have**
10 **wanted to sit down and talk with them.**
11     Q.  Did you request that the Governor designate the
12  issues of Voter ID as emergency legislation for 2011?
13         MR. HALPERN:  Objection, deliberative
14  process, legislative privilege.
15         Go ahead and answer.
16         MS. WESTFALL:  I would object to your
17  objection on the basis of deliberative process.  I'm
18  asking the Lieutenant Governor in his capacity as his
19  legislative functions and responsibilities.
20         MS. HALPERN:  And the deliberative process
21  privilege is that of Governor Perry.
22         MS. WESTFALL:  I'm asking about the
23  Lieutenant Governor's request of the Governor and
24  whether he made that request, not anything about what
25  the Governor was thinking or contemplating.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

37 (Pages 145 to 148)

---

145

1         MR. HALPERN:  Well, but to the extent that
2  would inform what the Governor did, it could be part of
3  the Governor's deliberative process.  It's a legitimate
4  objection.  I'm going to let the witness answer under
5  seal.
6         MS. WESTFALL:  Thank you.
7         MR. HALPERN:  Yes or no.
8     A.  I don't remember.  If I did, I'd be glad to
9  tell you I do, but I don't remember.
10        MS. WESTFALL:  Could you mark this.
11        (Exhibit 19 marked for identification.)
12    Q.  (By Ms. Westfall) You've been handed what's
13  been marked Exhibit 19.  And this document has been
14  produced as highly confidential.  It's TX 00034561
15  through 62.  Do you recognize this document?
16    A.  No.  This is the first time I've seen it.
17    Q.  Where do you think it came from if it didn't
18  come from your office?
19        MR. HALPERN:  Objection, misstates his
20  testimony.  He said he has not seen it.
21    Q.  (By Ms. Westfall) You may answer.
22    A.  If you -- if you give me a moment to look at it
23  carefully --
24    Q.  Sure.
25    A.  -- because I'm trying to determine whether it

---

146

1  may have come from my office or whether it came from
2  Senator Fraser's office.
3    Q.  Certainly.  Take your time.
4    A.  Well, it could have come from my office.  I
5  don't know that it came from my office and so I'm going
6  to have to just reply I don't know.
7    Q.  Okay.  Do you see that in Exhibit 19, it sets a
8  timeline for consideration of Senate Bill 14 from
9  January 20, 2011, through passage, anticipated passage
10  on Wednesday, January 26, 2011?
11        MR. HALPERN:  Objection, mischaracterizes
12  the document.
13    Q.  (By Ms. Westfall) You may answer.
14        MR. HALPERN:  The word "passage" is not on
15  here, Counsel.
16    Q.  (By Ms. Westfall) Consideration.
17    A.  And I apologize, your question is?
18    Q.  Do you agree -- well, let me -- let me
19  withdraw.  I will ask a different question.
20        Do you agree that the draft procedures for
21  consideration of Senate Bill 14 anticipated that the
22  Senate would consider it from a period of Thursday,
23  January 20th through Wednesday, January 26th?
24    A.  The term "considering" a bill is normally used
25  when the bill is put before them on the Floor.  And so I

---

147

1  would certainly agree that this document, Exhibit 19 as
2  it's written, contemplates that the Senate considers
3  Senate Bill 14 from 1:30 on Monday afternoon through
4  sometime on Wednesday, at which point it passes or could
5  pass.
6    Q.  Would you agree that this schedule sets a very
7  short period of time for consideration of a contested
8  bill like Senate Bill 14?
9    A.  No.
10    Q.  You don't?
11    A.  No, not at all.  Just the contrary.  Just
12  absolutely the contrary.
13    Q.  When has this happened before that a
14  substantive contested bill has been considered and
15  passed the Senate in the first -- within six days in
16  January?
17    A.  Well, but that wasn't your question.  Your
18  question was this particular compression of time.  And
19  the way that I -- as I answered your question, we have
20  -- we have, in the several cases where we've used a
21  Committee of the Whole, this process of having all your
22  testimony so all 31 members can hear it rather than just
23  -- than just half a dozen or so that attend the
24  Committee hearings, and then you move to pass it -- you
25  wait 24 hours and you bring the bill up -- has been done

---

148

1  on the three or four occasions that we've talked about
2  earlier in the day.
3        But this would be pursuant to the
4  Senators' rule that permits the bill to be taken up on
5  the Floor and sometime 24 hours after it passes out of
6  the Committee of the Whole to be taken up on the Floor
7  of the Senate, and that's what we had discussed at some
8  length earlier today.
9        The only difference between this and other
10  measures that we discussed is that Senate Bill 14 was
11  put on as emergency legislation along with, I think,
12  eminent domain, and maybe one or two other bills, to be
13  taken up during those first 60 days where
14  constitutionally we cannot pass legislation unless the
15  Governor declares it to be an emergency.
16    Q.  Why was the schedule for consideration of
17  Senate Bill 14 set in this manner?
18        MR. HALPERN:  Objection, legislative
19  privilege.
20        MR. BRISSENDEN:  Objection, form.
21    Q.  (By Ms. Westfall) You may answer.
22    A.  Because it's the most common sense approach.
23  The Governor puts four pieces of legislation -- or
24  three, I can't remember -- on an emergency call.  We
25  designate when it's going to be brought up.  And the

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

38 (Pages 149 to 152)

149

1  Senate rules say that 24 hours after you pass it out of
2  Committee of the Whole, you can -- you can consider the
3  bill, if I'm remember the special item correctly.  And
4  that's simply what we did.
5          The other -- the other pieces of
6  legislation had another day or two between them because
7  there wasn't the expedited 24-hour period between the
8  ending of the Committee of the Whole and being able to
9  bring the bill to the Floor.  We're talking about 24
10 hours, we're not talking about weeks and weeks.  It's
11 immaterial.
12     Q.  So put differently, the consideration of Senate
13 Bill 14 was similar to the other bills designated for
14 emergency consideration in 2011, of which there were two
15 or three?
16     A.  Yes.  I believe -- I don't know if anyone can
17 help refresh my memory, but I believe that eminent
18 domain was on the emergency call, and I thought another
19 bill was.
20     Q.  Okay.  Thank you.  So it is your recollection
21 that the -- the other bills set for emergency
22 consideration were also considered and passed the Senate
23 in six days?
24     A.  No.  That's your testimony.  What I'm saying is
25 that those other bills were -- were timely, considered

150

1  in Committee, and then moved to the Floor to pass.  And
2  my testimony was that -- was that the -- instead of
3  taking it on the Floor 24 hours after it passed the
4  Committee of the Whole, they were taken up -- and I'm
5  trying to remember the rule right now.  I normally have
6  to refresh myself during each session because I get busy
7  in so many other things.  But I believe it's 48 hours.
8  It's either 48 or 72.  But as quickly as we can, we try
9  to move the emergency bills through.
10     Q.  So Senate Bill 14 was considered in a --
11 24-hour time less than the other bills you just referred
12 to; is that the end result?
13     A.  The end result is either 24 or 48.  I don't
14 remember whether in this point in the session we could
15 bring up a bill after it came out of Committee in 48 or
16 72 hours.
17     MS. WESTFALL:  Would you mark this.
18          (Exhibit 20 marked for identification.)
19     Q.  (By Ms. Westfall) You've been handed what's
20 been marked as Exhibit 20.  Again produced in this
21 litigation as highly confidential.  It is TX 00034560.
22 Do you recognize this document?
23     A.  If you will permit me to read it.
24     Q.  Certainly, certainly.  Take your time.
25     A.  I believe this is a document with Talking

151

1  Points to the Senators on a conference call I made in
2  January 2011.
3     Q.  Do you recall seeing these Talking Points
4  before sitting here today?
5     A.  No.
6     Q.  Do you know who would have -- but you recognize
7  the content of the Talking Points; is that fair?
8     A.  Yes.
9     Q.  Do you know who in your office would have
10 drafted these Talking Points?
11     A.  I do not know at this point who specifically
12 drafted them.
13     Q.  Do you see that it's marked "Draft" at the top?
14     A.  Yes, I do.
15     Q.  Do you recall whether any changes were made to
16 the script after -- after this time?
17     A.  I do not remember.
18     Q.  Did you call members as indicated in this
19 Talking Point to advise them of the timing of Voter ID
20 legislation?
21     A.  The document would imply that I did.  I don't
22 remember.  There was a lot going on.  Other pieces of
23 emergency legislation, lots of other bills.  I don't
24 remember.
25     Q.  Do you agree with the content of the script?

152

1     A.  "I intend for the Senate to meet as long as it
2  takes next week to get the job done," I think that's
3  very fair.  "We have a lot of other very important work
4  ahead of us," which I just got through sharing with you.
5  "It's in the Senate's best interest to complete our work
6  on Voter ID so we can concentrate on the budget, eminent
7  domain, border security and other pressing --"
8     THE COURT REPORTER:  I'm sorry, I can't
9  follow --
10     THE WITNESS:  Excuse me.
11     THE COURT REPORTER:  -- that.
12     A.  "And I think it's in the Senate's best interest
13 to complete our work on Voter ID so we can concentrate
14 on the budget, eminent domain, border security and other
15 pressing issues."  That's what I believed then, I
16 believe now, and I believe I -- in fact, I remember
17 testifying that I thought it was in our best interest to
18 move Voter ID earlier in the session in order to give it
19 a better chance to pass.
20     Q.  (By Ms. Westfall) Okay.  When you indicated
21 here, "I've asked Senator Duncan and Senator Fraser to
22 move the bill as expeditiously as possible," is -- are
23 there any other reasons why you wanted to move the bill
24 as expeditiously as possible besides passing it quickly
25 and getting it to the House as quickly as possible?

LIEUTENANT GOVERNOR DAVID DEWHURST                     7/29/2014
CONFIDENTIAL TRANSCRIPT

                                           39 (Pages 153 to 156)

---

### 153

1    A.  No.
2    Q.  What did you mean when you said that the Senate
3    would meet the following week and take as long as it
4    took to get Voter ID done?
5    A.  Meaning that it's an important bill and that we
6    would work on it on the Floor until we got it passed.
7    Q.  Was this the first piece of business -- first
8    piece of legislation that the Senate was taking up in
9    2011?
10   A.  I don't recall.  I don't believe it was.  I
11   recall that the first bill I moved was not a bill but a
12   resolution on the balanced budget amendment for the U.S.
13   Congress.  Revolutionary thought.
14   Q.  Why did you place -- other than what you just
15   testified to, you wanted to get this bill quickly to the
16   House, was there any reason why you placed a priority on
17   passing Voter ID before some of these other items you
18   mentioned in the Talking Points:  The budget, eminent
19   domain, border security, et cetera?
20       MR. HALPERN:  Objection, legislative
21   privilege.
22   A.  Counsel, in my conversations with both
23   Republicans and Democrats, they wanted to get this issue
24   behind them and they thought it would be better that we
25   address it early in the session and got on with all of

---

### 154

1    our other work, and that came from conversations with
2    Republicans and Democrats.
3    Q.  (By Ms. Westfall) Is it true that Democrats did
4    have concerns about the expedited consideration of
5    Senate Bill 14, notwithstanding what you just testified
6    to?
7    A.  I know that certain Democrat Senators raised
8    concerns, but keep in mind that -- that they raised
9    concerns about anything involving this bill.  And I
10   viewed it as simply a delaying or measure, because from
11   my conversation with the Democrat Senators who had
12   talked to me over the period, at this point, four years,
13   five years, about trying to work together, this was a
14   wedge issue that the Democrats were not going to agree
15   to regardless of the fact, again, that the -- a super
16   majority of Texas voters, Anglo, African-American and
17   Hispanic, according to polls, were in favor of a Voter
18   ID.
19   Q.  Why did you think that it was in the Senate's
20   best interest to complete work on Voter ID before
21   focusing on these other issues?
22       MR. HALPERN:  Asked and answered.
23   Q.  (By Ms. Westfall) You may answer.
24   A.  Because I wanted to put this issue behind us so
25   we wouldn't have a spill-over on other issues that --

---

### 155

1    that I believed we had a excellent chance of working
2    together on a bipartisan basis.
3        MR. HALPERN:  Let me ask the reporter, I
4    think we should be at another hour by now, am I right?
5    Are we close to it?
6        THE COURT REPORTER:  About 7 minutes
7    short.
8        MS. HALPERN:  Okay.  We'll keep going a
9    little longer.
10   Q.  (BY MS. WESTFALL) Did the Senate adopt a
11   similar rule in 2011, that it had adopted in 2009,
12   related to the consideration of Voter ID legislation?
13   A.  You mean the special item we talked about?
14   Q.  Yes.
15   A.  Yes.
16       MS. WESTFALL:  Could you mark this?
17       (Exhibit 21 marked for identification.)
18   Q.  (By Ms. Westfall) You've been handed what's
19   been marked as Exhibit 21.  It's produced in this
20   litigation as highly confidential.  It's TX
21   00034565.  When you've had a chance to look at it, could
22   you let me know.
23   A.  Yes.
24   Q.  Do you recognize this document?
25   A.  I do not recognize it.

---

### 156

1    Q.  Do you think it likely was produced by your
2    office?
3        MR. HALPERN:  Objection, calls for
4    speculation.
5    Q.  (By Ms. Westfall) You may answer.
6    A.  Normally, this type of a memo to the members
7    was generated by the bill sponsor, because -- because
8    the first and second paragraph show a personal
9    preference on how handle the amendments.  So
10   traditionally, that would fall within the purview the
11   bill sponsor.
12   Q.  Can you explain what this Exhibit 21 intends to
13   convey and the effect?
14       MS. HALPERN:  Objection, calls for
15   speculation.
16   Q.  (By Ms. Westfall) You may answer.
17       MR. HALPERN:  Objection, no foundation.
18   A.  Well, if I understand your question correctly,
19   you're asking me what this means?
20   Q.  (By Ms. Westfall) Yes.
21       MR. HALPERN:  Objection, calls for
22   speculation.
23   Q.  (By Ms. Westfall) You may answer.
24   A.  The document says what it says.  It says that
25   -- so that I don't have to speculate, what it's asking

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

                                              40 (Pages 157 to 160)

157

1   of members is that the amendments filed on that day,
2   which I presume -- again, I'm speculating even though I
3   said I'm not.  I'm assuming that it was that Monday.
4   All amendments filed in the Committee of the Whole will
5   be held over until the next day, Tuesday, for
6   consideration by the full Senate on second reading.  The
7   second reading occurs after you have moved to suspend
8   the regular order of business.
9         Second paragraph says that -- that in
10  order to make it easier, that the -- whoever wrote this
11  said we're going to use the introduced copy of the bill
12  rather than the Committee printing, so that you could --
13  so that you don't have to go back and add page and line
14  number changes to consider the current amendment.  So it
15  made it easier on the members.  This was apparently, to
16  me -- and I'm not speculating because that's the only
17  purpose, to make it easier on accepting amendments.
18        Q.  Did it facilitate expediting consideration of
19  Senate Bill 14?
20        MR. HALPERN:  Objection --
21        Q.  (By Ms. Westfall) By avoiding the need to
22  reprint copies of the bill and make technical
23  corrections to lines and pages?
24        A.  Possibly.
25        MS. WESTFALL:  Could you mark this.

158

1              (Exhibit 22 marked for identification.)
2        Q.  (By Ms. Westfall) You've been handed what's
3   been marked as Exhibit 22.  Do you recognize this
4   document?
5        A.  No.
6        Q.  Do you see that this an article entitled
7   Dewhurst On Hot Seat in Houston Debate, dated September
8   16, 2013?
9        A.  Yes.
10       Q.  Do you see at the bottom of the second page,
11  there is a quote from you regarding Voter ID?
12            MS. HALPERN:  I'm sorry, Counsel, where on
13  the bottom of this?
14            THE WITNESS:  It's the second page over.
15            (Soto voce discussion.)
16       Q.  (By Ms. Westfall) Did you find that quote, sir?
17       A.  I did.
18       Q.  Did you have a chance to review it?
19       A.  I did.
20       Q.  Is it -- is it -- were you quoted about Voter
21  ID as telling the crowd you think, "That was easy.  That
22  was a bloodbath.  We had to change the rules.  We had to
23  fight the Democrats"?  Do you see that quote?
24       A.  I do.
25       Q.  Was that an adequate quote, to the best of your

159

1   recollection?
2        A.  I -- I don't remember whether it was an
3   adequate quote or not but it could have been.
4        Q.  Do you believe that Voter ID and getting Senate
5   Bill 14 enacted was a bloodbath?
6        A.  It may have been slightly an over-dramatic
7   statement.  No, I don't believe it was bloodbath.  It
8   was a long process over six years.  But I -- I admit I
9   was talking to a partisan crowd.
10       Q.  What did you mean by saying it was a bloodbath,
11  we had to change the rules?
12       A.  Well, I addressed the first part of that.  The
13  second part of that is that the Senators, in order to
14  bring it up during regular session, as compared to a
15  special session, they would have had to change the
16  rules.  But by bringing it up in regular session,
17  that -- the rule -- the Senators had to change their
18  rules.
19       Q.  Did you mean to suggest by that statement that
20  you -- that the Senate had to take some fairly drastic
21  measures?
22            MS. HALPERN:  Objection.
23       Q.  (By Ms. Westfall) You may answer.
24            MS. HALPERN:  Assumes facts not in
25  evidence.

160

1        A.  The -- not at all.  The history of the Senate
2   is replete -- excuse me, the legislative history of the
3   Texas Senate is replete with the example after example,
4   since World War II, of Lieutenant Governors abandoning
5   the two-thirds rule during regular session to pass bills
6   they wanted to pass and then putting bills back in to
7   recreate the two-thirds rule.  This was attempt by the
8   Senators to do just that.
9            After -- at that point, four years, and
10  with the majority, as I've testified, according to the
11  third-party polling, Anglo, African-American and
12  Hispanic voters in favor of Voter ID, this was a way
13  that they could pass the bill, which the majority of the
14  voters in the state of Texas wanted to see passed.
15       Q.  What is the basis of your knowledge that
16  Lieutenant Governors throughout the years changed the
17  two-thirds rule?
18       A.  The Senate Journal.
19       Q.  I believe you testified earlier in this
20  deposition that you were unaware of any rules that had a
21  carve-out by type of legislation for the two-thirds
22  rule; is that not -- is that not accurate?
23       A.  That is accurate but it's totally inconsistent
24  and has nothing to do with my previous statement.
25       Q.  Okay.  Can you explain --

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

---

161

1    A.  Sure.
2    Q.  -- how the two are reconciled?
3    A.  Yeah, let me explain how.  You asked me earlier
4  if there had been another special item that I'm aware of
5  that's been put into the Senators' rules, and I'm not
6  aware of any.  There may have been other special items.
7  There may have been a number of special items in the
8  past.  I'm just simply not advised.
9        Now, but the Journal that I have examined
10 carefully for over the last 30 or 40 years has numerous
11 cases where Lieutenant Governors, not just myself, but
12 others, Bob Bullock, Bill Hobby, passed the Blocker
13 Bill, meaning there was no bill in front, there was no
14 requirement to suspend the rules in order to -- or to
15 suspend the rules in order to move a bill forward -- had
16 done that many times.
17   Q.  Was that the method used with regard to Senate
18 Bill 14?
19   A.  No.
20   Q.  Was that embodied in the Senate rules?
21   A.  No.  But it was a practice that was used to
22 pass bills the Lieutenant Governor wanted to and where a
23 small minority did not want to pass it.
24       MS. HALPERN:  We're at an hour now,
25 surely.  How much more do you have?  Are you within

---

162

1  spitting distance of quitting?
2        MS. WESTFALL:  No.
3        MS. HALPERN:  Let's take a break.
4        (Recess 2:55 p.m. to 3:15 p.m.)
5        (Exhibit 23 marked for identification.)
6    Q.  (By Ms. Westfall)  You've been handed what's
7  been marked as Exhibit 23.  This has been produced in
8  this litigation as highly confidential.  It is
9  TX00262645 through 262649.  If you could take a look at
10 this e-mail and attachments and let me know when you've
11 had a chance to glance at them.
12   A.  I've looked at this.
13   Q.  Do you recognize Exhibit 23?
14   A.  No.
15   Q.  Have you ever seen any of the attachments
16 included in Exhibit 23?
17   A.  No.
18   Q.  Do you see that the e-mail on the cover is from
19 Bryan Hebert to several staff and copying Mr. Brunson
20 and Ms. Rathgaber?
21   A.  Yes.
22   Q.  Did you ever discuss ensuring compliance with
23 Supreme Court with Mr. Hebert?
24       MS. HALPERN:  Objection, asked and
25 answered.

---

163

1    Q.  (By Ms. Westfall)  You may answer.
2    A.  Yes.
3    Q.  Do you see where it refers to measures required
4  to offset burdens on voters?
5    A.  Yes.
6    Q.  Do you see that it indicates that availability
7  of provisional ballots and absentee ballots is required
8  to offset burdens on voters?
9    A.  Well, it's not necessarily required, but I see
10 that here it says, "measures required," and it includes
11 "availability of provisional ballots and absentee
12 ballots,"
13   Q.  Do you believe that the availability of
14 provisional ballots and absentee ballots is not required
15 to offset burdens on voters to comply with the Supreme
16 Court?
17       MS. HALPERN:  Objection, calls for a legal
18 conclusion.
19   Q.  (By Ms. Westfall)  You may answer.
20   A.  I don't know whether it does or not.  I know
21 that Senate Bill 14 provides for a provisional ballot
22 and allows absentee ballots.
23   Q.  Do you recall whether Senate Bill 14 changed
24 the law at all with regard to absentee ballots?
25   A.  No, I don't know whether it changed the law as

---

164

1  concerned -- as concerns absentee ballots.
2    Q.  To your knowledge, did it increase availability
3  of absentee ballots or maintain the status quo?
4    A.  I don't know.
5    Q.  Do you know under Senate Bill 14 what would
6  happen to a voter who appeared to vote in person without
7  appropriate photo ID?
8    A.  Yes.
9    Q.  What would happen?
10   A.  They would submit a provisional ballot and then
11 six days to return with acceptable ID in order for the
12 election authorities to count that provisional ballot.
13   Q.  Did this require -- did Senate Bill 14 require
14 those voters to make a trip to the election office to
15 bring an ID in order to ensure the ballot would be
16 counted?
17   A.  Yes.  Is that inconsistent with what I just
18 said?
19   Q.  No, I just wanted to confirm my
20 understanding --
21   A.  That it would require the voter who filed a
22 provisional ballot to go wherever was necessary, do that
23 which is necessary to provide -- to obtain an acceptable
24 ID pursuant to Senate Bill 14 and then return back and
25 present that ID.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

42 (Pages 165 to 168)

---

165

1    Q.  Do you recall earlier in this deposition you
2    testified about the previous provisional ballot
3    procedures for voters without ID?
4        A.  Yes.
5        Q.  What were those procedures?
6        A.  Under the previous -- under the previous
7    legislation, provisional ballots were counted if there
8    were -- were not -- were -- strike that.
9            Under the previous legislation, if someone
10   did not have the proper identification, they could vote
11   using a provisional ballot, and it would count if they
12   signed an affidavit, and then it was left up to the
13   county registrar board to -- to hopefully compare
14   signatures and see if it was a valid ballot.
15       Q.  So is it fair to say that Senate Bill 14, with
16   regard to provisional ballots, would require a voter to
17   make a second trip?
18       A.  Yes.
19       Q.  Do you see under Roman II, it indicates
20   "Measures required to offset burdens on voters," and it
21   says, "Ensure that obtaining ID is no more inconvenient
22   or burdensome than the usual act of voting"?
23       A.  Yes.
24       Q.  Do you believe that was a requirement to ensure
25   compliance for the Supreme Court?

---

166

1        A.  No.
2        Q.  Do you believe that Senate Bill 14 endeavored
3    to ensure that obtaining ID was no more inconvenient or
4    burdensome than voting?
5        A.  Yes.
6        Q.  And how did it do that?
7        A.  How did it not --
8        Q.  How did it -- how did it make obtaining ID no
9    more inconvenient or burdensome than the act of voting?
10       A.  In an effort to combat fraud and reduce the
11   number of fraudulent voters, whether it's in-person
12   voting, mail-in or registration, a process was started
13   to pass legislation which would have reduced in-person
14   fraud, and I tried to include a registration fraud, but
15   that was taken off because of the one -- the one-subject
16   rule -- the two-subject rule.  And -- and that
17   requirement to prove who you are has not changed.  And
18   efforts were made through the regulatory process in
19   order to make the ID that was required in order to vote
20   free, or as nearly free as possible, and to ease the
21   time that it took a person to obtain that documentation.
22   As I recall, it was reduced down to two days by
23   regulation or statute, so that it was no more
24   inconvenient or burdensome than the normal act of
25   voting.  Understanding that a voting ID was introduced.

---

167

1        Q.  So at the time that SB 14 was under
2    consideration, was an applicant -- in the bill that was
3    introduced, Senate Bill 14, it provided personal ID --
4    personal state ID for voters who indicated they did not
5    have qualifying Senate Bill 14 IDs; isn't that right?
6        A.  Could you repeat that?
7        Q.  Certainly.  In the bill, Senate Bill 14, as
8    introduced, provided for a personal state ID for voters
9    who indicated they did not have qualifying Senate Bill
10   14 ID?
11       A.  Would you permit me to look at Exhibit 15 for a
12   second?
13       Q.  Certainly.
14       A.  No, that is not correct.  What I have before me
15   in Exhibit 15, I thought we had gone over this, as
16   introduced, well, at least that's my memory that this
17   bill was introduced in exhibit -- and it's my memory
18   that Exhibit 15 represents Senate Bill 14 as introduced.
19   It either has a driver's license or a personal
20   identification card issued by the Department of Public
21   Safety, a U.S. military ID, a U.S. citizenship
22   certificate or U.S. passport.
23       Q.  Yes.  And I think I'm not being sufficiently
24   clear on my question.  My question is whether -- if you
25   -- Senate Bill 14, as introduced, if you didn't have any

---

168

1    of the necessary forms of photo ID, it provided that DPS
2    would issue you a personal state ID if you said you
3    didn't have any of those other forms of ID; isn't that
4    right?
5        A.  Yes.
6        Q.  And my question is whether -- and the Election
7    Identification Certificate was substituted for that
8    provision in conference; isn't that correct?
9        A.  And what was substituted in conference?
10       Q.  Election Identification Certificate, otherwise
11   known as EIC?
12       A.  I believe that's right, yes.
13       Q.  At the time that Senate Bill 14 was introduced,
14   was an applicant for a personal state ID required to
15   present documentary proof of citizenship?
16       A.  At the time that Senate Bill 14 was introduced
17   was -- under then current law, did one have to present
18   documentary proof of being an eligible voter?
19       Q.  Of citizenship to get a personal ID, not to
20   register to vote, to get a personnel ID?
21       A.  I don't know.  A personal ID issued by the
22   Department of Public Safety, I don't know.
23       Q.  Was documentary proof of citizenship required
24   to register to vote at that time?
25       A.  The identification required at the time that

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

43 (Pages 169 to 172)

---

169

1   Senate Bill 14 was introduced did not all require proof
2   of citizenship.
3       Q.  So register to vote; is that correct?
4       A.  To register to vote.
5       Q.  Was -- at the time Senate Bill 14 was
6   considered, was an applicant for a personal state ID
7   required to provide a set of fingerprints, to your
8   knowledge?
9       A.  I don't know.
10      Q.  Do you know whether many voters are able to
11  walk to their voting precinct to vote?
12      A.  Those that live near their voting precinct can.
13  Those that are in rural areas have to drive some
14  distance.
15      Q.  Do you know whether many voters must drive to a
16  driver license office, in other words, they're not
17  accessible by walking?
18          MS. HALPERN:  Objection, vague.
19      Q.  (By Ms. Westfall)  You may answer.
20      A.  I would have to speculate, but I would imagine
21  that a number of people have to drive.
22          MS. WESTFALL:  Would you mark this?
23          (Exhibit 24 marked for identification.)
24      Q.  (By Ms. Westfall)  You've been handed what's
25  been marked as Exhibit 24 and produced as highly

---

170

1   confidential.  It's TX00262650 through 52.  Would you
2   take a look at this document and all pages and let me
3   know if you've seen it before.
4       A.  I looked at the document.
5       Q.  Do you recognize this document?
6       A.  No.
7       Q.  Do you see that on the front page, it is an
8   e-mail from Bryan Hebert to other Senate staff,
9   including Janice McCoy, copying Blaine Brunson and Julia
10  Rathgaber?
11      A.  Yes.
12      Q.  Do you see that he expresses in the e-mail that
13  he is doubtful that -- doubtful about the photo ID law
14  being precleared?
15      A.  I see where he wrote that.
16      Q.  And do you see this e-mail is dated Saturday,
17  January 22nd?
18      A.  I do.
19      Q.  Was that days before the Committee of the
20  Whole's consideration of Senate Bill 14?
21      A.  Yes.
22      Q.  Did Mr. Hebert ever express to you his concerns
23  about preclearance of Senate Bill 14?
24          MS. HALPERN:  Objection, legislative
25  privilege.  Objection, attorney-client privilege.

---

171

1       A.  No.
2       Q.  (By Ms. Westfall)  Do you know whether any
3   changes were made to Senate Bill 14 to reflect some of
4   these concerns about preclearance expressed in Exhibit
5   24?
6       A.  I don't think they were, because I believe I
7   didn't agree with this position, nor did Senator Fraser.
8       Q.  Were you aware of Mr. Hebert's position, or is
9   this separate and apart from Mr. Hebert's e-mail?
10      A.  That's separate and apart from his e-mail.
11      Q.  What was the basis of your belief that Senate
12  Bill 14 would be precleared?
13      A.  Because it was modeled substantially after the
14  Indiana law which had been approved by the U.S. Supreme
15  Court and also modeled after the Georgia bill.
16      Q.  To your knowledge, was the Indiana photo ID
17  bill, was there any consideration of Section 5 of the
18  Voting Rights Act in that litigation?
19      A.  No.  And I beg your pardon.  I was focused more
20  on -- on the ultimate constitutionality of the bill.
21      Q.  Were you -- you were concerned about the
22  constitutionality of --
23      A.  In other words, what I was saying is that --
24  and not being a lawyer, that I can truthfully say I'm
25  not a lawyer -- that -- that I historically looked at

---

172

1   this as to how do we write a bill that fights fraud and
2   proves integrity of the election process so that more
3   people vote and that absolutely meets all the
4   constitutional test and would be approved by the U.S.
5   Supreme Court if we had to appeal it all the way to the
6   Supreme Court.  And that's why I kept relying on the
7   only two pieces of legislation that I know have been
8   approved by the Indiana law, by the U.S. Supreme Court
9   and the Georgia law was precleared by the DOJ.
10      Q.  Okay.  So is it -- because -- although -- is it
11  your testimony that the Indiana photo ID law did not
12  involve a claim of race discrimination, it involved a
13  challenge of the U.S. Constitution; is that correct?
14      A.  Could you ask your question again?  I'm not
15  following.
16      Q.  Sure.  Was the Indiana photo ID law, did it
17  withstand challenge under the U.S. Constitution?
18      A.  Yes.
19      Q.  And that was not a claim of race
20  discrimination; is that correct?
21      A.  If you make that representation, I will accept
22  it.
23      Q.  And is it your testimony that you thought
24  Senate Bill 14 would withstand or would be precleared
25  because the Georgia photo ID law had been precleared by

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

---

173

1  the Department of Justice?
2      A.  Yes, and because in my entire experience,
3  Counsel, my entire life with this bill, which seems like
4  longer than six years, I have never heard one person use
5  race discrimination as a reason for passing this bill.
6  And I have -- I have always wanted to increase the
7  number of voters, whether they're Hispanic, African
8  American or Anglo.
9      Q.  Were you present in the Committee of the
10 Whole's consideration of Senate Bill 14?
11     A.  Yes.
12     Q.  And I believe you testified earlier that you
13 voted in favor of Senate Bill 14 in the Committee of the
14 Whole?
15     A.  Yes.
16     Q.  But you were not able to vote on Floor
17 consideration of Senate Bill 14; is that correct?
18     A.  I think what I testified was that I don't
19 remember voting, but I'm sure I did.  We could look that
20 up very quickly.  I can't imagine I wouldn't have voted
21 for it.
22     Q.  In the Committee of the Whole or the Floor?
23     A.  In the Committee of the Whole.
24     Q.  Where are the records of the Committee of the
25 Whole recorded?  Are they in the Senate Journal or

---

174

1  elsewhere?
2      A.  They would be on the -- if we have a
3  legislative history of 14.  Let's see.  We have a
4  legislative history of 362, but that we wouldn't have
5  the individual votes except on the -- unless we looked
6  at the Journal.
7      Q.  While you're looking, let's go ahead and mark
8  another exhibit.
9          (Exhibit 25 marked for identification.)
10     Q.  (By Ms. Westfall)  Sir, you've been handed
11 what's been marked as Exhibit 25.  Do you recognize this
12 document?
13     A.  It purports to be the Texas Legislative Online
14 History, the legislative history of Senate Bill 14.
15         This enables me to be able to respond to
16 your earlier question.  I voted for -- for Senate Bill
17 362 as a member of the Committee of the Whole in 2009,
18 and I voted for Senate Bill 14 as a member of the
19 Committee of the Whole in -- in 2011.  Because as you
20 can see from one of the categories at the bottom, it
21 says, "Vote:  Ayes 20, Nays 12."  And that means at that
22 time in 2011, we had 21 members -- we had 20 Republicans
23 and I voted for it.
24     Q.  Thank you.
25     A.  I didn't mean to trail off in saying that.  I

---

175

1  just --
2          MS. WESTFALL:  Could you mark this?
3          (Exhibit 26 marked for identification.)
4      A.  She knew what I was saying.
5      Q.  (By Ms. Westfall)  I was able to do the math.
6          You've been handed what's been marked as
7  Exhibit 26.
8      A.  Yes.
9      Q.  Do you recognize this document?
10     A.  Looks to be a transcript of proceedings before
11 the Senate on January 25th when we were in the Committee
12 of the Whole.
13     Q.  I will represent to you that this is an excerpt
14 and not -- excuse me, not the entire transcript of the
15 entire committee hearing.  I want to turn your attention
16 to Page 44 of the transcript, an exchange between
17 Senator Van de Putte and Senator Fraser.  Do you see
18 that at the bottom of page 44, Senator Van de Putte asks
19 whether studies have been done to determine whether,
20 under current Texas voters law, any impact it would
21 have, the bill would have on classes of Latino and
22 African American voters?
23     A.  I'm looking to find that part.  Where are you,
24 on Page 44 or 45?
25     Q.  Page 44, line 24, at the bottom.

---

176

1      A.  At the very bottom.
2      Q.  At the very bottom, yes, sir.
3      A.  Yes, I see that.
4      Q.  Do you see Senator Van de Putte asks whether
5  there were any studies that determined the impact that
6  the law, that the bill, Senate Bill 14 would have on
7  Latino and African American voters?
8      A.  I see that in the transcript.
9      Q.  And do you see that Senator Fraser on Page 45
10 responds that the bill he's laying out has been approved
11 by the U.S. Supreme Court and precleared by the
12 Department of Justice in Georgia, it will deter fraud,
13 et cetera?
14     A.  I see that exchange.
15     Q.  Did you believe that Senator Fraser's response
16 to Senator Van de Putte was -- responded to her
17 question?
18         MR. BRISSENDEN:  Objection, form.
19     Q.  (By Ms. Westfall)  You may answer.
20         MS. HALPERN:  Objection, relevance.
21     Q.  (By Ms. Westfall)  You may answer.
22     A.  I think I've answered this question two or
23 three times, and that is, I had asked my staff,
24 principally, Mr. Hebert, to look into just this issue.
25 He'd had conversations with the -- both the DPS and the

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

---

177

1  Secretary of State's Office, and we were not able to
2  pull up the data that would give an indication.  And so
3  we had to rely on -- on authoritative results coming out
4  of both Indiana, who had photo voter ID, and Georgia,
5  who had photo voter ID, that it did not diminish
6  minority voter turnout, but actually increased the
7  -- I believe it's three studies that we found that
8  had been -- that had carefully looked at this in other
9  states, showed the same outcome.
10     Q.  But tuning my attention back -- turning your
11  attention back to my question, I'm not asking you about
12  the merits of Senator Fraser's response, but whether it
13  was responsive to her question or whether it responded
14  to a different question?
15         MR. BRISSENDEN:  Same objection.
16     Q.  (By Ms. Westfall)  You may answer.
17     A.  Well, I think my answer to you was more
18  specific than Senator Fraser's was.
19     Q.  Turning your attention to Page 162 of the
20  transcript, and 163.  Starting at 162, Line 17.
21     A.  Yes.
22     Q.  If you could just read the question of Senator
23  West and then the response of Senator Fraser and let me
24  know when you've had a chance to review that.
25     A.  Yes, I've read it.

---

178

1     Q.  Do you see that Senator West asked about
2  research conducted on the burdens of photo ID
3  requirements and whether they fall disproportionately on
4  racial minorities?
5     A.  Yes.
6     Q.  Do you see that?  And do you see that Senator
7  Fraser responded with information about polls,
8  concerning support for -- polls in support of
9  identification requirements?
10     A.  Yes.
11     Q.  Do you -- why -- why do you think that Senator
12  Fraser responded with polling data to that question?
13         MS. HALPERN:  Objection, calls for
14  speculation.
15     Q.  (By Ms. Westfall)  You may answer.
16     A.  I have no idea why Senator Fraser responded
17  that way.  I have no way to opine on why Senator Fraser
18  responded the way he did to the previous question.
19  Other --
20     Q.  Did you believe -- go ahead, I'm sorry.
21     A.  I'm sorry, go ahead.
22     Q.  Did you believe that -- that Senator Fraser's
23  response was -- that information was responsive to
24  Senator West's question?
25         MS. HALPERN:  Objection, calls for a legal

---

179

1  opinion.
2     Q.  (By Ms. Westfall)  You may answer.
3     A.  Certainly in part.
4     Q.  How did that --
5     A.  Certainly in part.
6     Q.  How was that responsive in your view?
7     A.  In that if the super majority of the people of
8  the state of Texas who happened to be -- and the
9  question was racial minorities -- African American,
10  Hispanic or other, were in favor of a voter ID, then
11  that's in part responsive.  But -- but partly based upon
12  the studies that were done in 2008 and 2009, and partly
13  now that we have a history here in Texas of having
14  implemented Senate Bill 14, we see that in 2008 and
15  2009, as well as in 2013 and 2014, there are no problems
16  with the difficulty.  I say no.  I'm not aware of
17  problems of difficulty in obtaining the necessary photo
18  voter ID that's required under Senate Bill 4.  And
19  certainly, that was all the testimony and empirical data
20  that we had seen from studies and from examining the
21  results of the Indiana photo voter ID as passed in 2008
22  and 2009, and the same with Georgia.
23     Q.  Do you recall during debate on the 2009 bill,
24  Senate Bill 362, that there was testimony by
25  representatives from the Brennan Center about ID

---

180

1  possession by Black and Hispanic voters?
2     A.  I'm afraid -- if you could differentiate it
3  just slightly more.  When you hear over 24 hours' worth
4  of testimony, it's hard to remember exactly.
5     Q.  Do you recall testimony by either a Mr. Justin
6  Levitt or Adam Skaggs from the Brennan Center about ID
7  possession of photo IDs by racial minorities?
8     A.  No, no, I don't.
9     Q.  Do you know anything about the Brennan Center?
10     A.  No, I don't.
11     Q.  I will represent to you that they testified
12  during this very lengthy hearing for --
13     A.  I believe you.
14     Q.  -- Senate Bill 362 --
15     A.  I believe you.
16     Q.  -- about disparate impact of ID by minority
17  voters?
18     A.  At the same time, we've seen that -- at least
19  I've seen testimony that some 95 percent of our voters
20  have driver's license.  I'm in the process of checking
21  that number, but a very high percentage of all of our
22  drivers -- I'm sorry, of all our voters have driver's
23  license.
24     Q.  Turning back to -- I think we got a little bit
25  sidetracked.  Turning back to the exchange, do you

---

LIEUTENANT GOVERNOR DAVID DEWHURST                      7/29/2014
CONFIDENTIAL TRANSCRIPT

46 (Pages 181 to 184)

---

181

1  believe that based on what -- that Senator Fraser's
2  response was responsive to Senator West?
3          MS. HALPERN:  Objection, relevance.
4      Q.  (By Ms. Westfall)  You may answer.
5          MS. HALPERN:  Objection, calls for a legal
6  conclusion.
7      A.  Well, Senator West asked, quote, unquote, was
8  there any research conducted on the burdens of photo ID
9  requirements that may fall disproportionately on racial
10 minorities.  I think the answer is no, based upon
11 research, but I'm not sure that Senator Fraser addressed
12 that question.
13     Q.  Thank you, sir.  You can put away this large
14 exhibit.
15         Do you recall that during the Senate's
16 consideration of Voter ID as to Senate Bill 14, there
17 were requests for information about the racial
18 composition of Texas voters who did not possess a driver
19 license?
20     A.  I'm sorry, I'm going to ask you one more time
21 to repeat that.
22     Q.  Let me strike that.  Let me withdraw that
23 question.
24         During consideration of Senate Bill 14,
25 was there a request from -- of the Secretary of State

---

182

1  for registered voters without a driver license?
2      A.  I believe there was.  Are you representing that
3  there was?
4      Q.  I was just trying to understand your memory
5  sitting here today.  Do you recall that Senator Williams
6  made such a request on the Senate Floor?
7      A.  You refreshed my memory.  Yes, I do.  Yes, I
8  do.
9      Q.  Do you recall that Ann McGeehan testified as a
10 resource witness at the hearing on Senate Bill 14?
11     A.  Yes, I do.
12     Q.  Do you recall that Senator Williams twice
13 during her testimony said when are you going to get me
14 the data comparing the registered voters and who have
15 driver's licenses?  Do you recall that?
16     A.  Yes.
17         MR. BRISSENDEN:  Objection, form.
18     Q.  (By Ms. Westfall)  Thank you.
19     A.  Which -- which is -- which is consistent with
20 what I've said to you several times today in that our
21 attempts to -- to investigate any alleged burden or --
22 or difficulty on the part of minority voters to get
23 acceptable photo voter ID was difficult to get the
24 information.  That's why we had to rely on -- on
25 national studies and the actual example in another

---

183

1  Section 5 state, Georgia, and another state, Indiana.
2      Q.  Do you think it was appropriate for Senator
3  Williams to seek this information from the Secretary of
4  State's Office?
5      A.  Sure.
6          MR. BRISSENDEN:  Objection, form.
7      Q.  (By Ms. Westfall)  Do you think it was --
8      A.  I'm sorry?
9          MS. HALPERN:  He's objecting to the form
10 of the question.
11     Q.  (By Ms. Westfall)  Do you think it was
12 advisable for Senator Williams to seek this information?
13     A.  I have no problem with him asking.
14     Q.  Do you agree that it's desirable for Senators
15 to have information about a bill's effects before the
16 Senate passes the bill?
17         MS. HALPERN:  Objection, legislative
18 privilege, calls for speculation, relevance.
19     Q.  (By Ms. Westfall)  You may answer.
20     A.  Well, my answer is going to be that based upon
21 all of the data that was available to us at the time
22 that we had looked into whether there was a burden,
23 decided that there was not a -- a burden that would, in
24 fact, be a problem and a hindrance to voting.  And from
25 all the empirical data that I've seen, as I mentioned,

---

184

1  as I mentioned repeatedly, the three national studies,
2  Indiana, Georgia, and our experience over the last four
3  elections, is that there's -- there is not an apparent
4  problem that I'm aware of with the access to the -- to
5  the photo voter ID so that anyone who wants, including
6  economically disadvantaged minority populations can
7  obtain that ID and vote.
8      Q.  Just to clarify the record, it is true that
9  information about how SB 14 was implemented during the
10 past several elections in 2013 and 2014 was not
11 available to the Texas Legislature when they were
12 considering Senate Bill 14 in 2011; is that right?
13     A.  Yes.  How Senate Bill 14 was implemented in the
14 subsequent four -- four elections was not available to
15 us as we were considering -- all we could consider was
16 the data coming out of Indiana and another Section 5
17 preclearance state, Georgia, and three national studies.
18     Q.  Are you aware, other than Senator Williams'
19 request of Ann McGeehan for this information, of any
20 other Senator making a request for similar information
21 from the Secretary of State's office?
22     A.  I'm not advised.
23     Q.  Are you aware --
24     A.  Normally you wouldn't have to ask, you wouldn't
25 have to have multiple Senators to ask.  So if he asked,

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

47 (Pages 185 to 188)

---

185

1  it should be sufficient.
2      Q.  Are you aware of whether the Secretary of
3  State's office responded to Senator Williams' request
4  for the number of voters without a driver license or a
5  personal ID card?
6      A.  I assume they did, but I don't know for a fact.
7      Q.  Do you know if your -- and why do you assume
8  that they did?
9      A.  Because the agencies are -- are well-advised to
10  be responsive to all the members of the Legislature,
11  including but not limited to the senior -- a senior
12  Senator who was -- in 2011, then the Secretary of the
13  Chair of our Transportation and Homeland Security
14  Committee.
15      Q.  Do you think it would be unusual for the
16  Secretary of State not to provide that information upon
17  request?
18      A.  If they had it, I would -- I would expect them
19  to provide.
20      Q.  Did your office, to your knowledge, ever
21  receive any such analysis from the Secretary of State's
22  Office?
23      A.  Would have to ask Bryan Hebert, but I'm not
24  advised on that.
25      Q.  Did you learn at any time during consideration

---

186

1  of Senate Bill 14 the number of registered voters
2  without a driver license or personal ID card?
3          MS. HALPERN:  Objection, assumes facts not
4  in evidence, misstates prior testimony.
5      Q.  (By Ms. Westfall)  You may answer.
6          MS. WESTFALL:  Are you done?  Sorry.  Are
7  you done?
8          MS. HALPERN:  Oh, what were you --
9          MS. WESTFALL:  He's not objecting.
10          MS. HALPERN:  I'll stick with assumes
11  facts not in evidence, misstates testimony of prior
12  witnesses in this case, misstates documentary evidence.
13      Q.  (By Ms. Westfall)  Did you learn at any time
14  during the consideration of Senate Bill 14 the number of
15  registered voters without a driver license or personal
16  ID card?
17      A.  I was told that it was a small number, but I
18  don't recall the exact number.
19      Q.  Do you recall who told you that?
20      A.  Staff.
21      Q.  Your staff?
22      A.  Yes.
23      Q.  Was that during consideration of Senate Bill
24  14?
25      A.  I don't remember.

---

187

1      Q.  Was that Mr. Hebert or someone else in your
2  office?
3      A.  I don't remember.
4      Q.  Did you learn that before Senate Bill 14 was
5  passed by the Senate?
6      A.  I believe I did.
7      Q.  By small, did you learn -- what do you mean by
8  small?
9      A.  3 to 7 percent.
10      Q.  Do you know how that estimate was derived?
11      A.  I was told that there was approximately 1
12  million registered voters who didn't have driver's
13  license, and the math flows from there.
14      Q.  Did you learn any estimate of those number of
15  voters who were Hispanic surnamed?
16      A.  I don't remember.
17      Q.  Did you learn any racial breakdown at all, the
18  African American voters?
19      A.  I don't remember.  But again, my
20  overwhelming -- the data in front of me showed that
21  there was no diminution of the or reduction in the
22  number of Hispanic or African American voters in both
23  Indiana and another Section 5 state, Georgia, and the
24  three studies that we relied on also indicated the same
25  thing after studying other jurisdictions.

---

188

1      Q.  Do you recall receiving analysis of the number
2  of voters who had registered to vote without listing a
3  driver license number?
4      A.  I don't recall seeing that.
5      Q.  Was that unrelated to what you just testified
6  to?
7      A.  Yes.
8      Q.  Are you aware of whether Senator Williams --
9  actually, strike that.
10          MS. WESTFALL:  Could you please mark this?
11          (Exhibit 27 marked for identification.)
12      Q.  (By Ms. Westfall)  You've been handed what's
13  been marked as Exhibit 27.  It is TX00107733 through 35.
14  Could you just take a look at this document and let me
15  know when you've had a chance to review it?
16      A.  Well, for a guy that's been busy doing a lot of
17  other things the last three years, the number I gave you
18  was pretty close.  And you're looking anywhere from 4
19  to -- 4 to 7 percent.
20      Q.  Do you recognize this document or any of the
21  numbers contained herein?
22      A.  No, I've never seen it before.
23      Q.  Did this -- did you receive any of this
24  information in an oral form from anyone?
25      A.  I must have been because the information I just

---

LIEUTENANT GOVERNOR DAVID DEWHURST                          7/29/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

---

189

1   shared with you that I was briefed that -- that up to
2   but not quite a million people.  And this is showing a
3   number between 650 and 700 -- 650,000 and 730,000, well,
4   anywhere between 519- and 844,000.  But do not have --
5   do not have -- well, let me just go with the conclusion.
6   Between 678,000 and 844,000 of the 12.6 million voters
7   in -- on January 27, 2011, don't have a Texas driver's
8   license or an ID.  That number is roughly 5 percent.
9       Q.  So you believe based on looking at Exhibit 27
10  that you received information in a different form of
11  these findings?
12      A.  I believe I received -- it would be my
13  assumption that what I was briefed by staff prior to --
14  prior to or simultaneous with the passing of Senate Bill
15  14, that there was some 3 to 7 percent of the voters in
16  Texas who didn't have Texas driver's license is in fact
17  what this statement says.  So.  Now, it has -- it is my
18  belief that that number has been dramatically reduced
19  through the efforts that we've implemented through the
20  regulatory agencies, DPS and Health and Human Services.
21      Q.  Okay.  And just because I just want you to
22  focus on the legislative process and what -- what
23  occurred during that process, what was your
24  understanding of how these estimates were arrived at?
25      A.  I was not briefed on that.  This is the first

---

190

1   time I'm looking at the document that goes into more
2   detail, other than the -- than the raw numbers, less
3   than a million out of almost 13 million voters.
4       Q.  And when you learned prior to -- I believe you
5   just testified prior to or during the Senate's
6   consideration of Senate Bill 14, did you understand that
7   that information had been derived from a match or
8   comparison of registered voters with people with driver
9   license, so two different databases?
10      A.  I know that earlier on that -- that Mr. Hebert
11  was told that they were having difficulty in taking the
12  list of driver's licenses in the DPS silo and the number
13  of registered voters and names in the Secretary of
14  State's Office and matching them.  I don't understand
15  why, but I was told that.  And Mr. Hebert was told that
16  by -- by -- I believe the person that sent this e-mail.
17  And then I remember that sometime shortly thereafter, I
18  was told there was less than a million people that
19  didn't have a driver's license out of the universe of
20  12.6, by that time, slightly more.  It looks -- let's
21  call it 13 million, and that's a little -- that's
22  roughly 5 percent of the voters.  And I know efforts
23  have been made to -- to facilitate Election
24  Identification Cards and that those that want to
25  provide -- that they're going after birth certificates

---

191

1   to make that at no cost.
2       Q.  And just turning your attention back to the
3   Legislature's consideration of Senate Bill 14.  When you
4   got that information from Mr. Hebert that 3 to 7 percent
5   of voters did not have a driver license, did you ask him
6   at that time whether there could be an analysis of the
7   voters with Spanish surnames to respond to the concerns
8   of bill opponents that Senate Bill 14 would have an
9   adverse impact on minority voters?
10      A.  No, I did not, because based on the examples in
11  Indiana, which is a different state than Texas, but
12  based upon the preclearance of the Georgia photo voter
13  ID and the national studies, I did not believe that
14  there was a -- that a photo voter ID -- ID bill would
15  reduce the minority voters, but it in fact would --
16  would generate just the opposite effect, increase
17  voting.
18      Q.  Did you believe that it was not necessary to
19  make that inquiry with regard to Texas voters because of
20  the information in the other states?
21      A.  Yes.
22      Q.  And why was that?
23          MS. HALPERN:  Objection, asked and
24  answered.
25      Q.  (By Ms. Westfall)  You may answer.

---

192

1       A.  I think I've said this four or five times.
2       Q.  I'm just trying to understand why you felt that
3   the information, since you had been provided by
4   Mr. Hebert --
5       A.  Right.
6       Q.  -- a universe of persons, Texas -- actual Texas
7   voters without the ID --
8       A.  Right.
9       Q.  -- why you wouldn't want to investigate the
10  racial breakdown of those voters and why you relied upon
11  data in other states?  That's what I'm -- simply what
12  I'm trying to ask you.
13      A.  If the universe of voters is 3 to 7 percent,
14  let's say, on average, 5 percent.  Then some -- some --
15  some percentage of that universe would be minority
16  voters.  And I felt that in light of the -- the efforts
17  which we were -- I had already communicated with Senator
18  Fraser on -- on making this a no cost to people that
19  want to obtain photo voter ID, that the agencies, DPS
20  and Health and Human Services, would implement what we
21  wanted, and they did.  And therefore, the -- that was
22  not going to be a problem.  A driver's license was not
23  the only form of identification that was required under
24  Senate Bill 14.  Senate Bill 14 did provide for free
25  identification.  It didn't make any difference.  All you

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 196)

---

193

1  had to do was apply and get an Election Identification
2  Card.  And so I didn't feel like, at that point, knowing
3  that they having problems marrying the databases and
4  knowing that there was a continuing problem with -- with
5  accessing the data, that it would be worth the time
6  spent, since I didn't believe it was going to be at that
7  point in time in 2011 productive.
8      Q.   Did you believe that the racial composition of
9  the voters in Texas was similar to the racial
10 composition of the voters in Indiana and in Georgia?
11     A.   Not in Indiana, although Indiana has a higher
12 percentage of minority voters than I had anticipated,
13 based upon the testimony from the Secretary of State's
14 Office, a large African American and increasing Hispanic
15 population in the carried area and others.  I thought
16 our population, not so much from a Hispanic point of
17 view, but from African American, was not totally
18 dissimilar in Georgia.  And based upon that, I felt that
19 the information in front of us clearly indicated that
20 there was not a risk of any discrimination against any
21 groups.  As a matter of fact, my goal from day one has
22 been to increase turnout.  I happen to be one of the
23 biggest critics of Republicans and Democrats for not
24 doing everything possible to increase voter turnout.  I
25 think it's healthy for democracy.  End of speech.  But I

---

194

1  really believe that.
2      Q.   Do you think it would have been -- putting
3  aside the Hispanic surname analysis, with regard to the
4  3 to 7 percent of voters without driver license, did you
5  conduct any investigation of where those voters resided
6  or any information about them whatsoever?
7      A.   I don't believe so.
8      Q.   Do you think it would have been helpful to
9  target efforts towards, for example, locating driver
10 license offices or implementing the EICs in the manner
11 in which you've testified to know more information about
12 where these voters resided?
13     A.   Yes, and we generally knew where they resided.
14     Q.   How?
15     A.   We knew -- because we have voter records, and I
16 talked to the DPS on several occasions about expanding
17 our hours, growing the -- increasing the size of our
18 driver's license departments, so we could -- so we could
19 handle more driver's license, both -- more driver's
20 applications and the new increase in Election
21 Identification Cards.  And the DPS has been responsive.
22 They have enlarged, based upon the appropriation that I
23 made for them last year, a number of their locations.
24 They have changed their hours to include Saturdays in a
25 number of their locations.  They have added, the last

---

195

1  time I looked, 25 mobile registration vans to move into
2  areas to increase registration.  I happen to believe
3  it's healthy, whether you're a Democrat or Republican,
4  to increase overall voter turnout.
5      Q.   And sir, I appreciate your testimony.  I want
6  to draw your attention back to the legislative process
7  and whether steps were taken during the pendency of
8  consideration of Senate Bill 14 to identify where those
9  voters were located.
10     A.   As I said, in my conversations with the DPS,
11 they had a general idea of where most of your population
12 was from, that was minority, that could be serviced from
13 their different driver's license stations.  And they
14 felt that by expanding those stations and by expanding
15 the hours of service, that they would access people that
16 needed free ID.
17     Q.   When did you have those conversations with DPS?
18     A.   During the pendency of Senate Bill 14 and
19 afterwards.
20     Q.   Did you --
21     A.   That's why you saw 25 new vans appropriated.
22 That's why you saw appropriations being made to expand
23 the Texas driver's license departments around the state.
24     Q.   And did those appropriations occur in the 2013
25 Legislature?

---

196

1      A.   That's right.
2      Q.   Okay.  Well, we'll talk about those a little
3  bit later.  Did you circulate to bill supporters written
4  recommendations on how to vote on certain amendments?
5      A.   No.
6      Q.   Did you otherwise convey your recommendations
7  on amendments to members?
8      A.   No.  There were a number of amendments that I
9  thought ought to be taken, but you need to keep in mind
10 -- well.  You don't need to keep in mind anything.  I
11 would recommend that -- that we discuss for a moment
12 that there's a general feeling among a lot of the
13 Republicans when they saw in the amendments a number of
14 the provisions that had been included in House Bill 218
15 and Senate Bill 362, that it confirmed what I shared
16 with you before, that this was all a stall game, and
17 there was no interest on the part of the Democrat
18 members to vote for a bill in any form.
19     Q.   Okay.  And I appreciate your testimony, but
20 we're just going to focus now on -- on the --
21          MS. HALPERN:  Actually, this is probably a
22 good time for a break.  Are we at another hour?
23          THE REPORTER:  Four minutes away.
24          MS. HALPERN:  Let's stop.
25          MS. WESTFALL:  Okay, we're doing great.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

50 (Pages 197 to 200)

197

 1   We're off the record.
 2         (Recess from 4:10 to 4:30 p.m.)
 3         (Exhibit 28 marked for identification.)
 4   Q.   (By Ms. Westfall) You've been handed what's
 5   been marked as Exhibit 174.  Do you recognize this
 6   document?
 7         THE REPORTER:  Exhibit 28.
 8         MS. WESTFALL:  I'm looking at a different
 9   exhibit sticker.  My apologies.
10   Q.   (By Ms. Westfall) You've been handed what has
11   been marked as Exhibit 28.  Do you recognize this
12   document?
13   A.   It looks like the Senate Journal from Wednesday
14   26, 2011.
15   Q.   Were you on the Floor for consideration of the
16   amendments to Senate Bill 14 in the Senate?
17   A.   Let me turn in Exhibit 28 to that part.  Yes.
18   Q.   Do you recall that Senator Davis offered an
19   amendment, Amendment Number 12, which would have
20   prohibited state agencies from charging a fee for
21   issuing documents used to obtain a photo ID, such as a
22   birth certificate, and that was Amendment 12 on Page
23   118?
24   A.   Yes.
25   Q.   Are you aware that under Indiana's photo ID

198

 1   law, indigent persons can obtain the underlying
 2   documents to obtain a necessary photo ID free of charge?
 3   A.   No.
 4   Q.   You're not aware that that -- of that part of
 5   the Indiana photo ID law?
 6   A.   That's correct.
 7   Q.   And was Amendment Number 12 tabled by the
 8   Senate?
 9   A.   Yes.
10   Q.   Do you know why it was tabled?
11         MS. HALPERN:  Objection, calls for
12   speculation.
13   Q.   (By Ms. Westfall) You may answer.
14   A.   Although we moved to make the election
15   identification card free of cost, and we -- through
16   regulations with the DPS, and we moved through
17   regulations with the Health and Human Services to
18   eliminate the charges for a birth certificate, and to
19   leave it either zero or maximum 3 dollars, I believe
20   that there was some concern that this would mean any
21   identification -- "an agency, institution or political
22   subdivision of the State may not charge any fee for the
23   issuance of document..."
24         I think perhaps, in retrospect as I look
25   back upon it, the procedure in looking at some of these

199

 1   amendments may have been going so fast, that although I
 2   don't have a problem with that particular amendment, and
 3   that is, in fact, one of the amendments that we, in
 4   fact, carried out -- in essence carried out, the
 5   practical effect of which, it -- it was not approved
 6   that night, although we have implemented it in a
 7   practical sense, since that time.
 8   Q.   Thank you.
 9         And do you see Senator Davis also offered
10   Floor Amendment Number 15 at Page 120, which would have
11   allowed the use of IDs that had expired after the last
12   general election, in other words, up to two years
13   previously?
14         MS. HALPERN:  Are you asking about
15   Amendment 15, Counsel?
16         MS. WESTFALL:  Yes.
17         MR. HALPERN:  The one that was withdrawn?
18         MS. WESTFALL:  Yes.
19         MR. HALPERN:  Okay.
20   A.   Yes, I see Amendment 15.
21   Q.   (By Ms. Westfall) Are you aware that the
22   Indiana photo ID law contains the same provision?
23   A.   Yes.
24   Q.   Was this -- did Senator Davis temporarily
25   withdraw and then make an amendment again to allow the

200

 1   use of photo IDs that had been expired for two years?
 2   A.   Counsel, I don't remember, but as we go through
 3   this, we'll find out the answer.
 4   Q.   Turning your attention to Amendment Number 19
 5   on Page 123, do you see that Senator Ellis offered an
 6   amendment which would have allowed the use of IDs -- I'm
 7   sorry -- which would have permitted the use of unexpired
 8   student photo IDs issued by public universities in
 9   Texas?
10   A.   Yes.
11   Q.   Are you aware that Indiana's photo ID law
12   allows the use of expired student -- of unexpired
13   student photo IDs?
14   A.   No.
15   Q.   And you see that this amendment was tabled; is
16   that correct?
17   A.   That is correct.  I know a number of us,
18   including myself, with all due respect to the ladies
19   here today, there had been some conversation about,
20   although there was support for students and facilitating
21   them voting, there are arguably hundreds of different
22   community colleges and universities, and every student
23   ID from a different university or college or a community
24   college would have been different, and it would have
25   been virtually impossible for election officials to be

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

51 (Pages 201 to 204)

---

201

1  able to know which ones were valid and which ones
2  weren't, which ones had been forged, which ones had not.
3     Q.  Isn't it true that most students -- you have to
4  vote where you reside, generally?
5     A.  Generally, but that's sometimes not followed in
6  practice.
7     Q.  Isn't it true that most students would be
8  voting close to their universities?
9        MS. HALPERN:  Objection, assumes facts not
10 in evidence.
11       A.  I repeat what I said.  Generally, but not
12 always.
13    Q.  (By Ms. Westfall) So wouldn't it be true
14 generally that poll workers would be likely to have an
15 understanding of student IDs that were locally issued
16 within that neighborhood?
17       MS. HALPERN:  Objection, assumes facts not
18 in evidence.
19    Q.  (By Ms. Westfall) You may answer.
20    A.  I can only speculate, and I wouldn't know
21 whether poll workers would have knowledge of the ID or
22 not.
23    Q.  Turning your attention to Amendment Number 21.
24       MR. HALPERN:  Counsel, I want to ask a
25 clarification.  I want to be sure that the questions

---

202

1  that you're asking are the ones that he's answering.
2  Are you asking him why the particular amendment was
3  tabled, why Senator Fraser did what he did, or are you
4  asking his opinion of why tabling it was a good idea?
5       MS. WESTFALL:  Well, let me ask the
6  question.  Why don't we take it up with a real question,
7  Counsel.
8    Q.  (By Ms. Westfall) Turning your attention to
9  Amendment Number 21, do you see that Senator Davis
10 offered an amendment which would have allowed the use of
11 IDs with a photo issued by the federal government or the
12 State of Texas?
13       MR. HALPERN:  Objection, misstates the
14 amendment.
15    Q.  (By Ms. Westfall) You may answer.
16       MS. HALPERN:  "An agency, institution or
17 political subdivision of the State, or an institution of
18 higher education in the state."
19       MS. WESTFALL:  My question was intended
20 not to repeat verbatim the amendment.
21    Q.  (By Ms. Westfall) Could you turn your attention
22 to Floor Amendment Number 21?  Do you see that
23 amendment?
24    A.  Yes.
25    Q.  Are you aware that under the Indiana and

---

203

1  Georgia photo ID laws, voters are permitted to use
2  federal IDs and state IDs with a photo?
3     A.  Yes.
4     Q.  And this Amendment Number 21 was tabled, was it
5  not?
6     A.  Yes.
7     Q.  Do you know why bill supporters opposed this
8  amendment, given that it would make Senate Bill 14 more
9  closely aligned with the Indiana and Georgia laws?
10    A.  No, other than the majority of the Senators
11 chose to vote against it.
12    Q.  Turning your attention to Floor Amendment
13 Number 24 on Page 126 of this exhibit, do you see that
14 Senator Hinojosa offered an amendment which would have
15 allowed county commissioners to authorize county
16 election officials to issue a voter registration card
17 with a photo ID?
18    A.  Yes.
19    Q.  If this amendment had been adopted in counties
20 that opted to provide this service, wouldn't it have
21 significantly reduced the burden of obtaining a photo ID
22 on voters who lacked requisite ID?
23    A.  Not necessarily.
24    Q.  Why not?
25    A.  Because, as we've discussed four or five or six

---

204

1  or seven times, you have an election identification
2  certificate being offered free of charge by the
3  Department of Public Safety, and -- or -- or someone
4  could apply for and receive a driver's license.
5     Q.  Is it your testimony that a voter who goes to a
6  voter registration -- an election official to register
7  to vote, and then separately obtains an EIC through the
8  driver's license office is as easy to do as going to
9  register to vote and getting your picture taken at the
10 same time in one trip?
11       MR. BRISSENDEN:  Objection, form.
12    Q.  (By Ms. Westfall) You may answer.
13    A.  It may require a separate trip.  It may not be
14 as easy, but now we're talking about relative terms.
15    Q.  Turning your attention to Floor Amendment
16 Number 29.
17    A.  You have to keep in mind, Counsel, that I
18 wasn't voting on these.
19    Q.  I appreciate your testimony.
20    A.  And as a result -- okay.
21    Q.  Well, I just have one more amendment to ask you
22 about, and then we'll be done with this exhibit, I
23 think.
24    A.  Sure.
25    Q.  Turning your attention to Amendment Number 29,

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

---

205

1   do you see that Senator Gallegos offered an amendment
2   which would have required DPS to provide extended hours
3   and Saturday hours?
4       A.  Yes.
5       Q.  It's on Page 129.
6       A.  Yes.
7       Q.  Are you aware that Senator Fraser said in
8   response to the offering of this amendment, that this
9   was not the place to debate DPS operations?
10      A.  I have not read that, but if that's what you
11  represent, I will take your word on that.
12      Q.  Do you agree that the debate on Senate Bill 14
13  was not the place to discuss DPS operations?
14      A.  I personally don't have a problem with -- with
15  using the debate on Senate Bill 14 to discuss the hours
16  of when people could apply for and receive their
17  driver's license, A, or B, their free election
18  identification card.
19          But what has, in fact, and what Senator
20  Fraser may have had in mind is, as I shared with you
21  before, the implementation, a lot of details of the
22  actual mechanics of bills, this isn't we got to pass a
23  2,000-page bill and we'll read it to see what's in it,
24  but to implement the details as carried out by the
25  regulating agencies.  And this is exactly what has

---

206

1   happened, that we have opened DPS offices, at least
2   certain DPS offices, quite a few on Saturdays, and I
3   don't know that we've opened them to 7 p.m. or later at
4   least one weekday night, but that's probably a good
5   idea.
6       Q.  But can you think of any reason not to include
7   these amendments to Senate Bill 14, as opposed to
8   discussing them with DPS post-enactment?
9       A.  Well, the bottom line and the practical effect
10  is we've implemented most of this.  I, for one, may have
11  voted for it, but it was nevertheless -- we are -- in
12  the practical sense, we're carrying this out at the
13  present time.  If memory serves, of the 41 different
14  amendments, the Senators approved 9, roughly 25 percent.
15      Q.  Do you recall that Bryan Hebert, after the
16  Senate -- strike that.
17          Did the Senate pass Senate Bill 14?
18      A.  Yes.
19      Q.  Do you recall that after the Senate passed
20  Senate Bill 14, Bryan Hebert characterized it as the
21  strictest photo ID law in the country?
22          MR. HALPERN:  Objection, mischaracterizes
23  the document.
24      Q.  (By Ms. Westfall) You may answer.
25      A.  Could you share with me the context in which he

---

207

1   said that?
2       Q.  Certainly.
3          MS. WESTFALL:  Could you mark this?
4          (Exhibit 29 marked for identification.)
5       Q.  (By Ms. Westfall) You've been handed what's
6   been marked as Exhibit 29.  It's been produced in this
7   litigation as highly confidential.  It's TX00034469
8   through 71.  Could you look at this document and let me
9   know when you've had a chance to review it.
10      A.  I have looked at it.
11      Q.  Have you seen this e-mail before or the
12  attachment?
13      A.  No.
14      Q.  Do you see that in the first line of
15  TX00034470, summarizing the bill, Mr. Hebert states
16  Senate Bill 14 would give Texas arguably the strictest
17  photo ID law in the country?
18      A.  I do.
19      Q.  Did he share that view with you?
20      A.  No.
21      Q.  Do you see the e-mail that he wrote on the
22  prior page at TX00034469 was dated January 27, 2011?
23      A.  2000 -- I'm sorry, did you say --
24      Q.  At the top of the e-mail, do you see that
25  it's -- at the top -- at the previous page, sir.

---

208

1       A.  Yes.  Right here?
2       Q.  Do you see at the top of the e-mail, it
3   indicates this e-mail was sent January 27, 2011?
4       A.  Yes, I do.
5       Q.  And was that the day after the Senate passed
6   Senate Bill 14?
7       A.  I believe that's right.
8       Q.  Did you at that time agree with Mr. Hebert's
9   assessment that Senate Bill 14 would give Texas arguably
10  the strictest photo ID law?
11      A.  Congratulations.  You've done that about seven
12  or eight times.  That is not my testimony.  You've never
13  put that into evidence.  I have no idea.  This is the
14  first I've seen that where he has stated for some
15  audience, one, two, three, four, five, six people, that
16  Texas arguably, arguably has the strictest photo ID law
17  in the country.  I respect his opinion.  Don't know if
18  it's right or wrong.
19      Q.  Do you believe that it was the intent of the
20  Texas Legislature to enact the strictest photo ID law in
21  the country?
22      A.  It was the intent of the legislature, it was
23  the intent of the Lieutenant Governor to pass a -- a
24  photo voter ID bill which reduced fraud, and not to
25  repeat myself, I apologize, but to improve the

---

LIEUTENANT GOVERNOR DAVID DEWHURST                     7/29/2014
CONFIDENTIAL TRANSCRIPT

53 (Pages 209 to 212)

209

1 confidence by the voters in Texas in our election
2 process.  Because I warrant to you, most voters didn't
3 have a lot of confidence in the validity of their vote
4 counting one person, one vote, and as a result, increase
5 the turnout of voters.  Because in Texas, we have a real
6 problem with low voter turnout.
7     Q.  Is it your understanding that the bill signed
8 into law is even stricter than the version of Senate
9 Bill 14 that was passed by the Senate?
10        MS. HALPERN:  Objection, misstates the
11 evidence.
12     Q.  (By Ms. Westfall) You may answer.
13     A.  The bill that we looked at a few moments ago,
14 that was the filed -- or filed bill?
15     Q.  That was the filed bill.
16     A.  The -- can you show me a copy of the bill as
17 passed?
18     Q.  Bear with me one moment.
19        MS. WESTFALL:  Let's mark this.
20        (Exhibit 30 marked for identification.)
21     A.  What you showed me, Counsel, on Exhibit 29, not
22 to doubt my own general counsel or deputy, but are these
23 substantially the terms of the bill as it passed out of
24 the Senate?  Because then I'm going to compare that to
25 the bill as passed.

210

1     Q.  (By Ms. Westfall) Okay.  Let me see if I can
2 craft a question that will -- I will represent to you
3 that Exhibit Number 29, the summary -- voter ID bill
4 summary substantive provisions represents, I believe, an
5 accurate description of the Senate passed.
6     Q.  Thank you.
7     Q.  So comparing that with the Senate -- with the
8 legislature -- with the final signed version, is it fair
9 to say that the bill, as signed into law, is even
10 stricter than the version that passed the Senate?
11        MR. BRISSENDEN:  Objection, form.
12     Q.  (By Ms. Westfall) You may answer.
13        MS. HALPERN:  Take your time.
14     A.  Well, under the Substantive Provisions -- I'm
15 tired -- under the Substantive Provisions, the first six
16 points are the same.
17        Let me go to the Exceptions.  Under
18 Exception Number 2 --
19     Q.  (By Ms. Westfall) Yes.
20     A.  -- a voter who is disabled and has provided a
21 physician certificate of the disability to the registrar
22 and received a registration card marked "Photo ID not
23 required" need only present the registration card on
24 Election Day.
25        The bill as passed, instead of having a

211

1 physician certificate of the disability, asked for an
2 exemption, some written documentation from the Social
3 Security Administration or the Veterans Affairs, as
4 applicable.  So that's a change.
5        On the -- I think that the religious
6 objection to being photographed is the same, but I don't
7 know about the indigent.
8     Q.  Do you believe that that was taken out during
9 the conference committee?
10     A.  Was it?  Okay.  So there would be two changes
11 there.
12     Q.  And turning your attention to the exception for
13 voters age 70 and older --
14     A.  Uh-huh.
15     Q.  -- do you recall that that was not in the
16 signed version of the bill?
17     A.  That's right.  That's right.  It wasn't.  And I
18 had wanted -- I'd wanted that to be in there.
19     Q.  Comparing the two versions, the Senate-passed
20 version versus what was signed into law, would you -- is
21 it fair to say that the bill signed into law was
22 stricter than the bill enacted by the Senate?
23        MR. BRISSENDEN:  Objection, form.
24     Q.  (By Ms. Westfall) You may answer.
25     A.  The bill that we passed out of the Senate had

212

1 several more exemptions.
2     Q.  I believe you testified earlier that the
3 election identification certificate was inserted into
4 the bill during conference committee; is that correct?
5     A.  Yes, I believe that's correct.
6     Q.  Did Mr. Hebert assist you in developing the
7 EIC -- I'll refer to it as the EIC -- the EIC provision?
8        MR.HALPERN:  Objection, lack of
9 foundation.  Assumes facts not in evidence.  Compound.
10     Q.  (By Ms. Westfall) You may answer.
11     A.  I don't remember.  I remember that we briefly
12 discussed creating this document in the conference
13 committee and wanting it to be free to a perspective
14 voter -- to a voter.
15     Q.  Did SB 14, as filed, prohibit DPS from charging
16 a fee for personal IDs issued to persons who affirmed
17 that they did not otherwise have qualifying ID?
18     A.  As filed?
19     Q.  As filed.
20     A.  I don't remember.  You want me to look back and
21 take a look?
22     Q.  I believe you testified earlier about the
23 personal IDs that were available in the filed version.
24     A.  Right.
25     Q.  Do you recall that?

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

---

213

1    A.  Yes.
2    Q.  And did -- let me ask you another question
3  before you refer back to that exhibit.
4        Was the EIC provision adopted in the
5  conference committee designed to address budgetary or
6  accounting concerns related to the Texas Mobility Fund
7  as it pertained to the personal IDs?
8    A.  That's not my intention.  The intention was to
9  provide a -- a free identification card.
10   Q.  Was the budget for the EICs derived from a
11  different source, other than the Texas Mobility Fund?
12       MS. HALPERN:  If you know.
13   A.  I don't know.
14   Q.  (By Ms. Westfall) Was it your understanding
15  that the personal state ID that was provided for in the
16  Senate, the version of the Senate Bill 14 as filed,
17  could be used for purposes other than voting?
18   A.  I remember that it could not be used for
19  driver's license purposes.  And I'd have to go back and
20  take a look at the language in the filed version.
21   Q.  Okay.  Let's --
22   A.  What exhibit is that?
23   Q.  I believe it's Exhibit --
24   A.  Fifteen?
25       MS. FARANSSO:  The filed version?

---

214

1        MS. WESTFALL:  The filed version.
2  Fifteen?
3        MS. HALPERN:  I'm sorry.  What's the
4  question pending?
5        MS. WESTFALL:  The question is whether the
6  personal state ID that was available, if you didn't have
7  others forms of Senate Bill 14 ID in the filed version,
8  could be used for purposes other than voting.
9    A.  Well, on the filed version, I'm looking at
10  Section 63.0101, one and the whole, that talks about "or
11  personal identification card issued to a person by the
12  Department of Public Safety that is not expired," and I
13  -- I don't see the answer to your question.
14   Q.  (By Ms. Westfall) Are there any prohibitions on
15  using that personal ID card for uses other than voting?
16   A.  I don't see -- if there are, I don't see it in
17  the introduced version of Senate Bill 14.
18   Q.  Are you -- have you -- are you familiar with
19  the opinion in the Texas versus Holder case denying
20  judicial preclearance of Senate Bill 14?
21   A.  Only to the extent that preclearance was -- was
22  turned down.
23   Q.  Do you know when that opinion was issued,
24  roughly?
25   A.  2012.

---

215

1    Q.  Was it late August 2012?
2    A.  Late August 2012.
3    Q.  Did you take any actions in response to that
4  decision?
5    A.  I don't know whether or not I was named -- I
6  don't remember whether or not I was named one of the
7  plaintiffs in the case.  I don't know.
8    Q.  And I'll represent to you that it was the State
9  of Texas that brought the lawsuit --
10   A.  Okay.
11   Q.  -- and not you.  But did you -- did you take
12  any actions in response to the decision?
13   A.  Other than talk to the Senators, tell them that
14  this was expected based upon the current makeup of the
15  Department of Justice, and that I felt comfortable -- I
16  felt confident that we would prevail, whether it's in
17  the Fifth Circuit or going all the way to the Supreme
18  Court, since I've never seen any indication in my
19  legislative life of any attempt to suppress votes, but
20  in this particular effort to expand our voter base.
21   Q.  And just to be clear for the record, were you
22  testifying about the Department of Justice's decision to
23  deny preclearance, or were you discussing the three-
24  judge court opinion and your reaction to that?
25   A.  The decision by the Department of Justice.

---

216

1    Q.  Did you have -- are you familiar with the
2  opinion issued by the three-judge court in Texas versus
3  Holder in August 2012?
4    A.  Generally.
5    Q.  Did you take any actions in response to the
6  decision by the court?
7    A.  No.
8    Q.  Did you propose any changes to Senate Bill 14?
9    A.  No.
10   Q.  How many times did the Legislature meet after
11  the decision came down in August 2012?
12   A.  How many times did the Legislature meet?
13   Q.  Uh-huh.
14   A.  We met in regular session in January 2013, and
15  we were in three special sessions during the summer of
16  2013.
17   Q.  Were any committee hearings held related to
18  Voter ID during that period?
19   A.  No.
20   Q.  Did you urge the Senate to convene any hearings
21  related to Voter ID?
22   A.  No.
23   Q.  Were any interim session committees convened to
24  consider Voter ID?
25   A.  I don't remember which -- if we had interim

---

LIEUTENANT GOVERNOR DAVID DEWHURST                         7/29/2014
CONFIDENTIAL TRANSCRIPT

55 (Pages 217 to 220)

---

**217**

1  charges on that.  We may have.
2      Q.  And did the 2012 presidential election occur
3  after the court's decision was issued?
4      A.  Yes.
5      Q.  Were there any efforts by the Legislature, you
6  were aware of, to hold hearings, convene a task force,
7  or otherwise examine the administration of the 2012
8  presidential election?
9      A.  No.
10     Q.  Were you aware of any in-person voter --
11     A.  Let's go back.
12     Q.  Certainly.
13     A.  Could you rephrase your question?
14     Q.  Do you not understand the question?
15     A.  I'm not sure what you're getting at.  In other
16  words, what I think you asked is whether or not I
17  convened any committees to look into the 2012
18  presidential election.  What specifically are you
19  asking?
20     Q.  About the administration, how the
21  administration went in the State of Texas.
22     A.  The administration of?
23     Q.  The 2012 election, yes, sir.
24         MS. HALPERN:  Objection, relevance.
25     Q.  (By Ms. Westfall) You may answer.

---

**218**

1          MR. BRISSENDEN:  Objection, form.
2      A.  I have tasked my staff, we talked to the
3  Attorney General's Office about whether or not there are
4  examples of undue burden by anyone, including
5  minorities, in order to obtain information -- voter IDs
6  and vote, and to the best of my knowledge, there is --
7  has not been a problem in the State of Texas.
8      Q.  (By Ms. Westfall) Okay.  Just to be clear in
9  terms of the time, I want to focus your attention on the
10  time between when the three-judge court issued the
11  ruling in August 2012, to the time when Senate Bill 14
12  went into effect in June 2013.  At that time, is it
13  correct that voter ID was not enforced in the State of
14  Texas?
15     A.  During the time period up until June of 2013?
16     Q.  Yes.
17     A.  That is correct.
18     Q.  Are you aware of any in-person voter
19  impersonation that occurred during the 2012 presidential
20  election in the State of Texas?
21     A.  I testified earlier that we were apprised of
22  multiple cases of in-person fraud in the period leading
23  up to the 2009 and 2011 sessions.  But I'm not aware of
24  any in-person fraud in the 2012 presidential election.
25     Q.  During any election in the State in Texas

---

**219**

1  between August 2012 and June 2013, are you aware of any
2  in-person voter impersonation that occurred in Texas?
3      A.  No.
4      Q.  As of June 26th or 25th, 2013, did Texas start
5  to enforce Senate Bill 14?
6      A.  Yes.
7      Q.  Has your office played any role in the
8  implementation of Senate Bill 14?
9      A.  Other than to monitor its implementation and
10  the effects on the State, which are continuing interim
11  charges that I have the responsible Senators, the
12  appropriate Senators working on, no.
13     Q.  Is an interim charge in the works presently, or
14  when will this occur?
15     A.  It was -- it was in -- it was included in the
16  interim period between the 2011 session and the 2013
17  session, and it's one of our interim charges that we
18  have at the present time that hasn't been issued yet.
19  It is in the process of being issued for the
20  jurisprudence committee.
21     Q.  And when will that -- is that convening a
22  committee or a charge in the future?
23     A.  No.  It's a study.  It's a study whereby we're
24  looking to see if there are problems, challenges, things
25  we have to address in the implementation of Senate Bill

---

**220**

1  14.
2      Q.  And when will that get underway?
3      A.  It's either underway or will soon be underway,
4  and with a report due back the end of December.
5      Q.  Will it be examining implementation of Senate
6  Bill 14 in the November election of this year?
7      A.  Yes, as well as collecting information on -- on
8  the November 2013 election, the March 4th primary
9  election, the May 27th run-off election, and the
10  November election.
11     Q.  What information is it gathering for that
12  report?
13     A.  If there -- the implementation of the voting
14  process, if, in fact, there's a smooth effort for people
15  to vote, if there are problems with the obtaining of
16  photo voter ID or other ID so that are we, in fact,
17  achieving our goal of expanding our voter base and
18  making sure that A, this is constitutional, and B, there
19  are no barriers to people voting.
20     Q.  Is that part of the interim charge, determining
21  whether there is an impact by race of voter, or is it
22  voters overall?
23     A.  Voters overall.
24     Q.  Are you aware of any efforts to determine the
25  number of provisional ballots cast for lack of

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

56 (Pages 221 to 224)

---

221

1  qualifying photo ID under Senate Bill 14?
2      A.  I've asked for that information.  I don't have
3  it.
4              MS. WESTFALL:  Would you mark this?
5              (Exhibit 31 marked for identification.)
6      Q.  (By Ms. Westfall) You've been handed what's
7  been marked as Exhibit 31.
8      A.  Uh-huh.
9      Q.  Do you recognize this document?
10     A.  Is a press release issued by my office on
11 January 26, 2011.
12     Q.  Did you authorize this language of this press
13 release before it was issued?
14     A.  I don't know if I did or not.  I think this one
15 was written by our press secretary, Mike Walz.
16     Q.  Did you see this language and approve of this
17 language before it was issued?
18     A.  I'm not -- I don't remember that I did.  I, in
19 earlier releases, have used the words "eligible voters."
20 So I don't know that I had time to review this or not.
21     Q.  Do you know why this press release refers to
22 ensuring that only U.S. citizens are able to vote in
23 Texas elections?
24     A.  Well, that's what I addressed just a moment ago
25 when I said "eligible voters," by ensuring that only

---

222

1  eligible voters vote in Texas elections.  I -- I had
2  been -- since -- since all of the voter ID and photo
3  voter bills are a -- are a measure of
4  step-in-the-direction of reducing fraud, building up
5  more confidence in the integrity of the election
6  process, and increasing voter turnout, and they're not a
7  -- as we discussed in some of your exhibits earlier, in
8  every case, a -- a measure to ensure that only U.S.
9  citizens vote, I think I -- I would have used the word
10 "eligible voters" instead of "U.S. citizens."  But this
11 came out of my office, so I obviously have to stand by
12 it.
13     Q.  Thank you, sir.
14             MS. WESTFALL:  Could you mark this?
15             (Exhibit 32 marked for identification.)
16     Q.  (By Ms. Westfall) You've been handed what's
17 been marked as Exhibit 32.  Do you recognize this
18 document?
19     A.  It's a press release from our office.
20     Q.  If you could review this and let me know
21 whether you approved this language before it was
22 included in this release.
23     A.  Yes, I did.
24     Q.  Turning your attention to the -- and what is
25 the date of the release?

---

223

1      A.  The date on the release is March 12, 2012.
2      Q.  Was that the day when the administrative
3  preclearance of Senate Bill 14 was denied?
4      A.  I believe that's right.
5      Q.  And do you see four paragraphs down, there is a
6  quote about the Voter ID law ensuring every legal
7  citizen can exercise their right to vote?
8      A.  Yes.
9      Q.  Do you know why the release indicates that the
10 voter ID will have that effect?
11     A.  Because it's been our intent that every legal
12 citizen can exercise their right to vote, and that was
13 the intent behind the free election identification card,
14 as well as trying to expedite the issuance of driver's
15 licenses.
16     Q.  And I think earlier today you testified that
17 some forms of the ID in Senate Bill 14 would not
18 necessarily show that the cardholder --
19     A.  That is exactly right.  That is exactly right.
20     Q.  And how is that consistent with this press
21 release?
22     A.  Because you're talking about apples and
23 oranges, Counsel.  You're talking -- you're talking is
24 the glass half full instead of the glass half empty.
25 Earlier we were talking about U.S. citizens, we were

---

224

1  talking about earlier testimony that not all forms of
2  the identification would prove that someone is an
3  eligible voter and a U.S. citizen.
4              What I'm saying here, and I may have been
5  very quick in writing this, but what I was trying to say
6  is that at least, if you're a legal citizen and an
7  eligible voter, you should be able to vote.  Because,
8  among other things, we're including passports, concealed
9  gun -- handgun licenses, government issued photo
10 driver's license and free identification.  That's where
11 I was coming from.
12     Q.  Okay, thank you.
13             (Exhibit 33 marked for identification.)
14     Q.  (By Ms. Westfall) You've been handed what's
15 been marked Exhibit 33.  Do you recognize this document?
16     A.  No.  But it looks to be like a copy of a
17 newspaper story by the Houston Chronicle.
18     Q.  Do you see that this is -- do you see the date
19 on this article?
20     A.  The article says April 25, 2007.
21     Q.  Would this have pertained to the Senate's
22 consideration of House Bill 218?
23             MR. BRISSENDEN:  Objection, form.
24     Q.  (By Ms. Westfall) You may answer.
25     A.  It may.  I haven't read it yet, but it may

---

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

57 (Pages 225 to 228)

225

1   have.  I don't know.
2           MR. HALPERN:  I'm going to direct you to
3   read it before you testify about it.
4           THE WITNESS:  All right.
5   Q.  (By Ms. Westfall) I would direct your attention
6   to the fourth and fifth paragraph.
7           MS. HALPERN:  I'm still going to ask him
8   to read the entire article before he answers any
9   questions about it, Counsel.  It's a newspaper article.
10  Q.  (By Ms. Westfall) Could you let me know when
11  you've had a chance to review this?
12  A.  Certainly.  I've read it.
13  Q.  Do you, where it quotes -- it purports to quote
14  you five paragraphs in, as concerning voter ID, "Why
15  isn't it necessary to prove that you're a U.S. citizen
16  to vote in U.S. elections?"  Do you see that?
17  A.  Yes, I do.
18  Q.  Do you believe it's an accurate quote?
19  A.  I don't know whether it's accurate or not.  I
20  don't know what -- under what circumstances -- if the
21  question was asked and I answered it.  But I'm more
22  focused on proving who you are and having eliminating
23  fraud and having more confidence in the election
24  process.  You know, I've been asked so many times,
25  Counsel, if you have to have a photo -- if you have to

226

1   have a photo ID to get on a plane, buy Sudafed, check
2   out a library book, why shouldn't you have one to vote,
3   which is so important and affects all of our lives?
4   Q.  So, in other words, you're not sure whether
5   this is an accurate quote?
6   A.  It may be accurate, it may not be accurate.
7   And I don't know whether I was responding to someone
8   that asked me that question:  Why should you have to
9   prove that you're a U.S. citizen?  So I don't know the
10  circumstances.
11  Q.  Thank you, sir.
12          MS. WESTFALL:  Could you mark this?
13          (Exhibit 34 marked for identification.)
14  A.  But let me go back, Counsel.  I'm fine.  I said
15  it within some context, and I believe it.
16  Q.  (By Ms. Westfall) And turning back to -- and
17  you're referring now to Exhibit 33?
18  A.  Yes.
19  Q.  And so you think that this quotation is
20  properly attributable to you:  Why isn't it necessary to
21  prove that you are a U.S. citizen to vote in U.S.
22  elections?
23  A.  Yes.
24  Q.  And how did Voter ID further that purpose of
25  showing that the cardholder was a U.S. citizen?

227

1   A.  It furthers it -- it furthers it, but it
2   doesn't eliminate the chance of someone who's not a U.S.
3   citizen to be able to vote, because not all of our forms
4   of photo ID require that -- and perhaps unfortunately --
5   that someone be shown to be an eligible voter, a U.S.
6   citizen, as our voter application shows, that they're
7   not a felon, that they're not mentally adjudicated not
8   to be able to vote, and that they live in the county in
9   which they registered to vote.
10  Q.  And why were you focusing on the particular
11  requirement of U.S. citizenship and not other
12  requirements to be eligible to vote in this quotation?
13  A.  Counsel, I have no idea.  This is simply one
14  quote.  I could have been asked this question and I
15  answered back.
16  Q.  And you've been handed what's been marked as
17  Exhibit 34.
18  A.  Uh-huh, yes.
19  Q.  Do you recognize this document?
20  A.  No, but I have in front of me a -- it looks
21  like a blog entitled "Dewhurst is Disappointed Voter ID
22  Measure Failed."
23  Q.  Do you see the date of the blog?
24  A.  Yes.  It says June 1, 2007.
25  Q.  And do you see that you were quoted in

228

1   Paragraph 2 concerning your disappointment?
2   A.  Yes, I do.
3   Q.  Do you believe that you were accurately quoted
4   in Paragraph 2 about your disappointment concerning the
5   voter ID program and your assertion that there were
6   thousands and thousands of noncitizens voting in Texas?
7           MR. HALPERN:  Objection, no foundation.
8   Q.  (By Ms. Westfall) You may answer.
9   A.  I don't know whether I was quoted accurately or
10  not, but I did provide ample testimony, which I repeated
11  on several occasions, that the testimony before us in
12  the 2009 and 2011 hearings proved this up, and -- and
13  although it's anecdotal, my traveling the state for a
14  period of six years, seven years talking to people who
15  wanted to see a fair voter ID bill passed, and they're
16  sharing with me stories, admittedly anecdotal, persuaded
17  me then and now that we have a number of ineligible
18  people who have voted in Texas.
19  Q.  And how did Voter ID -- I believe you testified
20  earlier, did you not, that Voter ID was instituted to
21  require voters to prove their identity at the polls,
22  correct?
23  A.  Right.
24  Q.  And how would it prevent a noncitizen voting in
25  Texas?

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

58 (Pages 229 to 232)

229

1    A.  Our goal is to have eligible people,
2  obviously.  The goal -- remember, five or six hours ago,
3  we were talking about the goal is to have eligible
4  people vote.  Noncitizens are not eligible people, but
5  our objective is to have people that are eligible,
6  they're U.S. citizens, they -- they're 18 years of age
7  or over, they don't have a mental competency challenge,
8  they're not felons -- I know I'm missing something --
9  and they live in the county in which they are registered
10 to vote.  That's what we would like to see.  And I
11 believe -- and I believe that the evidence shows, in
12 fact, not anecdotal but empirical evidence shows that
13 will increase turnout.  And that's what I want to see.
14 So that -- that was -- that was where I've been coming
15 from.
16        Again, this particular quote, I'm quoted
17 saying I was disappointed we did not get a Voter ID
18 program out of here, and then the quotes are thousands
19 and thousands and thousands.  It doesn't say of
20 noncitizens, it doesn't say of noneligible, it doesn't
21 say -- I mean, I don't know what I said there, so it's
22 not a quote with me using the word "noncitizens."
23    Q.  I see.  Thank you.
24        MS. WESTFALL:  I think we will take a
25 quick break and then switch counsel.

230

1        THE WITNESS:  Okay.
2        MS. HALPERN:  All right.  Let's go off the
3  record and figure out the time, because I think we're
4  going to probably take a little bit longer break.  This
5  may be close enough to an hour.
6        MS. WESTFALL:  Okay.
7        MS. HALPERN:  We'll just call this the
8  hour break.
9        (Recess from 5:22 to 6:00 p.m.)
10                EXAMINATION
11 BY MS. FARANSSO:
12    Q.  Lieutenant Governor, again, I'm Tania Faransso.
13    A.  Tania.
14    Q.  I'm here on behalf of the Texas League of Young
15 Voters Education Fund and Imani Clark.  I won't go over
16 the ground rules that Elizabeth laid for you --
17    A.  Right.
18    Q.  -- earlier today, but I trust that they will
19 remain the same --
20    A.  Yes.
21    Q.  -- for my questioning.
22    A.  Yes.
23    Q.  You testified today, and correct me if I'm
24 wrong, that you wanted to model SB 14 after the Georgia
25 and Indiana laws to make them as close as possible to

231

1  those laws; is that correct?
2    A.  Yes, what I testified was that my
3  recommendation was that, in light of all of the
4  concessions that we had made over the years, to try and
5  pull together a consensus on Voter ID and have a
6  bipartisan bill.  Since that wasn't successful, and
7  since we didn't want all this effort to be wasted, that
8  I recommended that we -- that we try and model a bill
9  after the Indiana bill that had been approved by the
10 U.S. Supreme Court and the Georgia bill that had been
11 precleared by the Department of Justice.  Not to say
12 that it had to be identical, but at least try and model
13 it after those two bills.
14    Q.  Okay.  And you and Ms. Westfall discussed
15 a bit today, but are you aware that Senate Bill 14 is
16 more restrictive than the Indiana and Georgia photo ID
17 laws?
18    A.  Well, I'm not sure that I agree with your words
19 of more restrictive, but it does not have as many
20 exceptions as the -- the Indiana and the Georgia bills
21 do.
22    Q.  And in addition to not having as many
23 exceptions as the Indiana and Georgia bills, would you
24 also agree that the Indiana and Georgia laws contain --
25 permit more forms of photo ID than Senate Bill 14?

232

1    A.  Yes.
2    Q.  Okay.  Did it concern --
3    A.  However, I never considered that a material
4  difference because, as you heard me testify earlier, we
5  have -- we have tried to identify if there were going to
6  be problems for -- for voters.  We've not been able to
7  identify a problem.  We have now run four different
8  elections under Senate Bill 14, and I'm not aware of a
9  problem where voters are having a hard time having
10 access to photo voter IDs.
11    Q.  So at the time, just to be clear, that Senate
12 Bill 14 was being considered, it did not concern you
13 that Senate Bill 14 permitted fewer forms of photo ID
14 than the Georgia and Indiana laws?
15    A.  No, because what I was focused on is having a
16 bill that was modeled after them, and I left it to
17 Senator Fraser to come up with the structure that --
18 that would provide us a safe harbor, make sure that --
19 that our bill was considered to be constitutional by the
20 U.S. Supreme Court.
21    Q.  Was it your view that Texas needed a voter ID
22 law that was stricter than the Indiana and Georgia laws?
23        MS. HALPERN:  Objection, misstates prior
24 testimony.
25    A.  It wasn't so much as trying -- it wasn't so

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

59 (Pages 233 to 236)

---

233

1  much as trying to model the bill after the Indiana and
2  Georgia bill as it was to go back to what I said earlier
3  repeatedly, and that is to -- to reduce voter fraud,
4  increase the -- the integrity of the election process,
5  and build up more confidence in the voters of Texas that
6  their vote is going to count, it's not going to be
7  offset by someone who's -- who's living in Connecticut
8  and in Texas or a snowbird that's come down or someone
9  from another country that's here.  We want our eligible
10 voters, all eligible voters, to vote.
11      Q.  (By Ms. Faransso)  Do you believe that Senate
12 Bill 14 was the least restrictive option to be able to
13 achieve the goals that you have just discussed?
14      MS. HALPERN:  Objection, calls for a legal
15 conclusion.
16      A.  I think Senate Bill 14 was an acceptable bill
17 modeled after Indiana and Georgia.
18      Q.  (By Ms. Faransso)  Can you imagine sitting here
19 today that a less restrictive version of Senate Bill 14
20 could have achieved the bill -- the goals that you were
21 hoping to achieve through that legislation?
22      MS. HALPERN:  Objection, relevance.
23 Objection, calls for speculation.
24      A.  I suppose I can sit here and speculate on what
25 I could have done differently in college to improve my

---

234

1  grade point average 1/10th of 1 percent but -- I'm sure
2  there are things which we could have done.  But -- but I
3  charged Senator Fraser, the Senators, with coming
4  together on a fair bill that could be modeled after
5  Indiana and Georgia in general, not necessarily exactly,
6  because the two bills were different, but one which we
7  could feel good about that would not discriminate
8  against anyone and still be upheld as constitutional
9  under the -- by the U.S. Supreme Court.
10      Q.  (By Ms. Faransso)  You also testified today
11 that you -- and again, correct me if I'm wrong or
12 mischaracterizing, but that you were not aware of any
13 data in Indiana and Georgia which have photo ID of
14 people being unable to access the ID they needed under
15 those bills; is that right?
16      A.  That is what I said because that's my
17 understanding.  If I'm not wrong.
18      Q.  Is the lack of reports of people being able to
19 access the IDs they needed in Indiana and Georgia, is
20 that the measure of whether a photo ID bill is lawful?
21      A.  In the Indiana case or the Crawford case, as a
22 layman reading the decision, if the photo voter ID did
23 more for the common good, even if there were a small
24 number of people affected, then that was permissible
25 under the law, if I read it correctly.

---

235

1  So although my goal would have been not to
2  have anyone that was negatively affected or had a hard
3  time getting voter ID, my point is that in Texas, during
4  the pendency of -- of our work on Senate Bill 362 and
5  then Senate Bill 14, there wasn't any data to get.  It
6  didn't exist in a form that I'm aware of how we could
7  get the data and compare.
8           Once -- once we -- on or about January
9  27th, when we got some preliminary information from the
10 -- from -- from one of these sources, in which we -- it
11 was stated that some 678,000 to 844,000 of the -- of the
12 12.6 million registered voters may not have been issued
13 a driver's license or ID by the DPS.  I'm not sure that
14 DPS knew if that was correct, if that many had not
15 received.  I don't know.  That obviously doesn't include
16 those with military ID.  We've got 287,000 active duty
17 military, some of which are Texas residents.  I don't
18 know if that included those numbers.  If you count the
19 spouses, I don't know if it counted those with
20 additional military.  I don't know if it counted those
21 with passports.  So -- so these numbers, I think, when
22 you factor in other elements, are starting to become
23 diminutive, and I think over time are.
24      MS. HALPERN:  Let the record reflect that
25 the -- the Governor was testifying from Exhibit --

---

236

1      MS. FARANSSO:  27, I believe.
2      MS. HALPERN:  -- 27.
3      THE WITNESS:  27.
4      MS. FARANSSO:  Thank you.
5      MS. HALPERN:  Referring to numbers from
6  Exhibit 27.
7      MS. FARANSSO:  Thank you.
8      Q.  (By Ms. Faransso)  Would your view of the
9  impact of the Indiana and Georgia laws on voters in
10 Indiana and Georgia have been different if you knew
11 whether those laws made it more difficult for eligible
12 registered voters to participate in elections?
13      MS. HALPERN:  Objection, vague.
14      A.  The -- the Secretary of State of Indiana, and I
15 believe the Deputy Secretary of State from Georgia, have
16 testified that their photo voter bills did not make it
17 harder for -- for people from Indiana, people from
18 Georgia and minorities to be able to get ID and vote.
19 And that was the testimony that was made.
20      Plus, not to just rely on that, we went
21 out and found a number of studies, I believe three, that
22 had done careful analytic study and come to the same
23 conclusion that states with photo voter ID do not reduce
24 voter turnout.  As a matter of fact, in a number of
25 cases, they increase it.

---

LIEUTENANT GOVERNOR DAVID DEWHURST                              7/29/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

237

1    Q.  (By Ms. Faransso)  What was the basis for the
2  testimony by the officials from Indiana and Georgia that
3  their laws had not made it more difficult for eligible
4  registered voters to vote in elections?
5         MR. BRISSENDEN:  Objection, form.
6    A.  Other than -- that's what they said?
7    Q.  (By Ms. Faransso)  Let me -- let me rephrase.
8    A.  Because I'm not following you.
9    Q.  Was the basis for the testimony from the
10  officials from Georgia and Indiana the fact that
11  minority turnout had increased or decreased?
12    A.  All I can report is what I heard, that the
13  election officials from Indiana and Georgia said that
14  the existence of their photo voter IDs did not diminish
15  minority turnout; in fact, most cases, in most areas of
16  their state, increased it --
17    Q.  And I --
18    A.  -- because people felt more confidence --
19    Q.  Thank you.
20    A.  -- that their vote counted.
21    Q.  And just to be clear, though, none of the
22  testimony from officials in Indiana or Georgia looked
23  into the burdens that voters experienced in attempting
24  to vote in those states?
25    A.  Well, by definition, if more people turn out,

238

1  then the burdens are not too difficult for them in fact
2  to meet those burdens and to vote.
3    Q.  Would you agree that it's possible that a
4  person may cast a ballot but in the process of casting a
5  ballot have experienced significant burdens or have
6  experienced burdens in attempting to vote?
7         MR. BRISSENDEN:  Objection, form.
8    A.  That's a hypothetical question.
9    Q.  (By Ms. Faransso)  Did you personally review
10  any analysis of the burdens that voters in Indiana and
11  Georgia experienced in attempting to cast ballots in
12  those states?
13    A.  Well --
14         MR. BRISSENDEN:  Objection, form, assumes
15  facts not in evidence.
16    A.  Well, you're implying that there were
17  significant burdens, and I'm not aware from any of the
18  testimony that there was.
19    Q.  (By Ms. Faransso)  Let's talk a little bit
20  about that minority turnout in Georgia and Indiana that
21  we've been discussing.  You mentioned three studies that
22  were separate and apart from the testimony you received
23  from officials from those states.
24    A.  Right.
25    Q.  What were those studies?

239

1    A.  One was a study by the Heritage Foundation, and
2  two others were by university professors that -- and I
3  can get you the names on those.
4    Q.  And you personally reviewed those studies?
5    A.  Yes.
6    Q.  And as we discussed earlier, the laws in
7  Indiana and Georgia permit more forms of photo ID than
8  Senate Bill 14, correct?
9    A.  Correct.
10    Q.  Do you believe it's a fair comparison to look
11  at the turnout in Georgia and Indiana and -- and
12  extrapolate from those the experiences in those states
13  to Texas, given the differences in the laws that have
14  been passed in Texas and Georgia and Indiana?
15    A.  Yes.
16    Q.  And why is that?
17    A.  Why is it not?  They're substantially similar.
18  They're not exactly similar, but they're substantially
19  similar.
20         Not only that, we've made a real effort in
21  Texas to mitigate any adverse effect; first, by spending
22  $2 million on voter education.  Secondly, by -- by
23  funding some 25 different DPS voter registration vans
24  that -- I'm sorry, strike voter registration -- but 25
25  DPS vans that -- that could go out in the neighborhoods,

240

1  go into rural areas, to facilitate the issuance of the
2  election identification cards.  Plus, we've funded
3  millions of dollars to enlarge DPS driver's license
4  facilities and have them open on Saturdays.
5    Q.  So is it your testimony that Senate Bill 14 is
6  substantially similar to the laws in Georgia and
7  Indiana?
8    A.  Similar, yes.
9    Q.  Substantially similar or similar?
10         MS. HALPERN:  Objection, vague.
11    A.  I think it's similar.
12    Q.  (By Ms. Faransso)  Okay.  Are there other
13  factors that can cause voter turnout to increase or
14  decrease from election to election?
15    A.  Yes.
16    Q.  Are -- what are some of those factors?
17    A.  Popularity of candidates, then current
18  economic condition, are two that quickly come to mind.
19    Q.  And specifically, could there be any reasons to
20  explain increased minority turnout in Georgia and
21  Indiana other than the substance of the photo ID laws in
22  those states?
23         MS. HALPERN:  Objection, calls for
24  speculation.
25    A.  To -- to answer yes, I would have to speculate,

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

61 (Pages 241 to 244)

241

1  and the only thing I know for sure is what the election
2  officials told me, that -- that, like Texas, voters want
3  to have more confidence that their vote counts.  When
4  they don't have confidence that their vote counts around
5  the country, fewer voters vote.  I've seen that in
6  Texas.  I know from my own experience over six to eight
7  years, traveling the state of Texas, talking in total to
8  thousands of different people who were preoccupied on
9  wanting a Voter ID bill passed so they could feel like
10  their vote counted.  It's very important to people.
11      Q.  (By Ms. Faransso)  You talked today about polls
12  in Texas showing that -- showing Texans' views on photo
13  ID laws.  Which specific polls were you referring to?
14      A.  I believe I mentioned it earlier, but let me
15  repeat.  I said a 2008 Rasmussen poll and two -- two
16  University of Texas polls, one in 2008, one in 2009, is
17  the -- that showed -- showed in all three a
18  super majority, meaning over two-thirds.
19      Q.  And did you review the polls or just hear about
20  them?
21      A.  No, I looked at them.
22      Q.  How -- do you know if these polls ensured that
23  respondents came from a representative sample of the
24  population?
25          MR. BRISSENDEN:  Objection, form.

242

1      A.  My understanding, and I have some experience
2  with polling --
3      Q.  (By Ms. Faransso)  Sure.  More than me, I'm
4  sure.
5      A.  Well, it's a difficult area.
6          My understanding is, in all three cases,
7  these were scientifically statistical samples.
8      Q.  Do you know whether the polls ensured that
9  respondents included low income respondents?
10      A.  My understanding is that these were -- were all
11  scientifically statistical where a cross-section of the
12  state was sampled.
13      Q.  If you don't mind, let's take a look at some of
14  the polls I believe you're referring to.
15          (Exhibit 35 marked for identification.)
16      Q.  (By Ms. Faransso)  Does this poll look familiar
17  to you?
18      A.  No.
19      Q.  I can represent to you that this is taken from
20  the University of Texas, Texas Tribune poll.  Is that
21  one of the polls that you were referring to earlier?
22      A.  It is, but I was looking at -- at earlier polls
23  that occurred in the 2008, 2009, 2010 time period.
24      Q.  Okay.  And just for the record, this particular
25  poll is dated February 2011.  Take a look at a 2008 poll

243

1  as well.
2          (Exhibit 36 marked for identification.)
3      Q.  (By Ms. Faransso)  And does that 2008 poll look
4  familiar to you?
5      A.  Yes, it does.
6      Q.  Okay.  And for the record, this also is taken
7  from the University of Texas, Texas Tribune website,
8  that includes the polling data.
9      A.  And I looked at a Rasmussen poll, which is a
10  running average of other polls --
11      Q.  Okay.
12      A.  -- that showed similar numbers.
13      Q.  If you could take a look at -- I believe it's
14  Exhibit 36, the last -- the 2008 poll?
15      A.  Uh-huh.
16      Q.  If you could turn to the very last page of that
17  document.
18      A.  Uh-huh.
19      Q.  And it says -- can you please read that, take a
20  moment to review that?
21      A.  "Broken down by race, support for legislation
22  requiring a photo identification" --
23      Q.  Actually, it's the very last page.  I believe
24  there's a page on the back, and if you could take a
25  moment to just review that.

244

1      A.  "11 percent of respondents answered 'don't
2  know' to this question.  Question asked in two parts.
3  First" --
4          MS. HALPERN:  Slow down.  Slow down.  The
5  reporter has to write that.
6      A.  Excuse me.  "11 percent of respondents answered
7  'don't know' to this question.  Question asked in two
8  parts.  First, respondents were asked whether or not
9  they support a law requiring individuals to present a
10  government-issued photo ID in order to be permitted to
11  vote.  Then, they were asked to gauge their strength of
12  their support or opposition."
13      Q.  (By Ms. Faransso)  Do you recall that this was
14  a question asked in this particular poll?
15      A.  That's the first time I've seen that statement.
16      Q.  Okay.  Does -- is it fair to say that this poll
17  then asked whether respondents would support a law
18  requiring individuals to present a government-issued
19  photo ID in order to be permitted to vote?
20      A.  I can only assume that it does because the
21  similar poll done three years later uses those words.
22      Q.  Right.  And we'll take a look at that in just a
23  moment.
24          Does this -- looking at the 2008 poll that
25  is Exhibit 36, does this question appear to define what

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

62 (Pages 245 to 248)

245

1  a government-issued photo ID is?
2     A.  The statement says what it says by -- by
3  stating that a government-issued ID is required.
4     Q.  And looking at the 2011 poll that you have in
5  front of you, which is Exhibit 35 --
6     A.  It's the same wording.
7     Q.  Same wording, correct?
8     A.  To present a government-issued photo ID.
9     Q.  Thank you.  So this, again, does not define
10 what a government-issued photo ID is?
11    A.  That's right.
12    Q.  So in looking at both of these polls, from
13 February 2011 and July of 2008, neither poll defines or
14 limits the term government-issued photo ID, correct?
15       MS. HALPERN:  Objection, asked and
16 answered.
17       MR. BRISSENDEN:  Objection, form.
18       MS. FARANSSO:  Just trying to confirm for
19 the record.
20    Q.  (By Ms. Faransso)  Correct?
21    A.  You're going to have to ask me again, because
22 I'm -- the voters were asked -- these voters were asked
23 whether or not they were for or against being required
24 to present a government-issued photo ID before they
25 could vote.

246

1     Q.  Okay.
2     A.  And this is showing a super majority across the
3  board of our ethnicity were in favor.
4     Q.  Okay.  And Senate Bill 14 does not include all
5  forms of government-issued photo ID, does it?
6     A.  No, it does not.
7     Q.  There are more government-issued photo IDs than
8  are included in SB 14?
9        MS. HALPERN:  Objection, asked and
10 answered.
11    A.  And I don't mean to be argumentative, Counsel,
12 but I think this is already -- we've already discussed
13 this.  The -- these two polls, and I'm not at all
14 suggesting that they're -- that you should agree with
15 them, but all I'm saying is that, that my experience
16 over the last decade and third-party polling which I've
17 seen all indicate the majority of Texans are in favor of
18 having to present a government-issued photo ID before
19 they're allowed to vote.  And it says "a" government-
20 issued photo ID.  So although there's not specificity in
21 the question as to which one, it's one to be picked out
22 by -- through the process in the legislature.  And we've
23 -- we have four or five that are allowed.
24    Q.  (By Ms. Faransso)  Is it fair to say that
25 there's no way to tell from this poll how a particular

247

1  respondent would interpret a government-issued photo ID?
2     A.  That's humorous.  Of course.  Of course.  A --
3  an individual, I believe, would interpret a
4  government-issued photo ID to be a fair and
5  representative one.  Again, instead of "a"
6  government-issued photo ID in Senate Bill 14, we have
7  five, four or five.
8     Q.  All right.  I'd also like to show you just one
9  additional poll, also from the University of Texas, the
10 Texas Tribune.
11       (Exhibit 37 marked for identification.)
12    Q.  (By Ms. Faransso)  You've been handed what's
13 been marked Exhibit 37.  And this is dated October 2012.
14 And as you see there, it has the same wording as the
15 previous polls, correct?
16    A.  Uh-huh.
17    Q.  If you turn to the very last page, which breaks
18 down the responses by race.
19    A.  Uh-huh.
20    Q.  Do you see that the percentage of respondents
21 that agree with requiring presentation of a
22 government-issued photo ID for the African American
23 population of respondents is 33 percent?
24    A.  I do.
25    Q.  And if you look back at the February 2011 poll,

248

1  which I believe was Exhibit 35?
2     A.  Yes.
3     Q.  And look at the very last page of that
4  particular poll.
5     A.  Yes.
6     Q.  The percentage of African American respondents
7  who believed that voters should be required to present a
8  government-issued photo ID was 63 percent.
9     A.  That is correct.
10    Q.  Does the drop from 63 percent to 33 percent
11 among the African American population surprise you?
12    A.  No.  It's because of the disingenuous
13 disinformation provided by the Department of Justice and
14 the lawsuits that have been filed in Texas.
15    Q.  Could there be any other explanation for the
16 drop in support among the African American population?
17       MS. HALPERN:  Objection, calls for
18 speculation.
19    A.  And the point I was making earlier was that
20 during the time period between 2008, 2009, 2010 and
21 2011, when we were considering Senate Bill 362 and --
22 and Senate Bill 14, that there was across the board
23 widespread super majority support, and that's why I felt
24 that it was important to push for this legislation and
25 we passed it.

249

1       Notice that -- that the percentage of
2  Hispanic voters who agree that a government-issued photo
3  ID at the polls should be implemented before they're
4  allowed to vote is actually in this poll, in October of
5  2012, higher than your White population, your Anglo
6  population.
7       Q.  (By Ms. Faransso)  But these polls do
8  demonstrate that between February 2011 and October 2012,
9  the percentage average of the Black population who
10 supported requirement of a government-issued photo ID in
11 order to vote dropped from 63 to 33 percent, correct?
12       MS. HALPERN:  Objection, asked -- asked
13 and answered.  The document speaks for itself.
14       Counsel, you've got about a half an hour
15 left on the clock and I am advised that Defendants are
16 going to ask some questions, so.
17       MS. FARANSSO:  I'm not worried about
18 timing, so.
19       Let's see.  Let's take look at just one
20 more quick poll and then we'll move on.
21       MS. WESTFALL:  Before we continue with the
22 exam, I just want to assert our position that the time
23 that the State takes to examine the Governor will not
24 count against our seven hours.
25       MS. HALPERN:  No, it will not, and there's

251

1  Requirement"?
2       A.  Yes.
3       Q.  Do you see that the question says, "Do you favor or
4  oppose requiring a valid photo ID before a person is
5  allowed to vote"?
6       A.  Yes.
7       Q.  This particular poll question does not define
8  or limit the term "valid photo ID," correct?
9       A.  Correct.
10       Q.  And you can put that away.  We can move on.
11       A.  Okay.
12       Q.  Earlier today I know we discussed EICs,
13 election identification certificates, so bear with me if
14 I ask any questions that seem repetitive.
15       You are familiar with the cost of
16 underlying documentation --
17       A.  Well, just -- just as my nature, and I
18 apologize to Ms. Westfall and to you, but -- but -- but
19 that -- what I said today repeatedly:  On third-party
20 polling showing that a super majority of Texans are in
21 favor of a photo voter ID, whether you ask that a valid
22 photo ID or a government-issued photo ID, is what I
23 said, and these are representative of what I had said.
24       Q.  Thank you.
25       A.  Excuse me.  Go ahead.

250

1  no question about that.
2       MS. WESTFALL:  Okay.  Thank you.
3       MS. HALPERN:  But you have a total of
4  seven hours, and I would save some time to -- or not,
5  but you're on notice now, and she's repeating questions
6  multiple times.
7       MS. WESTFALL:  We don't necessarily agree
8  with that position you're stating but --
9       MS. HALPERN:  I understand, but that is
10 the position we are stating.
11       MS. FARANSSO:  Can you mark this, please?
12       (Exhibit 38 marked for identification.)
13       Q.  (By Ms. Faransso)  You've been handed what's
14 been marked as Exhibit 38.  Does this poll look familiar
15 to you?
16       A.  The -- I believe I've seen this poll before.
17 I've seen a -- a poll from Lighthouse.
18       Q.  Do you remember that this poll was referenced
19 during the testimony on the debate of Senate Bill 14?
20       A.  I believe I remember that.
21       Q.  If you look at the third page of the document,
22 the Bates number ending in 9047.  The third page, so the
23 front of the second page.
24       A.  Uh-huh.
25       Q.  On the very bottom it says, "Photo Voter ID

252

1       Q.  So we'll move on to EICs, which we discussed
2  earlier today.  And you are familiar with the underlying
3  documentation required to obtain an EIC, correct?
4       A.  I believe so.
5       Q.  And I believe you and Ms. Westfall discussed
6  some of the costs involved in obtaining some of that
7  documentation, right?
8       A.  Well, I think we discussed, or rather I
9  discussed, my testimony reflects that there -- there is
10 not a cost in obtaining the -- the election
11 identification card from the DPS.  In the past, there
12 was a cost to obtain a birth certificate as one example
13 of the proof.  And that, through -- through the
14 regulatory implementation of Senate Bill 14, as I made
15 reference to repeatedly, has been eliminated at some
16 cost to the State, from $22 down to either zero -- and
17 don't ask me why, what this was done, it sounds very
18 strange to me -- zero or up to a $1.80 for the
19 Comptroller and another $1.20 for two other agencies.
20 $3, so...
21       Q.  And that reduction in the cost of the birth
22 certificate occurred during the regulatory
23 implementation of the bill following its passage?
24       A.  That's right.
25       Q.  Are you aware at the time that Senate Bill 14

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

64 (Pages 253 to 256)

---

253

1  was passed that 80 -- approximately 80 counties lacked
2  DPS offices in Texas?
3       A.  I knew that when we passed the bill,
4  approximately 80 -- 80 rural counties did not have DPS
5  offices.
6       Q.  And you mentioned earlier some discussions with
7  DPS during the pendency of Senate Bill 14.  I just want
8  to understand a little bit more about what kinds of
9  discussions you had -- your office had with DPS.  Did
10 you discuss the availability of public transit to DPS
11 offices throughout the state of Texas?
12      A.  I discussed with the DPS the continuing concern
13 with crowding in Texas driver's license offices.  And my
14 conversations with the -- with the DPS increased after
15 my wife spent three hours in line one day.  And after
16 several conversations, we have -- we had an agreement to
17 expand a number of the facilities, add more people, so
18 that people could obtain their driver's license or, as
19 envisioned, the election identification card in a short
20 time period.
21          I also wanted to make sure that we were
22 going to be able to reach out to rural counties, the 80
23 of which do not represent percentage-wise -- I mean,
24 everybody's important, every Texan is very important --
25 but percentage-wise, not that many people, but still,

---

254

1  how are we going to address these concerns.  And -- and
2  in the 2012 fiscal year, the DPS did not -- did not have
3  the funds to address it.  But in the last year, they
4  have been able to address it through funding we made in
5  2013 on something I wanted, a strong outreach, in
6  addition to $2 million from the Secretary of State's
7  Office on education reform.  And at last count -- I
8  believe there are more today -- but the last count that
9  I made, we had 25 mobile vans that were moving around
10 the state.
11      Q.  And you discussed the mobile vans --
12      A.  Yes.
13      Q.  -- with DPS during the pendency of SB 14?
14      A.  Yes, and after it was passed.
15      Q.  And Senate Bill 14 does not include any
16 provisions with respect to expanding existing DPS
17 facilities or adding mobile units to serve the rural
18 areas, correct?
19      A.  Again, Counsel, it's -- it's normally the norm
20 rather than the exception to implement details through
21 the regulatory agencies that implement.  And the DPS has
22 -- has done what I just shared with you.  And the
23 Department of Health and Human Services has worked with
24 local jurisdictions and has reduced the cost on birth
25 certificates.

---

255

1       Q.  And forgive me for not being terribly familiar
2  with how executive agencies function and --
3       A.  It's like Washington.  In other words, it's not
4  like -- but more efficient.  It's not like we've got to
5  pass a 2,000-page bill and then find out what's in it.
6  And it's not like the last three years have been spent
7  trying to implement the bill through the regulatory
8  agencies.  But there are certain details that we leave
9  up to work out with our regulatory agencies.  And I'm
10 proud that the -- that the Health and Human Services
11 eliminated the cost on birth certificates, because I
12 want more people to vote rather than less.  And I'm glad
13 that the Department of Public Safety can implement our
14 election identification cards for free, because I want
15 more people to vote rather than less.
16      Q.  Thank you.  And my question for you is a simple
17 one.  What would you have done if DPS was not able to
18 implement the steps that you discussed with them during
19 the pendency of SB 14?
20          MS. HALPERN:  Objection, calls for
21 speculation.  Objection, relevance.  Objection, assumes
22 facts not in evidence.  Objection, and the other ten
23 objections I can think of to what I think is a really
24 bad question, but you can try to answer it.
25          MS. WESTFALL:  Objection to the sidebar.

---

256

1          THE WITNESS:  Objection sidebar?
2          MS. HALPERN:  She's objecting to my
3  comments.
4          THE WITNESS:  Oh.
5          MS. HALPERN:  It's getting late in the
6  day.
7       A.  Well, first of all, I don't understand your
8  question because we did what I said we were going to do.
9  I don't understand your question because the agencies
10 did what we asked them in the legislature.  And I
11 suppose, if I'm going to speculate if the agencies
12 hadn't done what they said we were going to do -- what
13 they were going to do, then we would have addressed it
14 through additional legislation in 2013.
15      Q.  (By Ms. Faransso) Did you have any concerns
16 that individuals with low income would face burdens in
17 obtaining an EIC in Texas?
18      A.  No, Counsel, because the EIC was free, so
19 individuals with low incomes -- and that's -- were
20 specifically targeted to make it easy for them to get
21 identification so they could vote.
22      Q.  Aside from the cost of underlying documentation
23 to obtain an EIC, were you concerned that low-income
24 individuals would have to pay costs to travel to obtain
25 an EIC?

---

LIEUTENANT GOVERNOR DAVID DEWHURST                           7/29/2014
CONFIDENTIAL TRANSCRIPT

65 (Pages 257 to 260)

257

1    **A.  No, because that's an individual**
2    **responsibility.  Our bus system works in -- in most**
3    **large cities.  Most people have relatives who have**
4    **driver's license, if they don't have a driver's license**
5    **and can drive.  But that's an individual responsibility**
6    **to get to a centrally located location and get your free**
7    **voter ID so you can vote.**
8        Q.  Would you agree that for a voter who lived in a
9    remote area in Texas that did not have a DPS office
10   located in the county, that the farther they have to
11   travel to obtain an EIC, the less likely they are to
12   obtain one?
13           MR. BRISSENDEN:  Objection, form, calls
14   for speculation.
15           MS. HALPERN:  Objection, assumes facts not
16   in evidence.
17       A.  Counsel, I have had many conversations with
18   both Democrat senators and Republican senators about
19   that, and in our rural counties in which there aren't
20   DPS driver's license offices, virtually everyone, not
21   everyone, but virtually everyone has a driver's license
22   because they can't get around without one.  But be that
23   as it may, that's why we have now, at last count, 25
24   mobile vans going around the state to make sure that
25   anyone who wants a -- either a driver's license or an

258

1    election identification card can get one.
2        Q.  Do you believe that Senate Bill 14 burdens
3    anybody's right to vote?
4        A.  You're asking me to speculate.  It's almost a
5    hypothetical question.  I am sure somebody somewhere has
6    been burdened.  Now we have to get into the relative
7    analysis of how much they've been burdened.  But again,
8    I haven't heard of complaints.  I haven't heard any
9    concerns in Texas from the four elections that we've run
10   under Senate Bill 14 of people not being able to gain
11   access.  And I haven't heard anything from Ms. Westfall,
12   I haven't heard anything from you, about people that --
13   that are having a problem getting acceptable photo voter
14   ID.  If there are cases, then I'd love to know about it
15   because I want to address it.  I want to make sure
16   everybody has the chance to vote who wants to vote.  I
17   want to see more people vote.
18       Q.  Do you recall during the debate on adding the
19   EIC provision that some senators raised concerns about
20   the burdens associated with obtaining an EIC?
21       A.  They may have, but I don't remember the
22   specific debate.
23           MS. FARANSSO:  Actually, if we could take
24   a brief break for a couple of minutes.
25           (Recess from 6:44 to 6:50 p.m.)

259

1        Q.  (By Ms. Faransso)  Are you aware that during
2    the preclearance process the State of Texas reported
3    that around 795,000 registered voters did not possess a
4    driver's license?
5        A.  No, but that would be somewhat consistent with
6    -- with the information that we talked about earlier.
7        Q.  Okay.
8            MS. HALPERN:  Don't write on the exhibits.
9            THE WITNESS:  Oh, don't write on the
10   exhibits?
11           MS. HALPERN:  No.
12           THE WITNESS:  Okay.  Now she tells me.
13       **Q.  (By Ms. Faransso)  Sir, are you aware of a**
14   **number of EICs that have been issued?**
15       **A.  No.  How many?**
16       **Q.  Are you aware that as of February 2014, 260**
17   **EICs were issued?**
18       **A.  And I've asked staff about this.  I don't know**
19   **whether it reflects that not many people don't have**
20   **acceptable photo voter ID or whether we need to**
21   **publicize this more.  I don't know the answer.**
22       Q.  Thank you for your testimony.
23       A.  Thank you.
24           MS. FARANSSO:  Pass the witness.
25           THE WITNESS:  Hi.

260

1            MS. KORGAONKAR:  Hi, Mr. Dewhurst.
2            EXAMINATION
3    BY MS. KORGAONKAR:
4        Q.  I'd just like to turn your attention for one
5    minute to Exhibit 14.
6        A.  14.
7        Q.  You looked at it seems like a lifetime ago.
8            MS. HALPERN:  I'll help you find it.
9            THE WITNESS:  Thank you:
10       Q.  (By Ms. Korgaonkar)  And I'd to focus your
11   attention on the page marked TX00087008.
12           MS. HALPERN:  Hold on.  He does not have
13   it yet.
14           MS. KORGAONKAR:  I apologize.
15           MS. HALPERN:  Counsel, which version is
16   this?  The introduced version?
17           MS. KORGAONKAR:  No, it's not SB 14.  It's
18   Exhibit 14.
19           MS. HALPERN:  Right.  And what is it?
20           MS. KORGAONKAR:  It is an e-mail from
21   Mr. Hebert to Janice McCoy dated March 4th.
22           THE WITNESS:  We now have it, Counsel.
23       Q.  (By Ms. Korgaonkar)  Great.  If you could look
24   at the second page of the document.  It's entitled --
25           THE REPORTER:  I'm sorry, I can't hear

LIEUTENANT GOVERNOR DAVID DEWHURST                    7/29/2014
CONFIDENTIAL TRANSCRIPT

69 (Pages 273 to 276)

273

on 2011.
    A.  I remember -- I remember in 2009 being shocked,
and I believe the same thing happened in 2011, but I
remember that -- that upon passing Senate Bill 362 out
of the Senate in the 2009 session, staff brought me a
copy of the journal as amended by comments from a number
of Democrat senators a day or two later, and quite
frankly, I was disappointed.  "Hurt my feelings" was too
strong, but I was disappointed in the -- in the tone and
the words that were used by some of the senators.
    Q.  (By Mr. Scott)  Did you -- were you ever able
to determine why they would have submitted it after the
debate and after the vote on SB 362?
    A.  Sure.  This is all for the Department of
Justice.  Of course!  That's why they were submitting
them.  They didn't have the -- they didn't have the --
the -- let me stop there.  They -- they would have to say
it on the Floor of the Senate where we would have
responded to them, but they put it in letters and
submitted it into the journal.  I mean, it's not
different from in -- in -- in a letter that Senator
Laticia Van de Putte wrote in either 2009 or 2011 to
Senator Robert Duncan on the Committee of the Whole
objecting to what she felt was a short time line between
Thursday and a Monday afternoon hearing.  She copied the

274

Department of Justice in Washington.  So this was all
orchestrated.  It's well known among all the Republicans
and the Democrats, because I talked to them about it,
that during these proceedings, they all had third-party
prepared notes.  It was all scripted.  Everything was
scripted by their lawyers on what they said.
    Q.  So do you have an opinion as to whether they
were planning a lawsuit all along in consideration of
362 and SB 14?
        MS. WESTFALL:  Objection, calls for
speculation.
    Q.  (By Mr. Scott)  You may answer.
    A.  They were certainly preparing their legal
defense against an action by the Texas Senate.
    Q.  Let's go back to the comments that are placed,
the written comments by the senators that were placed
into a journal.  Do you recall whether there were
written comments placed into the journal after the
debate of -- and passage of SB 14?
    A.  I don't remember.  I could find out in couple
of minutes, but I don't remember.  I know that I was --
I think they just end on the amendments.
    Q.  Is there something -- how is it that you would
be able to look at those to determine whether they were
added after the fact?

275

    A.  If you --
        (Document handed to witness by
Ms. Halpern.)
        THE WITNESS:  No, it would come after --
it would come after --
        MS. HALPERN:  I think Counsel stated for
the record that was an excerpt of the journal and not
the whole thing, so.
        THE WITNESS:  Yes.  Yes.
        It would come at the end of the -- the
comments would come at the end of the session during the
process for adjournment.
    Q.  (By Mr. Scott)  And that would signify they
were taken -- the comments were submitted after the
passage of SB 14?
    A.  Yes, if they were taken -- if they were not
contained in the body of the debate.  And you can easily
-- sometimes, and I've seen them handled differently
by -- by the Secretary of the Senate's office, sometimes
they're included before the adjournment, but they're --
but they're turned in afterwards.  If -- if they are
comments relating to the debate but they're not in the
section of the journal during the debate, then they're
turned in after the session and asked to be printed in
the journal.

276

        MR. SCOTT:  Governor, thank you for your
service to the state.
        And I'll pass the witness.
        MS. WESTFALL:  We'll go confer.
        MS. HALPERN:  Okay.
        (Recess from 7:18 to 7:23 p.m.)
        MS. WESTFALL.  We have no further
questions.  Thank you very much for your service and
your time today.
        THE WITNESS:  Well, thank you, thank you
very much.
        (Deposition concluded at 7:23 p.m.)