CONFIDENTIAL

**[Page 1]**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS


CORPUS CHRISTI DIVISION


MARC VEASEY, et al.,            )
                               )
          Plaintiffs,           )
                               )
vs.                             )   CIVIL ACTION NO.
                               )   2:13-CV-193 (NGR)
RICK PERRY, et al.,            )
                               )
          Defendants            )


ORAL DEPOSITION


SENATOR ROBERT L. DUNCAN


AUGUST 28, 2014


        ORAL DEPOSITION OF SENATOR ROBERT L. DUNCAN,
produced as a witness at the instance of the Plaintiffs,
and duly sworn, was taken in the above-styled and
numbered cause on August 28, 2014, from 9:04 a.m. to
5:34 p.m., by Susan Myatt, Certified Court Reporter for
the States of Texas and New Mexico, reported by
computerized stenotype machine at the Embassy Suites,
Executive Board Conference Room, 5215 South Loop 289,
Lubbock, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

**CONFIDENTIAL**

---

**[Page 2]**

1    APPEARANCES
2
3    FOR PLAINTIFFS:
4        MR.  BRUCE GEAR
         DEPARTMENT OF JUSTICE
         1800 G Street NW
5        Washington, DC 20006
         (802) 353-0419
6
7        MR. DEUEL ROSS
         NAACP LEGAL DEFENSE FUND
8        40 Rector, 5th Floor
         New York, NY 10006
9        (212) 965-2200
10   FOR DEFENDANTS:
11       MR. PATRICK SWEETEN
         OFFICE OF ATTORNEY GENERAL
12       P. O. Box 12548
         Austin, TX 78711-2548
13       (512) 463-2007
14
15
16
17
18
19
20
21
22
23
24
25

---

**[Page 4]**

1    E X H I B I T S  (CONTINUED)
2    DUNCAN DEPOSITION EXHIBIT NUMBER        PAGE
3    RD-13, 3/18/2009 Senate Journal        147
4    RD-14, 1/24/2011 E-mail to Jennifer Fagan from
5        Ann McGeehan        153
6    RD-15, 3/29/2012 Various E-mails from
7        Senator Patrick        166
8    RD-16, 5/27/2011 Texas Legislature Online History 171
9    RD-17, SB No. 14        181
10   RD-18, 1/27/2011 E-mail to Jonathan Stinson and
11       others from Bryan Hebert        193
12   RD-19, 1/20/2011 Various E-mails RE: Announcement 208
13   RD-20, 1/24/2011 E-mail to Debby Hansard and
14       others from Megan LaVoie        215
15   RD-21, 1/24/2011 Senate Notice of Public Hearing 223
16   RD-22, 1/21/2011 E-mail to Jennifer Fagan from
17       opie@cdmlaw.com        227
18   RD-23, 1/21/2011 Various E-mails SB 14        237
19   RD-24, 1/26/2011 Senate Journal        252
20   RD-25, 8/26/2014 News Report from Lubbock
21       Avalanche-Journal        261
22
23
24
25

---

**[Page 3]**

1    I N D E X
2                    PAGE
3    Appearances        2
4    WITNESS:  SENATOR ROBERT L. DUNCAN
5        Examination by Mr. Gear        5
6        Examination by Mr. Ross        206
7    Deposition Concluded        287
8    Reporter's Certification        288
9
10   E X H I B I T S
11   DUNCAN DEPOSITION EXHIBIT NUMBER        PAGE
12   RD-1, 2012 Deposition of Senator Duncan        10
13   RD-2, 5/16/2007 Texas Legislature Online History   20
14   RD-3, HB No. 218        26
15   RD-4, 2/28/2007 Hearing on Elections        32
16   RD-5, 5/15/2007 Senate Journal        61
17   RD-6, 5/23/2009 Texas Legislature Online History  72
18   RD-7, 1/14/2009 Senate Rules        81
19   RD-8, 1/14/2009 Senate Journal        82
20   RD-9, 3/3/2009 Memo to Chairman Duncan from
21       Senator Van de Putte        88
22   RD-10, Reasons to Support SB 362 as Filed     94
23   RD-11, SB No. 362        105
24   RD-12, 3/5/2009 Memo to Senator Van de Putte
25       from Senator Duncan        114

---

**[Page 5]**

1        (Witness sworn by court reporter.)
2        MR. GEAR:  Senator Duncan, my name is Bruce
3    Gear.  I am from the Department of Justice.  I am here on
4    behalf of the United States in the current litigation.  I
5    just wanted to start by going over some ground rules with
6    you regarding the deposition.
7        But, maybe before we do that, we can put on
8    the record what you want to put on the record.
9        MR. SWEETEN:  Okay.  And, Bruce, we had a
10   short discussion just before we went on the record.
11       Senator Duncan will be asserting legislative
12   privilege today.  Pursuant to an order of the Court, we are
13   going to ask that the portions -- that the deposition be
14   kept under seal based upon the assertion of legislative
15   privilege.
16       At this point, it is not our intention to
17   instruct him not to answer on the basis of a legislative
18   privilege, but instead to provide the response -- yet
19   it's -- even though we will maintain the objection, you
20   know, as the deposition continues.
21       So I think that is a fair rendition of what
22   we have discussed and how we want to proceed, so -- and it's
23   my understanding there is no objection to putting the
24   deposition under seal; is that correct?
25       MR. GEAR:  I think we've done that in the

**CONFIDENTIAL**

**[Page 14]**

1    represented today?
2        A   Yes.
3        Q   And who are you represented by?
4        A   Mr. Sweeten with the Attorney General's Office.
5        Q   And as I ask you questions, I just want to
6    clarify that I am not asking you to reveal specific
7    conversations with your attorney.  I will do my best to
8    understand who was present during the discussions so that
9    we can speak appropriately.
10       But if there is a time where your -- you
11   had a discussion with your attorney, then you can let me
12   know that, and I will attempt to avoid those types of
13   questions.  Do you understand?
14       A   Yes, sir.
15       Q   So you also discussed that you reviewed an
16   e-mail to your district staff.  Can you tell me what the
17   subject matter of that e-mail was?
18       A   I think it was just basically information
19   concerning what was happening with regard to the process
20   for the voter ID legislation.
21       Q   Was it in regard to any particular piece of
22   photo ID legislation?
23       A   Well, I don't remember if it was 2009 or
24   2000 -- probably 2011.
25       Q   Do you know if you produced that particular

**[Page 15]**

1    document to your attorney, or do you know how --
2        MR. GEAR:  Strike that.
3        Q   (By Mr. Gear:)  Do you know if you produced that
4    particular document to your attorney?
5        A   I am sure we did.
6        Q   And regarding production of documents, did you
7    produce personal and work-related e-mails that deal with
8    photo ID legislation?
9        A   We --
10       MR. SWEETEN:  I may need to -- we have
11   obviously -- as I understand, as sort of the arc of this
12   case, we produced -- as you know, Bruce, we have
13   produced, on behalf of Senator Duncan, documents in the
14   2012 litigation.  That was reproduced in this case, as I
15   understand it.
16       And then I think, in addition, this Court
17   has, you know, required certain documents -- additional
18   documents from all the legislators that were subject to
19   legislative privilege, and I think those were all
20   produced.
21       So I think the answer -- I mean, he is
22   not under -- this isn't a subpoena duces tecum as to
23   this Notice of Deposition.
24       MR. GEAR:  That is correct.
25       MR. SWEETEN:  There is not an additional

**[Page 16]**

1    request, but I think that is -- having not been involved
2    in the production in the second case at all, I think
3    that is a rendition of kind of how -- the documents that
4    he has produced on this.
5        Q   (By Mr. Gear:)  So I still want to go into the
6    types of documents that you produced.
7        Do you recall producing personal e-mails
8    or work-related e-mails related to photo ID legislation?
9        A   We have produced everything that was requested
10   of us by the Secretary -- by whatever document, in
11   accordance with the Secretary of State's instructions, I
12   think -- or not the Secretary of State, but the Secretary
13   of the Senate, if I recall.  I am not sure.  I didn't
14   personally do that.
15       It was a process that I think -- I am
16   sure, like many other offices, we get requests like that
17   all the time, and so we have a process for putting that
18   information together and getting it to the proper
19   authorities, in accordance with the Attorney General's
20   instructions, as well as the Secretary of the Senate
21   sometimes gets involved in the Freedom of Information
22   Act or the Open Records Act, documents that are
23   frequently requested in our offices.
24       Q   So, if I understood your testimony correctly, it
25   was the Secretary of the Senate that made a document

**[Page 17]**

1    request of your office?
2        A   I don't know.  I can't tell you, because it was
3    handled by my staff.
4        Q   Okay.
5        A   I am just giving you a general -- an estimate
6    or general idea of how that normally works.
7        Q   Do you recall when that request was made?
8        A   No.
9        Q   Do you recall who on your staff searched for
10   those documents?
11       A   I would imagine that it was Jennifer Fagan
12   who -- to the best of my knowledge, it would be Jennifer
13   Fagan, who was the Committee Director for State Affairs,
14   and then perhaps my Chief of Staff, for anything that we
15   might have had in the office, in the Senate office.
16       Q   And who on your staff worked on photo ID
17   legislation?
18       A   Jennifer Fagan was the director of the
19   committee -- or the State Affairs Committee, and she was
20   primarily the staff person in charge of that.
21       Q   And as the director of the State Affairs
22   Committee, can you tell me what her responsibilities were?
23       A   Well, she basically made sure that -- she was
24   in charge of making sure that the process that we have in
25   our committee for scheduling bills, vetting bills, and

CONFIDENTIAL

**[Page 18]**

1  researching bills, she made sure those things were done
2  and often.  She is an attorney as well, and she provided
3  some analysis, as well, on different types of things in
4  the committee.  That would be her general role.
5        We had different staff persons who would
6  do things as well.
7    Q   And can you tell me the time period in which
8  Jennifer Fagan worked for you?
9    A   I think she started working for us in the
10  committee -- she always worked in the committee for -- in
11  jurisprudence in 2003.
12        And then, when we were named Chair of the
13  State Affairs Committee in 2004, I think she was then
14  General Counsel, and then later promoted to director of
15  the committee.
16    Q   So, by 2005, was she the director of the State
17  Affairs Committee?
18    A   I think so, but I don't know for sure.  I think
19  she was.  I don't know about 2005.  I think Lizzie
20  Coffman was by that point in time, but when Lizzie left,
21  we promoted Jennifer to director at that point.
22    Q   So between --
23    A   But I don't remember when that was.  I can't
24  remember.
25    Q   So, between 2005 and 2011, was it Jennifer Fagan

**[Page 19]**

1  that handled photo ID legislation issues for you?
2    A   Most likely.
3    Q   Would there have been anyone else specifically
4  tasked to handle photo ID legislation?
5    A   Other than -- no, just -- I mean, as far as the
6  specific issues, she may have had -- she may have
7  assigned tasks to others, but she was the one primarily
8  in charge of that.
9    Q   And so, during the legislative session, how did
10  you communicate with Jennifer Fagan?
11    A   She would come to my office.
12    Q   How often would she come to your office?
13    A   Daily.  Or I would go over to the State Affairs
14  Office, but we communicated in person.
15    Q   So, other than meeting with you daily, would you
16  communicate by e-mail?
17    A   No.
18    Q   Would you communicate by text messaging?
19    A   No.
20    Q   Telephone?
21    A   You know, maybe, if there were -- if there was
22  a quick question, but, you know, you're not by a phone
23  very much when you are in legislative session, quite
24  frankly.  It's hard to communicate by phone, so we always
25  had daily meetings.

**[Page 20]**

1    Q   Would you -- During your daily meetings, would
2  you reduce the subject matter of the meetings to writing?
3    A   Not -- I didn't, and I don't think she did
4  either.
5    Q   So I want to turn to 2007 and ask you:  Do you
6  recall that HB 218 photo ID legislation passed from the
7  House and was received by the Senate?
8    A   Yes.
9    Q   And did you follow the progress of HB 218
10  through the House?
11    A   Probably not.
12    Q   Would you have had any of your staff members
13  follow the progress of HB 218 through the House?
14    A   Probably not.
15        (Duncan Deposition Exhibit Number RD-2
16  marked.)
17    Q   (By Mr. Gear:)  I am going to show you what has
18  been previously marked as Duncan Exhibit 523.  I would
19  just ask you to take a look at this, and we will discuss
20  it.
21        (Witness reviewing document.)
22    Q   Do you recognize this document?
23    A   Yes.
24    Q   And what is this document?
25    A   This is a legislative history or a procedural

**[Page 21]**

1  history or calendar or timeline showing action taken on
2  House Bill 218.
3    Q   And that would have been the 80th Legislative
4  Session?
5    A   Yes, sir, regular session.
6    Q   And do you see the e-mail address up in the
7  right-hand corner?
8    A   No -- oh, right up here?
9    Q   Yes, top right-hand corner.  I'm sorry.
10    A   Right.  Yes.  Yes, sir.
11    Q   And do you recognize that e-mail address?
12    A   Capitol.state.tx.us/BillLookup.  Yeah, not
13  really, but, you know, I mean, it's -- it looks like it's
14  something that was e-mailed to somebody, or from, or
15  somebody went to a service and got it.
16    Q   Do you recognize the capitol.state.tx.us as
17  being the Senate's website?
18    A   It's the Capitol's website.  I don't know if
19  it's the Senate's website.
20    Q   And is it fair to say that the Texas Legislature
21  Online History is a detailed representation of what
22  occurred in the House and the Senate regarding HB 218?
23    A   It's simply a record of action taken on the
24  bill as it moves through the process.
25    Q   And do you have any reason to dispute that the

**[6] (Pages 18 to 21)**

[Page 22]

1   Texas Legislature Online History for HB 218 is inaccurate?
2       A   No.
3       Q   So, just to put the bill into context, if you
4   look at what has been Bates-stamped as USA 00033653, which
5   is the last page of this document, can you tell me the
6   date that HB 218 was filed?
7       A   Well, according to this document, it was filed
8   on November the 14th of 2006.
9       Q   In looking at Exhibit 2, can you tell me when it
10  was actually received by the Senate?
11      A   It was received on April 25th of 2007,
12  according to the document.
13      Q   It also appears that there was a first-time read
14  in the Senate on April 26th, 2007?
15      A   Correct.
16      Q   And it was then referred to the State Affairs;
17  do you see that?
18      A   Yes, sir.
19      Q   And that would have been April 26th, 2007?
20      A   Yes, sir.
21      Q   And during the consideration of HB 218, did you
22  hold any chairs within the Senate?
23      A   Yes.  I was Chairman of the State Affairs.
24      Q   And prior to HB 218 being referred to the Senate
25  or being received by the Senate, were you involved in any

[Page 23]

1   communications regarding HB 218 with House
2   representatives?
3       A   I don't remember if I was.  During that period
4   of the session, if I was, it was -- they came over to
5   the -- you know, it would have been a very informal
6   conversation, but I don't recall any.
7       Q   Do you recall the names of any House
8   representatives that you may have spoken to?
9       A   No.
10      Q   Do you recall who --
11          MR. GEAR:  Strike that.
12      Q   (By Mr. Gear:)  When HB 218 came over from the
13  House, do you recall who sponsored HB 218?
14      A   No.  I would have to look.  It seemed like,
15  reading the deposition, I recall maybe it was Rick or
16  Betty, Betty Brown.  I think Betty Brown is the --
17  according to this document, Betty Brown was the primary
18  author in the House.
19      Q   And does this document refresh your recollection
20  on that?
21      A   Well, I would rely on the document.  And I
22  don't have any reason to doubt it.
23      Q   So, just to be clear, Betty Brown was the author
24  of HB 218, correct?
25      A   That is what this document reflects.

[Page 24]

1       Q   And Senator Fraser was the sponsor of HB 218 in
2   the Senate?
3       A   That is what this reflects, and I recall that.
4   Yes, sir.
5       Q   And do you recall any discussions with any
6   senators regarding your being the sponsor of HB 218?
7       A   No.
8       Q   Did you consider sponsoring HB 218?
9       A   Probably not.
10          MR. SWEETEN:  Objection; privileged.
11  Let's say privilege on that, and you can answer.
12      A   Probably not.
13      Q   (By Mr. Gear:)  And when you say "probably not,"
14  what do you mean?
15      A   Well, I probably didn't consider it.  I didn't
16  generally do that.  Sometimes I did, but not generally.
17          It was not a -- It was not a general
18  political decision -- or political tact that I would use
19  or do.  A lot of people do, and sometimes you do, but I
20  just typically don't sign onto something unless I am a
21  primary sponsor.  I do sometimes in joint authors, but,
22  typically, I don't just for the sake of it.
23      Q   So, just for the sake of clarity on the record,
24  when you say "political tact," what do you mean?
25      A   Well, I mean, some people want to have their

[Page 25]

1   name on the bill.  I mean, it's important that they are
2   active, and they want to be able to reflect publicly that
3   they are in support of certain concepts, and they do
4   that, but --
5       Q   So did you support HB 218?
6       A   I believe I voted for it.
7       Q   So that would be a "yes"?
8       A   Yes, sir.
9       Q   Do you recall being involved in any discussions
10  or communications with any legislator regarding the types
11  of ID that would be included in HB 218?
12      A   Do I have independent recollection of that?
13  No.
14      Q   Is it possible that you engaged in that type of
15  discussion?
16      A   The record would reflect that, and I think it
17  probably does.
18      Q   And as you sit here today, what, if any, memory
19  do you have regarding what that record may reflect?
20      A   Well, as chairman of the committee, you lay
21  out -- you recognize the layout of the bill, and you
22  engage in the discussion, and I am sure that I did on
23  this one.
24      Q   And, again, so I am clear on your testimony,
25  prior to HB 218 coming -- being received by the Senate,

**CONFIDENTIAL**

[Page 26]

1    were you engaged in any communication regarding the types
2    of ID that would be included in HB 218?
3        A   I have no independent recollection of informal
4    conversations about that.  If there are conversations
5    about that, it would be in the record.
6        Q   And, again, is it possible that you engaged in
7    those types of communications?
8        A   Anything is possible.
9            MR. SWEETEN:  Object to speculation.
10           (Duncan Deposition Exhibit Number RD-3
11   marked.)
12       Q   (By Mr. Gear:)  So I'm showing you what's been
13   previously marked as Duncan Exhibit 28, and I will give
14   you a chance to take a look at that briefly.  Let me know
15   when you're ready.
16       A   (Witness reviewing document.)  I'm ready.
17       Q   Do you recognize this document?
18       A   Yes, sir.
19       Q   And what is this document?
20       A   This is House Bill 218.
21       Q   And do you recall testifying to this during your
22   previous deposition testimony?
23       A   I recall, from reading the record yesterday,
24   that this was brought up and attached as an exhibit.
25       Q   And this is a --

[Page 27]

1            MR. GEAR:  For the record, this is marked
2    as USA 00033583.
3        Q   (By Mr. Gear:)  Do you see that on the bottom
4    firsthand -- bottom right corner of this document?
5        A   Yes, sir.
6            MR. GEAR:  And, again, for the record,
7    this was previously marked as Duncan Exhibit 28, and it
8    is now marked as RD-3 for Robert Duncan.
9        Q   (By Mr. Gear:)  Sir, I want to direct your
10   attention to Page 9, specifically Section 63.0101.  Do you
11   see that?
12       A   Yes, sir.
13       Q   Is it accurate to say that HB 218 would have
14   allowed a driver's license or personal identification card
15   issued to the person by the Department of Public Safety
16   that is not expired or that has expired no earlier than
17   two years before the date of presentation?
18       A   That is the language on Line 17 through 20, I
19   believe.
20       Q   And do you recall HB 218 allowing that type of
21   documentation?
22       A   That is what it -- it appears in the bill; yes.
23       Q   Okay.  And if it appears in the bill, you
24   believe that language would be accurate?
25       A   I'm not sure I understand.  It's the

[Page 28]

1    language -- you know, I'm reading it.  It's in the bill.
2    It says it's in House Bill 218, and it says what it says.
3        Q   And House Bill 218, under Section 63.0101,
4    Number 2, also would have allowed for a United States
5    military identification card that contains the person's
6    photograph, correct?
7        A   Correct.
8        Q   Number 3, it would have allowed a valid employee
9    identification card that contains the person's photograph,
10   is issued by an employer of the person in the ordinary
11   course of the employer's business, correct?
12       A   Yes, sir.
13       Q   It would have allowed a United States
14   citizenship certificate issued by -- to the person that
15   contains the person's photograph, correct?
16       A   Yes, sir.
17       Q   It would have also allowed a United States
18   passport issued to the person?  And, again, I'm
19   referencing HB 218.
20       A   Well, I think the current law allowed that,
21   apparently.
22       Q   And HB 218 would have also allowed that,
23   correct?
24       A   Right.
25       Q   It would have allowed a student identification

[Page 29]

1    card issued by a public or private institution of higher
2    education located in the United States that contains the
3    person's photograph, correct?
4        A   Yes, sir.
5        Q   It would have also allowed a license to carry a
6    concealed handgun issued to the person by the Department
7    of Public Safety or, as Number 8 indicates, a valid
8    identification card that contains the person's photograph
9    and is issued by an agency or institution of the Federal
10   Government.  Do you see that?
11       A   Yes, sir.
12       Q   Or an agency, institution, or political
13   subdivision of the State.  Do you see that?
14       A   Yes, sir.
15       Q   Is it also accurate to say that HB 218 would
16   have allowed a number of non-photo identifications?
17       A   Yes, sir.
18       Q   And I believe your previous testimony was that
19   you voted in favor of HB 218, correct?
20       A   Yes, sir.
21       Q   And in voting in favor of HB 218, you also voted
22   in favor of the employee ID with photo?
23       A   I voted in favor of the language that was in
24   House Bill 218.
25       Q   And that is the language that we've just

**CONFIDENTIAL**

**[Page 30]**

1   discussed previously, correct?
2       A   I would just rely on the language in the bill,
3   because that is what I voted for.
4       Q   And you voted in favor of the language that was
5   included in the provisions of HB 218, correct?
6       A   Yes, sir.
7       Q   And, again, that would have included the use of
8   a student photo ID card issued by a public or private
9   institution of higher education in the U.S. that contains
10  a photo ID, correct?
11          MR. SWEETEN:  Objection; asked and
12  answered.  You can answer.
13      A   If that is the direct language out of the bill
14  that you are reading, yes.  I voted for the provisions of
15  House Bill 218.
16      Q   (By Mr. Gear:)  Can you tell me what the
17  publicly stated legislative purpose of HB 218 was?
18          MR. SWEETEN:  Objection; vague, as it's
19  publicly stated.  I'm not sure whose public statement
20  you're asking about.  You can answer.
21      Q   (By Mr. Gear:)  Let me --
22      A   There were 31 different public statements about
23  it, so, you know, it would be difficult.  I'm sure
24  everybody had their own public statement about it.  I
25  think the -- so I don't really know how to answer that

**[Page 31]**

1   question accurately.
2       Q   So, when you say there were 31 different public
3   statements, do you recall the public statement made by
4   Representative Brown regarding HB 218?
5       A   No, sir, I do not.
6       Q   Did you -- At any point, did you review the
7   legislative record regarding the purpose of HB 218?
8       A   No, sir, I really didn't.  Or at least I don't
9   recall that I would have reviewed the House -- anything
10  that came out of the House necessarily.  Sometimes we do.
11          But this was in, what, 2006?  So there
12  has been a lot of legislation I've looked at since then,
13  including a lot of voter ID issues as well, as we have
14  gone through 2009 and 2011.  So I don't have specific
15  recollection back that far as to what people said or who
16  I talked to specifically.
17          The record would reflect -- The only
18  thing that I can tell you is that the record would
19  reflect what public statements were made by persons as
20  this bill worked its way through the process.
21      Q   And would there be any reason for you to dispute
22  what is contained within the legislative public record?
23      A   You know, I don't have any knowledge to dispute
24  or not dispute it.  I just don't know what it is.  And I
25  haven't, you know, gone through and looked at everything,

**[Page 32]**

1   I guess, on the public record --
2       Q   So, if I was to tell you that Representative
3   Brown indicated that the intent of HB 218 was to prevent
4   illegal and noncitizen citizens from voting, would you
5   have any reason to dispute that?
6       A   I don't know whether she said that or not.
7       Q   Would you have any reason to dispute it, if it
8   was a public record?
9           MR. SWEETEN:  Objection; foundation.
10  Objection; calls for speculation.  You can answer.
11      A   I haven't seen it in the public record, so I
12  don't know.  You know, I don't know if she disputes it.
13  So I would have no way of accurately giving you a
14  response to that question.
15      Q   (By Mr. Gear:)  Well, let's look at the public
16  record real quick.
17          (Duncan Deposition Exhibit Number RD-4
18  marked.)
19      Q   (By Mr. Gear:)  I am showing you what has been
20  marked as RD-4, and I would just ask you to identify this
21  document.
22          MR. GEAR:  And for the record, this is an
23  excerpt.  It's not the complete legislative record.
24          MR. SWEETEN:  Yes, sir.
25      A   (Witness reviewing document.)  Okay.

**[Page 33]**

1       Q   (By Mr. Gear:)  Okay.
2       A   So that -- I'm not answering your question, but
3   I've finished reading it.
4       Q   Sure.
5       A   So you might repeat your question.  I'm sorry.
6       Q   So let's identify this document for the record.
7   Can you tell me what this is?
8       A   Well, it's a document that you have handed me
9   that is entitled "Texas House of Representatives
10  Committee on Elections, February 28, 2007, Excerpt of
11  Hearing Regarding House Bill" -- there's several bills,
12  but including House Bill 218.
13      Q   And on the bottom middle, it's identified as
14  JA 007340.  Do you see that?
15      A   Yes, sir.  Yes, sir.
16      Q   It's also Bates-stamped TX 00205011?
17      A   Correct.
18      Q   And also Bates-stamped USA 00022222, correct?
19      A   Yes, sir.
20      Q   And I would just direct your attention to
21  Page 57 at the bottom.  And to be clear --
22      A   Fifty-seven --
23      A   Actually, I'm sorry.
24      A   Which are you talking about?
25      Q   Turn to Page --

CONFIDENTIAL

**[Page 34]**

1    A   The transcript, Page --
2    Q   Yes.  Turn to Page 56, please.  I'm sorry.
3    A   Okay.
4    Q   On Page 56, do you see that there is a
5  discussion between Chairman Berman and Representative
6  Brown?
7    A   Yes, sir.
8    Q   And do you see that Representative Brown asks a
9  question of -- I'm sorry -- Representative Berman asks the
10  question of Representative Brown.  Do you see that?
11    A   I do.
12    Q   And do you see, at the bottom of Page 56, where
13  Representative Brown begins to answer Representative
14  Berman's question?
15    A   Yes, sir.
16    Q   And turning to Page 57, bottom paragraph, do you
17  see where it says, "The government requires voters to
18  register before receiving a ballot.  Therefore, verifying
19  the information they provided on their registration
20  application is not a measure designed to prevent any
21  citizen from voting"?  Do you see that?
22    A   That is what the language -- That is what the
23  transcript says; yes, sir.
24    Q   And do you see where Representative Brown
25  states, during the Texas House of Representatives

**[Page 35]**

1  Committee on Elections, February 28, 2007, that HB 218 is
2  intended as a "measure designed to keep illegal aliens,
3  noncitizens, and people otherwise not qualified from
4  voting and diluting legitimate votes cast by citizens"?
5  Do you see that?
6    A   That is what the transcript reflects.
7    Q   And do you have any reason to dispute the
8  accuracy of this transcript from the House?
9    A   I have no basis to dispute or not dispute it.
10    Q   Turning to the Senate, do you recall any
11  discussion in the Senate regarding HB 218 that -- where
12  constituents expressed concerns regarding noncitizens
13  voting?
14    A   I do not have independent specific recollection
15  of any testimony or statements.  The record would reflect
16  that we had a hearing.  So the record would reflect those
17  citizens and constituents who actually testified at the
18  hearing.
19         And so I don't have specific recollection
20  back to 2007 about what we heard at that point in time
21  in April, I guess, or May -- I guess it was in April of
22  2007.
23    Q   Let me ask you specifically regarding
24  constituent mail that you may have received.  Do you
25  recall receiving constituent mail that expressed concerns

**[Page 36]**

1  about illegal aliens or noncitizens voting?
2         MR. SWEETEN:  2007, you're asking?
3         MR. GEAR:  In 2007.
4    A   I don't recall receiving that.
5    Q   (By Mr. Gear:)  And let me expand that question.
6         Do you recall receiving constituent mail
7  regarding constituents expressing concerns that
8  noncitizens or illegal aliens were voting at any time
9  related to the photo ID legislation?
10    A   No, sir, I really don't.  I just really don't
11  remember that.
12    Q   Do you recall senators discussing the concern
13  that noncitizens or illegal aliens may be voting in the
14  State of Texas?
15    A   I have no independent recollection of that
16  specific discussion.  It would have to be in the record.
17  I don't have an independent recollection of that.
18    Q   Do you recall if there is a --
19    A   Are you talking about in 2007?
20    Q   I am talking about in 2007.
21    A   Yeah.  I don't have any recollection of that.
22    Q   Do you recall having any communications with
23  Senator Fraser regarding illegal aliens or noncitizens
24  voting at the polls?
25         MR. SWEETEN:  Objection; legislative

**[Page 37]**

1  privilege.  Go ahead.
2    A   No, sir.
3    Q   (By Mr. Gear:)  Do you recall having any
4  discussions with the Lieutenant Governor or the Governor
5  regarding illegal aliens and noncitizens voting?
6         MR. SWEETEN:  Objection; legislative
7  privilege.
8    A   No, sir.
9    Q   (By Mr. Gear:)  And just so we are clear, you
10  are --
11         MR. SWEETEN:  Do you want to give me a
12  running -- go ahead.  What were you going to say?  I
13  interrupted.
14         MR. GEAR:  Just so we are clear, I thought
15  we had put on the record that you would be asserting
16  legislative privilege and asking that it be maintained
17  under seal.  I am not sure how we would actually do that.
18         MR. SWEETEN:  Yeah.  All -- As I
19  understand the Court's order, they're saying --
20  suggesting that we assert it, and then he can go ahead
21  and testify with respect to the legislatively privileged
22  matter.
23         So, when I'm making the objection to
24  legislative privilege, I am letting him answer,
25  obviously, and so -- and as part of -- because we believe

CONFIDENTIAL

**[Page 38]**

1  that information is legislatively privileged.  And I
2  think you've also said that this has been done throughout
3  the case.
4          But we are asking that it be maintained
5  under seal, the deposition.  I think we have agreed to
6  that early in the deposition, because we are discussing
7  what we believe to be legislatively privileged matters.
8  I think that is --
9          MR. GEAR:  That's the Court's --
10         MR. SWEETEN:  -- at the point where I will
11 object to legislative privilege.
12         MR. GEAR:  Yes.
13         MR. SWEETEN:  I think, yes, with respect
14 to any matter where legislative privilege is asserted, we
15 want, obviously, that material to be kept under seal.  I
16 also understood you to say this entire deposition, the
17 way it has been done, is that it has been kept under
18 seal.  Is that not accurate?
19         MR. GEAR:  Well, I think you are objecting
20 a little bit differently.  So I want to make sure the
21 record is clear.
22         Essentially, in other depositions that I
23 have participated in, they have asserted the legislative
24 privilege and then agreed to not waive the legislative
25 privilege, but maintain the deposition under seal.  And

**[Page 39]**

1  the legislative privilege objection wasn't asserted each
2  and every time.
3          MR. SWEETEN:  Okay.  Well, I'm fine.  I
4  mean, Bruce, if you will give me a running objection on
5  legislative privilege as to all, you know, matters that
6  you are going to be discussing with respect to 2007 to
7  2011, I do not need to keep asserting legislative
8  privilege as to each question.
9          Where I don't want to be in a situation is
10 where I haven't asserted it or where there is some
11 argument that I haven't asserted it.  So I guess we can
12 do it one of two ways.
13         Either I'll keep just making the
14 assertions, again, letting him answer the question with
15 my objection, or if you will give me a running objection
16 between, you know, now and through the discussion of
17 legislative privilege -- I assume we are going to go
18 through '09 and '11 -- and then we can do it either way.
19 It's, you know, whatever, you are comfortable with.
20         I just don't want to be in a situation
21 where it's argued that I didn't assert legislative
22 privilege.  So that's why I am having to maintain the
23 objection.
24         MR. GEAR:  And would you agree that
25 legislative privilege is not -- the assertion of

**[Page 40]**

1  legislative privilege is not appropriate when dealing
2  with issues of constituents or interest groups?
3          MR. SWEETEN:  Well, I don't know that that
4  is -- I don't know that that is the case.
5          If you are talking about now his
6  discussions with constituent communications, I think
7  there is the argument -- we argue certainly, you and I,
8  back and forth, as to the D.C. Court as to whether
9  constituent communications would be covered by that.
10         So I would assert legislative privilege as
11 to constituent communications as well.
12         MR. GEAR:  And I would say that that's an
13 improper assertion.  I understand your position, and so
14 we can just move forward.  So I wouldn't give you just a
15 running objection --
16         MR. SWEETEN:  Okay.  I will just assert
17 it.  I will just assert it when appropriate.  Again, I am
18 not trying to be an obstructionist, but I have got to
19 maintain the record so that it is clear where we are
20 asserting it, in the absence of a running objection,
21 so --
22     Q   (By Mr. Gear:)  So we were -- we were discussing
23 constituent mail, and I believe your testimony was that
24 you don't have any independent recollection of receiving
25 constituent mail regarding constituents who may have

**[Page 41]**

1  expressed concern that illegal aliens or noncitizens were
2  voting.  Is that a fair representation?
3      A   I think that is a fair representation.
4      Q   Do you have any recollection as to whether your
5  staff would have received any type of constituent mail
6  along those lines?
7      A   I do not.
8      Q   Who would be responsible in your office for
9  responding to constituent mail?
10     A   2007, it would be various members of the staff
11 they spread that responsibility on.
12     Q   Would Jennifer Fagan be responsible for
13 responding to constituent mail?
14     A   Probably not.
15     Q   And do you recall the name of the staff member
16 who would be responsible for that?
17     A   In 2007?  Probably not.  I mean, there's
18 several.  It wouldn't be just one person.  There would be
19 several persons who respond with the processes that are
20 available to us.
21     Q   Do you recall what --
22         MR. GEAR:  Strike that.
23     Q   (By Mr. Gear:)  Do you recall that HB 218 was
24 intended to address voter fraud?
25     A   I recall the integrity of the ballot box was

CONFIDENTIAL

**[Page 42]**

1  one of the major issues and reasons stated for House Bill
2  218 and other bills that came up later in other sessions.
3      Q   Anything else that you recall related to voter
4  fraud regarding 2007 HB 218?
5          MR. SWEETEN:  Objection; vague.  Go ahead.
6      Q   (By Mr. Gear:)  Let me clarify that.
7      A   You know --
8      Q   Let me clarify that.  I'm sorry.  Any other
9  types of fraud that you recall on the legislative record
10 that relate to HB 218 that were discussed?
11     A   Well, generally, what I have said.  I think the
12 record, especially going back to 2007, would be the best
13 recollection I would have.  And I would not want to
14 venture or be inaccurate about what was said or what I
15 perceived back in 2007, you know, in 2014.  I just --
16 It's just not -- It's not a -- It's not realistic that I
17 could be accurate in that.
18     Q   Well, let me explore that for a second.  Would
19 you agree that HB 218 did not address the issue of by-mail
20 ballot fraud?
21     A   I don't know.
22     Q   And, again, it's your testimony that that would
23 be contained within the public record?
24     A   If I understand your question correctly, I
25 don't know whether House Bill 218, without looking at it,

**[Page 43]**

1  dealt with voter mail fraud.  I don't know.  I know those
2  were issues that were more generally discussed a lot of
3  times and dealt with -- you know, I think with different
4  legislation throughout the years.
5          But, in particular, I don't know whether
6  or not House Bill 218 dealt with it or not, without
7  looking at it.
8      Q   Fair enough.  You have HB 218 in front of you,
9  the House bill?
10     A   Somewhere here, yes, sir.
11     Q   And that has been marked as RD-2, correct --
12     A   3.
13     Q   -- or RD-3, correct?
14     A   Correct.
15     Q   In looking at House Bill 218, do you see any
16 provision within the bill that would address the issue of
17 by-mail ballot fraud?
18         MR. SWEETEN:  Object to the extent the
19 question would call for legislative privilege in the
20 answer.
21     A   (Witness reviewing document.) You know, a brief
22 45-second reading tells me that I don't see anything
23 about mail fraud, but -- wait.  I'm not through yet.
24     Q   (By Mr. Gear:)  And I will give you a chance to
25 complete it.

**[Page 44]**

1      A   Wait a minute.  There is something here.  No.
2  I'm sorry.  There is not.  It doesn't appear -- I mean,
3  it's 12 pages here.
4          I'm looking at it, and I don't see -- if
5  there is something in here, you might point it out to
6  me, because I don't see it in the quick reading.
7      Q   If I were to tell you that there is nothing in
8  there that addresses the issue of by-mail ballots
9  generally or by-mail ballot fraud, would you have any
10 reason to dispute that?
11     A   No, sir.
12     Q   And, again, looking at RD-3, which is again
13 Bates-stamped as USA 00033583, is it fair to say that HB
14 218 deals specifically with in-person voting at the
15 polling place?
16     A   The caption said, "related to requiring a voter
17 to present proof of identification," so -- and then I
18 think that language in there deals with in-person voting;
19 yes, sir.
20     Q   Looking at the language, do you see any
21 provisions that would deal with anything else other than
22 in-person voting?
23     A   Again, I am -- you know, a brief read of this
24 would indicate that you're correct; that there is nothing
25 in here other than in-person voting -- or nothing

**[Page 45]**

1  addressed in this bill other than in-person voting.
2      Q   Are you aware of any communication with the
3  Senate regarding an analysis conducted to determine if
4  noncitizens or illegal aliens were voting at the polls
5  related to HB 218, the 2007 bill?
6      A   I don't recall whether or not there was.
7      Q   So HB 218 was referred to the --
8      A   Senate State Affairs.
9      Q   -- Senate State Affairs Committee?
10     A   Yes, sir.
11     Q   And you were the chair of that committee?
12     A   Yes, sir.
13     Q   Why did -- Why was HB 218 referred to the
14 committee that you chaired?
15     A   Well, you know, the Lieutenant Governor has the
16 discretion to do that, but, generally, our committee
17 handled all election matters, among a lot of other
18 things.  But, generally, the election bills, all bills
19 dealing with voting and elections went to the State
20 Affairs.
21     Q   And is there a reason why all bills dealing with
22 voting and elections go to State Affairs?
23     A   Well, you know, generally, it's like any
24 committee, you want uniformity, you want people that you
25 have -- you want people that develop knowledge, a general

**[12] (Pages 42 to 45)**

CONFIDENTIAL

[Page 46]

1  overall knowledge of that area of the law so that
2  legislation, when it comes through, is consistent.
3          And you don't -- it's just -- that is not
4  true just in election law; it's true in tort, health and
5  human services, other things.  So you want to keep the
6  same people looking at the same issues to maintain
7  continuity at the committee level.
8      Q   And is it fair to say that up to 2007, HB 218,
9  all of the photo ID legislation was referred to the State
10  Affairs Committee?
11     A   That is my recollection.  Plus a lot of other
12  bills.
13     Q   Are you aware of any facts -- and, again, I'm
14  referencing specifically HB 218.  Are you aware of any
15  facts that would support that noncitizens or illegal
16  aliens were voting at the polls in 2007?
17         MR. SWEETEN:  Objection; legislative
18  privilege.  You can answer.
19     A   I am -- you know, again, I don't have
20  independent recollection of anything along that line.
21  Generally, I think there was concern about that.  I think
22  we addressed it in the report.  I think, you know, but,
23  generally and/or specifically, I have no independent
24  recollection of that.
25     Q   (By Mr. Gear:)  And can you identify a little

[Page 47]

1  more detail regarding the report that you believe you
2  addressed --
3      A   Well, we did an interim study on that issue
4  that reflected, I think, what I felt was a fairly good
5  recollection of those issues.
6      Q   And was that an interim study in 2007?
7      A   '06.  And was that through the State Affairs
8      Q   '06.  And was that through the State Affairs
9  Committee?
10     A   Yes, sir.
11     Q   And in 2006, did you chair the State Affairs
12  Committee?
13     A   Yes.
14     Q   Did you call for this interim study --
15     A   No.
16     Q   -- report to be conducted?
17     A   No.
18     Q   Do you know who called for this interim report
19  and study to be conducted?
20     A   It was part of general charges of the
21  Legislature that the Lieutenant Governor gives the
22  committee for a study.
23     Q   And can you tell me the process that was
24  followed regarding the interim report?
25     A   2006 was a long time ago.  I think probably the

[Page 48]

1  record reflects the hearings and the -- and the report
2  itself.
3      Q   So, related to the 2006 report, do you recall
4  what the results of the -- is it fair to say that it was
5  an analysis of noncitizens and illegal aliens voting at
6  the polls?
7      A   No.  I don't think -- I don't know.  You would
8  just have to read the report.  The report speaks for
9  itself.  I don't -- I'm not going to have independent
10  recollection of things other than in the report.
11     Q   As you sit here today, was there any evidence of
12  noncitizens or illegal aliens being prosecuted for voting
13  at the polls in 2006 or 2007?
14     A   I don't recall that.
15     Q   Was there any evidence identified within the
16  2006 report that noncitizens or illegal aliens had
17  committed voter impersonation at the polling place?
18     A   You would just have to -- the report will
19  indicate what the findings were.
20     Q   And, again, I don't mean to --
21     A   I know you don't.
22     Q   -- drill down too deep on this, but I just want
23  to understand what you know, as you sit here today.
24         And, again, referencing the 2006 report,
25  do you have any recollection that there was any evidence

[Page 49]

1  of noncitizens or illegal aliens voting at the polls in
2  2006 or 2007?
3      A   I have no recollection, just because it's eight
4  years ago or however -- whatever the math is for that.
5  I'm not trying to be coy with you.
6      Q   Sure.
7      A   It's just I want to be accurate --
8      Q   Sure.
9      A   -- and that's a long time ago.
10     Q   So let me expand that question then.  During
11  the course of consideration for any of the photo ID
12  legislation, do you have any recollection that there
13  were -- there was any evidence produced during the
14  consideration of photo ID legislation that would support
15  that noncitizens or illegal aliens were prosecuted for
16  voting at the polls?
17         MR. SWEETEN:  Objection; legislative
18  privilege.  You can answer.
19     A   I don't have independent recollection of that.
20  The record may or may not speak to that.  I don't have
21  independent recollection.
22     Q   (By Mr. Gear:)  But is it fair to say, as you
23  sit here today, you don't have any specific recollection
24  of that evidence being produced on the public record for
25  any of the photo ID legislation?

CONFIDENTIAL

[Page 50]

1          MR. SWEETEN:  Objection; asked and
2     answered.  Go ahead.
3          A   No, I don't.  We had several hearings, and one
4     of them went 24 hours, so I -- you know, I'm not going to
5     be -- you know, the record will reflect what was said,
6     and we accept the record -- a record of what was said in
7     each of those hearings.
8               So, you know, I will rely on that record
9     as to what was said, but I don't have independent
10    recollection, one way or the other, as we sit here in
11    August of 2014.
12         Q   (By Mr. Gear:)  Sure.  And just to focus again
13    on the record, which you testified that you would rely on,
14    do you have any reason to dispute what the record would
15    reflect related to that issue?
16         A   I wouldn't be in a position to dispute it or
17    affirm it either.  I mean, it's just -- the record is the
18    record, and I am sure you-all -- whatever you-all --
19    however you-all have preserved the record is not my -- a
20    matter that I would be able to evaluate.
21         Q   So, related to any photo ID legislation that was
22    considered in the House or the Senate, are you aware of
23    any prosecutions of noncitizens for voter impersonation at
24    the polls?
25         MR. SWEETEN:  Same objection; legislative

[Page 51]

1     privilege.  Go ahead.
2          A   I will stay with my answer.  I do not, but
3     there may be something in the record, and I'm going to
4     refer you to the record, because, again, I don't have
5     independent recollection of that particular fact coming
6     out, whether or not it did.
7          Q   (By Mr. Gear:)  Do you have any recollection of
8     the Texas Attorney General's Office providing testimony in
9     2007 regarding the prosecution of voter fraud?
10         A   I believe there was -- there was information
11    provided by the Attorney General's Office at that time.
12         Q   And based on that testimony, do you have any
13    recollection that the Texas Attorney General's Office in
14    2007 presented any evidence of prosecution of voter fraud?
15         A   The record will speak to that.  I don't have
16    independent recollection other than what the record might
17    show.  I would refer you to the record.
18         Q   Looking at RD-3, is there any provision in
19    there, that you are aware of, that would have prevented
20    noncitizens or illegal aliens from voting at the polling
21    place?
22         MR. SWEETEN:  Objection; legislative
23    privilege.  Go ahead.  You can answer.
24         A   That is an analysis that I don't know that I
25    can make, sitting here in a deposition, I mean.  So I

[Page 52]

1     don't know -- I can't answer that accurately.
2          Q   (By Mr. Gear:)  Fair enough.  Are you aware of
3     an analysis related to HB 218 that was conducted to
4     determine whether or not HB 218 would be effective in
5     preventing illegal aliens or noncitizens from voting at
6     the polling place?
7          MR. SWEETEN:  Objection; legislative
8     privilege.
9          A   If there was such an analysis, it would be in
10    the record.
11         Q   (By Mr. Gear:)  Are you aware of such an
12    analysis?
13         A   No.
14         Q   And I apologize if I've asked you this, but are
15    you aware of an analysis regarding voter fraud as it
16    relates to photo ID legislation in 2007 related to HB 218?
17         MR. SWEETEN:  Same objection.
18         A   I have no independent recollection today.  The
19    record would reflect that.
20         Q   (By Mr. Gear:)  Regarding HB 218, are you aware
21    of any analysis related to how the types of ID in HB 218
22    would impact minority voters?
23         MR. SWEETEN:  Same objection; legislative
24    privilege.  Go ahead.
25         A   I do not have independent recollection of that

[Page 53]

1     today.  The record would reflect that information, that
2     particular -- either objection or analysis, objection to
3     the legislation or analysis offered.
4          Q   (By Mr. Gear:)  Do you recall opponents of Bill
5     HB 218 expressing concern, during the consideration of the
6     bill, that the types of photo ID required in HB 218 may
7     have a negative impact on minority, elderly, or poor
8     voters?
9          A   I believe the record reflects that there was
10    debate and discussion along those issues.
11         Q   And as the Chair of the State Affairs Committee,
12    did you have authority to conduct any specific analysis to
13    address those types of concerns?
14         A   Well, I think every member of the Senate has
15    that authority.  We, in the committee, basically try to
16    resolve issues, if there are issues.  We have hearings,
17    and members vote their -- vote their beliefs and their
18    positions on the bills, and members lay out the reasons
19    for opposing bills and not opposing -- or in supporting
20    bills.
21              So there is a lot of analysis that goes
22    on there, as well, but as far as any analysis other than
23    what we do generally on the four or five hundred bills
24    that go through the committee, we do what we normally
25    do.

877-479-2484          US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

[Page 54]

1      Q   So I just want to break that out and understand
2   your answer here.
3            Regarding HB 218, is it your testimony
4   that there was no analysis related to what the impact may
5   be on minority voters?
6            MR. SWEETEN:  Objection; misstates
7   testimony.
8      Q   (By Mr. Gear:)  And, again, I just -- I am not
9   trying to trick you in any way.  I just want to understand
10   what the testimony is.
11      A   I don't know what you mean by "analysis."  Each
12   member looks at each bill, and they analyze those bills
13   in their own -- with their own process.  In the
14   committee, we hear from -- before the bill is heard, we
15   hear from people objecting or not objecting, and we try
16   to relay information to other members.
17            We develop a record, and then the members
18   and the sponsors of the bill bring forth witnesses and
19   evidence in support.  The opponents bring forth
20   witnesses and evidence in opposition.  This happens on
21   every bill that we do.
22            And voter ID was, you know, really no
23   different, other than it was in 2007.  Actually, it was
24   a bill that was considered like every other bill.
25            Would it be fair to say that photo ID

[Page 55]

1   legislation was controversial in the Senate?
2      A   It was.  It's not the only bill that was
3   controversial either, but it certainly was.
4      Q   You've indicated -- You've testified that
5   senators conduct -- follow their own process -- and
6   forgive me if I am misstating this; I am just trying to
7   understand the testimony again -- that there's -- they
8   follow a process when working their way through the bill.
9   Is that fair to say?
10      A   Yes, sir.
11      Q   So, related to HB 218 and the concerns that were
12   expressed on the Senate floor, regarding the impact to
13   minority voters, as the Chair of the State Affairs
14   Committee, did you follow any process to determine if
15   those concerns were valid?
16            MR. SWEETEN:  Objection; legislative
17   privilege.  You can answer.
18      A   You know, the answer to that question is yes.
19   We always try to listen to concerns in the committee and
20   determine whether or not they are valid.
21            Did we commission a study that would take
22   five weeks or six weeks or two years?  No.  We don't
23   have time to do that.  When you get a bill in the Senate
24   in April -- which what was the date that we received
25   this bill?  We received this bill -- it was April --

[Page 56]

1      Q   (By Mr. Gear:)  We can look back at the
2   legislative online history and roll.
3      A   April 26th.  There was literally 30 days left
4   in the session and probably less than two weeks to be
5   able to process the bill, have a hearing in committee,
6   and have a hearing on the floor.  So we rely on a lot of
7   different evidence, and the Legislature is different from
8   Congress, in that we operate on very strict deadlines.
9            And when you are in the Senate and you
10   receive a House bill later in the session, you don't
11   have time to commission studies or that sort of thing,
12   but people bring evidence and put evidence in the
13   record.  And as the committee, we encourage that, we
14   invite that, and we make sure that we have a hearing
15   that allows for that.
16            And then the members can conduct their
17   analysis of whether or not they believe differently or
18   what weight -- let's put it like this -- the members, on
19   their own, decide what weight they are going to give to
20   the evidence that comes before them in the committee.
21            And so that is the process that happened
22   in House Bill 218, and that is the same process that
23   would go on for any bill that went through State
24   Affairs, Jurisprudence, Health and Human Services, or
25   any other committee.

[Page 57]

1      Q   So is it fair to say that there was testimony by
2   opponents of the bill regarding the negative impact on
3   minority voters related to HB 218?
4      A   I would refer you to the record.
5            MR. SWEETEN:  Objection; asked and
6   answered on that question.
7      Q   (By Mr. Gear:)  Do you recall any testimony that
8   was presented by supporters of HB 218 that would have
9   supported the fact that there would have been no negative
10   impact to minority voters?
11      A   I would have to refer to the record on that.
12      Q   And as you sit here today, I would like to
13   understand your testimony.
14            Do you have any independent recollection
15   of that type of testimony being presented by supporters
16   of HB 218?
17      A   You know, I really don't, but if you look --
18   I'm sure that there was testimony for and against the
19   bill.  I mean, this was a bill that had a lot of -- it
20   was controversial, as you said.  And so we have hearings
21   about that, and we talk about it, and our committee was
22   very good about debating issues in the committee and on
23   the floor.
24            This bill went to the floor, and it was
25   debated on the floor as well, so -- but I don't have

CONFIDENTIAL

---

**[Page 58]**

1    any -- you know, just to sit here today, six or seven
2    years later, you know, I would be -- I am very hesitant,
3    because I would be only speculating and be inaccurate
4    about specific things, but the record will reflect the
5    specific things.
6              Generally, I'm sure there was testimony
7    in opposition and in favor of the bill.
8        Q   Well, let's talk specifically about you and your
9    role as the committee chair.
10             Do you -- Do you have any recollection of
11   how you responded to these concerns?
12             MR. SWEETEN:  Objection; legislative
13   privilege.
14       Q   (By Mr. Gear:)  Just so I'm clear, the concerns
15   that HB 218 would have a negative impact on minority
16   voters.
17             MR. SWEETEN:  Objection; legislative
18   privilege.
19       A   I supported the bill.  I listened closely to
20   the testimony.  And as far as what my thought processes
21   were seven years ago, no, I don't, but, generally, I
22   listened to the testimony, and I felt that the --
23   weighing the evidence, I weighed in favor of supporting
24   the bill.
25       Q   (By Mr. Gear:)  Do you have any recollection of

**[Page 59]**

1    whether you were concerned about the testimony by the bill
2    opponents related to the impact on minority voters?
3              MR. SWEETEN:  Objection; legislative
4    privilege.
5        A   No, I really don't.  I mean, it's not saying I
6    dissent.  I mean, I don't.  As it goes back to 2007, it
7    was a long time ago.  So I do know I supported the bill.
8              I really don't have any independent
9    recollection of that particular hearing, other than what
10   I am reminded of in the record.  That's how I have to
11   process this, is what is in the record.
12       Q   (By Mr. Gear:)  Do you have any independent
13   recollection of taking any steps, as the committee chair,
14   or directing your staff to look into the possibility that
15   HB 218 may have a negative impact on minority voters?
16             MR. SWEETEN:  Objection; privilege.
17       A   You know, I don't recall.  I do know that we --
18   we hear objections.  We try to follow through with
19   understanding those objections and present them to the
20   committee.  It's not our -- It's not our job to pass
21   judgment along those lines.  It's our job as the
22   committee to make sure that the members have the evidence
23   before them so they can make informed decisions.
24             And to the extent we have these
25   compressed timelines in the, you know, legislative

**[Page 60]**

1    process, you know, sometimes we are -- we are moving
2    fairly quickly but efficiently.
3              And I think this bill had -- 218, I'm
4    sure the record reflects, had a lot of -- a lot of
5    people weighed in on the issue, and the members made
6    their decision, for whatever reason, in their judgment.
7    They either supported or opposed the bill.
8        Q   (By Mr. Gear:)  Do you recall any of the
9    communication by Senator Fraser on the Senate related to
10   HB 218?
11       A   No, sir.
12       Q   Would it be fair to say his statements related
13   to HB 218 would be contained in the public record?
14       A   I think that is a fair statement.
15             MR. SWEETEN:  Let's take a break.
16             (Short break taken.)
17             MR. GEAR:  So, back on the record after
18   taking a brief break.
19       Q   (By Mr. Gear:)  We were talking about HB 218.  I
20   wanted to ask you some questions about the process of
21   considering HB 218.
22             Do you recall a point, when it was being
23   considered by the Senate, where Senator Fraser was
24   recognized for a motion to suspend the regular order of
25   business for HB -- to take up HB 218?

**[Page 61]**

1        A   Sitting here today, do I remember that?  No,
2    but I know it happened.
3        Q   If I showed you the legislative record on that,
4    would that help refresh your recollection?
5        A   Sure.
6              (Duncan Deposition Exhibit Number RD-5
7    marked.)
8        Q   (By Mr. Gear:)  So I'm showing you what's been
9    marked as RD-5, which is Bates-stamped USA 00023200, and
10   it's also identified as JA 008318.  Now, I will just give
11   you a chance to take a look at that.
12             And so it's also clear, I believe this is
13   the excerpt of this legislative record.  And my first
14   question will be:  Can you identify this for me?
15       A   Well, this appears to be an excerpt from the
16   Senate Journal for Tuesday, May the 15th of 2007.
17       Q   And that is during the 80th Legislative Session,
18   2007?
19       A   If you say so.  I don't think it says it on
20   this document that I'm looking on.  I can't see it,
21   but -- it's the 80th, yeah.  Here it is.  It's spelled
22   out.  I'm sorry.  It does say "Eightieth."
23       Q   Well, let's just turn to the last page, which
24   has an indication of Page 38, and it is JA 008320.  It
25   also has a Bates-stamp of USA 00023202.  And I would just

CONFIDENTIAL

[Page 62]

1    call your attention to the bottom of the last page, where
2    it indicates, "Committee Substitute, House Bill 218 on
3    Second Reading."  Do you see that?
4         A   Yes, sir.
5         Q   And in this legislative record, it indicates
6    that Senator Fraser moved to suspend the regular order of
7    business to take up for consideration CS HB 218, and at
8    this time, on its second reading.  Do you see that?
9         A   Yes, sir.
10        Q   And do you also see what happened with the
11   motion based on this record?
12        A   According to the record, the motion prevailed.
13        Q   And what did it prevail by?
14        A   Nineteen yeas, nine nays.
15        Q   And do you see an indication of who voted
16   against suspending the regular order of business to take
17   up consideration of HB 218?
18        A   Yes, sir.
19        Q   And Senator Ellis would be one of the people
20   that voted against it?
21        A   That is correct.
22        Q   And how do you pronounce --
23        A   Gallegos.
24        Q   Gallegos?
25        A   Yes, sir.

[Page 63]

1         Q   Hinojosa?
2         A   Hinojosa.
3         Q   Hinojosa.  Maybe if you just pronounced the
4    names for me, that might go faster.
5         A   Lucio, Shapleigh, Van de Putte, Watson, West,
6    and Zaffirini.
7         Q   And as to the discussion as to why they were
8    voting against suspending the regular order of business,
9    do you have any independent recollection of that?
10        A   I have independent recollection that there was
11   a discussion.  I don't remember what each member said, as
12   it relates to their position on the bill.
13        Q   Let's focus specifically on Van de Putte.  Do
14   you recall receiving a letter from Senator Van de Putte
15   regarding HB 218?
16        A   Not specifically, but I wouldn't doubt that I
17   did.  I don't know.  I would just have to see.
18        Q   Do you recall Senator Van de Putte expressing
19   concerns that related to HB 218 that this photo ID
20   legislation may result in a negative impact to minority
21   voters?
22        A   I know that Senator Van de Putte had taken that
23   position before, and so I don't have independent
24   recollection at this time of 218, but, you know, if you
25   have something in the record, I'm sure I wouldn't -- I

[Page 64]

1    wouldn't doubt that.
2         Q   Okay.  Do you see also on the Senate Journal,
3    last page, JA 008320, that two senators were counted
4    absent when the vote to suspend the regular order of
5    business to take up HB 218 was considered?
6         A   I think actually three members were absent.
7         Q   And what three members were those?
8         A   Senator Hegar, Uresti, and Whitmire.
9         Q   Was Senator Hegar an opponent or supporter of HB
10   218; do you recall?
11        A   Well, I believe that he supported the bill.  I
12   guess you would have to ask him, but --
13        Q   Based on your recollection.
14        A   Generally, I think he was a supporter.
15        Q   Do you know if Senator Uresti was a supporter or
16   opponent of HB 218?
17        A   I believe he was an opponent.
18        Q   What about Senator Whitmire?
19        A   I believe he was an opponent.
20        Q   Do you recall the circumstances surrounding
21   Senator Uresti being counted absent on this particular
22   day?  And we're talking about May 15, 2007.
23        A   I have a general recollection that he was
24   absent, but I don't -- the record would reflect the
25   details on that.  I don't have an independent

[Page 65]

1    recollection of that.  To be accurate, I remember there
2    was an issue about his absence.  That is what I remember.
3         Q   If I were to represent to you he was ill on that
4    day, would that help refresh your recollection as to
5    Senator Uresti's absence?
6             MR. SWEETEN:  Objection, assumes facts not
7    in evidence.  You can answer to the best of your
8    knowledge.
9         A   You know, whatever the record reflects on that,
10   you know, would be -- I don't know if he had an excused
11   absence or an absence or what.  I do not know.  I just --
12   I just remember vaguely there was an issue about him
13   being there.
14        Q   (By Mr. Gear:)  Do you recall the circumstances
15   surrounding Senator Whitmire being counted as absent
16   during the vote to suspend the regular order of business
17   to take up HB 218?
18        A   I do recall that.
19        Q   And can you tell me the circumstances --
20        A   I think he was off the floor.  I don't think he
21   was actually absent at the time of the vote.
22        Q   And can you tell me what the process is for
23   counting a senator present once he checks in on the floor?
24        A   The -- Say that again.
25        Q   I will do my best to restate that.

CONFIDENTIAL

[Page 66]

1    A   Okay.
2        Q   I'm trying to understand.  Is there a procedure
3    or a process in place, once a senator checks in on the
4    floor, related to whether or not they would be counted as
5    present during votes.  Does that make sense?
6        A   I think so.
7        Q   Okay.
8        A   At the beginning of the day, the secretary
9    calls the roll.
10       Q   Secretary of the Senate?
11       A   Secretary of the Senate.  Patsy Spaugh, in this
12   case.  And if you are -- if you are absent, typically,
13   you cannot be there because of illness or business, then
14   you report that you are -- report that -- the president
15   of the Senate will then entertain a motion to provide an
16   excused absence.
17       Q   And do you recall if Senator Whitmire was
18   present during the initial roll call by the Secretary of
19   the Senate?
20       A   I don't recall that.
21       Q   Do you recall discussion by Senator Whitmire
22   related to this particular issue; that he was present when
23   the motion to suspend the regular order of business was
24   taken up to consider HB 218?
25       A   I don't remember the details of anything

[Page 67]

1    Senator Whitmire said, but I do recall that he was
2    temporarily off the floor at the time the vote was taken,
3    and I think he objected to the fact that he was
4    temporarily off the floor and wasn't counted, for
5    whatever reason.
6        Q   And so, if a senator was on the floor, would it
7    be unusual for him to be counted as absent once he has
8    checked in with the Secretary of the Senate?
9        A   No, but if he doesn't register a vote -- and I
10   think that's if you are temporarily off the floor and a
11   vote is called -- then the secretary calls your name, and
12   if you're not there, then she can't record your vote.
13   And so I think that's what happened here.
14       Q   Do you recall Senator Whitmire stating that he
15   was present during the vote?
16       A   No, I don't.  He was -- I think he was off the
17   floor, is my recollection.  I don't know if the record
18   reflects anything different, but that's what I recall.
19       Q   Based on that discussion, do you recall if there
20   was a request to verify the vote related to the motion to
21   suspend --
22       A   Yeah.
23       Q   -- the regular order of business?
24       A   Yes, according to the -- according to the
25   record here, there was --

[Page 68]

1        Q   And which document are you referring to?  I'm
2    sorry.
3        A   The Senate Journal or Exhibit RD-5.
4        Q   And who made that request to verify the vote?
5        A   Senator Shapleigh.
6        Q   And, specifically, Senator Shapleigh called for
7    a verification of the vote by which the regular order of
8    business was suspended for HB 218?
9        A   Yes, sir.
10       Q   And do you recall what happened when he called
11   for a verification of the vote?
12       A   No.
13       Q   Do you recall there being a second vote to
14   consider suspending the regular order of business to take
15   up HB 218?
16       A   You know, I don't recall exactly what happened.
17   I recall that -- Let me see the record.  I recall that
18   there was -- there was additional activity after this,
19   but I don't recall exactly what happened.
20       Q   So, if you will show me the record, I
21   will -- that will refresh my memory.
22       A   Well, actually, I only have one copy of this.
23   Let me just see what your independent recollection is --
24       A   I have told you that -- you have got everything
25   I can tell you, you know.

[Page 69]

1        Q   Let me try this.  Do you recall a discussion
2    between Senator Fraser and Senator -- is it Shapleigh?  Is
3    that --
4        A   That's how you pronounce the name, Shapleigh;
5    yes, sir.
6        Q   Do you recall if there was a discussion
7    regarding the verification of the vote?
8        A   No, sir.  There may have been.  I just --
9    again, I would have to refer to the record.
10       Q   I will see if I can -- Do you believe the record
11   would reflect what happened in that particular
12   circumstance?
13       A   It should.
14       Q   Do you recall if there was a second vote
15   regarding HB 218 to suspend the regular order of business?
16       A   I do not recall.
17       Q   Do you recall if HB 218 passed out of the
18   Senate?
19       A   I know it didn't.
20       Q   And do you recall why it did not pass --
21       A   That's what I am trying to ask -- the record
22   would reflect that.
23       I know there were general discussions,
24   and it primarily related around Whitmire's temporary
25   absence from the floor, but I don't recall what -- I

CONFIDENTIAL

[Page 70]

1  don't recall exactly how -- what procedural activity
2  took place that caused the bill to fail.  I just recall
3  that it did fail.
4      Q   So, if you look at RD-5 -- and I'm sorry.  If
5  you look at RD-5, last page, JA 008321, do you see that?
6      A   I don't know.  I know why -- I don't have
7  the -- mine stops with 320; RD-5 does.  Well, I guess
8  maybe I'm in the dark here.  I don't have the last page.
9      Q   I apologize for that.  I have marked on this, so
10 I don't want to introduce it as an exhibit, but --
11     Q   You have notes on there?
12     Q   Not really.  I will show you what has already
13 been marked as RD-5 --
14     A   I see.
15     Q   -- correct, and just direct you to the last
16 page.  And can you identify the Bates-stamped numbers on
17 that?
18     A   Well, this -- what you have handed me, which is
19 I guess an auxiliary exhibit, but it's JA 008321, which
20 would seem to follow the Bates stamp on RD-5.
21     Q   Okay.  And just so the record is clear, turning
22 to the first page of this exhibit, would you agree that it
23 is the same document minus the 21 Bates stamp?
24     A   I will accept your representation of that.
25     Q   Okay.  So then looking at -- looking at JA

[Page 71]

1  008321, which is also Bates-stamped USA 00023203 -- I've
2  been asking you:  Do you recall if there was a second vote
3  to suspend the regular order of business.
4          And if I showed you the last page, would
5  that refresh your recollection as to what happened
6  regarding HB 218?
7      A   Can I look back in this?
8      Q   Sure.  You certainly can.  I don't think I have
9  any notes in there.
10     A   (Witness reviewing document.)  The record
11 reflects that when the roll call occurred on Senator
12 Shapleigh's motion for verification, that Uresti and
13 Whitmire were on the floor and registered to vote, along
14 with Ellis, Gallegos, Shapleigh, Van de Putte, Watson,
15 West, and Zaffirini, and that Senator Hegar was also on
16 the floor for the verification.
17         And so the motion, which required 21
18 votes, failed on a vote of 20 yeas and 11 nays.
19     Q   So, just so the record is clear, the -- I will
20 take that back.  Thank you.
21         The motion to suspend the regular order of
22 business was lost by the -- by a vote of 20 to -- 20 yeas
23 to 11 nays?
24     A   Right.
25     Q   And the same senators who voted to -- who

[Page 72]

1  opposed the suspension of the regular order of business on
2  the first vote also voted to oppose the regular order of
3  business on the second vote, but it also included Senator
4  Uresti and Senator Whitmire.  Was that your testimony?
5      A   Apparently, they were on the floor whenever the
6  vote roll call was taken.
7      Q   And what, if any other consideration, was there
8  of HB 218 by the Senate after this particular vote?
9      A   I don't -- I don't know.  The record would
10 reflect that.  I don't know if there was another motion
11 to suspend.  I don't think there was, but I don't know
12 that for sure.
13     Q   So, as you sit here today, are you aware of any
14 additional action taken on HB 218?
15     A   No, sir.
16     Q   And I apologize for that confusion.  I was
17 missing a page.
18     A   That's all right.
19     Q   In 2009, do you recall that SB 362 of photo ID
20 legislation was introduced by Senator Fraser in the
21 Senate?
22     A   Yes, sir.
23         (Duncan Deposition Exhibit Number RD-6
24 marked.)
25     Q   (By Mr. Gear:)  And just to put the bill into

[Page 73]

1  context, again, I'm going to hand you what has been marked
2  as RD-6.  I'll give you an opportunity to look at that
3  document, and if you could, identify that for me, please.
4      A   (Witness reviewing document.)  RD-6 appears to
5  be a Texas online history of Senate Bill 362 in the 81st
6  regular session.
7      Q   And do you recognize this as the legislative
8  history of SB 362?
9      A   That would appear to be what this is.
10     Q   And based on RD-6, can you tell me when SB 362
11 was filed?  And I will direct your attention to Page 2
12 of 3.
13     A   Yeah.  I'm not sure what this is.  I don't
14 understand this first entry on -- received by the
15 Secretary of the Senate.  I guess it seems out of order.
16 It looks like it was filed on December 15th of 2008.
17     Q   And it was read for the first time on
18 February 17th of 2009, based on the record?
19     A   That is what the record reflects.
20     Q   Now, it appears that on February 17th, 2009,
21 SB 362 was referred to the committee of the whole.  Do you
22 see that?
23     A   Yes, sir.
24     Q   Can you tell me the circumstances surrounding
25 the decision to refer SB 362 to the committee of the

CONFIDENTIAL

**[Page 78]**

1  again, you would have to go to the record on this or go
2  to the records and do the research -- but that the --
3  that the special order process had been used before --
4  which actually was a -- was in the rules.  It was a
5  provision that was in the rules, and this voter ID was
6  added to that.
7      Q   Well, we haven't discussed this in any detail,
8  but do you recall that there was photo ID legislation in
9  2005?  I believe that was HB 1706.
10     A   No.
11     Q   We talked in detail about HB 218.  That was
12  referred directly to the State Affairs Committee, correct?
13     A   Right.
14     Q   Prior to -- and that was in 2007, correct?
15     A   Right.
16     Q   Prior to 2007, specifically, are you aware of
17  any photo ID legislation that had been referred directly
18  to the committee of the whole?
19     A   No.  No, I'm not aware of that.
20     Q   So can you tell me each and every reason you are
21  aware of why SB 362 -- why the rules were changed so that
22  SB 362 was referred directly to the committee of the
23  whole?
24         MR. SWEETEN:  Objection; legislative
25  privilege.  Objection; asked and answered.  You can

**[Page 79]**

1  answer.
2      A   The provisions or the special order rule was
3  debated for eight or nine hours on the Senate floor.  The
4  reasons and the -- I will rely on the record as the
5  reasons for the passage of Senate Resolution -- what did
6  you say, 14 -- amending the rules; that those -- this
7  Senate acts as a body, and there are 31 members, and
8  there are 31 different reasons why people vote for
9  certain things.
10         And one person's reasons may be another
11  person's opposition.  Who knows.  I will rely on the
12  record of the debate where members stated their reasons
13  on the Senate floor.
14     Q   (By Mr. Gear:)  There may have been 31 different
15  reasons, based on your testimony, but you were involved in
16  communications, I believe you've stated, with Senator
17  Williams regarding the reasons why SB 362 -- the rules
18  were amended to refer this directly to the committee of
19  the whole.  Did I understand your testimony correctly?
20     A   Right.
21     Q   What reasons did Senator Williams provide as to
22  why SB 362 was required to be referred directly to the
23  committee of the whole?
24         MR. SWEETEN:  Objection; legislative
25  privilege.  You can answer.

**[Page 80]**

1      A   I don't recall specifically what he said.  I
2  think there are a number of considerations one could look
3  at.
4          One was, as I said earlier, a committee
5  of the whole would allow all members of the Legislature
6  to participate in the committee process and the in-depth
7  analysis and the -- and the listening to witnesses.
8          I think another reason -- you know, a
9  special order means that it doesn't come up in the
10 regular order of business, and that it could be taken
11 out of order without -- and be within the rules.
12     Q   (By Mr. Gear:)  When HB 218 was referred to the
13 State Affairs Committee, there were hearings on HB 218,
14 correct?
15     A   Right.
16     Q   And all senators are welcome to attend those
17 particular hearings?
18     A   Well, as a practical matter?
19     Q   Yes.
20     A   They are welcome, but they can't -- if you've
21 ever been in the Capitol during the session, you will see
22 that there are multiple committee meetings going on all
23 at the same time, and members don't have the ability to
24 monitor other committees.
25         And so one of the advantages to this

**[Page 81]**

1  special order process was:  It allowed all members of
2  the Senate to participate in the debate and listening
3  and hearing the witnesses and examining -- you know,
4  taking examination, cross-examination of the witnesses,
5  as well as presenting evidence themselves or presenting
6  their debate at the committee level.
7          And as you will recall and you may know,
8  we spent 24 solid hours in the committee of the whole,
9  taking testimony and debating the issue in the committee
10 of the whole.
11         (Duncan Deposition Exhibit Number RD-7
12 marked.)
13     Q   (By Mr. Gear:)  I want to show you what has been
14 marked as RD-7.  We have been discussing a change in the
15 Senate rules.
16         Does this help refresh your recollection
17 as to Senate Rule -- or Senate Resolution Number 14?
18     A   Yes, sir.
19     Q   And, specifically, that is Rule 5.11.
20     A   Correct.
21     Q   And that is the special order that you have been
22 discussing here today on the record?
23     A   That's what you've been asking me about; yes,
24 sir.
25     Q   Looking at Page 2 of the exhibit I've just

CONFIDENTIAL

**[Page 82]**

1   handed you, which is Bates Stamp Number USA 00025500, it
2   references Rule 5.11, correct?
3       A   Would you say that again?  I'm sorry.
4       Q   And I apologize.  Looking at Page Number 2 of
5   the exhibit that I've handed you, which is Bates Stamp
6   USA 00025500, it references the special order and
7   Rule 5.11, correct?
8       A   Yes, sir.
9       Q   And what did -- what did Resolution -- Senate
10  Resolution 14 allow in the Senate?  What did it allow to
11  happen?
12      A   Do you have it?  I mean, I would like -- if you
13  will give me the resolution, I will testify from that, as
14  opposed to just -- I think you've got it somewhere.
15      Q   I should.  I only have one copy of this, but
16  I will show you what has been previously marked as
17  Exhibit 168, Duncan Exhibit 168.
18      Q   Is that out of the earlier deposition?
19      Q   Yes.
20          (Duncan Deposition Exhibit Number RD-8
21  marked.)
22      Q   (By Mr. Gear:)  And I will mark this as RD
23  Exhibit Number 8 and give you an opportunity to look at
24  this.
25      A   (Witness reviewing document.)

**[Page 83]**

1       Q   Can you identify that for me when you get a
2   chance?
3       A   (Witness reviewing document.)  Okay.  Your
4   question?
5       Q   For the record, this is part of the Senate
6   Journal?
7       A   Yes, sir.
8       Q   And the date of the Senate Journal was the
9   second day, Wednesday, January 14th, 2009.  Do you see
10  that?
11      A   Yes, sir.
12      Q   And this is dealing with the 81st Legislature
13  regular session?
14      A   Yes, sir.
15      Q   And we have been discussing Senate
16  Resolution 14.  If you will turn to the second page,
17  which is has two Bates stamps on it, TX
18  0000890 and USA 0027620.  Do you see the Senate
19  Resolution 14?
20      A   Yes, sir.
21      Q   And you've indicated that if you were able to
22  see Senate Resolution 14, you would be able to answer my
23  question?
24      A   Yes, sir.
25      Q   And does this help refresh your recollection?

**[Page 84]**

1       A   Yes, sir.
2       Q   And so my question was:  What did Senate
3   Resolution 14 allow to happen within the Senate related to
4   SB 362?
5       A   As it relates to voter identification
6   legislation, it added Subsection (d) to Rule 5.11
7   entitled "Special Orders," and it added a specific
8   paragraph dealing with a bill or resolution related to
9   voter identification requirements that are reported
10  favorably from the committee of the whole.
11      Q   And again, my question would be:  Has
12  Subsection (d) ever been added to amended rules to allow
13  photo ID legislation specifically to be heard by the
14  committee of the whole?
15      A   I don't know the answer to that.  I have no
16  information that -- no reason to believe that it was
17  before, but I haven't done that research.
18      Q   Well, at the time SB 362 was considered, you
19  were the chair of the committee of the whole?
20      A   I was appointed to serve as chair of the
21  committee of the whole when it was considered; yes, sir.
22      Q   And who were you appointed by?
23      A   The Lieutenant Governor.
24      Q   That would be David Dewhurst?
25      A   Correct.

**[Page 85]**

1       Q   And why were you appointed to the --
2       A   Or, actually, the President of the Senate would
3   be a better way to say that, but right, correct, yes,
4   sir.
5       Q   So it would be more appropriate to refer to
6   Senator Dewhurst as the president?
7       A   Well, he wasn't a senator either, but -- he was
8   Lieutenant Governor, but --
9       Q   I'm sorry.
10      A   -- President of the Senate.
11      Q   Of the Senate?
12      A   Right.
13      Q   So the President of the Senate --
14      A   Right.
15      Q   -- David Dewhurst, appointed you to the
16  committee of the whole, correct?
17      A   Correct.
18      Q   And why did the president of the Senate appoint
19  you to the committee of the whole in 2009?
20          MR. SWEETEN:  Objection; calls for
21  speculation.  Objection; legislative privilege.  You can
22  answer.
23      A   I don't know.  You know, I guess it's more
24  likely --
25      Q   (By Mr. Gear:)  Let me --

CONFIDENTIAL

**[Page 86]**

1    A   -- than not -- this is speculation on my part,
2    but more likely than not, it is because I chaired the
3    Senate State Affairs Committee, and I served as a
4    president pro tem in that session, as well.  So it was a
5    natural -- for those two reasons, it was a -- probably a
6    fairly natural appointment.
7       Q   Did you have any specific communications with
8    the President of the Senate --
9       A   I'm sure I did.
10      Q   -- David Dewhurst, regarding your appointment to
11   the committee of the whole?
12      A   I'm sure I did.
13      Q   During those communications, did you have
14   any -- if you recall, do you have any recollection of
15   communications related to photo ID legislation and it
16   being heard by the committee of the whole?
17      A   I'm going -- I don't have any specific
18   recollection of detailed communications other than, you
19   know, would you do this, and then, you know, instructions
20   to work with the members to come up with a process to
21   efficiently hear the legislation in the committee of the
22   whole.  Those were my instructions.
23      Q   And your instructions were to come up with a
24   process.  What process did you come up with?
25      A   Well, it's -- there is -- you know, we had a

**[Page 87]**

1    procedure for -- and I worked with Senator Van de Putte,
2    who was the chairman of the Democratic caucus, and the
3    author of the bill, Senator Fraser, and the secretary of
4    the Senate and the sergeant at arms, about how we can do
5    this efficiently and allow citizens an opportunity to be
6    heard and members an opportunity to debate the bill in an
7    efficient way.
8        And I think we came up with a set of
9    procedures that actually I read in the -- they're in the
10   record, and so I don't want to try to guess at what they
11   were, but I think you have those in the record.
12       And I talked to Senator Van de Putte
13   about the requests that she had and other things that
14   we -- she and I worked through.
15      Q   Do you recall receiving any e-mails, letters
16   from the president of the Senate, related to your
17   appointment as the chair of the committee of the whole?
18      A   I don't know if I did or not, quite frankly.
19      Q   You've testified --
20      A   There may be something.  I don't know.
21      Q   You've testified that you had communication with
22   Senator Van de Putte regarding 362 and attempting to come
23   up with the procedures --
24      A   Uh-huh.
25      Q   -- as to how it would be handled in the

**[Page 88]**

1    committee of the whole; --
2       A   Correct.
3       Q   -- is that correct?
4          (Duncan Deposition Exhibit Number RD-9
5    marked.)
6       Q   (By Mr. Gear:)  I'm going to show you what has
7    been marked as RD-9.  It was previously marked as Duncan
8    Exhibit 526 in the Texas v. Holder deposition that you
9    gave.  And I will give you a chance to take a look at
10   that.
11         (Witness reviewing document.)
12      Q   I think you had testified previously that you
13   recalled seeing this letter from Senator Van de Putte in
14   2009?
15      A   Yes, sir.
16      Q   Focusing in on Number 2 on Page 1, which is
17   Bates-stamped USA 00033763, Senator Van de Putte is asking
18   you to conduct a detailed analysis on the effects on
19   minority voters protected under the Voting Rights Act.  Do
20   you see that?
21      A   (No verbal response.)
22      Q   More appropriately, let me just add that she is
23   requesting that the Senate conduct a detailed analysis on
24   the effects of minority voters protected under the Voting
25   Rights Act.

**[Page 89]**

1       A   I see that she, among other -- kind of a list
2    of things that's in the list that she had requested.
3       Q   So, again, similar to 2007, when HB 218 was
4    being considered, Senator Van de Putte requested that, you
5    know, there be some type of analysis conducted to
6    determine the impact on minority voters as it relates to
7    photo ID legislation; is that correct?
8       A   Yes.  It's -- I mean, she requested a detailed
9    analysis.  And I'm not sure.  She wasn't specific in what
10   she wanted that to be, but she did request something
11   along that line in Paragraph 2.
12      Q   Well, specifically, she requested that a
13   detailed analysis on the effects on minority voters
14   protected under the Voting Rights Act be conducted.  Do
15   you recall --
16      A   I don't think she really says that.
17      Q   Do you recall --
18      A   I don't want to argue, but I don't think --
19   that's not what she said.
20      Q   I'm sorry.  I'm talking over you.  Were you
21   finished with your answer?
22      A   I think she just -- she asked for a detailed
23   analysis.  She doesn't say -- and I think you implied
24   that the Senate should conduct that analysis.  I don't
25   think that's what she's saying here.

CONFIDENTIAL

[Page 90]

```
 1              I think she says there should be some,
 2   you know, evidence or whatever, but she doesn't, I
 3   think, call for the Senate to conduct a detailed
 4   analysis.  I think -- I don't read it that way.  Maybe
 5   you do, but I just don't read it that way.
 6       Q   Well, let's be clear for the record.  This
 7   letter is from Senator Van de Putte; is that correct?
 8       A   That's right.
 9       Q   And it's dated March 3rd, 2009?
10       A   Yes, sir.
11       Q   And it's to you, the chair of the committee of
12   the whole?
13       A   Yes, sir.
14       Q   And it specifically says to "Chairman Duncan"?
15       A   Right.
16       Q   And, again, this is from Senator Leticia Van de
17   Putte, and the subject here indicates "Ground rules,
18   Committee of the Whole Public Hearing"?
19       A   Right.
20       Q   And so is it fair to say that she's addressing
21   these concerns directly to you?
22       A   She was.
23       Q   And so, based on the concerns raised by Senator
24   Van de Putte that the detailed analysis on the effects on
25   minority voters protected under the Voting Rights Act
```

[Page 91]

```
 1   should be conducted, did you, as the chairman, take any
 2   steps to address her concerns?
 3              MR. SWEETEN:  Objection; it assumes facts
 4   not in evidence.  Objection; argumentative.  You can
 5   answer.
 6       A   We did.  We set up a process for each side of
 7   the issue, proponents and opponents, to invite the expert
 8   witnesses that they felt were most appropriate for the
 9   issues that are involved in this debate.
10              And so that was a response, and I know
11   she and I worked with that, to try to accommodate each
12   other on that, as well, as much as we can, and given the
13   time frames and the different demands on everybody's
14   schedule.
15              So, yes, we -- I believe we did -- we did
16   address those issues in her request.
17       Q   (By Mr. Gear:)  Do you recall expert testimony
18   from the opponents of SB 362 that there would be a
19   negative impact on minority voters?
20       A   I don't recall that.  I don't recall the
21   details of either side, as we sit here today, but the
22   record would reflect it.  And we kept a -- we put a court
23   reporter out there, and we made sure that an accurate
24   record was made for that.
25              And we basically, I think, gave
```

[Page 92]

```
 1   members -- the experts plenty of time to testify, and we
 2   allowed members, you know, unfettered time in
 3   questioning those witnesses.  So I believe that there
 4   was a -- the record will reflect what that information
 5   was, what that testimony was, though.
 6              And there was -- in addition to oral
 7   testimony, there was exhibits -- there were exhibits
 8   that were introduced and catalogued as they went into
 9   the record.
10       Q   And, in fact, her letter was catalogued as
11   Exhibit --
12       A   I'm sure it was.
13       Q   -- 1A based on the --
14       A   Yeah.
15       Q   -- exhibit that I've just handed to you?
16       A   That's correct.
17       Q   So I'm trying to understand your testimony, and
18   I don't want to --
19       A   I don't know if it was -- let me -- okay.
20   Maybe it was -- right.  I'm sorry.  I'm just trying to be
21   clear.  You're correct.
22       Q   I'm trying to understand your testimony.  As the
23   chair of the committee of the whole, did you direct anyone
24   within the Senate to conduct an analysis, a detailed
25   analysis, on the effects on minority voters protected
```

[Page 93]

```
 1   under the Voting Rights Act?
 2       A   No.
 3       Q   As the chair of the committee of the whole, are
 4   you aware if any senator conducted a detailed analysis on
 5   the effects of photo ID legislation related to minority
 6   voters?
 7              MR. SWEETEN:  Objection; vague as to what
 8   the analysis would be.  But you can answer.
 9       A   As we would do with any bill, the proponents
10   and opponents of the legislation would bring the evidence
11   to the Senate, to allow us to weigh that evidence and
12   make our decisions.
13              We do not have a specific -- well, I'll
14   just stay with that.  I mean, that's what we -- that's
15   how we do it.  That's how we did it on this bill.
16       Q   So you've said that Senate Resolution 14 was
17   controversial, and it was discussed for a number of hours
18   on the Senate floor, correct?
19       A   Yes, sir.
20       Q   Why was that bill controversial, or why was that
21   resolution controversial?
22              MR. SWEETEN:  Objection; legislative
23   privilege.  You can answer.
24       A   I will go, again, with:  There are 31 members.
25   So there were 31 reasons why it was controversial.
```

CONFIDENTIAL

**[Page 94]**

1    Q   (By Mr. Gear:)  And what concerns were being
2    expressed by the opponents of SB 362?
3    A   I think the primary concern was the -- being a
4    special order of business, that it would not require
5    suspension to take up on the Senate floor.
6    Q   And why was that a concern to opponents of SB
7    362?
8    A   You will have to go to the record for that.
9    I'm not going to speak for 31 members of the Senate.
10   Q   And just so the record is clear, I'm not asking
11   you to speak for 31 members.  I'm asking you to speak for
12   opponents, and there weren't 31 opponents --
13   A   No.
14   Q   -- to HB -- or SB 362.
15   A   I really can't speak to them.  It wouldn't be
16   appropriate nor would it be accurate.  I think it would
17   be better to go to the record on that.
18          (Duncan Deposition Exhibit Number RD-10
19   marked.)
20   Q   (By Mr. Gear:)  I'm showing you what's marked as
21   RD-10, and I'll give you a chance to take a look at that.
22          MR. GEAR:  I'll note for the record that
23   this document is marked as highly confidential.
24   A   (Witness reviewing document.)
25   Q   (By Mr. Gear:)  Do you recognize this document?

**[Page 95]**

1    A   No.
2    Q   Have you seen this document before?
3    A   No, I don't recall seeing it.  I certainly
4    haven't seen it.  I don't recall seeing this.
5    Q   Do you recognize that this document deals with
6    reasons to support SB 362 as filed?
7    A   Why don't you lay a foundation so I can
8    understand who prepared it and where it came from, and
9    then maybe that will refresh my recollection.
10   Q   Do you know who prepared this or where this
11   document came from?
12   A   No, no.  I couldn't tell you, sitting here
13   today.
14   Q   So, looking at Number 3 in Exhibit RD-10, which
15   is highly confidential and Bates-stamped TX 00087008, it
16   indicates that "Senators Fraser, Williams, and Duncan
17   support this version of the bill."  Did you support
18   SB 362?
19   A   I did.
20   Q   And you voted in favor of SB 362?
21   A   I did.
22   Q   And you voted in favor of the provisions
23   contained within that SB 362?
24   A   I did.
25   Q   And it also indicates that you were explaining

**[Page 96]**

1    SB 362 to members of the Senate and the House.
2          Putting the exhibit aside, do you have --
3    do you recall explaining SB 362 to members of the Senate
4    and the House?
5    A   I don't recall explaining it to the House.  I
6    do recall -- if people ask questions of me about a bill,
7    I'll explain it.  I didn't -- I don't think I scheduled
8    meetings to go around and talk to people.  I didn't.
9          But if someone had a question about a
10   bill, you know, I would try to answer the question.  If
11   not, I would get them to the right resource that would
12   answer their question.  If I didn't have the answer or
13   if I didn't understand their question, I would.
14         Basically, that's pretty typical.  It's
15   not just this bill.  That's pretty typical of what we do
16   on any bill that comes through the Senate.  That's what
17   the Chairman of Jurisprudence does on bills that come
18   through.  That's a pretty typical thing that occurs.
19   Q   Were you involved in any communications with any
20   legislators or with the Lieutenant Governor that
21   specifically requested that you explain the provisions of
22   SB 362 to the Senate?
23         MR. SWEETEN:  Objection; legislative
24   privilege.  You can answer.
25   A   I probably was, but I don't have any specific

**[Page 97]**

1    recollection of anything.  But I'm sure -- it's just what
2    I did in the regular course of any bill that I'm going
3    through.
4          This was a rather significantly debated
5    bill, and so, obviously, people had questions and wanted
6    to know, you know, what does this mean or what does that
7    mean.  And I'm sure I was involved in some of those
8    discussions, but not primarily.
9          I was basically more involved in the
10   process of setting up the hearing and conducting the
11   hearing as opposed to crafting the legislation.
12   Q   Do you recall who would have approached you to
13   discuss SB 362 with the Senate?
14   A   No.
15   Q   Specifically, do you recall if the Lieutenant
16   Governor approached you and asked you to explain SB 362 to
17   the Senate?
18   A   No, he didn't.
19   Q   Do you recall if the sponsor or the author of SB
20   362 approached you -- and that would have been Senator
21   Fraser, right?
22   A   Right.
23   Q   Do you recall if Senator Fraser approached you
24   and asked you to explain the provisions of SB 362 to the
25   Senate?

CONFIDENTIAL

[Page 98]

1    A   I'm pretty sure that he didn't.  It was his
2  bill, and he developed the language and, you know, it was
3  his legislation.  So I don't think he would have called
4  on me to explain it to him.
5         And, primarily, my job was to basically
6  make sure the process -- to preside over the hearing and
7  the process for hearing the bill in the committee of the
8  whole.
9    Q   And I think we established that, in 2007, you
10  were the Chair of the State Affairs Committee, correct?
11    A   That's right.
12    Q   And do you agree with the proposition in
13  Number 2 that SB 362 was a compromise bill that was
14  basically the same bill that passed the House and the
15  Senate State Affairs Committee last session?  That would
16  have been in 2007.
17    A   I don't -- I don't know who authored this, and
18  I don't know what they're talking about.  So I'm not
19  going to be able to answer any question with regard to
20  anything that's on this document, because I don't think I
21  prepared it, and I don't think I've ever seen it before.
22    Q   Fair enough.  Do you -- Would it be fair to say
23  that SB 362 was patterned after HB 218?
24         MR. SWEETEN:  Objection; privilege.  Go
25  ahead.  You can answer.

[Page 99]

1    A   Conceptually, it was similar.  I think it had
2  different provisions in it.
3    Q   (By Mr. Gear:)  It was similar conceptually,
4  because it allowed for both photo and non-photo
5  identification, correct?
6    A   I think -- which one?
7    Q   I'm talking about SB 362, --
8    A   Right.
9    Q   -- as compared to 218.
10    A   Yes, I think it was similar.  It was similar
11  conceptually to that, but I don't know whether word for
12  word -- whether it was or not.
13    Q   Do you have any recollection of having
14  communication with anyone in the Senate regarding SB 362
15  improving security in the election process, but not being
16  as restrictive as Indiana or Georgia?
17         MR. SWEETEN:  Objection; privilege.  You
18  can answer.
19    A   No.  But I don't recall any conversation like
20  that.
21    Q   (By Mr. Gear:)  Do you recall --
22    A   And that was in 2011?
23    Q   SB 362.  We're still in 2009.
24         MR. SWEETEN:  2009.
25    A   Or 2009?  I'm sorry.

[Page 100]

1    Q   (By Mr. Gear:)  Do you recall communications
2  related to the Indiana photo ID legislation in 2009?
3    A   Not in 2009.
4    Q   Do you recall communications related to the
5  Georgia --
6    A   And let me just say:  I don't recall them.
7  There may be.  I'm just saying, in 2009, I did not recall
8  having any conversations regarding that.  There may have
9  been, if it was out there at that point in time, because
10  we always see how other states are doing things.
11         But I don't recall a specific discussion
12  along those lines.
13    Q   Do you recall reviewing the Indiana photo ID
14  legislation?
15         MR. SWEETEN:  In 2009, Bruce, is that what
16  you're saying, or at any time?
17         MR. GEAR:  In 2009.
18         MR. SWEETEN:  Okay.
19    A   In 2009, I don't recall.  I may have, but I
20  don't recall.
21    Q   (By Mr. Gear:)  Do you recall reviewing the
22  Georgia photo ID legislation in 2009?
23    A   I probably did look at that, but I don't recall
24  exactly how I -- what analysis I made.  I may have read
25  it, but I don't think I did an analysis or a breakdown as

[Page 101]

1  if it were a bill that I was interested in like that.
2    Q   Would you agree that SB 362 was less restrictive
3  in Georgia with regard to photo ID legislation?
4         MR. SWEETEN:  Objection; legislative
5  privilege.  You can answer.
6    A   Sitting here today, I couldn't give you an
7  accurate answer on that.
8    Q   (By Mr. Gear:)  Was there communication in the
9  Senate in 2009 related to possible support by conservative
10  House Democrats?
11         MR. SWEETEN:  Read that question back.
12         (Court reporter read last question.)
13         MR. SWEETEN:  Objection; legislative
14  privilege.
15    A   I'm not aware one way or the other.  I don't
16  recall if there was.  There may have been.  I don't know.
17    Q   (By Mr. Gear:)  Is it possible that you engaged
18  in such communication?
19    A   Anything is possible, but I don't recall
20  engaging in those conversations.
21    Q   Do you recall a discussion in 2009 related to SB
22  362 regarding Federal preclearance of the photo ID
23  legislation?
24         MR. SWEETEN:  Objection; legislative
25  privilege.  You can answer.

CONFIDENTIAL

[Page 102]

1      A   I'm sure there was something on the record in
2   regard to that, and I'm sure there were discussions with
3   regard to making attempts to pass legislation that would
4   satisfy the requirements of preclearance under Section 5.
5      Q   And in supporting SB 362, did you believe that
6   it would have passed requirements for Federal
7   preclearance?
8      A   Yes.
9      Q   And why did you believe --
10         MR. SWEETEN:  Objection; legislative
11   privilege on the last question as to his analysis.  So go
12   ahead.
13         Q   (By Mr. Gear)  Why do you believe SB 362 would
14   have passed Federal preclearance in 2009?
15         MR. SWEETEN:  Objection; legislative
16   privilege as to his mental impressions of the legislation
17   session.  Go ahead.  You can answer.
18      A   Well, you know, I'm going back several years,
19   but I think the analysis was the testimony that I heard
20   and the discussions that, you know, we had on the Senate
21   floor and in the committee of the whole.
22         You know, I felt the work done by my
23   staff and others -- I felt like that we had -- this bill
24   was appropriately crafted to be in conformance with the
25   requirements of the Voting Rights Act, and so I had that

[Page 103]

1   general confidence that it would pass a Federal
2   preclearance examination.
3      Q   And when you say crafted in a way that would
4   pass Federal preclearance, what did you mean by that?
5         MR. SWEETEN:  Objection; legislative
6   privilege.  You can answer.
7      A   Design.
8      Q   (By Mr. Gear)  Design?  What do you mean by
9   that?
10      A   The provisions of the bill were appropriate in
11   satisfying the requirements of the Voting Rights Act.
12      Q   Do you believe the provisions of the bill were
13   crafted in a way to require voters who were voting at the
14   polling place to prove who they say they are?
15         MR. SWEETEN:  Objection; privilege.  Go
16   ahead.
17      A   I thought the requirements were fair, and I
18   thought that they were appropriate to protect the
19   integrity of the ballot box, which was my goal with
20   regard to voter ID registration.  And so I looked at it
21   through that prism in my mind.
22         Is it fair?  Will it address the problem?
23   And I believe that it did, and I believe that it would
24   do it within the requirements of the Voting Rights Act.
25      Q   (By Mr. Gear)  And when you say fair -- and I'm

[Page 104]

1   sorry I keep going back to this -- but when you say fair,
2   is it fair to say that you believed it was fair?
3      A   It would be fair to say it was fair.
4      Q   Was it fair --
5      A   I'm sorry.
6      Q   -- because it allowed for both photo and
7   non-photo identification?
8         MR. SWEETEN:  Objection; legislative
9   privilege.
10      A   I think it had opportunities in there for
11   people to -- and I think we also appropriated funds, and
12   Senator Ogden had indicated that we would appropriate
13   funds to provide for voter ID or free voter ID or free
14   identifications.
15         And I think, holistically, with all of
16   the things that were involved, that it was fair to
17   require a photo ID, given all of the accommodations that
18   we were trying to make to address the concerns that
19   people were raising.  And that's with 362.
20      Q   And 362 also allowed for non-photo ID?
21      A   It did, but that wasn't the equation in my --
22   or that wasn't a variable in my equation of fair.
23         I believed that, in my view, the
24   opportunity to acquire ID, in this day and age, was made
25   available through the legislative process, and I believe

[Page 105]

1   the photo process was fair in 362, and I felt like it
2   was in 218, as well, which were the two bills that we've
3   talked about.
4      Q   So that begs the question:  Do you believe that
5   the non-photo ID provisions of both 218 and 362 were fair?
6         MR. SWEETEN:  Objection; asked and
7   answered.
8      A   Well, I'm not saying they're not fair.  I think
9   the non-photo ID provisions were fair, as well, but I
10   believe, standing alone, independently, the photo ID
11   options were also fair.
12         (Duncan Deposition Exhibit Number RD-11
13   marked.)
14      Q   (By Mr. Gear:)  I'm showing you what has been
15   marked as RD-11.  I believe you've previously testified to
16   this as Duncan Exhibit 29 in your previous deposition
17   testimony.  Can you identify this document for me?
18      A   This appears to be Senate Bill 362.
19      Q   Which was authored by Senator Fraser and others,
20   correct?
21      A   Correct.
22      Q   In turning your attention to page -- turn your
23   attention to Page 5.  I just want to go through briefly
24   what SB 362 allowed.
25         Is it accurate that SB 362 allowed a

CONFIDENTIAL

[Page 106]

```
1    driver's license or personal identification card issued
2    to the person by the Department of Public Safety that has
3    not expired or that expired no earlier than two years
4    before the date of presentation?
5         A    Yes, sir.
6         Q    Is it accurate to say that SB 362 allowed for a
7    United States military identification card that contains
8    the person's photograph?  And I'm referring to Page 6,
9    Number 2.
10        A    Yes, sir.
11        Q    Is it accurate to say that SB 362 allowed for a
12   United States citizenship certification issued to the
13   person that contains the person's photograph?
14        A    Yes, sir.
15        Q    Looking at Number 5, is it accurate that SB 362
16   allowed for a license to carry a concealed handgun issued
17   to the person by the Department of Public Safety or a
18   valid identification card that contains the person's
19   photograph and is issued by an agency or institution of
20   the Federal Government or an agency, institution, or
21   political subdivision of the State?
22        A    Yes, sir.
23        Q    And is it your understanding that Provision 5 of
24   SB 362 would have allowed for student IDs issued by a
25   state institution within Texas?
```

[Page 107]

```
1         A    Where is that?
2         Q    I'm asking you to look at Section 5 of SB 362
3    and --
4         A    What page would that be on?
5         Q    I'm referring to Page 6, Section 6 -- Page 6,
6    Section 6 -- I'm sorry; I said Section 5 before --
7    Page 6, Section 6 of SB 362 would have allowed for a
8    valid identification card that contains the person's
9    photograph and is issued by an agency or institution of
10   the Federal Government, correct?
11        A    Right.
12        Q    And it would have allowed, under Section (b), an
13   agency -- a valid identification card that contains the
14   person's photograph and is issued by an agency,
15   institution, or political subdivision of the State,
16   correct?
17        A    Yes, sir.
18        Q    And that would have included student IDs issued
19   by a subdivision of the State?
20        A    I think that's a reasonable interpretation.
21   Are you talking about a higher institution or something
22   like that?
23        Q    Yes.  And do you -- comparing that to HB 218 --
24   and you can certainly look at the exhibit, if you need
25   to -- but comparing that to HB 218, do you know the reason
```

[Page 108]

```
1    why the use of student ID cards was narrowed between 2007
2    and 2009?
3              And just to refresh your recollection, in
4    2009, it allowed for -- in 2007, it allowed for the use
5    of any student ID card.  In 2009, it only allows for the
6    use of student ID cards issued by a state institution.
7              Do you have any understanding as to why
8    that use of student ID cards was narrowed?
9         A    No.
10        Q    Did you engage in any communications regarding
11   Provision 6 of SB 362 related to student ID cards?
12        A    No.  I believe there was probably some
13   discussion about that on the Senate floor with regard
14   to the committee of the whole testimony and in Senate
15   Bill 362.
16        Q    Do you recall what that discussion was?
17        A    I recall there was discussion, but I don't
18   recall what it was.  The record would probably reflect it
19   more accurately than I could recall it.
20        Q    Do you recall any reason given, during the
21   consideration of SB 362, regarding why student IDs were
22   narrowed to only being issued by a state institutions?
23        A    I would have to refer to the record.  I had no
24   part in that issue, in making that decision or drafting
25   that provision.
```

[Page 109]

```
1         Q    So it's your testimony that you were not
2    involved in any communications related to the decision to
3    narrow that type of ID to State institutions?
4         A    My testimony is that if I was, I don't remember
5    them, and if there was recollection -- my recollection is
6    more along the lines of there was discussion among the
7    members in the debate, which would be reflected in the
8    record.
9         Q    Are you aware of any analysis -- and I'll use
10   that in the same term that I've used it in our discussions
11   with HB 218 and HB -- or SB 362.  Are you aware of any
12   analysis that was conducted related to student IDs by the
13   Senate?
14        A    Well, I'm trying to understand what you mean by
15   "analysis," because I don't think we've ever really
16   clearly defined what that means, because an analysis
17   could mean 15 different things to each person when
18   they're -- and so give me your definition that you want
19   me to try to give you an answer around, and I'll see what
20   I can do with it.
21        Q    Let's see if we can do that.
22        A    Okay.
23        Q    For HB -- Actually, in 2006, you indicated that
24   there was an interim report --
25        A    Right.
```

CONFIDENTIAL

[Page 110]

1    Q   -- that was conducted.  And would you consider
2    that an analysis?
3    A   To an extent, it was more of a -- it was a
4    report.  It was designed to provide information to help
5    members understand the issues that are involved in voter
6    ID.
7         It reported different studies and
8    analyses that were done by the Carter-Baker Commission
9    and other things that were considered or other studies,
10   Court opinions that had an analysis in them.  It
11   referred members to different resources that they could
12   use in performing an analysis of the issues.
13        And that was the primary purpose of that
14   report and the primary purpose of any report that I
15   authored as chairman of the committee, but, in
16   particular, I recall on that one, because we did have a
17   hearing on it, and I recall there was -- there were a
18   lot of questions and issues raised on voter ID at that
19   time.
20        Initially, that was when it appeared to
21   me that it was -- you know, there was certainly people
22   that needed information about what other analyses that
23   were out there, and that is what we tried to provide in
24   that report --
25   Q   So --

[Page 111]

1    A   -- on both sides of the issue.
2    Q   I'm trying to define the issue of analysis.
3    A   Uh-huh.
4    Q   If I rephrased it and asked you, were there any
5    reports specifically completed by the Senate, designed to
6    assist the legislator in understanding student IDs, would
7    you understand what I'm asking you?
8    A   Yeah.
9    Q   Were there any reports completed by the Senate
10   designed to assist legislators in understanding student
11   IDs -- the issues related to student IDs in 2009?
12   A   Not that I'm aware of.
13   Q   Were there any reports designed to assist
14   senators in understanding whether there were prosecutions
15   of individuals who used student IDs and attempted to
16   impersonate someone else at the polls in 2009?
17        MR. SWEETEN:  Objection; legislative
18   privilege.  You can answer.
19   A   As it relates specifically --
20   Q   (By Mr. Gear:)  To student IDs.
21   A   -- to student IDs?  I'm not aware of any.
22   Q   And the answer is:  No, you're not aware of any?
23   A   Correct.
24   Q   Were there any reports designed to assist
25   senators in understanding whether or not there were any

[Page 112]

1    noncitizens that were prosecuted for using a student ID at
2    the polling place in 2009 related to SB 362?
3         MR. SWEETEN:  Same objection.
4    A   I'm not aware that that specific issue was the
5    subject of any report.
6    Q   (By Mr. Gear:)  And that specific issue being
7    noncitizens voting at the polls, correct, --
8    A   Right.
9    Q   -- and using student IDs?
10   A   Right.
11        THE WITNESS:  I'm getting about to that
12   range again whenever you're ready.
13        MR. GEAR:  That range?
14        MR. SWEETEN:  Break range.
15        MR. GEAR:  Let's go off the record.
16        (Short break taken.)
17   Q   (By Mr. Gear:)  So I would like to return
18   briefly to Senator Van de Putte's March 3rd, 2009 record,
19   which we identified as exhibit -- is it RD-9?
20   A   RD-9.
21   Q   Focusing again on Number 2, with our
22   understanding of what I mean when I reference the term
23   "analysis," I want to ask you:  Were there any reports --
24   Are you aware of any reports that were created within the
25   Senate to assist senators in understanding the effect on

[Page 113]

1    minority voters protected under the Voting Rights Act?
2    A   I don't think that was anything that was
3    generated as the work of the Senate.  As the author of
4    the analysis, I assume that there was evidence put in by
5    expert witnesses at the hearing that they touted as an
6    analysis, but I don't remember specifically about that.
7    I know there was a lot of discussion.
8    The record would reflect the details on that.
9    Q   Do you recall if the testimony by the experts
10   was by opponents or supporters of the SB -- I'm sorry --
11   of SB 362?
12   A   I would assume the opponents, and perhaps the
13   proponent experts, as well.  I don't recall.  The record
14   would probably reflect that better.
15   Q   As you sit here today, do you recall any
16   testimony by supporters of SB 362 that would have
17   supported that there would not be an impact on the
18   minority voters as it relates to the Voting Rights Act --
19   protected under the Voting Rights Act?
20        MR. SWEETEN:  Objection; vague.  Go ahead.
21   A   I believe the record would reflect that there
22   were proponents of the bill that supported -- there were
23   witnesses who were proponents of the bill that
24   reflected -- would you repeat your question?  I've lost
25   my train of thought in the question.

877-479-2484          US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

[Page 114]

1  Q   (By Mr. Gear:)  We were specifically -- We were
2  speaking specifically of the effects on minority voters
3  protected under the Voting Rights Act.
4  A   Right.
5  Q   My question previously was:  Are you aware of
6  any testimony by supporters of SB 362 that would support
7  facts that SB 362 would not have any effect on minority
8  voters protected under the Voting Rights Act?
9  A   Sitting here today, I don't recall specific
10  testimony.  I seem to be impressed that there was a
11  record, and it would reflect whether or not there was.
12  Q   And do you recall responding to Senator Van de
13  Putte's March 3rd, 2009 letter?
14  A   Yes, sir.  Yes, sir.
15  Q   Do you recall whether you addressed the issue
16  that she raised regarding her request for a detailed
17  analysis on the effects on minority voters protected under
18  the Civil Rights Act?
19  A   I would have to see the response.  I think I've
20  got it here.
21  Q   Did I hand it to you?
22  A   Yes.
23  Q   Okay.  Is that one page or two?  I've handed you
24  the wrong document.
25          (Duncan Deposition Exhibit Number RD-12

[Page 115]

1  marked.)
2  Q   (By Mr. Gear:)  Let me hand you what has been
3  marked as RD-12.
4      MR. GEAR:  And for the record, this was
5  previously identified as Senator Duncan Exhibit 527.
6  It's also identified as Exhibit 13 on the bottom and
7  Bates-stamped USA 00033765.
8  Q   (By Mr. Gear:)  Can you identify that document
9  for me, please?
10  A   It is a memorandum to Leticia Van de Putte,
11  Senator Van de Putte, from me, with a copy to Senator
12  Fraser dated March 5th, 2009.
13  Q   And so, specifically, my question to you was:
14  Did you respond within that memorandum, as you have
15  described it, to Senator Van de Putte's concern that there
16  be a detailed analysis to determine the effect on minority
17  voters protected under the Civil Rights Act?
18  A   Let me review it.
19  Q   Sure.  Take your time.
20  A   (Witness reviewing document.)  I don't believe
21  that this letter says -- dissects her letter to the
22  extent of any analysis that -- you know, or any
23  requirement, and I don't believe her letter asks for the
24  Senate to do a detailed analysis.
25          I believe her letter basically indicates

[Page 116]

1  that it needs to consider a detailed analysis, but it
2  doesn't require or call for us to do that, at least the
3  way I read it.
4          And it may be just a grammatical
5  interpretation on my part, but I don't think so.  I
6  think, basically, she's saying that the Texas Senate
7  should be as clear of any identifiable problems, to be
8  clear of the perils, and have a detailed analysis, which
9  is grammatically kind of basically a little bit
10  improper, I guess.
11          But it does not -- that sentence does not
12  call for the Texas Senate to do the detailed analysis.
13  And so the way I look at these things is like I look at
14  any other bill.
15          It's that the person who wants to pass
16  the bill needs to bring its proponents and its
17  analysis in support, and those who are opposed, they
18  need to bring their witnesses and their detailed
19  analysis in opposition.
20          And so I believe that what this indicates
21  happened here was that, as chairman, I would rely upon
22  her to bring whatever witnesses that she believed would
23  be compelling witnesses and whatever evidence, including
24  evidence of the detailed analysis, that would be
25  important to support any complaint that she or any other

[Page 117]

1  member had that might -- that would indicate -- or any
2  complaint relative to minority voter impact.
3          And I think the record reflects that
4  there were witnesses that were brought --
5  Q   By the opponents?
6  A   -- by the opponents, that laid that out.  And I
7  can't recall whether or not -- the specific details of
8  what the proponents brought or what that evidence was.
9  Q   But, as you sit here today, you're not aware of
10  any specific testimony by the supporters or the proponents
11  of SB 362?
12  A   I would phrase it this way:  The record will
13  reflect that.  I don't -- I'm not pulling -- recalling
14  anything, just merely because I haven't reviewed the
15  record in whole, and it's a long record.
16  Q   Sure.
17  A   And I have not reviewed it in preparation for
18  today.
19  Q   So I want to go back to SB 362, the actual
20  provisions, which are still in front of you, I believe.
21  A   Yes.
22  Q   And we are on Page 6.  And I believe it was your
23  testimony that you did interpret SB 362, Paragraph 6(b),
24  to include student IDs issued by state institutions,
25  correct?

CONFIDENTIAL

**[Page 118]**

1       I think I said that was a reasonable
2   interpretation.
3       Q   Do you agree with that interpretation?
4       A   I don't disagree with it.
5       Q   And you voted in favor of all of the provisions
6   under SB 362, correct?
7       A   Yes.
8       Q   Are you aware of any reason why this provision
9   narrowed from -- as compared to SB 218 -- narrowed the
10  types of student IDs that would be allowed under photo ID
11  legislation?
12      A   No, sir.
13      Q   Are you aware of any communications related to
14  that issue outside of the public record?  And I'm
15  referring to --
16      A   No.
17      Q   I'm referring to legislation.
18      A   I'm sure there was discussion on the record.  I
19  remember there was discussion on the record, but I don't
20  remember what the details of it were.  But I know it was
21  brought up, and I know it was discussed.  I just don't
22  know who did it and who discussed it or who raised the
23  issue and how it was handled with regard to the
24  discussion or justification for the change.
25      Q   And, again, under Paragraph 6(a), it allowed --

**[Page 119]**

1   it being SB 362 -- allowed for an agency or institution of
2   the Federal Government -- a photo ID from an agency or
3   institution of the Federal Government, correct?
4       A   Right.
5       Q   Are you aware of any reports designed to assist
6   the Senate in understanding issues as it relates to a
7   valid identification card that contains a photograph
8   that's issued by an agency or institution of the Federal
9   Government as it relates to photo ID legislation?
10      A   I lost you.  I'm sorry.
11      Q   And I'm sorry.  That was terribly garbled.  I
12  guess what I'm trying to ask you is:  As we understand
13  analysis now, in the way that you characterize it, as
14  reports designed to assist legislators in understanding
15  various issues related to photo ID legislation, I'm
16  specifically asking you if there were any reports designed
17  to address the concerns and assist senators in
18  understanding the concerns related to photo ID issued by
19  an agency or institution of the Federal Government.
20      A   I don't want to split hairs with you on the
21  definition of analysis, but I will say this:  I'm not
22  aware of any reports that were prepared in the Senate or
23  by any member or presented that dealt specifically with
24  the issue of student IDs.  There may have been, but I
25  certainly don't recall, and I doubt that there was.

**[Page 120]**

1       And the record may prove me wrong on
2   that, but --
3       Q   And would that also be true for reports that
4   dealt specifically with the issue of photo IDs issued by
5   an agency or institution of the Federal Government?
6       A   Right.
7       Q   Would you see any problem including within photo
8   ID legislation with student IDs issued by a private or
9   state institution within the State of Texas?
10          MR. SWEETEN:  Objection, vague and
11  legislative privilege.  You can answer.
12      Q   (By Mr. Gear:)  Let me rephrase that so it's
13  clear.
14          Would you have supported a provision in
15  photo ID legislation that would have allowed for photo
16  identification -- student photo identification issued by
17  either a state or private institution within the State of
18  Texas had it been included in SB 14?
19          MR. SWEETEN:  Objection, incomplete
20  hypothetical; and objection, legislative privilege.  You
21  can answer.
22      Q   (By Mr. Gear:)  Do you understand my question?
23      A   Yeah.  As one of 31, you know, it provided
24  the -- it provided that the authenticity of the ID could
25  be self-proved, I guess is the way to put it.  I mean, as

**[Page 121]**

1   long as it was -- had that -- the ID would be a valid --
2   one that would be regularly recognized as authentic, you
3   know, as one of 31, I probably would have objected to
4   that.
5       Q   So you would not have supported that?
6       A   I would --
7           MR. SWEETEN:  Same objection.
8       A   I said I would not have been -- I would have
9   supported that if that -- as long as it was --
10      Q   (By Mr. Gear:)  Thank you for that
11  clarification.
12      A   -- something that can be authenticated, not
13  just open-ended.
14      Q   Would that also be true for Federal
15  identification issued by -- let me get the language
16  correct here.
17          Referring specifically to SB 362, would
18  you have supported a valid identification card that
19  contains a person's photograph and issued by an agency or
20  institution of the Federal Government had it been
21  included in SB 14 --
22          MR. SWEETEN:  Objection.
23      Q   (By Mr. Gear:)  -- as provided in this
24  Provision 14?
25          MR. SWEETEN:  Objection; legislative

**CONFIDENTIAL**

---

**[Page 122]**

1  privilege.

2  A   As one of 31, I probably would have

3  supported -- I would have supported that legislation that

4  would have required that.

5  Q   (By Mr. Gear:)  Do you have any -- As you sit

6  here today, do you have any facts that would support

7  removing or excluding these provisions from SB 14?

8  MR. SWEETEN:  Objection, vague; objection,

9  legislative privilege.  You can answer.

10  Q   (By Mr. Gear:)  Well, let me clarify, because I

11  don't want this to be vague.

12  SB 14 does not include photo IDs issued by

13  an agency --

14  MR. GEAR:  Let me strike that.

15  Q   (By Mr. Gear:)  SB 14 does not include a valid

16  identification card that contains the person's photograph

17  and issued by an agency or institution of the Federal

18  Government, correct?

19  A   I believe that's correct.

20  Q   Do you have any facts that support why photo

21  identification issued by an agency or institution of the

22  Federal Government was excluded in SB 14?

23  MR. SWEETEN:  Objection; privilege.  You

24  can answer.

25  A   I wasn't involved in the decision to exclude

---

**[Page 123]**

1  it.  There may be something on the record.  So I couldn't

2  give you an accurate answer on that.

3  Q   (By Mr. Gear:)  Were you involved in any

4  communications related to concerns pertaining to valid

5  identification cards that contain a person's photograph

6  that were issued by an agency or institution of the

7  Federal Government?

8  MR. SWEETEN:  Objection; legislative

9  privilege.  You can answer.

10  A   Not that I recall, other than what discussions

11  and communications that occurred in debate on the Senate

12  floor, either in the committee as a whole or as

13  reconvened by the Senate.

14  Q   (By Mr. Gear:)  So, as you sit here today, are

15  you aware of any facts that support a reason why it should

16  be included or why it was excluded from SB 14?

17  MR. SWEETEN:  Objection, asked and

18  answered; objection, legislative privilege.  You can

19  answer.

20  A   I'll refer to the record on that.

21  Q   (By Mr. Gear:)  And I'm not necessarily asking

22  about the record.  I'm asking, as you sit here today, do

23  you -- are you aware of any reason why --

24  A   You're talking about my own opinion?

25  Q   Yes.

---

**[Page 124]**

1  A   You know, --

2  MR. SWEETEN:  Objection to privilege.  Go

3  ahead.  I'm sorry.

4  A   I haven't thought about it until today.  So I

5  don't -- you know, I don't know.  I mean, my answer would

6  be purely assumption as to the ability to verify whether

7  or not the ID was authentic or not.  That's my

8  assumption, pure swag, whatever you want to call it, as

9  to the reasons behind it.

10  But I think it probably is developed in

11  the record, and my opinion didn't weigh in on that, one

12  way or the other, so --

13  Q   (By Mr. Gear:)  As you sit here today, are you

14  aware of any information that would have supported

15  excluding student IDs from a private institution from the

16  provisions of SB 362?

17  MR. SWEETEN:  Objection --

18  A   No.

19  MR. SWEETEN:  -- legislative privilege;

20  objection, asked and answered.  You can answer.

21  A   No.

22  Q   (By Mr. Gear:)  And I believe I asked you if

23  you were aware of any facts that supported exclusion from

24  SB 14, but now I'm asking you specifically about SB 362.

25  And prior to the institution of IDs with

---

**[Page 125]**

1  the photo -- student IDs, with the photo, are you aware

2  of any facts that support why private student IDs with a

3  photo were excluded from SB 362?

4  MR. SWEETEN:  Same objection.

5  A   Students from private institutions?

6  Q   (By Mr. Gear:)  Yes.

7  A   No, I'm not aware of those reasons.

8  Q   And it's fair to say that there was no

9  report designed to assist legislators in the Senate to

10  determine --

11  MR. GEAR:  Strike that.

12  Q   (By Mr. Gear:)  Is it fair to say that there

13  were no reports designed to assist legislators in the

14  Senate to understand concerns related to student IDs --

15  MR. SWEETEN:  Objection; vague.  I'm

16  sorry.  Go ahead, Bruce, finish.  I didn't want to

17  interrupt your question.  Go ahead.

18  Q   (By Mr. Gear:)  -- related to SB 362?

19  MR. SWEETEN:  Objection, legislative

20  privilege; objection, vague.  You can answer.

21  A   Not that I'm aware of.

22  Q   (By Mr. Gear:)  Do you recall, during the

23  consideration of SB 362, that the issue of illegal aliens

24  and noncitizens was raised on the Senate floor?

25  A   You would have to refer to the record on that.

---

CONFIDENTIAL

**[Page 126]**

1    Q   Well, specifically, I would like to know if you
2    have any recollection of Senator Fraser raising the issue
3    of noncitizens or illegal aliens voting?
4        A   As I sit here today, in August of 2014, I do
5    not have specific independent recollection.  I would have
6    to refer to the record with regard to that.
7        Q   Were you or your staff involved in any
8    communications related to SB 362 regarding the issue of
9    insuring that illegal aliens or noncitizens were not
10   voting at the polling place?
11       A   You know, I'm going to be -- I'm not trying to
12   be coy.  I do not remember specific conversations about
13   that issue among my staff.
14           We were primarily concerned with process
15   at that point in time.  I didn't design the bill.  And
16   if there were conversations about that, they were
17   certainly on the record, and I don't recall specifically
18   any of those internally.
19       Q   And just to round that out, is it also your
20   testimony that you don't recall any specific testimony
21   with other legislators related to the issue of noncitizens
22   and illegals voting at the poll?
23       A   No, I don't, but, I mean, it has been seven
24   years ago or six or five or however many years.  So, you
25   know, if that issue came up, I don't recall discussing

**[Page 127]**

1    that.
2            I recall other reasons for being
3    concerned about the ballot integrity.  And so that's my
4    frame of reference.
5        Q   What reasons do you recall related to SB 362 --
6            MR. GEAR:  Strike that.
7        Q   (By Mr. Gear:)  Do you recall what the purpose
8    of SB 362 was?
9        A   The purpose of the bill was to preserve ballot
10   integrity and to prevent people from just basically
11   harvesting voter ID cards or voter registration cards and
12   using them to influence primary and general elections,
13   because -- under the provisions of the law.
14           Before we changed it, all a person had to
15   do was present a voter registration card that entitled
16   them to vote.  There was no way to verify whether that
17   person was the person represented on the card.
18           Likewise, there's no way to prove or
19   provide any sort of enforcement with regard to whether
20   or not the person who is presenting the voter
21   registration card, representing that they are the person
22   entitled to vote, was, in fact, that person.
23           And so the concerns that I was honed in
24   on was to stop that type of voter fraud that is almost
25   impossible to enforce against.

**[Page 128]**

1        Q   So you've said a number of things in that
2    statement.
3            THE WITNESS:  Can I get a glass of water?
4            MR. SWEETEN:  I'll get it.
5        Q   (By Mr. Gear:)  So you've talked about vote --
6    in your testimony, you've discussed vote harvesting of
7    voter registration cards, correct?
8        A   (Witness nods head.)
9        Q   Are you aware of any facts that will support
10   that there was vote harvesting -- prosecution of voter
11   impersonation at the polls of a person who was involved in
12   harvesting voter registration cards?
13           MR. SWEETEN:  Objection; compound, asked
14   and answered.  You can answer.
15       A   I don't know how you prove it, because you
16   can't -- if you can't require identification, then you
17   can't -- you can't develop evidence sufficient to
18   prosecute.  And the volunteers or the minimum wage
19   workers that work at the polls are certainly not law
20   enforcement and capable to enforce it.
21           And in politics, you get aware of people
22   that do those kinds of things.  History tells us that
23   those things are done.  If you have -- If you read
24   history, you read Box 13, Stevenson and LBJ, and you
25   know that it happens.

**[Page 129]**

1            And until you have the ability to -- and
2    the simplest way to avoid that from happening is to
3    require that the person who presents themselves to vote
4    verify that they are the person on that card or that
5    they're able to do it.
6            That is my simple, sole reason for
7    supporting Senate Bill 218 -- or House Bill 218, 362,
8    Senate Bill 362, and Senate Bill 14, I think.
9        Q   (By Mr. Gear:)  SB 14.
10       A   SB 14.
11       Q   And I understand your answer, and I understand
12   that you're concerned that there is difficulty in proving
13   voter fraud at the polls.
14           But my specific question was:  Are you
15   aware of any prosecutions related to voter impersonation
16   as a result of vote harvesting at the polling places in
17   Texas?
18       A   I believe that -- there are prosecutions, I
19   know.  I don't -- I can't drill down and have not drilled
20   down into those to be able to give an answer to that, but
21   I do know there have been prosecutions.
22           I don't know if they had the vote
23   harvesting components to it, but, in my view, that
24   was -- in my view, that's a risk that we have with the
25   current system of -- or the old system where you were

CONFIDENTIAL

**[Page 130]**

```
 1   not required to verify that you were the person; that
 2   the voting person was the person that was registered on
 3   that card.
 4       Q   So, as you sit here today, and as you debated SB
 5   362 or --
 6           MR. GEAR:  Strike that.
 7       Q   (By Mr. Gear:)  Any voter photo ID
 8   legislation -- are you aware of a measurable number of
 9   prosecutions for voter impersonation at the polling
10   places --
11           MR. SWEETEN:  Same objection.
12       Q   (By Mr. Gear:)  -- in Texas?
13       A   I think I've just answered it.  I think the
14   Attorney General -- I think, in the record that you have,
15   that was presented either in our report in 2006 or in the
16   legislative record on Senate Bill 362, maybe 14 -- I
17   don't know -- I think there was evidence that there was
18   prosecutions of voter fraud, and I assume that's voter
19   impersonation.
20           Probably, mail fraud is an area where it
21   seems like there was a lot of concern as well, you know,
22   mail-in ballots as well.  But, again, that's my
23   recollection.
24       Q   So let's just address the issue of mail fraud.
25   Looking at SB 362, the provisions of SB 362, is it fair to
```

**[Page 131]**

```
 1   say that there is nothing within SB 362 which would have
 2   addressed the issue of by-mail voter fraud?
 3           MR. SWEETEN:  And feel free to review.
 4       Q   (By Mr. Gear:)  Feel free to review and take
 5   your time.
 6       A   (Witness reviewing document.)
 7           MR. GEAR:  And for the record, Senator
 8   Duncan is referring to the provisions of SB 362, --
 9           THE WITNESS:  Yes, sir.
10           MR. GEAR:  -- which is identified as
11   RD --
12           THE WITNESS:  11.
13           MR. GEAR:  -- 11.
14       A   (Witness reviewing document.)  You know, I
15   don't think there is anything in here that specifically
16   deals with -- directly deals with mail fraud.  I think
17   there may be some general things about voter education
18   and things like that, but I don't know if that applies to
19   mail fraud or not.
20           It's more like -- I think the bill is
21   primarily focused here on, as we discussed earlier, the
22   personal voter --
23       Q   Impersonation?
24       A   -- voter presentation at the ballot box and not
25   as to mail fraud.
```

**[Page 132]**

```
 1       Q   I spoke over you, and I want to make sure that
 2   it's clear.
 3           Do you agree that SB 362 deals with
 4   in-person voting at the polling place?
 5       A   Yes, sir.
 6       Q   And do you agree that SB 362 deals with voter
 7   impersonation at the polling place?
 8       A   Yes.
 9       Q   Do you know if there is any --
10           MR. GEAR:  Strike that.
11       Q   (By Mr. Gear:)  Can you tell me what, if
12   anything else, SB 362 deals with related to voter fraud?
13       A   I think primarily voter impersonation is the
14   issue.
15       Q   Are you aware of any elections in the State of
16   Texas that were altered or were altered as a result of
17   voter impersonation at the polls?
18       A   I'll be consistent with what I said earlier.  I
19   don't know how you know, because you would have no
20   enforcement mechanism under the old law, because now the
21   new law requires that the voter verify his identity,
22   consistent with his voter registration.  You know, you
23   would be able to show that.
24           It's a deterrent to that occurring, as
25   well.  And so I just don't know how you would -- you
```

**[Page 133]**

```
 1   know, it would be very difficult to prove.  And so, you
 2   know, I'm saying I can't -- I can't tell you that I'm
 3   familiar with a specific instance of that.
 4       Q   And in 2009, during the consideration of SB 362,
 5   was there a measurable number that you recall regarding
 6   the number of prosecutions of in-person voter
 7   impersonation at the polls?
 8       A   There was a number of in-person prosecutions.
 9   I can't classify them as to what the violations were, but
10   I think the record would have that.
11       Q   And if I were to tell you that record reflected
12   that there were zero prosecutions of voter impersonation
13   at the polls, as of 2009, would you have any reason to
14   dispute that?
15       A   I --
16           MR. SWEETEN:  Objection; assumes facts
17   not in evidence.
18       A   I don't know what -- I couldn't dispute it or
19   not dispute it.  I wouldn't surprise me, because I know
20   it's something that would be difficult to prove.
21       Q   (By Mr. Gear:)  And in voting for SB 362, did
22   you believe that the provisions within that SB 362 were
23   sufficient to identify a person at the polling place?
24       A   Yes, I thought they were.  You know, I think
25   the Senate bill I voted for, I supported.  So, yes, I
```

877-479-2484          US LEGAL SUPPORT, INC.          www.uslegalsupport.com

**CONFIDENTIAL**

**[Page 134]**

1  did.

2          MR. GEAR:  Do you want to take a lunch

3  break now?

4          (Off the record discussion ensued; lunch

5  break taken.)

6      Q   (By Mr. Gear:)  We're back on the record.  So,

7  before we went off the record, you were discussing some of

8  the difficulties of identifying voter impersonation at the

9  polls.  Do you recall that?

10     A   Yes.

11     Q   And one of the points that you raised was:  It

12  would be difficult for poll workers to identify

13  impersonation at the polls.  Do you recall that testimony?

14     A   I do.

15     Q   What steps or what reports or analysis did you

16  or your staff conduct to determine if that position was

17  actually based in fact?

18     A   Well, I think, just anectodally, you know, you

19  think through issues.  When you represent a big district

20  like I do, you go around, and you talk to people.  And I

21  had 51 counties.  At that time, I think I had 46.

22          And voter ID and that sort of thing was a

23  big issue, and people would talk about that.  They

24  wouldn't talk about it in specific, "I saw this, or I

25  heard that, and you can do this."

**[Page 135]**

1          And one example that was given was if

2  somebody presented their wife's -- to vote with their

3  wife's card, that even they couldn't be turned down to

4  vote.  I don't know if that's true or not, but it kind

5  of registers the fact that how would we expect the poll

6  workers to really know whether John Doe is John Doe and

7  whether or not there is fraudulent activity going on

8  with that.

9          And then we heard -- at least off the

10  record -- but I heard of anectodal testimony where

11  people would harvest cards -- harvest cards and actually

12  market them, and that was a concern that I had, but,

13  generally, that was a common sense concern that I had.

14          And it seemed to me that requiring

15  identification to vote was a fairly -- was a fair way to

16  go about enforcing the requirement that you be

17  registered, and that you be the person that's on the

18  registration before you're allowed to vote.

19     Q   As you sit here today, do you recall the names

20  of any election judges you may have spoken to?

21     A   No, no.  I don't think I talked to election

22  judges.  I think I talked -- it may have been I didn't

23  talk to them in that capacity, just generally, when you

24  go out and you represent a district and you're doing your

25  job and you're speaking with your constituitents.

**[Page 136]**

1          And, you know, you also look and see --

2  we were also -- I was aware of the polls that basically

3  reflect very strong support among our constituents for

4  some way to enforce our -- you know, some sort of voter

5  identification.

6      Q   And you said "polls."  I'm sorry?

7      A   Right.  Just general polls that we were aware

8  of.  I didn't do any in my district, but things that were

9  done generally.

10     Q   Do you legislate based on polls?

11     A   Not normally.

12     Q   Now, were you aware that election judges at the

13  polling places actually do have certain law enforcement

14  privileges?  They have the power to arrest if they believe

15  that fraud had been committed?

16     A   Well, taking that as true, I've been to the

17  polls.

18     Q   Okay.

19     A   And I see that reality is different, and that's

20  never going to happen or not going to happen unless --

21  and if it does happen, it's going to be very -- it's

22  going to be a very difficult situation for someone who

23  probably is not trained in law enforcement or the ability

24  to do -- to safely detain someone who they suspect is a

25  fraudulent voter.

**[Page 137]**

1          And that's a pretty risky thing anyway if

2  you look at a lot of the -- you know, persons are

3  exposed when they do that, and if they're wrong, to a

4  liability.  So I would say that that would be a very --

5  I don't see that as a -- or I see that as a real issue

6  and a problem.

7          And I see that based on my own experience

8  of voting of seeing that there would be no way, at least

9  no practical way, reasonable way, or a reasonable

10  expectation that a poll worker or an election judge

11  would be able to effectively enforce the voter laws.

12          And the easiest nonintrusive way to do

13  that is just basically to say, "Identify yourself."

14     Q   Are you also aware that candidates are allowed

15  to have poll watchers in the polling place?

16     A   I am.

17     Q   And have you -- as an elected official, have you

18  ever used poll watchers in a polling place?

19     A   No.

20     Q   Are you aware that there was an effort by the

21  Texas Attorney General's Office to identify voting fraud

22  in the polling place?

23     A   No.

24     Q   Are you aware that the Texas Attorney General's

25  Office expended money in an effort to identify voter fraud

CONFIDENTIAL

**[Page 138]**

1  in the State of Texas?
2      A   I don't know exactly in what context you're
3  talking about.
4      Q   Well, let me clarify that.
5      I need a foundation.
6      Q   Are you aware that the Attorney General's Office
7  created a special investigations unit?
8      A   I'm aware of that.
9      Q   And that one of the tasks of the special
10 investigations unit was to receive referrals from the
11 Secretary of State's office and other local prosecutors,
12 and in some cases, citizens regarding voter fraud?
13     A   Well, I'm not familiar with the specific
14 details of the task force.
15     Q   But you are familiar with the task force?
16     A   Generally, their existence.
17     Q   Are you aware that poll watchers have the
18 ability to challenge a voter's -- a voter in the polling
19 place, and that challenge would be issued directly to the
20 election judge?
21     A   Yes.
22     Q   Are you aware of -- and you indicated that you
23 had been at the polls before.  I suspect you had been
24 there to vote, correct?
25     A   Yes.

**[Page 139]**

1      Q   Have you ever worked as a --
2      A   No.
3      Q   -- poll official?
4      A   No.
5      Q   Have you ever spent any significant time in the
6  polling place, to observe polling place activities?
7      A   Yes.
8      Q   And in what capacity?
9      A   Standing in line, waiting to vote.
10     Q   So, other than standing in line, you haven't
11 worked at the poll --
12     A   No.
13     Q   -- as a poll watcher; you have not worked as an
14 election judge; you have not worked at the poll --
15     A   Correct.
16     Q   -- as a poll worker?
17     A   That's right.
18     Q   And you have not, based on your recollection,
19 spoken directly to any election judges regarding their
20 ability to identify in-person voter fraud at the polling
21 place?
22     A   I think we had some testimony to that effect.
23 I can't recall specifically.  The record would reflect
24 that, if we did.
25     Q   But, as you sit here today, you don't recall

**[Page 140]**

1  that testimony?
2      A   Right.
3      Q   I want to show you what has been previously
4  marked as RD-10 in this deposition, and I'll direct your
5  attention to Number 1.  And I understand that you do not
6  recall seeing this document.
7      So I would like you to just focus on the
8  last sentence of Number 1.
9      A   Could you tell me who prepared it?
10     Q   I don't know.  If you could tell me --
11     A   I don't know.  I don't know what the source is.
12     Q   So --
13     A   I guess what source -- what is the source of
14 RD-10?
15     Q   It's marked as highly confidential, and it was
16 produced by the State of Texas as TX 00087008.  But, I
17 mean, I can accept your testimony if you don't know who
18 authored this document.
19     A   Okay.
20     Q   And you don't know -- if you don't know who
21 authored the document, I understand that testimony.
22     So, not introducing this for the
23 authenticity of the document, I would like to explore
24 your knowledge about concerns related to SB 362, possibly
25 disenfranchising elderly, poor, or minority voters.

**[Page 141]**

1      Were you involved in any communications
2  with any legislators that expressed concern that SB 362
3  may possibly result in the disenfranchisement of elderly,
4  poor, or minority voters.
5      A   Generally, as the bill was debated on the
6  Senate floor, and I would assume as the special order
7  provision was also debated on the Senate floor, in
8  2009 -- are we talking about that 2009?
9      Q   SB 362.  Correct.
10     A   So I would assume that that was -- I know those
11 discussions took place on the Senate floor.  I don't
12 recall specifically what they were, but the record will
13 reflect that.
14     Q   And what, if any, reports or analyses or steps
15 did you or your staff take specifically to address the
16 concerns that SB 362 may result in the disenfranchisement
17 for elderly, poor, or minority voters?
18     A   We followed up with our role, to make sure we
19 had a hearing that allowed the opponents and proponents
20 of the legislation to bring evidence before the body, so
21 the body could deliberate on that evidence, weigh it, and
22 make a decision.
23     Each individual member of the Senate
24 could make that decision if that was appropriate for its
25 constituents in its own judgment.

CONFIDENTIAL

## [Page 142]

1    Q   So, other than the hearing itself and the
2  ability to bring witnesses from either side, is it your
3  testimony that you're not aware of any specific reports
4  that address this issue?
5    A   Other than what's in the record.
6    Q   So I'm not -- I can't remember if we have
7  discussed this on the record, but do you recall that
8  SB 362 -- that there was a motion during the consideration
9  of SB 362 to suspend the regular order of business to
10  take up SB 362?
11    A   No, I don't.  Are you asking me:  Do I remember
12  or --
13    Q   Do you recall?  Do you remember?
14    A   No, I don't.
15    Q   Do you remember if SB 362 was heard in the
16  State Affairs Committee or in the committee of the whole?
17    A   362 was the committee of the whole.
18    Q   And I may have asked you this already.
19    A   All right.
20    Q   Do you know who proposed the motion to suspend
21  the regular order of business to take up 362?
22    A   I don't know that it would have required
23  suspending the regular order of business, because it was
24  a special order.
25    Q   And who introduced the special order?

## [Page 143]

1    A   I think that that was Senate Joint
2  Resolution 14.
3        MR. GEAR:  Let's go off the record for a
4  second.
5        (Off the record discussion ensued.)
6        MR. GEAR:  Back on the record.
7    Q   (By Mr. Gear:)  We had a brief conversation, and
8  there was a clarification, and thank you for that.
9        Can you tell me why SB 362 was considered
10  by the committee of the whole?
11        MR. SWEETEN:  Objection; legislative
12  privilege.  You can answer.
13    A   The special order -- The rule that was --
14  Rule 5.11(d) allowed for the -- called for or required
15  a committee of the whole's consideration of voter
16  identification and legislation, if it was to be
17  considered as a special order under that rule.
18        And so I assume that the Lieutenant
19  Governor then referred it to the committee of the whole
20  in accordance with Rule 5.11(d).  I think that's the
21  rule.
22    Q   And other than SB 362 and SB 14, are you aware
23  of any other photo ID legislation that was referred
24  directly to the committee as a whole?
25    A   I don't know that there was.  I don't think

## [Page 144]

1  there was.
2    Q   Are you aware of any other specific legislation
3  that was referred directly to the committee of the whole?
4        MR. SWEETEN:  I want to be clear, Bruce.
5  You're talking about '09; in '09?
6        MR. GEAR:  I am talking about '09.
7        MR. SWEETEN:  All right.
8        MR. GEAR:  Thank you for that
9  clarification.
10    A   Not that I recall.
11    Q   (By Mr. Gear:)  What about in 2011 during the
12  consideration of SB 14?  Do you recall any other --
13    A   I do not recall that there was any.  There may
14  have been, but I don't recall if there was.
15    Q   Did you --
16        MR. GEAR:  Strike that.
17    Q   (By Mr. Gear:)  Are you aware if the Secretary
18  of State's office conducted an analysis or prepared a
19  report to determine the number of Spanish surname
20  registered voters who lacked the required SB 14
21  identification?
22    A   If they did, it would probably be in the
23  record.  I don't have independent recollection of it, but
24  they may have.  I know they did testify at the hearing.
25    Q   Did you or your staff engage in any

## [Page 145]

1  communications with the Secretary of State's office to
2  determine if they maintained voter registration by Spanish
3  surname?
4    A   I didn't personally.  It would not surprise me
5  if my staff did, in the regular course of preparing bills
6  or following up on requests from other members to have
7  information brought before the committee of the whole --
8    Q   Would you --
9    A   -- or even in 218.
10    Q   Would you direct your staff to seek that type of
11  information?
12        MR. SWEETEN:  Objection; calls for
13  speculation.
14    Q   (By Mr. Gear:)  Well, let me clarify.  I'm
15  asking you specifically:  Would you have directed your
16  staff to seek information specific to voter registration
17  Spanish surname data?
18        MR. SWEETEN:  I'm still going to object on
19  speculation, because you're asking him to say if -- it's
20  a hypothetical.  Would you have -- I mean, the
21  question -- if the question --
22    Q   (By Mr. Gear:)  Did you --
23        MR. SWEETEN:  "Did you," I think, that's
24  fair.
25    Q   (By Mr. Gear:)  Let me restate the question.

CONFIDENTIAL

## [Page 146]

1    Did you direct your staff to seek information related to
2    voter registration information based on Spanish surname
3    data?
4          A   I don't remember if I did specifically.  That's
5    something that -- you know, I have a very competent
6    staff -- that they probably did that on their own without
7    asking, I mean, if they needed it or if it was requested.
8    You know, I could have, but I don't
9    recall doing it specifically.
10         Q   Do you recall if Jennifer Fagan sought that
11   information?
12         A   I do not.  I cannot speak for that.  I do not
13   know, sitting here today.
14         Q   Do you recall reviewing information related to
15   voter registration based on Spanish surname data?
16         A   It seems to me that in the hearing of the
17   committee as a whole, that evidence was brought forth,
18   but I can't accurately testify to that.  It would be in
19   the record, if it was.
20         Q   And just so the record is clear, do you recall
21   that being brought forth in 2009?
22         A   I think, if it was -- you know, it would occur
23   to me that it was, but, you know, again, I'm having a
24   vague recollection that there was -- that that was a
25   discussion that took place.

## [Page 147]

1          And it was in 2008.  And the record will
2    reflect more accurately than what my memory would serve.
3          MR. GEAR:  I only have one copy of this,
4    but let me mark this for the record.  I'm going to mark
5    this as RD-13.
6          (Duncan Deposition Exhibit Number RD-13
7    marked.)
8          Q   (By Mr. Gear:)  I'll give you a chance to look
9    at this and ask you to identify this document.
10         A   (Witness reviewing document.)
11         Q   And can you identify that document for the
12   record, please?
13         A   Looking at the first page, it appears to me to
14   be the Senate Journal record of proceedings on Wednesday,
15   March 18th, 2009.
16         Q   And that's part of the Senate Journal?
17         A   Yes, sir.
18         Q   And if I could just look at that briefly.
19         MR. GEAR:  For the record, I will just
20   identify that this is Bates-stamped as USA 00013425.  It
21   also was presented as a Defendant's exhibit in Texas v.
22   Holder as DE 006358.
23         Q   (By Mr. Gear:)  And I would direct your
24   attention to -- I would direct your attention to Page 589
25   in the Senate Journal, which is Bates-stamped as USA

## [Page 148]

1    0013431 at the bottom.
2          And I'll ask you questions about that,
3    once you've had a chance to look at it.
4          A   (Witness reviewing document.)
5          Q   So my question is:  Was there a point in time
6    during the hearing where Senator Van de Putte read into
7    the record a letter from Coby Shorter?
8          A   I don't know if she read it or placed it.
9    Often, members will place something in the record, and
10   it's in the record.  It doesn't mean that anybody else
11   saw it.  But I don't know if this was placed in the
12   record or whether it -- the journal probably would not
13   reflect that, one way or the other.
14         Q   And who is Coby Shorter, III?
15         A   Coby Shorter was the Deputy Secretary of State.
16         Q   And he was Deputy Secretary of State in 2009?
17         A   I believe so.  I think he testified at the
18   hearing.
19         Q   I'm going to direct your attention to Page USA
20   00013433, also Bates-stamped as DE 006366, and that's
21   Page 591.  And I'll ask you to take a look at the top.
22         A   (Witness reviewing document.)
23         Q   Does that help refresh your recollection in 2009
24   whether the issue of voter registration based on Spanish
25   surname was raised during -- in the Senate on the public

## [Page 149]

1    record or legislative record?
2          A   Well, all it does is tell me that this
3    letter -- let me read it --
4          Q   Sure.
5          A   -- so that I can understand what it is.
6          Q   Please.
7          A   (Witness reviewing document.)
8          Q   So, when you're done, let me just for the record
9    ask you to identify what that is that has been placed or
10   read into the record.  And if you can determine which,
11   that would be great, when you're done.
12         A   (Witness reviewing document.)  Okay.  So what
13   do you want me to do?
14         Q   So you were trying to determine what that was.
15   So, for the record, can you identify what exactly you're
16   reading for the record?
17         A   Okay.  This is a letter from Coby Shorter, who
18   was Deputy Secretary of State, dated March 11th, 2009.
19   That was apparently placed in the record on March 18th,
20   2009, following the vote on Senate Bill 362.
21         Q   And that was placed in the record by Senator
22   Van de Putte?
23         A   Yes, according to the record.
24         Q   And, again, directly your attention to --
25         A   The third --

CONFIDENTIAL

**[Page 150]**

1  Q   Yes.  My question was:  In 2009, were you made
2  aware that there was voter registration data available
3  based on Spanish surnames?
4  A   I believe that this letter indicates at
5  least -- and I don't know when this -- if this was in the
6  record before the committee of the whole or not.
7  Q   And in looking at the first page of this
8  document --
9  A   I mean, it could have been --
10  Q   Okay.
11  A   -- because it's dated --
12  Q   But, in any event, that's --
13  A   March 11th, 2009.
14  Q   That is the 2009 record, correct?
15  A   Right.  March 11th, 2009.
16  Q   Sorry about that.
17  A   So the meeting of the committee of the whole
18  began on March 17th, if I remember right, and concluded
19  on the 18th.  And this was placed in the record on the
20  18th after the Senate reconvened as the Senate, as the
21  full Senate, out of the committee of the whole, and voted
22  on 362.
23      So this is -- I don't know how this was
24  presented.  Often, members will place something in the
25  record, and for whatever purpose, in their legislative

**[Page 151]**

1  intent or whatever they want to do.  Other members
2  usually don't see it unless they read the journal every
3  day, which I'll say probably most people don't have time
4  to do that.  But the bottom line is:  That's what this
5  is.
6  Q   And so, specifically, there was a question posed
7  to Coby Shorter, who responds.  Actually, the question
8  was:  "Does the Secretary of State track the racial status
9  of registered voters?"
10      And are you aware of whether or not the
11  Secretary of State tracks the racial status of registered
12  voters?
13  A   According to Mr. Shorter's letter, they do not.
14  Q   Do you have any independent recollection of
15  whether or not the Secretary of State tracks the racial
16  status of registered voters?
17  A   No.
18  Q   And the question goes on to say, "If not, how
19  well the State prove that SB -- Senate Bill 362 does not
20  have an adverse impact on minority voters when the State
21  submits the bill for preclearance?"
22      And based on Page 591, USA 00013433, is
23  there an answer provided by Mr. Shorter?
24  A   Well, I think he basically -- maybe this is
25  where the confusion is.

**[Page 152]**

1  The Legislative Counsel assists your
2  office, DOJ, I guess, in basically compiling data on
3  race and ethnicity for the purpose of redistricting, and
4  I think he's suggesting that, you know, a similar effort
5  could be -- what he says -- I'm not going to paraphrase.
6  I'll just read it.
7  Q   Sure.
8  A   "A similar effort to obtain such demographics
9  may be required for a voter identification bill.
10  Historically, we have worked with legislators to ensure
11  the best data available is included in the submissions."
12  That was his answer.
13  Q   Was there any effort to compile such data by the
14  Senate?
15  A   If there was, it would have been in the record.
16  Q   Are you aware of any -- As you sit here today,
17  are you aware of any attempt to compile data -- and let me
18  see if I can get this right -- to compile data in an
19  effort to prove that Senate Bill SB 362 does not have an
20  adverse impact on minority voters when the State submits
21  the bill for preclearance?  Are you aware of any efforts
22  to do that?
23  A   It never was submitted for preclearance,
24  because it didn't pass.  So I assume that because it
25  didn't pass, as it relates to Senate Bill 362, that

**[Page 153]**

1  wasn't done.
2  Q   So --
3  A   But I'm assuming.  I mean, somebody may have,
4  postmortem that bill, done something along that line.  I
5  do not know.  If they did, I'm sure it's in the record
6  somewhere.
7  Q   And just so I'm clear on your testimony, are you
8  aware of any --
9  A   No.
10  Q   -- steps taken to compile this data?
11  A   No.
12      (Duncan Deposition Exhibit Number RD-14
13  marked.)
14  Q   (By Mr. Gear:)  I'm going to show you what has
15  been marked as RD-14.  I would note for the record that
16  this has a Texas Bates-stamp of TX 00204754, and it was
17  produced as a highly confidential document.
18      And I would just ask you to identify what
19  this is for me, please.
20  A   That appears to be correspondence between
21  Jennifer Fagan and Ann McGeehan in January of 2011.
22  Q   And that would have been during the
23  consideration of SB 14?
24  A   Right.
25  Q   And in the e-mail from Ann McGeehan to Jennifer

CONFIDENTIAL

## [Page 158]

1 through it, as best I can.
2     MR. GEAR:  And I understand the foundation
3 objection.  I said "would have."
4     Q  (By Mr. Gear:)  So it's my understanding that
5 you are not aware of data that was compiled related to
6 Spanish surnames as run against the state-wide database;
7 is that correct?
8     A  No.  It's a confusing issue, because we do get
9 that information with regard to redistricting.
10     Q  Okay.
11     A  And so, unless Counsel prepares that, I don't
12 know, or I can't recall whether that was used.
13         All we're talking about here, with
14 Mr. McGeehan's e-mail, was just a list of Spanish
15 surname voters.
16     Q  As run against the state-wide database.
17     A  Well, okay.  So it's raw data.  And so raw data
18 alone does not give you any analytical ability to predict
19 what any legislation would do along those lines.
20     Q  Well, you obtained --
21     A  The raw data especially is raw -- it's just
22 Hispanic surname individuals.
23     Q  And you indicated that you obtained similar
24 information for redistricting.  Why do you obtain the
25 information for redistricting?

## [Page 159]

1     MR. SWEETEN:  Objection.  I think that
2 misstates facts.
3     Q  (By Mr. Gear:)  And, again, I'm not trying to
4 misstate your testimony.
5         You've testified that similar information
6 was obtained --
7     A  Right.
8     Q  -- for redistricting, correct?
9     A  Right.
10     MR. SWEETEN:  So I'm -- as to what she's
11 saying or similar to you --
12     MR. GEAR:  Well, if you want to go into
13 the details of it, we can.
14     MR. SWEETEN:  Okay.
15     Q  (By Mr. Gear:)  You've testified that
16 information related to Hispanic surnames, as run against
17 the state-wide list of voters, was obtained for
18 redistricting, correct?
19     A  It's obtained in a different format for a
20 different purpose.
21     Q  And what is the purpose?
22     A  The purpose is for -- to draw for
23 reapportioning voter or legislative or congressional
24 districts.
25         And so the identification of Hispanic

## [Page 160]

1 surname persons for ethnicity is certainly relevant to
2 requirements under the Voting Rights Act.  And so for
3 that purpose is why we would be getting that
4 information.
5         With regard to the voter ID, just making
6 a point, the raw data would not be -- would not offer
7 any evidence of the impact of any voter ID legislation.
8 Without drawing wide assumptions, that would not be
9 statically valid.
10     Q  And how would you know that?
11     A  Well, it's just common sense.  It doesn't take
12 a rocket scientist to figure that out.  You know, the
13 data that she would provide would be gross data, meaning
14 bulk data, or it would provide no analytical information.
15         It just would be who has Hispanic
16 surnames, and that doesn't necessarily translate to any
17 useful information with regard to the impact of voter
18 identification legislation.
19     Q  Would it have been -- Could it have possibly
20 been useful in determining the number of Spanish surname
21 registered voters that may not have one of the necessary
22 SB 14 identifications?
23     A  No.
24     MR. SWEETEN:  Objection, foundation;
25 calls for speculation.  Go ahead and answer.

## [Page 161]

1     A  No.  It's just raw data.  It's just names.
2     Q  (By Mr. Gear:)  That's the -- Part of this that
3 is missing -- and I'm sorry if you've said this, but it's
4 Spanish surnames from the census, correct?  And those
5 Spanish surnames would be run against the state-wide list
6 of voters.
7         So, with that understanding, why are you
8 now saying that it would only be raw -- it would only be
9 names and raw data?
10     MR. SWEETEN:  Objection, foundation;
11 assumes facts not in evidence.  You can answer.
12     A  There is no other demographic information
13 provided.  It's just that raw data.
14     Q  (By Mr. Gear:)  Just to complete this and close
15 the circle, is it your testimony that you don't believe
16 that type of data would have been helpful in assisting the
17 Senate to understand the impact of photo ID legislation on
18 Hispanic voters?
19     A  I do not.
20     Q  And it's your testimony, as I understand it,
21 that you -- that it's your understanding that that would
22 just simply have been raw data?
23     A  My testimony is that raw data alone, as
24 proposed by Ms. McGeehan, could certainly be obtained,
25 and we probably may have obtained it.  I don't know.

877-479-2484        US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

[Page 162]

1    But without -- that alone and without
2    much more data and information on demographics and other
3    statistical analysis, this data would not be -- alone
4    would not be helpful.
5        Q    So, when you're talking about demographics and
6    other statistical analysis, what are you referring to?
7        A    Well, I'm just saying here that's -- all you're
8    doing here is just assuming that somebody with an
9    Hispanic surname is going to be impacted by Senate
10   Bill 362.
11       And I think that is an -- that is an
12   assumption that is not supported by any valid
13   statistical evidence or studies or anything else.  It
14   just -- It's just information.
15       And so, you know, I don't -- I'm not
16   following your point, but, again, that's pretty clear
17   and plain, in my view, from what she -- what is the
18   information she said she could provide.  It's just names
19   of people.
20       Q    And I believe I've asked you, and I'll just ask
21   you again.
22       A    Okay.
23       Q    Would that type of data have assisted in --
24   would that type of data --
25       MR. GEAR:  Strike that.

[Page 163]

1        Q    (By Mr. Gear:)  Would that type of data have
2    been helpful in assisting legislators in the Senate in
3    understanding what Hispanic registered voters may not
4    possess the necessary forms of ID under SB 14?
5        MR. SWEETEN:  Objection, foundation;
6    objection, asked and answered.
7        A    I think I've answered it in about as many
8    ways -- in my belief, of the value of that data.
9        Q    (By Mr. Gear:)  Do you have any recollection as
10   to whether or not --
11       MR. GEAR:  Strike that.
12       Q    (By Mr. Gear:)  Did Jennifer Fagan respond to
13   Ann McGeehan's offer to be provided the Spanish surname
14   voters' data?
15       A    You know, I don't recall if she did or not.  It
16   would be in the record if she did.
17       Q    Well, and, again, I would like to understand
18   what you know, as you sit here today.
19       Do you recall seeing any response sent by
20   Jennifer Fagan to Ann McGeehan?
21       A    No.
22       Q    Do you recall seeing any response, as a
23   follow-up to Ann McGeehan's offer to provide current --
24   the current number of Hispanic surname voters to Jennifer
25   Fagan -- do you recall seeing a response to that?

[Page 164]

1        A    No.
2        Q    Do you ever seek to determine what the number of
3    registered voters with Spanish surnames was that may have
4    lacked the required SB 14 identification?
5        A    I don't know.  I don't know if there's any.  I
6    don't recall any independently of what we did or what
7    other members of the Senate did or presented as evidence
8    at the hearing.  It would be reflected in the record.
9        Q    I want to, at last, turn to SB 14.  SB 14 was
10   the photo ID legislation that passed in the Senate in
11   2011, correct?
12       A    Yes, sir.
13       Q    Prior to the consideration of SB 14, were you
14   involved in any communications with other legislators
15   during which a comparison between photo ID legislation and
16   immigration was made?
17       A    I think, similar to other pieces of legislation
18   that we've talked about over the years, I don't have
19   specific recollection of any discussions about the issue
20   of illegal immigration with any specific member.  You
21   know, that's my recollection.
22       Q    Let me see if I can be a little more specific on
23   that question.
24       Do you recall engaging in communication
25   with Senator Patrick regarding photo ID legislation --

[Page 165]

1        MR. GEAR:  Strike that.
2        Q    (By Mr. Gear:)  Do you recall engaging in
3    communication with Senator Patrick during which a
4    comparison between photo ID legislation and immigration
5    was made?
6        A    Senator Patrick is a member who has expressed
7    concerns about that issue before.  So I don't know what
8    we discussed about that or not -- discussed that issue or
9    not.
10       Q    And what concerns did Senator Patrick raise?
11       A    Well, he has always had a concern about those
12   issues, but I don't know specifically.  He may have asked
13   somebody or me about that.  I don't know.
14       Q    And I'm trying to understand specifically what
15   the concerns regarding photo ID legislation and
16   immigration with Senator Patrick were?
17       A    I'm not sure.  I think I'm more relating it to
18   current -- to current things.  But back then I don't
19   recall exactly what -- I don't recall having a discussion
20   with him about that.  I'm not saying it didn't happen,
21   but I don't recall it.
22       Q    Do you recall having a discussion with Senator
23   Fraser regarding photo ID legislation and immigration
24   being one and the same?
25       A    Are you talking about on the record or off the

877-479-2484        US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

**[Page 166]**

1  record or what?
2      Q   I'm just talking generally about discussions or
3  communications.
4      A   I don't recall.
5      Q   Then the answer was "no"?
6      A   Right.
7      Q   You don't recall.  Do you recall having
8  communications with any legislator, either in the House or
9  the Senate, regarding photo ID legislation and immigration
10  being connected?
11      A   No, I don't recall having that conversation.
12          (Duncan Deposition Exhibit Number RD-15
13  marked.)
14      Q   (By Mr. Gear:)  I'm showing you what has been
15  marked as RD-15, and I will give you a chance to look at
16  that.
17          MR. GEAR:  And for the record, I would
18  indicate that this document has been marked as highly
19  confidential and was produced by Texas -- that's TX
20  00009987.
21      Q   (By Mr. Gear:)  And when you've had a chance to
22  look at that, we can talk about it.
23      A   (Witness reviewing document.)
24      Q   Have you had a chance to look at RD-15?
25          MR. SWEETEN:  I would caution the witness

**[Page 167]**

1  to take the time you need to review it.
2      A   Well, I've never seen this before.  I'm not
3  sure what it is.  But I guess I have seen it.  It came to
4  me.
5      Q   (By Mr. Gear:)  I'm sorry.  I didn't hear you.
6      A   Never mind.  I'm thinking about what this is.
7      Q   Okay.
8      A   And I haven't read the second part.  I don't
9  know if it's relevant.  I have read the first information
10  from Dan Patrick to several members of, it looks like,
11  the Republican caucus.
12          MR. GEAR:  So let's just identify this
13  for the record.  The first page is identified as TX
14  00009987.
15      Q   (By Mr. Gear:)  Do you see that there is an
16  indication "Forward, Follow up on meeting in Georgia, a
17  victory for citizenship verification."  Do you see that?
18      A   That's the subject line that Patrick was --
19  Senator Patrick assigned to this message, apparently.
20      Q   And do you see that this is from Senator
21  Patrick, and it's got a "danpatrick700@gmail.com" e-mail?
22      A   Yes.
23      Q   And that this was sent to various senators and,
24  as you've described, Republican senators on March 29th,
25  2012 --

**[Page 168]**

1      A   Yes.
2      Q   -- at 12:55 a.m.?
3      A   Yes, sir.
4      Q   And looking down at the forward message, again,
5  it's from Dan Patrick.  Who is "brianandmelbirdwell"?
6      A   He's a -- Brian is a member of the Senate.
7      Q   And Dan Patrick is a member of the Senate, also?
8      A   Yes, sir.
9      Q   And do you see that "Dueell"?
10      A   Bob Deuell.
11      Q   And do you know who that is?
12      A   Yes.  Senator Deuell.
13      Q   And Estes?
14      A   Craig Estes.
15      Q   And Estes is a senator?
16      A   Correct.
17      Q   And he is a Republican senator?
18      A   Correct.
19      Q   And Florence Shapiro?
20      A   Correct.
21      Q   Florence Shapiro is a senator?
22      A   At that time, yes.
23      Q   There's a Glenn Hegar -- Hegar?
24      A   Hegar.
25      Q   And Glenn Hegar, I believe we've discussed

**[Page 169]**

1  before, is a senator?
2      A   Correct.
3      Q   A Republican senator?
4      A   Yes.
5      Q   Jane Nelson?
6      A   Yes.
7      Q   And who is Jane Nelson?
8      A   A senator.
9      Q   Jeff Wentworth?
10      A   Senator.
11      Q   Is it JoAnn Huff?
12      A   Joan Huffman.
13      Q   Joan Huffman.  Senator?
14      A   Yes.
15      Q   John Cardona?
16      A   Carona.
17      Q   Carona.  Senator?
18      A   Yes.
19      Q   Kyle Slager?
20      A   Kel Seliger.
21      Q   I was close.
22      A   Not too close.
23      Q   Senator?
24      A   Senator.
25      Q   Why don't you just pronounce the next one?

**CONFIDENTIAL**

**[Page 170]**

1   A   I'll let you take a stab at it.
2   Q   Kevin --
3   A   Kevin Eltife.
4   Q   -- Eltife.  Senator?
5   A   Correct.
6   Q   And there are a number of other people here.
7   Mike Jackson; do you know who that is?
8   A   Yes.  Senator.
9   Q   There's an e-mail to Opie, "opie@cdmlaw.com."
10  Do you know who that is?
11  A   That's me.
12  Q   And you recognize that e-mail --
13  A   Yes.
14  Q   -- as being your e-mail?
15  A   (Witness nods head.)
16  Q   Robert Nichols; do you know who Robert Nichols
17  is?
18  A   Yes.
19  Q   Senator?
20  A   Yes.
21  Q   So does this refresh your recollection as to
22  whether you received this document?  Have you seen this
23  document before?
24  A   Well, again, it's addressed to me.  I don't
25  recall seeing it.

**[Page 171]**

1             But, again, during legislative session,
2   three years ago, you see a lot of things.  That wouldn't
3   have been something that I would have necessarily zoned
4   in on.
5   Q   August 29th, 2010, would there have been any
6   photo ID legislation pending at the time?
7             MR. GEAR:  Strike that.
8   Q   (By Mr. Gear:)  Do you know when SB 14 was
9   filed?
10  A   January of -- apparently, we've got a record
11  here, if you want to go --
12  Q   Let's just put this into context.  We're going
13  to mark this.
14  A   I don't have -- I don't have the record for 14,
15  I don't believe.
16            (Duncan Deposition Exhibit Number RD-16
17  marked.)
18  Q   (By Mr. Gear:)  I'm giving you what has been
19  marked as RD-16.  And the question was when was -- first
20  of all, let's identify the document.
21            Is it fair to say RD-16 is the Texas
22  Legislature Online History for SB 14?
23  A   That's what it appears to be.
24  Q   And that's for the 82nd Legislature?
25  A   Yes, sir.

**[Page 172]**

1   Q   And it identifies authors of that bill, correct?
2   A   Yes.
3   Q   And it identifies you as being an author of that
4   bill, --
5   A   Yes.
6   Q   -- along with a number of other --
7   A   Coauthors.
8   Q   -- senators?
9   A   Yes.
10  Q   Senator Fraser, Senator Birdwell, Carona --
11  well, why don't I let you read the authors of the bill?
12  A   Fraser, Birdwell, Carona --
13            COURT REPORTER:  Could you slow down a
14  little?
15            THE WITNESS:  Oh, I'm sorry.
16  A   Fraser, F-R-A-S-E-R, Birdwell, Carona, Deuell,
17  D-E-U-E-L-L, Duncan, Eltife, E-L-T-I-F-E, Estes, Harris,
18  two "Rs," Hegar, H-E-G-A-R, Huffman, two "Fs," Jackson,
19  Nelson, Nichols, Ogden, O-G-D-E-N, Patrick, Seliger,
20  S-E-L-I-G-E-R, Shapiro, Wentworth, and Williams.  Those
21  are the Senate sponsors or senate coauthors.
22  Q   (By Mr. Gear:)  And it appears that most, if not
23  all, of the authors of the bill appear on the e-mail
24  that's dated March 29th of 2012 -- I'm sorry -- March 29th
25  of 2010; is that correct?

**[Page 173]**

1   A   Your foundation is incorrect.
2   Q   Which ones -- Which senator is not listed on the
3   e-mail that is listed on the bill?
4   A   RD-15 is the first e-mail dated August the
5   29th, 2010.
6   Q   Correct.
7   A   And so that's what you're referring to.  I
8   think you said March, but I just was correcting that.
9   Q   Thank you.
10  A   And this appears to be the same -- these appear
11  to be -- the recipients of the e-mail dated August 29th,
12  2010, are the same persons who appear as authors of
13  Senate Bill 14.
14  Q   Okay.  Thank you for that.  So, turning your
15  attention to the March -- I'm sorry -- the August 29th,
16  2010 e-mail, it indicates that -- from Dan Patrick, it
17  indicates, "Senators, I thought our two days was very
18  beneficial and look forward to the next meeting."
19            Do you recall what meeting is being
20  referenced in this e-mail?
21  A   No, I don't.  I think, you know, typically it
22  may have been a general caucus meeting, where we discuss
23  a lot of issues, not just single issues, but it looks
24  like, from reading this e-mail, I would only be
25  speculating as to what other issues were discussed.

877-479-2484          US LEGAL SUPPORT, INC.    www.uslegalsupport.com

CONFIDENTIAL

[Page 174]

1    Q   And when you say a "general caucus meeting," I'm
2    not sure I understand that.
3    A   Well, just a Republican caucus like a Democrat
4    caucus.  From time to time, you get together and discuss
5    issues and other matters.
6    Q   So, apparently, there was a discussion at
7    breakfast about an independent conservative group?
8    A   Yes.
9    Q   Do you know which independent or what --
10   A   No.
11   Q   -- what the name of the independent conservative
12   groups are?
13   A   No.
14   Q   Are you a member of independent conservator
15   groups, along with the other members listed on this
16   e-mail?
17   A   The Republican party.  That's it.  I'm not --
18   I'm not a member of any of the other organizations that
19   are associated with --
20   Q   Were you a member of any other organizations
21   associated with all of these individuals?
22   A   No, I don't think so.  I'm not sure all of
23   these different individuals were a member of that either.
24   So I don't know.  I don't know what he's talking about
25   when it's just a nondescript independent conservative

[Page 175]

1    group.
2    Q   So, looking at the beginning of the third
3    paragraph, Page 1 of this e-mail, --
4    A   Uh-huh.
5    Q   -- it says, "In view of our discussion on voter
6    ID and immigration, several of you mentioned you thought
7    that the two issues were one and the same."  Do you see
8    that?
9    A   I do.
10   Q   And does this help refresh your recollection as
11   to whether or not you engaged in communication regarding
12   voter ID legislation and immigration being one and the
13   same?
14   A   No.
15   Q   On Page 2, which is Bates-stamped TX 00009988 --
16   and I'm not sure if part of the Bates-stamp was cut off.
17   It also indicates that "Or at a minimum connected."
18       Does that help refresh your recollection
19   of whether or not you engaged in communications with
20   other senators related to photo ID legislation and it
21   being connected to immigration issues?
22   A   No.
23   Q   Do you have any recollection regarding photo ID
24   and immigration being an issue during the consideration of
25   SB 14?

[Page 176]

1    A   Well, you know, you just have to go to the
2    records and see if it was on the record.  You know, I
3    don't remember it being -- I don't remember whether or
4    not it was discussed in the debates on SB 14 in the
5    committee of the whole or otherwise.
6        This e-mail reflects that at some point
7    in time, Senator Patrick discussed it, but I don't know,
8    you know, whether it was a part of a larger meeting.  My
9    sense is that this was a micro -- a topic that was
10   brought up in conjunction with a number of policy
11   issues, not related to voter ID, not related to any sort
12   of issue relating to election politics, but related to
13   other policy issues that we get involved in.
14   Q   And just so I'm clear, and I want the record to
15   be clear that in the exhibit that you're now reviewing,
16   it says, "In view of our discussion" -- and you've
17   identified that this is an e-mail that is at least
18   addressed to you -- "on our voter ID and immigration,
19   several of you mentioned you thought that the two issues
20   were one and the same."
21       Do you have a belief that immigration and
22   photo ID are one and the same?
23       MR. SWEETEN:  You're asking him if he
24   believes that?  Is that what you're saying?
25       MR. GEAR:  That's correct.

[Page 177]

1        MR. SWEETEN:  Okay.
2    A   You know, I take a -- you know, I don't really
3    know the answer to that.
4        I think the best way that I can respond
5    to it:  I think that immigration really is an issue of
6    Federal concern, and I have long held that belief.
7        And so the only thing that I've ever --
8    the only thing that I believe is the State's appropriate
9    role in immigration is with regard to protecting the
10   border, as we have done on -- against drug cartels and
11   those sorts of criminal violations of the border.
12   It's not -- Immigration is a Federal issue, and I don't
13   see necessarily that either one of them -- that voter ID
14   is connected.
15       I told you earlier the policy reason that
16   compelled me to support voter ID is the notion of voter
17   harvesting, and I do believe that that -- or voter
18   registration card harvesting -- I do believe that that
19   occurs, and I do believe that there is abuse of the old
20   current system because of the lack of ability to verify
21   whether or not the voter presenting the card is the
22   authentic voter, and the room for abuse that that lends
23   itself to.
24       Immigration was never a part of my
25   consideration with regard to voter ID.

CONFIDENTIAL

## [Page 178]

1   Q   And based on the e-mail, is it fair to say that
2   immigration was a part of at least some of the senators'
3   consideration as it relates to photo ID legislation?
4   A   The only thing, I think, that you can draw
5   conclusively from this is that at least the senators --
6   one senator -- I don't know.  I can't tell you whether
7   that verifies that other senators agreed with him or not.
8   It's only what he says.
9   Q   Continuing to focus on this document, it says,
10  as to the discussion at breakfast about the independent
11  conservative group, "I thought the idea suggested by
12  Fraser, Duncan" -- I'm having trouble with that name -- is
13  it Eltife --
14  A   Estes, Estes.
15  Q   -- "and Huffman and others and accepted by me
16  will only make the group stronger."
17      What ideas were suggested during the
18  breakfast, if you know?
19  A   I have no idea.  I don't recall that
20  discussion.
21  Q   Do you recall any communications from
22  constituents who supported SB 14 that expressed a belief
23  that voter ID legislation would prevent illegal immigrant
24  from voting at the polls?  And I'm referencing
25  specifically SB 14.

## [Page 179]

1   A   Would you repeat that?
2   Q   Do you recall any communications from
3   constituents who supported SB 14 that expressed a belief
4   or opinion that voter ID legislation would prevent illegal
5   immigrants from voting at the polls?
6   A   Not particularly -- Well, not -- No, I don't.
7   Q   Do you recall specifying any written
8   communications related to that issue?
9   A   I don't recall.  We may have.  I don't see all
10  of the written communications that we have.
11  Q   Do you recall responding to any communications
12  related to that issue?
13  A   I do not.  I'm not saying we didn't respond,
14  but I'm saying I do not remember it.  We may have.  I
15  don't know.
16  Q   Do you recall having any communications from any
17  interest groups who supported SB 14 that expressed a
18  belief or opinion that voter ID legislation would prevent
19  illegal immigrants from voting at the polls?
20  A   Sitting here today, I don't have any
21  recollection of that.
22  Q   Prior to the filing of SB 14, were you or your
23  staff involved in any communications regarding the types
24  of ID that would be included in the provisions of SB 14?
25      MR. SWEETEN:  Objection; legislative

## [Page 180]

1   privilege.
2   A   I don't believe that I was.  I do not know
3   whether or not my staff was.
4   Q   (By Mr. Gear:)  Were you aware that Senator
5   Fraser's original bill was numbered as SB 178 and later
6   refiled to identify it as SB 14?  Were you aware of that?
7   A   I don't recall being aware of that.
8   Q   Do you recall any communications related to the
9   refiling of SB 178?
10  A   No, I do not.
11  Q   Would you agree that SB 14 is a stricter bill
12  than HB 218 and SB 362?
13      MR. SWEETEN:  Objection; legislative
14  privilege.
15  A   What do you mean by "strict"?
16  Q   (By Mr. Gear:)  What I mean by "strict" is that
17  HB 218 and SB 362 would have allowed for government-issued
18  photo IDs, as well as student photo IDs issued by state
19  institutions.  SB 14 does not, correct?
20  A   I agree that SB 14 does not provide some of the
21  non-photo ID exceptions that 362 or 218 did.
22  Q   Well, does SB 14 provide any non-photo ID
23  exceptions?
24  A   I don't think it -- I think it -- I don't think
25  it does.  I don't think it does.

## [Page 181]

1   Q   So would you agree that SB 14 is a stricter bill
2   than HB 218 and SB 362?
3      MR. SWEETEN:  Objection; privilege.
4   A   I do not know if strict applies.  It's
5   different, and it's more confined to require -- committed
6   to the notion that photo ID should be required, as
7   opposed to other alternative forms.
8      (Duncan Deposition Exhibit Number RD-17
9   marked.)
10  Q   (By Mr. Gear:)  I'm showing you what has been
11  marked as SB 14.  Do you recognize this as the bill, SB
12  14?
13  A   (Witness reviewing document.)  Sure, yes.
14      MR. GEAR:  And for the record, this was
15  previously marked as Duncan Exhibit 530.
16  Q   (By Mr. Gear:)  And turning your attention to
17  the last page of SB 14, do you see that it has been signed
18  by the Governor?
19  A   I do.
20  Q   And what would that indicate, as far as the
21  status of the bill?
22  A   Passed.
23  Q   So this would be the final bill related to
24  SB 14?
25  A   Yes, sir.

877-479-2484          US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

**[Page 182]**

1    Q    Turning your attention to Page 9, Section
2    63.0101, "Documentation of proof of identification," I
3    just want to walk through these quickly with you.
4         Do you agree, based on the final -- based
5    on this exhibit, that SB 14 allowed for a driver's
6    license, election identification certificate, or personal
7    identification card issued to the person by the
8    Department of Public Safety that has not expired or that
9    expired no earlier than 60 days before the date of
10   presentation?
11   A    Yes, sir.
12   Q    Do you agree that SB 14 allows for a United
13   States military identification card that contains the
14   person's photograph that has not expired or that expired
15   no earlier than 60 days before the date of presentation?
16   A    Yes, I agree that that's a part of the bill.
17   Q    Do you agree that SB 14 allows for United States
18   citizenship certificates issued to the person that
19   contains the person's photograph?
20   A    Yes.
21   Q    It also allows for the United States -- for a
22   United States passport issued to the person that has not
23   expired or that expired no earlier than 60 days before the
24   date of the presentation, correct?
25   A    That's correct.

**[Page 183]**

1    Q    And it allows for a license to carry a concealed
2    handgun issued to the person by the Department of Public
3    Safety that has not expired or that expired no earlier
4    than 60 days before the date of presentation, correct?
5    A    Correct.
6    Q    Does it allow for any other type of photo
7    identification based on your review of this bill?
8    A    Well, let me read a little more here.
9    (Witness reviewing document.)
10        There are other exceptions that are
11   included in Section 17 of the bill, but --
12   Q    And what are those?  Are you referencing the
13   exemptions?
14   A    Right.  Exemptions with regard to provisional
15   ballotS.
16   Q    So my question was:  Under SB 14, are there any
17   other acceptable forms of photo ID that are allowed?
18   A    Well, that and the ones that are in 17, the
19   provisions for the provisional ballot.
20   Q    And that's the process by which a voter
21   provisionally can cure within a 60-day period?
22   A    Right.
23   Q    And does that process, the six-day cure period,
24   allow a voter to present anything other than the types of
25   ID that we've just described in SB 14?

**[Page 184]**

1    A    I think there's one narrow exception with
2    regard to the --
3    Q    Religious exemptions?
4    A    Maybe the religious exemptions.  I'm not -- I
5    don't know if that's -- I'm thinking more about the --
6    let me read the exemptions.
7    Q    Sure.
8    A    (Witness reviewing document.)  Religious
9    objections being photograph exemptions.  There is the
10   exemption for the person who lost their identification as
11   a result of a natural disaster.  Those are two of the
12   exemptions.
13   Q    There's also a disability exemption, correct?
14   A    I think you're right.  There is one.  I
15   remember us discussing that.
16   Q    But those aren't specifically photo ID -- those
17   are exemptions, correct?
18   A    Well, they're exceptions to the required photo
19   ID.
20   Q    Fair enough.  Can you identify any facts that
21   support why forms of non-photo IDs are exceptional options
22   in 2009, but not acceptable options in 2011 under SB 14?
23        MR. SWEETEN:  Objection; legislative
24   privilege.
25   A    Not as we sit here today.

**[Page 185]**

1    Q    (By Mr. Gear:)  Can you identify any facts to
2    support why all State and Federal Government photo IDs
3    were acceptable in 2009, under SB 362, but not in 2011,
4    during the consideration of SB 14?
5         MR. SWEETEN:  Objection; legislative
6    privilege.
7    A    Not as we sit here today.  The record may
8    reflect some discussion of that.
9    Q    (By Mr. Gear:)  Can you identify any facts to
10   support why all State and Federal Government photo IDs
11   were acceptable in 2009, under SB 362, but not in 2011,
12   during the consideration of SB 14?
13        MR. SWEETEN:  Objection to foundation; and
14   objection, legislative privilege.
15   Q    (By Mr. Gear:)  Well then, if you're not -- if
16   you don't understand my question, we can go back to --
17   A    No.  I understand it.  I just understand the
18   foundation objection, too, and agree with it.
19        But the question that you've asked me is
20   today, as we sit here today.  I don't have any
21   independent recollection of any specific facts that were
22   forwarded by the author or the primary author of the
23   bill for that -- for removing those different options.
24        The record does reflect discussion of
25   that, and I would refer you to the record.  I think it

877-479-2484          US LEGAL SUPPORT, INC.     www.uslegalsupport.com

CONFIDENTIAL

**[Page 186]**

1  does.  If I remember correctly, there was some debate
2  about that.  I don't remember specifically what the
3  debate was, but I do recall that there was discussion
4  about that at the committee of the whole level and
5  perhaps at the -- I can't remember if there was a
6  significant debate when the bill was laid out on the
7  floor as a vote for endorsement.
8      Q  And I want to be clear.  My question was:  Can
9  you identify any facts to support why all State and
10  Federal Government photo IDs were acceptable in 2009,
11  under SB 362, but not in 2011, during the consideration of
12  SB 14?
13         And I believe you've stated that you
14  understood my question to ask:  As you sit here today?
15      A  Right.
16      Q  But it was:  Can you identify any facts?
17         MR. SWEETEN:  Objection; legislative
18  privilege.
19      A  The facts that I would identify would be those
20  facts stated in the record.
21      Q  (By Mr. Gear:)  But, as you sit here today,
22  you're not aware of what the facts stated in the record
23  are related to this issue?
24      A  As I'm sitting here --
25         MR. SWEETEN:  Same objection.

**[Page 187]**

1      A  As I'm sitting here today, I'm not prepared to
2  articulate the facts, because I don't recall exactly
3  what -- I don't recall the specific reasons for removing
4  those issues.
5         I do recall them being discussed and
6  debated on the Senate floor at the committee of the
7  whole or on the second reading of the bill.
8      Q  (By Mr. Gear:)  Were you involved -- Were you or
9  your staff involved in communications related to excluding
10  State and Federal IDs from SB 14?
11      A  I don't believe I was.  I don't know if my
12  staff was or not.  "My staff" meaning the committee staff
13  or my internal staff, either one.
14      Q  Between 2009 and 2011, are you aware of any
15  facts that support that a Texas voter was prosecuted for
16  voter impersonation while using a State or Federal
17  Government photo ID?
18      A  I think we've discussed that at length before.
19  I think there's some information in the record.  I don't
20  know if this was for 362.  I think there was information
21  in the record from 2006.  I don't know if there was for
22  218 or 362 or 14.
23         I know there's some record.  There's some
24  information in the record that people were prosecuted
25  for voter fraud, and I don't think that the -- at least

**[Page 188]**

1  I did not delineate what type of voter fraud.  I don't
2  know that the records that we have before us indicate
3  exactly the nature of the fraud or infraction that was
4  alleged.
5      Q  Just so I'm clear, as you sit here today, you
6  can't delineate what type of fraud may have been testified
7  to --
8      A  That's right.
9      Q  -- related to photo ID legislation anyway?
10     A  Correct.
11     Q  Related to SB 14, are you aware of any reports
12  that were prepared for the Senate to assist the
13  Legislature in understanding the impact of SB 14 on
14  minority voters?
15         MR. SWEETEN:  Objection; legislative
16  privilege.
17     A  I think, again, I would answer with regard to
18  the record, and I do recall we did bring forward the
19  record on Senate Bill 362 and made it a part of the
20  record for Senate Bill 14.
21         So all of that information that was
22  developed in 2009 and then the additional information
23  and testimony that was developed and the evidence that
24  was developed in 2011 were available to the members in
25  their deliberations on Senate Bill 14.

**[Page 189]**

1      Q  (By Mr. Gear:)  And are you aware of any facts
2  in either the record of SB 362 or SB 14 that would --
3      A  No.
4      Q  -- support that those photo ID legislations
5  could not have an impact on minority voters?
6      A  As I --
7         MR. SWEETEN:  Same objection.
8      A  As we sit here today, I can't point to you any
9  specific facts.  I do believe the record supports the --
10  or provides information in regard to the facts that
11  you're requesting.
12     Q  (By Mr. Gear:)  Do you have any facts to support
13  why student IDs were excluded from SB 14?
14     A  I think we've discussed that.  No.
15         MR. SWEETEN:  I object to legislative
16  privilege on that question.
17     Q  (By Mr. Gear:)  Are you aware of any incident or
18  fact that occurred between 2009 and 2011 that would
19  have -- that would support the need to remove student IDs
20  from SB 14?
21     A  No, I'm not.  I'm getting closer to the --
22         MR. GEAR:  Now is a good time to take a
23  break.
24         (Short break taken.)
25         MR. GEAR:  Let's go back on the record.

**CONFIDENTIAL**

---

[Page 190]

1    Q   (By Mr. Gear:)  I believe we've talked about
2   this, so I'm just going to touch on it briefly.
3           SB 14 was referred to the committee of the
4   whole, correct?
5    A   Yes, sir.
6    Q   And was that done by special order or
7   resolution?
8    A   I believe it was done by motion to resolve by
9   the committee as a whole.  I don't know if that was a
10  motion in writing or just an oral motion.
11   Q   Do you recall Resolution 36, by any chance?
12   A   That may have been the writing or the -- I
13  think you probably have to do that by resolution, now
14  that I think about it.
15   Q   Do you recall Senator Van de Putte objecting to
16  that resolution?
17   A   I don't -- I'm sure she did.  I don't know.  I
18  don't recall.  I don't recall the debate, but I know
19  she's -- she was vocal on that issue.
20   Q   And as we have gone through the testimony,
21  Senator Van de Putte, it appears, was consistent in her
22  objection to photo ID legislation, correct?
23   A   Exactly.
24   Q   And, in fact, it appears that in our discussion
25  of HB 218, SB 362, and now SB 14 that she raised the

---

[Page 191]

1   concern that photo ID legislation may have a
2   disenfranchising impact on minority voters, correct?
3    A   You know, I would let the record characterize
4   her debate or her objection.
5    Q   Fair enough.
6    A   I would refer to that.
7    Q   And so, thinking about photo ID legislation, in
8   total, again, we didn't speak much about it, but SB 1706,
9   HB 218, HB -- SB 362, and SB 14 -- are you aware of any
10  reports that were prepared to assist the Senate in
11  identifying whether or not photo ID legislation would have
12  an impact on minority voters?
13   A   Well, I think the interim community report that
14  we did, in 2006, was a pretty fair analysis of the issue,
15  with resources for members to be able to begin their
16  research.  It wasn't certainly exhaustive, but I think
17  there was -- an effort was made to provide resources for
18  people to review, and, again, the hearing process that we
19  designed for the committee as a whole.
20           And, for example, in 218, we were at the
21  end of a legislative session when we heard that House
22  bill, and so there was really little or no time to
23  develop anything, other than what the House had
24  developed, probably, the way the legislative process
25  works.

---

[Page 192]

1           The committee of the whole process did
2   allow us, in 2009, to allow for expert testimony and lay
3   testimony before the entire Senate assembled, as the
4   committee of the whole, to provide a normal legislative
5   analysis, where members hear evidence, they deliberate
6   on the evidence, they individually weigh the evidence,
7   and make their decision, and that --
8    Q   So that --
9    A   That's how the legislative process works.  And
10  so I believe that the committee of the whole process
11  actually was a complement to allowing more -- or allowing
12  for a more in-depth deliberation on the issue and allowed
13  all members to input evidence into the record, or to the
14  body, to make compelling arguments for their side,
15  whichever -- whether they were an opponent or a proponent
16  of the legislation.
17   Q   So, specifically, other than the 2006 interim
18  report, were there any reports prepared by the committee
19  of the whole or the State Affairs Committee or -- I'm
20  sorry.  That's compound.  I will withdraw the question.
21   A   Okay.
22   Q   Other than the 2006 interim report, are you
23  aware of any other reports that were prepared to assist
24  the Senate in identifying whether or not SB 14 would have
25  a --

---

[Page 193]

1           MR. GEAR:  Strike that.  It's getting
2   late.
3    Q   (By Mr. Gear:)  Other than the 2006 interim
4   report, are you aware of any other reports that were
5   prepared to assist senators in understanding the impact of
6   photo ID legislative on minority voters?
7    A   I don't know if we did an interim report in two
8   thousand -- between the -- prior to the 2009 legislation
9   or not.
10   Q   You're not aware of it, as you sit here today?
11   A   I don't remember.  That's all I can say on
12  that.  But I'm not -- other than the 2006, you know, I
13  don't have a specific memory of any other reports that
14  were generated by the Senate, other than the data
15  analysis and evidence that we received from witnesses
16  testifying for and against the bills in the various
17  committees of the whole hearings or the committee of the
18  whole hearings.
19           (Duncan Deposition Exhibit Number RD-18
20  marked.)
21   Q   (By Mr. Gear:)  I'm going to show you what has
22  been marked as RD-18.  I will give you a chance to take a
23  look at that.
24   A   (Witness reviewing document.)
25           MR. SWEETEN:  Can I see a copy of that?

---

CONFIDENTIAL

## [Page 194]

1    MR. GEAR:  Yes.

2    MR. SWEETEN:  Thank you, sir.

3    MR. GEAR:  For the record, RD-18 is

4  identified as highly confidential.  It was produced by

5  Texas as TX 00021328.

6    Q   (By Mr. Gear:)  Can you identify what this --

7  the first page of this document is, please?

8    A   It's an e-mail from Bryan Hebert dated

9  January 27th.

10    Q   To Jennifer Fagan?

11    A   To Jonathan Stinson, Ryan LaRue, Amanda

12  Montagne, Wroe Jackson, Janice McCoy, and Jennifer Fagan.

13    Q   And just so I know, who is Jonathan Stinson, if

14  you know?

15    A   I don't know.

16    Q   Do you know who Ryan LaRue is?

17    A   No.

18    Q   Do you know who Amanda Montagne is?

19    A   No.

20    Q   Is that Wroe Jackson?

21    A   That's what it looks like.

22    Q   Do you know who Wroe Jackson is?

23    A   No.

24    Q   Janice McCoy?

25    A   I think Janice may be -- and I'm not -- maybe a

## [Page 195]

1  staff person for Senator Fraser.

2    Q   And you obviously know who Jennifer Fagan is.

3    A   Yes.

4    Q   She's your staff person.  And this is entitled:

5  "SB 14 floor amendments."

6    A   Yes.

7    Q   Do you see that?  The body of the e-mail

8  identifies -- or it indicates that "Attached is a summary

9  of all the SB 14 amendments (I used a list from the

10  Houston Chronicle, corrected it and cleaned it up), 41

11  amendments were proposed and nine were adopted -- eight of

12  which were sponsored or cosponsored by Democrats.  So I'd

13  say they had significant input into the bill."  Do you see

14  that?

15    A   Yes, sir.

16    Q   It also indicates that "I'm working on a summary

17  of the substantive provisions of the bill (i.e., 'What the

18  hell did we just pass?')"  Do you see that?

19    A   Yes.

20    Q   Have you seen this document before?

21    A   No, sir.

22    Q   Did you see the document that follows up on this

23  particular e-mail?

24    MR. GEAR:  I'm sorry.  I'll strike that.

25    Q   (By Mr. Gear:)  If you haven't seen it, then you

## [Page 196]

1  wouldn't know what follows up.

2    But let's turn to Page 2, which was

3  also -- which is also identified as highly confidential,

4  TX 00021329.  And I would just ask you to identify this

5  document for me.

6    A   It appears to be a list that somebody has

7  prepared related to amendments that were offered on

8  Senate Bill 14.

9    Q   And you were present during the offering of

10  amendments on Senate Bill 14?

11    A   Yes.  I don't know -- these are floor

12  amendments, so I assume that this is not -- these are not

13  amendments that were offered at that time at the

14  committee level.

15    Q   So let's talk about the floor amendments for a

16  minute -- for a minute.  I'm sorry.

17    Number 12, Wendy Davis -- I assume "W.

18  Davis" is Wendy Davis --

19    A   Yes.

20    Q   -- "would provide for a free state ID to those

21  who ask."  Do you see how that particular amendment was

22  handled?

23    A   Number 12?

24    Q   Yes.

25    A   It was tabled.

## [Page 197]

1    Q   And it was tabled by a vote of 19 to 12?

2    A   Yes, sir.

3    Q   Do you believe that if SB 14 included a

4  provision that would have provided free -- for free state

5  IDs to those who asked, it would have assisted in

6  minimizing the impact to minority voters?

7    A   I may be wrong on this, but I believe we did

8  appropriate, and we did provide those IDs.

9    Q   And I believe SB 14 provides for EICs, correct,

10  election identification certificates?

11    A   Right.  I guess that's -- I'm not --

12  technically, I can't remember exactly, but I do remember

13  conceptually that we -- that, you know, we appropriated

14  money to do that, and I know the bill provided -- the

15  bill authorized the expenditure, and we appropriated

16  that.

17    Q   And I guess I was interpreting her amendment --

18    A   That's my recollection.

19    Q   I was interpreting her amendment to at least

20  request a consideration that free Texas state IDs were

21  provided to those who asked, and SB 14 did not do that,

22  correct?

23    A   I haven't correlated that.  So I can't answer

24  that accurately, other than I believe we did provide

25  authority and appropriations to provide identification --

CONFIDENTIAL

**[Page 198]**

1  free identification sufficient to satisfy the
2  requirements of Senate Bill 14.
3      Q   Number 13 --
4      A   But correct me if I'm wrong.  I'm pretty sure
5  we did, though.
6      Q   And, again, I'll take your interpretation of
7  this amendment --
8      A   Sure.
9      Q   -- as referencing election identification
10  certificates, correct?
11      A   Seeing it for the first time today, I'll go --
12  I'm fine with understanding that.
13      Q   Number 13, "Wendy Davis, would allow for the use
14  of expired IDs."
15          And do you see how that particular
16  amendment was handled --
17      A   It was tabled.
18      Q   -- in the Senate?
19      A   It was tabled.
20      Q   And it was tabled by a vote of 19 to 11?
21      A   Yes.
22      Q   And if SB 14 would have allowed for the use of
23  expired IDs without limitation, do you believe that that
24  may have had a positive impact on avoiding
25  disenfranchisement of minority voters?

**[Page 199]**

1      A   I don't see how it would.  I would disagree
2  with that statement.
3      Q   Do you believe it would be easier for --
4      MR. GEAR:  Strike that.
5      Q   (By Mr. Gear:)  Are you aware of the number of
6  registered voters in the State of Texas, during the
7  consideration of SB 14, that lacked either a state ID or a
8  Texas driver's license?  And that's a Texas state ID.
9      A   I do not know the -- I don't recall that there
10  was accurate testimony on that.
11      Q   And I'm sorry.  You don't --
12      A   I do not recall that there was any evidence on
13  that, but there may have been.  I don't recall it.  If
14  there was, it was certainly an estimate.
15      Q   And if you don't recall the testimony, you don't
16  recall if it was an estimate or an accurate projection?
17      A   Well, the record would reflect that.
18      Q   Turning your attention to Number 20, which was
19  offered by Senator West, he offered to use a Medicare card
20  as a form of identification.
21          If that particular amendment would have
22  been included in SB 14, would you have supported it?
23      A   I probably would have supported the amendment.
24  I mean, you know, it's not -- I think, to get a Medicare
25  card, you probably have to -- I imagine you may have to

**[Page 200]**

1  submit an ID.  I don't know.
2          But I would -- we're arguing policy here.
3  Again, it's hypothetical, or at least it didn't pass.
4  But bottom line is:  I think, on a Medicare card, it
5  would be like any other benefit.  You would have to show
6  some sort of ID to be able to qualify or meet the
7  various Federal qualifications for Medicare.
8      Q   And you would have supported it if it was
9  included in SB 14?
10      A   Sure, yes.
11      Q   And do you see how that particular amendment was
12  handled in the Senate?
13      A   It was tabled.
14      A   And it was tabled by a vote of --
15      A   Nineteen to 11.
16      Q   Number 21, an amendment offered by Wendy Davis,
17  would have allowed any photo ID issued by the Federal
18  Government, subentity of Texas, or higher education
19  amendments -- I'm sorry.  I didn't read that right.  I did
20  read it right.
21      MR. GEAR:  Strike that.
22      Q   (By Mr. Gear:)  21 would have allowed any photo
23  ID issued by the Federal Government, sub-Texas --
24  subentity of Texas, or higher education.
25          And I believe your prior testimony is that

**[Page 201]**

1  if it was included in SB 14, you would have supported
2  such provisions, correct?
3      A   I would have voted -- I would not have -- I
4  would have supported the bill with that provision.
5      Q   Turning your attention to Number 30, an
6  amendment offered by Senator Ellis would have required the
7  Secretary of State to examine whether or not the bill has
8  an adverse effect on district population groups.  Do you
9  see that?
10      A   Yes.
11      Q   And based on your prior testimony and our
12  discussion regarding concerns that SB 14 and other photo
13  ID legislation would have a disenfranchising impact on
14  minority voters, do you believe that if included in SB 14,
15  this might have minimized some of those concerns or
16  mitigated some of those concerns?
17      A   I don't know the answer to that.  It would be
18  pure speculation on my part.
19      Q   Well, if the Secretary of State were allowed to
20  examine whether or not the bill had an adverse impact on
21  district population groups, do you believe -- do you have
22  any opinion as to whether or not that would have resolved
23  some of the concerns expressed during consideration of the
24  photo ID legislation?
25      MR. SWEETEN:  Objection to speculation,

CONFIDENTIAL

**[Page 202]**

1  asked and answered; objection, legislative privilege.  Go
2  ahead.
3      A   The Secretary of State does not have resources,
4  the expertise, or the jurisdiction to make, in my view,
5  that type of judicial determination.  So I just don't see
6  that that would have improved the bill or at least made
7  the bill -- I don't see where that would have a positive
8  impact with regard to affecting or improving the bill.
9          The Secretary of State's office typically
10  does not make those types of determinations on behalf of
11  the State of Texas.
12      Q   And do you see how this particular amendment was
13  handled?
14      A   It was tabled.
15      Q   And it was tabled by a vote of --
16      A   Nineteen to 11.
17      Q   Number 39 was an amendment offered by you,
18  Senator Davis, Senator Ogden, and Senator Patrick,
19  correct?
20      A   Correct.
21      Q   And that amendment would have allowed for the
22  exemption from photo ID for indigent and religious
23  objections -- objectors.  And do you see that that was
24  passed by a vote of 30 to zero?
25      A   Yes.

**[Page 203]**

1      Q   And in reviewing SB 14, the signed version of
2  the bill, is it fair to say that the exemption from photo
3  ID for indigent voters is no longer included in the
4  provisions of SB 14?
5      A   That's a fair statement.
6      Q   It was passed by a vote of 30 to zero.  Can you
7  tell me where that particular provision was removed from
8  your consideration of SB 14?
9      A   Generally, it appears that it was removed
10  during the deliberations in the House.
11      Q   If SB 14 would have included an exemption from
12  photo IDs for indigent voters, would you have supported
13  it?
14      A   Yes.
15      Q   And, in fact, you did support it?
16      A   Yes.
17      Q   And, in fact, the Senate supported it
18  unanimously by a vote of 30 to zero, correct?
19      A   That's correct.
20      Q   And why do you think that --
21          MR. GEAR:  Strike that.
22      Q   (By Mr. Gear:)  Can you identify the facts for
23  me of why you believed that the exemption from photo ID
24  for indigent voters was important to be included in the
25  provisions of SB 14?

**[Page 204]**

1          MR. SWEETEN:  Objection; legislative
2  privilege.  You can answer.
3      A   Well, there were several issues that were
4  raised with regard to the indigencies, and in addition to
5  the fact that that provision was also included in the
6  Indiana law, and I thought that it would be an
7  appropriate measure to be included in this bill.
8          Senator Davis originally had an
9  amendment.  I don't think the amendment was -- I can't
10  remember why I thought there was a flaw in it, but she
11  and I worked on it, I made a change in it, and we agreed
12  to go with it, as other members did, too.
13          But, primarily, because it tracked the
14  Indiana law, we felt like that was -- or at least I felt
15  like -- I can't speak for everybody but myself, but I
16  felt like that was a provision in the Indiana law that
17  was appropriate, and I didn't have any objections to
18  that.
19      Q   And, in fact, it appears, based on a vote of 30
20  to zero, that none of the senators in the House had an
21  objection to that.  In fact, they supported that?
22      A   None of the senators in the Senate.
23      Q   The Senate.  Thank you.  And the exemption that
24  you drafted, was that similar to the exemption from photo
25  IDs for indigent voters in the Indiana law?

**[Page 205]**

1      A   Yes, sir.
2      Q   And did you have any communications with the
3  House, during their considerations of SB 14, regarding
4  leaving that particular exemption in SB 14?
5      A   No, I did not.  I did -- I was on the finance
6  committee, and we started working on the budget.
7      Q   Would you have preferred that that particular
8  exemption had been left in SB 14?
9      A   Well I offered it, and so -- I offered it.
10      Q   I'm sorry?  You --
11      A   I offered it as an amendment.
12      Q   Okay.  And so the answer is "yes"?
13      A   Well, I would -- I was fine with that being in
14  there.
15      Q   Okay.  Are you aware of any discussion from the
16  Secretary of State's office regarding the exemption from
17  photo IDs for indigent voters?  Was there any concern
18  expressed by the Secretary of State's office?
19      A   Not that I'm aware of.
20      Q   Was there any concern that you're aware of that
21  was expressed by the Texas Attorney General's Office
22  related to that particular exemption?
23      A   No.
24      Q   Do you know what the concern was that was
25  expressed in the House related to that particular

CONFIDENTIAL

---

**[Page 206]**

1    exemption?
2         A   No.  I haven't gone back and looked at that.
3         Q   Did you know, in 2011, what that concern was?
4         A   No.
5              MR. GEAR:  If you could give me a
6    five-minute break, --
7              MR. SWEETEN:  Sure.
8              MR. GEAR:  -- I may be passing the
9    witness.
10             MR. SWEETEN:  Okay.  Great.
11             (Short break taken.)
12             MR. GEAR:  I'll pass the witness.
13             MR. DUNCAN:  I'll never pass up a chance
14   to take a break.
15             (Short break taken.)
16                  EXAMINATION
17   BY MR. ROSS:
18        Q   Good afternoon, Mr. Duncan -- or Senator Duncan.
19   Excuse me.
20             I'm Deuel Ross.  I'm the attorney
21   representing the Plaintiff-Intervenors, Texas League of
22   Young Voters, and the individual Plaintiff, Imani Clark,
23   Plaintiff -- Plaintiff-Intervenor.  Excuse me.
24             I'm going to ask you a couple of follow-up
25   questions based on what Mr. Gear has already asked you

---

**[Page 207]**

1    this morning, as well as maybe go back over a couple of
2    things just, you know, to make sure we've exhausted
3    everything.
4              Just starting with SB 14, are you aware
5    that it was designated an emergency legislation?
6         A   Yes.
7         Q   Okay.  Do you know who designated it so?
8         A   Only the Governor can designate that.
9         Q   Okay.  Do you have a sense of why he did that?
10        A   You would have to read his proclamation.
11        Q   Okay.  What's your -- you don't have an
12   understanding of his reason?
13        A   It's speculation.  I'm not going to speculate
14   on what the Governor was thinking at the time he does
15   something.
16        Q   Do you know the process for designating
17   something as an emergency legislation?
18        A   I think he basically must have -- he enters
19   into a -- he just signs a proclamation, declaring
20   something an emergency and presents it --
21        Q   Okay.
22        A   -- to the presiding officers of both Houses.
23        Q   I want to introduce -- did you have any
24   communication with the Governor about designating it an
25   emergency legislation?

---

**[Page 208]**

1         A   No.
2         Q   No phone calls, e-mails?
3         A   Not that I recall.
4         Q   Just as an exhibit, I was making sure it gets in
5    there.  I'm sorry.  I'm going to mark this as --
6         A   The last one was RD-18.
7         Q   The last one was 18.
8         A   That's what I have.  I've tried to keep them in
9    order here.
10             (Duncan Deposition Exhibit Number RD-19
11   marked.)
12        Q   (By Mr. Ross:)  Okay.  Can you take a look at
13   that document for me?
14        A   (Witness reviewing document.)
15        Q   Are you familiar with this document?
16        A   No.
17        Q   Can you tell me who it was sent from?
18        A   This is from Julia Rathgeber on January 20th,
19   2011.
20             MR. SWEETEN:  Do you have another copy of
21   that?
22             MR. ROSS:  I gave it to you.  It's right
23   there.
24             MR. SWEETEN:  Oh, I have it.
25        Q   (By Mr. Ross:)  Sorry.  It was from who?

---

**[Page 209]**

1         A   Julia Rathgeber.
2         Q   Okay.  And that was January 20th, 2011?
3         A   Yes.
4         Q   To Jennifer Fagan?
5         A   Yes.
6         Q   Okay.  Can you take a look at the bottom of that
7    e-mail?
8         A   Yes.
9         Q   Do you see who that e-mail was from?
10        A   Blaine Brunson.
11        Q   Do you know who Blaine Brunson is?
12        A   He was on the executive staff for the
13   Lieutenant Governor.
14        Q   Do you see who it was to?
15        A   It was to Julie Rathgeber, Karina Davis, Josh
16   Robinson -- I don't know who that is -- Mike Walz,
17   Jennifer Fagan, Porter Wilson, and Janice McCoy,
18   "Subject:  Announcement."
19        Q   Do you know who Julia Rathgeber is?
20        A   She was a legislative director for
21   Lieutenant Governor Dewhurst.  She is now the Insurance
22   Commissioner.
23        Q   Karina Davis?
24        A   She was the parliamentarian for the Senate.
25        Q   You said you don't know who Josh Robinson was?

---

CONFIDENTIAL

**[Page 210]**

1    A   No.

2    Q   Mike Walz?

3    A   I don't know he is.

4    Q   And Jennifer Fagan worked in your office?

5    A   Yes.

6    Q   Porter Wilson?

7    A   He was in my office.

8    Q   And Janice McCoy?

9    A   She was -- I believe she was Senator Fraser's

10   staff member.

11   Q   Do you see the second line -- or excuse me --

12   the second paragraph at the bottom of that e-mail?

13   A   Yes.

14   Q   Can you read that for me?

15   A   "Met with Senator Duncan.  He will chair COW,"

16   which is the committee of the whole, "and asked Jennifer

17   to meet with Karina on a draft plan, and then for them to

18   come meet with him in a few hours."

19   Q   Do you know what -- can you tell me what "COW"

20   stands for?

21   A   Committee of the whole is what I'm assuming.

22   Q   Okay.  Do you know what draft plan they're

23   referring to?

24   A   No.  Other than, you know, I'm speculating, but

25   more likely than not, coming from Karina, it would be the

**[Page 211]**

1    same type of plan that we had in 2009 for the committee

2    of the whole.  We're talking logistics here.  We're not

3    talking about a bill.

4    Q   So, to your understanding, you're not talking

5    about the bill in this particular incident?

6    A   I would not have been talking about it with

7    Karina.  I would have been talking about -- Jennifer and

8    Karina were basically helping us to navigate the process

9    and make sure that we thought through all of the

10   logistics of the hearing of the committee of the whole.

11   Q   Okay.  This says Mr. Brunson met with you; is

12   that right?

13   A   Probably.

14   Q   Well, it says, "Met with Senator Duncan.  He

15   will chair the committee of the whole."

16   A   Right.  That's what I just -- I guess I was

17   advised by the Lieutenant Governor's office that there

18   would be a committee of the whole, and I would chair it.

19   Q   And it's your position that you didn't volunteer

20   for that; is that right?

21   A   Well, you know, being -- I don't know if I

22   volunteered for it or not.  I mean, it was -- it's just

23   part of the things I do in the Senate.  So, if they

24   wanted me to do it, I would be happy to.

25   Q   So the Lieutenant Governor asked you?

**[Page 212]**

1    A   Yes.  Well, his staff did, but I assume that he

2    asked them to ask me.

3    Q   Okay.  Do you recall that conversation --

4    A   No.

5    Q   -- in which they asked you?

6    A   No.

7    Q   Do you recall if there were any e-mails

8    exchanged other than that?

9    A   Other than this, I haven't seen any.

10   Q   Okay.  We can move up to the next line.

11   A   Move up?

12   Q   Yes.  It's the e-mail from Karina Davis.

13   A   Oh, yes.

14   Q   January 20th, 2011, at 12:27.

15   A   Yes, sir.

16   Q   Was that also sent to the same --

17   A   Same string of everyone, it says.

18   Q   Including Jennifer Fagan in your office?

19   A   Yes.

20   Q   Do you see where it says, "We have a potential

21   game plan"?

22   A   Yes.

23   Q   "And Jennifer is going to run it by Duncan and

24   circle back"?

25   A   Right.

**[Page 213]**

1    Q   Do you know what she was referring to there on a

2    potential game plan?

3    A   Coming from Karina Davis, the parliamentarian,

4    it would have been a game plan for the process and the

5    logistics of conducting a committee of the whole.

6    Q   Do you recall a conversation where the next line

7    says, "Jennifer is going to run it by Duncan and circle

8    back"?  Do you recall that conversation?

9    A   Jennifer and I had many, many conversations

10   about how to make this work smoothly, efficiently, and

11   correctly.  So I don't recall that specific conversation,

12   but I'm sure we had it.

13   Q   Okay.  And these were conversations about just

14   running the committee of the whole?

15   A   You know, there are a lot of things that you

16   do, just procedural steps and logistical steps of people

17   that are involved in that sort of an event.  So we

18   made -- there were -- this is a lot of planning --

19   Q   Yeah.

20   A   -- to make sure that each of the 31 members and

21   their staffs have the ability to have input into this

22   process.

23   Q   Okay.  So, moving right along, the line above

24   that, do you see an e-mail from Jennifer Fagan on

25   January 20th, 2011, at 1:41, --

CONFIDENTIAL

**[Page 214]**

1   A   Yes.
2   Q   -- to others on that previous string?
3   A   Yes.
4   Q   Okay.  It says, "Duncan wants to give Dewhurst a
5   call.  What's the best way to reach him in the next 20 to
6   30 minutes?"
7       Do you recall that conversation with him,
8   or did you, in fact, call Senator Dewhurst -- or
9   Lieutenant Governor Dewhurst?
10   A   I'm sure I did.
11   Q   Do you recall that conversation?
12   A   No, I don't.
13   Q   Okay.  Do you know whether it related to voter
14   ID?
15   A   Well, I assume that, since it's coming through
16   the string, it probably had to do with the process of
17   what we -- you know, the committee of the whole -- what
18   did he expect from the process and things like that.
19   Q   Okay.
20   A   So, more likely than not, that was the subject
21   of the conversation.
22   Q   Well, do you recall the specifics at all?
23   A   No, I don't.
24       MR. ROSS:  I'm going to be going to the
25   next one.

**[Page 215]**

1       COURT REPORTER:  20.
2       MR. ROSS:  This is 20.
3       (Duncan Deposition Exhibit Number RD-20
4   marked.)
5   Q   (By Mr. Ross:)  Okay.  Take a minute to look
6   at this document.  It's marked highly confidential.  It's
7   LEG 00005004.  Have you ever seen this document?
8   A   I saw it yesterday.
9   Q   Okay.  This was -- You saw it yesterday?
10   A   And I may have seen it before, because it went
11   to my staff members, and typically I would sign off on
12   something before I do that.
13   Q   Who is this e-mail from?
14   A   Megan LaVoie.
15   Q   Who is she?
16   A   She was a staff person on my Senate staff --
17   Q   Okay.
18   A   -- or for the committee staff.
19   Q   What was her role on the Senate staff?
20   A   At that time, she was generally in charge of
21   communications.  She was a law student.
22   Q   Okay.  This is from January 24th, 2011, at
23   11:25 a.m.  Had the committee of the whole occurred yet?
24   A   I don't think so.  I don't recall what date.
25   Q   Do you see the other people who this e-mail was

**[Page 216]**

1   to?
2   A   Yes.
3   Q   Can you read their names and tell me whether
4   you're familiar with them, please?
5   A   Do you want me to read them out loud?
6   Q   Yes.
7   A   Debby Hansard, she was my district director in
8   the Lubbock office; Janis McCutchin, she works as a
9   district employee in the Lubbock office; Jennifer Foster
10   was the district director in Childress; John Stokes was
11   the district director in San Angelo; and Sarah Clifton
12   was a -- at that time she was a district -- she was a
13   natural resource person, but also had a territory out of
14   the Lubbock district.
15       Most of these or all of these employees
16   were employees who interfaced on a daily and regular
17   basis with constituents in the district as opposed to in
18   the Austin Capitol office.
19   Q   Okay.  Can you read silently -- take a review of
20   this e-mail for just a moment?
21   A   (Witness reviewing document.)
22   Q   Well, can you read the subject of this e-mail?
23   A   I haven't finished reading the whole thing.
24   Q   Oh, sorry.
25   A   (Witness reviewing document.)  Okay.  I'm

**[Page 217]**

1   through.
2   Q   Can you read the subject of this e-mail just for
3   a minute?
4   A   "Subject:  Voter ID talking points."
5   Q   Okay.  Do you regularly have communications with
6   folks like Megan LaVoie who write talking points for you?
7   A   I think on different issues.  These are not my
8   talking points, though.
9   Q   Oh, okay.  Whose talking points are they?
10   A   These are -- This is information given to the
11   district staff to respond to who will be responding to
12   questions that may come in from constituents with regard
13   to a voter ID.
14   Q   Okay.
15   A   And so we do this typically with major
16   legislation that we carry, TRS reform, retirement system
17   reform, different issues with regard to the budget, to
18   make sure that the people in my big old district -- I
19   have 51 counties basically -- have information consistent
20   with where we are in Austin.
21       So we keep them up so that when they
22   interface with constituents in the district, that
23   they're getting correct information to the people in the
24   district.
25   Q   In case that a constituent might call in to one

877-479-2484        US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

## [Page 218]

1   of the district offices?

2        A   Right.

3        Q   Okay.

4        A   And our folks are very active in getting out in

5   the community, as opposed to just sitting in the office.

6   In fact, I don't like them to sit in the office.  I would

7   rather them be in the car and going to the different

8   counties and answering questions and being proactive, as

9   opposed to reactive.

10       Q   Okay.  Just a couple of quick questions as we've

11  gone on to that a little bit.

12           When you -- When someone calls your

13  office, a constituent calls your office, does your staff

14  generally keep a record of that?

15       A   It depends.  You know, we don't keep an exact

16  log.  I think there is a legislative service where you

17  can track calls if you want to.  But I think, on TRS

18  reform, we tracked them probably at that point in time.

19       Q   Okay.

20       A   And this, I don't know if we did or not.

21       Q   Okay.  If you did, do you know whether that

22  would have been produced to --

23       A   If we did, it would have been.

24       Q   Okay.

25       A   It would have been produced to the AG.

## [Page 219]

1        Q   Okay.  It would have been produced, and

2   presumably they would have produced it to the Plaintiffs?

3        A   It's out of my hands.

4        Q   Okay.  Great.  Going back to these talking

5   points quickly -- sorry.  I've missed my spot.

6            So it says that "Lieutenant Governor

7   Dewhurst asks Duncan to chair the committee of the whole

8   so the Senate can take up this issue this week.  Moving

9   voter ID this fast isn't Duncan's doing, although he

10  believes it is an important issue and will vote for it."

11           Can you explain why the voter ID

12  legislation was moving so fast?

13       A   Well, I'll give you some basics --

14       Q   Sure.

15       A   -- on it.  With regard to whenever an issue is

16  designated as an emergency by the Governor, then that

17  basically allows the Senate to take it up earlier in the

18  session.

19           The Constitution generally says that

20  you've got to wait 60 days before you can bring up a

21  bill without a suspension of two-thirds of the Senate or

22  four-fifths of the House.  So, by declaring legislation

23  an emergency, it simply allows you to bring the

24  legislation up earlier in the session.

25       Q   Okay.

## [Page 220]

1        A   So given -- 2011 was a fairly significant year.

2   I don't know if you recall in your state, but in our

3   state, we were facing a $27 billion short-fall.  We were

4   dealing with a lot of redistricting issues.  We were

5   dealing with a lot of different issues that were very

6   time-consuming.

7            And so moving legislation quickly was --

8   you know, it was an important priority for any bill, not

9   just this bill but any bill.

10       Q   Okay.  Well, it also says that you believe that

11  this was an important issue, right?

12       A   Yes, sir.

13       Q   And that's consistent with what you've just

14  said, right?

15       A   Yes, sir.

16       Q   Is the way in which this document describes your

17  role in the committee of the whole accurate?

18       A   And point me to what you're referring to,

19  please.

20       Q   Well, that Lieutenant Governor Dewhurst asked

21  you to chair the committee of the whole?

22       A   Yes, he did.

23       Q   And if you look at the next paragraph, "While

24  voter ID is a crucial issue, there are many major issues

25  the Legislature has to vote on this session, including

## [Page 221]

1   redistricting and the budget."

2        A   Yes, sir.

3        Q   Is that what you were just referring to?

4   "Resolving this well-debated issue at the beginning of the

5   session will help legislators turn their focus to those

6   major issues."

7        A   Yes, sir.

8        Q   If you look towards the third paragraph, at the

9   bottom, the last line, "If you are 70 or over, photo ID is

10  not required (this will be phased out; you have to be 70

11  when the law is enacted)."  Do you see that?

12       A   Yes.

13       Q   Why was the provision for voters over 70 going

14  to be phased out?

15       A   I don't know.

16           MR. SWEETEN:  I will just assert a

17  legislative privilege.  Go ahead, Senator.

18       A   I don't recall what that was about.

19       Q   (By Mr. Ross:)  Okay.  Do you recall whether

20  there was -- I mean, recall that SB 14 included an exemption

21  for people over 70?

22       A   I don't remember.  I would have to look, to be

23  accurate.

24       Q   Okay.  I'm going to show you -- oh, let me cover

25  this real quick.

**CONFIDENTIAL**

**[Page 222]**

1    There's also, at the bottom, the last
2  paragraph: "There will be education and notice of the
3  new law before the" -- is that before the bill takes
4  effect?
5    A   I guess so.
6    Q   Do you know whether that was included in the
7  final bill?
8    A   I think it was.
9    Q   Do you see, "As the bill is written now, the
10  first election using this new law will be the 2014 primary
11  election"?
12    MR. SWEETEN:  I think it's 2012.
13    MR. ROSS:  Oh, excuse me.  2012.  Yes.
14  I'm sorry.
15    A   That's what it says.
16    Q   (By Mr. Ross:)  Do you know if that provision
17  was ultimately included in the law?
18    A   Well, I think there were various delays that
19  occurred in the final implementation.  So I would assume
20  that that was the -- that was probably in the original
21  file version.  I don't know what ended up in the final
22  bill.
23    Q   I'll ask you a little bit --
24    A   I think that's what -- I believe that's what
25  started as the final bill.

**[Page 223]**

1    Q   I'll ask you a couple of questions about that.
2    MR. ROSS:  I want to mark RD-21.
3    (Duncan Deposition Exhibit Number RD-21
4  marked.)
5    Q   (By Mr. Ross:)  Have you seen this document
6  before?
7    A   I don't normally see them.  It's just a -- It's
8  the notice which is posted down in the -- it's the
9  official posting of a hearing of a committee, which, of
10  course, we would do every week for the State Affairs
11  Committee.
12    And so I didn't always -- I didn't see
13  these routinely.
14    Q   Okay.  And what is this notice of a public
15  hearing for?
16    A   This was the notice of the public hearing for
17  Senate Bill 14 relating to "the requirements to vote,
18  including presenting proof of identification, providing
19  criminal penalties."
20    Q   And can you tell me what time and date it was
21  set for?
22    A   The committee of the whole was scheduled for
23  1:30 p.m. on Monday, January 24th, 2011.
24    Q   And is that your understanding of when it took
25  place?

**[Page 224]**

1    A   Well, that's -- I don't recall any delays.  It
2  might not have started exactly at 1:30, but I believe it
3  started generally in that time frame.
4    Q   Great.  Do you see sort of in the middle of the
5  page, where it says, "The committee will hear invited
6  testimony only on SB 14"?
7    A   Yes.
8    Q   Do you recall whether you invited anyone to
9  testify at that hearing?
10    A   I don't know that I did or not.  I know usually
11  I rely on the author of the bill, but sometimes we would
12  do it on different bills.  I don't recall on this one
13  that we invited our committee-appointed experts.  No.
14    Q   Okay.  Do you remember who was invited to speak
15  at that committee?
16    A   The record would have to reflect that.
17    Q   Do you recall whether or not -- well, let's
18  start with this.
19    Have you ever heard of an organization
20  called "True the Vote"?
21    A   I have heard of them.
22    Q   What have you heard?  What do you know about
23  them?
24    A   I was asked about them in my last deposition,
25  and that's about as much as I know of that organization.

**[Page 225]**

1  It seems like maybe in later days, in the news, I think
2  I've seen them.  They may be involved in the income tax
3  issue that's going on in the Federal Government, denial
4  of 501.  I'm not sure if they are.  I think that's -- but
5  I do not know that individual -- that organization
6  generally.
7    Q   Have you heard of the King Street Patriots?
8    A   I have.
9    Q   What do you know about that organization?
10    A   Nothing other than they are a -- I would say an
11  organization -- a fairly -- a very conservative
12  organization.
13    Q   Okay.  Do you know whether -- Do you know who
14  Catherine Englebrecht is?
15    A   No.  I've heard of her name, but I don't know
16  her.
17    Q   Do you remember what you heard?
18    A   Relating to one of these committees.
19    Q   Okay.  She --
20    A   They may have testified at the first hearing a
21  long time ago.  I don't know.  I don't know for sure.
22    Q   You don't know whether or not they testified?
23    A   I just don't know them.  So it wouldn't be in
24  my memory bank, whether they testified or not, unless I
25  saw the name.

CONFIDENTIAL

**[Page 226]**

1    Q   Okay.  And it's your understanding that if they
2  did testify at the committee of the whole on SB 14, based
3  on this notice, it would have been by invitation?
4    A   If they did testify, I think so.
5    Q   Do you remember whether you heard from True the
6  Vote --
7    A   No, sir.
8    Q   -- in regards to SB 14?
9    A   I don't remember if I did or not.
10   Q   Do you remember if you heard from the King
11 Street Patriots?
12   A   I don't know.
13   Q   Do you remember hearing from any sort of
14 organization constituent about SB 14?
15   A   There were a lot of generally partisan
16 organizations that, you know, take interest in these
17 types of issues.  Anything involving elections, you're
18 going to have organizations that evolve around Republican
19 politics and organizations that revolve around Democratic
20 politics that take an interest in these types of
21 legislation, as they did in 2007 and 2009, and I assume
22 they did here at this time, too.
23   Q   Okay.  Great.  But are you aware of whether you
24 received any e-mails from True Vote?
25   A   I don't know.

**[Page 227]**

1    Q   Any letters?
2    A   I don't know.
3    Q   Phone calls?
4    A   They would be in the records.
5    Q   Okay.  Let me turn to --
6        MR. ROSS:  This is 21?
7        COURT REPORTER:  22.
8        MR. ROSS:  We're on a roll.
9        (Duncan Deposition Exhibit Number RD-22
10 marked.)
11   Q   (By Mr. Ross:)  Then I will hand you 22, if you
12 want to take that.  Are you familiar with this document?
13   A   I was at the time I received it.
14   Q   Can you take a look at the bottom of the
15 document, where it says -- from the one that's dated
16 January 21st, 2011, at 17:41.  So it was 5:41 p.m.
17   A   Are you talking about who signed it?
18   Q   No, no.  I'm actually looking on the cover page,
19 the e-mail.
20   A   Okay.
21   Q   Yes, sir.
22   A   Okay.  I'm sorry.
23   Q   It was from --
24   A   Leticia Van de Putte, Senator Van de Putte.
25   Q   To --

**[Page 228]**

1    A   To me -- no -- for Jennifer Fagan.  I'm sorry.
2    Q   Oh, at the bottom, it says to "opie," O-P-I-E?
3    A   That's me.
4    Q   That's you.  Okay.  And then we're turning to
5  the second page, and this is marked highly confidential.
6  It's Bates-stamped TX 00204742 to 44.  Can you tell me
7  what this is?
8    A   The one that begins with 743 --
9    Q   Yes.  743.
10   A   -- dated January 21st?  It's a letter from
11 Leticia Van de Putte to me.
12   Q   Okay.  And you're familiar with this document?
13   A   I was at the time.
14   Q   Okay.  Will you take a moment briefly to just
15 flip through it real quickly?
16   A   (Witness reviewing document.)
17   Q   Do you see --
18   A   I am not that fast.  (Witness reviewing
19 document.)  Okay.
20   Q   Okay.  Do you see the first paragraph, it says,
21 "I want to reiterate our deep concern for the timing of
22 the public hearing on voter ID legislation"?
23   A   Yes.
24   Q   Do you recall what her concerns were regarding
25 the timing of the public hearing on the voter ID

**[Page 229]**

1  legislation?
2    A   They were stated in the letter.
3    Q   And reviewing this letter now, do you know --
4  based on the letter and your memory, do you recall what
5  those concerns were?
6    A   I would just rely on the letter.
7    Q   So, I guess, if you look at the second
8  paragraph, where Senator Van de Putte says that
9  "Lieutenant Governor, fully aware that most, if not all,
10 of the senators had left town on Thursday (if not
11 Wednesday afternoon), waited until very late in the day
12 Thursday to deliver a letter to Senators, literally
13 slipping it under most office doors after hours," do you
14 recall that?
15   A   That's stated in the letter.  I don't know how
16 they delivered it.
17   Q   Okay.  But are you -- you're not familiar with
18 that having occurred?
19   A   I'm saying she stated that, and that I do not
20 know when they delivered letters to all 31 members.  So,
21 you know, I would -- I don't doubt that that's what
22 happened to her.  I don't know what happened to the other
23 members.
24   Q   Okay.  Do you recall that your earlier testimony
25 was that the purpose of the committee of the whole was so

CONFIDENTIAL

[Page 230]

1  that all members had an opportunity --
2      A   Right.
3      Q   -- to address this?  Is it fair to say, given
4  the concerns raised by Senator Van de Putte, that some
5  senators felt that they did not have enough time to
6  address the concerns around SB 14?
7      A   I think one of the things that we did -- and I
8  will say that Senator Van de Putte expressed that
9  concern.
10     Q   And are you -- you are aware that Senator Van de
11 Putte expressed that concern?
12     A   Right.  She sent me the letter.
13     Q   Okay.  And I guess, looking at the next
14 paragraph then, it says, "Please understand the stark
15 contrast to the previous session two years ago, when
16 Senators knew a month or more in advance that a full
17 hearing on this legislation would take place."
18         Does that reflect your recollection of
19 what happened in the previous session in the 2009?
20     A   Well, I thought we had a fairly robust hearing,
21 and at that time, there were also all sorts of -- a week
22 wasn't long enough, but typically our rules require we
23 post for 24 hours, and many times, that what we do at the
24 end of the session.  Especially in the beginning, maybe
25 we post -- you know, typically, generally, on the

[Page 231]

1  standing committee, we would post a little bit more than
2  that.
3          But this is not -- this time period is
4  not out of the ordinary for when we were going to post
5  the bill, but I think we also used the record from 2009,
6  and everyone agreed to make that a part of the record
7  for the 2013 hearing.
8      Q   Okay.
9      A   We had -- you know, I think there was a -- well,
10 that's all.
11     Q   Go ahead.
12     A   I think she said we had a candid discussion.
13 She and I did talk about these sorts of things.
14     Q   And do you recall that conversation?
15     A   No, but I have a good relationship with Senator
16 Van de Putte.  I have a lot of respect for her.
17     Q   Do you have any reason to believe that the
18 concerns that she expressed in the letter were inaccurate
19 or --
20     A   Well, I mean, they were her concerns.  I'm not
21 going to challenge her belief, just like I'm sure she
22 wouldn't challenge mine, but I think, I mean, it's
23 just -- that was her concern, and we certainly had
24 discussions about it.
25     Q   Do you see the next Page 744, which is the

[Page 232]

1  ending numbers for the Bates, there is a second paragraph,
2  towards the last sentence, where it says, "In previous
3  legislative sessions in which we have preserved the
4  two-thirds rule, all the senators representing districts
5  in which minority voters are playing a determinative role
6  in electing the Senator of their choice did indeed block
7  legislation designed to achieve the same result, blocking
8  the bill."
9      A   I'm sorry.  I was -- I didn't find that.  Right
10 here, I see now.
11     Q   Yeah.  The second paragraph, the last sentence
12 there, where she says -- can you read that to yourself?
13     A   Yes, I see that.
14     Q   Okay.  Is that an accurate -- here -- an
15 accurate statement in terms of which senators voted
16 against getting rid of -- suspending -- excuse me -- the
17 two-thirds rule?
18     A   I'm not going to adopt anything in there with
19 regard to anything, other than there was -- there was a
20 voter ID bill.  We've talked about House Bill 218, and
21 that didn't pass because of the two-thirds rule.  And so
22 I recognized that.
23     Q   And are you aware of who voted against that?
24     A   I think we've talked about that earlier in the
25 day.

[Page 233]

1      Q   Okay.  And is it fair --
2      A   The record reflects that very clearly.
3      Q   Is it fair to say that senators who were from
4  majority/minority districts voted against SB -- or excuse
5  me -- the 2009 voter ID legislation?
6      A   I'm not prepared to agree with that statement.
7      Q   Okay.
8      A   I don't have enough information to agree with
9  that statement.
10     Q   Do you have any reason to believe that convening
11 the committee of the whole was called to circumvent the
12 concerns raised by Senator Van de Putte about the
13 two-thirds rule?
14     A   I don't believe it was.  I believe that the --
15 well, let me go back.  I believe the special order allows
16 a bill to be brought up out of the regular order of
17 business.  That does not require suspension.
18         So, to the extent the committee of the
19 whole process, as it relates to voter identification
20 bills, complies with that rule, it can be brought up out
21 of order.
22     Q   Okay.
23     A   And it does not require 21 votes.
24     Q   Do you remember --
25         MR. ROSS:  Strike that.

[59]  (Pages 230 to 233)

CONFIDENTIAL

[Page 234]

1    Q   (By Mr. Ross:)  Do you remember how many times
2    the committee of the whole has been called in the last
3    five years?
4        A   In the last five years?
5        A   Yes.
6        A   I've been in the Senate for -- I was in the
7    Senate for 16 or 17.  I can't remember.  Time flies,
8    but --
9        Q   Well, in the 16 or 17 years --
10       A   -- I recall typically on issues like
11   redistricting or something like this, that is a very
12   controversial type of -- sometimes even a partisan-type
13   issue -- that those would be committee of the whole
14   issues.
15          I think a long time ago worker's comp was
16   heard as a -- it was a very controversial party lines
17   sort of issue, well, back in '89, and I think -- if I
18   remember correctly -- and I might could be corrected,
19   but I was working in the Senate at that time.  But I
20   remember that there was a committee of the whole
21   convened to hear that issue.
22          And there may have been others.  But, in
23   the last five years, probably, if you want to confine it
24   to that period --
25       Q   Just the last five years, do you remember the

[Page 235]

1    committee of the whole --
2        A   Probably -- It's probably these two bills.  It
3    may have been a redistricting bill.  I don't remember.
4        Q   And the last ten years?
5        A   Well, I'm saying redistricting -- I remember
6    some committees of the whole.  They're not all that
7    exciting.  But there have been more than just for this.
8        Q   Okay.  Would it be fair to say that in the
9    last -- well, in the last five years, you only recall the
10   photo ID related committee of the whole?
11       A   Right.
12       Q   Okay.
13       A   But, remember, five years in the legislative
14   cycle is pretty short, really.
15       Q   Well, in the last ten years, you only recall
16   photo ID and perhaps redistricting?
17       A   Yeah.  Perhaps workers' comp.  I don't know.  I
18   mean, there have been -- there may have been other
19   committees of the whole.
20       Q   Okay.
21       A   It's not -- It's not that unusual.
22       Q   Do you recall if you responded to this letter
23   from Senator Van de Putte?
24       A   I don't know if I responded in writing or
25   whether I just called her, and we talked about it.

[Page 236]

1        Q   Do you remember, if you had a conversation, what
2    that conversation might have been?
3        A   No.
4        Q   Do you recall when you might have had it?
5        A   We had -- I know we had a conversation
6    immediately prior to the letter, because she refers to
7    it.
8        Q   Do you recall that conversation at all?
9        A   No.
10       Q   Did you take her concerns seriously?
11       A   I always take Senator Van de Putte's concerns
12   seriously.
13       Q   Do you recall if you tried to address them in
14   any way?
15       A   I'm sure I did in some ways.  I couldn't
16   address them 100 percent.  Chairman can't -- you just
17   can't do that sometimes.  Sometimes you've got different
18   perimeters that you have to try to move within.
19          And so there is -- and so -- but I
20   listened to Senator Van de Putte, I think, a lot of her
21   judgments and opinions, and I tried to accommodate her
22   probably in more ways than I could recall here.
23          But I do believe there were discussions
24   about how we could bring the record forward with regard
25   to the invited testimony and that sort of thing.  The

[Page 237]

1    members were really -- at that point in time, you know,
2    we pretty well -- there wasn't a lot of turnover between
3    2009 and 2011, and the members were very familiar with
4    this issue.
5        Q   Okay.
6        A   So it wasn't like -- if there was new evidence
7    that needed to come forward, that we wanted to allow it,
8    and that's why we had invited testimony to allow that to
9    happen.
10       Q   Okay.
11          MR. ROSS:  We'll do 23, which is marked
12   highly confidential, TX 00204747.
13          (Duncan Deposition Exhibit Number RD-23
14   marked.)
15       Q   (By Mr. Ross:)  Are you familiar with this
16   document?
17       A   (Witness reviewing document.)  Okay.
18       Q   Are you familiar with this document?
19       A   Okay.  No, I'm not, but this is the first time
20   I've seen it, I guess, maybe the one from
21   Leticia to me that starts the string out, or thread, or
22   whatever you want to call it.  But I don't think I got
23   the rest of it.
24       Q   Do you see sort of the second e-mail from the
25   bottom from Jennifer Fagan to Blaine Brunson, Julia

CONFIDENTIAL

**[Page 238]**

1   Rathgeber, and Janice McCoy, sent at 18:05 on
2   January 21st, 2011, --
3        A   Uh-huh, yes, sir.
4        Q   -- where she says, "Duncan and I are still
5   discussing it"?
6        A   Right.
7        Q   Do you recall what you discussed with her?
8        A   No, but I received a letter from Senator Van de
9   Putte, raising concerns and issues, and I was discussing
10  them, I'm sure, with Jennifer, "How do we address those
11  concerns?"
12       Q   But you don't recall the specifics of any
13  conversation?
14       A   No.
15       Q   Okay.  Do you see it's where -- the e-mail at
16  18:48, on the 21st, where it says, "Left it that they
17  would talk again over the weekend -- probably on Sunday"?
18       A   Yes.
19       Q   Do you recall what conversations Ms. Fagan is
20  referring to?
21       A   More likely than not, a conversation that I
22  would have had with the Senator; that she expected that I
23  would have with Senator Van de Putte over the weekend.
24       Q   Do you recall -- Do you remember if you had that
25  conversation?

**[Page 239]**

1        A   No.  I probably did.  I just don't remember the
2   conversation.
3        Q   Do you see how it says, "As of now, he wants to
4   move ahead as planned"?
5        A   Right.
6        Q   Does that sound familiar to you?
7        A   Yes, sir.
8        Q   And do you see -- well, do you recall why he
9   wanted to move ahead as planned?
10       A   I don't recall today.  I mean, I typically like
11  to move things on, because it's a matter of managing --
12  the legislative process is primarily a matter of managing
13  large complex issues, and the more you wait, the issues
14  all converge.
15            And when you take on an issue like voter
16  ID up front, especially in January, the members are not
17  as occupied with other issues as they are when you get
18  into February, March, April, or May.
19            So it was my view -- and there were
20  several things that were put on the emergency agenda
21  that session.  I don't remember all of them.
22            But the last session before, there was
23  controversy.  The House stalled the bill, killed a lot
24  of legislation in the process of doing that.  And so
25  there was, I think, an interest in moving forward to try

**[Page 240]**

1   to give the House plenty of time to debate this issue,
2   because they never really got to debate that issue on
3   the House floor that year.  I think that year, in 2009,
4   it never reached the floor.
5            And so my process, thought process, was
6   generally, "Let's get -- Let's move this.  We've heard
7   this."  We had a good -- We had a good, long, heavy
8   robust debate on this issue in the Senate in 2009.
9            And by moving the record forward and
10  allowing invited testimony to augment that record, if
11  necessary, would have -- in my view, was a reasonable
12  and legitimate way to move this bill forward and to
13  allow the process to work.
14       Q   And it was your prior testimony that this robust
15  discussion in 2009 was over SB 362?
16       A   Right.
17       Q   And SB 362 included non-voter ID?
18       A   Right.
19       Q   Do you see, at the top of this e-mail chain,
20  from Julia Rathgeber to Jennifer Fagan at 7:20 p.m., --
21       A   Right.
22       Q   -- January 21st, where it says, "It doesn't
23  leave much room for negotiation"?
24       A   Yes, I see that.
25       Q   Do you know what that means?

**[Page 241]**

1        A   I have no idea.
2        Q   Do you know why there was no room for
3   negotiation?
4        A   I have no idea what that means or why that
5   would have been a thought that she had.
6        Q   Okay.  Could it have been negotiations between
7   you and Senator Van de Putte?
8        A   I have no idea.
9        Q   Okay.
10       A   Typically, Van de Putte and I negotiate well.
11       Q   Okay.  Do you recall any conversation -- any
12  negotiations between you and Senator Van de Putte over the
13  weekend?
14       A   I don't recall, but the process, you know,
15  ended up -- we came up with a process.  And, you know,
16  I'm sure that -- you know, in the legislative body,
17  people don't always agree, believe it or not.  And so,
18  you know, we may or may not have agreed, but we tried to
19  reach some sort of consensus, at least, about going
20  forward.
21            I don't know what her position is on
22  that.  I know that, at least in my mind, I felt
23  comfortable in moving forward, based on my conversations
24  with various members of the Senate and an informal --
25  you know, basically, an understanding of:  We want to

CONFIDENTIAL

**[Page 242]**

1  move this -- this is a divisive issue.  We have many
2  other divisive issues.  We have been through this one
3  before, and we pretty well know what these issues are.
4      To the extent we need additional invited
5  testimony, we'll have it.  And so we did that.  And I
6  don't recall exactly -- this was a much shorter hearing
7  than the one that we had in 2009, but I don't think
8  there was much -- I don't recall much objection about
9  that being done more efficiently.  There may have been
10  some objection about the timing, but not efficiency of
11  the hearing.
12      Q   Okay.  I just want to very quickly go back to
13  the prior exhibit that we entered in these piles of
14  exhibits.  Let me have a quick second on this.
15      MR. ROSS:  Sorry.  Can we go off the
16  record for just a minute?  Thank you.
17      (Short break taken.)
18      MR. ROSS:  We're back on the record.
19      Q   (By Mr. Ross:)  We're looking at RD-14.  Do you
20  recall talking about this e-mail earlier --
21      A   Yes, sir.
22      Q   -- regarding the request from Jennifer Fagan to
23  Ann McGeehan --
24      A   Yes.
25      Q   -- and the Secretary of State's office for

**[Page 243]**

1  Hispanic surname voters?
2      A   Yes.
3      Q   So it was your testimony earlier that the raw
4  data on Latino registered voters would not be helpful in
5  determining the impact of SB 14; is that correct?
6      A   I think that summarizes what I said.
7      Q   Okay.  Would it have been helpful to know -- to
8  have a comparison between the DPS database and the
9  registered voters with Latino surnames who did not have
10  photo IDs?
11      A   Well, if you knew that, if you had some way to
12  know that.  I don't know that this information that's
13  being requested asks for that information.  It just
14  basically said, "We can identify voters with Hispanic
15  surnames, but that's all we can do."
16      So, you know, I'm not sure -- I don't
17  know whether or not we got that information, but even if
18  we got that information, my testimony is:  I'm not sure
19  that raw data alone would be beneficial.
20      Q   So it's your testimony that it would not be
21  helpful to know the number of Spanish surname voters who
22  did not have photo IDs -- DPS-issued photo ID?
23      A   Well, this does not ask for that information.
24  It does not ask for information related to that.  It only
25  asked for raw data, and she says the raw data is not

**[Page 244]**

1  complete.
2      Q   Okay.  And by -- I'm sorry.
3      A   So that's what I read that as saying to me.
4      Q   And just to clarify, what do you mean by raw
5  data?
6      A   Just the names of voters with Hispanic
7  surnames.
8      Q   So you're saying just the list of registered
9  voters with Spanish surnames would not be helpful; is that
10  your testimony?
11      A   Right.  It's raw data.
12      Q   Is it your understanding of whether or not a
13  comparison between voters with Spanish surnames and people
14  who have DPS-issued photo IDs was ever conducted?
15      A   That's not what -- I don't know if it was or
16  not, but that's not what this request for information --
17      Q   Yeah.
18      A   -- asks for.
19      Q   Well, regardless of what this asks for, are you
20  aware of whether or not that analysis was ever done?
21      A   I don't know if any of the proponents or
22  opponents of the bill asked for that analysis.
23      Q   Do you know if an analysis might have been done
24  in connection with seeking preclearance for SB 14?
25      A   You know, I do not know.  I was not involved in

**[Page 245]**

1  the preclearance process.  So it may have been, but I
2  don't know.
3      Q   Okay.  Just very quickly, are you familiar with
4  what I'm referencing when I talk about preclearance?
5      A   Yes.
6      Q   Okay.  And is it your understanding I'm talking
7  about preclearance under Section 5 of the Voting Rights
8  Act?
9      A   Exactly.  Yes, sir.
10      Q   And are you familiar with the retrogression
11  standard under Section 5 of the Voting Rights Act?
12      A   I know there is a standard.  I am not an expert
13  on that area of the law.
14      Q   Okay.  But you are -- generally, you are
15  generally familiar with the standard?
16      A   I'm generally familiar that there are
17  standards.
18      Q   Okay.  Fair enough.  So, before SB 14 was filed,
19  are you aware of any analysis of the likely impact on
20  voters was conducted?
21      A   Again, you know, whether or not the proponents
22  or opponents of the bill conducted that, it would be --
23  if they did and they presented it, it would be in the
24  records.
25      Q   If it had shown that Spanish surname voters were

CONFIDENTIAL

**[Page 254]**

1    A   I will go on the record on that.
2    Q   Do you recall why you voted to table any other
3    amendments?
4    A   No.
5    Q   Let's move on from this document unless --
6    A   I see -- what page are you looking at?
7    Q   I'm on 123.  Okay.  I think we're done with this
8    document.  Oh, actually -- excuse me.
9         Can we go to page -- I think it's the next
10   Page 124.  Do you see 124, where Senator Davis offered
11   Amendment 21?
12   A   Yes.
13   Q   Do you see where it says, Paragraph (5), "a
14   valid" -- amending SB 14 to allow for "a valid
15   identification card, including an employee identification
16   card, that contains the person's photograph and is issued
17   by an agency or institution of the Federal Government"?
18   A   Yes, I see that.
19   Q   "And an agency, institution, or political
20   subdivision of this state, or an institution of higher
21   learning in the state."  Do you see that?
22   A   "Higher education in the state."  Yes, sir.
23   Q   Excuse me.  "Institution of higher education in
24   the state."
25        Do you see that the amendment to SB 14 is

**[Page 255]**

1    read, and on a motion from Senator Fraser, Amendment 21
2    was tabled by a vote of 19 yeas and 11 nays?
3    A   Yes.
4    Q   Do you see the yeas list?
5    A   Yes.
6    Q   Do you see your name?
7    A   Yes.
8    Q   Do you recall why you voted yea to table that
9    amendment?
10        MR. SWEETEN:  Objection; legislative
11   privilege.
12   A   No.
13   Q   (By Mr. Ross:)  Do you see amendment -- excuse
14   me.  Turn to Page 30, please.
15   A   Page 30?
16   Q   Yes, sir.
17   A   Go back to Page 30?
18   Q   Oh, 130.  So you were at 124, I think.
19   A   Okay.  130.  Okay.
20   Q   I believe this was Duncan Exhibit 536 on the
21   prior deposition.  We had mentioned that earlier on Floor
22   Amendment Number 30.  Do you see that?
23   A   Yes.
24   Q   Can you look for me, Senator Duncan, where it
25   says -- I'm sorry -- Paragraph (7) of that amendment, "an

**[Page 256]**

1    analysis by a subgroup of whether the enhanced
2    identification requirements for being accepted to vote
3    produce a disparate impact on women, the elderly, persons
4    with disabilities, students, or racial and ethnic
5    minorities."
6    A   I see that.
7    Q   Do you see how Amended 14 was read, and on a
8    motion from Senator Fraser --
9    A   Right.
10   Q   -- the amendment was tabled --
11   A   Yes, sir.
12   Q   -- by 19 yeas and 11 nays?  Do you see the yeas
13   on the next top of 131?
14   A   Yes, sir.
15   Q   Do you see your name --
16   A   Yes, sir.
17   Q   -- in that list of yeas?
18   A   Yes, sir.
19   Q   Do you recall why your name was -- why you voted
20   to table that amendment?
21   A   You know, again, when you're at a --
22        MR. SWEETEN:  Objection; privilege.  Go
23   ahead.
24   A   There are numerous amendments that are voted on
25   in committee, but this one, I don't remember the reasons

**[Page 257]**

1    why particular -- I've already stated, though, the
2    reasons why, on many of those amendments, I would vote no
3    or just go with the author of the bill and trust his
4    judgment on whether or not that meets the bill.  On this
5    particular amendment, I've previously testified.
6         And I want to be clear that I do not
7    believe that the Secretary of State's office is the
8    right -- the right agency to be able to make a State
9    finding on whether or not -- which would be a judicial
10   finding, more or less, with regard to disparity impact.
11        Now, as far as reporting data and things
12   like that -- but part of this requires them to be -- to,
13   more or less, make a determination that would require
14   some discretion with regard to a quasi-judicial
15   function.  To me, it would have been the inappropriate
16   agency to do this.
17   Q   If an appropriate agency, whether in conjunction
18   with the Secretary of State or other Texas agencies was
19   asked to produce a report showing the number of women who
20   didn't have SB 14 required ID, would you have supported
21   that amendment?
22   A   The data -- The data does not bother me.  I
23   mean, the data would be -- it's just not a -- that's not
24   an issue.  The issue is:  How do you analyze the data and
25   what judgment is passed on that data?

877-479-2484          US LEGAL SUPPORT, INC.   www.uslegalsupport.com

**[Page 258]**

1    And so data can be produced and actually
2    acquired, but the issue is: What do you do with that
3    data? What is the integrity of the process that it goes
4    through, becoming the analysis of the data, and that's a
5    matter of deliberation.
6        And you have the bill, and you have one
7    side that says, "This does have an impact," and one
8    expert will say it doesn't. And so it's up to the
9    legislative body, as designed by the Constitution, to
10   deliberate on those issues and make that determination,
11   or a Court to do that, make those determinations.
12       But the Secretary of State's office is
13   not staffed nor appropriated with sufficient funds to
14   conduct this type of study. So that would be a reason
15   why that amendment would have been inappropriate.
16   Q.  Okay. Do you include in that data having data
17   on a number of people who did not have SB 14 ID? Do you
18   believe that's helpful data to have at that time?
19       MR. SWEETEN: Objection to legislative
20   privilege. I'm going to object to the incomplete
21   foundation, and objection to speculation. Go ahead.
22   A   I don't know that it would be helpful or not.
23   Q   (By Mr. Ross:) Okay. Fair enough. We'll move
24   on from that. Let me go briefly back to student IDs.
25       You're presently the Chancellor of the

**[Page 259]**

1    Texas Tech University system; is that correct?
2    A   Yes.
3    Q   Do you know how students get student IDs at
4    Texas Tech; how a person would get a student ID?
5    A   They go over to the ID office, and they check
6    their matriculation number, and then they issue the ID.
7    Q   Okay. Do you know -- So you would have to be a
8    student at Texas Tech in order to get a student ID; is
9    that correct?
10   A   At the time you applied for it.
11   Q   And do you know whether someone would have to go
12   through the process in order to confirm that they are a
13   student in order to -- excuse me.
14   A   The lady looks it up on the record.
15   Q   Uh-huh. And they just look through the record?
16   A   Here is your -- can you show me your ID? And
17   the lady looks it up on the record, and basically she
18   takes a picture, and then gives you the ID.
19   Q   Okay. Do you know how you get on this registry
20   that you're talking about?
21   A   No. I've only been here six weeks.
22   Q   Okay. Fair enough. Are you aware of what
23   student IDs may be used for at Texas Tech?
24   A   Admission to certain events and probably other
25   aspects of benefits and things like that, scholarships

**[Page 260]**

1    and financial aid. And in an account like that, they
2    need probably identification numbers. I'm speculating a
3    little bit here, but having not been a student for
4    several years --
5    Q   Do you know whether the students can use their
6    ID to access money, like financial information?
7    A   Well, I think, more likely than not, they have
8    to have an ID to access student financial aid, and they
9    have certain electronic identification primarily for
10   that.
11       And, in fact, the old card, as we had it,
12   when we were in school, when you were in school, is
13   probably less important today than the internet or
14   computer ID numbers that students receive to access --
15   or their parents -- to receive access of their academic
16   record or to access their financial aid records. So
17   this little card that you get is probably less important
18   today than it was 10 or 15 years ago.
19   Q   Okay.
20   A   In fact, I don't even -- I got one, but I don't
21   know where it is.
22   Q   Do you know whether -- Are you aware of how many
23   out-of-state students there are at Texas Tech University?
24   A   How many -- I'm sorry. I didn't hear you.
25   Q   How many students who are not from Texas, at

**[Page 261]**

1    least not prior to --
2    A   Quite a bit of international students, as well
3    as students who come in from other states.
4    Q   And do you know whether those students are
5    allowed to -- are allowed to vote while they live here in
6    Texas as long as they're citizens and over the age of 18?
7    A   As long as they register and they are -- and
8    they establish proper residency in accordance with the
9    Election Code.
10   Q   Let me show you what I would like to mark as RD
11   Number 25.
12       (Duncan Deposition Exhibit Number RD-25
13   marked.)
14   Q   (By Mr. Ross:) Are you familiar with this
15   document?
16   A   Yes. Well, I remember the story.
17   Q   Is that -- This look like, at the top, that you
18   were -- excuse me -- the Web site address for this is
19   lubbockonline.com; is that right?
20   A   Yes, sir.
21   Q   And is it fair to say this is a Tuesday,
22   August 26th, 2014, Lubbock Avalanche-Journal article?
23   A   Yes.
24   Q   And what is the title of this article? It looks
25   like it might have been cut off a little bit, but --

CONFIDENTIAL

**[Page 266]**

1    that.

2        Q    But it's your general understanding that the
3    election identification certificate is provided by the
4    Department of Public Safety, right?

5        A    Yes.

6        Q    And are you aware of -- well, excuse me.  At the
7    time that SB 14 was being considered, did you know that
8    80 counties did not have DPS offices, 80 Texas counties?

9        A    I know that there was -- I recall testimony
10   that there was some concern that there were not -- that
11   every county didn't have a full-time active DPS presence
12   with regard to licensing persons.

13       Q    And did you have concerns regarding the lack of
14   the DPS in the 80 counties in Texas at the time?

15       A    Well, let me tell you --

16            MR. SWEETEN:  Objection; legislative
17   privilege.

18       A    I thought it was an issue that we should try to
19   address, because we went through the process.

20       Q    (By Mr. Ross:)  Do you believe SB 14 addresses
21   those concerns?

22       A    I believe other initiatives do.  I think we
23   have worked hard to try to get more driver's licenses --
24   to do more -- we've tried to fill in those gaps more.

25       Q    Do you know if SB 14 requires additional DPS

**[Page 267]**

1    offices?

2            MR. SWEETEN:  The bill itself?

3            MR. ROSS:  Yes.

4        A    I don't think it required more.  I think that
5    we made a conscious effort to improve the availability of
6    the driver's license process in different counties in
7    rural counties.

8        Q    (By Mr. Ross:)  But the bill itself did not
9    require it?

10       A    The bill did not require it, but, obviously, I
11   think we heard those issues and started trying to address
12   them.

13       Q    Okay.  Are you aware of the mobile election
14   identification certificate program?

15       A    Only that I've heard about it, but I haven't
16   studied it or touched it, felt it, you know, been
17   thoroughly briefed on it.

18       Q    Do you know if that was required by SB 14?

19       A    I don't know that it was required by SB 14,
20   but it was done.

21       Q    It was done in response to SB 14?

22       A    It was done in response to and a need for
23   more accessibility for that sort of processing in rural
24   areas.

25       Q    And do you know whether that was done after

**[Page 268]**

1    SB 14 was passed or those --

2        A    Yes, it was.

3        Q    -- those plans -- after it was signed into law?

4        A    Right.

5        Q    What's the demographic makeup of your district?

6        A    It varies.  You know, I've had -- since we
7    began the voter ID, I've had two different districts.  I
8    would say, roughly, the district is at least 30 percent
9    Hispanic and probably between 55 and 60 percent,
10   somewhere in that range, of Anglo, and the other is
11   African-American and other.

12       Q    How much are African-American?

13       A    Less than 10 percent or in that area,
14   African-American or other ethnic groups.

15       Q    So probably about 35 percent nonwhite, is that
16   fair, nonwhite, non-Anglo?

17       A    Well, 40 to 45 percent.

18       Q    Forty to 45 percent Latino, black, and other?

19       A    Roughly.  These are real guesses here.

20       Q    No.  Fair enough.

21       A    But it's familiarity.  I was always out in the
22   district quite a bit, and so that would be my sense.  And
23   I think, at some point in time, we've looked at that and
24   made sure that we understand the demographics.

25       Q    Is it fair to say that your black and Latino

**[Page 269]**

1    constituents were important to you?

2        A    They sure are, or still were, and still are, I
3    guess, but yes.

4        Q    So you had earlier testified that it would be
5    problematic if people were using voter registration cards
6    illegally then; is that right?

7        A    Right.

8        Q    It's hard to see on the registration cards?

9        A    Right.

10       Q    Would it be problematic to you if
11   African-Americans were unable to vote, valid
12   African-American voters were unable to vote because of
13   SB 14?

14       A    I would not reach the conclusion that they were
15   unable to vote because of Senate Bill 14, because Senate
16   Bill 14 provides mechanisms to allow that to occur.  In
17   my experience -- let me rephrase that.  I'll stop there.

18            I do not believe that Senate Bill 14
19   would restrict their right to vote.

20       Q    Well, let me back up.  Would it be problematic
21   if SB 14 diminished the Latinos being able to vote?

22       A    I would disagree with the proposition that
23   Senate Bill 14 diminishes the right of anyone to vote in
24   the State of Texas.

25       Q    What is your factual basis for that?

CONFIDENTIAL

**[Page 270]**

1    A  Well, --
2        MR. SWEETEN:  Objection; legislative
3    privilege.
4    A  Well, common sense.  I'm familiar with the law.
5    Most -- to function in the society today, people have a
6    need for IDs.  The bill provides a free ID for those who,
7    for whatever reason, don't have one.
8        And so it allows a way, and we've worked
9    to try to make sure that there are available DPS places
10   to -- making sure that that happens.  There have been
11   two elections, I guess now, where voter ID will actually
12   occur -- or was used, and we're fixing to have another
13   one here in this district, in my district, on September
14   the 9th.
15       I haven't heard any significant issues;
16   that people were denied the right to vote.  I think
17   there were some issues with regard to married names and
18   maiden names and things like that, but I think those
19   were resolved.
20       So I haven't heard the -- it's like a lot
21   of things.  I haven't heard the -- I haven't seen in the
22   news that there is a substantial, significant, if any,
23   issue or problem caused by the requirements of Senate
24   Bill 14.
25       Q  Do you know how many provisional ballots did not

**[Page 271]**

1    get counted in the last two elections --
2    A  No.
3        Q  -- because of SB 14, because someone did not
4    provide a photo ID?
5    A  I don't know that.
6        Q  Do you have any factual basis for your -- other
7    than news reports, that people were not allowed to vote in
8    this last election?
9    A  That's my basis for that.
10       Q  Just news reports or the lack of news reports?
11   A  Well, the lack of -- you know, I was a member
12   of the Senate until July the 3rd, and I certainly didn't
13   hear any complaints.  I'm not aware of any complaints in
14   our district that were -- that were coming into our
15   office.
16       And I've had an Hispanic -- a very
17   active, robust Hispanic community and African-American
18   community, especially in Lubbock.  And I haven't really
19   heard complaints.  At least no one complained to me.
20       Q  Do you know whether your constituents -- or
21   Latino constituents, did they raise any concerns to you
22   that SB 14, prior to its passing, disenfranchised Latino
23   voters?
24   A  I do not recall.  If they did, that was
25   something that -- there may have been some written

**[Page 272]**

1    communication that I do not recall today, but I do not
2    recall getting addressed verbally about that issue.
3        Q  Do you recall African-American voters bringing
4    that issue to your attention?
5    A  No.
6        Q  At any time, since the passage of SB 14, have
7    you come to believe that SB 14 has a disproportionate
8    impact on the voters as compared to the Anglo voters?
9    A  I have not.
10       Q  Was SB 14 enacted, in part, to reduce Latino
11   voter participation?
12   A  No, it was not.
13       Q  Was it enacted to reduce African-American voter
14   participation?
15   A  No, it was not.
16       Q  Let me ask you about Texas v. Holder.  Are you
17   familiar with that decision from 2012?
18   A  There's so many Texas v. Holders.
19       Q  From 2012, the case in which SB 14 was denied
20   judicial preclearance under Section 5 of the Voting Rights
21   Act --
22   A  I recall reading that.  Yes.
23       Q  -- did you read that decision?
24   A  I think I probably did.
25       Q  How did you react to that?

**[Page 273]**

1    A  I disagreed with it.
2        Q  Why did you disagree with it?
3    A  Well, because I was there.  I mean, I believe
4    we provided fair process.  We heard the evidence.  And I
5    was never convinced that there was any sort of -- that
6    Senate Bill 14 -- I was very clear.  I said it earlier.
7        I don't believe the provisions of this
8    bill denied anybody, Anglo, Hispanic, African-American,
9    the right to vote.  They provide a process for doing
10   that, just like voter registration.  You know, the
11   voter -- everyone has to go register to vote, and
12   everyone now, you know, needs to have an ID.
13       And these are just requirements that we
14   had to protect the integrity of the ballot box.  And
15   that's the sole purpose of this bill, and that's why I
16   supported it and voted for it.
17       Q  Do you know how the Senate, as a whole, reacted
18   to the Texas v. Holder decision?
19   A  No.
20       Q  Do you recall?
21   A  No.
22       Q  Do you know -- Did you take any action to
23   address the Texas v. Holder decision?
24   A  What?
25       Q  Did you take any action to address the Texas v.

877-479-2484          US LEGAL SUPPORT, INC.   www.uslegalsupport.com

CONFIDENTIAL

**[Page 274]**

1    Holder position in the Senate?
2         A   No.  I don't think we've done anything.  I
3    think, shortly thereafter, the Supreme Court took action,
4    but as far as -- not on Section 5 of the Voting Rights
5    Act.  So I think that that issue became moot.
6         Q   Well, in the time between -- I believe you're
7    referring to --
8         A   The legal issue.
9         Q   -- Shelby County versus Holder; is that correct?
10        A   Yes, sir.
11        Q   Are you aware that an election took place
12   between the three-judge panel's decision denying
13   preclearance on SB 14 in 2014 and the Shelby County
14   decision in June of 2013?
15        A   The timeline is getting a little fuzzy to me
16   here.  So I am not following that.  So you might
17   rephrase.
18        Q   Well --
19            MR. SWEETEN:  It's really hard to hear.
20   I'm sorry.
21            MR. ROSS:  This is rain right above you.
22        Q   (By Mr. Ross:)  I'm sorry.
23            (Off the record discussion ensued.)
24        Q   (By Mr. Ross:)  SB 14, to your understanding, do
25   you know whether Texas v. Holder -- when the decision came

**[Page 275]**

1    down?
2         A   No.
3         Q   Would it be accurate if I -- or would it be
4    accurate to say that it occurred prior to the November of
5    2012 Presidential election, to your knowledge?
6         A   I don't remember.  I don't have a good timeline
7    on it.  I guess that's why I'm not following your
8    question, because I don't have my own timeline as to the
9    dates.
10        Q   You don't recall when that decision was issued?
11        A   I don't recall.
12        Q   I will submit that it was August of 2012.
13        A   Okay.
14        Q   How many times did the Legislature meet after --
15   well, sorry.
16            How many times did the Legislature meet
17   after August 2012?
18        A   We met in the regular session within 2013, and
19   then we met in a -- I think we had two-special sessions
20   in June of 2013 that I'm aware of.
21        Q   Are you aware of any committee hearings held
22   related to voter ID after Texas v. Holder was issued?
23        A   I don't think we did.  I'm not -- I don't
24   remember any.  It was in the Senate.
25        Q   Did you seek any analysis after Texas v. Holder

**[Page 276]**

1    to address the concerns raised in that opinion?
2         A   No.
3         Q   Do you know if there were any reports created by
4    that in the Senate?
5         A   I do not know.
6         Q   Were there any reports requested or considered
7    by your office?
8         A   I don't believe so.
9         Q   Do you know if there was any communication
10   between yourself and other senators regarding Texas v.
11   Holder?
12            MR. SWEETEN:  Objection; legislative
13   privilege.
14        A   I'm not -- I don't recall any, but -- you know,
15   I don't recall.  It was not an issue that we were -- at
16   least that I was involved in, because I don't believe
17   there was any legislation submitted to the State Affairs
18   Committee on that issue or any other committee.
19        Q   (By Mr. Ross:)  Do you recall any conversations
20   between you and other senators about Texas v. Holder?
21        A   No, no, not -- no.
22        Q   Do you recall -- well, in your request for
23   opponents of the bill, did you request any analysis?
24        A   I don't know.  That's a good question.  I don't
25   know.  I do not know.  I'm not aware of any, and there

**[Page 277]**

1    may be.  I don't know if there was or not.
2         Q   So, earlier, you testified you're familiar with
3    the Supreme Court case of Shelby County v. Holder?
4         A   Yes.
5         Q   Do you recall when that decision came down?
6         A   No.
7         Q   I will submit that it was June 2013.  Does that
8    sound about right to you?
9         A   It doesn't -- I don't have a timeline on it.
10        Q   Okay.  Did you read that decision?
11        A   You know, I didn't -- it was long, and I don't
12   think I read -- I read the syllabus, probably.  I didn't
13   read the whole opinion.
14        Q   And are you aware that that decision suspended
15   preclearance under Section 5?
16        A   That's what I'm aware of.
17        Q   Okay.  Were there any interim session committees
18   convened between August 2013 and June -- or excuse me --
19   August of 2012 and June of 2013 to address SB 14 or voter
20   ID, that you're aware of?
21        A   I'm not aware of any.
22        Q   Okay.
23        A   I don't know for sure about that.  I think -- I
24   don't believe there was any charged to the committee to
25   do that.

CONFIDENTIAL

[Page 278]

1    Q   Okay.  And you were still in the Senate at that
2    time; is that right?
3    A   Right.
4    Q   And you were still the chair of the --
5    A   Right.  We typically studied issues when they
6    were charged to us from the Lieutenant Governor's office.
7    And I don't believe that there was an interim charge
8    between '11 and '13, 2011 and 2013, to do a voter ID
9    study.
10             But you could refresh my memory.  There
11   may have been something, and I just don't recall it.
12        Q   But you do not recall -- well, I'm submitting
13   that between Texas v. Holder and Shelby County v. Holder,
14   there was the 2012 Presidential election.
15             Does that -- I'm submitting that that's
16   true, based on the dates --
17        A   Well, remind me --
18        Q   -- of the decisions.
19        A   I guess that's correct.
20        Q   In August 2012, the Texas v. Holder --
21        A   I'm going to be in layman's mode here, and you
22   can tell me this --
23        Q   Sure.
24        A   -- and maybe we will understand each other
25   better.

[Page 279]

1    Q   Sure.
2    A   I do not -- Voter ID was in the last
3    Presidential election.  Texas did not use the voter ID
4    statute; is that correct?
5    Q   Yes, because of Texas v. Holder.
6    A   Right.
7    Q   Yes.
8    A   But, after that, we've had a primary season,
9    and I think a Constitutional amendment election, I
10   believe, where the voter ID was implemented.
11   Q   Yes, that's my understanding.
12   A   Post-Holder and Shelby County.
13   Q   Yes.
14   A   That's my timeline on it.
15   Q   Yes.  And that's the correct timeline.  We're
16   understanding each other.
17             Were there any efforts made on the part of
18   the Legislature to hold hearings or task force to
19   otherwise examine the administration of the 2014
20   election?
21        A   I don't know.
22        Q   Do you recall?
23        A   I don't recall any.  I don't believe we were
24   charged with that.  We've been a little bit -- We've had
25   elections going on in the State, as well.

[Page 280]

1             After 2013, we began kind of a
2    generational aspect in our legislative process, where
3    you had a Governor announcing that he wasn't going to
4    run.  So we've had a lot of different election issues
5    going on, not related to voter ID, that has delayed the
6    interim process of the Senate.
7             So I think that's one reason why you
8    haven't seen a lot of -- you haven't seen priorities set
9    on any issues at this point in time.
10        Q   Okay.
11        A   And there's some uncertainty as to where the
12   leadership is.
13        Q   Are you aware of any in-person voter
14   impersonation that occurred in Texas during the 2012
15   Presidential election?
16        A   I'm not -- I can't give you a personal -- no,
17   I'm not aware of any specific anecdotal evidence on that.
18        Q   Are you aware of any in-personal voter
19   impersonation that occurred in Texas during any election
20   between August 2012 and November 2013?
21        A   I'll stick with my former testimony.  I don't
22   know how you could prove it unless you just had, you
23   know, some sort of super effort that, in and of itself,
24   would be oppressive, to try to shake down people every
25   time that they came to vote.

[Page 281]

1             The only way to avoid that kind of, what
2    I would call, oppressive enforcement is just to simply
3    say, "Present your ID."  And that's what Senate Bill 14
4    does.  And it provides processes.  If you don't have an
5    ID, the State of Texas will give you one for free.
6             So, to me, in my legislative and
7    political judgment, that was an appropriate policy
8    decision laid out in Senate Bill 14.
9         Q   Okay.  As of June 26th, 2013, Texas has enforced
10   SB 14; is that correct?  As of June 26th, 2013, SB 14 has
11   been in effect; is that your understanding?
12        A   Post-Shelby County?
13        Q   Yes.
14        A   Yes, sir.
15        Q   Okay.  Immediately after the Shelby County
16   decision, the Texas Attorney General announced that he
17   would begin enforcing SB 14 immediately.  Do you recall
18   hearing that?
19        A   I recall reading it in the newspaper.
20        Q   Did you have any communication with him about
21   that?
22        A   No.
23        Q   Did you have any communication with anyone about
24   that announcement?
25        A   No.

[71] (Pages 278 to 281)

CONFIDENTIAL

**[Page 282]**

1    Q   Is it your understanding, then, that SB 14 is
2  now being enforced?
3    A   Yes.
4    Q   Are you aware of what documents you need to
5  produce in order to obtain an election identification
6  certificate?
7    A   It's stated in the legislation.  We can look it
8  up.
9    Q   Well, let's pull -- go back to SB 14.  Let's do
10  this then.
11      MR. ROSS:  We might take a quick break.
12    Q   (By Mr. Ross:)  So I'll submit that you're
13  required -- well, let me say:  Is it your understanding
14  that you're required to present a birth certificate in
15  order to get an election identification certificate?
16    A   (Witness reviewing document.)  I'm reading the
17  statute.  So it's okay.  I may not be able to --
18    Q   Well, do you know?
19    A   It's probably not in the bill.  I think there's
20  another -- there's another statutory reference here that,
21  I think, cross-references it.  I don't think it's
22  actually included in the bill.
23    Q   Well, do you know whether SB 14 requires the
24  documents needed to show -- to get an election -- excuse
25  me --

**[Page 283]**

1      MR. ROSS:  Strike that.
2    Q   (By Mr. Ross:)  Do you know whether SB 14
3  requires that the underlying documents that one would need
4  to show, in order to get an election identification
5  certificate, be provided for free?
6    A   I don't believe it does.  I believe it provides
7  that the certificate, though, must be provided for free.
8    Q   Okay.  Do you know whether there were any
9  amendments offered to require that?
10    A   Yes.  I believe there was.  In reviewing the
11  testimony -- reviewing something that you showed me -- I
12  think that the other Counsel showed me today -- I saw an
13  amendment by, I think, Davis that covered that.
14    Q   Do you recall how you voted on that amendment?
15    A   I think I recall, from that document, that I
16  voted either to table or in opposition.
17    Q   And do you recall why?
18      MR. SWEETEN:  Objection; legislative
19  privilege.
20    A   No, I really don't, other than -- you know, I
21  guess we can reconstruct it -- the counties, I think,
22  basically, are charged with those vital statistics or the
23  local health departments.  I'm not sure exactly how
24  complex that would be, to be able to provide those.
25      So it might be fleshed out to understand

**[Page 284]**

1  whether or not it worked -- or whether we even had
2  jurisdiction to mandate that.  So there was some
3  confusion in my mind about how that would really work.
4  And so that was one of the reason I would have voted
5  against that.
6    Q   (By Mr. Ross:)  Do you have any concern about --
7  in order to get an EIC -- requiring an underlying
8  document, but not making the underlying document free --
9  would prevent voters from obtaining that form of ID?
10    A   I heard those concerns in the testimony, and I
11  weighed them.  And, in fact, to me, the weight was not
12  sufficient to cause me to have judgment against the bill.
13    Q   Do you recall -- if we move to --
14      MR. ROSS:  Well, let me take a break here.
15      (Short break taken.)
16      MR. ROSS:  So we're back on the record.  I
17  think I just have a couple of more questions, and we'll
18  let you-all go.
19    Q   (By Mr. Ross:)  Thank you, Senator, again, --
20    A   Sure.
21    Q   -- for taking the time to do this one more time.
22  So you said you were familiar with Texas v. Holder, right;
23  that you had read the opinion?
24    A   Yeah, I read it one time.
25    Q   Okay.  Do you recall -- Well, would it bother

**[Page 285]**

1  you to learn that some voters had to travel between 150 --
2  or 150 miles round trip in order to obtain an SB 14 ID?
3    A   You know, I think there's nothing we can do
4  that's ever perfect.  I do think that we've tried to
5  address that issue.
6      I know I even had legislation in the last
7  session, I think, to work some issues out with Senator
8  Nichols and others to try to make sure that we start
9  processing and accessibility in the rural areas.  I
10  think that Representative King was big on that, as well,
11  up in the Panhandle.
12      And so, you know, you can't solve every
13  problem that a piece of legislation presents, but when
14  you're recognizing -- when you start trying to address
15  them, and I think we have, I don't think that it's --
16  you know, in my view, we did work to try to address
17  those issues.
18    Q   Do you think it would be burdensome for someone
19  to have to drive 100 miles in order to get SB 14 required
20  ID?
21      MR. SWEETEN:  Objection; foundation;
22  assumes facts not in evidence.  You can answer.
23    A   You know, I don't want to venture -- if someone
24  has to drive 100 miles to get an ID, they probably have
25  to drive 100 miles to shop, as well.

**CONFIDENTIAL**

**[Page 286]**

1    So, generally, I don't know that it's --
2    that it would be burdensome if it's 150 miles.  If you
3    live 150 miles -- if you live in rural remote areas,
4    you're used to driving 150 miles.  I grew up in a rural
5    area.  So driving 150 in West Texas is not -- most
6    people don't consider that over the top or a long way.
7         Q   (By Mr. Ross:)  Well, --
8         A   I say most people.  Those of us out here are
9    used to driving 150 miles.  They may not true in New
10   York.  That may sound like a long way, but in West Texas,
11   we're -- you know, we do that, and, you know, you
12   would -- but, again, we've tried -- we've made efforts
13   for those of us who live in rural counties.
14           And I've represented rural counties for
15   28 years -- 20 years in the Legislature, and we've tried
16   to make -- we always try to address those issues and
17   make sure that we improve them, and I think we have.
18        Q   Would it be burdensome, if someone did not
19   have a car, to drive 100 miles in order to get to a DPS
20   office --
21           MR. SWEETEN:  Same objection.
22        Q   (By Mr. Ross:)  -- with SB 14 required ID?
23           MR. SWEETEN:  Objection.
24        A   It depends on each individual case.  I don't
25   think you can say a blanket statement in the deposition

**[Page 287]**

1    at the seventh hour --
2         Q   (By Mr. Ross:)  Fair enough.
3         A   -- that it would be burdensome or not.  It
4    would just depend on each individual case.
5         Q   Okay.
6            MR. ROSS:  I think that's it.
7            MR. SWEETEN:  No questions.  Thank you.
8            MR. ROSS:  Thank you very much.
9            (Deposition concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**[Page 288]**

1    STATE OF TEXAS
2    COUNTY OF LUBBOCK
3            REPORTER'S CERTIFICATE
4         ORAL DEPOSITION OF SENATOR ROBERT L. DUNCAN
5            AUGUST 28, 2014
6       I, the undersigned Certified Shorthand Reporter for
7    the States of Texas and New Mexico and Registered
8    Professional Reporter, certify that the facts stated in
9    the foregoing pages are true and correct.
10      I further certify that I am neither attorney or
11   counsel for, related to, nor employed by any parties to
12   the action in which this testimony is taken and, further,
13   that I am not a relative or employee of any counsel
14   employed by the parties hereto or financially interested
15   in the action.
16      SUBSCRIBED AND SWORN TO under my hand and seal of
17   office on this the 31st day of August, 2014.
18
19      _____
        Susan Myatt, CSR
20      Texas CSR #3927
        Expiration:  12/31/15
21      CAPROCK COURT REPORTING
        Firm Certification Number:  374
22      U. S. Legal Support
        425 Park Avenue, 5th Floor
23      New York, NY  10022
        (866) 876-8757
24
25

VICTOR FARINELLI                                                5/9/2014

---

**1**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    CORPUS CHRISTI DIVISION
 3    MARK VEASEY, et al.,          §
                                    §
 4              Plaintiffs,         §
                                    §
 5    vs.                           § Civil Action Number
                                    § 2:13-cv-193(NGR)
 6                                  §
                                    §
 7    RICK PERRY, et al.,           §
                                    §
 8              Defendants.         §
      -------------------------------------------------
 9
10               30(b)(6) DEPOSITION OF
11    THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION
12                   VICTOR FARINELLI
13                     MAY 9, 2014
14    -------------------------------------------------
15
16         ORAL DEPOSITION OF VICTOR FARINELLI, produced
17    as a witness at the instance of the United States of
18    America, and duly sworn, was taken in the
19    above-styled and numbered cause on May 9, 2014, from
20    9:02 a.m. to 1:42 p.m., before Melody Renee
21    Campbell, CSR in and for the State of Texas,
22    reported by method of machine shorthand, at the
23    Price Daniel Building, 209 West 14th Street, Austin,
24    Texas, pursuant to Notice and Subpoena and the
25    Federal Rules of Civil Procedure.
```

---

**3**

```
 1                     I N D E X
                                            Page
 2    EXAMINATION
         By Mr. Freeman.......................... 5
 3       By Mr. Doggett......................... 157
 4    CHANGES AND SIGNATURE........................172
      REPORTER'S CERTIFICATE.......................173
 5
 6
 7
 8              E X H I B I T S
 9    No.  Description                          Page
10    106  Notice                                13
11    107  38 TexReg 5416 Proposed Rules 08/23/13  24
12    108  38 TexReg 7307 10/18/13 Adopted Rules   26
      109  Birth Certificate for EIC              68
13
14    110  Sample of EIC Birth Certificate        71
15    111  TAC Title 25, 181.28                   94
16    112  Remote Front Office: Birth Certificate 100
           Issuance user Guide
17    113  Application for Election Identification 102
           Birth Certificate
18
      114  List of Remote Birth Certificate Access 111
19         Sites
20    115  List of Offices with Remote Access     119
21    116  Information Re: Birth Certificate for   143
           Election Identification
22
      117  12/24/13 E-Mail from TXHHS to Derek    146
23         Johnson re: EIC Alert
24
25
```

---

**2**

```
 1          A P P E A R A N C E S
 2    FOR THE UNITED STATES OF AMERICA:
         Mr. Daniel J. Freeman, Esq.
 3       U.S. DEPARTMENT OF JUSTICE
         NWB Room 7524
 4       950 Pennsylvania Avenue, NW
         Washington, DC 20530
 5       202.305.4355
         202.307.3961 (Fax)
 6       Daniel.Freeman@usdoj.gov
 7
 8    FOR THE TEXAS DEPARTMENT OF HEALTH AND HUMAN
      SERVICES COMMISSION:
 9       Mr. John B. Scott, Esq.
         Mr. J. Reed Clay, Jr., Esq.
10       Post Office Box 12548
         Austin, Texas 78711
11       512.475.0131
         512.936.0545 (Fax)
12       John.Scott@texasattorneygeneral.gov
         Reed.Clay@oag.state.tx.us
13       -and-
         Mr. Timothy E. Bray, Esq.
14       Texas Department of State Health Services
         Post Office Box 149347
15       Mail Code 1919
         Austin, Texas 78714
16       512.776.6966
         512.776.7720
17       Tim.Bray@dshs.state.tx.us
18
19    FOR THE ORTIZ DEFENDANTS:
         Mr. Robert W. Doggett, Esq.
20       Texas Rio Grande Legal Aid, Inc.
         4920 North IH-35
21       Austin, Texas 78751
         512.374.2725
22       512.447.3940 (Fax)
         RDoggett@trla.org
23
24
25
```

---

**4**

```
 1          E X H I B I T S - Cont'd
 2    No.  Description                          Page
 3    118  10/14/13 Memo from Geraldine Harris to  147
           Local Registrars and County Clerks re:
 4         Use of Election Certification Stamp on
           Birth Certificates for Local Registrars
 5         Offices not Linked to the State Vital
           Statistics Office Via the Remote Birth
 6         Access System
 7    119  08/07/13 E-Mail from Joe Peters to Robert 150
           Bodisch re: About Those Free Voter ID
 8         Cards - Few Sign Up, With Attachment
 9    120  U.S. Census Bureau American FactFinder,  154
           Place of Birth by Nativity and
10         Citizenship Status
11
12              *-*-*-*-*
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

VICTOR FARINELLI                                                    5/9/2014

5

1              VICTOR FARINELLI,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. FREEMAN:
5      Q.  Sir, could you state your name for the
6  record.
7      A.  Victor Anthony Farinelli.
8      Q.  My name is Daniel Freeman, and I represent
9  the United States in this litigation.
10             MR. FREEMAN:  And if others could
11  take a moment to introduce themselves for the
12  record.
13             MR. DOGGETT:  Robert Doggett, Texas
14  Rio Grande Legal Aid, for the Ortiz plaintiffs.
15             MR. BRAY:  Timothy Bray, Deputy
16  General Counsel for the Department of State Health
17  Services.
18             MR. SCOTT:  John Scott.  I'm with the
19  AG's office in Texas, and I'm representing Health
20  and Human Services witnesses for the 30(b)(6)
21  deposition.
22     Q.  (BY MR. FREEMAN)  Mr. Farinelli, have you
23  ever been deposed before?
24     A.  No.
25     Q.  So let me explain how a deposition works.

6

1  It's a question and answer.  And I will ask the
2  questions, and, in general, you will give the
3  answers, unless you don't understand my questions, in
4  which case you can ask me a question back,
5  essentially.
6             And the court reporter is here to take
7  a record, and so we need to speak rather than our --
8  we need to -- rather than gesture.  Just like you
9  just nodded there --
10     A.  Yes.
11     Q.  -- that doesn't work.  Okay.  Just making
12  sure you understand.  So do you understand?
13     A.  Yes.
14     Q.  Okay.  The purpose of this deposition is to
15  record your full and complete testimony.  Do you
16  understand?
17     A.  Yes.
18     Q.  Okay.  I may not always be clear, as I
19  said.  If you don't understand, just ask me to
20  restate the question and I'll do my best to make it
21  make more sense.
22     A.  Okay.
23     Q.  Great.  If you need a break, let me know.
24  We will finish the question that's pending and then
25  we'll see about a break.  Does that work?

7

1      A.  Okay.
2      Q.  It's important that we don't talk over each
3  other, because that makes it very hard for the court
4  reporter.  So I will make sure not to ask a question
5  until you're done answering.  And will you try to
6  wait until I've finished asking my question before
7  you respond?
8      A.  Yes.
9      Q.  Great.  If you need more water or -- there
10  isn't coffee here, but if you need coffee, similarly,
11  please wait until we're done with whatever question
12  is floating out there, finish that up, we can get you
13  more water, figure out where we can find you some
14  coffee.  Sound good?
15     A.  Yes.
16     Q.  Great.  If you want to talk to your
17  attorney, that's fine.  But, again, if there's a
18  question pending or if you're in the middle of an
19  answer, I need you to finish that up first and then
20  you can talk to your attorney.  Does that work?
21     A.  Yes.
22     Q.  Great.  Sometimes you might remember
23  something later in the day about a question that was
24  asked earlier.  If that happens, will you let me know
25  and we'll add it to the record?

8

1      A.  Yes.
2      Q.  Great.  And I'll give you a few chances to
3  do that along the way as well.
4             Also, sometimes when we've been
5  talking for a while, you may realize that a prior
6  answer you gave was not completely accurate.  If you
7  realize that, will you let me know?
8      A.  Yes.
9      Q.  Great.  Sometimes while you're answering,
10  you may think of a document that would help you
11  remember or help you answer more accurately, just
12  refresh your recollection.  If you do, will you let
13  me know?
14     A.  Yes.
15     Q.  I have a few documents here.  Your counsel
16  may have some documents.  I'm sure their computer is
17  somewhere if you really need something.  We'll do our
18  best.
19             There are a few totally standard
20  questions that I have to ask that may sound a little
21  odd.  Are you on any medication or drugs of any kind
22  that would make it difficult for you to understand my
23  questions or to answer them?
24     A.  No.
25     Q.  Have you had anything alcoholic to drink in

VICTOR FARINELLI                                              5/9/2014

3 (Pages 9 to 12)

---

9

1    the last eight hours?
2        A.  No.
3        Q.  Are you at all sick today in a way that
4    would make it difficult for you to understand my
5    questions or to answer them?
6        A.  No.
7        Q.  Is there any other reason you can think of
8    why you wouldn't be able to answer my questions fully
9    and accurately?
10        A.  No.
11        Q.  And last thing.  I'm going to remind you
12    that you're under oath and subject to federal
13    penalties for giving false or misleading testimony,
14    so it's important to answer my questions truthfully,
15    accurately, and completely.  Do you understand?
16        A.  Yes.
17        Q.  Any questions at this time?
18        A.  No.
19        Q.  Great.  Do you understand that you are
20    testifying on behalf of the Texas Health and Human
21    Services Commission and not in your individual
22    capacity?
23        A.  Yes.
24        Q.  What is your position?
25        A.  I am the electronic registration manager of

---

10

1    the Department of State Health Services Vital
2    Statistics Unit.
3        Q.  And what are your responsibilities as the
4    electronic records manager?
5        A.  With the Vital Statistics, we have an
6    electronic registration system.  I manage and oversee
7    the registration of vital events in those areas.
8        Q.  Okay.  And who do you report to?
9        A.  The director, Ms. Geraldine Harris.
10        Q.  And what is her title?
11        A.  Director 1, State Registrar of the Vital
12    Statistics Unit.
13        Q.  And what does director 1 mean?
14        A.  She's -- that's her classification.
15        Q.  Okay.  And do you know who she reports to?
16        A.  She reports to the chief operating officer,
17    Ed House.
18        Q.  Ed --
19        A.  Ed House.
20        Q.  And that's at the Vital Statistics Unit?
21        A.  That's for the Department of State Health
22    Services.
23        Q.  Okay.  And how many individuals report to
24    you?
25        A.  25.

---

11

1        Q.  And what types of positions do those
2    individuals have?
3        A.  Part -- admin 3s, admin 2s, which are --
4    have -- they process requests, complete delayed
5    registrations.
6            I also manage the electronic
7    registration help desk, which helps the -- our
8    customers with electronic registration and the
9    communications department.
10        Q.  Okay.  How long have you held your
11    position?
12        A.  Current position, eight months.
13        Q.  Okay.  And what is your educational
14    background?
15        A.  High school, some college.
16        Q.  And what is your employment background?
17        A.  I've been with the Department of State
18    Health Services Vital Statistics Unit for 12 years.
19            Prior to being manager, I was with the
20    Field Services for five years and worked in paternity
21    registry -- I mean paternity requests in -- for
22    approximately a year, and worked my way up through
23    there.
24            Prior to that, I was a chef with --
25    through various restaurants.

---

12

1        Q.  And what do you mean by field services?
2        A.  Field services is our contact between our
3    service and source providers and the State.  So they
4    represent the State Registrar in 2R -- service and
5    source providers: local registrars, funeral homes,
6    doctors, birth registrars.
7        Q.  Those last two categories you gave, those
8    are service and source providers?
9        A.  Yes.
10        Q.  Okay.  Just trying to make a clear record.
11            And besides what we've discussed, no
12    other positions working for the State?
13        A.  With the State, just worked my way up.  I
14    started off as a clerk 3, just doing filing; clerk 4,
15    again, filing.  And then admin 2, processing requests
16    that come in.  And then program specialist 1, and
17    that was a team lead position; and then moved over to
18    field services as a field rep, representing the State
19    Registrar to our locals.  And then -- and then the
20    manager.
21        Q.  Okay.  Great.  When did you first learn
22    that you would be testifying on behalf of the State?
23        A.  Don't recall the exact date, but it was a
24    couple of weeks ago.
25        Q.  Okay.  And are you represented by counsel

---

VICTOR FARINELLI                                        5/9/2014

4 (Pages 13 to 16)

13

1    here today?
2       A.  Yes.
3       Q.  And who is representing you?
4       A.  The Office of Attorney General and our
5    Office of General Counsel with the Department of
6    State Health Services.
7       Q.  And that's Mr. Scott to your left.  And I
8    forget the other gentleman's name.  I'm sorry.
9           MR. DOGGETT:  Tim Bray.
10          MR. FREEMAN:  Okay.  Great.  Just
11   wanted to make it clear.
12      Q.  (BY MR. FREEMAN)  If one of them objects to
13   a question that I ask, you may answer after that
14   objection, unless they instruct you not to answer
15   specifically.  So we may do our lawyer thing, but
16   just keep going unless they specifically instruct you
17   not to answer.  Does that make sense?
18      A.  Yes.
19      Q.  Okay.  Great.
20          MR. FREEMAN:  Mark this as
21   Exhibit 106.
22          (Exhibit Number 106 marked.)
23      Q.  (BY MR. FREEMAN)  Sir, have you seen this
24   document before?
25      A.  Yes.

14

1       Q.  And what is this document?
2       A.  It is the deposition document for --
3    requesting that we provide information regarding the
4    electronic -- I mean the election identification
5    card.
6       Q.  Okay.  If you could turn to Exhibit A.
7    Now, I've had some discussions with your counsel, and
8    there are some questions that are covered by these
9    topics that we are probably going to hold off on for
10   another witness.  But I just would like to go through
11   them and understand what you have knowledge of as we
12   go through.
13          So if you could take a look at
14   Topic 1.
15      A.  Uh-huh.
16      Q.  Looking to Topic 1, who at HHSC knows the
17   most about Topic 1?
18      A.  Myself and the State Registrar.
19      Q.  The State Registrar?
20      A.  Uh-huh.
21      Q.  Who is the State Registrar?
22      A.  Geraldine Harris.
23      Q.  And did you talk to Ms. Harris in
24   preparation for this deposition?
25      A.  Briefly.

15

1       Q.  And did Ms. Harris provide you with any
2    documents?
3       A.  No.
4       Q.  If you could take a look at Topic 2.  Who
5    at HHSC knows the most about Topic 2?
6           MR. SCOTT:  If you know.
7       Q.  (BY MR. FREEMAN)  If you know.
8       A.  Myself.
9       Q.  Did you talk to anyone else specifically
10   about Topic 2 in preparation for this deposition?
11      A.  Just my attorneys.
12      Q.  Okay.  And I'm never going to ask for what
13   you said to your attorneys.  That's out of bounds.
14   Just -- and Mr. Scott said a moment ago, "If you
15   know."  That's essentially part of every question.
16   If you don't know, it's a perfectly fair answer to
17   say, "I don't know."  It's always to the extent of
18   your knowledge.
19      A.  Uh-huh.
20      Q.  If you could take a look at Topic 3.  We
21   will not be discussing, at this deposition --
22   sorry -- the comments on the proposed rule, and we
23   will not be discussing communications prior to the
24   adoption of that rule with local registrars and
25   county clerks.  But it's my understanding --

16

1           MR. FREEMAN:  And, Mr. Scott, if
2    you'll let me know if I have this wrong at all --
3    that everything else on Topic 3 should be okay for
4    this deposition?
5           MR. SCOTT:  Yes.
6       Q.  (BY MR. FREEMAN)  Okay.  If you could take
7    a look at Topic 3.  To your knowledge, who at HHSC
8    has the most knowledge concerning Topic 3?
9       A.  The -- to the best of my knowledge, besides
10   myself, would be the Office of General Counsel.
11      Q.  And who at Office of General Counsel would
12   you know of specifically?
13      A.  Mark Connolly and Lisa Hernandez.
14      Q.  And are they -- do they work at the Office
15   of General Counsel, is that for the Department of
16   State Health Services?
17      A.  It's for the Department of State Health
18   Services.
19      Q.  And are you prepared to testify today
20   concerning Topic 3, to the extent of your knowledge?
21      A.  To the extent of my knowledge, yes.
22      Q.  Okay.  And who at HHSC would know the most
23   about Topic 4?
24      A.  Myself and the State Registrar.  I would
25   say most of the employees who process requests, too,

VICTOR FARINELLI                                          5/9/2014

5 (Pages 17 to 20)

17

1    Q.  Individual frontline employees?
2    A.  Uh-huh.
3    Q.  Okay.
4         MR. SCOTT:  Yes, no, something.
5    A.  Yes.  Oh, I'm sorry.
6    Q.  (BY MR. FREEMAN)  Thank you.
7    A.  That was a question.
8    Q.  It was.  It generally will be.
9         And how about Topic 5, who at HHSC
10   would know the most about Topic 5?
11   A.  Myself and the field services staff.
12   Q.  Okay.  And just so we're clear, when I say
13   HHSC, I mean the Texas Health and Human Services
14   Commission.  Do you understand?
15   A.  Yes.
16   Q.  Great.  Okay.  And so am I correct that
17   you're prepared to talk -- to discuss all five of
18   these topics, to the extent of your knowledge?
19   A.  Yes.
20   Q.  And with the limitation that I mentioned
21   before regarding Topic 3?
22   A.  Yes.
23   Q.  Great.  Talking with Geraldine Harris, what
24   else did you do to prepare for this deposition?
25   A.  Talked to my general counsel of Department

18

1    of State Health Services and also with the Attorney
2    General's Office.
3    Q.  And was anyone else present at any of those
4    meetings?
5    A.  Another individual, Albert Rivera, who used
6    to be the manager of field services.
7    Q.  And he's no longer the manager of field
8    services?
9    A.  No.
10   Q.  When did he leave HHSC?
11   A.  He's still with HHSC.  He works for
12   immunization.
13   Q.  And who is the new manager of field
14   services?
15   A.  I am the interim manager of field service.
16   Q.  I see.  So currently you're wearing two
17   hats?
18   A.  Correct.
19   Q.  Got it.
20        Did you review any documents when
21   preparing for this deposition?
22   A.  Yes.
23   Q.  And what documents did you review?
24        MR. SCOTT:  We have brought all those
25   that he reviewed with us here today.

19

1         MR. FREEMAN:  Okay.
2         MR. SCOTT:  So we can mark them as an
3    exhibit.
4         MR. FREEMAN:  That is that pile of
5    documents in front of you there?
6         MR. SCOTT:  Yes.
7         MR. FREEMAN:  Okay.  Sometime on a
8    break, I will want to take a look at those.
9    Q.  (BY MR. FREEMAN)  And did you review any
10   documents, other than the large pile of documents
11   currently sitting in front of your attorney?
12   A.  No.
13   Q.  Great.  Thank you.
14        MR. FREEMAN:  And, Mr. Scott, will
15   you produce those subject to the agreement
16   concerning production format at a later date?
17        MR. SCOTT:  Yes.
18        MR. FREEMAN:  No need for an
19   additional request?
20        MR. SCOTT:  Nope.
21        MR. FREEMAN:  Much appreciated.
22   Q.  (BY MR. FREEMAN)  Did you speak with anyone
23   else about your deposition today?
24   A.  Just the State Registrar -- not
25   specifically about the deposition information itself,

20

1    but just the State Registrar, to let her know I was
2    coming to the deposition.
3    Q.  Makes sense.  Thank you.
4         Have you ever testified in court
5    before?
6    A.  Not in court.  SOAH hearing.
7    Q.  What hearing?
8    A.  A SOAH hearing.
9    Q.  What is a SOAH hearing?
10   A.  It's for -- I can't --
11        MR. SCOTT:  State Office of
12   Administrative Hearings.
13   Q.  (BY MR. FREEMAN)  And what did that relate
14   to?
15   A.  The -- for a hearing against a doctor for
16   the Texas Medical Board, for a violation of a statute
17   and rule; and for the Texas Funeral Service
18   Commission against a funeral director for a violation
19   against statute and rule.
20   Q.  And in those matters, were you a witness
21   for the State of Texas?
22   A.  Yes.
23   Q.  Okay.  Any other matters?
24   A.  That's it.
25   Q.  Okay.  Have you ever personally been a

**21**

1  party to a lawsuit?
2       A.  No.
3       Q.  Any other involvement in a case in which
4  the State of Texas was a plaintiff or a defendant?
5       A.  No.
6       Q.  And how were those SOAH hearings resolved?
7       A.  I did not get feedback on what -- how those
8  were resolved.
9       Q.  Okay.  Great.
10          Are you familiar at all with Senate
11  Bill 14 from the 2011 regular session?
12      A.  Yes.
13      Q.  What is your understanding of Senate Bill
14  14?
15      A.  It requires that anyone that is wanting to
16  vote would need a picture identification in order to
17  vote.
18      Q.  And if I refer to Senate Bill 14 as SB 14,
19  will you understand that for purposes of this
20  deposition?
21      A.  Yes, sir.
22      Q.  Great.  Any other understandings that you
23  have of SB 14?
24      A.  No.
25      Q.  Are you familiar with the term "election

**22**

1  identification certificate"?
2       A.  No.
3       Q.  I think earlier you said something along
4  the lines of election identification card?
5       A.  Correct.
6       Q.  Okay.  If I represent to you that the term
7  that SB 14 uses for that card is an election
8  identification certificate, can we understand that I
9  mean essentially the same thing?
10      A.  Yes.
11      Q.  Okay.  Do you understand what the
12  relationship is between an election identification
13  certificate and SB 14?
14      A.  Yes.
15      Q.  And what is that relationship?
16      A.  If a voter cannot afford a picture ID, they
17  can get this identification card, driver's license --
18  they can get this certificate for free through the
19  Department of Public Safety, to vote.
20      Q.  Did you have any understanding of what an
21  election identification certificate was prior to
22  meeting with counsel?
23      A.  Yes.
24      Q.  Okay.  How did you arrive at that
25  understanding?

**23**

1       A.  I had completed the bill analysis on that
2  bill for the Department of State Health Services
3  Vital Statistics Unit and provided that analysis to
4  the State Registrar.
5       Q.  And as part of what prior position did you
6  conduct legislative analysis?
7       A.  In the field services department, as a
8  program specialist.
9       Q.  Okay.  And what parts of SB 14 did you
10  conduct legislative analysis on?
11      A.  On the whole bill.  We had to review the
12  whole bill to see if it had an impact on our agency.
13      Q.  Okay.  And did you determine that it did?
14      A.  We determined that if the -- we had impact,
15  it would be minimal.
16      Q.  Okay.  And why did you believe that the
17  impact would be minimal?
18      A.  Because they had removed the certificate of
19  birth as a primary source of use for election
20  purposes, as an identification.
21      Q.  Okay.  Any other ways that you saw SB 14
22  affecting your department?
23      A.  No.
24      Q.  If I refer to an election identification
25  certificate as an EIC, will you understand that for

**24**

1  purposes of this deposition?
2       A.  Yes.
3       Q.  Great.  Do you have any understanding of
4  the requirements to obtain an EIC?
5       A.  That they will need -- as far as I know,
6  they will need a supporting document in order to get
7  that birth certificate; I believe a Social Security
8  card.
9       Q.  So a birth certificate is one of the forms
10  of supporting documentation that an individual might
11  need?
12      A.  Yes.
13          MR. FREEMAN:  Okay.  If we could mark
14  this as Exhibit 107.
15          (Exhibit Number 107 marked.)
16      Q.  (BY MR. FREEMAN)  And, again, we're going
17  to limit how much we do discuss -- first, have you
18  seen this document before?
19      A.  Not this specific document.
20      Q.  Do you know what this document is?
21      A.  It appears to be from the Texas Registrar,
22  which is what is used to publish proposed rules and
23  changed rules to the Texas Administrative Code.
24      Q.  But you've never seen this particular
25  proposed rule before?

**25**

1    A.  I've seen the proposed rule, but not this
2    particular document as it's formatted.
3    Q.  Okay.  Did you see the proposed rule before
4    it was sent to the Texas Registrar?
5    A.  Yes.
6    Q.  Okay.  And when did you see it?
7    A.  A couple of days ago.
8    Q.  Okay.  But you said you had seen it before
9    it was --
10   A.  Proposed.  Yes, yes.  So that was when --
11   right before the rules were first put into place.
12   Q.  Do you know who wrote this proposal?
13   A.  No, I don't.
14   Q.  And just looking at this, when is this
15   document dated?
16   A.  August 23rd, 2013.
17   Q.  And if you look at the proposed rule, do
18   you see when it was submitted to the office of
19   Secretary of State?  It's on the back.
20   A.  Oh, August 12th of 2013.
21   Q.  Thank you.  Turning back to the front, can
22   you review the explanation of the proposed
23   regulation?
24   A.  Clarify explanation.
25   Q.  The background and purpose section, to be

**26**

1    specific.
2    A.  Okay.  The background, let's -- informs us
3    that --
4    Q.  I was just asking you to review it before
5    questions.
6    A.  Oh, I'm sorry.
7    Q.  That's fine.
8    Am I correct that the Texas -- the
9    executive commissioner of the Health and Human
10   Services Commission wrote that the cost of a
11   certified birth record may impose a barrier to a
12   person who is required to produce a certified copy
13   for the purpose of obtaining an EIC?
14   A.  Yes.
15   Q.  We can put this aside, but we will
16   definitely be returning to it.
17   MR. FREEMAN:  And if we could mark
18   this as Exhibit 108.
19   (Exhibit Number 108 marked.)
20   Q.  (BY MR. FREEMAN)  Have you seen this
21   document before?
22   A.  Not this particular document, but I've seen
23   the adopted rules.
24   Q.  Okay.  And so what is this document?
25   A.  It's -- it is the publication in the Texas

**27**

1    Register for the publication of the approved rules.
2    Q.  And do you know which specific approved
3    rule this is?
4    A.  To waive the fee for a certified copy of a
5    birth certificate.
6    Q.  And did you see the final adopted rule
7    before it was published?
8    A.  Yes.
9    Q.  When did you first see it?
10   A.  I don't have an exact date, but it was a
11   few weeks before it was published.
12   Q.  So sometime in September?
13   A.  Yeah.
14   Q.  Okay.  And when is this adopted rule dated?
15   A.  October 18th, 2013.
16   Q.  And if you look to the back again, when was
17   this adopted rule filed with the office of the
18   Secretary of State?  Last page.
19   A.  October 1st, 2013.
20   Q.  Thank you.  Can you review again the
21   background and purpose section?  Just review and then
22   I'll ask you a question in a moment.
23   A.  Yes.
24   Q.  Am I correct that the executive
25   commissioner of the Health and Human Services

**28**

1    Commission took the position that the cost of a
2    certified birth record would be paid by the person
3    who is required to produce a certified copy for the
4    purpose of obtaining an EIC?
5    A.  Yes.
6    Q.  And if you look at the comments about
7    costs, on page 2, and the final response, am I
8    correct that the executive commissioner took the
9    position that the department believes that to the
10   degree it may exercise -- reasonably exercise
11   discretion over the matter, cost should not prevent
12   anyone from obtaining an EIC who wants one?
13   MR. SCOTT:  Objection; form.
14   A.  Which one are you -- I'm not for sure which
15   comment you're looking at.
16   Q.  (BY MR. FREEMAN)  Sure.  So under comments
17   concerning cost, and then there's response.
18   A.  Okay.  All right.
19   Q.  The second sentence, am I correct that this
20   states, "The department believes that to the degree
21   it may reasonably exercise discretion over the
22   matter, cost should not prevent anyone from obtaining
23   an EIC who wants one"?
24   A.  Yes.
25   Q.  And is the premise of this statement that

VICTOR FARINELLI                                        5/9/2014

8 (Pages 29 to 32)

---

29

1   the $22 fee, the existing fee, could prevent someone
2   from obtaining an EIC who wants one?
3       A.   Yes.
4       Q.   So original or certified copies of a birth
5   record are available from HHSC or one of its
6   components.  Correct?
7       A.   The Department of State Health Services or
8   a local registrar.
9       Q.   And does HHSC or one of its components ever
10  assist individuals who need a birth certificate, but
11  the only birth certificate that they could get is a
12  Department of State certificate of live birth abroad?
13      A.   We provide them with information on how to
14  obtain that.
15      Q.   And what information is that?
16      A.   We direct them to the Department of State
17  website on -- specifically the travel website
18  regarding the certificate of U.S. citizen born
19  abroad.
20      Q.   And do you maintain any paper materials
21  on-site regarding those?
22      A.   No.
23      Q.   Do you train your staff at all regarding
24  the specific availability of those forms?
25      A.   Yes.

---

30

1       Q.   And do you train them regarding the cost of
2   obtaining the certificate of live birth abroad?
3       A.   No.
4       Q.   Okay.  And just so I'm very certain, an
5   individual can't get a certificate of live birth
6   abroad from HHSC or any of its components.  Right?
7       A.   No.
8       Q.   Does HHSC or any of its components ever
9   assist individuals to obtain a birth certificate if
10  they were born in another state?
11      A.   No.
12      Q.   They don't even provide the same
13  information they provide by the State Department
14  certificate of live birth abroad?
15      A.   Yes, we do provide that.  We'll provide
16  them with the address and contact information for --
17  of the office where they should contact to obtain
18  that.
19      Q.   Okay.  But no other assistance?
20      A.   No.
21      Q.   And there's no other specific information
22  available in your office about any specific states or
23  neighboring states?
24      A.   No.
25      Q.   Okay.  And, again, you can put this aside

---

31

1   for now but we will swing back to it later.
2            When is a birth certificate originally
3   issued in Texas?
4       A.   Define issued.
5       Q.   After -- after a child is born, when is the
6   original record created?
7       A.   The record is registered with the birth
8   registrar, the person responsible for filing the
9   record if a child is born in a hospital, that is, a
10  birth registrar that is designated by that hospital
11  administrator to file those records.  It is required
12  to file those within five days of the child's birth.
13      Q.   So that's automatic and required?
14      A.   Uh-huh.
15           MR. SCOTT:  Is that a yes?
16      A.   Yes.  Sorry.
17      Q.   (BY MR. FREEMAN)  That's fine.  And is a
18  record created or do the parents automatically get a
19  copy of that record?
20      A.   Record is created, but they do not
21  automatically get a copy of that record.
22      Q.   Okay.  But no one needs to request that the
23  record is created?  It's required by law?
24      A.   Yes.
25      Q.   Okay.  In order to get a copy of that

---

32

1   record, do the parents have to specifically request
2   it?
3       A.   The parents or another qualified applicant.
4       Q.   Okay.  What is the ordinary process for the
5   creation of a birth record when there's an
6   in-hospital birth in Texas?
7       A.   The child is born.  The birth registrar,
8   who is the designation person to file those records,
9   gets the information about the birth certificate from
10  the parents: name, the parents' names, and -- gets
11  that information, gathers it, and then enters it into
12  our electronic registration system.  They enter it,
13  certify that this is true and correct to the best of
14  their knowledge, and transmit that information to our
15  office, in which we actually print off a paper
16  document and house it.
17      Q.   Okay.  So that goes directly to HHSC?
18      A.   Yes.
19      Q.   What is the role of the local county
20  registrar in that process?
21      A.   We have a dual registration system in the
22  State of Texas --
23      Q.   Okay.
24      A.   -- where a copy is held at the State and
25  then a copy is held at a local registrar's office,

---

VICTOR FARINELLI                                         5/9/2014

---

**33**

1  which could be a county clerk, Justice of the Peace,
2  or a municipality.
3      Q.  So do you send -- by you I mean HHSC.  Do
4  you send that information to the local or is it
5  submitted to both at the same time?
6      A.  We send it to the local -- once we've filed
7  it, it gets sent to the local for filing.
8      Q.  Okay.  What are the requirements for a
9  parent or other qualified relative to obtain a copy
10  of a child's birth certificate immediately after
11  birth, as soon as the record is created?
12      A.  They would have to either go into a local
13  registrar's office and complete an application,
14  provide picture identification, and pay a fee to get
15  a certified copy.
16          They can also contact our office,
17  either coming into our office, by mail or through
18  Texas.gov, which is an online service they can
19  request certified copies through.
20      Q.  Okay.  And we're going to discuss all of
21  those different methods later.
22          Just specifically with regard to birth
23  certificate immediately after a birth, is the cost
24  the same as obtaining a birth certificate at any
25  later point?

---

**34**

1      A.  Yes.
2      Q.  And do you know if there's any type of
3  public assistance that's available specifically with
4  regard to obtaining a birth certificate immediately
5  after birth?
6      A.  No.
7      Q.  And do you know if Medicaid or any other
8  type of medical-related program or health insurance
9  covers that cost?
10      A.  Not that I'm aware of.
11      Q.  Okay.  And the ID requirements, those are
12  also the same as obtaining an ID -- or, excuse me,
13  obtaining a birth certificate at a later date.
14  Correct?
15      A.  Correct.
16      Q.  Okay.  Are there circumstances in which a
17  birth in Texas may occur but a birth record is not
18  created?
19      A.  Yes.
20      Q.  What are those circumstances?
21      A.  If by chance the parent accidently had the
22  child at home, the way the law is written, they're
23  required to go to the local registrar's office and
24  present documentation to prove that the child was
25  born alive on the date stated, the mother was

---

**35**

1  pregnant, and the child was born in their
2  registration district.
3          There are times that the parent
4  doesn't realize that.  They automatically think that
5  the birth certificate will be filed somehow.  And so
6  there are times -- if it's not registered within five
7  days, from five days to one year, it can still be
8  filed on a regularly filed birth certificate.  After
9  one year, a law requires that it go -- they go
10  through a delayed registration process.
11      Q.  Just to be clear, the law requires
12  submission by -- within five days.  Correct?
13      A.  Correct.
14      Q.  Between five days and one year, you've
15  broken the law, but it's still not a delayed
16  submission?
17      A.  It's considered a delayed, but the way the
18  law is written, it can be still filed on a regular
19  birth certificate from that point.
20      Q.  And after one year --
21      A.  You go through the delayed registration
22  process and it -- it's a special certificate that is
23  required for delayed registration.
24      Q.  Okay.  And you said that there are
25  documents that must be submitted if there's a home

---

**36**

1  birth.  What are those documents?
2      A.  It depends on -- so proof that the child
3  was born alive, some kind of document from a medical
4  personnel, physician, or EMT, if an ambulance was
5  called, to prove that the child is alive, was born
6  alive.
7      Q.  Okay.
8      A.  Date stated.  Generally, that's the same
9  document because it has a date the child was born.
10  Proof of pregnancy, some kind of document from a
11  healthcare provider showing that the mother was
12  pregnant.  And then proof that the child was born in
13  the registration district, some document showing
14  where the mother was born -- or mother is a resident
15  of.
16      Q.  Okay.  And that medical document that
17  said -- so that the proof that the child was born
18  alive, that generally requires -- or does that
19  specifically require that there's a medical personnel
20  of some kind?  Who may sign that?
21      A.  It's -- it's not a specific form that they
22  complete.  It's just a statement from them --
23      Q.  Okay.
24      A.  -- of the facts.
25      Q.  But who is qualified to sign that?

---

VICTOR FARINELLI                                          5/9/2014

---

37

1       A.  Any medical personnel, a physician, EMT,
2   registered nurse.
3       Q.  Okay.  And generally -- so generally, the
4   parents will have to pay someone for the medical
5   attention that is required to establish that the
6   child was born alive.  Correct?
7       A.  Generally, yes.  Sometimes they will -- it
8   depends on the local registrar there accepting the
9   documents.  They may accept an affidavit of personal
10  knowledge, but that's going to be up to them, what
11  other supporting documents they will use.
12      Q.  Okay.  So that's up to the local, that's
13  not HHSC's control?
14      A.  We provide information in our Texas
15  Administrative Code, but in the Texas Administrative
16  Code it does specifically state any other form of
17  supporting document that's acceptable by the local
18  registrar.
19      Q.  Okay.  So they have discretion?
20      A.  Uh-huh.
21      Q.  Great.
22          MR. SCOTT:  Yes.
23      A.  Yes.
24          MR. FREEMAN:  Thank you again.
25      Q.  (BY MR. FREEMAN)  Approximately how often

---

38

1   in the last ten years is a child born in Texas and
2   no -- just no birth record is created?
3       A.  I wouldn't have those -- percentage
4   offhand.
5       Q.  Who would know at HHSC, if anyone?
6       A.  We would have to gather that information.
7       Q.  Do you know historically whether that's
8   changed over time, the number of people who are born,
9   but no birth record is created at all?
10      A.  Yes.
11      Q.  And how has that changed over time?
12      A.  We find that, from our experience, that
13  individuals who were born in the '30s, '40s, and '50s
14  may have been born at home and a record was never
15  filed.  With more modern -- with the advent of
16  technology and information being out there, we're
17  finding less with the newborns within the past ten
18  years.
19      Q.  Okay.  Do you know if certain demographic
20  groups historically were more likely to not have a
21  birth record created?
22      A.  Not that I'm aware of.
23      Q.  Any racial groups?
24      A.  Not that I'm aware of.
25      Q.  Okay.  Who would know this?

---

39

1       A.  We would have to perform a study to find
2   that out.
3       Q.  Okay.  Do you have any idea, in the last
4   ten years, how often no birth certificate is issued
5   following creation of a birth record after a birth?
6   So how often a child would be born, but their parents
7   or relatives don't obtain the actual certificate?
8       A.  I wouldn't know.
9       Q.  Okay.  So you were mentioning earlier that
10  at a hospital there would be a designated person who
11  has to submit the records.  What is that person's
12  technical role, title?
13      A.  They are -- the way the law is written, it
14  says the hospital administrator or designee.  So they
15  are the designee at the hospital, administrator.
16          We, at the Vital Statistics office,
17  generally refer to them as a birth registrar.  And
18  then at that point they can get a birth registrar
19  certification to perform that function.
20      Q.  And you said if the child is born at
21  home, it's the parents' responsibility.  Correct?
22      A.  Unless there is a midwife who was
23  attending, and it's the midwife's responsibility at
24  that point.
25      Q.  Okay.  And would a birth center be treated

---

40

1   similarly to a hospital?
2       A.  Yes.
3       Q.  Who is responsible if the child is born
4   en route to the hospital?
5       A.  En route to the hospital, if the child was
6   not removed from the conveyance until the hospital,
7   the hospital will file that record.
8       Q.  Okay.
9       A.  Because the place of birth is going to be
10  where that child was first removed from the
11  conveyance.
12      Q.  Okay.  So just to be clear, if they're in
13  an ambulance on the way to the hospital, the child is
14  born in the ambulance, and nobody opens the door and
15  takes the child out until they get to the hospital,
16  the child is technically born at the hospital?
17      A.  Correct.
18      Q.  Okay.
19      A.  It's designated on the birth certificate as
20  an en-route birth.
21      Q.  Okay.  I am going to learn a lot today.
22          And how about a foundling?  Let's say
23  a woman gives birth to a child, drops the child off
24  at the front door of the church, who is responsible
25  for making sure the birth record is created?

---

VICTOR FARINELLI                                          5/9/2014

41

1    A.  Generally those children are brought to a
2    hospital.  It is the position of the Department of
3    State Health Services, in order to assist that child
4    in -- to having a productive -- being a productive
5    member of society, to be able to have a birth
6    certificate to move forward, so we will file a birth
7    certificate for that child as a foundling designated
8    birth certificate so that that child, if -- it can be
9    adopted at a later date at ease.
10       Q.  So HHSC actually creates the record
11   without --
12       A.  We designate the hospital to go ahead and
13   file those for the foundling.
14       Q.  Okay.  Thank you.
15       A.  Yes.
16       Q.  Is there any requirement -- you had
17   mentioned five days before.  Is there any requirement
18   related to a 15-day deadline for submission of
19   records?
20       A.  Yes.  If the parents specifically ask that
21   the birth certificate be delayed for naming purposes,
22   for religious purposes, the birth registrar is to
23   delay that no more than 15 days.  It's the parents'
24   responsibility to come back to the birth registrar or
25   the midwife who is responsible for filing the record,

42

1    and letting them know what that name is before the
2    15th day.
3        Q.  Great.  Thank you.
4            What other information is gathered
5    besides the name of the child, the name of the
6    parents, and the date of the child's birth?
7        A.  The parents' date of birth, the place of
8    birth of the parent, and the address of the mother,
9    which would include their street address, county,
10   state, and city of residence.
11       Q.  Do you gather the race of the mother?
12       A.  Yes.
13       Q.  And do you gather the race of the father?
14       A.  Yes.
15       Q.  How long has that information been
16   gathered?
17       A.  That information has been gathered -- it's
18   been on the legal birth certificate since 1903.
19       Q.  Okay.
20       A.  To the best of my knowledge.  I haven't
21   looked at a 1903 in a while.
22       Q.  That's fine.  I appreciate it.
23           MR. SCOTT:  But to clarify, it's no
24   longer on a birth certificate itself.
25           MR. FREEMAN:  I'll let the witness

43

1    testify.
2        Q.  (BY MR. FREEMAN)  Is the race of the
3    parent -- race of the mother and the race of the
4    father currently on a birth certificate?
5        A.  On the legal portion of the birth
6    certificate, no.
7        Q.  But you do collect that information?
8        A.  Correct.
9        Q.  Are you aware of when that information was
10   no longer on the birth certificate itself?
11       A.  Starting in 1994.
12       Q.  Okay.  Is the HHSC birth record database
13   searchable?
14       A.  Only by individuals at the Vital Statistics
15   Unit and in-house and local registrars who have
16   access to our remote system.
17       Q.  Okay.  What type of queries can be
18   conducted?
19           MR. SCOTT:  Objection; form.
20       Q.  (BY MR. FREEMAN)  What type of queries may
21   be conducted on the HHSC birth record database?
22           MR. SCOTT:  And objection.  This is
23   your personal -- this is not as a 30(b)(6) witness.
24   I don't think he's been offered -- I don't see an
25   area that he's qualified under.  But go ahead and

44

1    testify under your personal knowledge, if you have
2    any.
3        A.  The queries on that particular system,
4    through the front end, would be basic information
5    that's on the birth certificate.  So if you have the
6    name of the child, their date of birth, you can
7    search through that.  If you don't have a name of a
8    child, but you have a parent's name, you can search
9    under parents' name.
10       Q.  (BY MR. FREEMAN)  Okay.  Anything else?
11       A.  With -- we can search just under a birth --
12   date of birth, but you're going to get a lot of hits
13   on that.
14       Q.  Fair enough.  Are there any types of
15   summary reports?
16       A.  We -- define a summary report.
17       Q.  So if I wanted to know how many births
18   happened on November 3rd, 1987 --
19       A.  Center for Health --
20           MR. SCOTT:  One second.  Let me go
21   ahead and object.  Same one.  Mr. Freeman, I want to
22   make sure.  He's coming in -- obviously it's your
23   right to ask him questions outside of the 30(b)(6)
24   notice, and I don't want to be too intrusive from
25   the standpoint of letting the deposition go forward.

VICTOR FARINELLI                                                5/9/2014

45

1   But to the extent we're outside of the scope of his
2   capacity as the 30(b)(6) representative, because I
3   don't -- we've not prepared him to address the
4   issues of what computer capabilities are available
5   over at Health and Human Services in -- within the
6   Department of State Health Services, so I want to
7   make sure that -- whether we can have an agreement
8   without me interrupting constantly.  And I don't
9   know what the easiest way to do that is, but I don't
10  want to keep saying, objection; form outside the
11  scope of Rule 30(b)(6).
12          MR. FREEMAN:  Why don't we -- do you
13  want to just -- rather than doing it question by
14  question, say that you'll reserve that objection?
15          MR. SCOTT:  That's great.  That would
16  be perfect.  How about that.
17          MR. FREEMAN:  Okay.  That's fine.  I
18  mean, and I don't think that we're going to be
19  worried that much about what's binding HHSC versus
20  what's his testimony.  I would think that this is
21  relevant, although I -- to Topic 1, although I
22  recognize that it's getting pretty far out there.
23  So rather than having a fight, keep going, you
24  reserve the objection.
25          MR. SCOTT:  Thank you.

46

1           MR. FREEMAN:  Sounds great.
2       Q.  (BY MR. FREEMAN)  That was the lawyer stuff
3   we were talking about.
4           So we were talking about the summary
5   reports and the capability of the database to produce
6   a summary report.  If you wanted to produce a summary
7   report of every child who was born on November 3rd,
8   1987, could you do that?  Is that -- well, first, is
9   it technically feasible?
10      A.  The Department of State Health Services
11  can, through the Center for Health Statistics.
12      Q.  Is that a standard product of some kind?
13      A.  They have a health statistics report --
14  Vital Statistics report that they publish after they
15  have dealt with all the statistical scrubbing, making
16  sure all the data is correct to the best of their
17  knowledge.
18      Q.  Okay.  Is there any type of summary report
19  that could be conducted by race?
20      A.  Yes.
21      Q.  Are there any types of standard reports, to
22  your knowledge, that are produced with regard to
23  births by race, routinely produced?
24      A.  To the best of my knowledge, the report,
25  the Vital Statistics report does break down the

47

1   number -- the percentage of births by race and
2   categorizes them.  It can also do by race, by region.
3       Q.  And what are the regions that you use?
4       A.  They are the health regions throughout the
5   state.  There's -- I believe there's ten, and they're
6   divided throughout the state, like Region 1, for
7   example, is the Panhandle area.
8       Q.  Do you know if those are the same regions
9   the DPS uses, the Department of Public Safety?
10      A.  No, I don't -- I'm not aware of that.
11      Q.  Okay.  So earlier you mentioned a delayed
12  birth certificate or a delayed certificate of birth.
13  What is a delayed certificate of birth?
14      A.  It is a birth certificate that is filed a
15  year or more after the child is born.  They have to
16  present basically the same type of information that
17  they would if they were -- if they were -- had the
18  child at home and was going to the local registrar.
19          Depending on the age of the child,
20  depends on how many documents we will require.  Like
21  if the child is one to four -- one to four years of
22  age, we will only need two documents, one of them
23  being an attested statement from a healthcare
24  provider.  The -- and then -- I'm sorry, there's only
25  one document needed from one to four.

48

1       Q.  Okay.  If we could stop there real quick
2   and then we'll keep going.
3       A.  Okay.
4       Q.  So is there a distinction between a home
5   birth and a delayed birth certificate between ages
6   one and four where the healthcare provider is
7   required at that point, as opposed to at the
8   discretion of the local registrar?
9       A.  We're -- the way our rules are written,
10  we're going to need something showing that that child
11  is alive.
12      Q.  Okay.
13      A.  Where they go afterwards and get a checkup,
14  showing that that child is alive.
15      Q.  Okay.  Are there any other differences
16  between a -- the documents required to establish a
17  home birth and the documents required for the
18  creation of delayed birth record when the child is
19  between the age of one and four?
20      A.  They could vary because we may not ask for
21  as many documents to assist them in order to get that
22  child.  Because the way the law is written and the
23  rules, we just need -- depending on when they're
24  filing it, we need documents that show the child's
25  name, date of birth, and one -- at least one that has

VICTOR FARINELLI                                                    5/9/2014

13 (Pages 49 to 52)

---

49

1   their parents' name on it.
2       Q.   And what is the process for obtaining the
3   delayed certificates of birth?
4       A.   They first have to request that we search
5   our information for a birth certificate, just to
6   ensure that no delayed birth certificate has already
7   been filed.  If we do not find -- if we find one, we
8   will send them a certified copy, because if we don't,
9   we will send them information on how to file a
10  delayed birth certificate.
11      They have to pay $22 for the search
12  fee.  And then when they have submitted all their
13  documents for the delayed record, they have to pay a
14  $25 fee to complete that record so we can file it.
15      Q.   And how long does it take to obtain a
16  delayed birth record?
17      A.   It could vary.  It could be a couple of
18  weeks, could be up to a year.
19      Q.   And what would cause it to take up to a
20  year?
21      A.   Depending on the documents they submit.
22  Generally, older individuals, there's a little bit
23  harder time for them to get the documents, and some
24  of those documents need to be verified that they are
25  on file at a specific -- the holder of those records,

---

51

1       A.   Yes.
2       Q.   (BY MR. FREEMAN)  About how often does your
3   office issue delayed certificates of birth -- or
4   create -- sorry.  How often do they create a delayed
5   birth record?
6       A.   To my offhand knowledge, we get in
7   approximately 60 requests a month.
8       Q.   Okay.  Are you aware of any racial
9   distinctions within the group of people requesting
10  delayed birth records, the creation of delayed birth
11  records?
12      A.   We don't -- no, I'm not aware of any racial
13  distinctions.
14      Q.   So it's not, for example, more often Latino
15  families from the Valley rather than Anglo families
16  or elsewhere?
17      A.   We would have to do a study on that to find
18  out.
19      Q.   All right.  Is there any process to correct
20  a birth record that contains errors?
21      A.   Yes.
22      Q.   What is that process?
23      A.   They can request that an amendment be
24  filed.  There's an amendment form, it's called the
25  VS 170.  The parents complete that.

---

50

1   for example, a Baptismal record.  We will check the
2   archdiocese to make sure that that is on file at that
3   archdiocese.
4       Q.   Okay.  And what are the additional
5   requirements if the -- we'll say individual ones were
6   past one to four, if they're older than four?
7       A.   From four to 15, they need two documents,
8   one -- at least one showing parents' name on it.  So
9   both have to have name, date of birth, place of
10  birth.  One has to have the parents' names on it.
11      Q.   Okay.  And beyond 15?
12      A.   Three documents, same requirement, name,
13  date of birth, place of birth.  One has to have the
14  parents' names on it.
15      Q.   And anything -- is it 15 to the end?
16      A.   15 to -- yeah, yeah.
17      Q.   Okay.  And so you said there's a $22 search
18  fee and a $25 processing fee.  Are there any other
19  fees involved?
20      A.   If they want a certified copy once we've
21  completed the new birth certificate, the delayed
22  record, they can purchase one for $22.
23      Q.   And that's the normal fee?
24      A.   Uh-huh.
25      MR. SCOTT:  Yes?

---

52

1       If a child is under 17 years of age,
2   they would need a parent to sign that document, a
3   parent -- if -- parent or parents, if both parents
4   are on the record, both parents have to sign it.  If
5   only one parent is on the record, one parent has to
6   sign that in front of a notary.
7       Depending on the correction, we may
8   need a supporting document such as a school record,
9   Baptismal record.
10      Q.   You know, I realized I needed to ask one
11  more question about the creation of the delayed birth
12  record.  Where does a person have to go to create
13  those records?
14      A.   It can be only done by the Department of
15  State Health Services.
16      Q.   Do they have to travel to Austin in order
17  to do it or can they submit documents by mail?
18      A.   They can submit it by mail.
19      Q.   And do local registrars provide that
20  information to individuals?  Are they trained to do
21  that?
22      A.   Yes.
23      Q.   Okay.  Back to the amendments.  You said
24  that the request for an amendment needs to be
25  notarized.  Correct?

---

**53**

1    A.   Correct.
2    Q.   Do any HHSC employees have the authority to
3    sign and authenticate these requests for amendments
4    without a notary?  Or it specifically has to be a
5    notary?
6    A.   We have Department of State Health Services
7    staff who are notaries.
8    Q.   And do those notaries require any form of
9    identification to establish that the person is who
10   they say they are before they will notarize the
11   statement?
12   A.   I'm not a notary, so I wouldn't know what
13   their requirements are.
14   Q.   Okay.  How long does it take in order to
15   get a birth certificate amended?
16   A.   We have -- we're required to respond to the
17   individuals within 30 business days of receipt of the
18   amendment.  If the amendment application -- if the
19   amendment can be processed within the 30 business
20   days, we'll send them notification that it has been
21   processed.
22         If they included a fee for a certified
23   copy, we will send them a certified copy also.
24         If the amendment can't be processed,
25   we need additional information, we'll send them a

**54**

1    letter asking for what -- that information.
2    Q.   And how much does it cost to get an
3    amendment?
4    A.   It's a $15 processing fee.
5    Q.   About how often do you get requests for
6    amendments?
7    A.   We get them daily, and I couldn't tell you
8    the amount of amendments we get in.  We get quite a
9    few.
10   Q.   Okay.  And what are generally the bases for
11   asking for amendments?
12   A.   They have discovered that there's an error
13   on their birth certificate, that when it was filed,
14   either a spelling error or they have been going by a
15   different name, because they have been told by their
16   parents that their name is different.
17   Q.   Got it.  And do you have any awareness of
18   the racial distributions of the individuals who
19   request birth certificate amendment?
20   A.   No.
21   Q.   Okay.  Is there any other way, besides what
22   we've discussed, in which a birth record is created?
23   A.   No.
24   Q.   Okay.  Been going about an hour.  Do you
25   want to take a break for about five minutes?

**55**

1    A.   Sure.
2         (Recess.)
3    Q.   (BY MR. FREEMAN)  Back on the record.
4         I just want to go back and clarify one
5    thing.  When I was saying distinctions by race, I
6    also included language minorities.  Going forward,
7    I'll be using the term "race" to include Hispanics as
8    a distinct race from Anglos.  Does that make sense?
9    A.   Yes.
10   Q.   And with that definition in mind, do any of
11   your past questions about tracking particular types
12   of birth certificate amendments or issuance of late
13   birth certificates, do those answers change at all?
14   A.   No, my answers don't change.
15   Q.   Okay.  Just making sure.
16         So ordinarily, how much does it cost
17   to obtain a certified copy of a birth record from the
18   Department of State Health Services?
19   A.   $22.
20   Q.   Are there any additional costs, depending
21   on whether a request is -- strike that so it's not
22   compound.
23         Are there any additional costs for a
24   request made in person?
25   A.   No.

**56**

1    Q.   Are there any additional costs for requests
2    made by mail?
3    A.   No.
4    Q.   Are there any additional costs for requests
5    made online?
6    A.   There is a processing fee for a credit
7    card.
8    Q.   And how much is that fee?
9    A.   I'm not aware of what that fee is, offhand.
10   Q.   A couple dollars, no more?
11   A.   $3 at the most.
12   Q.   Okay.  Is there any option to expedite the
13   purchase of a birth record?
14   A.   Yes.
15   Q.   And is there an additional fee to expedite?
16   A.   Yes.
17   Q.   How much is that fee?
18   A.   $5.
19   Q.   And are there any additional fees if the
20   birth record was requested from a remote office?
21   A.   The local registrar's office, in accordance
22   to the Health and Safety Code 191.0045, can charge an
23   additional dollar on top of the fees, for records
24   preservation, training, and security.
25   Q.   Okay.  So there's just one additional

VICTOR FARINELLI                                      5/9/2014

15  (Pages 57 to 60)

57

1   dollar on top of the normal fee, if you obtain it at
2   a local office?
3       A.   Correct.
4       Q.   If you could return to the proposed rule,
5   which I believe is Exhibit 107.  And am I correct,
6   this is a proposed amendment to a regulation that
7   addresses fees charged under Section 181.22 of
8   Title 22 of the Texas Administrative Code?
9       A.   Yes.
10      Q.   And these are some but not all of the fees
11  that make up that $22.  Am I correct?
12      A.   These are all the fees that make up that
13  $22.
14      Q.   Okay.
15      A.   Did they put them all in?  Oh, no.  Okay.
16  So, yeah, they didn't include the whole rule, so this
17  is just that section of that rule.
18      Q.   Okay.  Does Section 181.22 of Title 22 of
19  the Texas Administrative Code set out all the fees
20  that make up the $22 to obtain a birth certificate?
21      A.   Yes.
22      Q.   Okay.  And we had already said this rule
23  was submitted to the Secretary of State as a proposal
24  on August 12th, 2013?
25      A.   Yes.

58

1       Q.   Do you know if litigation about SB 14 was
2   already underway when this rule was submitted?
3       A.   I don't know.
4       Q.   Okay.  If we could go back to Exhibit 108,
5   which is the adopted rule.  Do you know when this
6   regulation went into effect?
7       A.   October 21st, 2013.
8       Q.   Are there any components that that $22 cost
9   of this regulation does not address?
10      A.   Only those charged by the local.
11      Q.   What about the $2 search fee under the
12  Texas Health and Safety Code?
13      A.   That -- in the Texas Administrative Code,
14  the surcharge for $2 is indicated in that under
15  181.22(c).
16      Q.   And so it's your testimony that this
17  administrative rule waives, for certain individuals,
18  the $2 search fee under the Texas Health and Safety
19  Code?
20      A.   Through the Department of Health and Human
21  Services, yes.
22      Q.   What is your basis for believing that to be
23  true?
24      A.   Because we have it in the fee schedule in
25  our fees charged by Vital Statistics, so we have

59

1   waived that $2 fee.
2       Q.   If you look at Subsection T, which I
3   believe is the new provision, doesn't it say that the
4   fee is waived, except as provided in Subsection C?
5       A.   You are correct.  But we waive that fee.
6       Q.   You do waive that fee?
7       A.   Yes.
8       Q.   The $2 fee?
9       A.   Uh-huh.
10      Q.   And even though it's required by statute?
11      A.   We still pay it to the Comptroller, but we
12  waive that fee.
13      Q.   Okay.  You waive that fee to the individual
14  who is obtaining the birth record?
15      A.   Uh-huh.
16           MR. BRAY:  Is that a yes?
17      A.   Yes.
18      Q.   (BY MR. FREEMAN)  Has any notice been
19  provided that the $2 fee is not being charged,
20  notwithstanding the text of this proposed -- or,
21  excuse me, of this adopted rule?
22      A.   Not that I'm aware of.  We -- if an
23  individual comes into our office and requests an EIC
24  certificate, we're going to -- we're not going to
25  charge them.

60

1       Q.   And when did that particular practice go
2   into effect?
3       A.   We put that into place at the beginning.
4       Q.   Does this regulation address the $1 county
5   fee?
6       A.   No.
7       Q.   Okay.  If you go back to the final
8   responses of the Executive Commissioner regarding
9   comments, and back to the final responses regarding
10  cost, which is on the second page, do you see the
11  last paragraph in the first column where it says --
12      A.   First column.
13      Q.   The last paragraph that starts, "Regarding
14  fees"?
15      A.   Yes.
16      Q.   Do you see -- does it state, "The fees
17  required to be paid pursuant to Health and Safety
18  Code Section 191.0045(e) and 191.022(f), $2, are
19  statutorily required and are not waived by this
20  rule"?
21      A.   Uh-huh.  Yes.
22      Q.   And so the notice provided in the Texas
23  registrar -- or register states that the $2 fee is
24  still not waived and must be paid.  Correct?
25      A.   Correct.

VICTOR FARINELLI                                          5/9/2014

16 (Pages 61 to 64)

---

61

1   Q.   Okay.  And that's the only statutory fee
2   for a -- for obtaining a birth certificate.  Correct?
3       A.   Correct.
4       Q.   The other fees are all set by regulation by
5   HHSC?
6       A.   Of the $22, yes.
7       Q.   Yes.  Okay.  So the Texas Legislature
8   didn't take any action to eliminate birth certificate
9   fees for individuals who require a birth certificate
10  in order to obtain an EIC.  Correct?
11      A.   No.
12      Q.   No, I'm not correct or no, they --
13      A.   Oh, yes.  Yes.
14      Q.   -- did not take any --
15      A.   They -- no, they did not take any action.
16      Q.   Okay.  And so this regulation is the most
17  that could be done at the discretion of HHSC,
18  correct, to eliminate fees?
19      A.   Yes.
20      Q.   Okay.  Could this be reversed at the
21  discretion of HHSC at some later date?
22           MR. SCOTT:  Objection; form.  Go
23  ahead.
24      Q.   (BY MR. FREEMAN)  Could this regulation
25  waiving certain fees for an individual who requests

---

62

1   an EIC birth certificate, be changed back at some
2   later date at HHSC discretion?
3       A.   The HHSC has rulemaking authority, so they
4   could change the rule.
5       Q.   Okay.  Okay.  In other circumstances, are
6   there full statutory waivers of fees for obtaining a
7   birth record?
8       A.   Through -- there are.  But offhand, I
9   don't -- I'm not sure what those are.
10      Q.   Are active duty military -- members of the
11  military permitted to obtain birth records before
12  deployment abroad?
13      A.   Yes, I am aware of that one, yes.
14      Q.   And are any veterans or families of
15  veterans permitted to obtain birth certificates
16  without a fee when they -- in order to substantiate
17  claims?
18      A.   Yes.
19      Q.   Okay.  But there's no full statutory waiver
20  of fees for individuals who require a birth
21  certificate to obtain an EIC.  Correct?
22      A.   I'm sorry, could you repeat that?
23      Q.   Absolutely.  Am I correct that there is no
24  full statutory waiver of fees for individuals who
25  require a birth certificate to obtain an EIC?

---

63

1   Correct?
2       A.   Correct.
3       Q.   If we go back to the proposed regulation --
4   I'm sorry to dance back and forth.  That's 107.  If
5   you look on the second page, under public benefit, am
6   I correct that this states, "The public will benefit
7   from the adoption of this amendment because it allows
8   a person who does not have a birth certificate to
9   obtain one at little or no cost for the purpose of
10  securing an EIC to vote"?
11      A.   Uh-huh, yes.
12      Q.   Would it be more accurate to say that under
13  the terms of this regulation, it would allow an
14  individual to obtain a birth certificate at little
15  cost?
16           MR. SCOTT:  Objection; form.
17      Q.   (BY MR. FREEMAN)  You may answer.
18           MR. SCOTT:  Actually, I'm going to
19  instruct the witness not to answer.  The document
20  speaks for itself.  The comments speak for
21  themselves.  And this is not a witness we posed to
22  comment on interpretation of the rules.
23           MR. FREEMAN:  That's not a proper
24  instruction.  As long as you're not trying to
25  protect a privilege, it's not proper to instruct the

---

64

1   witness not to answer.
2           MR. SCOTT:  You've been so
3   instructed.  The document speaks for itself.
4       Q.   (BY MR. FREEMAN)  Can we agree that an
5   individual who seeks an EIC birth certificate must
6   take time to travel to a location where they can
7   apply for the EIC birth certificate?
8       A.   Yes.
9       Q.   Can we agree that because of the hours that
10  these locations are open, some individuals will have
11  to take time off of work to obtain an EIC birth
12  certificate?
13      A.   Yes.
14      Q.   Can we agree that many individuals will
15  have to spend money on transportation to get to these
16  locations because the individuals who need an EIC
17  birth certificate are not individuals who have
18  driver's licenses?
19      A.   Yes.
20      Q.   And if I refer to the birth certificate
21  obtained at a reduced fee under this regulation as an
22  EIC birth certificate, will you understand my use of
23  that term?
24      A.   Yes.
25      Q.   Okay.  Is the birth certificate provided to

---

VICTOR FARINELLI                                           5/9/2014

                                              17 (Pages 65 to 68)

---

**65**

1   an individual who requests the partial fee waiver
2   under the regulation we've discussed, is that birth
3   certificate different from an ordinary certified copy
4   of a birth certificate?
5        A.   Yes.
6        Q.   How does it differ?
7        A.   We designate on that document that it can
8   be used for the electronic identification card only.
9        Q.   Election identification card?
10       A.   Uh-huh, yes.
11       Q.   Okay.  What other purposes do individuals
12  need birth certificates for?
13       A.   There are many different reasons.  For
14  showing proof of birth, insurance, school.  There's
15  numerous reasons.
16       Q.   Okay.  What is the purpose of limiting the
17  circumstances in which an EIC birth certificate can
18  be used?
19       A.   We are -- we wanted to be in line with --
20  A, we wanted to be in line with the Department of
21  Public Safety in that their -- their election card
22  can only be used for election.  So we wanted to put
23  our death/birth certificate the same.
24            B, we believe that the -- we're --
25  that once the public found out that they could get a

---

**66**

1   free birth certificate for election purposes, they
2   would just get a free birth certificate and use it
3   for all other purposes, without needing to get an
4   election card.
5            We're already losing -- we already pay
6   to a Texas.gov through our fees for a contract, $10
7   off of that.  Plus the Department of State Health
8   Services also waives that $2 fee, which we pay to the
9   Comptroller.  So we believe we would lose quite a bit
10  of revenue, plus having to pay out of our budget to
11  subsidize those records that are being given for
12  free.
13       Q.   And when you mentioned $10 being paid out
14  to Texas.gov, is it possible to obtain an EIC birth
15  certificate online?
16       A.   No.
17       Q.   Okay.
18       A.   We are contracted -- regardless of whether
19  we issue it online or through our office, we are
20  required to pay $10 for each record issued, per
21  contract, to Texas.gov.
22       Q.   And would you agree that the time and costs
23  that an individual have to take that we just
24  discussed to obtain the EIC birth certificate,
25  limiting the use of the birth certificate to only

---

**67**

1   being able to use it to get an EIC, that means that
2   all those burdens are only going to be related to
3   voting and that -- would you agree with that?
4        A.   I agree.
5        Q.   Okay.  What law authorizes the creation of
6   a limited use birth certificate?
7        A.   The State Registrar has authority for
8   issuing birth certificates, so it's up to her
9   discretion.
10       Q.   Okay.  When was the EIC birth certificate
11  developed?
12       A.   We began developing it once the proposed
13  rules were put in to the registrar -- the registry.
14  And I believe it was by -- we had it in place by
15  October 30th.
16       Q.   And how does the EIC birth certificate
17  physically differ from the ordinary certified copy of
18  a birth record?
19       A.   It just has that designation statement
20  saying it's for election purposes only.
21       Q.   And how many EIC birth certificates can an
22  individual obtain over their lifetime?
23       A.   I believe it's one.
24       Q.   What happens if they lose that EIC birth
25  certificate?

---

**68**

1        A.   They would have to purchase one.
2        Q.   So after the first time, they're going to
3   have to pay full rate?
4        A.   Uh-huh.
5        Q.   How is that tracked?
6        A.   If they have lost one?
7        Q.   Yes.  How is it tracked to determine that
8   an individual has gotten their one lifetime EIC birth
9   certificate?
10       A.   We track that in our information database.
11       Q.   Was there any time when an EIC birth
12  certificate was issued in a different form from the
13  present?
14       A.   Not that I'm aware of.
15            MR. FREEMAN:  If we could mark this
16  as Exhibit 109.
17            (Exhibit Number 109 marked.)
18       Q.   (BY MR. FREEMAN)  What is this document?
19       A.   Appears to be a screen shot of our remote
20  system.
21       Q.   Have you seen any printout like this
22  before?
23       A.   This is the first time I've seen this
24  document.
25       Q.   And was October 21st, was that -- we said

---

VICTOR FARINELLI                                              5/9/2014

18 (Pages 69 to 72)

---

69

1   that was when the rule went into effect about the EIC
2   birth certificates.  And does -- if you look at the
3   bottom, does this appear to be notarized?
4       A.   I don't know what that signature is, or
5   seal.
6       Q.   Okay.  I honestly have not -- I honestly
7   don't know what this document is, and I was just
8   hoping you could clear it up.  So --
9       A.   It -- from the best of my knowledge, if
10  it -- I don't know where this was issued from, but it
11  appears that one of our local registrars took a
12  screen shot of our remote, and issued that as -- for
13  election identification purposes without our
14  knowledge.
15      Q.   Okay.  And why would you not want to -- why
16  would this not be sufficient to establish someone's
17  birth record?
18      A.   Because it's not a document that has been
19  approved by the State Registrar for issuing for that
20  document.
21      Q.   At a practical level, does this establish
22  the fact of someone's birth?
23      A.   Not according to State law, no.
24      Q.   But does it set out all the same facts as a
25  birth certificate would?

---

70

1       A.   I can't see exactly what's on this screen,
2   so I wouldn't be able to tell you for sure.  However,
3   to the best of my ability to read this document, it
4   appears to be the information that's issued from the
5   abstract birth record.
6       Q.   Okay.  And the abstract birth record, does
7   that contain all the same information as a birth
8   certificate?
9       A.   The Department of State Health Services has
10  two forms of certified copy of birth certificate; an
11  abstracted birth, which is limited information: name,
12  date of birth, parents' names, and county of birth,
13  and the file date and the issuance date.
14           The full-sized copy has the additional
15  information, which is on the legal portion of the
16  birth certificate, such as the parents' -- the
17  mother's address, the hospital name, time of birth of
18  the child.
19      Q.   And does an EIC birth certificate have all
20  that long-form information?
21      A.   Depending on where they get it.
22      Q.   Where would the distinction lie?
23      A.   If they issue it off of our remote -- so if
24  we issue it, and we're going to issue this, where
25  it's just going to be the abstract, if -- when I say

---

71

1   we, I mean the Department of State Health Services
2       Q.   And that's the Austin office?
3       A.   Yes.
4       Q.   Okay.
5       A.   If a local registrar who is on our remote
6   issuance system, they have access to our database,
7   they will issue the abstract.  If they are not on our
8   remote database, they're going to access that
9   record -- their own records to issue that.
10      Q.   Okay.  And someone who is not on the
11  remote, that's the local county that had their
12  original copy?
13      A.   Uh-huh.
14      Q.   Okay.
15      A.   Yes.
16      Q.   Okay.  And this would -- the document
17  that's Exhibit 109 would no longer -- if it ever were
18  acceptable, it is certainly not acceptable now, is
19  that correct, for use?
20      A.   No, it's not acceptable.
21           MR. FREEMAN:  Okay.  If we could mark
22  this as Exhibit 110.
23           (Exhibit Number 110 marked.)
24      Q.   (BY MR. FREEMAN)  What is Exhibit 110?
25      A.   It is a sample of what the election -- EIC

---

72

1   birth certificate would look like once it's been
2   issued.
3       Q.   And what are the -- what are the specific
4   features of an EIC birth certificate?
5       A.   The only difference between a regular birth
6   certificate and an EIC birth certificate is this
7   statement that says, For election purposes only.
8   Cannot be used for -- as identification.
9       Q.   And is this printed on a special security
10  paper?
11      A.   Yes.  All certified copies of birth
12  certificates are issued on security paper that has
13  specific security features as it's laid out in the
14  Texas Administrative Code.
15      Q.   And how much does security paper cost?
16      A.   Offhand, I don't know.
17      Q.   Do you have any knowledge of how many of
18  those unacceptable forms of EIC birth certificates
19  were ever issued?
20      A.   No, I don't.  I don't have any knowledge of
21  that.
22      Q.   Give me just one moment.  I'm cutting out
23  the questions that your counsel and I have agreed
24  that I'm not going to ask.
25           Does HHSC connect to anyone other than

---

VICTOR FARINELLI                                          5/9/2014

19 (Pages 73 to 76)

---

73

1   the local issuance offices, to provide data regarding
2   births?
3       A.  Through the remote system?
4       Q.  Yes.
5       A.  Yes.  We provide access to the Social
6   Security Administration for them to verify births.
7           HHSC, through Medicaid, they have a
8   portal through their Medicaid program where they
9   enroll people that hits off of that same database.
10  It's not the same interface, but it hits off of that
11  database.
12      Q.  Okay.  Is an individual related to an EIC
13  birth certificate applicant allowed to request that
14  EIC birth certificate on their behalf?
15      A.  I believe, from my knowledge, the
16  individual will have to request that document.
17      Q.  So, for example, a parent could not request
18  an EIC birth certificate for their child?
19      A.  I think I'm going to step back and say, I
20  believe it -- actually, I was incorrect on that last
21  statement.  I actually -- thinking about it, I think
22  it was -- we -- I'm not sure what that -- what the
23  answer is on that.
24      Q.  Okay.  We're going to come back to that
25  after a break, and I'll see if I can find something

---

74

1   to refresh your memory on that one.
2       A.  Okay.
3       Q.  Do you know if there's any limitation based
4   on age for individuals who apply for an EIC birth
5   certificate?
6       A.  We instruct that it should only -- 16 years
7   of age or older for that.
8       Q.  And why is there no regulatory change
9   necessary for that?
10      A.  The Department of State Health Services,
11  under Texas administration -- Texas Health and Safety
12  Code states that the State Registrar can propose
13  rules, propose legislation, and create policy and
14  procedure.  And this falls under policy and
15  procedure.
16      Q.  Okay.  So as we already discussed, an
17  individual can't apply -- well, sorry, let me take
18  that back.
19          As we already discussed, an individual
20  can apply for a certified copy of a birth certificate
21  online, correct, an ordinary certified copy?
22      A.  Yes.
23      Q.  Is there any -- and you said the extra
24  cost -- sorry -- was the credit card processing?
25      A.  Yes.

---

75

1       Q.  How long does it take to get a birth
2   certificate that an individual applies for online?
3       A.  We process it within ten to 15 business
4   days.
5       Q.  Can it be expedited?
6       A.  Yes.
7       Q.  How fast?
8       A.  It's -- well, let me step back.  It's
9   already in expedited service.
10      Q.  Okay.
11      A.  To have it returned back to them overnight,
12  after we're done processing it, they can pay an
13  additional shipping fee.
14      Q.  And how much is that, to your knowledge?
15      A.  $8.
16      Q.  Okay.  So no matter what, there's no way to
17  get a birth certificate that you're applying for
18  online in less than six days.  Right?
19      A.  Yes.
20      Q.  Okay.  And it requires a photo ID to get an
21  ordinary, certified birth certificate online.
22  Correct?
23      A.  Yes.
24      Q.  What kinds of photo ID?
25      A.  Driver's license.

---

76

1       Q.  Any other kinds?
2       A.  And identification card.
3       Q.  Does it have --
4       A.  Issued from either this state or another
5   state.
6       Q.  Okay.  Anything else?
7       A.  No.
8       Q.  And do those have to be currently valid?
9       A.  Yes.
10      Q.  Can an individual obtain a certified copy
11  of a birth certificate by mail?
12      A.  Yes.
13      Q.  Same $22 cost?
14      A.  Yes.
15      Q.  And how long does that take?
16      A.  That will take generally six to eight
17  weeks.
18      Q.  Can that be expedited?
19      A.  Yes.
20      Q.  How much does that cost?
21      A.  It's $5 expedite --
22      Q.  The $5 fee?  And how fast would that be?
23      A.  Again, that's ten to 15 business days on
24  that one, too.
25      Q.  Okay.  So online is automatically

---

VICTOR FARINELLI                                                5/9/2014

20 (Pages 77 to 80)

---

**77**

1   expedited?
2       A.  Yes.
3       Q.  I got it.  And can you pay additional to
4   have that then overnighted back?
5       A.  Yes.
6       Q.  And that's $8?
7       A.  Yes.
8       Q.  But no matter what, if you're applying by
9   mail, it's going to take more than six days.
10  Correct?
11      A.  Correct.
12      Q.  And you can't get an EIC birth certificate
13  by mail.  Correct?
14      A.  No, you cannot.
15      Q.  And this requires a photo ID to apply for a
16  birth certificate by mail?
17      A.  Yes.
18      Q.  Same as online?
19      A.  We will accept -- for mail-ins, we will
20  accept passport, other government-issued
21  identification, such as a concealed handgun permit.
22      Q.  Is it any government-issued photographic
23  identification?
24      A.  Yes.
25      Q.  And is it any -- is it any federal?

---

**78**

1       A.  Yes.  We'll accept federal, too.
2       Q.  And any state issued?
3       A.  Yes.
4       Q.  And does that include identification issued
5   by, for example, a State university?
6       A.  That -- that -- you mean like a school
7   identification?
8       Q.  Like a UT ID.
9       A.  We will accept that as a secondary.
10      Q.  But not as a primary form of
11  identification?
12      A.  Not as a primary, no.
13      Q.  So what is the limitation on state-issued
14  IDs?
15      A.  Has to be issued from a -- like their
16  Department of Motor Vehicles, or federal government.
17  We differentiate between the schools and -- because
18  some schools aren't state-run schools.
19      Q.  Okay.  So for the photo IDs by mail -- let
20  me make sure I understand this -- any federal photo
21  ID is fine.  Correct?
22      A.  (Nods head.)
23      Q.  And any state ID that is issued by the
24  Department of Public Safety or a DMV or an equivalent
25  state agency.  Is that correct?

---

**79**

1       A.  Uh-huh.
2       Q.  And that will include --
3       A.  Yes.
4       Q.  And that will include concealed handgun
5   licenses in Texas.  Correct?
6       A.  Yes.
7       Q.  Are there any -- oh, sorry.
8           How about local IDs?  So like if I
9   work for the City of Austin, and they give me an
10  employee ID, would that be sufficient?
11      A.  That would be sufficient.
12      Q.  It would?
13      A.  Yes.
14      Q.  Okay.  Do employee IDs issued by the State
15  are those sufficient?
16      A.  Yes.
17      Q.  Okay.  So that's something else beyond
18  DMVs.  Right?
19      A.  Right.
20      Q.  Okay.  How about if a library card has a
21  picture on it, is that going to be enough?
22      A.  That one, I believe, is not in our rules
23  for that specific one.
24      Q.  Okay.  And how about like a monthly bus
25  pass with a picture on it?

---

**80**

1       A.  That's not in our rules.
2       Q.  Okay.  Are there any other photo IDs that
3   you're aware of that are sufficient to obtain a birth
4   certificate by mail?
5       A.  Not that I'm aware of.
6       Q.  Okay.  Do those IDs that you have to submit
7   by mail, do those have to be currently valid?
8       A.  As a primary, yes.
9       Q.  So is there a set of secondary IDs that you
10  can use to obtain a birth certificate by mail?
11      A.  Yes.
12      Q.  What are those?
13      A.  Any document that has -- that's issued from
14  an agency that has a signature on it or an expired
15  driver's license, 90 days expired.
16      Q.  Okay.  And if you submit a secondary form
17  of identification, do you have to provide supporting
18  identification as well?
19      A.  You have to submit two secondary.
20      Q.  Okay.
21      A.  So like an expired driver's license and a
22  Social Security card.
23      Q.  Okay.  There's no third tier of documents?
24      A.  We have supporting documents.
25      Q.  Okay.

VICTOR FARINELLI                                              5/9/2014

21 (Pages 81 to 84)

---

81

1    A.  So if you have a secondary document,
2    secondary ID -- expired driver's license -- you could
3    submit two supporting documents.  That's up to the
4    discretion of the State Registrar or the local
5    registrar.
6    Q.  Okay.  And what are the -- to your
7    knowledge, what are the supporting documents?
8    A.  Could be a letter from Medicaid, high
9    school ID.
10   Q.  I don't mean to quiz you.  Do you know if
11   those supporting documents are all listed in a
12   regulation?
13   A.  They're in the Texas Administrative Code.
14   The primary and secondary are in the Texas
15   Administrative Code.  Supporting documents, it states
16   that's up to the discretion of the State and local
17   registrar.
18   Q.  We don't need to make this an exhibit, but
19   if you could just take a look at this document and
20   see if this refreshes your recollection as to which
21   regulation contains the list of supporting -- or of
22   primary, secondary, and supporting documents
23   required.
24   A.  G.  Texas Administrative Code
25   Title 25 181.28(g), it begins.

---

82

1    Q.  And so 181 --
2    A.  Wait.  I'm sorry, it's H.
3    Q.  But 181.28 contains the list of the
4    relevant documents.  Is that correct?
5    A.  Yes.
6    Q.  All right.  Then we don't need to go
7    through that with you.
8    Can an individual obtain a certified
9    copy of a birth certificate at the Department of
10   State Health Services office in Austin?
11   A.  Yes.
12   Q.  Where is that office located?
13   A.  1100 West 49th Street.
14   Q.  And is that near mass transit?
15   A.  Yes.  There's a -- to my knowledge, there
16   are two buses that stop there.
17   Q.  But that's west of I-35.  Right?
18   A.  Yes.
19   Q.  What type of area is that, in terms of
20   residential, commercial?
21   A.  I wouldn't be able to answer that.
22   Q.  Okay.  Do you know -- is it near the
23   university?
24   MR. SCOTT:  Objection; form.
25   A.  Define near the university.

---

83

1    Q.  (BY MR. FREEMAN)  Is it within a mile of
2    UT?
3    A.  I'm not sure of the length.  To the best of
4    my knowledge, approximately that.
5    Q.  Okay.  Do you know if that's a
6    predominantly Anglo part of the city?
7    A.  I wouldn't know.
8    Q.  Okay.  Is it located near any DPS offices?
9    A.  We're approximately half a mile from the
10   DPS.
11   Q.  Okay.  What are the hours that the office
12   is open?
13   A.  8:00 to 5:00, Monday through Friday.
14   Q.  No evenings?
15   A.  No.
16   Q.  No weekends?
17   A.  No.
18   Q.  Okay.  How long is the wait, generally, to
19   be served there?
20   A.  Depending on the day, could be five, ten
21   minutes to anywhere to 20, 30 minutes.
22   Q.  And do you get your birth certificate right
23   away or do you have to come back?
24   A.  You can get it right away.
25   MR. FREEMAN:  Can we go off the

---

84

1    record for a second.
2    (Discussion off the record.)
3    Q.  (BY MR. FREEMAN)  Does an individual who
4    comes to the Austin office get their birth
5    certificate while they're there or do they have to
6    come back again to get it?
7    A.  The majority of them will get it while
8    they're there, depending -- if we have to do a
9    search, say the information that they put on their
10   application doesn't pull up anything in our database,
11   we'll go and do a manual search of the record.  That
12   could take a little bit longer.
13   Q.  And are there any other circumstances
14   besides the information provided on the application
15   not getting a hit in your database in which a search
16   would be required?
17   A.  Can you ask that again?
18   Q.  Are there any other circumstances, besides
19   the circumstances you just described, where the
20   information provided does not get a hit in the
21   database --
22   A.  If they don't have a birth certificate.
23   Q.  Okay.  And how long does the search take?
24   A.  Depending on how many searches we have to
25   do, the search itself takes roughly about 20, 30

---

VICTOR FARINELLI                                              5/9/2014

22 (Pages 85 to 88)

**85**

1  minutes.  But if we have quite a few searches that we
2  have to do, it piles that on top of that.
3      Q.   And why would a manual search turn up
4  records that aren't in the database?
5      A.   There may be an error on the birth
6  certificate.  There would be a discrepancy between
7  what the applicant believes their name is spelled to
8  be versus what's on the birth certificate, what they
9  believe their birth date is versus what's on the
10  birth certificate.
11      Q.   So the person searching just checks a few
12  variations, plus or minus a few days?
13      A.   Yeah.  We check multiple variations, yeah.
14      Q.   And an individual who applies for a birth
15  certificate in person in Austin, can they show the
16  same combination of documents that a person applying
17  by mail can show to get the birth certificate?
18      A.   Yes.
19      Q.   And if a person is applying for a birth
20  certificate on behalf of their child, they only need
21  to establish their own identity and not the identity
22  of the child.  Correct?
23      A.   Correct.
24      Q.   Who -- what is the relationship that an
25  individual can have to the individual whose birth

**86**

1  record is sought in order to obtain that birth
2  record?
3      A.   According to the Texas Administrative Code,
4  an immediate family member is defined, to the best of
5  my knowledge, as parent, sibling, so brother/sister,
6  and grandparent.
7      Q.   And how do you establish that relationship,
8  other than a parent?
9      A.   They are attesting to the fact on the
10  application.  However, if there is any question
11  whether or not that individual is -- let's say, for
12  example, they're the individual's sister.  We will
13  ask for a birth certificate showing that the same --
14  that shows they're the same parentage issues.
15      Q.   What -- and so -- sorry.  What type of
16  documents would you use to establish common
17  parentage?
18      A.   Like a birth certificate.
19      Q.   Okay.
20      A.   Certified copy of a birth certificate.  We
21  have many individuals who are born outside of the
22  state.  If they were born here in Texas, we will just
23  check our database.  If they are born outside of
24  Texas, we need a certified copy of their birth
25  record.

**87**

1      Q.   And how about for grandparents?
2      A.   They attest to the fact on there, so we
3  will take it on face value.  But if there is any
4  question about the parentage of that individual, we
5  will -- we will check -- either check in our database
6  if the parents were born here, see what their
7  parentage is; and if they were born out of state, we
8  will ask for a document that shows the -- like their
9  child's birth certificate, who is the parent.
10      Q.   Okay.  And can a child apply for a birth
11  certificate on behalf of their parent?
12      A.   Yes.
13      Q.   Okay.  Is an EIC birth certificate
14  available at the Austin office?
15      A.   Yes.
16      Q.   How are customers made aware that the EIC
17  birth certificate is available?
18      A.   We have an application available, but we
19  don't have any signage.
20      Q.   So there's no signage in the office.
21  Correct?
22      A.   Correct.
23      Q.   And if a person gets to the front of the
24  line and says they need a birth certificate, does the
25  person working there ask them if they needed to get

**88**

1  an EIC?
2      A.   We ask them what purpose they are needing
3  it for.
4      Q.   And if they say, I need it to get an EIC?
5      A.   We provide them with that application.
6      Q.   And that's part of the standard procedure
7  for interfacing with an individual applying for a
8  birth certificate?
9      A.   Yes.
10      Q.   Okay.  Where are the EIC birth certificate
11  applications kept?
12      A.   We have them in-house and we also have them
13  online.
14      Q.   Okay.  And does an individual have to go
15  get the application from a set of potential forms to
16  fill out, or does the person working there provide
17  them with the form?
18      A.   Every person who walks in goes to an
19  information desk first and we ask them what their
20  purpose is.
21      Q.   Okay.
22      A.   Whether it's just getting a certified copy
23  or correcting a record or -- and then at that point,
24  they will -- the processor will determine which
25  application they need at that point.



89

1    Q.  And if they just go in and say, I need a
2  birth certificate, the processor will still ask, what
3  do you need your birth certificate for?
4    A.  Yes.
5    Q.  Okay.  When was that changed?  Or has that
6  always been -- not always.  Sorry.
7         When did that procedure begin?
8    A.  We've had that process where we ask them
9  what the purpose is, for -- since as long as I've
10  been there.
11    Q.  And before the EIC birth certificate was
12  available, what was the reason for that process?
13    A.  Depending on what they needed the birth
14  certificate for would depend on what type of document
15  we would -- if we -- before we had our records
16  imaged, we would issue abstracts, mostly for speed,
17  to get them out, because we used to have to -- for
18  full-size copies, actually go out, make a photocopy
19  of the record from the stacks, so that would take
20  time.
21         So in order to speed it up, we would
22  give them the abstract, and that was generally good
23  for purposes like getting a driver's license, school.
24         If they needed a passport, we would
25  provide them with the original -- the long form, so

90

1  that took a little bit longer.  So that's why we
2  wanted to find out which they needed it for.
3  Sometimes they need a long form for Indian enrollment
4  cards.
5    Q.  Okay.  Are there any other specific
6  procedures related to applications for an EIC birth
7  certificate?
8    A.  No.
9    Q.  If you turn back to what I believe is
10  Exhibit 108, the notice of rule adoption.
11    A.  Uh-huh.
12    Q.  Look on the second page, up at the top
13  where it says, response.  Does it say, "To ensure the
14  rule becomes effective in time for the November 2013
15  elections, the department is ensuring the rule will
16  be effective on October 21st, 2013"?
17    A.  Yes.
18    Q.  What actions were taken between
19  October 1st, when this document was submitted, and
20  October 21st, to ensure that the rule would be
21  effective?
22    A.  I'm not sure exactly what the question
23  means.
24    Q.  Let me rephrase, then.  What actions were
25  necessary in order for this rule to go into effect?

91

1    A.  The rule itself, just creating a -- an
2  application for the EIC.
3    Q.  But at a practical level, in order for
4  people working in the Austin office to know about the
5  rule, to implement the rule, what needed to happen in
6  that 20 days?
7    A.  We had to, you know, inform all our staff
8  regarding the new policy and procedure and the new
9  rule, what the requirements were.  So staff training.
10  Putting into place the use of the application, and
11  that was for the staff.  We had to do some database
12  changes for issuance of the election identification
13  card through the abstract.
14    Q.  And when did that training occur in the
15  Austin office?
16    A.  We provided that shortly after we knew the
17  rules were going to be going into effect.  And we
18  provided information prior to that, just that this
19  may be going into effect, if the rules are adopted.
20         Once they -- we were sure that they
21  were going to go through in effect we provided that
22  information to all our front office staff.
23    Q.  Was there any sort of sit-down training
24  about the new EIC birth certificate?
25    A.  There wasn't much need for that.

92

1    Q.  Why not?
2    A.  Because most of the staff are experienced
3  staff for issuing certified copies, so all they had
4  to know is that this record is for election purposes,
5  it's free if you issue it, issue the election card
6  record.
7    Q.  And was there any written material that was
8  provided to them as part of that sort of basic
9  heads-up?
10    A.  Not that I'm aware of.
11    Q.  Okay.  And you said that there were changes
12  to the database that needed to occur.  What were
13  those changes?
14    A.  In order to -- the abstract that's issued
15  off of our database just issued a regular abstract.
16  We had to change the system to add that little
17  section that had the election for election
18  identification purposes.
19    Q.  So it was just to change the output so it
20  would print those two lines?
21    A.  Yes.
22    Q.  Were there any other changes to the
23  database?
24    A.  That's it.
25    Q.  Was there any change to record whether a

VICTOR FARINELLI                                      5/9/2014

24 (Pages 93 to 96)

93

1   given individual had received one EIC birth
2   certificate?
3        A.   Yes, that is true, yes.
4        Q.   Anything else?
5        A.   To the best of my knowledge, no.
6        Q.   Okay.  Is an individual required to provide
7   any kind of proof that they need their birth
8   certificate in order to obtain an EIC, in order to
9   get the free EIC birth certificate?
10       A.   No.
11       Q.   So they don't have to submit an affidavit?
12       A.   No.
13       Q.   Just have to show an EIC application?
14       A.   Just fill out the EIC application.
15       Q.   Okay.  What documents does the individual
16  who applies for an EIC birth certificate need to show
17  in order to obtain the EIC birth certificate?
18       A.   The same as the regular birth certificate.
19       Q.   Are there any forms of primary
20  identification, to your knowledge, that an individual
21  who lacks the ID needed to vote under SB 14 would,
22  nonetheless, have?
23       A.   I would have to review those documents in
24  order to --
25            MR. FREEMAN:  I was trying to avoid

94

1   making too many exhibits, but let's do it.  This is
2   going to be Exhibit 111.
3            (Exhibit Number 111 marked.)
4        Q.   (BY MR. FREEMAN)  What is this document?
5        A.   This is a printout, I believe, of the Texas
6   Administrative Code, Title 25 181.28.
7        Q.   And have you seen this particular provision
8   before?
9        A.   Yes, I have.
10       Q.   Okay.  So with this document in front of
11  you to aid you, could you tell me what specifically
12  the primary forms of identification are?
13       A.   Primary forms of identification are
14  driver's license; federal or State identification;
15  federal, State or City law enforcement employment
16  identification card, or an employee badge accompanied
17  by an employment identification card; offender's
18  identification card from the department of state
19  health -- Department of Criminal Justice correction
20  facility or institution; military identification,
21  department -- oh, okay.
22            So Department of Homeland Security,
23  United States Citizenship and Immigration Services
24  issued; employment authorization document; permanent
25  resident card; travel documents, reentry permit,

95

1   refugee travel status, advance parole; SENTRI card,
2   S-E-N-T-R-I, card; and U.S. citizen identification
3   card.  United States Department of State border
4   crossing card, (B-1 for business or pleasure, and B-2
5   for medical purposes); or a visa; concealed handgun
6   license; pilot's license; or United States passport.
7        Q.   And with regard to the documents that
8   are -- that would be held by noncitizens, these are
9   to help individuals get a birth record for their
10  child.  Is that correct?
11       A.   Correct.
12       Q.   Okay.  And am I correct that each of these
13  have to be current and valid?
14       A.   Yes.
15       Q.   And the offender identification card issued
16  by the Department of Criminal Justice, is that Texas
17  only?
18       A.   According to the rule here, it says
19  department -- Texas Department of Criminal Justice.
20       Q.   Okay.  Does the individual's
21  identification, does the name on the identification
22  have to match the name on the birth certificate?
23       A.   Yes.
24       Q.   So if you have a married woman and her
25  married name is on her driver's license, is her

96

1   driver's license not sufficient to obtain the birth
2   certificate?
3        A.   With the exception of that.
4        Q.   How does that work?
5        A.   We are aware that many individuals who get
6   married, whether that's male or female, will change
7   their last name to that or their partner's married
8   name.  So we -- if they have identified all the other
9   elements on the birth certificate, based on their
10  identification, we can reasonably deduce that that is
11  the same individual.
12            However, if there's any question about
13  that individual's relationship between their
14  identification and the information that's on the --
15  on a birth certificate and whether that's the same
16  person, we will ask for their marriage license.
17       Q.   How about a misspelling?  If, say -- I
18  don't know, let's use my name.  If my birth record is
19  Freeman and, like many people do on the phone, my
20  driver's license said Friedman and I had not bothered
21  to get it corrected, could I still get the birth
22  record?
23       A.   We will notify you that the information is
24  incorrect.  We will discourage you from getting it
25  because we believe we would be doing you a disservice

VICTOR FARINELLI

5/9/2014

25  (Pages 97 to 100)

---

**97**

1   by giving you an incorrect birth certificate that
2   doesn't match your other identification.  Because,
3   through our experience, presenting those two
4   different documents that have different information
5   on them, to another agency, for example, Social
6   Security Administration, they're not going to accept
7   those two.
8        Q.  But could I still get the document if I
9   told you my driver's license was wrong?
10       A.  Yes.
11       Q.  How about if an individual has multiple
12  last names?  Say they're from a Hispanic family and
13  they have both a paternal last name and a maternal
14  last name?  So let's use Representative Trey Martinez
15  Fischer and let's say that his birth record had
16  Martinez Fischer and his driver's license just said
17  Trey Fischer.
18       A.  We will inform them that they would need to
19  match.
20       Q.  And so would you not give the birth record?
21       A.  We would -- again, we would inform them
22  that this information should match, you should get
23  this amended.  If they say, no, I want the copy of
24  the record, we will give it to them.
25       Q.  Okay.  And if an individual doesn't have

---

**98**

1   any of those forms of primary ID, what are the forms
2   of secondary identification that are acceptable?
3        A.  In accordance to the Texas Administrative
4   Code, current student identification, any primary
5   identification that is expired, our policy is
6   generally 90 days on that, depending on the -- how --
7   depending on the situation.
8            If it's an older identification where
9   it's been expired for quite a number of years, we
10  probably won't accept it.  But if it's a little over
11  90 days, we will accept that.
12           Signed Social Security card or
13  Numident, DD 214 Form certificate of release set out
14  in this rule.  Wait a second.  Oops, sorry.  Wrong
15  side.
16           Medicaid card, Medicare card, Veterans
17  Affair card, medical insurance card, foreign passport
18  accompanied by a visa issued by the United States
19  Department of State, foreign passport in accordance
20  to the United States Department of State Visa Waiver
21  Program, certified birth certificate from Department
22  of State, private company employment identification,
23  Form I-94 accompanied by an applicant's visa or
24  passport, Mexican voter registration card, or foreign
25  identification with identifiable photo of applicant.

---

**99**

1        Q.  I have a few questions on those.  What is a
2   Numident?
3        A.  Numident is the -- from the Social Security
4   Administration.  It's their -- it's a printout of
5   their application information.
6        Q.  And the DD Form 214 certificate of release,
7   is that a Texas form?
8        A.  No.  That's a United States government
9   form.  That's used when someone in military service
10  is discharged.
11       Q.  Okay.  And why does a foreign passport have
12  to be accompanied by a visa establishing -- or issued
13  by the United States Department of State?
14       A.  To ensure -- that helps us ensure that that
15  is a valid passport.
16       Q.  But if it's a foreign passport and, let's
17  say, someone who is in the United States unlawfully,
18  but has a child in the United States and that child
19  becomes a United States citizen, wouldn't this
20  foreign passport -- or wouldn't an individual
21  potentially have trouble obtaining a birth record for
22  that child if they are required to show a visa?
23           MR. SCOTT:  Objection; form.
24           Speculation.
25       A.  They could possibly have difficulty.

---

**100**

1        Q.  (BY MR. FREEMAN)  Okay.  And so you had
2   said before, an individual can show two forms of
3   secondary identification?
4        A.  Uh-huh.
5        Q.  Or a form of secondary identification and
6   two forms of supporting identification?
7        A.  Correct.
8        Q.  And supporting identification, that's --
9   that's set out in some other policy.  Is that
10  correct?
11       A.  Correct.
12       Q.  Okay.  Do you know where that policy is?
13       A.  We have -- we had information in our
14  issuance handbook --
15       Q.  Okay.
16       A.  -- for our processors at the Vital
17  Statistics office.  We provide some information to
18  our local registrars through the local registrars
19  handbook.
20       Q.  And are those hard requirements or are they
21  just soft guidelines?
22       A.  Soft guidelines.
23           MR. FREEMAN:  Okay.  If we could have
24  this marked as Exhibit 112.
25           (Exhibit Number 112 marked.)

---

VICTOR FARINELLI                                                5/9/2014

26  (Pages 101 to 104)

---

101

1      Q.  (BY MR. FREEMAN)  First, what is this
2    document?
3      A.   This is the remote front office -- which is
4    our remote system for issuing birth certificates --
5    user guide.
6      Q.   And if you could turn to page 7 and look
7    under EIC certificate.  Does this refresh your
8    recollection as to whether an individual can apply
9    for an EIC birth certificate for someone else, for a
10   relative?
11     A.   It states that the applicant -- make sure
12   that -- certain that the applicant is the registrant
13   on the record; so, therefore, it can be deduced that
14   it has to be the applicant.
15     Q.   And does that apply to the Austin office as
16   well?
17     A.   Yes.
18     Q.   All right.  What is the purpose of that
19   rule?
20     A.   I really can't -- I'm not sure what that
21   purpose is.
22     Q.   And isn't it possible that eliminating the
23   ability of having an individual apply for a birth
24   certificate on a relative's behalf related to
25   individuals who lack ID could create problems for

---

102

1    those individuals to be able to provide the
2    supporting ID that they need?
3              MR. SCOTT:  Objection; form.
4    Speculation.
5      A.   It could.
6              MR. FREEMAN:  Have this marked as
7    Exhibit 113.
8              (Exhibit Number 113 marked.)
9      Q.  (BY MR. FREEMAN)  What is this document?
10     A.   This is the application for election
11   identification birth certificate.
12     Q.   And is this used at the Austin office?
13     A.   Yes.
14     Q.   Is this used at the remote birth
15   certificate issuance sites as well?
16     A.   We provide that to them, but they can also
17   duplicate for their own application.
18     Q.   Does it say, "Application without photo
19   identification will not be processed"?
20     A.   Yes.
21     Q.   Why does it say, "Application without photo
22   identification will not be processed"?
23     A.   I'm not sure why it says that.
24     Q.   In fact, most people who need an election
25   identification birth certificate will not have a

---

103

1    photo ID.  Correct?
2      A.   Correct.  To the best of my knowledge.
3      Q.   And so if an individual comes in to your
4    office and asks to apply for an EIC birth
5    certificate, they will be given this form.  Correct?
6      A.   Uh-huh.
7      Q.   And they will be told that the application
8    without photo -- an application without photo
9    identification will not be processed?
10     A.   In our office, we will let them know that
11   we need identification, whether that's primary or
12   secondary.
13     Q.   But the form that they're handed will tell
14   them that the application without photo
15   identification will not be processed.  Correct?
16     A.   Correct.
17     Q.   And any remote issuance site that uses this
18   form, they will also be told that an application
19   without photo identification will not be processed?
20     A.   Correct.
21     Q.   Okay.  Are there any further requirements
22   specific to an EIC birth certificate of which you're
23   aware?
24     A.   Not that I'm aware of.
25     Q.   Let's take five minutes.

---

104

1              (Recess.)
2      Q.  (BY MR. FREEMAN)  So let's turn to the
3    remote birth certificate issuance sites.
4      A.   Okay.
5      Q.   Can an individual obtain a certified copy
6    of a birth record from a remote birth certificate
7    issuance site?
8      A.   Yes.
9      Q.   What is a remote birth certificate issuance
10   site?
11     A.   It is a local registrar who, through
12   contract, has access to our -- the State database of
13   Vital Statistics records.  So they can not only issue
14   from their own office, but any -- they can issue a
15   certified copy of any birth that occurred throughout
16   the state.
17     Q.   And so that's just a digital connection?
18     A.   Correct.
19     Q.   Similar to the connection between the
20   Social Security Administration and your office?
21     A.   Correct.
22     Q.   Okay.  What is the relationship between
23   HHSC and the remote birth certificate issuance sites?
24     A.   They're under contract through us.  They're
25   a local registrar, so they -- they're under contract

VICTOR FARINELLI                                          5/9/2014

105

1  through us, and they -- we provide them access to
2  that.
3      Q.   And what -- sort of what is the type of
4  contract?  Are you a paying them?  Are they paying
5  you?
6      A.   They pay us $1.83 per record issued.
7      Q.   Okay.  Do you have any authority over them?
8      A.   They have a contract and, through that
9  contract, we lay out what the use of that remote
10 issuance program is used for.  If they violate that
11 contract, we can discontinue their use.
12     Q.   And in the last five years, have there been
13 any instances in which HHSC has discontinued use for
14 violation of the contract?
15     A.   I'm not sure.
16     Q.   Okay.  So not to your knowledge?
17     A.   Not to my knowledge, no.
18     Q.   Okay.  And HHSC doesn't provide any funding
19 to the locals?
20     A.   No, huh-uh.
21     Q.   Okay.  Does any -- are there any terms in
22 that contract that specifically address EICs?
23     A.   No.
24     Q.   Are there any terms in that contract that
25 specifically address notices that must be put up in

106

1  the office?
2      A.   No.
3      Q.   Are there any terms in that contract that
4  specifically address the use of particular forms?
5      A.   No.
6      Q.   Are there any terms in that contract that
7  specifically address training that employees must
8  undergo?
9      A.   No.
10     Q.   Are there any terms in that contract that
11 address specific procedures that those offices must
12 follow?
13     A.   Not in the contract itself.
14     Q.   Does the contract incorporate any
15 procedures that --
16     A.   There's some general information, to the
17 best of my knowledge, without seeing the contract
18 itself, that states what it -- the remote should be
19 used for, for searching and document production,
20 vital -- birth certificates.
21          It talks about submitting -- I believe
22 it talks about submitting, like, if they accidentally
23 print off a record and we need to void it and remove
24 from the lifetime print count, that accidental print.
25 So they will submit information on that.  But I

107

1  haven't seen the contract in a while, so...
2      Q.   What is the lifetime print count?
3      A.   Ten.
4      Q.   Is that the maximum number of birth
5  certificates an individual can obtain?
6      A.   No.  That's the maximum number that they
7  can obtain without having to -- without us having to
8  investigate the reason why they have already received
9  ten certified copies of the birth certificate.
10     Q.   What would that investigation entail?
11     A.   It goes through the Office of Inspector
12 General and they just look into the background of the
13 individual and how many copies were issued, what the
14 lifespan was on those copies, see if there's any
15 fraud investigations going on on that individual.
16          And if everything looks okay, we will
17 issue another copy.  If there's any question about
18 what that -- if they find evidence that there's been
19 abuse on the record, they won't issue a copy, and it
20 has to go to hearing after that.
21     Q.   And how long does that investigation
22 usually take?
23     A.   I'm not sure exactly the extent of that
24 investigation.
25     Q.   But the investigation needs to be complete

108

1  before an individual with ten -- with a print count
2  of ten can obtain an additional copy?
3      A.   Yes.
4      Q.   Is there a term -- does the term "abused
5  record" apply in this context?
6      A.   I believe it does in accordance to -- to
7  the best of my knowledge, to the Texas Administrative
8  Code, yes.
9      Q.   Okay.  But -- so an abused record is a
10 record of print count of ten or more?
11     A.   Uh-huh.
12     Q.   Okay.
13          MR. SCOTT:  Yes?
14     A.   Yes.
15     Q.   (BY MR. FREEMAN)  So if we can go back real
16 quickly to the contract and violating the contract,
17 are there any particular bases that you're aware of
18 in which a remote birth certificate issuance site
19 would have their contract terminated?
20     A.   If they were not paying us the $1.83 per
21 record issued, we would probably terminate their
22 contract.  If they have been just searching on the
23 database without document production, we would more
24 than likely investigate it; and if it continues,
25 terminate their contract.

VICTOR FARINELLI                                              5/9/2014

28 (Pages 109 to 112)

109

1    Q.  Okay.  Anything else you can think of?
2    A.  Not offhand.
3    Q.  So you're not aware of any additional bases
4  why you've terminated a contract?
5    A.  Mm-hmm.
6    Q.  And by "mm-hmm" you mean?
7    A.  No.  Sorry, sorry, sorry.
8    Q.  Do these sites volunteer to participate in
9  issuing birth certificates?
10   A.  Yes.  Off the remote.
11   Q.  Off the remote.  HHSC doesn't ask any
12 particular locations to serve as remote birth
13 certificate issuing sites?
14   A.  No.
15   Q.  Okay.  If a local office doesn't want to
16 offer EIC birth certificates, does HHSC have any
17 recourse?
18   A.  The way the -- so the way the law is
19 written, State Registrar has supervisory power over
20 Vital Statistics processes with their local
21 registrars, deputy registrars, sub registrars.
22 That's what the law says.  So we will go and do
23 inspections; however, we don't have any enforcement
24 power over stopping them from doing -- from not
25 following policy and procedure.

111

1  marked as long as we're relying on it.  This is
2  Exhibit 114.
3            (Exhibit Number 114 marked.)
4    Q.  (BY MR. FREEMAN)  This is Exhibit 114, and
5  this is a list of your remote birth certificate
6  access sites.  Correct?
7    A.  Yes.
8    Q.  And you brought this to the deposition.
9  Correct?
10   A.  Yes.
11   Q.  And so in a given year, you're going to be
12 doing a site visit at a quarter to a third of these
13 remote birth certificate issuance sites?
14   A.  Well, depending on -- we do them for all
15 local registrars.  We have over -- we have 421 local
16 registrars in the state of Texas.  This is just the
17 ones who are on the remote.
18        So we will check on the remote status
19 and what they're doing with the remote, but also we
20 check with -- those who are not on a remote, we will
21 check to see if they are issuing EICs through their
22 own records.
23   Q.  Okay.  So we're talking about roughly an
24 eighth of the sites are going to have a visit in a
25 given year?

110

1    Q.  Have you conducted any inspections to see
2  if offices are issuing EIC birth certificates?
3    A.  We've conducted -- we conduct inspections
4  in general.  Our field services goes out and conducts
5  site visits on a regular basis.
6    Q.  And as part of those site visits, have you
7  in any way verified that these offices are offering
8  EIC birth certificates?
9    A.  Yes.  That's part of our site visit
10 inspection process, is when we're talking about
11 issuing birth certificates, we will ask them, do you
12 issue the election identification record.
13   Q.  And how often do you conduct site visits?
14   A.  We generally conduct anywhere between 50
15 and 70 site visits a year.
16   Q.  And how many, roughly, remote birth
17 certificate issuance sites are there?
18        MR. SCOTT:  If I can intervene.
19 We've prepared for you a list of those so it
20 wouldn't be...
21   A.  I'm not sure exactly the amount, but it's
22 over --
23   Q.  (BY MR. FREEMAN)  Roughly 200?
24   A.  Yeah, about that.
25        MR. FREEMAN:  Why did we have this

112

1    A.  Uh-huh, yes.
2    Q.  Okay.  Are these sites aware of an audit or
3  of a site visit when you're coming in?
4    A.  Yes.  We prepare them ahead of time.
5    Q.  Okay.  So it's possible that the sites
6  could be telling you that they're issuing the EIC
7  birth certificates, but you have no knowledge of
8  whether they're issuing them when there isn't a site
9  visit going on.  Correct?
10   A.  Correct.
11   Q.  And do you monitor their procedures
12 concerning letting individuals know that an EIC birth
13 certificate is available?
14   A.  We will ask them how they proceed with any
15 issuance process.
16   Q.  Okay.  But there are no posted notices
17 required in those offices.  Right?
18   A.  No.
19   Q.  And you're just asking them if they let
20 people know?
21   A.  Uh-huh.  Yes.
22   Q.  Okay.  But there's no specific procedure in
23 that office like there is in the Austin office, where
24 an individual is asked for what purpose they need
25 their birth certificate.  Correct?

113

```
 1      A.  That is correct.
 2      Q.  And the State doesn't pay for staffing for
 3 those offices.  Right?
 4      A.  No.  They're separate offices from us.
 5      Q.  And you guys don't -- sorry.
 6          The State of Texas doesn't supply the
 7 supplies for birth certificates.  Correct?
 8      A.  No.
 9      Q.  And that includes the security paper?
10      A.  Security paper, yes.
11      Q.  But EIC birth certificates should be
12 available at remote birth certificate issuance sites.
13 Right?
14      A.  Correct.
15      Q.  Other than the procedure we just discussed
16 where an individual is asked what they need their
17 birth certificate for, are there any other ways in
18 which you're aware that procedures differ between the
19 Austin office and the remote birth certificate
20 issuance sites?
21      A.  No.
22      Q.  Now, each EIC birth certificate effectively
23 costs your office money when someone asks for one at
24 the Austin office.  Correct?
25      A.  Uh-huh.
```

114

```
 1      Q.  How much money does it cost your office?
 2      A.  I can give you -- it would cost us, off --
 3 just off the top, $12 per one.  That's not including
 4 the cost of the paper, cost of labor, computer usage.
 5 We spend quite a bit of funds on changing the
 6 database, so that would be available.
 7      Q.  But on a per-birth-certificate basis, in
 8 your office, it's $10 to Texas.gov, $2 for the
 9 statutory fee?
10      A.  Right.
11      Q.  And then labor.  Correct?
12      A.  Uh-huh.  Yes.
13      Q.  Security paper --
14      A.  Yes.  Yes and yes.
15      Q.  And do the local offices also have to pay
16 $10 to Texas.gov?
17      A.  No.
18      Q.  Do they -- do the local offices waive the
19 $2 fee, the statutory fee?
20      A.  No, they do not.
21      Q.  So if I get an EIC birth certificate in a
22 local office, am I correct, I have to pay the $2
23 statutory fee, plus the $1 local office fee?
24      A.  The -- they will pay, at a minimum, $2.
25      Q.  Okay.
```

115

```
 1      A.  Some locals charge $1 more.  The statute
 2 says they may charge $1 per issuance for their
 3 records preservation.  Some do, some don't.
 4      Q.  Approximately, to the best of your
 5 knowledge, what percentage of the locals charge the
 6 $1?
 7      A.  I wouldn't know.
 8      Q.  Okay.  That's fine.  And you don't know how
 9 much the security paper costs per birth certificate?
10      A.  No, I don't.
11      Q.  Okay.  So the locals, am I correct, they
12 have a financial incentive not to -- if a person
13 comes in looking for a birth certificate -- let me
14 start over.
15          If a person comes into a local asking
16 for a birth certificate, the local will make money if
17 they get a regular birth certificate, but will lose
18 money if they get an EIC birth certificate.  Correct?
19      A.  A local?
20      Q.  Yeah.
21      A.  Yeah.  Yes.
22      Q.  And so the locals have a financial
23 incentive for each person who walks in, to get them
24 to get a regular certified birth certificate rather
25 than an EIC birth certificate.  Right?
```

116

```
 1      A.  Financial incentive.
 2      Q.  It will make money rather than lose money?
 3      A.  Right.  Yeah, yeah.
 4      Q.  And you're not aware of any specific
 5 procedures that the locals have adopted to make sure
 6 that people know the EIC birth certificate is
 7 available?
 8      A.  No.
 9      Q.  How long does it take to obtain a birth
10 certificate from the locals?
11      A.  Depending on the local office, it could be
12 minutes.  Could be as long as our wait is, which
13 is -- could be 10 to 20 minutes.  And, you know,
14 it -- depending on if they have to do a search, a
15 couple hours.
16      Q.  What type of search would they be doing at
17 a local?
18      A.  Searching their own records.
19      Q.  So that's only if they were the place where
20 the birth occurred?
21      A.  Right.  Correct.
22      Q.  So if an individual comes in to a local in
23 Houston and they were born in Dallas, and the digital
24 doesn't match up, they can't do the type of manual
25 search that you would do in Austin.  Correct?
```

**117**

1      A.  Correct.
2      Q.  Okay.  So either they're going to get it
3  immediately or, if they were born in that county,
4  they're going to get it after a search or they're not
5  going to get it.  Correct?
6      A.  Correct.
7      Q.  And that manual search, they're still going
8  to get it relatively quickly.  Correct?
9      A.  Correct.
10     Q.  Rough estimate on how long it usually
11  takes?
12     A.  It could vary on the office.  Could be
13  anywhere between a couple of minutes, depending on
14  the size.  If it's a small office, couple of minutes.
15  If it's the City of Dallas or Tarrant County clerk's
16  office, could take a while.
17     Q.  Does it ever take multiple days?
18     A.  That would -- I wouldn't know.
19     Q.  Okay.
20     A.  Yeah.  That doesn't sound feasible, but it
21  could.  We would have to pull each office to find out
22  how long.
23     Q.  So you have no knowledge of whether it does
24  or doesn't, in some cases, take several days?
25     A.  No.

**118**

1      Q.  Okay.  And the State has no control over
2  the hours of those offices?
3      A.  No, we don't.
4      Q.  No control over staffing?
5      A.  No.
6      Q.  Who does control those offices?
7      A.  Those local governments.
8      Q.  Okay.  Is there anything that an office has
9  to do to qualify to be a remote birth certificate
10  issuance site?
11     A.  They just have to be a local registrar.
12     Q.  Okay.  Is there any additional training?
13     A.  No.  We provide them with the instructions,
14  the user guide to the system.
15         Most are local registrars already, so
16  they know what the process is for issuing a
17  certificate.  It's just being able to actually use
18  the system in order to issue, so...
19     Q.  And it's just a query through the Internet?
20     A.  Yes.
21     Q.  Okay.  Is an office ever denied when they
22  request to be a local -- a remote birth certificate
23  issuance site?
24     A.  To my knowledge, no.
25     Q.  Is there a remote birth certificate

**119**

1  issuance site in every county?
2      A.  No.
3      Q.  Do you know how many counties don't have a
4  remote birth certificate issuance site?
5      A.  I'm not sure how many locals aren't.  It's
6  roughly -- well, county-wise, I believe it's -- I
7  believe we -- somewhere around 60 or so counties are.
8  But there's a local registrar in each county.
9          MR. FREEMAN:  Okay.  So this is
10  slightly redundant with the prior exhibit, but I'm
11  going to mark this Exhibit 115.
12         (Exhibit Number 115 marked.)
13     Q.  (BY MR. FREEMAN)  What is this document?
14     A.  This appears to be a printout from our --
15  from the Department of State Health Services Vital
16  Statistics Unit website of a list of remote access --
17  offices that have the remote access.
18     Q.  And does this list every county that does
19  not have a remote access site?
20     A.  It will.  We have every county in there and
21  if it doesn't, we'll put "no remote access."
22     Q.  Okay.  And I don't know if you want to
23  check this.  But are there approximately 85 counties
24  that do not have remote birth certificate issuance
25  locations?

**120**

1      A.  That sounds correct.
2      Q.  Okay.  And there are no more than five per
3  county, even in the largest counties.  Correct?
4      A.  Correct.
5      Q.  No more than five remote birth certificate
6  access sites?
7      A.  Correct.
8      Q.  Certainly far fewer than there are, for
9  example, polling places in a given county.  Correct?
10     A.  Correct.
11     Q.  Are there any plans to change these
12  locations this year?
13     A.  No.
14     Q.  Well, because you don't --
15     A.  To the best of my knowledge, no.
16     Q.  Yeah.  You don't decide who is going to be
17  the access site; the locals decide.  Correct?
18     A.  Right.
19     Q.  And if you can turn to Harris County, how
20  many locations are there in the city of Houston?
21     A.  Four.
22     Q.  And if you can turn to Dallas County, how
23  many are there in the city of Dallas?
24     A.  There's two.
25     Q.  And just one more.  If you can turn to

VICTOR FARINELLI                                          5/9/2014

---

**121**

1  Bexar County, how many are there in the city of
2  San Antonio?
3      A.  That's one.
4      Q.  So for the entire city of San Antonio,
5  there's only one place where you can go to get a
6  birth certificate, unless you go to the local
7  registrar that has your original certificate?
8      A.  One office -- well, one entity, yeah.
9      Q.  Do you know if that entity offers these
10  services at multiple locations?
11      A.  Many offices do.  So like the City of
12  San Antonio does have sub offices that will have
13  access to that.
14      Q.  But these sub offices are not listed on the
15  complete list?
16      A.  Right.  Yeah.  These are just the local
17  registrars that have access to our system.
18      Q.  Okay.  And do you know where those lists of
19  sub entities would be if someone went looking for
20  them on your website?
21      A.  You would have to contact that local
22  office.
23      Q.  Okay.  So on your website there's no
24  additional information?
25      A.  No.

---

**122**

1      Q.  Okay.  And you have no ability to control
2  where those locations are in major urban areas.  Is
3  that correct?
4      A.  Correct.
5      Q.  So you have no ability to control whether
6  they're on or near public transit.  Correct?
7      A.  No.
8      Q.  And do you have any knowledge of whether
9  they're on or near public transit?
10      A.  No.
11      Q.  And you have no ability to control whether
12  they're placed in predominantly minority communities.
13  Correct?
14      A.  No.
15      Q.  And you have no knowledge of whether
16  they're in predominantly minority communities?
17      A.  No.
18      Q.  Do you know if any of these remote birth
19  certificate issuance sites are co-located with DPS
20  offices?
21      A.  I'm not sure if they are or not.
22      Q.  Okay.  Do you know if any of these remote
23  birth certificate issuance sites are co-located with
24  places where DPS or the office of Secretary of State
25  has set up a mobile station for issuing EICs?

---

**123**

1      A.  I'm not sure, no.
2      Q.  Okay.  So if an individual doesn't have a
3  birth certificate and they need to go to a remote
4  access site to get their birth certificate so they
5  can get their EIC, that's going to require multiple
6  trips, to your knowledge?
7      A.  It could possibly.
8      Q.  All right.  Let's go on to those local
9  registration offices.  Can an individual obtain a
10  copy of their birth certificate from a local
11  registration office?
12      A.  If they were born in that registration
13  district or they have remote access.
14      Q.  Okay.  And so some local registration
15  offices are remote access sites and some are not.
16  Correct?
17      A.  Correct.
18      Q.  And how does a person know what local
19  registration district they're in within a given
20  county?
21      A.  With many counties, the county clerk is the
22  only local registrar in that county.
23      Q.  Okay.
24      A.  Depending on the county.  Tarrant County,
25  there may be multiple.  They may not know unless they

---

**124**

1  know what city they were born in.
2      Q.  Okay.  And so if you were born in Tarrant
3  County and you go to the local registrar in
4  Arlington, but you were actually born in Fort Worth,
5  you're not going to be able to get your birth
6  certificate unless the one that you go to is also a
7  remote access site.  Is that correct?
8      A.  Correct.
9      Q.  What is the relationship between HHSC and
10  the local registration offices?
11      A.  We perform the same functions.  We're the
12  keeper of vital records.  We have -- again, we can
13  give them instructions on what they're to do when it
14  comes to issuance of Vital Statistics records and
15  security and keeping those records secure.  We
16  perform inspections; however, we don't have any
17  enforcement power.
18      Q.  Okay.  So is it essentially a local
19  government function that you supervise?
20      A.  Correct.
21      Q.  But you don't have enforcement power to
22  make sure that they follow those regulations?
23      A.  Correct.  The only -- the only thing that
24  we can do is -- is state to that local government,
25  this person is not doing their job.

VICTOR FARINELLI                                              5/9/2014

---

**125**

1    Q.  Okay.
2    A.  And it's up to that local government to
3    take action.
4    Q.  And how often does that happen?
5    A.  Doesn't happen that often.
6    Q.  Does HHSC provide any funding for the local
7    registration offices?
8    A.  No.
9    Q.  Does HHSC conduct any training with the
10   local registration offices?
11   A.  Yes, we do.
12   Q.  And what type of training?
13   A.  We -- during our site visits, those are
14   also training purposes, so we'll spend quite a few
15   hours there actually inspecting and doing training.
16       We have regional conferences every
17   summer, which is four -- three to four locations
18   throughout the state, where local registrars can come
19   and take training.
20       Plus, we have an annual conference
21   every year in Austin, where local registrars -- not
22   only local registrars, but all our service and source
23   providers can come and get Vital Statistics training.
24   Q.  So the training that you conduct during
25   site visits, that's only about one out of -- we said

---

**126**

1    every eight offices per year.  Correct?
2    A.  Correct.
3    Q.  And the conferences, are those mandatory or
4    optional?
5    A.  Optional.
6    Q.  Okay.  And does HHSC provide specific
7    procedures to the local registration offices?
8    A.  Yes.
9    Q.  Where are those procedures set out?
10   A.  They're in the local registrar handbook.
11   Q.  Is that the document that we already
12   reviewed a moment ago?
13   A.  No.  That's the remote issuance.
14   Q.  That was the remote issuance handbook.
15   Okay.  Different document?
16   A.  Different document.
17   Q.  Are there any other guidelines besides that
18   handbook?
19   A.  What it -- what's laid out in our rules and
20   laws.
21   Q.  Okay.  If an individual applies for a
22   copy -- a certified copy of a birth certificate at a
23   local registration office, one that is not a remote
24   office, is there any extra cost beyond the $22?
25   A.  If they charge the dollar preservation fee.

---

**127**

1    Q.  Okay.  So those offices can also charge a
2    $1 preservation fee?
3    A.  Yeah.  Depends on -- yeah.  It's per local
4    registrar, not per remote.
5    Q.  And, again, in most -- just to get through
6    this quickly.  In terms of timing, it's the same
7    timing that we discussed before for a local search?
8    A.  Correct.
9    Q.  Shouldn't take very long?
10   A.  Correct.
11   Q.  Do they -- well, if you're going to the
12   local, is it only a manual search or do they have
13   some kind of digitized system?
14   A.  Many local registrars have digitized
15   systems.
16   Q.  How many do not?
17   A.  I'm not aware of how many that do not.
18   Q.  Do you know roughly what share?
19   A.  No.
20   Q.  Okay.  Is it most of them that have
21   digitized?
22   A.  Most of them are local governments that
23   also deal with other types of documents besides Vital
24   Statistics, so they are addressing many different
25   issues in that.  So they -- most of them track that

---

**128**

1    information in their -- in a document repository
2    system.
3    Q.  So if they have the digitized documents,
4    about how long should it take to pull up someone's
5    birth record?
6    A.  Shouldn't take that long.  Minutes.
7    Q.  And if they don't have a digitized system,
8    about how long does it usually take to retrieve a
9    birth record?
10   A.  Depending on the size, anywhere between
11   five minutes, but it could be longer.
12   Q.  Okay.  Do you know of any instance in which
13   it would take more than six days?
14   A.  Six days?
15   Q.  Six days.
16   A.  Not that I'm aware of.
17   Q.  Is it possible?
18   A.  It's possible.
19   Q.  Okay.  Are EIC birth certificates available
20   from the local registration office, not using your
21   remote access list?
22   A.  Yes.
23   Q.  But that person has to go to the local
24   registration office that holds their original birth
25   record.  Correct?

---

VICTOR FARINELLI                                          5/9/2014

---

129

1      A.   Correct.
2      Q.   Do they use the same procedures as the
3   remote access sites that have the digital connection
4   to Austin?
5      A.   Yes, they do.
6      Q.   Could these remote registration offices
7   decide they don't want to issue EIC birth
8   certificates?
9      A.   We instruct them that they have to.  But,
10  again, if they're not following procedure, we can
11  tell them that they're not following procedure, and
12  then at that point have to pursue going through their
13  local government supervisor and telling them they're
14  not following procedure.
15     Q.   And so you have no control to make them
16  issue the EIC birth certificates.  Correct?
17     A.   Correct.
18     Q.   And other than the local visits that they
19  know are coming, you don't perform any kind of audits
20  to make sure that they're issuing EIC birth
21  certificates.  Correct?
22     A.   We ask them to complete self-assessment
23  surveys every year.
24     Q.   Okay.
25     A.   But it's not mandatory.

---

130

1      Q.   Okay.  Anything else?
2      A.   No.
3      Q.   And just like the local -- the remote
4   access sites, the State doesn't pay for staffing for
5   local registration offices?
6      A.   No.
7      Q.   Doesn't provide birth certificate supplies?
8      A.   No.
9      Q.   And like the remote access sites, the local
10  registration offices have a financial incentive not
11  to offer the EIC birth certificates.  Correct?  They
12  lose money when they offer --
13     A.   Yes, they lose money.
14     Q.   And do you know if any of the remote
15  access sites -- excuse me, any of the local
16  registrations offices that aren't remote access sites
17  are co-located with DPS?
18     A.   I'm not sure.
19     Q.   Okay.  Are there any additional ways,
20  besides what we have discussed -- online, by mail, in
21  Austin, remote access sites, and local registration
22  offices -- that an individual can obtain a certified
23  copy of a Texas birth certificate?
24     A.   No.
25     Q.   Are there any additional ways besides at

---

131

1   Austin, at a remote access site, or at a local
2   registration office that an individual can obtain an
3   EIC birth certificate?
4      A.   They can only get it through our office --
5   they have to come in person, so local registrar
6   office, remote access office, and our office.
7      Q.   Do you know if there were any press
8   releases concerning the availability of an EIC birth
9   certificate at a reduced price?
10     A.   No, there were not.
11     Q.   Was there any media campaign?
12     A.   No.
13     Q.   Was there any direct notice to registered
14  voters?
15     A.   No.
16     Q.   And we've already agreed there's no notice
17  of EIC birth certificate availability posted at the
18  Austin office of HHSC.  Right?
19     A.   No.
20     Q.   And there's no notice posted in the remote
21  birth certificate access sites?
22     A.   No.
23     Q.   And there's no notice posted at the local
24  registration offices.  Correct?
25     A.   Not that I'm aware of, no.

---

132

1      Q.   Are you aware of whether HHSC has provided
2   any information to DPS to give to individuals who try
3   to apply for an EIC, but don't have a birth
4   certificate?
5      A.   No.
6      Q.   So there's been no effort to educate
7   individuals who need an EIC and need a birth
8   certificate that a birth certificate is available at
9   a reduced price.  Correct?
10     A.   Correct.
11     Q.   Do you know if there's anything on the
12  general public section of your website that lets
13  voters know that an EIC birth certificate is
14  available at a reduced price?
15     A.   General public section of the Vital
16  Statistics website?
17     Q.   Yes.
18     A.   No.
19     Q.   No, you don't know; or, no --
20     A.   No, there's nothing on the general...
21     Q.   Do you know where on the website that
22  information would be?
23     A.   We have information for the EIC card on our
24  Vital Statistics partners' portion of the website,
25  and that's for our local registrars.

---

VICTOR FARINELLI                                           5/9/2014

34  (Pages 133 to 136)

---

133

1    Q.  Okay.  What documents are generally
2  circulated to staff at the Vital Statistics office in
3  Austin when there's a change to the laws or
4  regulations affecting their work?
5    A.  We send out notices through e-mail, and the
6  individual managers will discuss the information with
7  them.
8    Q.  Was a similar notice by e-mail sent when
9  there was a change for the EIC birth certificates?
10    A.  I believe there may not have been.  But
11  they -- it was only for the front office individuals,
12  so...
13    Q.  What documents are used -- are sent to the
14  remote birth access offices when there are changes to
15  laws or regulations affecting issuance of certified
16  copies of birth certificates?
17    A.  We generally send out -- so we try to send
18  out as much information as possible, and we will send
19  out a letter or memos under Geraldine Harris's name
20  to all the local registrars.  If they have a fax
21  number and we have that, we will send them a fax
22  blast of the new information.
23        We have an e-mail distribution list
24  through GovDelivery.  We will also send information
25  through GovDelivery.

---

134

1    Q.  What is GovDelivery?
2    A.  It is a system that the Texas government
3  uses for an e-mail LISTSERV.  There's many Texas
4  government agencies that use that, DSHS, HHSC uses
5  it.
6    Q.  Do you have any way to determine whether
7  the local offices are reading those blasts that go
8  out?
9    A.  No.
10    Q.  Do you know specifically whether that type
11  of information went out regarding the availability of
12  the EIC birth certificates?
13    A.  Yes, it did.
14    Q.  Has any training occurred at any conference
15  thus far about EIC birth certificates?
16    A.  Yes.  We had a panel at the annual
17  conference regarding the electronic -- the election
18  identification card and that -- and also other voter
19  requirements that the local registrars had to comply
20  with.
21    Q.  Do you know how many people attended that
22  panel?
23    A.  No, I don't.
24    Q.  Was that a panel for everyone who appeared
25  or was that one of several panels -- or for everyone

---

135

1  at the conference or was that one of several panels
2  in a time slot?
3    A.  It was one of several panels in a time
4  slot.  But any of the conference attendees could have
5  attended.
6    Q.  And approximately how many individuals
7  attended that conference?
8    A.  It was over 600.
9    Q.  And do you know how many of those were
10  employees at local registration offices?
11    A.  Offhand, no.
12    Q.  Usually at the conference, the annual
13  conference, about how many -- what percentage,
14  roughly?
15    A.  I would say 25 to 35 percent are local
16  registrars.
17    Q.  Okay.  Or employees of local registrars?
18    A.  Or employees of local registrars.
19    Q.  Do you know if there were any handouts at
20  that panel?
21    A.  I'm not sure if there was or not.
22    Q.  Other than that panel and any training that
23  may have gone on during local site visits between
24  October and the present, has there been any other
25  training regarding EIC birth certificates?

---

136

1    A.  We briefly mentioned it at our regional
2  conferences when the rules were being put into place,
3  but we didn't do any specific training on it because
4  the policies and procedures weren't available yet.
5    Q.  Okay.  And we've already discussed, HHSC
6  doesn't provide specific guidelines about informing
7  people of the availability of EIC birth certificates?
8    A.  Correct.
9    Q.  Do you have any specific information
10  regarding the number of remote access offices that
11  have -- that you know have offered EIC birth
12  certificates?
13    A.  We have the number of EICs that were issued
14  off of remote sites.  I don't have each individual
15  office that have issued them, but I have the number
16  that have been issued.
17    Q.  The EIC birth certificates?
18    A.  Yeah.
19    Q.  Do you know what that number is?
20    A.  Off the remote, 60.
21    Q.  And do you know how many EIC birth
22  certificates have been issued from local registration
23  offices?
24    A.  No.  Because there -- we -- we're not
25  required to track that --

VICTOR FARINELLI                                        5/9/2014

35 (Pages 137 to 140)

137

1     Q.  Okay.
2     A.  -- because those are their individual
3  records.
4     Q.  Do you know how many have been issued from
5  the Austin office?
6     A.  We have not issued any.
7     Q.  Okay.  So at the present, there have been
8  no instances in which the EIC birth certificate has
9  been offered absolutely for free.  Correct?
10    A.  At the Department of State Health Services?
11    Q.  Yes.
12    A.  We haven't had anybody come in and ask for
13 it.
14    Q.  But at the present -- let me start over.
15        The Department of State Health
16 Services is the only office, to your knowledge, that
17 is waiving the $2 statutory fee?
18    A.  Correct.
19    Q.  And the Department of State Health Services
20 has never had to waive that fee yet because no one
21 has come into the Austin office asking for an EIC
22 birth certificate.  Correct?
23    A.  Correct.
24    Q.  So at present, no EIC birth certificates
25 have been issued for free.  Correct?

138

1     A.  Correct.
2     Q.  And other than the remote -- excuse me --
3  the site visits that you've conducted, there are no
4  procedures in place to ensure that when an individual
5  goes into a remote access office and asks for an EIC
6  certificate that they need for an EIC, that they're
7  getting the EIC birth certificate.  Correct?
8     A.  Correct.
9     Q.  And you don't know whether those offices
10 are specifically requiring the individual from the
11 public to ask for an EIC birth certificate
12 specifically.  Correct?
13    A.  Correct.
14    Q.  And you don't know how -- those 60 EIC
15 birth certificates that have been issued from local
16 access offices, they could all have been issued from
17 one office.  Correct?
18    A.  They could have been, yes.
19    Q.  You have no knowledge to the contrary?
20    A.  No.
21    Q.  Okay.  If we can turn back to the proposed
22 amendment, which I believe is 107.  Do you see the
23 fiscal note?
24    A.  Fiscal.  Okay.
25    Q.  Am I correct that the fiscal note states

139

1  that, "Due to the low number of individuals who have
2  requested an EIC from the DPS for each year of the
3  first five years that the section is in effect, there
4  will be no fiscal implications to State or local
5  governments as a result of enforcing and
6  administering the section as proposed"?
7     A.  That's correct.
8     Q.  And at the top of this same page, it states
9  that -- this proposed rule states that the DPS
10 reports that as of the publication date of this
11 proposed amendment, fewer than 20 individuals
12 statewide have requested an EIC.  Correct?
13    A.  Correct.
14    Q.  Now, you've already issued more EIC birth
15 certificates than at the time of this proposal there
16 have been EICs.  Correct?
17    A.  Correct.
18    Q.  At the time that the regulatory amendment
19 was proposed, there had never been a statewide
20 election while SB 14 was in place.  Correct?
21    A.  Correct.
22    Q.  Do you know what HHSC's basis was to
23 believe that there would not be an increase in demand
24 for EIC birth certificates?
25    A.  This basis was based on the original bill

140

1  analysis that was done on SB 14 regarding
2  certificates of birth that were requested
3  specifically for voter -- for voting purposes.
4        At that time, we had less than one
5  percent of all individuals coming in to request a
6  certified copy of a birth certificate were requesting
7  them for voting purposes.
8     Q.  I'm sorry, I'm confused.  Oh, I -- and
9  those were individuals who needed a birth certificate
10 to vote under the predecessor rules before --
11    A.  Prelaw.
12    Q.  -- SB 14?
13    A.  Correct.
14    Q.  But under that rule, didn't -- wasn't
15 anyone available -- couldn't anyone vote just with
16 their voter registration card?
17    A.  They could.
18    Q.  And everybody got a voter registration card
19 in the mail.  Right?
20    A.  Yeah.
21    Q.  So how did that -- how did the fact that
22 people weren't needing birth certificates for the
23 purpose of voting under the predecessor to SB 14, how
24 did that support the idea that they weren't going to
25 need it under SB 14?

VICTOR FARINELLI                                              5/9/2014

---

141

1      A.   This was just -- to my knowledge -- the
2  best of my knowledge -- I'm not sure how -- where
3  this came from, but this was what was -- this is how
4  that was derived.
5      Q.   Okay.
6      A.   I'm not sure exactly why it was used here.
7      Q.   Okay.  And that's fine.  And I know that
8  you're not specifically here to talk about these
9  regulations, and I appreciate that, and I appreciate
10 your willingness to testify to the extent of your
11 knowledge.
12          Do you know how many EIC birth
13 certificates were issued between October 21st, 2013,
14 and the November 2013 general election?
15     A.   I -- we have a printout of what was issued
16 each month.  But offhand, I do not know.
17     Q.   And how are the EIC birth certificates that
18 have been issued from the remote access offices, how
19 are those tracked?
20     A.   They are tracked through our database.  And
21 the way the system was designed, it -- if they were
22 doing a regular abstract, it goes from one and gets
23 marked one way.  If it's a -- if it's a remote for
24 election identification purposes, it's marked another
25 way.  So when it's marked in our database separately.

---

142

1      Q.   And does anyone see an abstract of that
2  data on a monthly basis?
3      A.   We don't check it on a monthly basis, no.
4      Q.   How often do you check it?
5      A.   When we're asked how many have been issued.
6      Q.   Okay.  So in this case, you happen to know
7  it was 60 because you checked in preparation for this
8  deposition?
9      A.   Yes, we checked prior to that.
10     Q.   Do you know if anyone had checked
11 previously at any point?
12     A.   When the process was first started, we
13 checked to see how many were issued.  But I'm not
14 sure exactly what that number was at that time.
15     Q.   Do you know how long that was after the
16 process first started?
17     A.   Generally a few weeks after.  I'm not sure
18 exactly what the date was.
19     Q.   So that may have been just around the
20 November election.  Correct?
21     A.   Correct.
22     Q.   Do you still have a copy of an output of
23 that search?
24     A.   No.
25     Q.   Okay.  Based on the number of EIC birth

---

143

1  certificates that have been issued to date, would you
2  describe this program as successful?
3      A.   I wouldn't be a really good -- I couldn't
4  really answer that one.
5      Q.   Do you know if anyone is going to assess
6  this program?
7      A.   To the best of my knowledge, no.
8      Q.   Are there any plans to change this program
9  in the future?
10     A.   To the best of my knowledge, nope.
11     Q.   Are there any technical impediments to
12 connecting -- let's go off the record.
13          (Lunch recess.)
14     Q.   (BY MR. FREEMAN)  So during the break, your
15 counsel gave me a few of the documents that you've
16 reviewed over the time that you were preparing for
17 this deposition, and so I just wanted to ask you a
18 few follow-up questions about topics we had already
19 covered based on these documents.
20     A.   Okay.
21          MR. FREEMAN:  So first off, I'm going
22 to mark this as 116.
23          (Exhibit Number 116 marked.)
24     Q.   (BY MR. FREEMAN)  And what is this
25 document?

---

144

1      A.   This is from our website.  This is some
2  information that we've provided to -- on our website
3  regarding the new birth certificate for election
4  identification for our -- and this is for our local
5  registrars.
6      Q.   And so as you said before, that's not on
7  the public -- the section of your website for the
8  general public.  Right?
9      A.   Right.  It's more for our partners.
10     Q.   How would someone go about finding that
11 document on your website?
12     A.   If they go to the regular website, they
13 select VSU partners, I believe.  And there's a link
14 on that page, I believe, where they can get to this.
15     Q.   Okay.
16     A.   It's also under our hot topics section.
17     Q.   Where is the hot topics section?
18     A.   It's on the Vital Statistics partners front
19 page.
20     Q.   Okay.  And we only have one copy of this
21 document, and it would be rather difficult to make it
22 an exhibit, so let me -- let's do it this way.  If
23 you were to look at this document, would this refresh
24 your recollection concerning the topics that were
25 discussed at the annual conference regarding election

VICTOR FARINELLI                                          5/9/2014

145

1    identification certificate --
2        A.  Yes.
3        Q.  -- and birth certificates?
4            Was there anything discussed
5    concerning voters abstract information?
6        A.  Voters abstract information, yes.  But that
7    specifically is for -- meaning for local registrars
8    to provide to the Secretary of State's office.
9    They're required by the election code to provide an
10   abstract of death to the Secretary of State's office
11   for when a person -- a voter over 18 years of age
12   dies, to take them off the voter roles.  That's what
13   that is.
14       Q.  So that was further discussion on the same
15   panel concerning voter registration list maintenance?
16       A.  Yeah.
17       Q.  Okay.
18       A.  Yeah.
19       Q.  And does this confirm your prior
20   recollection that there were multiple panels going on
21   at the same time?
22       A.  Yes.
23       Q.  Okay.
24       A.  Yes.
25       Q.  And there were, in fact, three different

146

1    panels going on at the same time?
2        A.  Three, yes.
3            MR. FREEMAN:  Great.  I'm going to
4    mark it as 117.
5            (Exhibit Number 117 marked.)
6        Q.  (BY MR. FREEMAN)  Was this the -- sorry.
7    What is this document?
8        A.  It is -- this is what was sent through the
9    GovDelivery LISTSERV of information about the
10   election identification certificate.
11       Q.  Is this the only e-mail that went out to
12   that LISTSERV?
13       A.  Yes.
14       Q.  And does that describe in any detail any
15   procedures relating to EIC birth certificates?
16       A.  No.
17       Q.  Who sent this e-mail?
18       A.  It was sent by our field services.
19       Q.  And so there's someone in the field
20   services office --
21       A.  Specifically Derek Johnson was the one who
22   sent it.
23       Q.  Okay.  Who is Mr. Johnson?
24       A.  He's one of the field services
25   representatives.

147

1        Q.  Okay.  And so if a remote birth access
2    office had wanted any information, other than the
3    existence of the EIC birth certificates, and the
4    purpose of the EIC birth certificates, and the age
5    limitation on the EIC birth certificates, they would
6    have to reach out to an area representative for
7    further information?
8        A.  Correct.
9        Q.  Yes?
10       A.  Correct.
11       Q.  Do you know how many e-mail responses
12   Mr. Johnson received -- or any area representative
13   received in response to this e-mail?
14       A.  No.
15       Q.  Do you have any basis to believe that there
16   were any responsive e-mails asking for further
17   information or guidance?
18       A.  I'm not sure.
19       Q.  Does your office track phone calls received
20   from local registration offices at all?
21       A.  No.  We don't have a phone tracking system.
22           MR. FREEMAN:  Okay.  And I'm going to
23   mark this as Exhibit 118.
24           (Exhibit Number 118 marked.)
25       Q.  (BY MR. FREEMAN)  What is this document?

148

1        A.  It is the memo from the -- pardon me --
2    from the State Registrar regarding the election
3    identification card and the remote system and the
4    stamp that we provided to the local registrars.
5        Q.  And am I correct that the State Registrar
6    wrote that, "The fees required to be paid pursuant to
7    Health and Safety Code Sections 191.0045(e) and
8    191.022(f), ($2.00), are statutorily required, and as
9    a result are not waived by this rule and must still
10   be charged by the DSHS, local registrars, and county
11   clerks"?
12       A.  Correct.
13       Q.  DSHS is the Austin office.  Correct?
14       A.  Correct.
15       Q.  And so this letter states that DSHS will
16   still charge $2.  Correct?
17       A.  Correct.
18       Q.  At what point was the policy changed such
19   that the DSHS would no longer charge $2 to
20   individuals seeking EIC --
21       A.  We were -- our policy was that if we ever
22   had anybody come in.  So at the beginning, it's been
23   that way.  But we had this in there just -- since
24   it's statutorily required, if we needed to begin
25   taking the fee, then we would.

VICTOR FARINELLI                                                    5/9/2014

149

1    Q.  So it's possible that at some point in the
2  future your office may begin taking the $2 fee?
3    A.  It's possible, yes.
4    Q.  Is there any technical impediment to
5  connecting the birth certificate database that your
6  office maintains, to the Department of Public Safety?
7    A.  They're not able to access it.  They
8  don't...
9    Q.  But would it be possible for the Department
10  of Public Safety to access it?
11    A.  Yeah, it would be possible.
12    Q.  Is there any legal impediment that you're
13  aware of?
14    A.  Birth record information is close to -- is
15  closed record information.  We would have to -- so
16  there would have to be some agreements made between
17  Department of Public Safety and HHSC in regards to
18  access to that.
19    Q.  Okay.  And if those agreements were in
20  place, though, and if they had the necessary
21  software, there wouldn't be any other impediment to
22  connecting DPS to your birth records?
23    A.  (Shakes head.)
24    Q.  No?
25    A.  No.

150

1    Q.  Okay.  Would that, then, allow individuals
2  to go to DPS, even if they didn't have a birth
3  certificate, and they could look up the birth record
4  and they could get an EIC in one trip?
5    A.  Yes.
6         (Exhibit Number 119 marked.)
7    Q.  (BY MR. FREEMAN)  I'm going to mark this
8  document as Exhibit 119.  Have you seen this document
9  before?
10    A.  No.
11    Q.  Could you review this document?  I'm only
12  going to ask you questions about the first page.
13         What is this document?
14    A.  It appears to be an e-mail from the
15  Department of Public Safety.
16    Q.  And do you know who Joe Peters is?
17    A.  No.
18    Q.  Do you know who Robert Bodisch is?
19    A.  No.
20    Q.  Am I correct that according to this e-mail,
21  Mr. Peters -- well, does this e-mail provide
22  Mr. Peters' title?
23    A.  Yes.
24    Q.  And what is Mr. Peters' title?
25    A.  Assistant director.

151

1    Q.  He's the assistant director for the
2  driver's license division.  Correct?
3    A.  Yeah, Department of Public Safety driver's
4  license division.
5    Q.  Now, according to this e-mail, Mr. Peters
6  met with DSHS officials regarding the possibility of
7  providing them -- of them providing free birth
8  certificates for EIC applicants.  Correct?
9    A.  Correct.
10    Q.  Do you know who he met with?
11    A.  No.
12    Q.  According to this e-mail Mr. Peters also
13  proposed a near-term e-mail solution and a
14  longer-term solution that would involve their CSRs
15  being able to directly query HHSC database for
16  confirmation.  Correct?
17    A.  According to this, yes.
18    Q.  Do you know who discussed that with
19  Mr. Peters?
20    A.  No.
21    Q.  Do you know why that was never implemented?
22    A.  No.
23    Q.  But you agree that would be technically
24  feasible.  Correct?
25    A.  Correct.

152

1    Q.  Do you know who at your office would know
2  who discussed this with Mr. Peters?
3    A.  As far as I know -- just the chief
4  operating officer, as far as I know.
5    Q.  And who is the chief operating officer?
6    A.  Ed House.  I don't know of anybody else.
7    Q.  Do you know of any other discussions that
8  have ever occurred between DPS and your office,
9  concerning establishing an online link between your
10  records and DPS?
11    A.  Not that I'm aware of.
12    Q.  But at present, no such link exists.
13  Correct?
14    A.  No.
15    Q.  And you have no knowledge of any plans to
16  establish such a link?
17    A.  Not at this time.
18    Q.  Do you know what the costs would have been
19  to establish such a link?
20    A.  No.
21    Q.  How much does it cost to connect a remote
22  issuance site?
23    A.  There's no cost to connect, but every
24  record they issue, they actually issue, we'll charge
25  them $1.83 for that.

VICTOR FARINELLI                                          5/9/2014

---

153

1      Q.   And they're just using an ordinary computer
2  with some kind of software on it.  Is that correct?
3      A.   There's no software.  It's an
4  Internet-based application.
5      Q.   So it's a Web application?
6      A.   Yes.
7      Q.   So they take a normal computer, they open
8  up a Web browser, And they -- do they have to verify
9  who they are before they --
10     A.   They have to log in -- they have a user ID
11  and password so everybody who gets -- who logs into
12  the remote system has a user ID and password.  So
13  they enter their user ID and password, and then if
14  they have entered it successfully, they will have
15  access to it.
16     Q.   So in order to give DPS access to it, am I
17  correct that the only thing you would need to do
18  would be to reach an agreement and give them user
19  names and passwords, DPS staff?
20     A.   Yes.  There may need to be some program
21  changes.  So if -- from my understanding of what this
22  says, is they're just going to be verifying, so we
23  would eliminate the use of having to print anything.
24  So just a verification screen.
25     Q.   It would just be a query?

---

154

1      A.   Yeah.
2      Q.   And for a query, you don't even charge
3  local offices.  Correct?
4      A.   We don't charge the locals, no.
5      Q.   Has HHSC asked DPS for any information
6  about EIC applicants who didn't have a birth
7  certificate?
8      A.   No, not that I'm aware of.
9      Q.   Has HHSC reached out to any of those
10  individuals?
11     A.   Not that I'm aware of.
12     Q.   Texas has a lot of immigration from other
13  states within the U.S.  Right?
14     A.   Yes.
15     Q.   Do you know about what proportion of the
16  adult population in Texas was born in another state?
17     A.   No, I don't.
18         MR. FREEMAN:  Mark this exhibit as
19  Exhibit 120.
20         (Exhibit Number 120 marked.)
21     Q.   (BY MR. FREEMAN)  Have you ever seen this
22  document before?
23     A.   No, sir.
24     Q.   What does this document appear to be?
25     A.   It appears to be from the Census Bureau.

---

155

1      Place of birth by nativity and citizenship status.
2  Universal: Total population from 2008 to 2012, an
3  American Community Survey Five-Year Estimate.
4      Q.   What is the estimated -- according to the
5  Census Bureau, what is the estimated native born
6  population in Texas?
7      A.   Native born, estimate total is 25
8  million 200 and -- oh, native.  Native.  I'm sorry.
9      Q.   That's born in state of residence.
10     A.   Yes.  I'm sorry.  21,109,883.
11     Q.   That's -- am I correct, that's the total
12  number who are native to the United States?  Correct?
13  I'm specifically asking the total number who are born
14  in the state of residence of Texas.
15     A.   Yes.
16     Q.   What is that number?
17     A.   Oh, 15,000 -- 15,248,259.
18     Q.   Okay.  And so that's a little less than 75
19  percent, three quarters of the total native born
20  population of Texas?
21     A.   Yeah.  Yes.
22     Q.   And so among those -- the native born
23  population, the population born in the United States
24  in Texas, about 25 percent were born in other states.
25  Right?

---

156

1      A.   Yes.
2      Q.   And this is the total population?  This is
3  not by age.  Right?
4      A.   It appears to be total population, yes.
5      Q.   Is it possible to obtain a copy of a birth
6  certificate from your office if an individual was
7  born in another state in the United States?
8      A.   Not from our office.
9      Q.   Okay.  Do you know how much it costs to
10  obtain a birth certificate from the states that
11  neighbor on Texas?
12     A.   Not offhand.  It varies.
13     Q.   Do you know what the approximate range is
14  for other states?
15     A.   It's anywhere between 11 and 30.
16     Q.   Okay.  Do other states all allow
17  individuals to apply for copies of birth certificates
18  by mail?
19     A.   To the best of my knowledge, yes.
20     Q.   Okay.  Are you aware of any problems
21  related to Puerto Rican birth certificates?
22     A.   No.
23     Q.   And do you know how much it costs to obtain
24  a U.S. Department of State certificate of birth for
25  native born -- U.S. citizens born abroad?

---

VICTOR FARINELLI                                            5/9/2014

157

1    **A.  No.**
2        Q.  Do you know if it's possible to obtain such
3    a document without photo ID?
4        **A.  I'm not sure what their requirements are.**
5            MR. FREEMAN:  With that, I'm going to
6    pass the witness to Mr. Doggett.  I may have a few
7    concluding questions at the end.
8            EXAMINATION
9    BY MR. DOGGETT:
10       Q.  As usual, all the good questions have been
11   asked, so I'm only left with a few clean-ups, which
12   often don't even sound like questions.  So I
13   appreciate your patience.
14           If a person requests an EIC birth
15   certificate and requests it on an expedited basis, is
16   that fee waived?
17       **A.  If they come in office, it's going to be**
18   **expedited, anyway.**
19       Q.  Why is that?
20       **A.  Because they're in -- in-house, so it's --**
21   **we do it in realtime.**
22       Q.  On -- when you say expedited, that means
23   just as soon as possible?
24       **A.  Right.**
25       Q.  Okay.  So -- and the only way to get an

158

1    EIC, then, is to come in in person?
2        **A.  Correct.**
3        Q.  Okay.  Just wanted to make sure I
4    understood.  There was some discussion about that.
5            On the exhibit --
6            MR. SCOTT:  EIC birth certificate?
7            MR. DOGGETT:  Yes.  I'm sorry.  Did I
8    not say that?  My apologies if I didn't.  I'm sorry.
9            MR. SCOTT:  I thought I just heard
10   EIC.  But that --
11       Q.  (BY MR. DOGGETT)  If I just say EIC, I'm
12   more than likely meaning the EIC birth certificate.
13   So if I leave that off, please feel free to correct
14   me.
15           I'm looking at exhibit -- or what's
16   been marked as 113.  It looks like the application
17   for the EIC birth certificate.  Did you find that
18   one?
19       **A.  11 what?**
20       Q.  113.  113.
21       **A.  There we go.  Yes.**
22       Q.  At the top, it says, "Please print and
23   include valid photo ID."  Right?
24       **A.  Yes.**
25       Q.  And I think you already discussed why that

159

1    may not be applicable.
2            But underneath it, it says, full name
3    of registrant?
4        **A.  Yes.**
5        Q.  Is the registrant the name of the person
6    who you want the birth certificate for?  Is that
7    right?  In other words, the person's name you want on
8    the birth certificate?
9        **A.  The person -- the registrant is the person**
10   **that's -- whose birth certificate it is for.**
11       Q.  Okay.
12       **A.  Yeah.  It's their birth certificate.**
13       Q.  I'm with you, I think.
14           Underneath it has "Your name."  Do you
15   see that line underneath that -- those boxes?
16       **A.  Yes.**
17       Q.  And a slot for your name.  Shouldn't that
18   be the same in this case, because don't you have to
19   be the registrant in order to obtain an EIC birth
20   certificate, or not?
21       **A.  Yes.  But you could be married and have**
22   **changed your name.  So your legal name may be your**
23   **married name at that point, so -- sometimes it's**
24   **going to vary a little bit.**
25       Q.  So someone may say, my name is now Jane

160

1    Smith, but the name on my birth certificate, I know,
2    is different, and so they're going to put in the last
3    one?
4        **A.  Right.**
5        Q.  Okay.  I see what you're saying.  And on
6    the name of the father and then full maiden name of
7    the mother, I believe you indicated earlier that when
8    people get married, sometimes either -- either party,
9    either sex changes their name as a result.  Is that
10   your understanding?
11       **A.  Yeah.**
12       Q.  I believe you testified to that, is the
13   reason I'm asking.
14       **A.  Yeah.  They have the option of changing**
15   **their name, but that never changes anything on their**
16   **birth certificate.**
17       Q.  Right.  And so it could be, though, a male
18   changes their name as a result of being married.  Was
19   that your testimony earlier?
20       **A.  Yes.**
21       Q.  Okay.  The form talks about first name,
22   middle name, maiden name for the mother.  Do you
23   follow that line?
24       **A.  Yes.**
25       Q.  But nothing for the father, for example.

SENATOR TROY FRASER                                            7/23/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

**1**

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,         )
                                 )
 4        Plaintiff,             )
                                 )
 5  VS.                          )  CIVIL ACTION NUMBER:
                                 )  2:13-CV-193 (NGR)
 6  RICK PERRY, et al.,          )
                                 )
 7        Defendants.            )
                                 )
 8  _____
                                 )
    UNITED STATES OF AMERICA,    )
 9                               )
          Plaintiff,             )
10                               )
    VS.                          )  CIVIL ACTION NUMBER:
                                 )  2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS )
12  EDUCATION FUND, et al.,      )
                                 )
13      Plaintiff-Intervenors,   )
                                 )
14  TEXAS ASSOCIATION OF HISPANIC)
    COUNTY JUDGES AND COUNTY     )
15  COMMISSIONERS, et al.,       )
                                 )
16      Plaintiff-Intervenors,   )
                                 )
17  VS.                          )
                                 )
18  STATE OF TEXAS, et al.,      )
                                 )
19        Defendants.            )
                                 )
20  _____
    TEXAS STATE CONFERENCE OF    )
21  NAACP BRANCHES, et al.,      )
                                 )
22        Plaintiffs,            )
                                 )  CIVIL ACTION NUMBER:
23  VS.                          )  2:13-CV-291(NGR)
                                 )
24  NANDITA BERRY, et al.,       )
                                 )
25        Defendants.            )
```

**2**

```
 1  BELINDA ORTIZ, et al.,    )
                             )
 2      Plaintiffs,          )
                             )
 3  VS.               ) CIVIL ACTION NUMBER:
                      ) 2:13-CV-348(NGR)
 4  STATE OF TEXAS, et al.,  )
                             )
 5      Defendants.      )
                         )
 6  _____
 7
 8       **************************************************
 9              DEPOSITION OF
10          SENATOR TROY FRASER
11              JULY 23, 2014
12       **************************************************
13           HIGHLY CONFIDENTIAL
14      ORAL DEPOSITION OF SENATOR TROY FRASER, produced as
15  a witness at the instance of the Plaintiff, was duly
16  sworn, was taken in the above-styled and numbered cause
17  on the JULY 23, 2014 from 9:03 a.m. to 7:57 p.m., before
18  Chris Carpenter, CSR, in and for the State of Texas,
19  reported by machine shorthand, at the Office of the
20  Attorney General, 209 West 14th Street, Austin, TX
21  78701, pursuant to the Federal Rules of Civil Procedure
22  and the provisions stated on the record or attached
23  hereto.
24
25
```

**3**

```
 1
 2
 3          A P P E A R A N C E S
 4  FOR THE UNITED STATES OF AMERICA:
 5      Elizabeth Westfall
        U.S. JUSTICE DEPARTMENT
 6      CIVIL RIGHTS DIVISION
        Room 7254 NWB
 7      950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
 8      (202) 514-0828
        elizabeth.westfall@usdoj.gov
 9
10  FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
11      John Scott
        J. Reed Clay, Jr.
        Assistant Deputy Attorney General
12      ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
13      Austin, TX 78711-2548
        (512) 475-3281
14      john.scott@texasattorneygeneral.gov
        reed.clay@texasattorneygeneral.gov
15
16  FOR THE WITNESS:
17      Linda Halpern
        Manager of Complex Litigation
18      ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
19      Austin, TX 78711-2548 MC109
        (512) 475-1969
20      linda.halpern@texasattorneygeneral.gov
21      Brooke Paup
        Deputy Division Chief
22      Intergovernmental Relations Division
        ATTORNEY GENERAL OF TEXAS
23      P.O. Box 12548
        Austin, TX 78711-2548
24      (512) 936-1381
25      brooke.paup@oag.state.tx.us
```

**4**

```
 1  FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND:
 2      Tania Faransso
        Richard Shordt
 3      WILMER HALE
        1875 Pennsylvania Avenue, NW
 4      Washington, DC 20006
        (202) 663-6262
 5      tania.faransso@wilmerhale.com
        richard.shordt@wilmerhale.com
 6
 7  FOR D.C. LULAC:
 8      Armand Derfner (appearing by telephone)
 9  ALSO PRESENT:
10      Roberto Rivera, summer intern with WilmerHale
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SENATOR TROY FRASER                                          7/23/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

21

1    Q.  Are you aware that according to the 2010
2  census, the voting age population of your district was
3  approximately 70 percent White?
4    A.  I'm sorry, would you repeat that question?
5    Q.  Are you aware that according to the 2010
6  census, the voting age population of your district was
7  approximately 70 percent White?
8    A.  I'm sorry, I can't verify that because I
9  believe it is lower than that.
10   Q.  When did you first take an interest in Voter ID
11  issues?
12   A.  2007.
13   Q.  And was there any particular reason or event
14  that prompted you to take interest in those issues?
15   A.  There was a bill that had been filed in the
16  Texas House and it was moving forward and I watched that
17  bill as it moved.
18   Q.  Are you referring to House Bill 218?
19   A.  Yes.
20   Q.  Okay.  Janice McCoy served as your Chief of
21  Staff at that time, correct?
22   A.  Yes.
23   Q.  And how long did she serve as your Chief of
24  Staff?
25   A.  I believe she was employed in 1999, two years

---

22

1  after I was elected.
2    Q.  And when did she leave your employ?
3    A.  Approximately October 15th of last year.
4    Q.  And is that when Ms. Mathis became your current
5  Chief of Staff?
6    A.  Yes.
7    Q.  While Ms. McCoy was your Chief of Staff, she
8  was your primary contact person on voting ID issues; is
9  that correct?
10   A.  That's correct.
11   Q.  Did she handle all election-related issues for
12  you until the time she left your employment?
13   A.  Yes.
14   Q.  And did Ms. Mathis assume those
15  responsibilities when Ms. McCoy left your employment?
16   A.  That's actually -- it's not a -- would not be
17  an accurate question because she is assuming Chief of
18  Staff because we are not having legislative activities
19  because we're not in session, but she will be assuming
20  those as they begin.
21   Q.  Got it.  Is there anyone else on your staff who
22  has worked on voting ID issues?
23   A.  No.
24   Q.  Senator, do you still serve as the Chair of the
25  Senate Committee on Natural Resources?

---

23

1    A.  Yes.
2    Q.  Okay.  And do you also sit on the Economic
3  Development Committee?
4    A.  Yes.
5    Q.  How about the Nominations Committee?
6    A.  Yes.
7    Q.  And State Affairs?
8    A.  Yes.
9    Q.  Okay.  While serving as the Chair of the Senate
10  Committee on Natural Resources, have you introduced
11  legislation that has been referred to that committee?
12   A.  Yes.
13   Q.  What are some examples of legislation that you
14  have introduced?
15   A.  That would be an extremely broad question and
16  if you held specific issues you'd like to ask me did I
17  sponsor it, I'll be glad to respond.
18   Q.  But you have introduced legislation?
19   A.  Yes.
20   Q.  Before you introduce legislation, do you
21  consider the impact of that legislation or your
22  constituents?
23   A.  Would you please repeat that question?
24   Q.  As a general matter, before you introduce
25  legislation, do you consider the impact of that

---

24

1  legislation on your constituents?
2    A.  Yes.
3    Q.  And do you consider the impact of the
4  legislation on Texans outside of your voting district?
5    A.  Yes.
6    Q.  Before you introduce legislation, do you
7  consider the impact of that legislation on the Texas
8  budget?
9    A.  Yes.
10   Q.  And do you consider how a bill, if enacted into
11  law, would be administered?
12   A.  No.
13   Q.  And why not?
14   A.  The legislation -- generally, a bill that is
15  filed is the starting point of legislation, and it is
16  likely to be changed many times either in the Senate or
17  when it's sent to the House.  So assuming how it would
18  be enacted and administered is getting way ahead of
19  where you are at the process, where the job is to lay
20  out a concept, allow public input and then determine at
21  that point how that bill should be adjusted in order to
22  be good public policy.
23   Q.  Okay.  You mentioned House Bill 218 earlier, so
24  we're going to take look at that, if I could --
25        (Exhibit 4 marked for identification.)

---

25

1   Q.  (By Ms. Faransso) Senator, you've just been
2   handed what has been marked as Exhibit 4.  Do you
3   recognize this document?
4       A.  No.
5       Q.  I can represent to you that this is House Bill
6   218 and it's the engrossed version as recorded by the
7   House on April 24, 2007.  Does it look familiar to you?
8       A.  You can represent that but there's no marking
9   on the bill to show that this is engrossed by the House
10  and sent, you know.  This appears to be a bill as if it
11  would be filed, but there's no document -- no markings
12  to show that it had passed the House.
13      Q.  Okay.  I'll represent to you that I pulled this
14  from the Texas Legislature's website and that it was
15  marked as the engrossed version of the bill dated April
16  24, 2007.
17          You sponsored this bill in the Senate; is
18  that right?
19      A.  That is correct.
20      Q.  Why did you decide to sponsor this bill?
21          MS. HALPERN:  For the record, I'm going
22  the to object on the grounds of legislative
23  privilege.  And I'm -- we're going to do in this
24  deposition what we have done in the others, which is
25  that based on the court's ruling and our understanding

26

1   of the court's ruling, the witness is going to be
2   allowed to answer the question under seal.  Doing so
3   does not constitute a waiver of the legislative
4   privilege.  And that battle will be fought I gather at a
5   later time in your litigation.  But we will be asserting
6   the legislative privilege from time to time.  When he
7   goes ahead and answers your question, if appropriate,
8   we'd ask that that portion be under seal, which may
9   dictate then that the entire transcript needs to be put
10  under seal.  And we've had that discussion with this
11  reporter in the past as well and that's probably
12  something that needs to be hashed out on the record
13  right now.
14          I won't go through this lengthy an
15  objection every time.  I will simply object on the
16  grounds of legislative privilege.  I want a continuing
17  and running objection, and I want it understood that
18  every time that we object on the grounds of legislative
19  privilege, rather than directing him not to answer, he
20  will answer with the understanding that that portion of
21  the transcript, whatever else happens to the rest of the
22  transcript, will be under seal, and you will be put to
23  whatever burdens the court deems appropriate in order to
24  use that testimony.
25          MS. FARANSSO:  Understood.  Does that work

27

1   for counsel?
2           MS. WESTFALL:  Thank you.  Yes.
3       Q.  (By Ms. Faransso) So, I believe the question
4   pending was why did you decide to sponsor HB 218?
5           MS. HALPERN:  Do we have an agreement that
6   the entire transcript is going to be under seal?  We had
7   this discussion last time.
8           MS. WESTFALL:  I don't think we have an
9   agreement that the entire transcript will be under seal.
10  I think we would agree to designate as Highly
11  Confidential pursuant to ECF 105, the Protective Order,
12  whatever responses to which you object to the question
13  on the basis of legislative privilege and any testimony
14  about documents that have been produced as highly
15  confidential pursuant to the court's ruling on
16  legislative privilege.  But to the extent that there is
17  examination on the public record and the questions do
18  not implicate legislative privilege, we would -- we
19  believe that those portions of the transcript should not
20  be designated under seal or highly confidential or along
21  those lines, and those should be -- the Plaintiff should
22  be able to file those publicly with the court and not
23  under seal.
24          MS. HALPERN:  And we don't actually have a
25  position on that.

28

1           You will have to speak for yourself,
2   Mr. Reporter, before you get put in the bind you were in
3   before.  Be your own advocate, sir.
4           THE COURT REPORTER:  Well, the only way I
5   can -- the only way I can do a transcript in a one-day
6   turnaround is to mark the entire transcript as highly
7   confidential and not for me to be making decisions as to
8   what is and what is not confidential.
9           MS. WESTFALL:  We can certainly agree to
10  -- for purposes of just the transcript, that the counsel
11  could agree that it's not going to be all designated as
12  confidential and the counsel can at a later date make
13  that determination if there are disputes.
14          MS. HALPERN:  If that's the way we're
15  going to operate, then I would ask that you make at
16  least an attempt to call out on the record whether we
17  are on -- or whether we are under seal or not under
18  seal, because otherwise, I am leaving a problem for my
19  colleagues who represent the defendants in this case to
20  debate with you what is on -- what is under seal and
21  what isn't, and that is not a fight you want to have any
22  time close to trial, so.
23          MS. WESTFALL:  Certainly.  I'm going to --
24  it's been my practice in deposition to -- when I'm using
25  highly confidential documents, to make that announcement

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1   on the record, and I believe counsel will be doing the
2   same here in this case.
3        MS. HALPERN:  Okay.
4        THE COURT REPORTER:  Can we go off the
5   record for a second?
6        (Brief discussion off the record for
7   clarification that the reporter is to mark entire
8   transcript as "Highly Confidential" and counsel will
9   later agree on which portions to de-designate.)
10   Q.  (By Ms. Faransso) So, I think maybe the third
11   time's a charm.  Why did you sponsor HB 218?
12   A.  I want it clear that I am asserting legislative
13   privilege in answering this question.  Under privilege,
14   it is under understood that my answer that I'm giving is
15   disclosing thoughts about legislation and that I would
16   ask that that answer be considered as sealed --
17   Q.  Thank you, Senator.
18   A.  -- and I will answer your question.
19   Q.  Okay.
20   A.  The legislation that was sent -- passed in the
21   House, which was 218, had followed the legislation.  I
22   had conversations with Betty Brown, that was the sponsor
23   of the bill, realizing she was carrying it, and once it
24   passed the House, it was referred to the -- referred to
25   Committee and I picked the bill up as the sponsor and

---

30

1   had hearings in Committee on the bill, and then it was
2   passed out of Committee and moved forward to the Floor.
3   Q.  Uh-huh.  Did Skipper Wallace ask you to be the
4   Senate sponsor of the bill?
5   A.  I don't remember whether Skipper Wallace, at
6   this time, asked me to carry this -- on that particular
7   question you're asking about -- so I guess my answer is,
8   on this particular 218, I don't remember if he asked me
9   to, if we had communication.
10   Q.  Okay.  And just for the record, who is Skipper
11   Wallace?
12   A.  Skipper Wallace is one of my constituents.  He
13   is a County Chairman of Lampasas, which as mid-sized
14   county, and he has served as Chairman of the County
15   Association.  He's a constituent.
16   Q.  And is he -- have you communicated with
17   Mr. Wallace about Voter ID issues in the past?
18   A.  Because this bill has been seen -- heard three
19   different sessions, the answer is yes, because he had an
20   interest in election issues.
21   Q.  Okay.  Did you read House Bill 218 before you
22   decided to sponsor it?
23   A.  Yes.
24   Q.  And do you recall thinking that any parts of
25   that bill needed to be changed?

---

31

1   A.  That would be a privileged question because
2   you're asking about my thoughts on that, and my answer
3   is, I did read the bill and was aware of what was in the
4   bill.
5   Q.  Did you think that anything in the bill needed
6   to be changed?
7        MS. HALPERN:  Privilege objection.
8   A.  I've answered the -- I've answered the
9   question, is that I read the bill and was aware of what
10   was in the bill and was prepared to move forward and
11   listen to the testimony in the Senate and then determine
12   what direction we should go.
13   Q.  (By Ms. Faransso) Okay.  Thank you.  What
14   eventually happened to HB 218 in the Senate?
15   A.  Senate bill 218 passed the Committee, was
16   referred to the full Senate, the bill was sent to the
17   Lieutenant Governor, it was placed in the regular order
18   of business.  And I'm sorry, I do not have the date when
19   I was recognized, but I was recognized for a motion to
20   suspend the regular order of business to take up and
21   consider House Bill 218.  That motion failed and the
22   regular order of business was not suspended.
23   Q.  So HB 218 did not pass the Senate then; is that
24   correct?
25   A.  Senate Bill 218 was never brought before the

---

32

1   Texas Senate.  The motion to suspend failed.
2   Q.  Understood.  And so no Voter ID bill was
3   enacted in 2007?
4   A.  House Bill 218 passed the Texas House, it
5   passed a Committee in the Senate, it was brought to the
6   Floor and the bill was failed to suspend in order to
7   bring before the Texas Senate.
8   Q.  Right.  And so that means that no Voter ID bill
9   passed into legislation in Texas in 2007; is that right?
10   A.  House Bill 218 passed the Texas House.  218 was
11   referred to the Senate.  218 passed the Senate
12   Committee.  218 was referred to the Floor.  I was
13   recognized on a motion to suspend the regular order of
14   business in order to take up and consider 218.  I made
15   that motion and that motion failed to pass.
16   Q.  Thank you for your testimony.  Did any Voter ID
17   bill become law in Texas in 2007?
18   A.  No Voter ID was signed into law by the
19   Governor.
20   Q.  Okay.  I'd like to just ask a few questions
21   about HB 218 itself.  If you could turn to Page 9 of the
22   exhibit.  And there is a list of permissible forms of ID
23   there that continues onto Page 10, if you'd like to take
24   a moment to review that list.
25        And in the interest of time, I will

---

**37**

1  when I use a word like "analysis," that you indulge me
2  and interpret it broadly to encompass anything that you
3  would consider to be analysis, such as studies and
4  research on a bill. And if you'd like to me clarify
5  further with respect to specific questions, please let
6  me know and I will try to do that.
7      A.  And my answer to this is that --
8          MS. HALPERN:  There's no question.
9      A.  Oh, there's --
10         MS. HALPERN:  No.  She's got to ask you a
11  question.
12     Q.  (By Ms. Faransso) So I will just ask again if
13  you were aware of any analysis that was done as the bill
14  moved along in the Senate regarding its impact on voters
15  in Texas?
16         MS. HALPERN:  Same objection.
17         You can answer if you can.
18     A.  And I will answer that the word of "analysis,"
19  you're being vague and it could be very broad.  And that
20  in an analysis of the bill, I consider the process of
21  both reading the bill, taking testimony, and hearing
22  input from the public and other legislators as analysis,
23  so my answer would be yes, we conduct analysis but it is
24  in the form I just described.
25     Q.  (By Ms. Faransso) Do you recall any particular

**38**

1  analysis and can you give me examples of the analysis
2  that was done with respect to this bill?
3      A.  I believe I've of just answered that question,
4  is that when the bill was filed, we took testimony, and
5  we had a lot of testimony from both sides on the bill
6  and that served as an analysis and input on the
7  bill.  And had 218 come before the Texas Senate, I
8  believe I would have had input from both the opponents,
9  you know, the opponents and also the people that were in
10  favor of the bill, we would have had additional input.
11     Q.  Understood.  Did any of that testimony that you
12  mentioned pertain to how many Texas voters possessed the
13  forms of ID in HB 218?
14     A.  Once again, I'll make you aware of the fact
15  that that was seven years ago.  But to my knowledge,
16  there was just questions of projecting possibly what
17  would have been, but Texas had no ability to project
18  because those records were not kept.
19     Q.  Senator, what was the purpose of HB 218?
20     A.  Now you're asking --
21         MS. HALPERN:  No, you can answer that one.
22     A.  The purpose of 218 was to protect the integrity
23  of the ballot box.
24     Q.  (By Ms. Faransso) And was the integrity -- was
25  the ballot box lacking in integrity at that time?

**39**

1      A.  We understood very clearly that under current
2  Texas law, we did not possess the tools to determine
3  that a person was who they said they were when they
4  reported to come to the ballot box.
5      Q.  And so HB 218 intended to deter fraud at the
6  ballot box then?
7      A.  House Bill 218 was a first step moving toward
8  trying to protect the integrity of the ballot box.
9      Q.  And was that specifically with respect to
10  in-person fraud at the ballot box?
11     A.  The only issue that House Bill 218 attempted to
12  address was in-person voting.
13     Q.  Understood.  You mentioned that you did not
14  believe that Texas had the tools to protect the ballot
15  box at that time.  At that time in the state of Texas,
16  voter fraud was subject to criminal penalties; is that
17  right?
18     A.  Yes.
19     Q.  And what was your factual basis for believing
20  that those penalties were not sufficient to deter fraud
21  at the ballot box?
22     A.  Because of testimony we had on the bill and
23  input from both the public election officials and other
24  State officials, we realized that we did not have
25  current tools available in order to stop someone that

**40**

1  was voting illegally.
2      Q.  And what was your factual -- what was the
3  factual basis for your belief that in-person voter fraud
4  was occurring in Texas?
5      A.  Texas at the time before the passage of our
6  Voter ID bill, did not have sufficient tools to identify
7  when a person was voting illegally.
8      Q.  So then did you have any actual evidence of
9  voter fraud having taken place at the polls?
10     A.  Before the passage of these bills, Texas did
11  not have current -- or tools available to identify when
12  a person was voting illegally.
13     Q.  So your testimony is that there did not exist
14  any evidence of fraud having taken place at the polls?
15         MS. HALPERN:  Objection, misstatements his
16  testimony.
17     A.  You're trying to answer for me and my answer
18  continues to be, Texas does not -- did not -- prior to
19  passage of the photo ID bill, did not have tools
20  available to identify when someone was voting illegally.
21     Q.  (By Ms. Faransso) Do you recall having heard of
22  any specific incidents of fraud at that time?
23     A.  Yes.
24     Q.  Can you tell me what those specific incidents
25  were?

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

11 (Pages 41 to 44)

41

1    A.  Again, you're asking for me to recall specific
2  information that was in testimony seven years ago, but I
3  cannot give you the specifics other than we had
4  testimony from numerous witnesses, many that were
5  election officials that had identified people attempting
6  to -- to vote illegally that they were not able to stop.
7  We had other testimony that I've seen of -- of charges
8  that were filed by the Attorney General, where people --
9  there were persons that were deceased that continued to
10  vote after they were deceased, and we had other reports
11  of people that were convicted of voting more than one
12  time on election day.
13    Q.  And let me just ask a couple of questions about
14  your testimony.  You mentioned convictions and
15  prosecutions for individuals who had voted for deceased
16  individuals.  Was that in-person voter fraud or was that
17  pertaining to mail-in voter fraud?
18    A.  Once again, that was seven years ago, and I
19  know that we had testimony of that, but I'm sorry, I
20  could not verify whether it was in-person or mail-in.
21    Q.  And I appreciate that it was seven years ago
22  and I know that was a long time.  Let me ask a more
23  general question:  Do you recall any convictions based
24  on the incidents of fraud that you heard of in 2007?
25    A.  Once again, I'll remind you that was seven

42

1  years ago, and I am -- remember testimony of this;
2  whether they were convicted or not, I do not have
3  information.
4    Q.  Thank you.  Do you recall hearing of any
5  incidents that were not on the public record in the
6  testimony that you have mentioned?
7    A.  Rephrase your question.
8    Q.  Do you recall hearing of any incidents of voter
9  fraud that were not on the public record in testimony
10  that you heard in considering HB 218?
11    A.  Once again, that was seven years ago, but to my
12  knowledge, I believe most of the testimony would likely
13  have been on the record.
14    Q.  Did you believe that HB 218 as drafted would
15  have been effective in combating in-person voter fraud?
16    A.  May I speak to my counsel?
17    THE WITNESS:  This is not privileged?
18    MS. HALPERN:  Well, it is.  All right, we
19  object on the basis of legislative privilege.
20    And with that, and all of the explanation
21  that goes with that, you can answer.
22    And this answer should be sealed.
23    A.  Would repeat the question.
24    Q.  (By Ms. Faransso) At the time that HB 218 was
25  being considered, did you believe that HB 218 as drafted

43

1  would have been effective at combating in-person voter
2  fraud?
3    A.  I claim privilege on thoughts involving
4  legislation and I ask this to be under seal.  The answer
5  is, I believe that 218 was a first step toward ensuring
6  the integrity of the ballot box.
7    Q.  I'd like to move ahead to 2009.
8    (Exhibit 5 marked for identification.)
9    Q.  (By Ms. Faransso) And the court reporter has
10  handed you what has been marked as Exhibit 5.  Do you
11  remember recognize this document?
12    A.  This appears to be Senate Bill 362 as filed in
13  2009.
14    Q.  And I can represent to you that you're correct.
15  This is the as-introduced version.
16    You introduced this bill, correct?
17    A.  Yes.
18    Q.  When did you decide to introduce Senate Bill
19  362?
20    A.  Again, I would --
21    MS. HALPERN:  Objection, legislative
22  privilege.
23    You may answer.
24    A.  I will assert privilege as you're asking for my
25  thoughts on legislation and I would ask it be under

44

1  seal.  Again, this is five years ago, and telling you
2  the exact time that I decided to carry it, the official
3  time was when I filed the bill.  But I'm sure prior to
4  that, I had thoughts about picking it up and probably
5  the, you know, thoughts I had were continued from the
6  time of the prior session until this.  So there had been
7  multiple thoughts but the official time of the decision
8  I'm assuming would be when I filed the bill.
9    Q.  (By Ms. Faransso) Okay.  Why did you decide to
10  file Senate Bill 362?
11    MS. HALPERN:  Objection on the grounds of
12  legislative privilege.
13    You may answer with the understanding that
14  the answer will be under seal.  Can go ahead and answer.
15    A.  I claim privilege.  I filed 362 in order -- as
16  far as a good first step of ensuring the integrity of
17  the ballot box.
18    Q.  (By Ms. Faransso) And was SB 362 designed to
19  combat in-person voter fraud only?
20    A.  362 only addressed in-person voting fraud.
21    Q.  Thank you.  Did anyone ask you to introduce
22  this bill?
23    MS. HALPERN:  Objection on the grounds of
24  legislative privilege.
25    You may answer with the understanding that

SENATOR TROY FRASER                                      7/23/2014
CONFIDENTIAL TRANSCRIPT

12  (Pages 45 to 48)

45

1  the answer will be under seal until a later
2  determination is made.
3      **A.  And I would claim privilege in answering.  The**
4  **-- I think my answer to your question will be no, I was**
5  **not asked by anyone to carry it.**
6      Q.  (By Ms. Faransso) Did you promise anyone that
7  you would introduce the bill?
8      **A.  I did not promise anyone that I would carry the**
9  **bill.**
10     Q.  Do you recall having conversations with Skipper
11  Wallace about the bill?
12     **A.  Once again, this was five to six years ago and**
13  **I cannot remember specific conversations, but I believe**
14  **that Skipper Wallace and I did discuss and I think he**
15  **actually he asked the question, "Are you going to carry**
16  **the Voter ID bill?"  And my answer was, "Yes."**
17     Q.  Okay.  Did you have communications with any
18  other legislators before filing Senate Bill 632?
19         MS. HALPERN:  You can answer that yes or
20  no.
21     **A.  No.**
22     **Q.  (By Ms. Faransso) So unlike House Bill 218, you**
23  **were the author of this bill; is that right?**
24     **A.  Yes.**
25     **Q.  So you controlled the draft of the bill?**

46

1      **A.  This specific bill, I did.**
2      **Q.  Senate Bill 362 was modeled after HB 218; is**
3  **that right?**
4      **A.  It was substantially the same.**
5      Q.  Did you consider making any changes to Senate
6  Bill 362?  Changes from the version that was HB 218?
7      **A.  Yes.**
8      Q.  What changes did you consider?
9          MS. HALPERN:  I'm going to object on
10  grounds of legislative privilege and ask that the answer
11  that follows be placed under seal.
12         MS. WESTFALL:  Counsel, can we -- is there
13  a way to streamline these objections?
14         MS. HALPERN:  I'm trying.
15         MS. WESTFALL:  Both the witness -- both --
16  the witness who does not need to make objections, and I
17  think you understand -- you appear to understand his
18  concerns about legislative privilege.  Is there any way
19  -- because this is breaking up the flow of questioning.
20  I object to that.
21         MS. HALPERN:  All right.
22         As long as I object, you don't have to.
23  So I have now objected so you can go ahead and answer
24  under seal.
25         MS. WESTFALL:  You can have a standing

47

1  objection if you assert legislative privilege, it will
2  be under seal, and then with your assertion, we can
3  agree to that.
4          MS. HALPERN:  We can streamline to that
5  extent.  To the extent that the entire transcript is not
6  being placed under seal, you have put me in the position
7  of having to make sure that I object to every single
8  question and if she's got a question aligned with 20
9  questions in it, I have to object 20 times.  You have
10  done that by not agreeing to put the whole transcript
11  under seal.  So I'm happy to just say "objection,
12  legislative privilege" as long as it's understood, you
13  and the court reporter understands that means it's going
14  under seal.  And anybody who reads this transcript
15  understands that when we say -- when I say "objection,
16  legislative privilege," the question -- the answer that
17  follows is going under seal, and if we can have that
18  understanding --
19         MS. WESTFALL:  I can agree to that.
20         MS. HALPERN:  All right.
21         MS. FARANSSO:  I consent.  Thank you.
22         THE COURT REPORTER:  I'm going off the
23  record a second to clarify.  My understanding is that
24  tonight I'm putting the entire transcript under seal and
25  marking it "Highly Confidential."

48

1          MS. WESTFALL:  You are.
2          MS. FARANSSO:  You are.
3          MS. HALPERN:  You are.  And let's have
4  this conversation on the record if you don't mind.
5          THE COURT REPORTER:  Okay.
6          MS. HALPERN:  Instead of off.
7          THE COURT REPORTER:  Okay.
8          THE WITNESS:  And I want a point of
9  clarification as the witness, that I'm the one answering
10  the questions, you're asking me the questions, and if
11  I'm asserting privilege, I want it clear that if my
12  attorney asserts privilege, she is in fact answering for
13  me and it is clear that I have -- or am asserting
14  privilege; is that clear?
15         MS. FARANSSO:  That's clear.
16         MS. HALPERN:  It is clear.
17         MS. WESTFALL:  That's clear.
18         MS. HALPERN:  That's normal.
19         THE WITNESS:  So anytime that we're
20  asserting privilege -- if she has asserted privilege, I
21  do not have to repeat it.
22         MS. FARANSSO:  Right.
23         MS. WESTFALL:  Yes.
24         THE WITNESS:  And you realize the rules --
25  those rules are very different than the depositions

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

49

1    prior to this?
2         MS. WESTFALL:  Yes.
3         THE WITNESS:  And that is the
4    understanding, and it's not a problem?
5         MS. WESTFALL:  Yes.
6         THE WITNESS:  Okay.
7    Q.  (By Ms. Faranso) Okay.  I believe we were
8    discussing what changes you considered making to HB 218
9    before you decided to file Senate Bill 362.  Can you
10   tell me what those changes were?
11        MS. HALPERN:  Objection, legislative
12   privilege.
13        Go ahead.
14   A.  218, as it was sent over from the House and
15   became the model for 362, we considered a good starting
16   point for the legislation.  There were numerous things
17   in the bill that I was uncomfortable with and that hoped
18   would be changed in the process.
19   Q.  (By Ms. Faranso) Do you recall any of the
20   things that you were uncomfortable with that you wanted
21   to change?
22   A.  Yes.
23   Q.  Can you tell what those were?
24        MS. HALPERN:  Objection, legislative
25   privilege.

50

1    A.  I'm free to answer?
2         MS. HALPERN:  Yes, under seal.
3    A.  The 362 as filed was not a clear photo ID bill,
4    which was my goal to pass, and so I was uncomfortable
5    with the fact that it was not a full photo ID bill.
6    Q.  (By Ms. Faranso) What do you mean when you say
7    it was not a full photo ID bill?
8    A.  There were provisions in the bill that allowed
9    someone to show identification that was not a clear
10   photo identification in order to vote.
11   Q.  But to be clear, the version of the bill that
12   you filed did include non-photo identification?
13   A.  That is clear.
14   Q.  Okay.  What was the purpose of Senate Bill 362?
15   A.  To ensure the integrity of the ballot box.
16   Q.  And so the purpose of Senate Bill 362 was to
17   ensure the integrity of the ballot box by deterring
18   in-person fraud; is that right?
19   A.  Are you attempting to answer the question for
20   me?
21   Q.  No, I'm simply clarifying that when you say
22   that the purpose was to protect the integrity of the
23   ballot box, it was to do that via deterring in-person
24   voter fraud, correct?
25   A.  If you would like to answer -- ask me a

51

1    question that is clear, I'll be glad to answer, but you
2    attempted to answer the question for me.
3    Q.  Senate Bill 362 was intended to prevent
4    in-person voter fraud; is that correct?
5    A.  Yes.
6    Q.  Okay.
7         Is now a good time for a break for you?
8    A.  I would love a break.
9         (Recess from 10:02 a.m. to 10:15 a.m.)
10        (Exhibit 6 marked for identification.)
11   Q.  (By Ms. Faranso)  Senator, you've just been
12   handed what has been marked as Exhibit 6.  Do you
13   recognize this document?
14   A.  It appears to be a press release from my
15   office.
16   Q.  And I can direct you to the second page, if you
17   look about three full paragraphs down, do you see that
18   this press release is about Senate Bill 362?
19   A.  I'm sorry, help me, where are you --
20   Q.  Sure.  So I'm looking on the second page.
21   A.  I'm sorry, wait, wait, is this the back side?
22   Q.  Yes, the back side.
23   A.  Second page is referring to the back side?
24   Q.  Back side, yes --
25        MS. HALPERN:  Counsel, let me enter an

52

1    objection or at least a clarification for the record,
2    first of all, that the document is marked highly
3    confidential.
4         MS. FARANSO:  I'm sorry, I --
5         MS. HALPERN:  So this questioning needs to
6    be under seal for that reason.  Second of all, it
7    appears to be two documents stapled together.
8         MS. FARANSO:  Right, and I will get to
9    that.
10        MS. HALPERN:  Two distinct documents --
11        MS. FARANSO:  Yeah.
12        MS. HALPERN:  -- stapled together.
13        MS. FARANSO:  I apologize for not noting
14   that it was highly confidential.
15   Q.  (By Ms. Faranso) So, first, Senator, if you
16   look in the third full paragraph, you see that --
17   A.  Could I stop you?  I'm sorry, I'm confused.
18   I'm having the same problem following this.  You -- you
19   have two different press releases that appears.  Do you
20   have the time line of when these were released?
21   Q.  So I was about to get to that, but it appears
22   that these were produced as one document.  If you look
23   at the Bates number in the lower right corner, it's
24   continuous numbering.  So you would know better than me,
25   actually, if these were versions of each other or

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

14 (Pages 53 to 56)

---

53

1  successive press releases.  But I can ask you, do you
2  recall drafting these two documents?
3      A.  Can I -- I'm sorry, I'm going to disagree with
4  you.  The number on the bottom is a LEG counsel number.
5  It would have been drafted by lawyers and legislative
6  counsel.  So if this came from my office, it would not
7  have had a stamp on the bottom, so, I'm sorry, I can't
8  verify that this -- what this document is.
9          (Sotto voce discussion.)
10     A.  I don't --
11     Q.  (By Ms. Faransso)  That's a Bates stamp,
12 Senator.  Do you see on the first page of the document,
13 the title of the document is, "Voter ID is good for
14 Texas," by Senator Troy Fraser?
15     A.  Yes.
16     Q.  Do you recall drafting this document?
17     A.  I don't draft documents.
18     Q.  Do you recall reviewing this document?
19     A.  Once again, if you will give me the time line
20 of when this happened, maybe you can refresh my memory.
21 The answer right now is no, I don't remember drafting
22 this.
23     Q.  Would you agree that this document pertains to
24 Senate Bill 362?
25     A.  You have made a reference to that, but I'm

---

54

1  still not seeing it.
2      Q.  It is on the second page in the third full
3  paragraph.
4      A.  I see that.
5      Q.  Do you know who would have drafted this
6  document for you?
7      A.  Most of my press at this time was drafted by my
8  chief of staff, Janice McCoy.
9      Q.  Would you have reviewed what she drafted and
10 put your name on as the author?
11     A.  Yes.
12     Q.  I just want to ask you a few questions about
13 the document.  And I realize that you may not remember
14 it, but if you do recall it, please let me know.  And
15 otherwise, I'll just ask you if you agree with the
16 statements, and we can move on.  If you look at the
17 second paragraph on the first page, and I will read you
18 the paragraph.  "But unfortunately, someone undermined
19 our fundamental rights.  Consider, for example, the
20 Beeville woman who was convicted of voting for her dead
21 mother, and the Corpus Christi suspect who was charged
22 with the felony for stepping in front of an elderly
23 couple who she claimed to be helping at the polls and
24 illegally casting their ballots, or the former city
25 council woman who was sentenced to five years in prison

---

55

1  after illegally registering noncitizens to vote."
2          I just want to ask you a couple questions
3  about this paragraph.  First of all, do you recall
4  having read or reviewed this paragraph in the past?
5      A.  I recognize these as issues that I have seen in
6  the past, yes.
7      Q.  Okay.  And as we discussed earlier, Senate Bill
8  362 was intended to deter in-person voter fraud,
9  correct?
10     A.  Yes.
11     Q.  The first example in this paragraph, the
12 Beeville woman who was convicted for voting for her dead
13 mother, that was a case of mail-in voter fraud; is that
14 correct?
15     A.  I'm sorry?
16     Q.  That was a correct -- that was an incident of
17 mail-in ballot fraud; is that correct?
18     A.  I have no -- no way to know that.  If you have
19 information, something you'd like me to look at, I'd be
20 glad to look at it, but I don't.
21     Q.  In the second example, the Corpus Christi
22 suspect who was charged with a felony for stepping in
23 front of an elderly couple, that case did not involve an
24 attempt at voter impersonation, did it?
25     A.  Once again, you're answering the question for

---

56

1  me.  I have no reason -- no way of knowing.
2      Q.  Well, Senator, if you just look at the actual
3  words themselves, "the suspect stepped in front of an
4  elderly couple," that would not be a case of voter
5  impersonation, would it?
6      A.  Once again, if you have something you'd like to
7  show me to have me verify.  The words say that they
8  illegally cast their ballot.
9      Q.  On the third example, the former city council
10 woman who was sentenced to five years in prison after
11 illegally registering noncitizens to vote, that involved
12 a case of voter registration fraud, not in-person voter
13 fraud; is that right?
14     A.  The sentence obviously says she was convicted
15 of registering, but if someone is registering, it was
16 implied that they planned to vote.
17     Q.  But this particular case was about voter
18 registration fraud; is that right?
19     A.  If you would like to -- to show me something
20 that that is the case, the only thing I see is the words
21 on the paper that says that they were convicted of that.
22     Q.  Do you recall any factual basis beyond these
23 three examples demonstrating that voter fraud, in-person
24 voter fraud existed in Texas at that time?
25         MS. HALPERN:  Objection, harassing the

---

57

1  witness.  You can answer if you can.
2      A.  Once again, this is, in this case, probably
3  five to six years ago, and the bulk of the information I
4  had, had either come from charges that were filed by the
5  Attorney General and/or testimony they had received from
6  either the public and/or other legislators.
7      Q.  (By Ms. Faransso)  But all of that testimony
8  and all of the evidence of which you were aware was on
9  the public record, correct?
10     A.  I previously answered that question that said,
11 to my knowledge, most of the things that I remember were
12 public record.
13     Q.  Were there any purposes of Senate Bill 362 that
14 were not disclosed on the public record?
15     A.  There was no -- the bill spoke for itself.
16 The intent of the bill was to preserve the integrity of
17 the ballot box.
18     Q.  Will you turn back to -- and I believe it was
19 Exhibit 5, which was Senate Bill 362 itself.  And if you
20 turn to page 5 of that bill, Senate Bill 362 allowed the
21 use of both photo and nonphoto ID, correct?
22     A.  Yes.
23     Q.  Did you discuss the inclusion of nonphoto ID in
24 Senate Bill 362 with anyone?
25     A.  Please rephrase your question.

58

1      Q.  Did you discuss the inclusion of nonphoto ID in
2  Senate Bill 362 with anyone?
3          MS. HALPERN:  You can answer "yes" or
4  "no."
5      A.  I'm sorry, I'm missing -- ask the question
6  again, please.
7          MS. FARANSSO:  Can you please read it
8  back?
9          (Question read back by the court
10 reporter.)
11     A.  Yes.
12     Q.  (By Ms. Faransso) With whom?
13         MS. HALPERN:  Objection, legislative
14 privilege.  You may answer under seal.
15     A.  The discussion on that would have likely been
16 with my chief of staff, Janice McCoy.
17     Q.  (By Ms. Faransso)  And what was nature of those
18 conversations?
19         MS. HALPERN:  Objection, legislative
20 privilege.  You may answer under seal.
21     A.  The conversation throughout the entirety of 218
22 and 362 were that we thought it was a good starting
23 point for the bill, but it did not do what we intended
24 to do, and you know, we -- our preference would have
25 been to have a full photo ID bill, photo ID.

59

1      Q.  (By Ms. Faransso)  But you believed at the time
2  that this set of IDs, which included nonphoto IDs, would
3  have prevented in-person voter fraud; is that right?
4      A.  You're answering and trying to say that I
5  believe that.  That -- I think I've answered that the
6  bill was a good starting point for the process.  But my
7  preference would have been to have a full photo ID.
8      Q.  Did you believe that the set of IDs included in
9  Senate Bill 362 would prevent in-person voter fraud?
10     A.  I believe it was a good first step moving
11 toward eliminating voter fraud.
12     Q.  Did you view the inclusion of nonphoto ID as an
13 important feature of the legislation?
14         MS. HALPERN:  Objection, legislative
15 privilege.
16     A.  And I'm going to have to ask you to ask the
17 question again.
18         MS. FARANSSO:  Can you please read it
19 back?
20         (Requested portion was read back by the
21 court reporter.)
22     A.  I did not view it in any way.  That was put
23 into the bill in the Texas House.  It was included in
24 the bill, so I didn't include it in.  We filed the bill
25 substantially as it had passed the House as a starting

60

1  point of discussion.
2      Q.  (By Ms. Faransso)  If you don't mind, could you
3  look back at Exhibit 6, please?  And turn to that second
4  page, that back page, the back of the first page there.
5  And if you look at the third paragraph of that page,
6  which is the second full paragraph, it reads, "So I'm
7  offering Texas voters new protections that will prevent
8  fraud at the ballot box.  But importantly, the
9  legislation I filed will not send anyone away from the
10 polling place without being able to cast their ballot.
11 Senate Bill 362 will require voters to show either one
12 form of photo identification or two other forms of
13 nonphoto identification.  The nonphoto identification
14 can be a utility bill, mail from a government entity or
15 even a library card.  And voters who cannot produce
16 acceptable forms of identification will still be allowed
17 to cast a provisional ballot.  So despite all the
18 rhetoric some might hear from the opposition, let me be
19 clear:  No eligible voter will walk away from a polling
20 location without being able to cast their ballot."  Do
21 you recall this text?
22     A.  Yes.
23     Q.  Did you agree with these statements at the
24 time?
25     A.  Yes.

SENATOR TROY FRASER                                7/23/2014
CONFIDENTIAL TRANSCRIPT

---

**61**

1    Q.   Did you believe that it was an important
2  feature of Senate Bill 362 that nonphoto ID was included
3  in the bill?
4       **A.   I believed that --**
5            MS. HALPERN:  Objection, legislative
6  privilege.
7       **A.   I believed that this was a good starting point**
8  **for discussion on the bill.**
9       Q.   (By Ms. Faransso)  But you believed that the
10 inclusion of nonphoto identification would mean that no
11 one would be sent away from the polling place without
12 being able to cast their ballot; is that right?
13           MS. HALPERN:  Objection, assumes facts not
14 in evidence.
15      **A.   No, that's not -- you're -- you're answering**
16 **the question for me.  If you'd like to restate, I'll**
17 **answer.**
18      Q.   (By Ms. Faransso)  Do you believe that the
19 inclusion of nonphoto ID in Senate Bill 362 would mean
20 that no one would be sent away from the polling place
21 without being able to cast their ballot?
22           MS. HALPERN:  Objection, compound.
23      **A.   You're asking multiple questions.**
24      Q.   (By Ms. Faransso)  Senator, I'm actually
25 quoting from this press release.  I'm simply asking if

---

**62**

1  you agreed with the sentence in the very first paragraph
2  I read.
3       **A.   You're -- you're -- you're compounding two**
4  **thoughts into one.  The question I believe you're**
5  **answering is about someone being cast away from the**
6  **ballot box.  And in every bill, I believe, from 218, 362**
7  **and 14, we had the ability to cast a provisional ballot**
8  **to -- if there was a contradiction about that, they**
9  **would be allowed to cast a provisional.  And there was a**
10 **methodology for making that ballot be a permanent vote.**
11 **So the answer to your question is -- and I say, "and**
12 **voters can produce acceptable forms of identification**
13 **and will still be allowed to cast a provisional ballot,"**
14 **that kept them from leaving the ballot box without**
15 **voting.**
16      Q.   And thank you for your testimony.  Senate Bill
17 362 was also designed to allow the presentation of
18 nonphoto ID, correct?
19      **A.   I'm sorry, you're going to have to ask that**
20 **again, because I think you're trying to answer the**
21 **question for me.**
22      Q.   A voter who did not have a form of photo ID
23 could have shown two forms of nonphoto and casted their
24 ballot in that way; is that right?
25      **A.   As 362 was filed in the Texas Senate, yes, that**

---

**63**

1  would have been the case.
2       Q.   Okay.  Senator, do you recall that House Bill
3  218, I'm making you go back seven years now, included a
4  provision permitting the use of student IDs as an
5  acceptable form of identification?
6       **A.   Would you please show me where in the bill it**
7  **says that?**
8       Q.   Sure.  That was Exhibit 4.  And if you turn
9  to --
10      **A.   Page 10?**
11      Q.   Yeah, page 10, thank you.
12      **A.   Paragraph 6.**
13      Q.   Thank you, Paragraph 6.  Do you see that HB 218
14 included student ID as an acceptable form of
15 identification?
16      **A.   Yes.**
17      Q.   And Senate Bill 362, going back to Exhibit 6,
18 does not include student ID as a form of identification;
19 is that right?
20      **A.   I do believe 362 as filed does not have it.**
21      Q.   Okay.  Do you recall testifying in the
22 Committee of the Whole on Senate Bill 362, that Senate
23 Bill 362 still did permit the use of student IDs?
24      **A.   Would you please repeat your question?**
25           MS. FARANSSO:  Can you read it back,

---

**64**

1  please?
2            (Requested portion was read back by the
3  court reporter.)
4       **A.   Okay.  I'm asking you a time line.  When you're**
5  **saying Committee of the Whole, when are you suggesting**
6  **that I made this testimony?**
7       Q.   I'm suggesting the Committee of the Whole
8  debate that took place in March of 2009, specifically
9  March 10th, 2009.  I can show you the testimony if that
10 would help.
11      **A.   I would like that, yes.**
12      Q.   Sure.
13      **A.   And I'm sorry, I'm trying to remember the --**
14 **because we have three different bills, I'm trying to**
15 **filter which bill we're talking about.**
16           (Exhibit 7 marked for identification.)
17      Q.   (By Ms. Faransso)  Do you recognize this
18 document?
19      **A.   No.**
20      Q.   I can represent to you that this is the
21 transcript -- an excerpted transcript from the Committee
22 of the Whole that took place on March 10, 2009.  And if
23 you turn to page 115, which is just a couple of pages
24 in, the page number on the upper right.  And I believe
25 it's a discussion between you and Senator Zaffirini.

---

---

65

1  Did I pronounce that correctly?
2      A.  Zaffirini is correct.
3      Q.  Okay.  And Senator Zaffirini is asking you
4  about the fact that student IDs are not included in the
5  2009 bill, in Senate Bill 62.  And at the bottom of that
6  page, you respond, "Just a second, the reference you're
7  making is the public institutions of higher learning.
8  The student ID card is still included.  The wording
9  changed, but it's covered by Number 6A."  And if you go
10 to 6A, back in your version of Senate Bill 362, it
11 reads, "A valid identification card that contains the
12 person's photograph and is issued by an agency or
13 institution of the federal government or an agency,
14 institution or political subdivision of this state."
15 Did you agree at the time that this language in 6A
16 permitted the use of student identification cards as an
17 acceptable form of identification for verifying one's
18 identity at the ballot box?
19     A.  I agreed that the words say that a valid
20 identification card that contains a person's photograph
21 and is issued by an agency or institution of the federal
22 government or an agency, institution of a political
23 subdivision of the state.
24     Q.  Do you agree that those words encompass student
25 identification issued by a public university in Texas?

---

66

1      A.  I can't agree to that because I'm -- I'm not
2  sure of the interpretation.
3      Q.  I can refresh your recollection if you don't
4  mind turning back to the transcript.
5      A.  Okay.
6      Q.  And following the testimony -- the testimony
7  that I just read, Senator Zaffirini responded, "So
8  you're saying that, on Page 6, beginning at Line 8,
9  where it reads a valid identification card that contains
10 the person's photograph and is issued by, (a), an agency
11 or institution of the federal government, or (b), an
12 agency, institution or political subdivision of this
13 state, you're saying that would include institutions of
14 higher education and that, therefore, student
15 identification cards would be acceptable proof of
16 identification?"
17     A.  I'm sorry, I'm going to have to interrupt you.
18 You're going so fast, I can't --
19     Q.  Okay.
20     A.  -- follow what you're saying.  If you want to
21 start all over and explain where -- point out the line
22 that you're -- you're addressing.
23     Q.  Certainly.
24     A.  I'm -- I have a lot of trouble following your
25 voice when you speak so fast.

---

67

1      Q.  Sure.  I was reading at Line 25 of page 115.
2      A.  Okay.  One second, 115, line 25.  So you're
3  saying that, okay.
4      Q.  Senator Zaffirini says to you --
5          MS. HALPERN:  Counsel, maybe it would be
6  better if you just let him read it himself and then ask
7  the question.
8          MS. FARANSSO:  Okay, sure.
9          MS. HALPERN:  The pages aren't
10 consecutive, so when you turn the page, you're already
11 someplace else.
12     Q.  (By Ms. Faransso)  Senator, you only need to
13 read through page 116.
14     A.  Okay.
15     Q.  So did you respond yes to Senator Zaffirini's
16 question of whether Paragraph 6A of Senate Bill 362
17 would include student identification from a public
18 university?
19     A.  It appears that I did answer yes at Line 19.
20     Q.  Thank you.  Are you familiar with the Supreme
21 Court's decision in Crawford versus Marion County
22 election board?
23     A.  Could you clarify a little.  The answer, I
24 believe I am, but you -- is this the Supreme Court
25 decision of what state?

---

68

1      Q.  The Indiana photo ID law.
2      A.  Okay.  The answer is "yes."
3      Q.  Okay.  Do you recall when that decision was
4  issued?
5      A.  I do not have the specific date, but I believe
6  it was prior to us laying out the bill in 2007.  My
7  recollection is 2005.
8      Q.  So I'll actually submit to you that it was
9  issued in April 2008, which would have been after HB 218
10 was laid out.
11     A.  Okay.
12     Q.  But that would have been before Senate Bill 362
13 was laid out, correct?
14     A.  Yes.
15     Q.  Did you read that decision at any time prior to
16 introducing Senate Bill 362?
17     A.  Yes.
18     Q.  And did you discuss that decision with anybody?
19         MS. HALPERN:  Yes or no.
20     A.  Yes.
21     Q.  (By Ms. Faransso)  With whom did you discuss
22 that decision?
23         MS. HALPERN:  Objection on the grounds of
24 legislative privilege.
25     A.  Once again, if it was in 2008, we're talking

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

69

1    about six years ago, my recollection would be, I would
2    assume I had discussed this with my chief of staff,
3    Janice Steffes.
4       Q.  (By Ms. Faransso)  I'm sorry?
5       A.  With Janice -- Janice McCoy.  I'm sorry, that
6    was her maiden name.  Janice McCoy.
7       Q.  Do you recall anything about the Indiana voter
8    ID law itself?
9       A.  It's a very broad question.  Would you like to
10   clarify what you're asking?
11      Q.  Do you recall that that voter ID law did not
12   permit nonphoto ID?
13      A.  I do not recall that now.
14      Q.  Did the Crawford decision have any impact in
15   your development of Senate Bill 362?
16      A.  No.
17      Q.  And why not?
18         MS. HALPERN:  Objection, legislative
19   privilege.
20      A.  I've stated before that 362 was almost exactly
21   like the 218 that we brought forward, and we decided
22   that was a good starting point for discussion.
23      Q.  (By Ms. Faransso)  Before filing Senate Bill
24   362, did you analyze or direct anyone to analyze the
25   impact of that bill on your constituents?

70

1         MS. HALPERN:  Objection, vague.
2       A.  And I'm going to ask you to answer -- ask the
3    question again.
4         MS. FARANSSO:  Can you read it back?
5         (Requested portion was read back by the
6    court reporter.)
7       A.  Once again, you're using the word "analyze" in
8    a very broad sense.  And the answer is yes, we
9    constantly analyzed the bill and the impact on my
10   constituents.
11      Q.  (By Ms. Faransso)  Can you tell me what kind of
12   analysis you did to research the impact of the bill on
13   your constituents?
14      A.  As I answered, we constantly analyzed the issue
15   to analyze the impact on the -- the constituents.
16      Q.  In analyzing the issue, did you specifically
17   look at the impact of the bill on minority voters in
18   your district?
19      A.  Again, the process in Texas, we file
20   legislation, you have testimony by the public and other
21   legislators, and through that testimony, it allows you a
22   clear analyzation of the impact.
23      Q.  You served on the State Affairs Committee,
24   correct?
25      A.  Yes.

71

1       Q.  And so I take it you're familiar with the
2    preclearance standard under Section 5 of the Voting
3    Rights Act?
4       A.  Yes.
5       Q.  You wanted to ensure that Texas would be able
6    to enforce Senate Bill 362 if, in fact, it was passed,
7    correct?
8       A.  Yes.
9       Q.  Did you anticipate that Texas was going to need
10   to provide either the Department of Justice or a federal
11   court with information about the effect of Senate Bill
12   362 on minority voters in Texas?
13      A.  Would you rephrase that again?  You're asking,
14   was I aware that I would be able to have to?
15         MS. FARANSSO:  Could you please read the
16   question back?
17         (Requested portion was read back by the
18   court reporter.)
19      A.  I was aware that all the testimony we had had
20   on the bill would be moved forward to the Department of
21   Justice, but until the bill was either precleared or
22   allowed to move forward, we would not have the election
23   information.
24      Q.  (By Ms. Faransso)  In considering Senate Bill
25   362, did you research who might not have the documents

72

1    necessary to vote under Senate Bill 362?
2       A.  Once again, you're asking for research on the
3    bill, and I've told you that we do not have the budget
4    to do the research -- you know, research and we're --
5    research -- the way we do our research in Texas is
6    through the testimony that is given on the bill.  And
7    through the testimony on the bill, that information was
8    discussed.
9       Q.  Do you recall specifically the testimony about
10   how many voters would not have the documents necessary
11   to vote under Senate Bill 362?
12      A.  The -- most of the documentation we received
13   was actual elections from other states and the number of
14   people that would have like documentation, and that
15   testimony we had showed us that they were very, very few
16   people that would not have sufficient documentation.
17      Q.  And that testimony you mentioned was about
18   other states.  Do you recall specifically what states
19   those studies were about?
20      A.  The -- the two studies we had actual results
21   from was Indiana and Georgia.
22      Q.  Did you know the racial demographics of Indiana
23   and Georgia at the time you were considering Senate Bill
24   362?
25      A.  Yes.

SENATOR TROY FRASER                                      7/23/2014
CONFIDENTIAL TRANSCRIPT

19 (Pages 73 to 76)

73

1    Q.   And what were those demographics?
2    A.   Again, you're asking me to recall data that
3   happened seven years ago.  That -- but my recollection
4   is that Indiana probably doesn't have as high a makeup
5   of minority, but the Georgia was very close to the
6   racial makeup of Texas.
7    Q.   Was the population of Hispanic voters in
8   Georgia close to the population of Hispanic voters in
9   Texas?
10    A.   I remind you of your definition that when we
11   started this, that you said minority voters will be
12   considered any non-White, and the non-White makeup in
13   Georgia and the non-White makeup in Texas were
14   substantially the same.
15    Q.   That's correct, but for this particular
16   question, I'm just asking about Hispanic voters.  Was
17   the population of Hispanic voters in Georgia as high as
18   the population of Hispanic voters in Texas?
19    A.   The data that -- that we were given didn't
20   break out the difference between Hispanic or what
21   minorities would be included in Hispanic, so I don't
22   have that information.
23    Q.   Okay.  Senator, do you recall during the
24   Committee of the Whole debate on March 10th, stating
25   that you had done more research and more reading and

74

1   more debate on this bill than maybe you had ever done
2   before?
3    A.   Yes.
4    Q.   When did you conduct most of your research on
5   Voter ID?
6    A.   The bulk of the research was done, obviously,
7   after the filing of 218, starting there, and then
8   leading all the way to the laying out of 362.
9    Q.   And how much time did you spend on that
10   research?
11    A.   More time than I've ever spent on any other
12   bill.
13    Q.   Can you tell me about the sources you consulted
14   in doing that research?
15        MS. HALPERN:  Objection, legislative
16   privilege.  You can answer.
17    A.   The starting point was the Baker Carter report,
18   was obviously the start.  But I spent a lot of time
19   Googling the issue, and in Googling that we found
20   multiple studies that had been done, one by the
21   University of Missouri, was one by the Heritage
22   Foundation.  There were polls that had been taken.  One
23   of the polls that I had a lot of credence in was an
24   independent poll done by the University of Texas that
25   showed that if you asked someone whether they were in

75

1   favor of someone showing a photo -- we actually asked --
2   had asked the question photo ID, and the -- over 80
3   percent of the people said yes, they did, and that
4   spread, you know, positively for both Republicans and
5   Democrats and for White and non-White.  And there is
6   also a racial breakup on that and both African American
7   and Hispanics said affirmatively that they believed that
8   someone should show positive identification at the poll.
9    Q.   Did you read that poll yourself --
10    A.   Yes.
11    Q.   -- or --
12    A.   Yes.  All the polls I, by Googling and pulling
13   up the polls, there were multiple polls done, and I
14   looked at the polls that -- every one of the polls, who
15   consulted -- who conducted the poll, what was the
16   question asked and the result of the poll.
17    Q.   Do you know how that particular poll by
18   the University of Texas ensured that the people
19   responding to it were a representative sample of the
20   population?
21    A.   This was a, you know, a nonpartisan poll by a
22   public university, and that my belief was that they --
23   that the sampling that they had received was a proper
24   sampling.
25    Q.   Do you know whether the poll asked about

76

1   specific forms of identification and asked whether the
2   responders to the poll would support a Voter ID bill
3   that included those specific forms of identification?
4    A.   To my knowledge, those questions were not
5   asked, because at that time, the bill was still in a
6   maturing process and that I think the question they
7   asked was should someone have to prove they are who they
8   say they are when they go to vote.
9    Q.   Do you know whether the poll also asked whether
10   voters would support a Voter ID bill that had the effect
11   of disproportionately impacting a portion of the
12   population?
13    A.   To my knowledge, that question was not asked.
14    Q.   Do you agree that the responses to a poll
15   depend on the particular questions that are asked?
16    A.   I believe when you have a poll, whatever
17   question is asked is what people will respond to.
18    Q.   You also mentioned that you looked at studies
19   from I believe it was the Heritage Foundation and the
20   University of Missouri.  Do you recall what those
21   studies pertained to?
22    A.   The same issue, they asked if someone should
23   have showed positive identification before voting.
24    Q.   And what population were they asking that
25   question of?

SENATOR TROY FRASER                                          7/23/2014
CONFIDENTIAL TRANSCRIPT

20 (Pages 77 to 80)

---

Page 77

1    A.  Again, I'm -- I'm not privileged to the sample
2  of people that they used.
3    Q.  Was -- were those studies directed at Texas or
4  at other states?
5        MS. HALPERN:  I want to be clear here.
6  Are you asking about studies or about polls?
7        MS. FARANSSO:  I'm asking about the
8  Heritage Foundation and University of Missouri --
9        MS. HALPERN:  Studies, okay.
10       MS. FARANSSO:  -- that he referenced.
11   A.  The studies -- you're asking about studies or
12 polls?
13   Q.  (By Ms. Faransso)  You tell me.  Were they
14 studies or were they polls?
15   A.  They were both.
16   Q.  Okay.  And did they pertain specifically to
17 Texas or to other states?
18   A.  The studies were general polls about the
19 results in other states.  The polls that I was looking
20 at were actually Texas polls.
21   Q.  Which polls pertained to Texas?
22   A.  I've told you that I saw polls from the
23 University of Texas, an independent poll.  I believe the
24 University of Mississippi or Missouri did a poll in
25 Texas.  And I believe the Heritage foundation did a

---

Page 78

1  poll.  And there -- they -- I'm sorry, there's a --
2  another poll that was quoted often that I've used
3  before, and I just can't pull up the name of it.
4    Q.  So I --
5    A.  Lighthouse, I believe it was.
6    Q.  Lighthouse, okay.  So I was asking you some
7  specific questions about the University of Texas polls.
8    A.  Uh-huh.
9    Q.  With respect to other polls that you looked at
10 that pertained to Texas specifically, did any of them
11 ask about specific forms of identification when asking
12 responders whether they would support a Voter ID bill.
13   A.  To my knowledge, I never saw a poll that said
14 specifically, would you support this particular type.  I
15 think the questions were generic, should they have to
16 identify themselves is that a positive identification
17 before voting.
18   Q.  Okay.  Thank you.  You gave advance notice to
19 the Lieutenant Governor that you were going to file SB
20 362 before you filed it, correct?
21       MS. HALPERN:  Objection.
22   A.  Yes.
23       MS. HALPERN:  Legislative privilege.  You
24 can answer.
25   A.  The answer is "yes."

---

Page 79

1    Q.  (By Ms. Faransso)  And why did you notify the
2  Lieutenant Governor?
3        MS. HALPERN:  Objection, legislative
4  privilege.
5    A.  It is -- it is custom in the Texas Legislature
6  that if you're filing a bill, you should lay out notice
7  that you're filing it.  It doesn't keep someone else
8  from filing it, but you're putting a kind of place
9  keeper on that legislation that it is your intent to
10 file.  And I was advising both the Lieutenant Governor
11 and the other members that I did plan to file it.  And,
12 but it also didn't mean that other members wouldn't also
13 file a bill.
14   Q.  (By Ms. Faransso)  Sure, that makes sense.  Was
15 Voter ID legislation a priority for the Lieutenant
16 Governor at that time?
17       MS. HALPERN:  Objection, calls for
18 speculation.
19   A.  I think you'll probably have to ask the
20 Lieutenant Governor that question.
21   Q.  (By Ms. Faransso)  Okay.  Was Senate Bill 362
22 considered a low bill number in the Texas Senate?
23   A.  362 was the bill number of -- there were 361
24 bills filed before I filed it, and 362 was the bill
25 number that was assigned.

---

Page 80

1    Q.  And would you consider that a low bill number?
2    A.  I consider it that the -- it was 361 bills
3  filed before it.
4    Q.  Do you know how many bills are filed in a
5  legislative session?
6    A.  About 7,000.
7    Q.  Did you ask to refile the bill to receive a
8  lower bill number?
9    A.  Once again --
10       MS. HALPERN:  Objection, legislative
11 privilege.  You may answer.
12   A.  -- you're asking about something that happened
13 five to six years ago.  I don't remember, but I do not
14 believe that I asked for a lower number.
15       MS. WESTFALL:  Objection, nonresponsive
16 answer.  What -- to the extent that we keep hearing
17 about how this happened five years ago, that was
18 nonresponsive to the question.  Move to strike.
19   A.  Well, I will reanswer that, to my knowledge, I
20 do not remember asking for a lower bill number.
21       MS. HALPERN:  The witness is entitled to
22 qualify his answer, Counsel.
23   Q.  (By Ms. Faransso)  Senator, do you recall any
24 conversations with bill opponents before Senate Bill 362
25 was filed?

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

---

81

1     A.  Again, you're asking me to confirm that someone
2  is going to be an opponent, and we don't know that
3  they're an opponent until they're voted on.  But I had
4  conversations with people that had been opposed to the
5  bill prior to this.
6     Q.  And with whom did you have those conversations?
7        MS. HALPERN:  Objection, legislative
8  privilege.
9     A.  The senators have a lot of conversation with
10  each other because we're friends and we travel
11  together.  A conversation I remember is with John
12  Whitmire, which is the senior Democrat member.
13     Q.  (By Ms. Faransso)  Do you recall the nature of
14  that conversation?
15     A.  I believe he asked me if I was going to file
16  Voter ID again.
17     Q.  Okay.  Do you recall any other conversations
18  with senators who had opposed Voter ID legislation in
19  the past after you filed Senate Bill 362?
20        MS. HALPERN:  Objection, legislative
21  privilege.
22     A.  If you're asking if I had a conversation after
23  the filing, the answer would be yes, because that would
24  extend up to the period of the discussion of the bill.
25  And the members of the Texas Senate, we visit with each

---

82

1  other every day on the Floor, so the answer would have
2  to be yes.
3     Q.  (By Ms. Faransso)  Did you take any steps to
4  address any concerns raised by bill opponents prior to
5  filing the bill?
6        MS. HALPERN:  Objection, assumes --
7     A.  I --
8        MS. HALPERN:  Objection, no foundation.
9        MS. FARANSSO:  I'll rephrase.  I'm sorry.
10     Q.  (By Ms. Faransso)  Did you take any steps to
11  respond to concerns raised by bill opponents generally
12  at any point in the process?
13     A.  Well, the answer would have to be yes, because
14  the bill that came from the House in 2007, I wasn't
15  comfortable with what was in the bill, and I thought it
16  was a good starting point.  But I did address the
17  concern of members, because we used that as a starting
18  point for 362.
19     Q.  I'd like to talk a little bit about the
20  Senate's consideration of Senate Bill 362.
21        (Exhibit 8 marked for identification.)
22     Q.  (By Ms. Faransso)  You've just been handed
23  what's been marked as Exhibit 8.  And Senator --
24     A.  Hold on a minute.
25     Q.  Oh, sure.

---

83

1     A.  Let me do a little housekeeping here and get
2  some of this out of my way, so I've -- I've got too many
3  items open at the moment.
4        MS. HALPERN:  Are you through with 362?
5        MS. FARANSSO:  I would keep it available
6  just in case.  Thank you.
7        MS. HALPERN:  Through with 218?
8        (Brief discussion off the record.)
9     A.  Okay, go.
10     Q.  (By Ms. Faransso)  Okay.  And Senator, I'm not
11  going to ask you to review the entire document.  It's
12  actually just an excerpt.  But just looking at the cover
13  page, do you know what this is?
14     A.  It appears to be at least a cover of the Senate
15  Rules that were adopted on January 14, 2009.
16     Q.  And does the Senate adopt a new set of rules
17  each legislative session?
18     A.  Every regular session and every special
19  session.
20     Q.  Thank you.  If you could turn to page 24, just
21  a few pages in, because as I mentioned, this is an
22  excerpt.  And looking at page 24, are you familiar with
23  Rule 5.11?
24     A.  I am.
25     Q.  Okay.  What is a special order?

---

84

1     A.  Special order, as you can see would be, "order
2  should be considered at the time for which it's set and
3  considered and the date disposed of and unless the time
4  is fixed as pending," and if you'd like me to read the
5  whole thing, "a special order would set a special order
6  of business."
7     Q.  Okay.  Is the purpose of Rule 5.11 that a
8  two-thirds' vote is required in order to move a bill out
9  of the regular order of business on the Senate calendar?
10        MS. HALPERN:  Objection, calls for
11  speculation.  You can ask for his interpretation.
12     A.  You're -- you're actually asking duplicate
13  questions that are not connected to each other that we
14  discussed in the last deposition is that we have a
15  regular order of business, and the rules say that all
16  bills will be held -- heard in that order.  If you want
17  to have your bill heard out of order, you have the right
18  to suspend the regular order of business.  To suspend a
19  rule is a two-thirds' vote.  If you choose to make that
20  motion, then you ask to suspend the regular order of
21  business.  Then once that -- if you're successful in
22  doing that, your bill jumps over the other bills above
23  it and can be held -- heard.
24     Q.  (By Ms. Faransso)  Thank you.  So is it fair to
25  say that without a two-thirds' vote, a bill must be

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

85

1  considered in the regular order of business?
2      A.  Unless you -- no, that is not correct.  A bill
3  per the rules of the Senate has to be heard in the
4  regular order of business.
5      Q.  And what is the purpose of that procedural
6  framework?
7          MS. HALPERN:  Objection, calls for
8  speculation.
9      A.  The purpose of the special -- the vote to
10  suspend the regular order of business is that I want my
11  bill to be heard before the bills in front of it.
12      Q.  (By Ms. Faransso)  That makes sense.  If you
13  could please look at Subsection D of Rule 5.11?  What is
14  the effect of Subsection D?
15      A.  "Notwithstanding Subsection A of this bill, the
16  bill or resolution relating to voter identification
17  requirements reported favorably from the Committee of
18  the Whole may be set as a special order for a time at
19  least 24 hours when the motion is adopted by a majority
20  of the members of the Senate."
21      Q.  Thank you.  Who introduced the resolution to
22  add Subsection D to Rule 5.11?
23      A.  You're asking me to speculate on who inserted
24  that, and I can't speculate other than I didn't -- I was
25  not involved.

86

1      Q.  And just to be clear for the record, I'm not
2  asking you to speculate.  I'm simply asking if you were
3  aware.  And that goes for all my questions.
4      A.  Wait, was I aware of what?
5      Q.  Are you aware of who introduced the resolution
6  to add Subsection D to Rule 5.11?
7      A.  No.
8      Q.  Okay.  Thank you.  Was it your idea to
9  introduce this rule?
10      A.  No.
11      Q.  What was the purpose of providing that Voter ID
12  legislation could be treated as a special order under
13  this rule?
14          MS. HALPERN:  Objection, vague.
15      A.  Would you like for me to read D to you again,
16  because the words speak for themselves?
17      Q.  (By Ms. Faransso)  I'm simply asking for you to
18  tell me what you think the purpose was, if you know.
19          MS. HALPERN:  That's a different question,
20  and I'm going to object to that one on legislative
21  privilege, and then you can answer it, what you think
22  the purpose was.
23      A.  Well, the words speak for themselves is that
24  this would be a special order and could be adopted at
25  least 24 hours after a motion by majority of the Texas

87

1  Senate.  It is not unusual for a special order to be put
2  in the rules.  Actually, between 1972 and 1979, during
3  the 20 -- obviously, it was a 20-year period, I believe
4  it took 15 or 16 of those years at special sessions that
5  a special order is put in place by the Democratic
6  Lieutenant Governor, so it is not unusual that you have
7  special orders to be put in -- in the rules.
8      Q.  (By Ms. Faransso)  And when you say it's not
9  unusual, you mean that there would be a paragraph
10  similar to this?
11      A.  Exactly identical to this but it would be
12  addressing specific issues, and they would have a
13  special order for a bill to be heard per the same
14  wording, this D, 24 hours after the motion is adopted by
15  a majority of the Texas Senate.
16      Q.  Thank you.  Senator, do you believe that Senate
17  Bill 362 would have passed the Senate if it were not for
18  Rule 511D?
19          MS. HALPERN:  Objection, calls for
20  speculation.
21      A.  And I may need that question asked again,
22  please.
23      Q.  (By Ms. Faransso)  Do you --
24          MS. FARANSSO:  Can you, actually, read it
25  back, please?

88

1          (Requested portion was read back by the
2  court reporter.)
3      A.  There's no way for me to project what the
4  people would have voted for or against.
5      Q.  (By Ms. Faransso)  That's fair.  You mentioned,
6  I believe, that it is not unusual for legislation to be
7  treated as a special order.  Is that true for regular
8  sessions of the Senate or special sessions?
9      A.  Yes, it is true for both.
10      Q.  For both.  And how many special orders have
11  been set by Republican Senators?
12          MS. HALPERN:  Objection, assumes facts not
13  in evidence.
14      A.  And you're asking an extremely broad question
15  and assuming that I know everything from the history of
16  Texas all the way back to 1845 when we became a state.
17  But the current history of since I've been there in the
18  Legislature and the research I've done, I did go back as
19  far as 1972, and every special order that was put in
20  place prior to probably 1999 was placed in special order
21  by a Democrat Legislature or Senate or a Democrat
22  Lieutenant Governor.  So asking a question of what's
23  Republican or Democrat, very, very, very few have been
24  placed by Republicans, because we didn't have Republican
25  control until 1997.

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1    Q.  (By Ms. Faransso)  Thank you for that
2  explanation.
3        The Lieutenant Governor referred Senate
4  Bill 362 to the Committee of the Whole; is that right?
5    A.  Yes.
6    Q.  Is that very common?
7    A.  Yes, well, I'm going to retract my yes.  You're
8  using the word "common."  It is not unusual for a bill
9  to be filed.  There are not very many bills that are
10 filed with the Committee of the Whole, but it is a
11 common practice that is used when there's a bill that
12 has the interest of all Senators.
13   Q.  Election bills are normally referred to the
14 State Affairs Committee; is that right?
15   A.  Once again, you're making a generalization.
16 State Affairs receives a lot of election bills.  But the
17 referral of bills is left up to the Lieutenant Governor,
18 and I think that question would be best asked of him.  I
19 believe you're going to be able to ask that.  But
20 generally saying that they're all sent, I would have to
21 say no.
22   Q.  HB 218 was referred to the State Affairs
23 Committee; is that correct?
24   A.  To my knowledge, that's where it went.
25   Q.  Do you recall any election bills other than

90

1  Senate Bill 362 and Senate Bill 14 that were referred to
2  the Committee of the Whole during your tenure as a
3  Senator?
4    A.  To my knowledge, I do not remember another
5  election-related bill referred to the Committee of the
6  Whole.
7    Q.  Does referral of a bill to the Committee of the
8  Whole expedite the consideration of that bill?
9    A.  No.
10       MS. HALPERN:  I'm sorry, what was the
11 answer?
12   A.  No.  The bill would still be heard in the
13 regular order of business.  If you're going to change
14 the regular order of business, you know, it would be a
15 vote unless there was a special order on the bill.
16   Q.  (By Ms. Faransso)  Unless there was a special
17 order on the bill.
18       (Exhibit 9 marked for identification.)
19   Q.  (By Ms. Faransso)  Senator, you've been handed
20 what has been marked as Exhibit 9.  Right there.  And
21 it's an e-mail from Bryan Hebert to your chief of staff,
22 Janice McCoy, dated March 4, 2009.
23       MS. FARANSSO:  And I will note for the
24 record that this is highly confidential.
25       MS. HALPERN:  Which means any questions

91

1  about it are under seal.
2        MS. FARANSSO:  In case it was not clear.
3    Q.  (By Ms. Faransso)  Who is Bryan Hebert?
4    A.  I'm -- I don't know how to answer that.  It's a
5  name I'm familiar with, but it is not in my employ.
6    Q.  Okay.
7    A.  I'm not sure who he --
8    Q.  Do you see on the cover e-mail there that his
9  title is Deputy General Counsel, Office of the
10 Lieutenant Governor?
11   A.  I see that.
12   Q.  There are some attachments to this e-mail, and
13 I simply want to know whether you recognize any of these
14 attachments.
15   A.  I recognize none of the --
16   Q.  I'm sorry?
17   A.  I recognize none of the attachments.
18   Q.  (By Ms. Faransso)  Okay.  If you don't mind, I
19 might just ask you a couple quick questions about the
20 document and then we can move on.  If you turn to the
21 second page, which is the back of the first page, it's
22 titled, "Reasons to Support SB 362 as Filed."  Could you
23 please read point 1 on that page?
24   A.  "The bill improves security in election process
25 but not as restrictive as Indiana and Georgia.  There's

92

1  less chance of disenfranchising elderly, poor and
2  minority voters."
3    Q.  Did you agree with the statement?
4    A.  I've never seen that -- that before, so.
5    Q.  Do you recall hearing this argument?
6        MS. HALPERN:  Objection, vague, no
7  foundation.
8    A.  Could you be clearer of who I would have heard
9  it from?
10   Q.  (By Ms. Faransso)  Do you recall during the
11 consideration of Senate Bill 362 the argument that that
12 bill was left restrictive than the Indiana and Georgia
13 Voter ID laws, and thus, had a less of a chance of it
14 disenfranchising elderly, poor or minority voters?
15   A.  No.
16   Q.  Did Janice McCoy ever mention this argument to
17 you?
18   A.  No.
19       MS. HALPERN:  Objection, legislative
20 privilege.  You can answer.
21   A.  No.
22   Q.  (By Ms. Faransso)  Sitting here today, would
23 you agree with the statement?
24   A.  You're asking me to agree to a statement made
25 by someone else, and you would have to ask them.

SENATOR TROY FRASER                                          7/23/2014
CONFIDENTIAL TRANSCRIPT

93

1    Q.  I'm just asking if you agree with the
2  statement.
3    A.  I don't have enough information to make a
4  determination.
5    Q.  Could you please read point 5 for me?
6    A.  "Increases chances of federal preclearance,
7  because many forms of ID are acceptable and provisional
8  ballots and procedures are less burdensome."
9    Q.  Do you recall hearing the argument during the
10  consideration of Senate Bill 362 that there was an
11  increased chance of federal preclearance because many
12  forms of ID were acceptable and the provisional ballot
13  procedure was less burdensome?
14    A.  No.
15    Q.  Do you recall Janice McCoy mentioning this
16  argument to you?
17    A.  No.
18    Q.  You can put that document away.  Just a few
19  more questions on Senate Bill 362, Senator, and then
20  maybe it would be a good time for a break.
21        (Exhibit 10 marked for identification.)
22    Q.  (By Ms. Faransso)  The court reporter has
23  handed you what has been marked as Exhibit 10.  Do you
24  recognize this document?
25    A.  Appears to be a -- from the Senate Journal,

94

1    Wednesday, March 18, 2009.
2        MS. HALPERN:  Let the record reflect this
3  is an excerpt.
4        MS. FARANSSO:  That's correct.
5    Q.  (By Ms. Faransso)  This is an excerpted copy of
6  the Senate Journal.  If you could turn to page 591, and
7  again, it's not too many pages because this is an
8  excerpt.  Do you see the statement, "Submitted by
9  Senator West" halfway down the page?
10    A.  Yes.
11    Q.  Do you recall this statement?
12    A.  No.
13    Q.  Could you please read the first paragraph of
14  the statement?
15    A.  "Senator West submitted the following
16  statement."
17    Q.  Can you please read the second paragraph?
18    A.  "We offered the following statements with
19  respect to our votes in Senate Bill 362 and ask that
20  they be spread upon the Journal of the Senate."
21    Q.  Thank you.  If you could turn to the next page,
22  the statement continues on to that page.  Could you
23  please read Paragraph 6?
24    A.  "On March 18, the Senate took up Senate Bill
25  362 on third reading.  The vote on the legislation was

95

1  19-12.  All eight ethnic minority senators voted against
2  the legislation."
3    Q.  And could you please read Paragraph 8?
4    A.  "Of all the opportunities members of the Senate
5  have to vote on voter identification legislation or
6  Senate process regarding voter identification
7  legislation, no senator who is an ethnic minority has
8  voted in favor of such legislation or the process
9  related to such legislation."
10    Q.  Is it fair to say that this statement from
11  Senator West reflects that all eight senators who are
12  ethnic minorities at that time voted against Senate Bill
13  362?
14    A.  No.
15    Q.  Why is that not a fair statement?
16    A.  I don't believe Senator Watson is an ethnic
17  minority.
18    Q.  Senator --
19    A.  I believe Senator Whitmire is an ethnic
20  minority.
21    Q.  I might actually point out, if I'm not
22  mistaken, if I'm counting correctly, that the names
23  listed there are ten names, but the statement actually
24  refers to eight Senators.
25    A.  Once again, I don't see eight ethnic minorities

96

1  within that group.
2    Q.  Were you aware that senators who were ethnic
3  minorities were opposed to Senate Bill 362?
4    A.  There were ethnic minorities that opposed my
5  bill.
6    Q.  Do you know why they opposed your bill?
7    A.  I believe you would have to ask them.
8    Q.  Do you recall any of their specific objections
9  to the bill?
10    A.  There in the testimony and the questioning on
11  the Floor that went for 27 hours, yes, there were
12  objections raised.
13    Q.  Did you have any concerns that those objections
14  would create any barriers to preclearance of the bill
15  under Section 5 of the Voting Rights Act?
16    A.  I believe that the bill that we were attempting
17  to pass would pass preclearance.
18    Q.  Why do you think there was such strong
19  opposition by these senators to your bill?
20    A.  I have no idea, because I do not believe that
21  their constituents had said affirmatively that they were
22  in favor of photo identification and is one of the
23  questions I asked them is how could you possibly be
24  against this bill.  I did not understand why any of
25  these people opposed the bill.

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

25 (Pages 97 to 100)

97

1    Q.  And if you could just clarify what you said.
2  You said that their constituents were in support of the
3  bill?
4    **A.  The polling had showed in every instance that**
5  **over 50 percent of Republicans, Democrats, African**
6  **Americans, Hispanics, were over 50 percent were in favor**
7  **of this.  That would imply that their districts, their**
8  **constituents were in favor of it.**
9    Q.  Is that the polling that we discussed a little
10 bit earlier this morning?
11   **A.  Yes.**
12   Q.  And again, that polling did not ask about
13 specific forms of ID, did it?
14   **A.  They asked, should you have to identify, give**
15 **positive identification before you vote.**
16   Q.  But it did not ask about specific forms of ID
17 that might be included in Voter ID legislation?
18   **A.  I don't -- I do not know the answer to that.**
19   Q.  Senate Bill 362 passed in the Senate but not in
20 the House, correct?
21   **A.  That is correct.**
22   Q.  Do you recall who sponsored the bill in the
23 House?
24   **A.  Todd Smith.**
25   Q.  Did you or anyone in your office have any

98

1  conversations with Representative Smith regarding the
2  bill once it went to the House?
3    **A.  Yes.**
4    Q.  And what was the nature of those conversations?
5        MS. HALPERN:  Objection on the grounds of
6  legislative privilege.  In order to be consistent,
7  I'm going to direct him not to answer.  Because the line
8  that we have drawn for the court is that where the
9  witness is being asked his own opinions, thoughts and
10 mental impressions, he can waive his own legislative
11 privilege.  He cannot waive the legislative privilege of
12 somebody else.  That representative is entitled to
13 legislative privilege.  And if I allow the witness to
14 answer the question, then that representative is being
15 deprived of even the ability to assert it.  So for these
16 questions, and I'm just making a clear record, where you
17 ask him about somebody else's opinion or statements, I'm
18 going to direct him not to answer.
19       MS. WESTFALL:  For the record, we can --
20 it is our position that we can ask questions along the
21 lines of privilege law, how many conversations, general
22 nature of the conversation, who was the conversation
23 with, notwithstanding your direction.  Would you agree
24 with that?
25       MS. HALPERN:  And we would agree with

99

1  that, yes.  You can ask about the number of
2  conversations.  You just can't ask about the substance
3  of them.
4        MS. FARANSSO:  Can you read the last
5  pending question, please?
6        (Requested portion was read back by the
7  court reporter.)
8    **A.  My answer would be yes.**
9    Q.  (By Ms. Faransso) How many conversations?
10   **A.  It would be impossible for me to tell you the**
11 **number of conversations.  The very nature of the way the**
12 **Texas Legislature works is that once a body -- the bill**
13 **leaves one body and moves to the other, we allow the**
14 **process to work, and they would deal with the bill.  If**
15 **they had questions on the bill, we would answer those**
16 **questions.  So I'm sure there were conversations.**
17 **Generally, the conversations are staff-to-staff.**
18 **Member-to-member conversations are not as common.  I'm**
19 **sure that I had conversations with Representative Smith,**
20 **but very few.**
21   Q.  Would Ms. McCoy have had those conversations on
22 your behalf?
23   **A.  I cannot speak for Ms. McCoy.**
24   Q.  When you say staff-to-staff, who on your staff
25 would have had those conversations?

100

1    **A.  Ms. McCoy.**
2    Q.  Did you have conversations with any other House
3  members about the bill once it went to the House?
4    **A.  362, I would say no.**
5    Q.  Okay.  Did you have any discussions with the
6  Lieutenant Governor's office about a strategy for
7  securing passage of Senate Bill 362 in the House?
8        MS. HALPERN:  I'm going to object to that
9  on the grounds of legislative privilege, because you've
10 suggested a subject matter as well as the fact of
11 conversations.
12   Q.  (By Ms. Faransso) Did you have any
13 conversations with the Lieutenant Governor's office
14 about Senate Bill 362 once it went to the House?
15   **A.  To my knowledge, no.**
16   Q.  Would you like to continue or do you need a
17 break?
18   **A.  I'm fine.**
19   Q.  Okay.  I'm going to move on to Senate Bill
20 14.  After failure of Senate Bill 362 in the House, did
21 you have any discussions with the Lieutenant Governor's
22 office about next steps with regard to Voter ID
23 legislation?
24       MS. HALPERN:  Objection, legislative
25 privilege.  You can say "yes" or "no."

SENATOR TROY FRASER                                     7/23/2014
CONFIDENTIAL TRANSCRIPT

26 (Pages 101 to 104)

101

1   A.  Yes.
2   Q.  (By Ms. Faransso)  How many conversations?
3   A.  More than likely only one.
4   Q.  Did you have any discussions with anyone else
5   about being the author of a new Voter ID bill?
6   A.  I'm sorry, I need to back up.  Was the question
7   you asked before prior to the filing of?
8   Q.  Yes.
9   A.  And my answer still is likely one.
10  Q.  Did you have any conversations with anybody
11  else about being the author of a new Voter ID bill after
12  Senate Bill 362 failed?
13  A.  Yes.
14  Q.  With whom did you have those conversations?
15      MS. HALPERN:  Objection, legislative
16  privilege.  You can answer.
17  A.  Ms. McCoy.
18  Q.  (By Ms. Faransso)  Okay.  When did the Voter ID
19  issue arise again for you?
20      MS. HALPERN:  You mean after 362?
21      MS. FARANSSO:  Yes.
22      MS. HALPERN:  What is again in reference
23  to?
24      MS. FARANSSO:  Let me clarify.
25  Q.  (By Ms. Faransso)  After Senate Bill 362 failed

102

1   in the House, when did the issue of Voter ID legislation
2   arise again?
3   A.  You're implying that it went away.  It was
4   always there.  And after 362 failed, 14 was a
5   continuation of 362.
6   Q.  Do you recall that you filed a Voter ID bill in
7   the Senate on November 8th, 2010, and that it received
8   the bill number of Senate Bill 178?
9   A.  Yes.
10  Q.  Okay.  You refiled that bill to get a lower
11  bill number; is that right?
12  A.  You've asked the question incorrectly.  If
13  you'll ask it correctly, I'll answer your question.
14  Q.  Did you refile that bill to get a lower bill
15  number?
16  A.  Once again, if you'll read -- if you'll ask the
17  question correctly, I'll answer it.
18  Q.  I'm simply --
19      MS. WESTALL:  Objection, move to strike on
20  nonresponsive.
21  Q.  (By Ms. Faransso)  Did refile Senate Bill 178?
22  A.  No.
23  Q.  How -- actually --
24      (Exhibit 11 marked for identification.)
25  Q.  (By Ms. Faransso)  Did your staff refile --

103

1   did anyone on your staff --
2   A.  I'm very aware of where you're trying to get
3   to, but the -- 178 was filed and continued as a bill
4   that had been filed.
5   Q.  Did that bill get refiled?
6   A.  The content of one -- of a -- a like content of
7   bill 178 was refiled again.
8   Q.  And when that bill was refiled, did it receive
9   the bill number Senate Bill 14?
10  A.  Yes.
11  Q.  And did you refile that bill at the request of
12  the Lieutenant Governor?
13  A.  Yes.
14  Q.  Okay.  Thank you.  Does the Lieutenant Governor
15  reserve lower bill numbers for legislative priorities?
16  A.  Yes.
17  Q.  Does a lower bill number expedite the
18  consideration of a bill?
19  A.  No.
20  Q.  Is there any other procedural advantage to
21  having a lower bill number?
22  A.  No.
23  Q.  So what is the purpose of refiling a bill?
24  A.  I believe you're going to have to ask the
25  Lieutenant Governor that question.

104

1   Q.  What did you believe was the purpose of
2   refiling Senate Bill 178 as Senate Bill 14?
3       MS. HALPERN:  Objection, calls for
4   speculation.  You can ask him what he thought himself,
5   not what he thought the Lieutenant Governor's thought
6   was.
7       MS. FARANSSO:  I believe I asked what --
8   what he thought.  Can you read the question back?
9       (Requested portion was read back by the
10  court reporter.)
11  A.  I believe it was the response from the
12  Lieutenant Governor that said he would like for you to
13  refile the bill.
14  Q.  (By Ms. Faransso)  Thank you.  You were the
15  author of Senate Bill 14; is that right?
16  A.  Yes.
17  Q.  And as the author, you drafted and filed the
18  bill, correct?
19  A.  No.
20  Q.  Who drafted and filed the bill?
21  A.  Janice McCoy.
22  Q.  She filed -- drafted and filed the bill on your
23  behalf, correct?
24  A.  Yes.
25  Q.  Were you involved in the drafting of the bill?

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

27 (Pages 105 to 108)

105

1    A.  Yes.
2    Q.  What was your involvement?
3    A.  Suggestions on content of the bill.
4        (Exhibit 12 marked for identification.)
5    Q.  (By Ms. Faransso)  Senator, you've been handed
6    what has been marked as Exhibit 12, and we will spend
7    very little time on this document.  But do you recognize
8    this document based on the cover page?
9    A.  Appears to be an excerpt from the Senate Rules
10   of the 2011 session.
11   Q.  If you could please turn to page 24 and look at
12   Rule 5.11, and specifically Rule 511D.  Does this
13   reflect that in 2011, the Senate adopted the same rule
14   it had adopted in 2009, which allowed bills relating to
15   Voter ID to be set by a special order by a majority of
16   the Senate rather than by two-thirds' vote?
17   A.  It implies that the rules that were adopted in
18   2009 carried forward and were readopted as they were in
19   2011 -- 2009, they were adopted identically in 2011.
20   Q.  Thank you.  Do you recall if there was an
21   exemption for any area of legislation in the 2013 rules?
22   A.  I'm sorry, I do not.
23   Q.  You do not recall?
24   A.  I don't recall.
25   Q.  Okay.  Do you recall that during the 2011

106

1    legislative session, Governor Perry designated the issue
2    of Voter ID legislation as emergency legislation?
3    A.  Am I aware?
4    Q.  Yes.
5    A.  I am aware.
6    Q.  Okay.  Did you or your office have any
7    conversations with the Governor's Office prior to the
8    Governor making that designation?
9    A.  No.
10       MS. HALPERN:  Object -- I would have, but
11   it doesn't matter now.
12   A.  No.
13   Q.  (By Ms. Faransso)  Did you or your office have
14   any conversations with the Lieutenant Governor's Office
15   prior to the Governor making that designation?
16       MS. HALPERN:  Objection, legislative
17   privilege.
18   A.  No.
19       MS. HALPERN:  Do you want to take a break?
20   A.  Sure.
21       MS. HALPERN:  Let's take a break.
22       MS. FARANSSO:  Sure.
23       (Brief discussion off the record and
24   recess delayed.)
25       (Exhibit 13 marked for identification.)

107

1    Q.  (By Ms. Faransso)  Senator Fraser, you've been
2    handed what has been marked as Exhibit 13.  Do you
3    recognize this document?
4    A.  Press release from my office.
5    Q.  Did Ms. McCoy draft this document?
6    A.  Yes.
7    Q.  Did she draft it at your direction?
8    A.  It appears that -- I'm assuming she drafted it
9    because most of it -- she did most of the ones, and I'm
10   assuming -- I don't know that I directed her.  She may
11   have drafted it and then shown it to me.  So I can't say
12   that I asked her to.
13   Q.  And does this press release pertain to Governor
14   Perry's declaration of Voter ID as an emergency item of
15   legislation?
16   A.  It appears to be.
17   Q.  Okay.  Why did you think it was important to
18   designate Voter ID legislation as an emergency item?
19       MS. HALPERN:  Objection, legislative
20   privilege.
21   A.  Governor Perry is the one that declared it
22   emergency.  I didn't ask him to do it.  This is a
23   announcement that he has done it and thanking him for
24   doing it.
25   Q.  (By Ms. Faransso)  Can you please read the

108

1    first paragraph of the press release?
2    A.  "I want to thank Governor Rick Perry for
3    declaring Voter ID an emergency for the legislative
4    session by taking this action.  The Legislature will be
5    able to address this priority issue more quickly."
6    Q.  Does this reflect that by designating Voter ID
7    as an emergency item of the legislation, the issue would
8    be addressed more quickly by the legislature?
9    A.  It is implied that is the case, but that's not
10   always the case.  I had an emergency item in the 2013
11   session that wasn't heard until the end of the session.
12   So it doesn't necessarily always mean it will be heard.
13   Q.  But generally speaking, the Texas Constitution
14   prohibits the passage of bills within the first 60 days
15   of the legislative session unless the Governor
16   designates an item as an emergency matter; is that
17   correct?
18       MS. HALPERN:  Objection, calls for a legal
19   conclusion.
20       MS. FARANSSO:  Counsel, I'm asking about
21   the Texas Constitution and his familiarity with it based
22   as a -- his familiarity with it.
23       MS. HALPERN:  You can ask him his
24   familiarity with it, but we've had objections in other
25   depositions from defendants to witnesses proffering

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

---

109

1 legal conclusions about what the Texas Constitution
2 says.  So having been instructed in that fashion, I am
3 objecting that you're calling for a legal conclusion.
4 He can tell you what he thinks it means.
5       Q.  (By Ms. Faransso)  Senator, are you aware that
6 the Texas Constitution prohibits the passage of a bill
7 within the first 60 days of a legislative session unless
8 it has been designated as an emergency item?
9       A.  That is my understanding of the Texas
10 Constitution.
11      Q.  Thank you.  Was there an urgency in your mind
12 requiring the expeditious passage of Senate Bill 14?
13      A.  It's interesting that the Democratic caucus
14 took a position that it would like to go ahead and get
15 this out of the way.  So the answer is yes, that it was
16 a general consensus of the Senate as a whole.  We didn't
17 make an official decision of that because you can't do
18 that.  But the -- both caucuses agreed that it would be
19 nice to go ahead and deal with this issue early.
20      Q.  The release states -- and let me just find the
21 paragraph.  The second to last paragraph, the very last
22 full line, it states, "Without a photo ID requirement,
23 we can never have confidence in our system of voting."
24 What did you mean here by confidence in our system of
25 voting?

---

110

1       A.  I believe that without a photo ID requirement,
2 we can never have confidence in our system of voting.
3       Q.  And what do you mean by confidence?
4       A.  Without a photo ID requirement, we can never
5 confidence in our system of voting.
6       Q.  What was your -- the factual basis for your
7 belief that without a photo ID requirement, we could not
8 have confidence in our system of voting?
9       A.  I don't think I'm quoting anything other than
10 saying without a photo ID requirement, we can never have
11 confidence in our system of voting.
12      Q.  So there was no factual basis to that
13 statement?
14      A.  That that's your opinion.  You're answering for
15 me.  The words on the paper say you cannot have a --
16 without a photo ID requirement, we can never have
17 confidence in our system.  That gives my opinion.
18          MS. WESTFALL:  Objection, nonresponsive.
19      Q.  (By Ms. Faransso)  Can you please tell me
20 whether there was a factual basis for that opinion?
21      A.  There had been hours of testimony on the bill
22 over the last six years on this issue and so there had
23 been a lot of evidence delivered showing that without a
24 photo ID requirement, we could not have confidence in
25 our system.  So yes, there was many, many, many hours of

---

111

1 testimony showing that.
2       Q.  The photo ID requirement in Senate Bill 14 was
3 intended to combat only in-person voter fraud, correct?
4       A.  Yes.
5       Q.  Do you recall whether January 11, 2011 was the
6 first day of the 82nd session?
7       A.  I do not recall, no.
8       Q.  I can represent to you that it was the first
9 day unless you would like to see a document showing
10 that.
11      A.  If you say it is, I -- that's sounds right.
12      Q.  Do you recall when Senate Bill 14 passed?
13      A.  It was the end of January.  The last week of
14 January.
15      Q.  And I think, specifically, I can represent to
16 you it was passed on January 26th, during the last week
17 of January.  Are there any other substantive
18 bills that the Senate passed in the first two weeks of
19 the legislative session in January?
20      A.  Of 2011?
21      Q.  Yes.
22      A.  I'm sorry, I don't -- I don't have that
23 information.
24      Q.  Do you think it's unusual for a bill to pass
25 within the first two weeks of a legislative session?

---

112

1       A.  No.
2       Q.  Is it fair to say that Voter ID legislation was
3 a priority for the Lieutenant Governor at this time?
4       A.  You'd have to ask the Lieutenant Governor that.
5       Q.  Did you have any conversations with the
6 Lieutenant Governor's Office during the consideration of
7 Senate Bill 14?
8          MS. HALPERN:  Yes or no.
9       A.  Yes.
10      Q.  (By Ms. Faransso)  How often did you have those
11 conversations?
12      A.  It's a very, very broad question you're
13 asking.  I talked with the Lieutenant Governor almost
14 every day so we had more than one conversation.
15      Q.  Going back to Senate Bill 14 itself, you
16 mentioned that Janice McCoy drafted the legislation and
17 you were involved as she drafted that legislation?
18      A.  Yes.
19      Q.  Do you recall consulting any sources as your
20 office drafted Senate Bill 14?
21      A.  You're going to have to be --
22          MS. HALPERN:  Objection.
23      A.  -- more specific.
24      Q.  (By Ms. Faransso)  Do you recall looking at any
25 laws of other states while you were drafting Senate Bill

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

---

113

1  14?
2        MS. HALPERN:  And I'm going to object on
3  the basis of legislative privilege.  You can answer.
4        A.  Yes.
5        Q.  (By Ms. Faransso)  What's states in particular
6  did you look at?
7        MS. HALPERN:  Objection, legislative
8  privilege.
9        A.  There were 24 states by the time we passed
10 Senate Bill 14 that had enacted Voter ID laws.
11       Q.  (By Ms. Faransso)  Did you look at the laws in
12 Indiana and Georgia?
13       A.  Yes.
14       MS. HALPERN:  Objection, legislative
15 privilege.  I've got to do this every question.
16       Q.  (By Ms. Faransso)  Was anyone else involved in
17 the drafting of Senate Bill 14 other than Mr. McCoy?
18       A.  I want to go back to the prior question if I
19 could to continue my answer.  I looked at the laws
20 passed in all 24 states that had enacted laws.
21       Q.  Thank you.
22       (Exhibit 14 marked for identification.)
23       Q.  (By Ms. Faransso)  Senator, you've been handed
24 what has been marked as Exhibit 14.  Do you recognize
25 this document?

---

114

1        A.  Appears to be the legislation, I believe, as
2  filed.
3        Q.  That's correct.  This is the introduced version
4  filed on January 12, 2011.  If you turn to Page 9 of
5  this bill, I'm sorry, Page 8, and there's a list of
6  documentation of proof of identification provided there.
7  Senate Bill 14 included only photo identification,
8  correct?
9        A.  That is correct.
10       Q.  What was the purpose of excluding nonphoto
11 identification from Senate Bill 14?
12       MS. HALPERN:  Objection, legislative
13 privilege.
14       A.  By the time Senate Bill 14 was enacted, we had
15 six years of history in Texas and over eight years of
16 history of the issue in the United States, so we had
17 multiple elections that had been held and case law that
18 had gone before the U.S. Supreme Court, preclearance by
19 the Georgia Voter ID law, and that it was clear to us
20 from the testimony that we had heard that Texas was best
21 served by having a clear photo ID bill.
22       Q.  (By Ms. Faransso)  You mentioned that there
23 were six to eight years of previous history.  Did
24 anything specifically occur between 2009 and 2011 that
25 made nonphoto ID an acceptable option in 2009 but not in

---

115

1  2011?
2        MS. HALPERN:  Objection, assumes facts not
3  in evidence.
4        A.  And my answer would the same as the last
5  question, the last answer I gave, it will be the
6  identical answer, and I'll give it again if you'd like.
7        Q.  (By Ms. Faransso)  I'm asking what you can
8  point to between 2009 and 2011 that made nonphoto ID an
9  acceptable option in 2009 but not in 2011.
10       MS. HALPERN:  Objection, assumes facts not
11 in evidence.
12       A.  And my answer will continue to be the same, and
13 I will give the same answer again if you would like.
14       Q.  (By Ms. Faransso)  Please do.
15       A.  That we had had six years of history in Texas
16 of testimony on the bills.  You had had at least eight
17 years of history of both elections held in other states,
18 rulings by the U.S. Supreme Court and preclearance of
19 issues, including preclearance in Georgia, and with the
20 combination of all of that, Texas made a clear decision
21 that we would be best served by a clear photo ID bill.
22       Q.  Let me first ask you about the elections you
23 referred to.  Which elections specifically are you
24 referring to?
25       A.  You're going to have to be more specific in

---

116

1  your question, because there were 24 states that had
2  enacted the laws so you've had elections for in 24
3  states over that period.  The longest period, obviously,
4  is Indiana and Georgia, and we reviewed the election
5  results.  There had been studies done by multiple
6  people, including the University of Missouri, looking at
7  the results of turnout in those states.
8        Q.  And did those studies look at the 2008
9  election?
10       A.  There were studies of elections in 2008.
11       Q.  Did those studies look at elections following
12 the 2008 election?
13       A.  There were studies after 2008, yes.
14       Q.  I'm sorry?
15       A.  There were studies after 2008, yes.
16       Q.  Were there studies of elections that occurred
17 after 2008?
18       A.  The answer would be yes because this was due to
19 be held in 2011.
20       Q.  Were you aware at the time of the racial
21 demographics in Georgia and Indiana?
22       MS. HALPERN:  Objection, asked and
23 answered.
24       MS. FARANSSO:  I'm asking at the time,
25 2011.  We previously discussed 2009.

---

SENATOR TROY FRASER
CONFIDENTIAL TRANSCRIPT

7/23/2014

30 (Pages 117 to 120)

---

**117**

1      A.  The answer would be the same, because I don't
2   believe we had a mass exodus of one group coming or
3   going in those two states.  I would represent, I would
4   believe, it would be, you know, pretty much the same.
5      Q.  (By Ms. Faransso)  Thank you.
6      A.  Predominantly the same.
7      Q.  With respect to Georgia and Indiana, those laws
8   are less restrictive than Senate Bill 14; is that
9   correct?
10      A.  That would be your determination.
11      Q.  Are those bills less restrictive than Senate
12   Bill 14?
13      A.  Again, that would be your determination.
14      Q.  Do you agree with the statement that those
15   bills are less restrictive than Senate Bill 14?
16      A.  No, I do not agree with that.
17            (Exhibit 15 marked for identification.)
18      Q.  (By Ms. Faransso)  Senator, the court reporter
19   has handed you what has been marked as Exhibit 15.  It's
20   an e-mail from Bryan Hebert to several individuals,
21   including Janice McCoy.
22            MS. FARANSSO:  And I will note for the
23   record that this document is highly confidential.
24      Q.  (By Ms. Faransso)  Do you recognize the
25   attachment to Mr. Hebert's e-mail?

---

**118**

1      A.  No.
2      Q.  Do you see that it's a Voter ID bill summary
3   for Senate Bill 14?
4      A.  Appears to be.
5      Q.  Can you please read the very first sentence of
6   that summary?
7      A.  "Senate Bill 14 would give Texas arguably the
8   strictest photo ID law in the country.  A review of the
9   U.S. Supreme Court approval of Indiana law and DOJ's
10   approval of Georgia photo law indicates the December
11   14th is likely to be upheld under both constitutional
12   review of Section 5 Voting Rights Act."
13      Q.  With respect to that first sentence, "Senate
14   Bill 14 would give Texas arguably the strictest photo ID
15   law in the country," did you agree with that statement
16   at the time?
17            MS. HALPERN:  Objection, assumes facts not
18   in evidence.
19      Q.  (By Ms. Faransso)  Have you seen this
20   statement?
21      A.  No.
22      Q.  Have you heard the argument that Senate Bill 14
23   arguably would have been the strictest photo -- photo ID
24   law in the country?
25      A.  No.

---

**119**

1      Q.  And just for the record, do you agree with that
2   statement sitting here today?
3      A.  You're projecting, I -- you know, I haven't
4   seen it.  I haven't made that statement.  And this
5   statement is made by someone else.  It's not an employee
6   of mine.  So the answer is no.
7      Q.  You mentioned that you looked at the history of
8   elections in other states.  Did you conduct any analysis
9   of data in Texas that led you to believe that photo ID
10   in 2009 was an acceptable option but was not an
11   acceptable option in 2011?
12            MS. HALPERN:  Objection.  I'm not sure
13   that's a question you meant to ask.  Can I have it read
14   back?
15            MS. FARANSSO:  I'm sorry.
16            MS. HALPERN:  Maybe I misheard, but --
17            MS. FARANSSO:  I will -- I will rephrase.
18      Q.  (By Ms. Faransso)  Did you look at any data
19   pertaining to Texas to determine that nonphoto ID was an
20   acceptable option in 2009 but not in 2011?
21            MS. HALPERN:  And I'm going to object to
22   that because it assumes facts not in evidence.
23      A.  You want me to go ahead and give you the
24   answer?  It's going to be the same as I did prior to
25   that.  Is we had six years of history of looking at

---

**120**

1   this, many, many, many hours of testimony on this issue,
2   and based on that and the election results in other
3   states and other laws that had been enacted in other 24
4   states, we made the decision that Texas was best served
5   by strict photo ID bill.
6      Q.  (By Ms. Faransso)  When you say six years of
7   history, what did that history pertain to?
8      A.  House Bill 218 was filed in 2007.
9      Q.  What changed in Texas?
10      A.  When I say -- I guess I need to clarify.  Six
11   years would be three legislative sessions that are two
12   years between each one of them.  So it wasn't six actual
13   years, but it was three legislative sessions that this
14   went on.
15      Q.  Were there any facts that changed in Texas
16   pertaining to voter fraud that led you to believe that
17   nonphoto ID was an acceptable option in 2009 but not in
18   2011?
19            MS. HALPERN:  Objection, assumes facts not
20   in evidence.
21      A.  Once again --
22            MS. HALPERN:  Compound.
23      A.  -- there were three legislative sessions of
24   testimony that were heard on this issue, and we believe
25   based on the testimony of the elections that were held

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

---

121

1  in other states, election results, 24 states enacting
2  Voter ID bill, that Texas would be best served by a
3  strict photo ID bill.
4      Q.  (By Ms. Faransso)  And I'm asking specifically
5  about facts about Texas.  Were there any facts related
6  to the process of elections or voter fraud that led you
7  to believe that nonphoto ID was not -- no longer a
8  reliable means of proving one's identity at the polls?
9      MS. HALPERN:  Objection, assumes facts not
10 in evidence.
11     A.  Once again, the -- I will answer the exact same
12 way, because the testimony that happened, and more
13 specifically on 362, we had 27 hours of testimony in a
14 Committee as a Whole, to my knowledge, the longest
15 testimony that had ever been held on a bill, and based
16 on that testimony, the results of -- through the
17 Committee and looking at election results in other
18 states, and what had been passed, we believed Texas was
19 best served by a strict photo ID bill.
20     Q.  (By Ms. Faransso)  With respect to the
21 testimony on Senate Bill 362 that you mentioned, did any
22 of that testimony pertain to convictions related to
23 in-person voter fraud?
24     A.  I can't specifically answer that, but I know it
25 was discussed that there -- I'm sorry, I can't answer

---

122

1  that specifically.
2      Q.  You do not recall any specific instances of
3  convictions?
4      A.  You asked me to give specific information that
5  was in 2009, so it was five years ago, and I'm sorry,
6  no, I can't give you a specific example.
7      Q.  Would allowing the use of nonphoto
8  identification in Senate Bill 14 have interfered with
9  the purposes of Senate Bill 14?
10     A.  The bill speaks for itself.  It was a strict
11 photo ID bill.
12     Q.  And how would allowing nonphoto ID have
13 interfered with the purpose of preventing in-person
14 voter fraud?
15     A.  It would have changed the bill from a strict
16 photo ID to a nonstrict photo ID.
17     Q.  How would allowing nonphoto ID have interfered
18 with the purpose of preventing in-person voter fraud?
19     A.  I don't believe we're discussing the purpose.
20 The purpose was to protect the integrity of the ballot
21 box, and in order to protect the integrity of the ballot
22 box, it is best served by having a strict photo ID bill.
23     Q.  And again, just to -- so that the record is
24 clear, Senate Bill 14 was assigned only to combat
25 in-person voter fraud; is that correct?

---

123

1      A.  That is correct.
2      MS. FARANSSO:  I think it would be a good
3  time for a break.
4      MS. HALPERN:  I'll see you back here
5  around 1:00.
6      (Lunch recess from 11:54 a.m. to
7  1:02 p.m.)
8      Q.  (By Ms. Faransso) Senator Fraser, you referred
9  before lunch to testimony and research that the
10 Committee received during consideration of the various
11 Voter ID bills.
12     A.  Uh-huh.
13     Q.  Did any of that testimony or research show that
14 legislation allowing the use of non-photo identification
15 would not prevent in-person voter fraud?
16     A.  I'm glad you asked me that question because at
17 lunch, I refreshed my memory and went back over data
18 that we had released.  In 2010, there was a University
19 of Texas poll that was a strict photo ID -- the question
20 was asked about a strict photo ID and they broke it down
21 in both White, African-American and Hispanic, and it
22 showed overwhelmingly in any all three areas that a
23 strict photo ID was acceptable.  Another poll was done
24 by Lighthouse just prior to the bill passing in the 2011
25 and actually the numbers had gone up considerably.  So

---

124

1  there had been at least one, maybe two polls by the
2  University of Texas on that, that were strict photo ID,
3  and they asked the question specifically about a strict
4  photo ID.  So yes, there was considerable research done
5  about polling of Texas people on that issue.
6      Q.  Thank you.  And we may come back to those polls
7  later, but aside from the polls that showed what the
8  public thought about Voter ID, did the testimony and
9  research show that legislation allowing the use of
10 non-photo ID would not prevent in-person voter fraud?
11     A.  Well, any testimony came from the Democratic
12 party -- the National Democratic Party trying to make a
13 case that that was a case, but it actually was totally
14 inverse of what the public thought.  Because the public,
15 when you asked the public what they thought of should
16 you have a photo ID, they were overwhelming in favor it.
17 So, yes, it was testimony, but the testimony came from
18 either advocacy groups working against it or the DNC.
19     Q.  So just to be clear, there were no facts that
20 were raised showing that the use of non-photo ID would
21 not prevent in-person voter fraud?
22     MS. HALPERN:  Objection, assumes facts not
23 in evidence.
24     A.  I think I just said that there was polling.  We
25 did not have in it place so you didn't have any actual

---

125

1  elections that had happened, but we asked the public,
2  "Do you believe that it would increase the integrity of
3  the ballot box if you used a strict photo ID," and the
4  polling showed that the numbers were very high, in some
5  cases up into the upper 80s.  One poll conducted in 2011
6  right before my bill was passed, showed that it was 83
7  percent of African-Americans and 86 percent of Hispanics
8  believed that a photo ID bill should be passed.
9       Q.  (By Ms. Faransso) And just to confirm for the
10  record something we discussed a bit earlier, none of
11  those polls asked what the views the responders would be
12  with respect to a strict photo ID law if they knew that
13  that law would disproportionately impact minority
14  voters, correct?
15           MS. HALPERN:  Objection, assumes facts not
16  in evidence.  Objection, compound.  Objection,
17  misleading.
18           You can try to answer.
19       A.  There's a -- you know, you're -- you know,
20  there possibly may have been polls about that.  If you
21  have that, you'd been glad to show them to me.
22           The polls that I Googled, the polls that I
23  found, the polls that were delivered to me by opponents,
24  all were in reference to a strict photo ID, and that
25  those were the -- obviously, the direction that the

126

1  public was encouraging us to go.
2       Q.  (By Ms. Faransso) Let me ask a slightly
3  different question.  Did any of the testimony or
4  research that you've been referring to show or
5  demonstrate that allowing non-photo identification would
6  result in incidents of in-person voter fraud?
7       A.  The answer is that the information we found
8  that the -- the best way to ensure the integrity of the
9  ballot box, to make sure the person was who they -- you
10  know, they said they were, was to have a photo ID.
11       Q.  And what was that information?
12       A.  Testimony from the public and polling of asking
13  the public if they thought that was a -- you know, the
14  best way.
15       Q.  So your basis for thinking about the inclusion
16  of non-photo ID would result in in-person voter fraud
17  were polls asking the public what they thought about
18  voter ID?
19       A.  You're answering your own question.
20       Q.  So that's a yes?
21       A.  You want to ask that -- no, that's not a yes at
22  all.  If you want to ask me a question instead of a
23  compound question, you know -- the public, when asked,
24  do you think that the ballot box, integrity of the
25  ballot box would be improved by having a strict photo

127

1  ID, the answer was an overwhelming yes, in some cases,
2  as high as 88 percent.
3       Q.  Thank you for that testimony.  Other than the
4  polls, putting aside the polls, were there any other
5  facts showing that allowing non-photo ID in a Voter ID
6  bill would result in incidents of voter fraud?
7       A.  Well, there are multiple studies that have been
8  done all the way back to 2000.  There were -- a study by
9  the University of Missouri, there was a study by the
10  University of Delaware, there's a study by the Heritage
11  Foundation, studies by the Baker Carter group, all
12  showing that a photo ID would improve the integrity of
13  the ballot box, and in fact, the implementation of a
14  photo ID bill would not lower turnout in an election.
15       Q.  And none of those studies looked at data in
16  Texas, correct?  They looked at other states?
17       A.  There had been no elections in Texas at the
18  time those studies would have been done because we
19  didn't implement the bill -- we passed the bill in 2011.
20  It wasn't implemented until last year.
21       Q.  But those studies, for example, did not look at
22  what percentage of the population in Texas may or may
23  not possess photo identification required by Senate Bill
24  14?
25       A.  The data that they had to look at was the

128

1  implemenation of states that -- where it had been
2  implemented and the turnout and results of the
3  elections.  And, you know, they -- they projected
4  that.  There was no elections held in Texas with a
5  strict photo ID until 2013.
6       Q.  Thank you.  We talked a bit about this earlier
7  today, but do you recall that Senate Bill 362 permitted
8  photo IDs issued by state and federal agencies or
9  institutions?
10       A.  Yes.
11       Q.  Are you aware that Indiana and Georgia's photo
12  ID laws also include photo ID issued by state or federal
13  agencies or institutions?
14       A.  I'm sorry, I'm not -- not -- I would not say
15  that I know that.
16       Q.  Are you aware that Senate Bill 14 does not
17  include photo identification issued by state or federal
18  agencies or institutions?
19       A.  I would disagree with that.
20       Q.  And why would you disagree with that?
21       A.  Is a passport issued by the state or federal
22  government?  Is a driver's license issued by the state
23  government?  So IDs by state and federal government are
24  approved as identification for Senate Bill 14.
25       Q.  And that's fair.  Let me clarify my question

SENATOR TROY FRASER                                      7/23/2014
CONFIDENTIAL TRANSCRIPT

33 (Pages 129 to 132)

---

**129**

1 then.  I'm referring specifically to the provision we
2 looked at earlier this morning in Senate Bill 362 that
3 read that, "A valid identification card that contains a
4 person's photograph and is issued by an agency or
5 institution of the federal government or an agency,
6 institution or political subdivision of the state was
7 included in Senate Bill 362."  And there is no parallel
8 provision in Senate Bill 14, is there?
9     A.  As you're doing in your questions, clarifying,
10 we clarified in Senate Bill 14 specifically what federal
11 IDs and what state IDs would be acceptable to be used
12 for identification to make it for the ease of the poll
13 worker and the voter knowing what the --
14           (Interruption by teleconference recorded
15 message.)
16     Q.  (By Ms. Faransso) Did you finish your answer?
17     A.  Well, I was entertained by the phone.
18     Q.  Please do finish.
19     A.  I was finished.
20     Q.  Okay.  So is it a fair statement to say that
21 Senate Bill 14 narrowed the state or federal issued
22 forms of ID that were acceptable?
23     A.  No, that's your statement.  Senate Bill 14
24 clarified what federal agencies and what state agencies
25 would be both allowed to issue identification, and if we

---

**130**

1 were issuing a state ID, who would issue it and the
2 parameters it would be issued under, which it is, as you
3 know, free.
4     Q.  So Senate Bill 14 clarified which state- or
5 federal-issued ID would be acceptable?
6     A.  Yes.
7     Q.  You mentioned that Senate Bill 14 clarified
8 that set of identification because you thought that that
9 would be for the ease of the voters, correct?
10     A.  And poll workers.
11     Q.  And poll workers.  Specific to voters, why
12 would it be easier on voters to have a narrower set of
13 identification?
14     A.  It's clear whenever they go into to vote of
15 what an acceptable form of ID would be.
16     Q.  Would it be easier for a voter who did not
17 possess one of the forms of identification stipulated in
18 Senate Bill 14?
19     A.  It would be clear to that voter.
20     Q.  It would be clear to that voter that they did
21 not possess that form of identification?
22     A.  It would be clear to them what forms of
23 identification are acceptable.
24     Q.  Would it be easier for that voter to then cast
25 a vote?

---

**131**

1     A.  You're trying make me determine what someone's
2 mind that I haven't met what is and is not.  That's
3 subjective.
4     Q.  Senate Bill 14 list of acceptable
5 identifications includes driver's license expired no
6 earlier than 60 days before the date of presentation; is
7 that correct?  We can take a look at the bill if that
8 would refresh your recollection.
9     A.  Please.
10     Q.  Okay.  Let's actually take a look at the final
11 version of the bill.
12           (Exhibit 16 marked for identification.)
13     Q.  (By Ms. Faransso) Senator, you've been handed
14 --
15           MR. CLAY:  I'm sorry, what number are we
16 on?
17           MS. FARANSSO:  16.
18     Q.  (By Ms. Faransso) You've been handed what has
19 been marked as Exhibit 16.  And this is the final signed
20 version of Senate Bill 14.  Do you see that?
21     A.  I do.
22     Q.  Okay.  And if you could, please turn to Page
23 10 -- actually, I'm sorry.  If you could turn to Page 9,
24 and under Documentation of Proof of Identification, in
25 Section 63.0101, Paragraph 1 reads, "A driver's license,

---

**132**

1 election identification" --
2     A.  I'm going to have to stop you.  I'm sorry, I
3 was reading.  I was reading the bill.  So if you will
4 start your question again.
5     Q.  Sure, sure.  Why don't you --
6           MS. HALPERN:  It seems to work better if
7 you let him just read the thing you're going to ask him
8 about rather than --
9           MS. FARANSSO:  I was just about to say
10 that.
11     Q.  (By Ms. Faransso) Why don't you just read
12 Paragraph 1 under Section --
13     A.  I was reviewing the bill to make -- see what
14 you were going to ask me.
15     Q.  Sure.  And I'm only going to ask you about this
16 paragraph, so.
17     A.  Okay.
18     Q.  If you would like to look at Paragraph 1, under
19 Section 63.0101 on Page 9.
20     A.  Okay.  Paragraph Number 1 or the first
21 paragraph?
22     Q.  The -- Paragraph Number 1.
23     A.  Okay.  Okay.
24     Q.  Is it fair to say that Senate Bill 14 included
25 driver's license that had been expired no earlier than

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

SENATOR TROY FRASER                                              7/23/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

137

1  there were numerous IDs on the market that people had
2  created -- a University called Monsters University or
3  Tom's University -- and they would create their own ID.
4  And we realized that if there wasn't a uniform standard
5  for identification, that we could not control the
6  identification mechanisms going into a polling place and
7  would confuse poll workers.
8      Q.  (By Ms. Faransso) Did you give any
9  consideration to options for requiring, for example,
10 expiration dates on student IDs?
11     A.  Unfortunately, there's a lot of identification
12 cards.  I actually just noticed there's one right here
13 on Linda's -- could I see your card?  This is a very
14 classic -- it was issued by the State of Texas, it has
15 her picture on it and this allows her to get in, but
16 there is no identification anywhere on the card.
17 Unfortunately, we found that to be the case on a lot of
18 cards that were issued.  And without an identification
19 -- an expiration date, we ran into the same problem we
20 had with driver's licenses.
21     Q.  So specifically with respect to student
22 identification, did the Senate or you personally give
23 any consideration to ways of making student
24 identification more uniform across the state of Texas?
25     A.  We spent extensive time looking at that issue

---

138

1  trying to determine if there's a way to do it, and we
2  found that if someone -- you couldn't restrict someone
3  from let's say the University of Texas or in a private
4  college like Austin College in Denton where they -- was
5  not a state institution.  We didn't know who was issuing
6  those cards.  A lot of cases, we didn't know the
7  university who it represented and there was no way to
8  standardize it.  And we made an agreement that that was
9  probably not an acceptable way and it would actually
10 confuse the process.  And so we eliminated student IDs
11 from the list.
12     Q.  You mentioned the difficulty of standardizing
13 IDs from public -- from private institutions of higher
14 education.  Did you give any consideration to
15 standardizing ID from public institutions of higher
16 education in Texas?
17     A.  Actually, we did, but we get into the same
18 Kinko's problem, is that you could go there this
19 afternoon and make your own ID very, you know, easily at
20 Kinko's.  We realized that the -- in Texas, we came up
21 with a very sophisticated process with the driver's
22 licenses with multiple things that cannot be replicated
23 and will keep people from either changing or duplicating
24 a Texas driver's license on an ID that is issued by the
25 Department of Public Safety.

---

139

1      So, to ensure the integrity the ballot box
2  and make sure that an ID has been not been issued by an
3  unauthorized source, we chose to use the four sources
4  that we -- either the federal government of the
5  passport, federal government military ID, a -- the
6  handgun picture ID or an ID issued by the Texas driver's
7  license, the Department of Public Safety or an ID that
8  had been issued for voting were the acceptable forms.
9      Q.  Senator, at the time you were drafting and
10 considering Senate Bill 14, were you aware of any
11 instances in Texas when a -- where a forged student ID
12 had been used for in-person voter fraud?
13     A.  I'm not sure how to answer that because that
14 was not information we ever asked for.  I am very, very
15 aware of the fact that it's easy to make a fake ID to
16 buy liquor and/or to do other things, so we -- we were
17 aware that it was easy to do a forged ID.  And we --
18 because of information we received from the Department
19 of Public Safety and the fact that we had an ID that was
20 very hard to forge or replicate, we felt like that was
21 the safest way to preserve the integrity the ballot box.
22     Q.  But just to confirm, you had no factual
23 information as to whether a student ID had been used to
24 commit in-person voter fraud in Texas?
25     A.  That testimony, to my knowledge, I don't know

---

140

1  that it was ever asked.
2      Q.  Okay.  Are you aware of any such instances of
3  student ID being used to commit voter fraud anywhere in
4  the country?
5      A.  I don't know that that information has ever
6  been delivered to me.
7      Q.  Okay.  And you did not ask for any such
8  information with respect to Texas or other states,
9  correct?
10     A.  No.  We were moving toward making sure that we
11 do IDs that could not be forged.
12     Q.  Did you conduct any analysis as to whether
13 college students were more or less likely to possess the
14 forms of identification that were listed in Senate Bill
15 14?
16         MS. HALPERN:  Objection, vague.
17     A.  Actually, there was a lot of discussion about
18 who possessed driver's licenses, who had ID, who had
19 passports, who had concealed handgun permits, and yes,
20 it was discussion about the age of the people and who
21 had what, and we determined that actually, the younger
22 people were more likely to have the -- all the forms of
23 ID that could be used.
24     Q.  (By Ms. Faransso) Did that --
25     A.  And a student ID was not needed.

---

SENATOR TROY FRASER                                        7/23/2014
CONFIDENTIAL TRANSCRIPT

36 (Pages 141 to 144)

141

1    (Interruption by teleconference recorded
2  message.)
3      Q.  (By Ms. Faransso) Did that research that
4  pertained to the younger population break down the
5  percentages of the younger population that possessed ID
6  by race?
7      A.  To my knowledge, not -- no.
8      Q.  Did you -- did the Senate Committee receive any
9  testimony that Texas -- Texas driver's licenses or
10 personal identification cards cannot be replicated?
11     A.  The answer would be no on that because I think
12 anything in today's technology can be replicated.  We
13 believe we have one of the most safeguards in our Texas
14 driver's license of virtually any state, but in today's
15 technology, I suspect anything could be replicated.
16     Q.  Did the Committee receive specific testimony
17 regarding the basis for why the Texas IDs were
18 particularly secure?
19     A.  Yes.
20     Q.  And what was that testimony?
21     A.  I just gave you the testimony.  That we -- they
22 showed me at least six different places on the Texas ID
23 that is a specific marking that makes it extremely
24 difficult to replicate not unlike the marking they put
25 on a dollar bill to keep it from being counterfeited.

142

1      Q.  What about the concealed handguns license, did
2  you receive any testimony about the difficulty of
3  replicating that ID?
4      A.  Juan Hinojosa is a Democratic member, that I
5  worked very closely with, presented an amendment.  He is
6  a -- both a carrier of the permit and a -- and he
7  carries a handgun all the time on the Floor.  And he
8  asked that that amendment be put into the bill, and I
9  accepted his amendment.
10     Q.  And was there any testimony about the
11 difficulty of replicating that kind of ID?
12     A.  That permit I believe is issued by the
13 Department of Public Safety, so we believe that same
14 replication -- in Texas, if it's issued by them, we
15 believe that we have that same ability.
16     Q.  If it's issued by the Department of Public
17 Safety?
18     A.  Yeah, I'm assuming it is, and I -- I would not
19 make the representation because I do not know that for
20 sure.
21     Q.  Senator, do you recall that Senate Bill 14
22 includes as of a form of permissible ID, a United States
23 Citizenship Certificate that contains a person's
24 photograph?
25     A.  Okay, I'm sorry, you're going to have to ask

143

1  that again.
2      Q.  Are you aware that Senate Bill 14 includes as a
3  form of permissible ID a citizenship certificate from
4  the United States --
5      A.  Yes.
6      Q.  -- that includes the person's photograph?
7      A.  Yes.
8      Q.  Do those citizenship certificates expire?
9      A.  I'm sorry, I don't know the answer to that.
10     Q.  If you could, take a look at Senate Bill 14, if
11 you have it in front of you.
12     A.  Okay.
13     Q.  And turn to Section 20, which is on Page 13.
14     A.  Got it.
15     Q.  And for the record, we're using the final
16 signed version of Senate Bill 14.
17         Section 20 pertains to the Election
18 Identification Certificate; is that right?
19     A.  Appears to.
20     Q.  I might refer to that as EIC so bear with me.
21         This provision regarding the Election
22 Identification Certificate was added to Senate Bill 14
23 during Conference; is that right?
24     A.  That is -- the best of my recollection, yes.
25     Q.  Okay.  Did anybody ask you to include this

144

1  provision?
2         MS. HALPERN:  Objection, legislative
3  privilege.
4      A.  This actually was in the development of the
5  bill as it has continued to be since it was implemented.
6  We look for ways to ease the implementation to the
7  public.  Two of the things that we were trying to make
8  sure that we were supplying to the public, if they did
9  not have an ID, we wanted to make it easy to get an ID
10 and we wanted to be -- the cost of the ID to be very low
11 or free.  And this was a result of that.
12     Q.  (By Ms. Faransso) Why -- what was the -- why
13 specifically were you looking for ways to ease the
14 implementation of the bill to the public?
15     A.  Because if someone wanted to vote, we wanted to
16 make sure that we made it as easy as possible for them
17 to meet the parameters of the photo ID requirement.
18     Q.  Was it your understanding that to be lawful,
19 Senate Bill 14 needed to offset the burdens on the
20 voters by providing this EIC?
21     A.  I'm sorry, I didn't understand what you said.
22         MS. FARANSSO:  Can you please read back
23 the question.
24         (Requested portion was read back by the
25 reporter.)

SENATOR TROY FRASER                              7/23/2014
CONFIDENTIAL TRANSCRIPT

37 (Pages 145 to 148)

---

**145**

1      A.   No.
2      Q.   (By Ms. Faransso) And why not?
3      A.   We believed that the bill we were passing was
4  both constitutional and would pass the preclearance
5  standards, but in order -- as kind of the Texas way, we
6  wanted to continue doing everything we could to make it
7  as easy as possible, so we added both the identification
8  card availability and the free card -- making it free as
9  part of the bill.
10     Q.   Okay.
11          MS. HALPERN:  Can we get a time check?
12          THE COURT REPORTER:  (Calculating.)  3
13  hours and 10 minutes.
14          (Exhibit 18 marked for identification.)
15     Q.   (By Ms. Faransso) Senator, you have now been
16  handed what has been marked as Exhibit 18.  Does this
17  document look familiar to you?
18     A.   No.
19          MS. FARANSSO:  I'll note for the record
20  that this document is highly confidential.
21     Q.   (By Ms. Faransso) Senator, does this appear to
22  be Talking Points that you used in the consideration of
23  Senate Bill 14?
24     A.   This appears to be Talking Points that I could
25  have used.

---

**146**

1      Q.   Do you believe that Ms. McCoy would have been
2  the most likely person to have drafted these Talking
3  Points for you?
4      A.   Yes.
5      Q.   And would you have reviewed this draft?
6          MS. HALPERN:  Counsel, let me just --
7      A.   The answer is no.
8          MS. HALPERN:  Let me just note for the
9  record that the numbers here are consecutive but I'm not
10  sure this is one document.
11          MS. FARANSSO:  It was how it's produced.
12  So we're just using documents as they were produced so
13  as to cut documents, if that --
14     A.   So if you're going to ask that question that --
15  you appear to have three or four or maybe more documents
16  that are separate and that --
17     Q.   (By Ms. Faransso) I'm only going to ask you a
18  few questions for right now.  If I get to the pages, we
19  can deal with those pages at that moment that I do that.
20          MS. HALPERN:  All right.  With respect to
21  identification, though, I'm going to ask you to have him
22  identify every page.
23          MS. FARANSSO:  That's fine.  That's
24  certainly fine.
25          MR. CLAY:  Have we sealed the entire

---

**147**

1  deposition?
2          MS. HALPERN:  No.
3          MS. WESTFALL:  No, we're going to
4  objection by objection and document by document.
5          MR. CLAY:  Okay.
6          MS. WESTFALL:  But the whole thing will be
7  designated Highly Confidential and we can -- counsel can
8  work out later what's confidential and what's not
9  confidential.
10          MS. HALPERN:  And any time there is a
11  statement on the record related or any question about a
12  highly confidential document, that portion and that
13  discussion is supposed to be sealed.
14          MR. CLAY:  Okay.
15          MS. WESTFALL:  We already went over that.
16          MR. CLAY:  Okay, I just wanted to know.
17     Q.   (By Ms. Faransso) So again, Senator Fraser,
18  just to confirm, this appears to be Talking Points that
19  you could have used in preparing for the debate on
20  Senate Bill 14, correct?
21     A.   (Witness nods head yes.)
22     Q.   Okay.  If you would just turn to Page 2, which
23  is the back of that first page, and in bolded letters
24  there, it says, "Compliance with U.S. Supreme Court."
25  Do you see that?

---

**148**

1      A.   Yes.
2      Q.   And there are two bullets underneath there.
3  I'm looking at the second bullet, which reads, "It
4  complies with the Supreme Court decision because it
5  offsets burdens on voters by...," and then it provides a
6  list.  Do you see that?
7      A.   Can I -- you're going to the second one?
8  You're skipping over the first?
9      Q.   Yes, I'm skipping over the first and going to
10  the second bullet.
11     A.   Okay.  You don't want to talk about the first?
12     Q.   Not right now.
13     A.   Okay.  I like the first better.  Go.
14     Q.   Looking at second bullet, which reads -- again,
15  "It complies with the Supreme Court decision because it
16  offsets burdens by..."  The first sub-bullet says,
17  "Providing access to free photo ID cards."  Do you agree
18  with this statement?
19     A.   No, I don't.  I can't verify that because I
20  don't know that the Supreme Court specifically said that
21  we had to provide free photo ID cards.
22     Q.   Do you know why this would have been included
23  in these Talking Points?
24     A.   Probably should have asked Ms. McCoy that.
25     Q.   Do you recall debates in the Senate pertaining

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

38 (Pages 149 to 152)

149

1  to the idea that the EIC would offset the burdens on
2  voters imposed by Senate Bill 14?
3      A.  Clarify debate.  Are you talking about debate
4  on the Floor?
5      Q.  Yes.
6      A.  I don't remember that, no.
7      Q.  Are you aware of any analysis to determine the
8  burdens of acquiring an EIC while Senate Bill 14 was
9  being considered?
10     A.  A study?
11     Q.  Any analysis:  Study, research, any testimony
12 that was put forward on the Floor.
13     A.  We had testimony by the Department of Public
14 Safety and we also -- not only in the testimony but also
15 after and during the Conference Committee instructing
16 the Department of Public Safety or asking them ways that
17 we could ease the burden on someone in acquiring it.  So
18 the answer would yes.
19     Q.  Okay.  And are you familiar with the underlying
20 documentation that's required to obtain an EIC?
21     A.  I don't know where you're headed so I guess I'd
22 say no.
23     Q.  Are you aware that in order to obtain an EIC,
24 one must prove -- show proof of citizenship and
25 identity?

150

1      A.  I am aware of that, yes.
2      Q.  Are you aware that there are fees associated
3  with obtaining the documentation, the underlying
4  documentation required to obtain an EIC?
5      A.  Yeah, you're going to have that ask that again,
6  I didn't get what you said.
7      Q.  Are you aware that there are fees associated
8  with obtaining the underlying documentation required to
9  obtain an EIC?
10         MS. HALPERN:  Objection, assumes facts not
11 in evidence.
12     A.  Why don't you explain what you're asking and
13 I'll tell you whether I know it or not.
14     Q.  (By Ms. Faransso) Are you aware, for example,
15 that an individual seeking to obtain an EIC must provide
16 proof of citizenship?
17     A.  Yes.
18     Q.  And are you aware that one way to prove
19 citizenship is by showing one's birth certificate?
20     A.  Yes.
21     Q.  And are you aware that at the time that Senate
22 Bill 14 was passed, a birth certificate cost $22 in the
23 state of Texas?
24     A.  And are you also aware that the -- that
25 provision had been removed and now it's either free --

151

1  the most a birth certificate can cost is $3 now, but not
2  always.  In a lot of cases, it is free.  One of the
3  provisions we changed.
4      Q.  But that was not the case when Senate Bill 14
5  passed, correct?
6      A.  There was instruction that had been given that
7  -- to move toward making sure that was done.  So by the
8  implementation of the law, by the time the first
9  election was held, that was in place.
10     Q.  Who was that instruction given to?
11     A.  To -- I believe it's the health service, I
12 believe, is the one that does birth certificates.
13     Q.  So the --
14     A.  But it's both the Department of Public Safety
15 for a driver's license and the ID cards and then the
16 birth certificates went through the Texas Health
17 Services, I believe, is the name of the agency.
18     Q.  So Texas Health Service -- Health Services, as
19 an agency, was entrusted with ensuring that a birth
20 certificate did not cost $22 by the time the first
21 elections rolled around?
22     A.  That is correct.
23     Q.  Are you aware that approximately 80 counties in
24 Texas lack DPS offices?
25     A.  I'm not -- no, I'm not aware.

152

1      Q.  Were you aware of that at the time that Senate
2  Bill 14 was being debated?
3      A.  There was discussion on the Floor of -- by DPS
4  and the question asked about the availability of
5  offices, and so that -- I did listen to that discussion,
6  yes.
7      Q.  During consideration of Senate Bill 14, did you
8  conduct or review any analysis of the distances that
9  voters living in counties without a DPS office would
10 have to travel to get to the nearest DPS location?
11     A.  Yes.
12     Q.  And what were your findings?
13     A.  That Texas is a very large state with a very
14 sparse population and -- in a lot of the state, and that
15 we have done the best job within -- that's possible in
16 order to make be sure the DPS offices available -- I
17 know there's a lot of people interested in getting a
18 driver license -- and that because of the shear size of
19 the state, it was impossible to have a DPS office
20 everywhere.
21         MS. FARANSSO:  If you don't mind, if we
22 could go off the record for a moment to reopen the line.
23         MS. HALPERN:  Actually, before we go off
24 the record, I want to make a statement for the record,
25 which is this:  This Exhibit 18, I stated earlier that I

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

39 (Pages 153 to 156)

153

1  was concerned that it was multiple documents stuck
2  together and I'm not questioning how you received it,
3  but we have another exhibit, Exhibit 9, which is a
4  transmittal e-mail from Bryan Hebert, and to that are
5  attached three documents, one of which is identical to
6  TX 00009466.
7          MS. FARANSSO:  Counsel, if I may, it's not
8  impossible that certain documents, Talking Points for
9  example, would be attached to multiple documents.  So
10 that may explain why an identical document is attached
11 to two documents --
12         MS. HALPERN:  Well --
13         MS. FARANSSO:  -- that have been used as
14 any exhibits in this deposition.
15         MS. HALPERN:  Well, but the point is, it
16 doesn't mean that it's one single document.  I also know
17 something about how the documents were produced in this
18 case.  We had testimony from Ms. McCoy that everything
19 went in a box.  And I think in order to produce these
20 documents to you, everything was taken out of the box.
21 How it was arranged in the box is not clear to me, and I
22 just -- I'm not convinced that Exhibit 18 is in fact a
23 single document.  I very strongly believe it is not a
24 single document, and I just wanted to say that for the
25 record.

154

1          MS. FARANSSO:  Thank you.  And for the
2  moment, I don't intend to ask questions about the pages
3  you are referring to, so hopefully it will be a
4  non-issue for this deposition.
5          MS. HALPERN:  Well, and I want to make it
6  clear that his identification is just with respect to
7  the pages that you specifically questioned him about.
8          MS. FARANSSO:  That's fine.
9          MS. HALPERN:  All right.
10         (Pause to re-establish teleconference
11 connection with Mr. Derfner.)
12 Q.  (By Ms. Faransso) Senator, before we went off
13 the record, you had referenced the sheer size of the
14 state, which I am well aware of.  Is it fair to say
15 based on the sheer size of the state and the fact that
16 we could not -- Texas could not locate a DPS office in
17 every county, that some voters living in more remote
18 areas would need to travel farther distances than others
19 to obtain an EIC from the nearest DPS location?
20 A.  I'm going ask you to ask that again --
21         MS. FARANSSO:  Can you please read it
22 back.
23 A.  -- you -- very long, multiple question.
24         MS. FARANSSO:  Can you please read it
25 back.

155

1          (Requested portion was read back by the
2  court reporter.)
3  A.  You're making an assumption that the people in
4  that area don't already have a driver's license and have
5  identification.  That our testimony showed that the
6  numbers are in the high 90s percent of people, eligible
7  voters, that have a driver's license.  That testimony
8  was received during the bill.  But if someone did not
9  have that, they could also have the other choice of
10 either voting by mail or, obviously, if they had to
11 travel to it, they would be traveling to the same place
12 the driver's licenses are issued.
13 Q.  (By Ms. Faransso) Are you aware that some
14 voters prefer to vote in person rather than by mail?
15 A.  Yes.
16 Q.  During consideration of Senate Bill 14, did you
17 conduct or review any analysis regarding the
18 availability of public transit to DPS offices throughout
19 the state?
20 A.  There was much discussion in the laying out of
21 the bill about public transportation, who would have --
22 what percentage of the population would be able to
23 access it.  And I think the testimony we heard is that
24 the majority, the overwhelming majority of the state was
25 served by public transportation that was available to

156

1  get to DPS offices.
2  Q.  And in what form was that public transportation
3  that you were looking at?
4  A.  Public transportation.
5  Q.  What kind of public transportation?
6  A.  The testimony was about public transportation.
7  I don't know it was broken out per.
8  Q.  Did you conduct any analysis regarding the
9  hours and days during which DPS offices are open?
10 A.  Much discussion during the bill about asking
11 questions about times that they're open.  We were very
12 pleased to find out that in most cases across the state,
13 DPS offices were open up to 7 o'clock.  So someone
14 getting off work at 5 could go to the DPS office up
15 until 7.
16 Q.  What about weekend hours?
17 A.  There were some available on weekends, not as
18 much as late hours during the week.
19 Q.  When you say most DPS offices were open to
20 7 p.m., do you know exactly what percentage of DPS
21 offices were open until 7 p.m.?
22 A.  If I said most, I would like to retract that.
23 There were -- many offices were open.  I don't know the
24 percentage.
25 Q.  Do you know the location, generally speaking,

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

40 (Pages 157 to 160)

157

1  across the state of which DPS offices were open past --
2  or open until 7?
3      A.  I think my statement said that in areas of high
4  population.  So the bulk of the population of the state
5  would have access to a DPS office that was open up until
6  7 o'clock.
7      Q.  In areas of high population, okay.
8          Senator, would you agree that for some
9  voters, the farther they have to travel to obtain an
10  EIC, the less likely they are to obtain one?
11          MS. HALPERN:  Objection, calls for
12  speculation.
13      A.  Yeah, and I think you're speculating whether --
14  that same thought would be of whether they would get a
15  driver's license.  If someone -- if they're in a remote
16  area, they chose to live in that remote area for a
17  reason and they understand that by living in a remote
18  area, there's challenges in getting groceries, getting a
19  driver's license, and it would be the same distance to
20  get a card.  If they chose not to get an identification
21  card, they still have the right to vote by mail, which a
22  lot of people do exercise.
23      Q.  (By Ms. Faransso) Would you agree that
24  obtaining a driver's license gives you additional
25  benefits beyond voting?

158

1      A.  Ask that again.
2      Q.  Would you agree that obtaining a driver's
3  license gives you additional benefits beyond voting?
4      A.  Yes.  You get to drive a car.
5      Q.  That's right.  And would you agree that
6  obtaining an EIC is for the sole purpose of voting?
7      A.  No, I think I disagree with that because I
8  believe the voter identification cards can be served as
9  identification for buying cigarettes, I'm assuming
10  riding an airplane.  I think it is a state issued
11  identification.  That is my understanding.
12      Q.  That's your understanding.  But the purpose of
13  an EIC is to permit an individual to vote, correct?
14      A.  But that wasn't the question that you asked.
15  We're not talking about the purpose.  You're saying
16  could it be used for something else, and it could be
17  used for other things.  That's the same question you asked
18  about the driver's license, yes, it could be used for
19  other things.
20      Q.  And for what things can an EIC be used for in
21  the state of Texas?
22      A.  I believe -- for any type of identification
23  where a state ID should be issued, I believe it should
24  be able to be used.
25      Q.  Do you believe that if a voter had to travel a

159

1  hundred miles round trip to obtain an EIC, that that
2  would impact their decision as to whether to obtain an
3  EIC?
4      A.  Once again, people in Texas that have chosen to
5  live in remote areas, by choosing to live there, they
6  understand that they would have to travel to receive
7  groceries, food, water, driver's license, and the
8  election identification.
9      Q.  Do you believe that all people who live in
10  remote areas have decided to live in those remote areas
11  by choice?
12      A.  I think -- I don't think you could say all on
13  anything because there's probably exceptions to every
14  rule.
15      Q.  And do you believe that the choice of living in
16  a remote area should impact one's right to vote?
17      A.  Everyone in remote areas have the right and
18  opportunities to vote if they either choose to get an
19  identification card.  If they choose not to get one,
20  they can vote my mail.
21      Q.  And I believe you -- I believe I asked you
22  before, but just to confirm for the record, there are
23  some groups of people who prefer to vote by -- in person
24  rather than by mail, correct?
25          MS. HALPERN:  Objection, vague.

160

1      A.  I'm -- it's vague and I can't -- it's
2  subjective because I can't read the minds of people
3  living in remote areas.
4      Q.  (By Ms. Faransso) Would you agree that a form
5  of identification is not free if it cost money to obtain
6  these underlying documents required to obtain that form
7  of identification?
8      A.  It's very clearly not free if it cost money,
9  but the state of Texas has done everything they can to
10  make it either free or as least expensive as possible.
11      Q.  Would you agree that a form of identification
12  is not free if it cost money to travel to obtain that
13  form of identification for the sole purpose of voting?
14      A.  Obviously, if you travel there, there is a cost
15  to travel.
16      Q.  Did you conduct any analysis of the burdens of
17  obtaining an EIC that would fall on low income voters?
18      A.  Once again, we're back to the study issue of
19  what you consider study, and lot of that came from
20  testimony.  The district that I represent is I believe
21  still the third poorest in the state.  I traveled
22  exclusively -- extensively across my district and asking
23  questions, and the feedback I had from my district and
24  the feedback we had from testimony is that the, you
25  know, people would be able to get identification.

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

---

**161**

1    Q. Did -- when you were discussing with your
2 constituents this issue, did you discuss the cost
3 involved in obtaining the underlying documentation to
4 obtain an EIC?
5      MS. HALPERN: Objection, legislative
6 privilege.
7    **A. The answer is yes. A lot of that would be me**
8 **asking questions and me also responding, making sure**
9 **that we were doing everything we could to either make**
10 **the card free and/or driver's license free or very**
11 **inexpensive or birth certificates free or very**
12 **inexpensive.**
13    Q. (By Ms. Faransso) Did you conduct any analysis
14 of the burdens of obtaining an EIC that a low income
15 voter would experience in taking off work to obtain an
16 EIC?
17    **A. Once again, the question that was asked was,**
18 **how often -- or what areas and what -- how much we**
19 **served in the areas where they would have offices open**
20 **until 7, and I was pleasantly surprised at the number**
21 **and availability of people that would be able to access**
22 **offices that were open until 7.**
23    Q. But not all offices were open until 7, correct?
24    **A. The majority of Texas in high population areas,**
25 **there is access up to 7.**

---

**162**

1    Q. In high population areas, okay.
2      Senator, are you aware of the racial
3 makeup of the low income population in Texas?
4    **A. No.**
5    Q. When the EIC provision was proposed and being
6 considered, some Senators raised concerns about the
7 burdens associated with obtaining an EIC. Do you recall
8 that testimony?
9    **A. No.**
10    Q. Do you recall that some Senators raised
11 concerns that such burdens would prevent voters from
12 exercising their right to vote?
13    **A. No. Because I believe everyone in Texas has**
14 **the ability and the right to vote because of mail-in**
15 **ballots.**
16    Q. Do you -- do you believe that for a person who
17 would prefer to vote in person -- in-person and who does
18 not possess one of the forms of ID required by Senate
19 Bill 14, that that person might experience burdens in
20 obtaining an EIC to vote?
21      MS. HALPERN: Objection, calls for
22 speculation.
23    **A. It would be impossible for me to project each**
24 **person. But again, it -- our research showed by the**
25 **testimony that an extremely high population of Texas has**

---

**163**

1 **-- already has identification, and interestingly since**
2 **then, the data we looked at and the number of people**
3 **that have gotten the free card, the percentage is**
4 **extremely low because people already had these others**
5 **forms of identification.**
6    Q. (By Ms. Faransso) Could there be other reasons
7 to explain the low percentage of people who have sought
8 to obtain an EIC?
9    **A. Would you like to suggest what those could be?**
10    Q. Could it be a low percentage of people who have
11 sought to obtain an EIC be explained by the difficulty
12 involved in obtaining such an identification?
13    **A. Or it could be that they chose to vote my mail.**
14    Q. Implementation of the EIC program was left to
15 the Department of Public Safety; is that correct?
16    **A. Repeat the question, please.**
17    Q. Implementation of the EIC program was left to
18 the Department of Public Safety?
19    **A. Yes.**
20    Q. And after SB 14 was enacted, did your office
21 have any communications with DPS about the rollout of
22 the EIC program?
23    A. Yes.
24    Q. Do you know the number of people who have
25 obtained an EIC in the state?

---

**164**

1    **A. I could not give you the accurate number, no.**
2    Q. Senator, do you recall during the debate in the
3 Committee of the Whole on SB 14, responding, "I am not
4 advised to numerous questions"?
5    **A. Would you ask your question again?**
6      MS. FARANSSO: Can you please read it
7 back?
8      (Requested portion was read back by the
9 court reporter.
10    A. Yes.
11    Q. (By Ms. Faransso) What does the answer "I am
12 not advised" mean?
13    **A. It means that I don't have -- I do not have**
14 **sufficient information to answer your question.**
15    Q. Do you recall being asked questions about the
16 potential impact of Senate Bill 14 on minority voters?
17    **A. No, I do not remember the specific question.**
18    Q. What was your response -- actually, can you
19 hand me Tab 20, please?
20      (Exhibit 19 marked for identification.)
21    Q. (By Ms. Faransso) Senator, you've been handed
22 what has been marked Exhibit 19. Does this document
23 look familiar to you?
24    **A. No.**
25    Q. Does this appear to be the transcript of the

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

42 (Pages 165 to 168)

---

165

1  debate during the Committee of the Whole on Thursday
2  January 25, 2011?
3          MS. HALPERN:  Counsel, can we clarify that
4  its an excerpt only and that the pages jump around
5  and are not --
6          MS. FARANSSO:  I was just about to do
7  that.
8          MS. HALPERN:  Like the pages from --
9          MS. FARANSSO:  Yes, as with the other
10 transcripts, I was about to say this is an excerpt.
11     A.  Okay.
12     Q.  (By Ms. Faransso) Okay.  If you could turn to
13 Page 170, labeled in the right-hand corner.  If you'd
14 like to take a moment to review that page.
15     A.  Okay.
16     Q.  Okay.  Having looked at this page, does this
17 refresh your recollection of being asked questions about
18 the potential impact of Senate Bill 14 on minority
19 voters during the debate in the Committee of the Whole?
20         MS. HALPERN:  I'm sorry, can I have that
21 read back?
22         MS. FARANSSO:  Sure.
23         (Requested portion was read back by the
24 court reporter.)
25     A.  Are you waiting for an answer?

---

166

1     Q.  (By Ms. Faransso) I am.
2     A.  No.
3     Q.  You do not recall?
4     A.  Did you ask if I recalled or?
5     Q.  Does it refresh your recollection looking at
6  this page --
7     A.  No.
8     Q.  -- that you were asked questions about the
9  impact on minority voters of Senate Bill 14?
10    A.  No.
11    Q.  Do you recall that Senator West asked you
12 specifically, "Will the elimination of the government
13 documents as a form of ID disproportionately affect
14 African-Americans and Hispanics"?
15    A.  If this is an accurate indication of what was
16 said, the paper says yes, that --
17    Q.  Do you have any reason to doubt the accuracy of
18 this transcription of the record?
19    A.  No.
20    Q.  Do you see that you responded, "I am not
21 advised to Senator West's question"?
22    A.  Yes.
23    Q.  Why did you respond, "I am not advised"?
24    A.  He asked me if the -- if the elimination of
25 government documents would disproportionately affect

---

167

1  African-American and Hispanic.  There had been a poll
2  taken less than a week before that asking Hispanics and
3  African-Americans if they were in favor of the passage
4  of a strict photo ID bill, and the percentages were in
5  the upper 80s that they responded that they were in
6  favor of the passage of a strict photo ID bill.  So, the
7  answer is no.
8     Q.  Were those responders asked whether they would
9  be in favor of a strict photo ID bill if it had the
10 effect of disproportionately impacting a percentage of
11 the minority population in Texas?
12    A.  I think if you're asking a Hispanic or an
13 African-American and you know their ethnicity and you
14 asked them, "Are you in favor of an implementation of a
15 strict photo ID bill," and they say yes, you have to
16 assume they understand the -- that if they're being
17 asked, they understand the implication.
18    Q.  Just to be clear, aside from the polls that
19 you've referenced, you didn't conduct any other studies
20 or review any other studies about what the impact of
21 Senate Bill 14 would be on minority voters in Texas,
22 correct?
23         MS. HALPERN:  Objection, assumes facts not
24 in evidence.
25    A.  You know, we've discussed this multiple times

---

168

1  in questions asked today.  You're using the word study
2  in a very broad sense.  There was extensive testimony
3  for three different sessions, there were -- the time I
4  spent out in the field and across the state, there was a
5  -- studies that I pulled from the impact of elections in
6  others states and there were polls that were taken in
7  Texas asking people about the implementation of a strict
8  photo ID bill, and it was broke down by ethnicity.  And
9  so the answer is yes, we did a lot of studying.
10    Q.  (By Ms. Faransso) Do you think it would be
11 problematic if a Voter ID bill made it more difficult
12 for minority voters to participate in elections?
13    A.  You're being subjective with the what-if
14 because the bill we were passing, we believed was not
15 disproportionately in effect, that they -- it was clear
16 that they were in favor of the passage and that the
17 implementation was -- would not -- as the Carter-Baker
18 study showed, not give any due burden on people for --
19 to meet the terms of.
20    Q.  I'd like to move on to the debate on the
21 various amendments to Senate Bill 14.
22         MS. HALPERN:  You want to take a break?
23    A.  Sure.
24         MS. FARANSSO:  Take a break.
25         (Recess from 2:07 p.m. to 2:20 p.m.)

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

43 (Pages 169 to 172)

---

169

1           (Exhibit 20 marked for identification.)
2      Q.  (By Ms. Faransso) Senator, you've been handed
3   what has been marked as Exhibit 20.  Do you recognize
4   this document?
5      A.  No.
6      Q.  Does this appear to be the Senate Journal from
7   January 26, 2011?
8      A.  I do have a question on this, this has got two
9   exhibit numbers, 174 and then --
10          MS. HALPERN:  It was used in somebody
11  else's deposition, but 20 is the one you want to focus
12  on.
13          THE WITNESS:  Okay.
14          MS. HALPERN:  It was used with Bryan
15  Hebert.
16          THE WITNESS:  Okay.
17      Q.  (By Ms. Faransso) And so does this appear to be
18  the Senate Journal from January 26, 2011?
19      A.  It does.
20      Q.  And is the Senate Journal essentially a record
21  of events that occur on the Senate Floor?
22      A.  Yes.
23      Q.  If you could please turn to Page 118.  Do you
24  recall that a number of amendments were offered to
25  Senate Bill 14, some of which were adopted; some of

---

170

1   which were not?
2      A.  Yes.
3      Q.  Looking at Page 118, do you see Amendment 12
4   offered by Senator Davis?
5      A.  Yes.
6      Q.  This amendment would have prohibited the State
7   from charging fees for documents used as proof of
8   identification under Senate Bill 14, correct?
9      A.  Do you have a copy of the actual amendment
10  itself?
11      A.  I am looking at the underlying text.
12      A.  That is a short version of it.  That's not the
13  amendment itself.  If you're going to ask me about the
14  amendment, you're going to have to show me the amendment
15  in full.
16      Q.  Do you recall generally that this amendment
17  would have prohibited the State from charging fees for
18  documents to use as proof of identification under Senate
19  Bill 14?
20      A.  If you could show me the exact amendment that
21  was filed, I might -- you might can refresh my memory.
22      Q.  Does the Senate Journal not accurately reflect
23  the substance of the amendment?
24      A.  The substance of the amendment, the caption of
25  the amendment does not capture the body of the

---

171

1   amendment, and 75 percent of the amendment could have
2   been fine, but the other 25 percent might not have been.
3   So you have to look at the amendment in its entirety to
4   see what the amendment did.
5      Q.  Does the Senate Journal not reflect the words
6   that would have been added to Senate Bill 14 via this
7   amendment?
8      A.  The Senate Journal does the CliffsNotes of the
9   amendment.
10      Q.  Is it fair to say that Senator Davis offered an
11  amendment that would have prohibited fees charged by the
12  State for documents used as proof of identification
13  under Senate Bill 14?
14      A.  And I can't verify that unless you can produce
15  the actual amendment so I can look at it?
16      Q.  This is public record, correct, the Senate
17  Journal?
18      A.  Yes.
19      Q.  Does this not reflect the events that happened
20  on the Senate Floor?
21      A.  The events, the Cliffs Notes of the content,
22  but it does not have the full everything.
23      Q.  What do you think is missing from Amendment 12
24  here?
25      A.  You would have to tell me that, but if you can

---

172

1   produce the amendment.
2      Q.  Is this language -- do you believe that
3   language is missing, language that would have been added
4   via Amendment 12?
5      A.  It would be subjective for me to try to project
6   that.
7      Q.  I'm just trying to understand what you mean by
8   a Cliffs Note version.  What I see here is underlying
9   language that would have been added to Senate Bill 14
10  via this amendment.
11          Do you believe that there is language
12  beyond this language that would have been added via this
13  amendment?
14      A.  Yes.
15      Q.  Would you bear with me and be willing to talk
16  about the language we see here in the Senate Journal,
17  which as you noted, is public record?
18      A.  Sure.
19      Q.  Okay.  So based on the Senate Journal that is
20  public record, does it appear that this amendment
21  offered by Senator Davis would have prohibited the State
22  from charging fees for documents used as proof of ID
23  under Senate Bill 14?
24      A.  I can't tell, because we don't have the
25  amendment.

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

---

173

1    Q.  You moved to table this amendment, correct?
2    A.  On a motion by Senator Fraser, the motion was
3  tabled.
4    Q.  And would adopting an amendment that would have
5  prohibited the State from charging fees for documents
6  used as proof of ID under Senate Bill 14 have interfered
7  with the purposes of Senate Bill 14?
8    A.  Once again, unless you have the amendment to
9  look at it, it is likely that there was a cost to doing
10  this, which if you're going to use a driver's license
11  for identification, and if there's a charge for a
12  driver's license in the State of Texas, and if you're
13  going to say you're going to use that for
14  identification, that would mean you would have to give
15  everyone a free driver's license.
16    Q.  Let's look at Paragraph 2 in this particular
17  amendment.  Is it fair to say that this amendment, as
18  written here in the Senate Journal, would also have
19  prohibited the State from charging fees to obtain
20  underlying documentation required to obtain an EIC?
21    A.  Once again, furnish the amendment to me and I
22  can answer that question.
23    Q.  Separate and apart from this document, would an
24  amendment prohibiting the State for charging fees to
25  obtain the underlying documentation required to obtain

---

174

1  an EIC have interfered with the purposes of Senate Bill
2  14?
3    A.  You're being subjective in assuming a what-if.
4  If you're going to have an exact example of something
5  that happened, I'll be glad to comment on it.
6    MR. WEST:  Objection, nonresponsive.
7    Q.  (By Ms. Faransso) I am asking you if an
8  amendment had been adopted, which, Senator, if you bear
9  with me, I believe it's a fair question, if an amendment
10  had been adopted that prohibited the State from charging
11  fees to obtain underlying documentation to obtain an
12  EIC, if that amendment would have interfered with the
13  purposes of Senate Bill 14?
14    A.  Again, you're going to have to look at the
15  amendment, because if the amendment had required that a
16  driver's license be given free of charge, that would
17  have created an undue burden on the State, because
18  currently we have a revenue stream from driver's
19  license.
20    Q.  The purpose of Senate Bill 14 was to deter
21  in-person voter fraud, correct?
22    A.  Yes.
23    Q.  I appreciate that an amendment might have a
24  fiscal impact on the budget.  I am simply asking whether
25  this particular amendment that we've been looking at

---

175

1  would have interfered with the purpose of Senate Bill 14
2  to deter in-person voter fraud?
3    MS. HALPERN:  But you don't want him to
4  focus on the fiscal impact of any other particular
5  aspect?
6    MS. FARANSSO:  I'm simply asking about --
7    MS. WESTFALL:  Objection to the sidebar.
8    MS. HALPERN:  Objection, relevance.
9    A.  The net result of the bill was that in the
10  final version, we did offer a free ID and virtually free
11  birth certificate.
12    Q.  (By Ms. Faransso) Senate Bill 14 provided for a
13  free birth certificate?
14    A.  No.  I said by the time of implementation, by
15  the time of the first election, that was the results.
16  And by the instruction to DPS and the Department of
17  Health Services to move in that direction, that we were
18  able to do that.
19    MS. WESTFALL:  Objection, relevance.
20    Q.  (By Ms. Faransso) Senate Bill 14 did not
21  include a provision requiring a free birth certificate,
22  did it?
23    A.  No.
24    Q.  Okay.  If you could move on to Page 121.  Do
25  you see Amendment 16 offered by Senator Vanderpute?

---

176

1    MS. HALPERN:  Vanderpute.
2    MS. FARANSSO:  Vanderpute, thank you.
3    A.  Okay.
4    Q.  (By Ms. Faransso) Take a moment to review that,
5  please.
6    This amendment would have expanded the
7  list of acceptable forms of identification in Senate
8  Bill 14, correct?
9    A.  Yes.
10    Q.  And you moved to table this amendment, correct?
11    A.  Yes.
12    Q.  Would allowing the forms of ID listed here in
13  Senator Vanderpute's amendment have interfered with the
14  effectiveness of Senate Bill 14?
15    MS. HALPERN:  Objection, asked and
16  answered.
17    MS. FARANSSO:  I'm asking this question
18  with respect to a new amendment.
19    MS. HALPERN:  But you spent all morning
20  testifying about why those things weren't in his bill.
21    MS. FARANSSO:  We did not discuss this
22  amendment.
23    MS. HALPERN:  Not this amendment, no.
24    A.  This amendment is exactly what we discussed all
25  morning.  This is putting back -- I'm sorry, I would

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

---

177

1  have to have both the Election Code Book to accurately
2  answer you, and also look at 362.  But I believe this
3  amendment puts back in all the forms of the
4  identification that was in 218 and 362.  I believe that
5  is the case.
6      Q.  (By Ms. Faransso) HB 218, SB 362 and SB 14 all
7  served the same purpose, correct?
8      A.  The purpose was to protect the integrity of the
9  voting box.
10     Q.  And these were forms of ID that were included
11  in the previous versions of the Voter ID legislation,
12  correct?
13     A.  They were unacceptable to me?
14     Q.  At the time were they acceptable?
15     A.  Yes.
16     Q.  And you sponsored a bill that you found
17  unacceptable?
18     A.  I said that they were a starting point, a good
19  starting point, and that in the process that I wanted to
20  correct that.  My goal was to change the forms of
21  identification, yes.
22     Q.  Do you typically sponsor bills that you find to
23  be unacceptable?
24     A.  Yes.
25     Q.  Do you typically carry bills from the House

---

178

1  that you find to be unacceptable?
2      A.  I would carry a bill, and during the process
3  try to improve the bill.
4      Q.  If you could turn to Page 123, please.  And do
5  you see Amendment Number 18 offered by Senator Hinojosa?
6      A.  Okay.
7      Q.  This amendment concerned concealed handgun
8  licenses, correct?
9      A.  Yes.
10     Q.  And this amendment was ultimately adopted,
11  correct?
12     A.  Yes.
13     Q.  Do you know why this amendment was adopted?
14     A.  I think I've already answered that question.
15     Q.  Can you indulge me and let me know again why
16  this particular amendment was adopted?
17         MS. HALPERN:  Objection, legislative
18  privilege.
19     A.  Senator Hinojosa is a respected Hispanic
20  member, a friend of mine, and he laid out the basis that
21  he would like to have this included.  One of the reasons
22  that this is an acceptable form of identification is
23  because it is issued by the Texas Department of
24  Transportation, DPS.  The indications on the bill, and I
25  actually need to go back to the far earlier testimony I

---

179

1  gave where I didn't clarify, but that identification is
2  almost identical to the Texas driver's license.  It's
3  issued by the same agency, so the same controls for
4  duplication are in it.  And I've also in the break have
5  realized that Texas is recognized as one of the safest
6  or the toughest to change or replication.  So the ID
7  from the Department of Public Safety on concealed
8  handguns seemed like a logical place, and I accepted the
9  amendment in the mode of compromise to a Hispanic member
10  of the Texas Senate, Democrat Hispanic.
11     Q.  Do you believe that this amendment was
12  duplicative insofar as many applicants who apply for a
13  concealed handgun's license use a Texas driver's license
14  to obtain that form of identification?
15         MS. HALPERN:  Objection, assumes facts not
16  in evidence.
17     A.  Not in evidence, and I have no way of knowing
18  that.
19     Q.  (By Ms. Faransso) On the same page --
20         MS. WESTFALL:  Objection to your
21  argumentative objection and the tone, Ms. Halpern.
22         MS. HALPERN:  Counsel, I know what's
23  required to get a concealed handgun license, and you
24  don't show a driver's license to get one.  I'm sorry.
25  It assumes facts not in evidence.  You get fingerprinted

---

180

1  in Texas.
2          MS. WESTFALL:  I've looked at the
3  requirements myself, too.  I'm not sure that's accurate,
4  but...
5          MS. HALPERN:  I have one.  I know it's
6  accurate.
7          MS. WESTFALL:  Well, let's continue.
8          MS. HALPERN:  You get fingerprinted.
9      Q.  (By Ms. Faransso) If we could continue to look
10  at the same page, Amendment 19, offered by Senator
11  Ellis, do you see that amendment?
12     A.  Amendment 19?
13     Q.  Yes.  Right below 18.
14     A.  I don't see Ellis's name.
15     Q.  It's right above Floor Amendment Number 19,
16  Senator Ellis offered the following amendment.
17     A.  Got it.  Got it.  Okay, yes.  Okay.
18     Q.  Okay?  And this amendment would have allowed as
19  an acceptable form of identification a student ID card
20  from a public university in Texas that contained the
21  person's photograph and has not expired, correct?
22     A.  Yes.
23     Q.  Just to be clear, this amendment would not have
24  permitted student IDs from other states, would it?
25     A.  No.

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

46 (Pages 181 to 184)

---

181

1    Q.   And this amendment would not have permitted
2    students IDs from private institutions of public -- of
3    higher education in Texas, would it?
4    A.   No.
5    Q.   So this amendment would have allowed a limited
6    set of student ID cards from public universities in
7    Texas, correct?
8    A.   Yes.
9    Q.   And you moved to table this amendment; is that
10   right?
11   A.   Yes.
12   Q.   Did you personally oppose this amendment?
13   A.   Yes.
14   Q.   Why is that?
15   A.   Are you aware of the number of public
16   universities in Texas and the difficulty for a poll
17   worker to identify which is a real public university and
18   which is not?  Austin College sounds like a public
19   university, but it is, in fact, not.  And the difficulty
20   of a poll worker having the burden of deciding that, of
21   them not knowing, we made the determination that that
22   was much too difficult of a burden to put on a poll
23   worker and we chose not to use that.
24   Q.   And would allowing the use of student
25   identification from a public university in Texas have

---

182

1    interfered with the effectiveness of Senate Bill 14?
2    A.   Yes, because it puts the difficulty of a burden
3    on a poll worker of interpreting, is that a fair -- a
4    real type of identification, or is it one that had been
5    duplicated at Kinko's?
6    Q.   If you turn to Page 137, do you see Amendment
7    40 offered by Senator Duncan?
8    A.   Okay.
9    Q.   Do you want to take a moment to review that
10   amendment?
11   A.   Sure.
12   Q.   Ready?
13   A.   Uh-huh.
14   Q.   So Amendment 40, in part, would have required
15   the counting of provisional ballots, voters who attest
16   that they're indigent and do not have ID; is that
17   correct?
18   A.   That is correct.
19   Q.   Did you see that this amendment was adopted by
20   the Senate?
21   A.   Yes.
22   Q.   But it was not ultimately included in the final
23   version of Senate Bill 14, correct?
24   A.   Yes.
25   Q.   Yes, it was not included?

---

183

1    A.   It was not included.
2    Q.   Do you know why it wasn't included?
3    A.   It was an amendment that on its face appeared
4    to be acceptable.  We accepted the amendment, and I
5    think it was accepted by voice vote, unanimous voice
6    vote.  But once the bill matured as it went through the
7    House and into Conference Committee, that the bill we
8    found was not -- was not practical to implement.
9    Q.   And why was it not practical?
10   A.   Because there's too many opportunities for
11   abuse.
12   Q.   Too many opportunities for abuse.  In what ways
13   would there be abuse of this particular provision?
14   A.   Because you're enabling a broad group of people
15   to vote without identification, and I think it was
16   determined that this opened up an area that we were
17   not -- you know, would not be secure for the voter box,
18   the integrity of the voting box.
19   Q.   When you say it's opening up an area for a
20   broad group of people to vote, are you referring to --
21   the broad group, does that refer to indigent voters in
22   Texas?
23   A.   A group of people that would not be showing
24   proof of identification of who they are -- who they -- a
25   photo ID.

---

184

1    Q.   And that group of people would have proven that
2    they were indigent under this particular provision,
3    correct?
4    A.   And I think that was part of the difficulty of
5    clarifying that someone was indigent.
6    Q.   Do you know if there are other items of
7    legislation in Texas that require proof of indigency?
8    A.   I don't know.
9    Q.   Had this amendment been adopted in the final
10   version of Senate Bill 14 that was signed into law,
11   would it have reduced the burden on poor voters in
12   Texas?
13   A.   I don't know.
14   Q.   Can you imagine that it would have allowed a
15   segment of the population who could otherwise not afford
16   to obtain ID to vote in Texas under Senate Bill 14?
17   A.   That would be subjective.
18   Q.   You can put that away.  Just a few more
19   questions.
20        Senator, are you familiar with the
21   decision of the DC District Court in Texas v. Holder
22   denying judicial preclearance under Senate Bill 14 -- of
23   Senate Bill 14?
24   A.   No.
25   Q.   You don't recall that decision or the basis for

---

SENATOR TROY FRASER                                7/23/2014
CONFIDENTIAL TRANSCRIPT

47 (Pages 185 to 188)

---

185

1  that decision?
2      **A.  If you'd like to give me a document showing me**
3  **that, it will probably refresh my memory.**
4      Q.  You have enough documents, so I will spare you
5  that.
6          Are you familiar with the Supreme Court's
7  decision in Shelby County, which had the effect of
8  terminating the enforcement of Section 5 of the Voting
9  Rights Act?
10     **A.  Yes.**
11     Q.  Do you recall when that decision came out?
12     **A.  No.**
13     Q.  I'll represent to you that it was June 2013.
14 Are you aware that immediately after that decision was
15 handed down, the Texas Attorney General announced that
16 he would immediately begin enforcing Senate Bill 14?
17     **A.  Yes.**
18         MR. SCOTT:  Objection, misrepresentation.
19     Q.  (By Ms. Faransso) Was your testimony yes?  You
20 can answer the question.
21     **A.  I'm aware that we moved forward to implement**
22 **the Voter ID bill.**
23     Q.  Did you or anyone in your office speak with the
24 Office of the Attorney General about the decision to
25 enforce Senate Bill 14?

---

186

1          MS. HALPERN:  Yes or no answer.
2      **A.  I'm not -- I don't know.**
3          MS. FARANSSO:  I'll pass the witness.
4          MS. WESTFALL:  Would you like to take a
5  break --
6          MS. HALPERN:  Yes.
7          MS. WESTFALL:  -- before we switch seats.
8          (Recess from 2:41 p.m. to 2:49 p.m.)
9          MS. WESTFALL:  Let's go back on the
10 record.  We're back on the record.
11             EXAMINATION
12 BY MS. WESTFALL:
13     Q.  Senator Fraser, my name is Elizabeth Westfall.
14 I represent the plaintiff United States.  I just have a
15 few questions for you.
16         Do you know what the requirements are to
17 be eligible to vote in Texas?
18     **A.  I actually looked at that recently.  I think**
19 **anyone that is 18 years old, a resident of Texas, and I**
20 **do believe you need to be a citizen, and you are**
21 **eligible, I believe, to vote.**
22     Q.  And is it also true that you need to be -- you
23 can't be a convicted felon unless you have completed
24 your sentence --
25     **A.  I believe that's correct.**

---

187

1      Q.  -- probation and parole?
2      **A.  I believe that is correct.**
3      Q.  And I just want to caution you.  I know we've
4  been in this before, but we need not to talk over each
5  other so that the transcription can be proper, okay?
6      **A.  We have a history of that.**
7      Q.  We do have a history of that.
8          Is it also true that to be eligible to
9  register to vote, you have to have not been declared by
10 a court to be mentally incapacitated?
11     **A.  I do believe that is correct, yes.**
12     Q.  And to register to vote must an applicant
13 complete a voter registration application?
14     **A.  Yes.**
15         **(Exhibit 21 marked for identification.)**
16     Q.  (By Ms. Westfall) You've been handed what's
17 been marked as Exhibit 21.  Do you recognize this
18 document?
19     **A.  No.**
20     Q.  Could you turn to the second page of this
21 document?
22     **A.  Uh-huh.**
23     Q.  Do you see what it says at the top?
24     **A.  Texas voter registration application.**
25     Q.  Do you recognize this to be a Texas voter

---

188

1  registration application?
2      **A.  I do not.**
3      Q.  Do you see that the application indicates that
4  a person completing an application to register to vote
5  in Texas must check a box under Section 1 indicating
6  that the applicant is a U.S. citizen?
7      **A.  Yes.**
8      Q.  Do you see at the bottom under Section 9, that
9  the person must sign at the X?
10     **A.  Yes.**
11     Q.  And do you see that the applicant must sign
12 under penalty of perjury that the applicant is a U.S.
13 citizen?
14     **A.  Yes.**
15     Q.  And putting aside Exhibit 21, do you know that
16 if once a county registrar approves a voter registration
17 application, that the registrar will mail the applicant
18 a voter registration card?
19     **A.  Yes.**
20     Q.  Is it fair to say that after the voter submits
21 a voter registration application, the voter doesn't need
22 to take any other steps to get that card?
23     **A.  Yes.**
24     Q.  Before Texas started to enforce Senate Bill 14,
25 what were voters required to show at the polls to prove

---

SENATOR TROY FRASER                                        7/23/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

189

1  their identity?
2      A.  A voter registration card or a driver's
3  license.  Or a passport also was accepted.
4      Q.  Do you know whether if a voter lost their
5  registration card they could present from one of a
6  number, a large number of forms of ID?
7      A.  Yes.
8      Q.  With regard to absentee voting in Texas, do you
9  know whether it is a no excuse absentee voting state?
10     A.  It is an excuse.
11     Q.  What do you mean by that?
12     A.  That you -- there's parameters that you have to
13  meet in order to vote by absentee.
14     Q.  So only certain categories of voters in certain
15  situations can vote absentee; is that correct?
16     A.  By rule and by law, yes.
17     Q.  Before Texas started enforcing Senate Bill 14,
18  if a voter appeared without a voter registration card or
19  any form of acceptable ID, could the voter still vote?
20     A.  I believe they could vote a provisional ballot.
21     Q.  Are provisional ballots always counted?  Under
22  prior -- prior to Senate Bill 14, were they always
23  counted?
24     A.  Not to my knowledge.
25     Q.  Do you know under what circumstances if a

190

1  voter, prior to Senate Bill 14, came in to vote didn't
2  have an appropriate ID and voted a provisional ballot,
3  that that ballot would be counted?
4      A.  If they came back within an appropriate number
5  of days and gave correct identification, it would be
6  counted.
7      Q.  Is your testimony with regard to the law as it
8  existed before Senate Bill 14 was in effect --
9      A.  I believe --
10     Q.  -- or after?
11     A.  I believe it's the same.  Because we have a
12  provisional ballot provision in Senate Bill 14.
13     Q.  Okay.  We may talk about that a little bit
14  later.
15         Under Senate Bill 14, if a voter appears
16  without required photo ID, can the voter cast a ballot?
17     A.  Yes.
18     Q.  What type of ballot can the voter cast?
19     A.  Provisional.
20     Q.  Under what circumstance will that provisional
21  ballot be counted?
22     A.  If they return within, I believe it is five
23  days, with sufficient photo ID, they will be counted.
24     Q.  Are there any exceptions to that requirement?
25     A.  Not to my knowledge.

191

1      Q.  Do you recall that one exception was, under
2  Senate Bill 14, that if the voter fills out an affidavit
3  indicating a religious objection to being photographed?
4      A.  I -- I'm sorry.  I'm not -- I don't know.
5      Q.  What criteria for determining which photo IDs
6  -- what were the criteria for determining which photo
7  IDs to include in Senate Bill 14?
8      A.  I think we've done an asked and answered on
9  that, and I'll be glad to go through it again, if you'd
10  like.
11     Q.  What is your answer?
12     A.  My answer is I'll be glad to go through it
13  again, but I've already answered that question once.
14         MS. WESTFALL:  Could you read back the
15  question, please?
16         (The requested portion was read back by
17  the court reporter.)
18     A.  You'd like me to answer it?
19     Q.  (By Ms. Westfall) Yes.
20     A.  The criteria we used was coming up with both
21  federal and state government identification that was
22  issued by both entities that were secure.  The ones we
23  came up with from the federal government was the
24  passport and/or military ID that were not expired, and
25  then they had a -- the certificate of -- what's it

192

1  called?  The immigration certificate where -- I'm sorry.
2  I've lost the word.  Do you mind if I reference the --
3      Q.  Certainly.
4         MS. WESTFALL:  For the record, the witness
5  is looking at Exhibit Number 16.
6      A.  Okay.  What is the page number?  A United
7  States citizenship certificate with a photograph on it.
8  From a state basis, we are allowing a Texas driver's
9  license, a concealed handgun license that was issued by
10  DPS, or an identification card that was issued by DPS.
11     Q.  (By Ms. Westfall) Did you consider whether a
12  form of photo ID to be included in the bill would prove
13  that a voter was eligible to vote in Texas?
14     A.  At the time the bill was passed and shortly
15  after, the answer was yes.
16     Q.  What did you consider in that regard?
17     A.  That one of the determination that on the Texas
18  driver's license it clarified if someone was a citizen
19  by if they were using a Texas driver's license.  There
20  was a law that -- there was a bill that was passed since
21  then that has since changed that so that a -- a
22  nonresident can receive a Texas driver's license, and if
23  they were willing to sign this and fraudulently say they
24  are a citizen and they go to the ballot box and they
25  present the driver's license, that they would likely be

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 196)

---

193

1  able to vote.
2        MS. HALPERN:  Let the record reflect that
3  the exhibit he used to find this he was referring to was
4  Exhibit 21, the --
5        THE WITNESS:  Voter registration.
6        MS. HALPERN:  -- voter registration.
7     Q.  (By Ms. Westfall) So this was legislation that
8  was enacted after Senate Bill 14?
9     A.  Texas law provides that the last bill to be
10 signed into law is the law of the land, and it trumped
11 the treatment that we had on the driver's license.  The
12 old driver's license provided that you -- it was a
13 temporary license by a noncitizen.
14    Q.  So if a voter presented one of the forms of
15 photo ID under Senate Bill 14 at the time it was
16 enacted, would that indicate that the voter was eligible
17 to vote in Texas necessarily?
18    A.  They would still have to be on the voter
19 roll.  You have to be on the voter roll per registering
20 to vote, you have to go to the right location for that
21 voting, and you have to have a photo ID proving you are
22 who you say you are.
23    Q.  Turning back to my question, if you presented
24 the photo ID listed under Senate Bill 14, would that
25 prove that you're eligible to be voting?

---

194

1     A.  No.
2     Q.  That would just prove that you were who you
3  were when you came into the poll, is that correct?
4     A.  It proves you are who you are on that card.
5     Q.  Okay.
6     A.  It doesn't prove that you are eligible to vote.
7     Q.  Are permanent residents eligible to serve in
8  the U.S. military, to your knowledge?
9     A.  Ask that question again, please.
10    Q.  Are permanent residents of the United States
11 allowed to serve in the U.S. military?
12    A.  Yes.
13    Q.  So they can obtain a military ID; is that
14 right?
15    A.  They are given a military ID as a result of
16 serving.
17    Q.  Can permanent residents obtain a Texas driver's
18 license?
19    A.  Yes.  If they claim that is their residence.
20    Q.  Can permanent residents be issued a personal ID
21 card in Texas?
22    A.  Yes.
23    Q.  Can permanent residents obtain a concealed
24 handgun license?
25    A.  Yes.

---

195

1     Q.  Can persons who are mentally incapacitated
2  obtain a passport?
3     A.  I would believe you could.
4     Q.  Can persons who are mentally incapacitated
5  obtain a personal state card in the State of Texas?
6     A.  I would think so, yes.
7     Q.  Can a Texan who is on probation for a felony
8  conviction lawfully possess a driver's license in Texas?
9     A.  I don't know the answer to that.
10    Q.  Is it fair to say that presenting a form of
11 photo ID allowed by Senate Bill 14 does not necessarily
12 prove that the cardholder is eligible to vote in Texas?
13    A.  Based on the questions you just asked, it is
14 obvious that there are people that will have a photo ID
15 that are not eligible to vote.
16    Q.  Turning back to your testimony about House Bill
17 218, after House Bill 218 was referred to the Senate,
18 was there a time that you moved to suspend the regular
19 order of business?
20    A.  Repeat the question again.
21    Q.  Certainly.  After House Bill 218 was referred
22 to the Senate, was there a time when you moved to
23 suspend the regular order of business?
24    A.  Yes.
25    Q.  Did that occur on May 15, 2007?

---

196

1     A.  I don't know the date.
2        MS. WESTFALL:  Would you please mark this.
3        (Exhibit 22 marked for identification.)
4     Q.  (By Ms. Westfall) You've been handed what's
5  been marked Exhibit 22.  Do you recognize this document?
6     A.  No.
7     Q.  Is it the Senate Journal from May 15, 2007?
8     A.  It appears to be.
9     Q.  Turning your attention to -- and the
10 pagination, as you know, is at the top of the page,
11 turning your attention to Page 2063.
12    A.  Okay.
13    Q.  Do you see at the bottom half of the page that
14 you moved to suspend the regular order of business to
15 take up Committee Substitute House Bill 218?
16    A.  Yes.
17    Q.  Is it correct, therefore, that you did, in
18 fact, on May 15, 2007, move to suspend the regular order
19 of business to allow the Senate to consider House Bill
20 218?
21    A.  Yes.
22    Q.  Why did you ask to be recognized for a motion
23 on House Bill 218 that day?
24    A.  I didn't ask to be recognized.
25    Q.  Why did you move to suspend the regular order

---

SENATOR TROY FRASER                                          7/23/2014
CONFIDENTIAL TRANSCRIPT

50 (Pages 197 to 200)

---

197

1  of business on that day?
2      A.  Sorry.  Let me retract my answer.  I was
3  advised, which is a normal event, is that someone from
4  the front desk, the Lieutenant Governor's desk, came
5  back and said you're going to be recognized for a motion
6  on 218 in five minutes.
7      Q.  Was that the first time that you heard that you
8  were going to be recognized for that motion?
9      A.  Yes.
10     Q.  Had you asked Lieutenant Governor Dewhurst's
11 Office in advance of this request if you could make the
12 motion?
13     A.  No.
14     Q.  Did the Lieutenant Governor's Office ask you in
15 advance of that notification you just testified to, to
16 make a motion to suspend the rules?
17     A.  Prior to?
18     Q.  Yes.
19     A.  No.
20     Q.  Would it surprise you to learn that Senator
21 Williams testified in a deposition that you were likely
22 involved in the decision to be recognized to make the
23 motion on House Bill 218?
24     A.  Yes, I'd be surprised.
25     Q.  Do you think Senator Williams' recollection is

---

198

1  incorrect in that regard?
2      A.  I know that -- the answer is yes.
3      Q.  The support of two thirds Senators was required
4  to suspend the rules and bring House Bill 218 to the
5  floor for a vote, was it not?
6      A.  Yes.
7      Q.  And the motion to suspend the regular order of
8  business with the first vote to take up House Bill 218
9  prevailed 19 to 9; is that correct?
10     A.  That is correct.
11     Q.  Was the request made to verify that vote?
12     A.  Yes.
13     Q.  By whom?
14     A.  Senator Shapleigh.
15     Q.  To whom was that request made?
16     A.  You have to make a request on the floor to the
17 presiding officer.
18     Q.  Would that have been the Lieutenant Governor?
19     A.  I don't know who was in the chair at the time.
20     Q.  Turning your attention to Exhibit 22, is there
21 any way to ascertain from Exhibit 22 who was presiding?
22     A.  No.
23     Q.  Whoever was presiding permitted the
24 verification of the vote to occur, correct?
25     A.  Yes.

---

199

1      Q.  Did you at any time ever talk to that person?
2      A.  Who, Senator Shapleigh?
3      Q.  To the person whoever was presiding to allow
4  that vote to occur?
5      A.  No.
6      Q.  Are you certain that it was not the Lieutenant
7  Governor?
8      A.  I didn't say that.  My answer is I don't know
9  who was in the chair.
10     Q.  Did you hear from anyone at any time as to why
11 the verification of the vote was permitted?
12         MS. HALPERN:  You can answer yes or no.
13     A.  No.
14     Q.  (By Ms. Westfall) What was your reaction to the
15 decision to permit a verification of the vote?
16     A.  There is no reaction, there's a motion and they
17 acted on it.
18     Q.  Were you disappointed?
19     A.  I had no reaction either way.
20     Q.  What was the outcome of the verification of the
21 vote?
22     A.  The motion to suspend was -- did not suspend.
23     Q.  Did it not suspend because Senators Uresti and
24 Whitmire voted against that motion?
25     A.  Because Senator and Uresti were not present,

---

200

1  even though they had -- if you will look at the front
2  page, they had checked in and shown to be present when
3  the vote was taken.  But when the vote -- actually the
4  first vote, they did not vote.
5      Q.  Did the Senate take any further action on House
6  Bill 218?
7      A.  218, no.  218, during that session, there was
8  no other action.
9      Q.  Why not?
10         MS. HALPERN:  Objection, legislative
11 privilege.  You can answer if you know.
12     A.  I was never recognized again for a motion to
13 suspend.
14     Q.  (By Ms. Westfall) Were there any conversations
15 about why House Bill 218 did not pass the Senate
16 afterwards?
17         MS. HALPERN:  You can answer yes or no.
18     A.  No.
19     Q.  (By Ms. Westfall) Did you testify in your
20 previous deposition that you had one conversation with
21 Ms. Rathgeber?
22     A.  I believe I was asked if I had a conversation,
23 and I said I wasn't sure.  The question was asked, if
24 you had one, who would it have been?  And I said it
25 probably would have been Ms. Rathgeber.  You asked just

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

51 (Pages 201 to 204)

201

1  then do I remember a conversation, the answer is no.
2  Seven years ago, I do not remember a conversation.
3      Q.  Did you have, after the vote on House Bill 218,
4  any conversation with anybody about strategy for
5  ensuring passage of Voter ID in 2009?
6      A.  No.
7      Q.  At any time between 2005 and 2011, were you
8  concerned about the State of Texas's voter roles?
9      A.  Ask that question again.
10     Q.  At any time between 2005 and 2011, were you
11  concerned about the state, the quality of Texas's voter
12  rolls?
13     A.  Yes.
14     Q.  Could you describe those concerns?
15     A.  Testimony had shown that we were having
16  numerous discrepancies of people voting that were
17  deceased, people that were on the voter roll that
18  shouldn't have been on it, people that are not eligible
19  to vote voting, people that were showing up at the
20  polls.  And we didn't have the tools available to stop
21  ineligible people from voting, so yes, I had concerns.
22     Q.  Did you introduce any legislation to require
23  the removal of ineligible voters from the voter roll
24  during that time period 2005 to 2011?
25     A.  To my knowledge, no.

202

1      Q.  Between 2005 and 2011, did the legislature
2  enact any legislation to require improvements to the
3  maintenance of the State's voter rolls?
4      A.  I'm sorry, I don't know.
5      Q.  Did they enact anything to ensure that
6  ineligible voters are more promptly removed from the
7  poll -- from the rolls?
8      A.  I don't know.
9      Q.  Any time since you served in the Senate have
10  you been concerned about voter fraud related to absentee
11  ballots?
12     A.  Yes.
13     Q.  What is the nature of your concern?
14     A.  We're reasonably sure that there is fraud in
15  absentee voting.  It has been evidenced by the fact that
16  multiple times we've uncovered ineligible people were
17  signed up.  There was a major fraud of the Acorn
18  Operation that was uncovered.  There was evidence that
19  showed that there was in one case all the Dallas Cowboys
20  had been signed up to vote and the voter cards sent to
21  one residence, so it was implied that there was an
22  attempt to illegally vote people.
23     Q.  Are you talking about voter registration
24  irregularities or absentee ballot irregularities?
25     A.  Both.

203

1      Q.  Do you believe there's more voter fraud related
2  to absentee ballots than to in-person voter
3  impersonation?
4      A.  I have know way of knowing.
5      Q.  Did you introduce any legislation to address
6  voter fraud relating to voting by mail, absentee voting?
7      A.  To my knowledge, no.
8          (Exhibit 23 marked for identification?)
9      Q.  (By Ms. Westfall) Senator, you've been handed
10  what's been marked Exhibit 23.  Do you recognize this
11  document?
12     A.  Uh-huh.
13     Q.  What is it?
14     A.  It appears to be a release from December 15,
15  2008, from Janice McCoy from my office.
16     Q.  Did you review this press release before it was
17  issued?
18     A.  I'm sure I did.
19     Q.  Do you see that in the second paragraph, it
20  states that the intent of Senate Bill 362 was to ensure
21  that the person who shows up at the polls is who he or
22  she claims to be?
23     A.  Would you point out where you're seeing that?
24     Q.  Certainly.  It's at the second paragraph, a
25  couple of sentences in where you're quoted beginning

204

1  with photo ID.
2      A.  Yes.
3      Q.  And it indicates that this bill is intended to
4  ensure that the person who shows up at the polls is who
5  he or she claims to be?
6      A.  Yes.
7      Q.  Was that your -- did you believe that was the
8  intent of Senate Bill 362 at the time of this press
9  release?
10     A.  Yes.
11     Q.  Do you see this press release also refers to
12  Senate Bill 363?
13     A.  Yes.
14     Q.  Could you describe that legislation?
15     A.  In the Legislature, it is not uncommon to file
16  a companion bill to a bill that is a -- what we refer to
17  as a shell bill, that if for some reason something
18  happens to the original bill, you have a fallback
19  position of a secondary bill that could be used if
20  needed if for some reason the first bill doesn't make it
21  through the process.  Senate Bill 363 was a shell bill,
22  and it was never even given a hearing because it was not
23  needed.
24     Q.  It was a shell bill as a shell for Senate Bill
25  362; is that your testimony?

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

---

**205**

1    A.  Yes.
2    Q.  And you were filing 363 in case Senate Bill 362
3  failed; is that your testimony?
4    A.  There are places throughout the Legislature
5  that a bill can get hung up and mysteriously die, and
6  that we were putting in a fallback position.  It is a
7  shell bill that's very common in the Legislature.
8  Virtually every important bill that I file, we would
9  file a shell bill in companion with it.
10    Q.  Did Senate Bill 363 differ substantively from
11  Senate Bill 362?
12    A.  363 was a shell bill that had no substance.  It
13  was only there as a placeholder and was never given a
14  hearing.  So it was just a bill with a caption in order
15  to hold a place in line.
16    Q.  But it had legislative language, it had a
17  change to the Election Code, it had substance, did it
18  not?
19    A.  But it was not intended to be implemented with
20  that language, that it was a shell and that it was
21  intended to -- to implement new language into it if it
22  was needed.
23    Q.  If that is the case, why did you talk about it
24  in this press release substantively?
25    A.  Because we filed it.

---

**206**

1    Q.  Could you explain what Senate Bill 363 was --
2  said it did?
3    A.  Described in the bill what was currently in the
4  bill.
5    Q.  In other words, Senate Bill 363 required a
6  voter applicant to prove that he or she was a U.S.
7  citizen by furnishing a birth certificate, correct?
8    A.  Yes.
9    Q.  Is it fair to say that's a different part of
10  the voting process than what was required under Senate
11  Bill 362?
12    A.  Yes?
13    Q.  Did you regard these two bills as complimentary
14  in any way?
15    A.  The 363 was never even asked for a hearing.  It
16  was a shell bill.
17    Q.  But they are different subject matter wise, are
18  they not?
19    A.  Subject matter-wise, but the -- the caption of
20  the bill could have been used for either one.
21    Q.  Senate Bill 363 pertained to voter registration
22  requirements, correct?
23    A.  Unless you furnish me a copy of 363, I couldn't
24  tell you.
25    MS. WESTFALL:  Let's go off the record for

---

**207**

1  one second.
2    (Brief pause off the record.)
3    MS. WESTFALL:  Let's go back on the
4  record.
5    Could you mark this?
6    (Exhibit 24 marked for identification.)
7    Q.  (By Ms. Westfall) You've been handed what's
8  been marked as Exhibit 24.  Do you recognize this
9  document?
10    A.  No.
11    Q.  Can you see at the top that this says, by
12  Fraser Senate Bill 363?
13    A.  I do.
14    Q.  And that it indicates it relates to procedures
15  for registering to vote and accepting a voter at the
16  polling place?
17    A.  Yes.
18    Q.  Could you describe what this legislation would
19  do?
20    A.  Again, this is a shell bill, that the idea was
21  to file a bill as a placeholder in case a second bill
22  was needed.  So --
23    Q.  But -- go ahead.
24    A.  The language of the bill was put there as a
25  shell and not intended to move forward evidenced by the

---

**208**

1  fact that I didn't ask for a hearing on the bill.
2    Q.  Not withstanding the -- your testimony that
3  it's a shell bill, you did not seek a hearing, et
4  cetera, you issued a press release about the filing of
5  Senate Bill 363, did you not?
6    A.  My chief of staff issued a press release.
7    Q.  I believe you just testified that you approved
8  the issuance of this press release, did you not?
9    A.  I think you said did I read the press release.
10  I don't remember saying I approved it.
11    Q.  Senate Bill 362 pertained to identification
12  requirements at the polls when voting, correct?
13    A.  Yes.
14    Q.  Did anyone request that you file Senate Bill
15  363?
16    A.  I did not remember, but I do not think so.
17    Q.  Do you see that the release says, "Instead, I
18  want to ensure that" -- and this is one, two, three
19  four -- four paragraphs down -- "I want to ensure that
20  illegal aliens, noncitizens, and people otherwise not
21  qualified, do not dilute the legitimate votes cast by
22  citizens"?
23    A.  To be eligible to vote in Texas, you have to be
24  an authorized or legal person to vote.  A subset of
25  those people that are not legal to vote are people that

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

53 (Pages 209 to 212)

209

1  are noncitizens.  So if someone is not legal to vote by
2  that subset, no, they should not be voting.
3     Q.  Just to go back to my question, Senator, you do
4  in the press release indicate that the purpose of Senate
5  Bill 363 is to ensure that illegal aliens, noncitizens,
6  and people otherwise not qualified, do not dilute
7  legitimate votes cast by citizens; isn't that correct?
8     A.  I don't believe there's a reference there to
9  363 in that statement.
10    Q.  The statement -- do you agree that there is
11 that statement in the press release?
12    A.  The statement is there, but it does not
13 reference Bill 363.  It's also referencing 362.  In 362
14 we're making sure that the requirement of the people
15 voting are eligible to vote, and a subset of that are
16 people that are not citizens, because they are not
17 qualified to vote legally in Texas.
18    Q.  Are you testifying about Senate Bill 363 or
19 362?
20    A.  I'm saying there is not a reference to whether
21 that statement referred to either one.  363 was never
22 asked for a hearing, so it was a shell bill and never
23 heard.  362 did have a hearing, was passed in the
24 Senate, went to the Texas House, and failed to be
25 adopted.

210

1     Q.  And I appreciate your testimony, but if you
2  could focus on my question, we'll get through the day
3  much faster.
4        Turning your attention back to Exhibit 23,
5  you express an interest in ensuring that illegal aliens
6  and noncitizens are not participating in elections,
7  isn't that right?
8     A.  The press release says that they are a subset
9  of making sure that people in Texas that are qualified
10 to vote are the only ones voting, and of the ones that
11 in order to qualify for Texas, someone who is not a
12 citizen is a subset of that group and is not qualified
13 to vote.
14    Q.  Did you have a concern about illegal aliens
15 voting in Texas at the time of this press release?
16    A.  I had a concern before, during and after this
17 was done making sure that every person in Texas was a
18 qualified voter and subsets of that, that were not
19 qualified, should not be voting.
20    Q.  Turning your attention back to my question, did
21 you have a concern about illegal aliens in Texas
22 participating in elections in Texas at that time?
23    A.  Before, during and after the bill was filed, I
24 continued to have -- make sure that anyone on -- that
25 only eligible voters in Texas could vote and a subset of

211

1  those illegal voters, were persons that were not
2  citizens, and if they were not citizens, they should not
3  be allowed to vote.
4     Q.  So the answer to my question is yes?
5     A.  The answer is I was concerned prior, before,
6  during and after and that anyone who is not qualified to
7  vote in Texas should not vote, and a subset of that is
8  people that are noncitizens.
9     Q.  So I'm going to try again.  Did you have a
10 concern, as part of the concerns you just testified to,
11 that illegal aliens were participating in elections in
12 Texas?
13    A.  I had a concern that no one in Texas that was
14 not eligible to vote should be voting, and a subset of
15 that were people that were noncitizens.
16    Q.  So is the answer to my question yes?
17    A.  The answer is I continue to have a concern of
18 making sure that no one that was ineligible to vote in
19 Texas should be voting, and a subset of that was people
20 that were noncitizens.
21    Q.  What was the basis of your concern with regard
22 to undocumented persons participating in Texas
23 elections?
24    A.  I was concerned with making sure that the --
25 for the integrity of the ballot box, that only people

212

1  that were eligible to vote should be voting, and no one
2  that's ineligible should vote, a subset of that were
3  people that were not citizens.
4        MS. WESTFALL:  Okay.  I'm going to move to
5  strike as nonresponsive.
6     Q.  (By Ms. Westfall) I want you to listen
7  carefully to the question so we can get through and move
8  on to another topic and another exhibit, sir.
9        What was the factual basis for your
10 concern about undocumented persons participating in
11 Texas elections?
12    A.  I -- my concern was making sure that I did not
13 feel that we had the tools in Texas to ensure the
14 integrity of the ballot box, and that if someone was not
15 qualified to vote, we did not have sufficient tools in
16 place to identify that person and prosecute them for
17 voting illegally.  So anyone that was not qualified to
18 vote was a concern, a subset of that were people that
19 were noncitizens.
20    Q.  And I believe you testified earlier that the
21 sole purpose of Senate Bill 362 was to prevent in-person
22 voter impersonation, right?
23    A.  It was to -- I think what I said was to protect
24 the integrity of the ballot box.
25    Q.  As it pertained to in-person voter

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

---

213

1  impersonation, correct?
2      A.  Senate Bill 362, you're referring to?  Referred
3  to in-person, yes.
4      Q.  Sitting here today, can you recall any facts,
5  convictions, information about noncitizens participating
6  in Texas elections?
7      A.  I'm going to need that repeated.
8          MS. WESTFALL:  Could you read it back?
9          (Requested portion was read back by the
10  court reporter.)
11     A.  You've asked multiple questions about
12  convictions, and I don't think I've addressed
13  convictions in anything we've said.  My answer continues
14  to be that Texas did not have the tools available under
15  current law to identify people that were not eligible to
16  vote, and of that people ineligible to vote were
17  obviously people that were not -- that didn't meet the
18  requirements.
19     Q.  (By Ms. Westfall) Why did you believe that the
20  tools were insufficient?
21     A.  Because, you know, after looking at the --
22  listening to the testimony, doing my research of what
23  had happened in other states, looking at the passage of
24  the Indiana and the Georgia law, looking at the
25  recommendations that had been placed by the Carter-Baker

---

214

1  Commission, an accumulation of all that data convinced
2  me that Texas did not have sufficient tools to protect
3  the integrity of the ballot box.
4      Q.  Did you have concerns about noncitizens from
5  particular countries or areas of the world who were
6  participating in Texas elections?
7      A.  Again, my concern was making -- that we did not
8  have sufficient tools to protect the integrity of the
9  ballot box to ensure that people that were not qualified
10  to vote, you know, would not be voting, and obviously a
11  subset of that was people that were noncitizens from
12  multiple countries around the world that were not U.S.
13  citizens.
14     Q.  I want to ask this question a different way.
15         THE WITNESS:  Can I take a break?
16         MS. WESTFALL:  Sure.
17         (Recess from 3:29 p.m. to 3:38 p.m.)
18     Q.  (By Ms. Westfall)  Senator, before the break we
19  were talking about Exhibit 23 and Senate Bill
20  363.  Senate Bill 363 did not ensure that all types of
21  ineligible voters would be kept off the rolls; is that
22  correct?
23     A.  I don't believe we addressed that.  I think
24  I've made it clear that 363 was a shell bill and that
25  the only thing we were interested in was a caption as a

---

215

1  fallback position for 362, there was no intent to pass
2  363.  363 was never asked for a hearing.
3      Q.  I understand that it was -- that your testimony
4  is that it was a shell bill, that you did not ask for a
5  hearing, but it did have content to the bill, did it
6  not?
7      A.  Like all shell bills that are filed in the
8  Legislature, you have to have some verbiage in the bill
9  in order to file a bill.  But when a bill is a shell
10  bill and there's no intention to pass, that is generally
11  disregarded by everyone until a hearing is held and then
12  you look at the content.
13     Q.  You nevertheless issued a press release
14  announcing that you had filed Senate Bill 362 in
15  describing the substance of the bill, did you not?
16     A.  I'm sorry?
17     Q.  You had a press release announcing that you had
18  filed Senate Bill 363?
19     A.  There's a press release filed by Janice McCoy.
20     Q.  Certainly, Janice McCoy was the contact for a
21  press release that came out of your office; isn't that
22  right?
23     A.  It says she was the contact, yes.
24     Q.  Senate Bill 363, turning your attention now to
25  Exhibit 24, did not try to prevent persons who did not

---

216

1  reside in Texas from registering to vote; isn't that
2  right?
3      A.  Ask your question again.
4      Q.  Senate Bill 363 was not designed so prevent
5  non-Texans from registering to vote?
6      A.  363 was not designed to do anything.  It was a
7  shell bill.  There was no intent to pass 363.  363 was a
8  placeholder of a caption in case it was needed.
9      Q.  Okay.  Just so we can move on to another
10  exhibit.  In summary, your testimony is that Senate Bill
11  363 was a shell bill.  You did not ask for a hearing.
12  But nevertheless, your office issued a press release
13  describing the filing of Senate Bill 363, is that your
14  -- is that your testimony?
15     A.  Someone from my office issued a press release.
16     Q.  Okay.  I believe you testified earlier that
17  voter registration applicants have to attest to their
18  citizenship as U.S. citizens when they complete a voter
19  registration application; is that correct?
20     A.  Actually, I believe you're putting words in my
21  mouth.  I believe you're the one that pointed out that
22  that is on the application, and you asked me to verify
23  that I saw it on the application.  And yes, I did see it
24  on the application.
25     Q.  And you believe it to be a requirement of voter

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

SENATOR TROY FRASER                                          7/23/2014
CONFIDENTIAL TRANSCRIPT

55 (Pages 217 to 220)

---

**217**

1  registration applicants in Texas?

2       A.  I believe that it's a question asked and that

3  people certify that they're telling the truth.

4       Q.  It is a requirement that Texas has the voter

5  registration applicants indicate that they are U.S.

6  citizens; is that correct?

7       A.  They have to certify that they are a U.S.

8  citizen.

9       Q.  Are you aware that Texas law requires county

10 election officials to review documents received from

11 court listing people who are excused from jury duty

12 because they are not U.S. citizens?

13      A.  I'm not aware of that, and I'm not sure how

14 that applies to the testimony we're talking about today.

15      Q.  But -- but in answer --

16      A.  I'm not aware of it, no.

17      Q.  Do you have any evidence, are you aware of any

18 evidence that non-U.S. citizens have registered to vote

19 in Texas?

20      A.  The word "evidence" is a very broad word.

21 There are many pieces of articles that you have in the

22 information that was released to you press releases

23 from across Texas of multiple news agencies that

24 reported incidents of people that were illegal to vote

25 that had been reported that were voting.

---

**218**

1       Q.  Was Senate Bill 363 referred to the State

2  Affairs Committee?

3       A.  I don't know.

4       Q.  Was Senator Duncan the chair of the committee

5  at that time?

6       A.  Of what committee?

7       Q.  The State Affairs Committee?

8       A.  Well, likely was, I don't -- I'm not sure, but

9  I'll suspect he probably was.

10      Q.  Do you recall discussing Senate Bill 363 with

11 Senator Duncan at any time?

12      A.  No, I don't remember that at all.

13          MS. WESTFALL:  Could you mark this?  And

14 this is a highly confidential document so the testimony

15 will be designated as highly confidential under the

16 protective order.

17          (Exhibit 25 marked for identification.)

18      Q.  (By Ms. Westfall)  You've been handed what's

19 been marked as Exhibit 25.  Do you recognize this

20 document?

21      A.  I do not recognize the document.

22      Q.  Do you see that it is an e-mail from Dan

23 Patrick to a number of senators including you?

24      A.  Okay.

25      Q.  I'm sorry?

---

**219**

1       A.  Yes.

2       Q.  Do you see that it reads, "Dear Senators," and

3  then there's two paragraphs, and then there's a line on

4  the bottom of page TX00009987, is the Bates stamp.  Do

5  you see that line that starts, "In view of our

6  discussion on Voter ID"?

7       A.  The very last line, "In view of our

8  discussion"?

9       Q.  Yes, and then --

10      A.  I see it there, yes.

11      Q.  -- it continues on to the next page.  Could you

12 just review that and let me know when you've had a

13 chance to look at that sentence?

14      A.  Okay, I've read it.

15      Q.  And is Senator Patrick expressing the view that

16 Voter ID and immigration are the same issue, one and the

17 same or connected issues?  Do you see --

18      A.  I think you probably have to ask him that.

19      Q.  -- he's expressing that opinion?  But do you

20 see that this document, TX00009987 through 88, Exhibit

21 25, contains an e-mail from Senator Patrick with that

22 sentiment?

23      A.  I see that this is represented that this is an

24 e-mail from him saying that.

25      Q.  Do you agree with that view that is expressed

---

**220**

1  in the e-mail?

2       A.  That is his view.

3       Q.  Do you agree with that view?

4       A.  That is his view.

5          MR. CLAY:  Objection, this

6  mischaracterizes the e-mail.

7          MS. WESTFALL:  I'm going to object to your

8  response as unresponsive.

9       Q.  (By Ms. Westfall)  Do you share the view

10 expressed in Exhibit 25 that Voter ID and immigration

11 are the same issue or connected?

12          MR. CLAY:  Same objection,

13 mischaracterizes the e-mail.

14          MS. HALPERN:  You can answer the question.

15      A.  I do not share that view.

16          (Exhibit 26 marked for identification.)

17      Q.  (By Ms. Westfall)  You've been handed what's

18 been marked as Exhibit 26.  Do you recognize this

19 document?

20      A.  Do not.

21          MS. WESTFALL:  It is Highly Confidential

22 and the testimony pertaining to this document, which is

23 Exhibit 26, at TX00086376 through 3788, will be

24 designated as Highly Confidential.

25      Q.  (By Ms. Westfall)  Turn your attention to the

---

SENATOR TROY FRASER                                          7/23/2014
CONFIDENTIAL TRANSCRIPT

221

1  second page of this document at TX00086377.  Do you see
2  that there's a quote from you about the 2009 session?
3          MS. HALPERN:  Can you be specific as to
4  where?
5      Q.  (By Ms. Westfall)  The second page, the second
6  page about halfway down on the left, where it says,
7  "Fraser introduces a similar bill in 2009 that passed in
8  the Senate, but it died in the House."  And then it goes
9  on to quote you as saying, "We're going to attempt to go
10 ahead and try to move it earlier this year."  Do you see
11 that paragraph?
12         MS. HALPERN:  Counsel, I'm going to ask
13 that you let him read the whole article.
14         MS. WESTFALL:  I'm directing his attention
15 to a quoted portion of the article.  I'm not going to
16 examine on anything other than the quoted portion.
17         MR. HALPERN:  I see that.
18         MS. WESTFALL:  Just to move things along.
19     A.  Okay.
20     Q.  (By Ms. Westfall)  Do you see that this article
21 is dated November 14, 2010?
22     A.  Yes.
23     Q.  And it's the Abilene Reporter News?
24     A.  Yes.
25     Q.  Is that correct?  And turning your attention to

222

1  the paragraph in which you are quoted as saying, "We're
2  going to attempt to go ahead and try to move it earlier
3  this year," referring to Voter ID --
4      A.  Yes.
5      Q.  -- do you believe that was an accurate quote by
6  the reporter?
7      A.  Yes.
8      Q.  And at this point in time, in November 2010,
9  what -- did you have a strategy for moving Voter ID
10 forward in the Senate so that it could actually get
11 passed into law?
12     A.  We had already passed it once.  So my
13 assumption is we could pass it again.
14     Q.  Did you have any -- and in 2009, Senate Bill
15 362 failed in the House, correct?
16     A.  Yes.
17     Q.  Did you have any strategy at this point in
18 November 2010 for moving Voter ID through both the
19 Senate and the House and having it enacted into law?
20     A.  It was not my strategy, but there was a
21 different -- a different bill sponsor in the House.  And
22 it was my belief that the problem with the bill the year
23 before was the bill sponsor.
24     Q.  Was another problem that you alluded to in this
25 article that the bill did not move quickly enough

223

1  through the Senate to get to the House in time to, for
2  the House to likewise pass it?
3      A.  Could you show me where that says that?
4      Q.  I'm referring to the paragraph where you say,
5  "We're going to attempt to try to move it earlier this
6  year."  Did you see that as part of the strategy to --
7      A.  I see that, but no, I'm not -- what point
8  you're trying to make is not correct.  The words speak
9  for themself is that we're going to try to move it
10 quicker.  It doesn't say anything about the Senate.  It
11 refers to the House.
12     Q.  Are you aware of any research conducted before
13 the 2009 session to determine a procedure to increase
14 the likelihood of Senate passage of a Voter ID bill?
15     A.  Ask that question again.
16     Q.  Sure.  Are you aware of any research about
17 Senate procedure that was conducted in advance of 2009
18 to ensure that Voter ID would be passed in the Senate?
19     A.  No.
20     Q.  Are you aware of Senator Tommy Williams having
21 conducted any research about how -- about procedures to
22 put into place in the Senate Rules to ensure passage of
23 Voter ID in the Senate --
24     A.  No.
25     Q.  -- in 2009?

224

1      A.  No.
2      Q.  Did Senator Williams spearhead -- strike that.
3          I believe you testified earlier about the
4  Rule 5.11 in the 2009 rules.  Do you remember that rule?
5      A.  Yes.
6      Q.  How did that rule come to be included in the
7  Senate Rules in 2009?
8      A.  I -- I have previous testimony that I'm not
9  aware of that other than I was not a party to putting it
10 in.
11     Q.  So you had no involvement whatsoever in any
12 research to figure out those procedures?
13     A.  No.
14     Q.  Is that correct?
15     A.  No.
16     Q.  Do you know who was involved in devising that
17 procedure in the Senate?
18     A.  No.
19     Q.  Was Senator Williams at all involved in
20 devising that procedure in 2000 --
21     A.  You need to ask Senator Williams that.
22     Q.  Are you aware of Senator Williams having any
23 involvement in devising that procedure?
24     A.  No.
25     Q.  Did Senator Williams introduce the Senate

225

1  resolution to include Rule 5.11 in the 2009 rules?
2      A.  The rule was presented by Senator Eltife that
3  is the Chairman of Administration.
4      Q.  Are you certain of that?
5      A.  No.  Oh, I'm -- I'm certain that Senator Eltife
6  is the one that presents the rules.
7      Q.  Did Senator Williams introduce a Senate
8  resolution to modify the rules in 2009 to include Rule
9  5.11?
10     A.  I don't -- I don't know, but I don't think so,
11 because the rules have to be adopted by the Senate as a
12 whole on the Floor of the Senate, and to my knowledge,
13 I've never seen -- I don't know of an amendment being
14 offered on the Floor.
15         MS. WESTFALL:  Would you mark this?
16         (Exhibit 27 marked for identification.)
17     Q.  (By Ms. Westfall)  Senator, you've been handed
18 what's been marked Exhibit 27.  Do you recognize this
19 document?
20     A.  No.
21     Q.  Is this the Senate Journal from January 14,
22 2009?
23     A.  Appears to be.
24     Q.  Turning your attention to the third page of
25 this document, which is Page 23 of the Senate -- this

226

1  particular Senate journal.  I'd like to turn your
2  attention to Senate Resolution 14.  Senator, does
3  Exhibit 27 refresh your recollection as to Senator
4  Williams' involvement in Senate Resolution 14?
5      A.  No, it does not.
6      Q.  Do you know anything about the circumstances
7  under which Senate Resolution 14 was introduced?
8      A.  No.
9      Q.  Or the reason for it?
10     A.  No.
11     Q.  You can put aside this exhibit.  We're done for
12 the time-being.  When you were laying out a bill in
13 committee, do you do your best to be accurate in your
14 answers?
15     A.  Yes.
16     Q.  Truthful?
17     A.  Yes.
18     Q.  Provide complete answers?
19         MS. HALPERN:  Objection.
20     Q.  (By Ms. Westfall)  You may answer.
21     A.  You'd have to give a definition of what a
22 complete answer is.  That, obviously, you answer the
23 question that is asked.
24     Q.  If you say something you later learn is
25 erroneous, is there a mechanism by which you can correct

227

1  the record?
2      A.  You can correct what you said and correct it.
3      Q.  But after you said something on the Senate
4  Floor and you learn that it's wrong, can you correct the
5  official record later, or is there not a mechanism for
6  that?
7      A.  You're asking again a very broad question,
8  because it depends on the procedures going on.  And if
9  the procedure's already been resolved, that I could
10 enter a statement into the record that something was
11 said incorrect and you could enter something in the
12 record to correct that.  So the answer I guess is yes,
13 you can.
14     Q.  Did you make any corrections to the record of
15 your statements concerning Senate Bill 362?
16     A.  I'm sorry, I don't remember.
17     Q.  Did you make any corrections to the record of
18 your statements about Senate Bill 14?
19     A.  Also, I don't remember.
20     Q.  Earlier in this deposition you testified that
21 Senate Bill 362 made you feel, quote, uncomfortable.  Do
22 you remember that testimony?
23     A.  Yes.
24     Q.  Why were you uncomfortable about Senate Bill
25 362?

228

1      A.  That I considered 362 a starting place, but it
2  lacked, like many things in the Legislature, it didn't
3  do everything that I'd like to have seen done, which I
4  was in favor of a full photo ID.
5          MS. WESTFALL:  Could you mark this?
6          (Exhibit 28 marked for identification.)
7      Q.  (By Ms. Westfall)  Senator, you've been handed
8  what's been marked as Exhibit 28.  Do you recognize this
9  document?
10     A.  No.
11     Q.  Senator, is there anything in the record
12 related to your discomfort with Senate Bill 362?
13     A.  Probably not.
14     Q.  Turning back to Exhibit 28, which is highly
15 confidential, and the questions related thereto are
16 deemed highly confidential.  Exhibit 28 is Texas
17 00265592 through 96.  Do you see the chart on the second
18 page of this document?
19     A.  Yes.
20     Q.  Okay.  The first page of this document, is it
21 an e-mail?
22     A.  You're asking me?
23     Q.  Yes.
24     A.  I don't do e-mails, so I don't know the answer.
25     Q.  Do you see that the Janice McCoy is listed as a

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

58 (Pages 229 to 232)

229

1  recipient of this document?
2      A.  Yes.
3      Q.  And she is your former chief of staff who
4  worked on Voter ID issues, right?
5      A.  Yes.
6      Q.  And this document is dated January 21, 2011,
7  correct?
8      A.  Yes.
9      Q.  It was shortly before the Senate's
10 consideration of Senate Bill 14, right?
11     A.  Yeah.
12     Q.  And so turning your attention back to the
13 chart, have you ever seen a chart like this?
14     A.  No.
15     Q.  And does this chart appear to compare
16 provisions of the Indiana photo ID law, Georgia photo ID
17 law and Senate Bill 14 as introduced and Texas current
18 law?
19     A.  It appears.
20     Q.  Would you mind taking a look at the row
21 entitled "Provisional Ballot," and let me know when
22 you've had a chance to look at?
23     A.  Yes.
24     Q.  I believe you testified earlier about
25 provisional ballot procedures.  Does this chart indicate

230

1  that Senate Bill 14 as introduced would require a voter
2  who didn't have appropriate ID to return to cast a
3  provisional ballot and then return within six days with
4  appropriate ID in order to ensure that ballot would be
5  counted?
6      A.  It appears to stay that.
7      Q.  And does it indicate that under then current
8  law, if the voter -- Texas current law, that if the
9  voter had no ID, the voter would cast a provisional
10 ballot and the registrar would confirm eligibility
11 within seven days and then count that ballot?
12     A.  That's what it says, yes.
13     Q.  Was that your understanding of current law
14 about provisional ballot when you were considering
15 Senate Bill 14?
16     A.  I think I've advised that you asked me the
17 question, and I think I told you that I wasn't totally
18 sure on provisions on current law.  I knew that on
19 Senate Bill 14 that we had the bill to cast a
20 provisional ballot and they had to return within six
21 days with an ID in order to vote.
22     Q.  So based on information in the chart which you
23 just testified you believe is correct --
24     A.  I didn't say that I believe this is correct.
25 You're representing that someone sent this to someone

231

1  else.  I haven't seen it, and I haven't represented that
2  it's correct.
3      Q.  At any time during consideration of Senate Bill
4  14, do you recall receiving information about the
5  current procedures related to provisional ballots and
6  people who didn't -- voters who did not have appropriate
7  ID?
8      A.  No.
9      Q.  Assuming that this chart lays out an accurate
10 comparison of Texas current law and Senate Bill 14, do
11 you think it is a significant change in provisional
12 ballot procedure between the then current law and Senate
13 Bill 14?
14     A.  Yes, because we had a significant change in the
15 ID procedures and that if someone is going to vote, they
16 had to have a photo ID.  If they didn't have that and
17 they still wanted to vote, they could vote
18 provisionally, but they had to come back and show their
19 photo ID.  So yes, it was a change.
20     Q.  And before under previous law, the voter would
21 not have to return to the registrar a second time?
22     A.  In the previous law we did not have a photo ID.
23     Q.  But in answer to my question, the voter would
24 not need to return; isn't that correct?
25     A.  And I've already told you that I'm not aware --

232

1  I'm not familiar with that.
2      Q.  Are you aware of whether provisional ballots
3  are paper ballots?
4      A.  I'm sorry, I'm not aware of that either.  I
5  don't know.
6      Q.  Do you know whether the voter fills out an
7  affidavit outside of provisional ballot?
8      A.  I feel sure that there's some affidavit they
9  have to do in order to file a ballot, yes.
10     Q.  And county election officials ordinarily for
11 provisional ballots make a determination as to whether
12 that ballot should be counted; is that right?
13     A.  That's your answer, not mine.
14     Q.  You don't -- you don't know?
15     A.  I don't -- no, I don't.  The provisions for
16 that are set by the Secretary of State or by the local
17 counties that they have a methodology that they put in
18 place for voting for provisional, and that was not
19 dictated by the Legislature.
20     Q.  Are you aware, were you aware -- strike that.
21         Were you aware at the time of considering
22 Senate Bill 14 of any need, factual need to change the
23 law as it pertained to provisional ballots?
24     A.  Of course I was aware of the need to change,
25 because if you're implementing a photo ID and someone

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

59 (Pages 233 to 236)

233

1  doesn't have a photo ID, we want them to be allowed to
2  vote, but they're going to have to come back and prove
3  they have a photo ID.
4      Q.  But isn't it true that under Senate Bill 362,
5  the provisional ballot process was that a voter would --
6  a voter who did not have ID would vote provisionally,
7  and the county board would determine whether to count
8  that without the voter having to return to the office?
9      A.  362 was not a pure photo ID bill, and I've
10 stated before that there was things in 362 that I was
11 not in agreement with.  We changed that in Senate Bill
12 14 and changed it to a pure photo ID bill.
13     Q.  But do you know whether Senate Bill 362
14 included that provision, not requiring the voter who
15 cast the provisional ballot to return to the registrar?
16     A.  I cannot verify that.
17     Q.  Are you aware of any erroneous determinations
18 by a county election official concerning whether to
19 count a provisional ballot?
20     A.  I'm sorry, I'm not -- no, I've not been
21 advised.
22     Q.  Do you recall that Senator Van de Putte asked
23 you questions about the provisional ballot procedures in
24 Texas during the hearing on Senate Bill 14?
25     A.  I'm still -- I do not remember that.

234

1      (Exhibit 29 marked for identification.)
2      Q.  (By Ms. Westfall)  You've been handed what's
3  been marked as Exhibit 29.  Do you recognize this
4  document?
5      A.  No.
6      Q.  I will represent to you that it is an excerpt
7  of the transcript of proceedings before the Texas Senate
8  on January 25, 2011, related to consideration of Senate
9  Bill 14, and that the testimony includes -- I mean the
10 transcript includes your laying out of the bill and
11 questions and answers that you received from Senators.
12         Turning your attention to Senate
13 transcript, the Senate transcript at Page 44, do you see
14 that you were asked questions by Senator Van de Putte
15 about the provisional ballot process?
16     A.  What was the question?
17     Q.  Do you see that you referred Senator
18 Van de Putte and her questions regarding the changes in
19 law to provisional ballots to the Secretary of State's
20 office?
21     A.  Yes.
22     Q.  Do you know whether there was any consideration
23 given by you or others to the consequences of changing
24 the law in Texas as it pertained to provisional ballots?
25     A.  The -- in the -- the reason we referred her to

235

1  the Secretary of State was because it was scheduled to
2  be one of the invited guests to testify.  The questions
3  to the author come prior to that.  The next person to
4  come up was the Secretary of State, and it would be
5  eligible to ask questions.  At that point, if questions
6  were asked and concerns were raised, we would listen to
7  the concerns.  If the concerns were valid and needed to
8  be changed, we could have addressed that by amendment.
9  So the order -- if she's raising a question, I'm saying
10 the correct place to ask that is to the next witness.
11     Q.  So you referred her to the Secretary of State's
12 Office?
13     A.  I didn't refer her to the Secretary of State.
14 I said the Secretary of State's Office will be
15 testifying as the next person.  Once they come up, the
16 question you're asking, they can give you the clearest
17 description to make sure that I'm not inaccurately
18 telling you what the -- the question you're asking.
19     Q.  In light of the change in law of provisional
20 ballots, whereas before the voter did not have to return
21 to the registrar to present any documentation, and the
22 ballot could still be counted, whereas as under Senate
23 Bill 14, the voter who cast a provisional ballot for
24 lack of ID would have to come and present ID in order to
25 ensure that that would be counted, was any consideration

236

1  given to -- by the Senate to the consequences of this
2  change on voters?
3      A.  Sure.  I mean, there was a discussion where --
4  it's here in the record where Senator Van de Putte and I
5  had a discussion about it, and then when the Secretary
6  of State came up, it was discussed.  That was -- that
7  was a point of discussion.  As it's turned out that it
8  was not a problem at all, that as history has shown us
9  since we've had elections since then, we found out that
10 we have had virtually no problem with the provisional
11 ballots and that people -- there are very few of them
12 being filed, and the ones that have been filed, that it
13 has not been a problem.
14     Q.  What is the basis of your knowledge?
15     A.  On this?
16     Q.  On the provisional ballot process?
17     A.  Asking questions of the Secretary of State.
18     Q.  That has happened after the bill has -- since
19 the time the bill has been implemented?
20     A.  Yeah, it would be an impossible to project
21 prior to the passage of the bill what the impact would
22 be other than asking questions of the Secretary of State
23 of how they intended to implement.  And by after we --
24 they explained how they had planned to implement this
25 and education of the voters, it turned out that the way

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

237

1 we implemented it worked well.
2     Q.   Did you make any changes to the bill based on
3 the testimony of representatives from the Secretary of
4 State's office with regard to provisional ballots?
5     A.   I don't remember making that, and I don't
6 believe that there was an amendment that was accepted
7 for that.
8     Q.   Is the voter registrar's office generally open
9 on weekends?
10     A.   Voter registrar's, to register to vote?
11     Q.   The county elections office, is it open on
12 weekends?
13     A.   We have 254 counties, so I don't know how to
14 answer that.
15     Q.   Are you aware of any county election's office
16 that's opened on the weekends?
17     A.   It's not an issue. I know -- I don't -- I'm
18 sure that that was addressed and asked, but I don't have
19 an answer today.
20     Q.   Are you aware of any county election's office
21 that's open outside of business hours during the week?
22     A.   Once again, it's not one that I've researched.
23 I researched the one on DPS office.  I didn't look at
24 registrar's office.
25     Q.   Is there anything in Senate Bill 14 that

238

1 requires county election offices to be opened on the
2 weekends?
3     A.   To my knowledge, no.
4     Q.   Or during -- outside of business hours?
5     A.   To my knowledge, no.
6     Q.   Was there any consideration given to extending
7 the hours of county election offices based on new
8 provisional ballot procedures?
9     A.   I -- I don't remember that whether there was
10 discussion of it or not.
11     Q.   Were any changes made to the provisional ballot
12 provision in the bill after the bill was referred to the
13 House?
14     A.   Not to my knowledge.
15         MS. WESTFALL:  Can you mark this?
16         (Exhibit 30 marked for identification.)
17     Q.   (By Ms. Westfall)  Senator, you've been handed
18 what's been marked as Exhibit 30, which is a highly
19 confidential document.  It is TX00034516.  Do you
20 recognize this document?
21     A.   I do not.
22     Q.   Do you see that it is sent from your chief of
23 staff, former chief of staff, Janice McCoy?
24     A.   Yes.
25     Q.   On April 12, 2011?

239

1     A.   Yes.
2     Q.   And it is sent to Mr. Hebert, correct?
3     A.   Appears to be.
4     Q.   Do you know why -- and do you see that it
5 indicates the subject is "OAG Language"?
6     A.   Yes.
7     Q.   And do you see that this refers to a change in
8 provisional ballots regarding persons who have religious
9 objections to being photographed?
10     A.   (Reading.)
11     Q.   Do you know why -- do you see that language?
12     A.   Yes.
13     Q.   Do you know why the OAG was providing
14 legislative language related to Senate Bill 14?
15     A.   Did not.
16     Q.   Was this provision related to an exception for
17 persons with religious objection to being photographed
18 part of the Indiana photo ID law, to your knowledge?
19     A.   I don't have the information on that.
20     Q.   Did you have any concerns about -- did you
21 serve on the Conference Committee for Senate Bill 14?
22     A.   Chaired it.
23     Q.   Did you have any concerns about having an
24 out-of-bounds resolution related to Senate Bill 14?
25     A.   Anytime you have an out-of-bounds resolution

240

1 it's problematic, because an out-of-bounds requires a
2 two-thirds' vote to put in.
3     Q.   Two-thirds' vote of both bodies?
4     A.   Both bodies.
5     Q.   So did you want to avoid that if possible?
6     A.   Well, the -- in most cases, if there's a bill
7 that you're concerned about getting two-thirds' vote,
8 that the answer would be yes.
9     Q.   Did you have concerns about getting two-thirds
10 of a vote for the out-of-bound resolution in the Senate?
11     A.   This isn't -- this is not from me.  It's not to
12 me.  And I told you that I haven't seen this.  So
13 assuming that I had concerns about it implies that I
14 knew about it, and I've just said that I don't -- you
15 know, this -- I have not seen this.
16     Q.   After Senate Bill 362 passed the Senate, was it
17 reported in the press that Representative Smith was
18 pursuing a modification to Senate Bill 362 that would
19 involve allowing the voter to use an affidavit?
20     A.   I'm not advised and you'd have to ask
21 Representative Smith that.
22     Q.   Was the OAG office involved in drafting any
23 other provisions for Senate Bill 14 that you're aware
24 of?
25     A.   Not to my knowledge.

SENATOR TROY FRASER                                      7/23/2014
CONFIDENTIAL TRANSCRIPT

61 (Pages 241 to 244)

---

241

1    Q.  Besides Exhibit 30?
2        MS. HALPERN:  Actually, let me enter an
3  objection here and now.  This witness has not verified
4  for you that OAG drafted this language, and I understand
5  that the subject line in the e-mail says OAG language.
6  But it is also a fact that e-mails go back and forth and
7  the content changes and the subject line never changes,
8  and I'm going to object that there is no foundation that
9  the OAG drafted the actual language that appears on
10  Exhibit 30, and this witness has certainly not confirmed
11  that.
12        MS. WESTFALL:  Ms. McCoy testified to it,
13  but I appreciate your comments.
14    Q.  (By Ms. Westfall)  I believe you testified
15  earlier that you're aware that the record on
16  consideration -- of consideration of Senate Bill 14
17  would be provided to the Department of Justice; is that
18  correct?
19    A.  Would you repeat that, please?
20    Q.  I believe you testified earlier in this
21  deposition that you were aware that the legislative
22  record of the consideration of Senate Bill 14 would be
23  provided to the Department of Justice as part of the
24  preclearance process; is that correct?
25    A.  I don't know that's entirely true, because I

---

242

1  believe there was two routings to go, either
2  preclearance or a three-judge panel, so I don't think
3  that I said that everything was going to -- to
4  preclearance.
5    Q.  Did -- was it your belief that it would go --
6  that the public legislative record would go either to
7  the Department of Justice or a three-judge panel as part
8  of the Section 5 review process?
9    A.  I did believe that it would go one of the two
10  places.
11    Q.  Did that make you consider how -- how -- what
12  sort of statements you made on the Senate Floor?
13    A.  I was aware that everything that I was saying
14  was part of public record.
15    Q.  So you had to be careful; is that correct?
16    A.  You're putting words in my mouth.
17        MS. HALPERN:  Objection.
18        MR. CLAY:  That mischaracterizes his
19  answer.
20    Q.  (By Ms. Westfall)  Did you --
21    A.  I just said that I was aware that everything I
22  said was part of public record.
23    Q.  Did you provide drafts of your Floor statements
24  to the Office of the Attorney General before you made
25  them related to Senate Bill 14?

---

243

1    A.  No --
2        MS. HALPERN:  Let me stop.  Stop.  I'm
3  going to object on the grounds of attorney-client,
4  because if he did that, then he did that because he was
5  consulting a legal opinion, and so I'm going to direct
6  him not to answer that.
7        MS. WESTFALL:  Okay.
8    Q.  (By Ms. Westfall)  What is the base -- factual
9  basis of your -- well, strike that.
10        I believe you testified earlier in this
11  deposition that according that according, to use your
12  words, the Democrats wanted to deal with Senate Bill 14
13  early in the session and get it over with.  Is that --
14  was that your testimony?
15    A.  No.  It's not what I said.  I said that
16  there -- the Democrats and Republicans both were in
17  agreement that we should go ahead and move Senate Bill
18  14, because they believed the likelihood that it was
19  going to pass and go ahead and get it out of the way is
20  I think is the way --
21    Q.  What is the basis of your knowledge and
22  testimony?
23    A.  Conversations with other Senators.
24    Q.  And can you identify, not the content of the
25  conversation, but the Senators by name?

---

244

1    A.  I would claim privilege on that because of the
2  communications between other Senators.
3    Q.  Do you recall that Senator Van de Putte sent
4  Senator Duncan a letter objecting to the timing of the
5  Senate's consideration of Senate Bill 14 because there
6  was not enough notice?
7    A.  No.
8    Q.  Do you recall that, notwithstanding that the
9  Senate's consideration of Senate Bill 14 was not as
10  lengthy in time as Senate Bill 362, that bill opponents
11  expressed strong opposition to the bill even though they
12  knew they didn't have the votes to stop it?  Do you
13  recall that?
14    A.  No.
15        MS. HALPERN:  Counsel, I'd like a five-
16  minute break to confer with the witness before you ask a
17  question.
18        MS. WESTFALL:  Sure.
19        (Recess from 4:25 p.m. to 4:42 p.m.)
20        (Exhibit 31 marked for identification.)
21    Q.  (By Ms. Westfall)  You've been handed what's
22  been marked as Exhibit 31.  It is a highly confidential
23  document, TX00262650 through TX00262652.  Do you
24  recognize this document?  Do you recognize this
25  document?

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

62 (Pages 245 to 248)

---

245

1    **A.  No.**
2    Q.  Have you ever seen it before?
3    **A.  No.**
4    Q.  Do you see that this an e-mail dated January
5    22, 2011?
6    **A.  Yes.**
7    Q.  And it's from -- it embeds an e-mail that is
8    from Mr. Hebert to a number of recipients, including
9    Janice McCoy?
10   **A.  Yes.**
11   Q.  Did Ms. McCoy -- although you just testified
12   you've never even this document before, Exhibit 31, did
13   Ms. McCoy share any of the contents or messages that
14   were conveyed by Mr. Hebert to her?
15   **A.  No.**
16   Q.  Did you want Senate Bill 14 to be enforceable?
17   **A.  Yes.**
18   Q.  To be enforceable at the time it was enacted,
19   it needed to be precleared under Section 5 of the Voting
20   Rights Act; is that correct?
21   **A.  I believe I just testified that I think we had**
22   **two choices, either preclearance or three-judge panel.**
23   Q.  And so it was either administrative
24   preclearance through the Department of Justice or
25   judicial preclearance through the three-judge panel; is

---

246

1    that right?
2    **A.  That's correct.**
3    Q.  Did you have any concerns in January of 2011
4    about the prospects of preclearance for Senate Bill 14?
5    **A.  No.**
6         MS. HALPERN:  Objection, legislative
7    privilege.  You can answer.
8    **A.  No.**
9    Q.  (By Ms. Westfall)  Did you believe at that time
10   that there was -- that preclearance was doubtful?
11   **A.  No.**
12   Q.  Why were you confident that it would be
13   precleared?
14   **A.  That based on looking at the opinion of the**
15   **U.S. Supreme Court and what had been precleared in**
16   **Georgia, that I believed our bill was both**
17   **constitutional and would be precleared.**
18   Q.  Do you see that Mr. Hebert in Exhibit 31
19   suggests adding forms of ID that had been issued in
20   Georgia's law related to IDs issued by the federal
21   government, state government or local government?
22   **A.  Mr. Hebert is not my counsel and that I had no**
23   **dealings with him.**
24   Q.  But turning back to my question, do you see
25   that he made that recommendation in Exhibit 31?

---

247

1    **A.  I see that it is on his paper, yes.**
2    Q.  Were those forms of ID from Georgia's law
3    related to IDs issued by the federal government, state
4    government or local government added to Senate Bill 14
5    during the legislative process?
6    **A.  No.**
7    Q.  Why not?
8    **A.  The bill as we had laid it out we believed was**
9    **both constitutional and would be precleared.**
10   Q.  Do you believe that adding those forms of ID,
11   either ID issued by the federal government, state
12   government or local government, would have interfered
13   with the effectiveness of Senate Bill 14 in preventing
14   in-person voter impersonation?
15   **A.  We were very comfortable with the bill, Senate**
16   **Bill 14, as filed.**
17   Q.  In response to my question, and I would move
18   to -- as --
19        MS. WESTFALL:  I object as unresponsive to
20   your response.
21   Q.  (By Ms. Westfall)  Would adding those forms of
22   ID have interfered with the effectiveness of Senate Bill
23   14 in preventing in-person voter impersonation?
24   **A.  I believe that Texas needed a clear photo ID**
25   **bill.**

---

248

1         MS. WESTFALL:  I would object as
2    nonresponsive.
3    Q.  (By Ms. Westfall)  And ask you again, do you
4    believe that adding IDs issued by the federal
5    government, state government or local government would
6    have interfered with the effectiveness of Senate Bill
7    14?
8    **A.  I do not believe the bill would have been as**
9    **effective because we believed we needed to implement a**
10   **clear photo ID bill.**
11   Q.  And the Georgia law and the suggestions of
12   Mr. Hebert were photo IDs, correct?
13   **A.  I'm sorry, I don't -- well, I don't know.**
14   Q.  Do you know whether --
15   **A.  I haven't studied this.**
16   Q.  My apologies.  Do you know whether the Georgia
17   photo ID law allows for the use of photo ID issued by
18   the federal government?
19   **A.  I do not know.**
20   Q.  Do you know whether the Georgia photo ID law
21   allows for the use of photo ID issued by the state
22   government?
23   **A.  I'm sorry, I do not know.**
24   Q.  Do you believe that federal employee IDs are
25   secure?

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

                                        63 (Pages 249 to 252)

---

**249**

1    A.  I'm sorry, I do not know.
2    Q.  Do you know whether some federal employee IDs
3  encrypt the fingerprint of the cardholder into the card?
4    A.  I do not know that.
5    Q.  Do you believe or know whether some federal ID
6  employee IDs are more secure than state-issued forms of
7  photo ID?
8    A.  I do not know that.
9    Q.  Turning your attention back to the Committee of
10  the Whole debate in January 25, 2011, which is Exhibit
11  29.  Turning your attention to page 35 of the debate.
12  And actually, it starts at 34.  Can you see -- do you
13  see that Senator Van de Putte asked you what Senate Bill
14  14 was modeled after and whether it was modeled after
15  the Indiana law?
16    A.  Would you like to point out where it says that?
17    Q.  Certainly.  At the bottom of page 34, beginning
18  at Line 21, if you could just review that question from
19  Senator Van de Putte and your answer on page 35.  And
20  let me know when you've had a chance to do that, I
21  appreciate it.  And Senator, feel free to unclip that if
22  you're not able to read.
23    A.  Okay.
24    Q.  Do you see that Senator Van de Putte asks
25  whether Senate Bill 14 was modeled after the Indiana

---

**250**

1  law?
2    A.  I don't believe I see the word "modeled."
3    Q.  Well, at the top of Page 35, that, "this year's
4  model is fashioned after the Indiana law," do you see
5  that part of her question?
6    A.  Okay.
7    Q.  And she was asking, was she not, whether Senate
8  Bill 14 was based on modeled after the Indiana photo ID
9  law, correct?
10    A.  I believe my answer is that we've had two years
11  later that we've had a Supreme Court decision and a
12  preclearance of Georgia, and with that experience
13  that -- and also the recommendation of the -- the
14  Baker-Carter Commission, that we have decided to go with
15  the photo -- pure photo ID bill.
16    Q.  Do you believe that your answer responded to
17  her question?
18    A.  She said thank you.  I'm assuming it did.
19    Q.  Turning your attention to page 45.  Actually,
20  begins at page 44.  Do you see that Senator Van de Putte
21  asked you whether there had been any studies done to
22  determine whether, under current Texas voter law, there
23  would be an impact on classes of Latino or African
24  American voters?  And what was -- do you see that?
25    A.  Uh-huh.

---

**251**

1    Q.  You have to just say "yes" for the court
2  reporter.
3    A.  Yes.
4    Q.  And what was your response to her question?
5    A.  You would like me to read the response?
6    Q.  No, could you just summarize your response?
7    A.  I think my response is, is that the bill that
8  we're laying out is modeled after bills that was
9  approved by the Supreme Court and the Department of
10  Justice in Georgia.  We're providing free access cards,
11  and we believe that to protect the confidence in
12  election in making sure that only eligible voters are
13  counted.
14    Q.  Do you believe that your response answers
15  Senator Van de Putte's question?
16    A.  She didn't appear to -- that it did not.
17    Q.  So is your testimony that you did answer her
18  question?
19    A.  I believe I answered her question.
20    Q.  Turning to page 162 of the transcript.  Do you
21  see that Senator West asked you a question about whether
22  there was research conducted on the burdens of photo ID
23  and whether they may fall disproportionately on racial
24  minorities on page 162?
25    A.  Would you show me where it says that?

---

**252**

1    Q.  Sure.  It begins on Line 17 of 162.
2    A.  Yes.
3    Q.  And what was your response to Senator West's
4  question?
5    A.  The -- I quoted the results of the current poll
6  had been done two weeks before the bill was heard
7  showing that if you ask the public -- and if they were
8  African American, do you believe that a valid photo ID
9  -- a valid photo ID would -- should be allowed to vote,
10  82 percent of African American people responded
11  positively, yes, we should implement that.
12    Q.  Why did you respond to Senator West's question
13  with polling data that you just described?
14    A.  He was asking if the polling data was broken
15  down by ethnicity and had both African American and
16  Hispanics responding.
17    Q.  How did you believe that that was responsive to
18  his question about how burdens of photo ID requirements
19  fall on racial minorities?
20    A.  If you ask an African American or Hispanic if
21  they believe that it should be implemented and they say
22  yes, it does, you -- the assumption is that they agree
23  with it.
24    Q.  In other words, that the polling data indicated
25  there was no effect, is that your testimony?

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

253

1   A.   The testimony is as -- as we've, you know,
2   explored all day, Texas has no ability for us to do
3   independent studies.  The way you do studies are either
4   testimony that happens with a legislation or a poll that
5   is conducted by someone else.  This is a poll that's
6   conducted two weeks prior to the bill being heard.  I
7   was giving him the data of the poll.
8   Q.   And you -- and is it your testimony the data
9   from the poll was responsive to Senator West's question?
10  A.   I believe it is.  He accepted it.
11  Q.   Turning to Page 159 at Line 16.  Do you see
12  that Senator West asked you whether there was any
13  prosecution of fraud in Texas associated with
14  identification?
15  A.   (Reading.)
16  Q.   Senator, do you see that Senator West requested
17  information about prosecutions of fraud associated with
18  that?
19  A.   I do not.
20  Q.   On page 159?
21  A.   No.
22  Q.   You don't see it on page 159 at Line 16?
23  A.   No.  Okay.  I see whether --
24  Q.   That's exactly right.  That's where it starts.
25  A.   What was your question?

254

1   Q.   Do you see your response to that question?
2   A.   I do.
3   Q.   What was your response?
4   A.   "I believe the bill that we're bringing forward
5   today will clearly say when you walk in the voting
6   booth, you identify yourself as who you say you are, and
7   the bill that we're bringing forward, we believe will
8   pass the Supreme Court of the United States and be
9   approved by the Justice Department."
10  Q.   Do you believe that your response was
11  responsive to Senator West's question?
12  A.   It must have been because he did respond and
13  went to the next question.
14  Q.   Is that the only reason why you think it was
15  responsive?
16  A.   Well, other than I know Senator West very well,
17  and he's not bashful about asking a second question.
18  Q.   During the Senate's -- and you can put away
19  that exhibit for the time-being.  During the Senate's
20  consideration of Voter ID legislation, were there
21  requests for information about the racial composition of
22  Texas voters that did not possess a driver license?
23  A.   I believe there was a question asked of DPS
24  when they were testifying.
25  Q.   Did you make any requests yourself?

255

1   A.   No.
2   Q.   When did you first become aware of requests for
3   information about the racial composition of Texans who
4   lacked -- Texas voters who lacked a driver license?
5   A.   Questions that were asked by -- by opponents of
6   the bill during the hearing.
7   Q.   And did you first learn about that during
8   consideration of Senate Bill 362?
9   A.   I think those questions have been asked through
10  three sessions, through 218, 362 and Senate Bill 14.
11  Q.   Did you prepare for the Committee of the Whole
12  hearing on Senate Bill 14 by meeting with anyone from
13  the Secretary of State's Office?
14  A.   No.
15  Q.   Did you meet with Ann McGeehan in January 2011,
16  before the Committee hearing?
17  A.   Not to my knowledge.
18  Q.   Does the Secretary of State maintain data about
19  Texas voters who have Hispanic surnames?
20  A.   I'm sorry, I don't know that answer.
21  Q.   Who is Coby Shorter?
22  A.   He was an employee of the Secretary of State.
23  Q.   Is he the Deputy Secretary of State?
24  A.   To my knowledge he is.
25  Q.   Was he at the time of consideration of Senate

256

1   Bill 14?
2   A.   I believe he was, yes.
3   Q.   Before the Committee of the Whole hearing on
4   Senate Bill 14, were you standing outside of the Senate
5   chamber with Senator Williams before the hearing?
6   A.   There's no way I would remember that.
7   Q.   Do you recall that during the Committee of the
8   Whole consideration of Senate Bill 14, that Ann McGeehan
9   testified as a resource witness?
10  A.   In 2011, Senate Bill 14?
11  Q.   Yes.
12  A.   I'm sorry, I don't remember.
13       (Exhibit 32 marked for identification.)
14  Q.   (By Ms. Westfall)  You've been handed what's
15  been marked as Exhibit 32.  Do you recognize this
16  document?
17  A.   No.
18  Q.   Turning your attention to pages -- I will
19  represent for the record that Exhibit 32 is a transcript
20  of the Committee of the Whole, Senate, January 25, 2011,
21  and it is an excerpt that includes Ann McGeehan's
22  testimony.  Do you see that on pages 446 of this
23  transcript, excerpted transcript, at the bottom of the
24  page --
25  A.   Okay.

SENATOR TROY FRASER
CONFIDENTIAL TRANSCRIPT

7/23/2014

66 (Pages 261 to 264)

---

**261**

1  people -- what document they've used to register to
2  vote.
3      Q.  Do you know whether Senator Williams or his
4  staff ever followed up with the Secretary of State's
5  Office to get information about the number of registered
6  voters without a driver's license?
7      A.  I don't know.
8      Q.  Did you ever discuss Senator Williams' request
9  with any other Senators?
10     A.  No.
11     Q.  Did you ever discuss Senator Williams' request
12  with the Lieutenant Governor and his staff?
13     A.  Not to my knowledge.
14     Q.  Did you ever discuss Senator Williams' request
15  with any House member or his or her staff?
16     A.  Not to my knowledge.
17         MS. HALPERN:  Where are we on time?
18         MS. WESTFALL:  Let's go off the record
19  while he --
20         MS. HALPERN:  You have one more
21  questioner, right?
22         (Off the record while time is computed.)
23         THE REPORTER:  5 hours and 50 minutes.
24         (Exhibit 33 marked for identification.)
25     Q.  (By Ms. Westfall)  You've been handed -- you've

---

**262**

1  been handed what's been marked as Exhibit 33, Senator.
2      A.  What?
3      Q.  You've been handed what's been marked as
4  Exhibit 33, which is Texas 00107733 through Texas
5  00107735.  Do you recognize this document?
6      A.  No.
7      Q.  Have you ever seen this document before?
8      A.  No.
9      Q.  Have you ever seen -- turning your attention to
10  the third page of this document which has Question,
11  Discussion and Conclusion.  Have you ever seen any of
12  these numbers before today?
13     A.  I do believe I've seen the numbers on the back
14  of the page, yes.
15     Q.  Do you see that this relates to voters without
16  a driver license number or ID number or who matched a
17  DPS record?
18     A.  Yes.
19     Q.  So this is different from the analysis you just
20  testified to involving voters who do not indicate a
21  driver license number when they registered; is that
22  correct, to vote?
23         MS. HALPERN:  Objection, misstates the
24  evidence.
25     Q.  (By Ms. Westfall)  You may answer.

---

**263**

1      A.  I'm not -- I'm not sure of the answers.  I
2  don't know the answer.  It was a cross-reference, but
3  the -- what we deemed from -- and I'm actually not sure
4  I've ever seen this, but the information that I have
5  seen showed that it was inconclusive, and the Secretary
6  of State didn't have the ability to determine how many
7  people had driver's license.
8      Q.  Have you ever seen any analysis or discussed
9  any analysis of a cross-referencing of the Texas voter
10  registration database with the DPS database?
11         MS. WESTFALL:  Could we go off the record?
12         MR. SCOTT:  Yeah, we've got something
13  to give to you so he can be released.  So off the record.
14         (Recess from 5:11 to 5:12 p.m.)
15         MS. WESTFALL:  Back on the record.
16     Q.  (By Ms. Westfall)  Senator, did you ever, when
17  you were -- during the time of consideration of Senate
18  Bill 14, receive any information from the Secretary of
19  State's Office about its attempt to match the TEAM
20  database with the DPS driver license database to
21  determine which voters had a driver license?
22     A.  The answer is no.  This correspondence was
23  February 1st.  So as the bill was being held in the --
24  or heard in the Senate -- the answer is no.
25     Q.  So, in other words, even after the Senate had

---

**264**

1  passed out and had passed Senate Bill 14 and had moved
2  it to the House, you at no time received any analysis
3  subsequent to Senate passage of Senate Bill 14 related
4  to analysis of Texas voters without a driver license?
5      A.  If I did, that was five years ago, and I'm
6  sorry, I don't remember.
7      Q.  Would any of this analysis or information have
8  been helpful to you during your consideration of Senate
9  Bill 14?
10     A.  No.  The analysis they did was nonconclusive
11  because the -- it was determined that the Secretary of
12  State did not possess data that would, you know, was
13  conclusive.
14     Q.  Are you referring to the analysis of the TEAM
15  database as to who indicated a driver license number on
16  the voter registration application?
17     A.  Yes.
18     Q.  And that I would represent to you is different
19  from the analysis contained in Exhibit 33, which is a
20  comparison as indicated on Page 2 of the TEAM database
21  with a driver license database.
22         Turn your attention to the last page of
23  this document, at the Conclusion, can you just look at
24  that one sentence?
25     A.  There's a lot of sentences.  Which sentence?

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

67 (Pages 265 to 268)

265

1    Q.   The last sentence, the Conclusion, there's one
2  sentence.  Can you just look at that sentence and let me
3  know when you've had a chance to look at it?  Are you --
4  have you looked at it?
5    A.   Yes.
6    Q.   Thanks.  We just need "yes" for the record.  Do
7  you think it would have been helpful to have this
8  information when you were considering Senate Bill 14?
9    A.   The information because it says it may not, is
10 not conclusive, and the answer would be no because it's
11 not conclusive data.
12   Q.   Do you think it would have been helpful for
13 bill opponents to have access to this information during
14 consideration of Senate Bill 14?
15   A.   You know, they -- they had the opportunity to
16 seek the information also, so I would not project
17 whether they would have liked to have had it.
18   Q.   Do you think Texans had a right to this
19 information when Senate Bill 14 was being considered by
20 the Legislature?
21   A.   It is not conclusive information, and we have
22 since found that this is bad -- not only nonconclusive,
23 it's bad information.
24   Q.   So you think the public did not have a right to
25 have access to this information, is that your testimony?

266

1    A.   Public --
2        MS. HALPERN:  Objection, argumentative.
3    Q.   (By Ms. Westfall)  You may answer.
4    A.   The public should, you know -- they -- if it is
5  bad information, there's not a reason to feed bad or
6  questionable information to the public.
7    Q.   And why -- what's the basis of your assertion
8  that this is bad information?
9    A.   The conclusion is that they may not have, it is
10 not conclusive.
11   Q.   Were you aware of any other information that
12 estimated the number of Texas voters who did not have a
13 record in the driver license database?
14   A.   We went entirely, or not entirely, but we took
15 the information from prior studies that had been done of
16 the Baker -- the Baker -- the President?
17       MS. HALPERN:  Carter.
18   A.   Carter, Carter.  Baker Carter Commission.  The
19 study that's done by the Heritage Commission, which, you
20 know, they did a study of the states that had put this
21 into law, put the 24 states -- the Delaware study, and
22 the the University of Missouri study, all of those
23 studies showed that the percentage of people like
24 states, the percentage was extremely high of people that
25 possessed driver's license.  We had no reason to believe

267

1  in Texas that that was not true.
2    Q.   Okay.  So is it your testimony that information
3  about voters in other states and their possession of
4  driver license information would be superior to any
5  information contained in Exhibit 33?
6    A.   The number -- the information in -- in this
7  document says they -- it's inconclusive that it may not
8  and it is in no way conclusive.
9    Q.   So the answer is yes, the information based on
10 the studies you just testified to in other states is --
11 is better?
12   A.   You're answering my question for me.  I stated
13 my answer is that I used the data from the four studies
14 from the data they had collected from actual elections,
15 and since 2004, prior to the passage of Senate Bill 14
16 in 2011.
17   Q.   Are you aware of better, more accurate
18 information that was available in January 2011 than the
19 information -- about which voters lacked a Texas driver
20 license than what is available in what is set forth in
21 Exhibit 33?
22   A.   No.
23   Q.   Did Senator Davis --
24       THE WITNESS:  I need a break.
25       MS. WESTFALL:  Oh, sure, certainly.

268

1        (Recess from 5:18 p.m. to 5:29 p.m.)
2        MS. WESTFALL:  We're back on the record.
3    Q.   (By Ms. Westfall)  Senator, do you recall that
4  Senator Davis offered an amendment which would have
5  prohibited state agencies from charging a fee for
6  issuing documents used to obtain a photo ID like a birth
7  certificate?
8    A.   Would you like to show me a copy of that
9  amendment?
10   Q.   I'm just asking, sitting here today, do you
11 recall an amendment?
12   A.   No.
13   Q.   Are you aware that under Indiana's photo ID
14 law, indigent persons can obtain underlying documents to
15 obtain photo ID free of charge?
16   A.   No.
17   Q.   Do you recall that you moved to table Senator
18 Davis's amendment?
19   A.   No.
20   Q.   Do you recall that you objected to her
21 amendment on the record because it was not means tested?
22   A.   No.
23   Q.   Could Senate Bill 14 have been amended prior to
24 enactment to include a means tested provision?
25   A.   Any -- any bill can be amended for any

269

1  provision.
2      Q.  There was nothing preventing that from
3  occurring, correct, procedurally?
4      A.  Procedurally nothing, no.
5      Q.  And would that change have made Senate Bill 14
6  resemble more closely the Indiana photo ID law?
7      A.  I wouldn't have an opinion on that.
8      Q.  Do you recall that Senator Davis also offered
9  an amendment which would have allowed the use of expired
10 IDs?
11     A.  No.
12     Q.  Are you aware that the Indiana and Georgia
13 photo ID laws permitted the use of expired IDs?
14     A.  No.
15     Q.  Do you recall that you moved to table Senator
16 Davis's amendment related to the use of expired IDs?
17     A.  No.
18     Q.  Do you recall that you supported an alternative
19 amendment offered by Senator Lucio that would have
20 permitted the use of ID expired from no more than 60
21 days?
22     A.  I'm sorry?
23     Q.  Do you recall that you supported an amendment
24 offered by Senator Lucio that would have allowed the use
25 of IDs expired no more than 60 days?

270

1      A.  I do believe that was an amendment that was
2  accepted.
3      Q.  Do you recall that Senate Bill 14 as originally
4  filed did not allow the use of expired IDs at all?
5      A.  I believe that is correct.
6      Q.  And then it was amended to adopt Senator
7  Lucio's amendment permitting the use of IDs --
8      A.  Which is a Democratic Hispanic Senator that we
9  took in the -- the mode of compromise.
10     Q.  And that amendment was adopted, correct?
11     A.  Yes, it was.
12     Q.  Do you recall whether DPS had estimated that it
13 can take up to 40 days to receive a new ID once an order
14 for a new ID is placed?
15     A.  No.
16     Q.  Did you support the amendment for that reason?
17     A.  That wasn't the reason I accepted it, no.
18     Q.  Why did you support that amendment?
19     A.  In the mode of compromise of a Democrat
20 Hispanic senator that asked me to take his amendment,
21 and I accepted it.
22         MS. WESTFALL:  Could you mark this?
23         (Exhibit 34 marked for identification.)
24     Q.  (By Ms. Westfall)  You have been handed what's
25 been marked as Exhibit 34.  It is a highly confidential

271

1  document.  I am unable to read the Bates numbers.  It is
2  entitled "Senate" -- "SB 14 Amendment, Wroe Jackson,"
3  and it is a chart of amendments.  It looks like it's
4  five or six pages long.  Senator, have you seen this
5  document before?
6      A.  No.
7      Q.  Do you know who Wroe Jackson was working for at
8  the time of consideration of Senate Bill 14?
9      A.  No.
10     Q.  Was he working for Senator Huffman?
11     A.  I have no idea.  I don't know that name.
12     Q.  Turning your attention to Page 2 of this
13 document, do you see it lists an amendment in the
14 center, three rows down, by Senator Lucio providing
15 voters a 60-day window following an ID's expiration, on
16 the second page of the document?
17     A.  Yes.
18     Q.  Do you see in the column following the
19 description of the amendment, it says it's "acceptable
20 to members because DPS estimates that it takes up to 45
21 days to receive a new ID"?
22     A.  Yes.
23     Q.  Did you support the amendment in part based on
24 this recommendation?
25     A.  No.

272

1          MS. HALPERN:  Counsel, I need a
2  clarification.  This witness hasn't seen this before.
3  You're representing that it was prepared by Wroe
4  Jackson?
5          MS. WESTFALL:  Well, that's what the
6  document says.
7          MS. HALPERN:  Okay.
8          MS. WESTFALL:  I do not know the
9  custodian; but I have investigated the custodian, I do
10 not know the custodian.
11         MS. HALPERN:  We also don't know whether
12 it's accurate then, right?  I mean, I've seen this --
13 I've seen somewhere where things are wrong.  Who
14 wrote -- I mean, can I voir dire the document?  Who
15 wrote the summary?  Who wrote the discussion points?  Is
16 any of this supposed to be Senator Fraser's?
17         MS. WESTFALL:  If you want to examine on
18 your own time.  He doesn't recognize the document.  I'm
19 not planning on asking him any --
20         MS. HALPERN:  All right.  Well, just --
21         MS. WESTFALL:  -- questions.
22         MS. HALPERN:  Then I would ask that you be
23 careful about suggesting what's in here is accurate.
24         MS. WESTFALL:  Okay.  You can put away
25 Exhibit 34 for the time-being.

SENATOR TROY FRASER                                           7/23/2014
CONFIDENTIAL TRANSCRIPT

69 (Pages 273 to 276)

273

1    Q.  (By Ms. Westfall)  So is your testimony that
2  you supported Senator Lucio's amendment in the spirit of
3  compromise?
4    A.  Yes.
5    Q.  Is there any other reason you supported his
6  amendment?
7    A.  Senator Lucio offered the amendment, and I
8  accepted it.
9    Q.  Did Senator Davis, do you recall, offer an
10 amendment which would have allowed the use of IDs that
11 expired after the last general election, in other words,
12 up to two years?
13   A.  I don't remember.
14   Q.  Do you know whether the Indiana photo ID law
15 contains the same provision allowing the use of expired
16 IDs up to two years?
17   A.  I do not.
18   Q.  Did Senator Ellis offer an amendment which
19 would have permitted the use of unexpired student photo
20 IDs issued by public universities in Texas?
21   A.  I'm not aware.
22   Q.  Are you aware that Indiana's photo ID law
23 allows the use of expired student photo IDs?
24   A.  No.
25   Q.  Do you recall -- or I guess strike that.

274

1        Prior to consideration of the amendments,
2  were you open at any time to allowing the use of student
3  photo ID and to amending Senate Bill 14 to allow the use
4  of student photo IDs?
5    A.  Would you ask that question again?
6    Q.  It was a bad question.  I will withdraw that
7  question.
8        Prior to the consideration of the
9  amendments on the Floor related to Senate Bill 14 --
10   A.  What year?
11   Q.  2011.
12       --- did you tell other bill supporters you
13 would defer to the will of the body on whether to allow
14 the use of student IDs?
15   A.  Not to my knowledge.
16   Q.  Did Senator Williams believe that student IDs
17 should not be included in Senate Bill 14?
18       MS. HALPERN:  Objection, legislative
19 privilege.
20   A.  You need to ask Senator Williams that.
21   Q.  (By Ms. Westfall)  Was it your impression that
22 Senator Williams opposed inclusion of student photo IDs
23 in Senate Bill 14?
24   A.  To my knowledge, it was never discussed.
25   Q.  Pardon?

275

1    A.  To my knowledge, it wasn't discussed.
2    Q.  So you didn't know Senator Williams' position
3  one way --
4    A.  I don't --
5    Q.  -- or the other?
6    A.  Did not know Senator Williams' position.
7    Q.  Did Senator Davis also offer an amendment which
8  would have allowed the use of IDs with a photo issued by
9  the federal government or the State of Texas?
10   A.  I'm not aware of that.
11   Q.  Are you aware that Indiana and Georgia laws
12 permitted the use of federal ID and state ID with a
13 photo?
14   A.  No.
15   Q.  Did Senator Hinojosa offer an amendment which
16 would have allowed county commissioners to authorize
17 county election officials to issue voter registration
18 cards with a photo?
19   A.  No.
20   Q.  Do you recall that on the Senate Floor you
21 cited concerns about the expense of this amendment and
22 that it could be an implied mandate on the counties?
23   A.  Are you referring to the last question you just
24 asked?
25   Q.  Yes.

276

1    A.  The House amendment?
2    Q.  The amendment related to county election
3  officials being able to create voter registration cards
4  with photos.
5    A.  And would you repeat?
6    Q.  Certainly.  Do you recall that in response to
7  that amendment you cited concerns about the expense of
8  such an amendment and that it would be an implied
9  mandate on the counties to offer this services to
10 voters?
11   A.  And I think, if you remember, it was the
12 potential expense.
13   Q.  Do you recall your concerns?
14   A.  Yes.
15   Q.  Had any county election officials expressed
16 that concern to you?
17   A.  County -- other county officials had not seen
18 it because the amendment was not brought forward in
19 enough time to contact.
20   Q.  So the answer is no, you had not heard
21 concerns?
22   A.  No.
23   Q.  You also -- do you recall that you said on the
24 Senate Floor that a free card, quote, unquote, free card
25 from DPS was a superior option?

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

70 (Pages 277 to 280)

277

1      **A.  Would you please repeat that?**
2      Q.  Do you recall that in response to Senator
3  Hinojosa's amendment concerning county election
4  officials being able to create their own photo ID
5  registration cards, that you said that the -- having
6  a card issued by DPS with no cost was a superior option?
7      **A.  Yes.**
8      Q.  Why did you think cards issued by DPS were a
9  superior option?
10     **A.  Because you had one central source, DPS, with a**
11 **secure card being issued rather than 250 different**
12 **possibilities of cards, and controlling it from one**
13 **source was a much better option.**
14     Q.  Did you think that providing photo IDs through
15 county election officials would enable voters to
16 register to vote and get their photo ID in sort of
17 one-stop shopping and that that would be desirable?
18     **A.  No.**
19     Q.  You didn't think voters would enjoy that
20 experience?
21         MS. HALPERN:  Objection, argumentative.
22     Q.  (By Ms. Westfall)  You may answer.
23     **A.  We -- we weren't determining what was going to**
24 **be enjoyable for voters.  We're trying to secure the**
25 **ballot box.  And the most secure way of doing that is**

278

1  **having a source, that was already in the business of**
2  **issuing picture IDs, do it rather than 254 counties that**
3  **had not done it before.**
4      Q.  Did you consider the needs of and experience of
5  the voters in any regard in enacting Senate Bill 14?
6          MS. HALPERN:  Objection, argumentative.
7      Q.  (By Ms. Westfall)  You may answer.
8      **A.  Ask the question again.**
9      Q.  Did you consider the needs or experience of
10 voters in any respect of considering Senate Bill 14?
11     **A.  Of course.**
12     Q.  How?
13     **A.  That we were securing the integrity of the**
14 **ballot box so that they knew that their vote would be**
15 **correctly counted.**
16     Q.  Are you aware of any voter who did not vote in
17 an election due to concerns about ineligible voters
18 participating in elections?
19     **A.  No.**
20     Q.  Do you recall that Senator Gallegos offered an
21 amendment which would have required DPS to provide
22 extended hours and Saturday hours at DPS offices?
23     **A.  No.**
24     Q.  Do you recall that in response to that
25 amendment, you said this was not the place to debate DPS

279

1  operations?
2      **A.  I believe during the debate of that amendment**
3  **that we had said we were going to ask DPS to explore the**
4  **potential of expanding both offices and operational**
5  **hours.**
6      Q.  And this was at the discretion of DPS; is that
7  correct?
8      **A.  It was instruction to the -- the -- DPS by the**
9  **Legislature.**
10     Q.  It was not within the Texas Senate Bill 14; is
11 that correct?
12     **A.  It was not included in the statute, yes.**
13     Q.  Why was it not appropriate to consider the
14 issue of extended and Saturday hours for DPS in the
15 Texas statute?
16     **A.  Normally in statutes, you do not micromanage an**
17 **agency.  You give very broad authority to the agency and**
18 **instruction of what you'd like to them to do, and then**
19 **they explore implementing and also considering cost.**
20     Q.  Do you know whether in Senate Bill 14, DPS was
21 provided with any regulatory authority with regard to
22 the hours of operation?
23     **A.  The answer is no, there was no instruction to**
24 **DPS in the statute.**
25     Q.  If DPS subsequently cut back its hours of

280

1  operation for driver licenses, wouldn't that have an
2  impact on the ability of Texans to access photo ID
3  necessary under Senate Bill 14?
4      **A.  It would subjective of me determining whether**
5  **it would or wouldn't.  I wouldn't have an answer to**
6  **that.**
7          MS. WESTFALL:  Would you mark this?
8          (Exhibit 35 marked for identification.)
9      Q.  (By Ms. Westfall)  Senator, you've been handed
10 what's been marked as Exhibit 35.  Do you recognize this
11 document?
12     **A.  No.**
13     Q.  This is a highly confidential document.
14 Testimony about this document will be under the
15 protective order as highly confidential.  It's
16 TX00086577.  Do you know whether Ms. McCoy drafted this?
17     **A.  I've never seen this document so I wouldn't**
18 **know.**
19     Q.  Do you recall that the House added an amendment
20 that would have provided for Voter ID identification
21 education targeted to low-income voters?
22     **A.  No.**
23     Q.  Do you recall that in the Senate, Senator
24 Duncan introduced an amendment that permitted voters who
25 cast a provisional ballot to return within six days, and

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

73 (Pages 289 to 292)

---

289

1    Q.  Do you know why this refers to problems in
2 large urban counties?
3    **A.  Do we know when this was -- the date on this,**
4 **when it was released?**
5    Q.  Well, I'm just asking you based on your --
6    **A.  I'm trying to give you an answer based on when**
7 **this was released.**
8    Q.  Certainly.  Turning to the following page, do
9 you see that it refers in a couple of paragraphs down,
10 to the Senate Bill 362?
11    **A.  I believe the reference there was made in the**
12 **testimony on 362 that in Houston, there was an election**
13 **judge that had had a lady with a big hat with fruit on**
14 **the top of it, brightly colored, voted, left, went to**
15 **her car, came back in, in 15 minutes, came back and**
16 **voted.  The exact same woman voted again.  There was a**
17 **-- the person -- the election person went to the**
18 **election judge running the voting and made them aware**
19 **that the woman was voting for the second time and they**
20 **were made aware, "Well, we don't have the ability stop**
21 **her from voting.  We don't have the tools to stop her."**
22 **So, that probably is a reference to a large urban**
23 **county, i.e., Houston, where that actually happened.**
24    Q.  Do you know the race of that voter by chance?
25    **A.  I believe it was an Anglo.**

---

290

1          MS. WESTFALL:  Could you mark this --
2    **A.  I -- let me retract that.  I have no way to**
3 **know that.  There's no reason I would know what the**
4 **ethnicity of that person.**
5    Q.  Thank you.
6          MS. WESTFALL:  Could you mark this.
7          (Exhibit 37 marked for identification.)
8          MS. WESTFALL:  Can we go off the record.
9          (Brief discussion off record.)
10    Q.  (By Ms. Westfall) You have been handed what's
11 been marked as Exhibit 37.  Senator, have you seen this
12 document before that's been marked -- produced in this
13 litigation as highly confidential, TX 00021227
14 through --
15    **A.  Is this the University of Texas poll that was**
16 **done in 2009 and released in 2010?**
17    Q.  Well, looking at the date on this document, do
18 you see that it was circulated by Bryan Hebert on
19 January 24, 2011?
20    **A.  I'm still asking questions about this --**
21    Q.  Well --
22    **A.  -- if you don't mind, if you'll -- you asked me**
23 **do I recognize this.  It's making reference to a poll in**
24 **2008, and then there was a second poll done later.  Is**
25 **this in reference to the University of Texas poll done**

---

291

1 later?
2    Q.  Well, I'm here to ask questions of you and you
3 can testify as to what --
4    **A.  You asked me if I recognize this document.**
5    Q.  Yes.
6    **A.  I'm trying to clarify what the document is.**
7    Q.  Okay.  Well, I -- I can ask questions during
8 this deposition, you're -- or I'm asking questions,
9 you're answering them, so I can't answer that question.
10    Based on your review of Exhibit 37, what
11 do you believe it to be?
12    **A.  The subject says University of Texas Polling**
13 **Data on Voter ID, and it was released on January 24,**
14 **2011, so I'm assuming it was the second Texas poll that**
15 **came out.  There was one in 2008 and one in late 2010**
16 **that was released in January of 2011.  Is that the --**
17 **yes.**
18    Q.  And so that's what you believe this to be,
19 Exhibit 37?
20    **A.  I believe that to be, yes.**
21    Q.  Do you see that it indicates at the top of the
22 page, at the first page, that respondents were asked
23 about, "Some people argue that requiring registered
24 voters to present government issued photo ID reduces
25 voter fraud?"

---

292

1    **A.  Yes.**
2    Q.  Do you see that sentence?
3          Does Senate Bill 14 allow voters to allow
4 any form of government issued photo ID?
5          MR. HALPERN:  Objection, compound.
6    Q.  (By Ms. Westfall) You may answer.
7    **A.  A -- the answer is yes.  Because a passport is**
8 **a government issued ID, a military ID is a government ID**
9 **and the citizenship is a government ID, so yes, we do**
10 **allow it.**
11    Q.  Does Senate Bill 14 allow voters to present any
12 form of government issued photo ID?
13    **A.  The answer is yes because that is a type of ID.**
14    Q.  But Senator, there are many forms of ID that
15 are issued by the government that you testified about
16 today that were not included in Senate Bill 14; isn't
17 that right?
18    **A.  But that's not the question you asked me.  You**
19 **said does it -- are they -- are "any" allowed, and "any"**
20 **would include passports -- passports, you know, the**
21 **citizenship papers, the -- you know, the three that I've**
22 **mentioned.**
23    Q.  This poll asked voters about a requirement that
24 voters present government issued photo ID, right?
25    **A.  No.  The -- this poll actually asked the**

---

SENATOR TROY FRASER                                              7/23/2014
CONFIDENTIAL TRANSCRIPT

74 (Pages 293 to 296)

293

1  question, "Would you be in favor of a photo ID," an
2  absolute photo ID, and if you'll see at the bottom, the
3  results of this were exactly -- almost exactly the same
4  at July 2008.  The results were exactly the same in
5  2010, it was asked, that showed that over 65 percent of
6  African-Americans said "Yes, we would be in favor of a
7  photo ID," and then 70 percent of Hispanics said, "Yes,
8  we're in favor of it."  Those results were almost
9  exactly the same as they found two years earlier.  And
10  this is one of the documents that I referred to with the
11  Democrats saying, "How can you be against this, that you
12  have 70 percent of Hispanics that are in favor of a
13  photo ID?"
14          MS. WESTFALL:  Okay.  I'm going to object
15  as nonresponsive and a narrative response.  I'm going to
16  move to strike your response.
17       Q.  (By Ms. Westfall) Looking at the paragraph as
18  to what respondents were asked, does this describe
19  accurately the provisions of Senate Bill 14?
20       A.  The question that were asked on the poll is
21  would they be in favor of a strict photo ID.
22       Q.  And therefore, do you believe that this
23  question, asked the voters, accurately represents the
24  provisions of Senate Bill 14?
25       A.  The -- question that we're asking is were

294

1  people in favor of a strict photo ID.
2          MS. WESTFALL:  I would object as
3  nonresponsive.
4       Q.  (By Ms. Westfall) Does this poll ask about the
5  provisions of Senate Bill 14?
6          MR. HALPERN:  Counsel, let me enter an
7  objection for the record because you don't have the poll
8  question.  You have somebody's recitation of what
9  the poll question was.  So he's answered your question.
10       Q.  (By Ms. Westfall) I'm asking about --
11          MR. HALPERN:  He's telling you he thinks
12  it was a difference poll question.
13       A.  And if you'll allow me to answer, you are
14  incorrect.  I do know what the poll question was, and
15  the question was, "Would you be in favor of a strict
16  photo ID to vote," and respondents answered, 70 percent
17  of Hispanics said yes.  And that is not a nonresponsive
18  answer, that is a correct answer based on the poll,
19  because this was a poll that was conducted based by the
20  University of Texas in late -- in late December of 2010
21  and it matched the results of the poll they did in 2008.
22       Q.  (By Ms. Westfall) Do you know whether this poll
23  was conducted by Darren Shaw?
24       A.  I do not know.
25       Q.  Do you know that Darren Shaw testified as an

295

1  expert on behalf of the State of Texas in the litigation
2  Texas versus Holder concerning Senate Bill 14?
3       A.  Do you know -- no, I do not know Darren Shaw
4  and I do not know that.
5       Q.  Do you know that his testimony was disregarded
6  by the three judge panel in that case?
7       A.  No.
8          MS. HALPERN:  Objection, relevance.
9       Q.  (By Ms. Westfall) Does strict photo ID, as you
10  state in this poll asked, mean only the photo IDs
11  permitted by Senate Bill 14?
12       A.  The answer obviously is no because the Senate
13  Bill 14 had not been passed at this time.  This was an
14  independent poll that was taken prior to the legislative
15  session and probably prior to Senate Bill 14 being
16  enacted and had nothing to do with the legislation
17  coming forward.  It was a question asked independently
18  by a bipartisan group at the University of Texas as they
19  had done in 2008, and they asked the question, would --
20  do you believe that voters should be able to -- or
21  required to show a photo ID before voting?  That was the
22  question that was asked.  70 percent Hispanics and 65 of
23  African-Americans said yes.
24          MS. WESTFALL:  As they say in Texas, I
25  will pass the witness to Mr. Derfner.

296

1          MS. HALPERN:  How much time has
2  Mr. Derfner got?  Time out, we're going to do a time
3  check.
4          (Brief discussion off the record.)
5          THE COURT REPORTER:  24 minutes.
6          MS. HALPERN:  You have 24 minutes.
7          MS. WESTFALL:  Armand?
8          MR. SCOTT:  Is he's still on the phone?
9          MS. WESTFALL:  I hope so.  Hey, Armand.
10          MR. SCOTT:  Are you muted, Armand?  You
11  don't have any questions?
12          MR. DERFNER:  Can you hear me now?
13          MS. HALPERN:  Yes, yes.
14          MR. DERFNER:  My problem is the mute has
15  no light on it so I can't tell if it's on or off.
16          Okay, are we ready?
17          MS. HALPERN:  We are.
18          EXAMINATION
19  BY MR. DERFNER:
20       Q.  Senator Fraser, my name is Armand Derfner, I'm
21  a lawyer for some of the plaintiffs, the D.C. LULAC
22  plaintiffs.
23       A.  Hello, Armand.
24       Q.  And I'm here to ask you a few questions.  My
25  first question is:  When you talked earlier about the

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

75 (Pages 297 to 300)

297

¹ House, the agency takes -- makes its rules and
² regulations and you give them a fair amount of leeway;
³ is that correct?
⁴     A.  I referred to it as broad powers.
⁵     Q.  Okay.  When you -- when SB 14 was passed, was
⁶ the intention to give DPS -- with respect to the EIC,
⁷ the Election Identification Certificate, was the
⁸ intention to give DPS some good guidance or give them
⁹ very broad open-ended discretion?
¹⁰     A.  We gave them very clear instructions of the
¹¹ direction that we wanted them to go under the broad
¹² powers that had been given them under the Legislature,
¹³ and also by the appropriations process, gave them a
¹⁴ revenue stream in order to develop the EIC card.
¹⁵     Q.  And in terms of what they should require an EIC
¹⁶ applicant to present, did you give them guidance or
¹⁷ leave them pretty much open ended?
¹⁸     A.  They are in the business, because of driver's
¹⁹ license, of interpreting that and that we gave them the
²⁰ jurisdiction to do it and instructions and -- but we
²¹ gave them broad authority to issue this.
²²     Q.  Okay.  Would -- can we find the exhibit which
²³ is SB 14, and I'd like you to take a look at that and
²⁴ look particularly near the end in Chapter 20?
²⁵     MR. SCOTT:  13.

298

¹     MR. SHORDT:  Armand, we have two versions,
² a as-is produced and a final signed version.
³     MR. DERFNER:  Final.
⁴     MR. SHORDT:  That's Exhibit 16.
⁵     A.  What page?
⁶     Q.  (By Mr. Derfner) It's near the end in Chapter
⁷ 20.
⁸     A.  Well, there's not chapters.
⁹     Q.  Sorry.
¹⁰     MS. FARANSSO:  Should be Section 20.
¹¹     Q.  (By Mr. Derfner) Okay.  It's -- I'm sorry,
¹² Section 20, which creates Chapter 521 A of the
¹³ Transportation Code.
¹⁴     A.  I've got it.
¹⁵     Q.  Okay.  If you look at Subsection F, do you see
¹⁶ there, it says the department may require each applicant
¹⁷ to provide the information required by Section 521.142?
¹⁸     A.  Okay.
¹⁹     Q.  Do you see that?
²⁰     A.  Yes.
²¹     Q.  Okay.
²²     MR. DERFNER:  Tania, could you give the
²³ Senator Section 521.142, and let's mark that as an
²⁴ exhibit.
²⁵     MS. HALPERN:  What number?

299

¹     THE COURT REPORTER:  38.
²     (Exhibit 38 marked for identification.)
³     MR. SCOTT:  What number are we on?
⁴     THE COURT REPORTER:  38.
⁵     MS. HALPERN:  38.
⁶     Q.  (By Mr. Derfner) Senator, do you have that?
⁷     A.  I have it in front of me.
⁸     Q.  Okay.  And if you will look, you'd see that it
⁹ lists some things that the applicant is supposed to do.
¹⁰ Look down at Subsection E, would you please?
¹¹     A.  If you'll allow me, I'm going to read the whole
¹² thing as we're moving forward, if you'll give me a
¹³ little time.
¹⁴     Q.  Okay.  Just Subsection E.
¹⁵     A.  But I'm reading the whole thing.
¹⁶     Q.  No, not the whole thing.
¹⁷     A.  But E ties to the whole thing, so I'm going to
¹⁸ read the whole thing.
¹⁹     Okay, I'm to E.
²⁰     Q.  Okay.  Read E out loud, please.
²¹     A.  "The application must include other information
²² the department requires to determine the applicant's
²³ identity, residency, competency and eligibility as
²⁴ required by the department or state law."
²⁵     Q.  Actually, it says, "Must include any other

300

¹ information," doesn't it?
²     A.  "Any other information."
³     Q.  You read, "must include other information,"
⁴ but it says, "any other information," right?
⁵     A.  Okay.
⁶     Q.  Okay.
⁷     MR. DERFNER:  Tania, would you give the
⁸ Senator the Regulation Section 15.183, and mark that as
⁹ an exhibit, please.
¹⁰     (Exhibit 39 marked for identification.)
¹¹     MS. FARANSSO:  It's been marked as Exhibit
¹² 39.
¹³     Q.  (By Mr. Derfner) Tell me when you have that,
¹⁴ Senator.
¹⁵     A.  I have it.
¹⁶     Q.  Okay.  If turn to the second -- oh, do you
¹⁷ recognize this as some of regulations that DPS issued
¹⁸ relating to the EIC?
¹⁹     A.  No.
²⁰     Q.  Okay.  Would you take a look at it and just see
²¹ if that's what it seems like?
²²     A.  Do you represent that that's what it is?
²³     Q.  I do.  I do.
²⁴     A.  Okay.
²⁵     Q.  If you look at -- on the front page, it says --

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

76 (Pages 301 to 304)

---

301

1  the last line is Subchapter L, Election Identification
2  Certificate.
3      A.  Okay.  I don't see Subchapter L.  Got it.  Got
4  it.
5      Q.  Turn to the second page and look at Subsection
6  3.  Read that to me.
7      A.  "The fingerprints of the applicant, this does
8  not apply to an applicant who is permitted and utilizes
9  an alternative method for renewing or duplicating an
10  election identification certificate."
11      Q.  Were you aware that the Department of Public
12  Safety had issued regulations requiring applicants for
13  an EIC to give their fingerprints to the DPS in order to
14  get an EIC?
15      A.  No.
16      Q.  Is that -- was SB 14 intended to give that kind
17  of or that degree of discretion to DPS?
18      A.  We gave broad authority under rule to DPS to
19  develop the EIC.
20      Q.  So if DPS says they want an applicant for an
21  EIC to issue -- to give them their fingerprints, is that
22  in keeping with SB 14?
23      A.  We gave broad authority to DPS to develop
24  guidelines.
25      Q.  Do you, as a legislator, think it's sound

---

302

1  policy to make a -- somebody who wants to get a document
2  for voting give his fingerprints in order to get that
3  document?
4      A.  I would not be able to answer that question
5  without the rationale from DPS of the reasoning for
6  what -- their Number 3.
7      Q.  If DPS had come to you and said, "We want these
8  people's fingerprints," what would you have said?
9          MS. HALPERN:  Objection, calls for
10  speculation.
11      A.  You're asking me to speculate --
12      Q.  (By Mr. Derfner) Right.  Go ahead and
13  speculate.
14      A.  -- on something that didn't happen.  I'm sorry,
15  I don't speculate during this deposition.
16      Q.  You -- well, okay.  If -- if Senator Patrick in
17  his deposition said he thought it was perfectly okay for
18  them to demand fingerprints, would you agree with that?
19      A.  I would say that Senator Patrick's entitled to
20  his opinion if he said that.
21      Q.  Okay.  Okay.  If DPS -- what rationale could
22  there be to justify asking for fingerprints from a voter
23  applicant?
24      A.  Speculative.  I wouldn't speculate what it is
25  until DPS gave me their rationale of why they asked for

---

303

1  it.
2      Q.  Okay.  If I were to represent to you that DPS's
3  witness has said that's what they do for driver license
4  applicants and therefore they did the same for the EIC
5  applicants, what would your reaction be?
6      A.  I would say they have the authority to develop
7  the guidelines for both driver's license and EIC, and we
8  gave them authority to develop those guidelines.
9      Q.  And why did you give that authority to DPS --
10      A.  You're using --
11      Q.  -- in the case of the EIC?
12      A.  You're using why did "you," you're implying
13  that I gave the --
14      Q.  Why was that done in SB 14?
15      A.  You're speculating.
16          I'd have to speculate when that authority
17  was given.  Probably years before I came into the
18  Legislature, and I would not speculate on that.
19      Q.  Is there a valid reason for giving DPS the
20  authority over the EIC?
21      A.  I gave the response to that about four or five
22  or ten questions ago, explaining why we gave the
23  authority to DPS.  That authority was given because they
24  have the driver's license, they have the expertise to
25  issue it, and we asked them to develop that same

---

304

1  guidelines for EIC.
2      Q.  Well, if the EIC is supposed to represent or be
3  based on policies relating to security, as in issuance
4  of a secure document, but also protecting the interest
5  of the voter who wants to vote, how did you -- how does
6  SB 14 reflect the latter interest, that is the interest
7  of the voter, wanting to vote?
8      A.  Senate Bill 14 assigned the authority to
9  develop the guidelines to the Department of
10  Transportation -- I'm sorry, to the Department of Public
11  Safety because they are -- the primary form of
12  identification is a driver's license, they have security
13  measures that they implement into the driver's license,
14  and we asked them to develop one for EIC because that
15  was the type of security we were looking for on this
16  photo ID.
17      Q.  Do you think that the rights of a person to
18  drive are identical to the rights of a person to vote?
19      A.  Obviously not.
20      Q.  In what way?
21      A.  A person driving a car, you give a license --
22  you test them to see their ability to drive a car.  The
23  identification that we're issuing for the voter is
24  solely to represent that they are who they say they are
25  whenever they show up at the poll.

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

---

305

1    Q.  That wasn't my question, I think.  Let me ask
2  the question again.  Are the rights of a person seeking
3  to vote any different from the rights of a person
4  seeking to drive?
5    **A.  I'm not sure I understand the question you're**
6  **asking.  That -- obviously, someone that is asking for a**
7  **driver's license is asking for the rights to drive the**
8  **vehicle.  The identification for voting is trying to**
9  **identify that they are who they say they are.**
10   Q.  Are there constitutional rights involved in
11 either the right to drive or the right to vote?
12   **A.  I don't believe there's a constitutional right**
13 **to drive.**
14   Q.  What about the right to vote?
15   **A.  The -- there's a constitutional right for the**
16 **ability to vote.**
17   Q.  Okay.  Well then, does -- how is that
18 constitutional right protected if you impose the same
19 requirements for a voter as you do for a driver?
20        MR. HALPERN:  Objection, misstates the
21 testimony, assumes facts not in evidence.
22   Q.  (By Mr. Derfner) Okay.  Would it be -- if an
23 agency were to treat a voter in the same way as -- a
24 voting applicant in the same way it treats a driving
25 applicant, would that be protecting the constitutional

---

306

1  rights of the voter?
2        MS. HALPERN:  Objection, calls for a legal
3  conclusion.  This witness is not an expert witness.
4    Q.  (By Mr. Derfner) Fine.  Can you answer the
5  question, Senator?
6    **A.  I'm not an expert witness.**
7    Q.  I know you're not an expert witness.  What is
8  your belief?
9    **A.  That would be based on speculation that -- I'm**
10 **not an expert witness in this area.**
11   Q.  Okay.  Did you take any -- when you were
12 participating in the legislative consideration of SB 14,
13 did you take into consideration any different -- any
14 constitutional difference between the rights of drivers
15 and the rights of voters?
16   **A.  I'm not sure that issue was ever raised by**
17 **anyone in the debate.**
18   Q.  Okay.  Did you consider it?
19   **A.  I can't say that I considered it because it was**
20 **not raised as an issue by anyone in the debate.**
21   Q.  Okay.  Do you know if -- do you know if anybody
22 else considered it?
23   **A.  I just said that I don't know that anyone**
24 **raised this as an issue.**
25   Q.  Okay.  I believe you -- I believe you said

---

307

1  earlier on that there's been some other legislation
2  after SB 14 that dealt with, as I recall, citizens or
3  other people and qualifications to vote; is that
4  correct?
5    **A.  No.**
6    Q.  I'm sorry, what?
7    **A.  The answer is no.**
8    Q.  Okay.  Do you remember SB 1, the Budget Bill,
9  that came after SB 14?
10   **A.  You're going have to be more specific.  Every**
11 **Budget Bill in every session is SB 1.**
12   Q.  Okay.  In 2011, the Budget Bill, SB 1, was not
13 passed in the regular session, it was passed in a
14 special session in July, and as part of that budget
15 bill, there was a provision, as I recall, this Chapter
16 72, that was added by Senator Williams in the process
17 which dealt with the driver's license and basically,
18 among other things, required applicants for new or
19 renewal licenses to present documentary proof of
20 citizenship.  Do you remember that?
21   **A.  No.**
22   Q.  Were you involved in that at all?
23   **A.  No.**
24   Q.  Are you aware that the requirements for
25 driver's license applicants have been increased since

---

308

1  the time you passed -- since the time that SB 14 was
2  passed?
3    **A.  No.**
4    Q.  Okay.  I think I have just one more question.
5        Did you at any point in 2011 say to
6  Senator Ellis that the reason you were carrying SB 14,
7  or the Voter ID bill, was because you "drew the short
8  straw"?
9    **A.  No.**
10   Q.  Okay.
11       MR. DERFNER:  I have no more questions.
12  Thank you.
13       MR. SCOTT:  How much time?
14       MS. HALPERN:  Well, they're done.
15       MR. SCOTT:  Well, I was just going to see
16  if they left me any.
17       MS. HALPERN:  Well, you're -- it's by
18  party, by who is above and below the V.
19       MR. SCOTT:  Oh, okay.
20       MS. HALPERN:  You're below the V.
21       MR. SCOTT:  Okay.  Well, then how much
22  time do they have left?
23       MS. HALPERN:  How much time do they have
24  left, around 10 minutes?
25       THE COURT REPORTER:  Just a second.

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

81 (Pages 321 to 324)

321

1  very important to the state.
2      Q.  Had you ever seen chubbing like occurred over
3  SB 362?
4          MS. WESTFALL:  Objection, relevance.
5      A.  Unfortunately chubbing is -- has happened
6  before but it was probably excessive on this particular
7  bill.
8      Q.  (By Mr. Scott) 2011, SB 14 passed out of the
9  Senate by not requiring two-thirds for Voter ID; is that
10  correct?
11     A.  That's correct.
12     Q.  In your mind, do you think whoever made the
13  decision to treat Voter ID differently in 2011 as
14  compared to 2007, 2009, has to do with the fact that the
15  bill was continually blocked by a vocal group of
16  Democrats even though a vast majority of Texans approved
17  of the additions?
18         MS. WESTFALL:  Objection, calls for
19  speculation.  Objection, asked and answered.
20     Q.  (By Mr. Scott) You may answer.
21     A.  The bill actually was heard by special order in
22  2009 and 2011.  The special order was put in place in
23  the rules at that time.  Special order actually was not
24  unusual.  This special order had been used multiple
25  times, more especially by the Democratic Lieutenant

322

1  Governor, during the period from '72 to '92 when he was
2  in office, approximately 15 times that he used the
3  special order.  So bills that are -- have an importance
4  to Texas, will be put on as a special order.
5      Q.  How long have you served again in the State
6  Senate and the House?
7      A.  I came into the House in 1988, served in '93,
8  the Senate in '97 and I've been in the Senate
9  since '97.
10         MR. SCOTT:  Let me take a break and let me
11  mark these.  Let's go off the record and mark these as
12  exhibits real quick.
13         (Exhibits 40, 41, 42, 43 and 44 marked for
14  identification.)
15         MR. SCOTT:  45's the next one but I don't
16  have anymore so that's it.
17         THE COURT REPORTER:  Okay.
18         MS. WESTFALL:  I want to object to the
19  caucusing in the middle of this exam between counsel.
20         MR. HALPERN:  There's no question pending,
21  Counsel.
22         MS. WESTFALL:  Well then, let's take away
23  the exhibits from the witness.
24         MR. SCOTT:  Oh, that's just -- so for the
25  record, caucus between counsel, it wasn't me caucusig

323

1  with anybody, just for the record.
2          MS. WESTFALL:  No, I understand.  No, I
3  understand, Mr. Scott.  I understand.
4          MR. SCOTT:  I was just letting the witness
5  look at the exhibits just so to maybe --
6          MS. WESTFALL:  Right.
7          MR. SCOTT:  -- fast forward some
8  stuff.  Well, I was going mark a couple of more
9  exhibits.  Let me -- let's go ahead and ask some
10  questions though.
11     Q.  (By Mr. Scott) Senator, if you would turn to, I
12  believe the first document is Exhibit 40.  Have you seen
13  that document before?
14     A.  Yes, I have.
15     Q.  What is that?
16     A.  That's a poll taken by the University of Texas,
17  July 2008.  The questions that were asked, per Voter ID,
18  they were asked, "Do you support a law requiring an
19  individual to present a government issued photo ID and
20  in order to be permitted to vote?"  A full photo ID.
21     Q.  And that is information you had and looked at
22  before the passage of SB 14, correct?
23     A.  And this was July '08, so this was actually
24  delivered to me prior to the 2009 session.  And the
25  results showed that at that time, 73 percent of Anglos

324

1  favored a full photo ID, 68 percent of Black -- or
2  African-American and 65 percent of Hispanics.
3      Q.  Okay.  So let's turn over to Exhibit 41.
4      A.  Okay.
5      Q.  What is that document?
6      A.  That is the Lighthouse opinion poll that was
7  done prior to January 10, 2011, two weeks prior to the
8  passage of Senate Bill 14.
9      Q.  And did it ask -- was there information in
10  Exhibit 41 relating to Voter ID?
11     A.  It was a question asked, "Do you favor or
12  oppose requiring a valid photo ID before a person is
13  allowed to vote?"
14     Q.  And what were the breakdown of the percentages
15  in support?
16     A.  White, 86 percent; African-American, 82
17  percent; Hispanic, 83 percent.
18     Q.  And to your knowledge, who was provided that
19  information in the poll that is contained in
20  Exhibit 41 in the Texas Legislature?
21     A.  This was a public poll, a statewide landscape
22  benchmark survey and it was provided to the public.  Do
23  you have -- I had access -- I had this information when
24  I laid out Senate Bill 14.
25     Q.  Do you know if any other state Senators had

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

83 (Pages 329 to 332)

---

**329**

1    A.  Yes.  And I would like to make an additional
2   reference on this, actually.  During the laying out of
3   the bill in 2007, Senator Zaffirini had noticed that I
4   had a huge book with all of this in there, and she asked
5   to see it.  I not only gave it to her, but I made sure
6   that she was aware of all the things I had in the book
7   pertaining to these, that they had received.
8           (Exhibit 45 marked for identification.)
9    Q.  (By Mr. Scott) Let me hand you what's been
10  marked as Exhibit 45 to your deposition.
11   A.  Yeah.
12   Q.  Have you ever seen that document?
13   A.  Yes, I have.
14   Q.  What is it?
15   A.  It was a poll done by the University of Texas
16  in which we received in February of 2011, the poll
17  actually was taken in December of 2010.  It was a
18  follow-up to the 2008 poll of basically asking the same
19  questions saying, "Do you agree or disagree that
20  registered voters should be required to present a
21  government issued photo ID before they can be allowed to
22  vote?"  Of the people that they polled, 75 percent
23  agreed.  The racial makeup of the poll showed that it
24  was broadly agreed to even among Democrats and
25  Republicans and that if you looked at the racial makeup

---

**330**

1   of who agreed with this, 80 percent of Anglos agreed, 63
2   percent of African-Americans and 68 percent of Latinos.
3   The Latino number actually increased in that two-year
4   period.
5    Q.  And did you -- and you had that in your
6   possession prior to the passage of SB 14?
7    A.  Yes, I did.  And I made this available to all
8   31 members.
9           (Exhibit 46 marked for identification.)
10   Q.  (By Mr. Scott) I hand you what's been marked as
11  the Exhibit 46 to your deposition.  Have you seen this
12  document?
13   A.  This is a follow-up poll, I believe, to -- by
14  the University of Texas.
15   Q.  And what were the results of that poll?  Well,
16  first of all, what did they poll?
17       MS. WESTFALL:  Objection, relevance.  This
18  is past the enactment.
19   Q.  (By Mr. Scott) You may answer.
20   A.  This poll was taken after the bill was passed,
21  enacted, but it has not been enacted into law because
22  Texas did not enjoy the benefits of Voter ID law until
23  after the -- the ruling by the Supreme Court, Section
24  5.  The question they asked, "Do you agree or disagree
25  with the idea that registered voters should be required

---

**331**

1   to present a government issued photo ID before you can
2   be allowed to vote?"  The numbers continued to be the
3   same as the prior numbers we had seen.  The makeup of --
4   on this poll, the Hispanic numbers actually increased
5   again from 68 percent to 75 percent.
6        MS. WESTFALL:  Objection, I'm going to
7   move to strike this narrative response.
8    Q.  (By Mr. Scott) Let's go by this -- taking time,
9   I'm sorry.
10       So, if I could, get you to turn to the
11  first slide on Exhibit 46.
12   A.  Okay.
13       MS. WESTFALL:  And Counsel, I'd like a
14  that standing objection to relevance --
15       MR. SCOTT:  That's fine.
16       MS. WESTFALL:  -- given that this is after
17  the -- well after the enactment of the bill.
18   Q.  (By Mr. Scott) And so, Senator, on the first
19  slide, would you -- what was the question posed to the
20  -- for purposes of obtaining the polling?
21   A.  "Do you agree or disagree with the idea that
22  registered voters should be required to present a
23  government issued photo ID at the polls before they can
24  be allowed to vote?"
25   Q.  And were -- what was the percentage of people

---

**332**

1   agreed?
2    A.  66 percent agreed.
3    Q.  And let's look at Section 5.  What was the
4   question?
5    A.  "Do you agree with the idea of the registered
6   voter should be required to present a government issued
7   ID at the polls before they can be allowed to vote?"
8    Q.  And what were the percentages by party in
9   agreement?
10   A.  You actually had three different categories
11  here because the -- there were people that called them
12  "Independents" in 2012.  Along party lines, 92 percent
13  of Republicans; 37 Democrat; but Independents, 73
14  percent said that they should, which gave an overall
15  total of 66 percent.
16   Q.  And if you'll turn over to the fourth slide,
17  would you read the question -- the poll question on
18  that?
19   A.  "Do you agree or disagree with the idea that
20  registered voters should be required to present a
21  government issued photo ID at the polls before they can
22  be allowed to vote?"
23   Q.  And what were the percentages of agreement
24  based upon race?
25   A.  That this -- you're asking the race?

---

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

84 (Pages 333 to 336)

---

333

1    Q.  Yes.
2    A.  Okay.  That would be the fourth page, and it is
3    the same question.  White voters at that time were 71
4    percent; African-American, 33 percent; Hispanics were 75
5    percent.
6    Q.  So let's close that.
7        Let's look at Exhibit 33.
8    A.  33?
9    Q.  Yes, sir.
10   A.  Okay.  Where would 33 be?  I'm going to have to
11   dig it out.
12   Q.  While you're looking for that, do you have an
13   opinion whether the Texas Tribune would be considered a
14   conservative publication?
15       MS. WESTFALL:  Objection, calls for
16   speculation, relevance.
17   Q.  (By Mr. Scott) How would you describe the Texas
18   Tribune?
19   A.  They are generally not regarded as a
20   conservative group.
21   Q.  And have you found Exhibit 33?
22   A.  I have.
23   Q.  Let me ask you a couple of questions first.  As
24   the bill sponsor, is it part of your obligation in order
25   to try to get your bill passed, to understand what votes

---

334

1    you've got and what votes you don't have?
2    A.  Yes.
3    Q.  And in doing so, how do you get -- well, how do
4    you get to that position where know basically whether
5    you have somebody's vote or not?
6    A.  The Senate, generally, you have a private
7    conversation with each member.
8    Q.  And with regard to Exhibit 33, is there
9    anything in Exhibit 33 that you believe, had the people
10   who voted for SB 14 actually had, would have changed the
11   support that you ultimately received from them in the
12   passage of SB 14?
13       MS. WESTFALL:  Objection, compound,
14   confusing, calls for speculation.
15   Q.  (By Mr. Scott) You may answer.
16   A.  This report, the fact that it says it -- you
17   know, was not conclusive, and they say there -- it may
18   not have been issued, the Secretary of State has agreed
19   that they did not have the data available to compare
20   this, and Public Safety, the same thing, and there was
21   not a single person that if they had had this data at
22   the time of the vote would have changed their vote.
23       MS. WESTFALL:  Objection, move to strike.
24   This witness testified he'd never seen this document
25   before and he's testifying as to the Secretary of

---

335

1    State's interpretation and intent.
2        MR. SCOTT:  No further questions.
3        Thanks.
4        MS. WESTFALL:  I think we need a minute
5    outside.
6        (Recess from 7:09 p.m. to 7:26 p.m.)
7        EXAMINATION
8    BY MR. SHORDT:
9    Q.  Senator, my name is Richard Shordt.  I'm with
10   the Texas League of Young Voters.
11   A.  Are we back on the record?
12       MR. SHORDT:  Sorry.  Are we on the record?
13       THE COURT REPORTER:  Well, yes.  I thought
14   she was going to be asking the questions, so...
15       MS. HALPERN:  And it's not appropriate
16   switching off.
17       THE WITNESS:  And there's four minutes
18   left?
19       MR. SHORDT:  We'll discuss that.
20       MS. HALPERN:  Well, let them get started,
21   but I'm surprised that you're doing the questioning and
22   not the counsel who started this deposition.
23       MR. SHORDT:  Well, we represent the same
24   party.
25       MS. HALPERN:  I understand that, but

---

336

1    normally the rule is only one lawyer per party.
2        MR. SHORDT:  We're not really interrupting
3    a line of questioning.
4        MS. HALPERN:  Well, I'll let you go ahead,
5    but --
6        MR. SHORDT:  I don't remember you raising
7    an objection when Reed and Mr. Scott were switching on
8    and off, but we can go ahead.
9        MR. HALPERN:  Well, I'm not responsible
10   for that.
11   Q.  (By Mr. Shordt) Senator, I'd like to talk to
12   you about a few exhibits that Mr. Scott examined you
13   on.  First is Exhibit Number 40 -- I'm sorry,
14   Exhibit 45, apologies, it's the Texas Politics poll.
15       MR. HALPERN:  Which year, Counsel?
16       MR. SHORDT:  February of 2011.  I'm going
17   to ask about all three of them.
18   Q.  (By Mr. Shordt) Do you have that?
19   A.  I have it.
20   Q.  Now, can you read what the first question is,
21   it says, "Do you agree or disagree?" Can you read that
22   question, please?
23   A.  "Do you agree or disagree that registered
24   voters should be required to present a government issued
25   photo ID before they can be allowed vote?"

337

1  Q.  And you a said that this poll is one of the
2  polls that you used as a basis to suggest that a photo
3  ID requirement --
4     A.  It was one of the polls that we did reference
5  of a poll that was taken.
6     Q.  If this poll says that voters should be
7  required to present, quote, "a government issued photo
8  ID," why doesn't SB 14 include all government issued
9  photo IDs?
10     A.  Would you ask the question again?
11     Q.  This poll says, the question is, "Voters should
12  be required to present a government issued photo
13  ID."  You pointed to the overwhelming support of 75
14  percent supporting this statement as a defense of
15  including a photo ID requirement in Texas.  Why does
16  SB 14 not include all government issued photo IDs?
17     A.  I believe it says "a government," not "all
18  government photo IDs."  "A government issued photo ID"
19  is what is represented in Senate Bill 14.
20     Q.  Well, are there more than one photo IDs in SB
21  14; is that correct?
22     A.  There's either four or five examples, yes.
23     Q.  And can you point me anywhere in this poll
24  where the individuals are questioned about only those
25  photos IDs included in SB 14?

339

1  the question is:  Should voters have to present a
2  government issued photo ID?  And this is not directly
3  connected to any piece of legislation.  The voters were
4  asked should they show a photo ID and they said yes.
5     Q.  Does this poll anywhere identify what a
6  government issued photo ID is?
7        MS. HALPERN:  Counsel, I'm going to
8  object.  You're past the four minutes.  I'm going to
9  allow you to continue with your questioning, but I'm not
10  going to allow it if you continue to ask the same
11  question 17 times in a document that speaks for itself.
12  It's either there or it's not, and asking this witness
13  whether it's there or it's not isn't going to change the
14  fact it is there or it's not.  So I'm indulging you by
15  giving you extra time.  I'd appreciate it if you didn't
16  waste it.
17     Q.  (By Mr. Shordt)  I'd appreciate it if, Senator
18  Fraser, if you could answer my question:  Does this poll
19  define what a government issued ID is?
20     A.  In a poll the question that is asked is the
21  question that is asked.  They asked the question that I
22  read to you.  The question I think speaks for itself.
23     Q.  Senator, do you recall the questioning from
24  Ms. Westfall with respect to Exhibit 37?
25     A.  You're going to have to help me what 37 is and

338

1     A.  I don't believe this poll had reference to
2  Senate Bill 14.  I believe this was an independent poll
3  done by the University of Texas asking the citizens of
4  the state of Texas independently of any legislation, "Do
5  you agree" --
6     Q.  Can you --
7     A.  Not could you -- do you mind if I finish?
8     Q.  I'm sorry.
9     A.  Do you agree or disagree that registered voters
10  should be required to present a government -- a
11  government issued photo before they can be allowed to
12  vote, and 75 percent of the public agreed with that, and
13  the agreement was broad across all demographic lines of
14  ethnicity.
15     Q.  Can you point me where in this exhibit it
16  defines what a government issued photo ID is?
17     A.  I can only read you what the question was
18  asked, and I don't think that probably was -- it was a
19  very clear question to the public, and if they asked
20  John Q. Public that question, they left the question to
21  stand on it's own.
22     Q.  Can you point me where in this poll it
23  identifies a government issued photo ID as a driver
24  license?
25     A.  I don't believe that's the question.  I think

340

1  what questioning you're representing.
2     Q.  Well, I -- when you find it, I'll ask a more
3  specific question.
4        MS. HALPERN:  Was 37 asked about on the
5  cross?
6        MR. SHORDT:  Ms. Westfall asked it.
7        MR. HALPERN:  Well, she asked about it.
8  You're suppose to responding to the cross examination.
9  He wasn't asked about that in the cross examination, so
10  it's beyond the scope.
11        MR. SCOTT:  Okay.
12     Q.  (By Mr. Shordt)  So can you tell me does this
13  poll, the poll in Exhibit 45, reference strict photo
14  IDs?
15     A.  I believe the question stands on its own that
16  it says a government issued photo ID for --
17     Q.  Do you recall -- sorry.
18     A.  Do you mind?  I'd love to answer if you don't
19  interrupt me, please.
20     Q.  Go ahead.
21     A.  Would you allow me to finish my response?
22     Q.  Yes.
23     A.  Thank you.
24        The question clearly says that should a
25  government issued photo ID be required before they're

SENATOR TROY FRASER                                7/23/2014
CONFIDENTIAL TRANSCRIPT

86 (Pages 341 to 344)

341

1  allowed to vote.  The question stands on its own.
2     Q.  Okay.  Do you recall when Ms. Westfall asked
3  you with respect to Exhibit 37 and read into testimony,
4  "Do you agree or disagree with the idea that registered
5  voters should be required to present a government issued
6  photo ID at the polls before they can be allowed to
7  vote," do you recall telling her that was not your
8  understanding of the question in the poll and you stated
9  that the question asked about strict photo ID?
10    A.  Okay.  I have no idea what you just said.  If
11 you'd like to repeat that and slow down.  I can't follow
12 what you're saying.
13       MR. SHORDT:  Chris, would you please
14 repeat the question?
15       MS. HALPERN:  Is this the clarification he
16 made after we came back from the break or the testimony
17 he gave before the clarification, Counsel?
18       MR. SHORDT:  This is the testimony that he
19 gave.  He didn't give a clarification with respect to
20 this.
21       MR. HALPERN:  Actually, I think he did.
22       MR. SHORDT:  I don't believe that he did.
23    (Requested portion read back by the court
24 reporter.)
25    A.  So what is the question?

342

1     Q.  (By Mr. Shordt) Do you recall that testimony?
2  Do you recall that testimony from earlier this
3  afternoon?
4        MS. HALPERN:  He just read it back to you.
5     A.  Yeah.  The answer is yes.
6     Q.  (By Mr. Shordt) So is it fair to say that this
7  poll does not include the words "strict photo ID"?
8     A.  The poll that they're asking was not
9  commissioned by anyone connected with Senate Bill 14.
10 This was a poll that was commissioned independently
11 that -- by the University of Texas and we believe.  I
12 saw the poll and the poll asked a question and the
13 question is very clear and the words speak for
14 themselves.
15    Q.  That's not what I asked you, Senator.  I asked
16 you if the words "strict photo ID" appear anywhere in
17 this document?
18    A.  In what document?
19    Q.  Exhibit 45.
20    A.  The wording that is -- the question clearly
21 says that you present a government issued photo ID.
22    Q.  Do you agree that there are more government
23 photo IDs that exist than are included in SB 14?
24    A.  It says "a government photo ID."
25       MR. HALPERN:  Let's just answer his

343

1  question.
2     A.  Do I agree that are there more than what is
3  included?  The answer is yes.
4     Q.  (By Mr. Shordt) And you don't know how any
5  single respondent to this poll interpreted the phrase "a
6  government issued photo ID;" is that correct?
7     A.  It would be subjective for me to project what
8  someone that was asked a poll the way they interpreted
9  this.
10    Q.  So the answer is yes?
11    A.  The answer is yes.
12    Q.  Can you please turn to Exhibit Number 41 that
13 Mr. Scott asked about.
14    A.  I don't know where 41 is.  Well, here it is
15 right here.  Got it.
16    Q.  And I'll point you to what is page 3, Bates
17 TX_00009047.
18    A.  Got it.
19    Q.  Do you see at the bottom where it says Photo --
20 Photo Voter ID Requirement?
21    A.  Uh-huh.
22    Q.  And can you read that question, please?
23    A.  "Do you favor or oppose requiring a valid photo
24 ID before a person is allowed to vote?"
25    Q.  Do you understand what a valid photo ID means

344

1  in this poll?
2     A.  I believe the words speak for themselves.
3     Q.  Does the poll define what a valid photo ID is?
4     A.  This questionnaire was not connected to --
5        MR. HALPERN:  Just answer his question.
6  Is there a definition in the document?
7     A.  Is there a definition of the document in the
8  question?
9     Q.  (By Mr. Shordt) Sorry.  Is "valid photo ID"
10 defined anywhere in this Lighthouse opinion poll?
11    A.  No.
12    Q.  And is it fair to say that you have absolutely
13 no idea how any respondent to this poll interpreted the
14 phrase "valid photo ID"?
15    A.  It would be subjective for me to in any way
16 guess what they -- I think the person had to rely on the
17 question on its face of what it said.  This is a
18 question that was asked.
19    Q.  So your answer is you do not know how any
20 person interpreted the phrase "valid photo ID"?
21    A.  It would be impossible for me to do it other
22 than the question speaks for itself.
23    Q.  So your answer is a yes, you don't know how any
24 person interpreted the word -- phrase "valid photo ID"?
25    A.  My answer is that the question speaks for

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

345

1  itself and there's going to be no way for me to
2  interpret the way they interpreted it.
3     Q.  Can you look at the last page of this poll,
4  please, Survey Geographic Zones is at the top.  And I
5  apologize -- yeah, the last page is Texas Bates
6  TX00009052, it's a map.
7     A.  My map is not very good, but yes.
8     Q.  Does this appear to be a complete map of Texas?
9     A.  No.
10    Q.  To your knowledge, was this survey taken of
11 voters throughout all of Texas?
12    A.  I don't believe I can determine that because I
13 think this probably was a color coded map and there's
14 references to the areas you're talking about.  I think
15 you're making an assumption based on the fact that is
16 bad printing off of a bad printer and I don't think it
17 is conclusive what it is because, if you look at the
18 description below that, there's a reference to the
19 Austin area and a code of a color that would have been
20 there and that -- there's a hole in the map where that
21 would have been, but because this is not a color map, it
22 doesn't show up.
23    Q.  But you don't know the geographic breakdown of
24 the respondents for this poll?
25    A.  It would be impossible for me to determine

346

1  because that, the map you're looking at here, has no
2  guidelines of where they, you know, they took the poll,
3  so the question you're asking is impossible to determine
4  based on this map.
5     Q.  Can you please turn to page 3?
6     A.  On the same exhibit?
7     Q.  Yes, sir.
8     A.  Got it.  Page 3 I'm assuming is 9047?
9     Q.  Yes, sir.
10    A.  Yes.
11    Q.  At the very top, do you see where it says,
12 "Single most important problem facing Texas"?
13    A.  Yes.
14    Q.  Is lack of confidence in voting any of the most
15 important problems facing Texas?
16    A.  I do not see it listed there, but I don't think
17 that was one of the ones -- the things that was asked,
18 the question -- the choices available.  I believe if you
19 totaled the numbers of percentages, that will total to a
20 hundred.  They gave these people eight choices of
21 questions they could ask.  They chose between those
22 eight.  The question you're asking was not a choice they
23 included.
24    Q.  But this poll does ask about photo voter ID
25 requirements; is that right?

347

1     A.  Yes.
2     Q.  So questions were asked about photo IDs?
3     A.  Yes.
4     Q.  And you don't believe that any questions --
5  well, strike that.
6        Is photo voter ID requirements listed as
7  one of the single most important problems facing Texas?
8     A.  It's not one of the questions they asked.
9     Q.  Do you know if any questions were asked about?
10    A.  There's no way to determine from this poll.
11    Q.  And can you please turn to Exhibit 42.
12    A.  42?
13    Q.  Yes, sir.
14    A.  Okay.
15    Q.  "The Effects of Photographic Identification
16 ffon Voter Turnout in Indiana, a County Level Analysis"?
17    A.  Yes.
18    Q.  Would you please turn to Page 7 of the report
19 which is Bate stamped Texas 00008826.
20    A.  I'm there.
21    Q.  I'll point you in the direction to what is
22 Section 5 discussion in the second column halfway down.
23    A.  I'm there.
24    Q.  Can you look at the first two paragraphs,
25 primarily I have a question about the second paragraph,

348

1  so when you've had a chance to review it, please let me
2  know.
3     A.  I'm sorry?
4     Q.  Let me know when you've had a chance to review
5  it.
6        Have you had as a chance to review it,
7  Senator?
8     A.  No.
9        Okay, I've finished reading.
10    Q.  Okay.  Do you see where it says, "In this
11 study, I exploit the existence of a natural experiment
12 in the impact of photo ID: the change in turnout between
13 the 2002 and 2006 midterm elections in Indiana."
14        Do you understand that this report
15 analyzes election results in the 2006 and 2006 midterm
16 elections in Indiana?
17        MR. HALPERN:  I think you misspoke,
18 Counsel.  You meant 2002 and 2006?
19    Q.  (By Mr. Shordt) I'm sorry, 2002 and 2006.
20    A.  I believe that's what it says.
21    Q.  Are you aware of whether 2002 or 2006 were
22 presidential election years?
23    A.  I believe that they are referring to midterm,
24 and midterm generally means that's not a presidential
25 election year.

SENATOR TROY FRASER                                    7/23/2014
CONFIDENTIAL TRANSCRIPT

88 (Pages 349 to 352)

**349**

1    Q.  Do you understand that -- or in your experience
2  as a Senator, is voter turnout generally higher during
3  midterm elections or general elections?
4    A.  The analysis of this is not determining whether
5  turnout was high or low in reference to a midterm or
6  presidential year.  They compared it to like midterm
7  years and other midterms.
8    Q.  But that wasn't quite my question.  Is turnout
9  generally higher in a midterm elections, Senator, or --
10   A.  In a presidential year, it generally is higher.
11   Q.  So do you think that an analysis of midterm
12  elections would accurately reflect turnout rates in a
13  presidential election then?
14   A.  Well, as someone who's been in politics for a
15  long time, I can tell you that the -- anytime that you
16  look at polling data, you always look at midterm.
17   Be in a presidential race, it depends on the
18  candidates running and you can have anomaly that
19  happens.  And we had an anomaly 2008 because Obama was
20  able to turn out a large portion of voters that normally
21  wouldn't vote.
22       In the midterm prior to that, in 2006 and
23  the midterm of 2002, normally you do not have that
24  anomaly and you get a very like sample so the
25  representation is better, and that's the reason they

**350**

1  used 2002 and 2006.
2    Q.  But is true that more people will vote in a
3  presidential election year?
4    A.  I know the question you're asking, but this
5  report is referencing a study in 2002, 2006, and it has
6  nothing to do with a presidential year.
7    Q.  So it has nothing to do with analyzing an
8  election where more people will likely vote?
9    A.  Not if there's an anomaly because of the
10  presidential election turning out an abnormally -- an
11  abnormal number of people.  They're looking at comparing
12  apples and apples.  If you used a reference of what
13  happened in 2002 and 2006, it is apples and apples with
14  other midterm elections.
15   Q.  Do you think that 2008 was the only
16  presidential abnormality election?
17   A.  I was using 2008 as an example, but generally
18  you'll have, if you're going to have an abnormal
19  turnout, it will be in an highly contested presidential
20  election.
21   Q.  One last question:  You testified with respect
22  to the amendments that were offered by legislators less
23  than 24 hours prior to consideration of SB 14, and
24  correct me if I'm mischaracterizing your testimony, but
25  there was not enough time to analyze the amendments; is

**351**

1  that correct, sir?
2    A.  I testified that in the Senate, both policy and
3  the request to turn in amendments, so we're allowed to
4  look at the physical impact and the input back from the
5  agencies of the implementation of the -- of the
6  amendment, and the reason you do that in advance is that
7  it helps the person carrying the amendment chances of
8  passing because it allows the agency that impact.
9       Generally in the legislature, if an
10  amendment is dropped in late; i.e., you only have a few
11  minutes to look at it, its chances of passage are very
12  thin or unlikely, because you do not have sufficient
13  time to analyze the impact of the -- of the amendment
14  that's offered.
15   Q.  What would a sufficient time to analyze the
16  amendment offered be?
17   A.  24 hours.
18   Q.  And do you feel that two weeks is enough time
19  to analyze the sufficiency of a major piece of
20  legislation like SB 14?
21   A.  I would think two weeks would be, yes.
22   Q.  Were there any amendments offered that were not
23  provided 24 hours ahead of time that were adopted?
24   A.  I -- I do not know the answer to that.  I would
25  think it is the likelihood that the CL -- the concealed

**352**

1  handgun amendment license by Senator Hinojosa, I don't
2  think we had 24 hours notice, but that was an amendment
3  that was easy to analyze because we knew the impact
4  because it was already -- there wasn't a fiscal impact
5  because it was already in place.
6    Q.  So you did make some exceptions to the 24-hour
7  rule?
8    A.  If we were able to analyze the amendment.
9    Q.  Okay.  And can you tell me is it true that the
10  time of floor consideration was changed for -- from
11  9:20 p.m. on January 26, 2014 to the daytime hours on
12  January 26, 2014, so the public could watch?  Is that
13  accurate?
14   A.  Say it -- ask the question again, please.
15   Q.  Was the time of floor consideration for SB 14
16  changed from 9:20 p.m. on January 26, 2014, to the
17  daytime hours on January 26, 2014, so the public could
18  watch?
19   A.  I still am not getting the question.  You're
20  asking --
21   Q.  Let me ask you this.  Sorry to cut you off, but
22  I want to ask it probably a different way.  Do you
23  recall when consideration of SB 14 began?
24   A.  No.
25   Q.  Do you recall if it was in the morning or

353

1   afternoon or evening?
2       A.  No.  This is Senate Bill 14 you're referring
3   to?
4       Q.  Yes, sir.
5       A.  No, I'm sorry, I do not remember.
6           MR. SHORDT:  I have no further questions.
7           MS. WESTFALL:  I have one exhibit.
8           MR. HALPERN:  Let the record reflect that
9   y'all have had 25 minutes now.  I'm going to let you ask
10  your question.
11          MS. WESTFALL:  Could you mark this?
12          (Exhibit 47 marked for identification.)
13              FURTHER EXAMINATION
14  BY MS. WESTFALL:
15      Q.  Senator, you've been handed what's been marked
16  as Exhibit 47.  Do you recognize this document?
17      A.  I do not recognize the document, no.
18      Q.  Were you copied on this document in another
19  version?  Were you sent this separately?
20      A.  I'm sorry?
21      Q.  Were you sent this letter from Senator Van de
22  Putte separately?
23      A.  If you will give me a second to look at it.
24      Q.  Take your time.
25      A.  What was your question?

354

1       Q.  Were you sent this letter yourself from Senator
2   Van de Putte?  Or copied?
3       A.  I do believe our office received this, yes.
4       Q.  Do you see that this is a letter sent January
5   21, 2011?
6       A.  Yes.
7       Q.  And it's sent from Senator Van de Putte to
8   Senator Duncan?
9       A.  Yes.
10      Q.  And was Senator Duncan presiding over
11  consideration of Senate Bill 14?
12      A.  I do believe that he had been asked by the
13  Lieutenant Governor to preside over the hearing.
14      Q.  And that was before the Committee of the Whole;
15  is that correct?
16      A.  That was on January 21.  This is January 21.
17  The bill was heard on the 25th, I believe.
18      Q.  And was that in committee on the 25th and then
19  on the floor on the 26th?
20      A.  I'm sorry, I don't have that data in front of
21  me, so I can't answer that.
22      Q.  That's okay.  Don't worry about it.
23          Do you see that this letter expresses in
24  the first paragraph concern about the timing of the
25  public hearing on Voter ID?

355

1       A.  Yes.
2       Q.  And does Senator Van de Putte also express
3   concern in the second paragraph about the notice
4   provided to all senators about when the Committee of the
5   Whole hearing on Senate Bill 14 would be held?
6       A.  Yes.
7       Q.  Does Senator Van de Putte further express --
8   contrast the notice senators were afforded in 2011 with
9   the notice provided in 2009 in the last paragraph of the
10  first page?
11      A.  Yes.
12      Q.  And turning to the second page of Exhibit 47,
13  do you see that Senator Van de Putte also expresses that
14  under the Senate rules there was concern that there was
15  inadequate notice of the timing of the Committee of the
16  Whole hearing?
17      A.  Where is the --
18      Q.  That would be three paragraphs down.  Do you
19  see that concern?
20      A.  Yes, I do.
21      Q.  Do you recall that Committee of the Whole
22  hearing was held on January 25th, 2011?
23      A.  Again, I don't have that in front of me, but if
24  you represent the hearing was on the 25th, yes.
25      Q.  I will represent that to you, and I prefer not

356

1   to use another exhibit so we can all save time.
2           And do you remember that the floor
3   consideration on all the amendments were considered on
4   the 26th of January?  I'll represent that to you.
5       A.  Okay.
6       Q.  Do you recall that initially there was going to
7   be requirement of 24 hours between Committee of the
8   Whole consideration of Senate Bill 14 and the floor
9   consideration of Senate Bill 14 as required by Rule 5.11
10  of the Senate rules?
11      A.  Yes.
12      Q.  And that was agreed to initially; is that
13  correct?
14      A.  Yes.
15      Q.  And then the time was shortened in order to
16  allow the public to watch the debate on television?
17      A.  I'm not aware of that, no.
18      Q.  Did the debate and the amendments, were they
19  offered during the daytime hours or earlier than
20  9:20 p.m. on January 26th?
21      A.  I believe you are correct.  This is on the
22  26th?
23      Q.  Yes.
24      A.  Yes.
25          MS. WESTFALL:  Thank you for your time,