## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, et al.,          )
        Plaintiffs,           )
                              )
v.                            ) Civil Action
                              ) No. 2:13-cv-193(NGR)
RICK PERRY, et al.,           )
        Defendants.           )
_____)
                              )
UNITED STATES OF AMERICA,     )
        Plaintiff,            )
                              )
TEXAS LEAGUE OF YOUNG         )
VOTERS EDUCATION FUND,        )
et al.,                       )
                              )
        Plaintiff-            ) Civil Action
        Intervenors,          ) No. 2:13-cv-263(NGR)
                              )
TEXAS ASSOCIATION OF          )
HISPANIC COUNTY JUDGES AND    )
COUNTY COMMISSIONERS,         )
et al.,                       )
        Plaintiff-            )
        Intervenors,          )
                              )
v.                            )
                              )
STATE OF TEXAS, et al.,       )
        Defendants.           )
_____)

*************************************************
            ORAL DEPOSITION OF
               SHERI GIPSON
               JUNE 9, 2014
*************************************************
    ORAL DEPOSITION OF SHERI GIPSON, produced as a

## 2

witness at the instance of Plaintiffs, and duly sworn,

was taken in the above-styled and numbered cause on

June 9, 2014, from 9:31 a.m. to 11:19 a.m. before

Kim Seibert, CSR in and for the State of Texas,

reported by machine shorthand, at the law offices of

DECHERT LLP, 300 West Sixth Street, Suite 2010, Austin,

Texas, pursuant to the Federal Rules of Civil Procedure

and/or the provisions stated on the record or attached

hereto.

## 3

A P P E A R A N C E S

FOR PLAINTIFF UNITED STATES OF AMERICA:
    Ms. Jennifer L. Maranzano (By Telephone)
    U.S. DEPARTMENT OF JUSTICE
    Civil Rights Division
    950 Pennsylvania Avenue, NW
    NWB Room 7254
    Washington, DC  20530
    (202) 305-4355
    jennifer.maranzano@usdoj.gov

FOR THE VEASEY PLAINTIFFS:
    Mr. K. Scott Brazil
    BRAZIL & DUNN, LLP
    4201 Cypress Creek Parkway
    Suite 530
    Houston, Texas  77068
    (281) 380-6310
    scott@brazilanddunn.com

FOR THE DEFENDANTS:
    Mr. S. Ronald Keister
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, Texas  78711
    (512) 463-2197
    ronny.keister@oag.state.tx.us

ALSO PRESENT:
    Ms. Kathleen T. Murphy-Darveau
    TEXAS DEPARTMENT OF PUBLIC SAFETY
    5805 North Lamar Boulevard
    Austin, Texas  78752
    (512) 424-2420
    kathleen.murphy@dps.texas.gov

REPORTED BY:
    Kim Seibert, CSR, RPR
    U.S. Legal Support, Inc.
    Austin Centre
    701 Brazos, Suite 380
    Austin, Texas  78701

## 4

INDEX

Appearances......................................

SHERI GIPSON

Examination by Mr. Brazil.......................  5
Examination by Ms. Maranzano................  60
Further Examination by Mr. Brazil..............  80

Witness' Signature Page........................  84
Reporter's Certificate...............  86

EXHIBITS
NUMBER      DESCRIPTION                    PAGE
Exhibit 136  ...............................  54
            Texas Driver's License Document
            Requirements
Exhibit 137  ...............................  55
            Application for a Driver License
            or Identification Card
Exhibit 138  ...............................  55
            Identification Card Fees
Exhibit 139  ...............................  56
            Driver License Fees
Exhibit 140  ...............................  58
            E-mail dated July 24th, 2013
            from Mr. Peters to
            Robert Bodisch
Exhibit 141  ...............................  58
            E-mail dated November 15th,
            2011 to you from Karen
            Morris

SHERI GIPSON                                                  6/9/2014

---

**5**

1                SHERI LYNN GIPSON,
2    having been first duly sworn, testified as follows:
3                   EXAMINATION
4    BY MR. BRAZIL:
5       Q.  Please state your full name.
6       A.  Sheri Lynn Gipson.
7       Q.  Have you ever given your deposition before?
8       A.  Not for this, no, sir.
9       Q.  I'm sorry?
10      A.  Not for this, no, sir.
11      Q.  But have you been through the process --
12      A.  Yes, sir.
13      Q.  -- of a deposition?
14      A.  Many, many years ago.
15      Q.  Okay.  All right.
16          MR. KEISTER:  One at a time.
17          THE WITNESS:  Okay.
18      Q.  (BY MR. BRAZIL)  Just to remind you of a few
19   rules.  Let me finish my question before you give an
20   answer because the court reporter can only take one of
21   us at a time.
22      A.  Okay.
23      Q.  It's common in everyday talk, you know, we
24   speak over one another.  But in a deposition we're
25   going to have to pause between question and answer.

---

**6**

1          Other rule is, if I ask a bad question, I
2    speak too fast, my question doesn't make any sense, you
3    just say, "Scott, stop, back up, start over.  I didn't
4    understand."  Okay?  Fair enough?
5       A.  Fair enough.
6       Q.  All right.  And you have to give verbal
7    responses to everything because the court reporter
8    doesn't know what this means or this means.
9    Understand?
10      A.  Understand.
11      Q.  And if I remind you or I say, "Is that a yes
12   or a no," don't be offended.  Fair enough?
13      A.  Fair enough.
14      Q.  You are currently employed how?
15      A.  I am the senior manager over the records
16   enforcement area in the driver license division of
17   Texas Department of Public Safety.
18      Q.  And can you tell us briefly what you do in
19   that position?
20      A.  I manage the headquarters functions, which is
21   the license and records service, who's primarily
22   responsible for the issuance and mailing of the driver
23   license identification cards, the production of driver
24   records, and the production of driver record
25   application material and the enforcement and compliance

---

**7**

1    service, which is primarily responsible for the
2    suspension, revocation, action, initiation, and
3    compliance processing, as well as the conviction
4    reporting from across the state.
5       Q.  Wow.  That was a mouthful.  So I apologize in
6    advance if I go back over that sometime during your
7    deposition.  Okay?
8       A.  That's fine.
9       Q.  Who do you report to?
10      A.  I report to JoeAnna Mastracchio.
11      Q.  And her position?
12      A.  And she is the deputy assistant director of
13   driver license customer support.
14      Q.  Is your office here in Austin?
15      A.  Yes, sir.
16      Q.  And do you have people that report to you?
17      A.  Yes, sir.
18      Q.  Can you briefly describe that?  I mean,
19   position, not the names.
20      A.  Direct report or in total?
21      Q.  Direct report.
22      A.  Direct report?  I have two assistant -- or
23   two managers, one for each of the services, and then a
24   special license coordinator.
25      Q.  But you are -- there's nobody else that has a

---

**8**

1    different region of Texas that does what you do?
2       A.  No.
3       Q.  You're all over Texas, correct?
4       A.  That is correct.  I do just the headquarters,
5    the backup, the support operation, the record
6    information.
7       Q.  In preparation for your deposition today, have
8    you reviewed anything by way of records, depositions,
9    documents, law statutes, anything of that sort?
10      A.  I have reviewed statutes, the administrative
11   rules, and the websites.
12      Q.  And the websites?
13      A.  Uh-huh.
14      Q.  And is that a yes?
15      A.  Yes, sir.
16      Q.  And I assume by "websites," you mean the
17   Department of Public Safety website?
18      A.  Yes, sir.
19      Q.  Did you see anything on the website that
20   needed to be corrected or updated when you made that
21   review?
22      A.  I wasn't looking at it with that intent.  We
23   are constantly reviewing that information when we get
24   customer comment or problems from the field offices or
25   other customers that are reporting to us, and we review

---

SHERI GIPSON                                                    6/9/2014

9

1   it as it comes forward.
2       Q.  Are you in charge of any portion of the
3   website for DPS?
4       A.  No, sir.  That's the policy and business
5   improvement group.
6       Q.  But if you have something you would like to
7   add, change, or modify, do you send your request to
8   that group?
9       A.  That's correct.  We submit it through them.
10      Q.  I'm going to ask you this morning primarily
11  about driver's license and the personal identification
12  cards.  Okay?
13      A.  Okay.
14      Q.  The personal identification card, just for the
15  record, is what, in your opinion?  How do you see that?
16      A.  The personal identification card is a document
17  that is issued to an individual to show who they are
18  and where they live.  It does not give them the
19  privilege to drive a vehicle.
20      Q.  And other than -- what uses does a personal
21  identification card have in Texas, in your opinion?
22      A.  In my opinion, there's -- it's primarily used
23  as identification for business or banking or personal
24  such as residential.
25      Q.  Will it allow someone to gain access to a

10

1   state courthouse?
2       A.  Yes, sir.
3       Q.  What about boarding a plane?  Do you know if
4   that will allow a person to board a plane?
5       A.  Currently it does allow them to board a plane.
6       Q.  Does the personal identification card that is
7   issued by DPS, does it have a bar -- a bar code or any
8   type of magnetic strip that contains personal
9   identification?
10      A.  The personal identification card has both a 2D
11  bar code and a mag stripe.
12      Q.  And what kind of information is contained on
13  those two -- on the personal identification card?
14      A.  The information that is on the face of the
15  license and, additionally, it houses the weight and
16  height -- weight and hair color of the individual.
17      Q.  On the magnetic strip, or whatever you call
18  it?
19      A.  The mag stripe and the 2D bar code.
20      Q.  Okay.  What about the driver's license?
21  What -- what information is on the magnetic strip of a
22  driver's license?
23      A.  It's the same information.  It's the
24  information on the face of the license, plus the weight
25  and hair color.

11

1       Q.  So basically the same for both; personal
2   identification and driver's license?
3       A.  Yes, sir.
4       Q.  Let me ask you, first of all, about driver's
5   license in Texas, if I could.  If I go into the -- into
6   a DPS office and apply for a driver's license for the
7   first time, what type of information do I need to
8   provide to the DPS in order to obtain a Texas driver's
9   license?
10      A.  Okay.  For the -- for a driver license you
11  would fill out the application and you would also
12  provide us proof of identity, proof of residency, proof
13  of citizenship, and then if you held a previous license
14  in another state, that information as well.
15      Q.  Before I get to the forms of identification,
16  is there a fee for applying for a driver's license for
17  the first time?
18      A.  There is a fee for the driver license.  For
19  the regular driver license, it's $24.  For the
20  commercial driver license, it's $60.  And there's --
21  there's additional fees if you have motorcycles.
22      Q.  Is there any type of waiver by the DPS for
23  individuals who are -- cannot afford a driver's license
24  or a certain poverty level, anything of that sort?
25      A.  There is not a waiver for -- based on poverty,

12

1   no, sir.
2       Q.  Okay.  Is there a waiver based on age or
3   disability?
4       A.  There is.  There's a reduction in fee for an
5   identification card based on age.  There is a -- if you
6   are a veteran that receives 60 percent or more
7   disability, your driver license fees and identification
8   card fees are waived.
9       Q.  Are the fees the same for a personal
10  identification as they are for a driver's license?
11      A.  No, sir.  It's $15 for an ID.
12      Q.  But the waiver is the same?
13      A.  Yes, sir.
14      Q.  Are the requirements for receiving a personal
15  identification card the same as those for receiving a
16  driver's license for the first time?
17      A.  With the exception of proof of a license in a
18  former state.
19      Q.  Can a nonresident of Texas obtain a driver's
20  license in Texas?
21      A.  What do you mean by "nonresident"?
22      Q.  Someone who lives in another state.
23      A.  But if they're a citizen?
24      Q.  Yes.
25      A.  No, sir.  They have to -- for an original they

SHERI GIPSON                                                    6/9/2014

13

1    have to show residency --
2         Q.   Okay.
3         A.   -- and proof of living in Texas.
4         Q.   What about a non-US citizen, can they obtain a
5    driver's license in the State of Texas?
6         A.   Yes, sir, they can, as long as they can prove
7    lawful presence.  And then their card is issued based
8    on that.
9         Q.   And what is lawful presence in the mind of
10   DPS?
11        A.   Lawful presence means that they have a
12   document showing that they are here for an extended or
13   limited time period and that they have approval to be
14   in the United States.
15        Q.   And what type of documents would you expect to
16   see?
17        A.   You would have -- and you'll have to forgive
18   me.  I don't know all of the form numbers.  There is
19   documents for students for workers, permanent
20   residents, and asylees.
21        Q.   Does that driver's license have a different
22   identification on the face of it than for a
23   US resident?
24        A.   There -- it's got the same header as far as
25   the driver license, but it does say temporary resident.

14

1         Q.   And is it issued for a different period of
2    time than a driver's license for a US resident?
3         A.   It is.  The asylees and permanent residents
4    are issued for the same period of time.  But the
5    others, the expiration is based on their stay in the
6    United States.
7         Q.   Based on the documentation they provide to --
8         A.   They present.
9         Q.   -- the DPS?
10        A.   Yes, sir.
11        Q.   Okay.  Has Texas always required proof of
12   US citizenship to issue a driver's license?
13        A.   No, sir.
14        Q.   And when did that change?
15        A.   I don't recall when we initially started the
16   year.  It was as a result of voter -- the Help America
17   Vote Act.
18        Q.   How long have you been in your current
19   position at DPS?
20        A.   Since 2009.
21        Q.   What did you do before that?
22        A.   I was a manager of the license and records
23   service.  And then prior -- during that same time
24   period I served on a special project for four years.
25        Q.   How long have you been with DPS in general?

15

1         A.   32 years.
2         Q.   Congratulations.
3         A.   Thank you.
4         Q.   You don't remember exactly when proof of
5    US citizenship was required to obtain a Texas driver's
6    license?
7         A.   No, sir.  We -- the proof began in 2008.  But
8    prior to that we did start collecting that information.
9         Q.   Can you tell me the difference?  I'm not sure
10   I understood.
11        A.   Well, the difference before was -- okay.  The
12   difference before was it was a question that was asked,
13   "Are you a citizen," and the applicant provided the
14   information yes or no.
15        Q.   All right.  So before 2008 they just checked a
16   box that say US citizen?
17        A.   That's correct.
18        Q.   Okay.  After 2008, they had to show some type
19   of proof?
20        A.   Yes, sir.
21        Q.   And what type of proof did the DPS rely upon
22   to verify someone was a US citizen?
23        A.   Certificate of naturalization, birth
24   certificate, or passport.
25        Q.   Now, if I go into the DPS office to renew a

16

1    driver's license, okay, do I show all of the same
2    information or do I have to show all of the same
3    documentation as if I'm getting one for the first time?
4         A.   No, sir, you do not.
5         Q.   All right.  What if I have a driver's license
6    that was issued before 2008?
7         A.   I'm not sure what you're asking.  I mean, it's
8    the same process.  So there is certain fields, Social
9    Security number and citizenship, if they have not been
10   completed, then you do have to show proof of those two
11   for a driver license.
12        Q.   Okay.  So if I'm -- if I'm doing an in-person
13   renewal, does it make a difference in my age -- does my
14   age make a difference in what I have to show to the
15   DPS?
16        A.   No, sir.
17        Q.   All right.  So if I'm renewing a driver's
18   license that I obtained before proof -- written proof
19   was required of U.S. citizenship, I have to show it at
20   that time?
21        A.   If the system has not been updated to show a
22   citizenship yes or no, then, yes, yes, sir.
23        Q.   And how would the system get updated?
24        A.   By the information that the applicant
25   previously submitted.

17

1  Q. Okay. So they would look me up on the
2  computer, and if I had not provided that type of
3  documentation or proof before, then I would have to
4  show it when I renewed?
5  A. Well, it's not -- we don't look to see if
6  there's documentation. So the CSR is looking at the
7  system, and if the system displays a yes or no in that
8  field, they do not request additional information.
9  Q. Fair enough. Is -- what about a renewal
10  on-line?
11  A. Well, one of the requirements for a renewal
12  on-line is that the U.S. citizen equals yes.
13  Q. Say that one more time.
14  A. One of the -- the criteria for renewing
15  on-line is that the US citizenship field has to equal
16  yes.
17  Q. In the database --
18  A. In the database.
19  Q. -- maintained by DPS?
20  A. That's correct.
21  Q. Okay. So if I'm renewing on-line and it does
22  not show US citizen, then I need to supply that
23  documentation?
24  A. Yes, sir.
25  Q. Okay.

18

1  A. You would be required to go into the driver
2  license office.
3  Q. That was my next question. So I cannot renew
4  on-line unless the database shows that I am a
5  US citizen?
6  A. That's correct.
7  Q. Now, are there any exceptions to either
8  renewing in person or renewing on-line for when the
9  system does not show a US -- that I'm a US citizen?
10  A. What do you mean by "exception"?
11  Q. Are there any exceptions to that rule?
12  A. That they have to establish that?
13  Q. Yes.
14  A. No, sir.
15  Q. Okay. And -- but I -- the exception would be
16  if I'm a student or I have a student visa or something
17  of that nature, would that show in the database?
18  A. Yes, sir.
19  Q. Oh, it would?
20  A. Yes. It would show citizen, no, and then it
21  would give the information.
22  Q. So if I'm renewing on-line and I'm a -- I'm a
23  student here on some type of student visa or student
24  pass, it would show that within the DPS database?
25  A. It would and it would not allow you to renew

19

1  on-line.
2  Q. So I would have to go in person?
3  A. Right. That is correct.
4  Q. What -- you said you've reviewed some
5  statutes. And what statutes did you review?
6  A. Chapter 521, just overview of the application.
7  Q. And that's 521 of which code?
8  A. Transportation code.
9  Q. Now, if we switch to personal identification
10  cards. I go in to renew in person. Same type of
11  information is required as for a Texas driver's license
12  except for an out-of-state driver's license?
13  A. Yes, sir, except for the Social Security
14  number. That's also permissive on an ID. It's not
15  required.
16  Q. Okay. What about renew on-line? Can I renew
17  my personal identification card on-line?
18  A. You can if you meet all the criteria.
19  Q. Okay. And is it the same database or the same
20  flags that would come up with the DPS when I tried to
21  renew on-line?
22  A. Yes, sir, that's correct.
23  Q. Going back to driver's license for a moment.
24  I am applying for a Texas driver's license for the
25  first time. Am I required to provide fingerprints?

20

1  A. Yes, sir.
2  Q. Is a warrant check run when I apply for a
3  driver's license?
4  A. Yes, sir.
5  Q. And what type of activity would be in the
6  database that would prevent me from getting a driver's
7  license; for example, a felony conviction?
8  A. There is no -- felony convictions in
9  themselves would not prevent you from getting a driver
10  license. The only thing that would prevent you from
11  getting a driver license is if you had some type of
12  suspension or revocation action that prohibited that.
13  Q. Okay. So if I had some type of conviction for
14  DWI, which along with that was a suspension or
15  revocation, then that would be a hold on my ability to
16  get a license?
17  A. That would be a hold on the driver license
18  providing the suspension was still active. The fact
19  that you had a DWI alone would not do it.
20  Q. Okay. What other type of activity would
21  prevent me from getting a driver's license for the
22  first time? Is there some type of child support check?
23  Is there any other background information?
24  A. No, sir. The only thing that would stop you
25  initially is if there's something already in our

SHERI GIPSON                                                    6/9/2014

21

1  system.  So if you had received either convictions or
2  something of that nature prior to getting a driver
3  license and a record was established to document those
4  suspensions, then that would prohibit you from getting
5  the driver license.
6       Q.  Okay.  I read something about child support.
7  How does that affect someone's driver's license?
8       A.  Failure to pay child support, the Attorney
9  General's office sends us notification, and it will
10  suspend their driver license until they become
11  compliant.
12       Q.  All right.  Let's talk about personal
13  identification.  I go in for the first time to get a
14  personal identification card.  Am I required to provide
15  fingerprints?
16       A.  Yes, sir.
17       Q.  And is it handled in the same manner as the
18  application for a Texas driver's license?
19       A.  You mean in regard to get -- collecting the
20  prints?
21       Q.  The prints and the information that's in the
22  database for DPS.
23       A.  The prints are there and the information is
24  there, but suspension and revocation activity would not
25  prohibit you from getting an ID.

22

1       Q.  Would there be anything that would prevent me
2  from getting --
3       A.  Not from a suspension, with the exception of
4  sex offenders.  They are required to renew annually.
5  And so until they establish that they're -- they're
6  they're suspended.  But their compliance is coming in
7  and obtaining the ID or DL, so that wouldn't stop them
8  from getting it.
9       Q.  Okay.  I'm trying to put these in categories
10  so that the record will be clear, and so I'll ask you
11  to help me -- help me do that.
12       A.  Okay.
13       Q.  Renew on-line for a driver's license, the same
14  type of information would prevent me from getting a
15  renewal that we just spoke about?
16       A.  As far as revocations or suspension action?
17  Yes, sir.
18       Q.  Yes.  Okay.  Now, as someone in your
19  department, can you describe, what is the difference
20  between, for example, revocation, suspension,
21  cancellation, confiscation?  How -- put those in a box
22  for me --
23       A.  Put them in a box?
24       Q.  -- and tell me how you view those terms.
25       A.  It --

23

1       Q.  Let's -- driver's license, let's start with
2  that.
3       A.  Okay.  For a driver license, the actions that
4  can be taken against it, there -- it's basically how
5  it's recorded in statute and the process of whether or
6  not there's a hearing involved.  So for certain
7  suspension actions, you're given the opportunity to
8  request a hearing and go before the court or -- I just
9  forgot what they're called.  For ALR.  Just went blank.
10  SOAH, State Office of Administrative Hearings.
11       Q.  SOAH?
12       A.  SOAH.
13       Q.  Okay.
14       A.  So you're allowed to go before them for a
15  hearing, and then they make the final determination
16  whether the suspension continues or it's not.
17           For a revocation, it is --
18       Q.  Hold that thought for just a moment.
19       A.  Okay.
20       Q.  Suspension occurs after a hearing?
21       A.  Only if they request the hearing.  And there's
22  only certain suspensions that allow you to get a
23  hearing.
24       Q.  Okay.  All right.  Let's talk about
25  suspensions.  What are the criteria for the DPS to

24

1  suspend my driver's license?  Give me some examples.
2       A.  So we either receive conviction information or
3  a notice that you have not complied in another state
4  for an offense that occurred there.  Most of the -- the
5  most common one is probably the habitual violator is
6  one of them, where you received four tickets in a
7  12-month period.  So you can request a hearing, go
8  before the court, and then they will determine whether
9  the suspension action would be upheld.  And so then the
10  department would go ahead and initiate it or if they
11  overturn it, and then the suspension action would be
12  stayed.
13       Q.  So the suspension is automatic?
14       A.  The suspension is at a designated time period,
15  and depending on the outcome of a hearing, if you
16  requested it, it would be automatic.
17       Q.  So if you get notification -- let's say if the
18  DPS gets notification of a conviction; that is, one
19  which they suspend your license for, then the
20  suspension has a date on it?
21       A.  Yes, sir, a beginning date.
22       Q.  How is someone notified of that?
23       A.  They are notified by mail.
24       Q.  That your license will be suspended on X date?
25       A.  Correct.

SHERI GIPSON                                                    6/9/2014

---

29

1   that out-of-state ticket, then what happens to that
2   revocation?
3       A.   The revocation is stayed and never initiated
4   if they show proof prior to that start date.
5       Q.   Okay.  What about a personal identification
6   card?  Is it ever revoked?
7       A.   No, sir.
8       Q.   Now, is there a term of cancellation of
9   personal identification cards or driver's license?  Is
10  that -- is that a term the DPS uses?
11      A.   We do use "cancellation."
12      Q.   How is that different from revocation or
13  suspension?
14      A.   Basically when we do a cancellation it is
15  because that person is not qualified for that type
16  card.  So if we have information or get information
17  that the person did not pass the necessary test, we
18  would cancel that driver license.  Or in the instance
19  of an under 18, if a parent withdrew their
20  authorization, then we would cancel that driver
21  license.
22      Q.   And they would be notified in mail?
23      A.   Yes, sir.
24      Q.   They would be given a cancellation date?
25      A.   Yes, sir.

---

30

1       Q.   And they could get the DPS to lift the
2   cancellation date by complying with whatever
3   requirement they had?
4       A.   That would be correct.
5       Q.   Okay.  What about a personal identification
6   card, is it ever canceled?
7       A.   I can't think of an instance, but if we were
8   to -- if we were to discover that there was fraud
9   committed or that the identity was incorrect, then we
10  would cancel that card.
11      Q.   Okay.  Sticking to driver license, can a
12  driver's license be confiscated, physically taken from
13  the driver?
14      A.   Yes, it can be confiscated.  Typically it is
15  not.  The -- the officers usually just let them keep
16  the license because the State no longer requires that
17  it be confiscated.  Way back in the day they did
18  require it, but that statute is no longer required.
19  And so typically they will -- the officer will leave
20  it, because then they don't have to maintain that in
21  their evidence or submit it to us.
22      Q.   So they generally do not take physical
23  possession of it?
24      A.   Correct.
25      Q.   Does that apply -- and you say not always,

---

31

1   because do different law enforcement agencies handle it
2   differently?
3       A.   It would be dependent upon the officer.  They
4   are not instructed to take it, but there are some that
5   still take it depending on the circumstances at the
6   time of arrest.
7       Q.   But Department of Public Safety troopers do
8   not take possession of it?
9       A.   No, sir, not to my knowledge.
10      Q.   Okay.  But maybe some local agencies that do?
11      A.   Correct.
12      Q.   Okay.  If someone is stopped and arrested, for
13  example, for a DWI, what happens to their driver's
14  license?
15      A.   At the time of the stop or the whole process?
16      Q.   Whenever they're processed.
17      A.   Okay.  So --
18      Q.   Since they don't take physical possession of
19  it generally, I understand that.
20      A.   Uh-huh.
21      Q.   Is that a yes?
22      A.   Yes, sir.
23      Q.   Okay.  So what happens to their license?
24      A.   They would maintain possession of it.  And
25  they are served with a notice at the time of the stop

---

32

1   that their license is going to be suspended.  They're
2   given 15 days to request a hearing.  If they choose to
3   request the hearing, then they go through the hearing
4   process.  If the State Office of Administrative Hearing
5   stays it, then we would not initiate the automatic
6   suspension, the administrative license suspension.  If
7   they uphold it, then we would suspend the license.  But
8   it does not require that person to surrender that
9   license.  They can maintain it.
10      Q.   So the person that's arrested for DWI is given
11  some type of notification that the license will be
12  automatically suspended within 15 days if they don't
13  take certain action?
14      A.   No, they're given 15 days to request the
15  hearing.
16      Q.   Is their license to drive still good during
17  that 15 days?
18      A.   Yes, sir, it is.
19      Q.   Okay.  So the suspension is not in effect
20  until there's a hearing?
21      A.   If they request it.  Otherwise, it takes
22  effect on the 41st day, the suspension.
23      Q.   So the 15-day period is the period by which
24  they request a hearing?
25      A.   Correct.

---

SHERI GIPSON                                                    6/9/2014

33

1  Q.  If they request a hearing within 15 days, the
2  license stays -- the Texas driver's license stays valid
3  until there is a hearing?
4      A.  That is correct.
5      Q.  -- okay.  If they do not request a hearing
6  within the 15-day period, then their license is
7  automatically --
8      A.  Suspended.
9      Q.  -- suspended on the 41st day?
10     A.  Yes, sir, it is suspended on the 41st day.
11     Q.  For how long?
12     A.  It depends on whether or not they do a breath
13 test or if they refuse.
14     Q.  If they refuse, do you recall how long?
15     A.  If they refuse, I believe it's 180 days.
16     Q.  Okay.  If they take -- I mean, if they give
17 one or provide one?
18     A.  It's 90 days.
19     Q.  Is there a scenario where a personal
20 identification card would be confiscated?
21     A.  Not during -- not -- not related to a traffic
22 stop.  I mean, I can't -- I can't talk to what an
23 agency might do if they're arresting an individual.
24 But not for reasons that we would require.
25     Q.  There's not a DPS reason that you can think

34

1  of?
2      A.  No, sir.
3      Q.  All right.  If I go -- is there ever a reason
4  if I go into a DPS office for them to confiscate my
5  driver's license?
6      A.  The only reason they would confiscate it is if
7  it was proven that it was fraudulent activity.
8      Q.  And that would be the -- you called them CSRs?
9      A.  In the office?
10     Q.  Yes.  Is that term --
11     A.  CSR, customer service rep, yes, sir.
12     Q.  If I go in to apply for a driver's license and
13 there is a -- do they do an automatic warrant check
14 when I apply?
15     A.  For the driver license?
16     Q.  Yes.
17     A.  Yes, sir.
18     Q.  And for the personal ID as well?
19     A.  Yes, sir, for the ID as well.
20     Q.  And if there's an outstanding warrant, I
21 assume I'm arrested at that time?
22     A.  If there is an officer in the office.
23     Q.  Is there any type of, if you know,
24 fingerprinting requirement or warrant check for someone
25 applying for an EIC?

35

1      A.  No, sir.  They are not printed and the warrant
2  check is not done on that one.
3      Q.  If I go into a DPS office, do -- do I see
4  signage to that effect?  For example, is there a sign
5  that says, "When you apply for a driver's license, we
6  expect fingerprints," or, "We will take your
7  fingerprints and we'll do a warrant check"?
8      A.  Not to my knowledge.
9      Q.  For an EIC, is there something that says, "We
10 do not take fingerprints and we do not do a warrant
11 check"?
12     A.  Not to my knowledge.
13     Q.  Is there any way for a person applying for a
14 driver's license, personal identification, or EIC to
15 know what the differences are?  For example, the
16 website, does it make a distinction?  Could I determine
17 what I have to -- what's going to be done from the
18 website?  And don't guess.  If you don't know, you
19 don't know.
20     A.  Yeah, I'm not -- I can't answer that.  I would
21 have to go look at the website to be sure.
22     Q.  All right.  But as far as in person, if I walk
23 into a DPS office, I won't see signage that says, "This
24 is required for driver's license.  This is required for
25 personal identification.  This is required for an EIC"?

36

1      A.  I can't really answer that because I don't go
2  into the field office.  To my knowledge, it does not --
3  it does not go down to the fingerprint level.
4      Q.  We've talked about the hearings, the
5  administrative law judge hearings with SOAH.  Are there
6  any such hearings that someone can have for a personal
7  identification card?
8      A.  No, sir, because the personal identification
9  card wouldn't be required to go through that process.
10 Now, could they have a hearing because of a driving
11 incident?  Yes, sir.  But it wouldn't affect the
12 validity of their identification card.
13     Q.  If they -- if there was a problem with their
14 personal identification card, is there any way they can
15 appeal that process through the DPS to say, "I do have
16 proof and this is it and they didn't accept it and they
17 didn't issue me a card," anything of that sort?
18     A.  It would depend on the problem.  I'm not sure
19 what you're asking.
20     Q.  Is there any formal process?  I go in.  I
21 apply for a personal identification card.  I'm rejected
22 by the CSR.  How do I go to the next step?
23     A.  For -- in the instance if they don't have the
24 correct documents or something of that nature?
25     Q.  If I think I do, but the CSRs say I do not.

SHERI GIPSON                                                              6/9/2014

---

**37**

1      A.  You would ask to see the lead or the
2   supervisor in that office.
3      Q.  So there's not like a hearing process I have
4   to go through?
5      A.  No, sir.
6      Q.  When, for example, I go into Walgreens to buy
7   behind-the-counter allergy medicine, they swipe my
8   driver's license --
9      A.  Yes, sir.
10      Q.  -- is that information maintained just by the
11   pharmacies or is that information forwarded to DPS?
12      A.  That information is not forwarded to DPS.
13      Q.  Who maintains that?
14      A.  Well, let me clarify that.  It's not reported
15   to the driver license division.
16      Q.  Is it reported to some division, if you know?
17      A.  I don't know that.
18      Q.  Okay.  So it does not report that to DPS?
19      A.  No, sir, not to the driver license division.
20      Q.  Do you know of any voting locations that will
21   swipe my driver's license?
22      A.  I do not, because I live in a small town and
23   we don't swipe.
24      Q.  Okay.  But the only information that's on my
25   driver's license is what you spoke of earlier?

---

**38**

1      A.  Yes, sir.  If they're swiping the card, the
2   only information they're getting is what's on the face
3   of the card, with the addition of the two fields.
4      Q.  Okay.  What type of database does DPS
5   maintain?  Let me make that a broad question to begin
6   with.
7      A.  In relation to driver license or --
8      Q.  Let's start with driver's license.
9      A.  Okay.  So in relations to driver license, we
10   have a driver license system, which houses all of the
11   data related to the issuance of driver licenses and
12   identification cards.  It also houses all of the record
13   information; conviction, accident, crash involvements,
14   et cetera.  And then the -- there is a subset of that
15   database for the election certificate.
16      Q.  Is -- is -- is the database divided into
17   driver's license, personal identification cards, EICs?
18      A.  No, sir.  The driver licenses and
19   identification cards are in the main tables and then
20   the election certificate is in a sub-table or
21   sub-tables.
22      Q.  So if you wanted to search, for example, by
23   name, would you have to search driver's license and
24   then personal ID and then EIC, or could you do it all
25   at once?

---

**39**

1      A.  No, sir.  The only separation would be for the
2   EIC.
3      Q.  It's a separate, standalone database?
4      A.  Yes, sir.
5      Q.  Okay.
6      A.  Well, I can't say it's -- I don't know if it's
7   a separate, standalone database.  The search engines
8   are separate.
9      Q.  Okay.  All right.  And the reason it's a
10   separate search engine is because why?
11      A.  When it was developed, it was done as an --
12   basically as an offshoot of the driver license system.
13   It was not made part of the main driver license system
14   because of the differences in the printing and the
15   warrant checks, all of those things that weren't going
16   to be done.
17      Q.  How -- just looking at the driver's license
18   database, it has -- has the personal identification in
19   that database as well.  What type of categories can you
20   search?  Can you search by age, race, if you know?
21   What categories?
22      A.  You can search the primary searches either by
23   driver license number, Social Security number, name,
24   and date of birth.  We do have additional fields that
25   you can search on, which is age ranges, location, and

---

**40**

1   description.
2      Q.  What was the last one?
3      A.  Description, which is your height, weight,
4   race, et cetera.
5      Q.  Okay.  So under "Description," you could do it
6   by race?
7      A.  Correct, with additional information, not just
8   by race.  So you would have to have the name to go with
9   it.
10      Q.  I'm sorry.  I don't follow that.
11      A.  So, in other words, there's certain criteria
12   that has to be entered.  So at the minimum, you would
13   have to have a last name.  You couldn't just go in and
14   search for all white, in other words.  You have to have
15   a name to go with that.
16      Q.  Okay.  So you could -- you would -- in order
17   to -- okay.  So you couldn't go in there and say, "I
18   want to determine in that database how many
19   African-Americans hold driver's license in Texas"?
20      A.  Not off the -- just our basic search.  Now,
21   can that data be done through using our database
22   administrators?  Yes.  But just the basic search?  No,
23   sir.
24      Q.  Okay.  But it could be done if you wanted to?
25      A.  Yes, sir.

---

SHERI GIPSON                                           6/9/2014

**41**

1    Q.  All right.  And so what categories of race do
2  you have?  I mean, you have, I assume,
3  African-American?
4    A.  African-American, Asian, Pacific Islander,
5  White, Other, and Hispanic, which is the only ethnicity
6  that's included in that.
7    Q.  Okay.  Do you have any idea what the breakdown
8  is today of -- by race of --
9    A.  Percentages?
10   Q.  Uh-huh.
11   A.  No, sir.
12   Q.  Okay.  Can you search, either you or somebody,
13  search the database for -- to determine how many of the
14  driver's license -- how many of the Texas driver's
15  license holders are also registered to vote?
16   A.  No, sir.
17   Q.  Do you know approximately how many individuals
18  hold Texas driver's licenses today?
19   A.  Right now we have -- there is 18 million
20  records.
21   Q.  18 million?
22   A.  18 million records.
23   Q.  Okay.  And why do you use the term "records"
24  rather than "individuals"?
25   A.  It's just -- that's the word I use.  There's

**42**

1  no specific reason for it.  It's 18 million license
2  holders.
3    Q.  Okay.  And you cannot determine how many of
4  those are registered to vote?
5    A.  No, sir.  The only information we have in our
6  system is if they elected to do a voter registration
7  when they were doing their application.  But there's
8  nothing that ties it to the actual voter registration.
9    Q.  Of the 18 million registered -- of the
10  18 million people that hold Texas driver's licenses,
11  how many of those 18 million have show -- have shown
12  documentation or proof of US citizenship, do you know?
13   A.  I can't answer that.
14   Q.  Is it all 18 or not all 18?
15   A.  I would say it's not all 18.
16   Q.  Is that because as the renewals come up they
17  have to show proof that they didn't have to show
18  before?  Is that the reason?  What would be the reason
19  why all 18 million have not shown proof of
20  US citizenship?
21   A.  Because some of the people indicated that they
22  were citizens prior to us requiring them to show proof.
23   Q.  Okay.  I think -- all right.  That was my
24  question.  It was just a bad question.
25        But at some point the entire database

**43**

1  will be updated where everyone will have shown proof of
2  US citizenship?
3    A.  I can't answer that at this point because we
4  don't require it if it's already in the system.  And
5  there's nothing that indicates in our system whether or
6  not they've shown proof.  So unless the State of Texas
7  becomes real ID compliant and that becomes part of the
8  process for us to recertify all of our drivers, I can't
9  say how many will have not -- will have actually shown
10  proof.
11   Q.  Okay.  Let me ask a couple of questions
12  because I got confused earlier.
13   A.  Okay.
14   Q.  So as we sit here today, if someone is in the
15  system and the system shows US citizen --
16   A.  Uh-huh.
17   Q.  Is that a yes?
18   A.  Yes, sir.
19   Q.  -- that doesn't tell you in the DPS whether or
20  not they have shown proof or just checked the box?
21   A.  That is correct.
22   Q.  Okay.  But at some point that person will have
23  to show proof; is that correct?
24   A.  Not at this time.
25   Q.  What if their driver's license comes up for

**44**

1  renewal?  You're saying that if the driver's license
2  comes up for renewal and I renew on-line and the box
3  was checked many years ago, it's still checked?
4    A.  That is correct.
5    Q.  Okay.  All right.  And the real -- when you
6  said "real ID compliant," that is the real ID law that
7  we've talked about in other depositions?
8    A.  Right, that's correct.
9    Q.  Is Texas real ID compliant, for lack of a
10  better term?
11   A.  Not at this time, no, sir.
12   Q.  Okay.  All right.  Just so that I'll
13  understand this -- and I apologize.  So if someone had
14  checked the box "US citizen" many years ago, when would
15  they have to show physical proof that they are actually
16  a US citizen?
17   A.  Only if our statute changes us -- to require
18  us to recertify the drivers.
19   Q.  Okay.  When would I -- I'm 55 today, as a
20  matter of fact.  When would I have to go back into a
21  DPS office to get a driver's license?
22   A.  Well, it depends on at the time of your
23  renewal.  You're allowed alternate means of renewal,
24  which is either on-line, by mail, or over the phone
25  every other renewal period.  So if you renewed in the

SHERI GIPSON                                                6/9/2014

---

45

1   office last time and you meet all of the criteria, you
2   would be allowed to renew on-line the next renewal
3   cycle.
4        Q.   And then after that I would have to go back
5   into an office in person?
6        A.   That is correct.
7        Q.   And if I went in -- when I go back in to renew
8   and I go into a DPS office, if the database already
9   says "US citizen," I will not be asked for additional
10  proof?
11       A.   That is correct.
12       Q.   But if I go in for the first time, okay, I
13  turn 16 or I move here from another state, that's when
14  I need to show physical proof of US citizenship?
15       A.   That is correct.
16       Q.   Okay.  Thank you for helping me with that.
17            MR. BRAZIL:  Do you want to take a short
18  break?
19            MR. KIESTER:  Sure.  That would be great.
20            MR. BRAZIL:  We've been going for an hour
21  or so.
22            THE REPORTER:  Off the record.
23            (Recess from 10:17 a.m. to 10:32 a.m.)
24            (Exhibit Nos. 136 through 141 marked.)
25            THE REPORTER:  Back on the record.

---

46

1        Q.   (BY MR. BRAZIL)  Back --
2        A.   Okay.  Can I clarify one thing?
3        Q.   Yes, ma'am.
4        A.   When I was talking about the limited term and
5   the asylees, I referred to what's on the card as
6   temporary visitor.  That's what it was prior to a
7   change in 2011.  Now it actually says "limited term."
8   So it says, "Driver License" at the top of the license
9   and then "Limited Term" underneath there, not
10  "Temporary Visitor."
11       Q.   Okay.  So if it's a non-Texas resident
12  driver's license and they have a student visa or
13  they're here for a limited period of time, but they're
14  here legally, it will say what, again, on the face?
15       A.   It says -- it says, "Limited Term."
16       Q.   Is everything else the same?
17       A.   Everything else is the same except for the
18  expiration date is calculated not based on their
19  birthday, but on their lawful presence.
20       Q.   Okay.  And it just -- it doesn't say
21  "Temporary Resident"; it says, "Limited"?
22       A.   "Limited Term."
23       Q.   Okay.  Did it used to say "Temporary
24  Resident"?
25       A.   It said "Temporary Visitor" prior to.

---

47

1        Q.   Okay.  And when you say "prior to," what
2   timeframe?
3        A.   Prior to 2011.  We had a statutory change.
4        Q.   Okay.  Just a couple of follow-up questions on
5   the database we were talking about.  Can you search by
6   license revocation, or suspension, things of that
7   nature?
8        A.   Based on the offense, you mean?
9        Q.   The database we were talking about.  Could you
10  enter a search term to determine how many people have a
11  suspended license or how many people have had their
12  license revoked?
13       A.   The user cannot.  But through the database
14  administrator, if you provide them the enforcement
15  action codes, they can do a search on that.
16       Q.   Okay.  And so can they use any type of search
17  terms, if they want to, or that they're asked for?  Is
18  there any limit to that?
19       A.   The database administrator?
20       Q.   Yes.
21       A.   No, it would have to be the field information
22  or the codes that are allowed in the field.  You can't
23  just type in suspension.  We would have to actually
24  provide them with the enforcement action codes that we
25  wanted searched.

---

48

1        Q.   All right.  So you couldn't just use the term
2   "suspension"; you would have to say, "DW -- suspended
3   DWI code," whatever that was?
4        A.   It's actually a number of codes, yes, sir.
5        Q.   Right.  Okay.  Could you determine how many
6   suspensions or revocations there were for a specific
7   period of time?
8        A.   Yes, sir.
9        Q.   Okay.  But each time you would do that you
10  would have to give a certain code?
11       A.   You would have to give a certain code and the
12  time period that you wanted.
13       Q.   So if you wanted to search a year, you could
14  give all the search codes -- or provide all the codes
15  for suspensions, for example?
16       A.   Yes, sir.
17       Q.   And it would tell you those individuals and
18  how many in that period of time had a suspended
19  license?
20       A.   That would be correct.
21       Q.   Okay.  Could you also determine through the
22  administrator how many people were holding an expired
23  Texas driver's license?
24       A.   Yes, sir.
25       Q.   Okay.  When a driver's license expires, just

SHERI GIPSON                                          6/9/2014

---

**49**

1  somebody does not renew it -- if I don't renew my
2  driver's license, do I get a letter that says, "Your
3  driver's license has expired.  It's now suspended,
4  revoked, or canceled," any of that sort?
5      **A.  No, sir.  If -- if your license expires prior**
6  **-- eight weeks prior to the expiration, a renewal**
7  **notice is generated, which advises you you can either**
8  **go on-line or you renew through the mail or go into the**
9  **driver license office, whichever criteria you meet.**
10 **And then once that license has expired, that doesn't**
11 **create a suspension or revocation.  It's just an**
12 **expired license.**
13     Q.  Would your database -- could you do a search
14 by expired driver's license?
15     **A.  Not by expired driver license.  You would have**
16 **to give them the criteria to say "from this date**
17 **forward."**
18     Q.  I'm not sure I followed that part.
19     **A.  Okay.  So, in other words, I couldn't just**
20 **say, "Look for anything that's expired."  What I would**
21 **look for is an expiration date from this date in the**
22 **past, any record that had an expiration date, say,**
23 **prior to today's date, and it would identify all of the**
24 **records that were expired.**
25     Q.  Okay.  For example, you could do a search for

---

**50**

1  all driver's license that expired -- that were expired
2  as of January 1st, 2014?
3      **A.  Forward.  I'm not --**
4      Q.  Wouldn't that be the same thing?
5      **A.  Well, if it would -- you have to give them the**
6  **range.  So if I want to see driver licenses that just**
7  **expired within a certain time period -- and it would**
8  **have to be ones that are currently expired.  So, in**
9  **other words, I can't just go say, "Show me every**
10 **license that expired in 2011 and didn't get renewed for**
11 **a, you know, two-month period."  That type of search**
12 **would be difficult.**
13     **But if I go in and say, "Show me**
14 **everything that had an expiration date that is not up**
15 **to today's date," then it could identify which ones**
16 **expired.**
17     Q.  Is there any way to do a generic where it
18 tells you as of today, June the 9th, 2014, this many
19 driver's license --
20     **A.  Are currently expired?**
21     Q.  -- have expired, yes.
22     **A.  Yes, sir.**
23     Q.  Okay.  And then could you break that down by
24 geographical area, race, age?
25     **A.  You could break it down based on the**

---

**51**

1  criteria -- or based on any criteria that's in the
2  system.  So for geographical, it would be by city or
3  county.
4      Q.  Okay.  Do you know what the criminal penalty
5  is or the charge is for attempting to vote with an
6  invalid photo ID?
7      **A.  No, sir, I do not.**
8      Q.  Do you know if -- if you go to vote and I have
9  an expired driver's license, would the person at the
10 voting -- at the pole know that I had an expired
11 driver's license?
12     **A.  If they looked at the license, it has the**
13 **expiration date on it.**
14     Q.  Okay.  Other than that, there wouldn't be a --
15 something sent out by DPS to precincts or to the county
16 that says, "These driver's licenses have expired in
17 your county"?
18     **A.  No, sir.**
19     Q.  Okay.  What is a driver responsibility
20 surcharge?
21     **A.  A driver responsibility surcharge, that is an**
22 **administrative action that based on certain violations**
23 **an additional fine -- or not fine -- an additional**
24 **charge is done.  So, for instance, there's two types.**
25 **There is what's called points, which is for every**

---

**52**

1  movement violation that you are convicted of, you get
2  two points.  If a crash is involved, it adds an
3  additional point.  So it could be for one -- if you
4  have an offense and a crash, you would get
5  three points.
6      If you get six points or more within a
7  36-month period, then we do what's called a point
8  surcharge.  It's $100 for the six points and $25 for
9  each point after that.  You -- that is assessed
10 annually.  So if you reach six or more points, you
11 would be put into the point surcharge, and then
12 one year from that initial surcharge there would be an
13 evaluation of your record to determine do you still
14 meet the criteria.  If you do, then an additional
15 surcharge would be given.  If not, then that one is
16 done.
17     There's standalone offenses, which is
18 driving while intoxicated, driving while license
19 invalid, no insurance, and no DL.  And those come with
20 just a surcharge for three years from the date of
21 conviction.  So once you're convicted of, say, no
22 insurance, you would get an initial surcharge, and then
23 for two consecutive years you would get an additional
24 surcharge for that.
25     Q.  And what was the last one after no insurance?

---

SHERI GIPSON                                                    6/9/2014

53

1    A. It was no insurance, no driver license.
2    Q. And DWI?
3    A. DWI.
4    Q. And I thought there was a fourth one.
5    A. DWLI. It's driving while license invalid.
6    Q. Okay. Would I get a letter that says, "You
7  now are being surcharged"?
8    A. Yes. You would get a letter notifying you of
9  what the offense was and what the dollar amounts were
10  and the opportunities for payment. For that you can
11  either pay it upfront or make installment payments.
12    Q. And if I fail to pay upfront or make
13  installment payments, what happens to my license?
14    A. Your license is suspended because you go into
15  default.
16    Q. Is there any way to get that waived?
17    A. The fee?
18    Q. Yes.
19    A. You can get it reduced based on your income
20  levels --
21    Q. Okay. So I can --
22    A. -- for indigency.
23    Q. All right. So I can get it reduced based on
24  my income?
25    A. Yes, sir.

54

1    Q. Okay. But if it's not paid, either the
2  reduced amount or the full amount, it goes into
3  suspension?
4    A. Correct.
5    Q. Do I get a notice of suspension?
6    A. Yes, sir.
7    Q. Let me ask you just to identify some
8  documents. There's another attorney on the phone that
9  may have some questions about these, but I want to get
10  you to identify these documents for the record.
11    Exhibit No. 136 was taken, I believe,
12  from the DPS website. Would you identify that for us?
13    A. Yes, sir. This is on the website. It is also
14  a pamphlet that is provided to customers.
15    Q. And it is -- what would you call this?
16    A. It's just basic information of what they need
17  to bring when they're applying for a driver license or
18  identification card.
19    Q. Okay. For the record, it says, "Texas
20  Driver's License Document Requirements"?
21    A. Correct.
22    Q. Okay. That's 136, correct?
23    A. Yes, sir.
24    Q. Okay. Let me get you to identify No. 137, I
25  believe. And that is also a document which I believe

55

1  came from the DPS website, did it not?
2    A. Yes, sir. It is available on the website and
3  in the office. This is the application for a driver
4  license or identification card.
5    Q. And the information required is the same for
6  both on this application?
7    A. For the driver license and the identification
8  card, yes, sir, with the exception of the medical
9  questions.
10    Q. And the medical questions are only for the
11  Texas driver's license?
12    A. That's correct.
13    Q. Okay. Let me show you 138, which appears to
14  be from the DPS website as well?
15    A. That's correct.
16    Q. And would you identify this document for the
17  record?
18    A. This indicates the driver license fees and
19  the -- well, it's actually the page for the
20  identification card fees.
21    Q. So this is the website information for someone
22  trying to obtain a personal identification card and the
23  fees that are associated therewith?
24    A. That is correct. And this -- when I referred
25  to the $15 earlier, that's the statutory fee. This

56

1  actually includes the $1 transaction fee as well that's
2  charged in the office.
3    Q. Okay. And the transaction fee, is that just
4  on-line or is that in the office?
5    A. That's in the office as well as on-line.
6    Q. All right. Let me show you what is 139.
7    MR. KEISTER: Thanks.
8    Q. (BY MR. BRAZIL) That is also a page from the
9  DPS website, is it not?
10    A. That is correct. This is the -- from the DPS
11  website for the driver license fees.
12    Q. Okay. This also includes the
13  $1 administrative fee?
14    A. Yes. Yes, sir, that's correct.
15    Q. All right. You may not have seen this
16  exhibit, but this is Exhibit No. 140. I just want to
17  ask you a question about that.
18    MR. KEISTER: Thanks.
19    Q. (BY MR. BRAZIL) Read the paragraph there and
20  I'll ask you a couple of questions.
21    A. Okay.
22    Q. Was there a period of time at which DPS did
23  take fingerprints and do a warrant search for EIC
24  applicants?
25    A. I cannot answer on the fingerprints, but the

---

57

1    warrant message is not in part -- it's not part of the
2    EIC process.
3        Q.   Was it at one point, or do you know?
4        A.   Not the warrant.  No, sir, the warrant is not.
5        Q.   Was not?
6        A.   It is not, because there is, again, as I said,
7    the search and the database tables are completely
8    separate and the message that does the warrant request
9    is imbedded in the driver license application for the
10   DLs and IDs.  That same process is not imbedded in the
11   EIC process.
12       Q.   Has it ever been, to your knowledge?
13       A.   No, sir.
14       Q.   And on the fingerprint, do you know if that
15   was required at one time and that was stopped?
16       A.   I don't believe it was required, but I believe
17   that because the system allowed it at the beginning
18   that prints were captured.  But that's -- the system
19   has been modified now.
20       Q.   Okay.  Anything done with those prints, to
21   your knowledge?
22       A.   No, sir.
23       Q.   And I think we covered this earlier, but if I
24   go into a DPS office, you're not sure if I -- if
25   there's different signs telling the public what is

---

58

1    required or what will be taken for --
2        A.   That is correct.
3        Q.   -- driver's license?
4        A.   I know there's approved signages for the
5    offices.  I can't tell you what that is.
6        Q.   Okay.  Let me show you -- oh, and, by the way,
7    that was -- just for the record, I want to identify
8    that.  That was a -- Exhibit Number --
9        A.   140.
10       Q.   -- 140 was an e-mail dated July 24th, 2013
11   from Mr. Peters; is that correct?
12       A.   That's correct.
13       Q.   To?
14       A.   Robert Bodisch initially.
15       Q.   And then from Mr. Bodisch to Daniel Hodge?
16       A.   Correct.
17       Q.   Okay.  Let me show you 141 and ask you if
18   you've seen that e-mail before.
19            And, for the record, while you're looking
20   at that, that is an e-mail dated November 15th, 2011 to
21   you from Karen Morris?
22       A.   That is correct.
23       Q.   Okay.  It says, "For the EC racial profile
24   reports."  What is that?
25       A.   The election certificate racial profile

---

59

1    reports.
2        Q.   Okay.  Is that a question, "Should we be
3    counting the number of cards issued or the number of
4    persons"?
5        A.   That's the question, yes, sir.
6        Q.   Okay.  And the answer is, "For the existing
7    racial reports we count persons"?
8        A.   Correct.
9        Q.   Okay.  What's being discussed there?
10       A.   There was reports that were going to be
11   generated out of the initial process that we programmed
12   for in 2011 before it was stopped, and that was one of
13   the reports that we were working on to determine how
14   many cards were issued and the breakdowns.
15       Q.   And when you say "and the breakdown," the
16   breakdown by race?
17       A.   By race, yes, sir.
18       Q.   Okay.  Is that currently in existence?
19       A.   I can't answer that.  The process that -- when
20   it was reactivated last year, I was not involved with
21   that process, so I don't know if they used the initial
22   reports or not.
23       Q.   So you don't know if it's been changed or they
24   went back to the same system?
25       A.   They went back to the same system, but this

---

60

1    report I can't tell you whether or not they're actively
2    using it.
3        Q.   Okay.  And I assume there was no report in
4    November 2011?
5        A.   No, sir.  That was when we were doing the
6    development phase.
7        Q.   Okay.
8            MR. BRAZIL:  I'm going to pass the
9    witness at this time and let Jennifer ask you a few
10   questions.  I'll scan my notes in the meantime.
11            EXAMINATION
12   BY MS. MARANZANO:
13       Q.   Hi, Ms. Gipson.  This is Jennifer Maranzano.
14   I'm representing the United States in this matter.  Can
15   you hear me okay?
16       A.   Yes, ma'am.
17       Q.   Okay.  Great.  I'm going to jump around a
18   little bit here.  I'm trying to fill it in some
19   additional questions.
20       Q.   Do all first-time applicants need to
21   appear in person to apply for a Texas driver's license?
22       A.   Yes, ma'am.
23       Q.   Do all first-time applicants need to appear in
24   person to apply for a personal ID card?
25       A.   Yes, ma'am.

---

SHERI GIPSON                                            6/9/2014

---

61

1    Q.   And in terms of renewals, you and Mr. Brazil
2  discussed on-line renewals, but I believe you said that
3  there's also renewal by mail and by phone; is that
4  correct?
5    A.   That is correct.
6    Q.   Who is eligible to renew by mail?
7    A.   Individuals who their previous renewal was
8  done in person at a driver license office that they had
9  their portrait image on file, that they have a Social
10 Security number on file for driver licenses, not for
11 IDs, and that their US citizen equals yes.  And then
12 for driver license, there's some additional
13 restrictions that if that's on the face of the license;
14 for example, daytime only, they are required to go into
15 the driver license.  But other than that, they can
16 renew on-line, through the mail, or on phone.
17   Q.   Okay.  And if they renew by phone, do they
18 have to mail anything into DPS?
19   A.   No, ma'am.
20   Q.   So it's the same group of people who are
21 eligible for renewal by phone or on-line or by mail; is
22 that right?
23   A.   That is correct.
24   Q.   Okay.  And how about renewals of personal ID
25 cards?  Can they be done in ways other than in person?

---

62

1    A.   The same way.
2    Q.   And would it be the same categories of people
3  who would be eligible for renewals on-line, by mail,
4  and by phone?
5    A.   Yes, ma'am, with the exception of the
6  requirement of the Social Security number.
7    Q.   Okay.  Can you take a look at Exhibit 136 for
8  me?
9    A.   Okay.
10   Q.   This is the exhibit that says, "Texas Driver
11 License Document Requirements" at the top.  Is this --
12 can you just look at -- look through it and let me know
13 if it is accurate and current in terms of the
14 requirements that an applicant needs to present in
15 order to get a Texas driver's license?
16   A.   (Witness reading document.)  It appears to be.
17   Q.   Okay.  And is it still accurate and current in
18 terms of the underlying requirement to get a Texas
19 personal ID card?
20   A.   Yes, ma'am.
21   Q.   Is it -- is it the case that the name on an
22 individual's underlying documentation that -- that they
23 present when they're applying for a Texas driver
24 license has to be exactly the same on each of the
25 underlying documents?

---

63

1    A.   Well, it wouldn't have to be the same if
2  you're using marriage certificates and things like that
3  because the name would then be different.
4    Q.   So if a person's underlying documents have
5  different names, does that person need to present some
6  form of additional documentation showing the name
7  change?
8    A.   Yes, ma'am.
9    Q.   And what if the name on the underlying
10 documents are -- if it's similar, but it's not exactly
11 the same?  Would that -- would that disqualify the
12 individual from applying for a Texas driver's license?
13   A.   I'm not sure what you mean by "similar."
14   Q.   Well --
15   A.   So if the situation -- if one says "Robert"
16 and one says, you know, "John," then, no, that would
17 not be acceptable.
18   Q.   What if one appears to be a nickname?  Does
19 the DPS accept documents that -- that have names that
20 look like they could be derivations of the same name?
21   A.   I -- I don't know that I can answer that
22 fully.  It would depend on the name of the -- the name
23 and the types of documents that were being submitted.
24 I would need to see all of the documents to make a
25 determination if we would accept it or not.

---

64

1    Q.   And who makes that determination when someone
2  is applying for a license?  Is it the individual, the
3  customer service representative, or is it somebody
4  higher at DPS?
5    A.   If it's -- if there is something in question,
6  it would be somebody higher.  It would be someone in
7  the CSR's chain of command.
8    Q.   Okay.  Is that determination made -- would
9  that determination be made on the spot when the
10 individual is applying, or would there be some sort of
11 time lag while DPS considered the issue?
12   A.   It would depend on the circumstances.
13 There -- it could be done initially in the office
14 and/or it could require that it come to their --
15 through their chain of command to their senior
16 managers.
17   Q.   Okay.  Do all of the documents presented by a
18 driver's license applicant need to be original or
19 certified copies?
20   A.   No, ma'am.  The birth certificate -- there are
21 certain documents that do, such as the birth
22 certificate.  But not all of the documents have to be
23 originals.  The supporting documents can be copies.
24   Q.   Okay.  Can you turn to Page 2 of Exhibit 136?
25 Let's turn your attention to the first brochure that

---

SHERI GIPSON                                                    6/9/2014

18  (Pages 69 to 72)

69

1    identification card?
2        A.  Yes, ma'am.
3        Q.  In the top box that is labeled "Applicant
4    Information," the last line says, "Father's last name
5    and mother's maiden name."  Do you see that?
6        A.  Yes.
7        Q.  What does DPS do with that information?
8        A.  That information is just captured on the
9    application and it is used -- it is not used within the
10   driver license system.  It is information that can be
11   used if there is possible fraud or identity theft.
12       Q.  And how would you use that information to
13   determine whether there's fraud or identity theft?
14       A.  That would be up to the investigating officer.
15       Q.  How long has DPS included a question on the --
16   on this driver's license or identification card
17   application about the applicant's race or ethnicity?
18       A.  I believe the race has been on there -- gosh,
19   I don't even -- I can't even tell you.  It's been on
20   there for quite some time.  The ethnicity of Hispanic
21   was added with the implementation of the driver license
22   system in 2010.
23       Q.  And can you look at Exhibit 138 for me?
24       A.  Okay.
25       Q.  If you -- I have a few questions about 138 and

70

1    139, which are for the driver's license?
2        A.  Okay.
3        Q.  These -- are these accurate and current lists
4    of what the fees are for the Texas personal
5    identification card and Texas driver's license?
6        A.  Yes, ma'am.
7        Q.  And Exhibit 138 is for the Texas
8    identification card; is that correct?
9        A.  That is correct.
10       Q.  Exhibit 139 is a list of fees for the Texas
11   driver's license, correct?
12       A.  That is correct.
13       Q.  Are the fees for these -- for the Texas
14   driver's license and the personal identification card
15   set by the Legislature?
16       A.  The base fee is set by statute, and then the
17   $1 transaction fee is for the payment processing.
18       Q.  Okay.  Does DPS have any discretion with
19   regard to these fees?
20       A.  As far as when it is charged or not?
21       Q.  Yes.
22       A.  No, ma'am, not other than what's laid out in
23   statute, which allows veterans who have 60 percent or
24   more disability to waive the fee for the renewal or
25   issuance of the ID or DL.

71

1        Q.  And does DPS have any discretion in terms of
2    the amount of the fees?
3        A.  No, ma'am.  That's set by statute.
4        Q.  Is there any policy or procedure by which a
5    customer -- or an applicant for a Texas driver's
6    license or personal ID can defer payment or set up some
7    sort of payment plan?
8        A.  Not for the application fee.
9        Q.  For any other fees involved in the process?
10       A.  For the driver responsibility surcharge
11   program they are allowed to make payments.
12       Q.  Okay.  I believe that you talked to Mr. Brazil
13   earlier about the fact that child support fees could
14   lead to a driver license being suspended; is that
15   correct?
16       A.  That's correct.
17       Q.  Are there any other fees that if an applicant
18   owes these fees would lead to a driver's license
19   suspension?
20       A.  A DSHS overcharge or overpay.
21       Q.  I'm sorry.  What was that?
22       A.  DSHS, Department of State Health Services, if
23   they overpay a customer and that customer fails to
24   reimburse them, they can suspend the driver license.
25       Q.  Okay.  Any other fees?

72

1        A.  Not to my knowledge.
2        Q.  So if there are tickets that -- that haven't
3    been paid, that would not lead to a suspension; is that
4    correct?
5        A.  Yes, ma'am.  Sorry.  If you're talking about
6    citations that have not been paid, then --
7        Q.  Yes.
8        A.  -- there's -- there's actually two options.
9    If the citation occurred in another state, we are part
10   of a nonresident violator compact, so that state can
11   notify us.  And then if the court is part of the fail
12   to appear program in the State of Texas, they can enter
13   that person into the system and it denies the renewal
14   of their driver license.
15       Q.  Okay.  And are there any fees that would lead
16   to license revocation?
17       A.  I'm not sure what you're asking.
18       Q.  Well, wasn't -- I thought I understood that
19   revocation was a separate category from driver's
20   license suspension; is that right?
21       A.  Yes, ma'am.  In the NRVC, the nonresidential
22   violator compact, that's considered a revocation.
23       Q.  Oh, that's a revocation, not suspension?
24       A.  Yes, ma'am.  Sorry.
25       Q.  Okay.  Got it.  Okay.  Can you look at

SHERI GIPSON                                                    6/9/2014

---

73

1    Exhibit 140?
2         A.   Okay.
3         Q.   Now, this -- and did you look at that e-mail
4    that was from Mr. Peters to Mr. Bodisch at the bottom
5    on July 2013?  Is that your understanding of how DPS
6    handles arrest warrants for -- if an individual is
7    applying for a driver's license or a personal
8    identification card at a DPS office?
9         A.   Yes, ma'am.
10        Q.   So in some cases does DPS arrest applicants
11   for one of those forms of ID right outside the DPS
12   office building?
13        A.   Typically they take them into custody while
14   they're still inside the building.
15        Q.   Okay.  Is it fair to describe DPS primarily as
16   a law enforcement agency?
17        A.   Yes.
18        Q.   Are there usually troopers present at DPS
19   offices?
20        A.   They're not present in all offices, no, ma'am.
21        Q.   Do you know about how many offices they would
22   be present in?
23        A.   I do not.
24        Q.   What -- how is the determination made of which
25   offices they'll be present in and which ones they won't

---

74

1    be?
2         A.   That decision is made by the senior managers
3    of customer operations, our deputy assistant -- or,
4    sorry -- our assistant director Joe Peters, and the
5    highway patrol.
6         Q.   Do certain offices have troopers present all
7    the time or do they usually let troopers rotate between
8    different offices, or how does that system work?
9         A.   I can't answer that.  That's between the
10   senior managers and highway patrol or customer
11   operations.
12        Q.   Okay.  Are you aware of a public perception
13   that if you owe any fees, such as outstanding tickets
14   and enter a DPS office, you'll -- you will be arrested?
15             MR. KEISTER:  Objection, calls for
16   speculation, no foundation.
17             But you can answer.
18             THE WITNESS:  Not to my knowledge.  I
19   mean, some people, you know, come in knowing they have
20   warrants and other people are afraid to go in because
21   they -- they don't know.
22        Q.   (BY MS. MARANZANO)  Are you aware of a public
23   perception that if you owe any fees, such as
24   outstanding tickets, DPS will not issue you an ID?
25        A.   Not to my knowledge.

---

75

1         Q.   When a person applies for a driver's license,
2    do they -- how long does it take for them to obtain the
3    driver's license?
4         A.   Do you mean the actual card or the process to
5    get the license?
6         Q.   The -- how long does it take for them to get
7    their actual license?
8         A.   Okay.  So once they've passed all of the
9    examinations and provided everything they need and the
10   card is issued, they receive it within seven to
11   ten days.
12        Q.   And do they get a temporary license in the
13   meantime?
14        A.   They get a temporary license or a temporary
15   receipt with their photo on it.
16        Q.   And when do they get the temporary receipt?
17        A.   At the completion of their application.
18        Q.   Is -- after the person is issued a temporary
19   receipt, does DPS do any sort of quality control check
20   on the application?
21        A.   You mean as far as looking to see what the
22   application and what documents were presented?
23        Q.   Yes.
24        A.   I -- I don't know what kind of quality control
25   is done in the office, no, ma'am.

---

76

1         Q.   And when somebody applies for a personal
2    identification card, is the process somewhat similar in
3    terms of a temporary receipt and then a permanent card
4    later?
5         A.   That's correct.
6         Q.   And what is the time that it takes to receive
7    the permanent personal ID card between when the
8    applicant submits their application and when they
9    receive the personal identification card?
10        A.   Once the application process is completed,
11   it's seven to ten days.
12        Q.   Is there any quality control check on personal
13   ID cards after the temporary personal ID card is
14   issued?
15        A.   The same thing.  I don't know if they do
16   quality control within their office.
17        Q.   Are the permanent driver's license and
18   personal ID cards mailed to applicants?
19        A.   The final card?
20        Q.   Yes.
21        A.   Yes, they are mailed.
22        Q.   Is there a process for getting those cards to
23   individuals who may not have a permanent address?
24        A.   There is a process.  We have a onetime mailing
25   address that they can obtain -- or that they can be

---

SHERI GIPSON                                                    6/9/2014

77

1    issued to, and it can be sent to shelters or special
2    mailing addresses.
3        Q.  Is the temporary receipt that is given valid
4    for a temporary amount of time?
5        A.  It is.
6        Q.  How long is it valid for?
7        A.  I believe it's 30 days.
8        Q.  And is that true for both the Texas driver's
9    license and the Texas personal ID card?
10       A.  Correct.
11       Q.  If an individual moves within Texas prior to
12   the expiration date of his or her driver's license, are
13   they required to update their driver's license?
14       A.  They are.
15       Q.  What do they need to do to make it -- to sort
16   of register their change of address?
17       A.  They can either go on-line and apply for a
18   change of address on-line or they can go into the local
19   driver license office.
20       Q.  And do they get a new picture when they update
21   their address?
22       A.  If they go into the driver license office they
23   get a new picture.  If they do on-line we use the
24   photograph that's on file.
25       Q.  Does this update change their expiration date?

78

1        A.  No, ma'am, not if it's a duplicate or just a
2    change of address on-line.
3        Q.  And if -- if someone who holds a Texas
4    driver's license changes his or her name before the
5    expiration of the driver's license, what does that
6    person need to do to have -- or does that person need
7    to update their driver's license to reflect their new
8    name?
9        A.  If they choose to change their name, then they
10   come into the local driver license office and bring the
11   documents verifying the name change.  You're not
12   allowed to do a --
13       Q.  So that --
14       A.  I'm sorry.
15       Q.  Oh, yeah, I'm sorry.  Continue.
16       A.  You're not allowed to do a name change
17   on-line.
18       Q.  And do they get a new picture when they come
19   in to change their name?
20       A.  When they come into the driver license office,
21   yes, ma'am.
22       Q.  Does that change alter at all the date of the
23   expiration of the driver's license?
24       A.  No, ma'am, not if all they're doing is a name
25   change.

79

1        Q.  Are you familiar with the election
2    identification certificate?
3        A.  I am familiar with it, but don't know the
4    details of the processes.
5        Q.  Were you at all involved in the process of
6    creating the regulations for the issuance of an
7    election identification certificate?
8        A.  I worked -- in 2011, I worked on the
9    programming side, developing the -- the part within
10   the -- or separate from driver license system, the
11   separate tables for the -- for the election
12   certificate.
13       Q.  Is it your understanding that the regulations
14   governing election identification certificate issuance
15   were based on the regulations governing Texas driver's
16   license issuance?
17       A.  Based on my understanding, it was based on the
18   Texas identification card policies.
19       Q.  The Texas identification card; meaning, the
20   personal identification card and the driver's license?
21       A.  Yes.
22       Q.  And then someone with expertise in -- in the
23   requirements to obtain a driver's license and a
24   personal ID card in Texas, do you think it makes sense
25   to base the requirements for an EIC on the requirements

80

1    to get a Texas driver's license and personal
2    identification card?
3        A.  Yes, because you're establishing identity.
4        Q.  I want to ask you a question about something
5    that you talked about earlier with Mr. Brazil related
6    to an individual who is not a US citizen, but is in the
7    United States lawfully.  I think you said that their
8    Texas driver's license says "Limited Term" on it; is
9    that correct?
10       A.  That's correct.
11       Q.  Can you -- can you tell me where on the face
12   of the driver's license it would say "Limited Term"?
13       A.  It's in the header bar where -- at the very
14   top of the license where the city skyline is.  On the
15   upper right-hand side on -- these are over 21s that are
16   the -- it says, "Driver License Or Identification
17   Card," and beneath that it says, "Limited Term."
18       Q.  Okay.  I believe those are all of my
19   questions.  Thank you so much for your time.
20       A.  Thank you.
21           FURTHER EXAMINATION
22   BY MR. BRAZIL:
23       Q.  Did you say that the -- both the temporary
24   personal identification card and the temporary driver
25   license have a photo on them?

SHERI GIPSON                                          6/9/2014

81

1   A.  Yes, sir.
2   Q.  Okay.  They were good for, you believe, about
3   30 days?
4   A.  Yes, sir.
5   Q.  Okay.  The database or databases that we've
6   been talking about during your deposition, are those
7   shared with any other agency or with the Legislature on
8   any regular basis?
9   A.  The database itself is not, but data extracted
10  from there is.
11  Q.  Okay.  Is it on a case-by-case basis or
12  request basis or is it done automatically?  How --
13  what's done with that, to your knowledge?
14  A.  It -- it depends.  There is multiple ways that
15  that data is shared.  We have users that do what's
16  called an entire file and they receive weekly updates,
17  and they get basic information on individuals who apply
18  for a license.  And then if they're part of the weekly
19  update, they get any records that had a change within
20  that prior week.
21          We also do certain data extracts for the
22  Attorney General's Office, Secretary of State, just
23  different ones.  There's multiple entities that we
24  provide data to.
25  Q.  And so the people that may get updates

82

1   automatically, those are counties or cities or law
2   enforcement agencies, or what?
3   A.  They can be counties, cities, or private
4   entities, as long as they qualify for the information
5   under the Privacy Act.
6   Q.  Okay.  And what do they use that information
7   for?  For example, a county, what would they use that
8   for?
9   A.  I can't answer that.  I don't know what all
10  they would use it for.
11  Q.  Is there a fee associated with a county or
12  some agency or some private entity getting this
13  information?
14  A.  If it's -- if it's a public entity, there's a
15  fee associated with it.  If it's a governmental agency,
16  there's no fee associated.
17  Q.  If it's a private entity there is a fee?
18  A.  Correct.
19  Q.  If it's a public entity it's not?
20  A.  That's correct.
21  Q.  Okay.  Thank you.  Appreciate your time.
22          MR. BRAZIL:  That's it.
23          MR. KEISTER:  All right.  Well, we'll
24  reserve ours until the time of trial, and the witness
25  wants to read and sign, please.

83

1          THE REPORTER:  Off the record.
2   (Proceedings concluded at 11:19 a.m.)

84

1          WITNESS CORRECTIONS AND SIGNATURE
2      Please indicate changes on this sheet of paper,
   giving the change, page number, line number, and reason
3   for the change.  Please sign each page of changes.
4   PAGE/LINE    CORRECTION    REASON FOR CHANGE
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

25          _____
            SHERI GIPSON

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARK VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), AND DALLAS COUNTY, TEXAS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION<br><br>NO. 2:13-CV-193 (NGR)<br>[Lead case] |
| Plaintiffs, | ) ) ) |
| V. | ) ) |
| RICK PERRY, GOVERNOR OF TEXAS AND JOHN STEEN, TEXAS SECRETARY OF STATE, | ) ) ) ) |
| Defendants. | ) |

Martin Golando - 6/24/2014

**Page 2**

```
 1  UNITED STATES OF AMERICA,    )
                                  )  CIVIL ACTION
 2      Plaintiffs,               )
                                  )  NO. 2:13-CV-263 (NGR)
 3  TEXAS LEAGUE OF YOUNG VOTERS  )  [Consolidated case]
    EDUCATION FUND, IMANI CLARK,  )
 4  AND MICHELLE BESSIAKE,        )
                                  )
 5      Plaintiff-Intervenors,    )
                                  )
 6  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY      )
 7  COMMISSIONERS, HIDALGO        )
    COUNTY, AND MARIA LONGORIA    )
 8  BENAVIDES,                    )
                                  )
 9      Plaintiff-Intervenors,    )
                                  )
10  V.                            )
                                  )
11  STATE OF TEXAS, JOHN STEEN,   )
    in his official capacity as   )
12  Texas Secretary of State; and )
    STEVE McCRAW, in his official )
13  capacity as Director of the   )
    Texas Department of Public    )
14  Safety,                       )
                                  )
15      Defendants.               )
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  TEXAS STATE CONFERENCE OF     )
    NAACP BRANCHES; and the       )  CIVIL ACTION
 2  MEXICAN AMERICAN LEGISLATIVE  )
    CAUCUS OF THE TEXAS HOUSE OF  )  NO. 2:13-CV-291 (NGR)
 3  REPRESENTATIVES,              )  [Consolidated case]
                                  )
 4      Plaintiffs,               )
                                  )
 5  V.                            )
                                  )
 6  JOHN STEEN, in his official   )
    capacity as Secretary of      )
 7  State of Texas; and STEVE     )
    McCRAW, in his official       )
 8  capacity as Director of the   )
    Texas Department of Public    )
 9  Safety,                       )
                                  )
10      Defendants.               )
11  BELINDA ORTIZ, LENARD TAYLOR, )  CIVIL ACTION
    EULALIO MENDEZ JR., LIONEL    )
12  ESTRADA; ESTELA GARCIA        )  NO. 2:13-CV-348 (NGR)
    ESPINOSA, LYDIA LARA,         )  [Consolidated case]
13  MARGARITO MARTINEZ LARA,      )
    MAXIMINA MARTINEZ LARA, and   )
14  LA UNION DEL PUEBLO ENTERO,   )
    INC.,                         )
15                                )
        Plaintiffs,               )
16                                )
    V.                            )
17                                )
    STATE OF TEXAS; JOHN STEEN,   )
18  in his official capacity as   )
    Texas Secretary of State; and )
19  STEVE McCRAW, in his official )
    capacity as Director of the   )
20  Texas Department of Public    )
    Safety,                       )
21                                )
        Defendants.               )
22
23
24
25
```

**Page 4**

```
 1  ************************************************
 2          ORAL REALTIME DEPOSITION OF
 3          THE MALC 30(B)(6) WITNESS
 4              MARTIN GOLANDO
 5               JUNE 24, 2014
 6  ************************************************
 7     ORAL REALTIME DEPOSITION OF MARTIN GOLANDO,
 8  produced as a witness at the instance of the DEFENDANTS,
 9  and duly sworn, was taken in the above-styled and
10  numbered cause on the 24th day of June, 2014, from
11  9:34 a.m. to 2:09 p.m., before STEVEN STOGEL, CSR in and
12  for the State of Texas, reported by machine shorthand,
13  at the Offices of the Texas Attorney General, 209 West
14  14th Street, Austin, Texas, pursuant to the Federal
15  Rules of Civil Procedure and the provisions stated on
16  the record or attached hereto.
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFF TEXAS STATE CONFERENCE OF NAACP
    BRANCHES:
 3
        MS. AMY L. RUDD
 4      DECHERT LLP
        US Bank Tower
 5      633 West 5th Street, 37th Floor
        Los Angeles, California 90071-2013
 6      213.808.5700
        amy.rudd@dechert.com
 7
 8  FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 9      MS. ANGELA J. MILLER
        (Appearing via speaker phone)
10      Trial Attorney
        Voting Section
11      Civil Rights Division
        U.S. Department of Justice
12      202.514.2919
        angela.miller5@usdoj.gov
13
14  FOR THE DEFENDANTS THE STATE OF TEXAS, RICK PERRY, JOHN
    STEEN AND STEVEN McCRAW:
15      MR. STEPHEN L. TATUM, JR.
         - and -
16      MR. G. DAVID WHITLEY
        Assistant Attorney General
17      Opinion Committee
        P.O. Box 12548
18      Austin, Texas 78711-2548
        512.463.2110
19      stephen.tatum@texasattorneygeneral.gov
        david.whitley@texasattorneygeneral.gov
20
21  ALSO PRESENT:
22      Mr. Steven Stogel, Court Reporter
23
24
25
```

6

1                    I N D E X
2                                    PAGE
3   Appearances....................      5
4
5   MARTIN GOLANDO
6       Examination by Mr. Tatum.................      8
7   Reporter's Certificate.........................   168
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

8

1       MR. TATUM:  Good morning.  My name is
2   Stephen Tatum.  I'm an Assistant Attorney General
3   representing the State of Texas in this litigation.  It
4   is June 24th.  The time is 9:30, and we are here at the
5   Price Daniel building, the Attorney General's offices in
6   Austin, Texas.
7                    MARTIN A. GOLANDO,
8   having been first duly sworn, testified as follows:
9                    EXAMINATION
10  BY MR. TATUM:
11      Q.  Would you state and spell your full name for
12  the record, please?
13      A.  Martin Anthony Golando, M-A-R-T-I-N, Anthony,
14  A-N-T-H-O-N-Y, Golando, G-O-L-A-N-D-O.
15      Q.  Mr. Golando, where do you reside?
16      A.  San Antonio, Texas.
17      Q.  Are you represented by counsel today?
18      A.  I am.
19      Q.  And who is that?
20      A.  Ms. Rudd.
21          MR. TATUM:  And while we're there, let's
22  go ahead and make introductions.  I don't think we've
23  done that on the record yet.  I've said who I am.
24  Mr. Golando, you've introduced yourself.
25          MS. RUDD:  Amy Rudd for the Texas State

7

1           EXHIBIT INDEX
2                            PAGE
3   Exhibit No. 1...................................   19
        Notice of Deposition
4
    Exhibit No. 2...................................   61
5       Preliminary Statement Filed by the
        Texas State Conference of NAACP Branches
6       and the Mexican American Legislative
        Caucus
7
    Exhibit No. 3...................................  119
8       February 2011 Poll
9   Exhibit No. 4...................................  120
        February 2011 Poll
10
    Exhibit No. 5...................................  121
11      February 2011 Poll
12  Exhibit No. 6...................................  124
        October 2012 Poll
13
    Exhibit No. 7...................................  141
14      12/5/13 Public Records Request
15  Exhibit No. 8...................................  143
        List of Names
16
17
18
19
20
21
22
23
24
25

9

1   Conference of the NAACP and MALC and the witness today.
2           MS. MILLER:  And I'm Angela Miller for
3   the U.S. Department of Justice on the phone.
4           MR. WHITLEY:  And I'm David Whitley for
5   the defendants.  I can give you a card.
6       Q.  (By Mr. Tatum)  Mr. Golando, have you ever
7   been deposed before?
8       A.  No, sir.
9       Q.  So this is your first time being the subject
10  of a deposition?
11      A.  Being the subject, that's correct.
12      Q.  Okay.  Let me first go over some ground rules
13  that will control for this deposition.  I'm going to be
14  asking you questions, and I need you to give me audible
15  answers.  This means you need to say "yes" instead of
16  nodding your head, and you need to say "no" instead of
17  shaking your head.  And try to avoid saying "uh-huh" or
18  "hmm hmm," things like that.  We need to have audible
19  answers so the court reporter can get a clean record of
20  what's said here today.  Do you understand?
21      A.  I do.
22      Q.  And on that note, I ask that you please wait
23  until I finish asking my question before you begin to
24  answer, and I'll try to do the same for you.  This is
25  easier said than done.  I just ask that we try to let

Martin Golando - 6/24/2014

14

1  Q.  You were born in Missouri?
2  A.  Correct.
3  Q.  Had some schooling in Indiana, made your way
4  to Chicago, and eventually Texas.  Is that correct?
5  A.  There's lots of -- there's many more states in
6  between there, but, yes, that's generally correct.
7  Q.  Okay.
8  A.  Yeah.
9  Q.  And what year did you graduate from law
10  school?
11  A.  2007.
12  Q.  Aside from a law degree, do you have any other
13  professional qualifications?
14  A.  By which you mean certifications?
15  Q.  Sure.
16  A.  No.
17  Q.  Are you currently licensed to practice law?
18  A.  Currently, and in good standing.
19  Q.  In the state of Texas?
20  A.  Correct.
21  Q.  In what areas of practice do you have
22  experience?
23  A.  I'm an election law attorney, largely.  I've
24  done several election contests, and I represent elected
25  officials in helping them comply with their ethical

15

1  compliance rules.  I'm a voting rights attorney.  I have
2  some background in voting rights.  Anything I can get
3  paid for, frankly.  So if you need something, let me
4  know.
5  Q.  Mr. Golando, are you currently employed?
6  A.  I'm self-employed.
7  Q.  Does that mean you have a solo practice?
8  A.  I do.  I have a couple of different business
9  enterprises.  One is a solo practice.
10  Q.  Do you office here in Austin?
11  A.  No, not currently.  I will soon, hopefully,
12  but mostly in San Antonio.
13  Q.  Mr. Golando, what is your role at MALC?  And
14  before you answer that question, let me just go ahead
15  and say here, when I say "MALC," I mean the Mexican
16  American Legislative Caucus.  And throughout this
17  deposition, I might say "MALC" or "you" or "your," and
18  when I say that, I mean MALC unless I specifically
19  indicate otherwise.  Do you understand?
20  A.  I do.
21  Q.  Okay.  So getting back to my question, what is
22  your role at MALC?
23  A.  I am the general counsel of MALC.  That's my
24  title.
25  Q.  And how long have you held that position?

16

1  A.  Since May 1st.
2  Q.  Of this year?
3  A.  Correct.
4  Q.  Did you have any role at MALC before you
5  became general counsel?
6  A.  Yes.  It was basically the same job without
7  the title.  I weighed in on the legal consequences of
8  actions.  I weighed in on the day-to-day operations.  I
9  worked very closely with the executive director.  It's
10  essentially the same job with the title, so...
11  Q.  Is your current role as general counsel -- is
12  that a paid position?
13  A.  Yes.
14  Q.  Is that a full-time position?
15  A.  By full time, do you mean do I get a W-2 from
16  MALC?  I never have got a W-2 from MALC.  I get a --
17  they 1099 me, or whatever.  I'm a vendor, essentially.
18  Q.  So prior to becoming general counsel, you were
19  employed in a general counsel-type role at MALC.  It
20  just wasn't called general counsel.  Correct?
21  A.  Right.  I think it's listed in the C&E as a
22  consulting, but it's -- I do the same general things I
23  did before.
24  Q.  Okay.  As general counsel, what are your
25  official duties and responsibilities?

17

1  A.  I make sure that we comply with all ethical
2  laws that caucuses have to do for reporting.  I weigh in
3  on the legal consequences of certain actions we might
4  take.  I'm a strategic and tactical thinker for MALC on
5  our policy positions.  I do policy development.  I weigh
6  in on employment practices and how to train employees,
7  and I do -- and I work very closely with the Executive
8  Director to try to make sure we accomplish our
9  objectives.
10  Q.  And who is the Executive Director?
11  A.  Summer Luciano.
12  Q.  So would you say that you wear -- in a legal
13  capacity, you wear many different hats at MALC?
14  A.  Surely.  I think that's fair.
15  Q.  Who do you report to?
16  A.  The chairman, Martinez Fischer.
17  Q.  Do you manage anyone?
18  A.  I used to manage people as his chief of staff,
19  but I stopped being his chief of staff on May 1st, and
20  now I basically -- I don't think I'm directly managing
21  anybody currently, so...
22  Q.  So you were formerly the chief of staff for
23  Representative Trey Martinez Fischer.  Correct?
24  A.  That is correct.
25  Q.  And how long did you hold that position?

30

1   Q.   Are you prepared to testify to Topic 23?
2   A.   Yes, sir.
3   Q.   Last page.  Topic 24 states, "Any allegations,
4   whether substantiated or unsubstantiated or concerns
5   relating to voter fraud raised by your members or their
6   constituents or which were communicated to you from 2004
7   to the present."
8           Have you been designated to testify to
9   Topic 24?
10  A.   Yes.
11  Q.   Are you prepared to testify to Topic 24?
12  A.   Yes.
13  Q.   Topic 25 states, "Any calculations, reports,
14  audits, estimates, projections, or other analyses done
15  by you, commissioned by you, or in your possession,
16  custody, or control relating to voter fraud from 2004 to
17  the present."
18          Have you been designated to testify to
19  Topic 25?
20  A.   Yes.
21  Q.   Are you prepared to testify to Topic 25?
22  A.   Yes.
23  Q.   Finally, Topic 26 states, "Any calculations,
24  reports, audits, estimates, projections, or other
25  analyses done by you, commissioned by you, or in your

31

1   possession, custody, or control, relating to election
2   crimes from 2004 to the present."
3           Have you been designated to testify to
4   Topic 26?
5   A.   Yes.
6   Q.   Are you prepared to testify to Topic 26?
7   A.   Yes.
8   Q.   Okay.  Mr. Golando, I'd like to ask you a few
9   questions regarding MALC generally.
10  Can you describe the purpose and mission
11  of MALC?
12  A.   The purpose of MALC is to assist the members
13  of MALC and their staffs in being prepared to be a voice
14  for the Mexican Americans of Texas.  That's the purpose.
15  It's also listed in their bylaws, so...
16  Q.   So that's a stated mission that's in your
17  bylaws?
18  A.   Correct.
19  Q.   How long has MALC been in existence?
20  A.   Since 1973.  So 40 years -- 40-plus years.
21  Q.   And how was it formed?
22  A.   It was a caucus.  There's rumors about how it
23  was formed, in the back of a closet, but just members
24  of -- Mexican American members of the Legislature at
25  that time formed together a group.  And I think at the

32

1   beginning it was both the House and Senate, and at some
2   point there was a bifurcation between the two, so...
3   Q.   Does MALC have -- as a result of that
4   bifurcation, does it have an equivalent organization in
5   the Senate?
6   A.   Yeah.  There's a Hispanic caucus.  The chair,
7   I think, is Jose Rodriguez.
8   Q.   Do y'all regularly work with the Senate
9   Hispanic caucus?
10  A.   Define "regularly."
11  Q.   Are y'all involved organizationally with the
12  Senate Hispanic caucus?
13  A.   Yes.  I know Luis very well.  Luis Figueroa is
14  the liaison, I guess, for the Senate Hispanic caucus,
15  and I've worked with him for many years.
16  Q.   But is MALC a separate entity unto itself from
17  the Senate Hispanic caucus?
18  A.   Absolutely.
19  Q.   Okay.  How is MALC organized?
20  A.   We are a (c)3 and a (c)6 and a legislative
21  caucus.
22  Q.   Describe what it means to be a legislative
23  caucus.
24  A.   It's organized under the House housekeeping
25  resolution.  There's a portion dedicated to the creation

33

1   of legislative caucuses, which are groups of legislators
2   for various purposes.  So it's organized under that
3   statute.  And legislative caucuses also have certain
4   reporting requirements under the -- the C&E reports for
5   the Ethics Commission.  I think that covers it, so...
6   Q.   How was MALC organized internally?
7   A.   There is an executive committee made up of the
8   chair, the vice chair, the legal counsel, the treasurer,
9   and the secretary.  So it's five legislators who run for
10  leadership posts within MALC, and they make most of the
11  executive decisions.  By "internally," do you also mean
12  staff?
13  Q.   Sure.
14  A.   There's Executive Director Summer, and general
15  counsel, me, and then there are two policy analysts,
16  part time and full time, roughly.
17  Q.   So everyone on the Executive Committee is also
18  a legislator?
19  A.   Correct.  MALC is made up of legislators.
20  It's a group of legislators.
21  Q.   Do you work under the legal counsel?
22  A.   No.  I report to their chairman,
23  Representative Martinez Fischer.
24  Q.   Okay.  And is the Executive Committee elected
25  by the membership of MALC?

Martin Golando - 6/24/2014

34

1   A.   Correct.
2   Q.   And how long do they serve on the Executive
3   Committee?
4   A.   Roughly two years, and then there's elections
5   either during the session or just before the session,
6   right after the election, so...
7   Q.   And this is all in the bylaws, everything
8   you've told me so far?
9   A.   Yes, sir, that's correct.
10  Q.   Do you know how many members MALC has?
11  A.   41, I believe.
12  Q.   Does that stay the same over the years, or
13  does that fluctuate?
14  A.   It fluctuates.  In 2011, I think we had 39.
15  In 2013, we had 40, I believe.  And now we have 41
16  because Celia Israel just won a special election, and
17  she's decided to be a MALC member.
18  Q.   That leads me to my next question.  You stated
19  that she's decided to be a MALC member.  How does one
20  become a MALC member?
21  A.   There are two ways.  I think if you're
22  Mexican-American, you're entitled to automatic
23  admittance if you accept and -- or if you're a Latino.
24  But if you're not Latino but represent a majority Latino
25  district, you can get in through a committee process.

35

1   It's all listed in the bylaws, so...
2   Q.   Are there fees or dues involved with being a
3   member of MALC?
4   A.   There are.
5   Q.   Do you know how much those dues are?
6   A.   I think it's $300 for a two-year cycle.  I
7   think that's right.  It may be $300 a year.  I can't
8   recall exactly.  It's nominal.
9   Q.   Are there different levels of membership, or
10  is it you're a member of MALC and that's what everyone
11  is?
12  A.   I think you're a member of MALC and that's
13  what everyone is.
14  Q.   Okay.  Is MALC a partisan organization?
15  A.   No.
16  Q.   So the membership of MALC is comprised of both
17  Republicans and Democrats.  Is that --
18  A.   Correct.
19  Q.   -- correct?
20  A.   Correct.  I'm sorry.  I didn't mean to cut you
21  off.
22  Q.   No problem.  What kind of privileges or
23  benefits come with being a member of MALC?
24  A.   I think you get to speak as a unified voice on
25  matters of importance to the Mexican-American community.

36

1   You get the normal provisions that come with being part
2   of a legislator group, where you can work together to
3   form coalitions with other groups to pass legislation.
4   You get information.
5   So MALC members will call MALC staff to
6   help us -- help them research ideas.  We do some measure
7   of policy development, and we'll do anything we can for
8   members to help pass their bills or help them with an
9   initiative they have.
10  In addition, we have space, and sometimes
11  our space is used for events.  There's other things that
12  we can offer.  We do basically everything we can for our
13  members.
14  Q.   You mentioned that space.  Where is that
15  space?
16  A.   202 West 13th Street, which is about a block
17  away from here.  And we have space 204, which is
18  essentially a meeting space for caucus meetings or
19  for -- if MALC members want to meet with their
20  constituents there, it's our privilege to have them
21  there, so...
22  Q.   If you're a member of MALC, are you authorized
23  to speak on MALC's behalf?
24  A.   No.
25  Q.   Who is authorized to speak on MALC's behalf?

37

1   A.   The chairman.
2   Q.   Only the chairman?
3   A.   I believe that's true in the bylaws, that he
4   has a specific bylaw that says the chairman is
5   authorized to make executive decisions and speak on
6   MALC's behalf.  In practice, though, it rarely ever
7   comes up.  There may be some certain designees by the
8   chairman, "You can speak on this matter for us.  You can
9   speak on public education for us," but that's usually by
10  designation.
11  But I think as a matter of bylaw, I think
12  only the chairman has the authority to speak on behalf
13  of MALC.
14  Q.   So if someone seeks the official position of
15  MALC, they will seek that from the chairman,
16  Representative Martinez Fischer?
17  A.   That's right.  Yes, sir.
18  Q.   You mentioned employees and staff of which
19  you're a part.  Do you know how many, roughly, employees
20  or staff that MALC employees?
21  A.   It fluctuates.  During the session, there's
22  obviously more.  And there's also the MALLF fellows
23  program.  So they're paid for by the MALLF foundation,
24  but they are in the staff of certain representatives who
25  request and want MALLF fellows.  Currently we have four

Martin Golando - 6/24/2014

38

1 employees, and some -- I think we have two interns.
2    Q.   I'm sorry.  You said MALC has four employees?
3    A.   Currently.  And if you count me as an
4 employee, and I think you should, even though I'm
5 technically a vendor.  It's kind of a strange
6 difference, right, but --
7    Q.   So when you say you're a vendor, does that
8 mean you kind of operate on a contract basis?
9    A.   That's correct, a month-to-month,
10 nonrefundable retainer, thankfully, so...
11    Q.   You were just mentioning MALLF, I believe?
12    A.   Yes.
13    Q.   M-A-L-F?
14    A.   There's two Ls, I believe.  Mexican American
15 Legislative Leadership Foundation.  That's the (c)3.
16    Q.   Okay.  So that is a -- MALLF falls under the
17 umbrella of MALC?
18    A.   Correct.
19    Q.   And what is the purpose of MALLF?
20    A.   To fund fellowships for college students and
21 graduates to get a stipend to work in MALC member
22 offices so they can learn about the Legislature.
23    Q.   Okay.
24    A.   It's the Moreno/Rangel program.
25    Q.   Aside from the benefits and privileges that

39

1 come with being a member of MALC, which you just
2 described, who does MALC serve other than its members?
3    A.   We serve our members and, by extrapolation,
4 their constituents.
5    Q.   Does MALC maintain active communications with
6 the constituents of its members?
7    A.   We get some contact from the constituents of
8 members, some people at large will call us, contact us
9 about voter ID issues or redistricting issues or other
10 issues that we're at the forefront of.  It happens
11 occasionally, yes.
12    Q.   So when a constituent calls you, as you said,
13 are they calling to communicate with MALC as an
14 organization or to communicate with one of its
15 individual members?
16    A.   The former, MALC as an organization, so...
17    Q.   Now, you stated that MALC is a nonprofit
18 organization.  Correct?
19    A.   That's correct.
20    Q.   From where does MALC receive funding?
21    A.   It's listed in our C&E reports.  So lots of
22 PACs give to us --
23    Q.   I'm sorry.  Your --
24    A.   I'm sorry.  C&E reports, contribution and
25 expenditure reports.  So it's a matter of public record.

40

1 Lots of people give MALC money.  Some individuals, some
2 corporations, I believe, and some PACs do.  Members give
3 us money, too, through their dues, so...
4    Q.   So y'all receive funding through individual
5 donations?
6    A.   Occasionally.  It's rare, but yes.
7    Q.   Do y'all receive funding through corporate
8 donations?
9    A.   I believe that's true.  I'd have to check our
10 C&E.  I'm not sure to what degree we get corporate
11 funding or not, but --
12    Q.   So the C&E reports, which you said are
13 publically available, they detail the sources and
14 amounts of the funding that MALC receives?
15    A.   That is absolutely correct.  I think we are
16 one of the few legislative caucuses that detail every
17 one of our contributions and expenditures.
18    Q.   Do y'all receive funding from sponsorships?
19    A.   What does that mean?
20    Q.   Do y'all hold any events that are sponsored by
21 corporations or other entities?
22    A.   Truly.
23    Q.   What kind of events do y'all -- what kind of
24 such events do y'all hold?
25    A.   Annually we have a MALC golf tournament, which

41

1 will be October 2nd this year if you guys want to come
2 in.  And as part of that, there's, you know, various
3 events that are individually sponsored or sponsored by
4 people who give money to legislators, essentially.
5        We also have policy convenings that are
6 rare now because we've had a tremendous diversion of
7 resources because of these voting rights issues, but --
8 you know, there are other sponsored events, too.  We did
9 a Diez y Seis event at the Capitol.
10    Q.   I'm sorry.  Could you say that again?
11    A.   Diez y Seis event at the Capitol.  September
12 16th is the Mexican-American independence, and there was
13 grito at the Capitol.  It was a big event with -- I
14 think we partnered with some Latino television shows.
15 It was a great event.  I was not present, unfortunately,
16 but I heard it was great.  And during the session --
17 which is not a sponsored event, but we had a huge
18 concert for Mexican-Americans.  I don't know if you
19 recall.  It was toward the end of the session.  We had
20 8,000 people come from Austin to hear our MALC members
21 and a Latino musician come play at the Capitol.  It was
22 a great event.
23    Q.   Was that a fundraising event?
24    A.   No.  We can't -- we're subject to the
25 moratorium.  We don't fundraise during session.

42

1  Q.  Do you fundraise outside of session?
2  A.  Yeah, you have to, you know, unless you have a
3  money tree.  It would be great if you can plant one of
4  those, but --
5  Q.  You mentioned policy convenings?
6  A.  Correct.
7  Q.  Could you describe those a little more?
8  A.  I think three years ago we had an energy
9  convening where we had MALC members and important
10  decision-makers and other policy decision-makers come
11  together and talk about energy policy in Texas.  It was
12  an amazing event.  As a policy professional, I saw
13  honest bilateral dialogue on important matters that I
14  believe became an idea nursery for several of the
15  session's best ideas.  Anyway, we have some of that, but
16  less than we used to because of the diversion of
17  resources.
18  Q.  How many resources are required to put on one
19  of these policy convenings?
20  A.  It depends.  It's variable.
21  Q.  Does MALC organize and execute these policy
22  convenings by itself?
23  A.  Yes, largely.  I'm not sure what you mean by
24  yourself.  Maybe you can explain a little bit better.
25  Q.  Are these policy convenings -- are they put on

43

1  by MALC in conjunction with some other organization that
2  helps split the cost of running such a meeting?
3  A.  No.  It's run by MALC.
4  Q.  Okay.
5  A.  I mean, we'll have sponsorships sometimes, but
6  mostly MALC staff, MALC funded.
7  Q.  And how often are those typically held?
8  A.  You know, when I first began working for
9  Trey -- when Trey first began at MALC, which was
10  December of 2008, we had several MALC meetings during
11  the session and we had -- I think we had a MALC
12  convening at the golf tournament, so a couple times a
13  year.  And now I think we're down to one every two
14  years, roughly, so...
15  Q.  What would you say is MALC's largest source of
16  funding?
17  A.  You know, I don't know.  I'm sorry.  It may be
18  EFH or AT&T.  But it's listed in our C&E reports, so I
19  think that's probably the best descriptor of where we
20  get our money from.
21  Q.  What is EFH?
22  A.  Energy Future Holdings.  It's an energy
23  company that was part of the TXU private buy-out.
24  Q.  So would you say your largest source of
25  funding comes from corporate donations?

44

1  A.  I don't know.  Again, I think the best source
2  of that is to review -- you can do a spreadsheet, and I
3  could do that for you if you'd like.  But it's probably
4  from PACs, frankly, and not from corporations
5  themselves.
6  Q.  But again, that information would be in the
7  C&E report --
8  A.  Correct.
9  Q.  -- that you mentioned?
10  A.  Yes, sir.
11  Q.  Do you know if any of those C&E reports have
12  been produced to the defendants in this litigation?
13  A.  You know, I think they have, but I -- I
14  know that we -- we've done a lot of document production,
15  so -- thousands of documents, I believe.  I'm not sure
16  exactly what's in there.  I know that if they were in my
17  computer, then you guys received them.  But they are
18  also public documents that you can download, so...
19  Q.  Where can they be downloaded from?
20  A.  The Texas Ethics Commission.  It's
21  www.tec.state.tx.us.  And there's a prompt on the
22  left-hand side where you can do an advanced search.  You
23  can look at all of MALC's and MALLF's, both their caucus
24  C&E reports.
25  Q.  Does MALC prepare an annual budget?

45

1  A.  Yes.
2  Q.  And who has the ultimate authority over that
3  budget?
4  A.  The chairman.
5  Q.  So can the chairman decide to make last-minute
6  unilateral changes to that budget?
7  A.  Surely.  It rarely happens, but yes.
8  Q.  Are the annual budgets of MALC publicly
9  available?
10  A.  No.
11  Q.  Does MALC budget or reserve space in its
12  annual budget for set dedicated operating funds?
13  A.  I don't know what you mean by that.  We have
14  budget categories.  You know, there's a certain amount
15  for staff or for staff positions.  There's a certain
16  amount for rent.  Rent is very expensive.  There's a
17  certain amount for, you know, our other policy
18  focuses -- foci.  And large portions of that have been
19  dedicated for the last four years to voting rights,
20  so...
21  Q.  Does MALC reserve any space in its annual
22  budget for funds that can be allocated on an as-needed
23  basis?
24  A.  I don't know.  I don't think so.  I -- it's --
25  budgets are always documents of priorities, right, and

Martin Golando - 6/24/2014

---

**46**

1  they're also highly variable, depending on how much you
2      Q.   We try to keep a corpus of a certain
3           We try to keep a corpus of a certain
4  amount of money that we won't go below, and I think
5  we've gone below that.  We are currently in the worst
6  budget situation that we've ever had since I've been
7  here, and it's almost entirely because of our -- the
8  last four years of voting rights litigation and advocacy
9  on behalf of MALC.
10     Q.   Can you approximate a percentage of your
11  annual budget that's been dedicated towards voting
12  rights litigation?
13     A.   I can't, but I can approximate a current
14  budget, my time.  I get paid a certain amount, and 80 to
15  90 percent of my time is dedicated to voting rights
16  litigation.  So voting rights takes up 80 percent of my
17  time with MALC.  So that's less time for me to do policy
18  development.  It's less time for me to work with members
19  about their own bills.  It's less time for us to focus
20  on our core mission.
21     Q.   You mentioned the core mission of MALC.  Can
22  you describe generally the kinds of activities that MALC
23  regularly engages in in furtherance of its core mission?
24     A.   We try to develop policies to advance that
25  core mission.  We work with our members with their own

---

**47**

1  bills.  We try to pass their agenda.  We work with their
2  staffs to make sure that their staffs are the best
3  prepared that they can be.  We try to speak with
4  unanimity on issues of importance with the
5  Mexican-American community, and generally do everything
6  you can to try to speak with one voice about matters of
7  importance to the community as a whole, which includes
8  things like, you know, press releases, policy agendas,
9  and every other public kind of statements you can make,
10  so...
11     Q.   And what kinds of resources are devoted to
12  these core activities?
13     A.   Financial resources, staff resources, and
14  time.
15     Q.   So you said you started with MALC in 2008.  Is
16  that correct?
17     A.   That's when Trey began as chairman.  I was his
18  chief of staff then.
19     Q.   Okay.
20     A.   It was my job to act as a liaison and to some
21  measure deliver his message to MALC staff at the time.
22  So I guess the MALC staff, in some way, were managed by
23  me.  He was elected in December of 2008.
24           I'm sorry.  I apologize.  It was December
25  of 2010.  I'm off by two years.  I've worked for a long

---

**48**

1  time.  They kind of get jammed together.
2     Q.   So it was December 2010 is when your
3  involvement with MALC began?
4     A.   One second.  I'm sorry.  I'm trying to
5  remember.  It was 2009, because Pete was in the
6  legislature.  He was the chairman right before Trey.
7     Q.   When you say "Pete" --
8     A.   Pete Gallego.  I'm sorry.  Representative
9  Gallego at the time.  But Trey was chairman for one
10  session when Pete wasn't.  So that's why it was 2000 --
11  so I was right.  It was December 2008.  I'm losing my
12  mind a little bit, so...
13     Q.   Would this be a good time to take a short
14  break?
15     A.   No.  I'm square.  I'm good.
16     Q.   If you ever need to take a short break, please
17  just let me know.
18     A.   I'll just leave, so I'll be fine.
19     Q.   I'd appreciate it if you'd tell me before you
20  just leave.
21     A.   I'm just teasing.
22     Q.   Okay.  Since you've been with MALC -- and
23  let's call that since 2008.
24     A.   December, yes, sir.
25     Q.   December 2008.  What has MALC done to track

---

**49**

1  and follow voter ID legislation since then?
2     A.   We help develop amendments.  We certainly did
3  track the various voter ID bills that were filed at the
4  time.  We helped develop procedural points of order and
5  questions of order.  We developed Q and As for our
6  members and for the chairman to ask between the speaker
7  and he.  We developed a strategy dealing generally with
8  all that, and we worked to try to prevent its passage.
9     Q.   Does MALC consider the tracking of voter ID
10  legislation and the work you just described as part of
11  its core mission?
12     A.   Yes.  I think that's part of what we do, is --
13  as a legislative organization, is to track legislation.
14     Q.   Does MALC monitor voter ID legislation being
15  proposed or enacted in other states?
16     A.   Generally.  I think Texas is unique in many
17  ways, so the laws of Wisconsin or Pennsylvania or South
18  Carolina or Indiana or Georgia have tangential relevance
19  to what we do here.  But as part of investigating any of
20  these things, you should know what they're doing in the
21  states.  And so I know generally what they did, so...
22     Q.   Do you recall any specific voter ID laws in
23  other states that MALC has specifically spent resources
24  tracking or following?
25     A.   You know, I don't know the state, but I

---

Martin Golando - 6/24/2014

50

1  remember one had a photo ID requirement with a waiver --
2  an affidavit pass.  So you could sign a waiver saying
3  who you were.  And there were less restrictive policies
4  considered in all states compared to Texas.  And I'm
5  much more familiar with kind of the evolution of the
6  voter ID policy here, obviously.  By my estimation, we
7  have the most stringent voter qualification law in the
8  states, but that's maybe a limited opinion, so...
9      Q.   Does MALC communicate with members of other
10  state legislatures regarding these proposed voter ID
11  legislations in other states?
12      A.   Not regarding voter ID.  There are some
13  inter-caucus relationships through the Board of Hispanic
14  Caucus Chairs, and there was a legislator in -- a
15  Republican legislator in Florida who is very close with
16  my boss and Representative Anchia.  So they may have
17  spoken about voter ID, but nothing formally between the
18  two caucuses.
19      Q.   Do you remember who that legislator in Florida
20  was?
21      A.   He's a really nice guy.  I forget his name.  I
22  can look it up and make my answer more full.  I would
23  know him if I saw him.  I apologize.  I don't remember
24  his name.  Nice guy, though.  Smart guy.
25      Q.   At the end of the deposition, I'll give you an

51

1  opportunity to clarify or amend any kind of answers, so
2  if you think about it between now and then --
3      A.   Surely.
4      Q.   -- you will have an opportunity to state it at
5  the end.
6      A.   Surely.
7      Q.   So sorry.  Just to get back to voter ID being
8  proposed in other states and communications with members
9  of other state legislatures about voter ID legislation.
10          Did you testify that MALC does not
11  communicate with other states regarding voter ID laws?
12      A.   That's correct.  I think that we've sent some
13  letters -- I remember a letter before Trey was
14  chairman -- I think Pete sent a letter to the Illinois
15  legislature.  And there was a time in which the Delaware
16  legislature wanted to form its own Latino caucus, and I
17  think that Representative Gallegos, now Congressman
18  Gallegos, had discussed the bylaws.  And I think that
19  MALC is a model for these various legislative groups.
20  That's what I meant.  There was nothing formal there,
21  but there has been some inter-caucus communications, but
22  I can't speak to the depth of it for voter ID.
23      Q.   So if there were a legislative caucus in
24  another state that was dealing with or opposing a voter
25  ID legislation, would they ever reach out or contact

52

1  MALC regarding its stances or positions in regards to
2  voter ID legislation in Texas?
3      A.   They haven't.  I hope that they would, because
4  several of our members are very -- have a deep knowledge
5  of this area and how it affects the Latino community.
6  And I think that however it affects the Latinos here in
7  Texas, it probably affects them in Nevada the same way
8  or California or New Mexico, Arizona, all throughout the
9  American Southwest.  I would hope we could be a model
10  for them.
11      Q.   So y'all don't have any direct communication
12  with members of other state legislatures regarding voter
13  ID legislation.  Do y'all exchange documents or
14  materials with other members of other state legislatures
15  regarding voter ID legislation?
16      A.   No, not to my knowledge.  We haven't yet.
17      Q.   Does MALC engage in any kind of activities
18  related to voter registration?
19      A.   Only through our membership, but nothing
20  directly by the caucus itself.  I think it would be
21  inappropriate for MALC to do that.
22      Q.   When you say only through your membership,
23  what does that mean?
24      A.   If the legislators themselves do a voter
25  registration drive -- they're members of MALC, but

53

1  they're doing a voter registration drive for whatever
2  reason.  So through our members they register voters,
3  but nothing directed because of the caucus actions.
4      Q.   So if a member of MALC engages in any kind of
5  activity related to voter registration, are they doing
6  so in their individual capacity as a legislator and not
7  as a member of MALC?
8      A.   I think that's correct.
9      Q.   So is it correct to say that MALC does not
10  expend any resources towards voter registration
11  activities?
12      A.   Voter registration?
13      Q.   Yes.
14      A.   No.
15      Q.   Does MALC engage in any kind of activities
16  related to voter education?
17      A.   Absolutely.
18      Q.   Could you describe those activities?
19      A.   We are an information hub about the law, and
20  so our duty is to inform our members so they can inform
21  the constituents how various laws might affect them,
22  specifically SB 14.  Over the last -- since SB 14 began
23  to be enacted last year, we have received lots of
24  requests by legislators about what the law means and how
25  they can talk to the constituents about the law, what

54

1  their requirements are. And so MALC has been a resource
2  for voter education for the members themselves.
3      And there's also been members of the
4  community who would call up and ask what does the law
5  mean, and we would tell them to the best of our
6  knowledge, to give them resources as best we can.
7      We have an electronic newsletter that we
8  send out every week called The Caucus, and voter ID
9  has -- and SB 14 and its requirement have been a central
10  part of each of those, which I think we gave to you in
11  our document productions. Also our public statements,
12  where we try to educate voters about the effects of
13  voter ID and what the requirements are in order to
14  educate them for their vote, have been prominent. We've
15  also given you those things, too.
16      So it's my experience that we've devoted
17  a lot of resources to be an information hub to voter
18  educate on this issue, so...
19  Q. So do y'all expend or commit resources to
20  educate both members of MALC about voter ID laws and
21  constituents of members of MALC about voter ID laws?
22  A. I think that's right. I think that The Caucus
23  doesn't just go out to members. And our public
24  statements obviously travel wherever they go. And so I
25  think that it's for the public and for the members

55

1  themselves.
2  Q. Can you tell me what kinds of resources are
3  committed towards voter education activities?
4  A. First you have to understand the law in order
5  to talk about it. So much of my job is to suss out the
6  law and understand it. So some portion of my salary is
7  dedicated to that.
8      Our public statements via press releases,
9  Facebook responses, or through our caucus, are written
10  by staff. There is staff time devoted to that. It
11  costs money to do those things. The cost of contact --
12  I think we actually use a different email platform that
13  costs money each month to -- you have to develop the
14  words for this. There's editing involved in that.
15      Anyways, long story short, I think that
16  lots of staff time is diverted from our core purpose,
17  which is policy development and member relations, to
18  educating on this topic, so --
19  Q. Did MALC commit resources towards voter
20  education purposes prior to SB 14?
21  A. Not to my knowledge. There may have been some
22  resources committed to talk about the law generally, but
23  there's been a radical uptick -- a logarithmic increase
24  in the amount of money, time, staff that we spent
25  educating our members and the public at large about

56

1  SB 14.
2  Q. When you say "a radical uptick," can you
3  exemplify that by a certain percentage?
4  A. I think it's very difficult to empirically say
5  X amount of time or money was spent on this issue
6  because there's lots of indirect costs that you may not
7  be aware or you might miss.
8      I will just say this: When we began
9  working as a chairman, Trey had a vision for MALC to
10  have a broad, comprehensive policy horizon that changed
11  the way which MALC and Latino issues were talked about.
12  We've done some part of that, but his goal for MALC was
13  to be able to talk about roads, transportation, energy,
14  and to devote staffers to those core concepts. We've
15  been unable to do that because of the last four years
16  with the diversion of resources in order to answer the
17  clarion call to combat this bill and its law.
18  Q. But when you say "a radical uptick in
19  resources," what is that based on?
20  A. My prior knowledge of the budget. I just know
21  that we had a vision to hire policy analysts for complex
22  financial transactions. We had a vision to talk about
23  transportation and water policy and a more complex and
24  fundamental way to kind of change the way in which
25  people thought about Latino policy, and we've been

57

1  fundamentally unable to do those things because of our
2  diverted focus to voting rights issues. And I guess I
3  could -- I'm not sure how I could empirically show it to
4  you, but I just know it's true, so...
5  Q. Does MALC engage in any kind of activities
6  related to assisting voters during elections?
7  A. Only through voter education. I assume by
8  assisting voters you mean helping them to the polls or
9  GOTV effort. That would be inappropriate for a (c)3 or
10  a (c)6.
11  Q. When you say "GOTV," is that get out the vote?
12  A. That's correct. We don't do that. We just --
13  we voter educate as much as we possibly can.
14  Q. Do you have any knowledge of MALC's policy or
15  advocacy-related work with regard to voter ID
16  legislation prior to December 2008?
17  A. Surely.
18  Q. Could you describe MALC's policy or advocacy
19  working prior to 2008 with regard to voter ID
20  legislation?
21  A. Yes. It's the same general thing. We did
22  lots of amendments, lots of Q and A, lots of points of
23  order by and through our membership and their staffs to
24  try to defeat the bill in 2005, 2007, 2009. If you look
25  back at the chubathon, lots of those people doing the

Martin Golando - 6/24/2014

58

1  chubathon were MALC members.  Representative Raymond, I
2  think, had almost a whole day to himself where he talked
3  off a whole bunch of bills.  So I think that MALC
4  members have played a central role in advocating against
5  the bill in its various forms.
6      Q.   When you say "chubathon," is that in reference
7  to the practice known as chubbing?
8      A.   Yes, sir.
9      Q.   And what is chubbing?
10     A.   It's where you elongate the time on a bill,
11 longer than it normally would take, either through Q and
12 A or just long talking.
13     Q.   Is that a procedural tactic that MALC
14 regularly employs?
15     A.   Not regularly, but it happens -- legislators
16 employ it.  I think it happens once a session; although,
17 I can't point to a time this last session when it
18 happened.  Toward the end of any deadline, I think
19 there's always kind of a legislative desire to start
20 hitting the bricks.  This was much different.  This was
21 a concerted caucus-wide effort to defeat a bill by
22 literally talking off 150 bills off the calendar.  It
23 was amazing.
24     Q.   Do you remember what bill was defeated in that
25 instance?

59

1      A.   It was the Troy Fraser bill.  I think it was
2  SB 362, if I recall correctly.  But again, the numbers
3  kind of come together in my -- and it wasn't necessarily
4  a bill that was talked off.  His bill was on the
5  calendar, and there was an intervening local calendar.
6  And so the local calendar took six days to get through,
7  five or six days, which it would normally take four or
8  five hours.
9      Q.   Was that in 2009?
10     A.   Correct.
11     Q.   Has MALC ever taken a public position in
12 support for or in opposition of a voter ID-related bill?
13     A.   I think so.  I think that we had some press
14 releases against the bill.  I think Trey's public
15 statements as MALC chairman were against the bill.  I
16 think that we provided those to you as much as we had
17 them in our custody.
18     Q.   When you say "the bill," do you mean SB 14?
19     A.   That's correct.  All the bills.  I'm trying to
20 remember -- I don't remember, in 2005, if there was a
21 concerted press release issued by Chairman Gallego at
22 the time, and I don't remember in '07 and '09 directly,
23 but I know that Trey has made various statements, and
24 certainly in '09 and '11 against the bill, so...
25     Q.   Could you describe all the ways that MALC

60

1  would publicize its support or opposition to a voter ID
2  bill?
3      A.   By and through its members and public
4  statements issued by the caucus itself, public
5  statements issued by members of the Executive Committee
6  or the chairman.  I don't know if we ever did a policy
7  paper on it, but we may have.  Representative Anchia had
8  several statements.  He's a member of MALC.  I think
9  that's exhaustive.  There may be some things I'm missing
10 like social media, but I don't think our social media
11 really began until a little bit later, so...
12     Q.   Does MALC have a Twitter account?
13     A.   You know, I think we do.  I don't think it's
14 operational.  Usually Trey's Twitter account is kind of
15 the central point for public statements, either as Trey
16 or as MALC chairman.
17     Q.   But MALC employs various modes of social media
18 to communicate with its members and the constituents of
19 its members.  Is that correct?
20     A.   Yes, sir.  And the public at large.  Right.
21     Q.   Sure.
22     A.   I don't think I can --
23     Q.   So has MALC been engaging in voter education
24 activities related to various voter ID bills since 2004?
25     A.   I can't speak to 2004, 2005.  I can only speak

61

1  to the recent uptick since the bill has been passed.
2  Voter education is probably not necessary if there is --
3  the bill hasn't been passed or implemented.  Right?
4      Although, sometimes I think members
5  receive questions or MALC receives questions saying, "Do
6  I have to bring my ID or not?"  Right?  That's a form of
7  voter education.  But before the passage we would say,
8  "No," and after the passage we would say, "Yes."
9      I would just say generally there has been
10 a tremendous increase in the amount of information
11 requested and provided by MALC on this issue, so...
12     Q.   And when you say "this issue," you mean SB 14?
13     A.   Correct, the implementation of SB 14.
14         MR. TATUM:  Can we take a quick break for
15 a few minutes?
16         MS. RUDD:  That would be great.
17         THE WITNESS:  Surely.
18         MR. TATUM:  We'll go off the record.
19         (Recess from 10:41 a.m. to 10:49 a.m.)
20         (Exhibit No. 2 marked)
21     Q.   (By Mr. Tatum)  Mr. Golando, I'm handing you
22 what's been marked as Exhibit 2.  And I believe you
23 stated that you reviewed this document, but just to make
24 sure:  Do you recognize what this document is?
25     A.   I believe this is what I reviewed.

62

1   Q.   And what is this document?
2   A.   It's our intervention, I believe, or our
complaint.  I get confused between the two.
4   Q.   I'll represent to you that this is the
complaint that initiated MALC's involvement in this
6   lawsuit.  Did you assist with the preparation of this
document?
8   A.   No.  Sadly.
9   Q.   Is it true that MALC does not claim that SB 14
causes injury to any of its members?
11  A.   I believe that's true in the following way.
I've thought about this deeply for a while, and I think
that the passage of the bill did harm our members.  I
think it's harmful whenever the State of Texas passes a
racist law, and in that sense it harms members of the
minority community and their representatives very
gravely.
18        So I think that -- I'm not sure what's
said in the complaint on that score, but I believe that
there has been an immeasurable but serious harm to my --
the members of my organization.
22  Q.   Mr. Golando, I ask that question because I
have an email from one your counsel, Ms. Lindsey Cohan,
stating that MALC is not asserting individual injury to
any of its members.

63

1        MS. RUDD:  Okay.  Let me just clarify
that.  I believe our position is that MALC is not
asserting individual injury to any of its members for
purposes of proving standing in this case.  I think
that's a separate question from whether or not as an
esoteric matter SB 14 and voter ID legislation has some
form of harm or creates some sort of injury for members
generally speaking.  But that's certainly true for
purposes of standing, Stephen.
10        MR. TATUM:  Okay.
11  Q.   (By Mr. Tatum)  Okay.  So, Mr. Golando, do you
agree that for purposes of standing, MALC is not
asserting individual injury to any of its members
because of SB 14?
15        MS. RUDD:  And I'm just going to object
to the extent that that calls for a legal conclusion.
17  A.   I guess that's true.  I would say that none of
the members are probably going to be directly affected
by voter ID.  None of them are going to be prevented
from voting.  But again, I reassert that there is
immeasurable harm when a racist law is passed and harms
members of the minority community the most.
23  Q.   (By Mr. Tatum)  So is MALC asserting the
24  rights of its members in this lawsuit?
25        MS. RUDD:  Objection; calls for a legal

64

1   conclusion.
2        A.   Yes, organizationally, I think that's right.
3        Q.   (By Mr. Tatum)  Is MALC asserting the rights
4   of the constituents of its members in this lawsuit?
5        A.   To the degree that we represent the
6   Mexican-American community, of course.
7        Q.   Is that because MALC believes that SB 14
8   denies or abridges the right to vote of constituents of
9   MALC members?
10       A.   Correct.
11       Q.   Do members of MALC believe that SB 14 will
12  affect their constituents' ability to elect or reelect
13  them?
14       A.   Yes.
15  Q.   With regard to standing, is it MALC's position
that it is only representing the interests of itself as
an organization in joining this lawsuit?
18        MS. RUDD:  Wait.  Can you repeat that,
19  Stephen?
20        MR. TATUM:  Sure.
21  Q.   (By Mr. Tatum)  On the issue of standing, is
it MALC's position that it is only representing the
interests of itself as an organization in joining this
24  lawsuit?
25        MS. RUDD:  Objection; calls for a legal

65

1   conclusion.
2   A.   I don't really know the parameters of
standing.  I mean, I do, because I'm an attorney, but
I -- what I will say is that MALC sought this because --
in the interest of its members in the community and as
an organization.  So I'm not sure that answers your
question, but maybe if you say it again, I'll try to do
it.
9   Q.   (By Mr. Tatum)  Well, let me just ask:  Why
10  did MALC join this lawsuit?
11       A.   Because we believe that members of our
12  community and the legislators themselves will be deeply
13  harmed by its passage and have been.
14  Q.   When did MALC first learn of this lawsuit?
15  A.   This one -- the Section 2 one?
16  Q.   Yes.
17  A.   In the fall of 2013.
18  Q.   And how was it decided that MALC would join
this lawsuit?
20        MS. RUDD:  Okay.  I'm going to object to
the extent that calls for you to reveal any
communications, Marty, that were had between you and the
organization in your capacity as an attorney or with
other attorneys for MALC in determining what to do in
this lawsuit.

Martin Golando - 6/24/2014

70

1 members to my knowledge or MALC as an organization sent
2 a letter to the DOJ saying, "Please sue." I don't think
3 that happened. I think if there was advocacy, it was
4 limited to just, "We think this is a bad law. Something
5 should be done," and it was probably mostly done in
6 relation to Section 5 and not Section 2.
7    Q.   Does MALC feel that its interests are not
8 adequately represented by the United States of America
9 in this lawsuit?
10   A.   Yes.
11   Q.   And why is that?
12   A.   I think that there are unique requirements for
13 Latino-elected officials and their constituents that
14 aren't necessarily represented by the DOJ. I say that
15 with all respect to the DOJ, so...
16   Q.   Is MALC as an organization harmed by SB 14?
17   A.   Yes.
18   Q.   In what ways is MALC harmed by SB 14?
19   A.   For the last four years, roughly, we have
20 diverted a tremendous amount of financial resources and
21 staff time and other resources to educate the public
22 about its effects and to combat its implementation.
23   Q.   Can you tell me what portion of MALC's annual
24 budget is diverted towards educating Texans specifically
25 about SB 14?

71

1    A.   The portion -- about 80 percent of my salary
2 is devoted to voting rights -- 80 percent of my time and
3 therefore 80 percent of my salary, whatever it is, has
4 been devoted to voting rights issues in Texas generally.
5         I think that whatever space that we have
6 in our electronic correspondence, our weekly newsletter,
7 its cost -- and usually one-third of the copy is devoted
8 to SB 14 or voter ID or status update on litigation. So
9 whatever the monthly cost of that is.
10        Plus the staff time itself. We're not
11 hourly. We're flat rate, so it's hard to determine
12 what percentage, but a significant percentage. It's
13 prevented us from having lots of policy convenings that
14 we might want. And most recently I think that a good
15 example is that we have a border crisis right now for
16 UACs, unaccompanied children, and it would be a
17 traditional role of MALC to play a bigger role, have a
18 convening, talk about what the needs are for border
19 protection and how we can ameliorate this immediate
20 situation, and we haven't been able to focus on it
21 because of the diversion of staff time and focus and
22 financial resources, unfortunately.
23   Q.   Does MALC contend that it is unable to fulfill
24 its mission because of SB 14?
25   A.   Yes, in part.

72

1    Q.   In what way has MALC been unable to fulfill
2 its mission because of SB 14?
3    A.   The mission of MALC is to have a comprehensive
4 voice about all matters of importance to the
5 Mexican-American community, to provide assistance to our
6 member legislators and their staffs in order to further
7 that goal. The comprehensive goal is not just related
8 to the traditional civil rights issue.
9         Like I said before, Trey's goal for the
10 caucus was to have a diverse and new policy horizon for
11 MALC members and Latino policy. That current goal is
12 under serious constraints because of our diversion of
13 resources. It's sad, but it's true.
14   Q.   Does MALC consider its SB 14-related
15 activities as outside the scope of its mission?
16   A.   The voter education portion -- I wouldn't say
17 it's necessarily outside the scope of the mission, but
18 it certainly has taken away from the core mission which
19 is a comprehensive policy voice. Comprehensive means
20 more than just one thing. Right? If we wanted to talk
21 about water or transportation, complex financial
22 transactions, other issues that aren't considered Latino
23 issues, we wanted to change that, and we have been
24 unable to do so because of the devotion of the time and
25 resources to this issue, so...

73

1    Q.   Do you know what percentage of MALC's
2 financial resources have been diverted towards the
3 litigation of this lawsuit?
4    A.   This lawsuit, we've been lucky enough to have
5 little litigation expenses associated with this. We had
6 a lot more travel during the Section 5 trial. Mr.
7 Garza's salary, some part of it has been devoted to
8 this. And obviously, some portion of my salary is
9 devoted to this; although, I'm not involved with the
10 litigation, more the voter education policy development
11 side of it. I guess it's a mixed bag. I couldn't say
12 specifically, but there has been some resources -- some
13 significant financial resources devoted -- I guess -- a
14 bunch, I guess.
15   Q.   Who is Mr. Garza?
16   A.   He is my co-counsel in the redistricting
17 matter. He's also lead counsel for some of the
18 individual intervenors in this case, and he advises the
19 representative on voting rights matters.
20   Q.   And redistricting matters?
21   A.   Yes, he's the counsel on redistricting. But
22 to be clear, some portion of his salary throughout the
23 last three years has been dedicated to voter ID.
24   Q.   Has MALC publicized its participation in this
25 lawsuit?

74

1   A.  Yes, I believe so.
2   Q.  In what ways?
3   A.  Press releases.  I think we did a press call
4   when we intervened.  Trey talks about the litigation
5   generally.  We do less talking about it and more voter
6   education now than we used to.  But, yes, we certainly
7   talk about it publicly.
8   Q.  In the course of publicizing its involvement
9   in this lawsuit, has MALC sought donations or
10  contributions from its normal sources of funding?
11  A.  Do you mean is voter ID something we
12  fundraised off of?  Is that your question?
13  Q.  Yes.
14  A.  No.  You can't fundraise off of voter ID.
15  Q.  Why not?
16  A.  It's deeply controversial.  So our traditional
17  sources of funding are from institutional givers to
18  legislators.  Right?  Those legislators have a
19  multifaceted business, and they don't want to give
20  to controversial groups.  In fact, our fundraising
21  levels have slowly decreased over time, in part because
22  of our intervention and complaint in this lawsuit.  You
23  can't fundraise off this issue.  You just can't.  It may
24  give you cachet because you're a voting rights leader,
25  and that means something in the Latino community, but

75

1   there's no way you can fundraise off it meaningfully.
2   Q.  Has MALC attempted to fundraise off of SB 14?
3   A.  No, sir.
4   Q.  Does it have any plans to attempt to fundraise
5   off of SB 14?
6   A.  No, sir.
7   Q.  Is that because it believes it's just not
8   possible to do so?
9   A.  Not meaningfully possible.  I don't think
10  that's -- I don't think I can go to our institutional
11  givers and say, "Hey, fund this lawsuit.  And by the
12  way, give us more money."  That's not the way it works,
13  so...
14  Q.  Do you think that some of your organizational
15  givers might agree with your involvement in this
16  lawsuit?
17  A.  They may individually, but certainly the
18  organizations that they represent probably would not;
19  although, some of them may.  A very small percentage
20  may.
21  Q.  Have any of these organizations expressed
22  support for MALC's involvement in this lawsuit?
23  A.  I'm trying to think.  I believe that -- in
24  this lawsuit?  That's more true for redistricting,
25  because if you represent a PAC that's a labor union, you

76

1   may be more supportive of redistricting efforts that
2   MALC has been under, but it's less true for voter ID.
3   But I don't know for certain if any of
4   the statements -- any of the money we receive from
5   certain PACs, if those PACs themselves have said, "We
6   support voter ID or your efforts."
7   I don't recall, so -- but it would
8   be -- if it did, it would be a very small percentage of
9   the financial undertaking, so...
10  Q.  So is it your testimony that MALC has seen its
11  donations and or sponsorships decrease as a result of
12  its involvement with this lawsuit?
13  A.  This and other lawsuits, yes, I think that
14  that's empirically true.  And our costs have
15  skyrocketed.
16  Q.  You mentioned that costs have skyrocketed, but
17  I believe it was your testimony that you had minimal
18  costs related to this litigation.  Is that --
19  A.  I thought you meant litigation.  Other costs
20  have skyrocketed, like voter education and other
21  efforts.  That's how I understood your question, so...
22  Q.  Again, I don't want to mischaracterize your
23  testimony.  How would you describe the resources of MALC
24  that have been devoted to the litigation of this
25  lawsuit?

77

1   A.  Some portion of my salary, some portion of
2   Mr. Garza's salary.  Salary is kind of a loose term
3   here.  It's just what MALC pays them.  Some portion of
4   the -- our public statements, whatever they cost to
5   generate by staff or by the Executive Director, some
6   portion of our fixed costs associated with electronic
7   distribution there, some portion of our administrative
8   costs devoted to dealing with staff and paper,
9   et cetera, some portion of our rent, right, because
10  we've had some legal meetings about this litigation
11  between me and Mr. Garza and the representative there.
12  I mean, there's lots of indirect costs
13  that you could add up, but it adds up to a pretty big
14  number, I imagine, in terms of constraints.  Our travel
15  costs during the Section 5 trial.
16  Q.  Would the allocation of resources towards the
17  litigation of this lawsuit, would -- those be evident in
18  the C&E documents that you referenced earlier?
19  A.  They would largely be evident.  The travel
20  would be apparent, because it would have been during the
21  Section 5 trial.  You would see a plane ticket for me or
22  Mr. Garza, and the costs for lodging.  So that would be
23  during -- I guess that was July of 2012.
24  You would see my salary.  As I said, some
25  portion of my salary is dedicated to this litigation and

Martin Golando - 6/24/2014

78

1  to voter education generally.
2              Mr. Garza is less apparent because he's
3  more of a mixed bag.  He gets paid more for
4  redistricting than I do, but some portion is for voter
5  ID.  And I couldn't tell you -- month to month it
6  changes, so -- and so you'd figure some portion of the
7  amount of money we spent to distribute our electronic
8  newsletter, some portion of Lindsey's salary, because
9  she's the one who helps generate that content.
10      Q.  I'm sorry.  Who?
11      A.  Lindsey Rodriguez.  She's one of the policy
12  analysts we talked about before.  Some portion of
13  Summer's salary who runs the caucus, because we had to
14  devote time to preparing for all the stuff.
15              I guess my point is that the costs may be
16  nominal compared to redistricting, but they are
17  certainly larger than they normally would be, and they
18  are daunting to my caucus, so...
19      Q.  Mr. Golando, I just want to be clear that when
20  I'm asking you about costs associated with this
21  litigation, I mean the Section 2 litigation.
22      A.  Okay.  I'm sorry.
23      Q.  I'm not referring -- I'm not talking about
24  redistricting.  I'm not talking about Section 5
25  preclearance.  I'm talking about the Section 2 case that

79

1  we're currently involved in.
2      A.  I apologize.  So there's no travel, then.  But
3  some portion of Mr. Garza's salary since fall has been
4  devoted to voter ID.  Some portion of my salary has
5  been.  Again, the others would stay the same, generally,
6  so...
7      Q.  When you say a portion of your salary, does
8  that mean a portion of your already set salary, or has
9  your salary been increased because of your work with
10  this case?
11      A.  Recently it's been increased.  I used to get
12  about $1,000 from MALC a month, and now I get $1,600
13  roughly a month, and it's been increased in part because
14  of our increased needs for voting rights.  Not a lot of
15  money, but it's a lot of money to me, so --
16      Q.  Not making a judgment on any of that.
17              Do you know specifically what portion of
18  the kind of set costs that you referenced earlier have
19  had to have been diverted towards SB 14-related
20  activities?
21      A.  Again, it's very difficult to say.  So our set
22  costs are salary costs, rent, and other things like what
23  you pay for your newsletter distribution, what you pay
24  for your list, what you pay for your copier, et cetera.
25  what you pay for paper, what you pay for -- those are

80

1  set costs.  Right?
2              Obviously my salary is devoted largely to
3  voting rights.  Summer's salary in part is for handing
4  logistical issues and running litigation and SB 14
5  generally.  Lindsey, lots of our public statements are
6  about voter ID, so lots of her content is about voter
7  ID.  Nathan does video, so I think we had some videos
8  related to voting rights generally, so some part of his
9  stipend.  I can't estimate the paper.  Rent, obviously
10  some portion of their salaries is devoted to that, and
11  we've had meetings about voter ID at MALC.  Obviously
12  it's related in some way.
13              It's very difficult to say.  I just know
14  that we've devoted more resources than I can currently
15  measure for you, and it's been tremendously daunting for
16  my caucus.
17      Q.  So MALC does not have any kind of discernible
18  or tangible measure for the exact percentage of its
19  resources that have been diverted towards SB 14-related
20  activities.  Is that right?
21      A.  I don't think that's fair.  I think that it's
22  really difficult to untwine employment.  Right?  I do a
23  lot of things for MALC.  So does Summer.  And there are
24  hills and valleys in terms of what you're focusing on.
25              What I can speak to is that the last --

81

1  since fall of 2011, and since the implementation of
2  SB 14, I guess last year, since the vacation -- I guess
3  that would be 2012 -- no.  2013.  I'm sorry -- there's
4  been a tremendous amount of focus, time, and some money
5  devoted to educating our members, their constituents
6  about this issue.  Just because I can't give you a
7  percentage today like 65 percent, what would that mean
8  other than what you can measure?  I mean, how do you
9  measure staff time?
10      Q.  Let me ask you more broadly.
11      A.  Please.
12      Q.  Let's picture a pie chart.  A circle graph
13  that's divided up, and this graph depicts, you know, how
14  much -- how many resources are devoted to X activity,
15  how many resources are devoted towards Y activity,
16  et cetera.
17              If we were looking at this pie chart for
18  the resources of MALC, how big would the slice be that's
19  devoted towards SB 14-related activities?  Without
20  putting a specific percentage on it, just roughly how
21  big would it be?
22              MS. RUDD:  Objection; calls for
23  speculation.
24      A.  Probably a third, maybe more, maybe less.
25  It's larger for voting rights generally.  It's probably

Martin Golando - 6/24/2014

82

1 two-thirds, maybe 75 percent for voting rights
2 generally.  And they're all related in my mind.
3          Again, I don't know what -- how good a
4 predictor it is, but -- or a pie chart would be, but
5 some portion of my salary of the last month has been
6 dedicated to talking to legislators about legislative
7 privilege and what documents they have to turn over.
8 That's been really intense the last four weeks, lots of
9 questions, lots of concern on the staff.  So recently
10 there has been, you know, a real big hill.  There may
11 have been a valley sometime after our intervention.  I
12 guess it's really hard to say.
13      Q.   (By Mr. Tatum)  What did that hill look like
14 when MALC filed its complaint on September 17th, 2013?
15          MS. RUDD:  Objection; calls for
16 speculation.
17      A.   We spent a lot of time preparing for the
18 intervention, about our public statements.  Trey takes
19 his public statements on MALC very seriously.  We spent
20 some time talking about what kind of travel it might
21 require to go to Corpus.  We spent some time talking
22 about what Mr. Garza's role would be and what my role
23 would be and devoted salary to that goal -- or money,
24 frankly.
25          So not quite the hill it's been the last

83

1 four weeks in terms of document production, but -- in
2 terms of max effort, but it was a moderate hill,
3 certainly, right, so...
4      Q.   (By Mr. Tatum)  Can you specify what
5 particular activities that fall under the core mission
6 of MALC have had to be set aside because of MALC's
7 devoted attention to SB 14-related activities?
8      A.   Ideas aren't one to one.  It's a zero sum
9 game, largely.  But I can say that specifically our
10 focus the last four weeks in trying to get these
11 documents out and trying to prepare for litigations,
12 generally, has prevented us from taking a more -- a
13 deeper policy look at this UAC problem on the border.  I
14 discussed before how voter education efforts have taken
15 away from Trey's vision for MALC, which is to have a
16 more comprehensive and meaningful Latino policy in all
17 sectors.
18          Our goal was to have no issue be
19 considered a non-Latino issue.  Every issue should have
20 a Latino focus or Latino facet to it.  And so our policy
21 development operation has been relatively sapped because
22 of our entry in this lawsuit.
23          We've lost a lot of staff because we
24 couldn't afford to pay them because of our voter
25 education efforts and our litigations, generally.  We

84

1 lost a staffer to the TDP last fall in part because we
2 couldn't pay him what he was worth.
3          I left state employment in part because I
4 wanted to create budgetary space for us to not lose
5 people.  That's part of the reason I left, because you
6 can kind of have a hybrid employment between the caucus
7 and trades a capital staff.  Right?
8          And so I think that our financial
9 troubles have been exacerbated by our voter education
10 efforts and our efforts involving SB 14.
11      Q.   I think you mentioned earlier that MALC has
12 four staff employees.  Is that correct?
13      A.   Counting myself, and I'm not sure you can call
14 me an employee, necessarily, because I don't get a W-2
15 from them, but I think that's right.
16      Q.   Okay.
17      A.   We have one part-time employee, one -- and two
18 full-timers, and me, and then I think we have -- I think
19 they're actually interns, whom I haven't met yet, but
20 we've got some interns.
21      Q.   So that's current number of employees?
22      A.   Current.  Current.
23      Q.   How many employees did MALC have before they
24 joined this lawsuit?
25      A.   Five plus an intern right before -- you mean

85

1 like September of 2013.  Right?
2      Q.   Yes.
3      A.   Five.
4      Q.   And now you have four?
5      A.   Correct.  We lost somebody who was deeply
6 talented, a tremendous asset.  I miss him every day.
7      Q.   When you say you left state employment to
8 create budgetary space --
9      A.   In part.
10      Q.   In part.
11      A.   Yeah.
12      Q.   Does your salary attributable to your work as
13 a state employee -- does that come out of MALC's budget?
14      A.   No.  It comes from -- I'm not a state employee
15 anymore, but when I was a state employee, the salary
16 came from the state, so...
17      Q.   And was it not your testimony that you left or
18 you reduced your role with the state to create budgetary
19 space for MALC?
20      A.   Yes.  The Housekeeping Resolution considers
21 dual employment -- state employees can serve outside of
22 state employment with the permission of the member,
23 which includes caucus employment.  And the Housekeeping
24 Resolution also says you can use caucus equipment -- or
25 state equipment for caucus-related activities, as long

Martin Golando - 6/24/2014

86

1  as -- under certain parameters.  So it contemplates dual
2  employment with a legislative caucus.  Right?  There was
3  a time when that wasn't true, but that changed in I
4  guess '07, I believe.
5            Anyways, my goal was to in part leave
6  state employment to create space that we could -- you
7  know, I made about $4,200 a month from the state, and if
8  we could somehow shift my salary to Summer, that would
9  create $4,000 roughly for MALC to have more money to
10  make ends meet.  Like I said -- and I would appreciate
11  it if this wasn't publicized, but we have tremendous
12  budgetary constraints right now because of this effort.
13       Q.  You mentioned the chairman's goal or vision
14  for MALC which he kind of formulated when he came on in
15  2008?
16       A.  Correct.
17       Q.  Do you think it's still possible for MALC to
18  achieve that goal or vision?
19       A.  God, I hope.  I really do hope that we can
20  do that.  I hope that we can put this stuff behind us
21  and reach finality, enjoin this lawsuit, get the Texas
22  bill done appropriately, because of their actions, and
23  then focus on the session and try to make things better.
24  I hope we can do that.
25       Q.  Does MALC believe that SB 14 makes it

87

1  impossible for MALC to fulfill its goal and mission?
2       A.  It's been very difficult.  Impossible, I
3  think is -- I think that's an extraordinary standard,
4  because there's -- it's been my experience that Summer
5  Luciano and my boss can do anything, and I mean that
6  without hyperbole, but -- and the members of MALC are
7  deeply talented people, and I think the world of their
8  efforts, all of our members.  But it's been my
9  experience that we can't do what Trey wanted to do
10  because of this litigation, and that's problematic to
11  me.
12       Q.  Does MALC contend that SB 14 was enacted with
13  a discriminatory purpose?
14       A.  Absolutely.
15       Q.  What is that based on?
16       A.  Our belief is that the sum of the legislators
17  who sought the enactment did so with an impermissible
18  purpose.  It's based on our knowledge of legislative
19  procedure.  There were many deviations from normal
20  procedure in the enactment of the law.  There are also
21  straight comments from people advocating for the law and
22  straight comments from legislators throughout the course
23  of it that were -- I think belied an impermissible
24  purpose.  I think that they were -- either the
25  legislators were completely irrational or they voted

88

1  with an impermissible purpose.  I think the obvious
2  choice is that they enacted this lawsuit with a
3  discriminatory purpose.
4       Q.  Does MALC contend that the legislature
5  intended to harm any minority group by enacting SB 14?
6       A.  Yes.
7       Q.  Has MALC conducted any studies, reports,
8  audits, estimates, projections or anything like that on
9  the effect of SB 14 on minority voters or on voters who
10  are members of a language minority group?
11       MS. RUDD:  Objection; compound.
12       A.  I think that Representative Anchia did
13  something like that as a MALC member, and that would
14  have been given to you guys in our first tranche of
15  documents.  And I think that during the Section 5 trial,
16  I think we had an expert report -- I think that's true.
17  But that's the sum total, I think, of our expert
18  analysis on this point, so...
19       Q.  (By Mr. Tatum)  Does MALC contend that any
20  legislator who voted for SB 14 did so with a
21  discriminatory purpose?
22       A.  Yes.
23       Q.  Can MALC identify any specific legislators who
24  voted for SB 14 who did so with a discriminary
25  purpose?

89

1       A.  I think that's a difficult -- more difficult
2  question, because legislative intent is I think a
3  multifaceted kind of deal.  Arlington Heights talks
4  about the ways in which you can infer legislative
5  intent.  And I think it's important to know that because
6  legislative intent includes not only the intent of
7  legislators but their staffs and maybe their
8  constituents whom they're advocating on behalf for.
9  It's a much more deep proposition than a binary is this
10  person a racist or not.
11            I can't point to anybody who I think did
12  so impermissibly, but I do believe that they did so
13  because it's -- either they acted irrationally or they
14  had an impermissible purpose, which I think is far more
15  likely.
16       Q.  Did any members of MALC vote for SB 14?
17       A.  Yes.
18       Q.  Do you know which ones?
19       A.  Joe Pickett did, I think.  I think that Jose
20  Aliseda did when he was a member.  John Garza did.
21  Larry Gonzalez did.  I don't think Aaron Pena did.  I
22  could be wrong, though.  He may have, but I don't think
23  so.
24       Q.  Does MALC contend that any of its members who
25  voted for SB 14 did so with discriminatory intent?

90

1      A.  I don't know.  Like I said, I couldn't point
2  to a specific member and how they felt, what they
3  felt internally.  I just know -- I know there's
4  been generally -- Raul Torres I think voted for voter ID
5  as well.  I know them generally as good people.  Larry
6  Gonzalez is an exceptional person.  He was a great
7  staffer.  Raul Torres was one of the kindest people I've
8  ever met in the Legislature.  John Garza is a very nice
9  man.  I actually hit his car with my car once, and he
10  was very kind about it, like super kind.  Jose Aliseda
11  is super cool.  He's a pilot and he has a scuba license,
12  which is really neat.
13          Anyways, my point is I know these guys
14  personally, and I can't believe that they would, but I
15  also don't know what's in their hearts, and I don't
16  think it's also the point of legislative intent.  It's
17  not that they're -- it could be that they're deeply held
18  racists and they voted for it because they're racist.
19  That's possible.  I don't think so.  But it's also
20  possible that they did so with a still impermissible
21  purpose because they were advocating on behalf of
22  racists or they sought a racist law because they thought
23  it made sense pragmatically.  Anyways, I guess what I'm
24  saying is I don't know what's in their heart, but it's
25  possible, but I doubt it.

91

1      Q.  You mentioned that the -- or you testified
2  earlier that the Legislature acted outside of normal
3  legislative procedures in enacting SB 14.  Is that
4  correct?
5      A.  Yes, sir.
6      Q.  In what ways did the Legislature act outside
7  of its normal legislative procedures in enacting SB 14?
8      A.  It's a long answer, so I'll have to be fairly
9  narrative in this.
10      Q.  Just give me specific examples.
11      A.  Okay.  In 2005, the first bill came up that I
12  recall -- it was my first session in the Legislature --
13  and it passed the House with some consternation, and
14  then it died in the Senate on a two-thirds vote.  12
15  Senators or 11 Senators got together saying, "We will
16  not vote for this bill," and it died.
17          And then in 2007, a similar bill came up,
18  more restrictive.  It was the Betty Brown Bill, if I
19  recall correctly.  And Betty Brown said in committee --
20  I think something that I think is at least bigoted,
21  possibly prejudicial, maybe racist to Asian-Americans in
22  the course of considering this bill.  And then that bill
23  got passed by the House, and then died in a two-thirds
24  vote in the Senate again.
25          In the 2009 session, the Senate changed

92

1  the rules to have a specific carve-out for voter ID.  So
2  that's one full change right there.  And so it left the
3  Senate finally -- there was a Senate bill that came
4  over -- and the House members used their procedural
5  tactics to kill the bill.  That was the chubathon we
6  talked about earlier.
7          Fast-forward to 2011, there was a new
8  rule dealing with extended debate on the local calendar.
9  There was a new rule about -- or the same rule about the
10  two-thirds rule.  So two deviations from normal
11  procedure, and there was a creation of a fast-track
12  committee in the House and a committee as a whole in the
13  Senate.  All of those things are deviations from normal
14  procedure for bills like this.
15          I think it would be a deviation from
16  normal procedure to not listen to minority advocates.  I
17  can only look at my time in the leg when I've tried to
18  help pass a bill that I thought they were rational
19  bills, and when someone -- when my boss presents a bill
20  in committee and someone comes up and says, "We don't
21  think this bill is a good idea," that bill doesn't go
22  anywhere.  Right?  It gets stymied.  It gets absolutely
23  stopped until we solve that issue.
24          The legislative process is a process in
25  answering objections.  And every objection that was --

93

1  even small objections were virtually denied and moved
2  forward, because the bill had to get passed and passed
3  quickly.
4          All those things I think are deviations
5  from normal procedure.  There are others I could
6  probably think of.  There is a constitutional problem
7  with the bill.  The bill was stolen from the Texas
8  Mobility Fund to pay for TIC, that way it had a free ID.
9  And Trey brought a point of order saying that was
10  unconstitutional.  That was an A priority jurisdictional
11  issue.  The bill shouldn't be allowed to move forward
12  until it was solved.  They went forward anyway, passed
13  the bill, and it was solved in conference committee
14  through an outside the bounds resolution, which is
15  atypical I would say of a deviation from normal
16  procedure for a bill of this type.
17          I mean, the one thing I love about the
18  Texas Legislature is that there's a lot of bipartisan
19  cooperation, and this bill had none of that.  And there
20  was no listening to minorities or even, you know, just
21  rational objections to the bill.  That's outside the --
22  deviation from normal procedure.  And I'm trying to
23  think if there's any others I can think of right
24  offhand.
25      Q.  Let's deal with what you've testified to at

Martin Golando - 6/24/2014

102

1  status conference, which I can only assume means some
2  kind of regular meeting to discuss voter ID bills.
3      A.  It is possible that there was a MALC meeting.
4  2011, again, was three years ago.  I'm trying to
5  remember.  We had two or three or four MALC meetings,
6  some of which were related, one of which may have been
7  voter ID related -- one.  But I don't recall specifics.
8          A status conference, to me, sounds like a
9  conference with the Court, frankly, and I don't think
10  that's -- I don't recall talking to our members about
11  that, you know, so...
12      Q.  Did MALC draft or propose or research or
13  request any amendments to SB 14 while it was being
14  considered?
15      A.  Surely.
16      Q.  Who would be in charge of drafting such
17  amendments?
18      A.  TLC.  I'd call them up and say, "I would like
19  these amendments for my boss or my caucus."
20      Q.  And how would MALC decide on what amendments
21  it wanted to make?
22      A.  You know, it's a really informal process,
23  generally, because you're very time-constrained, and
24  there were significant time constraints with this bill.
25  And so you kind of go back to what you used to do and

103

1  try to think about it.  You brainstorm a little bit.
2  And if you get any idea on a bill like this, you kind of
3  throw it into TLC to have them draft it so you can get a
4  picture of it.  Because your bosses won't respond until
5  they can read it, honestly.  That's how legislators
6  work.  And so you just overdraft, draft as many as you
7  could, and see if you can't get authors for them, your
8  boss or have your boss do it.
9          And so informally is the answer to your
10  question.
11      Q.  So is that process of proposing amendments --
12  is that typically a pretty rushed procedure or pretty
13  fast-paced procedure?
14      A.  Largely, especially on this bill.  We had to
15  reset with this bill, because I think Armando Martinez
16  appointed it on a Rule 4, Section 32(c).  So there was,
17  like, a two-day reset.  So there was some lag time where
18  you can kind of catch your breath between the two days,
19  but there was still a lot of time, and there was a lot
20  of pressure to pass the bill, a lot of pressure to
21  defeat the bill, you know.
22      Q.  Did MALC feel like it was able to present all
23  the amendments that it wanted to with regard to SB 14?
24      A.  You know, I can't speak specifically to each
25  MALC member, but I think that every -- almost every MALC

104

1  member who proposed a bill proposed something or voted
2  for something, and there was lots of amendments we think
3  would ameliorate -- you look back in hindsight, could I
4  have done a different amendment that would make a better
5  argument.  I could probably think of several that I
6  would want to do now.  But at the time, I think I
7  remember being satisfied that we had fought a good
8  fight, so...
9      Q.  Do any members of MALC believe that they were
10  not given ample opportunity -- sorry.  Let me back up.
11          Do any members of MALC who opposed SB 14
12  believe that they were not given ample opportunity to
13  voice their opposition to the bill while it was being
14  considered?
15      A.  I think that's probably true in the sense that
16  the committee hearing itself lasted -- I think it was 20
17  hours.  It was kind of a marathon committee hearing,
18  which is not always the case, but sometimes the case.
19  And it was a real perfunctory meeting in the sense that
20  it was like witness, witness, witness.  It was just kind
21  of going through the motions.
22          Rolando Gutierrez is a close friend of
23  mine and a close friend of the representatives was on
24  that committee, and he described it as a sham process.
25  And so in that sense, I think that no amount of time

105

1  that was allotted could have, you know, represented the
2  complete opposition of the bill.  So the answer to your
3  question is probably yes, so...
4      Q.  Did MALC as an organization undertake any
5  efforts to prevent SB 14 from being passed?
6      A.  Yes.
7      Q.  And what were those efforts?
8      A.  Questions of order, trying to get people to
9  vote no, forming coalitions with other legislators to
10  try to get them to vote no, trying to get people to
11  voice their opposition, you know, getting quality
12  testimony to try to, you know, figure that out.
13      Q.  Did MALC employ tactics that were meant to
14  slow down or delay consideration of the bill?
15      Q.  During which session?
16      Q.  2011.
17      A.  I'm sorry.
18      Q.  All these questions I'm asking you right now
19  are within the timeframe of the 2011 Legislature during
20  which SB 14 was being considered.
21      A.  I don't think that they had those options
22  available to them in 2011 because of the rule change,
23  and the -- I mean, Representative Martinez -- Mando
24  Martinez pointed the bill, so in that sense that delayed
25  it for I think 48 hours, roughly.  So in a sense,

Martin Golando - 6/24/2014

106

1  literally the answer is yes, but I don't know -- the
2  same panoply of tactical options was not available to
3  MALC members in 2011 that were available for them in
4  2009.  So generally the answer would be no.
5      Q.  Did MALC use all tactics at its disposal to
6  delay or defeat SB 14?
7      A.  No.  I mean, quorum-busting is always an
8  option.  In 2011, probably not.  But you could have
9  tried to do it.  You could have had an informal or
10  formal quorum bust, and that would delay the passage of
11  all bills theoretically.  I don't think it was a real
12  tactical option at the time because of the time in
13  session in which the bill had come up.  But we didn't do
14  everything we could have done.  Theoretically, we could
15  have had a suicidal quorum bust, but --
16          MR. TATUM:  How are we doing?
17          THE WITNESS:  I'm square.  Mr. Whitley?
18          MR. WHITLEY:  Oh, I'm fine.
19      Q.  (By Mr. Tatum)  Do you recall Senate Bill 362
20  proposed during the 2009 Legislature?
21      A.  Mr. Fraser, yes, I remember the bill.
22      Q.  What was that bill about?
23      A.  It was a voter identification bill.
24      Q.  Did MALC oppose that bill?
25      A.  I believe so.  Members of MALC certainly did.

107

1  I don't remember if MALC itself had a statement at the
2  time in 2009, but most members did oppose the bill.
3      Q.  I'm sorry.  You don't believe that MALC had a
4  statement?
5      A.  You said when MALC had a -- had a public
6  statement saying, "We oppose SB 362."  I can't recall if
7  we had done that then, but most members opposed that
8  bill.
9      Q.  Did MALC engage in the same kind of tactical
10  efforts during the consideration of SB 362 that it did
11  with regard to SB 14?
12      A.  SB 362 never reached the House floor because
13  of the chubathon, so it wasn't the same tactical
14  efforts.  We didn't have amendments to SB 362.  We
15  didn't have points of order or questions.  It was just
16  delayed from consideration because of the extenuation of
17  the local calendar.
18      Q.  So it didn't have to engage in the same kind
19  of activities with regard to SB 362 that it did with
20  SB 14 because it successfully defeated the bill through
21  the chubathon?
22      A.  Correct.
23      Q.  Is that what it's called, the chubathon?
24      A.  Lots of people have different words for it.  I
25  think that's the most descriptive, so...

108

1      Q.  It's quite descriptive.
2      A.  Yeah.
3      Q.  Do you know if MALC expended more or less
4  resources opposing SB 362 than it did opposing SB 14?
5      A.  Less, because SB 14 has extenuated for years
6  now.  Right?  362 was limited just to the session.
7  SB 14 has been an ongoing problem since 2011.
8      Q.  Does MALC support the idea that only
9  registered voters should be allowed to vote?
10      A.  I think so.  And I don't mean to equivocate.
11  I think there's a reason -- I think registration --
12  there's been several bills that have been filed by MALC
13  members I think over the years to reconsider how we
14  register voters.  So generally, yes, but specifically
15  they eat away at what registration actually means.  So I
16  don't mean to be picayune.  I just want to be clear.
17      Q.  So does MALC believe that a nonregistered
18  voter should be allowed to vote?
19      A.  No, I don't think so.  But again, the notion
20  of registration itself is something that's open to
21  legislative amendment and change.  Right?  There are
22  some MALC members who wanted to get rid of -- I think
23  that there may be some MALC members who would be willing
24  to get rid of registration if it -- and use some other
25  form of proving up whether this person should be allowed

109

1  to vote.  That may be an idea that could kind of get
2  some hold among MALC members, but I would say that
3  MALC's position is we support voter registration,
4  generally.  And there may be better ways to do
5  registration, too.  Right?  You could do it online.  You
6  could do it lots of different ways.  Which kind of
7  changes the question a little bit, but I know what
8  you're saying, so...
9      Q.  Let's just frame it this way.  Under the
10  current statutory scheme regarding voter registration,
11  does MALC believe that only registered voters should be
12  allowed to vote?
13      A.  We should follow the law as it stands.
14      Q.  Does MALC believe that Texas should make sure
15  that people attempting to vote are registered voters?
16      A.  Yes.
17      Q.  Does MALC believe that Texas should make sure
18  that people do not vote or attempt to vote in the name
19  of another person?
20      A.  Yes.
21      Q.  Does MALC acknowledge that voter fraud exists?
22      A.  Voter fraud generally?
23      Q.  Yes.
24      A.  Yes.
25      Q.  Does MALC acknowledge that voter fraud exists

Martin Golando - 6/24/2014

114

1 referring to MALC's objections to the rule 30(b)(6)
2 notice, and this question is based on those objections.
3     Q.   Okay.
4     Q.   Specifically to topics, I believe, 25 and 26.
5     A.   I'm trying to think.  Could you say it again?
6     Q.   Sure.
7     A.   I lost it.
8     Q.   Sure.  Is it true that MALC has never
9 conducted any calculation, report, audit, estimate,
10 projection, or other analyses relating to voter fraud?
11         MS. RUDD:  Same objection.
12     A.   I don't think that's true.  I think that
13 Trey -- there was a time in which during the Section 5
14 trial Mr. Rosenberg questioned the -- the -- or
15 Mr. Forest, I think is his name.  He's a Texas Ranger,
16 inspector for y'all -- about voter fraud in person, and
17 he went through the -- I guess the five known cases of
18 in-person voter impersonation and went through how there
19 were indictments for several of them and how SB 14 may
20 not have been able to prevent those things.  So in that
21 sense -- and Trey has repeated that line and repeated
22 that analysis.  So now, since we've done a -- a surface
23 analysis of in-person voter fraud from the trial -- so
24 that's my answer, I think.
25     Q.   (By Mr. Tatum)  Has MALC ever commissioned or

115

1 possessed any calculation, report, audit, estimate,
2 projection, or other analyses related to voter fraud?
3     A.   Every month the AG -- or every other month --
4 periodically, the AG will have -- will give
5 Representative Anchia, I guess, a table of current
6 investigations -- whatever ones of those we have in our
7 possession we gave to you already.  And I had asked
8 Mr. Dire for the periodic updates, and I don't think --
9 I think I received one or two -- I think that I did.  I
10 don't recall receiving more than that.  I think I turned
11 those over.  But that's all I can think that's
12 responsive to that question, so...
13     Q.   Is it true that MALC has never conducted any
14 calculation, report, audit, estimate, projection, or
15 other analysis related to election crimes?
16     A.   Again, I think that same answer as before.
17 The voter fraud table is not limited to voter
18 impersonation.  It listed all election crimes I believe
19 that were being investigated by Mr. Forrest and the AGs
20 at the time through the referral service.  And so I
21 think that that's inclusive of that answer.
22     Q.   But MALC has never conducted any kind of
23 report on its own?  That's what I'm asking.
24     A.   You know, I don't think so.  I think other
25 than just to review the table and see how much was voter

116

1 impersonation and how much was election worker error or
2 malfeasance, how much was mail-in ballot fraud, how much
3 was just crazy people, you know, so...
4     Q.   Does MALC believe that voter fraud should be
5 illegal?
6     A.   Yes.
7     Q.   Do you think -- does MALC believe that SB 14
8 deters voter fraud?
9     A.   No.
10     Q.   Why not?
11     A.   In-person voter impersonation is so rare that
12 in the known cases that we know about, I think SB 14
13 would have prevented only one of them.
14         And so if you go back to the cases and
15 the number of votes over time that -- so in 2010 and
16 2012, there were something like 13 million votes cast in
17 various elections.  Right?  And over that same time
18 period, there was only four known voter impersonation
19 attempts and only -- I think only one indictment, I
20 think.  I may be getting the numbers slightly wrong.
21 And in that one, I think it was a father voting for his
22 son in Fort Worth.  And they had the same name, and I'm
23 not sure the ID would have caught that unless the
24 election worker looked at the date of birth, which maybe
25 they wouldn't have -- anyway, my point is that if SB 14

117

1 was targeted at that kind of crime, rare though it was,
2 in that one instance when it may have mattered, it may
3 not have mattered.  It may not have been able to prevent
4 that.  So in that sense, that justification is totally
5 irrational to me.
6     Q.   Does MALC believe that SB 14 would prevent
7 someone from casting the vote of someone else?
8         MS. RUDD:  Objection; vague.
9     A.   Generally, it's possible.  I think it's
10 unlikely.
11     Q.   (By Mr. Tatum)  Why is it unlikely?
12     A.   Most people who vote in person are voting for
13 their dead dad or that they're crazy.  It happened in
14 Bexar County once.  This woman had, like, 13 forms of
15 ID, all with different names, and she tried to vote with
16 some of those.  She had no mens rea.  Right?  You
17 couldn't indict her for that, because she was just
18 crazy.  Right?  And the known examples of in-person
19 voter impersonation that we're aware of, I don't think
20 SB 14 would have -- may not have prevented any of them.
21 So in that sense, empirically, it's not likely.
22         I also think that it's much more likely
23 to disenfranchise people far more quickly and horribly
24 than it is to prevent someone from illegally voting.
25     Q.   Has any member or constituent of MALC -- let

126

1  with this proposition, can you explain why that
2  percentage increased between February 2011 and October
3  2012?
4        MS. RUDD:  Objection; calls for
5  speculation.
6        A.  I think that it could be statistical noise
7  within the poll instrument itself.  That's certainly a
8  possibility, that it's within the blip.  Margin of error
9  can be more than 3.5 percent on either side.  It can be
10 far greater.  So that's one possibility.
11        Another possibility is that there's been
12 a small incremental shift in Latino opinion about voter
13 ID, at least in response to this poll over that time
14 period.  And I guess over that time period, that would
15 include the 2012 elections, at least the primaries.
16 This was October 2012.  Right?  And so there had been
17 lots of publicizing of voter ID problems throughout the
18 nation, and maybe Latinos didn't -- the Latinos who were
19 polled didn't think it was a problem.  I don't know.
20        It's possible that the people who
21 answered their phone for polling firms are
22 representatives of Latinos generally, or that these two
23 universes of people who are responding to these polls
24 are substantially different.
25        Also, the way in which you ask the

127

1  question, the polling instrument itself, the order of
2  the questioning determines certain blips.  It's
3  certainly possible, all those things could be possible,
4  so...
5        MR. TATUM:  That's all I have right now.
6  Would y'all like to take a break?  It's ten after 12:00.
7        MS. RUDD:  Yeah.  That's great.
8        (Recess from 12:13 p.m. to 1:19 p.m.)
9        Q.  (By Mr. Tatum)  Okay.  Mr. Golando, you stated
10 earlier that MALC believes that SB 14 denies or abridges
11 the right to vote of constituents of MALC members.  Is
12 that correct?
13       A.  Yes, sir.
14       Q.  Does MALC contend that a significant portion
15 of its constituency -- by that, I mean the constituency
16 of its members -- lack any of the acceptable forms of ID
17 under SB 14?
18       MS. RUDD:  Objection; vague.
19       A.  What do you mean by "significant"?
20       Q.  (By Mr. Tatum)  Let me rephrase.  Does MALC
21 contend that any portion of its constituency -- by that
22 I mean the constituency of its members -- lack any of
23 the acceptable forms of ID under SB 14?
24       A.  Again, I'm sorry.  "The constituency of its
25 members," do you mean the members themselves lacking ID

128

1  or the people that they represent?
2        Q.  The people that they represent.
3        A.  Absolutely.
4        Q.  Okay.  Do you know how many constituents of
5  the members of MALC lack any of the acceptable forms of
6  ID under SB 14?
7        A.  I recall from the Section 5 trial that there
8  was a number that was deeply contested.  The State had
9  proffered some evidence that as many as 795,000 might
10 not have access that's based off registration rules,
11 people that didn't have driver's license, didn't
12 register with Social Security cards.  And so I think
13 that was 795, and I think that our expert -- or the
14 DOJ's expert at trial in Section 5 came up with as many
15 as 1.8 million that didn't match the databases that he
16 had access to.
17        And then Dr. Shaw did a poll of that
18 universe and got a -- it was a very poor poll.  There
19 was a very low response rate.  But he determined that
20 some portion -- I think it was like 10 or 20 percent of
21 the 1.8 million would be affected.  And so I would say a
22 range of somewhere between 200,000 to 1.8 million Texans
23 might be affected and some portion of Texas MALC
24 members -- probably a higher portion than other members
25 of the state.  Because MALC members range from --

129

1  they're from all over.  And we have a lot of the
2  counties and a lot of the population.
3        Q.  Is MALC able to identify one constituent of a
4  member of MALC that does not have any of the acceptable
5  forms of ID under SB 14?
6        A.  The intervenors that are represented by
7  Mr. Garza, several of them are affected people.  I
8  believe that some of them are from Nueces County, and I
9  think they're represented by Able Herrero if I
10 recall correctly.
11       Q.  And is Mr. Guerrero a member of MALC?
12       A.  Mr. Herrero?  Yes.
13       Q.  Whoever you just --
14       A.  I'm sorry.  Yeah, Mr. Herrero is a member of
15 MALC.
16       Q.  Okay.
17       A.  He's former vice chairman.  He's current
18 chairman of the Criminal Justice Committee in the House.
19       Q.  Is MALC able to identify any constituents of
20 its members who do not have a driver's license?
21       A.  Undoubtedly they do, but I can't give you a
22 list of names of people without a TXDL.
23       Q.  Is MALC able to identify any constituents of
24 its members who do not have a state-issued photo ID?
25       A.  Again, undoubtedly they do because of the --

## 142

1  A.  No, I haven't.  I'm sorry.
2  Q.  Okay.  Can you describe to me what this
3  document is from looking at it?
4      MS. RUDD:  Objection; calls for
5  speculation.
6  A.  It's a document dated December 5th, 2013.
7  It's a public information -- it's an open records
8  request for provisional ballots that were cast, and some
9  other categories.
10  Q.  (By Mr. Tatum) I'll represent to you that
11  this document has been produced to the defendants in
12  this litigation, and there were a number of documents
13  just like this produced to us, documents that were
14  addressed -- this one is addressed to El Paso County.
15  There were many others addressed to various other
16  counties.
17      In your work at MALC, are you familiar
18  with these public records requests, or do you recall
19  MALC asking for counsel to submit these on its behalf?
20      MS. RUDD:  And objection to the extent
21  that that would require you to reveal any communications
22  in the pursuit of legal advice between MALC and any of
23  the attorneys for MALC in this litigation.
24  A.  No.
25  Q.  (By Mr. Tatum) Have you seen any of the

## 143

1  responses from the counties to a request like this?
2  A.  No.
3  Q.  So you don't know how many public records
4  requests like this were submitted on behalf of MALC?
5  A.  No.
6  Q.  Okay.
7      (Exhibit No. 8 marked)
8  Q.  (By Mr. Tatum) I'm now handing you what's
9  been marked as Exhibit 8.  If you wouldn't mind just
10  pressing down on that sticker.  I don't think I got it
11  on there all the way.  Thanks.
12      MS. RUDD:  All right.
13  Q.  (By Mr. Tatum) I'll represent to you that
14  this has been produced to the defendants in this
15  litigation, and it was produced in native format, so I
16  wasn't able to print it with a Bates number on it, but I
17  represent to you for future reference that the Bates
18  number for this document is MALC 00003780.
19      Do you recognize this document?
20  A.  We turned over lots of documents.  I don't
21  recognize this one, unfortunately.
22  Q.  So you don't know what the names on this
23  document represent?
24  A.  Well, I guess I could infer.
25      MS. RUDD:  Don't infer.

## 144

1      THE WITNESS:  Okay.
2      MS. RUDD:  If you don't know, don't
3  speculate.
4  A.  I don't know.
5  Q.  (By Mr. Tatum) Let me ask you:  What is this
6  document?  What does it look like?
7      MS. RUDD:  Objection; calls for
8  speculation.
9  A.  I don't know.  Possibly a list of voters,
10  possibly.
11  Q.  (By Mr. Tatum) Okay.  But you've never seen
12  this document before?
13  A.  You know, I don't think that I have.  At least
14  I don't remember seeing it.  I apologize.
15  Q.  I'm not going to ask you any more questions
16  about that document, so you can -- unless you want to
17  keep looking at it.
18  A.  No, I -- I may, actually.
19  Q.  Okay.
20  A.  But go ahead.  I'm listening.
21  Q.  Okay.  Does MALC contend that SB 14 amounts to
22  a poll tax?
23  A.  Yes, in part.
24  Q.  And why is that?
25  A.  Because it takes ID to get ID, and some people

## 145

1  without ID have to buy ID to get it.  And as a
2  consequence of that, it's, I guess, a literal poll tax.
3  Q.  Is MALC aware that an EIC is an acceptable
4  form of ID to vote under SB 14?
5  A.  It is.
6  Q.  Is MALC aware that an EIC is obtainable free
7  of charge?
8  A.  But if you don't have the foundational
9  documents to get an EIC, it's the same problem.  Right?
10  And an EIC also takes time to get.  Right?  You have to
11  go to DPS to do it.  You have to sign like three
12  different waivers that says, "I'm not going to use this
13  for ID purposes.  I need this for voting."  I mean, it's
14  a strange ID in that request.  Have you ever had to sign
15  something like that to get an ID?  It's very strange.
16      Anyways, my point is that you got to have
17  an ID to get an ID, and that includes the EIC, so...
18  Q.  But MALC is aware that the actual EIC is
19  issued free of charge?
20  A.  And I know why it's free of charge, and I know
21  how it came about, because my boss brought a point of
22  order on the bill considering the Texas Mobility Fund as
23  we discussed earlier, that was rejected.  But it turned
24  out that you couldn't rob the Texas Mobility Fund of
25  these license fees, because they would put the full

146

1 faith and credit of Texas on the line.  You couldn't do
2 that constitutionally.
3          And so they went into conference and they
4 decided to create a whole new ID that was outside of the
5 Texas Mobility Fund in order to solve this
6 constitutional problem.  And in order to do that, they
7 had to go outside the bounds because it's outside the
8 scope of the House rules to do this.  So, yes, I'm aware
9 of the EIC.
10     Q.  Are you aware that the EIC is issued free of
11 charge?
12     A.  Yes, sir.
13     Q.  Okay.  I want to ask you a couple more
14 questions regarding -- and I'm going back to our
15 discussion about legislative activities or procedures
16 that the Legislature used during the enactment of SB 14,
17 if I may.  Specifically I want to talk about the
18 practice that you called chubbing and the chubathon --
19 is that what it was called?
20     A.  Probably.  That's what I call it.
21     Q.  Okay.  I think I remember you calling it a
22 chubathon back in 2009.  And without going back in the
23 transcript, would you mind explaining again what
24 chubbing -- the practice of chubbing entails?
25     A.  Generally chubbing is the elongation of debate

147

1 on a bill in order to prevent the consideration of bills
2 south of it on the calendar.
3          In this case, it was a systematic effort,
4 that was a caucus-wide effort, to elongate the local
5 calendars for days to essentially force consideration of
6 House bills -- certain House bills on the calendar off.
7 Usually the local calendar is handled within one day,
8 and four to five hours at a time.  Right?  So a local
9 calendar usually has about 200 bills on it, and you read
10 through them real quickly, and then you pass them a
11 third time.  So the second and third reading are on top
12 of each other, and in between you have a legislative
13 day.  It's kind of hyper technical.  But usually it
14 takes about two to three hours.
15          This time we forced -- we -- the members
16 forced the authors of the bill to explain their bill for
17 a full ten minutes, and then there was ten minutes of
18 questioning on each bill.  So what usually would have
19 taken four hours, took I think five or six days,
20 essentially forcing the legislative calendar out.
21     Q.  And when you say "forcing the legislative
22 calendar out," does that mean forcing the bills that
23 were south of -- I believe in this instance it was
24 SB 362?
25     A.  Yes, I think that's correct.  Yes, sir.

148

1     Q.  So when you say forced the calendar out, does
2 that mean they forced all those bills that were south of
3 SB 362 on the calendar out?
4     A.  So there was a legislative deadline to get
5 Senate bills out, so the final consideration of Senate
6 bills.  I think it was -- it's usually the middle of
7 May, May 17th or May 20th, something like that.  And the
8 last day had on the local calendar was the day before,
9 something like that -- or a couple days before.  So over
10 the weekend, all -- the local calendar never finished in
11 time to consider these bills.  And then the last day, I
12 think it was a Sunday if I recall correctly, there
13 was -- there were all these calendars that had kind of
14 jammed up, and so there was about -- I think there was
15 about 110 substantive bills between the bill that was
16 first up and 362.  I think that's right.
17          Anyways, lots of bills to add that day
18 because of the tactic.  It was unfortunate.
19     Q.  So lots of bills died that day because of the
20 tactic employed by MALC in that instance?
21     A.  Many MALC members.  I mean, MALC is --
22     Q.  Sorry.
23     A.  Yeah.
24     Q.  Were any of those bills that died because of
25 the chubbing tactic employed by MALC members, were those

149

1 bills authored by MALC members?
2     A.  I think some of them were.  I'm sure that
3 my -- I'm trying to remember if my boss had one on the
4 calendar in 2009.  I think we did.  We usually get
5 considered pretty late in the session.  If we're lucky
6 to get calendar, it's a pretty late calendar.  I'm
7 trying to think what we had there.  It's probably one of
8 our VIA bills, I think.  I forget.  I think we had one
9 on the calendar.
10     Q.  One of your what bills?
11     A.  VIA bills.  San Antonio VIA is the bus place
12 for San Antonio.  I could be wrong about the actual
13 bill, but I think we had a bill on the calendar, and I
14 think it died because of it, which is how it goes.
15     Q.  Was the chubbing tactic employed on that day
16 during the, quote, unquote, chubathon, was that agreed
17 to by all the members of MALC?
18     A.  I don't know.  I think it was probably agreed
19 to by most members.  Because all that would have to have
20 happened in the chubathon for the record is to have five
21 members talk off every bill.
22          In the local calendar, you can either
23 talk off a bill by speaking for more than ten minutes,
24 or if you have four friends who can go to a bill and
25 say, "We want to talk off each of these bills," that's

154

1  days of consideration on the local calendar.
2      Q.  So would you say that it -- in executing the
3  chubathon, that MALC employed a tactic in a way that
4  diverted from normal legislative procedures?
5          MS. RUDD:  Objection; mischaracterizes
6  the testimony.
7      A.  I don't think so.  I think that it was a
8  unique tactical choice.  It was certainly -- I think
9  everything that's unique is somewhat a deviation from
10 normalcy.  So in that sense, partially.  But chubbing
11 itself had existed a long time before that for the
12 record.  Right?  It just hadn't been used to this degree
13 and on this calendar, so...
14     Q.  (By Mr. Tatum)  Has MALC or members of MALC
15 employed the tactic of chubbing since the chubathon?
16     A.  I think so.  I think chubbing -- again,
17 generally we're talking about.  Right?  In 2013, there
18 was -- towards the end of the debate on when you could
19 get House bills out, I think there was some slowing down
20 generally.  That's what generally happens.  It may have
21 been by MALC members or not.  I can't recall exactly.
22 But chubbing exists for reason.
23         Sometimes you just want to hit the brakes
24 because you're tired.  Sometimes you want to hit the
25 brakes because you want to hit the brakes to prevent a

155

1  bill from passing.
2          I can't recall the specific bill -- or a
3  specific bill from this session that may have been a
4  victim of chubbing.  And sometimes it's just kind of the
5  nature of the calendar itself.  There's just not enough
6  time to consider all the bills on the calendar.
7      Q.  In your legislative experience, have you found
8  that chubbing exists more on less often than an outside
9  the bounds resolution?
10     A.  Outside the bounds resolutions are common for
11 the appropriations bill.  That happens all the time for
12 appropriations.  And then for non-appropriations bills
13 or non-budget related bills, outside the bounds
14 resolutions occur at a much slower rate.  And you can
15 check by work, because it requires a House resolution to
16 do it, and it's just -- I think it requires an HCR or an
17 SCR, depending on what the origin of the bill is.  And I
18 think that those are rarer than you might imagine, maybe
19 20 or 30 -- fewer than that, probably -- per session.
20 And chubbing is probably a one-day event or a one-hour
21 event, so I'm not sure how you would magnify -- or how
22 you would make that determination.
23         Why I say that the voter ID bill was out
24 of bounds and why that's a deviation from normal
25 procedure is that most out of bounds resolutions are for

156

1  either non-substantive changes or for the budget to
2  adjust a category.  We want to give 5 million to a
3  budget category, not 4 million.  Right?
4          And there's a small category for
5  substantive changes, but this was an entirely new
6  provision in the bill, a creation of a whole new ID done
7  by an outside the bounds resolution in a conference
8  committee.
9          So something horribly substantive that,
10 you know, was responsive to both my bosses and other
11 MALC member concerns was decided outside of their
12 ability to influence that dialogue by the members of the
13 conference committee.  And they were -- and you don't
14 get a lot of notice on an outside the bounds resolution.
15 You wake up in the morning, and there's a resolution on
16 your table saying, "You have to agree to this," and you
17 can't amend it.  Right?
18         So it's one of those things where a
19 legitimate concern was taken, and then a smaller group
20 of legislators made a decision, and there was little
21 notice and little ability to change the outcome, so...
22     Q.  Is MALC able to identify a constituent of a
23 MALC member who has suffered harm at any point because
24 of SB 14?
25     A.  And this may be where I differ from my

157

1  attorney in the sense that on our discussion of harm --
2  because I believe that every one of our constituents
3  have been harmed by the bill.  And I don't mean this --
4  I really don't mean this esoterically.  It sounds like
5  I'm just preaching platitudes.  I'm really not trying to
6  do that.
7          I think every person in Texas is harmed
8  by the bill.  When Texas passes laws that are focused on
9  what I believe is a disfranchising intent that have a --
10 that were passed with an impermissible purpose, that
11 cheapens what it means to be a Texan.  And I'm saying
12 this as someone who is an adopted Texan.  I'm not even
13 from here, really.  But this is a great state, and it is
14 made a worse place because of bills like this, in my
15 opinion.
16         And so the honest answer to your question
17 is that I think everyone has been harmed by it; everyone
18 in this room, everyone in this state.
19     Q.  Can you elaborate on what you mean by
20 "impermissible purpose"?
21     A.  I think that -- impermissible generally means
22 an unlawful purpose.  In this instance, I mean a racist
23 purpose.  I think that this bill is -- it seeks to
24 abridge the voting rights of minorities on account of
25 their race.  That's what I mean.

Martin Golando - 6/24/2014

158

```
1              And I think that it also unequally
2     enforces the laws.  I think that there are several
3     provisions like that in this bill that do that.  So I
4     think that those are two impermissible motives on behalf
5     of policy and decision makers that enacted this bill.
6     Q.   Does MALC believe that anyone who supports
7     SB 14 is a racist?
8     A.   No, unless they're a racist and they support
9     it.  I mean, I'm certain that racists do support it, to
10    be clear.  I'm certain that there are prejudiced and
11    bigoted people who do support it, but I don't think it
12    makes you a racist just to support it.
13    Q.   What makes you certain that racists do support
14    SB 14?
15             MS. RUDD:  Objection; mischaracterizes
16    testimony.
17    A.   I'm not sure if this has been produced or not,
18    but there's been some -- I've gotten some emails from
19    people who support the bill and who have taken what I
20    think to be a racist tone with me.  And maybe it was
21    some emails that predate the litigation.  I have some
22    knowledge or awareness -- I have some memory of
23    correspondence with people who I think used racist terms
24    in their emails with me.
25             I've had conversations with people who I
```

159

```
1     thought -- that I thought were racist conversations who
2     told me they would support the bill.  But I think you're
3     asking me for something deeper than that, whether I
4     think that racists support the bill.
5     Q.   (By Mr. Tatum)  Well, let me stick to what you
6     just testified to.
7     A.   Sure.
8     Q.   You mentioned conversations with people who
9     you thought were racist who told you they support the
10    bill.
11    A.   Yes.
12    Q.   I'm reading that from the transcript here.  Do
13    you recall who those people were?
14    A.   There's a -- well, I can't recall his name.
15    I'm sorry.  There's a constituent who calls Trey's
16    office when I was working there fairly frequently, about
17    once a quarter, and we have very long conversations
18    about ethnicity and identity.  And he's very much
19    against hyphenation Americans, is what he calls them --
20    so Mexican-Americans, Italian-Americans -- and I always
21    try to defend multiculturalism.
22             He's never said a racist epithet to me,
23    but it's been my experience that people who espouse the
24    kind of rhetoric that he espouses probably have a racist
25    belief.  And he uses words like "takers" or "Latino
```

160

```
1     immigration is an infectious disease."  That's racist to
2     me.
3              And while he's a very nice man to me and
4     we have very deep conversations about this issue, I have
5     to tell you that I think that's a racist purpose -- or
6     that's a racist rhetoric.  And when -- it's not
7     surprising to me that he supports this bill, so...
8     Q.   Have you ever personally encountered rhetoric
9     like that from a legislator who supported SB 14?
10    A.   Personally, no.  But during the 2007 session,
11    I think Betty Brown pulled Ramey Ko -- and this is well
12    known; I'm sure you know it -- Ramey Ko aside and said,
13    "You guys should consider changing your names," meaning
14    Asian-Americans, "so people can understand you better."
15             And I think it's a well-intentioned thing
16    to say.  I don't know Betty Brown very well.  She and my
17    boss had a falling out about something personal, and I
18    couldn't say that I thought very highly of her.  But
19    when she said that, that took me aback that someone
20    would say that, that someone should change their name.
21             And it actually dovetails with the
22    Italian-American experience.  I'm Italian-American.  My
23    family came over here on a boat, and I think that we
24    were the Anglos' first Latinos, and my name was changed
25    when I got here.  Anyway, my point is, is that the
```

161

```
1     rhetoric used during that time period was rough.  And
2     during 2011, it was -- the rhetoric was pretty bad, too.
3              And it wasn't just from House members.
4     There were -- Rebecca Forest, I think, has a group
5     called Women Against the Wall, or something like that,
6     and they had a meeting at the Capitol -- on the Capitol
7     during the session, and she said the reason we can't
8     pass immigration reform is because there were too many
9     Latino legislators.  And I don't know what that means,
10    but it certainly sounds racial to me.
11             Anyway, to the degree that -- I know you
12    can't have a group on the Capitol stage without someone
13    greasing the skids for you with House administration, so
14    some member helped that person out.  And I don't know if
15    they support that person or not, but I've got to tell
16    you that that's change to me, that that happened.
17             And there were other things, too.  I
18    mean, the registering bill, I think, was a racist bill.
19    There were immigration bills that were considered that I
20    thought were racist in nature.  So it was kind of a part
21    and parcel throughout the whole session, kind of a hyper
22    racially charged session in 2011, so...
23    Q.   So in your opinion, SB 14 was not the only
24    bill passed during 2011 that may have had racial or
25    discriminatory intent?
```

Martin Golando - 6/24/2014

162

1    A.  Sadly, no.  I think that, obviously, the 2011
2  registering plan is a hyper discriminatory bill and was
3  intended to be discriminatory.
4    Q.  Mr. Golando, do you know if MALC has produced
5  any and all documents responsive to the various requests
6  for production that defendants have submitted?
7    A.  To my knowledge.  If I find more, I will
8  certainly make a more fulsome -- and it's certainly not
9  my intent to withhold anything.  We have nothing to
10  hide.  I think we've been particularly above board.
11  I've given you everything that's in MALC's control,
12  that's for sure.
13        There may be -- I know that there have
14  been a lot of third-party subpoenas issued, which I,
15  frankly, disagree with tactically, but -- in fact, we
16  received one and will be complying with that as soon as
17  I get all my documents in a row, so...
18    Q.  Why do you disagree with those subpoenas
19  tactically?
20    A.  I think --
21        MS. RUDD:  Okay.  Wait.  I don't know if
22  you're disagreeing with them as an attorney for MALC.  I
23  just don't want you to reveal any of your mental
24  impressions as an attorney.
25        THE WITNESS:  Fair enough.

163

1    A.  This is not from my attorney -- this is from
2  my legislative background.  It's uncommon for
3  legislators to get subpoenaed.  And I can't imagine that
4  Jay Dyer would want you to use a third-party subpoena
5  company to subpoena legislators, and that when members
6  look at the name of the subpoena deliverer and it was
7  associated with debt collection, it was a surprise to my
8  members that they were getting subpoenaed, generally,
9  and they were subpoenaed in this way, and so -- that's
10  why I disagree with it.
11    Q.  (By Mr. Tatum)  Okay.  Mr. Golando, if MALC is
12  successful in this litigation, do you intend to seek
13  attorney's fees for your services?
14    A.  For mine?
15    Q.  Yes.
16    A.  Like I said before, my litigation part of this
17  has been minimal.  It's been limited to just kind of
18  doing -- getting documents together.  I routinely
19  collect my hours, just because I try to monitor my own
20  time, but I do not intend to seek fees in this
21  litigation.  In this one.
22    Q.  Mr. Golando, I don't have any more questions
23  for you right now at this point.
24        Before I pass the witness, is there
25  anything you'd like to clarify with regard to any of

164

1  your answers, or is there anything you'd like to add
2  with regard to any of the answers you've given here
3  today?
4    A.  I meant to look up the name of the Florida
5  State Representative who is friends with my boss and
6  Representative Anchia.
7    Q.  Oh, that's right.
8    A.  I meant to do that.  I think it's Juan Zapata,
9  I think, but I'll have to -- I'm not certain.  He's a
10  nice guy.
11    Q.  You think that that might be the Florida
12  legislator --
13    A.  Correct, who is friends with Representative
14  Anchia and my boss.  And I'm not -- again, I am not
15  clear if they've ever discussed -- I imagine that they
16  haven't, but you asked me about inter-caucus
17  communications, so...
18    Q.  Right.
19    A.  I think that everything else will have to wait
20  until I review the transcript.
21        MR. TATUM:  I pass the witness.
22        MS. RUDD:  We have no questions at this
23  time.
24        Angela, do you have any questions for
25  Marty?

165

1        MS. MILLER:  No questions from the United
2  States.
3        MS. RUDD:  All right.
4        MR. TATUM:  Okay.
5        (Deposition concluded at 2:09 p.m.)
6        (Signature requested.)
7            * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                 SOUTHERN DISTRICT OF TEXAS
                  CORPUS CHRISTI DIVISION


                                )
MARC VEASEY, JANE               ) CIVIL ACTION
HAMILTON,  SERGIO DELEON,       )
FLOYD J. CARRIER, ANNA          ) NO. 2:13-CV-193 (NGR)
BURNS, MICHAEL MONTEZ,          )  [Lead case]
PENNY POPE, OSCAR ORTIZ,        )
KOBY OZIAS, JOHN                )
MELLOR-CRUMLEY, PEGGY           )
HERMAN, EVELYN BRICKNER,        )
GORDON BENJAMIN, KEN            )
GANDY, LEAGUE OF UNITED         )
LATIN AMERICAN CITIZENS         )
(LULAC), AND DALLAS             )
COUNTY, TEXAS,                  )
                                )
Plaintiffs,                     )
                                )
V.                              )
                                )
RICK PERRY, GOVERNOR OF         )
TEXAS AND JOHN STEEN,           )
TEXAS SECRETARY OF STATE,       )
                                )
Defendants.                     )
```

Blake Green - 6/18/2014



**Page 2**

```
1   UNITED STATES OF AMERICA,  )
                               ) CIVIL ACTION
2   Plaintiffs,                )
                               ) NO. 2:13-CV-263 (NGR)
3   TEXAS LEAGUE OF YOUNG      ) [Consolidated case]
    VOTERS EDUCATION FUND,     )
4   IMANI CLARK, AURICA        )
    WASHINGTON, CRYSTAL        )
5   OWENS, AND MICHELLE        )
    BESSIAKE,                  )
6                              )
    Plaintiff-Intervenors,     )
7                              )
    TEXAS ASSOCIATION OF       )
8   HISPANIC COUNTY JUDGES     )
    AND COUNTY COMMISSIONERS,  )
9   HIDALGO COUNTY, AND MARIA  )
    LONGORIA BENAVIDES,        )
10  Plaintiff-Intervenors,     )
11  V.                         )
12  STATE OF TEXAS, JOHN       )
13  STEEN, IN HIS OFFICIAL     )
    CAPACITY AS TEXAS          )
14  SECRETARY OF STATE; AND    )
    STEVE McCRAW, IN HIS       )
15  OFFICIAL CAPACITY AS       )
    DIRECTOR OF THE TEXAS      )
16  DEPARTMENT OF PUBLIC       )
    SAFETY,                    )
17                             )
    Defendants.                )
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   TEXAS STATE CONFERENCE OF  )
    NAACP BRANCHES; AND THE    ) CIVIL ACTION
2   MEXICAN AMERICAN           )
    LEGISLATIVE CAUCUS OF THE  ) NO. 2:13-CV-291 (NGR)
3   TEXAS HOUSE OF             ) [Consolidated case]
    REPRESENTATIVES,           )
4                              )
    Plaintiffs,                )
5                              )
    V.                         )
6                              )
    JOHN STEEN, IN HIS         )
7   OFFICIAL CAPACITY AS       )
    TEXAS SECRETARY OF STATE;  )
8   AND STEVE McCRAW, IN HIS   )
    OFFICIAL CAPACITY AS       )
9   DIRECTOR OF THE TEXAS      )
    DEPARTMENT OF PUBLIC       )
10  SAFETY,                    )
11                             )
    Defendants.                )
12  BELINDA ORTIZ, LENARD      ) CIVIL ACTION
    TAYLOR, EULALIO MENDEZ     )
13  JR., LIONEL ESTRADA;       ) NO. 2:13-CV-348 (NGR)
    ESTELA GARCIA ESPINOSA,    ) [Consolidated case]
14  ROXANNE HERNANDEZ, LYDIA   )
    LARA, MARGARITO MARTINEZ   )
15  LARA, MAXIMINA MARTINEZ    )
    LARA, AND LA UNION DEL     )
16  PUEBLO ENTERO, INC.        )
17  Plaintiffs,                )
18  V.                         )
19  JOHN STEEN, IN HIS         )
    OFFICIAL CAPACITY AS       )
20  TEXAS SECRETARY OF STATE;  )
    AND STEVE McCRAW, IN HIS   )
21  OFFICIAL CAPACITY AS       )
    DIRECTOR OF THE TEXAS      )
22  DEPARTMENT OF PUBLIC       )
    SAFETY                     )
23                             )
    Defendants.                )
24
25
```

**Page 4**

```
1   ********************************************
2         ORAL REALTIME DEPOSITION OF
3              BLAKE EARL GREEN
4                JUNE 18, 2014
5   ********************************************
6        ORAL REALTIME DEPOSITION OF BLAKE EARL GREEN,
7   produced as a witness at the instance of the
8   DEFENDANTS, and duly sworn, was taken in the
9   above-styled and numbered cause on the 18th of May,
10  2014, from 10:03 a.m. to 3:46 p.m., before Tamara
11  Vinson, CSR in and for the State of Texas, reported by
12  machine shorthand, at the Texas Southern University,
13  3100 Cleburne Street, Dean's Conference Room, Houston,
14  Texas, 77004, pursuant to the Federal Rules of Civil
15  Procedure and the provisions stated on the record or
16  attached hereto.
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1        A P P E A R A N C E S
2   FOR THE PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG
3   VOTERS EDUCATION FUND, IMANI CLARK, AURICA WASHINGTON,
    CRYSTAL OWENS, AND MICHELLE BESSIAKE:
4   MS. DANIELLE Y. CONLEY
5   WilmerHale
    1875 Pennsylvania Avenue, NW
6   Washington, DC  20006
    202.663.6006 Fax 202.663.6363
7   danielle.conley@wilmerhale.com
    - and -
8   MR. RYAN P. HAYGOOD
9   MS. NATASHA M. KORGAONKAR
    NAACP
10  40 Rector Street, 5th Floor
    New York, New York  10006-1738
11  212.965.7712 Fax 212.226.7592
    rhaygood@naacpldf.org
12  nkorgaonkar@naacpldf.org
13
14  FOR THE PLAINTIFF UNITED STATES OF AMERICA
15  MS. ANGELA J. MILLER
    (Appearing via speaker phone)
16  Trial Attorney
    Voting Section
17  Civil Rights Division
    U.S. Department of Justice
18  202.514.2919 Fax 202.307.3961
    angela.miller5@usdoj.gov
19
20  FOR THE DEFENDANTS THE STATE OF TEXAS, RICK PERRY,
    JOHN STEEN AND STEVEN McCRAW:
21
22  MR. STEPHEN L. TATUM, JR.
    Assistant Attorney General
23  Opinion Committee
    P.O. Box 12548
24  Austin, Texas  78711-2548
    512.463.2110 Fax 512.472.6538
25  stephen.tatum@texasattorneygeneral.gov
```

Blake Green - 6/18/2014

22

1   Q.   (By Mr. Tatum)  If you would, please, take a
2   minute to skim over it.
3   A.   Uh-huh.
4   Q.   Mr. Green, do you recognize this document?
5   A.   Yes.
6   Q.   And what is this document?
7   A.   It is a deposition notice.
8   Q.   And you stated a minute ago that you reviewed
9   this notice in preparation for this deposition.
10  Correct?
11  A.   Correct.
12  Q.   If you would please turn to Page 5.
13  A.   (Complying.)
14  Q.   Are you at Page 5?
15  A.   Yes.
16  Q.   Okay.  At the bottom of that page there's a
17  heading that says Matters, and following that heading
18  there is a series of numbered paragraphs from 1 to 31.
19  Is that correct?
20  A.   That is correct.
21  Q.   Okay.  Are you aware that you've been
22  designated by the Texas League of Young Voters to
23  testify and give binding answers on its behalf
24  regarding the topics contained in these paragraphs?
25  A.   Yes.

23

1        MS. KORGAONKAR:  I'd just like to note
2   for the record that we filed objections to this
3   notice.
4        MR. TATUM:  Uh-huh.
5        MS. KORGAONKAR:  And I'm sure that
6   counsel has those objections.  I'd also like to note
7   that topics 3 through 6 pertain to the identity of
8   members and that that's been resolved by stipulation
9   through counsel.
10  Q.   (By Mr. Tatum)  And, Mr. Green, what she's
11  referring to is a statement made that the Texas League
12  of Young Voters is not a membership organization and,
13  therefore, does not have any kind of membership list.
14  Is that your understanding?
15  A.   It is.
16  Q.   Is that a correct statement?
17  A.   Yes.
18  Q.   Okay.
19       MS. KORGAONKAR:  And sorry.  Just for
20  the record, also, topic 24 is affected by that
21  stipulation, as well.
22       MR. TATUM:  Okay.
23       MS. KORGAONKAR:  It's 3 through 6 and
24  24.
25       MR. TATUM:  All right.

24

1   Q.   (By Mr. Tatum)  Just to confirm one more time
2   just so we have it on the record, Mr. Green, is it
3   your understanding that you are not prepared to
4   testify to topics 3 through 6 and topic 24 because the
5   Texas League is not a membership organization and does
6   not, therefore, contain any lists of its members?
7   A.   Correct.
8   Q.   Okay.  Mr. Green, other than those topics
9   that we just discussed, are you aware that you've been
10  designated by the Texas League to give truthful and
11  binding answers on its behalf regarding all of the
12  other topics contained in these paragraphs?
13  A.   That's correct.
14  Q.   Okay.  And are you prepared to testify about
15  those topics?
16  A.   Yes.
17  Q.   Okay.  And you kind of already said this, but
18  are there any other topics on this list that you're
19  not prepared to testify to?
20  A.   No.
21  Q.   Okay.  I want to ask you some questions, some
22  general questions about the Texas League.  How long
23  has it be in existence?
24  A.   Since 2010.
25  Q.   And just generally, how was it formed?

25

1   A.   How was it formed?
2   Q.   Yeah.  How was -- who -- who initiated the
3   process that brought the Texas League into existence?
4   Who was involved in that process?
5   A.   It was our current state director and the
6   international organization.
7   Q.   So you said it was in 2010 is when the Texas
8   League was formed?
9   A.   Correct.
10  Q.   Okay.  And it is an affiliate of the national
11  organization?
12  A.   That's correct.
13  Q.   Okay.
14       (Exhibit No. 2 marked.)
15  Q.   Mr. Green, I'm handing you what's been marked
16  as Exhibit 2.
17  A.   Uh-huh.
18  Q.   I represent to you that this document has
19  been produced to Defendants in this litigation.  Do
20  you recognize this document?
21  A.   I do.
22  Q.   And what is this document?
23  A.   It is our mission and purpose of the
24  organization.
25  Q.   So this is the stated mission of the Texas

Blake Green - 6/18/2014

26

1 League of Young Voters.  Correct?
2    A.   That's correct.
3    Q.   Is this mission started by the national
4 organization?
5    A.   Correct.
6    Q.   Okay.  Does the Texas League operate for
7 profit?
8    A.   For profit, no.
9    Q.   So it is a nonprofit organization?
10    A.   Correct.
11    Q.   And how is it -- where does it get its
12 funding?
13    A.   From foundations, as well as from individual
14 donors.
15    Q.   What kind of foundations provide funding to
16 the Texas League?
17         MS. KORGAONKAR:  Objection as to
18 relevance.
19    A.   The kind of foundations, those that are --
20 those that are -- who are socially responsible and who
21 support the work of increasing civic participation
22 here in this country.
23    Q.   (By Mr. Tatum)  Can you give examples of some
24 of the organizations that provide funding to the Texas
25 League?

27

1         MS. KORGAONKAR:  Same objection, but you
2 can answer.
3    A.   In terms of names or. . .
4    Q.   (By Mr. Tatum)  Yes.
5    A.   We have the Ford Foundation, Open Society
6 Institute -- well, Open Society Foundation.  And those
7 are the pretty much the extent.
8    Q.   You said the other source of funding is
9 individual donations.  Correct?
10    A.   Correct.
11    Q.   Are there any other sources of founding that
12 the Texas League receives?
13    A.   Other sources of funding besides -- besides
14 -- we do receive some allocation from our national
15 organization.
16    Q.   Is that funding from the national
17 organization, is that received on an annual basis?
18         MS. KORGAONKAR:  Objection, again, as to
19 relevance.  And I think that this whole line is
20 actually beyond the scope of the notice, but you can
21 answer this question.
22    A.   Yes.
23    Q.   (By Mr. Tatum)  Do y'all conduct any kind of
24 fundraising activities?
25    A.   Fundraising activities?  To a certain extent,

28

1 yes, uh-huh.
2    Q.   And what kinds of activities are those?
3    A.   Making -- really just making calls to our --
4 to donor bases.
5    Q.   Within the Texas League, who decides -- and
6 you kind of touched on this earlier -- who decides how
7 its funds are used?
8         MS. KORGAONKAR:  Objection.  This is
9 beyond the scope of the notice, but you can answer.
10    A.   It's pretty much a joint -- a joint -- a
11 joint decision between myself and the state director.
12    Q.   (By Mr. Tatum)  It's a joint decision --
13         (Reporter interruption.)
14    Q.   (By Mr. Tatum)  And I'll try to slow down, as
15 well.  Now, we've already talked about how the Texas
16 League is not a membership organization.  Who does the
17 Texas League serve?
18    A.   We serve a constituent -- a constituent base
19 of people who has volunteered with us, either took an
20 action or signed a -- signed a pledge -- a pledge to
21 vote card.
22    Q.   So just to kind of repeat what you said, is
23 it correct -- so you have constituents.  Is that
24 correct?
25    A.   Correct.

29

1    Q.   And one becomes a constituent by -- or can
2 you explain again how one becomes a constituent of the
3 Texas League?
4    A.   Right.  One becomes a constituent by either,
5 you know, volunteering with our organization, you
6 know, attending an event of some sort, you know,
7 signing a pledge card after, you know, registering
8 them to vote or if they, in particular, took a
9 specific action with our organization.
10    Q.   And what kind of specific action are you
11 talking about or can you give an example of a specific
12 action?
13    A.   Right.  They may have signed a petition of
14 some sort.
15    Q.   Okay.  Does the Texas League maintain any
16 kind of list of constituents that you just described?
17    A.   We do, uh-huh.
18    Q.   Does the Texas League actively recruit new
19 constituents?
20         MS. KORGAONKAR:  Objection for
21 vagueness.  I don't know what you mean by "recruit."
22         THE WITNESS:  Right.
23    Q.   (By Mr. Tatum)  Does the Texas League
24 actively try to accumulate new constituents?
25    A.   Our main target is people between the ages of

34

1        MS. KORGAONKAR:  Same objection.
2    A.  We're actually representing, you know, young
3 people who are most affected by this law.
4    Q.  (By Mr. Tatum)  Are you aware that the United
5 States of America is a party to this lawsuit?
6    A.  United States of America, in terms?
7    Q.  The United States of American represented by
8 the Department of Justice, are you aware that they are
9 a party to this lawsuit?
10    A.  I am aware.
11    Q.  Okay.  Does the Texas League contend that the
12 interests of the Texas League are not adequately
13 represented by the United States in this lawsuit?
14        MS. KORGAONKAR:  Objection.  Calls for a
15 legal conclusion.  You can answer the question.
16    A.  I would say the Texas League could provide
17 more clarity in this particular space in terms of how
18 young people are affected.  And with that conclusion,
19 that information could be beneficial to the Department
20 of Justice.
21    Q.  (By Mr. Tatum)  So is it the Texas League's
22 objective in this lawsuit to provide clarity regarding
23 the issues that are central to this lawsuit?
24    A.  Well, we can provide a more so "on the
25 ground" representation on how this law has impacted

35

1 certain populations that this law affect.
2    Q.  And does the Texas League feel that it can
3 provide that representation to a better degree than
4 the United States of America represented by the
5 Department of Justice?
6    A.  I believe so.
7    Q.  And why do you believe so?
8    A.  Because we're on the ground doing the work
9 and we -- we have firsthand account on how this law,
10 you know, directly impacts people here in Texas.
11    Q.  How was the decision made to join this
12 lawsuit by the Texas League?
13        MS. KORGAONKAR:  Mr. Green, I'll just
14 caution you here that you can answer the question, but
15 not reveal the contents of any conversations that you
16 may have had with attorneys.
17        THE WITNESS:  Uh-huh.
18        MS. KORGAONKAR:  You can answer the
19 question.
20    A.  How do we make this decision?
21    Q.  (By Mr. Tatum)  Just generally describe the
22 process that led to the Texas League intervening in
23 this lawsuit without divulging any privileged
24 information.
25    A.  Our state director met with counsel.

36

1        MS. KORGAONKAR:  And I'll just caution
2 you --
3        THE WITNESS:  Uh-huh.
4        MS. KORGAONKAR:  -- that you can say
5 that, but not reveal any of the contents of
6 conversations.
7        THE WITNESS:  Uh-huh.
8    Q.  (By Mr. Tatum)  Mr. Green, I'll ask some more
9 direct questions.  So you mentioned that the state
10 director, Ms. Sanders, met with counsel.  Correct?
11    A.  Correct, uh-huh.
12    Q.  Were you present at that meeting?
13    A.  Were I present?  No.
14    Q.  Was anyone else present at that meeting?
15    A.  I don't recall.
16    Q.  Do you know if the Texas League met with any
17 other organizations to discuss the possibility of
18 joining this lawsuit?
19    A.  I don't know.  I don't think so.
20    Q.  Do you know if the Texas League met with any
21 other parties to this lawsuit to discuss the
22 possibility of joining this lawsuit?
23    A.  Parties, no.
24    Q.  Was there any kind of vote taken to determine
25 whether the Texas League would join this lawsuit?

37

1    A.  No.
2    Q.  So would you say it was a unilateral decision
3 by the state director to join this lawsuit?
4        MS. KORGAONKAR:  Objection.  That
5 mischaracterizes his testimony.
6    A.  Right.  I mean, we -- I mean, there were some
7 conversations with our national office and that's
8 pretty much it, uh-huh.
9    Q.  (By Mr. Tatum)  So who made the ultimate
10 decision for the Texas League to join in lawsuit?
11    A.  The ultimate decision was our state director.
12    Q.  Okay.  I want to go back to talking a little
13 bit about the activities of the Texas League, just
14 general activities.
15    A.  Uh-huh.
16    Q.  What -- could you describe the primary
17 general activities that the Texas League conducts?
18    A.  Sure.  We do voter registration, we do voter
19 education, we do what we call Get Out the Vote, and
20 also leadership training.
21    Q.  This just occurred to me that these might be
22 listed on the mission statement that I gave to you
23 previously.
24    A.  Uh-huh.
25    Q.  I believe on that document, if you have it --

38

1  do you have it in front of you?
2    A.  Uh-huh.
3    Q.  It says that our organizing and programming
4  model can be categorized in the following key areas:
5  Voter registration, Get Out the Vote, which you
6  mentioned, Voter Education and Issue Advocacy,
7  Election Protection, and Leadership Development.
8        Are those all activities of the Texas League?
9    A.  Correct.
10   Q.  Okay.  And in the course of carrying out
11  these activities, how does the Texas League
12  communicate with its constituents to let them know
13  about the activities or to organize them?
14   A.  I mean, we do it in a variety of ways.  One
15  of them is through -- you know -- through e-mails,
16  through text messages, social media, you know,
17  visiting campuses.
18   Q.  And how many different campuses do y'all
19  visit?
20   A.  I mean, I don't recall the number, but I
21  know, statewide, it's -- it's over -- it's over 25
22  different -- different campuses.
23   Q.  Throughout the state?
24   A.  Throughout the state, uh-huh.
25   Q.  What kinds of resources are devoted to these

39

1  activities?
2    A.  What do you mean, "kinds of resources"?
3    Q.  What kind of monetary financial resources are
4  devoted to these activities?
5    A.  I don't think I under -- I clearly don't
6  understand what you're -- what you're asking.
7    Q.  Do you have to pay -- like, what do you have
8  to pay for to carry out these activities?  Do you have
9  to pay for fliers?  Do you have to pay people's
10  salaries, pay volunteers, that kind of thing?
11   A.  Right.  We have -- we have -- we pay for
12  salaries, we pay for the cost to put on the program,
13  gas, print collateral, advertising.
14   Q.  Does the Texas League conduct any of these
15  activities in connection with any other organizations
16  in the State of Texas?
17   A.  What do you mean?  I don't understand the
18  question.  What do you mean, "in connection"?
19   Q.  Do you conduct these activities with any
20  other organization?
21   A.  We do collaborations, yes.
22   Q.  With what organizations?
23   A.  Some include the Texas Organizing Project,
24  Mi Familia Vota, Rock the Vote.  Pretty much those
25  that serve our -- our population, as well.  Well,

40

1  Texas Freedom Network.  Those who are -- who have
2  youth components that we work with, uh-huh.
3    Q.  Do y'all do any work with the Texas NAACP?
4    A.  We do -- we do some work, uh-huh.
5    Q.  And what kind of work is that?
6    A.  Pretty much around election protection.
7    Q.  And what exactly does election protection
8  entail?
9    A.  Well, election protection, I know they have a
10  1-800 number that people if people at the polls have,
11  you know, a problem or issue, they can call that
12  number.  And the NAACP will have people on the other
13  end that receives those -- or they have attorneys who
14  receive those -- that information and, I guess, try to
15  get those issues resolved.  And the only thing we do,
16  we just provide that number as a resource to our
17  constituent base if they were to have any problems at
18  the polls.
19   Q.  So what -- you kind of described what the
20  Texas NAACP does, in terms of election protection.
21  What does the Texas League of Young Voters do in
22  regards to election protection?
23   A.  Right.  We just refer them to that number.
24   Q.  You just refer them to that number?
25   A.  Uh-huh.

41

1    Q.  That's the extent of the Texas League
2  activities with regard to election protection?
3    A.  I mean, we do poll monitoring.
4    Q.  Poll monitoring?
5    A.  Uh-huh.
6    Q.  And what does that entail?
7    A.  Poll monitoring is, you know, if someone have
8  a problem at the polls, they will come to us.  And,
9  you know, we'll listen to what their issue is and, you
10  know, refer them to an agency or organization that
11  could -- that could assist with them.
12   Q.  Are there any other activities related to
13  election protection that the Texas League engages in?
14   A.  Being a voice for them and, you know, in
15  similar cases like this, you know, legal challenges,
16  but those are pretty much to the extent.
17   Q.  Does the Texas League engage in any kind of
18  policy or advocacy work with regard to legislation
19  that's being proposed during any session of the
20  legislature?
21   A.  Yes.
22   Q.  And what kind of work do they do in that
23  regard?
24   A.  Anything particularly that deals with youth
25  voting or voting rights.

Blake Green - 6/18/2014

42

1   Q.   Does the Texas League provide live or written
2   testimony during the consideration of legislation that
3   affects youth voting?
4   A.   Yes, uh-huh.
5   Q.   And who provides that testimony?
6   A.   It's generally our state director.
7   Q.   Have you ever provided such testimony?
8   A.   No.
9   Q.   Do you have any experience at the
10  legislature?
11  A.   (No verbal response.)
12  Q.   Let me clarify that.  Have you ever worked at
13  the legislature?
14  A.   I have.
15  Q.   And when was that?
16  A.   It was back in 2006, I believe.
17  Q.   So this was after your grad degree, but
18  before you joined the Texas League?
19  A.   Correct.
20  Q.   And who did you work for?
21  A.   I worked for a member of the Texas House of
22  Representatives.
23  Q.   And what member was that?
24  A.   Hubert Vo.
25  Q.   I'm sorry?

43

1   A.   Hubert, Hubert Vo.  Last name V-O.
2   Q.   Hubert Vo?
3   A.   Hubert Vo, uh-huh.
4   Q.   And he was a state representative?
5   A.   He was.
6   Q.   And how long did you work for him?
7   A.   It was an internship, so I would say -- to
8   the extent that I can recall, I would say about six
9   months.  About six months to a year.
10  Q.   And that was in 2006?
11  A.   As I can recall, yes.
12  Q.   Did that period of time that you were an
13  intern cover the 2007 legislature?
14  A.   No, I don't think so.  I think it was the
15  interim, uh-huh.
16  Q.   So you were talking about the activities that
17  the Texas League engages in with regard to legislation
18  that might affect its constituency.  You talked about
19  testimony given during the legislature.  Is there
20  anything else that the Texas League does in connection
21  with legislation that affects its constituency?
22  A.   No.  That's pretty much to the extent.
23  Q.   Do y'all conduct any polls of your own?
24  A.   No.
25  Q.   Do you conduct any studies of your own?

44

1   A.   We don't.
2   Q.   Can you describe the Texas League's
3   activities related to voter ID legislation that's been
4   proposed or enacted since 2004?
5   A.   Sure.  We joined a coalition where we
6   developed the "Got ID" campaign, which was an
7   educational campaign.
8        We visited a number of colleges and
9   universities to educate student voters on the new law,
10  as well as train student leaders.
11       We co-hosted community forums, community
12  events, in addition to host -- well, co-hosting a
13  voter ID clinic -- voter ID clinic.
14       We made phone calls, you know, to our, you
15  know, new and existing constituent base to make sure
16  that they are aware of the new law.
17       We monitored polling locations on election
18  day and during the early voting period to make sure
19  that people were aware before they stood in line that
20  they had to present some form of ID.
21       And on occasions, we did take a couple people
22  to the polls -- I mean, to the -- to obtain their --
23  to obtain an EIC.
24  Q.   So, for the more general activities that you
25  just described, has the Texas League been engaged in

45

1   those kind of activities since 2004 with regard to any
2   voter ID legislation?
3   A.   Did you say before 2004?
4   Q.   No.  Since 2004.
5   A.   Okay.  What's the question again?  I'm sorry.
6   Q.   You talked -- you mentioned a bunch of
7   activities there.  And I think some of the things you
8   mentioned were kind of more specific to SB 14.
9   A.   Uh-huh.
10  Q.   And my question was kind of generally about
11  any voter ID legislation since 2004.  And so you
12  talked about various clinics and workshops.  Is that
13  the kind of thing that the Texas League has done in
14  connection with voter ID legislation going all the way
15  back to 2004?
16       MS. KORGAONKAR:  Objection.  That's
17  compound.  I think if you maybe break it down.  It's a
18  little confusing.
19       MR. TATUM:  Sure.
20  Q.   (By Mr. Tatum)  The activities you just
21  described, are those activities that the Texas League
22  has engaged in with regard to -- generally, with
23  regard to voter ID legislation going back to 2004?
24  A.   No.
25       MS. KORGAONKAR:  Objection.  It's still

Blake Green - 6/18/2014

46

1 compound.
2          MR. TATUM:  Okay.
3          MS. KORGAONKAR:  I just want to make
4 sure.
5          MR. TATUM:  Yeah.
6      Q.   (By Mr. Tatum)  Okay.  Mr. Green, has the
7 Texas League conducted educational campaigns regarding
8 voter ID legislations going back to 2004?
9      A.   Prior to the enactment of SB 14?
10     Q.   Yes.
11     A.   As relates to voter ID, no.
12     Q.   Prior to the enactment of SB 14, did the
13 Texas League visit colleges and universities to
14 educate students on voter ID laws?  Again, prior to SB
15 14 and going back to 2004.
16     A.   Prior, no.
17     Q.   Prior to the enactment of SB 14, did the
18 Texas League host community forums, community events,
19 or voter ID clinics going back to 2004?
20     A.   As it relates to SB 14, no.
21     Q.   Prior to the enactment of SB 14, did the
22 Texas League make phone calls or send e-mail blasts
23 regarding voter ID legislation going back to 2004?
24          MS. KORGAONKAR:  Objection.  That's
25 compound.

47

1      Q.   (By Mr. Tatum)  I'm just reading it right off
2 your previous answer here.  You testified earlier that
3 you made phone calls to universities.
4      A.   Well, we made phone calls to voters, right,
5 not to universities.
6      Q.   Okay.  Did the Texas League, prior to the
7 enactment of SB 14, monitor polling locations on
8 election day and during the early voting period to
9 make sure that people were aware, before they stood in
10 line, that they had to present some form of ID?
11     A.   No.
12     Q.   Okay.  So prior to the enactment of SB 14,
13 what kinds of activities did the Texas League engage
14 in with regard to voter ID legislation?  That's
15 probably the question I should have asked right up
16 front.
17     A.   Before it was actually enacted?
18     Q.   Yes, prior -- between 2004 and the enactment
19 of SB 14, within that window of time, what kind of
20 activities did the Texas League engage in with regard
21 to voter ID legislations being proposed?
22     A.   Okay.  Well, I know that our -- I know we
23 participated in, you know, some coalition calls just
24 to -- coalition calls to just get an update on the
25 status of the bill.  Our state director testified on

48

1 one or two occasions on how the bill would affect
2 student voters.  That's pretty much the extent prior
3 to the enactment of the SB 14 law --
4      Q.   Okay.
5      A.   -- that I'm aware of.
6      Q.   Can you describe the Texas League's
7 activities related to voter ID legislation being
8 proposed or enacted in any other state?
9      A.   Oh, I don't -- I don't recall, no.
10     Q.   You cannot describe any of those activities?
11     A.   In terms of voter ID legislation in any other
12 state?
13     Q.   Yes.
14     A.   I can't recall.  I'm really just focused on
15 here in Texas.
16     Q.   To your knowledge, does the Texas League
17 engage in any kind of activity with regard to voter ID
18 legislation being proposed in any other state?
19     A.   No.
20     Q.   They do not?
21     A.   No.
22     Q.   There are other affiliates at the state level
23 of the League of Young Voters.  Correct?
24     A.   Correct.
25     Q.   Do you know where those affiliates are?

49

1      A.   We have Georgia, we have Wisconsin, and we
2 have Maine.
3      Q.   Does the Texas League regularly interact or
4 collaborate with those other affiliates in any way?
5      A.   Not necessarily.  I mean, we host -- I mean,
6 we do, I guess, affiliate-wide calls just to get
7 updates and share best practices.
8          MS. KORGAONKAR:  Stephen, after this
9 line of questioning, can we take a quick break?
10         MR. TATUM:  Oh, sure.  Let me just make
11 sure we don't have a ways to go and just find a good
12 stopping point.
13         MS. KORGAONKAR:  Of course.
14     Q.   (By Mr. Tatum)  Okay.  Mr. Green, does the
15 Texas League conduct any policy making or
16 advocacy-related work specifically with regard to
17 voter ID legislation?
18     A.   ----
19         MR. TATUM:  Why don't we go ahead and
20 take a break right now?
21         MS. KORGAONKAR:  Sure.
22         MR. TATUM:  Five or ten minutes?
23         MS. KORGAONKAR:  Sounds good.  I have
24 10:57.
25         (Break.)

Blake Green - 6/18/2014

54

1  about the law and how it impacts young people.  You
2  know, once it was enacted, we did do comment letter
3  that we submitted to the Department of Justice citing
4  our reason on why this law is a burden to our
5  constituency base.  And that's pretty much it.
6      Q.   With regard to SB 14, is there anything the
7  Texas League does besides issuing a comment letter?
8      A.   As it relates to SB 14?
9      Q.   Yes.
10      A.   I mean, as I said before, I mean, we've
11  educated -- you know -- our constituents about -- you
12  know -- about the law -- you know -- once it passed on
13  what's required to go to the polls and vote.
14      Q.   And what kinds of resources have been devoted
15  to SB 14-related activities?
16      A.   I mean, a lot of our resources have been
17  shifted to -- you know -- with -- with time and -- you
18  know -- printing -- you know -- print collateral
19  and -- and -- you know -- hope -- you know -- a great
20  deal of stuff to educate our -- you know -- our
21  constituent base about the new law.
22      Q.   Were more resources spent regarding the
23  education of SB 14 than were spent regarding the
24  education of previous voter ID bills?
25      A.   What do you mean, "previous voter ID bills"?

55

1      Q.   Any voter ID legislation that was proposed or
2  enacted prior to SB 14.
3      A.   Uh-huh.
4      Q.   I think you mentioned earlier that the Texas
5  League sought to educate its constituents and members
6  regarding those bills.  Is that correct?
7      A.   Prior -- prior to the passing of SB 14?
8          MS. KORGAONKAR:  I'd just object.  He's
9  testified that the League didn't exist before 2010.
10          THE WITNESS:  Yeah.
11          MR. TATUM:  Okay.  Thank you.
12      Q.   (By Mr. Tatum) So, since 2010, has the Texas
13  League spent any amount of resources on educating its
14  constituents regarding voter ID legislation, other
15  than SB 14?
16      A.   No.
17      Q.   No?
18      A.   No.
19      Q.   So is it correct to say that the resources
20  the Texas League has spent on educating its members
21  regarding SB 14 -- sorry.  Let me retract.
22          Is SB 14 the first voter ID bill that the
23  Texas League has spent resources towards educating its
24  members on?
25      A.   Yes.

56

1      Q.   Okay.
2          (Exhibit No. 4 marked.)
3      Q.   Mr. Green, I'm handing you what's been marked
4  as Exhibit 4.
5      A.   Uh-huh.
6          MR. TATUM:  I'm sorry I didn't bring
7  more.
8          MS. CONLEY:  Oh, that's okay.  No
9  worries.
10      Q.   Mr. Green, I represent to you that this
11  document was produced to Defendants in this
12  litigation.  Do you recognize these documents?
13      A.   Yes.
14      Q.   And what do these documents represent?
15      A.   About an upcoming coalition meeting that we
16  are part of, uh-huh.
17      Q.   A coalition that the Texas League is a part
18  of?
19      A.   Correct, uh-huh.
20      Q.   What is the name of that coalition?
21      A.   Well, it's part of the Got ID campaign or the
22  got ID Coalition.
23      Q.   So the coalition is the result of the Got ID
24  campaign that you mentioned earlier?
25      A.   Correct.

57

1      Q.   And was that coalition created in direct
2  response to SB 14?
3      A.   Right, it was created to, basically, educate
4  our populations about the new voter ID law, uh-huh.
5          MS. KORGAONKAR:  And, Stephen, I don't
6  want to interrupt your line of questioning, but I just
7  want to note for the records that it's two pages here,
8  but they don't appear to be consecutive --
9          MR. TATUM:  Okay.
10          MS. KORGAONKAR:  -- based on the Bates
11  stamp and don't appear to be one document.
12          THE WITNESS:  Right.
13          MR. TATUM:  That's correct.  If you'd
14  like, I can mark them as separate exhibits.
15          MS. KORGAONKAR:  I just wanted to note
16  that for the record.
17          MR. TATUM:  Okay.
18      Q.   (By Mr. Tatum) So, Mr. Green, you stated
19  that this e-mail describes an upcoming meeting.  Is
20  that correct?
21      A.   That's correct.
22      Q.   And is that the meeting described in the
23  e-mail here as occurring on Monday, October 7, 2013 at
24  the TOP headquarters?
25      A.   That's correct.

Blake Green - 6/18/2014

---

58

1   Q.   What is the "TOP"?
2   A.   It's one of the collaborating organizations
3   called the Texas Organizing Project.
4   Q.   Is that an independent organization?
5        MS. KORGAONKAR:  Objection.  Beyond the
6   scope of the notice and it calls for speculation.  You
7   can answer.
8   A.   I don't know if it's independent or not.
9   Q.   (By Mr. Tatum)  So what do you know about the
10  TOP?
11  A.   I know, to my knowledge, that the Texas
12  Organizing project, to my knowledge, do similar work
13  that we do.
14  Q.   Did you attend this meeting?
15  A.   On October 7th, I believe so.
16  Q.   And do you remember what was discussed at
17  that meeting?
18  A.   Pretty much -- if I can recall, pretty much
19  just looking at ways in which we could, you know,
20  develop materials and messaging on how -- you know --
21  just how to outreach to our target bases about the
22  voter ID law and what's required to vote at the polls.
23  Q.   Was this litigation discussed at that
24  meeting?
25  A.   Litigation, no, I don't -- I don't think so.

---

59

1   Q.   Turn to the next page.
2   A.   Uh-huh.
3   Q.   This next page references an October 15th
4   voter ID community workshop.  Is that correct?
5   A.   That's correct.
6   Q.   Okay.  Did you attend that?
7   A.   Yes.
8   Q.   And where was that held?
9   A.   If I can recall, the -- this particular one
10  was held at the S.H.A.P.E Community Center.
11  Q.   In what city?
12  A.   Here in Houston.
13  Q.   And was that community workshop put on by the
14  Texas League?
15  A.   No.  It was put on by the -- by the
16  coalition.
17  Q.   By the coalition?
18  A.   Uh-huh.
19  Q.   Do you know what other organizations are a
20  part of this coalition?
21  A.   We have -- you know -- as I said, we have the
22  Texas Organizing Project.  If I can recall, we have
23  Mi Familia Vota.  I know the NAACP has one.  The
24  Houston Area Urban League.  I mean, there may be more,
25  but I just can't recall.

---

60

1   Q.   Is that the only such workshop that has been
2   held by the coalition, to your knowledge?
3   A.   In terms of workshop, no.  There's been --
4   there's been -- there's been others.  There's been --
5   I know there was a voter ID clinic, as well as a --
6   there's a community education forum, as well.
7   Q.   And were these other clinics and forums that
8   you're referring to, were those directly related to
9   SB 14?
10  A.   They were relating to educating about the new
11  law and what's required to vote.
12  Q.   Were any such workshops or clinics held by
13  the coalition prior to the enactment of SB 14?
14  A.   No.
15  Q.   Sorry.  I forgot to ask.  The TOP
16  headquarters, do you remember where that was?
17  A.   It was here in Houston, uh-huh.
18  Q.   You mentioned this earlier, I just want to
19  confirm, has the Texas League conducted any kind of
20  studies or reports, audits, estimates, projections or
21  any other kind of analyses related to the effect of
22  SB 14 on minority voters or on voters who are members
23  of a language minority group?
24  A.   No.
25  Q.   No.

---

61

1        (Exhibit No. 5 marked.)
2   Q.   Mr. Green, I'm handing you what's been marked
3   as Exhibit 5.  Mr. Green, do you recognize this
4   document?
5   A.   This particular document, yes.
6   Q.   You've seen this document before?
7   A.   Yes, uh-huh.
8   Q.   Mr. Green, I represent to you that this is
9   the Amended Complaint in Intervention of
10  Plaintiff-Intervenors The Texas League of Young Voters
11  Education Fund, Imani Clark, Aurica Washington,
12  Crystal Owens, and Michelle Bessiake, filed on
13  November 14th, 2013.  Is that an accurate
14  representation of what this document is?
15  A.   Correct, uh-huh.
16  Q.   Okay.  So you're aware that the Texas League
17  intervened in this lawsuit along with Imani Clark,
18  Aurica Washington, Crystal Owens, and Michelle
19  Bessiake.  Correct?
20  A.   Correct.
21  Q.   And what -- with regard to those four
22  individuals that I just named, what is their
23  respective involvement with the Texas League, if any?
24  A.   (No verbal response.)
25  Q.   And if you want, I'll just -- I can ask

---

Blake Green - 6/18/2014

66

1 the possibility of joining this lawsuit?
2    A.  I mean, I wouldn't say we -- I mean, we
3 didn't actively seek.  No, we didn't actively seek.
4 But, you know, as I said before, we did -- I mean --
5 you know -- some of them, we -- you know -- we did
6 present with the opportunity.  But for them to
7 actually join the lawsuit, that was -- you know --
8 that's pretty much their decision, but we didn't
9 actively seek, no.
10    Q.  Did you meet with any of these -- and you
11 mentioned members of your organization.  By that, I
12 assume you mean constituents.  Correct?
13    A.  When I say members, I mean staff.  Well, I
14 meant staff.
15    Q.  So you meant to say that you came across
16 staff of the Texas League who came to you to say that
17 they've been impacted by the law and you presented
18 staff with the possibility of joining this lawsuit?
19    A.  Wait.  Go back.  Now, I'm confused.
20    Q.  Okay.  I'm trying to -- we need to clarify
21 this.
22    A.  Right.
23    Q.  You testified earlier, you said, We did come
24 across members of our organization who may have been
25 impacted about the law and the option was presented to

67

1 them about the lawsuit.  Correct?
2    A.  I believe I said, in the course of our work,
3 we came across -- I mean, I may have mentioned
4 members, but constituent -- constituency base or
5 people who we outreach to.
6    Q.  All right.  So when you said members, you
7 meant to say constituents, because we've established
8 that you don't have members?
9    A.  Right, correct.
10    Q.  Okay.  Did you meet with any of these
11 constituents that you referred to here?  Did you
12 personally meet with them?
13    A.  Did I personally meet with them, no.
14    Q.  Do you know who within the Texas League met
15 with these specific constituents?
16    A.  I don't recall exactly who.
17    Q.  You mentioned Arianna Williams earlier.  What
18 is her job with the Texas League?
19    A.  Well, I mean, she assists with our programs,
20 particularly voter registration and voter -- voter
21 engagement -- I mean, voter education.
22    Q.  Do you know if she was contacted by any
23 constituent about the possibility of joining this
24 lawsuit?
25    A.  I mean, I don't know personally.  I don't --

68

1 I mean, I don't know if she was contacted by any of
2 our constituents -- well, our constituents.
3    Q.  How do you know that your constituents -- let
4 me rephrase.  How do you know that the Texas League
5 came across these constituents who said they have been
6 impacted by the voter ID law?
7    A.  I mean, as I said before, in the course of
8 our work -- I mean, in the course of our work -- I
9 mean, like I say, I don't know who from the
10 organization, but I know that someone may have
11 mentioned this to them, that the opportunity is
12 available to join a lawsuit.
13    Q.  Do you know how that someone was?
14    A.  I mean, I don't recall exactly who, no.
15    Q.  Do you know if any of these constituents that
16 you came across in the course of your work, do you
17 know if any of those constituents included the four
18 individuals who are listed on the amended complaint?
19    A.  I mean, it's a possibility, but I don't know
20 for sure.
21    Q.  If you'll look at the Amended Complaint that
22 I've handed you there.
23    A.  (Complying.)
24    Q.  I'll represent to you --
25       MR. TATUM:  And, Natasha, please correct

69

1 me if I'm wrong.
2    Q.  (By Mr. Tatum)  -- that the Complaint alleges
3 that each one of the four individuals, Ms. Clark,
4 Ms. Washington, Ms. Owens, and Ms. Bessiake is and
5 will continue to be harmed by the voting laws enacted
6 by SB 14?
7       MS. KORGAONKAR:  And I just want to
8 clarify that Ms. Washing, Ms. Owens, and Ms. Bessiake
9 are no longer parties in this litigation.
10    Q.  (By Mr. Tatum)  Okay.  Mr. Green, do you know
11 -- do you have any idea why Ms. Washington, Ms. Owens,
12 or Ms. Bessiake are no longer parties to this
13 litigation?
14       MS. KORGAONKAR:  And Blake, I'll just
15 caution you that you can answer the yes for no
16 question, but not to reveal the contents of any
17 conversations that you may have had with counsel --
18       THE WITNESS:  Okay.
19       MS. KORGAONKAR:  -- about the
20 litigation.
21    A.  Right.  I mean, I don't recall exactly why
22 they are no longer on the case.
23    Q.  (By Mr. Tatum)  Have you ever interacted with
24 Ms. Washington, Ms. Owens, or Ms. Bessiake?
25    A.  No.

70

1    Q.   Okay.  Okay.  So then I'll represent to you
2  that the complaint alleges that Ms. Clark, who is
3  still a party to this litigation, is and will continue
4  to be harmed by the voting laws enacted by SB 14.  Is
5  that a correct representation of the Complaint?  In
6  fact, before you answer that, let me just find it and
7  point it out for you.
8         MS. CONLEY:  I'm sorry.  I don't think I
9  understood the question.  Can you -- do you mind
10  repeating it?
11         MR. TATUM:  Actually, I hadn't gotten to
12  the question yet.  I was --
13         MS. CONLEY:  Or --
14         MR. TATUM:  I'll start over.
15         MS. CONLEY:  Yeah.
16         MR. TATUM:  Let's re-rack.
17         MS. CONLEY:  Thank you.
18    Q.  (By Mr. Tatum)  Okay.  On Page 4 of that
19  Complaint that you have in front of you, at the top of
20  the page, Paragraph 12, the Complaint alleges that
21  Ms. Clark, Ms. Imani Clark's voting rights are impeded
22  by SB 14, as she will be prevented from voting in
23  person at the polls because of Defendants'
24  unnecessarily strict and racially discriminatory photo
25  identification law.

71

1         Is that an accurate reading of that
2  allegation?
3    A.   Correct.
4    Q.   Okay.  Do you know if the Texas League has
5  ever assisted Mrs. Clark or tried to assist Mrs. Clark
6  with registering to vote?
7    A.   I don't recall.
8    Q.   Do you know if the Texas League has ever
9  assisted or attempted to assist Mrs. Clark with regard
10  to obtaining an acceptable form of ID under SB 14?
11    A.   I don't recall.
12    Q.   Does the Texas League -- let me back up.
13         Has the Texas League ever assisted or
14  attempted to assist any of its constituents in
15  obtaining an acceptable form of ID under SB 14?
16    A.   I mean, yes.  Yes.  We've -- I mean, we've --
17  you know -- we've -- we've -- you know -- like I said,
18  we have a lot of print material where we educated them
19  on how to go about getting an -- getting an EIC.  And
20  I know on -- like I said, on one or two occasions, we
21  did take them to -- to -- you know -- a local mobile
22  DPS office to get an EIC.
23    Q.   Does the Texas League contend that SB 14
24  creates a burden for black and other voters of color
25  because those voters do not have an acceptable form of

72

1  ID under SB 14?
2    A.   Yes.
3    Q.   And what is that contention based on?
4    A.   Well, I mean, it's based on, you know, social
5  and economic status.  When you think about it, across
6  the board, African Americans and Hispanics are, you
7  know, disproportionately not able to, you know, have
8  the funds, you know, compared to, you know, white
9  people across the board to be able to afford the
10  requiring documents, especially those that are
11  underlying, to actually get an EIC.  And
12  specifically -- you know -- you know -- student IDs.
13  I mean, specifically, those out-of-state students that
14  don't have one of the forms of ID, like they had
15  before, which was a student ID, to vote.
16    Q.   Do you know what the current acceptable forms
17  of ID to vote are under SB 14?
18    A.   I do.
19    Q.   Can you list them?
20    A.   Sure.  You have your Texas Driver's License,
21  your Texas ID, you have a military ID, you have a U.S.
22  citizenship certificate with a photo, you have a U.S.
23  passport, you have a concealed handgun license, and
24  then you have your Election Identification
25  Certificate.

73

1    Q.   Also known as the "EIC"?
2    A.   EIC, correct.
3    Q.   Okay.  Now, is the contention you were just
4  discussing, is that based on any kind of study or
5  analyses?
6         MS. KORGAONKAR:  And I'll just object to
7  the extent that "contention" is a legal term and
8  Mr. Green is not a lawyer.
9    A.   Can you rephrase the question?
10    Q.  (By Mr. Tatum)  Sure.
11    A.   Uh-huh.
12    Q.   Well, let me back up if we're not going to --
13  if we don't like the use of the word "contention."
14  Does the Texas League -- does the Texas League believe
15  that SB 14 creates a burden for black and other voters
16  of colors because those voters do not have an
17  acceptable form of ID under SB 14?
18    A.   Yes.
19    Q.   Okay.  And you previously described the basis
20  for that belief.  Correct?
21    A.   Correct.
22    Q.   Okay.  Is that belief based on any kind of
23  formal study or analyses?
24    A.   I mean, I've read -- I mean, I've read
25  articles and, you know, papers and, you know, iPads

74

1 that talk about how, you know, the law has been a
2 burden. And just from people that we've talked to in
3 the field, you know, how it -- it -- you know -- it's
4 a burden to particularly African Americans and
5 Hispanics who don't have -- you know -- you know --
6 generally the money and the resources to get one of
7 the acceptable forms of ID under this law.
8    Q.   Does the Texas League believe that SB 14
9 amounts to a poll tax?
10   A.   Yes.
11   Q.   And what is that belief based on?
12   A.   I mean, it's pretty much based on that the
13 EIC generally isn't -- I mean, isn't a free -- you
14 know -- free -- you know -- a free document. You
15 know, for instance, you know, if you're out-of-state
16 student, number one, you have to -- you know -- go --
17 you know -- go get your -- you know -- pay for a birth
18 certificate, which is one of the forms of ID that's
19 required to prove your citizenship to actually get an
20 ID. So you actually have to pay for that, which in
21 some instances are $22 or more in order to get your
22 EIC. So, I mean, it can be argued that, you know,
23 getting an EIC or essentially even having -- you
24 know -- being eligible to use your eligibility to vote
25 can be referred to as a poll tax.

76

1    Q.   Yes.
2    A.   Lacks a significant?
3         MS. CONLEY:  I'm sorry. Can you repeat
4 the question. I don't think he understood it.
5         MR. TATUM:  Sure.
6    Q.   (By Mr. Tatum)  Does the Texas League believe
7 that a significant portion of its constituency lacks
8 any of the acceptable forms of ID under SB 14?
9    A.   I mean, I don't know -- I mean, I don't know
10 about the, you know, significant. But I know that the
11 people that we talk to and that who we serve -- and
12 like I said, particularly those who are out-of-state
13 students here on college campuses here in Texas who
14 don't have a Texas ID or one of the forms of ID, that
15 it -- that it affects them greatly.
16   For example, you know, in our meetings, you
17 know, some of the student organization meetings that
18 we go to -- one of them could be the California Club.
19 And we all know those students who are part of the
20 California Club are from California and don't have a
21 Texas ID or Texas Driver's License.
22   So that's a large -- well, the majority of
23 all those students most likely wouldn't have the form
24 of ID, with the exception to, you know, their student
25 ID and their out-of-state ID.

75

1    Q.   Does the Texas League believe that SB 14
2 denies or abridges the right to vote on account of
3 race or membership in a language minority group?
4    A.   On account of race?
5    Q.   Race or membership in a language minority
6 group.
7    A.   Yes.
8    Q.   And what is that belief based on?
9    A.   I mean -- I mean, as I said before, I mean,
10 I've been in this work for -- for -- I mean, for quite
11 some time. And, I mean, it's -- you know -- it's --
12 it's -- it's discriminatory. And I've said before,
13 you know, African Americans and Hispanics and, you
14 know, different minority groups -- you know -- you
15 know -- are disproportionately affected because of the
16 fact that, you know, they don't have the economic, you
17 know, resources to be able to fulfill the requirements
18 to get an EIC. And that pretty much puts a burden on
19 the populations we serve, which are, you know,
20 minority communities, particularly African Americans
21 and Hispanics.
22   Q.   Does the Texas League believe that a
23 significant portion of its constituents lack any of
24 the acceptable forms of ID under SB 14?
25   A.   That are constituency?

77

1    Q.   Can you identify one person who does not have
2 any of the acceptable forms of ID under SB 14?
3    A.   Can I identify one person?
4    Q.   Yes.
5    A.   Well, Imani Clark.
6    Q.   And she's a party to this lawsuit?
7    A.   Uh-huh.
8    Q.   Is there anyone else you can identify besides
9 Imani Clark?
10   A.   I mean, I don't know by names, I mean,
11 specifically, but, I mean, I do know that there are,
12 like I said, people within the California Club that
13 don't have it. I mean, I don't know them by name, but
14 I do know there is the large segment, such as that
15 group, that don't have the proper -- proper
16 identification.
17   Q.   Is Imani Clark part of the California Club
18 that you just mentioned?
19   A.   I don't think so, huh-uh.
20   Q.   Do you know how many of your -- do you know
21 how many Texas League constituents lack a driver's
22 license?
23   A.   I don't --
24   Q.   A Texas Driver's License?
25   A.   Oh, I don't know that information.

78

1    Q.   Do you know how many Texas League
2  constituents lack a Texas-issued photo ID?
3    A.   A Texas-issued photo ID?  I don't have that
4  number.  I don't know.
5    Q.   Do you know how many Texas League
6  constituents lack a concealed handgun license?
7    A.   Lack a concealed handgun license?
8    Q.   Yes.
9    A.   I don't know.
10    Q.   Do you know how many Texas League
11  constituents do not have a passport?
12    A.   I don't know.
13    Q.   Do you know how many Texas League
14  constituents do not have a military ID card with a
15  photo on it?
16    A.   Military ID?  How many, I don't know.
17    Q.   Do you know how many Texas League
18  constituents do not have a citizenship certificate?
19    A.   I don't know.
20    Q.   Do you know how many Texas League
21  constituents do not have the necessary documents to
22  get an EIC?
23    A.   I don't know.
24    Q.   Do you know how many Texas League
25  constituents have attempted to obtain an EIC?

79

1    A.   I don't have that number, as well.  Attempted
2  to?
3    Q.   Yes.
4    A.   I don't -- I don't know that number, no.
5    Q.   Can you identify any constituent of the Texas
6  League that has attempted to obtain an EIC?
7    A.   I mean, as I -- you know -- as I can recall,
8  you know, when our staff member, took, you know, on
9  those occasions two or three of our constituencies to
10  go get an EIC.  That was an attempt.
11    Q.   Do you recall what staff member took them?
12    A.   I can recall Arianna Williams, uh-huh.
13    Q.   Do you know where she took them to attempt to
14  obtain an EIC?
15    A.   Where?  I believe, to the Department of
16  Public Safety, to the DPS office.
17    Q.   And you said she took three people?
18        MS. KORGAONKAR:  Objection.  I don't
19  think that that was his testimony.
20    A.   Right.
21    Q.   (By Mr. Tatum)  Let me check.  I believe you
22  said two or three constituents.  It's kind of rough
23  there.  Anyway, regardless, Arianna Williams took some
24  constituents to attempt to get an EIC.  Is that
25  correct?

80

1    A.   That's correct.
2    Q.   Do you know if they were successful in
3  obtaining an EIC on that trip?
4    A.   Oh, I don't know, no.
5    Q.   Would she -- would Arianna Williams know?
6    A.   Oh, I don't know.  I mean, but let's -- let's
7  just say, as an organization, we made several attempts
8  just through our education to make sure that, you
9  know, our constituency base and those in our target,
10  you know, audience know about the steps on how to get
11  an EIC.  Now, some of those may have actually received
12  an EIC.  Some of them probably didn't, but we don't
13  know.  But I know we, as an organization, made every
14  attempt to educate them about, you know, if they don't
15  have one of the seven forms of ID, that they -- that
16  they are educated on how to get that.
17    Q.   Has the Texas League followed up with any
18  constituent that it's educated about getting an EIC to
19  determine whether or not they were successful in
20  getting one?
21    A.   Have we followed?  I don't -- I don't recall.
22  I don't believe so.
23        (Exhibit No. 6 marked.)
24    Q.   Mr. Green, I'm handing you what's been marked
25  as Exhibit 6.  Mr. Green, I represent to you that this

81

1  document has been produced to the Defendants in this
2  litigation.  Have you ever seen this document before?
3    A.   Yes.
4    Q.   What is this document?
5    A.   It's a comment letter that we submitted to
6  the Department of Justice to deny preclearance,
7  Section 5 preclearance, because we feel as though --
8  because we believe that, you know, the law pretty much
9  puts a burden on our key population.
10    Q.   So this comment letter was prepared by the
11  Texas League.  Correct?
12    A.   Correct.  It was jointly prepared by Texas
13  League and the Legal Defense Fund.
14    Q.   Okay.
15    A.   Uh-huh.
16    Q.   And it was submitted on September 8th, 2011.
17  It that correct?  Just going off the first page there.
18    A.   That's correct.
19    Q.   Okay.  If you wouldn't mind turning to
20  Page 5.  Let me know when you're there.
21    A.   I'm there.
22    Q.   Okay.  At the bottom of Page 5, it says, For
23  example, in explaining the hardship that the proposed
24  photo ID law would impose on them, Prairie View
25  students stated.  And following that sentence there's

106

1 in the way that you just described?
2    A.   Minority IDs, I think they would -- they
3 would be impacted more than the non-minorities.
4    Q.   And is that belief based on any kind of study
5 or analysis?
6    A.   I mean, like I said -- as I said before, you
7 know, in order to get one of the forms of ID,
8 especially for those out-of-state students, and
9 especially the ones that are, you know African
10 American and, you know, Hispanic, like I said, because
11 of their economic status across the board compared to,
12 you know, their white counterparts, it's -- it puts --
13 it puts -- it puts a burden for them, uh-huh.
14    Q.   Does the Texas League support the idea that
15 only registered voters should be allowed to vote?
16    A.   Only registered voters?
17    Q.   Yes.
18    A.   Yes, uh-huh.
19    Q.   Does the Texas League believe that Texas
20 should make sure that people attempting to vote are
21 registered voters?
22    A.   Okay.  Restate your question --
23    Q.   Sure.
24    A.   -- to make sure I understand.
25    Q.   Does the Texas League believe that the State

107

1 of Texas should make sure that people attempting to
2 vote are registered voters?
3    A.   Well, I don't know exactly what the State of
4 Texas should do, but I know that everyone who is
5 registered to vote should have the right to vote and
6 shouldn't have any barriers towards that -- towards
7 that right.
8    Q.   Does the Texas League believe that -- and
9 this might be repeating my previous question and let
10 me know if it is.  Does the Texas League believe that
11 the Texas should make -- that the State of Texas
12 should make sure that the person who is registered to
13 vote is the same person who is attempting to vote?
14    A.   One more time.
15    Q.   Does the Texas League believe that the State
16 of Texas should make sure that a person who is
17 registered to vote is the same person who is
18 attempting to vote?
19    A.   I mean, like, as before I said before, I
20 don't know, you know, what the State of Texas should
21 do, but I know currently, the way it is now does leave
22 out, you know, a significant amount of people and
23 makes it harder for them to vote.
24    Q.   Okay.  Leaving the State of Texas out of it,
25 does the Texas League believe that when someone is

108

1 casting a vote, they should be the same person who is
2 registered to vote?  In other words, does the Texas
3 League believe that voter fraud should be prevented?
4         MS. KORGAONKAR:  Objection.  That's a
5 compound question as stated.
6    Q.   (By Mr. Tatum)  Okay.  Let me rephrase.
7    A.   Uh-huh.
8    Q.   Does the Texas League believe that the person
9 who is registered to vote -- a person who is duly
10 registered to vote should be the same person that is
11 attempting to vote on election day?
12    A.   Well, I mean, we believe that everyone who
13 has the right to vote has a right to vote.
14    Q.   And does -- do you believe that when a
15 registered voter is voting, we should make sure that
16 they're the same person -- let me retract.
17         Mr. Green, do you think voter fraud should be
18 illegal?
19    A.   I mean, I don't -- I mean, I don't know about
20 -- I mean, I don't know anything about pretty much
21 voter fraud, but -- but the way that SB 14 is on the
22 books now, you know, as I said before, makes it --
23 makes it hard for certain people to actually vote.
24 And we believe that everyone who has a right to vote
25 should, in fact, have a right to vote without any --

109

1 any -- you know -- without any burdens or challenges
2 to it.
3    Q.   But do you think voter fraud should be
4 illegal?
5    A.   Like I said, I think everyone who has a right
6 to vote should have a right to vote.
7    Q.   Mr. Green, you're not answering my question.
8 I'm looking for a "yes" or "no."
9         MS. KORGAONKAR:  Maybe I'll object to
10 vagueness to the term "voter fraud."
11    Q.   (By Mr. Tatum)  Okay.  Do you have the notice
12 of this deposition in front of you in there somewhere?
13    A.   (No verbal response.)
14    Q.   Do you have the notice in front of you?
15    A.   I do, uh-huh.
16    Q.   Would you mind turning to Page 5, please?
17    A.   (Complying.)
18    Q.   When I refer to "voter fraud," I'm referring
19 to that term as it is defined in this notice and as it
20 was used in the deposition topics.  If you would,
21 please, take a moment to just review that definition
22 and let me know when you're finished.
23    A.   (Complying.)  Okay.
24    Q.   Have you had a chance to review that
25 definition?

Blake Green - 6/18/2014

126

1  legislators that voted for that bill?
2      A.   I mean, I don't know which particular, I
3  guess, Texas citizens you're referring to, because,
4  you know, there's a lot of citizens that -- I mean,
5  that are Texas citizens who are left out of the
6  process because of, you know, the current laws on the
7  books as it relates to SB 14.
8      Q.   Does the Texas League believe that no
9  citizens of Texas support voter ID requirements?
10     A.   That no citizens?
11     Q.   Correct.
12     A.   I mean, I would imagine some citizens support
13  it.
14     Q.   Do you have the Amended Complaint in front of
15  you?
16     A.   (No verbal response.)
17     Q.   Do you have it in front of you?
18     A.   Uh-huh.
19     Q.   Okay.  If you would please turn to Page 6.
20     A.   (Complying.)
21     Q.   Now, the question I'm about to ask is going
22  to be in reference to Paragraph 30.  Does the Texas
23  League believe that SB 14 forces the Texas League to
24  divert its limited resources, both financial and
25  otherwise, away from fulfilling its core mission of

127

1  registering and mobilizing young people of color to
2  vote, and, instead, towards helping its existing base
3  of voters secure one of the acceptable forms of ID
4  under SB 14?
5      A.   Yeah.
6      Q.   What is that belief based upon?
7      A.   Well, I mean, it's based upon our pursuit --
8  our core mission is to register voters to educate them
9  about the process, you know, and also to do, sort of,
10  what we call "leadership training."
11         Now, because of the enactment of SB 14, we've
12  been short of -- we're -- we have diverted our
13  resources to pretty much, you know, educate not only
14  -- not only our existing base of voters, but also our
15  new base of voters or constituency or population about
16  the -- about the particular SB 14 requirements under
17  the law.
18         So rather than us doing our normal function,
19  we have diverted -- we have diverted our resources to
20  pretty much educating people about, you know, how to
21  obtain one of the forms of ID.
22     Q.   Does the Texas League believe that educating
23  its constituents about voting requirements is a core
24  function of the Texas League?
25     A.   Educating them about voting requirements?

128

1      Q.   Yes.
2      A.   I mean, it's not the primary.
3      Q.   But does the Texas League believe that
4  educating its constituents regarding voting
5  requirements, and I should said voting laws, is a core
6  mission of the Texas League?
7          MS. KORGAONKAR:  Objection.  It's been
8  asked and answered.  You can answer.
9      A.   All right.  I mean, one of the things that we
10  do is, like I say, we engage in people in all respects
11  of the electoral process.  So we do -- you know -- you
12  know -- educate -- you know -- around -- you know --
13  different laws or issues that impact them directly.
14     Q.   (By Mr. Tatum)  Does the Texas League believe
15  that educating its constituents regarding the
16  requirements of SB 14 falls outside of its stated
17  mission?
18     A.   I mean, as one of our key sole
19  responsibilities, yes.
20     Q.   And how is educating its constituents
21  regarding the requirements of SB 14 different from
22  educating Texas constituents regarding voter
23  requirements prior to SB 14?
24     A.   You know, I mean, as I said before, our --
25  our main source -- or our main -- is to educate them

129

1  about the electoral process, to educate them about how
2  issues, you know, impact them, how issues affect them.
3  But since a lot of our constituent base, particularly
4  college students are affected by this law, we want to
5  made sure that -- are affected -- I mean, the ones
6  that are affected by this law -- I mean, we want to
7  make sure that those who are eligible are eligible to
8  vote.
9          And -- you know -- you know -- we thought we
10  had our existing base secured, but, now, with the new
11  law, we have to make sure that they -- that they who
12  voted previously, prior to SB 14, can vote again, you
13  know, after the law has been enacted.
14         So it has pretty much put a strain on, you
15  know, us being able to, you know, increase our voting
16  universe, add more people to the rolls through our
17  main focus -- one of our main focus is voter
18  registration has been deterred to actually, basically,
19  you know, make sure that our existing base of people
20  who will be registered who voted before and those who
21  are -- you know -- pretty much negative impact get the
22  requirements, so that they can vote -- that they can
23  vote again.
24         MS. KORGAONKAR:  Just slow down.
25     Q.   (By Mr. Tatum)  Mr. Green, in that allegation

130

1  that I read on Page 6 of the Complaint in Paragraph 30
2  --
3     A.  Uh-huh.
4     Q.  -- it makes a reference to limited resources,
5  financial and other.  Obviously "financial resources"
6  means money.  What does "other" refer to?
7     A.  I mean, time.
8     Q.  Anything else?
9     A.  I mean, just pretty much -- pretty much time
10  and -- and -- right, pretty much time and, you know,
11  financial resources, uh-huh.
12     Q.  So when they say limited resources, financial
13  and other, am I correct to say that you're referring
14  to financial resources and time?  Is that what you --
15  is that correct?
16     A.  I mean, people's time is a resource.
17     Q.  I agree.
18     A.  Right.
19     Q.  Are there any other kinds of resources that
20  the Texas League is referring to there?
21     A.  I mean, other, no.
22     Q.  (Indicating.)
23     A.  Oh, I said other, no.
24     Q.  I'm sorry.  I didn't hear you.
25        Of all the resources at the disposal of the

131

1  Texas League, what portion of those resources are you
2  having to divert towards SB 14-related activities?
3     A.  Which portion of it?  Well, all of our -- I
4  mean, pretty much a combination of all the re -- all
5  the re -- pretty much all the resources that goes
6  into, you know, our daily core mission.  So all of
7  that has been -- you know -- a portion of that has
8  really been diverted to, you know, incorporating, I
9  guess, making sure that people are educated in pretty
10  much all aspects, either it be with voter
11  registration, either it be with voter education or
12  even with leadership training.  We have to divert some
13  of the resource that was geared towards that to divert
14  to make sure that it covers, you know, incorporating
15  an SB 14 education component, as well.
16     Q.  Do you know what kind of time resources are
17  being diverted towards SB 14-related activities?
18     A.  I mean, I can say with myself and our state
19  director and even members of our -- of our staff --
20  you know -- rather than -- you know -- us -- you know
21  -- doing our essential Get Out the Vote -- you know --
22  activities -- you know -- we're now -- you know --
23  doing education -- going to do -- you know --
24  educational presentations.  I know myself and our
25  state director, we attend -- you know -- so many

132

1     different -- you know -- meetings to talk about -- you
2  know -- you know -- how do we better communicate this
3  all to our constituent base.  I mean, so all those are
4  examples of how -- you know -- our normal, I guess,
5  time during our core mission has been diverted to
6  combating this SB 14 law, uh-huh.
7     Q.  Mr. Green, looking at Paragraph 31 on Page 6,
8  do you see that paragraph?
9     A.  I do.
10     Q.  Okay.  Can you tell me what resources have
11  been diverted towards assessing who among the Texas
12  League constituency lacks one of the forms of required
13  photo ID under SB 14?
14     A.  As I said before, I know -- you know --
15  rather than just -- you know -- making phone calls to
16  them about getting out the vote -- you know -- we're
17  asking them -- you know -- do you have one of the
18  forms of required ID.
19        So it's -- it's taken extra time to have a
20  conversation with them about if they do have -- you
21  know -- one of the required forms of ID.  And if not,
22  we're spending extra time -- you know -- call time or
23  either in-person time telling them the specific steps
24  of how to do it.  And -- you know -- all that -- you
25  know -- all that takes -- takes time, and it takes

133

1     energy, and it takes more people.
2     Q.  What kind of financial resources have been
3  diverted towards assessing who among the Texas League
4  constituency lacks one of the forms of required photo
5  ID under SB 14?
6     A.  Financial resources, I know -- I know -- now,
7  this -- this --
8        MS. KORGAONKAR:  Objection as to form.
9  Sorry.
10     A.  Uh-huh.  And what do you mean by "forms"?
11     Q.  (By Mr. Tatum)  That's a question for your
12  attorney.  Were you through answering the question?
13     A.  No.  I haven't started answering the
14  question.
15     Q.  Okay.  By all means, proceed.
16     A.  Right.  I'm saying, I mean, what do you mean
17  by "forms"?
18     Q.  Oh, I'm sorry.  You're referring to forms in
19  my question, not the objection, form.
20     A.  In your question, right.
21     Q.  Sorry.  It says here in the Complaint under
22  Paragraph 31, it says, In particular, the Texas League
23  is now forced to undertake such activities as
24  assessing who among its constituency lacks one of the
25  forms of required photo IDs under SB 14.

134

1      I did not write this sentence, but I can only
2   assume it means the various documents that are
3   required to vote, the various forms of the photo ID
4   that are required to vote under SB 14, a driver's
5   licence, a concealed handgun license, state-issued
6   photo ID, et cetera.
7      A.  No.  I thought your question was forms of --
8   I think you said forms of resources or something or
9   forms of --
10     Q.  Okay.  Let's start over.
11     A.  Right.
12     Q.  Let's start over.  Can you tell me what
13   amount of financial resources have been diverted
14   towards assessing who among the Texas League
15   constituency lacks one of the forms of required photo
16   under SB 14?
17     A.  I mean, I don't know the specific amount.
18         MS. KORGAONKAR:  I'm objecting to the
19   form of the question.  You can answer it.
20     A.  I mean, I don't know the specific amount.
21     Q.  (By Mr. Tatum)  Mr. Green, can you tell me
22   what -- can you tell me how much time has been spent
23   hosting public education campaigns designed to inform
24   young voters of color that Defendants, State of Texas,
25   previously court-rejected photo ID law is now in

135

1   effect?
2      A.  Well, I mean, I can't give the exact -- the
3   exact amount, but I know we are spending more time
4   taking more trips -- well, not more -- well, actually,
5   more trips to college campuses.  I know we've been
6   called upon by a number of organizations who have use
7   as their constituency base that they've asked us,
8   because, you know, we're very familiar with the law,
9   to come to their events or to their public forums and,
10   you know, make a presentation about it.  And some of
11   those are during the weekends, some of those are after
12   hours, some of them are during the day.  But it's --
13   it's -- it's -- it's out of -- it's out of the norm
14   and we're making it so frequently.  Because one of our
15   key is, we want to make sure that -- you know --
16   particularly young people and students, we want to
17   make sure that they -- you know -- you know -- they
18   were able to vote prior to SB 14, and we want to make
19   sure that they are.  And that's one of the things that
20   we have been doing critically is ensuring that -- that
21   -- that base that voted in 2012 can vote again in 2013
22   and 2014.
23         (Exhibit No. 10 marked.)
24     Q.  Mr. Green, I'm handing you what's been marked
25   as Exhibit 10.  Mr. Green, I represent that this

136

1   document has been produced to the Defendants in the
2   litigation.  Have you seen this document before?
3      A.  Yes.
4      Q.  Now, there's a box at the top of this
5   document that's obscuring the title of it or whatever
6   is at the top there.  Do you know what's behind that
7   box?
8      A.  Oh, that's our logo.
9      Q.  That's the Texas League logo underneath that
10   box?
11     A.  Correct.
12     Q.  Okay.  Mr. Green, this document says, down
13   there in the middle, the third paragraph, it says,
14   quote, With the long history of voter
15   disenfranchisement in Texas oh the confusion of this
16   particular bill, we would have to do significant
17   election protection work for this election cycle.
18   Below are two ways in which we could make this happen.
19         Is that a correct reading of that paragraph?
20     A.  Correct.
21     Q.  Okay.  And below that it says -- it lists, 1,
22   Launch a comprehensive education campaign.  And 2, Run
23   a comprehensive election protection plan.  Is that
24   correct?
25     A.  Correct.

137

1      Q.  And below that it appears to be some
2   budgetary figures.  Is that correct?
3      A.  That's correct.
4      Q.  Do you know if the comprehensive education
5   campaign or the comprehensive protection plan
6   referenced in the document were ever executed?
7         MS. KORGAONKAR:  Objection.  Compound.
8   You can answer.
9      Q.  (By Mr. Tatum)  Let me rephrase.  This
10   document says, Below are two ways in which we could
11   make this happen.  To me, that indicates that the
12   comprehensive education campaign and comprehensive
13   election protection plan were just being proposed in
14   this document.
15     A.  Right.
16     Q.  Did the Texas League ever launch a
17   comprehensive education campaign as described in this
18   document?
19     A.  And this was back in 2012.  I think, to the
20   extent this -- I know this was just a proposal to
21   receive funding.  And I think -- back in 2012, I think
22   our education campaign pretty much focused on just Get
23   Out the Vote since, you know, the law wasn't enacted
24   at that time.
25     Q.  Did the Texas League ever run a comprehensive

Blake Green - 6/18/2014

146

1  education is part of the mission of the Texas League?
2      A.   Voter education?
3      Q.   Yes.
4      A.   Yes.
5      Q.   And does voter education include educating
6  voters about existing voter laws?
7      A.   I mean, to a certain extent.
8      Q.   Okay.
9      A.   I mean, but that's not our core -- when we --
10  when we say voter education.
11     Q.   What is your core when you say voter
12  education?
13     A.   Voter education is making sure that they know
14  their rights as a voter, you know, like when they go
15  to the polls, if they're turned away, stuff like that.
16     Q.   So educating Texas League constituents about
17  existing voter laws is not part --
18     A.   About existing voter laws?
19          MS. KORGAONKAR:  Objection.
20          MR. TATUM:  Sorry.
21          MS. KORGAONKAR:  Mischaracterizes what
22  he said.
23     Q.   (By Mr. Tatum)  Okay.  Is educating Texas
24  League constituents about existing voter laws not part
25  of the Texas League's mission?

147

1      A.   I mean, it is part to a certain extent.
2      Q.   Okay.  Would you agree that the law as
3  enacted by SB 14 is an existing voter law?
4      A.   Currently, on the books, yes.
5      Q.   Okay.  So by educating Texas League
6  constituents about the requirements of SB 14, is the
7  Texas League not fulfilling its mission to educate
8  voters about existing voter laws?
9      A.   I mean, we are for that mission, but we don't
10  want it to, you know, overshadow, you know, our
11  critical work, which is, you know, voter registration,
12  Get Out the Vote.  Now, when you start -- like us,
13  when we start getting to the point where, you know,
14  that's literally the majority of our time is educating
15  about, you know, a law that we think hinders our
16  population, then it's sort of, when you about it, a
17  deviation from, you know, our core activities.
18     Q.   Can you tell me how many time-related
19  resources of the Texas League have been diverted
20  towards providing financial assistance and
21  transportation to young voters who lack the required
22  photo IDs and/or underlying documents, so that they
23  can acquire them where possible?
24     A.   Okay.  Well, I mean, as I said before, I know
25  there were several occasions where one of our staff

148

1  member did take a couple of our, I guess, constituency
2  to attain their -- their EIC.  And as we know, gas is
3  a financial resource.  And, you know, let's -- let's
4  be very clear that, you know, we did also educate and
5  pass out print material and print collateral, and all
6  those are financial resources, as well.  You know,
7  cost of printing, you know, cost of design, all that,
8  you know, are, you know, budgetary items that are
9  needed to -- you know -- to make this happen.
10     Q.   Can you tell me what amount of financial
11  resources have been diverted towards the purposes you
12  just described?
13     A.   The amount?  I don't know the exact amount.
14     Q.   Does the Texas League believe that it has
15  been unable to fulfill its mission because of SB 14?
16     A.   It has made it hard.  I mean, it has put a
17  burden on the organization, yes.
18     Q.   But has the -- does the Texas League -- I
19  don't believe you answered my question.  Does the
20  Texas League believe -- or does it -- or does the --
21  is the Texas League taking a position -- let me start
22  over.
23          Does the Texas League take the position that
24  it has been unable to fulfill its stated mission
25  because of SB 14?

149

1      A.   Yes.
2      Q.   In what way has it been unable to fulfill its
3  stated mission because of SB 14?
4      A.   I mean, as I -- I mean, as I said before, you
5  know, one of our key components -- I mean, one of our
6  key, you know, areas is to get, you know, new people,
7  you know, registered and out to vote.
8          Like I said, now, we're basically, you know,
9  making sure that our existing base, which we thought
10  were secure, make sure that they know that -- you know
11  -- about -- about the new law.  And if it impacts
12  them, make sure that they get the necessary documents.
13          So when it gets to a point where -- you
14  know -- rather than just registering voters or getting
15  them out to vote, where we're incorporating a
16  significant amount of time and energy, you know,
17  pretty much combating and educating them and making --
18  and walking them through -- walking them through, you
19  know, hand in hand, you know, getting them the
20  necessary forms of ID, then, I mean, that's a
21  significant amount of time that we're spending just
22  on, you know, SB 14 that we didn't have to before.
23     Q.   You mentioned getting new people to register
24  to vote.
25     A.   Uh-huh.

Blake Green - 6/18/2014

150

1    Q.   Do you know, on average, prior to SB 14, how
2  many new registered voters the Texas League was able
3  to -- let me state that again.
4        Prior to SB 14, do you know, on average,
5  average how many voters the Texas League helped
6  register for the first time?
7    A.   I mean, I don't know the exact number, but I
8  know it's significantly higher than the amount we're
9  registering now.
10   Q.   Can you give me a ballpark percentage of how
11 much lower it is now, as opposed to before SB 14?
12   A.   I mean, I don't have that -- I mean, I don't
13 -- I can't -- I mean, I -- I don't have information
14 off the top of my head.  I would have to. . .
15   Q.   Does the Texas -- do you know how many -- or
16 does the Texas League maintain that kind of
17 information about how many new registered voters it
18 has -- about how many voters it has helped -- let me
19 start over.
20       Does the Texas League maintain information
21 indicating how many voters it has helped register for
22 the first time in a given year?
23   A.   I mean, we have some information, but it's
24 not -- I mean, it's not I mean, it's not -- I mean,
25 I would say it's not categorized as, you know, these

151

1  people we registered to vote.  Right.  Because we
2  don't -- we -- because -- you know -- we don't -- you
3  know -- possess that type of information.
4    Q.   So when you say that you haven't been able
5  to, for lack of a better word, get as many new
6  registered voters while SB 14 is in effect --
7    A.   Uh-huh.
8    Q.   -- as opposed to before it was in effect --
9    A.   Right.
10   Q.   -- what is that statement based on?
11   A.   Well, what I mean by that is that -- you
12 know -- prior to SB 14 -- you know -- we -- you know
13 -- we have the time and the resource to -- you know --
14 to attend college campuses and strictly do -- you know
15 -- voter registration now, after SB 14, you know,
16 we're spending a lot of our time -- I mean, we're
17 still doing VR, because that's -- like I say, that's
18 one of our core missions.
19       But, now, some of the time is, you know, like
20 I said, going to, you know, speak at events or, you
21 know, making presentations.  So a lot of our, I guess,
22 staff and, you know, volunteers are -- are now sort of
23 like in an educational phase, rather than just going
24 out registering to vote.
25       I mean, so I know that the number of, you

152

1  know, VR -- I guess, what I mentioned before as
2  tabling isn't as much as now, because we're now,
3  basically, just making presentations and actually, you
4  know, educating about this new law.
5    Q.   And for the record, when you say "VR"?
6    A.   Voter registration.
7    Q.   Okay.  Does the Texas League believe that any
8  of its SB 14-related activities fall outside of the
9  scope of the Texas League's mission?
10   A.   I already answered that question.
11   Q.   Okay.  I don't believe -- I've asked -- I've
12 asked you a lot of questions about the Texas League's
13 mission today, especially with regard to SB 14, but I
14 don't think I've asked this specific one.
15   A.   Okay.
16   Q.   So, if I may, I'll repeat it.
17   A.   Uh-huh.
18   Q.   Does the Texas League believe that any of its
19 SB 14-related activities fall outside of the scope of
20 its stated mission?
21   A.   Of our core mission, yes.
22   Q.   And what activities are those?
23   A.   What, our core?
24   Q.   What SB 14-related activities that the Texas
25 League engages in fall outside of the scope of its

153

1  core mission?
2    A.   Well, I mean, as I said before, our core
3  mission is voter registration and Get Out the Vote.
4  It's not solely, you know, about making phone calls to
5  ask people who we've registered and who voted last
6  time if they have the ID to register -- you know -- to
7  be able to register again.
8        I mean, our core mission is actually, you
9  know, bringing new people into the process and, you
10 know, getting them acclimated to electoral process,
11 not -- not solely -- you know -- like I said, now, we
12 are -- we have to go back to the people we registered
13 before and actually calling them and making sure.  So
14 it's sort of like double work in some sense.
15       MR. TATUM:  I think I've just got a few
16 more questions here and then we're done.
17       MS. KORGAONKAR:  Okay.
18   Q.   (By Mr. Tatum)  Mr. Green, have any Texas
19 League constituents ever raised an allegation or
20 concern relating to election crimes to the Texas
21 League?
22       MS. KORGAONKAR:  I just want to note for
23 the record that we objected to that topic in the
24 30(b)(6) notice, but you can answer the question.
25   A.   I don't know.  We don't -- I mean, that's not

Blake Green - 6/18/2014

---

154

1 our core mission. We don't focus on election crimes.
2 Q. (By Mr. Tatum) Do y'all focus on voter
3 fraud?
4 A. Do we focus on voter fraud? That's not what
5 our core mission is.
6 Q. So has the Texas League conducted any
7 calculations, reports, audits, estimates, projections,
8 or other analyses relating to election crimes or voter
9 fraud?
10 A. No.
11 Q. Mr. Green, to the best of your knowledge, has
12 the Texas League provided all documents responsive to
13 the Defendants request for production in this case
14 that were in the Texas League's possession, custody,
15 or control?
16 A. To the best of my knowledge, yes.
17 Q. Mr. Green, do you know a Mr. Yannis Banks?
18 A. Do I know him?
19 Q. Yes.
20 A. I've seen his name.
21 Q. Have you ever met or conferred with him about
22 anything?
23       MS. KORGAONKAR: Objection. Beyond the
24 scope, but you can answer that.
25 A. Yannis Banks, I know who he is. I haven't

---

155

1 spoken to him about anything.
2       MR. TATUM: Okay. Could we go off the
3 record real quick?
4       (Discussion off the record.)
5       MR. TATUM: Okay. Back on the record.
6 Q. (By Mr. Tatum) Okay. Mr. Green, we were
7 talking about this before, but we moved on after we
8 kind of got bogged done. I was asking you whether the
9 Texas League believes that the legislature, in
10 enacting SB 14, departed from its normal legislative
11 procedures. That's what we were talking about.
12       So I'm going to ask again: Does the Texas
13 League believe that the Texas Legislature departed
14 from its normal legislative practices and procedures
15 in enacting SB 14?
16 A. I don't know.
17 Q. Well, I don't have anything else for you,
18 Mr. Green, now that we've come to this point.
19 A. Okay.
20 Q. And before I pass the witness, do you have
21 any -- anything you'd like to clarify or modify with
22 regard to any of your answers given today?
23 A. I'm trying to think.
24 Q. And you can think about it after we break.
25 And if they ask you any questions, you can come back

---

156

1 to that.
2 A. Okay.
3       MR. TATUM: All right. Well, I have no
4 more questions for you and I pass the witness.
5       MS. KORGAONKAR: So we'll just take a
6 break right now and then reconvene.
7       MR. TATUM: Sure.
8       (Break.)
9       MS. KORGAONKAR: I'm ready to go back on
10 the record. We just have a couple of questions for
11 redirect.
12       MS. MILLER: Okay.
13             EXAMINATION
14 QUESTIONS BY MS. KORGAONKAR:
15 Q. Mr. Green, earlier you testified that when
16 you used the term "constituents" today, you've meant
17 people who have taken actions with the League, signed
18 petitions or signed pledge cards. Is that right?
19 A. That's correct.
20 Q. And you've also used the term "constituency
21 base." Is that right?
22 A. Correct.
23 Q. And is it correct that that doesn't
24 necessarily mean people who have taken an action with
25 the League or signed a petition or anything like that?

---

157

1 A. Yes, that's correct.
2 Q. Does constituency base, the way that you've
3 used today, mean the League's target demographic?
4 A. Right, our target population.
5 Q. What is a target population?
6 A. Eighteen to thirty-five-year-olds,
7 particularly young people of color.
8 Q. I'd like to just draw your attention back to
9 Exhibit, I believe it was 3, the list.
10 A. Oh, is this it? (Indicating.)
11 Q. This one, yes.
12 A. Okay.
13 Q. Earlier, you testified that that document is
14 a partial list of constituents. Is that right?
15 A. Correct.
16 Q. Does the League represent the interests of
17 constituents in this lawsuit?
18 A. Yes.
19       MS. KORGAONKAR: If we could just go off
20 the record for one moment?
21       (Discussion off the record.)
22       MS. KORGAONKAR: Okay. Those are all
23 the questions that we have.
24       THE WITNESS: Okay.
25       MS. KORGAONKAR: Does DOJ have any

---

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2               CORPUS CHRISTI DIVISION
 3    MARC VEASEY, JANE HAMILTON,    )
      SERGIO DELEON, FLOYD J. CARRIER,)
 4    ANNA BURNS, MICHAEL MONTEZ,    )
      PENNY POPE, OSCAR ORTIZ, KOBY  )
 5    OZIAS, JOHN MELLOR-CRUMMEY,    )
      JANE DOE, JOHN DOE, LEAGUE OF  )   CIVIL ACTION NO.
 6    UNITED LATIN AMERICAN CITIZENS )   2:13-CV-193 (NGR)
      (LULAC), AND DALLAS COUNTY,    )   (lead case)
 7    TEXAS                      )
                                 )
 8    VS.                        )
                                 )
 9    RICK PERRY, Governor of Texas,  )
      and JOHN STEEN, Texas Secretary )
10    of State                   )
      _____)
11                               )
      UNITED STATES OF AMERICA,      )
12                               )
      V.                         )
13                               )
      STATE OF TEXAS, JOHN STEEN, in )   CIVIL ACTION NO.
14    his official capacity as Texas )   2:13-CV-263 (NGR)
      Secretary of State, and STEVE  )   (consolidated case)
15    MCCRAW, in his official capacity)
      as Director of the Texas       )
16    Department of Public Safety,   )
      _____)
17                               )
      TEXAS STATE CONFERENCE OF NAACP )
18    BRANCHES, AND THE MEXICAN      )
      AMERICAN LEGISLATIVE CAUCUS OF  )
19    THE TEXAS HOUSE OF             )
      REPRESENTATIVES,             )
20                               )
      V.                         )   CIVIL ACTION NO.
21                               )   2:13-CV-291 (NGR)
      JOHN STEEN, in his official    )   (consolidated case)
22    capacity as Texas Secretary of )
      State, and STEVE MCCRAW, in his )
23    official capacity as Director of)
      the Texas Department of Public  )
24    Safety                     )
25
```

2

```
1    *******************************************
2             ORAL DEPOSITION OF
3               CAROLYN GUIDRY
4                 JULY 24, 2014
5    *******************************************
6
7         ORAL DEPOSITION of CAROLYN GUIDRY, produced as
8    a witness at the instance of the Plaintiffs, was taken
9    in the above-styled and numbered cause on JULY 24, 2014,
10   from 10:47 a.m. to 2:37 p.m., before Cynthia C. Miller,
11   CSR in and for the State of Texas, reported by machine
12   shorthand, at the Jefferson County Courthouse, District
13   Attorney's Office, 1085 Pearl Street, Third Floor,
14   Beaumont, Texas, pursuant to the Federal Rules of Civil
15   Procedure and the following stipulation and waiver of
16   counsel:
17        IT WAS STIPULATED AND AGREED by and between
18   counsel that if the original of said deposition is not
19   signed or available at the time of trial or any hearing,
20   an unsigned copy may be used in lieu thereof.
21
22
23
24
25
```

4

```
1              APPEARANCES CONTINUED
2
     FOR THE DEPONENT:
3
        Ms. Kathleen M. Kennedy
4       Mr. Philip Babin
        ASSISTANTS DISTRICT ATTORNEY
5       1085 Pearl Street, Third Floor
        Beaumont, Texas  77701
6       Tel:  409-835-8550
        Fax:  409-784-5893
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1                    APPEARANCES
2    FOR THE PLAINTIFFS:
3       Ms. Emma Simson
        CAMPAIGN LEGAL CENTER
4       215 E. Street, NE
        Washington, DC 20002
5       Tel:  202-736-2200, ext. 12
        Fax:  202-736-2222
6       Email:  ESimson@campaignlegalcenter.org
7       Mr. Chad W. Dunn
        BRAZIL & DUNN
8       4201 Cypress Creek Pkwy, Suite 530
        Houston, Texas  77068
9       Tel:  281-580-6310
        Fax:  281-580-6362 (fax)
10      Email:  chad@brazilanddunn.com
11
12   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
13      Mr. Bruce Gear (by telephone)
        DEPARTMENT OF JUSTICE
14      Civil Rights Division
        950 Pennsylvania Avenue N.W. (NWB-7200)
15      Washington, D.C.  20530
        Tel:  202-514-2919
16      Fax:  202-307-3961
        Email:  bruce.gear@usdoj.gov
17
18
        FOR THE DEFENDANTS STATE OF TEXAS,
19   RICK PERRY, JOHN STEEN, AND STEVE McCRAW:
20      Mr. S. Ronald Keister
        DEPUTY ATTORNEY GENERAL FOR LITIGATION
21      Southern District of Texas No. 10418
        209 West 14th Street
22      Austin, Texas  70711
        Tel:  512-475-0131
23      Fax:  512-475-2994
        Email:  ronny.keister@oag.state.tx.us
24
25
```

5

```
1                       INDEX
2
3                                            Page
4
     Stipulations...........................................2
5
     Appearances...........................................3/4
6
7
8
     Testimony of CAROLYN GUIDRY
9
        Examination by Ms. Simson........................6
10
        Examination by Mr. Gear.........................85
11
        Examination by Mr. Keister......................105
12
        Further Examination by Mr. Gear.................164
13
        Further Examination by Ms. Simson...............170
14
        Further Examination by Mr. Keister..............174
15
16
17
     Changes and Signature...........................177/178
18
     Reporter's Certificate..............................179
19
20
                       EXHIBITS
21
     Guidry Deposition Exhibit No. 1.......................65
22      (Substantially-Similar Name Analysis)
23   Guidry Deposition Exhibit No. 2....................176
        (Ms. Guidry's File)
24
25
```



**Page 6**

1    CAROLYN GUIDRY,
2    having been first duly sworn, testified as follows:
3    EXAMINATION
4    BY MS. SIMSON:
5    Q.  Could you go ahead and state your name for the
6    record, please?
7    A.  Carolyn Guidry.
8    Q.  Excellent.  And are you represented by an
9    attorney here today?
10   A.  Yes, I am.
11   Q.  And who would that be?
12   A.  Kathleen Kennedy.
13   Q.  Okay.  Excellent.  My name is Emma Simson, and
14   this is Chad Dunn.  We represent the Veasey/LULAC
15   plaintiffs in this lawsuit.  Do you understand you're
16   not a party to this lawsuit?
17   A.  I am.
18   Q.  Have you ever been deposed before?
19   A.  Yes, I have.
20   Q.  How many times?
21   A.  Probably twice.
22   Q.  Do you recall what the cases were about?
23   A.  I remember the most recent case.
24   Q.  Okay.  What was that one about?
25   A.  It had to do with property.

**Page 7**

1    Q.  Property?
2    A.  Uh-huh.
3    Q.  Did either of the depositions have anything to
4    do with elections?
5    A.  No, it did not.
6    Q.  Okay.  And you are the County Clerk for
7    Jefferson County; is that correct?
8    A.  That's correct.
9    Q.  Excellent.  So before we get started, I know
10   you've given two depositions before, but just a few
11   ground rules to kind of make this go smoothly.
12   The first is:  If you don't understand a
13   question that I ask, please let me know, and I'll try to
14   rephrase it in a way that makes sense.
15   A.  Okay.
16   Q.  Excellent.  The second is that I ask that we
17   try to avoid talking over each other.  So I will do my
18   best to wait until you finish your answer, and I'll ask
19   you to wait until I finish my question before you
20   answer.  Does that make sense?
21   A.  Okay.
22   Q.  The next I would ask is that you give verbal
23   answers because the court reporter is trying to get this
24   down, so if you nod or make a noise, she won't be able
25   to get that down.  Do you understand that?

**Page 8**

1    A.  Yes.
2    Q.  Excellent.  The next is that this shouldn't
3    take too long, but we can then try to take a break very
4    shortly after that.
5    A.  I will.
6    Q.  Excellent.  So to start us off, can you give
7    us a bit of background about yourself, where you're
8    from, where you went to school, past jobs?
9    A.  All right.  My name is Carolyn Guidry.  I am
10   originally from Beaumont, Texas.  I've lived here the
11   majority of my life.  I went to school here.  Attended
12   Catholic school, first part of my life through 8th
13   grade.
14   I went on and attended Hebert High
15   School.  Got married at an early age.  I attended some
16   business school.
17   I was hired on with Southwestern Bell in
18   1974.  I worked for them for 30 years.  Within that 30
19   years, I had several jobs in the business office, in the
20   network department.  I worked on equipment.
21   I was transferred to Houston for nine
22   years.  I worked in major marketing there.  I returned
23   to Beaumont, worked in the network department.  I worked
24   on the equipment.
25   I was vice president of my union, CWA.

**Page 9**

1    And I retired after 30 years with Southwestern Bell.
2    I ran for office in 2004 for county
3    clerk, and I was elected at that time for an unexpired
4    term.  So I've been county clerk since October of 2004.
5    And I am serving in my ninth year as county clerk.
6    And as county clerk, I oversee the
7    elections for Jefferson County.
8    Q.  Excellent.
9    A.  Here I am.
10   Q.  And did you run with a political party when
11   you ran for county clerk?
12   A.  Yes, I did.
13   Q.  And which party was that?
14   A.  Democrat party.
15   Q.  Excellent.  Have you had any other experience
16   working in a campaign?
17   A.  I have worked campaigns since I was about 12
18   years old.  I've always done -- I get out the vote
19   campaigns.  I have -- my uncle was very politically
20   active, so I've been involved in campaigns since he --
21   at a very, very young age.
22   So I always been involved, especially
23   being a union official, I was always very, very
24   involved, so yes.
25   Q.  All right.  So to turn to your responsibility

10

1  as county clerk, so you mentioned that you have some
2  election-related responsibilities.  What do those
3  entail?
4       A.  I do the elections for -- I administer the
5  elections for the county, so I'm responsible -- my
6  responsibilities are to do any elections that's called
7  by the Governor, or by the commissioners, but I also do
8  the elections for the political subdivisions.  I
9  contract with them to do their elections as well.
10      So as an administrator, what I do is I
11 make sure once they are given me -- once they call their
12 elections and do their part, which is to call the orders
13 and post their notices and stuff, I take their
14 information, I make sure that their ballots are done, I
15 do all their ballot information.  I get it programmed.
16      We do all the testing of the equipment.
17 We deploy all the equipment.  I employ all the election
18 workers.  Do all the payroll for those.  Staff all the
19 polling locations.  Do all the training for the polling
20 locations.  And make sure that we have the adequate
21 staffing for the counting station on election night.
22 And make sure that they have what they need.
23      I am not responsible for the actual
24 tabulation because those are appointed by Commissioners
25 Court.  But everything else I'm responsible for.

11

1       Q.  Do you also have responsibilities for voter
2  registration?
3       A.  No, I don't.
4       Q.  And who has responsibility for that?
5       A.  The voter registrar which is the tax
6  assessor/collector.
7       Q.  And who is that for Jefferson County?
8       A.  Right now it is Terry -- I can't say her last
9  name.  She's an interim.
10      Q.  Okay.  So you've been doing this now for about
11 nine years.  And how many staff do you have in your
12 office?
13      A.  As a county clerk, I have 35 people in my
14 office.  For the election department, I have five people
15 in the election department.
16      Q.  And who are the five that are in the election
17 department?
18      A.  Right now, the election manager is Naomi
19 Doyle.  The election programmer is Frederick Cribbs.
20 The warehouse manager is Toy Linton.  I have Denise
21 Plumber is a voting technician, and then Adrian Taylor
22 is also a voting technician.
23      Q.  And what do each of those employees do?  What
24 are their responsibilities?
25      A.  Naomi Doyle is the election manager.  She

12

1  oversees the entire department.  So she's responsible
2  for everything goes -- that goes on, starting with the
3  processing of all the mail ballots, all the way down to
4  everything that they do to make sure that they get all
5  the information they need to make sure the program is
6  done, to make sure the equipment is processed, the
7  equipment is programmed everything that they need is
8  done.  Just make sure that they are made ready for all
9  the elections.
10      Q.  Okay.
11      A.  Frederick Cribbs, the programmer, which he has
12 some training, he's new, and he does not do all the
13 programming right now, we're outsourcing that.  But once
14 he gets fully trained, he will do all the programming of
15 our ballots and stuff.
16      Right now, he does other Web site
17 updating, the EA tablets that we use to process the
18 voters and stuff.  So he has a lot of other
19 responsibilities as well.
20      Toy Taylor, she's the warehouse
21 supervisor, she maintains all the equipment.  She
22 actually works with programming the equipment, once we
23 get the program to program each Etronics, once it's sent
24 out to the field.
25      They also help -- all of them help with

13

1  all the testing and everything before it is deployed.
2  Of course, the voting technicians work under the
3  direction of the warehouse supervisor with all the
4  testing and making sure everything is operable.
5       Q.  Excellent.  Let's go back for a second, did you
6  receive a deposition notice today that requested
7  documents?
8       A.  Yes, I did.
9       Q.  And did you bring documents with you today?
10      A.  Yes, I did.
11      Q.  And could you describe generally what's
12 included in those documents?
13      A.  Well, what's in those documents -- first, I
14 pulled the Senate bill, which is what we're talking
15 about.  Also pulled things like the press releases that
16 we did pertinent to the photo ID, signs that we post at
17 the polling locations, training material that we use to
18 train our poll workers.
19      Public request we got pertaining to the
20 photo ID or anything to do with the photo ID or the
21 Senate bill.
22      Any complaints we got about the photo ID.
23 Budget allocations that we did to finance, finance for
24 photo ID.  Money we spent for advertising for photo ID
25 for what was required when they come to the polling

## 14

1    locations.

2        The mailing that went out for the 2014

3    tax statements that went out.  Communications that I had

4    between Judge Branick, as well as the Secretary of

5    State, that was regarding photo ID.

6        Communications and e-mails that we had

7    when we were trying to set up -- set up for an EIC in

8    order for the people in Jefferson County that did not

9    have the proper photo ID to be able to obtain their EIC

10   certificates to be able to vote.

11       Provisional ballots that we had during

12   the March primary and the runoff election that had to do

13   with voter ID, people that had to vote originally, as

14   well as the list of our election workers.

15       And then we only had one alleged incident

16   that might have been voter fraud.  Those are the

17   documentation that I pulled.

18       Q.   Excellent.  And was there someone in your

19   office who was put in charge of collecting all the

20   documents that were responsive, or did you do that

21   yourself?

22       A.   I collected those documents.

23       Q.   You did that, okay.  And was there any search

24   for documents outside of the county clerk's office but

25   that might be in possession of the county?

## 15

1        A.   No.

2        Q.   So we are here to talk today about Senate

3    Bill 14.  And if I say S.B. 14, you understand that I'm

4    talking about the photo ID bill that was passed in 2011;

5    correct?

6        A.   Yes.

7        Q.   Excellent.  So when did your office start

8    implementing, start working to implement S.B. 14?

9        A.   When the Senate bill originally came out, of

10   course, it was not implemented.  So it wasn't until we

11   got notification in June that it was going to go into

12   effect, and that was after the -- to do with the -- I've

13   got to back up a little bit.

14       Q.   Are you thinking of the Supreme Court case

15   came down?

16       A.   Yeah, the Supreme Court case came down and

17   then did away with something, I can't remember.  It's in

18   here.  I would have to go back and look at it.

19       And then all of a sudden, Greg Abbott

20   said we are going to implement it, even though we were

21   not going to implement it when it was passed.  That was

22   in June of 2013, I think.

23       Q.   How did you receive notification it was going

24   to go into effect?

25       A.   Through the Secretary of State.

## 16

1        Q.   Nobody contacted you separately from the

2    e-mail saying "get ready"?

3        A.   Judge Branick, our county judge, sens us an

4    e-mail, as well as the e-mail we got from the Secretary

5    of State's office.

6        Q.   Okay.  And when you got that e-mail, what did

7    the office have to do to get ready to implement S.B. 14?

8        A.   Well, nothing.  Well, we just had to make sure

9    that we had -- well, when they sent us the e-mail, they

10   also sent some things that we could send press releases

11   and stuff for, and we needed to get ready because the

12   next election was in November.

13       So knowing that was the next election

14   that would be affected by Senate Bill 14, then we

15   started looking at some things that we would have to

16   plan ahead for to make sure everybody had proper ID.

17       Q.   Were there any elections before November, any

18   local elections?

19       A.   No.

20       Q.   And so you get the notification.  Did you have

21   to train your staff or the elections department?  What

22   kind of training did they receive on implementing S.B.

23   14?

24       A.   Well, they got training prior to the November

25   election.  And that was in their regular poll workers

## 17

1    training that we would have done prior to the election.

2        Q.   And what is the regular poll worker training

3    consist of?

4        A.   Well, they have an on-line training, but that

5    on-line training did not include that.  We have a Power

6    Point training.  And we have that -- I have that

7    material also in what I brought here today.

8        Q.   When you say the on-line training didn't

9    include that, are you saying the on-line training didn't

10   include any information on photo ID?

11       A.   Right.  I didn't see any.  I think the

12   Secretary of State eventually put some on-line training

13   on there, but not the on-line training that we had at

14   the time.

15       Q.   And when you say "at the time," when was this?

16       A.   Well, at the time that the ruling came out on

17   June 27, there was nothing on-line at that time.

18       Q.   Okay.

19       A.   So we implemented something, we added

20   something to our Power Point training to include the

21   photo ID, Senate Bill 14.

22       Q.   So you added that into a special training

23   materials?

24       A.   Into our Power Point training, correct.

25       Q.   When did you give your Power Point training to

18

1  your employees?
2      A.  We gave it, I want to say, November the 5th.
3  It was for the November 5th training.  Let me log on
4  here, and I'll tell you.  I'm not sure exactly what date
5  it was given, but it was prior to the November.
6      Q.  Do you know if it was right after the
7  notification was given in June?
8      A.  No, it wasn't.
9      Q.  Closer to the election?
10     A.  What we normally do is we start training
11  before the early voting period starts.  So normally we
12  have training like a month before early training starts.
13         We were in training for at least two
14  weeks, because we have 200 people for training.  So we
15  have training classes four days a week.  They are like
16  two or three-hour sessions, and people come out to the
17  county session to train.
18     Q.  So you offer them four days a week.  Are
19  people expected to come all four days, or do they pick
20  one?
21     A.  No, they only come for two to three, two to
22  three hours one day.  And we assign them classes.
23     Q.  So this is an in-person training?
24     A.  Right.
25     Q.  For all the people that are going to work on

19

1  the polls on election days?
2      A.  Right.
3      Q.  Is there any training you had to do with your
4  staff in the office, the five people you mentioned
5  earlier?
6      A.  No, we train them as we go.  We train them
7  with the poll workers.
8      Q.  And did you attend any training for county
9  clerks from the Secretary of State's office, or anybody
10  from the state?
11     A.  No, not at that time.
12     Q.  Do you know if they offered any training on
13  those?
14     A.  Not that I'm aware of.  I know when the senate
15  bill initially came out 2011, we had got a lot of
16  literature at that time that we read.  And we went over
17  in the election law seminar prior to that, but that was
18  back in 2011 when the bill first passed.  But nothing
19  after that time.
20     Q.  Okay.  So the training that the poll workers
21  in Jefferson County receive, is it just the in-person,
22  or do they also do an on-line training?
23     A.  They have some on-line training as well.
24     Q.  And do you know if it's voluntary, or is it
25  mandatory?

20

1      A.  Oh, it's mandatory for us, because we have a
2  tracking system, and we can tell whether or not they
3  have taken all the classes.
4      Q.  Okay.  And how many classes do they have to
5  take on-line?
6      A.  It's a whole program of classes.  I mean, it's
7  like -- I'd have to look at that program.  It's our
8  clarity program, and it's just a different course that
9  tells you how to set up the polling locations.  It tells
10  you how to qualify a voter.
11         It's just a regular, normal set-up of
12  poll worker training.  And it has different -- I mean,
13  it just has different classes of training of how A to B
14  of what you do the entire day.
15     Q.  Was there any special training on the photo ID
16  and how to accept voters' identification?
17     A.  No, the training on photo ID was the training
18  that we gave in person.
19     Q.  And that was developed by the county?
20     A.  Right.
21     Q.  And did you receive materials from the
22  Secretary of State, like Power Points, or other training
23  materials to use when you educated your employees, or
24  your co-workers?
25     A.  We did get some material from the Secretary of

21

1  State that we implemented into our entire training.
2      Q.  So did you use those, or did you just
3  incorporate those into the county training?
4      A.  We incorporated some of it into the county's
5  training.
6      Q.  Okay.  So you mentioned that the November
7  elections were the first elections when you had to
8  implement S.B. 14.  How many elections total have you
9  had to implement S.B. 14 now?
10     A.  Four.  We had November 2013.  We had the March
11  primary.  We had the May election, the May special
12  district -- special senate district election.  Then we
13  had the May runoff election.
14     Q.  So in May, is that two or three?  There was a
15  special senate district election, and then a May runoff
16  election?
17     A.  We had two elections in May, one in March, and
18  then the November election.  So that's four elections
19  now.
20         So we're getting on our fifth election,
21  which is August the 5th, this one coming up.  So we've
22  had four already.
23     Q.  And what is the election August 5th?
24     A.  That's the runoff from the Senate District 4
25  special election.

22

1   Q.  So I asked before about your office -- what
2  your office had to do to implement S.B. 14.  Did you
3  have to change forms and other materials in preparation
4  for the elections?
5      A.  Yeah, forms had to be changed, because even on
6  the provisional ballots, there's a special form had to
7  be changed to say whether or not they were voting
8  provisionally because they did not have valid photo ID.
9      Q.  And does the county cover the cost associated
10  with changing those forms?
11      A.  No.  Of course, everything that,
12  unfortunately, legislature done, most of the time is
13  unfunded mandate.  So the cost is not assumed by no one
14  but the county.
15      Q.  Okay.  So you also mentioned that you did some
16  stuff to educate voters.  What types of things did you
17  do to educate voters?
18      A.  We had radio time that we did to educate the
19  voters.  We did workshops to educate the voters.  We
20  would reach out to different organizations and go out
21  and talk to them.
22          Like I said, we did the tax inserts for
23  every tax statement that went out.  I have that material
24  here for you.  We did it English and Spanish.  They were
25  little, you know, little slips that went out in every

23

1  tax statement to let them know when you go to vote now
2  you have to have voter ID.
3          Those are the things we did to make sure
4  the voters knew when they went to vote, effective
5  immediately, that you now had to have these type of
6  photo ID.
7      Q.  Did the county do any billboards?
8      A.  No, we did not do any billboards.
9      Q.  Or television ads?
10      A.  No television ads.
11      Q.  Nothing on busses, or brochures in offices?
12      A.  No.
13      Q.  Okay.  So the radio ads, do you remember when
14  those ran?
15      A.  I have the schedules of everything they ran.
16  Most of it ran during the election period before early
17  voting started for the March primary, and also for the
18  runoff, for the primary election.
19      Q.  Do you know if any radio ads were put on
20  before the November election?
21      A.  No, we didn't do anything before the November
22  election.
23      Q.  Okay.  And did -- so the county paid for the
24  radio ads?
25      A.  Right.

24

1      Q.  Do you know how much that cost the county to
2  run those ads?
3      A.  Yeah, I have the bills here.  The first one in
4  March was a little over 7,000.  And the ones in May was
5  right about $2,600.
6      Q.  And what did those radio ads generally say?
7  What was generally the content of those?
8      A.  Well, let me get to it, I'll tell you.  It
9  basically told them to bring the proper photo ID.  It
10  just said, "It's time to make your vote count in March,
11  Republican and Democratic primary elections, voters are
12  now required to present an approved form of photo
13  identification in order to vote in Texas.  Make sure you
14  have the approved photo ID required when going to the
15  polls."
16          And it talks about when early voting
17  begins.  So it just reminded them to make sure you had
18  the right photo ID for the polls.
19          MR. KEISTER:  Can I state that the
20  witness was reading from her personal computer?  It's
21  not a criticism.  And was what you just read, was that
22  part of the documents that you're producing today?
23          THE WITNESS:  Yes, I did, and I do have
24  the disks in my office of what was recorded.  And that
25  was the announcement, because I wrote the announcement.

25

1      Q.  (By Ms. Simson)  So the radio ad didn't
2  mention anything about the election identification
3  certificates, the free voter ID?
4      A.  No, it didn't mention that in this ad, no.
5  But we did do a campaign about the EICs.  And, like I
6  said, I have some e-mails that we went back and forth.
7          Because at one point we did have -- the
8  Secretary of State had a campaign with the state DPS
9  office to do EIC cards.
10          They brought two mobile units down here.
11  They were down here for two days, and we had the mobile
12  units down here, which we did advertise for people to be
13  able to go to the locations.
14          There were two different locations, one
15  each day.  One here in the Beaumont area.  The other one
16  in the Port Arthur area where they could go, if they
17  needed to, to go get an EIC, rather than try to visit
18  the DPS offices here, on those two days to get an EIC
19  card, if they were required to do so.
20          We did have advertisements for that
21  available.  And we did try to do that in advance.  That
22  was the only time that we did have advertisement about
23  obtaining EIC cards.
24          And that was in conjunction with the
25  campaign that the Secretary of State was doing.

26

```
1         Q.   You also mentioned workshops.  Who were those
2    workshops targeted at?  Were they targeted at voters?
3         A.   They were targeted at voters, and the elderly,
4    and the senior citizens, mostly, the senior citizen
5    groups.
6              We talked to, like, Our Mother of Mercy
7    senior citizen group.  Something else senior citizen
8    group.  A couple churches.  Rise, which is a disability
9    group.  We went out and talked to them about it.
10             I'm trying to think one of the other
11   groups we went out and talked to.  We provided
12   information to the Deltas of Port Arthur.  They came in
13   and got information from us.  The Deltas is -- out of
14   Port Arthur group.
15        Q.   So when you say workshop, is that something
16   where you would go speak for 15 minutes at one of their
17   meetings?
18        A.   Right, right.
19        Q.   And what would, generally, the content be for
20   those workshops?
21        A.   It would just be about the law has changed,
22   and now we're -- now we must use a photo ID, and this is
23   what we must do.
24             And one of the things that we also talked
25   about is that a lot of our seniors may or may not have
```

27

```
1    photo ID.  A lot of their driver's license have expired,
2    and we wanted to make sure that they knew in lieu of
3    photo ID, another way available made -- made available
4    for our seniors was the mail ballots, and we also talked
5    about mail ballots in lieu of photo ID.
6         Q.   And about how many workshops do you think you
7    had?
8         A.   I don't know.  Maybe about six or seven.
9         Q.   Six or seven?
10        A.   Uh-huh.
11        Q.   And do you have any estimate of about how many
12   people attended those?
13        A.   Well, for the senior citizens, their group
14   normally had about 60 to 70 people at the senior citizen
15   groups, the groups that we talked to.  For the Deltas,
16   it probably was about 20 or 30.
17             And then Rise, they probably had about
18   12 -- 12 or 13 members at the Rise group.
19        Q.   And I think you mentioned churches.  Were
20   there any at churches?
21        A.   Let's see.  Jamie went to -- I'm not sure
22   about how many was there, I would have to ask him,
23   because he spoke at Antioch, and I'm not quite sure.  I
24   wasn't in attendance at that one.
25        Q.   So these workshops that you just mentioned are
```

28

```
1    ones that you did personally?
2         A.   Yeah, the ones I did, I know who was there.
3    But the ones like if Jamie spoke at it, I couldn't tell
4    you what the numbers were, no.  I'd have to ask him.
5         Q.   So do you have any total workshops the office
6    did at a whole?
7         A.   That's what I'm saying, it wasn't no more than
8    seven or eight as a whole.
9         Q.   Okay.  Have you done -- when were these
10   workshops, were these before the November election, or
11   before the March election?
12        A.   They were before the March election.
13        Q.   Okay.  And you also mentioned talking to
14   different community organizations, beyond the workshops.
15   Did you also send out e-mails to community
16   organizations, or letters?
17        A.   No, not really.
18        Q.   Okay.
19        A.   I mean, we sent out a press release that went
20   to the press that we have on file, you know, like for
21   early voting.
22             We have a list of people that we send out
23   daily totals to, like, newspapers and different
24   organizations that want numbers.  And if we have their
25   e-mail address, we will just sent them out data and
```

29

```
1    stuff.
2              So when we sent out the press release, it
3    goes to those organizations, those people.
4         Q.   And the tax inserts, so when were those sent
5    out with the tax forms?
6         A.   I think the tax statements went out in
7    November.
8         Q.   So that would have been before the November
9    election?
10        A.   It might have been around the same time.  I'm
11   not exactly sure when they went out.
12        Q.   Okay.  And did those -- you said those went
13   out in English and Spanish?
14        A.   Yes.
15        Q.   Did any of the radio ads have a Spanish
16   component, or were any of the radio ads done in Spanish?
17        A.   No.  I did advertise in one Spanish newspaper,
18   which is El Perico.
19        Q.   Okay.  And you mentioned the tax inserts.  Do
20   you have an estimate of how much it cost, or do you know
21   how much it cost the county?
22        A.   I picked up -- I'd have to go back and get the
23   costs on that, because I paid for the printing, and the
24   tax assessor paid for the actual mail-out in the
25   inserts.
```



30

1     And I'm not quite sure what he paid for
2  that at that time. Shane Howard was here at that time.
3  And he paid for the actual inserts with that company.
4     Q.  Did the tax assessor also help pay for any of
5  the voter ads, or was that entirely the county clerk's
6  office?
7     A.  No, that was entirely out of my budget.
8     Q.  Okay.  Did you do any sort of database match
9  between the voter registration database and the
10  Department of Public Safety driver's license database to
11  figure out which voters may lack photo ID?
12     A.  No, I don't deal with the databases on that.
13     Q.  Okay.  Were you ever told that you could
14  obtain a list of voters who may lack ID from the
15  Secretary of State's office?
16     A.  No, I was not.
17     Q.  Okay.  So are you aware of any other counties
18  having done a database match where they looked at the
19  voter registration list against the driver's license
20  database to figure out if they lacked photo IDs?
21     A.  No, I'm not aware of that.
22     Q.  Okay.  If you had been aware that such a list
23  had been available from the Secretary of State's office
24  to know which of your voters may lack ID, is that
25  something you would have been interested in obtaining?

31

1     MR. KEISTER:  Object to form.
2     Q.  (By Ms. Simson)  You can go ahead and answer.
3     A.  Well, even with that list, I don't know what I
4  could have done with the list because I don't handle the
5  registration part.
6     Q.  So some counties, Dallas County, for instance,
7  used one of these types of lists of people who may lack
8  ID and sent out notices to those voters saying, "If you
9  need an ID, here is how to do it."
10     Is that something you think Jefferson
11  County would have been interested in doing if you had
12  that data available?
13     MR. KEISTER:  Object to form.
14     Q.  (By Ms. Simson)  Go ahead.  You can go ahead
15  and answer.  Just so you know, he's going to be making
16  objections.  He's free to do that, but you can go ahead
17  and answer.
18     A.  Yes.  I think that would have been a good
19  thing to do, absolutely.
20     Q.  So there were no mailings that the county sent
21  out to voters that they thought may lack ID?
22     A.  Not that I'm aware of.
23     Q.  Okay.  Who is generally responsible for voter
24  education activities in the state?  Is it usually the
25  Secretary of State's office, the counties, or some

32

1  combination of both?
2     A.  For voter education, I think it's probably a
3  combination.
4     Q.  And did you feel that it was particularly
5  important to educate voters about the photo ID law with
6  radio ads, tax inserts, et cetera?
7     A.  Oh, definitely.
8     Q.  And why did you think that was important?
9     A.  Well, I think it was a way to reach our local
10  voters.  I think it was the best way for us to reach our
11  local voters anyway.
12     I know that the Secretary of State
13  invested money in advertisement, which personally I
14  think that money would have been better spent had they
15  given us some budget money to spend here at our local
16  levels, but we weren't afforded that money.  It would
17  have been easier for the counties to be able to do that.
18     Q.  Could you expand a little bit on what you
19  think -- why the money would have been better spent if
20  they had sent it to the counties to do the outreach
21  instead of the Secretary of State's office?
22     A.  Well, I just think that we would have been
23  able to do better outreach locally, than just -- you
24  know, I know they did a lot of TV advertisement, but,
25  you know, a lot of people these days watch a lot of

33

1  cable TV, or maybe they did not necessarily reach our
2  local stations.  I'm not sure.
3     But I just think that if we would have
4  been able to do it locally, that maybe we could have
5  done something a little bit better locally, had we
6  had the funds ourselves to spend.
7     I would have liked to have more than
8  $10,000 to spend on radio, which is all we were afforded
9  to spend out of our budget.  Because it was something
10  that we had not planned for in our budget when it came
11  about, you know.
12     Because by the time that they said we're
13  going to institute it, in June of 2013, in June of 2013,
14  of course, our budget at that time had already been set
15  for that year.  Then we were able to allot some money
16  for the following year in October, so --
17     Q.  So all of the money that you did spend on
18  voter education and outreach, was all of that out of
19  your regular budget, or did you go to the Commissioners
20  Court and ask for additional funds?
21     A.  I asked for additional funds for that
22  following budget year.
23     Q.  So that would be for the fiscal year starting
24  when?
25     A.  2013-2014, October 1st.



**34**

1    Q.   October 1st of 2013?
2    A.   2013, right.
3    Q.   So you did ask for additional funds for that?
4    A.   Right.
5    Q.   And did you get those funds?
6    A.   Yeah.  They allotted me $20,000.
7    Q.   And is that $20,000 specifically for voter
8    education and outreach?
9    A.   Yes.
10   Q.   Did you ever ask the Secretary of State's
11   office for funds to do voter education and outreach?
12   A.   No.
13   Q.   Did the Secretary of State's office ever offer
14   funds?
15   A.   No.
16   Q.   Are there any other costs, though?  I think
17   we've covered the forms, the radio ads, the tax inserts.
18   Are there any other costs that were involved that your
19   office had to pay for that you would not have had to pay
20   for if S.B. 14 had not gone into effect?
21        MR. KEISTER:  Object to form.
22   Q.   (By Ms. Simson)  Let me actually rephrase that
23   question.  Aside from the radio ads, the tax inserts,
24   and changes to the forms, are there any other costs that
25   your office had to pay for that you would not have had

**35**

1    to pay for, if not for S.B. 14?
2        MR. KEISTER:  Object to form.
3    A.   You say the change in the forms.  No, I guess
4    that was the cost was just changing the forms, the
5    additional training.  That probably was it.
6    Q.   (By Ms. Simson)  So there were costs with
7    additional training?
8    A.   Well, yeah, we had to have additional
9    training.
10   Q.   And what additional training did you do that
11   you would not have done?
12   A.   Well, I mean, just adding it to the Power
13   Point, making sure that we got everybody retrained on
14   it.
15   Q.   Did the election clerks or the poll workers
16   have to go to any additional training in terms of time?
17   Did they spend any more time in training than we would
18   have otherwise spent?
19   A.   Yeah, because sometimes if we don't -- if
20   we're not adding anything new, it's not necessary to
21   bring them all back in.  But as we add new things, then
22   we need to cover new things with them to make sure they
23   understand what the changes have been.
24        So, you know, there was a lot of new
25   changes when you start talking about photo ID, and

**36**

1    especially when you're talking about similar names and
2    not similar names.  And that was very hard for them to
3    understand.  We spent a lot of time going over for them
4    to understand that.
5        And, you know, even at that, you know,
6    they kind of were very, very confused.  We spent a lot
7    of time even going to the polling locations during the
8    election period to try to straighten it out once people
9    got there when their identification saying, "No, see,
10   this really is the same, and this is okay, and you can
11   accept this or you can't accept that," you know.
12        So, yes, we spent extra time just trying
13   to help them understand.  But you have to understand,
14   the average age of our poll worker is 70 years old.  So
15   it's not as easy and cut and dry as just saying, you
16   know, "You do it this way," you know, "This is the way
17   it is."
18   Q.   And about how many poll workers do you have on
19   election day?
20   A.   Well, for the March primary, we had like about
21   410 probably, at least.
22   Q.   And I think before you said that in the past,
23   if there's not a big change to the law, then you do not
24   have to retrain some people?
25   A.   Right.

**37**

1    Q.   You can rely on their past training, and that
2    you had to have a bunch -- every person come back in for
3    training this year; is that correct?
4    A.   Right.  We had changes.  Make sure they know
5    what's going on.
6    Q.   Okay.  And on election day, how many people
7    work at a polling place?
8    A.   Well, at the larger polling locations, like if
9    you take some of my larger polling locations, I may have
10   15, 16 people.
11        Some of the smaller locations, probably
12   the minimum amount I'm going to have is going to be six.
13   Q.   And is there someone who's supervising at each
14   location?  Is there one person who's given the title of
15   judge?
16   A.   Well, during the primary elections, because we
17   have joint primary elections, we have co-judges, so
18   you're going to have a Democrat and a Republican
19   co-judge.
20        When it's a general election, it's not a
21   co-judge.  You have a judge and an alternate judge.  And
22   that's based on which party got the most votes in the
23   gubernatorial race, that determines who is the judge and
24   who is the alternate judge.
25   Q.   And so those are referred to as election

## 38

```
1    judges?
2         A.  Right.
3         Q.  And then who works below them, what would you
4    call them?
5         A.  They're election clerks.
6         Q.  Election clerks.  And do they all receive the
7    same training, or do election judges receive extra
8    training?
9         A.  No, they all pretty much receive the same
10   training, but the election judges have different duties.
11   They're delegated different duties to do.
12        Q.  And what are their duties?
13        A.  Well, they kind of, like, oversee -- they're
14   like the liaisons of everything that's going on.  They
15   have the ultimate responsibility to make sure that
16   everything is run smooth.  Whereas, they are not allowed
17   to come and go, like the clerks may be able to come and
18   go.
19             They have the ultimate responsibility to
20   make sure that everything runs right at their polling
21   location.  And at the end of the day it's their
22   responsibility to make sure that everything closes down
23   correctly, and that all the medium that's used to
24   tabulate at the end of the night is brought to the
25   accounting station.
```

## 39

```
1         Q.  But in terms of training, they receive the
2    same types of training that the election workers
3    receive?
4         A.  Right.
5         Q.  Or the election clerks?
6         A.  Yes.
7         Q.  Okay.  And when people complete training, do
8    they have to certify completion of that training?
9         A.  They get -- yeah, they get a certificate at
10   the end of their training, if they are on-line and
11   stuff.
12        Q.  Okay.
13        A.  Of course, it's training that we give, they
14   just get a little "attaboy," and "thank you for coming."
15        Q.  Right.  And you mentioned that during the
16   training, they were a little bit longer because there
17   was a lot of confusion around the -- for example, the
18   substantially-similar name issue.
19        A.  Right.
20        Q.  Do you do anything at the end of the training
21   to see if people understood the training?
22        A.  No.  Well, what we will do normally, we stay,
23   if they have any questions, they will come and ask us.
24   A lot of times they wouldn't ask us, they will wait
25   until they run into the situation, and we find out they
```

## 40

```
1    really didn't understand.
2             We take our training serious, because
3    when we train, we pay for training.  The Secretary of
4    State, like, during the primary election, because those
5    are actually the elections of the party, they do not pay
6    for training.
7             But any time we bring the people in for
8    training, the county -- whether it's the primary or not,
9    I'm paying them to come in.  Because that's their time,
10   and I want them to take it serious, and I want them to
11   learn.
12        Q.  So because you had to have every person come
13   back for training this year because of the photo ID law,
14   you had to also pay for additional training?
15        A.  That's right.
16        Q.  And so you don't do -- when you said before
17   there's -- they can come up for questions at the end,
18   but there is no kind of quiz at the end to see if they
19   understood the information?
20        A.  No.
21        Q.  Okay.  Do you think that you were successful
22   in training the election workers to prepare for the
23   photo ID law?
24        A.  Pretty much.  I only had one complaint, and
25   that's in here also.  One of the newer election judges
```

## 41

```
1    observed a behavior that she thought -- that she thought
2    was not conducive to the training.
3             And like I said, a lot of times people --
4    I mean, you would be surprised.  We train, we train, we
5    train.  And on election day, it's like people just go
6    blank.  They act like they have never been trained.  But
7    like I said, the average age is 70 years old.  So it
8    happens.
9         Q.  And did your office do anything to analyze the
10   impact of S.B. 14 on voters?
11             MR. KEISTER:  Object to form.
12        A.  Not other than we looked at the number of --
13   we had -- we didn't have a horrific amount of
14   provisional ballots when we looked at it.  I think we
15   had a total of seven over the March primary and runoff
16   election, which I guess isn't an enormous amount.
17             But I don't think that we've had a great
18   amount of people not having ID in the past.  But, of
19   course, most people come just with their voter
20   registration cards in the past.  So I don't know.
21        Q.  (By Ms. Simson)  Do you think it's possible
22   that some voters would not show up to the polls because
23   they now have to have a photo ID and they don't have
24   one?
25             MR. KEISTER:  Objection:  form.  Calls for
```

42

1  speculation.
2      A.  I think that's possible.  And I think that
3  what it may do is just encourage a whole lot of other
4  people just to vote by mail.
5      I know that a lot of the seniors are
6  doing that now because their driver's license have
7  expired, and they have no reason to get a driver's
8  license because, frankly, some of them don't need to be
9  driving.  But, yeah, that's a possibility.  I don't
10  know.
11      Q.  (By Ms. Simson)  Did you look at any numbers,
12  like voter turnout, before the photo ID law, after the
13  photo ID law, to see if there was any effect?
14      A.  No, I did not.
15      Q.  And before you mentioned that you found that
16  there was a relatively small number of provisional
17  ballots, were there any in the November election?
18      A.  No, there were not.  But normally, for the
19  constitutional amendment election, it's such a low
20  turnout, that you would not see anything significantly
21  happening anyway.
22      Q.  And are the March primary and May runoff
23  elections -- would you consider those to be typically
24  low turnout elections as well?
25      A.  No, those would normally be good turnouts.

43

1  Even though it's a governor race, it still was a much
2  better turnout normally for a governor's race, it was a
3  good turnout for this election.
4      Q.  Would you expect the turnout in November to be
5  significantly higher than the primary elections?
6      A.  I would.
7      Q.  And were there any provisional ballots in the
8  May special election?
9      A.  None to do with photo ID.
10      Q.  Okay.  And of the seven provisional ballots
11  that were cast because of an ID problem, how many of
12  those voters came back and cured their ballots?
13      A.  None, that I'm aware of.
14      Q.  Did you follow up with any of those who did
15  not cure?  So any of those seven voters, did you follow
16  up to find out if they had ID and just forgot it, or did
17  you follow up to find out if they just lacked ID?
18      A.  I did not follow up, but I know one
19  personally, and I know that she has ID.  And I think
20  that on Addie's part -- Addie Allen, I know her
21  personally.
22      I think on her part, that she just had a
23  misunderstanding of what day that she was actually due
24  back to cure her ballot.
25      And she had originally forgotten her ID

44

1  because she was in the midst of running back and forth
2  with her mother, who was a patient at TIRR in Houston.
3      And when she came in, that's when she
4  realized she did not have her ID with her.  Addie was
5  actually a candidate for a state rep office at one time,
6  and I know she votes constantly.
7      And it was totally an oversight on her
8  part.  And I know she really felt bad about it.  I
9  really felt bad for her, but there was nothing I could
10  do about that.
11      And then when she realized that she was a
12  day late to cure her ballot, I mean, there's nothing I
13  can do about it.  But, I mean, things happen.
14      Q.  Right.  What about the other six, do you have
15  any idea whether they have ID and just forgot it, or
16  whether they don't have the IDs?
17      A.  I have no clue about the other six.  I really
18  don't know them.  And I really can't tell from the
19  information on there, on the envelope what the issue
20  would have been.  It just says no ballot.  One of them,
21  I think, was not even a registered voter.
22      Q.  Okay.
23      A.  According to this, was not even in the
24  database.
25      Q.  Did the Secretary of State's office request

45

1  any information about how many provisional ballots had
2  been cast in the elections because of an ID problem?
3      A.  The Secretary of State's office did not.
4      Q.  Did you share these numbers with anyone else
5  for feedback about how the photo ID law was going?
6      A.  I did get a request from an attorney from the
7  Department of Justice.
8      Q.  Okay.  Now, if I say EIC, I'm referring to the
9  election identification certificate.  Do you understand
10  what the EIC is?
11      A.  Yes, I do.
12      Q.  Okay.  Does Jefferson County have the
13  authority to issue EICs?
14      A.  Not Jefferson County, Jefferson County DPS
15  office.
16      Q.  But the county clerk's office does not have
17  the authority to do that?
18      A.  Does not.
19      Q.  Are you aware that other counties have
20  received authorization to issue EICs through their
21  county clerk's office?
22      A.  No, I'm not.
23      Q.  Is that something that you would think the
24  county would be interested in doing if it were possible
25  for the county clerk's office to get authorization to

46

1  issue EICs?
2      A.  Yes.
3      Q.  DPS, you mentioned, is the authority within
4  Jefferson County that can issue EICs.  Do you know
5  approximately how many locations DPS has within
6  Jefferson County?
7      A.  I believe two.  One in Beaumont, and one in
8  Port Arthur.  Is the only two I'm aware of.
9      Q.  But you're not aware of any others?
10     A.  No.
11     Q.  And are you aware whether DPS offered Saturday
12  hours for issuing EICs within Jefferson County?
13     A.  No, I'm not aware of that.
14     Q.  So no one from the Secretary of State's office
15  contacted you and said DPS is going to have Saturday
16  hours to issue EICs?
17     A.  No, I'm not.
18     Q.  And you mentioned two mobile units on two
19  different days, so I took that to mean there was one
20  mobile unit on each day; is that correct?
21     A.  That's correct.
22     Q.  And were those two days before the November
23  election?  When were those --
24     A.  They were before the March primary.
25     Q.  So there were no mobile EIC units before the

47

1  November election?
2      A.  There were not.  They did contact me prior to
3  the November election, but they contacted me like days
4  before they wanted to bring the unit, and I didn't think
5  that was very beneficial because it did give us adequate
6  time to notify the people in order to give them adequate
7  time to be anywhere.
8          You know, if it's going to be a benefit,
9  I think you need to have time to at least to be able to
10  circulate maybe to the church or to the organizations,
11  "Hey, they are going to be here," so you would have a
12  good attendance.
13     Q.  Who contacted you before the November election
14  before having mobile EIC units in Jefferson County?
15     A.  The Secretary of State's office.
16     Q.  Do you know who the Secretary of State's
17  office?
18     A.  I can look at my e-mails.
19     Q.  It's okay.
20     A.  Okay.
21     Q.  So the Secretary of State's office contacted
22  you about having a mobile EIC unit for the November
23  election, but you declined because you didn't feel you
24  had enough time to organize it?
25     A.  That's correct.

48

1      Q.  So for the March election, you said you had
2  two mobile units before those.  And how far in advance
3  was that arranged?  Can you recall, was it a few days or
4  a few weeks before the election that you had those
5  units?
6      A.  Well, I think they actually came in February.
7  They actually came in February, because what they had
8  told me in November when I declined, they said, "Well,
9  if you don't want us to come now, when do you want to
10  come?"  I said, "Maybe in January some time."
11         They said, "Okay.  Contact us in
12  January."  So I started contacting them in January.  So
13  then when I tried to set them up in January -- and I had
14  set up some dates.
15         And then when I contacted them they said,
16  "No, we can't do it then," after I had set everything
17  up.  And then they turned around and gave me some more
18  dates.  And then we set up on those dates, which ended
19  up being in February.
20     Q.  And did they say why they couldn't do the
21  dates in January?
22     A.  Well, they said that I did not give them
23  enough time.  So we went -- just went back and forth for
24  a while.  So they ended up coming before the early
25  voting period started in February.

49

1      Q.  And how much time, approximately, did you have
2  to advertise that those units were going to be here?
3      A.  I have to look at these dates.  I think about
4  a week maybe.
5      Q.  So only about a week?
6      A.  Yeah, I think so.  I think about a week,
7  because I remember we did fliers at the church, at
8  different churches and stuff.  We had fliers as soon as
9  we could.  And I sent it to the radio stations.
10     Q.  And this is when you said, I believe, from
11  before, you said this is when you did the election
12  identification campaign, the EIC campaign?
13     A.  Right.
14     Q.  And so you mentioned fliers, you contacted the
15  radio stations, or did you again pay for radio
16  advertisements?
17     A.  No, we just e-mailed -- well, it's like a
18  public service, so I didn't have to pay for that.
19     Q.  Do you know if they ended up airing those
20  advertisements?
21     A.  They did.  They would announce it.
22     Q.  And do you have any sense for how many times
23  they aired that announcement?
24     A.  No, I don't.
25     Q.  Do you know if those announcements were both

50

```
1    in English and in Spanish?
2         A.  That, I don't know either.
3         Q.  Okay.  So when you did this campaign in
4    February to advertise the mobile EIC units, you think
5    you had about a week, did you feel that that was enough
6    time to advertise the mobile units?
7         A.  Well, it was better than a couple days.  It
8    was better than a couple of days.
9         Q.  Did the county provide any staff for those
10   mobile units?
11        A.  No, it was their staff, DPS staff.
12        Q.  DPS staff.  And did any -- did the county
13   actually provide any resources?
14        A.  No.  The only thing we did, my elections
15   manager went out there to meet them to make sure that
16   they had what they needed, make sure that the building
17   was opened, and they had whatever electrical outlets and
18   stuff that they needed.  That's all that we did.
19        Q.  And you mentioned two locations were used.
20   What were those two locations?
21        A.  One location was the Alice Keith Community
22   Center on Highland.  That's here in Beaumont.  And the
23   other one was the Port Arthur Public Library.  Of
24   course, that's in Port Arthur.  And the dates were
25   February 26th and February 27th.
```

51

```
1         Q.  And you're looking at an e-mail exchange?
2         A.  I'm looking at the two sites here, yeah, that
3    we had.
4         Q.  How were these two locations chosen?  Did the
5    Secretary of State's office choose them, did the DPS
6    chose them, or did the county choose them?
7         A.  No, the county chose them, we chose them.  We
8    talked to the commissioners, what was neutral to the
9    communities, what would be a good site, what was
10   available, what was public buildings, and where would we
11   get the most people in the community to go.  And that's
12   what we decided to do.
13        Q.  So it sounds like two of the factors were
14   where places that a lot of people in the community would
15   go?
16        A.  Right.
17        Q.  What was a neutral territory?
18        A.  Yeah.
19        Q.  Were there any other considerations?
20        A.  There were a couple other considerations, but
21   we looked at the areas and, you know, the buildings, the
22   parking, the community, where was it needed most.  I
23   mean, when you talk about needing photo ID, what
24   community really needs photo ID.
25             I mean, if you look at the area, you
```

52

```
1    would think that most people in the west end of Beaumont
2    would not need photo ID.  So why would you want to put
3    it out in the west end?  That would be a waste.
4             So that's some of the things we took into
5    consideration, where we wanted to put it.
6         Q.  So I don't know Beaumont very well.
7         A.  Okay.
8         Q.  So what is the west end?
9         A.  It's like a ritzier part of Beaumont.
10        Q.  So a wealthier area?
11        A.  Wealthier area, yeah.
12        Q.  So the areas that you chose, one of the
13   considerations was the income of the area?
14        A.  Right.
15        Q.  Did you also look at all at the racial
16   characteristics of the area?
17        A.  Absolutely.
18        Q.  And why was that?
19        A.  Well, because -- because you want to look at
20   what would the need be.
21        Q.  And so you had a sense that there might be a
22   greater need for ID among low income?
23        A.  Right, among minorities.
24        Q.  And minorities groups?
25        A.  Right.
```

53

```
1         Q.  So it sounds like you looked at the racial
2    characteristics of the areas, the income characteristics
3    of the areas, where there was space, where was a neutral
4    area, where the public goes.  Were there any other
5    considerations that were important?
6         A.  That covered it.  What was available, of
7    course.
8         Q.  And you said the Commissioners Court was
9    involved in making some of those decisions.
10        A.  Well, I talked to the commissioners,
11   individually, you know, because I can't gather more than
12   three.  Then you have a quorum, so --
13        Q.  So were the mobile units ever sent to special
14   events, like fairs?
15        A.  No.  That was the only time that they were
16   down here.
17        Q.  Was there ever any discussion about sending
18   mobile units to senior citizen centers?
19        A.  No.  This was the only time that they were
20   going to come down here.  This is the only time offered
21   to us, period.
22        Q.  Did you ever request to have more units sent
23   down here?
24        A.  No.  Like independent, this is the only two
25   days they were willing to give us, so we took what they
```

## 54

1  were willing to give us.
2  Q.  And did they say, "We can't do more than two"?
3  A.  Well, this is what they offered, and this is
4  what we took, so --
5  Q.  Okay.  So you didn't have to pay any money for
6  the mobile EIC units?
7  A.  No.
8  Q.  Do you have any -- do you know how many IDs
9  were issued at the mobile EIC units?
10  A.  No, I don't.
11  Q.  Do you know if any were issued?
12  A.  No, I don't.
13  Q.  You don't know?
14  A.  They didn't give me a report.
15  Q.  Do you know if there have been any EICs issued
16  by DPS within Jefferson County?
17  A.  No, I don't.
18  Q.  And is that because you were not given a
19  report about that?
20  A.  Yeah, I don't have any contact with DPS.
21  Q.  And no one from DPS or the Secretary of
22  State's office has ever contacted you about how many
23  EICs have been issued?
24  A.  No.
25  Q.  Now, you also mentioned the county has a

## 55

1  Web site.  Did information about the EIC units go up on
2  the Web site?
3  A.  Yes, it did.
4  Q.  And that would be about a week in advance?
5  A.  Right.  It was posted -- as soon as we
6  confirmed the dates with them, it was posted on the Web
7  site.
8  Q.  Were there any locations that you wanted to
9  send EIC units that the Secretary of State's office, or
10  the Department of Public Safety said they could not use?
11  A.  No.
12  Q.  So they left it up to you pretty much to
13  choose?
14  A.  Right.
15  Q.  Okay.  Now, you mentioned -- so you brought up
16  before that there may be one allegation of voter fraud.
17  Is there -- if you think that there's voter fraud going
18  on in the county, what happens?  Do you refer that to
19  someone?
20  A.  Yes, I refer it to the district attorney's
21  office.
22  Q.  Anyone else?
23  A.  No, I leave it up to them where it goes from
24  there.
25  Q.  Okay.  And have you referred any cases to the

## 56

1  district attorney's office?
2  A.  Yes, just this one.
3  Q.  And what were the circumstances of that one?
4  A.  It was a mail ballot, a request for a mail
5  ballot that we received.  And then we got a -- and we got a
6  report from the voter registrar saying this person was
7  deceased, so I sent that up.
8  Q.  So you mentioned that you've been county clerk
9  since October of 2004.  Are there any other instances of
10  alleged voter fraud that you can recall from your time
11  as county clerk?
12  A.  No, I can't.
13  Q.  So the only instance of voter fraud that you
14  can recall is this one potential fraud related to a
15  request for a mail ballot?
16  A.  Right.
17  Q.  And have you referred this case to the
18  district attorney's office?
19  A.  I have.
20  Q.  Have they -- do you know whether there's been
21  any prosecution for that?
22  A.  Not at this time.  I think it's still in
23  review at this time.
24  Q.  So are you aware of any instances in Jefferson
25  County that S.B. 14 could have prevented -- let me

## 57

1  rephrase that, sorry.
2  Are you aware of any instances of voter
3  fraud in Jefferson County that S.B. 14 could have
4  prevented?
5  MR. KEISTER:  Object to form.  Calls for
6  speculation.
7  A.  No.
8  Q.  (By Ms. Simson)  So the only instance of voter
9  fraud that you're aware of is a mail-in ballot?
10  A.  That's correct.
11  Q.  Okay.  Now, to turn to the
12  substantially-similar names provision that we've talked
13  about, who makes the decision -- when a voter walks in,
14  who do they hand their ID to?
15  A.  The clerk at the desk, whoever is processing
16  the voter at that time.
17  Q.  And so the election clerk processes the voter.
18  And what happens, the voter hands their ID over?
19  A.  Right.
20  Q.  And then the election clerk, what does the
21  election clerk do with the ID?
22  A.  We have voter administration tablets and we
23  have all the voters listed.  So their names should match
24  what their voter registration says.
25  And in the voter registration database,

## 58

1    they also have their former names as well.  For

2    instance, for a female, you may have a former name,

3    which will help with your identification.

4         Q.   So the election clerk takes the ID, looks it

5    up in this tablet.  Do they swipe the ID in a machine?

6         A.   No.

7         Q.   Okay.  So they just type in the last name or

8    the first name?

9         A.   Right.

10         Q.   And look the person up?

11         A.   Uh-huh.

12         Q.   And so the election clerk has the ID.  Are

13    they the ones who decide whether the ID is substantially

14    similar to the voter list?

15         A.   Right.

16         Q.   And did the county give any guidance beyond

17    what the Secretary of State's office gave out about what

18    substantially similar means?

19         A.   Yeah, that's part of our training.

20         Q.   And what kind of additional guidance did you

21    give?

22         A.   Well, it was part of the training that came

23    from the Secretary of State's office about similar

24    names.  And it's part of the training that we have, you

25    know.

## 59

1         Just basically, you have to -- you have

2    to look at the names, and some things are just kind of

3    like common sense stuff.

4         Q.   We went over this a little bit before, but you

5    did not do any sort of pre-match before the election

6    where you said, "Here's what this person's name is on

7    the voter list, here is a person in the driver's license

8    database, so we think their ID is a match"?  You didn't

9    give any guidance in advance to the clerks about the

10    voter ID?

11         MR. KEISTER:  Object to form.

12         A.   No, they wouldn't know until they get there.

13         Q.   (By Ms. Simson)  So there was no information

14    in advance to tell the election clerk to tell this

15    person might be a match or not a match?

16         MR. KEISTER:  Object to form.

17         A.   No, we have some samples here.  When we talk

18    about slightly different, customary variations, and

19    different fields.

20         So we talk about that, like spelling,

21    could be slightly -- could be different.  Some people

22    might spell Doris D-O-R-R-I-S, versus D-O-R-I-S.

23         Q.   (By Ms. Simson)  And what document are you

24    looking at right now?

25         A.   I'm looking at part of our training.

## 60

1         Q.   And is this the training that the Secretary of

2    State's office gave --

3         A.   Right.

4         Q.   -- or is this stuff that the county developed?

5         A.   The training the Secretary of State gave that

6    we implemented.

7         Q.   Okay.  So did you use the same examples from

8    the Secretary of State's office?

9         A.   Right.

10         Q.   And did you provide any additional examples

11    that the county developed?

12         A.   I did, which is kind of funny.  I provided,

13    like even -- what I provided also was on there, like

14    when you're talking about transposing numbers, like for

15    their birth date, sometimes, you know, even on their

16    driver's license, they will transpose numbers.  They

17    need to get it corrected.

18         Look at birth dates, like, it may be

19    1-27-52, they may have 1-17-52.  Or they may misspell

20    the name and stuff.

21         Even looking at a picture, sometimes on

22    their driver's license it may not look exactly like

23    them.  They may have changed their hairstyle, something,

24    but you've got to really look and use some common sense

25    sometimes, is that really that person.

## 61

1         And that's what I expect them to do.  And

2    then when all else fails, I tell them that's why they

3    have the judges and their alternate judges there to help

4    them to make those decisions.

5         And if all else fails, before you turn

6    down a voter, that's what we're here for.  Many days I

7    jump in a car, drive to a polling location to make a

8    decision.

9         Q.   So did that happen at all in any of the

10    elections where you got a call and they said, "We have

11    an issue," and you had to go to a polling place?

12         A.   Not for similar names.  I've not had to do

13    that, you know.

14         Q.   Okay.  And so if the election clerk thinks

15    that someone's name is substantially similar, but not an

16    exact match, what happens?

17         A.   If they think it's substantially similar?

18         A.   Uh-huh.

19         A.   And not a match?  Then they should let them

20    vote.

21         Q.   And does the voter have to do anything in

22    order to vote?

23         A.   They need to fill out a form.

24         Q.   Okay.  And what form is that?

25         A.   It's just a form saying, "Yes, that's me."

---

62

1  And we have forms for that, and it's in their kit, and
2  they fill it out.
3     Q.  And is that a little box on the poll book, or
4  do they have to fill out a longer form?
5     A.  No, it's an actual form.
6     Q.  And so if a person is found to have a
7  substantially-similar name but not an exact match, they
8  have to fill out a form?
9     A.  It's just an affidavit saying, you know, this
10  is -- "this is me, this is my name."
11    Q.  And does the voter fill that out?
12    A.  Right.  It's something that the voter fills
13  out, because it's like an affidavit.
14    Q.  And is that included in the documents you have
15  today?
16    A.  I don't have a sample of that form in the
17  documents today, but it is in their -- it is in their
18  training material, in their kit.
19    Q.  Are all of the training materials included in
20  the documents you've brought with you today?
21    A.  No, not all of it.  Well, the training
22  material -- but the training material does not include
23  everything that's in their binders that go to the
24  polling location.
25        Because there are forms that they have to

---

63

1  fill out.  And I say that, I probably need to go through
2  the whole kit.  I can look through here and see.  There
3  may be a form in here.  I can look.
4     Q.  Are these documents, if we followed up with
5  your attorney, that we could get copies of?
6     A.  Oh, yeah, absolutely.
7     Q.  Excellent.  So a person comes in, they have
8  got a substantially-similar name, but not an exact
9  match, they fill out a form.
10        If a person comes in and the election
11  clerk says, "You know what, this doesn't look
12  substantially similar," what happens?
13    A.  Then they are allowed to vote a provisional
14  ballot.
15    Q.  And does that get checked by anyone?  Does the
16  election judge -- before somebody votes a provisional
17  ballot because of a substantially-similar name issue,
18  does the election judge check that work?
19    A.  The election judge?
20    Q.  In other words, if an election clerk looks at
21  someone's ID and says, "I don't think this is
22  substantially similar" --
23    A.  Right.
24    Q.  -- before they tell the voter that they have
25  to vote a provisional ballot, would the election judge

---

64

1  verify that that person is not eligible to cast a
2  regular ballot?
3     A.  Yeah, the election judge should sign on the
4  provisional ballot.
5     Q.  So the election judge has to sign on all the
6  provisional ballots?
7     A.  Right, absolutely.
8     Q.  Okay.  Did you give any guidance, perhaps, on
9  nicknames?  Like did you give a list of nicknames that
10  people go by for various names?
11    A.  Yeah.  I think in here they even have samples
12  of stuff like that.
13    Q.  When you say "they have examples," is that the
14  Secretary of State's training?
15    A.  Well, the Secretary of State's training.
16    Q.  But did the county produce a list of
17  nicknames, for instance, for Spanish names?
18    A.  No, not necessarily.
19    Q.  For common Hispanic names?
20    A.  Because in here, they talk about like instead
21  of William B. Clements, it may be Bill Clements, you
22  know.  Bill instead of William, and that's okay.
23  Because we know, you know, basically you would know that
24  that's the same person.
25    Q.  But aside from the examples of nicknames that

---

65

1  the Secretary of State's office included in their
2  training, the county didn't provide any additional lists
3  of nicknames that people may go by for Hispanic names,
4  for instance?
5     A.  No.
6     Q.  Okay.  Do you know if any other counties
7  provided lists of nicknames to their election workers to
8  help with their substantially-similar name analysis?
9     A.  No, I'm not aware of it.
10    Q.  Okay.  If we can go ahead and mark this as
11  Exhibit 1.  This is going to be marked as Exhibit 1.
12  It's a substantially-similar name analysis.
13        (Guidry Deposition Exhibit No. 1 was
14  marked and is made a part of this deposition.)
15    Q.  (By Ms. Simson)  So if you look at Example 1
16  on the first page, you'll see that there's a place where
17  it includes information from the poll book, and then
18  some information from the driver's license.
19        And in Example 1, there's a slightly
20  different -- or there's a different first name, a
21  different last name, same date of birth, and different
22  addresses.
23        So if you were looking at a voter who
24  appeared with this driver's license, would you consider
25  this to be substantially similar or not?

---

70

1  he was born in 1911 but he appears with his driver's
2  license saying he was born in 1994, and he looks about
3  30.
4          Is that something that you could -- could
5  you let him vote a regular ballot?
6          MR. KEISTER:  Objection; form.  Calls for
7  speculation.
8      A.  I would probably let him vote a provisional
9  ballot.  That's confusing there.
10     Q.  (By Ms. Simson)  That's because there's a
11 significant age difference?
12     A.  Significant.
13     Q.  All right.  So we can put those to the side, I
14 think we can go through the rest of this pretty quick.
15         So you mentioned that there was a
16 complaint about photo ID.  What was that complaint
17 about?
18     A.  Okay.  That was on the election workers, just
19 made an observation.
20     Q.  Who made the observation?
21     A.  One of my election judges, she was a new
22 judge.  She made an observation.  Let me give it to you.
23         MR. KEISTER:  Let the record reflect that
24 the witness is looking at her personal computer.  If you
25 just let us know if you actually have a document that

71

1  matches the computer, that's what I'm concerned about.
2          THE WITNESS:  Oh, I do.
3          MS. KENNEDY:  All the documents here is
4  what she's looking at.
5          THE WITNESS:  This is what the judge
6  said.
7          MS. SIMSON:  We'll make copies of this.
8      Q.  (By Ms. Simson)  Do you recall the
9  circumstances of the complaint?
10     A.  It was just an observation that she made while
11 she was working at the polling location, that she --
12     Q.  And the observation was about an election
13 worker?
14     A.  Yes.  She said, "An elderly gentleman came to
15 vote early and brought his wife on election day.  He
16 stood with his wife when he checked in.  He then pulled
17 me aside and told me that he was never asked for ID
18 because he had his voter registration card.
19         "And he questioned it, but they never
20 took his ID.  He heard me explain to another person in
21 line that ID was now required to vote and that was
22 acceptable form."
23         So the voter was concerned because he was
24 not asked for his ID.  And he asked her, you know,
25 whether or not he was supposed to have ID or not.  So he

72

1  just brought it to her attention because he knew she was
2  a judge.
3      Q.  Okay.
4      A.  And so she reported it to us, which was the
5  proper thing for her to do.
6      Q.  So the complaint was that one of the election
7  workers was not implementing the law as it was intended?
8      A.  Right.
9      Q.  Were there any other complaints from voters in
10 Jefferson County about the photo ID law?
11     A.  None other than the one that I got from her.
12 And she had another one on there as well.  Basically the
13 same thing.
14     Q.  That somebody was not asking for ID when they
15 should have been?
16     A.  Right, right, right.
17     Q.  Do you know whether the election worker didn't
18 ask for an ID because they knew the person who was
19 voting, or was it that they just didn't ask for an ID
20 from some random person that they didn't know?
21     A.  I don't know which it was, but all we did was
22 we covered with the people at that polling location that
23 you are required to ask for a voter ID from everyone.
24     Q.  Regardless of whether you know the person?
25     A.  Regardless.

73

1      Q.  So if the sheriff for Jefferson County --
2      A.  I don't care.  If I come up there to vote, I
3  show voter ID, you know, so...
4      Q.  And so you have not received any other
5  complaints from constituents about this photo ID law?
6      A.  Have I received any complaints?
7      Q.  Yes.
8      A.  No.  You mean as far as going to the polling
9  locations?
10     Q.  The voters, yeah.
11     A.  No.
12     Q.  And do you know -- did you receive any
13 feedback from election workers about the implementation
14 of S.B. 14?
15     A.  No, I have not.
16     Q.  Did you request any feedback from election
17 workers about how it went, implementing the photo ID
18 law?
19     A.  No, I have not.
20     Q.  Did the Secretary of State's office contact
21 you at all about how the implementation of S.B. 14 went
22 in any of the elections?
23     A.  No, they have not.
24     Q.  And you have not contacted the Secretary of
25 State's office about how the implementation of S.B. 14



**74**

1   went in any of the elections?

2       A.   No, I have not.

3       Q.   Did the Secretary of State's office collect

4   any information from you about how the implementation of

5   S.B. 14 went?

6       A.   No, they have not.

7       Q.   Before you mentioned that the voters who were

8   found to be substantially similar had to fill out forms.

9   Do you have any sense for how many forms were filled out

10  for voters who were substantially similar?

11      A.   Oh, my.  We turn those in to voter

12  registration.  And, initially, we had a stack about that

13  big (indicating), and that was because the election

14  workers did not understand about the "substantially

15  similar."  So they were challenging everything that was

16  not exact in the voter registration database.

17           But I think since the first election,

18  which was the constitutional amendment election, we have

19  straightened that out.

20      Q.   So that was probably a couple hundred in that

21  forms filled out?

22      A.   Yeah, I think so.  And the voter registrar has

23  all of those.

24      Q.   And when you say that initially they were

25  challenging everyone who wasn't an exact match, what do

**75**

1   you mean by they were challenging them?

2       A.   I mean, if they weren't exact -- if they

3   weren't exactly the same on the voter ID as they were on

4   the voter registration database, they made them fill out

5   a form, if they weren't exactly the same.

6       Q.   Now, if they are not an exact match, what does

7   the voter have to do?

8       A.   They let them vote.  They don't have to be an

9   exact match.

10      Q.   Do they have to sign any kind of affidavit on

11  the poll book?

12      A.   No.

13      Q.   So as county clerk, does your office issue

14  certified copies of marriage licenses?

15      A.   Yes, we do.

16      Q.   And do you know if those are issued -- sorry.

17  Are those issued only in person, or can a person ask for

18  a certified copy of a marriage license by mail or

19  on-line?

20      A.   They can ask by mail or on-line.

21      Q.   And is there only one office location where a

22  person could request a certified copy of a marriage

23  license, or multiple offices in the county?

24      A.   Multiple.

25      Q.   And do you know, how many offices is that?

**76**

1       A.   I have two offices.

2       Q.   And what are the costs to get a certified copy

3   of a marriage license in Jefferson County?

4       A.   A marriage license is around $6.

5       Q.   Around $6.  And is there any sort of waiver if

6   a person says, "I need a certified copy of my marriage

7   license, but I can't afford $6"?

8       A.   No, there's not.

9       Q.   Okay.  The county also has the ability to

10  issue certified copies of birth certificates; is that

11  correct?

12      A.   That's correct.

13      Q.   And I imagine those are offered at both of

14  those locations you mentioned before?

15      A.   That's correct.

16      Q.   Okay.  And can you -- can a person request

17  that on-line or by mail from the county?

18      A.   They can, with proper ID.

19      Q.   With proper ID.

20      A.   Because those are not public forms for

21  everyone.

22      Q.   And what is the cost of getting a certified

23  copy of a birth certificate?

24      A.   I think it's $23.

25      Q.   $23.  Are you aware that fees are being waived

**77**

1   for birth certificates if they're needed to get an EIC?

2       A.   I know the fees have been lowered for birth

3   certificates to get an EIC card.

4       Q.   And what are they lowered to?

5       A.   I think they are $3, if I'm not mistaken.

6       Q.   $3.  Has anybody come in and requested one of

7   these reduced-fee birth certificates to get an EIC?

8       A.   No, but I did publish it that they were

9   available for $3.

10      Q.   And how did you publish that?

11      A.   We had published them on a Web site, and also

12  made it known -- we did the publication about the DPS

13  coming, that if they needed a birth certificate, that

14  the fee was only $3, if you needed it only for an EIC

15  card, though.

16      Q.   And does a person have to request one of these

17  reduced-fee birth certificates in person?

18      A.   Well, you have to show an ID to get a birth

19  certificate, because that's not just public records.

20      Q.   If a person showed up at a mobile EIC unit

21  without a birth certificate and said they didn't have

22  one, would they have had to come to this office to get a

23  copy of the birth certificate, or could they have gotten

24  it at the mobile EIC unit?

25      A.   They would come to the office.

ADVANTAGE REPORTING SERVICE - 281.376.9303



**78**

1    Q.   They would come to the office.  Did the office
2  advertise the reduced-fee birth certificates in any
3  other way?
4    A.   Not that I'm aware of.
5    Q.   So it was just in the advertisements about the
6  mobile EIC units and on the Web site?
7    A.   That's correct.
8    Q.   If a person comes into the office and says, "I
9  need a certified copy of my birth certificate," does the
10  clerk know to ask whether they are looking for one of
11  these to get an EIC?
12    A.   No, they're not going to ask.
13    Q.   So typically, if I walked into the office and
14  said, "I need a certified copy of my birth certificate,"
15  the person sitting at the desk would say, "That's going
16  to be $22"; is that correct?
17    A.   $23, that's correct.
18    Q.   $23.  If a person shows up at the polls and
19  the information on their ID doesn't exactly match the
20  information on the poll book, can they show other
21  documents to show the election clerk that they are who
22  they say they are?
23    A.   They have to have a -- one of their approved
24  forms of photo ID.
25    Q.   Could they, for instance, show a credit card

**79**

1  to show that their name has changed?
2    A.   No.
3    Q.   Okay.  So it's just based on the information
4  on their ID?
5    A.   Right.
6    Q.   What about if a person comes back to cure
7  their ballot, could they show additional documentation
8  then?
9    A.   There are forms of additional documentation
10  they can show to the voter registrar.
11    Q.   Okay.  And what are those additional documents
12  they can show?
13    A.   I'm not familiar with that.
14    Q.   And who is the person who would process the
15  cure ballots?
16    A.   The voter registrar.
17    Q.   And who is that?
18    A.   Right now, that's Terry.
19    Q.   Okay.  Are you aware that S.B. 14 provides an
20  exemption for people who have a religious exemption to
21  being photographed?
22    A.   I am aware of that.
23    Q.   Do you know -- I know that you said it's the
24  voter registrar that handles the cure process, but do
25  you know if anybody came in and tried to cure because of

**80**

1  a religious exemption?
2    A.   No, I'm not aware of that.
3    Q.   Okay.  Are you aware that S.B. 14 provides a
4  disability exemption for voters with certain types of
5  disabilities?
6    A.   I am aware of that.
7    Q.   And do you know whether anybody in the county
8  has applied for a disability exemption?
9    A.   I'm not aware of that.
10    Q.   Do you know if the county has done any
11  outreach about the existence of the disability
12  exemption?
13    A.   We talked to the people at Rise, which is a
14  disability group.  I'm not aware of any of them that
15  have applied for any disability exemption.
16    Q.   And when did you tell Rise about the
17  disability exemption?
18    A.   We've been out to talk to them several times.
19  They're always calling us.  They are very involved in
20  elections and voting, but I'm not aware that they have
21  applied for anything.
22        MS. SIMSON:  Okay.  Can we go off the
23  record?
24        (Recess from 12:16 p.m. to 12:23 p.m.)
25    Q.   (By Ms. Simson)  Just to go back over a few

**81**

1  things that we talked about previously, we talked about
2  the substantially-similar name provision.
3        Based on your experience as county clerk
4  and administering elections, do you think that the
5  substantially-similar name provision is one that all
6  poll workers will interpret the same way?
7    A.   No.
8    Q.   And why is that?
9    A.   Well, because, I mean, you have 400 people
10  thinking 400 different ways.  There is no way they are
11  going to think the same way.
12    Q.   And there is a regulation from the Secretary
13  of State's office that offers some guidance on
14  substantially-similar names; is that correct?
15    A.   That's correct.
16    Q.   And do you feel that that provides enough
17  guidance to poll workers?
18    A.   I mean, it provides the basic, but people just
19  don't always think the same.
20    Q.   So what might be substantially similar to one
21  poll worker might not be substantially similar to
22  another poll worker?
23    A.   Right.
24    Q.   Before, you also mentioned that the
25  Commissioners Court allocated $20,000 to do some voter

86

1  not here at this early voting location.  I can't tell
2  you about what happened on campus, but I'm not aware of
3  it.
4        Q.  Have you had any outreach efforts to the
5  university to educate students at Lamar University?
6        A.  Yes, we have.  We've done a voter outreach at
7  Lamar University.  Dr. Bruce Drury is one of our
8  advocates for the university.  He used to teach there.
9  And we've done a lot of outreach at Lamar University.
10       In fact, Lamar University is one of
11  our -- will be one of our early voting locations.  We
12  will have early voting there three days out of the early
13  voting period.
14       And what we're trying to do for the
15  students is to be able to catch them early, early enough
16  that if they don't have the proper photo ID, if we get
17  them during the early voting period, they have options.
18       They can either come to the courthouse
19  during the early voting period, which would allow them
20  to do a limited ballot with the proper photo ID, or they
21  can do a mail ballot from their registered county
22  because they would still have time to do that.
23       But I know they do have several campaigns
24  going on right now to educate them and to make sure that
25  they do have the proper photo ID.

87

1        When the mobile DPS unit came here, that
2  was one of the things that they tried to target on, and
3  that's why it was over at the Alice Keith Center, which
4  is right by Lamar University, was to try to get the
5  students the proper photo ID.
6        Because not everybody wants to change
7  their driver's license from the state where they live,
8  and, you know, they could have gotten the EIC cards
9  instead of changing their driver's license.
10       Q.  Are you aware of any situation during any of
11  the elections covered by S.B. 14 where a student
12  presented an out-of-state driver's license?
13       A.  I'm not aware of it.
14       Q.  We talked about two -- or you testified to two
15  DPS locations.  And I believe you said Highland, and
16  what was the other location?
17       A.  Port Arthur library.
18       Q.  That's Port Arthur library?
19       A.  That was two mobile.
20       Q.  As far as those locations are concerned, is
21  there public access to those locations from everywhere
22  in the county?
23       A.  Yes.
24       Q.  So if I lived in a rural area in Jefferson
25  County, do the rural areas have public transportation?

88

1  Let me strike that.  Let me ask this a different way.
2        Can you describe for me public
3  transportation and the availability of public
4  transportation in Jefferson County?
5        A.  Oh, boy.  I never been on the bus.  I'm
6  serious.  I mean, we have bus service.  I can't tell you
7  anything about the bus rides.  I'm serious, I've never
8  been on a bus.
9        But Alice Keith is located right off of
10  Martin Luther King, which is right by Lamar University.
11  I know buses run that way.  I can't tell you anything
12  about the bus route.
13       The Port Arthur library is right off of
14  69 and 9th Street, which is two of the main roads in the
15  Port Arthur area.  But as far as getting there on public
16  transportation, I would have no clue, sir.
17       Q.  Do you know whether there is the availability
18  of public transportation from every area to those
19  locations in the county?
20       MR. KEISTER:  Object to form.
21       A.  I would think not.
22       Q.  (By Mr. Gear)  And when you say you would
23  think not, what areas come to mind?
24       A.  Well, I can't think of any area where there is
25  transportation that you can get to from everywhere in

89

1  the county.  I can't think of an area where you can get
2  from the rural areas to everywhere.  I mean, inside the
3  county.  I wouldn't know.
4        Q.  And I'm specifically talking about to the DPS
5  offices, would that be the same testimony?
6        A.  Well, where the DPS offices -- where those two
7  locations that I told you were just the mobile units for
8  the DPS offices, when the Secretary of State came down.
9  That's not where the DPS offices are located.
10       Q.  So just so I'm clear, and I'm sorry, I'm not
11  actually in the room, I'm doing this by phone.  Where
12  are the DPS offices located in Jefferson County?
13       A.  Oh, the DPS office, you cannot get there.
14  They're not accessible.  I can tell you that right now.
15  And that's part of the problem.  That has been part of
16  the problem.
17       And that's been part of the complaint is
18  because I know the one in Beaumont is far out of the
19  way, and there are no buses that run out there.  Now,
20  the one --
21       Q.  You say that's been part of the complaint?
22       A.  That's been part of the complaint that I've
23  heard from people about the DPS office being one of the
24  only places that you can go and pick up your EIC card,
25  or even going to get any type of identification, for

90

1   anyone, whether it's EIC or just an identification,
2   period.  Because it's not that accessible.
3          And I don't know where the one in Port
4   Arthur is at all.  I know there's one out there, but I
5   don't know where it is.  But, no, it's not accessible.
6       Q.  Okay.  Let me ask you:  Are you aware of any
7   examples in Jefferson County of a registered voter who
8   has had difficulty obtaining an EIC?
9       A.  I'm not aware.
10      Q.  Have you communicated at all with DPS
11  regarding that issue?
12      A.  I have not communicated with DPS.
13      Q.  Has DPS shared any information with you
14  regarding any registered voter that may have had
15  difficulty obtaining an EIC?
16      A.  I have not communicated with DPS at all.  When
17  the voter registrar was here, prior to his resignation,
18  he was in contact with the DPS office because they were
19  trying to work out some arrangements to make it
20  accessible.
21          But I was not part of that -- I was not a
22  part of those conversations, so I'm not sure what
23  arrangements were made.
24      Q.  And as you sit here today, are you -- is it
25  your testimony that you just don't know if there were

91

1   any arrangements made to make DPS more accessible to
2   county residents?
3       A.  That is correct.
4       Q.  And if -- if there were arrangements that were
5   made, who would know that in the county at this point?
6   What county official would know that information?
7       A.  No one.
8       Q.  And why is that?
9       A.  Because he has left the county.
10      Q.  And I believe the person that has filled that
11  position is an interim person with the first name Terry?
12      A.  That's correct.
13      Q.  And have you had any discussions with Terry
14  regarding any arrangements that have been made to make
15  DPS offices more accessible in the county?
16      A.  No, I have not.
17      Q.  I'm turning your attention now to the mobile
18  EIC stations.  You indicated that -- I believe you
19  testified to the offer by the Secretary of State's
20  office to make EIC stations available prior to the
21  November 5th, 2013 election:  is that correct?
22      A.  Yes, that's correct.
23      Q.  You declined that offer?
24      A.  I did.
25      Q.  And I wasn't clear on specifically why you

92

1   declined that offer.  Would you mind telling me why?
2       A.  I declined it because they wanted to come like
3   the next week or so.  That was not timely enough for us
4   to notify the constituents of Jefferson County.
5       Q.  And when you say that -- when you testified
6   that they notified days before, was that days before
7   the November 5th, 2013 election?
8       A.  No, days before they wanted to set up the DPS
9   mobile station.
10      Q.  And did the Secretary of State's office offer
11  in any way to assist in providing notice to county
12  residents of the availability of the mobile EIC
13  stations?
14      A.  No.  At that time they did not tell me of any
15  assistance that they were going to give me on the
16  notification.
17      Q.  And when they were actually set up, the -- in
18  February, did they provide you with any assistance in
19  reaching out to the residents of Jefferson County
20  regarding the availability of the mobile EIC stations?
21      A.  When they set up in February, yes, they did.
22  They did some radio announcements.
23      Q.  But the Secretary of State's office did the
24  radio announcements?
25      A.  Yes, they did.

93

1       Q.  And when were those radio announcements
2   actually -- do you know how many radio announcements?
3       A.  No, I don't know how many, but they were done
4   like for at least a week.
5       Q.  And do you know what time of day, when they
6   actually occurred?
7       A.  No, sir, I don't.
8       Q.  Do you know what the substance of the radio
9   announcement was?
10      A.  The substance was just that they were going to
11  have the mobile election stations here for those requiring
12  election identification cards in order to vote, if you
13  didn't have the proper photo ID.
14      Q.  And were those radio announcements by the
15  Secretary of State, do you know if they were in both
16  English and Spanish?
17      A.  I don't remember the Spanish version.
18      Q.  And I believe you were asked the question --
19  or strike that.  Let me just ask you the question:  Do
20  you believe that a week's notice of -- was effective --
21  do you believe that the EIC stations in February were
22  effective?
23      A.  I'm not sure because I don't know what the
24  turnout was.  I know that we did the best that we could
25  to get the messages out to the churches and to the

94

1  organizations that we had access to.
2      And we had a couple of weeks in order to
3  get that message out, so at least I felt like we had
4  more time to get the messages out.  Whether or not they
5  were utilized, I'm not sure.
6      Q.  Okay.  And why are you not sure what the
7  turnout is in Jefferson County regarding the mobile EIC
8  station?
9      A.  Because at that time, I was involved in doing
10  the early voting for that election.
11      Q.  And did the DPS offer any information
12  regarding the mobile EIC stations?
13      A.  No, they did not.
14      Q.  Did you at any time request any information
15  regarding the mobile EIC stations?
16      A.  No, I did not.
17      Q.  And I believe -- and I apologize if you've
18  answered this question.  Was there any county staff that
19  were present during the operation of the EIC mobile
20  station?
21      A.  No, not -- only to the point of going to make
22  sure that the buildings were open and accommodating for
23  the DPS personnel they had out there.
24      Q.  Did the Secretary of State's office or DPS
25  offer to allow any county election officials to assist

95

1  during the operation of the mobile EIC stations?
2      A.  They didn't offer, and I did not offer because
3  I would not have had the staff available.  We were in
4  the middle of elections at the time.
5      Q.  So when you say "they didn't offer," you're
6  talking about DPS?
7      A.  DPS, or Secretary of State.
8      Q.  And if they had offered, you did not have
9  staff available, is that what you're telling me?
10      A.  No, I would not have had the staff available.
11      Q.  Regarding DPS, the DPS offices, have you --
12  are you aware of any complaints by Jefferson County
13  residents regarding their reluctance to go to DPS for
14  any reason?
15      MR. KEISTER:  Object to form.
16      A.  I'm sorry, would you repeat that?
17      Q.  (By Mr. Gear)  Sure.  That probably wasn't
18  clear.  Have you heard any complaints from county
19  residents regarding the DPS offices?
20      MR. KEISTER:  Object to form.  Vague.
21      A.  Well, yeah.  They complain it's not
22  accessible, it's far, and it's always too crowded.
23      Q.  (By Mr. Gear)  And when you say always too
24  crowded, do you have an idea as to what the wait times
25  in the DPS offices currently are?

96

1      A.  Well, I can only go by what I'm told, and
2  that's anywhere from 30 minutes to an hour, or longer.
3      Q.  And that would be the average wait time, as
4  you understand it, in the DPS offices in Jefferson
5  County?
6      MR. KEISTER:  Object to form.
7      A.  Yes.  And that's because of the wait time
8  behind those getting, I guess, driver's licenses, or
9  renewals, or whatever.
10      There is no -- as far as I know, there
11  has been no provisions just to go in and get EIC cards,
12  certificates.
13      Q.  (By Mr. Gear)  Do you have an understanding as
14  to what the EIC election identification certificate
15  process is at DPS?
16      A.  No, I don't.
17      Q.  Do you have an opinion as to whether or not
18  the underlying documents that are necessary to present
19  in order to receive an EIC are free?
20      MR. KEISTER:  Object to form.
21      A.  They are not free.
22      Q.  (By Mr. Gear)  And when you say they are not
23  free, what is the basis of your opinion?
24      MR. KEISTER:  Object to form.
25      A.  Well, you have to have some type of a birth

97

1  certificate, or a marriage license, or some type of form
2  to prove who you are.
3      Q.  (By Mr. Gear)  And in Jefferson County, if
4  someone does not have an original or certified copy of
5  their birth certificate, I believe you testified that
6  the amount has been reduced, but it is -- birth
7  certificate would not be free: correct?
8      A.  That is correct.
9      Q.  The reduced fee, would that be required to be
10  paid by the applicant for the birth certificate?
11      A.  Yes, that's correct.
12      Q.  And I believe you also testified that if an
13  individual enters into the office of vital statistics to
14  get a birth certificate, that they would not be
15  immediately informed of the reduced fee.
16      A.  Not unless they would tell the clerk what the
17  purpose was -- what they are there for, what they need
18  it for.  I mean, it's not information that's just
19  volunteered.
20      I mean, the clerk is not going to say,
21  "Do you need a birth certificate for an EIC card?"
22      Q.  So the answer to that is "no"?
23      A.  Yes.
24      Q.  You testified briefly about the religious
25  exemption for photo IDs, and you mentioned that -- well,

98

1    strike that.
2        How has the county advertised regarding
3    the religious exemptions for photo IDs?
4        A.   We have not advertised anything about
5    exemptions, religious exemptions.
6        Q.   Has the county advertised regarding disability
7    exemptions?
8        A.   No, we have not.
9        Q.   Are you aware of whether the state has
10   provided any -- any assistance in advertising that
11   information -- that type of information regarding
12   exemptions in Jefferson County?
13       A.   I'm not aware of any.
14       Q.   And as the election administrator, is it fair
15   to say that if they had, you would be aware of that?
16       A.   That's correct.
17       Q.   You mentioned that the county was responsible
18   for implementing its own training regarding S.B. 14.  Am
19   I correct on that?
20       A.   Yes.
21       Q.   Did you reach out to any other counties
22   regarding the training and the implementation of
23   S.B. 14?
24       A.   No, I did not.
25       Q.   Has any county resident expressed concerns

99

1    regarding a fear of going to DPS because they may be
2    targeted in any fashion?
3        MR. KEISTER:  Object to form.  Vague.
4    Calls for speculation.
5        Q.   (By Mr. Gear)  Well, let me clarify that.  I
6    asked has any county resident -- are you aware of any
7    county resident complaining to you or your staff
8    regarding DPS because of fear of being targeted in any
9    fashion by the DPS offices?
10       MR. KEISTER:  Objection: form.  Vague.
11       A.   Well, I don't know about fear.  I guess there
12   was an initial dialogue whether or not if they apply for
13   EIC, could they be arrested if they had warrants.
14       Q.   (By Mr. Gear)  When you say "initial
15   dialogue," who was this dialogue with?
16       A.   Just citizens of Jefferson County.  I mean,
17   that was the initial dialogue, any time they go to DPS,
18   though.
19       Q.   And what is your understanding of -- could you
20   please explain the substance of that dialogue?
21       A.   I mean, most people think that when they go to
22   DPS, that DPS is going to run their name to see if they
23   have any warrants.
24       I mean, I have known a lot of people that
25   if they have warrants, they go straight from DPS to

100

1    jail.  I guess if you do the crime, you do the time.
2        Q.   What about underlying traffic tickets?
3        A.   Those, too.
4        Q.   Have there been any concerns regarding names
5    of county residents being run who may have underlying
6    traffic tickets, or outstanding tickets?
7        A.   I guess there may have been some concerns as
8    well.
9        Q.   And what, if any, understanding do you have
10   about the process at DPS regarding running for warrants
11   for underlying tickets or traffic tickets?
12       A.   Well, I don't know what their process is.
13       Q.   So as you sit here today, your testimony is
14   that you heard from county residents regarding concerns
15   related to being arrested at DPS and having their names
16   checked for tickets or traffic tickets, but you don't
17   know what the process is at DPS currently?
18       A.   That's true.
19       MR. KEISTER:  Object to form.
20   Mischaracterizes previous testimony.  Plus, it's vague.
21       Q.   (By Mr. Gear)  And I didn't catch your answer
22   to that.
23       A.   That's true.
24       Q.   And I'm almost done.  I have maybe one or two
25   more questions.

101

1        Regarding the mobile EIC stations, did
2    the Secretary of State's office assist in any way to
3    determine the appropriate locations for the mobile EIC
4    stations?
5        A.   No, they did not.
6        Q.   Did they provide you with any data that may
7    suggest where the highest no matches may be in Jefferson
8    County?
9        A.   No, they did not.
10       Q.   And you have been the election administrator
11   since 2004, did I understand that testimony correctly?
12       A.   Yes, I've been county clerk since 2004.
13       Q.   County clerk.  And since 2004, are you aware
14   of any allegations, investigations, or convictions of
15   any person in voter fraud in Jefferson County?
16       A.   No, I'm not aware of any.
17       Q.   And that's true from 2004 to the present?
18       A.   That's correct.
19       Q.   And prior to 2004, are you aware of any
20   allegations, investigations, or convictions of any
21   person voter impersonation fraud?
22       A.   I'm not aware of any.
23       Q.   And one last question.  I understood -- and I
24   do not have the exhibits in front of me.  But I
25   understood that you provided some testimony regarding



**122**

1    Q.  Okay.  Could it be that the combination form

2  that's used at the election has a place for voters to

3  initial on the actual form when they have a

4  substantially-similar name, as opposed to -- as opposed

5  to the same match?

6    **A.**  **Well, we don't use combination forms in**

7  **Jefferson County because we use EA tablets, so our**

8  **voters sign electronically.  So we don't use combination**

9  **forms.**

10    Q.  Okay.

11    **A.**  **So I'm not familiar -- it may be on some**

12  **combination forms, but we don't use that form here in**

13  **Jefferson County.**

14    Q.  You would know better than I.  Do you have an

15  example in the documents you brought today of the type

16  of form that would be used when a name is substantially

17  similar but not an exact match?

18    **A.**  **Sir, I'm afraid I did not, but I -- I cannot**

19  **log on.  I'm sorry.**

20    Q.  Okay.  That's fine.  That's one thing, if we

21  could after the deposition, if we could try.

22    **A.**  **I will definitely get it in these documents.**

23    Q.  Okay.  Did anybody come to you after the 2013

24  election and tell you that they were unable to vote

25  because of the requirements of S.B. 14?

**123**

1    **A.**  **No, sir.**

2    Q.  Okay.  Did anyone report to you from your

3  office that anyone came to them and said, "Hey, I was

4  not able to vote because of the requirements of

5  S.B. 14"?

6    **A.**  **No, sir.**

7    Q.  Okay.  Now, the next election then was the

8  March primary; correct, of 2014?

9    **A.**  **March 4th, that's correct.**

10    Q.  Now, how many provisional ballots was cast in

11  the March primary?

12    **A.**  **Total, or to do with voter ID?**

13    Q.  Total provisional ballots.

14    **A.**  **I think total we had nine, but I think there**

15  **were only three to do with photo ID.**

16    Q.  Okay.  So provisional ballots are cast for a

17  lot of reasons, other than -- other than the

18  requirements of S.B. 14; correct?

19    **A.**  **That's correct.**

20    Q.  Okay.  So you think with respect to the March

21  primary of 2014, you think there were three provisional

22  ballots cast because of S.B. 14?

23    **A.**  **Uh-huh.**

24    Q.  And do you know what the basis of each of

25  those were?  Was it because the person didn't have any

**124**

1  ID, or didn't have a correct ID, or do you know?

2    **A.**  **No ID.**

3    Q.  No ID at all?

4    **A.**  **Well, I can tell you in a minute.  Well, this**

5  **one says, "failed to present acceptable ID," on the**

6  **first one.  The second one says, "failed to present**

7  **acceptable ID."  On the third one, it says, "expired**

8  **ID."  And on the fourth one, it was "expired ID."**

9    Q.  Okay.  So --

10    **A.**  **So I had two expired, and two failed to**

11  **present.**

12    Q.  Okay.

13    **A.**  **So it was four for the March 4th primary.**

14    Q.  Okay.  And were any of those provisional

15  ballots cured?

16    **A.**  **No, sir.**

17    Q.  Okay.  Do you know whether or not any of those

18  persons made any effort to cure the provisional ballot?

19    **A.**  **No, sir, it doesn't appear.**

20    Q.  Do you know if they came into the office, or

21  called and tried to cure it, but for whatever reason

22  could not?

23    **A.**  **According to the notes from the voter**

24  **registrar office, they did not come in.**

25    Q.  Okay.  So as we sit here today, we don't know

**125**

1  if those people could have cured it or --

2    **A.**  **They did not come in within the six days,**

3  **that's all we know.**

4    Q.  Okay.  Now, you had mentioned a lady --

5    **A.**  **Addie, Addie Allen.**

6    Q.  Is she -- was her provisional ballot during

7  the March primary?

8    **A.**  **Hers was during the runoff election.**

9    Q.  All right.  We'll come back to that.  Okay.

10  All right.  So we had four provisional ballots cast in

11  the 2014 primary.  And to your knowledge, those people

12  did not come in to cure?

13    **A.**  **They did not come in.**

14    Q.  All right.  How many -- do you know how many

15  votes total were cast in Jefferson County in the 2014

16  primary?

17    **A.**  **I can't get to that information, I'm sorry.**

18    Q.  How about -- I didn't ask you about the 2013.

19    **A.**  **I do know, but I can't -- sorry, I can't.  No**

20  **wifi.**

21        MS. KENNEDY:  It doesn't come back here,

22  though.

23    Q.  (By Mr. Keister)  That's fine.  The 2013

24  election, was it average, or more, or less?

25    **A.**  **For the constitutional amendment, it's always**

130

1   election; correct?

2   A. No, sir.

3   Q. All right. Then the next election was the

4   runoff election?

5   A. Yes.

6   Q. Was that in May?

7   A. Well, it actually wasn't the next one.

8   Q. What was the next election after the -- after

9   the March 2014 primary?

10  A. We had the Senate District, May 5th.

11  Q. Okay.

12  A. That was Senate District -- Senate District 4,

13  we had the May 5th election, and then we had the runoff

14  on May 27.

15  Q. That was a special election?

16  A. Yeah.

17  Q. Who had been the previous senator, or who

18  vacated their position?

19  A. Tommy Williams.

20  Q. All right. Were there any provisional ballots

21  cast during that particular election?

22  A. No, there were none.

23  Q. Okay. Were there any -- any similar names

24  afterwards filled out during that election?

25  A. There were none.

131

1   Q. Did you receive any complaints that anyone

2   complained that they were not allowed to vote during

3   that election because of any of the -- any of the photo

4   ID requirements?

5   A. Not that I'm aware of.

6   Q. Okay. Did anyone from your office report to

7   you they had heard complaints that someone had not been

8   allowed to vote because of the requirements of S.B. 14

9   or photo ID?

10  A. No, sir.

11  Q. Who were the candidates in that election, do

12  you recall?

13  A. Creighton, Todd, Galloway, and there was one

14  more. Do you know?

15  Q. That's fine.

16  A. One more. I can't remember.

17  Q. Okay. So with respect to -- well, let's just

18  go on. The next election then would have been the

19  runoff; correct?

20  A. The runoff, May 27th.

21  Q. All right. And with respect to the May 27th

22  runoff, were provisional ballots cast?

23  A. Yes.

24  Q. Okay. How many were cast?

25  A. I think there was seven, but three pertaining

132

1   to photo ID.

2   Q. How many total provisional ballots, if you

3   have it?

4   A. Total, 11 total.

5   Q. Okay. And do you know what -- why -- what the

6   provisional ballots were, other than the ones that were

7   cast because of S.B. 14? What type of issues?

8   A. Yeah, they were like -- they would show up and

9   they already had a ballot by mail, and they would show

10  up at the polling location to vote when they already had

11  a mail ballot that we had, or --

12  Q. In that situation, they would be allowed to

13  vote?

14  A. No, because we had their ballot by mail

15  already.

16  Q. They weren't allowed to vote?

17  A. They weren't allowed to vote, we already had

18  their ballot by mail.

19  Q. Okay. Do you keep records of that, when

20  somebody shows up to vote in person, and they have never

21  voted by mail?

22  A. Yeah. Because it's in the system, in the EA

23  tablet that we already have a mail ballot for them, and

24  we will pull it and we say we have a ballot by mail

25  right here, it's already been processed.

133

1   Q. Does that happen with regularity?

2   A. No, we have not, but we've had so many

3   elections this year, people got confused what elections

4   they were voting in because we have had so many back to

5   back.

6   Q. Is it your understanding that it would be

7   illegal if somebody voted by mail and then showed up and

8   voted in person and actually cast two votes?

9   A. Yeah, but because our system is real-time

10  voting, it would be very hard for us not to catch it.

11  Q. Right. But if you didn't catch it and

12  somebody did that, that would be an illegal act;

13  correct?

14  A. It would be.

15  Q. Would that be an in-person illegal act?

16  A. But, I mean, I don't think anybody would

17  intentionally. I think sometimes they don't realize it.

18  Like I said, we have had so many elections this year,

19  the voters really got confused.

20  Q. I understand. And isn't it fair to say that

21  the purpose of -- well, not the purpose, but that the --

22  that it's your effort to encourage as many people to

23  vote; correct?

24  A. Yeah.

25  Q. And you don't want to discourage, I don't mean

138

1    this doesn't appear to match"?
2        A.  Yeah.
3        Q.  Would they be arrested there on the spot?
4        A.  I don't know.
5        Q.  All right.  We'll move on.
6        A.  I really don't know.
7        Q.  Okay.
8        A.  So you want to talk about the other
9    provisional ballots?
10       Q.  Yes.  We're into the runoff election; correct?
11       A.  Right.
12       Q.  All right.  So we have provisional -- how many
13   provisional pallets?
14       A.  We had 11.
15       Q.  And how many of those related to --
16       A.  I think it's three.
17       Q.  Related to --
18       A.  Photo ID.
19       Q.  Right.
20       A.  And these two are "no ID presented," "failed
21   to present ID," one, twice.  Two of them are fail to
22   present ID, and one of them is just does not have
23   acceptable ID.  Whatever that means.
24       Q.  Okay.  Were any of those cured?
25       A.  No, sir.

139

1        Q.  Okay.  And was one of those the lady you were
2    talking about?
3        A.  Yes, sir, Ms. Allen.
4        Q.  And she came and talked to you personally?
5        A.  No, I spoke to her over the phone.
6        Q.  Okay.  And she related that she was aware of
7    the cure process; correct?
8        A.  Yes.
9        Q.  Just she got confused about the timing of it;
10   correct?
11       A.  Which day, yes.
12       Q.  Okay.  Did she have any complaints with the
13   information she was provided at the poll when they
14   allowed her to vote provisionally?
15       A.  Well, yes, because she was -- her complaint
16   was when was the actual six days, and when did the six
17   days begin, and when was the last day to cure.
18           So I don't know what the mix-up was as
19   far as the six days, six days from when, and when was
20   her sixth day to cure.
21       Q.  Does it indicate whether she voted early or on
22   the day of the actual election?
23       A.  This was for the -- let me see.  I can look at
24   it and see.  It says six days to cure.  So I don't know
25   what date.

140

1        Q.  It doesn't indicate whether it was an early
2    vote, or on election day?
3        A.  No.  But the six days they should have from
4    the date of the election.
5        Q.  Okay.  When a person votes with a provisional
6    ballot, is there a procedure that the poll worker is
7    required to go through in terms of telling them what the
8    provisional ballot is, and what they have to do to cure
9    it?
10       A.  Right.  And they have a form they put them on.
11   They have a provisional ballot list they put them on.
12   They also have a notice of provisional ballot which
13   explains to the voter, you know, why they are a
14   provisional ballot.
15           It should have had a date on there, the
16   date that she has to cure it by.  She should have been
17   given that notice as well.
18       Q.  Okay.
19       A.  It should have had the date for her to come in
20   by.
21       Q.  And that part of that notice, it tells when to
22   come in and where to come in; correct?
23       A.  Right.
24       Q.  And what was her name, Addie?
25       A.  Addie Allen.

141

1        Q.  Did Addie Allen indicate to you that she had
2    been provided that written information?
3        A.  She said she was provided that information,
4    but I never did see what she was looking at.
5        Q.  So she didn't complain that somebody at
6    the polling station had done something wrong, she just
7    misunderstood something about the information?
8        A.  Well, according to Ms. Allen, you know, from
9    the date she gave me, it would have been the day after
10   the date to cure.
11           But like I said, without me seeing what
12   she was given, I can't confirm or deny that she was
13   given the correct information.
14       Q.  Okay.  And the other two individuals that
15   voted provisionally, you had no contact with?
16       A.  No contact.
17       Q.  Okay.  So have we covered all the elections
18   that have occurred after June of 2013?
19       A.  Yes, sir.
20       Q.  Okay.  And then there's another election
21   coming up here shortly; correct?
22       A.  Early voting starts Monday.
23       Q.  Okay.  Based upon the five elections in
24   Jefferson -- or four.  Based upon the five elections
25   that's occurred in Jefferson County after S.B. 14 has

142

1   become implemented or became implemented, do you, based
2   upon that experience, have any reason to believe that S.B. 14
3   has prevented people from voting in Jefferson County?
4        A.   I don't think it's prevented people from
5   voting.
6        Q.   Do you see anything in the numbers of those
7   elections that would indicate to you that there has been
8   a decrease in voting in Jefferson County after the
9   implementation of S.B. 14?
10       A.   No, sir.
11       Q.   Has anyone complained to you that the actual
12  process of voting has been slowed down because of the
13  requirements of S.B. 14?
14       A.   Well, the election workers do complain it
15  takes them longer to process voters with the driver's
16  license than with the voter registration cards.
17       Q.   Has there been any complaints from the voters,
18  to your knowledge, that it's taking them too long to
19  vote because of the S.B. 14 requirements?
20       A.   No, sir.  I've not gotten any complaints from
21  the voters.
22       Q.   To your knowledge, has anyone in your
23  office gotten any complaints from your voters that it's
24  taking too long to vote because of the S.B. 14
25  identification requirements?

143

1        A.   No, sir, not to my knowledge.
2        Q.   Okay.  And you mentioned some of the poll
3   workers were complaining it was taking longer.  Did any
4   of them -- did any of those complaints relate to voters
5   telling the poll workers -- or complaining to the poll
6   workers that it was taking too long for the voters to
7   vote, or was it the poll workers complaining that they
8   were having to do additional work?
9        A.   Well, I don't think it was complaining because
10  they have to do additional work.  I think it takes them
11  longer to process the voters with the driver's license,
12  because not all the driver's licenses will scan in our
13  system.  Only the new driver's licenses will scan.  The
14  old ones won't.
15            Whereas, with the voter registration
16  cards, all the voter registration cards will scan.  So
17  it takes much -- it's a much quicker process to scan the
18  cards.  I don't know why the old licenses won't scan.
19            So it slows down the process when they
20  have to type it in versus just pop and scan.
21       Q.   Have any of the poll workers related that the
22  voters are complaining about the time it took to vote?
23       A.   No, sir, I guess not.
24       Q.   Okay.  Does your office send out the voter
25  registration cards?

144

1        A.   No, sir, we don't.
2        Q.   Who does?
3        A.   The voter registrar, tax assessor/collector.
4        Q.   Do you know what information is printed on the
5   voter registration cards?
6        A.   Like?
7        Q.   That are sent out.
8        A.   Well, like name, address.
9        Q.   Do you know whether or not on the current
10  voter registration card, whether or not it contains on
11  the back of the card the S.B. 14 photo ID requirements?
12       A.   No, sir, I don't know that.
13       Q.   That's not something your office deals with?
14       A.   No, sir.
15       Q.   You mentioned that you have two offices?
16       A.   Yes, sir.
17       Q.   Okay.  Where are the -- both offices?
18       A.   Here is the main location, and Port Arthur is
19  the substation.
20       Q.   Okay.  What are the office hours of your main
21  office?
22       A.   We're open 8:00 to 4:30 to the public.  We're
23  open until 5:00 to answer the phone, until 5:00, but we
24  close to the public at 4:30.
25       Q.   Okay.

145

1        A.   Because we still have to balance.  Same thing
2   at the sub office.
3        Q.   Okay.
4        A.   Monday through Friday.
5        Q.   Okay.  From 8:00 to 4:30?
6        A.   Yes.
7        Q.   And are you ever open on weekends?
8        A.   No, sir.
9        Q.   Ever open any late nights for any reason?
10       A.   Only during the election time.
11       Q.   Okay.  And is that open to the public, or is
12  that just --
13       A.   No, sir.
14       Q.   That's just the office being working --
15  working not open to the public?
16       A.   That's correct.
17       Q.   All right.  Does the county clerk's office
18  issue now any type of photo ID?
19       A.   No, sir, we don't.
20       Q.   For your employees, or anything else?
21       A.   No, sir.  That's done through the human
22  resource department.
23       Q.   Okay.  In dealing with the public, is there
24  ever any times that your office requires public persons
25  who come in, or public that comes in, for services to

154

1  they live outside of Beaumont but there is no public
2  transportation, no bus?
3  **A.  They have cars.**
4  Q.  Yeah.  Do you think that's a fairly common
5  situation for people who live outside of the City of
6  Beaumont, to own a vehicle?
7  **A.  Yes.**
8  MR. GEAR:  Objection; calls for
9  speculation.
10  Q.  (By Mr. Keister)  Or to have access to a
11  vehicle.
12  **A.  Yes, sir.**
13  Q.  Because we're not like some of the other
14  cities up north or east, we don't have big subways;
15  right?
16  **A.  Right.**
17  Q.  And we don't have bus systems that cover the
18  whole county; correct?
19  **A.  Correct.**
20  Q.  Do you know of any county in Texas that would
21  have a bus system that would cover every inch of the
22  county?
23  **A.  No, sir, I don't.**
24  Q.  Okay.  People down here drive vehicles; right?
25  **A.  Yes, sir.**

155

1  Q.  Okay.
2  MR. GEAR:  Calls for speculation, form.
3  Q.  (By Mr. Keister)  We like that, don't we?
4  **A.  Yes, sir.**
5  Q.  With respect to the DPS offices, you say
6  there's one in -- one in Beaumont, and one in Port
7  Arthur?
8  **A.  Yes, sir, I think.**
9  Q.  That you know of?
10  **A.  Yes, sir.**
11  Q.  Do you know the address of the one here in
12  Beaumont?
13  **A.  No, sir.  I know it's way out on Tram Road**
14  **somewhere.**
15  Q.  Do you know the location?  Does 7200 Eastex
16  Freeway sound familiar?
17  **A.  That sounds right.**
18  Q.  Okay.  Where would that be -- we're at the
19  courthouse today; correct, the district attorney's
20  office?
21  In relation to where we are today, where
22  would the Beaumont DPS office be that's at 7200 Eastex
23  Freeway, just generally speaking?
24  **A.  Catch the freeway, go 10, go 69, Eastex**
25  **Freeway, 69 going north, and it's all the way until you**

156

1  **get past 105, all the way out that way, exit 105.**
2  Q.  I'm not that familiar.
3  **A.  Okay.**
4  Q.  How far do you think it is from here?
5  **A.  It's a good little ways out.  It's nothing I**
6  **don't want to walk to.  It's about -- way out.**
7  Q.  How long do you think it would take you to
8  drive it?
9  **A.  It would take 20, 25 minutes to get out that**
10  **way, 25.**
11  Q.  With respect to Jefferson County, or at least
12  the people that particular office would serve -- I
13  suppose Port Arthur has its own -- geographically
14  speaking, do you think that's centrally located for the
15  people it's trying to serve?
16  **A.  No, not at all.**
17  Q.  Not at all?
18  **A.  No.**
19  Q.  Why not?  I'm just asking.
20  **A.  It's like the end of something, it's like the**
21  end of going to Lumberton.  It's closer to Lumberton
22  than it is to anything in Beaumont.
23  Q.  How long has that location been there?
24  **A.  Forever.  Forever.  Since I got my driver's**
25  **license.  Been a while.**

157

1  Q.  Okay.  That's where everybody goes for -- at
2  least for Jefferson County, to get their driver's
3  license?
4  **A.  Yes.**
5  Q.  And have been going there for many, many
6  years?
7  **A.  Yes, sir.**
8  Q.  Would it be reasonable to suspect that people
9  know the location?  Even though it may be difficult to
10  get to, they know where it is; correct?
11  **A.  Yes, sir.**
12  Q.  And when people want to get a driver's
13  license, they go out there; right?
14  **A.  That's where they go.**
15  Q.  Okay.  So if they want to go, they can go?
16  MR. GEAR:  Objection; form.  Calls for
17  speculation.
18  **A.  Yes, sir.**
19  Q.  (By Mr. Keister)  You had mentioned that you
20  had heard some complaints that it's not convenient and
21  that it takes time standing in line.
22  Has anyone made those complaints to you
23  with respect to getting the EIC specifically?
24  **A.  No, because I don't know anybody that's been**
25  **out there to get an EIC.**

170

1  how would you describe the minority voters as -- in
2  terms of renting in Jefferson County, do you know if
3  that's a significant number?  How would you describe
4  that?
5          MR. KEISTER:  Objection; form, vague.
6      A.  I'm sure it's a large number that's registered
7  voters.
8      Q.  (By Mr. Gear)  So if I understood your
9  testimony, you are sure that there's a large number of
10  registered minority voters that do not -- that rent in
11  Jefferson County?
12     A.  That is correct.
13     Q.  And is it fair to say that they would not have
14  received a property tax statement and the notice that
15  was sent out by the county?
16     A.  That is correct, sir.
17         MR. GEAR:  I don't think I have any
18  further questions.
19             FURTHER EXAMINATION
20  BY MS. SIMSON:
21     Q.  I have a few quick questions.  Is it possible
22  that if a voter shows up at the polls and is offered a
23  provisional ballot because they lack identification,
24  that the voter may decline to cast a provisional ballot
25  because they don't think they can make it back to the

171

1  voter registrar's office in six days?
2      A.  Yes.
3      Q.  So it's possible that a voter would show up
4  without an ID, and there wouldn't be a record of that?
5      A.  That's true.
6      Q.  On voting by mail, how far in advance of an
7  election does a voter have to submit a ballot?
8      A.  An application or a ballot?
9      Q.  The ballot itself.
10     A.  To return it?
11     Q.  Yes.
12     A.  They have until election day.
13     Q.  They can postmark it?
14     A.  No, we have to receive it on the election day.
15  We go to the post office all the way to the post office
16  close time.
17     Q.  They have to put it in the mail at least a few
18  days in?
19     A.  Or send it by carrier and have it delivered to
20  our office at least by 5:00 p.m.
21     Q.  Okay.  And does that mean if you vote by mail,
22  you may have to vote before a campaign finishes on
23  election day?  I can rephrase that question.
24     A.  Yeah, okay.
25     Q.  If you have to put it in the mail a couple of

172

1  days in advance, does that mean a voter who votes by
2  mail may not be able to wait until a campaign is done
3  or, you know, until election day to decide who they want
4  to vote for?
5      A.  Until election day?
6      Q.  Correct.
7      A.  Unless they send it by a private carrier, I
8  mean, you can have somebody to -- a carrier to deliver
9  it that same day's delivery.
10     Q.  Okay.  And are there people over the age of 65
11  that you know prefer to vote in person instead of by
12  mail?
13     A.  Absolutely.  We have some people that will not
14  vote early, and they insist on going on election day to
15  cast their ballot.
16     Q.  And why do you think that is?
17     A.  Just the way they have always been.  It's just
18  their belief.  They want to cast that ballot on election
19  day at their polling location.
20     Q.  And does the county clerk's -- I believe your
21  testimony earlier was that the county clerk's office
22  does not have the authority to issue any S.B. 14
23  approved IDs; is that correct?
24     A.  No, we do not.
25     Q.  And so would you expect a person to contact

173

1  your office if they needed a driver's license, a
2  personal ID, or an EIC?
3      A.  No, I would not.
4      Q.  Okay.  Earlier, you talked with Mr. Keister
5  about individuals who had shown up to the polls to vote,
6  but they cast their ballots by mail earlier.
7      A.  Right.
8      Q.  Would S.B. 14 have prevented any of those
9  individuals from casting an illegal ballot?
10     A.  No.  I mean, that happens all the time.
11     Q.  And it was your system that looked them up and
12  found that they had cast earlier ballots that stopped
13  them from voting?
14     A.  Right.
15     Q.  Did you -- you mentioned two individuals who
16  cast provisional ballots in March 2014 because of
17  expired IDs.  Did either of those individuals contact
18  your office to complain?
19     A.  No, they did not.
20     Q.  Before S.B. 14, what were generally the ID
21  requirements to vote?
22     A.  Your voter registration, any form of an ID
23  issued from DPS, your student ID.  You could have used a
24  utility bill, you know.  We had about nine or ten
25  different forms of ID that you could have used.

174

1    Q.   And based on your experience as a county clerk
2    administering elections, did you think those
3    requirements were sufficient to secure the voting
4    requirements?
5    A.   They were sufficient.
6         MS. SIMSON:  And I think that's all my
7    questions.  Thanks again.
8         FURTHER EXAMINATION
9    BY MR. KEISTER:
10   Q.   Ms. Guidry, did any of your poll workers
11   report to you that there were voters showing up and
12   turning down those provisional ballots because they
13   didn't have an ID?
14   A.   No.
15   Q.   Okay.  During any of the five elections that's
16   occurred, have any of your poll workers reported to you
17   during any of those elections people were showing up and
18   refusing a provisional ballot when they did not have an
19   ID?
20   A.   No.
21   Q.   Okay.  With respect to voting by mail and
22   having to -- or possibly having to complete your vote
23   before the campaigns had ended, isn't that scenario also
24   true with early voting, if people chose to vote early,
25   they vote prior to the end of the campaign?

176

1    as saying does the county track the number of people who
2    don't go to the polls and vote because they decided they
3    wanted to go fishing?  Wouldn't that be about the same
4    type of analysis?
5    A.   I guess so.
6    Q.   Okay.  If people don't vote, or don't go to
7    the poll, you can't -- or anybody else can't say why
8    they didn't go; correct?
9    A.   Right.
10   Q.   Other than asking that person specifically,
11   "Why didn't you go vote"; correct?
12   A.   Right.
13        MS. SIMSON:  Okay.  Thank you.
14        (Guidry Deposition Exhibit No. 2 was
15   marked and is made a part of this deposition.)

175

1    A.   Yes.
2    Q.   And isn't it true that it's simply a matter of
3    convenience for some people to make that choice to vote
4    early?
5    A.   Yes.
6    Q.   Or to have the -- everybody can vote early;
7    correct?
8    A.   Right.
9    Q.   But only a limited number of people can vote
10   by mail; correct?
11   A.   Right.
12   Q.   But those people who vote by mail also can
13   make that -- have the opportunity to make that
14   determination if they want to do it by mail, or get the
15   ID and vote in person; correct?
16   A.   Right.
17   Q.   Okay.  With respect to tracking persons who do
18   not go to the polls to vote because they do not have an
19   acceptable form of S.B. 14 ID, is there any possible way
20   the county or anyone else could track information like
21   that?  And I'm referring to the question Mr. Gear asked
22   you a few minutes ago.
23   A.   No, not other than making a list if they were
24   there.
25   Q.   Right.  And, I mean, wouldn't that be the same

177

1         CHANGES AND SIGNATURE
          FOR THE DEPOSITION OF CAROLYN GUIDRY
2              JULY 24, 2014
3    PAGE  LINE   CHANGE              REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

1 (Pages 1 to 4)

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,      )
              Plaintiffs,     )
 4                            )
       v.                     ) Civil Action
 5                            ) No. 2:13-cv-193(NGR)
    RICK PERRY, et al.,       )
 6             Defendants.    )
                              )
 7  _____ )
    UNITED STATES OF AMERICA, )
 8         Plaintiff,         )
                              )
 9  TEXAS LEAGUE OF YOUNG     )
    VOTERS EDUCATION FUND,    )
10  et al.,                   )
                              )
11         Plaintiff-         ) Civil Action
           Intervenors,       ) No. 2:13-cv-263(NGR)
12                            )
    TEXAS ASSOCIATION OF      )
13  HISPANIC COUNTY JUDGES AND)
    COUNTY COMMISSIONERS,     )
14  et al.,                   )
           Plaintiff-         )
15         Intervenors,       )
                              )
16     v.                     )
                              )
17  STATE OF TEXAS, et al.,   )
              Defendants.     )
18  _____ )
19
        <<<<<HIGHLY CONFIDENTIAL>>>>>
20
21  *************************************************
22                  ORAL DEPOSITION OF
23           REPRESENTATIVE PATRICIA HARLESS
24                    JUNE 20, 2014
25  *************************************************
```

**Page 2**

```
 1      ORAL DEPOSITION of REPRESENTATIVE PATRICIA
 2  HARLESS, produced as a witness at the instance of the
 3  Texas State Conference of NAACP Branches, Mexican
 4  American Legislative Caucus of the Texas House of
 5  Representatives, and duly sworn, was taken in the
 6  above-styled and numbered cause on June 20, 2014, from
 7  9:13 a.m. to 1:27 p.m., before Denyce M. Sanders, CSR,
 8  RPR, CRR, TCRR, in and for the State of Texas,
 9  recorded by machine shorthand, at the Attorney
10  General's Office, 808 Travis Street, Suite 1520,
11  Houston, Texas, pursuant to the Federal Rules of Civil
12  Procedure and the provisions stated on the record or
13  attached hereto; signature having been waived.
```

**Page 3**

```
 1               A P P E A R A N C E S
 2
    FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 3
      U.S. DEPARTMENT OF JUSTICE
 4    Civil Rights Division
      950 Pennsylvania Avenue, NW - NWB Room 7254
 5    Washington, D.C. 20530
      Mr. Daniel J. Freeman
 6    202.305.4355
      daniel.freeman@usdoj.gov
 7
 8  FOR THE PLAINTIFFS TEXAS STATE CONFERENCE OF NAACP
    BRANCHES, MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE
 9  TEXAS HOUSE OF REPRESENTATIVES:
10    DECHERT LLP
      902 Carnegie Center, Suite 500
11    Princeton, New Jersey 08540
      Mr. Ezra D. Rosenberg
12    609.955.3200
      ezra.rosenberg@dechert.com
13
14
15  FOR THE DEFENDANT TEXAS LEAGUE OF YOUNG VOTERS
    PLAINTIFF-INTERVENORS:
16    WILMER CUTLER PICKERING HALE AND DOOR, LLP
      1875 Pennsylvania Avenue, NW
17    Washington, D.C. 20006
      Ms. Tania Faransso
18    202.663.6262
      tania.faransso@wilmerhale.com
19
20
    FOR THE DEFENDANTS:
21
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
22    Consumer Protection Division
      808 Travis, Suite 1520
23    Houston, Texas 77002
      Ms. Rosemarie Donnelly
24    713.225.8919
      rosemarie.donnelly@texasattorneygeneral.gov
25
```

**Page 4**

```
 1  FOR THE DEFENDANTS RICK PERRY, STATE OF TEXAS, NANDITA
    BERRY, AND THE DEPARTMENT OF PUBLIC SAFETY:
 2
 3    OFFICE OF THE ATTORNEY GENERAL
      TORT LITIGATION DIVISION
 4    P.O. Box 12548, Capitol Station
      Austin,Texas 78711
 5    Mr. S. Ronald Keister
      512.463.2197
 6    ronny.keister@oag.state.tx.us
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

5 (Pages 17 to 20)

---

**17**

1  with you the idea of your being the sponsor of SB 14
2  in the House?
3      **A.  I don't remember.  I know I filed a bill**
4  **similar to SB 14.**
5          MR. KEISTER:  Can I ask you a question
6  before we get going?
7          MR. ROSENBERG:  Sure.
8          MR. KEISTER:  Are we doing this on a
9  question-by-question basis on the legislative
10  privilege, or are we doing a block of sealed
11  information?
12          MR. ROSENBERG:  If she is willing to
13  testify while asserting the privilege -- I think we
14  have to actually have the -- an understanding as to
15  when the privilege is asserted.
16          MR. KEISTER:  Right.  Yeah.
17          MR. ROSENBERG:  But I'd love to be able
18  to streamline this in some way.
19          MR. KEISTER:  I understand.
20          MR. ROSENBERG:  So that we don't have to
21  go through it each time.
22          MR. KEISTER:  And that was my concern,
23  Rosemarie, if we're going to have to do a question-by-
24  question or if there can be a block, because I don't
25  want you asserting the last question but now he's

---

**18**

1  asking another question.
2          MS. DONNELLY:  Yeah, if you will agree
3  to a running objection on this line of questioning
4  regarding SB 14, and then I don't have to keep
5  interrupting you.
6          MR. ROSENBERG:  You know, if she's
7  then -- willing to testify under seal; but if there's
8  something she's not saying and not testifying to, then
9  we have to know that.
10          MS. DONNELLY:  Yeah.
11          MR. ROSENBERG:  So I think then we can
12  do it that way.
13          MS. DONNELLY:  And I will be instructing
14  the witness not to answer questions regarding
15  conversations, communications with other legislators.
16          THE WITNESS:  Yes, ma'am.
17          MS. DONNELLY:  With that exception, your
18  answer will be under seal as we are talking about
19  SB 14.
20          Is that clear enough?
21          MR. ROSENBERG:  That works for me.
22          Mr. Freeman?
23          MR. KEISTER:  But I guess my question
24  is, does there become a cutoff point where we
25  suddenly --

---

**19**

1          MS. DONNELLY:  Switch.
2          MR. KEISTER:  -- are switching from
3  legislative privilege to non?  How are we going to
4  designate that?
5          MR. FREEMAN:  I mean, I think it's
6  necessary that we have an understanding of when the
7  objection -- the running objection ceases, because
8  obviously not the entire thing is --
9          MS. DONNELLY:  Well, why don't we run
10  the objection, and then we can decide when the
11  objection is no longer running?  How's that?
12          MR. ROSENBERG:  We can try that.
13          MR. FREEMAN:  That's absolutely fine.
14      Q.  (BY MR. ROSENBERG)  I think the question was:
15  Did there come a time when you became the sponsor of
16  SB 14 on the House floor?
17      A.  Yes.
18      Q.  And can you tell me, if you recall, what the
19  circumstances were that led to your becoming the
20  sponsor of SB 14 on the House floor.
21          MS. DONNELLY:  Here we're going to start
22  a running objection that this line of questioning will
23  be covered by the legislative privilege.  Your answers
24  will be under seal.  Until we, at such time, say the
25  running objection is no longer applied, your answers

---

**20**

1  will be under seal.  Please do not reveal
2  communications with other legislature [sic], and then
3  we can carry on.
4      A.  I don't recall.
5      Q.  (BY MR. ROSENBERG)  Are you aware that there
6  was a Select Committee on Voter Identification that
7  was composed in the House?
8      A.  I vaguely remember that.
9      Q.  Were you on the committee?
10      A.  I -- I do remember that.
11      Q.  Were you involved in the formation of that
12  committee?
13      A.  No, sir.
14      Q.  Who was involved in the formation of that
15  committee?
16      A.  I don't know.
17      Q.  Were you involved in discussions as to the
18  composition of that committee?
19      A.  No.
20      Q.  Was SB 14 considered an important piece of
21  legislation by you?
22      A.  All my legislation I consider to be
23  important.
24      Q.  So you do not consider SB 14 to be more or
25  less important than any other piece of legislation?

---

REPRESENTATIVE PATRICIA HARLESS                              6/20/2014
HIGHLY CONFIDENTIAL

6 (Pages 21 to 24)

21

1    A.  I think all my legislation is important.
2    Q.  Are they all of equal importance?
3    A.  To someone.
4    Q.  To you?
5        MS. DONNELLY:  You don't have to change
6    your answer just because he keeps asking.
7    A.  Yeah, they're all equally important.
8    Q.  (BY MR. ROSENBERG)  Was SB 14 given emergency
9    legislation treatment?
10   A.  I think the governor put it on the emergency
11   call, but I -- I can't remember for sure.  I think he
12   did.  I think we had some emergency.
13   Q.  Do you -- I'm sorry, were you finished with
14   your answer?
15   A.  Yeah.  I -- you probably know more than I do,
16   because I've gone through another session since then.
17   Q.  I've had a couple years since then, too.
18       Do you have an understanding as to why the
19   governor declared it an emergency piece of
20   legislation?
21   A.  I don't.
22       MR. KEISTER:  Object to the form.
23   Q.  (BY MR. ROSENBERG)  Did you consider there to
24   be an emergent need for SB 14?
25   A.  That's not my call.

22

1    Q.  Well, whether it's your call or not, did you
2    consider it to be an -- there to be an emergent need
3    for that legislation?
4    A.  I don't.  I don't get into what's an
5    emergency in the state or not.
6    Q.  Did you have any discussions with anyone in
7    the governor's office, including Governor Perry, at
8    the time that you were dealing with SB 14?
9    A.  Not that I remember.
10   Q.  Did you have any discussions with Lieutenant
11   Governor Dewhurst during this time?
12       MS. DONNELLY:  Don't get into that.
13   That's privileged.
14       MR. ROSENBERG:  The substance of the
15   discussion may be privileged, but whether she had a
16   discussion is not privileged.
17       MS. DONNELLY:  Well, but then --
18       MR. ROSENBERG:  We can't even build,
19   then, a foundation for challenging the privilege if we
20   don't know whether a discussion occurred or not.
21       MS. DONNELLY:  Yeah, but that's a
22   slippery slope.  Did you have a conversation with
23   Lieutenant Governor Dewhurst about X?
24       MR. ROSENBERG:  Well, the X is pretty
25   broad.  SB 14.

23

1        MS. DONNELLY:  You can answer.
2    A.  No.
3    Q.  (BY MR. ROSENBERG)  How about with Speaker
4    Straus?
5    A.  Possibly.  I don't remember.
6    Q.  How about with Senator Fraser?
7    A.  Probably.
8    Q.  Do you remember how many conversations you
9    had with Senator Fraser about SB 14?
10   A.  I don't.
11   Q.  Do you remember the substance of any of the
12   conversations that you had with Senator Fraser?
13   A.  Just about carrying the legislation in the
14   House, picking it up.
15   Q.  Anything beyond that?
16   A.  I don't remember.
17   Q.  During the time that you were dealing with --
18   or leading up to the enactment of SB 14, were you
19   concerned about voter fraud in Texas?
20   A.  I don't remember.
21   Q.  Were you concerned about voter fraud dealing
22   with absentee ballots in Texas?
23   A.  I don't recall.
24   Q.  Were you concerned about in-person voter
25   fraud in Texas?

24

1    A.  I would say yes, or I would not have filed
2    the legislation.
3    Q.  Do you recall what the basis was for your
4    concern about in-person voter fraud in Texas?
5        MS. DONNELLY:  We're still under the
6    running objection, so feel free.
7        MR. ROSENBERG:  Understood.
8    A.  No.  I'm sorry.
9    Q.  (BY MR. ROSENBERG)  Were you concerned during
10   this time with noncitizens voting in Texas?
11   A.  No.
12   Q.  Did you have any discussion with any outside
13   groups -- "outside groups" meaning not legislators --
14   concerning voter identification during this time?
15   A.  Not that I recall.
16   Q.  Do you recall whether you had any discussions
17   with people from the King Street Patriots?
18   A.  I don't remember.
19   Q.  Do you recall whether you had any discussions
20   with people from True the Vote?
21   A.  I don't remember.
22   Q.  Do you recall if you had any discussions with
23   people from the Texas Tea Party, either the women's
24   tea party or general tea party, if there's a
25   difference?

REPRESENTATIVE PATRICIA HARLESS                        6/20/2014
HIGHLY CONFIDENTIAL

7 (Pages 25 to 28)

---

25

1    A.  I don't recall.
2    Q.  Do you recall whether there were discussions
3  with constituents during this time concerning voter
4  ID?
5    A.  The time?  What time?
6    Q.  During the time leading up to the enactment
7  of SB 14.
8    A.  After filing the legislation or prior to
9  filing it?
10    Q.  Either prior to or after filing it.
11    A.  Yes, I'd had constituents come to me in the
12  past talking about the integrity of the elections.
13    Q.  Which constituents?
14    A.  I can't tell you.  I don't remember.
15    Q.  What -- how many such conversations did you
16  have?
17    A.  I don't remember.
18    Q.  When did those discussions occur?
19    A.  I don't remember.
20    Q.  What was the substance of the conversations?
21    A.  Typically, at a town hall meeting, talking
22  about why don't we have photo identification for
23  in-person voting.
24    Q.  And how many such conversations did you have?
25    A.  I don't remember.

---

26

1    Q.  More than two?
2    A.  Probably.  I give about five speeches a week
3  during the interim.
4    Q.  At every speech did this come up?
5    A.  No.  Probably not.
6    Q.  More than five conversations?
7    A.  It would -- it would be a guess.  I don't
8  know.
9    Q.  Do you recall whether you had any input from
10  lobbying groups that affected the drafting of SB 14?
11    A.  Not that I recall.
12    Q.  Is there anyone in your staff who would know
13  the answer better than you?
14    A.  My staff has a lot of communications I'm not
15  aware of, so they may.
16    Q.  Do you recall testifying that you thought
17  that there would be a, quote, "very, very small
18  universe," end quote, of people who did not have
19  the -- the photo ID required by SB 14?
20        MS. DONNELLY:  Objection.
21        Do you have a document?
22        MR. ROSENBERG:  I'm just first asking
23  her if she recalls.
24    A.  I don't.
25    Q.  (BY MR. ROSENBERG)  Did you, at the time that

---

27

1  SB -- that you were handling SB 14, believe that there
2  would be a very, very small universe of people who
3  would not have the identification required by SB 14?
4    A.  I don't remember what I believed then.
5    Q.  Sitting here today, do you believe that there
6  is a very, very small universe of people who do not
7  have the photo ID?
8        MS. DONNELLY:  Objection.  Form.
9    A.  I believe that in today's environment in
10  Texas it's difficult to do anything without a photo
11  ID.
12    Q.  (BY MR. ROSENBERG)  So you believe that
13  there's a very, very small universe of people who do
14  not have --
15    A.  I don't know.
16    Q.  Do you recall whether the Brennan Center
17  submitted a report to the legislature in connection
18  with the consideration of SB 14?
19    A.  I remember the name, the Brennan Center, but
20  I don't remember if there was a report submitted, if
21  they testified in committee or why I remember the
22  name, but I remember the name.
23    Q.  Do you recall whether you relied on the
24  Brennan Center's report in connection with your views
25  on SB 14?

---

28

1    A.  I don't remember.
2    Q.  Were you aware that minority legislatures
3  [sic] and minority groups spoke out against SB 14?
4        MS. DONNELLY:  Objection.  Form.
5    A.  I know there was hours of testimony and hours
6  of debate on the House floor.
7    Q.  (BY MR. ROSENBERG)  And do you recall that
8  African-American legislators and Latino legislators
9  spoke out against SB 14?
10        MS. DONNELLY:  Objection.  Form.
11    A.  I recall hours of debate on the House floor
12  with legislative members and colleagues and in
13  committee.
14    Q.  (BY MR. ROSENBERG)  And in the course of those
15  legislative debates that you remember, do you remember
16  that there were several African-American legislators
17  and Hispanic legislators that spoke out against SB 14?
18    A.  The only ones that come to mind that I
19  remember -- so I can't say several -- are Marc Veasey
20  and Rafael Anchia.
21    Q.  Do you remember that there were African-
22  American groups and Hispanic groups that also spoke
23  out against SB 14 before the legislature?
24        MS. DONNELLY:  Objection.  Form.
25        You can answer.

---

REPRESENTATIVE PATRICIA HARLESS                                6/20/2014
HIGHLY CONFIDENTIAL

                                                    8 (Pages 29 to 32)

---

29

1      A.  I don't remember.
2      Q.  (BY MR. ROSENBERG)  Are you aware of -- do you
3  have a memory of the assertions that were made by
4  Senator Veasey and Representative Anchia in connection
5  with the possible impact of SB 14 on the ability of
6  African-Americans and Hispanics to vote?
7      A.  I don't remember.
8      Q.  Do you remember whether anyone, in connection
9  with the legislature's consideration of SB 14,
10  indicated that it would impact adversely African-
11  Americans and Hispanics voting?
12          MS. DONNELLY:  Objection.  Form.
13      A.  I remember there were hours of debate.
14      Q.  (BY MR. ROSENBERG)  I understand you remember
15  there were hours of debate.
16      A.  I don't remember the substance of the debate.
17      Q.  At any time during your support of SB 14,
18  leading up to the passage of SB 14, did you undertake
19  an analysis of whether any groups of people would be
20  more or less likely to possess the identifications
21  that were listed in the bill?
22          MS. DONNELLY:  Since we're shifting, I
23  just want to make sure that the running objection that
24  we talked about earlier is still running.  Is that
25  right?

---

30

1          MR. ROSENBERG:  Understood.
2          MS. DONNELLY:  Thank you.
3      A.  One more time?
4      Q.  (BY MR. ROSENBERG)  Sure.
5          At any time during the time leading up to the
6  enactment of SB 14 did you undertake an analysis of
7  whether certain groups of people would be more or less
8  likely to possess any of the forms of identification
9  listed in SB 14?
10      A.  I don't remember what we did.
11      Q.  Do you know if you had any -- do you remember
12  whether you had any information as to whether certain
13  groups of people would be more or less likely to
14  possess certain of the identification of -- listed in
15  SB 14?
16      A.  I don't remember.
17      Q.  During that same period of time were you
18  aware whether any legislator undertook an analysis of
19  whether certain groups of people would be more or less
20  likely to possess the identification under SB 14?
21          MS. DONNELLY:  I'm going to inject
22  there, that, please do not reveal your knowledge of
23  what any other legislator did unless it's in the
24  public record.
25      A.  I do not remember.

---

31

1      Q.  (BY MR. ROSENBERG)  Do you recall whether you
2  had any information as to how many individuals had or
3  did not have the various forms of photo identification
4  listed in SB 14?
5      A.  If I had information?
6      Q.  Yes.
7      A.  I know we had testimony in committee about
8  what the Secretary of State or one of the agencies
9  thought that number may be.  But I -- I don't remember
10  the specifics of that and which agency that was.
11      Q.  During the same period of time did you have
12  any information as to the racial composition of the
13  people who may or may not have the IDs listed in
14  SB 14?
15      A.  I don't recall that.
16      Q.  During this time did you consider it
17  important as to whether racial -- different racial or
18  ethnic groups of people were more or less likely to
19  possess any of the identifications listed in SB 14?
20      A.  I think it's important to protect the
21  election process for all Texans.
22      Q.  And -- and did you specifically think it was
23  important as to whether or not there would be an
24  impact on African-Americans or Hispanics as a result
25  of SB 14?

---

32

1          MS. DONNELLY:  Objection.  Form.
2      A.  I -- I don't remember what all we looked at.
3      Q.  (BY MR. ROSENBERG)  Whether or not you
4  remember what you looked at, did you think it was
5  important?
6      A.  I know that we were making sure that it was
7  protecting the integrity of the election for everyone.
8          (Off the record.)
9      Q.  (BY MR. ROSENBERG)  Representative Harless,
10  are you aware that during the legislative debates over
11  SB 14 opponents of the bill indicated that there would
12  be certain burdens on people who did not have the
13  forms of identification listed in SB 14 to get those
14  identifications?
15      A.  I remember there were hours of debate.  I
16  don't remember the content.
17      Q.  Sitting here, you don't remember that anyone
18  said that it would be difficult for people to, for
19  example, drive perhaps an hour or more to a motor
20  vehicle facility?
21      A.  I know there were hours of debate.  I don't
22  remember specifically what the content of the debate
23  was.
24      Q.  Are you aware that during the debate
25  opponents of SB 14 asserted that the burden of getting

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

---

**33**

1    the forms of identification that are listed in SB 14
2    would fall most heavily on African-Americans and
3    Hispanics?
4           MS. DONNELLY:  I'm going to object
5    there.
6           Please do not discuss any communications
7    with other legislators or information you learned from
8    other legislators that is not in the public record.
9    **A.  I do not remember.**
10   Q.  (BY MR. ROSENBERG)  And you do not remember
11   because you're asserting privilege or you just don't
12   remember?
13   **A.  I just don't remember.  I know you've lived**
14   **this; but when I finish a bill, I finish a bill and I**
15   **move on, and I've had another session with other**
16   **bills, and I have limited memory space.**
17   Q.  Well, that's -- let me -- that actually leads
18   me to something else.
19          You're aware that SB 14 is now the law?
20   **A.  Yes.**
21   Q.  Have you been following implementation of
22   SB 14?
23   **A.  No, sir.**
24   Q.  Do you have an interest in wanting to make
25   sure that it's implemented correctly?

---

**34**

1    **A.  I've noticed they've done the training.**
2    **After I pass the legislation, it's up to the agencies**
3    **to do the implementation.  I have no control over**
4    **that.**
5    Q.  Are you aware of any problems with its
6    implementation?
7    **A.  Not that I've heard of.**
8    Q.  Have you heard any complaints from any voters
9    or constituents as to its implementation?
10   **A.  Not in my district.**
11   Q.  Do you have an understanding as to whether
12   its implementation has led to a decrease in voter
13   fraud?
14   **A.  I haven't -- I don't know.**
15   Q.  Did you or your staff take any steps to help
16   implement SB 14?
17   **A.  I did not.**
18          MS. DONNELLY: Objection.  Form.
19          Go ahead.
20   **A.  I did not.**
21   Q.  (BY MR. ROSENBERG)  Did you try to get out the
22   word as to SB 14?
23   **A.  We sent out e-mails to our constituents about**
24   **the requirements, several of them.**
25   Q.  When you said to your "constituents," did you

---

**35**

1    send it out to all of your constituents?
2    **A.  We sent it out by our e-mail blast of people**
3    **that have signed up, and we do every time there's an**
4    **election.**
5    Q.  So to whom would this -- I guess I'm
6    interested in who this -- who's on this database of
7    your constituents?
8    **A.  Anyone who's ever called, written, or come to**
9    **my office for any type of assistance since I've been**
10   **elected.  Their e-mail addresses, if they have one, is**
11   **collected, and they're added to our e-mail database,**
12   **and we send out information relevant to the district.**
13   **It's nonpartisan.  It's state-related business.**
14   Q.  And would that also go to contributors?
15   **A.  No.**
16   Q.  So --
17   **A.  Let me rephrase that.**
18          **There could be contributors that have**
19   **contacted our office that are on the list, but this is**
20   **a constituent-driven list.**
21   Q.  Do you know how many people are on that list?
22   **A.  I don't.**
23   Q.  Does the phrase "legislative purpose" have
24   any meaning to you?
25   **A.  No, sir.**

---

**36**

1    Q.  Does the phrase "legislative intent" have any
2    meaning to you?
3    **A.  Yes, sir.**
4    Q.  What's that mean?
5    **A.  It means what the intent of the legislation**
6    **was, what was argued for the intent.**
7    Q.  And when you say "what was argued for the
8    intent," what -- what are you referring to?
9    **A.  Or testified in committee on the floor.**
10   Q.  Are you limiting yourself to the public
11   record?
12   **A.  Yes.**
13   Q.  Can a legislative intent be based on things
14   outside the public record?
15   **A.  I don't know.**
16   Q.  Do you understand what the word
17   "discriminatory" means?
18   **A.  Yes.**
19   Q.  What's your understanding?
20   **A.  One person or thing not treated equal to the**
21   **same as another person or thing.**
22   Q.  Can a law have a discriminatory intent even
23   if that's not stated on the public record?
24          MR. KEISTER:  Object to form.
25   **A.  I -- I don't know.**

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

---

**37**

1    Q.  (BY MR. ROSENBERG)  Do you think it's
2    possible?
3        MR. KEISTER:  Object to form.
4        A.  I don't know.
5        Q.  (BY MR. ROSENBERG)  Is it your understanding
6    that there's only one intent behind the legislation?
7        A.  The stated intent.
8        Q.  Can there be unstated intent?
9        MR. KEISTER:  Object to form.
10       A.  I don't know.
11           MR. ROSENBERG:  Why don't we take a
12   break.  I think I'm going to go into some documents
13   now.
14           MS. DONNELLY:  Okay.  The running
15   objection is still running; is that right?
16           MR. ROSENBERG:  Well, you know what,
17   we'll -- sure.  But let's see what questions I ask
18   when we start again.
19           MS. DONNELLY:  Okay.
20           MR. ROSENBERG:  We might decide to --
21           MS. DONNELLY:  Since the running
22   objection was agreed upon, it has, at least to this
23   point, been running; is that right?
24           MR. ROSENBERG:  Right.
25           MS. DONNELLY:  And when we come back on

---

**38**

1    the record, we can talk about it some more.
2        MR. ROSENBERG:  Absolutely.  No problem.
3        MS. DONNELLY:  Very good.
4        (Break.)
5        (Harless Exhibit 163 marked/introduced.)
6        Q.  (BY MR. ROSENBERG)  Representative Harless,
7    I'll show you what's been premarked as Exhibit 163.
8        And ask you if you can identify this document
9    for the record.
10       A.  It looks like the House Journal from March
11   21, 2011.
12       Q.  And have you ever seen this document before?
13       A.  Not that I recall.  I may have.  I don't
14   know.
15       Q.  And do you know, looking at this document,
16   what proceedings this document records?
17       A.  It's the House Journal from March 21st, the
18   events that happened on the House floor on the 21st --
19   of 2011.
20       Q.  And looking through this document, as you
21   certainly can if you wish, does this document deal
22   with legislative consideration of SB 14?
23       A.  It looks like, on page 910, it's the second
24   reading of S -- committee substitute SB 14.
25       Q.  I'd like to direct your attention to page

---

**39**

1    910.  And you see where Representative Anchia asks, "I
2    wanted to ask you a couple questions about SB 14 and
3    voter impersonation.  You alluded to the fact that
4    this bill deals with one specific type of voter fraud,
5    correct?"
6        And the answer that is recorded:  "Yes,
7    potential voter fraud."
8        Do you see that?
9        A.  Yes, I see it.
10       Q.  And the colloquy goes on, Anchia says:  "And
11   that's voter impersonation?"
12       You answer "Yes."
13       And Anchia says:  "And how does -- describe
14   how voter impersonation works."
15       And you say:  "Someone shows up to the poll
16   with a voter registration card that may not be theirs
17   and passes a vote with that card."
18       And he then asks:  "How often does that
19   happen in the State of Texas, do you think?"
20       And you answer:  "I'm not advised."
21       Do you see that?
22       A.  Yes, sir.
23       Q.  And what -- what did you mean by "I'm not
24   advised"?
25           MS. DONNELLY:  I'm going to assert the

---

**40**

1    legislative privilege.
2        And subject to that objection, you can
3    answer under seal.
4        Do you want to continue a running
5    objection, Counsel?
6        MR. ROSENBERG:  Yes.
7        MS. DONNELLY:  Okay.  So we are back on
8    a running objection, and the running objection will
9    run until the parties agree that it is no longer
10   running.
11       Is that an agreement with all counsel?
12           MR. ROSENBERG:  That's the agreement,
13   yes.
14           MR. FREEMAN:  Yes.
15       A.  I'm not exactly sure what -- what all was
16   going on there, but typically, when I say I'm not
17   advised, meaning nobody has come up to me and given me
18   all that information.
19       Q.  (BY MR. ROSENBERG)  Was it a surprise to you
20   that this question would be asked in consideration of
21   SB 14?
22       A.  I -- I don't know.
23       Q.  Did you try to gather this information as --
24   as to -- any information as to this issue after this
25   debate?

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

12 (Pages 45 to 48)

---

### 45

1      A.  Say that one more time.
2      Q.  (BY MR. ROSENBERG)  Sure.
3          Sitting here today, do you have an
4   understanding as to the extent of in-person voter
5   fraud in Texas at the time SB 14 was enacted?
6      A.  I don't recall.
7      Q.  Do you have an understanding as to whether or
8   not it was more or less of a problem than absentee
9   ballot fraud?
10         MS. DONNELLY:  Objection.  Form.
11         Go ahead.
12     A.  I don't recall.
13     Q.  (BY MR. ROSENBERG)  Turning your attention to
14  page 915, Representative Anchia -- there's a --  the
15  first large paragraph, the one that begins:  "Here's
16  the quandary for this body."
17         Do you see that?
18     A.  Yes, sir.
19     Q.  And the last sentence says:  "How much money
20  is in the bill for informing Texans about the change
21  in the law?"
22         And you answered:  "The fiscal note on the
23  bill is $2,024,000"?
24     A.  Yes, sir.
25     Q.  Do you know whether or not that money has

---

### 46

1   been spent?
2      A.  I don't.
3      Q.  Do you know whether there was any legislative
4   oversight over the spending of that money?
5      A.  I don't.
6      Q.  Next page, on page 916, towards the middle,
7   you're quoted as saying:  "It" -- and again, we're
8   talking about the bill -- "It will increase turnout of
9   all voters and education of all voters."
10         Do you see that?  It's just about -- a little
11  below the halfway mark.
12     A.  Yes.
13     Q.  You can read the whole page if you want.
14     A.  Yes.
15     Q.  What is it -- do you have an understanding as
16  to your basis for stating "It will increase turnout of
17  all voters"?
18     A.  I don't.
19     Q.  Turning your attention to page 918.  And
20  first, Representative Anchia, just above the middle
21  half of the page, he says:  "Have you" -- "I know
22  you've done a lot of work on this bill, a lot of
23  research.  What academic studies have you run across
24  to determine the number of minorities that lack
25  required photo identification?"

---

### 47

1          ANSWER:  "From all the testimony that
2   we've had in committee, there was no possible way to
3   determine that."
4          Do you see that?
5      A.  Yes, sir.
6      Q.  (BY MR. ROSENBERG)  And then further down,
7   Representative Anchia says:  "But, are you aware of
8   any studies?  Above and beyond the testimony?"
9          You can read what's in between that.
10         MS. DONNELLY:  Yeah, take your time to
11  read between.
12     A.  Okay.
13     Q.  (BY MR. ROSENBERG)  And in response to
14  Representative Anchia's question:  "But, are you aware
15  of any studies?  Above and beyond the testimony?"  You
16  say:  "No.  Not advised."
17         Do you see that?
18     A.  Yes, sir.
19     Q.  Is -- can you tell me what you meant by "No.
20  Not advised".
21     A.  No.
22     Q.  Is it your understanding that there were no
23  studies available to determine the number of
24  minorities that lack required photo identification?
25     A.  I don't remember that.

---

### 48

1      Q.  Did you rely on any public opinion polls in
2   connection with your support of SB 14?
3          MS. DONNELLY:  Since we're shifting
4   gears, I'm going to just make sure our running
5   objection is still running.
6          MR. ROSENBERG:  It is.  It's still
7   running.
8          MS. DONNELLY:  As to all counsel.
9      A.  I don't recall.
10         (Harless Exhibit 164 marked/introduced.)
11     Q.  (BY MR. ROSENBERG)  I'd like to show you a
12  package of documents that we've marked as Exhibit 164.
13         MS. DONNELLY:  Counsel, 164 are
14  documents produced by Representative Harless's office;
15  is that correct?
16         MR. ROSENBERG:  That's correct.  And
17  these are, just for the record, marked "Confidential,"
18  not "Highly Confidential," so this part of the
19  transcript should be -- in addition to the highly
20  confidential treatment of Representative Harless's
21  testimony about the documents, these documents
22  themselves are "Confidential" and not Highly
23  Confidential.  I'm not sure exactly how that's going
24  to work, but just for the record.
25     A.  Well, I think they're confidential on this,

---

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

---

53

1    Q.  Let me just finish the question.
2    A.  Sorry.
3    Q.  -- to your e-mail account?
4    A.  Yes.
5    Q.  All your staff?
6    A.  Yes, sir.
7    Q.  And so you can't tell, looking at this, or
8  have no memory as to whether you actually wrote this
9  or a staff member wrote this; is that fair?
10   A.  That's fair.
11   Q.  Looking at the second paragraph in the
12 middle, it's written -- you may review this --
13 referring to "70 percent of Texans believe that there
14 should be some form of identification for voting.  You
15 may review this University of Texas poll by logging
16 onto" -- and you give a website.
17        Do you see that?
18   A.  Yes, sir.
19   Q.  Or it's given as a website.
20        Do you recall that poll?
21   A.  Do I?
22   Q.  Do you.
23   A.  Do I recall what?
24   Q.  That poll that you refer to.
25   A.  No.

---

54

1    Q.  When it's written that there should be some
2  form of identification for voting, it's not being
3  suggested here that the specific forms of
4  identification set forth in SB 14 were endorsed by
5  70 percent of Texans, is it?
6        MS. DONNELLY:  Objection.  Form.
7        You can answer.
8    A.  I don't know what the poll is or what it was
9  talking about.
10   Q.  (BY MR. ROSENBERG)  Are you aware of any poll
11 where the specific forms of identification set forth
12 in SB 14 were the subject of the poll?
13   A.  I don't recall.
14   Q.  Turning your attention to LEG 746.  You'll
15 see there's a Bates stamp on the lower right-hand
16 corner.  And I'll ask you to review that.  And it is
17 more than a one-page document.  If you want to review
18 the rest, you're welcome to.  But I'm only going to
19 ask you a question about the second paragraph.
20   A.  The second paragraph?
21   Q.  Yeah.  But first I want to ask you whether
22 you've ever seen this document before?
23   A.  I'm sure I probably have, but I don't
24 remember specifically.
25   Q.  Do you know who Duncan Parish is?

---

55

1    A.  I don't.
2    Q.  Looking at the second paragraph, it's
3  written:  "I'm not sure of the number nation wide
4  [sic].  In Texas during the May 29th primary, we had
5  239 dead people vote with 213 of those dead people
6  voting in person."
7        Do you see that?
8    A.  Yes, sir.
9    Q.  Do you recall having written that?
10   A.  No, sir.
11   Q.  Do you recall that subject matter of 239 dead
12 people voting with 213 of those voting in person?
13   A.  No, sir.
14   Q.  Do you have any idea where that information
15 came from?
16   A.  No, sir.  I don't remember.
17   Q.  Looking at page LEG 753.
18        First, I ask you whether you've seen this
19 document before?
20   A.  I don't remember.
21   Q.  Do you know who Linda Simcox is?
22   A.  Not that I know of.
23   Q.  Looking at the second paragraph, "My staff
24 contacted the Harris County Clerk's office to look
25 into this issue.  According to the County Clerk's

---

56

1  office, they have received no complaints or had any
2  problems implementing the Voter ID law.  Their poll
3  workers have been trained to check for name
4  similarities."
5        Do you see that?
6    A.  Yes, sir.
7    Q.  Do you recall this issue?
8    A.  No, sir.
9    Q.  Do you know who in your staff contacted the
10 Harris County Clerk's Office?
11   A.  No, sir.
12   Q.  Do you know the basis for your statement that
13 "Their poll workers have been trained to check for
14 name similarities"?
15   A.  No, sir.
16   Q.  Do you know what's meant by the sentence
17 "Their poll workers have been trained to check for
18 name similarities"?
19   A.  No, sir.
20        (Harless Exhibit 165 marked/introduced.)
21   Q.  (BY MR. ROSENBERG)  I'd like to show you
22 what's been marked as Exhibit 165.
23        And ask you if you can tell me what this is.
24   A.  No.
25        MS. DONNELLY:  Since we've shifted to a

---

57

1   new document, I do want to make clear that the running
2   objection is still running; is that correct, Counsel?
3            MR. ROSENBERG:  That's correct.  And
4   this document is a "Highly Confidential" document and
5   will be treated as such.
6            MS. DONNELLY:  Under the Court's order.
7   Thank you.
8            MR. ROSENBERG:  Yes.
9       A.  Do I know what it is?
10      Q.  (BY MR. ROSENBERG)  Yes.
11      A.  No.
12      Q.  It's -- the first two words on it are "OTB
13  Resolution."  In New York, that's off-track betting.
14  I don't think that's what it is here.
15           Can you tell me what it is.
16      A.  I would assume that OTB resolution, out of
17  bounds, out of the bounds.
18      Q.  Out of the bounds?
19      A.  Out-of-the-bounds resolution, maybe.
20      Q.  And what is an out-of-the-bounds resolution?
21      A.  Sometimes after conference -- when a bill
22  goes to conference committee, where there's
23  differences between the Senate and the House, you --
24  if you think that there's something that goes out of
25  the bounds of the original purpose of that part of the

58

1   section of the bill or the intent of that part of the
2   section of the bill, then you should do an out-of-
3   bounds resolution.  If there's something other, that
4   was added to the bill or taken away, that wasn't part
5   of the original bill.
6       Q.  And do you recall there being an out-of-the-
7   bounds resolution in connection with SB 14?
8       A.  Not until I saw this.
9       Q.  Have you ever seen this document before?
10      A.  I probably have.  It looks like it was maybe
11  my comments or -- or the -- I probably have.
12      Q.  Who -- can you identify the handwriting
13  or --
14      A.  That's my handwriting.  It's terrible.
15      Q.  And looking throughout the document, is
16  that -- wherever there's handwriting, is that your
17  handwriting?
18      A.  Yes.  On one, two, three, four -- on the
19  first five pages, the writing is mine.
20      Q.  And looking at the first page where it said
21  "a D" -- it says:  "DPS my understanding & Expectation
22  that DPS" -- I guess that means "will" -- "wl put a
23  photo on Election ID certificate."
24           Is that a fair reading of that?
25      A.  I guess.

59

1       Q.  Can you tell me what you meant by that.
2       A.  No.  I don't -- I don't recall.
3       Q.  By the way, was it your expectation that DPS
4   would be administering SB 14?
5            MS. DONNELLY:  Objection.  Form.
6            Go ahead.
7       A.  I -- I don't recall.
8       Q.  (BY MR. ROSENBERG)  Was it your expectation
9   that DPS would have any discretion as to the forms of
10  identification that would be accepted by DPS for
11  purposes of issuing a driver's license?
12      A.  I don't know.
13      Q.  Would it bother you if DPS had discretion to
14  decide whether or not a person should have a driver's
15  license which would be accepted as identification for
16  SB 14?
17      A.  I don't know what the duties of DPS are.
18      Q.  Turning your attention to page 6962, that's
19  TX 6962, which is about the fourth page.
20      A.  Okay.
21      Q.  Under "Notable Provision Kept/Modified," do
22  you see that?
23      A.  Yes, sir.
24      Q.  There's a discussion about an exemption for
25  natural disasters.

60

1            Do you see that?
2       A.  Yes, sir.
3       Q.  And then it says, the second bullet point:
4   "Why kept in?  The potential to impact a large number
5   of voters."
6            Do you see that?
7       A.  Yes, sir.
8       Q.  Do you have an understanding as to what's
9   meant by that?
10      A.  No, sir.
11           MS. DONNELLY:  Objection.  Form.
12      Q.  (BY MR. ROSENBERG)  Turn to the next page,
13  6963.  There's a question in bold:  "Isn't bill now
14  more restrictive than Indiana's or Georgia law?"
15           Do you see that?
16      A.  Yes.
17      Q.  Do you have an understanding as to whether
18  SB 14 was more restrictive than Indiana's or Georgia's
19  law?
20      A.  I don't recall.
21      Q.  Now, looking at the answer to the question --
22  well, strike that.
23           This says:  "General Q & A."
24           Do you see that?
25      A.  Yes, sir.

REPRESENTATIVE PATRICIA HARLESS                              6/20/2014
HIGHLY CONFIDENTIAL

16 (Pages 61 to 64)

---

61

1    Q.  Was it your understanding that -- is it your
2    understanding that this document sets forth questions
3    that were expected to be asked on the floor and
4    suggested answers?
5    **A.  I don't know.**
6    Q.  Is that a process that you typically do?
7    **A.  What do you mean?**
8    Q.  Meaning, when you -- first of all, is this
9    the only bill you've ever been the sponsor of?
10   **A.  No.**
11   Q.  When you're a sponsor of the bill, do you
12   anticipate, in legislative debates, that there will be
13   certain questions asked from the floor and you
14   anticipate what the answers might be?
15   **A.  This is -- this specifically is an out-of-**
16   **bounds resolution.  This is my only out-of-bounds**
17   **resolution that I've done in four sessions.  And after**
18   **you get to this point, typically you've debated the**
19   **bill at least three times; in committee, on the floor,**
20   **and then back on the floor for -- so I don't know if**
21   **that has to do with, because these are questions that**
22   **had been asked before.  I don't -- I don't know**
23   **what -- you know, I don't know that I -- I do that all**
24   **the time.**
25   Q.  Do you have an understanding what the purpose

---

62

1    of this document was?
2    **A.  This was to explain the out-of-bounds**
3    **resolution.  I...**
4    Q.  Was this to give you guidance on the floor?
5    **A.  Yes.**
6    Q.  Turning your attention back to page 6963,
7    does the paragraphs that follow the question -- do the
8    paragraphs that follow the question answer the
9    question whether the bill is more restrictive than
10   Indiana's or Georgia's?
11          MS. DONNELLY:  Take your time to read it
12   if you need to.
13   **A.  Seems to.**
14   Q.  (BY MR. ROSENBERG)  How?
15   **A.  That it's constitutional, and Indiana and**
16   **Georgia's laws were constitutional.  I don't think any**
17   **legislation is the same as the next.  I think there's**
18   **all different...**
19   Q.  Well, would you agree that if, for example,
20   you have two pieces of legislation that were identical
21   in terms of the photo identification that was required
22   in each, except that one had an additional category
23   that was allowed, would you agree that one was more
24   restrictive than the other in terms of documentation?
25   **A.  I -- I don't know.**

---

63

1    Q.  Do you recall any differences between Indiana
2    and Georgia's law on the one hand and SB 14 on the
3    other?
4    **A.  No.**
5    Q.  Do you recall whether Georgia allowed expired
6    driver's licenses, for example?
7    **A.  No.**
8    Q.  Do you know whether SB 14 allowed expired
9    driver's licenses?
10   **A.  From reading the bill last night, I think we**
11   **allowed ID -- expired no longer than 60 days.**
12          **(Harless Exhibit 166 marked/introduced.)**
13   Q.  (BY MR. ROSENBERG)  I'd like to show you
14   what's been marked as 166.
15          MS. DONNELLY:  This is also "Highly
16   Confidential," Counsel?
17          MR. ROSENBERG:  It is also "Highly
18   Confidential," and I will accept your continuing
19   assertion of privilege under seal.
20          MS. DONNELLY:  Thank you.
21   Q.  (BY MR. ROSENBERG)  Can you tell me what this
22   document is.
23   **A.  No.**
24   Q.  Do you recall if you've ever seen it before?
25   **A.  It looks vaguely familiar.**

---

64

1    Q.  Do you know if you wrote it?
2    **A.  It's typed; and, no, I don't know if I did.**
3    Q.  Turning your attention to page 7026 -- and
4    just for the record -- actually, if you would please
5    go back to 7025, and if you see -- what number does it
6    say on that page, above the Bates stamp?  Does it say
7    number 3?
8    **A.  Yes, sir.**
9    Q.  And if you go to page 7026, do you see what
10   page number is on that?
11   **A.  5.**
12   Q.  Right.
13          Do you know where page 4 is of this document?
14   **A.  I don't.**
15   Q.  And similarly, if you look at 7027 and go to
16   7028, that goes from page 6 to 8, right?
17   **A.  Yes, sir.**
18   Q.  Do you know where page 7 is of this document?
19   **A.  It was page 27023.  It looks like they're out**
20   **of page order.**
21   Q.  They're out of order.  Okay.  Good.  I don't
22   know if we can find page 4.
23          Okay.  Let's turn back.
24          On page 7026, which is page 5, is that
25   handwriting yours?

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

17 (Pages 65 to 68)

65

1      A.  Yes.
2      Q.  You do have bad handwriting.
3      A.  I know I do.  My son says I'm really smart,
4    though.
5      Q.  The bottom paragraph:  "How to get a voter ID
6    if you live a long distance to drive to get a TDL?"
7          And TDL, do you know what that refers to?
8      A.  Texas driver's license.
9      Q.  Right.
10         And "15 million TDL 750,000 ID's.  Very small
11   number..."
12         Do you know what is meant by "very small
13   number"?
14     A.  No, sir.
15     Q.  Turning your attention to the next page,
16   7027, where it says:  "-- plaintiffs have been unable
17   to produce a single individual who either did not have
18   an ID or could not easily find one."
19         Do you know what is meant by that?
20     A.  Where is that?
21     Q.  I'm sorry, it's under the second paragraph,
22   "Isn't this bill unconstitutional?"
23     A.  Okay.
24     Q.  "More restrictive than Indiana's Law"?
25     A.  I do not.

66

1      Q.  And you don't know the basis for that
2    statement, then?
3      A.  No, sir.
4      Q.  Turning your attention to 7037, can you tell
5    me what that is.
6      A.  It's a floor amendment by Bonnen.
7      Q.  And do you know -- do you recall this floor
8    amendment?
9      A.  I don't.
10     Q.  Looking at it, is it -- is it accurate to say
11   that this was the amendment that deleted the exemption
12   from the requirements of SB 14 for persons 70 years of
13   age or older?
14     A.  I would need to see it in context with
15   this --
16     Q.  Do you recall there being a provision in the
17   bill at some time that exempted persons who are 70
18   yeas of age or older from the requirements of having
19   to show a photo ID in order to vote in person?
20     A.  I don't remember.
21     Q.  And I assume, then, you don't remember there
22   being an amendment that deleted that from the bill?
23     A.  I don't.
24         (Harless Exhibit 167 marked/introduced.)
25     Q.  (BY MR. ROSENBERG)  I'd like to have this

67

1    marked as Exhibit 167 and ask you if you can identify
2    Exhibit 167 for the record.
3      A.  House Journal for Wednesday, March 23, 2011.
4      Q.  And have you ever seen this document?
5      A.  Not that I know of.
6      Q.  And feel free to look through it.
7          And could you tell me, after looking through
8    it, whether it refreshes your recollection as to
9    whether you've seen this document.
10     A.  I -- no.
11     Q.  Looking through it, does this document
12   reflect proceedings on the House floor concerning
13   SB 14?
14         MS. DONNELLY:  Can you point her to it?
15         MR. ROSENBERG:  Excuse me?
16         MS. DONNELLY:  Can you point her to it?
17         MR. ROSENBERG:  The whole document,
18   actually, from page -- after those initial resolutions
19   to -- from page 952 forward, I believe.  It's even
20   before that.
21     A.  Yes.  It starts on page 951, SB 14, committee
22   substitute SB 14 on second reading.
23     Q.  (BY MR. ROSENBERG)  And were these the
24   proceedings where amendments were offered to SB 14?
25     A.  This is the House Journal of the proceedings

68

1    of the floor on March 23rd.  I'm not sure.  But I
2    guess this was when I laid out the bill, I guess.
3      Q.  Turning your attention to page 966, and 967.
4    And we're dealing with Amendment No. 11.  And if you
5    could read that to yourself.
6      A.  966?
7      Q.  Yeah.  At the bottom, it says:  "Amendment
8    No. 11."  It begins:  "Representative Veasey offered
9    the following amendment..."
10     A.  Okay.
11     Q.  Do you recall this amendment being offered?
12     A.  No, sir.
13     Q.  Do you see where it says:  "Representative
14   Harless moved to table Amendment No. 11"?
15     A.  Yes, sir.
16     Q.  And Amendment No. 11 dealt with the execution
17   of "-- an affidavit under penalty of perjury stating
18   that the voter is the same person named on the list of
19   registered voters --"; is that correct?
20     A.  That's what it says.
21     Q.  Do you recall why you moved to table
22   Amendment No. 11?
23         MS. DONNELLY:  And once again, we're
24   still under the running objection?
25         MR. ROSENBERG:  Yes.

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

18 (Pages 69 to 72)

---

69

1     A.  No, sir.
2     Q.  (BY MR. ROSENBERG)  Sitting here today, do you
3  have an understanding as to why?
4     A.  No, sir.
5     Q.  Turning your attention to page 969, Amendment
6  No. 15, offered by Representative Martinez, which
7  stated that:  "Notwithstanding any other law, an
8  agency, institution, or political subdivision of this
9  state may not charge any fee for the issuance of any
10 document that may be used:  As proof of identification
11 under this chapter; or to obtain a document that may
12 be used as proof of identification under this
13 chapter."
14        Do you see that?
15    A.  Yes, sir.
16    Q.  And it says that Representative Harless moved
17 to table Amendment No. 15.
18        Do you see that?
19    A.  Yes, sir.
20    Q.  Do you recall why you moved to table
21 Amendment No. 15?
22    A.  No, sir.
23    Q.  Do you -- sitting here today, do you oppose
24 Amendment No. 15?
25    A.  I don't know what it means.

---

71

1     A.  No, sir.
2     Q.  Amendment No. 17, on page 974, wanted to
3  insert a temporary driving permit issued to the person
4  by DPS.
5        Do you see that?
6     A.  Yes, sir.
7     Q.  And then it says that you moved to table
8  Amendment No. 17.
9        Do you see that?
10    A.  Yes, sir.
11    Q.  Do you recall why you moved to table it?
12    A.  No, sir.
13    Q.  Sitting here today, do you understand what
14 Amendment No. 17 purported to do?
15    A.  No, sir.
16    Q.  If I were to suggest that Amendment No. 17
17 purported to include, as an additional form of ID, a
18 temporary driving permit issued to the person by the
19 DPS, would that make sense to you?
20    A.  Yes, sir.
21    Q.  And sitting here today, do you oppose that?
22        MS. DONNELLY:  Objection to form.
23    A.  I don't -- I don't know what a temporary
24 driving permit issued by the DPS looks like, if it has
25 a photo on it.

---

70

1     Q.  Moving to page 970, Amendment No. 16 offered
2  by Representative Raymond, which wanted to insert the
3  following -- I'll read it in part, just for the
4  record -- presents a paycheck or copy of another
5  official employment document that includes the
6  information of the voter's employer and informs the
7  election officer that:  The voter's employer does not
8  permit the voter to be absent from work for the
9  purpose of obtaining photo ID; and offices of the DPS
10 are not open for at least two consecutive hours
11 outside of the voter's working hours.
12        Do you see that?
13    A.  Yes, sir.
14    Q.  And if you turn to page 974, Representative
15 V. Taylor -- is that Van Taylor?
16    A.  I guess, yeah.
17    Q.  -- moved to table Amendment No. 16, and you
18 voted in favor of tabling it.
19        Do you see that?  Under the "yeas."
20    A.  Yes.
21    Q.  Do you recall why you voted in favor of
22 tabling the amendment?
23    A.  No, sir.
24    Q.  Do you have an understanding, today, of what
25 that amendment would do?

---

72

1     Q.  (BY MR. ROSENBERG)  Turning to page 975,
2  Amendment No. 18, Representative Dutton offered an
3  amendment to include -- to add Subdivision 25 to read
4  as follows:  "'Personal identification card' means a
5  personal identification voter certificate issued by
6  the Department of Public Safety," and there was a
7  motion to table that, which you moved.
8        Do you recall that?
9        MS. DONNELLY:  He's just asking if you
10 moved to table it.
11    A.  Yes.
12    Q.  (BY MR. ROSENBERG)  And do you know why you
13 moved to table it?
14    A.  No.
15    Q.  Turn the page, please.  978.
16        Representative Veasey offered an amendment
17 that would add as a form of identification "a valid
18 employee identification card that contains the
19 person's photograph and is issued by an employer of
20 the person in the ordinary course of the employer's
21 business."
22        Do you see that?
23    A.  Yes.
24    Q.  And you moved to table that amendment.
25        Do you see that?

REPRESENTATIVE PATRICIA HARLESS                                          6/20/2014
HIGHLY CONFIDENTIAL

19 (Pages 73 to 76)

73

1    A.  Yes.
2    Q.  Do you know why you moved to table that
3  amendment?
4    A.  No, sir.
5    Q.  Sitting here today, do you oppose that
6  amendment?
7    A.  I don't --
8       MS. DONNELLY:  Object to the form.
9    I don't know.
10   Q.  (BY MR. ROSENBERG)  Turning to page 979,
11 Amendment No. 23, Representative Dutton offered an
12 amendment that would add to the forms of photo ID in
13 SB 14, "a student identification card issued by a
14 public or private high school or institution of higher
15 education that contains the person's photograph."
16      Do you see that?
17   A.  Yes, sir.
18   Q.  And you voted to table that; is that correct?
19   A.  Yes, sir.
20   Q.  Do you know why you did so?
21   A.  No, sir.
22   Q.  Sitting here today, do you oppose that?
23      MS. DONNELLY:  Objection to form.
24   A.  I don't know.
25   Q.  (BY MR. ROSENBERG)  Are you aware as to

74

1  whether either the Indiana or Georgia statute included
2  a student identification card with a photograph as an
3  acceptable form of ID?
4    A.  I'm not.
5    Q.  Are you aware of whether you, yourself, have
6  in the past supported legislation that included a
7  student identification card as an acceptable form of
8  ID?
9    A.  I'm not aware.
10   Q.  Turning to the next page, Amendment No. 24,
11 which was offered by Representative Martinez Fischer
12 and would include as an acceptable form of ID in
13 SB 14, "a valid identification card that contains the
14 person's photograph and is issued by this state."
15      Do you see that?
16   A.  Yes, sir.
17   Q.  And that was moved to table, and you voted in
18 favor of tabling it.
19      Do you see that?
20   A.  Yes, sir.
21   Q.  Do you know why you did so?
22   A.  No, sir.
23   Q.  Sitting here today, do you oppose that?
24      MS. DONNELLY:  Objection.  Form.
25   A.  I don't know.

75

1    Q.  (BY MR. ROSENBERG)  Do you oppose allowing
2  individuals to use that form of ID, a valid
3  identification card that contains the person's
4  photograph and is issued by the state --
5       MS. DONNELLY:  Objection.
6    Q.  (BY MR. ROSENBERG)  -- in order to vote?
7       MS. DONNELLY:  Objection.  Form.
8       You can answer.
9    A.  I don't remember what the debate was relating
10 to all of this at the time.
11   Q.  (BY MR. ROSENBERG)  Sitting here today, do you
12 oppose allowing an individual to use a valid
13 identification card that contains a person's
14 photograph and is issued by the state in order to
15 vote?
16   A.  I don't know what the debate was --
17      MS. DONNELLY:  Objection.  Form.
18   A.  -- about, why it was important to use.
19   Q.  (BY MR. ROSENBERG)  So sitting here today, you
20 don't have a position on that issue?
21   A.  That's right.
22   Q.  And the same question as to the use of a
23 student identification card issued by a public or
24 private high school or institution of higher education
25 that contains the person's photograph:  Sitting here

76

1  today, do you oppose that form of identification being
2  used as a form of ID for a person to vote?
3       MS. DONNELLY:  Objection.  Form.
4       You can answer.
5    A.  I don't recall the debate on the purpose of
6  the IDs chosen.
7    Q.  (BY MR. ROSENBERG)  And therefore, sitting
8  here today, you don't have a position on it one way or
9  the other?
10   A.  Yes, sir.  I do not.
11      (Harless Exhibit 168 marked/introduced.)
12   Q.  (BY MR. ROSENBERG)  I'd like to have this
13 marked as Exhibit 168, please.
14      MR. ROSENBERG:  And this is a document
15 that's also "Highly Confidential."
16   Q.  (BY MR. ROSENBERG)  And first of all, I want
17 to ask you if you -- actually, if I may, I actually
18 gave you my copy.  Is it okay if we switched these,
19 because I had marked this?
20   A.  Sure.
21      MS. DONNELLY:  Of course.
22      THE WITNESS:  Sorry.
23      MR. ROSENBERG:  No, my fault.
24      THE WITNESS:  Am I a part-time attorney?
25      MS. DONNELLY:  You're doing fine.

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

20 (Pages 77 to 80)

---

Page 77

1  Q. (BY MR. ROSENBERG) Have you seen this
2  document before?
3  **A. Not that I recall.**
4  Q. And it's entitled "Reasons for Withholding
5  Certain Information Requested by Suzanne Gamboa,
6  Associated Press, from State Representative Patricia
7  Harless."
8     Do you see that?
9  **A. Yes, sir.**
10  Q. Do you recall, back in January of 2012, there
11  being a Freedom of Information Act request for certain
12  documents from you?
13  **A. No, sir.**
14  Q. Turning your attention to the second page,
15  the paragraph --
16     MS. DONNELLY: Counsel, the running
17  objection applies to those questions regarding Harless
18  168 as well.
19     MR. ROSENBERG: Absolutely.
20     MS. DONNELLY: The questions and answers
21  are sealed. This is a continuation of the running
22  objection.
23     You can answer.
24  Q. (BY MR. ROSENBERG) It begins: "There are
25  seven documents that the office seeks to withhold.

---

Page 78

1  Copies of those documents are included with this brief
2  and are marked in red pencil for identification and
3  designation of the specific grounds for which the
4  council seeks to withhold each document. Documents A,
5  B, C, D, and E are a single email chain between the
6  member and her Chief of Staff Colby Beuck containing
7  advice, opinions, and recommendations relating to a
8  speech on Senate Bill No. 14, Acts of the 82nd
9  Legislature, Regular Session, 2011 (Voter I.D. Law)
10  that the representative gave to the Cy-Fair Houston
11  Chamber of Commerce, Government Affairs Committee on
12  December 1, 2011. Documents F and G are emails
13  between Representative Harless and her chief of staff
14  that relate to the representative's request for an
15  outline and talking points for the speech on S.B. 14.
16  Portions of documents F and G are unresponsive to the
17  request, and are marked accordingly. Additionally,
18  documents F and G show that 'cc' copies were sent to
19  Julie Scott and Ella Edmiston" -- E-D-M-I-S-T-O-N --
20  "both of whom are employed in the representative's
21  office. All of the documents contain confidential
22  discussions and information regarding public policy
23  and the preparation of legislation."
24     Do you see that?
25  **A. Yes, sir.**

---

Page 79

1  Q. Does that refresh your recollection as to any
2  issue?
3  **A. No, sir.**
4  Q. Do you know whether these documents that
5  are -- first of all, do you recall what these
6  documents are?
7  **A. No, sir.**
8  Q. Do you recall having given a speech to the
9  Cy-Fair Houston Chamber of Commerce in December of
10  2011?
11  **A. No, sir.**
12  Q. Do you know whether the documents described
13  in this paragraph have been produced to the plaintiffs
14  in this case?
15  **A. I do not know.**
16  Q. Representative Harless, do you understand
17  that there has been a history of official voter-
18  related discrimination in the state of Texas?
19     MR. KEISTER: Object to form.
20  **A. Ask that one more time.**
21  Q. (BY MR. ROSENBERG) Sure.
22     Do you agree that there has been a history
23  of -- of voting-related racial discrimination in the
24  state of Texas?
25     MR. KEISTER: Objection. Form.

---

Page 80

1     MS. DONNELLY: And I join in that
2  objection. Form.
3  **A. I don't know. We have -- we have a 1965**
4  **Voting Rights Act.**
5  Q. (BY MR. ROSENBERG) And since 1965, do you
6  understand whether Texas has been found to have
7  violated the Voting Rights Act because of having
8  passed discriminatory legislation?
9     MR. KEISTER: Object to form.
10     MS. DONNELLY: Object to form.
11  **A. I don't know.**
12  Q. (BY MR. ROSENBERG) Are you unaware of there
13  being racial discrimination in Texas?
14     MS. DONNELLY: Objection to the form.
15     MR. KEISTER: Same.
16  **A. Am I unaware?**
17  Q. (BY MR. ROSENBERG) Uh-huh.
18  **A. Am I aware -- can you ask it a different way?**
19  Q. Sure.
20     Are you aware of there being racial
21  discrimination in Texas?
22  **A. No. Not -- not that I recall.**
23  Q. Do you agree that African-Americans have been
24  subject to discrimination in employment in the state
25  of Texas?

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

                                        21 (Pages 81 to 84)

**81**

1              MS. DONNELLY:  Object to form.
2              MR. KEISTER:  Objection.  Form.
3       A.  I don't know.
4       Q.  (BY MR. ROSENBERG)  How about Hispanics, do
5   you think they've been subject to racial
6   discrimination in the state of Texas?
7              MS. DONNELLY:  Objection.  Form.
8              MR. KEISTER:  Form.
9       A.  I have no information on it.
10      Q.  (BY MR. ROSENBERG)  Do you believe that
11  African-Americans or Hispanics have been subject to
12  discrimination in education in the state of Texas?
13             MS. DONNELLY:  Objection.  Form.
14      A.  I don't know.
15             MR. KEISTER:  Form.
16      Q.  (BY MR. ROSENBERG)  Do you know what the term
17  "polarized voting" means?
18      A.  No.
19      Q.  Are you aware of there ever being political
20  campaigns in the state of Texas that use subtle
21  appeals to racist sentiments?
22             MS. DONNELLY:  Objection.  Form.
23             MR. KEISTER:  Form.
24      A.  I don't know.
25             MR. ROSENBERG:  We can take a break.  I

**82**

1   might be done with my questioning, but we should take
2   a little break.
3          (Break.)
4              MR. ROSENBERG:  I will pass the witness
5   to Mr. Freeman.
6          E X A M I N A T I O N
7   BY MR. FREEMAN:
8       Q.  Thank you, Representative.  And we will do
9   our best to get you to your baseball game.
10      A.  I'll just listen to it.
11      Q.  Well, to get you to somewhere where you can
12  listen to it.
13         So first off, I just want to ask a couple
14  questions about SB 14 and -- and the importance of
15  SB 14.
16         So excluding SB 14, have you ever carried a
17  bill that was a subject that the governor had declared
18  an emergency?
19             MR. KEISTER:  Object to form.
20             MS. DONNELLY:  I second the objection.
21      A.  I -- I don't know for sure.
22      Q.  (BY MR. FREEMAN)  Can you identify any bill,
23  excluding SB 14, that was on a subject that the
24  governor had declared a legislative emergency?
25      A.  We have -- we have them, I think, most

**83**

1   sessions.  I -- I can't recall, but we have them most
2   sessions.
3       Q.  Okay.  But -- but you personally cannot
4   identify any bill other than SB 14 that was on a
5   subject -- that you sponsored that was on a subject
6   that the governor had declared a legislative
7   emergency?
8       A.  Not that I remember.
9       Q.  Okay.  And excluding SB 14, have you ever
10  carried any bill that had been subject to a multi-hour
11  debate on the floor of the House?
12             MS. DONNELLY:  Object to the form of the
13  question.
14         When you said "carried," what -- can you
15  be more specific?
16             MR. FREEMAN:  Sponsored.
17      Q.  (BY MR. FREEMAN)  Let me rephrase.
18         Excluding SB 14, have you ever sponsored a
19  bill that was subject to a multi-hour debate on the
20  floor of the House?
21      A.  As the sole sponsor, not that I recall.
22      Q.  Okay.  And excluding SB 14, have you ever
23  been the sole sponsor or lead sponsor of the bill that
24  was subject to significant, substantial news coverage?
25             MS. DONNELLY:  Objection to form.

**84**

1         You can answer.
2       A.  Not that I recall.
3       Q.  (BY MR. FREEMAN)  Would it be fair to say that
4   SB 14 is the most important bill that you have
5   sponsored in your legislative career?
6              MS. DONNELLY:  Objection.  Form.
7              MR. KEISTER:  Join.
8       A.  No.
9       Q.  (BY MR. FREEMAN)  Would it be fair to say that
10  it's the most high-profile bill that you've sponsored
11  in your legislative career?
12             MS. DONNELLY:  Objection.  Form.
13             MR. KEISTER:  Form.
14      A.  No.
15      Q.  (BY MR. FREEMAN)  And why not?
16      A.  I mean, it may be high profile to others, but
17  there are other legislation that I've carried that was
18  more high profile to my district, which is the people
19  I serve and who I pay attention to.
20      Q.  Okay.  Have you had a primary opponent since
21  SB 14 passed?
22      A.  No.
23      Q.  And, Representative, what are all of the
24  purposes of SB 14?
25             MS. DONNELLY:  Objection.  Form.  Object

85

1   on the grounds that the question calls for information
2   covered by legislative privilege.
3            You may answer if you would like to
4   answer, but your answer will be under seal.
5            If Counsel would like to agree to a
6   running objection, then I don't have to keep
7   interrupting you on every question.
8            Is that an agreement that we have?
9            MR. FREEMAN:  That's fine.
10           MS. DONNELLY:  Okay.  Is that an
11  agreement among all counsel?
12           MR. ROSENBERG:  Yes, it is.
13           MS. DONNELLY:  So from now until we both
14  agree that there's no longer a running objection,
15  there's a running objection.
16           MR. ROSENBERG:  Running objection is
17  right.
18           MS. DONNELLY:  Thank you.
19           A.  I don't know the -- I can't recall the answer
20  of all the purposes of it, but mainly to provide for
21  the integrity of the in-person voting by showing a
22  photo ID.
23           Q.  (BY MR. FREEMAN)  And there might be other
24  purposes, but you are not personally aware of them?
25           A.  I don't remember them.

86

1        Q.  Okay.  What is your basis for believing that
2   there was, prior to SB 14, a lack of integrity?
3        A.  Can you state that one more time?
4        Q.  Well, you had just testified that the purpose
5   was to ensure the integrity of the in-person vote,
6   correct?
7        A.  One of the purposes that I remember, that I
8   recall.
9        Q.  A purpose.
10           And so my question was:  What is the basis
11  for your belief that before SB 14 was passed there was
12  a lack of integrity in the in-person vote?
13           MS. DONNELLY:  Object to the form.
14           Go ahead.
15        A.  Just, when you show up to vote, saying who
16  you are, show them proof that you are who you say you
17  are.
18        Q.  (BY MR. FREEMAN)  But what is your basis for
19  believing that, absent showing that proof, there was a
20  lack of integrity in the in-person vote?
21        A.  I don't recall.
22        Q.  Before SB 14 passed, did you believe some
23  form of in-person voter fraud was occurring?
24        A.  I don't recall.
25        Q.  And to be clear, you don't recall any other

87

1   purpose of SB 14 besides ensuring the integrity of the
2   in-person vote; is that correct?
3        A.  Yes.
4        Q.  Do you remember discussing the Carter-Baker
5   Commission Report during the debate on SB 14?
6        A.  No, sir.
7        Q.  Do you recall what the Carter-Baker
8   Commission Report was?
9        A.  No, sir.
10       Q.  You have no recollection of anything called
11  the Carter-Baker commission or a commission involving
12  former Secretary of State Baker and former President
13  Jimmy Carter regarding election integrity or voter ID?
14       A.  I remember something being said about Carter.
15       Q.  And do you have any recollection of what that
16  was?
17       A.  No, sir.
18       Q.  And you said that you reviewed your
19  deposition testimony previously, correct?
20       A.  I went through, like, the first 30 pages --
21       Q.  Okay.
22       A.  -- while watching the TCU baseball game.  We
23  lost, by the way.
24       Q.  I'm sorry.  We'll come back to that after a
25  break.

88

1            I'd like to have you go back to Exhibit 166.
2   The first page of Exhibit 166, what are these
3   statements?
4            MS. DONNELLY:  Object to the form.
5            Q.  (BY MR. FREEMAN)  What is this document?  Just
6   the first page.
7            A.  It looks like talking points.
8            Q.  And am I correct that one of these talking
9   points was:  "This bill is not about citizenship,
10  language, immigration, it is about preserving and
11  protecting the integrity of our election process by
12  showing a photo ID when voting in person"?
13           A.  Yes, sir.
14           Q.  Why was it necessary to clarify that this
15  bill was not about citizenship?
16           A.  I -- I don't recall.
17           Q.  Do you recall whether any supporters of voter
18  ID had tied the bill to issues concerning voter
19  citizenship?
20           A.  I don't recall.
21           Q.  Do you recall whether supporters of voter ID
22  had tied the issue to immigration?
23           A.  I don't recall.
24       Q.  If you turn to the page concerning "Impact on
25  Voters."  Third page, I believe, but it's labeled page

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

23 (Pages 89 to 92)

---

**89**

1    7.
2         A. Okay.
3         Q. Do you have any other basis besides the
4    analysis that you suggest concerning Georgia and
5    Indiana and statewide turnout in those states, do you
6    have any other basis to believe that SB 14 would
7    increase minority turnout in Texas?
8              MS. DONNELLY: Objection. Form.
9              You can answer.
10        A. I don't remember all that went into the
11   debate and the preparation for SB 14.
12        Q. (BY MR. FREEMAN) Do you remember the factual
13   basis for why you asserted that the bill will increase
14   turnout among all voters --
15             MS. DONNELLY: Objection. Form.
16        Q. (BY MR. FREEMAN) -- in Texas?
17             MS. DONNELLY: Objection. Form.
18        A. No. I don't remember.
19        Q. (BY MR. FREEMAN) Do you know if you relied on
20   any Texas-specific information in making that
21   statement?
22        A. I don't remember. And it says "I think."
23        Q. Okay. Do you know when Georgia's voter ID
24   bill was enacted?
25        A. No. I don't remember. I know I did then, I

---

**90**

1    don't know now.
2         Q. Is it possible that minority turnout
3    increased in Georgia because President Obama was the
4    first African-American nominated by a major party for
5    president and not because a voter ID bill had been
6    enacted?
7              MS. DONNELLY: Objection. Form.
8              You can answer.
9              MR. KEISTER: Form.
10        A. I don't know.
11        Q. (BY MR. FREEMAN) If you can turn to the page
12   "About More Restrictive Bill," which is labeled page
13   1, but it is 7031, referring to the Bates number.
14        Q. Do you see where it says: "Plus, I believe
15   that Photo ID is simpler and less confusing for the
16   voters"?
17        A. Which paragraph is that?
18        Q. Second paragraph, end of the second
19   paragraph.
20        A. Yes, I see that.
21        Q. Why would reducing the number of ways that a
22   voter could establish their identity reduce confusion
23   for the voters?
24             MS. DONNELLY: Objection. Form.
25        A. I -- I don't know what went into preparing

---

**91**

1    the statement.
2         Q. (BY MR. FREEMAN) So --
3         A. I don't remember.
4         Q. -- let's just say, logically, before SB 14, I
5    could show a photo ID or I could show my voter
6    registration card or I could show a few other nonphoto
7    documents. After SB 14, I could only show a photo ID.
8         Why would reducing the number of documents
9    you can show make it less confusing for the voters if
10   they can't continue to show exactly what they've shown
11   before?
12        A. I -- I don't remember.
13        Q. But logically now, why would you -- do you
14   continue to believe that photo ID is simpler and less
15   confusing for the voters at this time?
16        A. I do.
17        Q. And why?
18        A. I think knowing that when you show up to vote
19   and show your photo ID, like you rent a video or do
20   other things, it's in their normal course of everyday
21   life.
22        Q. Does showing your voter registration card --
23   is that idea confusing to voters?
24        A. I -- I don't remember all the purpose in
25   that. I know a photo ID is what they carry every day.

---

**92**

1         Q. Do you see the last paragraph where it's
2    labeled "More restrictive different bill?"
3         A. Yes, sir.
4         Q. And do you see where it says that "2
5    additional years to see Photo ID working in other
6    states and 2 additional years to hear from my
7    constituents that a photo voter ID bill is something
8    they expect..."?
9         A. Yes.
10        Q. What additional evidence did you rely on from
11   the last two years, from 2009 to 2011, that suggested
12   that a strict photo ID bill was working in other
13   states?
14             MS. DONNELLY: Objection. Form.
15        A. I don't recall.
16        Q. (BY MR. FREEMAN) And what did you hear from
17   your constituents that suggested that they expected a
18   strict photo ID bill?
19             MS. DONNELLY: Objection. Form.
20             Go ahead.
21        A. Just what I've said earlier to him, in town
22   hall meetings, meetings with constituent groups, them
23   asking for legislation that required for people to
24   show a photo ID when they voted in person.
25        Q. (BY MR. FREEMAN) If you could turn back to

---

REPRESENTATIVE PATRICIA HARLESS                6/20/2014
HIGHLY CONFIDENTIAL

24 (Pages 93 to 96)

---

93

1   page 6, which is 7027, the page labeled 6.  And do you
2   see where it says that the bill "Provides exceptions
3   for elderly, disabled, or indigent voters" in the
4   third paragraph?
5       A.  Yes.
6       Q.  And did you consider those to be beneficial
7   features of the bill?
8       A.  I did.
9       Q.  Do you recall if you voted to eliminate the
10  exemption for elderly voters?
11      A.  I don't recall.
12          (Harless Exhibit 169 marked/introduced.)
13      Q.  (BY MR. FREEMAN)  Representative, what is this
14  document?
15          MS. DONNELLY:  I'm sorry, Counsel, this
16  is a "Highly Confidential" document.
17          MR. FREEMAN:  It is.
18          MS. DONNELLY:  It's going to be treated
19  as though --
20          MR. ROSENBERG:  Highly confidential.
21          MS. DONNELLY:  All the conversation and
22  questioning on this document will be treated as highly
23  confidential; is that right?
24          MR. FREEMAN:  Yes.  And the running
25  objection is still running.

---

94

1           MS. DONNELLY:  And the running objection
2   is still running on the exhibits.
3           MR. FREEMAN:  Thank you.
4       A.  It looks to be an e-mail from Colby, my chief
5   of staff at the time, to me.
6       Q.  (BY MR. FREEMAN)  And what does this e-mail
7   describe?
8       A.  It says differences between the CCR SB 14 and
9   House passage of SB 14.
10      Q.  And what does CCR mean?
11      A.  I guess the Conference Committee Report,
12  maybe.
13      Q.  Okay.  So this is the bill as it came out of
14  conference, correct?
15      A.  I -- I guess.
16      Q.  Okay.  Do you see the second paragraph where
17  it says that the Conference Committee Report removes
18  requirement that SOS education efforts target low
19  income and minority voters?
20      A.  I see that.
21      Q.  And that -- that was a provision -- it says,
22  next to it, "(Miles)," correct?
23      A.  Yes.
24      Q.  Does that mean that was a provision added by
25  Representative Borris Miles?

---

95

1       A.  I would think that that's what that would
2   refer to.
3       Q.  And who is Representative Miles?
4       A.  He was a House member -- or is a House
5   member.
6       Q.  And is Representative Miles from the Houston
7   area as well?
8       A.  Yes.
9       Q.  And is he African-American?
10      A.  Yes.
11      Q.  And does he represent a predominantly
12  African-American community?
13      A.  I don't know the percentage of his district.
14      Q.  And that was a provision that was passed by
15  the House, correct?
16      A.  I -- I can't tell you.  I guess it was.  I
17  don't know if it was the House.  I guess.
18      Q.  Okay.  And why was this provision removed
19  from SB 14?
20      A.  I don't recall.
21      Q.  Do you recall what the OAG or SOS concerns
22  were?
23      A.  No.
24      Q.  Do you see in Paragraph 5 where it talks
25  about removing "Tribal IDs as an acceptable form of

---

96

1   ID"?
2       A.  Yes.
3       Q.  And is it your understanding that the
4   Conference Committee removed Tribal IDs as an
5   acceptable form of voter ID?
6       A.  Yes.
7       Q.  And it says next to it "Naomi Gonzalez,"
8   correct?
9       A.  Yes.
10      Q.  And so this was an amendment sponsored by
11  Representative Gonzalez?
12      A.  Yes.  I assume that, yeah.
13      Q.  And Representative Gonzalez, she represents a
14  district in the El Paso area, correct?
15      A.  I think so.  I don't know.
16      Q.  And she's Hispanic, correct?
17      A.  She has a Hispanic surname.
18      Q.  And do you know if there are any recognized
19  Native American tribes in the El Paso area?
20      A.  I don't know.
21      Q.  Do you know why this amendment was rejected?
22      A.  I don't.
23          MS. DONNELLY:  Objection.  Form.
24      A.  I know what's written in the next sentence.
25      Q.  (BY MR. FREEMAN)  Do you know how many

---

97

1    different recognized tribes there are in Texas?
2    **A.  I don't.**
3    Q.  Do you know how many different forms of
4    military ID exist?
5    **A.  I don't.**
6    Q.  Do you know if there are more or fewer
7    recognized tribes in Texas than there are forms of
8    military ID?
9    **A.  I don't.**
10   Q.  Put that document aside.
11       Now, at the beginning of the legislative
12   session in 2011, you filed your own voter ID bill,
13   correct?
14   **A.  I think so, yes.**
15   Q.  Do you know if that was HB 112?
16   **A.  I don't remember the number.**
17   Q.  Do you remember what substantive input you
18   provided concerning that bill?
19   **A.  No.**
20   Q.  When you sponsor a bill, do you generally
21   tell your staff or the TLC what you would like to be
22   included in that bill?
23   **A.  My staff and I discuss what we're thinking or**
24   **what we've been asked to do or what we plan to do, and**
25   **they have those discussions.  I -- I don't know what**

98

1    **happens after that.**
2    Q.  Do you sign off on the bill before it's
3    submitted under your name?
4    **A.  I sign it when it's filed, after they've**
5    **provided a copy from leg' counsel.**
6    Q.  And do you review the bill prior to signing
7    it?
8    **A.  Yes.**
9        MR. FREEMAN:  Before we go into the
10   substance, if we want to take a break now that it
11   seems that lunch has arrived.  I don't know if people
12   have hot meals.  I'm happy to go off the record and we
13   can take a break.
14       MS. DONNELLY:  We can do that.
15       MR. KEISTER:  Sounds good to me.
16       (Lunch break.)
17   Q.  (BY MR. FREEMAN)  If we could just jump back
18   to Exhibit 167, which is the big, fat transcript.
19   Thank you.
20       Now, we had previously discussed how an
21   exemption for elderly people was important to you,
22   correct?
23       MS. DONNELLY:  Objection.  Form.
24   **A.  (Nods head.)**
25   Q.  (BY MR. FREEMAN)  Is that a "yes"?  You

99

1    nodded.
2        **A.  You asked me about the elderly and the**
3    **indigent and the poor and the Conference Committee**
4    **Report and if that was important, and I said yes.**
5    Q.  If you could turn to page 961.
6    **A.  Okay.**
7    Q.  Do you see Amendment No. 7 at the bottom of
8    the page?
9    **A.  Amendment 7, yes.**
10   Q.  Can you turn to the next page and review
11   Amendment 7?
12   **A.  "70 years old or older on January 1, 2012, as**
13   **indicated by the date of birth on the voter's voter**
14   **registration certificate; or..."**
15   Q.  And this was an amendment to strike that
16   language, correct?
17   **A.  That's what it says.**
18   Q.  And so this amendment struck the exemption
19   for individuals who were 70 years of age or older on
20   January 1, 2012; is that correct?
21   **A.  I guess so.**
22   Q.  Do you recall whether or not you voted in
23   favor of this amendment?
24   **A.  I don't recall.**
25   Q.  If you could turn to page 965, Record Vote

100

1    110.
2    **A.  Okay.**
3    Q.  Do you see whether you voted in favor of the
4    amendment?
5    **A.  965?**
6    Q.  At the bottom of that page, Record Vote 110,
7    Amendment 7?
8    **A.  Harless, yes.**
9    Q.  Why did you vote in favor of that amendment?
10   **A.  I don't recall.**
11       (Harless Exhibit 170 marked/introduced.)
12   Q.  (BY MR. FREEMAN)  I'd like to put another
13   document in front of you.  Exhibit 170.
14       MS. DONNELLY:  Counsel, before you start
15   asking questions, this document, Harless 170, is
16   Highly Confidential and will be treated as sealed
17   pursuant to the Court's order, right?
18       MR. FREEMAN:  Yes.
19   Q.  (BY MR. FREEMAN)  Representative, have you
20   seen this document before?
21   **A.  I don't remember if I have or haven't.**
22   Q.  And do you recall whether you produced this
23   from your legislative file in response to the subpoena
24   you received?
25   **A.  I don't know.**

REPRESENTATIVE PATRICIA HARLESS                6/20/2014
HIGHLY CONFIDENTIAL

26 (Pages 101 to 104)

---

**101**

1    Q.  When you keep an op-ed or a newspaper article
2  in a legislative folder or file, why do you usually do
3  that?
4    A.  I don't know that I do that.  I don't know if
5  I do it or if my staff does it.
6    Q.  When a -- thank you.
7        When a newspaper article or an op-ed is found
8  in your legislative file, why does it usually end up
9  there, to your knowledge?
10   A.  It's related to the bill.
11   Q.  Do you know if you've read this before?
12   A.  I don't know if I have.
13   Q.  And who is the author of this op-ed?
14   A.  It says by Jimmy Carter and James A. Baker
15 III.
16   Q.  So that's President Carter and former
17 Secretary of State Baker?
18   A.  I guess it is.
19   Q.  Okay.
20   A.  It doesn't say that, but I guess it is if you
21 say it is.
22   Q.  If you could go to the seventh paragraph.  It
23 begins:  "Here's the problem we were addressing..."
24   A.  Okay.
25   Q.  Could you read that paragraph into the

---

**102**

1  record, please?
2    A.  "Here's the problem we were addressing:  24
3  states already require that voters prove their
4  identity at the polls - some states request driver's
5  licenses, others accept utility bills, affidavits or
6  other documents - and 12 others are considering it.
7  This includes Georgia, which just started demanding
8  that voters have a state-issued photo ID, even though
9  obtaining one can be too costly or difficult for poor
10 Georgians.  We consider Georgia's law discriminatory."
11   Q.  And so did President Carter and former
12 Secretary of State Baker state in this op-ed that they
13 considered Georgia's law discriminatory?
14       MR. KEISTER:  Objection.  Form.
15   A.  The authors wrote it, and they say that in
16 this article.
17   Q.  (BY MR. FREEMAN)  And what is the date of this
18 article?
19   A.  September 23, 2005.
20   Q.  And do you believe that Georgia's voter ID
21 law is discriminatory?
22   A.  I don't --
23       MS. DONNELLY:  Objection.  Form.
24   A.  I don't have enough information to know.  I
25 don't recall.

---

**103**

1    Q.  (BY MR. FREEMAN)  Okay.  So you have no basis
2  to disagree, per se?
3        MS. DONNELLY:  Objection.  Form.
4    A.  Well, I -- if I remember correctly -- and I'm
5  not sure that I do -- I think Georgia's was precleared
6  by the Department of Justice.  So that would make it
7  nondiscriminatory.
8    Q.  (BY MR. FREEMAN)  My question is whether you
9  have a factual basis to disagree with the statement
10 that Georgia's law is discriminatory?
11       MR. KEISTER:  Objection.  Asked and
12 answered.
13       MS. DONNELLY:  Join in the objection.
14   A.  I would say that Georgia's law, if I remember
15 correctly, has been precleared by the Department of
16 Justice to be held constitutional; therefore, it is
17 not discriminatory.
18   Q.  (BY MR. FREEMAN)  If you move to Paragraph 9,
19 could you read just the first sentence?
20   A.  "Yes, we are concerned about the
21 approximately 12 percent of citizens who lack a
22 driver's license."
23   Q.  Do you have any basis to disagree with this
24 statement that approximately 12 percent of citizens
25 lack a driver's license?

---

**104**

1        MS. DONNELLY:  Objection.  Form.
2    A.  I have no basis to agree or disagree.
3        MR. FREEMAN:  Okay.
4        (Off the record.)
5        MR. FREEMAN:  Mark this Exhibit 171.
6        (Harless Exhibit 171 marked/introduced.)
7    Q.  (BY MR. FREEMAN)  And, Representative, you
8  filed your own photograph photo ID in 2011; we
9  discussed that before the break, correct?
10   A.  Yes, sir.
11   Q.  So this is Exhibit 171, and is this the bill
12 that you introduced in 2011?
13   A.  It looks to be.
14   Q.  And do you recall whether this bill allowed
15 individuals to cast a valid, in-person ballot, showing
16 photographic ID or nonphotographic ID?
17       MS. DONNELLY:  Just confirm, Counsel,
18 the running objection is still running.
19   A.  I don't recall.
20       MR. FREEMAN:  This is a public document,
21 but the objection speaks to her testimony.
22       MS. DONNELLY:  Yes.
23   Q.  (BY MR. FREEMAN)  If you could turn to page 6
24 and on to page 7.
25   A.  Okay.

REPRESENTATIVE PATRICIA HARLESS                         6/20/2014
HIGHLY CONFIDENTIAL

27 (Pages 105 to 108)

105

1    Q.  And do you see that documents listed as
2  acceptable as proof of identification --
3    A.  Yeah.
4    Q.  -- include a variety of nonphotographic
5  documents, correct?
6    A.  Yes.
7    Q.  Why did you include these nonphotographic
8  documents in your voter ID proposal?
9    A.  I don't know.
10   Q.  Would your ID proposal have helped fulfill
11 the purpose of SB 14 that you mentioned previously?
12   A.  I can't remember about this bill.
13   Q.  Did you think that these documents were
14 acceptable to establish a voter identity?
15   A.  I think -- I don't remember why this bill was
16 filed, unless it was just the same as the last session
17 bill.  The prior session.
18   Q.  Now, you previously testified that your
19 constituents had urged you to file a voter ID bill,
20 correct?
21   A.  Yes.
22   Q.  Had they urged you -- and after they urged
23 you, you filed this bill, correct?
24   A.  I filed this bill at the beginning of
25 session, because it's got a low number.

106

1    Q.  And --
2    A.  Or maybe even before session started, because
3  it's got a low number.
4    Q.  And so had your constituents urged you to
5  file anything different from this bill specifically?
6    A.  I don't recall.  I don't -- you know, if I
7  spent hours going over what happened during this 2011
8  session, I might understand more what was going on,
9  but I haven't done that.
10   Q.  As you stand now do you believe that the
11 documents listed as acceptable as proof of
12 identification are, in fact, effective ways for a
13 voter to establish their identity?
14   A.  I think the most effective way for a voter to
15 establish their identity for in-person voting is with
16 a photo ID.
17   Q.  Do you think that these are insufficient in
18 any way?
19   A.  If they don't include a photo ID, I do.
20   Q.  And why's that?
21   A.  Because a photo ID is to identify you are who
22 you say you are.
23   Q.  Do you know if HB 112 was referred to the
24 Select Committee on Voter Identification and Voter
25 Fraud?

107

1    A.  I don't remember.
2    Q.  Do you remember if HB 112 limited the use of
3  forms of identification to those that had been expired
4  by 60 days or fewer?
5    A.  I don't remember.
6    Q.  If you look at the bottom of page 5 and top
7  of page 6, do you see where it says:  "a driver's
8  license or personal identification card issued to the
9  person by the Department of Public Safety that has not
10 expired or that expired no earlier than two years
11 before the date of the presentation"?
12   A.  I see that.
13   Q.  Do you believe that a driver's license that
14 has expired by one year and 11 months is sufficient to
15 establish an individual's identity?
16   A.  I don't know why the two years was put in
17 this legislation.
18   Q.  But do you believe now, as we sit here, that
19 a driver's license that's been expired for 18 months
20 establishes an individual's identity, if the picture
21 matches?
22   A.  I -- I don't know why you would have an ID
23 that's been expired for two years.
24   Q.  Do some people sometimes not renew their
25 driver's license if they don't drive anymore, older

108

1  folks?
2    A.  I don't know.
3    Q.  Okay.  To your knowledge, did Colby Beuck,
4  your former chief of staff, provide assistance with
5  the drafting of this bill?
6    A.  I don't recall.  I know leg' counsel drafts
7  the bills.
8    Q.  Do you know if he provided any substantive
9  input to leg' counsel?
10   A.  I think we fill out forms to do it, and he
11 would have been the one who would have done that.
12   Q.  During the drafting of SB 14, do you know
13 if -- if Mr. Beuck helped provide input on the Senate
14 bill?
15   A.  I don't know.
16   Q.  Is there any circumstance in which a member
17 of your staff has worked with an individual on the
18 Senate to craft a Senate side bill?
19   A.  Not in my knowledge.
20   Q.  Okay.  Now, turning away from this bill and
21 just to SB 14, do you know why SB 14 includes military
22 ID as an acceptable form of photographic ID?
23   A.  I don't recall.
24   Q.  Do you know why it includes passports?
25   A.  No, sir.

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

---

109

1    Q.  Do you know why it does not include a federal
2  employee ID with a person's photograph on it?
3    A.  I don't recall.
4    Q.  Do you know why it doesn't include any other
5  federally-issued ID besides passports or
6  Department of Defense-issued or VA-issued ID?
7    A.  I don't remember.
8    Q.  Do you know why SB 14 doesn't include state
9  employee IDs?
10    A.  I don't recall.
11    Q.  Do you know why it doesn't include municipal
12  IDs?
13    A.  I don't.  I don't know.
14    Q.  Do you remember if you provided Mr. Beuck
15  with any instructions as to the substance of what you
16  wanted included in SB 14?
17    A.  I didn't draft SB 14.
18    Q.  Okay.  Do you remember if the Mexican
19  American Legal Defense and Education Fund, MALDEF, do
20  you remember if they took a position on SB 14?
21    A.  I think they did.
22    Q.  And what was that position?
23    A.  I think they were opposed to it.  I -- I
24  think there was testimony that they were opposed to
25  it.

---

110

1    Q.  Did it concern you that MALDEF was opposed to
2  SB 14?
3    A.  There was a lot of people that were in
4  support and opposition to the bill.  I'm -- no, I'm --
5  I'm never surprised.  I'm always willing to listen.
6    Q.  But does it concern you when a minority
7  rights group is actively opposed to a bill, does that
8  raise concerns for you specifically?
9        MS. DONNELLY:  Objection.  Form.
10    A.  I try to listen to all concerns from every
11  group.
12    Q.  (BY MR. FREEMAN)  Do you remember if the NAACP
13  took a position on SB 14?
14    A.  I can't say for sure, but I would think they
15  would.
16    Q.  And what would make you think that they
17  would?
18    A.  Well, I think they did.  I mean, I think I
19  read something.
20    Q.  Do you remember what that position was?
21    A.  Opposed to it.
22    Q.  And did it concern you that the NAACP was
23  opposed to it?
24        MS. DONNELLY:  Objection.  Form.
25    A.  I'm concerned when anybody's opposed to any

---

111

1  bills, and I try to listen to their concerns.
2    Q.  (BY MR. FREEMAN)  And why did you, in the end,
3  decide to continue to support SB 14, notwithstanding
4  the concerns that these groups raised?
5    A.  Because I thought that the bill was a good
6  bill and providing integrity in the election process.
7    Q.  Did MALDEF and the NAACP raise other concerns
8  about possible harms that SB 14 would have?
9    A.  I don't recall what their -- what their
10  opposition was.
11    Q.  Do you remember what Representative Anchia's
12  opposition was?
13    A.  No.
14    Q.  Do you remember what Representative Veasey's
15  opposition was?
16    A.  No.
17    Q.  Do you remember whether, at the Select
18  Committee on Voter Identification and Voter Fraud
19  hearing on SB 14, whether there were experts who
20  testified about the possible effects of SB 14?
21    A.  I don't recall specifically.  I know we had
22  someone come in and testify, but I couldn't even tell
23  you who that was.
24    Q.  Do you remember someone named Tova Wang?
25    A.  No.

---

112

1    Q.  Do you remember the term the Brennan Center?
2    A.  I remember the term.
3    Q.  And do you remember if anyone from the
4  Brennan Center provided testimony?
5    A.  I don't remember.
6    Q.  And we had previously discussed the
7  Carter-Baker Commission.
8        Do you remember someone named Toby Moore?
9    A.  I don't remember.
10    Q.  Do you know if he was a staff member of the
11  Carter-Baker Commission?
12    A.  I don't know.
13    Q.  Okay.
14    A.  I don't remember.
15    Q.  Do you remember whether there was any
16  testimony in the Select Committee hearing about the
17  number of people who might not have the types of IDs
18  required by SB 14 in order to cast a valid in-person
19  ballot?
20    A.  I don't.
21    Q.  Do you remember if there were disagreements
22  among the different experts about whether or not it
23  would be a problem, whether there would be a
24  substantial number of people who would lack ID?
25    A.  I remember the Secretary of State testifying,

---

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

29 (Pages 113 to 116)

---

**113**

1    but -- and arguments back and forth, but I can't
2    recall specifically what that was.
3        Q.   But in the end, you took the position that
4    there weren't going to be a large number of people who
5    lacked these IDs, right?
6            MS. DONNELLY:  Objection.
7        A.   I don't remember what my position was on
8    that.
9        Q.   (BY MR. FREEMAN)  Why do you think that there
10   was -- well, first -- sorry.  Strike that.
11           Would you agree that there was strong
12   opposition to SB 14 among the people who voted against
13   it?
14           MS. DONNELLY:  Objection.  Form.
15       A.   There was opposition.
16       Q.   (BY MR. FREEMAN)  Why do you think they
17   opposed SB 14?
18       A.   I don't know.
19       Q.   You have no understanding of -- of the
20   opposition to this bill?
21       A.   No.  Every bill, there's opposition, and I --
22   I never can quite understand all the workings behind
23   it.
24       Q.   Have you ever had an individual registered
25   voter tell you that they did not vote because they

---

**114**

1    were concerned about voter fraud canceling out their
2    vote?
3        A.   Not that I can recall.
4        Q.   Was there any testimony given to the Select
5    Committee on Voter Identification and Voter Fraud --
6    which I will, in the future, just call the Select
7    Committee, if that's okay.
8        A.   Okay.
9        Q.   Was there any testimony to the Select
10   Committee stating that SB 14 would have a
11   disproportionate impact on minority voters?
12       A.   I don't remember the testimony in committee.
13       Q.   Was there any testimony that minority voters
14   were less likely than Anglo voters to possess the
15   types of ID required to cast a valid in-person ballot
16   under -- or regular in-person ballot under SB 14?
17       A.   I don't remember the testimony in committee.
18       Q.   Are you aware of how many individuals had to
19   cast provisional ballots in either the November 2013
20   general election or the 2014 primary --
21       A.   No, sir.
22       Q.   -- because they arrived at a polling place
23   without the ID required by SB 14?
24       A.   No, sir.
25       Q.   So you haven't followed the implementation of

---

**115**

1    SB 14?
2        A.   No, sir.
3        Q.   As we sit here now, if it is, in fact, the
4    case that African-American and Hispanic voters lack
5    the ID required by SB 14 at a greater rate than Anglo
6    voters, do you think that SB 14 is still a worthwhile
7    law?
8            MS. DONNELLY:  Objection.  Form.
9            MR. KEISTER:  Form.
10       A.   I'm not going to speculate.
11           (Harless Exhibit 172 marked/introduced.)
12           MR. FREEMAN:  Mark the following
13   document as Exhibit 172.  And this document has been
14   designated Highly Confidential, so the document itself
15   will be placed under seal, and it is my understanding
16   that a running objection continues to run its
17   marathon.
18           MS. DONNELLY:  Thank you.
19       Q.   (BY MR. FREEMAN)  Representative, have you
20   seen this document before?
21       A.   Not that I recall.
22       Q.   What is this document?
23       A.   It looks like an e-mail from Ann McGeehan,
24   Secretary of State's office, sent to me and Colby and
25   copied a John -- I don't know how to say his last

---

**116**

1    name.
2        Q.   Sepehri?
3        A.   Sepehri.
4        Q.   Do you know who John Sepehri is?
5        A.   I don't remember.  It shows that it had some
6    attachments, and it's a letter to me.  Or an e-mail to
7    me, sorry.
8        Q.   And this is dated Friday, February 25th?
9        A.   Yes, 2011.
10       Q.   If you could just go to the third paragraph
11   of this e-mail, did Ms. McGeehan write to you that
12   "...concerning the number of voters who have not been
13   issued TDL/personal ID cards by DPS, we are still
14   working with our IT Dept to analyze that data, and
15   hope to have an analysis by Monday"?
16       A.   That's what this says.
17       Q.   Had you asked her for that analysis?
18       A.   I don't recall.
19       Q.   Did you follow up on this request?
20       A.   I don't remember.
21           (Harless Exhibit 173 marked/introduced.)
22           MR. FREEMAN:  The following document,
23   173, this has also been designated as "Highly
24   Confidential" and will be placed under seal.
25       Q.   (BY MR. FREEMAN)  Representative, what is this

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

30 (Pages 117 to 120)

---

**117**

1   document?
2       A.  It is an e-mail from Ann McGeehan to Colby,
3   dated February 25, 2011, questions what -- it says:
4   Question:  What is the number of voters that do not
5   have a Texas Drivers License/Personal ID or Social
6   Security Number in the statewide database?
7       Q.  And so this was sent just a couple of hours
8   after Exhibit 172?
9       A.  Three hours and 14 minutes.
10      Q.  I appreciate your precision.
11          This isn't saying the number of people who
12  have a Texas driver's license because of matching
13  against DPS, correct?
14      A.  I don't know what it's saying.
15      Q.  If you could take a moment to review it,
16  then.
17      A.  What did you ask, is it saying?
18      Q.  So this document does not say the number of
19  individuals who have been issued Texas driver's
20  license or personal identification cards by DPS --
21          MS. DONNELLY:  Objection.
22      Q.  (BY MR. FREEMAN)  -- correct?
23          MS. DONNELLY:  Please don't speculate on
24  what somebody else meant.
25      A.  Yeah, I -- yeah, I don't -- I don't know.

---

**118**

1       Q.  (BY MR. FREEMAN)  So if you look at 172,
2   would you say that 173 is the analysis that
3   Ms. McGeehan described in the third paragraph of 172,
4   or is this something different?
5           MS. DONNELLY:  Objection.  Form.
6           Please don't speculate.
7       A.  I don't know.  She said she'd have the
8   analysis by Monday.  This is on a Friday.  I don't
9   know.
10      Q.  (BY MR. FREEMAN)  Reading 173, as you
11  understand the document, is this a description of the
12  number of voters who possess a Texas driver's license
13  or identification card?
14          MS. DONNELLY:  Objection.  Form.
15      A.  What are you asking, if it is?
16      Q.  (BY MR. FREEMAN)  Is this an analysis of the
17  number of voters in Texas who possess a Texas driver's
18  license or personal identification card issued by DPS?
19      A.  I don't know that for a fact, no.
20      Q.  Did Ms. McGeehan provide a calculation of the
21  number of voters who provided a Texas driver's license
22  or ID number when they registered to vote?
23      A.  Well, in reading the paragraph, it goes into
24  details about how their system had been updated and
25  not everything is accurate, and the first set of

---

**119**

1   numbers reflect new registration since January 2006
2   and show what identification numbers that new
3   applicants provided.
4           The second set of numbers reflect the entire
5   statewide file of registered voters and shows which
6   identification numbers were provided by the applicants
7   before or after January 2006.  But she says that they
8   did not keep that information prior to 2006.
9           So I think it's not quite an analysis.  It's,
10  in their mind, an estimation of what they think, if
11  they had to guess.
12      Q.  Okay.  That's fine.
13          (Harless Exhibit 174 marked/introduced.)
14          MR. FREEMAN:  Mark the next document as
15  Exhibit 174.  This is not marked "Highly
16  Confidential."
17      Q.  (BY MR. FREEMAN)  What is this document?
18      A.  I have no clue.
19      Q.  Do you see, at the top of it, it says "Voter
20  Fraud Hearing, March 1, 2011"?
21      A.  "Volume 2, March 1, 2011," yes.
22      Q.  Would you agree that this is a transcript of
23  the Voter Fraud Hearing?
24      A.  It looks to be a transcript from the Voter
25  Fraud Hearing on March 1, 2011.

---

**120**

1       Q.  Do you recall when the Select Committee held
2   its hearing on SB 14?
3       A.  I do not.
4       Q.  Would it have been around March 1st?
5       A.  It could have been.  I have no reason to
6   doubt that this is anything but valid.
7       Q.  Okay.  I appreciate that.
8           During the Select Committee hearing, do you
9   recall whether any members of the committee asked Ann
10  McGeehan whether the Secretary of State's office had
11  matched the voter registration file against the
12  driver's license file to determine how many voters
13  lacked DPS-issued IDs?
14      A.  I don't remember what they specifically
15  asked.
16      Q.  If you could review page 289, the first page
17  of this transcript.
18      A.  Okay.
19      Q.  And actually, the second page as well.
20      A.  How far?  All the way down?
21      Q.  Just through the second page, yes.
22      A.  Okay.
23      Q.  Having reviewed this transcript, during the
24  Select Committee hearings, did any members of the
25  committee ask Ann McGeehan whether SOS, the Secretary

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

31 (Pages 121 to 124)

---

**121**

1  of State's office, had matched the voter registration
2  file against the driver's license file to determine
3  how many voters lacked DPS-issued ID?
4      MS. DONNELLY:  Objection.  The record
5  speaks for itself.
6      You can answer.
7      A.  In this -- in this transcript, she says that
8  they shared information, they worked with, I guess,
9  another agency.  But since 2006, they've required
10  Social Security, and they've matched that.  And it
11  says:  "So since that time, we show 34,506 voters out
12  of almost 4 million that stated they did not have
13  I.D."
14      Q.  (BY MR. FREEMAN)  Where are you reading that
15  from?
16      A.  On page 2, in the middle of the page under
17  Ann McGeehan.
18      Q.  That's page 291, so the third page of the
19  transcript?
20      A.  No.  Right here.  On the first page.  291,
21  yeah.  Page 291.  I didn't go to there.
22      Q.  I'm sorry, you have -- you have two copies of
23  the same.
24      MS. DONNELLY:  Yes, I have two copies of
25  the same as well.

---

**122**

1      Q.  (BY MR. FREEMAN)  You didn't have the first
2  page.  My apologies.  My mistake.  You didn't have the
3  page at all that I asked you to read.
4      A.  Okay.
5      Q.  If you could review pages 289 and 290.
6      A.  Okay.
7      Q.  So during the Select Committee, do you agree
8  that an unidentified representative asked Ms. McGeehan
9  whether SOS had done a match to determine with the
10  driver's license file as to whether particular voters
11  have driver's licenses or not?  That's on page 290.
12      A.  290?  "Have you all done a match to determine
13  with the driver's license file as to whether these
14  folks have driver's licenses or not?"
15      "Uh-huh."
16      Q.  Do you recall who asked that question, by any
17  chance?
18      A.  I don't.
19      Q.  Okay.  And did Ms. McGeehan state that the
20  Secretary of State's IT department was still working
21  on that analysis?
22      A.  We're looking at it to make sure.
23      Q.  So the analysis that Ms. McGeehan provided to
24  Mr. Beuck on February 25th, that wasn't this matching
25  analysis, right?

---

**123**

1      A.  I don't know.  I don't know.
2      Q.  Did you follow up on the request for this
3  information any time after March 1st, as the sponsor
4  of the bill?
5      A.  I don't remember.
6      Q.  Is there any circumstance that you're aware
7  of in which you've requested information from the
8  Office of the Secretary of State about a bill that you
9  sponsored and that the Secretary of State has not
10  provided that information, even though it had it?
11      A.  Not that I recall.
12      Q.  Is there any circumstance that you're aware
13  of with regard to any legislative order in which
14  there's been a request for information the Secretary
15  of State had and the Secretary of State simply did not
16  provide it?
17      MR. KEISTER:  Object to form.
18      A.  I would only be able to ask -- answer about
19  me.
20      Q.  (BY MR. FREEMAN)  Okay.
21      (Harless Exhibit 175 marked/introduced.)
22      MR. FREEMAN:  Mark the following
23  document Exhibit 175.  This document has not been
24  marked "Highly Confidential."
25      Q.  (BY MR. FREEMAN)  Representative, I'll ask you

---

**124**

1  to review this document in its entirety.
2      A.  Okay.
3      Q.  Have you seen this document before?
4      A.  Not that I recall.
5      Q.  Have you seen any similar document laying out
6  the analysis that is found on pages 2 and 3?
7      A.  Not that I recall.
8      Q.  Do you know why you never received this
9  analysis?
10      A.  I don't.
11      MS. DONNELLY:  Objection.  Form.
12      MR. KEISTER:  Objection.  Form.
13      A.  I don't know if I have or haven't.
14      Q.  (BY MR. FREEMAN)  To your understanding, is
15  this the analysis that was asked for during the Select
16  Committee hearing?
17      MR. KEISTER:  Object to form.
18      MS. DONNELLY:  Object to form.
19      A.  I don't know if it is or isn't.
20      Q.  (BY MR. FREEMAN)  Well, reviewing it, does it
21  appear to be a matching analysis between DPS records
22  and the voter file?
23      A.  I'm not sure what it is.  I mean, I know
24  they've got their queries and matching criteria and
25  number of voters, but I don't know why there's all the

---

---

125

1    different numbers.
2         And they have several questions:  "Does it
3    include Social Securities?"  "I don't know, I'll found
4    out."  So I'm not sure what it is, what it's about,
5    what it actually means.
6         Q.  And as you continue to review the document,
7    you have no better understanding of what it would mean
8    to run a query for particular matching criteria
9    between voters --
10        A.  Right.
11        Q.  -- and DPS records?
12        A.  Right.  I don't -- you know, I -- there's not
13   enough information here to tell you what it is.
14        Q.  We can agree that, at present, there's no
15   exemption from SB 14 for voters who are 70 or older,
16   correct?
17        A.  I don't remember.
18        Q.  Well, that's because Amendment 7 that we
19   discussed earlier, right?
20        A.  "Did we not put it back in in conference?"
21   "I don't remember."
22        Q.  Do you know whether SB 14 currently contains
23   an exemption for individuals who are 70 or older?
24        A.  I don't remember.
25        Q.  Looking at page 2 of this document -- I'm

---

126

1    looking at Query 1, Query 3 and Query 5, the ones that
2    don't contain an exemption for voters who are 70 or
3    older.
4         Of those three, what is the lowest number of
5    voters that did not match a DPS record?
6         A.  1, 3 and 5, what is the lowest number?
7         Q.  The lowest of the estimates there for the
8    number of voters who did not match a DPS record.
9         MS. DONNELLY:  Object to the form of the
10   question.
11        You understand the question?
12        A.  It would look like 3.
13        Q.  (BY MR. FREEMAN)  And is that 6- --
14        A.  Is that right?
15        Q.  Is that 678,560 voters?
16        A.  That's what this says.
17        Q.  If you had known, during consideration of
18   SB 14, that the Secretary of State's office was not
19   able to determine that 678,560 voters lacked -- or had
20   a DPS-issued ID, would you have still supported the
21   bill?
22        MR. KEISTER:  Objection.  Form.
23        MS. DONNELLY:  Objection.  Form.
24        MR. KEISTER:  Misstates the document.
25        A.  I don't know about the validity of all this.

---

127

1    I don't remember what the debate was.  I remember
2    there was some question in whether these numbers were
3    valid.  But I don't remember what that was.  That
4    numbers presented were in -- were not necessarily
5    valid.
6         Q.  (BY MR. FREEMAN)  Within the Texas population,
7    just knowing, based on your personal knowledge, would
8    you say that individuals who lacked -- or who are
9    poor, would you say they're more likely or less likely
10   to have a photo ID?
11        MS. DONNELLY:  Objection.  Form.
12        MR. KEISTER:  Form.
13        A.  I think that in this day and time, in
14   Houston, Texas, in Texas in general, that most
15   everyone has some form of photo ID.
16        Q.  (BY MR. FREEMAN)  Most everyone.  But what
17   about the people who don't?
18        A.  I have no clue who that might be.
19        Q.  I'm done with that document.
20        So you testified earlier that there was an
21   increased interest in matters related to elections in
22   your district --
23        A.  Yes.
24        Q.  -- before this term, correct?
25        Did those concerns ever focus on noncitizen

---

128

1    voting?
2         A.  I don't recall that.
3         Q.  Did they ever focus specifically on Hispanic
4    voters?
5         A.  I don't recall that.
6         Q.  Do you remember why your constituents
7    considered these issues important?
8         A.  They think one vote, one person, makes a
9    difference.
10        Q.  Did any of your constituents ever volunteer
11   specific information about why they found these issues
12   to be important?
13        A.  I can't recall.
14        Q.  If we could go back to Exhibit 164.  It's a
15   big packet of e-mails.  The first page has your
16   letterhead on it.  There we go.
17        If you could turn to page 711.  Actually, on
18   page 712.
19        A.  Okay.
20        Q.  And did a constituent write to you, saying,
21   "Recently, I was told of a democratic Hispanic group
22   jumping for joy saying ~"the Senate bill did nothing
23   on paper ballots...that is how we will continue doing
24   what we want to do"?  712.
25        A.  712.  Is that from the same person?  Yeah.

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

33 (Pages 129 to 132)

---

129

1    Okay.
2          Yes, I see that.
3     Q.  Did you receive many messages from
4  constituents saying that Hispanic groups were jumping
5  for joy about voter fraud?
6     A.  I don't recall.
7     Q.  And in your response, which is on page 711,
8  did you question this account at all?
9     A.  Do you want me to read my response?
10    Q.  I would, yes.
11    A.  Okay.  Okay.  What was your question?
12    Q.  Did you question this voter's account of
13  Hispanic groups "jumping for joy"?
14    A.  I didn't address it.
15    Q.  Okay.  And did you address in any way the
16  assertion that this voter's description of voter fraud
17  focused on Hispanic groups?
18    A.  I -- I don't see that I talked about that.  I
19  talked about how the ballot-by-mail process works and
20  where they can get more information on that and how
21  they handle it.
22    Q.  Okay.  Let's turn to page 744, which is
23  toward the back of the packet.
24          MS. DONNELLY:  I don't have a 744 or
25  745.

---

130

1          MR. FREEMAN:  I have a separate copy of
2  it.  I was trying to keep the number of exhibits down.
3          (Harless Exhibit 176 marked/introduced.)
4          MR. FREEMAN:  I'm going to mark this
5  document as Exhibit 176.
6     Q.  (BY MR. FREEMAN)  Representative, have you
7  seen this document before?
8     A.  Not that I recall.
9     Q.  What is this document?
10    A.  It looks like an e-mail to my state e-mail --
11  or from my state e-mail to a Sandra Thibodeau, dated
12  March 28, 2012.
13    Q.  And who is Sandra Thibodeau?
14    A.  I have no clue.
15    Q.  And do you see, in her e-mail, she said:  "So
16  why should someone who cannot produce documentation of
17  citizenship be allowed to vote in U.S. elections?"
18          MS. DONNELLY:  Why don't you take a
19  moment to read it.
20    A.  Yes.
21    Q.  (BY MR. FREEMAN)  Did you receive many
22  messages from constituents, either in person or by
23  e-mail or on the phone, arguing in favor of proof of
24  citizenship related to voter ID?
25          MS. DONNELLY:  Objection.

---

131

1     A.  Not that I recall.
2     Q.  (BY MR. FREEMAN)  And did you correct --
3  sorry.  Strike that.
4          Does SB 14 require proof of citizenship?
5     A.  I think, to register to vote, you check that
6  you are a citizen.
7     Q.  But does SB 14 require a voter who shows up
8  at the poll to provide a form of ID that establishes
9  citizenship?
10    A.  They can show a form of ID that's citizenship
11  that has their photo on it.
12    Q.  But do they have to?
13    A.  I don't think so.
14    Q.  Did you correct the voter's perception that
15  SB 14 requires proof of citizenship?
16    A.  I typically try not to correct my
17  constituents.  I try to give them relevant information
18  that will help them be more informed.
19    Q.  Would it help them be more informed to
20  explain what SB 14 does and doesn't do?
21    A.  In the real world, no.
22    Q.  And why's that?
23    A.  You know, I just think that it's best
24  sometimes to give them information to do their own due
25  diligence and not argue with them.  It's not my job to

---

132

1  change their mind.
2     Q.  But is it your job to educate them?
3     A.  I -- I do that.  I provide them information
4  where they can get more information.
5     Q.  And if we could go back to Exhibit 164, the
6  big packet.
7     A.  The e-mails?
8     Q.  Yes.
9          If you could just turn to the third page of
10  the document, which is -- which is --
11    A.  704?
12    Q.  -- 704, yes.
13          And did you write to this constituent that
14  Canada, Mexico, Germany, France, Greece, and even
15  Iraq, require photo identification to ensure that
16  there is not repetitive or deceptive voting?
17          MS. DONNELLY:  If you need to read the
18  whole document, feel free to do so.
19    A.  This is an e-mail from my state e-mail to
20  someone -- I don't know if they're a constituent or
21  not -- and I don't know if I wrote this or if my staff
22  wrote this, but it is a response to an e-mail.
23    Q.  (BY MR. FREEMAN)  When you write e-mail to
24  constituents or other individuals who write to you, do
25  you try to ensure that those statements are accurate?

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

34 (Pages 133 to 136)

133

1     A.  My staff tries to, yes.
2     Q.  Do you know if it's accurate that Canada,
3  Mexico, Germany, France, Greece, and even Iraq,
4  require photo identification in order to vote?
5     A.  I don't know what they did in 2009, I don't
6  know what they do today.
7     Q.  Okay.  One more.
8        If you turn to page 718.  If you look in the
9  first paragraph, did you -- did you write to this
10 individual:  "As the bipartisan Commission on Federal
11 Election Reform concluded, ballot access should
12 have...the same degree of integrity as boarding a
13 plane or cashing a check, both of which require a
14 photo ID"?
15    A.  I don't know if I wrote this.  There's a
16 response to a constituent that says what you just
17 read.
18    Q.  And is the bipartisan Commission on Federal
19 Election Reform, is that the Carter-Baker Commission
20 that we discussed earlier?
21    A.  I don't know.
22    Q.  Do you know for certain that photo ID is
23 necessary to board a plane?
24    A.  I don't know.
25    Q.  Do you know for certain that it's not

134

1  possible to cash a check without photo ID?
2     A.  I don't know.
3     Q.  When you sponsor a bill, is it important to
4  you to ensure that that bill complies with the Texas
5  Constitution?
6     A.  I think it's important for legislation to
7  comply with the Constitution.
8     Q.  And what steps do you take when you're
9  sponsoring a bill to ensure that the bill complies
10 with the Texas Constitution?
11    A.  Legislators typically rely on leg' counsel to
12 fulfill that responsibility.
13    Q.  Does leg' counsel provide a written opinion,
14 or how does that process work?
15    A.  They do the research.
16    Q.  And how do you know that they do -- that
17 they've done the research?
18    A.  That's their job requirement.
19    Q.  Is there any kind of sign-off saying, "We've
20 done the research, and we believe that this complies
21 with the Texas Constitution"?
22    A.  By drafting the legislation, that's our
23 understanding.
24    Q.  Does -- if leg' counsel receives a drafting
25 request, do they ever refuse to include certain

135

1  substantive provisions in a draft bill that a
2  legislator has asked them to draft because they
3  believe it would violate the Texas Constitution?
4     A.  I don't know what they do with other
5  legislators.
6     Q.  Have they ever done that for you?
7     A.  They've sent back stuff said -- saying that
8  we couldn't do it there, or the way we wanted to do
9  it, because it wouldn't fit in that area of the
10 government code or...
11    Q.  Have they ever sent something back saying
12 that it would violate the Texas Constitution?
13    A.  Not that I recall.
14    Q.  Have they ever sent something back saying it
15 would violate federal law?
16    A.  Not that I recall.
17    Q.  Have they ever sent something back saying
18 that it would violate the Voting Rights Act?
19    A.  Not that I recall.
20    Q.  Are there any other steps, other than relying
21 on whether or not leg' counsel sends back to you that
22 you take to ensure that a bill complies with federal
23 law?
24    A.  Not that I recall.
25    Q.  And are there any other steps other than

136

1  relying on bill drafters and leg' counsel to not
2  complete a bill drafting request that violates the
3  Voting Rights Act that you use to ensure that a bill
4  that you're proposing complies with the Voting Rights
5  Act?
6     A.  Not that I recall.
7     Q.  Are there any steps that you take when voting
8  on a bill, any additional steps, to ensure that it
9  complies with federal law or the Voting Rights Act?
10    A.  Not that I recall.
11    Q.  When other legislators have alleged that
12 particular legislation violates the Voting Rights Act,
13 do you take that seriously?
14    A.  I rely on leg' counsel to do their due
15 diligence to make sure that that doesn't happen.
16    Q.  So if a bill has been drafted and it's before
17 the House, it's made its way through leg' counsel, but
18 someone on the other side, an opponent of that bill,
19 says, "This violates the Voting Rights Act," you
20 believe that not to be true because leg' counsel has
21 drafted the bill?
22    A.  I believe that, yes.
23    Q.  Have any Texas laws ever been struck down
24 under the Voting Rights Act?
25    A.  I don't know.

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

35 (Pages 137 to 140)

---

137

1    Q.  Are you familiar with the opinion in Texas v.
2    Holder, the litigation in DC about SB 14?
3        A.  No.
4        Q.  Do you know which way that decision came out?
5            MS. DONNELLY:  Objection.  Form.
6        A.  No.  I know there's been a lot of litigation
7    surrounding it, but I don't know -- I don't know
8    where -- where it's at, what it's done, where we're
9    at, why we're here.
10       Q.  (BY MR. FREEMAN)  Okay.  Do you know if there
11   was a Select Committee on Voter Identification and
12   Voter Fraud convened in 2013?
13       A.  Not that I recall.
14       Q.  Were you a member of the House Elections
15   Committee in 2013?
16       A.  No.
17       Q.  Do you know if there were any committee
18   hearings held in 2013 about voter ID?
19       A.  I don't know.
20       Q.  Do you know if there were any bill proposals?
21       A.  I don't know.
22       Q.  Did you raise any bill proposals about
23   modifying SB 14 in any way?
24       A.  No.
25       Q.  Are you aware of any cases of in-person voter

---

138

1    impersonation that occurred in Texas during the 2012
2    presidential election?
3            MS. DONNELLY:  Objection.  Form.  I
4    think that's been asked and answered.
5        A.  Not -- not that I recall.
6        Q.  (BY MR. FREEMAN)  Are you aware of any other
7    cases of in-person voter impersonation that occurred
8    in Texas between May 2012 and June 2013?
9            MS. DONNELLY:  Objection.  Form.
10       A.  I don't know.
11           MR. FREEMAN:  Okay.  That's all I have.
12   Pass the witness.
13           THE WITNESS:  Okay.
14           MS. DONNELLY:  Want to take a quick
15   break before we turn you over to this last part?
16           MS. FARANSSO:  Actually, I'll be very
17   quick.
18           THE WITNESS:  I'm good.
19           E X A M I N A T I O N
20   BY MS. FARANSSO:
21       Q.  Just a couple of quick questions.
22       A.  Okay.
23       Q.  And again, Representative, my name is Tania
24   Faransso of WilmerHale, and I'm here on behalf of the
25   Texas League of Young Voters Education Fund.  I'll

---

139

1    make this very quick so you'll be able to make it to
2    your game or to watch your game.
3            If you could actually take a look at Exhibit
4    165.
5        A.  The e-mails?
6        Q.  It wasn't the e-mails, it was the OTB
7    resolution document.
8        A.  Okay.
9        Q.  And if you just turn to the page labeled 5 at
10   the bottom.
11       A.  Okay.
12       Q.  And I believe we looked at this a bit earlier
13   today.  It's one of your general Q and A questions and
14   answers.  And the question at the top of the page is:
15   "Isn't bill" -- referring to Senate Bill 14 -- "Isn't
16   bill now more restrictive than Indiana's or Georgia
17   Law?"
18           If you look at the second paragraph there, it
19   says:  "Plus, it complies with the Supreme Court
20   decision because it offsets the new requirements on
21   voters by" -- and then it provides a bullet-pointed
22   list, and the first bullet you see there reads:
23   "Providing access to free photo ID cards"?
24       A.  Yes.
25       Q.  And then do you also see the third bullet

---

140

1    that says:  "Ensuring that obtaining photo ID is no
2    more burdensome or inconvenient than the usual act of
3    voting"?
4        A.  Yes.
5        Q.  Are you -- with respect to the first bullet,
6    providing access to free photo ID cards, are you or
7    were you aware at the time during the debate on SB 14,
8    of what documentation would be required to obtain this
9    free photo ID card?
10       A.  No, I don't recall.  But I also wanted to say
11   earlier, when we were talking about this out-of-bound
12   resolution, I said this was my first one to do, I
13   don't actually draft the out-of-bound resolutions.
14       Q.  Understood.
15       A.  Since he was talking about bill drafting,
16   they're drafted by the leg' counsel, too.  But it was
17   the first time I had laid out an out-of-the-bound
18   resolution that I remember on a bill on the floor.
19       Q.  Thank you for clarifying that.  Understood.
20           Separate and apart from this out-of-bounds
21   resolution, would you have been aware at the time of
22   the documentation that would have been required to
23   obtain the free photo ID card?
24       A.  I may have, I just don't remember.
25       Q.  Were you aware of the costs in connection

---