BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

## Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                 CORPUS CHRISTI DIVISION
3  MARC VEASEY, et al.,      )
                             )
4          Plaintiff,        )
                             )
5  VS.                       )  CIVIL ACTION NUMBER:
                             )  2:13-CV-193 (NGR)
6  RICK PERRY, et al.,       )
                             )
7          Defendants.       )
                             )
8  _____  )
   UNITED STATES OF AMERICA, )
9                            )
           Plaintiff,        )
10                           )
   VS.                       )  CIVIL ACTION NUMBER:
11                           )  2:13-CV-263 (NGR)
   TEXAS LEAGUE OF YOUNG VOTERS )
12 EDUCATION FUND, et al.,   )
                             )
13    Plaintiff-Intervenors, )
                             )
14 TEXAS ASSOCIATION OF HISPANIC )
   COUNTY JUDGES AND COUNTY  )
15 COMMISSIONERS, et al.,    )
                             )
16    Plaintiff-Intervenors, )
                             )
17 VS.                       )
                             )
18 STATE OF TEXAS, et al.,   )
                             )
19         Defendants.       )
                             )
20 _____  )
   TEXAS STATE CONFERENCE OF )
21 NAACP BRANCHES, et al.,   )
                             )
22        Plaintiffs,        )
                             )  CIVIL ACTION NUMBER:
23 VS.                       )  2:13-CV-291(NGR)
                             )
24 NANDITA BERRY, et al.,    )
                             )
25        Defendants.        )
```

## Page 2

```
1  BELINDA ORTIZ, et al.,    )
                             )
2      Plaintiffs,           )
                             )
3  VS.               ) CIVIL ACTION NUMBER:
                     )  2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,   )
                             )
5      Defendants.    )
                      )
6  _____
7
   ***************************************************
8
             DEPOSITION OF
9
             BRYAN HEBERT
10
             JUNE 17, 2014
11
   ***************************************************
12
           HIGHLY CONFIDENTIAL
13
14     ORAL DEPOSITION OF BRYAN HEBERT, produced as a
15 witness at the instance of the Plaintiff, was duly
16 sworn, was taken in the above-styled and numbered cause
17 on the JUNE 17, 2014 from 9:05 a.m. to 5:51 p.m., before
18 Chris Carpenter, CSR, in and for the State of Texas,
19 reported by machine shorthand, at the Office of the
20 Attorney General, 209 West 14th Street, Austin, TX
21 78701, pursuant to the Federal Rules of Civil Procedure
22 and the provisions stated on the record or attached
23 hereto.
24
25
```

## Page 3

```
1            A P P E A R A N C E S
2  FOR THE UNITED STATES OF AMERICA:
3     Elizabeth Westfall
       U.S. JUSTICE DEPARTMENT
4      CIVIL RIGHTS DIVISION
       Room 7254 NWB
5      950 Pennsylvania Avenue, N.W.
       Washington, D.C. 20530
6      (202) 514-0828
       elizabeth.westfall@usdoj.gov
7
   FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
8
       G. David Whitley
9      Assistant Deputy Attorney General
       ATTORNEY GENERAL OF TEXAS
10     P.O. Box 12548
       Austin, TX  78711-2548
11     (512) 475-3281
       david.whitley@texasattorneygeneral.gov
12
13 FOR THE WITNESS:
14     Linda Halpern
       Manager of Complex Litigation
15     ATTORNEY GENERAL OF TEXAS
       P.O. Box 12548
16     Austin, TX  78711-2548 MC109
       (512) 475-1969
17     linda.halpern@texasattorneygeneral.gov
18     Brooke Paup
       Deputy Division Chief
19     Intergovernmental Relations Division
       ATTORNEY GENERAL OF TEXAS
20     P.O. Box 12548
       Austin, TX  78711-2548
21     (512) 936-1381
       brooke.paup@oag.state.tx.us
22 FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND:
23     Kelly P. Dunbar
       WILMER HALE
24     1875 Pennsylvania Avenue, NW
       Washington, DC 20006
25     (202) 663-6262
```

## Page 4

```
1  FOR THIRD-PARTY LEGISLATORS:
2      Arthur D'Andrea
       Assistant Solicitor General
3      ATTORNEY GENERAL OF TEXAS
       P.O. Box 12548
4      Austin, TX  78711-2548
       (512) 936-2868
5      arthur.dandrea@oag.state.tx.us
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

4 (Pages 13 to 16)

13

1 e-mail and your official state or e-mail run through the
2 Lieutenant Governor's Office.  Do you see that in the
3 instructions?
4       MS. HALPERN:  Can you give us a number,
5 Counsel?
6       MS. WESTFALL:  If you turn to Exhibit A on
7 Page 2 of Paragraph 8.
8    Q.  (By Ms. Westfall)  Do you see that the
9 instructions direct you to look at your personal e-mail
10 as well as your work e-mail --
11    A.  Yes.
12    Q.  -- for responsive e-mails?
13    A.  Yes.
14    Q.  Did you do that?
15    A.  Yes.
16    Q.  How does the Lieutenant Governor communicate
17 with his constituents?
18    A.  Typically, correspondence from constituents
19 comes into our office in the form of an e-mail or a
20 letter, and we reply in a similar manner.
21    Q.  Does he have an e-mail newsletter?
22    A.  I'm not sure.  I don't think so.
23    Q.  Does he have a mailing list that he sends
24 letters to?
25    A.  I'm not sure.

15

1 states?
2    A.  No.
3    Q.  And you were first hired -- I'm going to try to
4 lead you through some of your background so we can get
5 through this quickly since we've already covered that in
6 a prior deposition.  You were first hired as counsel for
7 public policy for Mr. Dewhurst in 2007; is that right?
8    A.  Correct.
9    Q.  You were promoted to Deputy General Counsel in
10 2008 or 2009; is that correct?
11    A.  Correct.
12    Q.  Which year was that you were promoted?
13    A.  2009 -- wait -- yes, I'd say 2009.
14    Q.  Did your responsibilities as Deputy General
15 Counsel include providing opinions on law to the
16 Lieutenant Governor?
17    A.  Yes.
18    Q.  What were the circumstances under which that
19 occurred?
20    A.  Analyzing legislation, reviewing open records
21 requests, and whatever questions he might have about any
22 legal matter.
23    Q.  Can you think of any other instances when you
24 provided him with legal advice?
25       MS. HALPERN:  Let me caution you not to

14

1    Q.  Did you prepare for today's deposition?
2    A.  Yes.
3    Q.  How did you prepare?
4    A.  I reviewed my transcript of my deposition last
5 time.  I met with counsel, and I just be sort of checked
6 to see if there were any current developments related to
7 implementation of Voter ID.
8    Q.  When you met with counsel, was anyone else
9 present?
10    A.  No.
11    Q.  Did you review any documents at that meeting
12 with counsel?
13    A.  Other than -- yes, copies of the bills, and my
14 transcript from last time.
15    Q.  Anything else?
16    A.  No.
17    Q.  Other than your attorney, have you spoken to
18 anyone about your deposition today?
19    A.  No.
20    Q.  Did you bring any notes or documents with you
21 today?
22    A.  No.
23    Q.  Are you still a member of the Texas bar?
24    A.  Yes.
25    Q.  Are you licensed to practice law in other

16

1 reveal any attorney-client confidences in answering that
2 question.
3    Q.  (By Ms. Westfall)  And just to clarify, I'm
4 only asking for categories of communications, not the
5 substance thereof.
6    A.  I think those broad categories cover it.
7    Q.  Did your responsibilities as Deputy General
8 Counsel include providing assistance to the Lieutenant
9 Governor in any legal proceedings?
10    A.  I -- I do not recall.  I do not think so.
11    Q.  Did your responsibilities as Deputy General
12 Counsel include providing professional legal services
13 unrelated to policy choices or political considerations?
14    A.  Can you just repeat that?
15    Q.  Sure.  Did your responsibilities as Deputy
16 General Counsel include providing professional legal
17 services unrelated to policy or political
18 considerations?
19    A.  I mean, to the extent the Lieutenant Governor
20 does things like communicate with constituents or
21 receive open records requests or procedural matters
22 within the Senate, yes, but for the most part, it was
23 all under an umbrella of legal advice.
24    Q.  And you served as Deputy General Counsel until
25 January 2012?

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

5 (Pages 17 to 20)

---

**17**

1    A.  Correct.
2    Q.  During the five-year period that you served as
3  Mr. Dewhurst's deputy general counsel, you were the
4  point person for the Secretary of State's office; is
5  that right?
6    A.  Correct.
7    Q.  Fair to say you're quite familiar with the
8  Texas election code?
9    A.  Correct.
10   Q.  You became employed somewhere else in January
11  2012?
12   A.  Yes.
13   Q.  Where was that?
14   A.  I was an independent political consultant, and
15  I had clients and was in the process of forming a
16  partnership.
17   Q.  You served -- did you serve as the executive
18  director for the Texas Conservative Roundtable?
19   A.  I did.
20   Q.  Was that a client or was that a paid employment
21  position?
22   A.  Client.
23   Q.  While you were consulting in 2012, did you ever
24  provide any advice to a campaign candidate or political
25  party?

---

**18**

1    A.  No.
2    Q.  And what happened to your efforts to enter into
3  a partnership?
4    A.  Before we could finish, I was given a great
5  offer to return to the capital when my boss was
6  remaining as Lieutenant Governor.
7    Q.  So was there a time when Mr. Dewhurst rehired
8  you?
9    A.  Yes.
10   Q.  When was that?
11   A.  That was in October of 2012.
12   Q.  What position did he hire you for?
13   A.  General counsel.
14   Q.  How did that opportunity arise?
15   A.  He unexpectedly was given the opportunity to
16  remain Lieutenant Governor, and his general counsel at
17  the time left to take another position.  And he had an
18  opening, and his chief of staff reached out to me and
19  offered me the position.
20   Q.  Who was his chief of staff at that time?
21   A.  Blaine Brunson.
22   Q.  What are your responsibilities?  Do you
23  currently still hold that position?
24   A.  I do.
25   Q.  What are your responsibilities as general

---

**19**

1  counsel?
2    A.  Overseeing the legal staff, providing legal
3  counsel to the Lieutenant Governor and staff, answering
4  open records requests, serving as public information
5  officer for our office, assorted other legal issues.
6    Q.  Are you still the point person for the
7  Secretary of State's Office or is someone else handling
8  those responsibilities?
9    A.  Someone else.
10   Q.  Who is that person?
11   A.  Constance Allison.
12   Q.  Has that person -- how long has Constance
13  Allison been employed with Mr. Dewhurst?
14   A.  I believe she started when I did, which would
15  be October or so, 2012.
16   Q.  Is she involved in any way in implementation of
17  SB 14?
18   A.  Not that I know of.
19   Q.  Who is the point person for the Department of
20  Public Safety in your office?
21   A.  I think currently that position is open, and so
22  I imagine our acting chief of -- acting chief of staff
23  would handle those requests.
24   Q.  Who is that person?
25   A.  John Opperman.

---

**20**

1    Q.  Do you handle communications with the
2  Department of Public Safety in any way right now for the
3  Lieutenant Governor?
4    A.  To the extent that DPS is involved with Voter
5  ID, I have communicated with them.
6    Q.  And when have those communications occurred?
7    A.  Maybe only during 2013, a couple of e-mails.
8    Q.  What were the e-mails about?
9    A.  They were inquiries from me about efforts to
10  implement distribution of identification.
11   Q.  Were these e-mails around the fall, early fall
12  of 2013?
13   A.  I can't recall.
14   Q.  And what did you learn as a result of your
15  e-mail communication with DPS?
16   A.  I learned that DPS -- I think I -- from this
17  e-mail, I learned that DPS was increasing their office
18  hours in certain locations.  They were implementing
19  mobile unit efforts.  They were pursuing an education
20  initiative.  There may have been more, but I think
21  that's right.
22   Q.  What prompted you to initiate these
23  conversations?
24   A.  I met with some constituents who asked about
25  state efforts to implement the program.

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

21

1   Q.  Who were the constituents?
2   A.  I don't remember their individual names, but
3   the organization, I believe, was called True the Vote.
4   Q.  And so you were following up on -- on
5   meetings -- meetings that you had with these
6   constituents and seeking a status update from DPS as to
7   how they were implementing the EICs; is that correct?
8   A.  Correct.
9   Q.  Have you had any communications with DPS
10  subsequent to those e-mail communications in 2013?
11  A.  I don't think so.
12  Q.  Do you have any reason to know whether DPS has
13  in fact undertaken the activities you've just testified
14  to?
15  A.  I've seen news accounts to that effect, so yes.
16  Q.  Where were the news accounts?
17  A.  We at the Capitol every day, we get a list of
18  legislative and newspaper clippings from across the
19  state and across -- reading those every day, I've --
20  I've seen various accounts.
21  Q.  And the accounts said what?
22  A.  They said that -- what I mentioned earlier,
23  that there were efforts through local media to publicize
24  extended hours, the mobile units, et cetera.
25  Q.  So you have not had any communications directly

---

22

1   with DPS since those e-mail communications in 2013; is
2   that correct?
3   A.  I think that's correct.
4   Q.  Has anyone, to your knowledge, in your office,
5   had any communications with DPS since the fall of 2013?
6   A.  Not that I'm aware.  I assume someone has, but
7   not relating to Voter ID.
8   Q.  During the 2009 legislative session, which I
9   guess was the 81st Session, who did you report to?
10  A.  2009, I would have been deputy general counsel
11  and would have reported to Frank Battle.
12  Q.  Did Mr. Battle review drafts of --
13  A.  I'm sorry.  It was either Frank Battle or
14  Spencer Reid, whoever was the general counsel, and I'm
15  forgetting when Spencer left.
16  Q.  Did Mr. Battle or Mr. Spencer review drafts of
17  your work product before they were circulated outside of
18  your office?
19  A.  Sometimes.
20  Q.  When would those circumstances arise?
21  A.  It -- I mean, some memos, I thought Frank or
22  Spencer had, you know, some -- that they either needed
23  to see it or it would be useful for them to see it, but
24  not every memo or brief was sent through them for
25  review.

---

23

1   Q.  How did you in your own mind decide when you
2   would run things by Mr. Battle for review?
3   A.  I can't say, just a case-by-case basis.
4   Q.  Would you typically run draft e-mails by him
5   before you sent them to other staff for the Senate?
6   A.  I may have, but not every time.
7   Q.  And if you did a memo or talking points or
8   something more substantive, would you tend to run those
9   by Mr. Battle before you sent them out?
10  A.  Again, maybe, it would depend on the specific
11  item.
12  Q.  Were there any rules or guidelines that
13  Mr. Battle presented you with or that were understood as
14  to when you could or could not circulate written work
15  product outside of the office?
16  A.  I don't think so.
17  Q.  Did anyone else in the office beside Mr. Battle
18  review your written work product before it went out if
19  you decided to run it by somebody?
20  A.  Possibly Julia Rathgeber, our policy director
21  or legislative director, I forget her title.
22  Q.  Anybody else?
23  A.  Possibly our chief of staff, who in 2009 would
24  have been Rob Johnson.
25  Q.  Did Mr. Dewhurst ever review any of your drafts

---

24

1   before they went out?
2   A.  Not that I recall.
3   Q.  Never, not once?
4   A.  Not that I recall.  There, again, there may
5   have been some particular memo, and I guess it depends
6   on who the intended audience would be, but not that I'm
7   recalling now.
8   Q.  Did you ever prepare memos from Mr. Dewhurst
9   that were also -- that you also subsequently shared with
10  the staff in the Senate?
11  A.  I may have shared memos with both Lieutenant
12  Governor Dewhurst and other staff.
13  Q.  Did any of those involve photo ID?
14  A.  Probably.
15  Q.  Do you recall which ones you shared with both
16  Mr. Dewhurst and staff?
17  A.  I do not.
18  Q.  Do you recall drafting talking points about the
19  bills, any of the bills that you shared with both
20  Mr. Dewhurst and other staff?
21  A.  I probably did.  I think drafting talking
22  points and substantive sort of white papers is pretty
23  common.
24  Q.  And they would be shared with both Mr. Dewhurst
25  and other staff concurrently or sequentially?

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

7 (Pages 25 to 28)

---

**25**

1  A. They may have been.
2  Q. During the 2011 82nd Session, who did you
3  report to?
4  A. 2011, I reported to Frank Battle, the general
5  counsel.
6  Q. And you're confident that that was the person
7  you reported to?
8  A. It was definitely Frank.
9  Q. Closer in time, easier to remember. Did
10 Mr. Battle have a similar kind of review process for
11 your written work product --
12 A. Yes.
13 Q. -- that you just testified to in 2009?
14 A. Yes.
15 Q. Thank you. And I think I asked you this before
16 a little differently but you -- were you involved in any
17 capacity in any of Mr. Dewhurst's campaigns?
18 A. No.
19    MS. HALPERN: Objection, asked and
20 answered.
21 Q. (By Ms. Westfall) Were you involved -- did you
22 have any advisory in or any informal role, unpaid role,
23 in any campaign?
24 A. No.
25 Q. Did the campaign staff consult with you on

---

**26**

1  anything ever?
2  A. I'm sure -- I mean, I know people on his
3  campaign. I'm sure I talked about the campaign and how
4  it was going, but I'm not remembering any specific
5  instance of any sort of consultation.
6  Q. Did Texas -- did the Texas Legislature consider
7  a Voter ID bill in 2007?
8  A. I believe yes.
9  Q. Was that bill HB 218?
10 A. I -- I get the numbers and the years confused.
11 If you had a copy to double-check, I could be certain.
12 Q. And was -- rather than marking another exhibit,
13 was any Voter ID bill passed, enacted in 2007?
14 A. I don't believe so.
15 Q. And was there support in the Legislature for
16 advancing a Voter ID bill in the following legislative
17 session?
18 A. In 2009?
19 Q. Yes.
20 A. Regular session, I believe a bill was filed,
21 and I do not believe a bill finally passed.
22 Q. Do you recall whether any particular members
23 expressed support for advancing a Voter ID bill in 2009?
24 A. I don't remember particular members, no. I
25 mean, obviously, the bill sponsors, but I can't remember

---

**27**

1  individual legislators.
2  Q. Do you recall that a bill advanced that was
3  called SB 362?
4  A. Again, I'm not clear on the number and what was
5  in that bill.
6  Q. Do you know where there was support in the
7  Legislature for Voter ID in 2009?
8     MS. HALPERN: Calls for speculation.
9  A. Probably lots of reasons.
10 Q. (By Ms. Westfall) Can you tell me what the
11 reasons were?
12    MS. HALPERN: Objection, calls for
13 speculation.
14 Q. (By Ms. Westfall) You may answer.
15 A. The reasons why there was support for passing
16 Voter ID?
17 Q. In the Legislature, yes?
18 A. I imagine that people wanted to stop voter
19 fraud and increase the security of the elections,
20 increase voter confidence. I'm sure there are other
21 reasons and probably unique to each member that
22 supported the bill.
23 Q. Are you aware of any facts that supported the
24 decision to push forward with Voter ID in 2009?
25    MS. HALPERN: Objection, vague.

---

**28**

1  A. Again, I'm not --
2  Q. (By Ms. Westfall) Any factual support for a
3  need for Voter ID that you're aware of?
4  A. Meaning the existence of fraud?
5  Q. Yes.
6  A. I think, yes, my recollection is that there was
7  evidence of fraud in the elections in Texas as there is
8  in, I assume, elections of every jurisdiction.
9  Q. Are you aware of any reasons for supporting
10 Voter ID in 2009 that were not in the public record?
11    MS. HALPERN: Objection, vague, calls for
12 speculation.
13 Q. (By Ms. Westfall) You may answer.
14 A. Reasons to support the bill were not in the
15 public record? I'm not aware of any.
16 Q. Were there any constituencies in 2009 that
17 wanted Voter ID?
18 A. Constituencies of the public or in the
19 Legislature?
20 Q. Of the public?
21 A. That wanted Voter ID? I mean, I think there
22 are public opinion polls that show a pretty large
23 majorities of the public supported the concept of Voter
24 ID.
25 Q. Putting aside polling, are you aware of

---

BRYAN HEBERT                                        6/17/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1  constituencies in the public in 2009 that were
2  supporting and pushing the Legislature to enact Voter
3  ID?
4       **A.  I don't know that they could be grouped into**
5  **constituencies except to the extent that they are**
6  **constituents who would like voter fraud reform or**
7  **improved voting security.**
8       Q.  Were there particular groups or organizations
9  that supported that cause in 2009?
10      **A.  I don't recall specific names of groups.**
11      Q.  Were there any individuals or groups that
12 contacted Mr. Dewhurst to express their support for
13 Voter ID in 2009?
14      **A.  I would have to look at, you know, old**
15 **communications.  I don't recall the names of specific**
16 **groups.**
17      Q.  Did Mr. Dewhurst himself support advancing
18 Voter ID in 2009?
19      **A.  My memory is his public statements were, yes,**
20 **he supported Voter ID.**
21      Q.  Why did he want to advance a Voter ID bill in
22 2009?
23      **A.  Again, he probably has his own --**
24          MS. HALPERN:  Let me caution you not to
25 reveal any attorney-client confidences in answering this

---

30

1  question.  To the extent that you're able to answer the
2  question without doing so, go ahead.
3       **A.  Again, I think his public statements were --**
4  **reflected the fact that he was concerned about voter**
5  **fraud and securing Texas elections and making sure that,**
6  **you know, eligible voters were able to cast votes in**
7  **secure elections.**
8          MS. WESTFALL:  And I'll object to that
9  objection to the extent that this is asking for policy
10 communications, not legal advice.
11      Q.  (By Ms. Westfall)  So did you answer fully or
12 was any of that withheld on the basis of purported
13 attorney-client privilege?
14          MS. HALPERN:  Well, then, let me renew a
15 different objection, Counsel, on this, the deliberative
16 process objection.  This witness is testifying as to his
17 opinions and his beliefs, which you're now asking him to
18 reveal the opinions or beliefs of others in the
19 Legislature and that violates their deliberative process
20 privilege.  You may ask these questions of them, but I'm
21 going to object and direct him not to answer with
22 respect to the opinions of others.
23          MS. WESTFALL:  Well, I think with regard
24 to deliberative process, I'm asking about Mr. Dewhurst's
25 roles and responsibilities as a legislator, so I don't

---

31

1  think deliberative process applies.  I think your
2  objection is not well-founded.  I ask that you withdraw
3  it.
4          MS. HALPERN:  I'm not withdrawing it,
5  Counsel.
6       Q.  (By Ms. Westfall)  Again, why did Mr. Dewhurst
7  want to advance Voter ID in the 2009 Legislative
8  session?
9          MS. HALPERN:  You may answer as long as
10 you don't reveal any confidence or communications you
11 had with the Lieutenant Governor.  Anything that was on
12 the public record you're free to reference.
13          MS. WESTFALL:  What is the privilege
14 you're asserting on?
15          MS. HALPERN:  In this case, it is
16 Lieutenant Governor Dewhurst's deliberative process
17 privilege and his legislative privilege.
18      Q.  (By Ms. Westfall)  You can answer.
19      **A.  Again, my memory is his public statements have**
20 **been consistent that he wants secure elections, to deter**
21 **fraud, to make sure that ineligible voters are not**
22 **casting votes.**
23      Q.  To be clear, for the record, are you
24 withholding any -- any testimony on the basis of your
25 counsel's advice not to testify on the basis of

---

32

1  deliberative process or legislative privilege?
2          MS. HALPERN:  And let me add attorney-
3  client at this point, as well, since he was in the
4  position of deputy general counsel to the Lieutenant
5  Governor.
6       Q.  (By Ms. Westfall)  Are you withholding any
7  testimony on the basis of those instructions?
8       **A.  No.**
9       Q.  Were there any problems that Mr. Dewhurst was
10 trying to fix in 2009 with the Voter ID legislation?
11      **A.  Well, again, the bill was sponsored by I think**
12 **Senator Fraser, and you would have to ask him his**
13 **specific problems that he was trying to fix.  The bill**
14 **as filed, again, I think was supported by the Lieutenant**
15 **Governor and other supporters.**
16      Q.  Were there particular constituencies that
17 Mr. Dewhurst was responding to in supporting Voter ID in
18 2009?
19      **A.  Again, you would have to ask him.  I believe,**
20 **you know, again, that there was a broad range of people**
21 **who supported the bill.**
22      Q.  So in answer to my question, there were not
23 particular constituencies to --
24      **A.  I -- I'm don't --**
25      Q.  -- your knowledge that he was responding to?

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 33 to 36)

---

33

1      A.  I'm not aware of particular constituencies.
2      Q.  Are you aware of any facts, any facts on the
3  ground that supported Mr. Dewhurst's support for Voter
4  ID in 2009?
5      A.  I recall accounts of voter fraud that were laid
6  out in various stages of the bill debate, and again, as
7  fraud exists in most elections, jurisdictions, at some
8  point, at some level.
9      Q.  And this is the -- the fraud you're referring
10  to is all within the -- in public debate in 2009; is
11  that correct?
12      A.  There was a lot of references to fraud, and I
13  should add, also, I guess, incomplete or inaccurate
14  voter roles, other problems within the election process,
15  correct.
16      Q.  Was Voter ID part of Mr. Dewhurst's legislative
17  agenda for 2009?
18      A.  I'm not sure what you mean by agenda.  I think
19  it's fair to say he supported the Voter ID bill.
20      Q.  Was the Voter ID bill filed in December 2008?
21      A.  I don't remember the date it was filed.  I know
22  that bills can be filed beginning in November before
23  each session.
24          MS. WESTFALL:  Could you mark this is as
25  150?

---

34

1          (Exhibit 150 marked for identification.)
2      Q.  (By Ms. Westfall)  You've been handed what's
3  been marked as Exhibit 150.  Do you recognize this
4  document?
5      A.  (Witness looking at document.)
6          MS. WESTFALL:  Could you mark this too?
7          (Exhibit 151 marked for identification.)
8      Q.  (By Ms. Westfall)  You've also been handed
9  Exhibit 151.
10      A.  This looks like Senate Bill 362.
11      Q.  Was this the bill you were just referring to
12  introduced by Senator Fraser?
13      A.  Senator Fraser is a sponsor.  I don't know at
14  what stage in the legislative process this version
15  reflects.
16      Q.  Who developed Senate Bill 362?
17      A.  I believe Senator Fraser and his staff with
18  input from other staff, others.
19      Q.  Were you also involved yourself?
20      A.  I -- I'm sure I was.  I can't remember to what
21  extent.  2009?  Right, I can't remember as to what
22  extent I was involved.
23      Q.  Do you recall any communications that occurred
24  before SB 362 was filed related to its development?
25      A.  I don't recall any.  There may have been, but I

---

35

1  don't recall specific communications.
2      Q.  And were you involved yourself in the
3  development of Senate Bill 362?
4      A.  Again, I know I, on behalf of my boss, was in
5  charge of sort of tracking and analyzing election
6  legislation including Voter ID.  I cannot recall
7  specific communications on the development of Senate
8  Bill 362.  That was five years ago.
9      Q.  Were you involved in the drafting itself of
10  Senate Bill 362?
11      A.  Again, I can't recall specific instances of
12  drafting language in the bill.
13      Q.  I believe you testified in your previous
14  deposition that Jennifer Fagan from the State Affairs
15  Committee was involved in drafting.  Does that sound
16  correct?
17      A.  That's probably right.
18      Q.  And Janice McCoy from Senator Fraser's was --
19  Senator Fraser's was involved in the drafting; is that
20  correct?
21      A.  That's probably right.
22      Q.  While drafting Senate Bill 362, do you recall
23  discussing any particular provisions of the bill?
24          MS. HALPERN:  Objection, assumes facts not
25  in evidence.

---

36

1      A.  So the question is while drafting?
2      Q.  (By Ms. Westfall)  While you were involved in
3  participating in the drafting process, do you recall any
4  discussions about any particular provisions of the bill?
5      A.  I don't recall particular discussions about
6  particular provisions.
7      Q.  Do you recall that Senate Bill 362 allowed the
8  use of both photo and nonphoto ID by voters?
9      A.  Looking at the bill in front of me, I can see
10  that it does.
11      Q.  Do you recall any discussions about the choice
12  to include that range of acceptable documents in the
13  bill?
14      A.  I don't recall specific conversations.
15      Q.  Do you recall any discussion about the
16  provision related to provisional ballots in Senate Bill
17  362?
18      A.  I don't recall.
19      Q.  Turning your attention back to Exhibit 150,
20  what forms, generally, of Voter ID are permitted by
21  Senate Bill 362?
22      A.  What forms of ID?
23      Q.  Of ID, yes.  And let me see if I can turn your
24  attention to page 5 and 6 of the bill.
25      A.  Senate Bill 362.  It looks like acceptable

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

10 (Pages 37 to 40)

37

1  forms of photo identification are a driver's license or
2  personal ID card issued by DPS, a United States military
3  ID card, a United States citizenship certificate, United
4  States passport, and a concealed handgun license issued
5  by DPS, and a valid identification card with a
6  photograph issued by the federal or state government.
7  And then there's a list of additional acceptable proof:
8  their voter registration certificate or a copy of
9  utility bill, bank statement, government check,
10 paycheck, other government documents.  Official mail
11 from the government.  Certified birth certificate, U.S.
12 citizenship papers, marriage license or divorce decree,
13 adoption, name change or sex change records.  Public
14 benefit cards, temporary driving permits, pilot license,
15 library card, hunting or fishing license.
16     Q.  So would you describe this as a very broad set
17 of IDs?
18     A.  It seems to be a broad set of IDs.
19     Q.  Do you recall that in your previous deposition
20 you testified that you had several conversations with
21 Ms. Fagan and Ms. McCoy about the forms of ID to include
22 in Senate Bill 362?
23     A.  I remember -- is the question do I recall from
24 my deposition?
25     Q.  Do you recall that you testified to that fact

38

1  in your deposition?
2      A.  I don't recall that specific time --
3      Q.  Do you recall that you in fact had several
4  conversations with Ms. Fagan and Ms. McCoy about the
5  forms of ID to include?
6      A.  I recall having conversations with Ms. McCoy
7  and Ms. Fagan about Voter ID, but I don't recall the
8  nature of those five years after and two years after my
9  last deposition.
10     Q.  Was Mr. Dewhurst involved in any of these
11 discussions?
12     A.  Not that I recall.
13     Q.  Was he involved in any discussion about what
14 forms of ID to include in Senate Bill 362?
15     A.  Not that I recall, and I don't know what
16 conversations he may have had with other people.
17     Q.  Yeah, I'm just asking you --
18     A.  Sure.
19     Q.  -- to talk about things in your knowledge --
20     A.  Sure.
21     Q.  -- obviously, thank you.
22         Do you know what -- what forms of ID
23 Mr. Dewhurst thought should be included in Senate Bill
24 362?
25         MS. HALPERN:  Objection, and direct the

39

1  witness, if this involves attorney-client
2  communications, do not reveal them.  And to the extent
3  that you are being asked about his thoughts and
4  impressions, I'm going to direct you not to answer on
5  the basis of that would waive his legislative privilege.
6  You can waive your own.  You can't waive somebody
7  else's.  You can ask those questions of him.
8         MS. WESTFALL:  I object to your objection.
9  Mr. Hebert only has legislative privilege and can assert
10 that on the basis of Mr. Dewhurst's legislative
11 privilege, which we take strong issue with in this
12 litigation, but it is not his privilege to -- it is not
13 his personal privilege, so I ask that you were withdraw
14 that objection because --
15        MS. HALPERN:  On the contrary, then he
16 can't answer your question at all.  We're trying to be
17 cooperative here, and I'm allowing you to ask him
18 questions as to his thoughts and opinions.  But you're
19 right, the privilege belongs to Lieutenant Governor
20 Dewhurst, as well, and he cannot answer questions about
21 Lieutenant Governor Dewhurst's thoughts and impressions,
22 because that would waive somebody else's -- that would
23 waive the deliberative process privilege of Lieutenant
24 Governor Dewhurst.  He's free to waive that himself, but
25 this witness is not free to waive it for him.

40

1         MS. WESTFALL:  Is that the sole privilege
2  you're asserting with regard to my question about
3  Mr. Dewhurst's opinions as to which forms of ID should
4  be included in this legislation?  Is it only
5  deliberative process?
6         MS. HALPERN:  Actually, that was
7  legislative privilege.
8         MS. WESTFALL:  And to be clear, you're not
9  asserting deliberative process with regard to his
10 testimony I'm seeking to elicit on views of Mr. Dewhurst
11 with regard to ID and legislation; is that correct?
12        MS. HALPERN:  It would depend whether it
13 was -- it would depend whether it was a final opinion or
14 not.  If it's an evolving opinion, then it's
15 deliberative process privilege.  If it's a final opinion
16 that was expressed in some way, then I guess the
17 decision has been reached.
18        MS. WESTFALL:  So just so the record is
19 clear, you're asserting both deliberative process and
20 legislative privilege with regard to the testimony in
21 response to the question I just asked about what forms
22 of ID the Lieutenant Governor thought should be included
23 in the bill; is that correct?
24        MS. HALPERN:  To the extent the witness
25 can answer the question with regard to public statements

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

11 (Pages 41 to 44)

41

1  that the Lieutenant Governor made, he's free to answer
2  it.
3      Q.  (By Ms. Westfall)  Could you answer as to
4  public statements?
5      A.  I don't recall particular public statements
6  regarding Senate Bill 362.
7      Q.  And do you recall -- I'm not asking for your
8  testimony.  You're counsel's already directed you not to
9  answer.  Do you recall private statements from
10 Mr. Dewhurst concerning his opinion on which forms of ID
11 should be included in the Senate Bill 362?
12     A.  I don't recall.
13     Q.  Are you familiar with the Crawford Voter ID
14 decision?
15     A.  Yes.
16     Q.  When was that issued?
17     A.  Oh, I can't remember the year.
18     Q.  Was it April 2008?
19     A.  That sounds right.
20     Q.  Did you read it when it was issued?
21     A.  Yes.
22     Q.  Did the Crawford decision have any impact on
23 the development of Voter ID legislation in Texas?
24     A.  Probably so.
25     Q.  Do you know how it did?

42

1      A.  It -- I can say for myself, it impacted my
2  understanding of permissible boundaries under the
3  constitution for voter identification legislation.
4      Q.  And what were those boundaries?
5      A.  I think, broadly speaking, the court in
6  Crawford said that the state has an interest in securing
7  elections and improving confidence in those elections
8  and deterring fraud and making sure that voter roles are
9  accurate.  That, I believe it says even if in some
10 negligible way individual voters might be adversely
11 impacted, if that does not rise to a level that
12 outweighs the good brought by enacting legislation, then
13 the law might be upheld.  In other words, there can be
14 some burden involved with photo identification or voter
15 identification legislation, and through that lens, they
16 upheld Indiana's voter identification.
17     Q.  And based on what you just said described about
18 the Crawford decision, how did that shape your view of
19 how Texas could enact Voter ID legislation?
20     A.  I think, again, generally speaking, it showed
21 that -- it confirmed that the Supreme Court will uphold
22 photo identification requirements in some circumstances.
23     Q.  And how did that apply to the Texas
24 legislature's efforts to enact Voter ID?
25         MS. HALPERN:  Objection, calls for

43

1  speculation as phrased.
2      Q.  (By Ms. Westfall)  You may answer.
3      A.  Yeah.  I think individual legislators or
4  sponsors of the bill might interpret their own way.  I
5  think it probably to each them said that if you enact a
6  plan that is not overly burdensome, then it will be held
7  constitutional.
8      Q.  Did the Indiana law issue, do you recall,
9  permit the use of nonphoto ID?
10     A.  I cannot recall if it was nonphoto or --
11     Q.  And I will represent to you that it did not
12 allow the use of nonphoto ID.
13     A.  Okay.
14     Q.  Why did, in light of the Indiana law and the
15 Crawford decision, SB 362 permit voters to present
16 nonphoto ID?
17     A.  I don't know.
18     Q.  Why was nonphoto ID permissible under Senate
19 Bill 362?
20         MS. HALPERN:  Objection, asked and
21 answered.
22     Q.  (By Ms. Westfall)  You may answer.
23     A.  Why was it permissible?
24     Q.  Why was it included as a form of permissible
25 ID?

44

1      A.  I don't know.  I mean, I can say generally in
2  the legislative process, bills change for lots of
3  reasons:  The desire of the sponsor, input from other
4  legislators, input from the public, litigation.  It
5  could be any reason or all of those reasons.
6      Q.  But do you know as to this particular issue as
7  to why nonphoto was included in Senate Bill 362?
8      A.  I do not, no.
9      Q.  Are you familiar with the model Voter ID bill
10 created by the American Legislative Exchange Council
11 known as ALEC?
12     A.  I know what ALEC is, but I'm not familiar with
13 new specific model legislation.
14     Q.  And do you have any understanding as to why
15 Senate Bill 362 limited the forms of acceptable ID to
16 those listed that you just testified to on Pages 5 and 6
17 of Exhibit 150?
18     A.  I don't know why this list is this list
19 specifically.
20     Q.  Do you know how any of the IDs on that list
21 arose in terms of their inclusion in the bill?
22     A.  Some of them are current law or were current
23 law at the time and were retained.
24     Q.  And those IDs would include which ones?
25     A.  Driver license, some of the nonphoto utility

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

---

**45**

1  bill, bank statement, government check, paycheck, other
2  government documents.
3      Q.   Anything else?
4      A.   That appears to be all of them that were
5  retained.
6      Q.   Do you recall how provisional ballots were
7  treated under Senate Bill 362?
8      A.   I don't recall, but I could look if you would
9  like.
10     Q.   Certainly, that would be helpful.
11  Unfortunately, I don't have a page to direct you to, but
12  I'm sure you're sufficiently familiar with this to find
13  it quickly.
14     A.   It looks like on the bottom of Page 7 on to
15  Page 8 is the election code section dealing with
16  provisional ballots, and it looks like it just changes a
17  cross reference, so I guess it retains the existing
18  provisional ballot system.
19     Q.   What was that system?
20     A.   As I understand it at the time, if the person
21  appears without appropriate identification or is
22  otherwise possibly not eligible to vote, they may still
23  cast a provisional ballot if they execute an affidavit
24  stating that they are indeed a registered voter and are
25  eligible to vote.

---

**46**

1      Q.   The voter need not take any further action
2  after other casting that ballot to ensure that it will
3  be counted; is that correct?
4      A.   They have to -- after they sign an affidavit.
5  So they have to cast a provisional ballot and then sign
6  the affidavit.
7      Q.   And after that, the voter need not return to
8  the election office with a form of acceptable ID; is
9  that correct?
10     A.   I think that's correct.
11     Q.   Do you know why Senate Bill 362 permitted
12  provisional ballots cast by voters without necessary ID
13  to be counted without requiring further action on the
14  part of the voter?
15     A.   I don't know.
16     Q.   Do you know why it essentially maintain the
17  status quo for provisional ballots?
18     A.   I don't know.
19     Q.   Are you aware of how the Indiana law at issue
20  in Crawford treated provisional ballots?
21     A.   I cannot recall.
22     Q.   Do you recall -- well, I'll represent to you
23  that it required the voter to return to the office.
24  Does that sound familiar?
25     A.   Okay.  I take your word for it.

---

**47**

1      Q.   So is it true, fair to say, that Senate Bill
2  362 was more lenient with regard to provisional ballots
3  than the Indiana law was?
4          MS. HALPERN:  You're asking him to rely on
5  your representation in answering --
6          MS. WESTFALL:  Yes.
7          MS. HALPERN:  -- that question, Counsel?
8          MS. WESTFALL:  Yes.
9      A.   I'm not sure I would use the word lenient.  I
10  think a voter allowed to return with appropriate
11  identification could be more certain that their
12  provisional ballot would be counted.  And so they are
13  different systems, I would allow that.
14     Q.   (By Ms. Westfall)  But certainly under Senate
15  Bill 362, the voter was not required to return a second
16  time to a voting official to show ID, correct?  And that
17  different from Indiana; is that correct?
18     A.   I think that's correct.
19     Q.   Before Senate Bill 362 was filed, was there any
20  analysis of the likely impact of that bill on voters
21  that you're aware of?
22     A.   I can't recall from 2009.
23     Q.   Any analysis about the number of registered
24  voters without requisite ID under Senate Bill 362?
25     A.   I don't recall.

---

**48**

1      Q.   Do you recall any communications about the
2  impact of Senate Bill 362 on minority voters?
3      A.   I don't recall specific communications.
4      Q.   Are you aware of any analysis of the impact of
5  Senate Bill 362 on minority voters?
6      A.   I can't recall any specific.
7      Q.   Was there any consideration given to analyzing
8  Spanish surnamed registered voters who had Texas driver
9  license or personal ID?
10     A.   It's possible.  I just can't recall.
11     Q.   So you testified in your prior deposition about
12  the purpose of Senate Bill 362, in which I think you
13  alluded to earlier in this deposition, the purposes were
14  to improve the integrity of elections and instill
15  confidence in the electorate.  Do you recall that
16  testimony?
17     A.   I don't recall the testimony, but I'm sure
18  that's correct.
19     Q.   And is that still your testimony about the
20  purpose of the Senate Bill 362?
21     A.   I think there are certain -- those are some of
22  the purposes, sure.
23     Q.   Which are the other purposes?
24     A.   Again, you'd have to ask the bill sponsors,
25  their purpose on sponsoring it and passing legislation.

---

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

**49**

1  Q.  Do you recall any that you were kind of -- you
2  were kind of in the mix of the development and drafting
3  of Senate Bill 362.  Do you recall any other purposes
4  sitting here today?
5  A.  And again, I think public statements that I
6  recall are in that same vein, protecting voting
7  integrity, improving voter confidence, making sure that
8  voter fraud or inaccurate voter roles or other problems
9  did not result in inaccurate or unsecured elections.
10  Q.  And what was the -- what was the basis for the
11  understanding that there was -- that there was the lack
12  of confidence in the electorate?
13  A.  Well, I think one indication would have been
14  that public polls again showed overwhelming numbers of
15  of citizens supported some form of photo ID.
16  Q.  And from the polls supporting Voter ID, you
17  could infer that there was a lack of confidence in the
18  electorate, is that your testimony?
19  A.  I think if people wanted an improvement in the
20  process, that would probably be derived from a -- some
21  lack of confidence in the system.
22  Q.  And aside from those public opinion polls, is
23  there any other basis or facts you're aware of that made
24  the legislature feel there was a lack of confidence in
25  the voting system?

**50**

1  A.  Again, I may be forgetting some testimony
2  during that session.  I'm sure individual sponsors had
3  communications with their constituents, but I'm not
4  particularly aware of those.
5  Q.  In terms of improving the integrity of
6  elections, again, what was the need for that in 2009?
7  A.  The need to?
8  Q.  What was the factual basis for the need to
9  remedy that issue?
10  A.  Again, I can't speak for what each individual
11  bill sponsor supporter thinks.  My understanding at the
12  time is that fraud exists in the elections, and there
13  are various ways you can improve the security of those
14  elections.  And those efforts to improve the security
15  are worthwhile if they're not unduly burdensome on
16  voters.
17  Q.  And to be clear, Voter ID addresses the problem
18  of in-person voter fraud; is that correct?
19  A.  That's correct.
20  Q.  And so is it your testimony that Voter ID
21  legislation to address that type of fraud addresses
22  fraud more generally?
23      MS. HALPERN:  Objection, confusing, vague.
24  A.  I -- I think it's unclear to me exactly how
25  certain types of fraud might be deterred from this

**51**

1  outside of in-person voter fraud.  I mean, to the extent
2  that it shows the Legislature and local officials are
3  concerned about fraud and aware of fraud and taking
4  steps to prevent fraud, that may indeed have an
5  impact and -- and deter other types of fraud.
6  Q.  (By Ms. Westfall)  And what particular types of
7  fraud are you -- are you describing or referring to?
8  A.  I mean, generally, in the elections, there can
9  be in-person voter fraud.  There can be mail ballot
10  fraud.  There might be undue coercion of voters or
11  manipulation of results.  I'm sure there are some others
12  that I'm forgetting.
13  Q.  Which types of fraud specifically do you
14  believe existed in 2009 that warranted Voter ID
15  legislation?
16      MS. HALPERN:  Objection, compound.
17  Q.  (By Ms. Westfall)  You may answer.
18  A.  The types of fraud that I believe existed in
19  2009 that warranted Voter ID legislation?  Again, I
20  think there's, you know, evidence in our history of each
21  of those types of fraud I just mentioned, and Voter ID
22  was certainly designed, as far as I can tell, to combat
23  one of those types of fraud.
24  Q.  And I believe you just testified that it would
25  combat the in-person voter fraud at the polls; is that

**52**

1  correct?
2  A.  Correct.  That was --
3  Q.  Is it also your testimony that it would address
4  these other types of fraud?
5  A.  It's my testimony that the intent of the bill,
6  as I understand it, was to address in-person voter
7  fraud, and that that attempt to address one type of
8  fraud might have the additional impact of deterring
9  other types of fraud.
10  Q.  Do you have any factual support for that
11  inference?
12  A.  No, other than, you know, common sense and
13  looking at the legislature generally.
14  Q.  How would Senate Bill 362 eliminate the lack of
15  confidence in the electorate?
16  A.  I mean, again, I think in my impression is that
17  if you make steps to eliminate fraud in elections,
18  people that do cast votes that are eligible voters can
19  be more secure that their vote will be counted and not
20  offset by an ineligible voter, and that will instill
21  confidence in that particular elector or voter, I should
22  say, and in the electorate, in general.
23  Q.  And how do you -- what's the basis for
24  inferring that?
25  A.  Again, I think just generally, any legislation,

BRYAN HEBERT                                                 6/17/2014
CONFIDENTIAL TRANSCRIPT

14 (Pages 53 to 56)

---

### 53

1   any criminal law, any area where the legislature is
2   acting and taking steps, the intended impact, at least,
3   is to give the public confidence that the legislature is
4   acting on their behalf.
5        Q.  Do you have any factual basis, other than what
6   you just testified to, that drawing that conclusion that
7   the bill would have that effect?
8        A.  I don't have -- I can't -- I don't have a
9   specific example, again, other than just that's sort of
10  the whole point of the legislature is to act on behalf
11  of the public presumably to instill confidence and not
12  to instill some other feeling.
13       Q.  Are you aware whether Mr. Dewhurst tied Voter
14  ID to immigration as issues that -- in other words, put
15  differently, that Voter ID and enacting that would help
16  to stem illegal immigration?
17       MS. HALPERN:  Let me again caution you not
18  to reveal any communications while you were wearing your
19  attorney-client privilege hat, not -- not to violate the
20  deliberative process privilege to the extent it's
21  applicable to this question, and not to violate his
22  legislative privilege.
23       A.  I'm not aware of any link between immigration
24  and Voter ID.
25       Q.  (By Ms. Westfall)  And are you not -- is any of

---

### 54

1   your answer not providing testimony based on the
2   instruction of your counsel?
3        A.  No.
4        Q.  Did Senate Bill 362, to your knowledge, require
5   a voter to prove citizenship when casting a ballot?
6        A.  I'd have to look at the bill if you don't mind.
7        Q.  Sure.  Certainly.
8        A.  I think some of these forms of ID would require
9   citizenship to obtain possibly, but they're also some on
10  here that it's possible that noncitizens would be able
11  to obtain.
12       Q.  So is your testimony that it -- Senate Bill 362
13  would not require a voter to prove citizenship for that
14  reason because some of these IDs do not require proof of
15  citizenship; is that correct?
16       MS. HALPERN:  Objection, misstates the
17  testimony.
18       Q.  (By Ms. Westfall)  You may answer.
19       A.  That sounds correct.
20       Q.  Are you aware of any nonpublic unstated
21  purposes of Senate Bill 362?
22       A.  I'm not aware of any.
23       Q.  What portion of the public is least likely to
24  possess ID documents?
25       A.  What portion of the public is least likely to

---

### 55

1   possess these documents in 362?
2        Q.  Yes.
3            MS. HALPERN:  Objection, calls for
4   speculation.
5        Q.  (By Ms. Westfall)  You may answer.
6        A.  I don't know specific segments of the
7   population.  It would seem to me that -- that any
8   segment of the population would be able in some way to
9   obtain at least one of these forms.
10       Q.  But getting back to my question in terms of
11  current possession, as opposed to ability to obtain ID
12  in 362, are there any portions of the population that
13  you believe are less likely to currently possess the
14  forms of ID in 362?
15       A.  I'm not sure.
16       Q.  Are poor voters the least likely to possess ID
17  documents?
18       A.  Well, I mean, one of the forms of ID is a
19  government check or government benefits, and so those,
20  in fact, to be populations most likely to receive those.
21  Driver's licenses or personal identification cards I
22  think are necessary to obtain a lot of those benefits,
23  so maybe -- I think they seem as likely to be able to
24  obtain or to possess those documents.  So I guess I
25  would say not necessarily to your question.

---

### 56

1        Q.  Are minority voters in Texas more likely to be
2   poor than Anglos, to your knowledge?
3        A.  I would assume, I mean, I think historically,
4   poor populations have generally had higher
5   representation among minorities, that's fair.  And
6   that's probably true in Texas and every other state.
7        Q.  Did supporters of Senate Bill 362 adopt any
8   procedural mechanisms to increase the likelihood of the
9   bill's passage?
10       A.  I'm sorry, could you repeat?
11       Q.  Certainly.  Did supporters of Senate Bill 362
12  adopt any procedural mechanisms to increase the
13  likelihood of the bill's passage?
14       A.  I don't recall specific examples.  I think any
15  bill sponsored uses the rules of the House and Senate to
16  get their bill passed, whether those are unique or
17  special or any other descriptive, probably in the eye of
18  the beholder.  If they're in the rules, they're in the
19  rules, and at the disposal of the sponsor.
20       Q.  But were -- getting back to my question.  Were
21  there any procedural mechanisms you can recall that were
22  put into place by the supporters of Senate Bill 362 to
23  ensure its passage?
24       A.  I don't recall specific examples.
25       Q.  Did the Lieutenant Governor's Office play any

---

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

---

**61**

1    A.  Okay.
2    Q.  Have you seen this -- could you take a look at
3  this exhibit.
4    A.  Okay.
5    Q.  What is the article about?
6    A.  It's about the beginning of the session in 2009
7  and the rules debate and Voter ID debate.
8    Q.  Do you recall having been in the closed-door
9  caucus of the full Senate meeting referred to in this
10  article?
11    A.  Again, I was not.
12    Q.  Do you recall hearing about what was said in
13  this closed-door Caucus of the full Senate?
14    A.  I did not hear anything.
15    Q.  Do you know which particular Senators supported
16  Rule 5.11D?
17    A.  I imagine the Senators that voted for the
18  adoption of the rules, and I don't know the specific
19  Senators who did.
20    Q.  Did the Senate ultimately adopt Rule 5.11D?
21    A.  My memory is, yes.
22    Q.  Is it true that only a simple majority of
23  Senators was required to enact the rules for 2009?
24    A.  My memory is that Senate rules are adopted by a
25  majority of the Senators.

---

**62**

1    Q.  And not of two-thirds of the Senators; is that
2  correct?
3    A.  I think that's correct but not -- not
4  parliamentarian.
5    Q.  Do you know why Rule 5.11D was adopted?
6    A.  I assume it was adopted because the Senate
7  liked it.
8    Q.  Any other reasons?
9    A.  If I could look back at the rule, 5.11D deals
10  with photo identification bills or resolutions.  I
11  assume that they wanted to make sure that those types of
12  bills or resolutions were treated as outlined in 5.11D.
13    Q.  What was the purpose of allowing -- providing
14  that Voter ID legislation could be treated as a special
15  order?
16    A.  I don't know the purpose of it.
17    Q.  What was the effect of treating it as a special
18  order?
19    A.  As I understand Senate rules, and as 5.11 lays
20  out, it would allow Voter Identification requirements to
21  be heard before the Committee of the Whole, 24 hours or
22  more after the special order was set.
23    Q.  How would a bill ordinarily be treated if this
24  5.11D were not in place?
25    A.  Bill or special order?

---

**63**

1    Q.  A bill.
2    A.  I mean, my understanding of the legislative
3  process is bills are introduced and referred to
4  committee and go through the committee process, and if
5  the Senator wished to bring it to the floor, it's placed
6  on an Intent Calendar, and then if the Lieutenant
7  Governor recognizes that Senator on that bill, the
8  Senate debates it.  And there are various procedures and
9  timetables in the mix there.
10    Q.  How does the 5.11D change consideration of the
11  Voter ID bill for 2009?
12    A.  It treated it -- it said that if a special
13  order relates to Voter ID, then it could be considered
14  within 24 hours.
15    Q.  And in order to do that only required a vote of
16  the majority of the Senate; is that correct?
17    A.  Correct.
18    Q.  And ordinarily to set a special order would
19  require two-thirds support from two-thirds of the
20  Senators; is that correct?
21        MS. HALPERN:  Objection, misstates the
22  testimony.
23    A.  I think -- right.  I mean 5.11A says that a
24  special order may be set with affirmative vote of
25  two-thirds.  And then D says, on Voter ID, it may be set

---

**64**

1  by a majority of the members of the Senate.
2    Q.  (By Ms. Westfall) So it carves out an exception
3  for Voter ID with regard to its designation as a special
4  order; is that correct?
5    A.  Yes.
6    Q.  Was Senate Bill 362 assigned to the Committee
7  of the Whole?
8    A.  My memory is, yes, it was.
9    Q.  What is the Committee of the Whole?
10    A.  Instead of being referred to committee with a
11  limited number of members that meets in a committee
12  room, typically, the Committee of the Whole consists of
13  every Senator and the Lieutenant Governor and they meet
14  on the Senate floor.
15    Q.  And ordinarily would 362, as an election bill,
16  have been assigned to the State Affairs Committee?
17    A.  Most State Affairs -- most election bills in
18  the Senate are referred to State Affairs.  My memory is
19  that some could be referred to jurisprudence and it's
20  possible some other committee.
21    Q.  Can you recall any other election bill that was
22  referred to the Committee of the Whole besides 362,
23  Senate Bill 362 and Senate Bill 14?
24    A.  I don't recall any.
25    Q.  Can you recall any other bills that the

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

65

1   Lieutenant Governor assigned to the Committee of the
2   Whole besides Senate Bill 362?
3       A.   I'm sorry, what types of bills?
4       A.   Any bill.
5       A.   Any bill.  My memory is that the Committee of
6   the Whole has met before and I cannot remember all the
7   specific instances except it's possible redistricting,
8   it's possible school finance -- and in fact, I should --
9   to clarify an earlier remark:  The school finance bill
10  from a few sessions ago may have had some election
11  provisions in it.  Those are the examples that come to
12  mind.
13      Q.   So school financing, what session was that,
14  that it was referred to the Committee of the Whole?
15      A.   It may have been, and again, I can't remember
16  if it was or not.  It may have been -- and it would have
17  been 2006.  But again, I cannot remember for sure if it
18  was the Committee of the Whole.
19      Q.   Was school financing set as a special order by
20  a simple majority?
21      A.   I can't recall.
22      Q.   Other than the bills you just testified to, are
23  you aware of any other bills that Lieutenant Governor
24  has assigned to the Committee of the Whole?
25      A.   I can't remember others.

66

1       Q.   And in terms of the redistricting bill, which
2   bill was this that was referred to the Committee of the
3   Whole?
4       A.   I can't remember specific examples.  Again, I
5   was just -- if the Committee of the Whole -- I remember
6   the Committee of the Whole has met in the last decade
7   that I've been around the Capitol and my memory is that
8   it might have been for redistricting one year, but I
9   can't remember a specific year example.
10      Q.   Do you know whether Mr. Dewhurst assigned
11  Senate Bill 362 to the Committee of the Whole to
12  expedite its consideration?
13      A.   I don't know why he did.
14      Q.   Did it have the effect of expediting
15  consideration?
16      A.   I can say, generally speaking, the Committee of
17  the Whole might expedite it, but it still I think
18  requires separate votes by the Committee of the Whole
19  and by the Senate as a sitting body.  And I also
20  remember, in I think it was 2009, this particular
21  Committee of the Whole met for better than 24 hours,
22  which seems like -- if that was speeding up the process,
23  then it didn't do a very good job, I guess.
24      Q.   Is it correct that when bills are assigned to
25  the Committee of the Whole as opposed to State Affairs,

67

1   that they can immediately or within a very short period
2   of time be heard by the full Senate?
3       A.   I'm not sure.
4       Q.   Do Mr. Dewhurst and Senator Fraser have a
5   social relationship outside of their working
6   relationship?
7       A.   I don't know.
8       Q.   Do you know whether Mr. Dewhurst had dinner
9   with Senator Fraser on March -- early March 2009?
10      A.   I don't know.
11      Q.   Do you know when Senate Bill 362 was considered
12  by the Senate in 2009?
13      A.   I don't remember the date.
14      Q.   Could you refer back to -- turn your attention
15  back to Exhibit 151.
16      A.   Yes.
17      Q.   Could you take a look at that -- and what is
18  that?
19      A.   Exhibit 151 is a printout from the Texas
20  Legislature Online.  It is the bill history for Senate
21  Bill 362 from the 81st regular session.
22           And your question is when did the Senate
23  consider Senate Bill 362?
24      Q.   Yes.
25      A.   Well, it was received by the Secretary of the

68

1   Senate in December 2008.  It was read and referred to
2   the Committee of the Whole on February 17.  It was
3   scheduled and considered for a public hearing on March
4   10th and then passed by the Senate on March 11.  Then
5   read a second time on March 17th, read a third time on
6   March 18th, and then reported by the Senate on March
7   18th.
8       Q.   Thank you.  And the lengthy public testimony
9   you're referring to that occurred a period of 24 hours
10  occurred on March 10th; is that correct?
11      A.   I think that must be right.  Testimony taken in
12  committee would likely have been March 10th.
13      Q.   Was that testimony taken in the Committee of
14  the Whole?
15      A.   My memory is that yes, it was.
16      Q.   During the Committee of the Whole's
17  consideration of Senate Bill 362, there were concerns
18  that were raised by the impact of the bill on minority
19  voters, right?
20      A.   I think that's right.
21      Q.   Did supporters of Senate Bill 362 take any
22  steps in response to those concerns?
23      A.   I can't recall specific steps but I do recall
24  that they -- I think I recall that they contested that
25  it would in fact have an adverse impact on minority

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

---

69

1    voters, so --
2        Q.  So they -- go ahead.
3        A.  All right.  And so, I'm sure that would inform
4    whether they felt the need to take steps.
5        Q.  So is it your testimony that no changes were
6    made to the bill in the Senate as a result of those
7    concerns?
8        A.  I would have to see the different versions of
9    the bill through this process to know for sure.
10       Q.  Did Mr. Dewhurst, to your recollection, take
11   any actions in response to the concerns about the impact
12   of the bill on minority voters?
13       A.  Take actions?
14       Q.  Yes.
15       A.  I mean, Lieutenant Governor's powers to act on
16   a bill once it's before a Committee or the Senate are
17   relatively limited.  He can't introduce amendments or --
18   he's not a bill sponsor.  I'm certainly not aware of any
19   formal action he took, whether he spoke with Senators or
20   the public, I don't know.
21       Q.  So to your knowledge, Mr. Dewhurst did not take
22   any actions in response to these concerns, based on your
23   knowledge; is that fair?
24       A.  I'm not aware of any specific actions he took.
25       Q.  Did Senator Fraser take any actions in response

---

70

1    to any of these concerns raised, that you're aware?
2        A.  I don't know.
3        Q.  And overall, were there any changes made to
4    Senate Bill 362 at any stage in the bill's history to
5    respond to concerns about minority voters?
6        A.  Again, I would have to see individual copies
7    from each state of the process.
8        (Exhibit 154 marked for identification.)
9        Q.  (By Ms. Westfall) You've been handed what's
10   been marked as Exhibit 154.  Do you recognize this
11   document?
12       A.  It looks like the Senate Journal entry from the
13   23rd day of session, which would be March 18, 2009.
14       Q.  And I believe you just testified that was
15   the day of the final -- the final day of the Senate's
16   consideration of Senate Bill 362; is that right?
17       A.  If I could look at the timeline again.  March
18   18th was when the Senate reported the engrossed version
19   of SB 362.
20       Q.  That concluded the Senate's consideration of
21   Senate Bill 362; is that right?
22       A.  It sent the bill to the House.
23       Q.  Thank you.  Do you see that on Page 591 of the
24   Senate Journal, Exhibit 154, there is a letter from
25   Senator West?

---

71

1        A.  Yes.  Statement regarding votes cast by Senator
2    West.
3        Q.  And do you recall generally without -- and I'm
4    not asking you to read the entire letter into the
5    record, but do you recall generally what this letter
6    concerns?
7        A.  I don't recall.
8        Q.  Do you want to take look at it and tell me when
9    you've had a chance to review it.
10       A.  Okay.
11       Q.  What does it generally pertain to?
12       A.  Senator West explains that each of the ethnic
13   minority Senators voted against Senate Bill 362 at each
14   stage of its passage.
15       Q.  Were there any responses to this letter that
16   you're aware of from supporters of Senate Bill 362?
17       A.  I'm not aware.
18       Q.  Are you aware of any responses off the record
19   in response to this letter?
20       A.  I'm not aware of any responses.
21       Q.  And that's on or off the record?
22       A.  I -- I don't recall any responses on or off the
23   record.
24       Q.  Are you aware of any concerns that refusal to
25   make changes to the bill, to Senate Bill 362, might

---

72

1    threaten its preclearance?
2        A.  Could you repeat, please?
3        Q.  Certainly.  Let me withdraw that question.
4            Are you aware of any concerns that refusal
5    to make changes to Senate Bill 362 in response to
6    concerns about its impact on the minority voters might
7    threaten it's preclearance under Section 5?
8        A.  I don't recall specific concerns or efforts.
9        Q.  Did the letter from Senator West cause you any
10   concern about its likelihood of preclearance under
11   Section 5 of the Voting Rights Act?
12       A.  I can't remember my specific reactions to
13   Senator West's statement or that I saw the statement.
14   It's possible in the Senate to go back after the day and
15   to amend the Journal by submitting a statement.  And so
16   I'm not sure if Senator West read this or submitted it
17   on the day of or submitted it later.  But in any case, I
18   can't remember my specific reaction.
19       Q.  Do you recall when you first became aware of
20   this letter from Senator West?
21       A.  I mean, I was aware at the time who voted
22   against the bill.  I don't know -- I can't recall when I
23   became aware of Senator West's statement as laid out in
24   the Journal.
25       Q.  Were you aware of these concerns, generally, at

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

19 (Pages 73 to 76)

---

**73**

1  the time Senate Bill 362 was being considered?

2    A.  My memory is that during the debate before the
3  Committee of the Whole, the Senators in opposition
4  stated something to this effect.

5    Q.  Did you have any concerns that -- that those
6  objections on the part of bill opponents would create
7  any barriers to preclearance under Section 5 of the
8  Voting Rights Act?

9    A.  It would be better if they had all voted for
10  it.  But I know it's also true that the Democrats, as a
11  block, voted against lots of bills over the years,
12  including Voter ID.  And in this case, he lays out that
13  all 12 Democratic Senators voted against the bill, and
14  yes, that includes minority Senators.  But it -- again,
15  I think Democrats voting as a block against bills is --
16  it's not unheard of.  It's not ideal in most cases, but
17  its not unheard of.

18    Q.  And you didn't see it as a problem in terms of
19  preclearance of Senate Bill 362 if that had happened, if
20  it had been enacted?

21    A.  Again, it would have been better if all the
22  Senators supported the bill.

23    Q.  So your answer is no?  It was not a hurdle?

24    A.  I don't recall my immediate impression, but I
25  don't think I would have seen it as an insurmountable

---

**74**

1  hurdle.

2    Q.  Senate Bill 362 was not passed by the House; is
3  that correct?

4    A.  I would have to check the bill history.

5    Q.  Please go ahead and feel free to do so.

6    A.  Correct.

7    Q.  Do you know what happened to Senate Bill 362 in
8  the House?

9    A.  It looks like on May 23, 2009, it would have --
10  it was placed on the major State calendar.  And my
11  memory is that there's a fair amount of opposition from
12  Democrats in the House, some would say stall tactics.
13  They talked at length on bills that normally would have
14  been passed as a matter of routine.  To delay
15  consideration of the bill on the major State calendar,
16  it was certainly, again, met with sort of stiff partisan
17  opposition in the House.  But I can't recall the
18  specific details of its demise.

19    Q.  Is there a term that is used to refer to when
20  there's a lot of talking about a bill to stop
21  consideration of other bills?

22    A.  "Chubbing" is the word or term around the
23  Capitol that's used, yes.  Again, it's -- there's no
24  filibuster allowed in the House.  They have strict rules
25  on the amount of time a person may speak, but if every

---

**75**

1  single person uses every second of time on every single
2  bill to delay consideration of other bills or other
3  actions, chubbing is the term that's often used.

4    Q.  And how did opponents of Senate Bill 362 -- how
5  did they manage to chub it to death, so to speak?

6    A.  Me memory from watching it on TV, because I was
7  not in the House, is that on other calendars, the major
8  State calendars, just one calendar bill the House
9  considers is that there were other calendars for that,
10  or days before that even, wherein the Democrats -- my
11  memory is that it was all Democrats -- spoke at length
12  on those procedural or uncontroversial bills to delay
13  the consideration of the major State calendar.

14    Q.  Who -- who was the Speaker at the time that the
15  Senate Bill 362 was under consideration?

16    A.  In 2009 it would have been Joe Straus.

17    Q.  Could Speaker Straus have assigned the Senate
18  bill to a different calendar when it was received in the
19  House to ensure its passage?

20    A.  My understanding is that it's the calendar's
21  committee and the Speaker who set the calendars in the
22  House.

23    Q.  Why did he set it for a calendar where it could
24  be chubbed?

25    A.  I don't know.  I don't know why he did what he

---

**76**

1  did.

2    Q.  Were there other matters the House had to
3  attend to in 2009 that were more important than Voter
4  ID, in your view, and that's what caused the delay?

5    A.  I don't recall specific measures being
6  considered by the House in 2009.

7    Q.  If Voter ID -- if Senate Bill 362 had been
8  received by the House earlier in the session, would it
9  have increased its likelihood of passage?

10    A.  Generally in the legislature, the earlier a
11  chamber considers it, the more likely it is to pass.
12        And as to your last question about the
13  importance, I think whether a bill is important or which
14  bill is more important is decided by each member of the
15  House and Senate and varies likely from member to each
16  member.

17    Q.  But there are leaders in each chamber, to be
18  fair; isn't that correct?

19    A.  Yes.

20    Q.  Not -- not every single member of the House has
21  equal weight or say as to what is given legislative
22  priority; isn't that correct?

23    A.  That's correct.

24    Q.  Is it fair to say Speaker Straus has a fair
25  amount of sway on which bill is to be heard in the House

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

81

¹ legislative privilege.  And your being -- the
² legislators and their staff were required to produce
³ these documents, under the procedures I just described
⁴ earlier, which is highly confidential in discovery,
⁵ under seal submitted to the court, and the court will
⁶ rule on its admissibility at a later date.
⁷          MS. HALPERN:  And I will also note this
⁸ appears to be predecisional since it's talking points
⁹ and reasons to support something which would seem to be
¹⁰ leading to part of the decision-making process, so I'm
¹¹ going to assert that as well.
¹²          MS. WESTFALL:  I'm not sure whether in
¹³ fact -- well, I don't believe, based on the logic of the
¹⁴ judge's ruling, that this document was withheld on the
¹⁵ basis of the legislative privilege and deliberative
¹⁶ process because the judge has not issued a ruling on
¹⁷ deliberative process in this litigation.
¹⁸          MS. HALPERN:  Well --
¹⁹          MS. WESTFALL:  Therefore, you can make
²⁰ that objection.  We would take strong issue with it
²¹ because this document, which is document -- Exhibit
²² Number 155, TX00087007 through 87013 -- actually 87014,
²³ it's a double-sided document -- pertains to Mr. Hebert's
²⁴ activities for the Lieutenant Governor acting in his
²⁵ capacity as leader of the Senate in a legislative

82

¹ capacity and not in an executive capacity which would,
² perhaps, under some circumstances, give -- give rise to
³ an ability to assert deliberative process.
⁴          MS. HALPERN:  That's correct.  And I mean,
⁵ I would even have a question about whether there was
⁶ attorney-client privilege here.  I don't know the bona
⁷ fides of this document.  I mean, the pages are stapled
⁸ together but whether, for example the last page, which
⁹ is clearly a recitation of law, has been stapled to the
¹⁰ preceding page but was it in fact part of some sort of
¹¹ legal memorandum, I don't know.  But just looking at it
¹² on the face of it, you know, as -- as his lawyer, that
¹³ would give me pause that in fact it actually may have
¹⁴ been attorney-client privilege.
¹⁵          MS. WESTFALL:  Well, I will -- I will
¹⁶ direct you to the Bates numbers.  I will direct you to a
¹⁷ list of the attachments on the cover e-mail, 00087007
¹⁸ that refers to these attachments.  This communication
¹⁹ was between Mr. Hebert and Janice McCoy, who is the
²⁰ staff person for Senator Fraser, therefore, no attorney-
²¹ client.
²²          MS. HALPERN:  Well, I would agree with
²³ that assuming that -- I will agree -- I will agree with
²⁴ you that if in fact that is the case, the attorney-
²⁵ client privilege is -- is probably a question.  There

83

¹ still might be an attorney work product privilege
² though.
³          MS. WESTFALL:  Let us proceed having
⁴ designated this testimony as highly confidential.  We'll
⁵ continue to keep it highly confidential until I indicate
⁶ that the designation is to be terminated.
⁷          MS. HALPERN:  And with a running
⁸ objection.
⁹          MS. WESTFALL:  With a running objection.
¹⁰ Understood.  Thank you, Counsel.
¹¹          Q.  (By Ms. Westfall) Turning your attention back
¹² to Exhibit 155, Mr. Hebert, do you recognize this
¹³ document?
¹⁴          A.  It looks like an e-mail I sent to Janice McCoy
¹⁵ for use -- or it says, "For your use as needed," and it
¹⁶ is a series of attachments relating to talking points
¹⁷ and arguments in support of Senate Bill 362 as well as
¹⁸ some overview of various election laws and processes
¹⁹ used.
²⁰          Q.  And you just described a bunch of -- several
²¹ attachments to the e-mail to Exhibit 155.  Did you draft
²² all those attachments yourself?
²³          A.  This looks like -- my memory is that, yes, I
²⁴ drafted or at least substantially drafted these
²⁵ documents.

84

¹          Q.  Turning your attention to the date of the
²          e-mail, what is the date of the e-mail?
³          A.  March 4, 2009.
⁴          Q.  Was this e-mail sent to Ms. McCoy shortly
⁵ before the Committee of the Whole's consideration of
⁶ Senate Bill 362?
⁷          A.  I'd have to refer to the history again.  The
⁸ e-mail is from March 4th and the committee took
⁹ testimony on March 10th.  It was passed after that.  So
¹⁰ yes, I mean, it was before consideration by the Senate.
¹¹          Q.  And several days before; is that correct?
¹²          A.  Correct.
¹³          Q.  When did you draft the attachments to Exhibit
¹⁴ 155?
¹⁵          A.  I do not recall.
¹⁶          Q.  Roughly around the same time as the e-mail?
¹⁷          A.  I can't recall.  It may have been the fall
¹⁸ before session.  It may have been right before.  I can't
¹⁹ recall.
²⁰          Q.  Do you know why you drafted the attachments?
²¹          A.  For her use as needed.  Again, I think to help
²² with passage of the bill by providing outlines of
²³ relevant law and arguments to extend to opponents of the
²⁴ bill.
²⁵          Q.  Did anyone direct you to draft these

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

22 (Pages 85 to 88)

---

85

1   attachments?
2       **A.  I don't recall.  I don't think so.**
3       Q.  Did Frank Battle ask you to draft these
4   attachments?
5       **A.  I don't recall.  I don't think so.**
6       Q.  Did you usually work independently and draft
7   things that you thought would be helpful or did someone
8   usually tell you to --
9       **A.  Usually I drafted --**
10          MS. HALPERN:  Objection, asked and
11  answered.
12      Q.  (By Ms. Westfall) You may answer.
13      **A.  As it was helpful, I drafted things.**
14      Q.  Did Ms. McCoy ask you for these documents?
15      **A.  I can't recall.**
16      Q.  Did anyone -- concerning all the attachments,
17  did anyone provide you with comments or revisions on the
18  documents before you sent them to Ms. McCoy?
19      **A.  I don't recall.**
20      Q.  Did you provide these attachments to
21  Mr. Dewhurst at any time during consideration of 362?
22      **A.  Possibly.  I can't be certain but possibly.**
23      Q.  Do you recall which attachments of Exhibit 155
24  you provided and shared to Mr. Dewhurst?
25          MS. HALPERN:  I'm going direct him not to

---

86

1   answer because that would -- that would violate the
2   deliberative process privilege to the extent that this
3   is giving advice for the forming of an opinion or the
4   taking of an action.  I think it falls squarely within
5   the deliberative process --
6          THE COURT REPORTER:  You think it's
7   falls -- I'm sorry, I'm having trouble hearing you.
8          MS. HALPERN:  I said to the extent that
9   this is giving advice for the forming of an opinion, I
10  think it falls squarely within the deliberative process
11  privilege.  And also, again, depending on the context in
12  which these would have been provided to the Lieutenant
13  Governor, I -- I think it still constitutes the
14  rendering of legal advice.
15          MS. WESTFALL:  We take issue with your
16  objections to the extent that the Lieutenant Governor
17  has both executive and legislative functions, and while
18  it may be appropriate, based on the positions that the
19  legislators have taken in this case to assert
20  legislative privilege when they want to, it would be
21  impossible to assert both privileges with regard to both
22  legislative and deliberative process with regard to
23  these sets of documents.
24          MS. HALPERN:  I'm not asserting
25  legislative, I'm asserting deliberative process.

---

87

1          MS. WESTFALL:  Solely?
2          MS. HALPERN:  Deliberative process and
3   potentially attorney-client.
4          MS. WESTFALL:  Okay.  Okay.  Thank you.
5       Q.  (By Ms. Westfall) Besides Ms. McCoy, did you
6   provide any of these attachments to any of other staff
7   for any other Senators?
8       **A.  I can't recall.**
9       Q.  Did you provide them to Senator Williams' staff
10  person?
11      **A.  I don't recall.  I don't remember Senator**
12  **Williams being particularly involved but I don't know**
13  **for sure.**
14      Q.  Did you provide them to Senator Duncan's staff?
15      **A.  It's possible Jennifer Fagan, as his staff**
16  **person and Chair of State Affairs, may have seen these**
17  **but I can't recall for sure.  I mean again, it's five**
18  **years ago.**
19      Q.  Turning your attention to Texas 00087008,
20  Reasons to Support Senate Bill 362 as Filed?
21      **A.  Uh-huh.**
22      Q.  Do you see that you indicate that, "Senate Bill
23  362 should be supported because that bill is not as
24  restricted as the Indiana and Georgia ID bills"?
25      **A.  That's what it says.**

---

88

1       Q.  And can you tell me what provisions of 362 made
2   it less restrictive than the Indiana and Georgia laws?
3       **A.  Well, I think at least the fact that there were**
4   **more acceptable forms of identification.  I'm not sure**
5   **what other specifics I might have been -- I had in mind**
6   **here.**
7       Q.  It's fair to say that 362 allowed for the use
8   of non-photo ID and the Georgia and Indiana laws did
9   not; is that correct?
10      **A.  Correct.**
11      Q.  So that would be a major difference between
12  Senate Bill 362 and those other bills; is that right?
13      **A.  Correct.**
14      Q.  And do you see that in Point Number 2 of
15  Reasons to Support Senate Bill 362 as Filed, you
16  characterize Senate Bill 362 as a compromised bill?
17      **A.  That's right.  And I should say, from looking**
18  **at these and the next page, it appears again these are**
19  **statements intended to garner support for the bill.  And**
20  **so, yes, it is characterized as a compromised bill here.**
21      Q.  How -- why is it a compromised bill?
22      **A.  Well, I would say that every bill is**
23  **compromised.  In most cases, in the fact that both photo**
24  **and non-photo ID were included is probably one example.**
25      Q.  Are there any other facets of 362 that served

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1  as the basis of your argument that it was a compromise?
2      A.  Not offhand.  I can look at 362 if you'd
3  like.  And again I say compromised bill, it's, you know,
4  my impression is that provisions, additional forms of ID
5  for example, were added to the bill in an attempt to
6  garner a compromise.  But as I mentioned earlier, every
7  Democrat still voted against it.
8      Q.  How did adding forms of ID constitute a
9  compromise, in your mind?
10     A.  I mean, again, I'm -- looking at this, it's
11  possible that specific types of ID within the list were
12  suggested by other staff or constituents or Senators, I
13  can't recall the specifics, but it's likely related to
14  the forms of identification.
15     Q.  And how -- what -- how was this a compromise
16  sort of relative to what other form of the bill it could
17  have taken?
18     A.  Well, the bill, I imagine, could have taken any
19  form, and I can't recall specific early forms of the
20  bill or that it even existed in a form.  It could have
21  been discussions with people around the Capitol or
22  listening to constituents or reading the newspaper or
23  reading Crawford or looking at the other state's laws.
24  I mean it could be, again, a product of lots of
25  different forms of input.

90

1      Q.  But I guess you characterizes it as a
2  compromise.  There could have been two.  What were the
3  two sets of extremes that it was a compromise with?
4      A.  Again, I can't recall what other forms this
5  bill existed in through the process, written or not
6  written, so I'm not sure what I was referring to here
7  five years ago.
8      Q.  Do you see that in Bullet 1 you write, "There
9  is less chance of disenfranchising elderly, poor or
10  minority voters"?
11     A.  Yes, it says that.
12     Q.  And how did you determine that Senate Bill 362
13  would have that effect?
14     A.  I don't recall specific reason for
15  that.  Again, other than this document taken as whole
16  with the others are intended to be arguments in favor of
17  the bill.  And, you know, any election reform has a
18  chance of disenfranchising voters, and this is evidently
19  less chance of disenfranchising voters.
20     Q.  And what particular provisions in Senate Bill
21  362 made is less likely to disenfranchise these classes
22  of voters?
23     A.  Again, I assume it's related to the forms of
24  identification that are acceptable.
25     Q.  So is it fair to say that given that it allowed

91

1  for the use of non-photo ID, that would make it less
2  likely to disenfranchise these classes of voters?
3          MS. HALPERN:  Objection, calls for
4  speculation.
5      Q.  (By Ms. Westfall) You may answer.
6      A.  It's possible.  Again, looking at Crawford, you
7  know, the court allowed that forms of voter reform will
8  often disenfranchise some voters and, you know, if it's
9  some minimal number or negligible number, then that
10  might be okay if there are other benefits to the law.
11     Q.  Turning your attention back to what you wrote
12  about Senate Bill 362, is it fair to say that you were
13  referring to the use of non-photo ID made it -- the bill
14  less likely that it would disenfranchise these forms of
15  -- these classes of voters?
16     A.  I can't be sure.  I know there are more forms
17  of ID certainly as compared to the current law, but I
18  don't know if I was specifically referring to photo or
19  non-photo.  And again, it says at less than a chance.
20  It doesn't -- I don't think it acknowledges that people
21  will be disenfranchised.  It acknowledges the chance of
22  disenfranchisement is some percentage less under this
23  bill.
24     Q.  Is it -- were you intending to suggest there
25  was less of a chance of disenfranchising elderly, poor

92

1  or minority voters relative to hard-photo ID bills than
2  would only permit the use of photo ID?
3      A.  I don't recall what I was drawing comparison
4  to.  Different forms of bills is all I can say.
5      Q.  So you, sitting here today, you can't tell sort
6  of what type of bill this was relative to that you were
7  referring to in Point 1?
8      A.  Presumably it refers to a bill with fewer forms
9  of acceptable identification but I don't know the sorts
10  or I'm not sure exactly what I had in mind at the time.
11  And it may have even been that there were other bills
12  filed that session that I was referring to, and I don't
13  have those other bills.
14     I mean, I know throughout this process of
15  voter ID over the last however many years it's been,
16  there have been people who want this law to go away and
17  there have been people who think this law is not
18  restrictive enough.  It may have been a reference to
19  those people -- or bills filed by those people as
20  legislators.
21     Q.  Is it fair to say that without the provision
22  allowing use of non-photo ID in Senate Bill 362, that it
23  would increase the likelihood of disenfranchisement for
24  these groups?
25          MS. HALPERN:  Objection, calls for

BRYAN HEBERT                                         6/17/2014
CONFIDENTIAL TRANSCRIPT

24  (Pages 93 to 96)

93

1   speculation.
2       Q.  (By Ms. Westfall) You may answer.
3       A.  It's possible.
4       Q.  And that's what you were suggesting in the
5   talking point; is that correct?
6       A.  Again, I'm not sure what else I was comparing
7   it to.  I can't remember what other specific or general
8   alternatives I was referring to when I say less of a
9   chance.  It's also possible I was, you know, giving, you
10  know, sort of best case scenarios to the staff to help
11  increase passage of the bill.
12      Q.  But is it fair to say that you had a good faith
13  basis and believed the talking points that you were
14  writing here --
15      A.  I would never encourage someone to lie.  And
16  yeah, I think it's fair to say that this is my good
17  faith understanding of what this bill does and does not
18  do.  Again, I just can't remember what else might have
19  been in the -- before the legislature.  There may have
20  been, you know, bills that were a bit more restrictive
21  and that may have been what I was referring to.
22      Q.  Did you believe that arguing that Senate Bill
23  362 would not disenfranchise elderly, poor or minority
24  voters would generate support for the bill?
25      A.  Yes.  I don't think anyone in the legislature

94

1   has an interest in disenfranchising elderly, poor or
2   minority voters.
3       Q.  Why do you think that argument needed to be
4   made?
5       A.  I don't know.  I think it's just sort of belt
6   and suspenders reminding people that this bill will not
7   have that effect.
8       Q.  And is fair to say that at the time you wrote
9   these reasons to support Senate Bill 362, that you were
10  aware of concerns -- there were concerns out there that
11  the bill would adversely impact these groups?
12      A.  Oh, sure.  I mean we knew, you know, Democrats
13  in particular opposed this bill before they cast their
14  vote, that's true.
15      Q.  Why did you write that, in Bullet 5, that
16  allowing many forms of ID would increase the chance of
17  federal preclearance?
18      A.  I think because it was true.  I mean, the
19  history of preclearance cases on voter ID showed us, you
20  know, that the more forms of ID were -- that were
21  permitable, permissible, the greater the chances of
22  preclearance.  It doesn't mean they were necessary to
23  get preclearance, but I think it's fair to say they
24  increased the chances.
25      Q.  And did you write that bullet point because you

95

1   believed that allowing more forms of ID would decrease
2   the bill's discriminary impact on voters?
3       A.  Would you repeat?
4       Q.  Did you write this bullet about preclearance
5   because you believed that allowing more forms of ID
6   would decrease the bill's discriminary impact on
7   voters?
8       A.  I believe that this bill, what it says,
9   increases the chances of preclearance because it had --
10  because of the list of acceptable ID in the bill.
11      Q.  And the preclearance standard is what?
12      A.  It was -- under Section 5, preclearance was
13  that there was -- the State has the burden or the
14  jurisdiction has the burden of proving that there's no
15  discriminary impact or effect on minority populations.
16      Q.  And here you wrote that Senate Bill 362 is
17  something that should be supported because it increases
18  chance of federal preclearance because many forms of ID
19  are acceptable; is that right?
20      A.  Right.  And again, I don't remember what other
21  alternative bills might have been proposed by other
22  members of the legislature.
23      Q.  But certainly Senate Bill 362 was not as
24  restrictive as a quote, unquote, hard-photo only Voter
25  ID bill, correct?

96

1       A.  It was not as restrictive and it was not as
2   secure either.
3       Q.  But it was -- it definitely allowed a broader
4   range --
5       A.  Yes.
6       Q.  -- of ID including non-photo ID?
7       A.  Yes.
8       Q.  And in your view and you were advocating to
9   Ms. McCoy, that a reason to support it was this broad
10  set of forms of ID could increase the chances of
11  preclearance under Section 5; is that right?
12          MS. HALPERN:  Object to the form, assumes
13  facts not in evidence.
14      Q.  (By Ms. Westfall) You may answer.
15      A.  I think the point of this document and some of
16  the following documents are for supporters of the bill
17  in speaking to opponents of the bill to give them things
18  to use to garner more support.
19      Q.  You also allude to the provisional ballot
20  procedure in Bullet 5 and you write, "Provisional ballot
21  procedure is less burdensome."  What did you mean by
22  that?
23      A.  I do not know.
24      Q.  Is it less burdensome because the voter did
25  not, after the election, have to appear -- if the voter

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

97

1  cast a provisional ballot, the voter would not have to
2  go back to the election office to show ID?
3       A.  It's possible.
4       Q.  And under the Indiana and Georgia laws, the
5  voter would have to come back and show ID if casting a
6  provisional ballot; is that correct?
7       A.  I think that's correct.
8       Q.  So relative to Indiana and Georgia, Senate Bill
9  362 was less burdensome on voters as to provisional
10 ballots; is that correct?
11      A.  I think that's fair.  Again, if I could just
12 clarify again:  Yes, burdensome.  In the earlier
13 deposition you used the word "lenient."  You know, it
14 depends on the eye of the beholder, I suppose.  But yes,
15 that's generally correct.
16      Q.  Turn your attention to the talking points at
17 Texas 00087009.  In the second bullet point about
18 protecting Texas voters, was it your view that Senate
19 Bill 362 would accomplish all these goals listed?  The
20 five bullets underneath Roman II.
21      A.  I hope I believed it would, yes.  My memory is
22 that yes, it would in fact.  Yes, the threat of fraud is
23 real.  Yes, this bill protects Texas voters.  And that
24 it attempted some -- it represented some attempt at a
25 compromise.  Sure.

98

1       Q.  But you're -- you were arguing that the Senate
2  Bill 362 would accomplish the goals in Roman II; is that
3  correct?
4       A.  Yes.
5       Q.  And in other words, Senate Bill 362, which
6  allowed for the use of photo and non-photo ID, would
7  accomplish these five goals, correct, under Roman II?
8       A.  Correct.  It doesn't say that this is the only
9  bill that will protect Texas voters, but yes, it does
10 say this bill will protect Texas voters.
11      Q.  We talked a little bit about the provisional
12 ballot process under Senate Bill 362.  It would not
13 alter the status quo --
14      A.  I believe --
15      Q.  -- of provisional ballot processing, to the
16 best of your recollection?
17      A.  I believe that's correct.
18      Q.  Under Senate Bill 362, voters without
19 qualifying ID could cast a provisional ballot; isn't
20 that right?
21      A.  Yes.  As they can today.
22      Q.  And the County Ballot Board would then check
23 their records and look at the ballot envelope and
24 determine whether to count based on their own review of
25 records of that ballot; is that correct?

99

1       A.  I believe that's correct.
2       Q.  The provisional ballot voter would not be
3  required to appear at the County election office; is
4  that right?
5       A.  That's correct.
6       Q.  And under Senate Bill 14, a voter without
7  requisite ID on election day would cast a provisional
8  ballot and then need to return to the election office
9  with qualifying ID in order for their ballot to be
10 counted; is that correct?
11      A.  If the reason for the provisional ballot is
12 that they did not have acceptable ID, then yes, they
13 have the opportunity to go confirm that after the voting
14 on election day.
15      Q.  And indeed, if they did not confirm, that their
16 ballot would not be counted?
17      A.  I believe that's correct.
18      Q.  Turning your attention now to Texas 00087011.
19      A.  Okay.
20      Q.  Actually strike that.
21          Turning your attention to 00087014, the
22 last page of Exhibit 155, Process for Obtaining a Texas
23 Birth Certificate.  When Senate Bill 362 was under
24 consideration, did you consider the cost of obtaining
25 photo IDs required under that law -- bill?

100

1       A.  Looking at this page, it is clear that I
2  considered it.  Again, I was not a bill sponsor.
3       Q.  Did you -- or your office conduct research on
4  the cost of documents like birth certificates required
5  to obtain an ID?
6       A.  I don't recall.
7       Q.  Does looking at Texas 00087014 refresh your
8  recollection as to whether you undertook or someone in
9  your office undertook research on the cost of birth
10 certificates in Texas?
11      A.  It's clear from this document that birth
12 certificates were considered.  Each of the 1, 2, 3 and 4
13 on that page mention birth certificates.  I can't recall
14 if I -- I would have been the one that did it, likely,
15 and I can't remember if I looked specifically at cost or
16 if I looked at birth certificates generally.
17      Q.  Do you know why you focused on the cost of
18 birth certificates?
19      A.  I don't know that I focused on the cost of
20 birth certificates.  I think I looked at the
21 availability of birth certificates, looking at this
22 document.
23      Q.  Do you know why you looked at the availability
24 of birth certificates as opposed to other forms of
25 identification?

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

---

101

1    A.  I think likely that birth -- I mean, I think
2  birth certificates are one of the more common methods of
3  obtaining other types of identification and so I looked
4  into how one goes about getting copies of birth
5  certificates.
6    Q.  And does this document here, Process for
7  Getting Copy Of Texas Birth Certificate, indicate that
8  it will cost $22 at least to get a birth certificate?
9    A.  That's what I put as of 2009.  That was -- I
10  assume -- I hope I got that correct.
11    Q.  And that to get a birth certificate for $22 as
12  opposed to 43 or 38, the applicant would have to appear
13  in person at Vital Statistics or another site or have
14  access to the Internet?
15    A.  To pay the $22, they would have to appear in
16  person or have access to the Internet, as you could get
17  at most any library, including in 2009.
18    Q.  At the time SB 362 was under consideration, was
19  Janice McCoy also focused on the issue of the cost of
20  obtaining a birth certificate?
21    A.  I don't know what Janice was focused on.
22    Q.  Did you -- do you recall any conversations with
23  her about that?
24    A.  I don't recall, but I sent her this.  So if she
25  wasn't before, then presumably she was aware after.

---

102

1      MS. HALPERN:  Counsel, we've been going
2  another hour and I need a break.
3      MS. WESTFALL:  Okay.  Certainly.  Let's
4  take a break.  I'm done with the document.  Let's take a
5  break.
6      (Recess 11:26 a.m. to 11:39 a.m.)
7    Q.  (By Ms. Westfall)  Okay.  We were -- you were
8  last discussing testifying about Exhibit Number 155,
9  which had been your testimony about that document had
10  been designated as highly confidential.  I want to
11  terminate or suspend that designation now, because I
12  want to ask you questions that don't pertain to that
13  document or other documents that have been designated as
14  highly confidential.
15    A.  Okay.
16    Q.  I believe you testified that Todd Smith was the
17  house sponsor of Senate Bill 362 in 2009?
18    A.  Correct.
19    Q.  And who was the House sponsor of Senate Bill
20  14?
21    A.  I believe it was Representative Harless.  There
22  may have been additional sponsors.
23    Q.  Do you recall that Representative Debbie Riddle
24  had strong interest in voter ID?
25    A.  I know that she has always had an interest in

---

103

1  voter ID.
2    Q.  And has it been across several legislative
3  sessions that she's held this interest?
4    A.  I think that's correct.
5    Q.  Do you know why Ms. Riddle was not selected to
6  carry either Senate Bill 14 or Senate Bill 362 in the
7  House?
8    A.  I don't know.  That's a decision that's made in
9  the House.
10    Q.  Do you know whether it has anything to do with
11  anything that she has said publicly related to
12  immigration?
13    A.  I don't know.
14    Q.  Was Senate Bill 14 filed in November 2010 in
15  the Senate?
16    A.  I don't recall when it was filed.
17      MS. WESTFALL:  Could you mark this 156?
18      (Exhibit 156 marked for identification.)
19      MS. WESTFALL:  I'm going to designate this
20  portion of the deposition as highly confidential because
21  we are -- I'm again going to use a document that has
22  been produced that has been designated as highly
23  confidential.
24    Q.  (By Ms. Westfall)  Mr. Hebert --
25      (Brief discussion off the record.)

---

104

1    Q.  (By Ms. Westfall)  So you've been handed what's
2  been marked as 156.  Do you recognize what this document
3  is?
4    A.  It looks like an e-mail from Janice McCoy to
5  various Senate staff with an attachment of a draft of
6  voter ID bill.
7      MS. WESTFALL:  For the record, Exhibit
8  Number 156 is Texas 00090532 through Texas 00090543.
9    Q.  (By Ms. Westfall)  Do you see that you were
10  copied on the e-mail?
11    A.  Yes.
12    Q.  Do you see the date of the e-mail?
13    A.  Well, it's two e-mails.  The first one,
14  November 8th, and the second on November 9th.
15    Q.  Did you know before you received this e-mail
16  that Senator Fraser would be filing a Voter ID bill?
17    A.  My memory is that he had -- or his staff had
18  already expressed an interest in refiling Voter ID
19  legislation.
20    Q.  Senator Fraser had been the sponsor of Senate
21  Bill 362; is that correct?
22    A.  Correct.
23    Q.  And you knew in advance of this date, November
24  2010, that he would be refiling a Voter ID bill; is that
25  right?

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

27 (Pages 105 to 108)

---

105

1      A.  Yes.
2          MR. WHITLEY:  Ms. Westfall, very quickly,
3  and I'm sorry for interrupting.  Is this -- and I may
4  have misheard.  Is this portion of the testimony also
5  designated --
6          MS. WESTFALL:  Yes.
7          MR. WHITLEY:  -- as highly confidential?
8          MS. WESTFALL:  I -- I hope I designated it
9  as highly confidential.
10         MR. WHITLEY:  And this is a document that
11 was produced pursuant to the protective order?
12         MS. WESTFALL:  Yes.
13         MR. WHITLEY:  And it was produced as
14 production from the last case pursuant to the court's
15 order to produce those documents from the last case?
16         MS. WESTFALL:  Yes.
17         MR. WHITLEY:  So the defendants are to
18 going have the same objection about this document as we
19 did before.
20         MS. WESTFALL:  Yes.
21         MR. WHITLEY:  Okay.
22         MS. WESTFALL:  Thank you.
23     Q.  (By Ms. Westfall)  So originally, as indicated
24 in the subject line, the Voter ID bill he filed in
25 November 2010 received a bill number of Senate Bill 178;

---

106

1  is that right?
2      A.  I'm not sure.  I guess so.  According to this
3  e-mail, yes.
4      Q.  And the bill number was later changed to Senate
5  Bill 14; is that correct?
6      A.  Correct.  Again, I'm not sure that it's the
7  exact same bill, but that might be correct.
8      Q.  Assuming it is the same bill, do you know why
9  the change in numbering was made?
10     A.  I don't know.  Typically, low bill numbers are
11 priorities of the Lieutenant Governor and the Senate.
12     Q.  Do you know whether Senator Fraser was asked to
13 refile so that he could be designated with a low bill
14 number?
15     A.  I don't know.
16     Q.  Do you know whether Mr. Dewhurst asked him to
17 do that?
18     A.  I don't know.
19     Q.  Do you see that the e-mail, the second e-mail
20 dated November 8th on Page 90532, alludes to a
21 discussion with the Lieutenant Governor's office --
22     A.  Yes.
23     Q.  -- in Paragraph 2?
24     A.  (Witness nods head yes.)
25     Q.  Were you part of that meeting?

---

107

1      A.  I might have been.  I cannot recall the
2  specifics of the meeting.
3      Q.  Do you see -- could you review that paragraph
4  starting, "After late discussion with Lieutenant
5  Governor's office," and let me know when you're done?
6      A.  Okay.
7      Q.  Could you indicate in your own words what it
8  describes?
9      A.  That someone, in looking at it now, it probably
10 was me, suggested that having voter registration fraud
11 provisions and a voter identification bill might present
12 a two-subject problem, which is a parliamentary --
13 or constitutional restriction that any one bill can only
14 contain one subject.
15     Q.  So was it your advice and recommendation that
16 Section 18 be removed from the bill?
17     A.  I assume it was my recommendation.
18     Q.  Could you refer me to the constitutional
19 provision that creates the two-subject rule?
20     A.  I don't know the number.
21     Q.  And again, Section 18 of this previous
22 iteration of the bill would have violated the
23 two-subject rule for what reason?
24     A.  It's possible that if a bill contained both
25 requirements for acceptable Voter ID voting at polls and

---

108

1  provisions relating to punishment of voter registration
2  fraud, that a House parliamentary or a Senate
3  parliamentary or a court after the fact could decide
4  that those two things were not one subject.  And to, you
5  know, to avoid that concern, it was probably safer to
6  remove that provision.
7      Q.  Do you know whether any other changes were made
8  to the draft besides the one you just testified to as a
9  result of your meeting with Ms. McCoy?
10     A.  I don't recall.
11     Q.  Turning to the bill itself --
12     A.  Can I?
13     Q.  Go ahead.
14     A.  To clarify, I don't know that if it was even a
15 meeting.  It says a discussion.  It may have been a
16 phone call.
17     Q.  Do you recall whether any other changes to the
18 bill occurred during that discussion?
19     A.  I don't recall.
20     Q.  Turning to the bill attached to Exhibit 156, it
21 appears -- if you could take a look at the bill, that
22 there was no exemption from the ID requirements for
23 voters over the age of 70; is that correct?
24     A.  I do not see an exemption.
25         MS. WESTFALL:  Could you mark this

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

---

109

1  document as Exhibit 157?
2          (Exhibit 157 marked for identification.)
3      Q.  (By Ms. Westfall)  You've been handed what's
4  been marked as Exhibit 157.  Do you recognize this
5  document?
6      A.  It's an e-mail from myself to a Senate staffer
7  relating to Voter ID bill.
8      Q.  Preliminary question:  Why did you copy
9  yourself, Bryan Hebert to Bryan Hebert, this e-mail?
10      A.  It's possible I did that just as a sort of
11  bookkeeping for myself to put it into one folder in my
12  archive system.  But you can see at the bottom it's got
13  my deputy general counsel signature, which would only
14  have come from my state account.
15      Q.  Thank you.  Who is Noe Barrios?
16      A.  Noe Barrios is I believe now chief of staff for
17  Senator Estes.  I'm not sure what his title was in 2011.
18      Q.  What is the party affiliation of Senator Estes?
19      A.  He's a Republican.
20      Q.  What were the concerns about SB 14's compliance
21  with the Voting Rights Act that are expressed by
22  Mr. Barrios?
23      A.  I don't know.  It says here that -- it looks
24  like Blaine Brunson, the chief of staff for the
25  Lieutenant Governor, had a conversation with Senator

---

110

1  Estes, and in that conversation concerns were raised.  I
2  don't recall the specific -- of whether Blaine relayed
3  the specifics of those concerns or whether he just said
4  Senator Estes wants to make sure this passes and is
5  precleared.
6      Q.  So you provided information about Crawford and
7  the Indiana law in response to these concerns, correct?
8      A.  That looks to be correct.
9      Q.  Why did you provide information about Indiana's
10  photo ID law in response to concerns about Senate Bill
11  14 under the Voting Rights Act?
12      A.  I think it was -- looks like it was a separate
13  point, I said, you know, the good news is that U.S.
14  Supreme Court has upheld a similar law in Indiana, and I
15  don't believe -- you know, I think the Crawford decision
16  is relevant to the discussion of whether Voter ID laws
17  will be upheld.  It's not a preclearance process, but it
18  is relevant.
19      Q.  And Crawford would be relevant to
20  constitutional challenges against Voter ID; is that
21  correct?
22      A.  Correct.
23      Q.  But Crawford is not -- doesn't -- Crawford was
24  not a statutory.
25      A.  It's not a Section 5 ruling.

---

111

1      Q.  So how did you believe that discussing the
2  Crawford case would be responsive to the concerns of
3  Mr. Barrios and his boss?
4      A.  I don't remember for sure today.  I would say
5  that if the Supreme Court approved an election change or
6  election program in a state, that certainly better
7  than if they did not approve it in terms of whether it
8  would pass preclearance.
9      Q.  So in measures required to offset burdens on
10  voters, do you see that at Roman II?
11      A.  Yes.
12      Q.  You mentioned availability of provisional
13  ballots and absentee ballots, correct?
14      A.  Correct.
15      Q.  And under Senate Bill 14, if a voter casts
16  provisional ballot, that voter for -- for not -- for
17  lack of acceptable photo ID, the voter would have to
18  return with acceptable photo ID in order for that ballot
19  to be counted, correct?
20      A.  Correct.
21      Q.  So how does the availability of provisional
22  ballots under Senate Bill 14 offset burden to voters?
23      A.  Because the voter is not turned away outright.
24  If they show up at the polls with no ID, they're not
25  just told too bad.  They're allowed to cast a

---

112

1  provisional ballot, and they're further given an
2  opportunity to appear with acceptable ID and have that
3  the ballot counted.
4      Q.  So under -- are you familiar with the Help
5  America Vote Act?
6      A.  Yes.
7      Q.  And doesn't the Help America Vote Act require
8  that no voter, under any circumstance, can be turned
9  away from the polls and is permitted to vote a
10  provisional ballot?
11      A.  I'll take your word for it.
12      Q.  So how does -- assuming that to be the case,
13  how does Senate Bill 14 offset burden to voters if it's
14  already provided for in federal law?
15      A.  I assume by -- at least by providing a clear
16  mechanism and by ensuring that the secure measures in
17  place at the polls are continued through the provisional
18  ballot process and providing guidance through election
19  workers and election clerks on how to handle such
20  requests so that they're not mishandled.
21      Q.  And on -- where you have Roman III, measures
22  recommended to offset burdens on voters, you mention an
23  exception for certain elderly voters.  Why did you raise
24  the issue of elderly voters in response to concerns
25  about the Voting Rights Act?

---

BRYAN HEBERT                                               6/17/2014
CONFIDENTIAL TRANSCRIPT

29 (Pages 113 to 116)

---

113

1    A.  I can't recall.
2    Q.  And elderly voters are not the protected class
3  of voters that are at issue in the Voting Rights Act,
4  correct?
5    A.  Correct.  Although, again, if I'm referencing
6  constitutional law, making sure all classes of voters
7  are treated the same way would increase the chances of
8  success before a court.
9    Q.  So it's more of an equal protection concern and
10 less of a Voting Rights Act concern; is that correct?
11   A.  Possibly.
12   Q.  Insofar as -- well, okay.  Did Mr. Barrios
13 respond to your e-mail?
14   A.  I don't recall.
15       MS. WESTFALL:  I'm going to terminate the
16 highly confidential designation right now.
17   Q.  (By Ms. Westfall)  Did you hear of any other
18 concerns about Senate Bill 14's compliance with the
19 Voting Rights Act at this period in time?
20   A.  In --
21       MS. HALPERN:  Objection, vague.
22   A.  In January of 2011, we would have been in
23 session, and I assume I did hear objections from
24 opponents of the bill.
25   Q.  (By Ms. Westfall)  Were there any concerns

---

114

1  about SB 14's compliance with the Voting Rights Act from
2  senators who later voted for the bill?
3    A.  I don't recall.  It's three years ago.
4    Q.  Governor Perry designated the issue of Voter ID
5  as emergency legislation, correct?
6    A.  I think that's correct.
7    Q.  And you had a conversation with Janice McCoy
8  about the designation of Voter ID as emergency
9  legislation, correct?
10   A.  I may have.  I don't remember specific
11 conversation about that designation.  Certainly after
12 the fact we would have talked about it.
13   Q.  But you don't recall what was said at that
14 conversation?
15   A.  I don't recall.
16   Q.  Just the existence of the conversation?
17   A.  I'm not even sure that we actually had that
18 conversation.  I would not be surprised if we talked
19 about the emergency designation after it happened.
20   Q.  I'll represent to you that in your prior
21 deposition you testified to the existence of a
22 conversation --
23   A.  Okay.
24   Q.  -- with Ms. McCoy about the emergency
25 designation.

---

115

1    A.  Sure.
2    Q.  And sitting here today, do you recall anything
3  about that conversation?
4    A.  I don't.  It's three years ago, two years since
5  my last deposition.
6        MS. WESTFALL:  Counsel, let's go off the
7  record for a second.
8        (Brief discussion off the record.)
9        (Exhibit 158 marked for identification.)
10   Q.  (By Ms. Westfall)  You've been handed what's
11 been marked as Exhibit 158.  It is TX0003456.
12       MS. HALPERN:  Counsel, if you don't mind
13 some unsolicited advice, let me suggest that rather than
14 discussing the contents of this, which would require you
15 to make this portion of the deposition confidential,
16 without describing it, why don't you just ask him if
17 he --
18       MS. WESTFALL:  Sure.
19   Q.  (By Ms. Westfall)  Do you know what this is?
20   A.  It looks like talking points for DHD, which
21 would be David Dewhurst, Call to Members Voter ID
22 Timeline and Procedures.
23   Q.  Did you draft this?
24   A.  I don't think I did.
25   Q.  Okay.

---

116

1    A.  And I -- I don't remember drafting it for sure,
2  but just as a practical matter, the ID in the first
3  line, I would never have done it lower case.
4    Q.  Fair point.
5    A.  And this also seems more sort of personal in
6  nature.  It's not the style I would have written in
7  either.
8    Q.  Do you know whether -- putting aside document 1
9  -- the Exhibit 158, do you know whether Mr. Dewhurst
10 called all members about consideration of Senate Bill
11 14?
12   A.  I don't recall.  I don't -- I don't remember
13 any firsthand knowledge for sure.
14   Q.  Do you have any idea who drafted this document?
15   A.  I don't.
16   Q.  Do you think Mr. Dewhurst himself drafted this
17 document?
18   A.  I don't know.
19   Q.  Would Frank Battle or Julia Rathgeber or Blaine
20 Brunson had drafted this document?
21   A.  In 2011, Frank Battle would have been -- let's
22 see if I remember -- I don't know.  I don't know.  It
23 could have been any of them.  It could have been the
24 Lieutenant Governor himself, but that seems unlikely.
25   Q.  Do you know why Mr. Dewhurst would have

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

117

1  indicated to members that he wanted to move this bill,
2  that is Senate Bill 14, as expeditiously as possible?
3      A.  I don't know.  Considering that Governor Perry
4  designated it an emergency, that might be one reason.
5      Q.  Do you know why he would have wanted to get
6  consideration of Voter ID out of the way before
7  considering some of the other issues mentioned in this
8  document such as budget, imminent domain, border
9  security and, quote, "other pressing issues," end quote?
10     A.  Again --
11         MS. HALPERN:  Objection, calls for
12  speculation.
13     A.  I don't know.  Again, I would guess that since
14  the Governor considered it an emergency, that that means
15  it warranted some attention.
16     Q.  (By Ms. Westfall)  Do you see that these
17  talking points indicate at Exhibit 158 that the Senate
18  would meet the following week as long as it took to get
19  Voter ID done, in essence?
20     A.  Yes.
21     Q.  Do you know why those steps were taken with
22  regard to this bill?
23     A.  I don't know.
24     Q.  Do you know why, other than what you just
25  testified to in terms of emergency designation, it was

---

118

1  moved so expeditiously through the Senate?
2      A.  I don't know.  Again, I could guess that given
3  the vocal opposition from Democrats, that he expected a
4  fight.  And as I said earlier, the earlier in the
5  process you start on controversial or contentious bills,
6  the better, in terms of getting it passed.  It may have
7  been some other reason.  Maybe the Speaker requested it
8  or maybe the Governor requested it.  I don't know.
9      Q.  Are you aware of other kind of substantive
10  bills that were pushed through the first week of session
11  in the January, to your knowledge?
12     A.  I don't recall what else might have been an
13  emergency.  The Senate rules and the Legislature's rules
14  prohibit consideration of certain types of bills during
15  certain points in the Senate.  It may have been that
16  this was the only bill we could consider that early in
17  session.  I don't know.  And I don't know when this was
18  drafted exactly either.
19     Q.  Putting aside 2011, since you were in the
20  Senate working as a staff person since 2007; is that
21  correct, 2007?
22     A.  Sadly, yes.
23     Q.  Are you aware of any other substantive bills
24  that were pushed through the Senate in the first week of
25  session in January?

---

119

1      A.  My memory is there have been a number of
2  emergency issues over those years.  I cannot recall
3  which specific bills were passed during the first week
4  or the first month or the first 60 days of session.
5      Q.  Do you know what subject matter they were?
6      A.  You know, I can't remember.  I know -- I should
7  know, but I know there have been a number of them that
8  have been emergencies, but I can't remember.  And I
9  should also say that it's possible for the Senate to
10  vote to suspend those rules to do so, and I can't
11  remember if that has happened or not.
12     Q.  Do you see in terms of the date of this
13  document that it starts off, "Today Governor Perry
14  designated Voter ID as an emergency"?
15     A.  Yes.
16     Q.  Does that suggest to you a certain date when
17  this document was drafted?
18     A.  Probably the date that the designation was
19  made.  I don't know when this was distributed or when he
20  might have met with the senators as indicated here.
21     Q.  Do you recall that Governor Perry designated
22  Voter ID as an emergency on January 20 of 2011?
23     A.  I don't recall the date, but I assume that's
24  correct.
25     Q.  Would it be in the legislative history on

---

120

1  Senate Bill 14 or no?
2      A.  The emergency designation, I don't believe
3  would be.  It would be a proclamation from the
4  Governor's office and would likely have been read on the
5  floor of the Senate and therefore be in the Senate
6  Journal.
7      Q.  Do you see that on document Exhibit Number 158,
8  it indicates that it would be in the Senate's best
9  interest to complete work on Voter ID before focusing on
10  these other issues listed?
11     A.  Yes.
12     Q.  Four paragraphs down.
13     A.  It says that --
14         MS. HALPERN:  I'm sorry.  I should have
15  interposed a running objection, and I apologize.  I said
16  it was okay for you to ask him if he authored it.  He
17  says he didn't.  And now we have a whole line of
18  continuing questions about this highly confidential
19  document.  So with your indulgence, because I think
20  we're having bilateral cooperation here, I want to go
21  back and assert a running objection starting from every
22  question after he says he didn't author this.
23         MS. WESTFALL:  Certainly.  Certainly.
24     Q.  (By Ms. Westfall)  Are you aware of any facts,
25  factual support, need for such prompt and expeditious

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

121

1  consideration of Senate Bill 14 before other legislative
2  priorities?
3      A.  I'm not sure what the Governor considered in
4  making the designation.
5      Q.  But the sole -- your sole -- your testimony is
6  that it was solely -- your understanding was it was the
7  Governor's designation of this bill as an emergency is
8  the sole factual support for why it was pushed so
9  expeditiously in the Senate in January --
10         MS. HALPERN:  Objection.
11     Q.  (By Ms. Westfall)  -- is that correct?
12         MS. HALPERN:  Assumes facts not in
13  evidence.
14     Q.  (By Ms. Westfall)  You may answer.
15     A.  I don't know is the short answer.  I know this
16  was a priority of Lieutenant Governor Dewhurst and of
17  many senators.  And it was clearly deemed an emergency
18  by the Governor.  And all that together seems enough to
19  call expeditious -- expediting the process.
20     Q.  Other than what you just testified to, there
21  are no other facts that warranted such prompt
22  consideration of Senate Bill 14; is that right?
23     A.  Again, the same that I mentioned earlier, the
24  desire to actually have it passed this time.  This was
25  now the third or fourth or fifth session that it had

122

1  been attempted to be passed.  And on multiple occasions,
2  had run out of time or procedural obstacles had been
3  placed in its way that stopped it.  So if nothing else,
4  to get it done.
5         MS. WESTFALL:  I'm going to terminate the
6  highly confidential designation right now.
7         MS. HALPERN:  When do you plan to stop for
8  lunch?
9         MS. WESTFALL:  I'm open.
10        MS. HALPERN:  Well, I'm assuming you've
11  got hours and hours to go before you sleep?
12        MS. WESTFALL:  I have hours and hours to
13  go before I sleep.  I have -- I have a bunch of short
14  exhibits to go through, so we're going to be here all
15  day as you -- it's 12 noon.
16        MS. HALPERN:  What do you want to do?
17        MS. WESTFALL:  I'm open.
18        THE WITNESS:  Maybe another half hour and
19  then break?
20        MS. WESTFALL:  Okay.  12:30 is a good time
21  for lunch.  Okay.  I'm going to -- could you please mark
22  this?
23        (Exhibit 159 marked for identification.)
24     Q.  (By Ms. Westfall)  You've just been handed
25  what's been marked as 159.  Do you recognize this

123

1  document?
2      A.  It looks like a press release from the
3  Lieutenant Governor's office.
4      Q.  What is it concerning?
5      A.  The Governor Perry emergency call.
6      Q.  Do you see the date of the release?
7      A.  Yes.
8      Q.  What is the date?
9      A.  January 20, 2010.
10     Q.  And when was this -- what does it refer to in
11  terms of when the emergency designation was made?
12     A.  "Today."
13     Q.  So, therefore, the emergency designation was
14  January 20th; is that correct?
15     A.  I assume that's true.
16     Q.  Do you see that -- turning your attention to
17  the last paragraph of this release, do you see that it
18  refers to the need to protect one man, one vote?
19     A.  It says, "One person, one vote," yes.
20     Q.  One person, one vote.  Do you know what was
21  meant by that?
22     A.  I mean, I just -- generally that each vote
23  shall count if cast by an eligible voter and not be
24  offset by a vote cast by an ineligible voter.
25     Q.  Was there a threat to the principle of one

124

1  person, one vote, that Voter ID was intended to remedy?
2      A.  Yes.
3      Q.  Can you explain that?
4      A.  In my judgment, as I just said, if an eligible
5  voter casts a vote, that vote is counted.  If an
6  ineligible voter casts a fraudulent vote, that has the
7  effect of eliminating or offsetting an eligible vote,
8  and therefore, is a threat to the principle of one
9  person, one vote.
10     Q.  And what was the basis for the need of ensuring
11  one person, one vote through Voter ID, other than what
12  you've just testified to?
13     A.  I think that's enough.  I think there's lots of
14  --
15     Q.  Principle.
16     A.  There are lots of ways to protect that
17  principle in Voter ID.  This Voter ID legislation was
18  one.
19     Q.  And do you see it alludes to uphold the
20  integrity of elections?
21     A.  Yes.
22     Q.  Why was there a need to uphold the integrity of
23  elections through Voter ID?
24     A.  Again, I think accounts of various types of
25  fraud have been well-documented in Texas and other

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

125

1   jurisdictions, and this attempt to decrease that fraud
2   has the effect of upholding the integrity of our
3   elections so that you can be sure that the person who
4   got the most eligible votes is the person that was
5   elected.
6         Q.   Were there indications that existing Voter ID
7   law in Texas had failed to protect the integrity of the
8   elections?
9         A.   I'm sure there were examples that I --
10  specifics of which escape me now, but yes, like I said,
11  there's been examples of fraud throughout Texas's
12  history.  This was one -- intended to be one step
13  towards curbing that fraud and curbing fraud in general.
14        Q.   And by voter fraud, you mean voter fraud
15  generally and not limited to in-person voter
16  impersonation; is that correct?
17        A.   This voter -- SB 14, as I saw it,
18  was intended to stop in-person voter fraud, but as I
19  discussed earlier, I think the potential impact of that
20  is much broader.
21             MS. WESTFALL:  Can you mark this?
22             (Exhibit 160 marked for identification.)
23        Q.   (By Ms. Westfall)  You've been handed what's
24  been marked as Exhibit 160.  Do you recognize this
25  document?

126

1         A.   It is a letter to Senator Birdwell, and my
2   recollection is that every senator got a similar letter
3   stating Lieutenant Governor Dewhurst's intent to
4   recognize Senator Duncan, to resolve the Senate into
5   Committee of the Whole to consider SB 14 relating to
6   Voter ID, to appoint Senator Duncan as chair of that
7   committee, and then some other time line procedural
8   issues.
9         Q.   Did you draft this letter?
10        A.   No.
11        Q.   Who drafted this letter?
12        A.   I don't know.
13        Q.   What did the initials at the bottom mean?
14        A.   DD would likely be David Dewhurst, and EG would
15  likely be Elaine Gonzalez, his assistant.
16        Q.   Why did Senator Duncan make a motion to resolve
17  the Senate to the Committee of the Whole?
18        A.   I don't know why he did what he did.
19  Procedurally, a senator has to make the motion to
20  resolve it into a Committee of the Whole.
21        Q.   And Mr. Dewhurst himself was not able to do
22  that; is that correct?
23        A.   Correct.  I'm not aware of a procedure where
24  the Lieutenant Governor can do so.
25        Q.   Was it -- was Senator Duncan selected for this

127

1   role because he was the chair of the State Affairs
2   Committee, which had jurisdiction over election-related
3   bills?
4         A.   I don't know the reason he was chosen.  I think
5   it was a good choice because in addition to his
6   experience with the election procedure, he's a
7   long-serving member of the Senate, familiar with Senate
8   rules and procedure, and just frankly, an even-handed
9   temperament and trusted by all members of the Senate.
10        Q.   Is there a reason why Senator Fraser was not
11  selected for that role?
12        A.   Likely because he was the sponsor of the bill
13  in question.
14        Q.   I see.  So he would appear as sort of a witness
15  or a resource?
16        A.   Correct.  I think -- well, the way it would
17  work is a senator would be appointed to preside, someone
18  other than Lieutenant Governor.  You would not have the
19  sponsor of the bill presiding.  Even in a regular
20  committee process, the chair of the committee would hand
21  the gavel off to the vice chair, someone else to preside
22  if a bill of the chair came before the committee.  So in
23  this case, Senator Fraser was almost certainly not
24  chosen because he was the sponsor of Senate Bill 14.
25             MS. WESTFALL:  Would you please mark this?

128

1             (Exhibit 161 marked for identification.)
2             MS. WESTFALL:  Go off the record one
3   second.
4             (Brief discussion off the record.)
5             MS. WESTFALL:  Back on the record.
6         Q.   (By Ms. Westfall)  You've been handed Exhibit
7   161.  Do you recognize this document?
8         A.   Appears to be copy of some version of SB 14.
9         Q.   Do you see the date at the bottom?
10        A.   Looks like the date January 12, 2011.
11        Q.   Can you refer yourself back to that other
12  exhibit and of the chronology of Senate Bill 14?
13        A.   Actually I don't have that.  I have the
14  chronology of 362.
15        Q.   All right.  Strike that.  We'll go back to that
16  a later time.
17             So the bill gets filed in November 2010,
18  correct?  And then are there changes to the bill between
19  its filing in November 2010 and January 2012 -- 2011?
20        A.   Well, we know there was at least -- again,
21  without knowing which versions were officially filed,
22  referring back to the earlier e-mail from Janice McCoy
23  to Senate staffers, it looks like she made one change
24  that she referenced there, deleted Section 18, and made
25  some changes -- or didn't make changes to Section 14.  I

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

33 (Pages 129 to 132)

---

**129**

1  don't know what changes may have been made between that
2  version and that attachment and this without looking
3  through it.  And I don't know which was filed and which
4  was not filed.
5      Q.  Is it possible that you could prefile a bill in
6  November of 2010 and then continue working on different
7  iterations and file another version in January 2011?
8      A.  Yes.  A bill can be changed by the author as
9  often as they like.
10     Q.  Do you recall that -- without looking at the
11  documents, do you recall from your memory whether
12  changes were made to the bill during that period of
13  time?
14     A.  I don't recall.
15     Q.  And you were involved in developing Senate Bill
16  14; is that right?
17     A.  I had conversations with Janice McCoy regarding
18  the bill, and I had been working on it previous
19  sessions.  Yes, I think it's fair to say I was aware,
20  and I was certainly -- and for my office's purposes, in
21  charge of analyzing and tracking the bill.
22     Q.  Was Ms. Jennifer Fagan also involved in the
23  drafting process or was it chiefly you and Ms. McCoy?
24     A.  I can't remember the extent to Jennifer Fagan
25  was involved.  And I should say the development.  The

---

**130**

1  drafting, I mean, for example, on this Exhibit 161,
2  there's a number at the bottom which I think indicates
3  it came from Senate Engrossing and Enrolling, which is
4  an agency within the Senate to draft bills.  So I don't
5  know how much input Jennifer Fagan or myself had on this
6  particular draft or the bill as a whole.
7      Q.  Were there other staff involved besides you,
8  Ms. McCoy and Ms. Fagan in drafting Senate Bill --
9  developing Senate Bill 14?
10     A.  I don't recall.  Again, I think given
11  Ms. McCoy's earlier e-mail, there's a list of Senate
12  staff.  I don't know to the extent to which any of those
13  people were or were not involved or whether people not
14  on that list were involved.
15     Q.  Were you involved in drafting Senate Bill 14?
16     A.  I don't recall.  I may have.  I have a
17  background of drafting bills.  It's possible that I may
18  have helped with the language, sure.
19     Q.  Do you recall what sources you consulted, if
20  any, to draft Senate Bill 14?
21         MS. HALPERN:  Objection, assumes facts not
22  in evidence.
23     A.  To the extent I did draft or help with drafting
24  language, I assume I would have looked at previous
25  versions of this bill.  I would have looked to other

---

**131**

1  states where Voter ID was implemented, Indiana and
2  Georgia and Louisiana.  I would have looked through
3  testimony provided during the course over the last
4  previous few sessions on this -- on this concept.  I
5  don't know what else.  I imagine I would have drawn from
6  a lot of sources.  But most importantly, if I was asked
7  to draft something, I would have just done what I was
8  asked to draft as a sort of administrative matter.
9      Q.  (By Mr. Westfall)  Kind of a technical matter?
10     A.  Correct.
11     Q.  And this would have been at the instruction of
12  Mr. Dewhurst?
13     A.  Unlikely.
14     Q.  At whose instruction?
15     A.  More likely at the instruction of Janice, whose
16  boss was the sponsor.  And as far as I know, Janice does
17  not have experience drafting bills herself, so she may
18  have asked me to help make sure the formatting was
19  correct and so forth.
20     Q.  I see.  Did you, besides the sources that you
21  just testified to, did you look at any model Voter ID
22  legislation from interest groups?
23     A.  No.  I don't recall looking at it.
24     Q.  Did you or the Lieutenant Governor exchange
25  drafts of Senate Bill 14 with anybody during this

---

**132**

1  period?
2      A.  I don't know what he did.  To the extent I
3  exchanged drafts or -- does that include reviewing
4  drafts?  It likely would have only have been with Janice
5  McCoy and possibly with Jennifer Fagan.  I don't recall
6  forwarding drafts to other people.  I may have, but I
7  don't recall.
8      Q.  Did you review any studies about the impact of
9  Voter ID in other states or any implications of Voter ID
10  in other states in drafting Senate Bill 14?
11     A.  To the extent I drafted portions of this bill
12  or didn't draft portions of the bill, I'm not sure.  I
13  know, generally, I was aware of studies related to voter
14  turnout and so forth in Voter ID states.
15     Q.  And by Voter ID states, you're referring to
16  Georgia and Indiana?
17     A.  Indiana and Georgia, and there seems like there
18  may have been some others in 2011, Louisiana or -- and
19  maybe some other jurisdictions.
20     Q.  Do you recall the particular studies you looked
21  at?
22     A.  I don't remember the names of the studies.  I
23  remember the gist being that turnout had not been
24  adversely impacted in the wake of Voter ID legislation.
25     Q.  How did you come upon learning about those

---

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

34 (Pages 133 to 136)

---

133

1  studies?
2      A.  Probably an Internet search.  Possibly from
3  testimony in prior sessions.  I think in one of our -- I
4  think in the 2009 session, one of the witnesses was an
5  Indiana elections official who would have probably
6  suggested or shown the impact in that state.
7      Q.  Did you chiefly learn about the studies of the
8  impact in Indiana and Georgia through those states'
9  election officials?
10     A.  I can't say chiefly.  I'm sure to some extent
11 it was directly from them.  To some extent it was
12 indirectly by reading reports from those agencies
13 online.  But I'm sure there were lots of other
14 independent sources I looked at.
15     Q.  When you were involved in drafting and
16 developing Senate Bill 14, did you consider other forms
17 of ID to include that were not ultimately in the bill
18 that became law?
19     A.  Did I consider them?
20     Q.  Yes.
21     A.  I think, sure.  I mean, lots of forms of ID
22 exist.  I think there was a process.  Again, I don't
23 remember making any sort of formal decisions about what
24 was and was not going to be included.  But yeah, there
25 were -- if only from other drafts of the bill in

---

134

1  previous -- similar bills in previous sessions, you
2  know, and opponents of the bill would certainly have
3  suggested alternative or additional methods of ID.
4      Q.  Could you --
5          MS. HALPERN:  Counsel, I'd like to confer
6  with the witness.  We're treading into deliberative
7  process privilege territory now, and I want to just
8  confer with him and see if he wants to waive it.  Can we
9  go off?
10         MS. WESTFALL:  Certainly.
11         (Recess taken from 12:20 to 12:24 p.m.)
12         MS. HALPERN:  I'm hoping that the both of
13 you counsel will confer, because the rule is seven
14 hours.  It's not seven hours for one and seven hours for
15 somebody else.  So if she uses up all your time, that's
16 a dispute you have to have with Elizabeth and not -- not
17 with this witness and not with his lawyer.
18         MS. WESTFALL:  We'll confer.
19         MS. HALPERN:  Okay.
20         MS. WESTFALL:  We're not saying we agree
21 with you.  We'll confer.
22         MS. HALPERN:  All right.
23         MS. WESTFALL:  In the interest of
24 cooperation.
25         MR. WHITLEY:  And to be clear, since we're

---

135

1  back on the record now, to the extent that the
2  defendants did not object to those portions of the
3  testimony that were designated as highly confidential or
4  exhibits introduced as part of that testimony, we're
5  going to assert a standing objection to those documents
6  that were produced from Texas v. Holder pursuant to
7  Judge Ramos's order that they were only legislatively
8  privileged.  So that's the same objection that we've
9  asserted previously in this deposition, and it will be
10 our standing objection to those documents that are
11 introduced as highly confidential.
12         MS. WESTFALL:  Very well.
13     Q.  (By Ms. Westfall)  Turning back to Exhibit 161,
14 Senate Bill 14, dated 1-12-2011.  We were just talking
15 about forms of ID that you considered and did not
16 include in the bill.  Do you recall any particular forms
17 of ID that you considered, you, collectively, you,
18 Ms. McCoy, Ms. Fagan, you, yourself, within your office,
19 that were not included in Senate Bill 14 ultimately?
20     A.  I'm not aware of what forms of ID Ms. McCoy or
21 others considered.  In terms of what I considered,
22 frankly, I don't recall.  But again, I'm sure I would
23 have considered, you know, forms of ID that had been
24 used in other states, that existed in the previous
25 versions of this legislation.

---

136

1      Q.  Did you consider allowing the use of expired
2  IDs in Senate Bill 14?
3      A.  I don't recall a specific consideration of
4  that.
5      Q.  Did you conduct during this period kind of in
6  the beginning of January or prior to that time, any
7  analyses about how many registered voters possessed the
8  required forms of ID under Senate Bill 14?
9      A.  I remember meeting with the Secretary of
10 State's office, but I can't recall -- about available
11 identification, but I cannot remember the details of
12 that meeting.
13     Q.  Was that meeting around February or late
14 January 2011?
15     A.  I don't know.
16     Q.  Was that with Ms. McGeehan?
17     A.  Yes.
18     Q.  Was Coby Shorter at that meeting?
19     A.  I cannot recall, but I don't believe so.
20     Q.  Was John Sepheri at that meeting?
21     A.  I don't recall.
22     Q.  Was Senator Williams' staff person at that
23 meeting?
24     A.  I can't recall.
25     Q.  What was the meeting about?

---

BRYAN HEBERT                                            6/17/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

137

1      A.   My memory is that Janice and myself, possibly
2  Jennifer Fagan and possibly others, met I believe in
3  Senator Fraser's offices to discuss generally the
4  availability of IDs.  I don't recall specifics of the
5  meeting.  I know it was generally about the election
6  process.  There may have been some discussion of how
7  different steps in the legislative -- electoral process
8  work, but I can't remember specifics.
9      Q.   Was this meeting before the Senate, the
10  Committee of the Whole or the full Senate considered
11  SB 14?
12      A.   Probably, but I can't be sure.
13      Q.   And was part of that discussion about which
14  registered voters have forms of state issued ID?
15          MS. HALPERN:  I'm going to object as
16  vague.
17      A.   Yeah, I think -- go ahead, I'm sorry.
18          MS. HALPERN:  I don't understand your
19  question.
20      Q.   (By Ms. Westfall)  You may answer.
21      A.   I think in speaking to Ms. McGeehan from the
22  Secretary of State's office, I would have been
23  interested in knowing how many voters used ID when they
24  vote as opposed to using just a registration card or
25  some other ID.

---

138

1      Q.   Interesting.  So what did you learn from that
2  question?
3      A.   I can't remember.
4      Q.   Did you --
5      A.   I think I remember, frankly, that she would
6  look into it to be sure, and I can't remember the
7  outcome of that.
8      Q.   What other forms of acceptable state-issued ID
9  under Senate Bill 14?
10      A.   Under Senate Bill 14, if I can look to make
11  sure I'm correct.  It's photo IDs including --
12      Q.   And I'm just turning your attention to the
13  state IDs only.
14      A.   The state IDs under Senate Bill 14, and again,
15  all I have is this copy of Senate Bill 14.  I don't know
16  what version this is.  But my memory is it would be a
17  driver's license, a personal identification card or
18  election identification card issued by DPS.
19          MS. HALPERN:  And I'd like the record to
20  reflect that the witness is testifying from Exhibit 151,
21  which is dated January 12, 2011.
22          MS. WESTFALL:  Thank you, Counsel.
23      Q.   (By Ms. Westfall)  Would it also include
24  license to carry --
25      A.   Right.

---

139

1      Q.   -- handguns?
2      A.   Yes, it would, CHL license, CHL, yeah.
3      Q.   Was there discussion in this meeting about --
4  with Ms. McGeehan, as to which voters possessed those
5  state-issued forms of ID?
6      A.   I don't think so.  I think it was strictly at
7  that time how many voters present a driver's license or
8  some other identification.  It wasn't meant to be the
9  types of voters or how many types of ID.  I think it was
10  just who does more than present their registration card.
11  That's my memory.
12      Q.   Is it your understanding from that meeting that
13  the Secretary of State's office collects that
14  information?
15      A.   I think they might.  They are the counties know
16  who presents just a card versus presents an ID.  I think
17  that might be right.
18      Q.   Is that your understanding that that was part
19  of the statewide voter registration database?
20      A.   I don't know what database it might exist in.
21      Q.   At this time in early January-February 2011,
22  was there any analysis to determine whether minority
23  voters would be disproportionately less likely to
24  possess the state-issued forms of ID that you just
25  mentioned?

---

140

1      A.   I -- I did not conduct such research, but I
2  don't know if it existed.
3      Q.   Are you aware of any analysis that you didn't
4  conduct along those lines?
5      A.   I have to say I don't recall.  I know there was
6  testimony in the committee process about the impact on
7  various populations, and I can't remember how much of
8  that was hypothesis and how much was based on other
9  states and how much was based on formal studies.
10      Q.   What was the purpose of not allowing voters to
11  use nonphoto ID in Senate Bill 14?
12      A.   I don't know the purpose, because it's not my
13  bill.  I think there was public discussion about the
14  need to have a secure process, and nonphoto ID is less
15  secure than photo ID.
16      Q.   What is the basis for that statement?
17      A.   There -- if a document has a photo with a
18  person's face on it, especially the type of document
19  listed in Senate Bill 14, that's generally a much more
20  secure document with various seals and holograms and
21  codes on it that make it more difficult to forge, as
22  opposed to some of the older law-permissible IDs such as
23  utility bills or government checks or so forth.
24      Q.   And is it -- was it your view that those bills,
25  those forms of ID and the nonphoto ID would not

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

36 (Pages 141 to 144)

141

1  sufficiently prove that the voter was who she said she
2  was at the polls?
3      A.  I think my opinion is that voters who appear
4  without photo ID, there's a greater chance that is
5  not the voter they claim to be --
6      Q.  Was there any --
7      A.  -- because it's a less secure form of
8  identification.
9      Q.  Was there any factual basis for drawing the
10 conclusion that nonphoto ID was not effective?
11     A.  Sure.  I think, for one, practice of the
12 federal government for many benefits and access at the
13 federal level, but also in Texas, you have to have a
14 photo ID.  So I guess a lot of us thought if it was good
15 enough for the feds, then it was good enough for Texas.
16     Q.  Under -- again, going back to the Help America
17 Vote Act, is it your understanding under that federal
18 law that if a voter registers and their information
19 cannot be matched against the driver license database or
20 Social Security, that they must show a form of ID when
21 they appear in person to vote; is that right?
22     A.  I'm not -- I'm not sure.
23     Q.  Okay.  Are you aware of any facts indicating
24 that a voter under Texas previous law came into the
25 polling place with a nonphoto ID and tried to him

142

1  impersonate another voter?
2      A.  I believe there was testimony during some of
3  the committee processes.  In fact, I think Senator
4  Williams' own brother was a victim of in-person voter
5  fraud.  He had been shown casting a vote but had, in
6  fact, not yet voted in that election.  There may have
7  been other examples that I can't specifically remember.
8      Q.  Other than the public record surrounding SB 14
9  and SB 362, are you aware of any other instances of the
10 use of nonphoto ID leading to that consequence that you
11 just described?
12     A.  Not -- no.
13         MS. HALPERN:  Counsel, lunch.
14         MS. WESTFALL:  Let's do lunch.  Let's go
15 off the record, because it will take a little while to
16 finish talking about this preliminary stuff.
17         (Lunch recess from 12:35 to 1:39 p.m.)
18     Q.  (By Ms. Westfall) So we were discussing before
19 lunch the Exhibit 161, the version of Senate Bill 14
20 dated January 12, 2011.
21     A.  Yes.
22     Q.  What was -- can you review the forms of ID
23 under this version of the bill, which are at pages,
24 gosh --
25     A.  Eight and nine.

143

1      Q.  Eight and nine.  Just take a look.  You don't
2  need to read them aloud, but if you could just take a
3  look and let me know when you've had a chance.
4      A.  Okay.
5      Q.  Do you see that this only includes photo ID?
6      A.  Yes.
7      Q.  Do you know why non-photo ID was not included?
8      A.  I don't know.
9      Q.  Do you know who made the decision not to
10 include non-photo ID in Senate Bill 14?
11     A.  I don't, but I can presume it's Senator
12 Fraser's bill.  And he decided, but I don't know that.
13         MS. HALPERN:  I ask the witness not to
14 speculate.
15     Q.  (By Ms. Westfall) Did anything occur between
16 2009 and 2011 that made two forms of non-photo ID an
17 acceptable option in 2009, but not in 2011?
18     A.  Not that I'm aware.
19     Q.  Would allowing the use of non-photo ID
20 interfere with the purposes of Senate Bill 14?
21     A.  Would allowing non-photo ID interfere with the
22 purposes?  The purposes, as I understand them, are to
23 increase the security of the elections, and so I
24 would -- in my opinion, I would say yes, non-photo is
25 less secure.  To the extent that's a purpose of the

144

1  bill, then it interferes with that purpose.
2      Q.  In 2009, with regard to Senate Bill 362, at
3  that time you argued in a previous exhibit we discussed
4  that non-photo ID did further the purpose of preventing
5  voter fraud, increasing voter confidence, et cetera; is
6  that correct?
7          MS. HALPERN:  Objection, misstates facts
8  not in evidence.
9      A.  I'd have to double-check and see.  I don't
10 think first that it was the purpose, and I'm not sure
11 that I argued that as you suggested.  To the extent that
12 you're referring to Exhibit 155, Reasons to Support 362
13 As Filed, I don't think it mentions -- on Number 5 on
14 00087008, one reason to support the bill is that it
15 increases the chance of the federal preclearance because
16 many forms of ID are acceptable, is that --
17         MS. WESTFALL:  Can I break in right now?
18 This needs to be designated as highly confidential, his
19 response.
20     Q.  (By Ms. Westfall) Turning your attention back
21 to Exhibit 155, did you not, with regard to the talking
22 points at Texas TX00087009, argue and present talking
23 points that at Roman II that the bill protects Texas
24 voters in five different regards?
25     A.  Yes, I did.

145

1    Q.  And that was -- you were arguing that the bill,
2  Senate Bill 362, protects Texas voters, were you not?
3       A.  Yes.  But I was not arguing it was the only way
4  to protect Texas voters.  That's what your earlier
5  question was asking.
6       Q.  Are you aware of any facts at all that support
7  the decision not to include non-photo ID in Senate Bill
8  14?
9       A.  I -- again, I'm not sure why Senator Fraser
10  crafted this bill the way he did.
11       Q.  Are you aware that Senate Bill 362 permitted
12  the use of state and federal issued photo ID?
13       A.  Yes.
14       Q.  Do you know why Senate Bill 14 did not include
15  these forms of ID?
16       A.  I don't.  Except to say it's a different bill
17  and a different session, but I don't know why.
18       Q.  Were you involved in any discussions about the
19  use of non-photo ID in -- about including that in Senate
20  Bill 14?
21          MS. HALPERN:  Objection, asked and
22  answered.  I think we covered this before lunch.
23       Q.  (By Ms. Westfall) You may answer.
24       A.  I don't recall specific discussions about what
25  -- whether those provisions should be in the bill or

146

1  not.
2       Q.  Do you recall any discussions about whether to
3  include state and federal issued photo ID in Senate Bill
4  14?
5       A.  I don't recall.
6       Q.  Are you aware of any facts that would support
7  any decision not to include those as acceptable forms of
8  ID in Senate Bill 14?
9       A.  No.  I mean, again, except to say that SB 14, I
10  think, provides a more secure electoral system than 362.
11  I don't know that that was the reason.
12       Q.  Other than what you testified to earlier today,
13  you're not aware of any other facts or rationales for
14  why those forms of ID were not included in Senate Bill
15  14?
16       A.  I don't think so.
17       Q.  Did Senate Bill 14 permit the use of employee
18  IDs?
19       A.  Senate Bill 14?
20       Q.  Yes.
21       A.  I don't believe it did.
22       Q.  Do you know why it did not allow the use of
23  employee IDs?
24       A.  I do not know.
25       Q.  Did Senate Bill 362 allow the use -- voters to

147

1  use employee IDs?
2       A.  I don't see employer IDs listed in this copy of
3  362 that I have, except to the extent they would be an
4  ID card issued by the federal or state government or
5  local government.
6       Q.  Thank you.
7          Did Senate Bill 362 allow for the use of
8  student IDs?
9       A.  Not specifically.  Again, to the extent that a
10  student ID card us considered an ID card issued by
11  federal or state government, it would be covered by 362.
12  So I suppose some ID cards from the universities.
13       Q.  So were student IDs included under agencies or
14  institutions of the state to the extent they were state
15  universities?
16       A.  I think the argument could be made that
17  institution of this state includes a state university.
18       Q.  Do you know why Senate Bill 14 did not include
19  the use of student IDs?
20       A.  I don't know.  I do know during the open -- the
21  floor debate on this bill, there were some concern that
22  universities might be treated differently and that it
23  would be confusing to allow some university IDs but not
24  others.  And the concern was that if it was not a state
25  university, there would be no way of controlling the

148

1  form of those IDs, and that might be less secure.
2       Q.  Do you know how the exception for individuals
3  with disabilities came to be included in Senate Bill 14?
4       A.  My memory is that it was suggested on the floor
5  by Senator -- and I can't recall for sure, if that is
6  correct, and if so, which Senator suggested it.
7       Q.  Was it Senator Patrick?
8       A.  It may have been.
9       Q.  Do you know why that was included as an
10  exception to the bill?
11       A.  My memory is that he, on the floor at least,
12  said -- and I don't know personally, but my memory from
13  the floor debate is that he had done lots of work with
14  disabled populations and wanted that exception in there.
15       Q.  Do you have any other information that was not
16  in public record as to why the disability exemption was
17  included in Senate Bill 14?
18       A.  No.
19       Q.  How did the exception for first -- strike that.
20          In one or more iterations of Senate Bill
21  14, was there an exemption for voters over the age of
22  70?
23       A.  I don't remember if Senate Bill 14 had such an
24  exemption or not.  Yet, other versions of the bill --
25  oh, wait, never mind.  On Exhibit 161 on Page 5, yes, I

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

38 (Pages 149 to 152)

149

1  see that there is an exception for people 70 years of
2  age or older as of January 1, 2012.
3      Q.  Do you know how this provision became included
4  in this version of Senate Bill 14?
5      A.  I don't know.
6      Q.  What is the purpose of that provision?
7      A.  I don't know the intended purpose, but my guess
8  is --
9          MS. HALPERN:  Let me stop you right there.
10     A.  I don't know the purpose.
11         MS. WESTFALL:  And for the record, I would
12 like to note that you can make an objection based on
13 speculation, but of course, the witness can answer it.
14 It's not a proper basis under the federal rules for
15 instructing the witness not to answer.
16     Q.  (By Ms. Westfall) Are you aware of any facts
17 that supported the need for this exemption for voters
18 over the age of 70?
19     A.  No.
20     Q.  How did the exception for individuals with
21 religious objections to being photographed arise?
22     A.  I can't recall.
23     Q.  What is the purpose of that provision?
24     A.  As I understand it, and again, I can't remember
25 who raised the issue, but there is apparently -- and I

150

1  don't know if it's from another case or another state,
2  but there's some religious sect or group that does not
3  believe in being photographed or believe that being
4  photographed somehow steals their soul or does something
5  that crosses the tenets of their religion, and
6  therefore, to be safe, that exception should be put in
7  the bill.
8      Q.  Can you think of any other purposes for that
9  exemption?
10     A.  No.
11     Q.  Did you believe that that exemption was legally
12 required as a first amendment issue?
13     A.  I don't know that I thought it was legally
14 required.
15     Q.  Did the Legislature in the course of debating,
16 amending, considering SB 14, make any changes to the
17 bills based on the concerns of the impact on racial and
18 ethnic minority voters?
19     A.  I'm not sure I can recall specific parts of the
20 bill.  I know specific amendments were suggested by
21 minority members of the Senate, but I'm not sure,
22 without walking through the bill line by line, what
23 might be characterized as you did.
24     Q.  Sitting here today, can you recall any of the
25 changes that were in the final version of the bill

151

1  signed into law that were made in responses to some of
2  those concerns?
3      A.  Again, without -- because I'm not the sponsor
4  of the bill, I don't know why each decision was made to
5  change the bill.  And alternatively, some of the bill
6  was changed by amendments on the floor, and it's hard to
7  say what the specific -- there's no one purpose for
8  every member's vote.  So I can say the bill did change,
9  I'm sure parts of the -- some of those changes were a
10 reaction to opponents who raised the issues you cited,
11 but I'm not sure I can name them off the top of my head.
12     Q.  Did the Lieutenant Governor play a role in
13 developing strategy to ensure that SB 14 would be
14 enacted?
15     A.  Strategy for it to be enacted?  Does that
16 mean --
17         MS. HALPERN:  I'm going to direct the
18 witness this sounds predecisional to me, and I think
19 we're starting to encroach on the Lieutenant Governor's
20 privilege.  So I'm going to direct you not to answer
21 that one.
22         MS. WESTFALL:  What is the privilege that
23 you're asserting here?
24         MS. HALPERN:  Predecisional.
25         MS. WESTFALL:  Deliberative process or

152

1  legislative --
2          MS. HALPERN:  Yes, deliberative process.
3          MS. WESTFALL:  Okay.  And we have a
4  standing disagreement on whether that is an appropriate
5  privilege to assert with regard to that question.
6      Q.  (By Ms. Westfall) Are you aware of any strategy
7  by the Legislature as a whole or individual legislators
8  to ensure that Senate Bill 14 would not have the same
9  fate that SB 362 did in the house?
10     A.  I'm not aware of specific discussions designed
11 to ensure passage, except to say that every decision in
12 the Legislature is designed to ensure passage.  By the
13 supporters, I should say.
14     Q.  Are you aware of any particular steps that were
15 taken by supporters of SB 14 to ensure the bill would be
16 enacted?
17     A.  By enacted, do you mean adopted by the
18 Legislature or implemented by Secretary of State?
19     Q.  Adopted by the Legislature.
20     A.  I don't -- I can't point to a specific step
21 within the legislative process, other than the ones
22 required by the constitution and the rules before a bill
23 can become law.
24         (Exhibit 162 marked for identification.)
25     Q.  (By Ms. Westfall) You've been handed what's

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

39 (Pages 153 to 156)

---

153

1  been marked as 162.  Do you recognize this document?
2      A.  It looks to be a copy -- the first page is a
3  copy of the cover of the Senate rule book, and the
4  second page is a copy of Rule 5.11 regarding special
5  orders.
6      Q.  Is 5.11D the same provision that was put into
7  place in the rules in 2009?
8      A.  Let me double-check.  Yes.  Appears so.
9      Q.  Was it adopted for the same reasons that the
10 rule was adopted in 2009?
11     A.  I don't know.
12     Q.  Under 5.11D from the 2011 session, it would
13 only require the support of a majority to ensure that
14 voter ID legislation was set as a special order; isn't
15 that correct?
16     A.  Correct.
17     Q.  And the rule itself in 2011, 5.11D was adopted
18 as part of all the rules that were adopted by a simple
19 majority of the Senate; is that right?
20     A.  Correct.
21         MS. WESTFALL:  Would you mark this?
22         (Exhibit 163 marked for identification.)
23         MS. WESTFALL:  And we're going to
24 designate this as highly confidential.
25     Q.  (By Ms. Westfall) You've been handed what's

---

154

1  been marked as Exhibit 163.  Do you recognize this
2  document?
3      A.  It looks like an e-mail from myself to some
4  Senate staff and some people in my office with attached
5  documents related to compliance with the Supreme Court,
6  talking points on the bill, and comparisons of various
7  state election laws.
8      Q.  Did you draft the cover?  And it's TX00262645
9  through TX00262649.  Did you draft all these documents,
10 including the cover e-mail?
11     A.  I think so.
12     Q.  Did you send this e-mail on Friday, January
13 21st, to Jason Baxter, Janice McCoy and Jonathan
14 Stinson?
15     A.  It looks that way.
16     Q.  And you copied your chief of staff and
17 Lieutenant Governor Blaine Brunson and Julia Rathgeber
18 as the policy director?
19     A.  Correct.
20     Q.  Is Jason Baxter a staff person, or was he at
21 the time, a staff person for Senator Williams?
22     A.  Yes.
23     Q.  And is Jonathan Stinson was Senator Huffman's
24 legislative director at the time?
25     A.  I don't know his title, but he was with Senator

---

155

1  Huffman.
2      Q.  Who did Wroe Jackson work for at this time?
3      A.  I believe Wroe worked for Senator Huffman, but
4  he's now with the Secretary of State's Office.  And I
5  forget at what point he went from one office to the
6  other.
7      Q.  Why did you circulate this e-mail?
8      A.  I think in the e-mail itself it says there's
9  several documents that may prove useful in preparing for
10 next week's voter ID debate.
11     Q.  And that's the reason why you sent it --
12     A.  I think so.
13     Q.  -- is to prepare --
14     A.  I can't recall sending the e-mail, but if
15 that's what I wrote at the time, I'm sure that's the
16 better indication.
17     Q.  Did you send these talking points, the summary
18 of the standard, and chart of the differences to any
19 other staff people for any other Senators?
20     A.  I don't recall.  If none turned up in the
21 discovery phase, then I don't think I did, or I don't
22 have those copies.  As far as I know, these are the only
23 people.
24     Q.  Did Mr. Brunson or Ms. Rathgeber view these
25 attachments before you sent this e-mail?

---

156

1      A.  I can't recall.
2      Q.  Did Mr. Dewhurst?
3      A.  I can't recall.
4      Q.  Do you see that in your e-mail you allude to
5  information discussed Sunday night?
6      A.  Yes.
7      Q.  Do you recall that discussion that you had
8  Sunday night?
9      A.  My memory is it was -- it may have been a
10 briefing, but I can't remember who it was for.  These
11 staffers presumably, but I can't remember if it was a
12 staff brief or Senators or who else might have been
13 there.
14     Q.  Were you doing a briefing prior to Senate
15 consideration of SB 14?
16     A.  Probably.  Without knowing the timing, I'm not
17 sure if it was designed to be directly ahead of floor
18 debate, or if it was just a general briefing and this
19 was the only time people could be available.
20     Q.  Do you know what information was discussed on
21 Sunday night that you allude to in this e-mail?
22     A.  My memory is it was just a general overview
23 similar to these documents, you know, big picture stuff,
24 on the legality of voter ID and what other states were
25 doing.

---

BRYAN HEBERT                                           6/17/2014
CONFIDENTIAL TRANSCRIPT

40 (Pages 157 to 160)

---

157

1    Q.  Turning your attention to the second page,
2  TX00262646, do you see it's called Ensuring Compliance
3  With the Supreme Court?
4    A.  Yes.
5    Q.  And you list five legitimate state interests
6  under column -- under Roman I?
7    A.  Yes.
8    Q.  How did you know that Senate Bill -- strike
9  that.
10      What was the basis for your argument that
11  Senate Bill 14 would deter and detect fraud?
12    A.  As I've said before, I think clear efforts to
13  stop criminal acts from occurring deter those acts from
14  occurring.  So in this case, if we know election fraud
15  exists and we take steps to stop it, that would deter.
16    Q.  Okay.  Other than that sort of logic that you
17  just set forth in this deposition, were there any facts
18  that would cause you to concluded that SB 14 would deter
19  and detect fraud?
20    MS. HALPERN:  Objection, mischaracterizes
21  his answer.  Objection, compound.  Objection,
22  misleading.
23    Q.  (By Ms. Westfall) You may answer.
24    A.  Again, I think taking the whole of testimony
25  over the preceding sessions, there have been testimony

---

158

1  and research done by myself and others showing that
2  fraud exists in Texas.  And this had been implemented in
3  other states and as far as we knew was successful, and
4  therefore, it seemed reasonable to implement in Texas.
5    Q.  How did you know that voter ID was successful
6  in other states?
7    A.  When I say successful, I mean it had been
8  upheld by the courts and had not resulted in decreased
9  turnout.  As it relates to fraud, I probably should have
10  used a different word, because I'm not sure sitting here
11  that I can say successful, but...
12    Q.  It was not -- those bills -- in other words,
13  those bills were not found to be unlawful, and according
14  to studies that you saw, it did not reduce turnout in
15  those states; is that correct?
16    A.  That is correct.
17    Q.  What facts are you aware of that SB 14 would
18  improve and modernize election procedures?
19    A.  Let me look at the bill real quick.
20    Q.  Take your time.
21    A.  First, I would say improve would include make
22  more secure, so by making the elections more secure,
23  you're improving them.  Further, it provides more detail
24  for voters to -- regarding how to make sure that their
25  vote counts should they be asked to cast a provisional

---

159

1  ballot.  There are various notice requirements, and the
2  forms of ID listed here tend to be more secure.  To the
3  extent we're talking about modernization, I think most
4  of these have various seals and bar codes and things
5  that make them more secure and more useful as
6  identification documents than some of the items
7  previously admissible under law.
8    Q.  And because of the security of those particular
9  forms of ID, it modernizes election procedures in your
10  view?
11    A.  Sure.  I think a recently issued state ID is a
12  more modern form of identification than a utility bill.
13    Q.  How does that modernize election procedures?
14    A.  They're more technological, you know, features
15  of those forms of ID.  They're more secure.  In some
16  cases, they may be more recently issued.  If they can't
17  be expired or can only be recently expired, that's
18  different than -- as far as I know, the utility bill,
19  for example, requirement didn't have an expiration
20  component to it.
21    Q.  So the next two bullets are kind of similar;
22  protecting against voter fraud enabled by inaccurate
23  voter registration rolls, and counting only the eligible
24  voters to vote, right?
25    A.  Right.

---

160

1    Q.  Kind of similar?
2      What facts do you know or did you know at
3  the time when you discuss this set of -- set of talking
4  points, that would enable you to predict that SB 14
5  would have that effect?
6    A.  Again, I think the whole intent of the bill is
7  to make sure eligible, properly identified voters are
8  casting votes.  We had had testimony over the years
9  that, in fact, the registration rules were not a hundred
10  percent accurate and, in fact, there may be registration
11  cards sent to people who are dead or felons or otherwise
12  ineligible.
13      And so accurate, up-to-date identification
14  required at the polling place seems on its face to
15  protect against fraud and be designed to count only
16  eligible voters and votes.
17    Q.  Isn't it true that some of the forms of ID
18  allowable under SB 14 could be obtained by persons who
19  are not U.S. citizens?
20    A.  Sure.  No system is perfect, but I think this
21  was a step in the right direction towards increasing the
22  security.  It didn't say make a hundred percent secure,
23  because there's no such thing.  But yes, any system
24  designed by humans can be abused by humans.
25    Q.  So what types of ineligible voters would SB 14

---

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

161

1  prevent from voting?
2      A.  It's a broad category, I think.  My
3  understanding of ineligible voters would be someone who
4  doesn't live in the state, someone who is dead, someone
5  who fraudulently obtains someone else's identifying
6  registration card, someone who produces false
7  documentation.  I could go on, I guess, but it's a broad
8  category.
9      Q.  Well, turning back to that first category,
10  people that don't reside in the state, those people are
11  clearly ineligible to vote in the State of Texas,
12  correct?
13      A.  Right.  Well, I should say if they're a
14  resident, but currently out of the state, they may vote.
15  But yes, generally, that's right.
16      Q.  Assuming someone moved to another state with
17  intent to remain in that other state, and they were not
18  a Texas resident, then suppose that individual came back
19  into the state with a driver's license with their former
20  Texas address and a picture, that would be a qualifying
21  ID under SB 14, correct?
22      A.  Uh-huh.
23      Q.  So under that circumstance, it would not
24  prevent an ineligible voter, who should not be on the
25  voter rolls, from participating in an election; isn't

162

1  that right?
2      A.  Right.  Like I said, there's no perfect system.
3  The universe of potential crimes or ineligible votes
4  that would be cast is larger without this bill, and it
5  is smaller with this bill, but it's not a perfect
6  system.  Of course, fraud still exists, and that's why
7  lots of other bills have been able to be introduced
8  regarding voter fraud.  There's lots of types of fraud
9  and efforts to stop that.
10      Q.  And then finally, what facts were you aware of
11  at the time that you wrote this, that SB 14 would
12  protect public confidence in elections?
13      A.  As you asked a similar question about 362, I
14  think the polling continued to show that the voters of
15  Texas supported photo ID, and that includes minority
16  voters, blacks and Hispanics, and then voters as a whole
17  overwhelmingly.  I think you could draw just from that,
18  that public confidence would increase by adopting
19  measures supported by the public.
20      Q.  Turning to measures required to offset burdens,
21  how did SB 14 accomplish and fulfill these required
22  measures?  And we'll start off with the first one, how
23  does SB 14 provide access to free photo ID cards?
24      A.  As I see it, the bill currently as implemented
25  allows -- required DPS to create election identification

163

1  cards, which are similar to driver's licenses, but for
2  the purpose of having a photo ID for elections, and
3  those were to be issued at no cost.
4      Q.  At the time that you wrote these bullet points,
5  you knew, did you not, that it cost -- there was a cost
6  associated with obtaining a birth certificate in the
7  State of Texas, correct?
8      A.  At the time of this, yes.
9      Q.  And that cost was $22 at a minimum.  Correct?
10      A.  Yes.  But it's not today, as I understand it.
11      Q.  But at the time the bill was being considered
12  when you wrote these bullet points, the cost was $22,
13  right?
14      A.  Again, yes, and this bullet point says, access
15  to free photo ID cards, the cards are free.
16      Q.  But the underlying documentation to get the
17  free card is not free, correct?
18      A.  If you already have a birth certificate, it's
19  free.
20      Q.  If you don't have a birth certificate, it's not
21  free though, right?
22      A.  It would have been 22 dollars, and now I
23  believe it's either zero, zero to 3 dollars.
24      Q.  That occurred -- the change in what it cost to
25  get a birth certificate occurred after Senate Bill 14

164

1  was enacted, did it not?
2      A.  I think that's right.
3      Q.  As to the second bullet, availability of
4  provisional ballots and absentee ballots, how did Senate
5  Bill 14 make available provisional ballots beyond what
6  was already required by the Help America Vote Act and
7  existing Texas law?
8      A.  Well, I mean, the section of the bill, I can
9  pull it out, as I said earlier, if a voter -- the intent
10  was if a voter appears without the appropriate ID, they
11  would not be turned away, they would be allowed to cast
12  a provisional ballot.  And then the bill sets out
13  provisions for a voter to provide better identification
14  to have the ballot counted.  And whether that's an
15  addition to provisions under HAVA or other statutes, I'm
16  not sure.  But it seems like this particular memo that
17  you're pointing to, in the Supreme Court decision, they
18  wanted to make sure provisional ballots were available.
19  Whether that's available because of HAVA or because of
20  state law, I don't think mattered to the court.
21      Q.  But provisional ballots aren't very meaningful
22  if you cast them and then they're not counted, right?
23  That's not really voting, right?
24      A.  It's voting, but I think again, the idea that a
25  constituent can go back and confirm that their ballot is

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

42 (Pages 165 to 168)

---

165

1  being counted was the point.  And then SB 14 voters are
2  allowed the opportunity to get the ID and make sure
3  their ballot is counted.
4      Q.  Do you think that having to go back to an
5  election official a second time is more burdensome or
6  less burdensome than voting a provisional ballot once
7  and having election officials determine whether that's
8  valid from the standpoint of the voters?
9      A.  It's all part of casting a vote.  Two trips is
10 more than one trip.  But again, in terms of the process
11 of voting, there's lots of steps.  In Texas, for
12 example, in primaries and caucuses and things, there are
13 multiple meetings and steps you have to have your voice
14 counted.  So yes, if you're asking me is two trips more
15 than one, yes, it is.  Is it more burdensome?  You know,
16 it's part of casting a vote, but I don't think it's too
17 burdensome.
18     Q.  In terms of the inconvenience of voting, are
19 you aware that to obtain an EIC, you must present a
20 document that indicates your U.S. citizenship?
21     A.  I'm not aware.  I'm aware that -- my
22 understanding is that the EIC runs parallel to driver's
23 licenses.  And obviously, the distinction being that one
24 is for voting only and one is for a broader set of
25 functions.  So I can't say that I know that to be a

---

166

1  fact.
2      Q.  Are you aware that Senate Bill 14 permitted DPS
3  in creating the EIC to require fingerprinting of
4  applicants?
5      A.  I'm not aware of that.  And I don't have the
6  EIC language in front of me, so I can't be a hundred
7  percent certain what the statute says.
8      Q.  And voters in registering to vote need not
9  supply fingerprints; is that correct?
10     A.  To register to vote, right, I don't think you
11 need to supply fingerprints.
12     Q.  To register to vote, you need not, in the State
13 of Texas, provide proof that you're a U.S. citizen,
14 other than signing under penalty of perjury on your
15 voter registration application; is that correct?
16     A.  Right.  I think signing that -- effectively
17 signing an affidavit is a step of assurance for the
18 State of Texas.
19     Q.  And that's a different way to prove citizenship
20 in the voter registration context than to obtain an EIC
21 assuming you have to show --
22     A.  Fingerprints and signatures are different, yes.
23     Q.  Right.  Now, strike that, because I think we
24 just got -- talked over each other.
25         Assuming that you must show documentary

---

167

1  proof of citizenship to obtain an EIC, that is not how
2  you prove citizenship when you register to vote; is that
3  right?
4      A.  I think that as correct.
5      Q.  Because when you register to vote, you sign an
6  application under penalty of perjury saying, I am a U.S.
7  citizen; is that correct?
8      A.  Correct.
9      Q.  And that's not the same as showing a
10 documentary proof of citizenship?
11     A.  Correct.
12     Q.  Is it true in the State of Texas that many
13 voters can walk to their precinct to vote?
14     A.  That seems accurate to me.
15     Q.  But it's not the case with regard to all driver
16 license offices, is that, that you can walk to your
17 driver license office?
18     A.  I don't know that.
19         MS. HALPERN:  Counsel, before you ask your
20 next question, I would like to confer with the witness.
21         MS. WESTFALL:  Certainly.  Do you want to
22 step out?
23         MS. HALPERN:  Yeah.
24         (Brief recess from 2:19 to 2:22 p.m. )
25         MS. HALPERN:  Back on the record.  I need

---

168

1  to make a late objection, Counsel, to your question
2  asking the witness if he was aware that SB 14 allowed
3  requiring fingerprints of a witness to get an EIC card.
4  I don't know if you meant to phrase it that way.
5         MS. WESTFALL:  I know what I intended.
6         MS. HALPERN:  All right.  I'm objecting to
7  that assuming facts not in evidence.
8         MS. WESTFALL:  Okay.  I guess we're
9  back -- we're still back on, so.
10        And we are continuing our designation as
11 highly confidential.  So I hope I did that for that
12 prior document, I believe I did.
13        Could you mark this?
14        (Exhibit 164 marked for identification).
15     Q.  (By Ms. Westfall) You've been handed what's
16 been marked as Exhibit 164.  Do you recognize this
17 document?
18     A.  Yes.
19     Q.  What is it?
20     A.  It is an e-mail from myself to various Senate
21 staff, cc'ing my chief of staff and policy director,
22 expressing concerns about preclearance.  And then
23 there's an attachment explaining generally the standard
24 of review by the Department of Justice.
25     Q.  Do you see that at the top -- and this is --

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

43 (Pages 169 to 172)

---

169

1  for the record, this is TX00262650 through TX00262652.
2        MS. HALPERN:  Counsel, this is marked
3  highly confidential.
4        MS. WESTFALL:  Yeah, we're still -- I
5  believe we're still -- we should be still on the highly
6  confidential designation.  Thank you.
7     Q.  (By Ms. Westfall) Do you see at top of Page
8  262650, that Mr. Stinson had forwarded this e-mail to
9  Wroe Jackson and another recipient?
10    A.  Yes.
11    Q.  Do you know who that recipient is,
12 jlawyer119@aol.com?
13    A.  No.  It's -- no.
14    Q.  Why did you believe that preclearance was
15 doubtful, to use your words?
16    A.  I think my reasoning was that the Obama DOJ had
17 been aggressively interpreting and enforcing the Voter
18 Rights Act through preclearance and didn't seem to
19 particularly like Texas, and so there were -- there was
20 a risk that it would not be precleared.
21    Q.  And you sent this e-mail Saturday, January 22,
22 2011; is that right?
23    A.  That's what it looks like.
24    Q.  That was prior to the floor consideration or
25 committee of the whole consideration of SB 14?

---

170

1     A.  I don't have the history of the bill passage,
2  so I think --
3     Q.  The best of your recollection.
4     A.  I can't remember the date the bill passed the
5  Senate.
6        MS. WESTFALL:  Could we go off the record
7  for one second?
8        (Brief discussion off the record.)
9     Q.  (By Ms. Westfall) Did you ever share your view
10 that preclearance was doubtful with Mr. Dewhurst?
11    A.  I can't recall.
12    Q.  Did you share with anyone else in your office
13 besides Mr. Brunson and Ms. Rathgeber?
14    A.  Probably not.
15    Q.  Did you share with other staff people besides
16 Mr. Baxter, Ms. McCoy and Mr. Stinson?
17    A.  I don't recall.
18    Q.  After you sent this e-mail, were there any
19 changes made to the bill to address any of these
20 concerns?
21    A.  Again, I don't know for sure without seeing
22 subsequent copies of the bill.  I know the bill changed
23 from January 22nd through final passage.
24    Q.  The Texas Legislature wanted Senate Bill 14 to
25 be precleared, did it not?

---

171

1     A.  Yes.
2     Q.  It wanted to enforce Senate Bill 14, did it
3  not?
4     A.  Yes.
5     Q.  Why did you make -- do you see -- strike that.
6        Do you see that in this e-mail you made
7  the suggestion that the Legislature might consider
8  adding a longer list of acceptable photo IDs?
9     A.  Yes.  It says to increase the chances, you
10 might consider adding a list of additional IDs.
11    Q.  And you proposed using language in Georgia's
12 law, which includes ID issued by the federal government,
13 state government or local government within the state?
14    A.  That's correct.
15    Q.  And you also suggested at a minimum, you might
16 include language from Senate Bill 362 concerning valid
17 ID issued by any agency or institution of the federal
18 government or agency or institution of political
19 subdivision of the state.  Do you see that suggestion?
20    A.  Yes.
21    Q.  Why did you suggest adding these forms of ID to
22 the bill?
23    A.  Again, I think we know that Georgia law was
24 precleared, and so closer to other precleared laws, the
25 better in terms of again increasing chances.  It doesn't

---

172

1  mean it was the only way to do it, but I think it's easy
2  to argue it would increase the chances of that
3  happening.
4     Q.  Was there any other reason besides following
5  Georgia's footsteps that you thought this would assist
6  in increasing the likelihood of preclearance?
7     A.  Not that I recall.
8     Q.  Were these forms of ID added to SB 14?
9     A.  No.  This language is not in SB 14.  There are
10 other -- there is other language from the Georgia law
11 and the Texas law, but not this underlying language in
12 Exhibit 164.
13    Q.  Are these IDs that you mention in your e-mail
14 less secure than the other IDs that ultimately made it
15 into SB 14?
16    A.  In my opinion -- is the underlying text less
17 secure than the final version of SB 14, is that the
18 question?
19    Q.  The question is:  are the IDs that you propose
20 adding to SB 14 less secure than the IDs that were
21 ultimately included in Senate Bill 14?
22    A.  I think the short answer is yes.  I think to
23 the extent you allow increasing number of
24 identifications, it increases the chance of confusion on
25 the part of the election poll workers and on the part of

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

---

177

1       MS. HALPERN:  Objection, compound.
2    Q.  (By Ms. Westfall) You may answer.
3    A.  So the -- so I understand, so the -- again, the
4  underlying -- additional forms of ID described by
5  Exhibit 164, how does allowing those improve security?
6    Q.  How does it interfere with their ability of
7  election officials to check your ID, see who you are,
8  see that you're on the rolls and allow you to vote a
9  regular ballot?
10   A.  Again, so the question is how does it make it
11 less secure, and I think the answer is, as I said,
12 potentially the more forms of ID, especially from any
13 political subdivision in the state is more easily forged
14 or less familiar to the poll worker.  So therefore, less
15 reliable as a form of ID.
16   Q.  Turning back now to Exhibit 164, when did you
17 draft the Standard of Review by the Department of
18 Justice at TK00262651?
19   A.  I don't recall.
20   Q.  Did you draft that before the session started
21 in 2010?
22   A.  I don't recall.
23   Q.  Why did you draft that document?
24   A.  To brief people who are unfamiliar on the
25 Standard of Review by the Department of Justice.

---

178

1    Q.  Were you directed to draft that document?
2    A.  I don't believe I was, but I can't recall for
3  sure.
4    Q.  Did you just do this of your own volition?
5    A.  Possibly, yes.
6    Q.  Did Mr. Dewhurst ask you to draft this?
7    A.  I don't recall that he did.
8    Q.  Under standard review under retrogressive
9  effect, did the Legislature, subsequent to your drafting
10 of this document, seek information to determine whether
11 Hispanic and African-American voters are less likely to
12 possess a photo ID?
13   A.  I'm not sure.  I can't recall from the public
14 testimony if that was mentioned or not.  I know it was
15 discussed at length amongst Senators in debate -- on the
16 house floor during the debate.
17   Q.  Is there anything not in the public discussion
18 about analysis of this question?
19   A.  Not that I'm aware of.  I mean, what is not in
20 the public discussion is evidence of a particular people
21 who would have been unable to.  I don't remember seeing
22 or hearing of any particular individuals who were unable
23 to obtain any ID.
24   Q.  But were there any private conversations among
25 legislators to seek information about whether Hispanic

---

179

1  or African-American voters possess the forms of ID in SB
2  14?
3    A.  Not that I'm personally aware of.
4    Q.  Did you or anyone talk to legislators
5  representing who were the candidates of choice of
6  minority voters about their position on SB 14?
7    A.  Did I speak to them?
8    Q.  Did you or anyone you know speak to anyone
9  about their position on SB 14?
10        MS. HALPERN:  Objection, vague.
11   A.  I don't know who other people spoke to, but at
12 least in the public debate, there was several hours of
13 back and forth between members of all races and parties.
14   Q.  (By Ms. Westfall) Other than the public debate,
15 are you aware of any other conversations with members of
16 the Legislature representing voters who were minority
17 voters.
18   A.  I was not in those conversations.
19   Q.  Do you see that you discuss less retrogressive
20 alternatives in your standard of review?
21   A.  Yes.
22   Q.  Were any additional forms of ID considered to
23 address this point?
24   A.  There were lots of forms of identification
25 considered.  Again, publicly, I don't know what all was

---

180

1  considered in private or by sponsors outside of my
2  knowledge.
3    Q.  Can you identify any attempts to make the bill
4  less retrogressive or as least burdensome as possible to
5  voters and still accomplish the goals of the
6  Legislature?
7    A.  Sure.  There were additional forms of ID added
8  by amendment on the floor.  There were broad exemptions
9  for certain class of people.  There were free election
10 identification cards issued.  I think all of those
11 things were designed to be less burdensome for voters.
12   Q.  What were the forms of ID that were added?
13   A.  I don't have a final copy of the bill.  I know
14 concealed handgun license was one form.  There may have
15 been others that I'm forgetting without the bill.
16   Q.  Are the seven forms of ID under SB 14 as
17 enacted, Texas driver license, Texas personal ID, EIC,
18 concealed handgun license, military ID, citizenship --
19 U.S. citizenship or passport, U.S. passport?
20   A.  Without -- those sound right, but without
21 having the final bill in front of me, I can't say a
22 hundred percent yes.
23        MS. HALPERN:  Counsel, I would like to
24 take a break.
25        MS. WESTFALL:  Okay.  Let's take a break.

---

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

---

181

1        (Recess from 2:41 to 2:51 p.m.)
2    Q.  (By Ms. Westfall)  We're back on the record,
3  and we were talking about Exhibit 164.
4    A.  Correct.
5    Q.  And in particular, the standard of review that
6  you had drafted at TX00262651.
7    A.  Okay.
8    Q.  Do you see that you flagged the issue of
9  whether the law includes mitigating effects?
10   A.  Yes.
11   Q.  And one of the things you list is education
12 efforts targeted at minority communities?
13   A.  Yes.
14   Q.  Do you recall whether SB 14 included any
15 targeted education efforts at minority communities as
16 signed into law?
17   A.  Without having the final version in front of
18 me, my memory is that Secretary of State was given
19 authority to implement an education program.  And the
20 need to do that and minority training I think was
21 discussed during debate over the bill.
22   Q.  But the discretion was given to the Secretary;
23 is that correct?
24   A.  I think that is correct.
25   Q.  It wasn't provided in the bill itself --

---

182

1    A.  I think --
2    Q.  -- is that correct?
3    A.  I think that is correct, although I believe
4  there was also reference requiring the Secretary of
5  State to coordinate with nonprofits and other groups in
6  developing the education efforts.
7    Q.  Do you see also that you listed programs
8  designed to provide photo ID --
9        (Noise interruption as someone enters
10 room.)
11       THE REPORTER:  I'm sorry.
12       MS. WESTFALL:  Let's go off the record for
13 one second.
14       (Brief discussion off the record.)
15       MS. WESTFALL:  Could you mark this?
16       (Exhibit 165 marked for identification.)
17   Q.  (By Ms. Westfall)  You've been handed what's
18 been marked as 165.  Do you recognize this?
19   A.  165 is a copy of SB 14.
20   Q.  This is the version that was signed into law;
21 is that correct?
22   A.  Appears so.
23   Q.  So turning your attention now to Exhibit 165,
24 are there education efforts targeted at minority
25 communities in this bill?

---

183

1    A.  Well, it requires the voter registrar of every
2  county that maintains a website to include information,
3  so that would presumably include minority majority
4  counties.
5    Q.  But to your knowledge, it's not a targeted
6  voter education program; is that correct?
7    A.  Statute -- statutory language does not have
8  specific reference to minorities.
9    Q.  In SB 14, does it include a provision about
10 providing photo IDs in isolated and impoverished areas?
11   A.  I don't see specific references, again, other
12 than the fact that those individuals would fall under
13 general directions to county officials and the Secretary
14 of State.
15   Q.  But to your knowledge, SB 14 did not have
16 targeted -- a targeted program for isolated and
17 impoverished areas; is that right?
18   A.  The statutory language did not, and I'm not
19 certain if the Secretary of State or DPS or other state
20 agencies have separate authority.
21   Q.  Does SB 14 -- any -- include any other programs
22 designed to minimize the impact on minority voters --
23 targeted on minority voters?
24   A.  I think the SB 14 has measures designed to
25 broaden access to identifications and to exempt certain

---

184

1  classes of individuals which might include minority
2  voters.
3    Q.  Who were those exempted classes of voters?
4    A.  Well, in the case of the election
5  identification cards, it would be voters who cannot
6  afford and do not have other forms of photo ID.  So to
7  the extent minority voters fall under that group of
8  people, they would be included.
9    Q.  Any other way?
10   A.  I thought there was exemptions, but I'm having
11 trouble finding them.
12       THE REPORTER:  I'm sorry?
13   A.  I thought there were other exemptions, but I'm
14 having trouble finding them.
15   Q.  (By Ms. Westfall)  Is there an exemption for
16 certain persons with disabilities who obtained
17 documentation from the Social Security Administration --
18   A.  Yeah.
19   Q.  -- or the Veterans' Affairs Department?
20   A.  Yes, I believe there is.
21   Q.  And how does that relate to your contention
22 that those are targeted to minority voters?
23   A.  It doesn't.  My contention is that minority
24 voters might be a class within these voters, the classes
25 you described, for -- for disabled voters.  For free

---

BRYAN HEBERT                                        6/17/2014
CONFIDENTIAL TRANSCRIPT

---

185

1  election identification cards, to the extent the
2  position is that minorities are more likely to be poor,
3  then I think providing free ID cards would be directly
4  targeted to them.
5      Q.  Do you see that you also list as mitigating
6  effects, photo IDs free of charge and widely available
7  on the standard of review?
8      A.  Yes.
9      Q.  At the time SB 14 was under consideration by
10 the Senate, did you consider that EICs would be as
11 implemented by DPS widely available?
12     A.  Yes.
13     Q.  What was the basis of that conclusion?
14     A.  Basis of concluding that EICs would be --
15 Would be widely available.
16     A.  -- widely available?  Because they are to be
17 administered by a state agency with jurisdiction across
18 the state.
19     Q.  Isn't it true that at the time SB 14 was under
20 consideration by the Senate and subsequent even into
21 2012, that 80 counties did not have a driver license
22 office?
23     A.  I don't know the number of counties exactly
24 without those offices, but I do know that there are
25 mobile efforts and extended hours and other provisions

---

186

1  that DPS has undertaken to implement the law.
2      Q.  Just to go back to the question that I posed to
3  you:  At the time that SB was under consideration by the
4  Senate --
5      A.  Uh-huh.
6      Q.  -- about 80 counties did not have driver
7  license offices at that time; isn't that correct?
8      A.  I don't remember the number.  I know there was
9  discussion of it during floor debate about the number
10 and whether it was accessible enough, but I don't
11 remember that number.
12     Q.  Plans to put into place mobile EIC units did
13 not get underway until long after SB 14 was signed into
14 law; isn't that correct?
15     A.  I don't know the date that those started.
16     Q.  It was after the date that SB 14 was signed
17 into law; isn't that correct?
18     A.  I don't know.
19     Q.  Do you see that it also lists, "How does this
20 compare to the law of other states, is it less
21 restrictive or more"?
22     A.  Yes.
23     Q.  Was consideration given to whether the Texas
24 voter ID law was less restrictive, equally restrictive
25 or more restrictive than the laws in Georgia and

---

187

1  Indiana?
2      A.  Was there consideration given to that?  I think
3  there probably was.  I don't remember specific debate
4  from the floor, but I would assume it was.
5          And something occurs to me regarding your
6  last question about IDs being widely available.  If you
7  point to the 80 counties' geography that you said at the
8  time did not have offices, it's still not clear to me
9  what percentage of Texans lived in those counties.  My
10 understanding is that the vast majority of Texas'
11 population lives in counties that do have those offices.
12     Q.  When did you learn that fact?
13     A.  When did I learn that?
14     Q.  Assuming that that's right, when did you learn
15 that fact?
16     A.  I believe that was discussed on the floor
17 during debate.
18     Q.  Were there any changes to the bill considered
19 as a result of your memo on the standard of review or
20 your cover e-mail at Exhibit 164?
21     A.  I -- to the extent there were changes to the
22 bill between this e-mail and the final version, I can't
23 say to what extent those changes were a result of this
24 memo.  I don't pretend that I have that much influence,
25 but there were changes to the bill.

---

188

1      Q.  Were any of these IDs that you suggested on the
2  cover e-mail of 164 added?
3      A.  No, we don't have -- and again, I think the --
4  the IDs described there, the underlined language on
5  Exhibit 164, meaning, all federal, state, local,
6  political subdivision IDs, it's considerably less secure
7  because of the reasons we mentioned.  They don't have
8  expiration dates.  They don't have bar codes.  They
9  could be, you know, produced by any -- an innumerable
10 almost number of entities in Texas, given the large
11 number of counties and local subdivisions within those
12 counties.
13         MS. WESTFALL:  I'm going to object to your
14 response as nonresponsive and ask you again.
15     Q.  (By Ms. Westfall)  Were any of the IDs that you
16 proposed in the e-mail in Exhibit 164 adopted in the
17 final version of Senate Bill 14?
18     A.  The final version of Senate Bill 14 does not
19 include this language.
20         MS. WESTFALL:  Could you mark this?
21         (Exhibit 166 marked for identification.)
22     Q.  (By Ms. Westfall)  You've been handed what's
23 been marked as Exhibit 166.  Do you recognize this
24 document?
25     A.  It looks like an e-mail, two e-mails.  One from

---

BRYAN HEBERT                                             6/17/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

189

1   me to some Senate staffers.  And then, again, an
2   additional e-mail from Senator Huffman's staff or to
3   another Huffman's staffer, or I think Huffman staffer,
4   with an attachment on possible questions and amendments
5   likely to arise tomorrow, which would be and the day
6   after January 24.
7       Q.  Okay.
8       A.  And again, the attachment is Janice's notes on
9   those questions.
10      Q.  And for the record, Exhibit 166 is TX00265539
11  through TX00265543.
12          Who is Amanda Montagne?
13      A.  Amanda Montagne at the time worked for Senator
14  Williams.
15      Q.  Who is Ryan LaRue?
16      A.  I believe he also worked for Senator Williams
17  at the time.
18      Q.  Why were you sending them this e-mail?
19      A.  My memory is that Senator Williams cared about
20  this issue and intended to help defend the bill on the
21  floor.
22      Q.  By this issue, you mean?
23      A.  Voter ID bill.
24      Q.  Did you have advanced notice of the amendments
25  that were going to be offered?

190

1       A.  I don't think -- sometimes in the legislature
2   they prefile amendment.  The House does that a lot more
3   often than the Senate.  I can't remember if I saw
4   amendments ahead of the floor debates.  This
5   amendment -- I mean, this attachment says the amendments
6   that are likely to arise.  I don't know how she came to
7   that conclusion, but I don't recall seeing any
8   amendments ahead of time.
9       Q.  Did you speak with authors of the amendments?
10      A.  It's possible.  I mean, I speak to a lot of
11  Senate staff every day from all parties on all sides of
12  all issues so it's possible.
13      Q.  The e-mail indicates that your suggested
14  revisions are in red; is that right?
15      A.  Yes.
16      Q.  And this is a black-and-white document; is that
17  right?
18      A.  Uh-huh.
19      Q.  Do you recall what changes you made to
20  Ms. McCoy's proposed responses to amendments in her
21  Q&A's?
22      A.  I don't remember.
23      Q.  Do you see there's a strikeout on the last page
24  at 265543?
25      A.  Yes.

191

1       Q.  Is that your strikeout?
2       A.  I don't -- I can't say for sure.
3       Q.  Do you see on page 265540, it discuss a lower
4   elderly threshold?
5       A.  Yes.
6       Q.  Do you recall which senators requested these
7   exemptions for voters over the age of 70?
8       A.  I don't.
9       Q.  Do you recall what other compromises, besides
10  these amendments listed here, bill opponents asked of
11  bill supporters?
12      A.  Without seeing a list of the amendments and
13  without knowing the conversations between the senators,
14  I don't know for sure what they -- what opponents
15  wanted.
16      Q.  Did bill opponents ask that Senate Bill 14
17  include additional forms of ID?
18      A.  Again, without having the amendments in front
19  of me, I just can't recall specifically.  I know -- I do
20  remember -- again, CHLs were added at the requests of
21  Senator Hinojosa.
22      Q.  CHLs are?
23      A.  Concealed handgun license.  So at least for one
24  case, opponents to the bill suggested an alternative
25  form of ID, and that was acceptable.

192

1       Q.  Do you see at page TX00265541 through 43, it
2   appears to be questions and answers?
3       A.  Yes.
4       Q.  Were these questions that Senator Fraser
5   expected to receive on the floor from bill opponents?
6       A.  I don't know.  I didn't write the documents, so
7   I don't know for sure.
8       Q.  Do you see at 265542, it references statistics
9   and voter turnout studies that were in the possession of
10  Senator Wentworth in the middle of the page?
11      A.  Yes.  I think Senator Wentworth has some
12  information on those statistics and voter turnout
13  studies.
14      Q.  What studies did the Lieutenant Governor use to
15  satisfy himself that Senate Bill 14 would not reduce
16  turnout among minority voters?
17      A.  Well, Senator -- I mean, the Lieutenant
18  Governor Dewhurst would have been a sitting member of
19  the Committee of the Whole, so he would have reviewed
20  all those documents presented during that debate.
21      Q.  Can you identify any studies that he reviewed
22  to satisfy himself that it would not reduce turnout
23  among minority voters?
24          MS. HALPERN:  Object to the form.  Object
25  that it calls for speculation.

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 196)

---

193

1    Q.  (By Ms. Westfall)  You may answer.
2    A.  I don't remember specific names of reports or
3  studies.  I do remember generally that Senator
4  Wentworth's presentation included voter turnout in
5  states that implemented voter ID.
6    Q.  In terms of the impact at the bottom of page
7  265542, references the impact to voter ID on Hispanic,
8  Black and poor voters.  Do you see that?
9    A.  Uh-huh.
10    Q.  And do you see a reference that's data from
11  Indiana?
12    A.  Yes.
13    Q.  And is it true that there was no data at that
14  point gathered concerning Texas voters and the impact in
15  Texas of Senate Bill 14?
16    A.  I don't know that no data had been collected --
17    Q.  But you're not aware of any, sitting here
18  today, that you can recall?
19    A.  Well, it had not been implemented yet, so.
20    Q.  There wasn't any analysis while the bill was
21  pending?
22    A.  Not that I can recall.  But again, there was no
23  testimony that I recall during that debate about actual
24  individuals who would not be able to get an ID.
25        MS. WESTFALL:  I would object to that

---

194

1  response as nonresponsive.
2    Q.  (By Ms. Westfall)  Turning back to Texas
3  00265543, I asked you about the strikeout before, and I
4  believe you did not -- you did not make that strikeout;
5  is that correct?
6    A.  I don't recall whether I did or not.
7    Q.  Do you know who would have made that strikeout?
8    A.  No.  I mean, the e-mail says attached are
9  Janice's notes, so I presume it would be Janice or
10  someone Janice knows.  And it may have been me.  I
11  honestly can't remember.
12    Q.  Did you agree with the strikeout that's
13  identifying particular numbers of voters without ID
14  might be, quote, potentially confusing, unquote?
15    A.  I don't know.
16    Q.  Did you anticipate that legislators might want
17  to know the number of voters impacted by Senate Bill 14?
18    A.  Yes.  And again, there -- I'm sure there was
19  debate about that.  It was a big part of the debate on
20  the floor before the Committee of the Whole.
21    Q.  What did bill supporters do to respond to those
22  questions?
23    A.  I can't remember specifics, all the specifics.
24        MS. WESTFALL:  Could you mark this?
25        (Exhibit 167 marked for identification.)

---

195

1    Q.  (By Ms. Westfall)  You've been handed what's
2  been marked as Exhibit 167.  Do you recognize this
3  document?
4    A.  Looks like a memo, an e-mail that I wrote to
5  several Senate staffers --
6    Q.  Well -- go ahead.
7    A.  -- relating to a proposed amendment that was
8  likely to be offered allowing a person to vote without
9  the photo ID but by signing an affidavit.
10    Q.  And you opined that that would gut the bill?
11    A.  It says, yes, it basically guts the bill.
12    Q.  How would it gut the bill?
13    A.  It means photo IDs are not necessary.  And to
14  the extent that this bill requires photo IDs at the
15  poll, that amendment would say they're really not.
16    Q.  Why did you mention the DOJ loves affidavits?
17    A.  I don't specifically.  I assume it was
18  because they reference that language in other
19  preclearance reports.
20    Q.  Did you believe that affidavits were relevant
21  to analysis of SB 14 under Section 5 of the Voting
22  Rights Act?
23    A.  I -- I can't recall specifically.  I can say
24  that all previous preclearance opinions are relevant
25  whether future laws are going to be precleared, and that

---

196

1  would be true in Texas and any other state.
2    Q.  Did you consider whether an affidavit provision
3  might impact minority voters in a favorable way in
4  Texas?
5    A.  I don't think I did.  I think the consideration
6  was what I said there is that it guts the bill in the
7  sense that it turns a photo ID bill into a bill that
8  does not require photo IDs.
9    Q.  Why did you send this e-mail concerning this
10  particular amendment and not others?
11    A.  I don't recall.
12    Q.  Do you have concern -- did you have concern at
13  the time that there might be support for this amendment?
14        MS. HALPERN:  Objection, assumes facts not
15  in evidence.
16    Q.  (By Ms. Westfall)  You may answer.
17    A.  I don't think that was my concern, but I don't
18  recall specifically why this -- the proposed potential
19  amendment warranted flagging.  It could be that was the
20  only amendment I was, you know, aware of might come up.
21  I don't recall.
22    Q.  Did Texas voter registration applications
23  require the voter's signature?
24    A.  Yes, I believe they did.
25    Q.  And so county election officials have a

---

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

50 (Pages 197 to 200)

197

1  signature of a voter on file in their offices; is that
2  right?
3      A.  I think that's probably right.
4      Q.  What is early voting by mail?
5      A.  A voter -- it means one of certain criteria can
6  request a ballot and complete that ballot and mail it
7  in.
8      Q.  And it's in Texas, early voting by mail is
9  not -- no excuse, correct?
10     A.  I'm sorry?
11     Q.  Let me withdraw that question.
12         You need to fall within a certain set of
13  categories to vote --
14     A.  Correct.
15     Q.  -- early vote in Texas; is that right?
16     A.  Correct.
17     Q.  When a voter --
18         MR. WHITLEY:  Objection.  I think you're
19  using early vote and vote by mail synonymously, and you
20  may have misstated something, but I want to make sure
21  your question is clear.
22         THE WITNESS:  That's a good point.
23         MS. WESTFALL:  Thank you for the
24  clarification, Counsel.
25     Q.  (By Ms. Westfall)  When a voter votes early

198

1  by -- actually, what's the difference between voting
2  early by mail and absentee voting?
3      A.  I believe, as far as I know, they're the same.
4  Absentee voting and mail-in voting are the same.  And
5  your -- if the question is, can only certain categories
6  of people cast a mail-in ballot, the answer is yes.
7  It's a pretty broad category of people.  Those, I think,
8  over 65, those with a disability, although I'm sure that
9  term is defined.  It think it's largely self-defined by
10  the voter.  And those who are residents to Texas but
11  temporarily out of the state.
12     Q.  For a mail-in ballot, how does the ballot board
13  determine whether the ballot is valid?
14     A.  I guess I'm not a hundred percent clear.  I
15  would imagine they compare signatures.
16         MS. WESTFALL:  Could you also mark this
17  one?  These two, doesn't matter what order.
18         (Exhibit 168 and 169 marked for
19  identification.)
20     Q.  (By Ms. Westfall)  You've been handed what's
21  been marked as 168 and 169.
22         MS. HALPERN:  I've only been handed 169
23  apparently.
24         MS. WESTFALL:  Didn't throw it far enough.
25         MS. HALPERN:  There you go.

199

1      Q.  (By Ms. Westfall)  Do you recognize these
2  documents?
3      A.  Let's see.  Exhibit 168 is an e-mail from
4  someone named Brent Connett.  I don't know to whom, to
5  himself, but then that e-mail is in the possession looks
6  like Jason Baxter sent it to me, and I replied to all,
7  to those parties.  Anyway, regarding suggested talking
8  points on election integrity.  And then me advising
9  caution.  And then 169 is the underlying e-mail, I
10  suppose, from Brent Connett to -- it says addressed to
11  Senators.  And then there's an attachment analyses and
12  talking points on election integrity.
13         MS. WESTFALL:  And for the record, Exhibit
14  168 is Texas 00081510.  Exhibit 169 is Texas 00080568
15  through 80572.  Actually, '3.  Sorry.
16     Q.  (By Ms. Westfall)  Did the Texas Conservative
17  Coalition that wrote the attachment to Mr. Baxter's
18  e-mail express support for voter photo ID requirements?
19     A.  It appears that, yes, they did.
20     Q.  Did the coalition urge adoption of such a
21  requirement as a means of combating noncitizens from
22  registering to vote?
23     A.  I'm not seeing that language, but it must be in
24  there, because in my e-mail I say that's not what the
25  bill is about, to avoid that language.  But I'm not

200

1  finding it in the attachment.
2      Q.  Thank you.  Was combating noncitizen voter
3  registration one of the purposes of SB 14?
4      A.  I think the purpose was to combat ineligible
5  voters.
6      Q.  Did that include non-U.S. citizens from
7  participating in elections?
8      A.  I think noncitizens are a subset of ineligible
9  voters.
10     Q.  So the answer would be yes?
11     A.  Yes.
12     Q.  Do you see that at 168, you commented on the
13  talking points, and you advised or recommended to
14  Mr. Baxter and Ms. Montagne and Mr. LaRue that talk of
15  the illegals and registration, to quote you, "be
16  avoided."  Do you see that?
17     A.  It doesn't say be avoided.  It says, "Avoid
18  talking about illegals and registration.  We're not
19  doing this to crack down on illegals but to generally
20  strengthen the security and integrity of the voting
21  process.  This is a bill about voting, not registering,
22  although some mention of registration fraud is useful to
23  show that fraud exists generally in the system."
24     Q.  Why did you write this?
25     A.  I think I wrote it -- I'm not familiar even

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

51 (Pages 201 to 204)

---

**201**

1  today, and I don't think I was familiar with the group
2  who sent the document to Texas Conservative Coalition or
3  Mr. Brent Connett.  I don't think I directly received
4  this information.  All the people that I include on that
5  e-mail worked for Senator Williams, and so I'm not clear
6  who received it beyond Senator Williams.  But I think
7  what I say in the e-mails is what I meant and it's true
8  today, despite some efforts by some to characterize it
9  as such, it's not an anti-immigrant or anti-illegals,
10  quote/unquote, illegals bill.  It's about strengthening
11  the security and the integrity of the voting system.  So
12  to the extent I was advising Senate staff who were then
13  advising their boss, I wanted to make sure that people
14  were careful about how they couched the bill, especially
15  if they weren't the sponsor of the bill, and that they
16  used rhetoric that was responsible and accurate.
17  Q.  How do you know that cracking down on illegals
18  and registration was not a purpose of Senate Bill 14?
19  A.  It was never -- I only know what I know from my
20  conversations with senators and staff and what I
21  witnessed publicly, and at no time did I see or witness
22  any of the above-mentioned people talk about immigration
23  or illegal or any of the other similar rhetoric as the
24  purpose of the bill.
25  Q.  Is it fair to say that there were some groups

---

**202**

1  like the Texas Conservative Coalition who believed that
2  Senate Bill 14 would further the purpose of cracking
3  down on noncitizens voting?
4  A.  I guess, yes, there's groups who interpret the
5  bill all manner of ways.
6  Q.  And you just testified that you thought a more
7  responsible way was to discuss it in terms of, as you
8  mention in the e-mail, as it relates to voting.  Why
9  would it be irresponsible to talk about Senate Bill 14
10  cracking down on illegals or noncitizens voting?
11  A.  Well, it's just inaccurate for one.  Again, I
12  think as I said here, that was not my understanding of
13  the bill's purpose or intent.  So to the extent it's
14  characterized as the intent, that's inaccurate.  And
15  again, we all know that there's inflammatory language
16  used by parties on both sides.  And certainly, the term
17  illegal and other terms used by people in and around the
18  Capitol are offensive to others.  And to the extent we
19  could avoid inflammatory rhetoric, that's always my
20  interest.
21  Q.  And why were you concerned with the possibility
22  that inflammatory rhetoric, as you called it, would be
23  used in the SB 14?
24  A.  There was inflammatory rhetoric on the floor of
25  the Senate between senators, so of course there was from

---

**203**

1  members on both sides of the issue across the states.
2  Q.  And were you concerned about quality of the
3  dialogue or any other repercussions that might come from
4  this type of rhetoric being used with regard to SB 14?
5  A.  Yeah, I think it's safe to say that I was
6  concerned about the quality of the rhetoric.  Anytime
7  you have a bill with all the Republicans on one side and
8  all the Democrats on the other, it tends to be
9  contentious, and the rhetoric in those situations can
10  escalate.  And I try to see myself as a sort of neutral
11  observer and legal advisor on these matters.  And to the
12  extent we can avoid overheated rhetoric, that's always
13  in the best interest of the Legislature, I think.
14  Q.  And beside Exhibit 169 and the cover e-mail
15  sent by Brent Connett and the attachment thereto, had
16  you heard other senators or their staff frame SB 14 as
17  something that would combat illegal voting and illegals
18  from voting and participating in elections?
19  A.  I'm sure there are instances -- what I recall
20  is statements to combat ineligible voters.  And it's
21  possible that noncitizens were listed as part of those,
22  that group, but I can't remember specific instances now.
23  Q.  If there were some supporters of SB 14 who
24  thought it would go after combating illegals and
25  noncitizens voting, and that was a faction who supported

---

**204**

1  SB 14, why wouldn't you let that message continue in the
2  public domain?
3  A.  Assuming that we're talking about people who
4  are not citizens of Texas, I think it's fair to say we
5  should not allow noncitizens of Texas to vote in Texas
6  elections.  That is part of the intent of SB 14.  But as
7  I said, the group of ineligible voters is much larger
8  than that.
9  To the extent you want to talk about
10  people from -- not -- that are not citizens of Texas
11  voting in Texas elections and that being a problem, that
12  seems totally fair to me.
13  Q.  But here in this e-mail in 168, you were
14  concerned about talk about illegals.  Who were you
15  referring to when you said illegals?
16  A.  I think I -- it appears I was quoting from the
17  document, and I'm also referring -- suggesting that
18  there's not a discussion about registration, because
19  neither of those things are the point of this bill.
20  Q.  But by illegals, were you referring to persons
21  who were not U.S. citizens?
22  A.  I don't know.  I don't know.  Again, I think my
23  impression is that I was quoting from the document, and
24  so I'm not sure what illegals referred to.  Yes,
25  generally speaking, I think people who use the term

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

205

1  refer to people who are not United States citizens.
2      Q.  Did you have any concern or was any of your
3  motivation in writing the e-mail at Exhibit 168 based on
4  concern that talk about illegals could be construed as
5  racially discriminatory?
6      A.  I don't know if that was a specific concern of
7  mine.  I think the concern, again, was that people
8  accurately framed the bill about what the bill actually
9  did and not what one line of one talking -- one, you
10  know, document of talking points from an outside group
11  said it might be about, but that it'd be based on what
12  the senators actually said and the sponsors of the bill
13  actually said.
14      Q.  And you -- so the purpose of the e-mail was to
15  bring it back to the public discussion about the
16  purposes of the bill and not as framed by groups such as
17  the Travis Conservative Coalition?
18      A.  Again, I can't specifically recall what I was
19  thinking at the time that I got this, but that sounds
20  roughly correct.
21      Q.  And what was the purpose of kind of reframing
22  the debate and keeping it on the public purposes of
23  Senate Bill 14?
24      A.  I don't know.  I mean, I just -- I was just
25  responding to the document that was sent to me.

206

1      MS. WESTFALL:  Could you mark this?
2          (Exhibit 170 marked for identification.)
3      Q.  (By Ms. Westfall)  You've been handed what's
4  been marked as 170, which is Texas 00081575.  Do you
5  recognize this document?
6      A.  Looks like an e-mail from myself to various
7  Senate staffers and my chief of staff and policy
8  director laying out, quote, the plan for Tuesday, which
9  I assume would have been floor debate and the Committee
10  of the Whole.  And it lays out invited witnesses,
11  certain roles different senators would play, some other
12  items.
13      Q.  Who was Katie Ogden?
14      A.  Katie Ogden worked for Senator Wentworth, I
15  believe, as chief of staff.
16      Q.  Is it fair to say that this e-mail is sort of
17  saying that plan for testimony and how consideration of
18  the bill would occur?
19      A.  To the extent you can have a plan and execute
20  it on the floor of the Senate, I suppose it is an
21  attempt to -- at best, it's an outline of how things
22  might go.
23      Q.  Were you responsible for that outline?
24      A.  I honestly can't remember if these are my ideas
25  or if this is me passing a message, but this is an

207

1  e-mail from me.
2      Q.  Who else would have developed this plan besides
3  you?
4      A.  Senator Fraser and his staff, any of the
5  senators listed here, perhaps Blaine Brunson or Julia
6  Rathgeber.
7      Q.  But is it more likely that it came from your
8  office given that you were the point person for the
9  elections and voting issues?
10      A.  It's unlikely I would have done all this
11  without significant input from the bill sponsor and the
12  senators listed.  It's not my place to tell senators
13  what they're going to be doing during debate of a bill.
14      Q.  But was it your role to kind of organize,
15  coordinate and communicate the plan to others?
16      A.  At least to these people, that seems fair.
17      Q.  Do you see that under "floor tasks" in the
18  parentheses, you urge senators to emphasize the
19  detection and deterrence of fraud and protect public
20  confidence in elections?
21      A.  Yes.
22      Q.  Why did you stress the need for senators to
23  emphasize those points?
24      A.  Because that was the goal of the bill as I
25  understood it.

208

1      Q.  Were you concerned that they may -- they might
2  say other things on the floor of the senate about other
3  reasons for SB 14 being considered?
4      A.  I -- even if I had concerns about a senator --
5  what a senator might say, there's no stopping a senator
6  who wants to say something.  But yeah, to the extent
7  that senators were looking for direction, I think this
8  was an attempt to remind people what the point of this
9  bill is.
10      Q.  And again, as with the previous exhibit, were
11  you concerned that there might on the Senate floor be
12  expressions of support for Senate Bill 14 as a basis of
13  cracking down on illegal non-U.S. citizens in this
14  country?
15      A.  I don't know that I was concerned about it,
16  again, because I don't recall that I had heard it from
17  many senators or their staff.  So I don't -- I don't
18  think I would say it was a concern of mine.
19      Q.  So if detecting and deterring fraud and
20  protecting public confidence was the sole purposes to
21  SB 14, why were you having to remind staffers to let
22  their bosses know that these were the purposes of the
23  bill?
24      A.  One, I would say it wasn't necessarily the sole
25  purpose, but it's in my estimation the main purpose.

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

53 (Pages 209 to 212)

---

**209**

1  But more importantly, I think senators have hundreds and
2  hundreds and hundreds of bills that they consider, and
3  while this is a very important bill, there were lots of
4  very important bills and items before the senators
5  during that session.  Plus, their day jobs, plus their
6  family lives, there's a lot going on.  And so we do this
7  for all sorts of bills, not just this bill, reminding
8  senators what the bill does and how it might be
9  discussed and so forth.
10       MS. WESTFALL:  We're going to stop the
11  highly confidential designation right now.
12       MS. HALPERN:  How long have we been going
13  since the last break?  I lost track of where we are.
14       MR. WHITLEY:  45 minutes.
15       MS. WESTFALL:  Okay.  Okay to proceed?  Do
16  you want to go off the record and have him calculate it
17  or do you want to take a break or do you want to --
18       MS. HALPERN:  Yeah, I'd like a five-minute
19  break.
20       MS. WESTFALL:  Okay.  That's fine.
21       (Recess from 3:33 to 3:45 p.m.)
22       (Exhibit 171 marked for identification.)
23  Q.  (By Ms. Westfall) You've been handed what's
24  been marked 171.  Do you recognize this document?
25  A.  It looks like the legislative history of Senate

---

**210**

1  Bill 14.
2  Q.  Right.  Are you aware that Senator Fraser
3  answered "I am not advised throughout the debate on
4  Senate Bill 14"?
5  A.  I remember that he gave that answer to some
6  questions.
7  Q.  Did you know in advance that he was going to
8  take that approach, in terms of answering questions,
9  during the consideration of SB 14 in Committee of the
10  Whole?
11  A.  No.
12  Q.  Did anyone know he was going to have those
13  answers?
14  A.  I don't know.
15  Q.  In advance?  Was Senator Fraser instructed by
16  anybody to answer in that manner?
17       MS. HALPERN:  Objection, calls for
18  speculation.
19  Q.  (By Ms. Westfall) You may answer.
20  A.  Not that I know of.
21  Q.  Was SB 14 the least restrictive option to
22  achieve the goal of preventing voter fraud?
23  A.  I don't know.  I mean, I suppose it could have
24  been more or less restrictive, but I'm not sure how that
25  would have affected the security of the elections.

---

**211**

1  Q.  But can you imagine, sitting here today, that
2  there could have been a less restrictive bill that could
3  have accomplished that same objective of SB 14?
4       MS. HALPERN:  Objection, relevance.
5  Q.  (By Ms. Westfall) You may answer.
6  A.  There would -- there could have been a less
7  restrictive bill.  I am not clear that that would have
8  been adequately secure or resulted in adequately secure
9  elections.
10  Q.  Was there any discussion in the Senate of how
11  to accomplish the goals of photo ID, generally,
12  requirements by less restrictive means?
13  A.  Yes.  I think a lot of the debate in the
14  Senate, and from what I saw at the House, there was that
15  debate.  Certainly opponents of the bill had a lot of
16  suggested amendments, some of which were adopted and a
17  lot of which were not.  So yes, there was discussion
18  about that.
19  Q.  Which ones were adopted to make the bill less
20  restrictive?
21  A.  I'll have to look to be sure.  In the Senate?
22  Q.  In the Senate.
23  A.  Two I can think of, off the top of my head, I
24  think the disability exception and the addition of CHLs
25  as acceptable ID.  There may have been others.  Maybe --

---

**212**

1  if I could just a second look at the bill.  My memory is
2  that the language in the bill referring to recently
3  expired IDs was a product of a floor amendment from a
4  minority member.  Without going through every individual
5  amendment, those are three examples I can think of.
6  Q.  Are you aware of whether Mr. Dewhurst had any
7  nonpublic conversations with other members or staff
8  about amendments to SB 14?
9  A.  I'm not aware of any conversations.
10  Q.  Were you part of any of those conversations
11  with Mr. Dewhurst and other members about amendments?
12       MS. HALPERN:  Objection, asked and
13  answered.
14  A.  Yeah.  I'm not aware.
15  Q.  (By Ms. Westfall) You can answer.
16       Were you on the Senate floor when SB 14
17  was being considered by the Committee of the Whole?
18  A.  Yes.
19  Q.  During for consideration, did Senator Williams
20  ask Ann McGeehan to conduct additional analysis of which
21  registered voters did not have driver licenses?
22  A.  I don't recall.  I believe Senator Williams was
23  chair of Transportation at the time, so he would likely
24  have had an interest in issues related to DPS-issued
25  identification, but I don't recall that specific

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

213

1  question.
2      Q.  Were you ever a party to conversations with the
3  Office of the Secretary of State's concerning analysis
4  of voters without a driver license?
5      A.  Again, it's possible.  I think I mentioned it
6  earlier in my deposition.  I recall a meeting with Ann
7  McGeehan.  I think it involved how people voted or
8  whether those people, voters had identification
9  typically.  But I cannot remember the specifics of that
10 conversation.
11     Q.  Do you recall whether that conversation was
12 after the Senate considered SB 14 or before?
13     A.  I don't recall.
14         MS. WESTFALL:  Could you mark this?
15         (Exhibit 172 marked for identification.)
16     Q.  (By Ms. Westfall) You've been handed what's
17 been marked as 172.  Could you take a look at this
18 document and let me know when you've had a chance to
19 review it.
20     A.  It looks like a chain of e-mails among
21 Secretary of State staff regarding the number of
22 registered voters that have not been issued a driver's
23 license or personal ID card by DPS.
24     Q.  Have you ever seen this document before today?
25     A.  I can't recall if I have or not.  I can't

214

1  recall.  It seems like it would have -- if it was a
2  public document, it would have come up in either the
3  House or Senate debate, so it's possible I heard
4  reference to it, but I can't recall if I saw it
5  specifically.
6         MS. WESTFALL:  For the record, Exhibit 172
7  is Bates number TX00 107733 through 107735.
8      Q.  (By Ms. Westfall) Have you ever seen this
9  document not in the public debate?
10     A.  I don't think so, but I can't recall.  Again,
11 it's -- I know that I met with Ann McGeehan, and I think
12 I talked about issues similar to this, I can't recall if
13 this is a response to a question I raised or a question
14 someone else raised, and I'm not a recipient anywhere on
15 here, so I don't remember seeing the document before,
16 no.
17     Q.  Do you see the date of this document, the dates
18 of these e-mails?
19     A.  The document is undated, but the e-mails are
20 January 27th, February 1st, and February 1st of 2011.
21     Q.  So is it fair to say that these e-mails were
22 drafted after the Senate consideration of Senate Bill
23 14?
24     A.  Yes.
25     Q.  Had you ever heard any of these numbers or

215

1  results prior to today, even if you hadn't seen this
2  particular set of e-mails?
3      A.  I can't recall.  Again, it's possible that Ann
4  or the Secretary of State's Office had some of these
5  numbers in previous meetings I had with them, but I
6  don't recall specific instances of that.
7      Q.  You were involved in preparation of Defendants'
8  interrogatory responses to the United States
9  interrogatory requests in this action; is that correct?
10     A.  Yes, I believe I was.
11     Q.  And as part of those responses, did you provide
12 information about occasions on which analysis of which
13 voters have state-issued forms of ID had been conducted?
14     A.  I know I assisted with the interrogatories to
15 the extent they requested documents or information from
16 my -- from the Lieutenant Governor's Office, and I can't
17 remember if what you described would have been a
18 response to that or not.
19         MS. WESTFALL:  Could you please mark this?
20         (Exhibit 173 marked for identification.)
21     Q.  (By Ms. Westfall) You have been handed what's
22 been marked as Exhibit 173.  Do you recognize this
23 document?
24     A.  It looks like a copy of the Defendants'
25 Objections and Responses to Plaintiffs and Intervenors

216

1  First Set of Interrogatories.
2      Q.  Have you seen this document before?
3      A.  I'm not sure I've seen this version or the --
4  I'm assuming this is the final version.  I think I saw
5  it, but I can't be a hundred percent sure.
6      Q.  Turning your attention to Page 6, do you see
7  you are listed?
8      A.  Yes.
9      Q.  And do you see it indicates that you provided
10 assistance with responses to interrogatories number 2,
11 17, 18, 19?
12     A.  Yes.
13     Q.  Turning your attention to Page 59, which is
14 where the response to Interrogatory 17 is located.
15     A.  Uh-huh.
16     Q.  Do you see that you contributed responses to
17 Interrogatory 17, 18 -- 17 and 18, which requests
18 information about analysis of which voters don't have
19 certain forms of ID?
20     A.  Yes.
21     Q.  Could you describe information that you
22 provided to respond to Interrogatory requests 17 and 18?
23     A.  I don't recall that I provided any information.
24 I can't remember that we had anything responsive or not.
25     Q.  Do you believe that the indication on Page 6,

BRYAN HEBERT                                        6/17/2014
CONFIDENTIAL TRANSCRIPT

55 (Pages 217 to 220)

---

217

1  that you provided information for numbers 2, 17, 18, and
2  19, was in error?
3      **A.  I don't believe that.  Let me double check.  It**
4  **says the following persons assisted generally in either**
5  **providing information or preparing responses.  I'm not**
6  **sure which one of those I fall into, but I do remember**
7  **helping with some of these.**
8      Q.  Did you do any drafting, do you recall, for the
9  responses to 17 and 18?
10     **A.  I don't recall doing any specific drafting.**
11     Q.  Did you provide information?
12     **A.  I think it's more likely I would have provided**
13  **any information I had in my -- had available to me.**
14     Q.  And as evidenced on the face of the responses
15  to 17, which requests information about analysis of
16  voters without state forms of ID, there is no
17  information disclosed about the matching analysis in
18  Exhibit 172 which you just reviewed, correct?
19     **A.  Let me see.**
20         MS. HALPERN:  Counsel, I'm going to
21  object.  I want the record to reflect that this witness
22  has not identified as having received Exhibit 172.  He's
23  neither to nor from nor cc'd.
24         MS. WESTFALL:  I'm asking about
25  interrogatory responses to which Defendants have

---

218

1  indicated he has participated in.
2         MS. HALPERN:  Well, I understand that, and
3  I think you're mischaracterizing the interrogatory as
4  well.  Certainly, this Exhibit 172 doesn't have anything
5  about demographic characteristics in it.  At best, it
6  has numbers.  And I, frankly, don't understand the
7  exhibit to the extent that the first row in each query,
8  which is labeled Number of Voters With No -- presumably,
9  that means driver's license or ID number -- that number
10  is the sum of the two rows below it, numbers that did
11  not match and numbers that did match.
12         MS. WESTFALL:  Okay.  Well, you're not
13  here to testify, but I appreciate your comments on the
14  exhibit.
15         MS. HALPERN:  Well, I just don't want you
16  mischaracterizing his role in the interrogatory
17  responses, asking about number or demographic
18  characteristics, when this aide doesn't do either.  He
19  didn't see the document.
20         MS. WESTFALL:  Well, you're not -- you're
21  not here to testify about this document, so I'm going to
22  move to strike those comments.
23     **A.  So to the extent my office was asked about**
24  **whether we possessed documents described by**
25  **interrogatory 17 and 18, I don't think we had any**

---

219

1  **documents in our possession, and I don't recall**
2  **providing any specific input otherwise to the response.**
3      Q.  (By Ms. Westfall) Do you have any information
4  about why the analysis included in Exhibit 172 was not
5  listed in this interrogatory response?
6      **A.  It doesn't appear to have been sent to any**
7  **legislator from the face of this document, this e-mail.**
8  **It looks like internal e-mails by the Secretary of**
9  **State.**
10     Q.  Do you have any information about why -- is it
11  your understanding the Secretary of State is a defendant
12  in this action?
13     **A.  I'm not sure that's correct, but I will take**
14  **your word for it.**
15     Q.  I will represent to you --
16     **A.  Thank you.**
17     Q.  -- because the caption is condensed, the
18  Secretary of State is a defendant in this action.
19         MS. HALPERN:  I'm going to object to your
20  question, Counsel, because it calls for speculation on
21  the part of this witness, since he is not a defendant
22  and obviously don't know.
23     Q.  (By Ms. Westfall) You may answer.
24     **A.  What was the question?**
25     Q.  Do you know why analysis in 172 was not

---

220

1  included in the response to the Interrogatory 17 and 18?
2      **A.  I do not know.  I know I did not provide it**
3  **because I do not possess it.**
4         MS. WESTFALL:  Could you please mark this?
5         (Exhibit 174 marked for identification.)
6      Q.  (By Ms. Westfall) You've been handed what's
7  been marked as Exhibit 174.  Do you recognize this
8  document?
9      **A.  It appears to be the Senate Journal entry**
10  **from -- or at least part of Wednesday, January 26, 2011.**
11     Q.  Did the Lieutenant Governor circulate to the
12  Republican caucus written recommendations on how to vote
13  on certain amendments?
14     **A.  Not that I'm aware.**
15     Q.  Ever?
16     **A.  Not that I'm aware.  And as a practical matter,**
17  **from my experience, generally on the floor of the**
18  **Senate, which was every day in recent sessions,**
19  **amendments are not generally known until the senator**
20  **submits it, which could be seconds before they are**
21  **considered.  So as a practical matter, I don't think**
22  **there would have been time to submit written positions**
23  **on how to vote on amendments.**
24     Q.  I direct your attention to Page 137 of this
25  Senate Journal.

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

56 (Pages 221 to 224)

221

1      A.  All right.
2      Q.  Do you see that it lists a floor amendment
3   offered by Senator Duncan --
4      A.  Yes.
5      Q.  -- related to indigent voters?
6      A.  Yes.
7      Q.  Would this amendment have required the counting
8   of provisional ballots of individuals, voters who attest
9   they are indigent and do not have ID?
10      A.  If the person executed an affidavit stating
11   that they were indigent or had a religious objection or
12   were not otherwise challenged, then it looks like, yes,
13   that that provisional ballot would have been counted.
14      Q.  This amendment was adopted by the Senate, was
15   it not?
16      A.  I don't have the vote on that.
17      Q.  Sir, does it indicate, on Page 138, the vote?
18      A.  I'm sorry.  Yes.
19      Q.  Was it adopted by the Senate?
20      A.  Yes.
21      Q.  Was this provision included in the final
22   version of SB 14 that's signed into law?
23      A.  I do not believe it was.
24      Q.  Had this been adopted in the final version of
25   the bill signed into law, would it have reduced the

222

1   burden on poor voters?
2      A.  I think it would -- would it have reduced the
3   burden on poor voters if this had been adopted?  It's
4   possible.
5      Q.  Are poor voters disproportionately minority?
6      A.  I don't know that to be true, but I suspect
7   that to be true.
8      Q.  May I direct your attention to Page 118 of
9   Exhibit 174.
10      A.  Okay.
11      Q.  Do you see that there's a floor amendment
12   Number 12 offered by Senator Davis to prohibit state
13   agencies from charging fees for the issuance of
14   acceptable forms of photo ID under Senate Bill 14 or for
15   underlying documentation --
16      A.  Yes.
17      Q.  -- to get those forms of ID?
18      A.  Yes.
19      Q.  Was this amendment adopted by the Senate?
20      A.  No.
21      Q.  Had this been adopted, would this have reduced
22   the burden on poor voters?
23      A.  It is possible, although, again, today, I think
24   the charge for a birth certificate is three dollars or
25   zero dollars depending on the county.

223

1      Q.  But at the time Senate Bill 14 was adopted by
2   the Legislature, that was not the case, correct?
3      A.  Correct.
4      Q.  Would adopting this floor amendment Number 12
5   have interfered with the effectiveness of the bill?
6      A.  Effectiveness is pretty broad.  It would have
7   been a costlier bill.  It would have potentially been a
8   larger burden on counties or other agencies.  I'm not
9   sure what other adverse effects might have resulted.
10   I'm not sure it would have affected the security of
11   elections, but I can't say that it wouldn't undermine
12   the effectiveness of the bill as a whole.
13      Q.  Given that you were aware of the cost of
14   obtaining a birth certificate and you circulated that
15   memo that you testified about earlier today, why did the
16   Legislature not adopt Amendment Number 12?
17      A.  I can't recall.  I don't know.
18      Q.  Turning your attention to Page 121, do you see
19   there is an amendment that was offered by Senator Van de
20   Putte?
21      A.  I do.
22      Q.  And this would have substituted -- well, if you
23   could review this amendment and let me know when you've
24   had a chance.
25      A.  (Reviewing document.) Okay.

224

1      Q.  Would this amendment, in essence, have provided
2   the same forms of ID that were part of SB 362?
3      A.  It looks to be very similar to 362.  One photo
4   or two nonphoto, which, again, was, at the time, opposed
5   by every Democrat that I recall.
6      Q.  But in answer to my question, it was very
7   similar to Senate Bill 362?
8      A.  It is similar.
9      Q.  In terms of the ID.  And this amendment was not
10   adopted by the Senate, correct?
11      A.  It was not.
12      Q.  Do you know why the Legislature didn't adopt
13   this amendment?
14      A.  I can't recall the debate, so no, I don't know.
15      Q.  Turning your attention to Page 123, which is
16   something you testified about earlier, the Floor
17   Amendment Number 18 concerning concealed handgun
18   licenses?
19      A.  Yes.
20      Q.  Do you see that that amendment was adopted?
21      A.  Unanimously, yes.
22      Q.  Do you know why that was adopted?
23      A.  I can't recall, no.  I don't know.
24      Q.  And do you know whether other amendments to
25   allow the use of Medicare cards and student IDs were

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

---

225

1 also offered?
2    A.  Do I know why?
3    Q.  No.  Do you know -- are you aware that there
4 were other amendments to include Medicare cards and
5 student ID cards that were offered on the Senate floor?
6    A.  Yes.
7    Q.  And were those amendments adopted by the
8 Senate?
9    A.  No.
10    Q.  Are you aware of any facts or basis for
11 including concealed handguns as an acceptable form of
12 ID, but not Medicare cards or student ID cards?
13    A.  Well, from my own knowledge, I would -- I know
14 that the concealed handgun licenses are issued by DPS,
15 which also issues driver licenses and election ID cards
16 and personal identification cards.  I know they have
17 personal -- identifying information and expiration dates
18 on their face.  Medicare cards, I'm honestly not sure
19 what those look like.  I'm not sure if they include
20 expiration dates or other identifying information.
21        Students IDs, I've talked about before.  I
22 think even if as in the proposed amendment in the
23 Senate, you say accredited public university in Texas,
24 that's still a very, very large pool of potential
25 identifications, which may or may not have security

---

226

1 elements or expiration dates or any other number of
2 identifying characteristics.
3    Q.  Were there any forms of ID issued by DPS that
4 were -- are not acceptable photo IDs under Senate Bill
5 14?
6    A.  I'm not aware of any.
7    Q.  Would you turn your attention to 130.  Do you
8 see that Senator Ellis offered a Floor Amendment Number
9 130?
10    A.  Yes.
11    Q.  Pertaining to the collection of data?
12    A.  Yes.
13    Q.  And requiring the Secretary of State to conduct
14 studies related to eligible voters?
15    A.  Yes.
16    Q.  And this amendment was rejected, correct?
17    A.  Yes.
18    Q.  This was not included in the final version of
19 Senate Bill 14 signed about the Governor; is that right?
20    A.  Correct.
21    Q.  Had Floor Amendment Number 30 been adopted,
22 would it have interfered with the effectiveness of
23 Senate Bill 14?
24    A.  Yes, to the extent it required a large devotion
25 of resources by the Secretary of State that might be

---

227

1 used in other areas, looking at the text of Senator
2 Ellis's amendment, it required an annual report, which
3 would already be unusual in the legislatures, and we
4 meet every other year, and a list of seven items that
5 would have to be included in that annual report,
6 including the number of residents eligible to vote, the
7 average wait time to obtain certain types of documents.
8        So yeah, I think, assuming the Secretary
9 of State could even determine these numbers, they seem
10 like a -- it would be pretty time consuming to get all
11 seven of these items produced on an annual basis.
12    Q.  Was there any concern that the data gathered
13 would show a discriminatory impact of Senate Bill 14 on
14 minority voters?
15    A.  I'm not aware of any such concern.
16        MS. WESTFALL:  Could you please mark this?
17        (Exhibit 175 marked for identification.)
18    Q.  (By Ms. Westfall) You've been handed what's
19 been marked as Exhibit 175.  Did you recognize this
20 document?
21    A.  It looks like a press release by the Lieutenant
22 Governor.
23    Q.  Did you see a draft of this before it was
24 finalized?
25    A.  I don't recall if I did or not.

---

228

1    Q.  Did you write this?
2    A.  No.
3    Q.  Did you advise Mike Walz, who is listed as a
4 contact here, about the contents of this release?
5    A.  It is possible, but I do not recall seeing this
6 or advising on this.
7    Q.  Do you see that in the second paragraph, it
8 states, "A voter ID will ensure that only U.S. citizens
9 who are legally eligible vote in Texas elections"?
10    A.  Yes.
11    Q.  Why does this press release reference a need to
12 ensure only U.S. citizens are participating in
13 elections?
14    A.  Why does it reference that?  I don't know.  I
15 mean, the bill does ensure that.
16    Q.  Doesn't it seem that this message about SB 14
17 seems a bit in conflict with what you had been
18 recommending senators to say about the bill?
19    A.  Well, Lieutenant Governor is not a senator or
20 the sponsor.  I don't think it conflicts with that
21 necessarily.  I think my e-mail that you referenced
22 earlier was warning about using certain types of terms.
23 They're talking about certain subjects that were not a
24 matter covered by the bill.
25    Q.  So you see no conflict between the message

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

58 (Pages 229 to 232)

---

229

1  about Voter ID in Exhibit 175 and the purposes of the
2  bill as you saw them?
3      A.  I think it's a more narrow interpretation of
4  the bill than -- it doesn't include everything the bill
5  covers, so it's more narrow than I might personally
6  characterize it.
7      Q.  Why was there a need for ensuring that only
8  U.S. citizens vote in Texas elections?
9      A.  I don't know.  I don't know why.
10     Q.  Was there any factual basis for non-U.S.
11 citizens participating in elections at the time and they
12 need to be stamped out by the Legislature?
13     A.  Again, I think non-U.S. citizens or non-Texas
14 citizens are a subset of a larger class of ineligible
15 voters who would hopefully be deterred from trying to
16 cast fraudulent votes.
17     Q.  This press release references in particular
18 U.S. citizens and ensuring that only U.S. citizens are
19 participating in elections in Texas, correct?
20     A.  Correct.
21     Q.  Were there any facts, that you're aware of at
22 the time, that non-U.S. citizens were participating in
23 Texas elections?
24     A.  I can't recall specific examples.
25     Q.  And was there a lack of public confidence in

---

230

1  the election process as a result of noncitizens
2  participating in the elections?
3      A.  Again, I think was my impression -- it is my
4  impression that voters in Texas, citizens in Texas saw
5  room for improvement, specifically in the form of photo
6  ID, as evidenced by public opinion polls, among all
7  voters, minority voters, and subsets of minority voters.
8          MS. WESTFALL:  I would like to designate
9  this now as highly confidential.
10         (Exhibit 176 marked for identification.)
11     Q.  (By Ms. Westfall) You've been handed what's
12 been marked as 176.  Do you recognize this document?
13         MS. HALPERN:  And just before he answers
14 that, and again, I wasn't involved in that process.  But
15 to the extent that this document has been marked as
16 highly confidential, I think it's incumbent on me to
17 enter a running objection to questions about this
18 document to the extent that whatever privileges were
19 asserted by the person who wrote this document are
20 obliterated by your asking questions about it.
21         MS. WESTFALL:  I take strong objection to
22 the word "obliterated," Counsel.  But your objection is
23 on the record.  And this is designated as highly
24 confidential pursuant to the consent protective order
25 ECF 105.

---

231

1      Q.  (By Ms. Westfall) Do you recognize this
2  document?
3      A.  Yes.
4      Q.  What is it?
5      A.  It looks like an e-mail from myself to Senate
6  staffers, some Senate staffers, with an attached summary
7  of SB 14 as it passed the Senate.
8          MS. WESTFALL:  For the record, Exhibit 176
9  is Texas 00034469 through Texas TX 00034471.
10     Q.  (By Ms. Westfall)  Did you draft the attachment
11 to Exhibit 176?
12     A.  I think I probably did.
13     Q.  And the attachment is titled Voter ID Bill
14 Summary, correct?
15     A.  Correct.
16     Q.  Who was the intended audience of this bill
17 summary?
18     A.  I assume the people on the e-mail that I sent
19 it to.
20     Q.  Was it solely for purposes of advising these
21 staff people, or was it intended for a broader audience?
22     A.  It's possible it was intended for people on the
23 Lieutenant Governor's staff, as well as the recipients
24 of this e-mail.
25     Q.  Did you circulate this summary to anybody else

---

232

1  besides the recipients on the first page of Exhibit 176?
2      A.  I don't recall whether I did or not.
3      Q.  Was this summary reviewed and approved by
4  anyone in your office before it went out?
5      A.  Probably not, but I can't be sure.
6      Q.  Did Lieutenant Governor Dewhurst see this
7  summary?
8      A.  I can't recall, but it's possible.
9      Q.  Do you see it was dated January 27th, 2011?
10     A.  The e-mail is dated January 27th, 2011, yes.
11     Q.  Was this e-mail drafted after the Senate had
12 adopted Senate Bill 14?
13     A.  It appears that yes, it was.
14     Q.  Do you see that under the Bill Summary, the
15 first sentence characterizes SB 14 as the strictest
16 photo ID bill in the country?
17     A.  Yes, arguably the strictest photo ID bill.
18     Q.  What was your assessment based on?
19     A.  The comparison of Texas requirements to states
20 that had other photo ID requirements.
21     Q.  What made it -- what particular facets of the
22 bill made it the strictest in the country?
23     A.  I assume it was related to the forms of
24 acceptable ID.  It could also have been related to
25 criminal penalties associated with fraudulent election

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

59 (Pages 233 to 236)

233

1    activity.
2         Q.  Anything else?
3         A.  Without looking at it in my comparison, I'm not
4    sure offhand.
5         Q.  Do you believe it was the intent of the Texas
6    Legislature to enact the strictest photo ID law in the
7    country?
8         A.  I believe it was the intent of the Legislature
9    to enact a photo ID law that was successful in securing
10   the integrity of elections.  But I'm not sure they --  I
11   don't think they did it to get ahead of what other
12   states were doing or not doing.
13        Q.  Do you see that in the first paragraph, you
14   predict that it will be upheld under Section 5, Voting
15   Rights Act Review?
16        A.  I do see that.
17        Q.  Why did you in this summary, right after the
18   bill was passed by the Senate, opine that it will be
19   preclearance, having only days before expressed grave
20   doubts about its state under Section 5?
21        A.  Well, I think there's a different bill, and so
22   given the addition of additional acceptable photo IDs
23   and blanket exceptions for certain classes of voters and
24   other provisions related to availability of
25   identification -- election identification cards and

234

1    education.
2         Q.  Were election identification cards included
3    when the Senate passed the bill, or was that in
4    conference committee?
5         A.  A good question.  Let me check.  It may have
6    been in conference.  I can't remember for sure offhand
7    without having a copy of the Senate and engrossed
8    version.
9         Q.  So the basis of your opinion about the bill
10   being likely precleared is based on the exemptions for
11   disability and what other provision?
12        A.  Again, the changes made in the Senate after
13   filing included additional forms of acceptable photo ID,
14   exceptions for certain classes of people, including
15   voters over 70, disabled voters, indigent or religious
16   objectors; the fact that the name and ID must be
17   substantially similar to the name on the list as opposed
18   to exactly matching.  I can't remember what else.
19        Q.  And were those provisions -- did those
20   provisions ensure that there would not be disparate
21   impact on minority voters, or was that simply a
22   lessening of the burden on all voters?
23        A.  I think both.  Minority voters are included in
24   all voters, so in lessening the burden on all voters
25   would almost certainly reduce the burden on minority

235

1    voters.
2         Q.  In terms of what was passed in the Senate, did
3    the provision excluding voters over 70, was that
4    included in the bill signed into law?
5         A.  I do not believe it was.
6         Q.  Was the exemption for SB 14, by presenting a
7    certificate related to disability, passed into law?
8         A.  I believe it was.
9         Q.  Are you -- are you -- do you believe that it
10   was -- the voter had to obtain documentation from the
11   Social Security Administration or Veterans
12   Administration in the version that was enacted?
13        A.  For the disability exception?  I cannot
14   remember the specific documentation required.  I'd have
15   to look it up.  I can if you'd like.
16        Q.  Was the Senate -- do you recall, was the Senate
17   version -- did the Senate version have a provision where
18   a person with a disability could obtain a certificate or
19   documentation from a physician to be exempt?
20        A.  I can't recall that except by looking at this
21   summary, that I presumably prepared.  It says that a
22   voter who is disabled and has provided a physician
23   certification of that disability to the registrar may
24   get a certain type of registration card.
25        Q.  And was that provision part of the bill that

236

1    was signed into law?
2         A.  I can't remember the exact language in the
3    final bill.
4         Q.  Was something more restrictive related to just
5    the Social Security Administration and the Veterans
6    Administration signed into law?
7              MS. HALPERN:  Object to the form.
8         A.  I mean, it's possible.  I can look at the bill.
9         Q.  (By Ms. Westfall) Please.
10        A.  Yes.  There is different language.  And my
11   guess is, it was made to conform with some standardized
12   language regarding a definition of disability.
13        Q.  It had the effect of being more -- providing a
14   narrower class of persons with disabilities relief from
15   the bill, did it not?
16        A.  I can't recall now what the affect was, but I
17   do recall, now that I have the language in front of me,
18   that it was designed to make it parallel to existing
19   definitions of disability elsewhere in Texas law.
20        Q.  Fair to say it's easier to get a note from a
21   doctor than it is to get a document from the Social
22   Security Administration or Veterans Administration?
23        A.  I honestly don't know.  I mean, the language
24   here is a physician certification of the disability.
25   I'm not sure exactly what that entails, and I'm not sure

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

237

1  if these documents from the Social Security
2  Administration or Department of Veterans Affairs are
3  obtainable online or by mail or in the possession of
4  people receiving disability benefits anyway.
5       Q.  Did you have any knowledge about that process
6  at the time that SB 14 was enacted by -- passed by the
7  Senate?
8       A.  I'm not sure that I did.
9       Q.  In the summary, you also reference persons who
10  are indigent --
11       A.  Yes.
12       Q.  -- being exempt from the bill in certain
13  regards of being able to get a photo ID or not being
14  able to get a photo ID.  That provision was not included
15  in the bill signed into law, correct?
16       A.  Correct.  And I think the answer is because
17  voting, election identification certificates free of
18  charge were added, which removed the need to exempt
19  indigent people up front.
20       Q.  Fair to say that the bill that was signed into
21  law was stricter than the version that the Senate
22  passed?
23       A.  I'm not sure strict is the right word.  I mean,
24  there were -- there is different language.  They added
25  some things and removed some things.  But without a

238

1  side-by-side comparison, I wouldn't say strict.  And
2  even if I saw them side by side, I'm not sure strict is
3  the right word.
4       Q.  Did the Lieutenant Governor play any role in
5  the conference committee's consideration of Senate Bill
6  14?
7       A.  I don't know.
8       Q.  Did he appoint the conferee?
9       A.  He did do that.
10       Q.  Was it just the Senate conferees, or did he
11  also -- was he also involved in the House conferee side
12  of things?
13       A.  The Lieutenant Governor appoints Senate
14  conferees to conference committees, so I'm not aware of
15  any other involvement in appointees.
16       Q.  Does he appoint conferees for all bills in the
17  Senate or only certain bills?
18       A.  Any bill that goes to conference committee has
19  conferees appointed by the Lieutenant Governor.
20       Q.  During the conference committee's consideration
21  of SB 14, did the conference committee remove the
22  provision to require that voter education be targeted at
23  low income and minority voters?  Are you aware of that?
24       A.  I can't remember when that language was added
25  or taken out.

239

1       Q.  Do you know why it was taken out?
2       A.  I don't.
3       Q.  Were you involved in drafting the EIC provision
4  that was adopted during the conference?
5       A.  I believe I was.
6       Q.  How did you develop will that language?
7       A.  I believe my intent was to have it parallel
8  existing statutory or rule language for drivers'
9  licenses, after removing parts that were not relevant.
10  The goal was to have the cards and the information be
11  similar to drivers' licenses and issued by the same
12  agency.
13           MS. WESTFALL:  And I meant to suspend the
14  designation of highly confidential right before I
15  started asking about the conference committee.  I don't
16  know if it's possible to insert it at this juncture.
17       Q.  (By Ms. Westfall) Did you consider the hours of
18  operation for driver license offices when you were
19  developing the EIC provision?
20       A.  I mean, generally, the hours of operation of
21  DPS offices were debated on the floor of the Senate, so
22  I think, yes, I would have considered it.
23       Q.  Was there any response legislatively to those
24  concerns raised?
25       A.  Not within the face of this statute, but I'm

240

1  not sure what other legislative actions were taken.  And
2  again, I know as a fact that actions were taken by the
3  Department of Public Safety.
4       Q.  Was it left to DPS, when the bill was being
5  crafted, as to what the hours of the driver license
6  offices would be?
7       A.  Yes.  DPS sets the hours of their office based
8  on the whole range of factors, including population and
9  usage and so forth.
10       Q.  And Senate Bill 14 did not direct or influence
11  in any way where driver licenses offices were located;
12  is that correct?
13       A.  I'd have to check to be sure.
14           (Reviewing document.) I don't see any
15  language doing that.
16       Q.  Did the Legislature, in crafting SB 14, give
17  any consideration to the availability of driver license
18  offices via public transit?
19       A.  Again, my recollection is that it was -- that
20  may have been part of the debate on the floor, but I
21  can't remember any specific language in the face of the
22  statute addressing that.
23       Q.  During consideration of SB 14, was there any
24  analysis of cost or steps a voter would need to take to
25  obtain an EIC?

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

61 (Pages 241 to 244)

---

241

1    **A.  I can't recall.**
2    Q.  Is it fair to say that Hispanic and African
3    American senators asserted during the legislative
4    process that Senate Bill 14 would diminish the
5    participation of Hispanic and African American voters?
6    **A.  I recall that was, yes.**
7    Q.  Do you agree with that assessment?
8    **A.  No, not necessarily.**
9    Q.  I should say, did you at the time agree with
10   that assessment?
11   **A.  No.**
12   Q.  What was your basis, factual basis at the time
13   to have skepticism about those assertions?
14   **A.  I would say the entirety of testimony over the**
15   **course of multiple sessions; the fact that not just in**
16   **Texas, but in no other state, that I was aware of, had**
17   **even a single minority or other plaintiff come forward**
18   **that was unable to obtain an ID or they already**
19   **possessed an ID, and that was true for minority**
20   **populations, poor populations, and all populations.**
21   **      So I would guess -- I would say in part,**
22   **based on the experience of other states and the lack of**
23   **people -- even a single person identified as unable to**
24   **obtain identification.  And again, the fact that during**
25   **the multiple sessions of testimony, I was not convinced**

---

242

1    **that this would adversely impact any one class of people**
2    **in Texas.**
3    Q.  Do you think that it would be problematic if SB
4    14 made it more difficult for Hispanic and African
5    American voters to participate in elections, even if it
6    didn't wholly disenfranchise them?
7          MS. HALPERN:  Objection, calls for a legal
8    conclusion.
9          Q.  (By Ms. Westfall) You may answer.
10   **A.  Would it be problematic if SB 14 adversely**
11   **impacted minority populations?**
12   Q.  Made it more burdensome.
13   **A.  Made it more burdensome.  It would depend on**
14   **the extent of that burden.  It would be dependant on**
15   **whether it was only minorities that were burdened.  It**
16   **would depend on whether there was an intent to burden**
17   **only those minorities.  So possibly, just to answer, I**
18   **guess.**
19   Q.  At any time since the passage of Senate Bill
20   14, have you come to believe that Senate Bill 14 was
21   passed with any discriminatory purpose?
22   A.  Before I say yes or no, how was it phrased
23   again?  Do I believe that it was passed --
24   Q.  At any time since the passage of Senate Bill
25   14, have you come to believe that it was passed with any

---

243

1    discriminatory purpose, in whole or in part?
2    **A.  I do not believe that it was passed with any**
3    **discriminatory purpose, in whole or in part.**
4    Q.  Was Senate Bill 14 enacted in part to reduce
5    the participation of Hispanic voters?
6    **A.  I do not believe so.**
7    Q.  Was SB 14 enacted in part to reduce the
8    participation of African American voters?
9    **A.  I do not believe so.  And, in fact, at least on**
10   **the House side, there were minority members, black and**
11   **Hispanic, who voted for the bill.**
12   Q.  At any time since the passage of Senate Bill
13   14, have you come to believe that Senate Bill 14 will
14   have a disproportionate effect on minority voters as
15   compared to Anglo voters?
16   **A.  I have not seen any evidence to convince me of**
17   **that.**
18   Q.  Are you familiar with the opinion of Texas
19   versus Holder denying judicial preclearance of Senate
20   Bill 14?
21   **A.  I am generally familiar.**
22   Q.  Did you read the opinion?
23   A.  It's been a while.
24   Q.  But yeah?
25   A.  Yes, I have read it.

---

244

1    Q.  Did the Lieutenant Governor have a reaction to
2    the decision?
3    **A.  My memory is that he was disappointed.**
4    Q.  How did the Senate on the whole react?
5          MS. HALPERN:  Objection, calls for
6    speculation.
7    Q.  (By Ms. Westfall) You may answer.
8    **A.  Public reactions from individual to senators**
9    **varied.**
10   Q.  How did -- go ahead.
11   **A.  Some were disappointed and some were pleased, I**
12   **imagine.**
13   Q.  Did the Lieutenant Governor take any actions to
14   respond to the decision?
15   **A.  I can't remember any specific action.**
16   Q.  Did he propose any changes to Senate Bill 14?
17   **A.  I can't recall.**
18   Q.  Did he or any senator urge that amendments to
19   Senate Bill 14 be made to address any of the concerns
20   raised by the court?
21   **A.  I can't recall specific suggestions.**
22   Q.  How many times did the Legislature meet after
23   -- strike that.
24         When did the decision -- when was it
25   issued?

---

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

245

1   A.  I can't recall a date.
2   Q.  Is it -- was it issued around August 2012?
3   A.  That sounds right.
4   Q.  How many times did the Legislature meet after
5   August 2012?
6   A.  They would have met in regular session in the
7   spring of -- winter and spring of 2013, and one or two
8   special sessions after that.
9   Q.  Are you aware of any committee hearings held
10  related to Voter ID after Texas versus Holder was
11  issued?
12  A.  It's possible that the issue was addressed
13  during the regular legislative session, but I also know
14  that courts -- the U.S. Supreme Court's decision
15  regarding Section 5 of the Voting Rights Act impacted
16  concern over preclearance.
17  Q.  Do you know when that decision was issued?
18  A.  It was the summer.  I forget the date.
19  Q.  Was it issued June 25th, 2013?
20  A.  That sounds -- that sounds right.
21  Q.  And so for the period from the time that Texas
22  versus Holder was issued in August 2012 to June 25th,
23  2013, were there any committee hearings held related to
24  Voter ID in the Texas Legislature?
25  A.  I'm not sure on the House side, and I can't

246

1   recall on the Senate side.  But again, I think there was
2   -- I, as an observer, expected a decision soon regarding
3   the constitutionality of Section 5 of the Voting Rights
4   Act, given the animosity that arose out of Senate Bill
5   14 and the earlier versions of that; the extreme
6   partisan split on the issue that I don't think anybody
7   was in a hurry to get right back into it when there were
8   pending U.S. Supreme Court cases on the issue.
9   Q.  Were any pending -- the Shelby County case,
10  that's the case you're referring to?
11  A.  Correct.
12  Q.  And that did not -- that was not an appeal of
13  the Texas Voter ID decision, correct?
14  A.  Correct.
15  Q.  That was about the constitutionality of the
16  formula of coverage under Section IV of the Voting
17  Rights Act?
18  A.  Correct.
19  Q.  As well as Section 5 of the Voting Rights Act,
20  correct?
21  A.  By reference, yes.
22  Q.  Were any interim session committees convened
23  during this period to address the issue of Voter ID that
24  you're aware of?
25  A.  Between the period -- the end of session and --

247

1   Q.  Between August -- August 2012 and June 2013?
2   A.  Well, they wouldn't have been called right
3   before the regular session because there wasn't time.
4   And then during the regular session, as I said, I don't
5   recall what specific action or consideration committees
6   gave to it.  And then session ended late May, early
7   June, and the Shelby County decision came out late June.
8   So I think no, there was not consideration given through
9   the legislative process.
10  Q.  And after the decision in Texas versus Holder,
11  Texas held a major election, did it not?
12  A.  I think that's right.
13  Q.  A presidential federal election in November
14  2012; is that right?
15  A.  Right.
16  Q.  Were there any efforts made on the part of the
17  Legislature to hold hearings, convene task force or
18  otherwise examine the administration of the 2012
19  election?
20  A.  I'm not sure.
21  Q.  Would you be aware of those had they been?
22  A.  I might be aware of them, but be unable to
23  remember them now.  But I don't remember any specific
24  efforts by the Legislature to examine the effects.
25  I know there were various news accounts by

248

1   the media.  There were comments from county election
2   official in those media reports.  I know the Secretary
3   of State's Office was reviewing the implementation of
4   the program.
5   Q.  I just want to make sure we're testifying --
6   you're testifying about the election I'm referring to.
7   The election during November 2012, SB 14
8   was not in effect, correct?
9   A.  Correct.
10  Q.  Was there any examination of how that election
11  went by the Legislature?
12  A.  I'm not clear.
13  Q.  You don't know?
14  A.  I don't know.
15  Q.  And you would be the person who would likely
16  know for the Lieutenant Governor, would you not, because
17  you handle election issues?
18  A.  Actually, in November 2012, I had just returned
19  to the Lieutenant Governor's Office, and I was not
20  handling elections of the broad issue when I returned.
21  Q.  Who was?
22  A.  Constance Allison.
23  Q.  Are you aware of any in person voter
24  impersonation that occurred in the state of Texas during
25  the 2012 presidential election?

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

63 (Pages 249 to 252)

249

1      A.  I am not personally aware of any.
2      Q.  Who would be the best person in the state of
3   Texas to answer that question?
4      A.  Individual county law enforcement officials.
5      Q.  Who would be the best person at the state level
6   to answer that question?
7      A.  I suppose the Secretary of State, possibly the
8   Attorney General.  But those would only come to the
9   Attorney General if they forwarded by local law
10  enforcement.
11     Q.  Are you aware of any in person voter
12  impersonation that occurred in Texas during any election
13  between August 2012 and June 2013?
14     A.  I cannot recall being aware of any.
15     Q.  As of June 26th, 2013, Texas started to enforce
16  Senate Bill 14, correct?
17     A.  On what date?  I'm sorry.
18     Q.  June 26th, 2013, it started to enforce the law?
19     A.  I think that's correct.
20     Q.  After Shelby was issued; is that right?
21     A.  That's correct.
22     Q.  Have you or anyone in the Lieutenant Governor's
23  Office played any role the implementation of Senate Bill
24  14 since June 26th, 2013?
25     A.  I don't think I can say we played a role in the

250

1   implementation.
2      Q.  Have you had communications with DPS other than
3   the communications you testified about earlier this
4   morning?
5      A.  I don't believe I have.
6      Q.  Has the Lieutenant Governor attempted to assess
7   the impact of Senate Bill 14 on minority voters since
8   Texas began enforcing Senate Bill 14?
9          MS. HALPERN:  I want to remind the witness
10  that he is the general counsel for the Lieutenant
11  Governor, and in that capacity, not to reveal any
12  attorney-client confidences.
13     A.  I am not sure what efforts he has and has not
14  undertaken.
15     Q.  (By Ms. Westfall) Has the Lieutenant Governor
16  requested that the Secretary of State Office assess the
17  impact of Senate Bill 14 on minority voters?
18     A.  I'm not aware that he has.
19     Q.  Has any legislator who supported Senate Bill
20  14, to your knowledge, made any effort to assess the
21  impact of Senate Bill 14 on minority voters?
22     A.  It's possible.  Again, on my behalf, I have
23  reviewed news accounts following each of the recent
24  elections, statements from Travis County officials,
25  election officials and other -- Harris County, I

251

1   believe, other election officials saying there has not
2   be noticeable problems, and I can't remember if senators
3   may have been quoted in any of those individuals'
4   accounts.
5      Q.  Has the Lieutenant Governor or the Legislature
6   made any efforts to determine the number of voters who
7   have appeared to vote in person without a qualifying
8   photo ID?
9      A.  I'm not sure there has been a legislative
10  effort to do that.
11     Q.  So the answer is no?
12     A.  As far as I'm aware, the answer is no.
13     Q.  Has the Lieutenant Governor or the Legislature
14  made any effort to determine the number of provisional
15  ballots cast for lack of qualifying photo ID that were
16  not counted?
17     A.  I am not sure.
18         MS. WESTFALL:  I want to take a slight
19  break, and then we're nearing the end for me.
20         (Recess taken from 4:45 p.m. to 4:57 p.m.)
21         (Exhibit 177 marked for identification.)
22     Q.  (By Ms. Westfall)  I'm going to hand you what's
23  been marked as 177, and this is highly confidential
24  another highly confidential document.
25         MS. HALPERN:  We're going back to that

252

1   mode.  177.
2      Q.  (By Ms. Westfall)  Do you recognize this
3   document?  Take your time to look at it.
4          MS. WESTFALL:  It is, for the record,
5   LEG00004939 through 4941.
6      A.  It looks like e-mails between myself and
7   representatives from a group called True the Vote.
8      Q.  (By Ms. Westfall)  When did these exchanges
9   occur?
10     A.  The first e-mail is August 30, and the last one
11  is September 16, 2013.
12     Q.  Were the representatives from True the Vote
13  asking for your assistance?
14     A.  Yes.
15     Q.  What were they seeking from you?
16     A.  They were wanting updates on efforts to
17  implement voter -- voter -- getting identification to
18  voters and related matters, voter registration election
19  integrity issues.
20     Q.  Did this relate to EICs?
21     A.  I'm not sure that it related specifically to
22  EICs.  I think it was more identification in general,
23  but certainly, EIC would have been included in that.  I
24  can review to be sure.
25     Q.  Sure.  Why don't you take a moment to look and

BRYAN HEBERT                                         6/17/2014
CONFIDENTIAL TRANSCRIPT

65 (Pages 257 to 260)

---

257

1          MR. DUNBAR: Thank you, Ms. Westfall.
2                    EXAMINATION
3 BY MR. DUNBAR:
4          Q. Good afternoon, Mr. Hebert. I'm Kelly Dunbar.
5 As I mentioned before, I represent the Texas League of
6 Young Voters' Education Fund and Imania Clark as an
7 individual.
8          THE REPORTER: I'm sorry, why don't you
9 move down here.
10          MR. DUNBAR: Sure.
11          (Changing seats.)
12          MS. HALPERN: Just for clarification, I am
13 representing this witness and I'm not otherwise part of
14 this lawsuit. Who is your client?
15          MR. DUNBAR: The Texas League of Young
16 Voters' Education Fund.
17          MS. HALPERN: What is that?
18          MR. DUNBAR: It's a public interest
19 organization in Texas. They're getting deposed tomorrow
20 by the State, so.
21          MS. HALPERN: You represent voters like
22 under 22 or something?
23          MR. DUNBAR: It's focused on registering
24 and issues relating to young voters in the state.
25          MS. HALPERN: Thanks. I appreciate that.

---

258

1          MR. DUNBAR: And one individual who is a
2 student.
3          MS. HALPERN: Okay.
4          Q. (By Mr. Dunbar) Mr. Hebert, good afternoon. I
5 think my introduction is on the record. Just to be
6 clear, I assume we will continue the deposition under
7 kind of the same ground rules and understanding that
8 Ms. Westfall provided you now early this morning. Is
9 that acceptable to you?
10          A. Yes.
11          Q. Great. And I think I'll just start. I had a
12 few questions about some of the highly confidential
13 e-mails, so would ask that this part be designated as
14 highly confidential and that I'm hopeful we can move off
15 that and not need to worry about that with respect to
16 the rest of my questions.
17          MR. WHITLEY: Mr. Dunbar, sorry to
18 interrupt. Just to be clear, even though you're asking
19 the questions now, the defendants will assert the same
20 objections as to the highly confidential portions that
21 we did while Ms. Westfall was asking the questions.
22          MR. DUNBAR: Understood. Thank you.
23          Q. (By Mr. Dunbar) And I'd ask that you gather
24 Exhibit 176 and Exhibit 155.
25          A. Can you tell me what 155 is?

---

259

1          Q. Sure. That's the March 4th, 2009 e-mail from
2 you to Janice McCoy.
3          A. Okay.
4          Q. And then you found 176?
5          A. I did.
6          Q. Okay. And Ms. Westfall asked you some
7 questions about these, so I guess I want to start with
8 exhibit -- Exhibit 176. And if you turn to --
9          MR. WHITLEY: I'm sorry. That's one of
10 the ones I didn't get. Do you have an extra copy for
11 me?
12          MS. WESTFALL: Which one is that?
13          MR. WHITLEY: 155.
14          THE WITNESS: The summary of SB 14.
15          MR. DUNBAR: I'm on 176 right now, which I
16 do not have an extra copy of.
17          MR. WHITLEY: I've got 176. I don't have
18 155.
19          MR. DUNBAR: Oh, I'm sorry, 155.
20          MS. HALPERN: What is 155?
21          MR. DUNBAR: That's the Mr. Hebert e-mail
22 to Janice McCoy in March of 2009.
23          MS. HALPERN: Oh, yeah. Let me just see
24 if I can find that for you.
25          (Brief discussion off the record.)

---

260

1          Q. (By Mr. Dunbar) Okay. And just to be clear,
2 so the record is clear on this point, this is an e-mail
3 and attachment from you on January 7, 2011, to a group
4 of Senate staffers; is that correct?
5          A. January 27.
6          Q. Yeah, you're correct. Thank you for the
7 clarification.
8          A. Uh-huh.
9          Q. And on the first page after the cover e-mail, I
10 believe you answered this question for Ms. Westfall
11 already. You explained that SB 14 would give Texas
12 arguably the strictest voter ID law in the country; is
13 that correct?
14          A. That's what it says, yes.
15          Q. And is it fair to describe this attachment as
16 advocating for the strictest photo ID law in the
17 country?
18          A. I don't think it's advocating for the strictest
19 photo ID law in the country. I think it's
20 characterizing it as arguably so, but then the next
21 sentence says, also, that I thought it was going to be
22 upheld under the constitution and Section 5 of the
23 Voting Rights Act.
24          Q. Right. So is it fair to say by January 27,
25 2011, it was the position of you or your office that

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

261

1    SB 14 should be adopted as it was -- as it was written?
2        A.   Yes.  The Senate likes no changes from the
3    House as a general rule.
4        Q.   But I'm asking about the position of you as a
5    representative of the office of the Lieutenant Governor
6    who were advocating enacting the bill as written; is
7    that correct?
8        A.   I think that's fair.
9        Q.   And again, that would be the strictest photo ID
10   law in the country, correct?
11       A.   The bill as passed by the Senate at the time
12   was arguably the strictest photo ID law in the country,
13   yes.
14       Q.   Okay.  No, that's helpful.  I then wanted to
15   turn to Exhibit 155, which is, again, a document that
16   we've talked about in the record.  This is an e-mail
17   from you on March 4, 2009 to Janice McCoy; is that
18   correct?
19       A.   Yes.
20       Q.   And on page 1 of this document, which I --
21   again, we've already discussed, you have, "Reasons to
22   Support SB 362 as Filed," is that correct?
23       A.   Correct.
24       Q.   And would you read into the record, if you
25   haven't already, what the first bullet is in support

262

1    that you've written?
2        A.   The first bullet reads, "This bill improves
3    security in the election process but is not as
4    restrictive as Indiana and Georgia.  There's less chance
5    of disenfranchising elderly, poor or minority voters.
6        Q.   And I believe the record already reflects in
7    answer to this question, apologies if I'm wrong, but you
8    drafted these sets of bullets; is that correct?
9        A.   I think I did.
10       Q.   And so I guess my question is:  What facts
11   changed from May -- or excuse me, March 2009 to January
12   2011 that led your office from advocating a least
13   restrictive version of the law to what you then
14   characterize as one of the most restrictive photo ID
15   laws in the country?
16           MS. HALPERN:  Objection, compound.
17       Q.   (By Mr. Dunbar)  You can answer.
18       A.   I think the question, as I understand it, the
19   answer is these are different types of documents.  One
20   is talking points and essentially a sales pitch for
21   members to use to get support for the bill.  The other
22   is a summary of what is in the bill.  In 2009, this was
23   the bill before the Legislature, and so I believe the
24   Lieutenant Governor supported it.  In 2011, this was the
25   bill before the Legislature, and the Lieutenant Governor

263

1    supported it.
2            MS. HALPERN:  And let the record reflect
3    that when he says in 2009, this was the bill before the
4    Legislature, the witness is referring to Exhibit 155.
5    And when he says in 2011, this was the bill before the
6    Legislature, the witness is referring to Exhibit 176.
7        A.   And for both of those, when I say the
8    Lieutenant Governor supported it, that's based on his
9    public statements.
10       Q.   (By Mr. Dunbar)  So would it be fair to say
11   there was no change in the position of your office from
12   2009 to 2011 with respect to how strict a photo ID law
13   should be?
14       A.   I can't speak for the Lieutenant Governor
15   personally, but I can say on my own behalf, there was
16   support for a voter ID bill that improved the security
17   of elections in Texas.  And both bills did that to
18   varying extents.  And again, what was before the
19   Legislature in 2009 was supported by my office.
20       Q.   So were there any facts that changed from 2009
21   to 2011 that in your offices, your view or your office's
22   view, justified a stricter photo ID measure than had
23   been discussed in 2009?
24       A.   I'm not aware of facts that drove changes
25   between the bills, but again, I was not -- the

264

1    Lieutenant Governor was not a sponsor of either bill.
2        Q.   Right.  And you've testified to that point
3    before, and I guess I just want to be clear on that.
4    That when you say he wasn't the sponsor, you mean in a
5    formal parliamentary sense, the Lieutenant Governor was
6    not the sponsor of the bill; is that correct?
7        A.   Correct.  The Lieutenant Governor cannot file
8    bills.
9        Q.   But did the Lieutenant Governor, I believe
10   you've stated, based on public statements, strongly
11   supported voter ID measures; is that correct?
12       A.   That is correct.
13       Q.   And that you and your office played a role in
14   drafting and implementing various iterations of the bill
15   between 2009 and 2011, correct?
16       A.   I wouldn't use the word implemented, but yes,
17   we were consulted in the process.
18       Q.   And you're not aware of any facts that change
19   from 2009 to 2011 that would have justified a stricter
20   form of a photo ID law?  Is that your testimony?
21           MS. HALPERN:  Objection, compound, calls
22   for -- misstates prior testimony.
23       Q.   (By Ms. Westfall)  You can answer.
24       A.   I cannot recall specific factual evidence
25   between 2009 and 2011 as evidenced through testimony or

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

---

265

1  other methods that I was aware of, but it is possible
2  there were additional examples of fraud that I'm
3  forgetting.  It's possible that there was additional
4  input from experiences of other states.  Beyond those
5  things, I'm not sure.
6      Q.  But sitting here today, you can't recall any
7  specific instances of additional fraud or examples from
8  other states; is that correct?
9      A.  I can't recall right now.
10     Q.  And I'd ask that you take a look at Exhibit
11 166, which again is also highly confidential.  And then
12 after we're done talking about this, we can probably
13 conclude the highly confidential portion.  This is the
14 January 24, 2011 e-mail chain involving Jonathan
15 Stinson, Wroe Jackson.
16     A.  Yes.
17     Q.  And if you turn to page -- I guess to Texas
18 00265541, the second bullet down, do you see the
19 question:  "Why is this bill different from the bill you
20 filed last session?"
21     A.  Yes.
22     Q.  And can you read -- can you read into the
23 record what your answer is?
24     A.  The question is:  "Why is this bill different
25 from the bill you filed last session?"

---

266

1      And the -- I think is a proposed response
2  is:  "We have had two additional years to see photo ID
3  working in other states and two additional years to see
4  that voter fraud is still a problem.  Only a true photo
5  ID bill can deter and detect fraud at the polls and can
6  protect the public's confidence in elections.  Plus, I
7  believe that photo ID is simpler and less confusing for
8  the voters."
9      Q.  And I believe your prior testimony is that you
10 did not write that response; is that correct?
11     A.  That's correct.
12     Q.  Would you agree with that response?
13     A.  Seems like a fair response.
14     Q.  And again, the response references two
15 additional years to see photo ID working in other
16 states.  What did you understand that to mean at the
17 time when you saw these bullets?
18     A.  I can't recall what I thought at the time.
19 Looking at it now, I -- it seems evident on its face
20 that states that had voter ID had not experienced
21 problems, and in fact, had seen increases in voter
22 turnout.
23     Q.  So you would interpret working in that sentence
24 to mean an actual increase in voter turnout?
25     A.  That could be one interpretation of working.

---

267

1      Q.  Okay.  And there's a second part of that
2  sentence then says that there have been two additional
3  years to see that voter fraud is still a problem,
4  correct?
5      A.  Correct.
6      Q.  And but again, I believe that you've just
7  testified that you can't recall any specific examples of
8  voter fraud between 2009 and 2011 that would justify a
9  stricter voter ID law, correct?
10     A.  I cannot recall specific examples.  I know as
11 part of my duties, tracking election legislation, in
12 general, there were constant examples in the news that
13 almost every election of some sort of fraud or another.
14     Q.  And in general, when you consider these
15 instances of fraud, did you draw distinctions between
16 the types of fraud that were at issue?
17     A.  As a legal matter or as a professional matter?
18     Q.  As a policy matter, was it relevant to you
19 whether the actual fraud that you perceived to be a
20 problem was in-person voter fraud, the type of fraud
21 that would be addressed by SB 14?
22     A.  In assessing whether fraud, in general, was a
23 problem, I didn't make distinctions.  In addressing
24 potential legislation in the future to address those
25 problems, I probably did.

---

268

1      Q.  So as long as there was, quote/unquote,
2  evidence of voter fraud, you saw that as a rationale for
3  SB 14 across the board, correct?
4      A.  I -- yeah, I do.
5      Q.  Okay.  I think that concludes the highly
6  confidential portion unless something else comes up.
7          SB 14 does include student IDs as an
8  acceptable form of ID; is that correct?
9      A.  Correct.
10     Q.  And prior to SB 14, I believe we've already
11 talked about student IDs would have been an acceptable
12 form of ID; is that correct?
13     A.  In earlier sessions, in some drafts, student
14 IDs were included, yes.
15     Q.  Sorry.  And my question -- my question, I don't
16 think was clear.  I meant prior to SB -- SB 14 going
17 into effect, setting aside prior versions of voter ID
18 legislation, a student voter in Texas could use a
19 student ID to vote; is that correct?
20     A.  I'm actually not sure if that's correct.
21 Meaning, in 2009, if a student showed up and their only
22 identification was a student ID, could they vote?
23     Q.  Right.
24     A.  I'm not sure that's true.
25     Q.  Let me take a look, then, I may be misreading

---

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

68 (Pages 269 to 272)

269

1  things, so you can help me out here.  This would be
2  Exhibit 150, which is not highly confidential.
3          MR. WHITLEY:  What is that?
4          MS. HALPERN:  362.
5          MR. DUNBAR:  Yeah, this is 362, right,
6  which has the strike-through of what I took to be
7  existing law.  So let me clarify that if I'm wrong.
8      A.  Got it.
9      Q.  (By Mr. Dunbar)  Found it.  If you look at page
10 6 of the document, or I guess, for the record, can you
11 tell me what Exhibit 150 is?
12     A.  Exhibit 150 is a draft of Senate Bill 362 at
13 some point in the process.
14     Q.  And you see throughout the draft underlining
15 and strike-throughs, correct?
16     A.  Correct.
17     Q.  And is it correct to say that underlining
18 represents the additional statutory text?
19     A.  The underlined is the proposed new text, and
20 the struck-through is the existing law.
21     Q.  Okay.  Then on page 6 of the bill, under the
22 first heading at the top, you see strike-through?
23     A.  Uh-huh.
24     Q.  Beginning with form of identification
25 containing -- that states, "Form of identification

270

1  containing the person's photograph that establishes the
2  person's identity," correct?
3      A.  Correct.
4      Q.  And to the extent that a student ID had a
5  photograph on it, would that have satisfied the existing
6  law there allowing someone to use a student ID to vote?
7      A.  I suppose it could have.  I'm not sure how
8  that's interpreted by election officials.
9      Q.  Okay.  So it's your testimony that in
10 considering SB 14 and whether to include student IDs or
11 not, you were not aware of whether student IDs could
12 actually historically have been used to vote?
13     A.  I can't recall if I was aware of it at the
14 time, but, so I'm not sure.
15     Q.  Okay.  And I believe you -- you answered my
16 first question which may have been unclear, which is the
17 second question I wanted to ask.  The prior versions of
18 draft or proposed photo ID legislation that were
19 considered in this relevant time frame did include
20 student IDs as an acceptable form of ID; is that
21 correct?
22     A.  That's correct.
23     Q.  And do you recall when the decision was made to
24 drop student IDs as a form of acceptable ID from the
25 bill, from the draft bill?

271

1      A.  I don't recall.  I mean, again, there was an
2  ongoing discussion amongst senators about what forms of
3  identification are actually reliable, and in the context
4  of that conversation, I believe it was removed.
5      Q.  You don't recall who first suggested that
6  students IDs not be an accepted form of voter
7  identification?
8      A.  I don't recall.
9      Q.  As you recall here today, it was not your
10 office that proposed the idea?
11     A.  Correct.
12     Q.  So it was likely proposed by someone in the
13 Legislature?
14     A.  Yes.
15     Q.  And did your office have an official position
16 on the question of whether student IDs should or should
17 not be included as an acceptable form of ID?
18     A.  I know I was -- I don't think we had an
19 official position.  I have and had concerns about
20 whether or not student IDs are secure forms of
21 identification given the problems I've discussed:  The
22 lack of expiration dates, the varying degrees of
23 security, the different types of institutions and
24 locations of institutions and technological capability
25 of institutions and et cetera.

272

1      Q.  And did you discuss -- did you have discussions
2  with legislative staff about whether to include student
3  IDs?
4      A.  It's possible.  I can't recall specific
5  conversations.
6      Q.  Would you have talked to Janice McCoy about the
7  issue?
8      A.  Probably.
9      Q.  Would you have talked to -- would there be
10 others that you likely would have talked to about the
11 subject?
12     A.  I think possibly anyone in these e-mails we've
13 covered today.  Senator -- staffers from Senator
14 Williams, Senator Duncan, Senator Huffman, senators who
15 were actively involved in supporting the legislation, as
16 well as, potentially, again, as I mentioned, I had
17 interacted with senators and their staffs daily from
18 both parties, so it's possible I talked to others about
19 it.
20     Q.  And would there be one particular legislative
21 office that you would say was the strongest proponent of
22 not including student IDs as a form of acceptable ID?
23     A.  I don't recall anyone being particularly
24 outspoken.
25     Q.  So there was no one that was really that

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

69 (Pages 273 to 276)

273

1  supportive of the idea?
2      A.  Supportive of the idea of removing --
3      Q.  Right.
4      A.  -- student IDs?  No one senator or person
5  stands out to me.
6      Q.  Okay.  And I think you've gotten -- you got
7  into this slightly before in answering a different
8  question, but what was the purpose of excluding student
9  IDs or the purposes of excluding students IDs as a form
10 of acceptable identification?
11     A.  I don't know --
12         MS. HALPERN:  Objection, asked and
13 answered.
14     Q.  (By Mr. Dunbar)  I hadn't asked the question
15 before so you can answer.
16     A.  I don't know the author's intent, because I'm
17 not the author.  As I've said, my understanding is and
18 my -- my position is that those forms of ID are
19 inherently less secure and less reliable.
20     Q.  And at the time that SB 14 was being
21 considered, were you aware of any facts or evidence that
22 suggested student IDs had been used for voting fraud in
23 Texas?
24     A.  Not that I recall.
25     Q.  Were you aware of any evidence that student IDs

274

1  had been used for voting fraud anywhere in the country?
2      A.  Not that I recall.
3      Q.  Was any analysis done of how many people used
4  students IDs historically in elections to vote?
5      A.  Not that I recall.  I know there was debate
6  about the use of student IDs, and I can't remember if
7  there was an analysis of what percentage of voters used
8  those IDs.  I know the document that was presented to me
9  earlier estimated that something along the lines of 95
10 percent of voters possessed a driver's license, but I
11 don't know if there was similar analysis for student
12 IDs.
13     Q.  So you're sitting here today, you're aware of
14 no analysis that was done on the question of the number
15 of -- the number of voters that had historically used --
16 excuse me, that had historically used students IDs to
17 vote, correct?
18     A.  Correct.
19     Q.  And was there any discussion about the effect
20 of excluding student IDs on voter -- on student voter
21 turnout generally?
22     A.  Yes.  There was debate on the floor about that
23 issue, I recall.
24     Q.  And what was the nature of that debate on the
25 floor?

275

1      A.  Opponents of the bill were concerned that it
2  would make it harder for students to vote and proponents
3  disagreed.
4      Q.  And was there any analysis done by proponents
5  on the question of whether those assertions were
6  correct?
7      A.  I am not aware.
8      Q.  Was there any discussion about the effect of
9  excluding student IDs on voting at historically Black
10 colleges or universities in the state?
11     A.  Was there any analysis?
12     Q.  Correct.
13     A.  I'm not aware.
14     Q.  So there was no assessment on the impact of
15 excluding student IDs on minority voters?
16     A.  I'm not aware of any analysis.
17     Q.  I believe you mentioned earlier the possibility
18 of student IDs being forged because they're less secure.
19 Was there any comparison done of the ability or the ease
20 of forging student IDs versus other forms of accepted
21 identification?
22     A.  I don't recall of specific studies, but I have
23 some memory of floor debate or maybe even student IDs
24 were held up as an example to show that, for example,
25 there was no expiration date on them, that they didn't

276

1  have, you know, backing bar codes or things that might
2  indicate it was a formal identification.  But I can't
3  remember, specifically, studies that might have been
4  done.
5      Q.  And did your office consider alternatives to
6  banning the use of student IDs to address some of the
7  problems that you've identified with their potential
8  use?
9      A.  My memory is at different stages of the -- of
10 similar legislation over multiple sessions, did have
11 different forms of student ID.  I think one was all
12 student IDs.  One was only government-issued student IDs
13 in Texas.  And I certainly considered it in my head as I
14 was providing input on this legislation.
15     Q.  But presumably one alternative to banning the
16 use of student IDs while also addressing the concerns
17 you've addressed would be for the state to adopt
18 guidelines or best practices with respect to
19 university's issuance of students IDs, correct?
20     A.  That could have been done.  I'm not sure if
21 that would have been effective.  And again, there's lot
22 of potential alternatives that were not considered or
23 adopted.
24     Q.  So that alternative was simply not considered?
25 Is that your testimony?

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

70 (Pages 277 to 280)

277

1    A.  I'm not aware that it was considered.
2    Q.  Were there any other specific alternatives
3  considered to address some of the concerns with the
4  secureness of student IDs that you've discussed as
5  opposed to simply an outright ban on their use?
6    A.  I don't believe so.  And for my own sake,
7  again, I think the impression was that people who had
8  student IDs also had some other form of official photo
9  ID.
10    Q.  And what was the basis for that assumption?
11    A.  The entirety of testimony over multiple
12  sessions.
13    Q.  Is there any specific testimony you can recall
14  that addressed that subject?
15    A.  I can't recall specific testimony.
16    Q.  But it's your testimony you -- you may recall
17  someone who testified that if you have a student ID,
18  you're also likely to have other forms of acceptable ID?
19    A.  Again, I think, just today, I can't remember if
20  this is jogging my memory or if it's what I've just
21  learned today, but there was an estimate that 95 percent
22  of voters have a driver's license.  So that would
23  confirm that, you know, to the extent students are
24  voters, they also have a driver's license, at least in
25  addition to whatever other CHL or passports or other

278

1  forms of ID are acceptable.
2    Q.  And I believe we've already established that
3  the Supreme Court's decision in Crawford was decided in
4  2008.  Does that sound about right?
5    A.  I think that's right.
6    Q.  And I believe you testified that you -- well, I
7  shouldn't characterize your testimony.  Did you pay
8  close attention to Crawford after 2008?
9    A.  Yes.
10    Q.  And the attempt was, I believe as you put it,
11  to attempt to make sure that Texas' photo voter ID law
12  would comply with the boundaries established by the
13  Supreme Court in Crawford; is that correct?
14    A.  I certainly hoped it would.
15    Q.  And would it be fair to say you did a
16  comprehensive assessment of whether Texas' proposed
17  photo ID laws complied with the Supreme Court's decision
18  in Crawford?
19        MS. HALPERN:  Objection, vague.
20    A.  Yeah, I read Crawford.  I've read the various
21  stages of the bill and made assessments of whether it
22  might be permissible under Crawford.  But obviously,
23  there's no way to know for sure until the court rules.
24    Q.  (By Mr. Dunbar)  And was your analysis of
25  Crawford an attempt to -- well, strike that.

279

1        With respect then to the issue of post
2  Crawford, I believe the record already establishes that
3  your office at least undertook no analysis of the number
4  of registered voters in the state without an acceptable
5  form of identification under SB 14; is that correct?
6    A.  I'm not aware of that analysis.
7    Q.  Do you think that analysis would have been
8  helpful in assessing the burden standard that Crawford
9  established?
10    A.  I think, again, for my own sake, I can't speak
11  for anyone else, that the entirety of the testimony over
12  multiple sessions showing the impact on voter turnout in
13  other states with photo ID, including Indiana, as well
14  as the absence of any individual who was unable to
15  obtain an ID and brought that claim to court, and any
16  other state with photo ID was indicative to me that it
17  was not going to be an undue burden.
18    Q.  Okay.  And in engaging in this analysis in the
19  wake of Crawford, how did you define a permissible and
20  an impermissible burden?
21    A.  I suppose, ultimately, about -- it was as an
22  official manner, can the person obtain an identification
23  and then what hurdles exist to get that identification,
24  I'm not sure I can quantify it in any specific way.
25    Q.  Okay.  Well, at several points in the

280

1  deposition today, I believe you said that you were
2  looking at whether there would be any individual that
3  would be unable to obtain a form of voter ID.  Does that
4  accurately summarize your testimony?
5    A.  That is one thing that I considered was the
6  success of plaintiff's in other jurisdictions with photo
7  ID requirements.
8    Q.  So the burden standard you applied in thinking
9  about voter identification legislation in the wake of
10  Crawford was whether the Texas law would leave any
11  voters unable to obtain a form of ID?
12    A.  No, that's not the only thing I considered.
13    Q.  What else did you consider?
14    A.  Again, what other hurdles might -- what burdens
15  might be put upon a person trying to obtain
16  identification or cast a vote and do the measures laid
17  out in various forms of this legislation address those
18  burdens and/or outweigh those burdens?
19    Q.  Okay.  And as a procedural matter, how did you
20  go about attempting to identify the hurdles or burdens
21  that an individual might face in attempting to get an
22  EIC?
23    A.  To get an EIC?
24    Q.  Correct.  To obtain an acceptable form of
25  identification.

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

71 (Pages 281 to 284)

281

1    A.   Just looking at the requirements of the
2  statute --
3            MR. WHITLEY:   I object to that question.
4  Are we talking about EICs or all the different forms of
5  identification on election day?
6            MR. DUNBAR:   Well, I'm assuming that an
7  EIC is the lowest cost option, so I ask -- but I'll
8  ask the question generally.
9    Q.   (By Mr. Dunbar)  What you -- you've testified
10  or you've just testified that, in thinking about the
11  burden that the law would impose, you thought about the
12  hurdles that an individual might have to overcome in
13  order to obtain an acceptable form of ID.  And I'm
14  asking, my question is -- and thank you for the
15  clarification.  With respect to any of the acceptable
16  forms of ID, what process did you use to identify those
17  hurdles?
18    A.   Again, I just looked at the requirements to
19  obtain the forms of identification.
20    Q.   So you did no analysis of the actual location,
21  locations in the state that a voter would have to go to
22  get -- to acquire one of the acceptable forms of
23  identification?
24    A.   I believe there was significant discussion
25  during the floor debate and the Committee of the Whole

282

1  about that topic.
2    Q.   But your office's analysis in the wake of
3  Crawford in analyzing the burden issue, you didn't look
4  into that issue?
5    A.   I don't think I did a separate analysis apart
6  from the hours of public testimony.
7    Q.   And so I also take it that means you did no
8  analysis of the hours of operation in the various DPS
9  locations; is that correct?
10    A.   I did not do any independent analysis apart
11  from the hours of testimony, correct.
12    Q.   And you would agree, wouldn't you, that those
13  factors would be relevant to an assessment of the burden
14  required with achieving an acceptable form of
15  identification?
16    A.   They are relevant.  And again, I feel like they
17  were adequately addressed in the hours of testimony on
18  this bill over multiple sessions.
19    Q.   In any of those hours of testimony, do you
20  recall any quantification that was done with respect to
21  identifying the burdens of acquiring an acceptable form
22  of identification?
23    A.   Sure.  I mean, I know there was -- and again,
24  it was presented to me in an exhibit today, there was a
25  specific number of counties that did not at the time

283

1  have offices located in them.  There was discussion
2  about the operating hours of those offices that do
3  exist.  There was discussion about the percentage of the
4  population that actually lives in these counties that
5  don't have offices and whether that is a significant
6  number of the population or not.  And then there was a
7  discussion about what efforts going forward the
8  Secretary of State and DPS and other agencies might
9  undertake to -- to expand the access to identification.
10    Q.   And again, though, you didn't -- in undertaking
11  this burden analysis in the wake of Crawford, you didn't
12  do an independent study or analyses of the number of
13  voters that would actually be affected by SB 14; is that
14  correct?
15    A.   I did no independent analysis.
16            MS. HALPERN:   Counsel, how much more do
17  you think you have?
18            MR. DUNBAR:   10 to 15 minutes probably.
19            MS. HALPERN:   How much more time does he
20  have?
21            THE REPORTER:   I have to go off the record
22  to compute.
23            (Off the record from 5:38 to 5:40 p.m.)
24            MR. DUNBAR:   Back on the record.  Can you
25  repeat the last question?

284

1            (Requested portion read by the court
2  reporter.)
3    Q.   (By Mr. Dunbar)  And would there be any answer
4  to that analysis that would change your view of whether
5  SB 14 imposes an undue burden on the exercise of voting
6  rights?
7            MS. HALPERN:   Objection, calls for a legal
8  conclusion.
9    Q.   (By Mr. Dunbar)  Go ahead, sir.
10    A.   So if an analysis showed that a significant
11  number of students do not have one of the acceptable
12  forms of ID, including a driver's license, and could not
13  obtain one of those forms of identification, then,
14  possibly, that would make me second-guess my conclusion.
15    Q.   My question was a slightly more basic one,
16  which is:  If, hypothetically, you had undertaken the
17  analysis of the number of registered voters without an
18  acceptable form of ID and it turned out to, say, be 20
19  percent of the registered voter population, would you
20  find that significant or relevant to the burden
21  analysis?
22    A.   Possibly.
23    Q.   But it wouldn't change your view of
24  permissibility of SB 14?
25    A.   It would depend on the exact nature of that

## 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     CORPUS CHRISTI DIVISION
 3     MARC VEASEY, et al.,        )
                                   )
 4          Plaintiffs,            )
                                   )
 5     v.                          ) CIVIL ACTION NUMBER
                                   )  2:13-cv-193(NGR)
 6     RICK PERRY, et al.,         )
                                   )
 7          Defendants.            )
 8
 9     ***************************************************
10                    ORAL DEPOSITION OF
11                      KEITH INGRAM
12                     APRIL 23, 2014
13     ***************************************************
14          ORAL DEPOSITION OF KEITH INGRAM, produced as a
15     witness at the instance of PLAINTIFF UNITED STATES OF
16     AMERICA and duly sworn, was taken in the above-styled and
17     numbered cause on the 23rd day of April, 2014, from
18     9:02 a.m. to 6:13 p.m. before TEENA L. HARMON-DAVIS, a
19     Certified Shorthand Reporter in and for the State of
20     Texas, reported by machine shorthand at the offices of
21     Dechert LLP, 300 West Sixth Street, Suite 2010, Austin,
22     Texas, pursuant to the Federal Rules of Civil Procedure
23     and/or the provisions stated on the record or attached
24     hereto.
25
```

## 2

```
 1              A P P E A R A N C E S
 2
 3     FOR PLAINTIFF UNITED STATES OF AMERICA:
 4        Ms. Elizabeth S. Westfall
          Ms. Jennifer Maranzano
 5        U.S. DEPARTMENT OF JUSTICE
          Civil Rights Division
 6        950 Pennsylvania Avenue, NW
          Washington, DC 20530
 7        elizabeth.westfall@usdoj.gov
          jennifer.maranzano@usdoj.gov
 8
 9     FOR THE VEASEY PLAINTIFFS:
10        Mr. Neil G. Baron
          LAW OFFICE OF NEIL G. BARON
11        914 FM 517 West, Suite 242
          Dickinson, Texas 77539
12        neil@ngbaronlaw.com
13        and-
14        Mr. Scott Brazil
          BRAZIL & DUNN, LLP
15        4201 Cypress Creek Parkway, Suite 530
          Houston, Texas 77068
16        scott@brazilanddunn.com
17
       FOR THE TEXAS STATE CONFERENCE OF NAACP BRANCHES
18     PLAINTIFFS:
19        Mr. Vishal Agraharkar
          BRENNAN CENTER FOR JUSTICE
20        161 Avenue of the Americas, 12th Floor
          New York, New York 10013
21        vishal.agraharkar@nyu.edu
22        and-
23        Mr. Ezra D. Rosenberg
          DECHERT LLP
24        902 Carnegie Center, Suite 500
          Princeton, New Jersey 08540
25        ezra.rosenberg@dechert.com
```

## 3

```
 1     APPEARANCES/continued:
 2     FOR THE TEXAS LEAGUE OF YOUNG VOTERS
       PLAINTIFF-INTERVENORS:
 3
          Mr. Deuel Ross
 4        Ms. Natasha M. Korgaonkar
          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
 5        40 Rector Street, Fifth Floor
          New York, New York 10006
 6        dross@naacpldf.org
          nkorgaonkar@naacpldf.org
 7
       and-
 8
          Ms. Lynn Eisenberg
 9        WILMER CUTLER PICKERING HALE & DORR, LLP
          1875 Pennsylvania Avenue, NW
10        Washington, DC 20006
          lynn.eisenberg@wilmerhale.com
11
       FOR THE ORTIZ PLAINTIFFS:
12
          Mr. Robert W. Doggett
13        Mr. Jose Garza
          TEXAS RIO GRANDE LEGAL AID, INC.
14        4920 North IH-35
          Austin, Texas 78751
15        rdoggett@trla.org
          jgarza@trla.org
16
       FOR THE TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND
17     COUNTY COMMISSIONERS PLAINTIFF-INTERVENORS:
18        Mr. Rolando L. Rios
          ROLANDO L. RIOS & ASSOCIATES, PLLC
19        115 East Travis, Suite 1645
          San Antonio, Texas 78205
20        rrios@rolandorioslaw.com
       FOR THE DEFENDANTS:
21        Mr. S. Ronald Keister
          Ms. Whitney Deason
22        Ms. Lindsey Wolf
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
23        P.O. Box 12548
          Austin, Texas 78711
24        ronny.keister@oag.state.tx.us
25
```

## 4

```
 1     APPEARANCES/continued:
 2        Mr. Wroe Jackson
          OFFICE OF THE SECRETARY OF STATE
 3        Capitol Building, Room 1E.8
          P.O. Box 12697
 4        Austin, Texas 78711
          wjackson@sos.state.tx.us
 5
 6     ALSO PRESENT:
 7        Ms. Kathleen Murphy-Darveau
          TEXAS DEPARTMENT OF PUBLIC SAFETY
 8        (512) 424-2890
          kathleen.murphy@dps.texas.gov
 9
       and -
10
          Ms. Teena L. Harmon-Davis, Court Reporter
11        US LEGAL SUPPORT
          701 Brazos, Suite 380
12        Austin, Texas 78701
          (512) 292-4249
13
14     VIA TELEPHONE:
15        Ms. Jennifer Clark, Brennan Center for Justice
16        Ms. Emma Simpson, Campaign Legal Center
17        Ms. Myrna Perez, NAACP
18
19
20
21
22
23
24
25
```

KEITH INGRAM                                                    4/23/2014

5 (Pages 17 to 20)

---

17

1  consider those to be in the files of Ann McGeehan, but I
2  did review those.
3       Q.  Did you review any documents authored by
4  Elizabeth Winn?
5       A.  No, I mean, other than the hand she would have
6  had in the first version of 81.71 and first version of
7  the provisional ballot rules.
8            MS. WESTFALL:  Could you mark this.
9            (Exhibit No. 2 marked)
10      Q.  I'm handing you what's been marked as
11 Exhibit 2.  Do you recognize this document?
12      A.  Yes.
13      Q.  What is it?
14      A.  It appears to be the answers to the first set
15 of interrogatories from the State of Texas.
16      Q.  Did you assist in the preparation of these
17 interrogatory responses?
18      A.  I did.
19      Q.  What were the interrogatories you contributed
20 to as a general matter?
21      A.  Generally I helped with the ones that related
22 to our office.
23      Q.  And those would include?
24      A.  Do you want specific numbers?
25      Q.  Please.

---

18

1       A.  Number 1, number 3, number 8 indirectly,
2  number 9 indirectly, number 10 directly, number 11
3  directly, number 12, number 13, number 14, number 16,
4  number 17, number 18, number 19, number 22, 24 and 25
5  were, sort of, and I believe that's it.
6       Q.  Thank you.  The interrogatory responses state
7  that in July 2013 the voter registration list was matched
8  against the jury wheel used by DPS.  Is that correct?
9       A.  That's correct.
10      Q.  Were you involved in that matching process or
11 overseeing that matching process?
12      A.  I did.
13      Q.  What is the jury wheel list?
14      A.  The jury wheel is a list of persons with a
15 driver license and a state ID that the DPS provides to us
16 once a year for the purpose of constituting the list of
17 jurors for each county.
18      Q.  And how does that differ from the list of
19 driver license holders and personal ID holders?
20      A.  I don't know.
21      Q.  Is it different insofar as it is limited to
22 U.S. citizens and persons without felony convictions?
23      A.  I believe that one of the first things we do
24 with the jury wheel when we're making -- we do with that
25 list from the DPS when we're making the jury wheel is

---

19

1  eliminate non-citizens, so I believe they're on that
2  list.
3       Q.  The jury wheel list that you get from DPS; is
4  that correct?
5       A.  That's correct.
6       Q.  And then your office removes non-citizens and
7  persons with felony convictions; is that correct?
8       A.  That's correct.
9       Q.  And you prepare the jury list; is that right?
10      A.  That's right.
11      Q.  What data elements from the TEAM database were
12 matched against the jury wheel list that was conducted in
13 July 2013?
14      A.  What we did is -- we compared several different
15 ways, but primarily the name, first name, last name, date
16 of birth, and any identifying numbers that might have
17 been included, so either the driver license number or the
18 last four of the Social or, if we had it, the full nine
19 of the Social.
20      Q.  And were those the sum total of the fields that
21 you matched?
22      A.  I am not sure about middle name.  I do not
23 believe it's used in that process.
24      Q.  Who in your office conducted the match?
25      A.  Betsy Schonhoff is my voter registration

---

20

1  manager, so she interfaced directly with our IT
2  department, and our IT department would actually do the
3  sequel server queries to generate the list.
4       Q.  How many active voters were not present on the
5  jury wheel list?
6       A.  I don't know.
7       Q.  Do you have any ballpark estimate?
8       A.  I'm not sure what you're asking.  If you're
9  asking about the number of people that didn't match with
10 an ID -- is that what you're asking?
11      Q.  Yes.
12      A.  It was just under 800,000, 795,000 or so.
13      Q.  This was a number that was -- that came out of
14 the July 2013 match?
15      A.  It's in that ballpark.  It might have been
16 seven-eighty-five, but it was somewhere in the upper
17 700,000, yes, ma'am.
18      Q.  Do you recall that a similar type of matching
19 process was conducted in 2011?
20      A.  Yes.
21      Q.  And was the matching result roughly the same?
22      A.  I believe it was less than that.  I'm not sure
23 exactly what process was used in September of '11.  That
24 was prior to my time with the Secretary of State's
25 Office.  But it's my recollection that number was

---

KEITH INGRAM                                                4/23/2014

21

1   something under 700,000 non-matches.
2        Q.   So just to be clear about your testimony, is it
3   your testimony that the Secretary of State's Office
4   prepared a jury wheel list from information from the DPS
5   and then you compared the jury wheel list with a list of
6   registered voters?  Is that correct?
7        A.   No, ma'am.
8        Q.   Could you clarify?
9        A.   No, we took the DPS database that they provided
10  for jury wheel purposes and matched the voter
11  registration database against that database, so we didn't
12  match it against the actual jury wheel.  The jury wheel
13  consists of both registered voters and driver license
14  holders, and the goal of making the jury wheel is to make
15  sure that duplicates aren't on that list.
16       Q.   I see.  I see.
17       Q.   So that somebody's not on the jury list because
18  they've got a driver license and on the jury list because
19  they're a registered voter.
20       Q.   I see.  Did you provide the matching results
21  from this July 2013 match to anyone outside of the
22  Secretary of State's Office?
23       A.   We did.
24       Q.   Who were those entities or people?
25       A.   I'm not sure if I can remember all of them off

22

1   the top of my head.  I know Sondra Haltom from Empower
2   the Vote Texas requested it.  I know that Chris Tomlinson
3   from the Associated Press requested it.  We also provided
4   it to counties who asked for their particular voters who
5   were non-matches, so there were some counties -- I know
6   Dallas, Travis, I believe Harris all asked for their list
7   for their county of persons who didn't match within their
8   county.
9        Q.   Were there any other counties you can recall at
10  this time?
11       A.   I don't know.  I can't -- I mean, there might
12  have been some smaller ones that asked for it as well.
13  But I know -- I know Travis did, I know Dallas was
14  interested in it, and I know that Harris was.
15       Q.   Why did you conduct this match?
16       A.   The purpose of that match was to get an idea by
17  ZIP code of where concentrations of voters would be that
18  didn't match with a driver license or state ID.  We were
19  contemplating the use of mobile election identification
20  certificate units and we wanted to have some idea -- a
21  rough idea, because obviously non-matches doesn't mean
22  they don't have an ID.  But we wanted to have a rough
23  idea of where the voters might be concentrated who could
24  benefit from election identification certificate mobile
25  unit.

23

1        Q.   Okay.  And then how did counties and other
2   entities, such as Ms. Haltom and Chris Tomlinson, learn
3   about the existence of this match?
4             MR. KEISTER:  Objection, calls for
5   speculation.
6        A.   I don't know how Sondra Haltom and
7   Chris Tomlinson learned about it.  The counties learned
8   about it because we were contacting them and were
9   letting them know that we had done this match and we had
10  a list of ZIP codes in their counties and the numbers of
11  non-matches within those ZIP codes and did they know of
12  anyplace where an EIC unit could be set up within those
13  ZIP codes.
14       Q.   I see.  And just to be clear -- because it's
15  not clear in my mind or I misunderstood the interrogatory
16  response.  You prepared -- you obtained -- the process
17  was that you obtained from DPS the list of driver license
18  and personal ID holders and you created the jury wheel,
19  is that correct, in-house?
20       A.   That's right.
21       Q.   And then you took the jury wheel and you
22  compared it with the TEAM database; is that correct?
23       A.   No.
24       Q.   Correct me, because I'm not understanding the
25  matching process.

24

1        A.   The purpose of mentioning the jury wheel is to
2   say that it was the driver license database associated
3   with the jury wheel process.
4        Q.   I see.  I see.
5        A.   So we matched with the DPS database that we use
6   for jury wheel.
7        Q.   Did you contact every single county about the
8   results of this match?
9        A.   No, ma'am.
10       Q.   How did you identify which counties?
11       A.   Like I said, the purpose of this was we were
12  investigating where to send mobile EIC units, and so the
13  goal was to find -- there were two competing variables
14  with regard to mobile EIC units; number 1, we wanted to
15  make sure that rural communities had access to EICs if
16  they needed an election identification certificate.  So
17  that was one interest at stake with regard to the EIC
18  mobile program.  The other interest was to find
19  concentrations of voters that may benefit from this
20  program.  So with regard to this matching exercise, it
21  was -- the purpose was to find concentrations of voters
22  that could benefit, potentially, from an EIC, and so
23  that's the reason those counties with high concentrations
24  in a ZIP code were contacted.  Obviously, in Reeves
25  County or Upton or any of the other rural counties, they

**Page 25**

1  don't have large concentrations of voters.  The matching
2  exercise was not really pertinent to that aspect of the
3  mobile EIC program.
4      Q.  So in some you contacted some counties with
5  large concentrations and some counties with rural
6  populations that might not have a driver license office
7  or where you were contemplating putting a mobile EIC
8  unit?
9      A.  Right.  And it wasn't just that they didn't
10 have a driver license full time in their county, it was
11 that they were rural and they could be -- you know, even
12 if it was within the same county, they could be a
13 significant distance away from the driver license office,
14 so we wanted to make sure that there was rural coverage.
15     Q.  How many counties was it total that you
16 contacted, approximately?
17     A.  With regard to what?
18     Q.  With regard to the jury wheel match results in
19 July 2013.
20     A.  I am not sure.  It would have been all of the
21 big ones, so Bexar, Harris, Dallas, Travis, Williamson,
22 Hays, Fort Bend, Brazoria, Jefferson.  You know, it would
23 have been all of the larger counties, Cameron, Hidalgo.
24     Q.  Did you produce the matching results to your
25 counsel in this litigation?

**Page 26**

1      A.  I believe so, yes, ma'am.
2      Q.  Have they been turned over to the United States
3  and the other plaintiffs in this litigation?
4      A.  I don't know.
5      MS. WESTFALL:  Mr. Keister, have the
6  matching results been produced in this litigation?
7      MR. KEISTER:  Counsel, I can't answer that
8  question.  I'm sorry.
9      MS. WESTFALL:  Could you, after this
10 deposition, look into that and determine whether you
11 have?  And we would request that the matching results be
12 produced.  They are responsive to our request for
13 production.
14     A.  Could I clarify that request?
15     Q.  Certainly.
16     A.  There's two different forms that this response
17 takes.  They're both in an Excel spreadsheet.  There's
18 one that is just broken out by county by ZIP code, so it
19 just has the numbers on it, and then there's another one
20 that has the actual voters underneath those numbers.  You
21 want one or both of those?
22     Q.  So there are two files, one is a summary by
23 county of the number of voters and one is a list of the
24 actual voters; is that correct?
25     A.  That's right.  And so, you know, the one with

**Page 27**

1  the voters in it is very large.
2      Q.  We would request both of those matching
3  results.  Thank you for your clarification.
4      MR. KEISTER:  Counsel, let me just state
5  on the record I do not know if those have been produced
6  or not.  I'm not saying they have, I'm not saying they
7  haven't.  And just to make it clear, my memory is not as
8  good as it once was, so don't rely upon anything said at
9  the deposition for me to follow up on.  Please give it to
10 me in writing or give it to us in writing.
11     MS. WESTFALL:  Certainly we will do that.
12     MR. KEISTER:  Not to be problematic, but
13 I'm sure by the end of the day this will all be gone from
14 my memory.
15     MS. WESTFALL:  We will do that.  Thank
16 you.
17 BY MS. WESTFALL:
18     Q.  Did you contact any voters on the matching list
19 individually and advise them of SB 14's ID requirements
20 or the availability of an EIC?
21     A.  No, ma'am.
22     Q.  Why didn't you do that?
23     A.  Well, because there's too many of them.  I
24 don't know -- you know, we break it down by county.  The
25 counties deal with their voters.  So I know that

**Page 28**

1  Bruce Elfant here in Travis County sent all of his voters
2  on that list a postcard.  I know that Toni Pippins Poole
3  did it up in Dallas.  And so it's their responsibility to
4  interface with their voters if they feel the need to do
5  so.
6      Q.  And as the Secretary of State responsible for
7  enforcing the statute, SB 14, you did not feel it was
8  within your responsibility to contact the voters
9  individually?
10     A.  We have not -- as an office we have not made
11 that decision.  There are budgetary and resource
12 constraints that are all too real whenever we're talking
13 about a list that large.
14     Q.  So was it -- it was budgetary and resource
15 constraints that caused you to conclude at that time that
16 you were not going to contact voters individually?  Is
17 that your testimony?
18     A.  Yes, ma'am.
19     Q.  Did you have on that list of matched voters
20 phone numbers for those voters?
21     A.  No, ma'am.
22     Q.  They're not available --
23     MS. WESTFALL:  Strike that.
24     Q.  Do voters supply their phone number when they
25 register to vote?

KEITH INGRAM                                                              4/23/2014

---

29

1     **A.   Some do.**
2     Q.   And is that information in the TEAM database?
3     **A.   I don't believe so.**
4     Q.   It's not input in the TEAM database?
5     **A.   No, ma'am.**
6     Q.   What are those phone numbers used for when
7     they're input on the voter registration application?
8     **A.   The counties sometimes use them to contact the**
9     **voters.**
10    Q.   Is it your testimony that there are no phone
11    numbers associated with individual voters in the TEAM
12    database?
13    **A.   I don't know for sure, but I don't believe**
14    **there are.**
15    Q.   Aside from Sondra Haltom, Chris Tomlinson, and
16    the counties, did anyone else request this list?
17    **A.   I don't remember.  I think there were a couple**
18    **of other requests, but I don't know who they were.  I**
19    **know that in response to Interrogatory No. 17 we provided**
20    **a spreadsheet with the folks who had requested that list.**
21    Q.   Did the Secretary of State's Office play any
22    role in the development of the EIC application form?
23    **A.   No, ma'am.**
24    Q.   And by EIC I'm referring to the election
25    identification certificate, okay?

---

30

1     **A.   Okay.**
2     Q.   Did the Secretary of State's Office play any
3     role in developing the regulations promulgated by the
4     Department of Public Safety pertaining to EICs?
5     **A.   I don't know.  I think so.**
6     Q.   Do you know what that role or participation
7     was?
8     **A.   Well, when we were contemplating the use of**
9     **mobile election identification certificate units we were**
10    **trying to gather the list of equipment that would be**
11    **required to issue election identification certificates on**
12    **a remote basis away from the office, and there was some**
13    **equipment in there that we asked questions about, and I**
14    **believe as a result of our question asking the need for**
15    **that equipment went away, so I don't know how that played**
16    **out over on the DPS side.**
17    Q.   Who in your office interfaced with the
18    Department of Public Safety, if you know, over these --
19    concerning the promulgation of regulations related to
20    EICs?
21    **A.   And that's -- that's my point.  It wasn't**
22    **directly regarding the promulgation of regulations, but**
23    **it did, I think, have an impact on the final version of**
24    **those regulations.**
25         MS. WESTFALL:  Could you mark this as 3,

---

31

1     please.
2         (Exhibit No. 3 marked)
3     Q.   I'm handing you what's been marked as
4     Exhibit 3.  Have you seen this document before?
5     **A.   No, ma'am.**
6     Q.   Did the Department of Public Safety solicit the
7     views of your office about whether to require EIC
8     applicants to provide fingerprints?
9     **A.   They didn't solicit our advice.  We gave it**
10    **unsolicited.**
11    Q.   Who in your office gave that input?
12    **A.   Myself and Secretary Steen.**
13    Q.   When was that input provided?
14    **A.   Several occasions.**
15    Q.   Do you know approximately the first time that
16    you provided input on fingerprinting requirements?
17         MR. KEISTER:  Mr. Ingram, let me advise
18    you that to the extent that it was deliberative process
19    of the Secretary of State's Office, I'm going to advise
20    you not to answer, but if it's not within deliberative
21    process, you can.
22    **A.   You're talking about the date?**
23         MS. WESTFALL:  And, Mr. Keister, the
24    Department of Public Safety was the entity responsible
25    for administering the EICs, so I'm not sure what decision

---

32

1     you are referring to that would have been made by the SOS
2     with regard to fingerprinting.
3         MR. KEISTER:  Well, what you're asking
4     for, to me, is calling for the deliberations of the
5     Secretary of State with respect to advice they gave to
6     the Department of Public Safety.  And to the extent,
7     Mr. Ingram, that that is within the deliberative process,
8     the process that you guys went through, then I'm going to
9     instruct you not to answer.
10        MS. WESTFALL:  Could you read back the
11    question, please.
12        (Question read by the reporter)
13    **A.   So --**
14        MR. KEISTER:  With respect to that
15    question you can answer, but with respect to any
16    underlying conversations or deliberations between you and
17    your office, don't give any additional information.
18    **A.   The timing of it would have been in July and**
19    **August of 2013.**
20    Q.   What was your input with regard to
21    fingerprinting?
22    **A.   It was our belief that fingerprinting was**
23    **unnecessary with regard to an election identification**
24    **certificate.**
25    Q.   What was the basis of your view?

---

KEITH INGRAM                                                    4/23/2014

33

1    A.  It was the basis for our view that SB 14 had in
2    its transportation code amendment that the requirements
3    that the DPS could require for the election
4    identification certificate said that they may require the
5    same identification points as a driver license requires,
6    which would have included fingerprint, and since that
7    language was worded permissively it didn't require all of
8    the elements that are required to obtain a driver license
9    and that we felt that fingerprinting for this process to
10   prevent in-person voter impersonation fraud for a
11   single-use certificate that could only be used for voting
12   was unnecessary and didn't need to be.
13        Q.  Are you aware that the DPS regulations
14   concerning the application form and what an applicant has
15   to provide for an EIC do require fingerprinting?
16        A.  That was DPS' response, that their rule
17   required it, and I said, well, that's your rule and it
18   can be changed.
19        Q.  And are you aware that as of today it hasn't
20   changed?
21        A.  I am not aware of that, no, ma'am.
22        Q.  Was there ever a time when applicants for an
23   EIC were required to provide fingerprints?
24        A.  I believe so, yes, ma'am.
25        Q.  What was that period of time?

34

1        A.  Before July or August of 2013.  So there
2    were -- I don't know.  At that point seems like there
3    might have been 17 or 20 that had been issued statewide,
4    and probably those folks gave fingerprints.
5        Q.  So that was between the period when the law
6    began to be enforced around the 25th of June 2013 and
7    sometime in July 2013; is that correct?
8        A.  Or perhaps August, but yes, ma'am.
9        Q.  Were there any complaints received by your
10   office or by county election officials about the
11   fingerprinting requirement?
12        A.  No, ma'am.
13        Q.  How did this issue come to your attention?
14        A.  Like I said, it was with regard to getting a
15   list of equipment that would be required to do mobile
16   election identification certificates.
17        Q.  And one of the items in that equipment related
18   to fingerprinting; is that correct?
19        A.  That's right.
20        Q.  And that's how it was brought to your
21   attention; is that right?
22        A.  Yes.
23        Q.  And to your knowledge about 15 to 20 people had
24   to be fingerprinted during that period when fingerprints
25   were required?

35

1        A.  I don't know how many.  That's just my best
2    guess.
3        Q.  Does a voter registration applicant in Texas
4    need to provide fingerprints?
5        A.  No, ma'am.
6        Q.  Do you know who made the decision at DPS to
7    require fingerprints?
8        A.  I have no idea.
9        Q.  Do you know whether an applicant for a U.S.
10   passport needs to provide fingerprints?
11        A.  I don't know.  I doubt -- I don't think so.
12        Q.  Do you know whether a person in the military
13   obtaining an ID needs to provide fingerprints?
14        A.  I don't know.  I don't think so.  I should ask
15   my son.
16        Q.  Do you know what offices EIC applicants were
17   required to provide fingerprints in?
18        A.  No, ma'am.
19        Q.  Or what counties?
20        A.  No.
21        Q.  Do you know whether any voters were deterred
22   from applying for EICs due to this fingerprinting
23   requirement?
24        A.  I have no idea.
25        Q.  How many conversations did you have with the

36

1    Department of Public Safety concerning fingerprinting?
2        A.  How many?  I don't know.  Three or four.
3        Q.  Who at the Department of Public Safety did you
4    communicate your views to?
5        A.  We communicated our views to Mr. Bodisch,
6    Mr. Peters, and Mr. McCraw, Colonel McCraw.
7        Q.  What was their reaction?
8        A.  I don't know.  I don't know what you mean.
9        Q.  Did they respond favorably to your suggestion
10   to remove that requirement or were they resistant?
11        A.  They were resistant.
12        Q.  What was the basis of their views as you
13   perceived them?
14        MR. KEISTER:  Calls for speculation.
15        A.  I don't know.
16        Q.  What did they tell you as to why they needed to
17   continue this requirement?
18        A.  I don't know.  I don't -- their view was that
19   they're a law enforcement agency and as a law enforcement
20   agency that's their primary way to look at the world and
21   when they've got the opportunity to interface with
22   someone they want to get that data on that person and
23   that the potential for somebody to impersonate someone to
24   get an EIC existed apart from the fingerprint to confirm
25   their identity.

KEITH INGRAM                                          4/23/2014

10 (Pages 37 to 40)

---

**37**

1   Q.  Do you know what the Department of Public
2   Safety -- and I'm going to refer to it interchangeably as
3   DPS and Department of Public Safety.  Do you know what
4   they did with the fingerprints when they obtained the
5   fingerprints from the EIC applicants?
6       A.  No, ma'am.
7       Q.  Do you know what the standard practice is of
8   DPS when they obtain fingerprints from applicants for
9   other forms of ID?
10      A.  I do not.
11      Q.  Are you confident sitting here today that no
12  DPS offices are requiring fingerprinting of EIC
13  applicants?
14      A.  I am not.
15      Q.  Do you know who would know the answer to that
16  question?
17      A.  The Department of Public Safety.
18      Q.  Do you know who at DPS would know?
19      A.  I don't know for sure who over there would
20  know.  Probably all of the ones that I mentioned would
21  know as well as Mr. Rodriguez.
22      Q.  And was there a time after you had three or
23  four conversations with DPS that they agreed with your
24  position and decided that fingerprints would not be
25  required?

---

**38**

1       A.  There was, and that the equipment that we
2   purchased for the mobile EIC units did not include the
3   fingerprint equipment.
4       Q.  And it's your testimony this was about
5   August 2013?
6       A.  Yes, because we started the actual usage of the
7   mobile EICs in the middle of September, so it would have
8   been late August or early September.
9       Q.  Do you know whether the determination to stop
10  requiring fingerprinting was communicated to DPS
11  personnel?
12      A.  I have no idea.
13      Q.  Do you know who would know the answer to that
14  question?
15      A.  The folks over at DPS.
16      Q.  Were you concerned -- was part of the reason
17  why you didn't feel fingerprinting was necessary was that
18  you were concerned that fingerprinting EIC applicants
19  would be intimidating to those voters?
20          MR. KEISTER:  Objection.  Are you asking
21  Mr. Ingram his personal opinion or are you asking is
22  there a position of the Secretary of State?
23          MS. WESTFALL:  I'm asking his personal
24  opinion.
25          MR. KEISTER:  Well, then I'm going to

---

**39**

1   instruct him not to answer his personal opinions.  That's
2   outside the scope of what we're here for today.  He's
3   here to testify on the areas in the subpoena, and that's
4   not his personal opinions.
5           MS. WESTFALL:  Well, Mr. Keister, we can
6   certainly notice Mr. Ingram for another deposition in his
7   personal capacity if that's how you would like to proceed
8   or we could try to efficiently conduct this deposition
9   and have him here for one day.
10          MR. KEISTER:  Counsel, that's your call
11  how you want to proceed, but I'm going to instruct
12  Mr. Ingram only to testify, to the extent possible, as to
13  the issues in the subpoena, and that's -- and I do not
14  want this record to confuse Mr. Ingram's personal
15  opinions for being that of the Office of the Secretary of
16  State.  It's going to be a long depo, and I'm afraid it
17  will get confused.
18          MS. WESTFALL:  I'll ask it a different
19  way.
20          MR. KEISTER:  Okay.
21  BY MS. WESTFALL:
22      Q.  From the standpoint of the Secretary of State's
23  Office was the Secretary of State at any time concerned
24  that some voters might be intimidated by the
25  fingerprinting requirement?

---

**40**

1       A.  I don't know if intimidated is the correct
2   word.  It felt to us like it was unnecessary and would
3   create an additional hurdle that might be a problem for
4   some voters for whatever reason, and we did not believe
5   that the hurdle was necessary.
6       Q.  Did you think that the Secretary of State's
7   Office felt that voters might be discouraged from
8   applying for an EIC because of this requirement?
9           MR. KEISTER:  Once again, Mr. Ingram --
10  are you asking for his personal opinion at this point or
11  are you asking for the Office of the Secretary of State?
12          MS. WESTFALL:  The Office of the Secretary
13  of State.
14      A.  We were of the opinion that it would create
15  a hurdle for some voters that was unnecessary.
16      Q.  Are EIC applicants required to provide
17  documentary proof of U.S. citizenship?
18      A.  I believe so.  I believe they're required to
19  produce proof of citizenship and identification, but the
20  specific elements of those requirements would be a DPS
21  question.
22      Q.  And could the decision to require or not
23  require fingerprints be reversed at any time?
24      A.  I don't know.
25      Q.  Do you know why EIC applicants are required to

---

## 41

1    provide documentary proof of U.S. citizenship?
2         A.  I do not.
3         Q.  Did DPS solicit the views of the Secretary of
4    State on this issue?
5         A.  No, ma'am.
6         Q.  Do you know who at DPS decided that EIC
7    applicants would have to provide documentary proof of
8    U.S. citizenship?
9         A.  I do not.
10        Q.  Do you know what the purpose of this
11   requirement is?
12        A.  I do not.
13        Q.  It's not required by SB 14, is it?
14        A.  SB 14 says that the DPS can require the same
15   elements of proof of ID and proof of citizenship that are
16   required for a driver license.
17        Q.  Do you think documentary proof of citizenship
18   is a necessary requirement for EIC applicants?
19             MR. KEISTER:  Objection.  Once again,
20   counsel, I'm going to instruct --
21        Q.  On behalf of the Secretary of State.
22        A.  Our office has no position on that.
23        Q.  Is documentary proof of citizenship required
24   when you register to vote in Texas?
25        A.  No, ma'am.

## 42

1         Q.  Is it required to obtain a license to carry a
2    concealed handgun?
3         A.  I don't know.
4         Q.  Is it required to obtain a Texas driver
5    license?
6         A.  I don't know.
7         Q.  Is it required to obtain a Texas personal ID
8    card from DPS?
9         A.  I don't know.
10        Q.  At any point were EIC applications compared
11   against other state databases to see if the applicant had
12   any outstanding traffic tickets?
13        A.  I'm not sure.
14        Q.  Have you heard anything about this before?
15        A.  Well, I know that when we were getting the
16   mobile EIC unit concept underway that one of the
17   requirements was realtime connectivity at a fairly high
18   data bit rate, and when we questioned the need for that
19   the response was that it was to perform background
20   checks.  So I don't know if a background check includes
21   unpaid traffic tickets or not, but that was another thing
22   that we felt was unnecessary.
23        Q.  What was the resolution of your dispute with
24   DPS as to background checks on applicants?
25             MR. KEISTER:  Objection to the

## 43

1    characterization of testimony as a dispute.
2         Q.  You may answer.
3         A.  The mobile EIC units did not have realtime
4    connectivity.
5         Q.  So in other words, the mobile EIC units did not
6    conduct background checks of EIC applicants?
7         A.  I don't know.  They did not have realtime
8    Internet connectivity for performing said background
9    checks in realtime.
10        Q.  Do you know whether EIC applicants who went to
11   driver license offices were subjected to background
12   checks?
13        A.  I do not know.
14        Q.  Do you know who would know that?
15        A.  The DPS.
16        Q.  Who at DPS?
17        A.  I don't know.
18        Q.  Do you know whether EIC applicants had -- when
19   they submitted their application, had a check for arrest
20   warrants as part of the background check you described?
21        A.  I believe that was the purpose of the
22   background check.
23        Q.  Do you believe background checks are occurring
24   currently for EIC applicants?
25        A.  I have no idea.

## 44

1         Q.  Is there any state law that you're aware of
2    that would prevent DPS from conducting background checks
3    of EIC applicants?
4         A.  No, ma'am.
5         Q.  And the Secretary of State's Office doesn't
6    compare voter registration applications against data
7    showing whether you have an outstanding traffic ticket,
8    does it?
9         A.  No.
10        Q.  And when you're processing voter registration
11   applications you don't do any check to determine whether
12   the applicant has any outstanding arrest warrants; is
13   that correct?
14        A.  That is correct.
15        Q.  Is the Secretary of State's Office aware of any
16   public perception that if you go to a driver license
17   office a warrant check will be conducted while you're
18   there?
19        A.  I have no idea.
20        Q.  Are state troopers or law enforcement generally
21   present at driver license offices?
22        A.  Yes, they are.
23        Q.  Are you aware -- is the Secretary of State's
24   Office aware of any concerns about the presence of law
25   enforcement at driver license offices?

45

1    A.  No, ma'am.
2    Q.  Is there any law enforcement at polling places
3    on election day?
4    A.  Well, there can be, but usually not.
5    Q.  And why is that?
6    A.  Not usually a need.  If the election judge
7    feels that there is a potential breach of the peace, then
8    they certainly can have a constable or a local law
9    official at the polling place, but normally there's not
10   a perceived threat to public order or safety that would
11   require the election judge to make that request of local
12   law enforcement.
13   Q.  And is it generally true that county election
14   offices don't have law enforcement at polling places
15   because it would be intimidating to voters?
16   MR. KEISTER:  Objection, calls for
17   speculation.
18   A.  Right.  I don't believe that has anything to do
19   with it, no, ma'am.
20   Q.  Has the Secretary of State's Office played any
21   role in the issuance of EICs?
22   A.  Yes.
23   Q.  And describe that role.
24   A.  We were a part of the program for the mobile
25   EIC units last fall, and then we have actually had

46

1    several of our employees trained to issue election
2    identification certificates, and in the spring campaign
3    before the March primary some of our agency employees
4    were out with the mobile units paired with a DPS person
5    and they did issue a couple or maybe three or four EICs.
6    Q.  Is there any other way in which the Secretary
7    of State's Office has played a role in issuing EICs?
8    A.  No, ma'am.
9    Q.  Did your office have any role in issuing EICs
10   in October or September 2013?
11   A.  We -- we had a role in trying to direct the
12   locations of the election identification certificate
13   mobile units, and so we coordinated very closely with DPS
14   in that process.  But no, we didn't actually issue the
15   election identification certificates.
16   Q.  So you had no involvement in issuing EICs at
17   driver license offices; is that correct?
18   A.  That's correct.
19   Q.  You have no plans to be involved in issuing
20   EICs at driver license offices; is that correct?
21   A.  Our office has no such current plans.  If the
22   legislature decides that we need to have a role, then we
23   will.
24   Q.  Fair point.  Has your office played any role in
25   working in other -- in county offices to issue EICs?

47

1    A.  Yes.
2    Q.  What has that role been?
3    A.  There was what we call Phase 3 of the mobile
4    EIC unit program, and it involved permanent fixtures of
5    election identification certificate mobile units inside
6    counties that didn't have a permanent driver license
7    office, so I, for the Secretary of State's Office,
8    contacted those counties -- I don't remember how many
9    there were, 79 or 80 of them -- and talked to them about
10   the possibility of having the training, having the
11   equipment and the ability to issue election
12   identification certificates locally on a full-time basis.
13   Q.  Has that been executed or is that a plan?
14   A.  It has been executed and it is currently in the
15   process of continuing to be executed.  So there were some
16   counties who were very quick on deciding to take us up on
17   the offer, there were other counties who were more
18   reluctant, and so it's been a process.
19   Q.  What is the current status of how many counties
20   without driver license offices have entered into this
21   arrangement?
22   A.  I am not sure.  The last I heard it was 40 had
23   the ability to do EICs on a full-time basis locally.  I'm
24   not sure of what the updated numbers are past that.  I
25   believe that there were several more who had agreed to be

48

1    trained and accept the equipment.  I just don't know what
2    the current status is.
3    Q.  Are those 40 currently operating offices that
4    issue EICs or is this -- is your testimony that they've
5    entered into an agreement to do that?
6    A.  No, no, they -- they -- they -- they're up and
7    running, so if someone needs an election identification
8    certificate in those counties they can go to their
9    local -- it depends on the county which office has the
10   equipment.  Sometimes the county judge's office has it,
11   sometimes it's the sheriff, sometimes it is the voter
12   registrar, and sometimes it's the county clerk, so it
13   depends on the county.
14   Q.  Okay.  We'll talk a little bit about that
15   Phase 3 later, after we talk about earlier phases.
16   Are you aware that there have been changes
17   to the rules related to the issuance of birth
18   certificates to be used to obtain an EIC?
19   A.  Yes.
20   Q.  Have you had any role or involvement or input
21   in the changes to those rules?
22   A.  No, ma'am.
23   Q.  Are you familiar with mobile EIC centers?
24   A.  I'm not sure.
25   Q.  Units?

**49**

```
 1      A.  Yes.
 2      Q.  What are those?
 3      A.  It is equipment that can be transported from
 4   location to location that has within it the ability to
 5   take the person's information, scan it in and issue a
 6   temporary form of an election identification certificate.
 7      Q.  What prompted development of mobile EIC units?
 8          MR. KEISTER:  Mr. Ingram, to the extent
 9   that calls for any deliberations within the office, I'm
10   going to instruct you not to answer that.  To the extent
11   it's simply telling what the office does, then you can go
12   into that.
13      A.  Yeah, then I don't know if I can answer that
14   question.
15      Q.  When did the beginning of the program start?
16      A.  It actually started with mobile EIC units in
17   place sometime around the 15th or 20th of September.  I'm
18   not sure exactly the kickoff date.
19      Q.  When did the plans for the units start?
20      A.  It would have been June and July of 2013.
21      Q.  Who was involved in developing the plans?
22      A.  Our office, the Governor's Office, the
23   Department of Public Safety.
24      Q.  Who at the Governor's Office was involved?
25      A.  I am not sure who all was involved.  There's a
```

**50**

```
 1   deputy chief of staff.  I can't think of his name to save
 2   my life right now.  But anyway, he -- he was the primary
 3   point person for the Governor's Office on it.
 4      Q.  Were you the point person for the Secretary of
 5   State's Office?
 6      A.  I along with our general counsel and our
 7   deputy.
 8      Q.  And who was the point of contact at DPS?
 9      A.  Duke Bodisch and Joe Peters.
10      Q.  Were there other means of reaching registered
11   and eligible voters who lacked EICs that you considered?
12      A.  One of the things that we had talked about was
13   Saturday hours at some of the higher traffic DPS offices.
14      Q.  Were there any other avenues of reaching voters
15   without EICs that you contemplated?
16          MR. KEISTER:  Mr. Ingram, to the extent
17   that goes into the deliberations of the office I'm
18   going to instruct you not to answer that, and also to the
19   extent that it invades the attorney-client privilege I'm
20   going to instruct you not to answer that.
21      Q.  And I'm certainly not asking you about any
22   conversations you've had with your attorneys, but were
23   there other means or avenues of reaching voters that you
24   contemplated?
25          MR. KEISTER:  Once again, to the extent
```

**51**

```
 1   that that's concerning deliberations in your office about
 2   what ultimately resulted in the mobile EICs, I'm going to
 3   instruct you not to answer that.
 4      A.  I guess I can't answer.
 5      Q.  You had the list of voters who didn't have
 6   state-issued IDs in July 2013, correct?
 7      A.  No, ma'am, I did not.
 8      Q.  You had testified earlier in this deposition
 9   that you had conducted a match of TEAM with the jury
10   wheel list, correct?
11      A.  That we matched TEAM with the DPS database used
12   for jury wheel, yes, ma'am.
13      Q.  Correct.  And you had a list of voters who did
14   not have state forms of -- who did not have a Texas
15   driver license or a personal ID.
16      A.  No, ma'am, that is not what I testified.
17      Q.  Could you clarify?
18      A.  We did not have such a list.  We've never had
19   such a list, and as far as I know such a list does not
20   exist.
21      Q.  Can you testify as to your understanding of
22   what that matching list constituted and represented?
23      A.  That list of persons were registered voters who
24   we could not prove had a state-issued ID, that we
25   couldn't match with a state-issued ID.  That does not
```

**52**

```
 1   mean that they did not have one, and in fact, we believe
 2   most of them do have one, we just didn't have the
 3   necessary information to show it.
 4      Q.  What was the basis of your belief that most of
 5   them had the state forms of ID?
 6      A.  Because it's our understanding that most people
 7   have a state-issued ID of some sort or another.
 8      Q.  But for some reason they were not in the DPS
 9   driver license database?
10      A.  No, ma'am.  They didn't match with a person in
11   the DPS driver license database.
12      Q.  So it's your testimony that it was a matching
13   problem, but that the 795,000 or 785,000 people you just
14   testified about likely, because of matching issues,
15   actually had state forms of ID; is that correct?
16      A.  That's right.
17      Q.  And it's because the matching that you
18   conducted was somehow flawed; is that correct?
19      A.  The information that we use for matching
20   purposes has within it deficiencies, so what we have
21   associated with a registered voter are certain bits of
22   information.  What the driver license database has
23   associated with a particular driver or state ID holder
24   are certain bits of information.  Making those bits of
25   information match so that you feel comfortable it's the
```

KEITH INGRAM                                                    4/23/2014

---

57

1      A.  The head of this particular division is
2   Elizabeth Kirkwood, but I don't know which of the guys
3   actually did it.
4      Q.  Did you consider robocalling voters on this
5   list that you prepared in July 2013 to let them know
6   about SB 14 or the availability of EICs?
7      A.  No, ma'am.
8      Q.  Why did you not consider that?
9          MR. KEISTER:  And by you, you're referring
10  to the office?
11     Q.  The office.
12     A.  The Office of the Secretary of State doesn't
13  have their phone number and we don't have the resources
14  or the ability to contact the voters, and they're not our
15  voters, they're the counties' voters, and every single
16  voter in the state received, in 2011, a voter
17  registration card with a list of photo ID requirements
18  that would be in effect if preclearance happened and then
19  they got a voter registration card -- every single voter
20  in the state got a card at the end of 2013 with a list of
21  photo ID requirements.  So every voter has been contacted
22  with regard to the need for a photo ID at the polling
23  place.
24     Q.  The voter registration card was reissued in
25  '13?

---

58

1      A.  Yes.
2      Q.  So I believe you testified that mobile EIC
3   units were in operation in advance of November 2013.  Is
4   that correct?
5      A.  That's correct.
6      Q.  And you testified a bit about your involvement
7   in that program.
8      A.  Right.
9      Q.  And the involvement was providing the equipment
10  for the units?
11     A.  We bought the equipment and we interfaced with
12  the counties about locations to put the units, and that
13  was my job.
14     Q.  And DPS was involved in what capacity?
15     A.  DPS made sure that the locations that were
16  proposed by the county election officials were sufficient
17  for the purpose and made sure that the equipment and the
18  personnel to run the equipment were on the location on
19  the dates needed.
20          MS. WESTFALL:  Could you mark this as 4.
21          (Exhibit No. 4 marked)
22     Q.  I've handed you what's been marked as
23  Exhibit 4.  Do you recognize this document?
24     A.  Yes, ma'am.
25     Q.  What is it?

---

59

1      A.  It is a Memorandum of Understanding between our
2   office and the Department of Public Safety.
3      Q.  When did your office and DPS enter into this
4   agreement?
5      A.  It shows to be October 8th of 2013.
6      Q.  Why did you enter into this agreement?
7      A.  To have a record of -- of -- of what our
8   offices had agreed to do jointly with regard to election
9   identification certificate mobile units.
10     Q.  Does it remain in effect today?
11     A.  Yes, ma'am.
12     Q.  Are you aware of any law or regulation
13  requiring the Secretary of State's Office and DPS to
14  enter into this memorandum?
15     A.  No, ma'am.
16     Q.  Are you aware of any law requiring the
17  Secretary of State or DPS to offer mobile EIC units, make
18  them available to voters?
19     A.  No, ma'am.
20     Q.  Could the Secretary of State and DPS terminate
21  this agreement at any time?
22     A.  I don't know.  I don't know what it says.  I
23  guess.
24          MR. KEISTER:  Don't guess.
25     A.  Yeah, I don't know.

---

60

1      Q.  Turning your attention to page 3, at VII,
2   Duration of Partnership, and on page -- continuing on to
3   page 4, do you see that it is effective on the date it's
4   executed and can terminate on written agreement of the
5   parties?
6      A.  Right.
7      Q.  So is it your understanding that DPS and the
8   Secretary of State's Office could terminate this
9   agreement upon written agreement?
10     A.  I guess we could.  We certainly have no plans
11  to do so.
12     Q.  Is the future of mobile EI -- the EIC program
13  at the discretion of the Secretary of State and DPS?
14     A.  And probably from input from the Governor's
15  Office, but yes.
16     Q.  Did the Governor's Office play any role in this
17  memorandum?
18     A.  I don't know what you mean by played any role.
19  They didn't sign it.
20     Q.  Did they participate in the development of the
21  terms of this memorandum?
22     A.  I don't believe so.  Not the actual terms,
23  no, ma'am.
24     Q.  Did they participate in the development of the
25  relationship between DPS and the Secretary of State's

---

KEITH INGRAM                                                        4/23/2014

16 (Pages 61 to 64)

61

1  Office to provide these units?
2          MR. KEISTER: Mr. Ingram, to the extent
3  that goes into deliberative process I'm going to instruct
4  you not to -- not to answer that question. You can give
5  the ultimate answer as to what they did, but in terms of
6  how things were discussed and developed underlying the
7  final determination I'm going to instruct you not to
8  answer, as well as based on attorney-client.
9          MS. WESTFALL: Mr. Keister, I am asking
10 whether an office was involved. I'm not asking the
11 substance of the involvement, recommendations, or any
12 deliberations prior to a decision. I'm asking for an
13 identity of an office that was involved, yes or no, and
14 I think that's appropriate even assuming that
15 deliberative process privilege is appropriately asserted
16 here, which -- which -- which I'm not conceding.
17         MR. KEISTER: You can answer that
18 question, but don't go into the underlying discussions.
19     Q.  Was the Governor's Office involved in the terms
20 of the memorandum?
21     A.  I don't believe --
22     Q.  Or the concept?
23     A.  I don't know if they were involved in the
24 memorandum. They were involved in the development of the
25 mobile EIC program, you bet.

62

1      Q.  Who was the person in the Governor's Office who
2  was involved?
3      A.  I can't remember his --
4      Q.  Could you identify the title of the person in
5  the Governor's Office involved?
6      A.  He's the deputy chief of staff, and I swear
7  he's going to kill me if I can't remember his name, but
8  I'm just drawing a blank.
9      Q.  If you remember at a break will you tell me a
10 little bit later in the deposition?
11     A.  Certainly.
12     Q.  When was the Governor's Office involved in the
13 development of the mobile EIC units?
14     A.  All the way, stem to stern, beginning to end,
15 alpha and omega.
16     Q.  What time period was the office involved?
17     A.  I am not sure. It would have been sometime in
18 July until it was underway.
19     Q.  Was anyone from the Lieutenant Governor's
20 Office involved in the development of the mobile EIC unit
21 program?
22     A.  No. They, I believe --
23         MR. KEISTER: Just answer the question.
24     Q.  Was there more than one person involved at the
25 Governor's Office in developing this program?

63

1      A.  Yes.
2      Q.  Can you think of anyone else by name of who was
3  involved?
4      A.  Sure. The chief of staff, Cathy Walt, was also
5  involved.
6      Q.  It's Walt, W-A-L-T?
7      A.  Yes.
8      Q.  Anyone else?
9      A.  No, ma'am.
10     Q.  During what periods of time have the units been
11 in operation from the time it started until the present?
12     A.  Right. The -- the -- it kind of depends on
13 what phase you're talking about. Phase 2 units were in
14 operation from middle of September until the week after
15 election day, so I believe that would be through
16 November 12th or so, and then they were put back into
17 service in January of this year through March, and we
18 actually, I believe, have restarted the program now
19 building into the November election.
20     Q.  So what was Phase 1 of the mobile EIC unit
21 program?
22     A.  I don't know. I think that Phase 1, there
23 were -- there was initially an idea that there were some
24 complex pieces of equipment on trailers, and I think that
25 might be what the DPS refers to as Phase 1, but we didn't

64

1  ever use those.
2      Q.  Turn back to Exhibit 4. Do you see that it
3  provides for 25 such units?
4      A.  Yes.
5      Q.  How was the decision made to provide 25 units?
6          MR. KEISTER: Mr. Ingram, to the extent
7  that calls for deliberative process, I'm going to give
8  you the same instruction not to -- not to go into the
9  underlying deliberations. To the extent that you can
10 give the ultimate results, you're welcome to do so.
11     A.  I guess I can't answer.
12         MR. BARON: Just for the record -- I've
13 been quiet for like over an hour, which is a personal
14 record. But it seems like we're entitled to know what
15 they did and what they didn't do. I understand your
16 objection to what went on behind the scenes in terms of
17 why, but a lot of these questions, particularly the ones
18 asking him what they did, don't seem to completely
19 involve the deliberative process to me, Ronny, just as
20 a general comment.
21         MR. KEISTER: And I'm trying to walk that
22 line and instruct him to answer as to what they did, but
23 not to go into deliberations. I'm trying to do it as
24 surgically as possible.
25         MR. BARON: All right.

KEITH INGRAM                                                    4/23/2014

17 (Pages 65 to 68)

**65**

BY MS. WESTFALL:

Q.   Mr. Ingram, you could have provided 35 units, correct?

A.   Well, obviously we have resource constraints. This is -- we're having to move money from other places in our budget to pay for this, and so there was definitely an upper limit.  So the goal is to have as many units as would be useful for accomplishing the purpose within the available resources.

Q.   Was 25 the upper limit or were there more that you could have done that you decided not to do?

A.   Well, as it turned out, not.  They were not -- it was not against the upper limit.  As initially proposed from DPS it was very much the upper limit.  So the configuration of the mobile units changed in a way that made them cheaper, so -- and at that point we had 25 committed.

Q.   I see.  So you could have -- you could have done more.  You had more budget because you did it cheaper than expected; is that correct?

A.   Well, there's two pieces to this.  There's the piece for the equipment that the Secretary of State was responsible for and then there's the piece for the personnel that DPS was going to be responsible for, and so 25 could well have been very much where they felt like

**66**

they could go.

Q.   For your original budget, correct?

A.   Right.

Q.   And then you were able to do it less expensively, and you could have done more, but you didn't.  Is that your testimony?

A.   No, ma'am.  No, ma'am.  I'm saying that as far as the Secretary of State on the equipment piece, we could have done a few more, but I don't know if DPS could have serviced more in an effective way.

Q.   Did you offer DPS the additional units and they declined because of the cost of personnel?

A.   No, ma'am.

Q.   Did you let them know that you had additional units available or did you not communicate that to DPS?

A.   We didn't have additional units available.

Q.   But you had budget for additional units; is that correct?

A.   We didn't have budget for any of this.

Q.   Was it your testimony you had capacity to do more than 25?

A.   We could conceivably have done more than 25. We did not feel that more than 25 was necessary, and I don't know if that would have been up against DPS' resource constraints or not because it wasn't necessary

**67**

to engage in that discussion.

Q.   Did you conduct any analyses of the number of mobile units needed to reach registered and eligible voters without state forms of ID?

A.   No, ma'am.

Q.   And why not?

A.   Because we're missing one of the variables in that equation.

Q.   Which is?

A.   The number of persons without an ID.

Q.   So is it your testimony that 25 was kind of somewhat of an arbitrary number of units?

A.   I don't think it was arbitrary.  I think that 25 was believed to be sufficient to have pretty good coverage across the state in the time period that was before the election.

Q.   And by coverage across the state what do you mean?

A.   I mean coverage across the state.

Q.   In particular counties or areas of the state or across the entire state?

A.   In the areas that we felt like would be beneficial -- that it would be beneficial to have these. Like I said before, there were two primary drivers of where the mobile EIC units would go.  Number one, we

**68**

wanted to make sure that rural voters had access at a fairly close distance, so we wanted to spread them out in the rural parts of Texas, and we had ZIP codes where we had significant numbers of non-matches that we wanted to target.  So the combination of those two purposes, we felt like 25 was sufficient to cover it.

Q.   The basis of your understanding as to where there were large concentrations of voters without ID was based on your list or based on -- based on what?

A.   I did not have an understanding that there were large concentrations of voters without an ID.  I had an understanding that there -- we had an understanding that there were large concentrations of voters that didn't match with an ID.

Q.   And that was the basis of where you came up with the 25?

A.   No, ma'am.

Q.   What is your testimony on this?

A.   That there were two primary drivers for where the mobile election identification certificate units would go.  Number one, we wanted to have sufficient to reach that crescent of Texas from El Paso down to Cameron County where it's very rural and up in the Panhandle where it's very rural.  We wanted to make sure that we had some representation in those counties where

KEITH INGRAM                                                    4/23/2014

---

69

1   rural voters live.  The other consideration was we wanted
2   to make sure that where we had identified non-matches by
3   ZIP code, that there were EIC units in reasonably close
4   proximity to those ZIP codes sometime before the
5   election.
6       Q.  I see.  And the ZIP code analysis was based on
7   your July 2013 matching process; is that correct?
8       A.  That's correct.
9       Q.  And your concern about rural voters along the
10  border of Mexico, is that -- were you concerned about
11  counties without existing driver license offices or were
12  you just concerned about the driving distance in those
13  counties or both?
14      MR. KEISTER:  Object that that
15  mischaracterized the previous testimony.
16      A.  Yeah.  The goal was to make sure that those
17  very large counties along the border had the availability
18  of EIC units, you know, sprinkled around.
19      Q.  Did the Secretary of State's Office determine
20  the particular locations within each county in which to
21  locate a mobile EIC unit?
22      A.  It was a collaborative effort between the
23  county, our office, and DPS.
24      Q.  How did that -- how did that work?
25      A.  I would call the county election official,

---

70

1   usually the voter registrar, sometimes the county clerk,
2   and if there was an election administrator I would call
3   them, and ask them where they thought it would be useful
4   to have an election identification certificate mobile
5   unit.  They would identify potential places.  We would
6   submit those to the Department of Public Safety.
7   Department of Public Safety would vet them for
8   sufficiency, and sometimes they would say that they are
9   not sufficient and we need to find someplace else, and
10  they would tell me and I would call the county and the
11  county would find an alternate location.
12      Q.  So the communications were between your office
13  and the county election officials; is that right?
14      A.  It was between me and the county election
15  officials, yes, ma'am.
16      Q.  Okay.  Great.  And what was the split between
17  coverage that you were providing in rural areas versus
18  coverage with ZIP -- the ZIP codes with large
19  concentrations of persons on this July 2013 list?
20      A.  I don't know.  It was -- it was -- it varied,
21  so sometimes we would have more in cities and less in the
22  rural and sometimes we would have more in the rural and
23  less in the cities, so it just -- it just depended on
24  where they were that week.
25      Q.  Did you consult any other list to determine

---

71

1   where to locate these units besides the July 2013 list?
2       A.  No, ma'am.
3       Q.  And when you were consulting the July 2013 list
4   did you rely upon that information for any other
5   decisions about mobile EIC units besides the location?
6       A.  No, ma'am.
7       Q.  In other words, you didn't rely upon that list
8   to determine the hours of operation, the days of
9   operation, et cetera?
10      A.  No, ma'am.
11      Q.  And did you rely upon the July 2013 list to
12  determine the total number of mobile EIC units?
13      A.  No, ma'am.
14      Q.  Who in your office consulted the list to
15  determine the locations of mobile EIC units?
16      A.  Myself, our general counsel, Mr. Jackson, and
17  deputy secretary of state.
18      Q.  Mr. Shorter?
19      A.  Mr. Shorter.
20      Q.  Anyone else?
21      A.  I don't believe so.
22      Q.  Did you rerun this jury wheel DPS list against
23  TEAM for the purposes of locating EIC mobile units in
24  advance of the March 2014 election?
25      A.  No, ma'am.

---

72

1       Q.  Why did you not do that?
2       A.  Because it was not a useful tool.
3       Q.  And why is that?
4       A.  Because it did not result in any usage of the
5   EIC program on the local basis.
6       Q.  Do you plan to rerun this matching process in
7   advance of the November 2014 election?
8       A.  No, ma'am.
9       Q.  For the same reasons you just testified to?
10      A.  That's correct.
11      Q.  Turning back to October 2013, did any county
12  request a mobile EIC unit in its county?
13      A.  Yes.
14      Q.  Which counties?
15      A.  I don't know if I remember.
16      Q.  Do you remember any?
17      A.  Yeah, there were several.  I just don't
18  remember off the top of my head who made specific
19  requests.  I know that Carolyn Guidry over in Jefferson
20  County wanted to make sure that we came her direction.
21  I'm pretty sure that Jacque Callanan down in
22  Bexar County, she had a county commissioner or city
23  council person that wanted one in his precinct or
24  district.  I don't know which it was.  And so we had
25  requests like that from several people, I just don't know

---

**73**

1   off the top of my head where they were.
2      Q.  How many counties would you say?
3      A.  I don't know.
4      Q.  Half a dozen?  Dozen?
5      A.  Maybe.
6      Q.  Dozen?
7      A.  Maybe a dozen.  Probably between half a dozen
8   and a dozen.
9      Q.  Did you grant all those requests and locate
10  mobile EIC units in those counties?
11     A.  Sure.
12     Q.  Were any denied?
13     A.  I don't think so.
14     Q.  Did you try to provide equal access -- other
15  than what you've just testified that it's split between
16  the rural and the concentrations of voters, did you try
17  to provide equal acces to mobile EIC units to all voters
18  without a qualifying ID?
19     A.  Yes.
20     Q.  Did you make any particular efforts to locate
21  the units in areas with high concentrations of minority
22  voters?
23     A.  No.  You know, we did want to make sure that
24  Hidalgo and Cameron County were well represented, as well
25  as El Paso, but that wasn't primarily because there are

**74**

1   minorities there, it's because there were ZIP codes with
2   significant numbers of non-matches.  And so, you know, I
3   don't know if we necessarily had in mind -- we wanted to
4   make sure that -- in Houston at the Holman Street Baptist
5   Church they had a mobile EIC unit almost the whole time
6   before the November 2013 election, and there were two
7   purposes for that.  There was several ZIP codes in that
8   area with -- with high concentrations of voters and the
9   University of Houston was pretty close to it as well, so
10  we were kind of killing two birds with one stone there.
11     Q.  But your testimony is you supplied the mobile
12  EIC units uniformly across all voters without a state ID,
13  to the best of your knowledge.
14         MR. KEISTER:  Object to form.
15     A.  I don't think that we -- that it's possible to
16  do that because we don't know who doesn't have a state
17  ID.
18     Q.  Did you make any particular efforts to target
19  low income voters?
20     A.  I don't know.  You know, I don't know if low
21  income was specifically a requirement.  We don't have any
22  idea where low income is, but some of the places that we
23  went probably would be characterized as low income
24  places, rural Texas and some of the -- some of the ZIP
25  codes inside the cities.

**75**

1      Q.  Did you -- did your office suggest any
2   locations that DPS rejected?
3      A.  Specific locations, yes.
4      Q.  Which were those locations?
5      A.  I think over in Liberty County there was a
6   place that the local election administrator thought would
7   be good that DPS didn't think was sufficient, and they
8   ended up doing it at a place in the next block, stuff
9   like that where a particular location, for whatever
10  reason, didn't meet DPS' requirements and it would be
11  moved to a different location in close proximity.
12     Q.  What was the basis of DPS' concern?
13     A.  I don't know.
14     Q.  Can you think of any other examples where DPS
15  vetoed the decision about where to put a mobile unit?
16     A.  No, ma'am.
17     Q.  Just Liberty County?
18     A.  It was either Liberty or Hardin or Orange.  It
19  was one of those over there north of Jefferson County, in
20  that area of Texas.  I don't remember which one
21  specifically it was.  I believe it was Liberty, but it
22  could have been Hardin and it could have been Orange.
23     Q.  Did you consider locating mobile EIC units
24  close to early voting locations?
25     A.  As the early voting began that was one of the

**76**

1   things that I talked to county election officials about
2   was saying it would be a good idea if you could have an
3   EIC unit either in the same building as an early voting
4   location or across the street from it, yes.
5      Q.  Did that happen?
6      A.  Yes.
7      Q.  In what counties?
8      A.  I don't know.
9      Q.  How many counties?
10     A.  Several.
11     Q.  Did it not happen in certain counties because
12  it wasn't -- for whatever reason?
13     A.  No, I think all the places that we talked about
14  it, it was -- that was their concern is the place where
15  we would have this is close to the early voting, and I
16  said that's good, that's useful.  So no, I don't think
17  that it didn't happen.  You know, there was no resistance
18  to the idea.
19     Q.  Was the mobile EIC unit in operation at the
20  same time early voting was being conducted or different
21  days?
22     A.  At the same time, in close proximity, once
23  early voting began.  Mobile units were in place before
24  early voting began.
25     Q.  What were DPS' particular requirements for

KEITH INGRAM                                                      4/23/2014

77

1   location?
2       A.  I don't know.
3       Q.  Do you know who at DPS would know?
4       A.  I don't know for sure.  Tony Rodriguez was the
5   one for DPS who was overseeing the operation, so maybe he
6   would know.  Maybe it would be the regional people
7   underneath him.  I don't know.
8       Q.  In any counties was there anything that
9   prevented you from working with a county to locate a
10  mobile EIC unit close to early voting?
11      A.  No, ma'am.
12      Q.  Did you consider locating mobile EIC units in
13  polling places on election day?
14      A.  No, that was not considered.
15      Q.  Why did you not consider that?
16      A.  Because we don't want anything extra at a
17  polling place.
18      Q.  And what do you mean by that?
19      A.  I mean that polling places are for voting, not
20  for other stuff.  Now, if a polling place has a room down
21  the hall from the polling place where an EIC unit could
22  go, that was definitely considered, but in the polling
23  location itself, no, ma'am.
24      Q.  What was the basis of your concern about having
25  those two activities in the same room?

78

1       A.  That we don't have anything besides voting
2   going on in polling places.  That's -- that's the law.
3   That's what we do.
4       Q.  Is there a legal prohibition against issuing
5   EICs in the same room?
6       A.  Yes, 61.001 of the Election Code.
7       Q.  Nothing else can occur in that room?
8       A.  Nobody else can be in that room unless they're
9   a worker or voting.
10      Q.  In October 2013 or September --
11          MS. WESTFALL:  Strike that.
12      Q.  In -- on election day, November 5, 2013, did
13  you have EICs being issued in the same building as a
14  polling place in any county across the state?
15      A.  Sure.
16      Q.  What county?
17      A.  I don't know.  I'd have to go back and look and
18  see where they were and when they were.  But yeah, that
19  was a common occurrence.
20      Q.  Are you certain that there were EICs issued on
21  election day?
22      A.  Oh, issued.  I'm sorry.  I didn't hear the
23  question well.  I don't know if there were any EICs
24  issued at all, period, through this whole program.  That
25  would be a DPS question.

79

1       Q.  But are you aware of whether EIC issuance was
2   available in the same building as polling places on
3   election day in 2013?
4       A.  I don't know on election day itself.  Maybe, or
5   across the street or down the block, but they probably
6   were close.
7       Q.  Were EICs issued on election day in mobile EIC
8   units at all?
9       A.  I don't know.
10      Q.  Did you consider whether to locate mobile EIC
11  units where they were accessible to public transit?
12      A.  I don't know.  You know, that would have been
13  a local county election official's decision on whether or
14  not to put one close to a bus stop or a train stop, and I
15  don't know if any of these places had that consideration
16  in mind.
17      Q.  Does the elections division conduct voter
18  registration drives?
19      A.  No, ma'am.
20      Q.  Did you consider -- were any mobile EIC units
21  located in public schools or near public schools?
22      A.  High schools?
23      Q.  Yes.
24      A.  I don't know.
25      Q.  Were any located near -- near or in social

80

1   services offices?
2       A.  I think so, yes, ma'am.
3       Q.  In what counties?
4       A.  I don't know for sure.  You'd have to ask the
5   county election officials how close the proximity was.
6   But, you know, this one that I'm talking about over in
7   Liberty or Orange or Hardin, wherever it was, was close
8   to a benefit office.  But anyway, that happened all over.
9   The government offices are usually clustered together.
10      Q.  Turn your attention back to Exhibit 4, Section
11  IV.  Do you see that under the list of equipment on
12  page 2 of this exhibit it lists -- it states that SOS
13  will notify DPS in writing of the final location at least
14  two full business days in advance of the start date of
15  operations?
16      A.  That's right.
17      Q.  Why was there only two days advanced notice of
18  the location of the operation?
19      A.  We tried, obviously, to have more notice than
20  that, but that was the minimum amount of notice that DPS
21  could operate within.
22      Q.  Did you feel that that was adequate notice?
23      A.  Adequate notice for who?
24      Q.  DPS.
25      A.  I don't know if it was adequate notice for DPS

**81**

1  or not.  We generally gave them more notice than that.
2  So I don't know.
3      Q.  Do you think two days notice of where a
4  location will be would be adequate notice for voters or
5  for county officials?
6      A.  I don't know.  Adequate notice for what?
7      Q.  To provide notice to voters about the
8  availability of these services.
9      A.  Well, like I said, we generally gave more
10  notice than that.  This was the minimum that DPS
11  required.  This doesn't have anything to do with notice
12  to the public of the location.
13      Q.  But do you think two days is adequate notice to
14  DPS?
15          MR. KEISTER:  Object.
16      A.  They agreed to it.  I don't know.
17      Q.  Did the Secretary of State's Office have any
18  concern that providing two days notice would not allow
19  sufficient time to provide notice to voters about the
20  availability of the EICs?
21      A.  The two-day notice requirement doesn't have
22  anything to do with notice to voters.
23      Q.  If voters -- explain that.
24      A.  That we endeavored to give as much notice as we
25  could give so that the county and us and DPS had a final

**82**

1  location.  We preferred a week.  We preferred two weeks,
2  but sometimes it wasn't possible.  The minimum notice
3  that DPS required in order to make a functioning EIC unit
4  at a place was two days.  I don't know of very many
5  instances where it came down to two days.  Obviously the
6  goal was to have as much advanced notice as possible,
7  especially in rural areas where the newspaper comes out
8  once every two weeks.  So yes, if it was too late to get
9  into the newspaper for a rural area, then the local
10  election official was on the radio and whatever local
11  television news they could get.  There were stories all
12  over the state trying to get the word out to the public,
13  so sometimes there was more time to get word out to the
14  public, sometimes there wasn't as much time, but usually
15  the places where it was less time for notice to the
16  public were during early voting, and the primary goal of
17  those places was if somebody showed up without an ID, to
18  send them down the road, and there's not as much need for
19  notice to the general public for those places.
20      Q.  So what was the least amount of notice that you
21  can recall providing DPS?
22      A.  I don't know.
23      Q.  Was it five days? four days?
24      A.  I don't know.
25      Q.  But it was -- it was -- is it your testimony it

**83**

1  was always more than two days?
2      A.  No, ma'am.
3      Q.  Sometimes it was two days?
4      A.  Probably.
5      Q.  Do you recall what counties in which it was
6  only two days notice?
7      A.  I have no idea.
8      Q.  Which agencies or entities actually staffed the
9  mobile EIC units?
10      A.  The DPS.
11      Q.  Did the DPS contract with county -- county
12  employees to staff those units or was it actually DPS
13  employees in all of these units?
14      A.  If we're talking about the 25 mobile EIC units,
15  it was DPS staffed.  If we're talking about the Phase 3
16  units for permanent county placement, then it's a mixture
17  of county and DPS.
18          MR. KEISTER:  Elizabeth, when you get to
19  a good spot could we consider a break?
20          MS. WESTFALL:  Oh, yeah.  Do you want to
21  take one right now?
22          MR. KEISTER:  Are you ready?
23          MS. WESTFALL:  Sure, we can go on break.
24  Let's go off the record.
25          (Recess from 10:28 a.m. to 10:46 a.m.)

**84**

1          (Exhibit No. 5 marked)
2  BY MS. WESTFALL:
3      Q.  Mr. Ingram, I'm handing you what's been marked
4  as Exhibit 5.  Do you recognize this document?
5      A.  Yes.
6      Q.  What is it?
7      A.  It is the proposed agreement between DPS and
8  counties who are going to issue EICs locally.
9      Q.  It allows, but does not require, counties to
10  perform certain processing services of EIC applicants; is
11  that right?
12      A.  I'm not sure what you mean.
13      Q.  In other words, counties can voluntarily enter
14  into this agreement; is that correct?
15      A.  That's right.
16      Q.  Counties can determine if they want to
17  participate; is that right?
18      A.  They can.
19      Q.  Are you aware of any legal obligation of any
20  county to participate in this program?
21      A.  No, ma'am.
22      Q.  And counties -- this Exhibit 5, the Interlocal
23  Cooperation Contract, indicates that counties can set the
24  hours of operation; is that correct?
25      A.  That's correct.

KEITH INGRAM                                                          4/23/2014

85

1    Q.  Did any counties sign this contract?
2    A.  I don't know for sure.
3    Q.  Were you involved in the process of reaching
4    agreement between counties and DPS on this contract?
5    A.  Yes.
6    Q.  Was this contract used for the mobile EIC unit
7    program in September and October 2013?
8    A.  It did not -- this is not something that would
9    be used with regard to the 25 mobile EIC units under
10   Phase 2.  This is a Phase 3 document.
11   Q.  Could you describe what this contract pertains
12   to with regard to Phase 3?
13   A.  It is the agreement under which DPS would
14   provide the equipment to the counties as well as the
15   training for them to issue EICs on a local basis and on
16   a continuing basis.
17   Q.  Was this in effect for February 2013?
18   A.  I'm not sure what you mean.
19   Q.  Was this contract -- I'm sorry.
20       MS. WESTFALL:  Strike that.
21   Q.  Did counties staff the mobile EIC units and
22   provide employees in 2014?
23   A.  Well, I don't know for sure.  It's my
24   understanding that we've got as many as 40 counties, and
25   probably more than that now, who have signed this

86

1    agreement who are issuing EICs or are able to issue EICs
2    currently, and I don't know how many counties joined,
3    officially, the program over time, but I -- I just --
4    there were counties who had the equipment who had signed
5    the agreement who were issuing EICs in February of 2014,
6    yes, ma'am.
7    Q.  Who would know the most about the status of the
8    Interlocal Cooperation Contracts?
9    A.  Over at the Department of Public Safety.
10   Q.  Who in particular at DPS would know about this?
11   A.  I don't know for sure.  Probably Joe Peters
12   would know, and I would imagine Tony Rodriguez would know
13   as well, probably not as much as Joe.
14   Q.  So Mr. Peters was the primary point of contact
15   for these contracts?
16   A.  He's the one that's in charge of the division
17   that does this program, or the deputy chief.  I'm not
18   sure what his exact title is, but he's the operations
19   hands-on guy.
20   Q.  Do you know whether of the -- I think it was 79
21   counties that you testified about that don't have driver
22   license offices.
23   A.  Right.
24   Q.  And you just testified about 40 of them have
25   agreed to participate in this program; is that correct?

87

1    A.  I believe it's more than 40 now.  I don't know
2    how many more than 40.  I don't have current data.
3    Q.  When did this contract get underway with the
4    counties?
5    A.  It was -- it was something that came along
6    after we had begun the Phase 2 units, but pretty closely
7    in proximity thereto, so I would say October of 2013 this
8    was of primary focus.
9    Q.  So after October DPS started the process of
10   entering into these agreements with counties?
11   A.  No, ma'am.  During October they would have
12   started this process.
13   Q.  But the counties -- when was the earliest that
14   the counties started issuing EICs under this contract?
15   A.  I can't say for certain, but it would have been
16   in October of 2013.  I just don't know if it would have
17   been the first week or the middle or maybe the third
18   week, but it would have been in October of 2013 that
19   the -- the early adopters would have started.
20   Q.  I see.  And so prior to the November 2014
21   election it was a mix of DPS employees and county
22   employees that were staffing the mobile EIC units?  I
23   mean, it was -- it varied by office?  Is that your
24   testimony?
25   A.  It varied by program.  So for the -- for the

88

1    counties who had undergone the training, who had accepted
2    the equipment from the state, they were issuing the EICs.
3    The DPS would pick up that data from the counties and run
4    it through their process.  So for those Phase 3 units it
5    was county only.  For the 25 mobile EIC units in Phase 2,
6    DPS was staffing those, so it was only DPS officials.  So
7    it was not a mix of DPS and counties staffing the units.
8    There were two different programs going on, one staffed
9    by the counties and one staffed by the DPS.
10   Q.  Thank you for your testimony.  What was the
11   Secretary of State's involvement in the Interlocal
12   Cooperation Contracts?
13   A.  Our -- our role in Phase 3 was to sort of act
14   as go-between between the counties and DPS to make
15   introductions and hand them off to the Department of
16   Public Safety.
17   Q.  So Phase 2 -- just so I have it clear in my
18   mind, Phase 2 is the mobile EIC units run by DPS, the 25
19   that you testified about?
20   A.  The 25 mobile units that are the subject of the
21   Memorandum of Understanding that's Exhibit 4.
22   Q.  I see.  And that was in advance of both the
23   November 2013 election and the March 2014 election?
24   A.  That's right, and the November of 2014 election
25   as well.

KEITH INGRAM                                              4/23/2014

89

1    Q.  I see.  And then this county program is
2    separate and apart, and you refer to it as Phase 3; is
3    that correct?
4    A.  That's correct.
5    Q.  Do you see that in Exhibit 5, the Interlocal
6    Cooperation Contract, that counties are not paid for
7    their services?
8    A.  Yes.
9    Q.  Why would counties want to participate in this
10   program?
11   A.  To help their voters.
12   Q.  Did any counties complain that this was an
13   unfunded mandate and refuse to participate on that basis?
14   A.  There were some counties who were concerned
15   about how much time it would take and how much effort it
16   would take and that it was unfunded, and I think that,
17   you know, a significant number of counties had those
18   concerns alleviated.
19   Q.  How were they alleviated?
20   A.  By me.
21   Q.  Did you get them some budget or funding or did
22   you encourage them to participate?
23   A.  I encouraged them to participate and that it
24   would be not a high stress, high demand product, that it
25   would be a once in a while thing and it wouldn't tax them

90

1    unnecessarily.
2    Q.  Which were these counties?
3    A.  I don't know.  I talked to a lot of counties.
4    Q.  How many counties did you talk to?
5    A.  Seventy-nine.
6    Q.  What period of time did you have these
7    conversations?
8    A.  October of 2013.
9    Q.  You talked to all 79 in October 2013?
10   A.  Multiple times.
11   Q.  And the final -- the end result as of today is
12   that 40 counties are participating; is that correct?
13   A.  I think it's more than that.  I don't know how
14   many more.
15   Q.  But you did not provide them with any funding
16   to do this work, did you?
17   A.  No, ma'am.  We provided the equipment and the
18   training.
19   Q.  And according to this contract, under paragraph
20   13, counties have to certify that they have the budget
21   currently to conduct this program; is that correct?
22   A.  Well, it looks like both parties have to make
23   that assertion.
24   Q.  Has this part of the contract proven
25   problematic for any counties in terms of county

91

1    participation?
2    A.  I don't know.  I haven't had anything to do
3    with this program since the initial handoff to DPS.  That
4    would be a Department of Public Safety question.
5    Q.  And under this contract -- so this contract,
6    Exhibit 5, is not signed, correct?
7    A.  Correct.
8    Q.  Is this the contract that -- to your knowledge,
9    that was used with all counties?
10   A.  As far as I know.  You know, some of them,
11   after I had contacted them to see if they had signed it,
12   would send it back to me, and so this looks like what I
13   saw.
14   Q.  Is this the standard contract that's been used
15   with all the counties, to your knowledge?
16   A.  As far as I know it is.
17   Q.  There haven't been any changes, to your
18   knowledge?
19   A.  I don't know of any.
20   Q.  And do you see that -- under Terms and
21   Conditions on page 1, that either party can voluntarily
22   cancel this contract for any reason with 30 days notice?
23   A.  Which paragraph?
24   Q.  Under IV, Terms and Conditions, on page 1,
25   under paragraph 2, Termination, either party can

92

1    terminate at any time with 30 days notice.  Do you see
2    that?
3    A.  Yes.
4    Q.  So it's pretty -- I mean, a party can -- the
5    county could unilaterally terminate its participation in
6    this contract; is that right?
7    A.  According to this it looks like they could on
8    30 days notice, yes, ma'am.
9    Q.  And counties, because they're not paid and
10   they're not legally obligated to, as you just testified,
11   participate, they are the ones who determine whether they
12   want to participate; is that right?
13   A.  Counties who participate in this program do so
14   voluntarily, yes, ma'am.
15   MS. WESTFALL:  Could you mark this.
16   (Exhibit No. 6 marked)
17   Q.  I'm handing you what's been marked as
18   Exhibit 6.  Do you recognize this document?
19   A.  No, ma'am.
20   Q.  Could you take a look to review it?  While
21   you're looking --
22   MS. WESTFALL:  Could you mark this one.
23   (Exhibit No. 7 marked)
24   Q.  I'm handing you what's been marked as
25   Exhibit 7.  Have you seen this document?

KEITH INGRAM                                                    4/23/2014

93

1    A.  I don't believe so, no, ma'am.
2    Q.  Do you know what it represents?
3    A.  No, ma'am.
4    Q.  I will represent to you, and I'm sure your
5  counsel will not object to this representation, that
6  these documents were attached -- were produced in
7  conjunction with Defendants' interrogatory responses in
8  this action.  Could you take a quick look at this -- both
9  of Exhibit 6 and Exhibit 7 and let me know when you've
10 had a chance to scan them?
11   A.  (Reviewing documents)  Okay.
12   Q.  Do you believe that Exhibit 6 is a final list
13 of mobile stations issuing EICs in October 2013?
14   A.  No, ma'am.
15   Q.  What makes you say that?
16   A.  Because this doesn't have any of ours on it.
17   Q.  And by ours, you mean?
18   A.  The Phase 2 units.
19   Q.  What list do you believe this -- what does this
20 represent to your mind?
21   A.  I don't know.
22   Q.  And turning your attention to Exhibit 7, do you
23 know what this represents?
24   A.  I do not.
25   Q.  Do you know whether there was a reduction in

94

1  the number of mobile EIC units between October 2013 and
2  February 2014?
3    A.  There was not.
4    Q.  Was it an increase or did it stay the same?
5    A.  It would have been the same.
6    Q.  Did some -- so to your knowledge no counties
7  that participated in October 2013 decided not to in 2014?
8    A.  I don't know what you mean by counties that
9  participated.  Participated in what?
10   Q.  In the mobile EIC unit program.
11   A.  Which phase?
12   Q.  The phase -- Phase 3 is the county offices, so
13 those are not mobile EIC units, correct?
14   A.  They are.
15   Q.  You call them mobile EIC units?  Are they --
16   A.  They're mobile.
17   Q.  They're mobile?  Those are not -- those are --
18 those are not permanent sites that issue EICs permanently
19 or you consider those to be mobile and temporary?
20   A.  They're -- they're located within the county
21 permanently, but it's the same equipment that a mobile
22 unit would have.  It's -- it's transportable from one
23 office to an office down the hall if they need to.
24 It's -- it's mobile.
25   Q.  Okay.  So turning back to 6 and 7, are these

95

1  lists of mobile stations -- do they encompass all of the
2  mobile stations staffed by DPS in October 2013 and
3  February 2014?
4    A.  No, ma'am.
5    Q.  So these are not complete lists, to the best of
6  your knowledge --
7    A.  No.
8    Q.  -- as to where any subset, Phase 2, Phase 3,
9  et cetera -- these are not complete final lists of mobile
10 EIC unit locations?
11   A.  No.  If I -- well, I don't want to guess, but
12 if I were going to guess about what these are I would say
13 that these are Phase 3 counties that haven't yet accepted
14 the training where the DPS is going to provide EIC
15 services.  That is my best speculation, which I'm sure my
16 lawyer doesn't like.
17   Q.  Okay.  Turning your attention back to Exhibit 6
18 and 7, these refer to dates in the past, October and
19 February.  You, nevertheless, believe that these are not
20 final lists.  Okay.  Well, let's -- let's put these
21 aside.
22         And I believe it was your testimony that
23 there was not a change in counties participating in
24 mobile EIC unit availability between October 2013 and
25 February 2014.  Is that correct?

96

1    A.  Well, I don't know what you mean by that.
2  That's -- that's what I don't understand, because the
3  number of counties who directly participated by offering
4  EICs themselves went up between October and February,
5  October of 2013 and February of 2014, so the number of
6  counties that -- that were in that 79 that didn't have a
7  DL office that DPS had to service directly went down.  So
8  it changed, but I believe it increased.
9    Q.  Okay.  And then with regard to mobile EIC units
10 run by DPS itself, not run by the counties, did that
11 number increase or decrease between October 2013 and
12 February 2014?
13   A.  I don't know.  That's a DPS question.  It's my
14 understanding that the number actually run by DPS
15 themselves decreased between October and February because
16 the number that were serviced by the counties themselves
17 increased, and the number of personnel involved would
18 have decreased because our office became involved in the
19 mobile Phase 2 program and supplied some of the
20 personnel.
21   Q.  And when did that -- that aspect start with --
22 with the Secretary of State staffing?
23   A.  January of 2014.
24   Q.  Why did that occur?
25   A.  I don't know.  I mean, it occurred because we

KEITH INGRAM                                                    4/23/2014

97

 1   thought it was a good idea to assist the DPS with
 2   staffing these units and DPS thought it was a good idea
 3   and offered the training to us.
 4        Q.   Was DPS unable to or have shortcomings or
 5   difficulty in staffing its mobile EIC units itself and
 6   sought your assistance?
 7        A.   No, it was just an agreement between us that it
 8   was better for us to participate in sharing the load.
 9        Q.   And why was that?  Was it a resource issue?
10   Were there other considerations?
11        A.   I don't know if it's a resource issue on
12   DPS' part, but we definitely wanted to have a part in --
13   in making these available to the public.
14        Q.   Were you concerned about any aspects of DPS'
15   administration or issuance of the EICs and you wanted to
16   have a role in it yourself as Secretary of State?
17        A.   No, ma'am, there were no concerns.  We were
18   just trying to help.
19        Q.   Turning back to October 2013, are you aware of
20   any problems in the -- any difficulties, complaints,
21   shortcomings in the operation of the mobile EIC units?
22        A.   I don't know what you mean.  Do you mean
23   objectively were there issues that came up logistically
24   or do you mean subjectively did people complain about it?
25        Q.   Let's start off with the people complaining

98

 1   about it.  Are you aware of complaints?
 2        A.   I know that we had one e-mailed complaint from
 3   a fellow, I believe his name was Glen Johnson, in
 4   Harris County about the Holman Street location, signage
 5   and that sort of thing.  I don't know of any other
 6   subjective complaints that we received from the public.
 7   You know, some of the election officials in the counties
 8   might have had some issues with, you know, how they were
 9   talked to by DPS, you know, that sort of interpersonal
10   thing, but, you know, I can't remember anything specific.
11        Q.   Is there anything else, any other complaints
12   that you heard about people making about the October 2013
13   program?
14        A.   Not that I can recall our office receiving off
15   the top of my head.
16             MS. WESTFALL:  Would you mark this.
17             (Exhibit No. 8 marked)
18        Q.   I'm handing you what's been marked as
19   Exhibit 8.  Have you seen this document before?
20        A.   By the way, that's the fellow's name in the
21   Governor's Office.
22        Q.   Is it Mr. Stephenson MacGregor or MacGregor
23   Stephenson?
24        A.   MacGregor Stephenson.
25        Q.   Okay.  Thank you for that correction.  Glad

99

 1   this prompted your memory.  Have you seen this e-mail
 2   before?
 3        A.   Not that I can recall, no, ma'am.
 4        Q.   Do you see that it indicates that several
 5   counties have declined to participate in the EIC program?
 6        A.   This list pertains to the Phase 3 portion of
 7   the program, and yes, these counties, as of September 26,
 8   had declined to participate.
 9        Q.   Did they at some point thereafter change their
10   mind?
11        A.   I don't know.  I'd have to see what the current
12   list of participating counties is to know that.
13        Q.   Do you know what the basis was for their
14   refusal to participate?
15        A.   Just what the e-mail says.  It says lack of
16   facilities, staffing, population, or some combination of
17   the three.  That is consistent with my conversations with
18   some of these counties.
19        Q.   Were you otherwise able to locate a DPS-run
20   Phase 2 mobile EIC unit in these counties, to the best of
21   your recollection, in October 2013?
22        A.   These counties would have received a Phase 3
23   unit, and the Phase 3 units were in place longer than the
24   Phase 2 units, so DPS would have blocked out a five-day
25   window of time in each of these counties to -- to be

100

 1   present prior to the November 2013 election.
 2        Q.   And DPS was able to do that even without the
 3   consent of these counties or they -- they went in and
 4   somehow got facilities for the mobile EIC unit?  How did
 5   that -- how did that actually happen?
 6        A.   I don't know.  You'd have to ask DPS how that
 7   happened.  But certainly DPS can go where they want to go
 8   and do what they want to do.  They don't have to have the
 9   county's consent to do that.
10        Q.   Just to clarify your testimony as to -- as to
11   Phase 3 -- I haven't heard these terms before this
12   deposition, so I just want to make sure your testimony on
13   the record is clear.  These counties did not want to
14   participate in the county-run mobile EIC program; is that
15   correct?
16        A.   That's correct.  These counties were declining
17   to accept the equipment at this point, September 26,
18   2013.  I believe some of these counties changed their
19   mind thereafter.  But they didn't want the equipment,
20   they didn't want the training, they didn't want to have
21   to be issuing election identification certificates on an
22   ongoing basis to voters in their county.
23        Q.   And there -- was there anything that DPS or --
24   or Secretary of State's Office could do when faced with
25   counties that refused to participate in Phase 3 from a

KEITH INGRAM                                                    4/23/2014

26 (Pages 101 to 104)

101
1    legal standpoint?
2         A.   From a legal standpoint, no.  But we could
3    definitely call and persuade.
4         Q.   Did these counties, to your knowledge, have
5    driver license offices?
6         A.   I don't believe that these counties have a
7    driver license office.
8         Q.   Was Phase 3 and the targeting of the Phase 3
9    directed towards -- only towards counties that did not
10   have driver license offices?
11        A.   That's correct.
12        Q.   Do you know which counties of this list in
13   Exhibit 8 changed their position with regard to
14   participation in the Phase 3?
15        A.   I'd have to go -- I'd have to go check to make
16   sure.  I don't want to -- I don't want to guess about
17   that.
18        Q.   Thank you.  To your knowledge did any counties
19   refuse to receive training on how to issue EICs?
20        A.   Yes.
21        Q.   And which counties; do you recall?
22        A.   I don't know.  There's a list at DPS of
23   counties who have accepted the training, accepted the
24   equipment.  There's -- there are counties who have
25   accepted the training and it hasn't occurred yet, and

102
1    then there are counties who have refused the training and
2    refused the equipment, so I don't know what that current
3    list is.  That's the Department of Public Safety.
4    Phase 3 has been handed off.
5         Q.   From the standpoint of the Secretary of State's
6    Office, is there anything you can do in response other
7    than persuasion to try to change the position of those
8    counties on acceptance of Phase 3?
9         A.   At this point, no, ma'am.
10        Q.   Are you aware of any complaints about
11   inadequate notice of locations of mobile EIC units?
12        A.   From the public?  From the election officials?
13   From the DPS?
14        Q.   From -- from any source whatsoever.
15        A.   I don't know.  I can't recall any specific
16   complaints from the public.  I know that, you know,
17   sometimes the local election officials wish they would
18   have received a call sooner when we were talking about
19   coming next week.  And so I don't know.  You know, it's
20   the -- it's the normal sort of thing when you're putting
21   together a program on the fly.
22             MS. WESTFALL:  Could you mark this as 9.
23             (Exhibit No. 9 marked)
24        Q.   I'm handing you what's been marked as
25   Exhibit 9.  Have you seen this before?

103
1         A.   I don't know if I've seen it.  Wroe would have
2    talked to me about it.
3         Q.   And what is this?
4         A.   This is an e-mail from Tony Rodriguez to our
5    general counsel, Wroe Jackson, about some locations,
6    looks like in Travis County.
7         Q.   And what is the concern expressed here?
8         A.   That -- that there had been poor communication
9    between Travis County and the locations regarding the
10   arrival of mobile EIC units.
11        Q.   Were you aware of these concerns about poor
12   communications?
13        A.   Yes.
14        Q.   What was your response or reaction?
15        A.   My response -- I don't know.  We were
16   coordinating, I believe, with both Mr. Elfant's office as
17   well as Dana DeBeauvoir's office on these, but I probably
18   would have called Michael Winn and said, you need to get
19   on the stick, these people didn't know we were coming,
20   what's the deal.
21        Q.   Who is Michael Winn?
22        A.   Michael Winn is the director of elections for
23   Travis County.
24        Q.   Did the Secretary of State's Office have any
25   concern that, given what appeared to be lack of

104
1    communication, that there would not be adequate notice to
2    voters about the availability of EICs through these
3    offices?
4         A.   I -- I don't know if we had any specific
5    concerns in that regard.  Obviously less time is less
6    ability to generate awareness.
7             MS. WESTFALL:  Could you mark this as 10,
8    please.
9             (Exhibit No. 10 marked)
10        Q.   I'm handing you what's been marked as
11   Exhibit 10.  Have you seen this before?
12        A.   I don't believe so, no, ma'am.
13        Q.   Do you see that it is an e-mail concerning
14   Coke County's inability to attend training?
15        A.   That's right.
16        Q.   Is this what you testified about earlier, that
17   some counties were not available or were unwilling to
18   attend training?
19        A.   Yes.  And --
20        Q.   And you're referring back to Exhibit --
21        A.   I was looking back on Exhibit 8 to see if
22   Coke County was one of the ones that had -- that had
23   declined, but they -- they do not appear on that list, so
24   apparently they had agreed to it, they just couldn't work
25   out the logistics on this round of training.

KEITH INGRAM                                                    4/23/2014

27 (Pages 105 to 108)

105

1          MS. WESTFALL:  Could you mark this.
2          (Exhibit No. 11 marked)
3       Q.  I'm handing you what's been marked as
4   Exhibit 11.  Have you seen this e-mail before?
5       A.  I don't believe so, no, ma'am.
6       Q.  Does this e-mail indicate that Mason County
7   decided to not participate in training?
8       A.  Yes, that's what it indicates, that
9   Mason County, as of October 15, had declined.
10      Q.  Had you heard anything about problems with
11  Mason County?
12      A.  Yeah, Mason County was one that was in and out,
13  and so, yeah, I remember Mason County.
14      Q.  And this is with regard to the Phase 3
15  county-run offices?
16      A.  That's correct.
17      Q.  What is the current status of Mason County?
18      A.  I don't know.
19      Q.  Have you sought to persuade Mason County to
20  participate?
21      A.  I did back then.  I haven't talked to them
22  since October.
23      Q.  Did you have any complaints or concerns from
24  county election officials about inadequate number of
25  sites within their counties of mobile units?

106

1       A.  I don't know.  I'm sure that there were some
2   counties who wanted more locations than the DPS and us
3   were able to provide, and our solution to that was to
4   offer them to come back later or to do it in 2014
5   election cycle.
6          MS. WESTFALL:  Could you mark this,
7   please, as Exhibit 12.
8          (Exhibit No. 12 marked)
9       Q.  I'm handing you what's been marked as
10  Exhibit 12.  Do you recognize this document?
11      A.  No, ma'am.
12      Q.  Had you heard about any -- is this an e-mail
13  from Robert Heard to Wroe Jackson?
14      A.  Appears to be, yes, ma'am.
15      Q.  And could you take a minute to look at the
16  e-mail, the message at the top to Mr. Jackson?
17      A.  (Reviewing document)  Okay.  Yes, ma'am.
18      Q.  Had you heard about this concern from
19  Mr. Heard?
20      A.  I don't know if I heard about this concern
21  specifically.  I know that Dallas wanted more EIC
22  service.
23      Q.  What was the response of DPS and Secretary of
24  State to that request?
25      A.  Well, our response would have been to either

107

1   schedule a return visit closer to the election or to
2   offer them EIC mobile units in 2014.
3       Q.  Do you know whether other counties had similar
4   complaints about or concerns about lack of adequate
5   number of EIC mobile units?
6       A.  I don't know.  It could be that there were
7   other ones that wanted more coverage.
8          MS. WESTFALL:  Could you mark this as
9   Exhibit 13.
10         (Exhibit No. 13 marked)
11      Q.  I'm handing you what's been marked as
12  Exhibit 13.  Have you seen this before?
13      A.  I don't know if I've seen it, no, ma'am.
14      Q.  Do you see that the e-mail in the middle of
15  this from Wroe Jackson to Mr. Javier Chacon was -- you
16  were copied on it?
17      A.  Uh-huh.
18      Q.  Do you recall receiving this e-mail?
19      A.  I know that we were talking to El Paso about
20  it, yes.
21      Q.  Do you recall the problem in El Paso?
22      A.  That they wanted more time during the day, more
23  extended hours.
24      Q.  Did you -- what was your response to that
25  request?

108

1       A.  That we explained to them when DPS could be
2   there and that for extended hours we'd need advance
3   approval.
4       Q.  So in other words, your response was that you
5   were not able to provide longer hours?
6       A.  I don't know if we ended up providing longer
7   hours or not.  I do know that we had to talk to DPS about
8   that, and we did in a few locations.  I know we did it in
9   Webb County.  I'm not sure what happened in El Paso.
10      Q.  Do you know whether in October 2013 any of the
11  DPS-run mobile EIC units were open past four o'clock in
12  the afternoon?
13      A.  I believe some were, yes, ma'am.
14      Q.  Do you know which counties were?
15      A.  I know in Webb County that there were extended
16  hours to 6:30 or 7:00.
17      Q.  And do you see a reference to logistical and
18  staffing concerns with DPS that are referred to in this
19  e-mail?
20      A.  Yes.
21      Q.  Do you understand what those logistical and
22  staffing concerns were?
23      A.  I don't know the specifics on that, no, ma'am.
24      Q.  Was there -- did DPS take the position that the
25  mobile EIC units run by DPS should be open during

KEITH INGRAM                                                    4/23/2014

28 (Pages 109 to 112)

109

1   business hours only because that's when their staff was
2   available to staff them?
3        A.  DPS believed that the mobile units should be
4   open during business hours, yes, ma'am.
5        Q.  And was that the practice and the case for
6   mobile units prior to November 2013 election?
7        A.  That was the case for the Phase 2 units.  I
8   don't know what the counties did with the Phase 3 units.
9   And I know that we had some exceptions to this general
10  rule, but we would have to get it pre-approved by DPS.
11       Q.  So in other words, it was DPS' decision as to
12  the hours of operation of its mobile -- of mobile EIC
13  units run by DPS; is that correct?
14       A.  DPS was staffing the units and they had the
15  units in their possession, so the logistics on getting
16  the units to the location and having staff available to
17  man the units would have been a DPS decision, yes, ma'am.
18       Q.  Did you have conversations with DPS about
19  extending its hours of operation in the mobile EIC units?
20       A.  Yes.
21       Q.  When were those conversations?
22       A.  I don't know.  In the fall of 2013.  You know,
23  specifically in the context of Webb County I know we had
24  that discussion and some extended hours were approved.
25  I don't know of another instance where that occurred.

110

1        Q.  And what was your position in that -- or what
2   was the Secretary of State's position in that
3   conversation?
4        A.  Our position was that if we could have at least
5   one day at each location with an hour past regular
6   closing hours, that that would be a good thing to do if
7   we could do it.
8        Q.  And did DPS accept that recommendation?
9        A.  Not all the time, no, ma'am.
10       Q.  And you can only recall one county, Webb
11  County, where that occurred at least with regard to the
12  2013 operation of the mobile units?
13       A.  That I can recall right now.  I don't know if
14  it happened more than that.  I think perhaps it did, but
15  I know it happened with Oscar in Webb County.
16       Q.  I'm sorry.  With another county called?
17       A.  With Oscar Villarreal.  He's the election
18  administer in Webb County.
19       Q.  Thank you.  Were there any other logistical or
20  staffing concerns that you were aware of that Mr. Jackson
21  was alluding to in this e-mail at Exhibit 13?
22       A.  No, ma'am.
23       MS. WESTFALL:  Could you mark this,
24  please, as Exhibit 14.
25       (Exhibit No. 14 marked)

111

1        Q.  I'm handing you what's been marked as
2   Exhibit 14.  Do you recognize this document?
3        A.  No.
4        Q.  Were you -- did you become aware of any of
5   these concerns raised in these e-mails from Mr. Jackson?
6        A.  I don't know.  We would have talked about it
7   probably.
8        Q.  Turning your attention to page TEX 00461906,
9   which is the second page of Exhibit 14, do you see an
10  e-mail from Mr. Jackson to Pam Smith --
11       A.  Yes.
12       Q.  -- at the bottom?  And do you see that there is
13  discussion of the three-day deadline to get locations
14  locked in?
15       A.  Yes.
16       Q.  And do you see Mr. Jackson expressed concerns
17  about the practicality of doing that?
18       A.  Yes.
19       Q.  Do you recall having difficulties getting
20  locations locked in within three days?
21       A.  When we were first getting the program rolling,
22  definitely, when we were cobbling it together and trying
23  to get places lined up.  But as we went on, then I had
24  more lead time to work with the counties and this was far
25  less of a problem after we were rolling.

112

1        Q.  When did -- when were the problems with meeting
2   the three-day deadline occurring just in terms of the
3   calendar?
4        A.  Right.  That would have been late September or
5   early October.
6        Q.  When did you feel that locations -- the
7   identification of the locations became easier and
8   clearer?
9        A.  Well, you know, we had mapped out where we
10  intended to be, and so -- some counties are more
11  responsive and easier to work with than other counties.
12  And so as the program progressed there were counties who
13  were what we call green -- I don't know if you've seen
14  the matrices from Tony Rodriguez, but the green counties
15  stretched out further and further in advance.  But even
16  in those weeks there were some counties who were still
17  black, which means that they hadn't committed one way or
18  the other to give us locations.  So overall the program
19  got better by the middle of October for sure, but there
20  were always some counties where it was, you know, sort of
21  putting it together at the last minute.
22       Q.  I see.  And so I -- I don't think I know the
23  document you're referring to, but the green counties were
24  counties that had agreed to participate in Phase 2 or
25  Phase 3?

113

1    A.  Phase 2.
2    Q.  Phase 2, DPS?
3    A.  We're talking about Phase 2 on -- on this --
4  this e-mail is the MOU.
5    Q.  Right.
6    A.  This is Phase 2.
7    Q.  Oh, the MOU, right, right.  Thank you.
8          MS. WESTFALL:  Could you mark this as 14.
9          MR. KEISTER:  15.
10         MS. WESTFALL:  15?  Sorry.
11         (Exhibit No. 15 marked)
12   Q.  I'm handing you what's been marked as
13 Exhibit 15.  Have you seen this document before?
14   A.  Yes.
15   Q.  What is it?
16   A.  It's a letter from Bruce Elfant to me.
17   Q.  Who is Bruce Elfant?
18   A.  He's the tax assessor-collector for
19 Travis County.
20   Q.  When was the letter sent?
21   A.  October 13, 2013.
22   Q.  How would you describe the purpose of the
23 letter?
24   A.  The purpose of the letter was to tell me what
25 they had done with regard to voter outreach and to say

114

1 that they didn't think any more EIC units in
2 Travis County would be necessary for this election cycle.
3    Q.  So can you describe and list all of the
4 concerns that Mr. Elfant raised?
5    A.  You want me to read his letter?
6    Q.  No, just as you perceived it, since the letter
7 was directed to you.
8    A.  I mean, you'd have to ask Mr. Elfant what his
9 concerns were.  I can read his letter.
10   Q.  Did he have concerns about inadequate notice of
11 the location of the sites?
12   A.  He said that there was short time, very little
13 time.
14   Q.  And so that was inadequate notice; is that
15 right?
16   A.  I don't know if that's inadequate notice or
17 not.  You'd have to ask Mr. Elfant if that's what he
18 thought was meant by very little time.  I think he says
19 that he appreciated the SOS' efforts in this regard.
20   Q.  Did he also raise a suggestion that there could
21 have been mailings done to voters without state-issued
22 IDs?
23   A.  He -- he thinks that a better way to go would
24 be to mail new voter ID requirements to each voter, and
25 that's what happened in the mass mail-out at the end of

115

1 2013.
2    Q.  So you decided to follow his advice and do a
3 mass mail-out?  Was that done by the Secretary of State's
4 Office or was that done by county -- county offices?
5    A.  No, ma'am, that is the normal county process
6 that they do at the end of every odd-numbered year.
7    Q.  And this was the election registration
8 certificate that went to voters?
9    A.  That's right.  Orange colored this year.
10   Q.  Probably not using the right term.  But the
11 voter registration card was sent out to every single
12 voter in the state?
13   A.  Every single voter.
14   Q.  And on the back of it, it listed the forms of
15 ID?
16   A.  That are required to vote, yes, ma'am.
17   Q.  What else did it list on the card that
18 pertained to SB 14?
19   A.  I don't believe it has anything else with
20 regard to SB 14.  The list of required IDs is in Spanish
21 and English on the back of the card.
22   Q.  Did it provide any information about how a
23 voter may obtain an EIC?
24   A.  I don't know.  I'd have to read the card.
25   Q.  Has the card been produced to us in litigation?

116

1    A.  I have no idea.
2          MS. WESTFALL:  Mr. Keister, do you know?
3          MR. KEISTER:  I can't answer that
4 question.  I would suspect it has been, but --
5          MS. WESTFALL:  If it hasn't been, we would
6 ask that it is.
7 BY MS. WESTFALL:
8    Q.  So the cards -- the voter registration cards
9 were sent by the counties; is that correct?
10   A.  That's right.
11   Q.  And did the Secretary of State separately do
12 any mailings to voters in response to Mr. Elfant's
13 letter?
14   A.  No, ma'am.
15   Q.  Did you take any steps at all in response to
16 Mr. Elfant's letter?
17   A.  No.
18   Q.  Why not?
19   A.  What steps should I take?
20   Q.  Did you think he raised any legitimate concerns
21 in his letter or did you not?
22   A.  I just appreciated his input.
23   Q.  Do you see that Mr. Elfant makes the
24 observation that it's much more difficult to reach this
25 population than expected?

KEITH INGRAM                                                     4/23/2014

---

117

1    A.  I see that Mr. Elfant is assuming there's a
2    population to reach, yes.
3        Q.  And that he is of the view that it's a
4    difficult population to reach.  Is that what he expresses
5    in the letter?
6        A.  That's what he says.  We can read his letter
7    together if you want.
8        Q.  Do you agree with that assessment?
9        A.  I don't know what population he's talking
10   about.
11       Q.  So you do not -- just to clarify, you don't
12   agree with the assessment that they're difficult to reach
13   because you don't believe there is such population.  Am I
14   summarizing your testimony correctly?
15       A.  No, ma'am.
16       Q.  Could you clarify?
17       A.  I don't know who the population is that doesn't
18   have an acceptable form of ID.  That has been the
19   question that has been in our minds the whole time we've
20   been going through this process, so whether or not there
21   is a particular population that doesn't have an
22   acceptable form of ID and whether or not that population
23   is hard to reach are very unresolved questions at this
24   point.  I appreciate Mr. Elfant's input.
25           MS. WESTFALL:  Could you mark this as 16,

---

119

1        Q.  And what does DL mobile refer to?
2        A.  I don't know.
3        Q.  Do you know who would know?
4        A.  I presume the Department of Public Safety.
5        Q.  Do you know how many EICs were issued as of
6    February 3, 2014?
7        A.  I do not.  I heard the number 226 somewhere
8    around that time, but I don't know if it was after that
9    or before that.
10       Q.  I will represent to you that based on this
11   document produced from Defendants with interrogatory
12   responses that it indicates that 65 EICs were issued
13   through a DL mobile station.  Does that sound accurate to
14   you based on your knowledge of the mobile program?
15       A.  I have no idea.
16       Q.  So, Mr. Ingram, as you may recall from our
17   discussion of the deposition notice, one of the topics in
18   the notice is -- well, let's turn to Exhibit 1.  Turning
19   back to Exhibit A to Exhibit 1, which is the amended
20   notice of deposition, it indicates that topic 1 is
21   concerning policies and procedures related to
22   implementation concerning applications for and issuance
23   of EICs.
24       A.  Sure.
25       Q.  And you are here to testify, and you said

---

118

1    please.
2           (Exhibit No. 16 marked)
3        Q.  Mr. Ingram, I'm handing you what's been marked
4    as Exhibit 16.  Have you seen this document before?
5        A.  No, ma'am.
6        Q.  Do you see that it's a list of valid EIC
7    issuances?  At least that's what it's captioned on
8    page 1.
9        A.  I see that caption, yes, ma'am.
10       Q.  Do you know who prepared this list?
11       A.  I have no idea.
12       Q.  If you could, take a look at Exhibit 16 and let
13   me know when you've had a chance just to scan through the
14   pages.
15       A.  (Reviewing document)  Okay.
16       Q.  I will represent to you that this list was
17   produced in connection with Defendants' interrogatory
18   responses.  Do you have any reason to believe that this
19   list of valid EIC issuances as of February 3, 2014, is
20   not accurate?
21       A.  I don't have any basis for saying it's accurate
22   or not accurate.
23       Q.  Do you see that the list indicates whether the
24   EIC was issued in an office or a mobile?
25       A.  I do see that.

---

120

1    you're qualified to testify for all the topics listed in
2    this notice; is that correct?
3        A.  Right.  And the notice is served on the
4    Secretary of State's Office.
5        Q.  Correct.  And you're here --
6        A.  So with regard to our office I am the one most
7    qualified to testify on that point, and with regard to
8    our office the DPS does not tell us how many they've
9    issued and from what source they've been issued.
10       Q.  I see.
11           MR. KEISTER:  Let her ask her question.
12           MS. WESTFALL:  So, Mr. Keister, is there
13   someone more knowledgeable about the number of EICs
14   issued from DPS, from the standpoint of the Secretary of
15   State's Office, who can -- who's qualified to testify on
16   Topic 1 on EICs?
17           MR. KEISTER:  I can't add anything to what
18   Mr. Ingram just stated.  I think he pretty well stated
19   it.
20           MS. WESTFALL:  My question is whether
21   there is a more knowledgeable, prepared designee for
22   Topic 1 as it pertains to EICs from the Secretary of
23   State's Office than Mr. Ingram.
24           MR. KEISTER:  Well, the person we have
25   designated is the person that we think has the most

---

KEITH INGRAM                                                    4/23/2014

121

1  knowledge on these particular issues.
2          MS. WESTFALL: So there's no one --
3          MR. KEISTER: Or at least has knowledge to
4  testify on these issues.  Now, obviously they can't
5  testify about DPS issues.  I think that's what Mr. Ingram
6  was trying to state.
7          MS. WESTFALL: Okay.  Okay.  But you --
8  you did not serve any objections to this notice as to
9  the -- as to the topics and inability to testify from the
10 standpoint of Secretary of State; is that correct?
11         MR. KEISTER: Correct.
12 BY MS. WESTFALL:
13     Q.  So assuming that as of February 3, 2014, 65
14 EICs were issued from mobile EIC units, would that relate
15 to the mobile EIC unit program just in September and
16 October 2013 or was it available continuously from the
17 time it was established in the summer of 2013 up until
18 February 3, 2014?
19     A.  I'm not sure what you're asking.
20     Q.  Do mobile EIC units -- are they continuously in
21 operation or only for certain dates and times?
22     A.  Again, I'm not sure what you're asking.
23     Q.  For Phase 2 DPS-run mobile units, are they only
24 available for certain dates and times or are they
25 continuously available as of when they start?

122

1      A.  The mobile EIC Phase 2 program went from
2  September to the week after the election, which I believe
3  was November 12th.  We could have stopped it
4  November 10th or so.  I'm not sure.  But anyway, that --
5  that was Phase 1 of Phase 2, and then we started the
6  second phase of Phase 2 program mobile units in
7  January of 2014, so there was a gap from the middle of
8  November and December of 2013 before the mobile units
9  involved in Phase 2 began again.
10     Q.  When did they start up again in 2014?
11     A.  January.
12     Q.  January.  At the beginning of the month?
13     A.  I don't believe so.  It was more like the
14 second or third week.
15     Q.  So assuming that this document, Exhibit 16, is
16 accurate and 65 EICs were issued from mobile EICs,
17 whatever DL mobile means, what is your assessment of the
18 mobile EIC unit program as of February 3rd?  Was it
19 successful?
20     A.  I don't believe that our office has made an
21 assessment of the success or failure of this program.
22 I would say, speaking personally, that 65 sounds like
23 a higher number than I thought it was, so I'm -- I'm
24 pleased to know that number.
25     Q.  And what was your expected number of issuances?

123

1      A.  I thought it was significantly less than that,
2  so --
3      Q.  What was that based on?
4      A.  Just me in my head.
5      Q.  Are there no other facts or bases for that
6  prediction?
7      A.  No.  The DPS has not reported to the Secretary
8  of State's Office on a regular basis at all the number of
9  EICs issued, the location that those were issued from,
10 the circumstances of their issuance.  That is not
11 something that DPS has reported to the Secretary of
12 State's Office, so with regard to the actual number of
13 EICs issued, we have been in the dark on that.  Our
14 office has not kept tabs with it, our office has not been
15 informed of it, our office hasn't requested to know it.
16 It's just been the general impression that we've
17 received.  So 65 sounds good to me personally.  Whether
18 it sounds good to our office -- our office has not
19 evaluated the success or failure of the mobile program.
20     Q.  Do you know how many -- and I think you just
21 answered this.  But do you know how many EICs were issued
22 out of mobile EIC units in 2014?
23     A.  I do not.
24     Q.  Why have you not requested this information of
25 DPS?

124

1      A.  Because the -- the responsibility for issuing
2  election identification certificates rests with DPS.
3  That is not something that the legislature has made our
4  responsibility and it's not our responsibility other
5  than, you know, human curiosity to know these things.  So
6  DPS doesn't need to report to us how they're fulfilling
7  their statutory mandate.  That's just -- that's just not
8  required.
9      Q.  Without understanding how many EICs have been
10 issued out of the mobile EIC units is it possible for you
11 to figure out how to improve the program or do you
12 believe you need that data?
13     A.  Well, certainly at some point we will need to
14 sort of reevaluate, reassess, figure out what worked,
15 what didn't work, but we're not at that point yet.  We
16 are currently in a different type of Phase 2 where we are
17 trying to work with counties who are having events where
18 people will be at the events and making sure that we have
19 an invitation and the opportunity to participate in those
20 events, and so we're going at it from a different
21 direction right now.
22     Q.  Is there a point in time at which you will
23 evaluate the -- you know, the success of the mobile EIC
24 program?
25     A.  Certainly.

KEITH INGRAM                                          4/23/2014

125

1    Q.  When will that be?
2        A.  Probably after the November 2014 election.
3    Q.  Do you see, turning your attention back to
4    Exhibit 16, that there is a list of invalid applications
5    at page TEX I.R.000415?
6        A.  Yes.
7    Q.  And do you see that a number of those
8    individuals did not have sufficient supporting
9    documentation?
10       A.  I do see that, yes, ma'am.
11   Q.  Are you aware of whether DPS or anyone within
12   the state government of Texas has contacted these voters
13   to assist them in applying for an EIC successfully and
14   overcoming any of these challenges?
15       A.  I do not know.  Certainly our office has not
16   made any effort because we didn't know who they were or
17   where they were.
18   Q.  Do you plan to operate -- to work with DPS and
19   the counties to operate or assist them in operating
20   mobile EIC units in May 2014?
21       A.  For Phase 2 or for Phase 3?
22   Q.  For Phase 2 and Phase 3.
23       A.  Well, for Phase --
24   Q.  For either.
25       A.  For Phase 3, we're out of the loop on that

126

1    unless DPS wants us to assist anything.  For Phase 2
2    we are currently -- we have mobile EIC units out.
3    Q.  They're currently operating in -- currently
4    presently operating in advance of the May 27th election?
5        A.  That's right.
6    Q.  And do you plan to operate those units in
7    advance of the November 2014 election?
8        A.  Yes, ma'am.
9    Q.  Do you have any specific plans or changes or --
10       A.  As I said, we're trying to go more toward an
11   invitation model and more of an event-driven model so
12   that the counties, as they have an event that voters will
13   be present at, invite us to come.
14   Q.  I see.  So what exactly does that mean, more of
15   an event model?  Is that a voter registration drive?  Is
16   that a --
17       A.  No, it could be county fairs, it could be
18   watermelon festivals, it could be whatever they have at
19   which they believe it would be useful to have the
20   opportunity for election identification certificates to
21   be available to their -- to their citizens.
22   Q.  I see.  So these are county -- county fairs,
23   county fairs and that?
24       A.  Events.
25   Q.  Events, okay.  As opposed to having them in

127

1    government offices; is that correct?
2        A.  Right.  We're trying to -- to see about getting
3    the mobile EIC possibility or availability to the voters
4    as much as we can and not waiting for them to come to us.
5    Q.  What is the status of these plans for
6    event-based?
7        A.  I am not sure of the current status.  There's
8    a lady in my office, Louri O'Leary, who's our point
9    person with DPS and with the counties on that so that I'm
10   not making all the calls now, so I don't know what is
11   currently scheduled, but I do know that she is working on
12   that program and that she's made contacts and she's got a
13   schedule.
14   Q.  Is there a plan in place, a written plan, to
15   put this program together?
16       A.  I don't know.  I don't know what you would
17   consider a written plan.  I don't believe so, no, ma'am.
18   Q.  Is there -- are these targeted in counties that
19   don't have driver license offices or --
20       A.  No, ma'am.  The Phase 2 program has never been
21   targeted to counties that didn't have driver license
22   offices.  That's Phase 3.
23   Q.  Okay.  So this is just a Phase 2 program as it
24   pertains -- and by Phase 2, I mean that bucket of
25   counties, the rural counties and the ones with high

128

1    concentrations of people who may not have an appropriate
2    ID.  Is that correct?
3        A.  That -- that's part of it, but now we've
4    introduced a new variable with regard to invitations and
5    events.
6    Q.  And invitations and events, this program you
7    just testified about, is this in lieu of mobile EIC units
8    in government offices or in addition?
9        A.  It's another factor to consider when we're
10   talking about where to send the EIC units.  Our goal is
11   to have more events and more invitations because we
12   believe that that's a more effective way to reach voters
13   who might need an ID.  For instance, the city of Trinity
14   had a collection of senior citizens who needed election
15   identification certificates, and they wanted us to bring
16   a mobile EIC unit to Trinity, the city of Trinity.
17   Trinity County, in their county seat, has accepted the
18   training.  They have a permanent mobile EIC unit at the
19   county seat, but the city of Trinity felt like that was
20   too far for their folks to drive, so they wanted us to
21   come, so we made available a mobile EIC unit for them --
22   I don't know if it was one or two days -- and we
23   fulfilled that request, and I believe EICs were issued at
24   that event.  So that's the kind of model that we're
25   talking about.  If -- if the counties or cities within

129

1   those counties have a population of voters that feel like
2   they want an EIC unit, we want to be there.
3          Now, in addition to that we want to make
4   sure that the rest of the machines are not just sitting
5   idle, so we'll continue inviting ourselves, but we would
6   prefer it to be primarily event-driven and
7   invitation-driven for 2014.
8       Q.  Thank you.  And you have plans in place for
9   November of 2014 for these event-driven collaborations
10  with counties, but as you sit here today can you
11  guarantee that -- that this collaboration will happen in
12  particular counties?
13          MR. KEISTER:  Object, calls for
14  speculation.
15      A.  Right.  If you're asking if we have anything
16  scheduled, I don't know.  I'd have to talk to Louri and
17  see what -- what's planned for down the road.  I don't
18  know how far in advance she's got a schedule working.  If
19  you're talking about making sure the counties know that
20  we're interested in coming to their events, then yes,
21  we've done that already.  We'll continue to do it as we
22  go through the summer.
23      Q.  And the model will be more at the request of
24  the county at least with regard to events; is that
25  correct?

130

1       A.  That's right.
2       Q.  It will be in the discretion of the counties;
3   is that right?
4       A.  That's right.
5       Q.  Were you involved in the decision that certain
6   driver license offices have Saturday hours for the
7   issuance of EICs in October 2013?
8       A.  Our office was not involved in that decision
9   other than it was part of a process that we've talked
10  about with regard to El Paso and Bruce Elfant's letter
11  that it would be useful to have non-business hour
12  availability of EICs.  So we had that discussion with --
13  with DPS, and I believe their response to that was to
14  have Saturday hours at the most busy offices.
15      Q.  But that -- was that the extent of the
16  Secretary of State's involvement in that particular
17  program?
18      A.  Exactly.  And I don't know if it was
19  involvement or not.  I'm just saying it could have had
20  a role to play in that decision.  I don't know.
21      Q.  Did you have conversations with DPS yourself
22  about Saturday hours?
23      A.  We did.  They told us what they were going to
24  do with regard to Saturday hours.
25      Q.  Did they decide the offices where to have

131

1   Saturday hours or did you have any input whatsoever?
2       A.  They -- they decided the offices that were
3   going to be open and how many to open.
4       Q.  Is there -- to your knowledge is there any
5   legal requirement that DPS offer EICs during Saturday
6   hours?
7       A.  To my understanding there is not such a
8   requirement.
9       Q.  And so DPS has offered EICs and Saturday hours,
10  but it may decide not to do so in the future; is that
11  your understanding?
12          MR. KEISTER:  Objection, calls for
13  speculation.
14      A.  I don't know how their processes work.
15          MS. WESTFALL:  Can you mark this as
16  Exhibit 17.
17          (Exhibit No. 17 marked)
18      Q.  I'm handing you what's been marked as
19  Exhibit 17.  Have you seen this document before?
20      A.  I don't know if I've seen this version of this
21  document, but I have seen maybe a press release mock-up
22  of it.
23      Q.  Do you know how -- first of all, as to
24  Exhibit 17, do you know if this is an accurate list of
25  the offices that offered Saturday hours in 2013?

132

1       A.  I -- I don't know if it's accurate or not.
2       Q.  Do you know how these locations were
3   identified?
4       A.  No.
5       Q.  Do you know who made the decision about what
6   offices would have Saturday hours?
7       A.  I do not.  I know that Joe Peters and
8   Tony Rodriguez and Duke Bodisch told us about it.
9       Q.  Was this a temporary program to have Saturday
10  hours to offer EICs in advance of the November 13th
11  election?
12      A.  It was for those Saturdays that were between
13  the announcement and the election.
14      Q.  Do you know whether DPS was cooperative --
15  well, I believe you testified DPS made the decision to
16  have Saturday hours, but was DPS cooperative in executing
17  this program to operate EICs during Saturday hours?
18      A.  I don't know what that means.
19      Q.  Was there any resistance on the part of DPS to
20  offering -- providing Saturday hours?
21      A.  I don't know.
22          MS. WESTFALL:  Could you mark this as 18.
23          (Exhibit No. 18 marked)
24      Q.  You've been handed what's been marked as
25  Exhibit 18.  Have you ever seen this document before?

133

1    A.  No.
2    Q.  Can you take a look at just the first page, the
3    e-mail on the first page, and let me know when you've had
4    a chance to look at it?
5    A.  Sure.  (Reviewing document)  Okay.
6    Q.  Do you see that Mr. Rodriguez is the author of
7    the e-mail?
8    A.  I see that.
9    Q.  Do you see that Mr. Rodriguez asks that state
10   troopers -- or troopers be present at the driver license
11   offices for the Saturday hours?
12   A.  I do.
13   Q.  Do you know why he made that suggestion?
14   A.  I'm not sure I understand the question.
15   Q.  Do you know why he asked the -- the recipients
16   of the e-mail to provide troopers during Saturday hours
17   at the DPS offices?
18   A.  Specifically DPS troopers and not just clerks?
19   Q.  Well, he says troopers, does he not, in the
20   second paragraph?
21   A.  Yeah.  I don't know DPS' policy on who has to
22   be present when an office is open.  That's -- that's a
23   DPS question, so I don't know.  If you're specifically
24   asking if there's a reason to have troopers in the office
25   on a Saturday, I -- that is -- I don't know.

134

1    Q.  And do you see that -- in the first paragraph
2    that his thought is that if there's no demand for EICs
3    they can make the case for stopping having Saturday
4    hours?
5    A.  That's what he says.
6    Q.  Why do you think he said that?
7    MR. KEISTER:  Objection, calls for
8    speculation.
9    A.  I don't know why he said it.  I don't know why
10   he said it.  I know that DPS was having to pay overtime
11   for these employees.
12   Q.  So you think DPS was not enthusiastic about the
13   payroll involved in the Saturday hours for the EIC
14   program?  Is that your sense?
15   A.  I have no idea if they --
16   MR. KEISTER:  Objection, calls for --
17   calls for speculation.
18   A.  I have no idea if they were enthusiastic or
19   not.
20   Q.  Do you see in the first sentence that it
21   indicates that the Secretary of State's Office is
22   targeting 13 counties?
23   A.  It looks like he took our list from the
24   July '13 matching exercise, picked the top 13 counties
25   and decided those would be the offices that would be

135

1    open.
2    Q.  And was that at your request, that the Saturday
3    hours would be initiated?
4    A.  No.  I mean, it -- we were definitely of the
5    opinion that off hours should be offered.  I don't know
6    if that played a role in this or not.
7    Q.  Do you know how many EICs were issued during
8    Saturday hours in October 2013?
9    A.  I do not.
10   Q.  Did you track that at all?
11   A.  No, ma'am.
12   Q.  Do you know, for example, on one Saturday at
13   nine offices only two were issued?  Are you aware of that
14   fact?
15   A.  No.  We could have been told that somewhere
16   along the way, but as I sit here today I don't remember
17   it.
18   Q.  Have you made any assessment of the success of
19   Saturday hours to offer EICs at driver license offices?
20   A.  No, ma'am, our office has not made any
21   assessment of Saturday hours.
22   Q.  Do you know whether Saturday hours will be
23   offered in February 2014 at driver license offices?
24   A.  I don't know.
25   Q.  And have you worked with -- I believe you

136

1    testified you worked with DPS to offer EICs through
2    mobile EIC units in February 2014, correct?
3    A.  Our office did.  It would have been Louri at
4    that point.
5    Q.  Have you made any changes in your program in
6    2014 from 2013 for the mobile EIC units?
7    A.  As I said, we're trying to have more of the
8    units placed with events and invitations.
9    Q.  That is for the future.  I guess just limiting
10   the EIC mobile unit as it pertains to February, in
11   advance of the March 2014 election, have you made any
12   changes from October 2013?
13   A.  Yes.  The event-driven invitation model is the
14   2014, not just for the November election, but also for
15   the primary.
16   Q.  I see.  Any other changes?
17   A.  No, ma'am.
18   Q.  And I believe you testified earlier that the
19   Secretary of State is staffing some of the mobile units?
20   A.  That is correct.
21   Q.  And that is for this month, February 2014?
22   A.  This month is April.
23   Q.  I'm in the wrong -- I'm sorry.  I'm saying
24   February.  I -- I'm thinking about the May election.  My
25   apologies.  I'm messing up the record.

KEITH INGRAM                                      4/23/2014

35 (Pages 137 to 140)

---

137

1          MS. WESTFALL:  Strike that.
2     Q.  Okay.  So you -- okay.  The Secretary of
3  State's Office staffed in February in advance of the
4  March 2014 election --
5     A.  We did.
6     Q.  -- some mobile offices.  Which offices?
7     A.  I don't know how many.  There were quite a few.
8  My -- my office has the numbers if you need them.  We've
9  got the schedule and we've got the numbers of who went
10 where.  But it was -- it was quite a few of them.
11    Q.  Why did that occur?
12    A.  I think I've answered this question.  Our
13 office and DPS thought it would be a useful thing to have
14 Secretary of State employees involved in the process of
15 issuing election identification certificates.  They
16 offered us the training.  We took the training and now we
17 have staff with DPS.  The -- the -- the rollout in
18 February and before the March primary was one DPS person,
19 one Secretary of State person for each of the mobile
20 units.
21    Q.  Why did you decide to agree to have your staff
22 play that role?
23    A.  Because we can.
24    Q.  As of February, the beginning of February, were
25 there about 33 counties in Texas without a driver license

---

138

1  office or permanent EIC program?  Does that sound right?
2     A.  That sounds like it could be correct.  I don't
3  know the precise number.
4          MS. WESTFALL:  Bear with me for one
5  moment.  Let's go off the record for one second while
6  I get my exhibits together.
7          (Off the record 11:57 a.m. to 11:59 a.m.)
8          (Exhibit No. 19 marked)
9  BY MS. WESTFALL:
10    Q.  I'm handing you what's been marked as
11 Exhibit 19.  Have you seen this before?
12    A.  I don't believe I have, no, ma'am.
13    Q.  Do you see it's from Louri O'Leary, whose name
14 I think you just mentioned, concerning some sites in
15 February 2014 for a mobile EIC?
16    A.  Yes.
17    Q.  And do you see that Ms. O'Leary is talking
18 about tight deadlines again and confirming locations
19 again?  Do you see that?
20    A.  I do.
21    Q.  Were there continued concerns about securing
22 sites with adequate notice in February 2014?
23    A.  No, ma'am.
24    Q.  There were no concerns?
25    A.  No.

---

139

1     Q.  So you think this e-mail is inaccurate?
2     A.  No.
3     Q.  Or doesn't reflect that?
4     A.  I don't think it reflects that.
5     Q.  Why does it not reflect that?
6     A.  I think it reflects that the -- sites were
7  given with the five days notice, we've -- we've stretched
8  out the required minimum notice to five days, and that if
9  there's some sort of problem, then the EIC units would be
10 rescheduled.
11    Q.  And you see that she -- this e-mail was sent on
12 February 14th?
13    A.  I do.
14    Q.  And she was trying to confirm locations within
15 two days, is that right, by the 16th?
16    A.  Right.  But that wasn't when they were going to
17 start.
18    Q.  And when --
19    A.  That's just when she wanted to know for sure
20 whether it was a go or no go.
21    Q.  When were they going to start?
22    A.  I don't know.  I would have to see the
23 schedule.  It was sometime after Sunday the 16th.
24    Q.  But it's your testimony today there were no
25 concerns about no adequate notice in February 2014 for

---

140

1  these locations?
2     A.  No, ma'am, there was no concern.
3     Q.  In February 2014 did you -- did your office
4  have any involvement in the Saturday hours of where EICs
5  would be offered?
6     A.  No, ma'am.  Louri participates in a daily
7  conference call with DPS, so she probably knew about it,
8  but it wasn't anything that we were driving.
9     Q.  Based on -- we talked about this a little bit
10 earlier.  But based on the number of applications that
11 you've received for EICs do you believe this program has
12 been successful?
13    A.  We haven't received any applications for EICs.
14    Q.  Based on the number of applications that have
15 been submitted do you believe this program has been
16 successful?
17    A.  I don't know for sure how many applications
18 have been submitted.  I know what you showed me before,
19 and I've said that we're going to make an assessment
20 probably at the end of the year after the November
21 election about whether or not this program has been
22 successful.
23    Q.  So your testimony today is you do not know
24 whether the EIC program has been successful or not; is
25 that correct?

---

KEITH INGRAM                                                    4/23/2014

---

141

1          A.  I don't know what you mean by EIC program.  If
2    you mean Phase 2 mobile unit program, it -- I don't know
3    is the answer, yes.
4          Q.  I guess overall do you think the EIC program,
5    making it available to persons who otherwise do not have
6    acceptable photo ID under SB 14, do you think it's been
7    successful?
8          A.  I don't know.
9          Q.  And I will represent to you that the
10   defendants' interrogatory responses indicate in the
11   responses themselves that as of February 3, 2014, 167
12   applications for EICs had been received.  Does that sound
13   accurate from your standpoint?
14         A.  I know that the number is more than that now.
15         Q.  Does it sound accurate as of February 3, 2014?
16         A.  I would have thought it would be closer to 200
17   as of February.
18         Q.  And based on that number do you have any
19   assessment as to whether making EICs available to the
20   public has been successful or not?
21             MR. KEISTER:  Objection, asked and
22   answered, and since he's already stated that they haven't
23   made an assessment, it would be speculation, unless
24   you're asking him personally.
25         Q.  You may answer.

---

142

1          A.  As I said, we haven't made an assessment of the
2    success or failure of this program yet.  That'll probably
3    occur after the November 2014 election.
4          Q.  Are you -- is your office trying to increase
5    the number of EIC applications?
6          A.  It is not our role to increase the number of
7    EIC applications.  It is our role to do whatever we can
8    do to make EICs available to voters who need an
9    acceptable form of ID to vote.  So I don't know if there
10   is a way to measure the success or failure of that other
11   than we provided the opportunity, and it is our goal to
12   provide the opportunity as widely as we can.
13         Q.  And I believe you testified before that there's
14   no legal obligation on the part of the Secretary of State
15   to increase the number of applications of EICs.  Is that
16   right?
17         A.  The EIC application process is not ours, it's
18   the DPS'.
19         Q.  And is it -- I know your testimony is that the
20   Secretary of State's Office does not have an obligation
21   to increase the number of EIC applications.  Is it the
22   responsibility of any other entity, state or local, in
23   the state of Texas to increase the number of EIC
24   applications?
25         A.  I don't know of any requirement for any minimum

---

143

1    number of EIC applications to comply with any statutory
2    mandate.  I do know that we want to make them as widely
3    available as we can make them.
4          Q.  Have you taken any steps to ensure that
5    unregistered eligible voters who lack SB 14 ID obtain an
6    EIC?
7          A.  No, ma'am.
8          Q.  Have you given any consideration to that issue
9    at all?
10         A.  No, ma'am.  There -- there -- we just had an
11   interim elections committee hearing, and one of the
12   things that was under discussion was interstate
13   crosscheck programs between voter lists and doing list
14   maintenance.  One of the things that we talked about at
15   the interim committee was the ERIC program.  The ERIC
16   program has as a component offering the opportunity to
17   currently nonregistered but eligible citizens the
18   opportunity to register to vote.  I don't know what the
19   legislature will decide with regard to participating in
20   that program or not.  That's just one of the things that
21   we talked about at the interim elections committee
22   hearing.  And that is the only program that I know of
23   that reaches out to currently unregistered voters.
24         Q.  Could you describe that program?
25         A.  ERIC?  I don't know if I know enough about it

---

144

1    to describe it.
2          Q.  That's okay then.  I don't want you to testify
3    about things you don't know about, so that's okay.
4              Could county election officials issue an
5    EIC when a voter registers to vote?  Would it be possible
6    for the county election officials to do that?
7          A.  The counties who have accepted the training and
8    have the equipment, yes.
9          Q.  It could all be within one -- a one-step
10   process?
11         A.  It wouldn't be a one-step process, it would be
12   a two-step process.  But yes.  One of the requirements to
13   receive an election identification certificate is either
14   that you are already registered to vote or you submit an
15   application to register to vote contemporaneously with
16   your application for the EIC.  So in some of the counties
17   in Phase 3 I believe the voter registrar is where the EIC
18   equipment is, and so if -- if a voter registers to vote
19   and needs an ID, there is the opportunity to get both at
20   the same visit to the voter registrar's office.
21         Q.  To your knowledge are any counties presently
22   doing that?
23         A.  Yes.
24         Q.  Which counties?
25         A.  I don't know.  There's 40 or so.

---

---

145

1     Q.  They're all -- so all of those 40 counties in
2  which there isn't a driver license and which they're
3  participating in Phase 3, those counties are issuing the
4  EICs from the county election office; is that correct?
5     A.  Well --
6     Q.  Or elsewhere?
7     A.  Yeah, the county election office is -- is a --
8  is a moving target, so I don't know what you mean when
9  you say that.  We have -- the county clerks in a lot of
10  counties run the elections.  The voter registrar is
11  usually the tax assessor-collector.  There are some
12  counties where those roles are reversed and there's some
13  counties where one or both -- one of those will have both
14  roles.  There are other counties, about 100 of them,
15  where there's an election administrator who does both the
16  election piece and the voter registrar piece.
17        So I don't know which counties you're
18  talking about, but with regard to the counties that don't
19  have a driver license office that do have the EIC
20  available, I am aware of Grimes County.  Becky Duff is
21  the elections administrator over there, and she issues
22  EICs.  As far as I know she's the only county with a
23  permanent location who's actually issued an EIC, but
24  she's very pleased that she's done three of them.
25     Q.  Thank you.  Now I want to turn to a different

---

146

1  topic, the disability exemption.
2        MS. WESTFALL:  Could you mark this as
3  Exhibit 20.
4        (Exhibit No. 20 marked)
5     Q.  I'm handing you what's been marked as
6  Exhibit 20.
7     A.  Yes.
8     Q.  Do you recognize this document?
9     A.  Yes, I do.
10     Q.  And what is it?
11     A.  This is some FAQs that we prepared for county
12  election officials with regard to implementing photo ID
13  SB 14s for the November 2013 election.
14     Q.  And does it set forth various procedures
15  related to the disability exemption?
16     A.  Well, this -- this is sort of a response
17  document to input that we receive from the counties,
18  so -- the nature of a frequently asked questions document
19  is to answer frequently asked questions, and so if
20  there's some disability questions in here, then that is a
21  response to ones we had received.  The -- the disability
22  exemption advisory came out earlier in the year, shortly
23  after the Shelby County decision on June 25th of 2013.
24  We might have issued that advisory as early as June 26th.
25  I think that it was pretty much ready to go if -- if the

---

147

1  law became enforceable.  And so I think that we had
2  previously issued the disability exemption advisory.  You
3  know, I think the advisory also had stuff with regard to
4  religious exemption and disaster declaration exemption as
5  well, but the primary purpose of that advisory was the
6  disability exemption.
7     Q.  Is the September 13, 2013, FAQs the most
8  up-to-date piece of information about how the disability
9  exemption works or you're saying the advisory is more
10  accurate or up to date or are they both?
11     A.  You're misunderstanding my point.  The
12  advisories set forth the policy, the procedure, this is
13  how you do it.  The FAQ answers questions with regard to
14  that policy and that procedure.  So my point is that they
15  work together to -- to talk about disability exemption
16  procedure.
17     Q.  Got it.  If a voter wants to obtain a
18  disability exemption must the voter appear at the county
19  registrar or the election official in person or can this
20  be obtained in other means?
21     A.  They can mail it in.
22     Q.  They can mail in their original documentation
23  certifying the disability to the election official; is
24  that correct?
25     A.  No, they can mail in a copy.

---

148

1     Q.  Mail in a copy.  That's right.  But they can do
2  it by mail?
3     A.  They don't need to mail in their original
4  disability documents.
5     Q.  Okay.
6     A.  They need to mail in a copy or present a copy
7  in person.
8     Q.  What sort of documents from the Social Security
9  Administration or the Veterans Administration will
10  suffice?
11     A.  You know, I don't know what documents they
12  issue.  It's our belief in the Secretary of State's
13  Office that there is a letter at the end of a process
14  where someone gets evaluated that will show a disability
15  rating of X percent.  With regard to the Social Security
16  Administration, if there's any disability at all they're
17  qualified for the disability exemption.  With regard to
18  the Veterans Administration the disability rating has to
19  be more than 50 percent.  So I don't know what form that
20  notice takes to the voter, but whatever they get, they
21  present a copy of it to the election officials.
22     Q.  Thank you.
23        MS. WESTFALL:  Can you mark this as 21.
24        (Exhibit No. 21 marked)
25     Q.  I'm handing you what's been marked as 21.  Do

KEITH INGRAM                                                  4/23/2014

149

1  you recognize this document?
2      **A. I do.**
3      Q. What is it?
4      **A. This is the application form -- the request**
5  **form that we came up with for requesting a disability**
6  **exemption.**
7      Q. Do you see that a voter must indicate that the
8  voter does not have another acceptable form of SB 14
9  qualifying ID in order to get this exemption?
10     **A. I believe that's the statutory requirement.**
11     Q. Is it? Is that the source of the obligation?
12     **A. I believe so. Now I don't remember where it**
13  **is.**
14             MR. KEISTER: I don't think she asked you
15  to find it. If she wants you to, that's fine.
16             MS. WESTFALL: For the record, Mr. Ingram
17  is preparing -- is looking at the Election Code.
18     **A. Yes.**
19     Q. What is the source of the obligation that
20  voters say they don't have any other forms of ID?
21     **A. It is Election Code 13.002, subpart (i),**
22  **subpart 2.**
23     Q. And this is SB -- this is SB 14 as codified?
24     **A. I believe so.**
25     Q. If a voter obtains a disability exemption,

150

1  appears to vote and is not -- and is listed on the list
2  of voters as exempted, has an E in the list of registered
3  voters, but does not have the card showing an E, the
4  voter registration certificate, that voter must vote by
5  provisional ballot, right?
6      **A. That's right.**
7      Q. And what is the purpose of that requirement as
8  you understand it?
9      **A. Because they have to identify themselves as the**
10  **voter and they at least need their certificate with the E**
11  **on it.**
12     Q. But if they had an old certificate that didn't
13  have an E on it, why wouldn't that suffice to prove the
14  identity of the voter provided the voter has an E in the
15  poll book?
16     **A. An old certificate is not an acceptable form of**
17  **identification under 13.002(i) or 63.0101.**
18     Q. Isn't the purpose of the disability exemption
19  to exempt certain people with disabilities from the SB 14
20  identification requirements?
21     **A. No, ma'am.**
22     Q. What is the purpose of the disability
23  exemption?
24     **A. The purpose of the disability exemption is to**
25  **exempt certain people from the requirement that they show**

151

1  a photo ID, but they still have to show an acceptable
2  form of ID under SB 14.
3      Q. So your understanding is that the purpose is to
4  show identification and it must have an E, the voter
5  registration certificate? That's your understanding?
6      **A. That's right.**
7      Q. Is there any time period by which a county
8  official must process an application for a disability
9  exemption?
10     **A. I don't remember what our advisory says. You**
11  **know, obviously they need to do it.**
12     Q. Is there any legal requirement under the code
13  or regulation other than the advisory you just discussed?
14     **A. I don't think that we've actually put it in the**
15  **rule, so I don't know if there's a time requirement for a**
16  **county to act on the disability exemption.**
17     Q. Is it true, therefore, that the voter is not
18  guaranteed that her application for a disability
19  exemption will be processed in time for an election?
20  There's no -- there's no guarantee?
21     **A. I don't know what that means, there's no**
22  **guarantee.**
23     Q. There's no certainty if a voter applies at a
24  certain date that the exemption will be granted before an
25  election -- upcoming election by law?

152

1      **A. Again, what's the certain date? I mean, I**
2  **don't understand the question. There are -- there are**
3  **county election officials all over this state who are**
4  **very diligent and care a lot about what they do. There**
5  **are also a lot of people who register to vote at the last**
6  **minute, so there is a requirement that voters be**
7  **registered 30 days before an election. There is a**
8  **requirement that if you're going to have an election**
9  **identification -- or a disability exemption that you have**
10  **a card with an E on it. However, sometimes counties get**
11  **overwhelmed with last minute surges in applications, and**
12  **potentially a disability exemption could be caught up in**
13  **that surge, and so they might not have the actual**
14  **physical card with an E on it yet, but the E will be on**
15  **the official list of registered voters by the time of the**
16  **election, and if a voter applies for the disability**
17  **exemption in that 30-day window, then there's not a**
18  **guarantee that it'll be on there, but if it's done**
19  **before -- 30 days before the election, then they'll have**
20  **the E on the official list of registered voters and they**
21  **can bring their current election -- their current voter**
22  **registration card without the E and show it, because**
23  **it'll have the right color, not a previous one, and they**
24  **can -- they can get the disability exemption without a --**
25  **without a provisional ballot. However, if they ask for**

KEITH INGRAM                                                    4/23/2014

153

1  the disability exemption within the 30-day window, then
2  no, there's not a guarantee.
3      Q.  So they may still have their registration card
4  that doesn't indicate an E and they'll vote by
5  provisional ballot?
6      A.  No, ma'am.  If they have their current orange
7  colored voter registration certificate and they show up
8  to vote and they bring that with them and they say,
9  I'm -- I'm disabled, they'll look on the official list of
10  registered voters.  If there's an E on the official list
11  of registered voters for that voter, then they can vote a
12  regular ballot.
13      Q.  And that is pursuant to what?
14      A.  That's pursuant to our advisory and this FAQ.
15      Q.  Under what circumstance would a voter who has
16  applied for a disability exemption and hasn't received it
17  have to vote provisionally?
18      A.  If they did it less than 30 days before the
19  election.
20      Q.  If a voter obtains a disability exemption and
21  moves to another county, that voter needs to reapply for
22  the exemption; is that correct?
23      A.  That's right.  They also need to reregister to
24  vote in the new county.  Voter registration is a
25  county-based system, and so the counties don't have any

154

1  obligation to share information.
2      Q.  What is the purpose of that reregistration of
3  the disability exemption requirement if one moves?
4      A.  I don't know how to explain it any better than
5  I just did.
6      Q.  Isn't the voter identified as E within the TEAM
7  statewide database?
8      A.  Probably.  Yeah, I think we've got --
9      Q.  So why is there a reason for the voter to have
10  to reapply for that exemption when she moves?
11      A.  Because they have to reregister to vote and
12  they have to apply for an exemption in the new county
13  with their new voter registration so that that county
14  knows that that voter has got a disabled exemption, and
15  they've got an obligation -- the county has an obligation
16  under 13, I believe, 054 of the Election Code, maybe
17  13.104, to maintain information regarding active voters
18  as long as that voter is active and for up to two years
19  for a canceled voter.
20          So the county has an obligation to have
21  the information related to its voters, and if the voter
22  registered to vote, got a disability exemption at another
23  county, then the county -- the new county wouldn't have
24  that data, they would be not complying with their
25  statutory obligations.

155

1      Q.  But it's not enough to have the voter indicated
2  in TEAM as exempt, in other words --
3      A.  No.  No, that --
4      Q.  -- because the counties must have separate
5  documentation.  Is that your testimony?
6      A.  The counties have to maintain documents with
7  regard to their voters, and an E in TEAM that, let's just
8  say, Grimes County has because they've seen the
9  disability exemption paperwork and they've got it
10  maintained for that voter means nothing to Navasota -- I
11  mean to Marion County.  That -- Marion County just sees
12  an E.  They don't know that that voter -- they don't know
13  what was shown, they don't have it, they don't -- they've
14  got a statutory obligation to have the paperwork.  The
15  county has an --
16      Q.  Does SB 14 require that?
17      A.  No.  Preexisting law requires that information
18  specific to a voter be in the county where the voter is
19  registered.
20      Q.  Do you know how many voters have applied for
21  this exemption?
22      A.  I don't know the current numbers.  I know that
23  as of January there were 19 in the TEAM system.
24      Q.  Would you agree that the disability exemption
25  is a narrow exemption to the requirements of SB 14 for

156

1  ID?
2      A.  I don't know how to characterize it.
3      Q.  Would you characterize 19 as a large number of
4  voters?
5          MR. KEISTER:  Objection, vague.
6      A.  I don't know in reference to what 19 exists.
7      Q.  Do you have any -- any view on the part of the
8  Secretary of State of whether this is -- provides much
9  relief from the ID requirements under SB 14?
10      A.  I don't believe that the ID requirement needs
11  relief.  The Secretary of State's Office is in the
12  business of implementing the laws as they are put to us
13  by the legislature, and in doing so we don't express
14  opinions about whether or not the law is ill-founded,
15  well-founded.  We don't express opinions about whether
16  exemptions are narrow or wide.  That is not our role.
17  Our role is to implement the law.
18      Q.  Have you assessed whether persons who are
19  eligible for the exemption have had any problems or
20  success in applying for this exemption?
21      A.  I have not.
22      Q.  Do you know of any office that has?
23      A.  I am not aware of any office that has made such
24  an assessment.  I do know that our advice to the counties
25  is to be -- is to not take a stringent view of the

## 157

1  documentation provided, so if there's any indication on
2  the documents anywhere that there's some kind of
3  disability from Social Security Administration, we advise
4  the county to accept it.  We don't -- we don't want them
5  in the business of second-guessing Social Security
6  Administration documents.
7      Q.  Was there a time when you determined that
8  certain forms of photo ID not expressly listed in SB 14
9  were sufficient as ID?
10     A.  No.
11     Q.  Did you determine that the -- that a
12 citizenship certificate also included a Certificate of
13 Naturalization?
14     A.  We did determine that when the legislature
15 listed citizenship certificate as a form of ID they --
16 they also meant to include naturalization certificate,
17 yeah, that when they said citizenship certificate they
18 meant a certificate that you get when you become a
19 citizen.
20     Q.  How did you make that determination?  What was
21 that based on?
22     A.  Well, we investigated -- you know, talked to
23 the Immigration and Naturalization Service about what is
24 a citizenship certificate.  This thing exists.  Well,
25 there is a particular form that the Immigration and

## 158

1  Naturalization Service comes up with that is a
2  citizenship certificate by name, and we talked to the
3  drafters of the legislation and asked them if that's what
4  they meant when they said citizenship certificate, did
5  they mean a particular document or did they mean the
6  document that you get -- a person gets whenever they
7  become a citizen, and they said the latter.  We said,
8  okay, well, there -- there's two things, then.  We've got
9  a naturalization certificate and a Certificate of
10 Citizenship.  Certificate of citizenship was meant
11 generically in SB 14, and it actually has a specific
12 thing.  So we haven't expanded what the legislature
13 intended, we've only implemented what the legislature
14 intended.
15     Q.  Did you have discussions with Senator Fraser
16 about this issue?
17     A.  No.
18     Q.  Others in the legislature?
19     A.  Did I?
20     Q.  Yes.
21     A.  No, ma'am.
22     Q.  Did anyone in your office?
23     A.  Yes, ma'am.
24     Q.  Who in your office?
25         MR. KEISTER: Let me just -- before we go

## 159

1  any further, to the extent that specific legislatures had
2  specific communications related, I don't want you to get
3  into the details of those based on legislative privilege,
4  but I think you can answer the general question.
5      A.  The person in our office whose role it is to
6  interface with legislatures and their staff is our
7  general counsel, Wroe Jackson.
8      Q.  Certificates of Citizenship are particular
9  documents, are they not?  Is that your understanding?
10     A.  That is -- that is what we discovered whenever
11 we were putting this process together, yes, ma'am.
12     Q.  And that was what is specifically mentioned in
13 the text of SB 14, is it not?
14     A.  It says -- it says certificate of citizenship,
15 but it didn't mean citizenship certificate the way that
16 INS means it.
17     Q.  So your interpretation is that it includes
18 Certificate of Naturalization?
19     A.  That's right.
20     Q.  Could the Secretary of State's Office reverse
21 its decision on this position at any time?
22     A.  Could they?
23     Q.  Yes.
24     A.  I don't know.
25     Q.  Could you legally reverse your decision and

## 160

1  decide that that was not an acceptable form of ID?
2      A.  I don't know.
3      Q.  You haven't issued a regulation to this effect,
4  have you?
5      A.  No.
6      Q.  How has this been communicated to county
7  election officials, that this form of ID is acceptable?
8      A.  We have, obviously, training materials for poll
9  workers as well as county election officials, and it's
10 included in that training.
11     Q.  Beyond training is there any legal embodiment,
12 any regulation or any steps that you've taken to make
13 this permanent in a legal sense?
14     A.  No, ma'am.  The statutes made it permanent.
15     Q.  Because, as you testified earlier, you believe
16 the legislature intended to list that form of ID even
17 though it's not expressly included; is that correct?
18     A.  No, ma'am.  That is not what I said.  I said it
19 was listed.  It is listed.
20     Q.  You believe a Certificate of Naturalization is
21 a Certificate of Citizenship?  That's your testimony
22 today?
23     A.  That is my -- that is my testimony, as the
24 legislature intended it, you bet.
25     Q.  Do you believe that the Secretary of State's

165

1    Q.  Every single person in the elections division?
2    A.  I believe so, yes, ma'am.
3    Q.  And you individually did that search or did
4  your counsel?
5    A.  I did it.
6    Q.  Was that true for all employees?  Did the
7  Office of the Attorney General conduct any searches or
8  did -- did all the individual e-mail users do their own
9  searches?
10        MR. KEISTER:  Don't comment on what the
11  Office of the Attorney General did.  That's worker --
12  that's worker -- attorney -- attorney-client and work
13  product.  But you can tell her what y'all did.
14    A.  We were responsible for producing our
15  documents.  Now, that involved individual searches as
16  well as global searches by our IT department.
17    Q.  When did you most recently search your own
18  e-mail in response to the request for production?
19    A.  When it was answered.
20    Q.  So that would be in January or February of this
21  year?
22    A.  Yes, ma'am.
23    Q.  Have you conducted any subsequent searches
24  since that time?
25    A.  No, ma'am.

166

1    Q.  Do you use personal e-mail to communicate with
2  the Secretary of State employees, your personal e-mail
3  and not the Secretary of State's e-mail to conduct
4  official business?
5    A.  No, ma'am.
6    Q.  Do you know whether anyone else in your office
7  or your IT department has conducted search -- searches of
8  e-mail or of the server in response to the RFP subsequent
9  to January or February of this year?
10    A.  I don't know what they've done.  I don't
11  believe so.
12    Q.  Have you provided any additional documents
13  since the response was -- was made in February or January
14  of this year?
15    A.  No, ma'am, just what we brought today, the
16  communication stuff.
17    Q.  Are you continuing to try to locate responsive
18  documents in response to the request today or at any time
19  since the responses?
20    A.  No.  If we were asked to we would.  You know,
21  there have been some documents generated since the
22  requests for production have been responded to that would
23  probably be responsive, and so we could certainly.
24    Q.  Thank you.
25        MS. WESTFALL:  And, Mr. Keister, we would

167

1  request that the responses to the RFP be updated and
2  supplemented as required by the federal rules.
3    Q.  Now we're going to turn to another topic,
4  information provided to the legislature.  I'm going to --
5        MR. KEISTER:  Elizabeth, would this be a
6  good time for a break?
7        MS. WESTFALL:  I think it would.  What is
8  the time?
9        MS. MARANZANO:  12:30.
10        MS. WESTFALL:  If I can push through I can
11  get through my topics.  I have a few more pages.  Can you
12  bear with me?
13        MR. KEISTER:  I'll try.
14        MS. WESTFALL:  Okay.
15        MS. MARANZANO:  Can we take a quick break?
16        MS. WESTFALL:  Yeah, let's take a quick
17  break.  We can go off the record.
18        MR. KEISTER:  Yeah.
19        (Recess from 12:33 p.m. to 12:47 p.m.)
20  BY MS. WESTFALL:
21    Q.  Mr. Ingram, I want to turn to a different
22  topic, which is item number 5 on the notice related to
23  all information that was provided to the Texas
24  Legislature regarding certain bills.
25    A.  Right.

168

1    Q.  During the 79th Legislative Session in 2005 did
2  the Secretary of State's Office provide the Texas
3  Legislature with any information or data related to voter
4  ID?
5    A.  I don't know, and the thing is, nobody in our
6  office knows.
7    Q.  Okay.  And during the 80th Legislative Session
8  in 2007 did the Secretary of State's Office provide the
9  legislature with any information or data related to voter
10  ID?
11    A.  Again, I don't know and nobody in our office
12  knows.  Whatever the documents reflect was provided is
13  what we know about.
14    Q.  And the same question with regard to the 81st
15  Legislative Session in 2009; do you know whether the
16  Secretary of State's Office provided the legislature with
17  any information or data related to voter ID?
18    A.  I don't know and nobody in our office knows.
19  Whatever the legislative documents and hearing testimony
20  reveals is what it reveals.
21    Q.  Turning to -- do you know whether Ann McGeehan
22  would know the answer to those questions?
23    A.  She would have a better idea than -- than
24  anybody currently at our office.
25    Q.  Would she be the best person to answer those

KEITH INGRAM                                                                4/23/2014

43 (Pages 169 to 172)

169

1   questions, do you think?
2       A.  I don't know.  I would expect that either she
3   or Elizabeth Winn would be the ones to talk to, but I
4   don't know.
5       Q.  Between January 1, 2005 and May 27, 2011 did
6   the Secretary of State's Office conduct any analyses of
7   registered voters who possess a Texas driver license or
8   personal ID?
9       A.  I don't know.  I've seen documents that reflect
10  that -- that there was some matching going on in the 2011
11  Legislative Session.  I don't know if there was any
12  before that.
13      Q.  Okay.  And what was that matching in 2011?
14      A.  It was similar to the matching that occurred in
15  September of 2011, January of 2012, and August -- or July
16  of 2013.
17      Q.  Was that the only matching that you're aware of
18  during that time period other than the other ones you
19  just testified to?
20      A.  That's right.
21      Q.  In 2011 did the Secretary of State's Office
22  receive a request for a comparison of registered voters
23  with a driver license database from the legislature?
24      A.  I don't know.  I think that such a request was
25  made, yes, ma'am.

170

1       Q.  And was it made by Senator Williams?
2       A.  I don't know.
3       Q.  Did the division or the Secretary of State's
4   Office subsequently conduct an analysis of registered
5   voters compared with the driver license database?
6       A.  I have seen some e-mail traffic -- whenever I
7   first started with the Secretary of State we were pulling
8   together documents related to photo ID for a public
9   information request, and there were some documents in
10  that pile that indicated that there was some matching
11  going on in the spring of 2011.
12          MS. WESTFALL:  Could you mark this.
13          (Exhibit No. 22 marked)
14      Q.  You've been handed what's been marked as
15  Exhibit 22.  Do you recognize this?
16      A.  No, ma'am.
17      Q.  Did you -- have you ever reviewed -- well, you
18  can see on the -- on the cover page that it's a
19  transcript of proceedings before the legislature in the
20  82nd Legislature on January 25, 2011; is that right?
21      A.  I do see that, yes.
22      Q.  So you have not reviewed this testimony in
23  advance of this deposition today?
24      A.  No, ma'am, I have not.
25      Q.  Are you aware that on page 490 of this

171

1   transcript, which is TX 00000846, there is a colloquy
2   between Senator Williams and Ann McGeehan concerning a
3   data request?
4       A.  I see that Senator Williams talks about that,
5   yes.
6       Q.  And he was requesting a comparison of voters
7   with the driver license database; is that correct?
8       A.  Looks like that's what he was doing, yes,
9   ma'am.
10      Q.  Is it your understanding that such an analysis
11  was undertaken by the Secretary of State's Office?
12      A.  I have seen the evidence that there was some
13  matching going on, yes, ma'am.
14      Q.  What was the evidence that you refer to?
15      A.  I've seen some e-mail traffic.
16      Q.  What did that e-mail traffic indicate?
17      A.  That there was some matching going on.
18      Q.  What was the results of the matching?
19      A.  I don't remember.  It seems like there were --
20  that they had done the analysis several different ways
21  and come up -- came up with several different results
22  that were all pretty close to the same thing.
23      Q.  What were the results, if you recall?
24      A.  I don't really remember.  To the best of my
25  recollection, it was somewhere in the 650,000 range,

172

1   600,000 range, five-eighty-six.  So it was in the -- it
2   was in the ballpark of what was later done in September
3   of 2011 is what I remember, that it was not very
4   different from what was later done for preclearance.
5       Q.  Do you know who in the division of the
6   Secretary of State's Office was involved in this matching
7   process?
8       A.  I don't know who it would have been in 2011.
9       Q.  And do you know whether it was released outside
10  of the Secretary of State's Office?
11      A.  I do not.
12      Q.  Do you know who would know the answer to that
13  question?
14      A.  I don't know if anybody would.  Certainly not
15  anybody in our office.
16      Q.  Do you know if Ann McGeehan would know the
17  answer to that question?
18      A.  She might.  I don't know.
19      Q.  Do you know if Elizabeth Winn would know the
20  answer to that question?
21      A.  She might.  I don't know.
22          MS. WESTFALL:  Can you mark this, please.
23          (Exhibit No. 23 marked)
24      Q.  I'm handing you what's been marked as
25  Exhibit 23.  Can you take a look at this exhibit and let

173

1   me know if you've seen it before?
2        A.  I believe this is the e-mail that was attached
3   to either the request for admission or request for
4   production.
5        Q.  And have you reviewed this in advance of this
6   deposition?
7        A.  No.  I saw it whenever it came with the
8   discovery request.
9        Q.  Do you see that the e-mail was drafted
10  around -- it's a bunch of e-mails from January 27, 2011,
11  to February 1, 2011?
12       A.  I see that.
13       Q.  And it has an analysis of voters -- or an
14  estimate and reporting of the number of registered voters
15  without a driver license or personal ID card?
16       A.  No, I do not agree that that's what it shows.
17       Q.  What does it show, in your view?
18       A.  It shows non-matches.
19       Q.  And do you see there's a summary about the
20  question presented, a discussion, and a conclusion on
21  page TX 00107735?
22       A.  I see that.
23       Q.  And do you see the conclusion is between
24  844,000 plus voters to 678,000 plus voters may not have
25  been issued a driver license or ID by DPS?

174

1        A.  I see that.
2        Q.  And was this -- to your knowledge was this
3   question, discussion, and conclusion drafted by Ann
4   McGeehan?
5        A.  No.
6        Q.  Who was it drafted by?
7        A.  Karen Richards.
8        Q.  And who is Karen Richards?
9        A.  She was the voter registration manager back
10  then.
11       Q.  Do you know whether SB 14 was being considered
12  by the Senate or the House of the Texas Legislature at
13  the time these e-mails were written?
14       A.  I do not.
15       Q.  Do you know whether this analysis was conducted
16  in response to Senator Williams' inquiry?
17       A.  I don't.
18       Q.  Do you know whether this analysis was released
19  outside of the Secretary of State's Office?
20       A.  I do not.  I've seen nothing to indicate that
21  it ever was.
22       Q.  Do you know whether anyone within the Secretary
23  of State's Office directed that it not be released --
24       A.  I don't know.
25       Q.  -- outside the Secretary of State's Office?

175

1        Q.  Do you know where -- is Karen Richards
2   employed with the Secretary of State today?
3        A.  She is not.
4        Q.  Where is she employed?
5        A.  She is, I believe -- last I heard she was
6   employed with VOTEC.
7        Q.  And where is that company based?
8        A.  VOTEC, I believe, has their headquarters in
9   California.  She works here in Austin.
10       Q.  When did she leave the Secretary of State's
11  Office?
12       A.  I'm not sure on her exact leave date, but I
13  believe it was July of 2011.
14       Q.  What were the circumstances of her -- the
15  ending of her employment with the Secretary of State's
16  Office?
17       A.  I don't know.  It was before my time.  From
18  everything I can see, she got a better offer.
19       Q.  Do you know whether the Texas Legislature ever
20  saw this analysis during -- when it was considering
21  SB 14?
22       A.  I don't know for sure, but I've seen nothing to
23  indicate that they did.
24       Q.  Do you know why, in response to
25  Senator Williams' request, this wasn't provided to the

176

1   legislature?
2        A.  I don't.  It is my belief that it's because the
3   data is uncertain and we didn't want to give a wrong
4   impression.
5        Q.  And what is that belief based on?
6        A.  The fact that in subsequent matching exercises
7   we have a pretty high degree of uncertainty.
8        Q.  So Senator Williams' request was not -- there
9   was no response to him?
10       A.  I don't know what response was given to him.
11       Q.  In 2011 did the division receive any other
12  requests for information about voters without a driver
13  license or a personal ID card?
14       A.  I don't know.
15       Q.  And besides the analysis on an e-mail on
16  Exhibit 23, are you aware of any other analyses that the
17  division conducted that relate to SB 14 during 2011
18  before the bill was signed into law in May?
19       A.  I don't -- I don't believe that any other
20  analyses were performed.  I think that these queries that
21  are outlined on page TX 00107734 are the queries that
22  were done.
23       Q.  Do you know why this analysis was not part of
24  the defendants' interrogatory responses in response to
25  requests about analyses that have been done of voters

177

1    without a driver license?
2         A.  I don't know.  That's -- I don't know.
3         Q.  Was any other analysis done by the Secretary of
4    State's Office in 2011 regarding registered or eligible
5    voters without any other forms of ID required by SB 14?
6         A.  Not that I'm aware of.  I don't believe so.
7         Q.  Can you state every single occasion on which
8    the Secretary of State has attempted to match the TEAM
9    database to the DPS driver license database?
10        A.  Well, I don't know if I can give you every
11   time.  I know the ones that I know about.
12        Q.  Okay.
13        A.  And based on what I know, the DPS database
14   hasn't been a constant variable in these matching
15   exercises.
16        Q.  Okay.  Could you describe every occasion that
17   you're aware of?
18        A.  So we've got this that happened early in 2011.
19   I have no idea which version of the DPS database they
20   used for this, and so I don't know.  That's one.  Then we
21   know about September of 2011, and what I don't know is if
22   previous results were given in response to requests from
23   the Department of Justice or if a new analysis was done.
24   I believe that one of these queries was produced, but I
25   don't know that for sure, and it looks like the numbers

178

1    match maybe Query 3, but I don't know.  So I don't know
2    if there was a separate matching exercise done or if they
3    relied on results they'd received earlier in the year.
4    For the January 2012 matching exercise we got a new
5    version of the DPS database that was specifically for
6    that exercise, and it was a version that contained race
7    and ethnicity data as the DPS had it, and so we did that
8    exercise.  That exercise happened in December of 2011
9    before I began with the office in January of '12.  And
10   then the next time we did it was with the DPS database
11   that was provided for the jury wheel constitution, and
12   that was done in 2013.  So those are the ones that I know
13   about.
14        Q.  Those are the sum total that you're aware of?
15        A.  That I'm aware of, yes, ma'am.  And I don't
16   know if September of '11 was a separate matching exercise
17   or a giving of the data from before.
18        Q.  Has the Secretary of State ever provided the
19   TEAM database to anyone other than the Department of
20   Justice for purposes of matching to the DPS driver
21   license office?
22        A.  I don't -- I can't understand that question.
23        Q.  Okay.  Any other -- you described some matching
24   that the Secretary of State's Office has done itself with
25   TEAM and DPS, correct -- the driver license database,

179

1    correct?
2         A.  Right.
3         Q.  And then are you aware that in this litigation
4    the TEAM database has been supplied to the Department of
5    Justice along with the DPS database to conduct matching?
6         A.  Sure.
7         Q.  Are there any other entities or parties that
8    your office has provided the TEAM database to, to conduct
9    matching with the driver license database?
10            MR. KEISTER:  As long as it has nothing to
11   do with the attorney-client privilege.  Don't mention
12   anything about the OAG.
13        A.  We get public information requests for the TEAM
14   database on a regular basis, and I don't know what people
15   are doing with it, so I can't really answer the question.
16   It could be that some people who are getting the TEAM
17   database are trying to do some kind of matching.  I don't
18   know.  I do know that the counties were interested in
19   doing matching on their own, and so they obtained a
20   driver license database from DPS that we facilitated that
21   transaction so that they could match their voter
22   registration data against the DPS, but they already have
23   the TEAM database, so I don't know if that's what you're
24   talking about or not.
25        Q.  I guess putting aside copies of the TEAM

180

1    database or communications that you've had with your
2    counsel, because I don't want you to testify about that,
3    have you supplied the TEAM database to anybody else with
4    the intention of the -- for the purpose of matching
5    against the driver license database?
6         A.  I -- I don't -- I don't know how to answer that
7    question.  I know that the Department of Justice is not
8    the only plaintiff in this litigation or in the previous
9    litigation, and I believe the other plaintiffs also
10   received a copy of the database.  I don't know if they
11   actually were planning to do matching with that or not.
12   I just -- I don't know what the purpose of someone's
13   request is.
14        Q.  So you have not received any other matching
15   results outside of any communications you've had with
16   OAG's office concerning TEAM and the DPS driver license
17   database?
18        A.  No.  Some counties have done some matching, and
19   so they've -- they've communicated some of those results
20   to us.
21        Q.  Which counties?
22        A.  Parker County comes to mind.
23        Q.  So Parker County has matched its county
24   database against the DPS driver license database; is that
25   right?

KEITH INGRAM                                                    4/23/2014

46 (Pages 181 to 184)

---

181

```
 1      A.  That's right.
 2      Q.  And there was a result and they provided it to
 3  you; is that correct?
 4      A.  They did.
 5      Q.  And when did that occur?
 6      A.  I don't know for sure.  I believe it was after
 7  our county election official seminar last year in July of
 8  2013, so maybe August or September of 2013.
 9      Q.  Have any other counties engaged in similar
10  matching?
11      A.  I know that Dallas County has done it.  I've
12  seen news media reports indicating that they've got
13  results that they've acted upon.  And then I know that
14  Harris County has done it.  They haven't reported to us
15  the results, but I know that they've got copies of both
16  of those databases, done some matching, and reached out
17  to voters.  And I know that Travis --
18      Q.  But Dallas -- Dallas and Harris -- I'm sorry --
19  and Travis have not supplied you with the fruits of that
20  matching?
21      A.  That's right.  And I don't know if any other
22  counties have done it.  I just don't know.
23      Q.  Do you know what fields they compared in
24  conducting those matches or do you have any information
25  about how those matches were conducted?
```

---

182

```
 1      A.  I do not.
 2      Q.  I would like to turn to matching between the
 3  Bureau of Vital Statistics and the TEAM database.
 4      A.  Okay.
 5      Q.  Your interrogatory responses indicate that the
 6  vital statistics sends over a list of deceased persons to
 7  the Secretary of State's Office weekly; is that right?
 8      A.  That is correct.
 9      Q.  And what happens with that information?
10      A.  It is -- it automatically goes through a
11  process where matches are made and sent out to the
12  counties.
13      Q.  This is an automatic process that -- that
14  matches the deceased individuals identified by vital
15  statistics with TEAM and then it just sends it out; is
16  that correct?
17      A.  That's right.
18      Q.  And this is conducted centrally in your office?
19      A.  It is since 2007.
20      Q.  Then the individual counties get those results
21  and determine what to do in terms of list maintenance for
22  their own county list; is that correct?
23      A.  Not exactly.  For the strong-matched deceased,
24  they are automatically canceled in TEAM.  For on-line
25  counties that means that the voter is canceled.  For
```

---

183

```
 1  off-line counties it means that there is a task for the
 2  off-line county to perform with regard to that voter, and
 3  the task is a 99 to cancel.
 4      Q.  How many counties are still not on-line for
 5  TEAM?
 6      A.  I think the current number is 215 on-line and
 7  39 off-line.
 8      Q.  When you get a weak match, as referred to in
 9  the -- in the interrogatory responses --
10      A.  Sure.
11      Q.  -- what happens to them?
12      A.  Weak matches are investigated by the counties.
13  There was a little tweak -- I believe it was
14  House Bill 3593 -- that required the counties to do some
15  actual investigative work before they send a letter.  It
16  used to be that counties could claim as their
17  investigation sending a confirmation notice to the
18  potentially deceased voter, but now the law requires them
19  to do an actual investigation before they send a letter.
20  If they can't determine if the voter is deceased or if
21  they can't determine if the voter is alive, then they
22  will send a letter to the voter that says, we've done
23  some matching and it looks like you could be deceased, we
24  hope you're not.
25      Q.  And that's done at the county level?
```

---

184

```
 1      A.  That's all at the county level.
 2      Q.  Does the voter still stay in active status
 3  during all the investigation until the letter goes out?
 4  It's not put in any sort of suspense or inactive status?
 5      A.  Their status doesn't change unless 30 days goes
 6  by without a response to the letter.
 7      Q.  And then if there is no response, they're
 8  presumed to be deceased then?
 9      A.  They're canceled.  16.037 of the Election Code
10  requires immediate reinstatement if someone is wrongfully
11  canceled, so if they show up and they're not actually
12  deceased, then they're immediately reinstated and vote a
13  regular ballot.
14      Q.  They will not appear on the list of registered
15  voters, correct?
16      A.  That's correct.
17      Q.  But if they appear with a proper ID and a voter
18  registration card, what happens then?
19      A.  If they appear with a proper ID -- they don't
20  need the voter registration card unless they're disabled,
21  but if they appear with a proper ID and they say, this is
22  my precinct, then often the poll workers will call the
23  voter registrar and the voter registrar will look them up
24  and will determine if they were canceled for being
25  deceased, and they'll say, but I'm not dead yet, and they
```

---

185

1  will be reinstated.
2      Q.  Turning to your interrogatory responses again,
3  at page 66 -- I believe it's Exhibit 2.  Is a weak match
4  found where there is a match on first name, last name,
5  date of birth alone without also looking at Social
6  Security number when comparing TEAM with the
7  Social Security Administration Death Master File?
8      A.  Yeah, that -- that's a different process.  So
9  the Bureau of Vital Statistics, first name, last name,
10  date of birth is not one of the matching criteria.
11      Q.  Right.  But did I accurately describe what
12  happens with regard to the Social Security Administration
13  Death Master File?
14      A.  Yes.
15      Q.  And the Social Security -- the -- pardon me.
16  The Secretary of State started using the Social Security
17  Administration Death Master File in June 2012; is that
18  right?
19      A.  That is correct.
20      Q.  Was there a reason why the Secretary of State's
21  Office did not use it prior to that time?
22      A.  It was not required to by the legislature.  The
23  legislature passed a bill that ended up being 18.068 of
24  the Election Code that required it.
25      Q.  That was in 2012?

186

1      A.  Yes.  Well, they passed the bill in 2011.
2      Q.  Was there anything that prevented the Secretary
3  of State's Office from using the Death Master File prior
4  to that time?
5      A.  It -- it costs money to have the Death Master
6  File and we didn't have any budget for it, so I don't
7  know if that was the reason.  I didn't -- I wasn't here
8  before 2012, so I don't know what the office's thought
9  was with regard to the Social Security Administration's
10  Death Master File before 2012.
11      Q.  Are you aware of any legal prohibition on using
12  the Death Master File prior to that time?
13      A.  Prohibition?  I don't know of any prohibition.
14      Q.  It just wasn't required; is that your
15  testimony?
16      A.  Right.  And -- and -- yeah, that's right.
17      Q.  Turning to Topic 17, what changes have been
18  made to the TEAM database to implement and enforce
19  SB 14's requirements?
20      A.  The TEAM database has been -- has been updated
21  to accommodate the E for the disability exemption so that
22  that can be coded for a voter.  The other thing that
23  changed was we tightened up the name fields.  So prior to
24  SB 14 there was no category for exact name match versus
25  substantially similar name, it was just find the voter's

187

1  name on the list of registered voters, and so there was
2  no real need to be tight with regard to name fields
3  inside of TEAM.  But with the advent of the substantially
4  similar name requirement versus exact name match some
5  voters might be interested to know how their name is
6  going to appear on the official list of registered
7  voters, and so to have the name appear on the voter
8  registration certificate the way it will appear on the --
9  on what we call the OLRV, then to have it appear on the
10  look-up for Am I Registered the way it'll appear on the
11  OLRV, and then to appear on the OLRV in a uniform way, we
12  tightened up the name rules inside of TEAM.
13      Q.  What do you mean?  Can you just describe --
14  I -- I understand the similar -- similar name rule, but
15  what is the tightening that you're --
16      A.  Well, before --
17      Q.  -- referring to?
18      A.  Before we messed with the name fields inside of
19  TEAM it's possible that a voter could have a voter
20  registration card with one name on it, they could look
21  themselves up on Am I Registered and see a different
22  version of their name, and then they could show up on the
23  official list of registered voters and it would be yet
24  another version of their name.  They were all the same
25  names that they had given to us when they registered to

188

1  vote, but they weren't first, middle, last, former,
2  nickname, suffix, you know, all of the things that are --
3  that are -- so what we did inside of TEAM is make that
4  tight so that first, middle, and last would show up over
5  the mailing address on the voter registration
6  certificate, first, middle, and last would show up if
7  someone looks themselves up on Am I Registered, and
8  first, middle, and last would show up on the official
9  list of registered voters.  So what we did is we made the
10  names consistent so that a voter could look themselves up
11  and have notice beforehand if there's not an exact match
12  to whatever form of ID they want to use.
13      Q.  Did you make any changes to the provisional
14  ballot fields?
15      A.  No.
16      Q.  So if a provisional ballot is rejected does
17  TEAM indicate the reason for rejection?
18      A.  No.
19      Q.  And is it still the case that TEAM only
20  reflects successful applicants for disability exemptions?
21      A.  I believe that's correct, yes, ma'am.
22      Q.  So if you apply and you're rejected, it's not
23  so indicated?
24      A.  Right.  The counties would have that
25  information.

KEITH INGRAM                                        4/23/2014

---

189

1    Q.  Is the Secretary of State's Office doing
2    anything to monitor whether counties are properly
3    administering the disability exemption?
4        A.  What do you mean?
5        Q.  To see whether they're correctly processing
6    applications?
7        A.  Again, what do you mean?
8        Q.  To determine whether the counties are using the
9    proper criteria?
10       A.  No, I understand that question.  What I don't
11   understand is what you would suggest we would do to
12   monitor their success or failure.
13       Q.  Well, are you aware -- are you aware of whether
14   they are successfully implementing it or not?  Is there
15   any oversight whatsoever you can identify today in your
16   deposition?
17       A.  I don't know what form this oversight would
18   take.
19       Q.  So is the answer no?
20       A.  Well, I mean, we respond to questions that the
21   counties ask.  If they have a question about the process,
22   if they have a question about a document they received
23   from a potentially disabled person and what to do with
24   it, then certainly we respond to questions.  And so there
25   is assistance that we give, but that's -- that's our

---

190

1    role.  Secretary of State is not an enforcement agency,
2    it's not an investigative agency, it is a -- it is -- it
3    is technical support for elections in Texas, and in that
4    role we do assist counties with disability exemptions,
5    you bet.
6        Q.  And what is -- I mean, that assistance is the
7    questions?  If a county has a question you will answer
8    it, otherwise you let the counties administer it?
9        A.  And we -- we did the frequently asked questions
10   that included a portion on disability exemption.  As I
11   recall, there were quite a few questions answered that we
12   had received from counties that we figured needed a
13   broader broadcast of answers to those questions.
14       Q.  I believe you testified earlier that voters who
15   do not have appropriate SB 14 are the county's voters.
16   It's the county's responsibility.  Is that a correct
17   summary of your testimony?
18       A.  No.  I don't know what that is.
19       Q.  Well, with regard to registered voters who do
20   not have a qualifying ID, that to the extent EICs are to
21   be offered, it's the responsibility of the counties, it's
22   the responsibility of DPS; is that correct?
23       A.  No, that -- if I gave that impression, then
24   that's not what I meant to convey.  What I mean to convey
25   is that if a county wants to interact with its voters

---

191

1    with regard to -- some sort of supplemental or extra way
2    with regard to voter ID or substantially similar name or
3    whatever, then they can undertake that on the county
4    level.  That is not our responsibility, yes, ma'am.
5        MS. WESTFALL:  Okay.
6        MR. ROSENBERG:  Okay.  Why don't we take a
7    break until 2:00.  Is that good?  And then we'll continue
8    with the other questioning.
9        (Recess from 1:15 p.m. to 2:00 p.m.)
10       EXAMINATION
11   BY MR. BARON:
12       Q.  Good afternoon, Mr. Ingram.  My name is Neil
13   Baron.  I'm one of the lawyers with the Veasey-LULAC
14   group.
15       A.  Howdy.
16       Q.  I'm going to talk to you for a few minutes
17   about substantially similar.
18       A.  Okay.
19       Q.  Before I go into that I wanted to -- I heard
20   you testify earlier today that the Secretary of State's
21   role is to implement the law that's passed by the
22   legislature.  Do you remember talking about that?
23       A.  I do.
24       Q.  And that you don't -- you're not an enforcement
25   agency?

---

192

1        A.  That is true.
2        Q.  And you supply technical assistance to counties
3    that request it?
4        A.  That is true, as well as advisories
5    prophylactic in nature.
6        Q.  So I was looking at your website, and it says
7    that the Secretary of State serves as the chief election
8    officer to assist county election officials to ensure
9    uniform application and interpretation of election laws
10   throughout Texas.  Is that also one of your
11   responsibilities?
12       A.  That is, 31.003 of the Election Code.
13       Q.  Uniformity?
14       A.  Uniformity.
15       Q.  And so --
16       A.  Obtain and maintain uniformity.
17       Q.  Okay.  In the application, operation, and
18   interpretation of the code, right?
19       A.  That's right.
20       Q.  So when we look at substantially similar, your
21   office adopted 81.71, Texas Administrative Code.
22       A.  That's true.
23       Q.  I think back in 2011?
24       A.  The initial version of that rule was adopted in
25   2011.  There was an emergency version that was an

---

KEITH INGRAM                                                    4/23/2014

193

1  amendment thereto that was adopted before the November of
2  2013 election, and subsequently that emergency version,
3  as slightly modified, was finally adopted, I believe, two
4  or three or four weeks ago.
5      Q.  The one I'm looking at here in front of me
6  says:  Amend to be effective April 3, 2014.  Does that
7  sound right to you?
8      A.  That sounds right.
9      Q.  And so looking through this I'm struck by the
10 amount of discretion given to the election worker, and
11 I want to talk to you about that for a few minutes.
12     A.  Sure.
13     Q.  With regard to substantially similar the rule
14 says that if the name does not match exactly, the
15 election worker shall refer to the standards in Section
16 C.  Do you want a copy of this in front of you to look
17 at?
18     A.  I've got one.
19     Q.  I know you do, and it might be helpful.  I
20 promise not to spend too much time parsing words with
21 you, but I do need to go over a few of these things.
22     A.  Sure.
23     Q.  So looking down there, it says a voter's name
24 is considered substantially similar, and then it
25 references those four examples, 1, 2, 3, and 4, right?

194

1      A.  I wouldn't call them examples.  I think there
2  are examples within those categories, but those are four
3  different ways that we feel that names can be
4  substantially similar, yes.
5      Q.  Sure.  But, for example, to repeat myself,
6  number 2 says it's for illustrative purposes only, right?
7      A.  That's right.
8      Q.  And it uses some terminology, for example, on
9  C(1), slightly different.
10     A.  Right.
11     Q.  See that?  On C(2), customary, right?
12     A.  Customary variation, yes, sir.
13     Q.  And so that's kind of in the eyes of the
14 beholder, right?  That's up to the election worker at the
15 time the ID is presented.
16     A.  Right.
17     Q.  Are there any official Secretary of State
18 publications, other than what I'm looking at here in
19 Rule 81.71 and your on-line training, which has some more
20 examples of names, like Lady Bird Johnson and William
21 Clements and Earl C. Campbell -- I mean, I could bring
22 them all out.  Are there any official publications that
23 give the election workers guidance on the definitions of
24 slightly different or customary?
25     A.  I'm not sure what you mean and I don't know

195

1  what you refer to when you're talking about the on-line.
2  We've got -- we've got several different --
3      Q.  The training materials that I've looked at
4  on-line.
5      A.  Right.  And I don't know what you've looked at.
6      Q.  Okay.
7      A.  Have you taken the on-line poll worker training
8  course from start to finish or have you just reviewed a
9  PowerPoint?
10     Q.  I reviewed the PowerPoints.
11     A.  Which PowerPoints?
12     Q.  I'll bring those up.  Let's move on and I'll
13 come back to that, okay?
14     A.  No, no, I'm just -- I'm asking because we've
15 got several different publications and they've changed
16 a little bit over time, but with regard to similar name
17 they've been pretty consistent across -- across
18 publications.
19     Q.  Okay.  Well, let's -- I'll bring that up in a
20 second and we'll come back to it while I keep on working
21 my way through this part of the process.
22         Do you agree that the election worker has
23 total discretion to determine whether the name on the
24 offered ID is not substantially similar to the official
25 list of registered voters?

196

1      A.  I don't know what that means, total discretion.
2      Q.  Okay.  Can --
3      A.  And I don't know what it means when you say
4  election worker.  You're going to have to ask a specific
5  question.
6      Q.  Okay.  I thought that was a specific question.
7  Election worker is defined in Rule 81.71.  Take a look at
8  81.71(b) right there on the first page.
9      A.  Right.
10     Q.  Talks about the reviewing early voting clerk,
11 deputy early voting clerk, election judge, or election
12 clerk collectively included in the term election worker.
13     A.  Sure.
14     Q.  So we can have an agreement today that when
15 I say election worker that's what I'm referring to?
16     A.  Right.  But I don't know what you mean when you
17 say total discretion.  There is a process that happens at
18 a polling place when a voter presents themselves to vote,
19 and in the process of qualifying a voter to vote there is
20 a process that's gone through.  So you would have
21 initially an election clerk checking in a voter.  If an
22 election clerk had a question that they felt like they
23 were unable to resolve or if they resolved the question
24 and the voter was unhappy with that resolution, then they
25 can appeal to the election judge in that polling

197

```
 1    location.  The election judge will then make a decision.
 2    If, for some reason, the voter or -- is not happy or the
 3    judge feels like they can't make a decision, then they
 4    can call the early voting clerk.  So when you say total
 5    discretion, I don't know what that means with regard to
 6    the specific players in the polling place on election day
 7    qualifying the voter.
 8        Q.  All right.  Well, let's go through them one at
 9    a time, then, because your rule collectively calls them
10    election workers.
11        A.  Sure.
12        Q.  So the early voting clerk would be a clerk
13    who's employed during early voting, correct?
14        A.  No.  An early voting clerk is typically the
15    chief election official for the entity holding the
16    election, so if it's a school district election it'll be
17    the school superintendent; if it's a city, then it'll be
18    the city secretary; if it's a county election it'll be
19    the county clerk or the election administrator.  So the
20    early voting clerk changes depending on who's holding the
21    election.
22        Q.  Okay.  Tell me what you define the deputy early
23    voting clerk as.
24        A.  Well, a deputy early voting clerk is somebody
25    that works in the early voting clerk's office, whoever
```

198

```
 1    that is.
 2        Q.  Election judge?
 3        A.  Election judge is the one who has been
 4    appointed either for early voting or for election day by
 5    either -- either the entity holding the election or
 6    political party to be the election judge for a polling
 7    place.
 8        Q.  And election clerk?
 9        A.  Election clerks are people that the election
10    judge picks to staff the polling location with him or
11    her.
12        Q.  So when we go down to C where it talks about
13    when a voter's name is considered substantially similar,
14    it says that election workers should consider whether
15    information on the presented ID document matches elements
16    of the voter's information on the official list of
17    registered voters, correct?
18        A.  That's right.
19        Q.  So election workers would include all of the
20    people that we just talked about in B.
21        A.  That's right.
22        Q.  It would basically include anybody authorized
23    to administer the election at the particular polling
24    location.
25        A.  Yes.
```

199

```
 1        Q.  So when the voter shows up, those people have
 2    the discretion to determine whether the voter's name on
 3    the ID that he offers, the SB 14 ID that he offers or she
 4    offers, is substantially similar to what the Secretary of
 5    State has on your OLRV, your official list of registered
 6    voters.
 7        A.  Yeah.  And really I don't mean to quibble, but
 8    the OLRV is a county document.
 9        Q.  That's okay.  We're here to quibble.  That's
10    okay.
11        A.  It's not a Secretary of State document.
12        Q.  All right.
13        A.  The OLRV is generated by the county and it --
14    in the first instance, the election workers on scene have
15    that discretion.  They can -- if they have a question
16    they can call the early voting clerk and talk to the
17    clerk or one of their staff members, a deputy early
18    voting clerk, and then, obviously, all of this gets
19    reviewed by the voter registrar during the cure period,
20    so the voter registrar then makes a recommendation to the
21    early voting ballot board.  The early voting ballot board
22    is the one who makes the final decision, if someone had
23    to vote provisionally, whether to accept that provisional
24    ballot or not.  So there is discretion in the first
25    instance when a voter presents themselves, and that
```

200

```
 1    discretion we've encouraged them to exercise for the
 2    benefit of the voter, and if that voter is unhappy with
 3    that resolution at the polling location they will have
 4    the opportunity with the voter registrar and the early
 5    voting ballot board to change that outcome.
 6        Q.  So let's talk about the voter registrar.  Skip
 7    on down to Section J, the last portion of the rule where
 8    it says that in determining whether an ID document
 9    presented to the voter registrar -- this is based on a
10    provisional ballot now.
11        A.  Right.
12        Q.  The voter registrar shall utilize the processes
13    outlined in subsections C and D of this section, which
14    takes you right back to where we just were, right?
15        A.  That's right.
16        Q.  So the voter registrar's decision is equally as
17    discretionary as the election worker's --
18        A.  Sure.
19        Q.  -- in terms of whether that individual person
20    thinks the name is substantially similar or not.
21        A.  That's right.
22        Q.  Now, is there an appeal process from a decision
23    of the voter registrar to not count a vote?
24        A.  No.
25        Q.  That's a final decision, correct?
```

KEITH INGRAM                                              4/23/2014

51 (Pages 201 to 204)

201

1     A.  That is not a final decision, it's a
2  recommendation that's made to the early voting ballot
3  board.  The early voting ballot board has the final
4  decision.
5     Q.  Now, we have run a few elections in Texas under
6  this new law.
7     A.  Yes, we have.
8     Q.  The November 2013 constitutional, the
9  March 2014 primary, and a few school board bond election
10  type elections, I think, in, probably, what, September of
11  2013?
12     A.  Yeah, in the November 2013 election on the
13  uniform date there were local elections across the state,
14  so there were city and school district elections as well
15  as the constitutional amendment election, so it was a
16  uniform date available for elections to be held, and
17  quite a few entities across the state took advantage of
18  the availability of that date.  In addition to the
19  uniform election date on the first Tuesday in November of
20  2013 and the March primary we have had several school
21  districts have tax ratification/tax rollback elections
22  that are not required to be held on a uniform date and we
23  might have had a city council special election for a home
24  rule city with four-year terms, and they can have those
25  special elections that aren't on a uniform date according

202

1  to Article 11, Section 11 of the constitution.
2     Q.  And although none of these elections are of the
3  magnitude in terms of volume of voters as the
4  presidential or gubernatorial, it is a fair number of
5  elections, and particularly November and March 2013 and
6  March 2014 took place in every county across the state,
7  correct?
8     A.  That's right.  I can't -- I hesitate because
9  the primary is the party -- the political party primary,
10  and so there's some counties that didn't have a
11  Democratic Primary because there wasn't a party chair to
12  put on election.  There are some counties that didn't
13  have a Republican Primary.  I'm not aware of any county
14  that didn't have both party chairs and didn't have a
15  primary at all, but it could be that there was such a
16  county.  I just -- I don't think there was in 2014.  I
17  know for 2012 primary election that in the runoff
18  Sterling County didn't have a runoff at all because both
19  party chairs quit between the runoff and the primary.
20     Q.  So with the possible exception of a county or
21  two, every county has had an opportunity to administer a
22  couple of elections under this new law.
23     A.  I believe so, yes, sir.
24     Q.  And we agree that part of the SOS' mission is
25  to ensure uniform administration of elections across the

203

1  state, right?
2     A.  That is one of the goals of the office, yes,
3  sir, statutory obligation.
4     Q.  Has there been any analysis conducted by the
5  Secretary of State on the substantially similar
6  combination form that's been used in these elections?
7     A.  I'm not sure I understand what that question
8  means.
9     Q.  Has the Secretary of State gotten copies of
10  these forms from the various counties to take a look at
11  how substantially similar is being implemented?
12     A.  You're talking about the combo form where a
13  voter signs in?
14     Q.  Yes.
15     A.  We have not made a practice of looking at combo
16  forms.  Occasionally we'll get a combo form when someone
17  makes an election law complaint regarding something
18  that's on that form, so --
19     Q.  So the answer to my question is that you
20  haven't, in the Secretary of State's Office anyway, taken
21  a look at any of these combo forms from these elections
22  in 2013 or 2014 since Senate Bill 14 was passed into law.
23     A.  No, we have not made a practice of procuring
24  combo forms from the counties.
25     Q.  What about analyzing provisional ballots; have

204

1  you taken a look at any of those?
2     A.  I don't know if we've seen any, but we
3  certainly haven't made a practice of pulling provisional
4  ballots from counties and looking at them.
5     Q.  What, if anything, have -- has, so that I don't
6  ask you personally, the Secretary of State's Office done
7  to analyze and ensure that the counties and the election
8  workers are implementing Senate Bill 14 uniformly across
9  the state with regard specifically to the substantially
10  similar name issue?
11     A.  I don't know -- it seems like you have a
12  misconception of the Secretary of State's role.  As I --
13  as I said to Ms. Westfall before, we are not an
14  enforcement agency.
15         MR. BARON:  I'm going to object as
16  nonresponsive.
17     A.  Can I answer your question, sir?
18     Q.  If you get around to answering it, that'll be
19  fine.
20     A.  I'm answering your question.
21     Q.  Okay.
22     A.  It comes in a context.  All of this comes in a
23  context, and the context is that our office has a 1-800
24  number available to county election officials and it has
25  a 1-800 number available to voters, and every single

KEITH INGRAM                                                4/23/2014

205

1  voter registration certificate has on it that 1-800
2  number for the voters to use, and we have a feedback
3  loop that is phenomenal from voters and from election
4  officials, and if there is an issue with regard to some
5  portion of the administration of an election we hear
6  about it.  We hear about it quickly.  And so I don't know
7  the best way to tell you this, but if there was an issue
8  with regard to the implementation of the substantially
9  similar name rules we would have heard about it, and we
10 haven't heard about it at all, not from a voter and not
11 from an election official.  There hasn't been any issue
12 raised with our office with regard to substantially
13 similar names, and so it is our belief, our strong
14 belief, that there hasn't been any problem with regard to
15 the implementation of the substantially similar name
16 rules.
17         Now, if we were wrong in that regard and
18 if we were hearing about voters who were being
19 disenfranchised because they were wrongly believed to
20 have their name not be substantially similar, then we
21 would take action in that regard same as we do whenever
22 we hear that a voter doesn't have a provisional ballot
23 offered to them.  If we hear that a voter has not been
24 offered the opportunity to vote provisionally, the voter
25 calls and they're upset, we will immediately call that

206

1  county on election day, during the early voting period,
2  whenever it happens, and we will tell that county, this
3  is the complaint we received from the voter, this is the
4  place where they tried to vote, you need to make sure
5  that those poll workers understand that they need to
6  offer a voter a provisional ballot, they can't make that
7  decision for the voter.  And so that is the way this
8  process works from our perspective.
9       Q.  Have you completed your answer?
10      A.  I think so.
11          MR. BARON:  Okay.  I'm going to object as
12 nonresponsive.
13      Q.  I just want to verify that the Secretary of
14 State's Office has not analyzed any of the combo forms
15 for the substantially similar sign-in sheets/affidavits
16 or the provisional ballots that have been cast in any of
17 the elections held in Texas since the implementation of
18 SB 14.  Correct?
19      A.  And as I said previously, we have not made a
20 practice of pulling combo forms or provisional ballots
21 from the counties with regard to those elections.
22      Q.  And you're relying, I guess, on the lack of
23 phone complaints you receive from I think what you said
24 earlier in your deposition was literally thousands of
25 calls per month?

207

1       A.  That is right.
2       Q.  I believe you get those calls.  Having been a
3  frequent caller to the Secretary of State's Office
4  myself, I have absolutely no reason to doubt that you
5  guys get thousands of calls, but I want to ask you a
6  slightly different question.  Are those logged?
7       A.  No, not generally as a matter of course.
8  However, on election day whenever we -- we put together
9  a phone bank and -- the lawyers and some of the other
10 voter registration people in my office, we put computers
11 and phones in a conference room and we collectively take
12 phone calls in that room all day, and those calls are
13 logged into an access database.  So the election day
14 phone calls are logged.
15      Q.  And are those maintained?
16      A.  Yes.
17      Q.  So those would be available for us?  There
18 would be a log of those types of calls from election day?
19      A.  There should be.
20      Q.  Any other time period?
21      A.  You know, sometimes if we get a phone call from
22 a place, the lawyers, if they don't know the answer right
23 off, will send an e-mail to the other lawyers asking
24 about, you know, I got this phone call, this is the
25 question, what do we -- what do we say back to the

208

1  county, and so we could have an indirect reference to
2  phone calls that way.
3       Q.  Of the thousands of calls you get a month, who
4  categorizes the subject matter of the calls?  I mean,
5  you --
6       A.  The caller does.
7       Q.  Sure.  But at the Secretary of State's Office.
8  I mean, you said they're not about substantially similar
9  name problems, for example.
10      A.  Uh-huh.
11      Q.  Who takes those calls and who categorizes them?
12 How do you know what they're about?
13      A.  Sure.  That's a fair question.  My office is
14 right outside the receptionist area where we have three
15 receptionists whose full-time job is to answer phone
16 calls, so I hear them talking.  In addition, the phone
17 calls that we receive if the frontline receptionist can't
18 answer the question for the voter will go through to
19 either voter registration or electronic funds management
20 or the legal division for resolution, and I meet weekly
21 with my managers for those sections and we talk about
22 what's going on, and one of the things that we talk
23 about -- my -- my administration manager, Louri O'Leary,
24 one of the things that she'll talk about is call volume
25 and the nature of the calls, but we don't keep a record

KEITH INGRAM                                                    4/23/2014

---

209

1    of what calls come in with regard to what.  But
2    whenever -- whenever the voter registration certificates
3    are mass-mailed out, you know, you can hear that a lot of
4    the calls are about the voter registration certificate
5    and, you know, the information that's on it, so that's
6    the questions that the receptionists are answering
7    primarily, and there has never been a time where the
8    topic of the phone calls has been problems with similar
9    name implementation at the polling place.
10           There have been calls and there have been
11   periods where the phone calls have been about,
12   prospectively, I'm going to go vote, I'm afraid I won't
13   be able to because my name doesn't match.  We had a whole
14   bunch of those calls, and so that was before the November
15   of 2013 election, but there hasn't been any calls
16   retrospectively or during the active voting about an
17   issue regarding substantially similar name, and there
18   would have been if there was a problem.  That I can
19   promise you.
20        Q.  The combo forms would tell us whether the
21   election workers are implementing substantially similar
22   name policy correctly, right?
23        A.  I don't know if they would or not.  I don't
24   think so.  I don't know why you think that.
25        Q.  Well, I guess when I went to vote with my ID,

---

210

1    which is Neil G. Baron, and my voter registration was
2    Neil Geoffrey Baron, I had to initial the affidavit.
3        A.  Sure.
4        Q.  So it would seem to me that that would identify
5    the fact that I had a substantially similar name issue
6    that was correctly addressed, because middle initial
7    versus full middle name is one of the specific examples
8    in 81.71, right?
9        A.  That's right.  But that's of no informational
10   value to my office in determining whether there's a
11   problem to correct.  That is -- that is -- that is all
12   the way it's supposed to be.  What would indicate there's
13   a problem to my office that would need to be corrected
14   either with the local officials with regard to their poll
15   worker training or something else would be if people are
16   made to vote provisionally when their name is Neil
17   J. Baron instead of Neil Jefferson Baron.  That's when I
18   would know we had a problem, and that would be of value
19   to determine whether or not additional training would be
20   necessary.
21        Q.  And so the better documents to analyze, from
22   what you're telling me, would be the provisional ballots.
23        A.  If there were provisional ballots where someone
24   had a substantially similar name or what we would
25   consider to be a substantially similar name and they were

---

211

1    made to vote provisionally, that would be of some value
2    in this -- in this regard, yes, sir.
3        Q.  And do you know how many provisional ballots
4    were cast as a result of the March 2014 primary
5    elections?
6        A.  I do not.
7        Q.  Do you reside in Travis or Williamson?
8        A.  Williamson.
9        Q.  Do you have any idea how many were cast in
10   Williamson?
11       A.  For the March primary I haven't asked Jason
12   that question.  I think it was something like 25 for
13   November.  I can text him right now if you want me to.
14       Q.  Well, I think you're familiar with
15   Bill Sargent, right?
16       A.  I am.
17       Q.  My elections administrator?
18       A.  I am familiar with Sarge.
19       Q.  We're going to come back to Sarge in a few
20   minutes.  I think we had 160 in Galveston --
21       A.  Okay.
22       Q.  -- in the primaries, I think 25 in the
23   Democratic Primary and 120 or 130 in the Republican
24   Primary.
25       A.  Total provisional ballots?

---

212

1        Q.  Yes.
2        A.  Okay.
3        Q.  About 160.
4        A.  Yeah, I think I heard 154 for Galveston, but --
5        Q.  I'm probably -- I'm rounding up.  If you were
6    to just extrapolate that statewide you would think there
7    would have been multiple thousands of provisional ballots
8    cast statewide at least.
9        A.  For the primary I believe there were several
10   thousand.  I think there was maybe 3,000 or 4,000 right
11   here in Travis County.  They were not ID related.
12       Q.  And I guess my question there is, if you
13   haven't analyzed them how do you know?
14       A.  Because I can read the news and I can talk to
15   Travis County election officials and I can talk to Sarge.
16       Q.  And so that would be a better source of
17   information than the provisional ballots themselves?
18       A.  No.
19       Q.  So you -- prior to the implementation of
20   Senate Bill 14 you did receive concerns expressed in
21   e-mails and letters -- or the Secretary of State's
22   Office?
23       A.  Sure.
24           (Exhibit No. 24 marked)
25       Q.  I mean, for example, I'm just going to hand you

---

KEITH INGRAM                                                    4/23/2014

213

1    what's been marked as Exhibit 24, which is an
2    October 2011 letter to Ann McGeehan. It's fair to say
3    that this is an example of several types of
4    correspondence that's been received by the Secretary of
5    State's Office from 2011 continuing pretty much into the
6    end of last year, right?
7        A. I agree with that. As a matter of fact, I got
8    some correspondence yesterday similar to this, but it
9    wasn't exactly like this. It was about similar names
10   being inappropriately applied. But yes.
11       Q. Okay. And since we're taking Sarge's name in
12   vain, I'll let you take a look at -- keep that. I'm
13   going to ask you a couple of general questions about
14   these three or four documents I'm going to give you.
15           (Exhibit No. 25 marked)
16       Q. This is the Sarge e-mail and this is an
17   e-mail -- it's several e-mails, but the one at the bottom
18   of the page -- or in the middle of the page from
19   Melanie Huff to Betsy Schonhoff with the last paragraph
20   about Sarge making the classic mistake of ensuring
21   identity.
22           (Exhibit No. 26 marked)
23       Q. Exhibit 26 is another e-mail from Elizabeth
24   Winn to Melanie Huff referencing concerns about giving
25   the election worker what's essentially unfettered

214

1    discretion.
2           So we've got 254 counties in the state,
3    some with hardly anybody living in them and some with
4    multiple millions of people, right?
5        A. That's right.
6        Q. We've got some counties where the tax assessor
7    is also the voter registrar, some counties where the
8    county clerk is the voter registrar, some counties where
9    they've actually, like Galveston, created an elections
10   administration position, right?
11       A. Galveston has not created an election
12   administration position.
13       Q. Well, Sarge is the -- he works for the county
14   clerk, but he is the elections administrator.
15       A. He is the deputy at the clerk's office that
16   deals with elections; however, the tax
17   assessor-collector, Cheryl Johnson, is in charge of voter
18   registration.
19       Q. She is in charge of voter registration, that's
20   correct, but Sarge runs the elections. But I won't get
21   into an argument with you about Galveston County.
22   Throughout the state there are counties that have
23   election administrators.
24       A. Right. And the point of an election
25   administrator is to take the election function and the

215

1    voter registration function out of the two separate
2    county offices and combine them into one office under a
3    person who's actually named an election administrator
4    under Chapter 31 of the code.
5        Q. Fair enough. Regardless, there are at least
6    254 different people running elections in the 254
7    counties in the state of Texas.
8        A. Well, sort of. It depends upon what election
9    we're talking about. You know, if you've got the primary
10   election that we just had, some of those the county runs
11   for the parties, some of those the parties run for
12   themselves, and so you can have a lot more than 254
13   during a primary. You also have elections where, like
14   the November constitutional amendment election, the
15   county can be running a constitutional amendment election
16   at the same time entities are running a separate local
17   entity election. So yeah, I would say at least 254.
18       Q. At least and probably more.
19       A. Right.
20       Q. And quite a few concerns have been regularly
21   raised about this issue with substantially similar.
22       A. I don't -- I don't know what time period you're
23   talking about.
24       Q. Well, the e-mails that I've handed you so far
25   run from -- there's one in August of 2011, one in January

216

1    of 2013, one in October of 2011.
2           (Exhibit No. 27 marked)
3        Q. I actually neglected to hand you the Caroline
4    Geppert e-mail, Exhibit 27, dated October 21, 2013.
5        A. Okay.
6        Q. I think you testified that in advance of these
7    elections there were regular calls from voters concerned
8    about problems they might have with this substantial
9    similarity issue, correct?
10       A. That -- that is exactly correct, and that is my
11   point with regard to nailing down the time frame. Most
12   of these exhibits that you've shown me have to do with
13   before Shelby County even came down, so there hadn't been
14   any communication with the counties other than 81.71
15   about what substantially similar name meant or how to
16   exercise their discretion at the polling place. We
17   hadn't had a county election officials seminar where we
18   did in July of 2013, we hadn't had any PowerPoint
19   presentations, and we hadn't done any poll worker
20   training modifications, and so all of that was very
21   preliminary, very prophylactic. I will say that on my
22   first day, whenever I first joined the Secretary of
23   State's Office, January 5, 2012, I had a meeting with
24   Elizabeth Winn, and Elizabeth Winn was the legal director
25   at the time and she told me, she said, Keith, the problem

217

1  with voter ID is not going to be people not having IDs,
2  the problem with voter ID is going to be substantially
3  similar names.  So substantially similar names was very
4  much on people's minds going into the process.
5  However -- and it became -- it became a factor in the
6  public's mind with some news reports primarily from
7  Judge Watson in Corpus Christi who had raised it with her
8  local news media, so then that's when we started getting
9  e-mails like this one to Caroline worrying about whether
10 or not they were going to have a problem voting.  And I
11 want to emphasize that people are not bashful about
12 contacting our office about issues that they perceive
13 with regard to the election process, and since elections
14 have actually happened there has been no complaints with
15 regard to the implementation of substantially similar
16 name.  It has been a non-factor.  So with regard to how
17 it was going to be, people were very concerned and we had
18 a lot of communication about that.  How it's actually
19 been, not a problem as far as we're concerned or as far
20 as we can tell.
21         Q.  And you're relying totally on the anecdotal
22 information from your fielding of phone calls and not on
23 any data analysis.
24         A.  We haven't done any data analysis from the
25 counties.  However, I have talked to a lot of county

218

1  election officials about their provisional ballots and
2  asking them how it went, what were the issues, what came
3  up.  Substantially similar name has not been an issue.
4  Some of the issues that we've heard from voters with
5  regard to substantially similar name as a result of these
6  two elections are the voters believe -- their -- their
7  belief that the poll workers were making them change
8  their name.  They were still allowed to vote, they just
9  were offered the opportunity to change their name with a
10 name change form and they believed that the poll worker
11 was making them change the name, and they didn't want to
12 change their name on the voter registration, they wanted
13 to change their name on their driver license.  So we've
14 heard some of those kind of complaints, but nobody that
15 was told they couldn't vote or had to vote a provisional
16 ballot because their name didn't match.
17         Q.  Again, all based on anecdotal --
18         A.  Based on a tool that we use --
19         Q.  What tool is that?
20         A.  -- in our office, and this is the feedback that
21 we get.  If there is an issue that we hear three or four
22 or five or ten phone calls on, then we have a pretty good
23 indication that it's more widespread than that and we'll
24 issue an advisory.  That is a very important tool in our
25 arsenal with regard to the implementation of the

219

1  Election Code.  Since we don't have any budget for
2  investigation, we don't have any budget for enforcement,
3  what we can do is listen carefully to our constituents,
4  see if there's a problem that needs to be addressed and
5  to address it.
6         As an example, during early voting for the
7  primary, right in the middle of early voting we got
8  a phone call from a voter who said, I used my new VA card
9  to vote and they wouldn't take it, so that's how we
10 learned that the Veterans Affairs Administration had
11 issued a different form of the card.  We immediately that
12 day sent out an advisory to all the counties, VA's got a
13 new card, this is what it looks like, please put it in
14 your list of acceptable forms of ID.
15         Q.  Fair enough.  We've gone over this several
16 times.  The only documentation on the calls would be the
17 election day logs?
18         A.  No, that's not what I said.
19         Q.  Okay.  Tell me what you said.
20         A.  I said that sometimes we'll generate e-mails
21 about them, especially if there's a pattern of phone
22 calls, I'm getting a lot of phone calls about this,
23 should we issue an advisory.  There'll be e-mails about
24 that.
25         Q.  Okay.  And as far as you know those logs are

220

1  maintained by your office somewhere?
2         A.  The access database for election day?  You bet.
3         Q.  How would we get those?
4         A.  I don't know.  I guess you can make a request.
5         Q.  What type of information is reflected in those
6  logs?
7         A.  It depends on how much information the caller
8  gave us.  Usually we'll have the caller's name or a
9  portion thereof, we'll have the county, we try to get the
10 precinct where they voted, and then the nature of the
11 problem, the complaint, the issue that they raised.
12         Q.  Is that maintained in some kind of Excel
13 spreadsheet or something?
14         A.  Access database.
15         Q.  All right.  Let's talk briefly about the
16 affidavit.  Senate Bill 14 requires a voter who is
17 determined to be substantially similar to still sign an
18 affidavit to confirm that he or she is that person,
19 correct?
20         A.  You're talking about 63.001(c)?
21         Q.  Yeah, the bill itself.
22         A.  Yeah, and it's codified at 63.001(c).
23         Q.  Right.  Yeah, sure.  Let me pull my copy of it
24 out too, get specifically to the language.  I just want
25 to talk about the process that was utilized to create the

KEITH INGRAM                                           4/23/2014

221

1   combination form.
2       A.  Sure.  Yeah, C says that if in making a
3   determination under this subsection an election officer
4   determines under standards adopted by the Secretary of
5   State that the voter's name --
6           THE REPORTER:  Would you slow down.
7       A.  I'm sorry.  I think the reading is boring, so I
8   try to go through it quickly.
9           If in making a determination under this
10  subsection the election officer determines under
11  standards adopted by the Secretary of State that the
12  voter's name on the documentation is substantially
13  similar to, but does not match exactly with, the name on
14  the list, the voter shall be selected for voting under
15  subsection (d) if the voter submits an affidavit stating
16  that the voter is the person on the list of registered
17  voters.
18      Q.  And I think starting in 2011, and probably
19  continuing for a while, various people, including
20  counties, raised concerns about the procedure that was
21  going to be necessary to implement that.
22      A.  Well, I don't know --
23      Q.  The actual signing of an affidavit.
24      A.  Sure.  And I don't know exactly what concerns
25  might have been raised in that regard from counties

222

1   because I arrived in the office on January 5, 2012, and
2   the folks who were here before that aren't here anymore.
3   But I will say that when I arrived the proposed form of
4   the affidavit was a separate piece of paper that was --
5   looked like an affidavit.
6       Q.  Going to be actually notarized.
7       A.  Well, the election judge has the discretion of
8   a district court judge on election day, and so the
9   election judge would be the one that would be actually
10  attesting to all these signatures.  But it would be a
11  very troublesome process to have a separate piece of
12  paper in the election kit that would now have to be used
13  for who knows how many voters, and because of the power
14  of the election judge to witness signatures I asked
15  Elizabeth Winn at the time, why can't we just put this on
16  the combo form; they used to -- before SB 14 they used to
17  have to sign an affidavit that you've lost your
18  certificate if you show up to vote with another form of
19  ID besides your certificate, and that was on the combo
20  form, why can't we do this that way.  And I talked to
21  Steve Rayburn in Tarrant County.  He thought that would
22  be a much better way to handle it, so that is what we
23  started working toward with changing the combo form to
24  add that as a place for the voter to initial.  And
25  Harris County wanted to use their own version of the

223

1   combo form that would allow the voter to check a box, and
2   I didn't feel like that was a sufficient attestation of
3   an affidavit.  I thought that at least initials needed to
4   be given and not a checkmark, so I would not approve
5   Harris County's proposed combo form for a checkmark.
6       Q.  And that was implemented pursuant to the
7   Secretary of State's authority to adopt rules to
8   essentially implement that statute, correct?
9       A.  That's right.
10      Q.  And that's an authority that you have?
11      A.  You bet.
12      Q.  That's part of your mission?
13      A.  That's right.
14      Q.  And so if there were other problems with
15  implementation of this law, you would have the same
16  ability to adopt rules or regulations in order to solve
17  those problems, whatever they might be, correct?
18      A.  Well, it would depend.  I mean, you know, if
19  there's a substantive issue that somebody has, the
20  legislature would have to address that.  So I don't know
21  what you're talking about.  I can't really speak
22  hypothetically.
23      Q.  Well, that's fair.  You had previously
24  testified that your role is to implement the law.
25      A.  That's right.

224

1       Q.  And this is an example of passing a rule to
2   implement a portion of the law.
3       A.  This is an example of prescribing a form to
4   implement a law.
5       Q.  I guess adjusting the technical definition of
6   an affidavit.
7       A.  No, I don't believe we've adjusted the
8   definition of an affidavit at all.  We have prescribed
9   the form of affidavit to take -- that it has to take,
10  yes.
11      Q.  Right.  Initials.
12      A.  That's right.
13      Q.  Versus a check.
14      A.  Versus a check.
15      Q.  Check is no good.  Initials, in your opinion,
16  were okay.
17      A.  Sufficient indication of intent.
18      Q.  Didn't think you needed the whole separate form
19  signed by the voter in front of the elections official?
20      A.  No.
21      Q.  And that was done, again, pursuant to your
22  authority to -- as the chief election officer of the
23  state.
24      A.  That's right.
25      Q.  Okay.  Let me talk to you briefly about the

225

1   OLRV, the official list of registered voters.  You
2   testified a little while ago that that's a county
3   document?
4       A.  That's right.
5       Q.  Generated from the TEAM database?
6       A.  Not for all counties.
7       Q.  How many counties don't access TEAM, don't use
8   TEAM to get their OLRV?
9       A.  I don't know.  Some of the off-line counties --
10  there's 39 off-line counties currently, but some of them
11  actually do generate their OLRV out of TEAM, some
12  generate it out of their proprietary voter registration
13  database, and I don't know which are which.  I don't know
14  if we keep track of that.
15      Q.  Tell me -- it's my understanding that the
16  source of data that the OLRV would need from TEAM was
17  updated, and I think you testified earlier in response to
18  Ms. Westfall's questions about how you adjusted the
19  fields.  Remember that testimony?
20      A.  That we tightened up the name rules inside of
21  TEAM, yes.
22      Q.  So that you could be sure to have former names
23  included in a specific order?  Tell me -- tell me exactly
24  what you did.
25          MR. BARON:  Well, strike that.

226

1       Q.  Just tell me what you did.  We'll take out
2   exactly, okay?
3       A.  Yeah, because technically I have no earthly
4   idea.  The mission that was given to the IT department
5   with regard to TEAM was to make it so that someone's
6   official list of registered voters name would appear over
7   the mailing address on their voter registration
8   certificate, would appear on Am I Registered if they
9   looked themselves up, and would appear on the OLRV in
10  exactly the same way.  So I don't know how the technical
11  people made that happen.  I understand that the name
12  rules inside of TEAM with regard to fields for particular
13  names were not well defined prior to us making it well
14  defined in connection with this process that my voter
15  registration manager and I thought was necessary, and
16  part of our reason for thinking it was necessary is
17  because of input from the counties because they were
18  concerned that voters who wanted to look themselves up
19  would get two or three different answers.
20      Q.  When was that update completed?
21      A.  I don't know.
22      Q.  I saw an e-mail that looked like it was being
23  undertaken in August of last year.  Does that sound about
24  right?
25      A.  It does.  And the reason that we needed to get

227

1   it done was so that voters looking themselves up before
2   the November election would be able to have good
3   information.  We had our county election officials
4   seminar toward the end of July, I believe, and it was
5   after that seminar that we undertook this process.
6       Q.  Since it's been completed has it been tested
7   for accuracy other than through the process of the
8   election?
9       A.  I -- I don't know -- I mean, we test things
10  before we implement them, so --
11      Q.  What did you do?
12      A.  The voter registration team in my office, the
13  voter registration section, Betsy's group, they do all of
14  the assurance testing before -- before a software update
15  is put into production, so that testing would have
16  occurred before it went into production.  Since it's gone
17  into production we have had real world evidence as well.  But
18  yeah, it seems to have done exactly what it was intended
19  to do.
20      Q.  And tell me in your opinion what that was.
21          MR. KEISTER:  Objection.  Are you asking
22  for his personal opinion or the Secretary of State's?
23      Q.  In the context of the Secretary of State's
24  Office what was the intent or the purpose of it?
25      A.  Right.  And the intent is what I just said,

228

1   that our office was of the opinion that a voter needed to
2   have the form of the name that was going to show up on
3   the official list of registered voters match at least one
4   of the names on the voter registration certificate as
5   well as the Am I Registered.  The Am I Registered one is
6   the one that required the tweaking, and it had the
7   corollary benefit of tweaking the voter registration name
8   as well.
9       Q.  All right.  Let me take you -- this is
10  Exhibit 2, and I'm going to take you to page 42, go
11  through a few things with you on this.
12      A.  Sure.
13      Q.  Well, actually, if you look on page 40, I think
14  that's where the question is.  Sorry.  So on page 44, the
15  last paragraph talks about totality of circumstances.
16      A.  Right.
17      Q.  You assisted in answering this question?
18      A.  I did.
19      Q.  Okay.  And so what this answer tells me is that
20  totality of circumstances can only be used to assist the
21  voter in determining that the name is substantially
22  similar; is that correct?
23      A.  That is correct.
24      Q.  Cannot be used to disqualify the voter --
25  quote/unquote, disqualify as being not substantially

KEITH INGRAM                                    4/23/2014

229

1    similar.
2        A.   That's right.
3        Q.   So just as an example, if my name's not -- you
4    know, Neil G. versus Neil Geoffrey -- I'll use the same
5    example I've been using -- and my date of birth doesn't
6    match, the election worker is supposed to ignore that?
7        A.   I don't know what you mean.  If your name
8    matches exactly --
9        Q.   No, we're not talking about -- right.  I
10   understand.  But forget about matching exactly.  We're
11   talking about in the case of a non-exact match, so now
12   we're making a substantially similar determination,
13   right?
14       A.   Right.
15       Q.   If my name doesn't match exactly, then that
16   bounces us to is it substantially similar, correct?
17       A.   Right.
18       Q.   And then the election officer, the election
19   worker, whichever one of these individuals it might be
20   has the ability to look at address, date of birth, some
21   of the other information to assist that official in
22   determining whether the name is substantially similar,
23   correct?
24       A.   Right.  And that's -- that's not exactly the
25   way I would picture the decision tree.  If someone

230

1    doesn't have an exact match and the only difference is
2    there's a middle initial versus a middle name, then they
3    don't need totality of the circumstances.  That -- that's
4    substantially similar.  So totality of the circumstances
5    only comes in when you've got something like Claudia
6    Taylor Johnson versus Lady Bird Johnson.  Then you've
7    got -- then you've got to sort of go outside the name
8    itself to determine whether or not this is the same
9    person.
10            What we've told the counties repeatedly is
11   that the point from our office's perspective of SB 14 is
12   to prevent in-person voter impersonation fraud.  It's a
13   measure to make sure that the person standing in front of
14   you is the person who's on the official list of
15   registered voters.  And so from our perspective, if you
16   can make that determination with the information that
17   you've got in front of you, then give the benefit of the
18   doubt to the voter and let them vote.  It's only if there
19   is no possible way to verify the identity of the voter
20   from the identification provided that they vote
21   provisionally.
22       Q.   But this is what confuses me, because I'm
23   reading the sworn answers and it says if the election
24   worker is trying to determine if a voter's name fits into
25   one or more categories of substantially similar names,

231

1    the election worker should -- doesn't say may, says
2    should use the totality of circumstances method to verify
3    the voter's identity, and then it goes on to talk about
4    the election worker should compare all available
5    information on the list of registered voters and the
6    voter's identification, such as date of birth, address,
7    and other information to assist in making a
8    determination.  That's what it -- that's what these
9    answers say, right?
10       A.   That's right.
11       Q.   So what you're saying here today is that if it
12   obviously fits in one of these categories, like a middle
13   initial or a former name, they shouldn't go with totality
14   of circumstances, they should automatically conclude
15   substantially similar exists.
16       A.   That's right.  That's the way we've taught it
17   to the counties, that's the way it's in the poll worker
18   training, that's the way I've given it in I don't know
19   how many speeches since this implementation has occurred.
20   So if I need to amend this answer so that it makes you
21   feel better, I'm glad to do that.  This is not what we've
22   told the counties.
23       Q.   Okay.  So the answers in these interrogatories
24   are different than what you believe is being disseminated
25   by your office to the counties?

232

1        MR. KEISTER:  Objection, that's
2    mischaracterizing his answer in the interrogatory.
3        MR. BARON:  Well, let me clarify it.  I'm
4    not trying to -- this part, this section that we're
5    talking about right here, this paragraph --
6        MR. KEISTER:  I know, but the following
7    paragraph spells out what Mr. Ingram is trying to
8    explain, and I think it's only fair to allow him to read
9    that whole paragraph.
10       A.   And my point is that I don't believe it's at
11   variance with what we've been telling the counties, and
12   my point is that if you've misunderstood our answer so
13   that it's not clear, then I am perfectly willing to amend
14   this answer to make it more clear so that you understand
15   exactly what we intended.
16       Q.   Well, it's not my understanding that I'm
17   worried about, it's those more than 254 election
18   administrators throughout Texas and the thousands upon
19   thousands of election workers who are trying to implement
20   this statute in a way that it sounds like you are trying
21   to do to ensure that people --
22       A.   Can vote.
23       Q.   -- get to vote.
24       A.   And those election officials haven't read these
25   interrogatory answers.  They've heard our training.

233

```
 1      Q.  So to get back to totality of circumstances,
 2   regardless of when it's used, it's not supposed to be
 3   used, as this answer says, to the detriment of the voter.
 4      A.  That's right.
 5      Q.  Which means that, again, if the election worker
 6   isn't sure whether the name fits into one or more of the
 7   categories of substantially similar names, the election
 8   worker is supposed to look at the other information
 9   that's available.
10      A.  Right, to assist the voter, not to their
11   detriment.
12      Q.  And only to benefit the voter.
13      A.  That's right.
14      Q.  Besides this interrogatory answer, where else
15   is that directive located?
16      A.  It's in all of our training materials, it's in
17   every speech we give, it's -- it is what we say.  It's
18   what we say in our advisories, it's what we say in the
19   FAQ that's an exhibit to this deposition.
20      Q.  Is it in 81.71 somewhere?
21      A.  I don't know.
22      Q.  Part of the reason I ask that is because I --
23   you're familiar with concerns that a number of voters,
24   particularly in Harris and Dallas County, I think for
25   sure, have default dates of birth because they registered
```

234

```
 1   before HAVA.
 2      A.  Sure.
 3      Q.  So there's a fairly large number of people who
 4   are still in the voter database, in the TEAM database,
 5   whose dates of birth are probably not accurate, correct?
 6      A.  Absolutely.  I don't know if it's a lot.  I
 7   know that last I heard there was about 24,000 in Dallas.
 8   And so I don't know, you know, out of a million
 9   registered voters if that's a lot, but there are some,
10   you bet.
11      Q.  Sure.  But we all --
12      A.  We've heard about a situation down in Jim Wells
13   County from the 2012 election where somebody thought
14   there was voter fraud because several voters had, you
15   know, January 1, 1911, as their date of birth, and nobody
16   believed that many --
17      Q.  People would all be born on the same day?
18      A.  Right, and that old voting, and it was just
19   because that's the placeholder that was put in for people
20   who don't have a date of birth in the voter registration
21   database.
22      Q.  And so it's important -- that's another one of
23   those words your lawyer won't like.  But it's important
24   that the totality of circumstances application be
25   understood very clearly, right?
```

235

```
 1      A.  Yes.  And it's -- it's not just the totality of
 2   the circumstances.  You know, we have voters who call us
 3   on election day who say that they weren't allowed to vote
 4   because their address didn't match on the driver license
 5   and the official list of registered voters and their name
 6   is an exact match.  So this is not a situation where it's
 7   just the totality of the circumstances.  Some poll
 8   workers just don't understand that the addresses don't
 9   have to match, and so it's very important that they get
10   that information, and we try every way we can to make
11   sure that poll workers understand that, that the address
12   doesn't have to match.
13      Q.  All right.  Again on totality of circumstances,
14   it also applies to the photographic identification.  I'm
15   just looking at your answers.  After the election workers
16   found the voter on the list of registered voters they
17   still have to compare the voter to the photo, right?
18      A.  It's what 63.001(d) calls verifying the
19   identity of the voter.
20      Q.  Right.  And there they may use the totality of
21   circumstances to assist in verifying the voter's
22   identity?
23      A.  Right.  If the pictures don't look a lot the
24   same, then they can use other information available to
25   them to help the voter.
```

236

```
 1      Q.  And is that the same rule, only to the benefit
 2   of the voter, or in that circumstance can totality of
 3   circumstances be used to the detriment of the voter's
 4   right to vote?
 5      A.  No, it's the same thing.  It's to help the
 6   voter, not to -- not to count against him.
 7      Q.  And is that information also contained in all
 8   of your training materials?
 9      A.  Sure.
10      Q.  A couple of other questions that aren't really
11   on substantially similar.  The 25 mobile EIC units that
12   you talked about this morning?
13      A.  Sure.
14      Q.  Do you know whether any outside groups, True
15   The Vote, King Street Patriots, any of those independent
16   organizations were allowed at the EICs?
17      A.  I don't know what that means.
18      Q.  Were they allowed to be present in the EICs
19   when they were operable?
20      A.  Allowed?
21      Q.  Yes.
22      A.  It was not a closed area.  Anybody was allowed.
23      Q.  Okay.  I think you testified about this as well
24   this morning.  But did the Secretary of State have any
25   specific goal in terms of number of days of advance
```

KEITH INGRAM                                                    4/23/2014

**237**

1  notice for when the EICs would be in place?
2      **A.  As much as we could manage.**
3      Q.  So there was no specific goal, you just did as
4  much as you could?
5      **A.  We tried to put it in as much advance as we**
6  **could so that the county would have the opportunity to**
7  **get information out to the news media and so that our**
8  **media office could put out a press release.  We tried to**
9  **endeavor to have as much advance notice as possible.**
10 **Sometimes it wasn't possible to have much.**
11         MR. BARON:  I'm going to pass the witness
12 for now.
13             EXAMINATION
14 BY MR. BRAZIL:
15     Q.  You want to take a quick break or are you okay?
16     **A.  No, I'm fine.**
17     Q.  All right.  I'm going to jump around to save
18 time.  You've been here a long time, we've all been here
19 a long time.  So if I lose you along the way, just say
20 stop, back up, slow down, okay?
21     **A.  Okay.**
22     Q.  What is your understanding in your position as
23 to the definition of provisional ballot?  How do you
24 understand that in your position as director of
25 elections?

**238**

1      **A.  A provisional ballot is something that a voter**
2  **casts because there's some issue that prevents them from**
3  **casting a regular ballot.**
4      Q.  And in order to cure that vote on the
5  provisional ballot they have to do what?
6      **A.  Well, not all provisional ballots can be cured,**
7  **so I don't know -- if you're talking about specifically**
8  **ID provisional ballots, it depends upon the reason why**
9  **the ID provisional ballot was -- why the voter had to**
10 **vote that way.  So if it's because they didn't have an ID**
11 **at all, then they need to bring an acceptable form of**
12 **photo ID.  If it's because they were expired, then they**
13 **need to renew their form of photo ID.  So I don't know --**
14 **I don't know how to answer that question.**
15     Q.  Which of the categories can be cured in the
16 six-day period?  Let me ask it that way.
17     **A.  Well, it's not a six-day period.**
18     Q.  Okay.
19     **A.  It's until six days after the election, so if**
20 **somebody votes the first day of early voting they've got**
21 **substantially more than six days to cure it.  They've got**
22 **until --**
23     Q.  Let's just assume in a normal election on
24 election day.
25     **A.  Okay.**

**239**

1      Q.  That's six days after that?
2      **A.  That's right.**
3      Q.  Okay.  And in what instances can they cure that
4  provisional ballot in those six days?
5      **A.  If the reason for the provisional ballot was**
6  **some form of failure to present an acceptable form of**
7  **identification, that's a curable thing.**
8      Q.  And they would have to bring the same type of
9  photo ID within that six-day period that they would on
10 election day, is that correct, to cure that.
11     **A.  I'm not sure I understand that question.**
12     Q.  Well, let me ask it this way.  Is there
13 anything different they need to bring within that six-day
14 period?
15     **A.  I still don't know if I understand the**
16 **question.  Let me try.  If --**
17     Q.  Tell me how they cure.  Let me make it simple.
18     **A.  Right.  It depends upon what the problem was,**
19 **but if the problem was that their picture was completely**
20 **different because they've had some sort of transgender**
21 **operation, they can bring a doctor note and say, this is**
22 **the reason my picture didn't match.  We've got the things**
23 **that they can do to cure in 81.71.  So if -- if it was a**
24 **name issue, they can present a marriage license to show**
25 **that their name has changed.  Hopefully that won't happen**

**240**

1  because that should be a substantially similar name.  But
2  they can also -- if they've changed their name from,
3  let's say, Keith Ingram to Squirrel Period, then they can
4  show the court order changing their name to
5  Squirrel Period and they'll be allowed to vote.  They can
6  bring a letter from a doctor saying that they're
7  undergoing transgender operations.  They can also -- if
8  they don't have any of these and they don't have -- and
9  they haven't renewed their driver license or whatever,
10 they can sign an affidavit at the voter registrar's
11 office that says they're the same person on the official
12 list of registered voters.
13     Q.  And who is the person that has the authority to
14 make that determination within that six-day period?
15     **A.  The voter --**
16     Q.  Is it only the voter registrar or is there
17 someone else?
18     **A.  Well, the voter registrar is the one that the**
19 **voter will interact with during the six-day period, the**
20 **voter registrar or one of their employees in the office,**
21 **so it could be a deputy voter registrar, and then the**
22 **early voting ballot board will make the final decision on**
23 **the ballot.**
24     Q.  Will they get a recommendation from the
25 registrar?

241

1    A.  They will.
2    Q.  And then they will make the ultimate decision
3  on whether or not to count that vote?
4    A.  That's right.
5    Q.  Now, is there any -- and you may have answered
6  this.  Is there any analysis or any procedure for the
7  Secretary of State's Office after an election to gather
8  in a central location information from all the 254
9  counties on the individual problems with provisional
10  ballots or the provisional ballots themselves?
11    A.  No.
12    Q.  So just so that I'm clear, there's no database
13  that the Secretary of State's Office has or generates
14  after an election to say, okay, we had this many
15  provisional ballots statewide because of A, B, C?
16    A.  No.
17    Q.  Has there ever been a suggestion that the
18  Secretary of State's Office do that type of tracking or
19  recording of provisional ballots?
20    A.  I don't know.  You know, there's a -- there's
21  a bit of an issue with that sort of thing because of
22  secrecy of the ballot.  In some counties there aren't
23  very many provisional ballots and the counties -- you
24  know, we -- we give them the opportunity to list
25  provisional ballots accepted in their voter history

242

1  report that's required by the legislature, and some of
2  them don't do it that way, they'll do it as a regular
3  election day vote or an early vote because they don't
4  want -- there's only one or two ballots and they don't
5  want to compromise the secrecy of the ballot.  So I don't
6  know if anybody has ever suggested that the Secretary of
7  State gather this information regarding provisional
8  ballots after an election, but if they did I can imagine
9  a situation where some counties, especially smaller
10  counties, would express concerns with that and would want
11  to make sure that there were adequate protections in
12  place regarding the voters and the secrecy of their
13  ballot.  There is a thing that happens at the end of
14  every even-numbered year called the Election Assistance
15  Commission Survey, and the federal voting assistance
16  program also does a survey -- this year they're going to
17  be combined for the first time -- and a lot of the
18  questions with regard to provisional ballots are included
19  in that survey.  So there is general information
20  regarding provisional ballots that were done during early
21  voting, that were done on election day and that were
22  rejected and that were accepted.  There is a database
23  with regard to globally, but that's only in even-numbered
24  years and it's only at the end of the year with the EAC
25  survey.

243

1    Q.  So the next time that information would exist
2  would be at the end of '14?
3    A.  Right.  And the EAC will probably have it from
4  us -- I don't know -- by February or early March of 2015.
5    Q.  And what under SB 14 is the reporting
6  requirements for the county with regard to provisional
7  ballots?  Is there any reporting requirement?
8    A.  No, not that I'm aware of.
9    Q.  So there's no aspect of SB 14 where the county
10  has to, after a general election or after any election,
11  report to the Secretary of State provisional ballots or
12  problems with provisional ballots?
13    A.  That's right.
14    Q.  Now, the affidavits that can be completed, for
15  example, a natural disaster affidavit, I think there's
16  one for a religious objection to having your photograph
17  taken, how are those handled?  Are those handled on
18  election day by the election officials or are they
19  handled as a provisional ballot after the election?
20    A.  That's part of the cure process for a
21  provisional ballot based on ID.
22    Q.  And same question with regard to those
23  affidavits.  Is there any compilation by the Secretary of
24  State's Office or any analyzation of that or any database
25  created as a result of those?

244

1    A.  No.
2    Q.  So you could not tell us in your position how
3  many people filed an affidavit, for example, with a
4  religious objection?
5    A.  That's right.  Not unless I ask all the
6  counties.
7    Q.  I'm sorry?
8    A.  Not unless I ask all the counties.
9    Q.  Now, just so that I'll understand a couple of
10  the databases -- for example, the DPS has a database that
11  you spoke of earlier, correct?
12    A.  Yes.
13    Q.  And is there a separate CHL database as well?
14    A.  I don't know.
15    Q.  Do you know whether or not the DPS database
16  includes the CHLs?  And you know what I mean by CHL,
17  right?
18    A.  Sure, concealed handgun license.  But what I
19  don't know is if DPS has a database with those combined.
20  We don't have access to a database with those combined.
21    Q.  Okay.  And the TEAM is a database of what?
22    A.  Registered voters.
23    Q.  That is maintained by the Secretary of State?
24    A.  That's right.
25    Q.  Are there any other databases that we haven't

KEITH INGRAM                                                    4/23/2014

245

1   spoke of?  We've got TEAM, we've got DPS, maybe CHL.  Is
2   there any other database maintained by any other state
3   agency that we haven't spoken about?
4       A.  I'm sure there are lots of databases from lots
5   of state agencies.  I don't know what --
6       Q.  For registered voters.
7       A.  Okay.  We have -- we have maintained within our
8   system a list of all of the deceased persons from the
9   Bureau of Vital Statistics, so it's not directly
10  registered voters, but it is the complete list, and so
11  when somebody registers to vote their application is
12  checked against deceased persons.  So we have that
13  database that people are checked against.
14      Q.  And what was the database that these on-line
15  counties can access that you spoke of earlier?  You said
16  almost all but 20 or 30 of the counties were on-line.
17  What did you mean by that?
18      A.  That means that they interface with TEAM in
19  realtime, so if they add a voter to TEAM it's added right
20  then.  If an off-line county were to add a voter as a
21  registered voter it will be batch processed overnight,
22  and so that voter will show up in TEAM the next day.
23      Q.  Is there any other database that's available to
24  the counties from any source, whether it be DPS or
25  Secretary of State or a third-party vendor, that counties

246

1   could utilize in updating their voter registration rolls
2   or anything of that sort?
3       A.  I don't know.  You know, I don't know what they
4   could use.  I've heard that some use public data for list
5   maintenance purposes, especially with regard to
6   investigating weak matches that we send the counties.
7   There's a possibility that counties could subscribe to
8   national change of address.  I don't know if any of them
9   do.  So I don't know if there's something out there that
10  they could use.
11      Q.  Is there any database maintained by the
12  Secretary of State's Office or DPS that charges the
13  individual counties for usage?  Is there a charge to the
14  counties to access TEAM or any of the databases the
15  Secretary of State's Office may have?
16      A.  TEAM itself, since 2007, since it's been in
17  place, has not charged the counties either off-line or
18  on-line.  We do have statutory authority under Chapter 18
19  of the Election Code to make contracts with the counties
20  for their participation in electronic voter registration
21  database.  We haven't used that authority since TEAM has
22  been in place because it's been well funded by the
23  federal government under HAVA, so there may come a time
24  in the future whenever we'll have to change that policy.
25      Q.  But as of today, no?

247

1       A.  Well, previously under -- under TVRS -- before
2   TEAM, the Texas Voter Registration System, TVRS, was the
3   electronic version that wasn't HAVA compliant, but it
4   existed before HAVA -- counties were charged a
5   participation fee.
6       Q.  You mentioned VOTEC earlier.  What is that
7   entity, VOTEC?
8       A.  I don't know what all they do.  One of the
9   things that I do know they do is they provide voter
10  registration services to some off-line counties in Texas.
11      Q.  What exactly services, if you know, do they
12  offer?
13      A.  I don't -- I don't know what's on their menu of
14  options, but they do voter registration and election
15  management for those -- for those counties, and I don't
16  know if there's a sliding scale of different options that
17  they could elect to have or not.  I just -- I don't know.
18      Q.  Do you know how -- do they interface at all
19  with the Secretary of State's Office?
20      A.  Sure, every night.
21      Q.  So they have access to TEAM as well?
22      A.  They do.  And every off-line county vendor or
23  every vendor that wants to provide voter registration
24  services to counties off of TEAM has to be certified by
25  the Secretary of State, and our certification process is

248

1   to ensure that we get accurate data from them whenever
2   they submit data to us, so we put them through some
3   tests.
4       Q.  So the county would provide that information to
5   a company like VOTEC and then they would provide that to
6   the Secretary of State's Office?
7       A.  Well, I don't know if they --
8       Q.  What information were you referring to?  Let me
9   ask that question.
10      A.  Well, anything that happens with regard to a
11  person who registers to vote.  So from the application
12  getting entered into the system as an application, that
13  will then come to TEAM.  TEAM overnight will do a live
14  check process to make sure that this voter has correctly
15  identified themselves, and then that information will be
16  passed back to the county the next night, so then if
17  anything ever happens with regard to that voter, if they
18  move or change their name or if their voter registration
19  certificate bounces from their address, they'll be put in
20  suspense.  So any activity with regard to that voter
21  happens at the local level on the voter registration
22  system of the off-line vendor.  That's the direct
23  interface that the VR office will have in that county,
24  and that information will then be transmitted to TEAM in
25  a batch process overnight.

KEITH INGRAM                                                    4/23/2014

249

1          Now, if we get a deceased voter or a felon
2   or some sort of notification with regard to one of the
3   off-line county voters, then that will be sent to the
4   county overnight as a task for them to work, so they'll
5   have to work their task list and make sure their task
6   list is kept current.  If a county -- an off-line county
7   doesn't interface with TEAM regularly, if they skip
8   several nights, then we -- we will chop off, cut off
9   access to their Chapter 19 voter registration money until
10  they submit a batch process.  So we have a mechanism for
11  making sure that the counties stay regular in their
12  interface with TEAM.
13         Q.  Would it be only the off-line counties that
14  would utilize an outside vendor or can they use both TEAM
15  and an outside vendor?
16         A.  I can't think of a situation -- I mean, there
17  are all kinds of vendors in the election world.  So they
18  could have a poll book vendor on TEAM.  They could
19  have some sort of -- I don't know -- list maintenance,
20  letter generating.  They could have all kinds of vendors
21  that would use TEAM's information, so I don't know
22  exactly how to answer that question.
23         Q.  Let me go to a different area now.  Has there
24  ever been an instance where the Secretary of State would
25  send to the individual voters -- you talked about this

250

1   700,000 or 800,000 people that may or may not have a
2   photo ID.  Ever an occasion where the Secretary of
3   State's Office itself would send out a letter to those
4   potential voters or is that left up to the individual
5   counties?
6          A.  Well, as I mentioned to Ms. Westfall, every
7   single registered voter in the state gets a card every
8   two years, and for the last two cycles of that process on
9   the card has been a list of identification requirements
10  necessary to vote.
11         Q.  I'm talking about just those that you have
12  found through your matching, the Secretary of State's
13  Office found through their matching that may not have the
14  correct ID.  Did they get a separate letter?
15         A.  They did not get a separate letter from the
16  Secretary of State's Office.  I don't know if they
17  received one from their county or not.
18         Q.  Was that list sent to the individual counties
19  so they could make that determination?
20         A.  The counties that asked for it, yes.
21         Q.  And would those -- would it be automatically
22  available to those that are on-line?
23         A.  No.
24         Q.  That would be a separate list or a separate
25  request would have to be made by the counties?

251

1          A.  Sure.
2          Q.  How would the individual counties know the
3   Secretary of State's Office had this list of 700,000 or
4   800,000 registered voters who may or may not have correct
5   ID?
6          A.  I don't know how anybody knows anything.
7   That's -- that's a hard question to answer.
8          Q.  Well, I see e-mail blasts that may go out to
9   the county -- county election officials from your office,
10  from the Secretary of State's Office.  Was that ever done
11  to say, okay, we have this match, we have eight or --
12  700,000 or 800,000 registered voters who may not have the
13  correct ID, if you would like those in your county
14  request it?
15         A.  I don't think we ever sent a mass e-mail on
16  that.  We -- we do talk about it regularly with counties
17  and they talk amongst themselves.  The Texas Association
18  of Counties has a list serve, and so a lot of the things
19  that one county's doing with regard to a process they
20  share with each other on their list serve.  And so I
21  don't know if we've ever sent an e-mail out on that
22  particular point, but we have talked about it at our
23  seminars and I'm sure they've talked about it amongst
24  themselves.  And there are some counties who've received
25  the DPS database themselves and done the matching

252

1   themselves.  So it's up to the county how they want to do
2   that.
3          Q.  So a county could take their registered voter
4   database and match it with DPS --
5          A.  Sure.
6          Q.  -- if they wanted to?
7          A.  They can.
8          Q.  The seminars that you have spoken of during
9   your deposition, are those where county officials can log
10  on on-line?  How is that conducted?  How would somebody
11  in Harris County or Galveston County know that you're
12  going to conduct a seminar, for example?
13         A.  Well, it's an annual event and it's a live
14  event that we have here in Austin, and so the seminars --
15  the official election law seminars, we will have one
16  every year for county election officials, we will have
17  one every year for city, school, and other political
18  subdivisions, and we'll have one every other year for
19  political county chairs, county party chairs.  So those
20  are -- those are set, and it is a -- it is a much
21  anticipated event when we post the dates of those
22  seminars.
23         Q.  And that's a live seminar?
24         A.  That's a live seminar.
25         Q.  Do you ever do a Skype type seminar for county

KEITH INGRAM                                                4/23/2014

253

1   election officials?
2        A.  We do.  We've had -- we've had -- our voter
3   registration section has done webinars monthly.  They
4   have drafted what they call mini manuals with regard to
5   the topic that's going to be presented at next month's
6   webinar, post that mini manual to the TEAM communication
7   web page so that counties who want to participate in the
8   webinar that month can read the materials ahead of time
9   and be prepared for the webinar, and we've had those
10  monthly for, I want to say -- if it's not all of 2013,
11  it's almost all of 2013.  And we have them every month,
12  so there's a topic every month, and it's not just voter
13  registration.  Now we've started branching out into some
14  election related webinars, specifically the legal team
15  was involved in one for volunteer deputy registrars.  So
16  yeah, webinars are a tool in our arsenal.
17       The other thing that we do is regional
18  county election officials have meetings -- some of them
19  do it monthly, some of them do it bimonthly, some of them
20  do it quarterly -- and they will have us to come speak
21  on a topic and we will do that.  The other thing is the
22  election administrators in Texas have their own
23  association, and they get together once a year, usually
24  in January, and they invite us to speak at their meeting
25  as well.

254

1        Q.  These webinars, are they recorded where someone
2   could log on a few days later and watch the webinar
3   again?
4        A.  Not by us.
5        Q.  This matching that you spoke of earlier today,
6   the 700,000 or 800,000 registered voters who may lack
7   some form of identification, is that broken down by race
8   or geographic location?  How specific is that list
9   category-wise?
10       A.  Texas does not keep any racial information or
11  ethnicity information with regard to voters, so there's
12  no indicator anywhere in our database about anybody's
13  race.  It is categorized by -- there's -- like I told
14  Ms. Westfall, there's actually two separate lists;
15  there's one that has the county and the ZIP codes within
16  that county and the number of non-matches by ZIP code and
17  then there's one that has that information plus the
18  voter's name and address.
19       Q.  Was any survey or focus group or follow-up
20  specifically done by the Secretary of State's Office
21  after, for example, the November 2013 election?  You know
22  what I mean by that?
23       A.  No.
24       Q.  I mean, just to determine how the election went
25  forward, what the problems were.  I mean, did you do

255

1   anything specifically -- rather than receive complaints,
2   did you do anything affirmatively to determine how things
3   could be done better or how they could be more efficient
4   by doing focus groups or just randomly calling election
5   officials, anything of that sort?
6        A.  So you're talking about voters, surveying
7   voters?
8        Q.  No, I'm talking about the election officials,
9   surveying how things went in the November 2013 election,
10  how we could improve what we're doing, what problems you
11  had.  Was there any survey or follow-up or focus group
12  done by the Secretary of State's Office?
13       A.  I wouldn't say that there was a survey or a
14  focus group.  We do talk.  We talk all the time, and
15  obviously that's a question on our minds, how did it go,
16  what needs to be improved, what was -- what was -- what
17  needs some tweaking.  So that -- that conversation occurs
18  all the time.  It -- it occurs in person.  You know, we
19  had a Conference of Urban Counties meeting and I went to
20  it, and that was the hot topic, how did -- how did voter
21  ID go for the November election.  And so all of the folks
22  there I talked to one-on-one.  So yes, this -- this is --
23  there's not any official formal process, but like I was
24  explaining, there is a very real and active feedback
25  loop.

256

1        Q.  But just so I'll understand your answer,
2   there's no official follow-up or survey that's completed
3   by your office?
4        A.  There's not any formal process for gathering
5   information in a systematic way.  There is very much a
6   very real and very alive feedback loop that is constant.
7        Q.  Has there been any -- has there been any
8   investigation -- and maybe that's not the right word --
9   or review by the Secretary of State's Office into things
10  like same -- same day voter registration or putting --
11  you know, making the DPS office, you know, a place where
12  you can register to vote, get your ID, all of that?
13       A.  The legislature introduces bills, you know,
14  every other year, and I believe that on-line voter
15  registration has been a bill that's been introduced, and
16  as such it's a bill that we would have analyzed and we
17  would have done a fiscal note, so --
18       Q.  You would have done a what?
19       A.  Fiscal note, how much will it cost the state if
20  we implement same day voter registration.  So if that's
21  what you mean by analysis of same day voter registration,
22  we've done that.  With regard to the DPS being an ID and
23  voter registration shop, that's what they do now under
24  the 1993 National Voter Registration Act.
25       Q.  The analysis for the same day voter

KEITH INGRAM                                              4/23/2014

257

1  registration, where would we find that in the document
2  production?  Would that be on-line or do you know?
3     A.  Yeah, that would be -- I don't know where stuff
4  goes related to a legislative session, but that would be
5  associated with whatever particular bill had same day
6  voter registration in it, and the legislature would keep
7  those records in the Legislative Reference Library or --
8  I don't know where fiscal notes go after a session.
9     Q.  But the fiscal analysis would have come from
10 your office in that regard?
11    A.  Part of it probably.
12    Q.  Has there been any request by your office for
13 a fiscal analysis of, say, waiving all the fees for
14 indigent voters?
15    A.  I don't understand that question.
16    Q.  I don't know how to rephrase it.  There's been
17 some talk about waiving all of the fees for individuals
18 who cannot afford to get, for example, a birth
19 certificate or a driver license.  Has your office ever
20 been asked to provide an analysis of the cost of doing
21 that, waiving those fees?
22    A.  No.  Whenever the Health and Human Services
23 issued their rule amendment saying that a birth
24 certificate for election identification certificate
25 purposes could be purchased for the statutory minimum fee

258

1  of $2 or $3, whatever it is, we did hear from a lot of
2  county clerks who believed that a source of revenue was
3  being cut from them, but we did not do any analysis of
4  how much that was.
5     Q.  So there were some complaints about the loss of
6  revenue, but your office did not analyze how much that
7  would be?
8     A.  No, sir.
9     Q.  Is there any other aspect of Senate Bill 14 or
10 one of the amendments where your office was asked to
11 perform some type of fiscal -- fiscal analysis that you
12 can think of?
13    A.  I can't think of any.  There -- you know, I
14 don't want to -- there was talk in the 2011 82nd
15 Legislative Session about voter education with regard to
16 ID requirements and there was a specific -- I don't know
17 what mechanism the legislature used, but they designated
18 $2 million of the Help American Vote Act money for that
19 purpose, so there was that bit of fiscal piece to SB 14.
20    Q.  Somebody else is going to cover that area with
21 you in a few minutes.
22    A.  Okay.
23    Q.  But as far as the budget from the Secretary of
24 State's Office for educational purposes for SB 14, was
25 that from your budget, meaning the Secretary of State's

259

1  budget, or was it all from HAVA?
2     A.  Well, we do things all the time to educate
3  counties that are within our budget.  I believe the HAVA
4  designated money was specifically for a paid media public
5  relations campaign in addition to what we do within our
6  budget.  So it's both, to answer your question.
7     Q.  But the HAVA money was specifically -- has to
8  be specifically used for a specific purpose, as I
9  understand that bill.  Is that correct?
10    A.  That's right.
11    Q.  Okay.  Has there been any analysis or has
12 anyone in the Secretary of State's Office analyzed
13 provisional ballots from, let's say, the general election
14 in 2008, general election in 2012, the November 2013
15 election?  Has anybody analyzed whether provisional
16 ballots are going up or going down, anything of that
17 sort?
18    A.  No, other than the EAC survey that I mentioned
19 before so you can compare the data across even-numbered
20 years.  The EAC survey pertains to the general election
21 in those even-numbered years.
22    Q.  Other than the forms we have seen that have
23 been produced by your office, has there ever been a form
24 that was sent to the election officials as part of a
25 potential survey just for Secretary of State's feedback

260

1  purposes, like tell us how we're doing, tell us what the
2  problems are, anything of that sort?
3     A.  Well, currently we're doing our annual survey,
4  customer satisfaction survey, so that's at the bottom of
5  all of our outgoing e-mails now.
6     Q.  Okay.  And how often does that occur?
7     A.  It occurs one month every year.  And it's for
8  all Secretary of State customers, not just elections
9  division.
10    Q.  Have there been any complaints from the
11 counties that they do not have enough staff to handle
12 some of the aspects of SB 14?
13    A.  No.  No, the -- the -- the concerns that have
14 been expressed have been with regard to a fear of
15 increased on -- increase on provisional voters, so we've
16 heard from some voter registrars who were concerned about
17 a potential increase in workload, but all of that was
18 before actual elections had taken place.  We haven't
19 heard anything to that effect since the elections have
20 actually occurred.
21    Q.  Have any of the counties asked for extra
22 funding because of some aspect of SB 14, to your
23 knowledge?
24    A.  I don't know.  They would have asked their
25 county commissioners for funding, so I -- I just don't --

KEITH INGRAM                                                4/23/2014

66 (Pages 261 to 264)

261

1   I haven't heard about it.
2       Q.   Would it ever come to the attention of the
3   Secretary of State's Office through the county
4   commissioners court or anybody that they needed extra
5   funding or would it go to the legislature or some
6   other --
7       A.   Right.  If -- if there was some sort of thing
8   that counties felt like they needed money for they'd go
9   to the legislature for it.
10      Q.   They wouldn't come to your office and there's
11  no mechanism for them doing that under SB 14?
12      A.   That's right.
13      Q.   The training of the election officials or the
14  election judges or clerks, is that required by the
15  Secretary of State's Office?
16      A.   Well, it depends.  All election poll workers
17  have to undergo training with regard to photo ID
18  requirements.  County election officials are required to
19  train poll workers for county official election
20  elections.  Primaries there's not a requirement for
21  general poll worker training and for any local entity
22  election there's not a requirement for poll worker
23  training.  However, to the extent that the local entities
24  have an election run by the county, the county will offer
25  poll worker training, and like I said, all poll workers

262

1   have to be trained with regard to photo ID requirements,
2   for primary, for local elections, for county elections
3   that -- that they're running for local entities.
4       Q.   And how is that monitored by your office or is
5   it?
6       A.   It's not.
7       Q.   So they just -- you just make sure that the
8   counties know they're supposed to train the poll workers,
9   but there's no way for you to know if they actually do
10  that?
11      A.   That's right.  And for -- we have to inform the
12  political party chairs, and we did that at our seminar in
13  October of 2013, of their responsibility to train their
14  poll workers with regard to photo ID requirements.  So
15  that is part of SB 14.
16      Q.   Who in your office, whether it be a division
17  head or someone underneath you, was in charge of
18  implementing the educational requirements to the public
19  or the advertising to the public of the new requirements
20  of SB 14?
21      A.   The paid media piece and the Secretary of
22  State's election official visits would have been
23  coordinated with our communications director,
24  Alicia Pierce.
25      Q.   Would she be the best person to address how the

263

1   funds were spent, how much was utilized on media, print,
2   et cetera?
3       A.   I'm ready to talk about that today.
4       Q.   Okay.  I think that's somebody else's area.
5   I don't want to step on anybody's toes and I don't want
6   to re-plow --
7       A.   I mean, and if there's a specific answer that
8   I can't answer, then probably she would be best, but --
9       Q.   Okay.  Did your office do any research before
10  the first election under SB 14 that came from other
11  states?  Did you do any outreach to other states who may
12  have had a similar bill and had an election under that
13  type of bill to get feedback before you came up with your
14  forms, before you did the training, anything of that
15  sort?
16      A.   I am a member of the National Association of
17  State Election Directors, and yes, I have talked to
18  secretaries of state as well as election directors in
19  other states about their implementation of photo ID, what
20  they found that worked, what they found that didn't work,
21  you know, issues they ran into and how they overcame
22  them.  Yeah, we've definitely had those kind of
23  conversations, not anything systematic or official.
24      Q.   Not any exchange of letters or documents,
25  anything of that sort, all oral?

264

1       A.   I don't know if I've received any documents.
2   I'm pretty sure that Tennessee sent me some examples of
3   their public communications.  I don't know if it was
4   links back to their website or what, but definitely I got
5   some information from Tennessee.
6       Q.   Any other states that you can recall?
7       A.   I've talked to Marcy over in South Carolina.
8   She's the state election director.  I've talked to the
9   election officials in Alabama.  They don't usually come
10  to our meetings, but I've -- I've talked to them and then
11  I've talked to Mark Goins and Tre Hargett in Tennessee.
12  I also talked to Trent -- I can't think of his last name.
13  He's the democratic elections director for Indiana -- and
14  Brad King, the Republican in -- in Indiana.  I've talked
15  to both of them.  Trent Deckard.
16      Q.   Did any of those other states or individuals
17  provide you with any information that you utilized or
18  relied upon?
19      A.   I can't think of anything in writing.  I did
20  get a letter that Indiana received from the Election
21  Assistance Commission about using HAVA money for
22  education purposes.
23      Q.   And who in your office is responsible for
24  requesting HAVA money?
25      A.   The HAVA money was -- was sent pretty much as

265

1    a one-time payment, so we've had the HAVA money in the
2    comptroller's accounts since whenever it arrived.
3        Q.  Was it there after you took your position or
4    was it there before?
5        A.  It was given to us by the federal government
6    before I arrived.
7        Q.  That amount of 3 -- 2 million?  3 million?
8    I don't remember.
9        A.  No, the total amount of 203.7 million.
10       Q.  But designated for the educational or the
11   advertising portion was how much?
12       A.  I don't know.  We've got -- we've got a state
13   plan for usage of the HAVA money that we had to submit to
14   the Election Assistance Commission before they would
15   release the money, and so there -- there is an Election
16   Improvement Fund that would have contained education as
17   one of the strategies within that fund, and I don't know
18   how much was originally put into that strategy, but there
19   are variances within each element of the state plan, so
20   it can be a range of dollars that can be spent, and we
21   are well within our state plan range.
22           MR. BRAZIL:  Thank you.  I'll pass the
23   witness.
24           MR. BARON:  I've got a few quick
25   follow-ups.

266

1              FURTHER EXAMINATION
2    BY MR. BARON:
3        Q.  When I was talking to you earlier we talked
4    about the training materials and the PowerPoints, so I
5    went on-line finally and tracked them down.  I see two
6    here, and one is the Intro to Photo ID that's dated
7    February 6th of 2014.
8        A.  Okay.
9        Q.  Are you familiar -- I mean, I'll show it to
10   you.  I mean, they're a little hard to print out, but you
11   can scroll up to the top of it.  That one's dated
12   February 6th of 2014.
13       A.  Okay.
14       Q.  And so there's just two slides there I wanted
15   to ask you about.  Slide 6 --
16       A.  I don't know what speech this was in regard to
17       Q.  That's fine.  They're on your website.  I'm not
18   trying to play gotcha here.  I'm just going to ask you
19   a few questions.
20           MR. BARON:  Hey, if they turn out to be
21   gotcha answers I'll be surprised.  But, you know, this
22   guy's a pretty good witness, so he'll have an
23   enough, I'm sure.
24       A.  Right.  Slide 6.  I've got it.
25       Q.  Okay.  So that one says:  Secretary of State

267

1    will help counties contact potentially impacted voters,
2    right?
3        A.  That's right.
4        Q.  What are you talking about there?  Is that
5    substantially similar or is that the general
6    informational program that you talked about?
7        A.  It's -- it's -- it's all of that, yes, and it's
8    people who need IDs, where they can get IDs.  So part of
9    our help to the counties is to have our statewide
10   education program and our election visits from the
11   Secretary of State so that we can get earned media as
12   well as paid media, and so we -- we made a commitment to
13   the counties to consistently direct voters to
14   VoteTexas.Gov and Am I Registered because voters need to
15   look themselves up to make sure their names will match
16   and change it if they want to.  So that's -- that's our
17   commitment here.  And we also -- when we say contact us
18   if you need more information, that's where we would have
19   talked about, you know, if you need information with
20   regard to voters in your county who don't match with an
21   ID, then we've got -- we've got a list from last summer.
22       Q.  But in terms of funding, that doesn't refer to
23   any assistance with funding?
24       A.  No, it doesn't refer to any assistance with
25   funding.

268

1        Q.  Counties are on their own in terms of costs?
2        A.  Right.  Now, it -- it -- if -- they have
3    available to them state money under Chapter 19 to assist
4    with voter registration, and so conceivably they could
5    have some sort of voter registration campaign with regard
6    to checking your names and stuff and they could ask for
7    a Chapter 19 reimbursement, and we would, of course,
8    evaluate those claims.
9        Q.  Go to Slide 17, Totality of Circumstances.
10       A.  Uh-huh.
11       Q.  And you see that, right?
12       A.  Sure.
13       Q.  And we talked about totality of circumstances.
14   And all it says there is to remember to compare all info.
15       A.  Right.
16       Q.  Doesn't include -- and you can look through the
17   whole thing.  I mean, I have.  It doesn't include that
18   discussion about only using the information to the
19   benefit and not to the detriment of the voter; is that
20   correct?
21       A.  Right.  The slide doesn't, but the speech
22   behind the slide sure does --
23       Q.  Fair enough.
24       A.  -- every time it's given.
25       Q.  Okay.

269

1   **A.  And I've given the speech a lot of times.**
2       Q.  I'm not arguing with you, I'm just going with
3   what's --
4       **A.  You want to hear it?**
5       Q.  I'm sure before this case is over we'll
6   probably get to, but --
7       **A.  Absolutely.**
8       Q.  And I'm going to go to one more -- one more
9   presentation real quick.
10          MR. KEISTER:  Counsel, is there some way
11  to identify that for the record?
12          MR. BARON:  Yes, this is the -- the
13  PowerPoint, and it's titled Intro to Photo ID, and it's
14  dated February 6, 2014, and it is contained on the Texas
15  Secretary of State website under the annual seminar
16  presentation files.
17          MR. KEISTER:  Okay.  Thank you.
18          MR. BARON:  And they're hard to print out.
19  You have to do some fancy thing about saving them and all
20  that.
21      **A.  And that's why I think that February 6th date**
22  **is not correct.**
23      Q.  And I'm not arguing with you, but -- okay.  The
24  other one I want to talk to you about very briefly is the
25  one that's titled How to Handle Substantially Similar

270

1   Names, and that's actually dated August 12th of 2013.
2   And I also want to go to the -- you can look at the whole
3   thing if you want.  I mean, I think this is where you
4   have the totality of circumstances with the Lady Bird
5   Johnson example on Slide 10, and then on Slide 11 again
6   it says to use the info to assist in the determination
7   without making it clear that the totality of
8   circumstances analysis is only supposed to be used to the
9   benefit of the voter, not to the detriment of the voter,
10  correct?
11      **A.  Sure.  It doesn't say it on the slide, but we**
12  **definitely say it in the speech.**
13      Q.  A few quick questions.  Were -- one more
14  question on the counties.  Were counties given lists of
15  no-match voters for free or did they have to pay for
16  that?
17      **A.  No, no, if they wanted it we'd give it to them.**
18      Q.  But only if they requested it?
19      **A.  Sure.**
20      Q.  Okay.  Talking about curing -- I think you were
21  testifying about that a little bit earlier.
22      **A.  Uh-huh.**
23      Q.  Can voters, in the totality of circumstances
24  analysis, show other non-SB 14 identification to assist
25  in the totality of circumstances analysis, in your

271

1   opinion?
2       **A.  At the polling place?**
3       Q.  Yes, sir.
4       **A.  No.**
5       Q.  Okay.  What about -- so they can't do that to
6   show that the name should be considered substantially
7   similar?
8       **A.  No.**
9       Q.  Okay.  And --
10      **A.  Not at the polling place.**
11      Q.  Not at the polling --
12      **A.  That's a matter for the voter registrar during**
13  **the cure period.**
14      Q.  Only during the cure period?
15      **A.  That's right.**
16      Q.  So during the cure period your position is,
17  I could show up with whatever, my utility bill, some --
18  some additional documentation?
19      **A.  No.  You could show up with a marriage license,**
20  **court order, letter from a physician, or you can make an**
21  **affidavit.**
22      Q.  Okay.  Those four things that are listed in the
23  statute and those things only.  Okay.  Has the Secretary
24  of State, to your knowledge, done any searches for
25  information on any of the individual plaintiffs in this

272

1   case?
2       **A.  I don't know.**
3       Q.  Okay.
4       **A.  I mean -- I don't know.**
5       Q.  Has the Secretary of State requested any
6   information searches from any other state agencies on any
7   of the individual plaintiffs in this case?
8       **A.  We have not.**
9       Q.  On the mobile units -- this is my last
10  question.  You talked about no fingerprinting equipment
11  on those mobile units, right?
12      **A.  That's right.**
13      Q.  Is there anything else that's not on those
14  mobile units that the DPS uses that issue EICs at
15  DPS locations that you can think of?
16      **A.  I don't want you to be under the impression**
17  **that they collect IDs for EICs at DPS locations.**
18      Q.  Well, if I'm --
19      **A.  So if you're under that impression I'm not**
20  **going to -- I'm not going to agree with that assumption**
21  **in light of that question.**
22      Q.  I'm -- I'm confused then.  What I'm saying is,
23  is there any equipment --
24          MR. BARON:  Strike it.  I'll rephrase it
25  and maybe fix the problem.

KEITH INGRAM                                          4/23/2014

273

```
 1      Q.  Is there any other equipment not on the mobile
 2  units that DPS uses in the EIC process at the DPS
 3  offices?
 4      A.  Not that I'm aware of.
 5          MR. BARON:  Okay.  Thank you.
 6          MR. ROSENBERG:  Want to take a break?
 7          MR. KEISTER:  I'm ready to.
 8          (Recess from 3:49 p.m. to 4:03 p.m.)
 9              EXAMINATION
10  BY MR. AGRAHARKAR:
11      Q.  Good afternoon, Mr. Ingram.  My name is
12  Vishal Agraharkar and I represent Texas NAACP and MALC,
13  and I'll be asking you a few more questions today.
14      A.  Okay.
15      Q.  At any time between January 1, 2011, to the
16  present has the Secretary of State analyzed or estimated
17  the total number of registered voters who are either
18  Anglo, African-American, Latino, or other?
19      A.  What was the date range?
20      Q.  January 1, 2011 to the present.
21      A.  There was a matching exercise that the
22  Department of Justice made us undergo, and I sent the
23  letter to them with the results of that exercise, I
24  believe January 12th or so of 2012, and every month we do
25  a report of the number of Hispanic surname voters by
```

274

```
 1  household and by county.
 2      Q.  Okay.  And the first matching exercise that you
 3  mentioned, was that just with respect to Hispanic
 4  surnames or what was the -- what was the match?
 5      A.  The request by the Department of Justice in the
 6  administrative preclearance process was to match with the
 7  DPS data that contained race and ethnicity because the
 8  previous matching that we had done was with our in-house
 9  database and it did not contain any race or ethnicity
10  information.  And so we did a separate matching process
11  with a more complete, in that regard, database from the
12  Department of Public Safety, and it carried with its
13  own set of problems that I outlined in my letter to the
14  Department of Justice about those results.
15      Q.  Okay.  And has the Secretary of State during
16  that time done anything else to attempt to determine the
17  racial demographics of registered voters?
18      A.  No, sir.
19      Q.  Okay.  Is a suspended driver license acceptable
20  for voting?
21      A.  I don't know.  I don't know how a poll worker
22  would know that a driver license is suspended.  So if you
23  show up with a driver license and it's not expired you
24  can use it to vote.  If it's suspended by the Department
25  of Public Safety, there's no way for a poll worker to
```

275

```
 1  know that.
 2      Q.  But if a voter came to the polls and said, my
 3  driver license is suspended, there is currently -- is
 4  your testimony that there is no rule or guidance as to
 5  whether or not that is acceptable ID for voting?
 6      A.  That would be an acceptable form of ID.
 7      Q.  That is an acceptable form of ID?
 8      A.  If it's not expired more than 60 days.
 9      Q.  And has that been clearly communicated to
10  election officials in trainings or to voters in any other
11  way?
12      A.  We have not discussed suspended driver's
13  licenses at all because a suspended driver license is not
14  something that a poll worker would have knowledge of.
15      Q.  Okay.  So it is possible, then, that voters,
16  poll workers, and other election officials may believe
17  that a suspended license is not a valid ID for voting?
18          MR. KEISTER:  Objection, calls for
19  speculation.
20      A.  I don't know if they would believe that or not.
21  It's not a category that has come up or would come up.
22      Q.  Have you in your public education or other
23  advertisements used the phrase current ID to describe the
24  types of driver's licenses that are acceptable for
25  voting?
```

276

```
 1      A.  I don't know if we've said current ID.  What we
 2  say is an ID that is not expired or is not expired more
 3  than 60 days before the date it's presented.
 4      Q.  Okay.  And assuming that you use the phrase
 5  current at times, is -- do you see room for confusion as
 6  to whether a suspended driver license would meet that
 7  definition?
 8      A.  I don't know if a suspended driver license
 9  would be current or not.  That's -- that's not the
10  phraseology the statute uses and that's not the
11  phraseology that we use in our training.
12          (Exhibit Nos. 28 through 30 marked)
13      Q.  Okay.  I'd like to show you these marked
14  documents, Exhibit 28, Exhibit 29, and Exhibit 30.
15          MR. AGRAHARKAR:  I'm afraid I don't have
16  many copies of them.
17          MR. ROSENBERG:  Why don't you just
18  identify them for the record.
19          MR. AGRAHARKAR:  Exhibit 28 is titled,
20  Fall 2013 Campaign $400,000 (all non-HAVA money); Exhibit
21  29 is titled, 2014 Voter Education Campaign Phase 1 -
22  about $400,000 (HAVA); and Exhibit 30 is titled, 2014
23  Voter Education Campaign Phase II - about $1.6 million
24  (HAVA).
25      Q.  Mr. Ingram, do you know what these documents
```

277

1    are?
2         A.   Yes.
3         Q.   What are they?
4         A.   They are summary sheets that the director of
5    communications prepared for me to prepare for this
6    deposition.
7         Q.   Okay.  So when were they produced?  I'm sorry.
8    When were they produced to us?
9         A.   Today.
10        Q.   Today.  And are there other documents with
11   respect to the Voter Education Campaign that have not yet
12   been produced to the plaintiffs?
13             MR. KEISTER:  Objection, vague.
14        Q.   Are there -- well, you may answer if you -- if
15   you understand the question.
16        A.   I don't know -- I don't know what's been
17   produced and what hasn't been produced.
18        Q.   Have you --
19        A.   These didn't exist until late last week, and so
20   they couldn't have been produced.
21        Q.   Okay.  And who made this?
22        A.   Alicia Pierce, our communications director for
23   the Secretary of State's Office.
24        Q.   Okay.  And is that true for Exhibit 28,
25   Exhibit 29, and Exhibit 30?

278

1         A.   Yes, sir.
2         Q.   And just looking at Exhibit 28, does this
3    include all of the components of a -- of a voter
4    education plan for 2013?
5         A.   Not exactly.  This would -- this has the -- the
6    paid media visit extra effort kind of stuff.  There are
7    other things that we do in our office for the counties as
8    well as for the national voter registration agencies
9    under Chapter 20 of the Election Code that are not
10   included on this that would have been public outreach.
11   So this is the media component of the public outreach
12   that our director of communications would have directly
13   oversaw.  There is also an ongoing sort of voter
14   education effort within the election division that we
15   participate in with the counties and the national voter
16   registration agencies.
17        Q.   So this is just the media component, but
18   there's a separate education component; is that -- is
19   that right?
20        A.   Right.  There's -- the education of the public
21   has, I would say, sort of two main ways that we do it.
22   We do it on an ongoing basis through the counties and
23   through our partners in voter registration as well as
24   with the public and our -- our VoteTexas.Gov website.
25   And so there's those kind of ongoing things that are not

279

1    of special extra money paid media campaign or effort, and
2    those are very real and they're very much a part of the
3    education of the public with regard to photo ID, and
4    this -- these summary sheets talk about the other piece
5    of it, which is the special event paid media, earned
6    media campaign with regard to voter education.
7         Q.   Okay.  And I'm just trying to get some clarity
8    with respect to the components of the education campaign
9    that are not listed on here for 2013.
10        A.   Sure.
11        Q.   You said that there was some education with
12   counties and then there is a website.  Is -- what did you
13   mean by the education with the county officials?
14        A.   Well, the county election officials are very,
15   very important in our relations with the public.  You
16   know, we have to have the county election officials -- we
17   have to teach them what's new and how it's going to be
18   different and what's going to be required on the part of
19   their voters, and then they turn around and educate their
20   local communities.  These local election administrator
21   folks, county clerks, tax assessor-collectors, and EAs
22   usually have very good working relations with their local
23   media.  Their local media usually is very happy to do a
24   story, you know, about what it -- a public information
25   kind of story about voting and what's different and

280

1    what's coming up, so this is -- this is a good
2    opportunity for them to provide that information.  So our
3    first line of defense is for our elections division to
4    interface with the county election officials so that they
5    are prepared.  We -- we -- we do -- I don't know what you
6    call it.  Collateral, I think, is the official media
7    relations term for handouts, posters, stuff like that for
8    the counties to use, and we give that to them from our
9    graphics department.
10        Q.   Okay.  And that is separate from what is listed
11   on here, which -- under the headings Paid Media, Earned
12   Media, and Web Social Media?
13        A.   That's correct.
14        Q.   Okay.  And then you mentioned the website,
15   which you said is also separate from this.  Are there any
16   other components of your voter education campaign?
17        A.   Sure.  We -- we also have partner agencies
18   under Chapter 20 in the National Voter Registration Act
19   that assist with voter registration, and they have -- in
20   their offices where benefit recipients go to interface
21   with them about benefits they have posters from the
22   Secretary of State's Office, so we make sure that the
23   information on those posters is current, and we actually
24   produce the posters in English and Spanish for those NVRA
25   agency offices.

KEITH INGRAM                                                    4/23/2014

281

```
 1      Q.  Okay.  And are those posters the same posters
 2   that -- and bear with me.  I haven't had much time to
 3   review this.  But are there -- I believe there are
 4   posters mentioned on here or print items.  Are those the
 5   same posters that are mentioned on here or are those just
 6   specific to the partner agencies?
 7      A.  Those are -- those are separate from anything
 8   on here.  Anything on here is something the secretary
 9   would use in her personal visits to counties.  What I'm
10   talking about are posters that we produce in-house -- we
11   do the graphics for them as well as the printing -- and
12   distribute to counties and to benefit agencies.
13      Q.  Okay.  And other than the routine
14   communications with the counties that you mentioned, the
15   website, and these partner agency collaborations, are
16   there any other components that you'd say to the
17   education campaign?
18      A.  Well, you know, as I mentioned before, the mass
19   mail-out of voter registration certificates occurs at the
20   end of every odd-numbered year, and we communicate
21   information on those as well specifically with regard to
22   photo ID.  The mass mail-out in 2011 didn't actually
23   occur until April of 2012 because of redistricting, and
24   so that delayed card, anyway, when it was mailed it had
25   on the back of it a conditional, if cleared by the
```

282

```
 1   federal government this is what you'll be -- you'll need
 2   to bring to vote, and it had the list of forms of photo
 3   identification.
 4      Q.  Okay.  Are there -- have there been any
 5   documents created that list everything that the Secretary
 6   of State does with respect to photo ID education in
 7   particular?
 8      A.  I don't think that any such document has been
 9   created, no, sir.
10      Q.  Okay.  Let me mark one more document here as
11   31.
12          (Exhibit No. 31 marked)
13      Q.  And if you could just take a look at this, and
14   let me know when you've had a chance.
15      A.  (Reviewing document)
16      Q.  Do you recognize this document?
17      A.  I don't believe I've ever seen this document,
18   but I can tell you what it is.
19      Q.  Okay.  What is it?
20      A.  It is -- I don't know if it's all or if it's
21   part of the paid media summary of the campaign prior to
22   the November 2013 election from our vendor TKO.
23      Q.  Okay.  And is this -- so was TKO responsible
24   for each of these components, radio, cable, and print
25   newspaper ads?
```

283

```
 1      A.  Yes, in collaboration with our communications
 2   department, but we -- I don't know how you -- we hire a
 3   vendor with certain expertise so that they -- and we rely
 4   on that expertise.
 5      Q.  Okay.  And is this -- based on your
 6   understanding, is this the entirety of the paid media
 7   campaign?  Do you think -- or I'll let you respond.
 8      A.  I don't know if it's all of it or not.  It says
 9   it's a wrap-up.  It doesn't give an indication that
10   there's more than one page, but I -- I don't know.
11      Q.  Do you know if there was a wrap-up document
12   that contained all of the paid media campaign?
13      A.  I am not aware if a document other than this
14   one exists or not.
15      Q.  Does the vendor develop documents that contain
16   wrap-ups separately from the Secretary of State's
17   documents that they send to you?
18      A.  Yes.  I think that's what this is.
19      Q.  Okay.  And if there was such a document would
20   that have already been produced?
21      A.  Yes.
22      Q.  Assuming this is the entirety of the wrap-up,
23   then, of the paid media campaign, I'd like to direct your
24   attention to the first table, which is entitled, Radio
25   Flights.
```

284

```
 1      A.  Yes, sir.
 2      Q.  Is this -- assuming this is the entirety of the
 3   radio flights, would this include both English and
 4   Spanish -- English and Spanish components of your radio
 5   campaign?
 6      A.  See, I just don't -- I just don't know.
 7      Q.  Okay.  Well, do you see the column marked -- or
 8   titled, Market?
 9      A.  Yes.
10      Q.  Is that a list of all of the markets where
11   there were radio advertisements?
12      A.  I don't know.  I know that they rely on the
13   Texas State Network for statewide stuff, and you can see
14   that most of the impressions are off of Texas State
15   Network.
16      Q.  Okay.  And what is an impression?
17      A.  An impression is an opportunity for an audience
18   member to hear the spot.
19      Q.  Okay.  And so you said it's an opportunity.  It
20   is not -- is not actually a measure of how many people
21   have actually seen the ad?  Is that right?
22      A.  That's right.
23      Q.  So, for example, if someone -- let's say under
24   the cable TV flights, if someone had one of these
25   channels, they subscribed to one of these channels, would
```

285

1  that count as an impression?
2      A. Not exactly. They somehow do some magic with
3  the ratings for whenever the spot runs to determine how
4  many people had the opportunity to see the spot. So in
5  other words, it's not just how many people have access to
6  the channel, it's how many people were -- the ratings
7  show were actually on the channel.
8      Q. Okay. And is there -- there may be duplication
9  among some of these impressions? Some people might count
10 as being one of the impressions under the radio as well
11 as under cable; is that right?
12     A. Well, I don't know -- I don't know if that's --
13 if that's true or not. I would imagine that you could
14 have somebody who would have an opportunity to hear one
15 or more of these radio spots would also have an
16 opportunity to see one or more of these TV spots, yes.
17     Q. Right. And even within the radio flights, I
18 mean, someone may be in one of the city markets, but they
19 might also be counted within the statewide market; is
20 that right?
21     A. Certainly they could have been listening to the
22 spots when they played locally as well as on the state
23 network.
24     Q. Okay. So there's no -- the figure of
25 impressions doesn't -- it doesn't count for that

286

1  duplication?
2      A. The figure of impressions is a -- is a term of
3  art used in media campaigns to -- to measure how many --
4  how far-reaching the ad campaign was. So it's not
5  designed to be correlated directly with audience members
6  that specifically heard it or saw it, it's designed to
7  show how far-reaching the media campaign was, and so
8  there's not any way to do a one-for-one comparison of
9  actual views of the ads unless you do surveys, and as
10 part of our media campaigns we actually have the vendors
11 do audience surveys as well.
12     Q. Okay. And did -- what were all the surveys
13 that were done to determine where the paid media should
14 be placed?
15     A. I don't know how they make those
16 determinations. Again, we hire vendors with certain
17 expertise and we rely on that expertise to -- to do the
18 placements.
19     Q. Do you work with them to develop the criteria
20 that would go into determining a proper placement of
21 advertisements?
22     A. We -- you know, I can speak more particularly
23 of the 2014 campaign because I was part of the RFO
24 process. We put out in the request for proposal
25 parameters that we would like for a vendor to be able to

287

1  fill, and one of the parameters is market penetration and
2  specific target markets. And there was an emergency
3  procurement in the fall campaign, so the emergency
4  procurement didn't go through the full RFP process, and
5  so I don't know exactly what was communicated to TKO with
6  regard to what they needed to emphasize. I do know that
7  Alicia worked closely with TKO with regard to the
8  schedule for where things would be placed. And, of
9  course, the budget was all of our Secretary of State
10 money, so it had to be used judiciously.
11     Q. And would Alicia be the best person to speak to
12 about the details of the paid media campaign plan?
13     A. Alicia dealt with it directly. However, I'm
14 happy to answer any questions that you've got on it.
15     Q. Okay. And one question would be, how were
16 these specific markets chosen?
17     A. TKO's expertise.
18     Q. And so the Secretary of State didn't --
19     A. With the assistance and guidance of the
20 Secretary of State and what they wanted to emphasize to
21 get the most bang for our limited bucks.
22     Q. Okay. And what did you want to emphasize?
23     A. Number of impressions.
24     Q. The number of impressions. And what are the
25 types of places where you would get more impressions?

288

1      A. Places with lots of people.
2      Q. Places with lots of people. And those would
3  probably be the larger markets; is that right?
4      A. Larger markets and statewide, yes, sir.
5      Q. Okay. So was there any research done to
6  determine whether the largest markets where you wanted to
7  target your paid media campaign were also the places
8  where there happened to be more people who needed
9  education on the law?
10     A. I don't know how to determine who needs
11 education on the law. We figure with a -- with a
12 complete change -- or a significant change like photo ID
13 requirements that the widest possible market needs to
14 know about it since it's going to affect all voters and
15 all voters haven't previously known about it.
16     Q. Okay. And of the -- of the, I think, 19
17 different radio campaigns that are listed, as you look at
18 this list are -- are you familiar with the cities listed
19 here?
20     A. Sure.
21     Q. Okay. Are any of them, let's say, south of
22 Houston?
23     A. I don't know. I don't think Beaumont is south
24 of Houston. It's probably level with it.
25     Q. Okay. Well, are any of them in, let's say,

KEITH INGRAM                                                          4/23/2014

289

1    Corpus Christi or further south of that?
2        A.  Well, the statewide spots for the Texas State
3    Network are -- are statewide, so yes.
4        Q.  Okay.  And the statewide network -- if you look
5    under the column marked Station, is that just -- is there
6    just one station listed there?
7        A.  The Texas State Network feeds programming to
8    stations all over the state.
9        Q.  Okay.  So do you have a sense of how many radio
10   stations is incorporated in the Texas statewide network?
11       A.  No, but I know that their -- their people who
12   purchase their programming are rural and smaller market
13   stations.
14       Q.  Okay.  And how many counties did this get to --
15   did this reach, I think is -- was the terminology used.
16       A.  I don't know.  As far as I know every county
17   was reached.
18       Q.  Okay.  And --
19       A.  Had -- had impressions in every county.
20       Q.  So if one county had -- how many impressions
21   does it take -- or how do you define reach?  Would one
22   impression, would that constitute being that a county was
23   reached, if it received one impression?
24       A.  I don't know.  You know, the -- when it comes
25   to paid media, the more money you spend and the more

290

1    repetition you get, the more impressions you get, the
2    more likely that you've actually penetrated the
3    consciousness of a person or two or 15 or 30.  So we
4    didn't have very much money.  This is money that we
5    assembled together inside of our agency, because Help
6    America Vote Act money for voter education can't be used
7    for non-federal voter campaigns, so if we were going to
8    have a campaign at all for the constitutional amendment
9    and local election on the uniform date in November of
10   2013, then we needed to come up with money from other
11   agency strategies, and then what we did with that money
12   that we came up with was put it inside of HAVA as a state
13   match and then spent the money as state money, but using
14   the HAVA strategy.  And so that limitation meant that we
15   had to maximize the reach of the program and not the
16   depth.  So, you know, to the extent that the quibble is
17   with the depth of the program and whether or not it
18   actually impacted particular voters in particular
19   counties, we did the best we could with the money that we
20   had, and our goal was to -- was to maximize the reach,
21   not the depth, for the fall 2013 campaign.
22       Q.  Okay.  And so was any research done after the
23   fall 2013 campaign to determine -- to determine the
24   effectiveness of the paid media campaign?
25       A.  Yes.

291

1        Q.  And what was that research?  Did it just
2    measure the number of impressions?
3        A.  No, no, it -- there was a full-blown survey
4    performed by Burson Marstoller in connection with the
5    spring 2014 campaign, and the research was -- you know,
6    it was a general opinion survey done with regular opinion
7    survey methods and metrics testing whether or not voters
8    had heard of the Secretary of State's fall campaign,
9    testing whether or not voters were familiar with the
10   forms of ID, testing whether or not they had deficiencies
11   in their level of knowledge with regard to any of this.
12   And so the goal of that survey was to make sure that the
13   education program -- the paid media education program for
14   2014 addressed any deficiencies that remained after the
15   fall 2013 campaign, and the Burson Marstoller survey had
16   very high levels of familiarity with the requirement of
17   having a photo ID, with the -- with the ability to get a
18   free election identification certificate if needed.  It
19   was -- it was really a very -- from our perspective, the
20   earned media, the paid media, the -- the complete news
21   effort that occurred in 2013 had its intended results in
22   that most voters across the state in all demographics
23   were familiar with the need to have a photo ID and how to
24   get one if they didn't have one.
25       Q.  Did you give this survey to your attorney in

292

1    response to the request for production?
2        A.  I don't know if that's a proprietary document
3    of Burson Marstoller or not.
4        Q.  But it would be within the Secretary of State's
5    possession and responsive to the -- the request?
6        A.  I -- I don't know, because it was part of a
7    request for a proposal process, and so I don't know if
8    that stays confidential and is not subject to open
9    records.  I don't know if that's subject to something
10   that would have to require confidential sealing.  I don't
11   know the discovery process on that document.
12       Q.  Okay.  You mentioned that the survey tested the
13   deficiencies in people's knowledge of the ID
14   requirements.  What were -- what were the deficiencies
15   that you found?
16       A.  Very little.
17       Q.  Could you elaborate?  Were there -- what were
18   they?
19       A.  Well, like I said, most voters -- I don't
20   remember the numbers -- were familiar with the need to
21   bring a photo ID and they had a pretty good idea -- they
22   could spontaneously regurgitate a significant number of
23   the categories of photo ID.
24       Q.  Did it test knowledge of the -- like any
25   components of the election identification certificate

293

1   process?
2        A.  I don't know if that was specifically asked
3   about or if it was just more general, do you know that
4   there's a free election identification certificate
5   available from DPS.  So I don't know specifically what
6   the question was on EIC.
7        Q.  Okay.  Going back to Exhibit 28.
8        A.  Okay.
9        Q.  If you look at I E., it says that you targeted
10  rural voters, African-American voters, and Hispanic
11  voters.
12       A.  Sure.
13       Q.  Why did you target such voters?
14       A.  Well, there's a -- there's a -- I don't know if
15  you're familiar with the problem of media consumption in
16  our modern age that we live in.  We have a very
17  fragmented media consumption environment.  It used to be
18  that people had the same television channels that they
19  watched at the same time and were generally susceptible
20  to advertising through limited number of channels.  With
21  our fragmented media environment, with the Internet and
22  people consuming what they want to consume rather than
23  what's pushed at them and the huge number of cable
24  channels, it's just an amazingly difficult proposition to
25  get a message out across enough platforms to reach the

294

1   people that you want to reach.  And there are differences
2   in the way media is consumed by demographic group, so
3   African-American voters get a lot of their information
4   from their community newspapers and Hispanic voters get
5   a lot of information on mobile devices.  And so the idea
6   was to use the expertise of TKO and to use the expertise
7   of Burson Marsteller for this year's campaign to make
8   sure that we get the message across all the demographics
9   in the state of Texas in this very challenging media
10  environment given the limitations of the resources
11  available.
12       Q.  Did you find that these groups of voters --
13  would you say that these groups of voters
14  disproportionately needed education on the ID
15  requirements, then, because of deficiencies or problems
16  in the way that they get information?
17       A.  No, that's -- that's not the implication at
18  all.  The implication is that since they consume media
19  differently, to reach those voters there has to be a more
20  targeted effort.
21       Q.  Okay.  And you may have gone over this already.
22  But the 400,000 figure at the top, is that -- what does
23  that figure represent?  Is that what was budgeted?
24       A.  Yes, that's -- that's money that we came up
25  with from our agency to use for this effort.

295

1        Q.  And was it all spent?
2        A.  Yes.
3        Q.  And was it all spent specifically on education
4   of the ID law?
5        A.  I believe so.  I don't think there was any
6   other general voter education message in the fall
7   campaign.  I think it was all photo ID.  All of the radio
8   advertising were forms of ID that are acceptable and
9   required, and all the print media was the same and all
10  the TV was the same.
11       Q.  And in Exhibit 29, Phase 1 of the 2014
12  campaign, the $400,000 figure there, is that -- would you
13  give the same response that you just gave, that it's all
14  on voter ID?
15       A.  No.  The Help America Vote Act education money
16  can't be specifically targeted to only one thing, so
17  voter ID in -- in the voter education campaign this year
18  is the largest, most substantive component of the
19  education campaign, but it is in a larger, be prepared to
20  vote campaign.
21       Q.  Okay.  And what component of that would you
22  say, then, is spent on voter ID?
23       A.  Most of it.  And it's -- and it's featured in
24  every single communication.
25       Q.  Okay.  And in Phase 2 in Exhibit 30 it mentions

296

1   1.6 million.  Do you have a sense of what proportion of
2   that amount will be spent specifically on voter ID?
3        A.  Well, that's what I'm trying to say, that the
4   campaign for 2014 is part of HAVA, and HAVA has more
5   broad education requirements, so we have a more robust
6   voter education campaign.  Voter ID is central to that
7   campaign, so every communication in this campaign is
8   going to talk about voter ID.  So it's not as if part of
9   the money is going to voter ID and part of it's not.
10  It's part of a bigger picture this year than it was last
11  fall.
12       Q.  And do you have -- or has the budget for voter
13  education been established for any elections after 2014?
14       A.  No.
15       Q.  Do you have plans to increase the budget in
16  2016?
17       A.  I don't know what the legislature is going to
18  do about that.  I don't -- that's down the road.
19       Q.  What does it depend on?
20       A.  It depends on their willingness to give us
21  money.
22       Q.  Okay.  All right.  So the -- back on
23  Exhibit 31, the paid media wrap-up, the second table has
24  to do with cable TV.  How were those markets chosen?
25  Were those also primarily chosen based on impressions?

KEITH INGRAM                                                    4/23/2014

297

1      A.  Yes.  And again, it's -- it would have been
2   TKO's expertise and consultation with Alicia Pierce.
3      Q.  And the criteria was more in terms of how many
4   people would be hit and not so much who needed education
5   on voter ID?
6      A.  The goal of the campaign was to have as wide
7   a reach as possible, to have as wide a reach for the
8   impressions as possible, yes, sir.
9      Q.  Okay.  And in -- in the third table, on the
10  print --
11     A.  Can I -- I'm sorry.
12     Q.  Sure.
13     A.  What I would like to add is that when it comes
14  to cable TV advertising it can be a much more targeted
15  sort of effort, and I don't know which particular cable
16  channels are behind these spots, and so it could be that
17  there was some consideration given to the particular
18  demographic of the audience for a particular channel that
19  received one or more of these spots.
20     Q.  And would there be a document somewhere that
21  would show all those considerations?
22     A.  TKO should have some sort of sheet showing
23  where each individual spot was run.
24     Q.  Would it show all the considerations that were
25  taken into account in determining that these were the

298

1   best markets?
2      A.  No.
3      Q.  Okay.  Switching topics to poll worker
4   training, you stated in prior deposition testimony
5   that -- or earlier today, actually, that local officials
6   are responsible for making sure that the poll workers go
7   through training; is that right?
8      A.  That's right.
9      Q.  Okay.  And what are all the materials that
10  the -- or what is the Secretary of State's involvement in
11  developing poll workers' materials?
12     A.  We -- we do -- in 2013 it was kind of a special
13  thing because we were in the midst of implementing the
14  law at the -- at -- on the fly.  And so, you know, in
15  August and September we had local elections in Hidalgo
16  County and Galveston, and so they needed to train their
17  poll workers on photo ID requirements right away, and so
18  we adopted some of the materials that we used for our
19  county election officials seminar in July and made that
20  into poll worker training with regard to photo ID, and we
21  sent those PowerPoints to the counties to use in
22  connection with the rest of their poll worker training
23  process for those local elections.  By the time the poll
24  worker training came around in September for the November
25  election we had completely revamped our on-line poll

299

1   worker training module as well as prepared a complete
2   PowerPoint for poll worker training that counties could
3   use if they didn't want to use our on-line module and --
4   and had made that change throughout all the materials,
5   and so we didn't have a specific photo ID poll worker
6   training piece after that.  We also -- I lost my train of
7   thought.  I'm sorry.  That -- that -- that's basically
8   it.  And the poll worker training that we had, the
9   counties can also add their own stuff to it.  All we have
10  is what the minimum requirement is.
11     Q.  Okay.  And if a county were to add their own
12  stuff to the -- to the training that you provide them, do
13  you review those?
14     A.  Usually, yes, sir.
15     Q.  And do you have to give approval before those
16  are used?
17     A.  I don't know if we have to.  Counties usually
18  ask us to.
19     Q.  Okay.  And you mentioned the on-line poll
20  worker training tool.  When did you say that was
21  finalized?
22     A.  I don't remember the exact date.  It would have
23  been in September of 2013, probably middle to the end of
24  the month.
25     Q.  Okay.  And do you have a sense of what

300

1   percentage of poll workers are trained through that tool?
2      A.  I would -- I would say a low percent.
3      Q.  Okay.  And what is the breakdown of the way in
4   which poll workers are trained?
5      A.  Well, in any given election you could have as
6   many as 20,000 poll workers, and we've had 13,000 people
7   use the on-line poll worker training tool since it's been
8   in effect since 2007, so that tells you right away that
9   the numbers percentage-wise of poll workers actually
10  being trained with the on-line tool is small.
11     Q.  Okay.  And you said 20 percent?  I'm sorry.
12  What was --
13     A.  No.  Every election has probably more than
14  20,000 poll workers, and 13,000 have used on-line poll
15  worker training since its inception eight years ago.
16     Q.  Got it.
17     A.  Seven years ago.
18     Q.  Okay.  And have you received feedback from
19  election officials or poll workers about the tool?
20     A.  The feedback that we've received regarding the
21  on-line poll worker training tool has been positive for
22  the ones who use it.  The reason that it's not used as
23  much as we would like is because the county election
24  officials like to have in-person training sessions where
25  they can interface with the poll workers and, you know,

KEITH INGRAM                                          4/23/2014

76 (Pages 301 to 304)

301

1  have -- have that feedback loop that I mentioned earlier.
2      Q.  Okay.  Let's mark this document.
3           (Exhibit No. 32 marked)
4      Q.  I'll give you a chance to look through a few
5  pages.
6      A.  Okay.
7      Q.  Okay.  And do you know what this is?
8      A.  This appears to be screen shots from our
9  on-line poll worker training.
10     Q.  Okay.  And do you have the underlying documents
11 that make -- does the Secretary of State keep the
12 underlying documents that make up the on-line poll worker
13 training, the -- the pages?  Are those in your system
14 somewhere?
15     A.  I'm not sure in what form they exist.  I know
16 that Leticia Salazar in my office is the one who has this
17 responsibility and role.  She gets the input from the
18 attorneys about the content, but actually making the
19 changes on here is her province, and I believe that she
20 has this on one of our hard drives that we share in the
21 elections division and that she's got the previous
22 version before photo ID saved as well.
23     Q.  Okay.  And so will you produce those documents
24 if -- if you haven't already?
25           MR. KEISTER:  Counsel, the witness isn't

302

1  going to make agreements on production, but if they
2  haven't been produced, you can certainly request them.
3      Q.  Okay.  Could you flip to the fourth page on
4  here.  Okay.  If I represent to you that this is the --
5  the part of the training that deals with qualifying
6  voters at the polls, does that sound accurate?
7      A.  Well, that's -- that's what the first page of
8  this says.
9      Q.  Okay.  And the date at the bottom right-hand
10 corner, that's yesterday; is that correct?
11     A.  That's what it says.
12     Q.  Okay.  And could you just review the text
13 underneath the title, Step 1:  Voter Registration
14 Certificate?
15     A.  Uh-huh.
16     Q.  Does that seem like an accurate statement of
17 the law?
18     A.  It does not.
19     Q.  What does it say?
20     A.  It says for a voter to present their voter
21 registration certificate as it is preferred.
22     Q.  And could you read the sentence after that?
23     A.  There are eight other acceptable forms of ID.
24     Q.  Okay.  And the -- on that same page, on the
25 sidebar underneath the title, Key Point, do you see that

303

1  the text underneath Key Point?
2      A.  I do.
3      Q.  Okay.  And is that an accurate statement of the
4  law?
5      A.  It is not.
6      Q.  Okay.  And does that basically say the same
7  thing, that -- could you read it out loud, please.
8      A.  Sure.  It says:  Each voter must present a
9  voter registration certificate or one of eight acceptable
10 forms of ID.
11     Q.  Okay.  And neither of those statements are
12 accurate with respect to the -- the voter ID law,
13 correct, currently?
14     A.  That's correct.
15     Q.  Okay.  And you haven't received any feedback
16 from election officials or poll workers about -- about
17 this?
18     A.  We have not.
19     Q.  Okay.
20     A.  What I don't understand is why there's a button
21 that says:  Photo ID now required for voting in Texas.
22 Is there a way for me to get a copy of this and leave
23 with it today?  I don't want to take the exhibit, but I
24 want this.
25     Q.  Yes.  Yes, I'll give you my other copy of it.

304

1           MR. ROSENBERG:  Or we can make another
2  copy.
3      Q.  Okay.  Switching topics again, do you ask
4  counties to keep track of persons who are turned away at
5  the polls?
6      A.  No.
7      Q.  Okay.  So if someone was not provided or if
8  there's no ballot and turned away, you have no way of
9  tracking that?
10     A.  Well, I don't know what you mean by turned
11 away.  They shouldn't be turned away.  They can
12 voluntarily decide to leave and go get an acceptable form
13 of ID and come back.  So if we hear about a voter being
14 turned away we will call that to the county election
15 official's attention and ask them to remedy it with the
16 poll workers.
17     Q.  Okay.  And how would you normally hear of that
18 happening?
19     A.  A voter calls.
20     Q.  Through the hotline that you mentioned earlier?
21     A.  That's right.
22     Q.  How is that hotline advertised?
23     A.  Well, there -- there's information in the
24 polling place.  The notice of ID requirements has the
25 phone number on it.  I don't know.  There's probably

KEITH INGRAM                                                    4/23/2014

305

1  several other pieces of information inside the polling
2  place posted on the walls that has the phone number on it
3  as well as the voter registration certificate has the
4  phone number on it.
5      Q.  Okay.
6      A.  And if you Google Secretary of State you'll get
7  VoteTexas.Gov or SOS.TX.US.Gov, and both of them have the
8  phone number.
9      Q.  And the phone number, is that a general phone
10  number to the Secretary of State's Office or is this a
11  separate hotline that is advertised separately?
12      A.  No, no, it's -- it's -- it's our phone number.
13      Q.  Okay.
14      A.  The voter hotline is our phone number.
15      Q.  Okay.  One last set of questioning on the
16  mobile EICs.  What factors do you use to determine the
17  hours of the -- for the mobile EIC units?
18      A.  Well, the hours that the building will be open
19  and the hours the DPS is available to operate the
20  equipment.
21      Q.  Anything else?
22      A.  That was for the fall campaign, so I don't --
23  sometimes the counties want extended hours or we'd ask
24  DPS to provide extended hours or we'd make sure that the
25  county used a building that had extended hours available,

306

1  but primarily the drivers of availability were the
2  building being open and DPS being available.
3      Q.  Okay.  So you didn't prioritize weekend hours
4  or weekday evening hours then?
5      A.  No.
6          MR. AGRAHARKAR:  Okay.  If I could just
7  have a moment off the record.
8          (Off the record 4:51 p.m. to 4:52 p.m.)
9          MR. ROSENBERG:  I have a few follow-up
10  questions and then we'll pass the witness.
11          EXAMINATION
12  BY MR. ROSENBERG:
13      Q.  Just going back to the person that
14  Mr. Agraharkar spoke about in terms of whether someone
15  can use a suspended license as one of the SB 14 forms of
16  identification.  Can one use a revoked license?
17      A.  Well, again, I don't know if a revoked license
18  will still be in the driver's possession.  If it is and
19  it's not expired, then yes.
20      Q.  And then just a few follow-ups on the issue of
21  the targeting of blacks -- black voters and Hispanic
22  voters.  Precisely how was that targeting done?
23      A.  That's -- that's one of those situations where
24  we rely upon the expertise of the vendor to -- to make
25  sure that they use appropriate channels to get to those

307

1  voters.
2      Q.  Do you know what they did?
3      A.  I do know that they emphasized community
4  newspapers in African-American communities, that they
5  primarily geared the mobile app and mobile information
6  for Hispanic voters, and then, of course, used
7  advertising on media consumed by those voters.
8      Q.  Do you know what studies or analyses were done
9  as to which forms of media were best to be used for
10  purposes of reaching certain minorities?
11      A.  I don't.  That would be -- that would be within
12  the expertise of Burson or TKO.
13      Q.  And you mentioned polling that was done by
14  Burson.  Do you recall whether the polling results were
15  broken down in terms of the -- how successful the
16  campaign was for different minority groups?
17      A.  I believe that there was demographic
18  information in the poll, yes, sir.  I don't know how
19  the -- how do you call it -- the margin of error might
20  have changed for smaller subgroups within the large
21  group.
22      Q.  Do you know what the results were within the
23  subgroups?
24      A.  I don't.  I don't recall off the top of my
25  head.

308

1      Q.  And who would be the best person to ask those
2  questions of?
3      A.  Burson Marsteller.
4      Q.  Who at Burson Marsteller?
5      A.  I don't know.
6      Q.  Who would know at the Secretary of State?
7      A.  Well, I would whenever my mind's working
8  properly.  I can't remember her name off the top of my
9  head who's our account executive at Burson.
10          MR. ROSENBERG:  Okay.  We pass the
11  witness.
12          EXAMINATION
13  BY MR. ROSS:
14      Q.  Hello, Mr. Ingram.
15      A.  Hello.
16      Q.  How are you?
17      A.  Marvelous.
18      Q.  My name is Deuel Ross.  I'm an attorney with
19  the NAACP Legal Defense Fund.
20      A.  Yes, sir.
21      Q.  And I'm representing the Texas League of Young
22  Voters.  I'm going to talk to you a little bit about the
23  availability of EICs and ask you some follow-up questions
24  about the mobile stations.
25      A.  Okay.

KEITH INGRAM                                                    4/23/2014

309

1    Q.  Can you tell me -- can you walk me through the
2    process of how the locations of the mobile stations for
3    Phase 2 were decided?
4        A.  Sure.  As I -- as I mentioned to Ms. Westfall,
5    there were two sort of driving characteristics of the
6    fall mobile EIC location placement, and number one was
7    where are concentrations of voters that don't match with
8    a DL or a Texas ID in our process and where are wide-open
9    empty spaces away from a driver license office.  So those
10   were the two driving considerations for location of the
11   mobile EIC units in the fall of 2013.
12       Q.  Were there any other factors taken into
13   consideration?
14       A.  I believe that some counties requested the
15   presence of a -- of an election identification
16   certificate mobile station, and so we certainly took
17   those into account if someone requested it.
18       Q.  Do you know who from those counties requested
19   it?
20       A.  I know that Dallas wanted a repeat visit.  I
21   know that Bexar County wanted to make sure that -- that
22   we had a repeat visit to Bexar County.  I don't know of
23   any others off the top of my head.
24       Q.  Would they be the county registrars that
25   requested it or anyone specific?

310

1        A.  Both Dallas and Bexar County have elections
2    administrators, and so it would have been their office.
3        Q.  Did any state-elected officials request that
4    something come?
5        A.  I don't know if we had any state-elected
6    officials.  I'm pretty sure that Representative Turner
7    wanted to make sure that there were some in his district,
8    and we accommodated that.  I don't know of any others
9    that made the specific request to have EIC unit
10   placement.
11       Q.  What about -- I know you mentioned some city
12   officials; I think it was in Trinity.
13       A.  That's right.
14       Q.  Anyone else who --
15       A.  The city manager in Trinity, Buddy Drake,
16   wanted to make sure that we came to Trinity this -- this
17   spring.
18       Q.  And were there any other city officials who
19   requested it?
20       A.  Not that I know of off the top of my head.
21       Q.  Okay.  Did you place any special priority on
22   who was requesting the presence of the mobile stations?
23       A.  No.  We've -- we've had a low enough number of
24   requests that all of them could be accommodated.  We
25   haven't had to prioritize or leave anybody out in the

311

1    cold.
2        Q.  What about people who weren't in government who
3    requested the presence of EICs?
4        A.  There -- we had some interactions with the
5    student government as well as the administration over at
6    Prairie View A&M on an unrelated matter last year, and
7    they wanted to make sure that we had an EIC unit come to
8    Prairie View, and so we accommodated that request.
9        Q.  How did you accommodate that request?
10       A.  By having an election identification
11   certificate come to the Prairie View campus.
12       Q.  Okay.
13       A.  Mobile unit.
14       Q.  Do you know what days it was --
15       A.  I do not.  It was -- it was early on because we
16   knew their request existed early.
17       Q.  Early on like a month maybe?
18       A.  I would say -- yeah, I would say late September
19   or early October.  I don't know for sure though.
20       Q.  Do you know how many days it ended up being?
21       A.  I don't know.  I would have to talk to
22   Robin German.  She was the election administrator for
23   Waller County at the time and she had at least two units
24   to work with, and so I don't know how many days she spent
25   on campus and how many days were elsewhere around the

312

1    county.
2        Q.  Do you know how many days ahead of time
3    Waller County was notified?
4        A.  I don't.
5        Q.  So, sir, going back a little bit to the
6    process, can you explain again what the role of the
7    Secretary of State is in deciding the location of a
8    mobile station?
9        A.  Well, it was our role to -- what we did is the
10   matching process to identify ZIP codes where there were
11   significant numbers of non-matches, so we -- we had that
12   role to play, and then it's also been our role to
13   interface with the county election officials to -- to
14   talk to them about where their voters might benefit from
15   an election identification certificate mobile station,
16   and then once we get locations from the county, to
17   communicate that information to the Department of Public
18   Safety so that they could do their process to make sure
19   it was a sufficient, adequate location for a unit.
20       Q.  And so if a -- if a county requested the
21   presence of a unit and DPS disagreed with that location,
22   what role would the Secretary of State play in sort of
23   mediating that?
24       A.  Well, I don't know if you're asking if a county
25   asked for EIC units and DPS refused in general, because

KEITH INGRAM                                                    4/23/2014

313

1   that never happened.
2       Q.  Well, if they refused for a particular
3   location.
4       A.  Right.  And there was a -- there was a location
5   identified over in East Texas -- I think it was Liberty
6   County, as I mentioned before -- that DPS felt was not
7   suitable, and so we asked the county election
8   administrator to find a backup location, and she did.
9       Q.  Okay.  So if there's a dispute between DPS and
10  your office regarding the location of a -- of a mobile
11  unit, who gets the final say in terms of where the
12  location will be?
13      A.  I don't know.  There -- there never has been
14  such a dispute.
15      Q.  If there were a dispute, do you --
16          MR. KEISTER:  Objection; calls for
17  speculation.
18      A.  Yeah, I just -- I can't imagine that happening.
19      Q.  Are there particular groups of individuals
20  within the Secretary of State's office who makes -- make
21  decisions about where to locate mobile stations?
22      A.  The -- the team for the fall was myself,
23  Mr. Jackson, and our deputy secretary, Coby Shorter.
24  Currently we have my administration manager, Louri
25  O'Leary, who's heading up that process.

314

1       Q.  And is there -- is there a task force between
2   the Secretary of State and DPS that makes those
3   decisions?
4       A.  Currently the primary point of contact between
5   DPS and Secretary of State is Louri O'Leary, one of my
6   managers.
7       Q.  How were they selected for that position?  How
8   were they selected?  How were the individuals you just
9   mentioned on the Secretary of State's task force selected
10  to join in?
11      A.  Well, last fall Wroe, myself, and the deputy
12  secretary did it because it needed to be done and the
13  time to do it was right now.  We -- the deputy and I
14  talked about having that responsibility shifted to
15  someone else in the office, and so that's -- we felt like
16  Louri is very good at event planning sort of stuff --
17  she's an administrator by nature -- and so that she would
18  be a good person for that role, and we asked Louri to
19  take it on.
20      Q.  So is it fair to characterize it as a sort of
21  ad hoc committee, people -- or you picked folks who you
22  thought would be good to make those decisions or to work
23  on this project?
24      A.  I wouldn't -- I wouldn't call it ad hoc.  I
25  would -- I would characterize it more as adding to one of

315

1   my manager's job description.
2       Q.  Okay.  If we go back to -- I believe it's
3   marked Exhibit 4, the Memorandum of Understanding between
4   DPS and the Secretary of State's Office.
5       A.  Sure.
6       Q.  Would you look at page 2 of that document?
7       A.  Yes, sir.
8       Q.  And do you see the first full paragraph that
9   begins:  Mobile EIC centers?
10      A.  Yes.
11      Q.  Can you read that paragraph, just review it
12  briefly?
13      A.  Sure.  (Reviewing document)  Okay.
14      Q.  Is that your understanding of the Secretary of
15  State's role in deciding the location of EICs?
16      A.  I believe that accurately summarizes our role.
17  I will say that for this -- for this year's effort we've
18  changed that two day to five day.
19      Q.  Okay.  Can you read aloud your -- the portion
20  that you believe is your understanding of the Secretary
21  of State's role in that paragraph?
22      A.  Sure.  It says:  Mobile EIC centers will move
23  throughout the state to locations determined by SOS and
24  agreed to by DPS.  SOS will notify DPS in writing of the
25  final location for each mobile EIC center at least two

316

1   full business days in advance of the requested start date
2   of operations at that location.
3       Q.  And your -- your testimony was that it's now
4   five days, correct?
5       A.  That's right.  And I don't know if we've done
6   an official written modification of this MOU, but we
7   definitely have agreed that it's five days and not two
8   now.
9       Q.  So then based on your understanding of this
10  paragraph and the way the process works, the Secretary of
11  State's Office has final authorization about the location
12  of mobile stations?
13      A.  Yeah, I don't think that that's exactly what
14  this says.  What this says is the location is determined
15  by SOS and agreed to by DPS, and that's the way it's
16  worked in practice, that -- that our office has
17  determined where the mobile EIC units should go.  We
18  offered those locations to DPS.  DPS has agreed to almost
19  all of them except one that I can remember off the top of
20  my head.
21      Q.  And that's the Liberty Hill location -- or
22  excuse me -- Liberty location?
23      A.  Liberty County location, right.  And it could
24  be Orange and it could be Hardin.  I just -- it's over in
25  Southeast Texas.

317

1    Q.   And do you know why the location in Liberty was
2  considered unsuitable by DPS?
3    A.   I don't remember exactly what DPS' concern was.
4  I believe that it was that the room was too small, too
5  crowded, and they felt like there needed to be more space
6  for -- for everything to work properly.
7    Q.   Okay.  You previously testified that the
8  Secretary of State's Office used a January 2014 no-match
9  list to determine the location of the Phase 2 mobile
10  stations?
11    A.   No, it was a July 2013 no-match list.
12    Q.   July 2013.  My apologies.  So can you explain
13  the process in which the Secretary of State used that
14  no-match list to determine where mobile stations would be
15  located?
16    A.   Well, as I've described before, there were two
17  drivers for locations for the mobile EIC units in
18  Phase 2; one was rural nature of some parts of Texas, the
19  other was ZIP codes that had a high number of no matches
20  for ID.  And so what we did was roughly split the mobile
21  units, some for taking care of rural voters and some for
22  taking care of concentrations in ZIP codes of
23  non-matches, and then we just worked the list.
24    Q.   Okay.
25       THE REPORTER:  Excuse me, counsel.  Can we

318

1  go off the record for a minute?
2       MR. ROSS:  Okay.
3       MR. KEISTER:  You want to take a break for
4  a couple of minutes?
5       THE REPORTER:  If you don't mind.
6       MR. ROSS:  We can take a few minutes
7  break.
8       (Recess from 5:11 p.m. to 5:15 p.m.)
9  BY MR. ROSS:
10    Q.   You mentioned that in determining where to
11  place EICs -- or excuse me -- mobile stations you
12  primarily looked to whether a location was rural and then
13  whether or not there were ZIP codes with a high number of
14  no matches, people on the no-match list.
15    A.   That's right.
16    Q.   Okay.  And you also mentioned the request from
17  Prairie View was a particular location that -- well, you
18  mentioned Prairie View, right?
19    A.   Right.
20    Q.   Okay.  Is there -- was there any other effort
21  to locate a mobile station near a college?
22    A.   Sure.  One of the mobile units that was pretty
23  consistently in place throughout the period before the
24  November 13 election was at Lone Star College, a junior
25  college campus in Houston, and then the Holman Street

319

1  Baptist Church location was in reasonably close proximity
2  to the University of Houston.  This spring we went to
3  Texas Women's University fulfilling a request, and I'm
4  not sure if we actually went to University of Texas or
5  just talked about it.  But yes.
6    Q.   Okay.  So you mentioned -- what was the women's
7  college?  What was the name of that?
8    A.   Texas Women's University.
9    Q.   And that was in response to a request?
10    A.   That's right.
11    Q.   Do you know who made that request?
12    A.   It was a graduate student and a professor.  I
13  don't remember their names.
14    Q.   Okay.  Do you know how they made that request?
15    A.   In an e-mail to me.
16    Q.   And the location at the University of Houston,
17  how was that request -- or why was that location chosen?
18    A.   Well, the ZIP codes in that proximity were --
19  for Harris County were some of the highest non-match ZIP
20  codes, and so we wanted a location in that area.  The
21  Holman Street Baptist Church is a place that our deputy
22  secretary is familiar with, and they were willing to make
23  their facilities available for an extended period of time
24  for this purpose, and so we were accommodating a local
25  population that was pretty rich in non-matches.  So I

320

1  don't know if they actually needed IDs or not, but that
2  was the -- the primary purpose of the Holman Street
3  Baptist Church location was to accommodate those ZIP
4  codes.  The secondary purpose was it was close to the
5  University of Houston.
6    Q.   Okay.  You said it was there for an extended
7  period of time?
8    A.   That's right.
9    Q.   Do you know how long that was?
10    A.   It was there almost the entire period that EIC
11  units were out and about, from late September to after
12  the election.  I think that the Holman Street unit was
13  used in another county for a few days during that period,
14  but it was back at Holman Street thereafter.
15    Q.   Okay.  And during that period, that couple of
16  months period it sounds like, was the mobile unit
17  stationed there for every day of the week?
18    A.   Workdays, yes, sir.
19    Q.   Workdays.  Was it stationed there after
20  four o'clock?
21    A.   I don't know what the hours were.  I don't
22  believe so.  Maybe 4:30.
23    Q.   Okay.  You also mentioned the West Star
24  University; was that it?  Or excuse me.  I'm sorry.
25  Lone Star.  I'm in Texas.

321

1          MR. ROSS:  Let me strike that question.
2     Q.  The Lone Star --
3     A.  Lone Star College.
4     Q.  -- College, yes.
5     A.  Yes.
6     Q.  How was the decision to locate a mobile unit
7  made there?
8     A.  That was -- the location for that was chosen
9  with regard to Representative Turner's request.  I
10  believe that that location is within his district.
11     Q.  Okay.  Do you know when that location was open?
12     A.  It was open the same as the Holman Street,
13  almost the entire time.
14     Q.  Okay.  Do you know the days in which it was
15  open, days of the week?
16     A.  It would have been Monday through Friday.
17     Q.  Do you know the hours?
18     A.  Business hours.  I'm not sure exactly what the
19  schedule was.
20     Q.  After four o'clock?
21     A.  Maybe to 4:30.
22     Q.  Okay.  Do you know why those hours were chosen
23  for that location?
24     A.  DPS availability and the -- and the hours that
25  the building was open.

322

1     Q.  Okay.  You said that you used a -- excuse me --
2  the no-match list in part to determine locations.  Did
3  you rely on any data to determine when people were
4  available in those locations, any -- did the Secretary of
5  State do any studies to determine when people who were on
6  the no-match list were available to go to EICs?
7     A.  No.
8     Q.  Or excuse me.  Go to mobile stations?
9     A.  No.
10     Q.  You previously testified that Webb County was
11  the only county you're aware of where a mobile unit was
12  run after business hours?
13     A.  It's my belief that at least Webb County had a
14  location that had some extra hours.
15     Q.  Do you know how that decision was made in
16  Webb County?
17     A.  They asked for it and we asked DPS for it.
18     Q.  Okay.  Do you know what DPS' response was?  Do
19  you remember?
20     A.  I don't remember exactly how it went down.  I
21  don't remember if Oscar wanted the locations to be
22  extended hours every day and DPS gave him one.  I don't
23  remember how that process happened.
24     Q.  Oscar was --
25     A.  Oscar Villarreal, the -- the elections

323

1  administrator in Webb County.
2     Q.  Okay.  Do you know why he asked for the
3  extended hours?
4     A.  He thought it would be good for his voters.
5     Q.  Do you know why he thought it would be good for
6  his voters?
7     A.  I don't.
8     Q.  Were you involved in that decision to open the
9  office for extended hours, the mobile station?
10     A.  I was the interface between Webb County and the
11  DPS.
12     Q.  Okay.  Do you know if the Secretary of State's
13  Office supported that effort to open the Webb County
14  mobile station for extended hours?
15     A.  Sure.
16          (Exhibit No. 33 marked)
17     Q.  Okay.  I'd like to introduce what I marked as
18  Exhibit 31 -- 32.  I'm sorry.
19          THE REPORTER:  There's a 32 also.
20     Q.  Oh, 33.
21          MR. KEISTER:  I suggest we ask the court
22  reporter.
23          THE REPORTER:  33.
24     Q.  Okay.  So looking at Exhibit 31 (sic), can you
25  turn to page 2, which is Bates-stamped number

324

1  TEX 00462498?
2     A.  Yes, sir.
3     Q.  In the middle of that page do you see the
4  e-mail from Mr. Jackson to Mr. Rodriguez dated October 2,
5  2013, at 10:24 a.m.?
6     A.  Yes.
7     Q.  Can you please review that e-mail?
8     A.  Certainly.  (Reviewing document)
9     Q.  So have you had a chance to look at it?
10     A.  Uh-huh.
11     Q.  Can you read the line beginning with, Keith
12  has?
13     A.  Right.
14     Q.  Can you read it aloud, please.
15     A.  Thank you.  Keith has already contacted them to
16  request the change in hours from 9 to 4 with one day
17  available for off-business hours as we discussed.
18     Q.  Do you remember why you requested that the
19  hours for the mobile station be from 9:00 a.m. to
20  4:00 p.m.?
21     A.  DPS made that request.
22     Q.  Well, this says:  Keith has already contacted
23  them to request the change in hours from 9 a.m. to 4 p.m.
24     A.  Right, because DPS wanted me to make that
25  request of the county.

325

1    Q.  Okay.  And did you oppose that request at all
2    or did you have an opinion on that request to limit the
3    hours from the evening?
4    A.  I don't -- I don't understand your question.
5    Q.  Well, your testimony was that the Webb County
6    elections administrator asked that there be evening hours
7    for the mobile stations; is that correct?
8    A.  That's right.
9    Q.  And your understanding is that DPS opposed
10   evening hours at that time, right?
11   A.  That's right.
12   Q.  But it appears from the e-mail -- and feel free
13   to correct me -- that the Secretary of State's Office
14   requested the change from 9:00 a.m. to 4:00 p.m.
15   A.  I was the point of contact for the counties, so
16   when DPS got the proposed locations from Webb County,
17   they got the proposed hours from Webb County, they did
18   not want to accommodate those locations at those hours
19   and they asked Wroe to ask me to ask the county to modify
20   the hours with one day available for off-business hours,
21   and that's the request that I made to Oscar.
22   Q.  Did the Secretary of State's Office play any
23   role in determining when mobile stations were open, the
24   hours they were open for?
25   A.  I don't know how to answer that question.  We

326

1    wanted as much availability as possible.  DPS was
2    responsible for manning the stations, and there were
3    building constraints for some buildings, so operating in
4    an environment where another agency is supplying the
5    personnel and county or city agencies are running the
6    building, to the extent we had any control over the
7    process, which was very little, we wanted as many hours
8    as possible.
9        (Exhibit No. 34 marked)
10   Q.  Okay.  So I'm going to show you what is marked
11   as Exhibit 34.  Can you read the second e-mail message
12   from the top there?
13   A.  Right.
14   Q.  And who is that e-mail message from?
15   A.  That is me to the Hays County elections
16   administrator.
17   Q.  And what does the e-mail say?
18   A.  Says:  Excellent.  The times are basically up
19   to you.  We think business hours are better -- is
20   better -- or we think during business hours is better.  A
21   table for the computer printer and a place to plug in for
22   electricity.
23   Q.  Okay.  So why -- why did you think that
24   business hours were better?
25   A.  I didn't.

327

1    Q.  Okay.  Isn't that what the e-mail says, that
2    you thought business hours were better?
3    A.  I'm using -- I'm using we in the sense to
4    encompass us and DPS.  Since DPS is manning the stations,
5    this is DPS' request.
6    Q.  So is it your testimony that you were merely
7    conveying DPS' request for limited hours?
8    A.  That's right.
9    Q.  Okay.
10   A.  But I didn't want -- whenever you're doing
11   something like this -- I don't know if you've got kids,
12   but human beings are human beings, and if they sense any
13   daylight between participants in a program they will
14   exploit that, so there's -- there's no benefit to
15   Joyce Cowan understanding that DPS and I didn't really
16   agree on the hours, so I'm going to tell her we think,
17   because I'm saying we who are doing this program, have
18   agreed upon business hours being better.
19   Q.  Okay.  What recourse would the Secretary of
20   State's Office have with -- in an instance where there
21   was a strong disagreement between the Department of
22   Public Safety and your office about the hours of a mobile
23   station?
24   A.  If -- if there was a disagreement and it was
25   incapable of being resolved, I don't know.

328

1    Q.  Does the MOU say anything about it?
2    A.  It does not.  And, you know, sometimes when --
3    well, no, it doesn't.
4    Q.  Okay.  Exhibit 34 was Bates range 462497 to
5    462499.
6    A.  That's Exhibit 33.
7    Q.  Excuse me.  Exhibit 33.  And Exhibit 34 was
8    Bates range 462079 to 4620 -- well, they're all 462079.
9    My apologies.
10       MR. ROSS:  Strike that.
11   Q.  To your knowledge has a mobile station visited
12   every county in Texas?
13   A.  I don't know.  I doubt it.
14   Q.  Do you know why it wouldn't have visited every
15   county in Texas?
16   A.  I guess because we haven't had time to yet.
17   Q.  Okay.  Do you know which counties have not been
18   visited?
19   A.  I do not.
20   Q.  Do you know why particular counties might not
21   have been visited other than not getting around to it?
22   A.  You've got 25 units, you've got 254 counties,
23   and you've got a limited amount of time.
24   Q.  Okay.  Do you know if there are any plans to
25   send mobile stations to counties that have not received

KEITH INGRAM                                                4/23/2014

329

1   one in the past?
2       A.  I don't know if that's a particular part of the
3   consideration.  I don't think it is.
4       Q.  You don't know if it's a particular
5   consideration whether or not a county has already been
6   visited?
7       A.  That's right.
8       Q.  Okay.  In those counties that have not been
9   visited by a mobile station does your office know how far
10  the average person has to go to reach a mobile station?
11          MR. KEISTER:  Objection, vague.
12      A.  Yeah, I -- I don't think the metric should be
13  how far someone has to drive to get to a mobile station.
14  I think the metric should be how far does somebody have
15  to drive to get to a driver license office or other
16  available place for an election identification
17  certificate.
18      Q.  Well, based on that metric, has the Secretary
19  of State's Office conducted any studies to determine how
20  far people have to go in order to reach mobile -- or
21  excuse me -- DPS offices?
22      A.  I have received information from the DPS
23  indicating areas of the state that are more than 50 miles
24  away from a driver license office and I have received
25  information from the DPS about places in the state that

330

1   are more than 100 miles away from a DPS office.
2       Q.  And is that information taken into
3   consideration in deciding where to locate a mobile
4   station?
5       A.  Yes.
6       Q.  Has that -- did that come in the form of a
7   report or data set or --
8       A.  You're talking about the information about how
9   far people have to drive?
10      Q.  The information about how far, yes.
11      A.  It was a -- it was visual demonstration with
12  colored places being within 50 miles of a -- of a driver
13  license office and white portions not being within
14  50 miles.
15      Q.  Okay.  Do you know if that information has been
16  produced to the plaintiffs?
17      A.  I have no idea.
18      Q.  Okay.  In general do you know the racial
19  demographics of the counties that have been visited by
20  a mobile station?
21      A.  No.
22      Q.  Do you know the demographics of the counties
23  that have not been visited by a mobile station?
24      A.  No.
25      Q.  The racial demographics.  So you're -- based on

331

1   the no-match list you're aware of particular ZIP codes
2   that have high rates of individuals with no match that
3   appear on that list, right?
4       A.  That's right.
5       Q.  Okay.  Are you aware of the racial demographics
6   of those ZIP codes?
7       A.  No.
8               (Exhibit No. 35 marked)
9       Q.  Okay.  I'm going to introduce one more exhibit.
10  It's number 35 and the Bates number is 461925.
11  Mr. Ingram, are you familiar with this document at all?
12      A.  I think that Janie might have sent this to me.
13      Q.  Okay.  What is it?
14      A.  This is a notice for Val Verde County for where
15  EIC mobile units would be available for the public.
16      Q.  Who is Janie?
17      A.  Janie Ramon is the -- I believe she's the
18  county clerk in Val Verde County.
19      Q.  So was this created -- this was created by
20  Val Verde or who created this document?
21      A.  I believe that -- that this is a Val Verde
22  County created document.
23      Q.  Do you know if the Secretary of State's Office
24  played any role in creating it?
25      A.  We might have.  This might be based on a form

332

1   that we gave counties to use.  I don't know.
2       Q.  Okay.  Did the Secretary of State's Office have
3   a role in deciding to locate a mobile station in
4   Val Verde County?
5       A.  Sure.
6       Q.  To your knowledge how was that decision made?
7       A.  This would have been in the rural voters
8   component.  We were trying to -- most of the places that
9   were far away from a driver license office were in the
10  Rio Grande Valley.  I don't know if you've ever been to
11  Val Verde County, but it's very large, and we wanted to
12  make sure that counties like that had an opportunity to
13  have election identification certificate mobile units.
14      Q.  Do you know the racial demographics of that
15  county?
16      A.  I do not.
17      Q.  Okay.  On which dates does this press release
18  indicate that the mobile stations would be in Val Verde
19  County?
20      A.  Thursday, October 31st and Friday,
21  November 1st.
22      Q.  Do you know how those dates were selected?
23      A.  I don't.  It was -- it was working our way
24  down from El Paso and that's where we happened to be
25  those two days.

333

1      Q.  Do you know whether there were discussions
2  about operating the Val Verde County mobile station
3  during a weekend?
4      A.  I'm -- I don't believe there were any such
5  discussions, no, sir.
6      Q.  I guess, in general, for how many days a week
7  is a mobile station open at one location?
8      A.  We usually had the mobile stations in a general
9  vicinity for two days, and usually the county liked to
10  move it from one place to another on each day.  Sometimes
11  the county would want it to be at the same location both
12  days.
13      Q.  Why two days?
14      A.  That's just what we put into the schedule.
15      Q.  So there were no discussions about having a
16  mobile station in a location for more than two days?
17      A.  Sure there was.
18      Q.  What sorts of discussions were there?
19      A.  As I mentioned, Harris County had a couple of
20  locations that were almost continuous throughout this
21  period.  Harris County also has 2.8 million registered
22  voters.
23      Q.  So what went into consideration for deciding
24  whether or not to open a mobile station for more than two
25  days?

334

1      A.  How many voters could be helped by it.
2      Q.  Okay.  To your knowledge are mobile stations
3  ever operated on weekends?
4      A.  I don't know if they have been for the spring
5  or not.  Since we've gone to more of an event-driven
6  invitation model the likelihood is pretty high that we're
7  going to have some weekend EIC units.
8      Q.  But you don't know if that's happened in the
9  past?
10      A.  I'm not sure if it's actually happened yet this
11  year or not.  I know it didn't happen last fall.
12      Q.  You know it did not happen last fall?
13      A.  It could have.  Now, I don't want to speak
14  about Phase 3.  There were DPS-operated mobile EIC units
15  in those counties that don't have a driver license
16  office, and they might have had some on weekends in those
17  counties.  I wasn't directly involved in scheduling
18  those, so I don't know.
19      Q.  Okay.  Do you know what counties those might
20  have been that had Saturday mobile stations?
21      A.  No.  It would have been one of the 79 that
22  didn't get the training and the equipment to issue EICs
23  themselves and didn't have a driver license office.
24      Q.  Okay.  Going back --
25      A.  And also, just to clarify, those mobile

335

1  stations that DPS operated in those counties were in
2  place for five days, not two.
3      Q.  And those are the Phase 3 mobile stations?
4      A.  That's right.
5      Q.  Okay.  Was it the Secretary of State's opinion
6  that the rural -- the rural voters in Val Verde County
7  would be able to easily access the mobile station there
8  on weekdays between 9:00 a.m. and 4:00 p.m.?
9      A.  Secretary of State's Office didn't have an
10  opinion in that regard.  We did make it available for
11  folks.
12      Q.  Do you know if efforts were made to advertise
13  the presence of mobile stations in Val Verde County?
14      A.  I'm not sure what Janie did locally.  I know
15  that we would have issued a press release, and I don't
16  know what else she did.
17      Q.  Do you know --
18      A.  I know that she was pretty excited about them
19  coming.
20      Q.  Do you know what efforts the Secretary of
21  State's Office in general does to advertise the location
22  of a mobile station?
23      A.  We will prepare materials that we release
24  directly to the media and we'll also prepare materials
25  for the county to use in their interactions with the

336

1  media.
2      Q.  Is there a budget for advertising mobile
3  stations?
4      A.  In 2013, no.  We do have part of our money
5  reserved this year for EIC unit program.
6      Q.  How much money is that for 2014?
7      A.  It's not -- it's, you know, however much we
8  need, but we've tried to save back a portion of our
9  $2 million.
10      Q.  Do you know what amount that is, about what
11  amount that is?
12      A.  I don't.  300,000 or 400,000.
13      Q.  Okay.  How is that money used, that $300,000
14  or $400,000?
15      A.  It hasn't been used.
16      Q.  Oh, it hasn't been used at all?
17      A.  That's right.
18      Q.  Okay.  Are there plans to use it specifically?
19      A.  If needed, sure.
20      Q.  Do you -- what kinds of plans in general?
21      A.  Well, if we decide that we need to have an
22  extra budget for mobile EIC units, then it would be for
23  everything associated with them, banners, signage,
24  travel, employee expense.  It would be everything
25  associated with the program.

KEITH INGRAM                                                    4/23/2014

337

1    Q.  Okay.  So the money that you mentioned for --
2  that's budgeted for 2014 is for the mobile stations in
3  general, not for advertising them specifically?
4    A.  Right.
5    Q.  Okay.  And -- and you mentioned that the
6  Secretary of State's Office has model press releases for
7  the mobile locations.
8    A.  Right.
9    Q.  Yeah.  Does the Secretary of State's Office
10  sign off on ads before -- like the Val Verde one before
11  they're sent out by the counties?
12    A.  Not usually, no, sir.
13    Q.  Does the Secretary of State's Office have
14  guidelines for effective advertising of mobile stations?
15    A.  No.
16    Q.  Okay.  Do you know if DPS has a budget for
17  advertising mobile stations?
18    A.  I do not know.
19    Q.  Do you know if any other agency does?
20    A.  I do not.
21    Q.  Okay.  Well, you mentioned the Secretary of
22  State's efforts to reach out to particular groups through
23  the media about the SB 14 voter ID requirement.
24    A.  Right.
25    Q.  Do you know if similar efforts to reach

338

1  particular groups, minorities in particular, were made
2  as --
3        MR. ROSS:  Well, strike that question.
4    Q.  Do you know if the Secretary of State's Office
5  made a particular effort to advertise to minorities the
6  presence of mobile stations in a location?
7    A.  The Secretary of State's Office didn't make
8  advertising efforts with regard to mobile EIC units.
9    Q.  Okay.  To your knowledge how many people were
10  issued EICs by the mobile stations in Val Verde County on
11  October 31st and November 1st of 2013?
12    A.  I do not know.
13    Q.  Do you have an estimate of how many people?
14    A.  I do not.
15    Q.  It was your earlier testimony that the
16  Secretary of State's Office plans to evaluate the
17  effectiveness of the mobile unit program after the 2014
18  November elections?
19    A.  If we're going to do some sort of comprehensive
20  evaluation, that's when it will occur.
21    Q.  Do you know how the Secretary of State's Office
22  might measure the effectiveness of the mobile stations
23  program?
24    A.  Well, I don't -- that's -- that's a difficult
25  question because the effectiveness of it -- the -- the

339

1  purpose is not to get EIC applications, right?  That's
2  the hope for a benefit, but that's not the point.  The
3  point is to make sure that people have the opportunity to
4  get an election identification certificate in close
5  proximity to them if they need it.  We want to make the
6  opportunity available, so metrics on making the
7  opportunity available are a little more amorphous than
8  actual persons who have taken us up on the opportunity.
9    Q.  Okay.  Let me ask you a couple of questions
10  about Phase 3 mobile units.  You previously testified
11  that about 40 counties are participating in Phase 3?
12    A.  No, what I testified to is that there were 40
13  counties involved last I heard.  I believe there's more
14  than that now.
15    Q.  Okay.  And according to your testimony, the
16  decision to locate mobile units in a particular county
17  was based in part on whether a DPS office was in that
18  county?
19    A.  You talking about for Phase 3?
20    Q.  Phase 3, yes.
21    A.  For Phase 3 all of those counties were targeted
22  for mobile EIC units.
23    Q.  All of which counties?
24    A.  All of the 79 counties that don't have a driver
25  license office.

340

1    Q.  Okay.  Did your office take any other factors
2  into consideration when deciding whether to place a
3  Phase 3 mobile station in a particular county?
4    A.  The Phase 3 program is not ours.  We were just
5  a point of contact for the counties for DPS.
6    Q.  Okay.  So the Secretary of State's Office --
7  well, what role did the Secretary of State's Office play
8  in determining the location of a mobile station in
9  Phase 3?
10    A.  None.
11    Q.  None.  Okay.
12        MR. ROSS:  Can we take a really quick
13  break off the record?
14        (Off the record 5:44 p.m. to 5:45 p.m.)
15  BY MR. ROSS:
16    Q.  Are you familiar with roughly how many DPS
17  offices there are in Texas?
18    A.  I -- I -- I don't know.
19    Q.  Okay.  Do you have a sense of where the DPS
20  offices are located in Texas?
21    A.  No.
22    Q.  Not even based on your work on the mobile
23  units?
24    A.  No.  What I know is the coverage area of a
25  particular -- of the DPS offices, but I don't remember on

KEITH INGRAM                                                4/23/2014

341

1    that map there being a point where the DPS office
2    actually is.  It was just a shading for counties that
3    were within a 50-mile radius and a 100-mile radius of an
4    office, but I don't think it showed the offices.  It
5    might have, but I don't think so.  It's not something
6    that I would have keyed on at all.
7        Q.  Let's go back to one quick question.  So you
8    mentioned that MOU, Exhibit 4, that it may have been
9    updated from two to five days notice for DPS and the
10   Secretary of State's Office on the location of a mobile
11   station?
12       A.  I think what I said is that we've agreed to
13   extend that to five days.  Whether or not it's been
14   formalized or not, I don't think it has.
15       Q.  Formalized -- by formalized you mean whether
16   it's in writing somewhere?
17       A.  That's right.  I mean, I'm sure -- well, I
18   don't know.  I mean, I saw Louri's e-mail from earlier
19   mentioning the five-day requirement and I know the
20   five-day requirement has been agreed to by our respective
21   offices.
22       Q.  Okay.  If it was memorialized in writing do you
23   know if it would have been produced?
24       A.  I don't.
25       Q.  Okay.  If it were not memorialized in writing

342

1    could it be changed based on an understanding between the
2    Secretary of State's Office and DPS, be changed back to a
3    two-day requirement?
4        A.  If it were changed it would be to make it
5    longer, not to make it shorter.
6            MR. ROSS:  Okay.
7                EXAMINATION
8    BY MS. KORGAONKAR:
9        Q.  I just have one very quick question -- I
10   understand it's late in the day -- about the July 2013
11   match that gave you ZIP codes where there's the highest
12   concentration of people who didn't match who may not have
13   an ID.
14       A.  Right.
15       Q.  Was there any effort made by the Secretary of
16   State's Office to learn anything about those populations
17   within those ZIP codes?
18       A.  No.
19       Q.  There was no inquiry into, for example, whether
20   those people worked within those ZIP codes?
21       A.  No.
22       Q.  Or the hours that those people were likely,
23   based on perhaps census data, to have been within those
24   ZIP codes during a weekday?
25       A.  No, ma'am.

343

1            MS. KORGAONKAR:  Okay.  That's all.
2            MR. ROSENBERG:  Let's take a short break,
3    and then we can come back for any type of follow-ups.
4            (Recess from 5:47 p.m. to 5:55 p.m.)
5                FURTHER EXAMINATION
6    BY MR. ROSENBERG:
7        Q.  We're going to try to do this as expeditiously
8    as possible, Mr. Ingram.  Just before the end of the
9    questions you were talking about the metric that you
10   would use for evaluating the success of the mobile -- or
11   of the EIC program, and could you again please tell me
12   what you -- what metric you referenced?
13       A.  Sure.  It would be easy to say that the program
14   is a success or failure based upon the number of EIC
15   units that are issued for mobile units, but I don't think
16   that that's the best measure of whether or not the
17   program was a success or needs to be repeated.  The
18   metric that I would advocate for is how widely available
19   were the EICs made, and the idea being that we would want
20   to make sure that populations of voters and voters who
21   don't live in population centers both had access to an
22   election identification certificate if they needed one.
23       Q.  And how would you judge how widely available
24   EICs were made?
25       A.  See, that's what I mean.  That's a much more

344

1    amorphous metric and that's a very difficult thing to
2    evaluate.
3        Q.  Have you given some thought to that?
4        A.  No.
5        Q.  Have you considered what factors you might take
6    into consideration?
7        A.  No.
8        Q.  Did the state have a contract with any vendor
9    or marketing agency to provide a statewide voter
10   education program from June 25, 2013, to the end of 2013?
11       A.  We had a statewide voter education campaign
12   that was in place toward the end of the year, but not
13   from June 25th on.
14       Q.  Do you know when in 2013 it began?
15       A.  I believe it was in September.
16       Q.  Was that pursuant to an RFP?
17       A.  It was not.
18       Q.  Who was the vendor?
19       A.  We did an emergency procurement with TKO since
20   they were involved in our voter education campaign in
21   2012 and were familiar with the requirements of that RFP,
22   which included voter ID education.
23       Q.  How much did it cost?
24       A.  We allocated 400,000 to the -- to the effort.
25       Q.  And do you know what it covered?

345

1      A.  As much as we could cover for 400,000.  It
2   covered -- it covered --
3      Q.  You and I would spend it quite differently.
4      A.  Yeah, exactly.  It covered paid media,
5   advertising on cable TV and newspapers and radio, and it
6   also covered visits by the secretary -- at that time it
7   was Secretary of State Steen -- to election officials
8   across the state to gather earned media.
9      Q.  And was TKO responsible for placing the ads on
10  radio and television, newspaper, all of that?
11     A.  They were.
12     Q.  On the Burson Marsteller contract, was that
13  pursuant to a public bid?
14     A.  It was.
15     Q.  And have those bidding materials been produced
16  in connection with this litigation; do you know?
17     A.  I don't know.
18     Q.  What was the budget for that?
19     A.  Two million.
20     Q.  And there was a contract, I assume?
21     A.  Yes.
22     Q.  And do you know if that's been produced?
23     A.  I don't.  I believe the contract is for
24  1.675 million.
25     Q.  And the 2 million comes from -- or the

347

1      A.  I'm not sure exactly how to answer that
2   question.  They -- they were -- I don't want to violate
3   my attorney's instruction --
4      Q.  Well, let's see if we can parse it just a bit.
5   I think your attorney -- well, which part of your
6   attorney's instruction are you concerned about violating?
7      A.  Deliberative privilege and attorney-client
8   privilege.
9      Q.  What attorney was involved in -- what attorney
10  communications are involved in your answer?  When I say
11  what attorney, I mean the identity of the attorney.
12            MR. KEISTER:  Don't answer that question.
13            MR. ROSENBERG:  Then how can we tell
14  whether the attorney-client privilege applies?
15            MR. KEISTER:  Well, it's the
16  attorney-client privilege because the attorney-client --
17  the attorneys were involved in it, and we're not going to
18  get into those discussions and argue and -- I mean, you
19  can ask him anything that has to do with the -- you know,
20  with the ultimate decisions or work that the governor put
21  into it, but going into the deliberations behind it and
22  any possible attorney-client communications, who, when,
23  what, and where, I'm going to instruct him not to answer.
24            MR. ROSENBERG:  And the only reason I'm
25  just a little puzzled is because my questions have to do

346

1   difference between the 2 million and 1.675 comes from?
2      A.  The money that we've held back if we need it
3   for EIC mobile unit program.
4      Q.  What, to your knowledge, has been the
5   participation of anyone in the Governor's Office in the
6   implementation of SB 14?
7      A.  I don't know what all the governor has done
8   with regard to the implementation of SB 14.  The
9   Governor's Office and MacGregor Stephenson has worked
10  with us on mobile EIC units.  We've talked to, you know,
11  people in the Governor's Office about implementation of
12  the voter ID list to make sure that we were communicating
13  with all the stakeholders about the list of acceptable
14  IDs as we interpreted it.
15     Q.  Anything else?
16     A.  I don't -- I can't think of anything else off
17  the top of my head.
18     Q.  What was the specific participation of the
19  Governor's Office in connection with the mobile EIC
20  units?  What was -- what recommendations did it make?
21            MR. KEISTER:  To the extent that that
22  involves any attorney-client communications or
23  deliberative process communications, I'm going to
24  instruct you not to answer, but if you can give him
25  the --

348

1   with communications between the Governor's Office and --
2            MR. KEISTER:  The Governor's Office is a
3   defendant in this case as is the Secretary of State and
4   as is DPS.
5            MR. ROSENBERG:  Well, then let me back up
6   and ask these questions.
7   BY MR. ROSENBERG:
8      Q.  Have you had any communications with anyone
9   from the Governor's Office concerning the implementation
10  of SB 14?
11     A.  Yes.
12     Q.  With whom did you have such communications?
13     A.  I've talked to MacGregor Stephenson and I've
14  talked to Cathy Walt.  I don't know if I've talked to
15  anybody else.
16     Q.  And what subject areas did you discuss with
17  MacGregor Stephenson concerning the implementation of
18  SB 14?
19            MR. KEISTER:  Without going into the
20  details.  You can tell the subject matters, but not the
21  underlying conversations.
22     A.  The subject matters that I've spoken to the
23  Governor's Office about were our interpretation of the
24  list of photo IDs and mobile EIC unit program.
25     Q.  And when you say your interpretation of the

KEITH INGRAM                                                        4/23/2014

349

1    list of photo IDs, what do you mean by your
2    interpretation of the list?
3         A.   The information that I went through with
4    Ms. Westfall about the specific forms that we believe a
5    military ID takes, the specific forms that a certificate
6    of citizenship takes, that sort of thing.
7         Q.   And did the Governor's Office provide its
8    opinion on any of those issues?
9         A.   They agreed with our interpretation.
10        Q.   Now, the second area that you said you
11   discussed was the mobile EIC units.  With whom did you
12   have discussions concerning mobile EIC units?
13        A.   MacGregor Stephenson and Cathy Walt in the
14   Governor's Office, if that's what we're talking about.
15        Q.   And which issues relating to the mobile EIC
16   units did you discuss?
17        A.   We -- we discussed with them whether to do the
18   program or not.
19        Q.   Did the Governor's Office provide its opinion
20   and recommendation to you on that issue?
21        A.   Yes.
22        Q.   And what was it?
23        MR. KEISTER:  Once again, in terms of any
24   communications that are deliberative, I'm going to
25   instruct you not to answer based on deliberative process.

350

1    He can give you the ultimate implementation decision, you
2    know, but in terms of giving the discussions I'm going to
3    instruct him not to answer.
4         A.   They strongly supported the effort.
5         Q.   Did you have discussions with anyone in the
6    Governor's Office concerning any locations of the mobile
7    EIC units?
8         A.   I don't believe so.
9         Q.   Do you know if anyone in your office did?
10        A.   I don't believe so.
11        Q.   Do you know if anyone in your office other than
12   yourself had discussions with anyone in the Governor's
13   Office concerning implementation of SB 14?
14        A.   Yes.
15        Q.   And who was that?
16        A.   Our general counsel, Wroe Jackson, and our
17   deputy secretary of state, Coby Shorter, as well as
18   Secretary Steen.
19        Q.   And were you privy to those discussions?
20        A.   I was privy to the ones that I was privy to.
21   I don't know if I was privy to all of them.
22        Q.   Were you aware of what the subject matters are
23   of the discussions where you were not privy?
24        A.   I don't know what I don't know.
25        Q.   Meaning did they tell you after the

351

1    discussions?
2         A.   I think that our -- our discussions with the
3    Governor's Office regarding the implementation of photo
4    ID centered around the interpretation of the secretary's
5    office about the list of acceptable IDs and the mobile
6    EIC unit program.
7         Q.   So other than those two issues, as far as
8    you're aware no one in your office had discussions with
9    anyone in the Governor's Office concerning the
10   implementation of SB 14?
11        A.   We could have.  I'm not sure about this, but
12   our office could have communicated with the Governor's
13   Office about voter education in the fall of 2013 and
14   funds to pay for that effort.
15        Q.   And when you say you could have, you mean you
16   think you might have or you --
17        A.   I don't know if that was the case or not.  If
18   it was, it would have been communication with
19   Mike Morrissey in the Governor's Office.
20        Q.   And who would have had that communication?
21        A.   Mr. Jackson and Mr. Shorter.
22        Q.   One last question I have -- I don't know if
23   anyone else has any follow-up.  In your -- in your view,
24   in the construction of SB 14, the education program that
25   is mandated by the statute, does it specifically mandate

352

1    that you focus on photo ID in terms of the education or
2    voter -- voter -- voter ID generally with photo ID kind
3    of folded into it?
4         A.   I don't know.
5         Q.   Or something else?
6         A.   No, I'd have to -- I'd have to read the bill to
7    see what it says.  But the -- the bill set aside a
8    particular pot of money, and that is money from the
9    federal government under the Help America Vote Act.  In
10   setting aside that particular pot of money it comes with
11   its built-in set of constraints, and so regardless of
12   what the legislature said and the words that they used
13   with regard to that $2 million, it can't overcome the
14   regulations associated with spending federal money on a
15   voter education program, so we have endeavored in our
16   office in putting this program together to have a program
17   that very much emphasizes voter ID education as directed
18   by the legislature while accommodating the requirements
19   on the use of the money by the federal government.
20        MR. ROSENBERG:  I'll pass to whomever else
21   wants to ask a question or two.
22             FURTHER EXAMINATION
23   BY MR. BARON:
24        Q.   Keith, just on that same topic -- I'll just
25   speak loud.  So the 1.675 million on the

```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                  CORPUS CHRISTI DIVISION

MARC VEASEY, JANE HAMILTON,        )
SERGIO DELEON, FLOYD J. CARRIER,   )
ANNA BURNS, MICHAEL MONTEZ,        )
PENNY POPE, OSCAR ORTIZ, KOBY      )
OZIAS, JOHN MELLOR-CRUMLEY, PEGGY  )
HERMAN, EVELYN BRICKNER, GORDON    )
BENJAMIN, KEN GANDY, LEAGUE OF     )
UNITED LATIN AMERICAN CITIZENS     )
(LULAC), AND DALLAS COUNTY,        )
TEXAS,                             ) CIVIL ACTION
     Plaintiffs,                   ) NO.
                                   ) 2:13-CV-193
v.                                 ) (NGR)
                                   ) [Lead case]
RICK PERRY, Governor of Texas;     )
and JOHN STEEN, Texas Secretary    )
of State,                          )
     Defendants.                   )
_____    )
                                   )
UNITED STATES OF AMERICA,          )
     Plaintiffs,                   )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, IMANI CLARK, AND   )
MICHELLE BESSIAKE,                 )
     Plaintiff-Intervenors,        )
                                   )
TEXAS ASSOCIATION OF HISPANIC      )
COUNTY JUDGES AND COUNTY           )
COMMISSIONERS, HIDALGO COUNTY,     )
AND MARIA LONGORIA BENAVIDES,      ) CIVIL ACTION
     Plaintiff-Intervenors,        ) NO.
                                   ) 2:13-CV-263
v.                                 ) (NGR)
                                   ) Consolidated
STATE OF TEXAS, JOHN STEEN, in     ) case
his official capacity as Texas     )
Secretary of State; and STEVE      )
McCRAW, in his official capacity   )
as Director of the Texas           )
Department of Public Safety,       )
     Defendants.                   )
_____    )
```

Linda Lydia - 6/6/2014

2

```
 1  _____  )
                                      )
 2  TEXAS STATE CONFERENCE OF NAACP   )
    BRANCHES; and the MEXICAN         )
 3  AMERICAN LEGISLATIVE CAUCUS OF    )
    THE TEXAS HOUSE OF                )
 4  REPRESENTATIVES,                  )CIVIL ACTION
    Plaintiffs,                       )NO.
 5                                    )2:13-CV-291
    v.                                ) (NGR)
 6                                    )Consolidated
    JOHN STEEN, in his official       )case
 7  capacity as Secretary of State of )
    Texas; and STEVE McCRAW, in his   )
 8  official capacity as Director     )
    of the Texas Department of Public )
 9  Safety,                           )
    Defendants.                       )
10  _____  )
                                      )
11  BELINDA ORTIZ, LENARD TAYLOR,     )
    EULALIO MENDEZ JR., LIONEL        )
12  ESTRADA; ESTELA GARCIA ESPINOSA,  )
    LYDIA LARA, MARGARITO MARTINEZ    )
13  LARA, MAXIMINA MARTINEZ LARA, AND )CIVIL ACTION
    LA UNION DEL PUEBLO ENTERO, INC.  )NO.
14  Plaintiffs,                       )2:13-CV-348
                                      ) (NGR)
15  v.                                )Consolidated
                                      )case
16  STATE OF TEXAS; JOHN STEEN, in his)
    Official capacity as Texas        )
17  Secretary of State; and STEVE     )
    McCRAW, in his official capacity  )
18  As Director of the Texas          )
    Department of Public Safety,      )
19  Defendants.                       )
    _____  )
20

21      -----------------------------------

22              ORAL DEPOSITION OF

23                 LINDA LYDIA

24               JUNE 6, 2014

25      -----------------------------------
```

Linda Lydia - 6/6/2014

3

1

2

3            ORAL DEPOSITION OF LINDA LYDIA,

4    produced as a witness at the instance of the

5    Defendants, and duly sworn, was taken in the

6    above-styled and numbered cause on June 6, 2014,

7    from 8:48 a.m. to 1:11 p.m., before Karen L. D.

8    Schoeve, CRR, RDR, in and for the State of Texas,

9    reported by machine shorthand, at the law offices

10   of Locke Lord, LLP, 2200 Ross Avenue, Suite 2200,

11   Dallas, Texas, pursuant to the Federal Rules of

12   Civil Procedure and the provisions stated on the

13   record or attached hereto.

14

15

16

17

18

19

20

21

22

23

24

25

Linda Lydia - 6/6/2014

7

```
 1              P R O C E E D I N G S

 2

 3                  LINDA LYDIA,

 4  having been first duly sworn, testified as

 5  follows:

 6                  EXAMINATION

 7  BY MR. TATUM:

 8       Q.   Good morning.

 9       A.   Good morning.

10       Q.   My name is Stephen Tatum.  I'm an

11  assistant attorney general in the State of Texas,

12  and I'm representing the defendants in this

13  matter.

14            This is Case Number 2:13-CV-193 in

15  Federal District Court, Southern District of

16  Texas, and consolidated cases.

17            This is the deposition of Linda

18  Lydia.  It is about 8:48 on June 6th.  We're here

19  at the offices of Locke Lord in Dallas, Texas.

20            Ms. Lydia, would you please state

21  your full name for the record, please.

22       A.   Linda Darden Lydia.

23       Q.   And, Miss Lydia, where do you reside?

24       A.   I reside at the 1332 Bow Creek Drive,

25  Duncanville, Texas 75116.
```

Linda Lydia - 6/6/2014

20

1      Q.   Do you feel like you were prepared to

2  testify about the factual bases of the claims

3  stated in this complaint?

4      A.   For the most part.

5      Q.   For the most part.   Okay.

6              (Discussion off the record.)

7      Q.   (BY MR. TATUM)   And, Ms. Lydia, you

8  mentioned your employment in the real estate

9  industry.

10      A.   Yes, sir.

11      Q.   Are you also employed by the Texas

12  NAACP?

13      A.   No, I'm not.

14      Q.   What is your involvement with the Texas

15  NAACP?

16      A.   I'm an elected officer of the Texas

17  NAACP.

18      Q.   And as an elected officer, do you have

19  an official title?

20      A.   Yes, I do.

21      Q.   And what is that?

22      A.   Secretary.

23      Q.   And when were you elected to that

24  position?

25      A.   Gosh, probably about eight years ago --

Linda Lydia - 6/6/2014

39

1  today?

2       A.   Yes, sir.

3       Q.   Miss Lydia, do you vote?

4       A.   Yes, I do.

5       Q.   When was the last time that you voted?

6       A.   In the last election we had about two

7  weeks ago.

8       Q.   Miss Lydia, have you ever been unable

9  to vote because of the requirements of SB 14?

10      A.   No.

11      Q.   Have you ever been unable to vote for

12  any other reason?

13      A.   No.

14      Q.   Miss Lydia, why do you choose to vote?

15      A.   It is an absolute right that we have

16  earned and very hard-fought earned.  So I feel a

17  strong sense of responsibility to vote for those

18  people who did make those valiant efforts to open

19  those doors for us to vote.  Because for many

20  years we were denied the right to vote.

21      Q.   Miss Lydia, why did the Texas NAACP

22  join this lawsuit?

23      A.   Because of the impact it will have on

24  minorities.

25      Q.   And what is that impact?

1        A.    That impact is the burden of acquiring

2   an additional piece of identification when we

3   were operating with a voter's registration card.

4   And I guess in most states they still will

5   operate with a voter registration card, as the

6   only piece of identification needed to vote.

7        Q.    Miss Lydia, are you aware that the

8   United States is a party to this lawsuit

9   represented by the Department of Justice?

10       A.    Yes.

11       Q.    Is it the position of the Texas NAACP

12  that the United States does not adequately

13  represent its interest in this lawsuit?

14             MS. RUDD:  Objection --

15       A.    I really couldn't --

16             MS. RUDD:  Sorry.  Objection calls

17  for a legal conclusion.  You can answer.

18       A.    I really couldn't answer that question.

19       Q.    (BY MR. TATUM)  Miss Lydia, in joining

20  this lawsuit, is the Texas NAACP representing the

21  rights of itself as an organization?

22       A.    Its rights as an organization for its

23  members, yes.

24       Q.    So it's representing the rights of the

25  members of the local branches?

Linda Lydia - 6/6/2014

67

1   its permissible authority?

2        A.   Not knowing exactly what is permissible

3   and not permissible, but I know that there were

4   some changes that were put in place that would

5   absolutely guarantee the passage.

6        Q.   Does the Texas NAACP contend that those

7   changes were -- or does the Texas NAACP contend

8   that the legislature was not authorized to make

9   those changes?

10       A.   No, I don't think that that is the

11   contention.

12       Q.   Do you recall -- outside of SB 14, do

13   you recall any other bill for which similar

14   changes were made by the legislature?

15       A.   Not to my knowledge.

16       Q.   Did the Texas NAACP have the

17   opportunity to voice its concerns with SB 14 to

18   the legislature during that legislative session

19   and --

20       A.   I do --

21       Q.   Sorry.  And I'm referring to the 2011

22   legislature.

23       A.   I would venture to say that we only had

24   maybe one or two people who actually had an

25   opportunity to speak opposing or even providing

Linda Lydia - 6/6/2014

68

1  recommendations that could perhaps be used to

2  amend the scope of this bill.  I know there were

3  other people who were interested in speaking, but

4  due to time constraints, it didn't happen.

5      **Q.   Does the Texas NAACP feel that its**

6  **voice was not adequately heard concerning SB 14?**

7      A.   I think the better answer would be,

8  your question, do we feel that our

9  recommendations were not listened to?

10     **Q.   Did you have ample opportunity to**

11 **present your recommendations?**

12     A.   You know, that takes us down a long

13 road when you ask that question, because like

14 myself, I am a volunteer.  I am losing income as

15 I sit here today.  And all of our people who are

16 in our units, whether they're branch presidents

17 or whatever capacity they may hold, they are all

18 volunteers.  And so the process of supporting

19 yourself and your family does not always allow

20 you the leisure of going to Austin and waiting

21 for days, perhaps, to voice your concern.

22          We have, you know, obviously tried

23 to assist people in getting to Austin to provide

24 testimony and we have been successful in some --

25 with some -- the process of getting them there

Linda Lydia - 6/6/2014

71

1         A.    Okay.

2         Q.    **Does the Texas NAACP engage in any**

3  **activities related to voter registration?**

4         A.    Definitely.

5         Q.    **And what activities are those?**

6         A.    We conduct voter registration drives.

7  We have a complete voter empowerment initiative

8  that includes voter registration, education,

9  mobilization and voter protection.  Those are the

10 four components and this is something that we

11 have had to really work a lot harder at, so to

12 speak, because of the changes in the law

13 regarding voting with the voter ID bill.

14              We had to ensure that people were,

15 one, aware that this had taken place, and we

16 wanted our units to please educate their

17 communities that this bill had become law, and

18 that there were certain things that must be done

19 that were different from what we had done

20 previously in order for people to vote.

21         Q.    **Specifically with regard to voter**

22 **registration --**

23         A.    Um-hum.

24         Q.    **-- in what way did SB 14 change the**

25 **activities of the Texas NAACP?**

Linda Lydia - 6/6/2014

72

1      A.    That not only were you getting someone

2  to fill out a voter registration card, you were

3  also giving them information about SB 4 -- 14

4  telling them, you know, that you need to make

5  certain that the name on this voter registration

6  card that you're filling out matches the name

7  that's on your pictured ID identically, otherwise

8  you may be denied the right to vote, so there was

9  a lot more -- education normally came after the

10  registration project.  Notice I said voter

11  registration, voter education, these are

12  compartmentalized.

13      Q.    Um-hum.

14      A.    But voter registration and education

15  became one at this point because of the nature of

16  SB 14.

17      Q.    So --

18      A.    I'm sorry.  In the new law.

19      Q.    So previously there was a -- there was

20  one compartment within the organization of the

21  Texas NAACP for voter registration purposes?

22      A.    Um-hum.

23      Q.    There was a separate compartment for

24  voter education purposes; is that correct?

25      A.    Yes, sir.

Linda Lydia - 6/6/2014

74

1    Q.   Okay.  And when you say -- when you're

2    talking about how it was previously just voter

3    registration and now it's voter registration

4    education --

5        A.   Um-hum.

6        Q.   -- what additional resources are

7    committed to the new compartment described as

8    voter registration education?

9        A.   We had to provide printed material

10   about the changes.  It's -- and obviously we were

11   instructing people, you know, that when you fill

12   out your voter registration card, make sure you

13   pull out your pictured ID that you're going to be

14   using, if you have one, that it matches that card

15   because of the discretionary power that a -- that

16   an election official has when it comes time to

17   vote.

18             If it does not match exactly, they

19   can decide that you're not the person that you

20   say you are or that your identifications, one or

21   the other, does not say -- says you are and you

22   could possibly be disqualified or be given a

23   provisional ballot which may or may not count,

24   depending on your actions later.

25       Q.   Are the resources that are dedicated to

Linda Lydia - 6/6/2014

76

1  have been added to the pot, so to speak.

2      Q.   How has the Texas NAACP -- in the past,

3  prior to SB 14, how has the Texas NAACP allocated

4  resources to educate its members regarding other

5  changes to voter laws?

6      A.   We've created postcards about when the

7  State enacted re-enfranchisement for felons who

8  were off paper.  That was a piece that we would

9  hand out with voter registration cards to let

10  people know if they or family members were off

11  paper, no longer reporting to a probation or

12  parole officer, that they were now entitled to

13  vote again, so we created documents for that.

14      Q.   So -- sorry.

15      A.   That's okay.  Go ahead.

16      Q.   So did that process involve allocating

17  resources for making printouts and handouts and

18  fliers?

19      A.   Yeah.  We had -- we had a card, I just

20  told you.  We created a card with another group

21  --

22      Q.   Um-hum.

23      A.   -- that we handed out with voter

24  registration cards just so that people were aware

25  of the law.  Anytime you have any legislative

1    changes we try to educate our community about

2    those legislative changes.

3         Q.    And so the education of your members

4    regarding SB 14 is not the first time you've had

5    to educate your members regarding a change in

6    voter laws; is that correct?

7         A.    No.  But this is the most extensive

8    change we've ever had to make.

9         Q.    And other than the printouts and the

10   new compartment that you already mentioned, in

11   what ways has the education of your members

12   regarding SB 14 been more extensive than with

13   previous changes in the law?

14        A.   We have obviously been involved in this

15   litigation now for -- this was filed in, what,

16   2013, and during the legislative session, again

17   we were very actively involved in lobbying and

18   advocating against this bill.  We have had to

19   do -- we have developed resources that we have

20   provided to our branches to hand out to people

21   during the registration process.  We've had to

22   create information on where you can go and when

23   you can go and where the closest DPS office is,

24   the hours the DPS offices are open.

25                  There is a whole plethora of things

1  that have come about as a result of this bill

2  that we've never encountered on such a lengthy --

3  for such a lengthy period of time, because the

4  learning curve is still going on.  We still have

5  people who show up to vote who do not realize

6  that they need these documents.  Students don't

7  understand why a state-issued student ID is not

8  sufficive [sic] to vote when it's initiated by

9  the State as well.

10      Q.   And so are these resources you're

11  allocating towards SB 14-related issues, that

12  includes resources dedicated to the ongoing

13  litigation of this lawsuit, correct?

14      A.   Yes.

15      Q.   Going back to you were talking about --

16  talking about funds, financial resources of the

17  Texas NAACP, and you mentioned -- and correct me

18  if I'm misstating any of this -- you mentioned

19  funds that are kind of set at the beginning of

20  the year that you don't touch.  Have -- because

21  of SB 14, have you had to -- for lack of a better

22  word -- eat into any of those fund allocations?

23      A.   No.

24      Q.   Can you tell me what activities,

25  outreach activities, programming activities, any

Linda Lydia - 6/6/2014

79

1    **kind of activity of the NAA- -- of the Texas**

2    **NAACP that it has -- that it usually conducts in**

3    **any given year.  Can you give me examples of such**

4    **activities that have been allocated less**

5    **resources as a direct result of SB 14?**

6         A.   The utilization of Yannis Banks, our

7    one staff person, that has almost been -- I would

8    say he's gone from being in a position that was

9    60 percent administrative and he's now doing

10   probably 80 percent legislative as a result of

11   this bill.

12        **Q.   He was doing 60 percent administrative?**

13        A.   Um-hum.  But he's no longer doing that

14   because he doesn't have the time.

15        **Q.   Could the Texas NAACP hire someone else**

16   **to make up for that lost time?**

17        A.   No.  We can't afford that.  Our pockets

18   are not that deep.

19        **Q.   Okay.  You mentioned voter ID**

20   **education --**

21        A.   Um-hum.

22        **Q.   -- how long has the Texas NAACP been**

23   **educating its members regarding voter**

24   **requirements -- regarding voter laws in general?**

25        A.   Since its inception.

Linda Lydia - 6/6/2014

90

1  volunteer.

2       Q.   **As part of the assistance that Texas**

3  **NAACP provides to voters, does that include**

4  **helping voters gather the necessary documentation**

5  **to vote?**

6       A.   Some of our units may have.  I'm not --

7  I'm not personally familiar with anyone who has

8  one of the units that has done something like

9  that.  I'm not really for sure.  But I know we

10 have encouraged them to assist their constituents

11 to -- to get the materials needed -- the

12 documents needed, whether it's a driver's license

13 or whether it's their birth certificate.

14       Q.   **In the election cycles that have**

15 **occurred after the implementation of SB 14 --**

16       A.   Um-hum.

17       Q.   **-- has Texas NAACP assisted voters**

18 **during those elections in the manner that you've**

19 **just described?**

20       A.   I'm sure we have.

21       Q.   **Did those activities require more or**

22 **less resources than for previous elections prior**

23 **to SB 14?**

24       A.   Definitely more.

25       Q.   **In what way?**

1          A.   You have to have a -- you have to have

2    a birth certificate to get a driver's license.

3    You have to have a birth certificate to get an

4    EIC.  I mean, those are all needed to move

5    forward in the process of getting identification.

6          Q.   But in the Texas NAACP's activities

7    related to assisting voters --

8          A.   Um-hum.

9          Q.   -- to vote --

10         A.   Okay.

11         Q.   -- have they expended more or less

12   resources for those activities as a result of SB

13   14?

14         A.   More.

15         Q.   In what way?

16         A.   Resources getting people to and from

17   sites, I'm sure were expended by some of our

18   units, where they need to get to DPS offices.

19   We've had Yannis who has been working exclusively

20   on this effort.  That has definitely increased

21   our expenditure.  Printing of material,

22   informational events to educate the community.

23   What else?  Just a number of different

24   activities.  Example that comes to mind, I know

25   some of the units who usually just do membership

1  recruitment, now as part of their membership

2  recruitment events, they do provide information,

3  and they always have the registration cards, but

4  they now also have to provide -- they provide

5  information about SB 14 and the requirements of

6  that as a prerequisite to vote.

7      **Q.   Has the Texas NAACP in any way been**

8  **unable to fulfill its stated mission as a result**

9  **of SB 14?**

10     A.   No.  I'd like to think that we're still

11 carrying out the mission of the NAACP.  Maybe not

12 to the extent that we have done previously

13 because of the allocations of whether it's

14 manpower or dollars to this particular effort.

15          I think we could have done more

16 with -- this is just my personal leaning now.  I

17 think we could have done more with resources to

18 give to students for scholarships, as we have

19 done in the past, and other youth-related

20 activities.

21     **Q.   Are resources dedicated to scholarships**

22 **and youth-related activities, are those allocated**

23 **on an as-needed basis?**

24     A.   Well, they were part of our

25 programmatic efforts.  We felt they were

1  **want you to give an honest answer.**

2      A.   Well, obviously the card has to be

3  filled out by someone in order for it to be

4  processed by the election department within the

5  respective county.

6              So there is some time, but the time

7  involved in that is so minimal.  We're talking

8  name, address, date of birth, the last four of a

9  social or a driver's license, and you sign it.

10 It does not require production of a -- any type

11 of documentation to prove who you are.

12     Q.   **Ms. Lydia, why does the Texas NAACP**

13 **feel it necessary to devote time and resources**

14 **towards voter registration activities?**

15     A.   Because it -- because this is a right

16 of citizenship in this country, the right to

17 vote.  And especially it has been hard fought by

18 African-Americans.  The time was we had poll

19 taxes as a form of disenfranchising.  "How many

20 bubbles in a bar of soap" kind of lunacy testing.

21              So, yeah, there is a long and

22 egregious history of African-Americans and other

23 minorities being disenfranchised in this country.

24              And maybe I'm a little bit outraged

25 that I even have to answer that question because

1   it's so blatantly obviously.

2        Q.   Ms. Lydia, to be clear, I am not

3   questioning whether someone should have the right

4   to register to vote.

5        A.   Okay.  Understood.

6        Q.   Okay.  I don't want to come across

7   as --

8        A.   I gotcha.

9        Q.   -- as questioning that right.

10       A.   Okay.  Thank you.

11       Q.   What I'm wondering is if there are so

12   minimal costs to getting a voter registration

13   card --

14       A.   Um-hum.

15       Q.   -- why does the Texas NAACP devote so

16   many resources towards helping people get

17   registered?

18       A.   Because it's part of our mission.

19       Q.   And is it still able to fulfill that

20   part of its mission since the enactment of SB 14?

21       A.   Yes, with added -- with an added

22   burden.

23       Q.   And with regard to getting a voter

24   registration card, what is that added burden?

25       A.   We have to educate them about what they