JANICE MCCOY
CONFIDENTIAL TRANSCRIPT

7/9/2014

1 (Pages 1 to 4)

## 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2               CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,          )
                                  )
 4        Plaintiff,              )
                                  )
 5  VS.                           )  CIVIL ACTION NUMBER:
                                  )  2:13-CV-193 (NGR)
 6  RICK PERRY, et al.,           )
                                  )
 7        Defendants.             )
                                  )
 8  _____ )
    UNITED STATES OF AMERICA,     )
 9                                )
          Plaintiff,              )
10                                )
    VS.                           )  CIVIL ACTION NUMBER:
11                                )  2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS  )
12  EDUCATION FUND, et al.,       )
                                  )
13    Plaintiff-Intervenors,      )
                                  )
14  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY      )
15  COMMISSIONERS, et al.,        )
                                  )
16    Plaintiff-Intervenors,      )
                                  )
17  VS.                           )
                                  )
18  STATE OF TEXAS, et al.,       )
                                  )
19        Defendants.             )
                                  )
20  _____ )
    TEXAS STATE CONFERENCE OF     )
21  NAACP BRANCHES, et al.,       )
                                  )
22        Plaintiffs,             )
                                  )  CIVIL ACTION NUMBER:
23  VS.                           )  2:13-CV-291(NGR)
                                  )
24  NANDITA BERRY, et al.,        )
                                  )
25        Defendants.             )
```

## 2

```
 1  BELINDA ORTIZ, et al.,    )
                             )
 2    Plaintiffs,            )
                             )
 3  VS.              ) CIVIL ACTION NUMBER:
                     ) 2:13-CV-348(NGR)
 4  STATE OF TEXAS, et al.,   )
                             )
 5    Defendants.      )
    _____)
 6
 7
    *************************************************
 8
            DEPOSITION OF
 9
            JANICE McCOY
10
            JULY 9, 2014
11
    *************************************************
12
            HIGHLY CONFIDENTIAL
13
14      ORAL DEPOSITION OF JANICE McCOY, produced as a
15  witness at the instance of the Plaintiff, was duly
16  sworn, was taken in the above-styled and numbered cause
17  on the JULY 9, 2014 from 9:02 a.m. to 5:23 p.m., before
18  Chris Carpenter, CSR, in and for the State of Texas,
19  reported by machine shorthand, at the Office of the
20  Attorney General, 209 West 14th Street, Austin, TX
21  78701, pursuant to the Federal Rules of Civil Procedure
22  and the provisions stated on the record or attached
23  hereto.
24
25
```

## 3

```
 1            A P P E A R A N C E S
 2
 3  FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND:
 4      Kelly P. Dunbar
        Richard Shordt
 5      Ryan Haygood (by telephone)
        WILMER HALE
 6      1875 Pennsylvania Avenue, NW
        Washington, DC 20006
 7      (202) 663-6262
 8      kelly.dunbar@wilmerhale.com
        richard.shordt@wilmerhale.com
10  FOR THE UNITED STATES OF AMERICA:
        Jennifer Maranzano
11      U.S. JUSTICE DEPARTMENT
        CIVIL RIGHTS DIVISION
        Room 7254 NWB
12      950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
13      (202) 514-0828
14      jennifer.maranzano@usdoj.gov
15  FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
16      S. Ronald Keister
        Assistant Deputy Attorney General
        ATTORNEY GENERAL OF TEXAS
17      P.O. Box 12548
        Austin, TX  78711-2548
18      (512) 463-2197
19      ronny.keister@texasattorneygeneral.gov
20  FOR THE WITNESS:
21      Linda Halpern
        Manager of Complex Litigation
        ATTORNEY GENERAL OF TEXAS
22      P.O. Box 12548
        Austin, TX  78711-2548 MC109
23      (512) 475-1969
        linda.halpern@texasattorneygeneral.gov
24
25
```

## 4

```
 1      Brooke Paup
        Deputy Division Chief
 2      Intergovernmental Relations Division
        ATTORNEY GENERAL OF TEXAS
 3      P.O. Box 12548
        Austin, TX  78711-2548
 4      (512) 936-1381
        brooke.paup@oag.state.tx.us
 5
 6  ALSO PRESENT:
 7      Alex Hiatt, summer associate with WilmerHale
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

**5**

INDEX

Appearances.......................................2
JANICE McCOY
   Examination by Mr. Dunbar.................7
   Examination by Ms. Maranzano............187
   Examination by Mr. Keister...............280
Signature and Changes.........................283
Reporter's Certificate........................284

EXHIBITS

NO. DESCRIPTION                    PAGE MARKED

1   Subpoena for Documents                13
2   Transcript of Janice McCoy, May 16, 2012   15
3   Version of HB 218                     29
4   Submission of Background Information   40
    Author's Statement of Purpose: HB 218
5   Version of SB 362                     59
6   Submission of Background Information   88
    Author's Statement of Purpose: SB 362
    Relating to Requiring a Voter to Present
    Proof of Identification
7   Senate Rules Adopted by 81st Legislature,   93
    Jan. 14, 2009
8   E-Mail March 4, 2009 and Attachments  103
9   E-Mail Chain Nov. 8, 2010 thru Nov. 9, 2010  122
    and Attachment
10  Press Release:  Fraser Applauds Governor   134
    Perry Declaring Voter ID Emergency Item
11  Enrolled Version of SB 14             146
12  E-Mail 1/22/2011 and Attachment       166

**6**

13  Senate Journal, 82nd Legislature, Jan. 16,   171
    2011
14  E-Mail Chain, Jan. 26, 2011           180
15  Fact Sheet for SB 14 by Fraser        196
16  Draft Procedures for Consideration of SB 14  209
    Voter ID Bill
17  E-Mail, Jan. 20, 2011                 210
18  E-Mail Chain, Jan. 21, 2011 and Attachments  214
19  E-Mail Chain, Jan. 24, 2011           223
20  E-Mail Chain, Jan. 23, 2011 thru Jan. 24,   226
    2011
21  Committee of the Whole Excerpt of     229
    Transcript, Jan. 25, 2011
22  E-Mail Chain, Jan. 24, 2011 and Attachments  231
23  E-Mail Chain, Jan. 27, 2011 and Attachment   247
24  A Bill to Be Entitled an Act          249
25  Voter ID Differences                  249
26  Proposed guest list to bill signing   270
    ceremony
27  January 20, 2011 letter from Governor Perry  280
    regarding emergency Voter ID legislation

**7**

MR. DUNBAR:  Ms. McCoy, my name is Kelly Dunbar, and I'm with the Texas League of Young Voters Education Fund and Imani Clark, who are plaintiff intervenors in this case.  I'm here with my colleague, Rich Shordt, and Alex Hiatt.  And I'll have --

MS. MARANZANO:  I'm Jennifer Maranzano, and I'm representing the United States.

MS. HALPERN:  I'm Linda Halpern.  I represent the witness.

MS. PAUP:  Brooke Paup.  I represent the witness.

MR. KEISTER:  Ronny Keister, representing the Defendants.

JANICE McCOY, having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION
BY MR. DUNBAR:

Q.  Good morning again, Ms. McCoy.
A.  Good morning.
Q.  Could you please state your full name for the record, please?
A.  Janice McCoy.
Q.  And could you spell that?

**8**

A.  J-A-N-I-C-E, M-C-C-O-Y.
Q.  And a few moments ago you were sworn under oath, and I know this isn't your first deposition.  Do you understand that you're expected to testify truthfully and completely as possible in response to the questions I ask?
A.  Yes.
Q.  And if you'd like to take a break at any time, please let me know and I'll accommodate, you know, as best -- as best we can at any available opportunity.  We'll likely take a lunch break at some point, but if you need breaks before then, feel free to ask.  Do you understand?
A.  Yes.
MS. HALPERN:  Counsel, let me make a statement for the record similar to the statement I made in the last deposition when we were together, which is that there are multiple parties participating in this deposition.  The rules provide for a seven-hour period of time.  To the extent that the Young Voters and the Department of Justice are both likely to have questions of this witness, I'm cautioning you now at the start of the deposition that it will end after seven hours on the record.  So please coordinate among yourselves and allocate your time appropriately.

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

17

1   deposition in the Section 5 litigation, was inaccurate
2   or incomplete?
3        A.  No.
4        Q.  Thank you.  And I believe you testified about
5   your professional background during your last
6   deposition, so I won't try and belabor those points, but
7   you attended Texas A&M University; is that correct?
8        A.  Yes.
9        Q.  And what year did you graduate?
10       A.  1991.
11       Q.  And what was your major?
12       A.  Political science.
13       Q.  And if I recall correctly, you do not have a
14  law degree; is that correct?
15       A.  That's correct.
16       Q.  And when did you start working with Senator
17  Fraser?
18       A.  September of 1998.
19       Q.  And what was your job title at that point?
20       A.  Legislative assistant, legislative aide.
21       Q.  Legislative assistant, legislative aide.  And
22  what responsibility -- what were your professional
23  responsibilities in that role?
24       A.  I would analyze legislation for him.
25       Q.  All types of legislation or did you have a

18

1   particular area of expertise or specialty?
2        A.  I can't remember from 1998, because I've done a
3   lot of different issue areas for the Senator.  I don't
4   remember what committees I worked that session.
5        Q.  Okay.  And I believe you've testified on the
6   record that you no longer work for Senator Fraser; is
7   that correct?
8        A.  That's correct.
9        Q.  And when did you stop working for Senator
10  Fraser?
11       A.  I left his employ at the end of October of
12  2013.
13       Q.  And what was your job title with Senator Fraser
14  prior to you leaving in October of 2013?
15       A.  Chief of Staff.
16       Q.  And are you employed today?
17       A.  I am.
18       Q.  For whom do you work?
19       A.  The Texas Funeral Service Commission.
20       Q.  And what is your job title?
21       A.  Executive Director.
22       Q.  And what job responsibilities do you have in
23  that role?
24       A.  I am the administrative head of the small state
25  agency, so I oversee the agency.

19

1        Q.  Oh, so it's a funeral --
2        A.  Texas Funeral Service Commission.
3        Q.  Got it.  When do you recall Senator Fraser
4   first taking an interest in Voter ID issues?
5            MS. HALPERN:  Let me stop here.  Let me
6   assert legislative privilege.  I assume we're going to
7   seal the deposition, which is what we've been doing in
8   the past.  And I'm going to make my spiel now and then
9   we can refer back to it during the rest of this
10  deposition.  Based on the representation essentially of
11  the court that if the witness answers under seal, the
12  privilege is not thereby waived.  We're going to today
13  permit this witness to answer questions, which we still
14  believe legislative privilege attaches, with respect to
15  her thoughts and mental impressions and those of her
16  boss.  We will still draw the line at the thoughts and
17  mental impressions of people in other legislative
18  offices who have to themselves choose whether or not to
19  assert legislative privilege.  She cannot waive that
20  privilege for them.  She does not have that right.
21           To the extent that you are asking her
22  questions about her thoughts and mental impressions
23  about legislation, about Senator Fraser's thoughts and
24  mental impressions about legislation, I'm going to
25  permit her to answer them under seal with the

20

1   understanding that we object to those questions, that
2   the legislative privilege attaches, and with the proviso
3   that, based on the court's direction, that we can either
4   stop the deposition and get a ruling and y'all come
5   back, or we can allow the witness to answer under seal
6   and keep going and not have to come back and fight about
7   that privilege later.  That's what we're going to do.
8            MR. DUNBAR:  And I appreciate that
9   clarification for the record.  I guess that does raise
10  the question of:  Is the point that you want to start a
11  Highly Confidential designation now that just will run
12  throughout the rest of the deposition or will you assert
13  which -- which questions that the witness is answering
14  that you believe implicate the privilege and thus need
15  to be under seal?  I assume this is really just a
16  practical consideration, I suppose, for the court
17  reporter.
18           MS. HALPERN:  I will assert the objections
19  as we go along, but in deference to our beleaguered
20  court reporter having gone through this drill already
21  and determining that it was impossible for him to go
22  back and figure out what little bits to put under seal
23  and what not, that we'll just seal the whole thing;
24  because otherwise, he has an impossible task.
25           MR. DUNBAR:  Do you have an objection to

JANICE MCCOY                                           7/9/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

21

1  that, Counsel?
2          MS. MARANZANO:  I don't -- I don't think
3  so.  Can we go off the record for a moment and confer?
4          MR. DUNBAR:  Sure.  You want to confer?
5          MS. MARANZANO:  Yeah.
6          (Discussion off the record and recess from
7  9:17 to 9:22 a.m.)
8          (Mr. Haygood calling in to listen in to
9  deposition.)
10         MR. HAYGOOD:  Good morning.  This is Ryan
11 Haygood for the Texas League of Young Voters with the
12 NAACP Legal Defense Fund.
13         MS. HALPERN:  Let me -- let me just ask a
14 clarification.  So he is -- he is with the same group
15 that you're with?
16         MR. DUNBAR:  Yes, ma'am.
17         MS. HALPERN:  So his questioning is being
18 done by you?
19         MR. DUNBAR:  Yes, ma'am.
20         MS. HALPERN:  Okay.  Thank you.
21         MR. HAYGOOD:  Sorry.  I'm just going to
22 play a listening role on mute.
23         MR. DUNBAR:  Thank you, Ryan.
24         And we're back on the record.
25         After conferring, we -- the procedure

---

22

1  makes some sense to us.  We'd ask if the entire -- if
2  the entire deposition is put under seal for purposes of
3  administrative convenience, that we be able to use
4  transcripts of the deposition with respect to Senator
5  Fraser's upcoming deposition.
6          MR. DUNBAR:  I don't think there's a
7  problem with that as long as that deposition is also
8  under seal.
9          MR. DUNBAR:  That those relevant portions
10 are under seal?
11         MS. HALPERN:  Yes.  That's fine.
12         MR. DUNBAR:  Great.  And so, Counsel,
13 you've made your standing objection with respect to
14 legislative privilege.  I understand that the witness
15 will be answering those questions to the best of her
16 recollection, but that -- and then that the entirety of
17 the testimony will be under seal.  Is that your
18 understanding?
19         MS. HALPERN:  Yes.  And every time I
20 assert a legislative privilege objection, it should be
21 understood that we are doing so in reliance -- and the
22 witness then goes ahead and gives an answer, it should
23 be with the understanding that we're relying on the
24 court's explanation that that was one of the two ways to
25 proceed that would preserve the privilege.

---

23

1          MR. DUNBAR:  Thank you.
2          MR. KEISTER:  May I ask a question?  Are
3  we going to do it question by question, or are we going
4  to have a series of running objections?  Because I know
5  that one question can to lead to another, so we don't --
6          MS. HALPERN:  I'll assert the objection
7  each time, but for brevity's sake, I'll just say,
8  "Objection, legislative privilege," and that's all I
9  will say with the understanding that the entire
10 objection is in fact being made each time I say it.
11         MR. DUNBAR:  Thank you.
12         MS. HALPERN:  The objection is a statement
13 of nonwaiver.
14         MR. DUNBAR:  Thank you.
15         ==Q.  (By Mr. Dunbar)  And so, Ms. McCoy, I believe==
16 ==the question on the table is:  When do you recall==
17 ==Senator Fraser first taking an interest in Voter ID==
18 ==issues?==
19         ==A.  I don't know that I can speak to when he==
20 ==actually became interested in Voter ID.  I can speak to==
21 ==when I was asked to start working on it, which was in==
22 ==the 2007 legislative session.==
23         Q.  And is that the first time you personally had
24 heard about the possibility of Voter ID law, a Voter ID
25 law being enacted in Texas?

---

24

1          A.  No.  I think that the Voter ID issue had been
2  raised in the session before and maybe even as early as
3  2003.
4          Q.  And in those prior iterations of the Voter ID
5  issues, Senator Fraser played no active role then?
6          A.  My recollection -- my recollection is that
7  those discussions were all in the Texas House of
8  Representatives.
9          ==Q.  I see.  And was there a particular event that==
10 ==prompted Senator Fraser's interest in 2007 in Voter ID==
11 ==issues?==
12         ==A.  My recollection is that a constituent of==
13 ==ours -- of his, I'm sorry, a constituent of his asked==
14 ==him to be the Senate sponsor of the bill.==
15         ==Q.  And who was that constituent?==
16         MS. HALPERN:  Let me object and assert
17 legislative privilege.  You can go ahead and answer.
18         ==A.  Skipper Wallace.==
19         Q.  And who is Mr. Wallace?
20         A.  Skipper Wallace was a constituent from Lampasas
21 County.
22         Q.  And what occupation did Mr. Wallace have?
23         A.  I'm not sure of his occupation.  I know that at
24 one point he had been on -- on the SREC, and I don't
25 know --

---

JANICE MCCOY                                               7/9/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1  constituent needs?
2     A.  No.
3     Q.  Do you know anything about the social --
4  socioeconomic characteristics of the district in 2007?
5     A.  No.
6     Q.  And again, you couldn't estimate?
7     A.  No.
8        MR. DUNBAR:  Could I get Tab 4, please,
9  Rich?  And asked that this be marked as McCoy Exhibit 3.
10       (Exhibit 3 marked for identification.)
11    Q.  (By Mr. Dunbar)  Ms. McCoy, you've been handed
12 what's been marked as Exhibit 3, and I'll give you a
13 moment to take a look at the document.
14    A.  Okay.
15    Q.  And based on your admittedly quick review, do
16 you recognize this document?
17    A.  I know that it is a version of House Bill 218.
18 I don't know which version of House Bill 218 it is.
19    Q.  Okay.  And when you say "House Bill 218," just
20 to tie together a few pieces, this is the Voter ID
21 legislation in 2007 that Senator Fraser agreed to
22 sponsor; is that correct?
23    A.  This is a version of House Bill 218.  I don't
24 know which version this is.
25    Q.  Right.  And how many versions of House Bill 218

---

30

1  were there that Senator Fraser sponsored in the Senate?
2        MS. HALPERN:  Objection, compound.
3     Q.  (By Mr. Dunbar)  You can answer.
4     A.  Senator Fraser sponsored the engrossed version
5  of House Bill 218 in the Senate.
6     Q.  Thank you.  And who sponsored the bill in the
7  House?
8     A.  Representative Brown of Kaufman.
9     Q.  And do you know how the bill was drafted
10 initially?
11    A.  No.
12    Q.  So when Senator Fraser made the decision to
13 sponsor the legislation, neither you nor he had any
14 knowledge of how the bill was drafted initially?
15       MS. HALPERN:  Objection, assumes facts not
16 in evidence.
17    Q.  (By Mr. Dunbar)  You can answer.
18    A.  I would say it's the case for most bills that
19 when a Senator agrees to pick up a House bill or even a
20 House member agrees to pick up a Senate bill, we don't
21 know who drafted the original bill.
22    Q.  And I guess I'm trying to just understand the
23 decision-making process of Senator Fraser to sponsor the
24 bill in 2007.  How many conversations did he have with
25 Mr. Wallace about the decision to whether to sponsor HB

---

31

1  218 in the Senate?
2     A.  I could not --
3        MS. HALPERN:  Objection, legislative
4  privilege.
5     A.  I cannot speak to how many conversations the
6  Senator had with the constituent.
7     Q.  (By Mr. Dunbar)  Did you have any direct
8  conversations with Mr. Wallace?
9     A.  Yes.
10    Q.  And how many times did you converse or
11 communicate with Mr. Wallace about HB 218?
12    A.  I don't know that I could answer that.
13 Mr. Wallace came into the Senator's office quite a bit,
14 every session.  And sometimes we would speak about this
15 bill and sometimes we would speak about other
16 legislation.  I would say quite a few conversations, but
17 I couldn't put a number.
18    Q.  And what -- what do you recall, if anything,
19 about the substance of those conversations about, again,
20 just about HB 218?
21    A.  From 2007?
22    Q.  Yes, ma'am.
23    A.  I have no recollection of the substance of a
24 conversation from 2007.
25    Q.  And what was the fate of HB 218 in the Senate?

---

32

1     A.  House Bill 218 failed because it didn't have
2  enough votes on the Senate floor.
3     Q.  Thank you.  I'd like to ask you just a few
4  specific questions about this version of HB 218.  If
5  you'd turn to page 9?
6     A.  Sorry.  Do you know what version of House Bill
7  218 this is?
8     Q.  I don't see any evidence of it.  This is the
9  version that was used, used in your last deposition.
10 But to the extent the version becomes relevant, if you
11 have a recollection of where it might differ from a bill
12 Senator Fraser ultimately ended up sponsoring, please
13 feel free to point that out for the record.  And if you
14 turn to page 9, do you see section -- do you see Section
15 63.0101, Documentation of Proof of Identification?
16    A.  Yes.
17    Q.  And just so I understand it, in Texas bill
18 drafting practice, what does a strike-through on the
19 page mean?
20    A.  It means that it is striking text that is in
21 current statute.
22    Q.  Got it.  And what does an underline mean?
23    A.  It's new -- proposed new language for the
24 statute.
25    Q.  Thank you.  And what would section -- what

---

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

---

**33**

1  would the changes to Section 63.0101 accomplish?
2       MR. KEISTER:  Objection to form, vague.
3       Q.  (By Mr. Dunbar)  Let me reclarify -- let me
4  clarify then.  Was the intent of the revisions to this
5  section to impose an identification requirement for
6  voting?
7       **A.  Yes.**
8       Q.  And so in common sense terms, this is a list of
9  acceptable forms of identification that someone would
10  need to vote in Texas if HB 218 were enacted; is that
11  correct?
12      **A.  I'm sorry, repeat that question.**
13      Q.  Sure.  To put -- to put the purpose of this
14  section in common sense terms, the purpose was to list
15  forms of identification that would be required -- that a
16  voter would be required to present at the polls to vote
17  in Texas; is that correct?
18      **A.  This section would provide which documentation**
19  **was acceptable to vote.**
20      Q.  And do you see on Page 10, under little 6, that
21  a student identification card issued by a public or
22  private institution of higher education located in the
23  United States that contains the person's photograph
24  would be acceptable?
25      **A.  Yes.**

---

**34**

1       Q.  And do you see under subpart B of that section,
2  that various forms of nonphoto identification would have
3  been acceptable as proof of identification under HB 218?
4       **A.  Yes.**
5       Q.  And so if I understand subpart B of HB -- of
6  this section correctly, a voter who didn't have a form
7  of photo ID could -- could use things like official mail
8  address to the person by name from a government entity,
9  a certified copy of a birth certificate, United States
10  citizenship papers, et cetera; is that correct?
11      **A.  If you look at page 6?**
12      Q.  Yes, ma'am.
13      **A.  It says that they would have to provide two**
14  **forms of the nonphoto ID, not just one form.**
15      Q.  Right.  Two forms of photo identification --
16      **A.  No.**
17      Q.  -- so under -- sorry, nonphoto identification,
18  correct?
19      **A.  Yes.**
20      Q.  ==So under subpart B, if you didn't have a form==
21  ==of photo identification but had a copy of a current==
22  ==utility bill and official mail, official mail addressed==
23  ==to the person by name from a government entity, you==
24  ==could vote; is that correct?==
25      **A.  ==Under the way this bill was written, yes.==**

---

**35**

1       Q.  And what criteria were used to determine which
2  IDs to include and exclude in HB 218?
3       **A.  Those were decisions that were made in the**
4  **Texas House, vetted on the Texas -- on the floor of the**
5  **Texas House of Representatives.**
6       Q.  Okay.  And did you or Senator Fraser ask what
7  criteria were used to include or exclude IDs before
8  deciding to become a sponsor of the bill?
9       **A.  I did not.  Cannot speak to what the Senator**
10  **asked or didn't ask.**
11      Q.  So sitting here today, you have no knowledge of
12  whether Senator Fraser asked what criteria were used to
13  include or exclude IDs before deciding to sponsor the
14  bill; is that correct?
15      **A.  Yes.**
16      Q.  And do you know if Mr. -- sitting here today,
17  do you know whether Mr. Wallace had any understanding of
18  what criteria were used to include or exclude the
19  various forms of ID?
20          MS. HALPERN:  Objection, calls for
21  speculation.
22      **A.  I cannot speak to what Mr. Wallace knew or**
23  **didn't know in 2007.**
24      Q.  (By Mr. Dunbar)  Okay.  And in connection with
25  HB 218, are you aware of any analysis done in either the

---

**36**

1  House or the Senate to determine how many residents
2  possessed the various forms of acceptable ID?
3       **A.  I don't recall in 2007 if there was any**
4  **analysis done or not done.**
5       Q.  And would the existence of such analysis be
6  relevant to Senator Fraser in deciding to sponsor the
7  bill or not?
8          MS. HALPERN:  Objection, calls for
9  speculation.
10      **A.  I'm sorry.  You're going to have to rephrase**
11  **that question.  I'm not sure I understood what you were**
12  **trying to get.**
13      Q.  Sure.  Let me step back.  Typically, when
14  Senator Fraser decides to sponsor a bill, is it correct
15  to say that Senator Fraser -- well, strike that.
16      ==When Senator Fraser decided to sponsor HB==
17  ==218, are you aware of him asking whether there was any==
18  ==analysis that had been done to determine how many Texas==
19  ==residents possessed the various forms of ID under the==
20  ==bill?==
21      **A.  ==I'm not aware of him asking that question.==**
22      Q.  Okay.  And in connection with HB 218, again, in
23  either the House or the Senate, are you aware of any
24  analysis done to determine the racial demographics of
25  Texas residents who might possess or not possess the

---

JANICE MCCOY                                        7/9/2014
CONFIDENTIAL TRANSCRIPT

10  (Pages 37 to 40)

37

1   various forms of acceptable ID?
2       **A.  Sorry, your questions are too long.**
3       Q.  In connection -- in 2007, in connection with HB
4   218, was any analysis done to determine the racial
5   breakdown of those people who possessed the ID versus
6   those people who didn't possess the acceptable IDs?
7       **A.  I don't recall.**
8       Q.  And also in connection with HB 218, in either
9   the Senate or the House, are you aware of any analysis
10  done to determine the socioeconomic breakdown of Texas
11  residents who might possess or not possess the various
12  forms of ID?
13      **A.  I don't recall.**
14      Q.  What was the purpose of HB 218?
15      **A.  Just to stop in-person -- to provide a tool to**
16  **stop in-person voter fraud.**
17      Q.  Are those all the purposes?
18      **A.  That's all the purposes that I knew of.**
19      Q.  Okay.  And so were there were no purposes for
20  the bill discussed among Senator Fraser or your staff
21  that were never disclosed on the public record?
22      **A.  No.**
23      Q.  Did you ever hear of any -- were you ever part
24  of or hear about any conversations about whether the
25  bill would give either party a partisan advantage in

38

1   elections?
2       MS. HALPERN:  Object on the grounds of
3   legislative privilege.  Let me just make the objection
4   and then you can go ahead and answer under seal.
5       **A.  No.**
6       Q.  (By Mr. Dunbar)  And what factual basis did
7   Senator Fraser have at the time to believe that HB 218
8   was needed to combat in-person voter fraud?
9       MS. HALPERN:  Objection, calls for
10  speculation.
11      Q.  (By Mr. Dunbar)  You can answer.
12      MS. HALPERN:  Objection, legislative
13  privilege.
14      **A.  The Senator has always said that there weren't**
15  **any tools, so we didn't know if in-person voter fraud**
16  **was occurring.  But there were anecdotal evidence.**
17  **People would say things or tell him things that there**
18  **was in-person voter fraud.  There were also polls out**
19  **there saying that the people of Texas wanted Voter ID,**
20  **and that's what he based his decision on.**
21      Q.  (By Mr. Dunbar)  Okay.  So the record's clear,
22  your testimony is that when Senator Fraser decided to
23  sponsor HB 218 in 2007, he didn't know whether voter --
24  in-person voter fraud was a problem in Texas, correct?
25      **A.  No.**

39

1       MS. HALPERN:  Objection, misstates the
2   testimony.
3       **A.  Yeah, that's not what I said.  He didn't have**
4   **-- the State doesn't have tools to know.**
5       Q.  (By Mr. Dunbar)  And --
6       **A.  But there was anecdotal evidence that it was**
7   **happening.**
8       Q.  And well, can you tell me anything about the
9   specifics of that anecdotal evidence?
10      **A.  I mean, just people telling him aside, you**
11  **know, I saw somebody voting who wasn't who they said**
12  **they were, and it was just --**
13      Q.  And were you privy to those conversations with
14  Senator Fraser?
15      **A.  No.**
16      Q.  Those were things Senator Fraser told you; is
17  that correct?
18      **A.  That's correct.**
19      Q.  Did he tell you about any specific
20  conversations he had with anyone where the topic of
21  in-person voter fraud would come up?
22      MS. HALPERN:  Objection, legislative
23  privilege.
24      **A.  We didn't talk specifics.  I mean, he**
25  **doesn't -- didn't ever say, oh, by the way, so and so**

40

1   said, we didn't have conversations like that.
2       Q.  (By Mr. Dunbar)  And did Mr. Wallace point to
3   any specific instances of in-person voter fraud when he
4   asked Senator Fraser to sponsor the bill?
5       **A.  Not that I can recall.**
6       MR. DUNBAR:  Tab 15, please.  Yeah, and so
7   the record's clear, this is -- this document is marked
8   Highly Confidential, but I understand that the entire
9   transcript will be under seal.
10      (Exhibit 4 marked for identification.)
11      MS. HALPERN:  Well, and I believe
12  defendants have -- I believe defendants have a running
13  objection to the use of Highly Confidential documents in
14  these depositions that they've asserted in other
15  depositions in which I've attended.
16      MR. KEISTER:  We'll --
17      MR. DUNBAR:  I'm sure the State will
18  appreciate you reminding them of that running objection.
19      MR. KEISTER:  It's legislatively
20  privileged, but pursuant to the court's order, I
21  understand that's the reason it's being introduced --
22      MR. DUNBAR:  Yes, sir.
23      MR. KEISTER:  -- we'll allow it.
24      Q.  (By Mr. Dunbar)  And, Ms. McCoy, you've been
25  handed what's been marked as Exhibit 4, and I'll give

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

11 (Pages 41 to 44)

---

**41**

1  you a moment to review the document.  Do you recognize
2  this document, Ms. McCoy?
3      A.  I recognize that I wrote it.  Do I remember
4  writing it, no.
5      Q.  And so you answered my next question.  You were
6  the author of this document; is that correct?
7      A.  Yes.
8      Q.  And what is it?
9      A.  In order to request a bill hearing, a Senate
10 author would need to create the statement of purpose to
11 send to the committee so that a bill analysis can be
12 written.
13     Q.  And when you say author, is the author here
14 considered Senator Fraser?
15     A.  Yes.
16     Q.  Because he was the Senate --
17     A.  Sponsor.
18     Q.  -- sponsor of the bill?
19     A.  Yes, sir.
20     Q.  And is this a document that's regularly created
21 in the course of legislative business?
22     A.  Yes.
23     Q.  So it's a requirement to -- for a committee
24 hearing, is that what you -- is that what you just
25 testified to?  Or let me back up and ask:  What is the

---

**42**

1  purpose --
2      A.  Right.
3      Q.  -- of submitting this document?
4      A.  So let me just start by saying that the process
5  may have changed from 2000 to 2013, so they may not be
6  using this particular document anymore, but they use
7  something similar.  But essentially, when you either
8  file or sponsor legislation, you have to request a
9  committee hearing from the committee chairman.  And so
10 as part of that request for a -- to hold a committee
11 hearing, you would need to prepare, at this time in
12 2007, it was called a statement of purpose, to submit
13 along with your request for a hearing.  And I'm not sure
14 at the time how -- each committee, I think, does it
15 differently.  Some committees will just drop in the
16 Senate author's text in its entirety.  Some committees
17 will rewrite it, and then that would be used to create a
18 bill analysis, so that if the bill is set for hearing,
19 there would be a bill analysis attached to it.
20     Q.  Thank you.  And the "From" line shows that this
21 is from you and Senator Fraser; is that correct?
22     A.  Yes.  Well, it's from me, Senator Fraser's
23 office.  He did not write this.
24     Q.  I see.  Thank you for the clarification.  Would
25 Senator Fraser have reviewed this document?

---

**43**

1      A.  No.
2      Q.  This is the type of document that you would
3  send out of -- out of his office without him reviewing;
4  is that correct?
5      A.  Yes.
6      Q.  And is it -- just so the record is clear, you
7  have no specific recollection of Senator Fraser
8  reviewing this document, or is it your testimony that
9  you recall that he did not review this document?
10     A.  It's my testimony that he did not review these
11 types of documents on any bill from our office to a
12 committee's office.
13     Q.  And the document is addressed to Anna Beth
14 White and Cary Choate; is that correct?
15     A.  That's correct.
16     Q.  And based on their titles that are provided in
17 the memorandum, they were employees of the Senate
18 Committee on State Affairs and the Senate Research
19 Center; is that correct?
20     A.  That's correct.
21     Q.  And what is the Senate Research Center?
22     A.  It's a division of the Senate that helps
23 committees prepare bill analysis and the other research
24 Directed by their chief of head, or I don't really know
25 who heads up the research center, but they're just a

---

**44**

1  little research arm of the Senate.
2      Q.  And are they -- do they provide legal advice or
3  legal function, or is it simply a research arm or body
4  of the Senate?
5      A.  The Senate research center does not provide
6  legal advice.  They're just research.
7      Q.  And would this document have been sent to
8  others in the Legislature besides Ms. White and
9  Ms. Choate?
10     A.  No.
11     Q.  And so the document would not have been shared
12 outside the Legislature in any circumstances?
13     A.  This document -- I don't know if this document
14 was shared.  Occasionally, another member's office on
15 any legislation, not specifically related to Voter ID,
16 would ask a question about a bill, and if the bill
17 analysis wasn't online yet, occasionally, documents like
18 this could be shared with other members' offices.  In
19 this instance, I would guess not, because it's a House
20 bill and there's already a lot of bill analysis already
21 out there on the House version.
22     Q.  And where did you get the information from to
23 write or to describe the statement of purpose that's on
24 the first page of the document?
25     A.  When Senator Fraser agreed to sponsor the bill,

---

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

---

45

1  Representative Brown sent over a bill book, and it was
2  in there.
3      Q.  And what is a bill book?
4      A.  Every member does it differently, but
5  typically, a bill book would be the book that a staff
6  person would put together for a member with all the
7  relevant documents related to that bill so that the
8  member would be prepared for a committee hearing or
9  floor debate.  So it would contain the bill, past
10 versions of the bill, bill analysis, physical notes,
11 background material.
12     Q.  And so you cut and -- is the idea that you cut
13 and paste this text from a description in the bill book
14 and put it into the submission of background
15 information?
16     A.  My guess, because I do not recall 2007, is how
17 I did my work back then, my guess is that, given the
18 date, a month before session was about to end, given the
19 fact that the bill was a House bill, that yes, I cut and
20 paste.
21     Q.  Okay.  Do you see in the middle of the first
22 paragraph on the first page, which for the record is
23 Texas 00085773, the sentence that begins with
24 "Individuals are not required"?
25     A.  Uh-huh.

---

46

1      Q.  And can you read that into the record?
2      A.  "Individuals are not required to show
3  identification to register to vote."
4      Q.  As you understand the law before Senate Bill 14
5  was enacted, is that an accurate recitation of the law?
6      A.  Well, this was from 2007, and I don't -- I
7  can't speak to what the election code said then.  I
8  cannot remember if this was before or after HAVA.  I
9  don't remember when HAVA was implemented.  But I think
10 it's accurate from my recollection of registering to
11 vote, I just fill out the card and send it in.
12     Q.  So in your view, then, a voter registration
13 card was not, quote, unquote, "identification"?
14     A.  Well, this isn't about -- this line is about
15 the registration application.
16     Q.  Right.
17     A.  Individuals are not required to show
18 identification to register to vote, so this is about the
19 application.
20     Q.  About the application for the registration.
21 Thank you.  And on page Texas 0085774, under Roman
22 Numeral II, there are answers to a series of questions,
23 correct?
24     A.  Yes.
25     Q.  And are the questions that are asked just stock

---

47

1  questions that go into any submission of background
2  information?
3      A.  From 2007, yes.
4      Q.  And did you write the answers to the questions?
5      A.  Yes.
6      Q.  Did you borrow the answers from the book bill
7  you received in connection with HB 218?
8      A.  I don't think borrow is the right word.  I
9  think after looking at the bill book, I wrote these
10 answers.  These -- these questions weren't asked and
11 answered in that bill book.  I had to write them myself,
12 but I used the information in the bill book to provide
13 the answers.
14     Q.  Okay.  And under subpart A, the question is:
15 "What is the specific problem being addressed by this
16 legislation?"  Do you see that?
17     A.  I do.
18     Q.  And what is the answer?
19     A.  "Potential for voter fraud."
20     Q.  And at the time you wrote this, what was the
21 factual basis for the statement that a potential for
22 voter fraud existed?
23     A.  I think you've already asked me that question,
24 and I've answered it.  I mean --
25     Q.  It's the same, then, at the time you wrote

---

48

1  this, the same evidence of a need to address voter fraud
2  was the anecdotal evidence that Senator Fraser's
3  constituents had told him?
4      A.  That's true.
5      Q.  I just want to be sure the record's clear --
6      A.  Yes.
7      Q.  -- that there's not any new information or
8  analysis at the time you wrote this --
9      A.  No.
10     Q.  -- that supported that sentence?
11     A.  No.
12     Q.  Thank you.
13         And so under subpart C, you write, "The
14 bill would require additional forms of identification in
15 order to vote."  And the idea, I take it, was that these
16 additional forms of identification would remedy the
17 voter fraud problem that you had identified in subpart
18 A; is that correct?
19     A.  That's correct.
20     Q.  And so at least as of 2007, it was your view,
21 at least, that HB 218 would have addressed the potential
22 for voter fraud that existed?
23         MS. HALPERN:  Objection, vague.
24     A.  I think, again, in 2007, there was a
25 recognition that there was in-person voter fraud

---

JANICE MCCOY                                                  7/9/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

---

**49**

1  occurring but not evidence that had been adjudicated in
2  any way.  That this was a first step in trying to get a
3  tool to try and stop in-person voter fraud.  With any
4  legislation, sometimes you have to take baby steps.
5      Q.  (By Mr. Dunbar)  And at the time you wrote this
6  in 2007, in-person voter fraud was a crime in Texas,
7  correct?
8      A.  Yes.
9      Q.  And do you see subpart D under Roman Numeral
10 II?
11     A.  Uh-huh.  Yes.
12     Q.  Can you read the question and answer into the
13 record, please?
14     A.  "Who do you believe will support this
15 legislation?  Why?"
16         "Republicans.  They say it will reduce
17 voter fraud."
18     Q.  And at what basis at this point in time did you
19 have to believe that Republicans would support the bill?
20     A.  I would assume it's because Skipper Wallace
21 brought the -- brought the Senator the bill to file, and
22 he was chair.  He was an active Republican.
23     Q.  And did Mr. Wallace explain to you why he
24 thought it was that Republicans would support the bill?
25         MS. HALPERN:  Objection, assumes facts not

---

**50**

1  in evidence.
2      A.  I'm sorry, ask your question again.
3      Q.  (By Mr. Dunbar)  Sure.  Did Mr. Wallace in any
4  conversations he had with you or to your knowledge with
5  Senator Fraser explain why he thought Republicans would
6  support HB 218?
7      A.  I don't recall if we had those kind of
8  conversations or not.  I know that as part of one of his
9  roles, whatever it was, I can't recall, he was
10 representing other Republicans when he came to our
11 office asking Senator Fraser to file this -- to sponsor
12 this legislation.
13     Q.  And did Mr. Wallace indicate in any of those
14 conversations that he thought a Voter ID law would be
15 politically advantageous for Republicans?
16     A.  No.
17     Q.  Do you see a subpart D under Roman Numeral II?
18     A.  Subpart D --
19     Q.  Right.
20     A.  -- we were just talking about?
21     Q.  Sorry, E.  My apologies.  Thank you.
22     A.  Yes.
23     Q.  And can you read that question and answer into
24 the record?
25     A.  "Who do you believe will oppose this

---

**51**

1  legislation?  Why?"
2          "Democrats.  They say it will reduce voter
3  turnout among those individuals who typically vote
4  democratic like the poor and the elderly."
5      Q.  And what basis did you have to write in 2007
6  that you believe democrats would oppose the bill?
7      A.  The House floor debate.
8      Q.  And what -- what about the House floor debate
9  convinced you of that?
10     A.  I think the -- if you listen to or watch the
11 floor debate, Democrats consistently spoke against the
12 bill and voted against the bill during that session.
13     Q.  And do you agree with the statement in the
14 submission that the poor and the elderly typically vote
15 democratic?
16     A.  No.
17     Q.  You don't?
18     A.  I couldn't speak to how the poor and elderly
19 typically vote.  I'm just repeating what the consistent
20 theme on the House floor debate was.
21     Q.  So this was your recitation of the argument
22 that your opponents were making; is that correct?
23     A.  That the House Democrats made on the Texas
24 floor.
25     Q.  And so in 2007, you had no basis to believe

---

**52**

1  that the poor or the elderly would be more likely to
2  vote democratic?
3      A.  I did not.
4      Q.  Do you -- did you, I should say, work with
5  Senator Fraser during any of his election or reelection
6  campaigns?
7      A.  Senator Fraser didn't have an opponent
8  throughout my tenure.  His first election, he had an
9  opponent, but I wasn't involved.  After that, I would
10 help him after hours writing a press release announcing
11 that he was going to run.  That was the extent of our
12 political campaigning.
13     Q.  Sounds like a nice way to politically campaign.
14         With respect to the Democratic, which I
15 now understand your testimony to be that subpart E is
16 reciting the position of the Democrats in the House,
17 that HB 218 would reduce turnout among the poor and the
18 elderly, was Senator Fraser or yourself, were Senator
19 Fraser or yourself concerned about that possibility at
20 the time?
21     A.  I can't speak to Senator Fraser's concerns.  I
22 think that with any legislation, if I didn't think -- if
23 I didn't think it was going to be beneficial for the
24 state, then I would have tried to advise him
25 differently.  So, again, in 2007, I can't really speak

---

JANICE MCCOY                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

14 (Pages 53 to 56)

---

53

1  to my motivations or not because that was a long time
2  ago.  But I would say that we -- I didn't have any
3  concerns and that he probably did not.
4      Q.  So there were concerns raised on the House
5  floor by Democrats about the potential to reduce voter
6  turnout, and Senator Fraser and yourself concluded that
7  those concerns were unfounded then; is that correct?
8          MS. HALPERN:  Objection, legislative
9  privilege.
10     A.  I would say yes.
11     Q.  (By Mr. Dunbar)  And what did you do, what --
12 what analysis did you undertake to decide that those
13 concerns were unfounded, again, this was in 2007?
14     A.  I don't know that we did any analysis in 2007.
15     Q.  Setting aside doing any analysis, what was
16 the basis of the logical argument been for why the
17 Democrats concern was unfounded?
18     A.  I think that the Senator assumed that most
19 people had some form of identification.
20     Q.  And those are the forms of identification that
21 were listed in HB 218, including the nonphotographic
22 identification, correct?
23     A.  Correct.
24     Q.  And you said HB 218 died -- died in the
25 Senate.  Do you remember the specific timing on that?

---

54

1      A.  I do not know the date, no, sir.
2      Q.  Sometime after April 2007?
3      A.  That's correct.
4      Q.  Okay.
5      A.  Had to have been in May.
6      Q.  Did the legislative sessions typically have a
7  set end point, would it have likely ended in May?
8      A.  Yes, well, or the first day of June.  Texas
9  sessions are 140 days.  They start the second Tuesday of
10 January.  So they're 140 days later.  Typically, it's
11 Memorial Day, so we -- everybody always works on
12 Memorial Day.  And then probably starting in 2003, maybe
13 a little before that, there were actually started to be
14 rules in place, end of session rules where bills
15 wouldn't be able to be considered after a certain
16 deadline, so a lot of bills -- you only really had about
17 60 days to get a bill through the process.
18     Q.  Okay.
19     A.  Because you had the first 30 days, and
20 essentially, you don't have the last 15 days.  So
21 you're -- you got to move fast.
22     Q.  And after HB 218 died in the Senate or did not
23 pass, did you have conversations with Senator Fraser
24 about next steps with respect to Voter ID legislation?
25         MS. HALPERN:  Objection, legislative

---

55

1  privilege.
2      A.  We didn't speak again about Voter ID until two
3  thousand and -- November -- October-November time frame
4  of 2008.
5      Q.  (By Mr. Dunbar)  And that's you and Senator
6  Fraser, correct?
7      A.  That's correct.
8      Q.  Did you have any conversations with Mr. Wallace
9  after the defeat of HB or the failure of the Senate to
10 pass HB 218 prior to November of 2008?
11     A.  No.
12     Q.  Did you have any conversations with Mr. Wallace
13 in the November 2008 time frame with respect to Voter ID
14 legislation?
15     A.  I can't recall specifically, but probably yes.
16     Q.  So it's fair to say Senator Wallace -- excuse
17 me, Mr. Wallace stayed involved in the Voter ID
18 legislation issue after HB 218 failed to pass the
19 Senate; is that correct?
20     A.  That's correct.
21         MS. HALPERN:  Counsel, we've been going
22 about actually an hour and seven or eight minutes.  Can
23 we take a break?
24         MR. DUNBAR:  Absolutely.
25         (Recess at 10:07 to 10:23 a.m.)

---

56

1      Q.  (By Mr. Dunbar) Ms. McCoy, I believe we were
2  about to start talking about the November 2008 time
3  frame.  I wanted to jump back for just one quick follow-
4  up question with respect to the 2007 time frame.
5      I believe it was your testimony that
6  Senator Fraser's -- the basis for Senator Fraser's
7  support for the House version of the Voter ID bill in
8  2007 was anecdotal evidence of in-person voter fraud; is
9  that correct?
10     A.  I can't speak to his whole motivation.  I do
11 know that he knew of anecdotal voter fraud as one reason
12 why he wanted to support the bill.
13     Q.  And just so the record is clear, are you aware,
14 and I appreciate that you might not know all of the
15 reasons, but are you aware of any other reasons that
16 Senator Fraser had to support HB 218 in 2007?
17     A.  I think he also supported it because his
18 constituents did.
19     Q.  Okay.  And with respect to the anecdotal
20 evidence that Senator Fraser heard, did he ever ask you
21 or anyone else on his staff to investigate the anecdotes
22 to determine whether they were true or false?
23     A.  In -- I'm sorry, thought you were about to say
24 something.
25     In 2007, no.  Again, we got the bill

---

JANICE MCCOY                                           7/9/2014
CONFIDENTIAL TRANSCRIPT

                                        15 (Pages 57 to 60)

---

**57**

1   around April 27.  The session was going to end in a
2   month, we didn't have time.  I mean, it was a very short
3   time frame to do anything in 2007.
4        Q.  Understood.  So no -- your office did no
5   independent investigation in that time frame of the
6   anecdote Senator Fraser had heard?
7        A.  That's correct.
8        Q.  And I believe you testified previously that the
9   issue of Voter ID came back on Senator Fraser's radar in
10  November of 2008; is that correct?
11       A.  That's correct.
12       Q.  And what happened in that time frame?
13       A.  Typically, prior to any legislative session
14  starting, I would sit down with the Senator and review
15  stuff that he had tried to pass in sessions before,
16  issues that had arisen from constituents, and just
17  walked through what he thought he wanted to do for the
18  prior session.  Bill filing is typically the first or
19  second Monday after election day, and so
20  October-November time frame, we would sit down and we
21  would start to talk about legislation that he wanted to
22  file for the next session.  In that conversation I asked
23  him, "Did you want to again do Voter ID?"
24       Q.  And what did he say?
25       A.  Yes --

---

**58**

1        MS. HALPERN:  Objection, legislative
2   privilege.
3        You can answer.
4        A.  He said yes.
5        Q.  (By Mr. Dunbar) So is your -- was your specific
6   question to him about whether he wanted to continue to
7   pursue Voter ID legislation that prompted his
8   consideration of it?
9        MS. HALPERN:  Objection.
10       A.  I can't speak to what he thought or didn't
11  think about -- (cell phone ringing.)
12       That's probably my husband texting me
13  back.  I'll put it away.
14       I -- I can't speak to his motivation about
15  what he was or wasn't thinking.  I can speak to what my
16  role was as his chief of staff and legislative director,
17  and that was to say, "What kinds of things are you
18  interested in doing?  Are you interested in doing this,
19  this, this and this?"  And -- because we had done Voter
20  ID in past, I asked him about it again.
21       Now would he have brought it to my
22  attention if I hadn't brought it to his, I can't speak
23  to that.
24       Q.  (By Mr. Dunbar) Okay.  Thank you.
25       MR. DUNBAR:  And could we get Tab 5,

---

**59**

1   please.
2        (Exhibit 5 marked for identification.)
3        Q.  (By Mr. Dunbar) Ms. McCoy, you've been handed
4   what's marked as Exhibit 5.  I'll give you a moment to
5   take a look at the document if you'd like.
6        A.  Okay.
7        Q.  And what is this document?
8        A.  This is a version of Senate Bill 362.  It's not
9   marked which version it is.
10       Q.  And did Senator Fraser introduce Senate Bill
11  362 in the Senate?
12       A.  Yes.
13       Q.  Why did this bill originate in the Senate
14  rather than the House as it had before?
15       A.  In any session, legislation can be introduced
16  in either body, and typically legislation is entered in
17  in both bodies.  I think Senator Fraser, if I recall
18  correctly, our conversation in November is, "It took the
19  House until the end of April to get us a bill, why don't
20  we try and get a bill out of the Senate first and get it
21  to them so that they might have more time to vet, to
22  make -- go through the process."
23       Q.  So the idea was that introducing it in the
24  Senate would allow for quicker passage, giving the House
25  more time to pass the bill?

---

**60**

1        A.  No.  I don't think that's what I said.  I think
2   that -- I think our motivation was it has to pass both
3   bodies, let's try the Senate first and see if we can get
4   it to them prior to April 27th.  Like they only gave us
5   the one month, let's see if we can get it out of the
6   Senate.  I imagine that the bill -- I don't know, but I
7   imagine a similar bill was filed in the House, so it
8   could have been on two tracks.
9        Q.  Okay.  And did anyone ask Senator Fraser to
10  sponsor Senate Bill 362?
11       MS. HALPERN:  Objection, legislative
12  privilege.
13       A.  I -- I don't recall that anybody asked us again
14  just to actually file the bill.  I do know that Skipper
15  and I -- Mr. Wallace and I did talk about the bill again
16  in that time frame.
17       Q.  (By Mr. Dunbar) And do you recall how many
18  conversations you had with Mr. Wallace in that time
19  frame?
20       A.  I don't recall.
21       Q.  Would those have been e-mail communications or
22  in-person meetings?
23       A.  Most likely on the phone.
24       Q.  Phone calls.
25       A.  (Witness nods head yes.)

---

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

---

61

1  Q.  And you don't recall the substance of those
2  conversations?
3  **A.  If I recall correctly, I think they were more**
4  **notification to Mr. Wallace that we were going to file**
5  **the bill again -- or file the bill, not again.**
6  Q.  Is it possible that the Lieutenant Governor's
7  Office would have asked Senator Fraser to introduce SB
8  362?
9  MS. HALPERN:  Objection, calls for
10  speculation.
11  **A.  I can't speak to conversations that the Senator**
12  **had with anybody in Lieutenant Governor's Office.  I can**
13  **-- I know that the Lieutenant Governor's Office never**
14  **approached me about it.**
15  Q.  (By Mr. Dunbar) So in the October-November 2008
16  time frame, you were not in communication with anyone in
17  the Lieutenant Governor's Office about SB 362?
18  **A.  I don't recall being in conversation with**
19  **anybody about Voter ID.**
20  Q.  And in terms of communications you had with
21  constituents in this time frame, were those
22  communications limited to Mr. Wallace?
23  **A.  I don't recall if I spoke to anybody else.  I**
24  **know I spoke to Skipper Wallace.**
25  Q.  And do you recall whether Senator Fraser in

---

62

1  that time frame spoke with any other constituents than
2  Mr. Wallace?
3  **A.  There would be no way for me to know who**
4  **Senator Fraser spoke with.  He was in the district a**
5  **lot.**
6  Q.  So the answer is that you just -- you don't
7  know?
8  **A.  I don't know who the Senator spoke with during**
9  **that time frame.**
10  Q.  Did he tell you about any communications he had
11  had with other constituents about SB 362?
12  MS. HALPERN:  Objection, legislative
13  privilege.
14  **A.  I don't recall if we ever had those**
15  **conversations.**
16  Q.  (By Mr. Dunbar) And your office was not
17  involved in the drafting of HB 218; is that correct?
18  **A.  That's correct.**
19  Q.  Was your office involved in the drafting of SB
20  362?
21  **A.  Yes.  My office -- in my conversation with the**
22  **Senator, when I asked him if he wanted to move forward**
23  **with the Voter ID --**
24  MS. HALPERN:  The question was, were you
25  involved, the answer was yes.  There is no question

---

63

1  pending.
2  THE WITNESS:  Okay.
3  **A.  Yes.**
4  Q.  (By Mr. Dunbar) Could you describe your
5  involvement in the drafting of SB 362?
6  **A.  In my conversations with the Senator, when we**
7  **were talking about a Voter ID bill and where we wanted**
8  **to go, given the way the debate went in the House, we**
9  **made the decision at that time to file the same bill,**
10  **essentially there may be word changes, but essentially**
11  **we made the decision to file the bill that had passed**
12  **the House in the previous session.**
13  Q.  And that was the initial decision to file SB
14  362, correct?
15  **A.  Yes.**
16  Q.  SB 362 during the course of the legislative
17  session underwent changes; is that correct?
18  **A.  Without seeing the record, I can't say.  But**
19  **most bills do make changes through the session.**
20  Q.  And going back to the November -- the
21  October-November 2008 time frame when you were drafting
22  the bill, did you communicate with other -- the offices
23  of other legislatures in doing so?
24  **A.  About drafting the bill?**
25  Q.  Correct.

---

64

1  **A.  No.**
2  Q.  So the bill was drafted entirely based on
3  advice or input from folks in your office; is that your
4  testimony?
5  **A.  Yes.**
6  Q.  And was Mr. Wallace happy with Senator Fraser's
7  decision to sponsor SB 362?
8  MS. HALPERN:  Objection, calls for
9  speculation.
10  **A.  I can't speak to Mr. Wallace's feelings.**
11  Q.  (By Mr. Dunbar) Did he tell you whether he was
12  happy or disappointed in the decision?
13  **A.  I think he was pleased that the bill had been**
14  **re-filed.**
15  Q.  And did he -- did Mr. Wallace have a view on
16  whether it was better to file first in the Senate or the
17  House?
18  MS. HALPERN:  Objection, legislative
19  privilege.
20  **A.  Again, can't speak to Mr. Wallace's feelings.**
21  **I think Mr. Wallace understood the Texas legislative**
22  **process and was again pleased that the bill had just**
23  **been re-filed.**
24  Q.  (By Mr. Dunbar) I'd like to talk a little bit
25  about the specifics of at least this version of SB 362,

---

JANICE MCCOY                                            7/9/2014
CONFIDENTIAL TRANSCRIPT

17 (Pages 65 to 68)

---

**65**

1  and again, if to the extent that you think this differs
2  from a version that you had introduced or Senator Fraser
3  supported, please point that out for the record.
4          If you turn to Page 3, under Section 6, do
5  you see a Subpart B?
6      A.  Yes.
7      Q.  And I assume that the testimony that you provided
8  with respect to the House version of the bill is correct
9  in that an underline represents an addition to the text
10  and a strike-through represents text that exists in
11  Texas statutes that would be deleted by the bill; is
12  that correct?
13      A.  That's correct.
14      Q.  And what would Subpart -- under Section 6,
15  Subpart B, is it correct that SB 362 is introduced or at
16  least this version of SB 362 allowed for the use of both
17  photo and non-photo identification?
18      A.  Yes.
19      Q.  And if you turn to Page 5, do you see a Section
20  63.0101 entitled Documentation of Proof of
21  Identification?
22      A.  Yes.
23      Q.  And then much like HB 218, there's a Subpart A
24  that lists acceptable forms of photo identification,
25  correct?

---

**66**

1      A.  Yes.
2      Q.  And under Subpart B, there's a list of
3  acceptable forms of non-photo identification; is that
4  correct?
5      A.  Yes.
6      Q.  How did this list of acceptable photo and
7  non-photo IDs -- how was this list of acceptable photo
8  IDs and non-photo IDs for SB 362 developed?
9      A.  As I just testified:  My conversation with
10  Senator Fraser about filing this bill, we made the
11  decision to file essentially House Bill 218 the next
12  session because it had already passed the House.  So
13  this list was created through House Bill 218 in 2007.
14      Q.  Right.  And your prior testimony was at the
15  time Senator Fraser decided to sponsor the House version
16  of the bill in 2007, you were not aware of the criteria
17  that were used to select which IDs should be included
18  and excluded; is that correct?
19      A.  That's correct.
20      Q.  And in the time between 2007 and 2009, or
21  November 2008, when Senator Fraser made the decision to
22  sponsor the bill modeled on HB 218, did Senator Fraser's
23  office undertake any investigations into which forms of
24  ID should be included or excluded?
25      A.  No.

---

**67**

1      Q.  Do you recall any discussion about whether any
2  of these forms of photo ID or non-photo ID should be
3  included or excluded?
4      A.  I think I recall discussions with the Senator
5  that the bill would be much better if it was a true
6  photo ID bill, but given the nature of what happened in
7  the House in the 2007 and the way the bill came out,
8  that it was -- our best approach was baby steps:  Let's
9  file the bill.  It's not a hundred percent the way we
10  want it -- he wanted it, and that we would take this
11  first step and use this -- use this bill, use this
12  language.
13      Q.  And do you recall how provisional ballots were
14  treated under SB 362, at least as introduced?
15      A.  No.
16      Q.  Would you turn to Page 4, please.  Do you see
17  the sentence that says, "An election officer shall
18  inform a voter who is not accepted for voting under this
19  section of the Voter Rights to cast a provisional ballot
20  under Section 63.011"?
21      A.  Is that lines 1 through 4?
22      Q.  Yes, ma'am.
23      A.  Yes.
24      Q.  And then if you turn to Page 8 -- actually it
25  starts at the top of Page 7.  Am I reading this

---

**68**

1  correctly that Section 63.011, which is referenced in
2  the prior sentence, would allow a person to use a
3  provisional ballot if the person executes an affidavit
4  stating that the person is a registered voter and is
5  eligible to vote in the election?
6      A.  Yes.
7      Q.  So this version of SB 362, if I understand it
8  correctly, would mean a voter that showed up at the
9  polls without an acceptable form of identification could
10  cast a provisional ballot subject to their showing up
11  later and signing the required affidavit; is that
12  correct?
13      A.  Yes.
14      Q.  And there was no separate requirement that the
15  voter on that second trip presents photo identification
16  in connection with the provisional ballot; is that
17  correct?
18      A.  I'm sorry, what second trip?
19      Q.  The person who shows up at the poll to cast a
20  provisional ballot --
21      A.  Uh-huh.
22      Q.  -- may then execute an affidavit stating that
23  they're a registered voter in the precinct in which the
24  person seeks to vote and is eligible to vote in the
25  election, correct?

---

JANICE MCCOY                                        7/9/2014
CONFIDENTIAL TRANSCRIPT

---

69

1    A. Yeah, but I don't think that's on the second
2 trip.
3    Q. Understood. That was my misstatement. But the
4 point is, they could execute -- they could execute that
5 affidavit without any of the forms of identification,
6 either photo or non-photo identification; is that
7 correct?
8    A. At the polling place?
9    Q. Right.
10   A. Okay.
11   Q. I'm just trying to understand you correctly --
12   A. I'm trying to understand your question. I'm
13 sorry.
14   Q. Right. Well, help me understand at least how
15 SB 362 have worked. A voter who showed up at the poll
16 without either of the acceptable forms of photo
17 identification or non-photo identification --
18   A. Uh-huh.
19   Q. -- could execute a provisional ballot that
20 would be counted so long as they executed the affidavit;
21 is that correct?
22   A. I'm sorry. I think you've
23 misinterpreted. This says, "they may cast." So under
24 Senate Bill 362, this legislation says they may cast.
25   Q. They may cast a provisional ballot?

---

70

1    A. I think you would have to get the election code
2 to see how that ballot would be counted.
3    Q. But as far as you're aware, under SB 362, there
4 would be no -- from the voter's perspective, there would
5 no further form of identification that would need to be
6 presented to have that provisional ballot counted; is
7 that your understanding?
8       MR. KEISTER: Objection, form,
9 mischaracterizes previous testimony and calls for
10 speculation.
11   Q. (By Mr. Dunbar) You can answer.
12   A. Okay. I still think -- I mean, you have to
13 have -- you have to read this in context of the election
14 code. So this section of law, even before 2007, someone
15 could cast a provisional ballot doing this, you're
16 correct, stating -- signing the affidavit and they
17 would -- but then you need to look at how it's counted,
18 if it's counted.
19   Q. Understood.
20   A. Okay.
21   Q. There are no further identification
22 requirements that would bear on whether that provisional
23 ballot is counted; is that correct?
24   A. I don't know without seeing the section of law
25 about what -- how you count it. There's a whole section

---

71

1 of the election code about how you count provisional
2 ballots, if you count provisional ballots that's not
3 contained in Senate Bill 362.
4    Q. So you're not aware sitting here today, whether
5 there is a separate photo identification requirement
6 that bears on whether a provisional ballot is counted?
7    A. From the way the election code read in 2009, I
8 could not tell you how provisional ballots were counted.
9    Q. Thank you.
10   A. And if the voter had to do anything else.
11   Q. And are you familiar with discussions in
12 Senator Fraser's office around the time, November --
13 October-November of 2008 about how to treat provisional
14 ballots in SB 362?
15      MS. HALPERN: Objection, assumes facts not
16 in evidence.
17   A. I'm sorry. You might need to restate your
18 question.
19   Q. (By Mr. Dunbar) Sure. Setting aside the
20 specifics of the provisional ballot provision changes
21 that would be made by SB 362, do you recall discussions
22 in Senator Fraser's office in the October-November 2008
23 time frame about how provisional ballots should be
24 treated under SB 362?
25   A. No.

---

72

1    Q. Are you familiar with the Supreme Court's
2 decision in Crawford versus Marion County Election
3 Board?
4    A. Yes.
5    Q. And that case involved Indiana's Voter ID law;
6 is that your recollection?
7    A. Yes.
8    Q. And do you recall when that decision was
9 issued?
10   A. No.
11   Q. Stipulate for the record that it was April
12 2008. And what I'm wondering is how, if at all, the
13 Crawford decision effected the Senator's views on how to
14 pursue Voter ID legislation in Texas?
15      MS. HALPERN: Objection, legislative
16 privilege, calls for speculation.
17   A. I'm not sure the Senator and I ever had a
18 discussion about his views on the Crawford decision. I
19 do know that as I was helping him prep for the 2009
20 debates and session, the Crawford decision was used by
21 him in testimony.
22   Q. (By Mr. Dunbar) Right. Because April 2008
23 would be after HB 218 died but before SB 362 was
24 sponsored by Senator Fraser; is that correct?
25   A. That's correct.

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

---

73

1    Q.  And did you read the Crawford decision when it
2  was issued?
3    A.  No.
4    Q.  Did you have discussions with other
5  legislatures or staff people, staff persons in other
6  legislature's office about the Crawford decision, again
7  confined to the April to October-November 2008 time
8  frame?
9        MS. HALPERN:  I'm going to object, or
10  actually ask for clarification.  You keep saying, other
11  "legislature's" offices.  Do you mean other legislator's
12  offices?  Or are you asking if she talked to Georgia and
13  Indiana?
14        MR. DUNBAR :  I mean other legislators.
15  My apologies for my not coming across clearly.
16        MS. HALPERN:  I saw that in an earlier
17  transcript as well and I wanted to be clear.
18        MR. DUNBAR:  Yeah.  No, no.  That's a good
19  point.  Thank you.
20        MS. HALPERN:  If you want to ask if she
21  talked to Georgia, that's a different question.
22    A.  **During the April to November time frame, I**
23  **cannot recall speaking to anybody about the Crawford**
24  **decision.**
25    Q.  (By Mr. Dunbar) Would you have had discussions

---

74

1  with anyone in the Lieutenant Governor's Office about
2  the decision?
3    A.  **During the April to November time frame?**
4    Q.  Right.
5    A.  No.
6    Q.  What about after?
7    A.  Yes.
8    Q.  Okay.  I think we'll get to that in a little
9  bit.
10        Do you recall anything about the specifics
11  of the Indiana voting ID law that was upheld in
12  Crawford?
13    A.  **I know that it was stricter than what's found**
14  **in Senate Bill 362, but other than that I don't know**
15  **specifically which forms of IDs they provide for.**
16    Q.  And when Senator Fraser made the decision to
17  sponsor SB 362 in October-November of 2008, that version
18  of the bill I believe you just testified was less strict
19  than the law that was upheld in Crawford; is that
20  correct?
21    A.  **That's my understanding, yes.**
22    Q.  And can you help me understand the decision
23  about why SB 362 should be made less strict than the law
24  that was upheld in Crawford?
25    A.  **I think I've asked -- I think you've asked and**

---

75

1  I've answer this question.  Again, the Texas Legislature
2  140-day session, it's a game of inches sometimes.  Given
3  what transpired in 2007 in the Texas House and the
4  nature of the debate and -- and even, you know, the way
5  the Senate went when the bill failed on the Senate
6  Floor, the Senator felt that this was a good first step.
7  It's not -- I don't think what he would have wanted to
8  file but given the way the Legislature works and it
9  being an incremental approach, this is the bill he
10  thought he could pass in 2009.
11    Q.  So in 2009, in this -- sorry.  In the
12  October-November 2008 time period, it's your
13  understanding that Senator Fraser would have supported a
14  stricter Voter ID law?
15    A.  It's my understanding, yes.
16    Q.  And that's based on conversations with Senator
17  Fraser?
18    A.  Yes.
19    Q.  Did you have discussions with other legislators
20  during this time about whether SB 362 should become
21  stricter in light of the Crawford decision?
22        MS. HALPERN:  Just answer yes or no for
23  now.
24    A.  No.
25    Q.  (By Mr. Dunbar) And before SB 362 -- before

---

76

1  Senator Fraser sponsored SB 362, was there any analysis
2  done by anyone that you're aware of, of the likely
3  impact of SB 362 on voters in Texas?
4    A.  No.
5        MS. HALPERN:  Objection, vague.
6    Q.  (By Mr. Dunbar) Is your answer still no, you're
7  not aware of any analysis that was done of the likely
8  impact of SB 362 on voters?
9        MS. HALPERN:  In Texas?
10    A.  Well, you said in Texas.
11    Q.  (By Mr. Dunbar) In Texas, yes, ma'am.
12    A.  Yeah -- no, we did not have the resources to do
13  an analysis of Texas voters.  What we did have, as we
14  entered the 2009 session, were three studies that were
15  done about Indiana and Georgia that showed there was no
16  impact on turnout after that photo ID bills had been
17  implemented.
18    Q.  And what are those three studies?
19    A.  I can't name three studies.  I know that
20  they were in the documents that were provided by Senator
21  Fraser's office.
22    Q.  I'm sorry.  So someone provided them to Senator
23  Fraser's office and then Senator Fraser's office
24  provided them to others?
25        MS. HALPERN:  No, Counsel, she means

---

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

20 (Pages 77 to 80)

---

**77**

1  they're in the documents that were provided in this
2  litigation to you all --
3          MR. DUNBAR:  Oh, understood.  I'm asking a
4  different question --
5          MS. HALPERN:  -- as part of production
6  from Senator Fraser's office.
7          MR. DUNBAR:  I appreciate that.
8      Q.  (By Mr. Dunbar) I'm asking a different
9  question, which is:  Did a constituent or someone
10 provide these studies to Senator Fraser's office?
11     A.  I'm not sure how we came across these studies.
12 I don't know if it was something that I found or someone
13 brought to me.  But they were things -- studies that I
14 did provide to the Senator and to other members and
15 staff if they asked for them.
16     Q.  And were you the person -- were you the person
17 in charge of Senator Fraser -- at -- strike that.
18          In Senator Fraser's office, were you the
19 person that would have been tasked with reviewing the
20 studies to determine what effect if any they should have
21 on his sponsorship of SB 362?
22     A.  I was the Senator's primary point person on --
23 on a Voter ID legislation, so yes, I was the person
24 responsible for reviewing information that came into our
25 office.

---

**78**

1      Q.  Did you have any people working under you at
2  that time on the Voter ID issue?
3      A.  No.
4      Q.  Okay.  And do you recall reading those studies
5  in that time frame?
6      A.  Yes.
7      Q.  And I understand it's been a while, but can you
8  describe what you took to be the take-away from those
9  studies?
10     A.  That photo ID did not impact turnout in Indiana
11 or Georgia.
12     Q.  And do you recall what election that analysis
13 was based on?
14     A.  I think 2006-2008 time frame but I'm not a
15 hundred pursuant sure.
16     Q.  And there could have been -- there could be
17 various reasons that voter turnout might vary from
18 election to election, couldn't there?
19          MR. KEISTER:  Objection, form, calls for
20 speculation.
21     A.  I can't speak to any voter's motivation for why
22 they do and don't vote.
23     Q.  (By Mr. Dunbar) I mean at an aggregate level,
24 could you -- could you imagine that there would be
25 circumstances in which one election voter turnout would

---

**79**

1  be one level and the next election voter turnout might
2  be at another level?
3      A.  Yes.
4          MR. KEISTER:  Objection, vague, calls for
5  speculation.
6      Q.  (By Mr. Dunbar) I believe your answer was yes;
7  is that correct?
8      A.  Uh-huh.
9      Q.  And do you recall how those studies accounted
10 for the possibility that there might have been other
11 factors that affected voter turnout in Indiana and
12 Georgia other than the Voter ID law?
13     A.  I do not.
14     Q.  Do you know if Senator Fraser read the studies?
15     A.  I provided the studies to the Senator.
16     Q.  Did you provide the studies to Mr. Wallace?
17     A.  I don't recall giving the studies to
18 Mr. Wallace.
19     Q.  So you have no recollection discussing those
20 studies with Mr. Wallace?
21     A.  No.
22     Q.  And just so -- just so that I understand your
23 testimony, the main take-away from those studies of
24 yours was that because turnout had not gone down in
25 Indiana and Georgia, that meant that Voter ID laws were

---

**80**

1  permissible or a good thing for a state to enact?
2          MS. HALPERN:  Objection, misstates the
3  testimony, assumes facts not in evidence.  Object the
4  characterization of the study as "your."
5          With that, you can answer if you can.
6      A.  You're going to have to --
7      Q.  (By Mr. Dunbar) Well, let me rephrase.  Let me
8  rephrase the question.
9      A.  Thank you.
10     Q.  Your testimony I believe was that you took away
11 from the studies that were provided to you that turnout
12 had not decreased in Indiana and Georgia; is that
13 correct?
14     A.  I think I said that the studies showed that
15 photo ID did not impact turnout.
16     Q.  And how did the studies determine that?
17     A.  I don't recall.  I don't remember what the --
18 how the studies did that.  I'm not a statistician.
19     Q.  And based on that fact that turnout did not
20 decrease, how did that affect your view on what SB 362
21 should look like when Senator Fraser sponsored it, if at
22 all?
23          MS. HALPERN:  Objection, assumes facts not
24 in evidence.
25     A.  I didn't have a view.  The Senator and I had a

---

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

81

1  discussion, again that I already told you about, "Do you
2  want to file photo ID again?"  We made the decision,
3  notwithstanding Crawford, notwithstanding Georgia, not
4  withstanding Indiana, that given the 2000 session
5  debate, that we felt this isn't -- 362 wasn't the best
6  version but it was the version we thought we could pass
7  -- he could pass.
8      Q.  Uh-huh.
9      A.  So notwithstanding all these other things, we
10  had to look at political realities of the Texas
11  Legislature and think what we could and couldn't get
12  passed.
13      Q.  I appreciate that.  My question -- I'm sorry
14  it's confusing.  It's probably very more basic.  You
15  have a set of studies come along that show Voter ID
16  turnout did not decrease in light of Indiana and
17  Georgia's Voter ID laws.  What, if anything, did that
18  mean for the Senator's support of SB 362 or how SB 362
19  should be drafted?
20      MR. KEISTER:  Objection, vague and
21  confusing.
22          MS. HALPERN:  Yeah, and let me also object
23  to the extent that it's -- you don't have the studies
24  here in front of the witness, they're lengthy, they have
25  lots of conclusions, and so I think your question is

82

1  framing everything on the answer she gave, and so I'm
2  objecting that it assumes facts not in evidence.
3      MR. DUNBAR:  Well, she's testified I
4  believe that she took away from the study that voter
5  turnout did not decrease in Indiana and Georgia.  My
6  very simple question is an attempt to understand what
7  relevance that had for whether Voter ID laws should be
8  enacted or how Voter ID laws should be structured.
9  That's the extent of the question at this point, which I
10  think is a fair and permissible question, so I'd ask
11  that the witness answer.
12          To the extent that you can.
13          MS. HALPERN:  If you formed an opinion
14  based on that one finding, go ahead and answer the
15  question.
16      A.  Again, I don't think those studies did anything
17  but support the Senator's position already that we need
18  the tools to stop in-person voter fraud and this
19  particular tool was not harmful.
20      Q.  (By Mr. Dunbar) And did those studies, to the
21  best of your -- did those studies, to the best of your
22  recollection, look at the racial demographics -- any
23  racially demographic differences between Indiana,
24  Georgia and Texas?
25      A.  I don't recall.

83

1      Q.  Did the studies assess whether, despite perhaps
2  an increased turnout, there may have been decreases in
3  turnout of particular groups in Georgia and Indiana?
4      A.  I don't recall what the studies said
5  specifically.
6      Q.  In November -- in October and November of 2008,
7  did you have a sense of what portion of the public would
8  be least likely to possess the forms of photo
9  identification that SB 362 required?
10      A.  I'm sorry, repeat the question.
11      Q.  In November and October of 2008, did you or the
12  Senator have a view on what portion or segment of the
13  public would be least likely to possess the forms of
14  photo identification that were required?
15      A.  No.
16      Q.  Do you have any views on that today?
17      A.  Well, given that we've held several elections
18  where Voter ID has been implemented, I don't think that
19  anybody's come forward to say that they haven't been
20  able to vote.  I could be wrong because I've been out of
21  process, but the likelihood is that most people are able
22  to vote if they choose to vote.
23      Q.  Right.  And Ms. McCoy, my question is something
24  slightly different, which is:  Sitting here today, do
25  you have any views on which portion of the Texas

84

1  population is least likely to possess the photo IDs that
2  were required under SB 362?
3      MS. HALPERN:  Objection, assumes facts not
4  in evidence.  "Which portion" assumes there is one,
5  Counsel.
6          MR. KEISTER:  And asked and answered.
7      A.  I'm going to go with asked and answered.  I
8  don't understand -- I don't understand your question.  I
9  don't -- I think I've answered it.
10      Q.  (By Mr. Dunbar) Okay.  Well, let's go back and
11  walk through the steps then.  SB 362 laid out several
12  forms of photo identification; is that correct?
13      A.  Let me look at the bill again.  I have it here.
14      Q.  This is Page 5 through 6.
15      A.  Yes.
16      Q.  Step 1 of my question was whether in 2007 you
17  or the Senator had a view on whether there were any
18  particular segments of the Texas population that would
19  be less likely to possess one of these forms of photo
20  identification?
21      A.  I think, again I would have assumed -- I'm not
22  going to speak for the Senator -- that most people would
23  be able to supply one of these forms of identification.
24      Q.  So the assumption that you and Senator Fraser
25  had in sponsoring SB 362 is that most Texas residents

JANICE MCCOY                                        7/9/2014
CONFIDENTIAL TRANSCRIPT

22 (Pages 85 to 88)

---

**85**

1  had one of these forms of photo ID?
2        MS. HALPERN:  Objection, misstates the
3  testimony.  She testified for herself.
4        A.  I did not testify for the Senator.  I'm not
5  going to assume what he thought.  I said that I would
6  assume that most people had these forms of
7  identification.
8        Q.  (By Mr. Dunbar) And did you have any
9  discussions with Senator Fraser about this question?
10       A.  No.
11       Q.  So Senator Fraser was willing to sponsor SB 362
12  without knowing how many Texas residents didn't possess
13  one of these forms the photo ID?
14       MS. HALPERN:  Objection, assumes facts not
15  in evidence.  Counsel, you're bordering on badgering.
16  You're going to have Senator Fraser to ask him what he
17  thought and what he knew.  She's told you she's not --
18  she doesn't know what he thought, and you're making
19  these conclusory statements, so he thought this and he
20  thought that, she hasn't testified to that.
21       Please confine your questions to the
22  answer she gave.
23       MR. DUNBAR:  Counsel, my question was
24  whether Mr. Fraser's -- excuse me, Senator Fraser's key
25  point person on photo identification knew or had any

---

**86**

1  reason to believe what part of the Texas populations
2  wouldn't have one of these forms of ID.
3        MS. HALPERN:  And she told you she didn't
4  know.  And your next question was, "so he was willing to
5  do something without knowing," when she didn't say he
6  didn't know.  She said she didn't know what he knew.
7  Please listen to the answer, you know, or this is going
8  to get ugly.
9        MR. DUNBAR:  Counsel, I think my questions
10  were entirely proper and we've talked throughout this
11  deposition today about things that both Ms. McCoy was --
12  Ms. McCoy might know and Ms. McCoy might know as Senator
13  Fraser's chief of staff.  To the extent there's a
14  question that I ask about what Senator Fraser might have
15  known that she can't answer, the answer is "I don't
16  know, I'm not Senator Fraser," and I'm happy to accept
17  that answer.
18       MS. HALPERN:  She gave that answer and
19  then you said so he believe X, after she just told you
20  she didn't know.
21       MR. DUNBAR:  Each step in the equation
22  could be a point where she would have some knowledge of
23  Mr. Fraser's belief.  I appreciate the concern and to
24  the extent there are points where you don't know what
25  Senator Fraser thought, please correct me, but I feel

---

**87**

1  like I'm entitled to ask the question whether she had a
2  reason to know Senator Fraser believed something.  But I
3  appreciate the concern and we'll work -- let's work on
4  it going forward.
5        MS. HALPERN:  All right.
6        Q.  (By Mr. Dunbar) During consideration of SB 362,
7  did you ever see any analysis of whether the bill would
8  comply with Section 2 of the Voting Rights Act?
9        A.  No.
10       Q.  I believe in your previous deposition, you
11  testified there may have been some analysis about
12  whether SB 362 would comply with Section 5 of the Voting
13  Rights Act.  Does that sound familiar?
14       A.  Yes.
15       Q.  And have you read Section 2 of the Voting
16  Rights Act before?
17       A.  No.
18       Q.  So you don't know what Section 2 of the Voting
19  Rights Act prohibits?
20       A.  No.
21       Q.  What was the purpose of SB 362?
22       A.  To stop in-person voter fraud.
23       Q.  Was that the only purpose?
24       A.  Yes.
25       Q.  Do you believe that SB 362 as it was written

---

**88**

1  would have accomplished that purpose?
2        A.  It would have gotten us closer to accomplishing
3  that purpose.
4        MR. DUNBAR:  Tab 6, please, Richard.
5        (Exhibit 6 marked for identification.)
6        Q.  (By Mr. Dunbar) And, Ms. McCoy, I'm going to
7  hand you what is I understand -- has been marked as
8  Exhibit 6 and I'll give you moment to review the
9  document.
10       A.  Okay.
11       Q.  We saw a version of this document in connection
12  with HB 218; is that right?
13       A.  Yes.
14       Q.  So I won't ask you all the same questions about
15  what the purpose is unless you tell me that between 2007
16  and 2009 there was some change in purpose or function of
17  submission of background information.
18       A.  There was not.
19       Q.  Okay.  This document was addressed to two new
20  individuals, a Ms. Spaw and a Ms. -- a Ms. Spaw and a
21  Ms. Austin, though, correct?
22       A.  That's correct.
23       Q.  And as best I can tell, in many places the text
24  is largely the same, so in a sense it's been asked and
25  answered, but were you the author of this document in

---

JANICE MCCOY                                         7/9/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1  2009 as you testified you were in 2007?
2      A.  Yes.
3      Q.  And I'd like to turn your attention to the
4  second page, which is Texas 0085875.
5      A.  Okay.
6      Q.  Roman Numeral II, Subpart A.  Could you read
7  the question and answer into the record.
8      A.  "What is the specific problem being addressed
9  by this legislation?"
10         "Potential for voter fraud."
11     Q.  And that's the same response that was provided
12  in 2007, I think; is that right?
13     A.  Without looking at the document, I think so,
14  yes.
15     Q.  And I just want to be sure the record is clear.
16  There was nothing -- that statement was not supported by
17  any additional factual information in 2009 from 2007; is
18  that -- is that a correct understanding?
19         MS. HALPERN:  I'm sorry.  Could we have
20  that read back, the question before that?
21     Q.  (By Mr. Dunbar) Sure.  I'll rephrase my
22  question.
23         My question is:  Was there any additional
24  factual basis you had to believe that voter fraud
25  existed in Texas in 2009 that you didn't have in 2007?

90

1      A.  In 2009, we had instances of voter fraud
2  presented to the Senator's office that we had not had
3  presented to us in 2007.
4      Q.  Okay.  Great.  That's what I was looking to
5  know.
6         And when were those instances of voter
7  fraud presented to Senator Fraser's office?
8      A.  I can't recall specifically but probably
9  sometime in January or February of 2009.
10     Q.  Of 2009.  And who presented those instances of
11  voter fraud to Senator Fraser?
12     A.  I think the Attorney General's Office provided
13  us with the list.
14     Q.  And do you remember, did you review this list?
15     A.  I remember getting a list and a lot of new
16  stories about voter fraud.  I remember looking at
17  it.  And I remember giving it to the Senator.
18     Q.  This is the list from the Attorney General's
19  Office; is that correct?
20     A.  Yes.
21     Q.  Would this have been a list compiled by the
22  special -- SIU, the Special Investigations Unit?
23     A.  I do not know who compiled the list.
24     Q.  Was it a spreadsheet?
25     A.  I can't recall.

91

1      Q.  Do you recall how many instances of voter fraud
2  were listed on the list?
3      A.  I cannot recall.
4      Q.  And do you recall whether the list that was
5  provided broke out different types of voter fraud, that
6  is, absentee mail, ballot voter fraud from in-person
7  voter fraud?
8      A.  The list did have all types of voter fraud on
9  it, not just in-person.
10     Q.  Okay.  Thank you.  And will you please take a
11  quick look at Subpart D of Roman Numeral II?
12     A.  Yes.
13     Q.  And can you read that question and answer into
14  the record.
15     A.  "Who do you believe will support this
16  legislation?  Why?"
17         "Those groups who believe that elections
18  should be protected to ensure the registered person is
19  actually who shows up at the poll to vote."
20     Q.  And that's slightly different from the 2007
21  answer, isn't it?
22     A.  Yes.
23     Q.  In that, the reference to Republicans is
24  deleted; is that right?
25     A.  That's correct.

92

1      Q.  And did you make that change to the form?
2      A.  I suppose so.
3      Q.  Do you have -- you don't have any recollection
4  of making that change?
5      A.  I do not.
6      Q.  So you assume you don't know if anyone asked
7  you to make that change?
8      A.  I would assume that nobody asked me to make
9  that change.
10     Q.  Do you have a recollection of why you made the
11  change?
12     A.  I would assume that I decided that it wasn't
13  necessarily a partisan issue and that there are
14  Republicans and Democrats who want to protect
15  everybody's ballot.
16     Q.  And then so with respect to Subpart E -- I
17  won't make you read that into the record -- but would
18  you agree with me that the reference to Democrats that
19  was there in 2007 has been removed?
20     A.  Yes.
21     Q.  And was that for the same reason, to the best
22  of your recollection?
23     A.  Yes.
24     Q.  And no one, again, as far as you're aware,
25  asked you to make that change?

JANICE MCCOY                                               7/9/2014
CONFIDENTIAL TRANSCRIPT

24  (Pages 93 to 96)

---

93

1      A.  That's true.
2      Q.  Ms. McCoy, I'd like to ask you just a few
3  questions about some the legislative procedures with
4  respect to SB 362?
5           MS. HALPERN:  Counsel, let me just let you
6  know now so I don't hit you up with this later.
7           You have to feed your meter by 11:25?
8           THE WITNESS:  11:25.  20 minutes.
9           MS. HALPERN:  20 minutes from now she's
10  got to go feed the meter, so.
11           MR. DUNBAR:  Okay.  Please just --
12           MS. HALPERN:  You've been forewarned.
13           MR. DUNBAR:  -- interrupt me, you know,
14  that's fine.
15           Richard, can we get Tab 9, please.
16           (Exhibit 7 marked for identification.)
17      Q.  (By Mr. Dunbar) Ms. McCoy, you've been handed
18  what's been marked as Exhibit 7, and I'm not going to
19  ask you read the whole thing but could you turn -- well,
20  first of all, based on the cover page at least, do you
21  recognize this document?
22      A.  It appears to be a portion, because it's very
23  short, of the Senate rules adopted in 2009.
24      Q.  And can you help me just understand a very
25  basic level, does each session at the Senate adopt its

---

94

1  own rules?
2      A.  Yes.
3      Q.  At the beginning of each session, typically,
4  the Senate will vote to adopt a set of rules?
5      A.  Yes.
6      Q.  And if you -- the only rule I have a question
7  about is Page 24, which is Rule 5.11.  Do you see where
8  I'm talking about?
9      A.  Yes.
10      Q.  Are you familiar with Rule 5.11?
11      A.  What do you mean by familiar?
12      Q.  Very basic level, no trick question, I'm just
13  trying to understand:  What is Rule 5.11, to the best --
14  based on your experience in the Texas Senate?
15      A.  Well, I would have to read it.  I don't know
16  the rules by number.
17      Q.  Please do.  Subpart A and D in particular, but
18  take your time if you need to read in between.
19      A.  Apparently it's a rule about special orders.
20      Q.  And do you know what a special order is?
21      A.  I do not.
22      Q.  I understood Rule 5.11 to basically mean -- and
23  you should correct me if I'm wrong or if you just don't
24  know -- that, ordinarily, a bill can't be taken up for a
25  vote without a two-thirds vote of the Senate.  Does that

---

95

1  sound familiar?
2           MR. KEISTER:  Object to the form, object
3  to the testimony by counsel.
4      Q.  (By Mr. Dunbar) I'm offering my impression and
5  asking if you think that's correct.  If it's incorrect,
6  please tell me.
7           MR. KEISTER:  Same objections.
8      Q.  (By Mr. Dunbar) You can answer.
9      A.  Well, the Senate rules require that a bill be
10  placed on the regular order of business calendar and
11  they're supposed to be taken up in that order, and in
12  order to -- to move a bill out of order, you have to
13  have a two-thirds vote.
14      Q.  Got it.  Thank you.
15      A.  But if the Senate went in order, then you would
16  not need a two-thirds vote.
17      Q.  Thank you for that clarification.  So the basic
18  gist of the rule is that without a two-thirds vote, a
19  Senate bill has to be considered in specific order of
20  business that's set at the beginning of the session?
21      A.  The regular order of business calendar changes
22  every day as bills are voted out of Committee.
23      Q.  And who sets that?
24      A.  It's as bills come out of Committee, they're
25  placed on the regular order of business.

---

96

1      Q.  In the order in which they come?
2      A.  That's correct.
3      Q.  Thank you.  And do you know when the rule that
4  that regular order of business can be changed by a
5  two-thirds vote was adopted?
6      A.  I'm sorry --
7      Q.  Do you know when -- sorry.
8      A.  You didn't ask your -- I don't know that you
9  asked the question correctly.
10      Q.  Do you know when the requirement of a
11  two-thirds vote to not follow the regular -- to not
12  follow the regular order of business was first adopted
13  by the Senate?
14      A.  There's no rule about circumventing the regular
15  order of business calendar.  There is a rule about the
16  regular order of business calendar.
17      Q.  And where does the two-thirds vote provision
18  come from?
19      A.  Without seeing the Senate rules, there's
20  another rule somewhere in there that says they can take
21  things out of order, but you have to read the rules in
22  context and I can't do that without the entirety rules
23  in front of me.
24      Q.  I understand.  I'm not asking for a technical
25  interpretation of the rules.  I'm really just asking, do

---

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

25 (Pages 97 to 100)

97

1  you know when this basic framework, that is, you follow
2  the regular order of business unless there's a
3  two-thirds vote for a special order was adopted?
4      **A. I do not.**
5      Q. And do you know what the purpose of that
6  framework was?
7      **A. I know that when I started working in the**
8  **Senate in 1998, it existed then. My personal thought of**
9  **why it was in existence -- again, you would have to**
10 **speak to the Senators about what their thoughts are, but**
11 **that it was a way to have the Senate work together.**
12     Q. And can you read -- turn your attention,
13 please, to Subpart D of Rule 5.11.
14     **A. Okay.**
15     Q. Could you read that into the record, please.
16     **A. "Notwithstanding Subsection A of this rule, a**
17 **bill or resolution relating to Voter Identification**
18 **requirements reported favorably from the Committee of**
19 **the Whole Senate may be set as a special order for a**
20 **time at least 24 hours after the motion is adopted by a**
21 **majority of the members of the Senate."**
22     Q. Do you know why -- well, let me scratch that.
23     Do you know when Rule 5.11D was adopted
24 for the 2009 session?
25     **A. I'm assuming, given the cover page of the**

98

1  **document you handed me, it was adopted on January 14th**
2  **of 2009.**
3      Q. And do you know why it was adopted, Subpart D
4  of Rule 5.11?
5      **A. I wasn't privy to writing this rules resolution**
6  **and I didn't get to vote for it, so I can't speak to it.**
7      Q. Do you recall conversations within Senator
8  Fraser's office about why Rule 5.11D was adopted?
9          MS. HALPERN: Objection, legislative
10 privilege.
11     **A. Senator Fraser -- I was not privy to anything**
12 **prior to the Senate rules being adopted on January 14 of**
13 **2009. I wasn't part of any conversations about the**
14 **change -- about these rules, about what the rules did or**
15 **didn't do until after they occurred. After they**
16 **occurred, obviously the Senator and I had conversations**
17 **about now we didn't have a two-thirds vote to get a**
18 **Voter ID out of the Senate.**
19     Q. (By Mr. Dunbar) And is it common for Senate
20 rules to make specific exemptions for specific
21 categories of legislation?
22         MR. KEISTER: Objection, form, vague.
23     **A. Yeah, I mean, I worked in the Senate for 15**
24 **years. I think this was the only time I had seen**
25 **it. Or maybe once for redistricting, I'm not sure.**

99

1      Q. (By Mr. Dunbar) Thank you. And what is the
2  Committee of the Whole?
3      **A. The Committee --**
4      Q. The Whole Senate. Sorry.
5      **A. Yeah. The Committee of the Whole Senate is all**
6  **31 members formed as a committee.**
7      Q. And was SB 362 at any point assigned to the
8  Committee of the Whole?
9      **A. Without seeing the official record, I do recall**
10 **that it was referred to the Committee of the Whole by**
11 **the Lieutenant Governor.**
12     Q. And I know you went over a lot of this in your
13 last deposition, so these questions are really just to
14 make sure I understand things.
15     Ordinarily with SB 362, as an election
16 bill, had been assigned to the State Affairs Committee?
17     **A. It's always up to the Lieutenant Governor to**
18 **decide which committee to assign a bill or not assign a**
19 **bill. Most election bills were assigned to Senate State**
20 **Affairs Committee.**
21     Q. Okay, thank you.
22     And what -- for what purpose at a very
23 general level does the Committee of the Whole procedure
24 exist?
25         MS. HALPERN: Objection, calls for

100

1  speculation.
2      **A. Yeah, I'm -- I'm just a staff person. I mean,**
3  **the Committee of the Whole, I assume it allows all 31**
4  **members to have a role in a Committee hearing.**
5      Q. (By Mr. Dunbar) And can you recall any other
6  bills that Lieutenant Governor assigned to the Committee
7  of the Whole in the 2009 session besides SB 362?
8      **A. I don't recall.**
9      Q. Do you know whether Mr. -- Lieutenant Governor
10 Dewhurst assigned SB 362 to the Committee of the Whole
11 to expedite consideration of the bill?
12     **A. I can't speak to Governor Dewhursts' motivation**
13 **of why he would or wouldn't assign a bill to Committee.**
14     Q. Did it have the effect of expediting
15 consideration of SB 632?
16     **A. I can't speak to that either. I mean, that**
17 **would -- I mean, you never know what a Committee Chair**
18 **is going to do or not do once a bill is assigned to a**
19 **committee. They can sit on it or not sit on it if they**
20 **choose to. It's Chair's discretion.**
21     Q. Right. So you're not aware of any
22 conversations in Senator Fraser's office about whether
23 assigning SB 362 to the Committee of the Whole would
24 expedite consideration of the bill?
25     **A. I don't recall having conversations about it**

JANICE MCCOY                                        7/9/2014
CONFIDENTIAL TRANSCRIPT

26 (Pages 101 to 104)

---

101

1  expediting the bill.  And I kind get confused between
2  sessions.  I mean, the Constitution prohibits any bill
3  from being considered within the first 30 days of
4  session.  And I can't remember if it was this session or
5  the next session where the Governor did an executive
6  order, and that's the only way to expedite the hearing
7  of a bill in that first 30 days.
8         MR. KEISTER:  Objection, nonresponsive.
9         MR. DUNBAR:  Well, we'll get to that and
10 make it responsive.
11     Q.  (By Mr. Dunbar) Thank you, Ms. McCoy.
12         And I believe you've also testified in
13 your prior deposition that during the Committee of the
14 Whole's consideration of SB 362, there were concerns
15 raised about the impact of the bill on minority voters.
16 Does that sound correct?
17     A.  I'll preface my remarks by saying that I was
18 four months pregnant with twins in February of 2009, and
19 I didn't stay for the entirety of the hearing because it
20 went into the night, so I do recall that when I was
21 there, and the Senators were questioning Senator Fraser,
22 there were concerns raised about the effect of this bill
23 on certain voters.
24     Q.  And did supporters of SB 362 take any steps in
25 response to those concerns that you're aware of?

---

102

1         MS. HALPERN:  Objection, vague.
2     A.  Again, I didn't stay for the entirety of the
3  hearing.  I know that Senator Fraser tried to address
4  the questions as best he could during that part where he
5  was being questioned by other members.  My understanding
6  is that people that were in support of the bill
7  testified during that lengthy hearing about anecdotal
8  evidence and in-person voter fraud that they had seen,
9  but I did not hear it.
10    Q.  (By Mr. Dunbar) Did Senator Fraser or anyone
11 else make any changes to the actual text of SB 362 as a
12 result of those concerns that were raised?
13    A.  I don't recall if the bill was amended or not,
14 without seeing the bill history during that time frame.
15    Q.  And I believe you mentioned testimony,
16 anecdotal testimony about in-person voter fraud during
17 the Committee of the Whole's consideration.  Were there
18 specific anecdotes or instances of in-person voter fraud
19 that you recall?
20    A.  I wasn't present.  I had left by that point.
21    Q.  Or that you heard about from Senator Fraser or
22 others?
23    A.  Senator Fraser, yes, there was a couple that he
24 told me about the next day that people had said, but I
25 couldn't speak to the specifics of it.  I just remember

---

103

1  him saying so-and-so testified or somebody testified and
2  said this and this, but that was the extent of those
3  conversations.  And I don't recall who he said and what
4  they said.
5     Q.  Did he ask you or anyone in his office to
6  investigate the allegations?
7     A.  No.
8         MR. DUNBAR:  I was about to bring out
9  another exhibit.  Should we take a break now --
10        MS. HALPERN:  Yeah.
11        MR. DUNBAR:  -- to feed the meter?
12        Thank you.
13        (Recess 11:22 a.m. to 11:41 a.m.)
14        (Exhibit 8 marked for identification.)
15    Q.  (By Mr. Dunbar)  Ms. McCoy, I've handed what --
16 I've handed -- you've been handed what's marked as
17 Exhibit 8.  I'll give you a moment to take a look at the
18 document.  And I probably won't go into the nitty-gritty
19 of all the attachments.
20    A.  Okay.
21    Q.  So we can stop, and I'll give you more time to
22 review if we do.
23    A.  Okay.
24    Q.  But starting with the cover page, this is -- so
25 this is an e-mail from Bryan Hebert to you; is that

---

104

1  correct?
2     A.  That's correct.
3         MS. HALPERN:  Let the record reflect that
4  this is another document that's marked Highly
5  Confidential.
6     Q.  (By Mr. Dunbar)  And it's dated Wednesday,
7  March 4, 2009.  Do you recall -- do you recall when this
8  e-mail was sent in relation to when the debate in the
9  Senate Committee of the Whole was going on?
10    A.  I do not.
11    Q.  And Bryan Hebert, according to the signature
12 block in his e-mail, was the deputy general counsel of
13 the Office of Lieutenant Governor.  Is that -- was that
14 your understanding at the time of his role?
15    A.  Yes.
16    Q.  And can you describe to me why Mr. Hebert sent
17 you these documents on March 4, 2009?
18        MS. HALPERN:  Objection, calls for
19 speculation.
20    A.  I can't speak to Bryan's motivation for sending
21 me an e-mail.  I just know that the documents attached
22 relate to House Senate Bill 362.
23    Q.  (By Mr. Dunbar)  Were you and Mr. Hebert -- did
24 you and Mr. Hebert communicate about SB 362 during the
25 2009 session?

---

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

27 (Pages 105 to 108)

---

105

1      MS. HALPERN:  Objection, legislative
2  privilege.
3          You can go ahead and answer.  Because he's
4  already testified, you can answer.
5      A.  Yes.
6      Q.  (By Mr. Dunbar)  And how did the Lieutenant
7  Governor's Office come to be involved in SB 362?
8      A.  I can't speak to how or why they became
9  involved.  My understanding was that Governor Dewhurst
10 supported the passage of Voter ID bill.
11     Q.  And when did Senator Fraser's office begin
12 having conversations with the Lieutenant Governor's
13 Office about Voter ID legislation?
14     A.  In relation to this session?
15     Q.  That's my -- well, so let me break up the
16 question then in a couple of parts.  Did you have
17 conversation -- did you have communication -- did
18 Senator -- strike all of that.
19          Did Senator Fraser's office have
20 communications with the Lieutenant Governor's Office
21 about Voter ID legislation prior to SB 362?
22     A.  Yes.
23     Q.  Do you recall when those communications began,
24 what year?
25     A.  2007, during the debate on House Bill 218.

---

106

1      Q.  And do you recall anything about the substance
2  of those communications?
3      A.  No.
4      Q.  I believe you testified earlier that the
5  Lieutenant's Governor's -- the Lieutenant Governor's
6  Office was not involved in the formulation of SB 362 in
7  the October to November 2008 time frame; is that
8  correct?
9      A.  Yes.
10     Q.  When did the Lieutenant Governor's Office
11 become involved with respect to SB 362?
12     A.  I don't recall specifically, but I think I
13 started to visit with Bryan in January of 2009.
14     Q.  And did you reach out to Mr. Hebert or did
15 Mr. Hebert reach out to you?
16     A.  I don't recall.
17     Q.  This e-mail from Mr. Hebert has a series of
18 attachments; is that right?
19     A.  Yes.
20     Q.  Do you know who drafted these attachments?
21     A.  I do not.
22     Q.  You did not draft these attachments though?
23     A.  I did not.
24     Q.  Do you recall when you got this e-mail who you
25 thought had drafted the attachments?

---

107

1      A.  I probably assumed that Bryan drafted them.
2      Q.  How did Mr. Hebert become involved in drafting
3  attachments about SB 362?
4      A.  I can't speak to the direction that he received
5  or didn't receive from his bosses.
6      Q.  Did you -- did Senator Fraser's office ask the
7  Lieutenant Governor's Office to provide any analysis --
8      A.  No.
9      Q.  -- on SB 362?
10     A.  No.
11     Q.  Do you know why Mr. Hebert sent these
12 attachments only to you on March 4, 2009?
13     A.  I do not.
14     Q.  Did you provide these attachments to any other
15 senators or their staff?
16     A.  I don't recall.
17     Q.  Do you recall having any subsequent
18 communications with Mr. Hebert about these specific
19 attachments with respect to the e-mail?
20     A.  I don't recall having any specific
21 conversations about these attachments.
22     Q.  Do you have any recollection of reading the
23 attachments?
24     A.  I have recollection of reading some of them.  I
25 don't recall reading all of them.

---

108

1      Q.  Do you recall disagreeing with anything that
2  was set forth in any of the attachments?
3      A.  I don't recall disagreeing with anything in
4  these attachments.
5      Q.  And as a general matter, was it common to get
6  analysis and talking points from the Lieutenant
7  Governor's Office?
8      A.  Can you define what you mean by general?
9      Q.  Was it unusual -- were there other instances in
10 which you can recall that the Lieutenant Governor's
11 Office provided Senator Fraser's office with talking
12 points or analysis without Senator Fraser requesting it?
13     A.  Yes.
14     Q.  And what are those other instances?
15     A.  Just this past session on water.  There's
16 probably been instances on energy issues that there were
17 communications between other staff, not me, and the
18 Lieutenant Governor's Office.
19     Q.  And the Lieutenant Governor can't sponsor a
20 bill himself; is that correct?
21     A.  I don't know.
22     Q.  Could you please turn to page Texas -- this is
23 the record, Texas 00087008, which is titled at the top,
24 "Reasons to support SB 362 as filed"?
25     A.  Okay.

---

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

---

**109**

1  Q.  And can you look at the first point and read
2  that into the record?
3  A.  "This bill improves security in election
4  process but is not as restrictive as Indiana and
5  Georgia.  There is less chance of disenfranchising
6  elderly, poor or minority voters."
7  Q.  Did you agree with Mr. Hebert's assessment that
8  a Voter ID law that would be less strict than Indiana
9  and Georgia's would have less of a chance of
10  disenfranchising the elderly, poor or minority voters?
11  A.  I don't recall thinking about this memo at all
12  at the time.  I really don't recall reading this memo in
13  2009.  So I don't really have a view from 2009 whether I
14  thought this statement was anything.
15  Q.  But you -- you didn't -- you didn't follow up
16  with Mr. Hebert about any particular statements in this
17  whole set of attachments; is that correct?
18  A.  No, that's not what I said.  I said that there
19  were some documents that I remembered seeing, some that
20  I didn't.  Specifically, the talking points, which is
21  TX00087009, I know that we spoke on that quite a bit.
22  Q.  Okay.  Well, I was just actually trying to make
23  it easier then.
24  A.  Right.
25  Q.  But if you did follow up with him on some

---

**110**

1  things, then I need to ask some more specifics.
2  A.  Uh-huh.
3  Q.  Do you recall following up with Mr. Hebert
4  about any of the five bullet points that are listed on
5  TX 0087008?
6  A.  I do not.
7  Q.  And at the time, do you recall having an
8  understanding of why SB 362 was less restrictive than
9  Indiana and Georgia's laws?
10  A.  This has been asked and answered.
11  Q.  I'm asking in the context of this e-mail.  And
12  your counsel can make objections, please.
13  A.  Well, I can tell you -- whatever anybody else's
14  motivation was when Senator Fraser and I had the
15  discussion about what bill to file in 2008, our decision
16  was to go with the bill that had passed the House the
17  session before as an incremental step.
18  Q.  Ms. McCoy, that wasn't responsive.  I was
19  asking, sitting -- at the time you received this, do you
20  know what made SB 362 less restrictive than Indiana and
21  Georgia's law?
22  MR. KEISTER:  Objection to form,
23  mischaracterizes previous testimony.
24  A.  I don't think that was your original question.
25  I will answer that question --

---

**111**

1  Q.  (By Mr. Dunbar)  Thank you.
2  A.  -- however.  This bill was less restrictive
3  than Indiana and Georgia because it allowed for nonphoto
4  ID.
5  Q.  And have you ever reviewed the text of the
6  Indiana law?
7  A.  No.
8  Q.  Or the Georgia law?
9  A.  No.
10  Q.  Point 5 on TX0087008 states that SB 362 would
11  "increase the chance of federal preclearance because
12  many forms of ID are acceptable and provisional ballot
13  procedure is less burdensome."  Do you see that
14  statement?
15  A.  I do.
16  Q.  And do you recall agreeing or disagreeing with
17  that statement with Mr. Hebert at the time?
18  A.  Again, as I stated, I don't recall seeing
19  specifically this memo and speaking to Ms -- Bryan about
20  it.
21  Q.  And point 3 of that same page says, "Senator
22  Fraser, Williams and Duncan support this version of the
23  bill, are explaining it to members of the Senate and
24  House."  I have just a very basic question of how
25  Senator -- how and when or -- when Senator Williams and

---

**112**

1  Duncan became involved with respect to SB 362?
2  A.  I don't recall when they started to get
3  involved with the bill.  I know that -- I think --
4  sorry, can I look at a previous exhibit?
5  Q.  Please.
6  A.  Okay.  It was a different question.  I don't
7  recall when Senator Williams and Duncan became involved
8  in the bill.  I know that the session before, in 2007,
9  both Senator Williams and Senator Duncan sat on the
10  State Affairs Committee, and they both voted for the
11  bill in 2007.
12  Q.  And during the time SB 362 was being considered
13  in the 2009 session, did you have communications with
14  members of Senator Williams' and Duncan's staff about
15  the bill?
16  A.  Yes.
17  MS. HALPERN:  Just answer "yes" or "no."
18  A.  Yes.
19  Q.  (By Mr. Dunbar)  And do you recall the
20  substance of those communications?
21  MS. HALPERN:  I'm going to object on the
22  grounds of legislative privilege, and I'm going to
23  direct her not to answer, because that constitutes
24  waiving a privilege for some other legislator's
25  office.  And that she does not have the authority to do.

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

29 (Pages 113 to 116)

113

1        MR. DUNBAR:  Thank you, counsel.
2    Q.  (By Mr. Dunbar)  So just so the record is clear
3  on that then, do you recall -- do you recall how many
4  conversations you had with Senator -- with members of
5  Senator Williams' or Duncan's offices during the 2009
6  legislative session?
7    A.  A lot.
8    Q.  And with whom in Senator Williams' or Duncan's
9  office would you have had those communications?
10    A.  Can you repeat the question?
11    Q.  Sure.  With whom in Senator Williams' and
12  Duncan's office would you have had the conversations?
13    A.  Senator Williams' office, it was Ryan -- what's
14  his last name?  I don't remember his last name.  Sorry.
15    Q.  Do you remember his job, his position or title?
16    A.  I want to say he was Senator Williams'
17  legislative director, but I don't know that for sure.
18        MS. HALPERN:  And I just want to let the
19  record reflect that both Senator Williams and Senator
20  Duncan, as I understand it, are scheduled to be deposed
21  in this litigation, so.
22        MR. DUNBAR:  Thank you, Counsel.
23    A.  In Senator Duncan's office, it was Jennifer
24  Fagan.  And I think at the time she was his committee
25  director.

114

1    Q.  (By Mr. Dunbar)  And could you please turn to
2  TX00087009 entitled "Talking Points."  Is this one of
3  the attachments that I believe you said earlier you did
4  read and have further discussions with Mr. Hebert about?
5    A.  Yes.
6    Q.  And what were the nature of those discussions
7  with Mr. Hebert?
8    A.  I think the nature of those discussions was --
9  with Mr. Hebert were that these were the talking points
10  that we would -- I would try and get the Senator to use
11  as he was laying out the bill in the Committee and on
12  the floor.
13    Q.  And did you raise any concerns about whether
14  these talking points should be changed in any way?
15        MS. HALPERN:  Objection, legislative
16  privilege.
17    A.  I don't recall having those discussions about
18  if I wanted them to be changed or not.
19    Q.  (By Mr. Dunbar)  And do you know if these
20  talking points were subsequently used by the Senator or
21  others in their advocacy in support of SB 362?
22    A.  I think that when I helped the Senator with his
23  scripts for the Committee of the Whole and with the
24  Senate floor debate, that I would take stuff from this
25  document and input it in the document that I wrote for

115

1  him.
2    Q.  So Senator Fraser, as far as you are aware, did
3  not review the talking points directly himself?
4    A.  Review the talking points that Bryan drafted?
5    Q.  Yes, ma'am.
6    A.  I don't recall if I showed this to him or not.
7    Q.  And Roman Numeral II of the talking points
8  says, "This bill protects Texas voters."  And then under
9  that it says, "Detects -- detours and detects fraud;
10  improves and modernizes election procedures; protects
11  against fraud enabled by inaccurate registration rules;
12  counts only eligible voters' votes; and protects public
13  confidence in the elections."  Did you agree with
14  Mr. Hebert at the time that SB 362 would accomplish
15  those objectives?
16    A.  Yes.
17    Q.  And that was despite the fact that SB 362
18  allowed voters to use, among other things, nonphoto
19  identification?
20    A.  I think that's because we were on our way to
21  implementing a tool, whether it was the right tool or
22  not, in getting a tool to stop in-person voter fraud.
23    Q.  And if you turn to the last page of the
24  attachment, TX0087013.  Entitled "Federal Preclearance
25  of Texas Voter ID Law Required."  This e-mail with the

116

1  attachment was sent in March of 2009.  Prior to that
2  time, do you recall discussions with Mr. Hebert or the
3  Lieutenant Governor's Office about preclearance of SB
4  362?
5    A.  I think I recall the questions were generally
6  that the bill would need preclearance.  I don't know
7  that there were discussions about anything more than
8  that, but that's what I recall.
9    Q.  And do you recall the first time personally --
10  strike that.
11        Do you recall the first time Senator
12  Fraser's office became aware of the need for
13  preclearance under Section 5?
14        MS. HALPERN:  Objection, vague.
15    A.  Senator Fraser sat on State Affairs for several
16  sessions and had a general understanding -- I had a
17  general understanding and I assume that he did too, but
18  you'd have to ask him, that all election bills needed
19  preclearance.
20    Q.  (By Mr. Dunbar)  So from the time from the 2007
21  legislative session forward, it would have at least been
22  your understanding that this debate was taking place,
23  this debate about Voter ID legislation was taking place
24  against a backdrop of the need for preclearance?
25    A.  Every discussion about an election bill was

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

---

117

1  under the assumption that it would have to have
2  preclearance.
3     Q.  So that's a "yes" then?
4     A.  Yes.
5     Q.  Thank you.  And I believe you answered this
6  question with respect to the whole document, but I just
7  want to be perfectly clear with respect to this
8  particular attachment.  Did Senator Fraser's -- did you
9  or anyone in Senator Fraser's office that you're aware
10  of ask the Lieutenant Governor's Office to provide an
11  analysis of preclearance?
12     A.  No.
13     Q.  It was just sort of an e-mail that Mr. Hebert
14  kind of sent out of the blue, an FYI on preclearance?
15     A.  I can't speak to his motivation in this e-mail
16  that I received from Mr. Hebert.
17     Q.  And when you received it at the time, you
18  weren't surprised that he had provided you with
19  preclearance analysis?
20     A.  I'm never surprised by an e-mail.  You never
21  know what you get.  You get what you get.
22     Q.  Thank you.  And what happened to SB 362 in the
23  2009 session?
24     A.  Without seeing the record, do you have a
25  record?

---

118

1     Q.  Do you recall?
2     A.  I think that it passed the Senate and it died
3  in the House because of lack of time.
4     Q.  Yeah.  And I'm -- really, don't want to get
5  into too much of the procedural issues.  I'm just trying
6  to understand how -- how the session ended and what your
7  office at least was thinking about -- about Voter ID
8  law.  So it passed the Senate and was sent to the House
9  at some point during the 2009 legislative session; is
10  that right?
11     A.  That's correct.
12     Q.  And did you or anyone in Senator Fraser's
13  office that you're aware of have subsequent
14  communications with anyone in the House once it went to
15  the House?
16     A.  I'm sure that I had conversations with the
17  House author's staff.  But I don't -- was Senate -- was
18  Representative Bonnen the author of the bill in 2000?
19  No?  Y'all don't know?
20     Q.  If you don't know --
21     A.  I don't even remember who the House author was
22  that year, to tell you the truth.
23     Q.  So it's possible there were communications, you
24  can't recall --
25     A.  Right.

---

119

1     Q.  -- any specific?
2     A.  I'm sure that, like I said, when we got -- in
3  2007, I'm sure I sent whatever documents I could send to
4  the House author's staff.  I can't speak for the Senator
5  and who he spoke to or didn't speak to.  I mean,
6  senators are allowed on the House floor.  House members
7  are allowed on the Senate floor.  So people come and go
8  all the time.  He has conversations that I'm not privy
9  to.  So he probably spoke to more people than I did.  I
10  don't recall --
11        MS. HALPERN:  And that's your answer.
12     A.  Yeah.
13     Q.  (By Mr. Dunbar)  You don't recall any
14  discussions within Senator Fraser's office about a
15  strategy of how to secure passage of the bill once it
16  went to the House, for example?
17     A.  No.
18     Q.  And was Mr. Wallace still involved in SBC -- SB
19  362 at this point, the end of the 2009 legislative
20  session?
21     A.  Yes.
22     Q.  Throughout the 2009 legislative session, did
23  you have frequent conversations with Mr. Wallace about
24  the bill?
25     A.  I had discussions with Mr. Wallace about the

---

120

1  bill while the bill was in the Senate, and I would tend
2  to recall that he -- as he came into our office
3  frequently, because he was a constituent, he would be
4  discussing other things, he might mention to me how it
5  was going in the House, but that was the extent of the
6  discussion.
7     Q.  And as far as you're aware, did Senator Fraser
8  have direct -- excuse me -- did Mr. Wallace have direct
9  communications with Senator Fraser about the status of
10  SB 362 during that same time frame, or were you the kind
11  of primary contact person with Mr. Wallace?
12     A.  I was typically the primary contact with
13  Mr. Wallace because I was more accessible, I mean, I sit
14  in an office.
15     Q.  Uh-huh.
16     A.  However, the Senator, if he saw Skipper, would
17  stop and talk to him.
18     Q.  And with respect to just your conversations
19  with Mr. Wallace, were they general -- were they of the
20  nature of a general kind of status update, which, what's
21  happened, what's going on with the bill, or were there
22  actual substantive discussions with Mr. Wallace about
23  strategy with respect to SB 362?
24     A.  At what point during the session are you asking
25  that question?

---

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

121

1    Q.  At any point in the 2009 legislative session, I
2  guess.
3    A.  I think while the bill was in the Senate --
4  well, yeah, I think the whole session, they were more
5  status.  I mean, Skipper would come and ask what he
6  could do to help, how he could rally witnesses.  I mean,
7  that it wasn't something that I initiated.  And then
8  after the bill got out of the Senate, then he would come
9  and give me status updates of what was happening in the
10 House.
11   Q.  Okay.  So SB 362 doesn't pass the House in the
12 2009 legislative session.  Do you recall having
13 conversations within Senator Fraser's office after its
14 failure to pass the 2009 legislative session about next
15 steps with respect to Voter ID legislation?
16   A.  Not immediately.  I gave birth in June of 2009
17 to twins, and I was out of the office quite a bit the
18 following year.
19   Q.  I hope quite a bit.
20   A.  I think, again, in 2010, as we were gearing up
21 for the 2011 session, I asked him again and again as
22 part of my general what do you want to do this session,
23 we brought it -- I brought it up again.  But I -- I
24 can't -- I don't recall, but I want to say it's the end
25 of 2009 that we had a discussion like let's try again.

122

1    Q.  Uh-huh.
2    A.  But I was pregnant, sorry.
3    Q.  And with that, when you say "we," was that you
4  and Senator Fraser --
5    A.  Yeah.
6    Q.  -- or were there others --
7    A.  No, he and I.
8    Q.  -- involved that you recall?
9    A.  No, just he and I.
10   Q.  And what -- at what -- months are fine, just to
11 help orient myself, time frame in 2010, did the issue
12 kind of come back, did the issue of Voter ID legislation
13 come back on Senator Fraser's radar, so to speak?
14   A.  Again, I would say October-November time frame
15 is when we started to kind of flush out what we were
16 going to do the next -- what he was going to file the
17 next session.
18         MR. DUNBAR:  And could I get Tab 22,
19 please?
20         (Exhibit 9 marked for identification.)
21         MR. DUNBAR:  And I'll just note for the
22 record, this is also designated Highly Confidential.
23   Q.  (By Mr. Dunbar)  And this is, Ms. McCoy, you've
24 been handed what's marked as Exhibit 10.
25   A.  Uh-huh.

123

1    Q.  I'll give you a moment to review the e-mail and
2  the attachment.
3         MS. HALPERN:  I have 9.
4         (Brief discussion off the record.)
5         MR. DUNBAR:  So while Ms. McCoy is reading
6  that, so the record is clear, Exhibit TX00090532 is
7  Exhibit 9.
8    A.  Okay.
9    Q.  (By Mr. Dunbar)  Okay.  And I'm sorry if I'm
10 testing your memory too terribly strong here, but tell
11 me if you can, if you can't remember, the bottom e-mail
12 is from -- from you to a group of folks on November 8,
13 2010 at 3:50 p.m.  Do you see that e-mail?
14   A.  I do.
15   Q.  And can you very quickly tell me who the group
16 of recipients on the To line are?
17   A.  They are either the chief of staff -- I think
18 pretty much they're all chiefs of staff, maybe one or
19 two other legislative director, committee directors, for
20 various Republican senators.
21   Q.  Got it.  And then who is Julia Rathgeber?
22   A.  She was Governor Dewhurst's policy director.
23 I'm not really sure of her full title, her actual title.
24   Q.  So she was in Lieutenant Governor -- she was in
25 the Lieutenant Governor's Office along with Mr. Hebert

124

1  at this time?
2    A.  That's correct.
3    Q.  And can you describe to me what the bottom --
4  what your transmitting in the bottom e-mail?
5    A.  Senator -- what?
6         MS. HALPERN:  Nothing, apparently.
7         MR. DUNBAR:  Oh.
8    A.  I was attempting --
9    Q.  (By Mr. Dunbar)  Fair point.  What were you
10 attempting to transmit in the bottom e-mail?
11   A.  Senator Fraser filed a Voter ID bill that I
12 had had -- we had asked the Republican senators to
13 cosign, and I was trying to get them a copy of that bill
14 that had been filed.
15   Q.  Got it.  And the subject line shows "Voter ID
16 SB 178."  Do you see that?
17   A.  I do.
18   Q.  And let me back up before I ask about
19 that.  What does it mean just as a very practical matter
20 to file a bill?  What does that entail?
21   A.  So after a senator decides or decides not to
22 file a bill to author legislation, essentially, you get
23 something drafted.  You can do it yourself.  An outside
24 lawyer can do it.  An inside lawyer can do it.  And in
25 the Senate, it's placed on a -- it's called an orange

JANICE MCCOY                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

125

1   back.  It's an orange piece of paper that has a list of
2   actions so that when the bill moves through the process,
3   it can be marked where it is and what it is, and it's
4   the official copy.  It's the actual piece of
5   legislation.  And so when you file a bill, you get that
6   prepared and you take that and ten copies to the Senate
7   calendar clerk's office.
8       Q.  Uh-huh.
9       A.  And you give them the bill, and they put a
10  number on it.  And then that number -- and they do it
11  sequentially.  So every time you come in and you get a
12  number, and then they disburse it to the different
13  offices that need it as it moves through the process.
14      Q.  And is there a difference -- and forgive me if
15  this an ignorant question.  Is there a difference
16  between filing a bill and being a sponsor of a bill?
17      A.  So from my purposes, if you file a bill, you're
18  the author.
19      Q.  Okay.
20      A.  And it's -- so a senator is the author of a
21  Senate bill, and a senator is the sponsor of a House
22  bill.
23      Q.  I see.  So it's correct to say then that with
24  respect to SB 178, Senator Fraser was the author, not
25  the sponsor?

126

1       A.  That's correct.
2       Q.  Very helpful for me.
3           And when -- do you recall when Senator
4   Fraser decided to become the author of what was
5   originally entitled SB 178?
6       A.  Again, if I recall correctly, at the end of the
7   2009 session, he and I had a discussion about doing it
8   again, trying again, the next session, because we were
9   unsuccessful in 2009.  And then again, as I answered
10  earlier, it was in the October-November time frame that
11  S Bill filing was about to start, that we started again
12  discussing it about what he wanted to file.
13      Q.  And did you or anyone that you're aware in
14  Senator Fraser's office in that October and November
15  time frame have discussions with other legislators about
16  Senator Fraser becoming the author of a new Voter ID
17  bill?
18          MS. HALPERN:  Yes or no?
19      A.  Yes.
20      Q.  (By Mr. Dunbar)  Do you recall who -- whose
21  senators were that your office or you had communications
22  with?
23          MS. HALPERN:  You can give the names.
24      A.  Well, I mean, the question isn't -- I think for
25  your purposes, because you're not familiar with the

127

1   legislative process, I think most senators, I would
2   think all 30 senators assumed that Senator Fraser was
3   going to file his bill again that didn't pass the last
4   session.
5       Q.  (By Mr. Dunbar)  Okay.  That's helpful.
6       A.  Right.
7       Q.  But did he have communications --
8       A.  So --
9       Q.  -- with any particular senators about doing it?
10      A.  So my communications after the Senator wanted
11  -- told me again that let's do it, and we started
12  talking about the details of the bill, I think I was in
13  communication with Bryan about it, to let them know we
14  were going to do it, but my communication with other
15  senators' offices was more about do you want to coauthor
16  the bill?  We're going file to it again, do you want to
17  be a coauthor?
18      Q.  And were all of the Senate staffers that are
19  identified on the e-mail, these are folks who worked for
20  senators that decided to coauthor?
21      A.  I would assume the answer to that question is
22  yes, but without seeing --
23      Q.  Fair enough.
24      A.  -- who signed on that day, I couldn't tell you.
25  But I would assume I sent it to them or was trying to

128

1   send it to them that day so if they -- if they got
2   questions about it, they would know what was in the
3   bill.
4       Q.  And the bill that was numbered SB 178 was later
5   changed to Senate Bill or SB 14; is that correct?
6       A.  No.  Senate Bill 178 --
7       Q.  Uh-huh.
8       A.  -- still exists.  We were asked by the
9   Lieutenant Governor's Office to refile the bill as
10  Senate Bill 14.
11      Q.  Got it.
12      A.  Senator Fraser was asked.  I'm sorry.
13      Q.  The text that follows as an attachment to your
14  e-mail, which was originally filed as SB 178, was
15  refiled at the request of the Lieutenant Governor's
16  Office as SB 14; is that right?
17      A.  Without seeing, and if you have the versions of
18  the bill, I can tell you.  I don't think it was
19  exact.  I think when we -- when we filed Senate Bill 14,
20  there might have been tweaks to it.
21      Q.  Got it.
22      A.  I -- without seeing the versions, I can't
23  answer that.  Essentially, yes, it was the same bill.
24      Q.  And do you know why that change in bill
25  numbering was made?

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

---

**129**

1  A.  In my history with the Senate, the Lieutenant
2  Governor has always taken the option to save the first
3  20 bill numbers.  So when -- on the first day of bill
4  filing, when a senator went in, it didn't start with
5  one.  They got Number 21.
6  Q.  Uh-huh.
7  A.  Or whatever.  It might not be 20.  It might be
8  15.  And so the Lieutenant Governor would save those 20
9  numbers for issues that he thought were important.  And
10  so I guess he thought this was important.
11  Q.  And why does having a lower bill number help --
12  scratch that.
13  Does having a lower bill number help
14  expedite consideration of bills?
15  A.  My personal opinion is no.
16  Q.  Have you heard others suggest that bills with
17  lower -- bills that have lower bill numbers are
18  considered on a more expedited basis?
19  A.  I think that there are other members out there
20  that think a low bill number is better.
21  Q.  And what's the -- what do you understand to be
22  the basis for their belief?
23  A.  I couldn't speak to it, because I don't think
24  it makes a difference.
25  Q.  But you've never heard anyone offer a reason

---

**130**

1  why they think that's the case?  That's all I'm asking.
2  A.  I mean, I think -- almost, they think it's
3  sexy.  Like, oh, I have a -- I have a low bill number.
4  I'm, you know, important.  I get -- I have --
5  Q.  SB 1 must be the most important of the
6  Lieutenant Governor's --
7  A.  Right.
8  Q.  -- agenda items?
9  A.  As you've -- as you've been in the Senate for a
10  while and you work the process, so all bills have to do
11  the same thing and --
12  Q.  So sitting here today, there's no procedural
13  advantage that you're aware of that a lower bill
14  number provides?
15  A.  I do not believe that there's a procedural
16  advantage, no.
17  Q.  Others must have a different belief, though.
18  A.  Yeah.  You would have to speak to them.
19  Q.  Is it a ordinary practice to refile bill
20  numbers with a lower bill number in your experience?
21  A.  I don't know what you mean by ordinary.  I --
22  and I don't know that I can answer the question
23  accurately, because I've never really watched to see if
24  bills are filed and refiled.
25  Q.  Just with respect to bills, then, that Senator

---

**131**

1  Fraser filed while you worked for Senator Fraser, are
2  there other instances you can think of where you refiled
3  with a lower bill number?
4  A.  No.
5  Q.  In turning back to the e-mail which is
6  TX00090532, the bottom e-mail, second paragraph,
7  references a late discussion with the Lieutenant
8  Governor's Office after which you deleted Section 18 of
9  the draft because of concerns that it might violate the
10  two-subject rule.  Can you explain that sentence to me?
11  A.  Apparently, I had shared the draft with the
12  Lieutenant Governor's Office, and I'm assuming it was
13  Bryan, because he was their elections, you know, person.
14  And he had a concern that whatever was in this section,
15  and the next sentence says it dealt with penalties for
16  voter registration fraud, might violate a two-subject
17  rule.  And I, apparently, I agreed, and so we took it
18  out before I filed it.  I took it out before we filed
19  it.
20  Q.  And do you know what, today, do you recall what
21  the two-subject rule is?
22  A.  I'm not a lawyer.  I think it's part of the
23  constitution that says no bill shall have two subjects.
24  All bills shall have one subject.  I don't know how it
25  reads.

---

**132**

1  Q.  The Texas constitution --
2  A.  Yes, sir.
3  Q.  -- to be clear?
4  A.  Uh-huh.
5  Q.  And the concern, as your discussion with
6  Mr. Hebert must have prompted you to think, was that
7  have including the voter registration provision might
8  violate that provision of the constitution --
9  A.  Right.
10  Q.  -- and you decided to delete it?
11  A.  (Witness nods head yes.)
12  Q.  In the 2011 Legislative Session, we now have an
13  SB 14 with a higher bill number.  I believe you
14  testified earlier that Governor Perry designated the
15  issue of Voter ID as emergency legislation; is that
16  right?
17  MR. KEISTER:  Objection, form,
18  mischaracterizes previous testimony, states facts not in
19  evidence.
20  Q.  (By Mr. Dunbar)  You can answer if you can.
21  A.  It's my understanding that the Governor did
22  declare Voter ID an emergency that session.
23  Q.  And did you have any conversations with Senator
24  Fraser prior to the Governor making that designation
25  about the topic of emergency -- of an emergency

---

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

34 (Pages 133 to 136)

---

133

1  designation?
2       MS. HALPERN: Objection, vague.
3       Q. (By Mr. Dunbar) You can answer.
4       MS. HALPERN: Conversations about that
5  happening?
6       Q. (By Mr. Dunbar) Prior to it happening, prior
7  to Governor Perry issuing the emergency -- the emergency
8  determination, did you have -- do you recall any
9  conversations with Senator Fraser about the topic?
10      A. I don't recall. It's all kind of blurred. The
11  conversations that happened, when they happened, I don't
12  recall. I mean, I know we spoke about it.
13      Q. You're just not sure if it was before or
14  potentially after?
15      A. Right.
16      Q. And did you have conversations with anyone in
17  the Lieutenant Governor's Office about Governor Perry's
18  determination that Voter ID was an emergency issue
19  either before or after?
20      MR. KEISTER: Objection, form,
21  mischaracterizes testimony or mischaracterizes the
22  evidence, the State's evidence. States facts are not in
23  evidence.
24      Q. (By Mr. Dunbar) You can answer.
25      A. Obviously, there were conversations about the

---

134

1  declaration after it happened. Again, I don't recall if
2  there were conversations before it happened or not. I
3  mean, obviously, after it happened, then we talked about
4  what we do next.
5       Q. Right. And what -- what does it mean to
6  declare Voter ID an emergency item for a legislative
7  session?
8       A. Again, I'm not a lawyer.
9       MR. KEISTER: Objection, form, misstates
10  facts not in evidence.
11      Q. (By Mr. Dunbar) You can answer.
12      A. Again, I'm not a lawyer, but my understanding
13  of the constitution is that no bill can be considered
14  during the first 30 or 60 days of a legislative session.
15  And that if he -- unless the Governor declares an
16  emergency.
17      MR. KEISTER: Objection, nonresponsive,
18  and stated a legal opinion without any qualifications.
19      MR. DUNBAR: Could we -- Rich, could you
20  get me Tab 23, please?
21      (Exhibit 10 marked for identification.)
22      Q. (By Mr. Dunbar) Ms. McCoy, you've been handed
23  Exhibit 10, and I'll give you a minute to review.
24      A. Okay.
25      Q. Thankfully, this is shorter than some of the

---

135

1  others.
2       MS. HALPERN: Counsel, is this the last
3  exhibit we're going to discuss before we go to lunch?
4       MR. DUNBAR: Sounds like a good idea.
5       A. Okay.
6       Q. (By Mr. Dunbar) Can you describe for me what
7  the document is?
8       A. It's a press release issued from Senator Fraser
9  that I wrote. And the title is, "Fraser Applauds
10  Governor Perry Declaring Voter ID Emergency Item."
11      Q. And do you see the second sentence of the first
12  paragraph that says, "By taking this action, the
13  Legislature will be able to address this priority issue
14  more quickly"?
15      A. Yes.
16      Q. And that sentence, I take it, reflects the
17  testimony you offered before that other counsel have
18  objected to as lacking a legal foundation, so I wanted
19  to ask what -- with whom you might have consulted about
20  the effect of an emergency designation prior to writing
21  that sentence?
22      A. Again, I'm not a lawyer, and I don't think I
23  consulted with anyone. I think it was just a general
24  understanding of the constitution that if the Governor
25  declared something an emergency, that they could -- the

---

136

1  Legislature could act on it prior to that period of
2  time, whether it was 30 or 60 days, I can't recall.
3       Q. And prior to Governor Perry's action, you don't
4  recall having -- whether you had communications with the
5  Lieutenant Governor's -- the Lieutenant Governor's
6  Office about the issue?
7       A. I don't recall.
8       Q. Do you know how the emergency was that
9  Governor Perry was responding to?
10      A. Without seeing his actual declaration, I don't
11  remember.
12      Q. Are you aware of any evidence today that there
13  was an emergency in January of 2011 that justified this
14  treatment of the bill?
15      MR. KEISTER: Objection, form, calls for
16  speculation.
17      Q. (By Mr. Dunbar) You can answer.
18      MR. KEISTER: Calls for a legal conclusion
19  which she's not qualified to give.
20      A. Again, without seeing the declaration and
21  seeing the Governor's reasoning, I can't speak to that.
22  I don't --
23      Q. (By Mr. Dunbar) So as of -- sitting here
24  today, you don't recall knowing anything about what the
25  justification was for the emergency designation?

---

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

137

1    A.   Not without seeing the actual declaration.
2    Q.   And are these emergency designations common in
3  your experience?
4    A.   Yes.
5    Q.   How often would they happen in a session?
6    A.   It's hard to put a number on it.  I mean, I --
7  I would think they happened every session but -- but
8  without seeing a record, I couldn't tell you, but
9  they're fairly common.
10   Q.   And do you remember how many there were in the
11 2011 session?
12   A.   I do not.
13   Q.   So I take it then, you don't remember the
14 topics of any other emergency declarations during that
15 session?
16   A.   I do not.
17   Q.   Do you recall an emergency declaration about
18 sanctuary cities during the 2011 session?
19   A.   I do not.
20   Q.   Or about eminent domain?
21   A.   I do not.
22   Q.   Or sonogram legislation?
23   A.   I do not.
24   Q.   I just want to make sure the record is clear.
25 And this release, and I think this will be my final

---

138

1  couple of questions about the press release and then we
2  can break for lunch.  This release states that "without
3  a photo ID requirement, we can never have confidence in
4  our system of voting"; is that right?
5    A.   What paragraph are you on?
6    Q.   That's a good question.  This is the last
7  sentence of the fifth paragraph.
8    A.   Okay.
9    Q.   "Voter impersonation is a serious crime, but
10 without a photo ID requirement, we can never have
11 confidence in our system of voting."
12   A.   Yes, I see that.
13   Q.   What -- what did you mean by "confidence in our
14 system of voting"?
15   A.   If you look at some of the things that Senator
16 Fraser had said in 2009, and would say in 2011, he
17 believed that people stopped voting and turnout was low
18 across the board because they didn't think their ballot
19 counted or mattered.  And so one way to do that is to
20 try and fix in-person voter fraud so that people had
21 more confidence that their vote counted or mattered.
22 And mattered.
23   Q.   Thank you, thank you for that.  And I
24 appreciate that this confidence explanation may be
25 slightly different than the previous discussion we've

---

139

1  had about combating in-person voter fraud, and I just
2  wanted to understand the link.  And you mentioned that
3  Senator Fraser in 2009 started making this point about
4  confidence, is that -- do I understand you correctly?
5    A.   I want -- it all is jumbled for me because I
6  did it all for three sessions, but I want to say that
7  yes, this is the point that he did make in 2009.
8    Q.   And in the 2009 to 2011 time frame, are you
9  aware of any analysis that Senator Fraser's office did
10 about whether voter turnout had actually declined
11 because of people's concerns about voter fraud?
12   A.   Senator Fraser's office did not do an analysis.
13 We didn't have the resources to do something like that.
14   Q.   And are you aware of any external analysis that
15 Senator Fraser's office reviewed that supported that
16 concept?
17   A.   No.
18       MR. DUNBAR:  I think we can break for
19 lunch.  Off the record.
20       (Recess for lunch from 12:29 p.m. to
21 1:29 p.m.)
22   Q.   (By Mr. Dunbar)  Ms. McCoy, we were in -- to
23 put ourselves back in the right time frame, we were in
24 the 2007, yeah, that is incorrect.  We were in the 2011
25 legislative session.  And in the entire time period that

---

140

1  SB 14 was in the Senate, are you aware of any analysis
2  that was done to determine how many registered voters in
3  Texas possessed the various forms of ID that might or
4  might not be included under SB 14?
5    A.   No.
6    Q.   Did Senator Fraser ever express to you an
7  interest in determining what those numbers might be?
8    A.   No.
9    Q.   Do you ever recall a meeting with Ms. Ann
10 McGeehan or Mr. Hebert about how many voters might or
11 might not have various forms of ID?
12   A.   I recall meeting with Ann McGeehan and Bryan
13 Hebert.
14   Q.   When do you recall meeting with them?
15   A.   I think we had a meeting in January of 2011.
16   Q.   And do you recall what that meeting was about?
17   A.   I think it was about Senate Bill 14, but I
18 don't -- generally, it was about Senate Bill 14.  I
19 don't remember the specifics of it.
20   Q.   And who -- what job -- what title did
21 Ann McGeehan hold at that time?
22   A.   I'm not sure of her exact title, but she worked
23 for the Secretary of State's Office in their elections
24 division.
25   Q.   And just generally speaking, what does the

---

JANICE MCCOY                                                7/9/2014
CONFIDENTIAL TRANSCRIPT

141

1  elections division of the Secretary of State's Office
2  do?
3      A.   Because I've never worked there, and I don't
4  know their whole role, but they are responsible for
5  conducting elections for the State of Texas.
6      Q.   And do you know who called the meeting between
7  you, Ms. McGeehan and Mr. Hebert?
8      A.   If I recall correctly, I asked her to come
9  over.
10     Q.   And for what purpose did you ask her to come
11 over?
12     A.   Again, I don't remember the specifics of the
13 meeting.  It was to talk about Senate Bill 14.
14     Q.   Other than Senate Bill 14, you don't recall
15 anything more specific about why you would have wanted
16 to talk to Ms. McGeehan?
17     A.   I mean, just about the bill the Secretary of
18 State's role.  I mean, I don't recall.
19     Q.   Would the Secretary of State's Office be part
20 of the -- the Texas government that would collect
21 information on things like statewide voter registration?
22     A.   Voter registration is kept by the Secretary of
23 State's Office, so yes.
24     Q.   So they would have the database on who the
25 State's registered voters are?

142

1      A.   Yes.
2      Q.   Is it possible that's one of the reasons you
3  wanted to meet with Ms. McGeehan to discuss the
4  State's -- the information the State had on voter
5  registration?
6      A.   It's possible, yes.
7      Q.   But to the best of your recollection, one
8  purpose of the meeting was not to try and figure out if
9  there was a way to determine who among the State's
10 registered voters possessed or didn't possess various
11 types of IDs, such as a driver's license, for example?
12         MS. HALPERN:  Objection, misstates prior
13 testimony.
14     A.   I don't recall the specifics of the meeting.  I
15 know that it was about Senate Bill 14.  I know that it
16 was potentially about their role in implementing Senate
17 Bill 14.  But I don't remember the specifics of a
18 meeting from 2011.
19     Q.   (By Mr. Dunbar)  Stepping back from that
20 specific meeting, are you aware of any effort by Senator
21 Fraser's office to inquire from the Secretary of State's
22 Office about the ability to match the State's voter
23 registration database with other databases that -- such
24 as the driver's license database?
25     A.   I'm sorry, ask that question again.

143

1      Q.   Sure.  Stepping back from that specific
2  meeting, are you aware of any efforts by anyone in
3  Senator Fraser's office in the 2007 -- excuse me, 2011
4  legislative session, to determine if there was a way to
5  match the State's voter registration database with other
6  ID databases such as the driver's license database to
7  determine how many voters had various types of IDs or
8  not?
9      A.   I don't recall that I asked the Secretary of
10 State's Office to do that.  And I don't know -- none of
11 my staff would have done that.
12     Q.   Are you aware of any effort by, say, the
13 Lieutenant's -- anyone in the Lieutenant Governor's
14 Office to make a similar request?
15     A.   It's my understanding, just given my
16 recollection in 2011, that somebody made a request for
17 the Secretary of State to look at data.  I don't know
18 who made that request, but I do recall that it happened.
19     Q.   And do you know what the outcome of that
20 request was?
21     A.   I think they wrote a memo that explained what
22 they could and couldn't do.  Again, I'm not sure.
23     Q.   And the memo -- the memo actually described the
24 substantive results of a match or just described why
25 they couldn't do it?

144

1      A.   I think I might have my time frames mixed up,
2  because I know that there was a memo produced by the
3  Secretary of State's Office in either 2009 or 2011, the
4  Senator referenced quite a bit about the database.
5      Q.   Uh-huh.
6      A.   And what could and couldn't be done.  And
7  that -- that memo was part of somebody's record.  I
8  think we produced it to you.  But I don't recall,
9  truthfully, if it was in 2009 or 2011.  I know that it
10 was when Hope Andrade was Secretary of State and --
11 because I think she signed it.  But I don't recall how
12 that memo came to be and who asked her to do it and when
13 it actually happened.  It all kind of mixes together for
14 me.  I'm sorry.
15     Q.   No, I understand.  Was there ever a bottom line
16 number, though, that you saw as a result of any analysis
17 by the Secretary of State's Office, for example, that
18 500,000 people are registered to vote but don't appear
19 in the Texas driver's license database, something along
20 those lines?
21         MR. KEISTER:  I object to the form, vague.
22     A.   It is vague, because I do --
23         MS. HALPERN:  If you -- he's asking you
24 about a specific number in a document he's not showing
25 you.

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

37 (Pages 145 to 148)

145

1   **A.  Right.  I mean, if you have a document --**
2        MS. HALPERN:  So either you know from
3   memory or you don't.
4        MR. DUNBAR:  I ask Counsel not to instruct
5   the witness how to answer.  It's a very simple question.
6   If you don't --
7   **A.  No, it's not a simple question, because this**
8   **Voter ID issue happened over six years.  And so there**
9   **were a lot of documents produced within six years.  I**
10  **don't remember when I saw all of them.  I do know that I**
11  **saw a document, and I want to say it was after the 2011**
12  **session, that somebody produced showing matches.  And I**
13  **don't know that I -- I think that happened after session**
14  **where they did a match and they showed names and they**
15  **were -- and essentially, the document said we can't**
16  **match because the names are different.  We don't**
17  **know.  But I want to say that happened.  I'm not trying**
18  **to not answer your question.  I just don't know when I**
19  **saw things.  And so I want to say that after 2011, that**
20  **-- that Secretary of State, in response to the**
21  **Department of Justice, produced a report, and I think**
22  **that's what I saw.**
23  Q.  (By Mr. Dunbar)  I see.
24  **A.  I don't know when I saw things.**
25  Q.  Yeah, no, and I'm not trying to trip you up.  I

146

1   asked a series of questions about efforts Senator
2   Fraser's office has taken to figure out how many people
3   might be affected by SB 14.  And one way to go about
4   doing that might be to ask the Secretary of State's
5   Office to compare the voter registration database with
6   the Texas driver's license database.  And I'm just
7   trying to understand, to the best of your knowledge
8   today, if that -- if that happened.  And it's --
9   **A.  I can -- from the best of my knowledge, Senator**
10  **Fraser's office didn't ask for that list.**
11  Q.  But you think you did see some analysis by
12  someone's request?
13  **A.  Yes.**
14  Q.  Along those lines?
15  **A.  At some point from 2007 to 2013, yes.**
16  Q.  Got it.  So you can't -- you can't pin that
17  down to the 2011 session?
18  **A.  That's correct.**
19       **(Exhibit 11 marked for identification.)**
20  Q.  (By Mr. Dunbar)  And so this is Exhibit Number
21  11, I believe that's correct.
22       And, Ms. McGeehan, can you tell from the
23  document --
24  **A.  Ms. McCoy.**
25  Q.  My apologies.

147

1   **A.  Sure.**
2   Q.  Ms. McCoy, can you tell from the document what
3   this is?
4   **A.  This looks to be like the enrolled version of**
5   **Senate Bill 14.**
6   Q.  And so the enrolled version would be the
7   version passed by the Senate and the House but prior to
8   the Governor's signature?
9   **A.  Well, the version that you gave me actually**
10  **shows me the signature page, so it has the Governor's**
11  **signature on it.**
12  Q.  Great.  And if you need to review the final
13  version of the bill at any time, please do, but does the
14  final version of SB 14 include nonphoto IDs?
15  **A.  It does not.**
16  Q.  And during the 2007 -- during the 2011
17  legislative session, were you personally involved in any
18  discussions about excluding nonphoto IDs from the bill?
19       MS. HALPERN:  I'm sorry, could you --
20  could I have the question read back?
21       (Requested portion read back by the court
22  reporter.)
23  **A.  Yes.**
24  Q.  (By Mr. Dunbar)  And with whom did you -- with
25  whom do you recall having those conversations?

148

1   **A.  Senator Fraser.**
2   Q.  And what was the nature of the conversations?
3   **A.  The conversation actually took place in 2010 as**
4   **we were preparing to file the bill, and I asked him if**
5   **he wanted to file the bill we had tried before or if he**
6   **wanted to file a photo ID bill.**
7   Q.  And the outcome of that conversation, I take
8   it, was filing a version of the bill without the
9   nonphoto IDs, correct?
10  **A.  That's correct.**
11  Q.  And what was the rationale for doing that?
12       MS. HALPERN:  Objection, legislative
13  privilege.  Go ahead.
14  **A.  I think that Senator Fraser's thought was that**
15  **we had two additional years of knowledge of Voter ID**
16  **working in other states and not impeding or hindering**
17  **voter turnout or any -- any voter across any class, and**
18  **that we shouldn't go backwards from that.  We should --**
19  **we should go ahead and just do photo ID like those**
20  **states did.**
21  Q.  (By Mr. Dunbar)  And those, the two years of
22  evidence you had, that was again based on -- was that
23  based on the Indiana and Georgia experience?
24  **A.  Yes.**
25  Q.  And other than the three studies that you

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

---

149

1 referenced earlier, were there other facts with respect
2 to Georgia and Indiana that factored into that decision
3 not include nonphoto IDs?
4          MS. HALPERN: Objection, vague.
5      A. I don't know that there were any -- I don't
6 know that there were any other bases for the Senator's
7 desire to have a photo ID. I think he would tell you
8 that that's what he would have always wanted throughout
9 every session. I think, in particular, for Senate Bill
10 14, when we were making -- when he was making the
11 decision on whether or not to file it and what version
12 to file, not only did we have that -- that extra two
13 years to see that it hadn't been detrimental in those
14 other two states, we also had the benefit of knowing
15 that it wasn't going to take a -- it would only take a
16 majority vote to move out of the Senate.
17     Q. (By Mr. Dunbar) And my question I meant to be
18 very basic was just other -- with respect to Indiana and
19 Georgia and the experience from Indiana and Georgia, you
20 had referenced three studies, and I just wanted to make
21 sure that in the interim, in the lead up to SB 362,
22 there weren't other sources of information about Indiana
23 and Georgia that you consulted?
24          MS. HALPERN: In the lead up to 362 or the
25 lead up to 14?

---

150

1          MR. DUNBAR: The lead up to SB 14. My
2 apologies.
3     Q. (By Mr. Dunbar) Any new studies other than
4 three. Any -- did you have conversations with the
5 legislators --
6     A. I did not have conversations with --
7     Q. -- of other --
8     A. -- those states, no.
9     Q. Did Senator Fraser?
10     A. You would have to specifically ask him that
11 question. My understanding is that yes, he had talked
12 with other states, elected officials, specifically in
13 Indiana.
14     Q. Do you recall Senator Fraser ever telling you
15 anything about the specifics of those conversations?
16     A. No.
17     Q. Do you recall him telling you how many times he
18 had those conversations?
19     A. No.
20     Q. And in your view, would allowing the use of
21 nonphoto identification, as had earlier versions of the
22 bill, interfere with the purposes of SB 14?
23     A. My personal view is that nonphoto ID was a
24 compromise to try and get the opponents to more
25 favorably agree to the bill, and that photo ID is the

---

151

1 true tool to stop in-person voter fraud.
2     Q. And is that -- is the conclusion that nonphoto
3 ID is a less reliable form of identification based on
4 any particular facts?
5     A. No.
6     Q. And are you aware of whether prior to SB 14, an
7 eligible -- an otherwise eligible student could use a
8 student ID to vote in a Texas election?
9     A. Without seeing the election code as it was that
10 year, I don't -- I can't speak to what people could or
11 couldn't use to vote.
12     Q. So at the time Senator Fraser had authored SB
13 14, you were not aware of whether, under pre-existing
14 laws, students could use student IDs to vote?
15     A. Under the pre-existing law, all you needed was
16 your voter registration card. If you didn't
17 have your voter registration card, then there was a list
18 of identification provided for by statute that you could
19 present in lieu of that voter registration card. I
20 cannot tell you today what was on that list without
21 seeing the election code from that year.
22     Q. And with respect to the bill, the actual
23 enrolled bill and the requirements, it is correct to
24 say, is it not, that student -- student IDs, even those
25 with photographs, are not an acceptable form of

---

152

1 identification?
2     A. Under the bill there's only five forms of
3 acceptable form of -- acceptable identification, and the
4 student ID is not one of them.
5     Q. Do you recall any discussions with Senator
6 Fraser about whether student IDs should be included or
7 excluded?
8     A. I recall discussion with a lot of people about
9 student IDs and other types of IDs that should be
10 included or not included.
11     Q. And from those conversations that you had with
12 various people, did you draw a conclusion about whether
13 student IDs should be included or excluded?
14     A. I think Senator Fraser made the decision to
15 exclude them.
16     Q. And do you know what that decision was based
17 on?
18     A. I think the -- the perception was that student
19 IDs -- there were several reasons why the list was
20 small, not just student IDs, but any ID, is that the
21 intent was to try and make it easy for election workers
22 to just know when someone walked in, these were the five
23 forms. And that if you had a hundred or 200, I mean,
24 there's lots of different types of entities that have
25 IDs, and if you start to kind of make it too big,

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

153

1  election workers wouldn't know if they were valid or
2  not.  A lot of IDs don't have expiration dates.  A lot
3  of IDs aren't secure.  A lot of IDs -- I mean, any
4  student ID, any -- even state IDs, that's just a badge,
5  an employee badge, is easy to be forged.  I mean, if you
6  were -- if you really wanted to protect, if you really
7  want to protect a ballot, then you need to use an ID
8  that's secure and that's not easily forged and not -- I
9  couldn't go mass produce 500, you know, University of
10 South Texas IDs that someone in Lubbock wouldn't know if
11 it was a true ID or not.
12      Q.  And sitting here today, are you aware of any
13 instance in Texas where a forged student ID has been
14 used for in-person voter fraud?
15      A.  Well, prior to -- no.
16      Q.  Are you aware of any such instance anywhere in
17 the country?
18      A.  No.
19      Q.  I believe you also mentioned the complexity of
20 having too many different forms of identification.  Is
21 it correct that certain forms in military ID are
22 permitted under SB 14?
23      A.  Yes.
24      Q.  And do you know how many different forms of
25 military identification from the various branches of the

154

1  military there are?
2       A.  I'm assuming, there's five branches, so that
3  would be five forms.  But I don't --
4       Q.  And it's your understanding that it's limited
5  to five?
6       A.  Uh-huh.
7       Q.  With respect to the concern you raised about
8  student IDs being issued, the potential of them being
9  forged, was there any consideration given to other ways
10 to make student IDs more secure, at least for the
11 State's public institutions?
12      A.  No.
13      Q.  Do you know why that's the case?
14      A.  I think the perception on my part, potentially
15 on the Senator's part, although you'd have to ask him,
16 is that most students at institutions of higher
17 education probably have driver's license or birth
18 certificate and they could go get a driver's license.
19      Q.  And that was -- that, you think, was the
20 Senator's assumption?
21      A.  Yes.
22      Q.  But to the best of your knowledge, that was not
23 based on any actual analysis?
24      A.  That was my assumption.  That's correct.  I
25 don't know if it's the Senator's.  I'm sorry.  Let's

155

1  backtrack.
2       Q.  Sure.  But with respect to your assumption,
3  that was not based on any particular factual analysis,
4  that was an assumption?
5       A.  Yes.
6       Q.  Can you tell me what an election identification
7  certificate is?
8       A.  On page 13 of your Exhibit 11.
9       A.  Uh-huh.
10      A.  The bill creates an election identification
11 certificate that allows a person who doesn't have a
12 driver's license or a personal ID card or one of the
13 other four forms of ID to go to DPS and seek out this
14 election identification certificate so that they
15 could -- for the purposes of voting.
16      Q.  And do you recall when the election
17 certificate -- the election identification certificate
18 or EIC, if I refer to it going forward, provision was
19 first considered being added to the Voter ID
20 legislation?
21      A.  So throughout the process, starting in 2007,
22 the bill provided for a free ID from DPS for people that
23 were able to vote.  At some point during the 2011
24 session, the issue was raised that potentially messes up
25 our Fund 6 transportation dollars and how those

156

1  appropriations work.  And so that these certificates
2  were created as a way to allow us to provide the free ID
3  so that people could vote.  Allow the State to provide a
4  free ID so people could vote, but they don't interfere
5  with the way the fund 6 dollars work.
6       Q.  And what is the -- what is the Fund 6?  I'm
7  sorry.
8       A.  Fund 6 is one of our revenue sources that funds
9  our state roadways and DPS.
10      Q.  And the problem with the previous iterations of
11 the bill in Fund 6 was that the dollars would have to
12 come -- the dollars for the cards, the certificates,
13 would have to come out of that fund?
14      A.  I'm sorry.  I don't -- I mean, I'm gonna speak
15 generally.
16      Q.  Sure.
17      A.  There's other probably people that you're going
18 to depose that can speak more to this issue.  My
19 understanding was we were asked -- Senator Fraser was
20 asked to create -- to create this election
21 identification certificate so that the State could
22 provide a free ID for people to vote, as opposed to
23 giving them a free personal identification card, which
24 was another thing that DPS does.
25      Q.  Okay.  Thank you.  In your view, does SB 14

JANICE MCCOY
CONFIDENTIAL TRANSCRIPT

7/9/2014

40 (Pages 157 to 160)

---

**157**

1  burden anyone's ability to vote?
2      A.  No.
3      Q.  Why not?
4      A.  Prior to Senate Bill 14 being implemented, in
5  my voting history, I rarely saw people taking their
6  voter registration card and most people were taking in
7  their driver's license to vote.
8      Q.  But for someone who didn't have one of the
9  required forms of identification, let's assume that
10  person exists, would it -- would SB 14 impose --
11      A.  I don't know --
12      Q.  -- a burden on them to vote?
13      A.  So you're assuming that there's someone that
14  doesn't have one of these?
15      Q.  Yes.  Just --
16      A.  You want to assume that that person doesn't
17  have one of these five --
18      Q.  Exactly.  Exactly.  I know you're not the
19  factual person to talk about.  Let's assume there is a
20  person in Texas who lacks one of the five forms of
21  required photo identification.
22      A.  Do you know of that person?
23      Q.  Ms. McCoy, I'm asking the questions.
24      A.  Okay.
25      Q.  For that person, would SB 14 impose any burden

---

**158**

1  on their ability to vote?
2          MR. KEISTER:  Objection, form, vague, and
3  "burden" is not defined.
4      Q.  (By Mr. Dunbar)  You can answer.
5      A.  I do not think this provides any additional
6  burden on the people of Texas to vote.
7      Q.  Even a person in Texas who doesn't have one of
8  the five forms of photo identification is my question,
9  ma'am.
10          MR. KEISTER:  Same objection.
11      A.  I mean, again, you're assuming that people that
12  don't have identification are wanting to vote and not
13  being able to vote, and I don't -- I don't believe in
14  that assumption.
15      Q.  (By Mr. Dunbar)  So your assumption -- your
16  assumption, at least, in enacting SB 14, was that
17  someone who didn't have a form of identification did not
18  want to vote?
19      A.  My assumption that potentially, yes, yeah.
20      Q.  So someone who didn't have a driver's license
21  or a concealed handgun permit, for example, because they
22  didn't have one of those two things necessarily did not
23  want to vote?
24      A.  I don't think that asking someone to show photo
25  ID is burdensome on voting, and I don't think it's

---

**159**

1  burdensome to ask someone to get a photo ID to vote.
2      Q.  And the second half of that answer I think is
3  what I want to ask a few more questions about.  Why do
4  you think it's not burdensome to ask someone to go get
5  an election identification certificate simply for the
6  purpose of voting?
7          MR. KEISTER:  Objection, form, vague,
8  "burdensome" is not defined.
9      A.  Could you tell me what you mean by burdensome?
10      Q.  (By Mr. Dunbar)  What do you mean by burden?
11      A.  Well, you brought it up.  I mean, you said it
12  first.  I don't think any -- I don't think asking
13  someone to show who they are when they vote is
14  burdensome.
15      Q.  And that answer makes some sense for someone
16  who owns a driver's license.  I'm asking for someone who
17  doesn't have a driver's license or doesn't have any of
18  the required forms of photo identification requiring
19  them to make a special trip to the DPS simply to acquire
20  a card that then gives them the ability to vote.  My
21  question is whether that imposes some burden on that
22  person.
23      A.  I think the government asks its citizens to do
24  a lot of things.  And this is just now one of the things
25  that the government asks you to do.  The government asks

---

**160**

1  you to get a driver's license to drive a car.  The
2  government asks you to provide your Social Security
3  number to get a job.  The government asks people to do a
4  lot of things.  I don't think it's burdensome to ask
5  people to have a photo ID to vote.
6      Q.  But if you're someone who has applied for a
7  driver's license, presumably, the reason you're applying
8  for the driver's license is because you want to drive.
9  You don't have to make a second trip to DPS just to
10  obtain a card to get a right to vote; is that right?
11          MR. KEISTER:  Objection, form.
12          MS. HALPERN:  Objection, misstates the way
13  the rule, the law works.
14      Q.  (By Mr. Dunbar)  You can answer.
15      A.  I don't know that I understand the question.
16      Q.  If I want to drive a car in Texas, I need to
17  apply for a driver's license or get a driver's license,
18  correct?
19      A.  That's correct.
20      Q.  And that driver's license allows me to vote; is
21  that correct?
22      A.  It is one of the forms that would allow you to
23  vote, yes.
24      Q.  So I don't need to make a separate trip to the
25  DPS to get something that gives me a right to vote; is

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

---

161

1   that correct?
2       A.  That's true.
3       Q.  But if I'm someone who doesn't have a driver's
4   license or any of the forms of ID, SB 14 now says that
5   I, if I want to vote, have to make a trip to DPS simply
6   to get a card to give me the ability to vote --
7       A.  Or --
8       Q.  -- is that correct?
9           MR. KEISTER:  Objection, form, states
10  facts not in evidence.  SB 14 does not state that.
11      A.  Driver's licenses aren't the only form of ID.
12  I mean, you could go to the post office and get a
13  passport.  I mean, could you not get one of the other
14  five -- four -- I mean, obviously, you can't get
15  citizenship papers, but I mean, could you go get a
16  passport from your post office?  I mean -- why couldn't
17  the person -- there's a post office everywhere.
18      Q.  (By Mr. Dunbar)  Right.  And for that person,
19  just so the record is clear, someone who doesn't already
20  have a passport or one of the other five forms of ID,
21  and they want to vote, and they only want to be able to
22  vote, has to make a separate trip to the DPS to get a
23  card that gives them the ability to vote --
24          MR. KEISTER:  Objection.
25      Q.  (By Mr. Dunbar)  -- is that correct?

---

162

1           MR. KEISTER:  Objection, form.
2           MR. DUNBAR:  Counsel, I'm not sure it's
3   appropriate for you to be objecting not on behalf of
4   your witness --
5           KEISTER:  I can certainly object all
6   night.
7           MS. HALPERN:  He can certainly object.
8           MR. KEISTER:  I represent the defendants
9   in this case, and I'm objecting.  That's form.  It
10  misstates the evidence.  It's vague --
11          MR. DUNBAR:  It doesn't do any such
12  things, Counsel --
13          MR. KEISTER:  Let me--
14          MR. DUNBAR:  -- but go ahead and --
15          THE REPORTER:  We can't talk at the same
16  time.
17          MR. KEISTER:  Let him get the objection on
18  the record.
19          MR. DUNBAR:  Your objection is on the
20  record.
21          MR. KEISTER:  No, it's not because you
22  were yacking.  Now listen.  I'm objecting to form.  I'm
23  objecting that your question misstates the evidence.
24  I'm objecting that your question misstates the reading
25  of SB 14.  And it calls for this witness to speculate.

---

163

1   Now, you may continue.
2           MR. DUNBAR:  There's a question on the
3   table for your objection.
4       A.  I'm just going to step back and say that my
5   perception and my intent and my whatever are what I
6   think, and I did advise the Senator.  But I don't get to
7   vote.  So whatever I think, whatever my perceptions are,
8   he's the one.  The 31 members of the Senate, the 150
9   members of the house, they're the ones whose perceptions
10  matter.  My perception is that it's not burdensome.  My
11  perception is that I think that yes, make a trip, go get
12  an ID.  And you know what, if you can, get a personal ID
13  certificate so that you can use it to go to the bank and
14  you can use it to get on an airplane.  I mean, take the
15  extra step.  I think having photo ID is good for people
16  of all economic classes.  It makes it easier to live
17  your life with a photo ID.  That's what I think.  What I
18  think?  I don't get to vote.  All I get to do is advise
19  the Senator.  He can take it or leave it.  And he's done
20  that.  That's what I think.
21      Q.  (By Mr. Dunbar)  Would there be any level of
22  kind of quantitative effect that would change your
23  analysis?  That is, for example, if 20 percent of
24  register voters didn't have one of the forms of required
25  IDs, and I understand you dispute that assumption, I'm

---

164

1   asking if that were the case, would that change your
2   perspective on the bill?
3       A.  I think --
4           MR. KEISTER:  Objection, form, vague and
5   argumentative.
6       Q.  (By Mr. Dunbar)  You can answer.
7       A.  I think that if the opponents had presented
8   evidence like that during debate, it could have changed
9   everybody's perception.
10      Q.  And what level of burden or effect do you think
11  would have changed people's minds?
12      A.  I can't speak for the 181 members of the Texas
13  Legislature.
14      Q.  What about you personally?
15          MS. HALPERN:  Objection, relevance.
16      A.  I don't -- I agree.  I don't -- again, my
17  opinion doesn't matter in terms of how a bill gets voted
18  on by the Legislature.  I mean, all I can do is advise.
19  And I don't know that I have a number in my head.  I
20  couldn't -- I'd have to see it.
21      Q.  (By Mr. Dunbar)  And with respect to the --
22  this question of the burden of acquiring the election
23  identification certificate, which I understand your
24  testimony to be you think -- you think people should
25  get.  My question is -- is a more simple one.  What

---

JANICE MCCOY
CONFIDENTIAL TRANSCRIPT

7/9/2014

42 (Pages 165 to 168)

---

165

1  analysis did Senator Fraser's office do to determine
2  what the burden of acquiring the election -- burdens of
3  acquiring an election identification certificate would
4  be?
5       MR. KEISTER:  Objection, form, vague,
6  "burden" is not defined.
7       A.  Senator Fraser didn't do any analysis like
8  that.
9       Q.  (By Mr. Dunbar)  Were you or anyone in Senator
10  Fraser's office aware of any analysis that had been done
11  by anyone in connection with the debate over SB 14?
12      A.  Analysis about what?
13      Q.  The burdens associated with acquiring an
14  election identification certificate.
15      A.  I'm not aware that anybody did an analysis of
16  the burden of acquiring an election identification
17  certificate.
18      Q.  So, for example, no one had analyzed the
19  average distance from certain sets of voters to a DPS
20  office?
21      A.  I'm sorry, I don't -- I think that at some
22  point during the session, somebody said -- asked a
23  question about where DPS offices are located.  There's
24  no way -- I don't know how you could say people live an
25  average distance from a DPS office.  I mean, Texas is a

---

166

1  pretty big state.
2       Q.  What about hours of operation that DPS -- DPS
3  offices are open, was that factor analyzed by anyone in
4  Senator Fraser's office?
5       A.  I think that information was provided to
6  Senator Fraser's office.
7       Q.  Do you recall what the information showed?
8       A.  I do not.
9       MR. DUNBAR:  Rich, could we get Tab 26,
10  please?
11      (Exhibit 12 marked for identification.)
12      Q.  (By Mr. Dunbar)  And Ms. McCoy, I've handed you
13  what's been marked as Exhibit 12.
14      MR. DUNBAR:  And for the record, this is
15  also designated as Highly Confidential.
16      Q.  (By Mr. Dunbar)  If you could just review the
17  document for a minute and let me know when you're ready
18  to talk a little bit about it.
19      A.  Okay.
20      Q.  And this is an e-mail from Mr. Hebert to a
21  group of people on January 22, 2011, and one of the
22  recipients is yourself; is that right?
23      A.  Yes.
24      Q.  And without going through name by name, is it
25  correct that other recipients of this e-mail would have

---

167

1  been staffers working for various legislators that
2  supported SB 14?
3       A.  And the Lieutenant Governor's Office.
4       Q.  Thank you.  And the Lieutenant Governor's
5  Office.  And if you look at the cover e-mail that
6  Mr. Hebert provided which for the record is TX000, three
7  zeroes, 15831.  It says he's attached a memo assessing
8  the chance of preclearance, and then he says, "The
9  bottom line: doubtful."  Do you see that sentence?
10      A.  I do.
11      Q.  Do you recall whether you agreed or disagreed
12  with Mr. Hebert's assessment of the chance of
13  preclearance at the time?
14      A.  I don't recall.
15      Q.  You'll also see in the cover e-mail that
16  Mr. Hebert had made some suggestions to include language
17  in Georgia's law, i.e., he says, "Any ID issued by the
18  federal government, state government or local
19  governments in the state, at a minimum, we might use
20  language in our bill that passed last session," and he
21  goes on to quote that language.  Those changes were not
22  made to SB 14; is that correct?
23      A.  That's correct.
24      Q.  And do you know why those changes were not made
25  to SB 14?

---

168

1  A.  I don't recall.
2       Q.  Did you personally have any discussions with
3  Mr. Hebert about the issue of making those changes to SB
4  14?
5       A.  I don't recall.
6       Q.  And do you recall whether you had any
7  conversations with Senator Fraser himself about whether
8  to makes those changes?
9       A.  I don't recall.
10      Q.  And if you will turn to the -- I guess the
11  attachment to the e-mail entitled, "Standard of Review
12  by the Department of Justice."  Under the "Standard of
13  legal review," one of the sub bullets is, "Does the new
14  law include mitigating effects?"  Do you see that?
15      A.  Yes.
16      Q.  And the first question is, "Are photo IDs free
17  of charge and widely available?"  The second is, "Is
18  there a phased-in period of implementation."  The third
19  is, "Are there fail-safe procedures, i.e., permit voting
20  if the voter signs an affidavit," et cetera.  "Are there
21  education efforts targeted at minority communities?  Is
22  there a program designed to provide photo IDs in
23  isolated and impoverished areas?  And are there other
24  programs or factors designed to minimize the impact on
25  minority voters?"

---

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

43 (Pages 169 to 172)

---

169

1    And my question is:  Of these mitigating
2  effects, are -- which, if any, were included in the
3  final version of SB 14?
4    A.  I think the free photo ID.
5    Q.  That would be EIC as we talked about?
6    A.  Uh-huh.  Yes.  There is a procedure for
7  provisional voting.
8    Q.  But that's, to be clear, that -- that provision
9  for provisional voting requires a voter to come -- to
10  come back with an accepted form of identification; is
11  that correct?
12    A.  I don't remember how that provisional process
13  worked without looking at the bill again.  There was an
14  education effort.
15    Q.  Was that targeted at minority communities?
16    A.  It was targeted at all voters, as I recall.
17  The bill did not provide for a program to provide photo
18  IDs in isolated areas because the bill was specifically
19  amending the election code.  But I know the State DPS
20  was planning on doing some mobile voting.  And that was
21  the mitigating effects that the bill had, the mitigating
22  factors.
23    Q.  Thank you.  And I'm glad you brought up the
24  mobile voting.  After SB 14 was enacted, did you or
25  anyone in Senator Fraser's office have communications

---

170

1  with the DPS about the actual roll-out of the EIC
2  program?
3    A.  It's my understanding that the Department of
4  Public Safety didn't roll out anything until 2013.
5    Q.  After the Shelby County decision?
6    A.  That's correct.
7    Q.  And you were just on your way out of Senator --
8  few more months in Senator Fraser's office --
9    A.  That's correct.
10    Q.  -- at that point in time?
11    A.  That's correct.  So I'm not -- I did not have
12  conversations with DPS at that time, I don't think,
13  about them doing their mobile location.
14    Q.  Are you aware of anyone else in Senator
15  Fraser's office doing so?
16    A.  No.
17    Q.  With respect to Senate consideration of SB 14,
18  was there a debate in the Committee of the Whole Senate
19  as there had been with respect to SB 362?  Did SB -- did
20  SB 14 go to the Committee of the Whole Senate?
21    A.  My recollection is that yes, it did.
22    Q.  And were you on the floor when SB 14 was being
23  considered by the Committee of the Whole?
24    A.  Yes.
25    Q.  Do you recall Senator Fraser being asked

---

171

1  numerous questions during that time to which he
2  responded, "I'm not advised"?
3    A.  Yes.
4    Q.  And do you know why Senator Fraser responded --
5  well, let me back up.  What does the response, "I'm not
6  advised" mean?
7    A.  My understanding or my recollection of what the
8  Senator said to a lot of questions was "I'm not advised.
9  I have a resource witness to help me answer that
10  question."  Which is a typical practice in a Committee
11  hearing.  That the elected official can't be expected to
12  know the details of how something may or may not work.
13  And his rationale in 2011 was that he was going to let
14  Department of Public Safety, his resource witness, the
15  Secretary of State's Office, answer some very specific
16  questions.
17    Q.  And was he asked questions about the potential
18  impact of SB 14 on minority voters?
19    A.  I don't recall the questions that were asked.
20    MR. DUNBAR:  Could we get Tab 14?
21    (Exhibit 13 marked for identification.)
22    Q.  (By Mr. Dunbar)  Ms. McCoy, I've given you
23  what's been marked as Exhibit 13.  I'm certainly not
24  going to ask you to read the whole thing.  I'm just
25  going to ask you about a few particular pages.  But

---

172

1  based on the cover page, at least, can you tell me what
2  this document is?
3    A.  It looks like it's the Senate Journal, the
4  fifth day, from Wednesday, January 26, 2011.
5    Q.  And the Senate Journal is just a recordation of
6  events that take place on the Senate floor; is that
7  accurate?
8    A.  Yes.
9    Q.  And if you turn to page 118.  Do you see a
10  Floor Amendment Number 12?
11    A.  Yes.
12    Q.  And if I'm reading this correctly, this was
13  offered by Senator Davis; is that correct?
14    A.  That's correct.
15    Q.  And if you need a second to read it, that's
16  fine, but what -- can you describe what the amendment
17  would have accomplished?
18    A.  It looks like it adds a new section to the
19  election code that says that any state agency may not
20  charge a fee for the issuance of documents that may be
21  used for proof of identification under this chapter or
22  obtain a document that's used as proof of identification
23  under the chapter.
24    Q.  And this chapter from the section header right
25  above that is Chapter 63 of election code; is that

---

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

---

173

1    right?
2        A.   Yes.
3        Q.   And then the Journal shows that on a motion of
4    Senator Fraser, Floor Amendment Number 12 was tabled by the
5    following vote.  Do you see that?
6        A.   Yes.
7        Q.   And what does it mean to be tabled?
8        A.   I'm not sure I can explain it.  Instead of
9    voting something up or down, they table it so that it is
10   essentially defeated but without a vote to defeat it.
11       Q.   And had -- did you discuss with Senator Fraser
12   ahead of time his position on Floor Amendment Number 12?
13       A.   I don't recall if we saw this particular floor
14   amendment ahead of time so that I was able to discuss
15   with him this particular floor amendment.
16       Q.   Sitting here today, do you have any reason to
17   believe that adopting this floor amendment would have
18   interfered with the effectiveness of SB 14?
19       A.   No.
20       Q.   And if you could turn to page 121, please,
21   Floor Amendment Number 16.  And as I can read it, please
22   correct me if I'm wrong, this was a floor amendment
23   offered by Senator Van de Putte, which would have, as I
24   can best I can tell, expanded the list of acceptable
25   forms of identification under the bill?

---

174

1        A.   That's correct.
2        Q.   And just so the record is clear, your answer
3    may very well be the same, but is this amendment you
4    discussed with Senator Fraser either before or after the
5    amendment had been proposed?
6        A.   Again, I don't recall if this was an amendment
7    that we saw before debate started.  I think the general
8    idea of an amendment like this might have been
9    discussed.
10       Q.   And do you recall anything about the substance
11   of those conversations?
12       A.   I think, generally, that it was a step
13   backwards from photo ID.
14       Q.   And Page 122 shows that on motion of Senator
15   Fraser, this amendment was tabled as well; is that
16   right?
17       A.   Yes.
18       Q.   If you turn to page 123, which is Floor
19   Amendment Number 18.  As I read this amendment, it
20   was -- would have -- or excuse me, did allow a license
21   to carry a concealed handgun issued by DPS to be an
22   acceptable form of identification; is that right?
23       A.   Yes.
24       Q.   And is that one you had discussed ahead of time
25   with Senator Fraser?

---

175

1        A.   I think we generally spoke about the idea that
2    it might get offered, yes.
3        Q.   And did you recommend to Senator Fraser that he
4    approve the amend -- or support the amendment?
5        A.   My recommendation to him was just table it.
6        Q.   To table it.  Why was your recommendation to
7    table it?
8        A.   My recommendation is that he should table it
9    because you need a driver's license to get a concealed
10   handgun license.
11       Q.   I see.  And so your view was that there was no
12   need to add the concealed handgun license because you
13   would have had to have the underlying driver's license
14   anyway?
15       A.   That's correct.
16       Q.   Why did Senator Fraser disagree with you?
17       A.   You'd have to ask him that.
18       Q.   Did he -- did he give you a reason?
19       A.   He did not.
20       Q.   Floor Amendment Number 19, which is right below
21   that, was offered by Senator Ellis; is that correct?
22       A.   Yes.
23       Q.   And this would have allowed as an acceptable
24   form of identification, a student identification from a
25   public university that was not expired and had a

---

176

1    person's photo; is that right?
2        A.   That's correct.
3            MS. HALPERN:  Objection, misstates the
4    text.  The public university located in Texas.
5        Q.   (By Mr. Dunbar)  With that clarification?
6        A.   Yes, it does allow for student ID from a public
7    Texas university that's not expired.
8        Q.   Right.  And so that was a fairly limited --
9    that would have allowed a fairly limited set of student
10   identifications, correct?
11       A.   I don't know how many public universities there
12   are in Texas.  I think there's quite a few.
13       Q.   But as counsel pointed out, it would not have
14   permitted me to use a student ID in another -- in
15   another state or another state institution though,
16   correct?
17       A.   That's correct.
18       Q.   And what happened to this amendment?
19       A.   It was tabled.
20       Q.   And did you have any discussions with Senator
21   Fraser before or afterwards about why he voted to table
22   that?
23       A.   He moved -- I think the discussion to table was
24   that he --
25            MS. HALPERN:  Objection, legislative

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

---

177

1   privilege.  Go ahead.
2       A.  I think it goes to his point again about five,
3   now five, because the CHL stuff happened, five IDs made
4   it easier for the election workers.  And once you start
5   expanding it, it makes it more difficult to train and
6   educate them.
7       Q.  (By Mr. Dunbar)  And do you see Floor Amendment
8   Number 20, which is at the bottom of that page?
9       A.  Yes.
10      Q.  And then rolls on to the next page.  It was
11  offered by Senator West and would have allowed as an
12  acceptable form of identification a Medicare
13  identification card issued to the person by the United
14  States Social Security Administration, accompanied by a
15  voter registration certificate issued to the person.  Is
16  that your understanding of what the amendment would have
17  accomplished?
18      A.  Yes.
19      Q.  Would adopting that floor amendment have
20  interfered with the effectiveness of SB 14?
21      A.  Again, the Senator wanted the strongest tool
22  possible to combat in-person voter fraud, and he -- he
23  wanted to keep the list of identifications that was
24  acceptable to an amount that was easy for an election
25  worker to recognize and be able to validate.

---

178

1       MS. HALPERN:  Counsel, I think we have a
2   pay-the-meter issue.
3       MR. DUNBAR:  Let's take a break.
4           (Recess taken from 2:20 to 2:33 p.m.)
5       Q.  (By Mr. Dunbar) Okay.  Just a few more
6   questions.  You're almost done with me, Ms. McCoy.
7   Page 124 of the exhibit we were just
8   looking at.  I apologize, Page 130.  It contains Floor
9   Amendment Number 30.  Do you see that?
10      A.  I do.
11      Q.  And this was authored by Senator Ellis, and
12  I'll give you a second -- a minute or two to read it.
13  It's a little bit longer, but I'd like you to describe
14  to us what you understood the amendment to be.
15      A.  It's a report -- it was an amendment that asked
16  the Secretary of State to submit a report annually, not
17  sure to whom, asking for seven different items.
18      Q.  Various categories of information in some way
19  related to SB 14 in its effect; is that a fair
20  characterization?
21      A.  Yes.
22      Q.  And Senator Fraser tabled this amendment as
23  well; is that correct?
24      A.  Senator Fraser did make a motion to table this
25  amendment.

---

179

1       Q.  And do you know -- did you have discussions
2   with Senator Fraser, either beforehand or after the
3   fact, as to why he tabled this amendment?
4       A.  We did not have discussions beforehand.  I'm
5   pretty positive we hadn't seen this amendment until
6   Senator Ellis offered it.  And I think, if I recall
7   correctly, Senator Fraser moved to table because it was
8   going to be too cost prohibitive for the Secretary of
9   State to produce this report, and they wouldn't -- don't
10  have the actual information that they would have needed
11  to do it.
12      Q.  And setting aside the cost and information
13  concerns, there's no reason that adopting this floor
14  amendment would have interfered with SB 14's stated
15  goals, though; is that correct?
16      A.  Well, you're asking the legislator to act -- a
17  Legislature to act in a bubble.  2011 was a bad session
18  moneywise.  So to ask them to set aside any cost
19  concerns, I don't know that you could do that.
20      Q.  Understood.  I'm not trying to make an
21  argumentative question; I'm just asking a more basic
22  question, which is, there's no reason that you can think
23  of that adopting this floor amendment would have
24  interfered with SB 14's ability to combat in-person
25  voter fraud, can you?

---

180

1       A.  No.  But the -- I don't know that the Secretary
2   of State could have done this report.
3       Q.  Fair enough.
4           MR. DUNBAR:  Rich Tab 33.
5           (Exhibit 14 marked for identification.)
6       Q.  (By Mr. Dunbar) And Ms. McCoy, I've handed you
7   what's marked as Exhibit 14.  Thankfully short, but I'll
8   give you a second to look at it.
9           MR. DUNBAR:  And I'll note for the record,
10  it's marked Highly Confidential as well.
11      A.  Okay.
12      Q.  (By Mr. Dunbar) The bottom e-mail is an e-mail
13  from a -- excuse me, a Ryan LaRue.  Is that the Ryan
14  earlier that you had identified in, I believe, Senator
15  Williams's office?
16      A.  That is.
17      Q.  Okay.  And Ryan LaRue sends an e-mail to
18  Jonathan Stinson, Amanda Montagne, Bryan Hebert and
19  copying you at 10:10 a.m. on January 26th; is that
20  right?
21      A.  That's right.
22      Q.  And that's the same day, is it not, that we
23  just saw the various Senate -- from the Senator along
24  with the various amendments we walked through were
25  considered?

---

JANICE MCCOY                                                        7/9/2014
CONFIDENTIAL TRANSCRIPT

46 (Pages 181 to 184)

181

1    A.  That's correct.
2    Q.  And so Ryan -- who is Jonathan Stinson and
3  Amanda Montagne?  Who are they or who were they?
4    A.  Jonathan worked for Senator Huffman and Amanda
5  worked for Senator Williams.
6    Q.  And Ryan references a conversation with you, I
7  assume you're the Janice, in the request for a meeting
8  to discuss all of the proposed amendments for the Voter
9  ID bill.  Bryan Hebert in an e-mail above responds and
10  says, "Let's do it now; we can do it my office."  Do you
11  recall if that meeting ever took place?
12    A.  I think that it did, yes.
13    Q.  Among the people identified on this e-mail
14  chain?
15    A.  That's correct.
16    Q.  There were no additional individuals present,
17  to the best your memory?
18    A.  To the best of my memory, no.
19    Q.  And do you recall what was discussed at this
20  meeting?
21    A.  I can't recall without looking at previous
22  journals if it was asked that amendments be prefiled or
23  not, so we were either going to discuss the prefiled
24  amendments if that happened.  And again, I don't -- I
25  thought it happened one session, but I don't know if it

182

1  happened in 2009 or 2011, or if we were just going to
2  meet and discuss things we thought might be proposed to
3  Senate Bill 14.
4    Q.  Do you recall whether there was unanimous
5  agreement among all of the people that met at that
6  11 a.m. meeting about how their Senators, or I guess in
7  Mr. Hebert's case there was not a Senator involved, but
8  how the respective Senators should vote on the various
9  amendments?
10    A.  I don't think we talked about how anybody was
11  going to vote or not vote.  I think we talked about what
12  we thought the amendments may say and what a counter
13  argument to those amendments should be.
14    Q.  But to best of your recollection, and I
15  understand it's been awhile now, you can't recall which
16  specific of those amendments that we talked about -- you
17  talked about at this meeting?
18    A.  I cannot.
19    Q.  Are you familiar with the decision of the
20  three-judge district court in Texas versus Holder that
21  denied judicial preclearance of SB 14?
22    A.  Vaguely.
23    Q.  And do you recall when that was issued?
24    A.  I want to say 2012.
25    Q.  I'll submit that it was August 2012.  So you

183

1  were still -- still safely employed by Senator Fraser at
2  the time?
3    A.  Yes.
4    Q.  Do you recall how Senator Fraser reacted to the
5  decision?
6    A.  I don't think he was pleased.  He may have
7  issued a press release.  I can't recall if we did or
8  not.
9    Q.  Did you or anyone in Senator Fraser's office
10  discuss ways that SB 14 might be amended at that point
11  in time to have it pass preclearance, so to speak?
12        MS. HALPERN:  Objection, Leg privilege.
13  You may answer.
14    A.  No.
15    Q.  (By Mr. Dunbar) There were no discussions of
16  legislative changes?
17    A.  No.
18    Q.  Are you aware of other Senators discussing the
19  idea of proposed changes to SB 14 to make it more likely
20  to pass preclearance?
21        MS. HALPERN:  Objection, legislative
22  privilege.  You can say yes or no.
23    A.  No.
24    Q.  (By Mr. Dunbar) Are you aware of any committee
25  hearings that were held related to Voter ID after the

184

1  Texas versus Holder decision was handed down?
2        MS. HALPERN:  In 2012, Counsel?
3    Q.  (By Mr. Dunbar) Since -- anytime since Texas v.
4  Holder.  I understand that overlaps somewhat when you
5  were there, but I'm just asking if you were aware.
6    A.  I'm not aware of any committee hearing on Voter
7  ID since 2011.
8    Q.  Since 2011, thank you.
9        And I believe we talked about earlier that
10  it was in 2013 that the Supreme Court -- the summer of
11  2013 that the Supreme Court's decision in Shelby County
12  was handed down.  Does that ring a bell?
13    A.  It does, but I thought you said earlier it
14  happened in May.
15    Q.  I apologize if I misspoke.  The Supreme Court's
16  decision in Shelby County, which struck down the Section
17  5 --
18    A.  About Section 5?
19    Q.  Right.
20    A.  I thought you said that --
21    Q.  (BY MR. DUNBAR )  Well, the May, June -- I
22  stipulate now that it was June.  And I apologize if I
23  stated May incorrectly earlier, but it's not
24  particularly relevant to my question.
25    A.  Okay.

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

47 (Pages 185 to 188)

185

1    Q.  Do you remember -- so in June of 2013, you were
2    still employed by Senator Fraser; is that correct?
3        A.  That's correct.
4        Q.  And are you aware that immediately after the
5    Shelby County decision, the Texas Attorney General
6    announced that he would begin immediately enforcing SB
7    14?
8        A.  Yes.
9        Q.  Did you or Senator Fraser have any discussions
10   with anyone in the Office of the Attorney General prior
11   to that time or after that point about the enforcement
12   of SB 14?
13       A.  Yes.
14       Q.  Whom did you have those conversations with?
15           MS. HALPERN:  Let me confer with the
16   witness.
17           MR. DUNBAR:  Are we going off the record?
18           MS. HALPERN:  Yeah.
19           MR. DUNBAR:  Okay.
20           MS. HALPERN:  There may be an attorney-
21   client issue here.
22           MR. DUNBAR:  Okay.
23           MS. HALPERN:  So I need to find out.
24           (Recess at 2:43 p.m. to 2:44 p.m.)
25           MS. HALPERN:  You can go ahead and repeat

186

1    the question.
2           MR. DUNBAR:  Okay.  We're back on the
3    record.
4        Q.  (By Mr. Dunbar)  After the Supreme Court
5    decision in Shelby County, are you aware of any
6    conversations of anyone in Senator Fraser's office with
7    anyone in the Office of the Attorney General about the
8    Attorney General's decision to enforce SB 14?
9        A.  I spoke with the Attorney General's Office
10   after it happened, and they -- they're like, we're going
11   to enforce it.  My conversation, though, specifically
12   was Senator Fraser wants to write a press release, will
13   you vet it before I release it.
14       Q.  Do you recall whom you spoke with in the
15   Attorney General's Office?
16       A.  I think it was Jay Dyer.
17       Q.  I've heard that name before.  Who is Jay Dyer?
18       A.  He's the assistant general counsel -- an
19   assistant general counsel for legislative affairs.
20           MS. PAUP:  In our governmental relations.
21       Q.  (By Mr. Dunbar)  And so that conversation about
22   vetting a press release was the extent of the
23   communication, as far as you're aware of, with anyone in
24   Senator Fraser's office --
25       A.  Essentially, yes.

187

1        Q.  -- about enforcing SB 14?
2        A.  Yes.  I think at the time they said, we're
3    going to move forward and I said, great, we're going to
4    write a press release, and I asked them to vet it.
5           MR. DUNBAR:  Thank you, Ms. McCoy.  That's
6    all I have.  Pass the witness.
7           MS. HALPERN:  How much time has been used?
8           (Recess to change places.)
9               EXAMINATION
10   BY MS. MARANZANO:
11       Q.  Good afternoon, Ms. McCoy.
12       A.  Hello.
13       Q.  I'm Jennifer Maranzano.  I'm representing the
14   United States in this matter.  Good to see you again.
15           I wanted to turn back for a moment to late
16   2008 and 2009 and talk a few minutes about SB 362.  Now,
17   I think you talked with Mr. Dunbar about a meeting that
18   you had with the Office of the Secretary of State in
19   2011.  Did you have any meetings with the Office of the
20   Secretary of State in 2009 or 2008?
21       A.  Probably in 2009.
22       Q.  Do you recall them specifically?
23       A.  No.
24       Q.  Do you recall if they were about SB 362?
25       A.  Yes.  I mean, I -- yes.

188

1        Q.  Do you recall who you met with?
2        A.  Most likely, it was Ann McGeehan.  And then
3    whoever was their general counsel at the time.  I think
4    her name was Elizabeth, but I don't know that for sure.
5        Q.  Was it possibly Elizabeth Winn?
6        A.  Potentially.
7        Q.  Do you recall if Bryan Hebert was at that
8    meeting?
9        A.  Bryan sat in on a meeting or at least one
10   meeting with the Secretary of State's Office at some
11   point between 2009 and 2011.
12       Q.  Okay.  Do you recall in 2009 what was discussed
13   with the -- with Ms. McGeehan?
14           MS. HALPERN:  Objection, legislative
15   privilege.  Go ahead.
16       A.  I think generally -- I mean, in 2009, obviously
17   we're talking about Senate Bill 362 at the
18   time.  Generally, when I spoke with a state agency, it
19   was about implementation, how things would get
20   implemented, how they would work, so that conversation
21   probably happened.  And then other than that, the
22   Secretary of State's Office didn't offer me -- I don't
23   know that I asked an opinion and they didn't offer me an
24   opinion on the bill; I think it was generally the
25   process of the bill, the process of their office, how it

JANICE MCCOY                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

---

189

1  would work.
2     Q.  Did you have any meetings with the Department
3  of Public Safety about implementations in 2008 or 2009?
4     A.  No.
5     Q.  Do you recall if in the meeting with
6  Ms. McGeehan in 2009, 2008 there was any discussion of
7  the number of registered voters who did not have one of
8  the forms of state issued ID under SB 362?
9     A.  I think this has been asked and answered.
10    Q.  And what's your answer?
11    A.  You want me to answer again?
12    Q.  Uh-huh.
13    A.  My recollection is that sometime between 2009
14 and 2011, the Secretary of State produced a document
15 that showed a match.  I don't know exactly when that
16 document was produced.
17    Q.  Okay.  So just to be clear in regard to this
18 specific meeting we're talking about, you don't recall
19 whether it was --
20    A.  I don't recall any information that was given
21 to me in that specific meeting from 2009.
22    Q.  Thank you.  I just wanted to be clear about
23 that.
24        Can you look at Exhibit 8, which was
25 already introduced?  I believe you testified earlier

---

190

1  that the third page of the document, which is labeled at
2  the bottom TX00087009, that -- that this -- it says,
3  Talking Points at the top, that this was a part -- this
4  was the document that you discussed with Mr. Hebert; is
5  that correct?
6     A.  Yes.
7     Q.  And can you look at Roman Numeral III?  And the
8  heading by Roman Numeral III says, "This bill represents
9  compromise and an attempt to ensure that every eligible
10 voter can vote and that only legitimate votes are
11 counted."  Did I read that correctly?
12    A.  Yes.
13    Q.  And then there's three points below that; is
14 that correct?
15    A.  That's correct.
16    Q.  Are those three points below -- below Roman
17 Numeral III, all ways in your mind that this bill
18 represents a compromise?
19    A.  These were Bryan's points, not mine.
20    Q.  Did you have any discussions with him about
21 Roman Numeral III?
22    A.  Most likely, yes.
23    Q.  Do you recall specifically?
24    A.  No.
25    Q.  Well, as you sit here right now, do you think

---

191

1  that these three bullet points are ways that SB 362
2  represented a compromise bill?
3     A.  Again, I don't know that I would use the word
4  compromise.  I think what SB 362 represented was a bill
5  that had gotten out of the House in 2007 and that
6  Senator thought potentially could pass again in 2009.
7     Q.  Are you aware of any requests from legislators
8  for other compromises on 362?
9     A.  I don't recall if amendments were offered on
10 this bill.
11    Q.  And apart from amendments, are you aware of any
12 other requests that legislators made to Senator Fraser
13 or to you for additional compromises on SB 362?
14    A.  I don't recall any other Senator asking the
15 Senator to amend his bill in any way.
16    Q.  Okay.  Can you look at the very last page of
17 this document?  Do you recall reviewing this document
18 when you got all of these documents from Mr. Hebert?
19    A.  I do not recall looking that closely at this
20 document.
21    Q.  I believe you testified that you hadn't asked
22 Mr. Hebert for this whole packet of information, but
23 just to be clear, did you ever ask Mr. Hebert for
24 information about the process of getting a birth
25 certificate or a DPS-issued ID?

---

192

1     A.  I don't recall if I ever asked him for that.
2     Q.  When you were crafting Senate Bill 362, did you
3  consider how much these forms of ID would cost to
4  obtain?
5     A.  Your word crafting is the wrong word.
6     Q.  I'm sorry.
7     A.  I didn't craft Senate Bill 362.  Senate Bill
8  362 was House Bill 218, which was written essentially by
9  the Texas House.  I just -- we just refiled it.
10    Q.  Okay.  Fair enough.
11        So when you refiled Senate Bill 362, did
12 you give any additional consideration to the cost of
13 obtaining either the Texas birth certificate, the
14 DPS-issued ID card, or any other forms of ID that were
15 contained in Senate Bill 362?
16    A.  No.
17    Q.  Are you aware that at the time SB 362 was
18 proposed, the cheapest way to obtain a birth certificate
19 for a Texas born voter was 22 dollars?
20    A.  Yes.
21    Q.  And is it true that the 22-dollar process was
22 only available for those who went to the Office of Vital
23 Statistics in person or who had access to the Internet
24 to get one online; is that correct?
25    A.  Well, according to this document, that's

---

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 196)

193

1  correct.  I didn't have knowledge truthfully of how it
2  worked.
3      Q.  Okay.  Do you have any reason to doubt that
4  what's in this document is correct?
5      A.  I do not.
6      Q.  And in terms of the bottom part of this
7  document where it talks about the process for getting a
8  DPS-issued ID card, can DPS issue an ID card to a
9  noncitizen?
10     A.  Yes.
11     Q.  One other question about the birth certificate.
12  Do you see at the bottom it talks about getting birth
13  certificates from other states?
14     A.  I'm sorry.  The bottom?
15     Q.  I'm sorry.  The bottom of the birth certificate
16  part of the document.
17     A.  Okay.
18     Q.  When you refiled SB 362, did you consider the
19  length of time it would take for a voter to get a birth
20  certificate from another state?
21     A.  No.
22     Q.  Thank you.  That's all I have with that
23  document.
24          I believe that you said that the purpose
25  of SB 362 was to deter voter fraud; is that correct?

194

1      A.  That's correct.
2      Q.  Did the Senator consider any alternative
3  legislative measure to accomplish that goal?
4      A.  I can't speak to if he thought of another
5  idea.  I did not.
6      Q.  Did -- do you know who introduced the rules
7  resolution in -- that was governing the legislative
8  session in -- in 2009?
9      A.  Usually the rules resolution is introduced by
10  the chair of Senate Administration Committee.
11     Q.  Do you know who that was?
12     A.  I think at the time it was Senator Williams.
13     Q.  Did Senator Fraser talk to Senators prior to
14  introducing SB 362 about whether they would support it?
15     A.  Yes.
16     Q.  Did he talk to all Senators?
17     A.  I don't know.  I know that I spoke with several
18  Senators' offices about signing on as co-authors, and I
19  can't speak to who he spoke to, but I would assume he
20  spoke to some off them.
21     Q.  Did you have a sense before you introduced SB
22  362 of how many people would vote in favor of it?
23     A.  Given the vote from the 2007 session, I assumed
24  that all 19 Republicans would vote for it.
25     Q.  Did Senator Fraser ask Senator Williams to

195

1  introduce the rules resolution to exempt the Voter ID
2  provision from the two-thirds rule?
3      A.  Not that I'm aware of.
4      Q.  Are you aware of whether Senator Fraser had any
5  concerns about exempting SB 362 from the two-thirds
6  majority vote tradition?
7      A.  No.
8      Q.  No, you're not aware?
9      A.  No.
10     Q.  Did you have any conversations with him about
11  this?
12     A.  About what?
13     Q.  About exempting the Voter ID from the
14  two-thirds majority rule.
15     A.  When?
16     Q.  In 2009.
17     A.  But specifically when?  We had a conversation
18  after the rules -- after the rule was adopted, yes.
19     Q.  And what did the conversation consist of?
20          MS. HALPERN:  Objection, legislative
21  privilege.  Go ahead.
22     A.  The Senator came and said the rules got
23  changed, we're going to go on Voter ID.
24     Q.  (By Ms. Maranzano) Anything else?
25     A.  No.

196

1      Q.  Do you know of any legislators who represented
2  districts that the majority of minority voters supported
3  SB 362?
4      A.  I don't know the makeup of the Senators'
5  districts.
6          (Exhibit 15 marked for identification.)
7      Q.  (By Ms. Maranzano) Ms. McCoy, I'm showing you
8  what we've marked as Deposition Exhibit 15.  Do you
9  recognize this document?
10     A.  It looks like a document I produced for the
11  Senator about Senate Bill 14.
12     Q.  When you say you produced it, do you mean you
13  drafted it?
14     A.  Yes.
15     Q.  Do you know when you drafted these?
16     A.  It looks like they were drafted at some point
17  in January of 2011.
18     Q.  Do you know what purpose they were drafted for?
19     A.  It looks like it was a white-pager on Senate
20  Bill 14 for the Senator to use.
21     Q.  And what do you mean by white-pager?
22     A.  A fact sheet of background.
23     Q.  Was it used -- was it for him to use at any
24  particular event or on the floor or do you recall?
25     A.  I don't recall.

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

50 (Pages 197 to 200)

197

1   Q.  Do you know if he actually used these?
2   A.  I do not recall.
3   Q.  Do you recall if he approved them?
4   A.  I don't recall.
5   Q.  Can you look at the part in the middle of the
6   page that says, "Why I made the law stronger"?
7   A.  Yes.
8   Q.  Do you see that it says, "This is a true photo
9   ID bill.  I decided that a true photo identification
10  bill was a better solution"?
11  A.  Yes.
12  Q.  What did you mean by a true Voter ID bill?
13  A.  Well, this looks to be a quote from him, so
14  potentially, although I don't recall, that this part of
15  it is something that he helped me craft.  Because if I
16  was going to offer a quote, and I did write his press
17  releases, so I wrote things for him all the time, but
18  typically when we wrote something -- he did actually
19  read that part, and I don't recall exactly what he meant
20  by better solution.
21  Q.  By true photo ID?
22  A.  I'm sorry, what was your question about?
23  Q.  About the phrase, "True photo identification
24  bill."
25  A.  Yes.  It meant that the bill only required

198

1   photo IDs and there were no nonphoto IDs in the bill.
2   Q.  And why -- what was the purpose of requiring
3   only photo identification?
4   A.  I think the Senator thought -- well, you're
5   going to have to ask him specifically -- that photo ID
6   was always the right tool to combat Voter ID fraud and
7   that nonphoto ID options still had a potential for
8   problems.
9   Q.  So do you believe that the other bills that
10  Senator Fraser sponsored would have combated voter
11  fraud?
12  A.  I believe that it was a step toward combating
13  voter fraud.
14  Q.  And what was the reason that Senator Fraser
15  changed his position and in 2011 introduced a bill that
16  only included photo identification?
17  A.  Well, his --
18      MS. HALPERN:  Objection, assumes facts not
19  in evidence, that he changed his position.
20  A.  That is a true statement.  He filed a different
21  bill, and I would say that if you asked him, he would
22  always have wanted a true photo ID bill from the very
23  beginning.  But here it says that he's had two
24  additional years to see that photo laws were working in
25  other states and two additional years to see voter fraud

199

1   was still a problem.  And his comment was, "Only a true
2   photo ID bill could deter and detect fraud and protect
3   the public's confidence in elections."
4   Q.  (By Ms. Maranzano)  And I know you spoke with
5   Mr. Dunbar a little bit about the two additional years
6   to see that photo ID was working.  What did he mean, to
7   the extent that you know and to the extent you worked
8   with him on this paper, about two additional years to
9   see that voter fraud is still a problem?  What was the
10  factual basis for saying that?
11  A.  I don't recall that we had any factual basis.
12  Q.  And do you see at the bottom of the page it
13  says, "Measures required to offset burdens on voters,"
14  and then the first bullet point says, "Access to free
15  photo ID cards"?
16  A.  Yes.
17  Q.  Was it your understanding that to be lawful, a
18  photo ID bill had to offset burdens on voters?
19  A.  Given Bryan's memo that we previously
20  discussed, and knowing that I'm not a lawyer, the answer
21  is yes.  Bills -- election bills, because we had to get
22  preclearance, had to have some measures like that.
23  Q.  And that was based on the information that you
24  received from Mr. Hebert?
25  A.  Yes.

200

1   Q.  And is it your understanding that the
2   requirement to offset burdens on voters is met solely by
3   establishing an ID that doesn't have an issuance fee?
4   A.  Well, if you'll turn the page, there's actually
5   three measures listed under that bullet point.
6   Q.  Okay.  And I'm sorry, just to be clear, I mean
7   with regard to the access to free photo ID cards, is
8   what's required just to have a provision that says there
9   will be an ID that doesn't have an issuance fee, or are
10  there any other requirements associated with this one
11  provision?
12  A.  I don't understand your question.
13  Q.  Was there any -- did you believe that you were
14  also required to make sure, for example, that a photo ID
15  card that was not -- that didn't have an issuance fee,
16  also didn't require underlying documents that did have
17  an issuance fee?
18  A.  I'm sorry.  I still don't understand your
19  question.
20  Q.  I guess what I'm wondering is, with regard to
21  this point that -- I understood you to say that you --
22  you believed that you were required to offset burdens on
23  voters by providing access to free photo ID cards.  So
24  I'm asking what does that mean?  What does access to
25  free Voter ID cards mean?  What's entailed in that?

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

51 (Pages 201 to 204)

201

1    A.  I don't know that the bill -- that the
2    legislation spoke to that.  But I think, you know,
3    essentially if you can get a photo ID, then you
4    should -- that would offset any supposed burden on a
5    voter.
6        Q.  Did you understand that there was any
7    requirement to try to make this -- this free photo ID
8    card accessible to communities who are most likely not
9    to have another form of ID?
10       A.  I'm sorry, your questions must be too long.  I
11   don't mean to be --
12       Q.  I know it's late in the day.
13       A.  I don't mean to be -- I mean, I don't
14   understand what you're asking me.
15       Q.  I'm just trying to understand was there any
16   other -- other -- other than just having a provision in
17   SB 14 that said there will be an ID that doesn't have an
18   issuance fee, did you understand there to be any other
19   obligation associated with this ID, other than that?
20       A.  No.
21       Q.  Okay.  Thank you.
22           And in terms of the second bullet point
23   that says, "Availability of provisional and absentee
24   ballots," what does that mean?
25       A.  Well, the bill provided for methods for people

202

1    to vote who did not have a photo ID.
2        Q.  And that method was a provisional ballot?
3        A.  A provisional ballot.
4        Q.  Did you understand that -- that you were only
5    required to have somebody be allowed to cast a
6    provisional ballot, or did you take the requirement to
7    be anything additional to that?
8        A.  I can't recall what the legislation says.  I'm
9    happy to pull it out and take a look at it if you want
10   me to.  I thought the bill spoke to how those ballots
11   would be counted.
12       Q.  I guess what I'm asking you, just to be clear,
13   is you drafted this paper, correct?
14       A.  Yes.
15       Q.  And -- and this bullet says that there are
16   measures that are required to offset burdens on voters,
17   and I just want to get some explanation as to what you
18   understood these measures to be.  So where it says,
19   "Availability of provisional ballots," I'm wondering,
20   did you take that to mean as long as a person was able
21   to cast a provisional ballot, then that was all that was
22   needed to offset the burdens on voters, or was there
23   anything additional you needed to do to offset that
24   burden?
25       A.  I think I took it just to mean that they were

203

1    available.
2        Q.  Okay.  And I believe you testified -- you
3    mentioned earlier, at least, the Help America Vote Act?
4        A.  Yes.
5        Q.  Are you familiar with the requirements of the
6    Help America Vote Act?
7        A.  Not specifically, no.
8        Q.  So do you know, as you sit here, whether SB 14
9    requires any additional availability of provisional
10   ballots, other than what's already required under the
11   Help America Vote Act, HAVA?
12       A.  I can't speak to if Senate Bill 14 does or
13   doesn't ask for more things than HAVA, because I can't
14   tell you what HAVA says.
15       Q.  Okay.  Are you -- are you familiar with the
16   provisional ballot provision that's included in SB 14?
17       A.  Not without reading the bill again.
18       Q.  You can refer back to it.
19       A.  So are you speaking -- are you going to speak
20   to them being cast or being counted?
21       Q.  Being counted.
22       A.  Okay.
23       Q.  So is it fair to say that if a person does not
24   have an ID under SB 14 and votes with a provisional
25   ballot, that person is required to show one of the forms

204

1    of ID under SB 14 to the voting registrar within six
2    days after an election unless they meet one of the
3    exceptions?
4        A.  The statute reads that a voter who
5    provisionally votes may not later than six days after
6    the date of the election present some form of ID.
7    That's required by the statute.
8        Q.  And are you aware of whether the voter
9    registrar's office is open on the weekend?
10       A.  I don't -- I couldn't speak to how every county
11   operated.
12       Q.  Are you aware whether they're opened outside of
13   business hours?
14       A.  I don't know.
15       Q.  Does anything in SB 14 require that the voter
16   registrar office be opened on the weekends?
17       A.  No.
18       Q.  Does anything in SB 14 require that the voter
19   registrar office stay open outside of regular business
20   hours?
21       A.  The bill does provide that the Secretary of
22   State shall prescribe procedures as necessary to
23   implement this section.  I don't know if they can or
24   cannot do any of the things that you're asking through
25   their rules.

JANICE MCCOY                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

---

205

1  Q.  Okay.  But nothing in the statute itself made
2  those requirements; is that correct?
3      A.  That's correct.
4      Q.  And did you ever have any conversations with
5  Senator Fraser about making a -- requiring the county --
6  the voter registrar's office to stay open outside of
7  business hours or on the weekend?
8      A.  I don't recall.
9      Q.  Did you ever have any conversations with
10 Senator Fraser about the fact that individuals who were
11 working an hourly wage might have trouble finding time
12 to take off work and go to the voter registrar's office
13 to show IDs to have their provisional ballots counted?
14     A.  I don't recall.
15     Q.  Turning back to Exhibit 15, in terms of the
16 availability of absentee ballots, can you tell me what
17 that means?
18     A.  No.
19     Q.  In Texas, do you know whether anybody who
20 requests to vote by absentee ballot is able to?
21     A.  I guess I'm confused by my own language in the
22 memo, because I don't -- I don't know that I would call
23 them absentee ballots.  Are we talking about voting by
24 mail?
25     Q.  Well, I would hesitate to define words that you

---

206

1  used.
2      A.  I can't speak to it, because I don't recall --
3  I don't know why I would use the word absentee.  I don't
4  know who those people are.
5      Q.  If -- if you meant voting by mail in that
6  provision, is it fair to say that only certain voters
7  are eligible to vote by mail in Texas?
8      A.  Yes.
9      Q.  So an absentee ballot or a vote-by-mail ballot
10 would only offset the burden for certain voters,
11 correct?
12     A.  That's correct.
13     Q.  And are you aware that some voters have a
14 strong preference to vote by in-person?
15     A.  I'm not.
16     Q.  Are you aware that in some communities there's
17 a strong preference to vote in person?
18     A.  I'm not.
19     Q.  Can you look at the last bullet there.  It
20 says, "Ensure that obtaining ID is no more inconvenient
21 or burdensome than the usual act of voting."  Do you
22 consider that to be the case under SB 14?
23     A.  Again, I think this has been asked and
24 answered.  I don't think it's inconvenient or burdensome
25 to ask someone to get a photo ID.

---

207

1  Q.  And do you know where the EICs are available to
2  be obtained?
3      A.  From the DPS offices.
4      Q.  And do you know how many DPS offices there are
5  around the state?
6      A.  I do not.
7      Q.  Do you know if there's one in every county?
8      A.  I do not.
9      Q.  Do you know if there's a polling place in every
10 county?
11     A.  There is.
12     Q.  Do you know if there's usually more than one
13 polling place in every county?
14     A.  I would assume that there are, but some rural
15 counties may have only one.
16     Q.  Do you know what a person needs to present to
17 obtain an EIC?
18     A.  No.
19     Q.  Is it fair to say that they need to present
20 some underlying documentation?
21     A.  Yes.
22     Q.  What does a person need to do to register to
23 vote?
24         MS. HALPERN:  Today, Counsel?
25         MS. MARANZANO:  Uh-huh.

---

208

1  A.  You fill out a voter registration application
2  and mail it in.
3      Q.  (By Ms. Maranzano) And how about when you wrote
4  this document, was that the same?
5      A.  Yes.
6      Q.  Is any underlying documentation necessary?
7      A.  No.  But the voter is required to put a
8  driver's license number or social security number down
9  on that application.
10     Q.  And the person -- the applicant can mail in the
11 registration application, correct?
12     A.  Yes.
13     Q.  And they can fill it out at their convenience
14 anytime day or night; is that correct?
15     A.  Yes.
16     Q.  And at any location; is that correct?
17     A.  That's true.
18     Q.  And the last bullet on this document says,
19 "Measures recommended to offset burdens on voters," and
20 the first subpoint says, "Phase in over two election
21 cycles."  Was SB 14 phased in over two election cycles?
22     A.  I don't recall.  I can look.  Just to be clear,
23 the document that we're talking about, Exhibit 15 --
24     Q.  Uh-huh.
25     A.  -- was about a filed piece of legislation.  So

---

JANICE MCCOY
CONFIDENTIAL TRANSCRIPT
7/9/2014

53 (Pages 209 to 212)

---

209

1  this document may or may not reflect the enrolled
2  version.
3  Q.  Okay.  But I believe you testified earlier in
4  response to Mr. Dunbar's questions that SB 14 began to
5  be implemented shortly after Shelby was decided; is that
6  correct?
7  A.  That's correct, but it was designed to be
8  implemented.
9  Q.  But as it -- as it sort of played out, was it
10 phased in over two election cycles?
11        MR. KEISTER:  Objection, form.
12        MS. HALPERN:  Objection -- yeah.
13 A.  I mean, I can only tell you -- I mean, I can
14 tell you that the bill was effective the September
15 following session in terms of training and education,
16 and that the requirement, according to the bill, for
17 photo ID took effect in January of 2012, so six months
18 later.  I don't think that would have been two election
19 cycles.
20 Q.  (By Ms. Maranzano) And the bill actually did
21 not go into effect in January of 2012, correct?
22 A.  It did not.
23 Q.  In terms of the second bullet, Exception for
24 Certain Elderly Voters, as SB 14 was signed into law, is
25 there an exception for elderly voters?

---

210

1  A.  No.
2  Q.  Thank you.  That's all I have on that document.
3        (Exhibit 16 marked for identification.)
4  Q.  (BY MS MARANZANO) Ms. McCoy, I'm showing you
5  what we're marking as Deposition Exhibit 16.  Do you
6  recognize this document?
7  A.  No.
8  Q.  You've never seen it?
9  A.  I don't know that I can speak to it.  I've
10 never seen it.  I did not draft it.
11 Q.  Does it look familiar to you?
12 A.  I don't recall if I saw this or not.
13 Q.  Do you know who did draft it?
14 A.  I do not.
15 Q.  Do you know if -- so you have no recollection
16 as to whether you saw this or not?
17 A.  I don't have a recollection whether I saw this
18 or not.
19 Q.  Okay.
20        (Exhibit 17 marked for identification.)
21 Q.  (By Ms. Maranzano) I'm showing you what we've
22 marked as Deposition Exhibit 17.  Do you recognize this
23 document?
24 A.  I don't necessarily recognize it.  I'm listed
25 as a recipient, so I'm sure I saw it at the time.

---

211

1  Q.  Okay.  Do you see that at the beginning of the
2  bottom message there, there is a reference to docs on
3  Voter ID and federal balanced budget.  Do you know what
4  that's referring to?
5  A.  I would assume it's referring to the Governor's
6  emergency declaration.
7  Q.  So does this -- did you know that these issues
8  were going to be made emergency designations prior to
9  their actually being designated as emergency items?
10 A.  Well, apparently if I saw the e-mail at 11:48,
11 I might have.
12 Q.  Do legislators typically request a bill to be
13 designated as an emergency item?
14 A.  I don't -- I can't speak for all legislators
15 and what they do or don't do.
16 Q.  Have you ever requested or to your knowledge
17 has Senator Fraser ever requested one of his bills be
18 designated as an emergency item?
19 A.  I don't know that -- I've never done it.  I
20 don't know if he has or not.
21 Q.  Do -- does the Lieutenant Governor typically
22 make a request about what item should be designated as
23 an emergency items?
24 A.  I can't speak to what the Lieutenant Governor
25 did or didn't do -- does or doesn't do.

---

212

1  Q.  Do you have any -- do you have any opinion as
2  to how the decision is usually made as to what items
3  will be designated emergency by the Governor?
4        MS. HALPERN:  Objection, relevance.
5  Objection, calls for speculation.
6  A.  I can't speak to how the Governor makes
7  decisions.
8  Q.  (By Ms. Maranzano) And in your capacity as the
9  chief of staff for a Senator, did you ever come to have
10 any knowledge as to how the office would go about
11 designating certain bills as emergency items?
12 A.  How the Governor's Office?
13 Q.  Yes.
14 A.  That's been asked and answered.  No.
15 Q.  Okay.  Does the Lieutenant Governor decide who
16 chairs the Committee of the Whole on any given day?
17 A.  Without seeing the Senate rules, I can't tell
18 you exactly how it works, but I know the Lieutenant
19 Governor gets to appoint committee chairs.  I'm assuming
20 that includes the Committee of the Whole.
21 Q.  What is the role of the chair of the Committee
22 of the Whole?
23 A.  Well, the role of a committee chair is to set
24 the agenda for his committee and then to manage that
25 agenda.  And I'm assuming that would be the same for the

---

JANICE MCCOY                                           7/9/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

---

213

chair for the Committee of the Whole.

Q.   And do you see in the second paragraph of the bottom e-mail, it says, "Met with Sen. Duncan, he will chair COW," does that mean Committee of the Whole?

A.   I didn't write this e-mail, but I would assume that would be yes.

Q.   Are you aware of whether Senator Fraser had any input into the decision that Senator Duncan would chair the Committee of the Whole during the Voter ID debate?

A.   Senator Duncan chaired the Committee of the Whole in 2009.  He was chair of State Affairs.  I would assume that Senator Fraser might have that knowledge that Senator Duncan would chair it again in 2011.

Q.   And I think you may have just answered this, but I just want to be clear:  Why do you think Senator Duncan was chosen to chair the Committee of the Whole?

MS. HALPERN:  Objection, calls for speculation.  Relevance.

A.   I mean, my speculation is that he chaired State Affairs, which was the election committee, so he should do this one, too.  But you would have to speak to Governor Dewhurst about that.

Q.   (By Ms. Maranzano) Because Lieutenant Governor Dewhurst made that decision?

A.   As far as I know, yes.

---

214

Q.   Okay.  And do you see the top e-mail comes from Karina Davis?

A.   Yes.

Q.   Do you know who Karina Davis is?

A.   She's the Senate Parliamentarian.

Q.   And who does she report to?

A.   Governor Dewhurst.

Q.   Is it her role to be unbiased when she's making decisions about Senate procedures?

A.   She reports to the Lieutenant Governor.  She's hired by him.  I think that's a question that's better left to his office than to me.

Q.   Well, let me ask you this:  Why -- what's your understanding of why the parliamentarian would be involved in making what she called a game plan for the Voter ID debate?

A.   I think the parliamentarian understood the Senate rules and how they worked and how the Senate operated, and so the Governor must have asked her to help make a game plan.

Q.   Is there any conflict of interest for her to be involved with creating a plan about a bill's consideration and then making decisions about the procedures?

A.   I can't speak to that.

---

215

Q.   You don't have an opinion on that?

A.   I don't.  It would take -- well.

(Exhibit 18 marked for identification.)

Q.   (By Ms. Maranzano) I'm handing you what we've marked as Exhibit 18 for the record.  Do you recognize this document?

A.   It's an e-mail that Bryan Hebert sent to three staff people and some of his colleagues in the Lieutenant Governor's Office.

Q.   Do you know what -- what this information that he sends was for?

A.   It again looks like an e-mail that he wanted to provide to various Senators about Voter ID.

Q.   Do you know if it was to be used during the Voter ID debate?

A.   According to the text of the e-mail, he says that it may prove useful in preparing for the debate.

Q.   And I believe you identified previously in this deposition Jonathan Stinson.  Who is Jason Baxter?

A.   He worked for Senator Williams.

Q.   And who is Wroe Jackson?

A.   He --

Q.   I'm sorry.  Just to be clear, what was his role at the time of this e-mail?

A.   Whose role?

---

216

Q.   Wroe Jackson's.

A.   I think in 2011, he worked for Senator Huffman as well.

Q.   Okay.  Can you look at the second page, which is TX00265593?

A.   Yes.

Q.   Now, this -- this is somewhat familiar as to some other documents we looked at, correct?

A.   This looks like a rehash of the memo that he -- that Bryan prepared in 2009.

Q.   And under the "Legitimate State Interest, Deterring and detecting fraud," is the only type of fraud that SB 14 would deter, is it in-person voter impersonation or are there other types of fraud that SB 14 would deter?

A.   Senate Bill 14 was designed to combat in-person voter fraud.

Q.   Only in-person voter fraud, correct?

A.   Yes.

Q.   And then the second point says, "Improving and modernizing election procedures."  Can you tell me what that means, to the best of your understanding?

A.   I cannot.

Q.   Did you ever ask Mr. Hebert?

A.   I did not.

---

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

---

217

1    Q.  And the third point, "Protecting against fraud
2  enabled by inaccurate registration rolls," do you know
3  what that means?
4    A.  If you look at the document, I think what Bryan
5  is laying out is five different reasons why a state
6  would have an interest in -- in election bills, not
7  necessarily Voter ID.  But these would be legitimate
8  state interests to move forward with any election
9  reform.  And to me, Number 3 says that you can protect
10 against -- it's a legitimate state interest for a state
11 to protect against fraud by rehashing its registration
12 rolls to make sure they're accurate.
13   Q.  I guess I'm just losing you a little bit on how
14 SB 14 is connected to that.
15   A.  I didn't write this document.
16   Q.  Uh-huh.
17   A.  So I'm just -- you're asking me to assume what
18 Bryan was thinking when he wrote this document.  So my
19 assumption is he was listing what would be a legitimate
20 state interest in any election reform bill, not specific
21 to Senate Bill 14.  And so you would -- again, I
22 don't -- I don't know.  That doesn't apply to Senate
23 Bill 14, so that's not an interest that I would ever
24 have used in my talking points for Senator Fraser.  You
25 would have to speak to Bryan about why he included it in

---

218

1  his memo.
2        MS. HALPERN:  Counsel, could we take a
3  break?  I think we've been going for an hour.
4        MS. MARANZANO:  Sure.
5        (Recess from 3:34 to 3:42 p.m.)
6    Q.  (By Ms. Maranzano)  Before the break, we were
7  talking about Exhibit 18.  And just to be clear, I -- I
8  understand you didn't write this document.  And when I'm
9  asking you questions, I'm just asking you as somebody
10 who received it, how you understand this, just so we're
11 clear about that.  And if, you know, I will also
12 probably ask for some of these bullets, if you had
13 conversations with Mr. Hebert about them.
14        And I want to turn your attention to the
15 bottom, Roman Numeral III.  The very last point and the
16 parentheses.  It says, "Exception for certain elderly
17 voters," and then in parentheses says, "to decrease size
18 of class of voters adversely impacted by the law."  How
19 did you understand that when you received this document?
20 What did you understand that to mean?
21   A.  I don't recall that I read that and had any
22 thought about it.
23   Q.  Do you believe that there are -- that there is
24 a class of voters adversely impacted by SB 14?
25   A.  No.

---

219

1    Q.  And did you have any conversations with
2  Mr. Hebert about what he meant when he wrote that?
3    A.  I don't recall.
4    Q.  Do you recall if you were concerned to see that
5  Mr. Hebert believed there was a class of voters
6  adversely affected by the law?
7    A.  I don't recall.
8    Q.  Did you, to the best of your recollection, pass
9  this information along to Senator Fraser?
10   A.  I don't recall if I gave him these memos or
11 not.
12   Q.  Can you look at the next page, which is
13 TX00265594?  And under Roman Numeral III, the very first
14 bullet there, it says that the bill, the "simplified
15 bill requires photo ID."  Can you tell me what you
16 thought -- what you understood that to mean in terms of
17 what was simpler about this bill?
18   A.  I think that the Senator is on the record, and
19 I think I been on the record today, that the bill, by
20 only requiring five -- at the time when this was filed,
21 four forms of photo ID -- was simpler and easier for
22 election workers to implement.
23   Q.  So it was simpler for the individuals
24 implementing or administering elections, correct?
25   A.  Yes.

---

220

1    Q.  Do you think it was simpler for individuals
2  attempting to vote?
3    A.  Again, as I've answered before, I don't know
4  that -- my personal opinion is that I don't think photo
5  ID is burdensome in that only saying these five IDs are
6  what you need to bring.  That's fairly simple for a
7  voter to understand, yes.
8    Q.  So you think it is simpler for the voters, and
9  that's because you think it's easier for them to
10 understand what the forms of ID are?
11   A.  I think it's easier for -- yes, for them to
12 understand what the forms of ID are, yes.
13   Q.  Would it be simpler for them to obtain forms of
14 ID if there were fewer forms of ID?
15   A.  As I've testified before, I didn't think it was
16 burdensome to ask them to get a photo ID.
17   Q.  How much advice did you receive from Mr. Hebert
18 about SB 14?
19   A.  Excuse me, how much what?
20   Q.  Advice.
21   A.  Bryan and I spoke often about Senate 14.  And I
22 mean, I don't know that I would classify his remarks as
23 advice or just comments, but we -- I mean, he would
24 offer his opinions, and I would take it or not.
25   Q.  Okay.  And when he offered legal opinions, did

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

56 (Pages 221 to 224)

221

1  you often follow those, because I believe you testified
2  earlier about a document we were looking at that you
3  made a certain statement based on something he had told
4  you in terms of requiring certain measures to offset
5  burdens on voters?
6      A.  I mean, if he had a point that I shared with
7  the Senator that the Senator wanted to move forward on,
8  then yeah, we would -- I guess you could say that was
9  taking his advice, yes.
10     Q.  And when -- when you talked to him about --
11  when you talked to Mr. Hebert about SB 14, did you --
12  was it your understanding that he was acting on behalf
13  of the Lieutenant Governor?
14     A.  Yes.
15     Q.  And did Senator Fraser also communicate
16  directly with the Lieutenant Governor about SB 14?
17     A.  Yes.
18     Q.  Did Senator Fraser usually follow the advice or
19  the comments that Mr. Hebert or the Lieutenant Governor
20  provided?
21     A.  I --
22         MS. HALPERN:  Objection, calls for
23  speculation.
24     A.  Yeah, I'm not privy to every conversation that
25  Senator Fraser has with Lieutenant Governor, so I can't

222

1  say "yes" or "no" to that question.  I mean, it's case-
2  by-case basis across the board.
3      Q.  (By Ms. Maranzano)  Fair enough.  How about
4  with respect to the conversations you had with Bryan
5  Hebert and then the information you passed along to the
6  Senator, would you say that the Senator usually tended
7  to agree with the comments that Mr. Hebert was
8  providing?
9      A.  I don't remember speaking specifically to the
10  Senator or talking in context of Senate Bill 14 about
11  this memo and Bryan's advice about what should or
12  shouldn't be in the bill and the Senator ever giving me
13  an opinion back on what he thought of that advice.
14     Q.  And just to be clear, I think I'm asking a
15  little more generally, not just about this memo, but in
16  terms of SB 14 and, you know, your -- what you
17  characterize, I believe, as frequent conversations with
18  Mr. Hebert.
19     A.  Well, I didn't share every conversation I had
20  with Mr. Hebert with the Senator.  I imagine that the
21  Senator -- again, I mean, I don't recall what the
22  Senator's response was to everything I told him from
23  Bryan.
24     Q.  So you don't really recall --
25     A.  I don't recall.

223

1      Q.  -- specifically?
2      A.  No.
3      Q.  Okay.
4          (Exhibit 19 marked for identification.)
5      Q.  (By Ms. Maranzano)  I'm showing you Exhibit 19.
6  Can you take a look at this and let me know if you
7  recognize it?
8      A.  I'm listed as the recipient of the e-mail.  I
9  imagine that I saw it at the time.  I do not recognize
10  it today as something that I saw.
11     Q.  So do you recall whether you shared the
12  information that was in this e-mail with Senator Fraser?
13     A.  I don't recall that I specifically shared the
14  information in this e-mail with the Senator.
15     Q.  Do you recall whether you shared with the
16  Senator, generally, the fact that Mr. Hebert was
17  suggesting that several states had a fail-safe option
18  and that DOJ loved it?
19     A.  I don't recall.
20     Q.  Did Senator Fraser consider allowing a person
21  without a photo ID to sign an affidavit?
22     A.  I can't recall if an amendment -- this actual
23  amendment was offered or not.  We'd have to look at the
24  record.
25     Q.  But apart from any amendments, did Senator

224

1  Fraser consider adding that to SB 14 at any point?
2      A.  As far as I recall, Senator Fraser didn't
3  consider adding any amendments to Senate Bill 14
4  himself.
5      Q.  Now, when -- when somebody registers to vote,
6  they sign at the bottom of their voter registration
7  application, correct?
8      A.  I don't know.  Do you have a voter registration
9  application?  I don't -- I haven't registered to vote in
10  a while.  I mean, I'm -- I get renewed, I don't know.
11     Q.  You don't know if that's the case?
12     A.  I'd have to see one.  I don't -- yeah, I don't
13  know.
14     Q.  Do you know if in Texas election law now,
15  signature matches are conducted in terms of counting
16  certain ballots such as provisional ballots or absentee
17  ballots?
18     A.  I don't know.
19     Q.  Is there any reason that you can think of
20  sitting here today that you would be unable to do a
21  signature match in terms of if somebody were to sign an
22  affidavit?
23     A.  I'm sorry, ask me that again.
24     Q.  Is there any reason that you can think of that
25  in terms of election administration, you would be unable

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

57 (Pages 225 to 228)

225

1  to conduct an affidavit if SB 14 were to include a
2  provision like what's discussed in this e-mail where a
3  person without photo ID signs an affidavit verifying
4  their identity?
5      A.  So the voter registration application could be
6  forged, so the signatures could match, and it's still
7  not the person who's supposed to be voting.
8      Q.  So -- so in your mind, that -- it would be less
9  secure --
10     A.  Yes.
11     Q.  -- to do that.  But is there any prohibition,
12 legal prohibition on -- on doing that?
13     A.  By who?
14     Q.  By the Texas election law, at this point,
15 before SB 14?
16     A.  I don't -- I don't know how the provisional
17 program worked prior to Senate Bill 14 being the
18 provisional ballot, provisions being enforced prior to
19 Senate Bill 14.  I'm not sure what they did or didn't do
20 prior to that, this bill.
21     Q.  Okay.  You don't know if they actually did
22 these signature matches --
23     A.  I don't.
24     Q.  -- to count certain ballots?
25     A.  I do not.

226

1      Q.  Did you ever -- strike that.
2          Did you -- did you consider whether adding
3  an affidavit provision, such as the one discussed in
4  this e-mail, might impact minority voters?
5      A.  No.
6      Q.  Are you aware of whether Senator Fraser
7  considered that?
8      A.  I am not.
9      Q.  Did you ever ask Mr. Hebert why he thought DOJ
10 loved this provision?
11     A.  I did not.
12     Q.  Did you have any understanding when you read
13 that as to whether that was related to preclearance?
14     A.  I did not have that understanding.
15         (Exhibit 20 marked for identification.)
16     Q.  (By Ms. Maranzano)  I'm showing you what we
17 marked as Exhibit 20.  Do you recognize this document?
18     A.  I don't recognize it.  But apparently, I
19 received it in 2011.
20     Q.  You received it.  And then the top e-mail is
21 one that you sent; is that correct?
22     A.  That's correct.
23     Q.  Does this refresh your recollection at all
24 about analysis and information related to people who had
25 state-issued IDs?

227

1      A.  The e-mail reads from me last year's
2  information, so that would have been -- not last year
3  but last session's information, 2009, "There are charts
4  about the number of people with driver's licenses.
5  Might be useful information if DPS can update it."  So,
6  apparently, I do recall that there were charts, and now,
7  apparently, they were delivered in 2009 --
8      Q.  And --
9      A.  -- and potentially updated in 2011.
10     Q.  And do you recall if they were actually
11 updated, if you got updated information?
12     A.  I don't know that I asked for updated
13 information, and I don't recall if I got it.
14     Q.  Why were you sending these charts to Senator
15 Williams' staff?
16     A.  Senator Williams was chair of the Senate
17 transportation and had more contacts with DPS than I
18 did.
19     Q.  So --
20     A.  And it looks like they requested it.  I mean,
21 they -- whatever the document was in the original e-mail
22 they requested, and then I added a line about the
23 driver's license.
24     Q.  I see.  And you thought that because they had
25 more contacts with DPS, they might be able to get

228

1  updated information more easily?
2      A.  Yes.
3      Q.  Okay.  And you never requested updated
4  information from them?
5      A.  I don't recall requesting that information.
6      Q.  All right.  Did you anticipate that -- how many
7  people had driver's licenses or other forms of
8  state-issued ID would be -- would come up during the
9  legislative debate on SB 14?
10     A.  Well, this e-mail says that it might be useful
11 to have that information, so, potentially, yes, I did
12 assume that it might be useful to have.
13     Q.  But even with the assumption that it might be
14 useful to have, it might come up, you didn't -- you
15 didn't send requests for --
16     A.  I don't recall requesting it.
17     Q.  Do you recall -- this e-mail was in 2011, and
18 as you said, it looks like these charts had been
19 available from the year prior.
20     A.  The session prior, yes.
21     Q.  The session prior.  So do you -- is it your
22 understanding that the charts that were -- that you're
23 referring to in this e-mail were used in the debate on
24 SB 362?
25     A.  Yes.

JANICE MCCOY                                         7/9/2014
CONFIDENTIAL TRANSCRIPT

58 (Pages 229 to 232)

229

1   Q.   And were they used in the public debate?
2   A.   I can't speak to that.  I don't recall.
3   Q.   Were you -- were you present during the
4   legislative debate on SB 14?
5   A.   Yes.
6   Q.   Do you recall during the legislative debate any
7   requests being made for information about individuals
8   who had the state-issued forms of ID?
9   A.   No.
10          (Exhibit 21 marked for identification.)
11   Q.   (By Ms. Maranzano)  I'm showing you what we
12   marked as Exhibit 21.  Just to see if this refreshes
13   your recollection.  This is an excerpt only.  It's not
14   the entire debate.  Does this look familiar to you?
15   A.   I don't know that I've seen this document.
16   Q.   Okay.  I'll represent to you that this is
17   what's produced in Texas V. Holder.  This is an excerpt
18   of what was produced.
19          MS. HALPERN:  Counsel, Counsel, just so
20   the record --
21          MS. MARANZANO:  Yeah.
22          MS. HALPERN:  -- is clear.  Can we assume
23   that Ms. McGeehan had given some kind of testimony, and
24   this represents, essentially, a cross-examination of her
25   by Senator Davis, because the direct testimony, if there

230

1   was any, is not there?
2          MS. MARANZANO:  Yes.  What I brought was
3   an excerpt only.  I -- I would say that what she had
4   done was she was a resource witness, and then there was
5   a variety of questions asked by different senators.
6   Q.   (By Ms. Maranzano)  And actually, what I would
7   like you to look at is page 446, or actually, what's
8   Bates stamped JA000801, at the very bottom of the page.
9   Ms. McGeehan notes that, "Senator Williams had
10   approached us earlier today to see if we could do some
11   comparisons to try and further focus in on who those
12   registered voters are that don't have or have not been
13   issued a driver's license or personal ID number.  So
14   we're trying to run some of those numbers now."
15          And then I also want you to take a look at
16   what's marked at the bottom of the page as JA000844.
17   And this is actually testimony by Senator Williams.  And
18   then if you see at the bottom, it says, "And then,
19   finally, I wanted to ask you, we had talked earlier
20   about the project that I asked you to do to
21   cross-reference the driver's licenses and the voter
22   registration, how is that coming along?  I know I only
23   asked today, but I just -- " and Ms. McGeehan says
24   "Yes."
25          Does this refresh your recollection at all

231

1   about the request?
2   A.   No.
3   Q.   No?  Okay.  Did you ever have any conversations
4   with Senator Fraser about this request?
5   A.   I don't recall the request.
6   Q.   So no?
7   A.   Yeah -- no.
8   Q.   Or you don't recall --
9   A.   I don't recall.
10   Q.   -- if you had any conversations.  Okay.
11          (Exhibit 22 marked for identification.)
12   Q.   (By Ms. Maranzano)  I'm showing you what we're
13   marking as Deposition Exhibit 22.  Take a look and tell
14   me if you recognize this.
15   A.   Exhibit 22 appears to be three different
16   documents.  I do not recognize the first page.
17   Q.   Okay.  Do you recognize the other pages?
18   A.   I do.
19   Q.   Did you draft those?
20   A.   I drafted -- I don't know that these are my
21   documents.  I think I had a version of these documents,
22   but these aren't my documents, because I don't think the
23   cross-throughs are mine --
24   Q.   Okay.
25   A.   -- the strike-throughs are mine.

232

1   Q.   So the initial page, which I believe you said
2   you hadn't seen before, is an e-mail from Mr. Hebert
3   that says, "Attached are Janice's notes on questions and
4   amendments that are likely to arise tomorrow.  My
5   suggested revisions are in red."  So is it possible that
6   without the strikeouts, that would be the document that
7   you drafted?
8   A.   Well, he says the revisions are in red, so he
9   potentially added words as well.
10   Q.   Uh-huh.  Fair enough.
11   A.   And since it's a black-and-white copy, I can't
12   say definitively what he added or struck through.
13   Q.   And when you look at this, do you have any
14   independent recollection of drafting such documents?
15   A.   I do recall drafting the documents, not these
16   documents, because Bryan's obviously said in his e-mail
17   that he's added some.
18   Q.   Uh-huh.  The documents where you laid out
19   possible amendments and responses to possible
20   amendments?
21   A.   Which is the second document.  And then the
22   third document looks to be a -- a Q&A for the Senator on
23   questions that he may have gotten on the floor and
24   potential answers that he can provide.
25   Q.   Uh-huh.  And did you draft such a document?

JANICE MCCOY                                            7/9/2014
CONFIDENTIAL TRANSCRIPT

59 (Pages 233 to 236)

233

1    A.  I did draft a document, not this document.
2    Q.  Okay.  How did you -- how did you know what the
3  possible amendments were that were going to come up?
4    A.  Again, I think I testified earlier, I'm not
5  sure if we had asked for prefiled amendments in 2009 or
6  2011, so we might have had some amendments prefiled.
7  The other way is that you could look at amendments that
8  had been filed in previous sessions.  And then there's
9  just some guesses probably.
10    Q.  And this certainly isn't all the amendments
11  that were offered, correct, because we looked at some
12  earlier today that aren't included here?
13    A.  I would assume, yes.
14    Q.  Do you recall whether you had any conversations
15  with staff from either Senator Ellis' or Senators West's
16  office about these potential amendments?
17    A.  I did not have conversations with Senator
18  West's office or Senator Ellis' about their amendments.
19    Q.  Did you talk to other senators or other Senate
20  staff about possible amendments to SB 14?
21    A.  Not that I recall.
22    Q.  To your knowledge, did Senator Fraser --
23    A.  I'm sorry.
24    Q.  Yeah.
25    A.  I think your question was vague.  Did I talk to

234

1  other Senate staffers about amendments prior to
2  amendments being offered?
3    Q.  Yes, thank you for the clarification.  That is
4  what I intended to ask.
5    A.  I talked to other Senate staff offices about
6  potential amendments that could be offered, not specific
7  amendments, yes.  So the answer to that question is yes.
8    Q.  Okay.  I think I lost you in the clarification
9  there.  What -- what conversations did you have with
10  other Senate staff?
11    A.  Well, with other Senate staff, I had
12  conversations about amendments that we thought could be
13  offered.
14    Q.  I see.  So you talked -- I see.  I
15  gotcha.  Now, were you talking with staff for the
16  Senators who you thought would be offering the
17  amendments or to other senators about how to respond to
18  the potential amendments or both?
19    A.  I don't think I spoke to any Senate staff who
20  were going to be offering amendments.  I don't recall
21  speaking to any Senate staff.  I primarily spoke to
22  Senate staff who -- about responses to the potential
23  amendments.
24    Q.  I see.  And were these staffers, staffers to
25  senators who generally supported SB 14?

235

1    A.  Yes.
2    Q.  And in terms of when you drafted questions and
3  responses, I believe you said that those were questions
4  that you anticipated might come up on the floor; is
5  that --
6    A.  I think that's what this document was, yes.
7    Q.  How did you anticipate what questions might
8  come up on the floor?
9    A.  Well, with any bill the Senator filed, you want
10  to try and anticipate what people may or may not ask.
11  And so I think looking at the previous history of the
12  legislation, from 2007 and 2009, looking at the
13  specifics of the bill, you could -- I was trying to just
14  pre -- preguess.  I mean, there's no way to really know.
15  I was just guessing.
16    Q.  Did you consult any written source when you
17  wrote these questions and answers?
18    A.  Written source to do what?
19    Q.  To come up with the questions and the answers?
20    A.  I imagine that the questions were my own.  And
21  then the answers, I may or may not have looked at.  I
22  mean, I don't know if I've quoted anything in here or
23  not.  I don't think I quote any studies in here or
24  not.  Oh, in the back page, there's a -- I apparently
25  looked at the survey of registered voters, so there were

236

1  documents that I looked at that I used to put in facts
2  in this Q and A.
3    Q.  Okay.  Can you look on the page that's marked
4  at the bottom TX00265541?  And there's a question
5  towards the end of the page that says, "Why is there an
6  exemption for the elderly," and a response.  Is that
7  something that you recall drafting or you believe as you
8  read it that you would have drafted yourself?
9    A.  This exemption happens between the filing of
10  Senate Bill 178 and the filing of Senate Bill 14, if I
11  recall correctly.  So it wasn't in 178, but it was in --
12  well, that's not true.  I don't know.  I can't recall
13  when that happened.  I'd have to look at the record.
14  I'd have to look at Senate Bill 178 as filed and Senate
15  Bill 14 as filed.  I can't recall when that exemption
16  happened.  If it happened as a committee substitute or
17  if it happened in the filed version.
18    Q.  And do you see the response says, "This
19  provision was added as a compromise to several of my
20  democratic colleagues"?
21    A.  Yes.
22    Q.  Do you know -- do you know who those colleagues
23  were?
24    A.  I don't.  I know that the Senator asked me to
25  add it at some point in the process, and so we had the

JANICE MCCOY                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

### 237

1 language inserted.
2      Q.  And did Democrats ask for any other
3 compromises?
4      MS. HALPERN:  Objection, vague, time
5 frame.
6      A.  Well, in -- I mean, the Democrats offered
7 amendments.  They potentially could have seen those as
8 compromises.  I don't know that any of those amendments
9 would have made them vote for the bill.
10     Q.  (By Ms. Maranzano)  Okay.
11     A.  But I don't know that you can classify an
12 amendment as a compromise if they were eventually going
13 to still vote no.
14     Q.  So I'm assuming, because this happened before
15 the debate, right, this was anticipated questions and
16 answers?
17     A.  Right.
18     Q.  Is that correct?
19     A.  That's correct.
20     Q.  So I'm assuming that this compromise was
21 reached before the floor debate.  So I guess what I'm
22 wondering --
23     A.  Well --
24     Q.  Yeah, I'm sorry?
25     A.  I'm -- I'm really not sure without seeing the

### 238

1 record.  I can't recall when the elderly provision was
2 added.  I can't recall if it was added when the bill was
3 filed.  I can't recall if it was added --
4      Q.  Well, is it fair to say this e-mail from Bryan
5 Hebert is dated January 24th, correct?
6      A.  Yes.
7      Q.  And the amendments that we looked at already --
8      A.  So it must be in the filed version.
9      Q.  And the amendments were offered on January
10 26th; is that correct?
11     A.  That's correct.
12     Q.  So I guess what I'm wondering, apart from
13 the amendments, were there other -- do you recall other
14 requests that Democrat colleagues made to Senator Fraser
15 about compromises on SB 14?
16     A.  If Senator Fraser was asked for something to be
17 added or excluded from the bill from any of his Democrat
18 colleagues, he didn't tell me.
19     Q.  And were you asked by any --
20     A.  No.
21     Q.  Okay.  Thank you.  Do you -- did you have any
22 conversations with Senator Fraser about why he was
23 willing to make this compromise?
24     MS. HALPERN:  Just so the record's clear,
25 this compromise you're referring to is an exemption for

### 239

1 the elderly?
2      MS. MARANZANO:  That's correct.  Thank you
3 for that clarification.
4      A.  I think -- I think that if you look at the
5 answer to the next question, he -- I wrote but he said
6 that the elderly -- there's a legitimate state interest
7 in exempting certain elderly voters from these
8 requirements, just like we allow certain classes of
9 voters to vote by mail.
10     Q.  (By Ms. Maranzano)  Do you -- do you think he
11 felt that it might be difficult for elderly voters to
12 obtain photo ID?
13     A.  I can't speak to his feelings.
14     Q.  Did you ever have any conversations with him
15 about this exemption?
16     A.  I feel like in his testimony -- I don't know
17 that he personally felt that someone who was elderly
18 might have a hard time getting a -- getting a photo ID.
19 But again, he thought this was something that was -- he
20 could do as a compromise, and it wouldn't -- that he
21 could do for -- as a compromise for his Democrat
22 colleagues.
23     Q.  I guess what I'm wondering is, and maybe you
24 don't know the answer to this, but what -- what was it
25 about elderly voters that made him believe they

### 240

1 shouldn't have to show photo ID like he was requiring of
2 all other voters?
3      A.  Well, I think you're assuming that he believed
4 something just because he added it to the bill.  You
5 would have to speak to him about his beliefs whether he
6 thought the elderly should be exempt or not.
7      Q.  I see.  So it's possible he was adding this
8 because he thought it would increase the chances of it
9 being passed?
10     A.  That potentially could be one reason why he
11 would add it, yes.
12     Q.  I see.  Are you aware of whether any
13 legislators asked Senator Fraser either before filing or
14 after filing, perhaps with an amendment, whether --
15 whether he would be willing to consider putting
16 something in SB 14 that would require extended hours at
17 offices that offered the free -- the EIC or the personal
18 ID card as it was -- SB 14 was first filed that would be
19 issued without an issuance fee?
20     A.  I don't know of any private conversations the
21 Senator had with other members that that was asked.
22 That was asked on the Senate floor.
23     Q.  That was --
24     A.  During the debate.
25     Q.  As a proposed amendment; is that correct?

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

61 (Pages 241 to 244)

241

1  A.  I think so, yeah.
2  Q.  And do you know why -- did he support that
3  request?
4       MS. HALPERN:  Objection, legislative
5  privilege.
6       A.  I'd have to go look at the record, but if that
7  amendment was offered, and I don't even know if there
8  was an amendment about DPS officers -- DPS offices
9  offered.  We'd have to look at the record.  I would
10 assume that he would have tabled it because the Senate
11 Bill 14 as an election bill wasn't the vehicle to talk
12 about DPS hours.
13      Q.  (By Ms. Maranzano)  Isn't your understanding
14 that that would have altered the purpose of SB 14 in any
15 way?
16      MS. HALPERN:  Objection, irrelevant.
17      A.  I think that if you look at the Senator's
18 intent, and you need to speak to him about what he would
19 or wouldn't have supported outside of Senate Bill 14,
20 but for his purposes, he wanted the Senate Bill 14 to be
21 about Voter ID fraud.  And a secondary issue about DPS
22 office hours could and should have been handled in a
23 different piece of legislation.
24      Q.  (By Ms. Maranzano)  Would extending DPS office
25 hours, though, have any impact on deterring voter fraud?

242

1  A.  I don't know that that's relevant, no.
2  Q.  No, okay.  And can you look at the next page
3  for me.  Do you see at the -- do you see that there's a
4  question that says, "Does this bill reduce minority
5  turnout?"
6  A.  I see that question, yes.
7  Q.  So does that at all refresh your recollection
8  as to an awareness that legislators would be concerned
9  about the impact of SB 14 on minority voters?
10      MS. HALPERN:  Objection, assumes facts not
11 in evidence.
12      A.  I was anticipating a question based on
13 testimony from other sessions and discussions from other
14 sessions.
15      Q.  (By Ms. Maranzano)  So it's fair to say that
16 you anticipated that that would come up; is that
17 correct?
18      A.  Yes.
19      Q.  And do you see that it says, "Senator Wentworth
20 has some information on those statistics and voter
21 turnout studies"?
22      A.  Yes.
23      Q.  Is that information the same information that
24 you testified earlier today about when Mr. Dunbar asked
25 you about questions related to turnout in other states?

243

1  A.  Yes.
2  Q.  Okay.  And is there anything additional that
3  you recall Senator Wentworth had, other than those three
4  studies that you talked about earlier?
5  A.  I don't know if Senator Wentworth got
6  additional information or not.
7  Q.  You don't recall any conversation with Senator
8  Wentworth's office about what he had and what he was
9  relying on?
10 A.  I do not.
11 Q.  Okay.  And at the bottom of the page, there's a
12 question about what is the impact on Voter ID on
13 Hispanic, Black and poor.  Do you see that?
14 A.  Yes.
15 Q.  And then is your response, do you see that you
16 refer to the Indiana Voter ID law?
17 A.  Just to be clear.
18 Q.  Uh-huh.
19 A.  This was my suggested answer to Senator Fraser.
20 So it's my response, but it's, essentially, at the end
21 of the day, his response.  So he either answered the
22 question using this information or he didn't.
23 Q.  Okay.
24 A.  Okay.  So, yes, I see that that says that.
25 Q.  Okay.  Do you -- do you know what the Indiana

244

1  Voter ID law required?
2  A.  A photo ID.
3  Q.  Do you -- do you know what forms of photo ID
4  were -- were required under the Indiana law?
5  A.  I know that it was a little bit broader than
6  the IDs that Texas was proposing in Senate Bill 14.
7  Q.  And so did that -- did it concern you to be
8  relying on information from a state with a different
9  Voter ID law when you answered this question?
10 A.  When I provided an answer to Senator Fraser who
11 potentially would answer the question, no.
12 Q.  Why not?
13 A.  Again, as I testified earlier, I didn't think
14 that the ID that we had listed in Senate Bill 14 was
15 burdensome to find or get.
16 Q.  And so because of that belief, you felt like it
17 was -- it was fair to rely on information from Indiana,
18 even though the law in Indiana is different than the law
19 that you were proposing or that Senator Fraser was
20 proposing?
21      MS. HALPERN:  Objection, asked and
22 answered.
23 A.  I would say asked and answered as well.
24 Q.  (By Ms. Maranzano)  You can answer.
25      MS. HALPERN:  Do you have anything new to

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

62 (Pages 245 to 248)

---

245

1  say?
2      A.  I don't have anything new to add.
3      Q.  (By Ms. Maranzano)  And do you see that on the
4  next page, you talk about a survey of 2,000 registered
5  voters?
6      A.  Again, I want to go back on the -- put it back
7  on the record that this document was edited by Bryan, so
8  I can't -- I mean, I -- I think I wrote the majority of
9  it, but if he added something, it may not be my
10  language.
11      Q.  And if you see anything --
12      A.  I don't know that I would know without seeing
13  the original document.
14      Q.  Okay.  That's fair.
15      A.  So let's make sure we're all aware,
16  potentially, some of these words could be Bryan's and
17  not mine.
18      Q.  Okay.  And if there's anything that you see
19  that you don't believe you wrote, please let me know.
20          In terms of this survey that you relied
21  on, do you recall the survey?
22      A.  The specific survey?
23      Q.  Uh-huh.
24      A.  I do not.
25      Q.  Do you recall how these 2,000 registered voters

---

246

1  were selected?
2      A.  I do not.
3      Q.  Do you know how the contact information for
4  those voters was obtained?
5      A.  I do not.
6      Q.  Do you know whether cell phones were used in
7  the survey?
8      A.  I do not.
9      Q.  Would you agree that without knowing more
10  details about the survey, it's difficult to determine if
11  it says anything about the impact of Voter ID on
12  minorities and the poor?
13      A.  Well, I would assume --
14          MR. KEISTER:  Objection, calls for
15  speculation.
16      A.  Well, I assume at the time I produced this
17  document, I also had the survey right next to it, and
18  that if someone had asked a question like you had asked,
19  that we would have been able to actually look at the
20  survey and see the answers that were given.
21      Q.  (By Ms. Maranzano)  And do you see that in the
22  next paragraph there's a couple of sentences that are
23  crossed out?
24      A.  Yes.
25      Q.  And there's a comment that says, "potentially

---

247

1  confusing"?
2      A.  Yes.
3      Q.  Do you think that there's anything about those
4  numbers that's potentially confusing?
5      A.  I think when I potentially wrote it, I didn't
6  think it was confusing.  In August or July of 2014, I
7  don't know that I can tell you what those numbers meant
8  without seeing them in the context of the information I
9  had at the time.
10      Q.  Do you know where these numbers came from?
11      A.  I do not.
12          (Exhibit 23 marked for identification.)
13      Q.  (By Ms. Maranzano)  I'm showing you what we've
14  marked as Deposition Exhibit 22.
15      A.  23?
16      Q.  23, thank you.  Do you recognize this document?
17      A.  No.  I mean, I'm a recipient of the e-mail.
18  I'm sure I saw it at the time.  I don't recognize it as
19  of today.
20      Q.  Okay.  Can you look at the second page of the
21  document, which is labeled TX00266556?  Do you see the
22  very first sentence?  It says, "SB 14 would give Texas
23  arguably the strictest photo ID law in the country."  Is
24  that your understanding of SB 14 as well?
25      A.  This memo was written by Bryan, for the record,

---

248

1  so these were his thoughts.  I don't know that at the
2  time I would have said this.  I don't know that I
3  disagree with it, but I don't know that I would have --
4  I don't know that I would have used these words.
5      Q.  Was it Senator Fraser's intent to author the
6  strictest Voter ID law in the country?
7      A.  Senator Fraser's intent was to enact a law that
8  would give Texas tools to stop in-person photo Voter ID.
9  I don't know that he had any designs to -- for it to be
10  strict or not, the strictest or not.
11      Q.  Can you look at the -- at the bottom where it
12  says, "Substantive Provisions"?  We already talked
13  earlier about Exception 1.  Under Exception 2, where it
14  talks about a voter who is disabled, if SB 14 was signed
15  into law, is this the process that a disabled voter
16  would go through to be considered exempt from the photo
17  ID requirement?
18      A.  No.
19      Q.  And under Exception 3, "Indigent people and
20  people with religious objections being photographed may
21  cast a provisional ballot on election day and return to
22  the registrar within six days to sign an affidavit
23  confirming their exempt status."  If SB 14 was signed
24  into law, was that provision in -- in the bill?
25      A.  There's a provision for the religious exemption

---

JANICE MCCOY                                           7/9/2014
CONFIDENTIAL TRANSCRIPT

63 (Pages 249 to 252)

249

1  and not for the indigent exemption.
2      Q.  I see.  So is it fair to say that SB 14 is
3  actually somewhat narrower than when this document was
4  written?
5          MS. HALPERN:  Objection, assumes facts not
6  in evidence.
7      A.  I would say that Senate Bill 14 is not the bill
8  that the Senate passed, but that's no bill makes it
9  through the process without both houses getting a say.
10     Q.  (By Ms. Maranzano)  It changed after it passed
11  the Senate is what you're saying?
12     A.  What I said was that most bills are amended by
13  both houses, both houses get a say in how a bill looks.
14     Q.  Okay.
15         (Exhibit 24 marked for identification.)
16     Q.  (By Ms. Maranzano)  I'm showing you what we're
17  marking as Exhibit 24.  Can you take a look at this and
18  tell me if you recognize it?
19     A.  I do recognize it.
20     Q.  And what is it?
21     A.  This is a document that I produced that
22  essentially rolled all of the House amendments into the
23  Senate bill as it passed the Senate.
24     Q.  Okay.  I actually want to give you another
25  document, and we may talk about these two documents

250

1  together.  If we keep that one out.
2         (Exhibit 25 marked for identification.)
3      Q.  (By Ms. Maranzano)  Okay.  I'm showing you what
4  we marked as Deposition Exhibit 25.  Do you recognize
5  this document?
6      A.  Yes.
7      Q.  What is it?
8      A.  This is a document that I produced that shows
9  what sections of Senate Bill 14 were amended by the
10  House with the little blurb about potentially what those
11  amendments did.
12     Q.  Okay.  So I want to ask you about the comments
13  on Exhibit 25, and if -- if you need to refer to Exhibit
14  24, I think that has the House additions to the Senate
15  bill.  Is that what you testified?
16     A.  I -- yes, I produced that document.
17     Q.  Okay.  And you produced Deposition Exhibit 25,
18  correct?
19     A.  Correct.
20     Q.  And that means that you drafted both of those
21  documents?
22     A.  Yes.
23     Q.  Okay.  So can you tell me, looking at Exhibit
24  25, the first thing on the page says, "Disability
25  definition, House better but..." can you tell me what

251

1  that means?
2      A.  So this document, Exhibit 25 is a document I
3  produced with my thought on a general statement of what
4  the amendment did and then my thoughts about my opinion,
5  sorry, my opinion on what those -- and how those
6  amendments worked or didn't work.
7      Q.  And what did you think was better about the
8  House version on the Disability definition?
9      A.  I thought that it was less likely to incur
10  fraud.
11     Q.  And what do you mean by that?
12     A.  Well, I thought the Senate version allowed for
13  a lot more fraud for people who chose to say they were
14  disabled by bringing a doctor's note.
15     Q.  I see.  So the House version -- the House
16  version provided that you needed documentation from the
17  Social Security Administration or the Veterans' Affairs
18  Department; is that correct?
19     A.  I think that's correct, yes.
20     Q.  And the House version -- I'm sorry, the Senate
21  version required a physician's note?
22     A.  That's correct.
23     Q.  And you felt like the physician's note wasn't
24  secure enough?
25     A.  That was my opinion, yes.

252

1      Q.  Okay.  And in the final version of SB 14, the
2  House version was -- was used in the law; is that
3  correct?
4      A.  Yes.
5      Q.  And what about the physician's note did you
6  think wasn't secure?
7      A.  Well, anybody could say they were a doctor.
8      Q.  I see.  And can you look at the second bullet
9  for me?
10     A.  Yes.
11     Q.  And that says, "Voter ID identification target
12  at low income voters."  Did you -- did you mean Voter ID
13  education targeted at low income voters?
14     A.  I assume so, the sections about identification
15  -- well, the section of law is about voter
16  identification education.
17     Q.  Okay.
18     A.  So if you look at -- so I was probably just
19  copying the title.
20     Q.  Okay.  And --
21     A.  So if you read the law, it says, "The Secretary
22  of State shall conduct a statewide effort to educate
23  voters regarding the identification requirements for
24  voting," because that's what the law, Senate Bill 14
25  said.

JANICE MCCOY                                              7/9/2014
CONFIDENTIAL TRANSCRIPT

64 (Pages 253 to 256)

253

1  Q.  Okay.  Thank you for that clarification.  And
2  apart from any conversations you've had with your
3  counsel representing you here today, can you tell me
4  what -- what this provision OAG dislikes, what that
5  means?
6      A.  If I recall, I had a conversation with the
7  Attorney General's Office about the House amendment and
8  their thoughts on the amendment.  And apparently, they
9  had indicated to me that they didn't like this
10 amendment.
11     Q.  Did they indicate why they didn't like it?
12         MS. HALPERN:  I'm going to direct the
13 witness not to answer that question on the grounds that
14 it's probably invading the attorney-client privilege.
15         MS. MARANZANO:  Okay.
16     Q.  (By Ms. Maranzano)  Why was OAG weighing in on
17 the -- on -- on language about a draft bill?
18     A.  Well, the Attorney General has the authority
19 and the ability to make his comments known on any piece
20 of legislation, and you'd probably have to speak to him
21 or his office about why he wanted to weigh in on this
22 bill.
23     Q.  Did the Office of the Attorney General contact
24 you about -- about providing comments or did you contact
25 them?

254

1      A.  I don't recall if I called them or not.  I know
2  that -- I mean, I spoke to them frequently.  I think we
3  all assumed that this bill -- we all knew this bill
4  needed preclearance and that the Attorney General would
5  have to defend this, so I probably called them just to
6  kind of check in with them periodically.
7      Q.  I know you said the Attorney General has the
8  ability to weigh in on legislation.  Is that common?
9      A.  His office has an intergovernmental relations
10 division, and I think that they -- they are regularly in
11 the capitol during session weighing in on legislation.
12     Q.  Did you or did Senator Fraser, to your
13 knowledge, believe that it was important to have
14 education targeted at low income voters?
15     A.  Senator Fraser's bill wanted to make sure that
16 every voter was educated on the provisions of the law.
17     Q.  So I guess I'm not sure if that answers my
18 question.  Did you -- did you believe that this
19 particular provision about targeting -- having an
20 education effort that was particularly targeted at low
21 income voters was important?
22     A.  I don't know his thoughts.  I think what I
23 recall is that the Senator wanted to make sure that
24 every voter was educated.
25     Q.  So --

255

1      A.  Regardless of income.
2      Q.  Okay.  So I take it that that's a no, but I
3  don't want to put words in your mouth.  He wanted to
4  make sure there was an education effort but that he
5  wasn't necessarily concerned with any targeted effort at
6  any particular class of voters?
7      A.  Again, I wouldn't speak to his concerns.  I
8  would tell you that his original bill required education
9  of all voters and this conference committee report
10 required education of all voters.
11     Q.  And did you not discuss this provision with him
12 even though there was different versions in the Senate
13 bill and the House bill?
14     A.  I -- so he -- I provided him the information
15 about the amendments and what they did or didn't do.
16 And then the conference committee discussed what they
17 were going to do moving forward, which parts of the
18 House bill they were going to keep, which parts of the
19 Senate version they were going to keep.
20     Q.  So you provided him with information and didn't
21 have additional conversations with him?
22     A.  I don't recall that we -- I mean, he -- I think
23 he told me when I was going to get the conference
24 committee drafted, keep this, don't keep that, but
25 that's after his conversations with his conference

256

1  committee members.
2      Q.  Okay.
3      A.  I didn't make those decisions.
4      Q.  Okay.  Can you look at the -- well, at the next
5  provision, it says, "Hochberg amendment...Governor veto
6  of HB 1457."  Do you know what HB 1457 is?
7      A.  I do not.
8      Q.  Do you know what the Hochberg amendment was?
9      A.  It looks to me like he was amending Section 9
10 of the bill, and he apparently added language about when
11 an election worker was trying to decide if the names
12 matched.  And his language said, "Under standards
13 adopted by the Secretary of State."
14     Q.  Okay.  And the next -- the next bullet is also
15 about that same provision, and it says, "The SOS says
16 it's hard to administrate."  Do you recall having
17 conversations with SOS about that provision?
18     A.  I think that I did have conversations with the
19 Secretary of State about how things would work or not
20 work.
21     Q.  And do you recall if they said anything else in
22 the bill would be hard to administer?
23     A.  I don't recall them saying anything else.
24     Q.  Okay.  Can you look down to a couple of bullets
25 below that where it says, "Disabilities exemption (Two

JANICE MCCOY                                                          7/9/2014
CONFIDENTIAL TRANSCRIPT

65 (Pages 257 to 260)

---

257

1  class of voters?  If you can make it to the polls, why
2  can't you make it to DPS?)"  Can you tell me what you
3  meant by that?
4      A.  Yeah.  Again my personal opinion is that we
5  didn't need to have an exemption for disabled people.
6      Q.  Your personal opinion --
7      A.  My personal opinion.
8      Q.  -- was that you didn't need any exemption?
9      A.  For disabled people, that's correct.
10     Q.  And under the next one down, it says the,
11 "Eiland amendment, natural disaster, too broad...who
12 leaves without ID?"  Can you tell me what you meant by
13 that?
14     A.  Representative Eiland's amendment --
15     Q.  Was the amendment to allow individuals who
16 didn't have an ID because of a natural disaster to be
17 able to sign an affidavit --
18     A.  Yes.
19     Q.  -- after voting?
20     A.  So he was providing that people that didn't
21 have identification as a result of a natural disaster
22 wouldn't have to have ID.  My take on that is, if you
23 look at the definition of natural disaster in the
24 statute is that includes droughts, it includes famine.
25 I mean, these aren't things that would require people to

---

258

1  lose an ID and not be able to produce it.  I mean,
2  obviously, what he -- I think, I'm assuming again --
3  that he represented Galveston, they had just gone
4  through a hurricane, that's where he was headed.
5      Q.  I see.  So you thought that the language as
6  drafted was too broad?
7      A.  That's correct.
8      Q.  And when you said, "who leaves without ID?"
9  what did you have in mind -- what did you have in mind
10 by that?
11     A.  Like if you're fleeing a hurricane, do you
12 leave without your purse?
13     Q.  Well certainly, it's possible somebody would
14 leave quickly, correctly -- correct?
15     A.  I guess you could assume that.  I wouldn't
16 leave without my purse.
17     Q.  So your opinion, your personal opinion was that
18 it was --
19     A.  Again, this whole document --
20     Q.  Right.
21     A.  -- shares my opinions with the Senator.
22     Q.  And did you -- did you have -- did you have a
23 conversation with him, I know we talked about one of
24 these provisions specifically, but about the document
25 overall?

---

259

1      A.  I mean, we talked -- I mean, I provided this to
2  him.  I don't recall if we sat down and went through
3  each amendment one by one.  I mean, I would assume that
4  we did, but I don't recall that.
5      Q.  Do you recall if there were any of these items
6  that you listed here that he -- where he disagreed with
7  your opinion?
8      A.  Well, we left in the disability exemption.
9  There is an exemption for natural disasters.
10     Q.  But I guess what I'm asking you right now is
11 not --
12     A.  So at the end of the day, I mean, if he didn't
13 like the conference committee report, I mean, it was his
14 bill, so yeah, we disagreed on a lot of things.
15     Q.  Okay.  So I guess what I'm asking, first of
16 all, is about Senator Fraser, whether he disagreed with
17 you, not what came out of the conference committee.
18     A.  I think that the answer was:  Because these
19 things ended up in the conference committee, he
20 obviously disagreed with my opinions.
21     Q.  So am I understanding you correctly that you
22 think his opinion carried a lot of weight in the
23 conference committee?
24     A.  Do you know how conference committees work in
25 the Texas Legislature?

---

260

1      Q.  No.  Perhaps you can tell me how conference
2  committees work.
3      A.  Okay, I'll take some time.  So essentially,
4  after the bill makes it through both chambers and
5  there's a different -- the author of the bill stands up
6  and says, "I don't like what the House did.  I don't
7  like what the Senate did, depending on the way -- I want
8  to go to conference."  And then he gets to ask
9  Lieutenant Governor to name members who were favorable
10 to his position to that conference committee, and
11 assuming that all of those members will go along with
12 how he wants the bill to look.
13     Q.  So Senator Fraser picks the Senate members of
14 the conference committee?
15     A.  Well, he gets to recommend.
16     Q.  Okay.
17     A.  And then Lieutenant Governor gets to name.
18     Q.  And the House also picks --
19     A.  I would assume it's the same way where the
20 House author gets to recommend and the Speaker names.
21     Q.  And are there the same number of committee
22 members from the Senate -- conference committee members
23 from the Senate and from the House?
24     A.  Usually five total each, so ten members.  Yes,
25 it's the same number.

---

JANICE MCCOY                                                    7/9/2014
CONFIDENTIAL TRANSCRIPT

66 (Pages 261 to 264)

261

1    Q.  So it sounds like in any conference committee,
2  the author of the bill is going to have a significant
3  amount of say in how the bill looks when it comes out of
4  the committee?
5    A.  Yes.
6    Q.  Thank you for that explanation.
7    A.  You're welcome.
8    Q.  Looking down this document at Tribal ID, it
9  says, "Too broad and easy to be faked."  How -- what
10 facts did you rely on in making that determination?
11    A.  Actually recall that, that particular
12 amendment, because another staff person and I sat in my
13 office, and I don't -- it wasn't in my office, it was
14 another Senator's staff person, and we started to try
15 and figure out which tribes were recognized in Texas and
16 how we would know which tribes were recognized in Texas
17 and how many tribes there were in Texas, and we could
18 never get a number.
19    Q.  Okay.
20    A.  We could never figure out how many tribes were
21 recognized in Texas, how they issued their IDs, how you
22 get a tribal ID.  We couldn't -- we couldn't get to a --
23 a way to require -- to know that there was a secure
24 tribal ID.  And I actually, I do recall sitting there on
25 my computer and Googling trying to figure out how many

262

1  tribes there were in Texas, how they have IDs, how you
2  get an ID, can anybody get an ID.  We couldn't find it.
3    Q.  So you were unable to determine --
4    A.  So my determination is that tribal IDs are too
5  broad and easy to be faked.
6    Q.  Okay.  And below that, it says, "ID approved by
7  state."  And then it also says, "Too broad and easy to
8  be faked."  What did that mean?
9    A.  Again, as I testified earlier, anybody could
10 say they were from any university, they could make up a
11 name, print it out, run it around.  I don't know how an
12 election worker would know if that university actually
13 existed or not.
14    Q.  Okay.
15    A.  Or even a state ID.  I mean, if you look at my
16 ID, I mean, I could reproduce those coming and going.
17    Q.  So when you say approved by state, that was to
18 include all state IDs, including state universities and
19 state employees?
20    A.  I don't -- I would assume that's what the
21 amendment said, but without looking at the amendment to
22 be sure, then --
23    Q.  And when there was a class of IDs where such as
24 tribal IDs or state IDs or as you talked about earlier,
25 student IDs, where you thought there were a lot of

263

1  different IDs that fit into that category, is it your
2  assumption that that opens it up to be faked?
3    A.  I'm sorry.  Ask your question again.
4    Q.  I guess I'm just wondering why, when in these
5  different forms of ID we talked about, the tribal ID,
6  the ID approved by the state, earlier we talked about --
7  you and Mr. Dunbar talked about student IDs, and -- and
8  you've said that those IDs are easy to be faked.  And
9  I'm just wondering what leads you to that conclusion?
10    A.  At the end of the day, the intent was to
11 provide a real tool to ensure that in-person voter fraud
12 did not occur.  And the only way to have a real tool is
13 to know that the IDs are secure.  Anything that anybody
14 could produce in their downstairs, you know, basement
15 with a laminator could be faked, and then potentially
16 lead to in-person voter fraud.
17    Q.  Okay.  So if there were a number of forms of
18 ID, you were concerned because poll workers might not
19 recognize what was legitimate and what wasn't?  Is that
20 --
21    A.  Yes.
22    Q.  Okay.
23    A.  And additionally, someone could, because the
24 registration process is just a piece of paper, you don't
25 have to show up, I could write anybody's name down,

264

1  anybody's address, and then I could go create an ID
2  specific to that application.  I'm registered to vote,
3  and I have an ID.  There's a lot of fraud that could
4  happen.
5    Q.  And a person who did such a thing would be
6  subject to criminal prosecution, correct?
7    A.  If you had the tool to know that they weren't
8  that person, yes.
9    Q.  Okay.  And can you -- can you look down at
10 where it says Section 17, and it says, "Senate exemption
11 for indigent isn't necessary."  Now, why -- why did you
12 write that?
13    A.  I think I wrote it because I assumed the bill
14 provided for free IDs, so if we could give them a free
15 ID, why would we need to give them an exemption.
16    Q.  And do you recall how this exemption worked?
17    A.  I do not.
18    Q.  Is it possible that somebody signed an
19 affidavit saying they were indigent and then a
20 provisional ballot would be counted?
21    A.  Without looking at the file or that version of
22 the bill, I don't -- I can't speak to that.
23    Q.  Would it be in Exhibit 24?
24    A.  Yes, it is.
25    Q.  And how does a provision work?

JANICE MCCOY                                           7/9/2014
CONFIDENTIAL TRANSCRIPT

67 (Pages 265 to 268)

265

1    A.   So a provisional ballot shall be accepted if
2    the board determines that the person executes an
3    affidavit under penalty of perjury stating that the
4    voter is indigent and unable to obtain proof of
5    identification without the payment of fee or has a
6    religious objection to being photographed.
7    Q.   Okay.
8    A.   And the voter has not been challenged and voted
9    a provisional ballot solely because the voter does not
10   meet the requirements of identification.
11   Q.   So is it fair to say that this provision would
12   be -- would be significantly different than the
13   requirement to get a free ID would be; is that -- is
14   that fair to say?
15   A.   Well, if the ID is free, how would they be able
16   to provide proof that they didn't have to pay anything?
17   Q.   I'm sorry?  I lost you on that.
18   A.   Well, you have to execute an affidavit saying
19   that they are indigent and they couldn't get ID without
20   paying a fee.  And so if the ID is free, where are they
21   showing that they paid a fee for ID?
22   Q.   So you think that this provision wasn't
23   workable because it didn't -- the language wasn't
24   workable?
25   A.   I don't know about that.  I don't know that I

266

1    can speak to that.  I can say that this provision in the
2    Senate version of Senate Bill 14 says that the voter has
3    to say they were indigent and they were unable to obtain
4    proof of identification without paying a fee.  And if we
5    were providing that identification for free, then they
6    wouldn't be able to say that.
7    Q.   Is it your position that somebody who goes to
8    get an EIC wouldn't have to pay a fee to get the
9    underlying documentation?
10   A.   Well, I know now that the Department of State
11   Health Services is providing birth certificates for free
12   for these types of -- for these types of people.
13   Q.   And was that the case when this was written?
14   A.   Well, when this was written, it was not the
15   case, but once the bill was implemented, agencies have
16   leeway to do what they need to do to make the bill work.
17   And so once it was implemented, I think somebody
18   somewhere decided to offer those birth certificates for
19   free.
20   Q.   And would you consider it to be a fee if
21   somebody had to pay, for example, to take transportation
22   to get to an office to get an ID that didn't have an
23   issuance fee?
24   A.   No.
25   Q.   Would you consider it to be a fee if somebody

267

1    lost wages to take the time to go and get an
2    identification that didn't have an issuance fee?
3    A.   No.
4    Q.   So then in your mind, would there be any set of
5    circumstances in which a person would be able to sign
6    this affidavit?
7    A.   If the State's offering free ID, then how would
8    they be able to sign this?
9    Q.   And was that your reasoning when you wrote this
10   document or was it something else when you said is it
11   necessary?
12   A.   I can't recall.  I mean, again, potentially,
13   that was my reasoning in 2011 when I wrote this
14   document.
15   Q.   Would you agree that it would be certainly be a
16   different situation if somebody could go and vote and
17   sign an affidavit saying that they were indigent and
18   have their ballot counted, that would certainly be a
19   very different situation than having that person --
20   requiring that person to go and take a trip and go get
21   an ID that would be issued without a fee?
22        MR. KEISTER:  Objection, form, vague.
23   A.   Can you ask the question again?
24   Q.   (By Ms. Maranzano)  Yeah.  I'm just wondering
25   if -- if this provision as written in Section 17 about

268

1    signing an affidavit that you're indigent and having
2    that affidavit be a basis for having a provisional
3    ballot be counted, if that offers a very different
4    alternative than the one in which a person has to go and
5    get an ID that's issued without a fee?
6    A.   Well, I think that it offers an alternative but
7    doesn't get to the end result of the bill, which is to
8    combat in-person voter fraud.  So if you're committing
9    fraud and you want to say you're indigent and you sign
10   an affidavit, then you're already cheating because
11   you're committing fraud, so you're willing to suffer the
12   penalty of perjury as well.  I mean, so if that's -- if
13   we create the exemption -- under my opinion, if you
14   create the exemption for indigent people and people are
15   already going to cheat and vote fraudulently, then
16   they're willing to lie as well.
17   Q.   So your concern was that an affidavit was not
18   --
19   A.   Well, my concern today, because you're asking
20   me the questions and you're making me think about it,
21   then yeah, it's still results that it doesn't combat the
22   problem of in-person voter fraud to allow for an
23   affidavit to be signed and to vote by affidavit.
24   Q.   I see.  And that's your concern today and
25   you're not sure what your concern was when you wrote

JANICE MCCOY
CONFIDENTIAL TRANSCRIPT

7/9/2014

69 (Pages 273 to 276)

---

**273**

1    Q.  Do you think Senator Williams was one of the
2  Senators who was most involved in this issue other than,
3  say, Senator Fraser?
4    A.  I would say that Senator Williams was a key
5  ally of Senator Fraser's during Senate Bill 14.
6    Q.  Now you spoke -- you spoke a little bit with
7  Mr. Dunbar earlier about the Texas v Holder decision --
8    A.  I'm sorry, the what?
9    Q.  The decision that came out of Texas v Holder.
10    A.  Okay.
11    Q.  Do you recall that?
12    A.  Sure.
13    Q.  Do you read that decision?
14    A.  Can we talk about what decision that is again?
15    Q.  Yes --
16    A.  I don't know them by what they're styled.
17    Q.  I'm sorry --
18        MS. HALPERN:  That was the one that was
19  overturned.
20    Q.  (By Ms. Maranzano) Texas v Holder was the case
21  under Section 5 of the Voting Rights Act --
22    A.  Okay.
23    Q.  -- that SB 14 -- that Texas was seeking a
24  declaratory judgment asking to implement SB 14.
25    A.  Okay.

---

**274**

1    Q.  And does that --
2    A.  Sort of.  I mean.
3    Q.  -- ground you in what we're talking about?
4    A.  Yeah, I guess so.  Is that what I was deposed
5  under last time?
6    Q.  That is the case in which you were deposed.
7        MS. HALPERN:  Before the Supreme Court
8  threw it out, yes.
9        THE WITNESS:  Before they threw out
10  Section 5?
11        MS. HALPERN:  Yes, and that decision.
12        THE WITNESS:  Okay.
13    Q.  (By Ms. Maranzano) And did you -- did you read
14  that decision?
15    A.  No.
16    Q.  Did you talk to anybody about what it said,
17  other than the outcome?
18    A.  Are we talking about the decision where Texas
19  lost?
20    Q.  There was a three-judge panel who decided that
21  SB 14 would have a retrogressive effect.
22    A.  I don't --
23        MS. HALPERN:  Before the Supreme Court
24  threw it out.
25    A.  Right.  I -- when that decision was issued -- I

---

**275**

1  would have to go through the volumes of paper that you
2  provided to me -- but typically when things like that
3  happen, Senator Fraser would issue a press release.  So
4  potentially, we issued a press release and, in issuing
5  that press release, I talked to people about what the
6  decision said or didn't say --
7    Q.  (By Ms. Maranzano) Okay.
8    A.  -- so that I could have accurate information to
9  write my press release.
10    Q.  Do you have any recollection, as you sit here
11  now, of the conversations about --
12    A.  No, without seeing --
13    Q.  Are you aware --
14    A.  -- or knowing a time frame, I don't.
15    Q.  Or would it refresh your recollection to hear
16  that -- that in that decision, the court found that
17  there were several amendments that were proposed to SB
18  14 that were not passed that would have made the case a
19  closer case?
20    A.  I'm not aware, no.
21    Q.  And you didn't have any discussions with
22  Senator Fraser about that or about those amendments?
23    A.  I am not -- I did not.
24    Q.  And you, I believe, testified earlier that
25  there were no committee hearings held on SB 14 after

---

**276**

1  that decision; is that correct?
2    A.  That's correct.
3    Q.  Did Senator Fraser request any committee
4  hearings?
5    A.  Not that I'm aware.
6    Q.  Did you have any discussions with Mr. Hebert
7  about any potential steps the Legislature could take to
8  respond to the decision?
9    A.  Not that I recall.
10    Q.  Any -- did you have any conversations with
11  anybody else about any potential steps the Legislature
12  could take to respond to the decision?
13    A.  I mean, potentially, I spoke with the Attorney
14  General's Office to get their take on what the State's
15  next step would be, not the Legislature's next step.
16  But I don't -- I mean, I think if I wrote a press
17  release, that's probably who I spoke with to make sure
18  that my data was correct if I had to write a press
19  release again.  But it would be a role of what they were
20  going to do next, not what Senator Fraser was going to
21  do next.
22    Q.  Okay.  And just to be clear, I'm just asking
23  about your role in things the Legislature might have
24  done.
25        Did -- how many times did the Legislature

---

JANICE MCCOY                                           7/9/2014
CONFIDENTIAL TRANSCRIPT

70 (Pages 277 to 280)

---

277

1  meet after that decision came out? The decision came
2  out -- I believe you and Mr. Dunbar talked about this
3  earlier -- in August of 2012.
4      A. I don't know --
5      Q. I'm sorry. Yes, that's right, August of 2012.
6      A. I don't -- I don't know without looking at a
7  record if the Governor called the Legislature into
8  session at any time after 2012 before session began in
9  January of 2013. So I don't recall if there was a
10  special session, so I think the next likelihood of a
11  Senate -- the Legislature meeting was when the regular
12  session started in January of 2013.
13      Q. And -- okay. So there's the 2013 session, and
14  then were there special sessions after that regular
15  session in 2013?
16      A. There were three or four.
17      Q. And during that time, was there any
18  consideration by the Legislature to making any changes
19  to SB 14 to respond to the decision in Texas v Holder?
20      A. I can't speak to the Legislature in its
21  entirety. I don't think that Senator Fraser or I had
22  discussions about amending Senate Bill 14 or the statute
23  in any way.
24      Q. And are you aware of any steps the Legislature
25  took to amend the statute in any way during that time?

---

278

1      A. I don't know that any bills were filed, but I
2  didn't -- I don't recall.
3      Q. Okay.
4      A. I don't know.
5      Q. And as -- as far as you know, and I realize you
6  no longer work for Senator Fraser, and apart from any
7  efforts related to this litigation, at any time since SB
8  14 has started to be implemented, has Senator Fraser
9  made any effort to assess the impact of SB 14 on voters?
10      A. So the first election that was held by the
11  State was in November of 2013? So Shelby happened in
12  June of 2013, right? I don't know. The State didn't
13  hold an election -- a full statewide election until
14  November of 2013, and I no longer worked for the Senator
15  at that time.
16      Q. Okay. So as you sit here today, are you aware
17  of any efforts Senator Fraser has made?
18      A. No.
19      Q. Okay. And to the best of your knowledge, are
20  you aware of any efforts any legislator who supported SB
21  14 has made to assess the impact of SB 14?
22      A. No.
23      Q. To the best of your knowledge, has any
24  legislator who supported SB 14 asked the Secretary of
25  State to assess the impact of Senate Bill 14 on minority

---

279

1  voters?
2      A. Not to my knowledge.
3      Q. Okay. How about has any legislator who
4  supported SB 14 asked the Secretary of State to assess
5  the impact of SB 14 on any voters?
6      A. I don't know of any legislator, supporter or
7  opponent, who has asked the Secretary of State for that
8  information.
9      Q. Okay.
10      MS. MARANZANO: I have nothing further.
11      THE WITNESS: Are you done?
12      MS. MARANZANO: Can you believe it?
13      THE WITNESS: I could actually go pick up
14  my kids but my husband is going to do it.
15      MS. MARANZANO: I want to make a quick
16  statement for the record that, although we agreed to
17  designate the entire transcript as highly confidential,
18  we're not agreeing that the full transcript is fully
19  confidential, that we agreed to that to make this more
20  convenient for everybody involved.
21      MS. HALPERN: Well, I tried to object to
22  the questions as they came along. I'm not sure that I
23  was successful in every instance. So if -- if push
24  should come to shove down the road, I may need to go
25  back in and insert objections.

---

280

1      MS. MARANZANO: Okay. I -- you know --
2      MS. HALPERN: I'm not saying that I'll do
3  that or that I want to do that, but.
4      MS. MARANZANO: Yeah. No, and --
5      MS. HALPERN: If I have to do that, I want
6  the option of doing it.
7      MR. KEISTER: I have a couple. Does
8  anybody else have anything?
9      MS. HALPERN: No. They don't get to ask
10  anything. They were already represented.
11      MR. KEISTER: Mark that, please.
12      (Exhibit 27 marked for identification.)
13      EXAMINATION
14  BY MR. KEISTER:
15      Q. Ms. McCoy, would you take look at what's been
16  marked as Exhibit Number 27, please.
17      A. Okay.
18      Q. Do you recognize Exhibit Number 27?
19      A. I don't recognize it. I have seen this before.
20  I imagine that I have. It appears to be a letter from
21  the Governor's Office to the Texas House of
22  Representatives with a declaration attached to it
23  declaring legislation that requires a voter to present
24  proof of identification voting as an emergency issue.
25      Q. Okay. And is this the emergency declaration by

---

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,         )
                                 )
 4          Plaintiff,           )
                                 )
 5  VS.                          ) CIVIL ACTION NUMBER:
                                 ) 2:13-CV-193 (NGR)
 6  RICK PERRY, et al.,          )
                                 )
 7          Defendants.          )
                                 )
 8  _____)
    UNITED STATES OF AMERICA,     )
 9                                )
            Plaintiff,            )
10                                )
    VS.                           ) CIVIL ACTION NUMBER:
11                                ) 2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS  )
12  EDUCATION FUND, et al.,       )
                                  )
13      Plaintiff-Intervenors,    )
                                  )
14  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY      )
15  COMMISSIONERS, et al.,        )
                                  )
16      Plaintiff-Intervenors,    )
                                  )
17  VS.                           )
                                  )
18  STATE OF TEXAS, et al.,       )
                                  )
19          Defendants.           )
    _____)
20                                )
    TEXAS STATE CONFERENCE OF     )
21  NAACP BRANCHES, et al.,       )
                                  )
22          Plaintiffs,           )
                                  ) CIVIL ACTION NUMBER:
23  VS.                           ) 2:13-CV-291(NGR)
                                  )
24  NANDITA BERRY, et al.,        )
                                  )
25          Defendants.           )
```

**Page 2**

```
 1  BELINDA ORTIZ, et al.,     )
                               )
 2      Plaintiffs,            )
                               )
 3  VS.                        ) CIVIL ACTION NUMBER:
                               ) 2:13-CV-348(NGR)
 4  STATE OF TEXAS, et al.,    )
                               )
 5      Defendants.            )
    _____)
 6
 7
        **************************************************
 8
              DEPOSITION OF
 9
            ANN McGEEHAN
10
            JUNE 18, 2014
11
12      **************************************************
13
14      ORAL DEPOSITION OF ANN McGEEHAN, produced as a
15  witness at the instance of the Plaintiff, was duly
16  sworn, was taken in the above-styled and numbered cause
17  on the JUNE 18, 2014 from 8:16 a.m. to 12:17 p.m.,
18  before Chris Carpenter, CSR, in and for the State of
19  Texas, reported by machine shorthand, at the Office of
20  the Attorney General, 209 West 14th Street, Austin, TX
21  78701, pursuant to the Federal Rules of Civil Procedure
22  and the provisions stated on the record or attached
23  hereto.
24
25
```

**Page 3**

```
 1
 2
 3           A P P E A R A N C E S
 4  FOR THE UNITED STATES OF AMERICA:
 5      Elizabeth Westfall
        U.S. JUSTICE DEPARTMENT
 6      CIVIL RIGHTS DIVISION
        Room 7254 NWB
 7      950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
 8      (202) 514-0828
        elizabeth.westfall@usdoj.gov
 9
    FOR THE NAMED DEFENDANTS RICK PERRY, ET AL., AND THE
10  WITNESS:
11      Ronald Keister
        ATTORNEY GENERAL OF TEXAS
12      TORT LITIGATION DIVISION
        300 W. 15th Street
13      Austin, TX  78701
        (512) 463-2197
14      ronny.keister@oag.state.tx.us
15  FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND AND
    IMANI CLARK:
16
        Lynn Eisenberg (by telephone)
17      WILMER HALE
        1875 Pennsylvania Avenue, NW
18      Washington, DC 20006
        (202) 663-6262
19      lynn.eisenberg@wilmerhale.com
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX
 2  Appearances.....................................2
 3  ANN McGEEHAN
 4      Examination by Ms. Westfall...............6
        Examination by Ms. Eisenberg..........137
 5      Further Examination by Ms. Westfall......145
        Examination by Mr. Keister...............146
 6      Further Examination by Ms. Westfall......157
 7  Signature and Changes..........................159
 8  Reporter's Certificate.........................160
 9           EXHIBITS
10  NO. DESCRIPTION                      PAGE MARKED
11  178  Deposition Subpoena                  9
12  179  E-Mail, Jan. 8, 2009, and Attachment   19
13  180  E-Mail Chain, Feb. 25, 2009, and Attachment 25
14  181  Voter ID Bill Filed in 2009          27
15  182  Texas Legislature Online History, SB 362  27
16  183  Senate Bill 14                       43
17  184  E-mail, Jan. 5, 2011, with attachment  45
18  185  E-Mail Chain, Jan. 24, 2011          47
19  186  Texas Legislature Online History of SB 14  49
20  187  Committee of the Whole Senate, Jan. 25, 2011 58
21  188  E-Mail Chain, Feb. 1, 2011           87
22  188  E-Mail Chain, Feb. 1, 2011           87
23  190  E-Mail, Feb. 25, 2011                98
24  191  Testimony of Ann McGeehan, March 1, 2011  102
25  192  E-Mail, Jan. 31, 2011                114
```

ANN McGEEHAN                                                    6/18/2014

9

1    Q.  When I refer to the term minority voter, I mean
2  voters who are not White and who are not Anglo; is that
3  okay?
4    **A.  Yes.**
5    Q.  Super.  Are you represented by counsel today?
6    **A.  Yes.**
7    Q.  Who is that?
8    **A.  Ronny Keister.**
9        **(Exhibit 178 marked for identification.)**
10    Q.  (By Ms. Westfall) You've been handed what's
11  been marked as Exhibit 178.
12    **A.  Okay.**
13        MS. WESTFALL:  Oh, I'm sorry, Mr. Keister.
14  Here.  (Handed to counsel.)
15        MR. KEISTER:  Thank you.
16        MS. WESTFALL:  I brought these copies,
17  might as well use them; I'm not bringing them home.
18    Q.  (By Ms. Westfall) Do you recognize this
19  document?
20    **A.  Yes.**
21    Q.  What is it?
22    **A.  This is the subpoena for my attendance at this**
23  **deposition and for documents.**
24    Q.  Thank you.  Do you see that there is, at the 1,
25  2, 3, 4, 5 -- the fifth page, there's an Attachment A

10

1  with instructions and definitions?
2    **A.  Yes.**
3    Q.  It is followed by a list of documents, 1
4  through 7.
5    **A.  Yes.**
6    Q.  Have you searched for those documents?
7    **A.  I have, but any documents that would be**
8  **responsive to this would be at the Secretary of State's**
9  **Office.  I don't have any personally.**
10    Q.  When you were employed with the Division, did
11  you use a personal e-mail to conduct any official
12  business?
13    **A.  No.**
14    Q.  Did you prepare for today's deposition?
15    **A.  Yes.**
16    Q.  How did you prepare you?
17    **A.  I had two meetings with Ronny Keister and I**
18  **reviewed my prior deposition, read through it once and**
19  **reviewed the exhibits to that deposition pretty quickly**
20  **but I read through it.**
21    Q.  Thank you.  When you met with Mr. Keister, was
22  anyone else present?
23    **A.  No.**
24    Q.  Did you review any of the Voter ID bills
25  besides anything attached to your deposition as an

11

1  exhibit?
2    **A.  No.  I don't think I even reviewed the Voter ID**
3  **bill.**
4    Q.  Other than Mr. Keister, did you speak to anyone
5  else about your deposition today?
6    **A.  Only to tell my current employer that I was**
7  **going to be out at this.**
8    Q.  Did you bring any notes or documents with you
9  today?
10    **A.  No.**
11    Q.  Did you start working for the Election Division
12  in 1989?
13    **A.  Yes.**
14    Q.  What was your first position with the Division?
15    **A.  I was staff attorney there.**
16    Q.  Was there a time when you were promoted?
17    **A.  Yes.**
18    Q.  What year was that?
19    **A.  That was 1991.  I was promoted to the legal**
20  **director, and then in 1995 I was promoted to Director of**
21  **the Elections Division.**
22    Q.  How long did you serve in that capacity?
23    **A.  16 years.**
24    Q.  16.  You were with the Division for over 20
25  years; is that right?

12

1    **A.  Yes.**
2    Q.  As director of the Division, you were
3  responsible for overseeing all the sections of the
4  division?
5    **A.  Yes.**
6    Q.  What were those sections?
7    **A.  They were the election administration; voter**
8  **registration; special projects, which included voter**
9  **education; and election funds management.  I believe**
10  **that was it.**
11    Q.  If a law was passed by the Legislature
12  providing new duties to the Secretary of State where you
13  had to adopt a rule, were you the one who was
14  responsible for overseeing the Secretary of State's
15  implementation of the rule or law?
16    **A.  Yes, you know, with guidance from the**
17  **Secretary.**
18    Q.  Can you provide me with some examples during
19  your tenure with the Division of rules that you
20  implemented or changes in Election administration in the
21  State?
22    **A.  We implemented the National Voter Registration**
23  **Act and initially had to do that through administrative**
24  **rule.  We implemented HAVA, Help American Vote Act, and**
25  **we implemented the MOVE Act.  Those were some big**

Case 2:13-cv-00193   Document 715-6   Filed on 11/14/14 in TXSD   Page 69 of 97

---

13

1 projects that we implemented.
2     THE COURT REPORTER: You said the MOVE
3 Act?
4     THE WITNESS: MOVE, Military Overseas
5 Voter Empowerment Act.
6     Q. (By Ms. Westfall) Did you have in your role as
7 director of the Elections Division, direct contact with
8 the executive staff of the Secretary of State?
9     A. Yes.
10     Q. This included direct contact with the Secretary
11 of State?
12     A. Yes.
13     Q. You also had direct contact with the Assistant
14 Secretary of State?
15     A. Yes.
16     Q. Is the Assistant the same as the Deputy or is
17 that a different role?
18     A. It's the same role. And it has had different
19 titles through the years, but it's usually the person,
20 you know, directly beneath the Secretary who can serve
21 in the Secretary's absence.
22     Q. Did you also have direct contact with the
23 general counsel for the Secretary of State?
24     A. Yes.
25     Q. In 2011 was Coby Shorter the Deputy Secretary

---

14

1 of State?
2     A. Yes.
3     Q. How closely did you work with Mr. Shorter?
4     A. Pretty closely. We were in separate buildings,
5 but I would keep him regularly updated on projects and
6 things like that. So we had regular communication.
7     Q. Were you -- how often were you in contact with
8 him?
9     A. Maybe once or twice a week, sometimes more,
10 sometimes less.
11     Q. In 2011, was John Sepehri the general counsel?
12     A. Yes.
13     Q. Am I pronouncing his name correctly?
14     A. I think it's "Se-per-ry."
15     Q. "Se-per-ry"?
16     A. Yeah.
17     Q. How closely did you work with Mr. Sepehri?
18     A. Pretty closely. We had regular contact. That
19 was probably more regular than with the Deputy, Coby.
20     Q. Did you talk to him on a daily basis?
21     A. Probably almost daily, uh-huh.
22     Q. In 2011, who was the Secretary of State?
23     A. Hope Andrade.
24     Q. How often were you in contact with Secretary
25 Andrade?

---

15

1     A. I would -- she traveled a lot, so I would be --
2 I would speak with her less frequently, but maybe once a
3 week or sometimes less, sometimes more.
4     Q. Did the Division have its own press staff or
5 was it -- did the press staff -- was it associated with
6 the Secretary of State's Office?
7     A. It was -- it was the -- our communications
8 director was within executive management, so the
9 Elections Division didn't have its own communications
10 staff.
11     Q. Who was the press contact you worked with
12 during consideration of SB 14?
13     A. Randall Dillard, I believe, was our
14 communications director then.
15     Q. Did you also work with Rick Parsons?
16     A. Yes, yes. He may have been -- we had a couple
17 of communications directors, it might have been -- I
18 don't remember. I forget now.
19     Q. In 2011, Coby Shorter -- was there a
20 separate Assistant Secretary to the Secretary of State
21 or -- I believe you testified it was the same role but
22 different titles?
23     A. Yes.
24     Q. So there wasn't a person who was separate and
25 apart from the deputy Secretary of State in 2011?

---

16

1     A. No.
2     Q. Was there a time when you stopped working for
3 the Division?
4     A. Yes. In November of 2011.
5     Q. Your replacement as director was Keith Ingram;
6 is that correct?
7     A. Yes.
8     Q. Was there a transition period where you
9 overlapped with Mr. Ingram?
10     A. No.
11     Q. Do you know anything about his educational
12 background?
13     A. I know he's an attorney.
14     Q. To your knowledge does he have any experience
15 in IT at all?
16     A. I don't know.
17     Q. When you were employed with the Division, did
18 the Division employ -- have personnel -- IT personnel on
19 staff?
20     A. The Division didn't have their own IT personnel
21 but there is an IT division within the Secretary of
22 State.
23     Q. Where are you currently employed?
24     A. I'm currently employed by the Texas County and
25 District Retirement Association -- System -- Retirement

---

28

1    the bill.
2       Q.  In 2009, did the Division receive or the
3    Secretary of State's Office receive any requests to
4    conduct any analysis of Senate Bill 362?
5          MR. KEISTER:  To the extent that calls for
6    any legislatively privileged communications, I'll
7    instruct you not to answer.  But to the extent you can
8    answer it without revealing any legislative context --
9          THE WITNESS:  Okay.
10         MR. KEISTER:  -- you may do so.
11      A.  Well, for clarification, are you talking about
12   analysis before the bill was filed, after the bill was
13   filed, or?
14      Q.  (By Ms. Westfall) At any point prior to the
15   filing of Senate Bill 362 or during its consideration in
16   2009, did you receive any requests for analysis from the
17   Legislature?
18      A.  Prior to filing, we received no requests for
19   analysis.  After filing, I would have to probably follow
20   the legislative privilege regarding any communications
21   on that.
22      Q.  This is with regard to Senate Bill 362 in 2009?
23      A.  Yes.
24         MS. WESTFALL:  On whose behalf, Counsel,
25   are you asserting the legislative privilege?  You're not

29

1    representing legislators in this action?
2          MR. KEISTER:  I am not, but I think to the
3    extent that it's privileged, I'm going to instruct this
4    witness not to -- not to go into legislatively
5    privileged communications.  I don't want us to be
6    inadvertently waiving their privileges by revealing
7    their conversations.  And you understand anything that's
8    publicly --
9          THE WITNESS:  Right.
10         MR. KEISTER:  -- this is only if it was a
11   private communication from the particular legislator.
12         THE WITNESS:  Right.
13      Q.  (By Ms. Westfall) Did you receive any requests
14   on the record for any analysis of Senate Bill 362?
15      A.  Yes.  When it was heard in the Senate, I
16   believe questions -- the resource witness from the
17   Secretary of State's Office when this was heard in the
18   Senate was Coby Shorter and I believe he was -- you
19   know, they asked him some questions.  It was heard in
20   the House, and I believe it was me and John Sepehri that
21   testified.  There were some questions.  That was all
22   public.
23      Q.  To be clear and just to establish a record, is
24   it your testimony that you received some -- one or more
25   private nonpublic requests for information on Senate

30

1    Bill 362 during its consideration?
2       A.  Yes.
3       Q.  And was that one or more requests?
4       A.  More than one.
5       Q.  Was that from one or more member of -- or staff
6    or a member from the Senate or House?
7       A.  More than one.
8       Q.  Did you conduct analysis in response to the
9    those requests?
10      A.  Okay.  Again, for purposes of clarification, as
11   far as conducting analysis, meaning I guess researching,
12   getting back to -- as opposed to simply answering
13   questions, do you consider those two separate things,
14   like a conversation as opposed to an analysis?
15      Q.  Did you -- let's -- I want you to construe this
16   as broadly as possible.  Did you respond to those
17   requests for information?
18      A.  Yeah, yes.
19      Q.  Did these requests for information pertain to
20   the number of voters without State-issued ID?
21      A.  At the last deposition, there were some
22   legislators that waived that privilege.  Is that still
23   in effect for --
24         MR. KEISTER:  Well --
25      Q.  (By Ms. Westfall) Yes.  There have been some --

31

1    there has been a list of -- and I think I could find it,
2    there have been -- primarily bill opponents have waived
3    their privilege, and many bill supporters have asserted
4    the privilege.
5          MR. KEISTER:  And let me just -- if I can
6    help.  If you talked about in the previous deposition
7    certain representatives that contacted you and that was
8    allowed to occur in that deposition, then I'm assuming
9    that that has been waived so can you talk about that.
10   With respect to anyone who has maintained the privilege
11   in that deposition, I think that they're still under the
12   same posture here.
13         THE WITNESS:  Right.
14         MR. KEISTER:  Does that help?
15         THE WITNESS:  Yes.
16         MR. KEISTER:  Okay.  Good.
17         MS. WESTFALL:  I think that's a fair
18   representation of the status quo.
19         MR. KEISTER:  So to the extent you can,
20   you can talk about those people that waived it
21   previously.
22      A.  Okay.  My recollection was that the only
23   legislators or legislative staff that asked for any kind
24   of analysis of the number of voters without ID was
25   Representative Rafael Anchia and his office.

ANN McGEEHAN                                                    6/18/2014

---

32

1    Q.  (By Ms. Westfall) Were there any bill
2    supporters who asked you for information about the
3    impact of the Senate Bill 362 on voters?
4           MR. KEISTER:  I'm going to object as
5    vague.
6           But you can answer it.
7       A.  Yeah, that's a slightly different question as
8    far as impact on voters.  But as far as the number of
9    voters without ID -- photo ID, I don't recall that.
10      Q.  (By Ms. Westfall) So is it your testimony that
11   you only received requests about the number of
12   registered voters without forms of photo ID from
13   Representative Anchia?
14      A.  That's my recollection.
15      Q.  Did you respond to his request?
16      A.  Yes.  And we may have copied the whole
17   committee as well.
18      Q.  Did his request relate to the number of voters
19   who had registered with a driver license number as
20   opposed to a social security number?
21      A.  I don't remember exactly, but he did ask, you
22   know, several questions concerning the data, refining
23   it.
24      Q.  In 2009, did the Division receive any requests
25   from the Legislature for information about which classes

---

33

1    or groups of voters possessed forms of allowable ID
2    under Senate Bill 362?
3       A.  I don't recall that.
4       Q.  Did you receive any requests for information
5    about the impact of Senate Bill 362 on minority voters?
6       A.  I don't recall that.
7       Q.  Are you aware of any communications about the
8    impact of Senate Bill 362 on minority voters?
9       A.  Could you state your question again?
10      Q.  Certainly.  Are you aware of any communications
11   about the impact of Senate Bill 362 on minority voters?
12      A.  Communication to our office or between who?
13      Q.  Generally.  Any communications?
14          MR. KEISTER:  I just want to interject an
15   objection that "impact" is vague.  But if you
16   understand, you can answer.
17      A.  Well, it was debated in the Legislature, so
18   there was testimony along that - those lines, but I
19   don't think the Secretary of State's Office received
20   anything directly.
21      Q.  (By Ms. Westfall) Were there any communications
22   within the Secretary of State's Office or the Division
23   related to the impact of Senate Bill 362 on minority
24   voters?
25          MR. KEISTER:  Object as vague.

---

34

1       A.  I don't recall any.
2       Q.  (By Ms. Westfall) After the bill -- turning
3    your attention back to Exhibit 182, do you see when the
4    bill was filed?
5       A.  Yes.
6       Q.  And when did the Senate start to consider
7    Senate Bill 362?
8       A.  In -- March 10, 2009.
9       Q.  Do you recall that in your previous deposition
10   you testified that you had a meeting about Senate Bill
11   362 with Senator Fraser, Janice McCoy, John Sepehri and
12   Elizabeth Winn before Senate consideration of the bill?
13      A.  Yes.  I don't know how the privilege comes in,
14   but I recall that in my deposition.
15      Q.  So the meeting based on your review, because
16   you had the meeting before Senate consideration, it must
17   have been before March 10, 2009; is that right?
18          MR. KEISTER:  Let me just renew the
19   objection that -- to legislative privilege.
20          And to the extent you testified about it
21   in a previous deposition, you may, but don't go into the
22   contents.  I believe, if my memory's correct, you didn't
23   go into the contents of --
24          THE WITNESS:  Okay.  Yeah.
25          MR. KEISTER:  -- that communication,

---

35

1    but...
2       Q.  (By Ms. Westfall) Do you recall -- do you
3    recall the meeting?
4       A.  Yeah, I recall the meeting and it was before
5    the bill was heard on the Senate -- in the Senate.
6          MS. WESTFALL:  Are you instructing her not
7    to answer as to what happened in that meeting based on
8    Senator Fraser's assertion of legislative privilege and
9    your instruction is not to answer?
10          MR. KEISTER:  That's correct, yes.
11          MS. WESTFALL:  Okay.
12          MR. KEISTER:  With respect to the
13   communications in that meeting, yes.
14          MS. WESTFALL:  Okay.  So in other words,
15   the court, in this, in Veasy versus Perry, has indicated
16   that legislators may have two options:  They may answer
17   the questions in deposition and object on the basis of
18   legislative privilege, all that remains highly
19   confidential, and it is determined at a later date as to
20   whether that testimony comes in as evidence.  Or the
21   legislator can refuse to answer, plaintiffs could move
22   to compel that deposition testimony and another
23   deposition should occur.
24          Just to be clear for the record, is
25   Ms. McGeehan going to be choosing, with regard to her

---

ANN McGEEHAN                                                    6/18/2014

---

44

1  which you have concluded this is the introduced version
2  based on the date?
3      A.  Yes.
4      Q.  Can bills be introduced or prefiled at the end
5  the year before a session starts and then continue to be
6  amended and changed before the beginning of a session?
7      A.  I don't know, to be honest with you.  I know
8  there's a prefiling.  I don't know if they can make
9  changes after it's been prefiled.
10     Q.  Turning your attention on Exhibit 183 to the
11 forms of ID listed, it's at Page 8 of the document.  Can
12 you just take a look at Section 12 on Page 8 --
13     A.  Okay.
14     Q.  -- which lists the documentation of proof of
15 ID, and let me know when you've had a chance to review
16 that.  Just on that page.
17     A.  Okay.  I reviewed it.
18     Q.  These are all photo IDs; is that correct?
19     A.  Yes.
20     Q.  Are you aware of any communications either
21 within the Division or with the Division and other
22 branches of government about which voters are likely to
23 possess any of these forms of ID?
24     A.  No.
25     Q.  Are you aware of any communications about which

---

45

1  voters are likely not to possess these types of ID?
2      A.  No.
3          MS. WESTFALL:  Could you mark this.
4          (Exhibit 184 marked for identification.)
5          (Page 45, Line 5 through Page 52, Line 1
6  designated highly confidential and is bound under
7  separate cover.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

52

1
2      Q.  (By Ms. Westfall) Did the Division in 2011
3  prepare a monthly report of Hispanic surname voters by
4  household and County?
5      A.  Yes.
6      Q.  Could you describe that report, please.
7      A.  Just to clarify:  Any member of the public
8  could request a list of registered voters and could
9  request a flag for Hispanic surname.  So that was
10 available on a daily basis based on the realtime data in
11 the database.
12         On a monthly basis, we would take a
13 snapshot just to be able to put it our website so that
14 we could have regular, you know, numbers going out so
15 you could say in, you know, June of 2013, the number of
16 Hispanic surname voters is X, so that report was just to
17 give a kind of a baseline number.
18     Q.  And it was disaggregated by County?
19     A.  Yes.
20     Q.  What were the other disaggregates in that
21 report besides County?
22     A.  I do not really remember any more.  We used to
23 have male/female.  We might have had age.  I don't
24 remember any more what the --
25     Q.  Mr. Ingram testified in his deposition recently

---

53

1  that there -- the report was disaggregated by household.
2  Does that ring a bell?
3      A.  That's an option or it used to be an option.
4      Q.  What does that mean "by household"?
5      A.  So that all the registered voters registered at
6  one address.  We just send it to one address rather than
7  send five mailings to one address.  We just send one.
8      Q.  I see.  How was that report prepared?
9      A.  I think it was -- it depends.  I think
10 sometimes it was prepared based on programming within
11 the Secretary of State's Office.  I think sometimes we
12 may have relied on a vendor, especially when he were
13 mailing out the explanatory statements of the
14 Constitutional Amendment because we would contract with
15 a mailer to mail it, and then sometimes they would do
16 their own householding on it.
17     Q.  But was the report generally prepared within
18 the Division by your IT staff?
19     A.  Yes.
20     Q.  Why was this report prepared on a monthly basis
21 on your website?
22     A.  The household report?
23     Q.  The Hispanic surname voter list.
24     A.  And I don't recall actually that the entire
25 report was posted, I think it was just that the

---

ANN McGEEHAN                                                              6/18/2014

11 (Pages 54 to 57)

54

1  number -- and it was just because we would -- as I
2  recall, generally we would want to update all of the
3  registration numbers, and this was just one of those
4  statistics that was updated.
5      Q.  Was there any legal requirement that the
6  Division prepare this report on a monthly basis?
7      A.  No.
8      Q.  And what was the purpose of providing that
9  information to the public?
10     A.  It was regularly requested information from the
11 media, so I think the intent was just to make it readily
12 available.
13     Q.  Did your office, beyond the website,
14 disseminate it in any other manner?
15     A.  The only other way it was disseminated was if a
16 person made a request for that information.
17     Q.  And could the person request, further, more
18 detailed information that was on the website through
19 your office about Hispanic surname voters?
20     A.  I believe they could get information, you know,
21 maybe down to age level, county, they probably could
22 even request a list of the, you know, specific voters
23 and their addresses.  Most of that is public.
24     Q.  Campaigns and candidates --
25     A.  Yes.

55

1      Q.  -- would make those types of requests?
2      A.  Yes, uh-huh.
3      Q.  Did you regularly provide this report to the
4  Legislature?
5      A.  It was -- it was provided to the Legislature
6  for purposes of the legislators mailing out their
7  newsletters and things like that.  I don't know that it
8  was provided in other -- in other contexts.
9      Q.  So individual legislators on a case-by-case
10 basis would seek this list from you; is that correct?
11     A.  Well, I don't know that they requested the list
12 with annotation for Hispanic surname.  That was --
13 basically we would have a standard form and you could
14 request this data and could you simply check box for
15 what you wanted.  So that was an option.  If you wanted
16 Hispanic surname flagged, that could be a request.  And
17 I don't remember if legislators requested that or not.
18     Q.  Did you regularly provide the list of Hispanic
19 surname voters to the Governor's Office?
20     A.  I don't recall doing that.
21     Q.  Did you provide it to the Lieutenant Governor's
22 Office?
23     A.  I don't think so.
24     Q.  Was Senate Bill 14 referred to the Committee of
25 the Whole Senate?

56

1      A.  Yes.
2      Q.  Did you testify before the Committee of the
3  Whole Senate on January 25, 2011?
4      A.  Yes.
5      Q.  Did you appear as resource witness?
6      A.  Yes.
7      Q.  Prior to the hearing on January 25, 2011, did
8  the Division update its analysis of which voters had not
9  supplied either a social security number or a driver
10 license number when they registered to vote?
11     A.  I believe we did.
12     Q.  And to conduct that analysis, the Division
13 reviewed the TEAM database only?
14     A.  Yes.
15     Q.  That's all you needed to look at was the TEAM
16 database; is that correct?
17     A.  That's right.
18     Q.  You did not have to match TEAM against any DPS
19 database; is that correct?
20     A.  That's correct.
21     Q.  Besides this analysis of TEAM for voters who
22 did not supply either social security number or driver
23 license number, did the Division conduct any other
24 research related to Senate Bill 14 prior to January 25,
25 2011?

57

1      A.  No.
2      Q.  And so the updating of the information that the
3  Division had conducted of voters who did not supply
4  those numbers on the voter reg application, that was
5  done sort of independently by the Division; is that
6  right?
7      A.  Correct.  In, you know, knowing that those
8  questions would likely come up, we tried to update the
9  information previously supplied to the Legislature.
10     Q.  And it had been previously requested by
11 Representative Anchia?
12     A.  Yes.
13     Q.  You anticipated that he would request it again
14 or another member; is that right?
15     A.  That's right.
16     Q.  At the hearing on January 25, Senator Williams
17 asked you to conduct additional analysis of which
18 registered voters did not have a driver license; is that
19 correct?
20     A.  Yes.
21     Q.  And at the end of your testimony, Senator
22 Williams followed up on his request for a
23 cross-reference of the driver license, DPS database and
24 the TEAM database; is that right?
25     A.  That's right.

---

58

1    Q.   And he asked when he could expect that
2  information; is that correct?
3    A.   Yes.  I think so.
4    Q.   So he asked you twice in one day for the same
5  information --
6    A.   Yes --
7    Q.   Okay --
8    A.   -- and I hadn't left the building yet.
9        MR. KEISTER:  All right.  Y'all are
10  speaking over each other a little bit, so...
11       MS. WESTFALL:  Sorry.  Just getting
12  through testimony quickly, I guess.  Just getting
13  through my outline.
14       MR. KEISTER:  Okay.
15    Q.   (By Ms. Westfall) Did you feel that there was a
16  sense of urgency to his request?
17    A.   Yes.
18    Q.   Did you explain to him during that hearing that
19  there was problems with the matching process but that
20  you expected to get it, the analysis done by the end of
21  the week?
22    A.   I don't remember that.
23       MS. WESTFALL:  Could you mark this.
24       (Exhibit 187 marked for identification.)
25    Q.   (By Ms. Westfall) You've been handed what's be

---

59

1  marked as Exhibit 187, and it was previously marked as
2  Exhibit 287 -- as luck would have it -- in your previous
3  deposition.
4    A.   Yes.
5    Q.   Do you recognize this document?
6    A.   Yes.  It looks like -- it looks like some of my
7  testimony -- may have been all of my testimony, but it's
8  at least some of my testimony before the Committee of
9  the Whole when they considered Senate Bill 14.
10    Q.   So for the record, turning your attention to
11  Page 446 of this excerpt of the Senate consideration of
12  Senate Bill 14, do you see the bottom of the page where
13  you are speaking -- on to page -- running from 446 to
14  447?
15    A.   Yes.
16    Q.   And what are you saying there with regard to
17  Senator Williams' request in response to a question from
18  Senator Davis?
19    A.   Okay.  Well, I reference that Senator Williams
20  had asked our office to see if we could do some
21  comparisons on registered voters that don't have -- that
22  have not been issued a driver's license or personal ID,
23  and I say, "We're trying to run some of those numbers
24  right now."
25    Q.   Then turning your attention a little later

---

60

1  towards the end of your testimony at Page 49 -- 489 and
2  490, if you could review Senator Williams' remarks that
3  run onto the next page, 490, and then your response.
4    A.   Okay.  So he asks -- okay, what he says, "I
5  want to ask you, we've talked earlier about a project to
6  cross-reference driver's licenses and voter
7  registration.  How that is coming along?"  And I
8  acknowledge that -- and I do say, "I would hope by the
9  end of the week we would have the information."  But I
10  do acknowledge that IT folks and Election experts are
11  struggling with matching criteria.
12    Q.   What were the problems with the matching
13  process that you were referring to?
14    A.   You have to make a decision to what fields
15  you're going to match on.  So there are lots of choices
16  on what fields to match on.
17    Q.   Did the Division regularly conduct matches of
18  voter registration information on an application with
19  the driver license database as part of the HAVA
20  requirements?
21    A.   Yes.
22    Q.   Wasn't the Division in a sense sort of familiar
23  with the matching process between TEAM and the DPS
24  driver license database?
25    A.   Yes.

---

61

1    Q.   But notwithstanding these concerns there were
2  some --
3    A.   Well, but there's a big distinction.  Because
4  if you have a driver's license number, it's a very
5  simple match.  If you don't have a driver license
6  number, then it's harder to match.
7    Q.   And why is there that difference?
8    A.   If you don't have a unique number to match on,
9  there can be variations in a person's first name or last
10  name, if there's a space between the -- you know, the
11  Mc, you know, McGeehan, De la Garza, things like that,
12  there are issues on matching.
13    Q.   Is it fair to say that notwithstanding the lack
14  of a driver license number, that the Division had
15  familiarity with the DPS driver license database at this
16  time?
17    A.   Well, we had some familiarity with it.
18    Q.   Who would actually conduct the HAVA matching
19  process for a voter who supplied a driver license
20  number?  Would that be done by DPS or by the Division?
21    A.   That was done by the Division.
22    Q.   And notwithstanding the matching concerns about
23  what fields to use, et cetera, that you just testified
24  about today, you nevertheless told Senator Williams that
25  you could produce -- you expected to be able to produce

---

ANN McGEEHAN

6/18/2014

13 (Pages 62 to 65)

---

**62**

1  the results in one week, correct?
2      A.  Right.
3      Q.  So you did not foresee any of these matching
4  problems to be insurmountable in any sense; is that
5  right?
6      A.  It looks like I tried to give myself a little
7  wiggle room knowing that sometimes things aren't as
8  straightforward, but I was trying to be responsive to a
9  legislator.
10     Q.  Prior to Senator Williams' request, had anyone
11  requested that the Division conduct this sort of
12  analysis of matching TEAM with the DPS driver license
13  database?
14     A.  I don't recall.  I don't think so.
15     Q.  Had the Secretary of State's Office discussed
16  with DPS the possibility of conducting this type of a
17  match prior to January 25th?
18     A.  There may have been a discussion of that but it
19  was outside the context of Voter ID, and it may have
20  been early days in implementing HAVA.
21     Q.  Prior to Senator Williams' request on January
22  25th, did the Secretary of State's Office anticipate
23  that legislators might want to know the number of
24  registered voters without a driver license number or
25  personal ID number?

---

**63**

1      A.  Well, we did, and that's why we were updating
2  the numbers in the -- in our TEAM database.
3      Q.  And that was with regard the voters who had not
4  supplied that number on their application?
5      A.  Right.
6      Q.  Prior to January 25th, did the Division
7  anticipate that the Department of Justice might want to
8  know the number of registered voters without a driver
9  license or personal ID number in conjunction with
10  Section 5 review?
11     A.  I don't know that we had focused on that at
12  that point in time.
13     Q.  But you testified earlier in your previous
14  deposition that you had overseen about a thousand
15  Section 5 submissions; is that right?
16     A.  That sounds about right, yes.
17     Q.  And typically, would the Department of Justice
18  in conducting that review seek information about the
19  effect of an election change on voters?
20     A.  Yes.
21     Q.  So it was -- although maybe the Division -- is
22  it your testimony the Division had not focused on that
23  particular issue as of January 25, that it was within
24  the realm of possibility and likelihood, in fact, that
25  the Department of Justice would seek that information as

---

**64**

1  part of Section 5 preclearance?
2          MR. KEISTER:  Objection, vague --
3      Q.  (By Ms. Westfall) You may --
4          MR. KEISTER:  -- and calls for
5  speculation.
6      Q.  (By Ms. Westfall) You may answer.
7      A.  I mean, we clearly anticipated that the Justice
8  Department would be asking a lot of questions and
9  requesting a lot of information because they always did.
10  As far as, you know, specifically identifying how we
11  would supply that, we hadn't identified that yet.
12     Q.  Did you anticipate that the Department of
13  Justice would request information about the impact of
14  the bill on minority voters as part of the Section 5
15  process?
16     A.  Yes.
17     Q.  That's sort of the core of the Section 5 --
18     A.  Right.
19     Q.  -- analysis, correct?
20     A.  Correct.
21     Q.  Subsequent to the Senate hearing on --
22  Committee of the Whole hearing on Senate Bill 14, did
23  the Division subsequently conduct a match of the TEAM
24  voter registration database with the DPS driver license
25  database?

---

**65**

1      A.  Yes.
2      Q.  Was that the first time that the Secretary of
3  State's Office attempted to conduct a match of TEAM and
4  DPS?
5      A.  Yes.
6      Q.  And when was the match conducted?
7      A.  I think it was shortly after this hearing.
8      Q.  Was it in response to Senator Williams'
9  request?
10     A.  Yes.
11     Q.  It was not separate and apart in any way from
12  Senator Williams' request; is that right?
13     A.  That's right.
14     Q.  Who from the Secretary of State's Office and
15  within the Division was involved in the process?
16     A.  It would be Karen Richards, who was the voter
17  registration manager within the Elections Division.  And
18  then in the -- in our IT Division, it would have been
19  John Mendoza and his supervisors Lee Guyette, maybe
20  Scott Brandt who was the IT director.
21     Q.  Anybody else?
22     A.  I don't think so.
23     Q.  Was there anyone involved from outside of the
24  Secretary of State's Office in this matching process?
25     A.  No.

---

ANN McGEEHAN                                                6/18/2014

14 (Pages 66 to 69)

---

66

1   Q.  Anyone involved in the Lieutenant Governor's
2   Office?
3   A.  No.
4   Q.  Anyone involved in the Governor's Office?
5   A.  No.
6   Q.  Were there any legislators or staff involved in
7   this process?
8   A.  No.
9       MS. WESTFALL:  Would you mark this.
10      (Exhibit 188 marked for identification.)
11  Q.  (By Ms. Westfall) You've been handed what's
12  been marked as Exhibit 188.  Do you recognize this
13  document?
14  A.  Yes.
15  Q.  What is it?
16  A.  This is an e-mail from between me and Karen
17  Richards, Lee Guyette and John Mendoza as we were
18  working on Senator Williams' request to do that query
19  between the driver license database and the voter
20  registration database.
21  Q.  For the record, this document is TX00107733
22  through TX00107735.  I believe you testified
23  Ms. Richards was the Division's head of voter
24  registration at the time?
25  A.  Yes.

---

67

1   Q.  She is no longer employed with the Division; is
2   that correct?
3   A.  That's correct.
4   Q.  Is she employed with VOTEC?
5   A.  Yes.
6   Q.  Turning your attention to the most recent
7   e-mail exchange on February 1, between you and others,
8   do you see that?
9   A.  Yes.
10  Q.  Is there a reason why you were copying yourself
11  on this e-mail?
12  A.  I don't know why I would do that.
13  Q.  Okay.
14  A.  I don't recall.
15  Q.  Looking at your e-mail, do you see you refer to
16  someone named Coby?
17  A.  Yes.
18  Q.  Is that Coby Shorter?
19  A.  Yes.
20  Q.  Do you see that in the first sentence you say,
21  "Talked with John."  Is that John Mendoza that you're
22  referring to there?
23  A.  I think so.  Looks like I was -- I had asked a
24  question previously -- earlier that same day about the
25  data, and John Mendoza would have been the one I

---

68

1   probably would have called and asked the question.
2   Q.  Do you see the second sentence says you have
3   drafted a summary that you'll send to Coby and John so
4   they can distribute it to legislative folk?
5   A.  Yes.
6   Q.  Are you referring to John Sepehri in that?
7   A.  Yes.
8   Q.  That John is John Sepehri --
9   A.  Yes.
10  Q.  -- and Coby is Coby Shorter?
11  A.  Correct.
12  Q.  I know you're anticipating my questions.  We're
13  talking over each other.
14  A.  I'm sorry.
15  Q.  Could you describe on page -- the second page
16  of this document, TX00107734, could you describe the
17  matching process that was undertaken?
18  A.  So it looks like we did six separate queries
19  with different matching criteria.  And the first one was
20  based on last name, first name, date of birth and
21  county, so if -- in same county.  And then that would be
22  considered a match between the two databases.
23      And then the second query is last name,
24  first name, date of birth, same county but they took out
25  voters 70 and older.

---

69

1       Third query is last name, date of birth
2   and same county.  So it just simply omitted first name.
3       And the fourth query is the same as the
4   third but they took out voter 70 or older.
5       And then the fifth query was last name,
6   first name, date of birth only.
7       And the sixth query was the same as 5
8   except that they took out voters over 70.
9   Q.  Who determined the matching criteria for this
10  exercise?
11  A.  As I recall, Karen Richards and John Mendoza
12  would talk and then -- and work through the possible
13  queries and then John Mendoza would run the query.
14  Q.  Turning your attention to Query Number 1, could
15  you just run me through the results of the various
16  columns in response to the matching criteria what you
17  found?
18  A.  Okay.  The number of -- so the number of voters
19  with -- I guess, the first number -- the first number is
20  pretty -- it should be the same.
21      But anyway, the number of voters with no
22  driver's license or identification number, I'm assuming
23  that means within the voter registration database, the
24  SOS database, was 2,814,965.  And then of that, you
25  know, 2.8 million, we ran that against DPS database and

---

ANN McGEEHAN                                                    6/18/2014

---

70

1    found that 1,970,252 matched a DPS record, so they
2    looked like they had a -- had been issued a driver's
3    license or personal ID.  And then the number of voters
4    that we could not match against the DPS database based
5    on that matching criteria was 844,713.
6        Q.  I see.  So what you did was to take -- you did
7    not match the entire TEAM database against DPS?
8        A.  Right.
9        Q.  All you did was to match those voters who did
10   not appear to have -- for whom you did not have a driver
11   license number in TEAM -- against TEAM to see if you
12   could find that in fact many of those voters did have a
13   driver license; is that right?
14       A.  Correct.  That's my recollection.
15       Q.  The reason why you have 2.8 million voters
16   without a driver license number from which you're
17   working is because pre-2006, it was not mandatory to
18   supply a driver license number; is that correct?
19       A.  That's correct.  That's would explain some of
20   those voters.
21       Q.  Right.  So that was why you started off with
22   that pool?
23       A.  But it could also include voters who registered
24   after 2006 that didn't -- that didn't have -- you know,
25   stated they'd didn't have one.

---

71

1        Q.  Correct.  What does the column Percentage to
2    State Numbers, what does that reflect?
3        A.  I think that reflects percent of -- compared to
4    the voter registration, total voter registration in the
5    State.
6        Q.  Do you see that for all of -- and are your
7    responses and explanations of the results for that
8    matching Criteria 1 equally applicable to all the other
9    queries conducted?
10       A.  Yeah, I -- to be honest, I don't understand why
11   the first number changes.  I would -- you know, I would
12   have to study this a little bit more.  I don't
13   understand why the number of voters with no TDL ID
14   number is different from Query 1, 3 and 5.
15       Q.  Do you believe that that relates to the
16   exemption of voters over the age the 70?
17       A.  That would explain the Query 2, 4 and 6.  But
18   the numbers are just like slightly different on, you
19   know.  So I would, you know, there's probably a reason
20   for that, I just -- I can't explain it.
21       Q.  I see what you're saying.
22       A.  Yeah.
23       Q.  Do you see that this chart indicates that under
24   the range of matching criteria you used, you concluded
25   that between 504,000, roughly, voters and as many as

---

72

1    844,000 voters did not have a driver's license according
2    to your comparisons?
3        A.  Did you say 504?
4        Q.  504,000?
5        A.  Yes.
6        Q.  Did you conduct this matching process using
7    information that the division had in its sole
8    possession?
9        A.  Yes.
10       Q.  Did the Division use the driver license
11   database that was known as the jury wheel?
12       A.  I believe that's what we did.  I'm just -- yes,
13   okay, that's what Karen's e-mail says on -- that they
14   compared the voter record database against the jury
15   wheel file that we receive from DPS.  And so it was the
16   October 2010 jury wheel file.
17       Q.  Could you explain what the jury wheel file is?
18       A.  It is a -- the Secretary of State is charged
19   with developing a jury -- we call it a jury wheel file.
20   It's probably an old fashioned name.  But it's basically
21   the jury list that is sent to all the counties and it
22   merges the voter file with the driver's license file.
23   And then the counties for State court are required to
24   pull their juries from that merged.  And so we do that
25   annually.  And we get a entire copy of the DPS -- DPS

---

73

1    file from DPS.  They send it to us and then that's what
2    -- that's how -- that was the data we used to compare
3    for this query.
4        Q.  Do you receive that annually in October of
5    every year?
6        A.  Yes.
7        Q.  And does your office compare records between
8    TEAM and DPS in that regard to create the jury wheel --
9        A.  Yes.
10       Q.  -- to provide to Counties?
11       A.  Yes.
12       Q.  Is that another way that the Division has some
13   familiarity with the DPS database?
14       A.  Yes.
15       Q.  I believe you testified that the Division used
16   the jury wheel for this analysis in Exhibit 188 but it
17   had been obtained in October 2010; is that correct?
18       A.  Right.
19       Q.  So the Division had in its possession all the
20   information it needed to conduct this analysis as of
21   October 2010; is that correct?
22       A.  Yes.
23       Q.  There's nothing that prevented the Secretary of
24   State's Office from conducting this analysis during the
25   prefiling of Senate Bill 14 or at any time prior to

---

ANN McGEEHAN                                          6/18/2014

16 (Pages 74 to 77)

---

74

1  January 25, 2011; is that correct?
2      A.  Yes.
3      Q.  What is your reaction to the finding that as
4  many as 844,000 voters may not have been issued a driver
5  license or the personal ID card by the State of Texas?
6      A.  I don't -- I don't think we were surprised by
7  these numbers.  I think they're within range of what had
8  previously been provided to Representative Anchia and
9  others.
10     Q.  Didn't you tell Representative Anchia that
11 there were about 35,000 voters who hadn't provided a
12 driver license or social security number on their
13 registration application between 2006 and the present?
14     A.  Yes.
15     Q.  So that number is significantly lower?
16     A.  But those are two different questions.
17     Q.  But how did you anticipate that the number was
18 going to be in this range of this analysis, such that
19 you were not surprised when you got these results?
20     A.  I believe that we had -- and I would have to
21 refresh my memory, but I believe we provided a lot of
22 information to Secretary Anchia and the whole House
23 Elections Committee regarding these numbers.  But I
24 don't have that at my fingertips.
25     Q.  Did you believe that this was a substantial

---

75

1  number of voters?
2      A.  You know, I don't really feel comfortable
3  answering that question.
4      Q.  But we're in a deposition.  Can you answer my
5  question?
6      A.  Well, I don't have the context.  You know what
7  I mean?
8      Q.  I see.  It's a percentage -- I mean, it's
9  certainly a percentage of the -- you can see the
10 percentages of the voter registration database that are
11 listed?
12     A.  Uh-huh.
13     Q.  You don't have an opinion on whether it's a
14 substantial number?
15         MS. WESTFALL:  Objection, asked and
16 answered.
17     Q.  (By Ms. Westfall) You may answer.
18     A.  I really don't.  I mean.
19     Q.  Did you conduct any analysis of -- as you --
20 strike that.
21         After you conducted this set of matching
22 criteria, did you conduct any analysis of where these
23 voters live?
24     A.  Yes.
25     Q.  When did you conduct that analysis?

---

76

1      A.  I believe that was after -- after the bill
2  passed and after session.
3      Q.  Why did you do that analysis?
4      A.  As I recall, we were attempting to respond to
5  requests of additional information from the Justice
6  Department.
7      Q.  Did you do any analysis of where the voters
8  resided before this Section 5 process got underway?
9      A.  I don't think so.
10     Q.  Did you do any analysis of where -- of how long
11 the voters had been on the registration rolls?
12     A.  No.
13     Q.  Did you do any analysis of the voter's voter
14 history?
15     A.  No.
16     Q.  Did you do any analysis before the Section 5
17 process submission was submitted of whether these voters
18 were Spanish surname voters?
19     A.  No.
20     Q.  Could you have conducted that analysis?
21     A.  Yes.
22     Q.  And in fact, you did conduct that analysis; is
23 that right?
24     A.  For the Justice Department.
25     Q.  How was that analysis -- when you had the list

---

77

1  -- or the voters flagged by Spanish surnames and you had
2  these lists of voters without --
3      A.  Actually, I have to correct that answer.
4  Because we could not do that.  We would have -- we would
5  have to have assistance from DPS on the voters that
6  weren't issued -- let me think through this.  I don't
7  think we could do it on our own.
8          Well, go ahead and ask your question.
9      Q.  Sure.
10     A.  I'm thinking through the process.
11     Q.  Did you need to get updated information from
12 DPS to conduct a match in 2011 because what -- the
13 information you had was October 2010 --
14     A.  Right.
15     Q.  -- is that correct?
16     A.  Yeah.
17     Q.  Turning back to Exhibit 188, on the e-mail
18 correspondence, do you see that you indicate that you
19 are seeking comments from Karen on the summary that you
20 have drafted?
21     A.  Yes.
22     Q.  And after that, you will forward the
23 summary to Coby Shorter and John Sepehri; is that right?
24     A.  Yes.
25     Q.  Did Karen Richards review this e-mail as you

---

ANN McGEEHAN                                                        6/18/2014

78

1   had requested?
2        A.  I'm sure she did.
3        Q.  Did she provide you feedback or changes to the
4   summary?
5        A.  I don't remember.
6        Q.  Did she respond to you in writing?
7        A.  I don't remember.  She could have or we could
8   have talked about it.  I really don't remember.
9             MS. WESTFALL:  Counsel, if this has not
10  been produced in litigation, we would request that it be
11  produced.
12       A.  I don't know if there is --
13            MS. WESTFALL:  Certainly, if it had -- if
14  it exists, we would request that it be produced.  I'll
15  represent to you that I do not believe that it has been
16  produced if it does exist.  So I want to make this
17  request on the record.  I will certainly follow up.
18            MR. KEISTER:  Yes, please follow up
19  because I'm not certain that the witness has even said
20  there's anything to be --
21       A.  Yeah, I don't know that there is.  I don't know
22  that there is.  I don't know.
23            MR. KEISTER:  Right.
24       Q.  (By Ms. Westfall) Did you send the summary to
25  Coby Shorter or John Sepehri?

79

1        A.  I don't know if I sent it or -- I know I
2   discussed it with them.  I may have just brought it with
3   me.  I don't remember.  Or I may have e-mailed it to
4   them.  I don't know.
5        Q.  Did they respond to you in any way as to what
6   they intended to do with this information?
7        A.  We discussed it.  You know, I explained how we
8   ran these queries, and my understanding was, they were
9   going to, you know, think about it and, you know, and to
10  not -- that they would be the ones to make the
11  determination to release it to a legislator.
12       Q.  Did you discuss -- did you have this meeting
13  with both Coby Shorter and John Sepehri?
14       A.  That's what I remember.
15       Q.  How long was the meeting?
16       A.  Maybe 30 minutes or so.
17       Q.  How soon after you sent the e-mail to
18  Ms. Richards was this meeting?
19       A.  I don't remember.
20       Q.  Was Ms. Richards at this meeting?
21       A.  No.
22       Q.  It was just the three of you?  You, Mr. Shorter
23  and Mr. Sepehri?
24       A.  Yes.
25       Q.  Why were you providing the information to the

80

1   two of them when the request had been made from Senator
2   Williams to you directly to provide this information?
3        A.  Well, to begin with, I don't know if Senator
4   Williams may have asked Coby and me together, because as
5   I recall, I think he approached us -- we were in the
6   Senator Floor, you know, I was waiting to be -- to be
7   called as a resource.  So I think the initial discussion
8   just might have been an informal to the both of us.
9        Q.  Mr. Shorter was with you before you --
10       A.  He -- yes, we were waiting together.  So I
11  think that's how the initial request was made.  And then
12  generally, the protocol was communications to
13  legislators would usually go through Executive.
14       Q.  So besides the person who conducted -- the
15  people who conducted the matching analysis, Mr. Guyette,
16  Mr. Mendoza, Karen Richards, you -- I may be forgetting
17  somebody within IT, but -- Mr. Brandt, Mr. Shorter,
18  Mr. Sepehri.  Are there any other people you can
19  identify who knew about the results of this analysis
20  either in a written form or a summary form, orally or
21  otherwise?
22       A.  Not that I know of.
23       Q.  So when you met with Mr. Shorter and
24  Mr. Sepehri shortly after February 1, 2011, they
25  instructed you at that time not to submit it to the

81

1   Legislature until they had given it further
2   consideration; is that correct?
3        A.  Well, my understanding is, they would be the
4   ones to -- to transmit it to the Legislature.
5        Q.  So it was in their hands?
6        A.  It was in their hands.
7        Q.  So as of sometime after February 1, 2011, this
8   project was -- was out of your hands?
9        A.  Yes.
10       Q.  Were you kind -- were you waiting to hear what
11  to do with this summary and analysis?
12       A.  I was waiting further direction.
13       Q.  Besides that conversation that you had with the
14  two of them and this e-mail chain of Exhibit 188, were
15  there any other communications within the Secretary of
16  State's Office about the analysis contained in Exhibit
17  188?
18       A.  I recall that I checked with them.  I don't
19  remember if it was Coby and John or just John about this
20  analysis before the bill was heard in the House.  And my
21  understanding was that it was still pending.  So, that's
22  really the only other conversation that I recall.
23       Q.  What was your understanding of the basis for it
24  continuing to be pending within the Secretary of State's
25  Office?

82

1   A.  I don't really know.  And I don't want to
2   speculate, and I don't know.
3   Q.  Did they provide any indication of why they
4   weren't releasing it to you?
5   A.  I think that there were some concerns about the
6   accuracy of it and, you know, there was such a wide
7   range that they may have had some concerns about, you
8   know, being -- just how reliable this was before they
9   released it.
10   Q.  Were they concerned about not being responsive
11   to Senator Williams by not providing him with this
12   information?
13   A.  You know, that would be up to them.  So I don't
14   know what their concerns were.
15   Q.  Were you concerned about that for your own
16   relationship with Senator Williams?
17   A.  I was concerned about it but once it was in
18   their hands, then I wasn't concerned about it anymore.
19   Q.  Was there a time when this analysis in any way,
20   shape or form was provided to anyone in the Legislature?
21   A.  During the session?
22   Q.  Let's start off with the session, yes.
23   A.  No, to my knowledge, it was not.  I mean I
24   didn't.  I don't know if somebody else did, but I --
25   Q.  Did it become known to the Legislature after

83

1   the session?
2   A.  I think so.  I believe that -- that after we
3   submitted the bill to the Justice Department for
4   preclearance, the Justice Department started to ask some
5   questions and they may have been informal, just
6   telephone requests, and I believe that we provided this
7   data via the phone or maybe an e-mail.  I don't remember
8   all the details.  But I believe we responded to the
9   Justice Department and then after that had occurred,
10   then I think we got -- you know, I think there was a
11   request from Senator Gallegos, and I sent that
12   information to him or his staff.
13   Q.  That was the first time the Legislature became
14   aware of this analysis, to your knowledge?
15   A.  To my knowledge.
16   Q.  What was -- turning back to Exhibit 188, why
17   did you indicate that Coby and John -- Coby Shorter and
18   John Sepehri would distribute it to the legislative
19   folk?  What was the basis of your understanding they
20   would do that?
21   A.  That -- that was their instruction, that on, I
22   guess on major legislative issues, that they would be
23   the primary point of contact.
24   Q.  I see.  So that was just -- that was not
25   anything particular to this request, it was how you

84

1   generally operated in the Division?
2   A.  Yes.
3   Q.  Is it fair to say that you yourself sometimes
4   routinely provided information for the Legislature in
5   response to requests yourself?
6   A.  It really would depend on the administration
7   and it would depend on the kind of information.
8   Q.  What made this information different, such that
9   it had to go through Mr. Shorter?
10   A.  Well, it was the first time we had conducted
11   this analysis and we were making some subjective calls
12   on the matching criteria, so we wanted to make sure
13   Executive was on board with that.
14   Q.  Do you know whether Mr. Sepehri had any
15   conversations with Senator Williams about his request?
16   A.  I don't know.
17   Q.  Did you report directly to Mr. Sepehri?
18   A.  No, I reported to Coby.
19   Q.  Can you definitively say that this analysis was
20   not ever supplied to the Legislature before the end of
21   session in 2011?
22   A.  No.  I mean, all I can say is I didn't release
23   it and I don't -- I didn't release it and I wasn't aware
24   that it was released.
25   Q.  Other than what you just testified to, you're

85

1   -- actually, strike that.
2        What is the basis of your testimony that
3   it may be an issue of reliability that caused Coby
4   Shorter not to want to -- and Secretary of State not to
5   provide this to the Legislature?
6   A.  Well, we discussed that.  I mean, it was when I
7   met with Coby and John, that was the discussion, and.
8   Q.  What did they say to you?
9   A.  I think perhaps they were expecting a single
10   number, and we didn't feel comfortable with that.
11   That's why we gave them a range.  So that's how I recall
12   the conversation going.
13   Q.  So they -- because you had used various
14   matching criteria, that created concerns for them
15   because there were different numbers that were generated
16   pursuant to those matching criteria?
17   A.  Yes.
18   Q.  Did you try to defend the quality of your
19   analysis in that meeting?
20   A.  I think I probably just stated this was
21   probably the best we could do based on the resources
22   within the Elections Division.  We're not statisticians
23   and don't have any other software to do matching, so
24   this was the best we could do.
25   Q.  Did you have any questions yourself about the

ANN McGEEHAN                                          6/18/2014

---

86

1  reliability of the analysis?
2      A.  I was comfortable with what we provided with
3  the caveats that were provided.  Whether there was a
4  better way to go about that, there may have been.  But
5  based on the resources that we had, this was the best we
6  could do as far as I understood it.
7      Q.  Would you personally have felt comfortable
8  providing this to the Legislature with the caveats that
9  you include in your summary?
10     A.  Yeah.  Yes.
11     Q.  Did Mr. Shorter or Mr. Sepehri express any
12 other concerns about the analysis besides fact that
13 different criteria were run and different numbers were
14 generated pursuant to this criteria?
15     A.  No, I don't think so.
16     Q.  Turning back to the exhibit -- of the bill
17 history of Senate Bill 14, was -- could you take a look
18 at that exhibit.  It was Exhibit 186.
19     A.  Okay.
20     Q.  And was it the case that the House first heard
21 the bill on the February 11, 2011?
22         MR. KEISTER:  Elizabeth, if we're changing
23 gears, can we take a break?
24         MS. WESTFALL:  Let's take a break.
25         (Recess from 10:06 to 10:22 a.m.)

---

87

1          MS. WESTFALL:  We're back on the record.
2  Could you mark this?
3          (Exhibit 189 marked for identification.)
4          (Page 87, Line 4 through Page 102, Line 3
5  designated Highly Confidential and bound under separate
6  cover.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

102

1
2
3
4      Q.  (By Ms. Westfall)  Ms. McGeehan, did you testify
5  before the House Select Committee on voter
6  identification and voter fraud?
7      A.  Yes.
8      Q.  Did that occur on March 1st, 2011?
9      A.  Yes.
10     Q.  Did you appear as a resource witness at that
11 hearing?
12     A.  Yes.
13     Q.  In response to a question about voters without
14 driver licenses, did you testify at that hearing that
15 you were still in the process of conducting this match?
16     A.  Probably.
17         MS. WESTFALL:  Could you mark this?
18         (Exhibit 191 marked for identification.)
19     Q.  (By Ms. Westfall)  You've been handed what's
20 been marked as Exhibit 191.  Do you recognize this
21 document?
22     A.  Yes.  I believe this is an excerpt from my
23 testimony before the Select Committee on Voter
24 Identification and Voter Fraud.
25     Q.  Turning your attention to Pages 1 -- I'm sorry.

---

103

1  Strike that.
2          Turning your attention to Page 289 and 290
3  of Exhibit 191.
4      A.  Okay.
5      Q.  Do you see that someone asked you a question
6  about the number of voters without a driver license
7  number on Page 289?
8      A.  Yes.
9      Q.  Do you know who the unidentified representative
10 was, even though the person is not identified in this
11 transcript?
12     A.  I believe it was Representative Anchia.
13     Q.  What was he asking you?
14     A.  He is asking about the number of voters who did
15 not register without a driver's license.  Wait.  Let's
16 see what it says here.  I may have to refer to the --
17         MS. WESTFALL:  Let the record reflect that
18 the witness is currently looking at the Exhibit 190.
19         THE WITNESS:  190.
20         MS. WESTFALL:  To refresh her recollection
21 about the analysis referred to on Page 289 of Exhibit
22 191.
23     A.  So he is asking about the figure, the number of
24 600,000.  A lot of people have been talking about this
25 voter figure of 600,000 as being people who registered

---

ANN McGEEHAN                                                6/18/2014

20 (Pages 104 to 107)

104

1  without their social security number or a driver's
2  license number, and that's consistent with the number on
3  Exhibit 190, which was 690,887.  And his question, is
4  the number bigger than that?  So I need to read on to
5  see what I was saying.
6     Q.  (By Ms. Westfall) Take your time.
7     A.  (Reviewing document.) I don't know how long I
8  should read, because we start to get into a different
9  train of --
10    Q.  I'll represent to you -- and you should feel
11 free to look at the entire --
12    A.  Okay.
13    Q.  But that your -- the discussion of the numbers
14 of voters without driver license number extends only
15 until Page 290 of the exhibit.
16    A.  Okay.
17    Q.  And then it gets into other topics.
18    A.  Okay.
19    Q.  As you -- as you confirmed.
20    A.  Okay.
21    Q.  Do you see on Page 290, that in response to
22 what you believe a question that came from
23 Representative Anchia about the number of voters without
24 driver's license, you testified that your IT department
25 was still in the process of getting good matching

105

1  criteria, et cetera?
2     A.  Yes.
3     Q.  And that it can be difficult to do the right
4  match?
5     A.  Yes.
6     Q.  Why did you not tell the Legislature that your
7  office had already conducted the matches?
8     A.  Well, I -- you know, as I stated earlier with
9  the conversation with Representative Harless, I didn't
10 feel like that that was the final product and that
11 changes could still come.  So it was my understanding
12 that it was still being analyzed and there could be
13 future changes.
14    Q.  Did you seek authorization from Mr. Shorter or
15 Mr. Sepehri to provide that response to the Legislature?
16    A.  I think I probably did ask them before this
17 hearing if we could release it, and that probably the
18 response was no, you know, we're still analyzing this.
19    Q.  Did they continue to have concerns about having
20 different sets of results based on the six queries, or
21 were there other -- well, first, a bad question.
22         Did they continue have a concerns about
23 the different results from the different queries?
24    A.  We didn't really have a substantive
25 conversation about it, so all I knew was they were still

106

1  looking at it.
2     Q.  Did you seek authorization, after you met with
3  Representative Harless, to release this information to
4  the Legislature?
5     A.  Probably.  I mean, again, I don't have a clear
6  memory, but my e-mail references it, so most likely, I
7  would have probably asked John about that.
8     Q.  Was it only John or was it also Coby Shorter?
9     A.  I don't have a clear memory of that.
10    Q.  Did you have a meeting with him in person, or
11 was it by e-mail?
12    A.  It probably would have been by phone or e-mail.
13    Q.  And what was -- what was your request to him?
14    A.  Again, it's very fuzzy.  I'm just -- but based
15 on the e-mail that I sent to Representative Harless's
16 office, I'm referencing it, so I -- in my mind, you
17 know, I was probably thinking that maybe it would be
18 released or -- but -- and most likely, I would have just
19 spoken to John over the phone or in person on it.
20    Q.  What did John say in response to your request?
21    A.  Again, I don't think it was any lengthy
22 discussion.  It was more like, you know, this is
23 still being reviewed, not ready.
24    Q.  Did he give you any substantive reasons as to
25 why it couldn't be released?

107

1     A.  No.
2     Q.  Did he understand that the House sponsor wanted
3  this information?
4     A.  Yeah.  I mean, I think he was copied on that
5  e-mail, and he was probably at that meeting, so I think
6  he understood that.
7     Q.  Did he understand that Representative Anchia
8  was likely interested in this information based on his
9  previous --
10    A.  I can't speculate, but...
11    Q.  Did you feel like you wanted a more substantive
12 response from John Sepehri as to why you were not able
13 to release this information to the Legislature?
14    A.  No.
15    Q.  Were you just following his direction without
16 much pushing on your part?
17    A.  That's right.
18    Q.  Can you -- sitting here today, can you identify
19 any other instance where you had completed analysis at
20 the request of the Legislature where you didn't turn it
21 over to the Legislature?
22    A.  No.
23    Q.  Turning back to Exhibit 191, when you advised
24 Representative Anchia that your IT department was still
25 looking at it and you were trying to get good matching

ANN McGEEHAN                                                    6/18/2014

21 (Pages 108 to 111)

---

**108**

¹ criteria, do you believe that that was accurate?
²     A.  Yes.  You know, I think that was -- based on
³ the only real conversation I had about it, that was the
⁴ concern was, was this reliable data, were these good
⁵ queries, and so that was -- that was my understanding,
⁶ that the concern was regarding the integrity of the
⁷ data.
⁸     Q.  Do you think a more accurate response to
⁹ Representative Anchia's question would have been to say
¹⁰ the general counsel is reviewing data, it is pending, we
¹¹ will get back to you?
¹²          MR. KEISTER:  Objection, argumentative.
¹³     Q.  (By Ms. Westfall) You may answer.
¹⁴     A.  You know, we were a team, so we don't like to
¹⁵ throw anybody under the bus, so it was just -- in my
¹⁶ mind, it was still a work in progress, so...
¹⁷     Q.  But, in fact, your IT department did not have
¹⁸ control of the data at the time of your testimony; isn't
¹⁹ that -- isn't that the case?
²⁰     A.  That's correct.
²¹     Q.  At any time after your testimony on March 1st,
²² 2011, was the information from the queries at Exhibit
²³ 188 released to the Legislature during session?
²⁴     A.  During session, no.
²⁵     Q.  Did Senator Williams or his staff ever contact

---

**109**

¹ you about the status of the match?
²     A.  No.
³     Q.  Did any other bill supporter contact you about
⁴ the status of the match?
⁵     A.  No.
⁶     Q.  Did any bill opponent or staff contact you
⁷ about the status of the match?
⁸     A.  No.
⁹     Q.  Did Representative Harless or Colby Beuck
¹⁰ contact you about the status of the match?
¹¹     A.  No.
¹² Q.  Was it your view that the information was not
¹³ being released because of the number of voters that had
¹⁴ been found not to have ID?
¹⁵     A.  No.
¹⁶ Q.  Did you believe that the reason it was being
¹⁷ withheld and not released to the public was legitimate?
¹⁸     A.  Legitimate.  Executive management had concerns
¹⁹ about the reliability of the data.  That's a legitimate
²⁰ reason not to release it.
²¹ Q.  Is that the only legitimate reason not to
²² release it?
²³     A.  There may be others.
²⁴ Q.  But sitting here today, is the sole one you can
²⁵ think of?

---

**110**

¹     A.  Yes.
²     Q.  Do you believe, as a general matter, that the
³ Legislature and the public should have information about
⁴ the impact of legislation being considered by the
⁵ Legislature?
⁶          MR. KEISTER:  Objection, calls for
⁷ speculation.
⁸     Q.  (By Ms. Westfall) You may answer.
⁹     A.  Texas has very strong public information laws,
¹⁰ so most of that information is readily available upon
¹¹ request.
¹²     Q.  But do you believe, as a -- as a matter of
¹³ public policy, that the public and the Legislature
¹⁴ should have information about the impact of legislation
¹⁵ being considered by the Texas Legislature?
¹⁶          MR. KEISTER:  Objection, calls for
¹⁷ speculation.
¹⁸     Q.  (By Ms. Westfall) You may answer.
¹⁹     A.  If the information is available, then it seems
²⁰ like yes, the public should have access to it,
²¹     Q.  Are you aware of -- from any quarter, whether
²² it's Mr. Shorter, Mr. Sepehri, elsewhere, that there was
²³ concern about releasing the data because it could
²⁴ threaten the passage of Senate Bill 14?
²⁵     A.  Was I aware of any concern?  No.

---

**111**

¹     Q.  Was there any concern about the releasing of
² this data threatening public support for Senate Bill 14?
³     A.  Not that I was aware of.
⁴     Q.  Was there any concern about providing this
⁵ information to bill opponents?
⁶     A.  No.
⁷     Q.  Was there any concern that this list of voters
⁸ without driver licenses could be compared against
⁹ Spanish surname registered voter lists?
¹⁰     A.  No.
¹¹     Q.  Was there any concern about this list sort of
¹² being the beginning of a process of figuring out the
¹³ impact on minority voters of Senate Bill 14?
¹⁴     A.  Not that I'm aware of.
¹⁵     Q.  Turning your attention back to Exhibit 199, on
¹⁶ Page 310, could you review -- could you review your
¹⁷ testimony before the Voter Fraud Committee hearing which
¹⁸ is on Page 310?
¹⁹     A.  Okay.
²⁰     Q.  Actually, strike that.  I have too many page
²¹ references, so I'm -- to your deposition versus your
²² testimony versus this and that.
²³          MS. WESTFALL:  Could we go off the record
²⁴ for one second?  Let me get myself together.
²⁵          (Recess from 11:02 a.m. to 11:03 a.m.)

ANN McGEEHAN                                                    6/18/2014

22 (Pages 112 to 118)

---

112

1          MS. WESTFALL:  Okay.  We're back on the
2     record.
3          Q.  (By Ms. Westfall) It is indeed.  If you could
4     review your testimony at the House hearing on Pages 310
5     into 311, and on 312, in fact, and let me know when
6     you've had a chance to take a look at it.
7          A.  Okay.  And you said 310 through --
8          Q.  314.
9          A.  314.  (Reviewing document.)  Okay.
10         Q.  Did you also testify at the House hearing about
11    affidavits that could be used where a voter does not
12    have ID, but the voter swears to his or her identity,
13    and is permitted to vote by regular ballot in lieu of
14    presenting photo ID?
15         A.  Yes.
16         Q.  Did you testify about the use of these type of
17    affidavits in Michigan and Florida?
18         A.  Yes.
19         Q.  Do you recall that in 2009, the Division did
20    some research into these affidavits?
21         A.  Yes.
22         Q.  Could you describe the research that was
23    conducted?
24         A.  I remember reaching out to some other states
25    to, you know, find out what their process was, and --

---

113

1     and it was along these lines on how voters without the
2     photo ID could vote.  And I think Michigan had an
3     affidavit process.  Florida had a provisional vote
4     process where you have a certain number of days to come
5     back in and show photo ID.  And I forget what Georgia
6     was.  There may have been a few other states.
7          Q.  Did you prepare a memo or a briefing paper to
8     present to the Legislature?
9          A.  I don't recall doing that.  I think it may have
10    just been shared with -- with one of the legislators.
11    Is that privileged?  I think I made some phone calls and
12    probably just discussed it with staff.
13         Q.  Did you contact the officials in Florida and
14    Michigan to learn more about their affidavit process?
15         A.  Yes.  And North Carolina.
16         Q.  Did you write up an e-mail or something
17    summarizing your findings?
18         A.  I may have.  I don't remember.
19         Q.  Did you provide that on the House side or the
20    Senate side?
21         A.  That was on the House side.
22         Q.  Did you provide that to Representative Todd
23    Smith?
24         A.  Yes.
25         Q.  Was he investigating whether -- was it your

---

114

1     understanding that he was considering drafting a bill
2     with an affidavit option in 2009?
3          A.  He was considering it, yes.
4          Q.  Are you aware of the provision in Senate Bill
5     14 that permits voters with a religious objection to
6     being photographed to sign an affidavit without further
7     documentation?
8          A.  Yes.  You know, vaguely familiar with it.
9          MS. WESTFALL:  Could you mark this?
10         (Exhibit 192 marked for identification.)
11         (Page 114, Line 11 through 118, Line 15
12    designated Highly Confidential and is bound under
13    separate cover.)
14
15
16
17
18
19
20
21
22
23
24
25

---

118

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15         Q.  (By Ms. Westfall) Does the Texas Election Code
16    provide for the use of affidavits or signatures as proof
17    elsewhere in the code?
18         A.  Under existing law?
19         Q.  Under existing law, yes.
20         A.  You know, I'm just a little bit rusty on it,
21    and some of the affidavits that existed previous, you
22    know, don't exist anymore.  So I think there probably
23    are, but I can't even name what they are right now.
24         Q.  If you vote by absentee ballot and you fill out
25    your ballot envelope, is that, in essence, an affidavit

---

ANN McGEEHAN                                                    6/18/2014

---

119

1  that you are who you say you are for purposes of
2  counting that ballot?
3       A.  I'm not aware of it being considered an
4  affidavit.  You know, the voter is attesting or is
5  saying it's correct, but I don't think they are
6  attesting.
7       Q.  So is the affidavit -- is the absentee ballot
8  process, to your mind, even less onerous than an
9  affidavit because it's not an attestation?
10      A.  Yeah.  It's not signed before anybody or...
11      Q.  Senate Bill 14 was signed into law in May 27,
12  2011; is that right?
13      A.  Let me make sure you are correct.  Yes.
14      Q.  Are you aware of the argument that Senate Bill
15  14 prevents all types of fraud, not just in-person voter
16  impersonation?
17           MR. KEISTER:  Objection, form.  Calls for
18  speculation, and there's been no testimony as to what
19  arguments that you're referring to.
20      Q.  (By Ms. Westfall)  You may answer.
21      A.  I don't think I'm familiar with that argument.
22      Q.  Had you heard any bill supporters at any
23  instance say Senate Bill 14 will deter all forms of
24  voter fraud?
25      A.  I don't recall that.

---

120

1       Q.  Have you ever heard -- strike that.
2           Did you ever hear the argument that Senate
3  Bill 14 was necessary to instill confidence in Texas
4  voters?
5       A.  Yes.
6       Q.  Are you aware of any facts indicating that
7  between 2005 and 2011, Texas voters, in fact, did lack
8  confidence in the system?
9       A.  Am I aware of any facts?
10      Q.  Yes.
11      A.  I'm not aware of any studies, but our office
12  would, you know, regularly get phone calls, e-mails,
13  letters from folks that had questions about the
14  integrity of the process and would advocate for more
15  safeguards.
16      Q.  Do you recall correspondence from constituents
17  related to concerns about in-person voter impersonation?
18      A.  I don't recall anyone calling it that,
19  in-person voter impersonation, but we, you know, would
20  get complaints from voters who wanted to see, you know,
21  more safeguards in the process, which would -- could
22  include photo ID.
23      Q.  Are you aware of any facts that would support
24  the need for voter ID as a means of instilling
25  confidence in Texas voters?

---

121

1       A.  I think, again, you know, based on
2  communications from the public with our office, yes, I
3  think that some voters would have a greater confidence
4  in the system with photo ID in place.
5       Q.  Do you think there was a factual basis for
6  those voters' belief?
7           MR. KEISTER:  Objection, form.  Calls for
8  speculation.
9       Q.  (By Ms. Westfall)  You may answer.
10      A.  Yeah.  I don't know what their -- you know,
11  what they -- what they base their beliefs on.
12      Q.  Are you aware of the argument that Senate Bill
13  14 would prevent ineligible voters on the roles from
14  participating in elections?
15      A.  Ineligible meaning people who shouldn't be
16  registered?
17      Q.  Yes.
18      A.  I'm not aware of arguments on that.
19      Q.  To your knowledge, were -- when you were at the
20  Division, ineligible voters participating in Texas
21  elections?
22      A.  We would get evidence sometimes of -- of cases
23  where that occurred.
24      Q.  Allegations?
25      A.  Or allegations is a better term, yes.

---

122

1       Q.  You did not -- your office didn't prosecute
2  those, any of those allegations, did it?
3       A.  We -- the process would be that we would make a
4  referral to the Attorney General's Office, and they
5  would investigate and then perhaps prosecute.
6       Q.  So sitting here today, you can't testify as to
7  whether ineligible voters were or were not, in fact,
8  participating in Texas elections; is that right?
9       A.  I cannot.  I don't have any specific facts in
10  mind.
11      Q.  Are you familiar with the opinion that was
12  issued in the Voter ID Section 5 case, Texas v.
13  Holder?
14      A.  The objection?
15      Q.  The opinion in the court case.
16      A.  The opinion the case?  Yes.
17      Q.  Did you read it?
18      A.  Vaguely.  I did -- I know I scanned it at one
19  point.
20      Q.  Do you know when it was issued?
21      A.  No.
22      Q.  Does August 2012 sound correct?
23      A.  Yes, but I don't have a -- I don't have a clear
24  memory of that.
25      Q.  And did that opinion deny judicial preclearance

---

ANN McGEEHAN                                          6/18/2014

123

1  of Senate Bill 14?
2        MR. KEISTER:  Objection, form.
3        Counsel, if you're going to question her
4  about the opinion, I suggest that it be produced to her.
5  I mean, she has clearly indicated she's --
6        MS. WESTFALL:  She's reviewed it.
7        MR. KEISTER:  Well, I know, but you're
8  asking -- I think you misstated the date, number one.
9        MS. WESTFALL:  I did not misstate the
10 date.  It was August 30th, 2012, when that judicial
11 preclearance ruling came out.
12       MR. KEISTER:  Oh, you're right.  I missed
13 it.  That would certainly be helpful, if you get a
14 question about legal opinion, to have it here.
15       MS. WESTFALL:  I don't have it.
16       MR. KEISTER:  I'm going to instruct her
17 not to speculate on anything about the opinion that you
18 don't clearly know.
19       MS. WESTFALL:  Sure.  Well, I'm not going
20 to get deeply into it.
21       MR. KEISTER:  Okay.
22       MS. WESTFALL:  I'm almost done.
23    Q.  (By Ms. Westfall) Were you -- a general
24 question:  Did Texas v. Holder deny judicial
25 preclearance of Senate Bill 14?

124

1     A.  Yes.
2     Q.  So the -- after August 2012, Senate Bill 14
3  could not be implemented as of that date?
4     A.  Yes.
5     Q.  And into the future until another event
6  occurred; is that correct?
7     A.  Right.
8     Q.  Okay.  Were you surprised by anything in the
9  opinion that you skimmed through?
10    A.  I really don't remember that opinion very well,
11 to be honest with you, so I can't remember if I was or
12 wasn't.
13    Q.  At any time since the passage of Senate Bill
14 14, have you come to conclude that Senate Bill 14 will
15 have discriminatory impact on African American or
16 Hispanic voters in the state of Texas?
17    A.  No.  I haven't seen any information to indicate
18 that.
19    Q.  At any time since the passage of Senate Bill
20 14, have you come to conclude that Senate Bill 14 was
21 enacted, at least in part, with a racially
22 discriminatory purpose?
23    A.  No.
24    Q.  Are -- just based on your experience in the
25 Division, are law enforcement officials present when one

125

1  registers to vote, typically?
2     A.  It depends where you register to vote.  If you
3  register at a DPS office, then there might be some
4  troopers around.
5     Q.  Is that otherwise generally not the case?
6     A.  Well, you know, more than half the voters
7  register at a motor vehicle license office, so... but if
8  you -- you know, you can register in your home, and
9  there wouldn't anybody present there from law
10 enforcement.
11    Q.  So but for DPS offices, is it fair to say that
12 law enforcement is generally not present when one is
13 registering to vote?
14    A.  Right, with the exception that, you know, over
15 50 percent of the people register at a motor vehicle
16 office.
17    Q.  Are law enforcement officials usually present
18 at polling officials on election day?
19    A.  Not usually.
20    Q.  Is it your view that it's a better practice to
21 avoid having law enforcement at polling official -- at
22 polling locations on election day?
23    A.  Yeah.  It's my opinion they should only be
24 there if there is some kind of disturbance of the peace
25 or something.

126

1     Q.  Is that because some voters may feel
2  intimidated by the presence of law enforcement?
3        MR. KEISTER:  Objection, calls for
4  speculation.
5        (By Ms. Westfall) You may answer.
6     A.  Well, there are -- you know, state law is
7  strict on who can be present at a polling place.  You
8  have to have an authorized purpose.  And law enforcement
9  wouldn't have any -- there's no general authority for
10 them to be there.  They have to have, you know,
11 specific -- an election judge would have to call them
12 in.
13    Q.  Is it your understanding that some voters may
14 be intimidated by law enforcement present or near the
15 polling location on election day?
16       MR. KEISTER:  Objection, calls for
17 speculation.
18    Q.  (By Ms. Westfall) You may answer.
19    A.  Yes.
20    Q.  And are minority voters in particular, some
21 minority voters may feel intimidated by the presence of
22 law enforcement while voting?
23       MR. KEISTER:  Objection, calls for
24 speculation.
25    Q.  (By Ms. Westfall) You may answer.

ANN McGEEHAN                                                    6/18/2014

25 (Pages 127 to 130)

---

**127**

1  A.  I don't -- I don't really have an answer on
2  that, other than, I think, all voters might feel
3  intimidated by that.
4  Q.  You never heard about any concerns about
5  minority voters in particular feeling concerned about
6  law enforcement's presence?
7  A.  I've heard people express that.
8  Q.  Did you, when you were at the Division, start
9  preparing a plan for implementing election
10  identification certificates?
11  A.  The -- we worked with DPS because DPS would be
12  actually issuing them.  So I don't -- we didn't initiate
13  that program.  DPS did.  But we worked with them.
14  Q.  Could you describe generally what you did in
15  preparation for administration of election
16  identification certificates, which I'll call EICs?
17  A.  Okay.  I left in November of 2011, so I didn't
18  have too much involvement.  I don't know what the
19  ultimate -- what the, you know, ultimate rules turned
20  out to be.  But we met with them to review what it would
21  look like, and I think we saw an initial draft of the
22  administrative rules that they intended to adopt that
23  would, you know, govern the process of issuing them.
24  Q.  Anything else?
25  A.  I think that was it.

---

**128**

1  Q.  Did you have any feedback from them on the
2  draft rules?
3  A.  Yes.  I think we had a meeting, and we
4  discussed the rules.
5  Q.  Do you recall the feedback that the Division
6  cited to DPS on the rules?
7  A.  I mean, as I recall -- and I don't -- I don't
8  know how they ended up, but in the initial draft, it was
9  going to pretty well follow the process of to get an
10  identification card.  So it required, you know, all the
11  standard identification process and may have required
12  fingerprints.  And I -- I think our -- we may have
13  encouraged them to maybe reexamine that and whether they
14  needed all of those to follow that exact process for the
15  EIC.
16  Q.  Why did you make that recommendation?
17  A.  You know, because it is not a process filed in
18  the elections arena, and so wouldn't think -- you know,
19  from -- from -- and I say our, that was probably just me
20  and Elizabeth, so I can't speak for the whole
21  Division -- and probably encountered preclearance issues
22  as well.
23  Q.  Why would it encounter preclearance issues?
24  A.  If the thought is that it's making it harder to
25  obtain the necessary identification.  So if it's harder

---

**129**

1  to obtain the EIC, then... you know, and again, it was
2  several years ago.  I think that -- I think the main
3  reason was just that it was unlike any existing process
4  in the election code.
5  Q.  And was your concern that people obtaining the
6  EICs would be predominantly minority, and so that might
7  trigger DOJ concerns?
8  A.  I don't know if that was a concern or not.
9  Q.  Was it your understanding that DPS was modeling
10  the EIC application process and the administrative rules
11  associated therewith, with obtaining both a personal ID
12  and a driver license?
13  A.  Yes, that was my recollection.
14  Q.  And the Texas -- Senate Bill 14 permitted DPS
15  to do that; is that correct?
16  A.  I don't remember the language, to be honest.  I
17  don't remember if it -- if it gave DPS direction on.  It
18  may have.  I just don't remember.
19  Q.  Aside from fingerprinting, did you have other
20  concerns with the rules?
21  A.  I don't know.
22  Q.  Did you have concerns that DPS was requiring
23  documents that would prove citizenship to obtain an EIC
24  in addition to proof of identity?
25  A.  I don't remember if that was a concern or not

---

**130**

1  or if we expressed it to DPS.  I don't remember.
2  Q.  Voter registration applicants need not prove --
3  provide documents to prove their citizenship on
4  registering to vote, correct?
5  A.  Right.
6  Q.  So that would be another difference between the
7  election code and DPS's rule if that was what they were
8  seeking; is that correct?
9  A.  That's true.
10  Q.  Would that cause you concern, sitting here
11  today, about a difference in how DPS is administering
12  EICs as opposed to the Texas Election Code?
13  MR. KEISTER:  Objection, vague and calls
14  for speculation.
15  Q.  (By Ms. Westfall) You may answer.
16  A.  Within the parameters of Senate Bill 14, you
17  know, it was an ID that DPS was issuing, and if they
18  were given direction that it needed to be issued sort of
19  consistent, then, you know, it may have been their take
20  that they had to do that.
21  MS. WESTFALL:  Let's go off the record for
22  one second.
23  (Brief discussion held off the record.)
24  MS. WESTFALL:  Could you mark this?
25  (Exhibit 193 marked for identification.)

---

ANN McGEEHAN                                                    6/18/2014

---

131

1    Q.  (By Ms. Westfall) You've been handed what's
2  been marked as Exhibit 193.
3    A.  Yes.
4    Q.  Do you recognize this document?
5    A.  This is the enacted Senate Bill 14.
6    Q.  Could I draw your attention to -- or could you
7  take a look at this to see where it sets forth the
8  information about the EIC and how it is to be
9  implemented by DPS?  I draw your attention to Page 13.
10   A.  Okay.
11   Q.  Do you -- drawing your attention to Page 14 of
12 Senate Bill 14 as signed into law, do you see, at
13 Subsection F, it indicates that the department can
14 require certain information under a different section of
15 the code, not the election code, I presume?
16   A.  Right.
17   Q.  Is it fair to say that Senate Bill 14 allows
18 the department, DPS, to seek information under a portion
19 of the Transportation Code and it does not specify the
20 information to be collected from EIC applicants?
21       MR. KEISTER:  Objection, vague and
22 confusing.
23   Q.  (By Ms. Westfall) Do you understand my
24 question, Ms. McGeehan?
25   A.  Could you restate the question?

---

132

1    Q.  Certainly.  Let me withdraw that question and
2  try again.
3        Does SB 14 direct DPS to collect certain
4  information from persons applying for an EIC, or does
5  that -- does SB 14 leave it to the DPS to make that
6  determination as to what to collect from EIC applicants?
7    A.  The language, as I read it in Subsection F on
8  Page 14, is that the department may require an applicant
9  to furnish information required by the this other
10 provision of the Transportation Code.  So it appears to
11 give DPS the discretion to determine what needs to be --
12 needs to be furnished.
13   Q.  So the Legislature, in crafting SB 14, did not
14 specify the particular things to be gathered from the
15 EIC applicants, did it?
16   A.  That's how I read this.  I don't know if other
17 legal minds have analyzed it, but that's -- that's how
18 I'm reading it today.
19   Q.  And DPS, in turn, was drafting administrative
20 rules related to EICs when you were still employed with
21 the Division; is that correct?
22   A.  That's right.
23   Q.  And DPS had plans, at one point, to collect
24 fingerprints from EIC applicants; is that correct?
25   A.  That's what I remember.

---

133

1    Q.  It's your testimony that you and Ms. Winn
2  discouraged the collecting of fingerprints from EIC
3  applicants; is that correct?
4    A.  Yes.  I believe that's what we communicated at
5  a meeting on that.
6    Q.  Is it -- and you did that because it was
7  inconsistent with the election code; is that right?
8    A.  Yes.
9    Q.  We were just talking about DPS's collection of
10 documentary proof of citizenship from EIC applicants,
11 right?
12   A.  Yes.
13   Q.  Is it your understanding, based on your review
14 of SB 14, that DPS made that determination to collect
15 that type of information from EIC applicants?
16   A.  Yes.  It was -- it was their program, so they
17 -- they -- at least -- and I don't know what the rules
18 today say, but...
19   Q.  Did you address that issue at all in your
20 meetings with DPS?
21   A.  I don't -- we may have discussed it.  I really
22 don't remember.
23   Q.  Did you have plans to evaluate the
24 effectiveness of the EIC program?
25   A.  Not, at least not at the point when I left the

---

134

1  Secretary of State's Office.
2    Q.  What did you foresee as the role of the
3  Secretary of State's Office with regard to EIC
4  administration?
5    A.  I think it was more the voter education role
6  to, you know, educate the voters that it was available
7  and how to -- how to obtain one.
8    Q.  Did you see that you would have any role with
9  regard to county election officials educating voters
10 about the availability of the EICs or no?
11   A.  Well, I mean, we -- we regularly trained the
12 county election officials, so, you know, that guidance
13 would have included information on the EIC as well.
14   Q.  I'm going to represent to you that in this
15 litigation, a copy of the TEAM database that has been
16 produced to the plaintiffs in the case that as of
17 January 15, 2014, 18 voters had obtained a disability
18 exemption under Senate Bill 14, and I want to ask if you
19 have a reaction to that number.
20       MR. KEISTER:  Objection, vague, and it
21 calls for speculation, I guess.
22   Q.  (By Ms. Westfall) You may answer.
23   A.  It's a small number.
24   Q.  If you were at the Division today, are there
25 any steps you would take in response to that number?

---

ANN McGEEHAN                                                          6/18/2014

135

1    MR. KEISTER:  Objection, form.  It calls
2    for speculation.
3    Q.  (By Ms. Westfall) You may answer.
4    A.  Any -- any statewide voter education effort
5    that we would conduct would always have a component for
6    voters with disabilities.  So, you know, I -- that would
7    be something that we would definitely try to reach out
8    and work with the disability community to make sure they
9    were aware of it, and maybe they don't need it and maybe
10   they have voter ID, so maybe they don't want to go
11   through this process.  I don't know -- you know, not
12   being there, I don't know if we had discussions with
13   disability groups and whether this is something they
14   are -- you know, think that voters with disabilities
15   need or -- you know, I just -- I don't have a sense of
16   the need for it.
17   Q.  I will also represent to you that in this
18   litigation, defendants have produced information
19   indicating that as of February 3rd, 2014, 166 EICs were
20   issued.  What is your interpretation of that number?
21       MR. KEISTER:  Objection, form.  It calls
22   for speculation.
23   Q.  (By Ms. Westfall) You may answer.
24   A.  I don't know that I've really formed an opinion
25   yet on what that means.

137

1    A.  Statewide elections, there have been -- there
2    was a constitutional amendment election in November of
3    2013, and then there were the primary elections, the
4    general primary, and the runoff primary.
5    Q.  I will also represent to you that in this
6    litigation, the State has indicated that as of February
7    3rd, 2014, 16 applications for EICs were rejected.  Do
8    you have an interpretation of that number?
9        MR. KEISTER:  Objection, form.  It calls
10   for speculation.
11   A.  I really --
12       MR. KEISTER:  And calls for an opinion.
13   A.  I really have no information about that.  I
14   don't have an opinion.
15       MS. WESTFALL:  I'm going to go off the
16   record for one moment.
17       (Recess from 11:42 a.m. to 11:49 a.m.)
18       MS. WESTFALL:  Okay.  We're back on the
19   record.  I'm going to turn you up a bit and put you
20   close to Ms. McGeehan.
21       MS. EISENBERG:  Great.
22       EXAMINATION
23   BY MS. EISENBERG:
24   Q.  Good afternoon, Ms. McGeehan.
25   A.  Good afternoon.

136

1    Q.  If you were at the Division, are there any
2    steps you would take in response to learning about that
3    number?
4        MR. KEISTER:  Objection, form.  It calls
5    for speculation.
6    Q.  (By Ms. Westfall) You may answer.
7    A.  You know, I don't know.  It's so early in the
8    process, I'm not sure.  I don't know if I -- you know,
9    if I was still there, if I would have done anything at
10   that point or not, you know, or... So I don't really
11   have an opinion.
12   Q.  Do you know how -- when SB 14 started to be
13   implemented in the state of Texas?
14   A.  I, you know, based on press reports, I believe
15   it was after the Shelby v. Holder decision.
16   Q.  And was that June 25th, 2013?
17   A.  I know it was the end of the June -- end of
18   June.  I don't remember the date exactly.
19   Q.  Okay.
20   A.  But that sounds correct.
21   Q.  Had there been elections in Texas since that
22   time?
23   A.  Yes.
24   Q.  Which major elections have there been since
25   that time?

138

1    Q.  I'm Lynn Eisenberg.  I represent the Texas
2    League of Young Voters Education Fund and Imani Clark,
3    who is an individual plaintiff in this case.
4        If it's okay with you, we'll just continue
5    under the same ground rules and the definitions that
6    Ms. Westfall discussed with you this morning.  Is that
7    okay?
8    A.  Yes.
9    Q.  Okay.  Great.  I just have a few questions.  It
10   shouldn't take too long.
11       Have you conducted any research or looked
12   into the voter identification laws in other states?
13   A.  As I discussed earlier with Ms. Westfall, in
14   2009, I did some research regarding voter identification
15   in other states and --
16   Q.  And that be -- sorry.  That would be the
17   affidavits in Michigan and Florida, correct?
18   A.  Yes.
19   Q.  Okay.  Are you familiar with the voter
20   identification law in Indiana?
21   A.  Not specifically.
22   Q.  Okay.  Are you familiar with the voter
23   identification law in Georgia?
24   A.  Again, I know they have one.  I don't know the
25   specifics.

ANN McGEEHAN                                                  6/18/2014

---

139

1    Q.  Okay.  Based on the understanding that you do
2    have, is it your understanding that Texas's voter
3    identification law is comparable to the law in any of
4    those four states?
5            MR. KEISTER:  Objection, form, vague.
6    Q.  (BY MS. EISENBERG) All right.  You may answer
7    if you're able.
8    **A.  I really don't have a strong enough**
9    **understanding of the other states' laws to have an**
10   **opinion.**
11   Q.  Okay.  Is it your understanding that Texas's
12   voter ID law is more burdensome than the law in many
13   other states?
14   **A.  Well, yeah.  The fact that it requires a photo**
15   **ID, that is more strict than some other states that just**
16   **require any form of voter identification.**
17   Q.  And as you -- and as you discussed and as you
18   testified earlier, it also -- the final version of the
19   law did not include the general affidavit provision,
20   correct?
21   **A.  Correct.**
22   Q.  Besides the disability?  Okay.
23           Are you aware of any special
24   circumstances --
25   **A.  Well, actually, let me correct that.**

---

140

1    Q.  Sure.
2    **A.  I mean, as I recall, if you -- if a person**
3    **doesn't have photo ID, they can vote provisionally and**
4    **then come back within a certain amount of time and show**
5    **that identification.**
6    Q.  Correct.  But they can't then sort of convert
7    their provisional ballot into -- their provisional
8    ballot won't be continued through the use of an
9    affidavit, correct?
10           MR. KEISTER:  Objection, form, vague.
11   Q.  (BY MS. EISENBERG) You may answer.
12   **A.  My understanding is the provisional ballot will**
13   **count if they sign the affidavit and they produce a**
14   **proper form of ID.**
15   Q.  Okay.  Are you aware of any special
16   circumstances or facts that would require Texas to have
17   a voter ID law -- have a strict photo ID law when other
18   statements may not have that requirement?
19           MR. KEISTER:  Objection, form, vague.
20   **A.  I don't really understand the question.**
21   Q.  (BY MS. EISENBERG) Okay.  Are you aware of any
22   facts where -- special facts in Texas that would require
23   it to have a more strict voter identification law than
24   other states?
25           MR. KEISTER:  Objection, form, vague, and

---

141

1    that it states information that's not in evidence in
2    this case, with respect to whether or not Texas is
3    stricter than other states.  But with that, if you can
4    answer.
5    **A.  I guess the answer is no, I don't have any**
6    **specific factual information on this.**
7    Q.  (BY MS. EISENBERG) Okay.  Does in-person voter
8    fraud represent a high percentage of the voting crimes
9    that came to your attention while you were at the
10   Secretary of State's Office?
11   **A.  I don't have those numbers, you know, before**
12   **me.  I think -- but we have provided that, you know,**
13   **consistently to the Legislature, so they're out there,**
14   **what the specific number of voter impersonation cases**
15   **were.**
16   Q.  But generally, given your professional
17   experience, would you say that in-person voter fraud
18   represented a high -- represents a high percentage of
19   the cases that came to your attention without getting
20   into specific numbers?
21   **A.  You know, I really don't feel like -- feel**
22   **comfortable making a general comment on that without**
23   **having access to those numbers.**
24   Q.  I believe you testified, during the Section 5
25   legislation, that there were two instances of in -- two

---

142

1    allegations of in-person voter fraud?  Does that sound
2    -- does that -- do you recall that?
3    **A.  In which session?**
4    Q.  During -- this was -- during your testimony
5    during the Section 5 deposition, the Texas v. Holder?
6    **A.  Well, I mean that's the problem.  We reported**
7    **several times, so I think maybe the first time we had --**
8    **or it was more than two by the time I left.  So that's**
9    **why I don't feel comfortable answering this question,**
10   **because I don't recall the data, the underlying data.**
11   Q.  Okay.  Are you aware of any instances of voter
12   -- of allegations of voter fraud in Texas using student
13   IDs to commit fraud?
14   **A.  I'm not aware of any.**
15   Q.  All right.  Based on your experience
16   administering elections, do you believe that a student
17   ID would not provide enough security to be used as a
18   form of identification?
19           MR. KEISTER:  Objection, form.  It calls
20   for speculation.
21   Q.  (BY MS. EISENBERG) You may answer.
22   **A.  I don't really have an opinion on that.  At the**
23   **Secretary of State's Office, we implemented state law,**
24   **and that was not one of the forms of ID that the**
25   **Legislature passed, so I don't really have any context**

---

ANN McGEEHAN                                                                6/18/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 19)

---

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    CORPUS CHRISTI DIVISION
3  MARC VEASEY, et al.,              )
                                     )
4           Plaintiff,               )
                                     )
5  VS.                               )  CIVIL ACTION NUMBER:
                                     )  2:13-CV-193 (NGR)
6  RICK PERRY, et al.,               )
                                     )
7           Defendants.              )
                                     )
8  _____
   UNITED STATES OF AMERICA,         )
9                                    )
            Plaintiff,               )
10                                   )
   VS.                               )  CIVIL ACTION NUMBER:
11                                   )  2:13-CV-263 (NGR)
   TEXAS LEAGUE OF YOUNG VOTERS      )
12 EDUCATION FUND, et al.,           )
                                     )
13    Plaintiff-Intervenors,         )
                                     )
14 TEXAS ASSOCIATION OF HISPANIC     )
   COUNTY JUDGES AND COUNTY          )
15 COMMISSIONERS, et al.,            )
                                     )
16    Plaintiff-Intervenors,         )
                                     )
17 VS.                               )
                                     )
18 STATE OF TEXAS, et al.,           )
                                     )
19           Defendants.             )
                                     )
   _____
20                                   )
   TEXAS STATE CONFERENCE OF         )
21 NAACP BRANCHES, et al.,           )
                                     )
22           Plaintiffs,             )
                                     )
23 VS.                               )  CIVIL ACTION NUMBER:
                                     )  2:13-CV-291(NGR)
24 NANDITA BERRY, et al.,            )
                                     )
25           Defendants.             )
```

---

**Page 2**

```
1  BELINDA ORTIZ, et al.,     )
                              )
2         Plaintiffs,         )
                              )
3  VS.                        )  CIVIL ACTION NUMBER:
                              )  2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,    )
                              )
5         Defendants.         )
   _____
6
7
   ************************************************
8
         HIGHLY CONFIDENTIAL PORTION
9
              OF DEPOSITION OF
10
              ANN McGEEHAN
11
              JUNE 18, 2014
12
13 ************************************************
14    ORAL DEPOSITION OF ANN McGEEHAN, produced as a
15 witness at the instance of the Plaintiff, was duly
16 sworn, was taken in the above-styled and numbered cause
17 on the JUNE 18, 2014 from 8:16 a.m. to 12:17 p.m.,
18 before Chris Carpenter, CSR, in and for the State of
19 Texas, reported by machine shorthand, at the Office of
20 the Attorney General, 209 West 14th Street, Austin, TX
21 78701, pursuant to the Federal Rules of Civil Procedure
22 and the provisions stated on the record or attached
23 hereto.
24
25
```

---

**Page 3**

```
1                 A P P E A R A N C E S
2  FOR THE UNITED STATES OF AMERICA:
3       Elizabeth Westfall
        U.S. JUSTICE DEPARTMENT
4       CIVIL RIGHTS DIVISION
        Room 7254 NWB
5       950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
6       (202) 514-0828
        elizabeth.westfall@usdoj.gov
7
       FOR THE NAMED DEFENDANTS RICK PERRY, ET AL., AND THE
8  WITNESS:
9       Ronald Keister
        ATTORNEY GENERAL OF TEXAS
10      TORT LITIGATION DIVISION
        300 W. 15th Street
11      Austin, TX 78701
        (512) 463-2197
12      ronny.keister@oag.state.tx.us
13 FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND AND
   IMANI CLARK:
14
        Lynn Eisenberg (by telephone)
15      WILMER HALE
        1875 Pennsylvania Avenue, NW
16      Washington, DC 20006
        (202) 663-6262
17      lynn.eisenberg@wilmerhale.com
18
19
20
21
22
23
24
25
```

---

**Page 19**

```
1
2
3
4
5
6       (Page 19, Line 7 through Page 27, Line 5)
7       MS. WESTFALL:  Before we take a look at
8  this exhibit, this exhibit has been marked highly
9  confidential -- has been produced in this litigation as
10 highly confidential and I would like to designate this
11 portion of the transcript as highly confidential under
12 Paragraph 2.1 of the Consent Protective Order, ECF
13 Number 105.
14      MR. KEISTER:  Just for clarification,
15 Elizabeth, was this a document that was produced
16 pursuant to the Court's order on the motion to quash
17 legislative privilege?
18      MS. WESTFALL:  It was.
19      MR. KEISTER:  Okay.  I just -- I guess I
20 need to assert an objection.  Maybe.  I'm not too sure.
21 But I'll object anyway.
22      MS. WESTFALL:  I won't give you any legal
23 advice in that regard, Mr. Keister.
24      MR. KEISTER:  Well, okay.  I'll object to
25 any discussion of this with respect to -- since it is
```

---

ANN McGEEHAN                                                    6/18/2014
CONFIDENTIAL TRANSCRIPT

4 (Pages 45 to 48)

---

**45**

(Page 45 Line 5 through Page 52 Line 1)

MS. WESTFALL:  We're going to mark this portion of the transcript as highly confidential.

Q.  (By Ms. Westfall) You've been handed what's been marked Exhibit 184.  It is TX00019424 through TX0019430.  Do you recognize this document?

MR. KEISTER:  And just let me interject the objection that this is a legislatively privileged document and we object to its use in the deposition and to any discussion related to it, but with respect to the previous understanding and the court's order, the witness may answer.

MS. WESTFALL:  Thank you.

Q.  (By Ms. Westfall) Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  The first -- excuse me -- the first page is an e-mail from me to Matt Creel -- and I think he worked for Representative Van Taylor -- and I copied John Sepehri and I am sending him a memo that had been prepared previously about how the voter registration

---

**46**

rolls are kept clean.

Q.  Do you know why Mr. Creel had requested this information?

A.  They were -- I believe they were considering some kind of election legislation, I don't remember exactly what it was.

Q.  Do you see the date of the document?

A.  Of the memo or the e-mail?

Q.  Of the e-mail.

A.  The e-mail, yes.

Q.  It was right before session started in 2011; is that right?

A.  Right, right.

Q.  January 5th.  Does this request for information about -- well, tell me what the memo was about.

A.  The memo is about how the -- how the State maintains the voter registration files and, you know, how the State protects the integrity of the file.  Not just what the Secretary of States do, but the whole process, what the Counties do as well.

Q.  Was this memo dated 2008?

A.  Yes.

Q.  Was the information in the memo up to date as of the day you sent the e-mail to Mr. Creel in 2011?

A.  I don't know.  To be honest, I don't know.  It

---

**47**

looks like I just sent him an earlier memo.  I don't know if we went in and made any changes.

Q.  Did Representative Van Taylor play a significant role in Senate Bill 14?

A.  I don't think so.

Q.  Was he a supporter of Senate Bill 14?

A.  I don't know for sure.

Q.  Did this request from Mr. Creel have anything to do with Senate Bill 14?

A.  I don't think so.

MS. WESTFALL:  Would you mark this.

(Exhibit 185 marked for identification.)

Q.  (By Ms. Westfall) You've been handed what's been marked as Exhibit 185.

This is a highly confidential document.  It's Bates Number TX00204754.

I understand your objection.

MR. KEISTER:  Right.  I'm just renewing the objections to legislative privilege.

Q.  (By Ms. Westfall) Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's an e-mail from me to Jennifer Fagan responding to her question concerning whether the

---

**48**

Secretary of State maintains or do the local election maintain ethnicity information on voters.

Q.  I believe you testified that Ms. Fagan worked at that time for Senator Duncan on the State Affairs Committee?

A.  Right.

Q.  Senator Duncan shared the State of Affairs Committee?

A.  Yes.

Q.  Was he responsible for managing Senate Bill 14 when it was considered by the Senate in the Committee of the Whole?

A.  Yes, I think he was.

Q.  Ms. Fagan asked whether the Secretary of State or County Election officials collected information on the ethnicity of voters, correct?

A.  Yes.

Q.  And you advised Ms. Fagan about the availability of a list of Hispanic surname voters, correct?

A.  Right.

Q.  Do you see the date of the e-mail that you sent in response to Ms. Fagan's request?

A.  Yes.

Q.  What was that date?

---

Case 2:13-cv-00193   Document 715-6   Filed on 11/14/14 in TXSD   Page 93 of 97

ANN McGEEHAN                                              6/18/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 49 to 52)

49
1    A.  January 24, 2011.
2    Q.  And you see you sent the e-mail at 7:41 p.m.?
3    A.  Yes.
4    Q.  Was that the day before the Senate considered
5  Senate Bill 14 in the Committee of the Whole?
6    A.  I don't remember.  It could have been.
7    Q.  Could you refer back to exhibit -- the exhibit
8  with the bill history of Senate Bill 14?
9    A.  I think that was -- that was the 2009.
10   Q.  Let me give you another exhibit.
11        MS. WESTFALL:  Would you mark this.
12        (Exhibit 186 marked for identification.)
13   Q.  (By Ms. Westfall) You've been handed what's
14  been marked as 186.  This is not a highly confidential
15  document.  That is a publicly available document.
16        Does this refresh your recollection as to
17  what -- when you sent the e-mail to Ms. Fagan relative
18  to Senate consideration of Senate Bill 14?
19   A.  Yes.  It was heard in the Senate on January
20  25th.
21   Q.  So you --
22   A.  It would have been the day before.
23   Q.  Do you know why Ms. Fagan was requesting this
24  information?
25   A.  Not particularly, no.

50
1    Q.  Did you -- were you under the impression that
2  she needed this information for the hearing on Senate
3  Bill 14 the following day?
4    A.  I don't remember today, you know, if that was
5  the case.
6    Q.  Is that -- do you see that you indicated you
7  could provide the number of Hispanic surname voters in
8  the morning in your e-mail?
9    A.  Okay.  Yes.
10   Q.  Does that indicate that you probably thought
11  she needed it for the hearing on Senate Bill 14?
12   A.  Could be.  Yes.
13   Q.  Did you understand this to mean that Ms. Fagan
14  anticipated that there might be questions related to the
15  impact of Senate Bill 14 on minority voters --
16        MR. KEISTER:  Objection.
17   Q.  (By Ms. Westfall) -- strike that.
18        On Hispanic voters?
19        MR. KEISTER:  Objection, calls for
20  speculation.
21   Q.  (By Ms. Westfall) You may answer.
22   A.  It could be that was her motivation.
23   Q.  Did you also understand that Ms. Fagan might be
24  trying to prepare her boss, Senator Duncan, to answer
25  questions along those lines?

51
1        MR. KEISTER:  Objection, calls for
2  speculation.
3    Q.  (By Ms. Westfall) You may answer.
4    A.  Yes, that could have been her intent.  I don't
5  know.
6    Q.  Staff usually gather information to help serve
7  -- service the needs of their bosses; isn't that case?
8        MR. KEISTER:  Objection, calls for
9  speculation.
10   Q.  (By Ms. Westfall) You may answer.
11   A.  Yes.
12   Q.  Did you have any phone call or calls with
13  Ms. Fagan related to this request?
14   A.  I don't remember.  I may have.
15   Q.  Did Ms. Fagan respond to your e-mail of
16  7:41 p.m.?
17   A.  I don't remember a response.
18   Q.  Did you provide a list of Hispanic surname
19  voters to Ms. Fagan?
20   A.  I don't recall doing that.
21   Q.  Did you provide a list of Spanish surname
22  voters to any other bill supporters of Senate Bill 14?
23   A.  I don't think so.  Not...
24        MS. WESTFALL:  I'm going to terminate the
25  designation of highly confidential of the transcript for

52
1  the time being.
2        (Return to non-confidential portion on
3  Page 52 Line 2.)
4
5 ...

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

ANN McGEEHAN                                              6/18/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 87 to 90)

87

3      (Page 87, Line 4 through Page 102, Lin3 3)
4         MS. WESTFALL:  I'm going to designate this as
5  confidential.
6         Q.  (By Ms. Westfall) You have been handed what's
7  been marked as Exhibit 189.  This is a highly
8  confidential document.  It is TX00007187 through
9  TX00007196.
10        MR. KEISTER:  And was this produced
11 pursuant to the court's order on legislative privilege?
12        MS. WESTFALL:  It was.
13        MR. KEISTER:  Okay.  Then I'll just renew
14 the objection that this is as legislatively-privileged
15 document, and I object to any testimony pursuant to this
16 document.  But pursuant to the court's order and our
17 previous understanding, then we'll allow the witness to
18 testify concerning it pursuant to the objections.
19        Q.  (By Ms. Westfall) Right before the break, we
20 were -- I had directed you back to the bill history of
21 Senate Bill 14.
22        A.  Yes.
23        Q.  Does the bill history indicate that the House
24 received Senate Bill 14 on January 27th, and it was read
25 for the first time in the House on February 11th, 2011?

88

1         A.  Yes.
2         Q.  Was Representative Patricia Harless the House
3  sponsor --
4         A.  Yes.
5         Q.  -- of Senate Bill 14?
6         A.  Yes, she was.
7         Q.  Mr. Beuck, Colby Beuck was her chief of staff
8  at the time; is that correct?
9         A.  I think so.
10        Q.  Turning your attention to Exhibit 189, do you
11 recognize this document?
12        A.  Yes.
13        Q.  What is it?
14        A.  It is an e-mail from me to Representative
15 Harless and Colby, and I don't know how to pronounce his
16 last name, with Representative Harless's office, and I
17 copied John Sephri.
18        Q.  What was the purpose of the e-mail?
19        A.  It looks like I am sending her information
20 concerning the availability of federal HAVA funds to
21 conduct a statewide education -- voter education program
22 on voter ID.  And then there is also some information
23 about the number of complaints regarding voter fraud and
24 information about the number of registered voters that
25 do not have a driver's license or a personal

89

1  identification card.
2         Q.  Did this e-mail arise after you met with
3  Representative Harless and Mr. Beuck or have a phone
4  call with them?
5         A.  Yes.
6         Q.  Did you have a meeting with them in person?
7         A.  Yes, we did.
8         Q.  When was that the meeting?
9         A.  You know, I don't remember exactly, but it was
10 probably after the bill passed the Senate and before it
11 was heard in the House.
12        Q.  What was the meeting regarding?
13        A.  I think it was probably to, you know, help
14 prepare Representative Harless for the debate on SB 14.
15        Q.  Who had requested the meeting?
16        A.  I don't know.  I don't know for sure.
17        Q.  Who requested the meeting you had with Senator
18 Fraser to prepare him?
19        A.  I don't know.  They were -- I think both of
20 these meetings were communicated to probably John
21 Sepehri.
22        Q.  Did you -- who was at that meeting besides you,
23 Representative Harless, Colby Beuck, and John Sopehri?
24        A.  I think that was it.  I don't remember exactly.
25 I think that was it.

90

1         Q.  Was Speaker Straus at the meeting?
2         A.  No.
3         Q.  Was Todd Smith at the meeting?
4         A.  No.
5         Q.  Besides preparing Representative Harless for
6  the hearing, was anything else discussed?
7         A.  No.
8         Q.  Was there a discussion about questions from
9  bill opponents that might arise?
10        A.  You know, I just -- I don't have a real clear
11 memory of this meeting.  I just remember generally it
12 was, you know, to prepare the representative for the
13 debates in the House.
14        Q.  Do you recall whether there was any discussion
15 of how to respond to questions about which voters did
16 not have forms of necessary photo ID?
17        A.  Well, it looks like -- and I don't see it
18 attached here, but it looks like we did -- that I was
19 sending her some information about the number of
20 registered voters that do not have a driver's license or
21 a personal identification card.  So, you know, that was
22 probably to help her answer those kinds of questions.
23        Q.  Was there an expectation that bill opponents
24 would ask about the number of voters who did not have
25 driver license?

ANN McGEEHAN                                                    6/18/2014
CONFIDENTIAL TRANSCRIPT

                                                    7 (Pages 91 to 94)

91

1    A.  You know --
2    Q.  And so that's why you were preparing --
3    A.  I was just, you know --
4    Q.  -- her?
5    A.  -- responding to her questions, so I can't
6  really speculate as to what her thoughts were.
7    Q.  Was there any discussion about how to respond
8  to concerns about the impact of Senate Bill 14 on
9  minority voters?
10    A.  I don't remember any discussions on that.
11    Q.  Do you see, towards the end of your e-mail, you
12  indicate that with regard to the number of voters who
13  had not been issued a driver license or a personal ID
14  card by DPS, you were still working with the IT
15  department to analyze the data?
16    A.  Yes, I see that.
17    Q.  Why did you write that?
18    A.  Well, I don't -- I guess, you know, I don't
19  know.  I guess we were still -- you know, I say we hope
20  to have the analysis by Monday.  So I guess in my mind,
21  it was still sort of an ongoing project.
22    Q.  The e-mail that you wrote at Exhibit 189 was
23  dated what?
24    A.  February 25th.
25    Q.  And when -- turning your attention back to

92

1  Exhibit 188, your e-mail, at the top of that exhibit, is
2  dated what?
3    A.  February 1st.
4    Q.  So roughly three weeks had elapsed between
5  Exhibit 188 and 189; is that right?
6    A.  Yes.
7    Q.  What had happened with the analysis during
8  those three weeks?
9    A.  Well, I don't know what date I gave the
10  analysis to Coby and John.  So, you know, at some point
11  after February 1st, I gave him the analysis, met with
12  them, and so it was still -- it was still in their hands
13  as of February 25th.
14    Q.  Is there a reason that you did not provide
15  Representative Harless and Colby Beuck with any
16  information about the fact that you, in fact, had run
17  some matches in your e-mail at Exhibit 189?
18    A.  I don't think in my -- at that point, I
19  probably didn't feel confident that -- I didn't have
20  enough confidence in those numbers that they would be
21  released to be, you know, saying what had happened yet.
22  In my mind, it was still sort of a work in progress.
23    Q.  Did you feel like you didn't have authority to
24  advise Representative Harless that the queries had been
25  run by your supervisor?

93

1    A.  I don't know that I didn't have the authority.
2  I think it was more that I didn't feel like it was a
3  finished product to be discussed.
4    Q.  And why did you feel that way, given that you,
5  on February 1st, had written to your colleagues saying
6  you were going to run that by your -- by your
7  supervisors, and then it would be ready to sent out?
8    A.  Well, you know, executive management had
9  expressed some concerns with the queries, so I didn't
10  know if we would get additional direction to do it
11  differently or if they might bring in other people to
12  help us, or, you know, what was going to happen with
13  that.
14    Q.  Did they tell you specifically not to, or was
15  it understood that you were not to share the existence
16  of the queries with members of the Legislature?
17    A.  I think it was understood that it was a work in
18  progress and that it shouldn't be released until they
19  felt confident that it was finished.
20    Q.  What were you were still analyzing on February
21  25th, 2011?
22    A.  Well, I wasn't analyzing it, but was in the
23  hands of the executive team.
24    Q.  Do you see that you indicate to Representative
25  Harless that your IT department was still analyzing the

94

1  data?
2    A.  I did say that.
3    Q.  Was that accurate?
4    A.  I don't know that -- I don't know that our IT
5  department at that point was doing anything else with
6  it, but in my mind, it was still an ongoing project, and
7  it was possible that we could get direction to refine
8  those queries or change up those queries, which would
9  have involved the IT staff to do that.
10    Q.  But in other words, the IT department was not,
11  at the moment that you wrote this e-mail, in fact,
12  analyzing the data; is that correct?
13    A.  I guess it would have been more accurate to say
14  we were still, you know, analyzing the data.  And the IT
15  department may have been needed, but at that precise
16  time, they weren't doing anything else.  But they may
17  have been needed to finish it up.
18    Q.  During the -- strike that.
19        Going back to Exhibit 188, is there any
20  reason that you would not have brought this analysis to
21  the attention of Coby Shorter and John Sepehri fairly
22  shortly after you wrote this e-mail on February 1st?
23    A.  No.
24    Q.  You would have held on to this data and not
25  released it to your supervisor pretty promptly?

ANN McGEEHAN
CONFIDENTIAL TRANSCRIPT

6/18/2014

8 (Pages 95 to 98)

95

1    A. No. Most likely, as soon as -- yes, I would
2 have tried to give it to them quickly.
3    Q. So is it fair to say that it was --
4 probably had been in the hands of Coby Shorter and John
5 Sepehri for roughly three weeks between February 1st and
6 February 25th?
7    A. Well, I honestly can't say. Sometimes it could
8 be hard to get a meeting with Coby, so, you know, I
9 don't know exactly.
10    Q. And so comparing again Exhibit 188 and 189, in
11 the periods between when you wrote the e-mails on
12 February 1st and February 25th, why did your position
13 change between indicating to your colleagues that you
14 were prepared to give it to your supervisors so they
15 could distribute it to legislative folk and advising the
16 House sponsor that it was still under analysis with your
17 IT department?
18    A. Well, you know, I hadn't gotten a green light
19 on -- with the initial analysis, and there were, you
20 know, some reservations expressed regarding the data, so
21 I didn't -- you know, like I said, this was -- this was
22 the analysis that we performed in-house. I didn't know
23 if executive management might bring additional resources
24 to bear to maybe improve upon that analysis.
25    Q. When you met with Mr. Shorter and Mr. Sepehri,

96

1 did they express any concerns to you about any political
2 ramifications of revealing these numbers to the
3 Legislature while it was considering SB 14?
4    A. No.
5    Q. They weren't concerned about the numbers of
6 voters who were indicated not to have a driver license?
7    A. They didn't express any of that to me.
8    Q. Did they express any concern about releasing
9 these numbers to the public during consideration of
10 SB 14?
11    A. The concerns that were represented to me was
12 regarding the, you know, integrity of those numbers and
13 whether those were accurate numbers for voters without
14 ID.
15    Q. Turning back to Exhibit 189, again, back to
16 that paragraph concerning the analysis of the data, you
17 indicate that you hoped to have the analysis by Monday.
18 Do you see that?
19    A. Yes.
20    Q. And what was that based on?
21    A. My -- you know, generally, I would try to be
22 very responsive to legislators, so I was probably
23 feeling like we should -- you know, that -- that we
24 would have this available, but it wasn't my decision,
25 so...

97

1    Q. Was this indication that you hoped to have an
2 analysis by Monday based on any conversations you had
3 had with Mr. Shorter or Mr. Sepehri to give you reason
4 for such optimism?
5    A. You know, I really don't remember. There may
6 have been. I just -- I don't remember.
7    Q. Turning your attention back to the Leg history
8 of Senate Bill 14, when was Senate Bill 14 due to be
9 considered on the House floor?
10    A. It was heard on March 1st, I think. It looks
11 like March 1st.
12    Q. So did you feel any urgency in providing this
13 analysis to Representative Harless in advance of the
14 House debate on Senate Bill 14 on March 1st?
15    A. I may have. I don't remember.
16    Q. Did you provide any analysis to Representative
17 Harless's office, as you indicated you would in this
18 e-mail?
19    A. I -- in the e-mail, it says that I'm attaching
20 a -- let me see what it says. Oh, okay. Well, I guess
21 we didn't send her anything. I was thinking maybe we
22 sent her, you know, our standard analysis of the voter
23 registration database, but it looks like, at least in
24 this e-mail exchange, I didn't -- we didn't send her
25 that. And instead, I'm referring to this other

98

1 analysis, which I don't think we have shared with her.
2        MS. WESTFALL: Court Reporter, I hope I
3 have designated all of -- all of the testimony about
4 this Exhibit 189 should be highly confidential.
5        I'm going to hand you another highly
6 confidential document to mark.
7        (Exhibit 190 marked for identification.)
8    Q. (By Ms. Westfall) You've been handed what's
9 been marked as Exhibit 190. It is highly confidential
10 and has been pursuant -- had has been ordered to be
11 produced in this litigation.
12        MS. WESTFALL: And I will continue the
13 designation of highly confidential for the questioning
14 of the witness.
15        MR. KEISTER: And I'll renew my objections
16 based on legislative privilege.
17        MS. WESTFALL: This document, for the
18 record, is TX00007185 through -86.
19    Q. (By Ms. Westfall) Ms. McGeehan, do you
20 recognize Exhibit 190?
21    A. Yes.
22    Q. What is it?
23    A. It is an e-mail from me to Colby in
24 Representative Harless's office.
25    Q. What information are you providing to him?

ANN McGEEHAN                                                    6/18/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 99 to 102)

---

### 99

1    A.  Providing him the number of voters that do not
2  have a Texas driver's license, personal identification,
3  or social security number in the statewide voter
4  database.
5    Q.  Do you see when you sent this e-mail?
6    A.  I sent it on February 25th at 4:47.
7    Q.  So was this roughly three hours after you had
8  sent the e-mail in Exhibit 189?
9    A.  Yes.
10   Q.  Why did you send this e-mail to Mr. Beuck?
11   A.  Well, in my prior e-mail, I referenced that we
12  were going to send him some information on the number of
13  voters that don't have drivers' license or personnel
14  identification card information, and so it looks like
15  this second e-mail is responsive to that.
16   Q.  Are there some -- could you describe the
17  analysis here and the limitations with the analysis
18  here, please?
19   A.  This looks like the analysis of the state voter
20  registration database, just, you know, based on the --
21  on the voter data we had, not compared against drivers
22  license data.
23   Q.  Is there a limitation with this analysis that
24  you explain with the bold asterisk sentences at the
25  bottom?

---

### 100

1    A.  Okay.  I haven't gotten to that.  Let's see.
2       MR. KEISTER:  Take your time and read it.
3       THE WITNESS:  Okay.
4    A.  Yes.  Okay.  There's triple asterisks there
5  under the number of voters without a -- for the total
6  numbers of voters registered in the state, there were
7  690,887 that did not have a social security number or a
8  Texas driver's license, personal ID number.  And there
9  is an annotation there that that number represents the
10  numbers in the statewide database that don't have a TDL
11  or SSN associated with their voter record, but it's
12  possible that those voters may, in fact, have been
13  issued a drivers license number or a social security
14  number, since those were optional fields prior to
15  January 1st, 2006.
16   Q.  (By Ms. Westfall) So that number is quite
17  questionable for those reasons, correct, the 690,887?
18   A.  Right.  Those -- you know, the statewide
19  database showed they didn't have those numbers, but they
20  could very well have them.
21   Q.  Did you feel that you could forward this to
22  Mr. Beuck because you had already provided this
23  information to Representative Anchia or you had already
24  provided this information that was updated to the
25  Senate?

---

### 101

1    A.  Yes.
2    Q.  Why is it that you felt that this information
3  was responsive to Representative Harless's request for
4  information about voters without a driver license?
5    A.  Well, this was the -- this was sort of the
6  standard query we did to provide information on this
7  question.
8    Q.  Did you believe that the analysis you had
9  conducted in Exhibit 188 was more accurate than this
10  information?
11   A.  Not necessarily.
12   Q.  Why is that?
13   A.  Well, you know, I think there's limitations
14  with both sets of data.  But, you know, as I've said,
15  the matching is not an exact science, and so we had
16  those difficulties, and that's why that summary memo has
17  the disclaimers.
18   Q.  So certainly you would agree, would you not,
19  that this number, 690,887, has a big limitation on its
20  accuracy, do you not?
21   A.  Yes, and that -- that's why we noted what that
22  limitation is.
23   Q.  And it was, nevertheless, provided to the
24  Legislature, both the Senate and the House, was it not?
25   A.  Yes, and it had been in previous sessions as

---

### 102

1  well.
2       MS. WESTFALL:  I'm going to terminate the
3  designation of highly confidential for the time being.
4       (Return to non-confidential portion on
5  Page 102, Line 4)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---