1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARK VEASEY, et al.,           §
                               §
            Plaintiffs,        §
                               §
vs.                            §  Civil Action Number
                               §  2:13-cv-193(NGR)
                               §
                               §
RICK PERRY, et al.,            §
                               §
            Defendants.        §
-----------------------------------------------------

ORAL DEPOSITION OF

JEFFREY MILYO, PhD

AUGUST 26, 2014

-----------------------------------------------------

        ORAL DEPOSITION OF JEFFREY MILYO, PhD,
produced as a witness at the instance of the
Plaintiffs Texas State Conference of NAACP Branches,
Mexican American Legislative Caucus of the Texas
House of Representatives, and duly sworn, was taken
in the above-styled and numbered cause on AUGUST 26,
2014, from 8:59 a.m. to 6:30 p.m., before Melody
Reneé Campbell, CSR in and for the State of Texas,
reported by method of machine shorthand, at the Law
Offices of Dechert LLP, 300 West Sixth Street,
Austin, Texas, pursuant to Notice the Federal Rules
of Civil Procedure.

JEFFREY MILYO, PhD                                          8/26/2014

```
                                                                 2
 1                 A P P E A R A N C E S
 2  FOR PLAINTIFFS TEXAS STATE CONFERENCE OF NAACP
    BRANCHES, AND THE MEXICAN AMERICAN LEGISLATIVE
 3  CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES:
           Mr. Ezra D. Rosenberg, Esq.
 4         Dechert LLP
           902 Carnegie Center, Suite 500
 5         Princeton, New Jersey  08540
           609.955.3222
 6         Ezra.Rosenberg@dechert.com
                 -and-
 7         Ms. Lindsey Cohan, Esq.
           Dechert LLP
 8         500 West Sixth Street, Suite 2010
           Austin, Texas  78701
 9         512.394.3027
           Lindsey.Cohan@dechert.com
10               -and-
           Mr. Vishal Agraharkar, Esq.
11         The Brennan Center for Justice at NYU Law
           School
12         161 Avenue of the Americas, Floor 12
           New York, New York  10013
13         Vishal.Agraharkar@nyu.edu
           (Via Teleconference)
14               -and-
           Mr. Mark A. Posner
15         Lawyers' Committee for Civil Rights Under Law
           1401 New York Avenue, N.W., Suite 400
16         Washington, D.C.  20005
           204.662.8389
17         MPosner@lawyerscommittee.org
18
19  FOR THE PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG
    VOTERS EDUCATION FUND, ET AL.:
20         Ms. Tania Faransso, Esq.
           Wilmer Cutler Pickerin Hale and Dorr
21         1875 Pennsylvania Avenue, NW
           Washington, DC  20006
22         202.663.6000
           Tania.Faransso@wilmerhale.com
23         (Via Teleconference)
24
25
```

JEFFREY MILYO, PhD                                        8/26/2014

```
                                                              3
  1              A P P E A R A N C E S - Cont'd
  2   FOR THE UNITED STATES OF AMERICA:
           Mr. Daniel J. Freeman, Esq.
  3        Mr. Richard A. Dellheim, Esq.
           U.S. DEPARTMENT OF JUSTICE
  4        NWB Room 7524
           950 Pennsylvania Avenue, NW
  5        Washington, DC  20530
           202.305.4355
  6        202.307.3961 (Fax)
           Daniel.Freeman@usdoj.gov
  7        Richard.Dellheim@usdoj.gov
  8
  9   FOR THE DEFENDANTS THE STATE OF TEXAS, ET AL.:
           Mr. S. Ronald Keister, Esq.
 10        Office of the Attorney General
           Post Office Box 12548
 11        Austin, Texas  78711
           512.463.2197
 12        Ronny.Keister@oag.state.tx.us
 13
 14   FOR THE ORTIZ DEFENDANTS:
           Mr. Robert W. Doggett, Esq.
 15        Texas Rio Grande Legal Aid, Inc.
           4920 North IH-35
 16        Austin, Texas  78751
           512.374.2725
 17        512.447.3940 (Fax)
           RDoggett@trla.org
 18        (Via Teleconference)
 19
 20   ALSO PRESENT:
           Mr. Toby Moore, U.S. Dept of Justice
 21
 22
 23
 24
 25
```

JEFFREY MILYO, PhD                                    8/26/2014

4

                      I N D E X
                                              PAGE
EXAMINATION
     BY MR. ROSENBERG................................  7
     BY MR. FREEMAN.................................. 161
CHANGES AND SIGNATURE............................306
REPORTER'S CERTIFICATE..........................307


                   E X H I B I T S
NO.  DESCRIPTION                              PAGE
 1   Rebuttal Declaration of Jeffrey Milyo       9
 2   Supplemental Rebuttal Declaration of       10
     Jeffrey Milyo

 3   Rebuttal Declaration of Jeffrey Milyo      10

 4   Motivated Skepticism in the Evaluation of  36
     Political Beliefs
 7   Texas Voter Identification Study/Barreto   36
     and Sanchez

 5   "The Influence of Partisan Motivated       36
     Reasoning on Public Opinion" By Bolsen,
     Druckman, Cook

 6   "From Voter ID to Party ID:  How Political 36
     Parties affect Perceptions of Election
     Fraud in the U,S." By Emily Beaulieu

 8   Barreto/Sanchez Expert Report              36

 9   Second Amended Notice of Deposition        36

10   Row Numbers of Some of the Problematic     36
     Observations in Barreto and Sanchez Survey
     Data

11   "The Effects of Photographic              179
     Identification on Voter Turnout in
     Indiana: A county-Level Analysis, by
     Jeffrey Milyo

JEFFREY MILYO, PhD                                    8/26/2014

5

EXHIBITS - Cont'd

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 12 | "Much Ado About Nothing?  An Empirical Assessment of the Georgia Voter identification Statute, by Hood and Bullock | 189 |
| 13 | Declaration of Stephen Ansolabehere | 230 |
| 14 | Affidavit of Jeffrey Milyo, in Support of Intervenors Dale L. Morris and Missouri Senator Delbert Scott | 254 |
| 15 | "How Postregistration laws Affect the Turnout of Citizens Registered to Vote," by Wolfinger, Highton and Mullin | 284 |
| 16 | Caltech/MIT Voting Technology Project, "The Effect of Voter Identification Laws on Turnout," by Alvarez, Bailey, Katz | 294 |
| 17 | "An Empirical Bayes Approach to Estimating Ordinal Treatment Effects," by Alvarez, Bailey, Katz | 298 |
| 18 | "The Empirical Effects of Voter-ID Laws: Present or Absent?" By Mycoff, Wagner, Wilson | 300 |

*-*-*-*-*

JEFFREY MILYO, PhD                                    8/26/2014

```
                                                           6
 1                MR. ROSENBERG:  Before we begin,
 2   we'll put our appearances on the record.  Ezra
 3   Rosenberg on behalf of the Texas State Conference of
 4   NAACP Branches and the Mexican-American Legislative
 5   Caucus.
 6                MR. POSNER:  Mark Posner for the same
 7   clients.
 8                MR. FREEMAN:  Dan Freeman on behalf
 9   of the United States.
10                MR. DELLHEIM:  Richard Dellheim for
11   the United States.
12                MR. MOORE:  Toby Moore for the United
13   States.
14                MS. COHAN:  Lindsey Cohan for the
15   same clients as Mr. Rosenberg and Mr. Posner.
16                MR. KEISTER:  Ronny Keister for the
17   defendants.
18                MR. ROSENBERG:  And I just heard
19   another beep, so I think there are three people on
20   the line.  Could they enter their appearances,
21   please?
22                MS. FARANSSO:  This is Tonia Faransso
23   on behalf of the Texas League of Young Voters.
24                MR. AGRAHARKAR:  This is Vishal
25   Agraharkar on behalf of Texas NAACP and MALC.
```

JEFFREY MILYO, PhD                                    8/26/2014

1          MR. DOGGETT:  This is Robert Doggett

2  on behalf of the Ortiz plaintiffs.

3                 JEFFREY MILYO, PhD,

4  having been first duly sworn, testified as follows:

5                    EXAMINATION

6  BY MR. ROSENBERG:

7      Q.   Okay.  Is it Dr. Milyo or Professor Milyo?

8  Which do you prefer?

9      A.   I'm easy.  Whichever you prefer.  You can

10  call me Mr. Milyo, if you like.

11      Q.   I'll try Professor Milyo.  Is that good?

12      A.   That would be fine.  That's what my wife

13  calls me.

14      Q.   Mine doesn't.

15            Professor Milyo, first of all, have

16  you ever been deposed before?

17      A.   Yes, I have.

18      Q.   How many times?

19      A.   I believe it's three times.

20      Q.   Okay.  We will get into what they were.

21  But even though you've been deposed in the past,

22  it's always helpful to refresh your knowledge of

23  what the instructions are for these kinds of

24  proceedings.

25            You understand that you're under

JEFFREY MILYO, PhD                                    8/26/2014

8

1    oath?

2         A.   Yes.

3         Q.   You understand that what you're saying is

4    being taken down by the court reporter?

5         A.   Yes.

6         Q.   And it's going to be put into a little

7    book called the transcript that may be used in these

8    proceedings.  Do you understand that?

9         A.   Yes.

10        Q.   And because of that, it's important that

11   you understand the questions that I ask before you

12   answer.  Okay?

13        A.   Yes.

14        Q.   If you don't understand, please tell me

15   right away, and I will do my best to clarify things

16   for you.  Okay?

17        A.   I will do my best.

18        Q.   It's also important -- you've been doing

19   very good so far -- that you answer orally.  Shrugs

20   of the shoulder, nods of the head can't be taken

21   down by the court reporter.  Okay?

22        A.   I will do my best.

23        Q.   And, also, this is not meant to be a test

24   of endurance for anyone but me.  So if at any time

25   you need a break, so long as there's not a question

JEFFREY MILYO, PhD                                      8/26/2014

9

1  pending, please tell me, and we'll take a break.

   Okay?

2

3      A.   Yes.

4      Q.   Do you have any questions of me before we

5  begin?

6      A.   Not at this time.

7      Q.   Is there any reason that you're not able

8  to testify completely and honestly and accurately

9  today?

10     A.   I don't believe so.

11     Q.   Okay.  Great.  By the way, what's your

12  date of birth?

13     A.   I was born on April 9th, 1964.

14     Q.   Okay.  And let me mark, because we'll

15  probably be referring back to them from time to

16  time, a few documents.  And we'll mark this one as

17  the first document.  We'll call that Milyo 1.

18                (Exhibit Number 1 marked.)

19     Q.   (BY MR. ROSENBERG)  And if you could look

20  at that and tell me what Milyo 1 is.

21     A.   This appears to be a copy of a report that

22  I did.  I'm trying to check, based on the date,

23  whether it included some corrections or not.  And

24  actually I'm blanking on the date, whether it's the

25  latest or not.

JEFFREY MILYO, PhD                                    8/26/2014

10

1        Q.    I'll help you.   Let's have this one marked

2    as Milyo Exhibit 2.

3                    (Exhibit Number 2 marked.)

4        A.    This probably helps.   So this looks to

5    be --

6                    MR. KEISTER:   You have to say --

7        Q.    (BY MR. ROSENBERG)   This being Milyo

8    Exhibit 2.

9        A.    Milyo 2.   I'm sorry.   Milyo 2 appears to

10   be -- it's titled Supplemental Rebuttal Declaration,

11   so this was done shortly after the Rebuttal

12   Declaration.

13       Q.    Is it fair to say that Milyo Exhibit 2

14   supersedes Milyo Exhibit 1 in the sense that Milyo 1

15   and Milyo 2 are identical except for several

16   changes?   And we can go through what those changes

17   are.   But, otherwise, they are completely identical?

18       A.    I believe there are a handful of changes.

19   And my recollection is that they are otherwise

20   identical.

21       Q.    And just to perhaps make it easier in

22   terms of the changes, let me give you another

23   exhibit which we'll mark as Milyo Exhibit 3.

24                    (Exhibit Number 3 marked.)

25       Q.    (BY MR. ROSENBERG)   And if you'll look at

JEFFREY MILYO, PhD                                        8/26/2014

11

1   that, I will represent to you that that's a document

2   that was sent to me by David Whitley from

3   Mr. Keister's office.  And he was kind enough to

4   send me a redlined copy of Milyo Exhibit 2.  And if

5   you want to take a look at that and see if that, in

6   fact, contains the changes.

7                   And I'm looking at them, making sure

8   I've given you the right document because I don't

9   want -- yes.  Okay.

10                  I think you can look through each

11  page and you'll see that there are redline changes.

12      A.    Milyo 3 has a date of August 1st.  So it's

13  not immediately clear to me how this would be the

14  same as Milyo 2.

15      Q.    That's interesting.  And when you say date

16  of August 1st on the signature page -- huh.  That

17  will be something that we'll have to ask some

18  questions about, then.  Because I will represent

19  that I did receive this from Mr. Whitley's office as

20  your report.  But thanks for pointing that out.

21                  Then what we'll do is, we will use

22  Milyo Exhibit 2 as the operative report.  Is that

23  fair?

24      A.    I don't know.  You've got three reports in

25  front of me.

JEFFREY MILYO, PhD                              8/26/2014

                                                        12

1        Q.   2.  I said Exhibit 2.

2        A.   Yes.  What I'm trying to answer is, you've

3   just represented to me that Milyo 3 is more recent

4   than Milyo 2.

5        Q.   No, no.

6        A.   I know that it has a title that's the same

7   as Milyo 1 and not Milyo 2.  So I'm a little

8   confused with what you're handing me and what you're

9   representing.

10       Q.   And I appreciate that, because I'm equally

11  confused.  As I said, I received this one from the

12  Attorney General's Office.

13            But we'll use Milyo Exhibit 2, which

14  you have identified.  Is that correct?

15       A.   I have not looked at it at length.  So it

16  appears to be a copy of the most recent report.

17       Q.   Right.  And we'll -- and you have the

18  right and the ability to look at it for as long as

19  you want, if you want to make sure it is what we're

20  saying it is.  Okay?

21            All right.  Looking at Milyo

22  Exhibit 2, it contains -- no, it actually doesn't.

23  We'll use Milyo Exhibit 1 because that's the only

24  one that contains your CV.

25            So let's just take a look at your CV

JEFFREY MILYO, PhD                                    8/26/2014

13

1  that's attached to Milyo Exhibit 1.  Okay.  Is that

2  your CV?

3       A.   This looks to be a copy of my CV, yes.

4       Q.   Great.  And just for the court reporter's

5  knowledge, this document has been marked as highly

6  confidential.  So the testimony concerning Professor

7  Milyo's reports, at least for present purposes, will

8  be deemed highly confidential because it was so

9  designated by the Attorney General's Office.

10                 MR. KEISTER:  Okay.

11      Q.   (BY MR. ROSENBERG)  Have there been any

12  updates to your CV since you submitted this report?

13      A.   I don't recall making an update.  Updates

14  to my CV are something I do on a running basis, so I

15  don't want to answer that with 100 percent

16  confidence.  But I don't recall any substantive

17  updates.

18      Q.   Okay.  Are there any updates you would

19  want to make that aren't -- that you didn't make?

20      A.   I haven't thought about it.

21      Q.   Okay.  A few quick questions.  From 1986

22  to 1994, throughout the time, were you trying to get

23  your PhD at Stanford, or were you doing something

24  else also?

25      A.   During that time, I did other things.

JEFFREY MILYO, PhD                                      8/26/2014

14

1      Q.   Are they listed on your resume?

2      A.   I don't believe so.

3      Q.   What other things did you do?

4      A.   I'm going off of my recollection, off the

5  top of my head.  Let's see.  Is there a year you

6  would like to start in?

7      Q.   1986.

8      A.   Let's see, that was a while ago.  I

9  believe -- to the best of my recollection, you'll

10  understand.

11     Q.   Sure.

12     A.   -- that I graduated the University of

13  Connecticut in May or June of that year, whatever

14  the regular graduation date was.  I don't recall my

15  summer employment offhand.

16            The next fall of 1986, I began the

17  doctoral program at Stanford University.

18     Q.   Other than being in the doctoral program

19  at Stanford University between 1986 and 1994, did

20  you have any other employment?

21     A.   Yes.

22     Q.   With whom?

23     A.   Would you like to do this chronologically?

24     Q.   Sure, let's do it chronologically.

25     A.   Okay.  And, again, this is to the best of

JEFFREY MILYO, PhD                                    8/26/2014

15

1   my recollection.  It's not something -- obviously

2   it's not on the CV.

3           Q.   Understood.

4           A.   So -- in 1986, I'm fairly certain I would

5   have worked some sort of summer employment that

6   year, although we're talking about 28 years ago, I

7   guess, so you'll have to forgive me.  My mind is a

8   little fuzzy.  I could hazard a guess if that were

9   important to you.

10          Q.   Well, I don't want you to guess.  Just

11  tell me what you remember.

12          A.   And so the fall of 1986, I believe I was

13  on a fellowship at Stanford that first year, so that

14  would not be considered employment.

15          Q.   Okay.  What's next?

16          A.   Well, next would be 1987.  As we move into

17  the spring of 1987, I would still be on fellowship

18  at Stanford University.

19                   That summer of 1987, I believe I had

20  another fellowship that supported some independent

21  research activity during the summer.  Or maybe it

22  would be better characterized as independent study

23  activity.

24          Q.   Who funded that fellowship?

25          A.   That was -- to the best of my

1   recollection, that would have been Stanford

2   University.

3          Q.   Next?

4          A.   That brings us to the fall of 1987.  And I

5   apologize for going by seasons, but these things are

6   tied to the academic year.

7          Q.   Let me make it a little easier for you.

8   Other than fellowships that were funded by Stanford

9   University between 1986 and 1994, did you have any

10  other employment?

11         A.   Yes.

12         Q.   What?

13         A.   Well, that's what we've been doing.

14         Q.   Well, yeah.  I know.  But you keep giving

15  me the fellowships that were funded by Stanford

16  University.

17         A.   I'm sorry.  You said that I should go

18  chronologically.

19         Q.   Yeah.  I'm trying to make it easier for

20  both of us.

21              Other than the fellowships that were

22  funded by Stanford University between 1986 and 1994,

23  did you have any other employment?

24         A.   Yes.

25         Q.   What?

JEFFREY MILYO, PhD                                    8/26/2014

17

1      A.    Would you like to go chronologically?

2      Q.    Sure.

3      A.    Okay.  It helps with my recollection.

4      Q.    Okay.

5      A.    I -- I mean, we are going back over a

6  couple of decades, and I'm trying to be thorough.

7      Q.    I understand.

8      A.    1987, I would have begun work at Stanford

9  as a teaching assistant.  Throughout the academic

10  year of 1887-88, I would have worked as a teaching

11  assistant, to the best of my recollection.

12      Q.    Let me make it even easier.  Other than

13  fellowships funded by Stanford University or

14  employment at Stanford University, did you have any

15  other employment between 1986 and 1994?

16      A.    Yes.

17      Q.    Where?

18      A.    I'm trying to answer your -- it will get

19  more exciting as we move closer to the future.

20      Q.    I'm hoping.  I'm on the edge of my seat.

21      A.    I believe we left off at the summer of

22  1988.  And I -- you know, the years run together a

23  little bit.  I'm trying to remember.  This would

24  have been after my second year of grad school.

25                    I think that's the summer that I

JEFFREY MILYO, PhD                                    8/26/2014

18

1  worked at the Rand Corporation in Santa Monica.

2      Q.    And what were you doing at the Rand

3  Corporation?

4      A.    They hire doctoral students in the summer

5  to do research.

6      Q.    And did you have any specific research

7  project?

8      A.    Let's see, I can recall a couple of

9  projects.

10     Q.    And what can you recall?

11     A.    One project had to do with reviewing a

12 report by a consulting firm on the defense

13 industrial base.

14              Another project had to do with

15 looking into the feasibility of collecting data on

16 fixed price contracts versus other forms of

17 contracting for the military, for the purpose of

18 supporting future research.  Those are two things I

19 remember specifically.

20              We're also given time to work on our

21 own research.

22     Q.    After the Rand Corporation, what's the

23 next non-Stanford funded, either employment or

24 fellowship, employment that you recall?

25     A.    I believe in the fall of 1988 -- but,

JEFFREY MILYO, PhD                                      8/26/2014

19

1   again, this is subject to the best of my
2   recollection.  Sitting here, I haven't thought about
3   these things in many, many years.
4                   I believe in the fall of '88, I began
5   work at -- I was an instructor at San Francisco
6   State University.
7       Q.   And what were you teaching?
8       A.   In the fall of '88, I believe I taught
9   principles of microeconomics.
10      Q.   What's the next --
11      A.   Possibly two sections of that.
12      Q.   What's the next job you recall?
13      A.   In the spring -- that would bring us to
14  1989 -- I continued teaching at San Francisco State,
15  teaching at least one section of macroeconomics.  I
16  don't recall whether the other was micro or macro.
17                  That brings us to the summer of '89.
18  That may have been -- this is harder than what it
19  might seem.
20                  But I think that summer I had a
21  fellowship from the law school at Stanford or via
22  the law school at Stanford and -- to support my own
23  research.
24      Q.   And at the time what was the research that
25  you were doing?

JEFFREY MILYO, PhD                                    8/26/2014

20

1      A.    Let's see, I believe I was looking at

2 competitiveness in State legislative elections,

3 broadly speaking.

4      Q.    And when you say, "Competitiveness in

5 State legislative elections," what do you mean?

6      A.    Although now that I'm -- you know, these

7 things are fuzzy over decades.  It might have also

8 have been looking at the federal budget process.

9 It's hard to say, with certainty, what I was doing

10 in the summer of 1989.  I may have even been looking

11 at both.

12      Q.    And when you say, "Competitiveness in

13 State legislative elections," what do you mean?

14      A.    Competitiveness, I mean it as a broad term

15 that might cover a number of different types of

16 outcome studies.

17      Q.    What does that mean?

18      A.    Well, in the literature, competitiveness

19 can be measured by the rate at which either

20 incumbents win reelection or members of a particular

21 party win reelection.

22            It may be measured by the vote share

23 of incumbents or the vote share of winning

24 candidates.

25      Q.    And was that what you were looking at?

1      A.   Well, as I said, I'm kind of hazy on the
2 summer of 1989, exactly what I was looking at at
3 that time.
4      Q.   And let's go beyond the summer of 1989.
5 What is the next thing you remember that you did
6 that was not Stanford funded?
7      A.   We're getting into the period where I
8 believe I was dating the woman who became my wife,
9 and so I'm getting hazier on the work part of what I
10 was doing.
11      Q.   Right.  And you weren't paid for that?
12      A.   Not a monetary salary.
13           Let's see, we're into the fall of
14 1989.  I believe I was still working as a teaching
15 assistant at Stanford then.  That would have been
16 the '89-90 academic year.  I may have been the head
17 teaching assistant at that time.  That, I think,
18 brings us to the summer of '90?
19      Q.   I think so.
20      A.   You know, I had a number of fellowships
21 during that time.  It's difficult to recall exactly.
22 So what I answered for '89 might have been for '90.
23      Q.   Understood.
24      A.   I don't recall other employment in the
25 summer of '90.

JEFFREY MILYO, PhD                                    8/26/2014

22

1      Q.    Okay.  Any other non-Stanford-related
2  employment between '90 and '94?
3      A.    Yes.
4      Q.    Where?
5      A.    Can we continue chronologically?
6      Q.    Absolutely.
7      A.    I find it helpful.
8      Q.    Okay.
9      A.    Such as it is.  Continuing into the fall
10 of '90, then I'm pretty confident I was the head
11 teaching assistant then at Stanford for that
12 academic year, '90 -- what are we talking about?
13 That would be the fall of '90-'91.
14            I may need to look at the inside of
15 my ring.  I think it was in the summer of '91 I was
16 married, so I don't believe I had outside employment
17 other than with Stanford until we get to about
18 August 1991.
19            Then I had a postdoctoral fellowship
20 from Washington University in St. Louis, and I was a
21 visiting instructor in the political science
22 department at Washington University.
23      Q.    And other than your positions at Wash U
24 and continuing relationship with Stanford, did you
25 have any other positions or employment between then

JEFFREY MILYO, PhD                                    8/26/2014

                                                              23

1   and 1994?

2        A.   Yes.

3        Q.   Where?

4        A.   Continuing chronologically, the Wash U

5   fellowship was during the academic year of '91-'92.

6   We then moved to the Boston area where I was on the

7   faculty at Tufts University, and I believe -- so

8   that takes us into 1992-93 academic year.  That was

9   full-time employment.  That continued until my

10  completion of my PhD, at which time then I began --

11  now we're on to the CV here.

12       Q.   Excellent.  I was going to say, that

13  wasn't that hard, but it was.

14            And you stayed at Tufts until 2000.

15  Is that correct?

16       A.   Yes.

17       Q.   Why did you leave Tufts?

18       A.   I had an employment offer from the

19  University of Chicago.

20       Q.   Had you been offered tenure at Tufts?

21       A.   I was not offered tenure at Tufts.

22       Q.   Were you denied tenure at Tufts?

23       A.   I was up for tenure and I was denied

24  tenure at Tufts.  That is correct.

25       Q.   And then you went to University of Chicago

JEFFREY MILYO, PhD                                    8/26/2014

24

1    to the Harris School, and you were there from

2    2000-2004.  Were you in a tenure track position at

3    the Harris School?

4         A.   Yes, I was in a tenure track position at

5    the Harris School.

6         Q.   Were you offered tenure in Chicago at the

7    Harris School?

8         A.   I was not offered tenure at the University

9    of Chicago.

10        Q.   Were you denied tenure at the University

11   of Chicago?

12        A.   I was put up for tenure and did not

13   receive tenure at the University of Chicago.

14        Q.   And you are tenured at the University of

15   Missouri now?

16        A.   Yes, I am tenured at the University of

17   Missouri.

18        Q.   Now, you mentioned that you have been

19   deposed a few times in the past, and I think you

20   said three.  When were those three times?

21        A.   I believe I've put those in my report.

22   And that would probably be more reliable than my

23   recollection, without glancing back at it, if you're

24   looking for time periods.

25        Q.   Okay.  I'm looking at page 3 of your

JEFFREY MILYO, PhD                                    8/26/2014

25

1    report.

2        A.    Okay.  Would you tell me which Milyo

3    report you're looking at?

4        Q.    Sure.  We will -- now that we're, at least

5    to this point, through with your CV, let's go to the

6    Rebuttal Declaration, which is Milyo 2.  And I

7    think, if you look at the bottom of page 2,

8    Paragraph 13, you mention producing expert reports

9    in state and federal election law disputes, and that

10   goes over into page 3.

11                Is that the paragraphs of the report

12   that you're referring to?

13       A.    I believe your question was, when I have

14   been deposed?

15       Q.    Yes.

16       A.    Yes.  This would help me to answer that

17   question.

18       Q.    Okay.  Does this information provide all

19   instance -- include all instances that you were

20   deposed?

21       A.    I believe so, yes.

22       Q.    Okay.  Which of -- there are six cases

23   that are described on page 3.  In which were you

24   deposed?

25       A.    I believe it's quite clear from the text.

26

1    Q.   Well, why don't you just tell me.

2    A.   All right.   In 2007, I produced an expert

3  report and was disposed [sic] in a dispute in

4  federal district court, et cetera.   That would be

5  Paragraph D.

6    Q.   Uh-huh.

7    A.   In 2008, Paragraph E, I produced an expert

8  report and was deposed in a dispute in federal

9  court.

10         And in Paragraph F, I write, in 2011,

11  I produced a report and was deposed in a dispute in

12  federal court.

13    Q.   And other than the cases that are

14  described on page 3 of the report, have you been

15  retained as an expert in any other kinds of cases?

16    A.   I'm sorry, would you repeat the question?

17    Q.   Sure.   Other than the cases that are

18  described on page 3 of your report, have you been

19  retained as an expert in any other kinds of cases?

20    A.   This case.

21    Q.   Other than this case and the cases that

22  are described in page 3 of the report?

23    A.   Not that I recall.

24    Q.   Have you ever testified in court?

25    A.   Not as an expert witness.

JEFFREY MILYO, PhD                                    8/26/2014

                                                              27

1        Q.    Have you testified in court in any other
2  capacity?
3        A.    The only thing I can think of that comes
4  to mind was in a jury selection procedure.
5        Q.    Meaning you were in the venire and they
6  were trying to decide whether you would be sitting
7  on the jury or --
8        A.    I don't know what you mean by venire.
9        Q.    Okay.  Why don't you tell me what you
10 recall about your testimony in a jury selection
11 procedure.
12       A.    We were asked if we had any conflicts with
13 serving on the jury.
14       Q.    Okay.  So you were -- there was a decision
15 as to whether or not to impanel you as a juror.  Is
16 that correct?
17       A.    I'm not sure exactly what you mean by
18 impanel.
19       Q.    Okay.  Well, we'll get back to that maybe.
20             Have you ever been qualified as an
21 expert in any proceeding?
22       A.    That sounds like a technical term as
23 you're using it, and I'm not quite sure exactly what
24 you mean.
25       Q.    Have you ever been disqualified -- or let

JEFFREY MILYO, PhD                                          8/26/2014

28

1    me ask.  Have you ever been disqualified as an

2    expert in any proceeding?

3          A.   Again, that sounds like a technical term,

4    and I'm not exactly sure what you mean.

5          Q.   And which term are you having trouble

6    with?

7          A.   Well, I'm not exactly sure -- lawyers use

8    terms with particular meaning.  That would be

9    different than common parlance.

10         Q.   Well, you can use whatever meaning you

11   ascribe to whatever word you want.  Tell me what

12   word you're having trouble with.

13         A.   You put emphasis on the word "qualified,"

14   so I'm not quite sure exactly what you mean by that.

15         Q.   Have your -- have you been accepted as an

16   expert by the court in any proceeding?

17         A.   I don't know exactly what that means.

18   When I have served as an expert witness, I've

19   produced a report.  I don't have legal training.

20         Q.   Have you ever been in a proceeding where

21   the court did not accept your opinions?

22         A.   What exactly do you mean by "accept"?

23         Q.   Have you ever been in a proceeding where

24   the court found your opinions to be unreliable?

25         A.   Again, I think you're using technical

JEFFREY MILYO, PhD                                    8/26/2014

29

1    terms about a court finding.  And I think I can help

2    you out.  Not being a lawyer, I don't know exactly

3    how to answer technical --

4         Q.   Well, you know what the word "court"

5    means.  Right?  We have no problem with the word

6    "court."

7         A.   A court.  Yes.

8         Q.   Right?  All right.  Do you have a problem

9    with the word "findings"?

10        A.   Potentially.

11        Q.   Okay.  Would the word "rulings" be better

12   for you?

13        A.   Potentially.

14        Q.   Okay.  Well, let's use the word "rulings."

15             Have you ever been in a proceeding

16   where the court ruled that your opinions were

17   unreliable?

18        A.   Again, not being a lawyer, it's difficult

19   for me to answer.  I was involved in a case where I

20   believe the entire case was thrown out.  So I'm not

21   sure what that means for findings and rulings.

22        Q.   What case was that?

23        A.   I believe that was the 2011 Washington

24   State case.

25        Q.   Did you read the court's opinion in that

JEFFREY MILYO, PhD                                    8/26/2014

30

1    case?

2         A.    I recall glancing at a document.

3         Q.    You recall glancing at a document.   When

4    you glanced at it, did you read anything about

5    yourself?

6         A.    That would have been the purpose for my

7    glancing.

8         Q.    So the answer is yes?

9         A.    I don't recall the specifics.

10        Q.    You don't recall anything about it?

11        A.    I don't believe I said that.

12        Q.    Well, I'm -- then tell me what you recall.

13   Come on.   You know, we're going to be here for a

14   long, long time.   And quite frankly, we're going to

15   be here for longer than seven hours if this keeps

16   up, because I'll -- I have no problem with calling

17   the Court.

18              So I asked you a question.   And

19   please tell me what you recall about the thing you

20   glanced at.

21        A.    I will continue to try to answer you as

22   honestly and completely as I can.

23        Q.    Well, go ahead, answer my question,

24   please.

25        A.    It's difficult to go back in time to give

JEFFREY MILYO, PhD                                          8/26/2014

31

1   specific and detailed answers about a document that

2   I've glanced at.

3              Is this a document that you have that

4   you'd like to show me to refresh my memory?

5        Q.   Let me go back and repeat what happened

6   here.   I asked you if you read the opinion.   You

7   said you glanced at it.   I asked you if you remember

8   something.   You said you didn't remember specifics.

9   I said, so you don't remember anything; you said, I

10  don't -- that's not what I said.   So then I asked

11  you to tell me what you remember.   And that's my

12  question.

13       A.   I can tell you what I remember at this

14  time, sitting here, off the top of my head, and to

15  the best of my recollection.

16              One thing that I remember was that

17  the judge didn't like a phrase that I coined and

18  suggested that it was not a peer-reviewed phrase.   I

19  recall being puzzled at that.

20       Q.   Do you remember anything else?

21       A.   I recall that the judge seemed to object

22  to the fact that I had been paid for my testimony.

23       Q.   Do you recall anything else?

24       A.   What I recall is a broad impression.

25       Q.   And what's the broad impression that you

JEFFREY MILYO, PhD                                    8/26/2014

32

1   recall?

2         A.   What I have said.

3         Q.   When were you retained by the State in

4   this case?

5         A.   I don't believe I was retained by the

6   State.

7         Q.   Okay.

8         A.   Oh, I'm sorry.  Which case are you

9   referring to?

10        Q.   I'm sorry.  We're turning our attention to

11   this case, the case that you're here to testify

12   about.

13             And let me withdraw that question and

14   ask you: when were you first contacted by anyone

15   from the State of Texas in connection with this

16   case?

17        A.   I can't recall an exact date.

18        Q.   Can you recall a general date?

19        A.   It probably would have been, to the best

20   of my recollection sitting here, if I had to pick a

21   date, maybe September 2013.

22        Q.   Who contacted you?

23        A.   I don't recall exactly.

24        Q.   Do you recall the substance of the

25   conversation that you had with the person?

JEFFREY MILYO, PhD                                              8/26/2014

1          MR. KEISTER:  And let me advise the

2   witness, don't go into specific details of

3   conversations with the attorneys.  But you can tell

4   the general discussion.

5        A.   I believe the general discussion would

6   have been about my willingness and availability to

7   be an expert in this case.

8        Q.   (BY MR. ROSENBERG)  Did you have an

9   understanding, as a result of that conversation, as

10  to what were the areas that the State was interested

11  in your being an expert on?

12       A.   Beyond that it would have something to do

13  with voter identification?

14       Q.   I don't know.  You tell me.

15       A.   I believe that I didn't have a specific

16  idea.

17       Q.   In that conversation did you agree to be

18  retained as an exert by the State in this case?

19       A.   I don't think it would have been in the

20  first conversation.

21       Q.   When would it have been?

22       A.   Possibly in a second or third

23  conversation.

24       Q.   When was the next time you had a

25  conversation with someone from the State?

JEFFREY MILYO, PhD                                    8/26/2014

34

1      A.   You're asking about a specific chronology,

2 and I just have to preface everything by saying,

3 it's not something I've devoted time to thinking

4 about, so I'm going off the top of my head.

5           It probably was in that same month.

6      Q.   And in that second -- what was the nature

7 of that second conversation?

8      A.   I really don't recall specifics.

9      Q.   Do you recall with whom you were speaking?

10     A.   Not exactly, no.

11     Q.   Do you recall -- maybe I can refresh your

12 recollection.  Was it John Scott?

13     A.   It may have been, but I don't recall.

14     Q.   Was it David Whitley?

15     A.   I still don't recall.

16     Q.   Was it Reed Clay?

17     A.   No, I still don't recall.

18     Q.   Was it Ronny Keister?

19     A.   I don't recall.

20     Q.   By the way -- I'll get back to this -- did

21 you prepare for this deposition?

22     A.   Yes, I did.

23     Q.   How did you prepare for this deposition?

24     A.   I tried to get a good night's sleep and

25 drink plenty of water.

1        Q.    Anything else?

2        A.    Yes.

3        Q.    What else?

4        A.    I reviewed my report and I reviewed other

5   reports.

6        Q.    Anything else?

7        A.    There were a couple of journal articles I

8   looked at.

9        Q.    Anything else?

10       A.    I think I reexamined the dataset provided

11  by Barreto and Sanchez.

12       Q.    Anything else?

13       A.    I had some questions for the legal team.

14       Q.    Anything else?

15       A.    Not that I recall at this time.

16       Q.    When you say you reviewed your report,

17  which version of your report did you review?

18       A.    Well, since we're not sure what we're

19  looking at with Milyo 1, 2, and 3, it's hard for me

20  to translate it to that.  It would have been, I

21  believe, my latest version of the report.

22       Q.    And just so the record is clear, when you

23  say we're not sure what we're looking at in terms of

24  Milyo 1, 2, and 3, take a look again at Milyo 1, 2,

25  and 3 and tell me which is the latest version of

36

1    your report.

2        A.   Well, you have represented to me that

3    Milyo 2 is the latest or 3?  Now I can't recall.  Do

4    you recall?

5        Q.   What I represented to you was that Milyo 2

6    was your latest report and that Milyo 3 was a

7    redline version of your latest report that

8    Mr. Whitley had sent to me.  You pointed out that

9    Milyo 3 had a date that was earlier than Milyo 2,

10   and I said, okay, let's go with Milyo 2.

11              So would you please identify which is

12   your latest report?

13       A.   From the appearance and from the date, if

14   I were forced to guess, I would go with Milyo 2.

15       Q.   All right.  Is that the report you

16   reviewed yesterday in preparation for --

17       A.   It is not literally the same copy, but it

18   was my intention to be reviewing the

19   latest supplemental --

20              MR. KEISTER:  Counsel, let me --

21              MR. ROSENBERG:  Yeah, I mean, I think

22   we have to take a break, Mr. Keister.

23              MR. KEISTER:  Let's take a break.

24              (Recess.)

25       Q.   (BY MR. ROSENBERG)  Professor Milyo,

JEFFREY MILYO, PhD                              8/26/2014

37

1  before we broke you had testified that you had

2  reviewed reports yesterday in preparation for your

3  deposition.  Is that correct?

4       A.   I don't believe I said yesterday.

5       Q.   When did you review the reports?

6       A.   Well, there are a large number of reports

7  and other things, so it would be difficult to give

8  an exact chronological ordering.

9       Q.   I'm not asking for an exact chronological

10  ordering.  When did you review the reports in

11  preparation for this deposition?  Just over the last

12  few days, over the last few weeks?

13       A.   This morning I took a glance at my own

14  supplemental report.  I may have looked at some

15  other reports also, as well, in the morning.

16       Q.   When you say, you may have, since it was

17  just this morning, did you look at any reports this

18  morning, other than your own?

19       A.   Well, I did some last night and some in

20  the morning.

21       Q.   Okay.  What reports did you look at last

22  night?

23       A.   I tried to take a look at some of the

24  supplemental reports from the other experts.

25       Q.   Which experts?

1      A.    The experts that did supplemental reports.

2      Q.    Their names, if you remember.

3      A.    Let's see, there was -- Barreto and

4 Sanchez did a supplemental report, and Ansolabehere

5 did a -- I'm not sure if it's titled Supplemental

6 Report, but a second report.  Bazelon did another

7 report.  Burden did a supplemental report.  There's

8 a couple others in there, too.

9      Q.    Webster?

10     A.    I believe he did -- my recollection is

11 there's a supplemental report.  I don't recall

12 looking at that one last night or this morning.

13             And then the fellow I always mix up

14 his name, whether it's Chandler Davidson or Davidson

15 Chandler.

16     Q.    Chandler Davidson.

17     A.    I'm not -- and then there's a Chapman.

18 And I'm not -- those -- I don't even recall if all

19 of them did supplemental reports.  There are a lot

20 of experts and, you know, there were a number of

21 reports that I have glanced at in the last couple of

22 days.

23     Q.    Had you seen those reports prior to the

24 last couple of days?

25     A.    I'm trying to remember when I would have

JEFFREY MILYO, PhD                                        8/26/2014

                                                               39

1   received those reports.  I assume it would have been

2   a few days earlier, certainly.

3        Q.   And did you review them when you first

4   received them?

5        A.   I certainly took a look at the

6   supplemental reports when I first received them,

7   yes.

8        Q.   When you say, "took a look," what does

9   that mean?

10       A.   Well, I'm trying to use a broad term that

11  would cover both glancing to see, you know, what the

12  general nature of the report was versus doing some

13  more detailed reading.

14       Q.   Have you ever read them in detail?

15       A.   Have I ever read --

16       Q.   Read the supplemental reports in detail?

17       A.   All of the supplemental reports?

18       Q.   Yes.

19       A.   Or any of the supplemental reports?

20       Q.   Well, we'll start with any.

21       A.   Well, I've had limited time to look at

22  them, so -- and I'm not quite sure what you mean by

23  detailed.

24       Q.   Well, you used the word detail.  I didn't.

25  I just used your word.  So what did you mean by

40

1   detailed?

2        A.   Well, let's put it this way.  Some I

3   looked at in more detail than others.

4        Q.   Which did you look at in detail or in more

5   detail, to use your words?

6        A.   Probably the ones that had more relevant

7   statements related to my report.

8        Q.   Which?

9        A.   In terms of quantity?

10       Q.   No.  In terms of which report.

11       A.   Well, as I said, I've looked at the Burden

12  report and the Barreto/Sanchez has something to say.

13  Ansolabehere has something to say.  A couple of the

14  others may as well.  It's not -- I haven't had as

15  much time to read or work with these.

16       Q.   Dr. Milyo, you said you looked at certain

17  reports in more detail than others.  And my question

18  is, which reports did you look at in more detail

19  than the others?

20       A.   The ones that I'm having an easier time

21  recalling.

22       Q.   Ansolabehere?

23       A.   Ansolabehere, I've looked at, although

24  that's a particularly large report, so there are

25  portions of it that I looked at in detail.

JEFFREY MILYO, PhD                                    8/26/2014

41

1           And the Bazelon report -- again,

2    these things cover more than just what was relevant

3    to my -- my report.

4                Barreto and Sanchez, Burden.  There's

5    so many experts, the names don't come easily to me.

6    If I had them in front of me, it would be easier.

7        Q.   We'll get to that in a few minutes.

8                You also said you reexamined data

9    from Barreto and Sanchez.  What data are you talking

10   about?

11       A.   I received a file that -- the exact title

12   skips my mind.  I believe it's what they provided.

13   It's something called like Final Clean Data.  I did

14   transmit that in the documents-relied-upon file.

15       Q.   And you also said you had questions for

16   the legal team.  Without getting into the details of

17   what those questions were, what did you mean by

18   questions for the legal team?  What -- were they

19   factual information that you needed?

20               MR. KEISTER:  And let me caution you

21   to just give a general description.  Don't give any

22   details.

23       A.   The general description would be something

24   like, given there are so many plaintiffs and

25   lawyers, what does that mean for the process of

42

1    questioning?  Is it done serially, et cetera?  It
2    was sort of procedural.
3         Q.   (BY MR. ROSENBERG)  Did you meet with
4    anyone from the legal team in preparation for the
5    deposition?
6         A.   Well, I don't -- you're using the word
7    "preparation."  I had a brief phone call last night.
8         Q.   Other than that brief phone call -- by the
9    way, with whom was that brief phone call?
10        A.   I believe John Scott was on it for a
11   little while.  And I apologize, I don't remember
12   your last name.
13             MR. KEISTER:  Keister.
14        A.   Keister, I believe, was on it.  And I
15   think it was Whitley.  I'm not sure if anybody else.
16        Q.   (BY MR. ROSENBERG)  How long was that
17   conversation?
18        A.   I wasn't watching the clock, so maybe on
19   the order of 20 minutes.
20        Q.   Other than that conversation, did you have
21   any other conversations or meetings with anyone from
22   the Texas Attorney General's Office in preparation
23   for the deposition?
24        A.   I've certainly never met with any of them
25   in person.  As sort of specific preparation for the

JEFFREY MILYO, PhD                                    8/26/2014

43

1  deposition, I don't recall.  Any conversations I had

2  were more about logistics.

3      Q.   All right.  Let's get back to when you

4  were actually retained as an expert in this case.

5  And I think you said it was sometime around

6  September of 2013.  Is that correct?

7      A.   To the best of my recollection.  You were

8  asking for a particular date, and I'm fairly

9  confident it would have -- would have been by then.

10     Q.   And when you were retained as an expert,

11  what did you understand that your role would be in

12  this case?

13     A.   My understanding is, the best I can recall

14  at that time, was that the plaintiffs would be

15  producing some reports and there would need to be a

16  response report.

17     Q.   What areas of expertise were you -- was it

18  your understanding that you would be providing a

19  response report in?

20     A.   Broadly regarding the effects of voter

21  identification laws.

22     Q.   And when you say, "the effects of voter

23  identification laws," what do you mean?

24     A.   Broadly, things that might be attributed

25  to voter identification laws.

JEFFREY MILYO, PhD                                    8/26/2014

44

1        Q.   When you say, "things that may be
2   attributed to voter identification laws," what do
3   you mean?
4        A.   I want to be responsive to your question.
5   Would it be satisfactory to give some examples?
6        Q.   Sure, for starters.
7        A.   An example might be, there's a literature
8   that looks at the effects of voter ID laws on voter
9   turnout.
10       Q.   Any other examples?
11       A.   There is a smaller literature that looks
12  at the effects of voter ID laws, broadly speaking on
13  voter confidence.
14       Q.   Any other examples?
15       A.   There are other academic studies that
16  would be broadly related to costs and benefits of
17  voting -- or voting laws and regulations.
18       Q.   Any other examples?
19       A.   I could probably go into more detail and
20  list a large number of examples.  I don't think
21  that's what you're asking for.  So I've given you
22  some examples.
23       Q.   Just so it's clear, I'm asking for what
24  was in your mind as to your understanding of the
25  nature of the expertise that you would be lending to

JEFFREY MILYO, PhD                                    8/26/2014

                                                              45

1  this case at the time that you were retained.

2       A.   Oh, okay.  That as a political economist,

3  with some expertise in policy evaluation, that there

4  would be expert reports produced that I would then

5  review and comment on.

6       Q.   And just so it's clear, you said, "as a

7  political economist with some expertise in policy

8  evaluation."  Is that what you said?

9       A.   I believe that is what I said.

10      Q.   And what do you mean by "policy

11 evaluation"?

12      A.   Broadly speaking, looking at the effects

13 of public policies on different kinds of outcomes.

14      Q.   What is the nature of your experience in

15 the effects of public policies on different kinds of

16 outcomes?

17      A.   I am a professor who has done research

18 broadly related to that issue, over a number of

19 years, have taught courses broadly related to that

20 issue a number of years.  I've also participated in

21 some court proceedings that we have mentioned.

22      Q.   Well, which public policies whose effects

23 you have studied, are you referring to?

24      A.   Well, this would be easier to answer if I

25 could reference my CV.  You're talking about a body

JEFFREY MILYO, PhD                          8/26/2014

                                                        46

1   of work over decades again.

2                MR. KEISTER:  And let me just

3   instruct the witness.  Anytime you need to look at

4   your report or your CV, please do.

5        Q.   (BY MR. ROSENBERG)  I agree with

6   Mr. Keister.

7        A.   So your question was about public policies

8   that I've examined?

9        Q.   Right.

10       A.   In answering that kind of question, I see

11  studies that look at campaign finance regulations,

12  term limits, professionalism in legislatures, voter

13  ID laws, early voting, same-day registration,

14  alcohol regulations, health insurance.  What other

15  things would be included in here?

16               Regulations on lobbying, regulations

17  on independent expenditures, ballot measures.  Work

18  that otherwise informs or is related to economic

19  regulations, health policy, political reforms.

20               There's some work which is probably

21  better characterized as methodological contributions

22  that might be useful in policy evaluation.  Reforms

23  to the budget process, effects of ethics laws,

24  sentencing reforms, work related to the recruitment

25  and training of poll workers, work relating to

JEFFREY MILYO, PhD                                    8/26/2014

47

1    regulations on ownership of broadcast television.

2                     These are some other examples from

3    the research studies listed on my CV in the course

4    of teaching or doing other kinds of work in

5    progress, referee reports, and the like.  There are

6    other areas that I've had occasion to speak to.

7         Q.   Which of the articles or publications that

8    are in your CV relate to early voting?

9         A.   I believe the article -- it's numbered 26,

10   under journal articles.

11        Q.   "Estimating the Impact of State Policies

12   and Institutions with Mixed-Level Data"?

13        A.   I believe there is a variable.  I'm going

14   off of the top of my head on the recollection of

15   that.  If I have access to look at that article, I

16   could be more sure.

17                     I'm not sure if 23 included a control

18   variable for early voting or not.  There may have

19   been other studies where a variable was included.

20   I'm looking through here.

21                     Under contributions to edited

22   volumes, I'm not quite -- I can't recall, off the

23   top of my head, exactly what was included in terms

24   of other variables in number 5 and number 3.  But

25   those would be -- if I were trying to refresh my

JEFFREY MILYO, PhD                                    8/26/2014

                                                              48

1   memory, I would take a look at those.

2        Q.   Is it fair to say that in looking at

3   numbers 3, number 5, number 23, and number 26, that

4   the primary focus of those articles was not early

5   voting but, rather, some other topic and early

6   voting may have been a variable?

7        A.   I wasn't finished answering the first

8   question.  Do you want me to finish answering?

9        Q.   Well, I want you to answer that first and

10  then I'll let you continue.

11       A.   Which is that?

12       Q.   The question I just asked, which is, is it

13  fair to say that numbers 3, number 5, number 23, and

14  number 26, the prime focus of the study is not on

15  early voting but, rather, early voting may have been

16  a variable that you considered in this study?

17       A.   It was not a focus of those studies.

18       Q.   Now you can -- are there any other studies

19  dealing with early voting?

20       A.   There's -- you say, "any studies."  It

21  captures more than just what's on a CV.  So I'm

22  referring to the CV here.

23            The review of poll worker best

24  practices with Barry Burden would have spoken to

25  early voting as well.

JEFFREY MILYO, PhD                                    8/26/2014

                                                          49

1        Q.   Any of the -- you mentioned that there
2   were perhaps an article or more or study dealing
3   with voter ID.   Which -- to which were you
4   referring?
5        A.   In terms of on the CV -- I don't think 26
6   had that in there.
7                 From the CV, I would point to, in the
8   technical and policy reports, number 8.
9        Q.   Which is, "The Effects of Photo
10  Identification on Voter Turnout in Indiana"?
11       A.   Yes, that certainly had to do with voter
12  ID.
13       Q.   Any others?
14       A.   Not on the CV.
15       Q.   When you say, "not on the CV," is there
16  something that you're thinking of that is not on the
17  CV?
18       A.   Well, your question was broad.   I don't
19  remember the exact words of it.   Do you?
20       Q.   Yeah.   Because it was -- actually dealt
21  with your CV.   But I'm asking you whether, outside
22  of your CV, have you -- other than in litigation,
23  studied photo -- voter ID?
24       A.   Studied is a broad term.   I've talked
25  about it in classes.   I have made a couple of

JEFFREY MILYO, PhD                                    8/26/2014

50

1    conference presentations.

2         Q.    Which conference presentations?

3         A.    I don't list conference presentations on

4    my CV, so that's going to be harder to remember

5    exactly.  But in the spirit of your question, let's

6    see, a few years -- I can't remember whether it was

7    the Midwest Political Science Association or the

8    American Political Science Association, so one or

9    the other or both, I've made two presentations that

10   I can recall that had to do with voter ID.

11                   There may have been a presentation at

12   the Public Choice Society conference.  I don't

13   recall exactly.

14        Q.    What is a Public Choice Society?

15        A.    The Public Choice Society is an academic

16   professional organization.

17        Q.    And what were the topics, if you recall,

18   of any of these presentations?  I understand you're

19   saying they dealt with voter ID, but what aspect of

20   voter ID?

21        A.    One had to do with public approval of

22   various voting reforms, early voting, vote by mail,

23   same-day registration, and voter ID.

24        Q.    Do you remember any others?

25        A.    And one had to do with effects of voter ID

JEFFREY MILYO, PhD                                    8/26/2014

51

1  on voter turnout.  And I think, again, in the spirit

2  of being responsive to your question, I've also

3  given some seminar presentations.

4       Q.   And where were the seminar presentations

5  given?

6       A.   Let's see.  I gave a seminar presentation

7  at Tulane University, and at least one

8  work-in-progress presentation in the Department of

9  Economics at Missouri.  And at least one

10 presentation in the Truman School of Public Affairs

11 at Missouri.

12      Q.   And each of these was on voter ID

13 specifically?

14      A.   Yes.

15      Q.   And on what topics of -- what area of

16 voter ID?

17      A.   The seminars at Missouri focused on

18 effects on voter turnout.  The seminar at Tulane, I

19 believe, also focused on that.

20                And I believe there was also a

21 panel -- I'm not quite sure how to describe it, but

22 a panel on -- or certainly relating to voter ID, at

23 the Cato Institute, where I was on the panel, part

24 of a collection of speakers.

25      Q.   What is a Cato Institute?

JEFFREY MILYO, PhD                                          8/26/2014

52

1        A.    The Cato Institute is a think tank in -- I

2   believe they're located in Washington, DC, proper.

3        Q.    You are associated -- or had been

4   associated with them in the past.  Is that correct?

5        A.    I have a title there.  I believe it's

6   fellow or senior fellow.

7        Q.    Has the Cato Institute itself taken a

8   position on voter ID; do you know?

9        A.    I don't know if they have.  I'm not sure

10  think tanks take lobbying positions, if that's what

11  you mean.

12       Q.    Are you paid by the Cato Institute?

13       A.    I'm not paid by the Cato Institute at this

14  time.

15       Q.    Have you ever been paid by the Cato

16  Institute?

17       A.    There was a time when I received payment

18  from the Cato Institute.

19       Q.    And how much do you receive?

20       A.    Let's see, I think we're going back to

21  2006.  And round numbers, it was in the nature of a

22  summer -- summer support, maybe $6,000, $8,000,

23  some -- it could have been more in that

24  neighborhood.

25       Q.    And getting back to the conferences that

53

1  you talked about, were the presentations that you

2  gave based upon your own studies, as opposed to a

3  literature review?  And I'll focus first on -- I'll

4  focus first on the -- the effects of voter ID on

5  voter turnout.

6       A.   I'm sorry, I'm kind of distracted by the

7  movement here.  I will try to pay attention if you

8  would...

9            MR. ROSENBERG:  Can you read the

10  question back, please.

11            THE REPORTER:  Question: "And getting

12  back to conferences that you talked about, were the

13  presentations that you gave based upon your own

14  studies, as opposed to a literature review?"

15       A.   In general, any presentation would include

16  both some literature review as a way to sort of

17  place a context for the analysis, and some -- some

18  original analysis.

19       Q.   (BY MR. ROSENBERG)  When you say, "some

20  original analysis," can you describe the form that

21  the original analysis took?

22       A.   Well, let's see --

23       Q.   On voter ID.

24       A.   Is there a particular occasion that you're

25  asking about?

JEFFREY MILYO, PhD                                    8/26/2014

54

1      Q.    Well, the one you were just talking about.

2      A.    At the Cato Institute?

3      Q.    Yeah.

4      A.    Oh, that would have been a discussion

5  on -- I'm not sure if it was specifically on a book

6  by John Fund, and I'm not sure if he had a coauthor.

7  But it would -- he was one of the main speakers and

8  it was more offering commentary on that, to the best

9  of my recollection.

10     Q.    Now, your presentation to the Midwest

11  Political Science Association, that was in 2013?

12     A.    I don't believe I said that.

13     Q.    No.  But I'm asking.

14     A.    I don't recall specifically whether it was

15  Midwest or whether it was 2013.  I had trouble

16  recalling.

17              To be honest, there's these two big

18  political science conferences, and I -- hard to keep

19  them straight.  It's all the same crowd.

20     Q.    Is 2013 a ballpark?

21     A.    You know, I don't recall.

22     Q.    Was the title of your presentation, "The

23  Voter ID Mess"?

24     A.    That sounds familiar.

25     Q.    And can you -- having refreshed your

JEFFREY MILYO, PhD                                    8/26/2014

55

1    recollection with that title, can you tell me what

2    the -- whether or not that study was based upon your

3    own research?

4         A.   It was a presentation of some work in

5    progress --

6         Q.   And when you say -- I'm sorry.

7         A.   -- as well as some review of the

8    literature.

9         Q.   And when you say, "work in progress,"

10   what do you mean?

11        A.   I mean work that at that time was not in a

12   state to be distributed publicly.

13        Q.   Has it reached a state where it's in a

14   position to be distributed publicly?

15        A.   That's an area of inquiry that I have

16   looked at over time, but I have not disseminated a

17   written report.

18        Q.   Did you disseminate any written materials

19   at that presentation?

20        A.   I don't recall.  It's possible I would

21   have had copies of an overhead presentation.  It's

22   possible that I had something in the way of a short

23   write-up that would have been given to a discussant,

24   but I don't recall specifically.

25        Q.   Do you recall which state -- state or

JEFFREY MILYO, PhD                                    8/26/2014

56

1  states you presented on?

2      A.   I believe in that presentation I discussed

3  aggregate turnout, looking at all 50 states, and

4  also -- and, again, I'm going off the best of my

5  recollection here.

6           And I believe also looking at the

7  current population survey, looking at all 50 states.

8      Q.   Did you -- do you recall whether you

9  studied voter ID laws -- whether you presented on

10 voter ID laws generally or specifically on photo ID

11 laws?

12     A.   Again, I'm going off of a recollection of

13 a talk from some time ago.  And my recollection is

14 that there would be some characterization of both ID

15 laws, in general, as well as specifically photo ID

16 laws.

17     Q.   Did you have a thesis for your

18 presentation?

19     A.   Again, trying to be responsive to the

20 spirit of your question, it focused on the effects

21 of voter ID laws on voter turnout.

22     Q.   Well, when you used the title, "The Voter

23 ID Mess," what did you mean by that?

24     A.   Professional conference presentations, you

25 submit a title many months in advance of the actual

JEFFREY MILYO, PhD                                    8/26/2014

57

1  presentation.  So that was something I thought

2  sounded catchy and marketable and would get my

3  presentation accepted.

4           I don't recall if I used the same

5  title in the presentation or not.  Again, you're

6  asking about a work-in-progress presentation from

7  some time ago, and I'm going off of the best of my

8  recollection at this moment.

9           I may have kept that in the title,

10 and then a colon.  I'm not quite sure.

11     Q.   After the colon, did it say something like

12 estimating the effects of state voter ID and voter

13 turnout and self-reported voting irregularities?

14 Does that sound familiar?

15     A.   That sounds like what the original

16 conference proposal would have been.  My

17 recollection is, by the time the rubber hit the road

18 and it was time to talk about results, I don't

19 know -- I -- definitely the focus was on voter

20 turnout.

21     Q.   Now, are you -- have you submitted that

22 writing anyplace for publication in a journal?

23     A.   As I mentioned, it wasn't a written report

24 and it hasn't been disseminated.

25     Q.   You mentioned earlier the technical

JEFFREY MILYO, PhD                                8/26/2014

58

1   report, "The Effects of Photographic Identification

2   on Voter Turnout in Indiana."  Was that submitted

3   for publication to a peer-review journal?

4        A.   No, it has not been.

5        Q.   Have you ever published in a peer-review

6   journal, a study on voter ID?

7        A.   Not that I would characterize as the main

8   focus was on voter ID, to the best of my

9   recollection.

10       Q.   Turning your attention to the first page

11  of document 2 in front of you.

12       A.   Milyo 2.

13       Q.   Milyo 2.  Actually, let's do it this way.

14  Let's look at Milyo 1, the first page.  And

15  Paragraph 5 states, "The State of Texas is

16  compensating me for any subsequent testimony in this

17  case at the rate of $400 per hour.  To date, I've

18  been paid $15,000 for my work in this case."  Do you

19  see that?

20       A.   I do.

21       Q.   Okay.  Can you tell me what the rate of

22  your compensation has been throughout this case?

23  Has it always been $400 or has it changed at all?

24       A.   The $400 an hour would be for the

25  subsequent testimony.  And I was paid on a flat fee

JEFFREY MILYO, PhD                                    8/26/2014

59

1   for producing expert reports.

2              The $15,000 was accurate at the time

3   of this writing.

4   Q.   So your agreement with the State was that

5   you would produce an expert report for $15,000?

6   A.   No, I did not say that.

7   Q.   Well, that's what I'm asking.  That was a

8   question.

9   A.   The -- well, there was an original

10  agreement that had a cap for payment and some

11  open-ended -- it was a long contract, and I have to

12  be honest, that -- I didn't go into the details of

13  it too much.  I went with my understanding of what

14  was to be produced.

15             The original cap, I believe, was

16  $25,000.  Since that time, the cap has been raised

17  over time.  And, again, I want to be responsive to

18  the spirit of your question here.

19             15,000 is what I have actually been

20  paid.  I have billed for more than that.

21  Q.   How much have you billed for?

22  A.   There's an outstanding invoice for 50,000.

23  Q.   On top of the 15?

24  A.   On top of the 15.

25  Q.   And are you billing that on the basis of

60

1  an hourly rate?

2      A.   No.  That was based on a flat rate.

3      Q.   And do you recall how much time you

4  spent -- do you keep track of your time?

5      A.   Since I'm being paid on a flat rate, I'm

6  not keeping detailed time.  I believe I had to

7  submit a declaration where I gave an estimate of the

8  time I have spent.

9      Q.   And the $400 an hour, does that come into

10 play after this first $65,000 flat work?

11     A.   It's not entirely clear to me.  I -- my

12 understanding is that it does.  I'm not sure there's

13 a complete meeting of the minds there.

14     Q.   Do you recall -- can you estimate how many

15 hours you have devoted to this case?

16     A.   In total?

17     Q.   In total.

18     A.   Not with great accuracy.  I submitted a

19 declaration which was a best estimate at that time.

20 And I can't even recall exactly when that was -- was

21 turned in.

22          So I can talk about the marginal

23 hours since then.

24     Q.   Well, do you recall approximately how many

25 hours you listed in the declaration that you

JEFFREY MILYO, PhD                           8/26/2014

61

1  submitted?

2      A.   You know, I don't recall it exactly,

3  because I wasn't keeping a formal record.  It was

4  based on my best estimate and understanding of the

5  hours.

6      Q.   Do you recall approximately?

7      A.   With a big approximation, 100.

8      Q.   100 hours?

9      A.   Does that work out about right?  Something

10 like that, more than that.

11     Q.   And do you recall approximately what scope

12 of work was included in that?  And by that I mean,

13 through the first report, through the second report,

14 something else?

15     A.   I'm trying to recall when that was

16 submitted.  This is where we get into the gray area

17 where it wasn't clear to me if there was a meeting

18 of the minds on everything.

19               I think that was submitted along with

20 the first report, over a short -- you know, maybe

21 not exactly contemporaneous.  But that's my

22 recollection of doing that declaration.

23     Q.   Now, the reports, documents 1 and 2, do

24 they contain all of the opinions you intend to give

25 in this case at trial?

JEFFREY MILYO, PhD                                    8/26/2014

                                                            62

1        A.   Well, you're asking about the future.  For

2   today, the report contains my opinions.  But as has

3   happened, as new information comes up -- again, I'm

4   not an expert on the legal process.  If I'm asked to

5   do something more -- I don't know if I'll have

6   occasion to do new analysis to look at supplemental

7   reports in more detail, et cetera.  So I would not

8   want to confine myself in the future to the report.

9   But for now, it contains my opinions.

10       Q.   And sitting here today, have you

11  undertaken any analyses that do not appear in either

12  Milyo document 1 or Milyo document 2?

13       A.   Well, as I've mentioned, I've glanced at

14  or looked at some of the supplemental reports.  One

15  can't help but have some thoughts.  But in terms of

16  any formal analyses or opinions, I can't say that I

17  have anything that I'd be comfortable discussing at

18  this time beyond the report.

19       Q.   In the past you've described your area of

20  academic expertise -- and tell me if this is

21  correct -- as American political economy, including

22  the empirical analysis of the effects of political

23  regulations and institutions.  Is that accurate?

24       A.   I don't recall that specifically.

25       Q.   Does that sound accurate to you?  Does

JEFFREY MILYO, PhD                                    8/26/2014

63

1    that accurately describe your area of expertise as

2    you would put it forward?

3         A.   Depending on the context, I could envision

4    describing that in that way.

5         Q.   Well, earlier today, I think you talked

6    about your scope of expertise in this case as a

7    political economist with expertise in policy

8    evaluation.  Is that correct?

9         A.   That sounds familiar to what we said.

10        Q.   Is that any -- do you consider that

11   different than American political economy, including

12   the empirical analysis of the effects of political

13   regulations and institutions?

14        A.   Those sound fairly synonymous to me.

15        Q.   Now, do you -- is the expertise that

16   you're putting forward in this case different than

17   either of those two descriptions?

18        A.   Broadly construed, no.

19        Q.   You consider yourself an expert in

20   statistics?

21        A.   I have some expertise in statistics.

22        Q.   Do you consider yourself an expert in

23   statistics?

24        A.   It would depend on the context, what

25   exactly you mean.

JEFFREY MILYO, PhD                                    8/26/2014

                                                              64

1          Q.    Are you a statistician?

2          A.    I do statistical work.

3          Q.    Do you consider yourself a statistician?

4          A.    I don't know that there's a union of

5    statisticians.  So, you know, it's a strange sort of

6    question.

7                     I do statistical evaluation.  I have

8    done some methodological statistical analysis.

9          Q.    Have you published a peer-reviewed article

10   on statistics?

11         A.    In a journal with statistics in its title

12   or generally considered in the field of statistics?

13         Q.    I'm asking whether you've ever published a

14   peer-reviewed article on statistics in any journal.

15         A.    Using statistical tools, absolutely.

16         Q.    Are you a member of any statistician

17   professional associations?

18         A.    No.

19         Q.    Have you ever taught a statistics course?

20         A.    I've certainly guest lectured in a course

21   on applied statistical methods through the economics

22   department.

23                     But if your question is about a

24   course in a statistics department, no.

25         Q.    Have you authored any scholarly works on

JEFFREY MILYO, PhD                                    8/26/2014

65

1    quantitative methodology in social science?

2         A.   Yes.

3         Q.   Which ones?

4         A.   Referring to my CV.  Well, in some sense,

5    almost any empirical study is going to have to do

6    with statistical methodology and the way of

7    analyzing a particular area.  So almost anything

8    empirical could be classified in that way.

9         Q.   Do you consider yourself an expert on

10   transportation?

11        A.   I would not consider myself an expert on

12   transportation.

13        Q.   Do you consider yourself an expert on

14   travel behavior?

15        A.   I would not consider myself an expert on

16   travel behavior.

17        Q.   Do you consider yourself an expert on

18   travel burdens?

19        A.   Well, now you're getting into an area of

20   describing potential costs and benefits, which is

21   within the bailiwick of economics.

22        Q.   But specifically on travel burdens.

23        A.   To the extent they have to do with

24   evaluating costs and benefits, the logic of

25   arguments.

JEFFREY MILYO, PhD                                    8/26/2014

                                                              66

1        Q.   You consider yourself an expert on travel

2   burdens, is that what you're saying?

3        A.   I didn't say that.

4        Q.   That's what I'm asking.

5        A.   If the discussion of travel burdens

6   relates to things that I have expertise in, then I

7   would have expertise in that.

8        Q.   Have you ever published a peer-reviewed

9   article on travel burdens?

10       A.   I don't believe so.

11       Q.   Do you consider yourself an expert on

12  surveys?

13       A.   I have analyzed surveys, so I have some

14  expertise.

15       Q.   Have you ever conducted a survey?

16       A.   I have been a participant in the

17  Cooperative Congressional Election survey for --

18  counting this year -- seven years.  That would be as

19  a team member.

20       Q.   I'm sorry, just slow down for a second.

21  Can you again tell me, you're a participant in what

22  survey?

23       A.   It's the CCES.  And, again, sometimes I

24  may conflate whether it's Cooperative Congressional

25  or Congressional cooperative.  But it's CCES.

JEFFREY MILYO, PhD                                    8/26/2014

67

1              Stephen Ansolabehere, I believe, is

2    still the principal investigator for that survey.

3         Q.   And what is your role in the CCES?

4         A.   As a team member, we submit questions to

5    be included in subsamples of team content.

6         Q.   Who else is a member of the team?

7         A.   For this year's survey, I am including a

8    graduate student in political science, and have

9    worked with her on some questions related to her

10   dissertation research.

11        Q.   And anyone else?

12        A.   For this year, no.

13        Q.   And when I say the team -- you mentioned

14   Stephen Ansolabehere.  Is he part of the team also?

15        A.   No.  The terminology of a team would be --

16   the CCES is a cooperative survey and so teams at

17   different universities buy in and contribute survey

18   questions for part of the analysis.

19        Q.   Who actually designs the survey in CCES?

20        A.   The overall survey?

21        Q.   Yes.

22        A.   In terms of who to ask?  That would be --

23   you could look it up.  But it -- they used to be

24   called Polimetrics.  I can't remember if they were

25   bought out.  And Stephen Ansolabehere as the PI, I

JEFFREY MILYO, PhD                                    8/26/2014

68

1    imagine, had something to do with that.

2        Q.    But your participation of that is limited

3    to suggesting questions that they might ask?   Is

4    that what you're saying?

5        A.    It's more than suggesting.   The questions

6    that we put in are asked.

7        Q.    Have -- but do you have anything to do

8    with the design of the survey, other than submitting

9    questions to be asked?

10       A.    No.

11       Q.    Do you have -- have you -- other than your

12   participation in CCES, have you ever designed a

13   survey?

14       A.    Let's see.   I think in the spirit of your

15   question, not -- not in terms of a large sample

16   public opinion survey.

17       Q.    Do you consider yourself an expert in

18   geography?

19       A.    I'm -- if you mean the scholarly

20   discipline of geography --

21       Q.    Yes.

22       A.    No.

23       Q.    Are you familiar with the discipline of

24   political geography?

25       A.    I've heard the term.

JEFFREY MILYO, PhD                                    8/26/2014

69

1      Q.   Do you consider yourself an expert in
2  political geography?
3      A.   To the extent they discuss issues and use
4  methods that overlap with things that I have
5  familiarity with, I would have some expertise.
6      Q.   But would you consider yourself an expert
7  in political geography?
8      A.   As I've answered, to -- in the areas where
9  there's overlap, where I do have expertise, then I
10  would have some expertise.
11      Q.   What's your understanding of what the
12  discipline of political geography is?
13      A.   My understanding is that it would involve,
14  in part, looking at issues such as redistricting.
15      Q.   And do you consider yourself an expert in
16  the issues of political geography that touch upon
17  redistricting?
18      A.   Well, you're asking about substantive
19  focus areas and, in doing so, I think something
20  that's missing would be -- again, there's areas of
21  any kind of analysis that may involve discussion of
22  costs and benefits of the behavior of individuals,
23  of the way to empirically evaluate phenomena.  Those
24  would be the broad areas that I have expertise, and
25  they can be applied across many different fields,

JEFFREY MILYO, PhD                                    8/26/2014

70

1   into many different areas, as my CV suggests.

2        Q.   Do you consider yourself an expert in

3   residential patterns of different racial and ethnic

4   groups?

5        A.   Again, I've given a repeated answer about

6   overlap and use of methods and tools.  In terms of a

7   substantive focus of my own inquiry, I would say no.

8        Q.   Do you consider yourself an expert on

9   poverty issues as they affect different racial and

10  ethnic groups?

11       A.   That's something where I have done more

12  work specifically on that topic, but I would -- I

13  would remind you of the answer about, my expertise

14  is more in methods of analysis that are broadly

15  applicable to many fields and issue areas.

16       Q.   So you would not consider yourself an

17  expert specifically on poverty issues as they affect

18  racial and ethnic groups?

19       A.   It -- I've done some research looking at

20  health consequences, social determinants of health.

21  And in any analysis, looking at political outcomes,

22  those are often controls.  So it depends on what you

23  mean by an expert.  I would characterize my

24  expertise more in the way I have, in the broad use

25  of tools within the area of American political

JEFFREY MILYO, PhD                                    8/26/2014

71

1    economy and policy evaluation.

2         Q.   Do you consider yourself an expert on

3    election fraud?

4         A.   I would answer the same way.  To the

5    extent it involves the tools of economic and

6    political analysis, I would be able to be conversant

7    with those kinds of studies.

8         Q.   Have you ever done a study on election

9    fraud?

10        A.   I have not published an article on

11   election fraud, specifically on that topic.

12        Q.   Have you ever studied election fraud?

13        A.   Broadly construed, studying, yes, I have

14   read about it.

15        Q.   Other than reading about it?

16        A.   I have thought about it.

17        Q.   Other than thinking about it?

18        A.   Well, thinking about it covers a lot of

19   ground.

20             The -- I think some of my work in

21   progress presentations probably contain some

22   discussion, but I don't have an exact recollection.

23        Q.   And you've never published any scholarly

24   work on voter fraud?

25        A.   As the main theme, I mean, we've pointed

JEFFREY MILYO, PhD                                          8/26/2014

72

1  to the voter ID study which I would guess mentions

2  something about illegal voting.

3       Q.   Other than that?

4       A.   Published might include an op-ed.  And so

5  now I'm trying to remember any op-eds I might have

6  done.

7            There's an op-ed called "The Votes

8  Are in."  That may have mentioned something about

9  illegal voting.  I don't recall it, the content of

10 it.

11      Q.   Have you ever done an op-ed on voter ID?

12      A.   If I were to pick one out -- let's see.

13 That one -- I'm looking at my list here.

14           To the best of my recollection, and

15 looking at my CV, that -- "The Votes Are in," it

16 looks like that might be an op-ed on that topic.

17 That's what I recall.

18      Q.   Do you recall what your opinion was that

19 you gave in that op-ed?

20      A.   Well, that's going back to 2008, so I

21 don't have a detailed recollection.

22      Q.   Would you consider that a scholarly work?

23      A.   No.  I generally don't consider op-eds a

24 scholarly work.  I thought you were asking about any

25 publication.

JEFFREY MILYO, PhD                                    8/26/2014

73

1       Q.    Do you consider yourself an expert on the

2   history of discrimination in Texas?

3       A.    To the extent any analysis involves

4   discussion of costs and benefits as -- used as

5   statistical tools, I would have some expertise.

6   But, no, I would not say that is a substantive focus

7   of expertise for me.

8       Q.    Have you published any articles on the

9   application of social science to civil rights

10  issues?

11      A.    I think one might characterize a fair

12  amount of my work on campaign finance along those

13  lines.  Also the voter ID study, that's what comes

14  to mind immediately.

15      Q.    On campaign finance, are you

16  characterizing that as a social science analysis

17  applied to civil rights because of the First

18  Amendment implications?

19      A.    Yes.

20      Q.    Not because of racial or ethnic issues.

21  Is that correct?

22      A.    That would be correct.

23              MR. ROSENBERG:  Why don't we take

24  a -- I think we've been going for about an hour, so

25  let's take a little break.

JEFFREY MILYO, PhD                                    8/26/2014

                                                            74

1              (Recess.)
2        Q.    (BY MR. ROSENBERG)   Professor Milyo,
3    you've had some connection with the institute of
4    justice.   Is that correct?
5        A.    Is it the institute of justice or
6    Institute For Justice?   But I -- yes.
7        Q.    Something that has the words "institute"
8    and "justice" in it?
9        A.    Yes.
10       Q.    What is the institute of or for justice?
11       A.    Best of my knowledge, I think I would
12   describe it as a -- I think you would call it a
13   public interest law firm or maybe we would call it
14   a -- no, they're not a firm.
15             It's a nonprofit that engages in some
16   public interest kinds of cases that does some think
17   tank kind of aspects.
18       Q.    And what's been your relationship with The
19   Institute For Justice?
20       A.    I have produced some reports for them and
21   I have also been an expert witness.
22       Q.    Do you have an ongoing relationship with
23   them?
24       A.    I would not characterize it that way.
25       Q.    Do you have a current relationship with

75

1    them?

2         A.    No.

3         Q.    Does The Institute For Justice -- has The

4    Institute For Justice taken a position on voter ID

5    laws?

6         A.    Not to my knowledge.

7         Q.    Do you have any relationship with the Koch

8    Foundation, K-o-c-h?

9         A.    I receive a grant to teach a seminar

10   course, from the Koch Foundation.

11        Q.    Is that the only grant you've received

12   from the Koch Foundation?

13        A.    I've received multiple renewed grants to

14   teach a seminar course, and that's the only current

15   grant at this time.

16        Q.    Has the Koch -- what is the Koch

17   Foundation?

18        A.    It's some sort of nonprofit that does

19   stuff.  I mean, my knowledge, it relates to -- they

20   have an interest in undergraduate teaching programs,

21   is most of my knowledge.

22        Q.    Do you know if the Koch Foundation has

23   taken a public position on photo ID laws?

24        A.    I do not.

25        Q.    Do you know if the Koch Foundation has a

JEFFREY MILYO, PhD                                    8/26/2014

76

1    relationship with The Institute For Justice?

2        A.    I do not.

3        Q.    By the way, do you have a personal opinion

4    as to photo ID laws of any kind?

5        A.    What do you mean by personal?

6        Q.    Well, do you think photo ID laws are good

7    or bad, that there are concerns, problems, no

8    problems, that kind of thing?

9        A.    Apart from what's in my report?

10       Q.    Apart from what's in your report.

11       A.    I'd say to the extents, recently I have

12   thought about photo ID laws.  It's been more in the

13   context of a researcher, looking for opportunities

14   to produce what might be some value-added research.

15       Q.    So do you have a personal opinion as to

16   whether photo ID laws are good or bad, generally

17   speaking?

18            MR. KEISTER:  Objection; form.

19       Q.   (BY MR. ROSENBERG)  You're allowed to

20   answer.  As a matter of fact, you have to answer.

21            MR. KEISTER:  Yes.  Unless I instruct

22   you not to, you answer.

23       A.    Well, the reason I'm having trouble with

24   your question in a way that maybe a layperson

25   wouldn't, is that in economics especially, we try to

JEFFREY MILYO, PhD                                8/26/2014

77

 1   distinguish between positive analysis and normative

 2   analysis, and, you know, we try to separate those

 3   barriers.

 4              So of late, I can't say that I've

 5   taken a stance on voter ID, other than maybe people

 6   seem to make a bigger deal of it than perhaps the

 7   evidence warrants.

 8       Q.   (BY MR. ROSENBERG)  When you say people

 9   seem to make a bigger deal about it than the

10   evidence warrants, what bigger deal are you

11   referring to?

12       A.   What bigger deal?

13       Q.   Yeah.  You used the words "bigger deal."

14   So you mean the --

15       A.   It could be this proceeding, it could

16   be -- there's a heated political debate, and as with

17   any heated political debate, one could -- if you're

18   asking for a lay characterization, characterize that

19   as making a big deal of something.

20       Q.   And by that you mean people who are

21   claiming that the law is not a good law?

22       A.   Well, when you're using the terms good and

23   bad, again, you're sort of mixing here my role as an

24   expert and a scholar doing positive analysis versus

25   some personal opinions that anybody might have.

JEFFREY MILYO, PhD                                    8/26/2014

78

1      Q.   And that's what I'm -- I'm asking for your

2   personal opinions.

3                MR. KEISTER:   I'm going to -- let me

4   object to form and object to this being outside of

5   the expert reports and the opinions for which he's

6   been designated to testify.

7                With that proviso, he can answer.

8      A.   As a personal opinion, I don't have a

9   problem with voter ID laws and -- but I don't think

10   I care terribly strongly, sitting here today.

11      Q.   (BY MR. ROSENBERG)   Let's turn to your

12   opinions in this case, your expert opinions.   And

13   let's turn to Exhibit Number 2, which we'll use.   Do

14   you have that in front of you?

15      A.   This is Milyo 2?

16      Q.   Milyo 2.

17      A.   Yes, I do.

18      Q.   And in Paragraph 1, you say that you've

19   been asked by the State of Texas to review the

20   expert reports submitted on behalf of plaintiffs,

21   and to comment on the quality of the arguments made

22   regarding the recently implemented voter

23   identification law in Texas SB 14.   Right?

24      A.   That looks like a verbatim reading.

25      Q.   Okay.   You did not, yourself, undertake

JEFFREY MILYO, PhD                                          8/26/2014

79

1   analysis of any data, other than as was presented to
2   you by plaintiffs' experts.  Is that correct?
3          A.   I don't believe it says that.
4          Q.   No.  I'm asking you that.
5          A.   In terms of what's in the report, I
6   believe I cite all of my sources in this report.
7          Q.   You did not, yourself, attempt to analyze,
8   for example, the TEAM voter list.  Is that correct?
9   T-E-A-M, all capitalized.  Is that correct?
10         A.   That is correct.
11         Q.   Or the DLS database.  Is that correct?
12         A.   That is correct.
13         Q.   Or the license-to-carry database.  Is that
14  correct?
15         A.   That is correct.
16         Q.   Or any of the federal databases.  Is that
17  correct?
18         A.   That is correct.
19         Q.   And you did not, yourself, come to a
20  conclusion whether from a reasonable degree of
21  scientific certainty, fewer African-Americans, on a
22  percentage basis, possess the IDs required by SB 14
23  than do whites.  Is that correct?
24         A.   I believe the nature of my comments and
25  opinions had to do with the quality of analysis made

JEFFREY MILYO, PhD                              8/26/2014

                                                      80

1    by the other experts.

2         Q.   So you, yourself, did not come to a

3    conclusion as to whether blacks as a group

4    disproportionally do not possess SB 14 compared to

5    whites as a group.  Is that correct?

6         A.   Well, I presented some evidence that would

7    be consistent with no statistical difference between

8    those groups.

9         Q.   Did you come to a conclusion, from a

10   reasonable degree of scientific certainty, that

11   blacks as a group possess the IDs -- do not possess

12   the IDs required by SB 14 compared to whites as a

13   group?

14        A.   I did not conduct an original analysis,

15   other than what is contained in the report.

16        Q.   You did not -- and the same question as to

17   Latinos as compared to whites.  You did not conduct

18   an analysis to allow you to come to a conclusion as

19   to a reasonable degree of scientific certainty that

20   Latinos as a group do not possess SB 14 IDs --

21        A.   Well, as discussed in the report, what I

22   commented on was the reasonable degree of scientific

23   certainty, as you put it, about the other experts'

24   conclusions.

25             And so I suppose in the sense of

JEFFREY MILYO, PhD                                  8/26/2014

81

1  saying, they don't really have quite the sufficient

2  evidence to make the conclusions they make, you

3  could view that as making a conclusion.  I'm trying

4  to interpret your using, you know, some particular

5  words here.

6              But, again, I would describe the

7  report as speaking to the quality of the arguments

8  made by the other experts.  I do present some

9  evidence about statistical significance in holding

10 of IDs across these groups.

11     Q.   You do not come to any conclusions,

12 yourself, as a result of your own study, as to

13 whether there's a history of racial discrimination

14 against blacks and Latinos in Texas, particularly as

15 to voting.  Is that correct?

16     A.   Again, the substance of the report would

17 speak more to the quality of arguments, on that

18 topic, less so than on other topics, I believe.

19     Q.   Do you believe that there is a history of

20 racial discrimination against blacks and Latinos in

21 voting in Texas?

22     A.   I don't have firsthand knowledge of that.

23     Q.   Well, whether you have firsthand knowledge

24 or not, do you have any opinion based upon your --

25 whatever your experience in whatever your fields

JEFFREY MILYO, PhD                                    8/26/2014

82

1    are?

2        A.    The opinions that I have in my report are

3    the ones that I'm -- that I currently have at this

4    time.  If you, you know, go outside that, it's

5    difficult for me to answer.

6        Q.    Meaning you don't have an opinion as to

7    whether or not there's a history of racial

8    discrimination against blacks and Latinos in Texas,

9    particularly as to voting?

10                 MR. KEISTER:  Object to form; asked

11   and answered.  You can answer.

12       A.    Again, lawyers use the word "opinion"

13   differently than other folks and so hence my -- my

14   hesitation.

15                 My report contains the opinions that

16   I'm offering as of this point in time.

17       Q.    (BY MR. ROSENBERG)  Are you offering an

18   opinion as to whether or not there's a history of

19   racial discrimination against blacks and Latinos in

20   Texas, particularly as to voting?

21       A.    I don't believe the report speaks to that.

22       Q.    Do you have an opinion, outside of the

23   report, as to whether there's a history of racial

24   and ethnic discrimination against blacks and Latinos

25   in Texas, particularly as to voting?

JEFFREY MILYO, PhD                              8/26/2014

                                                       83

1              MR. KEISTER:  Let me object to form

2    and to the extent it calls for opinions outside of

3    the expert report, and the purposes for what this

4    witness has been designated, I object.  But with

5    that said, you can answer if you can.

6         A.   I don't have firsthand knowledge.  I would

7    have to offer -- if you're asking for an opinion, it

8    would be as a -- as a layperson.  I haven't examined

9    the evidence in the context of providing an expert

10   report on that question.

11        Q.   (BY MR. ROSENBERG)  And as a layperson?

12        A.   My --

13             MR. KEISTER:  Same objections.

14        A.   My understanding in terms of my personal

15   opinion would be yes.

16        Q.   (BY MR. ROSENBERG)  Do you have an opinion

17   as to whether there's racialized, polarized voting

18   in Texas?

19        A.   Again, a particular terminology, I don't

20   believe that is something that my expert report

21   speaks to.

22        Q.   Do you understand what the term racial --

23   do you have an understanding of the term racialized

24   -- racial polarized voting?

25        A.   It's a phrase that I have seen.  And I may

JEFFREY MILYO, PhD                                    8/26/2014

84

1   not have the exact legal interpretation of that.

2        Q.   What's your understanding of the term?

3        A.   Again, this goes outside the bounds of my

4   report, in terms of things that I've expressed an

5   opinion on.

6        Q.   Yes.  And what is your understanding of

7   the term "racial polarized voting"?

8        A.   Broadly speaking, it would be that whites

9   and blacks -- or we could consider different

10  races -- either have different opinions or vote for

11  different types of candidates in a way that has a

12  high correlation with race.

13       Q.   And have you ever studied the issue of

14  whether there is racial polarized voting in Texas?

15       A.   By "study," do you mean...

16       Q.   Well, you can tell me how you would use

17  the word "study" and we can go with that definition.

18       A.   Well, the other expert reports provide

19  some numerical evidence.  That's certainly something

20  that I've looked at and thought about.  But I don't

21  think I speak to that in the report, so I haven't

22  offered any opinions on that in my report.

23       Q.   And do you have any basis upon which to

24  dispute the opinions in the other reports to which

25  you've just referred as to racial polarized voting

JEFFREY MILYO, PhD                                    8/26/2014

85

1  in Texas?

2      A.   Well, as I've repeatedly said, my report

3  contains the opinions that I have today at this

4  time.  If I'm asked to examine other aspects of the

5  expert reports or have the time and opportunity to

6  do so, and/or have the time and opportunity to do

7  so, I might.

8              But at this time, I would stick to

9  the opinions that I've offered in my report.

10     Q.   Based upon your experience in whatever

11 your fields are, do you have any opinions as to

12 whether or not there is racial polarized voting in

13 Texas?

14             MR. KEISTER:  Let me just object to

15 form.  And to the extent it's outside the expert

16 report and the issues which he's been designated, I

17 object.  With that objection, he can answer if he

18 can.

19     A.   I don't recall looking firsthand at the

20 kind of data that might speak to that issue, other

21 than some of the evidence presented by the other

22 experts in terms of differences in -- well, they

23 present differences in voting rates, differences in

24 registration rates.  That's not directly speaking to

25 the polarized voting, so I have not studied that

1   issue.

2        Q.   So you have no opinion on that issue?

3        A.   Again, you're using -- you know, we're in

4   a legal proceeding where opinion means something.

5   My expert opinions are contained in the report I've

6   provided.

7        Q.   Do you have a lay opinion on that issue?

8        A.   What was the issue we're talking about?

9        Q.   Whether there's racial polarized voting in

10  Texas.

11       A.   I have not looked at the data.

12       Q.   So you don't have an opinion?

13       A.   I could speculate as to an uninformed

14  opinion.  I'm not sure what value that would have.

15       Q.   I'm not asking you to speculate.

16            Do you have an opinion as to whether

17  there was a discriminatory purpose behind the

18  passage of SB 14?

19       A.   I believe to the extent that is discussed

20  in my report, what I've pointed out is that the

21  evidence presented is not entirely consistent with

22  that sort of claim.

23       Q.   And where in your report do you say that?

24       A.   Let's see.  This doesn't have a page

25  number, so it's -- let's see.  The first instance

JEFFREY MILYO, PhD                                    8/26/2014

87

1   that I see would be in Paragraph 18, at the bottom.

2        Q.    Paragraph 18, at the bottom, is where you

3   summarize the 17 expert reports submitted by

4   plaintiffs.  And part E says, "Racially

5   discriminatory intent."  Is that what you're

6   referring to?

7        A.    Below that.  "Given the limited time

8   available to me, I consider only the first four of

9   these arguments, A through D."

10       Q.    So you go on to say, "However, my findings

11  are sufficient to severely undercut the fifth and

12  final argument, E."  Is that what you're saying?  Is

13  that what you say?

14       A.    I believe that is a verbatim reading.

15       Q.    And what do you mean, which findings are

16  sufficient to severely undercut that there was

17  racially discriminatory intent in the passage of

18  SB 14?

19       A.    The summary I provided here was that SB 14

20  was passed with the intent to substantially and

21  disproportionately suppress turnout among otherwise

22  eligible black and Hispanic voters.

23                  The kind of evidence that is offered

24  primarily has to do with the effects -- and I point

25  out throughout the report -- problems with the

JEFFREY MILYO, PhD                                    8/26/2014

1   quality of those arguments.

2               If we -- can't be sure what the

3   effects of SB 14 was.  It's hard to know what the --

4   hard to support the idea that it was part of either

5   some scheme to achieve those kinds of ends.

6       Q.   Is it your understanding that the support

7   of -- that -- strike that.

8               Is it your understanding that

9   plaintiffs' position as to the discriminatory intent

10  behind SB 14 is limited to the effects of SB 14?

11      A.   Well, we're getting into an area that's

12  explicitly an area that I've said I have not

13  considered this argument.

14      Q.   So the only thing you've considered are

15  the effects.  Is that correct?

16      A.   I -- what I've written here is, I consider

17  only the first four of these arguments.  You didn't

18  let me finish a response to your other question,

19  which now I've forgotten.

20      Q.   Well, I'm not sure I didn't let you finish

21  anything.  But you're free to say whatever you want.

22              Do you want me to have the question

23  read back so that you can finish your answer?

24      A.   Is it something I desire?  No.  If it was

25  a question you wanted answered completely, then we

JEFFREY MILYO, PhD                                    8/26/2014

                                                          89

1    probably should.

2              MR. ROSENBERG:  Well, let's read back

3    two questions ago.  Make it three because of this

4    colloquy.

5              THE REPORTER:  "And what do you mean,

6    which findings are sufficient to severely undercut

7    that there was racially discriminatory intent in the

8    passage of SB 14?"

9         Q.   (BY MR. ROSENBERG)  Is that the question

10   that you did not finish your answer to?

11        A.   I don't think that was.

12             MR. ROSENBERG:  Read the next

13   question, please.

14             THE REPORTER:  "Is it your

15   understanding that plaintiffs' position as to the

16   discriminatory intent behind SB 14 is limited to the

17   effects of SB 14?"

18        Q.   (BY MR. ROSENBERG)  Is that the question

19   that you've not finished your answer to?

20        A.   No, I don't think that was the one I was

21   thinking of.

22             MR. ROSENBERG:  Can you read the

23   question after that one.

24             THE REPORTER:  "So the only thing

25   you've considered are the effects.  Is that

JEFFREY MILYO, PhD                                    8/26/2014

                                                              90

1    correct?"

2          Q.    (BY MR. ROSENBERG)   Is that the question

3    that you did not --

4          A.    I think it was going the other direction

5    in time.

6          Q.    Well, we're not going to waste more time

7    on that.   The record will speak for itself.

8                    If there's anything right now that

9    you want to add, go ahead.

10         A.    There may be at some point in time.   This

11   has been kind of a confusing interaction here, to be

12   honest.

13         Q.    I agree.

14                    Let's go to Paragraph 54 of the

15   report.

16         A.    Are we still in Milyo 2?

17         Q.    Yeah.   And Paragraph 54 begins your

18   discussion concerning the Barreto and Sanchez

19   survey.   Is that correct?

20         A.    Their survey may have been mentioned

21   earlier in the report.   I don't recall exactly.

22         Q.    But this is the substance -- Paragraphs 54

23   through 82 is the substance of your criticism of the

24   Barreto and Sanchez report?   And there's another

25   section later on I'll get to.   But that's the first

JEFFREY MILYO, PhD                                    8/26/2014

91

1   substantive --

2        A.   This would -- well, I don't know if it's

3   the first, but it is a substantive section.

4        Q.   Well, is there a section before this in

5   your report --

6        A.   I don't recall exactly if I had cited them

7   earlier.  I'm...

8        Q.   In this paragraph, I'm looking at the last

9   sentence where you say, "However, this estimate

10  (referring to the 1.2 million eligible voter

11  estimate) is likely biased upward since the methods

12  employed by Barreto and Sanchez are likely to

13  overstate the number of otherwise eligible voters

14  who lack requisite ID for several reasons."

15           Do you see that?

16       A.   Yes.

17       Q.   And can you quantify how likely that bias

18  is?  Do you have a quantification of that?

19       A.   Other than greater than zero?

20       Q.   Right.

21       A.   I do not.

22       Q.   Okay.  And when you say "likely to

23  overstate the number," do you have a quantification

24  of that?

25       A.   I do not produce an exact estimate in

JEFFREY MILYO, PhD                                    8/26/2014

92

1    terms of a correction of their work.

2         Q.    Paragraph 55, you refer to respondents who

3    do not report their year of birth and respondents

4    who do not report how long they have resided in

5    Texas, and who report that they were born in another

6    country but do not report when they became citizens.

7    Do you see that?

8         A.    I do.

9         Q.    Is it your opinion that because the

10   respondent did not report his or her year of birth,

11   the results should not be considered in the survey?

12        A.    The context for discussing this has to do

13   with the quality of the data screening and

14   validation.  And what I point out in numerous places

15   in the report would be instances of respondent

16   answers that are either difficult to interpret or

17   are inconsistent with other answers.

18                 And so I'm raising the question here,

19   talking about how a more thorough check might have

20   been possible.

21        Q.    But is it your opinion that because the

22   respondent did not report his or her birth -- year

23   of birth, that the results as to that respondent

24   should be omitted from the survey consideration?

25        A.    The concern that I'm raising with

JEFFREY MILYO, PhD                                      8/26/2014

93

1    respondents that give inconsistent or incomplete

2    responses has to do with the sensitivity of the

3    analysis.

4         Q.    So are you saying they should or should

5    not be considered in the analysis of the survey?

6         A.    Well, I think the way you're asking the

7    question is one of those normative kinds of

8    questions.  I think what we like to do is to see if

9    different treatments of different responses give us

10   different results; and if they do, then we have some

11   concerns and doubts that we should raise.

12                In general, with any kind of

13   empirical study, one expects the researcher to be

14   doing that kind of a sensitivity analysis.

15        Q.    Did you do that kind of sensitivity

16   analysis specifically in connection with the 210

17   respondents you describe here or the 87 respondents

18   you describe here or the 66 respondents you describe

19   here?

20        A.    Well, we can refer later in the report to

21   my description of some illustrative sensitivity

22   analysis.  And that would be the description of

23   Replications 1, 2, 3, and 4, beginning at

24   Paragraph 73.

25        Q.    Right.  And in Replications 1, 2, 3, and

JEFFREY MILYO, PhD                                    8/26/2014

94

1     4, did you omit from those replications any of the
2     respondents whom you describe in Paragraph 55?
3         A.   Well, let's see what we say here.
4     Replication 1 has to do with ambiguous responses to
5     unexpired ID or suspended driver's license.
6                  Replication 2 makes an adjustment for
7     disability exemption and over age 65.
8                  Replication 3 is similar to 2, except
9     I drop responses that might render their eligibility
10    to vote ambiguous or who refuse to indicate their
11    race and ethnicity.  This includes any respondents
12    that refuse to report their age, disability status,
13    state of residence, year of citizenship.  I also
14    omit those respondents that report both not
15    possessing requisite ID and report voting after
16    implementation.
17                  So this Paragraph 65 would include at
18    least some -- I'd have to look back to -- is it 55?
19        Q.   55, that's correct.
20        A.   So here we have some who are giving
21    ambiguous information about their age.
22        Q.   Well --
23        A.   And --
24        Q.   Let me stop you there for a second.  When
25    you say, "ambiguous information about their age," if

JEFFREY MILYO, PhD                                    8/26/2014

95

1    the respondent gave their age, but did not report

2    his or her year of birth, did you or did you not

3    omit that respondent in Replication Number 3?

4            A.    Repeat the question.

5            Q.    Sure.   If the respondent, in response to

6    one of the questions, gave age, or indicated

7    expressly that they were above the age of 18, 18 or

8    older, but did not, in response to another question,

9    give the year of birth, did you include or not

10   include that respondent in Replication Number 3?

11           A.    So I believe Replication 3 would drop

12   people who refused to answer their age.

13           Q.    That's different than -- I'll have to

14   repeat the question again.

15                 If the respondent expressly stated

16   that he or she was 18 years or older, but did not

17   report his or her year of birth, did you or did you

18   not include the respondent in Replication Number 3?

19           A.    I believe the initial screening question

20   asks more than just age 18 and older.

21                 But the point here was that there was

22   an inconsistency in response --

23           Q.    That's my question.

24           A.    -- or a potential inconsistency.

25           Q.    So is it your testimony that you did not

1    include all of the 210 respondents whom you say do

2    not report the year of birth in Replication

3    Number 3?

4         A.    That would be the description of

5    Replication Number 3.

6         Q.    And how about the 87 respondents whom you

7    described in Paragraph 55 as not reporting how long

8    they have resided in Texas.  Did you or did you not

9    include those in Replication Number 3?

10        A.    So Replication Number 3 omits those

11   respondents that refuse to report age, state of

12   residence, in terms of their length of residency,

13   that's correct.

14        Q.    Well, there's a difference between state

15   of residence and length of residency, is there not?

16        A.    You are correct in that.  And this would

17   be -- this would be an area where I could more

18   accurately describe.  You are correct.

19                  So for 75, we're talking about people

20   who did not answer how long they have been residents

21   of the state of Texas.

22        Q.    So even if someone indicated that they

23   were a resident of Texas, you would omit them from

24   Replication Number 3 because they did not state how

25   long they were a resident of Texas.  Is that

JEFFREY MILYO, PhD                                    8/26/2014

97

1    correct?

2        A.   That would be in Replication Number 3,

3    that's correct.

4        Q.   So that would mean that all of those 87

5    were omitted from Replication Number 3.  Is that

6    correct?

7        A.   Some of those may have already been

8    omitted for a different reason.  It would be --

9    those that did not give full responses to those

10   questions.

11       Q.   And then how about the 66 respondents

12   described in Paragraph 55 who reported that they

13   were born in another country, but do not report when

14   they became citizens, were they included or omitted

15   from Replication Number 3?

16       A.   As stated here in Paragraph 75, they would

17   be omitted from Replication Number 3.

18       Q.   And that's because they had not given

19   their year of citizenship?

20       A.   That's correct.

21       Q.   Even though they otherwise stated that

22   they were citizens?

23       A.   In the initial screening question, I

24   believe -- we don't have the survey instrument in

25   front of us --

JEFFREY MILYO, PhD                                8/26/2014

98

1        Q.    Well, we do, actually.

2        A.    -- there, so...

3        Q.    We'll be showing you the instrument in a

4    bit, if need be.    But I just wanted to make sure,

5    from your standpoint, that -- whether or not you

6    included or excluded the 66 respondents described in

7    Paragraph 55 who reported that they were born in

8    another country, but do not report when they became

9    citizens.

10                  And as I understand your answer,

11   you're saying you excluded them.   Right?

12       A.    These would be respondents that gave

13   responses that rendered our confidence and their

14   eligibility to vote ambiguous, that's correct.

15       Q.    Now, if you compare document -- Milyo

16   Document Number 2 with Milyo Document Number 1,

17   Paragraph 55 in each -- do you agree that that's one

18   of the paragraphs that you made changes to?

19       A.    It appears to be so, yes.

20       Q.    And I see three changes.   And I was going

21   to suggest it might even be helpful if you look at

22   the redline document, Number 3, and see if that

23   accurately shows the changes.   So if you look in

24   front of you, Milyo Number 3, Paragraph 55.

25                  And comparing those, is -- are the

JEFFREY MILYO, PhD                                        8/26/2014

99

1    changes that are redlined in Milyo Number 3 the

2    changes that you made between Milyo Number 1 and

3    Milyo Number 2?

4                 MR. KEISTER:  And just take your time

5    and make sure that you're comfortable with it.

6         Q.   (BY MR. ROSENBERG)  Sure.  And if you're

7    not, you can blame Mr. Whitley.

8         A.   Let's see, I see an underlined, a final

9    evaluation --

10                MR. KEISTER:  You don't need to speak

11   on the record.  Why don't you look at them, make

12   your determinations, and that will make it go

13   quicker.  Anything you speak on the record, she has

14   to take down, even if it's out loud to yourself.

15                THE WITNESS:  I apologize.  It will

16   be helpful to have them in order.

17        A.   That looks to be like a consistent

18   description of the changes from Milyo 1 to Milyo 2.

19        Q.   (BY MR. ROSENBERG)  And the -- one of the

20   changes was the deletion of the sentence, "Further,

21   Barreto and Sanchez do not attempt to screen out

22   respondents who may be registered to vote in other

23   states.  Nevertheless, Barreto and Sanchez assume

24   that all of their respondents are indeed eligible

25   voters in Texas."  Do you see that?

JEFFREY MILYO, PhD                                    8/26/2014

100

1        A.    I see that.

2        Q.    And those two sentences were deleted as

3   between Milyo 1 and Milyo 2.   Is that correct?

4        A.    That is correct.

5        Q.    Are you withdrawing your opinion now on

6   the sentences that were in Milyo 1, but are not in

7   Milyo 2?

8        A.    I may want to revisit because this is

9   asking specifically about screening for those who

10  are registered.

11             My recollection for this change was

12  that there was a final screening question.   I don't

13  have the survey instrument in front of me.   We could

14  look at what it asks specifically.

15       Q.    But that's your memory as to why you

16  deleted those sentences?

17       A.    My memory was that I had not sufficiently

18  paid attention to the last screening question, and I

19  thought it merited a change in the text to try to

20  make it more accurate and clear.

21       Q.    Paragraph 56, you state that, "Respondents

22  are also asked about whether official voter records

23  at the Secretary of State's office indicate that you

24  are currently registered to vote here in Texas."   Do

25  you see that?

JEFFREY MILYO, PhD                          8/26/2014

101

1      A.    Paragraph 56, I do.

2      Q.    And then you go on to say, "Strictly

3  speaking, respondents can't really know the answer

4  to this question."  Do you see that?

5      A.    I see that.

6      Q.    And what do you mean by that?

7      A.    Well, they're being asked about official

8  records at the Secretary of State's office, which I

9  assume they're not sitting in the Secretary of

10  State's office.  So...

11      Q.    Do you think that the question fairly asks

12  a voter as to whether or not they are registered to

13  vote?

14      A.    Fairly?  What do you mean by "fairly"?

15      Q.    Well, is that how you would understand the

16  question?

17      A.    I wouldn't make a point of characterizing

18  it as fair or not.

19      Q.    Did you understand the question that way,

20  when you read it?

21      A.    What struck me was odd was the wording

22  about consistency with official voter records.

23      Q.    Was that the entire question that you

24  quoted there?

25      A.    It doesn't look to be, because it doesn't

JEFFREY MILYO, PhD                                    8/26/2014

102

1   start with a capital letter.

2                MR. ROSENBERG:  Let me just take a

3   one-minute break.

4                (Off the record.)

5        Q.   (BY MR. ROSENBERG)  And are you saying

6   that if a respondent answered the question "No," it

7   could have been because the respondent, strictly

8   speaking, wouldn't know if the Secretary of State

9   actually had records registering him or her?

10       A.    Could we look at the question?

11       Q.    Yeah, but I just -- we will.  And if you

12  can't answer the question because you don't have the

13  survey in front of you, I'm happy to come back to

14  that.

15       A.    I think it would be better, if you don't

16  mind.

17       Q.    Okay.  Let's come back to that.

18                Let's go to Paragraph 57.  You say,

19  "In general, survey responses are subject to

20  'motivated reasoning' by respondents; that is,

21  respondents may systematically misreport on surveys

22  in a manner that fits their preconceptions or

23  preferences (ideological and partisan beliefs are

24  particularly important drivers of motivated

25  reasoning in surveys)."  And then you cite to

JEFFREY MILYO, PhD                                    8/26/2014

103

1    footnote 41.  Is that correct?

2        A.   That looks like a verbatim reading, yes.

3        Q.   Do any of the sources you cite in footnote

4    41 stand for the proposition that respondents

5    systematically misreport on surveys, asking them for

6    factual information about themselves in a manner

7    that fits their ideological or partisan beliefs?

8        A.   I think it would be helpful to pull out

9    those studies and take a look at them.

10       Q.   Sure.

11              MR. ROSENBERG:  Let's have this one

12   marked.

13              (Exhibit Number 4 marked.)

14       Q.   (BY MR. ROSENBERG)  I'm showing you what's

15   been marked as, I guess, Exhibit 3 -- 4.  That's

16   right.  I forgot we already had a 3.

17              Is that one of the studies that you

18   cite in footnote 41?

19       A.   It looks to be, yes.

20       Q.   And that's the article by Taber?

21       A.   Correct, Taber and Lodge.

22       Q.   And can you tell me where in that study

23   that it states the proposition that respondents

24   systematically misreport on surveys asking them for

25   factual information about themselves in a manner

1  that fits their ideological or partisan beliefs?

2      A.   I don't believe I made that specific

3  claim.

4      Q.   Well, you said that respondents may

5  systematically misreport on surveys in a manner that

6  fits their preconceptions or preferences.  And these

7  surveys ask for factual information about the

8  respondents, is that correct, the surveys that

9  are -- that Barreto and Sanchez did?

10     A.   Can I look through the survey?

11            MR. ROSENBERG:  All right.  We're

12 going to take a break now and get the surveys.

13            (Lunch recess.)

14     Q.   (BY MR. ROSENBERG)  Professor Milyo, a

15 couple of questions that I meant to ask a little

16 earlier.  Did you do all the work on -- that led to

17 the preparation of your report yourself, or did

18 anyone help you?

19     A.   I did all the work.  I occasionally

20 discuss issues with colleagues.  There's one that I

21 used as a sounding board along the way --

22     Q.   And who is that?

23     A.   -- but I would say that I did all the

24 work.

25     Q.   I'm sorry.

JEFFREY MILYO, PhD                                    8/26/2014

                                                           105

1        A.    Professor Tim Groseclose was somebody that

2   I sort of bounced off a couple of ideas.

3        Q.    Which ideas did you bounce off Professor

4   grossclose?

5        A.    I think one thing in particular was my

6   summary of the plaintiffs' argument.

7        Q.    Anything else?

8        A.    There's a section of the report -- I'd

9   better look at this here -- where I discussed

10  hypothetical examples 1 and 2 and --

11       Q.    What page is that?

12       A.    Paragraphs 143 through about 146, 145.

13  And, you know, those paragraphs are a little wordy

14  and complicated, and I recall reading that aloud to

15  try to make sure it sounded clear.

16       Q.    And did Professor grossclose make any

17  recommendations to you in regard to your report?

18       A.    No.  I don't -- I don't recall anything

19  specific.

20       Q.    And in terms of any number crunching that

21  you did in connection with your report, you did that

22  all yourself?

23       A.    Correct.

24       Q.    And turning back to the Barreto/Sanchez

25  report, you have no criticisms that Professors

JEFFREY MILYO, PhD                                    8/26/2014

106

1   Barreto and Sanchez are qualified to have conducted

2   the survey they did.  Right?

3        A.   I didn't speak to that issue.

4        Q.   And you have no criticisms, then?

5        A.   I raise a number of concerns about what

6   they did.  But my opinions are contained in the

7   report and I didn't --

8        Q.   Do you criticize the qualifications to

9   have undertaken this survey?

10       A.   I do not include that kind of broad

11  criticism in my report.

12       Q.   So the answer is, no, you do not criticize

13  their qualifications to conduct this survey?

14       A.   Subject to all the caveats we've mentioned

15  before, that my opinions are contained in the report

16  as of today.

17       Q.   Do you have any criticisms of professor --

18  or, rather, of Dr. Barreto's qualifications to

19  conduct this survey?  His qualifications.

20       A.   Not that I haven't expressed in the

21  opinions in my report.

22       Q.   In your report do you express any opinion

23  as to Dr. Barreto's qualifications to conduct this

24  survey?

25       A.   I think I would characterize the concerns

JEFFREY MILYO, PhD                                    8/26/2014

107

1    that are raised more about actions that were taken,

2    given their qualifications.

3         Q.    You have no criticisms in your report that

4    the surveyors identified -- strike that.

5                   In your report you do not criticize

6    whether the surveys identified an appropriate

7    population for surveying.  Isn't that correct?

8         A.    What exactly do you mean by that?

9         Q.    That the universe that they were choosing

10   for their survey was not the appropriate universe.

11        A.    I did not include any criticisms to that

12   effect.

13        Q.    You don't have any such criticisms.  Isn't

14   that correct?

15        A.    At this time, my opinions are contained in

16   the report.

17        Q.    And they do not include such a criticism?

18        A.    I did not include such criticisms in my

19   report.

20        Q.    Do you have any such criticisms?

21        A.    The opinions that I have are in the

22   report.

23        Q.    Do you have any such criticisms, whether

24   or not they're in the report?

25        A.    At this time I haven't criticized that,

JEFFREY MILYO, PhD                                        8/26/2014

                                                                108

1   no.  And I haven't given sufficient thought to give
2   you a response definitively.
3        Q.   Or to have a criticism to that effect?
4        A.   If I haven't thought about it
5   sufficiently, how can I answer you?
6        Q.   Well, you can answer me simply by saying
7   whether or not you have a criticism that they
8   identified an inappropriate population.
9        A.   And I think I've said multiple times, I
10  don't make that criticism in the report.
11       Q.   Or outside the report.
12       A.   Outside the report, I -- I do want to
13  leave open the possibility that if new information
14  is known to me, that I might do additional study and
15  develop some additional opinions.  But at this time,
16  my opinions are in the report.
17       Q.   Based on the information that you have, do
18  you have any criticism, whether or not it's in the
19  report, that Drs. Barreto and Sanchez did not
20  identify an appropriate population for purposes of
21  this survey?  Yes or no?  Please answer the
22  question.
23            MR. KEISTER:  As you sit here today.
24       A.   As I've said, it's not something that I
25  have given much thought to.  It was not a focus of

JEFFREY MILYO, PhD                                    8/26/2014

                                                            109

1    my review of their report.

2          Q.    (BY MR. ROSENBERG)  So you have no such

3    criticism.  Why can't you just answer that question?

4          A.    I think I have about eight times.

5          Q.    Well, then yes or no.  Do you have any

6    such criticism whether or not it appears in the

7    report?

8          A.    Do I have to answer yes or no?

9          Q.    Yes, you do.

10         A.    I will point out that Barreto and Sanchez

11   suggest they have the ability to tell whether people

12   answer yes or no even when they don't.  I will

13   answer you -- if you'd repeat the question, I'll

14   give you a yes or no answer.

15         Q.    Do you have any criticism whether or not

16   it's inside or outside the report that Drs. Barreto

17   and Sanchez did not identify an appropriate

18   population for purposes of this survey?

19         A.    No, not at this time.

20         Q.    Thank you.

21               Do you have any criticism, whether or

22   not it's inside or outside the report, that the

23   sample population approximates the relevant

24   characteristics of the target population?

25         A.    That's not something I address in my

JEFFREY MILYO, PhD                                    8/26/2014

110

1    report.

2         Q.    So, therefore, you have no such criticism

3    at this time.   Is that correct?

4         A.    At this time, I don't have such a

5    criticism.

6         Q.    Do you have any criticism, whether it's

7    inside the report or outside the report, as to the

8    method of oversampling that Dr. Barreto and

9    Dr. Sanchez did in connection with this survey?

10        A.    Again, it's not something mentioned in the

11   report.   At this time, I don't have an opinion on

12   that.

13        Q.    Do you have any criticism, whether it's

14   inside or outside the report, as to how Drs. Barreto

15   and Sanchez weighted the responses to the survey?

16        A.    To the extent I understand their weighting

17   process, that's not something I have addressed in

18   the report.   So at this time, I don't have a

19   concern.

20        Q.    Do you have any criticism at this time,

21   whether it's inside or outside the report, as to the

22   response rate that Drs. Barreto and Dr. Sanchez

23   obtained from their survey?

24        A.    I believe I did mention something that

25   they're -- they could have been more forthcoming

JEFFREY MILYO, PhD                                    8/26/2014

111

1    about -- I'm going off my recollection here, so
2    maybe I should refer to the report specifically.
3          Q.    Sure.
4          A.    So other than -- and I believe your
5    question was about responses?
6          Q.    The response rate.
7          A.    Response rate.  And I think in the spirit
8    of your question, you're referring to the number of
9    people that agreed to do the survey versus don't, at
10   the beginning, when they're first contacted, rather
11   than response rates to particular questions within
12   the survey?
13         Q.    That's correct.
14         A.    Okay.  You know, one issue I thought of,
15   but I don't think it's actually in the report, at
16   least I'm not seeing it.  And this is where memory
17   and trying to read under pressure don't serve one
18   well in this context.
19              So I'll say, to the best of my
20   recollection and under the circumstances, I don't
21   recall having a criticism in the report to that
22   effect.
23         Q.    Or outside the report, as far as you can
24   tell today, sitting here right now?
25         A.    The one thing I recall thinking about,

JEFFREY MILYO, PhD                                    8/26/2014

                                                            112

1    which is what I was looking for, was -- I recall not

2    being completely sure if they described the number

3    of people who start, but don't complete the survey,

4    and what they did with those people.  I don't --

5    honestly don't recall how I resolved that concern or

6    whether it was a long-standing concern, or even if

7    it's in the current report.  I haven't noticed it.

8    But that's the -- again, trying to be responsive to

9    your question, that was one concern that was related

10   that I recall --

11       Q.   But you don't recall how that concern was

12   resolved in your own mind.  Is that fair?

13       A.   I'm not seeing it in the report and so

14   I -- I think it was -- you know, there were time

15   constraints, there was a lot going on.  I don't

16   think that was something that I put into the -- into

17   the report as one of my opinions at that time.

18                  (Exhibit Numbers 7 marked.)

19       Q.   (BY MR. ROSENBERG)  Okay.  I'd like to

20   show you what's been marked as Exhibit Number 7.

21   We're skipping ahead just to save -- because we've

22   got them marked in that order.  Can you identify

23   that for the record?

24       A.   This appears to be a copy of the Texas

25   Survey Instrument -- I believe that was the title of

JEFFREY MILYO, PhD                                    8/26/2014

                                                          113

1   the file -- used by Barreto and Sanchez.

2        Q.   And you're free to look through it.  But

3   is this the Texas Survey Instrument that you were

4   referring to when you asked if you could see a copy

5   of, at today's deposition?

6        A.   Yes.

7        Q.   And just to go back and kind of clean up

8   any ambiguity, we were asking you a series of

9   questions about whether or not you omitted from your

10  Replication Number 3, those respondents whose

11  answers were described in Paragraph Number 55.  And

12  to the extent that you need to look through the

13  instrument that has now been marked as Exhibit

14  Number 7, Milyo Number 7, could you tell me whether

15  looking at that instrument changes your testimony in

16  any way?

17       A.   I don't recall what my testimony was

18  exactly.

19       Q.   Well, I'll tell you.  Your testimony was

20  that the respondents whose answers you described in

21  Paragraph Number 55, the 210 respondents who did not

22  give information as to their year of birth, the

23  respondents who did not give information as to --

24  the 87 respondents who did not report how long they

25  had resided in Texas, and the 66 respondents who

JEFFREY MILYO, PhD                                8/26/2014

114

1   reported they were born in another country, but did

2   not report when they became citizens, that all of

3   those respondents -- and I understand there may have

4   been some overlap among those three groups -- but

5   they were omitted from Replication Number 3.

6          A.   Yes, that's my recollection.

7          Q.   Okay.  And looking at the instrument, that

8   still is your testimony, to the extent that you

9   wanted to look at the survey instrument?

10         A.   I don't recall what spurred the request to

11  look at the survey instrument.

12         Q.   Okay.  That's fine.

13               Now, going back to the point we were

14  at before we broke, is it your testimony that survey

15  respondents in this case may have systematically

16  misreported in a manner that fit their

17  preconceptions or preferences as to the questions

18  asked in this survey?

19         A.   It sounded like you were reading something

20  verbatim.  Can you point me to that --

21         Q.   Sure.  Looking at Paragraph 57.

22         A.   And the statement here is that in general,

23  survey responses are subject to motivated reasoning.

24  So it is a general concern with any kind of survey

25  that would touch on some ideological or partisan hot

JEFFREY MILYO, PhD                                    8/26/2014

                                                              115

1   button items.

2        Q.    And do you have any -- do you apply that

3   general principle to questions that are asked for

4   factual information about the individual, such as,

5   in this case, whether or not they possess certain

6   forms of identification?

7        A.    Well, since I say it's a general concern,

8   it would be a general concern for anything that

9   someone has particular ideological or partisan

10  belief where their factual response might service

11  that belief.

12       Q.    And what is your support for that general

13  principle?

14       A.    There is a literature on motivated

15  reasoning, and I'm trying to recall if -- there's a

16  study here.

17              So part of it is the identification

18  of this general phenomena of motivated reasoning.

19       Q.    And those are set forth -- strike that.

20              And is it your position you find that

21  support in the footnote to the sentence in your

22  report, footnote number 41?

23       A.    This says, "for example," and then cites

24  one, two, and three articles that have to do with

25  the scholarship on motivated reasoning.

JEFFREY MILYO, PhD                                    8/26/2014

116

1       Q.   Do any of those three articles deal with
2  motivated reasoning as affecting responses as to
3  factual information as opposed to political beliefs?
4       A.   We could look at them in more detail.  I
5  don't recall --
6       Q.   Sure.  Let's look at -- we already gave
7  you one of them, I think, marked as Number -- what
8  is that -- the Taber article is marked as Number 4.
9       A.   Number 4.  Now, I'm guessing you don't
10  want me to read this.
11       Q.   Well, you can certainly take a look at it.
12  If you have to take a longer look, we can take a
13  break and you can read it as long as you want.
14       A.   So looking at the abstract, this one
15  focused on opinions about policy.
16       Q.   Right.  Not on factual responses.  Isn't
17  that correct?
18       A.   Well, if someone is saying, I support
19  affirmative action, that sounds factual.
20       Q.   Doesn't it sound as if that person is
21  giving an opinion?
22       A.   An opinion?  I can't have a fact about
23  a -- this is my opinion?
24       Q.   Wasn't the focus in the Taber article on
25  confronting arguments designed to either bolster

JEFFREY MILYO, PhD                                    8/26/2014

117

1  opinions or challenge prior beliefs and attitudes?

2       A.   That sounds consistent with the focus of

3  their article.

4       Q.   And the second article was the Bolsen

5  article, is that correct, that you cited?

6       A.   Bolsen, Druckman, and Cook.

7            (Exhibit Number 5 marked.)

8       Q.   (BY MR. ROSENBERG)  And I'm showing you

9  what's been marked as Number 5.   Is that the

10 article?

11      A.   Yes.

12      Q.   And the gist of that article was, when did

13 partisan identification slant the evaluation of

14 political beliefs.  Isn't that correct?

15      A.   Supporter opposition to policies.

16      Q.   Right.  It had nothing to do with survey

17 responses as to facts.  Isn't that correct?

18      A.   Well, again, people can -- it's a fact

19 whether or not they support a particular policy.

20      Q.   But wasn't the -- weren't -- wasn't that

21 article talking about whether or not partisan

22 identification would change people's opinions and

23 beliefs, not change facts?

24      A.    I'm not quite so sure whether it's

25 changing beliefs or changing the reporting of

1   beliefs.

2       Q.    Wasn't it on forming attitudes?

3       A.    Again, as they're measured.

4             (Exhibit Number 6   marked.)

5       Q.    (BY MR. ROSENBERG)   And the third article

6   was the Beaulieu article, which has been marked as

7   Number 6.

8       A.    I'm not sure how to pronounce her name.

9       Q.    Well, I'm going with my high school

10  French.

11            And, again, the gist of that article

12  had to do with how one's affiliation with a

13  political party affected perceptions as to, in that

14  case, election fraud.   Right?

15      A.    About -- the facts about election fraud?

16      Q.    About one's belief as to -- one's

17  perception of fraud.

18      A.    Perception of fraud in what sense, sir,

19  are you meaning?

20      Q.    Well, wasn't the conclusion of that paper

21  that the most substantial effect on a respondent's

22  perception of fraud depended on whether the

23  candidate's perceived benefit as shared ^ ck the

24  respondent's party's identification?

25            MR. KEISTER:  And let me just

JEFFREY MILYO, PhD                                    8/26/2014

                                                              119

1    instruct the witness to -- if you're going to answer

2    specific questions, make sure you're taking time to

3    be comfortable with it, to the extent you need to.

4         A.   I'm just reviewing the abstract to refresh

5    my memory.

6         Q.   (BY MR. ROSENBERG)  Sure.

7         A.   So here they're talking about a motivated

8    reasoning based more on a desire for their preferred

9    candidate to win.

10        Q.   Right.  But not as to whether or not they

11   are answering a fact about themselves honestly or

12   dishonestly?

13        A.   Other than that fact might be an opinion

14   that they have.

15        Q.   But, again, it's opinions they are talking

16   about, correct, that are being affected by the

17   preconditioning of partisan affiliation?

18        A.   Well, you're kind of emphasizing the

19   semantics here.  I'd be more comfortable if I had

20   time to look at it in more depth.

21        Q.   Well, you certainly had time before you

22   did your report, didn't you?

23        A.   I was looking for examples of studies that

24   are part of this literature.

25        Q.   And these were the examples you chose to

JEFFREY MILYO, PhD                                        8/26/2014

120

1    put in your report in --

2         A.    That's correct.

3         Q.    -- support of the proposition.  Is that

4    correct?

5         A.    In support of the general proposition that

6    there exists motivated reasoning.

7         Q.    Not that there exists motivated reasoning,

8    but that respondents may systematically misreport on

9    surveys in a manner that fits their preconceptions

10   of preferences in the context of this survey.  Isn't

11   that correct?

12        A.    In general, survey responses are subject

13   to motivated reasoning.  So that general phenomena

14   might apply to this survey.

15        Q.    Well, in fact, you went on to say, In the

16   present context, this implies that people who oppose

17   voter ID laws very strongly may be motivated to

18   report that they do not possess ID even when they

19   do.  Isn't that what you're saying?

20        A.    I think it raises that concern; I do.

21        Q.    Paragraph 58, you say that the survey

22   subjected respondents to a lengthy and repetitive

23   set of questions regarding multiple forms of ID.  Do

24   you see that?

25        A.    I see Paragraph 58.  Yes.

JEFFREY MILYO, PhD                                    8/26/2014

121

1      Q.   Okay.   Do you have a list of precisely

2  which questions you would have had Drs. Barreto and

3  Sanchez omit?

4      A.   No, I don't believe I speak to that in my

5  report.

6      Q.   Do you know how many questions you would

7  have had them omit?

8      A.   I don't believe I come up with a specific

9  number.

10     Q.   And do you have an idea of which questions

11 you would have them omit?

12     A.   That's not something I've given thought

13 to.   I'm merely commenting on the length and

14 repetitiveness of the survey.

15     Q.   Do you have any concrete evidence to

16 conclude that any respondent did not choose to

17 cooperate because of the length of the question?

18     A.   Well, you're asking about motivation.   I

19 really can't speak to the motivation of the

20 respondents.

21     Q.   Well, you said, "It is easy to imagine

22 that not all respondents choose to cooperate by

23 answering completely and honestly."   Isn't that what

24 you say in that paragraph?

25     A.   Yes, I believe it says it is easy to

JEFFREY MILYO, PhD                                    8/26/2014

122

1    imagine.

2        Q.    That's speculation on your part, isn't it?

3        A.    Well, there's a footnote there.  Oh, here

4    it is, "Barreto and Sanchez do not report how many

5    respondents failed to complete the survey after

6    starting, but survey length, complexity, and subject

7    interest are all factors."

8              So they don't report that.  That

9    might have been an indicator.  It's the kind of

10   thing that you might have expected to be reported,

11   so that would be the concern that I have there.

12       Q.    And do you have any support for any --

13   scholarly support for the proposition that people do

14   not answer completely or honestly if a question is

15   long?

16       A.    I can recall specific instructions to

17   avoid lengthy and complicated questions from the

18   CCES, in my experience working with them.

19       Q.    You cite to the McCarty article.  Does the

20   McCarty article specifically state that people do

21   not answer completely or honestly if a question is

22   long?

23       A.    I believe this is about drop-off.

24       Q.    That's right.  The McCarty article is

25   about response rates.  Right?

JEFFREY MILYO, PhD                                   8/26/2014

123

1        A.   If you want to call those response rates,

2   yeah.  But these are people who agreed and then

3   dropped off.

4        Q.   And we already -- and we already have

5   established that you don't criticize the response

6   rates in this survey as sufficient to support

7   conclusions.  Isn't that correct?

8        A.   Other than this footnote that I was

9   looking for and couldn't find.  And I think

10  sufficiently explain that it was in my memory, but I

11  wasn't seeing it in the report.

12       Q.   Paragraph 61, you criticize Drs. Barreto

13  and Sanchez's use of the 2013 CVAP data.  Do you see

14  that?

15       A.   The CVAP from 2008 to 2012 ACS, yes.

16       Q.   Is the 2014 CVAP data available?

17       A.   I don't believe it is available from that

18  source.

19       Q.   You agree that the 2014 CVAP data will be

20  much larger than the 2012 CVAP data in Texas?

21       A.   "Much" might be a debatable term.  My

22  expectation is that it would be greater.

23       Q.   Do you know how much greater?  Do you have

24  an idea?

25       A.   I did not form an estimate.

1        Q.    Do you know how much Texas's population

2   grows each year?

3        A.    That is not something I've spoken to in

4   the report.

5        Q.    You also criticize the use of CVAP because

6   you say that it's known that CVAP overstates the

7   voting eligible population.   Do you see that?

8        A.    Yes.

9        Q.    And what's your support for that?

10       A.    I have a footnoted article here, McDonald

11  and Popkin.

12       Q.    Does the McDonald article -- and that's

13  "The Myth of the Vanishing Voter"?

14       A.    That's what's cited.

15       Q.    Does that -- first of all, does that deal

16  with nationwide figures or Texas specific?

17       A.    My recollection is that they're looking at

18  national aggregate turnout.

19       Q.    And do you recall about what year that

20  article -- what year it ended its analysis?

21       A.    Not off the top of my head.

22       Q.    If I suggested 2000, would that refresh

23  your recollection?

24       A.    Given it was published in 2002, that might

25  be plausible, but I don't recall.

JEFFREY MILYO, PhD                                    8/26/2014

125

1        Q.    Now, the McDonald article, did it say that
2   CVAP greatly overstated VEP?
3        A.    I don't believe I used quotes on that.
4   Their concern had to do with turnout rates based on
5   measurement.
6        Q.    Right.   And, in fact, didn't it say that
7   VAP, VAP, meaning all persons of voting age, whether
8   citizens or not, overstated VEP?
9        A.    I think I'm seeing a confusion here in
10  what I wrote.
11       Q.    And what's the confusion you're seeing?
12       A.    Voting eligible population is typically a
13  synonym for citizen voting age population.
14       Q.    Right.
15       A.    So that's a goof on my part there.   I must
16  have had blurry eyes and saw that.   So I apologize
17  for that.
18       Q.    Let's turn to Paragraph 65.   You say it's
19  unclear how Barreto and Sanchez classified 34
20  respondents who did not report a race and 24 who
21  said "other."   I'm sorry.   And -- yes, 24 who said
22  "other."   And I'm looking at -- if you compare
23  Document Number 2, Milyo Number 2 to Milyo Number 1,
24  in that paragraph, there's a change in the figure.
25  Can you tell me why the figure changed?

JEFFREY MILYO, PhD                                    8/26/2014

126

1        A.    So which figure are you referring to?

2        Q.    I'm referring to where you say, "It's

3   unclear how Barreto and Sanchez classify race and

4   ethnicity of the 34 respondents who do not report

5   race and ethnicity.  Further, it is not clear how

6   they classify the" -- and in Number 2, it says 24.

7   Is that correct?

8        A.    Correct.

9        Q.    And originally you had 20.  Is that

10  correct?

11       A.    Correct.

12       Q.    And can you explain the basis for the

13  change?

14       A.    I don't have a specific recollection of

15  making that change, but I believe it would have been

16  going back and rechecking my count.  And apparently

17  I figured 24 was more accurate than 20.

18       Q.    Now, looking at Dr. Barreto and

19  Dr. Sanchez's tables and data and report, did you

20  notice that they had a column for "other"?

21       A.    Can we look at their report?

22       Q.    Yeah, sure.

23              (Exhibit Number 8 marked.)

24       Q.    (BY MR. ROSENBERG)  And drawing your

25  attention -- well, first of all, if you can identify

JEFFREY MILYO, PhD                                    8/26/2014

                                                           127

1    what's been marked as Exhibit Number 8.  That looks

2    to be the initial report submitted by Barreto and

3    Sanchez.

4              And directing your attention to

5    page 13 of that report, Table A, have you seen that

6    table before?

7         A.   If it's in their report, I would have seen

8    it.

9         Q.   And there is a row for "other," is there

10   not?

11        A.   There is a row for "other."

12        Q.   Does that at least shed some light on the

13   question as to -- you say it's unclear how they

14   classify the 24 respondents they specify in "other"

15   response, and how they classify the race and

16   ethnicity of 34 respondents who do not record a race

17   or ethnicity?

18        A.   It could.  I'd have to go through and

19   check the data.

20              MR. ROSENBERG:  Let me now have

21   marked this document.

22              (Exhibit Number 9 marked.)

23        Q.   (BY MR. ROSENBERG)  I'm showing you what's

24   been marked as Exhibit Number 9, and ask if you've

25   seen that document.

128

1          And for the record, that's the second

2   amended notice of deposition duces tecum to

3   Dr. Jeffrey Milyo.  Do you see that?  Have you seen

4   that before?

5          A.   Yes, I believe so.

6          Q.   And you produced documents a couple of

7   days ago in response to this duces tecum.  Is that

8   correct?

9          A.   That is correct.

10          Q.   The documents that you produced, among

11   them, were there any documents that you had not

12   produced before?

13          A.   My recollection is it was a zip file full

14   of academic articles.  I tried to go through and

15   identify sources cited in the footnotes and make

16   sure that those were provided to the best of my

17   ability in there, and then I tried to address the

18   questions here to the best of my ability.

19          Q.   And specifically, let's look at

20   Paragraph Number 4, which asks for documents

21   pertaining to the -- to respondents described in

22   Paragraphs 63, 64, 65, 66, 68, and 69, and 70.

23   Right?

24          A.   Correct.

25          Q.   Did you produce documents responsive to

JEFFREY MILYO, PhD                                          8/26/2014

                                                                    129

1    that?

2         A.    I've produced the data set from Barreto

3    and Sanchez that I was working with.

4                    (Exhibit Number 10 marked.)

5         Q.    (BY MR. ROSENBERG)  I'm showing you what's

6    been marked as Exhibit 10.  Is that what you

7    produced in response to the request number 4?

8         A.    I'm not seeing it in here.  I recall there

9    was a question asking for specific observation

10   numbers.  And I'm -- I don't know that -- I'm not

11   seeing it here.  Maybe that came from another

12   source.

13        Q.    I'll represent --

14        A.    This was not in -- specifically in

15   response to that.

16        Q.    Did you produce documents that

17   specifically set -- other than Barreto and Sanchez's

18   own data, did you produce your own, either mark-ups

19   or printout or spit-out of data that specifically

20   identified which respondents were described in

21   Paragraph 63, the seven respondents that

22   self-identify as both white and Hispanic in

23   Paragraph 64, and so on?

24        A.    I produced the original data set from

25   Barreto and Sanchez.  I produced the data set that

1   included the replication variables that I used.

2              My recollection is, is that there was

3   another question -- it may have come via e-mail --

4   for specific row numbers in the data set.  And so

5   this Exhibit --

6              MR. KEISTER:  Let me instruct the

7   witness, to the extent you're referring to any

8   communications you may have had with counsel in this

9   case, please don't go into those.  If it's not with

10  counsel, you're free to do so.

11       Q.   (BY MR. ROSENBERG)  Well, let me put the

12  question this way.  Do you have a document -- well,

13  first of all, what's been marked Exhibit 10, that's

14  a document that you created.  Is that correct?

15       A.   That is correct.

16       Q.   And this contains row numbers that relate

17  to the Barreto/Sanchez report.  Is that correct?

18       A.   That relate to the underlying data used in

19  the Barreto/Sanchez report.

20       Q.   (BY MR. ROSENBERG)  Professor Milyo, a

21

22       Q.   So, for example, just looking at the first

23  page, this says, "Row numbers of some of the

24  problematic observations in Barreto and Sanchez

25  survey data."  That's your language.  Correct?

JEFFREY MILYO, PhD                                    8/26/2014

                                                            131

1        A.    I wrote that, correct.

2        Q.    Is there another document similar to this

3  that you created that also has row numbers relating

4  to the Barreto/Sanchez data, or is this the only

5  such document?

6        A.    I believe this is the only such document.

7        Q.    Do you have any document that specifically

8  sets forth the row numbers for individuals with

9  suspended or revoked driver's licenses as described

10 in Paragraph 66 of your report?

11       A.    It's not in here?

12       Q.    It is not -- I will represent it's not in

13 there.  We can take a few minutes and go off the

14 record and you can look through that and compare

15 that to the requests in Number 4.

16       A.    As I said, this was not developed in

17 response to this request.

18       Q.    Did you develop a document in response to

19 that request that set forth the row numbers similar

20 to this document as to those respondents who are

21 described in Paragraph 46 of the subpoena duces

22 tecum?

23       A.    I don't recall doing so.

24       Q.    So sitting here, how can you tell me, for

25 example, which respondents you were referring to in

JEFFREY MILYO, PhD                                8/26/2014

132

1    65 or 66 or 68 or 69 or 70?  I assume you can't.  Is

2    that correct?

3        A.    We could pull up the dataset and I can

4    identify them.

5        Q.    When you say that, that means you would

6    have to kind of start from scratch and compare the

7    question that was asked in the survey to the

8    Barreto/Sanchez dataset, and then you would say,

9    well, this is one and this is another, and so on?

10       A.    If you wanted the specific row numbers, we

11   could go through that, or you can just do a

12   tabulation to find out -- to say the seven

13   respondents that self-identify as both white and

14   Hispanic.  If you want to know the exact row number,

15   then you would have to do an exercise like this.

16       Q.    And you never created a document similar

17   to this for the respondents who are described in

18   Paragraph 4 of the subpoena duces tecum?

19       A.    My recollection -- and this was a thick

20   document, but it was done under a time constraint.

21             And my recollection is, I was trying

22   to be forthcoming and presenting row numbers of

23   problematic observations.  That was my intent.

24   Admittedly, it was done under a time constraint.

25       Q.    So just walk me through the process, that

JEFFREY MILYO, PhD                                   8/26/2014

133

1    when you were putting together your report and

2    identified individuals with suspended or revoked

3    driver's licenses, did you somehow write that down,

4    create a spreadsheet?  What did you do so that you

5    could total up how many such people and identify

6    such people?

7         A.   Well, most of these are fairly simple

8    calculations, and so it would have been entered

9    directly into the Word document and then -- as a

10   note, and then the report written, created right

11   around it.

12              It is also sometimes my habit to

13   write notes on a piece of paper.  It's not my habit

14   to keep an archive of that once it's written into

15   the document.

16        Q.   So you would have done it once and would

17   not have maintained that note?  Did you recheck --

18   strike that.

19              Do you check over your work in that

20   regard?

21        A.   There was some checking, and that was one

22   of the reasons for one of the editing changes that

23   we identified.

24        Q.   And is it your testimony that you have no

25   record at home, your office, anyplace, that

JEFFREY MILYO, PhD                                    8/26/2014

134

1   specifies, by row number, the respondents who are

2   described in Number 4, if it's not included in

3   what's been identified as Exhibit -- Milyo Exhibit

4   Number 10?

5                  MR. KEISTER:  And to the extent you

6   need to review the document, please take the time to

7   do so.

8                  MR. ROSENBERG:  Sure.

9                  THE WITNESS:  I'm sorry, I couldn't

10  understand what you were saying.

11                 MR. KEISTER:  To the extent you need

12  to review the document to answer the question --

13      A.   If this is what I sent, then this is the

14  only...

15                 MR. KEISTER:  But please review it

16  and see if that answers the question.

17                 MR. ROSENBERG:  And that's why I

18  specifically said "except as set forth in this

19  document."  I'm not trying to trick him.  I'm just,

20  quite frankly, trying to find out where the

21  information is.

22                 MR. KEISTER:  I understand.  I think

23  he indicated that he thinks it's in there.

24                 MR. ROSENBERG:  And why don't we take

25  a break, then.

135

1          (Recess.)

2      Q.    (BY MR. ROSENBERG)   Okay.   Professor

3  Milyo, did you have a chance to look at Exhibit

4  Number 10 during the break?

5      A.    I did.

6      Q.    And does that contain all of the

7  information that was requested in Paragraph 4 of the

8  subpoena duces tecum?

9      A.    As I said to you, this wasn't produced in

10 response to that question.

11     Q.    Was there another document produced in

12 response to that question that does list the rows

13 that reflect the responses of -- described in

14 Paragraph 4 of the subpoena duces tecum?

15     A.    And actually I want to say, you know, the

16 timing of requests and things that were done under

17 pressure, I should answer with more caveats about to

18 the best of my recollection.   I don't want to

19 misrepresent anything.

20          My recollection was that -- as I

21 stated, my understanding was, there was a request

22 for row numbers, I produced that in response to that

23 request and then I received --

24     Q.    Is it Exhibit Number 9, I believe?   This

25 one here?

JEFFREY MILYO, PhD                                    8/26/2014

                                                           136

1        A.    I believe this came afterward.

2        Q.    Correct.  And did you comply with the

3   request that came afterward?

4        A.    As I said, to the best of my ability, I

5   provided documents that I had.  The only caveat that

6   I would add is that if this wasn't in the zip file,

7   my understanding was it had already been provided

8   because it had been requested.  So I don't recall

9   that it was in the zip file that I sent --

10       Q.    When you say this, you're referring to

11  Number 10?

12       A.    To Number 10, that's correct.

13       Q.    Well, let's assume that it was in the zip

14  file --

15       A.    I'm sorry.  Was or was not?

16       Q.    Was.  My problem isn't Number 10.  My

17  problem is whether there's -- my concern is that

18  there's something other than Number 10 that we don't

19  have.

20       A.    No.  I provided documents in response to

21  this request.

22       Q.    When did you provide documents in response

23  to that request?  We're talking about Number 4.

24       A.    This entire request.

25       Q.    And the documents specifically responsive

JEFFREY MILYO, PhD                                    8/26/2014

                                                          137

1   to Paragraph 4, other than Exhibit Number 10, would

2   be just Barreto/Sanchez data file.  Is that correct?

3   Or was there something else?

4        A.   I provided two datasets, the copy from

5   Barreto and Sanchez, the so-called final clean data,

6   and then the one in which I had created a couple of

7   variables.

8        Q.   And that was for your replications.  Is

9   that correct?

10       A.   That is correct.

11       Q.   But that dataset did not include the

12  specific row numbers of the respondents described in

13  Paragraph 4 of the subpoena duces tecum.  Is that

14  correct?

15       A.   Well, if you click on "browse data," there

16  will be row numbers in there.  So, yes, it does

17  include row numbers.

18       Q.   So you're saying that if we look at that,

19  we would be able to identify each and every one of

20  the persons that -- for example, in Paragraph 64 you

21  describe as individuals with suspended or revoked

22  driver's license?

23       A.   I'm sorry, are we on Milyo 1?

24       Q.   No.  Back in Document Number 4, which

25  refers to Paragraph 66.

1      A.   Document 4?

2      Q.   I'm sorry.  Paragraph 4 of Document 9.

3      A.   Document 9, which is referring to a

4 paragraph in Milyo -- is it 2 or --

5      Q.   It doesn't matter.  It will be the same

6 thing.  It's Paragraph 66.

7      A.   Okay.  So I have the stuff in front of me

8 here.  So what was the question?

9      Q.   All right.  Well, let's look at

10 Paragraph 67 of which document you're looking at.

11 Milyo which?

12      A.   2.

13      Q.   Okay.  And that says, first, Barreto and

14 Sanchez include individuals with suspended or

15 revoked driver's licenses among the group that lacks

16 requisite ID.  Correct?

17      A.   That's what that says.

18      Q.   And you're telling me that if we click

19 on the browse function, did you say?

20      A.   Or you browse the data, yes.

21      Q.   If we browse the data that you sent in

22 response to subpoena, we will be able to identify

23 specifically which individuals you're referring to

24 in Paragraph 67?

25      A.   You will be able to identify if you do --

JEFFREY MILYO, PhD                                    8/26/2014

                                                              139

1    it would be easier if you did a tabulation first on

2    the response to the relevant ID question, and then

3    you could identify observation numbers or row

4    numbers for individuals with suspended or revoked

5    driver's license.

6         Q.   But will those necessarily be the same

7    ones that you identified?

8         A.   I identify that there were people with

9    this characteristic.  And from my understanding of

10   the way --

11        Q.   Go ahead.

12        A.   From my understanding of the way in which

13   Barreto and Sanchez create their ID variable, it

14   appears that they treat individuals with suspended

15   or revoked licenses as individuals who do not have a

16   driver's license for SB 14 purposes.

17        Q.   By the way, as to the individuals that you

18   identified in that -- formed in that category, did

19   you check those respondents' answers to see if they

20   were -- had been able to look at their license

21   during the survey?

22        A.   We would have to look to where the number

23   of them is described.  So I think it would be

24   helpful if we pull up the survey, since you're

25   asking about specific survey questions and

JEFFREY MILYO, PhD                                    8/26/2014

                                                           140

1    tabulations of data results.

2                   Okay.  So Question 7A asks

3    specifically about the series of questions about the

4    license being currently valid, suspended, or revoked

5    or maybe lost or stolen, or you don't have it in

6    your possession.

7         Q.   So how does that respond to my question?

8         A.   I'm not remembering your question.  I've

9    been looking at the survey instrument.

10        Q.   Okay.  Let me ask my question again.

11                  Did you check respondents' answers to

12   see if they were able to look at their license

13   during the survey?  And that would be on 7B.  Isn't

14   that correct?

15        A.   I've certainly looked at 7B.  What is your

16   question?

17        Q.   My question is whether, as to any of the

18   people whom you identified as having a suspended or

19   revoked license, you looked at their answer to 7B

20   and took that into consideration as to how to

21   classify this --

22        A.   What I was pointing out is question by

23   question, responses that seemed problematic.

24        Q.   Well, let me ask you this.  If a voter

25   indicated that his or her license was suspended, but

JEFFREY MILYO, PhD                                        8/26/2014

141

1   the voter was not able or not willing to take out

2   the driver's license and check the expiration date,

3   for example, how did you classify that voter?

4       A.    I didn't do that kind of a classification.

5   I don't believe that that's claimed in the report.

6   I looked sequentially at the answers to each type of

7   question, trying to understand the nature of

8   responses that people gave.

9       Q.    And in your replication, did you just omit

10  all persons who stated that they did not -- well,

11  strike that.

12              How do you treat people who responded

13  that their license was suspended or revoked?

14      A.    Which replication?

15      Q.    In any of the replications.

16      A.    Well, let's see, in Replication 1, I do my

17  best to -- following the report here in Barreto and

18  Sanchez, to classify individuals who are without an

19  ID, and then go back and ten if any of them --

20  specifically, I omit responses that give answers of

21  don't know.

22              So these would be people who were

23  classified as not having ID, but had given an

24  unsure, maybe, can't remember, don't know, or

25  refused to provide an answer to any ID question.  So

JEFFREY MILYO, PhD                                          8/26/2014

142

1   they were classified as not having ID, even though

2   they didn't affirmatively say that they did not have

3   an ID.

4        Q.   Did this -- did the answer to 7A on

5   suspension or revocation factor into --

6        A.   Right.  So continuing past --

7             THE REPORTER:  Wait, you guys are

8   starting to talk over each other.  It's getting late

9   in the day and I can't keep up.

10            THE WITNESS:  My apologies.

11       A.   Paragraph 73, there's a semicolon and so

12  the sentence continues, I also omit respondents

13  having a suspended driver's license.

14            And so, again, this would be

15  individuals that were classified as not having an

16  ID, but had reported -- or otherwise classified as

17  not having an ID, but reported to have a suspended

18  driver's license.  The intention is to omit those as

19  well.

20            So these would be these sort of

21  responses where we're not sure if a person has the

22  requisite ID or not.  What happens if we omit them

23  from the analysis?  That's Replication 1.

24            Replication 2 is identical to

25  Replication 1, but then does some additional

JEFFREY MILYO, PhD                                    8/26/2014

143

1    changes.  3 is identical to 2, with some additional

2    changes.  And 4 is identical to 2 with some

3    additional changes.

4        Q.    (BY MR. ROSENBERG)  Turn to Paragraph 68.

5    And that's a paragraph where you made a change if

6    you want to compare Milyo 1 to Milyo 2, or simply

7    trust the redline in Milyo 3.

8        A.    Paragraph?

9        Q.    68.

10       A.    It's a long paragraph.  I will try to find

11   it in the redline.

12       Q.    Which is Milyo 3.  And the change I want

13   to focus on is, you took out all 44 of these cases,

14   is that correct, and you added the words "appeared

15   to"?  And this is in the next-to-last sentence of

16   that paragraph.

17       A.    So in 68, the last sentence --

18   next-to-last sentence -- that appears to be correct,

19   yes.

20       Q.    And why did you do that?

21       A.    Again, the nature of these changes was, I

22   had identified a couple of instances where it looked

23   like I was either unclear or not accurate, and I was

24   trying to improve the clarify and accuracy.

25       Q.    And do you have any notes relating to

JEFFREY MILYO, PhD                                      8/26/2014

144

1   those changes?

2        A.   No.  Just the reports.

3        Q.   I'd like to turn to the creation of the

4   replications themselves.  When you say in your

5   report that you took out certain respondents, does

6   that mean that you completely took them out of

7   the -- your calculations?  You did not treat them as

8   either yes or nos as to ID?

9        A.   I just want to get to that section of the

10  report.

11            So in Replication 1 where I say, Omit

12  certain respondents, that would be correct, that the

13  analysis would be done without including those

14  respondents.

15       Q.   Did you run any of -- make any runs of

16  replications that are not included in your report?

17       A.   Quite possibly, yes.

18       Q.   Do you know which ones?  Let me strike

19  that.

20            Did they take into consideration --

21  I'm sorry.

22            Were those other runs based upon --

23  including certain of the respondents you identified,

24  but not others, for example, perhaps including

25  suspended people but not revoked --

1          A.    No.

2          Q.    -- or anything like that?

3          A.    No, not of that -- not that sort of

4    micromanaging.  It was more an issue of, did it make

5    more sense to -- you know, how to order these things

6    and running the estimates with and without weights,

7    issues of that sort.  But I didn't -- I don't recall

8    sort of mixing and matching these categories.

9               The only thing that comes to mind

10   would be -- let's see, which is the most expansive

11   here -- is 75.  This was one where you could go --

12   this is Replication 3, I believe, refused to

13   indicate race.  This is where you could go on and on

14   with sort of respondents who have given inconsistent

15   answers of one type or another.  And so I think

16   it -- I just sort of truncated it here rather than

17   incorporating every possible instance of an

18   inconsistency that I could -- that I could go

19   through.

20         Q.    By the way, do you have any scholarly

21   research or secondary literature support for your

22   treating of what you call ambiguous answers the way

23   you did?

24         A.    It would not be uncommon, in empirical

25   analysis of surveys, to check sensitivity analysis

JEFFREY MILYO, PhD                                    8/26/2014

146

1    to different ways of coding responses, and

2    especially with regard to nonresponses.

3         Q.   But specifically in your report, you do

4    not list any of scholarly research support or

5    academic literature support for what you did.  Is

6    that correct?

7         A.   For what I did?

8         Q.   Yeah, for your omitting what you

9    considered to be ambiguous answers.

10        A.   I don't see any footnotes here in the

11   report, if that's what you're asking.

12        Q.   Now, when you mentioned that you looked at

13   different -- whether to weight it or not.  Is that

14   what you just said, in terms of some of these other

15   runs you were --

16        A.   That would be one -- that would be one

17   specification I recall looking at.  And -- yes.

18        Q.   How did you wind up ultimately weighting

19   what --

20        A.   What I did ultimately is to try to tow as

21   closely as possible to what appeared to be the

22   analysis in Barreto and Sanchez.  So I used their

23   weights, I used their tests of statistical

24   significance.  I used their Logit analysis.

25        Q.   And did you find any problems with those

JEFFREY MILYO, PhD                                      8/26/2014

147

1    weights that they had chosen or their statistical

2    significance approach or any of those things that

3    you applied to your replications?

4         A.   I did not.  As we covered already, I did

5    not produce any opinions about the weights or

6    criticize the weights.  In terms of a particular

7    statistical test, it seemed more straightforward to

8    just use the same one that they did.  I wanted to

9    focus the comparison on what happens if we make

10   these particular changes.

11                  MR. ROSENBERG:  Do you want to take a

12   quick break?

13                  (Discussion off the record.)

14        Q.   (BY MR. ROSENBERG)  Now, when you dropped

15   what you call the ambiguous cases from the data,

16   that winds up with -- you wind up with a smaller

17   sample of the data.  Is that correct?

18        A.   That would be correct.  It's a subsample.

19        Q.   Did you -- did you reconstruct the weights

20   of the new smaller dataset?

21        A.   I did not reconstruct weights.

22        Q.   Do you think you should have reconstructed

23   weights?

24        A.   It's not uncommon, in statistical analyses

25   and sensitivity analysis, to do something exactly

JEFFREY MILYO, PhD                                        8/26/2014

148

1    like what I did here.

2        Q.    Even when you are reducing the universe,

3    reducing the size of the dataset?

4        A.    It's not uncommon to look at subsamples.

5        Q.    Without doing any kind of reweighting?

6        A.    It's not uncommon to do that.

7        Q.    Do you have any scholarly literature,

8    academic support, secondary support for that

9    proposition?

10       A.    It's not something that I cited in the

11   report.

12       Q.    Okay.  Let's turn to a slightly different

13   subject.  You reviewed the reports of Drs. Chapman

14   and Henrici and Jewel and Webster.  Is that correct?

15       A.    I've looked at them, yes.

16       Q.    Now, do you criticize Dr. Webster and

17   Chapman because they analyze travel time in terms of

18   time rather than money?

19       A.    Can you refer me to where in the report I

20   discuss that?

21       Q.    Well, I was hoping you would do that.  But

22   let's start with 115, I am told.  Actually 1 -- you

23   can read over 113, 114, and 115.

24       A.    Okay.  I see a typo.  Okay.

25       Q.    Are you criticizing Drs. Webster and

JEFFREY MILYO, PhD                                        8/26/2014

149

1    Chapman because they analyzed travel time in terms

2    of time rather than money?

3         A.   No.  I believe the point here is about the

4    existence of opportunity costs that might vary.

5         Q.   So it's not your position that the only

6    way to approach this issue is to monetize it, is it?

7         A.   I don't believe I say that.

8         Q.   Did you have a chance to review

9    Dr. Chapman's reply report?

10        A.   I'm sure I've glanced at it.  I can't --

11   nothing -- there's so many reports, I can't really

12   recall anything specific.

13        Q.   Do you agree with the proposition that

14   it's well accepted within the fields of urban

15   planning and transportation studies that the effort

16   involved in individuals traveling from one location

17   to another by automobile, public transportation, or

18   walking may be measured by examining the time or

19   distance associated with such trips, with a

20   preference for using time because it accounts for

21   differential speeds of different mode choices?

22                  MR. KEISTER:  Object to form.  You

23   can answer.

24        A.   That was a very long statement.  I think

25   the first part of it, if you would repeat it, would

JEFFREY MILYO, PhD                                    8/26/2014

                                                            150

1    help me answer it.

2         Q.    (BY MR. ROSENBERG)   Sure.   That it's well

3    accepted within the fields of urban planning and

4    transportation studies that the effort involved in

5    individuals traveling from one location to another,

6    by car, public transportation, or walking, may be

7    measured by examining time or distance associated

8    with such trips?

9         A.    I don't believe I report any opinion that

10   speaks directly to that.

11        Q.    So you don't dispute that?

12        A.    I have no basis to dispute it.

13        Q.    Do you dispute that there is a preference

14   for using time because it accounts for differential

15   speeds of different mode choices?

16        A.    I don't speak to that in my report.

17        Q.    So you have no basis to dispute that?

18        A.    I have not disputed that in my report.

19        Q.    In Paragraph 119 of your report, you say

20   that experts for the plaintiff adopt methodologies

21   that exaggerate the travel costs of obtaining IDs,

22   and you go on to describe that position as

23   ridiculous, and explaining that if a rational person

24   desires to travel to multiple destinations, for

25   example, the bank, the grocery store, and the post

JEFFREY MILYO, PhD                                    8/26/2014

                                                            151

1   office, then they endeavor to minimize travel time

2   by combining activities into as few trips -- you say

3   tips; I assume you meant trips -- as possible.

4              Have you ever heard of the expression

5   "trip chaining"?

6        A.   I have heard of it.

7        Q.   Do you agree that trip chaining is

8   substantially harder for people who are not

9   traveling by car, but instead by public

10  transportation or walking?

11       A.   I imagine it would depend on the context.

12       Q.   Are you disputing that trip chaining is

13  substantially harder for people who are not

14  traveling by car, but are traveling by public

15  transportation, for example?

16       A.   I'm saying it depends on the context.

17       Q.   Well, you can't redirect a train, for

18  example.  Is that correct?  You cannot redirect a

19  train to a -- to stop it there --

20       A.   But you were making a general statement.

21       Q.   Right.

22       A.   And I said it depends on the context.

23       Q.   Do you dispute the principle that it is

24  generally accepted that trip chaining is

25  substantially harder for people who are not

JEFFREY MILYO, PhD                                    8/26/2014

152

1   traveling by car, but instead are traveling by

2   public transportation or walking?

3        A.   I don't think my report speaks to that.

4        Q.   So you don't dispute that as a general

5   proposition?

6        A.   I don't believe my report disputes that.

7        Q.   You understand that Dr. Chapman has found

8   that it's almost entirely those individuals who are

9   traveling by public transportation who would

10  experience the greatest travel burden in obtaining

11  an EIC?  Do you understand that as being his

12  conclusion, one of his conclusions?

13       A.   I would have to look back at the -- there

14  were so many reports, I would have to look back at

15  that one.  I don't believe I specifically spoke to

16  that in my report.

17       Q.   So you don't challenge the specific

18  finding that -- assuming that that was Dr. Chapman's

19  specific finding, that it is almost entirely those

20  individuals who would travel by public

21  transportation who would experience the most travel

22  burden?

23       A.   I don't believe I speak to that in my

24  report.

25       Q.   Paragraph 120, you indicate that the

JEFFREY MILYO, PhD                                    8/26/2014

153

1    potential costs of obtaining identification may be

2    ameliorated by the actions of neighbors, friends,

3    relatives, et cetera.  Do you see that?

4         A.   Yes, I do.

5         Q.   Now, you agree that that is unpredictable

6    in the sense that that's going to vary from

7    individual to individual and circumstance to

8    circumstance?

9         A.   Well, being variable and unpredictable are

10   two different concepts.

11        Q.   Well, do you agree that is unpredictable?

12        A.   I think I need to know what you mean by

13   unpredictable.

14        Q.   Well, I'll accept what your definition is

15   if you tell me what your definition is.

16        A.   That there's some probability.

17        Q.   Let's start there.  Can you quantify how

18   likely it is that potential costs of obtaining

19   identification may be ameliorated by the actions of

20   neighbors, friends, relatives, et cetera?

21        A.   I have not attempted to quantify that in

22   my report.

23        Q.   Are you aware of any study that has looked

24   at that issue of how potential costs of reducing

25   travel burden may be ameliorated by the actions of

JEFFREY MILYO, PhD                                    8/26/2014

154

1    neighbors, friends, or the like?

2         A.    I do not cite such studies here.

3         Q.    Are you aware of any such studies, whether

4    you cite them here or not?

5         A.    Well, there's a very large literature on

6    social capital, which is in general about how

7    connections between individuals can provide

8    different kinds of benefits, and rides would be an

9    example of one of those kinds of benefits.

10                There's also a -- literature about

11   the mobilization effects of different kinds of

12   phenomena where political entrepreneurs may try to

13   facilitate the ability of people to vote.

14                So I'm aware of some general

15   literatures that might apply, but in terms of a

16   specific study that I would have cited, I do not

17   have a footnote here.

18        Q.    And you agree that there would be -- there

19   could be, for example, quid pro quo, which could be

20   a cost in terms of asking a neighbor or a friend to

21   provide a ride?

22        A.    We could consider a number of scenarios

23   and different possibilities.  That might be one.

24        Q.    And so there would be costs even if people

25   were able to get rides from neighbors or friends,

JEFFREY MILYO, PhD                                    8/26/2014

                                                            155

1    and there's a time value, for example, in searching

2    for a ride.  Correct?

3                    MR. KEISTER:  Objection; form.  Calls

4    for speculation.

5                    MR. ROSENBERG:  I agree with that.

6         Q.   (BY MR. ROSENBERG)  But you can answer.

7         A.   I believe the point here is in terms of

8    what the experts for the plaintiff did or did not

9    consider.  And so the examples that you're bringing

10   up would also be things that they did not consider.

11        Q.   And the other side of that coin, for

12   example, you did not consider that even for

13   households who supposedly have access to a car, that

14   the car may be broken down.  Correct?

15        A.   In what sense should I be considering

16   that?

17        Q.   Well, you're talking about amelioration by

18   the actions of neighbors, friends, relatives,

19   coworkers, et cetera.  But there are also conditions

20   that could make -- could go in the other direction

21   that may vary by individual by individual, even if

22   someone has access to a car?

23        A.   So are you imagining a scenario where a

24   car is permanently broken down?

25        Q.   Perhaps, or that the person did not have

JEFFREY MILYO, PhD                                    8/26/2014

156

1    access to the car even if there's a car in that
2    household.  It's certainly possible, isn't it?
3         A.   So the question is?
4         Q.   That there are factors that go in the
5    other direction of amelioration that may vary
6    individual by individual.
7         A.   I would have to look back at their study
8    to -- you know, you're asking me to make additional
9    criticisms of what they have done.  The opinions
10   that I've produced in the report are those that I've
11   thought about.
12        Q.   Can you testify, to a reasonable degree of
13   scientific certainty, that the amelioration of
14   burden that you describe in Paragraph 120 will
15   decrease the travel time burden borne by blacks and
16   Hispanics compared to non-Hispanic whites?
17        A.   I don't believe that I state that in the
18   report.
19        Q.   Now, Paragraph 121, you theorize that even
20   if it costs money to get the underlying documents
21   for an EIC, the cost is not totally attributable to
22   the cost obtaining the EIC.  Is that correct?
23        A.   I'm sorry, what paragraph?
24        Q.   121.
25        A.   And so what is the question?

JEFFREY MILYO, PhD                                          8/26/2014

157

1       Q.   You theorize that even if it costs money
2  to get the underlying documents for an EIC, the cost
3  is not totally attributable to the cost of obtaining
4  an EIC?
5       A.   What do you mean by theorize?
6       Q.   Well, that's your theory, your opinion;
7  you opine.
8       A.   I state here that one would want to
9  apportion that in some way.
10      Q.   You do admit that at least $3 for a birth
11 certificate is attributable entirely to the cost of
12 obtaining an EIC.  Is that correct?
13               MR. KEISTER:  Object to form.
14      A.   I believe I state here that some
15 individuals can buy a $3 EIC.  So, I'm sorry, what's
16 the question?
17      Q.   (BY MR. ROSENBERG)  Well, that the $3 for
18 the birth certificate which you describe in
19 Paragraph 121 is attributable entirely to the cost
20 of obtaining the EIC.
21               MR. KEISTER:  Object to form.
22      A.   Well, the context here goes on to discuss
23 other things.
24               But in terms of what document you're
25 using, my understanding is, the EIC is only useful

JEFFREY MILYO, PhD                                    8/26/2014

158

1  for the purpose of voting.  So in that sense, the $3

2  would be a cost of doing that and it doesn't

3  necessarily provide any concomitant benefits, other

4  than the ability to vote in multiple elections.

5      Q.    (BY MR. ROSENBERG)  In Paragraph 122, you

6  say that because an EIC is valid for six years, you

7  should divide the cost of obtaining it by the number

8  of elections -- and I think that's what you're

9  referring to -- that a voter will be able to

10 participate in during that six-year life of the EIC.

11 Right?

12     A.    I believe it says one way of doing so.  It

13 should be apportioned in some manner over time.

14     Q.    Now, you agree that time spent in travel

15 is perishable, do you not?

16     A.    What do you mean by "time spent in travel

17 is perishable"?

18     Q.    You don't get it back.

19     A.    I don't know that we get any time back.

20     Q.    Right.  Are you aware of a single study

21 that stands for the proposition that individuals

22 view travel time in the same way that they view --

23     A.    I'm sorry, there was crosstalk.  Would you

24 mind starting over with the question?

25     Q.    I didn't hear the crosstalk.  I must have

1    missed something.

2              MR. POSNER:   Whispering too loudly.

3         Q.   (BY MR. ROSENBERG)  Are you aware of a

4    single study that stands for the proposition that

5    individuals view travel time in the same way that

6    they may view an investment in durable goods, where

7    a theory of behavior based on amortization may have

8    some value?

9         A.   I don't believe I cite a study of that

10   sort.

11        Q.   Paragraph 124, you raise the question,

12   "Does the individual bear any responsibility for

13   maintaining a record of citizenship and voter

14   eligibility."  Do you see that?

15        A.   I do.

16        Q.   Can you think of reasons as to why a

17   person who might not have an ID does not necessarily

18   bear a responsibility for that situation?

19        A.   That wasn't what I was thinking about

20   there in this context.  The context I had in mind

21   is, the same person losing their ID documents

22   multiple times and whether we should consider that

23   something --

24        Q.   Other than that example, you agree that

25   there are many instances you can think of where a

JEFFREY MILYO, PhD                                    8/26/2014

160

1   person is not at fault for not having an ID.  Is

2   that correct?

3        A.   I haven't thought about it.  I don't

4   believe I discussed that here.

5        Q.   Do you dispute that notion?

6        A.   What notion?

7        Q.   That a person may not bear fault for not

8   having an ID?

9        A.   What do you mean by "fault"?

10       Q.   Well, you used the word "responsibility."

11  You say, "Does the individual bear any

12  responsibility for maintaining a record of

13  citizenship and voter eligibility?"

14            Can you think of instances where the

15  person does not bear responsibility for not having a

16  record of citizenship and voter eligibility?

17       A.   Well, it's not something I've spoken to in

18  the report.

19            MR. ROSENBERG:  I am going to pass --

20  yep, I'm passing the witness to Mr. Freeman.  If you

21  want to take a break now --

22            MR. FREEMAN:  I'm fine.  Would you

23  like to take a break, sir?

24            THE WITNESS:  Let's keep going.

25            (Discussion off the record.)

JEFFREY MILYO, PhD                                    8/26/2014

161

1                          EXAMINATION

2    BY MR. FREEMAN:

3        Q.    Professor Milyo, I introduced myself

4    earlier, but, again, my name is Dan Freeman, and I

5    represent the United States in this litigation.  And

6    essentially the same rules apply as Mr. Rosenberg

7    explained earlier.

8                    I know we've been going for a while,

9    and there are miles to go before we sleep.  But if

10   you need another break, let me know, happy to take

11   one.  If you need coffee, water, happy to make sure

12   that you have that.  Is that okay?

13       A.    Yes.

14       Q.    Okay.  First off, just so you know, as a

15   ground rule, I'm only going to be discussing your

16   August 15th report.  So when I refer to your report,

17   that will just be Exhibit 2, which you have in front

18   of you.  Correct?

19       A.    Correct.

20       Q.    Okay.  First, did you read the corrected

21   report of Dr. Stephen Ansolabehere in its entirety

22   in preparation for your August 1st report?

23       A.    Are you referring to the supplemental

24   report from Dr. Ansolabehere?

25       Q.    I'm referring to the corrected report.

JEFFREY MILYO, PhD                                    8/26/2014

162

1    A.   I'm trying to recall how many Ansolabehere

2  reports there have been.

3    Q.   I can represent to you that there was an

4  initial report and then there was a correction in

5  which there were just some slight modifications made

6  to that initial report, and that was at the end of

7  June /beginning of July.  And then there was a

8  supplemental report.

9          So I'm referring to the middle

10 report.  Did you read that report in its entirety in

11 preparation for your August 1st report?

12   A.   My recollection is that the report -- and

13 there may have been appendicis -- was quite long.

14 So I don't think I would say that I have literally

15 read it from cover to cover.

16   Q.   And how many hours did you spend reviewing

17 Dr. Ansolabehere's report, to the best of your

18 recollection?

19   A.   I really don't have a basis for making

20 that estimate.  I mean, it's...

21   Q.   More than 10?

22   A.   I don't recall.  And in part, it's hard to

23 answer because there were multiple reports.  And one

24 might look from one to another.

25   Q.   Did you at any time sit down and say, now

JEFFREY MILYO, PhD                                    8/26/2014

163

1   I'm going to read Dr. Ansolabehere's report, and

2   read that report, or was it more of a back-and-forth

3   process, just so I understand?

4        A.   I've probably looked at that report

5   multiple times.

6        Q.   Did you read the corrected report of

7   Dr. Barry Burden in its entirety in preparation for

8   your August 1st report?

9        A.   And, again, there's multiple reports

10  moving around.

11       Q.   I will represent to you again, very

12  similarly to Dr. Ansolabehere's report, there was an

13  initial report and then there was a corrected report

14  in which just one paragraph was changed, just one,

15  and that was filed, I believe, early July; and then

16  there was a supplemental report.  So I'm referring

17  again to the middle one.  Did you read -- and that's

18  the longer one.

19            Did you read that report in its

20  entirety in preparation for your August 1st report?

21       A.   The Burden report that I read, I don't

22  recall if there were appendicis or not to that

23  report.  Can we take a look at it?

24       Q.   You know, I've printed a lot of things.

25  I'm not certain that I printed that, but it is my

JEFFREY MILYO, PhD                                    8/26/2014

164

1    recollection that there were not appendices.

2                    MR. ROSENBERG:  I'm sorry, which

3    report?

4                    MR. FREEMAN:  Burden.

5                    MR. ROSENBERG:  Which one, the

6    original?

7                    MR. FREEMAN:  The corrected.

8                    MR. ROSENBERG:  But not the reply

9    report?

10                   MR. FREEMAN:  No, not the reply.

11       Q.   (BY MR. FREEMAN)  Excluding any appendices

12   that there may have been, did you read the corrected

13   report of Dr. Burden in its entirety?

14       A.   My recollection is that I would have.

15   Although, again, with multiple copies of reports

16   running around, it's difficult to be 100 percent

17   sure at this stage.

18       Q.   Did you read the corrected report of

19   Dr. Chandler Davidson in its entirety in preparation

20   for your August 1st report?

21       A.   My recollection with Davidson -- I'm not

22   recalling his corrected report.  Do you have a copy

23   of it?  You might refresh my memory.

24       Q.   Again, I can represent to you that the

25   corrected report was nearly identical to the

JEFFREY MILYO, PhD                                    8/26/2014

                                                              165

1   original report, but for a small change in a single

2   number reflecting a change in Dr. Ansolabehere's

3   initial report, a correction.

4              So did you -- do you recall -- did

5   you read the entire, either original report or

6   corrected report of Dr. Chandler Davidson in its

7   entirety?

8       A.   You know, so many experts, so many

9   reports.  I'm actually not recalling the Davidson

10  report.  Let's see.  To the best of my recollection,

11  I would have -- I think I need to see it to really

12  recall.

13             Because if there were appendices --

14  some of them have numerous appendices and I'll admit

15  to if they weren't directly relevant to things that

16  I was going to be speaking to, that I would have

17  just glanced at them.

18      Q.   Let's exclude appendices to make this

19  easier.  Excluding appendices, do you recall if you

20  read the entirety of Dr. Davidson's report in

21  preparation for your August 1st report?

22      A.   I'd like to see the report to refresh my

23  memory.

24      Q.   I have a copy of Dr. Davidson's

25  supplemental report, which is similar, although some

JEFFREY MILYO, PhD                                    8/26/2014

166

1  paragraphs have changed.  But perhaps this can

2  refresh your recollection.  If we are just using it

3  to refresh, we won't mark this as an exhibit.

4       A.   I recall reading much of this.  There was

5  one section that's referencing events in the '60s

6  that is less familiar to me at this point in time.

7  But I believe I did read through the Davidson

8  report --

9       Q.   Okay.

10      A.   -- at some point.

11      Q.   So at some point you read it cover to

12  cover.  Is that your testimony?

13      A.   That is my recollection at this time.

14      Q.   Okay.  Did you read the report of Yair

15  Ghitza in its entirety in preparation for your

16  August 1st report?

17      A.   Can we see the report?

18      Q.   It's the individual who is employed by

19  Catalist.

20      A.   I know.  But there's lots of reports with

21  lots of pages, and you seem to be being very

22  specific, and so I want to be thorough in my

23  response.

24      Q.   Well, perhaps we can -- to the extent that

25  you're going to want to see them, we will have them

JEFFREY MILYO, PhD                                          8/26/2014

167

1   printed out and we'll get you a copy and we'll come

2   back to this, to the extent you're not able to

3   answer.  So I'll just mark these down.

4                MR. FREEMAN:  Let's go off the record

5   for a moment.

6                (Discussion off the record.)

7       Q.   (BY MR. FREEMAN)  Dr. Milyo, did you -- to

8   your recollection, did you read the report of

9   Dr. Jane Henrichi in its entirety in preparation for

10  your August 1st report?

11      A.   Can we see the report?

12      Q.   We'll get that for you, then, after a

13  break.

14                And did you read the corrected report

15  of Dr. Gerald Webster in its entirety in preparation

16  for your August 1st report, geographer from the

17  University of Wyoming, if that helps.

18      A.   It helps.  But, again, there were many

19  reports, many different names.

20      Q.   Okay.

21      A.   And...

22      Q.   Then we will loop back to those three.

23  That's fine.

24                At this time have you read the

25  supplemental and reply report of Dr. Barry Burden in

JEFFREY MILYO, PhD                                  8/26/2014

168

1   its entirety?
2        A.   I know I've looked at the report.  I
3   haven't had a lot of time to absorb it.
4        Q.   Okay.  So you've looked at it but you
5   haven't necessarily read it in its entirety.  Is
6   that correct?
7        A.   You know, I don't keep a spreadsheet of
8   what I've read in its entirety versus read one half
9   one day and the other 49 percent another day.  These
10  are differently -- you know, in that sense, it's
11  difficult.
12       Q.   So you're not certain?
13       A.   I know I've looked at that report.
14       Q.   Okay.  But you're not certain if you've
15  read it in its entirety?
16       A.   I believe I've said I've looked at that
17  report.
18       Q.   And my question is whether you've read it
19  in its entirety, and if you're certain that you've
20  read it in its entirety.
21       A.   I am not certain that I have read it in
22  its entirety.
23       Q.   Thank you.  And have you read the
24  supplemental report of Dr. Chandler Davidson in its
25  entirety?

JEFFREY MILYO, PhD                                    8/26/2014

                                                          169

1        A.    Again, I'd like to see the report.

2        Q.    That one is right here.  And it's actually

3   the report that I showed you before, it's just that

4   there is an updated version of it, which is the

5   actual version that you have in front of you now.

6        A.    For this supplemental report, I recall

7   looking to see if there were any particular

8   responses to my report.

9        Q.    And what particular responses were you

10  looking for?

11       A.    Well, I was looking for whatever

12  particular responses might exist.

13       Q.    What types of responses were you looking,

14  for, though, other than looking for your own name to

15  appear in the report?

16       A.    To see if it seemed to be addressing any

17  arguments that would be relevant to my report.

18       Q.    And what arguments were those with regard

19  to Dr. Davidson?

20       A.    Again, I haven't had a lot of time with

21  the supplemental reports.  I haven't produced a

22  document in response to them, so that would be going

23  beyond the opinions that I've expressed in my report

24  and something that I could do and speak to in the

25  future.  But at this time, I haven't really spent

JEFFREY MILYO, PhD                                        8/26/2014

170

1    enough time with all the different supplemental

2    reports.

3         Q.   Well, sir, you just testified a moment ago

4    that you were looking through that specific report,

5    looking for specific responses to specific

6    critiques.  And my question is: What specific

7    responses to specific critiques were you looking

8    for?

9         A.   And I think you have put words in my

10   mouth.

11        Q.   If we could, I guess, go back, then.  If

12   we could look back on the record to his response

13   when I asked if he had looked through the

14   supplemental report of Dr. Davidson.

15                  And so I asked:  "This one is right

16   here.  And it's actually the report that I showed

17   you before, it's just that there is an updated

18   version of it, which is the actual version that you

19   have in front of you now?"

20                  And you answered, "For this

21   supplemental report, I recall looking to see if

22   there were any particular responses to my report."

23                  I asked:  "And what particular

24   responses were you looking for?"

25                  And you answered, "Well, I was

JEFFREY MILYO, PhD                                    8/26/2014

171

1   looking for whatever particular responses might

2   exist."

3                   Now, my question is:  What particular

4   responses to your report were you looking for?

5        A.   And as I answered, I didn't have a

6   particular expectation of what I might see.  It was

7   a new report that I looked at.

8                   And also as I've said, I haven't had

9   sufficient time to really absorb and think about the

10  supplemental reports.

11       Q.   So you skimmed through the supplemental

12  reports.  Would that be accurate?

13       A.   I've said I've looked at the supplemental

14  reports.

15       Q.   Have you read the supplemental report of

16  Dr. Gerald Webster in its entirety?

17       A.   I believe, as with the others, I've looked

18  at the supplemental reports.  And I don't recall

19  Webster's supplemental report.  If you could produce

20  that, it might help refresh my memory.

21                  I'm sorry, what was the question?

22       Q.   Having now reviewed the supplemental

23  report of Dr. Webster, the question is: Have you

24  read the supplemental report of Dr. Gerald Webster

25  in its entirety?

JEFFREY MILYO, PhD                                    8/26/2014

172

1        A.    I don't believe so.

2        Q.    Did the State of Texas provide you with

3   additional data from Dr. Ansolabehere in July or

4   August of 2014?

5        A.    What do you mean by "additional data"?

6        Q.    Did the State of Texas provide you with a

7   dataset produced by Dr. Ansolabehere in either

8   July or August of 2014?

9        A.    I know there were some zip files sent

10  fairly recently.  July, I think not.  But July is

11  right next to August, so it's hard to be definitive.

12       Q.    It would have been the very end of July or

13  anytime in August.

14              MR. KEISTER:  And let me caution the

15  witness to please respond only to his question and

16  not to anything related to communications with the

17  Attorney General's Office, outside of what he's

18  asking you.

19       A.    With this case there have been a number of

20  datasets produced by different experts.  You know,

21  if you can show me the particular files, that might

22  help in terms of answering whether I had them and at

23  what time.

24       Q.    (BY MR. FREEMAN)  Now, you're aware that

25  in this case, the State of Texas, when it initially

JEFFREY MILYO, PhD                                    8/26/2014

173

1    produced the Department of Public Safety's driver's

2    license database, omitted 3.1 million records from

3    that first production.  Correct?

4         A.   My understanding is that there was some

5    sort of problem.

6         Q.   And are you aware of whether

7    Dr. Ansolabehere conducted initial -- excuse me,

8    additional analysis after receiving those 3.1

9    million additional records, as well as information

10   related to the card status field that was related to

11   that production error?

12        A.   I know that there was a recently produced

13   Ansolabehere report that comes up with different

14   numbers and presumably is based upon the updated

15   data.  I recall an explanation of that in his

16   report.

17        Q.   And did you receive the underlying data

18   that was produced related to that report, prior to

19   the date that you produced your supplemental report?

20        A.   I didn't rely on it in any report that I

21   did, so I don't recall if I did or didn't or have.

22   I have not looked at that data.

23        Q.   And why did you not look at that data?

24        A.   Because I did not have time and it was not

25   within the -- I want to say purvey.  I'm not sure if

JEFFREY MILYO, PhD                                      8/26/2014

174

1    that's the right word -- my assignment here and time
2    constraints.
3         Q.    Did you ever ask the State of Texas if you
4    could have an extension to the deadline to produce
5    your August 15th report?
6         A.    I didn't know I could ask for an
7    extension.
8         Q.    So, no, you did not ask?
9         A.    I did not ask for an extension.
10        Q.    And to the extent that Dr. Ansolabehere's
11   additional data took into account the 3.1 million
12   records that had not been produced and that his
13   results changed significantly as a result of
14   including those 3.1 million records, it's your
15   opinion that it was not within the purview of your
16   report to assess those updated data files from
17   Dr. Ansolabehere?
18        A.    I did not assess the un-updated data files
19   in doing my report.  The report was based on the
20   description of his analysis in his report.
21        Q.    And so you never looked at the underlying
22   data files that he produced to see if the no-match
23   number, for example, was lower once the 3.1 million
24   records were included?
25        A.    No, I did not.

JEFFREY MILYO, PhD                                    8/26/2014

175

1    Q.   And you didn't look to see what racial

disparity existed based on Catalist race estimates

in the updated data prior to producing your

supplemental rebuttal report.  Correct?

5    A.   In the updated which data?

6    Q.   In the August data that he produced that

included analysis of the 3.1 million previously

omitted DPS records.

9    A.   I did not look at those DPS records.

10   Q.   You did not look at Dr. Ansolabehere's

analysis based on those DPS records, correct, based

on your --

13   A.   Correct.  As I stated, I looked at his

reports.

15   Q.   And you didn't think that it was within

the scope of your report to assess

Dr. Ansolabehere's underlying data once he had

received the omitted DPS records?

19           MR. KEISTER:  Objection; asked and

answered.

21   Q.   (BY MR. FREEMAN)  Correct?

22   A.   The scope of the report is potentially

enormous and beyond what any one human being could

do.  So I had limited time and ability.

25           And as I explained in the report, I

JEFFREY MILYO, PhD                                    8/26/2014

                                                           176

1    give opinions on things that I have been able to

2    analyze and discuss.

3         Q.   But you have not been able to analyze and

4    discuss Dr. Ansolabehere's analysis of the matching

5    results once those matching results included the 3.1

6    million DPS records.  Correct?

7         A.   You keep saying "his analysis."  Do you

8    mean his report or the underlying data?

9         Q.   I mean the underlying data that he

10   produced.

11        A.   I have not examined the underlying DPS

12   data.

13        Q.   And have you examined the post-match data

14   that Dr. Ansolabehere produced to the State of Texas

15   prior to the production of your August 15th report?

16        A.   No.

17        Q.   I'd like to start off by talking about

18   database matching as a general matter.  If you could

19   turn to Paragraph 21 of your report.

20             Am I correct that in Paragraph 21,

21   you state, "I am unaware of any scholarly studies

22   that analyze the effect of voter ID by examining

23   non-matches between a State voter registration

24   database and external databases"?

25        A.   That's what's written there.

JEFFREY MILYO, PhD                                    8/26/2014

177

1      Q.   And do you make a similar statement in

2  Paragraph 22?

3      A.   Uh-huh.  There is a similar statement

4  there.

5      Q.   Have you ever relied on database matching

6  in any part of your own scholarly work?

7      A.   And I am aware that Professor Ansolabehere

8  has cited a study claiming that it's a contradiction

9  to that claim.  Having seen that, I might change the

10 wording of this to be more accurate.

11     Q.   So as you stand now, you would -- you

12 would no longer assert that you are unaware of any

13 scholarly studies that analyze the effect of voter

14 ID by examining non-matches?

15     A.   Well, the study that he refers to

16 specifically is estimating effects of ID on turnout

17 where they use a matched dataset as an input.  I

18 don't recall that the authors describe doing the

19 matching analysis.

20               So the distinction here is between

21 studies that are analyzing turnout as an effect of

22 voter ID versus those that stop by just looking at

23 matching data bases and pointing to persons that may

24 or may not have ID.

25               So I understand his point, and I

JEFFREY MILYO, PhD                                    8/26/2014

178

1    agree that I did not state this in a way that is

2    clear or correct.  So it could be edited.  I'm not

3    good at editing on the fly here.

4         Q.   So what you're unaware of was not studies

5    that examine the effect of voter ID by examining

6    non-matches.  You're unaware of studies that measure

7    the effect of voter ID in terms of non-matches.

8    Would that be more accurate?

9         A.   At that time, yes.  I would say that the

10   idea of trying to evaluate voter ID based on

11   non-matches of this sort of database matching solely

12   is what I had in mind.

13        Q.   Okay.  Back to the question I asked a

14   moment ago.  Have you ever relied on database

15   matching in any form in part of your own scholarly

16   work?

17        A.   Well, what do you mean exactly by database

18   matching?

19        Q.   Record linkages between large databases.

20        A.   I think in the spirit of your question, in

21   terms of replicating this kind of analysis, no.

22   There are other ways of matching databases, but I

23   don't think you mean that.

24        Q.   Okay.  Are you aware of whether database

25   matching has been used in other areas of social

JEFFREY MILYO, PhD                                    8/26/2014

179

1   science, outside of the studies of the effects of

2   voter ID?

3        A.   I don't know that I cite any in my report.

4        Q.   My question is to your awareness as a

5   social scientist as to whether database matching is

6   an accepted practice in the study of social science

7   and --

8        A.   I have a general awareness that there

9   exists studies or people who do database matching.

10       Q.   And that's an accepted practice within the

11  social sciences.  Correct?

12       A.   I suppose it depends how it's done.

13       Q.   A properly conducted database match would

14  be an accepted practice within the social sciences.

15  Correct?

16       A.   That sounds like a tautology.  Yes.

17                 MR. FREEMAN:  Mark this as

18  Exhibit 11.

19                 (Exhibit Number 11 marked.)

20       Q.   (BY MR. FREEMAN)  Dr. Milyo, what is this

21  document?

22       A.   This looks to be a copy of a report that I

23  wrote for the Institute of Public Policy at the

24  Truman School at the University of Missouri.

25       Q.   And this is a working paper.  Correct?

JEFFREY MILYO, PhD                                    8/26/2014

180

1       A.   No.   It's a policy report.   I believe
2  that's what they call it.
3       Q.   So it's not published in a peer-reviewed
4  journal of any kind; it's simply published by an
5  institution within the University of Missouri?
6       A.   That is correct.
7       Q.   Okay.   Let's turn to end note 3.
8       A.   Oh, end.
9       Q.   It's on page 8.   In end note 3, you cite
10 to a 2007 working paper by Hood and Bullock.
11 Correct?
12      A.   Well, I'd have to look in the references.
13      Q.   I'll represent to you that the Hood and
14 Bullock reference is in the same paragraph as the
15 Gerber and Green reference.   There should have been
16 a carriage return there, and there is not.
17      A.   That looks like, yes, it's referencing a
18 working paper.
19      Q.   And that was a scholarly study that
20 analyzed the effect of voter ID by examining
21 non-matches between a State voter registration
22 database and an external database.   Correct?
23      A.   Which was?
24      Q.   The Hood and Bullock article -- or working
25 paper from 2007.

JEFFREY MILYO, PhD                                      8/26/2014

                                                              181

1       A.   I don't remember the specifics of that

2   working paper from 2007.  Do you have a copy?

3       Q.   We'll get there in a moment.  If you could

4   look at your end note 3, would that refresh your

5   recollection as to the substance of that working

6   paper?

7                 Having reviewed end note 3, would you

8   agree that the 2007 working paper was a scholarly

9   study that analyzed the effect of voter ID by

10  examining non-matches between a State voter

11  registration database and external databases?

12      A.   I cite one -- one thing here about that

13  study.  Without looking back at the 2007 study that

14  I wrote about in 2007, it's difficult to remember

15  what exactly was in that working paper.

16      Q.   Well, you assert that Hood and Bullock

17  found that about 5 percent of registered voters in

18  Georgia do not have a valid driver's license or

19  State identification card.  Correct?

20      A.   That's what's stated in end note 3 here.

21      Q.   And you state here that Hood and Bullock

22  made a rather egregious error in that study.  Am I

23  correct?

24      A.   There is the statement, "This is a rather

25  egregious error."

JEFFREY MILYO, PhD                              8/26/2014

                                                    182

1      Q.   So you assert that Hood and Bullock made a

2   rather egregious error in their study.   Am I

3   correct?

4      A.   In this end note 3 of the 2007 report.

5      Q.   And that's a report that you wrote?

6      A.   That's correct.

7      Q.   Okay.   And what you describe as an error

8   was that Drs. Hood and Bullock did not investigate

9   how many of the registered voters' names in Georgia

10  are actually attached to eligible voters.   Correct?

11     A.   That's what's written here.

12     Q.   Is that the same deadwood issue that you

13  describe in your August 15th report in Exhibit 2?

14     A.   I'd have to look back at the report to see

15  the context.

16     Q.   So you can't tell me, sitting here today,

17  whether the issue that you identify in end note 3 is

18  the same issue that you identify in your August 15th

19  report related to deadwood?   You're not able to do

20  that?

21     A.   I would like to look back at that report

22  and get a recollection of what it is they did that I

23  was talking about.   It's difficult to think back

24  seven years, out of context.

25     Q.   But reading end note 3 is not enough

JEFFREY MILYO, PhD                                8/26/2014

183

1    information for you to be able to understand your

2    own critique.   Is that what you're saying?

3         A.   I'd like to be more certain.

4         Q.   That's fine.

5                   MR. ROSENBERG:   Why don't we take a

6    break.

7              (Recess.)

8         Q.   (BY MR. FREEMAN)   Okay.   We're back on the

9    record.   And we now have a copy of the 2007 working

10   paper from Drs. Hood and Bullock.

11             So I believe my question was -- well,

12   going back to the beginning, Drs. Hood and Bullock,

13   that was a scholarly study that analyzed the effect

14   of voter ID by examining non-matches between a State

15   voter registration database and external databases.

16   Correct?

17        A.   I would have to look at it.

18                   MR. FREEMAN:   We can go off the

19   record.

20             (Discussion off the record.)

21        A.   So what's the question about this working

22   paper?

23        Q.   (BY MR. FREEMAN)   The question was whether

24   this was a scholarly study that analyzed the effect

25   of voter ID by examining non-matches between a State

JEFFREY MILYO, PhD                                          8/26/2014

                                                                184

1    voter registration database and external databases.

2         A.   This is a study that, in part, does an

3    analysis or a prediction of possession of ID and

4    also looks at voter turnout.

5         Q.   And the prediction of possession of voter

6    ID is based on an examination of non-matches between

7    a State voter registration database and external

8    databases.   Correct?

9         A.   That's my understanding, from trying to

10   glance through the 2007 working paper.

11        Q.   And in your 2007 report, which has been

12   marked Exhibit 11, you assert that Hood and Bullock

13   found that about 5 percent of registered voters in

14   Georgia do not have a valid driver's license or

15   State identification card.   Correct?

16        A.   This is end note 3?

17        Q.   End note 3 on page 8.

18        A.   The quote here is that they argue that

19   about 5 percent of registered voter names do not

20   have a valid driver's license or State

21   identification card.

22        Q.   And you state, in end note 3, that Hood

23   and Bullock made a rather egregious error in their

24   study.   Am I correct?

25        A.   That is stated there in end note 3.

JEFFREY MILYO, PhD                                    8/26/2014

                                                         185

1        Q.   And you keep using the passive voice.   But

2   this is your writing.   You stated, in this paper,

3   that they made a rather egregious error.   Correct?

4        A.   Well, it's the past tense.   I'm trying

5   to -- in 2007, yes.   What's written here is, this is

6   a rather egregious error.

7        Q.   And what you describe as a rather

8   egregious error was that Dr. Hood and Dr. Bullock

9   did not investigate how many registered voters'

10   names in Georgia are actually attached to eligible

11   voters.   Correct?

12        A.   That would seem to be the statement here.

13        Q.   Is that the same deadwood issue that you

14   describe in your report in this case?

15        A.   I would have to look back at exactly what

16   they did to further understand if that's exactly the

17   same deadwood issue that I have referenced in

18   multiple occasions in the report.   It's a more

19   complicated question than it seems.

20        Q.   What is your understanding of the term

21   "deadwood"?

22        A.   I believe that I use the term deadwood --

23   I note in footnote 4 that in my report, I'm using

24   the term "deadwood" to describe any name listed in a

25   database of registered voters that's not a real

JEFFREY MILYO, PhD                                    8/26/2014

186

1    person, not alive, not residing at that address, or

2    otherwise not actually an eligible voter.

3         Q.   And is the same deadwood issue you discuss

4    in your report in this case, the same issue that you

5    discuss in end note 3 of your 2007 report?

6         A.   Without having read Hood and Bullock in

7    detail to verify, I would say that it appears to be,

8    sitting here.

9         Q.   And was Hood and Bullock's total failure

10   to investigate deadwood, did that render their

11   analysis fatally flawed, according to your paper?

12        A.   I'm not seeing the words "fatally flawed."

13   Do you see where that's written?

14        Q.   I'm not asking if it's a verbatim

15   recitation in there.  I'm asking, from your

16   analysis, to the extent that you are able to

17   understand what you previously wrote, would you say,

18   to your mind, that the total failure to investigate

19   deadwood rendered that analysis fatally flawed?

20        A.   I think what I would say is what is

21   written here.

22        Q.   My question is, is that analysis fatally

23   flawed due to the failure to investigate deadwood?

24        A.   Well, your -- there's more to what they do

25   than just that, so we would have to look through.

JEFFREY MILYO, PhD                                    8/26/2014

                                                           187

1              But as I've stated here, there's a
2    concern about registered voter names that are not
3    actually attached to eligible voters.
4         Q.   An egregious concern?
5         A.   I believe I said an egregious error.
6         Q.   Are you aware of whether Dr. Hood and
7    Dr. Bullock's working paper was eventually published
8    in a peer-reviewed journal?
9         A.   Well, if you show me the article that they
10   published, I could compare them.
11        Q.   I'm asking to your knowledge, right now.
12   Do you know if the 2007 working paper was eventually
13   published in a peer-reviewed journal?
14        A.   I know that they have a recent publication
15   in a peer-reviewed journal, and this is a
16   seven-year-old working paper that I have limited
17   recollection of.
18        Q.   So you don't know if that working paper,
19   as you sit here now, became an article in a
20   peer-reviewed journal.  Is that correct?
21        A.   Well, I imagine there may have been some
22   changes.
23        Q.   Do you know if a subsequent iteration or
24   revision of that particular paper was published in a
25   peer-reviewed journal?

JEFFREY MILYO, PhD                                    8/26/2014

                                                              188

1        A.   Well, let's check and see if the title is

2   exactly the same.   That might be one way to answer.

3   If you don't want to provide me the article.

4        Q.   I'm asking for your current knowledge.

5                  MR. FREEMAN:   Let the record reflect

6   that the witness is examining Exhibit 2 at this

7   time.

8        A.   I'm looking for the title of the published

9   article.

10       Q.   (BY MR. FREEMAN)   Perhaps this is easier.

11  Without looking at your report, are you able to tell

12  me, yes or no, whether or not you currently know

13  whether that 2007 working paper was published in a

14  peer-reviewed journal in a subsequent revision?

15       A.   Well, I just found the section I was

16  looking for.

17       Q.   There we go.   Having now looked at your

18  report for a few minutes, are you able to say

19  whether or not the 2007 working paper was

20  subsequently published in a peer-reviewed journal?

21       A.   Darn it, I'm looking for the particular

22  citation to see if there was any change in the

23  title.

24       Q.   Having looked at your report for a few

25  minutes, you are not able to tell me, from your

JEFFREY MILYO, PhD                                    8/26/2014

1   personal knowledge and your expertise as a social

2   scientist, whether or not the 2007 working paper was

3   published in a revised form in a peer-reviewed

4   journal.  Is that correct?

5        A.   Well, that's a different question than

6   you've been asking me repeatedly.

7        Q.   And I'm trying to speed up the process,

8   because you've been looking at your report for

9   approximately five minutes.  Is that correct?

10       A.   My understanding is that a revision of

11  this paper was published.

12       Q.   Okay.  Are you aware of whether Dr. Hood

13  and Dr. Bullock published a second article in a

14  peer-reviewed journal in which they also relied on

15  database matching to assess the impact of Georgia's

16  voter ID law?

17       A.   We've cited many papers here, and at this

18  late point in the day, papers are running together

19  in my mind, so...

20       Q.   I'm happy to refresh your recollection on

21  that one.

22            MR. FREEMAN:  Mark this as

23  Exhibit 12.

24            (Exhibit Number 12 marked.)

25       Q.   (BY MR. FREEMAN)  Dr. Milyo, what is that

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

JEFFREY MILYO, PhD                                  8/26/2014

190

1   document?  What is Exhibit 12?

2        A.   This is a copy of a paper.  The title is

3   "Much Ado About Nothing."

4        Q.   Are you familiar with that paper?

5        A.   Yes, I am.

6        Q.   Have you read it before?

7        A.   I have.

8        Q.   And is this a second article published by

9   Dr. Hood and Dr. Bullock in a peer-reviewed journal

10  in which they rely on database matching to assess

11  the impact of Georgia's voter ID law?

12       A.   As we have already discussed, this is a

13  paper in which they analyze voter turnout based on a

14  matched database that they access, I believe, from

15  the -- I believe it's from the State of Georgia, in

16  the analysis.

17       Q.   Are you aware of whether Dr. Charles

18  Stewart has published an article in the Oklahoma Law

19  Review in which he relied on database matching to

20  assess the impact of South Carolina's voter ID law?

21       A.   You know, I have not been aware of the

22  Oklahoma Law Review article until I recently saw a

23  reference to it.  I noticed it in one of the

24  supplemental reports, I believe.

25       Q.   At this time, are you now aware whether

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

JEFFREY MILYO, PhD                                    8/26/2014

                                                           191

1   Dr. Charles Stewart has published an article in the

2   Oklahoma Law Review in which he relied on database

3   matching to assess the impact of South Carolina's

4   voter ID law?

5        A.   I am aware of the claim.  I have not

6   looked up the original article yet and read it for

7   myself.

8        Q.   So you're aware that he has published a

9   scholarly work in which he relied on database

10  matching to assess the impact of South Carolina's

11  voter ID law.  You just haven't personally assessed

12  the article yourself.  Would that be fair?

13       A.   I am aware of the claim made in one of the

14  supplemental reports.  I haven't looked up the

15  article and read it for myself.

16       Q.   So would it then be fair to say you're not

17  familiar with the entire scholarly literature on

18  assessments of the effects of voter ID laws?

19       A.   There are new papers coming out all the

20  time.  If we're going back to working papers from

21  seven years ago or longer, in terms of what's

22  committed to memory and can be called up

23  immediately, that would not be something I would be

24  able to do without refreshing my recollection or

25  doing additional research.

JEFFREY MILYO, PhD                                    8/26/2014

192

1      Q.    What about an article published in 2013 by

2  Dr. Charles Stewart?  You weren't aware of that

3  prior to this litigation.  Is that correct?

4      A.    The Oklahoma Law Review article?

5      Q.    Yes.

6      A.    The Oklahoma Law Review article was one

7  that I was not aware of.

8      Q.    Okay.  Have you ever attempted to obtain a

9  driver's license database for research purposes?

10     A.    No.

11     Q.    Are you aware of whether states usually

12 make such files available outside of litigation?

13     A.    I am not aware.

14     Q.    If you could turn to Paragraph 14 of your

15 report, Exhibit 2.

16           To your knowledge, is the number

17 of -- is the number of eligible voters that you

18 describe experts for the plaintiffs claiming lack

19 SB 14 ID contained in Paragraph 14, still accurate?

20 Does it accurately reflect the current claims of

21 experts for the plaintiffs?

22     A.    There have been supplemental and revised

23 reports, using additional data where the overall

24 numbers have changed.

25     Q.    So the numbers in Paragraph 14, no expert

JEFFREY MILYO, PhD                              8/26/2014

193

1    for any of the plaintiff groups continues to make

2    the claim that you describe in Paragraph 14.  Is

3    that correct?

4         A.    No, I don't believe that's correct.

5         Q.    You believe that some experts still

6    maintain that more than 1 million eligible voters in

7    Texas lack SB 14 ID?

8         A.    No.  I said I don't believe it.

9         Q.    Okay.

10        A.    Because I believe Barreto and Sanchez did

11   an estimate of voters, and I'm not recalling

12   offhand, without looking back at their supplemental

13   report, whether they have removed that from their

14   report.  There would be no reason for them to do so,

15   but I believe they came up with an estimate of 1.2

16   million voters without ID, based on the first cut of

17   their survey.

18        Q.    None of the experts who are using a

19   database-matching methodology are continuing to

20   assert that more than 1 million otherwise eligible

21   voters in Texas lack SB 14 ID.  Correct?

22        A.    As I said before, I haven't had a lot of

23   time with the supplemental reports, and so this was

24   written based on the reports that I had at the time.

25        Q.    Did you have access to data, prior to

JEFFREY MILYO, PhD                                    8/26/2014

                                                          194

1    August 15th, based on that you could have updated

2    this figure?

3                    MR. KEISTER:   Objection; form.

4         A.    I'm not sure what you mean by "data."

5         Q.    (BY MR. FREEMAN)  Did you have access to

6    data produced by Dr. Ansolabehere prior to

7    August 17th, based on which you could have updated

8    this figure to more accurately reflect the claims

9    being made by plaintiffs' database-matching experts?

10        A.    Which claim?

11        Q.    The claim that more than 1 million

12   otherwise eligible voters in Texas lack SB 14 ID.

13        A.    I don't recall being in possession of the

14   data, but I know that I did not examine data for

15   that purpose.

16        Q.    Would you agree that every paragraph in

17   your report in which you assert that

18   Dr. Ansolabehere found a specific number of

19   non-matched voters, is no longer accurate?

20        A.    I would need to compare my report to his

21   report, paragraph by paragraph, to answer that.

22        Q.    Would you agree that every paragraph in

23   your report in which you assert that

24   Dr. Ansolabehere found a specific number of

25   unmatched voters reflects the analysis conducted by

JEFFREY MILYO, PhD                                    8/26/2014

195

1   Dr. Ansolabehere prior to receiving 3.1 million

2   additional DPS records?

3          A.    That sounds more accurate.

4          Q.    And to the extent that Dr. Ansolabehere is

5   no longer asserting that his prior figures are

6   accurate, because he lacked those records, would you

7   agree that your descriptions of his assertions are

8   no longer accurate?

9          A.    No.

10         Q.    And why is that?

11         A.    The criticisms and -- that I make, many of

12  them are about the conceptual analysis, which has

13  not changed.

14         Q.    I apologize.  My question was

15  insufficiently precise.

16               Would you agree that every paragraph

17  in your report in which you assert that

18  Dr. Ansolabehere found a specific number of matches

19  based upon the data that did not include 3.1 million

20  additional DPS records, that the numbers in your

21  report are no longer accurate because they no longer

22  reflect claims currently made by Dr. Ansolabehere

23  after receiving the complete DPS data?

24         A.    So if I understand you correctly, it's my

25  quoting specific numbers out of Dr. Ansolabehere

JEFFREY MILYO, PhD                                    8/26/2014

                                                              196

1   which were accurate, but given that he's changed his

2   numbers, would now be different, is your concern.

3        Q.   That's correct.

4        A.   I have not gone through every paragraph to

5   check that.  We could do so.

6        Q.   Would you agree that all of the figures in

7   your report reflect the pre -- reflect the numbers

8   contained in Dr. Ansolabehere's reports prior to his

9   receipt of the additional 3.1 million records?

10       A.   That would have been the intention, yes.

11       Q.   And so any figure that you include in your

12  report that is derived from Dr. Ansolabehere's prior

13  reports no longer reflects Dr. Ansolabehere's

14  current analysis.  Is that correct?

15       A.   This has not been updated, given any

16  corrected or supplemental reports.

17       Q.   But you had the data from Dr. Ansolabehere

18  prior to the publication of his updated report that

19  you could have used to produce updated numbers in

20  your own report.  Isn't that right?

21       A.   I don't believe I said that.

22       Q.   You're saying that you did not receive

23  additional data from -- that Dr. Ansolabehere

24  produced prior to producing your August 15th report?

25       A.   I don't believe I said that either.

JEFFREY MILYO, PhD                                    8/26/2014

                                                            197

1         Q.    Those were two sides of the same coin.

2         A.    And you're demanding --

3         Q.    I'm demanding --

4         A.    -- an affirmative answer.

5         Q.    Yes.  One or the other.

6         A.    And to the spirit of your question --

7         Q.    Thank you.

8         A.    There has been a dump of documents from

9    the other experts.  In my report I have not done

10   original data analysis of those database and so I

11   have not used or done the analysis that you're

12   describing.  I can't tell you with certainty when

13   they were dumped.

14        Q.    Okay.  Are you aware of Dr. Ansolabehere's

15   final no-match estimate?

16        A.    The exact number?

17        Q.    I'm not going to ask you to repeat it.

18   I'm just asking whether you have seen it.

19        A.    I have looked at his most recent report.

20        Q.    Does your report contain any opinions

21   regarding the size or plausibility of

22   Dr. Ansolabehere's final no-match estimate?

23        A.    In terms that the methods that he uses are

24   similar, yes.

25        Q.    Does your report contain any opinions

JEFFREY MILYO, PhD                                    8/26/2014

198

1   regarding the size or plausibility of

2   Dr. Ansolabehere's final no-match estimate?

3                  MR. KEISTER:  Objection; form.  Asked

4   and answered.

5        A.   As I've stated, the specific numbers may

6   change, but to the extent the methods are similar

7   and what I identify in my report are criticisms of

8   methods and interpretations, those would still

9   stand.

10       Q.   (BY MR. FREEMAN)  But does your report

11  contain any opinions regarding the plausibility of

12  the raw number of Dr. Ansolabehere's final no-match

13  estimate?

14       A.   Is there a section that you're referring

15  to specifically?

16       Q.   I'm asking whether the entirety of your

17  report contains any opinions regarding the

18  plausibility of the final number of estimated

19  no-matches that Dr. Ansolabehere found to exist in

20  Texas's voter registration database.

21                  MR. KEISTER:  Objection; form.  It's

22  been asked and answered twice.

23                  MR. FREEMAN:  It's been asked.  It

24  hasn't been answered.

25                  MR. KEISTER:  It's been answered.

JEFFREY MILYO, PhD                                    8/26/2014

199

1   You don't like the answer but he answered it.  He

2   said he's -- the methods he's criticizing, and you

3   asked the plausibility of it.  He's answered it.

4        Q.   (BY MR. FREEMAN)  My question is not about

5   the methods.  It's about the number.  I'm asking you

6   to answer the question that I'm asking rather than

7   the question that you'd like me to ask.

8              My question is: Does your report, in

9   any point, contain any opinion regarding the

10  plausibility of the number, just the number -- not

11  how he got there, but the number of no-matches that

12  Dr. Ansolabehere finds to exist based on his

13  analysis of Texas's voter registration database?

14             MR. KEISTER:  Objection; form.  It's

15  been asked and answered.  You're putting

16  plausibility in there and thus creating a vagueness

17  in your question.

18             But the question has been asked and

19  answered twice, and I'll object to the side-bar

20  comments.  But to the extent you can --

21       Q.   (BY MR. FREEMAN)  You may answer.

22       A.   First of all, you're using the word "any"

23  and "anywhere."  And to be completely sure, I would

24  need to look through to see, for example, if I

25  relied on the size of the specific number when

JEFFREY MILYO, PhD                              8/26/2014

200

1   comparing it to, say, other estimates and other

2   expert reports.

3             But you also used the word

4   "plausibility," which has to be related to the

5   methods by which the number is estimated.

6        Q.   So you didn't change any of the numbers in

7   your report from your August 1st report to the

8   August 15th report.  Is that correct?

9        A.   I believe we have already gone over the

10  minor editing changes that were made between the two

11  reports.

12       Q.   Was that at all responsive to the question

13  that I just asked?

14       A.   Yes --

15            MR. KEISTER:  Objection; side-bar.

16  Yes, Counsel, it was.  He hasn't produced another

17  report after Dr. Ansolabehere did his report.

18       Q.   (BY MR. FREEMAN)  Does your report provide

19  any new numbers as to the results of

20  Dr. Ansolabehere's matching process?  Yes or no?

21       A.   I have not updated the report in reliance

22  on his supplemental or corrected report.

23       Q.   Do you identify any specific steps that

24  you believe Dr. Ansolabehere should have taken in

25  his database-matching process that he did not take?

JEFFREY MILYO, PhD                                    8/26/2014

1    A.   Well, I think one step that's identified,

2  as Dr. Ansolabehere has emphasized in his own

3  research, the importance of cleaning the

4  registration database before attempting any

5  matching.  And he's used the Catalist data to do

6  that.

7              One of the points I made in my report

8  is that he doesn't attempt to do that until about --

9  I don't have his report in front of me.  It's

10  somewhere around page 40 of his analysis.

11              So he conducts the great bulk of his

12  analysis using methods that he has very strongly

13  criticized in his own scholarly research.  So that

14  would be one specific step that I am critical of.

15              I believe the nature of other

16  criticisms have to do with the extent of being

17  forthcoming about the potential errors or biases in

18  the numbers that are derived.

19              MR. FREEMAN:  Not my question, so I'm

20  going to object.

21    Q.   (BY MR. FREEMAN)  And I'm going to ask

22  again:  Do you identify any specific steps that you

23  believe Dr. Ansolabehere should have taken in his

24  database-matching process but did not take?

25    A.   I believe I've answered that question so I

JEFFREY MILYO, PhD                                    8/26/2014

                                                          202

1   don't think I'm understanding your question.

2        Q.   You identified a step that

3   Dr. Ansolabehere did take, but did not take until

4   you believe, it's your opinion, too late in the

5   report.  Correct?

6        A.   Well, he conducts a great deal of analysis

7   without taking that step.

8        Q.   Is it your belief that he conducted no

9   database cleaning to remove deceased individuals

10  prior to conducting the bulk of his analysis?

11       A.   That's not what I said.

12       Q.   I'm asking, is that your belief?

13       A.   I believe, from his report, he describes a

14  number of steps regarding cleaning that he did later

15  as part of the sensitivity analysis.

16                And I don't believe, from his

17  reports, that he conducted those same steps prior to

18  the initial no-match list.

19       Q.   So it's your understanding that prior to

20  the initial no-match list, he did not conduct any

21  steps to remove any deceased individuals on the team

22  database.  Is that correct?

23       A.   That's not what I said.

24       Q.   Is it your understanding that

25  Dr. Ansolabehere removed -- took steps to remove

JEFFREY MILYO, PhD                                      8/26/2014

                                                              203

1   deceased individuals who might be on the team

2   database, prior to conducting his initial no-match

3   list?

4        A.   I know that there were multiple different

5   versions of no-match lists created, and to be

6   completely sure, would need to look back at them.

7                 What I referenced was the extent and

8   number and thoroughness with which one might do that

9   kind of cleaning, comparing his scholarly work to

10  what he did in this report.

11       Q.   But you would agree, first off, that

12  Dr. Ansolabehere did take extensive steps to remove

13  deceased individuals from the team database prior to

14  conducting any matching exercise.  Is that correct?

15  Prior to producing his initial no-match count.  Is

16  that correct?

17       A.   You're using the word "extensive," which

18  seems value laden.  That's different than saying

19  there may have been some steps.  And that's

20  different from saying, taking all the steps that

21  might have reasonably been done.

22       Q.   Well, I'm asking if -- that was my

23  question.  I'm asking you to answer that question.

24                 Did he take extensive steps to remove

25  likely deceased individuals from the team database

JEFFREY MILYO, PhD                          8/26/2014

204

1  prior to producing his initial no-match count?

2      A.   Given his report, it's clear that he

3  didn't take all the steps that he might have done.

4  Given his scholarship, it's clear that he didn't

5  take all the steps that he might have done.  And

6  given, the results are dramatically different from

7  one section of the report to the other, it seems

8  that the cleaning was insufficient to --

9              MR. FREEMAN:  Objection;

10  nonresponsive.

11      Q.   (BY MR. FREEMAN)  My question is whether

12  he took extensive steps to remove deceased

13  individuals from the team database prior to

14  producing his initial no-match count?

15              MR. KEISTER:  Object to form.  Asked

16  and answered.

17      A.   You seem to be placing weight on the word

18  "extensive" and you're not liking how I'm

19  interpreting that word.  Do you want to give me a

20  definition?

21      Q.   (BY MR. FREEMAN)  If you don't like the

22  word extensive, you can say no.  That's fine.  But

23  please answer my question.  If you think no, then

24  say no.

25      A.   I prefer to use what I think is a more

JEFFREY MILYO, PhD                                    8/26/2014

205

1    accurate word.

2         Q.   So please.

3         A.   I don't believe that he took sufficient

4    steps in doing the initial no-match list.

5         Q.   Would you agree that he took some steps to

6    remove deceased individuals from the team database

7    prior to producing his initial no-match estimate?

8         A.   I don't recall all of the steps.  My

9    impression is that there were some steps taken.

10        Q.   And you would agree that the additional

11   steps that you suggest he might have taken, he did

12   take during his sensitivity analysis.  Is that

13   correct?

14        A.   There are some additional steps that he

15   might have taken that he did take in the sensitivity

16   analysis.

17        Q.   Does your report identify any additional,

18   specific steps that you believe Dr. Ansolabehere

19   should have taken at any point in his

20   database-matching process, but never took?

21        A.   Well, let me refresh my recollection.

22             I believe the opinions in the report

23   are contained to the actions actually taken.  I

24   think I -- well, I'm going to need a moment to find

25   the relevant sections.

JEFFREY MILYO, PhD                                    8/26/2014

206

1           MR. FREEMAN:  That's fine.  We can go

2  off the record.

3           (Recess.)

4      Q.   (BY MR. FREEMAN)  Now that you've had the

5  opportunity to review the report, can you identify

6  any specific steps that Dr. Ansolabehere should have

7  taken in his database-matching process, but never

8  took at any point in his report?

9      A.    I believe that the criticisms of the

10  database matching are more in the spirit of being

11  forthcoming about weakness -- weaknesses in the

12  method or the interpretation of the result.

13           The only thing that I recollected

14  that I was looking for here that might speak to your

15  question is that Ansolabehere would have had an

16  opportunity to further check the veracity of the

17  non-matches by using the Catalist data to -- the

18  updated Catalist data to see whether supposed

19  non-matches had actually voted since the passage of

20  SB 14.  That's mentioned in Paragraph 154.

21      Q.   But any subsequent Catalist data would not

22  reflect the snapshot of who had voter -- or who had

23  SB 14 ID on the date in question when the relevant

24  data was pulled from the databases.  Is that

25  correct?  It might show individuals who obtained

JEFFREY MILYO, PhD                                    8/26/2014

                                                              207

1   SB 14 ID after the date of the relevant snapshot.

2   Correct?

3          A.    I suppose it depends which election we are

4   looking at that they report voting in.

5          Q.    Any election subsequent to the snapshot.

6          A.    But I believe there would also be

7   elections prior, so we could have a way to identify

8   a problem with potential non-matches.  That would

9   also potentially be the case with non-matches who

10  report voting afterward.  We don't know the reason

11  that those supposed non-matches voted.

12         Q.    I would appreciate if you would answer the

13  question that I asked.  And the question that I

14  asked was, elections subsequent to the snapshot

15  would not indicate if a person had ID on the date of

16  the snapshot because they could have obtained ID

17  afterwards.  Isn't that correct?

18         A.    There would be uncertainty as to whether

19  the individual had ID on the date of the snapshot --

20         Q.    Thank you.

21         A.    -- for elections subsequent, after the

22  snapshot.

23         Q.    Does your report identify any additional

24  data cleanup or preparation steps that

25  Dr. Ansolabehere should have taken, but did not?

JEFFREY MILYO, PhD                                    8/26/2014

                                                            208

1        A.   Yes.

2        Q.   And what are those?

3        A.   Well, I believe another set of criticisms

4   has to do with the classification of race and

5   ethnicity.

6        Q.   Are those data cleanup or preparation

7   steps prior to the match?

8        A.   Oh, I'm sorry, you asked prior to the

9   match?

10       Q.   Data cleanup or preparation steps.  That's

11  what data cleanup and preparation steps are in a

12  database-matching process.

13             Are you familiar with the terminology

14  used in database matching?

15       A.   In an analysis, preparation can mean any

16  number of things, so I'm sorry.  I was thinking more

17  broadly of his analysis.

18       Q.   That's fine.  My question is, does your

19  report identify any data cleanup or preparation

20  steps that Dr. Ansolabehere should have taken prior

21  to running his matching combinations, but did not?

22       A.   Other than the concerns that have been

23  mentioned, I did not suggest specific steps to be

24  taken.

25       Q.   And does your report provide any

JEFFREY MILYO, PhD                        8/26/2014

209

1   additional matching combinations that

2   Dr. Ansolabehere should have used, but did not use?

3       A.   Broadly speaking, the only one of those

4   would be what I just mentioned, matching two

5   individuals who we have evidence have voted.

6               And you'll have to forgive me, I

7   would have to look through the report to find it

8   exactly.  I recall a question about whether

9   Ansolabehere had looked to see if -- using the

10  Catalist data, if individuals had reported voting or

11  being registered in other states.  I don't recall

12  specifically where it is in the report or even if

13  it's in the report, but I get the sense that no one

14  wants me to take a look through.

15      Q.   Dr. Milyo, do you know what a matching

16  combination is?

17      A.   They are the paradigms by which the

18  databases are matched.

19      Q.   They're the combinations of fields by

20  which databases are matched?

21      A.   And I was talking about matching to

22  another database to clean the database before the

23  analysis.

24      Q.   So that was not, in fact, responsive to my

25  question.  Correct?

JEFFREY MILYO, PhD                                    8/26/2014

210

1            MR. KEISTER:  Object to form.

2   Argumentative.

3        A.   I don't remember.

4        Q.   (BY MR. FREEMAN)  My question was: Does

5   your report provide any additional matching

6   combinations, combinations of fields that

7   Dr. Ansolabehere should have used, but did not?

8        A.   I do not identify specific fields that

9   should have been used.

10       Q.   Does your report contain any critique of

11   the use of one-to-many matching?

12       A.   I do not include any critique of

13   one-to-many matching.

14       Q.   Would you agree that one of the principle

15   findings of Dr. Ansolabehere's report is the

16   existence of a racial disparity in SB 14 ID

17   possession?

18       A.   I believe that is a characterization of

19   his findings.

20       Q.   Would you agree that for every universe of

21   registered voters analyzed by Dr. Ansolabehere,

22   including the universe of registered voters that you

23   describe as his hidden finding, that a disparity in

24   ID possession exists between Anglo voters and

25   African-American voters, and between Anglo voters

JEFFREY MILYO, PhD                                    8/26/2014

211

1  and Hispanic voters?

2       A.    For the reasons that I've laid out in my

3  report, I have concerns about that interpretation.

4       Q.    Would you agree that for every universe of

5  registered voters analyzed by Dr. Ansolabehere,

6  including the universe of registered voters that you

7  believe he should have focused on primarily, that

8  Dr. Ansolabehere found a disparity in ID possession

9  based on race?

10      A.    Again, for reasons that I've mentioned in

11  my report, I have concerns about -- if your question

12  is, what does he claim he finds, then I believe

13  that's accurate.

14      Q.    Would you agree that for every method of

15  estimating the race of voters employed by

16  Dr. Ansolabehere, with regard to the universe of

17  voters that you believe is the proper universe of

18  voters, the racial disparity in ID possession

19  persists?

20      A.    I don't believe that I made a claim about

21  what is the proper universe of voters.

22      Q.    You claimed that Dr. Ansolabehere should

23  have taken the steps that led him to what you called

24  the hidden finding, the total number, that reduced

25  total number.  Correct?

JEFFREY MILYO, PhD                                        8/26/2014

                                                               212

1        A.    I believe what I said is that there's --
2   given his own scholarship, that he has been very
3   critical of matching processes that don't attempt to
4   clean -- preclean the data more aggressively than it
5   appears he did for the bulk of his analysis.
6                   So I'm not saying that that's the
7   proper method, but that would be an improvement.
8        Q.    And are there further improvements that
9   you identify in your report that should have been
10  made beyond what he made to get to that last number,
11  but did not do?
12       A.    Which last number?
13       Q.    What you call his hidden finding.
14       A.    Well, are we talking about the aggregate
15  number of persons that he claims do not have SB 14
16  ID or by race?
17       Q.    First, the aggregate number.  Are there --
18  based on the aggregate number -- let's get to the
19  aggregate number.
20                  You would agree that there are no
21  additional slices or dices that you can identify
22  past that aggregate number that he should have done,
23  but didn't do.  Correct?
24       A.    I don't believe I state that in the
25  report.

JEFFREY MILYO, PhD                                    8/26/2014

                                                           213

1      Q.   You don't believe that you state that

2   there are no additional steps that he should have

3   done, but didn't do?

4      A.   Now, there's too many nos there.  It's

5   hard for me to follow that.

6      Q.   Would you agree that for the universe of

7   voters that you describe as the hidden finding, that

8   there is a disparity in ID possession within that

9   universe of voters, based on race?

10     A.   So now --

11     Q.   Based on the analysis performed by

12  Dr. Ansolabehere?

13     A.   So you've changed the question now to be

14  about the differences by races and ethnicity.  So we

15  are not talking about the aggregate number?

16     Q.   We are talking about the disparity.

17     A.   So I've raised a number of concerns about

18  the racial classifications, and so the

19  interpretation of those numbers, I believe I do

20  identify additional methods that should have been

21  explored in that analysis.

22     Q.   Are you aware of the current list

23  maintenance practices of the Texas Secretary of

24  State with regard to the Texas voter registration

25  file?

JEFFREY MILYO, PhD                                    8/26/2014

214

1        A.    Other than something about some missing

2    3 million observations, no.

3        Q.    Did you ask anyone to provide you with

4    information regarding the current list maintenance

5    practices of the Texas Secretary of State with

6    regard to the Texas voter registration file?

7        A.    No.

8        Q.    If you could turn to Paragraph 27 of your

9    report.   You point to particular anomalies in

10   Texas's voter registration data, discussing a 2012

11   article by Dr. Ansolabehere.   Correct?

12       A.    That looks to be correct.

13       Q.    And that 2012 article was based on 2010

14   data.   Correct?

15       A.    Well, they were obtained by Catalist in

16   2010.

17       Q.    And did you ask anyone to provide you with

18   information regarding changes in list maintenance

19   practices since 2010?

20       A.    No, I have not.

21       Q.    Does Texas attempt to remove deceased

22   individuals from its voter registration list?

23       A.    I don't know for a fact.   I would assume

24   so.

25       Q.    How does Texas attempt to remove deceased

JEFFREY MILYO, PhD                                    8/26/2014

                                                           215

1    individuals from its voter registration list?

2         A.   I do not know.

3         Q.   How often does the Texas Bureau of Vital

4    Statistics submit a list of deceased individuals to

5    the office of the Secretary of State to facilitate

6    the removal of deceased individuals from the Texas

7    voter registration list?

8         A.   I do not know.

9         Q.   Does Texas engage in database matching in

10   order to identify voters who are also on the list of

11   deceased individuals provided by the Bureau of Vital

12   Statistics?

13        A.   I don't know for a fact.

14        Q.   Are you aware of whether or not Texas

15   matches its voter rolls to the Social Security death

16   master file?

17        A.   I do not know.

18        Q.   Do you know how many times a year Texas

19   engages in that match?

20        A.   I do not know.

21        Q.   Do you know how long Texas has used the

22   Social Security death master file for removing

23   deceased individuals from its voter rolls?

24        A.   I do not know.

25        Q.   Would you agree that the more often the

216

1    office of the Texas Secretary of State matches voter

2    rolls to lists of deceased individuals, the less

3    deadwood there will be on the rolls?

4         A.   All else constant?

5         Q.   All else constant.

6         A.   Assuming no errors going the other

7    direction?

8         Q.   Would you agree, all else constant, that

9    the more often that the office of the Texas

10   Secretary of State matches its voter rolls to lists

11   of deceased individuals and removes the individuals

12   who were found to be on those lists, the less

13   deadwood there will be on the rolls?

14        A.   That's not something that I've spoken to

15   in my report.

16        Q.   Would you agree, as a social scientist,

17   that that is a correct and accurate statement?

18        A.   It sounds plausible.

19        Q.   Sounds correct and accurate?

20        A.   I said it sounds plausible.

21        Q.   I'm asking if it's correct and accurate?

22        A.   I like the word plausible better.

23        Q.   I like my question.

24                  MR. KEISTER:  Object to form.

25   Argumentative.  And this is outside the expert's

JEFFREY MILYO, PhD                                    8/26/2014

                                                            217

1    report and what he's designated for.  But to the

2    extent that you want to try and answer it, then go

3    ahead.

4         A.    I'm not comfortable making definitive

5    answers that go beyond my report, which is the

6    reason for my caution.

7         Q.    (BY MR. FREEMAN)  If you could turn to

8    Paragraph 44 of your report.  You assert that

9    Dr. Ansolabehere has noted in prior research that

10   Catalist may not be able to identify a large number

11   of actual dead voters.  Correct?

12        A.    Is there a line within 44?  That's a long

13   paragraph.

14        Q.    Lines 3 through 4, does this state, "In

15   one recent study, Ansolabehere speculates that

16   Catalist may not be able to identify a large number

17   of actual dead voters on State registration rolls."

18   Is that correct?

19        A.    That looks like a verbatim statement of

20   what I've written.

21        Q.    But Dr. Ansolabehere didn't use the word

22   "large."  That was your editorialization.  Correct?

23        A.    I would have to look back at his actual

24   statement.

25                   MR. FREEMAN:  If we could go off the

JEFFREY MILYO, PhD                                    8/26/2014

218

```
 1   record for just one second.
 2                (Discussion off the record.)
 3        Q.   (BY MR. FREEMAN)  Back on the record.
 4             Take a look at that article.  Would
 5   you agree that Dr. Ansolabehere didn't use the word
 6   "large" to describe the number of actual dead
 7   voters?
 8        A.   I can't view the entire document here, so
 9   I don't recall specifically if there's other
10   mentions.  In the snippet that you're using, he uses
11   the word "a number."
12        Q.   And actual dead voters, that's within
13   quotes of Paragraph 44 of your report, but the rest
14   is not.  Correct?
15        A.   And that looks like it should have just
16   been actual dead, in quotes.  So a typo there.
17        Q.   And in the same report, Dr. Ansolabehere
18   states, As an alternative to there being dead
19   numbers on the rolls, maybe doing a good job at
20   identifying and purging deceased voters.  Is that
21   correct?
22        A.   I'd like to see the claim that you're
23   referring to.
24        Q.   It is directly in front of you, sir.
25        A.   Do you have an idea what page number to
```

JEFFREY MILYO, PhD                                          8/26/2014

219

1    look at?

2         Q.   I believe it is on the page that is

3    currently on the screen.

4         A.   I can't get it to move.

5         Q.   It is the paragraph that is currently on

6    the screen directly in front of you.

7         A.   Well, now you've got a box that popped up

8    in the front here.

9         Q.   I will hold it so that you don't change

10   anything on the screen.

11            Would you agree that it says, as an

12   alternative, that the states may be doing a good job

13   at identifying and purging deceased voters?

14            MR. KEISTER:   Counsel, please give

15   him time to review the article.

16        A.   My interest was in refreshing my memory

17   about the article.   There may be other places where

18   there's a discussion.

19            I can't get to the bottom.   Your page

20   down doesn't -- or page -- oh, down.   There we go.

21            So is your question just about that

22   paragraph that you're showing me?

23        Q.   (BY MR. FREEMAN)   My question is just

24   about that paragraph.

25        A.   So which paragraph was that?   I've been

JEFFREY MILYO, PhD                                    8/26/2014

                                                              220

1   looking through here.  What page are we on?

2        Q.   (Indicating.)

3        A.   So you've identified a partial paragraph

4   here.  And I haven't had the time to review the

5   entire document to refresh my memory on anything

6   else they might say.  Your hand is wavering.

7             I think you're asking about the

8   sentence here that says, "This might be attributable

9   to states doing a good job at identifying and

10  purging deceased voters, or it may be that the

11  Catalist deceased flag does not capture a number of

12  actual dead registrants."

13       Q.   And Dr. Ansolabehere does not definitively

14  state, one way or the other, whether it's states

15  doing good jobs or whether it's that Catalist is

16  capturing deceased individuals who are still on the

17  voter rolls.  Is that correct?

18       A.   This particular sentence leaves open both

19  possibilities.

20       Q.   And you didn't list the second possibility

21  in your report, did you?  The possibility that the

22  states are doing a good job?

23       A.   A good job referring to the overall rate

24  of deceased voters being lower than expected, given

25  what we know about mortality rates.  So he's

JEFFREY MILYO, PhD                                    8/26/2014

221

1    identifying a problem in this data and speculating

2    as to multiple causes.

3                    I believe what I said is that

4    Catalist may not be able to identify a large number

5    of actual dead voters, which is -- you object to the

6    use of the word "large."  We can omit that.  A

7    number of actual dead voters, which is accurate.

8         Q.   And you did not state in your report that

9    it's a possibility other states are doing a good job

10   of identifying and purging deceased voters.

11   Correct?

12        A.   I don't believe that's a quote in my

13   report.

14        Q.   Do you know how often the office of the

15   Texas Secretary of State receives information from

16   the Texas Department of Public Safety on individuals

17   convicted of felonies?

18        A.   I do not.

19        Q.   Do you know if the office of the Texas

20   Secretary of State matches its voter rolls to that

21   list, to a list of individuals who have been

22   convicted of felonies?

23        A.   At this point in time, I don't have

24   firsthand knowledge of that.

25        Q.   Do you know if the office of the Secretary

JEFFREY MILYO, PhD                                    8/26/2014

222

1   of State removes individuals from its voter rolls

2   due to ineligibility for conviction of a felony?

3          A.   Off the top of my head, I can't tell.

4          Q.   Would you agree that your report does not

5   discuss any of the means by which the office of the

6   Texas Secretary of State removes deadwood from the

7   Texas voter rolls?

8          A.   I don't recall specifically citing any of

9   those means.

10         Q.   Let's go to Paragraph 25 of your report.

11  You estimate in Paragraph 25 of your report that up

12  to 24 percent of the team database may be deadwood.

13  Correct?

14         A.   I believe Paragraph 25 starts, "For the

15  sake of illustrating the potential magnitude of

16  deadwood in State voter rolls," et cetera.  So I

17  wouldn't describe it as an estimate.  It is an

18  illustration.

19         Q.   An illustration --

20         A.   About potential magnitude.

21         Q.   You estimate that the potential magnitude

22  of deadwood in the team database is up to 24

23  percent?

24         A.   I believe the context here gives other

25  concerns that may raise that number.  And so this

JEFFREY MILYO, PhD                                    8/26/2014

223

1   was just for the sake of illustration, using one

2   particular source of error.

3        Q.   And so is your actual opinion that the

4   quantity of deadwood is more than 24 percent or

5   somewhere between zero and 24 percent?

6        A.   Again, in the discussion here which

7   continues, what I'm identifying are potential

8   sources of problems.  I have not estimated a

9   specific number of deadwood.

10       Q.   In fact, in Paragraph 25 of your report,

11  you state, "Combining these overreporting

12  percentages in the study cited above, that implies

13  that about 24 percent of registered voters in Texas

14  may be deadwood."  Is that correct?

15       A.   And it's in the context of this

16  illustrative point using only that particular

17  criticism.  The report goes on to mention a number

18  of other potential sources of problems.

19       Q.   So then it may be more than 24 percent.

20  Is that what you're saying?

21       A.   Could be more than 24 percent.

22       Q.   Okay.  Does your report estimate the share

23  of deadwood that is on the no-match list versus not

24  on the no-match list?

25       A.   Is there a specific section of the report

JEFFREY MILYO, PhD                                    8/26/2014

224

1    that you're referring to?

2        Q.   I'm asking about the entirety of the

3    report.

4        A.   Well, then, I have to -- it's late in the

5    day and we've been at this a long time.  I have to

6    think about...

7                MR. FREEMAN:  Then let's go off the

8    record.

9                MR. KEISTER:  Do you want to take a

10   break?

11               THE WITNESS:  I need to hear the

12   question again.

13       Q.   (BY MR. FREEMAN)  Does your report

14   estimate the share of deadwood that is on the

15   no-match list versus not on the no-match list?

16       A.   I don't recall making such an estimate.

17       Q.   Does your report estimate the share of the

18   deadwood by race?

19       A.   No.  I don't believe I make such an

20   estimate.

21       Q.   Let's very quickly walk through how you

22   arrive at that 24 percent estimate.

23               First, am I correct that you looked

24   at an estimate by Professor Michael McDonald

25   comparing actual registration figures with

JEFFREY MILYO, PhD                                    8/26/2014

225

1   self-reported registration percentages?  Am I right?

2        A.   Are we talking about the illustrative

3   potential magnitude example?

4        Q.   Yes.

5        A.   And so what is your question?

6        Q.   The first step that you took to arrive at

7   that 24 percent figure was to look at an estimate by

8   Professor Michael McDonald, comparing actual

9   registration percentages with self-reported

10  registration percentages.  Am I right?

11       A.   Well, I'd have to refresh my recollection

12  on the development of this.

13                 I believe that's correct.

14       Q.   And was Professor McDonald's study

15  nationwide?

16       A.   You know, I'd have to look back at it to

17  verify.  It's been a while since I've looked at that

18  one.

19       Q.   Sitting here today, you don't know whether

20  the study was nationwide or limited to Texas?

21       A.   I don't believe it was limited to Texas.

22       Q.   What is your basis to apply this figure to

23  Texas?

24       A.   Is it being applied to Texas?

25       Q.   You're applying this figure to the -- an

JEFFREY MILYO, PhD                                    8/26/2014

226

1    estimate of the amount of deadwood on Texas's voter

2    rolls.   Correct?

3         A.   I wouldn't characterize it as an estimate.

4    I'd characterize it as I have characterized it: for

5    the sake of illustrating potential magnitude of

6    deadwood in State voter rolls.   It's just a simple

7    illustrative point to demonstrate that these are

8    nontrivial problems potentially.

9         Q.   So this illustration is not an estimate of

10   the amount of deadwood that's on Texas's voter

11   rolls.   Is that correct?

12        A.   It's clearly not an attempt to estimate

13   the amount of deadwood on Texas voter rolls, but

14   rather to illustrate the potential magnitude of the

15   problem that comes about from these kinds of issues.

16        Q.   That's fine.

17             Would you agree that Professor

18   McDonald's figure is derived from a survey?

19        A.   So I'm not recalling the specific details

20   of the study.   From the description here, there's a

21   reference to the current population survey, yes.

22        Q.   Do you present a margin of error for that

23   survey figure?

24        A.   For which survey figure?

25        Q.   The figure that you rely upon in your

JEFFREY MILYO, PhD                                    8/26/2014

227

1   report.

2        A.    I don't have a margin of error written for

3   the 72.9 percent of CVAP.

4        Q.    And why not?

5        A.    Because it's not relevant for the

6   illustrative exercise that I'm conducting.

7        Q.    The second step in arriving at your

8   illustrative percentage is to look at an estimate by

9   Bernstein, et al., that compared self-reported

10  turnout in Texas to actual turnout.  Am I correct?

11       A.    I'm not quite sure that you're

12  representing that accurately.

13       Q.    How would you represent it?

14       A.    As I've written it here.  So this is

15  overreporting of registration in the CPS, combined

16  with overreporting of voter turnout.

17       Q.    So you find that a study by Bernstein, et

18  al., found that self-reported turnout in the CPS

19  exceeds actual turnout in Texas by more than 14

20  percentage points.  Correct?

21       A.    I believe that that's cited above, yes.

22       Q.    And you simply assume that a similar rate

23  of overreporting applies to voter registration

24  rather than turnout.  Correct?

25       A.    For the sake of illustrating potential the

JEFFREY MILYO, PhD                                    8/26/2014

228

1    magnitude, yes.

2         Q.   Is there any data on which to base the

3    assumption that you make that the rate of

4    overreporting of turnout is approximately the same

5    as the rate of overreporting of registration?

6         A.   Not that I've cited in my report.

7         Q.   Do you know the share of the Texas voter

8    registration database that consists of voters in

9    suspense status?

10        A.   Not off the top of my head.

11        Q.   Do you agree that analyzing only active

12   voters, without suspense voters, would take into

13   account some of the deadwood issues that you

14   identify?

15        A.   Some of the issues identified.  Not all of

16   the issues identified.

17        Q.   And would you agree that Dr. Ansolabehere

18   analyzed whether a disparity in SB 14 ID possession

19   exists between racial groups in the universe of

20   active voters only?

21        A.   Are you referring to a specific table in

22   the Ansolabehere report?

23        Q.   Did you read Dr. Ansolabehere's report?

24        A.   Oh, there's a whole bunch of tables.  And

25   then they have As and Bs and 1s, so that's --

JEFFREY MILYO, PhD                          8/26/2014

229

1     Q.   Do you recall whether Dr. Ansolabehere

2  analyzed whether there's a racial disparity in ID

3  possession within the universe of active voters

4  only?

5     A.   There are a number of different

6  permutations.  It's possible he looked at that one.

7  I would have to -- to be sure, look back at the

8  tables in Ansolabehere's report.

9     Q.   So sitting here today, you are not

10 sufficiently familiar with Dr. Ansolabehere's report

11 in order to be able to opine on precisely what

12 universes of voters he examined in order to validate

13 whether or not an ID disparity persists between

14 racial groups?

15            MR. KEISTER:  Objection; form.

16 Argumentative.

17    A.   As I've stated, it's late in the day.

18 There are many expert reports and many tables in the

19 Ansolabehere report.  You're asking about a specific

20 result, refusing to show me the relevant table that

21 you're referring to.  I'm not completely confident.

22 There are many permutations that he looks at.

23    Q.   (BY MR. FREEMAN)  I intended to show it to

24 you and here it is.

25            MR. FREEMAN:  If we can mark this as

JEFFREY MILYO, PhD                                    8/26/2014

                                                            230

1    Exhibit 13.

2                  (Exhibit Number 13 marked.)

3        Q.   (BY MR. FREEMAN)   There you are.   If you

4    could take a look.

5        A.   Could you refresh my memory on what

6    exactly you were asking about?

7        Q.   Active voters only.

8        A.   So you want to see match with no suspense

9    voters?

10       Q.   Does the racial disparity persist in the

11   universe of active voters only?

12       A.   According to his finding?

13       Q.   Yes.

14                  MR. KEISTER:   Do you want to take a

15   break?

16                  (Recess.)

17       Q.   (BY MR. FREEMAN)   Would you agree that

18   analyzing only active voters, without suspense

19   voters, a disparity in ID -- SB 14 ID possession

20   persisted between racial groups in that universe?

21       A.   I believe you're referring to the

22   specification on page 99 in Table 7.1.B --

23       Q.   I'll take your word for it.

24       A.   -- Column 2?

25       Q.   Yes.

JEFFREY MILYO, PhD                                    8/26/2014

231

1        A.    And Ansolabehere reports finding a

2    disparity across racial categories for that column.

3        Q.    And excluding suspense voters, as well as

4    Catalist flagged records and individuals who are

5    matched to expired IDs, the racial disparity in ID

6    possession still persists.  Is that correct?

7        A.    Ansolabehere reports finding a racial

8    disparity in Column 4 of Table 7.1.B.

9        Q.    Thank you.  Before we move on, previously

10   you had asked at the beginning of my portion of the

11   deposition to see copies of the particular

12   declarations before you were able to let me know if

13   you had read the entirety of each report.  I now

14   have gathered those together and so I'd just like to

15   go through that very quickly.

16              First, the declaration of Steve

17   Ansolabehere.  That is the revised declaration you

18   have there.  But the initial report, did you read

19   the entirety of that report, including all

20   appendices, prior to -- prior to submitting your

21   declaration in this case?

22       A.    Certainly not many of the appendicis.

23       Q.    Would you say that you read 50 percent of

24   the report, including appendices?

25       A.    I couldn't tell you offhand.

JEFFREY MILYO, PhD                                    8/26/2014

232

1    Q.    Approximately how many hours did you spend
2 reviewing just that report?
3    A.    I can't really tell you off the top of my
4 head.
5    Q.    Four hours?
6    A.    I still can't tell you off the top of my
7 head.
8    Q.    More than four hours?
9    A.    It's not something I kept track of for
10 particular reports, how much time.  So...
11    Q.    And with regard to the declaration of
12 Dr. Barry Burden, did you read the entirety of
13 Dr. Burden's report, including all appendices?
14    A.    Again, not including all of the
15 appendices.
16    Q.    Did you read the entirety of the report,
17 excluding appendices?
18    A.    I believe so.
19    Q.    Did you read the entirety of
20 Dr. Ansolabehere's report, but excluding the
21 appendices?
22    A.    Are the tables in the appendicis?
23    Q.    I believe some are and some are not.
24    A.    I can't say that I've read every single
25 word of every single table, but I believe I've read

JEFFREY MILYO, PhD                                        8/26/2014

233

1    through the entire report.

2         Q.   So you've read the report, but not all the

3    tables.  Is that correct?

4         A.   What I said was not every word in every

5    single table.  Some of them are more relevant to my

6    reactions and some of them less relevant.

7         Q.   And how did you determine what was less

8    relevant without reading it?

9         A.   I didn't say I didn't read it at all.  I

10   said I didn't read every word in every table.  Some

11   of the tables have many words.  Some of them are

12   very tiny at the bottom.

13        Q.   Okay.  Did you read the entirety of the

14   declaration of Professor Chandler Davidson?

15        A.   Not including the appendices.

16        Q.   Excluding Professor Davidson's curriculum

17   vitae, did you read the entirety of Dr. Davidson's

18   report?

19        A.   I believe I did.

20        Q.   Did you read the entirety of the

21   declaration of Dr. Gerald Webster?

22        A.   I believe I have looked through the

23   entirety of this report.  There's a lot of end

24   notes -- sorry.  I believe I've looked through the

25   entirety of this report.

JEFFREY MILYO, PhD                                    8/26/2014

234

1    Q.   What do you mean by "looked through"?

2    A.   I believe my eyes have been on every page.

3    Q.   Have your eyes crossed every word?

4    A.   Well, there's these busy diagrams here,

5  and I can't say that I have examined them with great

6  detail in terms of all the little shaded areas, so

7  that would be the main concern I have about

8  answering your question about having read the entire

9  document.

10   Q.   Have you read all of the words and merely

11 glanced at the maps, or no?

12   A.   For this particular report, I'm less

13 confident that I've read every single word on every

14 single page.

15   Q.   Okay.  So you're not able to testify

16 today, under oath, that you read every word of every

17 page, is that correct, on Dr. Webster's report?

18           MR. KEISTER:  Objection; asked and

19 answered.

20   A.   I think that's what I just said.

21   Q.   (BY MR. FREEMAN)  Okay.  With regard to

22 the declaration of Mr. Yair Ghitza, have you read

23 the entirety of that declaration, prior to producing

24 your first report?

25   A.   I believe I did, yes.

JEFFREY MILYO, PhD                                    8/26/2014

235

1      Q.   And with regard to the declaration of

2  Dr. Jane Henrici, did you read the entirety of that

3  declaration prior to producing your report,

4  excluding the CV?

5      A.   I believe I did read this report.

6      Q.   Thank you.   Let's turn to Paragraph 98 of

7  your report.   At the end of Paragraph 98, you write

8  that, "Minorities may be more likely to move without

9  submitting a formal change of address to the post

10  office."   Correct?

11      A.   That looks like a quote from the text.

12      Q.   Does your report contain any data or

13  method to support this point?

14      A.   I believe it says, "For example."

15      Q.   Would you agree that this is speculation?

16      A.   It says, "For example, it may happen."

17      Q.   Would you agree that this is speculation?

18      A.   And the reason this example is here is to

19  point out other concerns that may be problematic in

20  these analyses.

21      Q.   Is this a concern that has no basis in

22  data or methodology?

23      A.   No, I wouldn't say that.

24      Q.   What is your data or methodology on which

25  you base the concern that minorities may be more

JEFFREY MILYO, PhD                                    8/26/2014

                                                           236

1    likely to move without submitting a formal change of

2    address to the post office?

3         A.   Oh, that wasn't what you just asked.  You

4    asked if it has no basis.  The basis would be, I

5    believe, Professor Ansolabehere has identified that

6    not everyone who moves submits a change of address,

7    and so that this is a concern in database-matching

8    technologies.

9         Q.   Would you -- do you provide any basis for

10   your example that minorities may be more likely to

11   move without submitting a formal change of address?

12        A.   I believe it's in the context of an

13   if/then statement.

14        Q.   So there's no actual basis for you to

15   opine that they may be more likely -- minorities may

16   be more likely to move without submitting a formal

17   change of address.  Correct?  That's just a

18   possibility?

19        A.   It is a possibility.

20        Q.   Does your report attempt to estimate the

21   effect of any racial disparity in post office

22   notification on the estimates of disparities in ID

23   possession provided by Dr. Ansolabehere?

24        A.   I do not.

25        Q.   Do you assess whether Dr. Ansolabehere's

JEFFREY MILYO, PhD                                      8/26/2014

237

1    matching algorithm is capable of linking records

2    even when address elements do not match?

3         A.   I have not assessed that.

4         Q.   If you could turn to page 25 of

5    Dr. Ansolabehere's report, which is Exhibit 13.

6              Would you agree that several matching

7    combinations contained in table 5.1 on page 25 do

8    not include any address element?

9         A.   Are you considering a zip an address?

10        Q.   Sure.

11        A.   There are some, yes.

12        Q.   So would you agree that even if an

13   individual does not report a move within Texas,

14   Dr. Ansolabehere's algorithm is capable of matching

15   a voter registration record to a form of ID obtained

16   at a prior address?

17        A.   I don't believe the claim is that no one

18   who moves can be matched but, rather, people who

19   move might be missed.

20        Q.   But if there are methods to capture people

21   who move by matching them without an address

22   element, is the fact that they have moved any basis

23   to believe that they would not be matched?

24        A.   I believe there's evidence of that in

25   comparing the results from the Catalist data to the

JEFFREY MILYO, PhD                                    8/26/2014

238

1   original no-match list, that there's additional

2   identifications -- or additional observations that

3   are flagged in the Catalist data.  But I would have

4   to spend more time with the report to review that

5   specifically.

6        Q.   Are you thinking of individuals who are

7   simply removed from the analysis because there's an

8   NCOA flag on their record?

9        A.   That's my -- what I'm referring to in the

10  Catalist data.

11       Q.   Removing individuals from the universe of

12  matches -- excuse me, from the universe of

13  registered voters because they have an NCOA flag

14  does not indicate that those individuals should or

15  should not have been successfully matched, does it?

16       A.   No.  It suggests that since we're getting

17  differences in data, that not everyone who has moved

18  has been captured.

19            Perhaps I'm not understanding your

20  question.

21       Q.   Do you have any opinion to that effect in

22  your report?

23       A.   I believe the only relevant reference

24  would be to Ansolabehere's discussion that not

25  everyone who moves is going to be captured in the

JEFFREY MILYO, PhD                                8/26/2014

239

1   database-matching technologies.

2        Q.   Where in Dr. Ansolabehere's report does he

3   state that the individuals who are -- who have NCOA

4   flags are necessarily false no-matches as opposed to

5   people who may or may not have moved out of Texas?

6        A.   What are you asking?  Where in his report

7   have the --

8        Q.   I'm trying to understand what you're

9   opining on about NCOA --

10        A.   To tell you the truth, I've gotten lost in

11   the questions here, so I'm not quite sure, as I've

12   said, that I understand your question.

13        Q.   Okay.  Would you agree that even if an

14   individual does not report a move within Texas,

15   Dr. Ansolabehere's algorithm is capable of matching

16   a voter registration record to a form of ID obtained

17   at a prior address?

18        A.   There could be a match.

19        Q.   Let's go to Paragraph 104 of your report.

20   You state that the number of non-matches for reasons

21   other than a voter that lacks requisite ID may be

22   correlated with minority race or Hispanic ethnicity.

23   Correct?

24        A.   There's a -- that's a partial phrasing of

25   a statement here.

JEFFREY MILYO, PhD                                    8/26/2014

240

1      Q.    Do you have any basis to believe that
2   there's a correlation between individuals who are
3   false no-matches and race?
4      A.    No.   It's being mentioned as a
5   possibility.
6      Q.    Okay.   Does your report provide any other
7   examples of potential racial biases in
8   Dr. Ansolabehere's analysis that could eliminate
9   racial disparities that Dr. Ansolabehere observes?
10     A.    Yes.
11     Q.    And what are those?
12     A.    Well, I believe there are a number of
13  things cited in the report.   In particular is the
14  concern that the actual estimates, even in what I
15  refer to as the hidden finding, which is now --
16  seems to be Table 7.1.B, that even these figures,
17  there's reason to believe that they're inflated.
18                In addition, in the report I raise a
19  specific concern about the Catalist categorization
20  by race and ethnicity.
21     Q.    My question -- let me just stop you there
22  because you're answering a different question from
23  what I intended to ask, which may have been that my
24  question was unclear.
25                My question is, are there any other

JEFFREY MILYO, PhD                                    8/26/2014

241

1   examples in Dr. Ansolabehere's methodology, his

2   matching methodology, that could bias the potential

3   results?  Not -- not increase the -- not

4   artificially increase the gross number of

5   non-matches, but bias the results on account of

6   race, that you identify in your report?

7        A.   Oh, well, if the false non-matches are

8   correlated with race or ethnicity, then that would

9   lead to that potential.

10       Q.   Are there any bases that you articulate in

11  your report, other than what we've already

12  discussed, on which you could claim that the false

13  non-matches are correlated with race, or is that

14  just a possibility?

15       A.   I believe it's raised as a possibility in

16  my report.

17       Q.   You state in your report that much

18  scholarly research eschews measures of turnout as a

19  percentage of registered voters.  Correct?  Do you

20  recall writing that?

21       A.   I recall the word "eschew."  Can you point

22  to the paragraph?

23       Q.   Do you recall -- given that you remember

24  "eschew," do you remember opining that scholarly

25  research eschews turnout as a percentage of

JEFFREY MILYO, PhD                                    8/26/2014

                                                            242

1    registered voters?

2         A.    I'd like to see the context if you're

3    referring to a specific statement in the report.

4         Q.    Paragraph 22.  Would you agree that that's

5    a statement within your opinion, within your report?

6         A.    I don't recall verbatim what you said, but

7    I see a sentence here that includes eschew.

8         Q.    Would you agree that you opined, "It is

9    for this reason that much of the scholarly research

10   on voter turnout in the United States eschews

11   measures of turnout as a percentage of registered

12   voters."  Correct?

13        A.    And the sentence keeps going.

14        Q.    Yes.

15        A.    So you've read a verbatim snippet of a

16   sentence.

17        Q.    Would you agree that some political

18   scientists have used turnout as a percentage of

19   registered voters in peer-reviewed publications?

20        A.    Yes.

21        Q.    Would you agree that it is an accepted

22   measure of voter turnout in the discipline of

23   political science?

24        A.    It depends on the context.

25        Q.    Are you familiar with the work of

JEFFREY MILYO, PhD                                    8/26/2014

243

1    Professor Darren Shaw?

2         A.   I know Professor Darren Shaw.

3         Q.   Would you agree that his work in

4    peer-reviewed journals is generally within the

5    accepted practice of political science?

6         A.   If they are in peer-reviewed journals,

7    then it would be tautological, I think, to say that

8    it's whatever it was you said.

9         Q.   Within the accepted practice of political

10   science?

11        A.   Well, you know, here is the thing.

12   Different people will raise different criticisms,

13   and just because a study is published doesn't mean

14   it can't be criticized.  So I'm not quite sure what

15   you mean by within the accepted whatever it was that

16   you said.

17        Q.   Is it your understanding that the work of

18   Darren Shaw, Professor Darren Shaw, is generally

19   within the accepted practice of political science?

20        A.   He has many publications.

21        Q.   So you would say some are not?

22        A.   I didn't say that.  I haven't examined his

23   record in detail.

24        Q.   Are you familiar with his 2000 article,

25   "Examining Latino Turnout in 1996," in the American

JEFFREY MILYO, PhD                                    8/26/2014

                                                              244

1    Journal of Political Science?

2         A.   Off the top of my head -- we've been

3    mentioning many studies.  I'm not immediately

4    familiar with that.

5         Q.   Are you familiar with his 2004 article,

6    "Registrants, Voters, and Turnout Variability Across

7    Neighborhoods" in Political Behavior?

8         A.   Same thing, off the top of my head.

9         Q.   Do you know if Professor Shaw measured

10   turnout as a percentage of registration in either of

11   those articles?

12        A.   I believe I recall seeing a claim in a

13   supplemental report that he did.

14        Q.   And are you familiar with the work of

15   Dr. Trey Hood?

16        A.   I have some familiarity.

17        Q.   And are you aware of whether he has used

18   registered voters as a denominator in measuring

19   turnout?

20        A.   I would have to look at specific papers to

21   refresh my memory.

22        Q.   I'd like you next to turn to Paragraph 36

23   of your report.

24             You state in Paragraph 36 that, After

25   Dr. Ansolabehere arrived at his no-match figures,

JEFFREY MILYO, PhD                                    8/26/2014

                                                              245

1    he, quote, also makes greater effort to remove

2    various non-matches that do not represent real and

3    legally registered voters who lack necessary

4    identification under SB 14.   Correct?

5         A.   I believe that's what's stated there.

6    Yes.

7         Q.   To your knowledge, does a racial disparity

8    exist in SB 14 possession in that pool of voters

9    using both ecological regression estimates and

10   Catalist estimates?

11        A.   In which pool?   There are many pools that

12   he examines.

13        Q.   The pool that you're referring to in

14   Paragraph 36 of your report.

15        A.   So this would have to go back to his --

16        Q.   7 --

17        A.   -- original report.   Can I take a look at

18   that?

19        Q.   Well, is his original report his current

20   estimate?

21        A.   Well, that's not what you asked.   You

22   asked about what I was citing here.

23        Q.   I'm asking about -- but to the extent that

24   your methodological concerns apply across both

25   reports, I'm asking about his current estimate after

JEFFREY MILYO, PhD                                      8/26/2014

                                                              246

1  he received over 3 million additional records from

2  DPS.  So if you could take a look at 7.1.A and

3  7.1.B.

4       A.   Okay.  What was the question?  I have the

5  tables in front of me.

6       Q.   Does a racial disparity persist in SB 14

7  ID possession in the pool of voters that you are

8  referring to?

9       A.   He reports a racial disparity.

10       Q.   And that's using both ecological

11  regression estimates and Catalist estimates.

12  Correct?

13       A.   That's correct.

14       Q.   And that figure excludes individuals on

15  the suspense list.  Correct?

16       A.   Which figure?

17       Q.   The figure -- the last column in 7.1.A and

18  7.1.B.

19       A.   So I think you're referring to, in

20  Table 7.1.B, 327,132?  That column?

21       Q.   Yes.

22       A.   That's what the label on the column

23  indicates, yes.

24       Q.   Are individuals on the suspense list

25  legally registered to vote?

JEFFREY MILYO, PhD                                    8/26/2014

247

1        A.    I would have to look back at the

2   definition of a suspense list.

3        Q.    So you're not aware of whether individuals

4   on the suspense list are legally eligible to vote?

5        A.    It's a particular vocabulary that I would

6   want to go back and refresh my recollection.

7        Q.    So as we sit here right now, you can't

8   recall.  Is that correct?

9        A.    I -- off the top of my head at this late

10  date in the afternoon, I would want to go back and

11  review the definition of the term.

12       Q.    And this figure excludes individuals who

13  are matched to expired ID.  Correct?  The last

14  column in 7.1.A and 7.1. --

15       A.    I'm sorry, excludes, is that what you

16  said?

17       Q.    Yes.  Excludes individuals who are matched

18  to identification that has expired.  Correct?

19       A.    That's what it says here, yes.

20       Q.    Those individuals may be individuals who

21  are legally registered to vote and don't possess

22  unexpired ID; they simply possess expired ID.

23  Correct?

24       A.    They may be registered to vote and possess

25  expired ID?

JEFFREY MILYO, PhD                                    8/26/2014

                                                            248

1       Q.    Yes.

2       A.    I believe that's correct.

3       Q.    They may not be deadwood.  Correct?

4       A.    What do you mean by "deadwood"?

5       Q.    It's a term that you use in your report

6   and you defined earlier.  Individuals, I believe,

7   who are on the registration list, but should not be

8   for some reason.  These people may, in fact, not be

9   deadwood.  Correct?

10      A.    Well, I'd want to look at the date of the

11  expiration, but I believe that's correct.  They may

12  not be deadwood.

13      Q.    This figure also excludes individuals who

14  are matched to NCOA flags.  Correct?

15      A.    That's not clear from the table.  I'd have

16  to go back to the text to verify, but I believe so.

17      Q.    And NCOA flags can indicate a move that is

18  within a single state.  Correct?

19      A.    I believe so.

20      Q.    Do you know, are most moves intrastate?

21      A.    I would have to look that up.

22      Q.    And those individuals may still be legally

23  registered to vote if they move within the state.

24  Correct?

25      A.    I don't know if particular individuals are

JEFFREY MILYO, PhD                                    8/26/2014

249

1   or are not.

2        Q.   Do you know if an individual who moves

3   within a single county is legally required to

4   reregister to vote?

5        A.   I would have to look up the relevant law

6   in Texas.

7        Q.   So the individuals who have NCOA flags may

8   be real voters who reside in Texas, but don't

9   possess SB 14 ID.  Correct?

10       A.   I believe that is true.

11       Q.   Are individuals who have a certain level

12  of disability exempt from SB 14's requirements, or

13  are they merely eligible to apply for an exemption?

14       A.   I would have to review the details of the

15  law to answer with certainty.

16       Q.   Are individuals over the age of 65

17  required to show SB 14 ID in order to vote in person

18  at a polling place?

19       A.   My understanding is that in order to vote

20  in person, they would.

21       Q.   Turn to Paragraph 43 of your report,

22  please.

23            What is your basis to assert that the

24  denominator for any of Dr. Ansolabehere's

25  calculations excludes individuals who qualify for a

JEFFREY MILYO, PhD                              8/26/2014

                                                     250

1  disability exemption?

2       A.   We're referring back to his original

3  report?

4       Q.   Well, again, you've asserted that his

5  methodological -- your methodological concerns

6  persist across reports.  So my question is: At any

7  time, in fact, does Dr. Ansolabehere exclude

8  individuals who qualify for a disability exemption

9  from the denominator of his calculations?

10      A.   I believe that you've overstated what I

11  claimed.  This is his supplemental report that I

12  haven't had the same amount of time to examine in

13  detail.  So I can go off my speculation of what may

14  or may not have changed in that particular table.

15  But what's described in the report here is referring

16  back to the table in the original report.

17      Q.   And you believe that the denominator

18  excludes voters who are registered but not required

19  to present SB 14 ID.  Is that correct?

20      A.   That's my understanding from the original

21  report.

22      Q.   Are you certain that that's accurate?

23      A.   As I said, that's my understanding from

24  the original report.  I can go back and check it.

25      Q.   When did you receive Dr. Ansolabehere's

JEFFREY MILYO, PhD                                      8/26/2014

251

1    supplemental report?

2        A.   I don't know exactly.

3        Q.   Sometime around the 15th?

4        A.   It's been a busy last few weeks.  I really

5    don't know exactly.

6        Q.   And you haven't had the time to review

7    Dr. Ansolabehere's supplemental report thoroughly

8    enough to be able to determine if your

9    methodological critiques persist from the corrected

10   report to the current report?  Is that your

11   testimony?

12       A.   No.  I believe what I've said is that many

13   of my methodological concerns would still apply to

14   the methods used.

15       Q.   But you're not certain if all of them do?

16       A.   I would need to spend more time on the

17   supplemental report in order to form an opinion on

18   the supplemental report.

19       Q.   Okay.  Which -- please turn to

20   Paragraph 40 of your report.

21                 Given the State of Texas's failure to

22   provide Dr. Ansolabehere with its complete DPS

23   database initially, do you continue to believe that

24   it was irresponsible and misleading for

25   Dr. Ansolabehere to provide the estimate that he set

JEFFREY MILYO, PhD                                    8/26/2014

                                                           252

1    forth in his initial and corrected report?

2         A.    I continue to believe that the methods and

3    lack of being forthcoming about the weakness of the

4    methods is particularly irresponsible and

5    misleading.

6         Q.    Do you continue to believe that the number

7    that he reports in his reply report is irresponsible

8    and misleading?

9         A.    I don't believe that that's what I said.

10   That the number was irresponsible.

11        Q.    And you say in Paragraph 40, It is

12   particularly irresponsible and misleading for

13   Ansolabehere to report as a finding that over

14   1 million voters in Texas do not possess acceptable

15   ID under SB 14.

16        A.    That's correct.

17        Q.    That's saying that reporting the number is

18   irresponsible and misleading, is it not?

19        A.    No.  I think it's what it says it is, to

20   report, as a finding, that number, which gets to

21   the --

22        Q.    And you believe that the current report

23   that incorporates the 3 million additional records

24   that were not provided to Dr. Ansolabehere, is

25   irresponsible and misleading to the extent that it

JEFFREY MILYO, PhD                                        8/26/2014

253

1    reports as a finding the top line number that it

2    reports?

3         A.   Which top line number are you referring

4    to?  We've looked at a number of tables.

5         Q.   The top line number is the no-match

6    number.  That's what I mean.

7         A.   And to the extent -- and this is based on

8    my understanding of the similarity of the methods

9    used, that my criticisms still apply.  And so, yes,

10   absolutely.

11        Q.   Okay.  In your expert reports do you

12   attempt to estimate the quantitative effect of your

13   criticisms of Dr. Ansolabehere's analysis on the

14   disparities that he observes and ID possession rates

15   between Anglos and Hispanics and between Anglos and

16   blacks?

17        A.   I have not worked with the actual data, so

18   no.

19        Q.   Would it be fair to say, then, that you

20   don't present your own best estimate of the rates of

21   SB 14 ID possession among Anglos, Hispanics, and

22   blacks in Texas?

23        A.   I do not present original estimates.

24                  MR. FREEMAN:  Let's mark this as

25   Exhibit --

JEFFREY MILYO, PhD                                    8/26/2014

                                                          254

1        A.   And actually, I'm forgetting your

2   question.   We're referring to Ansolabehere's number.

3   We could do that replication analysis.   So I'm not

4   recalling what your question was and I may want to

5   amend my answer.

6        Q.   (BY MR. FREEMAN)   Do you provide your own

7   best estimate of the rates of SB 14 ID possession

8   among Anglos, Hispanics, and blacks in Texas?

9        A.   I would not characterize it as that, no.

10            (Exhibit Number 14 marked.)

11            MR. FREEMAN:   Mark this as

12   Exhibit 14.

13        Q.   (BY MR. FREEMAN)   what is this document?

14        A.   This looks to be a report that I did with

15   Professor Marvin Overby in 2006.

16        Q.   And that was in litigation concerning

17   Missouri voter ID law.   Correct?

18        A.   Yes, it was.

19        Q.   If you turn to page 2, Paragraph 6-A, am I

20   right that this report represents the best estimate

21   that you were able to make concerning the number of

22   individuals who were likely to desire a photo ID

23   following implementation in Missouri's voter ID law?

24        A.   Page -- I think there's multiple page 2s

25   here.

JEFFREY MILYO, PhD                              8/26/2014

                                                                    255

1      Q.    Second page of the document,

2  Paragraph 6-A.   Am I right that this report

3  represents the best estimate that you were able to

4  make concerning the number of individuals who were

5  likely to desire a photo ID following implementation

6  of Missouri's voter ID law?

7      A.    What we report here is our best estimate

8  of the number of eligible Missouri voters,

9  et cetera.

10     Q.    And so you swore, under oath, that each

11 analytical step that you took was, in your opinion,

12 a valid determination based on your knowledge as a

13 social scientist.   Correct?

14     A.    I don't think that's what it says.   It

15 says our best estimate and has a summary of the

16 report that we've provided.

17     Q.    Would you agree that your best estimate

18 constitutes a valid determination based on your

19 knowledge as a social scientist?

20     A.    I would have to refresh my memory about

21 the actual estimate.   This is from eight years ago.

22               At the time and given the information

23 we had, it was intended to be an improved estimate.

24 I think we provided a variety of estimates, and then

25 among those, identify the best, conditional on that

JEFFREY MILYO, PhD                                    8/26/2014

256

1   set.

2       Q.   In fact, you described it as your best

3   estimate.   Correct?

4       A.   I believe it's described as our best

5   estimate, which is in the context of providing

6   several estimates and choosing the preferred

7   estimate among those.

8       Q.   And you determined that only 6,000

9   individuals were likely to desire a photo ID for

10  voting purposes under the Missouri voter ID law.

11  Correct?

12      A.   This says, Of these, about 6,000 are

13  likely to desire a photo ID for the purpose of

14  voting based upon historic voter participation

15  patterns, yes.

16      Q.   Let's work our way quickly, I hope,

17  through the methodology starting on page 3 of the

18  report itself, not the declaration that begins it.

19               You started by estimating the voting

20  age population of Missouri in July 2006.   Correct?

21  Middle paragraph.

22      A.   Well, it's been many years since I've seen

23  this document, so I'm going to need to take some

24  time to refresh my memory as we go along here.

25      Q.   Do you want to take a break so that you

JEFFREY MILYO, PhD                                   8/26/2014

257

1    can do that?

2         A.    I can do it as we go along.

3         Q.    Okay, that's fine.

4               So you start by estimating the VAP of

5    Missouri in July 2006.  Correct?

6         A.    What paragraph are you referring to?

7         Q.    Middle paragraph of page 3.

8         A.    "As an alternative," that paragraph?

9         Q.    "On August 4th, 2006," that paragraph.

10              MR. POSNER:  Dan?

11              MR. FREEMAN:  Yes.

12              MR. POSNER:  Excuse me, Counsel, why

13   don't we take a break, let the witness --

14              MR. FREEMAN:  Let's take a break.

15              (Recess.)

16        Q.    (BY MR. FREEMAN)  I am going to skip ahead

17   to try to get this puppy moving.  If you can move to

18   page 4 of the Missouri report.

19              Am I correct that you, within the

20   universe of individuals who lack ID, try to

21   determine the number of such individuals who would

22   actually need to acquire ID based on turnout

23   figures.  Correct?

24        A.    There's multiple steps here.

25        Q.    Uh-huh.

JEFFREY MILYO, PhD                                    8/26/2014

258

1      A.    And so part of the analysis involves

2  thinking about who would desire a photo ID in order

3  to vote.

4                So in that sense, turnout figures are

5  employed to get an estimate of that.

6      Q.    However, in the next paragraph you state

7  that, "This population of individuals who lack ID is

8  typically assumed to be poor, less educated, and

9  disproportionally composed of racial and ethnic

10  minorities."  Correct?

11      A.    That's what's written there.

12      Q.    And you, therefore, discount the number of

13  individuals believed not to have ID by a lower

14  turnout rate because you believe that this group

15  will exhibit a lower turnout rate.  Correct?

16      A.    No.  I believe it's referring to lowest

17  quintile of family income, persons without high

18  school education, exhibiting lower turnout rate.

19      Q.    And you state that you're focusing on this

20  group because the population of individuals that

21  does not possess a Missouri-issued photo ID is

22  typically assumed to be poor, less educated, and

23  disproportionately composed of racial and ethnic

24  minorities.  Correct?

25      A.    That's a paraphrasing of what's written

JEFFREY MILYO, PhD                                    8/26/2014

259

1    there.

2         Q.    But it's an accurate paraphrasing.

3    Correct?

4         A.    Well, it's different than what's written

5    there.   It says, "For this reason, we focus on the

6    lowest quintile."

7         Q.    And you focus on the lowest quintile

8    because you, as a social scientist, believe that

9    individuals who do not possess a State-issued photo

10   ID are more likely to be poor, less educated, and

11   disproportionately composed of racial and ethnic

12   minorities.   Correct?

13        A.    What it says is, "Typically assumed."

14        Q.    But you incorporated this in your best

15   estimate, did you not?

16        A.    It's incorporated in the report, that's

17   correct.

18        Q.    Let's move on to Mr. Ghitza's report.  Am

19   I correct that the only criticisms of Mr. Ghitza's

20   data, methods, or opinions contained in your report

21   concern the effects of the accuracy rate of the

22   Catalist race estimates?

23        A.    Which number is Mr. Ghitza's report?

24        Q.    It's not an exhibit.  I'm asking questions

25   about your report, and what your report says about

JEFFREY MILYO, PhD                          8/26/2014

260

1   Mr. Ghitza and the Catalist race estimate.

2                   Am I correct that the only criticisms

3   of Mr. Ghitza contained within your report concern

4   the effects of the accuracy rates of the Catalist

5   race estimates.  Is that correct?

6        A.   I'm trying to refresh my memory.  There's

7   a lot of words in my report.  So if you'll be

8   patient, I'll look through.

9                   MR. FREEMAN:  We can go off the

10   record while he looks through.

11        A.   Is there a particular section that you're

12   referring to?

13        Q.   (BY MR. FREEMAN)  I'm referring to the

14   entirety of your report.  I'd like to know the scope

15   of the critique that you have of Mr. Ghitza and the

16   Catalist race estimate.

17        A.   So my recollection, based on the report --

18   you're asking about a criticism of Mr. Ghitza

19   specifically or Catalist --

20        Q.   Or Catalist as a general matter.

21        A.   I think the Catalist data is discussed in

22   a number of portions in the report.

23        Q.   I'm asking about critiques of Catalist's

24   method of race estimate.  Your only -- your only

25   critique that you provide is -- regards the accuracy

JEFFREY MILYO, PhD                          8/26/2014

261

1    rates.  Is that correct?

2         A.   I'm looking for that section of the

3    report.

4         Q.   I believe it's Paragraph 105 and 106.

5         A.   Could be helpful.

6              So in this section of the report, I

7    mentioned Dr. Ghitza in particular.  And I mentioned

8    that the records are updated frequently, and the

9    evidence about the confidence and the coding of

10   black or Hispanic versus non-Hispanic whites.

11        Q.   Your report doesn't contain any criticisms

12   of the method by which Catalist estimates race.

13   Correct?  Just the accuracy?

14        A.   I don't believe I criticized the method by

15   which they estimate race.

16        Q.   Have you ever published any work in a

17   peer-reviewed journal in which you attempted to

18   estimate the races of individuals in the absence of

19   self-reporting?

20        A.   I don't recall so.

21        Q.   Have you ever relied upon race estimates

22   provided by any outside company?

23        A.   By a company?

24        Q.   Such as Catalist or a comparable

25   organization.

JEFFREY MILYO, PhD                                    8/26/2014

262

1        A.    In what context?

2        Q.    In your work as a social scientist.

3        A.    Work including what?

4        Q.    All work --

5        A.    Publications?

6        Q.    -- period.

7        A.    Not in -- I don't believe in any

8   publications.

9        Q.    How about any work outside of

10  publications?

11       A.    And so repeat the question.

12       Q.    Have you ever relied upon racial estimates

13  provided by Catalist or a comparable organization?

14       A.    So estimates of individual's race and

15  ethnicity?

16       Q.    Yes.

17       A.    Well, as I've mentioned, I've been a

18  participant in the CCES survey, and so Catalist has

19  provided some validated vote data in there.  But I

20  don't believe their racial estimates are in that

21  data, so I think I can say no.

22       Q.    But you, yourself, have relied on data

23  provided by Catalist in the work that you have done

24  as a social scientist.  Correct?

25       A.    Not -- I don't believe in publications, I

JEFFREY MILYO, PhD                                    8/26/2014

263

1    haven't used that work.

2         Q.   But you have relied on it in other work

3    that you've done as a social scientist, the Catalist

4    data.   Correct?

5         A.   Relied as I have access to data that

6    contains some variables from Catalist.

7         Q.   Okay.   Have you ever used ecological

8    regression to estimate racial effects or

9    disparities?

10        A.   Broadly speaking, I think we can say yes.

11        Q.   And you would agree that ecological

12   regression is an accepted methodology in political

13   science to estimate patterns of race?

14        A.   It is a method that is often misused in

15   terms of the interpretation of coefficients.

16        Q.   But it is an accepted method when it's

17   used correctly.   Correct?

18        A.   Regarding the interpretation of

19   coefficients, that they're not indicative of

20   individuals but, rather, of the characteristics of

21   places.

22        Q.   But ecological regression can also be used

23   to estimate the characteristics of individuals so

24   long -- as a group, so long as an individual does

25   not commit the ecological fallacy.   Correct?

JEFFREY MILYO, PhD                                    8/26/2014

                                                              264

1          A.   The ecological fallacy is the concern.
2     And so we typically see ecological regressions in
3     contexts where we don't have access to individual
4     level data.
5          Q.   But so long as an individual does not
6     commit the ecological fallacy, ecological regression
7     is an accurate and accepted method in political
8     science to estimate effects or patterns by race in
9     terms of groups.   Correct?
10         A.    You're committing the ecological fallacy
11    and stating it that way.   So that's inconsistent,
12    the way you're stating it.
13         Q.   Would you accept that ecological
14    regression, as a whole, is an accepted methodology
15    in political science so long as the ecological
16    fallacy is not committed?
17         A.   It is used in political science research,
18    yes.
19         Q.   And your report does not assert that
20    Dr. Ansolabehere commits the ecological fallacy in
21    his use of ecological regression.   Correct?
22         A.   I don't believe that opinion is contained
23    in my report.
24         Q.   And none of your critiques of the Catalist
25    race estimates address Dr. Ansolabehere's use of

JEFFREY MILYO, PhD                                    8/26/2014

265

1   ecological regression.  Correct?

2        A.   No, I don't believe that's correct.

3        Q.   You believe that your critiques of

4   Catalist race estimates also constitute a critique

5   of his use of ecological regression?

6        A.   Let me refer back to just refresh my

7   memory on one point I have in mind here.

8              No, I don't think there are critiques

9   of the Catalist data.  Estimates of race are

10  similarly critiques of the ecological regression.

11       Q.   And your critiques of Catalist race

12  estimates are not similarly critiques of estimates

13  using homogenous block groups.  Correct?

14       A.   Correct.

15       Q.   And your critiques of Catalist race

16  estimates are not similarly critiques of

17  Dr. Ansolabehere's use of Texas's Spanish surname

18  voter designation to estimate racial disparities.

19  Correct?

20       A.   Correct.

21       Q.   And your report doesn't contain any

22  critiques of Dr. Ansolabehere's use of ecological

23  regression.  Correct?

24       A.   I don't believe it does, other than the

25  basic points that there's a garbage-in/garbage-out

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

JEFFREY MILYO, PhD                                    8/26/2014

266

1    problem.  I don't think I used that terminology.

2                        But, rather, given that there's

3    problems with the estimates of persons who lack

4    SB 14 ID and that's an input to the ecological

5    regression.  So in that sense there's a criticism.

6         Q.   And the same is true of the homogenous

7    block group analysis?

8         A.   I believe that would be so.

9         Q.   And the same as the Spanish surname voter

10   registration analysis?

11        A.   I believe that's correct.

12        Q.   Paragraph 106, you state that the accuracy

13   of the Catalist race estimate is expected to be

14   correlated with the lack of ID.  Correct?

15        A.   I believe that's what's stated here.

16        Q.   What is your basis for that contention?

17        A.   Well, I don't have it footnoted to a

18   specific literature, so that would be a surmise that

19   lack of ID is correlated with minority status.

20        Q.   And with lack of -- sorry.

21                   You mean with minority status as

22   designated by Catalist, the errors?

23        A.   I believe this is a continuation of the

24   paragraph above.  So it's to the extent that these

25   probabilities are even lower for individuals with

JEFFREY MILYO, PhD                                      8/26/2014

267

1    low SES, it follows, et cetera.

2                    So --

3          Q.    But you don't have any basis --

4          A.    That should be -- fact is a poor choice of

5    words there, on my part.   That should be continuing

6    that if/then statement.

7          Q.    There's no factual basis to believe that

8    errors are correlated with lack of ID.   Correct?

9          A.    It's an if/then -- it should be an if/then

10   statement.

11         Q.    Have you attempted to quantify the effect

12   of the accuracy of the Catalist race estimate would

13   have on racial disparities and ID possession?   Did

14   you perform that analysis yourself?

15         A.    Attempted to quantify --

16         Q.    The effect of any lack of accuracy in the

17   Catalist race estimate would have on racial

18   disparities and ID possession?

19         A.    No, I don't believe I do that in this

20   reports.

21         Q.    Did you attempt to weigh observations in

22   Dr. Ansolabehere's calculations based on Catalist

23   race estimates by the probability that race or

24   ethnicity is estimated correctly?

25         A.    I don't have those estimates so I did not

JEFFREY MILYO, PhD                                    8/26/2014

268

1   do original data analysis.

2        Q.    Did you conduct an instrumental variable

3   regression to assess the accuracy of

4   Dr. Ansolabehere's calculations based on Catalist

5   race estimates?

6        A.    I've not conducted any original data

7   analysis.

8        Q.    So any of the concerns that you've

9   expressed regarding the effects of any lack of

10  accuracy in Catalist's race estimate, those concerns

11  are speculation, correct, of what might be?

12       A.    Well, they're concerns raised by the

13  information provided in the Ghitza report about the

14  accuracy of the racial and ethnic categorizations in

15  the Catalist data.

16       Q.    But whether those concerns might result in

17  the elimination of the statistical significance of

18  Dr. Ansolabehere's observations of racial

19  disparities or eliminations of the racial

20  disparities itself, that's speculation.  Correct?

21       A.    I have not done the analysis so I don't

22  know for sure.  I believe this is a discussion of

23  concerns that should have been addressed.

24       Q.    And in any other materials that you have

25  in your report that is not footnoted, those are

JEFFREY MILYO, PhD                                    8/26/2014

                                                            269

1    surmises.  Correct?

2              MR. KEISTER:  Object to form.

3        A.   That seems like it would -- there's a lot

4    of sentences that aren't footnoted.  So do you want

5    to go one by one?

6        Q.   (BY MR. FREEMAN)  No, I do not.  I don't

7    think your counsel wants me to, either.  And

8    probably, if you're going to make your flight

9    tomorrow, I don't think you want me to.

10             Does your report ever actually state

11   that you have determined that the racial ID

12   possession estimates Dr. Ansolabehere calculated

13   based on Catalist race estimates, are not

14   statistically significant?

15       A.   I did not conduct that kind of statistical

16   analysis.

17       Q.   Look at Paragraph 106.  You state that the

18   error known to exist in Catalist estimates of race

19   and ethnicity is not addressed by Dr. Ansolabehere.

20   Correct?

21       A.   That's what's written there.

22       Q.   In fact, Dr. Ansolabehere conducted a

23   separate estimate of racial disparities and ID

24   possession based solely on individuals for whom

25   Catalist has a high confidence of its race estimate.

JEFFREY MILYO, PhD                                      8/26/2014

270

1    Correct?

2         A.    He does report that.

3         Q.    Would you agree that as a matter of basic

4    statistical theory, errors in classification between

5    two groups will reduce the observed difference

6    between those groups rather than inflate the

7    observed difference?

8         A.    Not necessarily if there's multiple

9    sources of error and they're systematic, as they are

10   with the Catalist data.  I believe that the

11   categorization of high confidence is an apples and

12   oranges comparison across groups, which is evidenced

13   from Dr. Ghitza's report.

14        Q.    I'd like to turn to Paragraph 18.D of your

15   report.

16        A.    I'm there.

17        Q.    Which experts assert that SB 14 will

18   suppress voter turnout?

19        A.    I would have to -- again, there's a lot of

20   experts.  This is a characterization or a summary of

21   the overarching arguments that I interpreted in the

22   17 reports.  So several of them speak to SB 14 as an

23   obstacle or they reference the calculations of

24   voting to support differential effects on turnout.

25        Q.    Would you agree that voter turnout

JEFFREY MILYO, PhD                                          8/26/2014

                                                                   271

1   measures the aggregate determination of individual

2   voters as to whether to participate in an election?

3        A.   I think you can use the word "turnout" to

4   describe an individual's behavior as well.

5        Q.   But would you agree that it also describes

6   the aggregate, that that's an accurate

7   description --

8        A.   It can be used to describe aggregate votes

9   as a percent of some pool or it could be used to

10  describe whether an individual votes.

11       Q.   Okay.  Does voter turnout measure

12  opportunity to participate in the political process

13  or is that a separate question?

14       A.   That sounds like a much broader concept

15  than voting.

16       Q.   If a jurisdiction decided to fund an

17  election by charging every minority voter $5, but

18  did not charge Anglo voters, and the minority voters

19  decided that the election was so important that they

20  paid $5 each and showed up at the polls at the same

21  rate as the Anglo voters, would the election exhibit

22  reduced minority turnout?

23                 MR. KEISTER:  Object to form.

24       Q.   (BY MR. FREEMAN)  You may answer.

25       A.   All else constant?

JEFFREY MILYO, PhD                              8/26/2014

272

1      Q.   Yes.

2      A.   And -- I think the way you've read it,

3  it's missing something.  Try again.

4      Q.   Sure.  I'm happy to repeat my question.

5  My question was, in fact, complete, but I will read

6  it again.

7           If a jurisdiction decided to fund an

8  election by charging every minority voter $5, but

9  did not charge Anglo voters, but minority voters

10  decided that the election was so important that many

11  of them paid $5 each and they showed up at the polls

12  to vote at the same rate as Anglo voters did, would

13  that election exhibit reduced minority turnout?

14           MR. KEISTER:  Objection; form.

15  Relevancy and calls for speculation.

16      Q.   (BY MR. FREEMAN)  You may answer.

17      A.   Again, I think you've formulated the

18  question incorrectly, because you didn't say what

19  happened to -- you're talking about reduced turnout,

20  so there's a comparison to something else.  I don't

21  know what you're comparing to.

22      Q.   (BY MR. FREEMAN)  Vis-à-vis the Anglo

23  voters.

24           MR. KEISTER:  Same objections.

25      Q.   (BY MR. FREEMAN)  Or vis-à-vis their --

JEFFREY MILYO, PhD                                    8/26/2014

273

 1   either way, vis-à-vis past turnout or vis-à-vis

 2   Anglo voters.

 3                 If they decided that they were going

 4   to pay the $5 fee and continue to vote at the same

 5   rate that they voted previously, would there be

 6   reduced turnout?

 7                 MR. KEISTER:  Same objections.  Plus

 8   confusing, compound.

 9        Q.   (BY MR. FREEMAN)  Let me start over, then.

10   Trying to make it clean.  Doing my best.

11                 If a jurisdiction decided to fund an

12   election by charging every minority voter $5, but

13   did not charge Anglo voters, but a large group of

14   minority voters decided that the election was so

15   important that they would pay the $5 each and showed

16   up at the polls at the same rate that they had

17   previously showed up at the polls and at the same

18   rate as Anglo voters, would that election exhibit

19   that the $5 fee had reduced minority turnout?

20                 MR. KEISTER:  Objection; form.

21   Relevancy and calls for speculation.

22        A.   And I still don't like the way you're

23   phrasing the question.  It's too ambiguous.  You're

24   talking about a group turning out at the same rate.

25   It's not telling me about others in the group.  So

JEFFREY MILYO, PhD                                    8/26/2014

274

1   it's -- it's phrased ambiguously.

2        Q.   (BY MR. FREEMAN)  Let me try again.  We

3   have a jurisdiction.  The jurisdiction decides it's

4   going to charge black voters $5 in order to fund its

5   election.  Each black voter has to pay $5 to vote.

6   Within that jurisdiction, black voters, as a group,

7   decide the election is important.  They pay $5 each

8   to vote in sufficient numbers that the same

9   percentage of black voters are voting in the

10  election where they have to pay $5 as they voted in

11  the prior election where they didn't have to pay

12  anything at all.

13            Would you agree that the election in

14  which they had to pay $5 did not show reduced

15  minority turnout levels relative to the prior

16  election?

17            MR. KEISTER:  Objection; form.

18  Relevancy, vague and confusing, and calls for

19  speculation.

20       Q.   (BY MR. FREEMAN)  You may answer.

21       A.   I am a little confused.  May I see it in

22  writing?

23       Q.   Dr. Milyo --

24            MR. KEISTER:  It was a long, long

25  question.

JEFFREY MILYO, PhD                                    8/26/2014

                                                              275

1              MR. POSNER:  You could Xerox that

2    part of your page.

3         Q.   (BY MR. FREEMAN)  Read that.

4              MR. KEISTER:  And just let the record

5    reflect, the witness is looking at the written

6    question.  And I will still assert my same

7    objections, unless you want them in writing.

8         A.   So am I supposed to do as it was

9    originally written there or what you have written

10   in?

11        Q.   (BY MR. FREEMAN)  As I have corrected it

12   to try and make it clear for you.

13        A.   And what is this word?

14        Q.   Prior election.

15             MR. KEISTER:  And since there was

16   dialogue, I'll renew my objections.  Same

17   objections.

18        A.   If I interpret this as you're saying,

19   turnout doesn't change, does it change, then I would

20   say turnout doesn't change.

21        Q.   (BY MR. FREEMAN)  Okay.  Would you agree

22   that in that election, minority voters faced an

23   unequal opportunity to participate in a political

24   process vis-à-vis Anglos, because they had to pay $5

25   and Anglos did not?

JEFFREY MILYO, PhD                                      8/26/2014

                                                              276

1              MR. KEISTER:  Same objections.

2       A.   I don't believe my report speaks to that.

3       Q.   (BY MR. FREEMAN)  I'm trying to ask these

4  questions in order to understand and assess the

5  credibility of your report.  And so I would ask you

6  to answer the question regarding the hypothetical as

7  it goes to your methodology of assessing voter

8  turnout.

9              MR. KEISTER:  Same objections.  And

10  to the extent that it is outside of the report and

11  the issues which he's designated, I would also

12  object.  But you can answer.

13      A.   Given, by definition, you've stated that

14  black voters have to pay $5 to vote, that is a

15  difference.

16      Q.   (BY MR. FREEMAN)  Does voter turnout

17  isolate the rate at which particular election

18  administration provisions discourage individuals

19  from voting or does it include other variables?

20      A.   I think you mean is it predicted by or

21  influenced by other variables?

22      Q.   Yes.

23      A.   Okay.  Can we read it again, then?

24      Q.   Sure.  Does voter turnout isolate the rate

25  at which particular election administration

JEFFREY MILYO, PhD                                    8/26/2014

277

1    provisions discourage individuals from voting or is

2    it predicted by or influenced by other variables?

3         A.    Voter turnout overall would be predicted

4    by a large number -- or affected by a large number

5    of factors.

6         Q.    And you're not arguing in your report that

7    the D term is the -- in the cost of voting

8    calculation is the only term that matters.  Correct?

9         A.    What part of my report are you referring

10   to?

11        Q.    I'm referring -- well, let's start with

12   Paragraph 137.

13              Am I correct that you don't know,

14   without looking at your report, whether or not your

15   report states that only the D term matters?

16        A.    I like to be well informed about what I'm

17   talking about, and you're asking me specifics about

18   what my report says.  I think I would like to see

19   and refresh my recollection.

20        Q.    Okay.  Let me ask again, now that you've

21   had a chance to look.

22              You're not arguing in your report

23   that the only term that matters to voter turnout is

24   the D term, are you?

25        A.    This section of the report is a criticism

JEFFREY MILYO, PhD                                      8/26/2014

278

1  of the calculus of voting as articulated by Anthony

2  Downs and represented algebraically by Riker and

3  Ordeshook.   And so D is not the only determinant of

4  voting in that model.

5       Q.   So to the extent that experts in this case

6  have looked at the C term, holding D fixed, you

7  would not say that there's a methodological problem,

8  would you?

9       A.   Who has looked at the C term, holding D

10 fixed?

11      Q.   Would you say that there is no

12 methodological problem with Dr. Burden or

13 Dr. Webster, focusing on the C term, holding the D

14 term fixed?

15      A.   I'm not sure if "methodological" is the

16 word that you want to use.

17      Q.   I would like you to answer my question.

18      A.   I think there is a problem with assuming

19 that the voter ID law affects only the C term and

20 not some other determinants of voting.

21      Q.   And the other determinants of voting would

22 be the D term, to your mind?

23      A.   If one had to shoehorn it into this

24 particular representation of voting, you could do it

25 that way.

JEFFREY MILYO, PhD                                    8/26/2014

                                                            279

1        Q.   You would agree that it's a very well

2   established framework within political science,

3   correct, the cost of voting analysis?

4        A.   It is something that is frequently

5   appealed to, that's correct.

6        Q.   Well accepted.  Correct?

7        A.   As I've demonstrated, there are a number

8   of problems with the simplistic calculus of voting

9   that are well-known; and so, therefore, that is not

10   well accepted unless people don't know what they're

11   talking about; then sometimes they're a little

12   careless in how they state things.  So, you know.

13       Q.   In the abstract, the framework, the

14   Downsian calculus of voting is well accepted in the

15   discipline of political science.  Correct?

16       A.   As I've discussed here, I would amend it

17   the way Riker and Ordeshook do.  There are decades

18   of commentaries about the problems with the

19   simplistic Downsian analysis.  If what you mean is

20   that in general costs and benefits affect turnout,

21   that's different, in my mind, than specifically

22   referencing the Downsian analysis.

23       Q.   As updated by professors, such as Aldredge

24   and Ordeshook, the Downsian calculus of voting

25   framework is widely accepted in political science,

JEFFREY MILYO, PhD                                    8/26/2014

                                                              280

1    is it not, as a framework?

2         A.   Well, what do you mean as a framework?   It

3    is employed to discuss the problems such as the

4    paradox of voting.   It's the reason other people

5    have come up with game theoretic or other kinds of

6    explanations for voter turnout.

7              It is a problematic framework.   It is

8    well-known.   Costs and benefits are still a way in

9    which people talk about determinants of voting.

10        Q.   If you could look at Paragraph 139, you

11   state that, "It no longer follows modern or modified

12   version of the Catalist voting that a small change

13   in the cost of voting will lead to a dramatic change

14   in turnout."   Correct?

15        A.   This is Paragraph 139?

16        Q.   That's correct.

17        A.   That's what's stated there.

18        Q.   Would you consider a 5 percent change in

19   turnout statewide to be dramatic?

20        A.   This is in comparison to the predictions

21   of the simple Downsian model, which would suggest

22   that a very small change in costs could completely

23   wipe out turnout.

24        Q.   Let me try again.   What do you mean by

25   "dramatic"?

JEFFREY MILYO, PhD                                      8/26/2014

281

1        A.    I mean it in the context that it has been

2   used by others as a conclusion based on the simple

3   model, that whatever their conclusion is wouldn't

4   follow based on this model.

5        Q.    What percentage in turnout statewide would

6   you consider to be nondramatic?  Less than 10

7   percent?

8        A.    I don't have a specific number in mind.

9        Q.    What would you consider to be dramatic?

10  More than 10 percent?

11       A.    The issue of dramatic, again, is reference

12  to a statement about the elasticity or

13  responsiveness of turnout to a small change in

14  costs.  It's a reference to a high elasticity versus

15  a lower elasticity, might be one way to describe it,

16  or a lower responsiveness.

17              So the point here is not to identify

18  an absolute number, but a relative difference across

19  the two models.

20       Q.    You're not, by training, a political

21  scientist.  Correct?  You're an economist?

22       A.    I have a PhD in economics and I have

23  additional training in political economics.  I have

24  been hired as a political scientist.  I teach

25  political science.  Some people think I'm a

JEFFREY MILYO, PhD                                      8/26/2014

                                                                282

1    political scientist.  There isn't like an official

2    card that you get that describes you as a political

3    scientist.

4         Q.   But there is a degree in political science

5    and you don't have one.   Correct?

6         A.   I do not have a PhD in political science.

7         Q.   You don't have an undergraduate degree in

8    political science.   Correct?

9         A.   I do not have an undergraduate degree in

10   political science.

11        Q.   You have never received tenure as a

12   professor of political science.   Correct?

13        A.   My tenure home is in the department of

14   economics.

15        Q.   You've taught adjunct courses in political

16   science.   Correct?

17        A.   I have taught courses cross listed in

18   political science over the years, and I have taught

19   courses in political science over the years.

20        Q.   In Paragraph 140, am I correct that you

21   state, "In general, post-registration election

22   procedures" -- you provide some examples -- "have

23   fairly modest, insignificant, or even perverse

24   effects on voter turnout"?

25        A.   That is the statement there.

JEFFREY MILYO, PhD                                    8/26/2014

283

1      Q.   By "modest," do you mean effects in single
2  digits?
3      A.   By modest I mean referencing the results
4  in some of the literature that's cited, that many of
5  these studies are pointing out that large effects
6  that people thought existed previously, when looked
7  at with more recent data or methods, we'd sometimes
8  find smaller effects or statistically insignificant
9  effects, sometimes even a surprising sign on the
10  effect.
11      Q.   And you're aware of the 2005 study by
12  Wolfinger, Highton, and Mullin on this subject?
13      A.   I'm aware of that study.
14      Q.   And, in fact, you've written before that
15  their study deservedly won an award.  Correct?
16      A.   I believe that sounds familiar.
17      Q.   Wolfinger, Highton, and Mullin found that
18  for the lowest socioeconomic status voters,
19  estimated turnout can rise by more than 10 percent
20  when comparing states with the least burdensome
21  postregistration procedures as compared to the
22  states with the most burdensome postregistration
23  procedures.  Correct?
24      A.   I would have to look at their study to be
25  sure of that characterization.

JEFFREY MILYO, PhD                                    8/26/2014

                                                              284

1          MR. FREEMAN:  Mark this as

2    Exhibit 15.  And if you could turn to page 15,

3    Table 5.

4              (Exhibit Number 15 marked.)

5      Q.    (BY MR. FREEMAN)  And this table shows the

6    difference between the estimated turnout with worst

7    practices and the estimated turnout with best

8    practices.  For individuals with less than a high

9    school education it's estimated to be 10.7 percent.

10   Correct?

11     A.    That looks to be what this table reports.

12     Q.    And in the same table they found that the

13   projected turnout increases with universal adoption

14   of best practices, with smallest for whites, larger

15   for blacks, and larger still for Hispanics.

16   Correct?

17     A.    In this table, that looks to be correct.

18     Q.    You also cite to, "Why Electoral Reform

19   Has Failed.  If You Build It, Will They Come?", by

20   Traugott, in your report.  Do you recall that?

21     A.    It may be cited in multiple places.  I can

22   see one citation here in footnote 98.

23     Q.    And you cite that for the notion that

24   electoral reforms may only have modest, nonexistent,

25   or perverse effects on turnout?

JEFFREY MILYO, PhD                                      8/26/2014

                                                                285

1        A.   As part of the literature on

2   postregistration election procedures.

3        Q.   In fact, what Traugott describes as small

4   effects on turnout are changes that are mostly in

5   the single digits.  Correct?

6        A.   I don't recall that exactly.

7        Q.   Did you read Traugott in preparation for

8   your report in this case?  Did you rereview it?

9        A.   I believe I have looked at all of the

10  studies that are referenced.

11       Q.   And do you recall what size of effects

12  Traugott found?

13       A.   I don't recall off the top of my head.

14       Q.   Would you agree that Traugott observed

15  positive changes in turnout due to reductions in the

16  cost of voting?

17       A.   I would have to look to answer that with

18  complete confidence.  But --

19       Q.   Are you familiar with the political

20  science literature finding that costs related to

21  such mundane things as the weather may reduce voter

22  turnout?

23       A.   There are, I believe, multiple studies

24  that might fall under that heading.

25       Q.   Are you familiar with the political

JEFFREY MILYO, PhD                                    8/26/2014

286

1   science literature finding reductions in turnout

2   based on increased travel costs related to reaching

3   a more distant polling place?

4        A.   I believe I recall seeing a reference to

5   that in one of the supplemental reports.  And I

6   believe I have seen a working paper perhaps, or --

7   I'm not sure whether it was a working paper or a

8   recent publication.

9        Q.   Would you agree that SB 14 imposes a cost

10  primarily on those voters who do not already possess

11  SB 14 ID?

12       A.   For individuals who wish to -- who votes,

13  then they would need to acquire some form of ID.

14       Q.   So the cost of -- for purposes of the cost

15  of voting, the cost term increases caused by SB 14

16  relate primarily to individuals who don't already

17  have SB 14 ID and want to vote.  Correct?

18       A.   Yes.

19       Q.   Would you agree that for those voters who

20  do not already possess SB 14 ID, the cost required

21  to obtain SB 14 ID is greater than the cost of

22  registration, in terms of the cost of voter

23  framework?

24            MR. KEISTER:  Object to form.

25       A.   Are they already registered?

JEFFREY MILYO, PhD                                    8/26/2014

                                                            287

1       Q.   (BY MR. FREEMAN)  I'm asking for an

2   apples-to-apples comparison.  Person who is

3   registered, but needs to get ID, versus a person who

4   is not registered and needs to register.  Would you

5   agree that the cost to obtain ID is greater than the

6   cost to register?

7               MR. KEISTER:  Object to form.  It

8   calls for speculation.

9       A.   Yeah.  I don't think I speak to that in

10  the report.

11      Q.   (BY MR. FREEMAN)  I'm asking your basic

12  understanding of the processes involved here, as

13  someone who expressed familiarity with political

14  science and understands what the process involved is

15  to register to vote and someone who has studied

16  SB 14 to the extent demonstrated in your report.  Do

17  you believe it is more or less burdensome to obtain

18  an ID in comparison to registering to vote?

19               MR. KEISTER:  Object to form.

20      A.   I don't believe I spoke to that in the

21  report.  So you're asking for speculation.

22      Q.   (BY MR. FREEMAN)  So are you saying you

23  don't have enough information about the burdens

24  involved in obtaining an ID in order to be able to

25  compare it with what you already know about the

JEFFREY MILYO, PhD                                    8/26/2014

288

1  costs involved in simply registering to vote?

2              MR. KEISTER:  Object to form.

3  Mischaracterizes prior testimony.

4       Q.   (BY MR. FREEMAN)  You may answer.

5       A.   I believe what I said was that I don't

6  discuss that in the report.  I can -- it sounds like

7  you're asking me to speculate about that kind of --

8       Q.   (BY MR. FREEMAN)  I'm asking you to apply

9  the information that you have to a pretty simple

10 question, which is, is the cost entailed in

11 obtaining an ID greater than the cost entailed in

12 registering to vote?

13             MR. KEISTER:  Same objections.

14      A.   I suppose it depends on the circumstances

15 of the particular person.

16      Q.   (BY MR. FREEMAN)  On average, based on the

17 information that you have obtained in your

18 preparation to testify in this case, would you say

19 that the cost entailed to obtain ID is greater than

20 the cost entailed to register to vote?

21             MR. KEISTER:  Same objections.

22      A.   I have not examined, in this report, the

23 costs of registering to vote.

24      Q.   (BY MR. FREEMAN)  Are you aware, in any

25 background that you have as a social scientist, of

JEFFREY MILYO, PhD                                    8/26/2014

                                                              289

1    the costs involved in registering to vote in the

2    State of Texas?

3         A.    I would have to refresh my memory back to

4    the -- some of the expert reports, if they reference

5    that.  But nothing comes to mind immediately in

6    terms of a systematic estimate of the cost of

7    registration.

8         Q.    (BY MR. FREEMAN)  You mail in a form, am I

9    right, to register to vote?  You just mail in a

10   form?

11                MR. KEISTER:  Object to form.

12   Argumentative.

13        A.    I believe your experts have testified that

14   there's much more to costs.

15        Q.    (BY MR. FREEMAN)  Have you registered to

16   vote in the last ten years?

17        A.    In the last ten years.

18        Q.    Do you know how one registers to vote,

19   what the process is?

20        A.    I recall how I registered to vote.

21        Q.    Did you submit a form?

22        A.    I don't recall that exactly.  I believe it

23   was when I moved to Missouri.

24        Q.    And how did you register to vote?

25        A.    I believe it was at the time that I

JEFFREY MILYO, PhD                                   8/26/2014

290

1    obtained my driver's license.

2        Q.   For individuals who are not obtaining a

3    driver's license, are they able to register to vote

4    by mailing in a form?

5              MR. KEISTER:   Objection; form.

6    Argumentative, calls for speculation.

7        A.   I haven't made it my business to look at

8    the registration process in Texas, to answer that

9    definitively.

10       Q.   (BY MR. FREEMAN)  So you don't know how

11   one registers to vote in the State of Texas, whether

12   one can just mail a form?

13       A.   With complete confidence?  I --

14       Q.   Okay.  Compared to the number of polling

15   places, are you aware of whether EICs can be

16   obtained at more locations in Texas or fewer

17   locations in Texas?

18             MR. KEISTER:   Object to form.

19   Confusing, compound.

20       Q.   (BY MR. FREEMAN)  On average, do you know

21   if there are more locations where you can apply for

22   an EIC or more locations where you can vote in

23   person on election day?

24       A.   I'm not familiar with the number of

25   polling locations on a particular election day.

JEFFREY MILYO, PhD                                    8/26/2014

291

1      Q.    Have you studied election administration?

2      A.    Some aspects.

3      Q.    Are there generally multiple polling

4   places in a city, dozens, hundreds, sometimes?

5      A.    Could be.

6      Q.    Do you know if there are dozens or

7   hundreds of places to obtain an EIC in the city of

8   Houston, for example?

9      A.    I don't know the exact number.

10     Q.    Do you know if there are fewer than ten?

11     A.    I don't believe that's something that I

12  spoke to in my report.

13     Q.    Did you ever review the report of

14  Dr. Gerald Webster?

15     A.    Yes, I did.

16     Q.    Did you identify, in the report of

17  Dr. Gerald Webster, how many locations there are to

18  obtain -- to apply for an EIC in the city of

19  Houston?

20     A.    I don't recall committing that to memory.

21     Q.    Let's refresh your recollection.  You can

22  look at Figure 6 of Dr. Webster's report.  Let's

23  take a look at the dots that represent DPS locations

24  or temporary EIC locations.

25            Looking at that, would it be fair to

JEFFREY MILYO, PhD                              8/26/2014

292

1   say that there are likely far more locations in the

2   city of Houston where there are polling places on

3   election day than there are locations where one can

4   apply for an EIC?

5                   MR. KEISTER:   Objection; form.

6   Relevancy.

7        A.   Based on this diagram, I would say so.

8        Q.   (BY MR. FREEMAN)  Would you agree that on

9   average for those voters who do not already possess

10  SB 14 ID, the cost of traveling to apply for an

11  SB 14 is greater than the cost of traveling to a

12  polling place?

13                  MR. KEISTER:   Objection; form.

14       A.   That's not something I spoke to in my

15  report.

16       Q.   (BY MR. FREEMAN)  But based on your

17  knowledge as a social scientist and what we just

18  discussed, would you describe that statement as

19  accurate?

20                  MR. KEISTER:   Objection; form.

21       A.   Based on the diagram that you've

22  presented, costs, in terms of travel time, would

23  look to be greater, on average.

24       Q.   (BY MR. FREEMAN)  Would you agree that

25  there are education costs for an individual to

JEFFREY MILYO, PhD                                    8/26/2014

293

1    determine the requirements to apply for an EIC?

2         A.   By education costs you mean of acquiring

3    information?

4         Q.   Yes.

5         A.   There could be.

6         Q.   Would you agree that some individuals may

7    need to travel to obtain other documents necessary

8    to apply for an EIC?

9              MR. KEISTER:  Objection; form.  Calls

10   for speculation.

11        A.   I believe there may be individuals who are

12   in that circumstance.

13        Q.   (BY MR. FREEMAN)  Let's turn to

14   Paragraph 151 of your report.

15             You state that several recent studies

16   report that overall voter turnout rates are either

17   unaffected or there are no statistically significant

18   difference, or positively affected by State voter ID

19   laws.  Correct?

20        A.   I'm sorry, Paragraph 151?

21        Q.   151.

22        A.   "However, several recent studies," yes.

23        Q.   Which studies do you rely upon for the

24   notion that overall voter turnout rates are

25   positively affected by State voter ID laws?

JEFFREY MILYO, PhD                                    8/26/2014

                                                              294

1        A.    There's several studies here, so we would

2   have to pull them out.   But the statement is either

3   unaffected or positively affected.

4        Q.    And I'm asking based on the studies you

5   cited, which of those studies indicate a positive

6   effect?

7        A.    I would have to look back at the Mycoff

8   and the Loraca [phonetic] papers.

9        Q.    You say in your report -- excuse me.

10             You cite an article by Alvarez,

11   Bailey, and Katz, a working paper, is that correct,

12   for the notion that there's mixed evidence regarding

13   any different effect of State voter ID laws on black

14   and Hispanic voters?

15       A.    Is this footnote 109?

16       Q.    I'm looking at footnote 113 and 109 as

17   well.   Yes, footnote 109, the last citation.

18       A.    I see where they're cited.

19             MR. FREEMAN:    Mark this as

20   Exhibit 16.

21                  (Exhibit Number 16 marked.)

22       Q.    (BY MR. FREEMAN)   Turn to page 18, please.

23   Would you agree that Alvarez, Bailey, and Katz finds

24   that the probability of voting decreases as voter ID

25   regimes become more strict, both for white and

JEFFREY MILYO, PhD                                          8/26/2014

295

```
 1   nonwhite respondents?

 2        A.   Actually, they impose a restriction on the

 3   data estimate.  So this is not as transparent in the

 4   diagram here as you're representing.  And you can

 5   sort of look at it and see that there may be

 6   nonlinear effects.

 7        Q.   But would you agree that both lines have a

 8   negative slope for both white and nonwhite

 9   respondents?

10        A.   In the figures that they publish in this

11   report, it looks like both lines have a negative

12   slope.

13        Q.   Please look at the block quote in

14   Paragraph 151 of your report.  It's actually on the

15   next page from where you were.

16             You rely on this working paper for

17   the notion that controlling for education and

18   income, Alvarez, Bailey, and Katz did not see an

19   effect on voter ID laws by race.  Correct?

20        A.   Where are you pointing here on 151?

21        Q.   The block quotes.

22        A.   The block quote.

23        Q.   It's on the next page.  It's still part of

24   that paragraph.

25             You rely on Alvarez, Bailey, and Katz
```

JEFFREY MILYO, PhD                                    8/26/2014

296

1    for the notion that controlling for education and

2    income, they did not see an effect in voter ID laws

3    by race.   Correct?

4         A.   That's correct.

5         Q.   Turn to page 19 of Exhibit 16.

6              Would you agree, first, that the

7    sentence at the top of page 19 is not the same as

8    the sentence in your report, that the quotation in

9    your report is not accurate?

10        A.   I believe you have a different version of

11   the report than what I cite.

12        Q.   This is the 2008 working paper.

13        A.   I believe it says Version 2 on it.   And

14   what I cite doesn't say Version 2.

15        Q.   Okay.   Am I correct that there's no effect

16   on race only if you control for education and

17   income, however?

18        A.   In which specification?

19        Q.   In Alvarez, Bailey, and Katz.

20        A.   In which specification?   They run many

21   different statistical tests.

22        Q.   Well, with regard to what you quoted in

23   your report.

24        A.   Can we see the report that I quoted?

25        Q.   I'm afraid it appears that you're stating

JEFFREY MILYO, PhD                              8/26/2014

297

1   that I have a different version of your report, and

2   I don't know what version you cited to.  If there

3   are multiple versions, I apologize for that.

4            If you can -- if you can turn to page

5   21 of the working paper that we have here, the

6   Alvarez, Bailey, and Katz.

7        A.   This one?

8        Q.   Yes, page 21.  Would you agree that this

9   states that at the individual level, voter

10  identification requirements, that the strictest

11  forms - combination requirements of presenting

12  identification and matching signatures, as well as

13  photo identification requirements - have a negative

14  impact on voter participation relative to the

15  weakest requirement of stating one's name?

16       A.   That looks to be a verbatim reading of

17  what they state here.

18       Q.   Would you also agree that at the very

19  bottom of that page, it states, However, we do not

20  find -- or we do find that for registered voters

21  with lower levels of educational attainment, or

22  lower income, stricter voter identification

23  requirements do lead to lower turnout?

24       A.   I believe that is a verbatim reading of

25  what they state in this report.

1        Q.    Do you know if education and income levels
2    are similar between racial groups in Texas or if
3    Anglos, in fact, have higher levels of education and
4    income than minority Texans?
5        A.    I believe I have seen evidence from some
6    of the expert reports that would suggest differences
7    in socioeconomic status.
8        Q.    So, yes, there are differences and Anglos
9    have higher socioeconomic status, on average, in
10   Texas?
11       A.    That is my understanding.
12       Q.    Do you know if a subsequent version of
13   Alvarez, Bailey, and Katz was published?
14       A.    You know, they published a methodological
15   note in a journal called Political Analysis that
16   incorporates some of the material here.
17       Q.    Let's mark that as Exhibit 17 and we'll
18   know we have the same thing.
19              (Exhibit Number 17 marked.)
20       Q.    (BY MR. FREEMAN)  Please turn to page 28.
21   Would you agree, looking at pages 28 and 29, that
22   Alvarez, Bailey, and Katz applied two different
23   models to assess the impact of the strictness of
24   voter ID regimes on the probability of voting?
25       A.    I would need to refresh my memory about

JEFFREY MILYO, PhD                                    8/26/2014

                                                           299

1   this particular study.  Do you want to point me to

2   the two particular models that you have in mind?

3        Q.   Well, Figure 2 and Figure 3.

4        A.   Can you point me to the equations of the

5   description of the model?

6        Q.   I believe the models are laid out on pages

7   21 through 23.  And if you'd like to take a break to

8   review that, we certainly can.

9        A.   I can look at it right now.  21 through

10  23.  These are the general models.  I'm talking

11  about the particular application.  That's different

12  across these two specifications.  But I can look at

13  the diagram.

14       Q.   Would you agree that applying both models,

15  Alvarez, Bailey, and Katz found a large and

16  statistically significant negative effect for a

17  photo ID-required voter ID regime?

18       A.   I'm looking at the error bounds on photo

19  ID required in Figure 1.  And, again, as I recall

20  this method, they force a -- they force an ordering

21  relationship among these.  So this is not an

22  analysis that is similar to the typical kind of,

23  say, regression-based estimate.  This is why it's

24  published as a methodological note, this empirical

25  datas approach.

JEFFREY MILYO, PhD                                    8/26/2014

300

1              So they're imposing an assumption

2    about the relationship on the data that forces this

3    kind of ordering.  So that's one concern about this

4    study.

5         Q.   If you have concerns about the study,

6    let's move on, then.  That's fine.

7              (Exhibit Number 18 marked.)

8         Q.   (BY MR. FREEMAN)  I've marked this as

9    Exhibit 18.  Is this the article by Mycoff, Wagner,

10   and Wilson that you cite in your report?

11        A.   I believe this is the article.

12        Q.   If you could turn to page 5 of the

13   exhibit, Footnote 1.  It's page 125 of the journal,

14   fifth page of the exhibit, Footnote 1 and note 1.

15              Would you agree that Mycoff, Wagner,

16   and Wilson wrote that one can, however, reasonably

17   conclude that those without identification will be

18   less likely to vote?

19        A.   That is a verbatim reading of the last

20   sentence of Footnote 1.

21        Q.   Do you have any reason to disagree with

22   that statement under a photographic voter ID regime?

23        A.   Do I have any reason?

24        Q.   Yes.  That all else held equal,

25   individuals without ID will be less likely to vote

JEFFREY MILYO, PhD                                    8/26/2014

301

1   under a photo voter ID regime?

2        A.   Well, the question is, if I have any

3   reason, then yes.

4        Q.   What is that reason?

5        A.   Well, I have concerns about the ways in

6   which the treatment effects of voter ID laws on

7   voter turnout have been estimated in the extant

8   literature.

9        Q.   Have you -- you've published your own

10  study on the treatment effect of voter ID laws.

11  Correct?

12       A.   Long ago.  We looked at that policy

13  report.

14       Q.   But it wasn't published in a -- in a

15  peer-review journal.  Correct?

16       A.   That's correct.

17       Q.   And it showed a before and after look at

18  Indiana's photographic voter ID law.  Is that

19  correct?

20       A.   It did.

21       Q.   And it looked at 2002 and 2006 election

22  data?

23       A.   It did.

24       Q.   What is a historical confound?

25       A.   I know what confounding means.  You're

JEFFREY MILYO, PhD                                    8/26/2014

302

1  using a particular term of art that -- I don't know

2  that I've used that description.  Do you want to

3  give me a synonym?

4              MR. KEISTER:  Counsel, we've passed

5  seven hours, so if you want to wrap up this last

6  question.

7              MR. FREEMAN:  Counsel, we've wasted

8  many hours based on the dilatory --

9              MR. POSNER:  We should probably

10 discuss this off the record.

11             (Discussion off the record.)

12             MR. FREEMAN:  I'm going to state on

13 the record that the dilatory practices of this

14 witness have wasted an incredible amount of time in

15 this deposition, and the refusal to answer basic

16 questions have wasted multiple hours.

17             Moreover, the Rules clearly

18 contemplate that in depositions where there are

19 multiple parties or a particular witness addresses

20 numerous issues, that the parties should be free to

21 agree to a longer period of time.

22             I'm going to specifically request, as

23 a courtesy to counsel who has waited on the phone,

24 that at a minimum, we give ten to 15 minutes to that

25 counsel so that she will have an opportunity to ask

JEFFREY MILYO, PhD                                    8/26/2014

303

1   her questions.

2              However, I will request to leave my

3   own questioning open.  And I will be going to the

4   Court with this.

5              MR. KEISTER:  Okay.

6              MR. FREEMAN:  Because there's

7   absolutely no way that we should be limiting this

8   particular deposition, given the conduct that has

9   occurred here, to seven hours.

10              I would specifically request that we

11   allow counsel who is on the phone to get her 15

12   minutes as a professional courtesy, as a separate

13   matter.  I think that that's a reasonable thing.

14              MR. ROSENBERG:  And we obviously

15   support this.  I think it was clear, and if anyone,

16   particularly a judge looks at the transcript of what

17   occurred here, I think that there will be very

18   little doubt that this deposition will be continued.

19              But I certainly urge you to allow

20   counsel who has been on the phone to take her 15

21   minutes and ask the questions.

22              MR. KEISTER:  Let me just state, I

23   disagree with your characterization.  I think

24   Dr. Milyo has answered the questions that's come to

25   him fully and accurately.

JEFFREY MILYO, PhD                                    8/26/2014

                                                           304

 1                And as much as I normally would agree

 2    with professional courtesy, we've all got to get to

 3    Corpus Christi and I'm going to call this

 4    deposition.  So that's -- I'm sorry, but --

 5                    MR. FREEMAN:  Mr. Keister, I --

 6                    MR. KEISTER:  I'm sorry, I've got to

 7    go.

 8                    MR. POSNER:  Well, before -- I don't

 9    know --

10                    MR. KEISTER:  That's it.  We're going

11    to read and sign.  We're done.

12                    MR. POSNER:  The person on the phone

13    would like to speak.

14                    MR. KEISTER:  The person on the phone

15    can speak, but I'm calling the depo at seven hours.

16                    MS. FARANSSO:  Yeah, I would just

17    reiterate what Mr. Freeman said, and say that we

18    would like to reserve our opportunity to ask

19    questions at a later time.

20                    MR. FREEMAN:  Mr. Keister --

21                    MR. KEISTER:  I'm sorry.  I've got to

22    go.  I've got stuff to do.

23                    MR. FREEMAN:  We all have stuff to

24    do.  I understand that.  However, I don't think you

25    can deny that there are basic, simple questions that

1  this witness has refused to answer in a direct

2  manner.

3                    MR. KEISTER:  No, I --

4                    MR. FREEMAN:  And that that has

5  wasted an incredible quantity of time.  We are going

6  to waste time here.

7                    MR. KEISTER:  I don't agree with

8  that.  But, guys, I'm not --

9                    MR. FREEMAN:  Do you want this record

10 read to the Judge?

11                   MR. KEISTER:  Yes.  I'm not going to

12 change my opinion.  I'm going home.  I've got to

13 pack, I've got to take dogs to the kennel.  I've got

14 to get ready for tomorrow's hearings.

15                   We've done seven hours.  It's been

16 fun, it's been full.  He's answered every question

17 that's come to him, and we're off the record.  He'll

18 read and sign.  Thank you.

19                   MR. FREEMAN:  Tania, I personally,

20 deeply apologize for what's happened.

21                   MS. FARANSSO:  I appreciate it.

22 Thank you, Dan.

23                   MR. ROSENBERG:  We're off the record.

24                   (Deposition adjourned at 6:30 p.m.)

25                          -oOo-

JEFFREY MILYO, PhD                                    8/26/2014

306

1                    CHANGES AND SIGNATURE

2  RE: PEREZ v. PERRY

3  WITNESS:  JEFFREY MILYO, PhD

4  PAGE/LINE     CHANGE          REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20       I, JEFFREY MILYO, PhD, have read the

21 foregoing deposition and hereby affix my signature

22 that same is true and correct, except as noted

23 above.

24

25            _____

JEFFREY MILYO, PhD                                    8/26/2014

                                                            307

1                    REPORTER'S CERTIFICATE

2   STATE OF TEXAS   §

3   McLENNAN COUNTY §

4         I, Melody Reneé Campbell, Certified Shorthand

5   Reporter in and for the State of Texas, do hereby

6   certify that the foregoing deposition is a full,

7   true and correct transcript;

8         That JEFFREY MILYO, PhD, the witness

9   hereinbefore named, was duly sworn by the officer

10  and that the oral deposition was taken by the

11  officer in machine shorthand on AUGUST 26, 2014, and

12  is a true record of the testimony given by the

13  witness;

14        I further certify that the signature of the

15  deponent was requested and is to be returned within

16  30 days from date of receipt of the transcript.  If

17  returned, the attached Changes and Signature Page

18  contains any changes and the reasons therefor;

19        That $ _____ is the deposition

20  officer's charges for preparing the original

21  deposition transcript and any copies of exhibits,

22  charged to THE UNITED STATES OF AMERICA;

23        I further certify that I am neither counsel

24  for, related to, nor employed by any of the parties

25  in the action in which this proceeding was taken,

JEFFREY MILYO, PhD                                    8/26/2014

308

1    and further that I am not financially or otherwise

2    interested in the outcome of the action.

3            Subscribed and sworn to on this the 28th day

4    of AUGUST, 2014.

5

6

7            _____

     MELODY RENEE CAMPBELL, RMR, CRR, #38267

8    U.S. LEGAL SUPPORT, INC.

     CRCB Firm Registration Number 344

9    701 Brazos, Suite 380

     Austin, Texas  78701

10   512.292.4249

     512.292.3866 (Fax)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   JOB NO. 4-AUSTIN-168243

JEFFREY MILYO, PhD                                    8/26/2014

1

**A**

**$15,000** 58:18 59:2,5
**$25,000** 59:16
**$3** 157:10,15,17
  158:1
**$400** 58:17,23,24
  60:9
**$5** 271:17,20 272:8
  272:11 273:4,12,15
  273:19 274:4,5,7,10
  274:14 275:24
  276:14
**$6,000** 52:22
**$65,000** 60:10
**$8,000** 52:22
**a.m** 1:20
**ability** 12:18 109:11
  128:17,18 136:4
  154:13 158:4
  175:24
**able** 9:7 71:6 137:19
  138:22,25 139:20
  140:12 141:1
  154:25 158:9 167:2
  176:1,3 182:19
  183:1 186:16
  188:11,18,25
  191:24 217:10,16
  221:4 229:11
  231:12 234:15
  251:8 254:21 255:3
  287:24 290:3
**above-styled** 1:19
**absence** 261:18
**Absent** 5:14
**absolute** 281:18
**absolutely** 22:6 64:15
  253:10 303:7
**absorb** 168:3 171:9
**abstract** 116:14
  119:4 279:13
**academic** 16:6 17:9
  21:16 22:12 23:5,8
  44:15 50:15 62:20
  128:14 146:5 148:8

**accept** 28:21,22
  153:14 264:13
**acceptable** 252:14
**accepted** 28:15 57:3
  149:14 150:3
  151:24 179:6,10,14
  242:21 243:5,9,15
  243:19 263:12,16
  264:7,14 279:6,10
  279:14,25
**access** 47:15 155:13
  155:22 156:1
  190:14 193:25
  194:5 263:5 264:3
**account** 174:11
  228:13 241:5
**accounts** 149:20
  150:14
**accuracy** 60:18
  143:24 259:21
  260:4,25 261:13
  266:12 267:12,16
  268:3,10,14
**accurate** 59:2 62:23
  62:25 100:20
  126:17 143:23
  171:12 177:10
  178:8 192:19
  194:19 195:3,6,8,21
  196:1 205:1 211:13
  216:17,19,21 221:7
  250:22 259:2 264:7
  271:6 292:19 296:9
**accurately** 9:8 63:1
  96:18 98:23 192:20
  194:8 227:12
  303:25
**achieve** 88:5
**acquire** 257:22
  286:13
**acquiring** 293:2
**ACS** 123:15
**action** 1:5 116:19
  307:25 308:2
**actions** 107:1 153:2

  153:19,25 155:18
  205:23
**active** 228:11,20
  229:3 230:7,11,18
**activities** 151:2
**activity** 15:21,23
**actual** 56:25 169:5
  170:18 217:11,17
  217:23 218:6,12,16
  220:12 221:5,7
  223:3 224:25 225:8
  227:10,19 236:14
  240:14 253:17
  255:21
**add** 90:9 136:6
**added** 143:14
**addition** 240:18
**additional** 108:14,15
  142:25 143:1,3
  156:8 172:3,5 173:8
  173:9 174:11
  191:25 192:23
  195:2,20 196:9,23
  205:10,14,17
  207:23 209:1 210:5
  212:21 213:2,20
  238:1,2 246:1
  252:23 281:23
**address** 109:25
  128:17 186:1 235:9
  236:2,6,11,17 237:2
  237:8,9,16,21
  239:17 264:25
**addressed** 110:17
  268:23 269:19
**addresses** 302:19
**addressing** 169:16
**adjourned** 305:24
**adjunct** 282:15
**adjustment** 94:6
**administration**
  276:18,25 291:1
**admit** 157:10 165:14
**Admittedly** 132:24
**Ado** 5:1 190:3

**adopt** 150:20
**adoption** 284:13
**advance** 56:25
**advise** 33:1
**Affairs** 51:10
**affect** 4:17 5:8 70:9
  70:17 279:20
**Affidavit** 5:6
**affiliation** 118:12
  119:17
**affirmative** 116:19
  197:4
**affirmatively** 142:2
**affix** 306:21
**afraid** 296:25
**African-American**
  210:25
**African-Americans**
  79:21
**afternoon** 247:10
**afterward** 136:1,3
  207:10
**age** 94:7,12,21,25
  95:1,6,7,12,20
  96:11 125:7,13
  249:16 256:20
**aggregate** 56:3
  124:18 212:14,17
  212:18,19,22
  213:15 271:1,6,8
**aggressively** 212:4
**ago** 14:8 15:6 56:13
  57:7 89:3 128:7
  170:3 178:14
  191:21 255:21
  301:12
**Agraharkar** 2:10
  6:24,25
**agree** 33:17 46:5
  90:13 98:17 123:19
  149:13 151:7 153:5
  153:11 154:18
  155:5 158:14
  159:24 178:1 181:8
  194:16,22 195:7,16

JEFFREY MILYO, PhD                                    8/26/2014

2

| | | | |
|---|---|---|---|
| 196:6 203:11 205:5 | ambiguity 113:8 | 209:23 212:5 | 231:1,7,17 236:5,23 |
| 205:10 210:14,20 | ambiguous 94:4,10 | 213:11,21 238:7 | 240:9 244:25 250:7 |
| 211:4,14 212:20 | 94:21,25 98:14 | 240:8 253:13 254:3 | 251:22,25 252:13 |
| 213:6 215:25 216:8 | 145:22 146:9 | 258:1 266:7,10 | 252:24 264:20 |
| 216:16 218:5 | 147:15 273:23 | 267:14 268:1,7,21 | 269:12,19,22 |
| 219:11 222:4 | ambiguously 274:1 | 269:16 279:3,19,22 | Ansolabehere's |
| 226:17 228:11,17 | ameliorated 153:2,19 | 298:15 299:22 | 162:17 163:1,12 |
| 230:17 235:15,17 | 153:25 | analytical 255:11 | 165:2 174:10 |
| 237:6,12 239:13 | amelioration 155:17 | analyze 79:7 148:17 | 175:10,17 176:4 |
| 242:4,8,17,21 243:3 | 156:5,13 | 176:2,3,22 177:13 | 196:8,12,13 197:14 |
| 255:17 263:11 | amend 254:5 279:16 | 190:13 | 197:22 198:2,12 |
| 270:3,25 271:5 | amended 4:19 128:2 | analyzed 66:13 149:1 | 200:20 210:15 |
| 274:13 275:21 | Amendment 73:18 | 180:20 181:9 | 228:23 229:8,10 |
| 279:1 285:14 286:9 | AMERICA 3:2 | 183:13,24 210:21 | 232:20 236:25 |
| 286:19 287:5 292:8 | 307:22 | 211:5 228:18 229:2 | 237:5,14 238:24 |
| 292:24 293:6 | American 1:17 2:2 | analyzing 65:7 | 239:2,15 240:8 |
| 294:23 295:7 296:6 | 50:8 62:21 63:11 | 177:21 228:11 | 241:1 249:24 |
| 297:8,18 298:21 | 70:25 243:25 | 230:18 | 250:25 251:7 |
| 299:14 300:15 | Americas 2:12 | and/or 85:6 | 253:13 254:2 |
| 302:21 304:1 305:7 | amortization 159:7 | Anglo 210:24,25 | 264:25 265:17,22 |
| agreed 111:9 123:2 | amount 73:12 226:1 | 271:18,21 272:9,12 | 267:22 268:4,18 |
| agreement 59:4,10 | 226:10,13 250:12 | 272:22 273:2,13,18 | answer 8:12,19 12:2 |
| ahead 30:23 90:9 | 302:14 | Anglos 253:15,15,21 | 13:15 17:18 25:16 |
| 112:21 139:11 | analyses 62:11,16 | 254:8 275:24,25 | 29:3,19 30:8,21,23 |
| 217:3 257:16 | 147:24 235:20 | 298:3,8 | 45:24 48:9 70:5,13 |
| Aid 3:15 | analysis 4:23 53:17 | anomalies 214:9 | 71:4 76:20,20,22 |
| al 1:3,7 2:19 3:9 | 53:18,20,21 62:6,22 | Ansolabehere 5:5 | 78:7 82:5,11 83:5 |
| 227:9,18 | 63:12 64:8 67:18 | 38:4 40:13,22,23 | 85:17 88:23 89:10 |
| alcohol 46:14 | 69:21 70:14,21 71:6 | 67:1,14,25 161:21 | 89:19 95:12 96:20 |
| Aldredge 279:23 | 73:3,16 77:1,2,24 | 161:24 162:1 172:3 | 98:10 101:3 102:12 |
| algebraically 278:2 | 79:1,25 80:14,18 | 172:7 173:7,13 | 106:12 108:5,6,21 |
| algorithm 237:1,14 | 93:3,5,14,16,22 | 174:17 176:14 | 109:3,8,12,13,14 |
| 239:15 | 124:20 142:23 | 177:7 194:6,18,24 | 119:1 122:14,21 |
| alive 186:1 | 144:13 145:25,25 | 195:1,4,18,22,25 | 134:12 135:17 |
| allow 80:18 303:11 | 146:22,24 147:25 | 196:17,23 198:19 | 140:19 141:25 |
| 303:19 | 173:8 174:20 175:7 | 199:12 200:17,24 | 142:4 149:23 150:1 |
| allowed 76:19 | 175:11 176:4,7 | 201:2,23 202:3,25 | 155:6 162:23 167:3 |
| aloud 105:14 | 177:19 178:21 | 203:12 205:18 | 188:2 194:21 197:4 |
| alternative 218:18 | 184:3 186:11,16,19 | 206:6,15 207:25 | 199:1,6,21 203:23 |
| 219:12 257:8 | 186:22 190:16 | 208:20 209:2,9 | 204:23 207:12 |
| Alvarez 5:11,12 | 194:25 195:12 | 210:7,21 211:5,8,16 | 217:2 249:15 254:5 |
| 294:10,23 295:18 | 196:14 197:10,11 | 211:22 213:12 | 271:24 272:16 |
| 295:25 296:19 | 199:13 201:10,12 | 214:11 217:9,15,21 | 274:20 276:6,12 |
| 297:6 298:13,22 | 202:6,10,15 205:12 | 218:5,17 220:13 | 278:17 285:17 |
| 299:15 | 205:16 208:15,17 | 228:17,22 229:1,19 | 288:4 290:8 302:15 |

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

JEFFREY MILYO, PhD                                    8/26/2014

3

305:1
**answered** 21:22 69:8
82:11 88:25 102:6
170:20,25 171:5
175:20 198:4,22,24
198:25 199:1,3,15
199:19 201:25
204:16 234:19
303:24 305:16
**answering** 46:10 48:7
48:8 119:11 121:23
172:22 234:8
240:22
**answers** 31:1 92:16
92:17 113:11,20
134:16 139:19
140:11 141:6,20
145:15,22 146:9
217:5
**Anthony** 278:1
**anybody** 42:15 77:25
**anyplace** 57:22
133:25
**anytime** 46:3 172:13
**Apart** 76:9,10
**apologies** 142:10
**apologize** 16:5 42:11
99:15 125:16
195:14 297:3
305:20
**apparently** 126:16
**appealed** 279:5
**appear** 62:11 169:15
**appearance** 36:13
**appearances** 6:2,20
**appeared** 143:14
146:21
**appears** 9:21 10:9
12:16 98:19 109:6
112:24 139:14
143:18 186:7 212:5
296:25
**appendices** 164:1,11
165:13,14,18,19
231:20,24 232:13

232:15,17,21
233:15
**appendicis** 162:13
163:22 231:22
232:22
**apples** 270:11
**apples-to-apples**
287:2
**applicable** 70:15
**application** 73:9
299:11
**applied** 64:21 69:25
73:17 147:3 225:24
298:22
**applies** 227:23
**apply** 115:2 120:14
154:15 161:6
225:22 245:24
249:13 251:13
253:9 288:8 290:21
291:18 292:4,10
293:1,8
**applying** 225:25
299:14
**apportion** 157:9
**apportioned** 158:13
**appreciate** 12:10
207:12 305:21
**approach** 5:12 147:2
149:6 299:25
**appropriate** 107:6,10
108:20 109:17
**approval** 50:21
**approximately** 60:24
61:6,11 189:9 228:4
232:1
**approximates** 109:23
**approximation** 61:7
**April** 9:13
**archive** 133:14
**area** 23:6 51:15
55:15 61:16 62:19
63:1 65:7,19 70:25
88:11,12 96:17
**areas** 33:10 43:17

47:6 69:8,19,20,24
70:1,15 178:25
234:6
**argue** 184:18
**arguing** 277:6,22
**argument** 87:12
88:13 105:6
**Argumentative**
210:2 216:25
229:16 289:12
290:6
**arguments** 65:25
78:21 81:7,17 87:9
88:1,17 116:25
169:17,18 270:21
**arrive** 224:22 225:6
**arrived** 244:25
**arriving** 227:7
**art** 302:1
**article** 47:9,15 49:2
64:9,14 66:9 71:10
103:20 116:8,24
117:3,4,5,10,12,21
118:5,6,11 122:19
122:20,24 124:10
124:12,20 125:1
180:24 187:9,19
188:3,9 189:13
190:8,18,22 191:1,6
191:12,15 192:1,4,6
214:11,13 218:4
219:15,17 243:24
244:5 294:10 300:9
300:11
**articles** 35:7 47:7,10
48:4 73:8 115:24
116:1 128:14
244:11
**articulate** 241:10
**articulated** 278:1
**artificially** 241:4
**ascribe** 28:11
**asked** 27:12 30:18
31:6,7,10 48:12
62:4 68:6,9 78:19

82:10 85:4 100:22
101:7 113:4 114:18
115:3 132:7 170:13
170:15,23 175:19
178:13 198:3,22,23
199:3,15,18 200:13
204:15 207:13,14
208:8 231:10
234:18 236:3,4
245:21,22
**asking** 34:1 37:9 43:8
44:21,23 49:21
53:25 54:13 57:6
59:7 62:1 64:13
66:4 69:18 72:24
77:18 78:1 79:4
83:7 86:15 93:6
100:9 103:5,24
113:8 121:18 129:9
139:25 146:11
154:20 156:8
172:18 186:14,15
187:11 188:4 189:6
197:18 198:16
199:5,6 202:12
203:22,23 216:21
220:7 224:2 229:19
230:6 239:6 245:23
245:25 259:24
260:18,23 277:17
287:1,11,21 288:7,8
294:4
**asks** 95:20 100:14
101:11 128:20
140:2
**aspect** 50:19
**aspects** 74:17 85:4
291:2
**assert** 177:12 181:16
182:1 184:12
193:20 194:17,23
195:17 217:8
249:23 264:19
270:17 275:6
**asserted** 250:4

JEFFREY MILYO, PhD                                  8/26/2014

4

**asserting** 195:5
**assertions** 195:7
**assess** 174:16,18
  175:16 189:15
  190:10,20 191:3,10
  236:25 268:3 276:4
  298:23
**assessed** 191:11
  237:3
**assessing** 276:7
**Assessment** 5:3
**assessments** 191:18
**assignment** 174:1
**assistant** 17:9,11
  21:15,17 22:11
**associated** 52:3,4
  149:19 150:7
**Association** 50:7,8
  54:11
**associations** 64:17
**assume** 39:1 99:23
  101:9 132:1 136:13
  151:3 214:23
  227:22
**assumed** 258:8,22
  259:13
**assuming** 152:18
  216:6 278:18
**assumption** 228:3
  300:1
**attached** 13:1 182:10
  185:10 187:3
  307:17
**attainment** 297:21
**attempt** 79:7 99:21
  201:8 212:3 214:21
  214:25 226:12
  236:20 253:12
  267:21
**attempted** 153:21
  192:8 261:17
  267:11,15
**attempting** 201:4
**attention** 32:10 53:7
  58:10 100:18

126:25 127:4
**attitudes** 117:1 118:2
**Attorney** 3:10 12:12
  13:9 42:22 172:17
**attorneys** 33:3
**attributable** 156:21
  157:3,11,19 220:8
**attributed** 43:24 44:2
**August** 1:11,19 11:12
  11:16 22:18 161:16
  161:22 162:11
  163:8,20 164:20
  165:21 166:16
  167:10,16 172:4,8
  172:11,13 174:5
  175:6 176:15
  182:13,18 194:1,7
  196:24 200:7,8
  257:9 307:11 308:4
**Austin** 1:24 2:8 3:11
  3:16 308:9
**authored** 64:25
**authors** 177:18
**automobile** 149:17
**availability** 33:6
**available** 87:8 123:16
  123:17 192:12
**Avenue** 2:12,15,21
  3:4
**average** 288:16
  290:20 292:9,23
  298:9
**avoid** 122:17
**award** 283:15
**aware** 153:23 154:3
  154:14 158:20
  159:3 172:24 173:6
  177:7 178:24 187:6
  189:12 190:17,21
  190:25 191:5,8,13
  192:2,7,11,13
  197:14 213:22
  215:14 244:17
  247:3 283:11,13
  288:24 290:15

**awareness** 179:4,8

**B**

**B** 4:6
**back** 9:15 17:5 24:23
  27:19 30:25 31:5
  34:20 43:3 52:20,25
  53:10,12 72:20
  88:23 89:2 94:18
  102:13,17 105:24
  113:7 114:13
  126:16 137:24
  141:19 152:13,14
  156:7 158:18,19
  167:2,22 170:11,12
  178:13 181:13
  182:14,21,23 183:8
  183:12 185:15
  191:20 193:12
  203:6 217:23 218:3
  225:16 229:7
  245:15 247:1,6,10
  248:16 250:2,16,24
  265:6 289:3 294:7
**back-and-forth**
  163:2
**background** 288:25
**bad** 76:7,16 77:23
**Bailey** 5:11,13
  294:11,23 295:18
  295:25 296:19
  297:6 298:13,22
  299:15
**bailiwick** 65:21
**ballot** 46:17
**ballpark** 54:20
**bank** 150:25
**Barreto** 4:21 35:11
  38:3 41:4,9 90:18
  90:24 91:12 99:21
  99:23 104:9 106:1
  108:19 109:10,16
  110:8,14,22 113:1
  121:2 122:4 123:12
  125:19 126:3,18

127:2 129:2,17,25
  130:24 137:5
  138:13 139:13
  141:17 146:22
  193:10
**Barreto's** 106:18,23
**Barreto/Sanchez**
  4:18 40:12 105:24
  130:17,19 131:4
  132:8 137:2
**barriers** 77:3
**Barry** 48:24 163:7
  167:25 232:12
**base** 18:13 228:2
  235:25
**based** 9:22 53:2,13
  55:2 60:2 61:4
  81:24 85:10 108:17
  119:8 125:4 144:22
  159:7 173:14
  174:19 175:2,11,11
  178:10 184:6
  190:13 193:16,24
  194:1,7 195:19
  199:12 211:9
  212:18 213:9,11
  214:13 253:7
  255:12,18 256:14
  257:22 260:17
  267:22 268:4
  269:13,24 281:2,4
  286:2 288:16 292:7
  292:16,21 294:4
  302:8
**bases** 177:23 241:10
**basic** 265:25 270:3
  287:11 302:15
  304:25
**basis** 13:14 59:25
  79:22 84:23 126:12
  150:12,17 162:19
  225:22 235:21
  236:4,4,9,14 237:22
  240:1 249:23
  266:16 267:3,7

JEFFREY MILYO, PhD                                    8/26/2014

5

**Bayes** 5:12
**Bazelon** 38:6 41:1
**bear** 159:12,18 160:7
  160:11,15
**Beaulieu** 4:17 118:6
**beep** 6:19
**began** 14:16 19:4
  23:10
**beginning** 93:23
  111:10 162:7
  183:12 231:10
**begins** 90:17 256:18
**begun** 17:8
**behalf** 6:3,8,23,25
  7:2 78:20
**behavior** 65:14,16
  69:22 159:7 244:7
  271:4
**belief** 115:10,11
  118:16 202:8,12
**beliefs** 4:12 102:23
  103:7 104:1 116:3
  117:1,14,23,25
  118:1
**believe** 7:19 9:10
  10:18 14:2,9 15:12
  15:19 17:21 18:25
  19:4,8 20:1 21:8,14
  22:16 23:7 24:21
  25:13,21,25 29:20
  29:23 30:11 32:5
  33:5,15 35:21 37:4
  38:10 41:12 42:10
  42:14 45:9 47:9,13
  51:19,20 52:2,5
  54:12 56:2,6 59:15
  60:6 66:10 67:1
  79:3,6,24 81:18,19
  82:21 83:20 86:19
  87:14 95:11,19
  97:24 104:2 110:24
  111:4 112:25 121:4
  121:8,25 122:23
  123:17 125:3
  126:15 128:5 131:6

135:24 136:1 141:5
  145:12 149:3,7
  150:9 152:6,15,23
  155:7 156:17
  157:14 158:12
  159:9 160:4 163:15
  166:7 168:16
  171:17 172:1 180:1
  183:11 185:22
  187:5 190:14,15,24
  193:4,5,8,10,15
  196:21,25 200:9,24
  201:15,23,25 202:4
  202:13,16 205:3,18
  205:22 206:9 207:6
  208:3 210:18 211:7
  211:12,17,20 212:1
  212:24 213:1,19
  219:2 221:3,12
  222:14,24 224:19
  225:13,21 227:21
  230:21 232:18,23
  232:25 233:19,22
  233:24 234:2,25
  235:5,14 236:5,12
  237:17,23,24
  238:23 240:1,12,17
  241:15 244:12
  245:5 248:2,6,11,16
  248:19 249:10
  250:10,17 251:12
  251:23 252:2,6,9,22
  256:4 258:14,16
  259:8 261:4,14
  262:7,20,25 264:22
  265:2,3,24 266:8,11
  266:15,23 267:7,19
  268:22 270:10
  276:2 283:16 285:9
  285:23 286:4,6
  287:17,20 288:5
  289:13,22,25
  291:11 293:11
  296:10,13 297:24
  298:5 299:6 300:11

**believed** 258:13
**benefit** 118:23
**benefits** 44:16 65:20
  65:24 69:22 73:4
  154:8,9 158:3
  279:20 280:8
**Bernstein** 227:9,17
**best** 8:15,17,22 14:9
  14:25 15:25 17:11
  19:1 31:15 32:19
  43:7,13 48:23 54:8
  56:4 57:7 58:8
  60:19 61:4 72:14
  74:11 111:19
  128:16,18 135:18
  136:4 141:17
  162:17 165:10
  253:20 254:7,20
  255:3,7,15,17,25
  256:2,4 259:14
  273:10 284:7,14
**better** 15:22 29:11
  46:21 102:15 105:9
  216:22
**beyond** 21:4 33:12
  62:18 169:23
  175:23 212:10
  217:5
**bias** 91:17 241:2,5
**biased** 91:11
**biases** 201:17 240:7
**big** 54:17 61:7 77:19
**bigger** 77:6,9,10,12
  77:13
**billed** 59:20,21
**billing** 59:25
**birth** 9:12 92:3,10,22
  92:23 95:2,9,17
  96:2 113:22 157:10
  157:18
**bit** 17:23 98:4
**black** 87:22 261:10
  274:4,5,6,9 276:14
  294:13
**blacks** 80:3,11 81:14

81:20 82:8,19,24
  84:9 156:15 253:16
  253:22 254:8
  284:15
**blame** 99:7
**blanking** 9:24
**block** 265:13 266:7
  295:13,21,22
**blurry** 125:16
**board** 104:21
**body** 45:25
**Bolsen** 4:15 117:4,6
**bolster** 116:25
**book** 8:7 54:5
**born** 9:13 92:5 97:13
  98:7 114:1
**borne** 156:15
**Boston** 23:6
**bottom** 25:7 87:1,2
  219:19 233:12
  297:19
**bought** 67:25
**bounce** 105:3
**bounced** 105:2
**bounds** 84:3 299:18
**box** 3:10 219:7
**Branches** 1:16 2:2
  6:4
**Brazos** 308:9
**break** 8:25 9:1 36:22
  36:23 73:25 102:3
  104:12 116:13
  134:25 135:4
  147:12 160:21,23
  161:10 167:13
  183:6 224:10
  230:15 256:25
  257:13,14 299:7
**Brennan** 2:11
**brief** 42:7,8,9
**bring** 19:13
**bringing** 155:9
**brings** 16:4 19:17
  21:18
**broad** 20:14 31:24,25

JEFFREY MILYO, PhD                                8/26/2014

6

39:10 49:18,24
69:24 70:24 106:10
**broadcast** 47:1
**broader** 271:14
**broadly** 20:3 43:20
43:24 44:12,16
45:12,18,19 63:18
70:14 71:13 84:8
208:17 209:3
263:10
**broke** 37:1 114:14
**broken** 155:14,24
**browse** 137:15
138:19,20,21
**Bs** 228:25
**budget** 20:8 46:23
**Build** 284:19
**bulk** 201:11 202:10
212:5
**Bullock** 5:4 180:10
180:14,24 181:16
181:21 182:1,8
183:10,12 184:12
184:23 185:8 186:6
189:13 190:9
**Bullock's** 186:9
187:7
**bunch** 228:24
**burden** 38:7 40:11
41:4 48:24 152:10
152:22 153:25
156:14,15 163:7,21
164:4,13 167:25
232:12 278:12
**Burden's** 232:13
**burdens** 65:18,22
66:2,5,9 287:23
**burdensome** 283:20
283:22 287:17
**Bureau** 215:3,11
**business** 290:7
**busy** 234:4 251:4
**button** 115:1
**buy** 67:17 157:15

**C**

**C** 2:1 3:1 278:6,9,13
278:19
**calculated** 269:12
**calculation** 277:8
**calculations** 133:8
144:7 249:25 250:9
267:22 268:4
270:23
**calculus** 278:1 279:8
279:14,24
**call** 7:10 9:17 42:7,8
42:9 74:12,13 123:1
145:22 147:15
180:2 212:13 304:3
**called** 8:7 41:13
67:24 72:7 191:22
211:23 298:15
**calling** 30:16 304:15
**calls** 7:13 83:2 155:3
272:15 273:21
274:18 287:8 290:6
293:9
**Caltech/MIT** 5:10
**campaign** 46:11
73:12,15
**Campbell** 1:21 307:4
308:7
**candidate** 119:9
**candidate's** 118:23
**candidates** 20:24
84:11
**cap** 59:10,15,16
**capable** 237:1,14
239:15
**capacity** 27:2
**capital** 102:1 154:6
**capitalized** 79:9
**capture** 220:11
237:20
**captured** 238:18,25
**captures** 48:21
**capturing** 220:16
**car** 150:6 151:9,14
152:1 155:13,14,22

155:24 156:1,1
**card** 173:10 181:19
184:15,21 282:2
**care** 78:10
**careless** 279:12
**Carnegie** 2:4
**Carolina's** 190:20
191:3,10
**carriage** 180:16
**case** 26:20,21 29:19
29:20,22,24 30:1
32:4,8,11,11,16
33:7,18 43:4,12
45:1 58:17,18,22
60:15 61:25 63:6,16
78:12 114:15 115:5
118:14 130:9
172:19,25 185:14
186:4 207:9 231:21
278:5 285:8 288:18
**cases** 25:22 26:13,15
26:17,19,21 74:16
143:13 147:15
**Catalist** 166:19 175:2
201:5 206:17,18,21
209:10 214:15
217:10,16 220:11
220:15 221:4 231:4
237:25 238:3,10
240:19 245:10
246:11 259:22
260:1,4,16,19,20,21
261:12,24 262:13
262:18,23 263:3,6
264:24 265:4,9,11
265:15 266:13,22
267:12,17,22 268:4
268:15 269:13,18
269:25 270:10
280:12
**Catalist's** 260:23
268:10
**catchy** 57:2
**categories** 145:8
231:2

**categorization**
240:19 270:11
**categorizations**
268:14
**category** 139:18
**Cato** 51:23,25 52:1,7
52:12,13,15,18 54:2
**Caucus** 1:17 2:3 6:5
**cause** 1:19
**caused** 286:15
**causes** 221:2
**caution** 41:20 172:14
217:6
**caveat** 136:5
**caveats** 106:14
135:17
**CCES** 66:23,25 67:3
67:16,19 68:12
122:18 262:18
**Center** 2:4,11
**certain** 15:4 40:16
115:5 144:5,12,23
163:25 168:12,14
168:19,21 183:3
249:11 250:22
251:15
**certainly** 39:2,5
42:24 49:11 51:22
64:20 84:19 116:11
119:21 140:15
156:2 231:22 299:8
303:19
**certainty** 20:9 79:21
80:10,19,23 156:13
197:12 249:15
**certificate** 4:4 157:11
157:18 307:1
**Certified** 307:4
**certify** 307:6,14,23
**cetera** 26:4 42:1 62:7
153:3,20 155:19
222:16 255:9 267:1
**chaining** 151:5,7,12
151:24
**challenge** 117:1

JEFFREY MILYO, PhD                                    8/26/2014

7

152:17
**chance** 135:3 149:8
277:21
**Chandler** 38:14,15
38:16 164:19 165:6
168:24 233:14
**change** 100:11,19
117:22,23 125:24
126:13,15 143:5,12
165:1,2 177:9
188:22 198:6 200:6
219:9 235:9 236:1,6
236:11,17 275:19
275:19,20 280:12
280:13,18,22
281:13 305:12
306:4
**changed** 58:23
125:25 163:14
166:1 174:13
192:24 195:13
196:1 213:13
250:14
**changes** 4:4 10:16,16
10:18,22 11:6,11
98:18,20,23 99:1,2
99:18,20 113:15
133:22 143:1,2,3,21
144:1 147:10
187:22 200:10
214:18 285:4,15
306:1 307:17,18
**changing** 117:25,25
**Chapman** 38:17
148:13,17 149:1
152:7
**Chapman's** 149:9
152:18
**characteristic** 139:9
**characteristics**
109:24 263:20,23
**characterization**
56:14 77:18 210:18
270:20 283:25
303:23

**characterize** 58:7
70:23 73:11 74:24
77:18 106:25 226:3
226:4 254:9
**characterized** 15:22
46:21 226:4
**characterizing** 73:16
101:17
**charge** 271:18 272:9
273:13 274:4
**charged** 307:22
**charges** 307:20
**charging** 271:17
272:8 273:12
**Charles** 190:17 191:1
192:2
**check** 9:22 92:19
127:19 133:19
139:19 140:11
141:2 145:25 188:1
196:5 206:16
250:24
**checking** 133:21
**Chicago** 23:19,25
24:6,9,11,13
**choice** 50:12,14,15
267:4
**choices** 149:21
150:15
**choose** 121:16,22
**choosing** 107:9 256:6
**chose** 119:25
**chosen** 147:1
**Christi** 1:2 304:3
**chronological** 37:8,9
**chronologically**
14:23,24 16:18 17:1
22:5 23:4
**chronology** 34:1
**circumstance** 153:7,8
293:12
**circumstances**
111:20 288:14
**citation** 188:22
284:22 294:17

**cite** 79:6 102:25
103:3,18 122:19
154:2,4 159:9 179:3
180:9 181:12
284:18,23 294:10
296:11,14 300:10
**cited** 91:6 117:5
124:14 128:15
148:10 154:16
177:8 189:17
223:12 227:21
228:6 240:13 283:4
284:21 294:5,18
297:2
**cites** 115:23
**citing** 222:8 245:22
**citizen** 125:13
**citizens** 5:8 92:6
97:14,22 98:9 114:2
125:8
**citizenship** 94:13
97:19 159:13
160:13,16
**city** 291:4,7,18 292:2
**civil** 1:5,25 2:15 73:9
73:17
**ck** 118:23
**claim** 86:22 104:3
177:9 191:5,13
193:2 194:10,11
211:12,20 218:22
237:17 241:12
244:12
**claimed** 141:5 211:22
250:11
**claiming** 77:21 177:8
192:18
**claims** 192:20 194:8
195:22 212:15
**clarify** 8:15 143:24
**classes** 49:25
**classification** 141:4
208:4 270:4
**classifications** 213:18
**classified** 65:8 125:19

141:23 142:1,15,16
**classify** 126:3,6
127:14,15 140:21
141:3,18
**Clay** 34:16
**clean** 41:13 113:7
137:5 209:22 212:4
273:10
**cleaning** 201:3 202:9
202:14 203:9 204:8
**cleanup** 207:24 208:6
208:10,11,19
**clear** 11:13 25:25
35:22 44:23 45:6
60:11 61:17 100:20
105:15 126:5 178:2
204:2,4 248:15
275:12 303:15
**clearly** 226:12 302:17
**click** 137:15 138:18
**clients** 6:7,15
**clock** 42:18
**closely** 146:21
**closer** 17:19
**coauthor** 54:6
**coding** 146:1 261:9
**coefficients** 263:1
263:19
**coffee** 161:11
**Cohan** 2:7 6:14,14
**coin** 155:11 197:1
**coined** 31:17
**colleagues** 104:20
**collecting** 18:15
**collection** 51:24
**colloquy** 89:4
**colon** 57:10,11
**column** 126:20
230:24 231:2,8
246:17,20,22
247:14
**combination** 209:16
297:11
**combinations** 208:21
209:1,19 210:6,6

JEFFREY MILYO, PhD                          8/26/2014

8

237:7
**combined** 227:15
**combining** 151:2
  223:11
**come** 30:13 41:5 60:9
  79:19 80:2,9,18
  81:11 102:13,17
  121:8 130:3 167:1
  280:5 284:19
  303:24 305:17
**comes** 27:3 62:3
  73:13 145:9 173:13
  226:15 289:5
**comfortable** 62:17
  99:5 119:3,19 217:4
**coming** 191:19
**comment** 45:5 78:21
**commentaries**
  279:18
**commentary** 54:8
**commented** 80:22
**commenting** 121:13
**comments** 79:24
  199:20
**commit** 263:25 264:6
**commits** 264:20
**committed** 191:22
  264:16
**Committee** 2:15
**committing** 264:10
  291:20
**common** 28:9
**communications**
  130:8 172:16
**company** 261:22,23
**comparable** 261:24
  262:13
**compare** 98:15
  125:22 131:14
  132:6 143:6 187:10
  194:20 287:25
**compared** 80:4,12,17
  156:16 227:9
  283:21 290:14
**comparing** 98:25

200:1 203:9 224:25
  225:8 237:25
  272:21 283:20
**comparison** 147:9
  270:12 272:20
  280:20 287:2,18
**compensating** 58:16
**compensation** 58:22
**competitiveness** 20:2
  20:4,12,14,18
**complete** 60:13 112:3
  122:5 195:23
  251:22 272:5
  285:18 290:13
**completely** 9:8 10:17
  30:22 88:25 112:2
  121:23 122:14,21
  144:6 199:23 203:6
  229:21 280:22
**completion** 23:10
**complexity** 122:6
**complicated** 105:14
  122:17 185:19
**comply** 136:2
**composed** 258:9,23
  259:11
**compound** 273:8
  290:19
**concept** 271:14
**concepts** 153:10
**conceptual** 195:12
**concern** 92:25 110:19
  112:5,6,9,11 114:24
  115:7,8 120:20
  122:11 125:4
  136:17 187:2,4
  196:2 234:7 235:21
  235:25 236:7
  240:14,19 259:21
  260:3 264:1 300:3
**concerning** 13:6
  90:18 254:16,21
  255:4
**concerns** 76:7 93:11
  106:5,25 208:22

211:3,11 213:17
  222:25 235:19
  245:24 250:5
  251:13 268:8,10,12
  268:16,23 300:5
  301:5
**conclude** 121:16
  300:17
**conclusion** 79:20
  80:3,9,18 81:3
  118:20 152:12
  281:2,3
**conclusions** 80:24
  81:2,11 123:7
  152:12
**concomitant** 158:3
**concrete** 121:15
**conditional** 255:25
**conditions** 155:19
**conduct** 80:14,17
  106:13,19,23
  202:20 268:2
  269:15 303:8
**conducted** 66:15
  106:1 173:7 179:13
  194:25 202:8,17
  268:6 269:22
**conducting** 202:10
  203:2,14 227:6
**conducts** 201:11
  202:6
**conference** 1:16 2:2
  6:3 50:1,2,3,12
  56:24 57:16
**conferences** 52:25
  53:12 54:18
**confidence** 13:16
  44:13 98:13 261:9
  269:25 270:11
  285:18 290:13
**confident** 22:10 43:9
  229:21 234:13
**confidential** 13:6,8
**confine** 62:8
**conflate** 66:24

**conflicts** 27:12
**confound** 301:24
**confounding** 301:25
**confronting** 116:25
**confused** 12:8,11
  274:21
**confusing** 90:11
  273:8 274:18
  290:19
**confusion** 125:9,11
**Congressional** 66:17
  66:24,25
**Connecticut** 14:13
**connection** 32:15
  74:3 93:16 105:21
  110:9
**connections** 154:7
**consequences** 70:20
**consider** 63:10,19,22
  64:3 65:9,11,13,15
  65:17 66:1,11 68:17
  69:1,6,15 70:2,8,16
  71:2 72:22,23 73:1
  84:9 87:8 88:16
  154:22 155:9,10,12
  159:22 280:18
  281:6,9
**consideration** 92:24
  140:20 144:20
**considered** 15:14
  48:16 64:12 88:13
  88:14 89:25 92:11
  93:5 146:9
**considering** 155:15
  237:9
**consistency** 101:22
**consistent** 80:7 86:21
  99:17 117:2
**consists** 228:8
**constant** 216:4,5,8
  271:25
**constitute** 265:4
**constitutes** 255:18
**constraint** 132:20,24
**constraints** 112:15

JEFFREY MILYO, PhD                                      8/26/2014

174:2

construed 63:18
71:13

consulting 18:12

Cont'd 3:1 5:1

contacted 32:14,22
111:10

contain 61:24 71:21
135:6 197:20,25
198:11 199:9
210:10 235:12
261:11 265:21

contained 80:15 86:5
106:6,15 107:15
192:19 196:8
205:23 237:7
259:20 260:3
264:22

contains 11:6 12:22
12:24 62:2,9 82:15
85:3 130:16 198:17
263:6 307:18

contemplate 302:18

contemporaneous
61:21

content 67:5 72:9

contention 266:16

context 53:17 63:3,24
76:13 83:9 92:12
111:18 120:10,16
151:11,16,22
157:22 159:20,20
182:15,24 222:24
223:15 236:12
242:2,24 256:5
262:1 281:1

contexts 264:3

continuation 266:23

continue 22:5 30:21
48:10 251:23 252:2
252:6 273:4

continued 19:14 23:9
303:18

continues 142:12
193:1 223:7

continuing 22:9,24
23:4 142:6 193:19
267:5

contract 59:11

contracting 18:17

contracts 18:16

contradiction 177:8

contribute 67:17

contributions 46:21
47:21

control 47:17 296:16

controlling 295:17
296:1

controls 70:22

conversant 71:6

conversation 32:25
33:9,17,20,23,25
34:7 42:17,20

conversations 33:3
42:21 43:1

convicted 221:17,22

conviction 222:2

Cook 4:15 117:6

cooperate 121:17,22

cooperative 66:17,24
66:25 67:16

copies 55:21 164:15
231:11 307:21

copy 9:21 11:4 12:16
13:3 36:17 112:24
113:4 137:4 164:22
165:24 167:1
179:22 181:2 183:9
190:2

Corporation 18:1,3
18:22

Corpus 1:2 304:3

correct 12:14 23:15
23:24 27:16 37:3
43:6 52:4 62:21
63:8 73:21,22 74:4
79:2,8,9,10,11,12
79:14,15,17,18,23
80:5 81:15 88:15
90:1,19 94:19 96:13

96:16,18 97:1,3,6
97:20 98:14 100:3,4
103:1,21 104:8
105:23 107:7,14
110:3 111:13
116:17 117:5,14,17
119:16 120:2,4,11
123:7 126:7,8,10,11
128:8,9,24 130:14
130:15,17,25 131:1
132:2 136:2,12
137:2,9,10,14
138:16 140:14
143:14,18 144:12
146:6 147:17,18
148:14 151:18
155:2,14 156:22
157:12 160:2
161:18,19 168:6
173:3 175:4,11,13
175:21 176:6,20
178:2 179:11,15,25
180:6,11,22 181:19
181:23 182:3,6,10
183:16 184:8,15,24
185:3,11 187:20
189:4,9 192:3 193:3
193:4,21 196:3,14
200:8 202:5,22
203:14,16 205:13
206:25 207:2,17
209:25 211:25
212:23 214:11,12
214:14 216:17,19
216:21 217:11,18
217:22 218:14,21
220:17 221:11
222:13 223:14
224:23 225:13
226:2,11 227:10,20
227:24 231:6 233:3
234:17 235:10
236:17 239:23
241:19 242:12
245:4 246:12,13,15

247:8,13,18,23
248:2,3,9,11,14,18
248:24 249:9
250:19 252:16
254:17 255:13
256:3,11,20 257:5
257:19,23 258:10
258:15,24 259:3,12
259:17,19 260:2,5
261:1,13 262:24
263:4,17,25 264:9
264:21 265:1,2,13
265:14,19,20,23
266:11,14 267:8
268:11,20 269:1,20
270:1 277:8,13
279:3,5,6,15 280:14
280:16 281:21
282:5,8,12,16,20
283:15,23 284:10
284:16,17 285:5
286:17 293:19
294:11 295:19
296:3,4,15 301:11
301:15,16,19
306:22 307:7

corrected 161:20,25
163:6,13 164:7,12
164:18,22,25 165:6
167:14 196:16
200:22 251:9 252:1
275:11

correction 92:1 162:4
165:3

corrections 9:23

correctly 195:24
263:17 267:24

correlated 239:22
241:8,13 266:14,19
267:8

correlation 84:12
240:2

cost 154:20 156:21
156:22 157:2,3,11
157:19 158:2,7

277:7 279:3 280:13
285:16 286:9,14,14
286:15,20,21,22
287:5,6 288:10,11
288:19,20 289:6
292:10,11
**costs** 44:16 65:20,24
69:22 73:4 149:4
150:21 153:1,18,24
154:24 156:20
157:1 279:20 280:8
280:22 281:14
285:20 286:2 288:1
288:23 289:1,14
292:22,25 293:2
**counsel** 36:20 130:8
130:10 200:16
219:14 257:12
269:7 302:4,7,23,25
303:11,20 307:23
**count** 126:16 203:15
204:1,14
**counting** 66:18
**country** 92:6 97:13
98:8 114:1
**county** 249:3 307:3
**county-Level** 4:23
**couple** 17:6 18:8 35:7
38:8,21,24 40:13
49:25 104:15 105:2
128:6 137:6 143:22
**course** 47:3 64:19,20
64:24 75:10,14
**courses** 45:19 282:15
282:17,19
**court** 1:1 8:4,21 13:4
26:4,9,12,24 27:1
28:16,21,24 29:1,4
29:6,7,16 30:17
45:21 303:4
**court's** 29:25
**courtesy** 302:23
303:12 304:2
**cover** 20:15 39:11
41:2 162:15,15

166:11,12
**covered** 147:4
**covers** 71:18
**coworkers** 155:19
**CPS** 227:15,18
**CRCB** 308:8
**create** 133:4 139:13
**created** 130:14 131:3
132:16 133:10
137:6 203:5
**creating** 199:16
**creation** 144:3
**credibility** 276:5
**critical** 201:14 212:3
**criticism** 90:23
106:11 107:17
108:3,7,10,18 109:3
109:6,15,21 110:2,5
110:6,13,20 111:21
223:17 260:18
266:5 277:25
**criticisms** 105:25
106:4,17 107:3,11
107:13,18,20,23
156:9 195:11 198:7
201:16 206:9 208:3
243:12 253:9,13
259:19 260:2
261:11
**criticize** 106:8,12
107:5 123:5,12
124:5 147:6 148:16
**criticized** 107:25
201:13 243:14
261:14
**criticizing** 148:25
199:2
**critique** 183:2 210:10
210:12 260:15,25
265:4
**critiques** 170:6,7
251:9 260:23
264:24 265:3,8,10
265:11,12,15,16,22
**cross** 282:17

**crossed** 234:3
**crosstalk** 158:23,25
**crowd** 54:19
**CRR** 308:7
**crunching** 105:20
**CSR** 1:21
**current** 56:7 74:25
75:14 112:7 188:4
192:20 196:14
213:22 214:4
226:21 245:19,25
251:10 252:22
**currently** 82:3
100:24 140:4
188:12 195:22
219:3,5
**curriculum** 233:16
**cut** 193:16
**Cutler** 2:20
**CV** 12:24,25 13:2,3
13:12,14 15:2 23:11
25:5 45:25 46:4
47:3,8 48:21,22
49:5,7,14,15,17,21
49:22 50:4 65:4
70:1 72:15 235:4
**CVAP** 123:13,15,16
123:19,20 124:5,6
125:2 227:3

---

**D**

**D** 2:3 4:1 26:5 87:9
277:7,15,24 278:3,6
278:9,13,22
**D.C** 2:16
**Dale** 5:6
**Dan** 6:8 161:4 257:10
305:22
**Daniel** 3:2
**Daniel.Freeman@...**
3:6
**Darn** 188:21
**Darren** 243:1,2,18,18
**data** 4:21 18:15 41:8
41:9,13 47:12 79:1

85:20 86:11 92:13
123:13,16,19,20
126:19 127:19
129:2,18,19,24,25
130:4,18,25 131:4
137:2,5,15 138:20
138:21 140:1
147:15,17 172:3,5
173:15,17,22,23
174:11,16,18,22
175:3,5,6,17 176:8
176:9,12,13 177:23
192:23 193:25
194:4,6,14,14
195:19,23 196:17
196:23 197:10
201:5 206:17,18,21
206:24 207:24
208:6,10,11,19
209:10 212:4
214:10,14 221:1
228:2 235:12,22,24
237:25 238:3,10,17
253:17 259:20
260:21 262:19,21
262:22 263:4,5
264:4 265:9 268:1,6
268:15 270:10
283:7 295:3 300:2
301:22
**database** 79:11,13
173:2 176:18,24
177:5 178:11,14,17
178:24 179:5,9,13
180:22,22 181:11
183:15 184:1,7
185:25 189:15
190:10,14,19 191:2
191:9 192:9 197:10
198:20 199:13
201:4 202:9,22
203:2,13,25 204:13
205:6 206:10
208:14 209:22,22
215:9 222:12,22

JEFFREY MILYO, PhD                                  8/26/2014

11

228:8 251:23
**database-matching**
  193:19 194:9
  200:25 201:24
  205:20 206:7
  208:12 236:7 239:1
**databases** 79:16
  176:24 178:19,22
  181:11 183:15
  184:1,8 206:24
  209:18,20
**datas** 299:25
**dataset** 35:10 132:3,8
  137:11 147:20
  148:3 172:7 177:17
**datasets** 137:4
  172:20
**date** 9:12,22,24 11:12
  11:15 14:14 32:17
  32:18,21 36:9,13
  43:8 58:17 141:2
  173:19 206:23
  207:1,15,19 247:10
  248:10 307:16
**dating** 21:8
**David** 11:2 34:14
**Davidson** 38:14,14
  38:16 164:19,21
  165:6,9 166:7
  168:24 169:19
  170:14 233:14
**Davidson's** 165:20,24
  233:16,17
**day** 142:9 168:9,9
  189:18 224:5
  229:17 290:23,25
  292:3 308:3
**days** 37:12 38:22,24
  39:2 128:7 307:16
**DC** 2:21 3:5 52:2
**dead** 217:11,17 218:6
  218:12,16,18
  220:12 221:5,7
**deadline** 174:4
**deadwood** 182:12,19

185:13,17,21,22,24
186:3,10,19,23
216:3,13 222:6,12
222:16,22 223:4,9
223:14,23 224:14
224:18 226:1,6,10
226:13 228:13
248:3,4,9,12
**deal** 77:6,9,10,12,13
  77:19 116:1 124:15
  202:6
**dealing** 48:19 49:2
**dealt** 49:20 50:19
**death** 215:15,22
**debatable** 123:21
**debate** 77:16,17
**decades** 17:6 20:7
  46:1 279:17
**deceased** 202:9,21
  203:1,13,25 204:12
  205:6 214:21,25
  215:4,6,11,23 216:2
  216:11 218:20
  219:13 220:10,11
  220:16,24 221:10
**Dechert** 1:23 2:4,7
**decide** 27:6 274:7
**decided** 271:16,19
  272:7,10 273:3,11
  273:14
**decides** 274:3
**decision** 27:14
**declaration** 4:8,9,10
  5:5 10:10,12 25:6
  60:7,19,25 61:22
  231:16,17,21
  232:11 233:14,21
  234:22,23 235:1,3
  256:18
**declarations** 231:12
**decrease** 156:15
**decreases** 294:24
**deemed** 13:8
**deeply** 305:20
**defendants** 1:8 3:9

3:14 6:17
**defense** 18:12
**defined** 248:6
**definitely** 57:19
**definition** 84:17
  153:14,15 204:20
  247:2,11 276:13
**definitive** 172:11
  217:4
**definitively** 108:2
  220:13 290:9
**degree** 79:20 80:10
  80:19,22 156:12
  282:4,7,9
**Delbert** 5:7
**deleted** 100:2,16
**deletion** 99:20
**Dellheim** 3:3 6:10,10
**demanding** 197:2,3
**demonstrate** 226:7
**demonstrated** 279:7
  287:16
**denied** 23:22,23
  24:10
**denominator** 244:18
  249:24 250:9,17
**deny** 304:25
**department** 3:3
  22:22 51:8 64:22,24
  173:1 221:16
  282:13
**depend** 63:24 151:11
**depended** 118:22
**Depending** 63:3
**depends** 70:22
  151:16,22 179:12
  207:3 242:24
  288:14
**depo** 304:15
**deponent** 307:15
**deposed** 7:16,21
  24:19 25:14,20,24
  26:8,11
**deposition** 1:9,14
  4:19 34:21,23 37:3

37:11 42:5,23 43:1
  113:5 128:2 231:11
  302:15 303:8,18
  304:4 305:24
  306:21 307:6,10,19
  307:21
**depositions** 302:18
**Dept** 3:20
**depth** 119:20
**derived** 196:12
  201:18 226:18
**describe** 51:21 53:20
  63:1 74:12 81:6
  93:17,18,18 94:2
  96:18 137:21
  150:22 156:14
  157:18 177:18
  182:7,13 185:7,14
  185:24 192:18
  193:2 210:23 213:7
  218:6 222:17 271:4
  271:8,10 281:15
  292:18
**described** 25:23
  26:14,18,22 62:19
  96:7 97:12 98:6
  112:2 113:11,20
  128:21 129:20
  131:9,21 132:17
  134:2 135:13
  137:12 139:23
  250:15 256:2,4
**describes** 202:13
  271:5 282:2 285:3
**describing** 63:4
  65:20 197:12
**description** 4:7 5:1
  41:21,23 93:21,22
  96:4 99:18 174:20
  226:20 271:7 299:5
  302:2
**descriptions** 63:17
  195:7
**deservedly** 283:15
**design** 68:8

JEFFREY MILYO, PhD                                    8/26/2014

12

designated 13:9 78:6
83:4 85:16 217:1
266:22 276:11
designation 265:18
designed 68:12
116:25
designs 67:19
desire 88:24 119:8
254:22 255:5 256:9
256:13 258:2
desires 150:24
destinations 150:24
detail 39:14,16,24
40:3,4,5,17,18,25
44:19 62:7 116:4
186:7 234:6 243:23
250:13
detailed 31:1 39:13
39:23 40:1 60:6
72:21
details 33:2 41:16,22
59:12 226:19
249:14
determinant 278:3
determinants 70:20
278:20,21 280:9
determination
255:12,18 271:1
determinations
99:12
determine 233:7
251:8 257:21 293:1
determined 256:8
269:11
develop 108:15
131:18
developed 131:16
development 225:12
devoted 34:3 60:15
diagram 292:7,21
295:4 299:13
diagrams 234:4
dialogue 275:16
dices 212:21
difference 80:7 96:14

270:5,7 276:15
281:18 284:6
293:18
differences 85:22,23
85:23 213:14
238:17 298:6,8
different 20:15 28:9
45:13,15 63:11,16
67:17 69:25 70:1,3
70:9 84:9,10,11
93:9,9,10 95:13
97:8 146:1,13
148:12 149:21
150:15 153:10
154:8,11,23 167:19
170:1 172:20
173:13 189:5 196:2
203:4,18,20 204:6
229:5 240:22
243:12,12 259:4
279:21 294:13
296:10,21 297:1
298:22 299:11
differential 149:21
150:14 270:24
differently 82:13
168:10
difficult 21:21 29:18
30:25 37:7 82:5
92:16 164:16
168:11 181:14
182:23
digits 283:2 285:5
dilatory 302:8,13
direct 305:1
directing 127:4
direction 90:4 155:20
156:5 216:7
directly 85:24 133:9
150:10 165:15
218:24 219:6
disability 94:7,12
249:12 250:1,8
disagree 300:21
303:23

discipline 68:20,23
69:12 242:22
279:15
discount 258:12
discourage 276:18
277:1
discrimination 73:2
81:13,20 82:8,19,24
discriminatory 86:17
87:5,17 88:9 89:7
89:16
discuss 69:3 104:20
148:20 157:22
176:2,4 186:3,5
222:5 280:3 288:6
302:10
discussant 55:23
discussed 56:2 80:21
86:19 105:9 160:4
190:12 241:12
260:21 279:16
292:18
discussing 62:17
92:12 161:15
214:10
discussion 33:4,5
54:4 66:5 69:21
71:22 73:4 90:18
147:13 160:25
167:6 183:20 218:2
219:18 223:6
238:24 268:22
302:11
dishonestly 119:12
disparities 236:22
240:9 253:14 263:9
265:18 267:13,18
268:19,20 269:23
disparity 175:2
210:16,23 211:8,18
213:8,16 228:18
229:2,13 230:10,19
231:2,5,8 236:21
245:7 246:6,9
disposed 26:3

disproportionally
80:4 258:9
disproportionately
87:21 258:23
259:11
dispute 26:3,8,11
84:24 150:11,12,13
150:17 151:23
152:4 160:5
disputed 150:18
disputes 25:9 152:6
disputing 151:12
disqualified 27:25
28:1
disseminate 55:18
disseminated 55:16
57:24
dissertation 67:10
distance 149:19
150:7
distant 286:3
distinction 177:20
distinguish 77:1
distracted 53:6
distributed 55:12,14
district 1:1,1 26:4
divide 158:7
DIVISION 1:2
DLS 79:11
doctoral 14:17,18
18:4
document 9:17 11:1
11:8 13:5 30:2,3
31:1,3 58:11 62:12
62:12 98:15,16,16
98:22 125:23
127:21,25 130:12
130:14 131:2,5,6,7
131:18,20 132:16
132:20 133:9,15
134:6,12,19 135:11
137:24 138:1,2,3,10
157:24 169:22
179:21 190:1 218:8
220:5 234:9 254:13

JEFFREY MILYO, PhD                                          8/26/2014

13

255:1 256:23
**documents** 9:16
61:23 128:6,10,11
128:20,25 129:16
136:5,20,22,25
156:20 157:2
159:21 197:8 293:7
**documents-relied-...**
41:14
**Doggett** 3:14 7:1,1
**dogs** 305:13
**doing** 8:18 13:23
16:13 18:2 19:25
20:9 21:10 39:12
47:4 61:22 69:19
77:24 93:14 131:23
148:5 158:2,12
174:19 177:18
191:25 205:4
218:19 219:12
220:9,15,22 221:9
273:10
**Dorr** 2:20
**dots** 291:23
**doubt** 303:18
**doubts** 93:11
**Downs** 278:2
**Downsian** 279:14,19
279:22,24 280:21
**dozens** 291:4,6
**DPS** 175:8,9,11,18
176:6,11 195:2,20
195:23 246:2
251:22 291:23
**Dr** 7:7 40:16 106:18
106:23 110:8,9,22
126:18,19 128:3
148:16 149:9 152:7
152:18 161:21,24
162:17 163:1,7,12
164:13,19 165:2,6
165:20,24 167:7,9
167:15,25 168:24
169:19 170:14
171:16,23,24 172:3

172:7 173:7 174:10
174:17 175:10,17
176:4,14 179:20
185:8,8 187:6,7
189:12,13,25 190:9
190:9,17 191:1
192:2 194:6,18,24
195:1,4,18,22,25
196:8,12,13,17,23
197:14,22 198:2,12
198:19 199:12
200:17,20,24 201:2
201:23 202:3,25
203:12 205:18
206:6 207:25
208:20 209:2,15
210:7,15,21 211:5,8
211:16,22 213:12
214:11 217:9,21
218:5,17 220:13
228:17,23 229:1,10
232:12,13,20
233:17,21 234:17
235:2 236:23,25
237:5,14 239:2,15
240:8,9 241:1
244:15,25 249:24
250:7,25 251:7,22
251:25 252:24
253:13 261:7
264:20,25 265:17
265:22 267:22
268:4,18 269:12,19
269:22 270:13
274:23 278:12,13
291:14,17,22
303:24
**dramatic** 280:13,19
280:25 281:9,11
**dramatically** 204:6
**drawing** 126:24
**drink** 34:25
**driver's** 94:5 131:9
133:3 137:22
138:15 139:5,16

141:2 142:13,18
173:1 181:18
184:14,20 192:9
290:1,3
**drivers** 102:24
**drop** 94:9 95:11
**drop-off** 122:23
**dropped** 123:3
147:14
**Drs** 108:19 109:16
110:14,22 121:2
123:12 148:13,25
182:8 183:10,12
**Druckman** 4:15
117:6
**duces** 128:2,7 131:21
132:18 135:8,14
137:13
**due** 186:23 222:2
285:15
**duly** 1:18 7:4 307:9
**dump** 197:8
**dumped** 197:13
**durable** 159:6

---

**E**

**E** 2:1,1 3:1,1 4:1,6
26:7 87:4,12
**e-mail** 130:3
**earlier** 36:9 39:2
57:25 63:5 90:21
91:7 104:16 161:4,7
248:6
**early** 46:13 47:8,18
48:4,5,15,15,19,25
50:22 163:15
**easier** 10:21 16:7,19
17:12 40:20 41:6
45:24 139:1 165:19
188:10
**easily** 41:5
**easy** 7:9 121:21,25
**ecological** 245:9
246:10 263:7,11,22
263:25 264:1,2,6,6

264:10,13,15,20,21
265:1,5,10,22 266:4
**economic** 46:18 71:5
**economics** 51:9 64:21
65:21 76:25 281:22
281:23 282:14
**economist** 45:2,7
63:7 281:21
**economy** 62:21 63:11
71:1
**edge** 17:20
**edited** 47:21 178:2
**editing** 133:22 178:3
200:10
**editorialization**
217:22
**educated** 258:8,22
259:10
**education** 2:19
258:18 284:9
292:25 293:2
295:17 296:1,16
298:1,3
**educational** 297:21
**effect** 5:10 107:12
108:3 111:22
118:21 176:22
177:13,21 178:5,7
180:20 181:9
183:13,24 236:21
238:21 253:12
267:11,16 283:10
294:6,13 295:19
296:2,15 299:16
301:10
**effects** 4:22 5:12,14
43:20,22 44:8,12
45:12,15,22 46:23
49:9 50:25 51:18
53:4 56:20 57:12
58:1 62:22 63:12
87:24 88:3,10,15
89:17,25 154:11
177:16 179:1
191:18 259:21

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

JEFFREY MILYO, PhD                                    8/26/2014

260:4 263:8 264:8
268:9 270:24
282:24 283:1,5,8,9
284:25 285:4,11
295:6 301:6
**effort** 149:15 150:4
245:1
**egregious** 181:22,25
182:2 184:23 185:3
185:6,8 187:4,5
**EIC** 152:11 156:21
156:22 157:2,4,12
157:15,20,25 158:6
158:10 290:22
291:7,18,24 292:4
293:1,8
**EICs** 290:15
**eight** 109:4 255:21
**either** 18:23 20:19
62:11 63:17 84:10
88:4 92:16 116:25
129:18 143:23
144:8 165:5 172:7
196:25 244:10
269:7 273:1 293:16
294:2
**elasticity** 281:12,14
281:15
**election** 4:17 25:9
66:17 71:3,8,11,12
118:14,15 207:3,5
271:2,17,19,21
272:8,10,13 273:12
273:14,18 274:5,7
274:10,11,13,16
275:14,22 276:17
276:25 282:21
285:2 290:23,25
291:1 292:3 301:21
**elections** 20:2,5,13
158:4,8 207:7,14,21
**electoral** 284:18,24
**element** 237:8,22
**elements** 237:2
**eligibility** 94:9 98:14

159:14 160:13,16
**eligible** 87:22 91:10
91:13 99:24 124:7
125:12 182:10
185:10 186:2 187:3
192:17 193:6,20
194:12 247:4
249:13 255:8
**eliminate** 240:8
**elimination** 268:17
**eliminations** 268:19
**Emily** 4:17
**emphasis** 28:13
**emphasized** 201:2
**emphasizing** 119:18
**empirical** 5:1,12,14
62:22 63:12 65:5,8
93:13 145:24
299:24
**empirically** 69:23
**employed** 91:12
166:18 211:15
258:5 280:3 307:24
**employment** 14:15
14:20 15:5,14 16:10
16:23 17:14,15
18:23,24 21:24 22:2
22:16,25 23:9,18
**endeavor** 151:1
**ended** 124:20
**ends** 88:5
**endurance** 8:24
**engage** 215:9
**engages** 74:15 215:19
**enormous** 175:23
**entailed** 288:10,11,19
288:20
**enter** 6:20
**entered** 133:8
**entire** 29:20 101:23
136:24 165:5
191:17 218:8 220:5
233:1 234:8
**entirely** 60:11 86:21
152:8,19 157:11,19

**entirety** 161:21
162:10 163:7,20
164:13,19 165:7,20
166:15 167:9,15
168:1,5,8,15,19,20
168:22,25 171:16
171:25 198:16
224:2 231:13,19
232:12,16,19
233:13,17,20,23,25
234:23 235:2
260:14
**entrepreneurs**
154:12
**envision** 63:3
**equal** 300:24
**equally** 12:10
**equations** 299:4
**error** 173:11 181:22
181:25 182:2,7
184:23 185:3,6,8
187:5 223:2 226:22
227:2 269:18 270:9
299:18
**errors** 201:17 216:6
266:22 267:8 270:4
**eschew** 241:21,24
242:7
**eschews** 241:18,25
242:10
**especially** 76:25
146:2
**Esq** 2:3,7,10,20 3:2,3
3:9,14
**essentially** 161:6
**established** 123:5
279:2
**estimate** 60:7,14,19
61:4 91:9,11,25
123:25 162:20
193:11,15 197:15
197:22 198:2,13
205:7 222:11,17,21
223:22 224:14,16
224:17,20,22,24

225:7 226:1,3,9,12
227:8 236:20
245:20,25 251:25
253:12,20 254:7,20
255:3,7,15,17,21,23
256:3,5,7 258:5
259:15 260:1,16,24
261:15,18 263:8,13
263:23 264:8
265:18 266:13
267:12,17 268:10
269:23,25 289:6
295:3 299:23
**estimated** 198:18
200:5 223:8 267:24
283:19 284:6,7,9
301:7
**estimates** 145:6
175:2 200:1 236:22
240:14 245:9,10
246:11,11 253:23
255:24 256:6
259:22 260:5
261:12,21 262:12
262:14,20 264:25
265:4,9,12,12,16
266:3 267:23,25
268:5 269:12,13,18
**estimating** 5:12
47:11 57:12 177:16
211:15 256:19
257:4
**et** 1:3,7 2:19 3:9 26:4
42:1 62:7 153:3,20
155:19 222:16
227:9,17 255:9
267:1
**ethics** 46:23
**ethnic** 70:3,10,18
73:20 82:24 258:9
258:23 259:11
268:14
**ethnicity** 94:11 126:4
126:5 127:16,17
208:5 213:14

JEFFREY MILYO, PhD                                    8/26/2014

239:22 240:20
241:8 262:15
267:24 269:19
**evaluate** 69:23
178:10
**evaluating** 65:24
**evaluation** 4:11 45:3
45:8,11 46:22 63:8
64:7 71:1 99:9
117:13
**events** 166:5
**eventually** 187:7,12
**evidence** 77:7,10
80:6 81:2,9 83:9
84:19 85:21 86:21
87:23 121:15 209:5
237:24 261:9
294:12 298:5
**evidenced** 270:12
**exact** 32:17 37:8,9
41:11 49:19 71:22
84:1 91:25 132:14
197:16 291:9
**exactly** 21:2,21 27:17
27:23 28:4,7,14,17
28:22 29:2 32:23
34:10 47:23 50:5,13
60:20 61:2,21 63:25
90:21 91:6 107:8
113:18 147:25
178:17 181:15
185:15,16 188:2
209:8 230:6 251:2,5
285:6 289:22
**exaggerate** 150:21
**examination** 4:2 7:5
161:1 184:6
**examine** 85:4 178:5
194:14 250:12
**examined** 46:8 83:8
176:11,13 229:12
234:5 243:22
288:22
**examines** 245:12
**examining** 149:18

150:7 176:22
177:14 178:5
180:20 181:10
183:14,25 188:6
243:25
**example** 44:7 79:8
115:23 130:22
131:25 137:20
141:3 144:24
150:25 151:15,18
154:9,19 155:1,12
159:24 174:23
199:24 225:3
235:14,16,18
236:10 291:8
**examples** 44:5,10,14
44:18,20,22 47:2
105:10 119:23,25
155:9 240:7 241:1
282:22
**exceeds** 227:19
**Excellent** 23:12
**exciting** 17:19
**exclude** 165:18 250:7
**excluded** 98:6,11
**excludes** 246:14
247:12,15,17
248:13 249:25
250:18
**excluding** 164:11
165:19 231:3
232:17,20 233:16
235:4
**excuse** 173:7 238:12
257:12 294:9
**exempt** 249:12
**exemption** 94:7
249:13 250:1,8
**exercise** 132:15
203:14 227:6
**exert** 33:18
**exhibit** 9:18 10:2,3,8
10:13,14,23,23,24
11:4,22 12:1,13,22
12:23 13:1 78:13

103:13,15 112:18
112:20 113:13
117:7 118:4 126:23
127:1,22,24 129:4,6
130:5,13 134:3,3
135:3,24 137:1
161:17 166:3
179:18,19 182:13
184:12 188:6
189:23,24 190:1
192:15 230:1,2
237:5 253:25
254:10,12 258:15
259:24 271:21
272:13 273:18
284:2,4 294:20,21
296:5 298:17,19
300:7,9,13,14
**exhibiting** 258:18
**exhibits** 5:1 307:21
**exist** 169:12 171:2
198:19 199:12
245:8 269:18
**existed** 175:2 283:6
**existence** 149:4
210:16
**exists** 120:6,7 179:9
210:24 228:19
**expansive** 145:10
**expectation** 123:22
171:6
**expected** 122:10
220:24 266:13
**expects** 93:13
**expenditures** 46:17
**experience** 45:14
81:25 85:10 122:18
152:10,21
**expert** 4:18 25:8 26:2
26:7,15,19,25 27:21
28:2,16,18 33:7,11
43:4,10 45:4 59:1,5
62:4 63:19,22 65:9
65:11,13,15,17 66:1
66:11 68:17 69:1,6

69:15 70:2,8,17,23
71:2 73:1 74:21
77:24 78:5,12,20
83:3,9,20 84:18
85:5,15 86:5 87:3
192:25 200:2
229:18 253:11
289:4 298:6
**expert's** 216:25
**expertise** 43:17 44:25
45:3,7 62:20 63:1,6
63:7,15,21 66:6,7
66:14 69:5,9,10,24
70:13,24 73:5,7
189:1
**experts** 37:24,25 38:1
38:20 41:5 79:2
80:1,23 81:8 85:22
150:20 155:8 165:8
172:20 192:18,21
193:5,18 194:9
197:9 270:17,20
278:5 289:13
**expiration** 141:2
248:11
**expired** 231:5 247:13
247:18,22,25
**explain** 123:10
126:12
**explained** 161:7
175:25
**explaining** 150:23
**explanation** 173:15
**explanations** 280:6
**explicitly** 88:12
**explored** 213:21
**express** 106:22
**expressed** 84:4
106:20 169:23
268:9 287:13
**expression** 151:4
**expressly** 95:7,15
**extant** 301:7
**extension** 174:4,7,9
**extensive** 203:12,17

JEFFREY MILYO, PhD                                    8/26/2014

203:24 204:12,18
204:22
**extent** 65:23 69:3
71:5 73:3 83:2
85:15 86:19 110:16
113:12 114:8 119:3
130:7 134:5,11
166:24 167:2
174:10 186:16
195:4 198:6 199:20
201:16 203:7 217:2
245:23 252:25
253:7 266:24
276:10 278:5
287:16
**extents** 76:11
**external** 176:24
180:22 181:11
183:15 184:1,7
**eyes** 125:16 234:2,3
**Ezra** 2:3 6:2
**Ezra.Rosenberg@...**
2:6

---

**F**

**F** 26:10
**faced** 275:22
**facilitate** 154:13
215:5
**fact** 11:6 31:22 76:20
116:22 117:18
119:11,13 120:15
125:6 209:24
214:23 215:13
223:10 237:22
248:8 250:7 256:2
267:4 269:22 272:5
283:14 285:3 298:3
**factor** 142:5
**factors** 122:7 156:4
277:5
**facts** 117:17,23
118:15
**factual** 41:19 103:6
103:25 104:7 115:4

115:10 116:3,16,19
267:7
**faculty** 23:7
**failed** 122:5 284:19
**failure** 186:9,18,23
251:21
**fair** 10:13 11:23 48:2
48:13 73:11 101:18
112:12 191:12,16
253:19 291:25
**fairly** 15:4 43:8 63:14
101:11,14,14 133:7
172:10 282:23
**fall** 14:16 15:12 16:4
18:25 19:4,8 21:13
22:9,13 285:24
**fallacy** 263:25 264:1
264:6,10,16,20
**false** 239:4 240:3
241:7,12
**familiar** 54:24 57:14
63:9 68:23 166:6
190:4 191:17
208:13 229:10
242:25 243:24
244:4,5,14 283:16
285:19,25 290:24
**familiarity** 69:5
244:16 287:13
**family** 258:17
**far** 8:19 111:23 292:1
**Faransso** 2:20 6:22
6:22 304:16 305:21
**fatally** 186:11,12,19
186:22
**fault** 160:1,7,9
**Fax** 3:6,17 308:10
**feasibility** 18:15
**federal** 1:24 20:8
25:9 26:4,8,12
79:16
**fee** 58:25 273:4,19
**fellow** 38:13 52:6,6
**fellowship** 15:13,17
15:20,24 18:24

19:21 22:19 23:5
**fellowships** 16:8,15
16:21 17:13 21:20
**felonies** 221:17,22
**felony** 222:2
**fewer** 79:21 290:16
291:10
**field** 64:12 173:10
**fields** 69:25 70:15
81:25 85:11 149:14
150:3 209:19 210:6
210:8
**fifth** 87:11 300:14
**figure** 125:24,25
126:1 194:2,8
196:11 225:7,22,25
226:18,23,24,25
246:14,16,17
247:12 248:13
291:22 299:3,3,19
**figured** 126:17
**figures** 124:16 195:5
196:6 224:25
240:16 244:25
257:23 258:4
295:10
**file** 41:11,14 113:1
128:13 136:6,9,14
137:2 213:25 214:6
215:16,22
**filed** 163:15
**files** 172:9,21 174:16
174:18,22 192:12
**final** 41:13 87:12
99:8 100:12 137:5
197:15,22 198:2,12
198:18
**finance** 46:11 73:12
73:15
**financially** 308:1
**find** 22:7 115:20
123:9 132:12
134:20 143:10
146:25 205:24
209:7 227:17 283:8

297:20,20
**finding** 29:1 152:18
152:19 210:23
211:24 212:13
213:7 230:12 231:1
231:7 240:15
252:13,20 253:1
285:20 286:1
**findings** 29:9,21
87:10,15 89:6
210:15,19
**finds** 199:12 211:12
294:23
**fine** 7:12 114:12
160:22 167:23
183:4 204:22 206:1
208:18 226:16
257:3 300:6
**finish** 48:8 88:18,20
88:23 89:10
**finished** 48:7 89:19
**firm** 18:12 74:13,16
308:8
**first** 7:4,15 9:17
15:13 32:14 33:20
39:3,6 48:7,9 53:3,4
58:10,14 60:10
61:13,20 73:17
86:25 87:8 88:17
90:25 91:3 111:10
124:15 126:25
130:13,22 138:13
139:1 149:25
161:14,20 173:3
193:16 199:22
203:11 212:17
224:23 225:6
231:16 234:24
296:6
**firsthand** 81:22,23
83:6 85:19 221:24
**fit** 114:16
**fits** 102:22 103:7
104:1,6 120:9
**five** 189:9

JEFFREY MILYO, PhD                                    8/26/2014

**fixed** 18:16 278:6,10
  278:14
**flag** 220:11 238:8,13
**flagged** 231:4 238:3
**flags** 239:4 248:14,17
  249:7
**flat** 58:25 60:2,5,10
**flawed** 186:11,12,19
  186:23
**flight** 269:8
**Floor** 2:12
**fly** 178:3
**focus** 48:4,14,17 53:3
  53:4 57:19 58:8
  69:19 70:7 73:6
  108:25 116:24
  117:2 143:13 147:9
  259:5,7
**focused** 51:17,19
  56:20 116:15 211:7
**focusing** 258:19
  278:13
**folks** 82:13
**follow** 213:5 281:4
**following** 141:17
  254:23 255:5
**follows** 7:4 267:1
  280:11
**footnote** 103:1,3,18
  115:21,22 122:3
  123:8 154:17
  185:23 284:22
  294:15,16,17
  300:13,14,20
**footnoted** 124:10
  266:17 268:25
  269:4
**footnotes** 128:15
  146:10
**force** 299:20,20
**forced** 36:14
**forces** 300:2
**foregoing** 306:21
  307:6
**forgetting** 254:1

**forgive** 15:7 209:6
**forgot** 103:16
**forgotten** 88:19
**form** 53:20 76:18
  78:4 82:10 83:1
  85:15 123:25
  149:22 155:3
  157:13,21 178:15
  189:3 194:3 198:3
  198:21 199:14
  204:15 210:1
  216:24 229:15
  237:15 239:16
  251:17 269:2
  271:23 272:14
  273:20 274:17
  286:13,24 287:7,19
  288:2 289:8,10,11
  289:21 290:4,5,12
  290:18 292:5,13,20
  293:9
**formal** 61:3 62:16
  235:9 236:1,11,16
**formed** 139:18
**forming** 118:2
**forms** 18:16 115:6
  120:23 297:11
**formulated** 272:17
**forth** 115:19 131:8
  131:19 134:18
  252:1
**forthcoming** 110:25
  132:22 201:17
  206:11 252:3
**forward** 63:2,16
**found** 28:24 152:7
  181:17 184:13
  188:15 194:18,24
  195:18 198:19
  211:8 216:12
  227:18 283:17
  284:12 285:12
  299:15
**Foundation** 75:8,10
  75:12,17,22,25

**four** 87:8 88:17 232:5
  232:8
**framework** 279:2,13
  279:25 280:1,2,7
  286:23
**Francisco** 19:5,14
**frankly** 30:14 134:20
**fraud** 4:17 71:3,9,11
  71:12,24 118:14,15
  118:17,18,22
**free** 88:21 113:2
  130:10 302:20
**Freeman** 3:2 4:3 6:8
  6:8 160:20,22 161:2
  161:4 164:4,7,10,11
  167:4,7 172:24
  175:21 179:17,20
  183:8,18,23 188:5
  188:10 189:22,25
  194:5 198:10,23
  199:4,21 200:18
  201:19,21 204:9,11
  204:21 206:1,4
  210:4 217:7,25
  218:3 219:23 224:7
  224:13 229:23,25
  230:3,17 234:21
  253:24 254:6,11,13
  257:11,14,16 260:9
  260:13 269:6
  271:24 272:16,22
  272:25 273:9 274:2
  274:20 275:3,11,21
  276:3,16 284:1,5
  287:1,11,22 288:4,8
  288:16,24 289:8,15
  290:10,20 292:8,16
  292:24 293:13
  294:19,22 298:20
  300:8 302:7,12
  303:6 304:5,17,20
  304:23 305:4,9,19
**French** 118:10
**frequently** 261:8
  279:4

**friend** 154:20
**friends** 153:2,20
  154:1,25 155:18
**front** 11:25 41:6
  58:11 78:14 97:25
  98:24 100:13
  102:13 138:7
  161:17 169:5
  170:19 201:9
  218:24 219:6,8
  246:5
**full** 97:9 128:13
  305:16 307:6
**full-time** 23:9
**fully** 303:25
**fun** 305:16
**function** 138:19
**fund** 2:19 54:6
  271:16 272:7
  273:11 274:4
**funded** 15:24 16:8,15
  16:22 17:13 18:23
  21:6
**further** 99:20 126:5
  185:16 206:16
  212:8 307:14,23
  308:1
**future** 17:19 18:18
  62:1,8 169:25
**fuzzy** 15:8 20:7

---

### G

**game** 280:5
**garbage-in/garbag...**
  265:25
**gathered** 231:14
**general** 3:10 32:18
  33:4,5 39:12 41:21
  41:23 53:15 56:15
  93:12 102:19
  114:22,24 115:3,7,8
  115:12,18 120:5,12
  120:13 151:20
  152:4 154:6,14
  176:18 179:8

JEFFREY MILYO, PhD                                    8/26/2014

18

260:20 279:20 282:21 299:10
**General's** 12:12 13:9 42:22 172:17
**generally** 56:10 64:12 72:23 76:16 151:24 243:4,18 291:3
**geographer** 167:16
**geography** 68:18,20 68:24 69:2,7,12,16
**Georgia** 5:3 181:18 182:9 184:14 185:10 190:15
**Georgia's** 189:15 190:11
**Gerald** 167:15 171:16,24 233:21 291:14,17
**Gerber** 180:15
**getting** 21:7,9 41:16 52:25 53:11 65:19 88:11 142:8 238:16
**Ghitza** 166:15 234:22 260:1,3,15,18 261:7 268:13
**Ghitza's** 259:18,19 259:23 270:13
**gist** 117:12 118:11
**give** 10:22 30:25 37:7 41:21,21 44:5 61:24 93:1,9 95:9 97:9 108:1 109:14 113:22,23 141:20 176:1 204:19 219:14 302:3,24
**given** 11:8 18:20 41:24 44:21 51:3,5 55:23 70:5 87:7 97:18 107:2 108:1 108:25 121:12 124:24 141:23 145:14 196:1,15 204:2,4,6 212:2 220:24 241:23

251:21 255:22 266:2 276:13 303:8 307:12
**gives** 222:24
**giving** 16:14 94:20 116:21
**glance** 37:13 184:10
**glanced** 30:4,20 31:2 31:7 38:21 62:13 149:10 165:17 234:11
**glancing** 24:23 30:2,3 30:7 39:11
**go** 10:16 16:17 17:1 21:4 25:5 30:23,25 31:5 33:2 36:10,14 44:19 59:12 82:4 84:17 87:10 90:9,14 99:12 101:2 102:18 113:7 127:18 128:14 130:9 131:13 132:11 139:11 141:19 145:11,13,18 150:22 155:20 156:4 161:9 167:4 170:11 183:18 188:17 206:1 217:2 217:5,25 219:20 222:10 224:7 231:15 239:19 245:15 247:6,10 248:16 250:13,24 256:24 257:2 260:9 269:5 304:7,22
**goes** 25:10 84:3 157:22 223:17 276:7
**going** 8:6 14:4 16:5 17:5 23:12 30:13,14 34:4 47:13 50:4 52:20 56:4,12 57:7 65:5 72:20 73:24 78:3 90:4,6 98:20 104:12 111:1

112:15 114:13 118:9 119:1 126:16 153:6 160:19,24 161:8,15 163:1 165:16 166:25 169:22 183:12 191:20 197:17 201:20,21 205:24 216:6 238:25 242:13 256:23 257:16 269:8 273:3 274:4 302:12,22 303:3 304:3,10 305:5,11,12
**good** 7:11 8:19 34:24 76:6,16 77:21,22 178:3 218:19 219:12 220:9,15,22 220:23 221:9
**goods** 159:6
**goof** 125:15
**gotten** 239:10
**grad** 17:24
**graduate** 67:8
**graduated** 14:12
**graduation** 14:14
**Grande** 3:15
**grant** 75:9,11,15
**grants** 75:13
**gray** 61:16
**great** 9:11 13:4 60:18 201:11 202:6 234:5
**greater** 91:19 123:22 123:23 245:1 286:21 287:5 288:11,19 292:11 292:23
**greatest** 152:10
**greatly** 125:2
**Green** 180:15
**grocery** 150:25
**Groseclose** 105:1
**gross** 241:4
**grossclose** 105:4,16
**ground** 71:19 161:15

**group** 80:3,5,11,13 80:20 138:15 258:14,20 263:24 266:7 273:13,24,25 274:6
**groups** 70:4,10,18 80:8 81:10 114:4 193:1 228:19 229:14 230:20 264:9 265:13 270:5 270:6,12 298:2
**grows** 124:2
**guess** 15:7,8,10 36:14 72:1 103:15 170:11
**guessing** 116:9
**guest** 64:20
**guys** 142:7 305:8

**H**

**H** 4:6
**habit** 133:12,13
**Hale** 2:20
**half** 168:8
**hand** 220:6
**handful** 10:18
**handing** 12:8
**happen** 235:16
**happened** 31:5 62:3 272:19 305:20
**happens** 142:22 147:9
**happy** 102:13 161:10 161:11 189:20 272:4
**hard** 20:9 23:13 35:19 54:18 88:3,4 162:22 172:11 213:5
**harder** 19:18 50:4 151:8,13,25
**Harris** 24:1,3,5,7
**hazard** 15:8
**hazier** 21:9
**hazy** 21:1
**He'll** 305:17

JEFFREY MILYO, PhD                           8/26/2014

**head** 8:20 14:5 21:16
  22:10 31:14 34:4
  47:14,23 124:21
  222:3 228:10 232:4
  232:7 244:2,8 247:9
  285:13
**heading** 285:24
**health** 46:14,19
  70:20,20
**hear** 158:25 224:11
**heard** 6:18 68:25
  151:4,6
**hearings** 305:14
**heated** 77:16,17
**held** 300:24
**help** 10:1 25:16 29:1
  62:15 104:18 150:1
  171:20 172:22
**helpful** 7:22 22:7
  98:21 99:16 103:8
  139:24 261:5
**helps** 10:4 17:3
  167:17,18
**Henrichi** 167:9
**Henrici** 148:14 235:2
**hereinbefore** 307:7
**hesitation** 82:14
**hidden** 210:23
  211:24 212:13
  213:7 240:15
**high** 84:12 118:9
  258:17 269:25
  270:11 281:14
  284:8
**higher** 298:3,9
**highly** 13:5,8
**Highton** 5:9 283:12
  283:17
**hire** 18:4
**hired** 281:24
**Hispanic** 87:22
  129:22 132:14
  211:1 239:22
  261:10 294:14
**Hispanics** 156:16

253:15,21 254:8
  284:15
**historic** 256:14
**historical** 301:24
**history** 73:2 81:13,19
  82:7,18,23
**hit** 57:17
**hold** 219:9
**holding** 81:9 278:6,9
  278:13
**home** 133:25 282:13
  305:12
**homogenous** 265:13
  266:6
**honest** 54:17 59:12
  90:12
**honestly** 9:8 30:22
  112:5 119:11
  121:23 122:14,21
**Hood** 5:3 180:10,13
  180:24 181:16,21
  182:1,8 183:10,12
  184:12,22 185:8
  186:6,9 187:6
  189:12 190:9
  244:15
**hope** 256:16
**hoping** 17:20 148:21
**hot** 114:25
**hour** 58:17,24 60:9
  73:24
**hourly** 60:1
**hours** 30:15 60:15,23
  60:25 61:5,8 162:16
  232:1,5,8 302:5,8
  302:16 303:9
  304:15 305:15
**House** 1:18 2:3
**household** 156:2
**households** 155:13
**Houston** 291:8,19
  292:2
**huh** 11:16
**human** 175:23
**hundreds** 291:4,7

**hypothetical** 105:10
  276:6

_____

**I**
_____
**ID** 4:16,16 44:8,12
  46:13 49:3,12,23
  50:10,19,20,23,25
  51:12,16,22 52:8
  53:4,23 54:23 56:9
  56:10,10,14,15,21
  56:23 57:12 58:6,8
  72:1,11 73:13 75:4
  75:23 76:4,6,12,16
  77:5 78:9 91:14
  94:5,15 120:17,18
  120:23 138:16
  139:2,13 141:19,23
  141:25 142:1,3,16
  142:17,22 144:8
  159:17,21 160:1,8
  176:22 177:14,16
  177:22,24 178:5,7
  178:10 179:2
  180:20 181:9
  183:14,25 184:3,6
  189:16 190:11,20
  191:4,11,18 192:19
  193:7,16,21 194:12
  206:23 207:1,15,16
  207:19 210:16,24
  211:8,18 212:16
  213:8 228:18 229:2
  229:13 230:19,19
  231:5 236:22
  237:15 239:16,21
  246:7 247:13,22,22
  247:25 249:9,17
  250:19 252:15
  253:14,21 254:7,17
  254:22,23 255:5,6
  256:9,10,13 257:20
  257:22 258:2,7,13
  258:21 259:10
  266:4,14,19 267:8
  267:13,18 269:11

269:23 278:19
  286:11,13,17,20,21
  287:3,5,18,24
  288:11,19 292:10
  293:18,25 294:13
  294:24 295:19
  296:2 298:24
  299:17,19 300:22
  300:25 301:1,6,10
  301:18
**ID-required** 299:17
**idea** 33:16 88:4
  121:10 123:24
  178:10 218:25
**ideas** 105:2,3
**identical** 10:15,17,20
  142:24 143:1,2
  164:25
**identification** 4:13,23
  5:3,10 33:13 43:21
  43:23,25 44:2 49:10
  58:1 78:23 115:6,17
  117:13,22 118:24
  153:1,19 181:19
  184:15,21 245:4
  247:18 297:10,12
  297:13,22 300:17
**identifications** 238:2
**identified** 12:14
  107:4,6 108:8
  129:20 133:2,23
  134:3 139:7,18
  140:18 143:22
  144:23 201:1 202:2
  220:3 228:15,16
  236:5
**identify** 36:11 108:20
  109:17 112:22
  126:25 128:15
  132:4 133:5 137:19
  138:22,25 139:3,8
  182:17,18 198:7
  200:23 201:22
  205:17 206:5 207:7
  207:23 208:19

JEFFREY MILYO, PhD                                    8/26/2014

210:8 212:9,21 213:20 215:10 217:10,16 221:4 228:14 241:6 255:25 281:17 291:16
**identifying** 218:20 219:13 220:9 221:1 221:10 223:7
**ideological** 102:23 103:7 104:1 114:25 115:9
**IDs** 79:22 80:11,12 80:20 81:10 150:21 231:5
**if/then** 236:13 267:6 267:9,9
**IH-35** 3:15
**illegal** 72:2,9
**illustrate** 226:14
**illustrating** 222:15 226:5 227:25
**illustration** 222:18 222:19 223:1 226:9
**illustrative** 93:21 223:16 225:2 226:7 227:6,8
**imagine** 68:1 121:21 122:1 151:11 187:21
**imagining** 155:23
**immediately** 11:13 73:14 191:23 244:3 289:5
**impact** 47:11 189:15 190:11,20 191:3,10 297:14 298:23
**impanel** 27:15,18
**implementation** 94:16 254:23 255:5
**implemented** 78:22
**implications** 73:18
**implies** 120:16 223:12
**importance** 201:3

**important** 8:10,18 15:9 102:24 271:19 272:10 273:15 274:7
**impose** 295:2
**imposes** 286:9
**imposing** 300:1
**impression** 31:24,25 205:9
**improve** 143:24
**improved** 255:23
**improvement** 212:7
**improvements** 212:8
**inappropriate** 108:8
**include** 25:19 53:15 72:4 94:17 95:9,10 95:18 96:1,9 106:10 107:11,17,18 137:11,17 138:14 195:19 196:11 210:12 237:8 276:19
**included** 9:23 46:15 47:17,19,23 61:12 67:5 97:14 98:6 130:1 134:2 144:16 174:24 175:7 176:5
**includes** 94:11 242:7
**including** 62:21 63:11 67:7 144:13 144:23,24 174:14 210:22 211:6 231:19,24 232:13 232:14 233:15 262:3
**income** 258:17 295:18 296:2,17 297:22 298:1,4
**incomplete** 93:1
**inconsistency** 95:22 95:24 145:18
**inconsistent** 92:17 93:1 145:14 264:11
**incorporated** 259:14 259:16

**incorporates** 252:23 298:16
**incorporating** 145:17
**incorrectly** 272:18
**increase** 241:3,4
**increased** 286:2
**increases** 284:13 286:15
**incredible** 302:14 305:5
**incumbents** 20:20,23
**independent** 15:20 15:22 46:17
**Indiana** 4:23 49:10 58:2
**Indiana's** 301:18
**indicate** 94:10 100:23 145:13 152:25 207:15 238:14 248:17 294:5
**indicated** 95:6 96:22 134:23 140:25
**indicates** 246:23
**Indicating** 220:2
**indicative** 263:19
**indicator** 122:9
**individual** 115:4 153:7,7 155:21,21 156:6,6 159:12 160:11 166:18 207:19 237:13 239:14 249:2 263:24 264:3,5 271:1,10 292:25 297:9
**individual's** 262:14 271:4
**individuals** 69:22 131:8 133:2 137:21 138:14,23 139:4,14 139:15,17 141:18 142:15 149:16 150:5 152:8,20 154:7 157:15 158:21 159:5 202:9

202:21 203:1,13,25 204:13 205:6 206:25 209:5,10 214:22 215:1,4,6,11 215:23 216:2,11,11 220:16 221:16,21 222:1 231:4 238:6 238:11,14 239:3 240:2 246:14,24 247:3,12,17,20,20 248:6,13,22,25 249:7,11,16,25 250:8 254:22 255:4 256:9 257:20,21 258:7,13,20 259:9 261:18 263:20,23 266:25 269:24 276:18 277:1 284:8 286:12,16 290:2 293:6,11 300:25
**industrial** 18:13
**ineligibility** 222:2
**inflate** 270:6
**inflated** 240:17
**Influence** 4:14
**influenced** 276:21 277:2
**information** 25:18 41:19 62:3 94:21,25 103:6,25 104:7 108:13,17 113:22 113:23 115:4 116:3 134:21 135:7 173:9 183:1 214:4,18 221:15 255:22 268:13 287:23 288:9,17 293:3
**informed** 277:16
**informs** 46:18
**initial** 95:19 97:23 127:2 162:4,6 163:13 165:3 173:7 202:18,20 203:2,15 204:1,14 205:4,7 231:18 252:1

JEFFREY MILYO, PhD                                    8/26/2014

21

**initially** 172:25
251:23
**input** 177:17 266:4
**inquiry** 55:15 70:7
**inside** 22:14 109:16
109:22 110:7,14,21
**insignificant** 282:23
283:8
**instance** 1:15 25:19
86:25 145:17
**instances** 25:19 92:15
143:22 159:25
160:14
**institute** 51:23,25
52:1,7,12,13,16,18
54:2 74:3,5,6,7,10
74:19 75:3,4 76:1
179:23
**institution** 180:5
**institutions** 47:12
62:23 63:13
**instruct** 46:3 76:21
119:1 130:6
**instructions** 7:23
122:16
**instructor** 19:5 22:21
**instrument** 97:24
98:3 100:13 112:25
113:3,13,15 114:7,9
114:11 140:9
**instrumental** 268:2
**insufficient** 204:8
**insufficiently** 195:15
**insurance** 46:14
**intend** 61:24
**intended** 229:23
240:23 255:23
**intent** 87:5,17,20
88:9 89:7,16 132:23
**intention** 36:18
142:18 196:10
**interaction** 90:11
**interest** 74:13,16
75:20 122:7 219:16
**interested** 33:10

308:2
**interesting** 11:15
**interpret** 81:4 92:16
275:18
**interpretation** 84:1
206:12 211:3
213:19 263:15,18
**interpretations** 198:8
**interpreted** 270:21
**interpreting** 204:19
**Intervenors** 5:6
**intrastate** 248:20
**introduced** 161:3
**investigate** 182:8
185:9 186:10,18,23
**investigator** 67:2
**investment** 159:6
**invoice** 59:22
**involve** 69:13,21
**involved** 29:19
149:16 150:4
287:12,14,24 288:1
289:1
**involves** 71:5 73:3
258:1
**irregularities** 57:13
**irresponsible** 251:24
252:4,7,10,12,18,25
**isolate** 276:17,24
**issue** 45:18,20 70:15
84:13 85:20 86:1,2
86:7,8 106:3 111:14
145:4 149:6 153:24
182:12,17,18
185:13,17 186:3,4
281:11
**issues** 69:3,14,16
70:9,17 73:10,20
85:16 104:20 145:7
226:15 228:13,15
228:16 276:11
302:20
**items** 115:1
**iteration** 187:23

**J**

**J** 3:2
**Jane** 167:9 235:2
**Jeffrey** 1:10,14 4:8,9
4:10,24 5:6 7:3
128:3 306:3,20
307:8
**Jersey** 2:5
**Jewel** 148:14
**job** 19:12 218:19
219:12 220:9,22,23
221:9 308:25
**jobs** 220:15
**John** 34:12 42:10
54:6
**journal** 35:7 47:10
57:22 58:3,6 64:11
64:14 180:4 187:8
187:13,15,20,25
188:14,20 189:4,14
190:9 244:1 261:17
298:15 300:13
301:15
**journals** 243:4,6
**judge** 31:17,21
303:16 305:10
**July** 162:7 163:15
172:3,8,10,10,12
256:20 257:5
**June** 14:13 162:7
**jurisdiction** 271:16
272:7 273:11 274:3
274:3,6
**juror** 27:15
**jury** 27:4,7,10,13
**justice** 2:11 3:3,20
74:4,5,6,8,10,19
75:3,4 76:1

**K**

**K-o-c-h** 75:8
**Katz** 5:11,13 294:11
294:23 295:18,25
296:19 297:6
298:13,22 299:15

**keep** 16:14 54:18
60:4 133:14 142:9
160:24 168:7 176:7
185:1
**keeping** 60:6 61:3
**keeps** 30:15 242:13
**Keister** 3:9 6:16,16
10:6 13:10 33:1
34:18 36:20,22,23
41:20 42:13,13,14
46:2,6 76:18,21
78:3 82:10 83:1,13
85:14 99:4,10
108:23 118:25
130:6 134:5,11,15
134:22 149:22
155:3 157:13,21
172:14 175:19
194:3 198:3,21,25
199:14 200:15
204:15 210:1
216:24 219:14
224:9 229:15
230:14 234:18
269:2 271:23
272:14,24 273:7,20
274:17,24 275:4,15
276:1,9 286:24
287:7,19 288:2,13
288:21 289:11
290:5,18 292:5,13
292:20 293:9 302:4
303:5,22 304:5,6,10
304:14,20,21 305:3
305:7,11
**Keister's** 11:3
**kennel** 305:13
**kept** 57:9 232:9
**kind** 11:3 21:1 46:10
53:6 69:21 74:17
76:4,8 85:20 87:23
90:11 93:12,14,15
106:10 113:7
114:24 119:18
122:9 132:6 141:4

JEFFREY MILYO, PhD                                        8/26/2014

148:5 178:21 180:4
203:9 269:15 288:7
299:22 300:3
**kinds** 7:23 26:15,19
45:13,15 47:4 71:7
74:16 88:5 93:7
154:8,9,11 226:15
280:5
**know** 11:24 12:6
16:14 17:22 20:6
21:20 27:8 28:17
29:2,4 30:13 33:14
38:20 39:11 52:8,9
54:21 57:19 61:2,20
62:5 64:4,5 75:22
75:25 77:2 81:4
82:4 86:3 88:3 91:2
101:3 102:8 105:13
111:14 112:14
121:6 123:23 124:1
129:10 132:14
135:15 141:21,24
144:18 145:5
153:12 156:8
158:19 161:8,10,14
163:24 165:8
166:20 168:2,7,10
168:13 172:9,20
173:12 174:6 179:3
187:12,14,18,23
188:12 190:21
194:14 203:4
207:10 209:15
214:23 215:2,8,13
215:17,18,20,21,24
220:25 221:14,19
221:25 225:16,19
228:7 231:12 243:2
243:11 244:9
248:20,25 249:2
251:2,5 260:14
268:22 272:21
277:13 279:10,12
287:25 289:18
290:10,20 291:6,9

291:10 297:2 298:1
298:12,14,18
301:25 302:1 304:9
**knowledge** 7:22 13:5
74:11 75:6,19,21
81:22,23 83:6
187:11 188:4 189:1
192:16 221:24
245:7 255:12,19
292:17
**known** 108:14 124:6
269:18
**Koch** 75:7,10,12,16
75:16,22,25

----

**L**

**L** 5:6
**label** 246:22
**lack** 91:14 192:18
193:7,21 194:12
245:3 252:3 257:20
258:7 266:3,14,19
266:20 267:8,16
268:9
**lacked** 195:6
**lacks** 138:15 239:21
**laden** 203:18
**laid** 211:2 299:6
**language** 130:25
**large** 37:6 40:24
44:20 68:15 154:5
178:19 217:10,16
217:22 218:6 221:4
221:6 273:13 277:4
277:4 283:5 299:15
**larger** 123:20 284:14
284:15
**late** 77:4 142:8
189:18 202:4 224:4
229:17 247:9
**latest** 9:25 35:21,25
36:3,6,7,12,19
**Latino** 243:25
**Latinos** 80:17,20
81:14,20 82:8,19,24

**law** 1:22 2:11,15
19:21,22 25:9 74:13
77:21,21 78:23
189:16 190:11,18
190:20,22 191:2,4
191:11 192:4,6
249:5,15 254:17,23
255:6 256:10
278:19 301:18
**laws** 5:8,10,14 43:21
43:23,25 44:2,8,12
44:17 46:13,23 56:9
56:10,11,15,16,21
75:5,23 76:4,6,12
76:16 78:9 120:17
191:18 293:19,25
294:13 295:19
296:2 301:6,10
**lawyer** 29:2,18
**lawyers** 2:15 28:7
41:25 82:12
**lay** 77:18 86:7
**layperson** 76:24 83:8
83:11
**lead** 241:9 280:13
297:23
**League** 2:19 6:23
**leave** 23:17 108:13
303:2
**leaves** 220:18
**lectured** 64:20
**led** 104:16 211:23
**left** 17:21
**legal** 3:15 28:19
35:13 41:16,18 42:4
62:4 84:1 86:4
308:8
**legally** 245:3 246:25
247:4,21 248:22
249:3
**legislative** 1:17 2:2
6:4 20:2,5,13
**legislatures** 46:12
**lending** 44:25
**length** 12:15 96:12

96:15 121:13,17
122:6
**lengthy** 120:22
122:17
**let's** 10:1 12:25 14:5
14:8,24 18:8 20:1
21:4,13 25:5 29:14
36:10,23 38:3 40:2
43:3 50:5 51:6
52:20 53:22 58:13
58:14 68:14 72:12
73:25 78:11,13
86:24,25 89:2 90:14
94:3 98:8 102:17,18
103:11 116:6
125:18 128:19
136:13 138:9
141:16 145:10
148:12,22 153:17
160:24 165:10,18
167:4 180:7 188:1
212:18 222:10
224:7,21 235:6
239:19 253:24
256:16 257:14
259:18 277:11
291:21,22 293:13
298:17 300:6
**letter** 102:1
**level** 249:11 264:4
297:9
**levels** 274:15 297:21
298:1,3
**license** 94:5 137:22
139:5,16,20 140:4
140:12,19,25 141:2
141:13 142:13,18
173:2 181:18
184:14,20 192:9
290:1,3
**license-to-carry**
79:13
**licenses** 131:9 133:3
138:15 139:15
**life** 158:10

JEFFREY MILYO, PhD                          8/26/2014

23

**light** 127:12
**liking** 204:18
**limited** 39:21 68:2
  87:7 88:10 89:16
  175:24 187:16
  225:20,21
**limiting** 303:7
**limits** 46:12
**Lindsey** 2:7 6:14
**Lindsey.Cohan@d...**
  2:9
**line** 6:20 217:12
  253:1,3,5
**lines** 73:13 217:14
  295:7,11
**linkages** 178:19
**linking** 237:1
**list** 44:20 50:3 72:13
  79:8 121:1 135:12
  146:4 202:18,20
  203:3 205:4 213:22
  214:4,18,22 215:1,4
  215:7,10 220:20
  221:21,21 223:23
  223:24 224:15,15
  238:1 246:15,24
  247:2,4 248:7
**listed** 14:1 47:3 60:25
  185:24 282:17
**lists** 203:5 216:2,10
  216:12
**literally** 36:17 162:14
**literature** 20:18 44:7
  44:11 53:3,14,16
  55:8 115:14 119:24
  145:21 146:5 148:7
  154:5,10 191:17
  266:18 283:4 285:1
  285:20 286:1 301:8
**literatures** 154:15
**litigation** 49:22 161:5
  192:3,12 254:16
**little** 8:6 12:7 15:8
  16:7 17:23 42:11
  73:25 104:15

  105:13 234:6
  274:21 279:11
  303:18
**LLP** 1:23 2:4,7
**lobbying** 46:16 52:10
**located** 52:2
**location** 149:16 150:5
**locations** 290:16,17
  290:21,22,25
  291:17,23,24 292:1
  292:3
**Lodge** 103:21
**logic** 65:24
**logistics** 43:2
**Logit** 146:24
**long** 8:25 12:18 30:14
  30:14 42:16 59:11
  92:4 96:7,20,25
  113:24 116:13
  122:15,22 143:10
  149:24 162:13
  215:21 217:12
  224:5 263:24,24
  264:5,15 274:24,24
  301:17
**long-standing** 112:6
**longer** 30:15 116:12
  163:18 177:12
  191:21 194:19
  195:5,8,21,21
  196:13 280:11
  302:21
**look** 9:19 10:25 11:5
  11:10 12:18,25
  22:14 25:7 35:24
  37:17,21,23 39:5,8
  39:21 40:4,18 46:3
  46:11 47:15 48:1
  58:14 62:6 67:23
  94:18 98:21,23
  99:11 100:14
  101:25 102:10
  103:9 104:10 105:9
  113:2,12 114:9,11
  116:4,6,11,12

  119:20 126:21
  128:19 131:14
  135:3 137:18 138:9
  139:20,22 140:12
  148:4 152:13,14
  156:7 162:24
  163:23 170:12
  173:23 175:1,9,10
  180:12 181:4
  182:14,21 183:17
  185:15 186:25
  199:24 203:6 209:7
  209:14 217:23
  218:4 219:1 225:7
  225:16 227:8 229:7
  230:4 244:20
  245:17 246:2 247:1
  248:10,21 249:5
  260:8 269:17
  277:21 280:10
  283:24 285:17
  290:7 291:22,23
  292:23 294:7 295:5
  295:13 299:9,12
  301:17
**looked** 12:15 35:8
  37:14 40:3,11,16,23
  40:25 55:16 62:14
  84:20 86:11 140:15
  140:19 141:6
  143:22 146:12
  148:15 153:23
  163:4 168:2,4,13,16
  170:13 171:7,13,17
  173:22 174:21
  175:13 188:17,24
  191:6,14 197:19
  209:9 224:23
  225:17 229:6
  233:22,24 234:1
  253:4 278:6,9 283:6
  285:9 301:12,21
**looking** 11:7 12:21
  18:15 20:1,8,10,25
  21:2 24:24,25 25:3

  35:19,23 38:12
  45:12 47:20 48:2
  56:3,6,7 69:14
  70:19,21 72:13,15
  76:13 85:19 91:8
  112:1 113:15 114:7
  114:21 116:14
  119:23 123:9
  124:17 125:22
  126:18 130:22
  138:10 140:9
  146:17 169:7,10,11
  169:13,14 170:4,5,7
  170:21,24 171:1,4
  177:22 181:13
  188:8,11,16,21
  189:8 193:12
  206:14 207:4 220:1
  261:2 275:5 277:14
  291:25 294:16
  298:21 299:18
**looks** 10:4 13:3 44:8
  44:11 72:16 78:24
  99:17 103:2,19
  127:1 179:22
  180:17 184:4
  214:12 217:19
  218:15 229:22
  235:11 254:14
  260:10 284:11,17
  295:11 297:16
  303:16
**loop** 167:22
**Loraca** 294:8
**losing** 159:21
**lost** 140:5 239:10
**lot** 38:19 71:18
  112:15 163:24
  168:3 169:20
  193:22 233:23
  260:7 269:3 270:19
**lots** 166:20,21
**loud** 99:14
**loudly** 159:2
**Louis** 22:20

JEFFREY MILYO, PhD                    8/26/2014

**low** 267:1
**lower** 174:23 220:24
   258:13,15,18
   266:25 281:15,16
   297:21,22,23
**lowest** 258:16 259:6
   259:7 283:18
**Lunch** 104:13

**M**
**machine** 1:22 307:11
**macro** 19:16
**macroeconomics**
   19:15
**magnitude** 222:15,20
   222:21 225:3 226:5
   226:14 228:1
**mail** 50:22 289:8,9
   290:12
**mailing** 290:4
**main** 54:7 58:7 71:25
   234:7
**maintain** 193:6
**maintained** 133:17
**maintaining** 159:13
   160:12
**maintenance** 213:23
   214:4,18
**making** 11:7 13:13
   77:19 81:3 126:15
   151:20 162:19
   217:4 224:16
**MALC** 6:25
**manner** 102:22 103:6
   103:25 104:5
   114:16 120:9
   158:13 305:2
**maps** 234:11
**margin** 226:22 227:2
**marginal** 60:22
**mark** 1:3 2:14 6:6
   9:14,16 10:23 166:3
   167:3 179:17
   189:22 229:25
   253:24 254:11

284:1 294:19
   298:17
**mark-ups** 129:18
**marked** 9:18 10:1,3
   10:24 13:5 103:12
   103:13,15 112:18
   112:20,22 113:13
   116:7,8 117:7,9
   118:4,6 126:23
   127:1,21,22,24
   129:4,6 130:13
   179:19 184:12
   189:24 230:2
   254:10 284:4
   294:21 298:19
   300:7,8
**marketable** 57:2
**married** 22:16
**Marvin** 254:15
**master** 215:16,22
**match** 179:13 208:7
   208:9 215:19 230:8
   237:2 239:18
**matched** 177:17
   190:14 209:18,20
   231:5 237:18,23
   238:15 247:13,17
   248:14
**matches** 195:18
   215:15 216:1,10
   221:20 238:12
**matching** 145:8
   176:4,5,18 177:5,19
   177:23 178:11,15
   178:18,22,25 179:5
   179:9 189:15
   190:10,19 191:3,10
   200:20 201:5
   203:14 206:10
   208:14,21 209:1,4
   209:15,21 210:5,11
   210:13 212:3 215:9
   237:1,6,14,21
   239:15 241:2
   297:12

**material** 298:16
**materials** 55:18
   268:24
**matter** 76:20 138:5
   176:18 260:20
   270:3 303:13
**matters** 277:8,15,23
**McCarty** 122:19,20
   122:24
**McDonald** 124:10,12
   125:1 224:24 225:8
**McDonald's** 225:14
   226:18
**McLENNAN** 307:3
**mean** 17:5 20:5,13,14
   20:17 27:8,17,24
   28:4,14,22 36:21
   39:9,22,25 41:17,25
   43:23 44:3 45:10
   52:11 55:10,11
   56:23 61:12 63:25
   68:19 70:23 71:25
   75:19 76:5 77:14,20
   84:15 87:15 89:5
   97:4 101:6,14 107:8
   144:6 153:12 157:5
   158:16 160:9
   162:20 172:5 176:8
   176:9 178:17,23
   194:4 208:15 234:1
   243:13,15 248:4
   253:6 266:21
   276:20 279:19
   280:2,24 281:1
   283:1,3 293:2
**meaning** 27:5 28:8
   28:10 82:6 118:19
   125:7
**means** 28:17 29:5,21
   86:4 132:5 222:5,9
   301:25
**meant** 8:23 104:15
   151:3
**measure** 178:6
   242:22 271:11

**measured** 20:19,22
   118:3 149:18 150:7
   244:9
**measurement** 125:5
**measures** 46:17
   241:18 242:11
   271:1
**measuring** 244:18
**meet** 42:3
**meeting** 60:13 61:17
**meetings** 42:21
**Melody** 1:20 307:4
   308:7
**member** 64:16 66:19
   67:4,6
**members** 20:20
**memory** 31:4 48:1
   100:15,17 111:16
   119:5 123:10
   164:23 165:23
   171:20 191:22
   219:16 220:5 230:5
   244:21 255:20
   256:24 260:6 265:7
   289:3 291:20
   298:25
**mention** 25:8 110:24
   223:17
**mentioned** 24:18
   45:21 49:1 57:23,25
   62:13 67:13 72:8
   90:20 106:14
   110:10 146:12
   206:20 208:23
   209:4 211:10 240:4
   261:7,7 262:17
**mentioning** 244:3
**mentions** 72:1 218:10
**merely** 121:13
   234:10 249:13
**merited** 100:19
**Mess** 54:23 56:23
**met** 42:24
**method** 1:22 110:8
   206:12 211:14

JEFFREY MILYO, PhD                                        8/26/2014

25

212:7 235:13
260:24 261:12,14
263:14,16 264:7
299:20
**methodological**
46:21 64:8 245:24
250:5,5 251:9,13
278:7,12,15 298:14
299:24
**methodologies**
150:20
**methodology** 65:1,6
193:19 235:22,24
241:1,2 256:17
263:12 264:14
276:7
**methods** 64:21 69:4
70:6,14 91:11
197:23 198:6,8
199:2,5 200:5
201:12 213:20
237:20 251:14
252:2,4 253:8
259:20 283:7
**Mexican** 1:17 2:2
**Mexican-American**
6:4
**Michael** 224:24
225:8
**micro** 19:16
**microeconomics** 19:9
**micromanaging**
145:4
**middle** 162:9 163:17
256:21 257:7
**Midwest** 50:7 54:10
54:15
**miles** 161:9
**military** 18:17
**million** 91:10 173:2,9
174:11,14,23 175:7
176:6 193:6,16,20
194:11 195:1,19
196:9 214:2 246:1
252:14,23

**Milyo** 1:10,14 4:8,9
4:10,24 5:6 7:3,7,7
7:10,11,15 9:17,20
10:2,7,9,9,13,14,14
10:15,23 11:4,12,14
11:22 12:3,4,7,7,13
12:21,23 13:1 25:2
25:6 35:19,24,24
36:3,5,6,9,9,10,14
36:25 40:16 58:12
58:13,14 62:12,12
74:2 78:15,16 90:16
98:15,16,24 99:1,2
99:3,18,18 100:3,3
100:6,7 104:14
113:14 125:23,23
128:3 130:20 134:3
135:3 137:23 138:4
138:11 143:6,6,7,12
161:3 167:7 179:20
189:25 209:15
274:23 303:24
306:3,20 307:8
**Milyo's** 13:7
**mind** 15:7 27:4 41:12
44:24 73:14 102:16
112:12 145:9
158:24 159:20
178:12 186:18
189:19 265:7
278:22 279:21
281:8 289:5 299:2
**minds** 60:13 61:18
**Mine** 7:14
**minimize** 151:1
**minimum** 302:24
**minor** 200:10
**minorities** 235:8,25
236:10,15 258:10
258:24 259:12
**minority** 239:22
266:19,21 271:17
271:18,22 272:8,9
272:13 273:12,14
273:19 274:15

275:22 298:4
**minutes** 41:7 42:19
131:13 188:18,25
189:9 302:24
303:12,21
**Mischaracterizes**
288:3
**misleading** 251:24
252:5,8,12,18,25
**misreport** 102:21
103:5,24 104:5
120:8
**misreported** 114:16
**misrepresent** 135:19
**missed** 159:1 237:19
**missing** 69:20 214:1
272:3
**Missouri** 5:6 24:15
24:17 51:9,11,17
179:24 180:5
254:17 255:8
256:10,20 257:5,18
289:23
**Missouri's** 254:23
255:6
**Missouri-issued**
258:21
**misused** 263:14
**mix** 38:13
**mixed** 294:12
**Mixed-Level** 47:12
**mixing** 77:23 145:8
**mobilization** 154:11
**mode** 149:21 150:15
**model** 278:4 280:21
281:3,4 299:5
**models** 281:19
298:23 299:2,6,10
299:14
**modern** 280:11
**modest** 282:23 283:1
283:3 284:24
**modifications** 162:5
**modified** 280:11
**moment** 57:8 167:5

170:3 178:14 181:3
205:24
**monetary** 21:12
**monetize** 149:6
**money** 148:18 149:2
156:20 157:1
**Monica** 18:1
**month** 34:5
**months** 56:25
**Moore** 3:20 6:12,12
**morning** 37:13,15,17
37:18,20 38:12
**Morris** 5:6
**mortality** 220:25
**motivated** 4:11,14
102:20,24 114:23
115:14,18,25 116:2
119:7 120:6,7,13,17
**motivation** 121:18,19
**mouth** 170:10
**move** 15:16 17:19
219:4 231:9 235:8
236:1,11,16 237:13
237:19,21 239:14
248:17,23 257:17
259:18 300:6
**moved** 23:6 237:22
238:17 239:5
289:23
**movement** 53:7
**moves** 236:6 237:18
238:25 248:20
249:2
**moving** 163:10
257:17
**MPosner@lawyers...**
2:17
**Mullin** 5:9 283:12,17
**multiple** 75:13 108:9
120:23 150:24
158:4 159:22
162:23 163:5,9
164:15 185:18
203:4 221:2 254:24
257:24 270:8

JEFFREY MILYO, PhD                                8/26/2014

284:21 285:23
291:3 297:3 302:16
302:19
**mundane** 285:21
**Mycoff** 5:14 294:7
300:9,15
**Myth** 124:13

**N**

**N** 2:1 3:1 4:1
**N.W** 2:15
**NAACP** 1:16 2:2 6:4
6:25
**name** 38:14 42:12
118:8 161:4 169:14
185:24 297:15
**named** 307:9
**names** 38:2 41:5
167:19 182:9
184:19 185:10
187:2
**national** 124:18
**nationwide** 124:16
225:15,20
**nature** 34:6 39:12
44:25 45:14 52:21
79:24 141:7 143:21
201:15
**NCOA** 238:8,13
239:3,9 248:14,17
249:7
**nearly** 164:25
**necessarily** 139:6
158:3 159:17 168:5
239:4 270:8
**necessary** 245:3
293:7
**need** 8:25 22:14
43:15 46:3 98:4
99:10 113:12 119:3
134:6,11 153:12
161:10,11 165:11
194:20 199:24
203:6 205:24
224:11 251:16

256:23 257:22
286:13 293:7
298:25
**needed** 41:19
**needs** 287:3,4
**negative** 295:8,11
297:13 299:16
**neighbor** 154:20
**neighborhood** 52:24
**Neighborhoods**
244:7
**neighbors** 153:2,20
154:1,25 155:18
**neither** 307:23
**never** 42:24 71:23
132:16 174:21
205:20 206:7
282:11
**Nevertheless** 99:23
**new** 2:5,12,12,15
62:3,6 108:13
147:20 171:7
191:19 200:19
**next-to-last** 143:15
143:18
**night** 37:19,22 38:12
42:7
**night's** 34:24
**no-match** 174:22
197:15,22 198:2,12
202:18,20 203:2,5
203:15 204:1,14
205:4,7 223:23,24
224:15,15 238:1
244:25 253:5
**no-matches** 198:19
199:11 239:4 240:3
**nods** 8:20
**non-Hispanic** 156:16
261:10
**non-matched** 194:19
**non-matches** 176:23
177:14 178:6,7,11
180:21 181:10
183:14,25 184:6

206:17,19 207:8,9
207:11 239:20
241:5,7,13 245:2
**non-Stanford** 18:23
**non-Stanford-relat...**
22:1
**nondramatic** 281:6
**nonexistent** 284:24
**nonlinear** 295:6
**nonprofit** 74:15
75:18
**nonresponses** 146:2
**nonresponsive**
204:10
**nontrivial** 226:8
**nonwhite** 295:1,8
**normally** 304:1
**normative** 77:1 93:7
**North** 3:15
**nos** 144:8 213:4
**note** 133:10,17 180:7
180:9 181:4,7,20
182:4,17,25 184:16
184:17,22,25
185:23 186:5
298:15 299:24
300:14
**noted** 217:9 306:22
**notes** 133:13 143:25
233:24
**notice** 1:24 4:19
126:20 128:2
**noticed** 112:7 190:23
**notification** 236:22
**notion** 160:5,6
284:23 293:24
294:12 295:17
296:1
**number** 1:5 9:18
10:3,24 20:15 21:20
37:6 38:20 44:20
45:18,20 47:24,24
48:3,3,3,13,13,14
49:8 78:13 86:25
91:13,23 95:3,10,18

96:3,5,9,10,24 97:2
97:5,15,17 98:16,16
98:22,24 99:1,2,3
103:13 105:20
106:5 111:8 112:2
112:20 113:10,11
113:14,14,21 114:5
115:22 116:7,8,9
117:7,9 118:4,7
121:9 125:23,23,23
126:6,23 127:1,22
127:24 128:20
129:4,7 131:15
132:14 134:1,2,4
135:4,24 136:11,12
136:16,18,23 137:1
137:24 139:22
154:22 158:7 165:2
172:19 174:23
179:19 189:24
192:16,17 194:18
194:24 195:18
197:16 198:12,18
199:5,10,10,11,25
200:5 202:14 203:8
208:16 211:24,25
212:10,12,15,17,18
212:19,22 213:15
213:17 217:10,16
218:6,11,25 220:11
221:4,7 222:25
223:9,17 229:5
230:2 239:20
240:12 241:4 252:6
252:10,17,20 253:1
253:3,4,5,6 254:2
254:10,21 255:4,8
257:21 258:12
259:23 260:22
277:4,4 279:7 281:8
281:18 284:4
290:14,24 291:9
294:21 298:19
300:7 308:8
**numbered** 1:19 47:9

JEFFREY MILYO, PhD                                    8/26/2014

27

**numbers** 4:20 48:3
  48:13 52:21 112:18
  129:10 130:4,16,23
  131:3,8,19 132:10
  132:22 135:22
  137:12,16,17 139:3
  139:4 173:14
  192:24,25 195:20
  195:25 196:2,7,19
  198:5 200:6,19
  201:18 213:19
  218:19 274:8
**numerical** 84:19
**numerous** 92:14
  165:14 302:20
**NW** 2:21 3:4
**NWB** 3:4
**NYU** 2:11

**O**

**oath** 8:1 234:16
  255:10
**object** 31:21 78:4,4
  82:10 83:1,4 85:14
  85:17 149:22
  157:13,21 199:19
  201:20 204:15
  210:1 216:24 221:5
  269:2 271:23
  276:12 286:24
  287:7,19 288:2
  289:11 290:18
**objection** 76:18
  85:17 155:3 175:19
  194:3 198:3,21
  199:14 200:15
  204:9 229:15
  234:18 272:14
  273:20 274:17
  290:5 292:5,13,20
  293:9
**objections** 83:13
  272:24 273:7 275:7
  275:16,17 276:1,9
  288:13,21

**observation** 129:9
  139:3
**observations** 4:21
  130:24 132:23
  214:2 238:2 267:21
  268:18
**observed** 270:5,7
  285:14
**observes** 240:9
  253:14
**obstacle** 270:23
**obtain** 192:8 286:21
  287:5,17 288:19
  291:7,18 293:7
**obtained** 110:23
  206:25 207:16
  214:15 237:15
  239:16 288:17
  290:1,16
**obtaining** 150:21
  152:10 153:1,18
  156:22 157:3,12,20
  158:7 287:24
  288:11 290:2
**obviously** 15:1
  303:14
**occasion** 47:6 53:24
  62:6
**occasionally** 104:19
**occasions** 185:18
**occurred** 303:9,17
**odd** 101:21
**offer** 23:18 83:7
**offered** 23:20,21 24:6
  24:8 84:22 85:9
  87:23
**offering** 54:8 82:16
  82:17
**offhand** 14:15 193:12
  231:25
**office** 3:10,10 11:3,19
  12:12 13:9 42:22
  100:23 101:8,10
  133:25 151:1
  172:17 215:5 216:1

216:9 221:14,19,25
  222:5 235:10 236:2
  236:21
**officer** 307:9,11
**officer's** 307:20
**Offices** 1:23
**official** 100:22 101:7
  101:22 282:1
**oh** 32:8 45:2 54:4
  122:3 180:8 208:8
  219:20 228:24
  236:3 241:7
**okay** 7:7,20 8:12,16
  8:21 9:2,11,14 11:9
  12:20 13:1,10,18,21
  14:25 15:15 17:3,4
  22:1,8 24:25 25:2
  25:18,22 27:9,14,19
  29:11,14 32:7 36:10
  37:21 45:2 58:21
  78:25 91:22 102:17
  111:14 112:19
  114:7,12 121:1
  135:2 138:7,13
  140:2,10 148:12,24
  148:24 161:12,14
  161:20 166:9,14
  167:20 168:4,14
  178:13,24 180:7
  182:7 183:8 189:12
  192:8 193:9 197:14
  223:22 233:13
  234:15,21 239:13
  240:6 246:4 251:19
  253:11 257:3 263:7
  271:11 275:21
  276:23 277:20
  290:14 296:15
  303:5
**Oklahoma** 190:18,22
  191:2 192:4,6
**older** 95:8,16,20
**omit** 94:1,14 95:3
  96:23 121:3,7,11
  141:9,20 142:12,18

142:22 144:11
  221:6
**omits** 96:10
**omitted** 92:24 97:5,8
  97:14,17 113:9
  114:5 173:2 175:8
  175:18
**omitting** 146:8
**once** 133:14,16
  174:23 175:17
  176:5
**one's** 118:12,16,16
  297:15
**one-minute** 102:3
**one-to-many** 210:11
  210:13
**ones** 40:6,20 65:3
  82:3 139:7 144:18
**ongoing** 74:22
**oOo** 305:25
**op-ed** 72:4,7,11,16,19
**op-eds** 72:5,23
**open** 108:13 220:18
  303:3
**open-ended** 59:11
**operative** 11:22
**opine** 157:7 229:11
  236:15
**opined** 242:8
**opining** 239:9 241:24
**opinion** 4:15 29:25
  31:6 68:16 72:18
  76:3,15 78:8 81:24
  82:6,12,18,22 83:7
  83:15,16 84:5 86:2
  86:4,7,12,14,16
  92:9,21 100:5
  106:22 110:11
  116:21,22,23
  119:13 150:9 157:6
  174:15 199:9 202:4
  223:3 238:21 242:5
  251:17 255:11
  264:22 305:12
**opinions** 28:21,24

JEFFREY MILYO, PhD                                8/26/2014

28

29:16 61:24 62:2,9
62:16 77:25 78:2,5
78:12,12 79:25 82:2
82:15 83:2 84:10,22
84:24 85:3,9,11
86:5 106:6,15,21
107:15,21 108:15
108:16 112:17
116:15 117:1,22
119:15 147:5 156:9
169:23 176:1
197:20,25 198:11
198:17 205:22
259:20
**opportunities** 76:13
**opportunity** 85:5,6
149:4 206:5,16
271:12 275:23
302:25 304:18
**oppose** 120:16
**opposed** 53:2,14
116:3 239:4
**opposition** 117:15
**oral** 1:9,14 307:10
**orally** 8:19
**oranges** 270:12
**order** 42:19 99:16
112:22 145:5
215:10 229:11,12
249:17,19 251:17
258:2 274:4 276:4
287:24
**ordering** 37:8,10
299:20 300:3
**Ordeshook** 278:3
279:17,24
**Ordinal** 5:12
**organization** 50:16
261:25 262:13
**original** 53:18,20,21
57:15 59:9,15 80:14
129:24 164:6 165:1
165:5 191:6 197:10
238:1 245:17,19
250:2,16,20,24

253:23 268:1,6
307:20
**originally** 126:9
275:9
**Ortiz** 3:14 7:2
**outcome** 20:16 308:2
**outcomes** 45:13,16
70:21
**outside** 22:16 49:21
78:4 82:4,22 83:2
84:3 85:15 108:11
108:12 109:16,22
110:7,14,21 111:23
172:17 179:1
192:12 216:25
261:22 262:9
276:10
**outstanding** 59:22
**overall** 67:20 192:23
220:23 277:3
293:16,24
**overarching** 270:21
**Overby** 254:15
**overhead** 55:21
**overlap** 69:4,9 70:6
114:4
**overreporting**
223:11 227:15,16
227:23 228:4,5
**oversampling** 110:8
**overstate** 91:13,23
**overstated** 125:2,8
250:10
**overstates** 124:6
**ownership** 47:1

---

**P**

**P** 2:1,1 3:1,1
**p.m** 1:20 305:24
**pack** 305:13
**page** 4:1,7 5:1 11:11
11:16 24:25 25:7,10
25:23 26:14,18,22
58:10,14 86:24
105:11 127:5

130:23 180:9
184:17 201:10
218:25 219:2,19,20
220:1 230:22 234:2
234:14,17 237:4,7
254:19,24,24 255:1
256:17 257:7,18
275:2 284:2 294:22
295:15,23 296:5,7
297:4,8,19 298:20
300:12,13,14
307:17
**PAGE/LINE** 306:4
**pages** 166:21 298:21
299:6
**paid** 21:11 31:22
52:12,13,15 58:18
58:25 59:20 60:5
100:18 271:20
272:11
**panel** 51:21,22,23
**paper** 118:20 133:13
179:25 180:10,18
180:25 181:2,6,8,15
183:10,22 184:10
185:2 186:11 187:7
187:12,16,18,24
188:13,19 189:2,11
190:2,4,13 286:6,7
294:11 295:16
296:12 297:5
**papers** 189:17,18
191:19,20 244:20
294:8
**paradigms** 209:17
**paradox** 280:4
**paragraph** 25:8 26:5
26:7,10 58:15 78:18
87:1,2 90:14,17
91:8 92:2 93:24
94:2,17 96:7 97:12
97:16 98:7,17,24
100:21 101:1
102:18 113:11,21
114:21 120:21,25

121:24 123:12
125:18,24 128:20
129:21,23 131:10
131:21 132:18
135:7,14 137:1,13
137:20,25 138:2,4,6
138:10,24 142:11
143:4,5,8,10,16
150:19 152:25
156:14,19,23
157:19 158:5
159:11 163:14
176:19,20 177:2
180:14 192:14,19
192:25 193:2
194:16,21,21,22
195:16 196:4
206:20 214:8 217:8
217:13 218:13
219:5,22,24,25
220:3 222:10,11,14
223:10 235:6,7
239:19 241:22
242:4 244:22,24
245:14 249:21
251:20 252:11
254:19 255:2
256:21 257:6,7,8,9
258:6 261:4 266:12
266:24 269:17
270:14 277:12
280:10,15 282:20
293:14,20 295:14
295:24
**paragraphs** 25:11
90:22 98:18 105:12
105:13 128:22
166:1
**paraphrasing** 258:25
259:2
**parlance** 28:9
**part** 21:9 51:23 67:14
67:18 69:14 87:4
88:4 115:17 119:24
122:2 125:15

JEFFREY MILYO, PhD                                    8/26/2014

149:25 162:22 177:6 178:15 184:2 202:15 258:1 267:5 275:2 277:9 285:1 295:23
**partial** 220:3 239:24
**participant** 66:16,21 262:18
**participate** 158:10 271:2,12 275:23
**participated** 45:20
**participation** 68:2,12 256:14 297:14
**particular** 20:20 28:8 43:8 53:24 65:7 81:4 83:19 105:5 111:11 115:9 117:19 147:6,10 169:7,9,12 170:22 170:23 171:1,3,6 172:21 187:24 188:21 214:9 220:18 223:2,16 231:11 232:10 234:12 240:13 247:5 248:25 250:14 260:11 261:7 276:17,25 278:24 288:15 290:25 299:1,2,11 302:1,19 303:8
**particularly** 40:24 81:14 82:9,20,25 102:24 252:4,12 303:16
**parties** 4:17 302:19 302:20 307:24
**partisan** 4:14 102:23 103:7 104:1 114:25 115:9 117:13,21 119:17
**party** 4:16 20:21 118:13
**party's** 118:24
**pass** 160:19

**passage** 86:18 87:17 89:8 206:19
**passed** 87:20 302:4
**passing** 160:20
**passive** 185:1
**patient** 260:8
**patterns** 70:3 256:15 263:13 264:8
**pay** 53:7 273:4,15 274:5,7,10,11,14 275:24 276:14
**payment** 52:17 59:10
**peer-review** 58:3,5 301:15
**peer-reviewed** 31:18 64:9,14 66:8 180:3 187:8,13,15,20,25 188:14,20 189:3,14 190:9 242:19 243:4 243:6 261:17
**pending** 9:1
**Pennsylvania** 2:21 3:4
**people** 6:19 77:5,8,20 95:12 96:19 109:11 111:9 112:3,4 117:18 120:16 122:13,20 123:2 133:5,6 139:8 140:18 141:8,12,22 144:25 151:8,13,25 154:13,24 179:9 237:18,20 239:5 243:12 248:8 279:10 280:4,9 281:25 283:6
**people's** 117:22
**perceived** 118:23
**percent** 13:15 164:16 168:9 181:17 184:13,19 222:12 222:23 223:4,5,13 223:19,21 224:22 225:7 227:3 231:23 271:9 280:18 281:7

281:10 283:19 284:9
**percentage** 79:22 227:8,20 241:19,25 242:11,18 244:10 274:9 281:5
**percentages** 223:12 225:1,9,10
**perception** 118:17,18 118:22
**perceptions** 4:17 118:13
**PEREZ** 306:2
**perform** 267:14
**performed** 213:11
**period** 21:7 262:6 302:21
**periods** 24:24
**perishable** 158:15,17
**permanently** 155:24
**permutations** 229:6 229:22
**PERRY** 1:7 306:2
**persist** 230:10 246:6 250:6 251:9
**persisted** 230:20
**persists** 211:19 229:13 231:6
**person** 32:25 42:25 116:20 142:21 150:23 155:25 159:17,21 160:1,7 160:15 186:1 207:15 249:17,20 287:2,3 288:15 290:23 304:12,14
**personal** 76:3,5,15 77:25 78:2,8 83:14 189:1
**personally** 191:11 305:19
**persons** 125:7 137:20 141:10 177:23 212:15 258:17 266:3

**pertaining** 128:21
**perverse** 282:23 284:25
**PhD** 1:10,14 7:3 13:23 23:10 281:22 282:6 306:3,20 307:8
**phenomena** 69:23 115:18 120:13 154:12
**phone** 42:7,8,9 302:23 303:11,20 304:12,14
**phonetic** 294:8
**photo** 49:9,23 56:10 56:15 75:23 76:4,6 76:12,16 254:22 255:5 256:9,13 258:2,21 259:9 297:13 299:17,18 301:1
**photographic** 4:22 58:1 300:22 301:18
**phrase** 31:17,18 83:25
**phrased** 274:1
**phrasing** 239:24 273:23
**PI** 67:25
**pick** 32:20 72:12
**Pickerin** 2:20
**piece** 133:13
**place** 53:17 249:18 286:3 292:12
**places** 92:14 219:17 263:21 284:21 290:15 291:4,7 292:2
**placing** 204:17
**plaintiff** 150:20 155:8 193:1
**PLAINTIFF-INT...** 2:19
**plaintiffs** 1:4,16 2:2 7:2 41:24 43:14

JEFFREY MILYO, PhD                                    8/26/2014

78:20 79:2 87:4 88:9 89:15 105:6 192:18,21 194:9
**planning** 149:15 150:3
**plausibility** 197:21 198:1,11,18 199:3 199:10,16 200:4
**plausible** 124:25 216:18,20,22
**play** 60:10
**please** 6:21 8:14 9:1 30:19,24 36:11 46:4 53:10 89:13 108:21 130:9 134:6,15 172:15 204:23 205:2 219:14 249:22 251:19 294:22 295:13 298:20
**plenty** 34:25
**Plus** 273:7
**point** 25:5 49:7 82:16 87:24 90:10 92:14 95:21 101:17 109:10 114:13,20 149:3 155:7 166:6 166:10,11 177:25 189:18 199:9 205:19 206:8 214:9 221:23 223:16 226:7 235:13,19 241:21 265:7 281:17 299:1,4
**pointed** 36:8 71:25 86:20
**pointing** 11:20 140:22 177:23 283:5 295:20
**points** 201:7 227:20 265:25
**polarized** 83:17,24 84:7,14,25 85:12,25 86:9
**policies** 45:13,15,22

46:7 47:11 117:15
**policy** 45:3,7,10 46:19,22 49:8 63:7 71:1 116:15 117:19 179:23 180:1 301:12
**Polimetrics** 67:24
**political** 4:12,16 22:21 45:2,7 46:19 50:7,8 54:11,18 62:21,22 63:7,11,12 67:8 68:24 69:2,7 69:12,16 70:21,25 71:6 77:16,17 116:3 117:14 118:13 154:12 242:17,23 243:5,9,19 244:1,7 263:12 264:7,15,17 271:12 275:23 279:2,15,25 281:20 281:23,24,25 282:1 282:2,4,6,8,10,12 282:15,18,19 285:19,25 287:13 298:15
**poll** 46:25 48:23
**polling** 249:18 286:3 290:14,25 291:3 292:2,12
**polls** 271:20 272:11 273:16,17
**pool** 245:8,11,13 246:7 271:9
**pools** 245:11
**poor** 258:8,22 259:10 267:4
**Popkin** 124:11
**popped** 219:7
**population** 56:7 107:7 108:8,20 109:18,23,24 124:1 124:7 125:12,13 226:21 256:20 258:7,20
**portion** 231:10

**portions** 40:25 260:22
**position** 24:2,4 52:8 55:14 75:4,23 88:9 89:15 115:20 149:5 150:22
**positions** 22:23,25 52:10
**positive** 77:1,24 285:15 294:5
**positively** 293:18,25 294:3
**Posner** 2:14 6:6,6,15 159:2 257:10,12 275:1 302:9 304:8 304:12
**possess** 79:22 80:4,11 80:11,20 115:5 120:18 247:21,22 247:24 249:9 252:14 258:21 259:9 286:10,20 292:9
**possessing** 94:15
**possession** 140:6 184:3,5 194:13 210:17,24 211:8,18 213:8 228:18 229:3 230:19 231:6 236:23 245:8 246:7 253:14,21 254:7 267:13,18 269:12 269:24
**possibilities** 154:23 220:19
**possibility** 108:13 220:20,21 221:9 236:18,19 240:5 241:14,15
**possible** 55:20,22 92:20 145:17 146:21 151:3 156:2 229:6
**possibly** 19:11 33:22 144:17

**post** 3:10 150:25 235:9 236:2,21
**post-match** 176:13
**post-registration** 282:21
**postdoctoral** 22:19
**postregistration** 5:8 283:21,22 285:2
**potential** 65:20 95:24 153:1,18,24 201:17 207:8 222:15,20,21 223:7,18 225:3 226:5,14 227:25 240:7 241:2,9
**potentially** 29:10,13 175:22 207:9 226:8
**poverty** 70:9,17
**practice** 179:6,10,14 243:5,9,19
**practices** 48:24 213:23 214:5,19 284:7,8,14 302:13
**pre** 196:7
**precise** 195:15
**precisely** 121:1 229:11
**preclean** 212:4
**preconceptions** 102:22 104:6 114:17 120:9
**preconditioning** 119:17
**predicted** 276:20 277:2,3
**prediction** 184:3,5
**predictions** 280:20
**preface** 34:2
**prefer** 7:8,9 204:25
**preference** 149:20 150:13
**preferences** 102:23 104:6 114:17 120:10
**preferred** 119:8 256:6

JEFFREY MILYO, PhD                                          8/26/2014

31

preparation 36:16
  37:2,11 42:4,7,22
  42:25 104:17
  161:22 162:11
  163:7,20 164:19
  165:21 166:15
  167:9,15 207:24
  208:6,10,11,15,19
  285:7 288:18
prepare 34:21,23
preparing 307:20
present 3:20 5:14
  13:7 81:8 85:23
  120:16 226:22
  250:19 253:20,23
presentation 50:11
  51:6,8,10 53:15
  54:10,22 55:4,19,21
  56:2,18 57:1,3,5,6
presentations 50:1,2
  50:3,9,18 51:3,4
  53:1,13 56:24 71:21
presented 56:1,9
  79:1 80:6 85:21
  86:21 292:22
presenting 132:22
  297:11
pressure 111:17
  135:17
presumably 173:14
pretty 22:10 288:9
previously 175:7
  186:17 231:9 273:5
  273:17 283:6
price 18:16
primarily 87:24
  211:7 286:10,16
primary 48:4
prime 48:14
Princeton 2:5
principal 67:2
principle 115:3,13
  151:23 210:14
principles 19:9
printed 163:24,25

167:1
printout 129:19
prior 38:23 117:1
  173:18 175:3
  176:15 192:3
  193:25 194:6 195:1
  195:5 196:8,12,18
  196:24 202:10,17
  202:19 203:2,13,15
  204:1,13 205:7
  207:7 208:7,8,20
  217:9 231:20,20
  234:23 235:3
  237:16 239:17
  274:11,15 275:14
  288:3
pro 154:19
probabilities 266:25
probability 153:16
  267:23 294:24
  298:24
probably 9:15 10:4
  24:22 32:19 34:5
  40:6 44:19 46:20
  71:21 89:1 163:4
  269:8 302:9
problem 29:5,8 30:16
  78:9 136:16,17
  173:5 207:8 221:1
  226:15 266:1 278:7
  278:12,18
problematic 4:20
  130:24 132:23
  140:23 235:19
  280:7
problems 76:7,8
  87:25 146:25 223:8
  223:18 226:8 266:3
  279:8,18 280:3
procedural 42:2
procedure 1:25 27:4
  27:11
procedures 282:22
  283:21,23 285:2
proceeding 27:21

28:2,16,20,23 29:15
  77:15 86:4 307:25
proceedings 7:24 8:8
  45:21
process 20:8 41:25
  46:23 62:4 110:17
  132:25 163:3 189:7
  200:20,25 201:24
  205:20 206:7
  208:12 271:12
  275:24 287:14
  289:19 290:8
processes 212:3
  287:12
produce 59:5 76:14
  91:25 128:25
  129:16,18 147:5
  171:19 174:4
  196:19
produced 1:15 26:2,7
  26:11 28:19 45:4
  59:14 74:20 128:6
  128:10,12 129:2,7
  129:24,25 135:9,11
  135:22 156:10
  169:21 172:7,20
  173:1,12,18,19
  174:12,22 175:6
  176:10,14 194:6
  196:24 200:16
producing 25:8 43:15
  59:1 175:3 196:24
  203:15 204:1,14
  205:7 234:23 235:3
production 173:3,11
  176:15
professional 50:16
  56:24 64:17 303:12
  304:2
professionalism
  46:12
professor 7:7,11,15
  13:6 36:25 45:17
  74:2 104:14 105:1,3
  105:16 106:17

130:20 135:2 161:3
  177:7 224:24 225:8
  225:14 226:17
  233:14,16 236:5
  243:1,2,18 244:9
  254:15 282:12
professors 105:25
  279:23
program 14:17,18
programs 75:20
progress 47:5 55:5,9
  71:21
project 5:10 18:7,11
  18:14
projected 284:13
projects 18:9
pronounce 118:8
proper 52:2 211:17
  211:21 212:7
properly 179:13
proposal 57:16
proposition 103:4,23
  120:3,5 122:13
  148:9 149:13 152:5
  158:21 159:4
provide 25:18 84:18
  136:22 141:25
  154:7,21 158:3
  172:2,6 188:3
  200:18 208:25
  210:5 214:3,17
  236:9 240:6 251:22
  251:25 254:6
  260:25 282:22
provided 35:10 41:12
  86:6 87:19 128:16
  136:5,7,20 137:4
  215:11 236:23
  252:24 255:16,24
  261:22 262:13,19
  262:23 268:13
providing 43:18 83:9
  256:5
provisions 276:18
  277:1

JEFFREY MILYO, PhD                                    8/26/2014

proviso 78:7
public 4:15 45:13,15
  45:22 46:7 50:12,14
  50:15,21 51:10
  68:16 74:13,16
  75:23 149:17 150:6
  151:9,14 152:2,9,20
  173:1 179:23
  221:16
publication 57:22
  58:3 72:25 187:14
  196:18 286:8
publications 47:7
  242:19 243:20
  262:5,8,10,25
publicly 55:12,14
publish 295:10
published 58:5 64:9
  64:13 66:8 71:10,23
  72:4 73:8 124:24
  180:3,4 187:7,10,13
  187:24 188:8,13,20
  189:3,11,13 190:8
  190:18 191:1,8
  192:1 243:13
  261:16 298:13,14
  299:24 301:9,14
pull 103:8 132:3
  139:24 294:2
pulled 206:24
puppy 257:17
purging 218:20
  219:13 220:10
  221:10
purpose 18:17 30:6
  86:17 158:1 194:15
  256:10
purposes 13:7 83:3
  108:20 109:18
  139:16 192:9
  256:10 286:14
pursuant 1:24
purvey 173:25
purview 174:15
put 6:2 8:6 24:12,21

28:13 40:2 63:2
  68:6 80:23 112:16
  120:1 130:11 170:9
putting 63:16 133:1
  199:15
puzzled 31:19

---

**Q**

qualifications 106:8
  106:13,18,19,23
  107:2
qualified 27:20 28:13
  106:1
qualify 249:25 250:8
quality 78:21 79:25
  81:7,17 88:1 92:13
quantification 91:18
  91:23
quantify 91:17
  153:17,21 267:11
  267:15
quantitative 65:1
  253:12
quantity 40:9 223:4
  305:5
question 8:25 25:13
  25:17 26:16 30:18
  30:23 31:12 32:13
  40:17 44:4 46:7,10
  48:8,12 49:18 50:5
  51:2 53:10,11 56:20
  59:8,18 64:6,23
  68:15 76:24 80:16
  83:10 88:18,22,25
  89:9,13,18,23 90:2
  92:18 93:7 95:4,8
  95:14,19,23 97:23
  100:12,18 101:4,11
  101:16,19,23 102:6
  102:10,12 108:22
  109:3,13 111:5,8
  112:9 121:17
  122:14,21 127:13
  129:9 130:3,12
  132:7 134:12,16

135:10,12 138:8
  139:2 140:2,7,8,10
  140:16,17,22,23
  141:7,25 156:3,25
  157:16 158:24
  159:11 168:18
  170:6 171:3,21,23
  172:15 178:13,20
  179:4 183:11,21,23
  185:19 186:22
  189:5 195:14 197:6
  199:4,6,7,8,17,18
  200:12 201:19,25
  202:1 203:23,23
  204:11,23 206:15
  206:23 207:13,13
  208:18 209:8,25
  210:4 211:11
  213:13 216:23
  219:21,23 224:12
  225:5 234:8 238:20
  239:12 240:21,22
  240:24,25 246:4
  250:6 254:2,4
  262:11 271:13
  272:4,5,18 273:23
  274:25 275:6 276:6
  278:17 288:10
  301:2 302:6 305:16
questioning 42:1
  303:3
questions 8:11 9:4
  11:18 13:21 35:13
  41:15,17,18 67:4,9
  67:18 68:3,5,9 89:3
  93:8 95:6 97:10
  104:15 111:11
  113:9 114:17 115:3
  119:2 120:23 121:2
  121:6,10 122:17
  128:18 139:25
  140:3 239:11
  259:24 276:4
  302:16 303:1,21,24
  304:19,25

quick 13:21 147:12
quicker 99:13
quickly 224:21
  231:15 256:16
quid 154:19
quintile 258:17 259:6
  259:7
quite 25:25 27:23
  28:14 30:14 39:22
  47:22 51:21 57:10
  81:1 117:24 134:20
  144:17 162:13
  227:11 239:11
  243:14
quo 154:19
quotation 296:8
quote 184:18 221:12
  235:11 245:1
  295:13,22
quoted 101:24
  296:22,24
quotes 125:3 218:13
  218:16 295:21
quoting 195:25

---

**R**

R 2:1 3:1
race 84:12 94:11
  125:20 126:3,5
  127:15,16 145:13
  175:2 208:4 211:9
  211:15 212:16
  213:9 224:18
  239:22 240:3,20
  241:6,8,13 259:22
  260:1,5,16,24
  261:12,15,21
  262:14 263:13
  264:8,25 265:4,9,11
  265:15 266:13
  267:12,17,23,23
  268:5,10 269:13,18
  269:25 295:19
  296:3,16
races 84:10 213:14

261:18
**racial** 70:3,9,18
    73:20 81:13,20 82:7
    82:19,23 83:22,24
    84:7,14,25 85:12
    86:9 175:1 210:16
    211:18 213:18
    228:19 229:2,14
    230:10,20 231:2,5,7
    236:21 240:7,9
    245:7 246:6,9 258:9
    258:23 259:11
    262:12,20 263:8
    265:18 267:13,17
    268:14,18,19
    269:11,23 298:2
**racialized** 83:17,23
**racially** 87:4,17 89:7
**raise** 93:11 106:5
    159:11 222:25
    240:18 243:12
**raised** 59:16 107:1
    213:17 241:15
    268:12
**raises** 120:20
**raising** 92:18,25
**Rand** 18:1,2,22
**rate** 20:19 58:17,21
    60:1,2,5 110:22
    111:6,7 220:23
    227:22 228:3,5
    258:14,15,18
    259:21 271:21
    272:12 273:5,16,18
    273:24 276:17,24
**rates** 85:23,24 111:11
    122:25 123:1,6
    125:4 220:25
    253:14,20 254:7
    260:4 261:1 293:16
    293:24
**rational** 150:23
**raw** 198:12
**RDoggett@trla.org**
    3:17

**reached** 55:13
**reaching** 286:2
**reactions** 233:6
**read** 29:25 30:4 31:6
    39:14,15,16 40:15
    53:9 71:14 88:23
    89:2,12,22 101:20
    111:17 116:10,13
    148:23 161:20
    162:10,15 163:1,2,6
    163:17,19,21
    164:12,18 165:5,20
    166:7,11,14 167:8
    167:14,24 168:5,8,8
    168:15,18,20,21,23
    171:15,24 186:6
    190:6 191:6,15
    228:23 231:13,18
    231:23 232:12,16
    232:19,24,25 233:2
    233:9,10,13,17,20
    234:8,10,13,16,22
    235:2,5 242:15
    272:2,5 275:3
    276:23 285:7
    304:11 305:10,18
    306:20
**reading** 39:13 71:15
    78:24 87:14 103:2
    105:14 114:19
    166:4 182:25 233:8
    297:16,24 300:19
**ready** 305:14
**real** 185:25 245:2
    249:8
**really** 34:8 81:1
    101:3 121:19
    149:11 162:19
    165:11 169:25
    171:9 232:3 251:4
**reason** 9:7 76:23 97:8
    193:14 207:10
    217:6 235:18
    240:17 242:9 248:8
    259:5 280:4 300:21

300:23 301:3,4
306:4
**reasonable** 79:20
    80:10,19,22 156:12
    303:13
**reasonably** 203:21
    300:16
**reasoning** 4:15
    102:20,25 114:23
    115:15,18,25 116:2
    119:8 120:6,7,13
**reasons** 91:14 133:22
    159:16 211:2,10
    239:20 307:18
**rebuttal** 4:8,9,10
    10:10,11 25:6 175:4
**recall** 13:13,16 14:14
    18:8,10,24 19:12,16
    21:21,24 26:23
    27:10 30:2,3,9,10
    30:12,19 31:19,21
    31:23,24 32:1,17,18
    32:23,24 34:8,9,11
    34:13,15,17,19
    35:15 36:3,4 38:11
    38:18 43:1,13 47:22
    50:10,13,17 54:14
    54:21 55:20,24,25
    56:8 57:4 60:3,14
    60:20,24 61:2,6,11
    61:15 62:24 72:9,17
    72:18 85:19 90:21
    91:6 105:14,18
    111:21,25 112:1,5
    112:10,11 113:17
    114:10 115:15
    116:5 122:16
    124:19,25 129:8
    131:23 136:8 145:7
    146:17 149:12
    162:1,22 163:22
    165:4,12,19 166:4
    169:6 170:21
    171:18 173:15,21
    177:18 194:13

205:8 209:8,11
218:9 222:8 224:16
229:1 241:20,21,23
242:6 244:12 247:8
261:20 284:20
285:6,11,13 286:4
289:20,22 291:20
299:19
**recalling** 40:21 54:16
    164:22 165:9
    193:11 226:19
    254:4
**receipt** 196:9 307:16
**receive** 11:19 24:13
    52:19 75:9 173:17
    196:22 250:25
**received** 12:11 39:1,4
    39:6 41:11 52:17
    75:11,13 135:23
    175:18 246:1
    282:11
**receives** 221:15
**receiving** 173:8 195:1
    195:23
**recess** 36:24 74:1
    104:13 135:1 183:7
    206:3 230:16
    257:15
**recheck** 133:17
**rechecking** 126:16
**recitation** 186:15
**recollected** 206:13
**recollection** 10:19
    14:4,9 15:1 16:1
    17:3,11 19:2 24:23
    31:15 32:20 34:12
    38:10 43:7 47:14
    54:9 55:1 56:5,12
    56:13 57:8,17 58:9
    61:22 71:22 72:14
    72:21 100:11 111:1
    111:20 114:6
    124:17,23 126:14
    128:13 130:2
    132:19,21 135:18

135:20 162:12,18
164:1,14,21 165:10
166:2,13 167:8
181:5 182:22
187:17 189:20
191:24 205:21
225:11 247:6
260:17 277:19
291:21
**recommendations**
105:17
**reconstruct** 147:19
147:21
**reconstructed** 147:22
**record** 6:2 35:22 61:3
90:7 99:11,13 102:4
112:23 127:16
128:1 131:14
133:25 147:13
159:13 160:12,16
160:25 167:4,6
170:12 178:19
183:9,19,20 188:5
206:2 218:1,2,3
224:8 237:15 238:8
239:16 243:23
260:10 275:4
302:10,11,13 305:9
305:17,23 307:12
**records** 100:22 101:8
101:22 102:9 173:2
173:9 174:12,14,24
175:8,9,11,18 176:6
195:2,6,20 196:9
231:4 237:1 246:1
252:23 261:8
**recruitment** 46:24
**redirect** 151:17,18
**redistricting** 69:14
69:17
**redline** 11:11 36:7
98:22 143:7,11
**redlined** 11:4 99:1
**reduce** 270:5 285:21
**reduced** 211:24

271:22 272:13,19
273:6,19 274:14
**reducing** 148:2,3
153:24
**reductions** 285:15
286:1
**Reed** 34:16
**reelection** 20:20,21
**reexamined** 35:10
41:8
**refer** 92:2 93:20
111:2 148:19
161:16 240:15
265:6
**referee** 47:5
**reference** 45:25
180:14,15 190:23
226:21 238:23
270:23 281:11,14
286:4 289:4
**referenced** 185:17
203:7 285:10
**references** 180:12
**referencing** 166:5
180:17 279:22
283:3
**referred** 84:25
**referring** 9:15 25:12
32:9 45:23 48:22
49:4 65:4 77:11
87:6 91:10 111:8
113:4 126:1,2 130:7
131:25 136:10
138:3,23 158:9
161:23,25 162:9
163:16 198:14
218:23 220:23
224:1 228:21
229:21 230:21
238:9 242:3 245:13
246:8,19 250:2,15
253:3 254:2 257:6
258:16 260:12,13
277:9,11
**refers** 137:25 177:15

**reflect** 135:13 188:5
192:20 194:8
195:22 196:7,7
206:22 275:5
**reflecting** 165:2
**reflects** 194:25
196:13
**Reform** 284:18
**reforms** 46:19,22,24
50:22 284:24
**refresh** 7:22 31:4
34:11 47:25 119:4
124:22 164:23
165:22 166:2,3
171:20 181:4
189:20 205:21
220:5 225:11 230:5
244:21 247:6
255:20 256:24
260:6 265:6 277:19
289:3 291:21
298:25
**refreshed** 54:25
**refreshing** 191:24
219:16
**refusal** 302:15
**refuse** 94:10,12 96:11
**refused** 95:12 141:25
145:12 305:1
**refusing** 229:20
**regard** 105:17 133:20
146:2 169:18
211:16 213:24
214:6 232:11
234:21 235:1
296:22
**regarding** 43:20
78:22 120:23
197:21 198:1,11,17
199:9 202:14 214:4
214:18 263:18
268:9 276:6 294:12
**regards** 260:25
**regime** 299:17
300:22 301:1

**regimes** 294:25
298:24
**register** 287:4,6,15
288:20 289:9,24
290:3
**registered** 5:8 99:22
100:10,24 101:12
181:17 182:9
184:13,19 185:9,25
187:2 209:11
210:21,22 211:5,6
223:13 238:13
241:19 242:1,11,19
244:18 245:3
246:25 247:21,24
248:23 250:18
286:25 287:3,4
289:15,20 297:20
**registering** 102:9
287:18 288:1,12,23
289:1
**registers** 289:18
290:11
**registrants** 220:12
244:6
**registration** 46:13
50:23 85:24 176:23
180:21 181:11
183:15 184:1,7
198:20 199:13
201:4 213:24 214:6
214:10,22 215:1,7
217:17 224:25
225:1,9,10 227:15
227:23 228:5,8
237:15 239:16
244:10 248:7
266:10 286:22
289:7 290:8 308:8
**regression** 245:9
246:11 263:8,12,22
264:6,14,21 265:1,5
265:10,23 266:5
268:3
**regression-based**

JEFFREY MILYO, PhD                                    8/26/2014

299:23
**regressions** 264:2
**regular** 14:14
**regulations** 44:17
    46:11,14,16,16,19
    47:1 62:23 63:13
**reiterate** 304:17
**relate** 47:8 130:16,18
    286:16
**related** 40:7 44:16
    45:18,19 46:18,24
    67:9 112:9 172:16
    173:10,10,18
    182:19 200:4
    285:20 286:2
    307:24
**relates** 66:6 75:19
**relating** 46:25 51:22
    131:3 143:25
**relationship** 22:24
    74:18,22,25 75:7
    76:1 299:21 300:2
**relative** 274:15
    281:18 297:14
**relatives** 153:3,20
    155:18
**Relevancy** 272:15
    273:21 274:18
    292:6
**relevant** 40:6 41:2
    109:23 139:2
    165:15 169:17
    205:25 206:23
    207:1 227:5 229:20
    233:5,6,8 238:23
    249:5
**reliable** 24:22
**reliance** 200:21
**relied** 177:5 178:14
    189:14 190:19
    191:2,9 199:25
    261:21 262:12,22
    263:2,5
**rely** 173:20 190:10
    226:25 293:23

295:16,25
**remember** 15:11
    17:23 18:19 21:5
    31:7,8,9,11,13,16
    31:20 38:2,25 42:11
    49:19 50:4,6,24
    67:24 72:5 141:24
    181:1,14 210:3
    241:23,24
**remembering** 140:8
**remind** 70:13
**removal** 215:6
**remove** 202:9,21,25
    203:12,24 204:12
    205:6 214:21,25
    245:1
**removed** 193:13
    202:25 238:7
**removes** 216:11
    222:1,6
**removing** 215:22
    238:11
**render** 94:9 186:10
**rendered** 98:13
    186:19
**Reneé** 1:21 307:4
    308:7
**renew** 275:16
**renewed** 75:13
**repeat** 26:16 31:5
    95:4,14 109:13
    149:25 197:17
    262:11 272:4
**repeated** 70:5
**repeatedly** 85:2
    189:6
**repetitive** 120:22
**repetitiveness** 121:14
**replicating** 178:21
**replication** 94:4,6,8
    95:3,10,11,18 96:2
    96:5,9,10,24 97:2,5
    97:15,17 113:10
    114:5 130:1 141:9
    141:14,16 142:23

142:24,25 144:11
    145:12 254:3
**replications** 93:23,25
    94:1 137:8 141:15
    144:4,16 147:3
**reply** 149:9 164:8,10
    167:25 252:7
**report** 4:18 9:21
    11:20,22 12:16
    13:12 18:12 24:21
    25:1,3,11 26:3,8,11
    26:14,18,22 28:19
    35:4,16,17,21 36:1
    36:6,7,12,15 37:14
    38:4,6,6,7,7,11
    39:12 40:7,10,12,24
    41:1,3 43:16,19
    46:4 55:17 57:23
    58:1 59:5 61:13,13
    61:20 62:2,8,18
    76:9,10 79:5,6
    80:15,21 81:7,16
    82:2,15,21,23 83:3
    83:10,20 84:4,21,22
    85:2,9,16 86:5,20
    86:23 87:25 90:15
    90:21,24 91:5 92:3
    92:4,5,6,10,15,22
    93:20 94:12,14,15
    95:1,17 96:2,11
    97:13 98:8 104:17
    105:8,17,21,25
    106:7,11,15,21,22
    107:3,5,16,19,22,24
    108:10,11,12,16,19
    109:1,7,16,22 110:1
    110:7,7,11,14,18,21
    111:2,15,21,23
    112:7,13,17 113:24
    114:2 115:22
    119:22 120:1,18
    121:5 122:4,8
    123:11 124:4
    125:20 126:4,19,21
    127:2,5,7 130:17,19

131:10 133:1,10
    141:5,17 144:5,10
    144:16 146:3,11
    148:11,19 149:9
    150:9,16,18,19
    152:3,6,16,24
    153:22 156:10,18
    160:18 161:16,16
    161:21,22,24,25
    162:4,6,8,10,10,11
    162:12,17 163:1,2,4
    163:6,8,12,13,13,16
    163:19,20,21,23
    164:3,9,13,18,20,22
    164:25 165:1,3,5,6
    165:10,20,21,22,25
    166:8,14,16,17
    167:8,10,11,14,16
    167:25 168:2,13,17
    168:24 169:1,3,6,8
    169:15,17,23 170:4
    170:14,16,21,22
    171:4,7,15,19,23,24
    173:13,16,18,19,20
    174:5,16,19,19,20
    175:4,16,22,25
    176:8,15,19 179:3
    179:22 180:1 182:4
    182:5,13,14,19,21
    184:11 185:14,18
    185:23 186:4,5
    188:11,18,24 189:8
    192:15 193:13,14
    194:17,20,21,23
    195:17,21 196:7,12
    196:18,20,24 197:9
    197:19,20,25 198:7
    198:10,17 199:8
    200:7,7,8,17,17,18
    200:21,22 201:7,9
    202:5,13 203:10
    204:2,7 205:17,22
    206:5,8 207:4,10,23
    208:19,25 209:7,12
    209:13 210:5,10,15

JEFFREY MILYO, PhD                    8/26/2014

211:3,11 212:9,25
214:9 216:15 217:1
217:5,8 218:13,17
220:21 221:8,13
222:4,10,11 223:10
223:17,22,25 224:3
224:13,17 227:1
228:6,22,23 229:8
229:10,19 231:13
231:18,19,24 232:2
232:13,16,20 233:1
233:2,18,23,25
234:12,17,24 235:3
235:5,7,12 236:20
237:5,13 238:4,22
239:2,6,14,19 240:6
240:13,18 241:6,11
241:16,17 242:3,5
244:13,23 245:14
245:17,19 248:5
249:21 250:3,11,15
250:16,21,24 251:1
251:7,10,10,17,18
251:20 252:1,7,13
252:20,22 254:14
254:20 255:2,7,16
256:18 257:18
259:16,18,20,23,25
259:25 260:3,7,14
260:17,22 261:3,6
261:11 264:19,23
265:21 268:13,25
269:10 270:2,13,15
276:2,5,10 277:6,9
277:14,15,18,22,25
284:20 285:8
287:10,16,21 288:6
288:22 291:12,13
291:16,22 292:15
293:14,16 294:9
295:11,14 296:8,9
296:11,23,24 297:1
297:25 300:10
301:13
**reported** 1:22 97:12

98:7 114:1 122:10
142:16,17 209:10
**reporter** 8:4,21 53:11
89:5,14,24 142:7
307:5
**reporter's** 4:4 13:4
307:1
**reporting** 96:7
117:25 252:17
**reports** 11:24 13:7
25:8 35:5 37:2,5,6
37:10,15,17,21,24
38:1,19,21,23 39:1
39:6,16,17,19 40:17
40:18 43:15 45:4
47:5 49:8 59:1
61:23 62:7,14 74:20
78:5,20 84:18,24
85:5 87:3 144:2
148:13 149:11
152:14 162:2,23
163:9 164:15 165:9
166:20 167:19
169:21 170:2
171:10,12,14,18
175:14 190:24
191:14 192:23
193:23,24 196:8,13
196:16 200:2,11
202:17 229:18
231:1,7 232:10
245:25 246:9 250:6
252:7 253:1,2,11
267:20 270:22
284:11 286:5 289:4
298:6
**represent** 11:1,18
129:13 131:12
161:5 162:3 163:11
164:24 180:13
227:13 245:2
291:23
**representation**
278:24
**Representatives** 1:18

2:3
**represented** 12:3
36:2,5 278:2
**representing** 12:9
227:12 295:4
**represents** 254:20
255:3
**request** 114:10 129:7
131:17,19 135:21
135:23 136:3,21,23
136:24 302:22
303:2,10
**requested** 135:7
136:8 307:15
**requests** 131:15
135:16
**required** 79:22 80:12
249:3,17 250:18
286:20 299:19
**requirement** 297:15
**requirements** 249:12
293:1 297:10,11,13
297:23
**requisite** 91:14 94:15
138:16 142:22
239:21
**reregister** 249:4
**rereview** 285:8
**research** 15:21 18:5
18:6,18,21 19:23,24
45:17 47:3 55:3
67:10 70:19 76:14
145:21 146:4
191:25 192:9 201:3
201:13 217:9
241:18,25 242:9
264:17
**researcher** 76:13
93:13
**reserve** 304:18
**reside** 249:8
**resided** 92:4 96:8
113:25
**residence** 94:13
96:12,15

**residency** 96:12,15
**resident** 96:23,25
**residential** 70:3
**residents** 96:20
**residing** 186:1
**resolved** 112:5,12
**respond** 140:7
172:15
**responded** 141:12
**respondent** 92:10,15
92:22,23 95:1,3,5
95:10,15,18 102:6,7
121:16
**respondent's** 118:21
118:24
**respondents** 92:2,3
93:1,17,17,18 94:2
94:11,14 96:1,6,11
97:11 98:6,12 99:22
99:24 100:21 101:3
102:20,21 103:4,23
104:4,8 113:10,20
113:21,23,24,25
114:3,15 120:8,22
121:20,22 122:5
125:20 126:4
127:14,16 128:21
129:20,21 131:20
131:25 132:13,17
134:1 137:12
139:19 140:11
142:12 144:5,12,14
144:23 145:14
295:1,9
**response** 43:16,19
88:18 95:5,8,22
108:2 110:22 111:6
111:7,11 115:10
122:25 123:1,5
127:15 128:7 129:7
129:15 131:17,18
135:10,12,22
136:20,22 138:22
139:2 166:23
169:22 170:12

JEFFREY MILYO, PhD                8/26/2014

**responses** 93:2,9 94:4
94:9 97:9 98:13
102:19 110:15
111:5 114:23 116:2
116:16 117:17
120:12 135:13
140:23 141:8,20
142:21 146:1 169:8
169:9,12,13 170:5,7
170:22,24 171:1,4
**responsibility** 159:12
159:18 160:10,12
160:15
**responsive** 44:4 51:2
56:19 59:17 112:8
128:25 136:25
200:12 209:24
**responsiveness**
281:13,16
**rest** 218:13
**restriction** 295:2
**result** 33:9 81:12
174:13 206:12
229:20 268:16
**results** 57:18 92:11
92:23 93:10 140:1
174:13 176:5,5
200:19 204:6
237:25 241:3,5
283:3
**resume** 14:1
**retained** 26:15,19
32:3,5 33:18 43:4
43:10 45:1
**return** 180:16
**returned** 307:15,17
**review** 35:17 37:5,10
39:3 45:5 48:23
53:3,14,16 55:7
78:19 109:1 134:6
134:12,15 149:8
190:19,22 191:2
192:4,6 206:5
219:15 220:4 238:4
247:11 249:14

251:6 291:13 299:8
**reviewed** 35:4,4,16
36:16 37:2 148:13
171:22 181:7
**reviewing** 18:11
36:18 119:4 162:16
232:2
**revised** 189:3 192:22
231:17
**revision** 187:24
188:14 189:10
**revisit** 100:8
**revocation** 142:5
**revoked** 131:9 133:2
137:21 138:15
139:4,15 140:4,19
141:13 144:25
**reweighting** 148:5
**Richard** 3:3 6:10
**Richard.Dellheim...**
3:7
**RICK** 1:7
**ride** 154:21 155:2
**rides** 154:8,25
**ridiculous** 150:23
**right** 8:15 11:8 12:17
12:18,21 21:11 26:2
29:5,8,8 36:15 43:3
46:9 61:9 78:23
90:8 91:20 93:25
98:11 103:16
104:11 106:2
111:24 116:16
117:16 118:14
119:10 122:24,25
125:6,14 128:23
133:10 138:9 142:6
151:21 158:11,20
169:2 170:15
172:11 174:1
187:11 196:20
225:1,10 247:7
254:20 255:2 289:9
299:9
**rights** 2:15 73:9,17

**Riker** 278:2 279:17
**ring** 22:15
**Rio** 3:15
**rise** 283:19
**RMR** 308:7
**road** 57:17
**Robert** 3:14 7:1
**role** 43:11 67:3 77:23
**rolls** 215:15,23 216:2
216:3,10,13 217:17
218:19 220:17
221:20 222:1,7,16
226:2,6,11,13
**Ronald** 3:9
**Ronny** 6:16 34:18
**Ronny.Keister@oa...**
3:12
**Room** 3:4
**Rosenberg** 2:3 4:2
6:1,3,15,18 7:6 9:19
10:7,25 13:11 33:8
36:21,25 42:3,16
46:5 53:9,19 73:23
74:2 76:19 77:8
78:11 82:17 83:11
83:16 89:2,9,12,18
89:22 90:2 99:6,19
102:2,5 103:11,14
104:11,14 109:2
112:19 117:8 118:5
119:6 126:24
127:20,23 129:5
130:11,20 134:17
134:24 135:2 143:4
147:11,14 150:2
155:5,6 157:17
158:5 159:3 160:19
161:6 164:2,5,8
183:5 303:14
305:23
**round** 52:21
**row** 4:20 127:9,11
130:4,16,23 131:3,8
131:19 132:10,14
132:22 134:1

135:22 137:12,16
137:17 139:3
**rows** 135:12
**rubber** 57:17
**rule** 161:15
**ruled** 29:16
**rules** 1:24 161:6
302:17
**rulings** 29:11,14,21
**run** 17:22 144:15
296:20
**running** 13:14 145:6
164:16 189:18
208:21
**runs** 144:15,22
146:15

--- 

## S

**S** 2:1 3:1,9 4:6
**Safety** 221:16
**Safety's** 173:1
**sake** 222:15 223:1
226:5 227:25
**salary** 21:12
**same-day** 46:13
50:23
**sample** 68:15 109:23
147:17
**San** 19:5,14
**Sanchez** 4:13,21
35:11 38:4 41:4,9
90:18,24 91:12
99:21,23 104:9
106:1 108:19
109:10,17 110:9,15
110:22 113:1 121:3
122:4 125:19 126:3
127:3 129:3,25
130:24 137:5
138:14 139:13
141:18 146:22
193:10
**Sanchez's** 123:13
126:19 129:17
**Santa** 18:1

JEFFREY MILYO, PhD                                    8/26/2014

38

satisfactory 44:5
save 112:21
saw 125:16 190:22
saying 8:3 12:20 34:2
    50:19 66:2 68:4
    81:1 87:12 93:4
    98:11 102:5 108:6
    116:18 120:19
    134:10 137:18
    151:16 176:7 183:2
    196:22 203:18,20
    212:6 223:20
    252:17 275:18
    287:22
says 79:3 87:4 115:23
    121:25 126:6
    130:23 138:13,17
    158:12 219:11
    220:8 235:14,16
    247:19 252:19
    255:14,15 256:12
    259:5,13,25 277:18
    296:13
SB 78:23 79:22 80:4
    80:12,20 86:18
    87:18,19 88:3,10,10
    89:8,16,17 139:16
    192:19 193:7,21
    194:12 206:20,23
    207:1 210:16
    212:15 228:18
    230:19 245:4,8
    246:6 249:9,12,17
    250:19 252:15
    253:21 254:7 266:4
    270:17,22 286:9,11
    286:15,17,20,21
    287:16 292:10,11
scenario 155:23
scenarios 154:22
scheme 88:5
scholar 77:24
scholarly 64:25 68:19
    71:23 72:22,24
    122:13 145:20

146:4 148:7 176:21
    177:6,13 178:15
    180:19 181:8
    183:13,24 191:9,17
    201:13 203:9
    241:18,24 242:9
scholarship 115:25
    204:4 212:2
school 2:11 17:24
    19:21,22 24:1,3,5,7
    51:10 118:9 179:24
    258:18 284:9
science 22:21 50:7,8
    54:11,18 65:1 67:8
    73:9,16 179:1,6
    242:23 243:5,10,19
    244:1 263:13 264:8
    264:15,17 279:2,15
    279:25 281:25
    282:4,6,8,10,12,16
    282:18,19 285:20
    286:1 287:14
sciences 179:11,14
scientific 79:21 80:10
    80:19,22 156:13
scientist 179:5 189:2
    216:16 255:13,19
    259:8 262:2,24
    263:3 281:21,24
    282:1,3 288:25
    292:17
scientists 242:18
scope 61:11 63:6
    175:16,22 260:14
Scott 5:7 34:12 42:10
scratch 132:6
screen 99:21 219:3,6
    219:10
screening 92:13
    95:19 97:23 100:9
    100:12,18
searching 155:1
seasons 16:5
seat 17:20
second 4:19 17:24

33:22 34:6,7 38:6
    61:13 66:20 94:24
    117:4 128:1 189:13
    190:8 218:1 220:20
    227:7 255:1
secondary 145:21
    148:8
Secretary 100:23
    101:8,9 102:8
    213:23 214:5 215:5
    216:1,10 221:15,20
    221:25 222:6
section 19:15 90:25
    91:3,4 105:8 144:9
    166:5 188:15
    198:14 204:7
    223:25 260:11
    261:2,6 277:25
sections 19:11 205:25
Security 215:15,22
see 11:5,11 14:5,8
    18:8 20:1 21:13
    38:3 39:11 46:10
    50:6 51:6 52:20
    53:22 58:19 68:14
    72:12 86:24,25 87:1
    91:15 92:7 93:8
    94:3 98:20,22 99:8
    99:8,25 100:1,25
    101:4,5 113:4
    120:24,25 123:13
    124:7 128:3 134:16
    139:19 140:12
    141:16 145:10
    146:10 148:24
    153:3 159:14
    165:10,11,22
    166:17,25 167:11
    169:1,7,16 170:21
    171:6 174:22 175:1
    182:14 186:13
    188:1,22 199:24
    206:18 209:9
    218:22 230:8
    231:11 242:2,7

264:2 274:21
    277:18 284:22
    294:18 295:5,18
    296:2,24
seeing 111:16 112:13
    123:11 125:9,11
    129:8,11 186:12
    244:12 286:4
seen 38:23 83:25
    127:5,7,25 128:3
    177:9 197:18
    256:22 286:6 298:5
selection 27:4,10
self-identify 129:22
    132:13
self-reported 57:13
    225:1,9 227:9,18
self-reporting 261:19
semantics 119:19
semicolon 142:11
seminar 51:3,4,6,18
    75:9,14
seminars 51:17
Senator 5:7
send 11:4
senior 52:6
sense 10:14 65:4
    80:25 118:18 145:5
    153:6 155:15 158:1
    168:10 209:13
    258:4 266:5
sensitivity 93:2,14,15
    93:21 145:25
    147:25 202:15
    205:12,15
sent 11:2 36:8 134:13
    136:9 138:21 172:9
sentence 91:9 99:20
    115:21 142:12
    143:15,17,18 220:8
    220:18 242:7,13,16
    296:7,8 300:20
sentences 100:2,6,16
    269:4
sentencing 46:24

JEFFREY MILYO, PhD                                    8/26/2014

39

**separate** 77:2 269:23
  271:13 303:12
**September** 32:21
  43:6
**sequentially** 141:6
**serially** 42:1
**series** 113:8 140:3
**serve** 111:17
**served** 28:18
**service** 115:10
**serving** 27:13
**SES** 267:1
**set** 115:19 120:23
  129:2,17,24,25
  130:4 131:19
  134:18 208:3
  251:25 256:1
**sets** 131:8
**seven** 30:15 66:18
  129:21 132:12
  182:24 191:21
  302:5 303:9 304:15
  305:15
**seven-year-old**
  187:16
**severely** 87:11,16
  89:6
**shaded** 234:6
**share** 20:22,23
  223:22 224:14,17
  228:7
**shared** 118:23
**Shaw** 243:1,2,18,18
  244:9
**shed** 127:12
**shoehorn** 278:23
**short** 55:22 61:20
**shorthand** 1:22 307:4
  307:11
**shortly** 10:11
**shoulder** 8:20
**show** 31:4 112:20
  172:21 187:9
  206:25 229:20,23
  249:17 274:14

**showed** 169:3 170:16
  271:20 272:11
  273:15,17 301:17
**showing** 98:3 103:14
  117:8 127:23 129:5
  219:22
**shows** 98:23 284:5
**Shrugs** 8:19
**sic** 26:3
**side** 155:11
**side-bar** 199:19
  200:15
**sides** 197:1
**sign** 283:9 304:11
  305:18
**signature** 4:4 11:16
  306:1,21 307:14,17
**signatures** 297:12
**significance** 81:9
  146:24 147:2
  268:17
**significant** 269:14
  293:17 299:16
**significantly** 174:13
**similar** 94:8 131:2,19
  132:16 165:25
  177:1,3 197:24
  198:6 227:22 298:2
  299:22
**similarity** 253:8
**similarly** 163:12
  265:10,12,16
**simple** 133:7 226:6
  280:21 281:2 288:9
  304:25
**simplistic** 279:8,19
**simply** 108:6 143:6
  180:4 227:22 238:7
  247:22 288:1
**single** 158:20 159:4
  165:1 232:24,25
  233:5 234:13,14
  248:18 249:3 283:1
  285:5
**sir** 118:18 160:23

170:3 218:24
**sit** 108:23 162:25
  187:19 247:7
**sitting** 19:2 27:6
  31:14 32:20 62:10
  78:10 101:9 111:24
  131:24 182:16
  186:8 225:19 229:9
**situation** 159:18
**six** 25:22 158:6
**six-year** 158:10
**Sixth** 1:23 2:8
**size** 148:3 197:21
  198:1 199:25
  285:11
**Skepticism** 4:11
**skimmed** 171:11
**skip** 257:16
**skipping** 112:21
**skips** 41:12
**slant** 117:13
**sleep** 34:24 161:9
**slices** 212:21
**slight** 162:5
**slightly** 148:12
**slope** 295:8,12
**slow** 66:20
**small** 165:1 280:12
  280:22 281:13
  285:3
**smaller** 44:11 147:16
  147:20 283:8
**smallest** 284:14
**snapshot** 206:22
  207:1,5,14,16,19,22
**snippet** 218:10
  242:15
**so-called** 137:5
**social** 65:1 70:20
  73:9,16 154:6
  178:25 179:5,6,11
  179:14 189:1
  215:15,22 216:16
  255:13,19 259:8
  262:2,24 263:3

288:25 292:17
**Society** 50:12,14,15
**socioeconomic**
  283:18 298:7,9
**solely** 178:11 269:24
**somebody** 105:1
**sorry** 10:9 16:17
  26:16 32:8,10 53:6
  55:6 66:20 104:25
  125:21 134:9
  136:15 137:23
  138:2 144:21
  156:23 157:15
  158:23 164:2
  171:21 208:8,16
  233:24 247:15
  266:20 293:20
  304:4,6,21
**sort** 15:5 42:2,25
  53:16 64:5 75:18
  77:23 86:22 105:2
  142:20 145:3,7,8,14
  145:16 159:10
  173:5 178:11 295:5
**sound** 57:14 62:25
  63:14 116:20
**sounded** 57:2 105:15
  114:19
**sounding** 104:21
**sounds** 27:22 28:3
  54:24 57:15 63:9
  116:19 117:2
  179:16 195:3
  216:18,19,20
  271:14 283:16
  288:6
**source** 123:18 129:12
  223:2
**sources** 79:6 103:3
  128:15 223:8,18
  270:9
**South** 190:20 191:3
  191:10
**SOUTHERN** 1:1
**Spanish** 265:17 266:9

JEFFREY MILYO, PhD                          8/26/2014

**speak** 47:6 81:17
84:21 85:20 90:7
99:10,13 106:3
121:4,19 150:16
152:23 169:24
206:14 270:22
287:9 304:13,15
**speakers** 51:24 54:7
**speaking** 20:3 34:9
44:12 45:12 76:17
81:7 84:8 85:24
101:3 102:8 165:16
209:3 263:10
**speaks** 82:21 83:21
150:10 152:3 276:2
**specific** 18:6 31:1
33:2,15 34:1 42:25
104:2 105:19 119:2
121:8 122:16
124:16 126:14
129:9 130:4 132:10
137:12 139:25
149:12 152:17,19
154:16 166:22
170:4,5,5,6,7
194:18,24 195:18
195:25 198:5
199:25 200:23
201:14,22 205:18
206:6 208:23 210:8
223:9,25 226:19
228:21 229:19
240:19 242:3
244:20 266:18
281:8
**specifically** 18:19
51:13 54:5,14 55:24
56:10,15 62:24
65:22 70:12,17
71:11 93:16 100:9
100:14 111:2
122:20 128:19
129:14,17,19 131:7
134:18 136:25
138:23 140:3

141:20 146:3
152:15 177:16
198:15 209:12
218:9 222:8 238:5
260:19 279:21
302:22 303:10
**specification** 146:17
230:22 296:18,20
**specifications** 299:12
**specifics** 30:9 31:8
34:8 181:1 277:17
**specifies** 134:1
**specify** 127:14
**speculate** 86:13,15
288:7
**speculates** 217:15
**speculating** 221:1
**speculation** 122:2
155:4 235:15,17
250:13 268:11,20
272:15 273:21
274:19 287:8,21
290:6 293:10
**speed** 189:7
**speeds** 149:21 150:15
**spend** 162:16 232:1
238:4 251:16
**spent** 60:4,8 158:14
158:16 169:25
**spirit** 50:5 51:1 56:20
59:18 68:14 111:7
178:20 197:6
206:10
**spit-out** 129:19
**spoke** 152:15 287:20
291:12 292:14
**spoken** 48:24 124:3
160:17 216:14
**spreadsheet** 133:4
168:7
**spring** 15:17 19:13
**spurred** 114:10
**St** 22:20
**stage** 164:17
**stance** 77:5

**stand** 103:4 177:11
198:9
**standpoint** 98:5
**stands** 158:21 159:4
**Stanford** 13:23 14:17
14:19 15:13,18 16:1
16:8,15,22 17:8,13
17:14 19:21,22 21:6
21:15 22:11,17,24
**start** 14:6 39:20
102:1 112:3 132:6
148:22 153:17
176:17 257:4 273:9
277:11
**started** 256:19
**starters** 44:6
**starting** 122:6 142:8
158:24 256:17
**starts** 222:14
**state** 1:16,21 2:2 3:9
6:3 19:6,14 20:2,5
20:13 25:9 29:24
32:3,6,15 33:10,18
33:25 47:11 55:12
55:13,25,25 57:12
58:15 59:4 78:19
94:13 96:11,14,21
96:24 100:21 102:8
122:20 156:17
157:8,14 172:2,6,25
174:3 176:14,21,23
178:1 180:21
181:10,19,21
183:14,25 184:7,15
184:20,22 190:15
212:24 213:1,24
214:5 215:5 216:1
216:10 217:14,17
220:14 221:8,15,20
222:1,6,16 223:11
226:6 239:3,20
241:17 244:24
248:18,23 251:21
258:6,19 266:12
269:10,17 279:12

280:11 282:21
289:2 290:11
293:15,18,25
294:13 297:17,25
302:12 303:22
307:2,5
**State's** 100:23 101:8
101:10
**State-issued** 259:9
**stated** 95:15 97:16,21
135:21 141:10
175:13 181:20
184:25 185:2 187:1
198:5 229:17 245:5
266:15 276:13
280:17
**statement** 114:22
149:24 151:20
177:1,3 181:24
185:12 216:17
217:19,24 236:13
239:25 242:3,5
267:6,10 281:12
282:25 292:18
294:2 300:22
**statements** 40:7
**states** 1:1 3:2 6:9,11
6:13 56:1,3,7 58:15
99:23 103:23 161:5
192:11 209:11
218:18 219:12
220:9,14,22 221:9
242:10 277:15
283:20,22 297:9,19
307:22
**statewide** 280:19
281:5
**stating** 264:11,12
296:25 297:15
**statistical** 64:2,7,8,15
64:21 65:6 73:5
80:7 81:9 146:23
147:1,7,24 268:17
269:15 270:4
296:21

JEFFREY MILYO, PhD                          8/26/2014

41

**statistically** 269:14
283:8 293:17
299:16
**statistician** 64:1,3,16
**statisticians** 64:5
**statistics** 63:20,21,23
64:10,11,12,14,19
64:24 215:4,12
**status** 94:12 173:10
228:9 266:19,21
283:18 298:7,9
**Statute** 5:3
**stayed** 23:14
**step** 201:1,14 202:2,7
225:6 227:7 255:11
**Stephen** 5:5 67:1,14
67:25 161:21
**steps** 200:23 201:22
202:14,17,21,25
203:12,19,20,24
204:3,5,12 205:4,5
205:8,9,11,14,18
206:6 207:24 208:7
208:10,11,20,23
211:23 213:2
257:24
**Steve** 231:16
**Stewart** 190:18 191:1
192:2
**stick** 85:8
**stolen** 140:5
**stop** 94:24 151:19
177:22 240:21
**store** 150:25
**straight** 54:19
**straightforward**
147:7
**strange** 64:5
**Street** 1:23 2:8
**strict** 294:25
**stricter** 297:22
**strictest** 297:10
**strictly** 101:2 102:7
**strictness** 298:23
**strike** 88:7 107:4

115:19 133:18
141:11 144:18
**strongly** 78:10
120:17 201:12
**struck** 101:21
**student** 67:8
**students** 18:4
**studied** 45:23 49:23
49:24 56:9 71:12
84:13 85:25 287:15
291:1
**studies** 20:16 44:15
46:11 47:3,19 48:17
48:18,20 53:2,14
71:7 103:9,17
119:23 149:15
150:4 154:2,3
176:21 177:13,21
178:4,6 179:1,9
244:3 283:5 285:10
285:23 293:15,22
293:23 294:1,4,5
**study** 15:22 48:14,16
49:2 55:2 58:6 65:5
71:8 72:1 73:13
81:12 84:15,17
93:13 103:22
108:14 115:16
153:23 154:16
156:7 158:20 159:4
159:9 177:8,15
179:6 180:19 181:9
181:13,13,22 182:2
183:13,24 184:2,24
217:15 223:12
225:14,20 226:20
227:17 243:13
283:11,13,15,24
299:1 300:4,5
301:10
**Study/Barreto** 4:13
**studying** 71:13
**stuff** 75:19 138:7
304:22,23
**subject** 19:1 102:19

106:14 114:23
120:12 122:6
148:13 283:12
**subjected** 120:22
**submit** 56:25 60:7
67:4 215:4 289:21
**submits** 236:6
**submitted** 13:12
57:21 58:2 60:18
61:1,16,19 78:20
87:3 127:2
**submitting** 68:8
231:20 235:9 236:1
236:11,16
**subpoena** 131:21
132:18 135:8,14
137:13 138:22
**subsample** 147:18
**subsamples** 67:5
148:4
**Subscribed** 308:3
**subsequent** 58:16,25
187:23 188:14
206:21 207:5,14,21
298:12
**subsequently** 188:20
**substance** 32:24
81:16 90:22,23
181:5
**substantial** 118:21
**substantially** 87:20
151:8,13,25
**substantive** 13:16
69:18 70:7 73:6
91:1,3
**successfully** 238:15
**sufficient** 81:1 87:11
87:16 89:6 108:1
123:6 171:9 205:3
274:8
**sufficiently** 100:17
108:5 123:10
229:10
**suggest** 98:21 109:11
205:11 208:23

280:21 298:6
**suggested** 31:18
124:22
**suggesting** 68:3,5
**suggests** 70:1 238:16
**Suite** 2:4,8,15 308:9
**summarize** 87:3
**summary** 87:19
105:6 255:15
270:20
**summer** 14:15 15:5
15:19,21 17:21,25
18:4 19:17,20 20:10
21:2,4,18,25 22:15
52:22,22
**supersedes** 10:14
**supplemental** 4:9
10:10 36:19 37:14
37:24 38:1,4,5,7,11
38:19 39:6,16,17,19
62:6,14 161:23
162:8 163:16
165:25 167:25
168:24 169:6,21
170:1,14,21 171:10
171:11,13,15,18,19
171:22,24 173:19
175:4 190:24
191:14 192:22
193:12,23 196:16
200:22 244:13
250:11 251:1,7,17
251:18 286:5
**support** 5:6 19:22
52:22 88:4,6 115:12
115:21 116:18
117:19 120:3,5
122:12,13 123:6
124:9 145:21 146:4
146:5 148:8,8
235:13 270:24
303:15 308:8
**supported** 15:20
**Supporter** 117:15
**supporting** 18:18

JEFFREY MILYO, PhD                                    8/26/2014

**suppose** 80:25 179:12 207:3 288:14
**supposed** 206:18 207:11 275:8
**supposedly** 155:13
**suppress** 87:21 270:18
**sure** 11:7 12:19 14:11 14:24 17:2 25:4 26:17 27:17,23 28:4 28:7,14 29:21 35:18 35:23 38:5 39:22 42:15 44:6 47:16,17 51:21 52:9 54:5,6 57:10 60:12 86:14 88:2,20 95:5 98:4 99:5,6 103:10 105:15 111:3 112:2 114:21 116:6 117:24 118:8 119:2 119:6 126:22 128:16 134:8 142:21 149:10 150:2 161:11 164:17 173:25 194:4 199:23 203:6 227:11 229:7 237:10 239:11 243:14 268:22 272:4 276:24 278:15 283:25 286:7
**surmise** 266:18
**surmises** 269:1
**surname** 265:17 266:9
**surprising** 283:9
**survey** 4:21 56:7 66:15,17,22 67:2,7 67:16,17,19,20 68:8 68:13,16 90:19,20 92:11,24 93:5 97:24 100:13 102:13,19 104:10 106:2,9,13 106:19,24 107:10

108:21 109:18 110:9,15,23 111:9 111:12 112:3,25 113:3 114:9,11,14 114:18,23,24 117:16 120:10,12 120:14,21 121:14 122:5,6 123:6 130:25 132:7 139:21,24,25 140:9 140:13 193:17 226:18,21,23,24 262:18
**surveying** 107:7
**surveyors** 107:4
**surveys** 66:12,13 102:21,25 103:5,24 104:5,7,8,12 107:6 120:9 145:25
**suspended** 94:5 131:9 133:2 137:21 138:14 139:4,14 140:4,18,25 141:13 142:13,17 144:25
**suspense** 228:9,12 230:8,18 231:3 246:15,24 247:2,4
**suspension** 142:5
**swore** 255:10
**sworn** 1:18 7:4 307:9 308:3
**synonym** 125:13 302:3
**synonymous** 63:14
**systematic** 270:9 289:6
**systematically** 102:21 103:5,24 104:5 114:15 120:8

---

**T**

**T** 4:6
**T-E-A-M** 79:9
**Taber** 103:20,21 116:8,24

**table** 127:5,6 228:21 229:20 230:22 231:8 232:25 233:5 233:10 237:7 240:16 246:20 248:15 250:14,16 284:3,5,11,12,17
**tables** 126:19 228:24 229:8,18 232:22 233:3,11 246:5 253:4
**tabulation** 132:12 139:1
**tabulations** 140:1
**take** 9:1 11:5 12:25 35:24 36:22,23 37:23 48:1 52:10 73:23,25 99:4,14 102:2 103:9 104:12 116:11,12,12 131:13 134:6,24 141:1 144:20 147:11 160:21,23 161:10 163:23 183:5 200:25 201:24 202:3,3 203:12,24 204:3,5 205:12,15 209:14 218:4 224:9 228:12 230:4,14,23 245:17 246:2 256:23,25 257:13,14 291:23 299:7 303:20 305:13
**taken** 1:18 8:4,20 52:7 75:4,23 77:5 107:1 200:24 201:23 205:9,11,15 205:19,23 206:7 207:25 208:20,24 211:23 307:10,25
**takes** 23:8
**talk** 56:13 57:18 60:22 142:8 280:9
**talked** 49:24 53:1,12

63:5
**talking** 15:6 22:12 41:9 45:25 54:1 86:8 92:19 96:19 117:21 119:7,15 136:23 155:17 176:17 182:23 209:21 212:14 213:15,16 225:2 272:19 273:24 277:17 279:11 299:10
**Tania** 2:20 305:19
**Tania.Faransso@...** 2:22
**tank** 52:1 74:17
**tanks** 52:10
**target** 109:24
**taught** 19:8 45:19 64:19 282:15,17,18
**tautological** 243:7
**tautology** 179:16
**teach** 75:9,14 281:24
**teaching** 17:9,10 19:7 19:14,15 21:14,17 22:11 47:4 75:20
**team** 35:13 41:16,18 42:4 66:19 67:4,5,6 67:13,14,15 79:8 202:21 203:1,13,25 204:13 205:6 222:12,22
**teams** 67:16
**technical** 27:22 28:3 28:25 29:3 49:8 57:25
**technologies** 236:8 239:1
**Technology** 5:10
**tecum** 128:2,7 131:22 132:13 135:8,14 137:13
**Teleconference** 2:13 2:23 3:18
**television** 47:1

**tell** 8:14 9:1,20 15:11
    25:2 26:1 27:9
    28:11 30:12,19
    31:11,13 33:3,14
    35:25 55:1 58:21
    62:20 66:21 84:16
    103:22 109:11
    111:24 113:14,19
    125:25 131:24
    153:15 182:16
    188:11,25 197:12
    222:3 231:25 232:3
    232:6 239:10
**telling** 138:18 273:25
**temporary** 291:24
**ten** 141:19 289:16,17
    291:10 302:24
**tense** 185:4
**tenure** 23:20,21,22
    23:23,24 24:2,4,6,8
    24:10,12,13 282:11
    282:13
**tenured** 24:14,16
**term** 20:14 27:22
    28:3,5 39:10 46:12
    49:24 68:25 83:22
    83:23 84:2,7 123:21
    185:20,22,24
    247:11 248:5 277:7
    277:8,15,23,24
    278:6,9,13,14,19,22
    286:15 302:1
**terminology** 67:15
    83:19 208:13 266:1
**terms** 10:22 28:8
    29:1 35:23 40:9,10
    47:23 49:5 62:15
    67:22 68:15 70:6
    77:22 79:5 83:14
    84:4 85:22 92:1
    96:12 105:20
    146:14 147:6
    148:17 149:1
    154:15,20 155:7
    157:24 172:22

178:7,21 191:21
    197:23 234:6
    263:15 264:9
    286:22 289:6
    292:22
**terribly** 78:10
**test** 8:23 147:7
**testified** 7:4 26:24
    27:1 37:1 170:3
    289:13
**testify** 9:8 32:11 78:6
    156:12 234:15
    288:18
**testimony** 13:6 27:10
    31:22 58:16,25
    95:25 113:15,17,19
    114:8,14 133:24
    166:12 251:11
    288:3 307:12
**tests** 146:23 296:21
**Texans** 298:4
**Texas** 1:1,16,17,21
    1:24 2:2,3,8,19 3:9
    3:11,15,16 4:13 6:3
    6:23,25 32:15 42:22
    58:15 73:2 78:19,23
    81:14,21 82:8,20,25
    83:18 84:14 85:1,13
    86:10 92:5 96:8,21
    96:23,25 99:25
    100:24 112:24
    113:3,25 123:20
    124:16 172:2,6,25
    174:3 176:14 193:7
    193:21 194:12
    213:23,24 214:5,6
    214:21,25 215:3,6,9
    215:14,18,21 216:1
    216:9 221:15,16,19
    222:6,7 223:13
    225:20,21,23,24
    226:13 227:10,19
    228:7 237:13 239:5
    239:14 249:6,8
    252:14 253:22

254:8 289:2 290:8
    290:11,16,17 298:2
    298:10 307:2,5
    308:9
**Texas's** 124:1 198:20
    199:13 214:10
    226:1,10 251:21
    265:17
**text** 25:25 100:19
    235:11 248:16
**Thank** 109:20 168:23
    197:7 207:20 231:9
    235:6 305:18,22
**thanks** 11:20
**theme** 71:25
**theoretic** 280:5
**theorize** 156:19
    157:1,5
**theory** 157:6 159:7
    270:4
**therefor** 307:18
**thesis** 56:17
**thick** 132:19
**thing** 21:5 27:3 30:19
    31:16 76:8 88:14
    89:24 105:5 111:25
    122:10 138:6 145:9
    181:12 206:13
    243:11 244:8
    298:18 303:13
**things** 8:15 13:25
    14:3 16:5 18:18
    19:3 20:7 37:7 41:2
    43:24 44:1 46:15
    66:6 69:4 84:4
    135:16 145:5 147:2
    155:10 157:23
    163:24 165:15
    176:1 208:16
    240:13 279:12
    285:21
**think** 6:19 11:10
    17:25 19:20 21:17
    21:19 22:15 24:19
    25:7 27:3 28:25

29:1 33:19 35:10
    36:21 42:15 43:5
    44:20 49:5 51:1
    52:1,10,20 61:19
    63:5 68:14 69:19
    71:20 73:11,24
    74:11,12,16 76:6
    78:9 84:21 89:11,20
    90:4 93:6,8 101:11
    102:15 103:8 105:5
    106:25 108:9 109:4
    111:7,15 112:14,16
    116:7 120:20 123:9
    125:9 134:22
    139:23 145:15
    147:22 149:24
    152:3 153:12 158:8
    159:16,25 160:14
    162:14 165:11
    170:9 171:9 172:10
    175:15 178:20,23
    182:23 186:20
    201:1 202:1 204:23
    204:25 205:24
    220:7 224:6 234:20
    243:7 246:19
    252:19 254:24
    255:14,24 260:21
    262:21 263:10
    265:8 266:1 269:7,9
    271:3 272:2,17
    276:20 277:18
    278:18 281:25
    287:9 303:13,15,17
    303:23 304:24
**thinking** 34:3 49:16
    71:17,18 89:21
    111:25 159:19
    208:16 238:6 258:2
**thinks** 134:23
**third** 33:22 118:5
**thorough** 17:6 92:19
    166:22
**thoroughly** 251:7
**thoroughness** 203:8

JEFFREY MILYO, PhD                                    8/26/2014

44

**thought** 13:20 19:2
  57:1 71:16 72:24
  76:12 84:20 100:19
  108:1,4,25 111:14
  121:12 156:11
  160:3 283:6
**thoughts** 62:15
**three** 6:19 7:19 11:24
  24:20,20 89:3 98:20
  114:4 115:24 116:1
  167:22
**thrown** 29:20
**tied** 16:6
**Tim** 105:1
**time** 8:24 9:6,15,16
  13:22,25 18:20
  19:24 21:3,17,21
  23:10 24:24 30:14
  30:25 31:14 33:24
  34:3 35:15 39:21
  40:15,20 43:14 45:1
  52:14,17 55:11,16
  56:13 57:7,17,18
  59:2,16,17 60:3,4,6
  60:8,19 62:18 75:15
  82:4,16 85:4,5,6,8
  87:7 90:5,6,10 99:4
  107:15,25 108:15
  109:19 110:3,4,11
  110:18,20 112:14
  112:17 119:2,20,21
  132:20,24 134:6
  148:17,18 149:1,2
  149:18,20 150:7,14
  151:1 155:1 156:15
  158:13,14,16,19,22
  159:5 162:25 166:6
  166:13 167:24
  168:3 169:20,25
  170:1 171:9 172:23
  173:24 174:1
  175:24 178:9 188:7
  190:25 191:20
  193:23,24 219:15
  220:4 221:23 224:5

232:10 238:4 250:7
  250:12 251:6,16
  255:22 256:24
  289:25 292:22
  302:14,21 304:19
  305:5,6
**times** 7:18,19 24:19
  24:20 108:9 109:4
  159:22 163:5
  215:18
**timing** 135:16
**tiny** 233:12
**tips** 151:3
**title** 12:6 41:11 52:5
  54:22 55:1 56:22,25
  57:5,9 64:11 112:25
  188:1,8,23 190:2
**titled** 10:10 38:5
**Toby** 3:20 6:12
**today** 9:9 62:2,10
  63:5 78:10 85:3
  106:16 108:23
  111:24 182:16
  225:19 229:9
  234:16
**today's** 113:5
**told** 148:22
**tomorrow** 269:9
**tomorrow's** 305:14
**Tonia** 6:22
**tools** 64:15 70:6,25
  71:5 73:5
**top** 14:5 31:14 34:4
  47:14,23 59:23,24
  124:21 222:3
  228:10 232:3,6
  244:2,8 247:9 253:1
  253:3,5 285:13
  296:7
**topic** 48:5 70:12
  71:11 72:16 81:18
**topics** 50:17 51:15
  81:18
**total** 60:16,17 133:5
  186:9,18 211:24,25

**totally** 156:21 157:3
**touch** 69:16 114:25
**tow** 146:20
**track** 24:2,4 60:4
  232:9
**train** 151:17,19
**training** 28:19 46:25
  281:20,23
**transcript** 8:7 303:16
  307:7,16,21
**translate** 35:20
**transmit** 41:14
**transparent** 295:3
**transportation** 65:10
  65:12 149:15,17
  150:4,6 151:10,15
  152:2,9,21
**Traugott** 284:20
  285:3,7,12,14
**travel** 65:14,16,18,22
  66:1,5,9 148:17
  149:1 150:21,24
  151:1 152:10,20,21
  153:25 156:15
  158:14,16,22 159:5
  286:2 292:22 293:7
**traveling** 149:16
  150:5 151:9,14,14
  152:1,1,9 292:10,11
**treat** 139:14 141:12
  144:7
**treating** 145:22
**treatment** 5:12 301:6
  301:10
**treatments** 93:9
**Trey** 244:15
**trial** 61:25
**trick** 134:19
**tried** 34:24 37:23
  128:14,17
**trip** 151:5,7,12,24
**trips** 149:19 150:8
  151:2,3
**trouble** 28:5,12 54:15
  76:23

**true** 249:10 266:6
  306:22 307:7,12
**Truman** 51:10
  179:24
**truncated** 145:16
**trust** 143:7
**truth** 239:10
**try** 7:11 30:21 53:7
  76:25 77:2 100:19
  105:15 143:10
  146:20 154:12
  217:2 257:17,20
  272:3 274:2 275:12
  280:24
**trying** 9:22 12:2
  13:22 16:19 17:6,18
  17:23 27:6 38:25
  39:10 47:25 56:19
  61:15 72:5 81:3
  111:17 112:8
  115:15 132:21
  134:19,20 141:7
  143:24 162:1
  178:10 184:9 185:4
  189:7 239:8 260:6
  273:10 276:3
**Tufts** 23:7,14,17,20
  23:21,22,24
**Tulane** 51:7,18
**turn** 78:11,13 125:18
  143:4 144:3 148:12
  176:19 180:7
  192:14 214:8 217:7
  235:6 237:4 244:22
  249:21 251:19
  254:19 270:14
  284:2 293:13
  294:22 296:5 297:4
  298:20 300:12
**turned** 60:21
**turning** 32:10 58:10
  105:24 273:24
**turnout** 4:23 5:8,11
  44:9 49:10 51:1,18
  53:5 56:3,21 57:13

JEFFREY MILYO, PhD                                8/26/2014

45

57:20 58:2 87:21
124:18 125:4
177:16,21 184:4
190:13 227:10,10
227:16,18,19,24
228:4 241:18,25
242:10,11,18,22
243:25 244:6,10,19
257:22 258:4,14,15
258:18 270:18,24
270:25 271:3,11,22
272:13,19 273:1,6
273:19 274:15
275:19,20 276:8,16
276:24 277:3,23
279:20 280:6,14,19
280:23 281:5,13
282:24 283:19
284:6,7,13,25 285:4
285:15,22 286:1
293:16,24 297:23
301:7
**twice** 198:22 199:19
**two** 18:18 19:11 50:9
54:17 63:17 89:3
100:2 115:24 137:4
153:10 197:1
200:10 209:4 270:5
281:19 298:22
299:2,12
**type** 141:6 145:15
**types** 20:15 84:11
169:13
**typical** 299:22
**typically** 125:12
258:8,22 259:13
264:2
**typo** 148:24 218:16

**U**

**U** 22:23 23:4
**U,S** 4:17
**U.S** 3:3,20 308:8
**Uh-huh** 26:6 177:3
257:25

**ultimately** 146:18,20
**un-updated** 174:18
**unaffected** 293:17
294:3
**unaware** 176:21
177:12 178:4,6
**uncertainty** 207:18
**unclear** 125:19 126:3
127:13 143:23
240:24
**uncommon** 145:24
147:24 148:4,6
**undercut** 87:11,16
89:6
**undergraduate** 75:20
282:7,9
**underlined** 99:8
**underlying** 130:18
156:20 157:2
173:17 174:21
175:17 176:8,9,11
**understand** 7:25 8:3
8:8,11,14 14:10
17:7 43:11 50:18
83:22 98:10 101:15
101:19 110:16
114:3 134:10,22
141:7 152:7,11
163:3 177:25 183:1
185:16 186:17
195:24 239:8,12
276:4 304:24
**understanding** 33:9
43:13,18 44:24
59:13 60:12 61:4
69:11,13 83:14,23
84:2,6 88:6,8 89:15
135:21 136:7 139:9
139:12 157:25
173:4 184:9 185:20
189:10 202:1,19,24
238:19 243:17
249:19 250:20,23
253:8 287:12
298:11

**understands** 287:14
**Understood** 15:3
21:23
**undertake** 78:25
**undertaken** 62:11
106:9
**unequal** 275:23
**unexpired** 94:5
247:22
**uninformed** 86:13
**union** 64:4
**United** 1:1 3:2 6:9,11
6:12 161:5 242:10
307:22
**universal** 284:13
**universe** 107:9,10
148:2 210:20,22
211:4,6,16,17,21
213:6,9 228:19
229:3 230:11,20
238:11,12 257:20
**universes** 229:12
**universities** 67:17
**University** 14:12,17
14:19 15:18 16:2,9
16:16,22 17:13,14
19:6 22:20,22 23:7
23:19,25 24:8,10,13
24:14,16 51:7
167:17 179:24
180:5
**unmatched** 194:25
**unpredictable** 153:5
153:9,11,13
**unreliable** 28:24
29:17
**unsure** 141:24
**update** 13:13
**updated** 169:4
170:17 173:14
174:16 175:3,5
194:1,7 196:15,18
196:19 200:21
206:18 261:8
279:23

**updates** 13:12,13,17
13:18
**upward** 91:11
**urban** 149:14 150:3
**urge** 303:19
**use** 11:21 12:13,23
28:7,10 29:14 39:10
40:5 69:3 70:6,24
78:13 82:12 84:16
123:13 124:5 147:8
177:17 185:22
204:25 209:2
210:11 217:21
218:5 221:6 248:5
264:21,25 265:5,17
265:22 271:3
278:16
**useful** 46:22 157:25
**uses** 197:23 218:10
**usually** 192:11

**V**

**v** 306:2
**vague** 274:18
**vagueness** 199:16
**valid** 140:4 158:6
181:18 184:14,20
255:12,18
**validate** 229:12
**validated** 262:19
**validation** 92:14
**value** 86:14 155:1
159:8 203:18
**value-added** 76:14
**Vanishing** 124:13
**VAP** 125:7,7 257:4
**Variability** 244:6
**variable** 47:13,18,19
48:6,16 139:13
153:9 268:2
**variables** 47:24 130:1
137:7 263:6 276:19
276:21 277:2
**variety** 255:24
**various** 50:22 245:2

JEFFREY MILYO, PhD                                      8/26/2014

46

**vary** 149:4 153:6
  155:21 156:5
**VEASEY** 1:3
**venire** 27:5,8
**VEP** 125:2,8
**veracity** 206:16
**verbatim** 78:24 87:14
  103:2 114:20
  186:14 217:19
  242:6,15 297:16,24
  300:19
**verify** 186:7 225:17
  248:16
**version** 35:17,21,25
  36:7 169:4,5 170:18
  170:18 280:12
  296:10,13,14 297:1
  297:2 298:12
**versions** 203:5 297:3
**versus** 18:16 39:12
  77:24 111:9 168:8
  177:22 223:23
  224:15 261:10
  281:14 287:3
**view** 81:3 158:22,22
  159:5,6 218:8
**vis-à-vis** 272:22,25
  273:1,1 275:24
**Vishal** 2:10 6:24
**Vishal.Agraharkar...**
  2:13
**visiting** 22:21
**vitae** 233:17
**Vital** 215:3,11
**vocabulary** 247:5
**voice** 185:1
**volumes** 47:22
**vote** 5:8 20:22,23
  50:22 84:10 94:10
  98:14 99:22 100:24
  101:13 154:13
  158:4 246:25 247:4
  247:21,24 248:23
  249:4,17,19 258:3
  262:19 272:12

273:4 274:5,8
276:14 286:17
287:15,18 288:1,12
288:20,23 289:1,9
289:16,18,20,24
290:3,11,22 300:18
300:25
**voted** 206:19 207:11
  209:5 273:5 274:10
**voter** 4:13,16,23 5:3
  5:10 33:13 43:20,22
  43:25 44:2,8,8,12
  44:13 46:12 49:3,10
  49:11,23 50:10,19
  50:20,23,25 51:1,12
  51:16,18,22 52:8
  53:4,5,23 54:23
  56:9,10,21,21,22
  57:12,12,19 58:2,6
  58:8 71:24 72:1,11
  73:13 75:4 77:5
  78:9,22 79:8 91:10
  100:22 101:12,22
  120:17 124:13
  140:24 141:1,3
  158:9 159:13
  160:13,16 176:22
  176:23 177:13,22
  178:5,7,10 179:2
  180:20,21 181:9,10
  183:14,15,25 184:1
  184:4,5,7,19 186:2
  187:2 189:16
  190:11,13,20 191:4
  191:11,18 198:20
  199:13 206:22
  213:24 214:6,10,22
  215:1,7,15,23 216:1
  216:10 220:17
  221:20 222:1,7,16
  226:1,6,10,13
  227:16,23 228:7
  237:15 239:16,21
  242:10,22 254:17
  254:23 255:6

256:10,14 265:18
266:9 270:18,25
271:11,17 272:8
273:12 274:5 276:7
276:16,24 277:3,23
278:19 280:6
282:24 285:21
286:22 293:16,18
293:24,25 294:13
294:24 295:19
296:2 297:9,14,22
298:24 299:17
300:22 301:1,6,7,10
301:18
**Voter-ID** 5:14
**voters** 2:19 6:23
  87:22 91:13 99:25
  181:17 182:9,10
  184:13 185:9,11,25
  187:3 192:17 193:6
  193:11,16,21
  194:12,19,25
  210:21,22,24,25,25
  211:1,5,6,15,17,18
  211:21 213:7,9
  215:10 217:11,17
  218:7,12,20 219:13
  220:10,24 221:5,7
  221:10 223:13
  228:8,12,12,20
  229:3,12 230:7,9,11
  230:18,19 231:3
  238:13 241:19
  242:1,12,19 244:6
  244:18 245:3,8
  246:7 249:8 250:18
  252:14 255:8 271:2
  271:18,18,21 272:9
  272:9,12,23 273:2
  273:13,14,18 274:4
  274:6,9 275:22
  276:14 283:18
  286:10,19 292:9
  294:14 297:20
**votes** 72:7,15 271:8

271:10 286:12
**voting** 5:10 44:17,17
  46:13 47:8,18 48:5
  48:6,15,15,19,25
  50:22,22 57:13 72:2
  72:9 81:15,21 82:9
  82:20,25 83:17,24
  84:7,14,25 85:12,23
  85:25 86:9 94:15
  124:7 125:7,12,13
  158:1 207:4,10
  209:10 256:10,14
  256:19 270:24
  271:15 274:9
  276:19 277:1,7
  278:1,4,20,21,24
  279:3,8,14,24 280:4
  280:9,12,13 285:16
  286:15 294:24
  298:24
**vs** 1:5

---
## W

**W** 3:14
**Wagner** 5:14 300:9
  300:15
**Wait** 142:7
**waited** 302:23
**walk** 132:25 224:21
**walking** 149:18 150:6
  151:10 152:2
**want** 11:5,9 12:19,19
  13:15,19 15:10
  28:11 44:4 48:8,9
  59:17 62:8 88:21,22
  90:9 100:8 108:12
  116:10,13 123:1
  132:14 135:15,18
  143:6,12 144:9
  147:11 157:8
  160:21 166:22,25
  173:25 188:3
  204:19 217:2 224:9
  230:8,14 247:6,10
  248:10 254:4

JEFFREY MILYO, PhD                                      8/26/2014

256:25 269:4,9
275:7 278:16
286:17 299:1 302:2
302:5 305:9
**wanted** 88:25 98:4
114:9 132:10 147:8
**wants** 209:14 269:7
**warrants** 77:7,10
**Wash** 22:23 23:4
**Washington** 2:16,21
3:5 22:20,22 29:23
52:2
**wasn't** 23:13 42:18
48:7 57:23 61:3,17
116:24 117:20,20
118:2,20 123:11
135:9 136:6 159:19
236:3 301:14
**waste** 90:6 305:6
**wasted** 302:7,14,16
305:5
**watching** 42:18
**water** 34:25 161:11
**wavering** 220:6
**way** 9:11 34:20 40:2
42:9 53:16 55:22
58:13 63:4 65:6,8
69:23 70:24 71:4
74:24 76:3,24 84:11
93:6 101:19 104:21
113:16 130:12
139:10,12,17
145:20,22 149:6
157:9 158:12,22
159:5 178:1 188:2
207:7 220:14
256:16 264:11,12
272:2 273:1,22
278:25 279:17
280:8 281:15 303:7
**ways** 146:1 178:22
301:5
**we'll** 6:2 9:1,14,16,17
10:23 11:17,21
12:13,17,23 27:19

39:20 41:7 78:13
98:3 167:1,1,12
181:3 298:17
**we're** 12:19 15:6
18:20 21:7,13 23:11
25:4 30:13,14 32:10
35:18,18,23,23
52:20 86:3,8 88:11
90:6 96:19 104:11
112:21 136:23
142:21 183:8
191:20 238:16
250:2 254:2 304:10
304:11 305:17,23
**we've** 16:13 71:25
73:24 106:14
112:21 161:8
189:17 224:5
241:11 244:2 253:4
255:16 302:4,7
304:2 305:15
**weakest** 297:15
**weakness** 206:11
252:3
**weaknesses** 206:11
**weather** 285:21
**Webster** 38:9 148:14
148:16,25 167:15
171:16,23,24
233:21 278:13
291:14,17
**Webster's** 171:19
234:17 291:22
**weeks** 37:12 251:4
**weigh** 267:21
**weight** 146:13 204:17
**weighted** 110:15
**weighting** 110:16
146:18
**weights** 145:6 146:23
147:1,5,6,19,21,23
**well-known** 279:9
280:8
**went** 23:25 59:13
120:15

**weren't** 21:11 117:20
165:15 192:2
**West** 1:23 2:8
**Whichever** 7:9
**Whispering** 159:2
**white** 129:22 132:13
294:25 295:8
**whites** 79:23 80:5,12
80:17 84:8 156:16
261:10 284:14
**Whitley** 11:2 34:14
36:8 42:15 99:7
**Whitley's** 11:19
**widely** 279:25
**wife** 7:12 21:8
**willing** 141:1
**willingness** 33:6
**Wilmer** 2:20
**Wilson** 5:15 300:10
300:16
**win** 20:20,21 119:9
**wind** 146:18 147:16
**winds** 147:16
**winning** 20:23
**wipe** 280:23
**wish** 286:12
**withdraw** 32:13
**withdrawing** 100:5
**witness** 1:15 26:25
28:18 33:2 46:3
74:21 83:4 99:15
119:1 130:7 134:9
142:10 160:20,24
172:15 188:6
224:11 257:13
275:5 302:14,19
305:1 306:3 307:8
307:13
**Wolfinger** 5:9 283:12
283:17
**woman** 21:8
**won** 283:15
**word** 28:11,12,13
29:4,5,9,11,14
39:24,25 42:6 82:12

84:17 133:9 160:10
174:1 199:22 200:3
203:17 204:17,19
204:22 205:1
216:22 217:21
218:5,11 221:6
230:23 232:25
233:4,10 234:3,13
234:16 241:21
271:3 275:13
278:16
**wording** 101:21
177:10
**words** 40:5 49:19
74:7 77:13 81:5
143:14 170:9
186:12 233:11
234:10 260:7 267:5
**wordy** 105:13
**work** 17:8 18:20 19:5
21:9 40:15 46:1,17
46:20,24,25 47:4
55:4,9,11 58:18
60:10 61:9,12 64:2
70:12 71:20,24
72:22,24 73:12 92:1
104:16,19,24
133:19 177:6
178:16 191:9 203:9
242:25 243:3,17
244:14 256:16
261:16 262:2,3,4,9
262:23 263:1,2
**work-in-progress**
51:8 57:6
**worked** 15:5 17:10
18:1 67:9 253:17
**worker** 48:23
**workers** 46:25
**working** 21:14
122:18 129:3
179:25 180:10,18
180:24 181:2,5,8,15
183:9,21 184:10
187:7,12,16,18

JEFFREY MILYO, PhD

8/26/2014

48

188:13,19 189:2
191:20 286:6,7
294:11 295:16
296:12 297:5
**works** 64:25
**worst** 284:6
**wouldn't** 76:25
101:17 102:8
222:17 226:3
235:23 281:3
**wrap** 302:5
**write** 26:10 133:3,13
235:7
**write-up** 55:23
**writing** 57:22 59:3
185:2 241:20
274:22 275:7
**written** 55:17,18
57:23 88:16 133:10
133:14 176:25
182:11 185:5
186:13,21 193:24
217:20 227:2,14
258:11,25 259:4
269:21 275:5,9,9
283:14
**wrote** 125:10 131:1
179:23 181:14
182:5 186:17
300:16
**Wyoming** 167:17

**X**

**X** 4:1,6
**Xerox** 275:1

**Y**

**Yair** 166:14 234:22
**yeah** 16:14,19 36:21
49:20 54:3 77:13
90:17 102:11 123:2
126:22 146:8 287:9
304:16
**year** 14:5,13 15:6,13
16:6 17:10,24 21:16

22:12 23:5,8 66:18
67:12 92:3,10,22
94:13 95:2,9,17
96:2 97:19 113:22
124:2,19,20 215:18
**year's** 67:7
**years** 15:6 17:22 19:3
45:19,20 50:6 66:18
95:16 158:6 182:24
191:21 255:21
256:22 282:18,19
289:16,17
**yep** 160:20
**yesterday** 36:16 37:2
37:4
**York** 2:12,12,15
**Young** 2:19 6:23

**Z**

**zero** 91:19 223:5
**zip** 128:13 136:6,9,13
172:9 237:9

**0**

**08540** 2:5

**1**

**1** 4:8 9:17,18,20
10:14,14 12:7,23
13:1 35:19,24,24
58:14 61:23 62:12
78:18 93:23,25 94:4
98:16 99:2,18 100:3
100:6 105:10
125:23 137:23
141:16 142:23,25
143:6 144:11
148:22 193:6,20
194:11 252:14
299:19 300:13,14
300:14,20
**1.2** 91:10 193:15
**10** 4:9,10,20 129:4,6
130:13 134:4 135:4
136:11,12,16,18

137:1 162:21 281:6
281:10 283:19
**10.7** 284:9
**100** 13:15 61:7,8
164:16
**10013** 2:12
**104** 239:19
**105** 261:4
**106** 261:4 266:12
269:17
**109** 294:15,16,17
**11** 4:22 179:18,19
184:12
**113** 148:23 294:16
**114** 148:23
**115** 148:22,23
**119** 150:19
**12** 2:12 5:1 189:23,24
190:1
**120** 152:25 156:14
**121** 156:19,24 157:19
**122** 158:5
**124** 159:11
**125** 300:13
**12548** 3:10
**13** 5:5 25:8 127:5
230:1,2 237:5
**137** 277:12
**139** 280:10,15
**14** 5:6 78:23 79:22
80:4,12,20 86:18
87:18,19 88:3,10,10
89:8,16,17 139:16
192:14,19,19,25
193:2,7,21 194:12
206:20,23 207:1
210:16 212:15
227:19 228:18
230:19 245:4,8
246:6 249:9,17
250:19 252:15
253:21 254:7,10,12
266:4 270:17,22
286:9,11,15,17,20
286:21 287:16

292:10,11
**14's** 249:12
**140** 282:20
**1401** 2:15
**143** 105:12
**145** 105:12
**146** 105:12
**15** 5:8 59:23,24 284:2
284:2,4 302:24
303:11,20
**15,000** 59:19
**151** 293:14,20,21
295:14,20
**154** 206:20
**15th** 161:16 174:5
176:15 182:13,18
194:1 196:24 200:8
251:3
**16** 5:10 294:20,21
296:5
**161** 2:12 4:3
**17** 5:12 87:3 270:22
298:17,19
**179** 4:22
**17th** 194:7
**18** 5:14 87:1,2 95:7,7
95:16,20 294:22
300:7,9
**18.D** 270:14
**1875** 2:21
**1887-88** 17:10
**189** 5:1
**19** 296:5,7
**1964** 9:13
**1986** 13:21 14:7,16
14:19 15:4,12 16:9
16:22 17:15
**1987** 15:16,17,19
16:4 17:8
**1988** 17:22 18:25
**1989** 19:14 20:10
21:2,4,14
**1991** 22:18
**1992-93** 23:8
**1994** 13:22 14:19

JEFFREY MILYO, PhD                        8/26/2014

49

16:9,22 17:15 23:1
**1996** 243:25
**1s** 228:25
**1st** 11:12,16 161:22
  162:11 163:8,20
  164:20 165:21
  166:16 167:10,16
  200:7

---
**2**
**2** 4:9 10:2,3,8,9,9,13
  10:15 11:4,14,22
  12:1,1,4,7,13,22
  25:6,7 35:19,24,24
  36:3,5,9,10,14
  58:11,12,13 61:23
  62:12 78:13,15,16
  90:16 93:23,25 94:6
  94:8 98:16 99:3,18
  100:3,7 105:10
  125:23,23 126:6
  138:4,12 142:24
  143:1,2,6 161:17
  182:13 188:6
  192:15 230:24
  254:19 296:13,14
  299:3
**2:13-cv-193(NGR)**
  1:5
**20** 42:19 126:9,17
**2000** 23:14 124:22
  243:24
**2000-2004** 24:2
**20005** 2:16
**20006** 2:21
**2002** 124:24 301:21
**2004** 244:5
**2005** 283:11
**2006** 52:21 254:15
  256:20 257:5,9
  301:21
**2007** 26:2 180:10,25
  181:2,8,13,14 182:4
  183:9 184:10,11
  185:5 186:5 187:12

188:13,19 189:2
**2008** 26:7 72:20
  123:15 296:12
**2010** 2:8 214:13,16
  214:19
**2011** 26:10 29:23
**2012** 123:15,20
  214:10,13
**2013** 32:21 43:6
  54:11,15,20 123:13
  192:1
**2014** 1:11,20 123:16
  123:19 172:4,8
  307:11 308:4
**202.305.4355** 3:5
**202.307.3961** 3:6
**202.663.6000** 2:22
**204.662.8389** 2:16
**20530** 3:5
**21** 176:19,20 297:5,8
  299:7,9
**210** 93:16 96:1
  113:21
**22** 177:2 242:4
**23** 47:17 48:3,13
  299:7,10
**230** 5:5
**24** 125:20,21 126:6
  126:17 127:14
  222:12,22 223:4,5
  223:13,19,21
  224:22 225:7
**25** 222:10,11,14
  223:10 237:4,7
**254** 5:6
**26** 1:11,19 47:9 48:3
  48:14 49:5 307:11
**27** 214:8
**28** 15:6 298:20,21
**284** 5:8
**28th** 308:3
**29** 298:21
**294** 5:10
**298** 5:12
**2s** 254:24

---
**3**
**3** 4:10 10:23,24 11:12
  12:3 24:25 25:10,23
  26:14,18,22 35:19
  35:24,25 36:3,6,9
  47:24 48:3,13 93:23
  93:25 94:8 95:3,10
  95:11,18 96:3,5,9
  96:10,24 97:2,5,15
  97:17 98:22,24 99:1
  103:15,16 113:10
  114:5 143:1,7,12
  145:12 180:7,9
  181:4,7,20 182:4,17
  182:25 184:16,17
  184:22,25 186:5
  214:2 217:14 246:1
  252:23 256:17
  257:7 299:3
**3.1** 173:2,8 174:11,14
  174:23 175:7 176:5
  195:1,19 196:9
**30** 307:16
**300** 1:23 5:14
**306** 4:4
**307** 4:4
**327,132** 246:20
**34** 125:19 126:4
  127:16
**344** 308:8
**36** 4:11,13,14,16,18
  4:19,20 244:22,24
  245:14
**380** 308:9
**38267** 308:7

---
**4**
**4** 4:11 93:23 94:1
  103:13,15 116:8,9
  128:20 129:7
  131:15 132:18
  134:2 135:7,14
  136:23 137:1,13,24
  138:1,2 143:2
  185:23 217:14

231:8 257:18
**4-AUSTIN-168243**
  308:25
**40** 201:10 251:20
  252:11
**400** 2:15
**41** 103:1,4,18 115:22
**43** 249:21
**44** 143:13 217:8,12
  218:13
**46** 131:21
**49** 168:9
**4920** 3:15
**4th** 257:9

---
**5**
**5** 4:14 47:24 48:3,13
  58:15 117:7,9
  181:17 184:13,19
  280:18 284:3
  300:12
**5.1** 237:7
**50** 56:3,7 231:23
**50,000** 59:22
**500** 2:4,8
**512.292.3866** 308:10
**512.292.4249** 308:10
**512.374.2725** 3:16
**512.394.3027** 2:9
**512.447.3940** 3:17
**512.463.2197** 3:11
**54** 90:14,17,22
**55** 92:2 94:2,18,19
  96:7 97:12 98:7,17
  98:24 113:11,21
**56** 100:21 101:1
**57** 102:18 114:21
**58** 120:21,25

---
**6**
**6** 4:16 118:4,7 291:22
**6-A** 254:19 255:2
**6,000** 256:8,12
**6:30** 1:20 305:24
**609.955.3222** 2:5

JEFFREY MILYO, PhD                    8/26/2014

50

**60s** 166:5
**61** 123:12
**63** 128:22 129:21
**64** 128:22 129:23
  137:20
**65** 94:7,17 125:18
  128:22 132:1
  249:16
**66** 93:18 97:11 98:6
  113:25 128:22
  131:10 132:1
  137:25 138:6
**67** 138:10,24
**68** 128:22 132:1
  143:4,9,17
**69** 128:22 132:1

**7**

**7** 4:2,13 112:18,20
  113:14,14 245:16
**7.1** 247:14
**7.1.A** 246:2,17
  247:14
**7.1.B** 230:22 231:8
  240:16 246:3,18,20
**70** 128:22 132:1
**701** 308:9
**72.9** 227:3
**73** 93:24 142:11
**75** 96:19 97:16
  145:11
**7524** 3:4
**78701** 2:8 308:9
**78711** 3:11
**78751** 3:16
**7A** 140:2 142:4
**7B** 140:13,15,19

**8**

**8** 4:18 49:8 126:23
  127:1 180:9 184:17
**8:59** 1:20
**82** 90:23
**87** 93:17 96:6 97:4
  113:24

**88** 19:4,8
**89** 19:17 21:22
**89-90** 21:16

**9**

**9** 4:8,19 127:22,24
  135:24 138:2,3
**90** 21:18,22,25 22:2
  22:10,12,13
**902** 2:4
**91** 22:13,15 23:5
**92** 23:5
**94** 22:2
**950** 3:4
**98** 235:6,7 284:22
**99** 230:22
**9th** 9:13

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION
_____:
                              :
IN THE MATTER OF:             :
                              :
MARC VEASEY, et al.,          :
                              :
            Plaintiffs,  : Civil Action No.
                         : 2:13-cv-00193
      v.                      :
                              :
RICK PERRY, et al.,           :
                              :
            Defendants.  :
_____:


            Thursday,
            July 17, 2014

            Washington, D.C.


DEPOSITION OF:

                  MICHAEL L. MIMS

called for examination by Counsel for the State
of Texas, pursuant to Notice of Deposition, in
the offices of the Department of Justice Civil
Rights Division, located at 1800 G Street, NW,
Washington, D.C., when were present on behalf of
the respective parties:
```

14

```
1      A      The place of birth was Pensacola,
2  Florida. Date of birth is November 17, 1962.
3      Q      And, Mr. Mims, could you briefly
4  describe your educational background?
5      A      I have a Bachelor of Science from the
6  University of Florida in Computer Information
7  Science.
8      Q      Are those undergraduate degrees?
9      A      Yes.
10     Q      Do you hold any kind of post-graduate
11 degree?
12     A      No.
13     Q      Do you hold any kind of professional
14 qualifications or certifications?
15     A      I have a Project Management, what do
16 I call it? I'm a Certified Project Manager as
17 awarded by VA.
18     Q      And by VA you mean the  -
19     A      Veterans  -
20     Q      - Veterans Administration?
21     A      Yes.
22     Q      And when were you awarded that
23 certification?
24     A      I was first awarded it approximately
25 eight years ago.
```

16

```
1  Informatics and Analytics in April of 2012, which
2  is my current position as Program Manager for the
3  Health Care Identity Management Team.
4      Q      And you currently hold that position.
5  Correct?
6      A      Yes.
7      Q      And, I'm sorry, could you state the
8  title of that position one more time?
9      A      Program Manager, Health Care Identity
10 Management.
11     Q      And in your role as Program Manager,
12 the role you currently hold, what are your
13 official duties and responsibilities?
14     A      My duties are to insure the
15 maintenance and validation of the data that's
16 maintained within the Master Veteran Index, or
17 MVI.
18     Q      Is that your primary responsibility?
19     A      Yes.
20     Q      Who do you report to?
21     A      I report to Marcia Insley.
22     Q      And do you manage anyone below you?
23     A      Yes, I have a team of approximately 31
24 federal employees that work with me in the
25 maintenance and validation of our data within the
```

15

```
1      Q      Mr. Mims, are you currently employed?
2      A      Yes.
3      Q      And who is your employer?
4      A      Department of Veterans Affairs.
5      Q      And how long have you been an employee
6  with the Department of Veterans Affairs?
7      A      Since April of '87, which is
8  approximately 27 years.
9      Q      And could you tell me what positions
10 you've held at the Department of Veterans Affairs
11 starting with the first day of your employment up
12 to today?
13     A      The first day of my employment I was
14 a Computer Specialist working at a medical center
15 supporting the Information Resources Management
16 Office. Following that, I moved to the
17 Information Service Center as it was called then
18 under the Office of Information Technology, where
19 I worked as a programmer on the pharmacy
20 applications for a very long time, until
21 approximately 2000, or approximately 1998 when I
22 became a Project Manager. I was a Project Manager
23 for approximately three years until I became a
24 Program Manager on or around 2003. I remained in
25 that role until I joined the Office of
```

17

```
1  MVI.
2      Q      And are all those employees specially
3  trained to perform those functions?
4      A      Yes.
5      Q      Do you train them yourself?
6      A      No.
7      Q      How do they receive their training?
8      A      We have designated individuals who
9  have been trained and who provide that training
10 to the staff as they come on board.
11     Q      Do you receive periodic training in
12 this field?
13     A      Do I, myself?
14     Q      Yes.
15     A      What do you mean?
16     Q      Well, you mentioned that your
17 employees receive training regarding data and
18 updating it, and everything you just described.
19 I'm asking you if you receive similar training on
20 a periodic or regular basis?
21     A      Not formal training, but I do see the
22 documents and the training materials that they
23 are provided, but I do not participate in that
24 training.
25     Q      Mr. Mims, does your work require you
```

18

1  to regularly work with information databases?
2     A    Not directly. As I said, I supervise
3  the employees that actually do the maintenance
4  and validation of these databases.
5     Q    Okay. So you, yourself, don't actually
6  work with the data and the various databases.
7  Your employees do that under your supervision. Is
8  that correct?
9     A    That is correct.
10     Q    And in that work that you all do with
11  databases, do you all regularly conduct matches
12  in which you compare information in one database
13  to information in another?
14     A    Yes.
15     Q    And about how long have you all been
16  doing such work?
17     A    This team has been doing such work
18  since the MVI was created back  - I do not
19  remember the date, but it was back some time in
20  the 1990s is when the Master Veteran Index was
21  originally established.
22        MR. TATUM: Okay. Sam, if you would,
23  please locate the Second Amended Notice and mark
24  it as Exhibit 1, and offer it to the witness,
25  please.

19

1        (Whereupon, the above-referred to
2        document was marked as Exhibit 1 for
3        identification.)
4     THE WITNESS: Thank you.
5     COURT REPORTER: They have the exhibit.
6     BY MR. TATUM:
7     Q    Okay. Mr. Mims, if you would please
8  looking at the first page of the document that's
9  just been handed to you, would you read the text
10  in the middle of the page that is in bold capital
11  letters and underlined, please?
12     A    "Defendants' Second Amended Notice of
13  Intention to Take Oral Deposition of the United
14  States Department of Veterans Affairs."
15     Q    Mr. Mims, have you seen this document
16  before?
17     A    I do not believe so.
18     Q    If you would please, Mr. Mims, turn to
19  page 5 of that document.
20     A    Wait, I have seen this before. I'm
21  sorry. I saw it just prior to this meeting. I was
22  given it just prior to this meeting.
23     Q    Okay. And was that the first time that
24  you had seen this document?
25     A    Yes.

20

1     Q    Okay. Have you turned to page 5?
2     A    Yes.
3     Q    Okay. On page 5 you will see a heading
4  that says, "Matters," and it's followed by a
5  series of numbered paragraphs from 1 to 6. Do you
6  see those paragraphs?
7     A    Yes.
8     Q    Paragraph 1 states, "Any and all
9  databases in the possession, custody, or control
10  of the Department of Veterans Affairs used to
11  conduct a match with any database produced by the
12  defendants in this lawsuit." Is that an accurate
13  reading of that topic?
14     A    That is exactly what it says.
15     Q    Mr. Mims, are you aware that you've
16  been designated by the Department of Veterans
17  Affairs to testify on its behalf and give
18  truthful and binding answers on its behalf
19  regarding that topic?
20     A    Yes.
21     Q    And are you prepared to testify on
22  Topic 1?
23     A    I am.
24     Q    Mr. Mims, Topic 2 says, "With regard
25  to a database described in Matter 1 above, any

21

1  fields containing the same types of identifying
2  information found in the Texas Election
3  Administration Management System (TEAM) database
4  that was produced by the defendant in his
5  lawsuit." Is that an accurate reading of that
6  topic?
7     A    Yes.
8     Q    Is it your understanding that you've
9  been designated by the Department of Veterans
10  Affairs to testify and give truthful and binding
11  answers on its behalf regarding that topic?
12     A    Yes.
13     Q    And are you prepared to testify to
14  that topic?
15     A    Yes.
16     Q    Mr. Mims, Topic 3 says, "With regard
17  to a database described in Matter 1 above, the
18  frequency and process by which such a database is
19  maintained and updated." Is that an accurate
20  reading of that topic?
21     A    Yes.
22     Q    Mr. Mims, are you aware that eight
23  minutes prior to the start of this deposition the
24  Department of Veterans Affairs produced a written
25  response to this topic?

## 30

1  of that is subject to the attorney/client
2  privilege, is subject to the law enforcement
3  privilege, the investigatory privileges, and all
4  other sorts of government privileges; it could
5  be, in any event. So, we would direct the witness
6  consistent with all of those issues, the scope,
7  and the privileges, not to answer the question.
8       MR. TATUM: Thank you for listing the
9  privileges. I would just reiterate for the record
10 that requesting or instructing a witness not to
11 answer a question based on the objection that
12 it's beyond the scope of the request, that is an
13 improper instruction. So, to the extent that
14 you're instructing him not to answer, on that
15 objection I would just state for the record that
16 I believe that's an improper instruction.
17      MR. HEARD: I understand your position.
18      MR. TATUM: I think we understand each
19 other, so we'll move on.
20      BY MR. TATUM:
21   Q    Mr. Mims, could you briefly summarize
22 the match that you conducted in this case?
23   A    What do you mean?
24   Q    I mean, that DVA conducted a match in
25 this case. I'm asking you to briefly summarize

## 31

1  the process of conducting that match.
2   A    Okay. We received the TEAM database,
3  we loaded it into an area that we had available
4  to us where we could establish a flat file
5  containing the Texas database, pull in the
6  applicable information from the VA MVI,
7  standardize that information as described in the
8  instructions, and then go through the various
9  matching combinations that were specified in
10 those instructions.
11      MR. TATUM: Okay, thank you. At this
12 point I'd like for Sam, if you would please
13 locate the declaration of Michael Mims, and mark
14 it as Exhibit 2, and hand it to the witness,
15 please.
16      (Whereupon, the above-referred to
17      document was marked as Exhibit 2 for
18      identification.)
19      THE WITNESS: Thanks.
20      COURT REPORTER: They have the exhibit.
21      BY MR. TATUM:
22   Q    Okay. Mr. Mims, I think you think you
23 referenced this document earlier. Could you tell
24 me again, do you recognize the document that was
25 just handed to you?

## 32

1   A    Yes, I do.
2   Q    And what is this document?
3   A    This is the declaration describing the
4  data and the process to be used in performing the
5  matching.
6   Q    If you would please turn to the page
7   - I don't know if our copy has numbers on it.
8  Mine does not, I apologize. Could you turn to the
9  page that has one paragraph on it, and that's
10 paragraph 11, about five or six pages in.
11   A    Okay, I have it.
12   Q    Okay. Do you see a signature on that
13 page?
14   A    Yes, I do.
15   Q    Is that your signature?
16   A    Yes, it is.
17   Q    Did you assist in the preparation of
18 this document?
19   A    What did you mean when you say
20 "assist?"
21   Q    Did you help compile the information
22 contained in this document, or did you actually
23 write what's in this document yourself?
24   A    No.
25      MR. HEARD: That's a compound question.

## 33

1  I'll just object to that.
2       MR. TATUM: Okay. I'll separate those
3  questions.
4       BY MR. TATUM:
5    Q   Mr. Mims, did you write any of the
6  language that is in this document?
7    A   No. Well, hold on. Do you consider
8  Exhibit B part of this document? I'm assuming you
9  do.
10   Q   No, just the  - not Exhibit A or B,
11 but just the first part of it. All the numbered
12 paragraphs starting from 1 to 11 before your
13 signature.
14   A   And the question is did I assist in
15 writing that part of the document?
16   Q   Yes.
17   A   No, I did not.
18   Q   Did you assist in any way in the
19 preparation of this document?
20      MR. HEARD: Objection; vague, but you
21 can answer.
22      THE WITNESS: No.
23      BY MR. TATUM:
24   Q   Mr. Mims, aside from signing your name
25 at the end of this document you were not involved

34

1 in the compiling or drafting of this document at
2 all. Is that correct?
3      A   That is correct.
4      Q   Could you please turn to the page that
5 has Paragraph 3 on the top of it, and let me know
6 when you're there.
7      A   I have it in front of me.
8      Q   Okay. Could you tell me what generally
9 Paragraph 3 describes?
10     A   Paragraph 3 describes the receipt of
11 the hard drive containing the data from
12 Department of Justice. It describes the size of
13 the data, the number of records contained in the
14 data, what the data is. It also describes an
15 issue that we had where the data originally
16 received was corrupted, and describes another
17 copy of that data being sent to VA that was not
18 corrupted.
19     Q   Okay. Could you tell me exactly how
20 that hard drive was delivered to DVA?
21     A   I'm not sure what you mean.
22     Q   How did DVA obtain possession of the
23 hard drive described there?
24     A   It was delivered to one of the VA's
25 representatives who loaded  - who received the

35

1 data and then loaded it into our system.
2      Q   And do you remember who that DVA
3 representative was?
4      A   I do not.
5      Q   So, it was delivered to a
6 representative. Did that same representative also
7 upload the information that's described in that
8 paragraph?
9      A   I do not know.
10     Q   That paragraph describes that the file
11 was corrupted in the process of being loaded.
12 Could you tell me in what way it was corrupted?
13     A   I can't describe what the corruption
14 was. All I can say is that it was  - we were
15 unable to read the data on that drive when it was
16 received.
17     Q   So, did you request that the
18 Department of Justice send you another copy of
19 that data?
20     A   Yes.
21     Q   And when you received the copy of the
22 data there was no problem loading it, it was not
23 corrupted, and that information was uploaded.
24 Correct?
25     A   Correct.

36

1      Q   And where was that information
2 uploaded?
3      A   Into a database housed at the Austin
4 Automation Center.
5      Q   Is that in Austin, Texas?
6      A   Yes, in Austin, Texas.
7      Q   And, Mr. Mims, I don't believe I asked
8 you before, where is your office?
9      A   My office is in Tuscaloosa, Alabama.
10     Q   Were you present in Austin when the
11 data file described in Paragraph 3 was delivered
12 or uploaded?
13     A   No.
14     Q   Does Paragraph 4 right below that
15 describe the data that was in the file delivered
16 by Department of Justice?
17     A   Yes.
18     Q   And it's described as different fields
19 of data. Correct?
20     A   Yes.
21     Q   Looking on the column on the left if
22 you go down towards the bottom there begins a
23 series of entries of capital letters, the first
24 one being AGDN. Do you see that?
25     A   Yes.

37

1      Q   Can you tell me what those letters and
2 combinations represent?
3      A   I cannot tell you specifically what
4 AGDN is. I don't have that information in front
5 of me.
6      Q   Do you know what general purpose those
7 fields serve?
8      A   This was the combination  - the data
9 set up in combination as described in the process
10 for us to use in doing the matching with the
11 various data fields that concatenated together
12 for the various combinations of data to be used.
13     Q   Can you tell me with regard to these
14 fields listed here, can you tell me how the DVA
15 used these fields during the matching process?
16     A   Well, for each one of these
17 combinations which these signify we developed a
18 similar combination based on data extracted from
19 our Master Veteran Index to do the comparison and
20 the matching of the Texas data to the data within
21 our MVI.
22     Q   And did you use all of the fields
23 listed under Topic 4, or under Paragraph 4 during
24 that match?
25     A   No, we did not use all of the fields.

38

1     Q     Why did you use some fields, but not
2  others?
3     A     We used the fields that were specified
4  in that various combinations which we were asked
5  to do the matching on.
6     Q     And with those matches on those
7  combinations, did you run those pursuant to the
8  matching protocol that's attached as an exhibit
9  to this document?
10    A     Yes, we did the matching exactly as
11 was described later in this document.
12    Q     When you all received the data on the
13 file that was delivered from the Department of
14 Justice, what were you told that that data
15 represented?
16    A     We were told it was a copy of the
17 Texas TEAM database, specific data elements from
18 it, that it contained the different combinations
19 of those data elements that we were to use in the
20 matching.
21    Q     When the file was uploaded and the
22 information displayed in whatever form it was
23 displayed in, was there anything there to
24 indicate that this came from only the TEAM
25 database?

39

1     A     No.
2     Q     Okay. So, the only  - is it true that
3  the only way that you know that this came from
4  the TEAM database is because that's what the
5  Department of Justice told you when they
6  delivered the hard drive?
7     A     Yes.
8     Q     So, to the best of your knowledge the
9  information contained in the file is only from
10 the TEAM database, and not from any other
11 database from the State of Texas.
12    A     Yes.
13    Q     When you all received the data file
14 did the DVA do anything to clean up that data, or
15 rearrange it in any way necessary?
16          MR. HEARD: Objection; vague, but you
17 can answer.
18          THE WITNESS: No.
19          BY MR. TATUM:
20    Q     So, you all took the information as it
21 appeared in the file and used it during the
22 matching process in exactly the way that you were
23 told to by the Department of Justice in the
24 matching protocol. Is that correct?
25    A     Yes.

40

1     Q     And can you tell me what DVA databases
2  were used to conduct the match in this case?
3     A     We used data from the VA's
4  Administrative Data Repository or ADR. There's
5  two sources of data that we used within that
6  database, one being the Master Veteran Index
7  containing the identity information. The other is
8  data from an enrollment file which contains the
9  address information that was used for the
10 matching.
11    Q     So, how many total databases of DVA
12 were used?
13    A     Two.
14    Q     And did you run separate independent
15 matches for each database, or was there one match
16 in process that incorporated both of those
17 databases?
18    A     There was one matching process that
19 used data from both the MVI and from the
20 enrollment files.
21    Q     Okay. So, the data in those two
22 databases, those two DVA databases that you
23 described, those were compiled into kind of one
24 - well, let me back up.
25          So, just to confirm you didn't run one

41

1  match with the Texas data and the  - and one of
2  the DVA databases, and then run another match
3  with the other DVA database. There was just one
4  match conducted between the Texas database and
5  information contained in both of the DVA
6  databases. Is that correct?
7     A     Yes.
8     Q     And please correct me if I'm wrong in
9  describing any of these technical aspects of this
10 matching -
11    A     Well, let me back up. It may be
12 considered just one database, the ADR, the
13 Administrative Data Repository, but there were
14 data elements required for the matching that came
15 from two files within that database. It really  -
16 sorry.
17    Q     No, that's okay. Go ahead.
18    A     No, it just kind of depends on how you
19 define  - how you're looking at a database
20 itself.
21    Q     Okay. So, is it possible then that one
22 database, such as the ADR, contains separate
23 databases within it?
24    A     It could be considered that, yes.
25          MR. TATUM: Did I just hear a cow moo?

42

1      MS. BALDWIN: Or a Blackberry.
2      MR. HEARD: Or a Blackberry that sounds
3  like a cow.
4      MR. TATUM: Okay. Sorry, I just want to
5  make sure everything is all right over there.
6      BY MR. TATUM:
7  Q   Okay. So, the ADR database that was
8  used to conduct this match contained within it
9  kind of two sources of information. Correct?
10  A   Yes. It contains the two sources that
11  were used in this exercise.
12  Q   And in the matching protocol provided
13  by the Department of Justice, did they instruct
14  you how to compile information from those two
15  sources within the ADR?
16  A   They gave us very detailed
17  instructions as far as how these various
18  combinations were to be assembled, and from that
19  we determined which information should come from
20  the MVI, and which should come from the
21  enrollment files.
22  Q   Both of which are under the ADR.
23  Correct?
24  A   Yes.
25  Q   Okay. Once you determined what

43

1  information from those two files within the ADR,
2  once you determined what information from those
3  two files needed to be used during this match,
4  how did you go about extracting that information
5  and putting it into a form where it was ready for
6  the matching process?
7  A   We extracted the pertinent pieces of
8  information from the database. It's an Oracle
9  database that ADR is housed in. We extracted the
10  data both from MVI and from the enrollment files
11  into a flat file. Then we loaded it into a SQL
12  server database which we use SQL code to do the
13  actual matching of these various combinations.
14  Q   I'm sorry. Did you say SQL code?
15  A   Yes. It's S-Q-L, Structured Query
16  Language, I'm sorry.
17  Q   Thank you. And at any point during the
18  process that you've described up to this point,
19  was it necessary for DVA to create its own
20  program in order to conduct the match according
21  to the matching protocol provided by the
22  Department of Justice?
23  A   We used the model, code models that
24  the Department of Justice provided for us. We did
25  have to make some minor changes syntactically to

44

1  make it work within our environment, but did not
2  change anything that would have affected the
3  matching or the logic contained in those models.
4  Q   So, you followed the model codes
5  provided by the Department of Justice in - I'm
6  sorry. How exactly did you use those model codes
7  that you just referenced that were provided by
8  the Department of Justice?
9  A   We used that model code to do the
10  actual matching. There were some syntactic
11  changes that we had to make as far as the basic
12  structure of those models to work within our
13  environment. But those changes were very, very
14  minor and did not affect the logic that was
15  proposed within that model, or those models.
16  Q   Could the matching process have been
17  conducted without making those syntactic changes?
18  A   Not with the tools that we had
19  available for our use.
20  Q   Have you ever had to make similar
21  syntactic changes for other matches before?
22      MR. HEARD: Objection; vague.
23      THE WITNESS: Yes, that's a fairly
24  common occurrence, because you have different
25  versions of the SQL environment that you're

45

1  using, and those sorts of things that require
2  some minor tuning of those to work within that
3  environment.
4      BY MR. TATUM:
5  Q   And who makes the ultimate decision
6  with regard to any minor tuning that needs to
7  take place when conducting a match?
8      MR. HEARD: Again, objection; vague.
9      THE WITNESS: The specialists who I had
10  assigned to perform the actual matching,  those
11  two individuals proposed the changes and did make
12  those changes.
13      BY MR. TATUM:
14  Q   And did they make those changes
15  according to any kind of protocol, or guidelines,
16  or internal rules that govern that kind of thing
17  at the DVA?
18  A   They made those changes in
19  conjunction, or in line with the syntax required
20  with our SQL, SQL server environment.
21  Q   So, they presented those changes to
22  you and you approved them, and then they were
23  executed. Is that correct?
24      MR. HEARD: Objection; misstates his
25  testimony.

50

1 in a name.  Would that also include like dashes
2 in a birth date? You know, for example, someone's
3 birth date may be, you know, 1-1-82, and in
4 another database that would be written as 1/1/82,
5 something like that. Is that an example of a
6 formatting issue that you all encountered in
7 conducting the matching process in this case?
8      A      The instructions laid our specific
9 requirements for how those - each of those data
10 fields should be structured. One of those
11 requirements was the removal of any dashes or
12 that sort of information from the date of birth
13 field, for example. So, what we - the only
14 changes we made were to structure the data to be
15 used in this matching to match what was specified
16 within the instructions we were given.
17     Q      Okay. And with regard to all those
18 changes that you were directed to make, did you
19 run any kind of tests or trial runs to insure
20 that those instructions had been followed and
21 that the matching process would work according to
22 the protocol?
23     A      We did do reviews to make sure that
24 the data had been structured as specified.
25     Q      And did you conduct any kind of tests

51

1 or trial runs to make sure that the match would
2 be conducted in accordance with those
3 instructions?
4      A      I'm - could - what do you mean by
5 "trial run?"
6      Q      In other words, if you're required to
7 format the DVA's data in a way so that it could
8 be accurately matched with the Texas data, did
9 you do anything to insure that the way that you
10 formatted the DVA data would actually match or
11 not match with the Texas data accurately?
12     A      We ran processes that would make sure,
13 for example, that the dashes had been removed
14 from the data, as expected, to make sure that it
15 did match what was specified within the
16 instructions.
17     Q      So, did you run any kind of test run
18 with a, you know, subset of fields or
19 information, or combinations within the entire
20 matching process, or did you just run the whole
21 - once you got all the, you know, formatting
22 changes made did you just run the whole matching
23 process once?
24     MR. HEARD: I'm going to object to the
25 form of the question. It's kind of vague.

52

1      MR. TATUM: And I'm having - if any of
2 my questions aren't making sense please just let
3 me know.
4      THE WITNESS: I am certain that our
5 staff had taken a small subset and maybe a couple
6 of entries and run through the algorithm to make
7 sure everything was syntactically correct, that
8 there were no syntax errors, or errors in
9 compilation of the data prior to running the main
10 matching process.
11     BY MR. TATUM:
12     Q      In conducting the matching process
13 according to the protocols, did you encounter any
14 kind of problems or errors that needed to be
15 addressed?
16     MR. HEARD: Objection; vague, but you
17 can answer.
18     THE WITNESS: Of course, we had the
19 initial problem with the corruption of the data
20 that we received initially. Beyond that, I do not
21 know of any significant issues that we had once
22 we had the correct data in the correct format. I
23 don't know of any issues that we had with the
24 data, or the system in doing the matching.
25     BY MR. TATUM:

53

1      Q      In uploading, you mentioned a
2 corrupted file. In uploading the Texas data in
3 preparation for the matching process, do you
4 think anything occurred that might possibly have
5 altered that data?
6      A      No.
7      Q      In preparing the data from the DVA
8 databases for the matching process, anything
9 occur that might have altered that data?
10     A      No.
11     Q      And during the matching process itself
12 did you encounter any issues, errors, or problems
13 that may have altered the data, or the results
14 therefrom?
15     A      No.
16     Q      Mr. Mims, once the matching process
17 was completed how were the results of that
18 process compiled?
19     A      What - I'm not sure I understand the
20 question.
21     Q      Once the matching process was
22 completed, in what way did you compile or display
23 the results of that matching process?
24     A      I'm not sure I understand your
25 question. Are you - could you please phrase it

62

1 or communicate in any way with Lorraine Minnite?
2     A    No. You left off in the matching
3 process there, but I'm assuming that was implied.
4     Q    Yes, it was. Thank you. There are a
5 lot of names here.
6     A    I understand.
7     Q    During the matching process did you or
8 anyone else at the DVA involved in the matched
9 process receive instruction from or communicate
10 in any way with Kevin Jewell?
11     A    No.
12     Q    During the matching process did you or
13 anyone else at the DVA involved in the matching
14 process receive instruction from or communicate
15 in any way with Coleman Bazelon?
16     A    No.
17     Q    During the matching process did you or
18 anyone else at the DVA involved in that process
19 communicate with or receive instruction from
20 Orville Burton?
21     A    No.
22         MR. TATUM: Can we go off record just
23 for a quick five minutes?
24         MS. BALDWIN: Sure.
25         MR. HEARD: Okay, that's fine.

63

1         VIDEOGRAPHER: Going off the record at
2 13:02.
3         (Whereupon, the above-entitled matter
4 went off the record at 1:04 p.m., and resumed at
5 1:10 p.m.)
6         VIDEOGRAPHER: Going back on the record
7 at 13:09.
8         BY MR. TATUM:
9     Q    Mr. Mims, could you describe for me
10 any documents, electronic information, codes,
11 manuals or software that facilitated the use of
12 the databases that were used in this matching
13 process?
14     A    Used in the matching process, of
15 course, we used the declaration that had the
16 instructions that described how we were to do the
17 matching process. We used the environment, the
18 SQL environment that I described earlier to
19 actually perform the matching process. I do not
20 know of any other documents that were used to
21 support this.
22     Q    Does the DVA use its database to
23 preserve any kind of governing software, or code,
24 or manual?
25         MR. HEARD: Object to the vagueness of

64

1 the question, and to the scope to the extent it
2 exceeds whether those documents were used in
3 connection with the matching that was performed
4 in this case. You can answer subject to that.
5         THE WITNESS: Not that I'm aware of.
6         BY MR. TATUM:
7     Q    Do you know if any documents or
8 electronically stored information, codes,
9 manuals, or software other than anything you've
10 already mentioned was created specifically to
11 facilitate the use of DVA databases in this
12 matching process?
13     A    No.
14     Q    Mr. Mims, I believe that's all the
15 questions I have for you today. Before I pass the
16 witness, is there anything with regard to any
17 answer you've given today that you'd like to
18 clarify or amend?
19     A    No.
20         MR. TATUM: Well, I thank you for your
21 patience as I tried to talk about very technical
22 matters. And with that, I pass the witness.
23         MR. HEARD: Thanks, Stephen. Mr. Mims,
24 I just have  - I'm, for the record, Bradley Heard
25 for the United States. I just have a couple of

65

1 questions on your declaration that's been marked
2 as Defendant's Exhibit 2 in this deposition.
3         CROSS-EXAMINATION
4         BY MR. HEARD:
5     Q    You indicated that you had signed the
6 deposition on  - I'm sorry, the declaration on
7 that page that contains Paragraph 11. Is that
8 correct?
9     A    Yes.
10     Q    Prior to signing the document did you
11 review the document?
12     A    Absolutely.
13     Q    Did you review it for accuracy?
14     A    Yes.
15     Q    Was it, in fact, accurate?
16     A    Yes.
17     Q    Did you understand that you were
18 signing that document stating that it was true
19 and accurate, and under penalty of perjury?
20     A    I did.
21         MR. HEARD: Okay, thank you. I have no
22 further questions. I think  - so, that's all we
23 have, Stephen.
24         MR. TATUM: Okay. Well, I guess that
25 concludes this portion of the deposition. How do

## 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    CORPUS CHRISTI DIVISION
 3   MARC VEASEY, et al.,        )
                                 )
 4        Plaintiffs,            )
                                 )
 5   VS.                         )  CIVIL ACTION
                                 )  NO. 2:13-CV-348 (NGR)
 6   RICK PERRY, et al.,         )
                                 )
 7        Defendants.            )
 8   *******************************************************
 9                      ORAL DEPOSITION OF
10                   MAJOR FORREST MITCHELL
11                      AUGUST 12, 2014
12   *******************************************************
13
14        ORAL DEPOSITION OF MAJOR FORREST MITCHELL,
15   produced as a witness at the instance of the
     Plaintiff-Intervenors and duly sworn, was taken in
16   the above-styled and numbered cause on August 12, 2014,
17   from 9:11 a.m. to 2:00 p.m., before Jodi Cardenas, RPR,
18   CSR in and for the State of Texas, reported by
19   computerized stenotype machine at the Office of the
20   Attorney General of Texas, 209 West 14th Street, 7th
21   Floor, Austin, Texas, pursuant to the Federal Rules of
22   Civil Procedure.
23
24
25
```

## 3

```
 1              APPEARANCES (CONT'D)
 2
 3   FOR THE TEXAS STATE CONFERENCE OF THE NAACP AND THE
     MEXICAN AMERICAN LEGISLATIVE CAUCUS:
 4
         Ms. Jennifer L. Clark (Via Telephone)
 5       Ms. Myrna Pérez (Via Telephone)
         Mr. Vishal Agraharkar (Via Telephone)
 6       BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
         161 Avenue of the Americas, 12th Floor
 7       New York, New York 10013
         (646) 292-8332
 8       clarkj@exchange.law.nyu.edu
         perezm@exchange.law.nyu.edu
 9       agraharkar@exchange.law.nyu.edu
10       -and-
11       Mr. Ezra Rosenberg
         DECHERT, LLP
12       902 Carnegie Center, Suite 500
         Princeton, New Jersey 08540
13       (609) 955-3222
         ezra.rosenberg@dechert.com
14
15
16
17
18
19
20
21
22
23
24
25
```

## 2

```
 1                   APPEARANCES
 2
 3   FOR THE PLAINTIFF-INTERVENORS:
 4       Mr. Kelly P. Dunbar
         WILMER, CUTLER, PICKERING, HALE & DORR, LLP
 5       1875 Pennsylvania Avenue, NW
         Washington, DC 20006
 6       (202) 663-6262
         kelly.dunbar@wilmerhale.com
 7
 8
     FOR THE PLAINTIFFS, MARC VEASEY, ET AL.:
 9
         Mr. Scott Brazil (Via Telephone)
10       BRAZIL & DUNN, LLP
         4201 Cypress Creek Parkway, Suite 530
11       Houston, Texas 77068
         (281) 580-6310
12       scott@brazilanddunn.com
13
14   FOR THE UNITED STATES DEPARTMENT OF JUSTICE:
15       Mr. Bruce I. Gear (Via Telephone)
         UNITED STATES DEPARTMENT OF JUSTICE, VOTING SECTION
16       950 Pennsylvania Avenue, Room 7254 NWB
         Washington, DC 20530
17       (202) 353-0419
         bruce.gear@usdoj.gov
18
19
20   FOR THE ATTORNEY GENERAL OF TEXAS:
21       Mr. J. Reed Clay, Jr.
         ASSISTANT ATTORNEY GENERAL
22       209 West 14th Street, 7th Floor
         Austin, Texas 78701
23       (512) 936-2541
         reed.clay@oag.state.tx.us
24
25
```

## 4

```
 1                      INDEX
 2                                            PAGE
 3   Appearances.........................................2
 4   MAJOR FORREST MITCHELL
 5   Examination by Mr. Dunbar...........................6
     Examination by Ms. Clark..........................162
 6   Further Examination by Mr. Dunbar.................180
 7   Reporter's Certificate............................199
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MAJOR FORREST MITCHELL                                          8/12/2014

13

1          MR. DUNBAR:  Hi.  We're in the middle of a
2    deposition.
3          UNIDENTIFIED FEMALE SPEAKER:  Yes.
4          MR. CLAY:  Is Ezra on the line?
5          UNIDENTIFIED FEMALE SPEAKER:  I'm sorry.
6    I don't know.  The line was ringing so I picked it up.
7          THE REPORTER:  Do you want to go off while
8    we --
9          MR. DUNBAR:  Yeah.
10          (Off the record)
11    Q.  (BY MR. DUNBAR)  So in preparation for your
12    deposition, just to be clear, have you reviewed any
13    expert reports filed by any party in this litigation?
14    **A.  No, sir.**
15    Q.  And did you have any conversations with your
16    staff regarding the topics that you were going to
17    discuss today?
18    **A.  Yes, sir, I did.**
19    Q.  And who did you speak with about these topics?
20    **A.  I spoke with my administrative assistant,**
21    **Sherry Papke (phonetic), to help me -- this was months**
22    **ago -- to get the budget reports on how much the office**
23    **had spent on Election violations and prosecutions and**
24    **investigations.**
25    Q.  Okay.  And is that the only member of the staff

14

1    that you spoke with about the deposition topics?
2    **A.  Probably Tamara Chandler as well, who is our**
3    **office manager.**
4    Q.  And what would -- what would the nature of that
5    conversation have been?
6    **A.  The same thing --**
7    Q.  Okay.
8    **A.  -- to prepare the -- to prepare -- to get a**
9    **budget report.**
10    Q.  Did you have any conversations with anyone else
11    outside your office in the Attorney General's office
12    pertaining to this deposition?
13    **A.  No, sir.**
14    Q.  And did you speak with anyone outside the
15    Attorney General's office in preparation for or about
16    this deposition?
17    **A.  No, sir.**
18    Q.  And as a -- just as an aside, at times I might
19    refer to the Attorney's General's office as OAG in lieu
20    of saying the full name.  You understand what I mean?
21    **A.  Yes, sir.**
22    Q.  Great.  Thank you.
23          Now we've already established, I think,
24    that you were deposed as a part of the Section Five
25    litigation.  Is that correct?

15

1    **A.  Yes, sir.**
2          **(Exhibit No. 1 marked)**
3    Q.  (BY MR. DUNBAR)  And I'm now showing you a
4    document that has been labeled as Exhibit 1.  Do you
5    know what this document is?
6    **A.  Yes, sir.  It appears to be a transcript of the**
7    **deposition in the Section Five litigation.**
8    Q.  And I believe we've already established, but
9    just so the record is clear, you recall that deposition.
10    Correct?
11    **A.  Yes, sir, I do.**
12    Q.  And I also believe that you testified that you
13    reviewed that transcript in preparation for today's
14    deposition.  Is that correct?
15    **A.  Yes, sir.**
16    Q.  And to the best of your recollection, was your
17    deposition testimony in the Section Five litigation
18    truthful and accurate?
19    **A.  Yes, sir.**
20    Q.  Do you have any reason to now believe that any
21    part of your prior deposition testimony was inaccurate
22    or incomplete in any way?
23    **A.  No, sir.**
24    Q.  I believe you've also established that you do
25    recall that you testified under oath before a

16

1    three-judge panel in the United States for the District
2    of Columbia in that same Section Five case.  Is that
3    correct?
4    **A.  Yes, sir.**
5          **(Exhibit No. 2 marked)**
6    Q.  (BY MR. DUNBAR)  Major Mitchell, you've now
7    been handed a document that's been labeled as Exhibit 2.
8    Do you know what this document is?
9    **A.  Yes, sir.  This appears to be the transcript**
10    **from the bench trial which occurred in Washington, D.C.**
11    **on the Section Five litigation.**
12    Q.  And to be clear, it appears to be -- or it is
13    your trial testimony.  Is that correct?
14    **A.  Okay.  Please give me a moment.**
15    Q.  Absolutely.
16    **A.  Yes, sir, it does.**
17    Q.  I believe you testified previously that you
18    reviewed a transcript of this trial testimony before
19    that -- this deposition.  Is that correct?
20    **A.  Yes, sir.**
21    Q.  And that testimony was under oath.  Correct?
22    **A.  Yes, sir.**
23    Q.  Do you have any reason now to believe that any
24    part of your prior trial testimony was inaccurate or
25    incomplete in any way?

MAJOR FORREST MITCHELL                                    8/12/2014

5 (Pages 17 to 20)

17

1    **A. No, sir.**
2    Q. After the Section Five trial was over, did you
3    review your trial testimony at that point in time?
4    **A. No, I don't believe so.**
5    Q. Did you review the trial testimony of anyone
6    else in the Section Five case?
7    **A. No, sir.**
8    Q. Were you present live for the testimony of
9    other witnesses during the Section Five case?
10   **A. No, sir.**
11   Q. Did you have any discussions with any of the
12   other state's witnesses about their testimony after the
13   Section Five litigation?
14   **A. No, sir.**
15   Q. Did you have any conversation with anyone in
16   the Texas Attorney General's office after your trial
17   testimony in the Section Five case about your testimony?
18   **A. Yes, sir.**
19   Q. And whom did you speak with?
20   **A. I may have spoken with Patrick Sweeten and then**
21   **Reynolds Brissenden and then colleagues within my**
22   **office.**
23   Q. Okay. And the first two gentlemen, I believe,
24   were those your attorneys --
25   **A. Yes, sir.**

18

1    Q. -- in the Section Five case?
2    **A. (Witness nods head).**
3    Q. And then other than your attorneys that
4    represented you in that case, do you recall whom in your
5    office you spoke with about your testimony?
6    **A. It could have been any of the investigators who**
7    **worked for me or in my division. Many people had**
8    **questions about how it went in Washington, D.C.**
9    Q. And what did you report?
10   MR. CLAY: I'll object to the extent that
11   it involves a conversation that includes an attorney.
12   Any of that would be attorney-client privilege.
13   But to the extent that it doesn't, you can
14   answer.
15   MR. DUNBAR: Yes.
16   Q. (BY MR. DUNBAR) And to be -- so the record is
17   clear, my question at this point is these conversations
18   with your staff to the extent they did not involve an
19   attorney.
20   **A. I -- I would say I had 30 minutes of -- 30 or**
21   **35 minutes of testimony, and it was very -- very**
22   **stressful and intimidating.**
23   Q. And following the -- I'm sorry, let me
24   backtrack.
25   Did anyone in the Texas Attorney General's

19

1    office, outside of your particular -- outside of SIU,
2    say that you did a good or poor job testifying?
3    MR. CLAY: Again, to the extent that it
4    was -- included an attorney, you don't need to answer.
5    To the extent there was not an attorney, you can answer.
6    THE WITNESS: I -- no, not to my memory.
7    Q. (BY MR. DUNBAR) And in the time period since
8    the Section Five litigation, which was July of 2012,
9    have you had conversation with anyone in the Texas
10   Attorney General's office regarding in-person voter
11   fraud?
12   MR. CLAY: Same objection. Same
13   instruction.
14   THE WITNESS: Yes, sir.
15   Q. (BY MR. DUNBAR) And whom did you speak with?
16   **A. Investigators who were assigned to specific**
17   **cases as well as, potentially, the captain of the**
18   **special investigations unit, Daniel Guajardo.**
19   Q. So all of your conversations -- it sounds to me
20   like those conversations would have been limited to
21   discussions about particular cases or allegations or
22   investigations of in-person voter fraud?
23   **A. Correct.**
24   Q. Did you have any more general discussions with
25   anyone in the Texas Attorney General's office about the

20

1    general topic of in-person voter fraud since the --
2    since your testimony in the Section Five litigation?
3    MR. CLAY: Again, the same objection.
4    To the extent it doesn't include an
5    attorney, you can answer. To the extent it includes an
6    attorney, please do not answer.
7    THE WITNESS: I don't specifically recall
8    any conversations.
9    Q. (BY MR. DUNBAR) Okay. And as Reed mentioned
10   at the outset, we have reached an agreement with the
11   State and the Attorney General's office to rely a lot on
12   your old deposition testimony in lieu of retreading old
13   ground. And so -- with that in mind, I wanted to ask a
14   few questions about your educational and professional
15   background more in the way of just refreshing the
16   record. So I'll try and move through it quickly
17   understanding that you've testified about this a lot in
18   the prior case.
19   MR. CLAY: Thank you.
20   Q. (BY MR. DUNBAR) So, Major Mitchell, what is
21   your current job title?
22   **A. I am the major of -- in the law enforcement**
23   **division, and I currently supervise or oversee the sex**
24   **offender apprehension unit as well as the special**
25   **investigations unit.**

MAJOR FORREST MITCHELL                                    8/12/2014

21

1    Q.  And so correct me if I'm wrong.  At the time of
2    your previous deposition, I believe you supervised the
3    special investigations unit, or SIU, in the fugitive
4    apprehension unit.  Is that correct?
5    A.  Yes, sir.
6    Q.  So you've had some change in job responsibility
7    since you last testified?
8    A.  I apologize.  We commonly refer to the fugitive
9    unit as the sex offender apprehension unit or vice
10   versa.
11   Q.  I see.  So it's the same --
12   A.  It's the same things.
13   Q.  Since your prior deposition in the Section Five
14   litigation, have you been promoted or demoted in any
15   way?
16   A.  No, sir.
17   Q.  And have your job responsibilities changed in
18   any way since the June 2012 deposition?
19   A.  No, sir.
20   Q.  Have you received any additional degrees since
21   June 2012?
22   A.  No, sir.
23   Q.  Have you taken any additional graduate courses
24   since June 2012?
25   A.  No, sir.

22

1    Q.  Have you received any additional training
2    relating to Election Code violations since June of 2012?
3    A.  No, sir.
4    Q.  In your capacity -- in your current job title,
5    you -- you would consider yourself a State employee.  Is
6    that correct?
7    A.  Yes, sir.
8    Q.  You're paid by the State, I assume?
9    A.  Yes, sir.
10   Q.  And your prior testimony, was that in your
11   official capacity on behalf of the State of Texas?
12   A.  Yes, sir.
13   Q.  And who are you testifying on behalf of in this
14   deposition?
15   A.  The State of Texas.
16   Q.  Thank you.
17        I want to step back now and just --
18        MR. CLAY:  I'm going to interject here.  I
19   think that's not entirely accurate.  And -- and I think,
20   in part, because your question involves a legal
21   conclusion or a legal analysis by Major Mitchell who is
22   not a lawyer.  He's testifying on behalf of the Attorney
23   General's office and not the State of Texas.
24        MR. DUNBAR:  Okay.  Well, we'll note that
25   objection with his answer.

23

1    Q.  (BY MR. DUNBAR)  So Major Mitchell, I want to
2    step back and ask a few questions about the special
3    investigations unit, again, without, hopefully,
4    retreating too much old ground.  Can you describe in a
5    general sense the functions of the special
6    investigations unit?
7    A.  The special investigations unit conducts
8    criminal investigations which are typically referred to
9    our office by local prosecuting attorneys or local law
10   enforcement or other governmental officials.  And we
11   conduct criminal investigations throughout the entire
12   State of Texas.  And it is comprised of a number of
13   different teams which investigate different types of
14   crimes specialized in general areas.  Some of the teams
15   include the election team, a public integrity team, a
16   human trafficking team, a money laundering/financial
17   crimes team, and a prosecution assistance team.
18   Q.  And you supervise all of those functions.  Is
19   that correct?
20   A.  Yes, sir.
21   Q.  You would be at the top of the organizational
22   chart, so to speak, with respect to each of those teams?
23   A.  Well, I have bosses, too.  And I am the -- I am
24   the major -- there is a captain and lieutenant who also
25   oversee the investigators.  And then above me is a

24

1    deputy director and a director as well.
2    Q.  Of --
3    A.  The law enforcement division.
4    Q.  Great.  So I think you've answered my next
5    question describing the general types of cases and
6    investigations that SIU handles.  I guess I'll just ask,
7    were the teams or the areas of investigation that you
8    just identified all of the areas of investigations that
9    SIU would be assigned to?
10   A.  I -- it would also include fraud.  Financial
11   investigations and fraud.
12   Q.  So fraud in connection with financial
13   institutions or --
14   A.  A lot of mortgage fraud or -- we do some
15   benefit fraud cases as well.
16   Q.  And what do you -- just so the record is clear,
17   what do you mean by benefit fraud cases?
18   A.  An example of a fraud case that that team might
19   work would be a referral from our crime victims'
20   compensation fund that somebody perhaps may have
21   falsified the records and provided bogus receipts to try
22   to get crime victims' compensation funds, and so our
23   investigators might investigate that.
24   Q.  I see.  In a very general sense, have SIU's
25   priorities changed in any way since June 2012?

MAJOR FORREST MITCHELL                                    8/12/2014

---

25

1     A.   No.
2     Q.   So I take it that also means that SIU's
3   priorities haven't changed in any way since SB14 became
4   effective?
5     A.   No, sir.
6     Q.   And so the record is clear, you understand
7   that when I refer -- you understand what I mean when I
8   refer to SB14, the state's photo voter identification
9   law?
10     A.   Yes, sir.
11     Q.   And that became effective in July of 2013.  Is
12   that your understanding?
13     A.   I don't know for sure exactly when.
14     Q.   But you -- are you aware that there was a time
15   difference between when SB14 was enacted by the
16   legislature and signed by the governor and that it was
17   actually enforced?
18     A.   Yes, sir.
19     Q.   And did you play any role in the decision that
20   was made in July of 2013 to begin immediately enforcing
21   SB14's photo ID requirements?
22     A.   No, sir.
23     Q.   So you didn't have any conversations with
24   anyone at the Attorney General's office about that
25   issue?

---

26

1     A.   No, sir.
2     Q.   And how many individuals do you currently
3   supervise in the special investigations unit?
4     A.   I believe there are -- I believe there are 44,
5   45 positions within the special investigations unit.
6     Q.   Are all of those positions investigating
7   positions, so to speak, or does that include staff and
8   administrative support?
9     A.   That does include administrative and support
10   staff, which might include an auditor or analyst as well
11   as an administrative assistant.
12     Q.   And you've identified various teams within SIU
13   which are organized by subject matter of investigation.
14   Are there any overlap between these teams, meaning the
15   individuals belong to more than one team?
16     A.   Typically not.  However, any of the
17   investigators could be called upon to assist any of the
18   other teams as necessary.
19     Q.   And how many members are there currently of the
20   election team?
21     A.   Four.
22     Q.   Four.  And was that true at the time of your
23   Section Five deposition?  Do you recall?
24     A.   I believe that -- it was either three or four
25   at the time.

---

27

1     Q.   So as far as you're aware, there hasn't been a
2   substantial increase in staffing --
3     A.   No.
4     Q.   -- with respect to the reelection teams since
5   your prior deposition?
6     A.   No.
7     Q.   And where does that range in terms of size
8   within the SIU?  Is it the smallest -- smallest team?
9   Largest team?
10     A.   No.  I would say it's comparable to the other
11   teams.
12     Q.   So they're all about the same size?
13     A.   It's the same size as the -- roughly the same
14   size as the public integrity team but is not as large
15   as, perhaps, the money laundering team which has more
16   investigators.
17     Q.   So money laundering is the largest team
18   currently within SIU?
19     A.   Yes.
20     Q.   Do you know what the smallest team currently
21   within SIU is?
22     A.   I would say it's a tie between the public
23   integrity and elections.  Four investigators each.
24     Q.   And apologies if I missed this before.  What
25   does the public integrity -- the public integrity team

---

28

1   do?
2     A.   The Texas Attorney General's office frequently
3   receives referrals from local county and district
4   attorneys involving allegations of criminal misconduct
5   by various public officials.  It could be a police
6   officer.  It could be an elected official.  It could be
7   an appointed official in some agencies.  We also receive
8   referrals from other state agencies of alleged
9   misconduct by some of their employees.  And our mission
10   and job is to assist the referring agency in conducting
11   a criminal investigation.  We may or may not assist in
12   the prosecution as well, our office.
13     Q.   What type of training do individuals receive
14   when they're assigned particular teams, if any, to -- to
15   acquire expertise with respect to the various topics
16   they might be investigating?
17     A.   Mostly it's on-the-job training with the
18   guidance of a more experienced investigator.  We have an
19   orientation and then there might be a slide show
20   presentation in the various types of topics.  Like human
21   trafficking, we have a presentation that we would
22   provide investigators on human trafficking, mortgage
23   fraud, those kinds of things.  But most of it's
24   on-the-job training.
25     Q.   And are the members of the -- the current

---

MAJOR FORREST MITCHELL                                      8/12/2014

29

1   members of the election team the same folks that would
2   have been there in 2012?  Or has there been a turnover
3   in that -- in those slots?
4       **A.  There has been turnover in those slots.**
5       Q.  Can you describe generally what the nature of
6   that turnover has been?  Is it all new?  Just a few
7   people?
8       **A.  I believe it's all new people.**
9       Q.  And is there a reason why there's been such
10  high -- such turnover in the election team?
11      **A.  The investigators have moved to different types**
12  **of units.  Some types of cases are more interesting than**
13  **others, and some investigators have wanted different**
14  **challenges.**
15      Q.  Understood.  And what types -- we may get again
16  to this later, but just to make sure I understand the
17  state of the record today, can you describe generally
18  the range of Election Code violations that the election
19  team might investigate?
20      **A.  When you say range, do you mean the penalty**
21  **range of the offenses?**
22      Q.  No, sir.  I meant the nature of the underlying
23  Election Code offense.
24      **A.  We receive referrals of in-person voting**
25  **misconduct, which could involve voters or election**

30

1   **workers.  We also receive allegations of mail-in ballot**
2   **violations.  And then we also receive referrals**
3   **involving criminal misconduct that's associated with**
4   **voter registration.**
5       Q.  What about things like voter coercion?  Would
6   that be within the election team's ambit?
7       **A.  Yes, sir.**
8       Q.  And vote buying?
9       **A.  Yes, sir.**
10      Q.  Are there any types of election-type violations
11  that would fall outside the jurisdiction, so to speak,
12  of the election team?  Or would they pretty much handle
13  the full range of violations related to elections?
14      **A.  Yes, sir.  Under Texas law, there are some**
15  **statutes that are found in the Penal Code, for instance,**
16  **which directly affect voters and elections.  An example**
17  **is one that you mentioned which is coercion of a voter**
18  **or bribery of a voter.  That's actually found in the**
19  **Penal Code and not in the Elections Code, but our team**
20  **would work both.**
21      Q.  Got it.  And you may have answered this
22  question earlier, but to make sure I understand, are you
23  the highest-ranking individual within the special
24  investigations unit?
25      **A.  No, sir.  I -- I report to a deputy director**

31

1   and a director.
2       Q.  And so who are your direct reports?  Who
3   reports -- who reports to you from within SIU directly?
4       **A.  I have a captain who oversees the unit.**
5       Q.  So the captain oversees the unit, you're kind
6   of sitting above the captain, and then you report up to
7   the deputy director?
8       **A.  Correct.**
9       Q.  And I believe -- I know one of the things that
10  was produced last night, hopefully, was an
11  organizational chart, so I'm hoping to study that a
12  little bit more and come back to that with any other
13  questions I might have.  So that testimony has been
14  helpful.
15          A few more questions, actually, on the
16  reporting arrangement.  So given the structure of the --
17  the -- the criminal division, are your conversations
18  about Election Code violations contained within that
19  hierarchy or do you have conversations -- setting aside
20  your lawyers, do you have conversations with other folks
21  in the Attorney General's office about Election Code
22  violations?
23      **A.  Yes, sir.  We have discussed Election Code**
24  **investigations and prosecutions with, for instance, the**
25  **fugitive apprehension unit --**

32

1       Q.  Uh-huh.
2       **A.  -- to request their assistance in locating a**
3   **wanted person, for instance.**
4       Q.  And is that it?
5       **A.  I would also say that I would have**
6   **conversations, potentially, with my other majors.**
7   **There's a major of our cyber crimes.**
8       Q.  Uh-huh.
9       **A.  And there's also a major of our professional**
10  **standards and training.**
11      Q.  Uh-huh.
12      **A.  So I could have conversations with them as**
13  **well.**
14      Q.  Are there any -- are there any more policy-type
15  offices within the Attorney General's office with which
16  you might have conversations about election crime
17  issues?
18      **A.  I'm not sure I understand your policy.**
19      Q.  Is there a -- people who deal with legislative
20  affairs or policymaking in the Attorney General's
21  office --
22      **A.  Yes, sir.**
23      Q.  -- that you might have had conversations with
24  about election crime issues?
25      **A.  Yes, sir.**

MAJOR FORREST MITCHELL                                      8/12/2014

33

1       Q.   And who would those people be?
2       A.   We have an intergovernmental relations
3    division.  And I think it's run by Jay Dyer.
4       Q.   And again, since June 2012, have you had
5    conversations with Mr. Dyer about election crime or
6    voting fraud issues?
7            MR. CLAY:  Well, Mr. Dyer is an attorney.
8    And so you can answer to the extent that the discussion
9    doesn't involve legal discussions and is only related to
10   interactions -- policy discussions or interactions with
11   the legislature.
12      Q.   (BY MR. DUNBAR)  But to be clear, I -- I --
13           MR. DUNBAR:  I appreciate that objection.
14      Q.   (BY MR. DUNBAR)  The questions I just asked now
15   are more just foundational whether these conversations
16   existed and when.  If we can build the record on that.
17           MR. CLAY:  He was looking at me because he
18   knows that Mr. Dyer is an attorney.
19           MR. DUNBAR:  Sure.
20           MR. CLAY:  So I just wanted to make him
21   aware that there's a certain type of conversation that
22   if you decide you want to get into it, that he can talk
23   about.  And there's a certain type of conversation that
24   he can't.  So I just wanted to --
25           MR. DUNBAR:  No, I appreciate that.

34

1       Q.   (BY MR. DUNBAR)  I just wanted to make clear
2    for the witness that I'm -- at this point, I'm just
3    asking if you factually had conversations since June
4    2012 with Mr. Dyer about election crime issues?
5       A.   Yes, sir.  One of my duties is to provide
6    testimony potentially to the Texas legislature if I'm
7    summoned as a fact witness.  I'm also asked by Mr. Dyer
8    to provide occasionally the Election Code spreadsheets
9    that we maintain in the special investigations unit that
10   include our prosecutions and our charges pending.  So I
11   provide those to him as well.
12      Q.   And have you testified before the Texas
13   legislature on election crime issues?
14      A.   No, sir.
15      Q.   Was there a time period when you thought you
16   might had to testify?
17      A.   Yes.  I -- I go over there to be a resource
18   witness if they call upon me to.  I was over at the
19   legislature a couple of times last session.
20      Q.   But as I recall correctly, you were not a
21   resource witness in the legislative debate leading up to
22   the enactment of SB14.  Is that correct?
23      A.   Which session?
24      Q.   This would be, what, 2011?  Well, let me step
25   back.

35

1            MR. CLAY:  Are you talking about the
2    session that SB14 was enacted?
3            MR. DUNBAR:  Yes.
4            MR. CLAY:  That's 2011.
5            THE WITNESS:  I was not a resource witness
6    during that election -- or during that session.
7       Q.   (BY MR. DUNBAR)  Were you a resource witness
8    with respect to any of the prior versions of voter
9    identification laws?
10      A.   I believe -- I believe I was on standby in case
11   I was needed.
12      Q.   Do you remember what year that was?
13      A.   2009.
14      Q.   2009.  Besides the conversations -- well, let
15   me step back.
16           How often do you speak with Mr. Dyer or
17   others in the intergovernmental affairs office about
18   election crime-related issues?
19      A.   Rarely.
20      Q.   But you do remember these discrete instances
21   since 2012?
22      A.   Discrete?
23      Q.   The instances you were describing, how many --
24   let me back up.
25           How many times, to the best of your

36

1    recollection, have you spoken with Mr. Dyer about
2    election crime since June 2012?
3       A.   I believe I could have easily been asked
4    perhaps a half a dozen times for those spreadsheets.
5       Q.   And do you recall how many times you might have
6    had discussions with him about possibly being a
7    witness -- a resource witness in front of the Texas
8    legislature on election crime issues?
9       A.   Maybe once or twice.
10      Q.   And do you recall when that was?
11      A.   No, sir.
12      Q.   Does your unit -- and by "unit" I mean SIU --
13   receive any guidance from the Attorney General or the
14   Deputy Attorney General on matters relating to
15   investigations of election crimes?
16      A.   No, sir.
17      Q.   So it's more of a decentralized model in terms
18   of which types of crimes to concentrate your
19   investigative resources on?  Do you make those decisions
20   ultimately?
21      A.   I wouldn't say it's decentralized in the fact
22   that we are all geographically located in the same
23   location.  I would say that it is a consensus of myself,
24   the captain, lieutenant, and potentially even my deputy
25   director and director, as to which cases we devote the

**45**

1    want to say, about 300,000 a year.  And then
2    additionally I have three positions that are funded by
3    the West Texas High Intensity Drug Task Force out in
4    El Paso.  That includes two money laundering
5    investigators and one public integrity investigator.
6    And those grants are combined.  Let's say $250,000.
7        Q.  The election -- the resources associated with
8    the election team, then, would come exclusively through
9    the legislative appropriations channel?
10       A.  Yes, sir.  All the investigators who were
11   assigned to the elections team are general revenue
12   investigators.
13       Q.  Thank you.
14           And has that always been the case with
15   SIU?
16       A.  No, sir.
17       Q.  Can you explain?
18       A.  In 2005, I believe, the law enforcement
19   division -- criminal investigations division received a
20   grant from the governor's office.  I believe it was a
21   Byrnes grant.  And we hired, I want to say, about 15
22   positions under that grant.  And those were dispersed
23   between the various units of the criminal investigations
24   law enforcement division.  Money laundering team, sex
25   offender apprehension fugitive team, cyber crimes and

**46**

1    SIU.  You know, of SIU, some of those investigators were
2    public integrity, elections, fraud.
3        Q.  And what is a Byrnes grant?
4        A.  It's just a particular type of grant -- I think
5    it's called the Ed Byrnes grant that law enforcement
6    agencies in Texas can apply for through the governor's
7    office to fund various criminal justice initiatives.
8        Q.  And am I correct that there was a time when at
9    least part of SIU's functions were funded by a grant
10   from the Department of Justice?
11       A.  Yes, sir.  That is correct.
12       Q.  And what was the -- what was the nature of that
13   funding arrangement?  What did that -- what did that
14   fund?
15       A.  Like I just testified to?
16       Q.  Uh-huh.
17       A.  It funded a number of positions within the law
18   enforcement criminal investigations division.
19       Q.  I see.
20       A.  I believe it was about 12 to 15 positions.
21       Q.  And has that grant expired or run its course?
22       A.  Yes, sir.  I believe that it was for 2005.  And
23   I think it expired in 2012.
24       Q.  Okay.  Have general resources -- have resources
25   expended by the SIU increased or decreased as a general

**47**

1    matter since June 2012?
2            MR. CLAY:  Object to form.
3            To the extent you understand the question,
4    you can answer.
5            THE WITNESS:  I would say since 2012
6    the -- the financial resources available have increased.
7        Q.  (BY MR. DUNBAR)  And approximately -- sitting
8    here today, approximately how much of SIU's annual
9    expenditure of resources would be related to
10   investigations of election -- crimes or election
11   violations?
12       A.  I don't have an exact number of what we spend
13   each specific year.  I could put it in the perspective
14   of I have four investigators assigned to that team.
15       Q.  Uh-huh.
16       A.  In comparison to the law enforcement division
17   having potentially 108 FTEs.
18       Q.  Uh-huh.
19       A.  So I --
20       Q.  Within SIU, I guess, if you had to -- strike
21   that.  Let me rephrase it.
22           Within SIU, which of your investigative
23   teams is currently the most resource intensive?
24       A.  I would say it's the money laundering team.
25       Q.  Money laundering.  And where would the election

**48**

1    team rank?
2            MR. CLAY:  Objection; asked and answered.
3        Q.  (BY MR. DUNBAR)  You can answer.
4        A.  As I previously testified, it's on par with the
5    public integrity team.  Each of those teams have about
6    three or four investigators.  And if I could even
7    further clarify.
8        Q.  Please.
9        A.  The resources depend on the actual year.  We
10   receive more referrals in a year which contain a primary
11   and a general election than we do in the off years where
12   we only have, perhaps, school district and municipal
13   elections.  So on even numbers of years, we tend to see
14   more cases than we do on the odd number of years.
15       Q.  Right.  And I guess that's -- that's what I'm
16   trying to understand is that the -- I understand that
17   the FTE resources or fixed costs you have to pay,
18   employees, their salary, whatever benefits in any given
19   year, in that sense there's a rough equality between the
20   public integrity team and say, the election team.  I
21   would assume there are other costs that might cause
22   resource expenditures to fluctuate in any given year,
23   that is your investigators have to spend money on travel
24   or other costs that come up in an investigation that
25   would affect the -- the resource expenditures in any

MAJOR FORREST MITCHELL                                    8/12/2014

15 (Pages 57 to 60)

---

57

1   special investigations division, we characterize it as a
2   case type.  And the election violations is a case type.
3       Q.  Right.
4       A.  What --
5       Q.  I'm sorry.  Go ahead.
6       A.  What was -- what probably -- I can speak to the
7   manner and means by which we prepare it again, and that
8   is that we queried our mainframe system and said, please
9   identify all the OAG case numbers associated with
10  election violation as a case type.  We could then pull
11  those case numbers and then look at the billable hours
12  and the billable costs associated with each of those.
13      Q.  Great.  That's helpful.
14          And so all of the underlying information
15  that's on this spreadsheet, the hours worked, the total
16  hourly cost, direct expenses, that's all data that's
17  maintained within -- within the SIU system corresponding
18  to case number?
19      A.  We don't necessarily have our own SIU system.
20  We have an overall OAG mainframe which contains
21  case-related information as far as billable hours, case
22  costs, salary of investigators, the salary of
23  prosecutors, the costs associated with travel, the
24  specific case numbers.
25      Q.  And that's my final question, I think, about

---

58

1   this -- about this chart.  And then total -- total --
2   there's a category, total hours worked.  And I assume --
3   strike that.
4           There's a category, total hours worked,
5   and then total hourly costs, and then a direct expenses
6   category as well.  What would direct expenses include?
7           MR. CLAY:  Objection; foundation.
8           To the extent you know, you can answer.
9           THE WITNESS:  I'm not absolutely certain.
10      Q.  (BY MR. DUNBAR)  Do you recall if you reviewed
11  this chart before it was produced in the Section Five
12  litigation?
13      A.  I don't -- I don't specifically recall this
14  one.
15      Q.  And just so the record is clear, you're not
16  aware of having seen an updated chart or version of this
17  document since this was produced in 2012.  Is that
18  correct?
19      A.  What I testified to is that I believe that it's
20  not exactly formatted like this.  But we did do a new
21  printout.  I requested my administrative staff to
22  request a printout of all election violation costs with
23  the case numbers that we've identified.  And that period
24  goes from fiscal year 2001 to present.
25      Q.  And was there an aggregate -- was there a total

---

59

1   dollar value associated with that that you recall?
2       A.  There are actually two amounts.  One was an
3   amount for the criminal prosecutions division --
4       Q.  Uh-huh.
5       A.  -- which is the division that maintains all --
6   or has all of the criminal prosecutors who will be sworn
7   in as DAs to prosecute cases, and then also the law
8   enforcement description.  So there are two amounts.
9       Q.  So your office, SIU, doesn't conduct
10  prosecutions.  Is that correct?
11      A.  Yes.  We are only law enforcement personnel and
12  support staff.
13      Q.  I'm sorry.  Could you clarify that answer?
14      A.  The criminal prosecutions division has all the
15  Assistant Attorney Generals who prosecute election
16  violation cases.  The law enforcement division is
17  separate from that.  We're still part of the Attorney
18  General's office.
19      Q.  Uh-huh.
20      A.  But we are the investigator law enforcement
21  arm.  We have investigators and support staff such as
22  auditors and analysts who help.
23      Q.  I want to switch topics a little bit and talk a
24  little bit more about the nuts and bolts of what SIU
25  does and how they've done it since 2012.  Can you

---

60

1   describe to me how alleged Election Code violations get
2   referred to SIU?
3       A.  Yes, sir, I can.
4       Q.  Thank you.
5       A.  There are a number of different ways they may
6   be referred to the Attorney General's office.  Probably
7   the largest portion of cases are direct referrals from
8   the elections division of the secretary of state's
9   office.  A portion of the cases could be direct
10  referrals from a district or a county attorney in any of
11  the jurisdictions in Texas.  Or it could be a referral
12  from another law enforcement agency such as a sheriff's
13  department, the Texas rangers, FBI, any -- any type of
14  organization, any kind of law enforcement organization.
15  And then, finally, some of the referrals that we receive
16  are from elections administrators themselves.
17      Q.  And when you say election administrators, those
18  are the county officials or municipal officials involved
19  with running the elections?
20      A.  Yes, sir.  It depends on the jurisdiction
21  whether or not they would be an elections administrator
22  or the county clerk or the county tax
23  assessor/collector.
24      Q.  And do I understand Texas law correctly that
25  referrals could also come from voters directly in

---

MAJOR FORREST MITCHELL                                      8/12/2014

---

**61**

1  circumstances where the election involves more than one
2  county.  Is that right?
3      A.  Yes, sir.  In Chapter 273 of the Election Code,
4  voters may sign an affidavit and submit those affidavits
5  to a local county or district attorney for election
6  misconduct that occurs in that specific jurisdiction, or
7  they may submit it to the Texas Attorney General's
8  office if it involves a multi-jurisdictional election.
9      Q.  And a voter could, without going through the
10  affidavit route, could just directly contact the Texas
11  Secretary of State's office, which I believe maintains
12  an election hotline.  Is that your understanding?
13      A.  Yes, sir.  Voters can directly contact the
14  elections division at the secretary of state's office.
15      Q.  And do you know what SOS does with those
16  referrals?
17          MR. CLAY:  Objection; foundation.  You can
18  answer to the extent you know.
19          THE WITNESS:  I -- I don't know
20  specifically.
21      Q.  (BY MR. DUNBAR)  Do you know what standard the
22  secretary of state's office applies in determining
23  whether they should then refer that referral to your
24  office?
25          MR. CLAY:  Same objection.

---

**62**

1          THE WITNESS:  It's my understanding that
2  the only thing they would refer to our office is
3  something that they believe that there's a potential of
4  a criminal offense that occurred.
5      Q.  (BY MR. DUNBAR)  Can legislatures -- excuse
6  me -- legislators make referrals directly --
7      A.  No.
8      Q.  -- to your office?
9      A.  No, sir.
10      Q.  If a legislator wanted to make a referral, how
11  would he or she go about doing it?
12          MR. CLAY:  Objection; form, foundation.
13  You can answer to the extent you know.
14          THE WITNESS:  To your hypothetical
15  question, I would suggest that a legislature could
16  contact either the SOS and put those witnesses that they
17  may have in contact with the SOS.  Or they may contact
18  their local county and district attorney and do the same
19  thing.  Let those witnesses provide information about
20  the alleged misconduct.
21      Q.  (BY MR. DUNBAR)  And, again, in the time period
22  since June 2012, are you aware of any instances in which
23  a legislator has made a referral through either of those
24  routes?
25      A.  No, sir.

---

**63**

1      Q.  Does your -- does SIU ever receive direct
2  referrals from, say, public interest organizations or
3  just concerned citizens?
4      A.  Citizens call the Attorney General's office
5  every day about a wide variety of topics, including
6  Election Code violations.  It is our practice at the
7  AG's office and the law enforcement division that if
8  someone calls to complain about election violation, that
9  we direct them to the secretary of state's office, the
10  election hotline, so they can send it there.  We advise
11  the callers or the groups, if it was a group, that if
12  the SOS determines that a potential criminal violation
13  has occurred, that they would refer it to us.  But we do
14  not initiate investigations based off of a voter calling
15  our office or sending us a letter.
16      Q.  Right.  And do those calls typically go
17  directly to your unit, SIU, or are they -- is there some
18  general Attorney General's contact number that generally
19  deals with those types of calls?
20      A.  My understanding of the organization, we do
21  have a public information assistance division that
22  answers calls as -- you know, from citizens and
23  constituents and other agencies.  The law enforcement
24  division also has a -- a liaison who answers calls, who
25  may be forwarding calls from our PIA.  His name is

---

**64**

1  Captain Greg Lucas (phonetic).
2      Q.  Thank you.
3          So it would be fair to say that there are
4  a number of ways in which various individuals can make
5  election crime violations known to the Attorney
6  General's office and to SIU in particular.  Is that
7  right?
8      A.  They could -- they could make them known.
9  Correct.
10      Q.  There are a number of referral routes both
11  through the -- through the secretary of state's office
12  and then also direct referrals.  Is that correct?
13      A.  The only direct referrals that we would accept
14  would be direct referrals from the secretary of state's
15  office, a law enforcement agency, a local district or
16  county attorney, or a local elections administrator.
17          THE REPORTER:  A local?
18          THE WITNESS:  Elections administrator.
19      Q.  (BY MR. DUNBAR)  That's a helpful summary.
20  Thank you.
21          But just to make sure I understand,
22  voters, in certain circumstances, assuming that they
23  follow the procedures laid out in 273, can also make
24  those referrals as well.  Is that right?
25      A.  We would direct -- if a voter attempted to do

---

77

1    Grand Jury preliminary hearings and at trial. So our
2    investigators could be involved from the very beginning
3    of the case to the conclusion of the case, which would
4    be a criminal trial.
5        Q. And I believe you testified in the Section Five
6    case that OAG has the statutory authority to investigate
7    Election Code violations on its own. But its policy is
8    not to do so. Is that an accurate statement of your
9    testimony?
10       A. We prefer to work with local jurisdictions
11   whenever and wherever possible.
12       Q. But -- so the answer -- you -- OAG does have
13   the statutory authority to investigate on its own?
14       A. Under Chapter 273 of the Texas Elections Code,
15   if you're talking about a multi-jurisdictional justice
16   election, the OAG has authority to prosecute those
17   cases. And then we also have the ability to prosecute
18   those cases that are referred to our office by the
19   secretary of state's office.
20       Q. But to be clear, it would have the statutory
21   authority to investigate those multi-jurisdiction cases
22   as well, then. Is that correct?
23       A. Yes, sir. Investigate and prosecute, yeah.
24       Q. And that's without a referral from anyone?
25       A. Statutorily or policy?

78

1        Q. Statutorily.
2        A. 2273 -- I'm sorry. I don't have it in front of
3    me right now, for sure, but if it were referred to our
4    office and it involved a multi-jurisdictional election,
5    I believe our office would have the authority to do --
6    investigate it and prosecute it.
7        Q. And I wanted to ask you just slightly -- that
8    answer is helpful. I wanted to ask you just a slightly
9    different question, which is just if OAG became aware of
10   potential election crimes somewhere in the state that
11   involved multiple jurisdictions, as a statutory matter,
12   the office could investigate and then prosecute.
13   Correct?
14       A. As a statutory matter, I believe so. Yes.
15       Q. And then as a policy matter, I understand your
16   prior testimony -- and your testimony today to be that's
17   not what OAG does. Is that correct?
18       A. We are a referral-driven agency.
19       Q. And can you explain to me what the policy
20   rationale is behind being referral driven?
21            MR. CLAY: Objection; foundation, form.
22            THE WITNESS: It would just be speculation
23   on my part.
24       Q. (BY MR. DUNBAR) So you haven't had
25   conversations with anyone in the -- in the Attorney

79

1    General's office about why it's a referral-driven
2    policy?
3        A. I would say, yes, I have had conversations
4    about that with my staff. And it would be to say
5    that -- I mean, it would be speculation on my part, but
6    it would be to say that the reason we do a referral is
7    that you can't have an election without somebody being
8    upset and everybody complains about the results of
9    elections, typically the losers. We have to be
10   referral-driven because there's just so much out there
11   that people are upset about as far as elections go, but
12   we can only focus on the ones that are referred to our
13   office.
14       Q. So at bottom, then, that would be kind of a
15   resource question?
16       A. Yeah.
17       Q. A resource question?
18       A. A resource question.
19       Q. I think that's all I have on that question. I
20   was going to turn to start working through some of those
21   spreadsheet issues which may take a while. I don't know
22   if now -- if we want to keep going, that's fine with me,
23   but otherwise we can take a little break.
24            MR. CLAY: Just to clear up the record,
25   since we kind of modified Exhibit 3, I'm going to go

80

1    ahead and detach the --
2            MR. DUNBAR: Please do.
3            MR. CLAY: Okay. Just for her purposes.
4            (Exhibits No. 4 and 5 marked)
5        Q. (BY MR. DUNBAR) I've handed you what would
6    have been labeled Exhibits 4 and 5. One of them we only
7    need to talk briefly about, which is -- take a look at
8    Exhibit 5 first. You've testified that you -- that you
9    recall your deposition in the Section Five litigation.
10   My question is, do you recall what -- and you were asked
11   questions about the spreadsheet that I believe you
12   referenced earlier in your testimony in that deposition.
13   Is that correct?
14       A. Yes, sir.
15       Q. And do you recall the date that the spreadsheet
16   that was used in your June 2012 interview was last
17   updated?
18       A. Would you repeat that one more time?
19       Q. Sure.
20            You were deposed in June of 2012. Do you
21   recall the version of the spreadsheet that you were
22   asked questions about during that deposition?
23       A. No, not specifically.
24            MR. DUNBAR: And, counsel, this goes to
25   our agreement about kind of focusing on post Major --

MAJOR FORREST MITCHELL                                    8/12/2014

---

81

1     developments only since Major Mitchell's last
2     deposition. It's our understanding, for the record,
3     that what is Exhibit 5 was the version that was used,
4     which is dated March 12th, 2012. So although the
5     agreement is to talk only about developments since the
6     June deposition, since the June deposition was based on
7     a spreadsheet reflecting information from March of 2012,
8     I believe there are a few cases that fall within the
9     window between March 2012 and June of 2012 that I may be
10    asking questions about.
11              MR. CLAY:  Okay.  And that's fine so long
12    as -- you know, obviously subject to the law enforcement
13    privilege and other applicable privileges.  I'm not
14    going to object to --
15              MR. DUNBAR:  Right.  I understand those
16    discussions may be coming, but --
17              MR. CLAY:  There's a three-month period
18    here.
19              MR. DUNBAR:  There's -- as I understand
20    it, there is a three-month discrepancy and I just want
21    to make sure nothing falls through the cracks.  So we
22    can set Exhibit 5 aside for the time being.
23              MR. CLAY:  You represented that to be the
24    case.  I don't know whether it is the case or not, but
25    I'm also -- it's fine with me if you want to --

---

82

1              MR. DUNBAR:  That's my -- that's my
2     understanding.
3              MR. CLAY:  That's fine.
4              MR. DUNBAR:  If it turns out to be
5     different, we could then maybe modify the agreement.
6              MR. CLAY:  All right.  I have no objection
7     to you talking about, you know, March on versus June on.
8     No problem.
9              MR. DUNBAR:  Okay.  I just wanted the
10    record to be clear on that.
11     Q.  (BY MR. DUNBAR)  Okay.  So if you turn to
12    Exhibit 4, can you tell me what this document is?
13     A.  This document contains spreadsheets maintained
14    by the special investigations unit which talk about
15    investigation referrals that are received by this
16    office, prosecutions which are resolved, as well as
17    charges which are currently pending from OAG
18    investigations or prosecutions.
19     Q.  And so the record is clear about what I'm
20    doing, I understand that an updated version of the
21    spreadsheet was -- came in the production last night
22    from April of 2014.  I'm going to ask you questions
23    about this -- about the spreadsheet that's dated
24    February 18th, 2014, and then I think there are only a
25    few minor differences.  We may pull that document in

---

83

1     later and go through and talk about those -- any changes
2     that have occurred.  But for the time being, my
3     questions will be obviously focused on this spreadsheet,
4     which is dated February 18th, 2014.
5              MR. CLAY:  And, again, I'm just going to
6     preface all this with, you know, our understanding of
7     the court's order -- and I've got them here if we need
8     to discuss them -- is, for the most part, these
9     documents speak for themselves and so the testimony is
10    going to be more about the administerial and the
11    collection and maintenance of this documents and not
12    delve too much into the particular details of the
13    individual cases.
14              MR. DUNBAR:  I mean, I appreciate you
15    stating that for the record, but it may be easier to
16    just have the discussions as we get into the questions
17    about where the line is drawn.  Our understanding -- our
18    understanding of the court's order is that, you know,
19    she granted our motion to compel.
20              To the extent you think there is a law
21    enforcement privilege issue, I would ask certainly that
22    you could raise it.  But for many of the things I'm
23    going to be asking, I believe these -- these are topics
24    that Major Mitchell testified about in the Section Five
25    case in open court.  Similar level -- I will be asking

---

84

1     questions that I think are a similar level of generality
2     as to what Major Mitchell testified previously.
3              MR. CLAY:  Okay.  And I -- I just want to
4     be clear that -- I mean, I'm also going upon the amended
5     notice that you guys served on us, on the Attorney
6     General's office, and it refers specifically to those
7     matters ordered by the court on July 24, 2014.  And so,
8     you know, my understanding -- I've got -- again, I've
9     got the order here.
10              My understanding of what the court ordered
11    was the maintenance of these documents and sort of
12    the -- or the maintenance and the -- the maintenance,
13    generation, and things of that nature and -- and not
14    actually -- I mean, I think she actually uses the
15    words -- you know, these are documents.  They're data.
16    They kind of speak for themselves.  So to the extent
17    that we're going to get into particular details about
18    particular cases, you know, I may be objecting a lot --
19              MR. DUNBAR:  Okay.
20              MR. CLAY:  -- just based upon the scope
21    and also the law enforcement privilege.
22              MR. DUNBAR:  Well, we disagree with your
23    reading of the opinion and don't -- order and don't want
24    to spend a lot of time of Major Mitchell's time arguing
25    among lawyers here.  For the record, I will say that to

---

MAJOR FORREST MITCHELL                                      8/12/2014

85

1    the extent there's a topic that you invoke a law
2    enforcement privilege on, you know, I think we'll be
3    taking the position that if that privilege is enforced,
4    then that topic is off limits for all parties with
5    respect to any evidence that might come in. If we're
6    not allowed to ask questions about things, we don't
7    think the privilege should be both kind of a sword and a
8    shield.
9           The second thing I'll say about that is
10   that, again, I'm going to be asking questions that I
11   think are at the level of generality that Major Mitchell
12   testified about in the Section Five case, in both his
13   deposition and his testimony. If your position is
14   you've adopted a more expansive view since that time, that's fine. But
15   enforcement privilege since that time, that's fine. But
16   I would also ask that in making your objections, if you
17   could clarify whether your objection is based on what
18   you think the law enforcement privilege actually
19   protects versus what you think you -- you don't have to
20   produce just because of another dispute -- discovery
21   dispute you're having with DOJ. If you could separate
22   those objections, I think that would be helpful in
23   thinking about this going forward.
24          MR. CLAY: Sure.
25          And just to be clear, it's not -- and I do

86

1    want to get on with the testimony, but there are kind of
2    two lines of objections and it isn't based upon a
3    dispute with the DOJ. It's based upon both the language
4    of your notice and -- which talks about the July 24th
5    court order -- and the language of that order that I'm
6    relying on. And we're not producing Major Mitchell for
7    anything that is not contained within the four corners
8    of this notice or what the judge said on July 24th. And
9    so --
10          MR. DUNBAR: Right. And you made it --
11          MR. CLAY: -- he won't be testifying about
12   that.
13          MR. DUNBAR: You made a specific request
14   for the judge to clarify that his deposition would be
15   limited in the way of DOJ, and she -- she rejected that.
16   She said that to the extent there are law enforcement
17   privileges those can be dealt with in the ordinary
18   course. But you made the specific request after the
19   judge orally stated she was granting our motion. So we
20   can disagree about that and go through this deposition
21   and then take that up with the judge and then maybe have
22   to go back and revisit that, so --
23          MR. CLAY: Okay.
24          MR. DUNBAR: But that's fine. We'll just
25   ask the questions.

87

1           MR. CLAY: I mean, I just want to be
2    clear. I mean, the judge clearly said, you know, what's
3    good for one side is good for the other. So I don't
4    think that the scope of this deposition is going to
5    be -- is any larger than what the scope of the
6    deposition that we were granted with respect to DOJ is.
7           MR. DUNBAR: And you made that specific
8    request --
9           MR. CLAY: Okay.
10          MR. DUNBAR: -- which she -- she rejected.
11          MR. CLAY: Well, if we need to take it up
12   with the court, then we will.
13          MR. DUNBAR: We'll take it up with the
14   court. But again, to the extent anything is off limits
15   here, at a minimum we'll be taking the position that
16   it's off limits for you guys throughout your case in
17   chief.
18      Q.  (BY MR. DUNBAR) So with that in mind -- sorry
19   for that, Major Mitchell.
20          MS. CLARK: Kelly, can I jump in? This is
21   Jennifer Clark. Just for the help of those of us on the
22   phone, when y'all are talking about exhibits, if you
23   could refer to Bates number, it would be much
24   appreciated. Thank you.
25          MR. DUNBAR: Certainly.

88

1      Q.  (BY MR. DUNBAR) We are now referring to
2    Exhibit 4, which I've -- which is Texas -- Texas
3    IR000232 all the way through Texas IR000261. And
4    apologies, Major Mitchell, if I asked you this question.
5    It may have gotten lost in Reed and I's soliloquies, but
6    do you -- could you tell me what this document is again?
7      A.  Yes, sir. This document appears to be the
8    spreadsheets that are maintained by the special
9    investigations unit which document the Election Code
10   referrals received by our office, the charges which are
11   currently pending on Election Code investigations or
12   prosecutions that our office is involved in, and then
13   prosecutions which have been resolved.
14     Q.  Are you the author of this document?
15     A.  I used to be.
16     Q.  When did you stop authoring this document?
17     A.  All right. I passed the duty to the captain of
18   the special investigations unit sometime earlier this
19   year.
20     Q.  Were you the author -- did you or the captain
21   have the responsibilities for the February 18th, 2014
22   version?
23     A.  Yes, sir.
24     Q.  I'm sorry. Which of the two?
25     A.  I believe it was mine. I believe I was still

MAJOR FORREST MITCHELL                                          8/12/2014

---

**89**

1   doing it at the time.
2       Q.  So at least with respect to this document, you
3   believe it was you?
4       A.  Yes, sir.
5       Q.  And can you tell me why you keep track of this
6   information?
7       A.  Yes, sir.  We maintain this spreadsheet for the
8   purposes of keeping track of all Election Code
9   investigations and prosecutions and this document is in
10  a format which potentially could be released to the
11  public or contains information which is obtained through
12  other means such as getting a copy of an indictment, or
13  getting a copy of a judgment in a sentence.
14      Q.  Right.  And I believe you testified in the
15  Section Five case that -- as you've alluded to here,
16  that one of the reasons this document was created would
17  be able to present public information that wouldn't
18  implicate law enforcement privileges.  Is that correct?
19      A.  Yes, sir.
20      Q.  Did someone ask you to keep track of this
21  information?
22      A.  Yes, sir.  We created this spreadsheet at the
23  instruction of former Deputy Assistant Attorney General
24  Eric Nichols.
25      Q.  And when was that?

---

**90**

1       A.  I apologize.  I would say somewhere around
2   2008 maybe.
3       Q.  And are similar spreadsheets kept for other
4   categories of what we -- violations that SIU
5   investigates?
6       A.  Yes, sir.
7       Q.  For each of the other teams?
8       A.  No, sir.  I wouldn't say for each of the other
9   teams, but we do keep records of that -- of public
10  integrity cases that we investigate, as well as money
11  laundering cases we investigate.  We keep spreadsheets
12  as well.
13      Q.  And were those -- was the request to keep those
14  spreadsheets also made by Mr. Nichols?
15      A.  No, sir.
16      Q.  And what was Mr. Nichols' position again?
17      A.  He was the deputy attorney general for criminal
18  justice.
19      Q.  And you were in -- you were in -- you were
20  leading SIU at the time that request was made.  Is that
21  correct?
22      A.  Yes, sir.
23      Q.  And did you have conversations with Mr. Nichols
24  about why you were keeping the spreadsheet?
25          MR. CLAY: I'll object to the extent that

---

**91**

1   Eric is an attorney.  So to the extent that your -- your
2   discussions included any legal analysis or legal
3   discussion, you're directed not to answer.
4           THE WITNESS:  No, sir.
5       Q.  (BY MR. DUNBAR)  And how frequently is the
6   spreadsheet updated?
7       A.  As frequently as possible.  It may go a matter
8   of months before we have any kind of change in the
9   prosecutions resolved or change in the number of cases
10  that are currently charged.  Referrals may -- may be
11  updated more regularly because we are always getting
12  referrals.  So that may be monthly or every two months.
13  But we could go three or four months without any changes
14  to the criminal prosecutions.
15      Q.  Now, I believe the version that I was provided
16  of the spreadsheet I was provided last night was April
17  of 2014.  I'm not sure of the precise date.  Are you
18  aware of whether that's the most recent version of the
19  spreadsheet?
20      A.  It probably is not, because I know that we
21  recently obtained some convictions and then we recently
22  charged some new suspects.
23          MR. DUNBAR: Okay.  To the extent there is
24  a more recent version one than that, Reed, I renew my
25  request for that.  I'm not sure if there is.  And I may

---

**92**

1   be getting the date wrong on the spreadsheet.  I'll take
2   a look at that.
3       Q.  (BY MR. DUNBAR)  You testified that you created
4   the spreadsheet in part so that you could have -- could
5   have a document that you would be able to hand people
6   publically.  Has -- has anyone in the Texas legislature
7   asked you for this spreadsheet since June 2012?
8       A.  No one has specifically asked me for this
9   document.
10      Q.  Are you aware of anyone making any request to
11  SIU generally for this document, from the legislature,
12  since June 2012?
13      A.  I have been requested by our intergovernmental
14  relations division to provide these spreadsheets, and
15  they advised me it was a legislative request.
16      Q.  And do you know which legislatures were making
17  the request?
18      A.  I don't know all who have made the requests,
19  and I don't know if it was given to one legislature or
20  five legislatures.  I just don't know.
21      Q.  Do you know the names of any legislators that
22  made such a request?
23      A.  I know Anchia has requested this.
24          THE REPORTER:  You know who?
25          THE WITNESS:  Anchia.

MAJOR FORREST MITCHELL                                    8/12/2014

93

1           MR. CLAY:  A-N-C-H-I-A.
2       Q.  (BY MR. DUNBAR)  Is that the only person you
3   recall?
4       A.  Off the top of my head, yes, sir.
5       Q.  Okay.  Has anyone in the governor's office
6   asked you for this -- asked you, you meaning SIU, for
7   the spreadsheet since June 2012?
8       A.  No, sir.  Not that I'm aware of.
9       Q.  What about anyone outside OAG making requests
10  for this spreadsheet since June 2012?
11      A.  I believe our communications division has
12  received requests from newspapers and -- and reporters.
13      Q.  And so this -- this spreadsheet -- everything
14  we're seeing here would be produced in response to such
15  request?
16      A.  Correct.
17      Q.  And I believe you testified this is divided up
18  into three parts:  Charges pending, referrals, and
19  resolved prosecutions.  Is that right?
20      A.  Yes, sir.
21      Q.  And have you all -- has the spreadsheet always
22  been divided up in that matter, that is with those three
23  sections?
24      A.  Yes, sir.
25      Q.  So looking at the -- asking just some very

94

1   general questions to make sure I understand the
2   pending -- charges pending resolution tab, which for
3   those on the phone is, again, Texas IR000232, these are
4   pretty self-explanatory, but can you tell me what each
5   of the column titles refers to?
6       A.  On this chart, which is titled Charges Pending
7   Resolution --
8       Q.  Yes, sir.
9       A.  -- the first column would be county.  And that
10  is going to be the county of where the alleged offense
11  occurred.  And sometimes, pursuant to the Election Code,
12  the county where the offense occurred may not be
13  actually the county where we charge the criminal
14  offense.  We have the statutory authority to move those
15  criminal prosecutions between counties.  So it could be
16  the county where the offense occurred and then the
17  county where it's being prosecuted.
18              The second column is the defendant who was
19  charged in the offense.  The allegation is the
20  allegation that was contained in the referrals
21  spreadsheet, which is another document.  And that would
22  be what the allegation was made in the referral
23  document, such as the letter from the secretary of
24  state's office.  The specific election involved, whether
25  or not the year it was -- occurred, whether it was a

95

1   general election, a municipal election, a special
2   election, a constitutional election, the cause number of
3   any cases that were filed, the actual charges and the
4   number of counts for each of the charges, when those
5   were charged and what the relevant -- either Election
6   Code or Penal Code statutes are.
7       Q.  And with respect to the charges column, do
8   you -- do you -- and by "you" I mean yourself or anyone
9   with SIU, keep track of who files the charges and where
10  the charges are filed?
11      A.  Yes, sir.
12      Q.  And is that in a separate document?
13      A.  Well, we have a -- we have a policy whenever we
14  either receive a Grand Jury indictment or whether or not
15  we've filed an affidavit to obtain a warrant for arrest,
16  that the investigators provide the supervisors with a
17  copy of that charging instrument.  So that's a document
18  that -- that is maintained by a special investigations
19  unit, the indictment or the warrant.  And that tells us
20  what county it's arrested -- the person was arrested in
21  or charged in.  And it would also contain, generally,
22  information about -- if it was a different county where
23  the offense occurred versus where it was being charged,
24  that would also be in there as well.
25      Q.  Thank you.

96

1           So if I'm counting this right, at least as
2   of February 18th, 2014, there were eight pending cases.
3   Is that right?
4       A.  Yes, sir.  When this document was prepared,
5   there were eight pending cases.
6       Q.  And can you tell me what the different types of
7   charges pending against these eight people are?
8       A.  For instance, the first one is illegal voting,
9   which is under Election Code Chapter 64.012.
10      Q.  Uh-huh.
11      A.  And the portion of that statute which is
12  violated was voter impersonation.  And then, for
13  instance, the next one -- or -- the -- the -- going to
14  the third entry.
15      Q.  Uh-huh.
16      A.  Montgomery County involving Goeddertz.  It was
17  illegal voting, ineligible voter.  So it was a voter who
18  was not eligible to vote in that election because he
19  wasn't a resident of that jurisdiction.  But it also is
20  Chapter 64 of the Election Code.
21      Q.  So what other categories, besides residence,
22  what might be other types of reasons that a voter would
23  be ineligible to vote such that would fall under that
24  charge?
25      A.  If a voter is a convicted felon, they're not

MAJOR FORREST MITCHELL                                    8/12/2014

25 (Pages 97 to 100)

97

1  eligible to vote in the election.  If the voter is not a
2  U.S. citizen, they're not eligible to vote in our
3  elections.
4       Q.  I --
5       A.  And if the voter is already voted --
6       Q.  -- age --
7       A.  -- they're not -- yes.  Age is another example.
8  They must be over 18.
9       Q.  And so generally speaking, then, it looks like
10  the eight -- the eight pending charges here encompass
11  voter impersonation; ineligible voter; and ineligible
12  voter, felon.  Is that correct?
13       A.  Yes, sir.
14       Q.  And looking at the dates -- and you can take a
15  few minutes if it needs to -- how many of these cases
16  were pending resolution when you were last deposed on
17  June 5th, 2012?
18       A.  I would say all the bottom entry, which is
19  Cameron County election offense.
20       Q.  And do you know why those charges are still
21  pending?
22       A.  I'm sorry.  Maybe I -- perhaps I misunderstood
23  the question.  That's the only one that -- that was
24  subsequent to the last time I was deposed.
25       Q.  I'm sorry.  And I'm going to get to that one in

98

1  one sec.  I just wanted to ask one quick, cleanup
2  question with respect to the chart.  The cases where the
3  charges are still pending and those charges were pending
4  when you were last deposed, do you know why those
5  charges are still pending?
6       A.  Yes, sir.  The first entry, I believe her
7  name is -- the defendant is Mary Comparin.  And she has
8  been determined to be incompetent and has not been
9  prosecuted for any violations.
10       Q.  And you testified about her in your last
11  deposition and trial testimony.  Is that correct?
12       A.  Yes, sir.
13       Q.  I believe you testified that she was someone
14  who was voting in multiple elections.  Is that right?
15       A.  Yes, sir.
16       Q.  Or multiple times?
17       A.  Yes.  I testified that she was using multiple
18  identities, including one of her -- which was her
19  deceased sister, to vote multiple times in elections.
20       Q.  And what -- what IDs was she using to vote in
21  those different elections?
22       A.  I don't -- I would -- don't know specifically
23  unless I looked at the combination form of each of those
24  cases.
25       Q.  Okay.  So I think we've established the only

99

1  new pending charges case since the June 2012 deposition
2  relates to the last entry.  Is that correct?
3       A.  Yes, sir.
4       Q.  Okay.  And can you provide any general
5  background on that case?
6            MR. CLAY:  I'm going to go ahead and
7  assert law enforcement privilege.  To the extent it
8  doesn't require you to divulge any sensitive law
9  environment information, you can answer his question.
10            THE WITNESS:  I really can't provide you
11  anything outside what's already on the spreadsheet right
12  there.
13       Q.  (BY MR. DUNBAR)  And so the spreadsheet shows
14  in the Charges column that this was a one count of
15  illegal voting, ineligible voter, felon.  Am I reading
16  that right?  It looks like there might be a typo, but --
17       A.  Yes, sir, there's a typo.  Yes, sir.  That's
18  the offense that's charged.
19       Q.  And what does it mean for a case generally to
20  involve an ineligible voting felon?
21       A.  Under Texas law, a convicted felon may not vote
22  until the completion -- the entire completion of their
23  sentence.  That means that they're either completely
24  discharged by the Texas Department of Criminal Justice
25  from any parole terms or that they've completed any

100

1  terms of probation that are issued by the court.  So
2  this charge would indicate that this person still voted
3  while they were either on probation or parole.
4       Q.  So illegal voting, ineligible voter, felon, as
5  a charge wouldn't encompass anything like in-person
6  voter impersonation.  Is that correct?
7       A.  You could -- you could have a circumstance
8  where it's both counts --
9       Q.  Understood.  Just this charge standing alone
10  would not encompass in-vote -- or voting impersonation.
11  Is that correct?
12       A.  I can't speak specifically to any facts of this
13  case and whether or not voter impersonation was an
14  issue.  I -- this is the charge that we charged.
15       Q.  And under the -- under Texas law, under
16  64.012, ineligible -- ineligible person voting is a
17  separate violation from voter impersonation.  Is that
18  right?
19       A.  Yes, sir, it is.
20       Q.  And your -- your testimony today is you're just
21  not aware whether this case involves any allegations of
22  the in-voter -- voter impersonation -- excuse me --
23  in-person voter impersonation?
24       A.  If I could speak generally, many of the
25  referrals that we receive from the secretary of state's

MAJOR FORREST MITCHELL                                    8/12/2014

101

1  office or a DA's office could be global in nature where
2  it says that there's a wide variety of misconduct that
3  has occurred.  And it may be specifically that it says
4  illegal voting has occurred in this election.  The
5  referral document doesn't say whether that was one of
6  the three or four categories of illegal voting.  It may
7  say specifically it was illegal voting by a felon.  It
8  may say -- it could be illegal voting, that people voted
9  twice in an election.  But in this specific instance,
10 the allegation just says "illegal voting," so I don't
11 know what type of illegal voting is -- it is.
12      Q.  With respect to the actual charges brought,
13 however, those would not encompass allegations of --
14 in-person voter impersonation.  Correct?
15      A.  The only charges he was charged -- the suspect
16 was charged for was being a felon and not being eligible
17 to vote in the election.
18      Q.  And that type of voting crime -- that type of
19 voting violation would not be something that would have
20 been affected by SB14's photo identification
21 requirements one way or the other.  Is that correct?
22            MR. CLAY:  Objection; form, vagueness.
23      Q.  (BY MR. DUNBAR)  You can answer.
24      A.  No.  I don't believe so.
25      Q.  All right.  I'd now like to skip to the end of

102

1  the spreadsheet -- which for those joining by phone is
2  range -- would be the Prosecutions Resolved heading
3  which starts at Texas IR000255 and proceeds through
4  Texas IR00261 (sic).
5            Are you there with me, Major Mitchell?
6      A.  Yes, sir, I am.
7      Q.  And what does this heading or tab reflect?
8      A.  This is the prosecution's resolve spreadsheet
9  that the special investigation unit maintains of all the
10 cases that have been resolved and had a case
11 disposition.
12      Q.  And that's since 2005.  Is that correct?
13      A.  So the first entry is a -- a 2005 case, yes,
14 sir.
15      Q.  And does the universe of cases listed here
16 cover only matters that have at one point been referred
17 through your office?  Or would it encompass any other
18 prosecutions that you might -- that might not have been
19 referred through your office -- by your office I mean
20 SIU, I apologize -- that would not -- that you might
21 have learned about subsequently?
22      A.  The Prosecutions Resolved spreadsheet that --
23 that we maintain encompasses investigations that this
24 office has been involved in or prosecutions that this
25 office has been involved in.  There are other

103

1  investigations that occur in the State of Texas and
2  other prosecutions that this office has no knowledge of.
3  That can be done at a local level, and it would not be
4  encompassed in this document.  We -- this only
5  represents cases that either my investigators -- our
6  investigators have been directly involved in, or whether
7  or not OAG prosecutors have been directly involved in,
8  or a combination thereof.
9      Q.  And -- and that raises a question.  Are there
10 ever circumstances in which SIU doesn't conduct an
11 investigation of an Election -- Election Code violation,
12 but just becomes involved at the prosecution stage
13 perhaps with assisting local or state prosecutors?
14      A.  Yes, sir.
15      Q.  And -- and how many instances -- how often does
16 that occur?
17      A.  It's -- it's -- I would say very few.  Most of
18 them, the investigators are involved in from the very
19 beginning.  But there have been a couple of cases where
20 the local DA has just requested prosecutorial
21 assistance.
22      Q.  So that's -- just as -- by way of example, to
23 help me understand when that might happen, a local
24 prosecutor might learn of alleged Election Code
25 violations, decide to investigate himself or herself,

104

1  decide to prosecute, and at the prosecution stage, reach
2  out to SIU or OAG for assistance, and you might become
3  involved.  And that circumstance would be reflected on
4  your spreadsheet?
5      A.  Correct.  If I could expand a little bit
6  further.
7      Q.  Please.
8      A.  Local law enforcement or federal law
9  enforcement or state law enforcement could conduct an
10 investigation, present the case to the DA's office, and
11 the DA's office then ask for prosecutorial assistance.
12      Q.  What type of prosecutorial assistance would SIU
13 provide in a general case?
14      A.  Our investigators could help our OAG
15 prosecutors prepare a case for Grand Jury, presentation
16 of the case to a Grand Jury by helping them serve
17 witnesses with subpoenas, help them gather documents,
18 certify copies of documents.  Or do the same thing at
19 the trial as well:  Serving subpoenas, preparing,
20 getting documents together.
21      Q.  And do the columns -- without having to go
22 through all of the columns that are shown on the
23 Prosecutions Resolved heading that we talked about with
24 respect to charges pending, are the charges -- excuse
25 me -- are the -- can you identify for me which columns

MAJOR FORREST MITCHELL                                          8/12/2014

105

1    are different?  Are there -- are there additional --
2    well, let's just -- scratch all of that.  Let's just
3    work through the columns again.
4            Can you tell me what each of the columns
5    refers to?  And to the extent it's the same information
6    that you referred to in your -- with respect to the
7    chargings pending, you can just let me know that.
8        A.  Yes, sir.  It -- it is relatively the same as
9    the charges pending.  Again, it talks about the county,
10   both where the offense occurred and maybe where it's
11   prosecuted, the defendant, the allegation.
12       Q.  And again, the allegation, for purposes of this
13   column, is drawn -- is also drawn from the initial
14   referral documents?
15       A.  Yes, sir.
16       Q.  Okay.
17       A.  And then it has all the cause numbers for all
18   of the cases which are charged.  A difference between
19   that and the charges pending is that some -- we may
20   accept a plea for just one charge instead of ten
21   charges.  And then the other difference is in the
22   disposition, what the actual disposition of the case is.
23   Was the person found guilty, was the person found not
24   guilty, was there a plea agreement, was there deferred
25   adjudication, or was there probation?

106

1        Q.  And what record -- what records did you rely on
2    when you had these responsibilities to fill in that
3    Disposition column?
4        A.  We have a standard procedure in our office that
5    when a case is -- when we reach a disposition in a case,
6    that the investigator needs to attain the -- the final
7    documents in that case.  So the investigator will obtain
8    from the prosecutor or the district or county clerk the
9    judgment or sentence, which may or may not include the
10   probation, any kind of plea agreement or a pretrial
11   diversion program, or a dismissal, or -- whatever the
12   disposition documents are, the investigator needs to
13   obtain these.  And they provide it to myself or the
14   captain, and then we use those documents specifically to
15   prepare the spreadsheet.
16       Q.  Okay.  Thank you.
17           And do you know off the top of your head
18   how many resolved cases are reflected on the
19   spreadsheet?  If you don't, I don't want to make you
20   count.  But I just didn't want if that's something you
21   keep in the back of your head constantly.
22       A.  When I reviewed this last night, I counted 72.
23       Q.  Seventy-two.  Yeah.  I counted 74, but I may
24   have miscounted.  It was late last night, so --
25           MR. CLAY:  Well -- and also -- this is a

107

1    subject you touched on a minute ago.  It may be two
2    different documents.
3            MR. DUNBAR:  Right.  It may be a different
4    version.
5        Q.  (BY MR. DUNBAR)  So consistent with the rest of
6    my deposition, I want to focus on the cases that were
7    resolved, that came on to the Prosecutions Resolved
8    spreadsheet since your last deposition.  By my count
9    that begins on the page which is Bates-labeled Texas
10   I.R. 00259.
11       A.  Yes, sir.
12       Q.  So starting with Erica Perez, which the
13   resolution date is 4/4/12, which would -- again, would
14   have been a date after the March 2012 spreadsheet that,
15   as I understand it, was used at your last deposition.
16   Counting down from that, I get a total of 17 new
17   resolved cases since your last deposition.  Am I -- am I
18   reading the -- your chart correctly?
19       A.  Including Perez?
20       Q.  Yes, sir.
21       A.  Okay.  Yes, sir.  You are correct.
22       Q.  As an aside, so that the record is clear on
23   this, do you know when Texas held the first election for
24   which SB14's photo identification requirements were in
25   effect?

108

1        A.  The entire state or a jurisdiction within the
2    state?
3        Q.  For the entire state.
4        A.  I would believe it would be the 2013 -- I'm
5    sorry.  I would believe it would be the primary
6    elections this year.
7        Q.  Which were those, November of 2013?
8        A.  No, sir.  Those would be in March of this year.
9        Q.  Okay.  I had done some -- do you recall a
10   constitutional amendment election in November of 2013?
11       A.  Yes, sir.  I believe we did have a
12   constitutional election that would have been in November
13   of 2013.
14       Q.  Right.  And if the SB14's photo ID requirements
15   went into effect in July of 2013, they would have
16   applied in that election.  Correct?
17       A.  Yes, sir, I believe you're correct.
18       Q.  And so none of these 17 new cases on the
19   Prosecutions Resolved involved conduct -- let me
20   rephrase.
21           Is it accurate to state that the only new
22   17 resolved cases on this spreadsheet involve conduct
23   from before when SB14's photo ID requirements were
24   implemented?  I'll give you some time to look at that
25   just to make sure you're sure.

109

1   **A.  All of the elections that are listed here**
2   **occurred previous to the implementation of SB14.**
3       Q.  Thank you.
4           And how many of these 17 cases resulted in
5   a conviction or a guilty plea?  I count eight.  I just
6   want to make sure you agree with my interpretation.
7       **A.  Did you say a plea or a conviction?**
8       Q.  How many of the cases resulted in either a
9   conviction or a guilty plea?
10      **A.  I'm sorry.  I counted nine.**
11      Q.  Oh, it's possible I miscounted.
12          MR. CLAY:  Are we looking at just the ones
13  that have been resolved since --
14          MR. DUNBAR:  Yes, sir.
15          MR. CLAY:  -- March of 2012?
16          MR. DUNBAR:  From Erica Perez down.
17          MR. CLAY:  That's on 0259?
18          MR. DUNBAR:  Yeah.  So, please, if I'm
19  misreading the spreadsheet somehow --
20          MR. CLAY:  Well, the problem I see -- and
21  I just noticed this a minute ago and am now putting it
22  together -- is that there's two resolution dates
23  embedded in here that appear to have occurred prior to
24  his -- do you see the second and third line, the two
25  Smiths.  The resolution date seems to be a little bit

110

1   out of order, if that makes sense.
2           MR. DUNBAR:  I'm sorry.  I don't see the
3   Smiths.
4           MR. CLAY:  This is 2011 -- this is 0260.
5           THE WITNESS:  Okay.
6           MR. CLAY:  So Ronald Marsh Smith and Ann
7   Marie Marsh Smith.  Do y'all see that -- those two
8   lines?
9           THE WITNESS:  Yes, sir.
10          MR. CLAY:  The resolution date is in 2011.
11  Do you see that, Kelly?
12          MR. DUNBAR:  I do see that.  I guess would
13  that be -- I guess I'll just ask Major Mitchell.
14      Q.  (BY MR. DUNBAR)  Would that -- would that mean
15  we should take those two cases out of the -- out of the
16  calculation of cases resolved since you last testified?
17      **A.  I should -- if I may expand upon this.**
18      Q.  Please.
19      **A.  We do not update the spreadsheet until we**
20  **actually have a copy of the case disposition.  So by**
21  **this spreadsheet saying 3/23/11, it does not mean that**
22  **we updated the spreadsheet on 3/23/11.  Sometimes it**
23  **takes the clerk's office, you know, a month to provide**
24  **this to us or two months or sometimes it may go un --**
25  **unnoticed for a while, so --**

111

1       Q.  Yeah.  And your explanation is reminding me
2   that I had gone back.  And if you look at the March of
3   2012 spreadsheet that was used, these cases are not
4   listed there.  So this -- this 17 cases, as I understand
5   it, would be 17 resolved cases, perhaps since your last
6   deposition is an incorrect statement, but 17 resolved
7   cases that you did not have the opportunity to testify
8   about at your last deposition, if that makes sense?
9           MR. CLAY:  So maybe another way to put it
10  would be -- and, obviously, I want to let you conduct
11  the deposition.
12          MR. DUNBAR:  Sure.
13          MR. CLAY:  But another way to put it would
14  be there's 17 new cases on the Prosecutions Resolved --
15  or different cases on the Prosecutions Resolved list.
16  Two of those appear to have been resolved prior to his
17  last deposition, but were not on the list that was used
18  at his last deposition.
19          MR. DUNBAR:  That's -- that's correct.  I
20  will go -- going forward, we'll use the 17 different
21  cases formulation --
22          MR. CLAY:  Okay.
23          MR. DUNBAR:  -- to avoid confusion, and
24  I --
25          MR. CLAY:  Does that make sense?

112

1           MR. DUNBAR:  Yes, it does.
2       Q.  (BY MR. DUNBAR)  Does that make sense to you,
3   Major Mitchell?
4       **A.  Yes, sir, it does.**
5       Q.  Okay.  And I actually had some questions about
6   how those got on there, but you may have already
7   answered.  But we'll get to them when we come back.
8           So -- but there's maybe another basic
9   numbering error on my end which is of these 17 different
10  cases, figuring out how many resulted in a conviction or
11  a guilty plea.  And let me just recount that myself.
12  Well, let's just walk down them, because I think I still
13  get the same count.  So for -- we'll come back to some
14  of these a little more individually.  Erica --
15  Erica Perez is a not guilty during a bench trial.
16  Correct?
17      **A.  Correct, sir.**
18      Q.  Richard (sic) Medrano, Sr. is a not guilty
19  during a bench trial.  Correct?
20      **A.  Yes, sir.**
21      Q.  Gilda Hernandez is a guilty.  Correct?
22      **A.  Correct.**
23      Q.  So that's our first guilty.  The first Smith is
24  a guilty.  Is that correct?
25      **A.  Yes, sir.  Ronald Marsh pled guilty.**

MAJOR FORREST MITCHELL                                    8/12/2014

---

113

1      Q.  Oh, sorry.  I'm sorry.  You're right.  I was
2  looking at Ronald Marsh.  So that's our second.  His
3  wife, I believe, Ann Marsh, resulted in dismissal.
4  Correct?
5      A.  Yes, sir.
6      Q.  Jose De Jesus Cano is a guilty.  Is that
7  correct?
8      A.  Yes, sir.
9      Q.  So that gets us three.  Frank Ross is
10  dismissed.  Is that correct?
11      A.  Yes, sir.
12      Q.  Sylvia Medrano is dismissed.  Is that correct?
13      A.  Yes, sir.
14      Q.  Angel Trujillo pled guilty.  Correct?
15      A.  Yes, sir.
16      Q.  So that gets us four.  Rojas was a Grand Jury
17  no bill.  Correct?
18      A.  Correct.
19      Q.  And can you tell me what a Grand Jury no bill
20  is?
21      A.  In this spreadsheet, our office conducted an
22  investigation in cooperation with a local district
23  attorney.  The investigative findings were presented to
24  a Grand Jury.  And the Grand Jury voted on a no bill,
25  which is that no criminal charges would be filed

---

114

1  pursuant to that investigation.
2      Q.  Right.  And so that was the same resolution,
3  then, for the next two Velas.  Is that how you say the
4  last name?
5      A.  Vela.  Correct.
6      Q.  And skipping down to Castillo, we have a pled
7  guilty.  So that gets us to five.  Is that right?
8      A.  Yes, sir.
9      Q.  And then a Ozuna is a no contest.  And perhaps
10  that's where our difference is.  Can you tell me what a
11  no contest is?
12      A.  It's the suspect in this case didn't enter a
13  plea of guilty or not guilty.  They just didn't.  They
14  entered a plea of no contest to the charges as filed and
15  then they agreed to the -- a punishment.
16      Q.  So when you were answering my question about a
17  conviction or guilty plea, did you include the no
18  contest in that summary?
19      A.  For the purposes, I think, of criminal
20  convictions in the State of Texas, despite receiving
21  a -- despite entering a plea of no contest, you still
22  are found guilty -- or can be found guilty of a criminal
23  offense.
24      Q.  Okay.  That may have been the source of our
25  error, but just to finish the exercise to make sure.

---

115

1      Q.  The next voter, Lorenzo Antonio Almanza,
2  that's a pled guilty.  Is that correct?
3      A.  Yes, sir.
4      Q.  So that gets us to seven counting the no
5  contest.  And then Jenkins and Heath were both
6  convictions.  Is that correct?
7      A.  Yes, sir.
8      Q.  So that gets us to nine?
9      A.  Yes, sir.
10      Q.  Convictions of the 17 different cases.  Is that
11  correct?
12      A.  Yes, sir.
13      Q.  Okay.
14           THE REPORTER:  Are you at a good stopping
15  point?
16           MR. DUNBAR:  If we need to take a break,
17  I --
18           MR. CLAY:  Are you almost done with this
19  sheet?  If so, why don't we finish that and we'll take a
20  quick break?  If you're not, let's go ahead and break.
21           MR. DUNBAR:  Let's break now.
22           (Off the record)
23      Q.  (BY MR. DUNBAR)  All right, Major Mitchell.
24  We're still talking about the Prosecutions Resolved
25  portion of your spreadsheet.  And we've identified the

---

116

1  17 different cases since the -- since your last
2  deposition.  Of those 17, how many involved charges of
3  in-person voter impersonation?
4      A.  There's only one case that specifically illegal
5  voting, voter impersonation was charged and convicted.
6      Q.  And that's Mr. Almanza.  Is that correct?
7      A.  Yes, sir.  Lorenzo Antonio Almanza, Jr.
8      Q.  And what can you tell me about that case?
9      A.  I believe I testified in the -- in my trial and
10  in the deposition, that the facts and the circumstances
11  of that case were Lorenzo Antonio Almanza presented
12  himself at the Progreso School District election and
13  utilized his brother's voter registration certificate.
14  His brother, at the time -- I believe his name was
15  Orlando Almanza -- was in custody in San Antonio in the
16  state penitentiary when that election occurred, and that
17  Lorenzo used his voter registration certificate to vote
18  a second time in that election.
19           During the course of the -- when he
20  presented himself to the elections officials there, a
21  poll watcher observed the name that was being put down
22  on the combination form and recognized that this was
23  not Orlando Almanza, this was his brother, Lorenzo
24  Antonio, Jr., and brought that to the attention of the
25  election judge.  It was at that point in time, I

MAJOR FORREST MITCHELL                                8/12/2014

117

1   believe, that the mother, who had previously been
2   convicted in our -- at the time of my deposition and at
3   the time of the trial, that she interjected herself and
4   began to argue with the elections judge and election
5   workers, vouching that that was, indeed, her son Orlando
6   and not Lorenzo. And the elections administrator for
7   that school district election allowed him to vote, which
8   became a second vote in that election, utilizing his
9   brother's voter registration certificate.
10      Q. And I believe you testified previously, but
11  just to make sure I understand correctly, the mother
12  herself never cast a ballot improperly in that election.
13  Is that right?
14      A. No, sir. She was charged as a party to the
15  offense of illegal voting.
16      Q. Something like aiding and abetting?
17      A. Yes, sir.
18      Q. And during the Section Five deposition and
19  testimony where you spoke about Mr. Almanza, the matter
20  was still in the investigative stage at that time?
21      A. No, sir. He had already been indicted and
22  charged with the offense, but it was awaiting trial.
23      Q. So he would have been on the charges pending
24  portion of your spreadsheet. Is that --
25      A. Correct.

118

1       Q. Is that correct? And did your office
2   investigate that case?
3       A. Yes, sir.
4       Q. And can you describe generally what that
5   investigation entailed?
6           MR. CLAY: Again, subject to law
7   enforcement privilege.
8           I don't want you to reveal any sensitive
9   or law enforcement tactics or things of that nature, of
10  course.
11          THE WITNESS: It could -- any
12  investigation could involve reviewing records and
13  interviewing witnesses.
14      Q. (BY MR. DUNBAR) And so Lorenzo, as I
15  understand it, and I think you testified, presented his
16  brother's voter registration card to a poll worker. Is
17  that right?
18      A. Yes, sir. Under Texas law when you go to vote
19  in an election, at that time you could present your
20  voter registration certificate --
21      Q. Uh-huh.
22      A. -- which was issued by the elections office,
23  which would be mailed to your address that -- where
24  you're registered. That certificate you then take to
25  the elections -- or you take it to the polling place and

119

1   you may use that as one of your acceptable forms of
2   documents to verify that you are at a polling place.
3   Examples at the time would have been a utility bill, or
4   a bill -- some sort of correspondence from the
5   government. Any of those documents, you could use to
6   present yourself as a voter. So Lorenzo used his
7   brother's voter registration certificate, presented it
8   to the poll worker, elections worker, and said he was
9   Orlando Almanza.
10      Q. But a poll watcher recognized him and knew that
11  was not the case. Correct?
12      A. Correct.
13      Q. And so -- so a photo -- SB14's iden --
14  with respect to this particular case, SB14's photo
15  identification requirement wouldn't have been necessary
16  to get a conviction. Is that correct?
17          MR. CLAY: Objection; form and foundation.
18          THE WITNESS: I mean, that's pure
19  speculation on my part. I mean --
20      Q. (BY MR. DUNBAR) Put differently, you were able
21  to investigate and prosecute Mr. Almanza for what he did
22  without an SB14 photo identification requirement in
23  effect. Correct?
24      A. Yes, sir, because we had a witness who was able
25  to positively identify that suspect.

120

1       Q. Right. Was Mr. Almanza a part -- were there
2   allegations in Mr. Almanza's case that this was part of
3   a kind of coordinated effort to affect the outcome of
4   the election at issue?
5           MR. CLAY: Objection; form, foundation.
6       Q. (BY MR. DUNBAR) You can answer.
7       A. This case involved many allegations involving
8   many people.
9       Q. What were the nature of those allegations
10  regarding others? Setting aside -- how were -- how were
11  Lorenzo and his mother's conduct connected with a
12  broader coordinated effort?
13          MR. CLAY: Again, we're getting close to
14  implicating some law enforcement privilege, so just make
15  sure your answer doesn't divulge any sensitive law
16  enforcement information.
17          THE WITNESS: The Progresso Independent
18  School District election -- there have been many, many
19  allegations of illegal voting that have occurred in
20  that -- in that jurisdiction. They were not charged --
21  Lorenzo or his mother Reyna Almanza were not charged as
22  a party to any engaging in organized criminal activity.
23  But there are many allegations of illegal voting in that
24  jurisdiction.
25      Q. (BY MR. DUNBAR) Understood. I guess as a kind

MAJOR FORREST MITCHELL                                   8/12/2014

121

1   of general matter, my impression from at least the
2   Prosecutions Resolved spreadsheet is that a lot of the
3   conduct, whether it's in-person voter impersonation or
4   otherwise, seemed to involve one-off instances of
5   individuals engaging in election crimes.  Is that -- is
6   that an accurate portrayal?
7        A.  I'm not sure I understand the phrase one off.
8        Q.  Let me backtrack.
9             Do we know -- is it -- without implicating
10  the law enforcement privilege, can you talk about why
11  Lorenzo Almanza engaged in the voter impersonation that
12  he did?
13            MR. CLAY:  Objection; form and foundation.
14            THE WITNESS:  I was never allowed to
15  interview Lorenzo Antonio Almanza about what he did.  I
16  couldn't say.
17       Q.  (BY MR. DUNBAR)  So we don't know -- sitting
18  here today, you're not sure if it was part of an effort
19  to sway the outcome of the election or it was just an
20  individual making a stupid criminal decision?
21       A.  He wasn't charged as a party to any engaging in
22  organized criminal activity.
23       Q.  And Mr. Almanza, I believe we said, pled guilty
24  to illegal voting, voter impersonation, and he was
25  sentenced to two years in TDCJ.  Is that right?

122

1        A.  Yes, sir.  That refers to Texas Department of
2   Criminal Justice and that would be our state
3   penitentiary.
4        Q.  Okay.  And none of the other charges, with
5   respect to the 17 different cases involve in-person
6   voter impersonation.  Is that right?
7        A.  Of the 17 different?
8        Q.  Right.  I think this whole conversation started
9   with me asking you which did and you identified Lorenzo,
10  but I want to make sure I ask that question right and
11  that there aren't others.
12       A.  I'm not aware of any other cases of the 17 that
13  were identified that involve voter impersonation.
14       Q.  Thank you.
15            And just to -- to very briefly walk
16  through these cases, just to make sure at a high level I
17  understand what's going on, if it wasn't in-person voter
18  impersonation, I wanted to start with the Erica Perez
19  and the -- and the -- and the Medranos, which, as I
20  understand it, this was all part of a similar
21  investigation.  Am I wrong about that?
22       A.  No, sir.  There were multiple suspects who were
23  charged in the Dallas 2010 primary election case.
24       Q.  And that would have been Erica Perez, Ricardo
25  Medrano, and then -- or you're telling me

123

1   Gilda Hernandez and Sylvia Medrano were all part of that
2   same misconduct?
3        A.  This referral came in from the Secretary of
4   State's office and you can see on the allegation portion
5   of this spreadsheet --
6        Q.  Uh-huh.
7        A.  -- that it contains a wide variety of criminal
8   allegations.  If memory serves me correct, I think there
9   were roughly ten different categories of criminal
10  offenses.  And --
11       Q.  And this was in connection -- sorry -- to
12  clarify -- this was in connection with a primary
13  election in Dallas, you said?
14       A.  Yes, sir.  That's correct.
15       Q.  And can you describe just generally -- I can
16  read the allegation column, but your general
17  recollection of what the -- the case involved?
18       A.  There were allegations of mail-in ballot fraud.
19       Q.  Uh-huh.
20       A.  There were allegations of noncitizens voting.
21  There were allegations of people who weren't residents
22  of that particular precinct voting in that election.
23  There were allegations of misconduct in the processing
24  of the mail-in ballot applications.
25       Q.  Three of those four resulted in either not

124

1   guilty or dismissal.  Correct?  As I read it, only
2   Gilda Hernandez pled guilty?
3        A.  When you mean the three of the four, you're
4   also referring to Sylvia Medrano?
5        Q.  Yes, sir.
6        A.  Yes, sir.  Only Gilda Hernandez pled guilty.
7        Q.  And would any of the conduct for any of these
8   four individuals that was alleged been anything that
9   SB14's photo identification requirement would have
10  prevented?
11            MR. CLAY:  Objection; form, foundation.
12            THE WITNESS:  Any of the four individuals
13  meaning Erica Perez, Ricardo Medrano, Gilda Hernandez
14  and Sylvia Medrano?
15       Q.  (BY MR. DUNBAR)  Yes, sir.
16       A.  The answer is, no, I do not believe it would
17  have made an impact.
18       Q.  Thank you.
19            And then this brings us to the issue that
20  Reed hopefully pointed out earlier.  The next on my list
21  then would be the Marshes.  And this is -- for those
22  following on the phone, this is on Texas I.R. 000260 --
23  and as we discussed previously, the date -- the
24  resolution date there is March 23rd, 2011.  Is that
25  right?

MAJOR FORREST MITCHELL                                    8/12/2014

---

125

1    A.  Yes, sir.  March 23rd, 2011.
2    Q.  And as -- as we discussed before, I don't
3    believe that those were listed on the spreadsheet, that
4    March 2012 spreadsheet that you testified about in your
5    last deposition.  Is that your understanding?
6    A.  Yes, sir.
7    Q.  And can you explain the circumstances by which
8    this case came to your attention and came to be added to
9    the spreadsheet?
10   A.  If my memory serves me correctly, and I
11   apologize, there's lots of referrals to our office, I
12   believe this referral came from the local district
13   attorney from Smith County and involved allegations of
14   an election to determine whether or not a specific town
15   was going to have liquor sales, which we call a local
16   option election.  And I believe the suspects in this
17   case were identified as voters who voted in that
18   election, but did not actually reside in that
19   jurisdiction.
20   Q.  That's my understanding as well.  So, then,
21   Ronald Marsh pled guilty, and his wife, I believe,
22   Annie Marsh, her case was dismissed?
23   A.  Yes, sir.  That's correct.
24   Q.  So neither of the Marshes were charged with
25   voter impersonation.  Correct?

---

126

1    A.  No, sir.
2    Q.  And again, these wouldn't have been cases that
3    SB14's photo ID requirement would have prevented.  Is
4    that correct?
5    A.  Not prevented.  No, sir.
6    Q.  The next, moving on down the spreadsheet --
7    again, this is on the same page, is a Mr. Cano who was
8    charged with one count of illegal voting, ineligible
9    voter, felon.  Am I reading that correctly?
10   A.  Yes, sir.
11   Q.  And so, as we previously discussed, I believe,
12   the charge of ineligible voter, felon would not
13   encompass in-person voter impersonation.  Correct?
14   A.  I'm sorry.  Would you repeat that one more
15   time?
16   Q.  Sure.
17       I think as we previously testified, a
18   charge that reads ineligible voter, felon, does not
19   encompass in-person voter impersonation.  Correct?
20       MR. CLAY:  Objection; misstates his prior
21   testimony.  Objection; form.
22       THE WITNESS:  I would say that Martin --
23   or I'm sorry, Jesus Cano was charged with the allegation
24   of illegal voting as a convicted felon.  If you are
25   asking about the entire investigation of this case or --

---

127

1    I can't tell you whether or not --
2    Q.  (BY MR. DUNBAR)  No.  My question is -- is
3    limited to the charging decision, which is that based on
4    the charging decision, he was not charged with
5    impersonating anyone?
6    A.  That is correct.
7    Q.  So again, this wouldn't have been a case that
8    SB14's photo ID requirement would have prevented.  Is
9    that correct?
10   A.  His charges would not have -- SB14 would not
11   have impacted his charge.
12   Q.  Thank you.
13       We can skip Sylvia Medrano.  And, again,
14   on the same page, the next line down is Angel Trujillo,
15   who, according to the charges column, was, again, one
16   count illegal voting, ineligible voter, felon.  Is that
17   correct?
18   A.  Yes, sir.
19   Q.  And Mr. Trujillo pled guilty.  Correct?
20   A.  Yes, sir.
21   Q.  And again, I think we established that at least
22   as a charging decision matter, a charging decision does
23   not -- the charging decision for ineligible voter, felon
24   would not encompass in-person voter impersonation.
25   Correct?

---

128

1        MR. CLAY:  Objection; misstates prior
2    testimony.
3        THE WITNESS:  Mr. Trujillo was not charged
4    with any offense of voter impersonation.
5    Q.  (BY MR. DUNBAR)  So with respect to his
6    charges, again, this wouldn't have been a case that
7    SB14's photo ID requirement would have prevented.
8    Correct?
9    A.  I do not believe so.
10   Q.  Again, on the same page of Texas I.R. 000260
11   you have a set of charges -- excuse me, prosecutions,
12   arising from Hidalgo County involving Rojas, Sylvia
13   Salas Vela, Salvador Vela -- and those three.  My
14   understanding is that these involved a similar set of
15   allegations.  Am I correct about that?
16       MR. CLAY:  Objection; form, vague.
17   Q.  (BY MR. DUNBAR)  Well, we'll just talk about
18   them each individually, then.  Let's start with Baudelia
19   Zapata Rojas.  The charge there is -- well, can you read
20   for me what the charge is?
21   A.  Yes, sir.  She was charged with unlawfully
22   revealing information before the polls closed.  That --
23   that is typically a charge associated with somebody who
24   actually worked in the elections -- or -- for the
25   elections.

---

MAJOR FORREST MITCHELL                                    8/12/2014

33 (Pages 129 to 132)

129

1    Q.  Uh-huh.
2    A.  So she was an election worker and she
3  potentially could have been -- that charge means that
4  someone could have been revealing information on who has
5  voted and who hasn't voted or what the numbers are of
6  the votes.
7    Q.  And the Grand Jury returned a no bill in her
8  case.  Is that correct?
9    A.  That's my understanding.  Yes, sir.
10    Q.  And even as -- even as charged, the charge --
11  her charges had nothing to do with in-person voter
12  impersonation.  Is that correct?
13    A.  Yes, sir.  She was not charged for any voter
14  impersonation.
15    Q.  Okay.  Moving down the line, Sylvia Vela,
16  Salvador Vela, are those cases related or is it just a
17  coincidence they have the same name?
18    A.  I apologize.  I don't -- I'm not familiar with
19  them.
20    Q.  Starting with -- starting with Sylvia Vela, we
21  have a general charge of illegal voting.  Correct?
22    A.  Yes, sir.
23    Q.  And again, the jury returned a no bill there.
24  Correct?
25    A.  Correct.

130

1    Q.  And do you recall anything about the -- the
2  underlying nature of the charge of illegal voting?
3    A.  No, sir.  I -- I'm not familiar which type of
4  illegal voting it is, whether or not it's a felon, or
5  voter impersonation, or voting twice.
6    Q.  So sitting here today, you can't say that that
7  charge encompassed -- you're not sure whether it
8  encompassed in-person voter impersonation?
9    A.  That's correct.
10    Q.  Salvador Vela, we have a mail -- a mail-in
11  ballot violation, and the charge is listed method of
12  returning marked ballot.  Is that correct?
13    A.  Yes, sir, that's what it says.
14    Q.  Can you describe what those allegations and
15  charges would entail?
16    A.  There are a number of different ways a suspect
17  can commit a violation of method of returning marked
18  ballot, and the punishment varies in some cases by the
19  number of ballots that that person may possess or
20  returns.  If you are to assist a voter in the completion
21  of a mail-in ballot, you must provide your personal
22  identifying information on the actual mail-in ballot
23  carrier envelope.  And failure to do that could be a
24  criminal offense.  And, additionally, if you take or
25  carry a ballot for a voter to the post office or to a

131

1  mail or drop box or to the -- to the box out on the
2  street, and you're physically transporting that ballot,
3  you must identify yourself as a person on the carrier
4  envelope.
5    Obviously, if you handle more ballots than
6  one, the punishment can be increased.  Another way to
7  commit a violation of method of return marked ballot is
8  if you possess that ballot without the voter's knowledge
9  and consent.  And in some investigations, people who are
10  assisting voters with their mail-in ballots might
11  collect ballots and then hand them to a third person
12  without the voter's knowledge or consent.  And that
13  person could be charged as well.
14    Q.  Okay.  So a charge or method of returning
15  marked ballot, then, if I understand it correctly, would
16  be unrelated to in-person voter impersonation.  Correct?
17    A.  There's nothing to indicate that she was
18  charged for in-person voter fraud.
19    Q.  And so, again, as charged, those charging
20  allegations wouldn't have been anything that SB14's photo ID
21  requirement would have prevented.  Is that correct?
22    A.  That's correct.
23    Q.  Moving down the line, Fermina Castillo.
24  That's, again, one count of illegal voting, ineligible
25  voter, felon.  Correct?

132

1    A.  Yes, sir.
2    Q.  And there was a guilty plea in that case.  Is
3  that correct?
4    A.  Yes, sir.
5    Q.  And, again, I think we previously established
6  that the charge of ineligible voter, felon does not
7  encompass in-person voter impersonation.  Correct?
8    A.  That's correct.
9    MR. CLAY:  Objection; misstates his prior
10  testimony.
11    Q.  (BY MR. DUNBAR)  So as far as you're aware
12  sitting here today, Mr. Fermina Castillo's conduct, as
13  charged, wouldn't have been anything that would be --
14  that SB14's photo ID requirement would have prevented.
15  Correct?
16    A.  Correct.
17    Q.  Moving on down the line, still on Texas I.R.
18  000260, we see Margarita Rangel Ozuna.  And the
19  allegations list mail-in ballot violations, forgery.  Am
20  I reading that correctly?
21    A.  Yes, sir.
22    Q.  Then the charge is one count, assisting voter.
23  Is that correct?
24    A.  Yes, sir.
25    Q.  And can you explain to me generally what the

MAJOR FORREST MITCHELL                                    8/12/2014

34 (Pages 133 to 136)

133

1    allegations are and the charges and how they -- how they
2    might differ?
3         A.   There is a potential charge for unlawfully
4    assisting a voter in the preparation of a mail-in ballot
5    or as a poll-place violation.  If you communicate by
6    word, sign, or gesture how a person should -- I'm sorry.
7    That's unlawfully influence -- unlawfully assisting a
8    voter could be preparing a ballot contrary to the way
9    the voter instructed you to, or it could be providing
10   assistance to somebody who is not eligible for
11   assistance.  It's an offense that's frequently
12   associated with mail-in ballot violation.
13        Q.   So Ms. Azuna was not charged with in-person
14   voter impersonation, then.  Correct?
15        A.   Correct.
16        Q.   She didn't attempt to vote as someone else in
17   person?
18        A.   I only know what she was charged with, and that
19   wasn't voter impersonation, illegal voting.
20        Q.   She was not charged with voter impersonation?
21        A.   She was not charged.
22        Q.   So again, as charged, her conduct wouldn't have
23   been anything that SB14's photo ID requirement would
24   have prevented.  Correct?
25        A.   No, sir.

134

1         Q.   We have already discussed Mr. Almanza, which
2    then leaves us the last two, flipping the page to Texas
3    I.R. 000261.  We have James Alan Jenkins and Adrian
4    Heath.  Do you recall anything about the background of
5    these allegations?
6         A.   Yes.
7         Q.   What could you tell me about them?
8         A.   These two cases involve a special election
9    which occurred in Montgomery County.  This was for -- I
10   believe it was for a rural utility district, rural
11   utility district or municipal utility district, and
12   these persons registered to vote at a hotel located
13   inside the geographical boundaries of that jurisdiction
14   and, therefore, were not residents -- real residents
15   under the law and so were ineligible to vote in that
16   election and they voted in that election.
17        Q.   This is the case where the individuals were
18   upset about the decisions the utility board was making
19   and wanted to influence the outcome of the commissioner
20   election.  Is that right?
21        A.   Yes, sir.  It's my understanding that the
22   suspects in this case were -- were registering to the
23   vote in that election to -- to make an impact on the --
24   who the board members were for that municipal -- or
25   utility district.

135

1         Q.   And they did that by staying in a hotel for
2    several nights and claiming that hotel location was
3    their residence?
4         A.   Yes, sir.  It's my understanding that they
5    changed their voter registration address to reflect that
6    hotel.
7         Q.   And so as -- as charged, these -- these cases
8    had nothing to do with in-person voter impersonation.
9    Is that correct?
10        A.   Yes, sir.  That's correct.
11        Q.   And they didn't have anything to do with
12   noncitizens voting.  Correct?
13        A.   Nothing to do with noncitizens.  Correct.
14             (Exhibit No. 6 marked)
15        Q.   (BY MR. DUNBAR)  Major Mitchell, you're being
16   handed what I believe is Exhibit No. 6.  I'll give you a
17   minute to take a look at this.
18        A.   Okay.
19        Q.   Have you seen this e-mail before?
20        A.   No, sir.
21        Q.   I just want to direct your attention to one --
22   one part of it, the last line of Page 1.  Moving over to
23   Page 2, so it's the e-mail starting at the bottom.
24   There's a sentence that reads (as read), "A few moments
25   ago I concluded a conference call with the attorney

136

1    general's office on the voter fraud in the June 23rd
2    township election."  And then it goes on to outline the
3    appropriate procedures to follow under the OAG
4    guidelines.  Do you see that?
5         A.   Yes, sir.
6              MR. CLAY:  I'm sorry.  Where are you?
7              MR. DUNBAR:  Page two, which is Texas 0 --
8    I'm sorry.  The bottom of Page 1.  It's the e-mail
9    beginning on the very bottom of Page 1 from
10   Tommy Williams to James Stilwell and Bruce Tough and --
11             THE WITNESS:  I'm sorry.  I lost the
12   train -- where the question was -- I apologize.
13        Q.   (BY MR. DUNBAR)  That's fine.  But can you tell
14   me who -- do you know who Tommy Williams is?
15        A.   I believe Tommy Williams is a state senator --
16        Q.   Uh-huh.
17        A.   -- on the Texas legislature.
18        Q.   So he's sending an e-mail to a few individuals
19   saying that I just concluded a conference call with the
20   Attorney General's office on voter fraud in the
21   June 23rd township election.  My question is whether you
22   participated in that conference call that he's
23   referencing?
24        A.   No, sir.
25        Q.   Are you aware of who in the OAG's office may

MAJOR FORREST MITCHELL                                    8/12/2014

137
1  have participated in that conference call?
2      A.  No, sir.
3      Q.  But you recall the -- do you recall the
4  referral for the allegations relating to this
5  election -- election misconduct coming through your
6  office?
7      A.  Yes, sir.  I believe we got -- in that
8  particular case, I believe that the local district
9  attorney requested assistance as well as the secretary
10 of state's office issued a referral.
11     Q.  And do you know why Senator Williams took such
12 an interest in this case?
13     A.  No, sir.  I believe he's in that geographical
14 area.
15     Q.  Right.  Okay.  And so of the -- of the 17
16 different cases since your last deposition, then, to sum
17 up, one involve charges of in-person voter
18 impersonation.  Is that correct?
19     A.  That's correct.
20     Q.  I would now like to talk about the, I think,
21 final part of your spreadsheet, which is the referral
22 section, which is I.R. 000233 to I.R. 000254.
23         MR. CLAY:  Was the e-mail 6?
24         THE REPORTER:  The last one was 6.
25         MR. DUNBAR:  I've lost track.

138
1      Q.  (BY MR. CLAY)  Okay.  And can you tell me in
2  general terms, then, what the referrals section of your
3  spreadsheet encompasses?
4      A.  The spreadsheet is divided into two categories.
5  One would be direct referrals from the secretary of
6  state's office.  And that portion of the spreadsheet
7  would include the county.
8      Q.  Uh-huh.
9      A.  The specific election involved what type it is:
10 Municipal, special, constitutional, primary, general
11 election, what the date of the referral document was
12 from the secretary of state's office, and a general
13 explanation of what the allegations are as written in
14 the SOS referral letter.
15         The second portion of the spreadsheet is a
16 list of other complaints or allegations that have come
17 into our office.
18     Q.  Uh-huh.
19     A.  They're categorized as either by the voter or
20 other.  And if it is an other categorization, that
21 generally is a law enforcement official, an elected
22 district or county attorney, or a local elections
23 administrator.  Again, with the information about the
24 county, the election, or what the general allegations
25 are.

139
1      Q.  And for my clarification, which -- which page
2  does the second part of the referral spreadsheet start
3  on?
4      A.  The second portion of the referral -- the
5  second categorization starts on Page 15 of the document
6  which is identified as TX I.R. 000247.
7      Q.  Thank you.
8          And the second part -- the second part
9  that begins on I.R. 000247, to make sure I understand
10 your testimony, would be referrals from other sources
11 other than the secretary of state's office?
12     A.  Correct.
13     Q.  Okay.  Starting with the --
14     A.  If I could expand on that.
15     Q.  Please.
16     A.  I'm sorry.  It's not -- it's more than just
17 referrals.  It is allegations that this office had been
18 made aware of.  It may not be a full referral.  For
19 instance, you may see that some of these may be a voter.
20 A voter may have called our office and made us aware of
21 an allegation of misconduct.  It may not have resulted
22 in an investigation as previously testified.
23     Q.  I see.  So the -- the hypothetical voter that
24 we were talking about earlier that just might call AOG's
25 hotline and say, "I want to report voting fraud," I

140
1  believe you testified the person answering the call
2  would direct them to the secretary of state's hotline,
3  but you would still record that referral on this section
4  of the spread -- or somewhere in the referral section of
5  your spreadsheet?
6      A.  If it got to the attention of the law
7  enforcement division.  In some cases, our -- our
8  communications, public information and assistance are
9  successful in routing it to the SOS right away.  In
10 other cases, some people persist and it comes to the law
11 enforcement division.  And if they speak directly to a
12 police officer or an investigator, we'll document that.
13     Q.  I see.  And how often do -- does the persistent
14 caller get through to speak to someone actually in SIU?
15     A.  Not -- not very often.
16     Q.  Okay.  Okay.  Well, starting with the first
17 part of your referral spreadsheet -- and I appreciate
18 that clarification, because it goes to one of my
19 questions.  By my count, starting on Texas I.R. 000237,
20 which is Page 5 of your document, we have -- I'm using
21 the previous date that we've been using March 12th,
22 2012, it looks like starting with the entry -- it's
23 Angelina 2010 primary election 3/22/12, illegal voting.
24 Down would be the so-called new referral since your --
25 since your last deposition.  Am I interpreting your

MAJOR FORREST MITCHELL                                    8/12/2014

141

1  spreadsheet correctly in that regard?
2      A.  Yes.
3      Q.  Okay.  So everything -- everything that's on
4  this spreadsheet as of February 18th, 2014 was still in
5  some stage of investigation.  Is that correct?  Or would
6  this -- let me rephrase.
7          Would this spreadsheet encompass referrals
8  that have come over and then a decision has been made,
9  either not to investigate or not to prosecute?
10     A.  This spreadsheet reflects the referrals that
11 would be made to this office and what the originating
12 source was and what the date of that referral was.
13     Q.  So if I'm looking to take, for example, the
14 Angelina 2010 primary election referral, which has an
15 SOS referral date of 3/22/12, its presence on this
16 spreadsheet doesn't suggest that is as it continues to
17 be a pending investigation.  Am I understanding that
18 right?
19     A.  That spreadsheet does not reflect a disposition
20 of any investigation.
21     Q.  So this could -- it would -- this entry would
22 remain on your spreadsheet, even if your -- even if your
23 investigators had decided this case isn't -- there's
24 nothing to this case, or it's not worth prosecuting?
25     A.  This -- the referrals will never be removed

142

1  from the spreadsheet.  It's documenting all referrals
2  that come into this office regardless of prosecution
3  decisions or investigative decisions.
4      Q.  So it wouldn't be correct to assume that
5  everything that's listed here remains a pending
6  investigation?
7      A.  Again, this spreadsheet doesn't have anything
8  to do with -- about dispositions of cases.
9      Q.  And do you keep separate documentation on that?
10     A.  No.  We keep the spreadsheet on prosecutions
11 and we keep the spreadsheet on cases pending.
12     Q.  Uh-huh.  But no -- you have no internal
13 documents that track the status of ongoing
14 investigations and whether an investigation resulted in
15 a recommendation of no prosecution or was simply stopped
16 for some other reason?
17     A.  Well, we have lots of records as law
18 enforcement officers, including investigative reports,
19 supplemental reports, spreadsheets, but not specifically
20 for just elections.  We maintain spreadsheets for all
21 kinds of cases.
22     Q.  As a global matter, could you estimate what
23 percentage of the referrals that are listed on this
24 spreadsheet -- the SOS referrals since June of 2012
25 remain pending investigations as opposed to those that

143

1  are -- that have been completed or simply never started?
2          MR. CLAY:  Objection; form, foundation.
3          To the extent that you understand the
4  question and have an answer, you can answer.
5          THE WITNESS:  I haven't done any analysis
6  of how many are still pending or open or closed or --
7      Q.  (BY MR. DUNBAR)  Do you know how many pending
8  Election Code investigations there are in SIU currently?
9      A.  Not off the top of my head.
10     Q.  Would it be something like ten, or a hundred,
11 or a thousand?  What kind of rough ballpark of how many
12 investigations are actually considered ongoing at any
13 given time with respect to the election team?
14         MR. CLAY:  Objection; vague.  To the
15 extent you understand his question, you can answer.
16         THE WITNESS:  It depends on what the -- it
17 depends on what the definition of open is.  I mean, as
18 we discussed previously and I previously testified, the
19 only thing that we're statutorily bound by is the
20 statute of limitations and, technically, a case wouldn't
21 necessarily be completely closed until the statute of
22 limitations is completely expired.  Now, open and
23 active, or open and inactive, there's a wide variety or
24 there's a wide range of those categories.  Each
25 investigator could have five, ten, twenty cases, some

144

1  more.
2      Q.  (BY MR. DUNBAR)  At any given time --
3      A.  At any given time.
4      Q.  -- ones that are active in some sense?
5      A.  Various stages of completion.
6      Q.  So using that rough estimate, then, if you have
7  four folks on the election team, twenty, maybe eighty,
8  at most, active investigations that are being conducted
9  at any given point in time?
10         MR. CLAY:  Objection; form.
11         To the extent that you understand the
12 question, you can answer.
13         THE WITNESS:  As I previously talked to
14 about -- is that at any given time, any of the other
15 team members could have to accept -- may have to work
16 cases as well.
17     Q.  (BY MR. DUNBAR)  Uh-huh.
18     A.  To help out a particular team.  And some
19 election cases have to be given to public integrity
20 investigators or other fraud investigators.  So they,
21 too, themselves, could have a caseload of election
22 cases.  So you can't just use just the four on the team
23 to do a rough estimate.
24     Q.  Right.  Right.  Now, that's helpful.  Again,
25 I'm only trying to get a rough ballpark for my

MAJOR FORREST MITCHELL                                    8/12/2014

---

145

1  understanding.
2        Looking at Texas I.R. 000237.  This is an
3  entry that's one, two, three, four, five, six, seven --
4  seven up from the bottom.  You have Gillespie County
5  2012 municipal and primary election, an SOS referral
6  date of 7/12/2012, illegal -- illegal voting with
7  respect to the allegation, parenthetical, voter
8  impersonation, deceased voter.  Am I reading all of that
9  correctly?
10       A.  I'm sorry.  Could you give me the cite, the
11  page --
12       Q.  Sure.  This is Page 5 of your own spreadsheet,
13  which may be easier for you to use.
14       A.  So you're referring to 000237?
15       Q.  Yes, sir.
16       A.  And Gillespie County?
17       Q.  Yes, sir.  I think it's eight up from the
18  bottom.
19       A.  Yes, sir.  Okay.
20       Q.  Starting with that and then going four pages of
21  the spreadsheet to Page -- well, actually carries over
22  to Page 13, Texas I.R. 000245, the very top entry, you
23  have what appears to be hundreds of referrals that were
24  made on the same day that all have the same allegation
25  listed, which is illegal voting, voter impersonation,

---

146

1  deceased voter that were referred from the secretary of
2  state's office.  Am I -- am I understanding that
3  spreadsheet correctly?
4        A.  Yes, sir.
5        MR. CLAY:  Objection; form, foundation.
6        Q.  (BY MR. DUNBAR)  And those are from counties
7  across Texas, it appears.  Is that correct?
8        A.  Yes, sir.  There are multiple counties that are
9  listed in this -- in that -- in these referrals.
10       Q.  Can you provide me any background on how these
11  referrals came from the secretary of state's office?
12       MR. CLAY:  Objection; form, foundation.
13       To the extent you understand the question,
14  you can answer.
15       THE WITNESS:  These come to the
16  secretary -- these come from the secretary of state's
17  office like all of our referrals come from the secretary
18  of state's office.  A packet was prepared that was
19  referred to the director of law enforcement and then
20  given to our criminal justice intake division --
21       Q.  (BY MR. DUNBAR)  Uh-huh.
22       A.  And containing allegations of deceased
23  voters --
24       Q.  Uh-huh.
25       A.  -- who were voting in elections throughout all

---

147

1  the different counties mentioned in the spreadsheet and
2  the various elections mentioned in the spreadsheet.
3        Q.  And these referrals were made shortly after or
4  maybe even during the Section Five trial.  Is that
5  correct?
6        A.  The referral document date was 7/12/2012.
7        Q.  I believe, in fact, certain representatives of
8  states might even have testified about the possibility
9  that there was this -- this new referrals of deceased
10  voters voting coming over to the Attorney General's
11  office.  Are you familiar with that testimony?
12       A.  I didn't listen to anybody else's testimony.
13       Q.  Do you know what the basis for SOS's referrals
14  was, that is how in all of these different counties
15  across the state they were able to make these various
16  referrals of deceased voting?
17       MR. CLAY:  Objection; form, foundation.
18       THE WITNESS:  Globally, when you're
19  talking about voter impersonation and deceased voters,
20  it could be that these individuals were identified
21  through deceased notifications of driver's license,
22  Social Security, observed from the local elections
23  administrators.  There's a wide way -- a wide variety of
24  how deceased voters are identified.
25       Q.  (BY MR. DUNBAR)  But you don't recall anything

---

148

1  specifically about this bucket of a couple hundred
2  referrals?
3        A.  I think it's 254 referrals.
4        Q.  254.
5        A.  And I don't know specifically exactly how they
6  were identified in each one.
7        Q.  But it is unusual -- and I'm just looking at
8  your spreadsheet.  At least there's no other occasion
9  that I can tell where the secretary of state's office
10  has sent over this volume of referrals at once, is
11  there?
12       MR. CLAY:  Objection; form.
13       THE WITNESS:  There's one case that we
14  received allegations of illegal voting, voter
15  impersonation with deceased voters out of Harris
16  County --
17       Q.  (BY MR. DUNBAR)  Uh-huh.
18       A.  -- which is also contained in the spreadsheet.
19       Q.  Uh-huh.
20       A.  When we received that referral it said that
21  there were 10,000 individuals.
22       Q.  Uh-huh.
23       A.  So we do receive allegations of deceased voters
24  in elections.  It is atypical to get that many from
25  different jurisdictions.

---

MAJOR FORREST MITCHELL                                    8/12/2014

149

1    Q.   And are the investigations relating to these
2    deceased voting referrals still ongoing?
3        A.   The spreadsheet doesn't indicate the
4    disposition of any of those cases.
5        Q.   Do you know sitting here today?
6        A.   I don't know the number that are still ongoing
7    or closed or -- or in active status or --
8        Q.   Could you give an estimate?
9        A.   I don't know.
10       Q.   But I assume -- you would know -- if it was,
11   say, all eighty of the cases that the election team was
12   investigating were related to these, you would probably
13   know -- know that.  Correct?
14       A.   Your investigative reports are reviewed at the
15   lieutenant level.
16       Q.   Uh-huh.
17       A.   And so there are -- you know, the investigative
18   report is reviewed and the -- a determination is made by
19   the investigator and the lieutenant and captain as to
20   whether or not this case is going to be closed or
21   whether or not it's going to remain open.  And at some
22   point in time they do notify me that they're going to
23   close a case.  But I haven't kept any summary of which
24   ones are still open or closed.
25       Q.   And so just with respect to these 7/12/2010

150

1    referrals, you -- sitting here today, you're not aware
2    of the status of any of them, that is whether the
3    investigation is open, closed, inactive, et cetera?
4        A.   None of the -- none of the ones that are on
5    7/12 have been referred for criminal prosecution.  We
6    haven't charged anybody, and we haven't resolved any of
7    those cases yet.
8        Q.   You were jumping ahead to my next question.
9    Which I will ask you just to make sure the record is
10   clear.  But I just meant from an invest -- from purely a
11   status of the investigation standpoint is all I'm trying
12   to understand, you're -- either with respect to any
13   specific referral or as a general matter, sitting here
14   today, you can't say anything about the status of those
15   investigations?
16       A.   I can't say if they're all inactive or active
17   or open, being -- you know, I can't give you an exact
18   status for all 254 of those.
19       Q.   Do you know whether investigations actually
20   began with respect to any of the 254?
21       A.   Yes.  They -- they were investigated.  We
22   opened investigations.
23       Q.   Okay.  So none of the 254 were sort of screened
24   out at the -- at the early stages through that process
25   we -- that informal process we were discussing earlier?

151

1              MR. CLAY:  Objection; form.  I think it
2    misstates his earlier testimony.
3              THE WITNESS:  I -- I want to say I have a
4    memory of one that was determined to be a repeat.
5        Q.   (BY MR. DUNBAR)  I see.  But sitting here
6    today, that's the only one you can remember?
7        A.   That's the only one that sticks out in my mind.
8        Q.   Okay.  And I believe you answered my question,
9    but just to make sure I understand your spreadsheet
10   correctly, no charges against any voters in connection
11   with these 7/12/2012 referrals have been filed.
12   Correct?
13       A.   Not charged any suspects.
14       Q.   And under what section of the election code
15   would those prosecutions occur?
16       A.   There's a couple of offenses that could be
17   identified.  If you impersonate a deceased voter, it
18   would be 64.012, illegal voting, voter impersonation.
19   If you had also voted as somebody else, if you voted as
20   yourself, you could be charged as a double vote, which
21   would be also on 64.012.  You could also be charged for
22   tampering with a government record, which would be Penal
23   Code 37.10.
24       Q.   And with respect to the allegations with
25   respect to this -- the 254 referrals, do you know

152

1    whether any of them involved allegations of -- do you
2    know whether any of them involved allegations of use of
3    a forged student identification to vote?
4        A.   No, sir, I don't know.
5        Q.   What about an employer ID?
6        A.   No, sir.  I don't have any --
7        Q.   Or I believe you mentioned previously to vote
8    you could use a utility bill as a form of
9    identification.  Sitting here today, do you know whether
10   any of these cases involved the use of utility bills as
11   a form of identification?
12       A.   No, sir.  I don't have any specific information
13   about that.
14       Q.   And do you have specific information or do you
15   know specific information about any of the -- of how the
16   alleged deceased voter voting occurred in the -- with
17   respect to these referrals?
18       A.   Sitting here today, I don't really have much
19   information, aside from what's on the spreadsheet which
20   is the county where it occurred, the election that's
21   involved, whether or not it's municipal, and what the
22   date was it was referred.  No, I don't have any -- any
23   more than that.
24       Q.   Right.  And there's a lot of -- there's a lot
25   of ways that someone might attempt to impersonate a

MAJOR FORREST MITCHELL                                    8/12/2014

153

1   deceased voter and vote.  Correct?
2          MR. CLAY:  Objection; vague.
3          THE WITNESS:  Yes.  We have cases where
4   voters have impersonated someone else, and that's been
5   done in different ways.
6       Q.  (BY MR. DUNBAR)  And then turning to Texas I.R.
7   000245, which is Page 13 of your spreadsheet.
8       A.  (Witness complies).
9       Q.  With respect -- this is, again, just with
10  respect to the status of these referrals, as I'm reading
11  the allegation section, I see one that involves voter
12  impersonation but relates to a mail-in ballot from
13  Harris County.  Is that correct?
14      A.  Yes, sir.
15      Q.  And I see a second voter impersonation from
16  Hidalgo County in a 2011 municipal election, with the
17  SOS referral date of 2/12/13.  Is that correct?
18      A.  Yes, sir.
19      Q.  And do you know anything about the status of
20  either of those investigations?
21          MR. CLAY:  Again, to the extent it doesn't
22  implicate law enforcement privilege, you can answer.
23          THE WITNESS:  No, sir.  I'm not familiar
24  with the status right now.
25      Q.  (BY MR. DUNBAR)  And then flipping to the

154

1   second part of your referral spreadsheet, which is the
2   source of -- where the source of referral is not from
3   the secretary of state's office, dates of referrals are
4   not recorded here.  Is that correct?
5       A.  No, sir.  They're not.
6       Q.  So it's a little bit harder to tell what the
7   quote/unquote different referrals are, but I just want
8   to turn to the -- turn to Page 21, which is Texas I.R.
9   000253.  There are various allegations from 2012 general
10  election that relate to illegal voting, voter
11  impersonation, illegal voting, convicted felons.  Do you
12  see those entries, Major Mitchell?
13      A.  Yes, sir.
14      Q.  And again, do you recall -- with respect to the
15  voter impersonation referrals in particular, do you
16  recall anything specific about the status of those
17  referrals?
18      A.  All I can say is that none of those have been
19  added to the Prosecutions Resolved or charges pending.
20      Q.  And to be clear, to make it on to this referral
21  spreadsheet, would not even -- these referrals -- these
22  referrals, as I believe you testified earlier, could
23  come from simply a voter on the phone identifying an
24  alleged conduct.  Is that correct?
25      A.  Yes, sir.  If they spoke -- if they speak to

155

1   someone in the law enforcement division, they'll make a
2   record of that contact.
3       Q.  So by -- by being present on this spreadsheet,
4   this in no way suggests that -- that the SIU has
5   concluded that those allegations are credible in any
6   respect.  Correct?
7       A.  If I could answer as, because they're on the
8   spreadsheet, it does not indicate whether or not a full
9   investigation has been opened, if it is from a voter.
10      Q.  Right.  So if a voter calls and makes -- is
11  persistent, as you said, and gets through to your
12  office, an investigator listens to an allegation that I
13  saw in-person voter impersonation, that would make it on
14  to the spreadsheet without any further investigation by
15  that person to determine whether that allegation is --
16  is credible in any sense?
17      A.  That's correct.
18      Q.  Okay.  The -- the final set of questions I want
19  to ask just relate to the -- the SIU in the wake of
20  after SB14 has started to be implemented.  And I guess
21  as a general matter, since -- since SB14 has been
22  implemented in July of 2013 -- in particular its photo
23  ID requirements, has that had any affect on the
24  operation of the special investigations unit?
25      A.  No, sir.

156

1       Q.  So since that time you haven't dedicated either
2   more or less resources toward combating Election Code
3   violations?
4       A.  No, sir.  You know, we have three to four
5   investigators assigned.  Right now we have four
6   investigators assigned to that unit.  It's no more than
7   we had in 2012-'13.
8       Q.  And in your -- has there been a change in the
9   number of Election Code referrals that have come to
10  the -- that have come to the attention of SIU since SB14
11  became effective in July of 2013?
12      A.  No.  There's been no -- no significant change
13  in the amount of referrals.
14      Q.  And since SB14 became effective, have you
15  changed in any way the way you investigate in-person
16  voter impersonation?
17      A.  There was one way that we have changed, and
18  that is in the manner in which we conduct our photo
19  lineups, our photo arrays when we're interviewing
20  witnesses.  That's changed as a matter of state statute
21  and policy.
22      Q.  Can you just briefly expand on that?  I'm not
23  sure I'm familiar with that.
24      A.  Previously, we would prepare what we, in law
25  enforcement, call a -- a photo array, where it involves

157

1  six picture of suspects -- or six pictures of
2  individuals, one of whom may be a suspect.  The -- the
3  policy has been changed now where we -- instead of
4  having all of them on the same page, we now show our
5  pictures individually, if I'm able to describe myself.
6  We might have a stack of pictures that we show them.
7      Q.  I see.  So other than that, there hasn't been
8  any change?
9      A.  No.
10     Q.  What about change in terms of priority SIU
11 assigns to investigating or prosecuting in-person voter
12 impersonation?
13     A.  No.  No change in priority.
14     Q.  Part of -- part of SIU's mandate, as I
15 understand it, is to train police departments, sheriff's
16 offices, district and county attorneys to help identify,
17 investigate and prosecute election crimes.  Is that
18 correct?
19     A.  It was one of the things that we focused on
20 back in 2006.
21     Q.  Uh-huh.  And is that type of training still
22 ongoing?
23     A.  No.  We haven't done anymore.  The most recent
24 initiative that we wrapped up was a human trafficking
25 initiative where we trained officers throughout the

158

1  state in human trafficking investigations.
2      Q.  And when was the last time you conducted
3  training with respect to election crimes?
4      A.  Internally or externally?
5      Q.  I'm sorry.  With police departments, sheriff
6  offices, externally?
7      A.  That was all in 2006.
8      Q.  2006.  So you've done no new training, then,
9  since either SB14 was enacted or implemented with
10 respect to how to go about identifying, investigating,
11 or prosecuting election crimes?
12     A.  No new training since that time.
13     Q.  And SB14, so I understand it -- SB14's photo ID
14 requirements don't apply to early voting or absentee
15 ballots. Is that correct?  Is that your understanding?
16     A.  Well, I disagree.  It doesn't apply to mail-in
17 ballot voting, but it does apply to early voting.
18     Q.  Sorry.  So I should clarify.  SB14's photo ID
19 requirements don't apply to early voting through an
20 absentee ballot.  Is that correct?
21     A.  That's correct.
22     Q.  So if I'm someone who is really intent, say, on
23 using a dead person's registration to vote, even after
24 SB14's photo ID requirements were incorrect, I could do
25 so, just do so through an absentee ballot.  Correct?

159

1      A.  There's -- one way to impersonate a voter is
2  through mail-in ballot fraud.
3      Q.  Right.  And SB14's photo ID requirement doesn't
4  address that problem.  Correct?
5      A.  No.
6      Q.  So if I -- again, if I were someone who really
7  wanted to cast a dead person's vote after SB14's photo
8  ID requirements, I might decide not to go to the polling
9  place, but I could do so through absentee ballot fraud.
10 Is that correct?
11     A.  That is correct.
12     Q.  And SB14's photo ID requirements don't do
13 anything to address the other range of Election Code
14 violations, other than in-person voter impersonation.
15 Is that correct?
16         MR. CLAY:  Objection; vague.
17     Q.  (BY MR. DUNBAR)  Well, does SB14's photo ID
18 requirement do anything to address a problem with voter
19 coercion?
20     A.  Not to my knowledge.
21     Q.  Or vote buying?
22     A.  No, sir.
23     Q.  So if you were a group that was really intent
24 on trying to affect an election outcome, you -- there
25 would be other alternative ways that you could engage in

160

1  election fraud that SB14's photo ID requirement couldn't
2  do anything to prevent.  Correct?
3      A.  If I may retract my previous answer.  You made
4  the statement of vote buying.  It's been my experience
5  that we have conducted criminal investigations of
6  coordinated efforts by individuals to facilitate illegal
7  voting.  If the vote-buying effort was coordinated with
8  a fraudulent ID, then that may have an impact.
9      Q.  Right.  No, I understand that.  My question is
10 if -- in a hypothetical sense, if you're a group that
11 really wants to affect an election outcome after SB14,
12 doing so through in-person voter fraud is arguably
13 harder.  Correct?
14     A.  I believe so.  Yes, sir.
15     Q.  That's the intent of the law.  Correct?
16     A.  (Witness nods head).
17         THE REPORTER:  I'm sorry.  What was your
18 answer?
19         THE WITNESS:  I believe it is much more
20 difficult.
21     Q.  (BY MR. DUNBAR)  But that same group that
22 wanted to affect an election outcome could -- could
23 attempt to achieve that same result through a variety of
24 other types of election fraud such as vote buying, vote
25 coercion.  Correct?

MAJOR FORREST MITCHELL                                    8/12/2014

161

1        MR. CLAY:  Objection; form, calls for
2     speculation.
3            THE WITNESS:  I believe that mail-in
4     ballot fraud is still a means by which a person could
5     affect voter impersonation.
6        Q.  (BY MR. DUNBAR)  Outside the contents of
7     absentee ballot voting there are other things that this
8     group that really wants to affect an election outcome
9     could engage in, such as pressuring voters to vote in a
10    certain way or buying votes.  Correct?
11           MR. CLAY:  Same objection.
12           THE WITNESS:  I believe that those are
13    other ways that a person can commit a criminal offense
14    associated with elections.
15       Q.  (BY MR. DUNBAR)  And SB14's photo ID
16    requirement doesn't do anything to stop that -- those
17    types of voter fraud.  Correct?
18       A.  Not specifically the photo requirement, no.
19           MR. DUNBAR:  Okay.  That's all of my
20    questions, subject to the caveat that I really -- and
21    subject, obviously, to Major Mitchell's availability, I
22    know there are other folks that may want to answer
23    questions -- ask questions.  At some point, I think like a
24    little time just to be able to look at the new documents
25    with the hope that we can just ask questions about that

163

1        Q.  And how long have those four investigators
2     worked in your office?
3        A.  A couple have been in our office for about two
4     years.  Actually, I'd say three have been in our office
5     for about two years, and then one has been in our office
6     for maybe three or four years.
7        Q.  Okay.  And you -- they either directly report
8     to you or directly report to -- to someone under you.
9     Is that correct?
10       A.  Yes, ma'am.  They report directly to somebody
11    underneath me.
12       Q.  So you're aware of their -- their job
13    performance and how they're doing.  Correct?
14       A.  Yes, ma'am.
15       Q.  And have you been happy so far with their job
16    performance?  Do you feel like they've been doing a good
17    job?
18       A.  Yes, ma'am.
19       Q.  All right.  Thank you.  So you had mentioned
20    earlier in your deposition the different teams that are
21    housed within SIU.  And you mentioned a -- a team that
22    you referred to, I think, at the end of your list as
23    kind of a fraud team, I think is what you called it.
24    Could you explain a little bit more what -- what that
25    team consists of and what kind of work they do?

162

1     and close the -- close the deposition down today.  But
2     with that --
3            MR. CLAY:  Okay.
4            MR. DUNBAR:  -- I'll pass to whoever -- to
5     whoever wants to go next.
6            MS. CLARK:  Is this a good time to take a
7     lunch break?
8            THE WITNESS:  I'm fine.  I can keep going.
9            MR. CLAY:  He's ready to keep going.
10           MR. DUNBAR:  Let's go off the record.
11           (Off the record)
12           EXAMINATION
13    BY MS. CLARK:
14       Q.  Sir, this is Jennifer Clark from the Brennan
15    Center, representing MALC and Texas NAACP.  I will go
16    ahead, Mr. Mitchell, and ask you a few questions, kind
17    of circling back on some of your testimony from earlier.
18    Please let me know if you are having trouble hearing me
19    over the speaker phone.  Okay?
20       A.  Yes, ma'am.
21       Q.  Great.  Thank you.
22           So you had testified earlier that there
23    are currently four investigators on the elections team.
24    Is that right?
25       A.  Yes, ma'am.

164

1        A.  Yes, ma'am.  Statutorily back in 2008, the
2     Attorney General's office had the responsibility of help
3     coordinating, at -- at the state level, a mortgage fraud
4     task force.
5        Q.  Uh-huh.
6        A.  And so some of those investigators -- that --
7     that team has done a lot of mortgage fraud
8     investigations, but some of the other fraud
9     investigations that they get involved in are
10    investigations of like, for instance, as I explained,
11    crime victims' compensation fraud, where a claimant
12    might submit fraudulent receipts to get crime victims'
13    compensation benefits.  Receipts could be something like
14    for moving expenses that they didn't incur or re -- you
15    know, rent that they didn't pay.  So that's another
16    example of fraud that they investigate.
17       Q.  Okay.  Does that -- so does the fraud team also
18    investigate any form of public benefits fraud?
19           MR. CLAY:  Objection; vague.
20           THE WITNESS:  If you're -- an example of a
21    case that they just are -- are ramping up is a case
22    involving a -- a -- an employee of the local housing
23    development in Smithville, Texas.  And the director of
24    that organization was charged with stealing money from
25    the -- the housing development, and so that's an example

MAJOR FORREST MITCHELL                                    8/12/2014

43 (Pages 169 to 172)

169

1  have -- with four investigators, we are referral driven,
2  and that in and of itself is -- is more than enough work
3  for us to handle.
4      Q.  (BY MS. CLARK)  Why did you not reallocate any
5  of your investigators to the elections team?
6          MR. CLAY: Objection; form.
7          THE WITNESS: When specifically are you
8  talking about?
9      Q.  (BY MS. CLARK)  You mentioned that with four
10  investigators that referrals bring more than enough for
11  those four investigators to do, and I'm asking why you
12  did not make a decision to reallocate any investigators
13  to the elections team so that there could be more
14  investigations pursued within that unit.
15          MR. CLAY: Same objection.
16          THE WITNESS: I haven't really thought
17  about that.
18      Q.  (BY MS. CLARK)  Okay.  So in the course of --
19  of following up on a referral, if you come to believe
20  that an individual case may be part of a larger criminal
21  conspiracy or may be connected to other cases, would you
22  pursue an investigation of that based off of the
23  individual original referral?
24          MR. CLAY: Objection; form, vague.
25          THE WITNESS: Could you repeat that

170

1  question one more time?
2      Q.  (BY MS. CLARK)  Of course.  So, for example,
3  correct me if I'm wrong, but your testimony earlier was
4  that the elections team works off of referrals only.  Is
5  that correct?
6      A.  Yes, ma'am.
7      Q.  So if in the process of a referral that had
8  come from perhaps the secretary of state's office or
9  from a local district attorney's office, and it was a
10  referral of a single case of some type of elections
11  fraud, if in the course of investigating that your
12  office came to suspect that that was part of a --
13  larger conspiracy or a -- was connected to other cases
14  that had not been referred to you, was that something
15  that you would pursue in an investigate -- in your
16  investigation?
17          MR. CLAY: Same objection.
18          THE WITNESS: And if we had reason to
19  believe the other criminal activity occurred in
20  connection to an investigation that we were already
21  conducting, we would investigate those allegations.
22      Q.  (BY MS. CLARK)  And has -- has -- has that ever
23  happened with any referral of -- of in-person voter
24  impersonation fraud?  Has it ever led to a larger
25  investigation with multiple suspected incidences?

171

1          MR. CLAY: I'll object to the extent that
2  it would require Major Mitchell to divulge sensitive law
3  enforcement information.
4          To the extent it doesn't, you can answer.
5          THE WITNESS: Yes.  Some of our
6  investigations have involved larger groups of
7  individuals but who may not have been criminally
8  charged.
9      Q.  (BY MS. CLARK)  Could you -- to the extent that
10  you're able to, could you explain in what way that
11  happens?
12          MR. CLAY: Again, to the extent that it
13  would require you to divulge sensitive law enforcement
14  information, you're instructed not to answer.
15  Otherwise, you can answer to the best of your ability.
16          THE WITNESS: Law enforcement officers may
17  receive information through contacting witnesses who
18  provide us with additional information that may not be
19  contained in the original allegation that was referred
20  to our office.
21      Q.  (BY MS. CLARK)  So --
22      A.  They may have -- may have additional criminal
23  activity that we weren't aware of.
24      Q.  And are there any instances of that which
25  involve in-person voter impersonation fraud which are

172

1  not reflected on the sheets that you provided as part of
2  the document production in this matter, and which you
3  were testifying about earlier today?
4          MR. CLAY: Same objection, but you can
5  answer, I think, without divulging sensitive
6  enforcement information at a -- at a general level, at
7  sort of a yes-or-no answer.
8          THE WITNESS: One more time, your
9  instruction.
10          MR. CLAY: I think you can answer at a
11  very general level. I think she's asking a yes-or-no
12  question.  So I think an answer -- a yes-or-no answer
13  would not implicate any sensitive law enforcement
14  information.
15          THE WITNESS: Yes.
16      Q.  (BY MS. CLARK)  So can you -- sir, can you
17  please clarify your testimony with just, yes, there are
18  some large criminal conspiracy matters involving voter
19  impersonation fraud that are not reflected on this sheet
20  of Election Code referrals?
21      A.  I apologize.  Repeat --
22          THE REPORTER: I'm sorry.  Of election
23  "code" referrals or "vote" referrals?
24          THE WITNESS: All of our --
25          MS. CLARK: Code.

MAJOR FORREST MITCHELL                                    8/12/2014

173

```
 1          THE REPORTER: Code, C-O-D-E?
 2          MS. CLARK: Yes.
 3          THE REPORTER: Thank you.
 4          THE WITNESS: For -- for purpose of
 5   clarification, all of the investigations would be listed
 6   on the referrals spreadsheet. There may be
 7   investigations that do not appear on the criminal
 8   prosecution's or charges pending's spreadsheet that
 9   involve voter impersonation. The reason they're not is
10   because they haven't been charged or adjudicated.
11       Q. (BY MS. CLARK) Okay. Thank you for that
12   clarification.
13       A. I apologize for the misunderstanding.
14       Q. Okay. So, Mr. Mitchell, I believe you
15   testified earlier that there are multiple ways to
16   impersonate dead voters, and in that testimony you
17   specifically discussed one case that was listed in the
18   Election Code referral spreadsheet of -- of a woman
19   named Mary Comparin. Are there other ways beyond the
20   way that Mary Comparin impersonated a dead voter that
21   you have seen?
22       A. There is a case out of Harris County involving
23   Jack Carol Crowder, III, which is on prosecutions
24   resolved, to which I testified at my deposition and also
25   at the trial. And in that case, he used his father's
```

174

```
 1   voter registration certificate to cast a ballot as if he
 2   were his deceased father.
 3          There have been -- the case involving
 4   what I testified today and previously where -- it's not
 5   a deceased person, but they used their voter
 6   registration certificate to vote as well. And the final
 7   way is through the use of mail-in ballot fraud.
 8       Q. Thank you. So -- so those three ways you just
 9   discussed are the -- are the only ways you have seen?
10       A. Those are the only cases that we've charged.
11       Q. Thank you. Mr. Mitchell, do you believe that
12   there is undetected in-person voter impersonation fraud
13   occurring in Texas?
14       A. It is my opinion, yes.
15       Q. And what is your source for that opinion?
16       A. Having conducted criminal investigations, and
17   then reviewing criminal investigations of my staff, over
18   my tenure here at this office.
19       Q. So could you be more specific, or it's just
20   your general instinct?
21       A. We -- we have conducted investigations that did
22   not result in criminal charges, where we suspected voter
23   impersonation occurred. And that is both through my
24   experience as an investigator, investigating cases, and
25   also as a supervisor reviewing investigative reports.
```

175

```
 1       Q. In those circumstances, you -- they were
 2   detected by your office. Correct?
 3       A. Or they were detected prior to the referral to
 4   my office.
 5       Q. So that would not be undetected voter fraud.
 6   That would have been detected. Correct?
 7       A. That would have been detected fraud. Correct.
 8       Q. But there was insufficient information to -- to
 9   charge criminally. Correct?
10       A. There's a -- a number of reasons why not to
11   charge a criminal offense. One of -- one which may
12   be insufficient evidence.
13       Q. What are the other reasons, Mr. Mitchell?
14       A. Another reason may be prosecutorial discretion,
15   would be another example. Culpable mental state. That
16   culpable mental state wasn't there.
17       Q. Any other reason?
18       A. Not that I can think of right now.
19       Q. Thank you. So, Mr. Mitchell, do you believe
20   that SB14 will lead to an increase in voter
21   impersonation fraud referrals to your office?
22       A. I wouldn't think it would lead to a -- an
23   increase of illegal voting, no, ma'am.
24       Q. I'm sorry. I think there was a
25   misunderstanding. I was just asking if SB14 will lead
```

176

```
 1   to an increase in the number of referrals to your
 2   office. I'm sorry if that was unclear.
 3       A. No, ma'am. I -- I don't believe it will.
 4       Q. Okay. Thank you. And, Mr. Mitchell, are you
 5   aware that the -- the penalties for -- for voter
 6   impersonation fraud in Texas is a -- is a prison
 7   sentence of two to 20 years and up to a $10,000 fine?
 8       A. Illegal voting, yes, ma'am, is a -- is a second
 9   degree felony, yes, ma'am.
10       Q. Are you aware of any -- any federal law
11   consequences to casting an illegal vote?
12       A. No, ma'am.
13       Q. Would -- are you aware of the fact that under
14   federal law a nonUS citizen who commits voter fraud
15   is -- is considered automatically deportable?
16       A. No, ma'am.
17       Q. And are you aware that a person who is
18   prosecuted for voter fraud while ineligible to vote due
19   to a felony conviction faces additional prison time for
20   casting that ineligible vote?
21       A. Are you talking federal statutes?
22       Q. Yes.
23       A. No. I'm not aware of federal statutes, ma'am.
24       Q. Do -- do these penalties that we just discussed
25   seem sufficiently severe to you?
```

MAJOR FORREST MITCHELL                                          8/12/2014

---

177

1           MR. CLAY: Objection; form.
2           THE WITNESS: I'm not sure what the
3     penalty range as you've described under federal
4     statutes.
5           Q.  (BY MS. CLARK) Let's just talk about the --
6     the second degree felony for -- for this -- this
7     Texas -- Texas state law that -- that you are familiar
8     with.  Does that seem sufficiently severe to you?
9           MR. CLAY: Objection; foundation, form.
10          THE WITNESS: I believe a second degree
11    felony is a very serious offense in Texas, with a --
12    with a severe punishment, with a wide range of -- a
13    wind -- a wide range of sentencing latitude.
14          Q.  (BY MS. CLARK) So what kind of person do you
15    think would risk what you would classify as a -- as a
16    severe punishment for the low return of committing voter
17    fraud?
18          MR. CLAY: Objection; form.
19          THE WITNESS: I can only speak to the
20    people that -- the investigations that we've conducted
21    and the investigations that -- that -- where we've
22    identified witnesses and potentially even charged
23    suspects.  And we have had individuals who have voted
24    illegally for as little as 5 to $10, or who have voted
25    for $20 and risked that -- that punishment.  So

---

178

1     there's -- there's a -- I mean, anybody is capable of --
2     of committing the crime.
3           Q.  (BY MS. CLARK) So the -- the examples that you
4     just mentioned, are those people included on the
5     Election Code referrals spreadsheets that we were
6     talking about earlier today?
7           A.  It would be listed in the referrals, yes,
8     ma'am.
9           Q.  Thank you.  And just -- just one more line of
10    questioning for you, Mr. Mitchell.  In -- earlier you
11    had discussed -- earlier in your testimony you discussed
12    the -- a referral from the secretary of state's office
13    of, I think, a large number of supposed dead voters.  I
14    think maybe approximately 250 or so from July of 2012.
15    Is that correct?
16          A.  Yes, ma'am.
17          Q.  And in your experience, your long experience in
18    law enforcement and working in elections fraud, have
19    instances of -- of dead people -- alleged dead people
20    allegedly voting, has that been sometimes contributable
21    to administrative error, whether at the county level in
22    providing death records or perhaps at the federal level,
23    the -- the Social Security index?
24          A.  Yes, ma'am.
25          MS. CLARK: Okay.  Thank you very much,

---

179

1     Mr. Mitchell.  I have no more questions.
2           MR. DUNBAR: Others on the phone?
3           MR. ROSENBERG: Not from me.
4           THE REPORTER: Who was --
5           MR. GEAR: None for -- this is Bruce Gear.
6     None for me.
7           MR. DUNBAR: And I guess we've lost
8     Scott.
9           MR. BRAZIL: No, none from --
10          MR. DUNBAR: Oh.
11          MR. BRAZIL: -- Scott, from Scott
12    Brazil.
13          MR. DUNBAR: I think that's everyone,
14    then.  Correct?
15          MR. GEAR: I think that's correct.
16          MR. DUNBAR: I have a few follow-up
17    questions on the documents.  I don't know if you had any
18    that you wanted to do -- how you wanted to sequence --
19          MR. CLAY: Oh, no.  Go ahead.
20          MR. DUNBAR: Okay.
21          MR. CLAY: If I have any --
22          MR. DUNBAR: You'll do it --
23          MR. CLAY: -- redirect, I'll do it after
24    you're done.
25          MR. DUNBAR: Okay.  Great.

---

180

1           FURTHER EXAMINATION
2     BY MR. DUNBAR:
3           Q.  Let's see.  I apologize if I'm a little
4     disorganized here.  I'm trying to make sense now of
5     these new documents, and I think I have them greatly
6     understood now, so I'm just going to hand them to you,
7     three new exhibits, since these are stapled separately.
8           (Exhibit Nos. 7 and 8 marked)
9           Q.  (BY MR. DUNBAR) Mr. Mitchell, I believe you
10    should have two new exhibits.  And just as a purely
11    factual question, these appear to me to be May 1st, 2014
12    versions of the charges pending portion of the SIU
13    spreadsheet we've been talking about and the referrals
14    portion.  Is that correct?
15          A.  Yes, sir.
16          Q.  And do you know, is there a May 1st, equivalent
17    for the prosecutions resolved?  I have a prosecutions
18    resolved from April 24th, and I just don't know if
19    that's the most recent, and I just want to make sure
20    we're --
21          A.  I -- at the time these were produced, the April
22    1 may have been the most recent one.  As I -- I think I
23    testified earlier today, we just had some convictions at
24    the end of last month, and so there has been a more
25    recent one prepared.

---

MAJOR FORREST MITCHELL                                    8/12/2014

46 (Pages 181 to 184)

**181**

1    Q.  Than -- more recent than April 24th?
2    A.  Yes, sir, I believe so.
3    Q.  Okay.  It may be that it's somewhere in that
4  vast warehouse.  So why don't we -- why don't we
5  admit -- why don't we use the 424, and then maybe I can
6  just ask you questions about the result of prosecutions
7  that might be different from that sheet.
8            (Exhibit No. 9 marked)
9    Q.  (BY MR. DUNBAR)  All right.  And so starting
10  with the -- starting with the May 1st, 2014 charges
11  pending resolution spreadsheet -- and the reason I was
12  listening on the phone, this is a document produced last
13  night, I believe, TX0649837.  And as compared to the
14  February 2014 spreadsheet we were using earlier, can you
15  tell me what the differences are?
16    A.  We're specifically talking about the charges
17  pending?
18    Q.  Yes, sir.
19    A.  I believe the difference is that two of the
20  Montgomery County defendants were convicted.
21    Q.  And which two?  That -- it would be -- is that
22  Margaret -- Roberta Margaret Cook and Sybil Lea Doyle?
23    A.  Yes, ma'am -- yes, sir.  Yes, sir.
24    Q.  And so those would probably account, then, for
25  the two -- to the extent there is a May 1st version of

**182**

1  the Prosecutions Resolved spreadsheet, the difference
2  would be the addition of moving those two names from
3  pending to resolved?
4    A.  Prosecutions resolved, yes, sir.
5    Q.  And I believe we discussed earlier that these
6  charges as charged involved ineligible voter
7  allegations.  Is that correct?
8    A.  Yes, sir.  That's correct.
9    Q.  So, again, it may very well be in the record.
10  Those wouldn't -- those ineligible voter charges would
11  not have encompassed allegations of in-person voter
12  impersonation?
13    A.  No, sir.  They were not charged for in-person
14  voter impersonation.
15    Q.  Okay.  And it looks like there are no new
16  additions to the charges pending spreadsheet as of
17  May 1st.  Am I reading that correctly?
18    A.  As of May 1st.  But as I -- I testified
19  previously today, we did get some new cases filed that
20  haven't -- that's one of the updates that -- the most
21  recent update.
22    Q.  I see.  So some folks have moved from the
23  referrals category to the charges pending --
24    A.  Correct.
25    Q.  -- that aren't reflected here?

**183**

1    A.  Yes, sir.
2    Q.  And which -- what are the names associated with
3  those cases?
4    A.  I'm sorry.  I don't have those available right
5  now, but it's in Cameron County.
6    Q.  Do you know how many individuals were added?
7    A.  Six.
8    Q.  Six.  And can you describe the general
9  allegation -- the nature of the charges alleged in that
10  case?
11    A.  Those are specifically a a -- mail-in ballot
12  violations and handling of mail-in ballots and
13  unlawfully influencing or assisting voters --
14    Q.  Okay.
15    A.  -- with their mail-in ballot -- mail-in
16  ballots.
17    Q.  So the charges have nothing to do with
18  in-person voter impersonation.  Correct?
19    A.  That's correct.
20       MR. CLAY:  Kelly, and to the extent that
21  that's not in your documents, we're happy to get you an
22  updated version of the charges pending --
23       MR. DUNBAR:  I appreciate it.  I
24  appreciate it.  Yeah.
25       MR. CLAY:  -- that reflects those cases.

**184**

1       MR. DUNBAR:  I appreciate that.  It may
2  very well be it's there.
3       MR. CLAY:  Yeah.
4       MR. DUNBAR:  I may have missed it, but
5  this testimony is just as -- just as helpful.
6    Q.  (BY MR. DUNBAR)  So this -- this -- the
7  May 1st -- well, the after May 1st version of the
8  charges pending, the only difference that you're aware
9  of in terms of additions is these -- are these six new
10  individuals?
11    A.  Well, actually, I believe that there were --
12  there was another trial in Montgomery County in late
13  July.
14    Q.  Okay.
15    A.  So -- where additional defendants were
16  convicted in the Montgomery County case.
17    Q.  So it's possible --
18    A.  That might have been moved additionally now to
19  the prosecutions resolved.
20    Q.  So the -- those remaining cases, then, if I am
21  understanding the state of play here, would be the
22  Thomas Curry and William Bernsten?
23    A.  And the -- the Goeddertz case.  Yes.  Yes, sir.
24    Q.  The Goeddertz case.  Okay.  And those were all
25  convictions, you said?

MAJOR FORREST MITCHELL                                    8/12/2014

---

185

1    A.  Two of them were -- two of them were convicted
2  in late July and have now been moved to the prosecutions
3  resolved.
4    Q.  And those were ineligible voter charges again.
5  Correct?
6    A.  Correct.
7    Q.  So with respect to the re -- updated
8  referrals spreadsheet, which those on the phone is
9  TX0649815, this is dated May 1st, 2014.  Is it -- is it
10  likely that there's a more recent version of this
11  spreadsheet as well?
12    A.  Yes, sir.
13        MR. DUNBAR:  Okay.  And, Reed, I just
14  renew the request.
15        MR. CLAY:  Yeah.  Absolutely.
16    Q  (BY MR. DUNBAR)  Focusing on the secretary of
17  state referrals, and turning to Page 13, as best I can
18  tell, it looks like there may be three new secretary of
19  state referrals since the February 2014 spreadsheet.
20  And those are the ones on the bottom from Bexar County.
21    A.  Yes, sir.  Bexar County.
22    Q.  Ah.  Got it.  Thank you.  And the allegation
23  listed is abuse of official capacity, deputy voter
24  reg -- registrar.  What -- what does -- what does that
25  signify?

---

186

1    A.  Under state law, we have deputy voter
2  registrars who are basically volunteers who sign up to
3  assist voters in their registration efforts throughout
4  the state.  Usually -- they're done usually county by
5  county by county.  You sign up with each county to serve
6  as a volunteer deputy registrar to help register voters.
7        As such, you're going to come into contact
8  with voter information, and you're not allowed to record
9  or document any kind of information off that voter
10  registration application.
11    Q.  Uh-huh.
12    A.  And so abuse of official capacity is violating
13  any law governing the office of deputy voter registrar.
14  So one example is not documenting -- not copying what's
15  on the voter registration application.  Another
16  violation would be not turning in a voter registration
17  application, so...
18    Q.  I see.  And so, again, the -- these referrals
19  wouldn't have anything to do with in-person voter
20  impersonation.  Is that correct?
21        MR. CLAY:  Objection; vague.
22    Q.  (BY MR. DUNBAR)  These three referrals don't
23  involve allegations of in-person voter impersonation, as
24  I understand your description.  Is that correct?
25    A.  The -- this document specifically lists the

---

187

1  allegations that were provided in the referral --
2    Q.  Uh-huh.
3    A.  -- from the secretary of state's office.
4    Q.  Uh-huh.
5    A.  I don't know what all the allegations in that
6  case may be eventually.
7    Q.  You don't know one way or the other, then,
8  whether there could be --
9    A.  Correct.
10    Q.  -- in-person voter impersonation?
11        And the second part of the referral
12  spreadsheet again is the undated one, which makes it a
13  little harder to tell what's new.  But I'm looking at
14  Page 21, which is TEX -- TX0649835.  And, again, in
15  terms of in-person voter impersonation, it looks like
16  there's nothing different from the February 2014
17  spreadsheet in terms of new referrals, unless I'm
18  missing something.  Do you agree?
19    A.  I would -- I would speculate -- I would believe
20  that the last three would be new entries, since
21  they involved the primary election, and that occurred in
22  March.
23    Q.  In 2014?
24    A.  Yes, sir.
25    Q.  And those three -- again, the allegations as

---

188

1  they have come to you from other relate to mail-in
2  ballot violation, false information on application for a
3  place on a ballot, and false information on application
4  for place on a ballot.  At least based on those
5  descriptions, we don't know one way or the other whether
6  that would involve anything to do with in-person voter
7  impersonation.  Correct?
8    A.  Again, the spreadsheet just contains what that
9  was referred to us.
10    Q.  And you don't know in your own head, not on the
11  spreadsheet, whether that's true or false?
12    A.  As I sit here today, no.
13    Q.  Okay.  And remind me what other means, in terms
14  of source of referral.
15    A.  The other means elected -- I should say
16  district -- district or county attorney, law
17  enforcement, which includes state, local, or federal law
18  enforcement officials, or an elections administrator in
19  a geographical area.
20    Q.  All right.  And then the Prosecutions Resolved
21  spreadsheet that you think is more recent, that I don't
22  have in my hands right now, but it seems like you may
23  have a good handle of what would be on the most recent
24  version if it was here, would reflect, as I understand
25  it, the Montgomery County -- the successful Montgomery

MAJOR FORREST MITCHELL                                    8/12/2014

189

1    County prosecutions.  Is that right?
2        **A.  Yes, sir.**
3        Q.  Would there be -- is there anything else that
4    would be on that spreadsheet in terms of prosecutions
5    resolved?
6        **A.  No, sir.**
7        Q.  That's -- that's new since the February 2012 --
8    excuse me, 2014 version of the spreadsheet?
9        **A.  No, sir.**
10       Q.  Okay.  All right.  The final document is the
11   one I need the most help with.  I have my copy.  Where
12   did the other copies go?
13       **(Exhibit No. 10 marked)**
14       Q.  (BY MR. DUNBAR)  And, Major Mitchell, you've
15   been handed what I believe is Exhibit 10, which is Bates
16   Nos. TEX0650262 and TX0650261.  Is this -- you -- you
17   testified earlier -- well, let me backtrack.  Can you
18   tell me what this document is?
19       **A.  As I testified earlier, in response to this**
20   **litigation, I spoke with my staff and my coworkers,**
21   **including Sherry Papke (phonetic) and my office manager,**
22   **Tamara Chandler, to request budget -- or cost printouts**
23   **associated with election violation investigations and**
24   **prosecutions that our office has conducted.  And those**
25   **printouts come out -- there -- there are many pages to**

190

1    **that because it prints off each individual case number,**
2    **as well as a total for the -- each division in the**
3    **criminal prosecutions division and the criminal**
4    **investigations law enforcement division.**
5        Q.  Uh-huh.
6        **A.  And so this appears to be one of the pages that**
7    **show various case numbers, which are categorized in our**
8    **mainframe as election violation investigations.**
9        Q.  Uh-huh.
10       **A.  And the top of the page it shows that the query**
11   **period was from September 01, 2000 to March 31st of**
12   **2014.**
13       Q.  Uh-huh.  And corresponds to fiscal year 2001
14   through 2014, on the next line?
15       **A.  Correct.**
16       Q.  Is that correct?  Okay.  And so can you help
17   me --
18       **A.  I can further explain if you like.**
19       Q.  Yes, please.  So each -- I guess starting with
20   the client, the client reference numbers on the left --
21   the left-hand column, each of those unique numbers would
22   refer to a particular prosecution?
23       **A.  Or investigation.**
24       Q.  Or investigation.
25       **A.  So the client reference number is similar to**

191

1    **what you would see on Exhibit 3 --**
2        Q.  Uh-huh.
3        **A.  -- which is an -- what we call an OAG case**
4    **number.**
5        Q.  Uh-huh.
6        **A.  And the first two digits of that number are**
7    **going to be the calendar year in which -- or fiscal year**
8    **in which that investigation was opened.**
9        Q.  Uh-huh.
10       **A.  Investigation or prosecution was opened.  And**
11   **then ten remaining numbers would be that file specific.**
12   **So if you look at the first line, it says 13390344,**
13   **State of Texas versus Duval, 2012 election.**
14       Q.  Uh-huh.
15       **A.  That is the OAG case file for that specific**
16   **investigation and/or prosecution.**
17       Q.  I guess what I'm confused about is I would -- I
18   would have thought -- and we can look at the chart, but
19   between 2000 and 2014, there would have been far more
20   than ten Election Code prosecutions or investigations.
21   Correct?
22       **A.  The time frame again?**
23       Q.  Well, I'm just going off the time frame -- the
24   time frame at the top of this document.  It says
25   September 1st, 2000 through March 31st, 2014.

192

1        **A.  Oh, yes.  So there's -- there's more**
2    **investigations or -- and/or prosecutions than this**
3    **document.**
4        Q.  Okay.  So what -- what universe of cases is
5    this document about?
6        **A.  These are cases that are categorized as**
7    **election violations.  And the time frame that we're**
8    **talking about for these two pages is 2013 through 2014.**
9        Q.  Oh, I see.  So although the top -- that's maybe
10   what is confusing me.  Although the dates at the top
11   reflect September 1st, 2000, through March 31st, 2014,
12   that's -- this document reflects a smaller universe than
13   that?
14       **A.  Yes, sir.**
15       Q.  Okay.  And you can tell that from the client
16   reference numbers.  Is that what you're basing that on?
17       **A.  Yes, sir.**
18       Q.  So this, then, reflects -- this -- if I
19   understand things correctly, this would reflect
20   expenditures on Election Code investigations and
21   prosecutions from some particular point in 2013 to 2014?
22       **A.  For these specific case numbers.**
23       Q.  How are those case numbers chosen?  Do you
24   know?
25       **A.  I think our computer randomly generates the**

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   MARC VEASEY, JANE HAMILTON,    )
     SERGIO DELEON, FLOYD J. CARRIER,)
 4   ANNA BURNS, MICHAEL MONTEZ,    )
     PENNY POPE, OSCAR ORTIZ, KOBY  )
 5   OZIAS, JOHN MELLOR-CRUMMEY,    )
     JANE DOE, JOHN DOE, LEAGUE OF  )   CIVIL ACTION NO.
 6   UNITED LATIN AMERICAN CITIZENS )   2:13-CV-193 (NGR)
     (LULAC), AND DALLAS COUNTY,    )   (lead case)
 7   TEXAS                  )
                            )
 8   VS.                    )
                            )
 9   RICK PERRY, Governor of Texas,  )
     and JOHN STEEN, Texas Secretary )
10   of State               )
     _____)
11                          )
     UNITED STATES OF AMERICA,      )
12                          )
     V.                     )
13                          )
     STATE OF TEXAS, JOHN STEEN, in )   CIVIL ACTION NO.
14   his official capacity as Texas )   2:13-CV-263 (NGR)
     Secretary of State, and STEVE  )   (consolidated case)
15   MCCRAW, in his official capacity)
     as Director of the Texas       )
16   Department of Public Safety,   )
     _____)
17                          )
     TEXAS STATE CONFERENCE OF NACCP )
18   BRANCHES, AND THE MEXICAN      )
     AMERICAN LEGISLATIVE CAUCUS OF )
19   THE TEXAS HOUSE OF            )
     REPRESENTATIVES,              )
20                          )
     V.                     )   CIVIL ACTION NO.
21                          )   2:13-CV-291 (NGR)
     JOHN STEEN, in his official    )   (consolidated case)
22   capacity as Texas Secretary of )
     State, and STEVE MCCRAW, in his )
23   official capacity as Director of)
     the Texas Department of Public )
24   Safety                 )
25
```

**2**

1  **************************************************

2  ORAL DEPOSITION OF

3  DEBBIE NEWMAN

4  JULY 24, 2014

5  **************************************************

6

7  ORAL DEPOSITION of DEBBIE NEWMAN, produced as a

8  witness at the instance of the Plaintiffs, was taken in

9  the above-styled and numbered cause on JULY 24, 2014,

10  from 3:12 p.m. to 5:16 p.m., before Cynthia C. Miller,

11  CSR in and for the State of Texas, reported by machine

12  shorthand, at the offices of Wells, Payton, Greenberg &

13  Hunt, 550 Fannin, Suite 600, Beaumont, Texas, pursuant

14  to the Federal Rules of Civil Procedure and the

15  following stipulation and waiver of counsel:

16  IT WAS STIPULATED AND AGREED by and between

17  counsel that if the original of said deposition is not

18  signed or available at the time of trial or any hearing,

19  an unsigned copy may be used in lieu thereof.

20

21

22

23

24

25

---

**3**

1  APPEARANCES

2  FOR THE PLAINTIFFS:

3  Ms. Emma Simson
   CAMPAIGN LEGAL CENTER

4  215 E. Street, NE
   Washington, DC 20002

5  Tel:  202-736-2200, ext. 12
   Fax:  202-736-2222

6  Email:  ESimson@campaignlegalcenter.org

7  Mr. Chad W. Dunn
   BRAZIL & DUNN

8  4201 Cypress Creek Pkwy, Suite 530
   Houston, Texas  77068

9  Tel:  281-580-6310
   Fax:  281-580-6362 (fax)

10  Email:  chad@brazilanddunn.com

11

12  FOR THE PLAINTIFF UNITED STATES OF AMERICA:

13  Mr. Bruce Gear (by telephone)
   DEPARTMENT OF JUSTICE

14  Civil Rights Division
   950 Pennsylvania Avenue N.W. (NWB-7200)

15  Washington, D.C.  20530
   Tel:  202-514-2919

16  Fax:  202-307-3961
   Email:  bruce.gear@usdoj.gov

17

18

19  FOR THE DEFENDANTS STATE OF TEXAS,
   RICK PERRY, JOHN STEEN, AND STEVE McCRAW:

20  Mr. S. Ronald Keister
   DEPUTY ATTORNEY GENERAL FOR LITIGATION

21  Southern District of Texas No. 10418
   209 West 14th Street

22  Austin, Texas  70711
   Tel:  512-475-0131

23  Fax:  512-475-2994
   Email:  ronny.keister@oag.state.tx.us

24

25

---

**4**

1  APPEARANCES CONTINUED

2

3

4  ALSO PRESENT:

5  Ms. Sheila Houston

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**5**

1  INDEX

2

3  Page

4

5  Stipulations.............................................2

6

   Appearances...........................................3/4

7

8

9  Testimony of DEBBIE NEWMAN

10  Examination by Ms. Simson.........................6

11  Examination by Mr. Gear..........................54

12  Examination by Mr. Keister.......................74

13  Further Examination by Ms. Simson................96

14

15

16  Changes and Signature............................104/105

17  Reporter's Certificate.............................106

18

19  EXHIBITS

20  Newman Deposition Exhibit No. 1......................74
   (Documents from County Clerk's Office)

21  Newman Deposition Exhibit No. 2......................75
   (Letter from AG to County Clerk)

22

23  Newman Deposition Exhibit No. 3......................97
   (Examples)

24

25

## 6

1          DEBBIE NEWMAN,
2  having been first duly sworn, testified as follows:
3          EXAMINATION
4  BY MS. SIMSON:
5      Q.  Can you go ahead and state your name for the
6  record, please?
7      A.  Debra Dale Newman.  Better known as Debbie
8  Newman.
9      Q.  Okay.  And are you the county clerk for Jasper
10  County?
11      A.  I am.
12      Q.  My name is Emma Simson.  This is Chad Dunn.
13  We are the attorneys for the Veasey-LULAC plaintiffs in
14  the lawsuit over the photo ID law.
15      A.  Okay.
16      Q.  You understand you are not a party to this
17  lawsuit?
18      A.  I understand.
19      Q.  Have you ever been deposed before?
20      A.  Yes, I have.
21      Q.  How many times?
22      A.  Once.
23      Q.  What was the case about?
24      A.  It was a car wreck that I was involved in.
25      Q.  Okay.  And were you a party to that?

## 7

1      A.  Yes.
2      Q.  And you were the plaintiff?
3      A.  Correct.
4      Q.  Okay.  So you've been deposed once before, but
5  just to go over some ground rules that will make this go
6  smoothly.  The first is if I ask you a question and you
7  don't understand, please let me know and I will try to
8  rephrase it so it makes sense.
9      A.  I understand.
10      Q.  Then the second is we try to avoid talking
11  over each other, because she's trying to get everything
12  down, so I will do my best to let you finish your answer
13  before I ask my next question, and I'll ask that you do
14  the same and wait until I finish a question before you
15  answer.
16      A.  Understood.
17      Q.  The next thing is that you have provided
18  verbal answers like you've been doing so far, just so
19  that she can get this down on the record.  Does that
20  make sense?
21      A.  Correct.
22      Q.  And the last is I don't think this should take
23  too long, but if you need a break, please let me know,
24  and we'll finish up whatever line of questions we're on,
25  and we can take a break.

## 8

1      A.  Thank you.
2      Q.  So can you, first, start us off with a bit of
3  background about yourself, where you grew up, went to
4  school, past jobs?
5      A.  I grew up in Jasper, Texas, been there seven
6  generations, been married to my husband for 44 years,
7  and four years of high school.
8          I worked for Seal, Stauffer, Cofield &
9  Busby law firm for 15 years.  And I ran for county clerk
10  and been there ever since.  That was in '99.
11      Q.  You ran for county clerk in 1999?
12      A.  Well, '98.
13      Q.  '98.  And you took the position in '99?
14      A.  In '99.
15      Q.  And did you run with a political party when
16  you ran for office?
17      A.  I did.
18      Q.  Which party was that?
19      A.  Democrat.
20      Q.  Okay.  And were you opposed?
21      A.  Yes.
22      Q.  Okay.  And so how often do you have to run for
23  re-election for county clerk?
24      A.  Every four years.
25      Q.  Every four years.  So are you up for an

## 9

1  election?
2      A.  Well, actually three, you know.
3      Q.  Okay.  Have you had any past jobs, other than
4  county clerk, that related to elections in any way?
5      A.  No.
6      Q.  Okay.  So you received a deposition notice for
7  today that asked you to bring some documents.  Did you
8  bring any documents?
9      A.  We brought what we had.
10      Q.  Okay.
11      A.  And I don't think it's really what you want.
12      Q.  Okay.
13      A.  I'm going to give you what Sheila has given
14  me, because this is more her expertise.
15      Q.  Okay.  And are these all of the documents that
16  are responsive to the request?
17      A.  That's all we have.
18      Q.  Okay.
19      A.  You asked for --
20          MS. HOUSTON:  We had the simple ballot
21  already in those results right there, and she just had
22  me to do the summary of the constitutional run-off and
23  primaries.
24      A.  But you wanted provisional, and we had none.
25      Q.  (By Ms. Simson)  Okay.  Excellent.  So you've



**10**

1  been county clerk since 1999.  What are the job
2  responsibilities of county clerk?
3      A.  Well, they're huge.  It's too enormous to go
4  over in this deposition, but basically you order all the
5  ballots, you get all the polling places, all the poll
6  workers who are responsible for the poll watchers, the
7  candidates, furnish them with forms.
8      We do anyway.  A lot of county clerks do
9  not.  We help them with their paperwork.
10     Q.  And are you responsible for voter registration
11  as county clerk?
12     A.  Actually, my assistant, Sheila, is.
13     Q.  Okay.  But you supervise her with voter
14  registration?
15     A.  I supervise her.
16     Q.  Okay.  So you mentioned -- when did your
17  office begin work on implementing S.B. 14?
18      And before we start that, when I say S.B.
19  14, I'm referring to Senate Bill 14 that was passed in
20  2011 and requires voters to present photo
21  identification.
22     A.  Well first year was this year, or last year,
23  our first year.
24      MS. HOUSTON:  This past year, I think
25  wasn't it the first time, like actually had the -- like

**11**

1  by law, they had to show ID.
2      Q.  (By Ms. Simson)  And do you recall when that
3  was last year?
4      A.  That was in March.
5      Q.  In March?
6      A.  This March.
7      Q.  Okay.  Do you remember if --
8      A.  No.  Am I wrong?  Correct me if I'm wrong.
9      MS. HOUSTON:  I was trying to remember
10  which election it actually started.
11     A.  I know we did it in March.
12     Q.  (By Ms. Simson)  Do you recall if you
13  implemented S.B. 14 in November elections, November of
14  2013?
15     A.  No, I do not remember.
16     Q.  And how did you find out that the county was
17  supposed to start implementing S.B. 14?
18     A.  Through the Secretary of State.
19     Q.  Would that be through e-mail?
20     A.  Letters, and e-mail, and school.
21     Q.  Okay.  And when you found out that the state
22  was now implementing S.B. 14, what did your office have
23  to do to prepare to implement S.B. 14 during elections?
24     A.  Well, we really didn't have to do -- other
25  than advertise, we advertised, and we had it on our

**12**

1  local radio, which is a big deal in our little town.
2  And we had it locally.
3      Everybody knew, you know.  Small as our
4  town is, we have an average of -- in a November election
5  is 11,000 voters.  In this one, we only had probably
6  3,500.  So we had not -- we had one person, one, that
7  opposed showing their ID.
8      Q.  And when you say that person opposed showing
9  their photo ID --
10     A.  They just said they didn't see why they had
11  to, it was America.
12     Q.  Okay.  And did they end up showing their ID?
13     A.  They did.  Not an issue.
14     Q.  And then they cast a ballot?
15     A.  Yes, they did.
16     Q.  Okay.  So you said an average in November
17  elections you have about 11,000 voters?
18     A.  Yes.
19     Q.  Is that for maybe a November presidential
20  election?
21     A.  Yes.
22     Q.  Okay.  So the 3,500 this past November, how
23  come that was --
24     A.  That was a primary.
25     Q.  Okay.

**13**

1      A.  Primary.  Democrat/Republican primary.
2      Q.  And was the primary in November or March?
3      A.  March.
4      Q.  So in the November 2013 elections, did you
5  also have lower voter turnout?
6      A.  It's always lower in the primaries than
7  November.
8      Q.  Okay.
9      A.  You're either going with a governor's race or
10  the presidential race, then you have a good turnout.
11     Q.  Okay.  So the governor's race and presidential
12  races are when you have a much higher turnout?
13     A.  Yes.
14     Q.  Okay.  So with S.B. 14, there were some
15  changes to the identification requirements at the polls.
16  And what did you have to do to train election workers?
17     A.  We put on a school.
18     Q.  A school, what do you mean by a school?
19     A.  We school them.  We have them come to the
20  courthouse, or we go to them, all our election workers,
21  and we actually go through an election school.  And we
22  do this every election on what they are supposed to do.
23     Q.  And if a person has been an election worker in
24  past elections, do they have to attend training every
25  year?

14

1    A.   They do.
2    Q.   They do?
3    A.   Yes.
4    Q.   And when you say "school," can you describe
5    this school?
6    A.   We actually go through the whole synopsis of
7    how to hold the election, how to cast the ballot, how to
8    handle the election worker -- I mean, the election --
9    well, I can't think of the word now.
10        The voter, the voter, how to handle them
11   in any situation.
12   Q.   Okay.  And is it -- so it's in person?
13   A.   Yes.
14   Q.   And about how many hours, or how many days is
15   this school?
16   A.   We hold an election in Jasper that is -- we
17   have five towns in our county.  We hold one in Jasper,
18   and we hold one in Buna.  Buna is locally situated, you
19   know, for everybody.
20        And that makes it -- we have one at
21   2:00 o'clock, we have one at 6:00 o'clock where
22   everybody can attend.
23   Q.   So is it about a few hours?
24   A.   No, it runs about an hour-and-a-half, and then
25   we have -- usually we have desserts.

15

1    Q.   Okay.  So people attend about an
2    hour-and-a-half training.  Do they also have to do a
3    training on-line?
4    A.   They can choose to train on-line.
5    Q.   Okay.
6    A.   And some of them do do that.
7    Q.   So that's voluntary on-line?
8    A.   That's voluntary.
9    Q.   And so when you're at a polling place on
10   election day, how many people are working at the poll?
11   A.   You have a mandatory three.
12   Q.   Mandatory three.  And is there some person who
13   is supervising?
14   A.   You have your judge, your alternate judge, and
15   your election worker.
16   Q.   And those are the three people?
17   A.   And on the bigger ones, we have up to five to
18   six.
19   Q.   Okay.  And do they all attend the same
20   training?
21   A.   Yes.
22   Q.   Okay.  And who runs the training for the
23   election workers?
24   A.   Myself, and Diana South.
25   Q.   Okay.  And did you have to change your

16

1    training after S.B. 14?
2    A.   Yes, we had to, you know, put that into
3    perspective with everything.  We had to make sure that
4    everybody knew.  And we emphasized it so -- it was so
5    important, we emphasized it.
6    Q.   And emphasized that there is now a photo ID
7    requirement?
8    A.   Yes.
9    Q.   To make sure they ask voters for ID?
10   A.   We also said, you know, if someone says,
11   "Where do I get this, I don't have one," we would let
12   them know that they could go to the local DPS.
13   Q.   And so you had to let the election workers
14   know where the voters could go get IDs?
15   A.   Yes, we trained them.
16   Q.   Okay.  And how many election workers, roughly,
17   do you have in Jasper County?
18   A.   I would say 100.
19   Q.   Around 100?
20   A.   Around 100.
21   Q.   And did you have training materials that you
22   used at the school?
23   A.   Yes.
24   Q.   And did you bring those with you today?
25   A.   No.

17

1    Q.   Is that something if we --
2    A.   Well, we use the book that we get from the
3    Secretary of State.
4    Q.   So you use exactly the materials they give?
5    A.   Exactly.  And we also use a tape that is
6    furnished by the Secretary of State.  And then we just
7    do a local person-to-person instructions.
8    Q.   Okay.  And do you have any idea how many of
9    the election workers do the voluntary on-line training?
10   A.   Not very many.  I would say no more than five.
11   Q.   Is the content of the on-line training pretty
12   similar to the content of your training?
13   A.   Yes.
14   Q.   At the end of your training --
15   A.   It's actually the tape, I'm sorry.
16   Q.   Okay.
17   A.   It's the tape that the Secretary of State
18   provides, they just look at it on-line.  Then they get a
19   certificate.
20   Q.   And you also show the tape at the training?
21   A.   Correct.
22   Q.   Okay.  Do you do anything at the end of the
23   training to make sure that election judges understood
24   what you train them on?
25   A.   Yes.  And if they don't, we go one-on-one

18

1  personally with them.
2      Q.  And what do you do to figure out if they
3  understood?
4      A.  They come up to us.
5      Q.  Okay.  They will come up to you.  But is there
6  any kind of quiz at the end to see if they understood?
7      A.  No.
8      Q.  Do you think that you were successful in
9  training election workers about S.B. 14?
10     A.  Yes.
11     Q.  And what makes you say that?
12     A.  Done it many, many years.  And our election
13  workers tend to be the same ones.
14     Q.  So you have people who come year after year?
15     A.  I actually have one 90 years old.
16     Q.  How long has he or she --
17     A.  She has been there for, I would say, 40 to 45
18  years because I provide them with a pin, an election pin
19  of how many years, and hers is huge, you know.
20     Q.  So other than training the poll workers, and
21  other than educating voters, was there anything else you
22  had to do to get ready for S.B. 14?
23     A.  We had to put it in the local newspapers.
24     Q.  Was that required, or was that something you
25  decided to do?

19

1      A.  I don't know if it was required or not.
2  That's what we did.  We put it on the local radio
3  station, and our local radio personality tends to be
4  very vocal on elections, so he helps a whole lot.
5      Q.  And who is that?
6      A.  Mike Lout.
7      Q.  And what's the radio station?
8      A.  KJAS.
9      Q.  And what's the newspaper?
10     A.  Jasper News Boy, Buna Beacon, and Kirbyville
11  Banner.
12     Q.  Do you know if the radio station has coverage
13  for the entire county, or is it only for Jasper City?
14     A.  No, they have coverage throughout the whole
15  county, including parts of Sabine County.
16     Q.  Okay.  Did you do any -- did you do anything
17  else, like billboards, or signs on buses, or brochures
18  in offices?
19     A.  We don't have a bus in our town, and
20  billboards are too expensive for our budget.
21     Q.  Did you send letters to voters at all to
22  inform them of the changes in the law?
23     A.  No.
24     Q.  Did Jasper County ever conduct any sort of
25  database match between the voter registration list, and

20

1  the driver's license database to find out which voters
2  might lack ID?
3              MS. HOUSTON:  That lack ID, no, not to
4  see who doesn't have ID.
5      A.  Not that, but they are corresponding, you
6  understand.
7      Q.  (By Ms. Simson)  How does it correspond?
8      A.  I have to let her speak for me because that's
9  not something I know.
10     Q.  So you're not aware of how the driver's
11  license database interacts --
12     A.  Well, I know that when she sends it into
13  Austin.  It can also be sent in from DPS, too, to
14  Austin, and she knows whether it came from the DPS.
15             MS. HOUSTON:  Yeah, if they go to the DPS
16  to get their driver's license, they can register to
17  vote.  That's what she's talking about.
18     Q.  (By Ms. Simson)  But there wasn't after
19  S.B. 14 went into effect, you never took, for example,
20  the voter registration list for Jasper County to see if
21  there may be someone who lack a driver's license?
22             MS. HOUSTON:  No.
23     A.  I don't think.  No, I don't think we have that
24  option, do we?  With their software.
25     Q.  (By Ms. Simson)  Did the Secretary of State's

21

1  office ever offer to provide you with a list of people
2  who may lack ID because they don't have a driver's
3  license?
4      A.  Not that I'm aware.
5      Q.  Okay.  Is that something that if the Secretary
6  of State's office said to you, "We can run a match and
7  tell you which of your voters may lack an ID," would
8  that be something you would be interested in getting?
9              MR. KEISTER:  Object to form.
10     Q.  (By Ms. Simson)  I should let you know, he may
11  object from time to time.  That's for the attorneys to
12  work out later.  You can answer after he does that.
13     A.  Would it be helpful?
14     Q.  Would it be --
15     A.  Is that what you're asking me?
16     Q.  If the Secretary of State's office said to
17  you, "We can take your voter registration list and all
18  your registered voters and see which of them appear to
19  lack a driver's license, or may lack a driver's
20  license," is that information you would have been
21  interested in so you could, for example, send letters to
22  those voters?
23     A.  It would be interesting to me, but I think it
24  would be a privacy issue --
25     Q.  Okay.

22

1    A.   -- for the voter.
2    Q.   Okay.  Other than the radio ads and the
3  newspaper ads, was there anything else that you did to
4  educate voters?
5    A.   Also, there is on-line with the radio station.
6    Q.   The radio station's Web site had something?
7    A.   Yes.  And our Web site also provided
8  information.
9    Q.   That's the county clerk's office?
10   A.   No, the Jasper County.
11   Q.   Jasper County Web site.  Anything else that
12 you did to educate voters?
13   A.   No.
14   Q.   Did you have to -- so talking about the radio
15 ads, do you recall when those were aired?
16   A.   No, because it was voluntary.  It's not
17 something we paid for.
18   Q.   Okay.  So you did not have to pay for the
19 radio ads?
20   A.   Huh-uh.
21   Q.   And is -- do you have -- do you frequently
22 have the radio volunteer to put things on the radio
23 station for you?
24   A.   Yes.  But they're non-biased.
25   Q.   And in the newspaper, did you have to pay to

23

1  place those ads?
2    A.   Yes.
3    Q.   And do you recall how much that cost?
4    A.   All three are different prices.  Jasper being
5  the highest at around $100.  Kirbyville being -- the
6  other two being probably 60, 40.
7    Q.   And so did you -- and you didn't have to pay
8  the radio anything to put the ad up on the Web site?
9    A.   No.
10   Q.   Okay.  And on the radio station, was that kind
11 of a public service announcement, or an --
12   A.   Yes.
13   Q.   Okay.  And so you spent, it sounds like, a few
14 hundred dollars on newspaper ads.  Do you recall when
15 those were placed?
16   A.   It's mandatory when you have to place them.
17 We placed them upon -- when the Secretary of State told
18 us to.
19   Q.   So these were notices -- the notices in the
20 newspaper, were they about photo ID, or were they about
21 elections?
22   A.   They were about elections, but we also -- we
23 also put a separate ad in ourself, I do believe.  Am I
24 correct on that?
25        Diana would have to answer that, my chief

24

1  assistant, because she handles that.
2    Q.   So you're not sure if the county placed an ad
3  about photo ID in the newspaper?
4    A.   I am 90 percent they did.
5    Q.   They did, or did not?
6    A.   Did.
7    Q.   Okay.  And the radio ads that you mentioned
8  that were voluntary by the radio station, were those
9  about elections, or were those about photo ID?
10   A.   Elections.
11   Q.   Okay.  So they didn't specifically advertise
12 you need a photo ID to vote now?
13   A.   No, it was voluntary on the radio station.
14   Q.   Was there any education or outreach to voters
15 specifically about the photo ID law?
16   A.   I would say no.
17   Q.   Okay.  Do you know if there was any education
18 to voters about the election identification
19 certification, or the EIC?
20   A.   Not that I'm aware of.
21   Q.   And when I say the EIC, do you know what I'm
22 referring to?
23   A.   No, I really don't.
24   Q.   Okay.  Are you aware that under S.B. 14 there
25 is a free election ID that voters can obtain called an

25

1  election identification certificate?
2    A.   I'm not.  Were you?
3        MS. HOUSTON:  What I was told, they could
4  go to the DPS office to get a photo ID.  That was
5  supposed to be free.
6    Q.   (By Ms. Simson)  And you're aware of this?
7    A.   I am.
8    Q.   But you're not sure if that's the election
9  identification certificate?
10   A.   It's a photo ID.
11   Q.   Okay.  And is the -- as far as you're aware,
12 is the Department of Public Safety the only place that a
13 person can obtain -- is the Department of Public Safety
14 office the only place a person can obtain one of the
15 free IDs for voting?
16   A.   Yes.
17   Q.   Do you know how many locations there are in
18 Jasper County for driver's license offices?
19   A.   One.
20   Q.   One?
21   A.   Yes.
22   Q.   And is that located in Jasper?
23   A.   Jasper.
24   Q.   Okay.  Do you know if Jasper County ever had
25 mobile EIC units to offer the free photo IDs?



26

1    A. No. They -- we were told that they were going
2    to be, but never had one.
3    Q. Do you know why there never was one?
4    A. No.
5    MS. SIMSON: Can we go off the record for
6    one second?
7    (Recess from 3:32 p.m. to 3:34 p.m.)
8    Q. (By Ms. Simson) So the Department of Public
9    Safety office in Jasper County, is that accessible by
10   public transportation?
11   A. We do not have public transportation. What
12   are you talking about? A bus or a taxi? We have one
13   taxi.
14   Q. A bus.
15   A. No, we have no buses.
16   Q. Is there any public transportation in Jasper
17   County?
18   A. There's a taxi service.
19   Q. And what is the taxi service?
20   A. I don't know the name of it.
21   Q. Do you know can people get the taxi for free?
22   A. No.
23   Q. Okay. Do you have any idea how much it cost?
24   A. I think $5.
25   Q. And they can go anywhere in the county with

27

1    that?
2    A. Well, not anywhere. Our county is 72 miles
3    long, from one end to the other. So -- it's very long
4    and narrow, so they could not travel that far.
5    Q. And are you -- so you didn't have to pay for
6    the radio ads, you had to pay a few hundred dollars for
7    the newspaper ads. Is there any other cost that you had
8    related to implementing S.B. 14?
9    A. When you say not very much -- when you say not
10   very much, it's more than that, because you have to
11   advertise for early voting, and you have to advertise
12   for the day of voting.
13   It adds up to more than a few hundred.
14   It adds up more to like a thousand, which is a lot.
15   Q. Those ads weren't about photo ID, though;
16   correct?
17   A. We had some that were --
18   Q. Okay.
19   A. -- about photo ID. It might not have been a
20   huge ad, but we did have the ad that I -- I'm pretty
21   sure.
22   Q. Did the county do any advertising about the
23   availability of free voter IDs?
24   A. Not that I'm aware.
25   Q. Did you work with any community groups to

28

1    educate voters about the photo ID law?
2    A. We worked with local ministers.
3    Q. And how did you contact the local ministers?
4    A. We -- we're so small that we're very close
5    with the community. And then most of our polling places
6    are at churches, so we would have -- pass that
7    information on to that pastor, preacher.
8    Q. Do you recall which of the pastors, preachers,
9    ministers that you talked with about the photo ID law?
10   A. I would say just about every one of them. I
11   would say 50 percent, let me just put it like that.
12   Q. Okay.
13   A. We have 20 polling places.
14   Q. Okay. And I think you mentioned earlier --
15   hopefully, this was while we were doing -- while we were
16   on the deposition, but about how many people are in
17   Jasper County?
18   A. About 35,000.
19   Q. And how many registered voters do you have?
20   A. Around 20.
21   Q. And -- 20,000?
22   A. Yes.
23   Q. Okay. Do you think that you were successful
24   in educating voters about the photo ID law?
25   A. I think it could have been better.

29

1    Q. And why do you say that?
2    A. Because you have brought it to my attention.
3    Q. Which aspect of it?
4    A. I think we should have done more.
5    Q. To educate voters?
6    A. Yes.
7    Q. What do you think you might have done to
8    educate voters, if you had more time or money?
9    A. I think we could have done some radio ads,
10   more -- our town is more into radio, and the on-line.
11   That on-line goes out all over the world. And I think
12   we could have done more with that.
13   Q. And was it just you -- maybe you hadn't
14   thought about voters, or it was a cost issue?
15   A. We have a real big cost issue.
16   Q. And so you don't have a lot of money to spend
17   on education?
18   A. No, we don't.
19   Q. Did the Secretary of State's office ever offer
20   to give you money to educate voters about the photo ID
21   law?
22   A. Not that I'm aware.
23   Q. Did you ever request that from the Secretary
24   of State's office?
25   A. No.

30

1    Q.   Are you aware of what any other counties have
2  done to educate voters about the photo ID law?
3    A.   No.
4    Q.   Okay.  So you mentioned -- I believe you
5  mentioned earlier that there were no provisional ballots
6  cast because of an ID issue?
7    A.   No.
8    Q.   And that's during any of the elections that
9  S.B. 14 has been in effect?
10   A.   Correct.
11   Q.   Now, the free photo ID cards that are -- that
12 voters may obtain, these are called the election
13 identification certificates.  I may refer to them as
14 EICs.  Does the county have the authority to issue those
15 IDs?
16   A.   No.
17   Q.   Are you aware if other counties have the
18 authority to issue those IDs?
19   A.   No.
20   Q.   Have you ever asked the Secretary of State's
21 office if you could get authority to issue those IDs?
22   A.   No.
23   Q.   If I told you that some other counties have
24 the authority to issue these free voter ID cards, is
25 that something you would be interested in being able to

31

1  do?
2    A.   Yes.
3    Q.   Do you know if DPS in Jasper -- do you know if
4  the DPS office in Jasper ever did extended hours for
5  people who may need to get an ID to vote?
6    A.   Absolutely not.
7    Q.   Okay.  So you don't think they ever opened on
8  Saturdays to offer photo ID?
9    A.   Absolutely not.  We don't want to go there.
10   Q.   What do you mean by that?
11   A.   No comment.
12   Q.   Okay.  The mobile EIC units that you mentioned
13 before, you said the Secretary of State's office may
14 have offered them, but it never happened, or you never
15 heard anything: is that correct?
16   A.   Our Congressman James White's office brought
17 it to our attention, but we didn't hear anything else,
18 didn't know anything else about it.
19   Q.   So the Congressman brought to your attention
20 the possibility of having a mobile EIC station, but you
21 didn't hear anything from the Secretary of State's
22 office?
23   A.   We didn't hear anything else, period.
24   Q.   Okay.  Did you -- are you aware that other
25 counties had mobile EIC units available to them?

32

1    A.   No.
2    Q.   So as far as you're aware, there were never
3  any mobile units to issue free voter IDs in Jasper
4  County?
5    A.   No.
6    Q.   Okay.  Did you ever testify in front of the
7  legislature about voter ID laws?
8    A.   No.
9    Q.   Did you ever talk to any legislators about
10 them?
11   A.   No.
12   Q.   Has anyone from the Secretary of State's
13 office ever contacted you to ask for feedback about how
14 the voter ID law was implemented?
15   A.   No.
16   Q.   Has anyone from DPS ever contacted you about
17 the availability of free voter ID cards at their office?
18   A.   No.
19   Q.   Has anyone from DPS ever contacted you about
20 voters who needed IDs?
21   A.   No.
22   Q.   Has anybody at DPS -- have you had any
23 conversations with anybody at DPS about voter ID?
24   A.   Only on a personal level, and it's not -- it
25 would not be in my capacity as county clerk.

33

1    Q.   And what was the nature of those
2  conversations?  Who was the person at DPS?
3    A.   I'd rather not say.
4    Q.   What was the content -- what was the kind of
5  content of those conversations?
6    A.   It's a large job.  There's only two women
7  there for the whole county.
8    Q.   So did they express concerns about their
9  capacity to issue free voter IDs?
10   A.   Yes.
11   Q.   They did?
12   A.   On a personal level, not as -- in their work
13 capacity.
14   Q.   Certainly.  Have you spoken with anyone from
15 the Secretary of State's office at any time about
16 S.B. 14?
17   A.   I have not.  Now, some of my staff may have.
18   Q.   Okay.  Is that -- if one of your staff has a
19 concern about S.B. 14, is that something they would
20 bring to you?
21   A.   They normally will bring it to me, but they
22 will also take charge.
23   Q.   But to your knowledge, nobody on your staff
24 has spoken with anyone at the Secretary of State's
25 office about the implementation of S.B. 14?

38

1    Q.  Okay.  What is your understanding of -- when a
2  person presents an ID --
3    A.  Well, it would state your name and address,
4  but it wouldn't have -- it wouldn't have Social Security
5  number, or the last four digits of the Social Security
6  number, or -- that's all.
7    Q.  Are you familiar with a requirement that
8  this -- that the information, though, on a person's ID,
9  such as their name, is supposed to be substantially
10  similar to the information on the poll book?
11    A.  Yes.
12    Q.  And who makes -- when a voter comes in to
13  vote, what do they do?  They hand their ID to an
14  election worker?
15    A.  Their ID, or their voter registration card.
16    Q.  Okay.  And so if they hand over their voter
17  registration card, what happens next?
18    A.  They are able to vote.
19    Q.  Okay.  If they hand over their driver's
20  license, what happens?
21    A.  They are able to vote.
22    Q.  And does the election worker look them up in
23  the system, or how do they --
24    A.  Yes.
25    Q.  And what do they do, they take the ID?

39

1    A.  We have both.  We have the electronic poll
2  books, and we also have the book itself.  But the last
3  election we went strictly -- we bought enough poll books
4  to go strictly to the poll book.
5    Q.  When you say go straight to the poll book,
6  what do you mean?
7    A.  It's an electronic poll book.
8    Q.  Okay.  So they would look them up in an
9  electronic poll book?
10    A.  Yes.  And if they didn't find them, they would
11  call Sheila.
12    Q.  Okay.  So make sure that they are not somehow
13  missing any error?
14    A.  Correct.
15    Q.  Okay.  And when they -- let's say somebody
16  hands over their voter registration card.  Does the
17  election worker then ask them for a photo ID?
18    A.  Yes.
19    Q.  Since Jasper is such a small county, are there
20  times when the person might just say --
21    A.  No, not even their mother.
22    Q.  Okay.  And so if you hand over your ID, what
23  is the information that the election workers are told
24  they are supposed to check against the voter
25  registration cards?

40

1    A.  Their -- of course, physical picture, and
2  their name and address and all, needs to match up with
3  our poll, the poll books.
4    Q.  If an election worker said the information on
5  your ID is not substantially similar to the information
6  on the poll book, what happens?
7    A.  They would vote provisionally.
8    Q.  Okay.  And is there -- if the election clerk
9  makes the decision that the person does not have a
10  substantially-similar ID, would anybody check that
11  before they make the person vote provisionally?
12    A.  Well, they might on occasion call Sheila and
13  make sure that they are on there or not.  But then we
14  would let them vote provisionally.
15      Then that would go, you know, into after
16  the election whether it was counted or not.
17    Q.  Okay.
18    A.  It's put in a sealed envelope.
19    Q.  What kind of guidance did you give to election
20  workers about how to make a determination if an ID was
21  substantially similar to the voter registration list?
22    A.  We just visited with them one-on-one, and we
23  made it very important, as much as, "Don't let your
24  sister vote unless you have their photo ID."  We really
25  pressed those issues.

41

1    Q.  And if -- so if a person shows up and the name
2  on their ID, and the date of birth, and the address
3  don't match what's on the voter registration list, would
4  that person vote a regular ballot or a provisional
5  ballot?
6    A.  Provisionally, which would also correct any --
7  that's like re-registering or registering to vote when
8  you vote provisionally.
9    Q.  So when you vote provisionally because you do
10  not have a photo ID, what do you have to do to make sure
11  your vote is counted?
12    A.  It goes -- they have a chance to bring in a
13  proper ID.
14    Q.  Okay.  And if a person's name doesn't match
15  exactly between their ID and the poll book, what does
16  the voter have to do to vote a regular ballot?
17    A.  What do you mean?
18    Q.  Let me rephrase that.  If a person comes in
19  and they present an ID, and they don't have an exact
20  match between the name on their ID and the name on the
21  poll book -- let's say their middle name is on one and
22  it's not included in the other.  Is there anything that
23  person has to do to vote a regular ballot?
24    A.  I would think in that instance, they would
25  have to vote provisionally.

**42**

1  Q.  If there is not an exact name match?
2  A.  It would have to be really off.
3  Q.  So a pretty big difference?
4  A.  Yes.
5  Q.  Okay.  Did the county give poll workers any
6  examples of maybe an ID and information on the poll book
7  and say, when a voter shows up with information like
8  this, you should accept them to vote a regular ballot,
9  or you should tell them they have to vote a provisional
10  ballot?
11  A.  Not that I'm aware of.
12  Q.  Okay.  Did the county provide election workers
13  with anything like a list of nicknames, for instance,
14  for Hispanic names --
15  A.  No.
16  Q.  -- so that they had a sense of the nicknames?
17  A.  The Secretary of State did send some examples.
18  Q.  So the Secretary of State --
19  A.  Like William and Bill.
20  Q.  Right.  So the Secretary of State's office
21  sent some examples, but the county didn't come up with
22  any additional ones?
23  A.  We passed that information on to our -- during
24  the school.
25  Q.  So you gave the Secretary of State's

**43**

1  information to the election clerks?
2  A.  Yes.
3  Q.  But the county didn't provide any additional
4  examples?
5  A.  No.
6  Q.  Okay.  And the county did not provide any sort
7  of list of common nicknames for various names, or
8  anything like that?
9  A.  We did have that -- like I said, we passed it
10  on verbally.
11  Q.  From the Secretary of State's office?
12  A.  Yes.
13  Q.  Have you had any complaints from constituents
14  about the photo ID law?
15  A.  No.
16  Q.  Have you had any election workers complain to
17  you about having to implement S.B. 14?
18  A.  Yes.
19  Q.  And what were those complaints?
20  A.  Well, it's just extra work.
21  Q.  And when they say it's extra work, why is it
22  extra work?
23  A.  I don't know.  They're old and contrary.
24  Q.  The county clerk's office issues various
25  records; is that correct?

**44**

1  A.  Yes.
2  Q.  Do you issue certified copies of marriage
3  licenses?
4  A.  Yes.
5  Q.  Do you know how much those cost?
6  A.  We just went up.  Eight.
7  Q.  $8?
8  A.  Uh-huh.
9  Q.  And is that only issued -- how many office
10  locations do you have?
11  A.  We have one in Jasper, and we have a satellite
12  office in Buna.
13  Q.  So would a person have to go in person to one
14  of those offices?
15  A.  They would have to go to Jasper to obtain that
16  information.
17  Q.  They would have to go to Jasper?
18  A.  Uh-huh.
19  Q.  And can you only issue --
20  A.  I'm sorry.  No, I'm completely wrong on that.
21  We do not.  We only have Jasper.  That is in our
22  building thoughts to have a satellite location.
23  Q.  Okay.  So right now you only have one office?
24  A.  Yes.
25  Q.  Okay.  So if a person needed a certified copy

**45**

1  of their marriage license, they would go to Jasper?
2  A.  Yes.
3  Q.  And can you only issue certified copies of
4  marriage licenses if they were married in Jasper County?
5  A.  Yes.
6  Q.  So you don't have the ability to look up other
7  counties in Texas?
8  A.  No, only on birth.
9  Q.  Is there any sort of waiver if a person comes
10  in and says, "I need a certified copy of my marriage
11  license but I can't afford it"?
12  A.  No.
13  Q.  On the birth certificates, you also issue
14  certified copies of birth certificates; is that correct?
15  A.  Correct.
16  Q.  And how much do those cost?
17  A.  Twenty-three.
18  Q.  And that would also be available only at the
19  one county office?
20  A.  Yes.
21  Q.  And I believe you said that you can look that
22  up for anywhere in the state?
23  A.  Anywhere in the state, unless it's a delayed
24  birth, something like that.  We can't do delayed births,
25  or if the name is too long, we can't issue it.

**46**

```
 1    Q.   If the name is too long, you cannot issue it?
 2    A.   Yes.
 3    Q.   How come?
 4    A.   We can issue it on our part as far as on the
 5   paper, but we can't do it from the secretary -- from the
 6   state's part because the forms just will not allow the
 7   printer to do it.
 8    Q.   So if you printed one of these, would it be
 9   considered a certified copy?
10    A.   I'm sorry, I don't understand.
11    Q.   If somebody's name is too long and they come
12   in saying, "I need a certified copy of my birth
13   certificate," can you issue one?
14    A.   No.  Not unless -- I can issue it if it's in
15   Jasper County, but if it's from another county, like
16   Harden County, Newton County, something like that, it
17   won't let us print that out.
18    Q.   Okay.
19    A.   They have to go back -- or delayed birth, they
20   have to go back to the county they were born in.
21    Q.   So if somebody was born outside of Jasper
22   County, you would have to look that up in the Secretary
23   of State, and if the name is too long, you can't print
24   it?
25    A.   Uh-huh.
```

**47**

```
 1    Q.   Are you familiar that the state has waived or
 2   has reduced the fees for birth certificates if the
 3   person is using the birth certificate to get a free
 4   voter ID?
 5    A.   No, I'm not.
 6         MS. HOUSTON:  Yeah.
 7    A.   She knows more than I do.
 8    Q.   (By Ms. Simson)  So you were not previously
 9   aware that the state has reduced the fees for birth
10   certificates?
11    A.   No.
12    Q.   So --
13    A.   On occasion, I pay for them myself.
14    Q.   You pay for people to get birth certificates?
15    A.   If there is a situation, I will pay for it
16   myself.
17    Q.   And has that come up in the past?
18    A.   Yes.  I know everybody.
19    Q.   And what were the reasons the person didn't
20   have a birth certificate?
21    A.   They may never have gotten one.  They may be
22   very poor.  And there is -- they don't know who to go to
23   or where to go to to get any assistance.
24         You know, they're young.  I know all
25   their mothers and their grandmothers and their daddies
```

**48**

```
 1   and their brothers.  And there's been occasions where
 2   I've married and buried them.
 3    Q.   So there have been instances in the past where
 4   you've paid for someone to get a birth certificate
 5   because they needed one?
 6    A.   Yeah.
 7    Q.   So you -- in your experience, there are people
 8   in the state who don't have birth certificates?
 9    A.   I would say yes.
10    Q.   Okay.  If a person --
11    A.   Can I make an objection?  Why are we on
12   marriage licenses and not voter ID?
13    Q.   Well, are you aware that to get a free voter
14   ID, voters have to present certain documents to get one?
15    A.   Yes.
16    Q.   And do you know which documents those are?
17    A.   Well, yes, I do.  And birth certificate is
18   one.
19    Q.   And are you aware that if a person's name has
20   changed since birth, that they might have to provide
21   both a certified copy of their birth certificate and
22   something else?
23    A.   Okay, I gotcha.
24    Q.   Okay.  But if you have questions, please feel
25   free to let me know.
```

**49**

```
 1    A.   Oh, I will.
 2    Q.   So your staff issues birth certificates: is
 3   that correct?
 4    A.   Yes.
 5    Q.   And is your staff trained to issue the
 6   reduced-fee birth certificates if a person needs one for
 7   a photo ID?  I didn't know anything about it.  There's
 8   a possibility that the other girls did.
 9    Q.   Has the county done anything to advertise that
10   if a person needs a birth certificate to get a photo ID
11   to vote, that the county offers reduced-fee birth
12   certificates?
13    A.   No.
14    Q.   Okay.  If a person shows up at the poll -- I
15   know you've said multiple times that it's a small
16   county, people tend to know each other.
17         If a person shows up at the poll and
18   maybe their name has changed because of marriage and so
19   the name on the voter list is different than the name on
20   their ID, is it common that the person who's looking at
21   their ID would know them?
22    A.   It's common that we know them, but we do a
23   correction.
24    Q.   Okay.  So you would do a correction.  But if
```



**50**

1  they came in and their name had changed since they had
2  registered to vote, or vice-versa, the person at the
3  polls would tend to know the person?
4      A.  I would say more -- the workers are within
5  their polls, they know their people.  But we don't
6  depend on that.  They have to show their ID.
7      Q.  Right.  So they have to show their ID, but if
8  a person came in and their ID -- the information on
9  their ID had changed since they registered to vote, or
10  they had, you know, registered to vote more recently and
11  their information had changed since they got their ID,
12  is it likely that the person at the poll would know them
13  so they would know that it was the right person showing
14  the ID?
15      A.  I would say yes.  They would know them.
16      Q.  If they didn't know them and the information
17  didn't match, what do you think the poll worker would
18  do?
19      A.  Only make them vote provisionally.
20      Q.  Okay.  And would they -- are election clerks
21  allowed to ask for other documents to see if the voter
22  is who they say they are?
23      A.  Yes.
24      Q.  And what kind of other documents might an
25  election clerk ask for?

**51**

1      A.  Well, they can use a Visa, they can use a -- I
2  can't think right now.  A gas bill, an insurance card.
3      Q.  So a person could show up at the polls with a
4  photo ID and a gas bill and say, "Hey, my name is
5  changed, but I am who I say I am"?
6      A.  Yes.
7      Q.  Okay.  And if the person comes back to the
8  county office, and now they want to prove who they say
9  they are --
10      A.  We send them a letter.
11      Q.  You send them a letter.  And what does the
12  letter say?
13      A.  That letter tells them whether their vote
14  counted and why, if it didn't.  And it also registers
15  them to vote.
16      Q.  The letter registers them to vote?
17      A.  No.  When they issue -- we make them do a
18  card.  Well, when it's put in that green envelope, that
19  registers them to vote.
20      Q.  So they will be registered in the future?
21      A.  Yes.
22      Q.  But you may have some voters who are already
23  registered but may have to cast provisional ballots; is
24  that correct?
25      A.  Very -- that would be very, very few.  I mean,

**52**

1  that would be on a -- I don't think it would be very
2  much at all.  Do you?
3          MS. HOUSTON:  We will have some.
4      A.  Some.
5      Q.  (By Ms. Simson)  Some provisional voters.  And
6  if a person were to cast a provisional ballot because
7  they didn't have a photo ID, they have to come back
8  within six days to prove who they say they are; is that
9  correct?
10      A.  Uh-huh.
11      Q.  And when they come back, could they bring a
12  gas bill or some other documents with them to show who
13  they are?
14      A.  Uh-huh.
15      Q.  And is that a "yes"?
16      A.  Yes.  I'm sorry.
17      Q.  No problem.  Are you familiar with the
18  religious exemption in S.B. 14?
19      A.  No.
20      Q.  Do you know -- so you are not aware that under
21  S.B. 14 somebody could come to the voter registrar's
22  office after the election and say, "I have an objection
23  to being photographed," as a religious objection?
24      A.  Yes.
25      Q.  And are you aware of the disability exemption

**53**

1  under S.B. 14?
2      A.  Yes.
3      Q.  And what does the disability exemption allow?
4      A.  For us to mail them a ballot.
5      Q.  So that's the mail ballot, but are you aware
6  that there's a disability exemption that allows voters
7  who have certain disabilities to vote in person on
8  election day without a photo ID?
9      A.  Yes.
10      Q.  Has anybody in the county applied for a
11  disability exemption?
12      A.  No.
13      Q.  Do you know if the county has advertised that
14  there is a disability exemption to showing photo ID?
15      A.  No.
16      Q.  Are the election workers trained on the fact
17  that there may be some people who present a voter
18  registration card without a photo ID who are allowed to
19  vote because of a disability?
20      A.  No.
21      Q.  Did you do any sort of analysis after these
22  elections to figure out whether S.B. 14 had an effect on
23  the elections?
24      A.  No.
25          MS. SIMSON:  I don't have any more



54

1  questions at this time.  So I will see if -- Bruce, are
2  you on the phone?
3              MR. GEAR:  I am on the phone, and I do
4  have some questions.
5              EXAMINATION
6  BY MR. GEAR:
7      Q.  You were asked about the disability exemption,
8  and I just wanted to be clear for the record, and for my
9  purposes, were you aware of the existence of a
10 disability exemption?
11     **A.  Can you say that again?**
12     Q.  Are you aware -- or are you aware of the
13 existence of a disability exemption under S.B. 14?
14 Senate Bill 14, to be clear.
15     **A.  Yes.**
16     Q.  Pardon?  Did you not hear the question?
17     **A.  Yes, I heard it.  Yes, I'm aware.**
18     Q.  Do you know how a voter can obtain a
19 disability exemption in Jasper County?
20     **A.  There's a form that they have to present to a**
21 **doctor, and that doctor has to complete that form and**
22 **give it back to the voter registrar.**
23     Q.  And that's based on your understanding that
24 the only way a voter can obtain a disability exemption
25 pursuant to S.B. 14 or Senate Bill 14?

55

1      **A.  That's all I know, yes.  That's the only way I**
2  **know.**
3      Q.  And did I understand your prior testimony that
4  you had not advertised the disability exemption in
5  Jasper County?
6      **A.  No.**
7      Q.  Are you familiar with the natural disaster
8  exemption under S.B. 14?
9      **A.  No, I'm really not.**
10     Q.  Do you know how a voter would go about
11 obtaining a natural disaster exemption pursuant to
12 S.B. 14?
13     **A.  I would suppose it would be just like a ballot**
14 **by mail, if you're talking about them having to**
15 **evacuate.  Is that what you're talking about?**
16     Q.  Well, I'm just trying to understand your
17 knowledge of exemptions.  And I'm trying to understand
18 what your understanding is of the natural disaster
19 exemption.
20     **A.  I'm really not familiar with it.  I would just**
21 **assume that -- he would take my natural -- I mean, my --**
22 **what would come to me naturally, and do what I thought**
23 **best.**
24     Q.  When you say what would come to you naturally
25 and do what you can, can you explain that a little bit

56

1  more?
2      **A.  If they were out of the county, I would say**
3  **that would be a mail-out ballot to them.**
4      Q.  Are you familiar with the religious objection
5  under S.B. 14, or Senate Bill 14?
6      **A.  That question has been asked, and I said no.**
7      Q.  Do you know how an individual would go about
8  obtaining a religious exemption --
9      **A.  No, I don't.**
10     Q.  -- under S.B. 14?
11     **A.  No, I don't.**
12     Q.  Have you provided any training to your poll
13 workers or election judges regarding exemptions under
14 S.B. 14, or Senate Bill 14?
15     **A.  I've already answered that.  Yes, I have.**
16     Q.  And what was that training based upon?
17     **A.  What we received from the Secretary of State.**
18     Q.  Are you aware of whether any voter in Jasper
19 County has applied for a disability exemption?
20     **A.  No, there has not.  Other than -- not under**
21 **S.B. -- not under that, no, no.  We have had them apply**
22 **through a doctor, but not under this.**
23     Q.  If I understood your testimony correctly, you
24 understand that the disability exemption under S.B. 14
25 to require a doctor's -- something from a doctor?

57

1      **A.  Yes.**
2      Q.  Do you have any opinion as to whether or not
3  it's difficult to obtain a natural disaster exemption?
4      **A.  I would say no.**
5      Q.  And what's that understanding based upon?
6      **A.  We try to provide everybody with the right to**
7  **vote.**
8      Q.  Has anybody claimed a natural disaster
9  exemption in your county?
10     **A.  Has there been one?**
11     Q.  Been one, correct.
12     **A.  No.  It just so happens, we haven't had a**
13 **natural disaster during an election.**
14     Q.  Do you know who has the authority to authorize
15 the availability of a natural disaster exemption?
16     **A.  Our county judge, and our commissioners.  Our**
17 **county judge has the authority, the full authority.**
18     Q.  Okay.  And in discussing the election
19 identification certificates, it's my understanding
20 you're not familiar with that term; is that correct?
21     **A.  I'm familiar with it.**
22     Q.  Do you have any understanding as to the
23 process an applicant would have to go through to obtain
24 an election identification certificate?
25     **A.  Well, I really don't know, to tell you the**

58

1   truth.  I'm not going to profess I do, other than
2   applying for one -- I don't know if we have a form for
3   it or not.  We don't have a form.
4       Q.   Do you have any understanding as to where an
5   applicant would apply for an election identification
6   certificate?
7       A.   Well, I suppose with us, or with the Secretary
8   of State, DPS.
9       Q.   Are you aware of any voters or applicants
10  requesting an election identification certificate from
11  your office?
12      A.   No.
13      Q.   Have you trained your employees on how to
14  issue election identification certificates?
15      A.   We don't issue them because we do not have the
16  software to do that, or the means to do that.
17      Q.   Okay.
18      A.   Or the funds.
19      Q.   And when you say "or the funds," can you
20  explain a little bit more, please?
21      A.   Correct.  We are on a limited budget.
22      Q.   And that does not include the ability to issue
23  election identification certificates?
24      A.   No, I don't suppose we would have to -- I
25  mean, it costs money to do that.  You'd have to have

59

1   cameras, you would have to have someone trained to do
2   that.  It would have to have another person to do that.
3       Q.   And one more line of questioning regarding the
4   election identification certificates.  Do you have any
5   understanding of what the underlying document an
6   applicant would need to present to apply for an election
7   identification certificate?
8       A.   They would have to have a birth certificate.
9   They would have to have -- whatever we have to have now
10  --
11      Q.   I'm sorry.  Were you done?
12      A.   We don't have the requirements to do this.
13  Hold on.
14      Q.   Again, I'm just asking you:  Do you have any
15  understanding as to what documents an applicant would
16  have to present to obtain an election identification
17  certificate?
18      A.   I don't believe we have been given that
19  information.
20      Q.   You provided some testimony regarding birth
21  certificates, and I understand that your office issues
22  birth certificates; is that accurate?
23      A.   Correct.
24      Q.   And the cost for a birth certificate is $23.
25      A.   Yes.

60

1       Q.   Correct?
2       A.   Yes.
3       Q.   You talked about delayed birth, and I may have
4   misunderstood that.  Could you explain to me what
5   delayed birth -- a delayed birth certificate is?
6       A.   That would be somebody who applied for a birth
7   certificate after they were grown.  I'm just going to do
8   a simple synopsis of it.
9            They would apply for a birth certificate
10  after they were grown.  They would have to get
11  verification and witnesses saying who their mother and
12  their father were, afterwards.
13           That is a delayed birth, and it would go
14  in our records later on in their life.  Sometimes they
15  didn't get one until they were 65 years old when they
16  started to get Social Security.
17      Q.   And under what circumstances would somebody
18  seek a delayed birth certificate?
19           MR. KEISTER:  Objection; form.  Calls for
20  speculation.
21      Q.   (By Mr. Gear)  If you know.
22      A.   What would cause them to get one?
23      Q.   Under what circumstances would someone need to
24  seek a delayed birth certificate?
25      A.   They might want it for genealogy.  They might

61

1   want it for Social Security.  They might want it for
2   their children, various reasons.
3       Q.   Have you ever heard the term "midwife"?
4       A.   Yes.
5       Q.   Do you want me to repeat the question?
6       A.   I said yes, I have.  I know what a midwife is.
7       Q.   And do you have practicing midwives in Jasper
8   County?
9       A.   No, we don't.
10      Q.   Is there some law or regulation that prevents
11  the practice of midwives in Jasper County?
12      A.   No, there's not.
13      Q.   Are you aware of Jasper County residents that
14  have been born by midwives?
15      A.   No, I'm not.
16      Q.   Hypothetically, if a Jasper County resident
17  was born by a midwife, or born at home, how would they
18  go about obtaining a birth certificate?
19           MR. KEISTER:  Objection; form.  Calls for
20  speculation.  The witness testified she doesn't know.
21      Q.   (By Mr. Gear)  Let me clarify that.  If a
22  person was born at home and not in a hospital in Jasper
23  County, what process would they have to go through to
24  obtain a birth certificate in your office?
25      A.   They actually come in and fill out a form with

**62**

1  our office and submit it to Austin.
2     Q.   And is -- is that a $23 fee to accomplish
3  that?
4     A.   I believe it's a $25 fee.
5     Q.   A $5 fee?
6     A.   Twenty-five.  It does not go to us, it goes to
7  the state.
8     Q.   Do you know how long that process generally
9  takes?
10    A.   It could be 30 days, it could be six months.
11 I don't know.  It's a variation of it.
12    Q.   And have you actually had a situation where a
13 Jasper County resident needed a birth certificate
14 because they were born at home?
15    A.   Yes.
16    Q.   And it could take anywhere from 30 days to six
17 months because of the variation?
18    A.   Yes.
19    Q.   What type -- could you explain that variation
20 to me?  I'm not sure I understood that.
21    A.   Well, that goes to the state.  It doesn't have
22 anything to do with us.  So from the point of going to
23 the state, it's left up to the state to issue that, not
24 us.  We do get a copy of it to file in our records for
25 permanent keeping.

**63**

1     Q.   If I understood that last part of your
2  testimony, you would file a record of that birth
3  certificate in -- at your office for permanent keeping.
4  Did I understand that correctly?
5     A.   The state would furnish us that, yes.  And
6  from that point, we could issue a birth certificate to
7  that person, from then on, if he should need it, or her
8  should need it for any other instances.
9     Q.   Okay.  Focusing on the transportation system,
10 the public transportation system in Jasper County.  I
11 understood your testimony to be that there are no public
12 buses available in Jasper County.
13    A.   Correct.
14    Q.   And I understood your testimony to be that
15 there is a taxi service in Jasper County.
16    A.   One taxi service, that I'm aware of.
17    Q.   And do you know if that's based -- where that
18 taxi service is based in Jasper County?
19    A.   Jasper, Texas.
20    Q.   Is it the City of Jasper?  It's in Jasper
21 County?
22    A.   City of Jasper.
23    Q.   I'm not sure I understand your testimony.
24    A.   City of Jasper.
25    Q.   Do you have any understanding as to where that

**64**

1  taxi actually picks up and drops off in terms of Jasper
2  County as a whole?
3     A.   No, sir.
4     Q.   Would you agree that a person living in rural
5  Jasper County who lacked transportation but needed to
6  get to the DPS office, that that could be a substantial
7  cost, as far as taxi service is concerned?
8       MR. KEISTER:  Objection; form.
9     A.   I'm not aware of the cost.
10    Q.   (By Mr. Gear)  But you agree there would be a
11 cost associated for an individual who has to get a taxi
12 service and needs to get to DPS?
13      MR. KEISTER:  Objection; form.  Vague.
14 Calls for speculation.
15    Q.   (By Mr. Gear)  You can answer.
16    A.   I'm sure it would cost.
17    Q.   Your answer is "yes"?
18    A.   Yes.
19    Q.   Would you agree that there is a cost to obtain
20 a Texas driver's license?
21    A.   From my own personal experience, yes.
22    Q.   And do you know what the cost to obtain a
23 Texas driver's license is?
24    A.   I'm not sure.
25    Q.   From your own personal experience, how much?

**65**

1     A.   I would say $16.
2     Q.   $16?
3     A.   I believe so.
4     Q.   Would you also agree that there is a cost to
5  obtain a Texas state ID?
6     A.   I'm not aware that there is a cost for a Texas
7  state ID.
8     Q.   Could you clarify for me where the DPS office
9  is located in Jasper County?
10    A.   It is located approximately five miles -- one
11 mile out of the city limits.  Maybe not a mile, maybe a
12 hundred yards, out of the city limits.
13    Q.   Are you aware of the poverty rate in Jasper
14 County?  Do you have any knowledge of that?
15    A.   No, I don't.  I'm not an expert in that.
16    Q.   Describing the county demographically, is
17 there any location in Jasper County that's likely to
18 have individuals who live below the poverty line?
19    A.   I'm sure there are, but I'm not sure where
20 they're at.  That's not my expertise of location of
21 poverty.
22    Q.   So, for instance, do you have any low-income
23 housing in Jasper County, that you're aware of?
24    A.   We do.
25    Q.   And can you tell me where those low-income

**66**

1  housing facilities are located?
2  A.  One on -- two on 190 east and west.
3  Q.  East and west?
4  A.  Yes.
5  Q.  And is that located in any particular city?
6  A.  Jasper.
7  Q.  Jasper?
8  A.  And there's also one called Sweetbriar on MLK.
9  Let me correct myself.  There are four within the city.
10  Q.  Have you or the county made any attempts to
11  reach out to these low-income housing complexes
12  regarding S.B. 14?
13  A.  No.
14  Q.  And can you tell me -- because I don't know,
15  these low-income housing complexes, can you tell me the
16  racial make-up of these complexes?
17  A.  I don't know.
18  Q.  Can you tell me the percentage of
19  African-Americans, or minorities in general, in Jasper
20  County?
21  A.  I'm thinking, just a moment.
22  MR. KEISTER:  Bruce, when you get to a
23  convenient stopping place, I need to take a break.
24  We've been going for a while.
25  MR. GEAR:  Let her answer this question.

**67**

1  MR. KEISTER:  I understand.  I'm giving
2  you the heads up.  I'm crossing my legs.
3  A.  I really don't know.  I would say racially, 30
4  to 35 percent black.  It's depending on which end of the
5  county you're talking about.
6  The south end of the county is primarily
7  white.  The north end of the county is a big portion of
8  black.  But I'm not familiar with how many.
9  Q.  (By Mr. Gear)  When you talked about 190 east,
10  what end of town would those be on?
11  A.  There is one -- there is actually four.
12  Q.  Okay.
13  A.  And one is east of the Jasper City limits.
14  One is within the city limits of Jasper, west.
15  Q.  That's two.
16  A.  Okay.  Sweetbriar is on MLK.  And Hope
17  Village, the projects, is within the city limits.
18  Q.  That's Hope Village?
19  A.  Hope Village.  And Merits Village, which is
20  both black and white, and that's east.
21  Q.  I know people want to take a break.  Hope
22  Village, are you familiar with the general racial makeup
23  of Hope Village?
24  A.  Mostly black, but I'm not going to say for
25  sure, no.

**68**

1  Q.  Would you describe --
2  A.  I have not been in there.  I have not been in
3  and gone door to door --
4  Q.  Okay.
5  A.  -- to know who lives there.
6  Q.  But you described certain areas of the city as
7  being predominantly white or predominantly black.  Would
8  Hope Village fall into the area that you described as
9  predominantly African-American or black?
10  A.  Yes.
11  Q.  Did you say one of the housing complexes is
12  Switchburn (sic)?
13  A.  Sweetbriar.
14  Q.  Okay.  And would that be in an area that you
15  would describe as predominantly white or predominantly
16  black?
17  A.  Black.
18  Q.  Then you identified one of the complexes as
19  being on the east end.  Do you remember the name of that
20  complex?
21  A.  Merits Village.
22  Q.  And would you describe that as being an area
23  that's predominantly white or predominantly black?
24  A.  It's both, mixed.
25  Q.  What about the housing complex you described

**69**

1  on the west end, do you know the name of that housing
2  complex?
3  A.  Manor Apartments.
4  Q.  Would you describe that in an area that's
5  predominantly white or predominantly black?
6  A.  Manor Apartments is mixed.
7  Q.  When you say mixed, you're talking minority
8  and white population --
9  A.  Yes.
10  Q.  -- non-Hispanic population?  And just to
11  finish up this line of questioning, could you tell me
12  generally what the percentage of Hispanic population is
13  in Jasper County?
14  A.  Very few.
15  Q.  Very few.  And I guess --
16  A.  Are you talking legal or illegal?
17  Q.  Do you know what percentage the population is?
18  A.  Are you talking legal or illegal?
19  Q.  Well, you tell me.
20  A.  I don't know.
21  Q.  When you say very few --
22  A.  There is a community called Taco Flats, which
23  is primarily Spanish.
24  MR. GEAR:  Okay.  Maybe this is a good
25  place to take a break.



**70**

(Recess from 4:30 p.m. to 4:35 p.m.)

2  Q.  (By Mr. Gear)  I'm Bruce Gear.  I'm asking
3  questions on behalf of the United States.  I'm not sure
4  I noted my appearance for the record.  Going back to
5  talking about the housing called Taco Flats.
6  A.  Yes.
7  Q.  Is that the official name of the apartment
8  complex?
9  A.  No, it's not a -- it is not a -- it is only a
10  community with a local name.
11  Q.  And the local name is?
12  A.  Taco Flats.
13  Q.  And that community is predominantly Hispanic,
14  I believe you testified to.
15  A.  Yes.
16  Q.  Do I need to repeat that question?
17  A.  Yes, it's predominantly, yes.
18  Q.  Predominantly Hispanic?
19  A.  Yes.
20  Q.  And the answer is "yes"?
21  A.  Yes.
22  Q.  And has the county made any attempts to reach
23  out to the community known as Taco Flats that is
24  predominantly Hispanic, related to S.B. 14?
25  A.  No.

**71**

1  Q.  You testified previously regarding ads that
2  had been published by the county.  Do you recall that
3  testimony --
4  A.  Yes.
5  Q.  -- related to S.B. 14?
6  A.  Yes.
7  Q.  Okay.
8  A.  We provided -- we didn't specifically say
9  S.B. 14.  We said, you know, voter identification.
10  Q.  Do you know if those ads were in any other
11  language, other than English?
12  A.  I really don't.  I'm sure they were, but I
13  really don't.  We always put everything in Spanish and
14  in English.
15  Q.  As you sit here today, you're not aware?
16  A.  I'm not.
17  Q.  You're not aware of whether the ads --
18  A.  I cannot recall.
19  Q.  Are you familiar with the term "popularized
20  voting"?
21  A.  No.
22  Q.  Do you believe -- strike that.  Prior to the
23  implementation of Senate Bill 14, did you have an
24  opinion as to whether or not voter impersonation fraud
25  was a problem in Jasper County?

**72**

1  A.  No.  We -- I do not believe that we have voter
2  fraud.
3  Q.  And just so I'm clear, the question was:  Do
4  you have an opinion as to whether or not voter
5  impersonation fraud at the polls --
6  A.  No, I don't believe we do.  We've had it on
7  two occasions, but that's been very selective.  I mean,
8  no, I don't believe we have voter fraud.
9  Q.  And those are the two occasions that you
10  already testified to?
11  A.  Correct.
12  Q.  Do you have any evidence to support that the
13  prior law, the prior election law to S.B. 14 was
14  inadequate in any way?
15  A.  No.
16  Q.  Do you have an opinion as to whether the law
17  that was in place prior to S.B. 14 -- and I'm speaking
18  specifically of the election law -- was inadequate?
19  MR. KEISTER:  Objection; form.
20  A.  I don't believe it was inadequate, no.
21  Q.  (By Mr. Gear)  Based on your experience as an
22  election official and a county official, do you have an
23  opinion as to whether or not the voter registration card
24  was sufficient to prove a person's identity at the
25  polling place?

**73**

1  MR. KEISTER:  Objection; form.
2  A.  I think it was.
3  Q.  (By Mr. Gear)  I'm sorry.  The answer was you
4  think it was?
5  A.  I do.
6  Q.  And just for clarification purposes, at one
7  point during your testimony you were talking about two
8  women in a particular office, and I didn't catch which
9  office you were referring to.  Do you recall that
10  testimony?
11  A.  No, I don't.
12  Q.  Have you heard -- are you aware of any
13  complaints from any residents regarding the wait times
14  at DPS offices?
15  MR. KEISTER:  Objection; form.
16  A.  Yes, I've heard some.
17  Q.  (By Mr. Gear)  And can you tell me the
18  substance of those complaints, what the concerns are?
19  A.  Just a long time getting the card.
20  Q.  And I'm sorry, I didn't hear you.
21  A.  Just a long time getting the card was the
22  complaint I had.
23  Q.  And did the complaint that you had -- did they
24  describe the length of time it took to obtain the card?
25  MR. KEISTER:  Objection; form.

94

1    is aware of the need, or the requirement to show photo
2    ID when you vote?
3        A. They know to show ID.
4        Q. Okay.
5        A. It's just something that has been years and
6    years and years and years of doing it, and they know to
7    show ID. And so you don't have a big problem with that.
8        Q. Okay. Do you see a need for Jasper County to
9    spend money to undertake additional voter education,
10   advertising, or programs to educate the public about the
11   requirement?
12       A. Who are we talking about paying?
13       Q. The county.
14       A. The county does not have the money to do it.
15       Q. Okay.
16       A. In my opinion. We have not had a big problem
17   with it.
18       Q. Okay.
19       A. Do you want my personal opinion?
20       Q. Go ahead.
21       A. I think everybody has a right to vote. As
22   long as they're a legal citizen, I think they have the
23   right to vote. We have a hard enough time getting
24   someone to vote now.
25           You can see what our numbers are out of

95

1    35,000 people. It costs just as much to put on one
2    election for a thousand people than it does for 35,000
3    people.
4           We have to estimate that. We have to
5    guesstimate how many are going to vote. And if they
6    don't, we have to get more ballots.
7        Q. Okay. Putting money aside for a moment, do
8    you see -- forgetting the cost, do you see or think
9    there is a need to educate -- to more educate the voters
10   in Jasper County that they need to bring one of these
11   particular forms of ID that they come to vote?
12       A. There is always room for education.
13       Q. All right.
14       A. But as far as a problem with it in our county,
15   we have not had it.
16       Q. Okay. With respect to in-person fraud, you
17   stated two instances that you're aware of. Certainly
18   there could be other instances that you're not aware of,
19   these are just two you're aware of; correct?
20       A. I'm pretty sure there are not.
21       Q. Could there have been some before you became
22   county clerk?
23       A. I don't think so. She was more strict than I
24   was. She was meaner than I was.
25       Q. Okay. But obviously, unless you catch

96

1    somebody committing a crime, you don't necessarily know;
2    right?
3        A. No.
4        Q. I guess I don't need to give you an example.
5        A. We pride ourselves in our voters. We pride
6    ourselves in it.
7            MR. KEISTER: Okay. Ms. Newman, I
8    appreciate your patience. I pass the witness.
9            MS. SIMSON: Bruce, do you have any more
10   questions?
11           MR. GEAR: I do not have any follow-up
12   questions.
13           FURTHER EXAMINATION
14   BY MS. SIMSON:
15       Q. I just have a few more. It will be very
16   brief. The first question is: If voters -- if you feel
17   that most voters or all voters -- let me rephrase that.
18           Do you think that all of the registered
19   voters in the county are aware that they now need to
20   bring a photo ID to vote?
21       A. I am pretty sure that most of them do. Just
22   it might not have been advertised as well as it should
23   have been.
24           And I'm at fault there, and I'll take the
25   blame for it. But word of mouth and the news media on

97

1    television nowadays, they knew.
2        Q. And do you think that if a person knew that a
3    photo ID is now required and they did not have an ID,
4    would they go to vote on election day?
5        A. If they didn't have one? I really don't know
6    if they would try to do that or not.
7        Q. And you said before that your election workers
8    are told that even if they know the person, they have
9    got to require photo ID?
10       A. That's right.
11       Q. So if a person doesn't have a photo ID, they
12   may think it's not really worth their time to try to go
13   vote because they know they will be turned away?
14       A. I don't know.
15       Q. Okay. The last thing, I'm just going to enter
16   this as Exhibit 3.
17           (Newman Deposition Exhibit No. 3 was
18   marked and is made a part of this deposition.)
19       Q. (By Ms. Simson) We'll only go over about two
20   of these. If you look at Exhibit 3 on the first page,
21   it says, "example one, information on poll book," and
22   then beneath that it says, "information on the driver's
23   license".
24       A. Yes.
25       Q. And do you see that the name is different

98

1   between the information on the poll book and the
2   information on the driver's license?
3       A.  Uh-huh.
4       Q.  And you see that the date of birth matches?
5       A.  Uh-huh.
6       Q.  And do you see that there are different
7   addresses listed?
8       A.  I do.
9       Q.  If a person came into the poll place and
10  presented this driver's license to vote, do you think
11  that they would be allowed to vote a regular ballot or a
12  provisional ballot?
13              MR. KEISTER:  Objection; form.
14      A.  I would think they would vote provisionally.
15      Q.  (By Ms. Simson)  And why do you say that?
16      A.  Well, the names are not the same, the
17  addresses are not the same.
18      Q.  Okay.
19      A.  You don't know if they are living within the
20  same precinct now.
21      Q.  And is that -- if you're not sure if they are
22  voting in the same precinct, is that something that the
23  election clerk asks them about?
24      A.  Yes.
25      Q.  Okay.  And if the person said, "Yeah, my

99

1   address changed" --
2       A.  They do a residency card.
3       Q.  Okay.  And do you think in that circumstance
4   they would still have them vote a provisional ballot
5   even if they said their address changed?
6       A.  In this instance?
7       Q.  Yeah.
8       A.  In this instance, I think they would have them
9   vote provisionally.  It will give more names.
10      Q.  What was that?
11      A.  It's a possibility it will probably show
12  "Johnson" on there, too.
13      Q.  Okay.  So it's possible that if the voter --
14  what would have more information?
15      A.  I really don't know.  Hold on a minute.
16          I've been advised that this Johnson name
17  would probably show up with the Villarreal name.
18  However, it's really left up to the judge.
19      Q.  Okay.  So the election judge would look at
20  that and make a determination?
21      A.  Right.
22      Q.  And do you think that if 100 election workers
23  looked at that, that some of them might come up with a
24  different answer about whether the person votes
25  provisionally or not?

100

1       A.  I'm sure they would.
2       Q.  Okay.  If we could turn to Page 4, Example 4,
3   it says "Example 4" at the top.  And do you see that it
4   says, "information on the poll book," and it has a name
5   that is different from -- there's a first name that's
6   different from the name on the driver's license?
7       A.  Uh-huh.
8       Q.  And then do you see that the date of births
9   are different?
10      A.  Uh-huh.
11      Q.  And then you see that the addresses are the
12  same?
13      A.  Yes.
14      Q.  In this circumstance, do you think that an
15  election worker would allow the person to vote a regular
16  ballot or a provisional ballot?
17              MR. KEISTER:  Objection; form.
18      A.  I don't think they would let them vote because
19  the date of births are different.  That could be a
20  father and son.  And we have a lot of that in -- you
21  know, just like my son is William Mitchell Newman, the
22  third.
23      Q.  (By Ms. Simson)  Okay.
24      A.  But they know that this is a son and a father.
25      Q.  And then the last --

101

1       A.  Or grandfather.
2       Q.  Sorry.  The last example on Page 7, Example 7,
3   do you see that it says, "information on the poll book,
4   name Beto Ramirez, information on driver's license,
5   Roberto Ramirez"?
6       A.  Uh-huh.
7       Q.  And then do you see that the date of birth is
8   the same?
9       A.  Yes.
10      Q.  And then you see that the addresses are
11  different?
12      A.  Yes.
13      Q.  In this circumstance, do you think the person
14  would vote a regular ballot or provisional ballot?
15              MR. KEISTER:  Object to form.
16      A.  If they had their driver's license, we would
17  check their driver's license number, which would be on
18  the voter registration card, or on the poll book.
19      Q.  (By Ms. Simson)  So if a person presents a
20  driver's license, you could look up their driver's
21  license number on the poll book?
22      A.  Yes, correct.  No.  That's when they call us,
23  I'm sorry.
24      Q.  Okay.  And what do they do when they call the
25  county?