IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, et al.,          )
                             )
    Plaintiffs,              )
                             )
VS.                          )   CIVIL ACTION
                             )   NO. 2:13-CV-00193
RICK PERRY, et al.,          )
                             )
    Defendants.              )

*************************************************************

ORAL DEPOSITION OF

MIGUEL ORTIZ

AUGUST 14, 2014

*************************************************************

    ORAL DEPOSITION OF MIGUEL ORTIZ, produced as a
witness at the instance of the Defendants and duly
sworn, was taken in the above-styled and numbered cause
on August 14, 2014, from 3:31 p.m. to 6:08 p.m., before
Jodi Cardenas, RPR, CSR in and for the State of Texas,
reported by computerized stenotype machine at the Office
of the Attorney General of Texas, 209 West 14th Street,
7th Floor, Austin, Texas, pursuant to the Federal Rules
of Civil Procedure.

5

1                    (Mr. Rich not present)

2                       MIGUEL ORTIZ,

3   having been first duly sworn, testified as follows:

4                       EXAMINATION

5   BY MR. TATUM:

6       Q.   Good afternoon.  My name is Stephen Tatum.  I'm

7   an assistant attorney general representing the

8   defendants in this matter.  It's August 14th.  The time

9   is 3:57, or thereabouts.  We're here at the attorney

10  general's office in Austin, Texas, on the 7th Floor.

11              Would you please state your -- state and

12  spell your full name for the record, please?

13      A.    Miguel A. Ortiz.  M-I-G-U-E-L, A, O-R-T-I-Z.

14      Q.   And, Mr. Ortiz, where do you reside?

15      A.    San Antonio, Texas.

16      Q.   And are you represented by counsel today?

17      A.    He's right next to me.

18      Q.   And --

19      A.    Neil.

20      Q.   Neil Baron?

21      A.    Neil Baron.

22      Q.   Okay.  Mr. Ortiz, have you ever been deposed

23  before?

24      A.    No.  I've been on many depos on the other side

25  but not -- I don't -- I don't think I've ever been in a

1   are issues.  There are attorney-client privilege, for

2   example.  So we go into an executive meeting, where only

3   the executive members are present, just to keep that

4   confidentiality present.

5              So it all depends on what is discussed.

6   But any member can come to all these meetings and

7   express whatever concern they may have, regardless

8   whether they are members of the board or not.

9      Q.   (BY MR. TATUM)  So I guess what I -- what I'm

10  trying to get at is, how did LULAC's involvement in this

11  lawsuit originate.  Was it something that was brought to

12  the board by an individual member, or was this an issue

13  that the board members realized themselves?

14     A.   I cannot tell you.  I wasn't -- I wasn't

15  present when that -- when it first came about.  So I

16  cannot tell you at what point it was brought up

17  specifically and at what point it was voted.  I cannot

18  tell you.

19     Q.   Okay.  Do you know if LULAC consulted with any

20  of the other named plaintiffs on the complaint that you

21  have in front of you before deciding to initiate this

22  lawsuit?

23     A.   I don't have personal knowledge of that.

24     Q.   Okay.  Is LULAC representing the rights of its

25  members in this lawsuit?

24

1    A.    If you say that.   LULAC represents all

2  Hispanics or minorities.   The premises of the foundation

3  of the organization was to protect the rights of Latin

4  Americans and minorities in general.   You don't have to

5  be Hispanic to be a minority, so whomever gets affected.

6  And LULAC believes that a particular issue, a particular

7  law, a particular point is against -- or affects the

8  rights of the minorities and the community in general,

9  then they get involved.   So that's the policy.   That's

10  the general policy.

11    Q.    Okay.   That presents a good opportunity to

12  introduce my next exhibit.

13          (Exhibit No. 4 marked)

14    Q.    (BY MR. TATUM)   I'm handing you what's been

15  marked as Exhibit 4.   Mr. Ortiz, I represent to you that

16  this is a screen shot captured printout of the LULAC Web

17  site.   Is that what this looks like to you?

18          MR. BARON:   National or state?

19          THE WITNESS:   This is national, I think.

20    Q.    (BY MR. TATUM)   I believe this is national.

21    A.    It looks familiar, that it's -- it looks like

22  the national -- if I -- if I trust what it says on the

23  address up there --

24    Q.    Uh-huh.

25    A.    -- it says "lulac.org," and I have no reason to

1   doubt that this is a -- but I cannot tell you for sure.

2   It looks like that.

3                MR. TATUM:  Can we go off the record just

4   for one second?

5                (Off the record)

6       Q.    (BY MR. TATUM)  Okay.  If you would, please, on

7   Exhibit 4 here, on that first page, there's a title that

8   says "Frequently Asked Questions," and under that

9   there's a Paragraph 2 that says, "What is LULAC's

10  Mission?"  Do you see that?

11      A.    Yes.

12      Q.    Can you read for me what it says under that?

13      A.    "The mission of the League of United Latin

14  American Citizens is to advocate the economic condition,

15  education or attainment, political influence, housing,

16  health, and civil rights of the Hispanic population of

17  the United States."

18      Q.    And is that -- if that is the mission of the

19  national LULAC, which I believe that this Web site

20  represents, is that mission shared by the Texas branch

21  of LULAC?

22      A.    It's shared by the whole organization.  There's

23  no deviation from anything.

24      Q.    Okay.

25      A.    It is -- the League of United Latin American

1   Citizens is one organization.  It doesn't divide by --

2   it's not different organizations throughout the nation

3   of -- there's only one organization, one component, and

4   then just the members of --

5       Q.   Okay.

6       A.   -- how it's divided.

7       Q.   But you stated that the Texas, I guess, branch

8   of LULAC, for lack of a better word, has its own

9   executive board.  Is that correct?

10      A.   Every state.

11      Q.   Every state has its own executive board that

12  reports to the national board of LULAC?

13      A.   Right.  You have national, then you have

14  regional vice presidents.  They're a member of the

15  national board.  The national board is composed by the

16  national president, and then you have the vice

17  presidents which are regional, the southwest, the -- the

18  northwest, northeast, southeast.  I think there are six

19  or seven.  Wow.  I forgot the other ones.  But they're

20  divided by regions.

21            So each region will have their own vice

22  president, then that vice president will oversee seven,

23  eight states.  And -- and then the states have their

24  directors with their boards.  There's not a regional

25  board.  There's not a southwest regional board.  There's

Miguel Ortiz - 8/14/2014

27

1   just the vice president.

2           And then you get the state board.   Then

3   the state board oversees the state -- the district

4   directors, and then each direct -- each district

5   director will have councils, and then each council will

6   have their own little directive or, you know, the

7   president or the council just to operate themselves.

8   But everybody -- it's one constitution for everybody.

9   One book, one rule, one view.

10      Q.   Okay.   So in this lawsuit, does LULAC represent

11  the interests of its members in the State of Texas, or

12  does it represent all members of LULAC?

13      A.   I don't think there's a separation of that.

14  There is not a separation of who we -- it's the

15  organization.

16      Q.   Okay.

17      A.   So I don't know.   I mean, I'm pretty sure that

18  Texas is included in this because it affects Texas,

19  so...

20      Q.   Okay.   I'm just -- I'm just trying to get an

21  understanding of the organization of LULAC.

22      A.   Right, but it's only one membership.   I mean,

23  Texas has probably the majority of the members in the

24  organization.   It's the No. 1 state in membership.

25           MR. BARON:   Without messing up the record,

Miguel Ortiz - 8/14/2014

28

1  I think -- so what you're telling us is that -- so if

2  I'm a Texas member of LULAC, I am a national member of

3  LULAC?

4          THE WITNESS:  Right.

5          MR. BARON:  And if I am a California

6  member of LULAC, I'm a national member of LULAC?

7          THE WITNESS:  Right.

8      Q.   (BY MR. TATUM)  So there's different charters?

9      A.   The charters -- you cannot -- you cannot

10  just -- in order to be a member of LULAC, you've got to

11  pay your national dues and your state dues, of course.

12  But the membership is issued by national.

13     Q.   Okay.

14     A.   That's it.  Every member, no matter where

15  you're from, all states plus Puerto Rico, all members

16  are registered at the national level.

17     Q.   Can you tell me, if you know, what the Texas

18  state membership dues are?

19     A.   Like the membership dues?

20     Q.   How much those are.

21     A.   I cannot tell you with certainty.  I think I

22  know, but I cannot bet on it, because it changes.  But

23  you pay -- if you have a new council, a new council is

24  usually composed of 11 members or more.  That's usually

25  where -- you know, you have -- may have a council that

31

1      A.   I think.  I think it's $30.  Don't hold me on

2  the amount, but I think it's $30.

3      Q.   Okay.  So when you say half of that $30 --

4  we'll just say $30 for now.  When you say half of that

5  $30 goes to state, is that the Texas executive board of

6  LULAC?

7      A.   Right.  It goes to their state fund.

8      Q.   Okay.  And who has control over that fund?

9      A.   Of the state fund?  The state.

10      Q.   That would be the Texas executive --

11      A.   Each -- each state.  All states are the same.

12  They're all designed the same way, same structure,

13  same -- partial independence, I guess.  They control

14  their own funding, they do their own fund-raising,

15  councils still do the same.  A local council can open a

16  bank account and do their own fund-raising to contribute

17  to educational funds or things like that.

18      Q.   Okay.  Is LULAC -- is LULAC a partisan

19  organization?

20      A.   A what?

21              MR. BARON:  Object to form.

22              THE WITNESS:  LULAC is -- what is it

23  again?

24              MR. BARON:  He asked if they were a

25  partisan organization, and my objection is form,

1  vagueness.

2      Q.   (BY MR. TATUM)  Do you -- do you understand

3  what I mean when I say "a partisan organization"?

4      A.   For a particular party or something like that?

5      Q.   A particular political party, yes.

6      A.   None.  Actually, it's not.  It's civil rights.

7  We do not get involved in direct politics.

8           MR. BARON:  I'll withdraw my objection.

9      Q.   (BY MR. TATUM)  Does LULAC -- we talked about

10  members of LULAC.  Does LULAC have people that it would

11  consider its constituents?

12          MR. BARON:  I'm going to object to form.

13          THE WITNESS:  I really don't understand

14  what --

15      Q.   (BY MR. TATUM)  Let me ask it another way.

16          Does LULAC serve anyone other than its

17  members?

18      A.   The community as a whole.

19      Q.   Including people who might not be members of

20  LULAC?

21      A.   You're Hispanic, and LULAC is advocating for

22  Hispanic, and the result is positive, all Hispanics

23  benefit.  It's not for the particular benefit of its

24  members.  It's for a particular benefit of a class.  I

25  guess you could say it that way.

34

1     A.   Yes.

2     Q.  -- on that first page, Paragraph 3 there says,

3  "How does LULAC work toward achieving its mission."  Do

4  you see that paragraph?

5     A.   Yes, sir.

6     Q.   Okay.  And underneath that paragraph, the first

7  bullet point there says "Programming."  Do you see that?

8     A.   Yes, sir.

9     Q.   And in that paragraph, it talks about some of

10  its programming areas, which include civic

11  participation, civil rights, economic development,

12  education, health, leadership, et cetera.  Do you see

13  those?

14     A.   Yes.

15     Q.   Are those all activities that LULAC regularly

16  engages in?

17     A.   Yes.

18     Q.   The next one -- the next bullet point there

19  says "advocacy."  Can you tell me a little bit more

20  about the advocacy activities of LULAC?

21     A.   I can give you examples of -- example this

22  year, in October, LULAC every year tried to meet as many

23  congressmens (sic) and members of the legislature

24  nationwide.  They -- legislature nationwide, to express

25  LULAC's concern about issues regarding all the subjects

1   you mentioned in the paragraph above kind of deal.

2              So this year, for example, there is a

3   youth recognition ball in Washington, D.C., from the 2nd

4   to the 5th, I think.  And during that time, there are

5   meeting schedules to meet with legislators, just for us

6   to express the opinions -- I mean, to express the issues

7   that we have affecting each individual community because

8   people -- there's a lot of people that come from every

9   state.  And, of course, every state gets affected

10  differently.  So that would be some advocacy program

11  that we have kind of deal.

12      Q.   Okay.  And you mentioned those activities on

13  the national level.  Does LULAC engage in similar

14  activities at the state level?

15      A.   Yes.

16      Q.   And can you describe some of those

17  advocacy-related activities that LULAC has conducted

18  specifically in Texas?

19      A.   We have a legislature chair, like a committee.

20  Fidel Acevedo is the name of the chair.  And he comes

21  here to Capitol Hill and, I guess, try to enlighten the

22  legislatures about the positions that LULAC may have,

23  depending on what issues are pending or not pending in

24  the legislature.

25      Q.   Uh-huh.

1     A.     They -- they advise the state board, for

2  example, as to what's coming to -- to Austin, what is

3  pending, what is going to go to vote, whether we need

4  people to support, to go talk to -- to show support, to

5  make a present -- things like that.   Testify in

6  legislature hearings, if it's necessary.   That kind of

7  participation.

8     Q.   Did LULAC engage in any of those

9  advocacy-related activities with regard to Senate Bill

10 14 that was enacted during the 2011 legislature?

11    A.    I believe so.   I believe two members of our

12 organization actually testified, if my memory serves me

13 correctly, during the hearings.

14              MR. BARON:   Tell him what you recall.

15              THE WITNESS:   Don't hold me to it, but

16 I -- I think we have a few members that actually

17 testified in front of the legislature concerning SB14.

18    Q.   (BY MR. TATUM)  And at that time in 2011, you

19 were just a member of LULAC.  You were not the legal

20 adviser.   Correct?

21    A.    Two years back.   No.

22    Q.   Okay.

23    A.    That's correct.  I was not the legal adviser.

24    Q.   As a member of LULAC during that time, do you

25 recall getting any kind of mass communication or e-mail

1  blast from LULAC regarding SB14-related activities?  And

2  when I say "SB14," I'm referring to Senate Bill 14

3  enacted during the 2011 legislature?

4      A.    I'm not sure.   I know we were -- I know it was

5  a lot of talking and a lot of movement within the

6  organization, because the organization believed that the

7  legislature was not fair to the minorities.  So I know

8  it was a lot of talking, a lot of public appearances.  I

9  cannot recall who exactly did it.

10            Press conferences, maybe press releases, I

11  think some of them came out.  I don't -- I don't -- I

12  cannot tell you specifics, but I can tell you that,

13  during that time, the organization word -- you know,

14  SB14 is coming and SB14 -- so it was a pretty, I guess,

15  important subject within the organization during that

16  time.  I recall that, yes.

17      Q.    Did LULAC as an organization oppose SB14?

18      A.    I don't think so.

19      Q.    It did not?

20      A.    Back then?

21      Q.    Correct.  During --

22      A.    Well, I wasn't there, so I cannot tell you what

23  the people who testify said.  If you ask me based on

24  what we have today, then the answer to that is no.

25  Everybody opposed it, at least within the organization,

1   and that's why we involved, so --

2                    MR. BARON:  I think that's what he asked

3   you.  I think he asked did LULAC oppose it.

4                    THE WITNESS:  Oh, yes.  Yes.  Yes.

5                    MR. BARON:  I think you just didn't hear

6   him correctly.

7       Q.   (BY MR. TATUM)  Let me just -- restate?

8                    MR. BARON:  Because I was --

9                    THE WITNESS:  If you put two noes there,

10  then my Spanglish kicks in and --

11      Q.   (BY MR. TATUM)  Understood.  Let me just

12  restate the question, just for clarity purposes.

13                   In 2011, did LULAC as an organization

14  oppose the enactment of SB14?

15      A.   My answer -- my answer to that is yes.

16      Q.   And you testified that to your knowledge some

17  members of LULAC provided oral testimony during the

18  legislative session?

19      A.   Yes.

20      Q.   Voicing their opposition to that bill.  Is that

21  correct?

22      A.   That's my understanding.

23      Q.   Okay.

24      A.   I don't -- I don't know if what you said is

25  correct.  That's my understanding.

39

1     Q.    Do you know if any members of LULAC met

2  personally with members of the Texas legislature during

3  the consideration of SB14?

4     A.    Well, whether personal meetings were conducted

5  by certain individuals, I cannot tell you that.  You

6  know, we have a legislator -- legislature chair who

7  comes out on Capitol Hill so -- but I cannot tell you.

8  I don't have personal knowledge.

9     Q.    Do you know if any Texas legislators are

10  members of LULAC?

11     A.    My understanding is yes.

12     Q.    Do you know who those members are?

13     A.    I cannot tell you -- I cannot tell you because

14  I don't know that -- who is in good standing and who is

15  not.  I can -- if I tell you who is in good -- it's over

16  a hundred thousand members.  So I don't -- I can't tell

17  you who's in good standing or not today.  I did not

18  check before this deposition either.

19     Q.    To the best of your knowledge, were any members

20  of LULAC a city member of the Texas legislature in 2011?

21     A.    I -- I don't have personal knowledge of that.

22     Q.    Again, during the enactment -- or, sorry.

23  During the consideration of SB14 during the 2011

24  legislature, did LULAC write or publish any written

25  articles or opinion pieces regarding its position on

1  SB14?

2      A.    Whether something came out in the newspaper, is

3  that what you mean?

4      Q.    Yes.

5      A.    I want to say -- I want to say yes.  If my

6  memory serves me correctly, I want to say yes.  It's

7  been three and a half years, so I don't know.  Three

8  years, so I'm not sure a hundred percent, but I want to

9  say yes.

10     Q.    So would you say that LULAC publicized its

11 opposition to SB14?

12     A.    LULAC will publicize its opposition to anything

13 that LULAC believe that is against the well-being or

14 benefit or affects any minority.  I can tell you that

15 for sure.

16     Q.    And it -- LULAC did that with regard to SB14.

17 Correct?

18     A.    I -- I cannot tell you with certainty.  I was

19 not involved in 2011.  But I can tell you that -- I want

20 to say yes to that answer, but I'm not certain.

21     Q.    Did LULAC draft, propose, research, or request

22 any amendments to SB14 while it was being considered in

23 2011?

24     A.    I have no personal knowledge of that.

25     Q.    Does LULAC believe that it was not given the

Miguel Ortiz - 8/14/2014

42

1    Q.    Anything that -- did it do anything to slow
2    down or delay consideration of the bill?
3    A.    I don't know.  I don't even think they have the
4    power to do that.
5    Q.    Is there anything else that LULAC did with
6    regard -- let me back up.
7                Are there any other activities that LULAC
8    engaged in with regard to the consideration of SB14 that
9    you haven't mentioned?
10    A.    We had a -- sort of like an educational
11    briefing as to what SB14 is or was.  I just cannot
12    remember the day, but I know I was there.  I attended
13    that, where we got sort of educated on the specific of
14    the bill and the impact of the bill and what that means
15    to minorities and that -- so I just cannot tell you
16    whether it was before or after the bill was passed.  I
17    cannot remember that day.  But I remember attending
18    that.
19    Q.    Okay.  Do you remember who presented that
20    educational presentation?
21    A.    I don't remember who was the presenter.  I want
22    to say that happened in -- I think it was in Corpus
23    Christi, I think it was.  Either Corpus Christi or
24    Laredo.  I'm just not sure.  But I know for sure that I
25    did attend it, to one of those educational briefings

1    when someone came in and explained everything.

2        Q.   Was that educational briefing put on by LULAC?

3        A.   No.   It was put on by someone else who LULAC

4    invited to do the explanation and educate the Texas

5    organization as to what it meant.

6        Q.   LULAC is a nonprofit organization.   Correct?

7        A.   That's correct.

8        Q.   From where does LULAC receive its funding?

9        A.   Well, you've got membership fees.   We've got

10   very strong corporate alliance.   Nationwide.   Donations,

11   sponsorships.   That's where the funding comes in.

12       Q.   Do y'all hold fund-raising activities?

13       A.   Yes, but fund-raising activities will be

14   probably held more -- you see that more typically at the

15   local levels by the local councils, maybe the district,

16   you see those fund-raising activities kind of deal.

17       Q.   Uh-huh.

18       A.   It's to cover expenses of functions and then

19   pay for scholarships, funding for scholarships, things

20   like that.

21       Q.   Do y'all receive both individual and corporate

22   donations?

23       A.   Yes.

24       Q.   And the funds generated from membership fees,

25   donations, sponsorships, and fund-raisings, the things

1    Q.    I want to ask you some -- just a few questions

2    about some more activities that LULAC engages in.   Does

3    LULAC help its members register to vote?

4    A.    LULAC actually helps everyone registered to

5    vote.

6    Q.    Not just members?

7    A.    Not just members.

8    Q.    And is that something that LULAC has always

9    done?

10   A.    Yes.   And basically you see that more at the

11   council levels.   They organize district levels, council

12   levels, they do voting registration drives and voting

13   registration festivals, whatever it is.   They -- the

14   kids in college, we have LULAC councils probably in

15   every university, at least in Texas, and they -- they

16   really active on that.   They're very, very active on

17   voter registration, and so that -- you see that more at

18   the -- it's promoted throughout the organization

19   rankings, but the actual people who does it and you'll

20   see more active is the actual local councils.

21   Q.    And does LULAC consider helping people register

22   to vote, both members and nonmembers, part of its

23   mission?

24   A.    It's a civil right issue, so I want to say

25   it -- it -- it's directly or indirectly.   I'm not sure.

Miguel Ortiz - 8/14/2014

47

1    It's a civil rights issue.  Voting is a civil right

2    issue, and LULAC is involved on anything that encompass

3    any civil right issue.

4        Q.    So would you say that helping people register

5    to vote is part of LULAC's stated mission?

6        A.    Encouraging people to vote and to register,

7    yes.

8        Q.    And helping people -- actually helping someone

9    register to vote?

10       A.    What do you mean, the actual physical

11   application, is that what you mean?

12              MR. BARON:  Objection; form.  A little

13   vague on the word "helping."

14       Q.    (BY MR. TATUM)  You stated a minute ago that

15   one of the activities that LULAC engages in is helping

16   people register to vote.  I believe that's what you

17   testified to.  Is that correct?

18              MR. BARON:  Objection; form.

19              THE WITNESS:  LULAC conducts voting

20   registration drives, voter registration forum, voter

21   registration, I guess, activities to encourage people to

22   register to vote.  And also encourage people to use --

23   to actually go and vote.  That, LULAC does.  That's one

24   of LULAC's views as one of the primary civil rights that

25   we have.  Not just minorities, but everybody.

48

1          And when we do these voter registration

2    drives, whether they physically fill out the paperwork

3    or not, I -- I don't know.  I don't know.  Everybody

4    will have, I guess, their own individual method,

5    depending on who is doing it.  So I cannot tell you what

6    is actually happening at that place because I'm not

7    there, so...

8       Q.   (BY MR. TATUM)  Okay.  So would LULAC consider

9    these voter registration drives part of its mission?

10      A.   If it affects civil rights, yes.

11      Q.   Okay.  Does LULAC educate its members regarding

12   voting requirements?

13      A.   I just gave you the example of that.  Like this

14   luncheon that I went where we got -- LULAC was not the

15   one who was educating.  We invited someone to help us

16   with SB14, for example.  Whether we have a plan to

17   educate every -- every one of its members, I don't think

18   there is a specific educational plan.  LULAC national

19   encourage down -- down the -- the chain of command to

20   ensure that we get as many people registered, and to

21   ensure that we get as many people to go and vote.

22      Q.   Outside of the educational briefing that you

23   just referenced, has LULAC conducted any other

24   activities that educate its members regarding voting

25   requirements?

1    A.    At the -- at the -- at what level?

2    Q.    **At the state or local council level.**

3    A.    At the -- at the local council, I cannot tell

4  you.  There -- there -- a lot.  I mean, there's -- I

5  think there's like a thousand councils or a little more

6  than a thousand councils, I think.  So it's a lot.  I

7  don't know.  State-wise, when I attended to that

8  luncheon, it was a state -- it was a state board

9  meeting, and this guy came and educate the whole board

10  as to what -- and I'm pretty sure, I guess, pass along

11  the state director or the district directors -- I'm

12  pretty sure they go and educate the council members as

13  to what they learn and use that kind of scaling to pass

14  the word around.

15    Q.    Okay.  **Is educating its members regarding voter**

16  **requirements part of the stated mission of LULAC?**

17    A.    I'm sure it's included.  It's not the stated

18  mission.  We don't have a stated mission as to a

19  compromise with anyone to register people to vote.  I

20  don't think that's the mission.  I think the mission is

21  to ensure that -- that civil rights of the minorities

22  are protected.  Whether that is through vote, through

23  pending legislature or supporting legislature, or

24  advocating in the public, whatever that views are, I

25  don't think it's a specific issue on -- it's not a

50

1  specific mission of educating people as to voting.

2          Now, I can tell you that if there is

3  something comes out that affects minorities, then LULAC

4  is going to ensure that people understand what the

5  problems are, because they need to be, I guess, informed

6  of what -- what it is.

7      Q.   Let me ask it another way.  Does LULAC believe

8  that it is fulfilling its mission when it educates its

9  members on voting requirements?

10             MR. BARON:  Objection; form.

11             THE WITNESS:  I cannot answer that.

12     Q.   (BY MR. TATUM)  Does LULAC at the state or

13  local council level help its members get the

14  documentation or IDs necessary to vote under SB14?

15     A.   At what level?

16     Q.   At the state or local council level.

17     A.   What the little -- what the councils do, I -- I

18  cannot tell you at all, because I don't have any

19  personal knowledge as to -- it's about 400 just in the

20  State of Texas, so I don't know what they do

21  individually.  What -- what steps they take is up to

22  them, and there's no reporting up of what is taken

23  either.  So there's no like -- I can sit down and read

24  what local council No. 1 out of Corpus Christi have done

25  regarding anything, so -- because it's just not

Miguel Ortiz - 8/14/2014

55

1   the pleadings.  Right now, I cannot deviate from that

2   because it's what is on the pleadings.  I mean, unless

3   you want to ask me a different way, but --

4       Q.   (BY MR. TATUM)  Well, sure.  I'll ask you --

5       A.   The only thing I can contend is what is on the

6   pleadings.

7       Q.   Okay.  Well, let's look at the pleadings.  I

8   believe the complaint is Exhibit --

9       A.   Three.

10      Q.   -- 3.  Do you have it in front of you?

11      A.   Yes, sir.

12      Q.   On the first page of that complaint, I'm

13  looking at the first paragraph which states that "The

14  State of Texas has a long notorious history of

15  disenfranchising voters by various methods and

16  discriminating against classes of voters, especially on

17  account of race and ethnicity.  Senate Bill 14 of 2011

18  is another effort to achieve those unlawful ends."  Do

19  you see those sentences?

20      A.   Yes, sir.

21      Q.   Did I read them accurately?

22      A.   That's what it says in the pleadings.

23      Q.   Can you tell me how Senate Bill 14

24  disenfranchises voters?

25      A.   Specifically --

1           MR. BARON:  I'm going to object.  I'm

2   going to object on the basis that he's here as a

3   30(b)(6) witness, not as a expert witness on the effects

4   of SB14.

5           Subject to that objection, if you have a

6   response, you can make it.

7           THE WITNESS:  I don't -- I don't think I

8   have any -- I don't know.  I don't think I can give you

9   any answer as to -- do you want me to tell you what --

10  whether Texas has a notorious history of

11  disenfranchising voters?  Is that what you want me to

12  tell you?

13      Q.   (BY MR. TATUM)  Do you believe that to be true?

14      A.   I believe it's true.

15      Q.   And can you tell me what that belief is based

16  on?

17      A.   Well, we have a long history of case law.

18          MR. BARON:  And, again, I'm going to

19  object just to the extent that this seems to be outside

20  the scope of what a 30(b)(6) deposition is for.

21          MR. TATUM:  Well, it's -- and I would

22  respond that this is a allegation made in the complaint,

23  and the notice of this deposition specifically has a

24  topic that relates to the allegations made in the

25  complaint.

1    think we have any defenses.  In my -- I mean, I cannot

2    tell you that.  You've got to...

3       Q.    But you've been designated by LULAC to testify

4    on its behalf today.  Correct?

5       A.    Under the 30(b)(6).  Yes.

6       Q.    Okay.  Does LULAC contend that SB14 was enacted

7    with discriminatory intent?

8       A.    If I go by the pleadings, the answer to your

9    question is yes.

10      Q.    And do you know on what basis LULAC makes that

11   claim?

12      A.    Again, I think that will be experts.  I mean, I

13   don't -- I don't have any --

14              MR. BARON:  Same objection.  Object to the

15   last question as being outside the scope of 30(b)(6).

16              THE WITNESS:  Do you want -- I'll be

17   honest with you.  I --

18              MR. BARON:  Calls for a legal conclusion.

19      Q.    (BY MR. TATUM)  Would you -- in answer to that

20   question, would you just -- are you saying that you

21   would defer to what's written in the pleadings?

22      A.    I would defer from the pleadings and the file,

23   the records, exhibits, experts.

24      Q.    Okay.  So sitting here today, you're unable to

25   tell me what LULAC believes is discriminatory about

1   SB14.   Is that correct?

2            MR. BARON:   Same objection.   Of course, I

3   think this question is now repetitious, but it does seem

4   to be outside the scope of a 30(b)(6) deposition.   And

5   calls for legal conclusions.

6            And subject to that objection, you can go

7   ahead and answer and --

8            THE WITNESS:   If I read the pleadings,

9   LULAC believes that the requirement of -- the additional

10  requirement of an ID, aside from the voter registration

11  card, is a discriminatory against Hispanics.   That's

12  what LULAC believes.

13       Q.   (BY MR. TATUM)   And did you read that from the

14  pleading?

15       A.   No.   I'm not reading from any specific portion.

16  I'm telling you my short answer from the pleadings, or

17  from what I know.

18       Q.   And that belief that you just described, can

19  you tell me why LULAC believes that?

20       A.   What did LULAC believe as an organization that

21  is discriminatory?

22       Q.   Yes.

23       A.   I don't -- I don't know.   I'm -- I'm baffled by

24  the word "belief," because they believe that it's

25  discriminatory, the requirement of asking for an

60

1  additional ID imposed by SB14, aside from the voter

2  registration card is -- affects Hispanics and is

3  targeted and is designed to affect the Hispanic

4  population in the state of Texas.

5      Q.   Are you familiar with the requirements of SB14?

6      A.   Of the IDs that they need?

7      Q.   Yes.

8      A.   I'm -- I'm generally familiar what they need.

9      Q.   Can you tell me what IDs are required under

10 SB14?

11          MR. BARON:  I'm going to register the same

12 objection.  I mean, seriously, these kind of fact-based

13 questions seem to be now way outside the scope of a

14 30(b)(6) deposition.  And, certainly, I don't understand

15 the relevance of this witness's personal knowledge about

16 the requirements of SB14.  And, of course -- of course

17 there's -- I think there's something like 17 expert

18 reports that have been provided and countless documents

19 and other testimony that all would seem to be a better

20 source of information for the answers to these questions

21 than Mr. -- than our 30(b)(6) designee here.

22          Subject to that objection, tell him what

23 you know about Senate Bill 14.

24          THE WITNESS:  The ID requirements?

25      Q.   (BY MR. TATUM)  Yes.

1   they can or cannot.

2       Q.   And can you not tell me whether they can or

3   cannot -- is the reason you can't tell me because LULAC

4   does not have sufficient membership information to allow

5   it to identify a member that does not possess an SB14

6   ID?

7       A.   Well, when -- when LULAC members filed the

8   application for membership, there is not a specific

9   question whether they have any form of ID.  So what is

10  going to allow them to identify it in the future would

11  rely on the lawyers and experts and the team that are

12  representing LULAC in this to do that.  If that answers

13  your question.  I'm not sure.

14      Q.   Does LULAC maintain a list of its membership?

15      A.   I believe so.  Yes.

16      Q.   And from that list is LULAC able to determine

17  if any of its members have an acceptable form of ID as

18  required by SB14?

19      A.   There is not a specific field on the

20  application for that particular -- so the answer to that

21  would be no, if I look at the membership list.

22      Q.   Okay.  So then would you agree that LULAC does

23  not maintain sufficient membership information to allow

24  it to determine whether or not a LULAC member has a

25  acceptable form of ID under SB14?

1    A.    I don't have any personal knowledge of that.

2 The only thing I can tell you is what is required for

3 membership.   We don't ask for ID.

4    Q.    On June 26, 2013, could LULAC identify a member

5 of its organization that did not possess an acceptable

6 form of ID under SB14?

7    A.    I don't have any personal knowledge of that.

8    Q.    On August 22nd, 2013, could LULAC identify a

9 single member of its organization that did not possess

10 an acceptable form of ID under SB14?

11    A.    I don't have any personal knowledge.

12    Q.    On December 6, 2013, could LULAC identify a

13 single member of its organization that did not possess

14 an acceptable form of ID under SB14?

15    A.    I have no personal knowledge of that.

16    Q.    As of today's date, August 14, 2014, can LULAC

17 identify a single member of its organization who did not

18 possess an acceptable form of ID under SB14?

19    A.    I have no personal knowledge of that.

20    Q.    As of today's date, August 14th, 2014, can

21 LULAC identify any member of its organization who has

22 suffered harm at any point in any way because of SB14?

23             MR. BARON:   Object; form, vague,

24 overbroad.

25             THE WITNESS:   What -- I don't define what

84

1  questions that we've kind of already touched on, and

2  then I'll be done.

3           MR. BARON:  Okay.  We're here as long as

4  it takes for you to get done what you need to get done,

5  even though we would prefer it being sooner rather than

6  later.

7           MR. TATUM:  Believe me, I share that

8  preference.

9     Q.   (BY MR. TATUM)  Mr. Ortiz, does LULAC as an

10  organization claim that it is being harmed by SB14?

11    A.   The problem I have with that question that you

12  asked before is that LULAC is an organization, so LULAC

13  doesn't vote, so how can LULAC be harmed.

14    Q.   So is it your testimony that LULAC as an

15  organization is not harmed by SB14?

16           MR. BARON:  Object to form.

17           THE WITNESS:  That's not what I'm saying

18  is --

19           MR. BARON:  It calls for --

20           THE WITNESS:  I don't know how to answer

21  that question.

22    Q.   (BY MR. TATUM)  Does LULAC believe that it is

23  negatively impacted by the -- by the implementation of

24  SB14?

25    A.   LULAC believes that Senate Bill 14 affects the

Miguel Ortiz - 8/14/2014

85

1   right to vote to the Hispanic community and to the

2   minorities, and that's what LULAC believes.   That's why

3   LULAC is part of this lawsuit.

4        Q.   Does LULAC contend that the implementation of

5   SB14 has a negative impact on its resources, both

6   financial and other?

7        A.   Say that again.

8        Q.   Sure.   Does LULAC contend that the

9   implementation of SB14 has a negative impact -- and let

10  me -- let me back up.

11             Does LULAC contend that the implementation

12  of SB14 has a negative effect on the resources of LULAC?

13             MR. BARON:  I'm going to object.   I think

14  this is repetitious, but go ahead and answer it.

15             THE WITNESS:  Well, LULAC is involved in

16  this lawsuit, so, of course, it affects the resources

17  that LULAC have.

18        Q.   (BY MR. TATUM)  Outside of this lawsuit, has

19  SB14 had a negative impact on the resources of LULAC,

20  aside from anything dedicated towards the litigation of

21  this lawsuit?

22             MR. BARON:  I'm going to object to the

23  form of that question because I'm not sure how you can

24  separate that out, but subject to that objection...

25             THE WITNESS:  My question is just the

1  same -- I mean, my answer is the same.  LULAC, its

2  resources and -- is impacted by the suit because they

3  are a plaintiff in this lawsuit.  And the only way --

4  SBC was implemented, and LULAC got involved.  So LULAC

5  is affected by expending their resources to defend the

6  minority -- the rights of the minorities just because of

7  the impact that SB14 has on minorities for the right to

8  vote, including Hispanics.

9      Q.    (BY MR. TATUM)  Does LULAC contend that the

10  resources that it is having to devote towards this

11  lawsuit are affecting its ability to fulfill its

12  mission?

13      A.    The mission of LULAC is exactly what is

14  happening here.  Protect the rights of minorities.  If

15  those rights -- civil rights are affected the way LULAC

16  believes Senate Bill 14 affects the minorities right

17  now.

18      Q.    So is LULAC pursuing this lawsuit in

19  furtherance of its mission?

20      A.    Yes.

21      Q.    Mr. Ortiz, I don't have any other questions for

22  you today.  Before we go off record, is there anything

23  regarding any of your answers today that you would like

24  to clarify or amend?

25      A.    No.