SENATOR DAN PATRICK                                          7/11/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

## Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   CORPUS CHRISTI DIVISION
 3   MARC VEASEY, et al.,      )
             Plaintiffs,       )
 4                             )
     v.                        ) Civil Action
 5                             ) No. 2:13-cv-193(NGR)
     RICK PERRY, et al.,       )
 6           Defendants.       )
     _____)
 7                             )
 8          <<<<<HIGHLY CONFIDENTIAL>>>>>
 9
10   ********************************************
11                   ORAL DEPOSITION OF
12                  SENATOR DAN PATRICK
13                     JULY 11, 2014
14   ********************************************
15        ORAL DEPOSITION of SENATOR DAN PATRICK,
16   produced as a witness at the instance of the United
17   States of America, and duly sworn, was taken in the
18   above-styled and numbered cause on July 11, 2014, from
19   10:17 a.m. to 6:07 p.m., before Denyce M. Sanders,
20   CSR, RPR, CRR, TCRR, in and for the State of Texas,
21   recorded by machine shorthand, at the offices of
22   Attorney General's Office, 808 Travis, Suite 1520,
23   Houston, Texas, pursuant to the Federal Rules of Civil
24   Procedure and the provisions stated on the record or
25   attached hereto; signature having been waived.
```

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 4        U.S. DEPARTMENT OF JUSTICE
          Civil Rights Division
 5        950 Pennsylvania Avenue, NW - NWB Room 7254
          Washington, D.C.  20530
 6        Ms. Anna M. Baldwin
          202.305.4355
 7        anna.baldwin@usdoj.gov
 8   FOR THE VEASEY PLAINTIFFS:
 9        DERFNER ALTMAN & WILBORN
          575 King Street, Suite B
10        Charleston,South Carolina  29403
          Mr. Armand Derfner
11        843.723.9804
          aderfner@dawlegal.com
12
13   FOR THE DEFENDANT TEXAS LEAGUE OF YOUNG VOTERS
     PLAINTIFF-INTERVENORS:
14
          WILMER CUTLER PICKERING HALE AND DOOR, LLP
15        1875 Pennsylvania Avenue, NW
          Washington, D.C.  20006
16        Ms. Danielle Y. Conley
          202.663.6262
17        danielle.conley@wilmerhale.com
18
19   FOR THE DEFENDANTS AND WITNESS:
20        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
          Consumer Protection Division
21        808 Travis, Suite 1520
          Houston, Texas  77002
22        Ms. Rosemarie Donnelly
          713.225.8919
23        rosemarie.donnelly@texasattorneygeneral.gov
24            -and-
25         -CONTINUED-
```

## Page 3

```
 1        OFFICE OF THE ATTORNEY GENERAL
          DEPUTY ATTORNEY GENERAL FOR
 2        INTERGOVERNMENTAL RELATIONS
          P.O. Box 12548, Capitol Station
 3        Austin,Texas  78711
          Mr. Jay Dyer
 4        512.463.2197
          jay.dyer@oag.state.tx.us
 5
                 -and-
 6
          OFFICE OF THE ATTORNEY GENERAL
 7        OFFICE OF THE SOLICITOR GENERAL
          P.O. Box 12548, Capitol Station
 8        Austin,Texas  78711
          Mr. Arthur C. D'Andrea
 9        512.463.2197
          arthur.dandrea@oag.state.tx.us
10
11   FOR THE DEFENDANTS RICK PERRY, STATE OF TEXAS, NANDITA
     BERRY, AND THE DEPARTMENT OF PUBLIC SAFETY:
12
13        OFFICE OF THE ATTORNEY GENERAL
          TORT LITIGATION DIVISION
14        P.O. Box 12548, Capitol Station
          Austin,Texas  78711
15        Mr. J. Reed Clay, Jr.
          512.463.2197
16        reed.clay@oag.state.tx.us
17
18   ALSO PRESENT:
19        Ms. Lauren Sutterfield
20
21
22
23
24
25
```

## Page 4

```
 1                      INDEX
 2                ORAL DEPOSITION OF
 3        SENATOR DAN PATRICK, JULY 11, 2014
 4                      Page
 5   APPEARANCES...........................   2
 6   BY MS. BALDWIN.........................   9
 7   BY MS. CONLEY.......................... 196
 8   BY MR. DERFNER......................... 254
 9   BY MR. CLAY............................ 307
10   BY MS. CONLEY.......................... 331
11
12
13
14
15        REPORTER CERTIFICATION.................. 333
16
17
18
19
20
21
22
23
24
25
```

SENATOR DAN PATRICK                                          7/11/2014
CONFIDENTIAL TRANSCRIPT

4 (Pages 13 to 16)

---

13

1    MS. DONNELLY: Everything that was
2  reviewed has been produced in this litigation.
3    Q. (BY MS. BALDWIN) And did you bring any notes
4  or documents with you here today?
5    A. No.
6    **(Patrick Exhibit 1 marked/introduced.)**
7    Q. (BY MS. BALDWIN) I'm going to hand you a
8  document to be marked as Exhibit 1, which is the
9  document subpoena that was served on you in this case.
10    Would you take a moment -- do you recognize
11  this document, and in particular Exhibit A beginning
12  on page 3, which is the document requests?
13    A. Well, I don't believe I have seen it before.
14    Q. Were you aware that a document subpoena was
15  served on you in this litigation?
16    A. Yes.
17    Q. And how were these documents searched for?
18  Are you aware?
19    A. I am not. That was my -- my staff.
20    Q. Who on your staff handled that?
21    A. John Gibbs.
22    Q. And did you have any discussion with
23  Mr. Gibbs about that?
24    A. No. There may have been other people in the
25  office, but John is the one I worked with. And then I

---

14

1  searched my computer.
2    Q. And what did Mr. Gibbs -- let me start over.
3    Did Mr. Gibbs provide you the instructions of
4  what to search for and how to search your computer?
5    A. I believe so. Not certain, but I believe
6  that that's who I talked with.
7    Q. And what were those instructions?
8    A. Can't recall.
9    Q. Were they conveyed orally?
10    A. Yes. I believe so. I mean, I know that I
11  talked to him. I don't know if he -- I don't think he
12  sent me anything in writing, but I'm not positive.
13    Q. And do you remember, in general, what he told
14  you to search for?
15    A. I really don't know the -- I really can't
16  answer the question. I don't recall exactly
17  what -- whatever he asked for at the time, that's what
18  I searched for.
19    Q. And where did you search? Did you search
20  your personal e-mail address?
21    A. That's the only area that I searched.
22    Q. Okay. And what e-mail address is that?
23    A. Danpatrick700@gmail.
24    Q. Okay. And so any other searches would have
25  been carried out of other sources by your staff; is

---

15

1  that correct?
2    A. Correct.
3    Q. And did you provide any documents from your
4  Gmail address?
5    A. I believe I did.
6    Q. And do you know, was that in connection with
7  this litigation or the prior litigation?
8    MS. DONNELLY: Objection. Form.
9    A. The documents that I saw yesterday, I can't
10  recall.
11    Q. (BY MS. BALDWIN) Do you remember roughly when
12  you searched for the Gmail documents? Was that this
13  year or at an earlier date?
14    A. When was the request made?
15    Q. If you'll look on the first page of the
16  subpoena, which is Exhibit 1 --
17    A. Yes.
18    Q. -- the return date was for April 2014.
19    A. Then I would have searched this year.
20    Q. Did you previously search your Gmail account
21  for documents in the prior litigation?
22    MS. DONNELLY: Objection. Form.
23    A. I just don't recall. It's been a long time.
24    Q. (BY MS. BALDWIN) And when you were doing
25  that search, did you use particular search terms or

---

16

1  did you look message by message? How did you do that?
2    A. I don't recall.
3    Q. Do you keep everything that you receive in
4  your Gmail account?
5    A. No.
6    Q. What -- do you have a regular process on when
7  you delete things from your Gmail account?
8    A. Not a regular process, but on a fairly
9  frequent basis.
10    Q. What do you mean by "fairly frequent"?
11    A. Could be once a month, could be every couple
12  of months.
13    Q. And so if you searched for documents in this
14  case in 2014, is it likely that many e-mails from 2011
15  you would no longer have?
16    A. Repeat the question.
17    MS. BALDWIN: Can you read that back.
18    THE REPORTER: "And so if you searched
19  for documents in this case in 2014, is it likely that
20  many e-mails from 2011 you would no longer have?"
21    A. It depends on the subject.
22    Q. (BY MS. BALDWIN) For e-mails related to
23  SB 14, is it likely that there were some e-mails that
24  you either sent or received in 2011 that you would no
25  longer have today in your Gmail account?

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

---

17

1      A.  It's possible.
2      Q.  Did you ever receive a request from the
3  Attorney General's Office not to delete any documents
4  related to the subject matter of SB 14?
5      A.  I don't recall.
6      Q.  You don't recall seeing anything like that in
7  writing asking you not to delete anything?
8      A.  Before this request or after?
9      Q.  At any time.
10     A.  I don't recall.  I mean, I don't recall.
11     Q.  Is it likely if you had received something
12  like that you would remember it?
13     A.  No.
14     Q.  Would it be important to you to comply with a
15  request not to delete e-mails?
16     A.  Yes.
17     Q.  And so if it would be important to you to
18  comply with that, is it likely that you would, in
19  fact, remember it?
20     A.  No.  I mean, I don't know what else to tell
21  you.  It would be important that I would follow the
22  instructions, but I don't recall if --
23     Q.  But you don't recall actually receiving
24  those, is your point?
25     A.  Right.

---

18

1      Q.  If we could look back at the specifics of the
2  actual document request --
3      A.  Which page?
4      Q.  -- on page 4.
5      A.  All right.
6      Q.  Number 3 is a request for "All documents
7  related to any calculations, reports, audits,
8  estimates, projections, or other analyses related to
9  the effect that SB 14 imposes, or that SB 14 was
10  projected to impose, upon minority voters or on voters
11  who are members of a language minority group, from
12  December 1, 2010, through May 27, 2011."
13      Did you have any documents that were
14  responsive to that request?
15     A.  Not that I recall.
16     Q.  What about Number 4:  "All documents related
17  to any calculations, reports, estimates, projections,
18  or other analyses related to the impact of SB 14 on
19  voter turnout or voter registration," did you have any
20  documents responsive to that request?
21     A.  Not that I recall.
22     Q.  And have you ever had, not just presently
23  that you would maintain them, but have you ever had
24  any documents that would have been responsive to those
25  requests in your possession?

---

19

1      A.  Not that I recall.
2      Something I'd like to clarify so that you
3  have an understanding of this that may help moving
4  forward, even though I was listed as an author of the
5  bill, I didn't write the bill, nor was I an active
6  author.
7      So that you understand the process, when a
8  senator files a bill, you take the paperwork to the
9  clerk and you can submit it and you're the author.
10  You then can go to other senators and say, "Would you
11  like to co-author the bill with me?"  It means we
12  support the bill, and we add our name to it.
13      We also have a process from time to time
14  where senators, before they file the bill, they're the
15  author of it.  They will ask other senators, "Would
16  you like to be, not a co-author, but in essence a
17  joint author?"
18      Because there was some confusion on that in
19  my last deposition on this because, quite frankly, I
20  didn't even remember that had happened.
21      So Senator Fraser, who was the author of the
22  bill and did the work on the bill -- apparently, I had
23  forgotten -- had gone to the senators before he filed
24  it and allowed members to be authors.
25      So my involvement of the bill, outside of an

---

20

1  amendment, was primarily listening to testimony and
2  voting for the bill.  So that's why -- and I don't
3  recall that I ever had these documents.  But I
4  would -- this is totally different than a bill that I
5  would actually be the author of.
6      As chairman of education, this session, for
7  example, I authored a number of bills and I would have
8  documents related to those more than I would have in
9  this case.  So I have -- I would have had probably
10  little, if any, of those types of documents.
11      So I just want you to understand that process
12  because it was confusing in the last deposition and we
13  didn't really I think clarify that with the attorneys
14  asking the questions until in the middle of the day.
15  So if that will be helpful, going along.
16     Q.  Thank you.  I appreciate that.
17     A.  Okay.
18     Q.  So that I understand, for SB 14, you were
19  listed as effectively a joint author on the prefiling
20  end, but it was Senator Fraser who had actually
21  authored the bill; is that your testimony?
22     A.  Correct.
23     Q.  And so just so I have the terminology
24  correct, it would be most accurate to call you a joint
25  author rather than co-author?

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

21

1     A.  You could call me a joint author or an
2  author.
3     Q.  Okay.
4     A.  There is a difference between, again, being a
5  co-author.
6     Q.  Okay.  And what's the difference between an
7  author versus co-author?  Is that just the before
8  filing/after filing distinction?
9     A.  That's really the -- that's the distinction.
10     Q.  Okay.  Thank you.
11         And just to wrap up the topics on the
12  document subpoena, if you could look on page 5, topics
13  Number 8, and 9.
14     A.  Yes.
15     Q.  Topic Number 8 is:  "All documents related to
16  any calculations, reports, audits, estimates,
17  projections, or other analyses related to the effect
18  that voter identification requirements impose upon
19  minority voters or voters who are members of a
20  language minority group, from January 1, 2005, through
21  November 30, 2010."
22         Is it correct that you've never had any
23  documents on that topic in your possession as far as
24  you're aware?
25     A.  Yeah, I don't recall if I did or did not.

---

22

1     Q.  And the same with respect to 9:  "All
2  documents related to any calculations, reports,
3  estimates, projections, or any other analyses related
4  to the impact of voter identification requirements on
5  voter turnout or voter registration, from January 1,
6  2005, through November 30, 2010."
7     A.  I don't recall.
8     Q.  You didn't produce any documents on that
9  topic, correct?
10     A.  You know, that, I don't even -- I -- I don't
11  recall, and I -- if I did, I haven't seen them since.
12     Q.  Okay.  But you're not aware of ever even
13  having any documents on topic Number 9; is that
14  correct?
15     A.  Yeah, again, I don't recall that I did or did
16  not.
17         Another point for you to note -- just to help
18  us move through this -- that once a bill is passed, I
19  don't want to say that the file closes on it, but you
20  move on.  We cast somewhere in the neighborhood of
21  3500 to 4,000 votes a session, pass maybe a thousand
22  bills, or give or take a few hundred.
23         So whether I'm an author, a co-author, or
24  just someone who voted for or against a bill, once
25  that's gone, you move on.  So I would not expect that

---

23

1  I would have very many documents or e-mails or
2  anything else since 2011 to begin with.
3     Q.  And is that because of a general document
4  retention policy that you have -- I mean, once -- let
5  me ask that differently.
6         Once a bill has been voted on and the session
7  has ended, what do you normally do with the working
8  files related to that bill?
9     A.  Well, it would -- it would depend on our
10  involvement in the bill.  If we were just voting for
11  the bill, we might not have any documents except
12  something that, if you were a senator, you may have
13  sent me.
14         And then we would have the bill book, which
15  would be in the Senate Journal.  You would have copies
16  or access to that, which would be the actual
17  legislation.  We wouldn't keep that in our office.
18         So it would only be maybe correspondence with
19  a constituent or something, "Why did you vote for
20  that?", or "Why did you vote against it?", or -- but
21  it wouldn't be -- it wouldn't be a volume of
22  documents.
23         And to further help you understand the
24  process, so that you know -- so that you know I'm
25  being as candid as I can be on this -- is last

---

24

1  session, for example, I was chair of education on
2  higher education, criminal justice, transportation,
3  redistrict -- redistricting, Sunset and finance.
4         So, literally, we take the issues as we take
5  them and then we move on, and there's -- for me,
6  personally, and I -- you know, I can't speak for other
7  senators, but you move forward.
8     Q.  And so if you had received constituent
9  correspondence, would that be maintained indefinitely
10  or would you get rid of that once the issue is done?
11     A.  I don't know what the -- the procedure is on
12  that, how long those are retained.
13     Q.  Is that a -- something that each legislative
14  office sets?
15     A.  I don't know.  I don't know.
16     Q.  To get a little bit more of your background,
17  Senator Patrick, could you tell me how long you've
18  served in the Senate?
19     A.  Since 2007 was my first session.
20     Q.  And so you first ran in 2006?
21     A.  Correct.
22     Q.  And had you ever run for public office before
23  that?
24     A.  No.
25     Q.  And you represent Senate District 7; is that

---

SENATOR DAN PATRICK                          7/11/2014
CONFIDENTIAL TRANSCRIPT

7 (Pages 25 to 28)

---

**25**

1    correct?
2        A.  Yes.
3        Q.  And what areas of Texas are included in that?
4        A.  It's all confined to one county, Harris
5    County, and it's primarily west Harris County
6    with -- with a little bit -- an area a little towards
7    the city.  Since then we've had redistricting and my
8    district has changed a little bit.  I have less of the
9    city as population has shifted.  But it's primarily
10   west Harris County.
11       Q.  And what are the racial demographics of your
12   district?
13       A.  I don't know specifically.
14       Q.  Do you know generally?
15       A.  I really have not seen data in a while on
16   that.  I -- you know, I believe that -- it seems
17   to me I recall seeing data at some point it was in the
18   30 percent minority, but I'm not positive.
19       Q.  Okay.  And when you say "30 percent
20   minority," does that include both African-Americans
21   and Latinos?
22       A.  Yes.  Again, it seems to me I either read
23   that or heard it somewhere, and I don't know if that
24   was 2007 or 2010, or when that was last, but...
25       Q.  And you mentioned earlier that you're on the

---

**26**

1    Redistricting Committee?
2        A.  I was.
3        Q.  Okay.  And was looking at demographic
4    information of various districts, including your own,
5    something that you did as part of your role in the
6    Redistricting Committee?
7        A.  My role was very small in that committee.
8    That was primarily handled by the chairman.
9        Q.  But regardless of how large your role was,
10   was looking at demographic data something that you did
11   as part of your work on the Redistricting Committee?
12       A.  It probably was at some point.  Again, that's
13   been several years, so I don't -- I don't recall.
14       Q.  Before redistricting, was your district
15   majority Anglo?
16       A.  Yes.
17       Q.  And it was after redistricting as well?
18       A.  Yes.
19       Q.  And do you know if it became more or less so?
20       A.  I don't know.
21       Q.  During the 83rd session of the Texas
22   legislature, have you sponsored any election-related
23   or voter-related bills?
24       A.  Which year was the 83rd?
25       Q.  This most recent.

---

**27**

1        A.  Sorry.
2        Q.  Trying to use the terminology as well.
3        A.  Yeah, I know.  This session, did I sponsor
4    any election-related law?  I don't recall.  I
5    think -- I believe I sponsored 70 or 80 bills, but I
6    don't recall.
7        Q.  And do you have any leadership roles in the
8    Senate during the time that you served?
9        A.  Just chair of education.
10       Q.  Okay.  And is there a Tea Party caucus in the
11   Senate?
12       A.  Oh, yes.  Yes.  I'm chair of the Tea Party
13   caucus.
14       Q.  Okay.
15       A.  Yes.
16       Q.  And what does that role involve?
17       A.  It was we would meet with constituents,
18   grassroots folks, maybe once a month during session,
19   so maybe -- and not every month, but maybe four or
20   five times, usually on a Sunday.  That was the only
21   time we really could meet for a couple of hours and
22   listen to their thoughts and we would share our
23   thoughts.  It was more of a listening.
24       Q.  And were those organizations both from within
25   your district and other parts of the state?

---

**28**

1        A.  Statewide.
2        Q.  Statewide.  And is chair of the Tea Party
3    caucus an elected position within the caucus?  I
4    mean --
5        A.  Yes.
6        Q.  And how many members of the Senate were also
7    members of the caucus?
8        A.  Only -- one for sure.  Maybe one or two more.
9    I don't recall.
10       Q.  And who were those?
11       A.  I said one for sure.  I believe it was
12   Senator Birdwell, but not -- now I'm not positive, but
13   I believe so.
14       Q.  Okay.  And the other senator who you think
15   may have been?
16       A.  Might have been -- you know, there's a
17   difference between people who join and actually
18   participate, so that's what I'm trying to remember.
19   There may have -- maybe Senator Campbell, but I'm
20   not -- I'd have to go back.  I don't recall.
21       Q.  Was --
22       A.  It was mostly House -- I'm sorry,
23   mostly -- there were more House members.
24       Q.  Okay.  So the caucus included both members of
25   the House and of the Senate?

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1    **A.   Correct.**

2    Q.   And did you work with members of the House to

3    advance legislation regardless of which chamber it was

4    currently in?

5    **A.   We do that regardless of caucus work.   That's**

6    **a -- we work with them and they work with us on a**

7    **variety of bills.**

8    Q.   But did the Tea Party caucus in particular

9    work across chambers to pass and promote legislation?

10   **A.   I don't believe, and I can always be**

11   **corrected, but -- on this, I don't believe that there**

12   **was ever a bill that was generated out of a caucus**

13   **meeting that I carried or they carried.   It was more**

14   **of listening to what voters had to say in this case**

15   **and sharing with them what we were working on.**

16   **So it was more of an -- more of an update on**

17   **what was happening that was working on legislation.**

18   **The legislation that we worked on, we would have been**

19   **working on regardless.**

20   Q.   Right.  But the conversations were designed

21   to advance legislation that you were working on; is

22   that fair to say?

23   **A.   I don't know that I would characterize it**

24   **that way.   We just discussed legislation.**

25   Q.   That you were supporting?

---

30

1    **A.   Not always.**

2    Q.   But you did discuss legislation that you were

3    supporting?

4    **A.   Sure.**

5    Q.   And did you have any discussions about voter

6    ID with the Tea Party caucus?

7    MS. DONNELLY:  I'm going to assert

8    legislative privilege to that question.

9    As to communications other members of

10   the legislature had with you privately, please don't

11   discuss that.  It is their privilege to waive.  You

12   can talk about what was public statements.  You can

13   also talk about your own statements under seal

14   pursuant to the judge's order, but please do not

15   divulge communications that other members of the

16   legislature made to you privately.

17   Subject to that objection, go ahead and

18   answer.

19   **A.   Would you repeat the question for me?**

20   MS. DONNELLY:  Sorry.

21   THE WITNESS:  That's all right.

22   MS. BALDWIN:  Could you repeat the

23   question.

24   THE REPORTER:  "And did you have any

25   discussions about voter ID with the Tea Party caucus?"

---

31

1    **A.   With all that, I -- you know, I don't recall.**

2    **What I do remember is what I -- what I believe is**

3    **accurate, and I can be corrected, the Tea Party caucus**

4    **was formed in -- sometime before the -- that**

5    **would have been the 82nd session, I guess.**

6    MR. DYER:  2011.

7    THE WITNESS:  Okay.  I can never

8    remember those.

9    **A.   Maybe in December was our first meeting.  I**

10   **believe we took up voter ID in January.  So I'm not**

11   **sure that we ever -- that that was actually a topic.**

12   **Could have been.  I -- I mean, I don't really recall,**

13   **but that would have been very early on, so...**

14   Q.   (BY MS. BALDWIN)  So you don't have any

15   specific recollections of any conversation during Tea

16   Party caucus meetings about the subject of voter ID

17   legislation?

18   **A.   Nothing -- nothing specific.**

19   Q.   Anything general?

20   **A.   No.  I mean, I don't recall anything general.**

21   **We may have talked about it.  We may not have.  Again,**

22   **I think we had one -- maybe one organizational meeting**

23   **in -- in December right before a session.  But we may**

24   **not have met until after the bill had already passed**

25   **the first time.  I just don't recall.**

---

32

1    Q.   But even after the bill had passed the

2    Senate, when it was still moving through the House, do

3    you recall any meetings with the Tea Party caucus

4    about the bill at that point?

5    **A.   You know, I don't.**

6    Q.   And, Senator Patrick, you're currently

7    running for statewide office --

8    **A.   Yes.**

9    Q.   -- in Texas?

10   **A.   Yes.**

11   Q.   You're running for lieutenant governor,

12   correct?

13   **A.   Yes.**

14   Q.   Are you employed in a capacity other than as

15   a Texas senator?

16   **A.   I need to be.**

17   Q.   And who is your employer?

18   **A.   Patrick Broadcasting.**

19   Q.   Okay.  And what's your title at Patrick

20   Broadcasting?

21   **A.   I'm not sure, but I think I'm the general**

22   **manager or president.  It's my company.**

23   Q.   He who wears all hats?

24   **A.   Yes.**

25   Q.   And what are your responsibilities at Patrick

---

SENATOR DAN PATRICK
CONFIDENTIAL TRANSCRIPT                                      7/11/2014

**33**

1    Broadcasting?
2        A.   Operating the businesses as any owner would,
3    being responsible for hiring.  Not directly.  I have
4    staff that does that.  But, I mean, being responsible
5    for staff, being responsible for the success of the
6    business, overseeing -- it's a radio station --
7    overseeing our on-air product and -- everything from
8    vacuuming the floor, if needed, to call on clients, to
9    being on the air, which I'm not very often
10   as -- because of candidate rules.
11       Q.   Okay.  Prior to running for statewide office,
12   were you regularly on the air even during the time
13   that you were serving in the Texas Senate?
14       A.   I was regularly on the air.  Once I was
15   elected in '07, that time slowly but surely diminished
16   as my responsibilities increased.
17       Q.   Okay.  So during the time that the
18   legislature wasn't in session, did you have a regular
19   on-air --
20       A.   Yes.
21       Q.   -- time?
22       A.   I'm sorry.  Yes.
23       Q.   And what about when the legislature was in
24   session, did you...?
25       A.   The last two sessions, maybe the last

**34**

1    three -- I was not as busy in 7th or freshman, so I
2    was able to be on a bit more.  But the last several
3    sessions, I've just not been able to be on.  You know,
4    I would call in as a guest, but -- try to do a show on
5    occasion, but not very often.
6        Q.   And so it was your show essentially?
7        A.   It was.  But I was like Johnny Carson at the
8    end of his career, seldom there.
9        Q.   Okay.  And would you describe it as a
10   political talk show?
11       A.   Yes.
12       Q.   And a conservative political talk show?
13       A.   Yes.
14       Q.   Did listeners call in?  I mean, what was the
15   general kind of format?
16       A.   Hopefully.  Or I just talked to myself for a
17   couple of hours.
18       Q.   Got it.
19            Was voter ID something that you talked about
20   on the air?
21       A.   I'm sure we did.
22       Q.   Yeah.  Was voter ID an important issue to you
23   as a Texas senator?
24       A.   It was an important issue to listeners.  It
25   was an important issue to voters and citizens in

**35**

1    Texas.  If you look at the polling, I believe at one
2    point 90 percent of Texan voters -- which would be
3    Republicans, Democrats, Independents -- were in
4    support of it.  I believe I saw a poll with that.  But
5    it was a very high percentage.
6            But it was no more or -- I wouldn't say no
7    less, but there were many important issues.  It was
8    one of many issues that people would talk about.  And
9    some of that was not so much seasonal, but, you know,
10   talk radio is often driven by the headlines in the
11   news.  So it might be a hot topic if there was a story
12   and then it might not be discussed for months.
13       Q.   But you would say that the issue of voter ID
14   was important to your listeners on the radio?
15       A.   I believe the issue of photo voter ID -- I
16   know we talked about that early -- to be clear, was
17   important to, apparently -- based on some polls that I
18   read in the papers and saw somewhere -- 80, 90 percent
19   of the people in Texas.
20       Q.   Separating out the question of the polls,
21   though, just from your sense as both a politician and
22   in this dual role as a broadcaster, did you get a
23   sense from your callers that voter ID was an
24   important issue -- photo voter ID was an important
25   issue to them?

**36**

1            MS. DONNELLY:  Objection.  Form.
2            Go ahead.
3        A.   In my view, the issue of photo voter ID was
4    important, but so were a number of other issues.
5        Q.   (BY MS. BALDWIN)  When you say "a number of
6    other issues," are we talking about maybe three or
7    four?  I mean, how many other issues would you say
8    were of similar importance?
9            MS. DONNELLY:  I'm going to object to
10   form.
11           THE WITNESS:  So do you want her to
12   restate that?
13           MS. DONNELLY:  You can answer if you
14   know.  It's vague.  It's confusing.  You can answer if
15   you have an answer.
16       A.   I would -- I would say more than two or
17   three.  There are, again, depending -- you know, you
18   have a broad -- it's a broad constituency.  And for
19   some people, some issues are very -- there may be
20   issues to you that are very important, but to -- you
21   know, are -- it's not the most important.  So there
22   are many issues.
23           As we like to say in the legislature, any
24   bill that passes is really important to someone.  We
25   may look at bills as -- we may say, "Well, that's a

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

10 (Pages 37 to 40)

---

**37**

1   really important bill," and that's -- and one of the
2   things that I learned early on, and I think any
3   legislator would tell you, that any bill that passes
4   is important to someone.  So there are lots of
5   important bills.
6       Q.  (BY MS. BALDWIN)  Do you think that the
7   grassroots support for photo voter ID was important to
8   passing the bill ultimately?
9           MS. DONNELLY:  Objection.  Form.
10          You can answer.
11      A.  I think that -- when you say "grassroots,"
12   what do you mean by "grassroots"?
13      Q.  (BY MS. BALDWIN)  Do you think the support of
14   regular people who -- the callers to your show, for
15   example, the broad base of support -- let me strike
16   that.
17          Let me just switch topics a little bit.
18      A.  Sure.
19      Q.  You mentioned some polling that you were
20   aware of.  Did you ever see the specific poll
21   questions that you're referring to that reflected a
22   particular level of support for photo voter ID?
23      A.  I would imagine that I read the questions in
24   a newspaper article.  Did I see the actual poll?  Only
25   as it would have been reported, to my knowledge.  I've

---

**38**

1   seen results of polling.
2          But there were frequent articles, as I
3   recall, in the newspapers at the time, or online
4   somewhere, because this issue went on a number of
5   years, as you know, that would -- it was usually
6   always the same, that the vast majority of
7   Republicans, Democrats, and Independents, supported
8   the legislation.
9       Q.  And do you know if that poll ever asked, "Do
10   you support photo ID that requires voters to have...",
11   and then listed specific forms of identification?
12      A.  I don't.
13      Q.  And do you know if the poll question said,
14   "Would you still support photo ID even if you knew
15   that racial minorities were disproportionately less
16   likely to have acceptable ID?  Do you know if that was
17   part of the polling?
18          MS. DONNELLY:  Objection to the form of
19   the question.
20          You can answer.  Go ahead.
21      A.  I wouldn't know.
22      Q.  (BY MS. BALDWIN)  Do you know what the
23   response rate was for any of those polls, overall?
24      A.  What the response rate was?
25      Q.  Yeah.

---

**39**

1       A.  The number of people interviewed?  I don't
2   recall.
3       Q.  And do you have any idea of how they did the
4   sampling to ensure that the population of people they
5   were talking to is a representative sample?
6       A.  No.
7       Q.  So you just know the results, you don't
8   really understand any separate way to measure the
9   validity of the survey; is that fair to say?
10          MS. DONNELLY:  Objection.  Form.
11      A.  I wouldn't -- that's how you're
12   characterizing it.  I wouldn't characterize it that
13   way.  I just don't know the makeup of the poll.
14      Q.  (BY MS. BALDWIN)  Do you know who conducted
15   the poll?
16      A.  I did see one poll by Baselice, Mike
17   Baselice.  I don't know who did the other polls that
18   were reported on by the media.
19      Q.  Would you agree that the way the polling
20   questions are asked is sometimes important to what
21   response is given?
22      A.  That's the way you're characterizing that.  I
23   would not characterize it that way.
24      Q.  In general.
25      A.  I don't know.

---

**40**

1       Q.  Do you think that all polls are -- fairly
2   represent the actual opinion of the population?
3       A.  It depends on the poll.
4       Q.  Can polls be used unfairly for political
5   ends?
6       A.  Don't know.
7       Q.  Do you have any experience with that as a
8   candidate?
9       A.  Not really.
10      Q.  Are you familiar with the term "push poll"?
11      A.  Yes.
12      Q.  What do you understand by the term "push
13   poll"?
14      A.  Push poll, you would ask questions in a way
15   to solicit answers in a particular way.
16      Q.  And you don't know whether any of the numbers
17   that you're referring to would be more accurately
18   characterized as push polls or not; is that fair?
19      A.  Correct, I would not know.
20      Q.  Do you currently hold a Texas driver's
21   license, Senator Patrick?
22      A.  Yes.
23      Q.  And do you recall when you last renewed your
24   driver's license?
25      A.  No.

---

SENATOR DAN PATRICK                                7/11/2014
CONFIDENTIAL TRANSCRIPT

11 (Pages 41 to 44)

---

**41**

1    Q.  Do you recall whether you did that in person?
2    A.  I don't recall.  I believe the law states,
3  and I'm not certain, that you renew online and every
4  so many years you do it in person.  So I don't recall
5  when I last renewed it, how I renewed it.
6    Q.  Do you recall the last time you went to a DPS
7  office?
8    A.  No.
9    Q.  No recollection of renewing a driver's
10  license or getting it initially at DPS?
11    A.  At some point I went to a DPS office, but I
12  just don't remember one.
13    Q.  Do you recall having to wait ever at a DPS
14  office for services that you were there to receive?
15    A.  Not -- I don't recall a long wait.  I mean,
16  I'm trying to actually think of the last time.  I just
17  don't recall.
18    Q.  Do you know how far away the closest DPS
19  office is from, say, your house?
20    A.  Not exactly.
21    Q.  Do you know how you would get there if you
22  didn't have a car?
23    A.  How would I get there if I didn't have a car?
24    Q.  Uh-huh.
25    A.  I would ask a friend.

---

**42**

1    Q.  Do you know, is the DPS office accessible by
2  public transportation from your house?
3    A.  I would think not.
4    Q.  Do you think -- is that pretty common in your
5  district, that to get from residential areas to the
6  DPS office there is public transportation?
7    A.  Did -- repeat that again, how you said that.
8       THE REPORTER:  "Do you think -- is that
9  pretty common in your district, that to get from
10  residential areas to the DPS office there is public
11  transportation?"
12       MS. BALDWIN:  Is not public
13  transportation.
14       THE REPORTER:  Is not?
15       MS. DONNELLY:  Wait.  This is getting
16  confusing.  Start over.
17    Q.  (BY MS. BALDWIN)  Okay.  Let me start over.
18    A.  Okay.
19    Q.  Would you agree that it's more common than
20  not in your district for there not to be public
21  transportation to get to the DPS office?
22       MS. DONNELLY:  Object.  Form.
23       If you understand it, you can answer.
24    A.  I'm slightly confused, but I think I
25  understand what you're trying to ask me.

---

**43**

1    Q.  (BY MS. BALDWIN)  Let me try it one more time.
2    A.  I'm trying to follow you and I want to get
3  this right.
4    Q.  Can the majority of your constituents reach a
5  DPS office using public transportation, to the best of
6  your knowledge?
7       MS. DONNELLY:  Please don't speculate.
8    A.  Probably -- probably not.
9    Q.  (BY MS. BALDWIN)  When was the last time you
10  voted, Senator Patrick?
11    A.  This past runoff.
12    Q.  And did you vote on election day?
13    A.  No, I don't believe --
14       MR. DERFNER:  Could you speak up a
15  little bit?
16       THE WITNESS:  Yes.
17    A.  Did I vote on election day?  I don't believe
18  I did.  I believe I voted early.
19    Q.  (BY MS. BALDWIN)  Did you vote in person
20  early?
21    A.  I voted in person and I believe it was early.
22    Q.  And do you prefer to vote in person?
23    A.  If you're under 65, which I still can claim
24  that title, and unless you're away and get a waiver,
25  you vote in person.

---

**44**

1    Q.  Do you have a copy of your birth certificate,
2  Senator Patrick?
3    A.  I'm not sure.  I think I do, but not sure.
4    Q.  And do you know, does your birth certificate
5  reflect your current name?
6    A.  If it reflects a name, it would not be my
7  current name because I changed my name.  But I don't
8  know if it has my name on it or not.  I haven't seen
9  it in a long time.
10    Q.  Do you know how you would get a copy of it if
11  you needed it?
12    A.  I would find out.
13    Q.  And how would you go about doing that?
14    A.  I would make a call to the city of my birth,
15  which was Baltimore, and I would find out how to get a
16  copy of a birth certificate.
17    Q.  And do you know how much that would cost?
18    A.  No.
19    Q.  And do you know if there would be any
20  additional fees to update your name on your birth
21  certificate?
22    A.  Don't know that.
23    Q.  Prior to the passage of SB 14, do you know
24  how a voter's identity was verified at the polls in
25  Texas?

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

45

1       A.  No.
2       Q.  I'm going to represent to you that prior to
3   the passage of SB 14, voters could receive and vote a
4   regular ballot by showing their voter registration
5   card and providing their signature.
6       In your opinion was showing a voter
7   registration card and providing a signature at the
8   polls an adequate way to verify a voter's identity?
9       MS. DONNELLY:  You're asking him based
10  upon your representation?
11      MS. BALDWIN:  Yes.
12      MS. DONNELLY:  You can answer if you
13  understand.
14      A.  Would you -- would you repeat that for me?
15      Q.  (BY MS. BALDWIN)  In your opinion, was showing
16  a voter registration card and providing a signature at
17  the polls an adequate way to verify a voter's
18  identity?
19      A.  No.
20      Q.  Why is that?
21      A.  Because there was no proof of -- that you
22  were that person.
23      Q.  So having a voter registration card didn't
24  prove that you were the person.  Why is that?
25      A.  Because there was no proof, simply because I

46

1   had a card in my possession, that I was the person who
2   it was sent to or that should legally have it.
3       Q.  And what would constitute proof to you?
4       A.  What would constitute proof to me is that the
5   name on the registration card would match a legal
6   document with my name on it.
7       Q.  Are you aware of instances in which voter
8   registration cards were stolen?
9       A.  I'm not aware of anything specific.
10      Q.  Are you aware of instances in which showing a
11  voter registration card and providing a signature had
12  failed to prevent fraud at the polls?
13      A.  Please repeat.
14      Q.  Are you aware of any instances in which
15  showing a voter registration card and providing a
16  signature had failed to prevent fraud at the polls in
17  Texas?
18      MS. DONNELLY:  Objection.  Form.
19      A.  That's a really -- that's a hard question for
20  me to answer the way you've phrased that.
21      Q.  (BY MS. BALDWIN)  Are you aware of any time
22  while the prior system was in place in which that
23  system of showing a voter registration card and
24  providing a signature failed to prevent
25  in-person voter impersonation fraud?

47

1       MS. DONNELLY:  Objection.  Form.
2       You can answer.
3       A.  I really don't understand the question.
4       Q.  (BY MS. BALDWIN)  What don't you understand
5   about it so I can try and --
6       MS. DONNELLY:  "Failed to prevent" I
7   think is causing the problem.
8       A.  Yeah.  Yeah.  That's what I don't understand,
9   failed to prevent fraud.  Failed to prevent fraud is
10  confusing to me.
11      Q.  (BY MS. BALDWIN)  Sir, are you aware of any
12  instances in which there was in-person voter
13  impersonation under the prior system?
14      A.  Am I aware specifically, personally?
15      Q.  Yes.
16      A.  No.
17      MR. DERFNER:  Excuse me.  We're fighting
18  with this drilling outside, so could everybody speak
19  up a little bit?
20      MS. BALDWIN:  Certainly.
21      MS. DONNELLY:  We live it with every
22  day, so it's become white noise to me.  Sorry.
23      MR. DERFNER:  I thought they were doing
24  it just for us.
25      MS. DONNELLY:  Oh, no.  Trust me.

48

1       Q.  (BY MS. BALDWIN)  I'd like to talk about the
2   voter ID legislation that was introduced in the Senate
3   in 2009.  Do you recall that there was photo voter ID
4   legislation introduced in the Senate in 2009?
5       A.  I do recall that there was.
6       (Patrick Exhibit 2 marked/introduced.)
7       Q.  (BY MS. BALDWIN)  I'm going to hand you a
8   document to be marked as Exhibit 2, and this is a
9   nine-page document that states at the top that it is
10  SB No. 362.
11      MS. DONNELLY:  Counsel, we've been going
12  about an hour, so can we take a break now since you're
13  about to shift?
14      MS. BALDWIN:  Certainly.
15      MS. DONNELLY:  Thank you.
16      (Break.)
17      Q.  (BY MS. BALDWIN)  Senator Patrick, I've handed
18  you a document that's marked as Exhibit 2 and it's
19  titled SB No. 362.  Do you recognize this document?
20      A.  I don't recognize it, but I see that it's
21  Senate Bill 362.
22      Q.  You voted in favor of Senate Bill 362; is
23  that correct?
24      A.  If that's what the record reflects, yes.
25      Q.  Why did you support this bill?

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

---

**49**

1    A.  You're asking me to go back and remember what
2    I was thinking about a bill five years ago, which is
3    now 12,000 votes ago roughly and maybe 3,000 bills
4    ago.  I can't tell you what I was thinking
5    specifically at the time.
6        But I support photo voter ID, and if this
7    bill reflected that -- I haven't read this -- I
8    haven't read this bill in probably five years, so I
9    didn't -- haven't read it for preparation.  So it was
10   obviously a bill that I felt supported what I believe
11   the vast majority of all Texans wanted us to pass.
12       Q.  And is that why you supported it, because you
13   believe it reflected what you thought the majority of
14   Texans wanted, or were there other reasons why you
15   supported this bill?
16       A.  I believe it's important to protect the
17   integrity of the ballot box and I believe that it was
18   the will of the people.  As a legislator -- not
19   always, but much of the time -- you vote for
20   legislation that is supported by a majority of the
21   people.  And in this case it was a -- what I believe
22   was a large majority of Texans from all political
23   perspectives.
24       Q.  And how did you ascertain in your judgment
25   that this bill in particular was supported by a

---

**50**

1    majority of Texans?
2        A.  We have talked a little about this in the
3    deposition already.  Newspaper articles, polling that
4    I read about, talking to folks, whether it was on the
5    radio or in person, probably calls to our office.
6        There was a general sense that not 100
7    percent of the people, but 80 or 90 percent of the
8    people, believe that showing a photo when you came to
9    vote was -- was appropriate to protect the integrity
10   of the ballot box.
11       Q.  Were you aware that there are some Texas
12   voters who didn't support this legislation?
13       A.  The one thing you learn as a legislator is
14   you're never going to get 100 percent of the vote and
15   you're never going to get 100 percent of the people to
16   agree on any legislation.
17       Q.  Within the legislature itself, was it even
18   close to 100 percent of the Senate supporting this
19   bill?
20           MS. DONNELLY:  Objection.  Form.
21           You can answer.
22       A.  I believe it was 100 percent.  I could be
23   wrong.  But I believe it was 100 percent.  There may
24   have been one or two Republicans who didn't vote, but
25   I believe it was unanimous.  The Democrats did not

---

**51**

1    support it.  But their constituents -- based on
2    polling and news stories, and interviews that I
3    received, and general knowledge -- supported it.
4        Q.  (BY MS. BALDWIN)  So it's your judgment that
5    even though -- let me just be clear then.  So you
6    understood that no Democratic members of the Senate
7    supported SB 362; is that correct?
8        A.  Supported it or voted for it?
9        Q.  Voted for it.
10       A.  To my recollection, the record can correct
11   it, I do not believe any Democrats voted for it.
12       Q.  But you think, notwithstanding the fact that
13   no Democrats voted for it, you think their
14   constituents supported this bill in particular?
15       A.  I can't speak to this in particular.  I
16   believe that the majority of their constituents
17   support the concept.
18       Q.  Would you agree that there are a lot of
19   different ways to have a photo ID bill?
20       A.  You're asking me would I agree with your view
21   of that.  I can't answer what you're asking me to
22   agree to.  I -- could there be different forms of a
23   bill in any bill?  Of course, yes.  But that's a --
24   that's actually a hard question to answer.  You'd have
25   to really narrow that down into "What do you mean,

---

**52**

1    specifically, are there different ways to do it?"
2        Q.  So there are different forms of acceptable ID
3    that you could have in a photo ID bill, right?
4        A.  Yes.
5        Q.  And there are different forms of having both
6    photo ID or nonphoto ID that you could have in such a
7    bill, right?
8        A.  Say that again.
9        Q.  You could have a bill that allowed for both
10   photo ID and nonphoto ID; is that correct?
11       A.  Well, you're posing a hypothetical.
12   Hypothetically, yes, you could have a bill saying
13   anything.
14       Q.  Okay.  And a photo ID bill, it could vary in
15   terms of whether the forms of ID could be issued only
16   by the state of Texas or by other states; is that
17   correct?
18       A.  Once again, you're offering a hypothetical.
19   Any bill could have any language.
20       Q.  Right.  And a bill could have different
21   expiration periods for the IDs that have to be shown;
22   is that correct?
23       A.  Again, in a hypothetical context a bill could
24   say anything.
25       Q.  And so the idea that people may have

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

---

53

1  supported the general concept, there are a lot of
2  specifics that have to be worked out as to how any
3  concept would be implemented with respect to photo
4  voter ID; is that correct?
5          THE WITNESS:  Would you mind saying that
6  again?  I want to be sure I answer correctly.
7          Sorry.
8          THE REPORTER:  No problem.
9          "And so the idea that people may have
10  supported the general concept, there are a lot of
11  specifics that have to be worked out as to how any
12  concept would be implemented with respect to photo
13  voter ID; is that correct?"
14  **A.  I'm not trying to be difficult, that's a**
15  **confusing question to me.**
16  Q.  (BY MS. BALDWIN) Given how many choices you
17  have to make, and we've just walked through a number
18  of hypotheticals, how meaningful is it to you to just
19  say people supported photo ID without any
20  qualification?
21          MS. DONNELLY:  Objection.  Form.
22          Do you understand the question?
23  **A.  I don't.  I really don't understand the**
24  **question.**
25          MS. BALDWIN:  If I could just ask

---

54

1  if -- Senator Patrick, if you don't understand the
2  question, please feel free -- but let's let Senator
3  Patrick let me know that he doesn't understand the
4  question rather than have a speaking objection.
5  **A.  Well, that's why I asked you to repeat it for**
6  **me.  I'm not trying to be difficult.  I'm not sure**
7  **that I understand what you're trying to ask me.**
8  Q.  (BY MS. BALDWIN)  Okay.
9  **A.  Sorry.**
10  Q.  I'll move on from that.
11          THE WITNESS:  I didn't hear that
12  drilling until you brought that up before.
13          MS. DONNELLY:  For the record, there's a
14  jackhammer outside.  We're 15 floors up, but it sounds
15  like it's in the next room.
16          MR. DERFNER:  It's testifying I guess.
17          THE WITNESS:  Yes.  Yes.
18  Q.  (BY MS. BALDWIN)  What was the purpose -- the
19  legislative purpose of SB 362?
20  **A.  I have not read the bill since 2009.**
21  Q.  Why don't you take a moment to read it, then,
22  if that will help you answer.
23  **A.  All right.**
24          MS. DONNELLY:  I'm not trying to
25  interfere here.  Do you want him to read the whole

---

55

1  thing?
2          MS. BALDWIN:  Section 6, through 10.
3  **A.  Where does Section 6 begin, what page?**
4  Q.  (BY MS. BALDWIN)  Section 6 begins on page 3.
5  Actually, I think -- so that we get a full answer, I'm
6  willing to spend the time actually to just read from
7  Section 6 until the end, if you would.
8  **A.  Okay.**
9          MR. CLAY:  Anna, do you have another
10  copy?
11          MS. BALDWIN:  Here.
12  **A.  Okay.  I mean, if you have a specific**
13  **question, we may have to go back over a specific**
14  **point, but I've kind of went through it as quickly as**
15  **I could.**
16  Q.  (BY MS. BALDWIN)  So my question was:  ==What==
17  ==was the legislative purpose of this bill?==
18  **==A.  To protect the integrity of the ballot box by==**
19  **==doing our best to assure that the only people voting==**
20  **==were people who were eligible to vote and registered==**
21  **==to vote.==**
22  ==Q.  Were there any other purposes of this==
23  ==legislation, other than the purpose you've just==
24  ==stated?==
25  **==A.  I don't believe so, but I -- I may think of==**

---

==56==

1  **==something later.  But right now, that's the purpose,==**
2  **==of making sure that we have integrity at the ballot==**
3  **==box.==**
4  ==Q.  Was the purpose of this bill to increase==
5  ==voter confidence?==
6  **==A.  You know, I would just simply go back to the==**
7  **==purpose of the bill was to protect the integrity of==**
8  **==the ballot box.  And if that gave people more==**
9  **==confidence or it didn't, I can't make that call.==**
10  Q.  Was it your view that voters had a lack of
11  confidence in the election process in Texas prior to
12  this point?
13  **A.  Yes.  You -- you asked me earlier did**
14  **I -- was I -- I took the question as, was I personally**
15  **aware of any particular voter fraud; and my answer**
16  **was, was I personally aware, was no.**
17          **But there had been some news accounts, there**
18  **had been testimony, there was a belief in -- in -- by**
19  **the general public that potentially there was fraud**
20  **taking place in the voting booth.**
21  Q.  And specifically, in-person voter
22  impersonation fraud?
23  **A.  Yes, that -- that people believed in**
24  **general I -- I would say on two tracts.  They believed**
25  **that the system was ripe for fraud because anyone**

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

15 (Pages 57 to 60)

---

**57**

1    could show up with a voter registration card and you
2    didn't know if they were the person.
3             And secondly -- and this is why I believe the
4    bill would have universal support and -- again, from -- from
5    people from all walks of life and -- and minority and
6    majority populations -- they did not view it as being
7    unreasonable to require someone to have a photo ID to
8    vote.
9             Because what people would say to me all of
10   the time -- all of the time; whether it was on the
11   radio, in a meeting, seeing them down -- you know,
12   walking down the street talking about it, if -- if
13   this issue came up, is, we live in a society where
14   we're required to present a photo to do almost
15   everything we do; pick up your grandchild at school,
16   your child at school, get on an airplane, cash a
17   check, use your credit card.
18            The general public -- and this is why 90
19   percent of the people support it.  90 percent of the
20   people -- or at least, you know, the vast majority,
21   whatever the specific poll says -- people don't see it
22   as unreasonable because they are asked -- the majority
23   of people understand that this is -- is something that
24   is -- has become a part of the -- of society.
25            Q.  You keep referring to "universal support,"

---

**58**

1    notwithstanding the fact that every Democratic member
2    of the Senate voted against this bill.  Do you see any
3    contradiction in that?
4             A.  I think I've been clear.  And if I have not
5    been, for the record, let me be clear:  Universal
6    support by their constituents -- I think I said that
7    earlier.  We could go back and read the record.  I
8    said they may have voted against it; but their
9    constituents, when polled, were in favor of it.
10            Q.  So you're relying on a poll.  What poll are
11   you relying on to assert that their constituents
12   supported this and the poll shows that rather than
13   their own votes?
14            A.  Well, there are many polls.  We are a nation
15   of polls.  We see polls every night in the news.  Is
16   the President popular or unpopular, is Congress
17   popular or unpopular, is this issue, you know, popular
18   with people, unpopular.  I mean, we are also a nation
19   of polls.
20            And very often political parties, both
21   parties, will use polls to say, "This is where people
22   stand.  The President will use it.  Congress will use
23   it.  Democrats will use it.  Republicans will use it."
24            So I don't think it's a foreign concept
25   to -- thank you -- to suggest that poll after poll

---

**59**

1    after poll indicated that the majority of people,
2    including constituents who -- who voted for Democrats,
3    supported this issue.  I don't think that's -- that's
4    not a secret or a mystery.
5             Q.  But you're not aware of any specific polls
6    that were taken of the specific constituents of your
7    colleagues who are Democrats showing that they
8    supported SB 362, are you?
9             A.  I -- I don't know of a specific poll on 362.
10            Q.  So, in fact, you don't know, based on any
11   polling data, that SB 362 enjoyed anything like
12   universal support among Texas voters?
13            MS. DONNELLY:  Objection.
14   Argumentative.
15            MR. CLAY:  Objection.  Form.
16            A.  I think the first question you asked me a few
17   minutes ago was a general polling question, which I
18   answered.  If you're asking me now, specifically, have
19   I seen a poll that specifically said people supported
20   this bill word-for-word, no, I have not seen a poll.
21            Q.  (BY MS. BALDWIN)  So you don't --
22            A.  Not that I recall.
23            Q.  But other than polling data, do you have any
24   other reason to believe that there was widespread
25   support, including among minority Texans, for this

---

**60**

1    specific legislation -- in other words, SB 362 --
2    notwithstanding the unified opposition of every member
3    of the Texas Senate who represents a majority minority
4    district?
5             MS. DONNELLY:  Objection.
6    Argumentative.
7             Go ahead.
8             A.  And as I think I've answered -- as candidly
9    and as directly as I can -- it was more than polls.
10   This issue had been -- had been in the public for a
11   number of years.  You know, just general conversations
12   about it with people; whether they were in my district
13   or out of my district, whether they stopped me on the
14   street or whether it was at a meeting or whether it
15   was a phone call.
16            It's -- it was almost to the point, it was so
17   universal, that -- support for the bill, for the
18   concept of photo voter ID -- it was so universal that
19   you really had to shake your head and wonder why
20   anyone would be voting against it.  I can't explain
21   why the Democrats voted against it.
22            Q.  (BY MS. BALDWIN)  So sitting here today, you
23   don't have any idea of the reasons why your colleagues
24   in the Senate who voted against this bill did so?
25            A.  I really don't know.

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

61

1    Q.  What were the reasons that they gave?
2         MS. DONNELLY:  Objection.
3         To the extent that it's in the public
4    record, then certainly you can answer, but don't --
5    Q.  (BY MS. BALDWIN)  What were the public reasons
6    they gave?
7         MS. DONNELLY:  You can answer.
8    A.  Yeah, I'd have to -- I'd have to go back and
9    look at the testimony.  It was, I recall, 24 hours of
10   debate, or something like that; 20 hours, 18 hours, 30
11   hours.  I -- you know, I can't recall.  I didn't think
12   their arguments were very valid when I heard them, but
13   I -- I didn't really think they presented much of a
14   case, to be honest with you.
15   Q.  (BY MS. BALDWIN)  But it didn't concern you to
16   understand why they were opposed?
17        MS. DONNELLY:  Objection.  Form.
18        You can answer.
19   A.  When I'm crafting legislation or voting for
20   legislation, it's always great to have bipartisan
21   support.  It's -- it's a worthy goal.
22        It's a worthy goal to have unanimous support
23   within your own party.  But, that is often not the
24   case.  And I never really worry.
25        I listen to people.  I try to evaluate their

62

1    arguments to be sure that -- that I've made the right
2    decision in how I'm going to vote.
3         But at the end of the day, if someone chooses
4    to vote against something that I'm for, or for
5    something that I'm against, I don't really try
6    to -- after I've listened to their argument and maybe
7    talked to them to really try to get an understanding,
8    I don't really, you know, after the fact, think about
9    why they voted for something or against something.
10   Q.  (BY MS. BALDWIN)  And by the fact that every
11   Democratic member of the Senate voted against this
12   bill, is it also accurate to say that every member of
13   the Senate who represents a majority minority district
14   voted against this bill?
15        MR. CLAY:  Objection.  Form.
16   A.  Did every Democrat who represents a majority
17   minority district vote against the bill?
18   Q.  (BY MS. BALDWIN)  Yes.
19   A.  I -- I think the record -- I think the record
20   reflects every Democrat voted against it, and I
21   believe, but not certain, that Democrats represent
22   districts that are majority minority districts.  So
23   the answer would be yes, based on the knowledge that I
24   have.
25   Q.  And did every member of the Senate who is a

63

1    racial minority vote against this bill?
2    A.  I'd have to check the record.  I believe it
3    was unanimous.  If the record does not reflect that,
4    then my answer would be different, but I believe
5    you're correct.
6    Q.  And did that give you pause, that support and
7    opposition to this bill was split along racial lines?
8         MS. DONNELLY:  Objection.  Form.
9    A.  I have voted for bills where the final tally
10   was 30 to 1 and I was the 1.  Or 29 to 2.  I
11   don't -- I vote for what I believe is right and best
12   represents the people of Texas.
13        So I don't -- whether a bill passed by one
14   vote or was unanimous, I vote on legislation I
15   believe -- that I believe is the right thing for all
16   Texans, and I don't worry about if other Republicans
17   or Democrats -- we don't have any Independents in
18   this, in the Senate -- vote against me.
19   Q.  (BY MS. BALDWIN)  So to summarize, then, is it
20   fair to say you weren't bothered by the fact that all
21   African-American and Latino senators voted against
22   this bill?
23        MS. DONNELLY:  Objection.  Form.
24   A.  I don't want to answer the question as it's
25   your representation that I'm not "bothered by the

64

1    fact."  I didn't -- I listened to the testimony.  I
2    voted for the bill.
3    Q.  (BY MS. BALDWIN)  Did it make you think twice,
4    the fact that support and opposition was split along
5    racial lines in the Senate?
6         MS. DONNELLY:  Objection.  It's
7    argumentative.
8    A.  Yeah, I think I've -- I've answered this
9    as -- as candidly as I can.  I don't look at fellow
10   senators as Republicans or Democrats, or black, white,
11   and brown.  I look at my senators as equals.
12        And sometimes there are -- there's
13   legislation that Democrats support with me that
14   Republicans might not, not all of them; and sometimes
15   there are bills that only Republicans support and
16   Democrats.  I don't think like that.
17   Q.  (BY MS. BALDWIN)  And I'm not meaning to be
18   argumentative, but --
19   A.  Sure.
20   Q.  -- just so that I understand, you didn't take
21   any different significance away from this bill,
22   SB 362, because of the racial divide among the
23   senators; is that fair?
24        MS. DONNELLY:  Objection to form.
25   Argumentative.

SENATOR DAN PATRICK
CONFIDENTIAL TRANSCRIPT

7/11/2014

17 (Pages 65 to 68)

---

**65**

1  Go ahead.
2  A.  I would need you to say that one more time.
3  Q.  (BY MS. BALDWIN)  You didn't assign any
4  special significance to the fact that support and
5  opposition to this bill fell along racial lines in the
6  Senate?
7  MS. DONNELLY:  Form.
8  Go ahead.
9  I never take that in consideration.
10  Q.  (BY MS. BALDWIN)  Thank you.
11  Your prior testimony was that the purpose of
12  this bill was to protect the integrity of the ballot
13  box.  Do you believe that SB 362 would have
14  accomplished that purpose?
15  A.  To be very candid with you, it's very hard
16  for me to go back and even remember.  I remember
17  Senate Bill 14 a little bit better.  But going back to
18  2009, and trying to ask me what I believed or didn't
19  believe at the time...
20  Obviously, I voted for the bill, so the
21  record would reflect that I supported the bill.  I
22  can't tell you what my thinking was at the time;
23  hundreds and hundreds, and hundreds of hundreds,
24  hundreds -- maybe thousands of witnesses ago.
25  Q.  Is it correct that the only type of fraud

---

**66**

1  that would have been combatted by SB 362 is in-person
2  voter impersonation fraud?
3  A.  You're asking me an absolute, and I'm -- I'm
4  trying to move this along and I've slowed down the
5  process.  I have to think through what you said.  But
6  my first-blush response was, our concern was the
7  ballot, the integrity of the ballot for in-person
8  voting.
9  Q.  But sitting here today, can you think of any
10  other kind of fraud that this bill would have
11  addressed other than in-person voter impersonation
12  fraud?
13  A.  Sitting here today, and ten seconds of
14  thinking of your question, I can't.  But I -- if I
15  have a further reflection later, I'll let you know.
16  Q.  Okay.  I'd like to ask about some of the
17  specific provisions in SB 362.  On page 5 of the bill,
18  in Section 10, paragraph (1), do you see that this
19  bill would have allowed the use of Texas driver's
20  licenses or personal identification cards that had --
21  A.  What line are you on?  I'm sorry.
22  Q.  Sure.  I'm in subparagraph (1), on page -- on
23  Line Number 22.
24  A.  Line Number 22.  Okay.  I see it.
25  Q.  Do you see that SB 362 would have allowed the

---

**67**

1  use of driver's licenses that had been expired for up
2  to two years?
3  A.  I do see that.
4  Q.  And did you think that was a reasonable
5  provision?
6  A.  I can't remember what I thought at the time.
7  Q.  Sitting here today, do you have an opinion of
8  this provision?
9  A.  Sitting here today, that is not something
10  that I -- I would have supported, in terms of that
11  language.  But understand, that when you vote for a
12  bill, you're not always necessarily supportive of
13  every line in the bill.
14  And when you vote against a bill, it doesn't
15  mean that there isn't -- isn't something in the bill
16  that you voted against that you didn't support.
17  So that's what was in that at that
18  particular time, and that's how I voted, so...
19  Q.  Sitting here today, why is it that you
20  wouldn't support this language, if I've understood
21  your testimony correctly?
22  A.  I think it should be for a valid and not an
23  expired license.
24  Q.  And why is that in terms of the purpose of
25  the bill being to show somebody's identity?

---

**68**

1  A.  You know, it's just -- you know, it's like my
2  passport.  I noticed recently it's going to expire
3  next year.  It will still have my picture on it and
4  the information will be accurate, but I won't be able
5  to leave the country because it's expired.  And
6  there's a reason the federal government believes it's
7  important to have a valid passport, and I just believe
8  it's important to have a valid driver's license.
9  Q.  But the -- for a passport, you would agree
10  that the expiration periods are set for the purposes
11  of whatever the federal government has deemed for
12  using a passport, it's not the same purpose for -- let
13  me say that over again.
14  A.  Okay.
15  Q.  Did the federal government set passport
16  expiration periods with reference to whether or not it
17  would be sufficient to verify somebody's identity in
18  voting in Texas?
19  MR. CLAY:  Objection.  Form.
20  A.  I have no idea why the federal government
21  sets their rules.  My -- my point was that there is a
22  reason the federal government -- government sets an
23  expiration date and you can only use it for that
24  period.  And in my view, the state asking for a
25  driver's license to only be valid, based on nothing

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

---

69

1    expired, is -- is reasonable.  That's -- we're
2    not -- that's just my answer.
3        Q.  A driver's license that's been expired for a
4    month, is that any less likely to be able to show that
5    the person who's holding it is, in fact, the voter
6    that they say they are?  In other words, what does
7    expiration have to do with the ability to prove
8    somebody's identity?
9           MS. DONNELLY:  Objection.  Form.
10       A.  You know, I've kind of given you my answer on
11   it.  I just -- you asked me a question and I gave you
12   my answer that I would have preferred -- preferred at
13   the time, for it to be based on a valid driver's
14   license.
15       Q.  (BY MS. BALDWIN) I understand in terms of the
16   bill.  But just as a general matter of policy
17   preference, I'm trying to understand your position.
18          If the purpose is to verify a voter's
19   identity, why does a license being expired by a month
20   become inadequate to verify a voter's identity?
21          MS. DONNELLY:  Objection.  Form.
22       A.  You could make that same argument, that, is
23   two years' expiration okay or five years' expiration
24   okay or why wouldn't ten years of expiration be okay?
25          I just gave you my answer.  I believe that

---

70

1    being a current -- valid current driver's license
2    is -- is appropriate.
3        Q.  (BY MS. BALDWIN)  But what's the basis for
4    that belief in terms of how that's related to the
5    purpose of the bill in terms of being adequate to
6    verify somebody's identity?
7           MS. DONNELLY:  Objection.  Form.
8           Go ahead.
9        A.  I don't know how I can say it any
10   differently.  I believe that it should be a valid
11   driver's license.  I believe that's what the law is
12   today, I believe, so...
13       Q.  (BY MS. BALDWIN)  Do you think that more
14   people would have an ID that they would be able to
15   show at the polls if expired licenses were accepted?
16       A.  Do I -- say that again.
17       Q.  Do you believe that there are some Texas
18   voters who only have in their possession an expired
19   driver's license or passport?
20       A.  I wouldn't know that.  I mean, I wouldn't
21   know that.
22       Q.  Do you think that there are elderly people
23   who have let their driver's license expire and only
24   have that expired license in their possession; do you
25   think that's likely?

---

71

1        A.  Do I think that's likely?
2        Q.  Yes.
3        A.  Is it possible, yes.  Likely, I don't -- I
4    couldn't answer.
5        Q.  Do you have any elderly relatives in the
6    state of Texas?
7        A.  Yes.
8        Q.  Do they all still drive?
9        A.  My 88-year-old mother still has her valid
10   driver's license.  And elderly people who are over 65,
11   as anyone over 65, can vote by mail without any
12   identification.
13       Q.  But if they show up to the polls, they still
14   have to show ID; is that correct?
15       A.  Yes, they do.
16       Q.  And as a general matter, you would agree that
17   as people age sometimes they let their driver's
18   license expire because they no longer drive, right?
19          MS. DONNELLY:  Objection.
20       A.  I mean, I'm sure, again, it -- I'm sure it
21   occurs.
22       Q.  (BY MS. BALDWIN)  On page 6 of the bill, I'm
23   still in -- we're still in Section 10 --
24       A.  Uh-huh.
25       Q.  -- do you see that -- on Line 16, that the

---

72

1    bill, SB 362, would have allowed for the use of a
2    valid identification card that contains the person's
3    photograph and is issued by an agency or institution
4    of the federal government or an agency, institution or
5    political subdivision of Texas?
6        A.  Yes, I do.
7        Q.  Okay.  And did you support that language?
8        A.  I voted for the bill.
9        Q.  Do you think that a photo ID that's issued by
10   the federal government and is valid is an adequate way
11   to verify a voter's identity?
12       A.  If we were on the Senate floor right now I
13   would ask you exactly what you mean by all of this and
14   what valid IDs you're talking about, so...
15       Q.  A federal employee ID, do you think that
16   is an adequate form of ID to verify a voter's
17   identity?
18          MR. CLAY:  Objection.  Form.
19       A.  I'd have to think about it.
20       Q.  (BY MS. BALDWIN)  Why is that?
21       A.  Because I'd have to think about it.
22       Q.  Is there any reason, sitting here today, that
23   you can think of, why a federal employee ID wouldn't
24   be good enough to verify a voter's identity?
25       A.  I would have to think about it.

---

SENATOR DAN PATRICK                                     7/11/2014
CONFIDENTIAL TRANSCRIPT

19 (Pages 73 to 76)

73

1      Q.   What about a state employee ID?  Is that, as
2   you sit here today, in your judgment, adequate to
3   verify a voter's identity?
4      A.   I'd have to think through it.
5      Q.   Can you think of, sitting here today, any
6   reason why it wouldn't be good enough?
7      A.   I would have to think through it.
8      Q.   What factors would you consider in thinking
9   through that?
10     A.   You're kind of pivoting the discussion now
11  and getting into writing legislation and crafting a
12  bill and -- and I would want to have all the
13  information of -- of why certain things are considered
14  and why certain things aren't.  I might agree, I might
15  not agree, at the end of the day.
16     Q.   But you voted in favor of this bill, correct?
17     A.   Yes.
18          MS. DONNELLY:  Objection.  Asked and
19  answered.
20     A.   Yes.
21     Q.   (BY MS. BALDWIN)  And so at the time you voted
22  in favor of it, did you have adequate information to
23  make that judgment?
24     A.   Again, I don't recall the specifics of the
25  deliberation or the specifics of a bill five years

74

1   ago.  I voted for the bill.  It's on the record.  I
2   don't know what else I can say.
3      Q.   Would you agree that subparagraph (b) --
4   which allowed for IDs issued by an agency,
5   institution, or political subdivision of this state --
6   would have included student IDs from public
7   universities?
8      A.   I don't know if that included that or not.
9      Q.   Would you have supported that if it did?
10     A.   I don't know if we talked about that, you
11  know, regarding that bill or this bill.  I mean, I
12  don't know if that was part of this or not.
13     Q.   Do you have an opinion, sitting here today,
14  as to whether student IDs issued by public
15  universities in Texas are adequate to verify a voter's
16  identity?
17     A.   It might identify.  It may -- how did you
18  just say that?  I'm sorry.  How did you say that?
19     Q.   Do you have an opinion --
20     A.   To verify their identity?
21     Q.   Yes.
22     A.   It might verify their identity, but it would
23  not necessarily verify their residence.
24          MR. CLAY:  What were your last words?
25          THE WITNESS:  Would not necessarily

75

1   verify their residence.
2      Q.   (BY MS. BALDWIN)  Is the -- was verifying
3   residence one of the purposes of SB 362?
4      A.   The purpose of 362 was integrity of the
5   ballot box and making sure that people who voted were
6   eligible to vote and registered to vote.
7           So in the case of a student, you could have a
8   photo ID that would show this is who I am, but it
9   would not necessarily -- as an out-of-state student,
10  are they registered to vote?  So...
11     Q.   Do you know whether passports reflect a
12  voter's -- a passport holder's current residential
13  address?
14     A.   I haven't seen the latest passports because
15  mine are ten years -- almost ten years old, but
16  I -- but it does have on your passport where that
17  passport was issued, but I don't know that it has the
18  current address.
19     Q.   And are you aware that passports have a
20  ten-year validity period and can be issued in any
21  state?
22     A.   Yes.
23     Q.   So you would agree that for your passport,
24  for example, it doesn't say where you live on the face
25  of your passport?

76

1      A.   Mine doesn't.  I can't speak for others.  I
2   haven't seen others.
3      Q.   And your passport would have been accepted
4   under this bill; is that correct?
5      A.   I believe so.
6      Q.   And military IDs, are you aware of whether
7   they show --
8      A.   I'm -- I'm not.
9      Q.   So is your --
10     A.   I didn't want to finish your question there,
11  but I know where you were going.
12     Q.   You're not aware of whether military ID show
13  a voter's residence?
14     A.   Correct.
15     Q.   So is residence a concern that you only have
16  with respect to students?
17     A.   No.  Residence would be a concern that you
18  would have with everyone.
19     Q.   But there are a number of forms of ID that
20  were acceptable under this bill that wouldn't show
21  residence; would you agree?
22     A.   I'd have to go back and go through that, but
23  I believe -- I believe that would be an accurate
24  statement.
25     Q.   SB 362 also allowed for the use of nonphoto

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

Page 77

1   ID; is that correct?
2        A.  Yes, as I read it, correct.
3        Q.  What was the purpose of allowing for a voter
4   to use two forms of specified nonphoto ID?
5        A.  I don't know.
6        Q.  Did you ever know?
7        A.  Don't know.  I mean, I really -- I don't know
8   why that was in the bill.  I don't recall.
9        Q.  Did you ever have any conversation to try and
10  find out why that was included?
11       A.  That, I would not recall.
12       Q.  Did you support the inclusion of nonphoto IDs
13  in SB 362?
14       A.  I voted for the bill.  And as I said earlier,
15  on the record:  You vote for bills, you may not agree
16  with everything in a bill, and you vote against bills,
17  you may agree with some parts of the bill.  So I voted
18  for the bill, and that's the -- we've said that
19  multiple times.
20       Q.  So as you sit here today, do you have any
21  recollection of whether you supported or opposed
22  allowing a voter to verify their identity using a
23  Medicare or Medicaid card, for example?
24       A.  I don't know what a Medicaid or Medicare card
25  looks like.  I don't know if it has a photo or not.

Page 78

1        Q.  Nonphoto ID.
2        A.  Oh, under a nonphoto.  I do -- my belief was,
3   we needed a photo ID to protect the integrity of the
4   ballot box.  The other language that was in the bill
5   was in the bill.  I voted overall for the bill.
6        I would not -- I didn't -- would not have
7   agreed with that part of it, but it was in the bill.
8   That's the bill I had to vote for -- not had to vote
9   for.  That's the bill that -- that was the only bill I
10  had to vote on at that given time.
11       Q.  Did you analyze or direct anyone to analyze
12  which registered voters possessed one of the required
13  forms of photo ID identified in SB 362?
14       A.  I don't recall.
15       Q.  At the time that SB 362 was considered, were
16  you aware that Texas was subject to the Section 5
17  preclearance requirements of the Voting Rights Act?
18       A.  I'm sure I was.  Not specifically, but I'm
19  sure I was.
20       Q.  In deciding whether to support SB 362, did
21  you consider whether the legislation complied with
22  Section 5 of the Voting Rights Act?
23       A.  We always tried to write legislation
24  that -- we always try to write legislation that
25  complies with whatever given laws we're dealing with.

Page 79

1        Q.  Including, in this instance, Section 5 of the
2   Voting Rights Act specifically?
3        A.  Let's review, if you'd like, Section 5 of the
4   Voting Rights Act.  Specifically, my belief is that
5   just simply means our legislation has to be precleared
6   and -- so I knew that whatever legislation we passed
7   would be precleared.
8        Q.  Did you form a judgment for yourself about
9   whether the legislation complied with the Voting
10  Rights Act?
11       MS. DONNELLY:  This line of questioning
12  and -- on -- really, on 362 overall, this is all --
13  and to the extent the questions invade legislative
14  privilege, this is all under seal.  I just want to
15  make that clear for the record; is that correct?
16       MS. BALDWIN:  Yes.  The entire
17  transcript is under seal.
18       MS. DONNELLY:  Okay.  So we've
19  established that?
20       MS. BALDWIN:  Yes.
21       MS. DONNELLY:  Okay.  Thank you.
22       You can answer.  I'm sorry.  I didn't
23  mean to interrupt.
24       Q.  (BY MS. BALDWIN)  Did you form a judgment for
25  yourself as to whether the legislation that we're

Page 80

1   talking, SB 362, complied with the Voting Rights Act?
2        A.  I don't think I formed a judgement for
3   myself.  That's more -- I believe that's something
4   more that the author of the bill needs to consider
5   when he or she writes the bill.
6        Q.  Why isn't that something that you would want
7   to consider in casting -- in deciding how to cast your
8   votes?
9        A.  There are a lot of pieces of legislation that
10  are challenged in the courts everywhere.  And so, when
11  I'm writing a bill I'm going to do the best I can to
12  believe that it will survive challenges; and I assume
13  authors of bills are doing the same thing.  And so, I
14  don't think about it very much unless it's my bill.
15       And if it's my bill that I'm writing, then I
16  try to do my best to do that, because you want your
17  legislation to be upheld by the courts.
18       Q.  So is it fair to say that you didn't think
19  about very much whether SB 362 would have a negative
20  impact on the voting rights of racial minorities in
21  Texas?
22       MS. DONNELLY:  Objection.  Form.
23       Go ahead.
24       A.  I've never believed that asking someone to
25  have a photo voter ID infringed on anyone's rights.

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

81

1    Q.  (BY MS. BALDWIN)  And how did you form that
2    judgment?
3        A.  I believed it was not an unreasonable
4    request.  We've talked quite at length about the
5    support by the general public who did not have that
6    view that it was unreasonable, and it was important to
7    protect the integrity of the ballot box.
8        Q.  But you didn't know whether the specific
9    forms of ID that were required by SB 362 were not
10   possessed equally by members of all racial groups in
11   Texas?
12       A.  Would you say that again?
13       Q.  You didn't know whether the forms of ID that
14   were required by SB 362 were possessed in equal
15   proportion by members of all racial groups in Texas?
16       A.  I wouldn't have -- I wouldn't know that.
17       Q.  And would it also be fair to say that you
18   didn't think that that was an important consideration
19   to try and find out?
20           MS. DONNELLY:  Objection.  Form.
21       A.  If the question is, did I believe that the
22   vast majority of people had some type of photo
23   identification, the answer to that would be yes,
24   because it is required by so many businesses,
25   entity -- government entities.  Having a photo ID

82

1    today is very commonplace.  Does that mean that
2    everyone in the population had one, I couldn't answer
3    that.  But I did not think it was unreasonable,
4    regardless of if you were a majority or minority.
5           MS. BALDWIN:  Can we take a brief break?
6           THE WITNESS:  Sure.
7           (Break.)
8        Q.  (BY MS. BALDWIN)  Senator Patrick, before we
9    were talking about whether and the extent to which you
10   considered the Voting Rights Act and rates of ID
11   possession.  I want to present you a hypothetical.
12           If you were told that approximately 10 percent
13   of registered voters didn't have one of the forms of
14   acceptable ID under SB 362 and that those 10 percent
15   were disproportionately poor, that it was difficult to
16   get an ID and that they were disproportionately a
17   racial minority, would those combination of factors be
18   something that you would have considered?
19           THE WITNESS:  I'll ask a question of my
20   counsel.  Do I have to answer hypotheticals?
21           MS. DONNELLY:  You do if you understand
22   them.
23           Can we break this down, Counsel?  There
24   were a lot of parts to your question.
25       Q.  (BY MS. BALDWIN)  It's actually the

83

1    combination that's important to me.
2        A.  Okay.
3        Q.  So let's say that there are 10 percent,
4    approximately, of registered voters who lack a
5    required photo ID.  Also, assume that that 10 percent
6    is disproportionately poor, disproportionately a
7    racial minority, and that it's difficult to get one of
8    the required forms of photo ID.
9            Would that combination of factors be
10   something that you think should weigh into the
11   consideration of a bill like this?
12           MS. DONNELLY:  I'm going to object to
13   the form of the question.
14           But you can answer if you understand it.
15       A.  I could only answer with a hypothetical back,
16   of, how I would potentially look at that?  First,
17   would those people -- how many of those people, for
18   example, would be over 65 and who could vote by mail
19   and who do vote by mail.  Now, they -- some people
20   over 65 prefer to vote in person.  I understand that.
21   So that would have to be taken.
22           How many of those people live in urban areas
23   where it's very convenient to get to a DPS and get a
24   free ID, for example.  So what's the real percentage?
25           Again, the premise that you're making is not

84

1    a premise I agree with, that -- and I don't know what
2    the numbers are, obviously.  And you asked me a
3    hypothetical.  I do not agree with the premise that a
4    significant number of people do not have or cannot get
5    a photo ID.
6            And remember, even -- and if you look
7    since -- not through 62, but since SB 14 passed, we've
8    had, I believe, five total elections, maybe more, from
9    city to state, county.  You know, I don't think there
10   have been any complaints.  I'm not -- I'm personally
11   not aware.  It doesn't mean there haven't been a few,
12   but we've had millions of people vote.
13           And I think, in some cases, voter turnout is
14   actually higher.  Sometimes the primaries are not,
15   depending if it's the presidential or a gubernatorial
16   year.  But here we are, in 2014.
17           I'm not -- when you ask me am I aware of what
18   people think, I'm not aware of one complaint.  Maybe
19   there has been to my office.  I'm not aware of one
20   person that's complained, and I do have a district
21   where -- where, as I said earlier, I don't know the
22   exact number, but I think somewhere around 30 percent
23   plus, 35, 38 percent, are minority.
24           I'm not aware of any complaints to the
25   Secretary of State.  Maybe there have been -- the only

SENATOR DAN PATRICK
CONFIDENTIAL TRANSCRIPT

7/11/2014

22 (Pages 85 to 88)

---

**85**

1  thing that I -- I think I read a story about someone
2  complaining because they showed up and left it at
3  home.
4       So I think that what -- the bill that we
5  passed, I think we were thoughtful.  We tried to take
6  into account the hypotheticals that you present to us,
7  and I think the proof would show five years -- or not
8  five years -- three years, after the fact, that
9  students aren't complaining, seniors aren't
10  complaining, minorities aren't complaining, and voting
11  turnout is healthy.
12       Q.  (BY MS. BALDWIN)  You're aware that the law is
13  currently being subjected to challenge under the
14  Voting Rights Act, for having a racially
15  discriminatory impact, including by plaintiffs in the
16  state of Texas.  Does that count as complaining to
17  you?
18            MS. DONNELLY:  Objection to the form of
19  the question.
20       A.  Anyone can sue anyone for anything, but I'm
21  not aware of constituents and voters in any large
22  numbers complaining that they in some way were
23  disenfranchised.  And remember, for the record, let's
24  be very clear, if you show up and don't have a voter
25  ID and your name is on the voter rolls, you can still

---

**87**

1  have said, "Oh, my goodness, I couldn't get an ID or I
2  couldn't vote," so...
3       Q.  Have you looked into the number of
4  provisional ballots that have been cast since SB 14
5  has been in effect, for voters who didn't have ID, who
6  were not able to cure within the six-day period and as
7  a result those votes weren't counted?
8       A.  I have not.
9       Q.  So you're not -- if you haven't looked into
10  that, how do you know that voters aren't being
11  affected in the past five elections?
12       A.  When voters aren't happy, you hear from them.
13  They call your office.  They find a reporter.  They
14  show up on a news station.  And, again, there may have
15  been a report somewhere or a news story or -- you
16  know, somewhere, but I'm just not aware of any.
17       And, again, we're talking about millions of
18  people.  Could there been a handful?  I mean, I
19  don't know.  But I'm sure not aware of anyone.
20       You would have to show me that a significant
21  number of people felt they couldn't vote.  I just
22  haven't seen it.
23       So I think the bill has been a success; and I
24  think people, minority and majority, have embraced it
25  and feel that we have integrity at the ballot box.

---

**86**

1  vote a provisional ballot.
2       Q.  (BY MS. BALDWIN)  But that ballot won't cast
3  unless you show up within six days.  You make a
4  separate trip and show that you do, in fact, have a
5  valid form of identification; isn't that correct?
6       A.  Well, that is correct, because we have a
7  voter ID law.
8       But the suggestion that a person can't vote
9  if they're registered to vote and don't have a photo
10  ID, they do -- they can cast a provisional ballot and
11  they do have -- and they are given leeway to go back
12  and -- and -- if they left it at home or if they
13  didn't have it or they can get it, so I just -- it --
14  it -- I just -- I'm actually very, very pleased.
15       Whenever we pass legislation, we
16  always -- whatever legislation it is -- I passed a big
17  education bill last session on major reform and you
18  always want to see the result of it, and so it makes
19  me feel good in the case of the education reforms that
20  we passed last session when I hear parents and
21  superintendents say, you know, "This is really working
22  well."  And, no, it doesn't mean 100 percent of the
23  people are happy.  You never get 100 percent.
24       And so in this case, there just hasn't been
25  any, that I'm aware of, any large number of people who

---

**88**

1       Q.  Would it matter to you if there were hundreds
2  of votes from Harris County alone that hadn't been
3  able to be counted because they were provisional votes
4  and voters without ID?
5       A.  Hundreds of votes?
6       Q.  That were not counted because those voters
7  came to vote, lacked ID, and for whatever reason
8  didn't cure within the period.
9       A.  Well, as you've said, for whatever reasons.
10  I don't know what the reason was.  And secondly,
11  hundreds of votes out of millions cast, I don't know
12  what the percentage of that would be.  It would be a
13  very small percentage.  But I don't know the reasons
14  behind every one of those, so I can't tell you that I
15  would be concerned when I don't know the reasons.
16       Q.  So hundreds of votes, that would just be the
17  cost of doing business if those voters were
18  disfranchised?
19            MS. DONNELLY:  Objection to the form of
20  the question.  This is argumentative.
21       A.  Yeah, that's your word.  I wouldn't say that.
22       Q.  (BY MS. BALDWIN)  How many -- how many voters
23  would it take to have their provisional ballots not be
24  counted for that to count as a significant impact to
25  you?

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1      A.   There is -- let's go back to what the law is.
2   There is not a reason, in my view, or in the view of
3   the majority of citizens in the state of Texas, that a
4   person should not be able to get a photo voter ID.
5      In fact, I think the data -- I'm thinking,
6   don't have it in front of me -- but I think I have
7   read a story that there were very few people who went
8   to DPS to get a free ID, free photo ID.  We made that
9   available.  There were very few who did.
10     Again, I go back to this:  You've asked me a
11  lot of hypotheticals; in my opinion, and what do I
12  think.  I think very few people in America don't have
13  a photo ID that would be acceptable to vote or that
14  they can't get.
15     Are there some people?  There probably are
16  some people.  But I don't know who they are and what
17  effort they've made to get it.
18     Q.   And if it's difficult for those people to get
19  the ID, the percentage that don't have it, and they're
20  disproportionately minority, those aren't significant
21  concerns for you?
22          MS. DONNELLY:  Objection.
23  Argumentative.
24     A.   You keep -- you're a very nice person; but
25  you keep trying to characterize it from your point of

90

1   view, what my point of view is.  Your point of view
2   and my point of view are not the same.
3      I'm -- I'm always concerned about every
4   person and I want every bill that we pass that we try
5   to do the best we can.
6      Q.   (BY MS. BALDWIN)  Are you aware of statistics
7   showing that rates of poverty in the state of Texas
8   are higher among African-Americans than Anglos?
9      A.   Am I aware --
10     Q.   Sitting here today.
11     A.   -- of that?
12     I would say I'm generally aware of that.
13     Q.   And have you been aware of that throughout
14  the time that you've served in the Texas Senate?
15     A.   I don't know throughout the time.  But from
16  time to time I've -- you know, it's come up in a
17  particular -- whether it's health and human services,
18  education, or whatever it might be.
19     Q.   And are you also aware that African-Americans
20  are disproportionately like -- less -- let me start
21  over.
22     Are you also aware that fewer
23  African-American households have access to a car than
24  Anglo households in Texas?
25          MS. DONNELLY:  Objection.  Form.

91

1      You can answer.
2      A.   Yeah, I'm not aware of that.
3      Q.   (BY MS. BALDWIN)  That's not information
4   you've ever...?
5      A.   No, I've never seen the statistics on it.
6      Q.   If I represented to you that it is the case
7   according to the Census Bureau, that African-American
8   households lack access to a car at a higher rate than
9   Anglos, would that surprise you?
10     A.   It might.  I mean, I don't -- I've just never
11  really thought about it.
12     Q.   Okay.  And --
13     A.   When you say "access," you didn't say
14  ownership.  Access, I would say that almost every
15  person, no matter of their color, knows someone who
16  has a car.  I think that would be -- if I were asking
17  you the hypothetical question, do you think most
18  people know someone who has a car, and if most people
19  know someone who has a car, then most people might
20  have access to a car.
21     Q.   Is it harder to get to a DPS office if you
22  have to ask someone else for a ride than if you own a
23  car yourself?
24     A.   Not necessarily.
25     Q.   You don't think it imposes a different burden

92

1   if I have to go ask a family member to give me a ride
2   than if I can just go get in my own car?
3      A.   I think people ask people for rides all the
4   time, whether it's to go to the grocery store or go to
5   the airport or go to the doctor's office, who don't
6   have a car.  And for people who are -- who have public
7   transportation available to them, that's the option as
8   well.
9      Q.   But you've said within your district it's
10  likely that there are many people who don't have
11  access to public transportation to get to a DPS
12  office, correct?
13     A.   Most people who live in areas where you don't
14  have public transportation, which would be in -- in
15  your unincorporated areas where there isn't bus
16  service, or in rural Texas, when they move to those
17  areas they know that.
18     And so most people who live in those areas
19  have access to a car -- access can be a friend or a
20  relative -- because they know they have to leave the
21  house at some time and they can't walk to the mall.
22     I go to the mall in my area, Willowbrook
23  Mall, for example, and I'm sure not everyone at
24  Willowbrook Mall that I see shopping has a car, and
25  there isn't a bus that takes them there, but they get

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

---

93

1    there.
2         So I think most people who live in areas
3    where there isn't public transportation someone
4    who can help them get to a doctor or get to the
5    grocery store or get to the mall or get to DPS.
6    That's just my -- I don't think most people move to
7    the country without any ability to go anywhere.
8         Q.  But that's an additional burden that people
9    without a car have to navigate?
10        A.  I don't think it's a burden.  I think it's a
11   choice that they have made to live in an area that
12   maybe is less congested and -- that's their decision.
13   I don't think it's a -- I think it's choice.  I don't
14   think it's a burden.
15        Q.  So if you live in a county without a DPS
16   office, is that a choice you -- and you don't have a
17   driver's license, is that a choice you've made that
18   it's going to be more difficult for you to go get an
19   acceptable form of voter identification or a burden
20   that the state of Texas has imposed?
21             MS. DONNELLY:  Objection.  Form.
22        A.  I can't -- I mean, you're asking me a
23   question I can't possibly answer.
24        Q.  (BY MS. BALDWIN)  Okay.  Do you recall during
25   the consideration of SB 362 that there was a

---

94

1    discussion of the percentage of registered voters who
2    didn't have a driver's license on file with the
3    Secretary of State?
4         A.  No.
5         Q.  Is that something that you would have
6    considered?
7         A.  I don't know.
8         Q.  Would it have mattered to you if 12 percent
9    of registered voters weren't on file with having a
10   driver's license number with the Secretary of State?
11            MS. DONNELLY:  Objection.  Form.
12            Go ahead.
13        A.  I think I've answered this question already.
14   You'd have to break down the 12 percent and -- you
15   know.
16        Q.  (BY MS. BALDWIN)  Did you seek to break down
17   any number of voters who didn't have driver's license
18   numbers on file with their voter registration record?
19        A.  Well, first of all, I answered that.  I don't
20   recall the conversation or that fact, so I don't
21   recall.
22        Q.  You don't recall doing any follow-up about
23   that?
24        A.  No.  And I -- and I -- and I -- again, not
25   trying to be argumentative or difficult, we're --

---

95

1    you're asking me questions about a bill that didn't --
2    in essence, we've passed a bill since then.
3             But you're asking me about a bill that's five
4    years old, that's one of -- if you asked me the same
5    questions about most bills that passed or I voted on
6    or voted against in 2009, my answer would be the same,
7    because, you know, you just -- it's a lot of
8    information that we -- you know, that we process at a
9    given time and you move on to the next issue, so...
10        Q.  Okay.  I'd like to show you some testimony
11   that was given on SB 362 in an exhibit that I'll mark
12   as Number 3.
13        A.  Okay.
14            (Patrick Exhibit 3 marked/introduced.)
15        Q.  (BY MS. BALDWIN)  Sitting here today, Senator
16   Patrick, do you recall that there was any testimony
17   presented to the Senate when it was meeting as a
18   committee of the whole, about whether minority voters
19   were less likely to possess acceptable photo ID than
20   Anglo voters?
21        A.  I don't -- I don't remember the specific
22   testimony.  If it's here, I'm happy to read it, but I
23   don't recall it.
24        Q.  Sure.  I'd like to turn to, in this exhibit,
25   which is testimony from Tuesday, March 10, 2009, on

---

96

1    the page that's Bates numbered TX 00004155, testimony
2    from Tova Andrea Wang.
3         A.  Okay.
4         Q.  And I'm just going to read some of her
5    testimony and ask for your reaction.
6         A.  Okay.
7         Q.  Starting on Line Number 25:  "I want to start
8    out talking about the disenfranchising impacts of
9    voter ID such as this.  I know that for probably all
10   of you in the room -- and I would include myself -- it
11   seems so easy.  You have an ID in your pocket right
12   now, probably several.  But I have to really emphasize
13   to you all that it's not the case for everybody.  For
14   some people, they don't have their ID, and it would be
15   a real hardship for them to get that ID, and we need
16   to understand this group in our society.  In fact,
17   about 10 percent of the American people don't have
18   government-issued photo ID.  And as has been pointed
19   out repeatedly today, this is disproportionally the
20   case with African-Americans, immigrants, the poor,
21   people with disabilities, senior citizens and
22   students.
23             "There have been numerous studies to this
24   effect.  I want to point out one in particular,
25   Brennan Center survey, talking just about income.

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

97

1    People with incomes lower than $35,000 a year are
2    twice as likely not to have the kind of ID we're
3    talking about.  38 percent of Texans have incomes that
4    are less than $35,000 a year.  African-Americans are
5    three times less likely to have ID than whites.  And,
6    in fact, one-fourth of African-Americans don't have
7    government-issued photo ID."
8         Rereading that testimony now, Senator
9    Patrick, does it refresh your recollection as to
10   hearing it at the time, in 2009?
11        A.  No.
12        Q.  And do you know whether you took any steps to
13   look into the Brennan Center study that's cited in
14   this testimony?
15        A.  No.
16        Q.  You've testified repeatedly about relying on
17   polls showing support for photo ID.  Did you do any
18   research about the impact of photo ID?
19        A.  Don't recall.
20        Q.  What's your reaction to this testimony,
21   sitting here today?
22        MS. DONNELLY:  Objection.  Vague.
23        A.  Yeah, do you want -- would you like to be
24   specific?
25        Q.  (BY MS. BALDWIN)  You've testified repeatedly

98

1    that you just don't think that there are very many
2    people who lack photo ID.
3         Does it concern you that there are studies
4    that show that up to 10 percent of people lack the
5    forms of photo ID that are --
6         MS. DONNELLY:  Objection.
7    Mischaracterizes testimony.
8         You can answer.
9         A.  First of all, I don't know what the Brennan
10   study is.  I don't remember this testimony.  I don't
11   believe I asked any questions based on the record.
12        I don't know if I studied the Brennan study.
13   I don't know if it's -- I don't know what it's based
14   on.  But, again, as I said earlier, in the polls, you
15   know, so I -- you know, I don't know the validity of
16   it.
17        Again, if I were to look at this, of that
18   percentage, some are listed with disabilities
19   and -- and we addressed that.  Some of these folks
20   live in areas where they could easily get one.
21        I don't even know what percentage of these
22   people -- what if the 10 percent of these people
23   aren't even registered to vote?  I mean, I don't know
24   that they are or they aren't.
25        So it doesn't -- you know, there -- this

99

1    would just lead, potentially, to a lot of questions.
2    So it doesn't -- it doesn't jump off the page at me.
3         Q.  (BY MS. BALDWIN)  But the questions that it
4    would lead to today, they're not questions that you
5    recall doing anything to answer in 2009?
6         MS. DONNELLY:  Objection.  Vague.
7         A.  I mean, I just don't recall.  And the -- and
8    the other thing I was going to say, and I just kind of
9    paused for a second, it doesn't mean that some of
10   these people are -- I don't know what percentage were
11   over 65 and can vote by mail where you don't need a
12   photo ID.
13        So, hypothetically, 80 percent of the 10
14   percent could be over 65 and vote by mail, so...  And
15   that may have, you know, not been a question that I
16   asked.  It may have gone through my thought process at
17   the time.  I don't recall.
18        Q.  (BY MS. BALDWIN)  SB 362 didn't ultimately
19   pass; is that correct?
20        A.  I'd have to go back and look at the flow of
21   the bill.
22        Q.  Do you --
23        A.  It didn't become law.
24        Q.  It didn't become law.  That's a better way of
25   putting it.  Thank you.

100

1         A.  All right.
2         Q.  Do you know what happened to SB 362 in the
3    House?
4         A.  I do not recall.
5         Q.  I'd like to turn to SB 14, and I know we
6    talked about this a little bit at the beginning of the
7    day, but just to be clear:  Could you explain what
8    your specific role was in the development of the
9    language of SB 14 as introduced?
10        A.  To the best of my recollection, pretty much
11   zero.  To the best of my recollection.  If there's
12   some document or someone would testify otherwise, then
13   my memory is refreshed.  But as I recall, more than a
14   general discussion that maybe we had, in a caucus
15   meeting, about what should be in the bill of that.
16        But specifically, myself, I don't recall
17   working with -- with the -- who I would view as the
18   author of the bill, Troy Fraser.
19        And the -- and my involvement, to answer
20   your question, was two amendments, as I recall.  And I
21   refreshed my memory on this a little bit yesterday
22   because I didn't -- it was the amendment about people
23   with severe disabilities and an amendment with
24   Democratic Senator Hinojosa on CHLs.
25        So that would have been my only involvement

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

101

1   with the -- with the author, and I think that occurred
2   somewhere -- so we need -- I want to be very clear
3   that I'm answering accurately.
4         I didn't craft the bill.  But at some point I
5   believe that I talked with the author of the bill,
6   hence Senator Hinojosa, and said, "Look, you know, I
7   think we ought to do these things."  But in terms of
8   the overall bill, to my recollection, very little.
9         Q.  Prior to the bill being introduced in this
10  next session as SB 14, were there discussions of what
11  the provisions of it should be in Republican caucus
12  meetings?
13        A.  You know, I -- there could have been and
14  there probably were, but I -- I don't recall.  I don't
15  really remember anything specific, you know.
16        We -- we were probably talking about a lot of
17  different things, as we would normally do with an
18  upcoming session of what bills we want to move
19  forward, and I'm sure this was part of that
20  discussion.
21        Q.  Do you recall any discussion about changes
22  that should be made to 362 and to the bill that became
23  SB 14?
24        A.  I don't recall -- I don't recall the
25  discussion.  But obviously, somewhere along the line,

102

1   there was a discussion.  I just don't know if I was in
2   it or not, or if it was Senator Fraser and a small
3   group of people or a big group of people making the
4   changes.
5         Q.  Did you do any independent research on voter
6   ID in between consideration of 362 and SB 14 for your
7   own purposes?
8         A.  I don't recall.  I don't recall.
9              (Patrick Exhibit 4 marked/introduced.)
10        Q.  (BY MS. BALDWIN)  I'm going to hand you a
11  document to be marked as Exhibit 4.  And at the top of
12  this document it identifies that it is SB No. 14.
13        A.  Okay.
14             MR. CLAY:  I'm sorry, this is 4?
15             MS. BALDWIN:  Yes.
16        Q.  (BY MS. BALDWIN)  Do you recognize this
17  document, Senator Patrick?
18        A.  Again, very specifically, do I recognize it?
19  No.  But I see that it is a bill.
20        Q.  And do you see that it's the signed version
21  of SB 14?
22        A.  Yes, ma'am.
23        Q.  And as we discussed earlier, you were listed
24  as an author of this bill.  But as you've just
25  testified, just to make sure I understand, you weren't

103

1   involved actually in drafting; is that correct?
2         A.  And I want to be very careful how to answer
3   that.  I don't recall being heavily involved in the
4   crafting of this bill.
5         Could there have been a discussion?  Could
6   someone have asked me my thoughts on something
7   beforehand that was part of the bill?  Could have.
8         But I was, in the typical sense, an author of
9   a bill, who would kind of birth it and write it and
10  edit it and review it with people, I was not in
11  that -- I was not at that point.
12        Q.  And, again, even as you're qualifying that
13  you may have had conversations, is it correct that
14  sitting here today you remember none of the specifics
15  of any such conversation or even general topics or
16  even who you spoke to?
17        A.  With the exception of, I -- and I don't even
18  recall the conversations.  But obviously, since
19  Senator Hinojosa and I passed an amendment that I
20  think I was a joint author of the amendment or
21  co-author of the amendment, I think, obviously, I
22  discussed that with him.
23        And my -- and any time you offer an
24  amendment -- I shouldn't say any time.  Most of the
25  time when you offer an amendment, you go to the author

104

1   of the bill and say, "Look, I'd like to author this
2   amendment.  What do you think?  Would you accept it or
3   not accept it?  And if not, what can I do so you'll
4   accept it?"
5         So, obviously, there was a discussion at some
6   point with Senator Fraser, but I don't recall the
7   specifics.
8         Q.  Were all Republican senators listed as
9   authors of SB 14?
10        A.  I don't know.  I just don't know.  I think
11  possibly, but I don't know.
12        Q.  Let me see if this document -- it's just a
13  legislative history document -- refreshes your
14  recollection.
15        A.  Yes, this would show that -- well, let me
16  see.  There were 20 of us.  So I see 19 names.
17        Q.  Okay.
18        A.  I don't know if that's just an error or...
19        Q.  Okay.  Are all of the names listed of
20  Republican senators?
21        A.  Yes.
22        Q.  And is it unusual to have 19 people all
23  listed as authors on a bill?
24        A.  No.  I passed my first legislation, I put "In
25  God We Trust" in the Senate, and I had 31, as I

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

27 (Pages 105 to 108)

105

1   recall, authors.  All Democrats and all Republicans
2   who were authors.  So I don't know how frequently it
3   happened, but it's not -- it's -- it happens.
4       Q.  And why were so many people -- why did you
5   want to be listed as an author on this bill, yourself,
6   personally?
7       A.  I don't even know that I -- personally, I
8   don't recall asked to be.  I don't know that anyone
9   asked.  It may have just been an accommodation that
10  Senator Fraser -- you'd have to ask him.  I don't -- I
11  don't recall.
12      Because, again, in the last deposition I
13  didn't even remember that, to be honest with you.  I
14  was confused.  I kept saying, "I'm not an author."
15  And they kept saying, "Yes, you are."  And I said,
16  "No, I'm not."  And -- and then I figured out why.
17      So I -- I don't recall asking.  I don't know
18  if anyone asked.  He may have just said, "Look, I'd
19  like for all of you to author the bill."  It was a
20  piece of legislation that -- that we were proud of.
21      And -- and when I passed "In God We Trust" in
22  the Senate, no one asked me, but I just went to the
23  senators and said, "Look, I'm going to -- it hasn't
24  been up there in 100 years and would you like to be an
25  author of it?"  And so that's probably how it

106

1   happened.
2       Q.  Was SB 14 a priority of the Republican Party
3   of Texas?
4       A.  We have a lot of priorities each session and
5   that was a -- that was one of our priorities.
6       Q.  What was the purpose of SB 14?
7       A.  As I answered earlier:  To protect the
8   integrity of the ballot box and -- and pass a bill
9   that the vast majority of people had indicated they
10  wanted passed and believed should pass.
11      Q.  So is it fair to say that the purpose of
12  SB 14 was the same purpose as SB 362?
13      A.  I'm always careful when you characterize
14  something, but I think that's probably a fair
15  characterization.
16      Q.  And is the only kind of fraud that could have
17  been prevented by SB 14 in-person voter impersonation
18  fraud?
19      A.  I -- I believe that would be an accurate
20  statement.
21          MR. CLAY:  Could you read the question
22  back again, please.
23          THE REPORTER:  "And is the only kind of
24  fraud that could have been prevented by SB 14
25  in-person voter impersonation fraud?"

107

1       A.  And let me clarify that, since the question
2   was asked, and maybe I shouldn't have been so quick to
3   answer.  If you're suggesting that this bill did not
4   impact mail-in ballots, then that would be correct.
5   That's how I'm interpreting your question, and I
6   should not interpret your question.
7       Q.  (BY MS. BALDWIN)  Can you think of any other
8   kind of fraud that SB 14 -- other than in-person voter
9   impersonation -- would work to prevent?
10      A.  As I sit here today, no.  I would have to
11  study all that.
12      Q.  Okay.  Could you turn to page 9 of the bill,
13  which is Section 14?
14      A.  Was this an exhibit, by the way?  You handed
15  this to me.
16      Q.  It's just to refresh your recollection.
17      A.  Okay.  All right.
18      Q.  And this is the section that sets out the
19  allowable forms of photo ID under SB 14; is that
20  correct?
21      A.  Yes.
22      Q.  Do you know why these specific forms of
23  identification were included and not others?
24      A.  I do not.
25      Q.  Did you have any conversations with

108

1   constituents about what forms of ID to include in this
2   bill?
3       A.  If I did, I don't recall specifics.  And when
4   I -- in the previous question, I said "I do not,"
5   what -- I don't recall any, so, of -- or why.
6       Q.  Did you have any conversations with -- other
7   than about the concealed handgun license -- with other
8   senators -- about what forms of ID to include in the
9   bill?
10      A.  I may or may not have.  I don't recall.
11      Q.  Do you know if under SB 14 a voter can show
12  nonphoto ID and still cast a regular ballot?
13      A.  I'd have to go back through and be sure, but
14  I believe you must have a photo voter ID.
15      Q.  So that's a difference between SB 362 and
16  SB 14; is that right?
17      A.  Yes, ma'am.
18      Q.  And what was the purpose of removing the
19  option of showing nonphoto ID from the prior bill?
20      A.  You'd have -- you'd have to ask other folks.
21  I don't know.
22      Q.  Do you know who made that decision?
23      A.  I do not.  No.
24      Q.  So you're not aware of what changed between
25  2009 and 2011 that made nonphoto ID acceptable in one

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

109

1    session but not in this session?
2           MS. DONNELLY: Objection. Form.
3           You can answer.
4        A.  I don't know that this is the accurate
5    answer, but it could be part of the answer. For
6    example, when we go into session in 2015, this coming
7    session, of the 31 senators, I believe 22 will be new
8    since I was elected.
9           And I believe in 2011 -- I'd have to go back,
10   but I think there were two new -- I can't remember the
11   mix, but you always have different members and
12   different members have different contributions to a
13   bill or different opinions on a bill. So you may have
14   had -- may have had members on any given bill.
15          Bills all the time change from session to
16   session because members change. Maybe sometimes
17   information changes, but it's usually, you know,
18   members that change. In the House we have an even
19   bigger turnover, so that -- that may have been part of
20   it, but that's speculation and I shouldn't speculate.
21       Q.  (BY MS. BALDWIN) But other than personnel
22   change, in substance you don't know why SB 14 was made
23   more restrictive?
24          MS. DONNELLY: Objection. Form.
25       A.  I don't recall. But, you know,

110

1    this -- today, sitting here, I don't recall.
2        Q.  (BY MS. BALDWIN) Do you know what the purpose
3    of removing the option for a voter to show a
4    federally-issued photo ID as was allowed under SB 362
5    was?
6        A.  I don't -- I -- these are some of these areas
7    that sometimes if you're sitting with someone and they
8    refresh your memory, you say, "Oh, yeah, okay, I
9    remember that." But sitting here today, I don't
10   recall.
11          And as I said at the very beginning, I have
12   had -- I have had, to my recollection, very, very
13   little conversation about the bill since it's passed,
14   or communication since it's passed. It passed and we
15   moved on. So it's not something I've thought about
16   since 2011.
17       Q.  Did you conduct any analyses as to how many
18   registered voters possess the required forms of ID
19   required by SB 14?
20       A.  Not that I recall.
21       Q.  Did you ask that any analysis be conducted?
22       A.  Not that I recall.
23       Q.  Are you aware of any supporters of SB 14 who
24   asked for any analysis of how many voters had the
25   required forms of ID?

111

1        A.  Not that I recall.
2        Q.  Would that have been information that would
3    have been useful to consider?
4        A.  Yeah, that's a -- kind of a hypothetical. I
5    mean, we -- well, this issue, you know, we had already
6    worked on the session before, and so whatever
7    information was available was available. And we had
8    debated it, considered it and heard testimony. So --
9    so -- you know, so I just -- I don't recall
10   anything in 2011 specifically.
11       Q.  The bill changed significantly from 2009 to
12   2011, didn't it?
13          MS. DONNELLY: Objection. Form.
14       A.  Yeah, I -- you know, it depends on how you
15   say signifi- -- I'd have to go back and read and
16   compare it and do an analysis, but obviously there
17   were some changes.
18       Q.  (BY MS. BALDWIN) And you don't know, again,
19   the reason for why any of those changes were made?
20       A.  If I did then, I don't remember today why the
21   changes were made.
22       Q.  Would you agree that SB 362 was a more
23   lenient bill in the sense that there were more forms
24   of ID that were acceptable than SB 14?
25       A.  I wouldn't characterize it as "lenient." It

112

1    was just a different bill.
2        Q.  How would you characterize the difference
3    between the differences in allowable IDs between the
4    two bills?
5        A.  I wouldn't characterize it. I would let the
6    documents speak for themselves. And there were
7    more -- there were more options under 362 than 14.
8        Q.  Does it follow that the more options there
9    are, the more likely a voter is to have one of those
10   acceptable options?
11       A.  Not necessarily. But, you know, I mean, the
12   purpose of the bill was to protect the integrity of
13   the ballot box, and I think at the end of the day
14   there had obviously been a decision between 2009 and
15   2011 that this was a better bill.
16       Q.  So is it your view that SB 14 served that
17   purpose better than SB 362?
18       A.  To protect the integrity of the ballot box,
19   yes.
20       Q.  And why is that?
21       A.  Because we eliminated being able to vote
22   without a photo that you could do in SB 362.
23       Q.  Do you recall during the consideration of
24   SB 14 of whether other senators raised concerns about
25   the burdens that voters without an ID would face in

SENATOR DAN PATRICK                                7/11/2014
CONFIDENTIAL TRANSCRIPT

29 (Pages 113 to 116)

**113**

1   getting an election identification certificate from
2   DPS?
3       A. I don't recall.
4       Q. Do you recall there being any testimony about
5   the fact that not all counties have a DPS office?
6       A. You'd have to show it to me, but I do recall
7   that that was a question. I mean, I don't recall the
8   extent of it or who did -- or who said what, but...
9       Q. And was there also debate about and testimony
10  about the fact that even in counties that have DPS
11  offices, they're not necessarily open five days a
12  week, some are only -- have limited hours?
13      A. I don't recall that specific.
14      Q. Did the legislature do anything to address
15  the fact that not every county has DPS offices?
16      A. I don't know specifically. I'd have to go
17  back and look at my own amendment. I think that may
18  have been addressed for people with severe
19  disabilities, but I'm not positive.
20      Q. But other than for disabled voters; for poor
21  voters, for example?
22      A. I don't recall. You'd have -- the document,
23  as I often say on the Senate floor, in a debate,
24  speaks for itself.
25      Q. Would you agree that for some voters without

**114**

1   acceptable ID, the farther they have to travel to get
2   an EIC, the less likely they are to get one?
3       MS. DONNELLY: Objection. Form.
4       A. Yeah. Again, you're characterizing it,
5   but -- but my answer would be no.
6       Q. (BY MS. BALDWIN) So you think if a voter has
7   to travel 150 miles round-trip, that's not going to
8   impact whether or not they get an EIC?
9       A. Once again, you would have to give me the
10  specifics of that voter. Is that voter over 65? If
11  they're over 65, they can vote from mail, so it
12  obviously wouldn't impact them. You would have to
13  give me the specifics of a voter who you might be
14  trying to make that case for.
15      Has that voter ever gone anywhere from their
16  home -- anywhere near a DPS office, in between
17  elections or before an election? Because you only
18  have to do it once. So you'd have to give me the
19  specifics of a given person.
20      And as I've said earlier, to my knowledge we
21  haven't had any complaints from people who live in
22  these counties that don't have DPS -- to my knowledge
23  we haven't had any complaints of people saying, "Yeah,
24  gosh, I just never ever got by DPS to get a photo ID."
25      It's just -- and I've never heard any -- I've

**115**

1   never heard one Democrat senator or a Republican
2   senator who represents a rural area, since this bill
3   passed, say to me that it was a burden.
4       Q. Have you actively inquired, as to whether
5   it's a burden, from any colleagues?
6       A. I don't actively inquire on a number of bills
7   that we pass. Usually, if there's a problem with a
8   bill that we pass, someone will bring it up to you,
9   you don't have to ask them, if they're a problem.
10      Q. But you've represented a number of times that
11  there are hundreds of bills, thousands of votes, and
12  that after it's done you put it out of mind.
13      A. Uh-huh.
14      Q. But you expect that if there are problems
15  people will bring it up affirmatively without you
16  taking any further investigation?
17      A. That's pretty much how the system works. You
18  know, sometimes you pass legislation that just may
19  have a techni- -- you know, some kind of -- as we call
20  them, unintended consequences at times. And, believe
21  me, either -- you know, someone brings it to your
22  attention. And sometimes it's valid to try and fix it
23  in the next session, sometimes it's not.
24      But, I mean, I can sit here honestly today
25  and say I don't think I've had one senator, including

**116**

1   a Democrat, come back and say, you know, this -- "Dan,
2   this really didn't work out; you know, we need
3   to -- or we need to fix something, you know, we need
4   to make a change in the bill."
5       And we -- and, look, we've already had a
6   session in 2013 and I don't -- I stand to be
7   corrected, you can check the records.
8       I don't think one Democrat -- and every
9   Democrat voted against it. I don't think one Democrat
10  tried to amend this bill in any way or update it in
11  the last session. They may have, but I don't remember
12  it.
13      Q. Would there have been any likelihood that a
14  repeal of this bill could pass?
15      A. Not a repeal. I said to fix it. In other
16  words, if there's a problem, if you came to me and
17  said, "Dan, you know, this is a problem in my district
18  and I know the bill's not going to be repealed
19  and -- you know, but can we fix this? Can we try
20  to?"
21      I do not know of one Democrat senator who
22  came to me or made it an issue. I don't remember one
23  article. I don't -- I just -- but I think that's
24  because I don't think the Democrats are getting much
25  pushback in their district or questions.

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

117

1      Q.  But that's just your assumption, you haven't
2    actively sought out that information?
3          MS. DONNELLY:  Objection.
4    Argumentative.
5      A.  Well, what I'm saying to you is not an
6    assumption.  Well, it's -- yeah, I don't know if
7    anyone has complained to the -- what -- what I do -- I
8    do not recall.  Maybe someone said something to me in
9    passing or something or at lunch, but I do not recall
10   any Democrat senator or Republican senator saying that
11   we need to go back and tweak this, in any way, shape,
12   or form.
13         And I don't know that any -- maybe a bill was
14   filed to do so.  I -- you know, I don't know.  But
15   there was no -- maybe there was a bill filed to repeal
16   it because sometimes people will just file bills to,
17   you know, file a bill.  But in terms of a serious
18   change, I'm not aware of the Democrats coming to us
19   with any serious change.
20         And, again, being chair of education where I
21   really do have my arms around what happens, the best
22   example I can give you is several years ago we voted
23   for a number of standard state tests to graduate from
24   high school.
25         We had enough negative feedback from enough

118

1    parents and enough teachers and enough
2    superintendents, that collectively we went back and
3    changed the number of state tests.  We reduced them
4    from 15 to 5 last session.
5         So what I'm suggesting to you is, when we
6    pass major legislation -- and, again, every bill's
7    important -- the legislation impacts a large number of
8    people, that it is not uncommon for senators to go
9    back in another session or two sessions and say, "You
10   know what, we can improve it; we can make it better."
11        And so all I'm saying to you is, that in 2013
12   I'm not aware of anyone coming to us or -- or the
13   Democrat caucus, or a group of senators coming and
14   saying, "Look, this is the law, and we have to live
15   with the law."  That's out of the lawsuit.  But -- but
16   would -- "Would you-all work with us and change this?"
17   I'm just not aware of it.
18     Q.  (BY MS. BALDWIN)  There was some negative
19   feedback after SB 14 was passed, in the form of the
20   opinion of the three-judge court and the Section 5
21   litigation.  Did you read the opinion in that case?
22     A.  Sorry, no.  I -- I don't -- I don't follow.
23     Q.  Are you aware that that court found that
24   SB 14 would have a retrogressive, a negative impact,
25   on minority voters?

119

1      A.  I don't -- I have not followed the legal
2    wranglings of this legislation since then.
3      Q.  So that -- you've talked about, it's only had
4    good effects.  But you're not aware, at all, of what
5    the D.C. District Court held or its reasoning why?
6      A.  I respect the courts, but I'm more
7    con- -- quite frankly, more concerned with my
8    constituents and the people of Texas, say, or even my
9    fellow colleagues on the floor; and that's what I was
10   base -- basing my statement, that so far everybody
11   seems to be happy and there aren't very many
12   complaints, or none that I'm aware of.
13     Q.  So you're not aware that the D.C. court found
14   that, for example, the poverty rate in Texas is 25
15   percent for Hispanics, 23 percent for
16   African-Americans, as compared to just 8 percent for
17   whites; and that that means, quote, "the burdens of
18   obtaining an EIC will almost certainly fall more
19   heavily on minorities"?
20     A.  I'm not aware of that.
21     Q.  So because you weren't aware of that, you
22   couldn't consider whether that court finding was
23   something that might cause you to want to take
24   legislative action?
25         MR. CLAY:  Objection.  Form.

120

1      A.  Well, it apparently hasn't motivated any
2    Democrats to want to take, say, "legislative action",
3    that I'm aware of.
4      Q.  (BY MS. BALDWIN)  But it hasn't motivated any
5    supporters of SB 14, as far as you're aware?
6      A.  I'm not aware.
7      Q.  Were you surprised by the D.C. court ruling?
8      A.  Sitting here today, I couldn't even tell you
9    what the D.C. court ruling was.
10     Q.  And just to confirm then:  While SB 14 was
11   pending, you didn't conduct an analysis of the impact
12   of the bill on minority voters, as far as you recall?
13     A.  I think I've answered that multiple times;
14   but either, I don't recall something specifically
15   in -- or I considered it and moved forward and voted
16   for the bill.  I -- I just don't recall.
17     Q.  Okay.  And you're not aware of any of the
18   supporters of SB 14 conducting an analysis of the
19   impact of SB 14 on minority voters?
20     A.  I'm not aware what other senators do or do
21   not do.
22     Q.  I'd like to talk about the amendments that
23   were offered to SB 14 during the consideration of the
24   bill.
25         MS. DONNELLY:  Counsel, are you about to

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

121

1    move to a new area?
2              MS. BALDWIN:  Sure.
3              MS. DONNELLY:  It's ten after 12:00.
4    I'm wondering if we could take just a brief lunch
5    break.
6              MS. BALDWIN:  That's fine.
7              (Lunch break.)
8         Q.  (BY MS. BALDWIN)  Going back on the record,
9    I'd like to talk about some of the amendments that
10   were considered with respect to SB 14 and --
11             MS. BALDWIN:  Have we already marked
12   those or not yet?
13             MS. DONNELLY:  SB 14 is 4.
14             MS. BALDWIN:  But the --
15             THE WITNESS:  I haven't seen the
16   amendments, I don't think.
17        Q.  (BY MS. BALDWIN)  Okay.  Great.  So I'm going
18   to hand you a document to be marked Exhibit 5.
19             (Patrick Exhibit 5 marked/introduced.)
20        Q.  (BY MS. BALDWIN)  And, Senator Patrick, do you
21   see that this is a Senate Journal from January 26,
22   2011?
23        A.  Yes, ma'am.
24        Q.  Okay.  Could you turn to page 133 of this
25   document?

122

1         A.  I'm there.
2         Q.  Okay.  And Floor Amendment No. 35, is this an
3    amendment that you sponsored?
4         A.  I believe it is.  I was the -- I believe I
5    was the author of it.
6         Q.  Okay.  And what's the subject of this
7    amendment?
8         A.  The subject of the amendment, as I
9    recall -- I'd have to read it specifically here.
10        Q.  Feel free, if you'd like to take a moment.
11        A.  Yeah, let me read it.  Yeah, let me just read
12   it.  I know what the goal was, but let me see
13   specifically.
14             Okay.  It was to acknowledge that some people
15   with disabilities who lived in rural areas wanted to
16   be sure that they did -- that they were able to vote.
17             And I remember one conversation.  I do
18   remember that someone came to me from the disabled
19   community and said, "Dan, a lot of people who are
20   disabled, who depend on someone to get them somewhere,
21   can someone get them to drive them to the...", they can
22   vote by mail if they'd like, but they want to vote in
23   person.  And so they can get someone to drive them to
24   the poll, but they might not be able to get someone to
25   drive them, you know, 30, 40 miles.

123

1              And so I thought about that and I looked at
2    the Indiana law, as I recall, at the time, and they
3    had made an exception for that, and I also -- as I
4    said earlier, we try and write things that will -- you
5    know, will stand up in court.
6              And so my only function is, you know, my
7    amendment.  But looking at the bill, and I saw what
8    Indiana -- and I believe at the time Indiana had
9    been -- I guess it didn't have to be approved because
10   they weren't under Section 5, but -- so based on the
11   Indiana model and based on thinking about that issue,
12   I offered that amendment.
13        Q.  So you were concerned that for some people
14   getting to a DPS office to get an alternative form of
15   ID would be difficult?
16        A.  If they were severely disabled, I was
17   concerned.
18        Q.  And why only severely disabled?  What was
19   particular about that group of voters?
20        A.  Well, because they -- they -- they might be a
21   voter who, if they were severely disabled, never
22   served in the military, so they wouldn't have a
23   military ID.
24             If they were severely disabled -- and they
25   had to have doc-- -- a letter from a doctor.  I forget

124

1    how we defined it at the time.  They had to have a
2    letter that they were severely disabled.
3              They may not have a CHL because maybe they
4    just wouldn't need to carry a gun anywhere because
5    they're kind of immobile.
6              And a third reason, if, you know,
7    they're -- they still may want to be independent and
8    want to be able to vote in person.  And so it made
9    sense to me, it seemed like the right thing to do.
10        Q.  Did you consider including a separate
11   exemption on the basis of indigency?
12        A.  I did not.
13        Q.  Could some of those same considerations that
14   make it difficult for a person who's disabled to get
15   to DPS also apply to somebody who is poor?
16        A.  I -- obviously, at the time, I didn't -- I
17   didn't consider that at the same level of this.  And I
18   have -- and I've been on the -- I've been the chairman
19   of the charity for children with severe disabilities
20   since 1988 and so I work a lot with the disabled
21   community and -- and some -- there is a -- there is a
22   difference from being poor and being totally disabled.
23        Q.  But regardless of whether the burdens are the
24   same, could there be similar burdens that could apply
25   to the poor?

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

125

1          MS. DONNELLY: Objection. Form.
2     A.  You know, I can't speculate on that. I
3  just -- you know, as I've said multiple times today, I
4  believe that it was not an undue burden to ask people
5  to have a photo voter ID in the world that we live in
6  today in order to vote.
7          But with someone who was severely disabled,
8  who -- especially if they've been disabled their whole
9  life, may have never driven a car, and so that would
10 knock them out of a driver's license and military --
11 it just seemed to me to be -- and I looked at --
12 again, I looked at the Indiana law and they had
13 obviously thought through it as well, and I thought it
14 made sense.
15     Q.  (BY MS. BALDWIN) This amendment also included
16 an exemption for showing ID for voters over 70 years
17 of age; is that right?
18     A.  Let me look at it here.
19     Q.  In subsection (h)(1).
20     A.  Yes. Yes. I'm looking at this.
21          Yes. As I'm reading it, I mean, the document
22 speaks for itself. "The requirements for
23 identification...do not apply..." Yeah.
24          And, you know, to be very candid with you, I
25 don't remember that part of the amendment. That -- I

126

1  was so focused on the disabled. But I don't -- I
2  don't remember that part of it. But, obviously, it
3  speaks for itself.
4     Q.  So you don't recall why you included age in
5  this?
6     A.  No. I don't know if -- it may have been
7  another member who asked me would -- would I add it.
8  I wonder if it was amended on the floor, a
9  floor amendment? It doesn't look that way. I -- you
10 know, I just -- I don't recall the circumstances of
11 it.
12     Q.  So voters who are 70 years of age or older
13 already would have been able to vote by mail?
14     A.  Yes.
15     Q.  But did you think it was important that they
16 still have the same opportunity to vote in person --
17     A.  Well, I always --
18     Q.  -- even if they didn't have an ID?
19     A.  I always think everyone -- I think
20 everyone should have the opportunity to vote, however
21 they want to vote, you know.
22          More and more -- more and more seniors are
23 voting by mail as every election goes by. More and
24 more people vote early as every election goes by,
25 and -- but some people like to vote in person. I

127

1  just don't -- you know, I honestly don't remember the
2  circumstances of that. I just don't -- I don't
3  remember.
4     Q.  And you're not aware of the racial
5  demographics of voters 70 years of age or older --
6     A.  No --
7     Q.  -- in Texas?
8     A.  -- I'm not.
9     Q.  Other than the individual you mentioned from
10 the organization for the disabled, did you talk to
11 anybody else in deciding to introduce this amendment?
12     A.  I don't recall. I'm sure -- I'm positive I
13 would have had a conversation with Senator Fraser, as
14 the author of the bill.
15     Q.  Were you concerned that without such an
16 amendment the bill would not pass constitutional
17 muster?
18     A.  I -- as I recall, I do recall thinking that.
19 And I don't remember -- I don't remember the
20 circumstances or the -- the specifics of it.
21          But it seemed to me there was some discussion
22 that the -- would the Indiana -- well, I'm not asking
23 you questions. I don't know if the Indiana law
24 was -- it ever went to the courts or not.
25          But it was -- seemed to be something along

128

1  the lines of, the Indiana law was viewed as -- as the
2  courts upheld it, or I don't know if it was
3  challenged. Again, I know it wasn't under
4  preclearance.
5          But for some reason, I had the belief that
6  the Indiana law passed muster with the courts and they
7  had had that included. So that was probably a part of
8  the discussion.
9     Q.  So was this your idea to include this, or did
10 someone suggest to you that this amendment would be
11 helpful?
12     A.  I can't say for certain. I think it was
13 more -- I do, in my recollection. And I could be
14 wrong. Senator Fraser may have a different
15 recollection, so...
16          MS. DONNELLY: And if you're about to go
17 into communications that Senator Fraser made to you,
18 please do not.
19          THE WITNESS: Yeah.
20     A.  So I won't -- I just remember going to him
21 and saying, "I'll offer this amendment." But I don't
22 remember the circumstances of it.
23          But, again, because of my 25-year history of
24 working with the disabled, it may have been someone
25 came to me and said, "Dan, you know, you have a...",

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

33 (Pages 129 to 132)

129

1   and the senators are well aware of that because we've
2   done certain things on the floor with the disabled
3   community that I've been involved with.
4        So it may have been brought to me.  I may
5   have, you know, created it.  I'm not sure.  But I
6   ended up offering it.
7   Q.  (BY MS. BALDWIN) Were you concerned that for
8   disabled voters or for voters over age 70 that it
9   would be more difficult for them to have access to the
10  underlying documents that they would need in order to
11  get an EIC?
12  A.  Again, I do not recall the circumstances of
13  the 70s -- of the 70-year-old or older.
14       And I think I've answered the other question
15  that I -- of the severely disabled who -- who lived in
16  a rural area of Texas.  That was my main focus.
17  Q.  Okay.  I just wanted to distinguish the
18  travel to DPS.  I understand, from your statements
19  about the rural area.
20       But did you have any separate concern about,
21  for some voters, such as the disabled, getting the
22  underlying documentation that you need to show in
23  order to get an EIC?  Was that a concern?
24  A.  I don't recall.
25  Q.  Were you concerned that absent an amendment

130

1   like this, that for the voters that it targeted, if
2   there weren't these exemptions, that they might not
3   vote in Texas elections?
4        MR. CLAY:  Objection.  Form.
5   A.  Yeah, I -- you know, the only thing I recall
6   is -- is something to do with Indiana law; but I
7   believe I'm correct that it was in their law.  And
8   that, being someone who is pretty aware of the
9   disabled community, that it just seemed to register
10  with me as being the right thing to do.
11       And -- and I took some criticism from the
12  grassroots for it, because they mistakenly thought I
13  was creating a loophole for anyone who had a disabled,
14  handicapped placard to park; which, we have, as I
15  recall, about a half million of those.  I don't know
16  if it's in the state or -- it would in the state.  It
17  wouldn't be in the county.  But a half million, in the
18  state.
19       And someone thought -- I got a lot of, you
20  know, some criticism from some folks that said, "Dan,
21  why did you do this?  You just opened up a loophole."
22       Because, it's believed in Texas it's fairly
23  easy to get a handicapped placard, and that people
24  would just use that as a chance to vote.  And I -- and
25  I had to assure them that, no, it didn't, because it

131

1   required a letter from a doctor.
2        Anyone with a handicapped -- plus, which, the
3   people who criticized me for it weren't thinking; if
4   you have a handicapped parking sticker, you most
5   likely have a driver's license.
6   Q.  (BY MS. BALDWIN) Right.  In fact, were you
7   called a RINO, a Republican-in-name-only, for this --
8   A.  I don't know specifically if I was, but I
9   wouldn't be shocked, okay?
10  Q.  Were there any particular organizations that
11  had that concern that this was a loophole?
12  A.  I -- I remember seeing an e-mail yesterday as
13  we -- as I said earlier, that we met.  And there was,
14  I think, an e-mail to me, to -- I don't know if it was
15  specifically to Catherine Englebredth or to True the
16  Vote.  I do -- I hadn't remembered it, but I saw it
17  yesterday, so...
18  Q.  So there were -- True the Vote was one of the
19  organizations that was concerned that this was
20  creating a loophole?
21  A.  Well, and it was just their misunderstanding
22  of what the amendment did.  They -- they weren't
23  concerned, I don't believe -- I can't speculate what
24  their -- but the main concern was the handicapped
25  parking placards.

132

1   Q.  Would you say that True to Vote, in general,
2   favored having a strict ID requirement?
3        MS. DONNELLY:  Objection.  Form.
4   A.  I don't ever recall ever having any
5   discussions with them, what they favored or didn't
6   favor, so...
7   Q.  (BY MS. BALDWIN) I'd like to ask about
8   another amendment that you sponsored.  If you could
9   turn to page 123 of the Senate Journal from January
10  26th.
11  A.  Okay.
12  Q.  And Floor Amendment 18, is this an amendment
13  that you sponsored?
14  A.  I was the co-author of it with Senator
15  Hinojosa.
16  Q.  Okay.  And what was the purpose of this
17  amendment?
18  A.  It just included -- it gave one more item,
19  because we had -- we had somewhere in the
20  neighborhood, back then, 3 or 400,000 -- I shouldn't
21  speculate -- but hundreds of thousands of people with
22  CHLs, and -- and Senator Hinojosa, who is a person who
23  supports CHLs, in -- in my view, and he thought
24  that -- I know that he and I talked about it.  I just
25  don't remember the conversation.

U.S. LEGAL SUPPORT - HOUSTON, TEXAS
713.653.7100

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

34 (Pages 133 to 136)

133

1       But he was supportive of it, and so he
2   carried it just to give one more, because we knew that
3   those people that had a CHL had been -- not that you
4   need a background check for one; but we knew that was
5   an authentic, you know, government document.
6       Q.   Okay.  Did you look up whether there were any
7   other forms of Texas ID that would have met that same
8   standard?
9       A.   Yeah, I don't recall that I did, but...
10      Q.   Did Senator Hinojosa approach you or did you
11  approach him?
12      A.   I don't really recall.
13      Q.   So you testified you were aware at the time
14  of approximately the number of CHL holders?
15      A.   Yeah.  And I shouldn't -- I really shouldn't
16  have gone down that trail to speculate.  It just seems
17  to me that there were hundreds of thousands, and
18  I -- that may be something I just read somewhere.  I
19  don't recall that that was part of the decision.  But
20  it's a significant number.
21      Q.   But you weren't aware if whether there are
22  any other forms of state ID that are held by a
23  significant number of Texans that weren't included in
24  SB 14?
25      A.   No.

134

1       Q.   You have no recollection of ever seeking out
2   that information?
3       A.   No.
4       Q.   This amendment wasn't intended to help
5   minority voters, was it?
6       MS. DONNELLY:  Objection.  Form.
7       A.   You know, I don't -- I don't recall what the
8   intention was, but there are minority voters that have
9   CHLs.  I mean, the thought that only Anglos have CHLs
10  would, I think, be incorrect.  So obviously -- and
11  Senator Hinojosa, you know, was one of the authors of
12  the amendment, so he obviously thought so.
13      Q.   (BY MS. BALDWIN)  Sure.  But you don't have
14  any information suggesting that CHL holders are
15  disproportionately minority, do you?
16      A.   I don't know.
17      Q.   Do you have any information suggesting that
18  they're disproportionately Anglo?
19      A.   I do not.
20      Q.   Did you have a belief at the time, one way or
21  other?
22      A.   No.
23      Q.   Did you ask DPS for any information on the
24  race of CHL holders?
25      A.   I may have.  I don't recall.

135

1       Did you say on the race?
2       Q.   Yes.
3       A.   I'm sorry.  No, I definitely would not have
4   asked that.
5       Q.   I'd like to talk about some other amendments,
6   ones that you didn't sponsor.
7       A.   Okay.
8       Q.   If we could take a look on page 118 of the
9   journal, from January 26th, at Floor Amendment No. 12.
10      A.   Okay.
11      Q.   If you could take a moment to look at this,
12  and tell me when you're ready.
13      A.   No. 12.
14      Yes.  Okay.
15      Q.   This amendment would have provided that the
16  underlying documentation that you need to obtain a
17  state form of SB 14 photo ID would be provided free;
18  is that correct?
19      A.   Yes.
20      Q.   And would this amendment have interfered with
21  the effectiveness of the purpose of SB 14?
22      A.   I can't speak to that.
23      Q.   Sitting here today, do you have an opinion on
24  that?
25      A.   I'd have to think through it.  I'm not

136

1   prepared to give you an answer quickly.
2       Q.   Receiving a free birth certificate wouldn't
3   harm the ability of the state of Texas to verify a
4   voter's identity in any way that you can think of,
5   would it?
6       A.   I don't know that that's the -- I don't know
7   that that may have been the issue.  The issue may have
8   been there's a cost to produce a document, and, you
9   know, if there was a reasonable low cost for someone
10  to -- you know, to do that.  And I don't know if
11  that's changed since then or not.  But at the time, I
12  think that was the view.
13      Q.   So this amendment was tabled; is that
14  correct?
15      A.   Correct.
16      Q.   And just to make sure that I understand,
17  tabling means it doesn't go forward, it kills the
18  amendment?
19      A.   Correct.
20      Q.   And was this amendment tabled on a party line
21  vote?
22      A.   Yes.
23      Q.   And you voted against this -- you voted to
24  table, correct?
25      A.   Correct.

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

137

1    Q.   And do you recall why you voted to table?
2    A.   I do not.
3    Q.   This amendment would have placed the cost of
4    obtaining documents on the state rather than the
5    voters; is that right?
6    A.   Yes.
7    Q.   And did you oppose that concept?
8    A.   Well, I think by -- I think my record speaks
9    for itself.
10   Q.   So you wanted the cost imposed on voters?
11   A.   Yes, if it was a reasonable cost.
12   Q.   Well, whatever the costs were at the time
13   were the costs that were going to be imposed on voters
14   as a consequence of tabling this amendment; is that
15   correct?
16   A.   Not on voters, but people who were seeking --
17   I mean, it could have been a voter; it may not have
18   been a voter, but anyone seeking to get a birth
19   certificate or an ID.
20   Q.   Take a look at Floor Amendment No. 13, from
21   January 26, on page 119.
22   A.   Yes, ma'am.
23   Q.   Was the purpose of this amendment to allow
24   the use of expired photo IDs?
25        MS. DONNELLY:  Did you get a chance to

---

138

1    review it?
2        THE WITNESS:  Yeah, I'm just looking at
3    it now.
4    A.   But I'd have to go back and look at that
5    section of the bill to see what it's talking about.
6    It says:  "In SECTION 12 of the bill...strike
7    'that has not' and substitute, 'regardless of whether
8    it has.'"  I don't know what it's referring to by just
9    reading the amendment.
10   Q.   (BY MS. BALDWIN)  Okay.  Well, would you like
11   to take a moment and line it up with...
12   A.   Section 12.
13       MR. DYER:  Can I point something out?  I
14   think that Senate Bill 14 that you have is the past
15   version.  This would have been amending the version
16   that hit the Senate floor, so it may not sync up
17   section to section.  I don't know if it does or not.
18   I just want to -- if it doesn't, that may be why.
19   A.   Can you tell me, do you know what it referred
20   to?
21   Q.   (BY MS. BALDWIN)  My understanding is that
22   this is allowing the use of expired IDs.
23   A.   Section 10, Section 11, Section 12.  Okay.
24   Yeah, it doesn't.  I don't think it lines --
25   Q.   Yeah, it doesn't line up, you're right.

---

139

1        THE WITNESS:  Good catch, Jay.
2    A.   Well, we're looking for Section 63.0101.
3    Q.   (BY MS. BALDWIN)  Which is Section 14 of the
4    past bill, and the underlined language "that" --
5    A.   Okay.  There it is.  Okay.
6    Q.   -- "that has not" immediately precedes the
7    word "expired."
8    A.   Okay.  Okay.
9    Q.   So does it appear to you that this amendment,
10   by switching the language "that has not" or
11   "regardless of whether it has," the purpose of this
12   was to allow for the use of IDs even when they have
13   expired?
14   A.   Yes.
15   Q.   And this amendment was tabled; is that
16   correct?
17   A.   Correct.
18   Q.   And, again, that was on a party line vote,
19   correct?
20   A.   Correct.
21   Q.   And you voted in favor of tabling?
22   A.   Correct.
23   Q.   And why did you vote in favor of tabling?
24   A.   You know, I don't recall.  But as I did share
25   with you earlier, when we were talking about SB 362,

---

140

1    that that was my position, that I felt they should be
2    valid, you know.  As it turned out in this bill, we
3    did allow 60 days after expiration anyway, if I'm
4    reading -- if I am remembering and reading this
5    correctly.  Does it not say that?
6    Q.   Yes.
7    A.   Okay.
8    Q.   And --
9    A.   So I'm not -- I'm not so sure this
10   amendment -- I'm not sure what -- exactly what this
11   amendment -- it says "regardless of whether it has."
12   Q.   Would this amendment have allowed for the use
13   of indefinitely expired IDs?
14   A.   That's probably how I would have read that.
15   Q.   And would that have interfered with the
16   effectiveness of SB 14?
17   A.   As I spoke earlier, I believe we should have
18   a valid -- you should have a valid current.  So it's
19   just my belief.
20   Q.   But you can't say, one way or another,
21   whether that would interfere with the effectiveness of
22   the bill?
23   A.   No.
24   Q.   If you could turn to Floor Amendment No. 16,
25   on page 121.

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

36 (Pages 141 to 144)

141

1      A.  Okay.
2      Q.  And take a moment to review the substance,
3  and just let me know when you're ready.
4      A.  Okay.
5      Q.  This amendment would have allowed for the use
6  of the same nonphoto IDs that were included in SB 362;
7  is that right?
8      A.  I'd have to go back and compare.  Is it
9  exactly the same?  I don't know that that's the case,
10  but you'd have to...
11     Q.  But it does include, even just looking at it,
12  11 forms of nonphoto ID?
13     A.  Yes.
14     Q.  And this amendment also would have allowed
15  for DPS IDs to be expired for up to two years; is that
16  correct?
17     A.  Yes.
18     Q.  And that provision is the same as was in
19  SB 362, right?
20     A.  I don't recall.  Is that what -- if that's
21  what the document says.  I don't remember 362 allowing
22  you to vote with a library card.
23     Q.  Would you like to look at, if, in fact --
24     A.  I mean, I don't know if it did or not.
25     Q.  That was included.

142

1      A.  It was?
2      Q.  Yes.
3          And this amendment was also tabled on a party
4  line vote; is that correct?
5      A.  Correct.
6      Q.  And you voted in favor of tabling?
7      A.  Correct.
8      Q.  And do you believe that this amendment would
9  have, had it passed, interfered with the effectiveness
10  of SB 14?
11     A.  Yes.
12     Q.  And why so?
13     A.  Because you would have been able to vote
14  without a photo ID.
15     Q.  And could you take a look at Floor Amendment
16  20, please, Senator Patrick, which is at the bottom of
17  page 123.
18     A.  Okay.
19     Q.  Is this essentially a more narrow version of
20  the prior amendment in that it allows two specified
21  forms of nonphoto identification?
22     A.  Yes.
23     Q.  And those are a Medicare identification card
24  and then a Social Security card accompanied by a voter
25  registration certificate?

143

1      A.  Yes.
2      Q.  And if I understand your testimony
3  previously, you think that allowing any form of
4  nonphoto identification would have lessened the
5  effectiveness of the bill?
6      A.  Yes.
7      Q.  And so you voted to table this amendment?
8      A.  Yes.
9      Q.  And this amendment was also tabled on a party
10  line vote?
11     A.  Yes.
12     Q.  Take a look with me at Floor Amendment No.
13  24.
14     A.  What page is that?
15     Q.  That is on page 126.
16     A.  Got it.
17     Q.  And please let me know when you're ready.
18     A.  Okay.  (Reviewing.)  Okay.
19     Q.  This amendment would have allowed individual
20  counties to decide whether to issue voter registration
21  certificates with a voter's photo; isn't that correct?
22     A.  Yes.
23     Q.  This amendment was also tabled on a party
24  line vote, correct?
25     A.  Yes.

144

1      Q.  Why wouldn't it have been a good idea to let
2  individual counties decide whether or not to issue
3  photo voter registration cards?
4      A.  I don't recall.
5      Q.  Would this amendment have interfered with the
6  effectiveness of SB 14?
7      A.  I don't know, because I don't recall
8  the -- the specifics of the debate.
9      Q.  Would this amendment have been helpful, given
10  that, in alleviating the travel burdens that you
11  identified -- at least with respect to disabled
12  voters, and that there aren't DPS offices in every
13  county -- so through this amendment you would have had
14  a place in every county in Texas, if the county
15  wanted, they would have had the option to provide
16  photo ID?
17     A.  I don't know.
18     Q.  Well, a county can't unilaterally decide to
19  open a DPS office, can it?
20     A.  No.
21     Q.  But under this amendment, a county would have
22  been able to decide to offer its voters a photo ID?
23     A.  Under this amendment, I think so.
24     Q.  And sitting here today, you don't recall why
25  you opposed this?

SENATOR DAN PATRICK
CONFIDENTIAL TRANSCRIPT

7/11/2014

37 (Pages 145 to 148)

145

1      A. I do not.
2      Q. If you could take a look at Amendment No. 29,
3  on page 129.
4      A. All right.
5      Q. This is an amendment that would have expanded
6  DPS's operating hours to at least some evening and
7  weekend hours; is that correct?
8      A. Yes.
9      Q. And this amendment was also tabled on a party
10  line vote; is that correct?
11      A. Yes.
12      Q. So you voted against this amendment, correct?
13      A. Yes.
14      Q. And would this amendment have interfered with
15  the effectiveness of SB 14's stated purpose?
16      A. I can't respond because I -- I don't know
17  based on sitting here looking at this issue. There
18  obviously was some discussion by Senator Ellis and may
19  have been some discussion by someone who opposed it.
20  Don't know.
21      Q. Would this amendment have made it less
22  burdensome for voters without a photo ID who work
23  hourly jobs to get to a DPS office?
24          MR. CLAY: Objection. Form.
25  Foundation.

146

1      A. I -- I can't speculate on that.
2      Q. (BY MS. BALDWIN) You don't think it would be
3  helpful for a voter who has a 9:00 to 5:00 job,
4  without leave, to have the opportunity to go to DPS on
5  the weekend to get an EIC if they needed one?
6          MR. CLAY: Same objection.
7          MS. DONNELLY: I join it.
8      A. I can't speculate on it.
9      Q. (BY MS. BALDWIN) The last amendment I'd like
10  to talk about is Floor Amendment 30. If you could
11  take a moment to look at that.
12      A. Okay. (Reviewing.) Okay.
13      Q. This amendment would have asked the Secretary
14  of State to report on a number of issues related to
15  the implementation of SB 14; is that correct?
16      A. Yes.
17      Q. Did you oppose finding out the number of
18  voters, yearly, who voted a provisional ballot because
19  they came to the polls without acceptable ID?
20          MS. DONNELLY: Objection. Form.
21      A. The amendment speaks for itself and I voted
22  to table the amendment.
23      Q. (BY MS. BALDWIN) And did you oppose
24  specifically asking the Secretary of State to find out
25  whether the ID requirement was having a disparate

147

1  impact on women, elderly voters, minority voters,
2  students, or persons with disabilities?
3          MS. DONNELLY: Objection. Form.
4      A. The amendment speaks for itself and I voted
5  to table it.
6      Q. (BY MS. BALDWIN) And the amendment was tabled
7  on a party line vote; is that correct?
8      A. Yes.
9      Q. Similar to what I asked previously about
10  SB 362; in deciding whether to support SB 14, did you
11  consider whether the legislation complied with Section
12  5 of the Voting Rights Act?
13      A. Once again, I think I answered this question.
14  My -- without studying Section 5 -- belief is that
15  Section 5 simply says we are to be precleared. So my
16  goal would be the hope that our bill would be written
17  in such a way that would be precleared, so...
18      Q. But you surely understood that Section 5
19  isn't just a procedural requirement requiring
20  preclearance, but that it has substantive standards
21  that Texas has to meet, right?
22          MS. DONNELLY: Objection. Form.
23      A. I'm not a lawyer and nor a student of Section
24  5, so...
25      Q. (BY MS. BALDWIN) You're a member of the

148

1  Redistricting Committee, correct?
2      A. I am.
3      Q. And is having an understanding of the
4  framework that governed redistricting important?
5      A. Having a -- having a general knowledge is
6  always -- is always a good idea.
7      Q. And is part of that general knowledge that
8  the legislation would be reviewed under Section 5 of
9  the Voting Rights Act as to whether it had a negative
10  or retrogressive effect on the ability of racial
11  minorities to participate in the political process?
12      A. Would you repeat that?
13          THE REPORTER: "And is part of that
14  general knowledge that the legislation would be
15  reviewed under Section 5 of the Voting Rights Act as
16  to whether it had a negative or retrogressive effect
17  on the ability of racial minorities to participate in
18  the political process?"
19          MS. DONNELLY: Can we break that down?
20      Q. (BY MS. BALDWIN) Did you understand that
21  Section 5 required -- did you understand that for
22  legislation to be precleared under Section 5 of the
23  Voting Rights Act, the standard it has to meet was
24  that racial minorities wouldn't be negatively affected
25  compared to the standard that was already in place?

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

38 (Pages 149 to 152)

---

149

1    A.  Very candidly, I came in here today thinking
2  about voter ID, and not redistricting; but you've
3  asked me a question and I'll try to answer it.  And I
4  haven't really thought about that issue either, for
5  several years.
6        Yes, I think it would be fair to say that
7  that was my general understanding.
8    Q.  And did you understand that that was the
9  Section 5 standard that applied to both redistricting
10 and to voter ID?
11   A.  I'm not sure that -- that I knew that or
12 connected that or thought about that.  I'm not saying
13 I didn't, but I just -- I don't recall.
14   Q.  Did you discuss whether SB 14 would meet the
15 requirements of the Voting Rights Act with anyone?
16   A.  Not that I recall.  And -- and I'll qualify
17 that.  I'm sure it may have been discussed at some
18 point, but I don't recall specifically.
19   Q.  And during the Senate's consideration of
20 SB 14, do you recall any testimony regarding whether
21 minority voters were less likely to possess acceptable
22 photo ID than Anglo voters?
23   A.  I'm sorry, say that again one more time.
24   Q.  Sure.  During the Senate's consideration of
25 SB 14, do you recall any testimony being presented

---

150

1  regarding whether minority voters were less likely to
2  possess acceptable photo ID than Anglo voters?
3    A.  There may have been testimony, but I don't
4  recall it.
5    Q.  What's your understanding of why, with
6  respect to SB 14 specifically, the senators who voted
7  against SB 14 were opposed?
8        MS. DONNELLY:  Objection.  Speculative.
9    Q.  (BY MS. BALDWIN)  I'm asking your personal
10 understanding.
11   A.  And I think as I testified earlier, I'm -- I
12 really don't understand why they voted against it.  I
13 always -- I always respect a person's right to vote
14 for or against a bill and -- based on their own
15 reasoning.  Most of the time I don't know that
16 reasoning.
17   Q.  Did you think that any part of the reasoning
18 for why those who were opposed to SB 14 were -- had
19 any connection to the fact that they represented
20 majority minority districts and they were concerned
21 about SB 14 having a negative effect on their
22 constituents?
23        MS. DONNELLY:  Objection.  Speculative.
24   A.  Yeah, I really don't know their reasons, as I
25 testified, I believe, earlier.  I believe their

---

151

1  constituents, the majority supported the concept of
2  photo voter ID, so I'm not sure why they did not vote
3  to reflect the will of their constituents.
4    Q.  (BY MS. BALDWIN)  And it's your judgment that
5  you understood the preferences of the constituents of
6  every Democratic legislator in the House -- in
7  the -- excuse me.
8        It's your testimony that you understood the
9  preferences of the constituents of every Democratic
10 senator better than they did themselves?
11        MS. DONNELLY:  Objection.
12 Argumentative.
13        You can answer.
14   A.  Yeah, I wouldn't pretend that I know another
15 senator's district better than I know mine.
16        But, again, looking at the polling data and
17 the general sense of news reports and opinions on this
18 issue, it was clear that -- based on polling data and
19 other data -- that a majority, or a significant number
20 at least, in some of their districts, supported photo
21 voter ID.
22   Q.  (BY MS. BALDWIN)  And, again, just because I
23 know we -- I asked this question with regard to SB
24 362, but I want to make sure that I've asked it with
25 respect to SB 14:  You're not aware of any particular

---

152

1  polls that asked Texas voters about the specific forms
2  of ID and the specific requirements of SB 14, are you?
3    A.  It is -- my answer is no.  But it would be
4  highly unusual.  In fact, I can't think of one bill,
5  of the thousands that we pass, that is polled while
6  it's on the Senate floor being voted on.  It's usually
7  issues are polled.  The specifics of a bill are not at
8  the time a bill is being -- as -- as -- at the time of
9  the process of passing a bill.
10       So I -- I wouldn't think -- I can't think of
11 any situation -- maybe there has been one -- but I
12 can't think of any situation where the bill is being
13 polled while it's being -- while it's going through
14 the process.
15       MS. BALDWIN:  If we could just take
16 maybe a brief five-minute break?
17       MS. DONNELLY:  Sure.
18       (Break.)
19       (Patrick Exhibit 6 marked/introduced.)
20   Q.  (BY MS. BALDWIN)  Senator Patrick, I'm giving
21 you a document that's been marked as Exhibit 6
22 and -- which is a document that's been produced in
23 this litigation under a "Highly Confidential" label
24 and is Bates numbered TX 00010002 to 4.
25   A.  4, okay.

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

---

161

1    their organizations.
2        Q.   I'd like to ask a question about the last
3    paragraph of the --
4        A.   Okay.
5        Q.   -- e-mail, where you write:  "I believe all
6    of the Republicans have co-authored the bill, if not,
7    all will vote for it and it will pass along party
8    lines 19 to 2."
9            MS. DONNELLY:  "12."
10           MS. BALDWIN:  Thank you.
11       Q.   (BY MS. BALDWIN)  "19 to 12."
12           MS. BALDWIN:  Thank you.
13       A.   Okay.
14       Q.   (BY MS. BALDWIN)  So is it fair to say that
15   even before the bill was called for a vote, you
16   expected it to be a party line vote?
17       A.   Yes.
18       Q.   And why was that your expectation?
19       A.   Based on past votes on other bills of similar
20   subjects.
21       Q.   Other than past history, any other reasons?
22       A.   Well, I think it was just general knowledge
23   that the Republicans were in favor of this concept in
24   representing the majority of Texans and the Democrat
25   voters were -- I mean Democrat senators, were not.

---

162

1        Q.   And, again, it's not because of any specific
2    reasons; because you don't, as you sit here today,
3    know any specific reasons why the Democratic senators
4    were opposed to the bill?
5        A.   I mean, I can't -- I can't speculate on why
6    they voted against the bill.  I mean, it's just -- you
7    know.  And did one or two of them tell me why?  If
8    they did, I don't recall.  I mean, again, I don't
9    recall any deep discussion about it with them, outside
10   of what took place on the Senate floor or in a caucus
11   meeting maybe.
12       Q.   And what's the blocker bill?
13       A.   The blocker bill, if I can explain it to you
14   very simply, because -- it's not complicated.  Texas,
15   for a long time, was a -- and the reason I know pretty
16   well is because I've been opposing it for a long time
17   and I've given debates on the floor.
18           For most of the last century, Texas was an
19   all Democrat state, in terms of its legislators or
20   strong majority.  So in the '30s, '40s, '50s, and
21   '60s, when there were 31 senators, there may have
22   been, at any given time, two, three or four
23   Republicans with all Democrats.  For all the
24   Democrats -- and if it were all Republicans, it would
25   be the same thing.

---

163

1        But when everyone in the room is in the same
2    party, you have to -- and you want your bill and you
3    want your bill and he wants his bill and everybody
4    wants their own bill; well, not everybody can bring
5    their bill to the floor.  There's only so much time.
6    And so, how do you decide who gets their bill to the
7    floor?
8        So a little bit of the history of that, I
9    think this -- because it's a Senate rule, it's not in
10   the Constitution, it's voted on by senators.
11       So the Democrats, to -- the best history I
12   can recall, the Democrats actually created the bill,
13   in essence, so that there was a way to -- to organize
14   what bill comes on the floor.
15       So if you can get 20 other Democrats -- since
16   there's 26 or eight of you, however many -- if you can
17   get 20, okay, I'll take your bill.  But otherwise, I
18   just can't -- if you're the lieutenant governor, you
19   can't take everyone's bill.
20       In the 1950s, it really came into play where
21   it started being used a little bit.  In essence, what
22   the blocker bill says -- think of one street of
23   traffic.  If there's a car and it's broken down, every
24   car behind it can't go through, it's blocking traffic,
25   so you have to go around to move forward.

---

164

1        So what the blocker bill does is -- and,
2    again, the Democrats, from the best of my study,
3    started it, created it.  What the -- what the blocker
4    bill -- and it was also -- it's known as the rosebush
5    bill.  The Democrats would have someone file a bill
6    dealing with the landscaping of the Capitol and they
7    would never pass the bill.  It would block every other
8    bill.
9        So for you to pass your bill, you would have
10   to get 20 other senators to agree with you, because
11   you'd be the 21st vote, to suspend the rules to go
12   around that bill.
13       So what has been the tradition over the
14   years -- and, again, the Senate -- the lieutenant
15   governor doesn't decide, the senators vote on
16   that -- every year we vote on the rules.  The
17   senators, Democrats and Republican, we get in a room
18   and we vote all the rules.  We can vote any rule we
19   want.  And so that rule is still in place today.
20       And so every session there is a bill -- it
21   may not be -- I don't even know what they have been
22   the last couple of sessions.  I don't know if it's
23   landscaping anymore.  But a bill is filed, it's put in
24   the chute ready to go, but it never gets voted on.
25       So if -- if we were all senators, I

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

43 (Pages 169 to 172)

169

1    A.  There is, but I don't know the name of it.
2    Q.  Okay.  Does --
3    A.  Or I don't recall the name of it.
4    Q.  Okay.  There's one of the e-mails higher up
5    in the chain on 9976, Grassroots America; does that
6    ring a bell?
7    A.  Where is that?
8    Q.  Her signature block at the very top e-mail on
9    the top of the page.
10   A.  Yeah.  Grassroots America - We the People?
11   Q.  Yes.  What is that organization?
12   A.  Yeah, it's a -- I believe it's a two-party
13   group, but I'm not -- we have lots of different names
14   for the groups, so...
15   Q.  Could you take a look at the e-mail
16   that starts on 76 and then goes onto 77?
17   A.  Yes.
18   Q.  And tell me when you're ready.
19          MR. CLAY:  And just to be clear, again,
20   you're talking about the embedded e-mail --
21          MS. BALDWIN:  Yes.
22          MR. CLAY:  -- that starts at the bottom
23   of 76?
24          MS. BALDWIN:  Yes.  And that has the
25   date of June 14, 2011, at --

170

1          MR. CLAY:  Okay.  Thanks.
2          MS. BALDWIN:  -- at 8:18.
3    A.  Well, if -- if you want to just ask me about
4    specifics on this?
5    Q.  (BY MS. BALDWIN)  Sure.  Okay.  What's the
6    context of this message?  In other words, why were you
7    sending this message to JoAnn Fleming?
8    A.  I don't recall.  Again, it appears that it
9    appears that she sent me questions about a number of
10   issues, and I was responding, apparently, after
11   session was over.  I don't know if we were in special
12   that year or not.
13          But I sent it in, June 11th.  So it looks
14   like she was -- which many citizens ask me about, all
15   the time after session ends, about various bills, or,
16   you know, trying to get a better understanding of what
17   passed, didn't pass, why it passed, why it didn't
18   pass.
19   Q.  Do you see partway down that e-mail there's a
20   line after Number 6 and before Number 1, that says
21   "Bills that passed during session that directly or
22   indirectly impact illegal immigrants"?
23   A.  Okay.  Yes, I do.
24   Q.  And do you see that listed under there as
25   Number 3 is SB 14 photo voter ID?

171

1    A.  I do.
2    Q.  And why did you write that photo voter ID is
3    a bill that directly or indirectly impacts illegal
4    immigrants?
5    A.  Because once instituted, if you had to have a
6    photo ID of a government document and also be
7    registered to vote, it would prevent people who are
8    ineligible to vote to vote.  And people who come here
9    illegally are ineligible to vote.
10   Q.  Was that a concern that you had in passing
11   SB 14, that illegal immigrants were voting in Texas?
12   A.  Well, our concern was that we wanted
13   integrity of the ballot box so that no one who was
14   ineligible or not registered to vote, voted.
15          It didn't make any difference who they were
16   if they weren't eligible.  They could live in Texas
17   from another state, for example, have residency in
18   another state and not be eligible, or they might not
19   be registered.  So it wasn't specified any -- there
20   was no one targeted group.
21          It was just -- but she was apparently asking
22   me a question -- I'm assuming, based on my answer --
23   she was asking me bills that impacted people here
24   illegally.  And Senate Bill 14, that would be a
25   subgroup of many who would be ineligible to vote.

172

1    Q.  Did you view SB 14 as a bill that dealt with
2    illegal immigration then, if I understand?
3          MS. DONNELLY:  Objection.  Form.
4    Mischaracterizes his testimony.
5    A.  I think I just answered the question.  It did
6    not.  It dealt with it only if they would be a subset
7    of a group that were ineligible to vote.
8    Q.  (BY MS. BALDWIN)  Was that a problem, that
9    illegal immigrants were trying to vote in Texas?
10   A.  You can never prove a negative.  So if
11   someone voted who shouldn't vote and we didn't know
12   it, we didn't know it.  But the goal of Senate Bill
13   14, once again, was to be sure that people who were
14   ineligible to vote or not registered to vote weren't
15   able to vote.
16   Q.  But illegal immigrants, in particular?
17   A.  No.  You keep saying that; and I've said,
18   multiple times, that was not the reason.
19   Q.  But it's your words here, "That directly or
20   indirectly impact illegal immigrants."
21          So one question is:  Does SB 14 directly or
22   indirectly impact the illegal immigrants as you use
23   this language in this e-mail?
24          MS. DONNELLY:  Objection.
25   Argumentative.

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

173

1          Go ahead.
2          A.  I don't know how better to answer the
3    question.  The purpose of Senate Bill 14 was to make
4    sure we had integrity of the ballot box so that people
5    who were ineligible to vote or not registered, that
6    they didn't vote.  And that's a -- a spectrum of
7    people.  And illegal immigrants are a subset of that
8    group because they're not eligible to vote.
9          It wasn't -- in my view, it wasn't -- that
10   was not the sole purpose of the bill.  It wasn't the
11   sole purpose of the bill, beyond what I've said,
12   clearly.
13         Q.  (BY MS. BALDWIN)  Right, not a sole purpose;
14   but was it a purpose?
15         A.  Well, if felons aren't allowed to vote, for
16   example, or in this country -- so if you asked me
17   were -- did this bill impact felons, yes, we wanted to
18   be sure that felons weren't able to vote.
19         Q.  Could felons have a passport?
20         A.  They could vote -- the purpose of -- it was
21   to be sure that people who weren't eligible to vote,
22   could vote, that voted.
23         The point is -- my example is that felons,
24   like people who don't have residency in Texas, like
25   people who are here illegally, are all people who are

174

1    not eligible to vote.  So any subset of a group was
2    not eligible to vote.
3          But we weren't targeting felons, we weren't
4    targeting illegals, we weren't targeting people who
5    actually live in Oklahoma who happen to be here.  We
6    were targeting people who were ineligible to vote.
7          Q.  But with respect to the example you just gave
8    of felons, SB 14 couldn't have targeted those because
9    there are forms of ID -- a driver's license doesn't
10   say whether or not you're a felon, right?
11         A.  I think I've answered this question more than
12   enough for you.  I gave you my answer.  Anyone can
13   vote illegally.
14         Q.  But SB 14 wouldn't prevent felon voting,
15   correct?
16              MS. DONNELLY:  Objection.  Form.  This
17   is argumentative.
18         A.  It might.
19         Q.  (BY MS. BALDWIN)  How so?
20         A.  I can't explain how so.  It might.
21         Q.  Okay.  So -- but we -- we both agree that a
22   felon could have a U.S. passport or a Texas driver's
23   license?
24         A.  They could.  But they're not allowed to
25   register to vote.

175

1          Q.  Right.  But showing an ID wouldn't prevent
2    them from illegally voting?
3          A.  I don't understand your question.
4          Q.  Okay.  We'll move on.
5              Does Grassroots America, as an organization,
6    place a high priority on illegal immigration as an
7    issue?
8          A.  Don't know.
9          Q.  Did you seek and receive an endorsement from
10   Grassroots America in your campaign for lieutenant
11   governor?
12         A.  I'm sorry, say that again.
13         Q.  Did you seek and receive an endorsement from
14   Grassroots America in your campaign for lieutenant
15   governor?
16         A.  I sought an endorsement from JoAnn Fleming.
17         Q.  And did you receive an endorsement?
18         A.  Uh-huh.
19         Q.  And from JoAnn Fleming in her capacity as
20   affiliated with Grassroots America?
21         A.  That, I'm not sure.  Sometimes people endorse
22   you, sometimes they're groups; and I can't remember in
23   that case what the situation was.
24         Q.  I'd like to give you a document which, again,
25   has been produced in this litigation under the "Highly

176

1    Confidential" label, that has a Bates number of
2    TX 00009987 to 9990.  And this will be marked as
3    Exhibit 8.
4              (Patrick Exhibit 8 marked/introduced.)
5          Q.  (BY MS. BALDWIN)  I'd like to ask you a
6    question about the embedded e-mail that begins on 9987
7    that was sent on Sunday, August 29, 2010.
8          A.  All right.  August 29th?
9          Q.  Yes.
10         A.  Oh, I see it.  I'm sorry.  Okay.  I see it.
11         Q.  And is this an e-mail from you to a group of
12   Republican senators?
13         A.  Yes.
14         Q.  Can you explain to me the context of this
15   e-mail, specifically what the "two days together" that
16   you're referring to in the first paragraph is with
17   respect to?
18         A.  Let me read it.
19         Q.  Sure.
20         A.  Okay.  I don't remember the meeting, but we
21   must have met somewhere.
22         Q.  Did you have caucus retreats?
23         A.  We normally have maybe one, maybe two, before
24   a session.
25         Q.  Does this e-mail bring to mind any

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

177

1   discussions you may have had among the Republican
2   caucus about the process of bringing forward SB 14?
3        A.  You know what's interesting is, I wouldn't
4   even have remembered the meeting or the e-mail if you
5   didn't have it.  So it does not.
6        Q.  Okay.
7        A.  I'm looking at this, and it doesn't ring a
8   bell, and I obviously sent it.
9        Q.  Do you see the sentence, quote, "In view of
10  our discussion on voter ID and immigration, several of
11  you mentioned you thought the two issues were one in
12  the same, or at a minimum connected"?
13       A.  I do.
14       Q.  Is it your understanding that those two
15  issues are one and the same, voter ID and immigration?
16       A.  No.  I think what -- and I'm just reading
17  this for the first time in four years, three years,
18  two years.  It looks like several of you mentioned, or
19  at a minimum, connected; and I apparently found the
20  story that made their point.
21            Apparently someone brought up at the meeting,
22  if you read this, "In view of our discussion on voter
23  ID and immigration, several of you mentioned..."
24            I didn't say I brought up the fact.  So
25  "several of you" -- I'm not saying I didn't, but I

178

1   just -- it looks like it was a discussion by others
2   and I read this article and I sent it on to those who
3   made that point.
4        Q.  So is there a connection between photo ID and
5   the growth of immigration in Texas?
6        A.  On the growth of immigration, legal --
7        Q.  The immigrant population.
8            MS. DONNELLY:  Objection.  Form.
9        A.  Legal immigration or illegal immigration?
10       Q.  (BY MS. BALDWIN)  Either.
11       A.  There is a difference.
12       Q.  Sure.  But to your mind, is there a
13  connection between either?
14            MS. DONNELLY:  Objection.  Vague.
15       A.  I think you have to classify it.
16       Q.  (BY MS. BALDWIN)  Is there a connection
17  between the growth of the noncitizen population in
18  Texas, generally, and photo ID, to your mind?
19            MS. DONNELLY:  Objection.  Form.
20       A.  Legal or illegal?
21       Q.  (BY MS. BALDWIN)  Both.
22       A.  If you ask me separately, I can answer.  If
23  you ask me both, I can't answer.
24       Q.  Okay.  Is there a connection between illegal
25  immigration and photo ID?

179

1        A.  There could be.
2        Q.  Could be, but for you, was there?
3        A.  I'm sure, as I said earlier answering the
4   other question, that illegal immigrants are not
5   eligible to vote and they are a subset of people who
6   are ineligible to vote.  So, obviously, you could
7   connect between the two.
8        Q.  Do you recall who mentioned -- as you read in
9   this e-mail, several senators mentioned that they
10  thought these two issues were connected, or one and
11  the same.  Which senators those were?
12            MS. DONNELLY:  Objection.
13            And please do not disclose who said what
14  in private conversations.  You can reveal public
15  statements by another legislator, but please do not
16  reveal what was said in private conversations.
17       A.  I didn't even remember the meeting or the
18  e-mail, so I don't remember who said what.
19       Q.  (BY MS. BALDWIN)  I'd like to read you a
20  sentence and ask your reaction.
21       A.  Okay.
22       Q.  With 8 to 12 million illegal aliens currently
23  living in the U.S., the basic American principle of
24  one person, one vote, is in danger.
25            Do you agree with this statement?

180

1        A.  Is that from that article?
2        Q.  No.
3            MR. CLAY:  Objection.  Form.
4        A.  I'd have to think about it.
5        Q.  (BY MS. BALDWIN)  Have you ever heard that
6   sentiment expressed before?
7        A.  Not that I recall.
8        Q.  Has any voter ever told you that they're not
9   going to vote in a particular election because they're
10  afraid that their vote will be diluted by fraudulent
11  votes?
12       A.  Not that I recall.  Someone may have said it,
13  but I don't -- nothing specific that I can recall.
14       Q.  Do you believe that prior to the passage of
15  SB 14 there were Texas voters who did not vote because
16  they believed that in-person voter impersonation would
17  cancel out their vote?
18       A.  I wouldn't know that, but I've never heard
19  anyone say that to me.
20       Q.  Based on your knowledge of Texas politics,
21  would you agree that the majority of African-American
22  voters and the majority of Anglo voters vote for
23  different candidates in statewide general elections in
24  recent Texas elections?
25            MS. DONNELLY:  Objection.  Form.

SENATOR DAN PATRICK                                7/11/2014
CONFIDENTIAL TRANSCRIPT

46 (Pages 181 to 184)

---

181

1          A.  It depends on the -- first of all, I wouldn't
2     know specifically.  But it would -- but it would
3     depend on the person who's on the ballot.
4          Q.  (BY MS. BALDWIN)  Are you aware of any
5     partisan contest in Texas in which the majority of
6     African-Americans would have supported the Republican
7     candidate?
8          A.  No, I'm not aware of that, but I thought you
9     said would any, so...
10         Q.  I said "the majority," to be clear.
11         A.  Okay.  Okay.  I missed that.
12         Q.  So let me restate the question then to make
13    sure.  Would you agree that the majority of
14    African-American voters and the majority of Anglo
15    voters vote for different candidates in statewide
16    general elections in Texas?
17             MS. DONNELLY:  Objection.  Form.
18         A.  I think that the majority of -- well, again,
19    you know, I'd have to look at a specific election and
20    candidate.  But I -- but I would think, you know,
21    candidly, it would be fair to say that the majority of
22    minority voters vote for different candidates, but not
23    in every case, not -- at least not to my knowledge.
24         Q.  (BY MS. BALDWIN)  And when you say "minority
25    voters," are you including both African-American and

---

182

1     Hispanic voters in that statement?
2          A.  Yes.  For example, I don't know how many
3     Hispanic voters voted for George Bush when he ran for
4     president in 2000, 2004, but it might have been a
5     majority.  I just don't know that.
6          Q.  Can you think of any Texas candidate or
7     statewide office in Texas where you believe the
8     majority of minority voters would have voted for the
9     Republican candidate?
10         A.  I can't think of any offhand.
11         Q.  In your judgment, does racial polarization in
12    Texas politics play any role in why support for SB 14
13    was divided along party lines?
14             MS. DONNELLY:  Objection.  Speculation.
15         A.  Well, first of all, my position is, it was
16    not objected across party lines.  The majority of
17    voters in Texas, the majority of citizens in Texas,
18    supported voter ID.
19             I can't help what Democrat-elected officials
20    voted for or against.  But if you ask about an issue,
21    the -- that was a bipartisan, across-all-party-lines,
22    supported issue.
23         Q.  (BY MS. BALDWIN)  You have talked extensively,
24    and I won't retread that, about the concept and --
25         A.  Well, you keep asking me.

---

183

1          Q.  -- then not the specifics of the bills.
2             And to your knowledge, does the state of
3     Texas have a history of discriminating against
4     minority voters?
5          A.  Not in my personal knowledge.  Not in my
6     personal knowledge, of my personal knowledge.
7             Now, if you're talking about, have I read
8     history and views on history, yes.  But in my personal
9     knowledge, no.
10         Q.  Okay.  But you're aware, for example, that
11    the state of Texas had a poll tax?
12         A.  Not the specifics.  But if -- if you -- you
13    know, I'm a fairly good student of history, so I'm
14    aware there were some issues in the past; which, by
15    the way, when the Democrats were in charge of the
16    state, not Republicans.
17         Q.  Right.  And so you're aware that there was an
18    all-white Democratic primary in Texas, for example?
19         A.  I'm not aware -- I'm not actually aware of
20    that specific point, but I am aware of -- of issues in
21    the past.
22         Q.  Are you aware of whether Texas has a history
23    of official racial discrimination in other areas, such
24    as access to public education?
25             MR. CLAY:  Objection.  Form.

---

184

1          A.  You'll have to say that one again.  You
2     speeded up.
3          Q.  (BY MS. BALDWIN)  Are you aware of whether
4     Texas has a history of discrimination in other areas,
5     such as access to public education?
6          A.  I'm not personally --
7             MS. DONNELLY:  Objection.  Form.
8             THE WITNESS:  I'm sorry.
9          A.  I'm not personally aware.  But I'm sure, you
10    know, I've read or been told about things in the past,
11    long before I was even born or arrived in Texas.
12         Q.  (BY MS. BALDWIN)  As a current candidate for
13    statewide office, do you believe it's important to
14    campaign so as to appeal to all voters, regardless of
15    race?
16         A.  Of course.
17         Q.  During the time that you've been involved in
18    Texas politics, have you witnessed occasions where one
19    candidate tries to use race as a factor against
20    another candidate?
21         A.  I believe that in some cases Democrats have
22    tried to use that card from time to time.  I do not
23    know of Republicans who may have.  They may have.  But
24    I -- I see it more from the Democrat side.
25         Q.  Do you recall that David Dewhurst, the

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

47 (Pages 185 to 188)

| 185 |
|---|

1    current lieutenant governor, ran against Ted Cruz for
2    Senate in 2012?
3              MS. DONNELLY: Counsel, we're getting a
4    little far afield from voter ID here. Are we going
5    somewhere back to voter ID quickly here or is this
6    just going to be about politics?
7              MS. BALDWIN: You're welcome to raise a
8    relevance objection for the record, but Section 2
9    clearly has racial appeals as one of the Senate
10   factors and the court recognized that in its recent
11   decision, so --
12             MS. DONNELLY: The campaign between two
13   people who are not here to be deposed I'm not sure is
14   relevant in any regard.
15             MS. BALDWIN: You're welcome to state
16   that objection for the record and I'd just ask that we
17   move along with my questions and we'll get these over
18   and --
19             MR. CLAY: The Court has also said that
20   campaign stuff is not really relevant, so...
21             MR. DERFNER: Not exactly.
22             MS. BALDWIN: The Court said there's no
23   arguments --
24             MR. DERFNER: I don't think it's going
25   to take very long. It would probably be easier to ask

| 186 |
|---|

1    the questions, get them answered, than to argue about
2    it.
3              MS. DONNELLY: That's fine. That's
4    fine, as long as it's limited. But we're not going to
5    spend a lot of time on this thing, I take it.
6              MS. BALDWIN: It's not nearly the length
7    that we've been through before.
8              MR. CLAY: Hopefully not as pointed as
9    before either.
10   Q.   (BY MS. BALDWIN) Do you recall hearing a
11   radio ad or hearing about a radio ad that Lieutenant
12   Governor Dewhurst ran against Senator Cruz accusing
13   him of supporting amnesty for illegal immigrants?
14   A.   I don't -- that's a distant race for me, even
15   though it's only a year old. I've been busy in the
16   last year and a half in my own race.
17   Q.   I'd like to refresh your recollection and
18   just play you a copy of the ad and see if that...
19             (Ad playing.)
20   Q.   Do you recall ever hearing that ad before?
21   A.   Actually, I don't think I had heard that ad
22   before.
23             MR. DERFNER: You could have used it
24   yourself.
25   Q.   (BY MS. BALDWIN) Having heard that ad -- let

| 187 |
|---|

1    me back up. Are you familiar with the positions that
2    Senator Cruz takes on illegal immigration?
3              MR. CLAY: Objection. Relevance.
4              MS. DONNELLY: Objection. Relevance.
5              MR. CLAY: Form.
6              MS. DONNELLY: And also -- yes, form.
7    Q.   (BY MS. BALDWIN) You can answer.
8    A.   I have not closely followed Ted Cruz's
9    position in specifics, so I couldn't tell you
10   specifically where he is on issues. And if I were, I
11   would be guessing and I might guess wrong.
12   Q.   Okay. So having not heard the ad, I take it
13   you're not familiar with the fact that criticism was
14   leveled at it as being race-baiting?
15   A.   No, I -- no, I really didn't.
16             MS. BALDWIN: I'd like to mark a
17   document as Exhibit 9.
18             (Patrick Exhibit 9 marked/introduced.)
19             MR. CLAY: I'm going to go ahead and
20   lodge a general relevance objection to questions
21   regarding Exhibit 9.
22             MS. DONNELLY: Join that objection. It
23   is not relevant to voter ID.
24   Q.   (BY MS. BALDWIN) Senator Patrick, in your
25   campaign for lieutenant governor, would you agree that

| 188 |
|---|

1    illegal immigration has been a significant issue?
2    A.   Yes.
3    Q.   Do you believe that you've taken harder line
4    stances again illegal immigration than your Republican
5    opponents?
6    A.   They wouldn't say so. They all said they
7    agreed with me.
8    Q.   But do you believe that you took harder line
9    stances than your opponents?
10   A.   You know, I just believe I took the positions
11   I believed in and they took the positions they
12   believed in.
13   Q.   Do you believe that the issue of illegal
14   immigration contributed to the success of your
15   campaign?
16             MS. DONNELLY: Objection. Form.
17   A.   I believe a lot of factors contributed to the
18   success of my campaign.
19   Q.   (BY MS. BALDWIN) Do you believe that your
20   positions on illegal immigration were one thing that
21   specifically appealed to voters?
22             MS. DONNELLY: Counsel, this is
23   really -- this is all a line of questioning that has
24   nothing to do with voter ID.
25             I mean, how -- how many more questions

U.S. LEGAL SUPPORT - HOUSTON, TEXAS
713.653.7100

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

---

### 189

1  do you have on this?  We're going to allow a little
2  bit of questioning, but --
3            MS. BALDWIN:  Just a few.
4            MS. DONNELLY:  -- just not -- we're not
5  going to go on and on about this.
6       A.   Repeat, please.
7            MS. BALDWIN:  Could you read that back,
8  please.
9            MR. DERFNER:  I think it does have to do
10  with voter ID.  It's part of -- it is part of Section
11  2.  It's one of the factors that goes into there.
12            MS. DONNELLY:  Well, I wasn't --
13            MR. DERFNER:  We are going to end it
14  pretty soon.
15            MS. DONNELLY:  Okay.  I didn't hear the
16  judge's ruling, and I won't tell you I was there, but
17  it strikes me as this has nothing to do with it.
18            MR. CLAY:  We're also talking about a
19  campaign that took place several years after the
20  advent of voter ID, so...
21            MR. DERFNER:  Right.  All of which
22  relates to the atmosphere and --
23            MR. CLAY:  Several years after the
24  advent --
25            MR. DERFNER:  Oh, yeah, exactly.  Yeah.

---

### 190

1            MS. BALDWIN:  At any rate, if we could
2  just read the question back and we'll get through this
3  line of questioning.
4            THE REPORTER:  "Do you believe that your
5  positions on illegal immigration were one thing that
6  specifically appealed to voters?"
7       A.   Yes.
8       Q.   (BY MS. BALDWIN)  Exhibit 9, is this an image
9  that your campaign has used on the Internet?
10       A.   You know, I assume so.  We -- it was a long
11  campaign, obviously.  The record speaks for itself.
12       Q.   Could you describe what's pictured in this
13  image?
14       A.   Well, it speaks for itself.  It's people
15  getting on a train, is what it appears to me, or maybe
16  it's climbing a fence.  Hard to say.  It could be a
17  railcar.  It could be a fence.
18       Q.   Are the three men pictured supposed to
19  represent illegal immigrants?
20       A.   Don't know.  I didn't do the ad, but -- but
21  I -- that would be my -- I think that's what it would
22  suggest.
23       Q.   And as you look at this ad, what's the race
24  of the persons pictured?
25       A.   You can't tell by -- you can't tell by the

---

### 191

1  photo I've been given.
2       Q.   Do they look Anglo to you?
3       A.   The one in the middle of -- it's impossible
4  to tell, in my view.  And the one closest, impossible,
5  because the face is -- the whole person is -- is dark.
6       Q.   They are dark images, correct?
7       A.   They're dark images.
8            MS. DONNELLY:  Meaning the shadow, not
9  the face?
10       A.   The shadow, yeah.  I don't mean -- yeah, I
11  don't mean that they're dark, in being black or brown.
12  I mean they're dark in the shadow or the presentation
13  of the ad.
14            MS. DONNELLY:  The photograph is not
15  very good.
16            THE WITNESS:  Yeah.
17       Q.   (BY MS. BALDWIN)  Why does this ad use the
18  word "invasion"?
19       A.   Because the word "invasion" applied to the
20  number of illegal immigrants that had been pouring
21  over the border in recent times.  Other people might
22  use another word, but it's been a significant number
23  of people.
24       Q.   An invasion often carries the connotation of
25  an enemy force.  Do you mean it to have that

---

### 192

1  connotation?
2       A.   No.
3       Q.   When you were first running for Senate in
4  2006, did you state that -- about illegal
5  immigrants -- that, quote, "they are bringing third
6  world diseases with them," end quote, including,
7  quote, "polio and leprosy"?
8       A.   I was quoting -- I believe that's from a Fox
9  newscast, of which I was on.  And I was quoting a
10  Centers for Disease Control study from 2006, as best I
11  recall.  And I wouldn't even have any recollection of
12  that except I've been asked this before.
13       Q.   Do you believe that the statement was
14  accurate -- do you believe, today, that the statement
15  was accurate when you made it?
16       A.   Well, the Centers for Disease Control based
17  in Atlanta is a nonpartisan group, and so I would
18  think that their information is accurate.
19       Q.   So do you stand by the idea that today
20  undocumented immigrants are bringing polio and leprosy
21  to Texas?
22            MS. DONNELLY:  I'm going to object to
23  that question, and I -- I really do think we've gone
24  on and this is far, far afield.  I think we've
25  answered all the questions we're going to answer on

---

U.S. LEGAL SUPPORT - HOUSTON, TEXAS
713.653.7100

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 196)

193

```
 1    that.
 2         Q.  (BY MS. BALDWIN)  Last topic.  Are you aware
 3    of Ted Nugent, in public remarks, calling President
 4    Obama a "subhuman mongrel"?
 5             MS. DONNELLY:  This is way off field.
 6    We're not answering that one either.
 7             MS. BALDWIN:  I would hate to have to
 8    come back to reopen the deposition to just do four
 9    questions.
10             MS. DONNELLY:  If we're going to reopen
11    the whole deposition for that question, I guess I'll
12    be surprised by that.
13             Do you have an answer to that?
14         A.  What was the question?
15         Q.  (BY MS. BALDWIN)  Are you aware of Ted Nugent,
16    in public remarks, calling President Obama a "subhuman
17    mongrel"?
18             MS. DONNELLY:  Objection.  Relevance.
19             Have you heard of it?
20         A.  I may have heard something in the news about
21    it, or somewhere, but I -- it's not something that
22    jumps off the page to me.
23         Q.  (BY MS. BALDWIN)  Would you agree that it was
24    a racist statement to call President Obama a "subhuman
25    mongrel"?
```

194

```
 1         A.  I don't like seeing citizens calling any
 2    legislator or officeholder by names, period, whether
 3    they be Republican or Democrat, office holders or --
 4    or citizens.
 5         Q.  But this comment, in particular, would you
 6    agree that it is a racially inflammatory statement?
 7         A.  It sounds distasteful to me.
 8         Q.  But not racist?
 9         A.  I don't know what this has to do with Senate
10    Bill 14.  I don't mind sitting here for six hours and
11    answering your questions, or seven hours.  I feel like
12    this question is way out of bounds and I think I've
13    given you an honest answer.  I find it distasteful.
14    If that's what he said, I think it was very
15    inappropriate, and I can surely see how it could be
16    viewed as being racist, absolutely.
17         Q.  Are you aware that before Ted Nugent had
18    apologized for making those remarks, he campaigned
19    with and on behalf of Attorney General Abbott in his
20    run for governor?
21             MR. CLAY:  Objection.  Relevance.
22             MS. DONNELLY:  Objection.  Relevance.
23             Counsel, can we move on?  If we're not
24    going to talk about SB 14, let's move on.
25         A.  Yeah, I'm -- I don't have anything to say.  I
```

195

```
 1    think these questions are out of bounds.  And I'm not
 2    a lawyer, so I guess you can ask them, but I'm not
 3    going to respond to them.
 4         Q.  (BY MS. BALDWIN)  The last question:  What
 5    kind of message do you think it sends to
 6    African-American Texans for a candidate for governor
 7    to appear with someone who has used this kind of
 8    rhetoric?
 9             MR. CLAY:  Objection.  Form and
10    foundation.
11             MS. DONNELLY:  Out of bounds.
12    Irrelevant.
13             MR. DERFNER:  That sounds like a
14    perfectly good question to me.
15         A.  I'm not even going to respond to it.  I think
16    it -- I think it is -- I feel like I'm now being
17    attacked by you on a political basis, so I'm just...
18         Q.  (BY MS. BALDWIN)  That's certainly not my
19    intention, Senator.
20         A.  But I feel that way.
21         Q.  Well, again, that's not my intention.
22         A.  You're asking me to make a comment on someone
23    who's running for public office and I don't think it's
24    an appropriate question.  It has nothing to do with
25    voter ID.
```

196

```
 1         Q.  Again, my question is not about any candidate
 2    for office, but what kind of message do you think that
 3    sends to --
 4             MS. DONNELLY:  He's answered the
 5    question, Counsel.  We need to move on.
 6         A.  I have nothing else to say.
 7         Q.  (BY MS. BALDWIN)  Okay.  That's all I have on
 8    that topic.
 9             MS. CONLEY:  Can we take a quick break?
10             MS. DONNELLY:  Sure.
11             (Break.)
12             MS. BALDWIN:  Senator Patrick, I thank
13    you for your time and I'll hand over questioning.
14          E X A M I N A T I O N
15    BY MS. CONLEY:
16         Q.  Senator --
17             MS. DONNELLY:  Danielle, I'm sorry to
18    interrupt, but are we still under the seal?
19             MS. CONLEY:  Yes.  Yes.
20             MS. DONNELLY:  Okay.  Thank you.
21             MS. CONLEY:  We might as well keep the
22    entire transcript highly confidential.
23             MS. DONNELLY:  All questions, all
24    exhibits, all answers, are under seal.
25             MS. CONLEY:  Exactly.
```

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

---

**205**

1    center.  And many of our rural counties don't have
2    medical facilities.
3          So that's why it wasn't a main -- it just
4    says "The" -- let me read it.  "The purpose of the
5    amendment was to address the issue, as well as any
6    disabled person in any area who does not have a photo
7    ID and would face..."
8          For example, I've served on health and human
9    services three out of the last four sessions.  When
10   we -- and when we have testimony in Austin, we have a
11   lot of people who come in self-controlled -- what's
12   the word I'm looking for -- wheelchairs, motorized
13   wheelchairs.
14         And I see them very often when I'm leaving
15   the Capitol or coming in.  And some of them, by their
16   own initiative, without any help, because they are
17   very independent, many come blocks and blocks and
18   blocks to come to the Capitol.  They live somewhere in
19   Austin.
20         So my image is that that's that group of
21   people who want to come and testify on -- not voter
22   ID, but on a health and human service issue.
23         But even if you lived in a city the size of
24   Austin, you may be someone who needs help to get
25   around.  So even though DPS may only be two miles away

---

**206**

1    or three miles, it's too far for you to go in your own
2    wheelchair without help.  So that was the reason.
3    Q.  Okay.  So there are other reasons that --
4    A.  Other reasons.
5    Q.  -- there are other reasons that people could
6    face burdens in trying to obtain a photo ID other than
7    the lack of a DPS in their particular county?
8    A.  Well, for disabled people, yes.
9    Q.  Let's take a look at another e-mail.
10         (Patrick Exhibit 11 marked/introduced.)
11   Q.  (BY MS. CONLEY)  I think we're up to Exhibit
12   11.  And for the record, this e-mail is Bates stamped
13   TX 00261258 through 59.
14   A.  Correct.
15   Q.  Okay.  And looking -- starting about a third
16   down in the page, the e-mail that I'm looking at is
17   from you, Dan Patrick, dated February 1, 2011, to Paul
18   Bettencourt; is that correct?
19   A.  Yes, ma'am.
20   Q.  And who is Paul Bettencourt?
21   A.  Paul Bettencourt was a former -- I don't know
22   if he still was at the time -- tax assessor-collector
23   and -- in Harris County, and he was also a substitute
24   host on the radio for me when I was -- one of
25   several -- when I was in session and couldn't be on

---

**207**

1    the radio.
2    Q.  You said he was the Harris County tax
3    collector --
4    A.  Tax assessor-collector.
5    Q.  -- or tax assessor-collector.
6          Was he also the voter registrar?
7    A.  You know, I don't know if that comes under
8    his purview or not.  You know, I'd have to check.  I
9    don't know.  I don't know if that's the district clerk
10   or the county clerk.  You know, I'm not sure.
11   Q.  So you don't know.  And do you believe that
12   you -- do you know whether you knew at the time --
13   A.  I don't know.
14   Q.  -- that he was the voter registrar?
15   A.  Yeah, I don't know.  I just don't know.  I
16   think he had something to do with it, but I can't tell
17   you what the title was.
18   Q.  And why don't you take a little time to read
19   the e-mail before I ask you questions about it.
20   A.  Okay.  I speed-read through it.  The middle
21   was kind of the same as the other.
22   Q.  So did you frequently consult with
23   Mr. Bettencourt on pending legislation?
24   A.  Yeah, Paul is a friend.  And as a talk-show
25   host, I try to have the talk-show host of my radio

---

**208**

1    station informed of what's going on when I'm in the
2    legislature, because I'm pretty knowledgeable,
3    obviously.
4    Q.  And so did you talk to him fairly frequently
5    about voter ID issues?
6    A.  I don't know about voter ID issues
7    particularly, but we talked about all issues.
8    Q.  And in that -- I guess it's the second
9    paragraph, right after the "DO NOT FORWARD E-MAIL"
10   language, right -- you write:  "My office got a long call from
11   Hammerline and Ed Johnson today."
12         And taking those people one by one, who is
13   Hammerline?
14   A.  That's George Hammerline, and I don't know if
15   he worked for Paul, but he worked somewhere in county
16   government, either in the tax assessor-collector or
17   clerk's office or voter -- I'm not sure.  But he works
18   in -- I think he works in county government.
19   Q.  So is it your recollection that he was an
20   employee in the Harris County voter registration
21   department?
22   A.  You know, I don't know his exact position,
23   but that's my -- I don't actually know what George
24   does, but I believe that he's involved somewhere in
25   the county government.

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

53 (Pages 209 to 212)

209

1    Q.  Is he also a Republican campaign consultant?
2    A.  Not that I'm aware of.
3    Q.  So you're not one of his clients?
4    A.  Oh, no.  I don't think he's a consultant,
5    but, oh, no.
6    Q.  Okay.
7    A.  Again, I don't know if he is or he isn't, but
8    not to my knowledge.
9    Q.  And what about Ed Johnson?
10   A.  Ed Johnson has a similar role.  I'm not
11   exactly sure what Ed does, but he works in county
12   government.
13   Q.  He works in county government?
14   A.  It's something to do with -- with -- I think
15   something to do with either the clerk's office or
16   voter registrar or tax assessor.  Don't know.
17   Q.  Okay.  Is he a Republican campaign
18   consultant?
19   A.  If he is, I'm not aware of it.
20   Q.  And so you're not one of his clients?
21   A.  No.
22   Q.  What is your relationship with them?
23   A.  I just know them.
24   Q.  And let's take them one by one.
25   A.  Okay.

210

1    Q.  What's your relationship with George
2    Hammerline?
3    A.  I just know them over the years of being --
4    they're, you know, active people in the party and, you
5    know, I just know -- you know, I just know them.
6    Q.  And did you also --
7    A.  Ed is a precinct chair as well near where I
8    lived.
9    Q.  So with respect -- sticking with George
10   Hammerline for a minute -- did you often consult with
11   him when making decisions regarding legislation?
12   A.  Virtually never.  I mean, I've had very -- if
13   I talk to George twice a year, it'd be a lot.
14   Q.  Did you --
15   A.  Outside of a social thing or something.
16   Q.  Outside of this e-mail --
17   A.  Yes.
18   Q.  Let me rephrase the question.
19       Did you have any conversations with George
20   Hammerline regarding SB 14?
21   A.  You know, I might have, because he -- he
22   would hang around the Capitol, and he's kind of an
23   interested guy, and he may even -- he may even
24   have a -- I mean, I'm not exactly sure what George's
25   role was.  But he would be at the Capitol and come in

211

1    the office and -- you know, kind of an activist guy.
2    Q.  And when you say that your office "got a long
3    call," was that you, personally?  Did you personally
4    speak with George Hammerline?
5    A.  No.
6    Q.  It was someone on your staff?
7    A.  Yes.
8    Q.  Do you know who?
9    A.  I do not.
10   Q.  And then with respect to Ed Johnson, what is
11   your relationship with Ed?
12   A.  The same thing.  I know Ed.  You know, I see
13   him occasionally on social occasions, and he's a
14   precinct chair, so I see him at Republican gatherings
15   and -- and he would come to the Capitol, too.
16       I don't know if he represented the district
17   clerk's office, like, with a government relations
18   person.  He and George may have done some of that.
19   You know, I just don't know their specific official
20   role.
21   Q.  And did you frequently consult with him when
22   making decisions regarding legislation?
23   A.  Not legislation, in general.  But both -- Ed,
24   particularly, as I recall -- and I haven't talked to
25   him for -- at length, probably, since 2011 -- but I

212

1    think he has something to do with -- he's really
2    interested in the topic or -- and, so I think we
3    probably had a discussion or two about different
4    things.  But I don't recall specifically.  But I
5    wouldn't be surprised if we didn't have discussion.
6    Q.  And you say in this sentence, right after you
7    say that "My office got a long call from Hammerline
8    and Ed Johnson," you say, "Paul, please call these
9    guys and ask them to relax and not make this an
10   issue."
11       What were -- what were they making an issue?
12   A.  It all -- as I recall -- again, it all goes
13   back to this handicapped hanger, that it
14   just -- people just got up over the dashboard about
15   it, like, "Oh, my goodness, Dan's going to let 500,000
16   people just vote because they've got a handicapped
17   hanger."  That's what I recall.
18       And they just didn't -- they hadn't -- which
19   often happens.  They hadn't read it and didn't
20   understand what it meant.
21   Q.  So were they upset at the idea of an
22   amendment that would allow more people to vote?
23   A.  No, not more people.  They're fine with
24   people voting who are registered and eligible to vote.
25       Their concern was, it could create a loophole

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

213

1   for people who might want to vote illegally, to vote
2   by just walking in and saying, "Here" -- you know,
3   "Here's my -- I'm handicapped, I don't have to have
4   photo ID."  That was their -- I think their concern.
5       Q.  I see.  So your understanding -- your
6   understanding is that their impression was that they
7   could simply vote by showing the little hanging
8   sticker --
9       A.  Yes.
10      Q.  -- in their car?
11      A.  Yes.  Yes.  That -- that's what -- all the
12  confusion from Catherine Englebredth.  That's what
13  they all thought.  And, obviously, they were all
14  supportive of the photo voter ID and they thought
15  this -- that my amendment, potentially -- you know, I
16  can't speak for their opinion, in their mind.
17          But my -- my impression is, they thought this
18  was undermining the bill by creating a -- that people
19  would start, you know, asking for a handicapped
20  hanger.
21      Q.  And so -- I think I asked you this question
22  with respect to the last e-mail.
23          But with respect to this e-mail, does this
24  reflect -- does this reflect your understanding of the
25  purpose behind the disability amendment that you

214

1   proposed?
2       A.  Yes, it does.
3       Q.  Okay.  And so you note here, in the second
4   paragraph, just as you did in the previous e-mail that
5   we looked at, that "77 counties in Texas do not have a
6   DPS office," right?
7       A.  Yes.  77 counties, or more, in Texas, don't
8   have a lot of things.
9       Q.  Okay.  But this -- but this is specifically
10  about --
11      A.  Yes.
12      Q.  -- the lack of DPS offices --
13      A.  Yes.
14      Q.  -- in particular counties?
15      A.  Yes.
16      Q.  Okay.  Great.  And then you further note that
17  a disabled person may not be able to get "a ride over
18  75 miles if they live in one of these counties to get
19  the photo ID" --
20      A.  Right.
21      Q.  -- right?
22      A.  Yeah.  This was a little "belt and
23  suspenders."  I wanted to be sure that people who had
24  disabilities had -- made sure they had the opportunity
25  to vote in person if they wanted to vote.

215

1       Q.  Right.  And one of your -- your points here,
2   is that "Therefore, a disabled person may" not "be
3   able to get a ride to their local precinct" -- or,
4   sorry, "Therefore, a disabled person may be able to
5   get a ride to their local precinct, but not a ride
6   over 75 miles if they live in one of these counties to
7   get the photo ID."
8       A.  Yes.
9       Q.  Okay.  And I believe that you testified
10  earlier that -- your testimony was that people get
11  rides all the time and that you didn't think it was
12  harder for people without cars to get an ID.
13      A.  If they were not disabled.
14      Q.  So if the person is -- so you think it's a
15  burden, if someone is disabled, to get a ride from
16  someone to a DPS, but it's --
17          MS. DONNELLY:  Objection.  Form.  Go
18  ahead.
19      Q.  (BY MS. CONLEY)  -- but it's not a burden if
20  someone needs to get a ride for any other reason from
21  someone to go to a DPS?
22      A.  You know, to some of these things you apply
23  your common sense and your knowledge.  And we -- and
24  reasonable people -- that's how we write legislation,
25  very often.

216

1          And you come to the conclusion, as I've said
2   earlier in my testimony, that if a person chooses to
3   live in rural -- in a rural area, they usually have
4   some means of getting somewhere; otherwise...
5          Well, and again, take the disabled community
6   to the side.  I'm talking about an able-bodied
7   community -- whether they're black, white, or brown,
8   poor, middle class, or wealthy -- they have -- if they
9   live in a rural area, they have some means of getting
10  somewhere.  They either have their own car or a family
11  member has a car or a friend has a car.
12          It is not logical, to me, that someone lives
13  in a remote area without any access to transportation
14  to get anywhere; otherwise, they would be very
15  isolated.
16      Q.  Do you think that some -- you mentioned
17  living in a rural area being a choice, right?
18      A.  It can be.
19      Q.  It can be.
20      A.  Not always, but it can be a choice.
21      Q.  But you would admit that it's not always a
22  choice?
23          MS. DONNELLY:  Objection.  Speculative.
24      A.  Yeah, I don't know why people choose to live
25  places.  But all of us choose to live in a state,

SENATOR DAN PATRICK
CONFIDENTIAL TRANSCRIPT
7/11/2014

55 (Pages 217 to 220)

**217**

1 choose to live in a city, choose to live in a county,
2 choose to live wherever we live.  Sometimes it's by
3 where we work.  So I can't speak for everyone.  But
4 very often, people choose to live where they choose to
5 live.
6        Q.  (BY MS. CONLEY)  Would you agree that if you
7 are poor or live below the poverty line in a rural
8 area, that it may not necessarily be a choice to just
9 pack up and move?
10              MR. CLAY:  Objection.  Form.
11              MS. DONNELLY:  Objection.  Form.
12        A.  Yeah, I understand that in some cases it
13 might not be a choice.
14        Q.  (BY MS. CONLEY)  Okay.  So you also
15 state -- and let me find it -- in your Number 2 there,
16 in that same paragraph, it's the last sentence:  "It
17 could even be a burden in a suburban or urban area,
18 e.g. there is not a single DPS office inside the
19 Loop."  Is that --
20        A.  Yes.
21        Q.  Okay.  And by "inside the Loop," you mean
22 inside of the -- Interstate 610, correct?  The area of
23 Houston that's inside of Interstate 610; is that
24 right?
25        A.  Yes.  And I believe that's correct.  I may be

**218**

1 incorrect, and we may have opened one since then, but
2 I -- at the time, I believe that was correct.
3        Q.  But at this time there were no DPS locations
4 in the Loop?
5        A.  I believe it.
6        Q.  Okay.  So is it fair to say that at this time
7 in your view, the lack of DPS offices in some counties
8 and the lack of DPS offices inside the Loop would
9 impose an undue burden on disabled individuals who
10 needed to travel longer distances to obtain a photo
11 ID?
12              MR. CLAY:  Objection.  Form.
13              MS. DONNELLY:  Join it.
14        A.  I think the document speaks for itself.  I
15 think the document's pretty clear.
16        Q.  (BY MS. CONLEY)  At the time you wrote this
17 e-mail, it was your view that the lack of DPS offices
18 inside the Loop could pose a burden -- an undue burden
19 on disabled individuals --
20              MS. DONNELLY:  Objection.
21        Q.  (BY MS. CONLEY)  -- right?
22              MS. DONNELLY:  Objection.  Form.
23              Go ahead.
24        A.  It could impose a burden on people who have a
25 significant disability who otherwise, in my view, are

**219**

1 people who kind of try to live independently.  There
2 are a lot of disabled people who try to live on their
3 own.
4        Q.  (BY MS. CONLEY)  So it seems -- it seems to
5 me, based on everything that we've discussed today and
6 then looking at these e-mails, that you greatly
7 consider the burden that disabled individuals may face
8 in trying to obtain a photo ID; is that accurate?
9        A.  Please repeat the question.
10              MS. CONLEY:  Could you read that back?
11              THE REPORTER:  "So it seems -- it seems
12 to me based on everything that we've discussed today
13 and then looking at these e-mails, that you greatly
14 consider the burden that disabled individuals may face
15 in trying to obtain a photo ID; is that accurate?"
16        A.  Well, no, if the -- if the word "greatly
17 considered."  But obviously, I considered it.
18        Q.  (BY MS. CONLEY)  And you were persuaded that
19 certain individuals, specifically disabled
20 individuals, could face burdens in obtaining a photo
21 ID, and that was a problem that you wanted to remedy;
22 is that -- is that right?
23        A.  I think that my testimony and my documents
24 and the amendment speak for themselves.
25        Q.  And so did you consider the burden of

**220**

1 obtaining a photo ID that would fall on any groups
2 other than the disabled?
3        A.  No, because I didn't see it as a great burden
4 for a great number of people or a burden for a
5 significant number of people.  As I've testified
6 before, and I don't mind repeating:  We live in a
7 society where many people are required to have a photo
8 ID for -- for a variety of things.
9              I mean, you know, the federal government, for
10 example, has decided you have to have a legal photo ID
11 to get on an airplane; even people who live in remote
12 rural areas, even people who are poor, even -- you
13 know, people who fall into all categories, actually
14 including people with disabilities.
15              So I did not see it as an undue burden for
16 able-bodied people, regardless of their economic
17 status.
18        Q.  Would you agree that many poor people don't
19 ever get on an airplane?
20              MS. DONNELLY:  Objection.  Form.
21        A.  I have no idea about that.
22        Q.  (BY MS. CONLEY)  Would you agree that there
23 are forms of identification that you can use to get on
24 an airplane that you could not use to vote under
25 SB 14?

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

56 (Pages 221 to 224)

221

1    A.  I don't know what TSA today requires, in
2    terms of -- I mean, I don't know how they match up
3    with ours.  I don't know what you can use for an ID.
4       Q.  Okay.  But is it your testimony, sitting
5    here, that you think that the only forms of ID that
6    can be used to get on an airplane are the same forms
7    of ID that are required under SB 14?
8              MS. DONNELLY:  Objection.
9       A.  Yeah, I didn't say that.  I was just giving
10   you the example that the federal government doesn't
11   let you get on an airplane without a form of ID that
12   they consider appropriate.
13      Q.  (BY MS. CONLEY)  That's right.  And if I -- I
14   guess my question to you is:  Hypothetically, if you
15   could get on an airplane with 40 different forms of
16   photo ID, yet SB 14 only allows 7, is that a fair
17   comparison that you're drawing?
18             MS. DONNELLY:  Objection.  The
19   question's confusing, compound --
20             MS. CONLEY:  Well, wait.
21             MS. DONNELLY:  Can you break it down?
22             MS. CONLEY:  Just -- just for the
23   record, I don't mind an objection; but a speaking
24   objection, trying to get the witness to, you know,
25   say, "Yes, it's confusing," I think that's improper.

222

1       Q.  (BY MS. CONLEY)  If you didn't understand my
2    question, I'm happy to rephrase it, to have the court
3    reporter read it back, but let's try and not do the
4    speaking objections.
5              MS. DONNELLY:  Do you understand the
6    question?
7       A.  It would be helpful if you broke it down.
8              MS. DONNELLY:  Okay.  Can you read it back
9    for me?  Because now I've forgotten it.  I'm happy to
10   rephrase it, but I need to know what it was.  Thank
11   you.
12             THE REPORTER:  "That's right.  And if
13   I -- I guess my question to you is:  Hypothetically,
14   if you could get on an airplane with 40 different
15   forms of photo ID, yet SB 14 only allows 7, is that a
16   fair comparison that you're drawing?"
17             MS. DONNELLY:  Objection.  Form.
18             You can answer if you can.
19      A.  I don't particularly like answering
20   hypotheticals.  You've asked me the question.  I don't
21   think they compare.  I don't think they compare.
22      Q.  (BY MS. CONLEY)  Well, I'll tell you this:
23   For example, I can use a student ID to get on an
24   airplane, but I can't use a student ID if I'm a Texas
25   resident trying to vote in a Texas election.  Is that

223

1    your understanding?
2       A.  You -- if that's what the TSA rules are,
3    that's your knowledge, that's not my knowledge.
4       Q.  So I want to go back to something that you
5    said in response to my question a few questions ago,
6    and I believe it was your testimony that you didn't
7    think -- other than the disabled population, that you
8    didn't that there were burdens that were imposed on
9    other groups of people; is that right?
10      A.  Correct.
11      Q.  And so does that mean that you actually
12   considered other groups of people, and then said after
13   that consideration, "I don't think that these groups
14   of people are particularly burdened by this law"?
15      A.  If you look at what the bill said, and my
16   vote for the bill, you could reach that conclusion.
17      Q.  But I guess I'm asking you what you did.
18   Because your testimony was that you thought about
19   other groups of people and thought that the law didn't
20   burden them.
21             And so my question is:  In the process of
22   drafting and considering the bill, did you actually go
23   through groups of people and say, "No, I don't think
24   the law burdens this group of people"?
25             MS. DONNELLY:  Objection.  He didn't

224

1    draft it.
2              But go ahead.
3       A.  I'm sure I went through that mental process
4    because I'm a fair-minded person and I try to do the
5    right thing on behalf of all people, and walked
6    through that exercise and made that conclusion.
7       Q.  (BY MS. CONLEY)  Did you -- the exercise that
8    you performed in your mind, did that exercise ever
9    pertain to low-income people in Texas?
10      A.  It would have pertained to everyone in Texas.
11      Q.  So in considering SB 14, you considered the
12   burden or potential burden on low-income voters living
13   in one of the 77 counties without a DPS?
14      A.  I considered.  And you're using the word
15   "burden," so I choose not to use that word.
16      Q.  Or lack thereof?
17      A.  Or lack thereof.  I asked myself, is this a
18   reasonable request to protect the integrity of the
19   ballot box by able-bodied people living across Texas,
20   and the conclusion was obviously yes.
21      Q.  And that conclusion was regardless of whether
22   or not those able-bodied individuals were living below
23   the poverty line?
24      A.  We have -- yes.  We have -- based on your
25   data of the percentage of people who earn below 35,000

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

225

1  a year, based on the number of people who vote, a
2  minority community, as was established earlier,
3  that -- by your counsel -- that vote for Democrats, it
4  would be very, I think, safe to say that hundreds of
5  thousands of poor voters vote.  So I did not see -- so
6  I considered everyone.  I don't consider this to be
7  an obstacle or an unreasonable request.
8      Q.  Did you or any of your staff ever conduct any
9  analysis as to whether or not SB 14 would have an
10 impact on low-income voters?
11         MS. DONNELLY:  Asked and answered.
12         You can answer again.
13     A.  Yeah, I think I've already answered that.  I
14 think I've had eight or nine questions on that earlier
15 today.
16     Q.  (BY MS. CONLEY)  I'm sorry.
17     A.  That's okay.
18         Not to my knowledge.
19     Q.  Not to your knowledge?
20     A.  I don't recall.
21     Q.  And you don't --
22     A.  I don't think we did.
23     Q.  And you don't recall whether any of your
24 colleagues in the Senate performed such an analysis?
25     A.  Yeah, I don't recall.

226

1      Q.  Do you know whether anyone considered DPS
2  locations when drafting or considering or debating
3  SB 14?
4      A.  I don't know.
5      Q.  Did you or anyone on your staff consider
6  whether -- or consider how long it would take for
7  someone without a driver's license to get to a DPS
8  location?
9      A.  I don't recall.
10     Q.  You don't recall.  Well, I believe you
11 testified earlier that the majority of people in your
12 district couldn't get to a DPS by public transit; is
13 that right?
14     A.  To my -- that would be a best guesstimate,
15 based on my knowledge of the fact that we don't have
16 public transportation in much of my district.
17     Q.  And was that a consideration at all when you
18 were considering SB 14?
19     A.  Only in the context of, based on my answer
20 before, that I believe -- as I stated earlier today,
21 hours ago -- that people who live in my
22 district -- and it's not a poor district, but it's not
23 a super-wealthy district.  It's an average,
24 middle-class district.
25         I do think that most of the people who live

227

1  in my district, unincorporated Harris County, do
2  choose to live there for a variety of reasons --
3  school districts, less traffic.  Although, there is a
4  lot of traffic.  And so I don't think people move to
5  the suburbs without a way to get to the grocery store.
6         So I didn't think it was an undue burden, or
7  any burden, on anyone living in an area that doesn't
8  have public transportation and might be 10 miles or 12
9  miles from a DPS, to be able to get transportation to
10 go there.
11        Again, I just don't buy into the concept that
12 people who live in the suburbs, or even in somewhat
13 rural Texas, move into a place and say goodbye to
14 everyone after the moving truck leaves and never plan
15 to go out anywhere even if they don't own a car.  I
16 just -- so that's my response.
17     Q.  And that's your -- this is your personal
18 consideration and --
19     A.  That's my personal consideration --
20     Q.  -- judgment, correct?
21     A.  -- judgment, correct.
22     Q.  And it's not based on any sort of analysis
23 that you or anyone in the Senate conducted in
24 considering SB 14; is that right?
25     A.  I can't speak for other people.  But for me,

228

1  I just kind of logically walked through the steps of
2  wherever someone might live in Texas, if they were
3  able-bodied, whether they were poor, middle class,
4  or -- or otherwise, and I came to that conclusion.
5         And as I also testified earlier:  Three years
6  after the bill was passed, and multiple
7  elections, there's just no evidence -- and I know this
8  is all about evidence -- I don't think there's any
9  evidence, any significant evidence, of any large
10 number of people -- or anyone at all -- who has said
11 this is an issue.  We just haven't heard it.
12        And so I think the process that at least I
13 went through, and the decision that I made, turned out
14 to be proven to be correct.
15        And, again, as I said earlier, I haven't had
16 a -- and we have Democrats from the inner city and
17 rural areas all over the state.  I work very well with
18 them.  They work very well with me.  I've not had one
19 come to me and say, "Dan, we need to fix this."
20        And I'm not aware of any legislation to
21 address any of these issues that you bring up; which,
22 I respect you bring them up, but I just don't think
23 there's any -- there's just nothing here that you can
24 point to.  So I believe we were good.  I think we were
25 right.

SENATOR DAN PATRICK                                          7/11/2014
CONFIDENTIAL TRANSCRIPT

58 (Pages 229 to 232)

229

1    Q.  But, Senator, you're basing that on the
2    notion that no one's approached you personally and has
3    said "This is a problem for me"; is that right?
4        A.  I base that on no one's approached me,
5    personally, that I can recall; that no Democrat
6    senator or House member has approached me, that I
7    haven't read any media reports.
8            I just -- I just haven't -- I'm just not
9    aware of anything of significance.  You can always
10   have an outlier somewhere.  Again, I do remember there
11   was a story, some person complaining because -- that
12   she left it at home.
13       Q.  And for you, the D.C. District Court's
14   opinion in this Section 5 litigation in which they
15   found that there was a significant burden on poor
16   people, who were disproportionately people of color,
17   that doesn't count?
18           MR. CLAY:  Objection.  Form.
19           MS. DONNELLY:  Objection.
20   Argumentative.
21           MR. CLAY:  Foundation, too.
22       A.  And this was asked and answered before.  And
23   my answer, I think, was, I'm more concerned about what
24   the people of Texas say and what my colleagues on the
25   other side of the aisle say, than I am the D.C. court.

230

1    Q.  (BY MS. CONLEY)  So --
2        A.  Obviously, I respect their -- their opinion,
3    but -- but it doesn't impact my thinking.
4        Q.  Okay.  So, Senator, what was the purpose of
5    the provision that was added to SB 14 to provide for
6    an EIC, the electronic identification certificate?
7        A.  You're going to have to refresh my memory of
8    what that's all about.
9        Q.  First, do you know what the EIC is?
10       A.  No, I don't recall right now.
11       Q.  I can represent to you, just so that we can
12   save time and not have to go back to the bill --
13       A.  Sure.
14       Q.  -- but the EIC, the electronic identification
15   certificate -- or sorry.  Sorry.  That's the problem.
16   That's why you don't understand what I'm saying, I'm
17   saying the wrong thing.
18           Election identification certificate.
19       A.  Okay.  I'm still not -- you'll have to
20   refresh my memory on that.
21       Q.  It's the purportedly free ID.
22       A.  Okay.  That you get from DPS.
23       Q.  That you can get from DPS.
24       A.  That's what it's called.  Okay.
25       Q.  Yes, the EIC.

231

1        A.  I didn't remember that.
2        Q.  Very sorry.
3        A.  Okay.  No, that's fine.
4            MS. CONLEY:  Thank you, Anna, very much,
5    for clearing up the record there.
6        Q.  (BY MS. CONLEY)  And so you know what that is?
7        A.  Now that you remind me, yes.
8        Q.  Okay.  And so do you know whether during the
9    consideration of SB 14 there was any analysis done
10   regarding the cost that a registered voter would incur
11   to obtain an EIC?
12       A.  I don't.  I don't recall.  And -- well, I
13   shouldn't be asking you questions.
14           You're saying, we added that to the bill?
15       Q.  The EIC -- what I'm saying is that the EIC is
16   a part -- it's a part of SB 14.
17       A.  It's part of the bill.
18       Q.  Yes.
19       A.  Okay.  Yes.
20       Q.  But you don't recall any analysis being done
21   as to the cost that someone may incur in order to
22   obtain --
23       A.  Since I --
24       Q.  -- that ID?
25       A.  -- didn't recall the EIC, I don't recall the

232

1    details.
2        Q.  Okay.  So just to go back:  You've recognized
3    that there's at least some segment of the population
4    that could face undue burdens in obtaining even a free
5    photo ID, correct?
6            MR. CLAY:  Objection.
7            MS. DONNELLY:  Objection.  Form.
8    Mischaracterizes testimony.
9        A.  Yeah, you're characterizing that.
10           I want to go back and -- and respectfully
11   answer this for the multiple -- you know, I don't know
12   how many times.
13           I simply thought it was the right thing to
14   do -- to give people with significant disabilities an
15   opportunity to vote without a photo ID, if they could
16   get a letter from the doctor -- based on my life
17   experiences of working with disabled, based on the
18   Indiana bill, and based on I thought it was the right
19   thing to do.  It has no reflection on anything else or
20   any other subgroup of people.
21       Q.  (BY MS. CONLEY)  Do you think it would be the
22   right thing to do for a poor person without
23   transportation who didn't live close to a DPS?
24           MS. DONNELLY:  Objection.  Form.
25       A.  And I've answered this before, that I believe

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

59 (Pages 233 to 236)

233

1  that able-bodied people have an opportunity, even if
2  they're poor, to -- and they don't own a car, that
3  someone can take them to get their free ID; for the
4  few people, the small percentage of people, who may
5  not have any form of ID, whether it be a driver's
6  license, passport, military, or CHL, or the other
7  ones.
8      Q.  (BY MS. CONLEY)  But, Senator, I --
9          MS. DONNELLY:  He needs to finish his
10 answer.
11     Q.  (BY MS. CONLEY)  Did you finish?
12     A.  I'm finished.
13     Q.  Okay.  But -- I understand what you're
14 saying, and what you said.
15         However, was that even with respect to
16 low-income people, that they had an opportunity?
17     A.  Right.
18     Q.  And my question for you is:  Whether or not
19 they have an opportunity is sort of a different
20 question as to whether or not it poses a burden.
21         Wouldn't you agree that those are two
22 different questions?
23     A.  Not necessarily.  I -- if you have the
24 opportunity to get a free ID, as you've just phrased
25 it, then it's not a burden.

234

1      Q.  If you have a -- so it's your testimony,
2  sitting here today, that if you have an opportunity to
3  get a free ID it's not a burden?
4      A.  My testimony is:  I believe every able-bodied
5  person, regardless of their income level, can acquire
6  a free ID if they don't have one already.
7      Q.  Would you say that it would be easier for a
8  person who has a car and who lives close to a DPS to
9  go obtain a photo ID than someone who does not have a
10 car and who does not live close to a DPS?
11         MS. DONNELLY:  Objection.  Form.
12     A.  Is it easier for someone who has a car to go
13 to the grocery store or the mall than it is for
14 someone who doesn't have a car to go to the grocery
15 store or the mall?  I -- I don't think it's any more
16 difficult for a person.  Maybe they can't do it the
17 precise day and precise time that they'd like to go to
18 the store or go to DPS.
19         But I believe, again, that you're greatly
20 underestimating the wherewithal and the ability of
21 even poor people to find a means of transportation to
22 get to where they want to go if they want to go.
23     Q.  (BY MS. CONLEY)  Senator, I actually don't
24 think that I am, but let me ask just my question
25 here --

235

1      A.  Sure.
2      Q.  -- which is:  I believe what I'm hearing you
3  say is that there's no difference between a person who
4  has a car and lives close to a DPS and any burdens
5  that they would experience in going to get the photo
6  ID; from a person who doesn't have a car, who does not
7  live near a DPS, and them going to get a photo ID.
8          What you're saying is those two people are
9  equal; is that right?
10         MS. DONNELLY:  Objection.  Form.
11 Argumentative.
12     Q.  (BY MS. CONLEY)  I just want to understand.
13     A.  I think you're mischaracterizing my comments.
14 First of all, if you have a car and you can
15 go to the DPS to get a free ID, you don't need to go
16 to the DPS to get a free ID because you have a
17 driver's license; so, obviously, there could be a
18 difference.
19         If a poor person -- not poor.  A person
20 without a car, then maybe they don't have it, so there
21 could be that difference.  Maybe they don't have a
22 driver's license.
23         You can ask me all day long and we can take
24 all full seven hours, plus stoppage time.
25         My belief is, if you're an able-bodied

236

1  person, regardless of your income status, if you have
2  a desire and you need to because you don't have any
3  other ID, that you can get
4  a -- that it is not a burden to help shore up the
5  integrity of our ballot box, which is what our country
6  is based upon, the integrity of a ballot box, for all
7  of us, regardless of party.  I believe it is not a
8  burden to ask an able-bodied person to do so.
9      Q.  And that's based on your own personal
10 judgment and not anything else; is that right?
11         MS. DONNELLY:  Objection.  Form.
12     A.  It's based on -- well, I voted for the bill,
13 so there you go.
14         (Discussion off the record.)
15     Q.  (BY MS. CONLEY)  So as we discussed in
16 corresponding with Mr. Bettencourt in this e-mail, you
17 specifically mention that there are no DPS locations
18 in the Loop, right?
19     A.  I believe that that was correct at the time.
20 I may have been incorrect.  But I believe if I wrote
21 that, I assume that was correct.
22     Q.  Okay.  Did you conduct any analysis of the
23 racial demographic of the voters who live in the Loop?
24     A.  No.
25     Q.  Did you conduct a -- any analysis of the

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

60 (Pages 237 to 240)

237

1   racial demographic of voters who work in the Loop?
2       A. No.
3       Q. Are you aware what hours DPS locations in
4   Texas are open?
5       A. No.
6       Q. No?
7       A. No.
8       Q. Is that something that you considered when
9   evaluating SB 14?
10      A. I don't recall.
11      Q. Do you think it would impose a burden on an
12  individual who works business hours if a DPS location
13  is only open during business hours?
14      A. It obviously doesn't place a burden on people
15  to go get a driver's license during the hours that DPS
16  is open. Otherwise, if it did, we would hear enough
17  public complaint and there would be some response to
18  it. But people find a way, even though they have to,
19  obviously go to DPS for whatever reason they may have
20  to have, registration or license. So it's not a
21  consideration, as I recall.
22          MS. CONLEY: All right. We can take a
23  quick break.
24          (Break.)
25      Q. (BY MS. CONLEY) If you would just take a look

238

1   at the same document we've been looking at, the 258
2   e-mail from you to Paul Bettencourt.
3       A. All right.
4       Q. And on the first page, in that third
5   paragraph, you say: "For a disabled person to get an
6   exemption from voting in person without a photo they
7   must send in a letter from a doctor to the voting
8   registrar and sign, subject to perjury, that they are
9   disabled. No large groups are going to try to take
10  advantage of this exemption."
11      A. Right.
12      Q. What did you mean by that last sentence?
13      A. Pretty much what it said, that if there
14  were -- if there -- if there was any group attempting
15  to have people vote illegal, if there -- if there was,
16  this would not be a loophole for them to use. I think
17  that's what I meant by it, probably.
18      Q. So when you said "No large groups are going
19  to try to take advantage of this exemption" --
20      A. Right.
21      Q. -- were you -- were you pointing to that as a
22  selling point?
23      A. No, not necessarily. I was just -- I was
24  just -- just -- it was really a reflection of this
25  idea that 500,000 people had placards; and that if

239

1   someone wanted to circumvent the law, that my
2   amendment was not going to allow people to go out
3   there and get 100,000 placards and give them to people
4   so they didn't have to show a photo. I think that's
5   what I was suggesting.
6       Q. So even under your amendment, there would be
7   people who were disabled who still might not be able
8   to vote?
9       A. No.
10      Q. When you say "No large groups are going to
11  try to take advantage of this exemption," you're
12  saying that not a large group of disabled people are
13  going to use that exemption --
14          MS. DONNELLY: Objection.
15  Mischaracterizes testimony.
16      Q. (BY MS. CONLEY) -- correct?
17      A. No, I don't think that's -- I don't think you
18  understood me, or I'm not understanding you.
19      Q. (BY MS. CONLEY) Okay. We can move on.
20          In your last paragraph of the e-mail on page
21  2, the last sentence is: "Let's not sacrifice a very
22  good bill for perfect-especially if perfect for some
23  gets us thrown out by the courts."
24          And what did you -- what did you mean by this?
25      A. This is commonplace for a Republican or a

240

1   Democrat officeholder that very often Democrats will
2   have constituents who don't think their bill is
3   perfect in their view. So, heaven forbid, don't --
4   don't let the Republicans pull this one over on you.
5           And -- and Republicans, we have constituents
6   who will often call up and say, "Don't let the
7   Democrats pull this over on you; you need to do this,
8   this, this, and this." It happens on a lot of
9   legislation for all of us, in both parties.
10          And so my point was, that there were people,
11  apparently, who were contacting my office and all
12  upset about we shouldn't have this amendment or
13  placards, or whatever.
14          And that was my point: Look, this is a good
15  amendment, it was part of the Indiana bill, the courts
16  upheld the Indiana bill, let's not sacrifice this
17  important legislation because a -- you know, a handful
18  of people don't think it's perfect.
19      Q. Okay. But not because you didn't think it
20  was perfect?
21          MS. DONNELLY: Object to the form of the
22  question.
23      A. Give me a question.
24      Q. (BY MS. CONLEY) Let me rephrase that. What I
25  guess I want to know: For you, were you saying here

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

61 (Pages 241 to 244)

241

1    that the bill would have been perfect if it didn't
2    include the disability amendment?
3         A.  No.  No, I don't -- no.  What I -- what I
4    was -- what I was attempting to say -- maybe I didn't
5    say it artfully.  I thought it was a very good bill.
6         But if we try to please every person in our
7    constituency on every piece of legislation so that
8    the -- in the eye of the beholder, that person gets
9    the perfect bill, then we will never pass anything.
10        And the Democrats have the same problems on
11   their side.  That's why Washington is in gridlock and
12   why sometimes Austin's in gridlock.
13        Q.  And you referred to -- again, in your last
14   answer, the Indiana law?
15        A.  Yeah.
16        Q.  And I think on the first page of this e-mail,
17   you say:  "Our bill is similar to the Indiana law that
18   was approved by the courts."
19        And so are you familiar with the photo ID law
20   in Indiana?
21        A.  You know, I'm not today.  I'm -- I'm -- I
22   obviously was at some level in the past.
23        Q.  So at the time you wrote this e-mail you were
24   familiar with the photo ID law in Indiana?
25        A.  Apparently, at some level.

243

1         Q.  So are you familiar with the valid forms of
2    identification under the Indiana photo ID law?
3         A.  I'm not.
4         Q.  At the time that you wrote this e-mail, were
5    you familiar with the valid forms of identification
6    under the Indiana photo ID law?
7         A.  I may or may not have been.  I don't recall.
8         Q.  Well, would it surprise you that student IDs
9    from public universities and colleges are valid under
10   Indiana's photo ID law?
11        A.  If that's what it -- I don't know if it would
12   surprise me or not.  If that's what the Indiana law
13   is, then it is just different.
14        And while we may try and style our bills,
15   whatever subject it may be on, it doesn't mean we --
16   we copy exactly what another state does.  And very --
17   you know, very often, people copy what we do in Texas
18   and they may not copy it exactly.  So if that's their
19   law, that's their law.
20        Q.  So, but you did use -- you testified earlier
21   that you did use the Indiana law as a model, of sorts,
22   which is what gave you the idea for the disability
23   amendment, right?
24        MS. DONNELLY:  Objection.  Form.
25        A.  I'm not suggesting that I used it, because I

242

1         Q.  And did you think that it was important that
2    SB 14 be similar to the photo ID law in Indiana?
3         A.  Well, when we write legislation, particularly
4    on issues that we know are going to be litigated --
5    and there's always a group of bills you know are going
6    to be -- more than likely to be litigated; we surely
7    knew this one probably would be -- that you do look at
8    what other states do.
9         And whether -- again, whether it's Democrat
10   legislation or -- it's not a partisan thing.  You look
11   at what other states do and see what survived the
12   courts, you know, and -- and so you use that.  At
13   least I do, personally.
14        Whether I'm voting for a bill or supporting a
15   bill or crafting a bill, you know, I do look at what
16   other states have done and what the courts have said
17   at some level to give me some level of confidence; if
18   I do this, you know, it should -- it should pass
19   muster; and if I do this, I'm going to put all this
20   work in and it could likely be thrown out.
21        Because, none of us want to put -- you know,
22   to pass a bill -- forget the session.  You're working
23   on it months and sometimes years in advance.  You
24   don't want to pass a bill only to go to the courts and
25   have it thrown out.

244

1    didn't write the bill.  But I think, in general -- and
2    I can't speak for the true author of the bill, Senator
3    Fraser.  But I do believe, in general, maybe
4    there -- maybe there was discussion on the Senate
5    floor -- I mean, I just don't know -- that there was a
6    sense of, this bill is crafted similar to the Indiana
7    bill, is all I -- that's all I kind of recall.
8         Q.  (BY MS. CONLEY)  Were you aware that any photo
9    ID issued by the United States government is valid
10   under Indiana's photo ID law?
11        A.  You know, I -- I'm trying to be polite.  I
12   have no knowledge of the Indiana, so we can save time
13   if you want.
14        Q.  That was my question.
15        A.  Okay.
16        Q.  So thank you.
17        A.  Okay.
18        Q.  Finally, and I promise we can put this e-mail
19   to rest --
20        A.  Okay.  I'm good.
21        Q.  -- we can put this e-mail to rest after this
22   last question.
23        A.  I'm fine.
24        Q.  You -- at the very end, the second to the
25   last sentence, you note that this -- "Let's celebrate

U.S. LEGAL SUPPORT - HOUSTON, TEXAS
713.653.7100

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

62 (Pages 245 to 248)

---

245

1    a big victory one of the best photo voter ID bills in
2    the country..."
3            And I'm just curious, what did you -- what
4    did you mean by that?
5        A.  Well, we had -- I think an original bill had
6    been attempted in 2007.  We tried it in 2009, 2011.
7    It was important to our constituents.  It was
8    important to all Texans.  It was important to
9    everyone.
10           And so anytime you work years on something
11   and you feel like you've accomplished it and -- so
12   it's just, you know, let's celebrate a victory and
13   let's -- you know, let's move on and let's not
14   complain, because it wasn't perfect in the eyes
15   of some.
16       Q.  But what makes it one of the -- you noted
17   that it was one of the best in the country.  What do
18   you think made it one of the best photo ID bills in
19   the country?
20       A.  Well, I've worked on a lot of legislation
21   where it's taken me two or three -- I've only been
22   there four sessions, but it's taken me two or three
23   sessions to pass a bill.  And usually, over time, the
24   bills get better because over time you just get
25   more -- very often, more knowledge, more input, more

---

246

1    buy-in from people.
2            And -- and so, you know, I think by the time
3    we got to 2011, based on, again, this -- I don't
4    remember all the details of Indiana, but maybe there
5    had been some court cases that had been resolved or
6    addressed from '07 to '11.  I don't remember.  But I
7    just -- I think by then we probably had a better bill
8    than we had before, and that happens -- happens often.
9            And, you know, just because all the
10   Democrats -- we talked about voting along party lines
11   earlier.  Just because all the Democrats voted against
12   it doesn't mean that -- you know, they may
13   have -- they may have thought that this bill's a
14   little bit better bill than before; because they've
15   worked, obviously, to try to improve it or amend it or
16   work with me.  So I just think it was probably
17   a -- obviously they voted against it, but -- but --
18       Q.  And did you think it was better than other
19   photo ID bills in the country because it was more
20   restrictive?
21       A.  No.  I just -- no.  I just thought it was
22   a -- I thought it was a -- it was a well thought-out
23   bill at the end of the day and -- and I didn't think
24   it was -- I didn't think it was undue burden, as I've
25   said many times.

---

247

1            And I think we were thoughtful in the
2    deliberation of it and -- and I actually thought, and
3    I -- and I seem to recall Democrats saying at the time
4    that we had a very respectful 24- or 26-hour debate on
5    the floor.  There was no acrimony.  There was no -- it
6    was -- it was a very healthy, good discussion of the
7    issue and so that's, you know, what -- how I felt
8    about it.
9        Q.  So moving on very briefly to -- you and
10   Ms. Baldwin looked at some of the amendments, and I
11   believe that was Exhibit 5, the Senate Journal, and --
12       A.  That's it.
13       Q.  -- do you recall that an amendment was
14   offered that would have permitted the use of student
15   IDs containing a person's photograph as a permissible
16   ID for purposes of voting?
17       A.  I think we covered that earlier.  Didn't we?
18       Q.  I'm not sure that we did.
19       A.  Okay.  Well, then I don't know then.  Maybe
20   we've just been talking about it.
21       Q.  Yeah.  Maybe take a look at page 123.  It's
22   Amendment 19.
23       A.  All right.
24       Q.  Does that refresh your recollection?
25       A.  Amendment -- which one was it?

---

248

1        Q.  19.
2        A.  You said page 119, but what page --
3        Q.  I said page 123.
4        A.  I'm sorry.
5        Q.  Sorry.  Amendment 119.
6        A.  My mistake.  Okay.
7        Q.  How did you vote on this amendment?
8        A.  Against it.
9        Q.  Okay.  And why?
10       A.  I think that the belief was that this does
11   not meet the criteria of a document issued by the
12   state that would be something that would be as
13   foolproof as a driver's license or CHL or a military
14   document or passport.
15           We have -- I think we have 36 public
16   universities in the state, countless private
17   universities, countless community colleges.  And when
18   you go to vote, it would have been -- it could have
19   been very confusing for the election judge or the
20   person working -- the poll workers, to have a plethora
21   of all these IDs.  It's pretty clear now, it's --
22   people can identify all these other ones.
23       Q.  And, Senator, military IDs are a form of IDs
24   that are permissible under SB 14, right?
25       A.  Correct.

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

63 (Pages 249 to 252)

249

1    Q.  Do you know how many different forms of
2  military ID there are?
3    A.  I don't.
4    Q.  Do you know that there are several forms of
5  military IDs?
6    A.  Well, I know there's several branches of the
7  service and --
8    Q.  Right.
9    A.  But they're also government issued.  I think
10  there was also a belief that a student ID could be --
11  again, you could come up with a student ID.  It
12  doesn't mean you live in the state.  And there was
13  some concern of, could someone -- and maybe even
14  innocently, students voting incorrectly, so...
15    Q.  And you could vote with a passport, but that
16  also doesn't show that you're a resident of the state,
17  correct?
18    A.  But a passport is a government-issued
19  document.  And a student -- you could argue a state
20  university is a government-related agency.
21    We just made the decision that we didn't
22  think that that was a document that -- that helped
23  ensure the integrity of the ballot box.  And we also
24  believe that -- not all, of course -- but the vast
25  majority of students in college have a driver's

250

1  license.  Not all, but the vast majority.
2    Q.  So to that point, were there any studies
3  conducted on the number of students that had a
4  driver's license?
5    A.  There may have been or not.  I don't know.
6    Q.  So was -- was the -- was the number of Texas
7  students that had driver's licenses actually something
8  you considered while considering this amendment?
9    A.  It was something that -- you know, that
10  occurred to me, that not all students would have a
11  driver's -- not all students would have a car.  But
12  the vast majority -- not all -- but the vast majority
13  of college students over the age of 18 likely had a
14  driver's license.
15    Q.  I guess my question for you is:  Where are
16  you getting that information?  Is that just based on a
17  general intuition?
18    A.  Yeah.  I don't -- I don't -- there may have
19  or may not have been.  I don't know if there was any
20  research on that.  But if you were to ask me today --
21  if you were to go out on the street and ask a thousand
22  people, "Do you think the average student in college
23  over the age of 18 has a driver's license?", I think
24  most people would say, "Yeah, probably so."  It
25  doesn't mean all of them did.  But if they didn't,

251

1  they are able-bodied people and they can go to DPS and
2  get a free -- a free ID.
3    Q.  But you don't know now, and you didn't know
4  then, the exact percentage of Texas students that
5  lacked a driver's license; is that right?
6    A.  That is correct.
7    Q.  Okay.  And you mentioned that you and your
8  colleagues made the decision not to include student
9  IDs, you know, in furtherance of protecting the
10  integrity of the ballot box; is that right?
11    A.  Uh-huh.
12    Q.  Okay.  So at the time that SB 14 was being
13  considered, were you aware of any facts or evidence
14  that suggested that student IDs had been used for
15  voting fraud in Texas?
16    A.  I don't recall.  We had -- we had a lot of
17  testimony, and I don't recall the various testimony on
18  the various bills.
19    Q.  And do you recall whether there was any facts
20  or evidence presented that suggested that student IDs
21  had been used for voting fraud anywhere?
22    A.  I don't recall.
23    Q.  Sitting here today, are you aware of voter
24  fraud committed anywhere with student IDs?
25    A.  I'm not aware today.

252

1    Q.  Prior to the enactment of SB 14, did you or
2  any of your staff conduct any analysis on how many
3  registered voters have used student IDs to vote in
4  previous elections?
5    A.  No, not that I'm aware of.  Not that I
6  recall.
7    Q.  Did you or any of your staff perform any
8  analysis on the effect of excluding student IDs on
9  student voter turnout?
10    A.  No.
11    Q.  Do you recall any discussion about that at
12  all, whether it would decrease student voter turnout?
13    A.  I don't recall much -- as I testified earlier
14  today, I don't recall much of the discussions on, you
15  know, this bill.
16    Q.  Are you aware of the racial makeup of the
17  student population in Texas?
18    A.  Not specifically.
19    Q.  Sorry.  College and university student
20  population in Texas?
21    A.  Not specifically.  You know, I believe it's a
22  majority Anglo, but...
23    Q.  And did you or any of your staff conduct any
24  analysis on the effect of excluding student IDs on
25  registered student voters at historically black

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

64 (Pages 253 to 256)

253

1  colleges and universities in Texas?
2      A.  No.
3      Q.  Any studies on how many students at
4  historically black colleges and universities may lack
5  driver's licenses?
6      A.  No, not that I recall.  And, again, I -- I
7  want to go back to something I've said throughout the
8  day:  We are the canary in the cave, if you know what
9  that analogy means?  We're the first to get the
10 complaints.  I don't know of any college students --
11 it doesn't mean they haven't -- that have contacted me
12 complaining they were not able to vote.
13     Q.  Well, I'll represent to you that we represent
14 a college student, so there's that.  She's a plaintiff
15 in this lawsuit.
16     A.  I understand that, but --
17     Q.  I understand that -- I understand that your
18 testimony is that no one has contacted you personally.
19     A.  Right.  And we have not quite a million
20 students in the state.  And if one person had a
21 complaint, I mean, that's -- that would be a small
22 percentage of people.  It doesn't mean she's -- you
23 know, that she or he doesn't have a right to file a
24 complaint.  I'm just saying I'm not aware of it.
25 There hasn't been any outpouring of students saying,

254

1  "My goodness, I couldn't vote."
2      Q.  To you?
3      A.  To me.  And to my knowledge, I haven't heard
4  it from any Democratic senator and I haven't heard it
5  from any Republican senator.
6      Q.  Do you know whether any alternatives at all
7  were considered to banning -- let me rephrase my
8  question.
9          Do you know if there were any alternatives at
10 all considered to an outright ban on students IDs?  In
11 other words, were alternatives such as maybe putting
12 expiration dates on the student IDs or any other
13 alternatives considered?
14     A.  I don't recall.  I don't recall.
15         MS. CONLEY:  Thank you.  Passing the
16 witness.
17         MS. DONNELLY:  And we're still under
18 seal, correct?
19         MR. DERFNER:  Right.
20         (Patrick Exhibits 12, 12A-12E
21 marked/introduced.)
22         E X A M I N A T I O N
23 BY MR. DERFNER:
24     Q.  Senator Patrick, my name is Armand Derfner.
25 I live in Charleston, South Carolina, where I hope to

255

1  go back home soon, and I represent the Veasey/LULAC
2  plaintiffs.
3      A.  Okay.
4      Q.  And I'm going to try to ask you questions
5  that you haven't been asked before, if there are any.
6          So, first, I've given you some documents, I
7  think six documents.  And to speed things up, I'm
8  going to tell you what I think they are and you tell
9  me if that's about right.
10     A.  Okay.
11     Q.  These are all documents that came from you or
12 your office, I believe, and they basically reflect
13 your activity in voter ID laws since the 2007 session,
14 your strong support of those laws and your, I'll say,
15 instrumental role in those laws.
16     A.  Okay.
17     Q.  Is that about right?
18     A.  I'd have to go through them and look.  And in
19 the saving of time --
20     Q.  Okay.
21     A.  -- it appears, in general, that you're right.
22         But -- but specifically if I have a question,
23 we can go to them.
24     Q.  Okay.
25     A.  Is that fair?

256

1      Q.  And in a couple situations you also -- it
2  reflects that you also saw that the procedural rules
3  might have stood in the way of passage, and you took a
4  particular interest in objecting to or possibly making
5  changes in some of those procedural rules, like the
6  two-thirds rule.
7      A.  If the documents reflect that here, it would
8  not have been directly about photo voter ID.  It would
9  have been my general belief that we should have 19
10 required as opposed to 21, because that would be about
11 60 percent of the Senate, which would mirror the
12 cloture vote in the U.S. Senate, in which there were
13 extensive writings, as I recall.  Maybe not extensive.
14         But, writings from our founding fathers, on
15 why they did not require a two-thirds vote for all
16 bills in Congress.
17         So -- so it had nothing to do specifically
18 with voter ID.  It's just my belief that two-thirds is
19 too high of a threshold to pass every bill.
20     Q.  Okay.  Are you going to try to get rid of the
21 two-thirds rule if you're elected lieutenant governor?
22     A.  As lieutenant governor I don't have the power
23 to do that.  It's a Senate rule.  The senators vote,
24 31 senators, and I would -- I'm very consistent that I
25 believe it should be 19.  And it doesn't make any

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

65 (Pages 257 to 260)

257

1    difference, and I've said this on the record many
2    times.  If there were 20 Democrats and 11 Republicans,
3    I'd believe the same thing.
4        Q.  Let me turn your attention to the last of
5    those exhibits.  I guess it would be 12E.
6        A.  Okay.
7        Q.  And that, I believe, refers to a town hall.
8    Was that a town hall about the voter ID bill in 2011?
9        A.  Let me see here.  Let me see who this is from
10   and to.
11           MR. CLAY:  Can you give the Bates range
12   for the document you're looking at?
13           MR. DERFNER:  Yeah, that document would
14   be --
15           THE WITNESS:  27.
16           MR. CLAY:  27?
17           MR. DERFNER:  Yeah.
18           THE WITNESS:  Let me read this, Armand.
19           MR. DERFNER:  Sure thing.
20           MR. CLAY:  What is this one marked as?
21           MR. DERFNER:  That would be 12E.
22       A.  Okay.  I'm ready for your question.
23       Q.  (BY MR. DERFNER)  Okay.  Tell me what that's
24   about.  Was that a town hall meeting?
25       A.  It appears that Jared Woodfill, if I'm

258

1    reading this correctly, asked me -- and he was the
2    chairman of the Harris County Republican Party at the
3    time.  It appears he was having a town hall meeting on
4    the bill after it passed.  This is March 4th -- after
5    it passed the Senate.
6        Q.  Oh.
7        A.  This is March 4th is the date here.  He wrote
8    me on March 2nd.  I responded March 4th.  And it
9    looked like he wanted to have a town hall, basically,
10   to explain the bill, and wanted to know if I would
11   help; which, county chairmen, as you know, Republican
12   or Democrat, often ask legislators to kick in money to
13   help defray costs.  That's what it appears to be.
14           And I couldn't be there, of course, it
15   doesn't appear, because I was in session.  So it looks
16   like when I said "If anyone asks," that would
17   represent, to me, that I didn't attend.  I can't swear
18   that I didn't attend, but I don't -- apparently, I
19   didn't.
20           And so -- and the explanation here, to him,
21   is to share basically what we've been talking about
22   for the last two or three hours on the -- again, the
23   two amendments that I was involved in.
24       Q.  Okay.  And the $500?
25       A.  It says in his e-mail, if you look down on

259

1    March 2nd, it says, "$500 for the facility fee.  I
2    hope to have 100-500.  I stopped by your office in
3    Austin.  It looks great.  Donna gave me a tour.  Keep
4    up the great work!"  So I didn't --
5        Q.  Did you pay the $500?
6        A.  I don't know if I did or didn't.  It looks
7    like I said "I will pay..."
8        Q.  Oh, okay.
9        A.  Yeah.  I'm assuming I was good for it, okay?
10       Q.  Okay.  And March -- early March, that would
11   be -- you said it's after the Senate passed it, but
12   it's before the final passage of the bill, correct?
13       A.  Yeah, I'm not sure when it finally passed,
14   but I think that would be correct.
15       Q.  I'll say May 27th.
16       A.  Okay.  Okay.
17       Q.  Okay.  Thank you.
18           Okay.  Would you say the state has a general
19   policy of wanting to have voters be properly
20   identified when they vote?
21       A.  When you say "the state," who are you --
22       Q.  Texas.
23       A.  The citizens of Texas?
24       Q.  Well, or the state of Texas, through its laws
25   and policies.

260

1        A.  I think, in general, the citizens of Texas
2    supported and wanted a photo voter ID to protect the
3    integrity of the ballot box.
4        Q.  But the law reflects a state policy, does it
5    not, of wanting voters to be identified; is that
6    correct?
7        A.  Well, we don't have a state policy.
8        Q.  Okay.
9        A.  We have legislation passed by the
10   representatives of the people.
11       Q.  Okay.
12       A.  So I would just rephrase it to say SB 14
13   reflected the will of the voters as expressed through
14   vote, through some members of legislature.
15       Q.  Okay.  And is it the will of the voters as
16   expressed through various legislation also to
17   facilitate or enable eligible voters to vote in Texas?
18       A.  I'm not sure -- help me with that, Armand.
19       Q.  Okay.  Is it also the policy of the state
20   or --
21       A.  The citizens.
22       Q.  -- or the citizens, that eligible voters
23   should be able to vote?
24       A.  Yes.
25       Q.  And that's facilitated through things like,

SENATOR DAN PATRICK
CONFIDENTIAL TRANSCRIPT

7/11/2014

66 (Pages 261 to 264)

---

261

1  for example, putting polling places in neighborhoods
2  and things like that?
3       A. The people of Texas want every Texan who's
4  eligible to vote and who registers to vote to have the
5  opportunity to vote.
6       Q. Okay. Now, do those two policies, or
7  whatever you want to call them, the notion that every
8  Texan who's eligible should be able to vote and the
9  notion of identifying, can those sometimes be
10  intentioned, in the sense that if you make
11  identification stricter, it may make it harder to
12  vote; or if you make identification less strict, it
13  may make it easier to vote?
14       A. If I'm understanding your question, I don't
15  think they're connected. And the reason I don't think
16  they're connected is, if you look at the turnout and
17  we have -- for example, some states do not have early
18  voting. We have early voting, which, at some point in
19  time before my being in office, was decided to help
20  more people have time to vote. It is not
21  necessarily -- improve the percentage of people
22  voting.
23       So things that some people would view as
24  giving more opportunity, or some people would view as
25  less opportunities, is not necessarily reflecting

---

262

1  either more people registering to vote -- there's
2  still a lot of people who are eligible who don't
3  register to vote, they choose not to; and we have a
4  significant number of people who are registered to
5  vote, that don't vote. So I don't think you can
6  connect necessarily those dots.
7       Q. Well, you may not be able to connect turnout
8  or participation, but isn't there a connection, using
9  the example you gave, between the -- I'll call it the
10  stringency and the opportunity?
11       In other words, as you say, if -- if you
12  didn't have early voting, then people couldn't vote
13  early, correct?
14       A. Correct. If you didn't have mail-in, they
15  couldn't mail in. We make it pretty easy to vote in
16  Texas.
17       Q. If you have a more stringent photo ID law,
18  then that's going to make people have to make more of
19  an effort, will it not, to actually vote?
20            MR. CLAY: Objection. Form.
21       Q. (BY MR. DERFNER) Is that correct?
22       A. Well, that's your characterization, and I --
23       Q. Do you agree or disagree?
24       A. Well, I -- well, you and I -- I'm not going
25  to assume we have a philosophical difference. You may

---

263

1  just be doing your duty as -- for your job,
2  representing your client. You may not express your
3  personal beliefs.
4       But for sake of argument, I think we -- we
5  may have a philosophical difference, in that I believe
6  if citizens want to vote, they will do what it takes
7  to vote; and if -- and if it's required to have a
8  photo ID, the vast majority, overwhelming majority,
9  already have the required document.
10       But those who don't will find that document,
11  if they want to -- want to do what many people, you
12  know, consider for themselves is -- is very important,
13  and that's voting. So I don't see photo voter ID as
14  stringent.
15       Q. I understand that. But you can have
16  different kinds of photo IDs, can't you? We've been
17  talking about that all day.
18       A. Yes, sir.
19       Q. And isn't it true that if you have a more
20  stringent photo ID, the voters who want to vote -- and
21  I agree that most voters want to vote -- will have to
22  go an extra step or will have to do more on their part
23  to actually vote?
24       A. No. Because when Senate Bill 14 was
25  passed -- and I don't know the exact percentage; but,

---

264

1  based on some of the information that you have shared
2  with me today, or questions -- you must have access to
3  information that maybe 90 percent of the people, or
4  greater, already have what Senate Bill -- Senate Bill
5  14 required by law. And we didn't make it more
6  stringent, because we didn't have photo voter ID
7  before. This was new.
8       So if a law is passed that 90 percent of the
9  people, or more, already qualify for -- and the other
10  percentage of people are able to get a free -- free
11  voter card, for lack of better term -- then I don't
12  think that's made it more stringent.
13       Q. Well, what if -- what if 90 -- what
14  if -- okay.
15       If 90 percent of the people have a driver's
16  license, just --
17       A. Or military, or CHL, they have -- they
18  already qualify.
19       Q. Okay. That means 10 percent -- and we're
20  using these hypothetically now.
21       A. Hypothetical. Based on some numbers we
22  talked about a little earlier.
23       Q. And 10 percent don't; that means 10 percent
24  are going to have to go get another card, correct?
25       A. Not necessarily. Because of that 10 percent,

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

68 (Pages 269 to 272)

269

1        Q.  Okay.  If you had a bill that was like the
2    Indiana case -- like the Indiana law, and the Indiana
3    case came along and said, "The Indiana law is okay --
4        the Supreme Court case came along."
5        Okay?  Why would you go away from that?  Why
6    would you make your bill look less like the Indiana
7    law --
8            MS. DONNELLY:  Objection.  Form.
9        Q.  (BY MR. DERFNER) -- from 3- -- from S 362 to
10   SB 14?
11       A.  Well, first of all, if we had mirrored the
12   Indiana law exactly, my guess is someone would have
13   still filed suit and we'd still be sitting here.
14       Q.  Uh-huh.
15       A.  Secondly, I can't explain the thinking of all
16   the members of the Senate who helped craft the bill,
17   or the author of the bill, what his thinking was; and
18   what various people offered certain amendments or
19   decided they didn't want to do it the same as they had
20   done 362.
21          As I did testify earlier, some members change
22   and -- so I don't know the reasons why the bill
23   changed, you know, specifically.  I really don't know
24   the reasons.  I can't recall.
25       Q.  Were you aware -- you, with Senate Bill 14 --

270

1    that it was less like the Indiana law than Senate 362
2    had been?  Were you personally aware of that when you
3    were voting on it?
4        A.  Yeah, I don't -- I don't recall.  I don't
5    recall that.
6        Q.  Do you remember asking about that?
7        A.  No.
8        Q.  Do you remember anybody saying, "This bill is
9    less like the Indiana law"?
10       A.  I don't -- I mean, I really don't recall.  I
11   know that -- I know in all -- you know, when everyone
12   says in due respect, it means it's not -- I'm trying
13   to be as respectful.  I know this is your issue and
14   what all of you are working on.
15          It's one of, as I've said before, thousands
16   of votes, a thousand bills.  And so if you ask me
17   about 900 of those bills, I would probably have the
18   same answers.  I don't -- including my own bills.
19          If you ask me about bills from last session,
20   I would have many of the same answers.  I don't recall
21   the discussion or what went into it at the time.
22       Q.  Okay.  I'm going to show you -- well, let me
23   ask you this first --
24       A.  Do you want this back, the Indiana?  Do you
25   want the Indiana --

271

1        Q.  Yeah, I'll take it back.  Thanks.
2           What reason would there be -- or what reason
3    would you have for -- for not -- not covering -- not
4    letting state civil servants -- that is, people with
5    photo IDs from state agencies -- not letting that be
6    qualified under the photo ID voting law?
7        A.  You know, I can't remember at the time what
8    my thoughts were on that, Armand.
9        Q.  Well, can you think of one now?  What's a
10   good reason?
11       A.  You know, to be very candid with you, if you
12   were asking me today and we were voting on the bill, I
13   would say, "Let me do some homework on it and study on
14   it and get back to you with an answer.  I don't want
15   to give a quick response on why now, you know."  For
16   whatever reason, we made that decision then and -- as
17   we voted for the bill.
18          (Patrick Exhibit 13 marked/introduced.)
19       Q.  (BY MR. DERFNER) Okay.  What this is, this is
20   a piece of some interrogatory answers that the state
21   gave.  You know that in a lawsuit each side gets to
22   ask questions and the other side's supposed to answer
23   the questions.
24       A.  Right.
25       Q.  At a certain point we asked the state some

272

1    questions, and this is a piece of a document that came
2    back.  As you'll see, it's the first three pages --
3    first --
4        A.  Where do you want me to be?
5        Q.  I want you to go --
6        A.  Where do you want me to be?
7        Q.  I want you to go to page 70- --
8        A.  6?
9        Q.  -- -6.
10       A.  Okay.
11       Q.  And what this is, the question was
12   about -- actually, the question starts back a
13   little -- starts on 75, which is -- in fact, let's
14   start on 75.  Near the top you see 28, which is the
15   question.  Why don't you read that out loud.
16       A.  I'm on page 75.  You want me to read 28?
17       Q.  Yes.
18       A.  "Identify all Texas State and local public
19   agencies and entities that issue or are authorized to
20   issue photographic identification and state the
21   eligibility requirements for obtaining a form of
22   photographic identification from each such agency or
23   entity."
24       Q.  Okay.  Now let's turn over to page 76.
25       A.  All right.

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

69 (Pages 273 to 276)

---

273

1      Q.   And look at Interrogatory 28a --
2      A.   Okay.
3      Q.   -- near the top of the page.
4      A.   Yes.
5      Q.   And so you won't get -- read that first part
6   there.  Read what it says in No. 28a.
7      A.   "The Texas Department of Public Safety issues
8   the following forms of identification containing
9   photographs:"
10     Q.   Okay.  And it lists a number of things
11  that -- that DPS does, right?
12     A.   Yes.
13     Q.   "The Department of Public..."; and then after
14  that, what is the next sentence?  "The agencies listed
15  below," read that part.
16     A.   "Use DPS resources to issue security access
17  cards to their employees."
18     Q.   Okay.  So then you have several pages
19  listed --
20     A.   Yes.
21     Q.   -- of states agencies that use DPS
22  facilities --
23     A.   Right.
24     Q.   -- to issue their cards.
25     A.   Right.

---

274

1      Q.   What's the logic of not letting that be a
2   photo ID?
3            MR. CLAY:  Objection.  Misrepresents the
4   exhibit.
5            MS. DONNELLY:  Objection.  Form.
6            MR. CLAY:  Can you reread the question,
7   please.
8            MR. DERFNER:  Reread the question,
9   please.
10           THE REPORTER:  "Okay.  So then you have
11  several pages listed of states agencies that use DPS
12  facilities to issue their cards."
13           "What's the logic of not letting that be
14  a photo ID?"
15           MR. D'ANDREA:  Do you mind if I show the
16  witness my state-issued government ID and my driver's
17  license?  It will maybe help him make some policy
18  choices here on the fly.
19           MR. CLAY:  I also just want to make a
20  point, for the record, that what this actually says
21  is:  "The agencies listed below use DPS resources,"
22  not facilities.
23           MR. DERFNER:  Okay.
24     A.   Well, even before I saw this, because I have
25  my -- you know, my own card, photo card, to get in and

---

275

1   out as well as -- of the Capitol, the determination
2   was made at some point in the discussions, obviously,
3   that we wanted these documents.  And obviously, there
4   was a lot of thinking that went into that and
5   reasoning that went into that.  I don't recall what
6   that was three years later.
7            But this was the bill that was presented and
8   this was the bill that passed.  This was the bill that
9   has not met with objection from the public; with the
10  exception of, I guess, the one student who is suing
11  us, and -- and this is -- this is the bill that people
12  seem to be very happy with, so...
13           You know, we wanted to look at -- for
14  example, if you -- if you look at Arthur's card, for
15  example, there's no expiration date.  There's really
16  not much information on here.
17           It would be easy, if someone -- you know, a
18  driver's license -- and that's one of the reasons they
19  eventually put a cap on 60 days of expiration.
20           You know, what do you do?  I bet you have
21  cards like this sitting in a drawer or a desk
22  somewhere, and you do and you do, and we all do.  And
23  so when things -- or you change agencies.  Every
24  agency -- my card looks vastly different from this.
25           I -- you know, I don't recall this

---

276

1   conversation, but I think a reasonable person would
2   say that you don't want the line to be forever when
3   you're voting.
4            You talk about opportunity to vote.  One
5   thing that will keep people away from voting is when
6   they show up to vote and the line is out the door.
7   That sometimes occurs on the last day of voting or on
8   a -- on a very heavy election.
9            If -- if the volunteer -- well, they're paid
10  very little money -- election judge and precinct poll
11  worker has to go through 50 and 60 different IDs that
12  are brought to them, well, is this good, is this not
13  good, what is this one, they -- you know, it could
14  lead to confusion and delay.
15           And so we simplified it to documents which
16  most Texans have, or have available to them, one of
17  several documents.  And if they don't, they can get a
18  free one without, you know, inconvenience.
19     Q.   (BY MR. DERFNER)  So when you had these
20  choices --
21     A.   Right.
22     Q.   -- you made this choice at least on the more
23  stringent side, didn't you?
24           MS. DONNELLY:  Objection.  Form.
25     A.   Armand, you keep using that word "stringent"

---

SENATOR DAN PATRICK                                          7/11/2014
CONFIDENTIAL TRANSCRIPT

70 (Pages 277 to 280)

---

277

1    and you're --
2        Q.  (BY MR. DERFNER) It is.
3        A.  No, it's not stringent.
4        Q.  Okay.  Is it not more stringent to allow
5    fewer cards instead of more cards?
6        A.  No.
7            MS. DONNELLY:  Objection.  Form.
8        Q.  (BY MR. DERFNER) Okay.  Why not?
9        A.  I don't think it's -- it's stringent to say
10   more or less.  Example:  If you allowed every card
11   that you suggest in here, it might make voting, to use
12   your word, "more stringent," because it's going to
13   slow the process down dramatically and make the lines
14   much longer and discourage people from wanting to
15   vote.
16           I could see -- because sometimes people will
17   sue no matter what someone does, as you know.  I could
18   see someone coming and bringing a suit, "You know
19   what, you've allowed people to use 70 or 80 different
20   forms of ID; and you know what, that's made the lines
21   very long and I can't get home before the polls close
22   in time to get in line and I'm just not voting.
23           There's always going to be someone to take
24   issue, no matter what Democrats or Republicans do,
25   when trying to represent the public.  And we decided

---

278

1    on these identification cards, we felt, was the right
2    thing to do and we passed the bill.
3        Q.  Do you remember anything that was ever said
4    while the legislation was being considered?  Not
5    counting specific communications from other
6    legislators, private communications.
7            But anything that was either said on the
8    public record or at any other time, that explained why
9    state civil servants shouldn't -- that their cards
10   shouldn't be covered?
11       A.  If it's on the public record, then it would
12   be there and speak for itself.  I don't recall, and I
13   don't recall --
14       Q.  How about federal civil servants?
15       A.  Again, I've tried to be very candid.  My
16   answer is to answer all the questions I can all day
17   long.  I just don't recollect those.  It's a long time
18   ago and many votes ago.
19       Q.  We've talked -- you've used the phrase, "the
20   vast" -- I think the phrase you used was "the vast
21   majority of people have driver's licenses," right?
22       A.  Yes.  If you've seen our traffic, you know
23   I'm correct.
24       Q.  If I try to get to the airport, I'll sure
25   know that.

---

279

1        A.  You'll know.  I don't know what time your
2    plane is, but...
3        Q.  Well, the problem -- no, no.
4            A lot more people may not have licenses that
5    are out on the road anyway?
6        A.  Well, and some people go to vote who -- who
7    don't have -- you know, aren't registered.
8        Q.  You haven't ever actually -- you don't ever
9    actually -- you don't know, yourself, of any report
10   that you've ever gotten that somebody did that, have
11   you?
12       A.  Well, I was asked the question earlier today,
13   did I -- I don't know if the question was personal
14   knowledge, but I took it as do I personally know.
15       Q.  Yeah.
16       A.  But we had testimony on -- on the bills over
17   the various sessions of people voting who shouldn't be
18   voting.
19       Q.  Impersonators, or something else?
20       A.  I can't remember specifically what it was,
21   but people getting -- I believe there was testimony of
22   voter registration cards, you know, where people were
23   deceased.  People who didn't have the proper -- they
24   weren't -- you know, some people -- there was a lot of
25   testimony.  I don't want to go into specifics because

---

280

1    I may be wrong, but there was testimony on fraudulent
2    voting.  And some people in the state -- I believe the
3    Attorney General's Office, I stand to be corrected --
4    has actually prosecuted some people for fraudulently
5    voting.
6        Q.  Do you know how many?
7        A.  I don't.
8        Q.  Okay.  Would it surprise you to know that it
9    was approximately two?
10       A.  I don't know the number.
11       Q.  Okay.  Do you know how many people, or did
12   you ever know how many people, registered voters,
13   don't have driver's licenses?
14       A.  No.
15       Q.  Okay.  Would it surprise you -- let me put it
16   this way.  I don't want to -- I don't want to
17   misrepresent anything.
18       A.  Okay.
19       Q.  In the Department of Justice's letter
20   responding to the Section 5 submission, the department
21   reported that DPS had sent data indicating that,
22   depending on which data set was used, the number of
23   people -- registered voters who did not have driver's
24   licenses, was either 605,000 or 795,000.
25           Would that number -- do those numbers

---

U.S. LEGAL SUPPORT - HOUSTON, TEXAS
713.653.7100

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

71 (Pages 281 to 284)

---

**281**

1    surprise you?
2         A.  No.  I mean, I don't -- I don't -- I don't
3    want to say no.  Let me correct my answer.  Those
4    numbers don't mean anything to me because I don't have
5    the rest of the data.
6         Q.  Okay.  Well, suppose 795,000 registered
7    voters didn't have driver's licenses.  Is that a
8    problem for you?
9         A.  They may have a military ID.
10        Q.  Uh-huh.
11        A.  They may have a passport.  They might have a
12   CHL.  Or, I can only guess, I shouldn't, is a large
13   number, maybe half, maybe more, are over 65 and they
14   aren't driving anymore and they don't need a driver's
15   license to vote because they vote by mail.
16        We -- as you well know, Democrats and
17   Republicans, a large percentage of our voters are
18   senior citizens.  So the reason the 600,000 or 700,000
19   doesn't surprise me, or concern me, is because if you
20   really drill down than asking you the data, it might be that 4 to
21   500,000 of those people either aren't required to have
22   it, don't care to have it or have other photo ID.
23        Q.  But you didn't know the number, right?
24        MS. DONNELLY:  Right.  He's accepting
25   your premise.

---

**282**

1         A.  Yeah, I'm accepting your premise.
2         Q.  (BY MR. DERFNER) No, no.  But you never knew
3    what the number was in the debate, right?
4         A.  I don't recall if that was part of it or not.
5         Q.  Do you know if anybody ever said what the
6    number was or asked for it?
7         A.  I don't -- you know, I don't know.  I mean, I
8    really don't know.  I would expect if someone knew the
9    number, maybe a Democrat would have brought it up, if
10   not a Republican, but I don't know.  You'd have to go
11   back and look at the record.
12        Q.  Okay.  Why wouldn't somebody have asked DPS
13   for the number?
14        MS. DONNELLY:  Objection.  Speculation.
15        A.  You'd have to ask 30 other senators.
16        Q.  (BY MR. DERFNER) Well, what about you?
17        A.  It -- I don't know why I didn't make that
18   request.  It wasn't -- again, I was not the main
19   author of the bill and -- you know, I don't know why I
20   wouldn't have asked.  Maybe I -- maybe I assumed a
21   Democrat would ask and they would try to make that --
22   I don't know.  I mean --
23        Q.  You don't remember anybody ever telling you
24   that they knew a number, right?
25        A.  I -- you know, I honestly don't recall.

---

**283**

1    Someone could have, but I don't remember.  I don't
2    remember.
3         Q.  Okay.  Let's -- you've talked about -- we --
4    we'll call it the free -- the free ID or the EIC.
5         A.  Yes.
6         Q.  Okay?
7         A.  What does EIC stand for, election --
8         Q.  Election --
9         A.  -- something certificate?
10        Q.  -- identification certificate.
11        MS. CONLEY:  I'm sorry, I messed that up
12   for everybody.
13        THE WITNESS:  No, no, no, no.  No, no,
14   no, no.  Election identification certificate.  I got
15   it.
16        MS. CONLEY:  Yes.
17        Q.  (BY MR. DERFNER)  Okay.  Who decides what you
18   have to do to get that?
19        A.  What do you mean by that?
20        Q.  Well -- okay.  Rather than asking you the
21   question, I'm going to show you --
22        A.  Okay.
23        (Patrick Exhibit 14 marked/introduced.)
24        Q.  (BY MR. DERFNER)  This is SB 14.
25        A.  Okay.

---

**284**

1         Q.  And I want you to turn to -- up in the upper
2    right-hand corner, it's page 11 of 11.  Actually,
3    below that it says page 10.
4         A.  Okay.  I see that.
5         Q.  Actually, this is -- I'll just tell you, if
6    you start on the previous page, it's Section 20 of
7    SB 14, which deals with the famous EIC and it has a
8    bunch of provisions.  You're free to read those if you
9    like.
10        A.  Where is Section 20?
11        Q.  Section 20 is in the middle of page -- the
12   previous page.
13        A.  Oh, I see.  Okay.  I missed it.  I got it.
14        Q.  Okay.  So that tells you -- that creates the
15   EIC, which didn't exist before this bill.
16        A.  Right.
17        Q.  Okay.  And then it has a number of things
18   about what -- who you have to be and all that sort of
19   thing.  And then it says -- if you turn the page, on
20   Section (f) -- read Section (f) to me.
21        A.  "The department may require each applicant
22   for an original or renewal election identification
23   certificate to furnish to the department the
24   information required by Section 521.142.
25        Q.  Okay.  And I'm not trying to make a lawyer

---

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

285

1   out of you, although you probably could do it --
2       A.  I feel like after 16,000 votes I ought to get
3   some credit for some law school.
4       Q.  Let me show you the next document.
5       A.  Do you want me to, say, dog-ear this page and
6   stay there if you'd like to come back to that?
7       Q.  Yeah.
8       A.  Okay.
9           (Patrick Exhibit 15 marked/introduced.)
10          (Discussion off the record.)
11      Q.  (BY MR. DERFNER)  Okay.  This is, and I'll
12  tell you this, this is a section of the code called
13  Transportation Code 521.142.
14      A.  Okay.
15      Q.  You remember the section you just read,
16  said -- I'll paraphrase:  The department can ask for
17  any information required by 521.142.
18      A.  All right.
19      Q.  So here's 521.142, and there's a bunch of
20  things in here, including -- let's see.  Where is it?
21  If you turn to page -- the second page, look at (e).
22  I guess it's --
23      A.  I see it.  "The application must include"?
24      Q.  Yeah.  Read it out loud.
25      A.  "The application must include any other

286

1   information the department requires to determine the
2   applicant's identity, residency, competency, and
3   eligibility as required by the department or state
4   law."
5       Q.  So who does -- if you read those two
6   together, who decides what you need to do to get an
7   EIC?  Is it the legislature that decided that or is it
8   DPS?
9       A.  I'd have to study this a little bit and get
10  back to you in the morning.
11          Let me see if I can answer your question
12  here.  "The department may require..."  Well, it would
13  appear, stand to be corrected, it would appear since
14  we have a "may" instead of a "shall," number one, the
15  department makes the final decision.  So that would
16  appear, the department.
17          Number two, very often we pass legislation
18  and a lot of it is in the rule-making process by a
19  various agency.  So I'd have to go back and do a
20  little bit more homework on this and drill down to
21  this.  But it would appear it could be the department,
22  especially since we have a "may" instead of a "shall."
23      Q.  Okay.
24      A.  But I'm not positive.
25      Q.  I understand.  I understand.  Okay.

287

1           So -- so the department can make
2   it -- doesn't it look like the department can make it
3   as tough or as easy as it likes to get an EIC?
4       A.  You know, again, since I can't -- I really
5   can't answer your question.  I really can't, to be
6   honest.
7           (Patrick Exhibits 16 and 17
8   marked/introduced.)
9       Q.  (BY MR. DERFNER)  So you were talking about
10  rule-making.  So 16 is some rules that DPS came up
11  with, and if you look at 17 on the first page under --
12  I guess number (3).  Do you see number -- I don't know
13  if it's --
14      A.  Where is (3)?
15      Q.  Right about there.
16      A.  Oh, this is on page 8 of 8.
17      Q.  Yeah.
18      A.  Okay.  You didn't tell me that.
19      Q.  Okay.  Read Number (3).
20      A.  "the fingerprints of the applicant; this does
21  not apply to an applicant who is permitted and
22  utilizes an alternative method for renewing or
23  duplicating an election identification certificate;"
24      Q.  Would it surprise you to learn that DPS, at
25  least for a while, was making applicants who wanted to

288

1   vote with an EIC give them their fingerprints?
2       A.  No.
3       Q.  Do you think that's something they ought to
4   be able to do?
5       A.  I stand to be corrected, but I believe when
6   you get your driver's license, we give a fingerprint.
7   When you get a CHL, you get a fingerprint.  And when
8   you're in the military, you get a fingerprint.
9           So -- so for some other documents that we
10  already require -- and, again, I have to stand
11  corrected on the driver's license, but I know to get a
12  CHL you have to submit fingerprints.
13      Q.  Do you think it's appropriate to make
14  somebody get fingerprinted in order to be able to
15  vote?
16      A.  You could back that down and say, "Is it
17  appropriate to make someone give a fingerprint to get
18  a driver's license?"  We're trying to establish to be
19  sure that we have integrity at the ballot box.
20      Q.  Are you aware, since you're getting your
21  legal education here, that the Supreme Court has said
22  that voting has elements of the First Amendment in it,
23  that a voter's rights are First Amendment interests?
24          MS. DONNELLY:  Objection.  Form.
25      A.  I'll let the courts decide what the courts

SENATOR DAN PATRICK                                    7/11/2014
CONFIDENTIAL TRANSCRIPT

73 (Pages 289 to 292)

---

289

1   decide. I just write and pass legislation and vote
2   for legislation.
3       Q. (BY MR. DERFNER) Do you not see a difference
4   between the rights of a respective voter and the
5   rights of a respective driver?
6       A. As an individual -- as an individual, yes, I
7   understand and can philosophically see the
8   differences.
9       Q. Why did you tell DPS to make the rules for
10  voters in this case?
11          MS. DONNELLY: Objection.
12      Q. (BY MR. DERFNER) Are they the right agency?
13          MS. DONNELLY: Objection. Form.
14      A. I didn't tell anyone to --
15      Q. (BY MR. DERFNER) Well, you put it in the
16  statute.
17      A. I have to go back and see exactly what
18  was --
19      Q. Okay.
20          MR. DERFNER: Which number is that,
21  SB 14?
22          THE REPORTER: Now, that one, I don't
23  know.
24          MR. DYER: That's 14, I think, the bill.
25          MS. DONNELLY: Yeah, 14.

---

290

1       Q. (BY MR. DERFNER) You gave DPS the
2   responsibility for the EIC, didn't you?
3       A. We -- in legislation that we pass all the
4   time, whether it's education, we have the TEA, whether
5   it's health and human services and it's child
6   protective, whether it's transportation and TxDOT, we
7   often give agencies rule-making power.
8       Q. But you usually give the right agency the
9   power, don't you?
10          MR. CLAY: Objection. Form.
11          MS. DONNELLY: Objection. Form.
12          MR. CLAY: Argumentative.
13      Q. (BY MR. DERFNER) I mean, you wouldn't give --
14  you wouldn't give the agriculture department the
15  decision-making power over an education, or other
16  situation, wouldn't you, or health?
17      A. If it was --
18          MR. CLAY: Objection. Form.
19      A. -- dealing with the FFA case, you might. I
20  understand your point. I'm not trying to be flippant.
21      Q. (BY MR. DERFNER) So why did you give -- why
22  did you give this critical voting matter to DPS,
23  especially when other issues under the voter ID law do
24  go to the Secretary of State and the election
25  division?

---

291

1           MS. DONNELLY: Objection.
2   Argumentative.
3       Q. (BY MR. DERFNER) Okay. Then let me ask it a
4   little bit differently. Does DPS seem like the right
5   agency to put this awesome responsibility on?
6           MS. DONNELLY: Objection.
7   Argumentative.
8           MR. DERFNER: Is it still argumentative?
9   Suppose I take out "awesome."
10      A. You know, Armand, I've never thought it. I'd
11  have to think about it.
12      Q. (BY MR. DERFNER) Well, shouldn't you have
13  thought about it before you passed the bill?
14      A. I might have. I don't recall.
15      Q. Okay. Do you know if anybody said anything
16  about whether it should be DPS that has this
17  responsibility?
18      A. I do not recall.
19      Q. Okay. Do you know, by the way -- never mind.
20  Okay. Let's see.
21          MS. DONNELLY: Armand, We've been going
22  for over an hour.
23          MR. DERFNER: I'm almost done. We
24  probably can finish this in just a few minutes.
25          Do you want to take a short break? I'm

---

292

1   almost done. Let's take a short break and we can
2   finish it -- wrap it up right after that.
3           MS. DONNELLY: That will give you a
4   chance to get your question.
5           THE WITNESS: Okay. Let's keep it a
6   tight 5 and real short.
7           (Break.)
8           (Patrick Exhibit 18 marked/introduced.)
9       Q. (BY MR. DERFNER) Okay. I've handed you a
10  document, which is -- as far as I can tell, it's
11  a -- it's off a website, a DPS website, and it talks
12  about the EIC, what you have to do to get one, et
13  cetera.
14      A. All right.
15      Q. Are you familiar with this at all?
16      A. No, I have not looked at it --
17      Q. Okay.
18      A. -- until now.
19      Q. Look through it a little bit.
20      A. I did. I've looked through it.
21      Q. And you see it incorporates the various
22  requirements that -- that are in the EIC, including
23  documentation of citizenship, et cetera, correct?
24      A. Yes, sir.
25      Q. So are these things that the legislature

---

SENATOR DAN PATRICK                                7/11/2014
CONFIDENTIAL TRANSCRIPT

74 (Pages 293 to 296)

293

1    intended to require for people getting this EIC that
2    the legislature had created?
3        A.  I don't recall.
4        Q.  Did the legislature have any idea of what it
5    wanted to require?
6        A.  I don't recall.
7        Q.  Okay.  Do you remember anything -- well, I
8    guess you've said you don't recall.
9        A.  Yeah, I really don't.
10       Q.  If somebody can't meet these requirements,
11   are they able to vote?
12       A.  All people can go vote and cast a provisional
13   ballot.
14       Q.  Okay.
15       A.  I'd have to -- Armand, I'd have to look at
16   this and study it a little bit.  I'm seeing it for the
17   first time.
18       Q.  Well, let me clarify your answer about the
19   provisional ballot.  Casting a provisional ballot,
20   what does it take to get it counted?
21       A.  I believe the law -- and I stand to be
22   corrected -- today, is within six days or seven days,
23   one of the two, you have to bring back a photo
24   document showing that you're the person who voted.
25       Q.  So when you say anybody can cast a

294

1    provisional ballot, all you're saying, I take it, is
2    that it gives you more time, but you still need to get
3    the photo ID, right?  It just gives you six extra
4    days, in a sense?
5        A.  Correct.
6        Q.  So if you can't meet the requirements for an
7    EIC and you don't already have one of the other
8    things, like a driver's license or the military --
9        A.  Right.
10       Q.  -- then can you vote?
11           MR. CLAY:  Objection.  It's vague.
12       A.  Would you repeat that?  Do you mind?
13           MR. DERFNER:  Denise.
14           THE REPORTER:  "So if you can't meet the
15   requirements for an EIC and you don't already have one
16   of the other things, like a driver's license or the
17   military, then can you vote?"
18       A.  Well, my answer would be the -- the same
19   would apply.  If you can't meet the requirements of
20   being registered to vote, you can't vote.
21       Q.  (BY MR. DERFNER)  Okay.
22       A.  If you -- if you can't meet the requirements
23   of eligibility -- for example, resident of Texas or in
24   certain elections resident of a city -- you can't
25   vote.  So there are requirements.  You know, I live in

295

1    the county, so I can't vote in city elections.
2        Q.  So let's suppose you are a registered voter,
3    a proper resident of the precinct you want to vote
4    in -- not a felon, not disqualified for any other
5    reason -- so you're properly registered to vote; but,
6    you don't have one of the photo IDs listed in SB 14
7    and you can't meet these or you don't meet these
8    requirements for an EIC.  Can you vote?  And not
9    absentee.  Can you vote in person?
10       A.  You could vote in person a provisional ballot
11   and then you -- the vote -- you would have to come
12   back and prove up -- yes, if you don't have the
13   document, it's -- you know, again, I go back to all
14   the examples of photo ID.
15           Even if it's my child, my grandchildren now,
16   if I want to pick up at school, most schools require
17   you show an ID to go pick up your child from school to
18   take them to the doctor.  There are rules and...
19           Yes, so under the rules that have been set
20   forth by SB 14, you have to be eligible, you have to
21   be registered, and you have to have a photo ID to vote
22   in person.
23       Q.  Okay.  By the way, let me just clarify one
24   thing on an earlier topic --
25       A.  Yes.

296

1        Q.  -- about voting absentee -- or voting by
2    mail.
3        A.  Yes.
4        Q.  People who vote by mail don't have to go
5    through this, right?  Don't have to come up with a
6    photo ID?
7        A.  Correct.
8        Q.  Okay.  But if you were told you're not
9    allowed to vote in person, but you can only vote by
10   mail, would you be losing something?
11           MR. CLAY:  Objection.  Form.
12       A.  I'm not sure I understand.
13       Q.  (BY MR. DERFNER)  Would you feel that was some
14   kind of a disadvantage to you?
15       A.  I'll be happy when I'm 65 and can vote by
16   mail.
17       Q.  That wasn't my question.
18       A.  I know.  No.  I mean, I don't personally.
19   Again, we -- you know, we've had a pretty good day.  I
20   think it's been -- it's been --
21       Q.  Getting better by the minute.
22       A.  Getting better by the minute.  We just have a
23   philosophical belief here.  I just -- I, along with
24   millions of Texans, just don't believe that requiring
25   a photo to vote, a sacred -- many people consider it

SENATOR DAN PATRICK                                        7/11/2014
CONFIDENTIAL TRANSCRIPT

75 (Pages 297 to 300)

297

1    very important, the integrity of the ballot box. It
2    decides who our President and our Congress and
3    senators and local officials are.
4         Millions and millions of Texans, including
5    Democrats and poor people that we've talked about
6    today, and minorities, don't think it's a burden or an
7    issue to ask someone to have a photo when it's almost
8    impossible to have a normal life in America today
9    without having to show a photo ID to do so many
10   things.
11        Q.   That's a great answer, Dan, but it wasn't my
12   question.
13        A.   Okay.
14             MR. DERFNER:  Read the question again.
15             THE REPORTER:  "Okay.  But if you were
16   told you're not allowed to vote in person, but you can
17   only vote by mail, would you be losing something?"
18             "Would you feel that was some kind of a
19   disadvantage to you?"
20             MS. DONNELLY:  Objection.  Form.
21             Go ahead.
22        A.   I think I said, no, it wouldn't.
23        Q.   (BY MR. DERFNER)  Why not?  Are you serious?
24             MS. DONNELLY:  Argumentative.
25        A.   Okay.  Well, if the rules say I need a photo

298

1    voter ID to vote and I don't have a photo voter ID and
2    I don't -- and I'm not inclined to get a photo voter
3    ID, then that's -- you know, that's -- I mean, society
4    does have its rules and regulations to do certain
5    things that the people support.  And if the people did
6    support it, it wouldn't be law.
7             (Ms. Baldwin exits the room.)
8        Q.   (BY MR. DERFNER)  If there are people who have
9    driver's licenses now, who didn't have to meet these
10   requirements, these documentary requirements, such as
11   documenting citizenship in order to get that driver's
12   license, should they be able to use that driver's
13   license as a photo ID?
14        A.   I stand to be corrected, but I do believe you
15   have to prove citizenship to get a driver's license in
16   Texas.
17        Q.   Okay.  When did you last renew your driver's
18   license?
19        A.   I was asked earlier this morning.  I don't
20   recall.  I don't recall.
21        Q.   Okay.  Did you prove citizenship at that
22   time?
23        A.   I don't recall.
24        Q.   Did you ever prove citizenship to get your
25   driver's license?

299

1        A.   If, when I renewed my driver's license -- and
2    it's probably the first time, it's probably not on
3    renewal.  But I don't know, if that was a requirement
4    at the time, then I had -- then I had to do that.
5        Q.   But you don't know if it was a requirement at
6    the time, do you?
7        A.   I don't know.
8        Q.   If it was not a requirement at the time, then
9    maybe you didn't have to do it?
10       A.   I don't know.  Well, if it wasn't a
11   requirement, then I wouldn't have had to do it.
12       Q.   And if you didn't have to do it and there's
13   no documentation of citizenship in your DPS records,
14   should you be able to vote?
15       A.   The laws -- if people act under the laws at
16   the time, then they're acting under the laws at the
17   time.
18       Q.   So should DPS be able to make it harder to
19   get an EIC today than was required of people who have
20   driver's licenses, who would be able to go to the
21   polls?
22       A.   First, I don't suggest -- I don't buy your
23   characterization that it's harder.  And secondly, I
24   don't know when -- maybe I did have to prove -- I
25   mean, I just don't know the answer to that question.

300

1    I don't remember.  When I got my first driver's
2    license in Texas, I don't know what the law was.
3        Q.   One of the documents DPS calls for in order
4    to qualify for an EIC is a birth certificate; is that
5    correct?
6        A.   I believe so.
7        Q.   What does that do?  Why is that
8    identification?
9             MS. DONNELLY:  Objection.  Form.
10       A.   I don't know what their thinking is on it.
11   But very often many things require, like a passport,
12   that you provide a birth certificate.  Other things
13   require a birth certificate when they determine
14   that -- that a birth certificate is important to prove
15   that up.
16       Q.   (BY MR. DERFNER)  Does a birth certificate
17   have a photo on it?
18       A.   No, but it would prove your citizenship,
19   where you were born, what country you were born in.
20       Q.   Okay.  If you took your birth certificate in,
21   would it prove that Dan Patrick, the person standing
22   in front of the DPS office, was -- should be -- should
23   get his driver's license if he needs his -- a birth
24   certificate for it?
25       A.   Would you mind repeating that for me?

SENATOR DAN PATRICK                                          7/11/2014
CONFIDENTIAL TRANSCRIPT

76 (Pages 301 to 304)

---

301

1      Q.  That's a bad question.  Let me ask it again.
2      A.  Good.  I thought I was confused.
3      Q.  No, no, no.  When DPS requires a birth
4  certificate, which is virtually what you have to do,
5  what does that prove?  Why is that proof good
6  identification and citizenship?
7          MS. DONNELLY:  Objection.  Form.
8      A.  I'd have to do some research and -- and find
9  out what the thinking is on any agency, federal or
10 state or local, that requires a birth certificate for
11 anything, so...
12     Q.  (BY MR. DERFNER)  What does a birth
13 certificate prove?
14     A.  It proves when you were born and where you
15 were born.
16     Q.  Okay.  So if Dan Patrick took your birth
17 certificate in, would it prove anything?
18     A.  It would prove where I was born and when I
19 was born.
20     Q.  Where who was born?  The name on the birth
21 certificate, you told us earlier, is not Dan Patrick,
22 right?
23     A.  That's correct.  Right.  Correct.
24     Q.  So if you took the birth certificate that
25 accompanied your birth in, it wouldn't say anything

---

302

1  about Dan Patrick, would it?
2      A.  No, but I would -- I would have my name
3  change -- no different than a -- you know, it's more
4  typical for a woman than a man to change their name in
5  marriage.  But many women change their name when they
6  get married, and so you could make that same argument.
7          But we do require -- TSA requires it, you
8  know.  You are required to have your driver's license
9  in your name.
10     Q.  But what I'm getting at is, what did you have
11 to do to get your driver's license?
12     A.  As I testified earlier, I don't recall when I
13 originally got it.
14     Q.  And if you took your birth certificate in,
15 you'd need another document, wouldn't you?  You, I
16 mean.
17     A.  Would I?
18     Q.  Yeah.  Your birth certificate wouldn't tell
19 who you were.  I don't mean to be picking on you, but
20 you have a special situation, right?
21     A.  Well, no, not special.  Lots of people change
22 their name.  I mean, you know, half the population
23 that gets married, or women -- and most women change
24 their name when they get married, so they do the same
25 thing.

---

303

1      Q.  Well, do you recall when you went to get your
2  license, did you bring in a birth certificate and a
3  court order?
4          MS. DONNELLY:  Objection.  He's already
5  said he doesn't remember.
6      A.  I don't remember.
7          MS. DONNELLY:  We should move on,
8  Armand.
9      Q.  (BY MR. DERFNER)  So the question is:  Why
10 would the legislature give this free-floating
11 authority to DPS to make state policy on such an
12 important matter?
13         MS. DONNELLY:  Objection.  Form.
14     A.  Again, I don't recall the specifics.
15 My -- part of my reaction would be that they are
16 already set up to do so.  These EICs are similar to a
17 driver's license.  They take the place of a driver's
18 license.  They have the cameras there to take the
19 photograph.  They have the background check system so
20 they can -- when you turn in your information, they
21 can do -- to make sure it's accurate.  That's where
22 you get your driver's license.  So it would make
23 sense.
24         We don't -- we wouldn't want to create a
25 whole new agency to go to a whole new office.  People

---

304

1  are familiar with DPS.  And at least somebody in
2  someone's family is familiar, "Oh, yeah, that's where
3  I got my license, I can take you down to get your ID
4  if..."
5          Because, we're talking about people who don't
6  have a driver's license.  So it was the appropriate
7  agency to handle it.
8          And we, again, give rule-making authority.
9  We -- we don't micromanage everything that an agency
10 handles.  We don't tell every agency exactly what to
11 do in every situation.  We pass legislation and the
12 agency's enacted.
13     Q.  (BY MR. DERFNER)  Why didn't you give it to
14 the election officials?
15     A.  I just answered the question.
16     Q.  No, you told me what -- what the agencies do.
17 You didn't tell me why you picked that agency.
18     A.  Well, I told you I didn't know why we picked
19 that agency.  But my speculation is, they were the
20 ones already set up to do that.
21     Q.  When you say "that," what do you mean "that"?
22     A.  Walk in, get your photograph taken, half the
23 driver's licenses that he actually made, the
24 background checks done, they're the ones who do that.
25     Q.  And do they have any experience with voting?

---

---

305

1        A.  This isn't about -- the DPS side of this
2   isn't about voting.  It's about verifying that people
3   who -- are who they say they are, and they're the best
4   set up agency in the state, since they're issuing a
5   driver's license, to issue a similar card.
6        Q.  So if the legislature wasn't deciding this
7   important voting question, and if DPS is set up just
8   to deal with the driver's license side, who was
9   looking out for the voters in this process?
10           MS. DONNELLY:  Objection.  This is just
11   argumentative.
12           MR. DERFNER:  I don't think so.  Do you
13   want me to rephrase it?
14           MS. DONNELLY:  Counsel, really, let's
15   just ask substantive questions.  It's the end of the
16   day.
17           MR. DERFNER:  I understand.
18        Q.  (BY MR. DERFNER)  Who was looking out for the
19   voters in this process?
20           MS. DONNELLY:  Objection.
21   Argumentative.
22           You can answer.
23           But I really think we need to move it
24   along.
25        A.  I'm really done with the issue.  I've

---

306

1   answered it multiple times.
2        Q.  (BY MR. DERFNER)  Okay.  Let me just take a
3   second.
4           Senator Patrick --
5        A.  Yes, sir.
6        Q.  -- I asked you a number of questions about
7   the legislative process and what you knew and didn't
8   know, et cetera.
9           Is there anybody besides you who would know
10   or who might know more about some of those things, or
11   might have known more about some of the questions I
12   asked about the legislative process?  Is that a clear
13   enough question?
14        A.  Yes.  It would only be speculation on my part
15   because I can't speak for another senator.  But the
16   author of the bill may, or may not.
17           And, again, to be clear, you know, I don't
18   recall -- you know, if -- if someone testified I was
19   in a conversation or there was a meeting or something,
20   I just don't remember those.  And I'm not trying to be
21   vague.  I just don't remember.
22        Q.  So when you say the senator that authored the
23   bill, you mean Senator Fraser?
24        A.  If there was someone who might be able to add
25   clarity, he might.  But he might not be.  I can't

---

307

1   speak for him.
2        Q.  Anybody else?
3        A.  The House sponsor or author that -- we call
4   sponsors in this case.
5        Q.  You mean Ms. Harless?
6        A.  Ms. Harless.
7        Q.  Any staff people?
8        A.  If there were, I wouldn't know who those
9   were.
10        Q.  Okay.
11           MR. DERFNER:  Okay.  Thank you.
12           THE WITNESS:  Well, thank you.
13           E X A M I N A T I O N
14   BY MR. CLAY:
15        Q.  I've got a few follow-up questions for you.
16   I am going to try and go quick because I know you've
17   got to get home for dinner.
18        A.  That's fine.
19        Q.  My name is Reed Clay, and I'm representing
20   the State of Texas today and the various other
21   defendants in this case who are defending the voter ID
22   bill that you and the rest of the legislature passed
23   in 2011.
24           I just want to ask a few kind of clean-up
25   questions based upon your testimony earlier today.

---

308

1   The same ground rules, if -- you know, if I say
2   something you don't understand, just let me know and
3   I'll clear it up for you.
4           You're not a lawyer, right?
5        A.  Correct.
6        Q.  Okay.  But -- but we've had -- heard some
7   testimony today about the federal courts and -- and
8   perhaps the Supreme Court upholding Indiana's voter ID
9   law.
10           Are you aware that the Supreme Court has
11   upheld Indiana's voter ID law?
12        A.  It's as I -- I believe I testified earlier
13   today:  It seemed to me somewhere in the past that was
14   information that -- that I was aware of.
15        Q.  Were you aware of it in 2011 when the
16   legislature passed the voter ID law?
17        A.  I can't speak for certain, but I believe so.
18        Q.  Are you aware that Georgia has a voter ID
19   law?
20        A.  I think I've heard that.
21        Q.  Are you aware that the Department of Justice
22   precleared Georgia's voter ID law under the Voting
23   Rights Act?
24        A.  Actually, I do recall that story.
25        Q.  We also -- you also talked a little bit about

JOE PETERS                                                                    4/30/2014

---

**1**

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   CORPUS CHRISTI DIVISION
 3   MARC VEASEY, et al.,       )
                 Plaintiffs,    )
                                )
 4        v.                    ) CIVIL ACTION NUMBER
                                )   2:13-cv-193(NGR)
 5   RICK PERRY, et al.,        )
                                )
 6            Defendants.       )
 7   **************************************************
 8     ORAL 30 (b)(6) DEPOSITION OF THE TEXAS DEPARTMENT OF
 9                     PUBLIC SAFETY
10                       JOE PETERS
11                     APRIL 30, 2014
12   **************************************************
13        ORAL DEPOSITION OF JOE PETERS, produced as a
14   witness at the instance of Plaintiffs, and duly sworn,
15   was taken in the above-styled and numbered cause on
16   April 30, 2014, from 8:54 a.m. to 4:52 p.m. before Kim
17   Seibert, CSR in and for the State of Texas, reported by
18   machine shorthand, at the law offices of DECHERT LLP,
19   300 West Sixth Street, Suite 2010, Austin, Texas,
20   pursuant to the Federal Rules of Civil Procedure and/or
21   the provisions stated on the record or attached hereto.
22
23
24
25
```

---

**3**

```
 1   Mr. Ezra D. Rosenberg (By Telephone)
     DECHERT LLP
 2   902 Carnegie Center, Suite 500
     Princeton, New Jersey  08540
 3   Ezra.rosenberg@dechert.com
 4
     FOR THE TEXAS LEAGUE OF YOUNG VOTERS
 5   PLAINTIFF-INTERVENORS:
     Mr. Kelly P. Dunbar
 6      - and -
     Mr. Hasan Ali
 7   WILMER CUTLER PICKERING HALE AND DOOR, LLP
     1875 Pennsylvania Avenue, NW
 8   Washington, DC  20006
     (202) 663-6262
 9   kelly.dunbar@wilmerhale.com
10
     FOR THE ORTIZ PLAINTIFFS:
11   Mr. Robert W. Doggett
     TEXAS RIO GRANDE LEGAL AID, INC.
12   4920 North IH-35
     Austin, Texas  78751
13   (512) 374-2725
     rdoggett@trla.org
14
15   FOR THE DEFENDANTS:
     Mr. S. Ronald Keister
16   Mr. Stephen L. Tatum, Jr.
     Ms. Lindsey Wolf
17   OFFICE OF THE ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
18   Austin, Texas  78711
     (512) 463-2197
19   ronny.keister@oag.state.tx.us
20
     ALSO PRESENT:
21   Ms. Kathleen Murphy-Darveau
     TEXAS DEPARTMENT OF PUBLIC SAFETY
22   5805 North Lamar Boulevard
     Austin, Texas  78752
23   (512) 424-2420
     kathleen.murphy@dps.texas.gov
24
        - and -
25
```

---

**2**

```
 1           A P P E A R A N C E S
 2
 3   FOR PLAINTIFF UNITED STATES OF AMERICA:
     Mr. Daniel J. Freeman
 4      - and -
     Ms. Elizabeth S. Westfall (By Telephone)
 5   U.S. DEPARTMENT OF JUSTICE
     Civil Rights Division
 6   950 Pennsylvania Avenue, NW
     NWB Room 7203
 7   Washington, DC  20530
     (202) 305-4355
 8   daniel.freeman@usdoj.gov
 9
     FOR THE VEASEY PLAINTIFFS:
10   Mr. Scott Brazil
     BRAZIL & DUNN, LLP
11   4201 Cypress Creek Parkway
     Suite 530
12   Houston, Texas  77068
     (281) 380-6310
13   scott@brazilanddunn.com
14
     FOR THE TEXAS STATE CONFERENCE OF NAACP BRANCHES
15   PLAINTIFFS:
     Ms. Jennifer Clark
16   BRENNAN CENTER FOR JUSTICE
     161 Avenue of the Americas
17   12th Floor
     New York, New York  10013
18   (646) 292-8332
     jennifer.clark@nyu.edu
19
        - and -
20
     Ms. Amy L. Rudd
21   DECHERT
     300 West Sixth Street
22   Suite 2010
     Austin, Texas  78701
23   (512) 394-3000
     amy.rudd@dechert.com
24
        - and -
25
```

---

**4**

```
 1   Ms. Teresa Guerra Snelson
     ASSISTANT DISTRICT ATTORNEY
 2   411 Elm Street
     Dallas, Texas  75202
 3   (214) 653-7358
 4
 5   REPORTED BY:
     Kim Seibert, CSR, RPR
 6   U.S. Legal Support, Inc.
     Austin Centre
 7   701 Brazos, Suite 380
     Austin, Texas  78701
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

JOE PETERS                                                    4/30/2014

---

**5**

INDEX

Appearances.................................... 2

JOE PETERS

Examination by Mr. Freeman..................... 8
Examination by Mr. Brazil..................... 147
Examination by Mr. Dunbar..................... 189
Examination by Ms. Clark..................... 238
Examination by Mr. Doggett..................... 301
Further Examination by Mr. Freeman............. 320
Further Examination by Mr. Dunbar............. 323
Witness' Signature Page........................ 330
Reporter's Certificate........................ 332

EXHIBITS

NUMBER        DESCRIPTION              PAGE

Exhibit 36   ...............................   17
             Notice of Deposition
Exhibit 37   ...............................   28
             Senate Bill 14
Exhibit 38   ...............................   32
             Texas Administrative Code,
             Title 37, Part 1,
             Chapter 15
Exhibit 39   ...............................   60
             Article in the Fort Worth Star
             Telegram in September
             of 2013
Exhibit 40   ...............................   81
             Interlocal Cooperation Contract
             for Mobile EIC
             operations between the
             Department of Public
             Safety and Duval
             County, Texas
Exhibit 41   ...............................   88
             E-mail from Tony Rodriguez to
             Wroe Jackson dated
             October 2nd, 2013

---

**6**

Exhibit 42   ...............................   98
             Affidavit
Exhibit 43   ...............................  110
             E-mail dated
             February 1st of 2011
Exhibit 44   ...............................  123
             E-mail String
Exhibit 45   ...............................  145
             Texas Administrative Code
             Title 37, Chapter 15,
             Subchapter (b),
             Section 15.46
Exhibit 46   ...............................  186
             Calculation utilized in putting
             the fiscal note
             together for S.B. 14.
Exhibit 47   ...............................  197
             Cover e-mail from Janie Smith to
             Witness
Exhibit 48   ...............................  205
             Data from Texas State
             University
Exhibit 49   ...............................  211
             E-mail from Robert
             Bodisch dated 9-23-03
Exhibit 50   ...............................  219
             E-mail Exchange dated
             9-10-13
Exhibit 51   ...............................  246
             E-mail dated 6-21-13
Exhibit 52   ...............................  251
             E-mail dated 6-24-13
Exhibit 53   ...............................  268
             E-mail dated 10-3-13
Exhibit 54   ...............................  273
             County Election Certificate
             Training Plan, dated
             10-2-13
Exhibit 55   ...............................  276
             Texas Election
             Identification
             Certificate County
             Clerk Mobile Light
             Training

---

**7**

Exhibit 56   ...............................  276
             Manual Entitled
             "Election
             Identification
             Certificate County Set
             Up and Issuance
             Training"
Exhibit 57   ...............................  277
             Printout of Election
             Identification
             Certificates, EIC
             Documentation
             Requirements date
             stamped 4/27/2014
Exhibit 58   ...............................  285
             Poster: Election Identification
             Certificates Available
             Here
Exhibit 59   ...............................  289
             E-mail from Keith Ingram to
             Joyce Cohen entitled,
             "Mobile EIC"
Exhibit 60   ...............................  293
             Media Publication Outreach
             Election Identification
             Certificates
Exhibit 61   ...............................  302
             EIC Application
Exhibit 62   ...............................  322
             Report showing 53 EICs

---

**8**

1    MR. FREEMAN:  Okay.  We're on the record.

2         JOE PETERS,

3    having been first duly sworn, testified as follows:

4              EXAMINATION

5    BY MR. FREEMAN:

6    Q.  Mr. Peters, thank you for taking the time for

7    the deposition.  If you could please state your name

8    for the record.

9    A.  Joe Peters.

10   Q.  So my name is Dan Freeman, and I represent the

11   United States of America in this matter.  And I'll

12   allow the others in the room -- we have several other

13   attorneys in the room.  I'll allow them to introduce

14   themselves for the record as well.

15   A.  Okay.

16        MR. BRAZIL:  Scott Brazil for the

17   Veasey plaintiffs.

18        MR. DUNBAR:  Kelly Dunbar for the Texas

19   League of Young Voters Group.

20        MR. ALI:  Hasan Ali for the Texas League

21   of Young Voters Group.

22        MS. CLARK:  Jennifer Clark for MALC and

23   Texas NAACP.

24        MS. RUDD:  Amy Rudd for MALC and Texas

25   NAACP.

---

JOE PETERS                                          4/30/2014

8 (Pages 29 to 32)

29

1     Q.   Were you the legislative liaison for DPS at
2  the time that this was passed?
3     A.   No, sir.
4     Q.   Okay.  Could you turn to Page 13 and take a
5  look at Section 20?
6     A.   I'm there.
7     Q.   What is your best understanding of an
8  election -- of the requirements of an election
9  identification certificate based on your reading of
10 Exhibit 37?
11          MR. KEISTER:  Objection, vague.
12    Q.   (BY MR. FREEMAN)  You may answer.
13          MR. KEISTER:  You can answer.
14          THE WITNESS:  The Section 521A.001 says,
15 "The department shall issue an election identification
16 certificate to a person who states that the person is
17 obtaining the certificate for the purposes of
18 satisfying Section 63.001(b) of the election code and
19 that person does not have another form of
20 identification described by 63.0101 of the election
21 code."
22    Q.   And that's -- that's the text of
23 Section 521A.001, Sub (a)?
24    A.   Correct.
25    Q.   Okay.  If you'll look at Section 20,

30

1  Subsection (f)?
2     A.   F as in Frank?
3     Q.   F as in Frank.  What is your understanding of
4  that provision?
5     A.   The -- the text says, "The department may
6  require each applicant for an original or renewal
7  election identification certificate to furnish to the
8  department the information required by Section 521.142.
9     Q.   And that's Section 521.142 of the
10 transportation code?
11    A.   Correct.
12    Q.   Does the statute require an applicant for an
13 EIC to provide any particular information or data?
14    A.   Specific information?
15    Q.   Yes.
16          MR. KEISTER:  Objection, calls for a
17 legal conclusion.
18          But you can answer.
19          THE WITNESS:  I'm not certain exactly
20 what 521 requires, whether it specifies a particular
21 document.  I believe -- I believe it doesn't, but I
22 want to qualify the answer.
23    Q.   (BY MR. FREEMAN)  I guess if I can refine my
24 question.  Does Subsection (f) require -- state that
25 the department must require particular forms of

31

1  identification?
2     A.   No, sir.
3     Q.   It only establishes that the department may
4  require certain forms?
5     A.   Yes, sir.
6     Q.   And, to your knowledge, what information or
7  data may the Department of Public Safety require an
8  individual to provide?
9     A.   If you're talking about what 521.142 says
10 specifically, I don't recall specifically the
11 information that it requires.  But, you know, we do
12 require certain forms of identification.
13    Q.   And is it a matter of the department's
14 discretion, then, to determine what an individual must
15 require?
16    A.   Yes, sir.
17    Q.   Are you familiar with the regulations that the
18 Department of Public Safety has promulgated in order to
19 implement Section 521A.001(f) of the Texas
20 Transportation Code?
21    A.   Are you referring to the administrative rule?
22    Q.   Is -- are -- is the administrative rules -- is
23 that the term that you use to refer to regulations?
24    A.   Yes.
25    Q.   Then, yes.

32

1     A.   Yes.
2          (Exhibit No. 38 marked.)
3          THE REPORTER:  Exhibit 38.
4     Q.   (BY MR. FREEMAN)  What is this document?
5     A.   This appears to be a copy of the Texas
6  Administrative Code, Title 37, Part 1, Chapter 15.
7     Q.   Is this the complete set of regulations that
8  DPS has promulgated to implement its election
9  identification certificate program?
10    A.   I believe it is.
11    Q.   When were these promulgated?
12    A.   2011.
13    Q.   Do you know more specifically?
14    A.   No, but I think it was in December.
15    Q.   Who drafted these regulations?
16    A.   This was before my time, but I'm advised by
17 staff that it was a collaboration, and I think probably
18 Janie Smith was the primary drafter, with the
19 assistance and guidance from the Office of General
20 Counsel.
21    Q.   And who is Janie Smith?
22    A.   She is in our policy and business improvement
23 section of the customer support division.
24    Q.   Okay.  And that collaborative process, could
25 you explain the nature of that process?

JOE PETERS                                                    4/30/2014

33

```
 1        A.  Not for this.  I wasn't there.
 2        Q.  What is the general type of process that is
 3    used to develop regulations in areas under your
 4    supervision?
 5        A.  The policy and business improvement staff
 6    identifies the -- the need for those rules and the
 7    language that needs to be in those rules for DPS to
 8    accomplish whatever it is we're trying to accomplish.
 9    And the policy and business improvement staff will --
10    will develop a draft with -- in consultation with the
11    Office of General Counsel to be sure that we've covered
12    everything in statute that we're required to
13    accomplish.
14        Q.  And who is required to approve those
15    regulations once they've been drafted?
16        A.  Ultimately for the division?
17            MR. KEISTER:  You've got to slow down,
18    let him pause.
19            THE WITNESS:  Okay.
20            Would you restate your question?
21        Q.  (BY MR. FREEMAN)  Who is ultimately -- who has
22    to approve those regulations before they're finalized?
23        A.  Ultimately, I sign off on those.
24        Q.  Anyone above you?
25        A.  Well, let me back up.  I sign off on those and
```

34

```
 1    the Public Safety Commission has to approve final
 2    adoption of them once I've signed off on them.
 3        Q.  And that -- the Public Safety Commission is a
 4    separate supervisory body that oversees the Department
 5    of Public Safety?
 6        A.  Correct.
 7        Q.  If you could please take a look at
 8    Section 15.181(c)(1)?
 9        A.  C, as in Charles, 1?
10        Q.  C, as in Charles, 1.
11        A.  Okay.
12        Q.  Does this section require an applicant who is
13    already a registered voter to present a voter
14    registration card issued to that individual when
15    applying for an election identification certificate?
16        A.  That's what the rule says.
17        Q.  If the registered voter has lost their card,
18    are they unable to apply for an election identification
19    certificate?
20        A.  No, they would still be able to apply for an
21    election identification certificate.
22        Q.  How would they do that?
23        A.  They would specify on their application that
24    they are a registered voter.  If they're not a
25    registered voter, they can apply for voter registration
```

35

```
 1    at that point.
 2        Q.  But if they are a registered voter, but do not
 3    have a copy of their voter registration card because
 4    they have lost it, how would they apply?
 5        A.  They just attest that they are a registered
 6    voter.
 7        Q.  And so an applicant who is a registered voter,
 8    in fact, does not have to present their voter
 9    registration card?
10        A.  That's correct.
11        Q.  Okay.  Is it possible for the Department of
12    Public Safety to query the Secretary of State's office
13    to verify whether an individual is a registered voter?
14        A.  We -- I don't think we have direct connection
15    with the Secretary of State to develop -- I mean, to
16    determine whether or not a voter is registered.  They
17    sign the affidavit on the application form ensuring or
18    saying that they are, and we take that.  And from there
19    it's out of our hands.
20        Q.  So there's no current process to do that?
21        A.  Not that I'm aware of.
22        Q.  Is there any technical impediment to doing
23    that?
24        A.  Well, there is a technical impediment in that
25    we don't have connectivity to the voter -- direct
```

36

```
 1    connectively to a voter registration file.
 2        Q.  Could they call someone at the Secretary of
 3    State's office?
 4        A.  I suppose they could.
 5        Q.  Is there any legal impediment to doing that to
 6    your knowledge?
 7        A.  Not that I'm aware of.
 8        Q.  Could you please take a look at Section
 9    15.181(d)?
10        A.  B, as in boy?
11        Q.  D, as in --
12        A.  Oh, D, as in David?
13        Q.  -- as in David.
14        A.  Okay.
15        Q.  The term has been -- so -- sorry.  Strike
16    that.
17            This provision bars an individual who has
18    been issued certain documents that would be sufficient
19    to cast an in-person ballot under S.B. 14 from
20    obtaining an EIC, correct?
21        A.  Would you state your question again?  I'm not
22    sure I followed it.
23        Q.  Sure.  This provision bars an individual who,
24    quote, has been issued, close quote, a set of documents
25    that are sufficient to cast an in-person ballot under
```

---

**37**

1   S.B. 14 from obtaining an EIC from DPS, correct?
2       A.  Yes.
3       Q.  What if that document has been lost or stolen?
4       A.  If the document has been lost or stolen,
5   assuming that it's a driver's license or an ID card
6   that was issued by DPS, we can determine whether or not
7   they still have a valid card or still have a valid
8   license, and we would issue the -- we would not issue
9   the election identification certificate.
10      Q.  Is there a fee for an individual who has
11  DPS-issued ID, but has lost that ID to obtain a new
12  copy?
13      A.  Yes.
14      Q.  How does your office verify that an individual
15  has been issued one of those sets of documents?
16      A.  We would query the driver's license system,
17  the driver's license database, and determine whether or
18  not there's a valid card or a valid issuance.
19      Q.  The driver's license database addresses both
20  driver's licenses and Texas personal identification
21  cards?
22      A.  Yes, sir.
23      Q.  Does -- would -- strike that.
24          Does the department verify the license to
25  carry database?

---

**38**

1       A.  No, sir.
2       Q.  Does it check against any other forms of
3   identification set out in this regulation?
4       A.  No, sir.
5       Q.  Okay.  Is it correct that an individual whose
6   identification will be expired by 60 days or more on
7   the date of an upcoming election but whose ID is not
8   expired by 60 days on the date of the application
9   cannot apply for an EIC?
10      A.  They would -- they could apply.
11      Q.  They could apply --
12      A.  If --
13      Q.  -- notwithstanding the fact that their
14  identification is not expired by 60 days or more on the
15  date that they are applying?
16      A.  They could apply.
17      Q.  And so the -- the actual rule for DPS is not
18  that the person has not been issued a driver's license
19  that expired no earlier than 60 days before the date of
20  the application, correct?  That's not the rule?
21      A.  That is the rule.
22      Q.  So the rule is that an individual's driver's
23  license has to be expired by 60 days or more on the
24  date that they apply for an EIC, correct?
25      A.  The rule is that if they have a driver's

---

**39**

1   license or an ID card that has expired no earlier than
2   that 60 days, then we would not issue them an EIC.
3       Q.  So if an individual comes in seeking an EIC a
4   month before an election --
5       A.  Uh-huh.
6       Q.  -- their ID has been expired for 45 days --
7       A.  Uh-huh.
8       Q.  -- you will not issue them an EIC at that
9   time, correct?
10      A.  Correct.
11      Q.  They would need to come back closer to the
12  election, correct?
13      A.  Yes.
14      Q.  Okay.  And if the individual's license expires
15  the day before the election -- excuse me -- would be
16  60 days expired the day before the election, they would
17  not have to come back on that day, correct?
18      A.  I'm not sure I understand your question.  But
19  if you're saying that if their -- if their license
20  expired the day before the election and they came in --
21      Q.  No.  If their license was 60 days expired.  So
22  it would no longer --
23      A.  If it was already 60 days expired?
24      Q.  59 days the day before the election, you would
25  not issue them the EIC the day before the election even

---

**40**

1   though the election was the next day and the license
2   would not be sufficient to vote under S.B. 14 on the
3   election day, correct?
4       A.  Well, yeah, that would be correct.
5       Q.  Okay.  Please look at Section 15.182.  Am I
6   correct that this says that all documents that are used
7   to prove eligibility must be verifiable?
8       A.  You are correct.
9       Q.  What does verifiable mean?
10      A.  That means that if they use -- I don't know --
11  proof of residence, a -- if they bring a passport in,
12  for example, if they have a passport, we're not going
13  to issue the EIC.  I can't think off the top of my head
14  what all we're talking about now.  There's -- you know,
15  you should have a list of the acceptable documents for
16  identification, and if you have that I would be glad to
17  look at it.
18      Q.  Well, in fact, this regulation does provide
19  the list of acceptable documents.
20      A.  Yes.
21      Q.  And I guess maybe an easier way to ask the
22  question is, what documents are not verifiable?
23      A.  I don't have the answer.
24      Q.  Are there any documents on this list in
25  Section 15.182 that are -- that exist in any form that

---

JOE PETERS                                                          4/30/2014

**41**

1  the department would deem not verifiable?
2      A.  Okay.  The Texas driver license would be
3  verifiable.  The personal identification card issued by
4  the department would be verifiable.  And then the
5  secondary identification, a certified copy of a birth
6  certificate would ultimately be verifiable.  Not that
7  it would be verifiable at the time of application by
8  our customer service representative, but it would be
9  verifiable.
10             Original certified copy of the department
11  of state certification at birth, we would not be able
12  to verify on the spot.  Original or certified copy of a
13  court order with the name and date of birth indicating
14  an official change of name would not verifiable on the
15  spot, but would ultimately be verifiable.
16      Q.  Are there any that are listed here, that are
17  listed in Section 15.182(4), the supporting
18  identification, are there any of those documents that
19  are potentially not verifiable?
20      A.  I believe all of those would be ultimately
21  verifiable.
22      Q.  Okay.  So the provision that all documents
23  must be verifiable, that doesn't limit the use
24  of any of these categories of documents listed later in
25  the regulation; is that correct?

**42**

1      A.  That's correct.
2      Q.  Okay.  How was this list of documents created,
3  the documents required for obtaining an EIC?
4      A.  I don't know that.
5      Q.  Does it appear to be modeled on any other
6  provision set out by DPS?
7      A.  It does.
8      Q.  And what provision is that?
9      A.  That would be the requirements for driver
10  license identification and ID card identification.
11      Q.  And what was the basis for using the driver's
12  license or personal identification card requirements as
13  the requirements for an election identification
14  certificate?
15      A.  Continuity of the process.  The customer
16  service representatives, which if I can, I would refer
17  to them as "CSRs" going forward, if that's all right.
18      Q.  Okay.
19      A.  The CSRs are accustomed to the requirement for
20  a driver license and for ID card.  And the process for
21  entering data and issuing the driver's license and ID
22  card, my understanding from staff discussions, was that
23  thinking back in 2011 when they started putting the EIC
24  process together that there would be less chance for
25  error if the customer service representative that was

**43**

1  issuing driver licenses and ID cards as a matter of
2  business daily, that the election identification, or
3  EIC, certificate issuance was as similar as possible.
4      Q.  So --
5      A.  So they would be looking for basically the
6  same -- I'm sorry.  They would be looking for the same
7  documents for an EIC, the same documentation for an
8  EIC, although the data entry screen for an EIC is
9  separate and distinct from that of a driver license or
10  an ID card application.
11      Q.  So the purpose of modeling this list of
12  required documents was to reduce the administrative
13  burden on CSRs?
14      A.  Reduce the administrative burden and reduce
15  the chance for error.
16      Q.  And also to reduce the burden on perhaps the
17  programmers who put together the interface for the
18  CSRs?
19      A.  Possibly, yes, sir.
20      Q.  But not necessarily to reduce the burden on
21  individuals who are applying for an EIC?
22      A.  Correct.  My understanding was that the
23  thinking was if -- if individuals were accustomed to
24  what they had to have for -- for driver's license or
25  ID card issuance and knew that the same was applicable

**44**

1  to the EIC, there would be less confusion on the part
2  of the applicant for an EIC.
3      Q.  And if -- by "individuals" you mean CSRs,
4  correct?
5      A.  Yes.
6      Q.  Not applicants?
7      A.  Well, no, I'm talking about applicants.
8      Q.  But applicants for EICs are individuals who
9  are not accustomed to holding --
10      A.  That's correct.  That's correct.
11      Q.  Thank you.  If you could look at
12  Section 15.182(2), "Primary Identification."
13      A.  Uh-huh.
14      Q.  Am I correct that the only form of primary
15  identification that is independently sufficient to
16  establish EIC eligibility is a driver's license or ID
17  card that is expired for more than 60 days, but less
18  than two years?
19      A.  Yes, sir.
20      Q.  Why was this time period selected?
21      A.  I don't know.
22      Q.  What is this time period based on?
23      A.  The -- the driver license rule.
24      Q.  And the -- what is the driver license rule?
25      A.  That if you come in with an expired driver's

JOE PETERS                                                          4/30/2014

45

1   license you can -- that's been expired for 60 days, but
2   less than two years, you can apply for re-issuance
3   without testing.  If it exceeds two years, then you
4   have to go through retest.
5       Q.  By "retest" you mean test your driving
6   ability?
7       A.  Correct.
8       Q.  Does a driver's license that has expired for
9   less than two years establish identity?
10      A.  In most cases, yes.  It depends on when that
11  driver's license was initially issued.  If under the
12  Real ID Act -- Texas is not fully compliant yet with
13  Real ID, but we're working toward that, and we require
14  lawful presence verification now.  And some of the
15  older licensees may not have had lawful presence
16  established, and the -- the system will say
17  "citizenship not verified."  So then we would require
18  them to prove lawful presence.
19      Q.  But in terms of identity, in terms of proving
20  that a person is who they say they are, does a driver's
21  license that is expired for two years establish
22  identity?
23      A.  Less than two years?
24      Q.  Yes.
25      A.  Yes.

46

1       Q.  Does it establish citizenship?
2       A.  Not necessarily.
3       Q.  Is it, nonetheless, sufficient to obtain an
4   EIC if you have a driver's license that is expired by
5   less than two years?
6       A.  Less, yes.
7       Q.  Are you certain that DPS offices are not
8   requiring additional proof of citizenship from
9   individuals who present driver's licenses that are
10  expired for less than two years and attempt to obtain
11  an EIC?
12      A.  I can't say that I'm certain, because with
13  over 2,000 employees out there, some of them may
14  inadvertently require more than -- or ask for more than
15  what we actually require.
16      Q.  Are you taking any efforts to audit or
17  supervise this process?
18      A.  Yes, we are.
19      Q.  And have you been made aware of any instances
20  in which CSRs have asked for additional proof of
21  citizenship?
22      A.  Beyond what is required here?
23      Q.  Yes.
24      A.  I'm not aware of any.  That's not to say that
25  they haven't occurred.

47

1       Q.  Okay.  Are there any computerized checks of
2   citizenship that are made?
3       A.  Yes.
4       Q.  What type of computerized checks are made?
5       A.  We use the -- a federal database.  The
6   systematic -- well, one of them is the systematic alien
7   verification for entitlements to establish lawful
8   presence if the individual is not a citizen.
9       Q.  If --
10      A.  And then we rely on -- I'm sorry.  Go ahead.
11      Q.  Is that computerized check conducted for every
12  individual who applies for an EIC?
13      A.  Yes, I believe that's -- that's actually done
14  in the -- well, I better not answer that one that way
15  because I'm not real sure.  I'm thinking of the quality
16  assurance process that we go through once an EIC is
17  issued.  Our -- we have a -- our license and records
18  service is doing quality assurance on every EIC that's
19  issued.
20          Once they -- once the card -- or once the
21  application hits the database, then EIC staff -- I
22  mean, the -- the license of records, or LRS staff,
23  looks at every application in the database to be sure
24  that all the documentation that's required to prove
25  citizenship and birth and so forth is in the database.

48

1       Q.  Is -- is that the same level of scrutiny
2   provided to driver's licenses and identification cards?
3       A.  Yes, but on -- usually on a local level in a
4   spot check.
5       Q.  So it's an audit for driver's licenses and
6   identification cards, but it's a check for every EIC;
7   is that correct?
8       A.  Yeah.  And when -- when we're talking about
9   the audit for driver licenses, we process 7 million
10  applications a year, and it's next to impossible to --
11  to individually scrutinize each one of those
12  transactions.  But because we're going to -- with
13  respect to the issuance of EICs, we're going to err on
14  the side of issuance.  And there may be cases -- there
15  have been cases where an individual came in and applied
16  for an EIC and during the quality assurance process we
17  found out that they were not eligible most of the time
18  because they had a passport or they -- they had a valid
19  Texas ID card, various other reasons.
20      Q.  And how are you verifying that an
21  individual -- or determining that an individual has a
22  passport?
23      A.  In most cases they -- they tell us they have a
24  passport, and for whatever reason it -- it gets past
25  the CSR.

JOE PETERS                                                    4/30/2014

13 (Pages 49 to 52)

---

**49**

1      Q.  So that's on the application, correct?
2      A.  Yes, uh-huh.
3      Q.  Okay.  And in terms of the computerized
4  checks, while those are being run against federal
5  databases like SAVE, an individual is issued a
6  temporary EIC that they can use, correct?
7      A.  Correct.  Correct.
8      Q.  Okay.  What is the security benefit to the
9  election process of requiring an individual who has a
10  driver's license that has been expired for 61 days to
11  go to DPS and obtain an EIC rather than using their
12  driver's license?
13      A.  I'm not sure that there's an additional
14  benefit except that if they get the EIC, the data is
15  more current, the photo is more current.  Generally
16  with a driver license the picture can be as old as
17  12 years.
18      Q.  But if an individual had not -- had a new
19  driver's license, not a renewed driver's license that
20  expired --
21      A.  Uh-huh.
22      Q.  -- by 61 days, that could be a newer photo
23  than someone who has a driver's license that's about to
24  expire, but that had renewed that driver's license once
25  without getting a new photograph, correct?

---

**50**

1      A.  Yes.
2      Q.  Does a driver's license or identification card
3  that's expired by more than two years establish an
4  individual's identity?
5      A.  No.
6      Q.  Isn't it correct that a driver's license that
7  has expired by more than two years can be used as
8  supporting identification to obtain an EIC?
9      A.  As supporting identification.
10      Q.  And for that purpose does it establish an
11  individual's identity?
12      A.  Not in itself, I wouldn't think.  Not by
13  itself.
14      Q.  Can an expired Texas driver's license, along
15  with a non -- a form of non-photographic
16  identification, such as a birth certificate, be used to
17  obtain an EIC with no other photographic
18  identification?
19      A.  Say that again now.  I'm sorry.
20      Q.  Can an expired Texas driver's license by more
21  than two years be used along with a non-photographic
22  document, such as birth certificate, to obtain an EIC?
23      A.  That can be -- that -- that expired driver's
24  license could be used as a form of supporting
25  identification.

---

**51**

1      Q.  But it's your testimony that that expired
2  driver's license does not establish the individual's
3  identity?
4      A.  No, sir -- or, yes, sir, that's true.
5      Q.  Can expired driver's licenses or
6  identification cards be used for any other purpose?
7      A.  I'm not aware of what else they could be used
8  for.
9      Q.  If you could take a look at Section 15.182(3),
10  which is the secondary identification, what is the
11  purpose of requiring this set of documents?
12      A.  To help determine identity that the applicant
13  is who they say they are.
14      Q.  Only identity?
15      A.  It could be citizenship if -- in the case of
16  birth certificates, it could be name change, could be
17  citizenship in terms of naturalization documents.
18      Q.  How do the secondary identification documents
19  differ from the supporting identification documents?
20      A.  Well, in my mind, the secondary identification
21  document is a more secure or more sure form of
22  identification than the supporting identification
23  documents would be.
24      Q.  Isn't it the case that these all establish
25  citizenship?

---

**52**

1      A.  Yes.
2      Q.  Okay.  But, of course, an individual can
3  obtain an EIC without proof of citizenship if they
4  provide a Texas driver's license that's been expired
5  for less than two years, correct?
6      A.  Yes, sir.  Yes, sir.
7      Q.  Is it necessary to provide documentary proof
8  of citizenship in Texas in order to register to vote?
9      A.  Provide proof of citizenship in order to
10  register to vote?
11      Q.  Documentary proof of citizenship.
12      A.  I'm not aware that it is.
13      Q.  It is necessary to obtain -- or to provide
14  documentary proof of citizenship in order to obtain a
15  driver's license or an identification card in Texas?
16      A.  Yes.
17      Q.  Proof of citizenship --
18      A.  Yes.
19      Q.  -- or lawful presence?
20      A.  Well, lawful presence.
21      Q.  So a noncitizen --
22      A.  So a noncitizen could obtain -- could obtain a
23  driver's license or an ID card.
24      Q.  Can a noncitizen obtain a license to carry?
25      A.  I'm not aware whether they can or not.

---

JOE PETERS                                                4/30/2014

---

53

1    Q.  So this proof of citizenship requirement for
2    an EIC is an additional burden for individuals for
3    attempting to vote using an EIC that doesn't exist for
4    individuals who attempt to vote using a driver's
5    license or identification card, correct?
6    A.  That's my understanding.
7    Q.  Please look at Section 15.182(4), which is
8    supporting identification.  What is the purpose of this
9    set of documents?
10   A.  Supporting identification will aid the
11   customer service representatives or the person doing
12   the issuance in establishing the identity of the
13   applicant.
14   Q.  Under Sub (d) --
15   A.  (E).
16   Q.  -- or -- sorry.  Sub (c).  Sorry.  Why must an
17   insurance policy be at least two years old?
18   A.  I have no idea.
19   Q.  Okay.  Why must a military dependent
20   identification card under Sub (f) be unexpired when
21   compared to a driver's license which may be expired?
22   A.  I don't have that answer either.
23   Q.  Why must an out-of-state driver's license or
24   identification card have been expired within two years
25   when a Texas driver's license or identification card

---

54

1    can be expired for any amount of time?
2    A.  I don't have that answer.
3    Q.  There are several other documents on this list
4    that never expire, such as school records or military
5    records, correct?
6    A.  Correct.
7    Q.  Why are those acceptable when other documents
8    must have been expired within a certain amount of time?
9    A.  I don't have a good answer for that.
10   Q.  Can you please take a look at
11   Section 15.183(a)(1)?  And this sets out the
12   applicant's full name that must be included on an
13   application for an election identification certificate.
14   Does that full name have to match all the underlying
15   documents that are provided with the application?
16   A.  Yes.
17   Q.  If there is a disagreement between an
18   individual's voter registration record and that
19   individual's expired driver's license with regard to a
20   first name, will those documents be sufficient to
21   obtain an election identification certificate?
22   A.  If the applicant is otherwise eligible for the
23   election identification certificate and if the name
24   is -- the entire name is substantially the same, they
25   would more than likely be issued the EIC.

---

55

1    Q.  More than likely?
2    A.  Yes.
3    Q.  Is that in the discretion of the CSR?
4    A.  That would be in the discretion of the CSR,
5    and then final evaluation would be made at quality
6    assurance.
7    Q.  If a CSR declines to provide a -- an EIC based
8    on disagreement in the names that are underlying the
9    application on the supporting documents, can an
10   individual appeal that to any kind of supervisor?
11   A.  Well, that -- yeah, the supervisor -- the CSRs
12   are instructed if they have a question about the name
13   that they seek guidance from their -- their local
14   supervisor.
15   Q.  Is the substantially -- sorry.  Is the
16   substantially similar rule that you described earlier,
17   is that only with regard to first names?
18   A.  No.
19   Q.  So last names as well?
20   A.  Yes, sir.
21   Q.  If there is a disagreement because of an
22   individual's name having been changed, such as a woman
23   getting married, so that her first name remains the
24   same, but the last name is entirely different --
25   A.  Uh-huh.

---

56

1    Q.  -- will that application for an EIC be
2    granted?
3    A.  It -- it may not.  It does just depends on
4    what supporting documentation the applicant can provide
5    that will convince the -- the issuing CSR that she's
6    who she said she is.
7    Q.  So if Jane Smith married John Jones and her
8    driver's license says Jane Smith, but her voter
9    registration card says Jane Jones, would that be
10   granted without any other documentation?
11   A.  I'm sorry.  If -- what is she showing you
12   when -- the CSR when she comes in?
13   Q.  She's showing a driver's license that expired
14   two years ago --
15   A.  Okay.
16   Q.  -- that says Jane Smith.  She's showing a more
17   recent voter registration card that says Jane Jones
18   because she got married to lucky John Jones.
19   A.  Uh-huh.
20   Q.  Would that be sufficient to obtain an election
21   identification card?
22   A.  Without documentation to show the marriage, I
23   would say no.
24   Q.  Okay.  And if there is a disagreement in the
25   documents, but they're substantially similar; say,

JOE PETERS                                                              4/30/2014

57

1   Jane Smith and Janie Smith, would the EIC be issued
2   under the name Jane Smith or Janie Smith or would it be
3   her choice?
4        A.  It would be her choice based on what the
5   documentation that she has provided.
6        Q.  So she could provide either of these
7   substantially similar variations on the application and
8   that would be fine?
9        A.  That's my understanding.
10       Q.  Okay.  Is there any written guidance
11  concerning this substantially -- substantial similarity
12  rule?
13       A.  I'm not aware of it.
14       Q.  Do you know if it is any more stringent than
15  the rule that is used to compare a voter's name at the
16  voter registration table when they vote and the ID that
17  they show under S.B. 14?
18       A.  Am I aware of a difference?
19       Q.  Yes.
20       A.  No.
21       Q.  Is it the same rule?
22       A.  As far as I know.
23       Q.  Okay.  Could you take a look at
24  Section 15.183(a)(3)?
25       A.  Okay.

58

1        Q.  Who at DPS -- sorry.  First off, does this
2   require that an individual requesting an election
3   identification certificate submit to fingerprinting?
4        A.  The current rule does require.
5        Q.  Who at DPS decided to include this
6   requirement?
7        A.  Oh, that was decided before my time, but it
8   was -- it was part of the process of trying to ensure
9   that the EIC process -- or EIC issuance process was as
10  similar as possible to driver license and ID cards.
11  However, since this was -- this rule was adopted in
12  2011, I believe it was, we have determined -- the
13  Secretary of State, in discussion with them, had
14  concern that we were requiring fingerprint of an EIC
15  applicant, and upon review we determined that we had no
16  use for a fingerprint on an EIC application.  You know,
17  we weren't going to do anything with them anyway.  It
18  was a thumbprint.  And we saw no reason to require a
19  fingerprint.  And we sent directives to the field that
20  we would no longer require a fingerprint for an EIC
21  application.
22            And the -- the belief there was that it's
23  a rule that was adopted by DPS and we felt like we
24  could make enforcement of that rule less restrictive,
25  but we couldn't make one more restrictive.

59

1        Q.  When was the practice changed?
2        A.  I'm sorry?
3        Q.  When was this practice changed?
4        A.  I think it was toward the end of September
5   of 2013.
6        Q.  Are you confident that no driver's license
7   office or mobile EIC station or county office that is
8   accepting EIC applications is currently requiring
9   fingerprinting as part of the EIC application process?
10       A.  That's currently requiring them?
11       Q.  Yes.
12       A.  I am confident that none of them are requiring
13  them.  There again, with as many customer service
14  representatives as there are out there and because the
15  process changes, they have to get the fingerprint for a
16  driver license application, for an ID card application,
17  and it's -- it's a check box on the EIC data entry
18  screen where they bypass the fingerprint.
19       Q.  Okay.
20       A.  And there have been a couple of occasions
21  where a CSR failed to bypass it, and it won't let you
22  continue the application process until you either take
23  the thumbprint or the fingerprint or you check the box
24  to bypass it.
25       Q.  When the fingerprint requirement was in

60

1   effect, what did DPS do with the fingerprints?
2        A.  Nothing.
3        Q.  There was no type of check?
4        A.  No.
5        Q.  Didn't check the Texas Criminal Information
6   Center?
7        A.  No, sir.
8        Q.  No warrant check?
9        A.  No, sir.
10       Q.  No tickets?
11       A.  No, sir.
12       Q.  Didn't check the National Criminal Information
13  Center?
14       A.  No, sir.
15       Q.  Any other regular checks?
16       A.  No, sir.
17            (Exhibit No. 39 marked.)
18            THE REPORTER:  Exhibit 39.
19       Q.  (BY MR. FREEMAN)  Have you seen this article
20  before?
21       A.  Yes, I have.
22       Q.  And what is this document?
23       A.  This is -- excuse me.  It looks like a
24  transcript of an article that appeared in the Fort
25  Worth Star Telegram in September of 2013.

JOE PETERS                                                      4/30/2014

---

61

1      Q.  And does this article state that more than one
2  DPS employee said during the week of September 19th,
3  2013, that, "If you can't pass a warrant check, you
4  can't walk in and get a voter ID and, if you try, you
5  won't walk back out"?
6      A.  That's what the article says.
7      Q.  But it's your understanding that at no point
8  those CSRs were running warrant checks on individuals
9  who were obtaining -- or were attempting to obtain an
10 EIC?
11     A.  That's correct.
12     Q.  And so those -- those DPS employees were
13 telling reporters that they were running warrant
14 checks, but they weren't running warrant checks?
15     A.  That's --
16         MR. KEISTER:  Objection, form, calls for
17 speculation.
18     Q.  (BY MR. FREEMAN)  That's your understanding of
19 those statements?
20     A.  Yes, sir.
21     Q.  Who is Tom Vinger?
22     A.  He is our -- one of the staff in the public
23 information office, or media and communications office
24 it is.
25     Q.  And -- this article states that Mr. Vinger

---

62

1  had told the reporter that it's routine to check anyone
2  at a license office for warrants?
3      A.  Where do you see that?
4      Q.  Starting -- the line starting, "Just the day
5  before."
6      A.  Yes, sir, I see that.  And now what's your
7  question?
8      Q.  Would -- knowing Mr. Vinger, would Mr. Vinger
9  have misrepresented to a reporter that it was routine
10 for every DPS interaction to include a warrant check?
11         MR. KEISTER:  Objection, form, calls for
12 speculation, and also no basis of foundation.
13     Q.  (BY MR. FREEMAN)  I'm asking based on your
14 knowledge of Mr. Vinger's veracity.
15         MR. KEISTER:  Same objections.
16         THE WITNESS:  I have no question about
17 his veracity.  What I do believe with respect to
18 that -- to that statement was that there was a common
19 belief that the EIC -- excuse me -- the EIC database
20 and the data entry screens actually automatically ran a
21 warrant check on an applicant when, in fact, it did
22 not.  It does do an automatic warrant check on a
23 driver's license applicant or a Texas ID card
24 applicant, but at no time was the EIC application
25 screen or the EIC application process automatically

---

63

1  running a warrant check.
2         And -- and at the time Mr. Vinger made
3  this comment, he was not aware of that, nor were some
4  of the CSRs aware that that was not happening.  As a
5  matter of fact, we weren't aware of it until we went to
6  explore what was going on with it, because no one was
7  ever -- was ever turned away because of a warrant for
8  an EIC applicant.
9      Q.  (BY MR. FREEMAN)  Has DPS promulgated any
10 rules or notices in order to combat this perception
11 that a warrant check will be run?
12     A.  Well, as far as promulgating rules, published
13 rules in the administrative code, I don't recall that
14 there were.  There have been directives to the field
15 that there will be no warrant checks.  And, in fact, in
16 the EIC application screen there is no capability to
17 run a warrant check.  And even in the driver's license
18 screen, they can't arbitrarily run a warrant check.
19         In the driver's license application
20 process and the ID card application process, once
21 sufficient data, identifying data, for an applicant is
22 in there, the system goes and runs the warrant check
23 automatically.  And what it returns is there's a
24 warrant -- a notice on the screen that says there's a
25 warrant.  And then the CSR contacts local law

---

64

1  enforcement or a trooper, if there happens to be one in
2  the office, to handle it from that point on.  The CSR
3  doesn't know what the warrant is for typically.
4         In the case of EICs, there's no warrant
5  check run and they don't even have the capability to
6  run one.
7      Q.  How long are fingerprint records maintained
8  once they're taken by DPS?
9      A.  I don't know.  I would assume forever, but I
10 don't know that answer.
11     Q.  So the fingerprint records that were taken
12 while DPS was still requiring fingerprints as part of
13 the EIC application process, those are still maintained
14 in the DPS database somewhere?
15     A.  I'm not sure they are.  Those may have been
16 deleted.
17     Q.  But you don't know?
18     A.  I don't know for sure, no, sir.
19     Q.  Are individuals informed of any potential
20 future use of the EIC?
21     A.  Of the --
22     Q.  Oh, sorry.  Of the fingerprint that's taken?
23     A.  On -- on EICs?
24     Q.  Yes.
25     A.  Well, no, we're not taking fingerprints on

---

JOE PETERS                                                      4/30/2014

---

65

1    EICs.
2        Q.  But the ones that were taken --
3        A.  No --
4        Q.  -- before the process --
5        A.  -- not that I'm aware.
6        Q.  Okay.  Do you have discretion; "you," being
7    DPS, to begin taking fingerprints at any time under the
8    existing regulation?
9        A.  Yes, we do under existing regulations.
10       Q.  Are there any plans to amend the regulation?
11       A.  Absolutely not.
12       Q.  Why not?
13       A.  As I said before, we don't -- we don't see a
14   need for taking a fingerprint on -- on an EIC
15   applicant.
16       Q.  But are -- are there any -- given that the
17   regulation currently states that a fingerprint is
18   required, why would DPS not change the regulation?
19       A.  Because we don't see a need to take the -- oh,
20   you're talking about change the regulation to --
21       Q.  To eliminate --
22       A.  Yes, we can do that.  I'm sorry.
23       Q.  Is there any current plan to do so?
24       A.  As far as a written documented plan to do so,
25   no, I can't tell you when that's going to happen.  But

---

66

1    I can assure you that we will be doing that.
2        Q.  When did those discussions occur?
3        A.  Periodically since the September timeframe of
4    2013 to present.
5        Q.  But it hasn't happened yet?
6        A.  No.
7        Q.  Is there an administrative process where a
8    rule has to be sent out for comment?
9        A.  Yes.
10       Q.  And that process hasn't begun?
11       A.  That hasn't begun.
12       Q.  Any -- have there been any other postings,
13   notices, or press releases regarding the elimination of
14   the fingerprint requirement?
15       A.  Yes.
16       Q.  What are those?
17       A.  I'm not aware of specific notices or press
18   releases that -- that were issued.
19       Q.  But it's your understanding that there were
20   some?
21       A.  Yes, uh-huh.
22       Q.  Any other voter education efforts regarding
23   the elimination of the fingerprint requirements?
24       A.  Well, not on our part.
25       Q.  Okay.  Is it your understanding that there's a

---

67

1    public perception that interactions with DPS will
2    trigger a check for warrants?
3        A.  There is that public perception in some
4    circles.
5        Q.  Is law enforcement present at DPS offices that
6    issue driver's licenses and EICs?
7        A.  Some of those there are.
8        Q.  What is the distinction between the offices
9    that have law enforcement present and those that don't?
10       A.  Some of the driver's license offices are
11   co-located with highway patrol and rangers and criminal
12   investigation divisions, so forth, so there may be law
13   enforcement in the building.  Some of the larger
14   offices; our mega centers, for example, have a trooper
15   assigned to the -- to the office to handle warrants for
16   driver license and ID card applicants.  They're
17   generally not present in the -- excuse me -- in the
18   issuance area, but they're readily available.
19       Q.  And those larger offices, those are generally
20   in urban areas?
21       A.  Yes, sir.
22       Q.  So it's more likely that offices in urban
23   areas will have law enforcement present?
24       A.  Yes, sir.  I think that's a safe statement.
25       Q.  Is there any rule authorizing law enforcement

---

68

1    to be present at mobile EIC stations?
2        A.  No.
3        Q.  Are they present?
4        A.  Rarely, if ever.
5        Q.  But sometimes they are?
6        A.  Well, if some local law enforcement happens to
7    come in, there -- you know, there would be a law
8    enforcement presence there.  But there's no requirement
9    that one be there.  We don't ask for them to be there.
10       Q.  To your knowledge, does a voter registration
11   application in Texas require fingerprints?
12       A.  No.
13       Q.  Does a US passport application require
14   fingerprints?
15       A.  I don't know.
16       Q.  Does an applicant for a military ID have to
17   provide fingerprints?
18       A.  I don't know that.  When I got one I had to
19   give fingerprints.
20       Q.  Sounds like a basis of knowledge for me.  More
21   than I know.
22           Let's move to 15.183(a)(6).  Does this
23   brief description of the applicant that is required
24   under the application, does that include the race of
25   the applicant?

---

JOE PETERS                                                      4/30/2014

69

1    A.  Yes.
2    Q.  How is that race determined?
3    A.  Whatever the applicant puts on their
4  application.
5    Q.  It's on the form?
6    A.  Yes.
7    Q.  Is that recorded in a database of any kind?
8    A.  It is.
9    Q.  So would it be searchable by -- would that
10  database be searchable by race?
11    A.  It is.
12    Q.  If you can look at 15.183(b), Social Security
13  number.  Under what circumstances do federal or state
14  law require that an EIC not be issued in the absence of
15  proof of Social Security number?
16    A.  I'm not sure I understood your question,
17  but --
18    Q.  Am I correct that the regulation states that
19  if the applicant fails or refuses to provide Social
20  Security information, the election identification
21  certificate will be issued without such documentation
22  unless state or federal statute requires otherwise."
23        Is that a correct reading of that
24  provision?
25    A.  Yes, it is.

70

1    Q.  Under what circumstances would federal or
2  state law require that an EIC not be issued in the
3  absence of proof of Social Security number?
4    A.  I don't have the answer.
5    Q.  So, to your knowledge, there are no
6  circumstances in which failure or refusal to provide
7  Social Security number will result in failure of an EIC
8  to be issued?
9        MR. KEISTER:  Object to form,
10  mischaracterizes his testimony.
11    Q.  (BY MR. FREEMAN)  Is that your understanding?
12    A.  Yes, sir.
13    Q.  If we can go to 15.183(c), which addresses
14  notarization.  Is a notary present at all DPS offices?
15    A.  No, sir.
16    Q.  Is -- but all requirements for an EIC require
17  notarization?
18    A.  Yes.  But the customer service representatives
19  are authorized by statute to -- to certify or verify
20  the applications and the information although they're
21  not notaries.
22    Q.  Are individuals who work at all DPS mobile
23  stations authorized to administer oaths or
24  affirmations?
25    A.  If it's a customer service, a DPS employee

71

1    customer service representation -- I mean -- I'm
2    sorry -- a customer service representative, yes.
3    Q.  Are all the mobile EIC stations staffed by
4  CSRs?
5    A.  If -- well, no.  If it's a mobile station
6  that's operated by a county, a CSR won't be there.  If
7  it's a mobile station operated by Health and Human
8  Services Commission staff, a CSR won't be there.
9    Q.  And if it's a mobile -- sorry.  Strike that.
10        If it is a county office at which EIC
11  applications are accepted, there won't be a -- an
12  authorized employee of the Department of Public Safety
13  who can issue an oath or affirmation, correct?
14    A.  There won't be a DPS employee there.  There
15  may be others within the county offices that could do
16  that.  I don't know the -- how many of those would have
17  notary authorization.
18    Q.  And is there a cost associated with receiving
19  notary public services?
20    A.  No.  If you're talking about the customer
21  service representative certifying a document, no.
22    Q.  If a CSR is not present at either a mobile
23  station or a county office and an individual needs a
24  notary to -- under this regulation are notaries
25  authorized to charge for their services in Texas?

72

1    A.  They are authorized.
2    Q.  And how much does that cost?
3    A.  I don't know.  And I think it varies with the
4  notary.
5    Q.  Is it your understanding that a notary or an
6  official who can administer oaths or affirmations under
7  this provision is present at all mobile EIC stations?
8    A.  Let me hear the question again.
9    Q.  Sure.  At all mobile EIC stations is there an
10  official who can issue oaths or affirmations or a
11  notary present?
12    A.  I'm not aware.
13    Q.  At all county offices at which EICs are
14  available, is there a notary present or a similar
15  official who can administer oaths?
16    A.  I don't know the answer to that one either.
17    Q.  Does one have to show proof of identity to a
18  notary in order for the notary to notarize an
19  application for an EIC?
20    A.  Well, I'm not a notary, but in my experience,
21  yes, you do.
22    Q.  Do you know what documents satisfy proof of
23  identity for notarization in Texas?
24    A.  I know a Texas driver's license or an ID card
25  satisfies that requirement.  Beyond that, I don't know

JOE PETERS                                                          4/30/2014

---

73

1   what they require.
2       Q.  If you're not known to a notary, is it
3   required to show photographic identification to that
4   notary?
5       A.  It's my understanding that it is.
6       Q.  So if an individual needs a notary to notarize
7   an EIC application under this provision and they need
8   the EIC application because they don't have photo ID
9   and they're not known to the notary, they can't get a
10  notary to notarize that EIC application, correct?
11          MR. KEISTER:  Object to the form and it
12  calls for legal conclusion that he's not -- calls for a
13  legal opinion that's not qualified to give.
14          THE WITNESS:  And I don't know the answer
15  to the question.
16      Q.  (BY MR. FREEMAN)  Okay.  If we can go to
17  Section 151.184(a), the last page.  Does an EIC that is
18  at least seven years old establish an individual's
19  identity?
20      A.  No, sir.
21      Q.  Why not?
22      A.  It would have been expired by then unless they
23  have renewed it --
24      Q.  But does it --
25      A.  -- or unless they're over 60 years old.

---

74

1       Q.  But as a practical matter, how does the age
2   distinction change whether or not the document shows
3   that the individual is who they say they are?
4           MR. KEISTER:  Object to form, vague, and
5   calls for speculation.
6           THE WITNESS:  I don't have an answer.
7       Q.  (BY MR. FREEMAN)  What is the purpose of
8   requiring renewal?
9       A.  Updating the photo and updating an address in
10  the database.
11      Q.  But the address isn't on the card, correct?
12      A.  No, sir.
13      Q.  And doesn't -- is a new photo taken every time
14  you renew an EIC?
15      A.  Yes, sir, I believe it is.
16      Q.  Is a new photo taken every time --
17      A.  We haven't experienced that, but that's a
18  requirement.
19      Q.  Is a new photo taken every time you renew a
20  driver's license?
21      A.  No.
22      Q.  Why the distinction?
23      A.  If you are renewing your driver's license
24  within six years of -- of the original application or
25  within the last time you had a photo, then we don't

---

75

1   require another photo.  You renew by mail or by --
2   online, there's no new photo.  You have to come in
3   every 12 years to get a new photo taken.
4       Q.  So why allow individuals to use photos that
5   are up to 12 years old for a driver's license but not
6   for an EIC?
7       A.  I don't have a good answer for that.
8       Q.  Does an EIC that is at least seven years old
9   and was issued to an individual who was at least
10  77 years old establish that individual's identity?
11      A.  For our purposes in issuing the EIC, yes.
12      Q.  Why the distinction between older and younger
13  individuals with regard to the ability of the EIC to
14  establish an individual's identity?
15      A.  I don't know.
16      Q.  Please look at Section 151.184(b)(3) under
17  "Renewal."  This provision says, "The department may
18  provide certificate holders with alternative means of
19  renewing or duplicating an election identification
20  certification."
21          Have any alternative means been
22  established at this time?
23      A.  Not that I'm aware of.
24      Q.  Okay.  Please look at Section 151.184(c),
25  "Applications for Replacements and Corrections."  What

---

76

1   are the actual requirements for an application for a
2   replacement or correction?
3       A.  Notification that the EIC has been lost,
4   destroyed, or mutilated or if there's been a change of
5   name or gender.
6       Q.  And how is that notification made?
7       A.  By the applicant.
8       Q.  On what form?
9       A.  It could be a marriage certificate; it could
10  be an affidavit that they've lost it or that it's been
11  mutilated.
12      Q.  Is an individual required to go to a DPS
13  office in order to obtain a replacement or correction?
14      A.  Yes, sir.
15      Q.  Is there an existing form for replacements as
16  opposed to issuance of new EICs?
17      A.  I believe there is.  I'm not familiar with the
18  form right off the top of my head.
19      Q.  Okay.  Are these procedures set out in any
20  regulation, the procedures for replacements or
21  corrections?
22      A.  Other than what you see in the administrative
23  rule, I'm -- no.
24      Q.  Okay.  And would you agree with me that the
25  circumstances for replacement or correction are set out

---

JOE PETERS                                                          4/30/2014

|  | 77 |
|---|---|
| 1 | in the rule, but the procedures are not? |
| 2 | **A.  The procedures are not set out in the rule.** |
| 3 | Q.  Would you take a look at Section 151.185.  Are |
| 4 | there any grounds to cancel or require surrender of an |
| 5 | EIC other than noncompliance with the requirements of |
| 6 | Section 151.181? |
| 7 | **A.  I'm not aware of any.** |
| 8 | Q.  Has DPS enacted any other formal regulations |
| 9 | that are relevant to the implementation of S.B. 14 in |
| 10 | general and -- |
| 11 | **A.  I'm not aware of any.** |
| 12 | Q.  Are there any other administrative rules |
| 13 | besides the regulations that we've just been |
| 14 | discussing? |
| 15 | **A.  I'm not aware of any.** |
| 16 | MR. KEISTER:  Dan, is this a good time |
| 17 | for a break? |
| 18 | MR. FREEMAN:  It is a great time for a |
| 19 | break. |
| 20 | THE REPORTER:  Off the record. |
| 21 | (Recess from 10:19 a.m. to 10:39 a.m.) |
| 22 | THE REPORTER:  Back on the record. |
| 23 | MR. FREEMAN:  Back on the record.  Thank |
| 24 | you. |
| 25 | THE WITNESS:  Can I make a |

|  | 78 |
|---|---|
| 1 | clarification -- |
| 2 | Q.  Absolutely. |
| 3 | A.  -- on previous testimony? |
| 4 | I mentioned earlier, I believe, that we |
| 5 | did a SAVE verification or a computerized check on |
| 6 | citizenship and so forth.  That's not accurate.  It's |
| 7 | not done either at the CSR station at the point of |
| 8 | application or after -- or during quality assurance. |
| 9 | Q.  Thank you for that clarification.  I |
| 10 | appreciate that. |
| 11 | **A.  Sure.** |
| 12 | Q.  So before we move off the regulations real |
| 13 | quickly, I just wanted to verify with you.  So you're |
| 14 | in charge of the driver's license division as a whole, |
| 15 | correct? |
| 16 | **A.  Yes, sir.** |
| 17 | Q.  And you have expertise in the implementation |
| 18 | of the EIC program, correct? |
| 19 | **A.  That might be debatable, but, yes.** |
| 20 | Q.  And you had an opportunity before testifying |
| 21 | to determine the rationale for the regulations and |
| 22 | rules that we just discussed, correct? |
| 23 | **A.  I had that opportunity, yes, sir.** |
| 24 | Q.  And you were -- you were on notice that you |
| 25 | were going to be testifying on behalf of the state |

|  | 79 |
|---|---|
| 1 | regarding those regulations and rules, correct? |
| 2 | **A.  Yes, sir.** |
| 3 | Q.  And with regard to several of those rules, you |
| 4 | stated that you did not why certain rules were |
| 5 | structured as they -- as they are, correct? |
| 6 | **A.  That's correct.** |
| 7 | Q.  So to the best of your knowledge, after your |
| 8 | review and preparation for this deposition, there is no |
| 9 | reason for the rules that you did not know a reason for |
| 10 | them that they're structured as they are, correct? |
| 11 | MR. KEISTER:  Object to form, calls for |
| 12 | speculation and the question is confusing. |
| 13 | MR. FREEMAN:  I'm happy to rephrase. |
| 14 | Q.  (BY MR. FREEMAN)  With regard to those rules |
| 15 | that you did not know a basis for those rules, to the |
| 16 | best of your knowledge, is there no basis for those |
| 17 | rules? |
| 18 | MR. KEISTER:  Object to form.  Once |
| 19 | again, it calls for speculation and that would be a |
| 20 | misleading characterization of the testimony. |
| 21 | Q.  (BY MR. FREEMAN)  You may answer. |
| 22 | **A.  If you're asking if I believe there was no** |
| 23 | **basis for those rules?** |
| 24 | Q.  I'm asking, to your knowledge -- |
| 25 | **A.  Yes.** |

|  | 80 |
|---|---|
| 1 | Q.  -- is there no basis for the rules that you |
| 2 | did not know a basis for? |
| 3 | MR. KEISTER:  Same objections. |
| 4 | THE WITNESS:  I don't believe that there |
| 5 | was no basis for the rule.  Based on my experience in |
| 6 | ten months of having been involved in those, there is a |
| 7 | basis for everything we do with respect to rules. |
| 8 | Q.  (BY MR. FREEMAN)  But insofar as your |
| 9 | providing testimony here today on behalf of the State, |
| 10 | you cannot provide any basis for several of the rules |
| 11 | we just discussed, correct? |
| 12 | **A.  Yes.** |
| 13 | Q.  Okay.  I would like to move on to the mobile |
| 14 | stations and county offices that provide EIC services. |
| 15 | Are there any formal rules or regulations that |
| 16 | authorize the issuance of EICs for mobile stations? |
| 17 | **A.  There is legislation that was passed in the** |
| 18 | **83rd session that authorizes DPS to enter into a** |
| 19 | **memoranda of agreement with county offices to issue** |
| 20 | **driver licenses -- I'm sorry -- to provide renewal** |
| 21 | **services and address changes and so forth for driver** |
| 22 | **licenses and identification cards.  And that was the** |
| 23 | **basis for which we believed we were also authorized to** |
| 24 | **do issuance of EICs by the county.  And the process is** |
| 25 | **governed by a memorandum of agreement that the county** |

JOE PETERS                                                          4/30/2014

---

81

1    signed with DPS to conduct EIC issuance.
2        Q.  We'll get to eventually.
3        A.  Okay.
4        Q.  But my question was, are there any formal
5    rules or regulations that authorize the issuance of
6    EICs from mobile stations or county offices?
7        A.  Authorizing EICs specifically?  No.
8        Q.  Does S.B. 14 require or authorize issuance of
9    EICs for mobile stations or county offices?
10       A.  No.
11       Q.  Is it subject to DPS' discretion to terminate
12   the issuance of EICs from mobile stations?
13       A.  Yes.
14       Q.  Is it subject to DPS' discretion to terminate
15   the issuance of EICs from county offices?
16       A.  Yes.
17           (Exhibit No. 40 marked.)
18           THE REPORTER:  Exhibit 40.
19       Q.  (BY MR. FREEMAN)  What is this document?
20       A.  This is a copy of the interlocal cooperation
21   contract for mobile EIC operations between the
22   Department of Public Safety and Duval County, Texas.
23       Q.  And did you sign this document?
24       A.  Yes, I did.
25       Q.  What is the interlocal cooperation contract?

---

82

1        A.  That's the agreement that DPS entered with the
2    local agency; in this case, Duval County, and in what the
3    processes were, who does what, who provides what for
4    the issuance of an EIC.
5        Q.  Is there any DPS regulation that authorizes
6    this relationship?
7        A.  No.
8        Q.  Am I correct that the document says it was
9    authorized by Chapter 521 of the Texas Transportation
10   Code?
11       A.  Yes, sir.
12       Q.  Am I correct that Chapter 521 addresses only
13   driver's licenses and not EICs?
14       A.  Correct.
15       Q.  Is there any regulation under Chapter 521 that
16   authorizes DPS to delegate duties to local government?
17       A.  No, sir, not directly.
18       Q.  It also says it's authorized by Chapter 791 of
19   the Texas Government Code, correct?
20       A.  Yes.
21       Q.  Is that the Interlocal Cooperation Act?
22       A.  I believe it is, yes, sir.
23       Q.  Am I correct that the Interlocal Cooperation
24   Act authorizes local governments to contract for
25   services with other localities and state agencies?

---

83

1        A.  Yes, sir.
2        Q.  Am I correct that the Interlocal Cooperation
3    Act does not state that state agencies can contract
4    with a local government to delegate state services to
5    be provided at the local level?
6            MR. KEISTER:  Objection, form, calls for
7    a legal conclusion.
8        Q.  (BY MR. FREEMAN)  I'm happy to restate if you
9    didn't understand the question.
10       A.  Yeah, if you would.
11       Q.  Sure.  Am I correct that the Interlocal
12   Cooperation Act does not provide for state agencies to
13   delegate the provision of services to local government
14   entities to provide those services?
15       A.  I don't know.
16       Q.  Am I correct that nothing in S.B. 14
17   authorizes the use of interlocal cooperation
18   agreements?
19       A.  You're correct.
20       Q.  Am I correct that there's no regulation under
21   the Interlocal Cooperation Act that authorizes this
22   program?
23       A.  Yes.
24       Q.  Now, you previously discussed legislation from
25   the 83rd Legislature.  Was that S.B. 1729?

---

84

1        A.  Yes, sir.
2        Q.  Am I correct that this document does not say
3    that it is authorized by S.B. 1729?
4        A.  That's correct.
5        Q.  And am I correct that S.B. 1729 is a pilot
6    program that's limited to only eight counties of
7    specified sizes, correct?
8        A.  In it -- well, actually, it -- yeah.  But it
9    also authorizes us to provide those services in
10   counties where we already have scheduled offices.  So
11   we're not limited to -- to those eight counties.  If
12   there are other counties -- if there are 40 counties
13   out there that have a scheduled office, then our
14   interpretation of the legislation is that we could
15   establish the same presence in any of those counties.
16       Q.  So your understanding of S.B. 1729 is that it
17   is not a limited pilot program that is limited to
18   eight counties?
19       A.  It's limited to the extent that we would not
20   establish pilots in counties that -- that don't already
21   have -- the counties that we're limited to would be
22   those where we don't already have some limited
23   presence, whether there's a part-time office where we
24   don't have -- I mean, where we have equipment already
25   and we have connectivity and so forth, then we can

---

JOE PETERS                                                    4/30/2014

---

85

1   establish a county presence in any of those counties.
2      Q.  And so S.B. 1729 only allows you to establish
3   a presence in eight additional counties, correct?
4      A.  Yes.  Yes.
5      Q.  Am I correct that you've established either
6   mobile operations or operations in county offices in
7   more than eight counties in which you did not
8   previously have DPS offices?
9      A.  Are you saying for driver license issuance or
10  for EIC issuance?
11     Q.  EIC issuance.
12     A.  Okay.  Now, say the -- ask your question
13  again.
14     Q.  Sure.  Am I correct that you've established
15  EIC operations in more than eight counties in which you
16  do not have functional DPS offices?
17     A.  Yes.
18     Q.  And what is the statute, rule, or regulation
19  that authorizes that?
20     A.  I'm not aware of one.
21     Q.  Has any formal notice been given that EICs are
22  available from mobile stations as a general matter?
23     A.  Yes.
24     Q.  What formal notice is that?
25     A.  Press releases from the Department of Public

---

86

1   Safety Media and Communications Office, social media
2   from the -- from the media and communications office,
3   our website.  The Secretary of State, I believe, has
4   done notification.
5      Q.  Any direct mailers to registered voters?
6      A.  Not that I'm aware of.
7      Q.  Any targeted outreach to minority communities?
8      A.  From DPS perspective?  No.
9      Q.  Okay.  And, sorry.  I just -- I should have
10  asked one more question about S.B. 1729.  You said you
11  were not aware of any authorization beyond
12  eight counties in which DPS was not functioning.  So to
13  your knowledge, there is no authorization beyond -- for
14  DPS to have those county operations beyond eight
15  counties authorized by S.B. 1729?
16     A.  Well, 1729 does not mention EIC specifically.
17  To the extent that we're authorized to provide driver
18  license services and ID card services, there is
19  specific authorization.
20     Q.  How long in advance of a mobile station
21  location operating is notice provided regarding the
22  specific location?
23     A.  I'm not aware of how far in advance those
24  notices are given.  We have asked -- when the Secretary
25  of State's office identifies a location where they want

---

87

1   a mobile site we asked them for five days' notice for
2   us.
3      Q.  So the Secretary of State's office is the one
4   controlling where the mobile sites are located?
5      A.  Well, the -- to the extent that -- that
6   they're deploying their state -- their mobile stations,
7   the ones that they own --
8      Q.  Uh-huh.
9      A.  -- and that they man, they -- they govern all
10  of those.
11     Q.  Okay.
12     A.  To the extent that -- that we're deploying DPS
13  mobile stations in counties that don't have a driver
14  license present, we assign those on a rotating basis.
15  And our goal is to provide at least five days of
16  service in each of those counties prior to any
17  election.
18     Q.  And how far in advance of that -- those
19  five days of service do you provide notice that those
20  DPS-run mobile stations will be present in those
21  communities?
22     A.  That would be a question for media and
23  communications.  I can't tell you.  I don't know.
24     Q.  And so you don't know how that notice is
25  promulgated?

---

88

1      A.  I know -- I know that it's done with press
2   releases and social media contact and so forth.  But in
3   terms of how far in advance they -- they make those
4   notifications, I don't know.
5      Q.  And do you know whether those notifications
6   are made in Spanish language media?
7      A.  I don't know, but I'm sure they are.
8      Q.  But you don't have a basis to ensure that they
9   are?
10     A.  I've not seen -- I've not seen Spanish
11  language notification.  I know that there have been
12  interviews by Spanish language television stations and
13  so forth.
14        (Exhibit No. 41 marked.)
15        THE REPORTER:  Exhibit 41.
16     Q.  (BY MR. FREEMAN)  What is this document?
17     A.  This is an e-mail from Tony Rodriguez at DPS
18  to Wroe Jackson at the Secretary of State's office
19  dated October 2nd, 2013.
20     Q.  And am I correct that this e-mail relays
21  complaints from a county commissioner in Bexar County
22  concerning the sufficiency of notice before mobile
23  stations were present in Bexar County?
24     A.  That's correct.
25     Q.  Is Bexar County predominantly Hispanic?

JOE PETERS                                                    4/30/2014

23 (Pages 89 to 92)

---

89

1     A.  I'm not sure what the -- the demographics are
2  in Bexar County.
3     Q.  Are you aware of any other complaints from
4  local officials about insufficient notice before mobile
5  EIC units were sent out in their community?
6     A.  I'm not aware of any.  That doesn't mean that
7  there aren't any.
8     Q.  And am I correct that -- that this e-mail
9  describes an individual in DPS telling
10  Commissioner Rodriguez that she would tell him on
11  October 16th what date an EIC station will be present
12  in Bexar County and that that EIC station will be
13  present sometime between October 25th and October 28th?
14     A.  Are you asking me if that's what's in the
15  e-mail?
16     Q.  Yes.
17     A.  Yes.
18     Q.  And am I correct that that only provides
19  nine days of notice before the EIC station will be
20  present?
21          MR. KEISTER:  Object to form, calls for
22  speculation.
23          THE WITNESS:  Yes.
24     Q.  (BY MR. FREEMAN)  Are you aware of how many
25  other counties have provided similar complaints?

---

90

1     A.  I'm not aware of any.
2     Q.  Are such complaints relayed to you or only to
3  Mr. Rodriguez?
4     A.  Well, they wouldn't necessarily have been
5  directed to me specifically.  Mr. Rodriguez would
6  probably have been the first point of contact for them
7  since he was our point of contact for EIC.
8     Q.  Are you aware of how many community leaders
9  have made similar complaints regarding a lack of notice
10  before an EIC mobile station was sent into their
11  community?
12     A.  No, sir.
13          THE WITNESS:  I'm sorry.
14          MR. KEISTER:  Object to vague and calls
15  for speculation and fails to identify community
16  leaders.
17          Give me a chance to butt in if I need
18  to.
19          THE WITNESS:  Okay.
20     Q.  (BY MR. FREEMAN)  How has the State responded
21  to such complaints about lack of notice?
22          MR. KEISTER:  Object to vague.
23          THE WITNESS:  I'm not sure what those
24  responses would have been.  And, you know, to this one
25  the response, as you see in the e-mail, was that they

---

91

1  would get back with him and give him the dates.  And if
2  there were others, I'm not aware of them.
3     Q.  (BY MR. FREEMAN)  So you're not aware --
4  you're not aware of any specific efforts that were made
5  to provide more notice than the amount of notice that
6  this county commissioner deemed insufficient?
7     A.  I'm not.
8     Q.  Is there any rule that allows, but doesn't
9  require counties to perform certain processing services
10  for EIC applicants?
11     A.  Would you restate the question?
12     Q.  Sure.  Is there any rule that allows -- any
13  administrative rule or regulation that allows counties
14  to perform processing requirements for EIC
15  applications?
16     A.  Not that I'm aware of.
17     Q.  Is it up to counties to determine if they want
18  to participate in providing processing services for EIC
19  applicants?
20     A.  Yes, it is.
21     Q.  Are you aware of any legal obligation for
22  counties to participate?
23     A.  I'm not aware of any legal obligations.
24     Q.  Are counties paid for their services?
25     A.  No, sir.

---

92

1     Q.  Are you aware of any counties that have
2  declined to enter into an agreement to provide EIC
3  application services?
4     A.  I am.
5     Q.  Isn't it true that of the 79 or so counties
6  without driver's licenses -- driver license offices,
7  about 25 to 30 have declined to enter into such an
8  agreement?
9     A.  I don't believe that number is accurate now.
10     Q.  Sorry.  My question was sort of compound, so
11  let me restate it.
12     A.  Yeah.
13     Q.  Approximately how many counties have declined
14  to enter into an agreement to provide EIC services?
15     A.  I believe that number is 18 now.
16     Q.  And those are all counties that don't have DPS
17  offices?
18     A.  Correct.
19     Q.  Why have those counties declined to -- why
20  have -- sorry.  Let me restate.
21          What is the reason that those counties
22  have given for not wanting to enter into such an
23  agreement or provide services?
24     A.  Some of those counties have not given us a
25  reason, but the few that have believed it was not

---

JOE PETERS                                                    4/30/2014

93

```
 1    necessary.  They didn't have the staff to devote to EIC
 2    issuance.
 3        Q.  And DPS has not offered any resources to
 4    assist those counties?
 5        A.  I'm sorry?
 6        Q.  DPS has not offered any resources to assist
 7    those counties in terms of personnel or financial
 8    resources?
 9        A.  No financial resources and no -- no personnel
10    except that where a county has declined to participate,
11    DPS sends customer service representatives into those
12    counties to ensure that there's an opportunity for
13    county residents to obtain EICs in their county.
14        Q.  And that's the mobile station?
15        A.  Yes, sir.
16        Q.  But those are only available, you said,
17    approximately five days?
18        A.  Yes, sir.  That's our goal.
19        Q.  Five days before -- a total of five days prior
20    to an election?
21        A.  Correct.
22        Q.  Is there any formal notice, regulation, rule
23    that states that EICs are to be available from fixed
24    county offices as a general matter?
25            MR. KEISTER:  Object to form, compound.
```

94

```
 1        Q.  (BY MR. FREEMAN)  Is there any formal notice
 2    that EICs are to be available from fixed county offices
 3    as a general matter?
 4        A.  What's a formal notice?
 5        Q.  Regulation, a rule, or any other type of
 6    formal approved notice by your office?
 7        A.  I'm not -- I'm not aware of a formal rule or a
 8    regulation.
 9        Q.  Have you provided any other notice other than
10    your website of the list of fixed county offices where
11    EICs are available?
12        A.  Yes.
13        Q.  What notice?
14        A.  Press releases, we have spreadsheets that
15    indicate those offices where we're going to provide EIC
16    services.
17        Q.  Are you aware of any notice particular -- or
18    specific to a particular county office?
19        A.  No.
20        Q.  Are you aware of any outreach that's been
21    known to TV stations?
22        A.  I'm -- I know it's been done because I've seen
23    some of the releases.  But as -- when you're talking
24    specifics, I don't have it.
25        Q.  Are you aware of any outreach to Spanish
```

95

```
 1    language TV stations?
 2        A.  I know that Spanish language TV stations have
 3    been granted interviews and have done stories on the
 4    EIC process.
 5        Q.  Any African-American interest radio stations?
 6        A.  I'm not aware of any.
 7        Q.  Are there any regulations that authorize the
 8    issuance of EICs from DPS offices on Saturdays?
 9        A.  No regulation, no, sir.
10        Q.  And Saturday issuance is not required or
11    authorized by the text of S.B. 14?
12        A.  Correct.
13        Q.  And so this program could be terminated at any
14    time?
15        A.  Correct.
16        Q.  Have some DPS officials complained about the
17    issuance of EICs on Saturdays as a waste of resources?
18        A.  If they have it hasn't come to me.
19        Q.  Who would that go to?
20        A.  Well, they may -- a CSR might complain to the
21    local supervisor that they had to work on Saturday.
22    But, you know, I wouldn't hear about that.
23        Q.  Is there any rule that your office has
24    established concerning the amount of weekend or evening
25    hours that you've required for EIC issuance?
```

96

```
 1        A.  Rules?
 2        Q.  Yes.
 3        A.  No.
 4        Q.  At any point did DPS consider a rule that
 5    would have allowed individuals to obtain an EIC without
 6    bringing a certified birth certificate by connecting
 7    DPS stations directly to the Department of State Health
 8    Services in order to verify birth records?
 9        A.  There was discussion about that, about the
10    ability and the costs for DPS to have direct access to
11    verify birth certificates.
12        Q.  And when did that discussion occur?
13        A.  It would be purely a guess, but I think it was
14    in September of 2013.
15        Q.  And who was a part of that discussion?
16        A.  There were HHSC representatives and DPS
17    representatives at the table.  And I don't recall the
18    names of -- of the HHSC representatives.
19        Q.  And why was the decision made not to create
20    that direct connection?
21        A.  I'm not sure what the -- the issues were with
22    HHSC, but the primary problem was the connectivity and
23    DPS having direct access and the cost of programming
24    that would -- that would allow us to have direct
25    access.
```

JOE PETERS                                                    4/30/2014

---

**97**

1       Q.   So it would have been possible to connect
2   fixed location DPS offices to birth certificate
3   records, but it would have required someone to program
4   it out; is that correct?
5       A.   Yes.  It would have been technically possible,
6   yes.
7       Q.   And am I correct that this would have allowed
8   individuals who don't presently have a birth
9   certificate to obtain an EIC without traveling to
10  another location to obtain their birth certificate?
11          MR. KEISTER:  Object to form, calls for
12  speculation.
13          THE WITNESS:  I would say yes.
14      Q.   (BY MR. FREEMAN)  And there was no legal
15  impediment to this direct connection, correct?
16      A.   Right.
17          MR. KEISTER:  Object to form, calls for a
18  legal conclusion or opinion.
19      Q.   (BY MR. FREEMAN)  This rule -- this provision
20  was ultimately rejected, correct?
21      A.   Yes.
22      Q.   At any point did DPS consider a rule that
23  would have permitted individuals seeking an EIC to sign
24  an affidavit attesting to their citizenship rather than
25  providing a birth certificate?

---

**98**

1       A.   I don't recall.
2           (Exhibit No. 42 marked.)
3           THE REPORTER:  Exhibit 42.
4           MR. KEISTER:  Thank you.
5       Q.   (BY MR. FREEMAN)  Have you seen this document
6   before?
7       A.   I don't think I have.
8       Q.   Am I correct that this is an affidavit that
9   would have allowed an individual to qualify for an
10  election certificate by certifying that they were the
11  person that they said they were and that they were born
12  in a particular place on a particular date?
13          MR. KEISTER:  Objection, form, calls for
14  speculation.
15      Q.   (BY MR. FREEMAN)  Looking at this document
16  that you have in front of you, am I correct that this
17  document states that it allows an individual to
18  establish their identity by providing certain
19  information related to date and place of birth?
20      A.   Yes.
21      Q.   Is a signed copy of this document presently an
22  accepted alternative to providing a birth certificate
23  when applying for an EIC?
24      A.   I assume that it is.  I have not seen the
25  document.

---

**99**

1           MR. KEISTER:  Objection, nonresponsive.
2   Please don't assume.
3       Q.   (BY MR. FREEMAN)  Am I correct that the
4   regulations -- sorry.
5           To your knowledge, your personal
6   knowledge, is an individual able to provide this form
7   rather than providing a birth certificate when they
8   apply for an EIC?
9           MR. KEISTER:  Objection, form.  And, Dan,
10  he's not here for his personal audit.  He's here for --
11  to testify on behalf of DPS.  So if you're asking him
12  with respect to DPS -- you said personal.
13      Q.   (BY MR. FREEMAN)  With respect to DPS?
14      A.   Yes.
15      Q.   It's your testimony that -- are you certain?
16      A.   No.
17      Q.   Okay.  Would this -- would this form have a
18  form number or something else if it had been finalized
19  on it?
20      A.   It appears that it has not been finalized.
21      Q.   Have you ever seen a finalized version of this
22  form?
23      A.   No.  I haven't even seen this form.
24      Q.   Okay.  And the regulations don't allow an
25  individual to submit this form in lieu of birth

---

**100**

1   certificate, correct?
2       A.   Not that I'm aware of.
3       Q.   Okay.  Do you know when a decision was made
4   regarding whether or not this form would be accepted in
5   lieu of a birth certificate?
6       A.   No, sir.
7       Q.   And so you don't know who made that decision
8   as --
9       A.   That would be accurate.
10      Q.   And you don't know why that decision was made?
11      A.   No, sir.
12      Q.   Would you agree that this form would have
13  allowed an individual who doesn't presently possess a
14  birth certificate to obtain an EIC without the cost or
15  burden of obtaining a birth certificate?
16          MR. KEISTER:  Objection, form, calls for
17  speculation.
18          THE WITNESS:  No.
19          MR. FREEMAN:  Sorry.  Could you read that
20  back?
21          THE REPORTER:  Sure.
22          "Would you agree that this form would
23  have allowed an individual who doesn't presently
24  possess a birth certificate to obtain an EIC without
25  the cost or burden of obtaining a birth certificate?"

---

JOE PETERS                                                          4/30/2014

101

```
 1           Mr. Keister said, "Objection, form, calls
 2  for speculation."
 3           Answer, "No."
 4      Q.  (BY MR. FREEMAN)  And why not?
 5           MR. KEISTER:  Same objection.
 6           THE WITNESS:  I think it would defeat the
 7  purpose of identification and proof of citizenship.
 8      Q.  (BY MR. FREEMAN)  But if a person doesn't have
 9  a birth certificate and if this form were allowed, that
10  person wouldn't have to go through the burden of
11  obtaining a birth certificate in order to obtain an
12  EIC, correct?
13           MR. KEISTER:  Objection, calls for
14  speculation and no foundation as this form is not
15  adopted.
16           THE WITNESS:  Yes.
17      Q.  (BY MR. FREEMAN)  Okay.  Under the present
18  system an individual who lacks an S.B. 14 ID and lacks
19  a birth certificate must first obtain the birth
20  certificate by traveling to a birth certificate office
21  and then must obtain an EIC by traveling to a location
22  where they can apply for an EIC, correct?
23           MR. KEISTER:  Objection, form, compound.
24  And to the extent that calls for information with
25  respect to DPS issues, you can testify to that.  But
```

102

```
 1  testifying with respect to birth certificate issues is
 2  outside the scope of the items he's here to testify
 3  about.
 4           MR. FREEMAN:  Let me see if I can
 5  rephrase that and avoid that problem then.
 6      Q.  (BY MR. FREEMAN)  An individual who lacks the
 7  forms of secondary ID that we discussed earlier must
 8  obtain that ID in order to obtain an EIC, correct?
 9           MR. KEISTER:  Objection, form, calls for
10  speculation.
11           THE WITNESS:  Yes.
12      Q.  (BY MR. FREEMAN)  And then that individual has
13  to travel to a place where EICs are available, correct?
14      A.  I don't know what he has to do to get it.
15      Q.  Well, no, no.  In -- once they have the birth
16  certificate they have to go to an EIC location to
17  obtain an EIC, correct?
18      A.  Yes.
19           MR. KEISTER:  Objection, form, compound,
20  mischaracterizes previous testimony.
21      Q.  (BY MR. FREEMAN)  If an individual travels to
22  an office to attempt to obtain an EIC, but they don't
23  bring a birth certificate with them because they don't
24  have it, they won't be able to get the EIC, correct?
25      A.  Correct.
```

103

```
 1      Q.  Then they have to obtain the birth certificate
 2  and then they have to come back to the EIC location,
 3  correct?
 4      A.  Yes.
 5      Q.  So that's three trips, correct?
 6      A.  Well, I don't -- it's trip to the DPS
 7  office.
 8      Q.  And potentially one trip elsewhere to obtain
 9  the birth certificate, correct?
10      A.  Potentially.
11      Q.  Okay.
12           MR. KEISTER:  Object, calls for
13  speculation.
14      Q.  (BY MR. FREEMAN)  And so would permitting an
15  individual to use this affidavit to establish their
16  birth save that individual at least the additional trip
17  back to DPS --
18           MR. KEISTER:  Are you done?
19      Q.  (BY MR. FREEMAN)  -- to bring their birth
20  certificate?
21           MR. KEISTER:  Objection, form, calls for
22  speculation.  In addition, Dan, he's here to testify
23  with respect to what is currently DPS policies, and
24  this obviously is not.  So this is outside the items
25  that he's here designated to testify about.  So I'm
```

104

```
 1  going to instruct him not to answer.  This is all
 2  speculation.
 3           MR. FREEMAN:  Let me see --
 4           MR. KEISTER:  Because it's not -- it's
 5  not --
 6           MR. FREEMAN:  Let's try one more time
 7  then.
 8           MR. KEISTER:  Okay.
 9      Q.  (BY MR. FREEMAN)  Under the current rules,
10  which is within the scope of this deposition, an
11  individual arrives at an EIC station lacking a birth
12  certificate or any other form of secondary
13  identification, they -- a location that issues an EIC,
14  they can't get the EIC, correct?
15      A.  Yes.
16      Q.  The current rules do not allow an individual
17  to sign an affidavit establishing the same facts as a
18  birth certificate in lieu of providing a birth
19  certificate, correct?
20      A.  Yes.
21      Q.  And so the current rules would require the
22  individual to return on a second trip to DPS with a
23  birth certificate rather than signing an affidavit,
24  correct?
25           MR. KEISTER:  Objection, form, calls for
```

105

1   speculation, and I believe misstates the rules.
2            THE WITNESS:  Yes.
3        Q.  (BY MR. FREEMAN)  Thank you.
4            During the legislature's consideration of
5   S.B. 14, did any legislators request DPS to determine
6   the number of registered voters in Texas who lack a
7   DPS-issued ID?
8        A.  I don't know what happened during the -- the
9   S.B. 14 discussion and so forth.
10           MR. FREEMAN:  I believe he's been
11   designated specifically for that topic.  Am I correct,
12   Mr. Keister?
13           MR. KEISTER:  I believe you had that in
14   here, but he's giving you the testimony that he can
15   give you, so --
16           MR. FREEMAN:  Mr. Keister, am I correct
17   that Texas has designated Mr. Peters as his witness
18   regarding information that DPS provided during the
19   legislative process?
20           MR. KEISTER:  You have the designation
21   and he's here to testify, so you can ask him the
22   questions.
23           MR. FREEMAN:  Mr. Keister --
24           MR. KEISTER:  If you're not happy with
25   his answer we can discuss it later, but --

106

1            MR. FREEMAN:  His answer is that he lacks
2   all knowledge concerning a topic for which he's been
3   designated, correct?
4            THE WITNESS:  Well, I thought the
5   question --
6            MR. KEISTER:  Hold on.  Hold on.
7            No, that was not -- that was not his
8   answer.  And if you want to ask him questions, he will
9   answer the questions.  If you don't like the answers,
10   you can bring that up later, but let's go ahead with
11   the question.
12       Q.  (BY MR. FREEMAN)  Do you have any knowledge
13   regarding any questions that the legislature may have
14   asked DPS during the legislative consideration of
15   S.B. 14?
16           MR. KEISTER:  Objection, vague.
17           MR. FREEMAN:  Can we go off the record
18   for a second?
19           MR. KEISTER:  Yeah, let's go off the
20   record for a second.
21           THE REPORTER:  Off the record.
22           (Discussion off the record.)
23           THE REPORTER:  Back on the record.
24       Q.  (BY MR. FREEMAN)  We discussed earlier that
25   you are prepared to discuss all information provided by

107

1   or requested from DPS during legislative consideration
2   of S.B. 14, correct?
3        A.  Yes.
4        Q.  During the legislature's consideration of
5   S.B. 14 did any legislators request any information
6   from DPS?
7        A.  Not having been here during that deliberation,
8   during that discussion, I'm not personally aware of any
9   requests from -- from the legislature of DPS.
10       Q.  Is the Department of Public Safety aware of
11   any request received by the department from the
12   legislature during legislative consideration of
13   S.B. 14?
14       A.  Yes.
15       Q.  But you are not aware?
16       A.  Correct.
17           MR. KEISTER:  And by "you," you mean him
18   personally, not DPS?
19       Q.  (BY MR. FREEMAN)  I mean you as a witness that
20   has been designated by the State of Texas to testify
21   regarding this topic.
22           MR. KEISTER:  Okay.
23       Q.  (BY MR. FREEMAN)  Are you aware; "you," the
24   Department of Public Safety, aware of any request
25   received by the department from the Texas Legislature

108

1   during consideration of any prior photographic voter
2   identification bill by the legislature?
3        A.  Yes.
4        Q.  What requests were received?
5        A.  I don't recall the specific requests.  We were
6   asked for a fiscal note and what would it cost to
7   implement the provisions of the bill.  We were asked
8   what impact the provisions of that bill might have on
9   DPS and their driver license issuance process.
10       Q.  Were you ever asked to determine the number of
11   registered voters who lack DPS-issued ID?
12       A.  No, sir.
13       Q.  Were you ever asked to contribute any data or
14   other assistance in -- to a response to such a request?
15       A.  Yes.
16       Q.  When was that?
17       A.  I don't recall the date.
18       Q.  And was that -- with regard to S.B. 14
19   specifically, did DPS provide any assistance in
20   responding to a request that DPS or any other agency
21   determine the number of registered voters in Texas who
22   lack DPS-issued ID?
23       A.  I'm not aware of the specific dates of the
24   request for data.
25       Q.  Uh-huh.

JOE PETERS                                                    4/30/2014

---

109

1       A.  It may have been during the consideration of
2   S.B. 14 and it could have been after that.  I just -- I
3   don't know.
4       Q.  Are you aware of any similar request with
5   regard to any earlier photographic voter identification
6   bill?
7       A.  You mean earlier than S.B. 14?
8       Q.  Yes.
9       A.  No, sir.
10      Q.  At any time did DPS contribute to any
11  information -- sorry.
12          At any time did DPS contribute any
13  information towards a database match that would have
14  estimated the number of registered voters who lack an
15  S.B. 14-required ID?
16      A.  We provided driver's license database
17  information to the office of the Secretary of State.
18      Q.  When was that?
19      A.  I think there were two occasions, but I don't
20  know either of the dates.
21      Q.  Were those before or after S.B. 14 was passed?
22      A.  One was after, I'm sure.  The other I'm not
23  sure, but I believe it was during.
24          (Exhibit No. 43 marked.)
25          THE REPORTER:  Exhibit 43.

---

110

1           MR. KEISTER:  Thank you.
2       Q.  (BY MR. FREEMAN)  Have you ever seen this
3   document before?
4       A.  No, sir.  I don't -- can't say that I have.
5       Q.  What does this document appear to be?
6       A.  It appears to be an e-mail from Ann McGeehan
7   to Ann McGeehan and Karen Richards, with Lee Guyette
8   and John Mendoza copied on February 1st of 2011.
9       Q.  And are any of those individuals employed by
10  DPS?
11      A.  I'm sorry?
12      Q.  Are any of those individuals employed by DPS?
13      A.  They don't look familiar to me.
14      Q.  If you go to the second page, do you see the
15  listing of numbers of voters that match a DPS record or
16  do not match a DPS record?
17      A.  I see a list that has a total number of voters
18  in the state and then Query 1, "Matching Criteria," the
19  number of voters with no Texas driver's license or ID
20  number and the number of voters that matched a DPS
21  record and the number of voters that did not match a
22  DPS record.
23      Q.  Are you aware of what types of records DPS
24  provided in order to allow the Secretary of State's
25  office to conduct this match?

---

111

1           MR. KEISTER:  Objection, form, calls for
2   speculation and assumes facts not in evidence.
3       Q.  (BY MR. FREEMAN)  You previously testified
4   that DPS provided information for a matching program
5   between SOS registered voters and DPS drivers, correct?
6       A.  Yes.
7       Q.  And you said that that may have occurred
8   during consideration of S.B. 14, correct?
9       A.  Yes.
10      Q.  And the date of this e-mail, you said, was
11  February 1st, correct?
12      A.  Yes.
13      Q.  And that's before S.B. 14 was passed, correct?
14      A.  Yes.
15      Q.  And this e-mail indicates that some match was
16  performed between total voters in the State of Texas
17  and a DPS record, correct?
18      A.  Yes.
19      Q.  My question is, what type of DPS record did
20  DPS provide in order for SOS to perform that match?
21          MR. KEISTER:  Objection, form, calls for
22  speculation, mischaracterizes the evidence presented to
23  this witness.
24          And to the extent you can testify with
25  DPS knowledge what DPS provided to the Secretary of

---

112

1   State, you're allowed to do that.  To the extent you're
2   being requested to testify as to what the Secretary of
3   State did with that knowledge, if DPS does not know,
4   then that's outside what you're designated to testify
5   about, and I'll instruct you not to answer that.
6       Q.  (BY MR. FREEMAN)  You may answer.
7       A.  I don't know what all data -- I know the data
8   that was given to them was from the driver's license
9   database.  And as to the specific fields that were
10  provided to the Secretary of State, I don't know.
11      Q.  Are you aware of whether DPS provided records
12  from the active DPS database or whether it provided a
13  copy of the jury wheel?
14      A.  I believe on one of those occasions the jury
15  wheel was provided to them.  And prior to that, I'm not
16  sure what they got.
17      Q.  So you don't know if this was the driver's
18  license database or was the jury wheel with regard to
19  this particular match?
20          MR. KEISTER:  Objection, form, calls for
21  speculation, mischaracterizes the previous testimony.
22  There's no foundation, no evidence that the information
23  this witness has talked about is the information that
24  was used by the Secretary of State.
25          THE WITNESS:  Okay.  The question --

---

JOE PETERS                                                        4/30/2014

---

113

1    Q.  (BY MR. FREEMAN)  You may answer.
2    A.  The question is?
3    Q.  With regard to the information that DPS
4  provided that the Secretary of State matched in January
5  of 2011, are you aware whether that was from the active
6  DPS database or whether that was from the jury wheel?
7            MR. KEISTER:  Same objections.
8            THE WITNESS:  I'm not aware.
9    Q.  (BY MR. FREEMAN)  Okay.  Did DPS help devise
10 the comparison algorithm or the -- the match that was
11 used between registered voter databases and DPS data?
12   A.  My understanding is that DPS provided the data
13 and had no input otherwise.
14   Q.  Okay.  Are you aware of whether DPS provided
15 the ethnicity field from the driver's license database?
16   A.  I'm not.
17   Q.  Okay.  Are you aware of whether DPS provided
18 the expiration date field from the DPS database?
19   A.  I'm not.
20   Q.  Did anyone from DPS follow up with the
21 Secretary of State's office to determine if the match
22 had been completed?
23   A.  I'm not aware of whether they did or not.
24   Q.  So, to your knowledge, as -- sorry.  To the
25 knowledge of the Department of Public Safety and you as

---

114

1  their designee here, no follow-up was conducted,
2  correct?
3            MR. KEISTER:  Objection, form, vague,
4  confusion, calls for speculation.
5            MR. FREEMAN:  I'm happy to rephrase it.
6            MR. KEISTER:  Okay.
7    Q.  (BY MR. FREEMAN)  To the knowledge of the
8  Department of Public Safety, there was no follow-up
9  conducted to determine that this match for which the
10 department had provided data had been completed,
11 correct?
12           MR. KEISTER:  Objection, form,
13 mischaracterizes the previous testimony, no foundation,
14 and calls for speculation.
15           THE WITNESS:  I'm not aware.
16   Q.  (BY MR. FREEMAN)  Did DPS receive the output
17 of the match that was conducted in January 2011?
18   A.  I'm not aware.
19   Q.  Was the match that was conducted in January
20 of 2011 provided to any Texas legislators during
21 consideration of S.B. 14?
22   A.  I don't know what the Secretary of State's
23 office may have provided them, if that's what you're
24 asking.  I don't know.
25   Q.  To your knowledge --

---

115

1    A.  No.
2    Q.  -- DPS didn't provide a copy?
3    A.  No.
4    Q.  Did DPS make any legislators aware that the
5  match had been -- that it had provided data for this
6  match?
7    A.  I'm not aware of any specific notification to
8  any legislator that we have provided that data.
9    Q.  Was a decision made not to inform Texas
10 legislators that data had been provided for this match?
11           MR. KEISTER:  Objection, form.
12 Mischaracterizes previous testimony.
13   A.  I'm not aware.
14   Q.  (BY MR. FREEMAN)  So you don't know -- pardon
15 -- the Department of Public Safety does not know when a
16 decision was made not to inform legislators that this
17 data had been provided?
18           MR. KEISTER:  Objection, form.
19 Argumentative and mischaracterizes the previous
20 testimony.
21   A.  I'm not aware of any such decision that was
22 made.
23   Q.  (BY MR. FREEMAN)  Are you aware of any other
24 instance in which legislators have requested
25 information that DPS -- that DPS had in its possession

---

116

1  in which DPS did not provide that information?
2            MR. KEISTER:  Objection, form.
3  Mischaracterizes previous testimony, no foundation as
4  respect to you did not establish there was any request,
5  argumentative and calls for speculation.
6    A.  I'm not aware.
7    Q.  (BY MR. FREEMAN)  Are you aware of any
8  instance in which a Texas agency has declined to
9  provide readily available information to legislators
10 who have requested it?
11           MR. KEISTER:  Objection, form.  That's
12 outside the scope of the issues you're here to testify
13 about.  You can testify with respect to the knowledge
14 of DPS but not about other agencies.
15   A.  With respect to DPS I'm not aware of any
16 instance where we didn't provide information requested
17 by the legislature.
18   Q.  (BY MR. FREEMAN)  Is it ordinary procedure for
19 DPS to decline to provide readily available information
20 to the legislators who have requested it?
21           MR. KEISTER:  Object to form,
22 argumentative, mischaracterizes previous testimony and
23 no foundation.
24   A.  And your answer is no.
25   Q.  (BY MR. FREEMAN)  Okay.  Besides the

---

JOE PETERS                                                          4/30/2014

36 (Pages 141 to 144)

141

1    been completed successfully?
2       MR. KEISTER:  Objection, form.
3    Mischaracterizes previous testimony.  Vague.  No
4    foundation.  And asked and answered.
5       But you can answer it.
6    **A.  I'm not aware.**
7       Q.  (BY MR. FREEMAN)  Did DPS receive the output
8    of any analysis performed using the data that it
9    provided after August 31st, 2012?
10   **A.  I'm not aware that DPS received a formal**
11   **notification of the output.  We were made aware of what**
12   **the output was.**
13      Q.  What was the output?
14   **A.  As I testified earlier, I believe the output**
15   **was that there were over 700,000 potential voters out**
16   **there that did not have an ID or a driver's license.**
17      Q.  That was the output of the analysis performed
18   after August 31, 2012?
19   **A.  Oh, now, I'm not sure about the number -- I**
20   **mean, the date and that number on a specific date.**
21      Q.  Are you aware of whether there were different
22   outputs of different analyses that were performed
23   during -- or using DPS data?
24   **A.  No, sir.**
25      Q.  Who would be?

142

1    **A.  I would assume the Secretary of State would**
2    **have known if they conducted the analysis.**
3       Q.  Who in DPS would have been made aware of that
4    information?
5       MR. KEISTER:  Object to form.  Calls for
6    speculation.  Mischaracterizes previous testimony.
7    **A.  I don't know.**
8       Q.  (BY MR. FREEMAN)  Are you aware of whether DPS
9    provided data more than once since August 31st, 2012,
10   with regard to any S.B. 14-related analysis?
11      MR. KEISTER:  Objection, form.
12      Q.  (BY MR. FREEMAN)  Did DPS become -- provide
13   data on more than one occasion in order for S.B.
14   14-related analysis to be conducted?
15      MR. FREEMAN:  I'm also going to object to
16   the fact that the witness just looked at a note that
17   was passed between counsel while a question was
18   pending.
19      MR. KEISTER:  No, he did not, Dan.  I was
20   looking at that and I just --
21   **A.  What's your question?**
22      MR. KEISTER:  Hold on.  Let me caution
23   the witness that anything that has to do with
24   litigation or attorney/client information, you are not
25   to answer that question.

143

1    **A.  Okay.  And now the question was?**
2       Q.  (BY MR. FREEMAN)  Did DPS provide data more
3    than once after August 31st, 2012, for the purpose of
4    allowing S.B. 14 analysis to be conducted?
5       MR. KEISTER:  Objection, form.
6    Mischaracterizes previous testimony.  No foundation.
7    **A.  I'm not aware of what data was provided after**
8    **that date.**
9       Q.  (BY MR. FREEMAN)  You're not aware of the
10   scope of the data or the frequency with which data was
11   provided or both?
12   **A.  Both these -- all the above.**
13      Q.  Okay.  Are you aware of any future plans for
14   DPS to provide data for the purpose of conducting S.B.
15   14-related analysis?
16      MR. FREEMAN:  Don't give any testimony
17   with respect to attorney/client information.  But to
18   the extent there's anything else, you can answer that.
19      MR. KEISTER:  If there is.
20      Q.  (BY MR. FREEMAN)  You're not aware?
21   **A.  No.**
22   ==Q.  Okay.  All right.  One last topic and then==
23   ==you're done with me.  Are Texas driver's licenses==
24   ==available to individuals who are not U.S. citizens?==
25   ==**A.  Yes.**==

144

1    ==Q.  Under what circumstances?==
2    ==**A.  If an applicant is here on a visa or some**==
3    ==**limited term they are still eligible for a driver's**==
4    ==**license restricted to the expiration of their legal**==
5    ==**presence in the U.S.**==
6    ==Q.  Is there any difference in format between a==
7    ==driver's license issued to a citizen and a driver's==
8    ==license issued to a noncitizen?==
9    ==**A.  No.  Not that I'm aware of.**==
10   ==Q.  If an individual has a green card but is not a==
11   ==citizen, is there any distinction between the==
12   ==expiration of the driver's license of that noncitizen==
13   ==and the expiration of a driver's license of a citizen?==
14   ==**A.  The expiration of a driver's license of a**==
15   ==**noncitizen is limited to the term that they're**==
16   ==**permitted to legally be in the U.S.**==
17   ==Q.  But if a noncitizen has an indefinite==
18   ==permission to be present there will be no distinction==
19   ==in expiration date between their driver's license and a==
20   ==citizen's driver's license --==
21   ==**A.  Correct.**==
22   ==Q.  -- is that correct?==
23   ==    Are Texas ID cards available to==
24   ==individuals who are not U.S. citizens?==
25   ==**A.  Yes.**==

JOE PETERS                                                    4/30/2014

145

1     Q.  Same circumstances?
2     A.  Yes, sir.
3     Q.  Are Texas license to -- licenses to carry a
4  concealed handgun available to individuals who are not
5  U.S. citizens?
6     A.  I'm not aware.
7     Q.  Very quick with this.
8          (Exhibit 45 marked.)
9     Q.  (BY MR. FREEMAN)  What is this document?
10    A.  This appears to be a copy of the Texas
11  Administrative Code Title 37, Chapter 15, Subchapter
12  (b).
13    Q.  Section 15.46?
14    A.  Section 15.46.
15    Q.  Have you seen this document before?
16    A.  Well, not this particular document, excuse me.
17  I have seen the rule.
18    Q.  Okay.  Am I correct that this document states,
19  "An applicant for a driver's license or ID must provide
20  information relating to their United States
21  citizenship"?
22    A.  Yes.
23    Q.  How is this regulation applied with regard to
24  individuals who are noncitizens and apply for a Texas
25  driver's license or ID card?

146

1     A.  I'm not sure I understand your question.
2     Q.  Am I correct that this states that an
3  applicant must provide information relating to their
4  United States citizenship?
5     A.  Correct.
6     Q.  What if an applicant is not a United States
7  citizen?
8     A.  Then they have to provide proof of lawful
9  presence.
10    Q.  Okay.  So this -- this regulation does not
11  apply to U.S. -- to non-U.S. citizens, correct?
12          MR. KEISTER:  Objection, calls for legal
13  conclusion and legal opinion.
14    A.  I don't know.
15    Q.  (BY MR. FREEMAN)  Okay.  Is there any way for
16  an individual to know from the face of a Texas driver's
17  license, personal identification -- or personal
18  identification card that the carrier is a U.S. citizen?
19    A.  Not that I'm aware of.
20    Q.  Are there any current valid driver's licenses
21  or ID cards in circulation that don't distinguish
22  between citizens and noncitizens?
23    A.  That don't distinguish?
24    Q.  That's correct.
25    A.  I don't know.

147

1     Q.  Are there any other guidelines, regulations,
2  policies or procedures specific to the ability of a
3  noncitizen to obtain a Texas driver's license or
4  personal identification card?
5     A.  Let me hear the question again.
6     Q.  Are there any other guidelines, regulations,
7  policies or procedures that specifically apply to the
8  ability of noncitizens to obtain a Texas driver's
9  license or personal identification card?
10    A.  Not that I'm aware of.
11          MR. FREEMAN:  Okay.  I pass the witness.
12          MR. KEISTER:  Lunch?
13          THE REPORTER:  Off the record?
14          MR. KEISTER:  Yeah.
15        (Lunch Recess from 12:16 to 12:44 p.m.)
16          THE REPORTER:  Back on the record.
17                  EXAMINATION
18  BY MR. BRAZIL:
19    Q.  Good afternoon.
20    A.  Good afternoon.
21    Q.  I've got a few areas that I want to cover with
22  you before the other gentlemen have a turn as well.
23  And I speak very slowly so give me an opportunity to
24  finish my question before you give an answer.  And I'll
25  try to be very precise with my questions.  That way we

148

1  can get in, get out, and move on.  Okay?
2     A.  Yes, sir.
3     Q.  If you do not understand one of my questions
4  just say, "Scott, slow down," or, "Stop, back up,"
5  whatever.  Fair enough?
6     A.  Yes, sir.  Yes, sir.
7     Q.  I want to understand -- I like things simple.
8  I would like to understand and can you help me
9  understand the driver's license database.  I understand
10  from your testimony that the jury wheel is a part of
11  the driver's license database; is that correct?
12    A.  The data for the jury wheel comes from the
13  driver license database, correct.
14    Q.  So is there a master database that is
15  maintained by DPS?
16    A.  With respect to driver's license?
17    Q.  Yes.
18    A.  Yes, sir.
19    Q.  Okay.  And is there -- are there other
20  databases maintained by DPS other than the driver's
21  license database?
22    A.  Yes, sir.
23    Q.  Okay.  And what are those?
24    A.  There's a criminal history database.
25    Q.  Okay.

JOE PETERS                                                    4/30/2014

---

165

1    compliance based on the fact that the legislature only
2    meets once every two years, and some of the compliance
3    is going to require legislation.
4        Q.   Okay.  When you apply for a driver's license,
5    does DPS do a background check or criminal history
6    check?
7        A.   Don't do a criminal history check.
8        Q.   Okay.  What type of background check, if any,
9    does DPS do?
10       A.   We don't do a background check.  We do a
11   warrant check.
12       Q.   Okay.  And that's different from a criminal
13   history check?
14       A.   Yes, sir.  A criminal history check would give
15   you all of your arrests and whether or not there were
16   convictions, et cetera.
17       Q.   Okay.  Just do a warrant search?
18       A.   A warrant search.
19       Q.   Okay.  The same for CHL or is it more
20   extensive?
21       A.   The -- it's my understanding -- I'm not part
22   of CHL, but it's my understanding that the background
23   check for CHL is more extensive.
24       Q.   Let me switch gears, if I may.  And I will try
25   not to re-plow old ground, okay?

---

166

1        A.   Okay.
2        Q.   I thought you would know what that term meant.
3             The EIC training given to the counties,
4    is it only when they request it?  Is there any mandate,
5    rule or regulation that says that counties have to
6    undergo EIC training?
7        A.   That's in the memorandum of agreement between
8    DPS and the county.
9        Q.   So it's voluntary.
10       A.   No, sir.  If -- if they don't complete the
11   training then we won't execute the agreement.
12       Q.   They that will not be allowed to do -- to
13   issue EICs on their own?
14       A.   Correct.
15       Q.   You would have to send a mobile EIC unit to
16   that county?
17       A.   Correct.
18       Q.   When a county is -- does receive the training
19   or does undergo the training and is part of that
20   agreement, are they provided the equipment to issue the
21   EICs?
22       A.   Yes, they are.
23       Q.   Okay.  By DPS?
24       A.   Yes, sir.
25       Q.   Okay.  So the only -- so the budget issue to

---

167

1    the counties would be just their personnel?
2        A.   Yes, sir, to my knowledge.
3        Q.   Okay.  Is there any -- was there any budget
4    items, specific budget item in S.B. 14 that would
5    assist the counties in the EIC training or the extra
6    manpower they may need, anything of that sort?
7        A.   No, sir.
8        Q.   Was there any extra money in the S.B. 14
9    budget for assisting DPS with handling the EICs or any
10   issue of S.B. 14 to your knowledge?
11       A.   No, sir.
12       Q.   So it had to come from -- your budget comes,
13   what, out of transportation?  I forget.  But anyway.
14       A.   Some of it comes out of you Fund 6, but not
15   all of it.
16       Q.   All right.  Was there -- there was no extra
17   money given to or allocated to DPS to help implement
18   S.B. 14?
19       A.   That's correct.
20       Q.   Okay.  It just comes out of your operating
21   budget?
22       A.   That's correct.
23       Q.   Has anybody done a study at DPS on the
24   impact, the fiscal impact of S.B. 14 on the DPS budget?
25       A.   Yes, we have.

---

168

1        Q.   And who performed that and where would I find
2    it?
3        A.   The -- our driver license financial analyst
4    and our finance division.
5        Q.   Any specific names or just somebody in those
6    divisions?
7        A.   Saundra Truett is our financial analyst and
8    I'm not sure who in finance would have participated in
9    that.
10       Q.   Okay.  Was that provided to the legislature
11   during the process of S.B. 14?  When was that provided,
12   do you know?
13       A.   During the process of S.B. 14 there was a
14   fiscal note prepared and supplied to the legislative
15   budget board.
16       Q.   And how is that different from the analysis we
17   just spoke about?
18       A.   The fiscal note estimated the -- well,
19   actually we knew what the cost of a card would be.  And
20   we provided that information.  We had no idea how to
21   calculate how much staff time would be involved in
22   issuing EICs without knowing what the volume of EIC
23   applicants would be.
24       Q.   Do you recall when that fiscal note was
25   provided?

JOE PETERS                                                          4/30/2014

169

1      A.  2000 -- it was just prior to passage of S.B.
2  14.
3      Q.  And do you recall the amount that was
4  estimated?
5      A.  No, I don't --
6      Q.  Ballpark it.
7      A.  -- I don't recall the amount in total.  There
8  were -- there were costs to the bill dependent upon how
9  many EICs would be issued or would have been issued.
10  And that was indeterminant.
11      Q.  Okay.
12      A.  The only thing we could determine was that
13  each card was going to cost us so much money and that,
14  again, the total would have been dependent on how many
15  were issued.
16      Q.  Okay.  Has there been a follow-up study to
17  that to determine what the actual cost was?
18      A.  We have done an analysis as to what staff time
19  DPS employees have spent with respect to providing EIC
20  such as those that -- the employees that were
21  dispatched from a regular driver license office to a
22  mobile site.
23          We began tracking how much time they
24  spent on EICs, oh, last September I believe, September
25  or October, and we actually added a field in our

170

1  employee time accounting system to where when -- when a
2  CSR enters their time, if they spent one hour or six
3  hours providing EIC service, they enter it as EIC.  And
4  we're now able to track how much time a DPS employee
5  spends on EIC specifically.
6      Q.  Has DPS had -- had to hire extra people to
7  assist with implementation of S.B. 14?
8      A.  No, sir.
9      Q.  Do you know as we sit here today what the cost
10  has been to date to DPS?
11      A.  The last analysis that I saw was $845,000 and
12  that included equipment during the initial deployment.
13  That cost has gone down considerably since that time
14  because we don't have to buy more equipment, all we're
15  doing is providing staff time.
16      Q.  Does that number include staff time also, that
17  890 -- 845?
18      A.  Yes, sir.  That's everything we could come up
19  with that touched EIC.
20      Q.  Including the cost of the card?
21      A.  Yes, sir.
22      Q.  So when a county enters into this agreement
23  with DPS to handle the processing of EICs they are
24  given the training by DPS?
25      A.  Yes, sir.

171

1      Q.  And they're given the equipment by DPS?
2      A.  Yes, sir.
3      Q.  And how long do they get to keep the
4  equipment?  Is it up to them, is it pursuant to some
5  agreement?
6      A.  It's pursuant to the agreement, but it's up to
7  them, they keep it as long as they're willing to
8  provide the service.
9      Q.  And for those counties that will not provide
10  the service, that's when a mobile unit is utilized?
11      A.  With DPS employees, yes, sir.
12      Q.  So if a county says, "We're not going to be
13  part of that agreement," DPS would set up their mobile
14  station?
15      A.  Yes, sir.
16      Q.  And be manned only by DPS employees?
17      A.  Correct.
18      Q.  How would they determine the location and the
19  timing of those mobile units?
20      A.  The location is determined by the local
21  supervisors.  They'll travel to one of those counties
22  and scout potential locations and then determine
23  whether or not the owner or the proprietor of the
24  location agrees to let us have space for so many hours
25  a day for so many days.

172

1      Q.  And is there a separate budget for the mobile
2  units?
3      A.  No, sir.
4      Q.  It's just part of the overall --
5      A.  Part of overall operation.  Driver license, ID
6  card and EIC are all in the same operational budget.
7      Q.  And when we talk about these mobile units,
8  we're talking about basically enough equipment to be
9  one unit?
10      A.  Yes, sir.
11      Q.  Okay.  And there are 25 of these units?
12      A.  Well, there are 25 that the Secretary of State
13  has.  And then I don't remember the number now that DPS
14  has, but I think it's -- well, I don't know.  It would
15  be guessing.
16      Q.  Okay.
17      A.  But there are additional mobile units other
18  than the 25 that I think you were referring to that the
19  Secretary of State owns.
20      Q.  And when would the Secretary of State utilize
21  a mobile unit versus DPS?
22      A.  The Secretary of State generally responds to
23  requests from the local community, the local political
24  leaders, the legislature for mobile sites and offices
25  or, rather, in locations where we already have a driver

173

1    license office presence.
2          For example, Houston is an area where
3    they've provided mobile service in addition to all of
4    the driver license offices.  We -- or I say Secretary
5    of State has provided mobile sites in Harris County,
6    Dallas County, Tarrant County, I believe Hidalgo
7    County.  I'm not sure who else.
8        Q.  And DPS provides in those counties that do not
9    have a driver's license office?
10       A.  I'm sorry?
11       Q.  You -- DPS utilizes their mobile units in
12   counties that do not have a driver's license office?
13       A.  No, sir, not necessarily because all of those
14   counties all have driver license offices.  This is in
15   addition to what the -- like, a senator requested a
16   mobile station at a certain church in Harris County
17   Secretary of State provided that one.
18       Q.  Who could request a DPS mobile unit?
19       A.  Local officials can request it.  In the case
20   where we -- where we don't get a request from a local
21   county, our goal was to be able to provide EIC
22   availability in all 254 counties before every election.
23       Q.  So the same people could -- the same officials
24   could request the Secretary of State's mobile units as
25   DPS as well?

174

1        A.  Yes, sir.
2        Q.  Okay.  Are you aware of any provision of S.B.
3    14 that the DPS wanted delayed implementation of?
4        A.  No, sir.
5        Q.  Did anybody lobby on behalf of DPS for extra
6    funding for the implementation of S.B. 14?
7        A.  No, sir.  We don't lobby.
8        Q.  Ask for.  Let me change the term.
9        A.  There may have been a suggestion but --
10       Q.  Okay.  Do you know --
11       A.  No.
12       Q.  -- if someone made that suggestion and had a
13   specific amount in mind?
14       A.  No, I don't.
15       Q.  Do you know if the counties asked for a
16   specific budgetary item to help them comply with any
17   part of S.B. 14?
18       A.  I'm not.  Unless they may have made some
19   request to local commissioner's court, and I would not
20   be aware of that.
21       Q.  Are you aware of any rule or regulation or law
22   that makes it mandatory for the counties to undergo the
23   training to issue EICs?
24       A.  No, sir.
25       Q.  Have there been any studies -- you talked

175

1    about the monetary studies by DPS on the -- for
2    example, the wait times at some of the offices.
3    Have -- has there been any study to determine if the
4    lines are longer or there's more wait because of the
5    issuance of EICs?
6        A.  No, sir.  We track wait times in some of the
7    larger offices with queueing systems in places, but EIC
8    transactions are not distinguished in those queueing
9    systems.
10       Q.  Have you seen any increase in the wait time
11   since the -- since S.B. 14 went into effect?
12       A.  No, sir.  As a matter of fact, we're seeing
13   decreases in wait times.
14       Q.  Can a county request directly from DPS one of
15   their databases?
16       A.  I'm sorry?  One of their databases?
17       Q.  Yes.
18       A.  The counties -- the county appraisal districts
19   can request the driver's license database.
20       Q.  Any other database that you're aware of?
21       A.  I'm not aware of any other database they can
22   ask for the entire database.  The counties' sheriff's
23   office and police departments all have access to the
24   criminal history database via the Texas law enforcement
25   telecommunications system.

176

1         Y'all have to access to the sex offender
2    registry as well.
3        Q.  But the driver's license database is not
4    automatically accessible to the counties?
5        A.  It is to the law enforcement community in
6    those counties.
7        Q.  But not to the voter registrar or election
8    official in each county?
9        A.  I'm not aware that the voter registrar is.
10       Q.  Can they request it and be given it, given the
11   driver's license database?
12       A.  I suppose they can request it.  I don't know
13   that they would be given the entire database.
14       Q.  Do you know if there's any rule or regulation
15   that would prevent your office from giving them?
16       A.  I don't know of one.
17       Q.  Who is Mark Doggett?  Does he work for DPS?
18       A.  He used to.
19       Q.  What was his position when he was there?
20       A.  He was assistant director for the information
21   technology division.
22       Q.  Was part of his job EICs or part of the
23   implementation of S.B. 14?
24       A.  I'm not sure when he left.  But he may have
25   had a part in -- in the S.B. 14 development.

JOE PETERS                                                          4/30/2014

177

1    Q.  Did someone request that Texas State conduct
2  some kind of survey that was going to assist DPS?
3    A.  Yes.
4    Q.  And did DPS make that request or do you know?
5    A.  DPS made the request.
6    Q.  And what did they ask Texas State to do?
7    A.  We asked Texas State to look at population
8  centers and projected population growth and in order to
9  use that data to determine where we needed to place our
10  mega centers and that the -- the legislature had given
11  us money to -- for driver -- I'm sorry -- driver
12  license improvement.
13         And the -- the decision was to establish
14  these large driver license offices with a minimum of 25
15  customer service representatives in the office, and we
16  wanted to be certain that those offices were placed in
17  population centers where they would be the most
18  effective and where the population was going, where the
19  trends were, so we wouldn't invest in an office that
20  five years down the road was not in a population
21  center -- you know, if the population grew the other
22  direction, we didn't want people to have to drive clear
23  across the county to get to a major driver license
24  office.
25    Q.  Did any part of that request have within the

178

1  request S.B. 14 or any of the requirements that DPS was
2  going to have to meet, anything of that sort?
3    A.  Not that I'm aware of.
4    Q.  Is it separate and apart, as you know it, from
5  S.B. 14?
6    A.  That was done in order to improve our driver
7  license wait times.
8    Q.  Is that one of the reasons that you said the
9  wait time has gone down --
10    A.  Those --
11    Q.  -- because of the mega centers?
12    A.  Those are one of the reasons.  And some of the
13  other offices we've done refreshes and modified the
14  traffic flow within the office.  That also has
15  contributed.
16    Q.  Did you have to reallocate resources at DPS
17  offices for the EIC implementation?
18    A.  No, sir.
19    Q.  You just utilized existing personnel and
20  trained them for EICs?
21    A.  That's correct.
22    Q.  And that training is very similar to a
23  personal ID processing?
24    A.  It would be, although the DL process would be
25  a little more extensive.

179

1    Q.  You mentioned, with the counties, memorandum
2  of agreement.  Was that the exhibit we looked at?
3    A.  Yes, sir.
4    Q.  Okay.  Did -- has the DPS to your knowledge
5  done any survey or study to determine what the cost to
6  an individual is in, for example, obtaining a birth
7  certificate, certified copy of the birth certificate or
8  any of the other forms of identification we've talked
9  about?
10    A.  No, sir.
11    Q.  Can someone get a birth certificate at the
12  state -- I mean at the county level or do they have to
13  go to the state level to get that or do you know?
14    A.  Well, it's my understanding they can get -- in
15  most cases they can get them at county level, but I
16  have no DPS knowledge of that.
17    Q.  Okay.  Just so I understand, you talked
18  about -- you spoke about the fiscal note that was
19  provided sometime ago and then you said there was
20  something else done by someone within DPS to evaluate
21  the cost of S.B. 14.  Are those -- did I get that
22  correct, that there's two different analyses or --
23    A.  Well, it was all contained in the same
24  analyses, and DPS staff in that fiscal note said that
25  each EIC card, the production of that card would cost

180

1  some amount and that there would be a cost to the bill
2  for if someone came in and got an EIC and then did not
3  have to -- to purchase an ID or a driver's license, how
4  many ever -- the assumption was made for the purposes
5  of that fiscal note that if a thousand people came in
6  and got EICs and thus didn't require an ID or a DL,
7  then that would be a loss of revenue to the State by
8  whatever amount the driver license or the ID card would
9  have cost.
10    Q.  How often is the State -- the DPS driver's
11  license database updated?
12    A.  Daily.
13    Q.  Okay.  Is that the same for purging people
14  that have died or whatever?
15    A.  No, sir.
16    Q.  Okay.  When does that occur?  When does the
17  purging occur?
18    A.  If -- if we get notified that a death has
19  occurred, then we'll purge.  But the database has quite
20  a few in there where we did not receive notification
21  and the driver is no longer with us.
22    Q.  Do some people fall off automatically?  When
23  it's not renewed for a certain period of time, are they
24  purged from the system?
25    A.  No, sir.

185

1    discussion with Secretary of State's office.
2        Q.   Originally, a fingerprint scanner or device
3    was in the budget for the mobile units, correct?
4        A.   No, sir, there was no budget for mobile units.
5        Q.   Was there an estimate made for the mobile unit
6    equipment --
7        A.   Yes, sir.
8        Q.   -- cost?
9        A.   Yes, sir.
10       Q.   Was it -- was included in that a fingerprint
11   device?
12       A.   Initially, yes, sir.
13       Q.   Were they ever supplied to the mobile units
14   for any period of time?
15       A.   They were not.  We ordered them and then by
16   the time we got them they had to go through testing and
17   we decided against capturing fingerprints so we
18   returned them to the vendor.
19       Q.   Where would I find or who would have
20   possession of the documents that would address the cost
21   issues that you spoke of earlier, the
22   eight-hundred-plus thousand dollars, that cost on the
23   DPS?
24       A.   Driver license division will have that
25   document that was put together.  It's just a

186

1    spreadsheet that listed the cost.
2        Q.   Do you know if that's been produced in this
3    litigation?
4        A.   I don't.
5        Q.   I'm trying not to re-plow the same ground.
6        A.   Much appreciated.
7        Q.   Let me show you what I did locate and I was
8    not exactly sure what this was, but I'll hand you -- we
9    may mark it as an exhibit but it's -- it's
10   TEX 00220420.
11           Can you tell me what that document is?
12       A.   It appears to be a calculation that was
13   utilized in putting the fiscal note together for S.B.
14   14.  I mean, it doesn't -- and it says, "Cost to
15   implement S.B. 14."
16           And I don't know when this was produced,
17   but that's what it appears.
18       Q.   Is any of the information in that document,
19   was any of that produced by or provided by DPS?
20       A.   In this document?
21       Q.   Yes.
22       A.   Well, it was provided in the fiscal note.  Are
23   you talking about provided to -- for this litigation?
24       Q.   No.  Provided -- did DPS prepare that
25   document?  Let me ask it more simply.

187

1        A.   Well, the information in that document would
2    have come from DPS.
3        Q.   Okay.  Was it prepared by DPS?
4        A.   I don't know who it was prepared by.
5        Q.   Okay.  Do you --
6        A.   But some of the numbers in here do look
7    familiar to me.
8        Q.   -- have any idea when that document may been
9    prepared?
10       A.   No, sir.
11       Q.   Okay.  That would be number --
12           THE REPORTER:  46.
13           MR. BRAZIL:  46.
14           (Exhibit 46 marked.)
15           MR. KEISTER:  Let me see that just to get
16   the number off of it.
17       Q.   (BY MR. BRAZIL)  Did DPS contact directly any
18   of the counties regarding the EIC mobile units?  I
19   mean, did you reach out and say, "Okay, we don't have a
20   DPS office in this county, so contact that county and
21   see if they will undergo the training or whatever"?
22       A.   We did.
23       Q.   And did you have somebody assigned to do that
24   or how did that occur?
25       A.   In some cases the senior managers contacted

188

1    the counties.  In some cases the -- one of the deputy
2    assistant directors contacted the county and in most of
3    the cases the regional manager of the region involved
4    contacted the counties.
5        Q.   What happens when someone's driver's license
6    is revoked?  What does DPS do?  Do they send a letter?
7    How does that occur?
8        A.   They send a letter.
9        Q.   Same with the CHL, I assume?
10       A.   I don't know what happens with a CHL.
11       Q.   Let me check my notes here.  I'm just about
12   finished.
13           When a mobile site was set up and a
14   county underwent the training and was going to issue
15   the EICs, who would transport the equipment to the
16   county?
17       A.   The training staff did that.
18       Q.   And then the County would sign off on receipt
19   of the equipment?
20       A.   That's correct.
21       Q.   Was there any -- to your knowledge is there
22   any rule or regulation or mandate that the county open
23   their EIC office on Saturday?
24       A.   No, sir.
25       Q.   So it was up to the individual counties?

JOE PETERS                                                    4/30/2014

189

1    A.  Yes, sir.
2    Q.  I believe I'll pass the witness.  Thank you.
3    A.  Thank you.
4         THE REPORTER:  You want to go off the
5    record?
6         (Discussion off the record.)
7              EXAMINATION
8    BY MR. DUNBAR:
9    Q.  Good afternoon, Mr. Peters.  I'm Kelly Dunbar
10   again.  And as with -- I know we've covered lots of
11   ground today, so apologies in advance if I'm jumping
12   around a bit.  But it will be also in a perhaps failed
13   effort to avoid repeating some ground.
14        And I know Mr. Freeman gave you a series
15   of instructions about rules of the deposition.  I won't
16   repeat those, but it -- I assume you understand them
17   and if you have any questions, obviously feel free to
18   ask.
19   A.  Understood.
20   Q.  So I would like to start with the line of
21   questions about the locations of DPS offices generally
22   and in particular with reference to public
23   transportation.  And just to be clear, for this line of
24   questioning when I refer to DPS offices, I'm referring
25   to the traditional brick-and-mortar office.  I will

190

1    have some questions about the mobile EIC units or
2    stations or whatever we're calling them later, but for
3    this series of questions a reference to a DPS office
4    will be a reference to a brick-and-mortar operation.
5    Does that make sense to you?
6    A.  Yes, sir.
7    Q.  Great.
8    A.  And you do understand that some DPS offices
9    are not driver license offices and some are combination
10   and so forth.
11   Q.  That's exactly all things I want to get to --
12   A.  Okay.
13   Q.  -- to help make sure I understand.  I do not
14   understand that as well you.
15   A.  Okay.
16   Q.  So how many DPS offices are located in Texas,
17   total?
18   A.  There are 228 driver license offices and there
19   are more than that of -- I assume.  I don't know how
20   many total offices there are.
21   Q.  Okay.  And in those offices that do not -- so
22   there are some driver's -- there are some DPS offices,
23   then, that do not provide driver's license services but
24   provide other services?
25   A.  That's correct.

191

1    Q.  And what would those other services be?
2    A.  Primarily they would house other divisions,
3    agents and rangers and so forth of other divisions
4    within the department.  Criminal investigations,
5    administration.
6    Q.  Got it.  Got it.  That makes sense.  So and
7    that is a helpful clarification, then, for me.  So when
8    I refer to "DPS offices" for series, unless
9    context indicates otherwise or I say otherwise, I'm
10   meaning driver's license DPS offices.
11   A.  Okay.
12   Q.  And so as I understand your testimony there
13   are 78 -- currently 78 counties without a DPS office;
14   is that right?
15   A.  Correct.
16   Q.  And are these counties concentrated in
17   specific geographic regions in the state?
18   A.  No, sir.  They're not concentrated in any
19   specific geographic region of the state.  For the most
20   part they're rural area, counties and probably more in
21   the West Texas region than East Texas.
22   Q.  Okay.  So if you had to generalize about
23   counties that don't have a DPS office it would be some
24   combination of rural West Texas, understanding that
25   those -- there are probably lots of exceptions to that?

192

1    A.  Yes, and the Panhandle.
2    Q.  Correct.  And does DPS know anything about the
3    racial demographics of the counties without DPS
4    offices?
5    A.  No, sir.
6    Q.  Has anyone at DPS ever studied or analyzed
7    that issue?
8    A.  Not that I'm aware of.
9    Q.  Stepping back at a more general level, how is
10   the decision to locate a new DPS office made?
11   A.  We want to locate the offices in areas of the
12   greatest population concentration.
13   Q.  Uh-huh.
14   A.  And as mentioned earlier, we utilized the
15   Texas State study to determine what the projected
16   populations were going to be over the next ten years.
17   Q.  Right.  And I guess at a very even more basic
18   level, who actually makes the decision, the final
19   decision where to locate a DPS office?
20   A.  The driver's license division administration
21   makes a recommendation to the director, and the Public
22   Safety Commission generally has final say.  And if they
23   don't like where we want to put one, we don't put it.
24   Q.  So that you, the driver's license division,
25   would make a recommendation to the director of DPS; DPS

JOE PETERS                                                4/30/2014

193

1   would need ultimate signoff from the commission?  Is
2   that correct?
3        A.  Well, we don't have to have ultimate signoff
4   but as a courtesy to them, so they know what's going
5   on, we brief them.
6        Q.  I see.  I see.  And so are there statutes or
7   regulations that govern the decision where to locate a
8   DPS office?
9        A.  No, sir.
10       Q.  Okay.  And as a general matter would you agree
11  that in order for DPS to carry out its various missions
12  the public needs to be able to physically get to a DPS
13  office?
14       A.  If what they're trying to accomplish requires
15  them to come to a DPS office, yes.
16       Q.  Okay.  And which DPS services do not require a
17  member of the public to actually come to an office?
18       A.  Driver license renewal, ID card renewal, CHL
19  applications.  There may be others.
20       Q.  Got it.  Got it.  And has DPS ever analyzed
21  how the public actually does get to a DPS office?
22       A.  In the case of the mega centers we did.
23       Q.  Okay.  And that was recently?
24       A.  Well, to the -- to the extent that we looked
25  for locations that had access to public transportation.

194

1        Q.  And prior to the mega -- the mega center
2   locations, is it your understanding as the
3   representative of DPS that historically prior to that
4   time access to public transportation was a factor taken
5   into consideration when locating the DPS office?
6        A.  I'm not aware that access to public
7   transportation in the location of the earlier offices
8   was a factor.
9        Q.  So for any DPS office that was located prior
10  to the mega centers, DPS is simply unaware or you're --
11  DPS -- you speaking on behalf of DPS are unaware that
12  access to public transportation was a factor?
13       A.  Correct.
14       Q.  Is it just that you don't know or that you
15  could actually say for certain that that was not a
16  factor?
17       A.  It's that I don't know that -- that any
18  evaluation was done in location of the offices prior --
19  or access to the offices prior to the mega centers.
20       Q.  Right.  And given that the public does need
21  physical access to DPS offices for at least some DPS
22  services, do you have an understanding of why access to
23  public transportation wouldn't have been a factor
24  historically?
25       A.  No.

195

1        Q.  Does that make sense?
2            MR. KEISTER:  Object to form.  Calls for
3   speculation.
4        A.  Well, I believe now that it makes sense.
5   Depending on the population concentration.  If -- if
6   there was not public access to a driver license office,
7   it would be a concern.
8        Q.  (BY MR. DUNBAR)  Right.
9        A.  And again, it would depend on the size of the
10  office.  You know, if it's a -- if it's a small county
11  and a one- or two-person office maybe public access is
12  not so critical.
13       Q.  Right.
14       A.  And likely, publication transportation is not
15  available.
16       Q.  Right.  And I guess prior to S.B. 14, the
17  pre-S.B. 14 world, would you agree with the statement
18  that access to public transportation might not have
19  been as important given that the demographic you were
20  serving would be people who want driver's license or
21  have driver's license and thus probably have access to
22  a car or an automobile?
23       A.  I don't think that was a factor.  The
24  factor -- the primary factor in that was whether or not
25  there was public access -- if I understood your

196

1   question correctly -- the consideration as to whether
2   or not there was public access any time, whether it was
3   S.B. 14 or before.  But it just happened that the mega
4   centers were not a gleam in our eye until Senate Bill
5   14.
6        Q.  Okay.  In going forward, then, looking
7   prospectively, does DPS have a policy of locating
8   future offices near public transportation?
9        A.  There's no written policy, but that's our
10  desire.
11       Q.  That's your desire and, as with some of the
12  other discretionary things we've talked about, that
13  could change tomorrow.  It's not written down in a law
14  or regulation --
15       A.  No, it's not.
16       Q.  -- or policy?
17       A.  And that's a factor subject to funding
18  availability.  You know, if we had to -- if we were
19  going to put an office in downtown office where we
20  couldn't afford it, that would be a factor.
21       Q.  Okay.
22           MR. DUNBAR:  Hasan, could we get
23  exhibit -- Tab 12, please.
24           THE REPORTER:  Exhibit 47.
25           (Exhibit 47 marked.)

197

1     Q.  (BY MR. DUNBAR)  Mr. Peters, have you seen
2   this document before?
3     A.  Yes.
4     Q.  And there is a cover e-mail from someone named
5   Janie Smith to you which then includes an attachment.
6   For the time being I would like to focus on the
7   attachment, if you would flip the --
8          And can you describe for me the context
9   or tell me a little bit about what this document is?
10         MR. KEISTER:  Counsel, before we go any
11   further, I'm noticing this is an attorney/client
12   document which evidently was inadvertently produced.
13         MR. DUNBAR:  Can we go off the record to
14   talk about it?
15         MR. KEISTER:  Yes, let's go off the
16   record --
17         THE REPORTER:  Off the record.
18         (Discussion off the record.)
19         THE REPORTER:  Back on the record.
20         MR. KEISTER:  Counsel, with respect to
21   Exhibit 47, the cover page e-mail, we contend, is
22   attorney/client and attorney/client work product, and
23   we're going to request that that be clawed back or
24   returned to the OAG.
25         With respect to the information on the

198

1   attachment, I think that's been produced and used in
2   other forums, so we don't have any objections to the --
3   to the attachment to the e-mail.
4         MR. DUNBAR:  Okay.  And for the record, I
5   understand you'll put that request in writing just for
6   all of the groups which might not be here.  Is that
7   right?
8         MR. KEISTER:  That's right.  We will.
9         MR. DUNBAR:  Okay.
10     Q.  (BY MR. DUNBAR)  Okay.  So, Mr. Peters,
11   turning to just the attachment, then, can you describe
12   for me what the attachment is?
13     A.  The attachment appears to be a list of
14   driver's license offices, the cities they're in, the
15   counties they're in, the number of employees that are
16   assigned to that office, what DPS region the office is
17   in, the office hours and days that that office is
18   open --
19     Q.  Yeah.
20     A.  -- and estimated county population in 2012 --
21     Q.  Right.
22     A.  -- and whether or not public transportation
23   was available and whether or not it has electronic
24   queuing system available.
25     Q.  Thank you.  And for present purposes I want to

199

1   focus on the, quote/unquote, "Available Public
2   Transportation" column.  What does "available public
3   transportation" mean?
4     A.  That means that there's public transportation
5   available to the office or within near proximity.
6     Q.  So that means, if I understand you correctly,
7   that someone -- there, say, is a bus stop located near
8   the Dallas-Garland Mega Center, for example.  If
9   there's a bus stop located near the Dallas-Garland Mega
10   Center, an X was put in the "Available Public
11   Transportation" column, correct?
12     A.  That's my understanding.  I didn't create the
13   document, but that's my understanding.
14     Q.  Okay.  And so that means with respect to the
15   2.4 estimated million people that live in the county,
16   an X in this box does not mean that all 2.4 million of
17   those people have public transportation they could use
18   to get to that DPS office then, correct?
19     A.  I can't answer the question because I don't
20   know where the 2.4 million live and how far from access
21   to public transportation within that location they are.
22     Q.  Fair enough.  But the metric that was used to
23   determine whether to put an X in the box would not tell
24   someone looking at the chart whether all 2.4 million of
25   those people could access a DPS office through public

200

1   transportation; is that correct?
2     A.  That would be correct.
3     Q.  In connection with this chart did DPS analyze
4   the costs in time or dollars for those that could make
5   use of public transportation to arrive at a DPS office?
6     A.  No, sir, not that I'm aware of.
7     Q.  And what forms of public transportation were
8   considered in creating this chart?
9     A.  Bus lines, taxi service, rail if it was
10   available.
11     Q.  So taxi service was included as a potential
12   means of available public transportation?
13     A.  That's my understanding, yes, sir.
14     Q.  So if someone could -- that lived on the
15   outskirts of, say, Dallas County could call a taxi and
16   pay $80 to have the taxi take the person to the
17   Dallas-Garland Mega Center, that would be considered a
18   form of public transportation that would lead to a
19   checking of the X in this column?
20     A.  Yes, sir.
21     Q.  Okay.  How many -- and perhaps you don't know,
22   but do you know or does DPS know how many Texans live
23   in counties where the DPS office is not accessible via
24   public transportation?
25     A.  I don't know.

JOE PETERS                                                4/30/2014

51 (Pages 201 to 204)

---

201

1     Q.  Do you think it's a significant portion of the
2  Texas population?
3     A.  Statewide?
4     Q.  Yes.  Just doing the math based on this chart.
5        MR. KEISTER:  Objection, form.  It calls
6  for speculation and lack of a calculator.
7     Q.  (BY MR. DUNBAR)  Well, if I told you the
8  number was somewhere around 6 million, would that --
9  would that seem out of bounds to you?
10    A.  6 million that -- that population that had --
11    Q.  That live in counties without using the
12 State's metric --
13    A.  Without.
14    Q.  -- "available public transportation" to get to
15 a DPS office?
16    A.  Well, if you consider that there are roughly
17 21 million driver license and ID card holders, it would
18 be somewhat significant.
19    Q.  Okay.  And for those folks that don't have
20 access to available public transportation, as DPS is
21 defining it for purposes of this chart, are there any
22 forms of transportation assistance available to -- for
23 an individual to get to the DPS office to secure -- to
24 apply for an EIC or any information doc?
25    A.  Are you asking if DPS provides transportation

202

1  for those people to get to a DL office?
2     Q.  Yes.  Or any form of assistance designed to
3  enable them.
4     A.  There is a method that we can enable them in
5  certain circumstances.
6     Q.  And what are those circumstances?
7     A.  We call it homebound.
8     Q.  Homebound?
9     A.  Or if --
10    Q.  Can you describe that for me?
11    A.  -- if an individual for whatever reason is
12 physically challenged and can't get to a driver license
13 office and needs to do a driver license renewal or an
14 ID card renewal, then depending on those circumstances
15 we may dispatch a CSR to their home or their place of
16 residence and process their renewal or the address
17 change, whatever they're after.
18    Q.  And that service is also available for EICs?
19    A.  Yes, it would be.
20    Q.  And how many people have availed themselves of
21 that opportunity to get -- to apply for an EIC?
22    A.  None that I'm aware of.
23    Q.  And I guess my question that's -- thank you
24 for -- for telling me about that.  I wasn't --
25    A.  Well, let me --

---

203

1     Q.  Aware of that.
2     A.  -- let me qualify the answer.
3     Q.  Sure.
4     A.  There was one and maybe two that requested or
5  complained because they couldn't -- it was her mother,
6  I think it was, that couldn't vote because we denied
7  her an ID card and somehow it got twisted around to
8  where she was in there applying for an EIC when in fact
9  she was actually looking for an ID, and we did send
10 homebound -- or CSR did a homebound visit and got
11 her the ID.
12    Q.  Okay.  And is there a statute or regulation
13 that requires DPS to offer this homebound service?
14    A.  No, sir.
15    Q.  And this homebound service is just for those
16 with physical disabilities; is that correct?
17    A.  Well, whatever their disability is, each case
18 is evaluated individually at the office level.
19    Q.  So if I lived in a county, just looking at
20 this chart, say Texarkana and did not have a car or
21 the ability to get to a DPS office and that was my only
22 constraint, could I apply -- could I successfully apply
23 for the homebound service you described?
24    A.  You could.
25    Q.  Would I successfully apply -- would DPS grant

204

1  that request?
2     A.  Generally, yes.
3     Q.  If someone --
4     A.  I mean -- go ahead.
5     Q.  I'm sorry.  Please go ahead.
6     A.  If -- you know, depending on the circumstances
7  if -- you know, we certainly don't have staff to do
8  homebound visits for everyone that might apply.  But if
9  your circumstances were if you're elderly or infirm or
10 whatever the case is that would prevent you --
11 legitimately prevent you from coming into the office,
12 then we would consider a homebound visit.
13    Q.  The circumstance in my question was I don't
14 own a car and I live in a county without public
15 transportation, could I successfully apply for a
16 homebound service?
17    A.  Are there any other circumstances other than
18 that you don't own a car?
19    Q.  No, I don't own a car.
20    A.  No, sir.
21    Q.  Okay is there a document or guideline written
22 down somewhere that define the criteria for the
23 homebound service?
24    A.  No, sir.
25    Q.  So this is just up to each individual DPS

---

JOE PETERS                                                    4/30/2014

205

1  office?
2      **A.  To determine whether or not they're going to**
3  **D.A. homebound visit.**
4      Q.  With no directive or guidance from the central
5  leadership of DPS?
6      **A.  I'm not aware of any written directive or**
7  **guidance along those lines.**
8      Q.  Okay.  Thank you.
9          One last set of questions just on the
10  location of DPS offices.  And this -- it's on Tab 1.
11         THE REPORTER:  Exhibit 48.
12         (Exhibit 48 marked.)
13     Q.  (BY MR. DUNBAR)  And, Mr. Peters, have you
14  seen this document before?
15     **A.  I have.  Well, I've seen it in a color form.**
16     Q.  In a color form, sure.  And was this -- this
17  document shows -- references data from Texas State
18  University, so was this document produced in connection
19  with the mega center location analysis that you were
20  talking about earlier?
21     **A.  This was produced in connection not with the**
22  **mega center locations but after the mega centers**
23  **were -- were already under construction.  And we were**
24  **looking to see what the driver or an applicant would**
25  **have to -- how far an applicant would have to drive to**

206

1  **get to the office.  We wanted to see what the level of**
2  **coverage we had within a 25-mile radius of the existing**
3  **driver license offices.**
4      Q.  So did DPS itself prepare this document?
5      **A.  Staff at DPS did based on information that**
6  **they got from the government partnership program at**
7  **Texas State University.**
8      Q.  And what was the specific purpose of creating
9  this document?
10     **A.  To determine how many counties and how many**
11  **people would not be served within a 25-mile radius of a**
12  **driver license office.**
13     Q.  For the purpose of figuring out where to
14  locate new DPS offices or for the purpose of figuring
15  out to where to send mobile EIC units.
16     **A.  More the later, to figure out where we needed**
17  **to put mobile EIC units.**
18     Q.  Okay.  And so the document I gave you has two
19  sides.  One, you'll see, says "Percentage of population
20  within 25 miles of DL office," which I think you
21  previously defined to be a driver's license office; is
22  that correct?
23     **A.  Yes, sir.**
24     Q.  And the other chart shows the percentage of
25  population within 50 miles of a DL office; is that

207

1  correct?
2      **A.  Correct.**
3      Q.  How were the distance metrics chosen; that is,
4  25 miles and 50 miles?
5      **A.  It was arbitrary, just pulled it out of the**
6  **air.**
7      Q.  So -- okay.  So you pulled those numbers from
8  the air.  I guess was consideration given to the
9  burdens that, say, someone living 23 miles from a DPS
10  might have in getting to a DPS office?
11     **A.  No.**
12     Q.  And would you agree with me that if you chose,
13  say, a radius of ten miles, this chart looks a lot
14  different, particularly in its bright colorful form,
15  doesn't it?
16     **A.  It would.**
17     Q.  And it would look like there's a lot less
18  coverage in the state; is that correct?
19     **A.  That's correct.**
20     Q.  And your testimony, then, is that the 25-mile
21  and the 50-mile distances were chosen arbitrarily; is
22  that correct?
23     **A.  Yes, sir.**
24     Q.  And was there any -- has DPS, in connection
25  with this particular chart or more generally, done any

208

1  analysis of the cost associated -- the cost or burdens
2  associated with a Texas resident traveling some
3  distance to use a DPS service?
4          MR. KEISTER:  Objection, vague.
5      **A.  No.**
6      Q.  (BY MR. DUNBAR)  No studies have been done
7  like that?
8      **A.  Huh-uh.**
9      Q.  I would now like to shift gears a little bit
10  and ask a few questions about the effect of the EIC
11  program on DPS' overall delivery of services, and this
12  will be an area where I'll be jumping around even a bit
13  more than I have been because we have covered some of
14  this ground before.
15         Just so I understand your -- I
16  believe your prior testimony correctly, during the
17  legislative debates leading up to the enactment of S.B.
18  14, did anyone in the legislature reach out to DPS to
19  solicit its views on the specific issue of having DPS
20  be the agency that issues EICs?
21     **A.  I'm not aware of it.  But typically that**
22  **happens and since we did prepare a bill analysis for**
23  **internal use, that the -- there was some contact made.**
24     Q.  And is this bill analysis you're referencing
25  different from the fiscal note you previously

JOE PETERS                                                    4/30/2014

53 (Pages 209 to 212)

209

1   mentioned?
2       A.  That's correct.
3       Q.  And do you know if this bill analysis has been
4   produced in this litigation?
5       A.  I don't.
6           MR. DUNBAR:  Does counsel for Texas know?
7           MR. KEISTER:  I don't know.
8       Q.  (BY MR. DUNBAR)  Okay.  And can you describe
9   who -- so you've seen -- you weren't there when this
10  bill analysis was produced, correct?
11      A.  Yes, sir.
12      Q.  But you've seen this document before?
13      A.  I have.
14      Q.  Can you describe what this document said?
15      A.  There are various questions that -- it's an
16  internal document.
17      Q.  Uh-huh.
18      A.  And there are various questions that staff has
19  to respond to with respect to the language that's in
20  the legislation.  You know, how is it going to affect
21  our operation?  What's it going to cost us?  What IT
22  implications are there?  Questions such as that.
23      Q.  Were there any questions along the lines of
24  whether it made sense to have a traditional law
25  enforcement agency be tasked with the responsibility

210

1   for issuing voter identification cards?
2       A.  No, sir, not that I've seen.
3       Q.  You've never seen any documents that raise
4   those types of issues?
5       A.  No, sir.
6       Q.  And did DPS -- I believe in the fiscal note,
7   but I just want to make sure I understand that this is
8   exhaustive.
9           Is the fiscal note the only attempt DPS
10  did prior to S.B. 14's enactment to quantity the costs
11  the EIC obligation might have on the agency?
12      A.  That's the only one I'm aware of.
13      Q.  Okay.  And has DPS made any efforts to study
14  or quantify the costs of EIC mandate since S.B. 14's
15  enactment other than, I believe you referenced a
16  document, that $845,000 total --
17      A.  That's the.
18      Q.  -- is that correct?
19      A.  -- only one I'm aware of.
20      Q.  So purely in fiscal terms, but has there been
21  any analysis that's been done to evaluate whether the
22  EIC responsibility has interfered with DPS' ability to
23  carry out any of it traditional statutory missions?
24      A.  There's not been an analysis done.
25      Q.  No type of analysis like that has been done?

211

1       A.  No.  Well, we process 7 million transactions
2   every year in the driver's license offices, and we've
3   had 269 applications for EICs.  It would be hard to
4   believe that there was a significant impact on DL
5   operations.
6       Q.  Right.  And so I believe you testified earlier
7   that or stated on the record earlier that you hadn't
8   heard of anyone internally complaining about the EIC
9   mandate at least to you; is that correct?
10      A.  That's correct.
11      Q.  I want to see -- excuse me.  My notes are
12  getting a little turned around here.
13          MR. DUNBAR:  Hasan, could I get the tab
14  that the -- yes.
15          THE REPORTER:  Exhibit 49.
16          (Exhibit 49 marked.)
17      Q.  (BY MR. DUNBAR)  And, Mr. Peters, have you
18  seen this e-mail before?
19      A.  I have.
20      Q.  And it appears to be an e-mail from a
21  Robert Bodisch.  Am I saying that name right?
22      A.  That's correct.
23      Q.  He is the Assistant Director, Chief of Staff,
24  Texas Homeland Security; is that correct?
25      A.  Yes, sir.

212

1       Q.  And that's part of the Texas Department of
2   Public Safety; is that correct?
3       A.  Correct.
4       Q.  And looking at the 9-23-2013 e-mail on which
5   you're copied, is where I wanted to start.
6           MR. DUNBAR:  Well, and I note, I guess
7   just to be fair, the bottom part of this e-mail is the
8   one you have just suggested is subject to the clawback.
9           MR. KEISTER:  Okay.
10          MR. DUNBAR:  I don't want to talk about
11  that e-mail.  I want to talk about the top e-mail.
12          MR. KEISTER:  Okay.
13          MR. DUNBAR:  So I guess I want to make
14  sure I don't --
15          MR. KEISTER:  To the extent I objected to
16  the previous -- that part of the previous e-mail, I'll
17  also make the objection on this, to that part of the
18  e-mail and I'll also request to claw back.
19          MR. DUNBAR:  Okay.
20          MR. KEISTER:  But I don't see any problem
21  with the top part, do you?
22          MR. DUNBAR:  Okay.  I guess for the
23  clawback purposes for that, I guess we may need just a
24  redacted version of the -- do we need to go off the
25  record again?

213

1          MR. KEISTER:  Yeah.
2          MR. DUNBAR:  Okay.
3          THE REPORTER:  Off the record.
4          (Discussion off the record.)
5          THE REPORTER:  Back on the record.
6          MR. KEISTER:  I'm not sure where we were,
7     but with respect to Exhibit 49, once again the bottom
8     e-mail, which is from Joe Peters and dated July 3rd,
9     2013, we believe that was inadvertently produced and is
10    attorney/client, and we will be requesting for that to
11    be clawed back.
12          With respect to the top e-mail, which I
13    think is what you want to talk about today, that part
14    is fine.
15          MR. DUNBAR:  Okay.  And to clear up for
16    the record and the court reporter, would the best
17    process be for Texas to produce a redacted copy of this
18    exhibit for purposes of -- of this document or does the
19    State have an objection to that approach?
20          MR. KEISTER:  No, I think that would be
21    good.  Assuming everybody agrees that it's subject to
22    clawback, then I -- then we'll certainly do that.
23          Ought to be easy enough.  Or if you
24    wanted to just redact it, would that be okay for her
25    just to redact that part?

214

1          MR. FREEMAN:  That would be fine for us --
2          THE REPORTER:  Everybody agree that I can
3     do it?
4          MR. DUNBAR:  Yeah, we can do it.
5          MR. BRAZIL:  That would be fine.
6          MR. KEISTER:  That would be a lot less
7     confusing and that was on 49 and also on --
8          THE REPORTER:  I'm going off the record
9     because I can't write and talk at the same time.
10          (Discussion off the record.)
11          THE REPORTER:  Back on the record.
12          MR. DUNBAR:  Back on the record.
13     Q.  (BY MR. DUNBAR)  Okay.  So talking about
14    the -- I believe we were talking about the top e-mail
15    from Mr. Bodisch to -- well, to himself, apparently,
16    and to MacGregor Stevenson with you copied; is that
17    correct, Mr. Peters?
18     A.  Yes, sir.
19     Q.  Who is Stevenson MacGregor?
20     A.  MacGregor Stevenson is with the office of the
21    governor.
22     Q.  And looking at the e-mail, the e-mail says,
23    "What you may not understand is that we are currently
24    pulling trained customer service representatives out of
25    busy DL offices to fill the 25 mobile teams.  Lots of

215

1     internal grumbling about waste of tax dollars."
2          Then he goes on to say, "We don't have
3     the funds for what we are currently doing.  Pulling all
4     of the CSRs out of existing DL offices will severely
5     degrade our DL mission."
6          Did I read those parts of the e-mail
7     correctly?
8     A.  Yes, you did.
9     Q.  Okay.  And would you agree with the
10    characterization that this seems to be a complaint by
11    someone within DPS about assuming the EIC, about the
12    costs associated with the EIC mission?
13     A.  I wouldn't characterize it as a complaint.
14    What I would say is that it was an assessment from
15    Mr. Bodisch's perspective of the potential effects on
16    DPS or -- excuse me, driver license division.
17     Q.  Okay.  And he specifically referenced a
18    concern that at least in connection with the mobile EIC
19    stations the resource constraints would, quote,
20    "Severely degrade our DL mission"; is that correct?
21     A.  That's what it says.  And we mitigated that by
22    taking the CSRs out of the larger offices where we had
23    more CSRs.
24     Q.  So in your --
25     A.  We didn't close an office down to do EIC or

216

1     the mobiles.
2     Q.  So Mr. Bodisch is concerned that the EIC
3     mandate would severely degrade the DL mission turned
4     out to be incorrect.  Is that your testimony?
5     A.  I would say it was not totally accurate based
6     on our experience.  You know, when this was written in
7     September there was still that potential.  We were
8     coming up on November election and we had -- we didn't
9     have any idea what to expect.
10     Q.  And are there others within DPS still who have
11    concerns that the EIC mission could interfere with the,
12    quote/unquote, "DL mission"?
13     A.  Based on our experience since June 26th, I
14    think those fears have been allayed.
15     Q.  And what is the experience since June 26th,
16    you simply mean the rollout of the various mobile EIC
17    units and the DPS offices handling EIC applications?
18     A.  One is the volume of applicants that have
19    applied for volume of people that have applied for
20    EICs.
21          Two is that we were over the hump of
22    where we had to buy equipment, which was a significant
23    expense.  You know the equipment is already out there.
24    We don't have to worry about that anymore.
25          Three is that we have, I think, 52

JOE PETERS                                                    4/30/2014

55 (Pages 217 to 220)

217

1    counties that are now providing EIC services with their
2    staff which means that DPS does not have to furnish
3    staff for those mobile sites any longer.
4        Q.   Uh-huh.  And is there any -- I believe your
5    testimony was before there is no specific line item in
6    DPS's appropriation -- or in the transportation budget
7    generally for EIC unit; is that correct?
8        A.   That's correct.
9        Q.   So if there were unexpected needs in some of
10   the other, quote/unquote, "DL mission," you would face
11   resource constraints just like any agency; is that
12   correct?
13       A.   Yes, sir.
14       Q.   And is it fair to say that DPS's core mission
15   prior to the enactment of S.B. 14 was a law enforcement
16   mission?
17       A.   Yes, sir.  Well, actually the driver license
18   mission is -- is almost as large as the law enforcement
19   mission.
20       Q.   Right.  And you testified, I think, about your
21   background is in law enforcement; is that correct?
22       A.   Correct.
23       Q.   So you were chosen for this position at the
24   head of the DL division largely on the strength of your
25   law enforcement credentials; is that correct?

218

1        A.   I don't think it was so much on the basis of
2    my law enforcement experience.  It was management
3    experience that I had with when I was working for the
4    Sheriff's Association under the DOJ grant and as a
5    highway patrol sergeant, as a Ranger sergeant.
6        Q.   Right.  And I believe you said that, perhaps
7    in jest, that it was debatable whether you had
8    expertise in EIC implementation?
9        A.   That's correct.
10       Q.   And I guess my question is in, again, not
11   your personal opinion but in your capacity as
12   representative of DPS, does it make sense for DPS
13   rather than, say, the Secretary of State or some other
14   agency to have assumed a function so closely related to
15   elections?
16       A.   In terms of the resources available to DPS it
17   made sense for DPS to do that.
18       Q.   Because DPS had a lot of extra resources?
19       A.   Well, no, not that they had a lot of extra
20   resources, that we had resources -- we had 227 driver's
21   licenses offices out there and 18- or 1,900 CSRs that
22   could issue driver's licenses, EICs and ID cards.
23       Q.   So it makes sense in your view that there was
24   a basic convenience factor that the apparatus to issue
25   driver licenses was spread across the State, and it

219

1    made sense to impose this new EIC obligation on DPS for
2    that reason?
3        A.   Yes, sir.  We could not argue against it.
4        Q.   I would like to talk about a new exhibit.
5            MR. DUNBAR:  Hasan, give me Exhibit 9,
6    please.  I'm sorry tab for the record, that's tab in
7    our folder, not Exhibit 9.
8            (Exhibit 50 marked.)
9        Q.   (BY MR. DUNBAR)  Mr. Peters, have you seen
10   this e-mail exchange before?
11       A.   Whoops.  Yes, sir.
12       Q.   And I want to turn your attention to, I guess,
13   the last e-mail which is the September 10th, 2013,
14   e-mail from a Robert Herd?
15       A.   Wait a minute.  The last e-mail?  In the
16   string or the first e-mail in the string?
17       Q.   Sorry, yeah, the first e-mail in the string.
18   Last on the -- last physically.
19       A.   Okay.
20       Q.   But first e-mail on the string.  Good point.
21       A.   That's the September 10, 2013 at 12:12.
22       Q.   That's right.
23       A.   Got you.
24       Q.   And that's an e-mail from a Mr. Herd to a
25   Tracie Henson and Shaya Birch; is that correct?

220

1        A.   Yes, sir.
2        Q.   Do you know who Mr. Herd is?
3        A.   I believe he is the Dallas County voter
4    registrar.
5        Q.   Yeah, the bottom of the e-mail references the
6    Dallas County Elections Department Administrator.
7        A.   Yeah.
8        Q.   You're exactly right.  I don't know if that's
9    his position today, but at least at the time and then
10   who are Tracy Henson and Shaya Birch?
11       A.   I don't know.
12       Q.   Okay.  And looking at the e-mail, it appears
13   to be a request for assistance from DPS to deploy
14   mobile EIC units at various events.  Is that an
15   accurate --
16       A.   Yes, sir.
17       Q.   -- summary of the e-mail?
18       A.   Yes, sir.
19       Q.   And then there's a series of forwards of the
20   e-mail from -- the one I want to turn to, I guess, is
21   on September 10th, 2013, at 19:21, a JoAnn Mastrachio
22   says, "Tony, I'm handing this one off to the EIC guru."
23   Do you see that?
24       A.   At 19:21?  Yes, I see that.
25       Q.   And is it your understanding in this e-mail

JOE PETERS                                                      4/30/2014

56 (Pages 221 to 224)

221

1    the EIC guru is a reference to Mr. Rodriguez?
2        A.   That's correct.
3        Q.   Okay.  And then Mr. Rodriguez turns around and
4    sends the e-mail chain on Tuesday, September 10th at
5    2:13 to Mr. Watkins, who I believe you testified is one
6    your deputies?
7        A.   Yes.
8        Q.   And yourself --
9        A.   Yes.
10       Q.   -- is that correct?
11            And what are the first two words of his
12   e-mail?
13       A.   "Mission creep."
14       Q.   And what did you understand Mr. Rodriguez to
15   mean by "mission creep" when you saw this e-mail?
16       A.   That the mission was expanding.
17       Q.   And in what way was the mission expanding?
18       A.   By deploying the mobilizations.
19       Q.   And would you agree with me that "mission
20   creep" carries a negative connotation?
21       A.   It could.
22       Q.   Did you understand it to be that?
23       A.   I can't say that I did.  I mean --
24       Q.   You don't recall --
25       A.   It was a --

222

1        Q.   -- whether you understood --
2        A.   -- a fact, you know, that we -- we had these
3    requests and we -- we were going to do the best we
4    could to comply.
5        Q.   So you -- so your testimony is that you
6    understand Mr. Rodriguez's e-mail to reflect that it
7    was a negative development that a county was asking for
8    expanded mobile EIC access; is that correct?
9        A.   Well, yes.  And I understand that
10   Mr. Rodriguez is -- has an extensive military
11   background and is -- currently serves as a
12   major-general in the state guard, so he is familiar
13   with many missions of all types.  And I'm sure that's a
14   common reference that the military uses.  It was when I
15   was there.
16       Q.   Understood.  But I guess for clarity, I just
17   meant that it carries a negative connotation.
18            A mission creep is not a good thing; is
19   that correct?
20       A.   It could -- it could, yes.
21       Q.   Why would Mr. Rodriguez have represented the
22   request as mission creep in your view?
23       A.   I think it -- rather than a negative
24   connotation, it was that we need to expand, you know,
25   the mission is broader or about to become broader than

223

1    what we initially assessed.
2        Q.   But I thought you just testified that you
3    understand mission creep to carry a negative
4    connotation.
5        A.   It could.
6            MR. KEISTER:  Y'all are killing the court
7    reporter.
8        Q.   (BY MR. DUNBAR)  Okay.  What was the ultimate
9    resolution of Dallas County's request?
10       A.   We sent mobile units to Dallas County.
11       Q.   So Dallas County won over Mr. Rodriguez's
12   objections?
13       A.   Yes.
14       Q.   And do you know who ultimately made that
15   decision?  Was that your decision?
16       A.   Well, I was probably involved in that decision
17   that we were going to do it; but it was, you know, at
18   the request of and guidance from the Secretary of
19   State's office.
20       Q.   And have you heard other -- have there been
21   other references to mission creep in connection with
22   the EIC units during your tenure at DPS?
23       A.   No.
24       Q.   This was the only one?
25       A.   And I didn't even remember that one.  It just

224

1    didn't stick out in my mind.
2        Q.   Fair enough.  So I know we've had a lot of
3    questions about mobile EIC stations.  I want to really
4    just ask some basic clarifications.
5            I understand there have been three phases
6    of the mobile EIC program; is that correct?
7        A.   Yeah.  It depends on who you talk to and what
8    their understanding of a phase is, but go ahead.
9        Q.   But to be clear, this comes from Mr. Ingram's
10   deposition --
11       A.   Yes.
12       Q.   -- where there clearly were phases delineated
13   and this was the first time -- maybe it was my own
14   fault -- that I had heard of these phases.  So I want
15   to make sure I understand them correctly.
16            What would Phase 1 of the EIC program be
17   in your view?
18       A.   Phase 1 would have been -- if I remember
19   correctly, it was the Secretary of State's 25 mobile
20   stations and their assignments.
21       Q.   So Phase 1 is the 25?
22       A.   That's my understanding.
23       Q.   Okay.  I may have misunderstood.  I thought
24   that was the Phase 2.
25       A.   Well, I've tried not to refer to them as

JOE PETERS                                                    4/30/2014

225

1  phases because it's too confusing.  If I just said
2  Phase 1 or Phase 2 or Phase 3, nobody knows what we're
3  talking about.  But if I say Secretary of State's
4  mobile deployment, everybody knows what we're talking
5  about.
6       Q.  You should pass that along to Mr. Ingram.
7       A.  I will.
8       Q.  For all of our sakes.
9           Okay.  So I will sometimes use the
10  nomenclature, just to help understand what he might
11  have been referring to but also ask:  The Phase 1 in
12  your view, to the extent there was a Phase 1, is the
13  25 -- the 25 Secretary of State mobile EIC units; is
14  that correct?
15      A.  As I recall, yes, sir.
16      Q.  And who made -- this is the Secretary of
17  State's initiative.  Was it the Secretary of State's
18  idea to launch the 25 mobile EIC units?
19      A.  It was a collective decision to launch those
20  25 units and -- because the Secretary of State offered
21  to purchase those units.  Initially, the Secretary of
22  State offered to provide funding to DPS to buy those
23  units.  Then it was determined that they couldn't
24  provide DPS the funding; that they had to pay for them
25  themselves, and they had to own them.  And that's when

226

1  they became the Secretary of State's property.  And
2  they made those purchases based on specifications
3  recommended by DPS.
4       Q.  I see.  And when you say this was a collective
5  decision, though, I want to make sure I understand the
6  universe of the collective decision making here.
7           Was this DPS and the Secretary of State's
8  office only?
9       A.  No.
10      Q.  Who else was involved?
11      A.  Governor staff was involved.  The Secretary of
12  State staff, DPS staff.
13      Q.  Where did the idea initiate from for mobile
14  EICs?
15          MR. KEISTER:  To the extent this is going
16  to require you to state any of the deliberative process
17  that occurred in making this decision and to the extent
18  it's going to require you to give any attorney/client
19  information, I'm going to instruct you not to answer
20  those questions.  You can give the ultimate decision as
21  to what was done, but don't give the background
22  deliberations.
23          THE WITNESS:  Okay.  The ultimate
24  decision was that the Secretary of State would purchase
25  and own those mobile stations, the 25 mobile stations

227

1  that you're talking about.
2       Q.  (BY MR. DUNBAR)  But who made that ultimate
3  determination?
4       A.  I can't pinpoint any single individual that
5  made that decision.
6       Q.  So sitting here today, DPS has no view on who
7  came up with or ultimately decided on the Phase 1 of
8  the mobile EIC initiative?
9       A.  No, sir.
10      Q.  Okay.  And so Phase 1 or the 25 mobile
11  stations, that -- that program is ongoing; is that
12  correct?
13      A.  That's correct.
14      Q.  And is there a permanent appropriation for
15  those funds?
16      A.  No, sir.
17      Q.  So that program, like the entire EIC program,
18  is subject to the discretion of either the Secretary of
19  State or the Department of Public Safety; is that
20  correct?
21      A.  Correct.
22      Q.  And so Phase 3 of mobile EICs, at least the
23  Secretary of State's office would describe, it refers
24  to the county-led initiatives.
25          Is that your understanding?

228

1       A.  Yes, sir.
2       Q.  Okay.  And you've testified a lot about that
3  already, I believe; so I don't want to spend a lot of
4  time other than to understand Phase 3 is a DPS-led
5  initiative?
6       A.  Yes, sir.
7       Q.  And who came up with the idea for the Phase 3
8  initiative?
9       A.  Again, I can't pinpoint an individual.
10      Q.  Was it someone within DPS?
11      A.  Well, again, it was in collaboration with the
12  Secretary of State as to how we were going to achieve
13  coverage in all 254 counties.
14      Q.  Was DPS directed by any other agency in the
15  state to carry out Phase 3?
16      A.  Not that I'm aware of.  But there was
17  encouragement to explore that.
18      Q.  But the ultimate decision -- your
19  understanding is that the ultimate decision to say yea
20  or nay to Phase 3 rested with who?
21      A.  DPS.
22      Q.  The head of DPS or the commission?
23      A.  Ultimately based on recommendations from
24  staff.
25      Q.  Which among those two?  Who would have the

JOE PETERS                                                    4/30/2014

---

245

1     A.  I don't know.
2     Q.  You don't know?
3     A.  I haven't gone through the training.
4     Q.  Do you know who might know that?
5     A.  Any of the training division would know.
6     Q.  Is there a head of the training division?
7     A.  Yeah.  It -- the -- JoAnna Straphio (phonetic)
8  is the deputy assistant director for training.
9     Q.  Uh-huh.
10    A.  Lynn Hale is one of the trainers here in
11 Austin that trains the trainers.
12    Q.  Okay.  So with regards to the customer service
13 representatives, does DPS require them to have attained
14 a certain level of education in order to be employed?
15    A.  No.
16    Q.  How many of the customer service
17 representatives are fluent in Spanish?
18    A.  I don't know that.
19    Q.  Is there a requirement that offices have a
20 minimum number of Spanish speakers?
21    A.  No.
22    Q.  Okay.
23         (Exhibit No. 51 marked.)
24    Q.  (BY MS. CLARK)  So you can tell me on what
25 date DPS began issuing EICs?

---

246

1     A.  June 26th, 2013.
2     Q.  Okay.  And this document that's just been
3  marked as an exhibit, this is an e-mail dated
4  June 21st, 2013, correct?
5     A.  Yes.
6     Q.  And although it doesn't have a subject, it
7  attaches something that's called 32 Job Aid Election
8  Certificate, and 32 Tax Election Certificate, correct?
9     A.  Uh-huh.
10        THE REPORTER:  Yes?
11        THE WITNESS:  Yes.
12    Q.  (BY MS. CLARK)  If I can draw your attention
13 to the e-mail at the top of the page.  On the second
14 line where it says, "because of this possibility, we
15 are holding a WebEx refresher training at 4:00 p.m.
16 today."
17    Was WebEx refresher training held in
18 anticipation of EICs being issued?
19    A.  That's my understanding.
20    Q.  Okay.  Do you know whether all EIC employees
21 were trained on -- I mean, whether all DPS employees
22 were trained on the issuance of EICs prior to 2013?
23    A.  All DPS employees were not trained.
24    Q.  Do you know whether all -- which DPS employees
25 would have been trained?

---

247

1     A.  The driver license employees, the customer
2  service representatives.
3     Q.  And they were trained in 2012?
4     A.  They were trained in 2011, initially.
5     Q.  And were they trained again in 2012?
6     A.  They received -- some of them received
7  refresher training in 2012 or '13.  2013, I believe.
8     Q.  So is this e-mail talking about the 2013
9  refresher training to which you're referring?
10    A.  Uh-huh.
11    Q.  Okay.
12        MR. KEISTER:  You have to say yes.
13        THE WITNESS:  I'm sorry.  Yes.  Sorry.
14    Q.  (BY MS. CLARK)  So do you know which employees
15 in particular were required to attend this WebEx
16 refresher training?
17    A.  No.
18    Q.  You don't.
19    Do you -- was there a record that was
20 kept of which employees attended the training?
21    A.  Yes.
22    Q.  So would that be -- what form does that record
23 take?
24    A.  If -- on the webinar, the WebEx webinar, I'm
25 not sure how that was tracked.  The other training,

---

248

1  there's a sign-in sheet where everyone comes in and
2  places their signature on a spreadsheet that certifies
3  that they were there for that training.
4     Q.  What is the "other training"?
5     A.  What do you mean "other training"?
6     Q.  You just said that you know for the other
7  training?
8     A.  For in-person training.
9     Q.  I see.
10    A.  If they came in to -- to greet and to meet
11 with a facilitator and they had one-on-one or
12 one-on-many rather than a webinar, that's the other
13 training I was referring to.
14    Q.  So was the 2011 original training an in-person
15 training?
16    A.  I believe it was.
17    Q.  And so there would be a document that was --
18 that would be something like a sign-in sheet that would
19 reflect who had attended that training?
20    A.  There should be, yes, ma'am.
21    Q.  Do you know whether that document was produced
22 as part of this litigation?
23    A.  I don't know.
24        MS. CLARK:  Do you know whether that
25 happened?

---

JOE PETERS                                                    4/30/2014

---

253

1          What are the -- is there a list of
2    documents that meet the department's identification
3    policy on which employees are trained?
4          **A.  Yes.**
5          Q.  Is that part of the training that employees
6    received for issuing EICs?
7          **A.  Yes.  And I can't tell you where it is, but it**
8    **was in the packet -- the packet that I reviewed was an**
9    **inch thick.**
10         Q.  Uh-huh.
11         **A.  So either the fonts are smaller here or**
12   **there's a lot more information than what I reviewed.**
13         Q.  Okay.  So is there a different list for which
14   identification documents are accepted when applying for
15   an EIC and which are accepted when applying for a
16   driver's license?
17         **A.  The question again, please?**
18         Q.  Are there two -- is the list of acceptable
19   documents when applying for a driver's license the same
20   as the list of acceptable documents as when applying
21   for an EIC?
22         **A.  I believe the only difference would be lawful**
23   **presence of citizenship.  I'm not sure.**
24         Q.  You're not sure?
25         **A.  No.**

---

254

1          Q.  So -- but were employees trained on whether
2    there are any difference in the identification
3    documents accepted for EICs as opposed to driver's
4    licenses?
5          **A.  I don't know.  I wasn't there doing the**
6    **training.**
7          Q.  Okay.  So on the -- if you can turn to the top
8    of Page 3 where it says that the procedures for issuing
9    an election certificate are very similar to those used
10   to issue a driver's license or identification card.
11         **A.  Similar.**
12         Q.  Yes.  And then it says, "Similarities
13   include."  And if you go down to the third bullet
14   point, it says, "Collecting images, photos, thumb
15   prints, and signature," correct?
16         **A.  Yes.**
17         Q.  Okay.  So at the time of this training, which
18   took place on June 24th, 2013, the policy of DPS was to
19   collect thumb prints when applying for EICs, correct?
20         **A.  Correct.**
21         Q.  At what point did that policy -- did that
22   policy change?
23         **A.  The policy itself?  Well, yes.  I can say that**
24   **it changed, and that was in probably the end of**
25   **September of '13.**

---

255

1          Q.  Okay.  So if the training was in June of 2013
2    and the policy changed in September of 2013, at what
3    point were employees retrained on the new procedures?
4          **A.  If I remember correctly, there was no formal**
5    **training that we would not collect fingerprints or**
6    **thumb prints.  It was memos from the senior management**
7    **to each of the regional office and then passed to the**
8    **facilitators and to staff, the CSRs.**
9          Q.  So who was responsible, ultimately, for
10   getting the change in policy to the CSRs?
11         **A.  The regional managers, as it came from**
12   **headquarters through our senior managers.**
13         Q.  Okay.  So can you be assured that that policy
14   was communicated to all CSRs?
15         **A.  I was.  I mean, I didn't see it happen; but**
16   **that's what the senior managers were instructed to do.**
17         Q.  But there was no retraining at that point?
18         **A.  No formal retraining at that point that I'm**
19   **aware of.**
20         Q.  Okay.  If you could go to Page 4.  And towards
21   the top of the page where "prior to issuance of an
22   election certificate," under No. 1, towards the bottom.
23   It says, "Do not issue an election certificate if a
24   matching record is found under the following
25   circumstances:  DLS indicates the person is ineligible,

---

256

1    i.e., suspended, revoked, cancelled, or denied, if the
2    person maintains the card in their possession."
3          Can you explain what that means?
4          **A.  What that means is if the person still has**
5    **their ID or their driver's license in their possession,**
6    **even though it's revoked, they can still use it for**
7    **identification purposes.**  But their driving privileges
8    are revoked, and they can't use it to drive.
9          Q.  So when you say they could still use it for
10   identification purposes, they could still use it to
11   vote?
12         **A.  Yes.**
13         Q.  So they would be ineligible to receive an
14   election certificate if they had a suspended license?
15         **A.  If they had a suspended license.  If they**
16   **wanted the EIC, they could sign an affidavit**
17   **surrendering their license; and then we could issue**
18   **them an EIC.**
19         Q.  So in order to get an EIC, somebody with a
20   suspended license would have to physically return their
21   license to you?
22         **A.  No.**
23         Q.  No.  What does "surrender" mean?
24         **A.  If they lost the driver's license or if it**
25   **was -- well, surrender means they would give it up.**

---

JOE PETERS                                                    4/30/2014

261

1   what they might accept it for.
2       Q.  So if someone wanted to hold on to their
3   expired driver license for some other reason but also
4   wanted an EIC because they needed it to vote, would
5   be able to hold on to their driver license?
6       A.  I think they would.
7       Q.  So it isn't -- what you testified before was
8   not correct, that they would have to surrender it?
9       A.  If -- if they're going to surrender their
10  driving privileges and the card is not expired, then
11  they would have to surrender it.
12      Q.  I'm sorry.  The card is expired because it's
13  no longer valid.  The card is expired.
14      A.  Uh-huh.
15      Q.  They do not have the money to renew the card
16  but they want to hold on to it because they use it for
17  ID and other parts of their life, but it's no longer --
18      A.  Even if it's expired?
19      Q.  Yes.
20      A.  Okay.
21      Q.  But it's no longer valid for voting under
22  Texas' photo ID law, would they be allowed to get an
23  EIC without returning their license to you?
24      A.  I don't know the answer to that question.
25      Q.  Do you know who would know the answer to that?

262

1       A.  Probably license of record service that does
2   the quality assurance would be the best people.
3       Q.  Is there someone in particular there?
4       A.  Morgan Spinx.
5       Q.  To your knowledge, is there any statutory
6   reason for this policy about surrendering your driver's
7   license when you're getting an EIC?
8       A.  I'm not aware of it.
9       Q.  And are there regulations that require DPS to
10  do that?
11      A.  I believe there are.  I don't know what they
12  are specifically.
13      Q.  Okay.  So if you could turn to the next page,
14  Page 5, item No. 6 at the top.  That reads, "Will we
15  issue election certificates to home-bound applicants?"
16      A.  Uh-huh.
17      Q.  The answer to that is no.  Is that -- so DPS
18  employees are trained not to issue EICs to home-bound
19  applicants; is that correct?
20      A.  That's correct under these circumstances.
21      Q.  What are the particular circumstances?
22      A.  If a person is home bound, they could be
23  voting by mail; and an EIC would not be required.  If
24  they insist on a voter ID, then we will consider their
25  case on an individual basis and do a home-bound visit.

263

1       Q.  Is there anything in this training that says
2   that that would be considered on an individual basis?
3       A.  No.
4       Q.  So how would individual employees have that
5   information?
6       A.  That's -- when they get the request, the
7   regional manager or the office manager makes that
8   decision.
9       Q.  How would they know to elevate it?
10      A.  How would who know to elevate?
11      Q.  How would a CSR know if the stated policy is
12  that EICs are not issued to home-bound applicants?
13      A.  The CSR doesn't make the decision on a
14  home-bound visit.  Supervisors make those decisions and
15  then make the assignment.
16      Q.  Okay.  If you could turn to the -- or go to
17  the bottom of this page.  Question No. 13, "Will
18  renewal notices for an election certificate be sent to
19  card holders?"
20      And is it DPS' policy that renewal
21  notices for an election certificate are not sent to EIC
22  holders?
23      A.  I don't know the answer to the question.  We
24  haven't -- we're not that far along in the process.  I
25  know what -- what the training document says.

264

1       Q.  Is there anything that says something
2   different from this training document?
3       A.  Not that I'm aware of.
4       Q.  Are renewal notices sent to individuals with
5   driver licenses?
6       A.  Yes.
7       Q.  Are renewal notices sent to individuals with
8   photo identification?
9       A.  I believe they are.
10      Q.  What is the reason for the difference in
11  policy?
12      A.  I don't know.
13      Q.  Is there a reason?
14      A.  I don't know.
15      Q.  Would you agree that this makes it more
16  difficult for someone with an EIC to renew than someone
17  with a driver license because they are not informed of
18  its expiration?
19      A.  I don't know why it would make it more
20  difficult.  The requirements for renewal would be the
21  same whether they get notified or not.
22      Q.  So why are individuals with driver licenses
23  notified, because it's a convenience to them?
24      A.  Well, yeah.
25      Q.  Okay.  Can you turn to Page 7, please?  This

269

1   had made numerous contacts with the counties and had
2   some idea who had indicated an interest at that point
3   in participating.
4       Q. So on the letter that you attached to this
5   e-mail in the second half of the page, it outlines DPS
6   responsibilities and county responsibilities, correct?
7       A. Yes.
8       Q. Do you believe this is an accurate
9   representation of the division of responsibilities
10  between DPS and the county?
11      A. Yes, I do.
12      Q. So was either DPS or the county responsible
13  for publicizing the times and locations of the mobile
14  units?
15      A. Yes.
16      Q. Who was responsible?
17      A. DPS.
18      Q. Does that appear in the DPS responsibilities?
19      A. I don't recall that it's in this particular
20  document.
21      Q. But it's your testimony that DPS was
22  responsible for publicizing the times and locations of
23  the mobile EIC units?
24      A. Yes, except for those counties that were doing
25  it five days a week.

270

1       Q. So what form did that publication take?
2       A. I don't remember.
3       Q. You don't know how DPS informed --
4       A. Oh, how?
5       Q. -- the public?
6       A. Oh, yes. Press releases, social media feeds.
7       Q. Anything else?
8       A. I'm not aware of them.
9       Q. Okay. If you can look under "DPS
10  Responsibilities," the fourth bullet point is -- reads,
11  "Upon successful completion of a six-hour training
12  course, DPS will issue mobile EIC station equipment to
13  county personnel for return to their respective
14  counties."
15          What was successful completion of the
16  course? What did that constitute?
17      A. That constituted them completing this six-hour
18  training course.
19      Q. So successful completion just means sitting
20  through the course?
21      A. Yes.
22      Q. Did they have to take a test at any point to
23  demonstrate knowledge of the material?
24      A. They demonstrated the fact that they knew how
25  to set the equipment up and how to operate the

271

1   equipment. That was -- that was the only practical
2   test.
3       Q. Was part of the training whether or -- was
4   part of the training whether or not individuals were --
5   met the eligibility criteria for receiving an EIC or --
6   yeah.
7       A. I'm not sure I understand your question.
8       Q. You mentioned tests on practical factors such
9   as setting up the technology, correct?
10      A. Uh-huh. Uh-huh.
11      Q. Were county officials also tested on whether
12  or not they understood the EIC eligibility criteria?
13      A. I don't know.
14      Q. Were county officials ever issuing EICS in the
15  absence of DPS employees?
16      A. They could.
17      Q. But you don't know whether they were actually
18  trained on who could get an EIC?
19      A. Oh, yes. But I thought your question was:
20  Did county officials ever issue an EIC?
21      Q. No, I'm sorry. If that's what I said, I
22  misspoke.
23          I was asking whether county officials
24  were trained on the eligibility criteria for EICs.
25      A. Yes.

272

1       Q. Were they ever tested to make sure that they
2   understood the eligibility criteria?
3       A. Not that I'm aware of.
4       Q. Before we leave this document, if you could
5   flip to Page 2. It's actually Page 5 of the document,
6   but it has Page 2 at the bottom.
7          Is this an accurate list of all the
8   training locations and dates for county officials who
9   were issuing EICs in 2013?
10      A. I have no reason to believe that it's not.
11      Q. Are any such trainings scheduled for 2014?
12      A. Not that I'm aware of.
13      Q. Have there already been any trainings for
14  county officials?
15      A. Yes, there have. Yes, there have.
16      Q. When did those take place?
17      A. I don't recall the dates.
18      Q. Do you have a document that would give us that
19  information?
20      A. There are documents that would -- that
21  would -- that would document the training and where it
22  was conducted and by whom.
23      Q. Do you know whether those document were turned
24  over?
25      A. No, I don't.

JOE PETERS                                                    4/30/2014

277

1     **A.  I don't know.**
2     Q.  Do you know what -- were county officials
3     required by DPS to read the manual as part of the
4     training?
5     **A.  I don't know that either.**
6     Q.  So you mentioned before an appendix to
7     documents.  If you could turn to what is Appendix G.
8     **A.  "G" as in George?**
9     Q.  "G" as in George," which is located at Page
10    TexIR 303.  So this appendix outlines the primary
11    identification, secondary identification, and
12    supporting identification documents that are accepted
13    for an EIC, correct?
14    **A.  Yes.**
15        **(Exhibit No. 57 marked.)**
16        MS. CLARK:  Thank you.
17    Q.  (BY MS. CLARK)  The second document I just
18    handed you is a printout from Texas DPS's website from
19    a page entitled, "Election Identification Certificates,
20    EIC Documentation Requirements," is that correct?
21    **A.  Yes.**
22    Q.  And this -- if you can see through the staple,
23    this printout is date stamped 4/27/2014, correct?
24    **A.  Yes.**
25    Q.  So if you can look at the second page of the

278

1     website printout, at the top, it says "Primary
2     Identification"?
3     **A.  Yes.**
4     Q.  "Applicants can present one primary document."
5         What are the documents that are listed
6     there?
7     **A.  "Texas driver's license or personal**
8     **identification card issued to the person that has been**
9     **expired for 60 days and is within two years of**
10    **expiration may be presented as primary identification."**
11    Q.  And going back to Exhibit G, does that list
12    the same documents for --
13    **A.  Going back to where?**
14    Q.  Exhibit G from the other document we were --
15    I'm sorry.  Appendix G from the other document we were
16    just looking at.
17    **A.  Okay.  And what's your question?**
18    Q.  Whether the primary identification matches the
19    one that appears on your website?
20    **A.  The website doesn't mention an American Indian**
21    **card, I872.**
22    Q.  Does it mention a Northern Mariana card, I873?
23    **A.  It does not.  It does not.**
24    Q.  What accounts for the discrepancy?
25    **A.  I don't know.**

279

1     Q.  Which one is correct?
2     **A.  I believe the appendix is correct.**
3     Q.  So the website is presenting incorrect
4     information?
5     **A.  Well, it's incomplete.**
6     Q.  Incomplete information.
7         So were DPS employees trained to accept
8     an American Indian card as form of primary
9     identification?
10    **A.  I can't tell you that they were.**
11    Q.  Were they trained to accept a Northern Mariana
12    card?
13    **A.  I can't tell you that they were.**
14    Q.  Can you go to the secondary identification
15    category?
16    **A.  On which document?**
17    Q.  On the website printout, please.
18    **A.  Okay.**
19    Q.  And if you could compare the documents listed
20    there as acceptable secondary identification to the
21    ones listed on -- in Appendix G.
22    **A.  Okay.**
23    Q.  Are they the same?
24    **A.  There's an omission in the website with**
25    **respect the DHS -- or the Department of State Health**

280

1     **Services record of birth issued only for the purpose of**
2     **obtaining an EIC.**
3     Q.  So is it correct that the Texas Department of
4     State Health Services record of birth issued only for
5     the purpose of obtaining an EIC is an acceptable form
6     of secondary identification for an EIC?
7     **A.  It is.  It is.**
8     Q.  Why is the website not updated to reflect
9     that?
10    **A.  Someone just didn't update it.**
11    Q.  Do you know whether there's any information on
12    DPS's website about this EIC birth certificate?
13    **A.  I'm not aware.**
14    Q.  You're not aware of any?
15    **A.  I'm not aware of any on the website.**
16    Q.  Do you know if DPS did any publication or
17    otherwise attempted to raise public awareness of the
18    EIC birth certificate?
19    **A.  I'm not aware of any.**
20    Q.  Thank you.
21        So I would like to transition a little
22    bit into talking about outreach and assistance to the
23    public as well as public education.
24    Q.  Does DPS have a campaign to advertise the
25    EIC issuance program?

JOE PETERS                                                4/30/2014

---

281

1    A.  I don't know that I could classify it as a
2    campaign.  There is an effort -- an ongoing effort to
3    keep the public apprised of the availability of EICs
4    and where they can obtain them and when they obtain
5    them and what they need to obtain one.
6        Q.  So what are the primary venues in which that
7    information is publicized?
8        A.  Press releases.
9        Q.  That's the primary?
10       A.  That's the primary.
11       Q.  So where are your press releases published?
12       A.  Whoever picks them up.  They're sent out
13   statewide by our media office.  And then if a -- if a
14   publication or an electronic media outlet chooses to
15   use them, it's up to them.  Many of them do, as a
16   matter of fact.
17       Q.  So how many, on average, pick up your press
18   releases?
19       A.  I don't have a clue.
20       Q.  Does DPS encourage media companies to pick up
21   their press releases particularly with regards to the
22   EIC program?
23       A.  I don't know that they're particularly
24   encouraged.  They're provided the information, and it's
25   up to them to use it or not.

---

282

1        Q.  Are there any other forms that your -- that
2    your EIC public education program takes outside of
3    press releases?
4        A.  Social media.
5        Q.  What does that consist of?
6        A.  I know they have a Twitter feed.  I think
7    there's a Facebook page.  But again, media and
8    communications would be the ones to answer the
9    question.
10       Q.  And would the best person from media and
11   communications to answer that question be Katherine
12   Sessinger?
13       A.  It would.
14       Q.  Okay.  So how much money was budgeted in 2013
15   to publicize the EIC program?
16       A.  None that I'm aware of.
17       Q.  No money was budgeted for that?
18       A.  Well, not that I'm aware of; but I'm also not
19   familiar with the media and communications budget.
20       Q.  So Ms. Sessinger would be?
21       A.  Yes.
22       Q.  Thank you.
23           Were there any particular groups or
24   populations targeted by DPS for EIC public education?
25       A.  No, not that I'm aware of.

---

283

1        Q.  Has DPS made any attempts to evaluate
2    saturation of the message about the EIC among the
3    public?
4        A.  Not that I'm aware of.
5        Q.  Has DPS set up a hotline to field calls on the
6    EIC?
7        A.  Specifically for EIC?
8        Q.  Yes, first that.
9        A.  No, not that it was advertised; but anyone can
10   call the call center and get information on EIC's,
11   driver's license or ID cards or anything else DPS, for
12   that matter.
13       Q.  So it's one hotline number?
14       A.  Yes.
15       Q.  But was that hotline number advertised in --
16   or publicized in any press releases or anything else
17   specifically pertaining to EICs?
18       A.  I don't remember specifically that it was in
19   the press releases.  I believe there is a "for further
20   information" contact.  And on some of them that number
21   was published.  Now, whether the outlets picked it up
22   or not was up to them.
23       Q.  That's up to the outlet, that's not DPS?
24       A.  Yeah.  Yeah.
25       Q.  Does DPS -- do DPS offices have designated

---

284

1    lines for individuals seeking EICs?
2        A.  No.
3        Q.  How is that decision arrived at?
4        A.  How was the decision not to provide EIC
5    dedicated lines?
6        Q.  Yes.
7        A.  There was just -- there was no decision made
8    not to provide them.  We already have telephone lines
9    available for anything involving DPS or a driver's
10   license.
11       Q.  I'm sorry.  I was unclear.  I meant any
12   windows at the offices or lines as an actual.  You --
13       A.  Oh, I thought you were talking about telephone
14   lines.  I'm sorry.
15       Q.  Sorry.  That was unclear.
16       A.  No, there's not an EIC line in a driver's
17   license office, if that's your question.
18       Q.  Yes.
19       A.  No.
20       Q.  And how was that decision arrived at?
21       A.  Volume.
22       Q.  So that decision was arrived at after EICs
23   were already being issued?
24       A.  Yes.
25       Q.  And that was because DPS decided that not

JOE PETERS                                                    4/30/2014

285

1   enough people were coming in to warrant a separate
2   line?
3        A.   Yeah.  We couldn't -- we couldn't afford to
4   dedicate a customer service representative to an empty
5   line.
6        Q.   So would an individual who did come in for an
7   EIC be somehow expedited, even if there isn't a
8   separate line?
9        A.   Well, to the extent that -- that an office has
10  a queuing system that would indicate what they're there
11  for and then they would be directed to the appropriate
12  line.  And that appropriate line may be the original
13  application line depending on what the volume of
14  customers is at the time the applicant comes in.
15  They're dynamically allocated.
16       Q.   That's at larger DPS offices?
17       A.   Those offices that have queuing systems in
18  place.
19       Q.   Are those larger offices?
20       A.   Typically, yes.
21       Q.   Okay.
22            (Exhibit No. 58 marked.)
23       Q.   (BY MS. CLARK)  So this document is a poster
24  that says, "Election Identification Certificates
25  Available Here."  Is that correct?

286

1        A.   Yes.
2        Q.   Where is this displayed?
3        A.   These were typically displayed as door signs
4   on the front of the -- or the entrance to the driver's
5   license offices or the mobile stations.
6        Q.   Or the mobile stations?
7        A.   Yeah.  This was developed for the driver
8   license offices.  And I can't say they used the same
9   signs for the mobile stations 'cause they had banners.
10       Q.   Okay.  So did --
11       A.   And -- I'm sorry.  Go ahead.
12       Q.   No.  Go ahead.
13       A.   And I don't remember for sure, but I believe
14  this is the same format for the banners.
15       Q.   Where were the banners displayed?
16       A.   Outside the building.
17       Q.   Outside of DPS offices?
18       A.   Yes.  And if -- in the case of the mobile
19  stations, if it could be displayed outside the
20  building, it was; otherwise, it was inside the building
21  near the issuance point.
22       Q.   Okay.  So did DPS headquarters distribute this
23  sign and the banner that looks similar to this sign to
24  local offices?
25       A.   We did not distribute them from the

287

1   headquarters building.  We authorized the local offices
2   to have them printed at local prints shops.
3        Q.   So it was up to the local offices as to
4   whether or not they wanted to display them?
5        A.   No.  They -- they were required to display
6   them.  It was up to them to get them printed, and that
7   was done in order to save time and shipping costs.
8        Q.   Were -- did headquarters -- in addition to
9   requiring the offices to display them, did they tell
10  them where to display them or how many to put up in a
11  particular office?
12       A.   I don't recall the specifics of where they had
13  to -- what they were told about where they had to
14  display them.
15       Q.   Did -- were these documents displayed anywhere
16  other than DPS offices and potentially at mobile EIC
17  issuing units?
18       A.   I'm not aware.  I think the -- well, mobile
19  stations for the Secretary of State used them.  I don't
20  know who else would have.
21       Q.   Was any effort made to put these posters in
22  places such as community centers or non-DPS-affiliated
23  offices?
24       A.   Only if there was a mobile station there.
25       Q.   So are people who come to a DPS office more

288

1   likely to have ID than people who go to other places?
2        A.   (No verbal response.)
3        Q.   If someone is coming to a DPS office, are they
4   likely to already have ID?
5        A.   I can't answer the question.  I don't know.
6        Q.   Okay.  Was there any -- did you speak with any
7   politicians, local community leaders, anybody else
8   about whether they would be interested in displaying
9   this or similar signage?
10       A.   I did not.
11       Q.   Did DPS?  I'm sorry.
12       A.   I don't know whether they were or not.
13       Q.   Was this document produced in Spanish as well?
14       A.   It was.
15       Q.   Are your press releases also written in
16  Spanish?
17       A.   I've not seen one in Spanish, and I can't tell
18  you whether they were.
19       Q.   Do Spanish language media outlet's pick up
20  your press releases?
21       A.   They do.
22       Q.   Was there targeting of your press releases at
23  Spanish language media outlets?
24       A.   No.
25       Q.   Does DPS Tweet in Spanish?

JOE PETERS                                                    4/30/2014

73 (Pages 289 to 292)

289

1    A.  Do we what?
2    Tweet in Spanish?
3    A.  I don't know.
4    Q.  Do you Facebook post in Spanish?
5    A.  I don't know that either.
6    Q.  Thank you.
7    A.  I'm not a Facebook person or a Twitter person.
8    Q.  Fair enough.
9        (Exhibit No. 59 marked.)
10   Q.  (BY MS. CLARK)  So this is an e-mail.  The
11   second e-mail from the top on this page is an e-mail
12   from Keith Ingram to Joyce Cohen entitled, "Mobile
13   EIC."  Is that correct?
14   A.  Yes, it is.
15   Q.  Do you know who Keith Ingram is?
16   A.  Yes, I do.
17   Q.  Who is he?
18   A.  He's with the Secretary of State's office.
19   Q.  Who is Joyce Cohen?
20   A.  I don't know who that is.
21   Q.  Okay.  So in this e-mail Keith Ingram says,
22   "We think during business hours is better."
23       Do you see that?
24   A.  Where are you?
25   Q.  The second e-mail from the top of the page.

290

1    A.  Okay.
2    Q.  Where he starts with the line, "Excellent."
3    And in the middle of that line he says, "We think
4    during business hours is better."
5        Do you see that?
6    A.  Yes, I do.
7    Q.  So do you agree that he seems to be responding
8    to a question about the hours for a county unit issuing
9    EICs?
10   A.  One could assume that, but I don't know what
11   he was intending to do.
12   Q.  You didn't -- I know you weren't on this
13   e-mail.
14   A.  Correct.
15   Q.  But is that your understanding of what he is
16   talking about?
17   A.  Based on what I read, yes.
18   Q.  Okay.  Did -- does DPS -- did DPS prefer to
19   operate the mobile units during business hours?
20   A.  Well, we would have preferred to operate them
21   during business hours just because we -- it was more
22   convenient for all concerned.
23   Q.  Who is "all concerned"?
24   A.  The applicants, the staff.
25   Q.  So it's your testimony --

291

1    A.  The facilities.  You know, we had a county
2    facility, for example, that was not open after regular
3    business hours.  That would have been a problem.
4    Q.  So it was more convenient for DPS staff for
5    them -- for the units to be open during business hours?
6    A.  Well, that's part of the reason.
7    Q.  And you believe it was also more convenient
8    for applicants for the mobile unit to be open during
9    business hours?
10   A.  Possibly.
11   Q.  Did DPS consider whether it would be more
12   convenient for the applicants to be able to get an EIC
13   in the evening?
14   A.  We did.
15   Q.  So what leads you to say now that business
16   hours is more convenient for the applicants?
17   A.  I don't know.  I just -- that was my
18   assumption that, you know, they're accustomed to doing
19   business during business hours and not necessarily
20   accustomed to trying to get business done after
21   business hours.
22   Q.  Even if they also have their own business,
23   such as work, during business hours?
24   A.  Yes.
25   Q.  Was there any consideration given to whether

292

1    weekends might be more convenient for people?
2    A.  Yes, there was.
3    Q.  And were mobile EIC units run on weekends?
4    A.  I believe there were some that were run on
5    weekends, but I can't tell you when or where.
6    Q.  Is there a document that would catalog which
7    mobile EIC units were run on weekends?
8    A.  If -- if they were run on weekends, yes, there
9    would be.
10   Q.  But you don't know that they were?
11   A.  No.
12   Q.  Who at DPS would know?
13   A.  Probably Mr. Rodriguez would be the best since
14   he created the matrix that showed all of those
15   locations and times.
16   Q.  Would Mr. Rodriguez also be able to testify
17   about whether there were any mobile EIC units that were
18   run after -- outside of business hours during the week?
19   A.  Yes, he would.
20   Q.  He would.  Okay.  Thank you.
21       MR. KEISTER:  One at a time.  She keeps
22   looking at me.
23       MS. CLARK:  Sorry.
24       THE WITNESS:  Well, she needs to just
25   kick me.

293

1    Q.  (BY MS. CLARK)  So is it accurate then to say
2    that DPS believed during business hours it was better,
3    too?
4    A.  Yes.
5    Q.  Thank you.
6        (Exhibit No. 60 marked.)
7        MR. KEISTER:  Thank you.
8    Q.  So the document that I just
9    handed you is entitled, "Media Publication Outreach
10   Election Identification Certificates."
11       Is that right?
12   A.  Yes.
13   Q.  Does this -- and this document reports to
14   cover the times between August 30th, 2012 and
15   February 14th, 2014; is that right?
16   A.  Correct.
17   Q.  Does this represent the entirety of DPS'
18   public education and outreach campaign as to EIC
19   issuance?
20   A.  I can't answer the question with any assurance
21   of accuracy that this represents all of the outreach
22   efforts.  And the media office would be the best ones
23   to answer that question.
24   Q.  How did DPS arrive at its media and public
25   outreach campaigns?

294

1    A.  I don't know.
2    Q.  Does DPS have an statutory obligation under
3    S.B.14 to advertise or otherwise publicize the EIC
4    campaign?
5    A.  Not that I'm aware of.
6    Q.  Is there any other formal requirement that DPS
7    do so?
8    A.  Not that I'm aware of.
9    Q.  Does DPS have any obligation to publicize the
10   EIC program?
11   A.  Maybe a moral and ethical obligation, but no
12   written.
13   Q.  Is there another entity other than DPS who is
14   more responsible in educating the public -- for
15   educating the public about EIC?
16       MR. KEISTER:  Objection, form; calls for
17   speculation.
18       THE WITNESS:  I don't know.
19   Q.  (BY MS. CLARK)  So you haven't seen any
20   documents that would indicate who has that
21   responsibility?
22   A.  No.
23       MS. CLARK:  All right.  I pass the
24   witness.  Thank you.
25       MS. RUDD:  Let's go off the record.

295

1        MS. CLARK:  Okay.
2        THE REPORTER:  Off the record.
3        (Recess from 4:08 p.m. to 4:15 p.m.)
4        THE REPORTER:  Back on the record.
5    Q.  (BY MS. CLARK)  So I just want to visit a
6    couple of things that we talked about.  First, going
7    back to employee training within DPS, I think you
8    testified earlier that if an employee was not trained
9    on EIC issuance, then they weren't permitted to issue
10   an EIC; is that correct?
11   A.  Correct.
12   Q.  So if an employee wasn't trained on EIC
13   issuance, were they not permitted to then work their
14   next shift?
15   A.  I'm not sure I understand your question.
16   Q.  So --
17   A.  If they weren't trained.
18   Q.  Yes.  On EIC issuance.
19   A.  Uh-huh.
20   Q.  Then your testimony is that they would not be
21   allowed to issue EICs; is that right?
22   A.  Correct.
23   Q.  How would -- how is that monitored?
24   A.  The supervisors would be monitoring that.
25   Q.  Would they be monitoring that by not allowing

296

1    them to work?
2    A.  They -- no.  They're still -- they can still
3    issue or process driver license transactions and ID
4    card transactions.
5    Q.  So is it true, then, that no employee can
6    issue an EIC without first going to their supervisor?
7    A.  Well, they have to be trained.
8    Q.  But how does -- I understand that.
9    A.  The supervisor has the capability of
10   monitoring what a customer service representative is
11   doing at their station, and it would be kind of an
12   audit process where they take -- excuse me -- a sample
13   of who is doing what.
14   Q.  So you're saying, then, that any employee that
15   had not been trained on EICs after the point at which
16   Texas began issuing the EICs, would have been
17   consistently audited and monitored until they were
18   trained?
19   A.  No.  That's not what I'm saying.
20   Q.  Then how would there -- how would it be
21   prevented that they would encounter a customer seeking
22   an EIC?
23   A.  It wouldn't necessarily be prevented, that I
24   know of, you know; but the employees are told that they
25   would not be able to issue EICs.  But I'm not aware of

JOE PETERS                                                    4/30/2014

313

1     Q.   And the only reference to the Transportation
2   Code that I can find is Section 521.142.  It just says,
3   "The Department may require each applicant for an
4   original or renewal election identification certificate
5   to furnish to the Department the information required
6   by that," Section 521.142.
7            Possibly that's what you're talking about
8   that?
9     A.   That's what I think I'm talking about.
10    Q.   I understand.  It's not a test.
11    A.   Okay.
12    Q.   I couldn't tell you the number in two minutes
13  from now.
14    A.   Yeah.
15    Q.   And in reviewing that section, I'll represent
16  to you that it has a lot of things that -- that are
17  mentioned; thumb print, photograph, signature, brief
18  description, things I've seen before; the sex, these
19  kind of questions.  And nowhere does it say anything
20  specific about their place of birth.  There is one
21  section that says "The Department" -- I believe it
22  says, "The Department" -- sorry -- "The application
23  must include other information the Department requires
24  to determine the applicant's identity, residency,
25  competency, and eligibility as required by the

314

1   Department or state law."  Sort of a fairly broad
2   question.  Is that possibly where maybe the authority
3   could come from?
4     A.   Yes, sir.
5     Q.   I left that wide open, didn't I?
6            Well, I'm wondering if the place of
7   birth, how that could impact or make a determination of
8   someone's identity.  I mean, just because you know
9   where they're born, would that somehow or another make
10  the department feel like:  I'm comfortable with that's
11  who they say they are, 'cause you know where they were
12  born?
13    A.   I can't answer the question.
14    Q.   Okay.  What about any of the others;
15  residency, competency, or eligibility?  I'm just trying
16  to understand why it would make any difference to the
17  department where you're born in order to get an EIC.
18    A.   I -- I don't have an answer for why where
19  you're born makes a difference.
20    Q.   Is that -- by the way, I assume -- or I don't
21  know, actually.  Is -- is the place of birth also
22  required in order to get a driver's license and any
23  other -- and the personal identification card?
24    A.   I believe it is.
25    Q.   Okay.  So if it is, then, this would just be

315

1   consistent with that?
2     A.   That's correct.
3     Q.   Okay.  By the way, on the website -- and I
4   referenced it earlier -- you would agree that -- that
5   that is one place that the public would get information
6   from; is that right?
7     A.   Correct.
8     Q.   So when you have this listing of your various
9   press releases, which may or may not be picked up by
10  news organizations and Tweets, certainly the Internet
11  itself and your website itself would be one place you
12  should be able to get information?
13    A.   Yes.
14    Q.   And -- and thus, why I'm asking about it,
15  because, obviously, this is a -- definitely one
16  location that the public would want to gather
17  information from.
18           Do you have any idea how many times the
19  public has accessed this information off the website?
20    A.   I don't.
21    Q.   If that information was kept, it would be kept
22  by the web department, media department, something like
23  that?
24    A.   Yes, sir.
25    Q.   In the break I showed you a page that if you

316

1   type in DPS and EIC, that's all you type.  I represent
2   to you that this one page comes up first or second
3   every time.
4     A.   Yes, sir.
5     Q.   Google.  Sorry.  Using the -- you know,
6   these -- an unknown quantity to Google, right, not
7   being the other ones are.  And I showed you that at the
8   break, and I'm not going to test you on it.  I just
9   wanted you to look it over very briefly, and I don't
10  have a printout of it.  But I'll represent to you that
11  it says -- and this is the final thing.  Okay?  Final
12  topic.
13           It says that -- that if you're using a
14  name other than what's on your birth certificate, for
15  example, your married name, you will be required to
16  show legal documentation of your name change.  I'm just
17  reading right off the website.
18    A.   I understand.
19    Q.   "Documents must be original certified.  No
20  photocopies may be accepted.  Acceptable documents are:
21  one, marriage license; two, divorce decree; or three,
22  court ordered name change."  I'll represent to you that
23  that's the information I got.
24           Does that sound like accurate information
25  to you that DPS would want to put out?

JOE PETERS                                                              4/30/2014

321

1   contact with the Secretary of State's office.
2       Q.  Okay.  Are you currently tracking issuance of
3   election identification certificates?
4       A.  Yes.
5       Q.  Statewide?
6       A.  Yes.
7       Q.  By region?
8       A.  Yes.  Even by zip code.
9       Q.  Are you issuing any regional reports?
10      A.  As a statewide report.  We can issue a
11  regional report if it's required, yes.
12      Q.  Are the regions offering data to DPS centrally
13  on a weekly basis?
14      A.  They are -- they -- yes, they are.  They're
15  offering data daily.
16      Q.  Are they issuing any information specific to
17  mobile offices?
18      A.  Is DPS issuing the information?
19      Q.  The regions offering it to central DPS.
20      A.  Yes.  If -- when -- when a mobile office
21  issues an EIC --
22      Q.  Uh-huh.
23      A.  -- that data comes back to a driver license
24  office for upload into driver license system, and it's
25  at that point that it's reported to headquarters.

322

1       Q.  Are there any summary reports?
2       A.  Of -- of those --
3       Q.  Of those EIC issuances?
4       A.  Yes.
5       Q.  Are you currently tracking interactions with
6   individuals who come to DPS or a mobile station seeking
7   an EIC that do not result in an issuance of an EIC?
8       A.  Yes.  We know how many people came in and
9   actually made an application and for whatever reason
10  didn't get one.
11      Q.  And is that, again, a statewide report?
12      A.  Yes, it is.
13      Q.  Does that name the individuals who came in?
14      A.  In some cases it does.  Those that -- when an
15  application is made and accepted and a receipt is
16  issued and it comes to quality assurance?
17      Q.  Uh-huh.
18      A.  Then, yes, we track -- we have those names.
19      Q.  Sorry to add another -- one last exhibit.
20          (Exhibit No. 62 marked.)
21      Q.  (BY MR. FREEMAN)  Have you seen Exhibit 62
22  before?
23      A.  Yes, I have.
24      Q.  And Exhibit 62, am I correct that that's
25  present as of -- when only 53 EICs had been issued?

323

1       A.  Yes, sir.
2       Q.  Has that been updated since?
3       A.  Yes, it has.
4       Q.  One last question.  And this actually
5   something that I think Robert was trying to get at.
6          Can an EIC be obtained without proof of
7   Texas residence?
8       A.  Yes, I believe it can.
9       Q.  Okay.
10          MR. FREEMAN:  Then I pass the witness.
11          MR. DUNBAR:  No more than five minutes, I
12  promise.  Probably less.
13          FURTHER EXAMINATION
14  BY MR. DUNBAR:
15      Q.  And I apologize if I asked before.  I wanted
16  to the make sure the record is clear.
17          Has DPS at any time done a study or
18  analysis of expected demand for EICs?
19      A.  No, sir.
20      Q.  So as of today sitting here, there are no
21  internal documents that look forward predicting what
22  demand will be for EICs?
23      A.  Not that I'm aware of.
24      Q.  Okay.  And you've testified at today, I think,
25  in several different contexts, that references to MDILs

324

1   and that not that many people have applied for EICs; is
2   that correct?
3       A.  Yes.
4       Q.  Is that surprising to you that demand for EICs
5   has been what you would qualify as low?
6       A.  Does it surprise me that it's low?
7       Q.  Does it surprise DPS?
8       A.  Well, to some extent.  I mean, we really
9   didn't have a feel for how many were going to apply.
10      Q.  And I take it -- well, I shouldn't say it that
11  way.
12          Let me ask it this way.  In your view, is
13  the result of low applications for EICs a result of
14  DPS' failure to engage in appropriate outreach?
15      A.  No.
16      Q.  In your view, is the low demand for EICs to
17  date, again, low demand in your view, the result of
18  DPS' failure to ameliorate the burdens of obtaining an
19  EIC?
20      A.  No.
21      Q.  Okay.  So in DPS' view, DPS has done
22  everything right, yet demand for DPS applications has
23  been low.
24          Is that an accurate summary of DPS' view?
25      A.  Yes.

REPRESENTATIVE DEBORAH RIDDLE
HIGHLY CONFIDENTIAL

6/18/2014

1 (Pages 1 to 4)

**1**

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,      )
                Plaintiffs,   )
 4                            )
        v.                    ) Civil Action
 5                            ) No. 2:13-cv-193(NGR)
    RICK PERRY, et al.,       )
 6                Defendants. )
    _____  )
 7                            )
    UNITED STATES OF AMERICA, )
 8       Plaintiff,           )
                              )
 9  TEXAS LEAGUE OF YOUNG     )
    VOTERS EDUCATION FUND,    )
10  et al.,                   )
                              )
11       Plaintiff-           ) Civil Action
          Intervenors,        ) No. 2:13-cv-263(NGR)
12                            )
    TEXAS ASSOCIATION OF      )
13  HISPANIC COUNTY JUDGES AND)
    COUNTY COMMISSIONERS,     )
14  et al.,                   )
         Plaintiff-           )
15        Intervenors,        )
                              )
16       v.                   )
                              )
17  STATE OF TEXAS, et al.,   )
            Defendants.       )
18  _____  )
19
             <<<<<HIGHLY CONFIDENTIAL>>>>>
20
21  ********************************************
22            ORAL DEPOSITION OF
23       REPRESENTATIVE DEBORAH RIDDLE
24              JUNE 18, 2014
25  ********************************************
```

**2**

```
 1       ORAL DEPOSITION of REPRESENTATIVE DEBORAH
 2  RIDDLE, produced as a witness at the instance of the
 3  Plaintiffs and duly sworn, was taken in the
 4  above-styled and numbered cause on June 18, 2014, from
 5  9:14 a.m. to 2:55 p.m., before Denyce M. Sanders, CSR,
 6  RPR, CRR, TCRR, in and for the State of Texas,
 7  recorded by machine shorthand, at the offices of
 8  Riddle & Akiens, 4201 Cypress Creek Parkway, Suite
 9  550, Houston, Texas, pursuant to the Federal Rules of
10  Civil Procedure and the provisions stated on the
11  record or attached hereto; signature having been
12  waived.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1              A P P E A R A N C E S
 2
    FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 3
       U.S. DEPARTMENT OF JUSTICE
 4     Civil Rights Division
       950 Pennsylvania Avenue, NW - NWB Room 7254
 5     Washington, D.C.  20530
       Mr. Bruce Gear
 6     202.305.4355
       bruce.gear@usdoj.gov
 7
    FOR THE PLAINTIFFS TEXAS STATE CONFERENCE OF NAACP
 8  BRANCHES, MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE
    TEXAS HOUSE OF REPRESENTATIVES:
 9
10     DECHERT LLP
       902 Carnegie Center, Suite 500
11     Princeton, New Jersey  08540
       Mr. Ezra D. Rosenberg
12     609.955.3200
       ezra.rosenberg@dechert.com
13
              -AND-
14
       500 W. 6th Street, Suite 2010
15     Austin, Texas  78701
       512.394.3000
16     lindsey.cohan@dechert.com
       Ms. Lindsey B. Cohan
17
              -AND-
18
       NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
19     40 Rector Street, 5th Floor
       New York, New York 10006
20     Mr. Deuel Ross - via telephone
       212.965.2200
21     dross@naacpldf.org
22
              -AND-
23
24
25            -CONT'D-
```

**4**

```
 1
       LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
 2     1401 New York Avenue, N.W., Suite 400
       Washington,D.C.  20005
 3     Ms. Sonia Kaur Gill - via telephone
       202.319.1000
 4     sgill@lawyerscommittee.org
       Ms. Erandi Zamora - via telephone
 5     ezamora@lawyerscommittee.org
 6
    FOR THE DEFENDANT TEXAS LEAGUE OF YOUNG VOTERS
 7  PLAINTIFF-INTERVENORS:
 8     WILMER CUTLER PICKERING HALE AND DOOR, LLP
       1875 Pennsylvania Avenue, NW
 9     Washington, D.C.  20006
       Ms. Tania Faransso
10     202.663.6262
       tania.faransso@wilmerhale.com
11
12
    FOR THE DEFENDANTS:
13
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
14     Consumer Protection Division
       808 Travis, Suite 1520
15     Houston, Texas  77002
       Ms. Rosemarie Donnelly
16     713.225.8919
       rosemarie.donnelly@texasattorneygeneral.gov
17
18  FOR THE DEFENDANTS RICK PERRY, STATE OF TEXAS, NANDITA
    BERRY, AND THE DEPARTMENT OF PUBLIC SAFETY:
19
20     OFFICE OF THE ATTORNEY GENERAL
       TORT LITIGATION DIVISION
21     P.O. Box 12548, Capitol Station
       Austin,Texas  78711
22     Mr. John Scott
23
24
25
```

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

4 (Pages 13 to 16)

---

**13**

1    like I said, with all the grandchildren and
2    everything, by the end of the day, I was too tired to
3    read anything.  Have you ever been so tired your eyes
4    crossed?  So I did not -- I did not read it.  I should
5    have, but I did not.
6        Q.  Other than reading or glancing or whatever at
7    the transcript, did you review any other documents in
8    preparation for the deposition?
9        A.  No, sir.
10       Q.  Let me show you a document which I premarked
11   as Riddle Exhibit 1 [sic].
12           (Riddle Exhibit 148 marked/introduced.)
13       Q.  (BY MR. ROSENBERG)  Have you seen this
14   document?
15           MR. ROSENBERG:  And just for the record,
16   this is the subpoena to produce documents.
17       A.  I don't remember seeing it, if this was on
18   the -- what I looked at yesterday, I don't recall
19   seeing it.
20       Q.  Are you aware that in April of this year, a
21   subpoena was issued to you to produce documents in
22   connection with this case?
23       A.  I don't -- I don't -- I don't think so.  I
24   don't recall.
25       Q.  Do you recall undertaking a review of your

---

**14**

1    documents in order to collect documents for this case
2    this year?
3        A.  Are you referring to requests made of my
4    office?
5        Q.  Well, are you aware of any requests, either
6    to your office or to you, for the collection of
7    documents in connection with this case this year?
8        A.  There was a request made from my office, and
9    I suspect it was from you.  My chief of staff called
10   and said that y'all wanted various files and things to
11   review, and I said, "Just give them a key to the
12   office, they can have anything they want."
13       Q.  And who is your chief of staff?
14       A.  Shelton Green.
15       Q.  And do you recall when that conversation
16   occurred -- is Shelton a man, Mr. Green?
17       A.  Yes.
18           MR. SCOTT:  Keep going.
19           (Mr. Scott exits the room.)
20       Q.  (BY MR. ROSENBERG)  Do you recall when that
21   conversation occurred?
22       A.  No, sir.  I think it was a few months ago,
23   but I don't recall.
24       Q.  Do you know what documents were being
25   requested at that time?

---

**15**

1        A.  I believe that they were wanting any and all
2    bills that I had filed or worked with regarding the
3    voter photo ID issue.
4        Q.  Do you recall whether the request was more
5    extensive than just the bills but also covered
6    documents relating to the bills?
7        A.  I think they wanted absolutely everything.  I
8    think that I said, "Just let them have everything."  I
9    think they wanted notepads, Post-it notes, files, I
10   think they wanted computer access.  And I was a little
11   surprised, but I said, "I have nothing to hide.  Let
12   them have anything they want.  Just give them a key to
13   the office and they can have at it."
14       Q.  Do you know whether documents were produced
15   pursuant to that -- those requests?
16       A.  I believe they were.
17       Q.  What e-mail service -- servers do you use for
18   purposes of your correspondence?
19       A.  I have no idea.  I -- I have my iPad, and the
20   State -- my staff pretty much handles my State e-mail.
21           (Mr. Scott enters the room.)
22       A.  And my server at home is down, and I have no
23   idea what server that is, but I don't -- that's just
24   for my personal --
25       Q.  Do you --

---

**16**

1        A.  -- communication and campaign.
2        Q.  I'm sorry.  I don't mean to interrupt, and if
3    at any time I interrupt, please tell me I'm
4    interrupting you.
5            Do you use -- do you know which e-mail
6    service you use for your personal e-mail?  Is it AOL
7    or Yahoo or Gmail?
8        A.  I don't know.  I have to ask my son.  But
9    my server has been down so long, I've not even been
10   able to send anything out.  You're welcome to look at
11   my iPad.  I've got it in my office.  You can tell I've
12   not sent anything out.
13           I've received e-mails, but I've pretty much
14   let everybody know that I didn't know why I couldn't
15   send anything out from my personal.  My son said it's
16   because there's something wrong with my server, but,
17   quite frankly, I haven't had time to deal with it.
18   And as far as e-mails with my office, my staff handles
19   that.
20       Q.  Do you ever use your personal e-mail, before
21   your server -- your personal server went down for
22   conducting any State business in terms of
23   correspondence or e-mails relating to State business?
24       A.  No, sir.  And I can tell you why.  Because I
25   like everything having to do with the State on the

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

6 (Pages 21 to 24)

---

**21**

1    who live below the poverty line?
2        A.   Again, I don't look at those types of
3    statistics, sir.
4        Q.   I'm not even -- I'm not asking in terms of
5    statistics, just in terms of your general knowledge of
6    the district which you represent.
7        A.   The various subdivisions that the people live
8    in are families, for the most part, and they're
9    hardworking, God fearing, very patriotic people that
10   live in my district.  If they're below the poverty
11   line and if they call my office and need assistance,
12   then we give that assistance, sir.  But I don't do any
13   statistical analysis of who is above the poverty line
14   or who is not.
15       Q.   Okay.  I'd like to turn your attention to the
16   next document, which I premarked as Riddle -- well, as
17   I guess it's just Exhibit 149.
18            (Riddle Exhibit 149 marked/introduced.)
19       Q.   (BY MR. ROSENBERG)  And ask you if you can
20   identify this document just for the record.
21       A.   Yes, sir.  This is House Bill No. 1706.
22       Q.   And do you have a memory of what House Bill
23   No. 1706 is?
24       A.   We have so many bills every session, I'm not
25   even sure what session this is from.

---

**22**

1        Q.   Well, I'll turn your attention to the last
2    page, page 10, which said this act takes effect
3    September 1, 2005, and ask you if that refreshes your
4    recollection as to what session this is.
5        A.   I'm going to need to -- 2005, that must have
6    been my second session.  So then there 14 years.
7    I'm afraid I would need to read this in order to
8    recollect my -- have my memory click in here.
9        Q.   Well, I'd like you to turn your attention --
10   let's see if this helps you further your
11   recollection -- to page 4 of the document, "Section
12   63.0101.  Documentation of Proof of Identification."
13       A.   On what page?
14            MS. DONNELLY:  Let me interject here.
15            MR. ROSENBERG:  Sure.
16            MS. DONNELLY:  Representative Riddle, if
17   you need to read the document, feel free to do that.
18   Take the time to do that.
19       A.   I would really like to read the document,
20   please.
21       Q.   (BY MR. ROSENBERG)  Sure.  Go ahead.
22       A.   Okay.  What was your question?
23       Q.   Having reviewed the document, are you
24   familiar with this document?
25       A.   I -- I vaguely remember it, yeah.  It's been

---

**23**

1    a very long time.
2        Q.   And what do you remember about it?
3        A.   Looking at it, I can just tell you that it
4    was introduced.  I don't remember even if it came to a
5    vote, I don't recall.
6        Q.   And do you recall what the subject matter of
7    this bill was?
8        A.   I don't recall from my memory, but by looking
9    at the document, I can tell it has to do with
10   apparently presenting identification when one goes to
11   vote.
12       Q.   Do you recall whether you supported this
13   bill?
14       A.   I honestly don't recall the vote, if it -- I
15   don't even recall if it came to a vote; but if it came
16   to a vote, I suspect I did.
17            (Riddle Exhibit 150 marked/introduced.)
18       Q.   (BY MR. ROSENBERG)  I'm going to show you
19   another document, which we've marked as Riddle Exhibit
20   150, and ask you if you recall this document.  If
21   you've ever seen this document.
22       A.   Okay.  This takes effect in 2007.  This must
23   have been in my third session.  HB 101.  This, once
24   again, appears to be a bill regarding voters
25   presenting proof of identity.

---

**24**

1        Q.   And do you know who drafted this bill?
2        A.   Our legislative counsel at the capital
3    always -- usually always draft -- does the bill
4    drafting part.
5        Q.   Did you participate in the drafting of this
6    bill?
7        A.   As far as sitting down and writing it on a
8    legal pad or something like that?
9        Q.   How about asking for it to be drafted.
10       A.   Yes, sir, I have requested the draft.
11       Q.   And that's why your name is on the first
12   page?
13       A.   Yes, sir.
14       Q.   And are you considered the author of this
15   bill?
16       A.   Yes, sir.
17       Q.   And can you summarize what this bill
18   purported to do?
19       A.   I really cannot improve on the wording
20   itself, so it says, "a copy of a document providing
21   proof that the applicant is a United States citizen.
22   The following documentation is acceptable as proof of
23   citizenship...a birth certificate or other document
24   confirming birth that is admissible in a court of
25   law."

REPRESENTATIVE DEBORAH RIDDLE                          6/18/2014
HIGHLY CONFIDENTIAL

8 (Pages 29 to 32)

---

29

1    document says, because it is very clear what the
2    document has to say.  I cannot improve on the wording
3    that the document states.  If you want me to improve
4    upon it, that's impossible, because the document is
5    succinct, it's clear, it's underlined, it's easy to
6    understand.  I cannot improve upon what is here.
7        Q.  Okay.
8        A.  If you want me to do that, I can't do that.
9    I can't make it easier than it already is, sir.  And
10   so I'm going to have to go on legislative privilege,
11   because you're asking me to do something I -- I just
12   don't think is reasonable.
13       Q.  Well, I'm not exactly sure what your position
14   is, but I will move on and ask another question.
15       A.  Okay.
16       Q.  Paragraph 1 of -- on page 6 under 63.0101
17   states:  "a driver's license or personal
18   identification card issued to the person by the
19   Department of Public Safety or the equivalent agency
20   of another state that has not expired or that expired
21   no earlier than two years before the date of
22   presentation."
23           Did I read that correctly?
24       A.  Yes, sir.
25       Q.  And does that mean that one of the acceptable

---

30

1    documents of proof of identification under HB 101 was
2    a driver's license issued by either the Texas
3    Department of Public Safety, or that of any other
4    state, that has not expired or that expired no earlier
5    than two years before the date of presentation?
6        A.  According to Line 2 on page 6 of HB 101, it
7    states:  "The following documentation is an acceptable
8    form of photo identification under this chapter," and
9    then it goes down, "(1) a driver's license or personal
10   identification card issued to the" personal -- "person
11   by the Department of Public Safety or" -- and the part
12   that is underlined would be the new part of the
13   law -- "or the equivalent agency of another state that
14   has not expired or that expired no earlier than two
15   years before the date of presentation."
16       Q.  So was my reading correct?
17       A.  Your reading was correct.
18       Q.  Thank you.
19           In paragraph 3, it says:  "a valid employee
20   identification card that contains the person's
21   photograph and is issued by an employer of the person
22   in the ordinary course of the employer's business."
23           Did I read that correct?
24       A.  Yes, you read that correctly.
25       Q.  And in paragraph 6, it says:  "a student

---

31

1    identification card issued by a public or private
2    institution of higher education that contains the
3    person's photograph."
4           Did I read that correctly?
5        A.  Yes, sir, you read that correctly.
6        Q.  In paragraph 8 on the next page, it says:
7    "an identification card issued by a state agency of
8    this state that contains the person's photograph."
9           Correct?  Did I read that correctly?
10       A.  Would you please reread that?
11       Q.  Sure.
12       A.  I got distracted.
13       Q.  "An identification card issued by a state
14   agency of this state that contains the person's
15   photograph."
16           Did I read that correctly?
17       A.  Yes, sir, you read it correctly.
18       Q.  And paragraph 9 says:  "an identification
19   card that contains the person's photograph and is
20   issued by a county elections administrator or a county
21   clerk."
22           Did I read that correctly?
23       A.  Yes, sir, you did.
24       Q.  Then paragraph B deals with documentation
25   that is acceptable as proof of identification under

---

32

1    this chapter; is that correct?
2        A.  Yes, sir.
3        Q.  And it lists several nonphotographic
4    identifications; is that correct?
5        A.  I haven't read that yet.
6           Yes, sir.
7        Q.  And under -- I don't want you to have the
8    read the whole statute -- is it a fair construction of
9    your bill that proof of identity at the polling place
10   could be proved either by one piece of photographic
11   identification under Section A, 63.0101(a), or two
12   pieces of nonphotographic identification under Section
13   63.0101(b)?
14       A.  Yes, sir.
15       Q.  Do you know what happened to HB 101?
16           MS. DONNELLY:  Objection.  Form.
17           You can answer.
18           THE WITNESS:  I'm sorry?
19           MS. DONNELLY:  I said, "Objection.
20   Form."  I'm not sure what the question's asking.  If
21   you think you know --
22       A.  I don't -- you want me to remember what
23   happened to 101?
24       Q.  (BY MR. ROSENBERG)  Yes.
25       A.  We pass -- we have an average of 7,000 bills

---

REPRESENTATIVE DEBORAH RIDDLE                           6/18/2014
HIGHLY CONFIDENTIAL

9 (Pages 33 to 36)

---

33

1  filed every session.  We pass an average of about 700
2  bills.  That does not include all of the amendments,
3  the amendments to the amendments, and resolutions.  I
4  honestly do not recall --
5      Q.  Was this a --
6      A.  -- the final outcome.
7      Q.  I'm sorry, I didn't mean to interrupt.  Are
8  you finished with your answer?
9      A.  I'm a bit embarrassed.  My memory is not
10  allowing me to recall exactly what happened, but I
11  can -- if you want to give me time, I can call my
12  staff and have them look back in the file and check
13  and see.
14      Q.  We'll see.  But right now, we're in the
15  deposition, and I'll accept whatever answer your
16  memory gives you at this point, okay?
17      A.  But I'm not opposed to checking and seeing
18  for you.
19      Q.  Was this an important bill to you?
20      A.  Every bill I file is an important bill to me.
21  Every bill I file is something that my constituents
22  want me to move ahead with.
23          (Riddle Exhibit 151 marked/introduced.)
24      Q.  (BY MR. ROSENBERG)  Like to show you what's
25  been marked as Riddle Exhibit 151.

---

34

1          THE WITNESS:  Can we see where the
2  donuts are?  I'm starving.
3          MS. COHAN:  They're right here.
4          THE WITNESS:  You can tell I focused.  I
5  apologize.
6          (Discussion off the record.)
7      Q.  (BY MR. ROSENBERG)  Was HB 101 passed into
8  law?
9      A.  I -- I don't think so, but I've got to tell
10  you, I do not -- I would have to go back to my files.
11  We deal with so many bills, so many amendments, so
12  many resolutions, that was so many years ago, I cannot
13  remember the details on that.  I do not believe it was
14  passed, but I cannot tell you if it even came up
15  before.
16      Q.  I have put before you now another exhibit,
17  which was marked as 151, and it's HB No. 218.
18          And I ask you if you're familiar with that
19  document.
20      A.  Holy cow.  Let me look at the date of this
21  one.
22          Were y'all informed that I'm a 65-year-old
23  grandmother?
24      Q.  I'm a 64-year-old lawyer.
25      A.  Then you should give me a little sympathy.

---

35

1      Q.  I do, but I'm not a grandfather yet.
2      A.  You will be.  Then you'll sympathize.
3          Let's see.  What date was this?  2007.
4      Q.  And just to refresh your recollection, is
5  that the same date as HB 101?
6      A.  Let me look at 101.
7          Y'all are here just testing my memory, aren't
8  you?
9      Q.  No.
10      A.  Yes.
11      Q.  Okay.  Was the subject matter of HB 218 the
12  same as the subject matter of HB 101?
13      A.  I don't know.  I have to look at it.
14      Q.  Please do.
15      A.  In just a quick cursory review, it appears --
16  I don't want to sit here and take your time to read
17  the whole thing word for word, but it appears to be on
18  a similar track.
19      Q.  Now, were you the author of HB 218, or
20  co-author?
21      A.  I was not the author, I was a joint author.
22      Q.  And can you tell me the circumstances under
23  which you were either the author or co-author -- or
24  joint author of two bills dealing with what appears to
25  be the same subject matter?

---

36

1          MS. DONNELLY:  Objection.  The question
2  calls for information that would be covered by the
3  legislative privilege.
4          I'll instruct the witness not to answer.
5      Q.  (BY MR. ROSENBERG)  And again, I'm asking you
6  whether you -- well, first, I will again tell you, you
7  have, under the court's order, the ability to testify
8  under seal while still asserting the privilege or not
9  to testify and assert the privilege.
10      A.  I'm declaring my legislative privilege, sir.
11      Q.  And you will not testify in response to that
12  answer under seal -- response to that question under
13  seal?
14      A.  No, sir.
15      Q.  No, sir, you will not?
16      A.  No, sir, I will not.
17      Q.  Turning to your attention to -- page 7 of
18  this document.
19      A.  Oh, we're still on 218?
20      Q.  Yeah.  I'm sorry, it's not page 7.  Give me a
21  second.
22          Page 9 of the document.
23      A.  Yes, sir.
24      Q.  And I'd like you to look at 63.0101(a) 1, the
25  paragraph that reads:  "a driver's license or personal

---

REPRESENTATIVE DEBORAH RIDDLE 6/18/2014
HIGHLY CONFIDENTIAL

---

**37**

1  identification card issued to the person by the
2  Department of Public Safety that has not expired or
3  that expired no earlier than two years before the date
4  of presentation."
5       Did I read that correctly?
6  **A. Yes, sir, you did.**
7       Q.  Now, a few moments ago, you testified that
8  HB 101, its paragraph dealing with driver's license,
9  found acceptable driver's license issued by any state.
10      Do you recall that?
11 **A. Uh-huh.**
12      Q.  Do you agree that the paragraph I just read
13 in HB 218 does not allow or find acceptable a driver's
14 license issued by any state other than Texas?
15 **A. In that paragraph, it does not appear to be**
16 **there.**
17      Q.  Do you know the reason why that change was
18 made between HB 101 and 218?
19 **A. Sir, I'm going to have to declare legislative**
20 **privilege on that.**
21      Q.  Can you tell me whether any analysis was done
22 as to the acceptability of driver's license from any
23 state or driver's license just from Texas between the
24 time HB 101 was drafted and the time HB 218 was
25 drafted?

---

**38**

1           MS. DONNELLY:  I'm going to object.
2  Calls for legislative privilege.
3  **A. I'm going to have to declare legislative**
4  **privilege on that, sir.**
5       Q.  (BY MR. ROSENBERG)  And by the way, was HB 218
6  drafted after HB 101?
7  **A. I do not know that, sir.**
8       Q.  Does the number of the bills give you any
9  hint in that regard?
10 **A. No, sir, it does not.  The number of the bill**
11 **comes -- is given when the author of the bill files**
12 **the bill.  It has absolutely no indication as to when**
13 **the bill was drafted.**
14      Q.  From your memory, do you recall whether
15 HB 218 was drafted before or after HB 101?
16 **A. I have no idea, sir.**
17      Q.  Turning your attention to the next page, in
18 paragraph 6, it lists:  "a student identification card
19 issued by a public or private institution of higher
20 education located in the United States that contains
21 the person's photograph."
22      Do you see that?
23 **A. Yes, sir.**
24      Q.  Do you recall that HB 101, in dealing with
25 student identification card, did not have the language

---

**39**

1  issued "in the United States"?  And you can check
2  that.
3  **A. Let me check it.  Do you recall what line**
4  **that was on?**
5       Q.  It was on page 6, I believe.
6  **A. Now, what was your question?**
7       Q.  Well, actually, let me -- I'm going to
8  withdraw that question.
9       Since you have HB 101 in front of you, which
10 was a bill that you authored or were considered the
11 author of, the phrase "a student identification card
12 issued by a public or private institution of higher
13 education that contains the person's photograph," was
14 it your understanding that that was intended to cover
15 any student identification card issued by any public
16 or private institution anywhere in the United States?
17          MS. DONNELLY:  I'm going to object.
18 That calls for legislative privilege.
19          Instruct the witness not to answer.  You
20 can answer if you want to.
21 **A. I'm going to have to declare legislative**
22 **privilege on that, sir.**
23      Q.  (BY MR. ROSENBERG)  And you will not testify
24 even under seal?
25 **A. No, sir.**

---

**40**

1       **(Riddle Exhibit 152 marked/introduced.)**
2       Q.  (BY MR. ROSENBERG)  I'd like to show you
3  what's been marked as Exhibit 152 and ask you if
4  you've seen this document before.
5  **A. That goes back to, what, 2009?**
6       Q.  '09.
7  **A. I don't recall.  I would have to read this.**
8  **I don't recall.**
9       Q.  Well, why don't you take a look at it, then.
10 **A. Oh, this is a senate bill.**
11      Q.  Right.  SB No. 362.
12 **A. Okay.  Okay.**
13      Q.  Having looked at it, does it refresh your
14 recollection as to whether you've ever seen that
15 document before?
16 **A. I don't remember.  I don't recall seeing it,**
17 **I don't recall either seeing it or not seeing it.  I**
18 **don't remember this document.**
19      Q.  Okay.
20          (Riddle Exhibit 153 marked/introduced.)
21      Q.  (BY MR. ROSENBERG)  Let me show you what's
22 been marked as Exhibit 153 and ask you if you've ever
23 seen this document before.
24 **A. That's another senate bill.**
25      Q.  And I just noticed that there's a last page

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

11 (Pages 41 to 44)

41

1   of this document that was actually from an exhibit at
2   your previous deposition which doesn't really belong
3   with this document. And I don't care if it's included
4   or not for record purposes, but we don't -- that is
5   not what I'm asking you about.
6       A.  Okay. Not read every word of this, but I've
7   quickly glanced at it, sir.
8       Q.  And have you seen this before? This is
9   SB 14.
10      A.  I cannot tell you the time or the date that I
11  have seen it. I suspect I may have, but I cannot
12  recall exactly when.
13      Q.  Are you aware of a bill called SB 14?
14      A.  I believe that that was our voter photo ID
15  bill, sir.
16      Q.  And did you support the voter photo ID bill?
17      A.  Yes, sir, I did, sir.
18      Q.  I'd like to turn your attention to page 9 of
19  the document.
20      A.  Uh-huh.
21      Q.  Section 63.0101, "Documentation of Proof of
22  Identification. The following documentation is an
23  acceptable form of photo identification under this
24  chapter."
25          Did I read that correctly?

42

1       A.  Yes, sir.
2       Q.  "(1) a driver's license, election
3   identification certificate, or personal identification
4   card issued to the person by the Department of Public
5   Safety that has not expired or that expired no earlier
6   than 60 days before the date of presentation."
7           Did I read that correctly?
8       A.  Yes, sir.
9       Q.  Now, you agree that paragraph dealing
10  with driver's license as an acceptable form of
11  identification is different than the paragraph dealing
12  with driver's license as an acceptable form of
13  identification in HB 101 and HB 218 which we looked at
14  a few minutes ago; is that correct?
15      A.  I'd have to look at it again, but if you say
16  it's not the same, I'll take your word for it.
17      Q.  Do you recall that, for example, in HB 101,
18  driver's licenses could be issued by any state?
19      A.  I'd have to look to see. I'm looking for the
20  driver's license --
21      Q.  Page 6 of HB 101.
22      A.  Okay.
23          Okay. Now, what was your question, again?
24      Q.  Sure.
25          Do you recall that in HB 101, an acceptable

43

1   form of driver's license was a driver's license issued
2   by any state?
3       A.  Yes, sir.
4       Q.  And also under HB 101, an acceptable form of
5   driver's license was a driver's license that had not
6   expired within two years; is that correct?
7       A.  Yes, sir. That's what it says in 101.
8       Q.  And you agree that in SB 14, the acceptable
9   form of driver's license was limited to driver's
10  licenses issued by the Texas Department of Public
11  Safety; is that correct?
12      A.  What line is that on? Is that on page 9?
13      Q.  Yes. Yes, it is.
14      A.  Under what --
15      Q.  Under 63.0101(a)(1).
16      A.  Yes, sir.
17      Q.  And was limited to driver's licenses that had
18  expired -- that had not expired no earlier than 60
19  days before the date of presentation; is that correct?
20      A.  Yes, sir.
21      Q.  Can you tell me what analysis, if any, had
22  been done as to whether or not a driver's license
23  issued by --
24      A.  I'm going to have to declare legislative
25  privilege on that, sir.

44

1       Q.  And I appreciate that, but I'd also
2   appreciate it if you'd let me finish the question so
3   that the record's clear as to what the question was
4   before you assert the privilege. Okay? "Yes"?
5       A.  Yes.
6       Q.  Thank you.
7           Are you aware if any analysis was done as to
8   whether or not -- as to why a -- why the change was
9   made from what you had proposed in HB 101 to what was
10  proposed in SB 14 as to the standards for driver's
11  license?
12      A.  I'm going to need to declare legislative
13  privilege on that, sir, respectfully.
14      Q.  And you will not testify even under seal; is
15  that correct?
16      A.  I'm going to have to respectfully decline to
17  answer that under legislative privilege, sir.
18      Q.  Do you recall any discussions with any
19  legislators concerning the specific standards that
20  were set forth in SB 14 on page 9 under 63.0101(a)(1)?
21      A.  Sir, I'm going to have to respectfully
22  declare legislative privilege on that, sir.
23      Q.  Do you have an understanding in your own mind
24  as to the basis for the change as between what was in
25  HB 101 and SB 14 as to driver's licenses?

REPRESENTATIVE DEBORAH RIDDLE                          6/18/2014
HIGHLY CONFIDENTIAL

15 (Pages 57 to 60)

Page 57

```
 1            MR. SCOTT:  No, I appreciate -- Deuel,
 2   thank you for speaking up when you did.
 3            MR. ROSS:  No worries.  I stepped away,
 4   so that was all I heard.
 5            MS. DONNELLY:  Okay.  Thank you.
 6       (Riddle Exhibit 154 marked/introduced.)
 7       Q.  (BY MR. ROSENBERG) Okay.  Back on the record,
 8   I'd like to have this marked as Exhibit 154.
 9       Ask you if you've seen that.
10       A.  Okay.  This is 2012.
11       Yes, sir.
12       Q.  And what is this?
13       A.  It is House Bill 16, sir.
14       Q.  And were you the author of it?
15       A.  Yes, sir.
16       Q.  And do you recall it?
17       A.  I would need to review it to recall details
18   of it; but, yes, sir, I recall it.
19       Q.  And was this bill submitted during the same
20   legislative session as the bill that became SB 14?
21       A.  Yes, sir, I believe so.  Let me see.  Let me
22   double-check this.
23       Q.  Sure.
24       A.  Yes, sir.
25       Q.  And turn your attention to page 5, Section
```

Page 58

```
 1   63.0101(a), looking first at No. 1, "a driver's
 2   license or personal identification card issued to the
 3   person by the Department of Public Safety or the
 4   equivalent agency of another state that has not
 5   expired or that expired no earlier than two years
 6   before the date of presentation..."
 7       Do you see that?
 8       A.  Yes, sir.
 9       Q.  Now, that has a broader form of driver's
10   license that is acceptable than SB 14; is that
11   correct?
12       A.  Yes, sir.
13       Q.  Do you understand why there was a change
14   between your bill, HB 16, and the bill that became
15   SB 14?
16            MS. DONNELLY:  Objection.  That calls
17   for information covered by legislative privilege.
18       A.  I'm going to have to declare my legislative
19   privilege on that, sir.
20       Q.  (BY MR. ROSENBERG) Do you know if any
21   analysis was done by anyone in the legislature
22   concerning changing your -- the standard for
23   acceptable driver's license in HB 16 to what became
24   SB 14?
25            MS. DONNELLY:  Same objection.
```

Page 59

```
 1       A.  Same objection.
 2       Q.  (BY MR. ROSENBERG)  Turning your attention to
 3   paragraph 3 on page 6.
 4       A.  Yes, sir.
 5       Q.  "A valid employee identification card that
 6   contains the person's photograph and is issued by an
 7   employer of the person in the ordinary course of the
 8   employer's business..."
 9       Do you see that?
10       A.  Yes, sir.
11       Q.  And that was language that you thought was
12   acceptable as a form of identification?
13       A.  Yes, sir.
14       Q.  Do you know whether or not that provision
15   found its way into SB 14?
16       A.  I would have to look, sir --
17       Q.  You may look.
18       A.  -- to see if it's there.  If it's there, do
19   you know where it is?
20       Q.  I can tell you that it's not there.
21       A.  Okay.  Then I'll take your word for it, sir.
22       Q.  Do you know whether or not any analysis was
23   done by anyone in the legislature as to why a valid
24   employee identification card was not included in
25   SB 14?
```

Page 60

```
 1            MS. DONNELLY:  Objection.  Calls for
 2   information covered by legislative privilege.
 3       A.  I declare my legislative privilege on that,
 4   sir.
 5       Q.  (BY MR. ROSENBERG)  Do you have an
 6   understanding as to why a valid employee
 7   identification card was not included in SB 14?
 8            MS. DONNELLY:  Same objection.
 9       A.  Same objection, sir.
10       Q.  (BY MR. ROSENBERG)  Turning your attention to
11   paragraph 6: "a student identification card issued by
12   a public or private institution of higher education
13   that contains the person's photograph."
14       A.  Yes, sir.
15       Q.  And you felt that was an acceptable form of
16   identification for voting under HB 16, of which you
17   were the author; is that correct?
18       A.  It was in my bill, sir, yes, yes.
19       Q.  Do you know whether that found its way into
20   SB 14?
21       A.  I'm going to guess from your body language
22   and your statement that it probably isn't.  Is that
23   the case?
24       Q.  I'm not sure my body language changed, but my
25   statement did.  It is not in SB 14.
```

REPRESENTATIVE DEBORAH RIDDLE                          6/18/2014
HIGHLY CONFIDENTIAL

16 (Pages 61 to 64)

---

61

1    A.  Then I will accept your body language and
2    your statement, sir.
3        Q.  Do you know whether anyone in the legislature
4    did any sort of analysis as to --
5        A.  I'm going to have --
6        Q.  -- why student identification was not an
7    acceptable form of identification under SB 14?
8        A.  I'm going to answer that to my knowledge, I
9    don't really know.  I would say probably not, but I
10   don't really know.
11       Q.  Probably not what?  Probably not that there
12   was any analysis done, is that what you're saying?
13       A.  Between the two bills.
14       Q.  Right.
15       A.  I tend to doubt it.
16       Q.  Do you know if there ever was any analysis
17   done as to whether or not a student identification
18   card is an acceptable form of identification for
19   purposes of voting?
20           MS. DONNELLY:  Object.  That covers --
21   that's covered by legislative privilege.
22       A.  Let me answer that.
23           As a general rule in the legislature, a bill
24   analysis is always done on each individual bill.  But
25   I'm not aware of an analysis that is done in comparing

---

62

1    bills.  It may have occurred, but I'm not aware of it,
2    sir.
3        Q.  (BY MR. ROSENBERG)  Looking at paragraph 8 in
4    HB 16, it says:  "an identification card issued by a
5    state agency of this state that contains the person's
6    photograph..."
7        Do you see that?
8        A.  In paragraph 8?
9        Q.  Yeah.
10       A.  What page is this?
11       Q.  I'm sorry, page 6 of HB 16.
12       A.  Of HB 16.  Okay.  I'm on the wrong one.
13   Paragraph 8 on -- on page 16.  I don't have a 16.
14       Q.  You might be looking at --
15       A.  I'm looking at House Bill 16.  What house
16   bill are you talking about?
17       Q.  I'm sorry, paragraph 8, page 6.  Paragraph 8.
18       A.  Okay.  I'm sorry.  Yes, sir, paragraph 8 of
19   House Bill 16.
20       Q.  And you, as the author of HB 16, believe that
21   an identification card issued by a state agency of
22   this state containing the person's photograph was an
23   acceptable form of identification for purposes of
24   voting; is that correct?
25       A.  It is contained within my bill there, sir,

---

63

1    yes.
2        Q.  Do you know why that was not included in
3    SB 14?
4        A.  No, sir, I don't.
5        Q.  Do you know whether any analysis was done as
6    to whether or not that should be included in SB 14 --
7            MS. DONNELLY:  Objection.
8        Q.  (BY MR. ROSENBERG)  -- by anyone in the
9    legislature?
10           MS. DONNELLY:  Calls for legislative
11   privilege.
12       A.  Once again, the -- it's got to be the same
13   answer.  Very rarely is an analysis done between two
14   bills.  There's always a bill analysis of one bill, a
15   bill analysis of another bill.  But analyzing from one
16   to the other, I'm unaware of that, sir.
17       Q.  (BY MR. ROSENBERG)  Well, leaving aside
18   comparing two bills, do you know whether or not any
19   analysis was done as to whether or not an
20   identification card issued by a state agency of Texas
21   that contained the person's photograph could be an
22   acceptable form of identification for purposes of
23   voting in Texas?
24           MS. DONNELLY:  Objection.  Calls for
25   legislative -- information covered by legislative

---

64

1    privilege.
2        A.  Legislative privilege, I declare, sir.
3        Q.  (BY MR. ROSENBERG)  Looking at paragraph 9 of
4    HB 16, it says:  "a valid identification card that
5    contains the person's photograph and is issued by (A)
6    an agency or institution of the federal government; or
7    (B) an agency, institution, or political subdivision
8    of this state."
9        Do you see that?
10       A.  On page 9?
11       Q.  Page 6, paragraph 9.
12       A.  Oh, I'm sorry.
13       Q.  Towards the bottom.
14       A.  Okay.  "A valid identification card that
15   contains the person's photograph issued by an agency
16   or institution of the federal government."
17       Yes, sir, I see that.
18       Q.  And you believe that was an acceptable form
19   of identification for purposes of voting as set forth
20   in HB 16, which you authored?
21       A.  That was in my bill, sir.
22       Q.  And you believe it was an acceptable form of
23   identification for purposes of voting?
24       A.  Yes, sir, at that time, I felt that.
25       Q.  And when you say "at that time," did you

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

65

1  change your mind on that?
2       A.  I've not given it a great deal of thought,
3  sir.
4       Q.  Do you know whether any analysis was done as
5  to whether a valid identification card issued by an
6  agency or institution of the federal government or the
7  state is an acceptable form of identification for
8  purposes of voting?
9       A.  I'm unaware of any such analysis.  It may
10 have occurred, but I'm not aware of it, sir.
11      Q.  Now, turning to page 7 of HB 16, a bill which
12 you authored, included several forms of
13 nonphotographic identification that could be used to
14 verify a person's identification at the -- identity at
15 the polling place; is that correct?
16      A.  Yes, sir.
17      Q.  And I'll represent to you that -- well,
18 strike that.
19          Do you know whether SB 14 included
20 nonphotographic identification forms?
21      A.  Once again, by your body language and
22 question, I'll assume that there's -- that it's not in
23 there.  I don't know.  I'd have to read it and look
24 and see.
25      Q.  Okay.  Assuming it's not in there -- and I

66

1  will represent to you it's not in there --
2       A.  Okay.
3       Q.  -- do you have an understanding as to why
4  it's not in there?
5       A.  No, sir.
6       Q.  Do you know whether any analysis was done by
7  anyone in the legislature as to whether or not
8  nonphotographic identification should be in a bill
9  dealing with identification at the polling place?
10      A.  I'm unaware of any such.  It may have
11 occurred, but not to my knowledge.
12      Q.  At any time during your support for the
13 various photo identification bills leading up to the
14 passage of SB 14, did you ask anyone to undertake an
15 analysis as to whether voters were more or less likely
16 to possess certain forms of identification as compared
17 to others?
18          MS. DONNELLY:  Objection.  Calls for
19 information covered by legislative privilege.
20      A.  Yes, I declare my legislative privilege with
21 that.
22      Q.  (BY MR. ROSENBERG)  At any time during your
23 support for the various photo identification bills
24 leading up to the passage of SB 14, were you aware
25 whether any legislator asked anyone to undertake an

67

1  analysis as to whether the voters were more or less
2  likely to possess any specific form of photographic
3  ID?
4           MS. DONNELLY:  Objection.  Calls for
5  information covered by legislative privilege.
6       A.  I declare my legislative privilege on that,
7  sir.
8       Q.  (BY MR. ROSENBERG)  At any time during your
9  support of the various pieces of legislation leading
10 up to the enactment of SB 14, did you become aware of
11 any facts concerning whether voters were more or less
12 likely to possess any sorts of photo ID?
13          MS. DONNELLY:  Objection.  Calls for
14 information covered by legislative privilege.
15      Q.  (BY MR. ROSENBERG)  Do you think it's
16 important as to whether voters perform -- possess
17 certain forms of identification as compared to others?
18      A.  The -- you're asking for my opinion, sir?
19      Q.  Yes, I am.
20      A.  And what is your question again?
21      Q.  Whether you think it's important as to
22 whether voters possess certain forms of identification
23 as compared to others.
24          MS. DONNELLY:  I'm going to object.
25 Calls for information covered by legislative

68

1  privilege.
2           It's up to you if you want to answer the
3  question.
4       A.  You're asking my opinion if some forms of
5  voter ID are preferable over other forms of voter ID?
6       Q.  No.  Let me ask you whether you think it's
7  important as to whether voters possess certain forms
8  of ID as compared to other forms of ID.
9       A.  Yes, sir.
10      Q.  And why do you think it's important?
11          MS. DONNELLY:  Same objection.
12          You can answer if you'd like to.
13      A.  It is critically important for us to maintain
14 the integrity of the ballot box and for the voters to
15 have 100 percent confidence in the integrity of the
16 ballot box.  If a simple form of ID that basically
17 anybody could manufacture or say, like, a library card
18 is acceptable but really not something that would be a
19 strong form of ID, that could put the integrity of the
20 ballot box at risk.
21          Having the stronger forms of ID that are
22 acceptable in all of the other areas of government,
23 like what is necessary to cash a welfare check, or a
24 form of ID that is necessary to get into a courthouse,
25 or a form of ID that is necessary to get on a plane,

REPRESENTATIVE DEBORAH RIDDLE                                6/18/2014
HIGHLY CONFIDENTIAL

18 (Pages 69 to 72)

69

1    those are forms of ID that I think the public has
2    confidence in and therefore ensures the integrity of
3    the ballot box.
4           My primary concern is, was and will continue
5    to be maintaining and securing the integrity of the
6    ballot box, sir.
7    Q.   (BY MR. ROSENBERG) What forms of ID are
8    acceptable to get into a courthouse?
9    A.   Are you asking me or them?
10   Q.   You.
11   A.   Oh.  You were looking at them.
12          My daughter is a judge, and even I have to
13   present my driver's license or a picture ID in order
14   to get into the courthouse.  That is my understanding.
15   Q.   Do you know whether a student identification
16   card with a photograph issued by a public university
17   is acceptable to get into a courthouse?
18   A.   Been a long time since I've been a student.
19   I've not checked that out, sir.  I don't know.
20   Q.   Do you know whether an employee
21   identification card issued by a state or federal
22   agency is acceptable to get into a courthouse?
23   A.   I will be happy to clarify and check.  I can
24   give you an educated guess, but I'd rather not do
25   that.  I think my educated guesses would probably be

70

1    about 98 percent right, but I would feel a lot more
2    comfortable giving you 100 percent clarified answer on
3    that.  So I can, at our next break, call my daughter
4    and make sure that what I think is correct is, in
5    fact, 100 percent accurate.
6    Q.   Do you know what kind of identification is
7    acceptable to board a plane?
8    A.   Well, recently, my husband and I flew to Guam
9    for a special memorial trip to Iwo Jima, and my
10   husband and I fly to Israel frequently.  We're very
11   supportive of Israel.  And every time we board a
12   plane, I know that when we go out of the country, we
13   have to show our passport and usually our -- our
14   driver's license here in the States, if it's a local.
15   If it's a local flight.
16   Q.   Do you know if there are other forms of
17   identification that are acceptable for domestic
18   flights?
19   A.   Once again, I believe that there are, but I
20   don't want to give you a very good educated guess.  I
21   would prefer checking that out and giving you what I
22   consider 100 percent accurate.  I think that my
23   educated guess would be 100 percent on target, but I
24   really don't like guessing.  I prefer to do a quick
25   verification and I'll be happy to answer that.

71

1    Q.   Do you think it would have been appropriate
2    for the legislature to pass a bill making it a
3    requirement to show an ID in order to vote that
4    African-Americans were less likely to possess than
5    white people?
6           MS. DONNELLY:  Object to the form of the
7    question.
8           You can answer if you understand it.
9    A.   I don't understand your question.
10   Q.   (BY MR. ROSENBERG) Sure.  What don't you
11   understand about it?
12   A.   I don't understand your question period.  Are
13   you asking us to discriminate?
14   Q.   No, I'm asking you whether you think it would
15   be appropriate for the legislature to pass a statute
16   that required certain identification for purposes of
17   voting which were less likely to be possessed by
18   African-Americans than by white people.
19          MS. DONNELLY:  Object to the form of the
20   question.
21   A.   Sir, my best friend is a black woman.  She
22   would be highly insulted if I had anything to do with
23   passing a law that would demean and discriminate and
24   say that black people had less intelligence or less
25   ability to do anything, including voting.  I would not

72

1    insult my best friend, nor would I insult the black
2    members of my community or the people throughout Texas
3    who God gave skin that is the color of black.
4    Q.   (BY MR. ROSENBERG)  That wasn't my question.
5           My question was whether you think it would be
6    appropriate for the legislature to pass a bill
7    requiring certain identification that would be less
8    likely -- in order to vote that would be less likely
9    to be possessed by African-Americans than by white
10   people.
11          MS. DONNELLY:  Object to the form of the
12   question.
13          THE WITNESS:  I guess I'm not
14   understanding his question.  Is he saying that black
15   people should not have the same responsibility as
16   everybody else?
17   A.   I think everybody is intelligent enough to
18   understand how to vote and what to do.  I'm not about
19   to say that one group is less than another group.  I
20   don't think you would either.
21   Q.   (BY MR. ROSENBERG)  Well, leading up to the
22   passage of SB 14, were you aware that legislators said
23   there were certain forms of identification that
24   African-Americans or Hispanics would be less likely to
25   possess than white people?

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

---

**73**

1           MS. DONNELLY:  Objection to the form of
2      the question.
3           He's only asking if you're aware.
4           A.  Yes, I am aware that there were some
5      legislators that were making that claim.
6           Q.  (BY MR. ROSENBERG)  Did you undertake any
7      investigation into that point?
8           MS. DONNELLY:  Objection.  Calls for
9      information covered by legislative privilege.
10          A.  I'm going to declare my legislative privilege
11     on that, sir.
12          Q.  (BY MR. ROSENBERG)  Did those assertions occur
13     in the course of public debate?
14          A.  Yes, sir.
15          Q.  In the context of the public debate, was
16     there any response to those assertions?
17          A.  I don't recall.
18          Q.  Do you know whether the legislature undertook
19     any analysis as to whether those assertions were true
20     or false?
21          MS. DONNELLY:  Object.  That calls for
22     information covered by legislative privilege.
23          A.  I'm going to declare my legislative privilege
24     on that, sir.
25          Q.  (BY MR. ROSENBERG)  Are you aware that in the

---

**74**

1      time leading up to the passage of SB 14, legislators
2      stated in the public record that there would be
3      certain burdens in obtaining the identification
4      required by SB 14 that would fall more heavily on
5      African-Americans and Hispanics than on whites?
6           MS. DONNELLY:  Objection to form of the
7      question.
8           He's only asking if you're aware.
9           A.  I am aware, but I will be able to tell you
10     that some of my black constituents that I visited with
11     found those comments objectionable and insulting.
12          Q.  (BY MR. ROSENBERG)  How many of your black
13     constituents did you speak to about that?
14          A.  I would say, I don't know, five or six.
15          Q.  Who were they?
16          A.  I don't recall all their names.  At various
17     town hall meetings, they speak up.
18          Q.  Do you recall any of their names?
19          A.  No, sir.
20          Q.  Other than your discussing this with five or
21     six constituents, did you undertake any analysis of
22     the issue as to whether or not the burdens of
23     obtaining the documentation set forth in SB 14 in
24     order to vote would fall more heavily on
25     African-Americans and Hispanics than on whites?

---

**75**

1           MS. DONNELLY:  Objection.  Calls for
2      information covered by legislative privilege.
3           A.  I'm going to declare my legislative privilege
4      on that, sir.
5           Q.  (BY MR. ROSENBERG)  Do you understand that
6      there is a cost to obtaining some of the underlying
7      documentation necessary to get the photo ID required
8      by SB 14?
9           MS. DONNELLY:  Objection.  Form of the
10     question.
11          You can answer if you understand.
12          A.  It is my understanding, sir, that there is no
13     cost, or the cost is very, very minimal.
14          Q.  (BY MR. ROSENBERG)  What do you consider
15     minimal?
16          A.  I think it's less than $10.
17          Q.  Do you agree that, for some people, paying
18     less than $10 is not minimal?
19          A.  I believe that -- I think you can get a photo
20     ID at no cost.  I think that you can do that through
21     DPS.
22          Q.  Can you get it without a birth certificate?
23          A.  They have to have some form of
24     identification, sir, to show that you are who you say
25     you are.

---

**76**

1           Q.  And that form of identification includes a
2      birth certificate?
3           A.  That is -- likely is not one of the forms.
4           Q.  Do you know whether, if a person does not
5      have a birth certificate, it costs money to get a
6      birth certificate?
7           A.  If that individual is elderly, then the photo
8      ID, from my understanding, does not apply to them.
9      And the vast majority, from my understanding, which
10     I've not done research on this, but it's from just my
11     personal observation, that the vast majority of people
12     who do not have birth certificates tend to be those
13     that are elderly, and the voter photo ID excludes
14     those, sir, that I think are 65 and older.
15          Q.  And that they could vote at the polling place
16     or that they could vote by absentee ballot under those
17     circumstances?
18          A.  I would need to look at and see, but I do not
19     think that the voter photo ID applies to them at -- I
20     would need to review that, but I don't think that's
21     the case.
22          Q.  And if one is not elderly and has to obtain a
23     election identification card, that person would need a
24     birth certificate; is that correct?
25          A.  I believe that that's probably one of the

---

REPRESENTATIVE DEBORAH RIDDLE                    6/18/2014
HIGHLY CONFIDENTIAL

22 (Pages 85 to 88)

---

85

1    A.  I'm not willing to acknowledge that that's
2  even the case.  I think that you're making a statement
3  there that I don't think is necessarily accurate.
4    Q.  Have you analyzed -- well, strike that.
5       Are you aware of any analysis of the relative
6  burden of getting a photo ID on certain ethnic groups
7  as opposed to others?
8          MS. DONNELLY:  Objection.  Calls for
9  information covered by legislative privilege.
10   A.  Ask that question again.
11         MR. ROSENBERG:  Sure.
12       Can you read it back, please?
13         THE REPORTER:  "Are you aware of any
14  analysis of the relative burden of getting a photo ID
15  on certain ethnic groups as opposed to others?"
16   A.  No.
17   Q.  (BY MR. ROSENBERG)  Is it your testimony that
18  a -- a low-income person who has to take time off from
19  work and drive or take public transportation for, give
20  you an example, say, 90 minutes in order to get the
21  photo ID under SB 14 is not feeling a burden?
22         MS. DONNELLY:  Objection.  Form of the
23  question.
24       You can answer.
25   A.  Once again, it is not easy for anyone who has

---

86

1  a job to necessarily take time off in order to get
2  their driver's license renewed or get a driver's
3  license or get a photo ID or even to go vote.  We have
4  a lot of early voting that people can take advantage
5  of and voting on the weekends, but the vast majority
6  of Americans and Texans that I know consider it a
7  privilege to be able to make their voice heard.  They
8  don't consider it a burden, sir, they consider it a
9  privilege for which people have died.
10       Why were you asking my comments to be
11  striked?  Did you not like them?
12   Q.  (BY MR. ROSENBERG)  I can't answer questions.
13  You have to answer the questions.
14         THE WITNESS:  I don't think he should
15  have disliked my comments.
16   Q.  (BY MR. ROSENBERG)  During the time leading up
17  to the passage of SB 14, are you aware of any analysis
18  as to whether or not there was in-person voting fraud
19  in Texas?
20         MS. DONNELLY:  Objection.  Calls for
21  information covered by legislative privilege.
22   A.  I'm going to have to answer that,
23  respectfully, and the reason is because my husband was
24  the chairman of the ballot security for the Harris
25  County Republican Party.

---

87

1   A.  I can't tell you off the top of my head the
2  information -- specific information that they had, but
3  I do know that there was information that caused for
4  concern.
5   Q.  (BY MR. ROSENBERG)  When you say there was
6  information that caused for concern, what sort of
7  information are you talking about?
8   A.  Information regarding concern regarding voter
9  fraud.
10   Q.  When you say "voter fraud," what are you
11  talking about?
12   A.  Voter fraud.
13   Q.  Are you talking about all kinds of voter
14  fraud or --
15   A.  Various -- various types of voter fraud, sir.
16   Q.  What various types are you talking about?
17   A.  People that were voting fraudulently.
18   Q.  When they were voting fraudulently, how were
19  they voting fraudulently?
20   A.  Those are the details that I do not -- I
21  don't recall exactly, but I can go get that
22  information, I can obtain information regarding that.
23  I was receiving -- I was aware of information coming
24  in.
25       It would be dishonest for me to say that I

---

88

1  was unaware of anything, because my husband was the
2  chairman of ballot security for Harris County
3  Republican Party.
4   Q.  Were you aware of any specific instances of
5  in-person voter fraud?
6   A.  I don't recall the specifics, but I do recall
7  that there were issues.
8   Q.  When you say there were issues, are you
9  talking about issues of in-person voter fraud or voter
10  fraud generally?
11   A.  I would have to go back to get that
12  information, sir.
13   Q.  And where would you get that information?
14   A.  I would need to go get that information from
15  Harris County Republican Party.
16   Q.  And during what time frame are you --
17   A.  I would also have to get it from Elizabeth
18  Englebredth, who had the voter -- I forget the
19  organization.
20   Q.  Is Elizabeth Englebredth different than
21  Catherine Englebredth?
22   A.  I'm sorry, Catherine Englebredth.  Let me
23  correct that, Catherine Englebredth.
24   Q.  First of all, what time frame are we talking
25  about?  When -- this information covers what time

---

REPRESENTATIVE DEBORAH RIDDLE                           6/18/2014
HIGHLY CONFIDENTIAL

                                              25 (Pages 97 to 100)

97

1    couldn't say my own name and my face was paralyzed.
2    But I figured out a way to communicate, even though my
3    face was paralyzed.
4          And so I think almost everybody, at some
5    point in their life, has had one difficulty or
6    another, and certainly not all are pleasant.
7     Q.  (BY MR. ROSENBERG)  Sticking with the negative
8    side of discrimination, do you agree that, in the
9    past, Texas legislators have enacted legislation that
10   was discriminatory against certain minority groups?
11         MS. DONNELLY:  Objection to the form of
12   the question.
13         You can answer if you understand.
14    A.  I'm not aware of any pieces of legislation
15   that have passed in recent history to that.  That may
16   have happened back in the 1800s, but I'm not aware of
17   anything specific.
18         What are you referring to?
19    Q.  (BY MR. ROSENBERG)  Do you have any
20   understanding of legislation in the 20th Century
21   dealing with poll taxes for voting?
22    A.  I was a very little girl when there was poll
23   tax.  I remember it vaguely as a little girl, but I
24   don't have any working knowledge or working memory of
25   it.

99

1    legislators have attempted to pass any type of
2    legislation with the intent of discriminating.
3     Q.  But if they intended to discriminate, would
4    you expect them to state so expressly?
5     A.  That's a hypothetical, sir, that I can't
6    really answer, because I'm -- there's -- there's no
7    practical reality to what it is you're trying to get
8    me to agree to.  That's -- I've been there 14 years,
9    and I've not seen any type of legislation that would
10   come under that type of definition.
11    Q.  In your mind, is there a connection between
12   the various photo identification bills and whether
13   noncitizens are voting?
14    A.  What is your question?
15    Q.  Sure.
16         In your mind, is there a connection between
17   the various photo identification bills which you've
18   supported and whether illegal immigrants are voting?
19    A.  I think that -- that there could be a very
20   strong possibility that those who are not here legally
21   may attempt to vote.  And once again, the purpose for
22   the bills that we have passed regarding voter photo
23   ID, the one sole reason for that is to maintain the
24   integrity of the ballot box, regardless of who it is,
25   whether they're a citizen or whether they're here

98

1     Q.  Do you have an understanding --
2     A.  I might be a grandmother, but I'm not that
3    old.
4     Q.  Do you have an understanding as to whether
5    poll taxes were discriminatory?
6     A.  I suspect they may have been.
7     Q.  Do you think that -- do you have an
8    understanding as to whether or not the legislature
9    expressly stated in poll tax legislation that their
10   intent was to discriminate?
11    A.  I've not read that part, so I can't tell you
12   firsthand.  I've not read that legislation.  That was
13   a long, long time ago, sir.
14    Q.  If legislators did intend to discriminate
15   with a piece of legislation, discriminate against a
16   group, say, would you expect them to state so
17   expressly?
18    A.  If at that point in time in history -- I
19   can't tell you what the legislators were thinking.  I
20   was -- was I even born when they did that?  What year
21   was that?
22    Q.  Well, let's say now, if legislators intended
23   to discriminate with a piece of legislation, would you
24   expect them to state so expressly?
25    A.  I'm not aware of any time that any

100

1    legally or illegally or whatever.  It's to make sure
2    that the integrity of the ballot box is maintained.
3     Q.  You've used this phrase before.  What do you
4    mean by "integrity of the ballot box"?
5     A.  Integrity means something that is assured.
6    If a building maintains its structural integrity, then
7    that means that building is standing straight and
8    strong.  If the integrity of the building has been
9    compromised, then that means that building could
10   collapse on itself or the building could become
11   dangerous for anybody that might be in the building.
12         Integrity means a -- a straight, strong to
13   where the -- the purpose, the strength, the plumb line
14   has not been compromised.
15    Q.  And is it your testimony that the integrity
16   of the ballot box in Texas was compromised by
17   in-person voter fraud?
18         MS. DONNELLY:  Objection.  Information
19   is covered -- sought by that question is covered by
20   legislative privilege.
21    A.  For anyone to say that there has not ever
22   been any instance of voter fraud in the state of
23   Texas, I think that individual would be naive.
24    Q.  (BY MR. ROSENBERG)  Are you not asserting
25   privilege?

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

---

101

1     A.  I'm asserting privilege.
2     Q.  So you're not answering the question, then?
3     A.  No, sir.
4         MR. ROSENBERG:  Well, I have some more
5     questions.  Let's go off the record.
6         (Discussion off the record.)
7     Q.  (BY MR. ROSENBERG)  Representative Riddle, are
8     you aware that the governor declared a need for
9     emergency legislation concerning SB 14 in 2012?
10    A.  I don't recall that.  He may have, but I
11    don't recall.
12    Q.  So you don't recall that SB 14 was listed as
13    a piece of emergency legislation?
14    A.  No.  It -- it kind of -- I sort of have a
15    vague memory of it, now that you mention it.  I'd need
16    to go back in my file and look.  If you'd asked me
17    about did he do that, I'd have to say I don't know.
18    But now that you say that, it triggers a bit of a
19    memory.  It's a vague memory.
20    Q.  That's a procedure in Texas of a governor
21    having the power to declare a certain legislation,
22    emergency legislation?
23    A.  The governor can put a high priority on
24    things.
25    Q.  Do you have an understanding as to why the

---

102

1     governor declared photo ID to be a piece of emergency
2     legislation in 2012?
3     A.  I don't have the ability to read his mind.  I
4     wish I did.
5     Q.  Do you recall any discussions you had had
6     with anyone concerning the issue of whether photo ID
7     legislation should be emergency legislation?
8         MS. DONNELLY:  Objection.  That calls
9     for information protected by legislative privilege.
10    A.  I'm going to declare that, but you can keep
11    it sealed.
12        I -- I don't remember any conversations.  I
13    may have had some, but I -- I can't remember any
14    specifically.
15    Q.  Are you aware of any information between 2009
16    and 2011 that would have made voter ID an emergency
17    legislation?
18        MS. DONNELLY:  Objection.  Calls for
19    information covered under legislative privilege.
20        You can answer under seal if you would
21    like to.
22    A.  I'm going to have to declare that and then
23    keep it sealed, but I don't recall.
24    Q.  (BY MR. ROSENBERG)  Do you recall whether
25    SB 14 was put on fast track?

---

103

1     A.  What is fast track?
2     Q.  Okay.  Then let me ask you something.
3         Does "fast track" have any meaning to you in
4     terms of legislation?
5     A.  It's not a term that we use.
6     Q.  Was SB 14 expedited in any way when it was in
7     the legislature?
8     A.  It has a low bill number, which gives
9     evidence that it was taken seriously.
10    Q.  Do you recall what steps were taken to
11    expedite SB 14 in the legislature?
12    A.  It was not my bill, so I don't recall -- I
13    don't have knowledge of any specific steps to
14    expedite, no.  The author would know, but I don't.
15    Q.  Are you aware that a select committee was
16    formed to deal with SB 14?
17    A.  A select committee?
18    Q.  Yes.
19    A.  I was not on that committee.
20    Q.  Are you aware that there was -- that there
21    was a select committee?
22    A.  That's so long ago, I -- I have forgotten.
23    I -- I -- I truly don't recall.  I'd have to go back
24    and review everything for that particular session.
25        What you don't understand is, during

---

104

1     session -- when you ask me these things, I'd like you
2     to understand -- we're dealing with a lot of bills.
3     Every session, we're dealing with a lot of issues.
4     We're dealing with a lot of amendments.  When I'm on
5     the floor of the House, and we're dealing with a
6     particular bill and debate is going on with that bill
7     and amendments coming on with that bill, I'm working
8     the floor regarding amendments coming up that I like,
9     amendments that I want to see killed, amendments that
10    might be happening, debate that's going on.  And by
11    the way, other bills that are going to be coming after
12    this bill is over, then I want to give a heads up to
13    my colleagues.  We're juggling bowling balls here.
14        In addition to that, I'm also working,
15    because as soon as we get off, we go to committee
16    hearings, as a general rule, and I'm wanting to let
17    committee members know that I've got this bill, that
18    bill or another bill coming up that might be mine or
19    might not be mine that they're going to be hearing
20    that they need to pay special attention to or have
21    special concerns with.
22        So multitasking is a great understatement.
23    Q.  Do you rank bills in -- in order of priority
24    of importance to you?
25    A.  The bills that come up on a daily basis when

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

29 (Pages 113 to 116)

---

113

1        MR. SCOTT: Thank you.
2        Q.   (BY MR. ROSENBERG) I'd like to show you,
3    Representative Riddle, a document that's been marked
4    as Exhibit 156. And for the record, the Bates stamp
5    number is TX_00005511 through 14.
6        A.   Okay.
7        MR. ROSENBERG: It's marked highly
8    confidential, and I understand that the State is
9    asserting an objection to the use of these documents
10   at this deposition on a standing basis.
11       And by the way, I will represent on the
12   record that, according to the privilege log, these
13   documents were produced by Representative Riddle.
14       MS. DONNELLY: Can we take a quick
15   break?
16       MR. ROSENBERG: Sure.
17       (Break.)
18       Q.   (BY MR. ROSENBERG) The question I had -- and
19   actually -- well, have you seen that document before?
20       A.   I don't remember having seen it before,
21   actually. There are things that wind up in my bill
22   packets or things that are handed to me often or
23   things that come that just kind of get stuck in there.
24   I -- when you handed this to me, I don't remember ever
25   seeing this before.

---

114

1        Q.   Okay.
2        MS. DONNELLY: And I'm going to
3    interject there that if you're going to ask the
4    witness questions about Riddle No. 156, since it has
5    come from her bill file, that's covered by the
6    legislative privilege.
7        Subject to that objection, you can
8    answer.
9        A.   Okay. We're going to -- we're going to
10   declare legislative privilege here, but I am going to
11   add -- and it will probably be sealed -- that I don't
12   remember ever seeing this. I certainly didn't put it
13   in there, and I have no memory of this whatsoever.
14   But that is not necessarily uncommon. Things get
15   handed to me or get stuck in my bill files that, quite
16   frankly, I didn't put in there, my staff may not have
17   even put it in there. Something could have been
18   handed to me that I just stick in there and I don't
19   even look at it. So I have no idea what this is.
20       Q.   (BY MR. ROSENBERG) And to try to expedite
21   this part of the deposition, I'm going to show you
22   what's been marked as Exhibit 158, and it is a
23   collected group of documents that are in Bates stamped
24   order, beginning with TX_00005325 and ending at
25   TX_00005582.

---

115

1        A.   Uh-huh.
2        Q.   And these were those documents that were
3    produced by your office.
4        A.   Uh-huh.
5        Q.   And all of them are marked as highly
6    confidential.
7        A.   Uh-huh.
8        MR. ROSENBERG: I believe this was the
9    bill file --
10       MR. GEAR: Yes.
11       MR. ROSENBERG: -- from --
12       A.   Well, but I instructed my office --
13       Q.   (BY MR. ROSENBERG) Let me finish.
14       A.   Okay.
15       Q.   You can -- you can say whatever you want, I
16   just want to finish my sentence.
17       A.   Okay.
18       MR. ROSENBERG: This is the bill file
19   from Representative Riddle's office.
20       Q.   (BY MR. ROSENBERG) And now, I'm sorry, I
21   didn't mean to interrupt you, I just wanted to finish
22   my sentence.
23       MS. DONNELLY: There was no question.
24       A.   Well, let me make it clear that when I was
25   made aware that a request was made, I instructed my

---

116

1    office to copy everything within the files. I did not
2    discriminate, I did not say "Take this out, take that
3    out." I didn't even look at the files to remove
4    anything. I just said, "We're going to be completely
5    candid. I have no idea what's all in there, but just
6    copy everything and send it on."
7        (Riddle Exhibit 158 marked/introduced.)
8        Q.   (BY MR. ROSENBERG) This is a set of the bill
9    file, and I'd like you to turn -- just so you see
10   the -- if you turn to the third page, which is
11   TX_00005327 through 5329, and can you at least confirm
12   that that is the same document that we had just marked
13   as Exhibit 155?
14       MS. DONNELLY: Since Exhibit 158 is from
15   Representative Riddle's bill file, any questions
16   related to this exhibit are covered by the legislative
17   privilege.
18       And subject to that, and the answer
19   being under seal, you can answer that question.
20       A.   Yes, it appears to be the same.
21       Q.   (BY MR. ROSENBERG) Okay. Then turning your
22   attention to the handwriting in the upper left-hand
23   corner: "My husband was chairman of the ballot
24   security for Harris County Republican Party and we
25   both could tell some interesting stories," is that

117

1    your handwriting?
2    **A. Yes, sir, it is.**
3    Q.   And when you say "we both could tell some
4    interesting stories," could you tell me what you're
5    referring to?
6    **A.   Well, as far as I -- I don't remember the**
7    **stories at this point, but they were anecdotal stories**
8    **that were given to me.**
9    Q.   Is the handwriting that reads "There are
10   those who have fought & died and continue to fight &
11   die for our freedom to vote.  It would be
12   disrespectful to their courage & memory if we allowed
13   our ballot boxes become compromised," is that your
14   handwriting?
15        MS. DONNELLY:  I'm going to object to
16   that question.  It's covered by the legislative
17   privilege.  It's clearly not the same handwriting, and
18   it's clearly not Representative Riddle's right to
19   waive someone else's legislative privilege.
20        MR. ROSENBERG:  First of all, my
21   question was, was it her handwriting, and I think she
22   can testify as to whether or not it is her
23   handwriting.  I don't think either of us are
24   handwriting experts, and, quite frankly, I didn't look
25   at it and say, "Well, it's definitely someone else's

118

1    handwriting."  So I just asked her whether it was her
2    handwriting or not.
3        MS. DONNELLY:  Same objection.
4        And I instruct the witness not to
5    answer.
6    Q.   (BY MR. ROSENBERG)  Are you following your --
7    **A.   It's under seal.**
8    **It's my handwriting, sir.**
9    Q.   It is your handwriting?
10   **A.   Yes, sir.  And I mean it.**
11   Q.   And turning to the third page of -- I'm
12   sorry, page 5329, where it says:  "Our good friend the
13   former Representative Mary Denny presented this bill
14   last session.  My bill" -- the words "is very much" is
15   crossed out -- "replicates her bill with the various
16   amendments she accepted."
17        Is that your handwriting?
18   **A.   Yes, sir.**
19   Q.   Based upon this, had you compared your bill
20   with Representative Denny's bill?
21   **A.   You mean she and I sitting down together**
22   **doing that?**
23   Q.   No.  In any way.
24   **A.   I used hers as a good guideline.**
25   Q.   On the first page -- or, I'm sorry, page

119

1    5327, TX_00005327, where it says "Paul Bettencourt,"
2    do you see that?
3    **A.   Yes, sir.**
4    Q.   And then underneath there, it says:  "35
5    foreign nationals," do you see that?  But it's crossed
6    out.
7    **A.   Yes, sir.**
8    Q.   Is that your handwriting also?
9    **A.   I don't think so.  I don't recall writing**
10   **that.**
11   Q.   Do you have an understanding as to what is
12   meant by "35 foreign nationals"?
13   **A.   I don't recall, sir.  No, sir.  I don't think**
14   **that's my handwriting either.**
15   Q.   I'd like to turn your attention back to the
16   document you were looking at a few moments ago, which
17   is --
18        MR. SCOTT:  5515.
19        MR. ROSENBERG:  I'm sorry, what is it?
20        MR. SCOTT:  5515.
21   Q.   (BY MR. ROSENBERG)  5511, actually, in this
22   package.  If you turn to page 5511.  That's the Texas
23   voter registration application form.
24        Do you see that?
25   **A.   Uh-huh.**

120

1    Q.   And you see where it says, under "Complete
2    These Questions Before Proceeding, Check one, New,
3    Change, Replacement"?
4        Do you see that?  Towards the top.
5    **A.   Are you -- under which -- yes, sir.**
6    **"Complete These Questions Before Proceeding," yes,**
7    **sir.**
8    Q.   And you see where it says:  "Are you a United
9    States Citizen?"  "Yes" or "No"?
10   **A.   Yes.**
11   Q.   And I'd like you to turn to page 5515, which
12   is a document that's right after 5511 through 5514, do
13   you see that handwriting?  Is that your handwriting?
14   **A.   No, sir, it isn't.**
15   Q.   And like to turn your attention to page 5516.
16   Is that your handwriting?
17   **A.   No, sir, it isn't.**
18   Q.   Do you know whose handwriting is on 5515 or
19   5516?
20   **A.   No, sir, I don't.  And it was apparently in**
21   **the bill file, and let me explain to you briefly what**
22   **happens, how things get in a bill file that we may not**
23   **ever see.  It is not uncommon -- I wouldn't say it's**
24   **common.  It's not rare, but it's not necessarily**
25   **common, it happens that when I am laying out a bill,**

REPRESENTATIVE DEBORAH RIDDLE                     6/18/2014
HIGHLY CONFIDENTIAL

31 (Pages 121 to 124)

---

**121**

I'm usually standing at a podium before a dais, very much like y'all sitting here, and I have my bill folder and file before me, and I'm laying out that bill.

The public is behind me, seated in chairs. If you've ever been in a committee hearing room, you would see that to be the case.

There are times when members of the public that are seated behind me feel very emotional over various bills, and they will hand me a note either telling me what to say or what not to say or note about their feeling, and my standard operating procedure -- because I don't want to be distracted -- is, because they're behind me, sometimes I'll just see a note there, I'll grab it and stick it in my file. Usually in the back of the file. You know, just lift it up, stick it in, and I don't ever see it.

And when this was found the last time a couple of years ago -- this is not new. This is -- when this was found when they went through everything, my staff called. I said, "Scan it, I have no memory of that. I certainly would not have written it, and let me see if I recognize the writing."

They scanned it and sent it to me, and I didn't recognize the writing.

---

**122**

So the only way that I can tell you it got there is probably some member of the public behind me handed it to me, and I stuck it in the file and forgot about it.

Q. Had you remembered receiving it?

A. No, sir. I never -- I never laid eyes on it. I don't remember receiving it, I don't remember ever -- until the last time that y'all came and looked through everything a couple of years ago, that's when it was first found. And I didn't throw it away. I keep my bill files, everything in them, to -- and so -- actually, they wanted to do a handwriting analysis to make sure that it wasn't mine, and they gathered together legal pads, I'm told -- I wasn't there, but my staff said they gathered together legal pads and various things just to do a cursory analysis of it, and it became abundantly clear that it was not my handwriting.

So they didn't even bother to go further, and I gave them the explanation that, again, it's not uncommon for the general public that is literately within an arm's reach -- you know, we're standing in an aisle, and there's chairs on either side of us, they can reach out and touch me, and so it's not uncommon to -- I'd say it's not rare, it's not

---

**123**

necessarily common, but it happens -- hand me things, notes, and I never read them, because I don't want to get distracted. But I just put them in the back of the file and usually forget them.

Q. And when you say "they were considering doing a handwriting analysis," who's the "they"?

A. Y'all.

Q. And -- all right. We'll move on.

A. The people that did the deposition the last time. The Department of Justice that did the deposition the last time.

Q. Is it your understanding that the Department of Justice had that document two years ago?

A. Uh-huh. They had everything. They had -- my files have not changed. I didn't -- you know, I could have, quite frankly, instructed my staff to take that out and shred it, but I didn't. I don't -- I don't have anything to hide. So that was -- remained in there. It wasn't mine, it was a note. That was it.

Q. And I'm not asking you for anything that you were told by one of your attorneys.

Other than one of your attorneys, who told you that the Department of Justice was trying to get a handwriting expert to look at your files?

A. The last time that the Department of Justice

---

**124**

came in --

Q. Whenever you're talking about this conversation.

A. The last time you and I met. When was that, two years ago?

Q. Right.

A. Okay.

Q. I said who, not when. Who?

A. Well, the folks came in wanting to know, look at all my stuff. I assume that was the Department of Justice, was it not? You would know that better than I.

MS. DONNELLY: You had a conversation with your counsel that's privileged, so...

MR. ROSENBERG: Right. And I specifically said I was not asking for --

MS. DONNELLY: Just reminding the witness.

Q. (BY MR. ROSENBERG) Have you been following the implementation of SB 14?

A. Not really. I've been following the concerns of my constituents.

Q. Have constituents raised concerns about the implementation of SB 14 to you?

A. No, not really.

REPRESENTATIVE DEBORAH RIDDLE                          6/18/2014
HIGHLY CONFIDENTIAL

---

125

1      Q.  Have any voters told you that they were not
2  able to vote because of the requirements of SB 14?
3      A.  No.
4      Q.  Have any voters told you it's more difficult
5  for them to get the identification required by SB 14?
6      A.  No.
7      Q.  Have you taken any surveys of your
8  constituents on those questions?
9      A.  No.
10     Q.  Are you aware of any changes that are being
11 considered by the legislature as to SB 14?
12     A.  Changes to be considered to take up next
13 session?
14     Q.  Any session.
15     A.  Well, past sessions.  Any future sessions,
16 I'm not aware of any.
17     Q.  How about since the enactment of SB 14, have
18 there been any attempts to amend it since its
19 enactment?
20         MS. DONNELLY:  I'm going to instruct the
21 witness that to the extent it's in the public record,
22 you can answer it.  If not, then it's covered by
23 legislative privilege and instruct the witness not to
24 answer.
25     A.  I don't recall any.  There may be, but I

---

126

1  don't recall any.
2      Q.  (BY MR. ROSENBERG)  Have you or your staff
3  taken any steps to help implement SB 14?
4      A.  No, we just -- the bill passed.  It's up to
5  our county clerk to run the elections.
6      Q.  Have you or your staff done anything in terms
7  of trying to educate the public as to SB 14?
8      A.  No.  My constituency appear to be very happy
9  it was passed.
10     Q.  Are you aware of how much money has been
11 dedicated by the legislature for the implementation of
12 SB 14?
13     A.  No, sir.
14     Q.  Do you know how much money has been used by
15 the State of Texas and any of its agencies to
16 implement SB 14?
17     A.  No, sir.
18     Q.  Are you aware of any steps taken to educate
19 voters by the State of Texas as to SB 14?
20     A.  I can't think of anything specifically, but I
21 know that we, as the State of Texas, have pamphlets
22 and things like that for voters, but I can't think of
23 anything specifically that I know that those
24 education-type literature things exist.
25         MR. ROSENBERG:  All right.  I will pass

---

127

1  the witness to Mr. Gear.
2          And I thank you for your time.
3          THE WITNESS:  Thank you.
4            E X A M I N A T I O N
5  BY MR. GEAR:
6      Q.  So, Representative Riddle, again, my name is
7  Bruce Gear.  I'm with the Department of Justice
8  representing the United States.  Ezra Rosenberg has
9  now passed the witness to me, which is you, and I just
10 wanted to start off by, you know, just confirming that
11 you understand that the same ground rules apply for my
12 questioning as it did for Mr. Rosenberg's.
13     A.  Yes, sir.
14     Q.  You understand that?
15     A.  Yes, sir.
16     Q.  Do you understand that if you don't
17 understand one of the questions that I ask, you can
18 ask me to clarify?
19     A.  Yes, sir.
20     Q.  And do you understand that you continue to be
21 under oath and that you are required to give complete
22 and full answers?
23     A.  Yes, sir.
24     Q.  And if there's any part of the deposition, as
25 we continue on, that you may have a question for, you

---

128

1  can always ask me to clarify.
2          You understand that?
3      A.  Yes, sir.  And -- and I might also add that
4  we're in Chad Dunn's office.  He's a friend of ours,
5  and he's part of this.  You just might take that into
6  consideration.  It's a bit ironic, if he thought we
7  were such terrible people, I don't think we'd be in
8  his office.
9      Q.  So I'm going to do my best not to replicate
10 any of the questions that were already asked.  Forgive
11 me if I do, there were a lot of questions asked --
12     A.  That's okay.
13     Q.  -- and you gave a lot of answers.
14     A.  That's okay.
15     Q.  You were talking about -- when you were
16 referencing the handwritten notes that you thought the
17 Department of Justice was attempting to conduct a
18 handwriting analysis on --
19     A.  That's what my staff told me.
20     Q.  You indicated that you believed that was
21 handed to you while you were at the podium; was that
22 your testimony?
23     A.  That's the only explanation I can come up
24 with that makes any sense, because I had not seen that
25 prior to the -- and -- and to this good day, I've

---

REPRESENTATIVE DEBORAH RIDDLE                    6/18/2014
HIGHLY CONFIDENTIAL

34 (Pages 133 to 136)

133

1     that --
2          A.   Most of the Democrat legislators.
3          Q.   Were there any nonminority legislators that
4     supported SB 14?
5          A.   Yes, sir, I believe so.
6          Q.   And do you recall what the concerns that were
7     expressed regarding SB 14 were?
8          A.   Your question was, were there any minority
9     legislators that supported SB 14?  Did I get that
10    question right?
11         Q.   My question was:  Do you recall what concerns
12    these supporters of SB 14 raised during the public
13    debate regarding SB 14?
14         A.   Were there concerns of supporters of SB 14
15    that brought up concerns?
16         Q.   Do you not understand my question?
17         A.   I think I'm confused by your question.
18              Can you rephrase it?
19         Q.   Let me start over.
20         A.   Okay.
21         Q.   Were there support -- opponents of SB 14 --
22         A.   Uh-huh.
23         Q.   -- that raised concerns about SB 14 during
24    the public debate?
25         A.   Yes, sir.

134

1          Q.   And what were those concerns?
2          A.   You can go back to the debate.  You can even
3     watch them on the video if you'd like.
4               I think much of their concern had to do with
5     what you mentioned, inconvenience.  Having to, you
6     know -- primarily inconvenience, I think.
7          Q.   Is it fair to say that one of the concerns
8     regarding SB 14 is that it may discriminate against
9     minority voters?
10         A.   I think that that was one of the arguments
11    that they had.
12         Q.   And how did you respond to that concern?
13         A.   I did not feel like that was a valid
14    argument.
15         Q.   And did you or your staff conduct any
16    analysis to determine -- that attempted to determine
17    whether or not SB 14 actually discriminated against
18    minority voters?
19              MS. DONNELLY:  I'm going to object.
20    That question calls for information protected by
21    legislative privilege.
22              And instruct the witness not to answer.
23         Q.   (BY MR. GEAR)  And are you following the
24    advice of your counsel in not answering that question?
25         A.   Yes, sir, I'm going to declare a legislative

135

1     privilege on that.
2          Q.   And even -- are you also declining to testify
3     to that even if it's under seal?
4          A.   Yes, sir.
5               MR. GEAR:  Maybe this is a good place
6     for us to take a break and actually eat.
7               (Lunch break.)
8          Q.   (BY MR. GEAR)  So I think we left off, we were
9     discussing opponents of SB 14 and the types of
10    concerns that they raised during the public debate.
11              And just to summarize what you said before,
12    you identified inconvenience as one of the concerns
13    related to SB 14.
14         A.   Uh-huh.
15              MS. DONNELLY:  Objection to the form of
16    the question.
17              Go ahead.
18         Q.   (BY MR. GEAR)  And my question to you is:  Do
19    you recall any other concerns raised regarding SB 14?
20         A.   I think any and all other objections would
21    fall under the category of inconvenience.
22         Q.   When you say "inconvenience," what do you
23    mean?
24         A.   Something that would be inconvenient for
25    somebody.

136

1          Q.   As it applies to SB 14, how do you -- how do
2     you define "inconvenience"?
3               MS. DONNELLY:  I'm going to object to
4     the form of the question.  Please don't speculate what
5     other people meant by inconvenience.  Please don't
6     speculate.
7          A.   Okay.  Like, how far they would need to
8     travel, something of that sort.  It's been a long time
9     since we've had that debate.
10         Q.   (BY MR. GEAR)  And do you recall what the
11    discussion regarding travel was as it related to
12    SB 14?
13         A.   No.  Other than just length of time, length
14    of miles, maybe taking off of work, that type -- the
15    things that you mentioned rang a bell with me.
16         Q.   And so the length of time as it relates to
17    travel and taking off of work were identified as
18    inconvenient as it relates to SB 14?
19         A.   Yeah.  But that's no different than anybody
20    else.
21         Q.   And what do you mean by that?
22         A.   Well, you don't have to be of any particular
23    race, religion, color, anything else.  If you've got a
24    job, if you live further away, it's not a matter of
25    race.  I mean, there's inconveniences to all of us.

REPRESENTATIVE DEBORAH RIDDLE                    6/18/2014
HIGHLY CONFIDENTIAL

35 (Pages 137 to 140)

---

**137**

1    Q.  Well, do you recall how the opponents of
2    SB 14 applied the concept of inconvenience to the
3    bill?
4    A.  Not specifically.  I don't remember the
5    specifics of their examples.
6    Q.  Were there any concerns raised regarding
7    voters who may not have transportation, for example?
8    A.  I think that might have been mentioned.  I
9    don't remember who did it.  I -- I don't remember.
10   It's plausible it could have been brought up.  I can't
11   guarantee it.  But it's plausible.
12   Q.  What, if any, analysis did you or your staff
13   conduct regarding lack of transportation as it relates
14   to SB 14?
15            MS. DONNELLY:  Object to the extent that
16   the question calls for information covered by the
17   legislative privilege.
18            You can answer under seal if you want
19   to.
20   A.  Under seal.  We didn't really do any analysis
21   as such.  I am very tuned in with my constituents, the
22   way my constituents feel.  And my constituents were
23   very much in favor of the voter photo IDs.  As a
24   matter of fact, they were demanding it.
25   Q.  (BY MR. GEAR)  And again, you've -- you've

---

**138**

1    mentioned the term "constituents" and how your
2    constituents felt regarding SB 14.
3            How did your constituents feel regarding
4    SB 14?
5    A.  Not only were they for it, they were
6    adamantly in favor of it.
7    Q.  Did they tell you why?
8    A.  Because they, too, are concerned about voter
9    fraud.  They are very concerned about maintaining the
10   integrity of the ballot box.
11   Q.  Did any constituents tell you that they were
12   concerned regarding the integrity of the ballot box?
13   A.  Yes.
14   Q.  And did they provide any substance to that
15   communication?
16   A.  No.  Other than -- than their concerns.
17   Q.  And -- and I'm trying to understand what
18   their concerns were.
19   A.  The integrity of the ballot box.  They want
20   to make sure that when they vote, their vote is not
21   stolen.  Because if somebody votes illegally who
22   should not be voting because they're doing so
23   illegally or multiple times, then that, in essence,
24   steals their vote.
25   Q.  Did any constituent provide you with any

---

**139**

1    documented cases of examples where someone voted
2    multiple times?
3    A.  None documented.  Anecdotally, yes.
4    Documented, no.
5    Q.  Did any constituent provide you with any
6    documented cases that would support the integrity of
7    the ballot box was at risk?
8    A.  Anecdotally, yes.  Documented, no.
9    Q.  And when you say "anecdotally," what
10   anecdotal examples did they give you of examples where
11   the integrity of the ballot box was at risk?
12   A.  Multiple stories of where either they or
13   friends or family members had seen someone attempting
14   to vote that they knew had voted before or attempting
15   to vote that was not registered or just multiple
16   stories.
17   Q.  Were any of these cases prosecuted that
18   you're aware of?
19   A.  No.  No.  As you know, it's very difficult to
20   prosecute any case like that.  It's easy to say, hard
21   to do.
22   Q.  Why is it hard to prosecute in-person voter
23   fraud?
24   A.  You're the lawyer, not me.
25   Q.  Well, I'm asking you.

---

**140**

1    A.  I'm not a lawyer.
2    Q.  Did you discuss during the public debate
3    whether or not it was difficult to prosecute in-person
4    voter fraud?
5    A.  No.
6    Q.  Did you conduct any analysis that would
7    support your position that it's difficult to prosecute
8    in-person voter fraud?
9            MS. DONNELLY:  I'm going to object on
10   the grounds that the question calls for information
11   covered by legislative privilege.
12   A.  I'll declare my legislative privilege but
13   answer it under seal.
14            I did not have a large enough staff to
15   conduct the types of analysis that you're suggesting.
16   We're not in Washington, D.C., we're in Austin, Texas.
17   I don't have the kind of budgets -- or I don't have
18   the kind of budget in Austin that the people in
19   Washington, D.C., that y'all might be familiar with,
20   are accustomed to.  So doing that type of analysis is
21   not something that I have enough staff or funds to do.
22   Q.  (BY MR. GEAR)  So your answer is, no, you did
23   not conduct that type of analysis?
24   A.  Yes.  And I also told you why.
25   Q.  So taking you back to Exhibit HB 1706.

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

36 (Pages 141 to 144)

---

141

1       A.  Which one is that?
2       Q.  I'll give you the exhibit number.
3       A.  Which one is that?
4       Q.  Give me one second.  I'm sorry.
5           MR. ROSENBERG:  That would be Exhibit
6   No. 2, I believe.  I'm sorry.
7           What was the second exhibit we marked?
8           THE REPORTER:  It was 149.
9       A.  Here it is, 149.
10          House Bill 1706?
11      Q.  (BY MR. GEAR)  Yes, ma'am.
12      A.  Yes, sir.
13      Q.  You indicated during your testimony with
14  Attorney Rosenberg that the bill was similar to Mary
15  Denny's bill.
16          Do you recall that testimony?
17      A.  That we had just a few minutes ago?
18      Q.  Yes.
19      A.  Uh-huh.
20      Q.  And when you say that bill was similar to
21  Representative Denny's bill, how was it similar?
22      A.  Would you like me to do a side-by-side
23  analysis?
24      Q.  I'd actually like to -- to see what you know,
25  and if you feel it's necessary to do a side-by-side

---

142

1   analysis, feel free.
2       A.  So this is a test?
3       Q.  Not a test.
4       A.  You want to test my memory.  Man, you got me
5   up a creek with that one.
6           Okay.  I'm going to have to -- okay.  Well,
7   Mary Denny, for 1706, she is the author of this bill.
8       Q.  Okay.
9       A.  So what -- so you're wanting me to compare
10  this bill to what other bill?
11      Q.  The question was -- you can compare it to
12  HB 101.
13      A.  I think you're confused about it too, so
14  you'll have to forgive my confusion because of your
15  confusion.
16      Q.  Well, I don't want to confuse you, so let me
17  withdraw the question and ask you in a different way.
18      A.  Okay.
19      Q.  Did you pattern HB 101 after HB 1706?
20          MS. DONNELLY:  Objection to the form of
21  the question.  Calls for legislative privilege.
22      A.  I can answer under seal.
23          I think I've already done that.  You're
24  asking regarding my bill, the House Bill 16, in
25  comparison to House Bill 1706?

---

143

1       Q.  (BY MR. GEAR)  HB 101, is that your bill?
2       A.  House Bill 16 was my bill.  Let's see if 101
3   was my bill.
4           Y'all still don't understand the massive
5   about of bills and bill numbers that we deal with
6   session after session.  And 101, from one year to the
7   next, one second to the next, are different bills.
8           Okay.  Here's 101.
9       Q.  That's Exhibit 150 that you're referring to?
10      A.  Yes, sir, 150.
11      Q.  Was HB 101 your bill?
12      A.  Yes, sir.
13      Q.  And the question was:  Did you pattern HB 101
14  after HB 1706?
15          MS. DONNELLY:  Asked and answered.
16          You can answer again under seal.
17      A.  Yes, I can answer under seal.
18          Yes, sir, I believe that I did use it as a
19  pattern, to a large extent.
20      Q.  (BY MR. GEAR)  And do you recall the public
21  debate regarding HB 101?
22      A.  I don't think 101 -- I don't think 101 got to
23  the floor.  I don't think we had a public debate on
24  that.
25      Q.  Is it that you don't recall?

---

144

1       A.  No.  I don't think that we had a public
2   debate -- you mean in the committee or on the floor of
3   the House?
4       Q.  I'm talking about on the floor of the House.
5       A.  Okay.  Forgive my memory, but I don't think
6   that 101 went to the floor of the House.  Let me look
7   and see.
8       Q.  So was there public debate in the
9   committee?
10      A.  Well, it's -- it's -- what year was this?
11  2007.
12          First of all, I don't think it made it to
13  the floor of the House.
14          Second of all, I don't even recall if it got
15  out of committee or not.
16      Q.  If I was to show you the legislative record
17  on that, would that help refresh your recollection?
18      A.  Yes, it would, please.
19          MR. GEAR:  Why don't we go ahead and
20  mark that.
21          (Riddle Exhibit 159 marked/introduced.)
22      Q.  (BY MR. GEAR)  I'm placing in front of you
23  what's been identified as Exhibit 159.  And I'll give
24  you a chance to look at that.
25          MS. DONNELLY:  Well, there's about 231

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

37 (Pages 145 to 148)

---

145

1    pages, so --
2              MR. GEAR:  In particular, the first
3    page.
4         Q.  (BY MR. GEAR)  What is that?
5         A.  Okay.  This is the Committee on Elections,
6    and Chairman Berman is the chairman.  And I've not yet
7    laid the bill out, it appears here, from what I'm
8    looking at.
9         Q.  Would that be considered the legislative
10   record for the House?
11        A.  No, sir.
12        Q.  Is that a transcript of the hearing?
13        A.  This is a transcript of the hearing.
14        Q.  And that -- would that be considered an
15   official transcript of the hearing?
16        A.  That, I don't know.
17        Q.  What was the date of the hearing?
18        A.  February 28, 2007.
19        Q.  And the document is -- is titled what?
20        A.  "Excerpt of hearing regarding HB 1290,
21   HB 266, HB 101 and HB 218..."
22             So this is not all having to do with my bill.
23   This has to do with multiple bills.  This has -- this
24   is not on the floor of the House.  This is the
25   committee hearing.

---

146

1         Q.  So focusing on HB 101, does that help refresh
2    your recollection as to whether or not there was
3    public debate before the committee?
4         A.  I have to get to it.  Just a second.  To see
5    if there were -- was anybody publicly commenting on
6    it.
7         Q.  Well, if I direct your attention to page
8    75 --
9         A.  There's really no public debate.  It's
10   actually public comment that's taken.  The public
11   doesn't engage really in debate.  The public just
12   simply gives comment.
13        Q.  I stand corrected.
14             MS. DONNELLY:  Was there a page you
15   wanted to direct the witness to?
16             MR. GEAR:  75.
17        A.  Page 75.  Thank you.
18        Q.  (BY MR. GEAR)  And specifically 75 at the
19   bottom.
20        A.  Okay.
21        Q.  Do you see where you referred to HB 626,
22   HB 101 and HB 218 as being quite similar?
23        A.  Yes, sir.
24        Q.  And when you say that the bills were quite
25   similar, what -- what did you mean?

---

147

1              MS. DONNELLY:  Maybe the witness should
2    have an opportunity to read that part of the
3    transcript.
4              MR. GEAR:  Sure.  Please do.
5              MS. DONNELLY:  I think that would be
6    fair.
7              So take your time with that.
8         Q.  (BY MR. GEAR)  Let me know when you've had
9    time to read it.
10        A.  Okay.  I'm not going to read every word of
11   it, but, yes, sir, I remember now that this was my
12   laying out the bill before the committee.
13        Q.  And you remember referring to HB 626, HB 101
14   and HB 218 as being quite similar?
15        A.  Yes, sir.
16        Q.  And my question was:  What did you mean by
17   that?
18        A.  They were all about voter photo ID.
19        Q.  And referring to page 78, during the hearing,
20   do you recall saying that "Our bill is actually
21   patterned after Proposition 200 in Arizona"?
22        A.  Yes, sir.  I don't remember saying it, but
23   I'm -- I'm -- it's stated here, so I assume I did.
24        Q.  And what was Proposition 200 in Arizona?
25        A.  I just got through saying that I don't

---

148

1    remember saying this, but I'm reading here that I did,
2    and I can't tell you.  I don't recall.  That's been
3    some time ago.
4         Q.  And what I'm asking you is:  What was
5    Proposition 200 in Arizona?
6         A.  And I'm telling you, again, that's been some
7    time ago, sir.  I don't recall.  I can do some
8    research on it and come back and tell you.  I'm happy
9    to look it up for you.  But off the top of my head,
10   sir, I don't recall.
11        Q.  Do you also see, on page 78, where you say
12   publicly during the comments period that HB 101 was
13   patterned after HB 1706, Mary Denny's bill?
14        A.  Yes, sir.
15        Q.  Am I correct that HB 101 replicates HB 1706
16   and includes the amendments accepted by Representative
17   Denny during the debate on HB 1706?
18        A.  It does say that there, sir.  I would not
19   have remembered that off the top of my head, but I'm
20   reading it here.
21        Q.  And you identified HB 626 as being a photo ID
22   bill, correct?
23        A.  Yes, sir.
24        Q.  And did you have any communications with
25   Representative -- or strike that.

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

38 (Pages 149 to 152)

---

**149**

1       Who authored HB 626?
2       A.  Golly, I don't recall.  I don't remember what
3   it was.  I'd have to look and see.  But off the top of
4   my head, just spilling out a number means nothing.  I
5   would have to look and see.  I'll be happy to look it
6   up and tell you.
7       Q.  If I were to say that it was Representative
8   King, would that refresh your recollection?
9       A.  Not really.  But if you say it was, I'll take
10  your word for it.
11      Q.  Do you make a habit of communicating with
12  other representatives regarding similar bills prior to
13  their introduction?
14      A.  I wouldn't say I make a habit of it, but we
15  do communicate from time to time.
16      Q.  Based on the -- based on the transcript, you
17  referred to the bills as being quite similar.
18      A.  Uh-huh.
19      Q.  Can you explain to me what you meant by
20  "quite similar"?
21          MS. DONNELLY:  I'm going to object.
22  That calls for information that's protected by
23  legislative privilege.
24          If you want to answer subject to that
25  and it's sealed, it's up to you.

---

**151**

1   by legislative privilege to the extent the question
2   calls for communications with the author of 218.
3           Instruct the witness not to answer.
4       Q.  (BY MR. GEAR)  Are you familiar with the Texas
5   Conservative Coalition?
6       A.  Yes, sir.
7       Q.  And what is the Texas Conservative Coalition?
8       A.  It's a group of individuals that hold very --
9   very strong to our U.S. Constitution and to our basic
10  conservative values that this country was founded on.
11      Q.  When you say "group of individuals," is the
12  Texas Conservative Coalition comprised of elected
13  officials?
14      A.  There are some elected officials that belong
15  to it, yes.
16      Q.  State senators?
17      A.  To my knowledge, I believe so.
18      Q.  House representatives?
19      A.  To my knowledge, I believe so.
20      Q.  Local county officials?
21      A.  I think so.  I don't have the list of
22  their -- of their membership memorized.
23      Q.  Well, are you a member of the Texas
24  Conservative Coalition?
25      A.  I believe I am.

---

**150**

1       A.  Under seal.
2           They were apparently all about voter photo
3   ID.  It's not hard.
4       Q.  (BY MR. GEAR)  And is it fair to say that --
5   regarding the photo ID legislation that these bills
6   were drafted by legislative counsel?
7       A.  I would say 99.99 percent of all of our bills
8   are drafted by legislative counsel, sir.
9       Q.  Do you discuss similar bills with other
10  legislators -- and more specifically, did you discuss
11  HB 626 of photo ID legislation with the drafter of the
12  bill at the time it was being prepared?
13          MS. DONNELLY:  I'm going to object.
14  That calls for information that's protected by
15  legislative privilege.
16          And to the extent that that privilege
17  belongs to the author of 626, instruct the witness not
18  to answer.
19      A.  I'm going to need to declare legislative
20  privilege on that.  I can't betray somebody else's
21  legislative privilege.
22      Q.  (BY MR. GEAR)  And for the record, did you
23  discuss HB 218 with the author of that bill prior to
24  its introduction?
25          MS. DONNELLY:  Same objection.  Covered

---

**152**

1       Q.  And are you a member of any particular
2   committee on the Texas Conservative
3   Committee -- Commission or have you been a member of
4   any particular committee?
5       A.  I don't think I -- I don't think I've been on
6   a committee.  I may have been, but I don't recall.
7       Q.  Have you been on any task forces related to
8   the Texas Conservative Coalition?
9       A.  Again, I may have been.  I don't recall.
10  Over a period of 14 years, it's hard to remember all
11  those details.
12      Q.  And you're still a member of the Texas
13  Conservative Coalition?
14      A.  I assume so, if I'm all paid up.  I don't
15  know.  I'll make that assumption.
16          (Riddle Exhibit 160 marked/introduced.)
17      Q.  (BY MR. GEAR)  Putting in front of you what's
18  been marked Exhibit 160, and I'll give you a chance to
19  take a look at that.
20      A.  Okay.
21      Q.  And are you finished looking at it?
22      A.  Well, I've not read the whole thing, but,
23  yeah, I can -- I was going to ask, is it possible for
24  me to be excused to go to the ladies' room?
25          MR. SCOTT:  Sure.

---

REPRESENTATIVE DEBORAH RIDDLE                                6/18/2014
HIGHLY CONFIDENTIAL

---

153

1          (Break.)
2      Q.  (BY MR. GEAR)  So I had asked you to take a
3   look at Exhibit 160.
4          Have you had a chance to look at Exhibit 160?
5      A.  Well, of course I couldn't read it.  I've
6   just looked at the title and kind of thumbed through
7   it.
8      Q.  Okay.  And what is the title of Exhibit 160?
9      A.  "State Approaches to Illegal Immigration."
10     Q.  Have you seen this report before?
11     A.  I don't recall having seen it.  I may have,
12  but I don't recall.
13     Q.  Do you recall if you served on a task force
14  for the Texas Conservative Coalition Research
15  Institute?
16     A.  Well, it says here that I was on the task
17  force, so I must have.  When was this?  This is in
18  2006, for crying out loud.
19     Q.  And it's October 2006, to be exact.
20     A.  October 2006.  How many years ago is that?
21     Q.  Well, is there -- and you're looking at page
22  2, I -- I would put for the record, and it's titled
23  "Acknowledgments."
24         Was there anyone else on your staff that was
25  acknowledged as working on the task force in 2006?

---

154

1      A.  A member of my staff?
2      Q.  Yes.
3      A.  I don't see any staff members on -- yeah, Jon
4   English.  Yes, Jon English is my chief of staff.
5          Holy cow, I would have never remembered this
6   had I not looked at it.
7      Q.  And he worked on the task force along with
8   you in October of 2006?
9      A.  I -- according to this, he has been.  I truly
10  don't remember it.  This was some time ago.  I'm
11  really -- I'm really flattered that y'all think my
12  memory is so wonderful.  That's astounding.
13     Q.  I want to direct your attention to page 8.
14     A.  Eight years ago.
15     Q.  I'll give you a chance to look at page 8.
16     A.  Page 8.  Okay.
17         Eight years ago.  Man.  That's before some of
18  the grandchildren were even born.
19     Q.  Have you had a chance to look at page 8?
20     A.  I grabbed a donut.  I'm sorry.
21     Q.  And direct your attention to number 1 on page
22  8.
23     A.  Uh-huh.
24     Q.  And that's titled "Voting, Citizenship, and
25  Identity."

---

155

1      A.  Uh-huh.
2      Q.  As a member of the task force, do you recall
3   conducting research on the issue of voting,
4   citizenship and identity?
5      A.  I'm really embarrassed.  I -- this was so
6   long ago, so much goes on every session, so much goes
7   on during every interim, I really don't remember this
8   at all.
9      Q.  Do you recall what the purpose of -- of this
10  report, "State Approaches to Illegal Immigration,"
11  was?
12     A.  I can tell you what it says, but I don't -- I
13  don't know how many times I have to tell you or how
14  many ways I have to tell you, I truly don't remember
15  this.  This was many years ago.  A lot goes on every
16  session, a lot goes on every interim.  And to ask me
17  about details on this, no, I don't remember.  But if
18  it has it here in writing, well, I guess it's the
19  case, so you tell me.
20     Q.  Well, I also cannot answer questions.  But
21  let me just pose a different question to you.
22         During the time period of 2006, do you recall
23  conducting analysis regarding the attitudes of -- of
24  Texas citizens regarding illegal immigration?
25     A.  Me personally doing that?

---

156

1      Q.  As a member of the task force.
2      A.  No.  That's a long time ago.  I don't recall.
3   I wish I did.  I wish I had all the answers to your
4   questions.  Sure makes me feel stupid not doing it,
5   but I -- all I can tell you is what my memory recalls,
6   and I -- I still don't think y'all understand that
7   every session, we deal with so many things, and at the
8   end of session, on sine die -- which is Latin for
9   Miller time -- we -- it just sort of, like -- I'm
10  mentally -- and most of us mentally just shove it, you
11  know, bam.  And then we go into our interim, and then
12  we go into our next session.  And then after that
13  session, we shelve it.
14         To remember all these minute details of every
15  session, there's not a member in the legislature that
16  can do that.
17     Q.  Was illegal immigration or is illegal
18  immigration an important issue to you?
19     A.  Yes, it is.  However, you're asking me about
20  details of -- of meetings and minute things that
21  occurred years ago.  And to say, "Well, if illegal
22  immigration is important to you, then you should
23  remember absolutely everything."  That's like saying,
24  "If you love your mother, then you shouldn't forget a
25  single thing she ever did in your life."

---

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

                                                    40 (Pages 157 to 160)

157

1      Q.  Well, is it your understanding that illegal
2   immigration and voting are one and the same?
3          MS. DONNELLY:  Objection.  Form.
4      A.  I can answer that under seal.
5          Not necessarily.
6      Q.  (BY MR. GEAR)  And why not?
7      A.  There are people that come here illegally
8   that have no intention of voting.
9      Q.  And in reviewing the report "State Approaches
10  to Illegal Immigration," Exhibit 160, is it fair to
11  say that this report focuses heavily on illegal
12  immigration and voting?
13     A.  I have no memory of this report.  I'd have to
14  sit down, sir, and read this entire report to answer
15  your question.
16     Q.  Well, just referring your attention directly
17  to page 8, "Voting, Citizenship, and Identity," is it
18  your testimony that you have no memory of voting,
19  citizenship and identity being compared to photo ID
20  legislation?
21     A.  What, now?  Okay.  I'm on page 8.  B?  Are
22  you talking to B?
23     Q.  I'm talking about number 1.
24     A.  Okay.  Number 1.
25     Q.  "Voting, Citizenship, and Identity."

158

1      A.  Okay.
2      Q.  Is it your testimony that you have no memory
3   of voting, citizenship and identity being tied to
4   photo ID legislation?
5      A.  You're asking me -- you're trying to set a
6   trap, and I don't want to walk into a trap.
7      Q.  No, I'm not trying to set a trap, and I don't
8   mean to cut you off.
9      A.  Yeah, you are.  And what I'm -- you've handed
10  me something that I have no memory of.  And I've told
11  you repeatedly, I have no memory of this.  I don't
12  mind taking the time to sit down and read it, but this
13  was done back in 2006, for crying out loud.  October
14  2006.  It is now, what, 2014, and you're asking me
15  details of something that goes back that's how many
16  pages?  I don't think you yourself, as smart as I know
17  you are, could do this.  And I think it's unfair for
18  you to ask me.  And so I'm trying to answer your
19  questions as honestly and as straightforward as I can,
20  but you're asking me, you know, kind of "When did you
21  stop beating your wife" kind of a question.
22     Q.  Are you finished?
23     A.  No.  I want you to -- if you're going to ask
24  me questions, ask me direct questions that are fair
25  and right that I can look here and answer.

159

1          MR. GEAR:  I move to strike as
2   nonresponsive.
3      Q.  (BY MR. GEAR)  And I'd like you to set the
4   exhibit aside for a second, and I'll ask you questions
5   beyond the exhibit.  So I'm not asking you to focus on
6   the exhibit now.  I'm asking you, in the course of
7   your consideration of photo ID legislation, did you
8   ever conduct analysis that looked at voting,
9   citizenship and identity?
10     A.  I've already answered that question, and I
11  told you that, unlike Washington, D.C., that you're
12  very familiar with, we do not have unlimited amounts
13  of money.  Here in Texas, we're much more responsible
14  with our funds, and our budgets are very limited, and
15  I do not have the funds to conduct the kind of
16  analysis that you're talking about.
17         MS. DONNELLY:  I didn't get a chance to
18  object.  Legislative privilege.  That question was
19  answered under seal.
20     Q.  (BY MR. GEAR)  And you're answering that
21  question under seal?
22     A.  Under seal.
23     Q.  And your answer to that question was, no, you
24  did not conduct that analysis?
25     A.  I do not have the --

160

1          MS. DONNELLY:  Same objection.
2      A.  -- funds.
3          Same objections.  Under seal.
4          And quite frankly, I do not have the funds to
5   conduct all of the analyses that you're asking if we
6   conducted.  That's insane.  We do not have the funds
7   to do that as individual state representatives.
8      Q.  (BY MR. GEAR)  Did you undertake any analysis
9   regarding any photo ID legislation --
10         THE WITNESS:  He has no understanding of
11  what I'm saying, does he?
12     Q.  (BY MR. GEAR)  I'm sorry, did you have a
13  response?  I was asking a question.  I just appreciate
14  you allowing me to at least ask the question so we're
15  not talking over the court reporter.  So let me try to
16  ask that question again.
17         During your consideration of any photo ID
18  legislation, did you undertake any analysis to address
19  the concerns of opponents of any of the photo ID
20  legislation?
21         MS. DONNELLY:  I'm going to object.
22  Calls for information covered by the legislative
23  privilege.
24         I think we've gone over this before,
25  respectfully, and allow the witness to answer if she

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

41 (Pages 161 to 164)

---

161

1    would like to answer.  The answer will be under seal.
2         A.  I feel like you're at the point of badgering
3    me, because I've said repeatedly that none of us in
4    the legislature have the kind of funds to conduct the
5    type of analyses that you're referring to.  As close
6    as we can get to an analysis is what we hear in our
7    committee hearings or maybe what other organizations
8    might do or bring to us.
9         But you're asking -- so you can ask me from
10   now until the cows come home, "Did you conduct an
11   analysis?"  You can ask me if I conducted an analysis
12   on horses.  The answer to that is, no, we do not have
13   the funds to conduct the types of analysis that you're
14   used to in Washington, D.C.  We do not spend money we
15   do not have, and we're given a budget, and we cannot
16   exceed that budget.
17        Q.  (BY MR. GEAR)  So is it fair to say that you
18   did not review any analysis regarding any of the
19   issues that were raised as a concern by the opponents
20   of photo ID legislation?
21             MS. DONNELLY:  I'm going to object to
22   the form of the question.  I'm also going to object
23   because the question calls for information covered by
24   the legislative privilege.
25             You may answer subject to that

---

162

1    objection, and the answer will be under seal, if you
2    want to.
3         A.  You asked me if I reviewed any, not if I
4    conducted any?
5         Q.  (BY MR. GEAR)  That's correct.
6         A.  Those are two separate questions.
7         Q.  Correct.
8         A.  One I would have to pay for, the other I
9    would simply review if an outside organization
10   conducted it.  I do not recall.
11        Q.  I want to try to explore your knowledge of
12   what the attitude of Texas citizens was in 2006 during
13   the consideration of photo ID legislation.
14        Did you consider the attitude of your
15   constituents towards illegal immigration in 2006?
16             MS. DONNELLY:  Objection.  Calls for
17   information covered by legislative privilege.
18             You may answer if you'd like, and it
19   will be -- your answer will be under seal.
20        A.  Under seal, the answer to that question is
21   yes, sir.
22        Q.  (BY MR. GEAR)  And what, related to their
23   attitude, did you consider?
24             MS. DONNELLY:  Same objection.  The
25   answer, again, if you would like to answer, it is

---

163

1    under seal.
2         A.  Under seal, the vast majority, the huge,
3    overwhelming majority of my constituents are very
4    concerned about illegal immigration.  Even to this
5    good day, they want security on our border, and they
6    felt very strongly about having voter photo ID for all
7    of the reasons I've said repeatedly.  And that is the
8    overall consensus of -- of my constituency and I
9    believe others in the community that may not be in my
10   district.
11        Q.  (BY MR. GEAR)  And did your constituents
12   express concern regarding noncitizens or illegal
13   aliens voting at the polls?
14        A.  They expressed concern about anybody voting
15   at the polls that was not registered to vote or would
16   not be able to vote legally.
17        Q.  And my question was:  Did they express
18   concerns regarding noncitizens or illegal aliens
19   voting at the polls?
20        A.  Along -- yes, along with anyone else who
21   would be voting illegally.
22        Q.  And did you attempt to determine at any time
23   whether or not their concerns regarding noncitizens or
24   illegal aliens voting at the polls was valid?
25             MS. DONNELLY:  Objection.  Calls for

---

164

1    information covered by legislative privilege.
2             You may answer under seal if you would
3    like.
4         A.  Once again, I told you that we do not have
5    the funds to conduct the type of analysis; but from
6    the anecdotal information I had received, I felt like
7    that it was important for us to make sure that our
8    ballot boxes were, in fact, secure.
9         Q.  (BY MR. GEAR)  Did you receive anything other
10   than anecdotal evidence regarding noncitizens or
11   illegal aliens voting at the polls?
12             MS. DONNELLY:  Same objection.
13             You may answer under seal.
14        A.  I don't recall anything specifically, but
15   this was some time ago.  I don't want to give an
16   incorrect answer, so I'm going to have to say I don't
17   recall at this point.
18        Q.  (BY MR. GEAR)  Referring your attention to
19   Exhibit 158 -- and I'll give you a chance to pull
20   that.
21        A.  Okay.
22        Q.  And specifically, turning your attention to
23   page 6.
24             MS. DONNELLY:  Mr. Gear, same objection
25   on any questions regarding the documents that have

---

---

173

1    A.  It was -- it was -- having that included was,
2    I think, that they -- the consensus would say that it
3    was a step in the right direction, but it was
4    something they weren't thrilled with.  Their primary
5    thing that they wanted was voter photo ID.  Pretty --
6    pretty plain and simple.
7         Q.  So what changed between HB 218, HB 1706,
8    SB 362 photo ID legislation with your constituents
9    that would have made them think that nonphoto ID was
10   not a step in the right direction?
11        MS. DONNELLY:  We're still running
12   objection, right?  This is still all under seal,
13   correct?
14        MR. GEAR:  Sure.
15        A.  Nothing changed with the constituency.  We
16   got more of a majority in the House.  So we were able
17   to comply more with what our constituency was asking
18   for and not having to compromise quite as much.
19        Q.  (BY MR. GEAR)  So is it your testimony that
20   you limited the forms of ID under SB 14 because you
21   had a majority in the House?
22        A.  We were able, at that point, with more of a
23   majority, to not be forced into making compromises
24   that, quite frankly, my constituency was not
25   necessarily pleased with.

---

174

1         Q.  Is it fair to say that there were amendments
2    offered during the -- I call it the debate, you may
3    call it something different -- the public record on
4    SB 14 in the House that would have mitigated some of
5    the concerns that the opponents of SB 14 had?
6         A.  I don't remember the amendments.
7         Q.  Was there an amendment that -- I'll withdraw
8    that question.
9         MR. GEAR:  Why don't we take a
10   five-minute break.
11        MS. DONNELLY:  I'm sorry, before we
12   do -- I didn't want to interrupt your line of
13   questioning.
14        MR. GEAR:  Sure.
15        MS. DONNELLY:  This last line of
16   questioning, we kind of talked about --
17        MR. ROSENBERG:  Subject to --
18        MS. DONNELLY:  -- the running objection,
19   but this whole last line of questioning, from the time
20   that I asked for a running objection to now, when
21   we're taking the break, that's all under seal,
22   correct?
23        MR. GEAR:  Correct.
24        MR. ROSENBERG:  That's correct.
25        MR. GEAR:  I understood that.

---

175

1         MS. DONNELLY:  Okay.  Thank you.
2         (Break.)
3         Q.  (BY MR. GEAR)  Forgive me if this was asked
4    already, but was photo ID legislation important to
5    you?
6         MS. DONNELLY:  This has been asked.
7    This has been asked.
8         A.  Was it important?  (Laughing.)  Yes.  Does a
9    plane have wings?
10        Q.  (BY MR. GEAR)  Do you recall --
11        A.  I apologize.  Oh, my goodness.  Okay.
12        Q.  That was a segue to my question.
13        Do you recall --
14        A.  I didn't mean to be rude.  I apologize.
15        Q.  That's okay.
16        Do you recall a time period where you
17   actually camped out to file your photo identification
18   legislation first?
19        A.  Yes.  Uh-huh.  I recall that very well.
20        Q.  And why did you camp out?  And if you'd like
21   to use a different term, please do.
22        A.  Oh, "camp out" is good.  That's what I did.
23   I had asked the speaker for a low bill number, what's
24   called a -- a privileged or a low bill number that the
25   speaker reserves, like, about the first 10, 15 bill

---

176

1    numbers, and those are bills that are -- are
2    considered very important by the speaker.  And I was
3    denied.  And so I, by golly, wanted to be the first
4    one in line.  So in order to do that, I camped out.
5         And it was not outside, it was I just
6    stayed -- because we file our bills, the numbers given
7    are in order of when we do it, not -- not when they're
8    given to leg' counsel.  And so the chief clerk's
9    office is where they're filed, that's off the floor of
10   the House chamber, and I kind of camped out right at
11   the door of the House chamber.  And I didn't think
12   anybody would notice, quite frankly, but then the
13   whole world found out about it.  I did it just to
14   prove a point.
15        Q.  And what was the point you were proving?
16        A.  I wanted a low bill number.  But a low bill
17   number doesn't automatically mean you pass your bill.
18        Q.  Are we referring to HB 16 as the bill that
19   you camped out to file?
20        A.  Uh-huh.
21        Q.  And was that a bill which your constituents
22   asked you to file?
23        A.  On the voter photo ID?
24        Q.  Yes.
25        A.  That's why I was laughing so hard.  That was

REPRESENTATIVE DEBORAH RIDDLE                    6/18/2014
HIGHLY CONFIDENTIAL

45 (Pages 177 to 180)

177

1    their very high priority.
2        Q.  And did you discuss HB 16 with your
3    constituents?
4        A.  They discussed it with me, yeah.  Uh-huh.
5        Q.  And what concerns did they raise to you
6    regarding photo ID legislation in that time period?
7        A.  They were insisting that they wanted to make
8    sure that the integrity of the ballot box is, in fact,
9    secure.
10       Q.  So when they insisted regarding the integrity
11   of the ballot box, did they provide reasons why they
12   thought the integrity of the ballot box was not
13   secure?
14       A.  They wanted the ballot box secure.  They
15   wanted the integrity of the ballot box secure.
16       Q.  Right.
17           And my question was:  Did they provide
18   reasons for --
19       A.  Some did, some didn't.  But they all -- the
20   one thing they all had in common is, they wanted to
21   make sure that the integrity of the ballot box was
22   secure.  And, quite frankly, even to this good day,
23   they do not understand at all why anybody would
24   object.  Even my last conversation with my
25   constituents, which was yesterday, they just don't

178

1    understand why anybody could or would ever object to
2    it.  And those that do, they find suspicious.
3        Q.  Did any of your constituents identify the
4    reason why they thought the ballot box was not secure
5    was because noncitizens or illegal aliens are voting?
6        A.  They feel like insurance -- it's kind of like
7    insurance.  You don't buy insurance on your car after
8    you have a wreck.  You buy insurance on the car in
9    case you have a wreck.  They felt like that there were
10   probably violations, they didn't necessarily know all
11   the violations or any of the violations.  But they are
12   a well-educated lot of folks, and they wanted to make
13   sure that the ballot boxes were, in fact, secure, that
14   the integrity of the ballot box was well-established,
15   and they felt like a voter photo ID would accomplish
16   that to a large degree.  Maybe not completely, but it
17   would help take care of a large part of the problem.
18   Whether it's real or imagined, that's what they
19   wanted.
20       Q.  Did you or your staff attempt to determine
21   whether or not their concerns were real or imagined?
22       A.  Their concerns are valid.
23       Q.  And how do you know that?  What steps did you
24   take --
25       A.  If my constituents have a concern regarding

179

1    the ballot box, then nobody has to prove that that
2    individual, that their concerns are not valid if they
3    don't have an entire court case to prove it to me.  If
4    they have a concern, then I take their concern
5    seriously.
6        Q.  And as you've testified, you did not take any
7    steps to conduct any type of analysis to find out if
8    their concerns were valid or imagined; is that right?
9        A.  We do not have the budget, as a state
10   representative, to do that.  You don't understand.  We
11   do not spend money we do not have, unlike Washington,
12   D.C., and the Obama administration.
13       Q.  And I understand your answer, and the answer
14   was no?
15       A.  How many times have I said no?  I don't know
16   how many other times I can say the same answer.
17       Q.  Fair enough.
18           MR. GEAR:  I think, at this point, I'll
19   pass the witness.
20           THE WITNESS:  Thank you.
21           E X A M I N A T I O N
22   BY MS. FARANSSO:
23       Q.  Representative Riddle, again, I'm Tania
24   Faransso, and I'm here on behalf of the Texas League
25   of Young Voters Education Fund.

180

1            And just before I begin, quickly, do you
2    understand that the same ground rules that applied
3    when Mr. Gear and Mr. Rosenberg were questioning you
4    will apply when I'm asking you questions?
5        A.  Who is that group?  I'm not familiar with the
6    group.
7        Q.  It's a public interest group here in Texas
8    that works on behalf of young voters.
9        A.  Really?  Who funds you?  Who does your
10   funding?
11       Q.  Well, I'm their attorney, so I'm not part of
12   the group.  So those may be questions for another
13   time.
14       A.  Are they a 501(c) group?
15       Q.  I believe so.
16       A.  Okay.  I'm curious as to who funds them.  Who
17   does their funding?
18       Q.  I'm -- you know, I don't know if that's --
19   this is the appropriate time to get into it, given
20   that we are looking to keep things moving along.  So
21   if I can, I'll just go ahead and turn to my questions.
22       A.  Okay.
23       Q.  Do you recall, during your conversation with
24   Mr. Rosenberg about Senate Bill 14, that among the
25   list of permitted forms of identification for

REPRESENTATIVE DEBORAH RIDDLE                                    6/18/2014
HIGHLY CONFIDENTIAL

46 (Pages 181 to 184)

---

181

1   verifying one's identity at the polls, that that list
2   did not include student ID?
3       A.  Uh-huh.
4       Q.  You recall that.
5           And if I can have you look at --
6           MS. FARANSSO:  Have you marked this
7   document?
8           THE REPORTER:  It will be 161.
9           (Riddle Exhibit 161 marked/introduced.)
10      Q.  (BY MS. FARANSS0)  Representative, do you
11  recognize or know what this document is that is
12  Exhibit 161?
13      A.  Okay.  It says it's the House journal of the
14  82nd legislative regular session.
15      Q.  And that was the session that considered
16  Senate Bill 14; is that right?
17      A.  Uh-huh.
18      Q.  If you could please turn to page 979 of
19  Exhibit 161.
20      A.  979?
21      Q.  Yes.  That's right.
22          And take a look at that page specifically and
23  Amendment No. 23 that's listed there.
24      A.  Okay.
25      Q.  And do you see that that's an amendment to

---

182

1   insert into Senate Bill 14 a student identification
2   card issued by a public or private high school or
3   institution of higher education that contains that
4   person's photograph?
5       A.  Yes.
6       Q.  And do you also see that you -- that
7   Representative Phillips moved to table that amendment,
8   and you voted in favor of tabling that amendment?
9       A.  Yes.
10      Q.  What was your basis for voting to table
11  Amendment 23 to include student identification as a
12  permitted form of ID in Senate Bill 14?
13          MS. DONNELLY:  Objection.  Calls for
14  information covered by legislative privilege.
15          You may answer if you like, but it will
16  be under seal.
17      A.  Under seal, it had come to my attention that
18  there was concern that out-of-state students were
19  possibly voting twice, both in the location where
20  their college or university was, and then also voting
21  again where their home was.  That seemed like a --
22  kind of a serious -- serious fracture in the integrity
23  of the ballot box.  A serious crack, if you will.
24      Q.  (BY MS. FARANSSO)  At what point did that come
25  to your attention?

---

183

1       A.  Probably right around this time.  I don't
2   recall.  But kind of right around that time, I would
3   guess.  I don't recall.
4       Q.  And just for the record, do you recall that
5   in the same legislative session, you had proposed
6   HB 16, which did, in fact, include student ID as a
7   form of identification?
8       A.  When I had that drafted, I did not give it
9   that thought or was not aware of that.
10      Q.  More specifically, if you could elaborate on
11  what you were just speaking about.
12          What changed, in your mind, with respect to
13  whether student identification was a permitted form
14  of -- or an acceptable form of identification for
15  purposes of voting between the time you drafted HB 16
16  and the time that you were considering Senate Bill 14,
17  which, again was in the same legislative session?
18          MS. DONNELLY:  Objection.  The
19  information covers information covered by legislative
20  privilege.
21          You can answer if you want, but it's
22  under seal.
23      A.  I just got through telling you.
24      Q.  (BY MS. FARANSSO)  I'm sorry, would you mind
25  telling me again?  There's been a lot of questions

---

184

1   today, so...
2       A.  I just got through telling you that there was
3   some concern that had been brought up that students --
4   the concern was that students had, or we were told had
5   possibly voted both in the area where their school or
6   university was and then traveled home and voted again.
7       Q.  (BY MS. FARANSSO)  So those were concerns that
8   were coming up during the debate of Senate Bill 14?
9       A.  If I remember correctly, this was one of the
10  reasons why I voted to table that.
11      Q.  So were you aware of any specific pieces
12  suggesting that student IDs were being used
13  fraudulently at the polling place?
14          MS. DONNELLY:  Same objection.  Covered
15  by legislative privilege.
16          You can answer if you want.
17          Do you want to have a running objection
18  to this line of questions as being answered under
19  seal?
20          MS. FARANSSO:  Sure.
21      A.  I don't recall.
22      Q.  (BY MS. FARANSSO)  So you don't recall any
23  specific testimony regarding student IDs being
24  fraudulently used at the polling place?
25      A.  Huh-uh.

---

REPRESENTATIVE DEBORAH RIDDLE                    6/18/2014
HIGHLY CONFIDENTIAL

47 (Pages 185 to 188)

185

1      Q.  Representative, do you recall any analysis
2  that was discussed or reviewed on the record during
3  the debate as to whether student IDs were being used
4  fraudulently at the polling place?
5      A.  I don't recall.
6      Q.  And do you -- just a couple more questions.
7          Do you recall any discussion about the impact
8  of removing student IDs as an acceptable form of
9  identification on, for example, student turnout?
10      A.  I -- I really don't recall.
11          (Mr. Rosenberg and Mr. Scott left the room).
12      Q.  (BY MS. FARANSSO)  And finally, do you recall
13  any discussion about the impact of removing student
14  IDs as an acceptable form of identification on the
15  turnout of minority voters?
16      A.  No, I don't recall that at all.
17      Q.  And do you recall any alternatives that were
18  considered to include student IDs in Senate Bill 14,
19  any alternatives to ensure that those may be permitted
20  in the bill?
21      A.  There may have been, but I don't recall.
22  This is some time ago.
23          MS. FARANSSO:  Okay.  I think that's all
24  my questions.  I think that's all my questions, unless
25  anyone has any others.  And I think, if we can keep

186

1  the deposition open pending the resolution of the
2  various motions to compel responses --
3          MS. DONNELLY:  You mean the objections?
4          MS. FARANSSO:  Yes.
5          MS. DONNELLY:  To clarify for the
6  record, because I think I kind of muffled it, your
7  questions were all answered under seal.
8          MS. FARANSSO:  That's correct.
9          MS. DONNELLY:  And subject to the
10  legislative privilege.
11          Okay.  Thank you.
12          MS. FARANSSO:  Thank you.
13          MS. DONNELLY:  So I think that's all the
14  questions that anybody has; is that -- am I correct?
15          MS. COHAN:  I'll duck my head out and
16  just ask Ezra and John.
17          MR. GEAR:  This is Bruce Gear speaking.
18  I would also hold the deposition open pending a
19  resolution of the -- of the issues on legislative
20  privilege.
21          MS. DONNELLY:  I understand.
22          MS. COHAN:  I think everybody's done.
23          MR. SCOTT:  Let's go on the record on
24  this one, because I don't know how to handle this.
25          MR. ROSENBERG:  Well, to the extent --

187

1  I'm agreeable that, to the extent there have been some
2  lines of questioning as to which there was indicated
3  that there was continuing objections as to privilege,
4  that they will be handled as continuing objections.  I
5  don't think we have any problems on this record.
6          MR. SCOTT:  Yes.  But I meant from the
7  standpoint of sealing -- for purposes of just making
8  sure that this -- the highly confidential matters do
9  not become commingled with anything else
10  inadvertently.  There's documents that are portions of
11  the exhibits attached to the deposition.  All the
12  documents should be sealed that are of a highly
13  confidential nature.
14          MR. ROSENBERG:  Agreed.  And I'm
15  willing, certainly, to wait until after you've had a
16  chance to review the transcript to make sure that
17  there's not been anything that's fallen outside the
18  cracks of highly confidential for it to be remaining.
19          MR. SCOTT:  And I guess, from a -- I'm
20  just talking from a housekeeping standpoint, how are
21  we going to have her deliver the deposition?
22          MR. ROSENBERG:  I think those should
23  be -- all the -- the reporter should take charge of
24  the exhibits, consider them under seal -- you probably
25  have a procedure for doing that -- and then deliver it

188

1  to the witness as the --
2          MR. SCOTT:  I don't think she does.
3          THE REPORTER:  I can't talk and write.
4          MR. SCOTT:  Okay.  Do you have a
5  procedure for dealing with documents under seal?
6          THE REPORTER:  I'm sure we probably do.
7  But if not, we will find one.
8          MR. ROSENBERG:  There's two ways of
9  doing it:  One is to leave it in the hands of
10  reporter, the other is to leave it in the hands of one
11  of the attorneys with the understanding that the
12  attorney has custody of the documents.  I'm happy with
13  whatever works for you, John.
14          MR. SCOTT:  Well, I want to get copies
15  of the exhibits attached to our copy, so let's make
16  sure she's got them for the purposes of doing that.
17  Or, Ezra, if you want to keep the exhibits and make a
18  copy for us.  So let's give them to the court
19  reporter, let the court reporter maintain them and
20  make copies.
21          MR. ROSENBERG:  I'd rather the court
22  reporter, because I don't want to travel with them.
23          MR. SCOTT:  Perfect.  And then if you
24  will make sure that any entries that were designated
25  sealed are done in such a way that no one -- that

## 1

```
 1            IN THE UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF TEXAS

 2                   CORPUS CHRISTI DIVISION

 3   MARC VEASEY, et al.,        )

              Plaintiffs,        )

 4                               )

     v.                          ) CIVIL ACTION NUMBER

 5                               )  2:13-cv-193(NGR)

     RICK PERRY, et al.,         )

 6            Defendants.        )

 7   ********************************************************

 8                     ORAL DEPOSITION OF

 9                      TONY RODRIGUEZ

10                       MAY 8, 2014

11   ********************************************************

12       ORAL DEPOSITION OF TONY RODRIGUEZ, produced as a

13   witness at the instance of Plaintiffs, and duly sworn,

14   was taken in the above-styled and numbered cause on

15   May 8, 2014, from 9:16 a.m. to 6:35 p.m. before Kim

16   Seibert, CSR in and for the State of Texas, reported by

17   machine shorthand, at the law offices of DECHERT LLP,

18   300 West Sixth Street, Suite 2010, Austin, Texas,

19   pursuant to the Federal Rules of Civil Procedure and/or

20   the provisions stated on the record or attached hereto.

21

22

23

24

25
```

## 2

```
 1                      A P P E A R A N C E S

 2

 3   FOR PLAINTIFF UNITED STATES OF AMERICA:
         Ms. Jennifer L. Maranzano
 4         - and -
         Mr. Daniel J. Freeman
 5       U.S. DEPARTMENT OF JUSTICE
         Civil Rights Division
 6       950 Pennsylvania Avenue, NW
         NWB Room 7203
 7       Washington, DC  20530
         (202) 305-4355
 8       jennifer.maranzano@usdoj.gov
 9

10   FOR THE VEASEY PLAINTIFFS:
         Mr. Scott Brazil
11       BRAZIL & DUNN, LLP
         4201 Cypress Creek Parkway
12       Suite 530
         Houston, Texas  77068
13       (281) 380-6310
         scott@brazilanddunn.com
14

15   FOR THE TEXAS LEAGUE OF YOUNG VOTERS
     PLAINTIFF-INTERVENORS:
16       Mr. Richard F. Shordt
         WILMER CUTLER PICKERING HALE AND DOOR, LLP
17       1875 Pennsylvania Avenue, NW
         Washington, DC  20006
18       (202) 663-6262
         richard.shordt@wilmerhale.com
19        - and -
         Ms. Natasha Korgaonkar
20        - and -
         Mr. Ryan P. Haygood
21       NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.:
         40 Rector Street
22       5th Floor
         New York, New York  10006
23       (212) 965-2200
         nkorgaonkar@naacpldf.org
24
25
```

## 3

```
 1   FOR THE ORTIZ PLAINTIFFS:
         Mr. Robert W. Doggett (By Telephone)
 2       TEXAS RIO GRANDE LEGAL AID, INC.
         4920 North IH-35
 3       Austin, Texas  78751
         (512) 374-2725
 4       rdoggett@trla.org
 5

     FOR THE DEFENDANTS:
 6       Mr. S. Ronald Keister
         OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 7       P.O. Box 12548
         Austin, Texas  78711
 8       (512) 463-2197
         ronny.keister@oag.state.tx.us
 9

10   ALSO PRESENT:
         Ms. Kathleen T. Murphy-Darveau
11       TEXAS DEPARTMENT OF PUBLIC SAFETY
         5805 North Lamar Boulevard
12       Austin, Texas  78752
         (512) 424-2420
13       kathleen.murphy@dps.texas.gov
14

15   REPORTED BY:
         Kim Seibert, CSR, RPR
16       U.S. Legal Support, Inc.
         Austin Centre
17       701 Brazos, Suite 380
         Austin, Texas  78701
18       (512) 788-8627
         KimBowenCSR@yahoo.com
19
20
21
22
23
24
25
```

## 4

```
 1                       INDEX

 2   Appearances...................... 2

 3

 4   TONY RODRIGUEZ

 5
     Examination by Ms. Maranzano..................  8
 6   Examination by Mr. Brazil....................  189
     Examination by Ms. Korgaonkar..........  197
 7   Examination by Mr. Keister....................  316
     Further Examination by Ms. Korgaonkar..........  332
 8   Further Examination by Ms. Maranzano...........  334
     Further Examination by Ms. Korgaonkar..........  339
 9
     Witness' Signature Page........................  341
10   Reporter's Certificate.........................  343

11

12                      EXHIBITS
13   NUMBER      DESCRIPTION                 PAGE
14   Exhibit 63  ................................  20
                 Notice of Deposition
15   Exhibit 64  ................................  25
                 December 2011 Version of a DL-14C
16   Exhibit 65  ................................  45
                 E-mail to Witness
17   Exhibit 66  ................................  52
                 E-mail from Lynn Hale to Witness
18               dated June 26, 2013
                 with Attachment
19   Exhibit 67  ................................  95
                 E-mail from Witness
20   Exhibit 68  ................................  99
                 E-mail to Witness from Amelia
21               Flores, dated 10-24
     Exhibit 69  ................................  112
22               E-mail to DPS Regional Managers
                 from Witness
23   Exhibit 70  ................................  125
                 E-mail from Witness
24   Exhibit 71  ................................  129
                 E-mail to Witness in July
25
```

TONY RODRIGUEZ                                          5/8/2014

3 (Pages 9 to 12)

---

**9**

1    Q.  (BY MS. MARANZANO)  Sir, first of all, I would
2  like to go through some ground rules for this
3  deposition.  You've been placed under oath today, so
4  it's important that you testify truthfully, accurately,
5  and completely.  Do you understand?
6    A.  Yes.
7    Q.  The court reporter will prepare a transcript
8  of everything that is said.  So if you could wait until
9  I finish a question before you answer, and I'll wait
10 until you finish answering before I ask the next
11 question.  Is that okay?
12   A.  Yes.
13   Q.  And if you would please just remember to
14 respond to my questions verbally instead of nodding or
15 shaking your head.  Is that okay?
16   A.  Yes.  I'll try.
17   Q.  Thank you.  I will try to ask you clear
18 questions.  If you don't understand a question, please
19 just stop and let me know.  Is that okay?
20   A.  Yes.
21   Q.  If you wish to stop and take a break, let me
22 know and I will do my best to accommodate you.
23        From time to time your attorney may make
24 an objection.  He's making that objection for the
25 record and unless he instructs you not to answer, you

---

**10**

1  can go ahead and answer my question.  Okay?
2    A.  Yes.
3    Q.  Do you understand these instructions?
4    A.  Yes.
5    Q.  Are you on any medication today that would
6  affect your ability to testify truthfully, accurately,
7  and completely?
8    A.  No.
9    Q.  Is there any other reason why you cannot
10 testify truthfully, accurately, and completely today?
11   A.  No.
12   Q.  Today during this deposition I may use the
13 term "EIC."  When I do that I'm referring to an
14 election identification certificate.  Is that okay?
15   A.  That's fine.
16   Q.  And I may use the term "DPS" today.  And when
17 I use that term I'm referring to the Department of
18 Public Safety.  Is that okay?
19   A.  Yes.
20   Q.  Okay.  Are you employed?
21   A.  Yes.
22   Q.  Where are you employed?
23   A.  Physically?
24   Q.  No, the name of the entity that you work for.
25   A.  The Department of Public Safety.

---

**11**

1    Q.  And what is your position with them?
2    A.  I'm a senior manager in the driver license
3  division.
4    Q.  How long have you held that position?
5    A.  About 2-1/2 years.
6    Q.  Have you held any other positions at DPS?
7    A.  No.
8    Q.  What are your responsibilities?
9    A.  In my capacity as a senior manager in the
10 driver license division, I'm responsible for the
11 operations of all of the driver license offices in DPS
12 Regions 3, 4, 5, 6A, and 6B.
13   Q.  And what is the significance of those regions?
14   A.  That's how the Department of Public Safety
15 geographically divides the state.
16   Q.  So which geographic portion of the state is
17 that?
18   A.  That's roughly described as the western
19 portion of the state.  It extends from -- from the tip
20 of the -- tip of the state into the Panhandle and
21 out to El Paso.  And it also includes the central
22 portion of the state centered around Austin and
23 San Antonio.
24   Q.  Okay.  Does anybody report directly to you?
25   A.  Yes.

---

**12**

1    Q.  How many people?
2    A.  My direct reports?
3    Q.  Uh-huh.
4    A.  The managers for those regions that I
5  indicated previously, they all report to me.  And
6  that's about five.
7    Q.  And what are their positions?
8    A.  They're referred to as regional managers.
9    Q.  Who do you report to?
10   A.  I report to Deputy Assistant Director
11 Paul Watkins.
12   Q.  And who does Mr. Watkins report to?
13   A.  Paul reports to Assistant Director Joe Peters.
14   Q.  And how many people are between you and DPS
15 director Steve McCraw?
16   A.  Three, I believe.
17   Q.  So Mr. Peters reports to --
18   A.  Mr. Peters report to Cheryl, Cheryl MacBride.
19 She's the deputy director.
20   Q.  Okay.
21   A.  And Cheryl reports to Director McCraw.
22   Q.  Okay.  Can you tell me what your
23 responsibilities are specifically with regard to EICs?
24   A.  Yes.
25   Q.  What are they?

---

TONY RODRIGUEZ                                                    5/8/2014

4 (Pages 13 to 16)

---

**13**

1    A.  I was asked to -- to be the agency point of
2  contact or correction, the driver license point of
3  contact for the EIC program.
4    Q.  And what does that mean, the agency point of
5  contact?
6    A.  It means that I was responsible to oversee it
7  from -- from its start, roughly June until the present
8  time.
9    Q.  Are you still responsible for overseeing the
10  program?
11    A.  Yes.
12    Q.  Was that -- I believe you said you were asked
13  to do that?
14    A.  Yes.
15    Q.  Who asked you to do that?
16    A.  It was -- it was Paul Watkins and Joe Peters.
17    Q.  Did you -- did you request that role?
18    A.  Did I request it?
19    Q.  Uh-huh.
20    A.  No.
21    Q.  What was your training for that?
22    A.  I didn't receive any formal training for that.
23    Q.  Do you know why you were chosen for this role?
24    A.  It may have been -- well, it's speculant.
25        MR. KEISTER:  If you know.

---

**14**

1        THE WITNESS:  It's -- my speculation --
2    Q.  (BY MS. MARANZANO)  Uh-huh.
3    A.  -- is that it was because of my previous
4  experience in the US Army.
5    Q.  And what experience is that?
6    A.  I was an Army strategist.
7    Q.  And what was your role as an Army strategist?
8    A.  I planned wars.
9    Q.  And why do you think that that experience was
10  relevant to the -- to taking on the position overseeing
11  the EIC program?
12    A.  In order to do that, I graduated from the
13  School of Advanced Military Studies, and the curriculum
14  in the School of Advanced Military Studies establishes
15  a -- it establishes a plan or a way to design large
16  operations.
17    Q.  Okay.  Sir, did you say you were the statewide
18  point of contact for the EIC program?
19    A.  Within the Department of Public Safety.
20    Q.  Is there a statewide point of contact within
21  other agencies, other state agencies?
22    A.  There may be.  I don't know.
23    Q.  Okay.  Do you have a responsibility for
24  ensuring that DPS is issuing EICs accurately?
25    A.  Yes.  Define "accurate."

---

**15**

1    Q.  Making sure that those individuals who receive
2  an EIC are, in fact, eligible for an EIC.
3    A.  You're going to have to be more specific than
4  that because I have -- as I've described, I have
5  two responsibilities, my first responsibility within
6  the DPS regions that I spoke to you about.  And part of
7  that is to -- is to ensure that customers or applicants
8  who come to our offices receive the -- the documents,
9  the election certificates or driver licenses or
10  ID cards that they're seeking.  So I have that
11  responsibility.  But I also have a responsibility to
12  coordinate the election certificates.
13    Q.  Okay.  And in your role as coordination --
14  coordinator of the election certificates, do you -- is
15  part of your role to ensure that individuals who are
16  eligible for an EIC obtain an EIC?
17    A.  I -- I help establish the rules, the
18  procedures, to allow individuals to -- who seek EICs
19  and are eligible to receive those documents.
20    Q.  Okay.  Do you have responsibility for ensuring
21  the EIC program is a success?
22        MR. KEISTER:  Object, vague.
23        (BY MS. MARANZANO)  Do you understand the
24  question?
25    A.  Not entirely.

---

**16**

1    Q.  Do you have a responsibility for ensuring that
2  the EIC program is run effectively?
3    A.  I don't understand what you mean by
4  "effectively."
5    Q.  Do you have -- do you have a responsibility
6  for ensuring -- actually, strike that.
7        Can you tell me what percentage of your
8  time is spent on the EIC program versus the -- your
9  other role of overseeing the driver's license?
10    A.  That's -- it depends.  And the reason that it
11  depends is it will depend if we're in an election cycle
12  or not.  For example, in between election cycles we --
13  I don't spend more than about 30 minutes a day as --
14  and during an election cycle, as we're doing now, it
15  may -- it may increase.  But that information is
16  reflected on my time card.
17    Q.  Okay.  And have you given your time card to --
18  to counsel for Texas?
19    A.  No.
20    Q.  Has he requested it from you?
21    A.  No.
22    Q.  I'm sorry.
23        MR. KEISTER:  Don't answer any questions
24  about what you and I or any other counsel talked about.
25        THE WITNESS:  Sorry.

---

TONY RODRIGUEZ                                                    5/8/2014

17

1       MR. KEISTER:  That's all right.
2       Q.  (BY MS. MARANZANO)  Can you tell me -- you
3   said during an election cycle you spend more than
4   30 minutes a day.  What -- what do you define as an
5   election cycle?
6       A.  I define an election cycle as the --
7   approximately it's the period that leads up to an
8   election and while the -- up to the point of the
9   election; then if there is a cure period, then that
10  point in time after the election.
11      Q.  What -- when you say "the time leading up to
12  election," what -- how -- how far before an election do
13  you -- do you consider that starting?
14      A.  It depends.  It will depend on a variety of
15  things.  The more elections that we've done, then the
16  less time we need to prepare because the -- the
17  procedures are already in place.
18      Q.  And did you say right now you consider
19  yourself in an election cycle?
20      A.  Yes.
21      Q.  And when would you say this election cycle
22  began?
23      A.  To the best of my knowledge, we started our --
24  we started our daily meetings on the 28th of April.
25      Q.  The 28th of April.  And you're leading up to

18

1   which election?
2       A.  To the -- I should be able to rattle it off.
3   There's primaries that are coming up.
4       Q.  Do you know when they're coming up, what the
5   date is?
6       A.  I would have to look at a calendar, but it's
7   in late May.
8       Q.  And can you tell me, prior to the March
9   primary, when did you start spending more time on the
10  EIC program?
11      A.  Probably around the beginning of April.
12      Q.  The beginning of the -- the April before the
13  March primary, so almost 11 months?
14      A.  Oh, I'm sorry.
15      Q.  Is it --
16      A.  I can't remember.
17      Q.  Okay.
18      A.  Sorry.
19      Q.  Do you -- do you know approximately when?
20      A.  No.  I would have to look at a calendar.
21      Q.  When do you anticipate the program gearing up
22  in advance of the November general election?
23      A.  That will be a discussion between ourselves
24  and the Secretary of State.
25      Q.  Has it geared up now?

19

1       A.  Not to my mind, no.
2       Q.  And when you're in an election cycle can you
3   tell me about how much time you spend on the EIC
4   program?
5       A.  Well, it's variable, but, generally speaking,
6   it can be between one to three hours a day.
7       Q.  Between -- have you ever spent more than
8   three hours a day working on the EIC program?
9       A.  Yes.
10      Q.  And when was that?
11      A.  It was when the EIC program first started in
12  June.  And I certainly spent more than three hours a
13  day preparing for this.
14      Q.  And when the EIC program started in June,
15  about how much time did you spend on it?
16      A.  I couldn't tell you.  It was a lot.
17      Q.  Okay.  Do you understand that your testimony
18  today is on behalf of the Department of Public Safety?
19      A.  Yes.
20          (Exhibit No. 63 marked.)
21          THE REPORTER:  Exhibit 63.
22      Q.  (BY MS. MARANZANO)  I'm showing you what we've
23  marked for the record as Exhibit 63.  Do you recognize
24  this document?
25      A.  Stand by.  Yes.

20

1       Q.  What -- what is this?
2       A.  It's a notice of deposition.
3       Q.  Are you prepared to testify today about
4   Topics 1, 3, and 4?
5       A.  Yes.
6       Q.  What did you do to prepare for today's
7   deposition?
8       A.  Spoke with counsel.
9       Q.  Who did you meet with?
10      A.  Mr. Keister and Ms. Murphy.
11      Q.  Anybody -- was anybody else there?
12      A.  Present?
13      Q.  Present --
14      A.  No.
15      Q.  -- in that meeting.
16          And when did you meet with Mr. Keister
17  and Ms. Murphy?
18      A.  Sometime last week and this week.
19      Q.  Did you review any documents in preparation
20  for today's deposition?
21      A.  Yes.
22      Q.  Which documents?
23      A.  Well, we reviewed the deposition.  We reviewed
24  the state statute.  We reviewed the admin code.  We
25  reviewed other documents that escape me right now.  Oh,

TONY RODRIGUEZ                                                    5/8/2014

---

21

1   and I also have the documents that I brought with me.

2   Q.  And you said you reviewed the deposition?

3   A.  The notice of deposition.

4   Q.  Oh, the notice of deposition.  Okay.  Thank

5   you.

6   A.  I'm not a lawyer.

7   Q.  Did you talk to anybody else about your

8   deposition?

9   A.  Yes.

10   Q.  Who was that?

11   A.  I spoke with members of the DPS staff in

12   driver license to gather information.

13   Q.  Which members of the DPS staff?

14   A.  Ryan O'Connor.

15   Q.  And who is he?

16   A.  Ryan O'Connor is one of our analysts in our

17   business intelligence center.

18   Q.  Anybody else?

19   A.  I spoke with Kris Krueger.

20   Q.  Who is he?

21   A.  Kris Krueger is sort of our strategic analyst

22   in business intelligence.  Cynthia Collins, she is --

23   colloquially we call her battle captain.  She's

24   somebody who handles -- who gathers the day-to-day

25   information about EIC operations that are ongoing, so I

---

22

1   needed to speak to her.  She also runs our daily EIC

2   meetings.

3         I spoke with Paul Watkins about some

4   historical items.  I spoke briefly with Joe Peters.

5   I'm trying to remember if I spoke with anybody else.

6         That's all that comes to mind.  Oh, I

7   know that I spoke with Steve Bell.  He's the other

8   senior manager who's responsible for DPS Regions 1 and

9   2.

10   Q.  For Topic -- can you just look at this notice

11   for a minute.  For Topic No. 1, who would you say at

12   DPS has the most knowledge about Topic No. 1?  And if

13   it varies by subpart, you can identify that.

14         MR. KEISTER:  Object to form, calls for

15   speculation.

16         But you can answer.

17         THE WITNESS:  Okay.

18         I think if you're looking for a single

19   person that knows the most, it probably would be

20   Kathleen.  She's reviewed all the documents.

21   Q.  (BY MS. MARANZANO)  Are you talking about your

22   counsel?

23   A.  Yes.

24   Q.  Okay.

25         MR. KEISTER:  Don't talk --

---

23

1   Q.  (BY MS. MARANZANO)  I'm talking about --

2         MR. KEISTER:  Objection, attorney/client.

3   Don't talk about anything or any conversations you've

4   had with any attorneys in the case.

5         THE WITNESS:  Well, then, other -- other

6   than me, probably not.

7   Q.  (BY MS. MARANZANO)  And in relation --

8         MR. KEISTER:  Even if you're trying to

9   compliment, don't do it.

10         THE WITNESS:  I'm not trying to do that.

11   I'm just trying to answer the question.

12   Q.  (BY MS. MARANZANO)  In relation to Topic 3,

13   who at DPS, not including your counsel, has the most

14   knowledge about that topic?

15   A.  That would be me.

16   Q.  And on Topic 4, who at DPS has the most

17   knowledge about Topic 4?

18   A.  Well, with the exception of concealed handgun

19   licenses, that would be me.

20   Q.  Okay.  Did you rely on any documents in

21   preparing for today's deposition that you did not

22   produce to us today?

23   A.  Yes.

24   Q.  Which documents are those?

25   A.  So I -- you may have this already.  I relied

---

24

1   on an excerpt from the Transportation Code,

2   Chapter 521A, election identification certificate.

3   Q.  Anything else?

4   A.  Yes.  I relied on an excerpt of the Texas

5   Administrative Code.  I call it the admin -- admin

6   rules.  Paragraph 15.181 deals with election

7   certificates.

8   Q.  Anything else?

9   A.  Yes.

10         MR. KEISTER:  For the record, those are

11   the documents that were -- that he's given.

12         MS. MARANZANO:  Yeah.

13   Q.  (BY MS. MARANZANO)  I'm sorry.  Just to be

14   clear, I was just asking if there were other documents

15   apart from what you've produced this morning.

16   A.  So you don't want me to enumerate them?

17   Q.  I -- no, you don't need to enumerate the ones

18   that we have in our possession.

19   A.  Okay.

20   Q.  Thank you.

21         Were there any others apart from those

22   that you relied on?

23   A.  Not to my knowledge.

24   Q.  Okay.  Are you familiar with an application

25   for an election identification certificate?

---

TONY RODRIGUEZ                                      5/8/2014

---

**25**

1    A.  I'm familiar with the DL-14C.
2    Q.  When did DPS start issuing EICs?
3    A.  Late June of last year.
4    Q.  And, for the record, what is an EIC?
5    A.  An election identification certificate?
6    Q.  Uh-huh.
7    A.  It's a card.
8    Q.  What's the -- what is the purpose of it?
9    A.  The purpose is to allow someone to vote.
10       (Exhibit No. 64 marked.)
11       THE REPORTER:  Exhibit 64.
12   Q.  (BY MS. MARANZANO)  I'm showing you what we're
13   marking for the record as Exhibit 64.  Do you recognize
14   this document?
15   A.  Yes.
16   Q.  What is it?
17   A.  It's the December 2011 version of a DL-14C.
18   Q.  And has this document changed since
19   December 2011?
20   A.  This document has been modified.  It's been
21   updated, yes.
22   Q.  Can you tell me what's been modified?
23   A.  I would need to see the current version in
24   order to point it to you.
25   Q.  Do all offices accepting EICs use the DL-14

---

**26**

1    form?
2    A.  The DL-14C?
3    Q.  Uh-huh.  I'm sorry.  The DL-14C.
4    A.  Yes.
5    Q.  Who developed this application?
6    A.  Our -- our -- well, the person who oversaw the
7    development is Deputy Assistant Director
8    JoeAnna Mastracchio.  She works in driver license
9    division.
10   Q.  Did anybody else give input?
11   A.  Yes.
12   Q.  Who?
13   A.  That would have been myself, Stephen Bell, and
14   probably Paul Watkins, because we're the customer end
15   of the business.
16   Q.  Was there any input from the Secretary of
17   State's office?
18   A.  I'm unaware of any.
19   Q.  Was there any input from the governor's
20   office?
21   A.  I'm unaware of any.
22   Q.  Did DPS rely on other applications in
23   developing this application?
24   A.  Did they rely on other applications?
25   Q.  Uh-huh.

---

**27**

1    A.  Well, the DL-14C mirrors a DL-14, which is an
2    application for a driver license or a personal
3    identification certificate.
4    Q.  And how similar is the EIC application to the
5    application for a driver's license or a personal
6    identification certificate?
7    A.  You would have to show it to me and I can
8    point out the differences.
9    Q.  As you sit here today, you don't -- you don't
10   know what the differences are?
11   A.  No -- well, no.
12   Q.  Did DPS try to make the EIC application easy
13   to understand?
14   A.  Yes.
15   Q.  What steps did it take to ensure that the
16   application was easy to understand?
17   A.  Well, relying on the DL-14 that had gone
18   through an extensive vetting process.  And there are
19   modifications and updates to that to ensure the public
20   understands it.  And -- and so the department also --
21   when we were asked to -- to issue identification or
22   election identification certificates used the DL-14 as
23   a basis for it, and then we -- it was discussed to make
24   sure that it was -- the instructions were clear.
25   Q.  Did DPS give any consideration to the fact

---

**28**

1    that the population applying for an EIC might be
2    different than the population applying for the election
3    identification certificate?
4    A.  Not to my knowledge.
5    Q.  Isn't it true that an individual who's
6    applying for an EIC by definition wouldn't have a
7    driver's license?
8    A.  Not necessarily.
9    Q.  Wouldn't -- would not have a current driver's
10   license?
11   A.  Not necessarily.
12   Q.  How would a person who has a current driver's
13   license be eligible for an EIC?
14   A.  If the customer chose to, the customer could
15   surrender their driver license.
16   Q.  Okay.  Did DPS design the application -- the
17   EIC application to seek only the information that's
18   required to ensure EIC eligibility?
19   A.  The department designed the -- the DL-14C to
20   gather the information that was established in the
21   admin rules.
22   Q.  Did DPS have any other objectives when it
23   developed this -- the application for an EIC?
24   A.  I don't understand the question.
25   Q.  Well, we've -- you -- you testified that DPS

---

TONY RODRIGUEZ                                                5/8/2014

---

29

1  tried to ensure the EIC application was easy to
2  understand.
3       A.  The same way we do with all our documents,
4  yes.
5       Q.  And you testified that the application was
6  designed to solicit information that is required to
7  ensure EIC eligibility?
8       A.  That's correct.
9       Q.  Were there any other goals that DPS had in
10 developing this application?
11      A.  Not to my knowledge, no.
12      Q.  Did DPS consider the length of time it would
13 take an applicant to complete this application?
14      A.  Not to my knowledge.
15      Q.  Can you look at the bottom of the box, the box
16 at the top of the page, the last --
17      A.  The bottom of the box at the top of the page?
18      Q.  There's some information that's enclosed in a
19 box.
20      A.  You're going to have to help me with that.
21      Q.  Okay.  Well, I'm looking at --
22      A.  If you'll point to that I'll read the
23 information.
24      Q.  I'm looking at the last line, and it says,
25 "Father's last name and mother's maiden name."  Do you

---

30

1  see that?
2       A.  So the heading of the box says, "Applicant
3  information and contact information" at the top of the
4  box?
5       Q.  Yes.
6       A.  Okay.  So it says, "Father's last name"?
7       Q.  Yes.
8       A.  Yes.
9       Q.  And "Mother's maiden name" on that same line.
10      A.  I see that.
11      Q.  Are those two pieces of information on your
12 current application for an EIC?
13      A.  I believe so.
14      Q.  What's the purpose of asking applicants for
15 their mother's maiden name?
16      A.  It's part of the information that we were --
17 that we collect.
18      Q.  What does DPS do with that information?
19      A.  We use that to verify the applicant's
20 identity.
21      Q.  How do you -- how do you use the mother's
22 maiden name to verify the applicant's identity?
23      A.  That would depend on the applicant.  I mean,
24 some applicants, they -- they don't have a detailed set
25 of identity documents, and they may bring us a -- as they

---

31

1  may bring us their birth certificate.  And that would
2  have their mother's maiden or it could have their
3  mother's maiden name on it.
4       Q.  So is it your testimony that you asked for
5  this information to check it against underlying
6  documents that might also have the mother's maiden
7  name?
8       A.  Yes.
9       Q.  And is it the case that some applicants might
10 present documents that don't have their mother's maiden
11 name?
12      A.  That could be the case.
13      Q.  And they're still required to fill out on this
14 application their mother's maiden name, correct?
15      A.  Yes.
16      Q.  For those applicants is there any purpose in
17 gathering that information?
18      A.  Not to my knowledge.
19      Q.  Is there -- can you tell me the purpose of
20 asking for the father's last name?
21      A.  It's the same purpose.  It's a -- it helps us
22 establish who the individual is.
23      Q.  Is the father's last name on any of the
24 underlying documents that an applicant might present?
25      A.  It could be.

---

32

1       Q.  Which documents?
2       A.  Well, again, that would be the birth
3  certificate.  And there may be -- there may be other
4  documents.  It -- it would depend on the individual and
5  what they provide.
6       Q.  And when you -- when you do the verification
7  of the application with the underlying documents, are
8  you merely checking that the names match or are you
9  doing some other sort of check on a DPS database?
10      A.  No, we don't -- we don't check anything on DPS
11 database.  We make sure the documents that are
12 presented, they match.  And our term, colloquialism, is
13 to connect the dots for the person's identity.
14      Q.  So you're -- and this -- this box that we're
15 looking at, is this filled out by the applicant?
16      A.  Yes.
17      Q.  So you're verifying that the applicant writes
18 down the same name as is on their underlying
19 documentation; is that correct?
20      A.  No, I don't understand your question entirely.
21 It's -- the applicant presents the form.  I mean, if
22 the applicant isn't able to, somebody else may fill it
23 out for them.  It's -- sometimes it's not uncommon for
24 the children to fill out the information and provide
25 it.

---

TONY RODRIGUEZ                                              5/8/2014

9 (Pages 33 to 36)

---

**33**

1    Q.   Okay.  But what you're checking for is that
2  the name matches the underlying documentation if the
3  name is on the underlying documentation; is that
4  correct?
5    A.   It's one of the things we check for.
6    Q.   Is there anything else you check for?
7    A.   In this block of information here?
8    Q.   Well, right now just with regard to that line,
9  the father's last name and the mother's maiden name.
10   A.   I don't believe so.
11   Q.   Can you look at -- in that same box that we
12 were just talking about.  Do you see there's some lines
13 that ask for a physical description, such as eye color,
14 hair color, height, and weight?
15   A.   Yes.
16   Q.   What is the purpose of requesting information
17 about the physical characteristics of applicants?
18   A.   521.143 allows the department to gather a
19 brief physical description of the applicant.
20   Q.   And what do you do with that information?
21   A.   We enter it into the database.  That's it,
22 into our database for election certificates.
23   Q.   Do applicants complete the physical
24 description themselves?
25   A.   Yes.

---

**34**

1    Q.   Is any of that -- is any of the information
2  describing the physical description of an applicant
3  included on the face of an EIC?
4    A.   No.
5    Q.   Are DPS employees required to do some sort of
6  visual check to ensure the physical description written
7  matches the person standing in front of them?
8    A.   We don't have a scale in the office to make
9  sure their weight is right.
10   Q.   Do they do any other sort of visual check?
11   A.   Just a brief check.
12   Q.   And did you say you enter this data into an
13 EIC database?
14   A.   The EIC information is kept in our -- it's a
15 sub-compartment of our driver license system database.
16 It's a separate -- it's accessed through our DLS
17 computers, but it's a separate database.
18   Q.   Is that database searchable?
19   A.   Yes.
20   Q.   Is it searchable by different features,
21 different fields?
22   A.   I don't understand your question.
23   Q.   Presumably -- what information is captured in
24 your database?
25   A.   I think the name; social security number, if

---

**35**

1  they have; address, that type of information that's
2  depicted on the box.
3         MR. KEISTER:  Can you speak up a little
4  more?
5         MR. BRAZIL:  You keep getting more and
6  more quiet.
7         MR. KEISTER:  Could you try and keep your
8  voice up, please?
9         THE WITNESS:  I'll work on it.
10        MR. BRAZIL:  Thank you.
11        THE WITNESS:  The -- I have a problem
12 modulating my voice.  It's either too loud or not loud
13 enough.
14        MR. BRAZIL:  Can't be too loud for my
15 ears.
16        THE WITNESS:  I didn't want to be accused
17 of yelling at anybody.
18        MR. FREEMAN:  She's tough.
19        THE WITNESS:  It's nothing personal.
20   Q.   (BY MS. MARANZANO)  Is -- is the EIC database
21 searchable by race?
22   A.   I don't know.
23   Q.   What is the purpose of asking an applicant for
24 their race on the --
25   A.   The department --

---

**36**

1    Q.   I'm sorry.  I was just going to clarify -- on
2  the EIC application?
3    A.   The department gathers -- just part of the
4  demographic information that we gather.  We gather a
5  lot of information.
6    Q.   And what do you do with that information?
7    A.   Put it in the database.
8    Q.   Is the -- is the race of the applicant
9  included on the face of the EIC?
10   A.   No.
11   Q.   And once this information is gathered in your
12 database what's done with that information?
13   A.   To my knowledge -- well, the information is
14 verified at -- at our headquarters by our license and
15 records service as part of the issuance process.  And
16 what -- what the LRS, license and records service,
17 people do is they review the DL-14C, they review
18 whatever other documents that have been presented by
19 the applicant and scanned.  And then based on the
20 documents scanned, they do a quality assurance check to
21 make sure that the dates, the birthdays, match up and
22 the Social Security numbers match up if it's been
23 presented, and then they determine if it's a valid
24 issuance.  But -- but they don't they don't verify
25 race.  That's not part of the issuance process.

---

TONY RODRIGUEZ                                        5/8/2014

37

1    Q.  So is there -- is there any purpose for asking
2  for it on the EIC application?
3    A.  Just that it's part of the information that we
4  collect.  It's -- because you have to remember that --
5  that the election identification certificate process
6  mirrors or roughly matches the process that we go
7  through in order to issue a driver license or an ID
8  card.  And we did that in order to not have to -- in
9  order not to have to go back to retrain all
10  1,800 driver license employees for a special way to
11  issue an EIC.  As much as we could we wanted to keep
12  the procedures to issue an EIC as close to the
13  procedures that we use to issue a DL, driver license,
14  or an ID card.
15    Q.  So keeping the -- keeping the application as
16  similar as you could to the application for a driver's
17  license was primarily for the convenience of the DPS
18  employees?
19    A.  I wouldn't say it was for the convenience of
20  the DPS employees.  What it allowed us to do is it just
21  meant that we didn't have to go back and retrain them.
22  We have 1,800 employees spread across 254 counties in
23  the State of Texas.  It's extremely difficult for us to
24  get them all together to train.
25    Q.  So was there any training done on EICs?

38

1    A.  Yes.
2    Q.  So you did retrain the DPS employees?
3    A.  It wasn't a retraining.
4    Q.  Well, would --
5    A.  We provided initial training when we were --
6  the department was asked to -- to do EICs.  And then
7  that -- it was before my time, but I believe it was in
8  2011.  And there were -- there were training -- there
9  was training that took place either by WebEx or in
10  person depending on where the driver license customer
11  service representatives, or CSRs, were in relation to
12  the trainers.
13    And then when we were asked to -- when we
14  were asked to issue EICs in June there were some
15  WebExes, training WebExes around that time to refresh
16  the tenured employees who had been working for a while.
17  But it's part of our new employee training.  I don't
18  know if I answered your question or not.
19    Q.  I think you did.
20    A.  Okay.
21    Q.  Turning back to the application for a moment.
22  When developing this application did DPS consider that
23  asking for numerous pieces of personal information
24  might discourage individuals from applying for an EIC?
25    A.  DPS asked for the information that we're

39

1  allowed to ask for under the state -- under the admin
2  code.
3    Q.  So were you -- when developing this
4  application, DPS included all information that they
5  were permitted to ask for; is that correct?
6    A.  DPS included the information that we were
7  permitted to ask for relevant to elections.  So, for
8  instance, somebody who's here on a Visa, they're not
9  eligible to vote.  But we don't have for that because
10  they're not eligible to vote.  They can't get an EIC.
11    Q.  Okay.  So am I understanding you correctly
12  that you ask for all information that was relevant to
13  elections that you were permitted to ask for?
14    A.  As far as I know.
15    Q.  And there was not consideration given to
16  whether the information you were requesting was
17  necessary to determine eligibility for an EIC; is that
18  correct?
19    A.  The information that we ask for is -- is
20  collected in order to determine the eligibility.  And
21  also it's for administrative purposes.  We have to have
22  an address to mail the card.  We have to --
23  sometimes that differs.  The resident address and the
24  mailing address may be -- may be different.
25    Q.  But how does physical -- the physical

40

1  description of a person determine's one eligibility for
2  an EIC?
3    A.  It's just part of the information that we ask
4  for because we're allowed to gather a brief description
5  of applicants.
6    Q.  Okay.  So it does not impact whether the
7  individual is eligible for an EIC, correct?
8    A.  No.
9    Q.  Did DPS consider whether asking questions that
10  were not necessary for the determination of eligibility
11  for an EIC might deter individuals from applying for an
12  EIC?
13    A.  Could you restate that, please?
14    Q.  Did DPS consider when it was developing the
15  EIC application that requesting information from
16  applicants that was not necessary for DPS'
17  determination of whether they were eligible for an EIC
18  would deter individuals from applying for an EIC?
19    A.  I -- I don't believe so.
20    Q.  You don't believe that DPS considered that?
21    A.  No.
22    Q.  Okay.  Do you see at the -- towards the bottom
23  of this application there's a different box that says
24  "Verification" at the top?
25    A.  Yes.

TONY RODRIGUEZ                                            5/8/2014

---

45

1   Q.  Is that at every mobile unit?
2   A.  Yes.
3   Q.  And at every county office?
4   A.  Yes.
5   Q.  Are they available in any other languages?
6   A.  No.
7   Q.  Do you know when the DL-14C began to be
8   available in Spanish?
9   A.  I -- I know there was a discussion about it,
10  and there may have been some e-mails between
11  JoeAnna Mastracchio and myself.  And I believe the
12  timeframe was -- was in June or so, but I -- I can't
13  remember the exact date.
14          MS. MARANZANO:  Can you mark this?
15          (Exhibit No. 65 marked.)
16          THE REPORTER:  Exhibit 65.
17  Q.  (BY MS. MARANZANO)  I'm showing you what we
18  have marked for the record as Exhibit 65.  Do you
19  recognize this document?
20  A.  It looks like an e-mail.
21  Q.  And is this an accurate copy of an e-mail that
22  you received?
23  A.  My name is on it, so, yes.
24  Q.  Does this refresh your recollection as to when
25  the DL-14CS was made available?

---

46

1   A.  Let's see.  Yes.
2   Q.  When was the DL-14C made available in Spanish?
3   A.  So from the document here, it looks like it
4   was sometime around 9-5-2013.  That would be the 5th of
5   September.
6   Q.  Why was the DL-14CS not made available in June
7   when you began issuing EICs?
8   A.  I don't know.
9   Q.  Are you aware of any instances in which
10  someone with limited English proficiency wanted to
11  apply for an EIC but was unable to due to the
12  unavailability of a Spanish translation of the EIC
13  application?
14  A.  No.
15  Q.  Is that something you would be aware of if it
16  had happened?
17  A.  If it occurred within my area, the DPS regions
18  that I described to you, then I would get it through my
19  chain of command or if it -- from my subordinates.  Or
20  if I got it from -- if it happened over in Steve's
21  area, then he would -- he would tell me.  So I would
22  be -- eventually I would be.  It might -- it might take
23  a day or two, depending on -- on how fast the
24  information was transmitted up.
25  Q.  So you feel confident that if this had

---

47

1   happened, if somebody had been unable to apply because
2   the application was unavailable in Spanish, if it had
3   happened anywhere in the state you would be made aware
4   of that?
5   A.  Yes, I do.
6   Q.  And who is Steve?
7   A.  As I mentioned previously, Steve is
8   Stephen Bell.  He's the senior manager and he's
9   responsible for DPS Regions 1A, 1B, 2A, and 2B.  And
10  that's roughly described as the Dallas/Fort Worth
11  eastern part of Texas and Houston.
12  Q.  Do you and Stephen Bell split the state of
13  Texas or are there other individuals who are involved
14  in --
15  A.  That's it.
16  Q.  Okay.  And his role is overseeing the driver's
17  license offices as --
18  A.  He has the same duties and responsibilities
19  that I do and he exercises them over his DPS regions.
20  Q.  Does he have EIC responsibilities as well?
21  A.  He does have EIC responsibility.
22  Q.  And what are his responsibilities with regard
23  to EICs?
24  A.  He is our -- he's our logistician.
25  Q.  And what does he do in that capacity?

---

48

1   A.  In that capacity he was responsibility to
2   purchase all of the tubs that we used, all of the
3   screens to ensure that the computers were purchased
4   with all the peripherals, to take all that -- all those
5   different parts and configure them into sets that could
6   be -- that we now know as a mobile unit.
7          He's also responsible to track the
8   equipment so that he knows where each mobile unit is in
9   the state of Texas.  He's responsible for the inventory
10  control.
11  Q.  Okay.  Do all driver's license offices around
12  the state have at least one employee who is fluent in
13  Spanish?
14  A.  I don't know.
15  Q.  Do you know how many driver's license offices
16  do not have at least one employee who is fluent in
17  Spanish?
18  A.  I've never asked for that information.
19  Q.  Does DPS view fluency in Spanish as a positive
20  professional attribute when hiring its employees?
21  A.  It's asked for on the application for work.  I
22  don't know how it's regarded.
23  Q.  Has DPS made any effort to ensure that
24  Spanish-speaking employees are available to assist EIC
25  applications with limited English proficiency?

---

TONY RODRIGUEZ                                          5/8/2014

49

1     A. No.
2         (Discussion off the record.)
3         MR. KEISTER: You can answer.
4         THE WITNESS: Oh, okay. They were --
5         MR. KEISTER: They can chat. You just
6     answer.
7         THE WITNESS: I guess you're the
8     important one.
9         MR. KEISTER: Yes.
10         THE WITNESS: So would you mind restating
11    your question.
12     Q. (BY MS. MARANZANO) Has DPS made any effort to
13    ensure that Spanish-speaking employees are available to
14    assist EIC applicants with limited English proficiency?
15     A. Okay. So our offices are crewed by the people
16    who live around them by and large and -- and the
17    demographics of the office reflect the local
18    demographics in most instances. So I don't know if
19    we've made a special effort to transfer somebody from
20    one office to another solely based on the language that
21    they speak. But we hire people from the local area,
22    and if you go to different parts of Texas they'll speak
23    different languages, and -- and those are the people
24    that we hire.
25     Q. Does DPS have any policy about the placement

50

1     of employees who speak more than one language?
2     A. Not in driver license, and I don't believe DPS
3     does.
4     Q. Okay. Are DPS employees available to assist
5     EIC applicants who request assistance in completing the
6     application?
7         MR. KEISTER: Objection, vague.
8         Go ahead.
9         THE WITNESS: If a customer needs
10    assistance, then -- then our customer service
11    representatives help out the -- help the applicant,
12    yes.
13     Q. (BY MS. MARANZANO) Are all DPS employees
14    trained to help an applicant who needs assistance?
15     A. All DPS employees?
16     Q. I'm sorry. All DPS employees issuing EICs.
17     A. So the DPS employees in the driver license
18    division?
19     Q. Yes.
20     A. Okay. That's part of their new employee
21    training, yes.
22     Q. From the time that an EIC application is
23    submitted, how long does it take DPS to issue an EIC to
24    that person?
25     A. And when you say "issue," what do a mean?

51

1     Q. When -- when DPS is, I presume, mailing the
2     EIC to the person.
3     A. Okay. So that's two questions, and I'll
4     answer it this way. When the customer leaves the
5     office --
6     Q. Uh-huh.
7     A. -- they have what we call a transaction
8     receipt, and that enables the customer to vote right
9     away. And then the actual plastic card is -- is
10    mailed -- for driver licenses and ID cards, I checked
11    the mailing cycle yesterday. It was -- it was like
12    ten days. But in practice, election certificates are
13    mailed within five.
14     Q. Consistently?
15     A. It would depend on the number that we have and
16    what else is going on in the production run of ID
17    cards. So three -- three to five days is -- after the
18    QA process, which is three to five days, the card is
19    placed in the mail. So that could be six to ten days
20    and the card would be in the mail.
21     Q. Does DPS have a policy regarding an applicant
22    who does not have a mailing address?
23     A. Customers have to have a mailing address in
24    order to receive the card. Periodically we deal with
25    indigents and -- and the -- our -- our procedures are

52

1     that the applicant lists the -- if they're staying at
2     an indigent home or a shelter, to list that as their
3     address and we send the card there.
4     Q. And if a person doesn't have an address to
5     list, would they not be able to receive an EIC?
6     A. That's never come up. I don't know how to
7     answer that question.
8     Q. There's no policy -- DPS doesn't have a policy
9     about if a person doesn't have a permanent address to
10    list on their application?
11     A. Well, just for the physics of mailing the card
12    we have to have somewhere to send it.
13     Q. And there's no other delivery method that DPS
14    uses?
15     A. No, we use the US mail.
16     Q. Okay.
17         (Exhibit No. 66 marked.)
18         THE REPORTER: Exhibit 66.
19     Q. (BY MS. MARANZANO) I'm showing you what we
20    marked for the record as Exhibit 66. Can you take a
21    look at this and let me know if you recognize it?
22     A. Yes.
23     Q. What is this?
24     A. Well, the cover sheet an e-mail from Lynn
25    Hale, who's one of our trainers, to myself. It was

TONY RODRIGUEZ                                                    5/8/2014

14 (Pages 53 to 56)

53

1   sent on the 26th of June 2013.  And I understand this
2   to be an attachment to that e-mail; is that right?
3        Q.  Do you recall receiving this document with
4   this e-mail?
5        A.  No, but it's -- obviously I did.
6        Q.  Can --
7            MR. KEISTER:  Don't -- don't speculate,
8   Mr. Rodriguez.
9            THE WITNESS:  I mean, yeah, I guess.
10  Yes.
11           MR. KEISTER:  Don't guess.  Either you
12  did or you didn't.
13           THE WITNESS:  It's my name.
14       Q.  (BY MS. MARANZANO)  Can you turn to Page --
15  the page that has at the bottom "Texas" -- or
16  "TEX-048020"?  I think it's -- yeah, it's the one that
17  you're on.
18       A.  Yes.
19       Q.  Is this a sample EIC on this page?
20       A.  Yes.
21       Q.  And is this the way EICs look currently when
22  they're issued?
23       A.  Yes.
24       Q.  What is the purpose of including the date of
25  birth on the EIC?

54

1        A.  It's just -- it's part of what we have to --
2   we have to show their birthday for their voter
3   eligibility.
4        Q.  Is the date of birth compared to the voter
5   registration list?
6        A.  We don't compare it to any list.
7        Q.  So why do you need to show it for their voter
8   eligibility?
9        A.  Well, we compare it if they present a -- we
10  just present it on their card and --
11       Q.  Is there any reason for -- for the requirement
12  that the card have the date of birth on it?
13       A.  I can't recall.
14       Q.  Okay.  What's the purpose of including the bar
15  code that's shown on the back of the election
16  identification certificate?
17       A.  The card is made from standard card stock and
18  part of the -- part of 521 says that it must be similar
19  in form and appearance to a driver license, but
20  different.  And so we just used the same card stock
21  when we printed this scantron or the bar code on the
22  back.  That's -- that's on our card stock and we just
23  include it on the -- we include it on the EIC.
24       Q.  So this bar code is not used for scanning?
25       A.  No, I don't -- I don't -- not to my knowledge,

55

1   no.
2        Q.  Is it your understanding that 521A requires
3   that the EIC be similar to the driver's license?
4        A.  Just similar in form and appearance, but
5   distinguishable from.
6        Q.  Okay.  And -- and so the bar code was put on
7   this because that's on driver's licenses; is that
8   correct?
9        A.  We -- we use the same card stock for the --
10  for the driver license, the ID card, and for the
11  election certificate.
12       Q.  Okay.  So it's on the card stock?
13       A.  Yeah.  Yes.
14       Q.  Do you see on the face of the front of the
15  card at the bottom it says, "Cannot be used as
16  identification"?
17       A.  Yes.
18       Q.  But the EIC is intended to serve as
19  identification for voting; is that correct?
20       A.  For voting purposes.
21       Q.  Is there any concern that that's confusing
22  language?
23       A.  Confusing to who?
24       Q.  To an individual who receives an EIC.
25       A.  No.  Our customer service representatives --

56

1   as part of their dialogue with the customer when the
2   customer comes to the office to seek service, they
3   explain that the EIC is used for -- for voting.  And it
4   can be used for voting, but it's not meant to replace
5   the -- the Texas identification card.
6        Q.  If an EIC applicant expressed that they wanted
7   to use an EIC as identification for another purpose
8   other than voting, would they be permitted to receive
9   an EIC?
10       A.  Well, they would be advised that the card was
11  not intended for that, but that would not stop them
12  from getting an EIC.
13       Q.  If an individual went to a driver's license
14  office and said, "I would like to apply for an EIC.  I
15  would like to use this at my bank or in my office," is
16  it your testimony that that person would be -- that
17  the -- the EIC would still be issued to that person?
18       A.  The -- what the customer service
19  representatives do is they say, "Well, the EIC can only
20  be used for voting purposes.  It's not intended to be
21  an ID card," and they would -- they would explain the
22  uses -- or the purpose of the Texas ID card.
23       Q.  Are you aware of instances where an EIC
24  applicant wanted to obtain an EIC for something other
25  than voting and was turned away?

---

**57**

1    A. And was turned away?  Not to my knowledge, no.
2    Q. You're not aware of any instances?
3    A. No.
4    Q. What are the circumstances under which an EIC
5    can be canceled?
6    A. Canceled?
7    Q. Uh-huh.
8    A. Well, the -- admin rules allow us to
9    cancel it, permits the department to cancel it.  We
10   haven't canceled any EIC cards.  We haven't canceled
11   any.
12   Q. Okay.  So --
13   A. If -- if we found that the -- individual
14   was fraudulent and they presented fraudulent documents,
15   I suppose that would be a reason for us to cancel it.
16   Q. Is that the only basis under which DPS would
17   cancel an EIC?
18   A. There may be others; but to be honest with
19   you, it's never come up.  We've never canceled an EIC.
20   Q. As you sit here today, are you aware of any
21   other reasons that DPS would cancel an EIC, other than
22   fraudulent documents?
23   A. No.
24   Q. What are the circumstances under which you
25   would cancel an ID card, a personal ID card?

---

**58**

1    MR. KEISTER:  Counsel, this is beyond the
2    scope of the issues for which he's designated.
3    MS. MARANZANO:  Well, this is directly
4    related to the standards and procedures under which an
5    EIC may be cancelled.
6    MR. KEISTER:  No.  Did you say EIC?  I
7    thought you said a Texas ID card.
8    MS. MARANZANO:  I did say Texas ID card,
9    but I'm looking for --
10   MR. KEISTER:  That's beyond the scope of
11   what he's here to testify about, and I'm --
12   MS. MARANZANO:  He can still answer the
13   question.
14   MR. KEISTER:  I instruct him not answer.
15   It's beyond the scope.  I think we have somebody
16   designated specifically for those issues.  I'm
17   instructing him not to answer.
18   MR. FREEMAN:  Mr. Keister --
19   MS. MARANZANO:  Mr. Keister, it's
20   improper to instruct the witness not to answer based on
21   things that are beyond --
22   MR. KEISTER:  He's not going to give
23   answers about issues he's not designated on.  He's here
24   to testify on behalf of DPS with these specific issues
25   and he's not going to give an opinion about issues he's

---

**59**

1    designated on and I'm instructing him not to answer.
2    We do have somebody else who's designated for those
3    issues.  I'm not going to change my mind.
4    MS. MARANZANO:  Well, you know, I can
5    cite you cases because it's absolutely improper to
6    instruct him not to answer.
7    MR. KEISTER:  I'm not -- I'm not going to
8    change my mind.  I'm instructing him not to answer.  We
9    have other people designated for that issue.
10   MR. FREEMAN:  Mr. Keister, once a witness
11   has been designated --
12   MR. KEISTER:  I'm not --
13   MR. FREEMAN:  Please let me finish
14   talking.
15   MR. KEISTER:  I'm not changing my mind.
16   MR. FREEMAN:  Sir, let me finish talking.
17   MR. KEISTER:  Sir, no.  There's no reason
18   to have this discussion.  I've instructed the witness
19   not to answer anything beyond what he's designated here
20   for.
21   MR. FREEMAN:  If he has personal
22   knowledge, it is entirely proper for him to answer
23   Ms. Maranzano's questions.  I can cite you a half dozen
24   cases.  If you want us to call the judge --
25   MR. KEISTER:  If you want to call the

---

**60**

1    judge, call the judge.
2    MR. FREEMAN:  30(b)(6) deposition.
3    MR. KEISTER:  If you want to call, it's
4    up to you.  But I've instructed him not to answer.
5    That is my --
6    MR. FREEMAN:  You simply don't care about
7    the law in this area.  Is that your response?
8    MR. KEISTER:  Do you have any other
9    questions?
10   MS. MARANZANO:  I think for the moment
11   we'll continue, and we'll consider what to do.
12   MR. KEISTER:  Okay.
13   Q. (BY MS. MARANZANO)  Are you following your
14   counsel's instruction not to answer that question?
15   A. Yes.
16   Q. Can you tell what the process is for
17   cancelling an EIC?
18   A. We've never gone through it.  I couldn't
19   speculate.
20   Q. Does DPS have any policies for the process for
21   cancellation of an EIC?
22   A. The admin rules merely say that it can be
23   done.
24   Q. And has DPS developed any policy by which they
25   would they would follow to cancel an EIC?

---

TONY RODRIGUEZ                                                    5/8/2014

---

**61**

1    A.  No.
2    Q.  How is an EIC holder notified of cancellation,
3  if it occurs?
4    A.  I don't know because we haven't developed any
5  policies for it -- or procedures.  Excuse me.
6    Q.  Okay.  To obtain an EIC does an applicant have
7  to present documented proof of identity and proof of
8  citizenship?
9    A.  Yes.
10    Q.  And does your website state that applicants
11  need to prove identity and citizenship?
12    A.  Our website provides the information to the
13  document they need to bring with them, yes.
14    Q.  Do you train DPS employees issuing EICs that
15  applicants need to prove identity and citizenship?
16    A.  That's part of their training as new
17  employees, yes.
18    Q.  You train county employees who are issuing
19  EICs that applicants need to prove identity and
20  citizenship?
21    A.  Yes.
22    Q.  Can a non-citizen obtain a Texas driver's
23  license?
24    A.  Yes.
25    Q.  Can a non-citizen obtain a Texas personal

---

**62**

1  identification card?
2    A.  Yes.
3    Q.  Does a voter registration applicant need to
4  prove citizenship to become a registered voter?
5    A.  Registration is done at the Secretary of
6  State.  I don't know how they handle it.
7    Q.  Okay.
8        MS. MARANZANO:  This was previously
9  marked.
10    Q.  (BY MS. MARANZANO)  I'm showing you what has
11  been previously marked as Exhibit No. 38.
12        Do you recognize this document?
13    A.  Yes.
14    Q.  What is this document?
15    A.  This is an excerpt from our administrative
16  code.  I refer to them as admin rules, yes.
17    Q.  How was this regulation developed?
18    A.  This regulation is derived from the statute,
19  521.
20    Q.  Can you take a look at 15.181, subpart C,
21  subpart 1?
22    A.  Right.
23    Q.  And do you see that says, "An applicant must
24  be a registered voter in the state and present a voter
25  registration card issued to the individual"?

---

**63**

1        Did I read that correctly?
2    A.  It has colon, semicolon, or; but yes.
3    Q.  Right.  If a person -- if an EIC applicant
4  says that she is a registered voter, does DPS do a
5  check to confirm that?
6    A.  There's no way for us to check.  No.
7    Q.  Does the applicant need to present a voter
8  registration card?
9    A.  Yes.  If they don't have a voter registration
10  card, they need to be eligible to vote and then they
11  have to -- they can apply for a voter registration card
12  in the office as part of their application for an EIC.
13    Q.  What about if an applicant states that she is
14  already a registered voter but she doesn't have the
15  voter registration card with her?
16    A.  She can apply in the office.
17    Q.  So she doesn't need to present her voter
18  registration card when she applies?
19    A.  It says here, "and submit an application for
20  voter registration."
21    Q.  Would a voter who is already registered to
22  vote but doesn't have a voter registration card with
23  her have to reapply to register to vote?
24    A.  Yes.  They would submit the paperwork.
25    Q.  Okay.

---

**64**

1    A.  Actually, it's just a check on the box.
2    Q.  Check on which box?
3    A.  Are you eligible -- I'm sorry.  Exhibit 64,
4  the DL-14C dated December 2011.  "Are you eligible and
5  registering to vote today?"
6    Q.  So the applicant would check that box yes or
7  no?
8    A.  Yes.
9    Q.  But if the -- if an applicant is already
10  registered to vote but doesn't have her card with her
11  or forgot her card, is it your testimony that applicant
12  would re-register to vote when they applied
13  for an EIC?
14    A.  They would check the box.  We would send that
15  to the Secretary of State; and they would do whatever
16  they do with it, enter it in their database or update
17  their database, however they do that.  I'm not familiar
18  with that.
19    Q.  Okay.  So I guess what I'm trying to figure
20  out is:  If an applicant does haven't a voter
21  registration card on her --
22    A.  Right.
23    Q.  -- is she prohibited from applying for an EIC?
24    A.  No.
25    Q.  Okay.  Can you take a look at 15.182, which is

---

TONY RODRIGUEZ                                                    5/8/2014

17 (Pages 65 to 68)

---

65

1    on that same page.
2        A.  Uh-huh.
3        Q.  -- on Exhibit 38.
4            How was this list of underlying
5    documentation developed?
6        A.  So this -- this roughly corresponds with the
7    other information that we collect as a matter of course
8    under 6 check 521.143, but it's specific to -- it's
9    specific to voter -- voting, as I mentioned before.
10       Q.  And when you talk about the information you
11   collect, you're referring to the underlying
12   documentation listed in 15.182?
13       A.  Yes.  You talking about the one piece of
14   primary identification?
15       Q.  Right.  And then it goes on to the next page.
16       A.  Yes.  And then it goes into primary
17   identification; and it goes all the way down to B-B on
18   the next page, yes.
19       Q.  Yes.
20           Did DPS consider that the population
21   applying for an EIC might have different access to the
22   documents than the population of -- than the population
23   applying for a Texas driver's license?
24       A.  Different access to the documents?
25       Q.  Uh-huh.

---

66

1        A.  I --
2        Q.  Did DPS consider that the population of
3    individuals who are applying for an EIC might not be
4    able to obtain the underlying documentation on this
5    list as easily as the population applying for a Texas
6    driver's license?
7            MR. KEISTER:  Object, form.  That's vague
8    and ambiguous.  And the population has not been defined
9    or established, so there's no foundation for that.
10           To the extent you can answer, you're
11   about to answer.
12           THE WITNESS:  Thank you.  These are the
13   documents that we collect and -- in order to identify
14   the applicant.  It helps us identify the applicant.
15       Q.  (BY MS. MARANZANO)  Did -- when -- when DPS
16   developed this list of required underlying
17   documentation, did it consider the ease with which a
18   person might be able to obtain these documents?
19       A.  Not to my knowledge, no.
20       Q.  Did DPS consider whether individuals applying
21   for an EIC might be less likely to have access to their
22   birth certificates than individuals applying for a
23   driver's license?
24           MR. KEISTER:  Objection, form.  That's
25   vague.  That calls for speculation and it assumes facts

---

67

1    not in evidence as to whether or not people applying
2    for EICs would not have access to these documents.
3            To the extent you can answer.
4            THE WITNESS:  Yeah.  I don't know.  I
5    don't know what an individual would have to go through
6    to get the documents.
7        Q.  (BY MS. MARANZANO)  Do you know whether DPS
8    considered -- considered that when they developed the
9    regulation?
10           MR. KEISTER:  Same objection as
11   previously.
12       Q.  (BY MS. MARANZANO)  To be clear, did DPS
13   consider what individuals would have to go through to
14   get the documents?
15           MR. KEISTER:  Same objections.
16           THE WITNESS:  We don't know what an
17   individual would have to do in order to get the
18   documents that we're required to collect.
19       Q.  (BY MS. MARANZANO)  Okay.  Can you look at --
20   under -- under 15.182, Subsection 2, where it talks
21   about primary identification.  The only form of primary
22   identification that is independently sufficient to
23   establish EIC eligibility is a driver's license or ID
24   card that has been expired for more than 60 days but
25   less than two years, correct?

---

68

1        A.  Where does it say that?
2            MR. KEISTER:  Counsel, I think we're
3    missing something.  It looks Page 2 is missing.
4            THE WITNESS:  Oh, yeah.  It goes from
5    Page 1 to Page 3.
6            MS. MARANZANO:  I think that we referred
7    to the exhibit as it was introduced in -- it's in this
8    binder.
9            THE REPORTER:  Off the record.
10           (Discussion off the record.)
11           THE REPORTER:  Back on the record.
12       Q.  (BY MS. MARANZANO)  So we were looking at
13   15.182, Subsection 2 where it talks about a primary
14   identification.
15       A.  Yes.
16       Q.  And is the only form of primary identification
17   that's listed here, a Texas driver's license or
18   personal identification card issued to the person that
19   has expired for 60 days and is within two years of
20   expiration date -- that's the only form of primary
21   identification, correct?
22       A.  Or an ID card.  A driver license or an ID card
23   are accepted as primary forms of identification within
24   the -- within the parameters that you've laid out here,
25   the 60 days to two years of expiration.

---

TONY RODRIGUEZ                                                    5/8/2014

18 (Pages 69 to 72)

69

1    Q.  Okay.  And does a driver's license that has
2  been expired for more than 60 days but less than two
3  years establish citizenship?
4    A.  No.
5    Q.  Is it nonetheless sufficient to obtain an EIC?
6    A.  It's sufficient to prove that the individual
7  is who they say they are.
8    Q.  So would an individual who presented a
9  driver's license that had been expired somewhere
10  between 60 days and two years also have to show
11  documentary proof of citizenship?
12    A.  They may.  What would happen is that the --
13  the applicant would come to the office and they would
14  present the card and as part of the -- as part of the
15  issuance process for EICs, then the customer service
16  representative would look at the driver license
17  information and citizenship information is contained
18  under that tab.
19    Q.  Okay.  So that the -- the DPS employee would
20  look at a database?
21    A.  Well, now it's our driver license system.
22    Q.  Okay.
23    A.  So when you -- when you come to an office
24  that -- you know, you'll have somebody and they have
25  their computer; and all of our driver license

70

1  information is contained in our system.  So there's the
2  driver licenses, the ID cards, then there's a separate
3  tab for election certificates.
4    Q.  Okay.  So the driver's license database
5  contains information about citizenship?
6    A.  Yes.
7    Q.  And is that for all individuals who have
8  received a driver's license?
9    A.  Yes.  Or an ID card, yes.
10    Q.  That was my next question.  So an ID card
11  holder would have that same information in the
12  database?
13    A.  Yes.
14    Q.  So if an individual had an ID card that was
15  expired for between 60 days --
16    A.  Same parameters you've laid out in here.
17    Q.  Two years?
18         Would that individual -- would the DPS
19  employee check the database to determine if that
20  individual is a US citizen?
21    A.  Yes.
22    Q.  And so if an individual had a driver's license
23  or ID card that had been expired between 60 days and
24  two years and did not have additional documentary proof
25  of citizenship, would that individual be able to obtain

71

1  an EIC?
2    A.  I need to see -- can you restate that to make
3  it a little bit more clear for me?
4    Q.  If an individual had a -- had ID that was part
5  of this primary identification --
6    A.  Uh-huh.
7    Q.  -- either a Texas driver's license or an ID
8  card that had expired somewhere between 60 days and two
9  years but did not have any additional documentary proof
10  of citizenship, is that person able to obtain an EIC?
11    A.  The answer to that question is it would
12  depend, and it would depend on what the entry is in the
13  driver license system.
14    Q.  And what -- what would --
15    A.  There a box that just says --
16         MR. KEISTER:  Let her complete ask your
17  question.
18         THE WITNESS:  Sorry.
19    Q.  (BY MS. MARANZANO)  What would it depend on?
20    A.  It would depend on if the box that said, US
21  citizen, yes/no.
22    Q.  Okay.  So if the person was a citizen and DPS
23  could confirm that, they would be able to apply for an
24  EIC?
25    A.  Yes.

72

1    Q.  If the person was a citizen and didn't have --
2  did not have documentary proof of citizenship, would
3  they be able to apply for an EIC?
4    A.  I would need to see what other documents they
5  presented.
6    Q.  Okay.
7         MS. MARANZANO:  Do you do you want to
8  take a few minutes for a break?
9         MR. KEISTER:  I do.
10         MS. MARANZANO:  Okay.  Let's go off the
11  record.
12         THE REPORTER:  Off the record.
13         (Recess from 10:32 a.m. to 10:46 a.m.)
14         THE REPORTER:  Back on the record.
15         THE WITNESS:  So I had previously
16  referred to the rule inaccurately.  When I said that we
17  were allowed to collect identification information
18  under 521.143, that's not an accurate statement.  It's
19  521.142.
20    Q.  (BY MS. MARANZANO)  Thank you for the
21  clarification.
22    A.  I apologize for that.
23         MS. MARANZANO:  And before I get started
24  asking questions, I just want to read for the record
25  the citations that establish the proposition that we

TONY RODRIGUEZ                                                    5/8/2014

73

1  talked about, that it's improper to instruct a witness
2  not to answer questions beyond the scope of what he's
3  been designated for.  McMahan versus Presidential
4  Airways, Inc., 2006, US District Lexis 4909, middle
5  District, Florida 2006.  Push Lackey versus Reyes
6  (phonetic), 2014 US District Lexis 14278, District, New
7  Mexico, 2014.  Badger versus Walmart Stores, Inc., 2013
8  US District Lexis, 91216, District, Nevada, 2014.
9          And I want to note for the record that
10  these all cite Moore's Federal Practice, and they cite
11  other decisions in them.  And so we would appreciate if
12  you'd take a look and consider your position.
13          MR. KEISTER:  Do you have copies of those
14  cases?
15          MS. MARANZANO:  We have copies of
16  excerpts, which we can provide to you.
17          MR. KEISTER:  Thank you.
18          MS. MARANZANO:  Okay.
19      Q.  (BY MS. MARANZANO)  And before the break, we
20  were talking about what has been -- what has been
21  entered into the record as Exhibit No. 38.
22      Can you look at 15182?
23      A.  I'm sorry.  15 --
24      Q.  182.
25      A.  Yeah.

74

1          Q.  And we were talking about documents that
2  established citizenship before the break.
3          Can you look at the secondary
4  identification items, which is subpart 3 under 15182?
5      A.  I see that.
6      Q.  Do you know if an original or certified copy
7  of a court order with name and date of birth indicating
8  an official change of name or gender, which is listed
9  as subjection 3 -- I'm sorry. -- section C under 3.
10          Does that establish citizenship?
11      A.  No.
12      Q.  If an individual was to -- well, strike that.
13          Can you look at the list of supporting
14  identification?
15      A.  Paragraph 4?
16      Q.  Yes.
17      A.  Yes.
18      Q.  How many of these documents that are listed
19  here establish citizenship?
20      A.  Let's see.
21          MR. KEISTER:  Objection, form.  That
22  calls for a legal opinion and legal conclusion.
23          You can answer.
24          THE WITNESS:  To my knowledge, I only
25  believe it would be 2.

75

1      Q.  (BY MS. MARANZANO)  And is it --
2      A.  Well, I stand corrected.  To my knowledge, it
3  -- two, three, four -- I believe it would be -- I
4  believe it would be 4.
5      Q.  Four?
6      A.  Yes.
7      Q.  And is it the case that a person, an EIC
8  applicant can present one piece of secondary
9  identification and two pieces of supporting
10  identification under the regulation under 15182?
11          MR. KEISTER:  Objection, vague.  For what
12  purpose?  Has it has been stated?
13      Q.  (BY MS. MARANZANO)  Can you look at 15182,
14  Subsection 1, part C?
15      A.  Yes.  Yes.
16      Q.  So a requirement to obtain an EIC is that an
17  applicant must present one of these combinations of
18  underlying documentation; is that correct?
19      A.  Yes.
20      Q.  And is one of the combinations one piece of
21  secondary identification plus two pieces of supporting
22  identification?
23      A.  Yes.
24      Q.  If an individual presents the secondary
25  identification that we just talked about, Subsection C,

76

1  the change of name or gender, and supporting
2  identification that does not establish citizenship,
3  would that person have to show additional proof of
4  citizenship?
5      A.  They may be required to, yes.
6      Q.  And is that prescribed by the -- by the
7  regulation, that that individual would have to show
8  documentary proof of citizenship?
9      A.  The applicant has to -- has to be a U.S.
10  citizen, and they have to be able to show that.
11      Q.  And -- and what is that requirement based on?
12      A.  What's the requirement based on to -- to show
13  that you're a US citizen?
14      Q.  Uh-huh.
15      A.  I believe it's the voting code.
16      Q.  What -- do you know what section of the voting
17  code?
18      A.  I'm not familiar with that, no.
19      Q.  And are you -- just to be clear, are you
20  saying that the voting code requires that individuals
21  who are voting are citizens?
22      A.  Okay.  I don't know what the voting code is.
23  I'm not a voting code guy.
24      Q.  Right.  Right.  I was just trying to
25  understand your answer.

TONY RODRIGUEZ                                      5/8/2014

77

```
 1          A.  Yeah.  I guess I was trying to understand your
 2   question.  If you would restate it, I'll try and answer
 3   it better.
 4       Q.  Okay.  Perfect.
 5               I'm trying to determine what gives DPS
 6   the authority to require individuals to show
 7   documentary proof of citizenship in addition to the
 8   documents that are listed under 15182.
 9       A.  Okay.  These are -- these are supporting forms
10   of identification and -- how can I explain this?  This
11   will be longer than a yes or no.
12               The reason they're supporting forms of
13   identification is that -- that the farther that the
14   applicant gets from the driver license or the ID card,
15   which are primary forms of identification, and the --
16   the customer has already shown a lot of documents to
17   prove who they are and their citizenship and all that's
18   captured -- and those are primary documents, right?  So
19   the farther we get from those primary documents, then
20   you have to make up for that in -- in quantity of
21   documents.
22               So there may be other documents that are
23   required in order to -- to have the applicant show who
24   they are in order for us to be able to -- to verify
25   their identify or to issue the card.  The same for --
```

78

```
 1   well, we're doing the citizenship, but the same for a
 2   driver license or anything else.  So we recognize that
 3   there are -- there are customers who may not have some
 4   forms of ID and then that's why we ask for supporting
 5   identification and then those supporting
 6   identification, it will depend on the customer and it
 7   will -- it will depend on what they have.
 8               I mean, it's really -- that part is done
 9   on a case-by-case basis depending on what the customer
10   presents.  I mean, it's an imprecise answer; but --
11       Q.  Is this regulation that we're looking at what
12   establishes the criterion an applicant for an EIC would
13   have to present to obtain an EIC?
14       A.  It lists -- it provides a list of documents.
15   But I mean, if you -- if you look at B-B, it says,
16   "Document may be added depending on how things change
17   in the future."
18       Q.  Does this -- this regulation that we're
19   looking at --
20       A.  These rules, the admin rules?
21       Q.  Right.  The Exhibit 38.
22       A.  Okay.  Yes.
23       Q.  Does any part of this regulation require DPS
24   to confirm U.S. citizenship?
25       A.  Well, we don't confirm US citizenship.  The
```

79

```
 1   customer presents us with -- the customer presents us
 2   with their voter registration card, which is issued by
 3   the Secretary of State; or if they don't have it, they
 4   apply -- they can reapply.  But there's -- and if they
 5   have a driver license or an ID card, we can check in
 6   the driver license system to see if they have proved
 7   it.
 8               I -- it would depend on what they give
 9   us.  It would -- we have a network -- you know, we have
10   customer service representatives.  They make -- based
11   on the training that we've given them, the parameters
12   that we've established, they make -- they have
13   discretion to exercise latitude.  And we tell them to
14   issue -- you know, err on the side of issuance.  I
15   haven't been involved in any of these.  I mean,
16   ultimately, if there were problems, I would see it
17   based on my responsibilities as a senior manager; and I
18   would help resolve those.  I haven't been involved in
19   anything like you've described.  I'm sorry.
20       Q.  Is the discretion that is given to the DPS
21   employees who are issuing EICs, is that discretion
22   limited by the parameters of the regulation?
23       A.  No.  It's -- I don't believe so.  The --
24   the -- it's a permissive.  I'm sorry.  We -- the
25   regulation establishes a certain set of guidelines,
```

80

```
 1   okay; and we have procedures.  And then based on their
 2   best judgment and reviewing documents and -- you know,
 3   all of our CSRs review hundreds of documents, then they
 4   issue; and we've instructed them to be -- to be liberal
 5   in their issuance of EICs.
 6       Q.  Does any part of this regulation require that
 7   an EIC application must present documentary proof of
 8   citizenship?
 9       A.  Well, any part of the regulation?
10       Q.  Uh-huh.
11       A.  It says here, "U.S. citizenship or
12   naturalization papers."
13       Q.  As one --
14       A.  Secondary identification, D.
15       Q.  Okay.  And if an individual presented,
16   instead, the Subsection C as secondary identification?
17       A.  Original or certified copy of a court order
18   with the name, date of birth, indicating the official
19   name change?
20       Q.  Uh-huh.
21       A.  That doesn't indicate citizenship.
22       Q.  And if that person presented that document
23   with supporting documentation that also did not
24   establish citizenship, would that person have to
25   present independent documentary proof of citizenship?
```

TONY RODRIGUEZ                                              5/8/2014

21 (Pages 81 to 84)

---

81

1      A.  If I understand your question correctly -- and
2  I'll try and restate it.
3          So a customer comes to the office.  They
4  have a certified copy of the court order, okay, that
5  provides a name change and they don't have any other
6  documentation that establishes that they are a United
7  States citizen?
8      Q.  Yes.
9      A.  They would have to show that documentation.
10     Q.  And is that a requirement that's set out in
11  this regulation?
12     A.  I don't know.  I would have to -- I would have
13  to run through it.
14     Q.  Okay.  Do you know if it's set out in any
15  other DPS regulation?
16     A.  Not to my knowledge.  I don't know.
17     Q.  Can you look at -- under "Secondary
18  Identification," which is Subsection 3, the first one
19  listed under A, the birth certificate?
20     A.  Yes.
21     Q.  How much does it cost to obtain a certified
22  copy of a birth certificate?
23     A.  I don't know.
24     Q.  You have no idea?
25     A.  No.  My mother gave me mine, so I --

---

82

1  It's old, but it's mine.
2      MS. MARANZANO:  We're going to need to --
3  Let's go off the record for one second.
4      THE REPORTER:  Off the record.
5      (Discussion off the record.)
6      THE REPORTER:  Back on the record.
7      Q.  (BY MS. MARANZANO)  Okay.  Can you look at
8  15183?
9      A.  Can I --
10     Q.  Oh, sorry.
11     A.  I'm happy to.  Give me a second.
12     Q.  It's Exhibit 38.
13     A.  Okay.
14     Q.  Okay.  Subsection A, subpart 3.
15     A.  Subpart 3.  Fingerprints.  Yes.
16     Q.  Whose decision was it to include a
17  fingerprinting requirement for EIC applicants?
18     A.  That, I don't know.  I do know that it's no
19  longer required, and it hasn't been required -- I'm not
20  sure what the date is.  It was -- it was early -- it
21  was early in the EIC efforts, so that would put it late
22  summer or early fall of last year.  But the decision
23  was made that -- not to collect them; and actually,
24  it's almost a moot point on the equipment that we have.
25  We've updated the equipment in your driver license

---

83

1  offices; and if you try and issue an EIC, it's not even
2  a prompt.  So to explain, if -- for the driver license
3  issuance, there's a series of screens that the CSR goes
4  through; and it asks the individual -- you know, our
5  CSRs, you know, get this information and ask the
6  customer for that.  And for a driver license or an ID,
7  then the -- they're prompted for the -- for the
8  fingerprints.
9          But for an EIC, that prompt doesn't come
10  up; and our mobile systems and the systems that we have
11  in the counties don't have -- we didn't even buy the
12  thumbprint scanners to afford them, so we don't collect
13  them.
14     Q.  Do you know what the purpose of the original
15  requirement to do fingerprints was?
16     A.  I could speculate.  And my speculation is that
17  it we collect thumbprints and fingerprints as part of
18  the issuance for driver licenses and for ID cards, we
19  try to make this process go the same way as others.  We
20  just included that in there.
21     Q.  And why did DPS decide to suspend that
22  requirement?
23     A.  DPS was directed not to by the Secretary of
24  State.
25     Q.  Did they explain their reasoning?

---

84

1      A.  I didn't ask.  I certainly didn't ask.
2      Q.  Did DPS have any concern when it was
3  collecting fingerprints that that would deter EIC
4  applicants from applying for an EIC?
5      A.  I don't -- I don't -- I don't recall, no.
6      Q.  How did you communicate the change from
7  collecting fingerprints to not collecting fingerprints
8  to the public?
9      A.  Sure.  To the public?
10     Q.  Uh-huh.
11     A.  And when you say "you," you mean DPS?
12     Q.  I do mean DPS.
13     A.  I don't -- I don't -- I'm unaware of anything
14  the DPS did to -- to communicate that to the public.
15     Q.  Did any other state agencies communicate that
16  to the public?
17     A.  They may have.  I don't know.
18     Q.  Did DPS put an update on its web page?
19     A.  I don't -- I don't recall.  It would be our
20  standard practice, but I don't recall if we did or not.
21     Q.  Are you confident that no driver's license
22  offices are currently fingerprinting EIC applicants?
23     A.  Well, as I've explained, we have no equipment
24  that -- we can't do it, so -- and the counties can't do
25  it and our mobiles can't do it, so the answer to your

---

TONY RODRIGUEZ                                                    5/8/2014

---

85

1   question is, yes, I'm confident.
2       Q.   When the fingerprinting requirement was in
3   effect --
4       A.   Yes.
5       Q.   -- what did DPS do with the fingerprints?
6       A.   That information, along with the documents
7   that the applicant presented, were placed into the EIC
8   portion of driver -- of the driver license database,
9   which is -- that's a separate portion.  It's separate
10  and distinct from the ID cards and the driver licenses.
11      Q.   And what was done with that information?
12      A.   It was put there.  I don't think anything was
13  done with it.
14      Q.   Do you still maintain the fingerprints from
15  applicants who were fingerprinted when this policy was
16  in effect?
17      A.   Well, we were asked not to -- not to purge
18  anything from our database.  So as far as I know,
19  whatever we may have collected is supposed to still be
20  there because of what we're doing here today.
21      Q.   Is there any intention to use them in the
22  future for anything -- for any reason?
23      A.   EIC fingerprints?
24      Q.   Yes.
25      A.   No, not to my knowledge.

---

86

1       Q.   Are there any limitations on using EIC
2   fingerprints in the future?
3       A.   Not to my knowledge.
4       Q.   Why has DPS not changed the regulation to
5   remove the fingerprinting requirement?
6       A.   That's a good question.  We haven't got around
7   to updating our rules.  It's as simple as that.  We
8   just haven't done it, and we need to.
9       Q.   Could DPS at any time decide to start a
10  fingerprinting applicants again?
11      A.   In order to do that, we would have to field
12  new equipment to 229 driver licenses offices in 55
13  counties and the mobile units.  So the short answer is,
14  we don't have any plans to do that.
15      Q.   So there's no plans to do that, but is there
16  any impediment other than sort of logistical?
17      A.   Well, we would have to rewrite the code for
18  all the computers; and that would -- that would involve
19  a significant amount of time and money.  I mean,
20  it's -- we're not funded for that.  That's -- we have
21  no plans to do that.  We just got done fielding new
22  stuff.  Why would we want to go back and change?
23      Q.   Is there any legal impediment to DPS deciding
24  to fingerprint applicants at some point in the future?
25           MR. KEISTER:  Object to form.  Calls for

---

87

1   a legal opinion.
2            But you can answer.
3            THE WITNESS:  The Secretary of State has
4   directed us not to.
5       Q.   (BY MS. MARANZANO)  Does the Secretary of
6   State control in any way DPS' action?
7       A.   Control our action?  With regard to what?
8       Q.   With regard to the EIC program.
9       A.   The Secretary of State, as far as the
10  execution of the program?  In some ways.  I mean, when
11  I'm -- by way of answering, what I would say is they're
12  the ones that directed to go -- which counties to go to
13  and which locations in those counties, and they're the
14  ones that told us not to collect fingerprints.
15      Q.   Is there any requirement that you follow what
16  the SOS directs you do with regard to the EIC program?
17           MR. KEISTER:  Object to form; vague and
18  ambiguous.
19           THE WITNESS:  Go ahead?
20           I take my -- I take my instructions from
21  my chain of command.  And what discussions that the
22  Secretary of State have and DPS senior leadership have,
23  I'm not a party to those.  I'm not aware of any of
24  those.
25      Q.   (BY MS. MARANZANO)  And you take your

---

88

1   direction from who?
2       A.   I take my direction from Paul Watkins and AD
3   Peters.
4       Q.   Can you look at 15183, Subpart A, 1 and
5   then --
6       A.   Subpart A.
7       Q.   -- and then capital A?
8       A.   Married woman.  Is that what it says?
9       Q.   Yes.  And then a couple of sentence in it
10  says, "No name will be used that has not been
11  documented"?
12      A.   Right.
13      Q.   Can you tell me what that means?
14      A.   It -- if you remember what I -- what I said
15  previously and I used the term, "we connect the dots."
16  So that's part of our effort to connect to dots to
17  establish someone's identify.  If a woman were to come
18  to the office and she wanted to change her name and she
19  presented a marriage license and she had -- and she had
20  a birth certificate, let's say, so the marriage license
21  and the birth -- the married name -- I'm sorry.  The
22  maiden name would have to match the birth certificate.
23  But if there wasn't a match, then that wouldn't be a
24  documented name change; or it could be a court order, I
25  suppose.

---

TONY RODRIGUEZ                                          5/8/2014

---

89

1    Q.  Does DPS require that names -- that the name
2   of the applicant match exactly on the underlying
3   documentation that the individual presents?
4       A.  Without seeing the differences, I can't answer
5   that question.  I would need to see the specifics.  I
6   mean, if the name was -- was Shelly on one document and
7   Mary Lou on another, that would be a problem.  But we
8   would have -- I would have to see it, and I would have
9   to -- and if I couldn't make a determination, then I
10  would -- I'd ask -- I'd have to ask for advice.
11      Q.  Who would you ask for advice?
12      A.  Well, I mean, it would depend.  We have -- we
13  have counsel.  I can ask for advice from if there's a
14  problem with that.
15      Q.  So am I understanding you correctly that
16  there's some discretion about the name -- how exactly
17  the names match on the underlying documentation?
18      A.  Yes.  But again, without seeing an exact
19  example, I'd need -- I'd need to know.  I would need to
20  see that.
21      Q.  Okay.
22      A.  So I can't answer your question definitively.
23  I need to see -- I need to see what you're talking
24  about.
25      Q.  If the names are very different on the

---

90

1   underlying documentation --
2       A.  Then there's no connection.
3       Q.  -- and there's no connection, what does the
4   DPS employee advise to that individual?
5       A.  We -- we ask the customer to provide
6   documentation that would connect one name to the other.
7       Q.  Okay.  When someone appears at a driver's
8   license office and requests an EIC, what does the DPS
9   employee do, sort of each step, to ensure that that
10  individual is eligible for an EIC?
11      A.  Well, so when an applicant comes to one of our
12  offices, they're greeted by one of our customer service
13  representatives; and it's -- then there's a dialogue
14  between the applicant and the CSR before any paperwork
15  is done.  It's something -- it's a greeting; and then,
16  you know, what can we do for you today?  And depending
17  on what the customer says, then that would lead to
18  further -- further discussion about, well, here are the
19  forms that you need to fill out and have you brought
20  the documentation.  And then depending on how that went
21  and -- you know, because there's a lot of different
22  variables, then the customer could get issued their --
23  whatever document they were after.
24      Q.  When a person submits an EIC application, does
25  anyone at DPS review it for completeness?

---

91

1       A.  The customer service representative who
2   processes the applicant reviews it for completeness.
3       Q.  Is that done on the spot while the individual
4   is still in the office?
5       A.  Yes.
6       Q.  And if it's incomplete, will the person have
7   an opportunity to complete it before they leave the
8   office?
9       A.  The CSRs will -- will say, "You didn't fill
10  out block X and such," and then the customer is asked
11  to do that.
12      Q.  Okay.  Does DPS conduct any types of checks on
13  the applicants once the application is submitted?
14      A.  What do you mean "checks"?
15      Q.  Do they -- for example, do they check to
16  ensure that the individual doesn't have another form of
17  SB 14 compliant identification?
18      A.  SB 14?
19      Q.  Does the DPS employee check to ensure the
20  individual doesn't already have a driver's license?
21      A.  For a driver's license, as I mentioned before,
22  the customer service representative would -- if it's a
23  Texas driver's license, we can check within our driver
24  license system or the ID card system; and we can see if
25  an if -- an ID card or a driver license has been

---

92

1   expired to the customer.  I'm sorry -- has been issued
2   to the customer, not expired.
3       Q.  And if there is a current driver's license
4   issued to the customer, what does the DPS employee do
5   at that point?
6       A.  They say, "Ma'am, you have -- you have a
7   driver license and you can vote using your driver
8   license.  You don't need -- you don't need an EIC."
9       Q.  So that information is conveyed to the
10  applicant while they are in the driver's license
11  office?
12      A.  Yes.
13      Q.  Okay.  Does DPS do any background checks with
14  the information that is obtained from the EIC
15  application?
16      A.  Background checks?
17      Q.  Uh-huh.
18      A.  No.
19      Q.  Do they check for any outstanding tickets?
20      A.  No.
21      Q.  Do they check against the Texas Criminal
22  Information Center?
23      A.  No.
24      Q.  Against the National Criminal Information
25  Center?

---

TONY RODRIGUEZ                                                    5/8/2014

---

93

1    A.  No.
2    Q.  Do they do any immigration checks?
3    A.  No.
4    Q.  Do they check the United States Visitor and
5  Immigration Status Indicator Technology?
6    A.  Not to my knowledge.  I've never heard of
7  that.
8    Q.  Do they check against the Interagency Border
9  Inspection System?
10    A.  No.
11    Q.  Do they check for warrants?
12    A.  No.
13    Q.  Have they, at any time, checked for warrants?
14    A.  Driver license CSRs don't have the ability to
15  check for warrants.
16    Q.  So they haven't, at any time, checked for
17  warrants?
18    A.  They are able to.
19    Q.  Have they, at any time, done any of the other
20  checks that we just talked about?
21    A.  Not to my knowledge.
22    Q.  Are law enforcement officials present at DPS
23  offices?
24    A.  Well, the Department of Public Safety has law
25  enforcement officials assigned to it and there may

---

94

1  be -- it's not uncommon for highway patrol or Rangers
2  or CID to be co-located in some of our offices.  Our
3  offices aren't all standalone driver license offices.
4    Q.  And when an individual is applying for an EIC
5  and you said these -- these various checks are not run,
6  is some of this information nonetheless available to
7  the DPS employee, sort of -- they can see the
8  information on the screen such as outstanding tickets
9  or --
10    A.  No, I don't believe so.  Base on my
11  observation of the driver license system, outstanding
12  tickets and things like that aren't -- aren't
13  available.
14    Q.  And is the same true for warrants?
15    A.  No, we don't do warrant checks.
16    Q.  So warrant checks would not be something that
17  the employee could see on the screen?
18    A.  We don't have access to that, no.
19    Q.  Okay.  Are warrant checks done when an
20  individual is applying for a driver's license?
21    A.  Not by a driver license person, no.
22    Q.  Are you aware of a public perception that
23  applying for IDs at DPS offices will trigger warrant
24  checks?
25    A.  I'm not aware of it.

---

95

1    Q.  Do you have any concern -- does DPS have any
2  concerns that individuals will be deterred from
3  applying for EICs because they believe a warrant check
4  could be conducted?
5    A.  Not to my knowledge.
6    Q.  Does DPS have any concerns that individuals
7  will be deterred from applying for an EIC at a law
8  enforcement agency?
9    A.  No.
10    Q.  Have you heard any such concerns?
11    A.  No.
12      (Exhibit No. 67 marked.)
13    Q.  (BY MS. MARANZANO)  I'm showing you what we're
14  marking as Exhibit 67 for the record.  Can you take a
15  look at it and let me know if you recognize this
16  document?
17    A.  Yes.
18    Q.  Yes, you do recognize it?
19    A.  Yes.
20    Q.  Is this an accurate copy of an e-mail that you
21  sent?
22    A.  Yes.
23    Q.  Can you look down at the second paragraph,
24  there's a sentence that says, "In order to overcome
25  this, A.D. Skyler Hearne" --

---

96

1    A.  Hearne.
2    Q.  -- "has determined that our personnel can use
3  the regional communications centers to run a 1027 on
4  the applicants to verify their eligibility to receive
5  an EIC."
6    A.  Yes.
7    Q.  Did I read that correctly?
8    A.  Yes.
9    Q.  Can you tell me what a 1027 is?
10    A.  1027 is a police term.  It's a check for
11  other -- as I understand it, it's a check for other
12  documentation.  So we ask -- if you were to run a 1027
13  on me, it would come back and say that I have a dry
14  reporter license and a CHL.
15    Q.  So this -- a 1027 only shows other forms of
16  identification that an individual may have?
17    A.  Yes.  I mean, I'm not a cop.  That's how it
18  was explained to me, that's how I understand it, yes.
19    Q.  And what are the forms of identification that
20  you're checking for?
21    A.  Driver license, personal ID card, Texas
22  personal ID card, or a concealed handgun license.
23    Q.  Only those three?
24    A.  As far as I know, yes.
25    Q.  And are -- are these checks still being done

---

TONY RODRIGUEZ                                                    5/8/2014

25 (Pages 97 to 100)

---

97

on EIC applicants today?

A. Yes. I would like to point out these -- these checks are done at mobile stations and at the county offices. They're not done in a -- in a driver license office.

Q. I'm sorry, can you say that one more time?

A. Sure. These checks, the 1027 --

Q. Yeah.

A. -- to A.D. Skyler Hearne, that's done through a mobile site or through a county office. It's not done in a driver license office because our employees can look to see if the -- if the applicant has an ID card or a driver license by looking in the driver license system.

Q. I see. So a driver's license office does a similar check substantively, but in a different way; is that correct?

A. That's a good way to put it, yes.

Q. Okay. And the driver license office, are they also checking for concealed handgun licenses or not?

A. We can't check that. But in order to possess a concealed handgun license in the State of Texas, you must have a driver license or a Texas ID card.

Q. Okay. If a DPS employee determines that an

---

98

applicant for an EIC has been issued a driver's license, but the applicant states that she has lost the driver's license, is that person eligible to obtain an EIC?

A. Yes.

Q. Does that person need to surrender her driver's license?

A. Well, if they've lost it, they can't surrender it. I mean, they would -- they would fill out -- I believe it's on the form right here.

Q. Do you want to refer --

A. I want to refer back to whatever exhibit that y'all called the DL-14C.

Q. Exhibit 64. Is it in there?

A. There's a surrender document -- there's a surrender document that they can sign where they say, "I give it up, I surrender my driver license or ID card."

Q. So the individual would complete a form saying they surrendered their driver's license?

A. Yeah. But if they don't have it -- I mean, they don't possess it --

Q. Is an applicant who has an out-of-state driver's license required to surrender their out-of-state driver's license to obtain an EIC?

---

99

A. No.

(Exhibit No. 68 marked.)

Q. (BY MS. MARANZANO) Can you take a look at this document and tell me if you recognize it?

A. Yes. It looks like it's an e-mail from Amelia Flores to me, October 24th.

Q. Is this an accurate copy of an e-mail that you received?

A. Yes.

Q. Do you recall the situation that's described in the e-mail?

A. I do. It was out of my region, but I do.

Q. And do you -- can you read the bottom part?

A. Sure.

Q. Do you know whether that individual who is referred to in that e-mail who was told by DPS that he would need to surrender his out-of-state driver's license to obtain an EIC, do you know whether that individual left the office without applying for an EIC?

A. I don't know. So that was in -- that was in Steve's region, so I don't know if the -- if the person left without an EIC. But -- but this discussion, that -- that triggered -- that resulted in the answer that I gave you. Now we know that we can't -- we can't ask for out-of-state drivers to show their licenses.

---

100

Q. Did DPS subsequently try to contact this individual?

A. I don't know.

Q. Are you aware of any other situations in which DPS employees have told EIC applicants that they would have to surrender their out-of-state driver's licenses to obtain EICs?

A. I'm unaware of any.

Q. Would you be aware of them if that had occurred?

A. Yes.

Q. Did DPS make the public aware that applicants for an EIC do not have to surrender their out-of-state driver's licenses?

A. To my knowledge, DPS never did, no.

Q. Are you aware of any other instances where DPS employees have told EIC applicants the incorrect criteria for obtaining an EIC?

A. It comes up from time to time. I don't recall any specific instances. And, generally speaking, I mean, once they're -- once it's made aware to either myself or Steve Bell, the other regional senior manager, we try and resolve that as quickly as we can. I don't -- I don't think anything comes to mind, no.

Q. Can you tell me approximately how many times

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

TONY RODRIGUEZ                                                    5/8/2014

---

101

1   it's come up?
2       A.  No.
3       Q.  Because you don't know?
4       A.  Because I don't know, yeah.
5       Q.  Do you -- does DPS have any concerns that DPS
6   employees are deferring individuals for applying from
7   EICs by giving out incorrect information?
8       A.  Well, I mean, we have provided training for
9   the employees and we -- we do a QA/QC process on the
10  applicants.  And, you know, we're concerned about
11  providing incorrect information to any customer that
12  comes to our office, not just the EIC customers.
13      Q.  And the QA/QC process is done on individuals
14  who complete an application and submit it; is that
15  correct?
16      A.  Yes.
17      Q.  Is there a QA/QC process on individuals who
18  come into a driver's license office with a question
19  about an EIC?
20      A.  There's no QA/QC, but we do keep -- we do keep
21  track of that.  We refer to those as inquiries.
22      Q.  Do you feel confident that the EIC
23  rules are being followed by DPS employees?
24      A.  Yes.
25      Q.  Do you feel confident that the EIC rules will

---

102

1   are being followed by DPS employees 100 percent of the
2   time?
3       A.  Well, I mean, in any human endeavor there's a
4   margin of error.
5       Q.  Who makes the final determination of whether
6   to issue an EIC applicant the temporary receipt that we
7   talked -- that you referred to earlier when they're at
8   the driver's license office?
9       A.  Right.  So -- and I refer to that as a
10  transaction receipt.  That's the -- that's the --
11  person who takes the application and processes it at
12  the point of dealing with the customer.
13      Q.  So is that --
14      A.  The customer walks away with a transaction
15  receipt if they have satisfied all of the other -- all
16  of the requirements that we have established.
17      Q.  Is that a CSR?
18      A.  So a customer service representative -- and
19  when I say a CSR, I'm referring to a DPS employee who
20  works in driver license division, and there are also
21  county employees.  And they may issue a transaction
22  receipt, but they're not -- they're not CSRs, they're
23  county employees.
24      Q.  Okay.
25      A.  Or SOS employees or HHSs.

---

103

1       Q.  Okay.  And the quality control check that you
2   referenced earlier --
3       A.  Yes.
4       Q.  -- who -- whose decision was it to do this
5   quality control?
6       A.  I don't remember exactly who.  I believe it
7   came out in some discussions that we had, and the issue
8   revolved around our -- around the -- the training that
9   we provided for the counties.  And what we wanted to be
10  able to do was to ensure that we had the same level of
11  quality in issuing documents, whether it was a county
12  personnel or whether it was one of our own CSRs.  And
13  so, as a result of that, we have -- we have a QA/QC
14  process and it's -- it's relatively quick.  It goes
15  between three and five days.
16      Q.  What does this process consist of?
17      A.  So the -- it differs slightly from -- from
18  brick and mortar office to mobile.  So I would like to
19  talk about the brick and mortar office, and if you want
20  me to I can talk about mobiles, too.
21      Q.  Okay.
22      A.  So the customer service representative
23  receives the documents from the customer, okay, so the
24  person comes and makes the application.  They scan
25  those documents, the DL-14C, and whatever else the

---

104

1   customer is presented.  And then those documents are
2   placed in the -- on the EIC -- under the EIC tab in a
3   separate database.  And then the employees, or our
4   licensing and record service, I call that LRS, they
5   review the documents.  They review the birth
6   certificate and they make sure that the documents are
7   legible and that there's no administrative error.  And
8   sometimes, as I said, there's error in anything humans
9   do.  Sometimes the CSR enters the wrong birthday and
10  the birthday doesn't match up with the -- with the
11  birth certificate.  And they review those things and
12  that type of information is what they're looking at.
13      Q.  What is done if DPS determines that a
14  temporary EIC was issued in error?
15      A.  If a temporary EIC is issued in error and it
16  goes through our QA/QC process at the license and
17  records service, it would depend.  If it's a clear-cut
18  case where the LRS people feel confident that the
19  documents either aren't accurate or they can -- they
20  can contact the office.  If they can't get other
21  documents -- the customer can't provide other
22  documents, then -- then the department would issue a
23  letter from Austin headquarters to the applicant
24  explaining the reason why they aren't being issued an
25  EIC.  In some cases, and I've looked at -- if it

---

TONY RODRIGUEZ                                         5/8/2014

---

105

1    requires my decision or Steve's -- Steve is the other
2    regional manager -- then the LRS reps will show them to
3    us and Steve or I will review all the documents.  And
4    then, in those instances, if we -- if we issue, then I
5    write on the -- I handwrite, issue, I believe these
6    documents, I believe that, you know, there's not -- you
7    know, the names are substantially similar, or something
8    along those lines.  And then that's scanned into the --
9    the EIC as part of their record.  So if somebody were
10   to come back and say, "Why did you do that?", I would
11   say, "Well, the documents that were presented to me, I
12   thought they were substantial so I said to go ahead and
13   issue."
14       Q.  Okay.  Does DPS also conduct a quality control
15   check when an individual applies for a driver's
16   license?
17       A.  Well, there's -- there's a quality control
18   check that goes on, but because we issue seven million
19   driver licenses and ID cards on an annual basis, it's
20   not as -- it's not as thorough as we do for EICs.  We
21   have only issued 271 or 272 EICs.  I might be -- I
22   might be one EIC off.
23       Q.  And why are you doing a more thorough quality
24   control check for EICs?
25       A.  Well, it's because of the -- because of the

---

106

1    attention that's been paid to it and also because we
2    have such a few number, we're able to and we want to
3    make sure we're doing the right thing.
4        Q.  And I just want to make sure I understood your
5    previous testimony correctly about the check that you
6    do when an individual wants to apply for an EIC, but
7    doesn't end up filling out the application.  I believe
8    you said that --
9        A.  That's called an inquiry.
10       Q.  Okay.
11       A.  Okay.
12       Q.  And so what kind of check do you do on that
13   information?
14       A.  Well, there's really not a check.  I can --
15   can I show you something?  Does that work?
16           MR. KEISTER:  Well, just let her ask
17   questions.
18       Q.  (BY MS. MARANZANO)  You can just answer the
19   questions.
20       A.  We just -- there's really not a check.  If the
21   customer presents himself and says, "I want an EIC,"
22   for instance, and in the dialogue between the customer
23   service representative and the customer, you know, "Do
24   you have a passport?"  "Yep, I've got my valid U.S.
25   passport right here."  "Well, sir, ma'am, you know, you

---

107

1    can use that for voting."
2        Q.  And when --
3        A.  Or there are other categories of -- of
4    inquiries.
5        Q.  Does DPS record the names of the individuals
6    who make inquiries about EICs?
7        A.  Sometimes.
8        Q.  Why not all the time?
9        A.  Sometimes the customer comes in and they
10   ask -- they ask a question about a free ID and we
11   explain to them what the EIC is and what it does for
12   them and what a Texas ID is and what it does for them
13   and they walk out.  We don't -- we don't catch their
14   names.
15       Q.  Has DPS considered trying to get all the names
16   of individuals who have questions about EICs so that if
17   follow-up was necessary, they could -- they could do
18   that, follow-up with the individual?
19       A.  No.
20       Q.  No, you haven't considered that?
21       A.  No, we haven't.
22       Q.  If DPS determines that incorrect information
23   was given to a potential EIC applicant, what are the
24   steps it takes?
25       A.  Well, we -- since we don't collect anything of

---

108

1    the applicant, there's nothing we can do on that side.
2    We do -- we do counsel our CSR, and if we need to we
3    provide them remedial training to make sure they
4    don't -- they don't make the same mistake again.
5        Q.  And do you give out any information to other
6    CSRs to make sure that same mistake isn't happening by
7    other DPS employees?
8        A.  What kind of information?  Specific to an
9    inquiry?
10       Q.  If you determined that one CSR gave out
11   incorrect information, would you let everybody -- all
12   the CSRs or all the individuals who are issuing EICs
13   know about this mistake and what the correct way to
14   handle that situation is?
15       A.  It would depend if I thought it was a systemic
16   problem.
17       Q.  How would you determine whether it was a
18   systemic problem?
19       A.  I would -- if I had the same -- the same kind
20   of issues would pop up and I would discuss it with the
21   chain of command through the regional managers.
22       Q.  So if it's an issue that happens repeatedly,
23   then you'll let everybody know who is issuing EICs; is
24   that correct?
25       A.  It would depend on what the issue is, but we

---

TONY RODRIGUEZ                                                    5/8/2014

---

109

1   could -- I mean, there are a variety of ways we could
2   do that.
3       Q.   And do you feel confident that you're --
4   you're aware of the problems that are happening
5   repeatedly?
6       A.   Yes.
7       Q.   What gives you that confidence?
8       A.   I have -- I have routine interaction with my
9   regional managers.  And if there's -- if there's a
10  problem, I know that they'll talk to me.  They're not
11  shy about telling me.
12      Q.   Is DPS tracking the number of EICs that are
13  issued?
14      A.   Yes.
15      Q.   And when did that begin?
16      A.   Well, I believe it started from the beginning
17  of the program.
18      Q.   Whose decision was it to track the number of
19  EICs that are issued?
20      A.   I can't remember, but we thought that since it
21  was a new program, the discussion was that it should be
22  something we should keep track of.
23      Q.   And do you compile reports on EICs?  Is that
24  part of your responsibility?
25      A.   I used to compile a report.  And I -- I define

---

110

1   a report as it's a product that I get information from
2   and I -- I create and then I send it out to people.  So
3   I compiled an EIC report starting in June.  And first
4   we had different -- varying the cycle of the report and
5   the frequency of the report.  And we stopped -- we
6   stopped with the report itself, but we still track
7   that -- we still track that information.
8       Q.   When did you stop with the report?
9       A.   We stopped sending the report -- and, again,
10  the report -- so in order for me to answer the
11  question, I have to give you -- so I view a report as a
12  push, okay.  So I gather information, I compile a
13  report, and I push it out, I e-mail it to everybody who
14  is here.  So I push you the information.  We track the
15  information and the information has been tracked from
16  the beginning of the program, but now it's more of a
17  pull.  And the information that we have is resident on
18  a SharePoint site that's updated -- well, I won't say
19  real time because that would be a hyperbole, but near
20  real time.  And if you want the report, if you have
21  access to our SharePoint site, you can pull the report
22  that you want.
23      Q.   Okay.
24      A.   Or you can pull the tracking information.
25  It's not really a report.

---

111

1       Q.   So let's start with talking about the time
2   when you were gathering the information --
3       A.   Yes.
4       Q.   -- and pushing it out.  Who was sending you
5   that information?
6       A.   Well, I received the information from the
7   regional managers.
8       Q.   Okay.
9       A.   And they received it from -- from the CSR or
10  from their office supervisors.
11      Q.   And at the -- at the beginning, did you
12  receive information twice a day; is that correct?
13      A.   I know that I was sending -- maybe.  Things
14  were things moved very quickly, so I received the
15  information throughout the day.  There was -- there was
16  a period of time when I was making a daily EIC report.
17      Q.   Okay.
18      A.   And so I don't remember, but I know that I was
19  producing -- I did that for -- I want to say it was a
20  couple of weeks.  And that -- that became very labor
21  intensive, and so we changed the frequency of the
22  report to weekly.
23      Q.   Okay.
24           MS. MARANZANO:  Can I have this marked?
25           THE REPORTER:  Exhibit 69.

---

112

1           (Exhibit No. 69 marked.)
2       Q.   (BY MS. MARANZANO)  Okay.  I'm showing you
3   what we have marked for the record as Exhibit 69.  Do
4   you recognize this document?
5       A.   I do.
6       Q.   Is this an accurate copy of an e-mail that you
7   sent?
8       A.   Yes.
9       Q.   And can you tell me who the recipients of this
10  e-mail are?
11      A.   Yes.  On the "To" line?
12      Q.   Yeah.
13      A.   Thomas Carter -- how much specificity do you
14  need?  Do you just want me to say the regional managers
15  in DPS?
16      Q.   That would suffice?
17      A.   The regional managers and assistant managers
18  in DPS.
19      Q.   And does that also include the CC line?
20      A.   The cc line, those are some assistant managers
21  in DPS.  Paul Watkins, my direct supervisor, and Steve
22  Bell, and I mentioned him before.  He's the other
23  regional manager -- or, I'm sorry, the other senior
24  manager.
25      Q.   And in terms of the regional managers, those

---

TONY RODRIGUEZ                                                    5/8/2014

113

1    are individuals that you supervise, correct?
2        A.   That's not an accurate statement.  I supervise
3    Sam Silva.  He's the regional manager for Region 3.
4    Estella Valenzuela, Region 4; Tomas Valdez, Region 5;
5    Barbara Hubbard, 6A; Joe Garcia, 6B; Tom Carter, Kathy
6    Bergman, Salestus Winkley, and Johnnie Berkley, those
7    are the regional managers for DPS Regions 1A, 1B, 2A,
8    and 2B.  They're supervised by Steve Bell, who is on
9    the cc line.
10       Q.   With regard to the EIC program, since you were
11   the point of contact for that program, would you say
12   you supervise them with regard to EICs?
13       A.   I wouldn't use that term, but I -- because --
14   because, to my mind, "supervisory" means that I
15   evaluate them somehow or I'm somehow in their
16   administrative chain.  I have -- I can -- I can tell
17   them what to do regarding EICs.
18       Q.   Okay.
19       A.   All right.
20       Q.   That's what I was looking for in terms of
21   explaining the role.
22            So you can look at the date that this was
23   sent?
24       A.   June 26th.
25       Q.   Is that -- do you know how that date relates

114

1    to when you started issuing EICs?
2        A.   If I'm not mistaken, that's -- that's either
3    the beginning or roughly when we -- or when the DPS was
4    told to -- told to issue EICs.
5        Q.   Okay.  Can you read the first sentence of this
6    e-mail?
7        A.   Yes.  "Folks, election certificates will be a
8    big deal for the next week to ten days.  Expect to be
9    peppered with requests regarding the number of EICs" --
10   I'm sorry -- "the number of certificates we have issued
11   and if there are any problems with issuance.  We should
12   expect this as a normal course of events."
13       Q.   What did you mean by "a big deal for the next
14   week to ten days"?
15       A.   Well, in light of the -- in light of the
16   decision and in light of the directive for us to issue
17   these documents, I thought that it would be very
18   important.
19       Q.   What decision are you referring to?
20       A.   The decision to issue EICs.
21       Q.   Okay.  And is there a reason that you thought
22   the EICs would be a big deal for a week to ten days?
23       A.   Well, that was -- I didn't realize -- I
24   thought that after a week to ten days that it would --
25   things would settle and it would be a normal part of

115

1    our routine, the same way that we do everything else.
2    So that was -- that was obviously an inaccurate
3    statement.
4        Q.   Can you look at the last sentence of this
5    e-mail?
6        A.   "Thank you for your patience."
7        Q.   It says, "I will need negative activity
8    reports to feed the machine up here," the second to
9    last sentence.
10       A.   "I know this sounds redundant," yes.
11       Q.   What did you mean by that?
12       A.   The whole thing?
13       Q.   By "we need negative activity reports."
14       A.   A negative activity report, as I understand
15   that and based on my experience, is that you need to
16   hear something from somebody just to know that they're
17   out there.  So when I say a negative activity report,
18   if you were one of my office supervisors or if you were
19   one of my regional managers, I would expect you to come
20   back and say, "I did not issue any EICs today."  And I
21   do that as -- I did that as a forcing function because
22   if you work for me and I'm asking you to provide me
23   with information, then -- and even if you come back and
24   say, "Tony, there's no -- we have had no EICs," then I
25   have a reasonable expectation that you've done your due

116

1    diligence and you've checked with your subordinates and
2    that you know if any have been done.
3        Q.   Why were you assuming right at the beginning
4    of this EIC program that the reports would be negative?
5        A.   No.  They're -- no, I'm asking for information
6    and it could be, "I've issued an EIC," okay, that would
7    be a report to my mind, or, "I didn't issue an EIC," in
8    which case we haven't issued any, that would be
9    negative.  But I wasn't assigning any negative
10   connotations to that.  That's just the way I talk.
11       Q.   So when you said "negative activity reports,"
12   you referred -- you meant that to mean either active
13   reports in which an EIC was issued or in which an EIC
14   was not issued?
15       A.   What I wanted to hear from the -- the regional
16   managers was I wanted to know -- I wanted to hear from
17   them whether they had issued an EIC or they hadn't.  In
18   other words, if no one had come into the office, then I
19   expected to have -- to have the regional managers tell
20   me, "Nobody came into the office."  So there's not an
21   assumption -- there's a -- there's a -- there's
22   communication between both of us where I know that
23   you've checked and nobody has come into your office and
24   I know that for a fact.
25       Q.   Did you have any concerns about using this

TONY RODRIGUEZ                                          5/8/2014

---

### 117

```
 1   wording that it might suggest that you were looking for
 2   a negative report, in other words, that EICs had not
 3   been issued?
 4        A.  I'm not sure we're communicating right.  So
 5   the -- it didn't matter whether an EIC had been issued
 6   or not, okay.  That's not -- that's neither positive
 7   nor negative.
 8        Q.  Okay.
 9        A.  What I wanted to get from the regional
10   managers was, I wanted to know if somebody had come in
11   or if somebody had not come in.  And when I say
12   somebody had not -- nobody had come in, that would be
13   what I -- what I call -- what I have called for 22
14   years, a negative report.
15        Q.  Okay.  So why did you use the words "negative
16   report" if you wanted it to capture both when somebody
17   had come in and when somebody didn't come in?
18        A.  That's just the way I write.  I mean, that's
19   the way I -- ask my kids, that's the way I tell it.
20        Q.  Did you have any concerns that you were
21   suggesting a certain outcome by using the words
22   "negative activity report"?
23        A.  Not until right now.
24        Q.  What did you mean by "feed the machine"?
25        A.  That's a term that I use.  It's a -- a machine
```

### 118

```
 1   is a system and -- and the system runs on information
 2   and we have to know and that's why I ask for reports
 3   whether people had come into the office or not.
 4   Because -- because if you -- if you were my supervisor,
 5   for instance, and I said, "Well, five people went into
 6   five offices," then you would want to know if anything
 7   else had gone on.  It would be my -- the way I view it,
 8   it would be my responsibility to tell you, "We only had
 9   five and nobody else came in."  And I would have to be
10   certain of that information.
11        Q.  And who is the machine in this case?
12        A.  Well, I'm part of the machine because I'm
13   responsible for the program.
14        Q.  Who else is part of the machine?
15        A.  Well, I mean, "the machine" is a slang term
16   for -- for the system.  I refer to it as headquarters.
17        Q.  And by that, you mean DPS leadership?
18        A.  Well, certainly my leadership needed to know
19   that.
20        Q.  Your leadership being DPS?
21        A.  Being -- well, yes.  So it would be Paul
22   Watkins and Joe Peters.  They're the ones that I
23   reported to on EICs.
24        Q.  Do you know if this information was also
25   shared with the secretary of state's office?
```

### 119

```
 1        A.  It should have been, yes.
 2        Q.  Was it shared with the governor's office?
 3        A.  I don't know.
 4        Q.  Was it shared with the lieutenant governor's
 5   office?
 6        A.  I don't know.
 7        Q.  I believe earlier you testified that when
 8   somebody appears at a driver's license office and
 9   expresses an interest in obtaining an EIC, but does not
10   have the required underlying documentation, that person
11   is reported as an inquiry; is that right?
12        A.  Not necessarily.
13        Q.  Okay.  How is that person recorded?
14        A.  So give me the scenario again, please.
15        Q.  An individual wants to apply for an EIC, but
16   does not have the required underlying documentation.
17        A.  Well, it could be reported as an inquiry.  But
18   if they -- if they were seeking an EIC, then we would
19   send -- we would tell -- we would tell them what they
20   needed to have to satisfy the requirements.  I never
21   thought about it that way.  I guess the short answer is
22   I don't know.
23        Q.  Is it possible that person would not get
24   recorded at all?
25        A.  It's possible, yes.
```

### 120

```
 1        Q.  Okay.
 2        A.  I mean -- now, when I answer that question, we
 3   have -- we have talked to our staff repeatedly on the
 4   importance of collecting information on inquiries.
 5   So -- but, yes, of course, it's possible.
 6        Q.  Why did you not include in this e-mail to your
 7   staff a request to include information about inquiries?
 8        A.  I don't know.  That was an oversight.
 9   Because -- because it was the 26th of June and we had
10   just started and didn't know what we needed to get.
11        Q.  Are you confident that you have consistently
12   received information about EIC inquiries --
13        A.  Yes.
14        Q.  -- from all offices issuing EICs?
15        A.  Yes.
16        Q.  And what gives you that confidence?
17        A.  Because we have a quality QA/QC check, as I
18   discussed previously, done by LRS.  So when a -- I'm
19   sorry, are you talking about issuances or inquiries?
20        Q.  I'm talking about inquiries.
21        A.  Oh, inquiries.  Well, I have a reasonable
22   confidence.  We have -- we have told the chain of
23   command, we have talked to the CSRs about it.  By and
24   large, my experience has been they're conscientious
25   employees.  I think they're doing their job, so, yes.
```

TONY RODRIGUEZ                                          5/8/2014

121

1  Q.  Is it possible that you did not receive
2  reporting on all EIC applicants who wanted to apply for
3  an EIC, but did not possess the underlying required
4  documentation?
5          MR. KEISTER:  Objection, calls for
6  speculation.
7  Q.  (BY MS. MARANZANO)  You can answer.
8      A.  I don't know.  It's possible, I suppose.
9  Q.  Who -- what categories of people do get
10  recorded in the inquiry field?
11      A.  I believe there's -- it's general, so we have
12  had people come in and they ask general information.
13  And sometimes these are election officials and they
14  just want to educate themselves or they're customers
15  who think that they want a free ID card.  And we have a
16  way to categorize each one of those people who don't
17  have the documents, perhaps, or they need to go get the
18  documents, that kind of business.
19  Q.  Okay.  And did you say people who might want
20  to use the EIC for something else?
21      A.  I don't know.  Did I?
22  Q.  If somebody came in -- let me just back up and
23  ask.
24      A.  Yeah.
25  Q.  If somebody wanted to apply for an EIC --

122

1      A.  Right.
2  Q.  -- but they wanted to use it for another
3  purpose other than voting, is that somebody who
4  would -- who would be permitted to apply for an EIC if
5  they expressed their desire to the DPS employee?
6      A.  I think you asked me this question before.  I
7  guess it would depend.  I mean, it's -- we issue the
8  EIC to the customer.
9  Q.  Uh-huh.
10      A.  And we explain to the customer what it's used
11  for, what its intended use is for.  If the customer
12  goes and uses it for something else, to purchase
13  something or to prove something to a third party,
14  that's -- that's, I guess, the purview of that third
15  party.  But we inform the customer that that's not the
16  purpose.
17  Q.  Uh-huh.  And I guess what I'm asking you is,
18  if the customer expresses that desire to the DPS
19  employee when they're applying --
20      A.  Uh-huh.
21  Q.  -- does the DPS employee then -- do they
22  refuse to issue the EIC on that basis?
23      A.  I've never heard of that happening.
24  Q.  You've never heard of that?
25      A.  We advise the customer that the -- there are

123

1  other forms of identification that we can provide to
2  them, like a Texas ID card, which can be used for
3  identification purposes.  But I've never heard -- it's
4  never been brought to my attention -- or I don't think
5  it's been brought to my attention that we have denied
6  service to a customer who has said, "I want to take
7  this and use it for something else."  I don't recall
8  anything like that.
9  Q.  And the other forms of identification that
10  you're referring to, do they all cost some amount of
11  money to obtain?
12      A.  They do.
13  Q.  Does DPS compile these reports that it was
14  getting into a larger analysis?
15      A.  Which reports?
16  Q.  The reports that you were getting from the
17  customer service representatives.
18      A.  I don't believe so, no.
19  Q.  Is there any compilation of the number of
20  people who tried to apply for an EIC, but lacked a
21  birth certificate?
22      A.  A compilation?
23  Q.  Uh-huh.
24      A.  It's on a spreadsheet that we keep and we
25  would have to go through there.  But -- so I suppose --

124

1  I suppose the answer is yes.
2  Q.  You have a spreadsheet of everyone who wanted
3  to apply for an EIC, but lacked a birth certificate?
4      A.  We have a spreadsheet of every EIC application
5  and it also indicates whether it's valid or invalid and
6  the reason why it was valid or invalid.
7  Q.  And if somebody at a driver's license office
8  wants to apply for an EIC, but doesn't have a birth
9  certificate, would -- is it possible they wouldn't
10  actually fill out an EIC application?
11      A.  That doesn't make any sense.
12  Q.  Does it --
13      A.  Would you restate that?
14  Q.  I thought that you testified earlier that when
15  an individual enters a driver's license office and
16  wants to obtain an EIC --
17      A.  Yes.
18  Q.  -- there's a dialogue about what's required to
19  obtain an EIC.
20      A.  Yes, yes, yes.
21  Q.  If that person doesn't have some of the
22  underlying documentation, isn't it possible they might
23  leave without completing an EIC application?
24          MR. KEISTER:  Objection, form, calls for
25  speculation.

TONY RODRIGUEZ                                                        5/8/2014

---

125

1        THE WITNESS:  I don't know what they
2   would do.
3            (Exhibit No. 70 marked.)
4        THE REPORTER:  Exhibit 70.
5        Q.  (BY MS. MARANZANO)  Okay.  I'm showing you
6   what we have marked for the record as Exhibit 70.  Do
7   you recognize this document?
8        A.  I do.
9        Q.  Is this an accurate copy of an e-mail that you
10  sent?
11       A.  Yes.
12       Q.  Do you see at the bottom of the page the
13  e-mail that we just spoke about?
14       A.  I do.
15       Q.  And then there's a response from Mr. Winkley?
16       A.  Salestus Winkley, yes.
17       Q.  Who is Mr. Winkley?
18       A.  Salestus Winkley is the regional manager for
19  DPS Region 1A.
20       Q.  Is he responsible for determining whether to
21  issue an EIC applicant an EIC in his -- in the offices
22  that he oversees?
23       A.  Well, within our hierarchy, he could be -- I
24  mean, the -- we have a chain of command, but he's the
25  regional manager.  So if an issue was referred to him,

---

126

1   then he would be the one responsible.
2        Q.  And so he supervises employees who are issuing
3   EICs; is that correct?
4        A.  Yes.  Yes, he does.
5        Q.  Okay.  Can you look at your reply to
6   Mr. Winkley?
7        A.  Yep.
8        Q.  What do you mean by "zero is a good number"?
9        A.  That goes back to the discussion on the -- on
10  the e-mail below.
11       Q.  Uh-huh.
12       A.  And then when I say that I need negative
13  activity reports.  So as I was saying before, so now I
14  know that Salestus has had nobody go and an ask for an
15  EIC.
16       Q.  Were you saying that issuing -- that not
17  issuing any EICs is a desirable outcome?
18       A.  No.
19       Q.  Why is -- have you ever expressed the view
20  that issuing zero driver's licenses is a positive
21  outcome, is a good -- good thing?
22       A.  No.  I was referring to the number, so he
23  provided me information that I needed.  And, in this
24  instance, he hadn't issued and that's what I needed in
25  order to report to my chain of command and I needed to

---

127

1   have that number.  That was a negative activity report,
2   so now I know that nobody went into his office.  I
3   didn't have to make an assumption on whether he had
4   people go -- customers seeking EICs or not.  He
5   provided me the information.  And, in this instance, it
6   was zero and zero was the information that I was
7   looking for.
8        Q.  So when you said "zero is a good number,"
9   you're saying that that didn't have any -- you weren't
10  referring to the number zero itself when you said
11  that's a good number?
12       A.  Well, he provided me the information that I
13  wanted, okay.  And, in this instance, it was zero.  15
14  could have been a good number because I had the
15  information that I needed in order to fill out my
16  report.
17       Q.  Did you consider how the recipient of the
18  e-mail, Mr. Winkley, would respond to the statement
19  "zero is a good number"?
20       A.  Salestus knows me well enough to know how I
21  speak.
22       Q.  If you had received an e-mail that said "zero
23  is a good number," what would you have thought that
24  meant?
25       A.  I would have thought that I provided him with

---

128

1   the information that he was looking for and, in this
2   instance, that was zero and that was okay.
3        Q.  Do you think that an employee might be
4   deferred from issuing EICs to eligible applicants when
5   someone supervising the program says it's a good thing
6   not to issue any EIC applications?
7        MR. KEISTER:  Objection, form.  That
8   mischaracterizes the previous testimony.
9        THE WITNESS:  Say that again, please.
10       Q.  (BY MS. MARANZANO)  Do you think that an
11  employee might be deterred from issuing EICs, even to
12  eligible applicants, when a supervisor of the program
13  says it's a good thing to issue zero?
14       A.  Well --
15       MR. KEISTER:  Objection -- same
16  objection.
17       THE WITNESS:  I'll answer anyway.
18       MR. KEISTER:  Okay.
19       THE WITNESS:  No, because we have -- we
20  have told the employees to be liberal in how they look
21  at documents and to err on the side of issuance.  So
22  that's the first instance.
23            And the second instance is the
24  communication between Salestus and I, and Salestus
25  knows how I speak and how I express myself.

---

TONY RODRIGUEZ                                          5/8/2014

---

129

1  Q.  (BY MS. MARANZANO)  Did you consider whether
2  sending this e-mail would discourage employees from
3  issuing EICs?
4      A.  I did not.
5      Q.  Have you said similar things to other DPS
6  employees?
7          MR. KEISTER:  Objection, vague.
8          THE WITNESS:  Not that I can recall.
9      Q.  (BY MS. MARANZANO)  Do you believe that DPS
10 should not be responsible for issuing EICs?
11     A.  I believe that we should be responsible for
12 issuing EICs.
13     Q.  Do you believe that EICs should be made
14 available to individuals?
15     A.  Yes.
16          (Exhibit No. 71 marked.)
17     Q.  (BY MS. MARANZANO)  I'm showing you what we
18 have marked for the record as Exhibit 71.  Do you
19 recognize this document?
20     A.  I do.
21     Q.  Is this an accurate copy of an e-mail that you
22 received?
23     A.  Yes.
24     Q.  And also an accurate copy of an e-mail you
25 sent?

---

130

1      A.  Yes.
2      Q.  Okay, thank you.  Can you take a look at the
3  initial message on the bottom of the page?
4      A.  The one that was dated 5 July, yes.
5      Q.  And so, at this point, did you change the
6  frequency of which you were collecting EIC reports?
7      A.  Well, it says here, "Just to follow-up, I only
8  need your EIC reports once a day at 4:00."  So, yes.
9      Q.  And that happened on July 5th; is that
10 correct?
11     A.  Yes.
12     Q.  And who made the decision to change the number
13 of times you were gathering information from twice a
14 day to once a day?
15     A.  I discussed it with Joe Peters.  My
16 recommendation was that since -- since I was spending a
17 lot of time producing EIC reports that I wanted to go
18 from twice a day to once a day.
19     Q.  Okay.  And so was it Mr. Peters' decision to
20 do that?
21     A.  It was my recommendation, but he okayed it.
22     Q.  And can you tell me, do you see that
23 Mr. Carter sent you an e-mail that said, "Negative
24 today" --
25     A.  Yes.

---

131

1      Q.  -- in response to your response for EIC
2  reports?
3      A.  Yes.
4      Q.  And your response to that was, "No inquiries
5  either.  This is getting better by the day."
6      A.  Yes.
7      Q.  What did you mean by that?
8      A.  Tom Carter is an old Navy man.  So I
9  understood his report to be that he hadn't had any
10 activity and that was the negative report that I had
11 asked for, the negative activity report that I spoke
12 about earlier.  And so he didn't get any inquiries.  I
13 wanted to know if he got any inquiries, and he responds
14 about that that he hadn't got any.  And when I say
15 "this is getting better by the day," we thought we were
16 going to have -- we thought we were going to have a lot
17 of customers.  And so it just looked like nobody was
18 coming in.  We had gone through and worked to set up a
19 system in place, but nobody was coming in.
20     Q.  And did you consider it a good thing that
21 nobody was coming in?
22     A.  I was just stating a fact.
23     Q.  And the fact is that it was getting better
24 than by the day?
25     A.  The fact is that nobody was coming in.

---

132

1      Q.  And why did you characterize that as "getting
2  better"?
3      A.  Well, we had gone and established an
4  infrastructure of reporting, and so we had expended a
5  lot of time and effort to work on something, but nobody
6  was coming in.  So that was sarcasm.
7      Q.  And your characterization of that was that
8  that was a good thing?
9      A.  No.  It was -- it was merely -- it was merely
10 a special frustration that we had prepared for
11 something, but it hadn't happened.  We had prepared for
12 a football game, but nobody showed up.
13     Q.  So "this is getting better by the day" is an
14 express of frustration?
15     A.  My frustration.
16     Q.  Did you consider how Mr. Carter might take
17 that statement?
18     A.  Well, as I mentioned, again, Tom's a Navy guy.
19 So Tom and I were able to -- we were able to talk.  Tom
20 knows me well enough that when I say things, I use
21 military vernacular, that he takes it for what it's
22 worth.
23     Q.  Did you have any concern that you were
24 suggesting that no EIC activity is a good thing?
25     A.  No.  That wasn't what I was implying.

---

TONY RODRIGUEZ                                                    5/8/2014

---

133

1    Q.  Any concern that this message might discourage
2    DPS employees from issuing EICs -- EICs even to
3    eligible applicants?
4    A.  Since that would run contrary to the training
5    and the instructions we had given them, no.
6    Q.  Did you say similar things to other DPS
7    employees?
8    A.  I may have.
9    Q.  Any specific recollections, as you sit here
10   today?
11   A.  No.  I mean --
12   Q.  Have you ever made a similar comment about
13   driver's licenses?
14   A.  Not to my knowledge, no.
15   Q.  Have you ever made a similar comment about
16   personal identification cards?
17   A.  Not to my knowledge.
18   Q.  Have you ever made a similar comment about a
19   license to carry concealed handguns?
20   A.  Driver license division doesn't deal with
21   concealed handgun licenses.
22   Q.  So would that be a no?
23   A.  That would be, we don't have anything to do
24   with concealed handgun licenses.
25   Q.  Okay.

---

134

1    (Exhibit No. 72 marked.)
2    THE REPORTER:  Exhibit 72.
3    MS. MARANZANO:  Thanks.
4    Q.  (BY MS. MARANZANO)  I'm showing what we are
5    marking for the record as Exhibit 72.  Do you recognize
6    this document?
7    A.  Yes.
8    Q.  Is this an accurate copy of an e-mail that you
9    sent and received?
10   A.  Yes.
11   Q.  And on the bottom e-mail, who are the
12   individuals that this e-mail was sent to?
13   A.  Let's see.  Well, it's the regional managers;
14   Joe Peters, Paul Watkins, and Steve Bell.  Janie Smith
15   and Lori are policy people.  Enrique was one of our
16   tech solutions people.  He doesn't work for us anymore.
17   Joe Mastracchio is a DAD, a deputy assistant director.
18   Ron Grahovec works for L1.  John Crawford is one of our
19   IT guys.  Tom Vinger is one of our meeting
20   communications people.  So is Katherine Cesinger.
21   Stephanie Hunter is an assistant manager in one of the
22   regions.  It escapes me which one.  So is Charles
23   Wells, David Barber, Barbara Munoz, and Carolina
24   Segundo.
25   Q.  And this e-mail was sent on July 15th; is that

---

135

1    correct?
2    A.  The bottom one was sent on July 15th, yes.
3    Q.  Yes.  And, at this time, did you change the
4    reporting cycle to a weekly reporting cycle?
5    A.  Well, let's see.
6    Q.  I'm looking at the --
7    A.  Yeah, I know.  I'm reading it, too.  "We are
8    changing the reporting cycle from daily to weekly,"
9    yes.
10   Q.  Whose decision was that?
11   A.  That was -- that was Joe Peters decision based
12   on my recommendation.
13   Q.  What was your recommendation based on?
14   A.  My recommendation was based on the amount of
15   time that we were -- that we spent working on EICs and
16   compiling the information.
17   Q.  Okay.
18   A.  It didn't -- it seemed to me that the -- that
19   my assessment was that a daily report that captured all
20   the information that occurred during the day was a more
21   effective one than one in the morning and one in the
22   evening because sometimes you get those reports mixed
23   up.  So my recommendation -- I'm sorry -- then a daily
24   report, you get that information mixed up.  If you
25   didn't collect it all at the end of the week, you can

---

136

1    have what I call a roll-up, which is a compilation of
2    all the -- all the information -- all the activity that
3    happened in the previous week.
4    Q.  And after you went to weekly report, did you
5    ever change it back to getting reports more frequently
6    than once a week?
7    A.  Well, I don't think we changed the reports.  I
8    mentioned that we do a poll.  So if you want the
9    information right now, you can go to the SharePoint
10   site and you can pull the information.  If you want it
11   20 minutes from now, you can go back and pull the same
12   information.  But I don't recall me producing a report
13   and pushing it out to anybody to go back.  I may have,
14   but I don't -- I don't recall, no.
15   Q.  Okay.
16   MS. MARANZANO:  Can I mark this?
17   THE REPORTER:  Exhibit 73.
18   (Exhibit No. 73 marked.)
19   Q.  (BY MS. MARANZANO)  I'm showing you what we
20   have marked as Exhibit 73 for the record.  Do you
21   recognize this document?
22   A.  Yes.
23   Q.  Is this an accurate copy of an e-mail you sent
24   on the bottom of the page?
25   A.  Yes, June 27th.

---

TONY RODRIGUEZ

5/8/2014

---

137

1  Q.  And can you tell me, does it say, "Sir, we
2  continue our clean sweep.  No EICs issued.  We have had
3  a close call on Vantage Park, but the customer opted
4  out and left the office"?
5  A.  Yes.
6  Q.  Did I read that correctly?
7  A.  Yeah, you did good.
8  Q.  Thank you.  What did I -- what did you mean by
9  "close call"?
10  A.  The customer just didn't want it.
11  Q.  What did you mean by "clean sweep"?
12  A.  That we -- I would need to see the document on
13  there, but based on the inference, it seems to me that
14  we really hadn't any EICs that were issued.
15  Q.  Are you aware of why this customer opted out
16  and left the office?
17  A.  No.  It may be in the database someplace, in
18  our spreadsheet.
19  Q.  Why did you choose to use these words, "clean
20  sweep," "close call"?
21  A.  That's just the way that I speak.  When you do
22  something your entire adult life, it's just how you --
23  I'm sure you have the same -- same colloquialisms and
24  terms.  That's just what I've done.
25  Q.  Did you have any concern that describing an

---

138

1  individual who wanted -- who was expressing interest in
2  applying for an EIC as a close call would discourage
3  individuals working for you from issuing EICs?
4  A.  Certainly not.  That would run contrary to the
5  training and the guidance that we had given them.
6  Q.  But you're also supervising the EIC program,
7  correct?
8  A.  Right.
9  Q.  And you're using words like "close call" to
10  describe somebody who is interested in obtaining an
11  EIC, correct?
12  A.  That's just the way that I speak.
13  Q.  So you think that when you send a message and
14  there's training that has a contrary message that
15  employees will follow the training as opposed to what
16  their supervisor is telling them?
17  MR. KEISTER:  Objection, form.  That's
18  vague and mischaracterizes previous testimony.
19  THE WITNESS:  Thank you.  I wouldn't say
20  that it was a contrary message.  That's the way that I
21  express myself.  And -- and I don't think that -- that
22  anything that I've done in my actions towards the
23  customers or the guidance that we have put out in our
24  training procedures or during our conference calls or
25  anything like that would discourage our -- our

---

139

1  employees from issuing an election certificate to a
2  customer that was supposed to get one.
3  Q.  (BY MS. MARANZANO)  You don't have any
4  concerns about the language that you used being
5  discouraging to DPS employees?
6  A.  No.
7  Q.  Is it DPS's responsibility to implement the
8  EIC program in a way that ensures an eligible EIC
9  applicant can obtain an EIC?
10  A.  Yes.
11  Q.  Is it DPS's responsibility to make the EIC
12  process as easy as possible for an EIC applicant?
13  A.  Within the constraints of the law, yes.
14  (Exhibit No. 74 marked.)
15  THE REPORTER:  Exhibit 74.
16  Q.  (BY MS. MARANZANO)  Can you take a look at
17  this and tell me if you recognize it?
18  A.  Yes.
19  Q.  What is this?
20  A.  This appears to be an EIC report that I sent
21  for a -- it looks like it's a weekly report.
22  Q.  Can you turn to the second page?  Actually,
23  let me clarify.  When you say "weekly report," this is
24  the information that you were receiving from the
25  regional offices and putting into one piece of

---

140

1  information and pushing out; is that correct?
2  A.  I would refer to this as a product.  So I
3  received information from the offices, I consolidated
4  it into this product, and I pushed this out.
5  Q.  Okay.  On the second page, under Hidalgo
6  County --
7  A.  Yes.
8  Q.  Inquiry for information only, there's a -- one
9  person is listed as, "Customer was needing supporting
10  document."  And the one below that, "Customer was
11  needing birth certificate."
12  A.  Are you talking about La Joya City Hall, Unit
13  No. 17?
14  Q.  Yes.
15  A.  And Weslaco Business and Visitors Center, Unit
16  No. 17?
17  Q.  Yes.
18  A.  Yes.
19  Q.  Do all offices distinguish between applicants
20  lacking birth certificates and applicants lacking other
21  forms of supporting documentation?
22  A.  I'm not sure it's a -- I'm not sure it's a
23  hard distinction because a birth certificate is
24  documented.  It just depends on who is entering the
25  report and how they refer to it.

---

TONY RODRIGUEZ                                                    5/8/2014

36 (Pages 141 to 144)

---

141

1    Q.  Have you provided offices with any guidance
2  for tracking individuals who lack birth certificates?
3    A.  No.
4    Q.  And, previously, I believe you said that an
5  individual who lacked the underlying documentation may
6  or may not be recorded as an inquiry on this report; is
7  that correct?
8    A.  Yes.
9    Q.  Okay.  Can you turn to the third page under
10 Region 3?
11   A.  At the very bottom?
12   Q.  Uh-huh.
13   A.  Yes.
14   Q.  Do you see that there's an individual -- or
15 there's three -- I guess, three individuals listed as,
16 "Inquiry, did not have proof of citizenship"?
17   A.  Uh-huh.
18   Q.  Does that three indicate how many individuals
19 fall into that category?
20   A.  That's how I understand it.
21   Q.  Okay.  And is that based on basically what we
22 have talked about earlier, that individuals are
23 required to -- required to present some sort of
24 documentary proof of citizenship when they apply?
25   A.  Yes.

---

142

1    Q.  Okay.  How many times has a person sought to
2  apply for an EIC, but lacked the underlying
3  documentation?
4    A.  An individual?
5    Q.  Uh-huh.
6    A.  I don't know.
7    Q.  But that's information that you have some
8  tracking system for; is that correct?
9    A.  Not to the individual -- not to the -- not
10 down to the individual, I don't think.
11   Q.  Okay.
12   A.  I don't believe, no.
13   Q.  How many times has an individual attempted to
14 apply for an EIC, but been denied because they didn't
15 have documentary proof of citizenship?
16   A.  I don't know.
17   MR. KEISTER:  Objection, vague.  And I
18 think, counsel, that -- I think you're confused about
19 him saying "an individual."  I think he thinks you're
20 thinking about one individual coming back as opposed
21 to -- as opposed to how many individuals.
22   MS. MARANZANO:  Let me rephrase my
23 question.
24   MR. KEISTER:  I think.  I apologize, I'm
25 sorry if I'm wrong.

---

143

1    Q.  (BY MS. MARANZANO)  How many EIC applicants
2  have been unable -- or potential EIC applicants have
3  been unable to obtain an EIC because they lacked
4  documentary proof of citizenship?
5    A.  I -- I don't know.  I would have to go and
6  look -- look in our spreadsheet in order to provide
7  that information.
8    Q.  Do you know approximately how many?
9    A.  No, I don't.
10   Q.  Are you still doing okay?  Do you need --
11   A.  Well, I'll need some more water in a bit.
12   Q.  We'll push through a little bit longer.
13   A.  That's fine.
14   Q.  Okay.
15       THE REPORTER:  Off the record.
16       (Discussion off the record.)
17       THE REPORTER:  On the record.
18       (Exhibit 75 marked.)
19   Q.  (BY MS. MARANZANO)  I'm showing you what we've
20 marked as Exhibit 75 for the record.
21   A.  Give me a second.
22   Q.  Yep.
23   A.  I have it.
24   Q.  Can you take a look at this and tell me if you
25 recognize it?

---

144

1    A.  Sure.
2    Q.  What is this?
3    A.  Well, it's two-page document.  So the front
4  part is an e-mail.  The back part looks like it's a
5  report of inquiries and issuances for mobile stations
6  in at least two counties.
7    Q.  Can you look at the top inquiry box?
8    A.  Uh-huh.
9    Q.  It says, "Number of inquiries that did not
10 qualify, one"?
11   A.  Yes.
12   Q.  And then the remarks, "Did not meet ID
13 policy."
14       What does that mean?
15   A.  It means that the applicant wasn't able to
16 provide the identification documents that we require in
17 order to issue an EIC.
18   Q.  So is that another way of saying the applicant
19 did not provide the required underlying documents?
20   A.  Yes.
21   Q.  Do you break out -- in that remark column, do
22 you break out documents that show identification as
23 opposed to documents that show citizenship or something
24 else?
25   A.  I don't -- I don't recall any instruction to

---

TONY RODRIGUEZ                                                      5/8/2014

37 (Pages 145 to 148)

145

1   do that.  A lot of that would be up to the individual
2   who was putting the information into the blocks.
3        Q.  Okay.
4        A.  I don't -- I don't recall if we had any -- any
5   reporting standards that broke it down that way.
6        Q.  Okay.  Did you ever provide guidance to
7   individuals in terms of how to record the information
8   that they were sending to you?
9        A.  I don't recall doing that.
10       Q.  Okay.
11              (Exhibit 76 marked.)
12       Q.  (BY MS. MARANZANO)  I'm showing you what we've
13   marked as Exhibit 76.
14           Do you recognize this document?
15       A.  I do.
16       Q.  What is this?
17       A.  This is an e-mail from -- there's two e-mails
18   in there.  There's an e-mail from myself out to the
19   regional managers who work for me, sent on September
20   the 14th.  And then there was a response the next day
21   from Sam Silva, who's the regional manager for DPS
22   Region No. 3.
23       Q.  Do you see that second entry in the box of --
24   can you take a look at that?
25       A.  It says 9, slash, 14, 2013, Weslaco station?

146

1        Q.  Yes.  Exactly.
2        A.  Yes.
3        Q.  Do you see that the inquiry says that that
4   individual never had a US birth certificate?
5        A.  That's what it says, yes.
6        Q.  What's the appropriate way to handle an
7   applicant who says that they never had a US birth
8   certificate?
9        A.  Well, we -- we asked the customer to prove
10   their citizenship.  My father hasn't got a US birth
11   certificate.  He's a naturalized citizen.  He show his
12   naturalization card.
13       Q.  What if an individual is born in United States
14   but doesn't have a birth certificate, how is that
15   applicant handled?
16       A.  There are a variety of ways that we can help
17   mitigate that.
18       Q.  What are those ways?
19       A.  There may be a midwife certificate.  There may
20   be census documentation.  There may be other
21   documentation that we get from the Social Security
22   agency.  And it goes back to what I mentioned earlier
23   about the supporting documentation in that the farther
24   you get from the driver license or the identification
25   card, the more other documentation that you need.  The

147

1   customer may have a lot of things.  We've accepted
2   affidavits from people who were present at the birth of
3   a customer saying that, you know, he was born in such
4   and such a county.  It would depend on that.
5        Q.  So DPS will accept documents that prove birth
6   that aren't a certified copy of the birth certificate?
7   Is that what I'm hearing you say?
8        A.  We have -- we have discretion in the documents
9   that we do accept; but again, it would it would
10   depend on the other documents that were provided.
11   We -- when -- remember what I said about the -- the --
12   the lower the quality -- and I'm not saying that in a
13   pejorative way; but the farther you get from the driver
14   license and the ID card, the more we rely on a mass of
15   documents.  So if we had a number of documents, then we
16   could -- if the customer also had a Social Security
17   card or knew the Social Security number.  We call them
18   numies.  We could have that or an affidavit or there
19   are other things.  There could be tribal memberships
20   and things like that.  We can accept a lot of things to
21   help show that a customer was born in the United
22   States.
23       Q.  Doesn't the regulation specify what you can
24   accept?
25       A.  The regulation?

148

1        Q.  Uh-huh.  That we looked at earlier.
2        A.  You mean the rule?
3        Q.  Yes.
4        A.  The rule -- I need to go back and refer to it,
5   but I think that it also says other documents.  And we
6   can -- we do have some discretion which other ones we
7   deal with.
8        Q.  And the other document -- the other document
9   is -- the discretion to accept other documents is one
10   of the items listed in the supporting document
11   category; is that correct?
12       A.  Yes.
13       Q.  And doesn't the regulation require that
14   somebody show, along with the supporting documentation,
15   at least one of the forms of secondary ID?
16       A.  It does.  But some customers might not have
17   that.  It would depend on the customer.
18       Q.  When a customer doesn't have that, you're
19   willing to forego the requirement that they show the
20   secondary?
21       A.  Well, there's not a foregoance.  It's that we
22   accept other documents that give us a reasonable --
23   that would -- that make us reasonably certain that that
24   individual is who they represent themselves to be.
25       Q.  Is that permitted by the regulation, as you

TONY RODRIGUEZ                                                    5/8/2014

149

1  read it?
2      A.  By the rule?
3      Q.  Uh-huh.
4      A.  Well, we certainly do it, yes.
5      Q.  Is it a DPS discretionary decision?
6      A.  DPS has discretion, and driver license
7  exercises discretion when dealing with customers.
8      Q.  So is this policy written down or memorialized
9  anywhere?
10     A.  Well, it's -- it's in our -- in it's our --
11  our admin rules, and it's also part of our training as
12  a part of our procedures.
13     Q.  Which admin rules is it in?
14     A.  The ones that we discussed earlier.  The --
15  we're talking about EICs now?  Are we talking about --
16     Q.  We're talk about EICs.
17     A.  Okay.  So it's -- it's in the admin rules that
18  we spoke about earlier.  What is that, 15?  Whatever it
19  is.
20     Q.  But the admin rules actually say something
21  different, correct?
22     A.  The -- we're allowed discretion in what we
23  accept.
24          MR. KEISTER:  It may be on that.  I'm not
25  sure.

150

1          THE WITNESS:  I think it's these other
2  documents in the -- it's in the 521.  I can't -- I
3  can't remember it right now.
4      Q.  (BY MS. MARANZANO)  It's your testimony that
5  DPS has discretion to determine what documents are
6  sufficient?
7      A.  We have some discretion, yes.
8      Q.  Some discretion and --
9      A.  We can't accept nothing.
10     Q.  Can you, as you sit here today, tell me what
11  you could accept?
12     A.  I would need to see what it was.  And it would
13  depend on what the customer provided.
14     Q.  So --
15     A.  It's -- it's very much a -- it's very much an
16  individual case-by-case basis.  I need to see what the
17  customer or the office personnel -- I need to see what
18  the customer gives us or what they bring.
19     Q.  And it's -- and the case-by-case determination
20  is being made by whom?
21     A.  Well, initially, it's made by the people in
22  the office, our CSRs in the office.  If they have a
23  question -- and they can refer it to their office
24  supervisor, who makes a determination based on their
25  experience.  If they have a question, of course, they

151

1  would go to the assistant manager and the regional
2  manager; and they would come to me.
3      Q.  And the CSR, if they turn somebody away
4  because they don't think the documentation is
5  sufficient to establish identity, that -- that
6  person -- they may not have gotten that person's name
7  or contact information; is that correct?
8      A.  It would depend on where they are in the
9  process.
10     Q.  What do you mean by that?
11     A.  Well, so the customer would come and provide
12  the filled out application, the DL 14; and we would
13  have -- in that instance, we would have the customer's
14  name and some contact information.
15     Q.  So if the person has already completed the
16  application, you would have the person's name and
17  contact information?
18     A.  Yes.
19     Q.  And if you determine that somebody in that
20  situation was given incorrect information, do you
21  follow up with that applicant?
22     A.  We could, yes.  The office supervisors would
23  do that.
24     Q.  Is that something you do?
25     A.  It's not something I do, necessarily; but it's

152

1  something that the department would try to do if we're
2  able to.  We prefer the customer get the documents
3  that -- the identification documents that they're --
4  that they want and that they need.
5      Q.  And in terms of the documents that are
6  presented --
7      A.  Uh-huh.
8      Q.  -- is there any DPS office policy or office
9  guideline that lays out what CRS's or other individuals
10  issuing EICs are supposed to be looking for in terms of
11  this case-by-case determination?
12     A.  Well, it's based on their experience as driver
13  license employees.  So there's a standard training that
14  they all go through.  It's an eight-week training
15  program.  It's also based on their experience working
16  in those offices and accepting documents and referring
17  questions to their supervisors who have a tremendous
18  amount of experience in seeing identification
19  documents -- a variety of identification documents.
20     Q.  And do you see on this document that we're
21  looking, this particular customer was told that he
22  could not be processed.
23          Do you see that?
24     A.  I do.
25     Q.  And do you feel that that was the

TONY RODRIGUEZ                                                5/8/2014

---

153

```
 1   appropriate -- you believe that was appropriate way to
 2   handle this situation?
 3        A.  Well, it's -- he had never had a US birth
 4   certificate, and he couldn't be processed.  That's all
 5   I know about the transaction.
 6        Q.  Uh-huh.  Is there -- does it -- it doesn't
 7   describe any of the other alternatives that you just
 8   mentioned to me, does it?
 9        A.  No, ma'am.
10        Q.  If the -- if the DPS employee had explained
11   that, would that be captured in this report, explained
12   that the individual had the option of providing any one
13   of the different documents you've just described to me?
14        A.  All I know about the report is what's written
15   here on the e-mail.  I don't know what other exchanges
16   took place between the employee and the customer.
17        Q.  And you testified earlier that you haven't
18   given employees guidance on what information they
19   should be capturing in these reports; is that correct?
20        A.  That's true.
21        Q.  Okay.
22            MS. MARANZANO:  Is everybody okay?
23            THE WITNESS:  I would like to take a
24   break, if that's all right.
25            (Lunch recess from 12:26 p.m. to 1:13 p.m.)
```

---

154

```
 1            THE REPORTER:  Back on the record.
 2            MS. MARANZANO:  Okay.  Back on the
 3   record.
 4        Q.  (BY MS. MARANZANO)  Am I correct that you
 5   testified earlier that the first several weeks that DPS
 6   was issuing EICs you didn't actually issue any EICs?
 7        A.  To the best of my recollection, that's right.
 8   I don't remember -- I don't remember when we issued our
 9   first EIC.
10        Q.  What did you attribute that to, the lack of
11   issuing EICs?
12        A.  I don't -- I don't recall.
13        Q.  Did DPS evaluate the program at any time since
14   you've been issuing EICs?
15        A.  What do you -- how do you mean "evaluate"?
16        Q.  Was there any conversation about the fact that
17   you hadn't issued any EICs?
18        A.  Only that we hadn't issued any.
19        Q.  Was there any conversation or deliberation
20   about making any changes to the EIC program?
21        A.  What kind of changes?
22        Q.  Was there any conversation or deliberation
23   about making any changes?
24        A.  The -- the only conversations that we've had
25   regarding changing the EIC program have come after the
```

---

155

```
 1   election cycles when we conducted after action reviews
 2   to look at what we did and see what we could improve.
 3   But other than that, no.
 4        Q.  Okay.  And I want to talk to you a little bit
 5   more about that.  But in terms of looking at the fact
 6   that you have issued no EICs, did DPS change any of its
 7   publicity about the EIC program?
 8        A.  Not -- not to my knowledge.
 9        Q.  Did DPS make any changes to any educational
10   outreach efforts?
11        A.  Not to my knowledge, no.
12        Q.  Did you or anybody else at DPS do any
13   follow-up with the employees actually issuing EICs?
14        A.  Other than the after action reviews that we
15   spoke about, no.
16        Q.  And can you tell me what these after action
17   reviews are?
18        A.  An after action review is a -- it's a military
19   term, and what you do is you look at what you were
20   asked to do, what your mission was, and then you look
21   at -- you look at it in terms of things that you had
22   done well and, therefore, need to be sustained and
23   things that need -- areas that need improvement.
24        Q.  And what did you determine that you had done
25   well in these after action reviews?
```

---

156

```
 1        A.  Well, it would -- the specifics would depend
 2   on which after action review you're talking about.
 3        Q.  How many have you done?
 4        A.  Two.
 5        Q.  So why don't you tell me for each one what --
 6   what you thought was a success, what you thought was
 7   going well in the program in each after action report.
 8        A.  Sure.  So to the best of my knowledge, the
 9   discussion revolved around what had gone well with the
10   logistics and our ability to constitute the mobile EIC
11   units and then to get them to the county that we had
12   been asked to provide service in as an example of what
13   we did well.  And we recognized that an area that we
14   needed to improve on was the -- our internal data
15   tracking and also our media communications.
16        Q.  And why did you determine that you needed to
17   improve your data and tracking system?
18        A.  Well, it wasn't so much the information that
19   we were collecting.  It was that there were a lot of --
20   we had seen those reports and the report -- the
21   frequency of the report changed and we talked about how
22   we should -- how we should get -- provide information.
23        Q.  And you're referring to the reports that we
24   looked at earlier in your e-mails?
25        A.  Those reports that I produced, yes.
```

---

TONY RODRIGUEZ                                          5/8/2014

40 (Pages 157 to 160)

---

157

1    Q.   Okay.  And in terms of the media and
2    communications, why did you decide that that needed to
3    have some improvement?
4        A.   There was an internal -- it was an internal
5    communications between the driver license media point
6    of contact and the DPS media and communications point
7    of contact.
8        Q.   What caused you to think that it needed to be
9    improved?
10       A.   It was -- it was just based on comments that
11   we had at the after action review.
12       Q.   What -- can you remember any of those
13   comments?
14       A.   I don't remember specific comments.  I
15   remember that -- that our median -- media guy, he -- he
16   had a difficulty understanding where we were -- where
17   we were going to go to provide services.
18       Q.   Was there a concern that the media DPS was
19   providing was not accurate?
20       A.   No, that wasn't a concern.  It was that he
21   didn't understand.  The way we depicted the
22   information, he -- it wasn't laid out in a way he could
23   understand it.  He was looking for something
24   alphabetical and it was chronological.
25       Q.   And so the -- when you say media

---

158

1    communications needed to improve, you're talking about
2    internal communications to your media people?
3        A.   Internal from driver license to -- to the DPS
4    media communications.
5        Q.   Okay.  Was there any evaluation of your
6    external media communications?
7        A.   Not on our part.
8        Q.   Was that part of the after action review?
9        A.   Which part?
10       Q.   An evaluation of your external media.
11       A.   No.
12       Q.   Was part of the after action review an
13   analysis of how many EICs had been issued?
14       A.   No.
15       Q.   You didn't -- you didn't consider that at all?
16       A.   It was merely a statement of fact.  We issued
17   X number.
18       Q.   When -- you said there were two of these after
19   action reviews that you've done?
20       A.   Yes.
21       Q.   And when were they done?
22       A.   They were done after the election.  I don't
23   have the exact dates.  I believe one of them was
24   November and I believe the second one was -- was March.
25       Q.   March?

---

159

1        A.   To the best of my knowledge those are the
2    dates.
3        Q.   Okay.  So one -- to the best of your
4    knowledge, one was done after the November 2013
5    election and one was done after the March 2014
6    election?
7        A.   Yes.
8        Q.   Okay.
9            (Exhibit No. 77 marked.)
10           THE REPORTER:  Exhibit 77.
11       Q.   (BY MS. MARANZANO)  I'm showing you what we've
12   marked as Exhibit 77.  Do you recognize this document?
13       A.   I do.
14       Q.   What is this?
15       A.   This is a -- appears to be a spreadsheet dated
16   the 3rd of February with a list of names and the EICs
17   that were issued to individuals, location, and type of
18   office.
19       Q.   And can you turn to the -- last page,
20   which, I think, is the fifth page.
21       A.   It starts with, "Delgado, Monica"?
22       Q.   Yes.
23       A.   Yes.
24       Q.   What is that list?
25       A.   This appears to be a list of applicants who

---

160

1    were not issued EICs.
2        Q.   And are all of these individuals, individuals
3    who actually submitted a complete application to DPS?
4        A.   I believe so.  To the best of my knowledge it
5    is, yes.  As of the 3rd of February, yes.
6        Q.   And when it says, "Insufficient supporting
7    documentation," what does that mean?
8        A.   It just means that the document that the
9    individual provided was -- was found to be -- I hate to
10   use the same word, but insufficient in some way.
11       Q.   Is this something that would come up in the
12   quality control check?
13       A.   Yes.
14       Q.   So it was somebody who had the supporting
15   documentation, but for whatever reason it was found to
16   be insufficient; is that correct?
17       A.   If it occurred during the -- the quality
18   control check conducted by license and record service,
19   it was based on a review of the documentation that was
20   provided.
21       Q.   Okay.  And if an individual hadn't had the
22   documentation, hadn't had the required documentation,
23   is it likely they wouldn't have completed an
24   application in the first place?
25       A.   I don't know.

---

TONY RODRIGUEZ                                              5/8/2014

161

```
 1        Q.  Did DPS make any attempt to contact the
 2   individuals on this list?
 3        A.  To my knowledge, no.
 4        Q.  Did DPS share this list with any other
 5   agencies?
 6        A.  I don't know.
 7        Q.  Has any agency requested this information?
 8        A.  I have not been -- no one has requested it
 9   from me.  I can't answer that question.  I don't know.
10        Q.  Has any agency suggested to DPS that it would
11   be useful to follow up with individuals -- such
12   individuals who have invalid applications?
13        A.  Not to my knowledge.
14            (Exhibit No. 78 marked.)
15        THE REPORTER:  Exhibit 78.
16        (BY MS. MARANZANO)  I'm showing you what we've
17   marked as Exhibit 78.  Do you recognize this document?
18        A.  I do.
19        Q.  What is this?
20        A.  This appears to be an application overview for
21   election certificates dated 21 October 2013.
22        Q.  And what -- what did you say it was, an
23   application --
24        A.  An application overview.
25        Q.  Overview.  Oh, sorry.  I misheard you.  And
```

162

```
 1   what -- what is the basis for this overview, what --
 2   like what -- what do you use -- what information do you
 3   rely on when you're making an application overview?
 4        A.  What information do we use to create this?
 5   That was a question.  What information do we use to
 6   create this?
 7        Q.  Yes.
 8        A.  Okay.  We have information that's entered into
 9   an Excel spreadsheet.  It's currently resident on a
10   SharePoint site --
11        Q.  Uh-huh.
12        A.  -- although I can't tell you if this was
13   resident on the SharePoint site on the day this was
14   created.
15        Q.  Uh-huh.
16        A.  There was -- there was a spreadsheet and the
17   spreadsheet was used as a source document for this.
18        Q.  Okay.  And the spreadsheet, is that the
19   information -- the spreadsheet contains information
20   from the regional offices; is that correct?
21        A.  This -- no, not now.
22        Q.  Where does it get the information from?
23        A.  The spreadsheet as it currently stands is --
24   receives input from each CSR who is in the field.
25        Q.  Okay.  I understand.  Do you compile this
```

163

```
 1   application overview?
 2        A.  No.
 3        Q.  Who does that?
 4        A.  Well, on the 21st of October it was -- it
 5   probably -- I mean, to the best of my knowledge, it was
 6   a gentleman named Ryan O'Connor.
 7        Q.  And do you see -- let's see -- the number
 8   applied at the top of the first page?
 9        A.  Hang on a second.  This says, "Application for
10   EIC received at an EIC station"?
11        Q.  Yes.
12        A.  Yes.
13        Q.  Is that -- are those all the applications that
14   have been received at any office that was issuing EICs?
15        A.  Say that again, please.
16        Q.  Are -- is that -- No. 74, does that capture
17   all of the EICs that have been issued from any of the
18   offices that issue EICs?
19        A.  To the best of my knowledge, yes.
20        Q.  Can you look at the second page?  Who decided
21   how to put together these graphs or what information
22   would be captured in these graphs?
23        A.  I believe Ryan did that.
24        Q.  Do you know how he made that decision?
25        A.  Well, Ryan thought that might be information
```

164

```
 1   that we could use and he offered it as a suggestion,
 2   and I said it looked fine to me.
 3        Q.  Why is DPS tracking the number of applications
 4   by race?
 5        A.  Well, it's in response to a number of queries.
 6   We get queries from the media and we get queries from
 7   the legislators, and sometimes they want that
 8   information.  And after discussion with Ryan, what we
 9   felt was it was -- it was -- it was easier for us to
10   depict that information on the chart that you see in
11   front of you rather than to go back and query the
12   database each time we get a request like that.
13        Q.  Has there been any analysis of these numbers,
14   the number of applications by race?
15        A.  No, I'm not aware of any.
16        Q.  Did DPS do any analysis to determine whether
17   the racial breakdown of EIC applications is consistent
18   with the demographics of Texas?
19        A.  No, ma'am.
20        Q.  What do you do with this overview?
21        A.  We look at it.  I mean, we really -- it was in
22   there.  Ryan suggested it.  I thought it was a good
23   idea.  We -- we don't really -- we don't do anything
24   with it.  We look at it.  We depict it.  That's it.
25        Q.  In terms of this whole report, what -- what is
```

TONY RODRIGUEZ                                                    5/8/2014

---

165

1    the purpose of this -- compiling this information into
2    an overview?
3        A.  We -- we're asked periodically to provide this
4    information because -- because EIC is a topic that's
5    generated interest.  We found it was easier for us to
6    go ahead, since we had the information, to -- to show
7    it on a chart.  And that if way if -- for instance, if
8    Paul -- Deputy Assistant Director Watkins were going to
9    a meeting, I might print this and say, "If somebody
10   asks, here's the current status on the EICs."
11       Q.  Is it shared with -- with anybody routinely
12   apart from special requests?
13       A.  I don't know.  I mean, you would have to
14   specify -- not -- not to my knowledge.
15       Q.  Does it -- does it get sent to DPS Director
16   Steve McCraw?
17       A.  I never have.  I don't know.
18       Q.  Does Mr. Peters see it regularly?
19       A.  Mr. Peters sees it when I print it and provide
20   it to him.  Sometimes he asks for it and sometimes he
21   doesn't.
22       Q.  Does it get shared with any other state
23   agencies?
24       A.  I've never shared it with another state
25   agency.  I don't know of anyone who has.

---

166

1        Q.  Is it shared with the public?
2        A.  The -- no.  No, I don't think so.  No, ma'am.
3        Q.  Has this information been used to make any
4    changes to the EIC program?
5        A.  No.
6        Q.  To the best of your knowledge, has it been
7    used for any purpose?
8        A.  It's just -- just to tell people where we are
9    and how many we've issued.
10       (Exhibit No. 79 marked.)
11       THE REPORTER:  Exhibit 79.
12       Q.  (BY MS. MARANZANO)  I'm showing you what we've
13   marked as Exhibit 79 for the record.  Do you recognize
14   this?
15       A.  Yes.
16       Q.  What is this?
17       A.  This is an e-mail with an attachment that I
18   sent to Mr. Peters on the 17th of October.
19       Q.  And what -- what is this attachment?
20       A.  The attachment -- excuse me.  The attachment
21   seems to be the tabs that we have -- that we -- that
22   are on our spreadsheet, the number of tabs on the
23   spreadsheet where we enter the EIC information.
24       Q.  And you're referring to the same spreadsheet
25   that you talked about earlier?

---

167

1        A.  Yes.
2        Q.  Who does this report get sent to?
3        A.  Well, it's not a report.  It's a -- I mean --
4    remember, the way I think of the reports are something
5    that I write.  So this is -- this is something that I
6    thought that AD Peters might need.  And at that time in
7    the morning, I don't remember why I sent this one,
8    but --
9        Q.  Is this information that's compiled regularly
10   or was this a onetime compilation?
11       A.  By "regularly," what do you mean?
12       Q.  Have you compiled this information more than
13   once?
14       A.  Probably, yes.
15       Q.  Do you compile it when people request it or is
16   there another reason that you compile this information?
17       A.  We compile it when people request it or -- or
18   if I think that -- you know, if I'm going to a meeting
19   and I think I need it, or something along those lines.
20   But it's not a routine weekly occurrence.
21       Q.  Can you look at the first page?  There's
22   graphs on this page, number of applications by age and
23   number of applications by race.  What are you using
24   this information for?
25       A.  As I explained earlier, it's just the

---

168

1    information that -- that Ryan and I discussed and we
2    thought might be of interest.  We don't use the
3    information really for anything.
4        Q.  So would you say this information also has not
5    been used to make any assessments of the EIC program?
6        A.  Yes, I would say that.
7        Q.  Okay.  Can you turn to the fourth page where
8    it has charts?
9        A.  Charts?  Are you talking about this page?
10       Q.  That's the page --
11       A.  Thank you.
12       Q.  -- yes.  And they -- you also have a list of
13   EIC applications.  I assume -- actually, why don't you
14   tell me, what does that count represent?
15       A.  Well, it hasn't got a header on it.  So what I
16   believe it is is that that's the number of EICs that
17   have been issued to -- to various people.  We've got
18   the counties that have been depicted from Anderson to
19   Zavala, we've got ages, we've got demographics.
20       Q.  And has the information on this page been used
21   to make any assessments of the EIC program?
22       A.  No.  Not to my knowledge, no.
23       Q.  Can you turn to the next page, which is a
24   chart of individuals' names.  What does this page
25   represent?

---

TONY RODRIGUEZ                                                    5/8/2014

---

169

1    A.  This page represents the number of EIC
2  applications.  It's -- it's an actuality.  It's more of
3  a status chart for internal use.
4    Q.  What does the highlighting mean on this page?
5    A.  Which color?
6    Q.  Well, could you tell me what the yellow
7  highlighting means?
8    A.  Yes.  Well, the -- on the very top one it
9  says, "LRS Validated."
10   Q.  Uh-huh.
11   A.  That's the process that I described earlier
12 where with the license and records service --
13   Q.  Uh-huh.
14   A.  -- conducts the QA/QC.  And then -- and then
15 orange directly below that on Line 10, that's a not
16 valid.  That just means that we didn't issue that --
17 that driver correction, that -- that EIC.  And the
18 yellow and the question mark under the "Type of
19 Station" on Line 29, that's just a question mark.  It's
20 information that we just don't have.  And for some
21 reason we weren't able to get it.
22   Q.  So for those individuals who have the yellow
23 highlighted question mark, those are individuals where
24 DPS is unaware of the type of station that they
25 received the EIC from?

---

171

1    Q.  Do you see that it's not the same highlighting
2  as what we looked at previously?
3    A.  Well, it's yellow.  I don't know why they --
4  they highlighted the application count column.  I don't
5  know why they did that.
6    Q.  The application count column is for only
7  certain individuals, correct?
8    A.  Yes.  I don't know why they did that.
9    Q.  Is this -- is this chart -- or this group of
10 charts and tables shared with any other state agencies?
11   A.  Not to my knowledge.  I've never done it.
12 Nobody has asked me to.
13   Q.  And is any of this information included in any
14 of these charts or tables used to evaluate the EIC
15 program?
16   A.  No, ma'am.
17       MS. MARANZANO:  Can we -- can we go off
18  the record for one moment?
19       MR. KEISTER:  Sure.
20       (Discussion off the record.)
21       MS. MARANZANO:  Let me have this marked.
22        (Exhibit No. 80 marked.)
23       THE REPORTER:  Exhibit 80.
24       THE WITNESS:  Do you want to give her my
25  stuff?

---

170

1    A.  That's right.
2    Q.  And on the -- if you could flip two more
3  pages, there's another list.  Is this list the same
4  as -- is this the same as that we were just looking at?
5    A.  Well, it looks like it has some of the same
6  data on it, but the -- the list with the -- the orange
7  highlighting -- not that one, but the other one that we
8  had talked about previously.
9    Q.  The list we were just talking about --
10   A.  Yes.
11   Q.  -- and the list we were looking out now have
12 some of the --
13   A.  It has some of the same information on it.
14 What -- what this appears to be, the first list, is it
15 appears to be a tracking chart so we can see where the
16 EIC is in the process in case anybody has asked.  And
17 then what this list -- the shaded list that you're
18 looking at right now, what that appears to be is that
19 just appears to be the entry on the spreadsheet for the
20 customer that came to the office.
21   Q.  And what -- what does the highlighting on this
22 second list mean?
23   A.  The yellow highlighting?
24   Q.  Yes.
25   A.  I don't know.

---

172

1        MR. KEISTER:  You may need your tables or
2  your statutes.
3        MS. MARANZANO:  Thank you.
4        MR. KEISTER:  All right.
5    Q.  (BY MS. MARANZANO)  Okay.  I am showing you
6  what we have marked as Exhibit 80.
7    A.  Yes.
8    Q.  Can you tell me what this is?
9    A.  Yes.  This is what we refer to as our EIC
10 dashboard.  And by way of clarification, we have talked
11 about the way that we track EICs.  And initially there
12 was a report.  We referred to it as a push document,
13 push it out.  This is the final evolution or the
14 current evolution, I suppose I should say, for how we
15 track our election certificates.
16   Q.  Okay.  And this is compiled from those reports
17 that you get that you push out; is that correct?
18   A.  No.
19   Q.  Can you repeat what you just said then?
20   A.  Yes.  I'll try.  This is what is we call the
21 EIC dashboard, and this is the -- the current evolution
22 of how we track election certificates.
23   Q.  How frequently do you put together this
24 dashboard?
25   A.  In order to answer that question I have to --

---

TONY RODRIGUEZ                                                5/8/2014

173

1    I have to do some explaining.
2         Q.   Okay.
3         A.   I mentioned that there's a SharePoint site.
4         Q.   Uh-huh.
5         A.   Okay.  And our customer service
6    representatives have access to the SharePoint site, and
7    they enter -- on the SharePoint site they enter the
8    application data for customers that come to the office.
9    And once they update it there's a series of menus and
10   they go through their pull-down menus.  And then
11   they -- they post it or they, you know, submit it.  And
12   then that information updates a spreadsheet which is
13   kept on the SharePoint site, and from that spreadsheet
14   we derive this chart.
15        Q.   Okay.
16        A.   So it's not updated in the same manner as the
17   daily or the weekly reports that I would produce and
18   send.  This is -- this document can be -- or is updated
19   or carries, I suppose is the best way to put it, near
20   realtime information.  So if you go to an office in Bee
21   County, you get your EIC, the CSR puts it in there, and
22   it's updated.
23        Q.   Who can access that information?
24        A.   Any DPS employee and driver license division
25   has access to it in order to be able to update the

174

1    source document.
2         Q.   And who at DPS headquarters can access that
3    information?
4         A.   When you say "access the information," are you
5    referring to the charts or are you referring to the
6    underlying spreadsheet that's the source document for
7    the chart?
8         Q.   The underlying spreadsheet.
9         A.   We have that restricted.  I -- I can't give
10   you an exhaustive list of who it's restricted to.  And
11   the CSRs don't update the spreadsheet; they update the
12   SharePoint site, which updates the spreadsheet.  Okay?
13   So I can look at the spreadsheet and a few people can
14   look at the spreadsheet, but we can access the
15   dashboard to print it for ourselves.
16        Q.   Do you circulate the dashboard to anybody?
17        A.   No.  No, we don't.  If somebody wants it and
18   they have access to the site, then they can -- they can
19   print their own.  It's -- it's on the other side of the
20   DPS firewall, so only DPS personnel who have access
21   would be able to access the SharePoint site.
22        Q.   Who decided what information to include in the
23   dashboard?
24        A.   You have to understand that the -- this EIC
25   dashboard is an evolution of all the previous products,

175

1    so there's an element of, "Well, we had done it that
2    way before, so we're going to include it this way now."
3    And that's why the windows that you see are included in
4    here.
5             And -- and it also -- it's in response to
6    some -- sometimes we get media queries of how many
7    issues or how many applicants we had.  And rather than
8    answer the question several times a day, it was just
9    easier for us to give Tom Vinger, or whoever was
10   answering the question, the link and allow them to view
11   it themselves.
12        Q.   When -- when is this -- the information that's
13   on this dashboard that we're looking at, when is this
14   current as of?
15        A.   If you remember the answer to my previous
16   question that I gave you.
17        Q.   Uh-huh.
18        A.   So when -- it's current as of the time that
19   you print it.  Okay?  But the information on the -- on
20   the spreadsheet, or whatever it is, is updated as soon
21   as the CSR updates the share point site.
22        Q.   So I guess what I'm asking is, when was this
23   printed?
24        A.   I don't know.  It's whenever they printed it.
25   It's -- it doesn't say as of -- hang on a second.  It

176

1    might say it somewhere.  I don't know.
2         Q.   What's done with -- with this information?
3         A.   The same -- the same that we did with the --
4    with the other information.  We had talked about we
5    look at it.  If -- if somebody has a question, then we
6    provide them the information from it.
7         Q.   Do you circulate this EIC dashboard in sort
8    of -- as we're looking at it, something like this?  Not
9    the spreadsheet, but this compilation of the EIC
10   dashboard to any other state agencies?
11        A.   No.
12        Q.   Do you circulate any form of that, of the
13   information that goes into this EIC dashboard to other
14   state agencies?
15        A.   No, ma'am, not to my knowledge.
16        Q.   Do you use this EIC dashboard to evaluate your
17   EIC program?
18        A.   No, ma'am.
19        Q.   So you're collecting this information just in
20   case people ask for it?
21        A.   That's essentially it.
22        Q.   Has -- other than the press, have individuals
23   asked questions about information that's contained in
24   this EIC dashboard?
25        A.   Sometimes we get questions from legislators,

TONY RODRIGUEZ                                                    5/8/2014

45 (Pages 177 to 180)

---

177

1  and based on -- depending on what they ask, you can use
2  this to answer their questions.  But we -- to my
3  knowledge, we've never provided this to a legislator.
4      Q.  So this is an internal document that DPS uses
5  to answer questions, but DPS doesn't share this
6  document with others?
7      A.  No, ma'am, not to my knowledge.
8      Q.  Have legislators asked you for information
9  that's contained in here?
10     A.  On occasion, yes.
11     Q.  Do you know which ones?
12     A.  I -- I don't recall any right now off the top
13 of my head, no.
14     Q.  Is there -- was there any discussion of the
15 different information to categorize in this report?
16     A.  I'm sure that we -- or I know that we talked
17 about some of the information.
18     Q.  Do you know why you decided to do this graph
19 with the numbers -- and I'm looking on the --
20     A.  I see it.
21     Q.  -- fourth page --
22     A.  Yes.
23     Q.  -- the number of applicants by race.
24     A.  No, that was -- that goes back to the
25 statement that I had made where it was something that

---

178

1  we had collected, and we continued just to collect it.
2  When you make a spreadsheet and you create the tables
3  from the spreadsheet, sometime it's easier just to keep
4  them, and we just hung onto them.
5      Q.  Do you why you have that graph of the number
6  of applicants by age group?
7      A.  No, that was just something we included.
8      Q.  Okay.  I want to circle back to something that
9  we talked about earlier.
10         (Exhibit No. 81 marked.)
11         THE REPORTER:  Exhibit 81.
12     Q.  (BY MS. MARANZANO)  Does this look familiar to
13 you?
14     A.  It's a birth certificate affidavit.  We don't
15 use it.
16     Q.  Have you seen this before?
17     A.  Yes.
18     Q.  When was that?
19     A.  It was during our prep.  I'm sorry.
20         MR. KEISTER:  Beyond that.
21     Q.  (BY MS. MARANZANO)  Apart from any
22 conversations you had with counsel, did DPS at some
23 time consider using this affidavit instead of requiring
24 an individual to present a birth certificate?
25     A.  They must have, yes.

---

179

1      Q.  Do you have any awareness of that?
2      A.  No.
3      Q.  Do you have any knowledge of why this
4  affidavit is not used?
5      A.  Well, we -- we asked for -- we asked for birth
6  certificates.  I'm not sure what this would do for
7  anybody.
8      Q.  Did you testify earlier that an individual who
9  didn't have a birth certificate could provide other
10 documentation, such as a -- well, you mentioned an
11 affidavit of somebody who was at their birth; is that
12 correct?
13     A.  That's correct, but I think that I really
14 should have highlighted at that point in time that the
15 people who fall into that category are customers.
16 That's a very small number of people like that, and --
17 and so it's not something that we accept as a matter of
18 course or routine.  There are provisions, to answer
19 your question.
20         If somebody was born and they didn't have
21 a birth certificate, they could, but I personally have
22 never dealt with it.  I was instructed that that was
23 something that we could accept, but I've never dealt
24 with that in my time in DPS.  And, to my knowledge,
25 none of my subordinates have ever had to deal with that

---

180

1  kind of an affidavit.
2      Q.  And are -- you're saying it's a small number
3  of people who have never received a birth certificate?
4  Is that what you're saying?
5      A.  I'm saying that there a small number of people
6  who come to our office who -- who don't have a birth
7  certificate.
8      Q.  So your knowledge is based on what?
9      A.  My knowledge of that?
10     Q.  Uh-huh.
11     A.  It's -- it's anecdotal and personal knowledge.
12     Q.  What problems would there be in using this
13 affidavit in place of a birth certificate?
14     A.  Well, you're asking an individual to say that
15 they are who they say they are independently.
16     Q.  And why is that a problem?
17     A.  Well, they may not be who they say they are.
18     Q.  So --
19     A.  It's not -- it's not something that we can
20 compare to anything.  And there's -- there's no way for
21 us to connect the dots that I talked about before in
22 order to determine that the person who fills out the
23 application is actually who they say they are.
24     Q.  And is it the case that this person would be
25 signing this certification essentially under oath that

---

TONY RODRIGUEZ                                                5/8/2014

46 (Pages 181 to 184)

---

181

1    they are who they say they are, correct?
2        A.   That's what it looks like, yes.
3        Q.   DPS determined that that was insufficient?
4        A.   I -- yes.
5        Q.   You were not a part of that determination?
6        A.   I was not part of that decision.
7        Q.   But is it the case that DPS uses this
8    affidavit now or would accept this affidavit?
9        A.   We do not use that document.
10       Q.   Did DPS consider a rule at any point that
11   would have allowed individuals to obtain an EIC without
12   bringing a birth certificate to the office, but
13   allowing DPS to connect to the Department of Vital
14   Statistics to access the birth records?
15       A.   Not to my knowledge.
16       Q.   You're not aware of any discussion of such a
17   possibility?
18       A.   No.
19       Q.   Would there be any technical impediment to
20   doing that?
21       A.   I -- I don't know.  I'm not -- I'm not a
22   technical person.  I don't know how those things would
23   work.
24       Q.   Are you aware of any other impediment that
25   would have existed to doing that?

---

182

1        A.   No.
2        Q.   Okay.
3             (Exhibit No. 82 marked.)
4             THE REPORTER:  Exhibit 82.
5        Q.   (BY MS. MARANZANO)  Okay.  I'm showing you
6    what we have marked as Exhibit 82 for the record.  Do
7    you recognize this?
8        A.   I do.
9        Q.   What is this?
10       A.   This appears to be information that we derived
11   from our database, and it is a list of inquiries.
12       Q.   And when is this current as of?
13       A.   It's current as of whenever it was printed,
14   but that's not depicted on the document.  It's whenever
15   they printed it.
16       Q.   What's done with this list?
17       A.   Well, other than bringing it here for you,
18   nothing.  We look at it, but that's it.
19       Q.   Does DPS do any follow-up with any of these
20   individuals?
21       A.   Not to my knowledge, no.
22       Q.   To your knowledge, it hasn't done any
23   follow-up with anybody on that list?
24       A.   To my knowledge, no.
25       Q.   Does it do any sort of analysis of the inquiry

---

183

1    descriptions?
2        A.   No.
3        Q.   Does it use this at all for training
4    employees?
5        A.   No.
6        Q.   Does it use this at all for any sort of
7    outreach or education?
8        A.   No.
9        Q.   Where is this information kept, in a database?
10       A.   There's not a database.  It's information
11   that's derived from the applications.  It's on the
12   same -- it's on the same spreadsheet.  So the CSR -- if
13   you remember, I explained to you earlier, a customer
14   comes in for an issuance, the CSR accesses the
15   SharePoint site.  He enters the information relevant to
16   an issuance.  Well, there's also a way to enter
17   information relevant to an issue, yes.
18       Q.   Am I correct that when we looked at the weekly
19   reports earlier some of those reports had inquiries
20   without anybody's names listed?
21       A.   I would have to go back, but I believe you're
22   correct.
23       Q.   So what distinguishes an inquiry where a DPS
24   employee takes down the name?
25       A.   Just that the DPS employee had -- had the

---

184

1    customer's name.
2        Q.   So this -- this list of inquiries, which is
3    current as of some date -- we're not sure when --
4    wouldn't actually capture every inquiry that occurred.
5    Is that true?
6        A.   What this appears to be are the inquiries for
7    2014.
8        Q.   Uh-huh.  But is it the inquiries where you had
9    the name -- the customer's name?
10       A.   It's not -- it's not only -- if you look at
11   the second inquiry --
12       Q.   Uh-huh.
13       A.   -- it just says, "Customer had valid Texas ID
14   in 1981," but we didn't capture the customer's name.
15       Q.   That's not Annabelle --
16       A.   No.  Modified -- modified by the DPS employee
17   who entered that information.
18       Q.   I see, uh-huh.  So this is every inquiry that
19   was captured in a weekly report by -- or captured by a
20   DPS employee?
21       A.   No.  This is -- this is -- these are the
22   inquiries that were captured in -- and these are -- I
23   don't know how exhaustive it is.  These appear to be
24   the inquiries that were captured for 2014.  We don't do
25   weekly reports anymore.

---

TONY RODRIGUEZ                                                    5/8/2014

185

1    Q.  Okay.  And if somebody walks into a driver's
2    license office and just asks a couple of casual
3    questions, does that give -- about an EIC, would that
4    be reported in an inquiry?
5        A.  It's supposed to be.
6        Q.  Are you confident that it is?
7        A.  Yes.  I mean, within the scope of what we
8    talked about, there are errors for human -- human
9    errors.  If the -- the CSR is distracted by something
10   else or some other incident occurs in the office, it
11   might not be entered into the database.  But I'm
12   confident as a general rule that that's entered in
13   there.
14       Q.  Can you take a look at --
15           THE REPORTER:  Hold on just a second.
16   I'm trying not to cover up something.
17       Q.  (BY MS. MARANZANO)  I'm showing you what's
18   been marked for the record --
19           THE REPORTER:  Exhibit 83.
20       Q.  (BY MS. MARANZANO)  -- as Exhibit 83.  Do you
21   recognize this document?
22       A.  It's a good thing that I wear trifocals, yes.
23       Q.  And what is this?
24       A.  This is a printout of -- I can't tell you if
25   it's the entire spreadsheet that we use or a portion of

186

1    it, but it appears to be a printout of -- of the
2    spreadsheet where we keep all of the EIC issuance
3    information.
4        Q.  And can you tell me when this is current as
5    of?
6        A.  It's -- no, it's the same -- it's the same
7    answer for the other documents, and I don't know.  I
8    can't tell from looking at it.
9            MR. KEISTER:  Counsel, just if you want
10   to know, all these were printed Tuesday, so -- on that
11   day.  So they're current this week or whatever.
12           MS. MARANZANO:  Okay.  Thank you for that
13   clarification.
14           MR. KEISTER:  I think it was Monday; it
15   could have been Tuesday.
16           THE WITNESS:  Don't get me to start
17   saying anything.
18       Q.  (BY MS. MARANZANO)  Have you used this chart
19   for any -- anything related to the EIC program?
20       A.  This chart?
21       Q.  Yes.
22       A.  No, ma'am.
23       Q.  Have you focused any outreach efforts or any
24   staffing efforts where more EICs are issued?
25       A.  No, ma'am.

187

1    Q.  You haven't used this chart for any -- or the
2    information contained in the chart for any assessments
3    of the EIC program?
4        A.  No.
5        Q.  Would you consider the EIC program to be a
6    success?
7        A.  You're asking me to provide you with my
8    opinion?
9        Q.  Yes.
10       A.  In my opinion, it's been a success, yes.
11       Q.  And what are you basing that on?
12       A.  I'm basing that on the fact that we were able
13   to provide the opportunity for Texans in all
14   254 counties to get an EIC.
15       Q.  Is accessibility of places to obtain an EIC a
16   factor in determining whether the program is a success?
17       A.  I don't understand what kind of accessibility
18   you're talking about.
19       Q.  Is the number of places issuing EICs a factor
20   in determining whether the program is a success?
21       A.  The number in and of itself?
22       Q.  Uh-huh.
23       A.  No, I don't believe so.
24       Q.  Is the number of EICs issued a factor in
25   determining whether it's a success?

188

1    A.  No, I don't believe so.
2        Q.  Have you received any complaints from DPS
3    employees about the EIC program?
4        A.  I have not, no.
5        Q.  Now that you've been sort of overseeing --
6        A.  Tenderized?
7        Q.  -- the EIC program for about a year, how --
8    how would you say you find the additional
9    responsibility in terms of your workload?
10       A.  Well, it's -- it's cyclic and the hours that I
11   put in at DPS aren't much different.  In many ways
12   they're easier than the hours that I've put in working
13   at other places.
14       Q.  Has it impacted your ability to deal with
15   other responsibilities that you have at DPS?
16       A.  That's a discussion you have to have with my
17   boss.
18       Q.  Fair enough.  Okay.
19           MS. MARANZANO:  At this time I will pass
20   the witness.
21           THE WITNESS:  Okay.
22           MS. MARANZANO:  Thank you.
23           THE WITNESS:  Thank you.  Can I get a
24   break?
25           MR. KEISTER:  Yeah.

TONY RODRIGUEZ                                                5/8/2014

48 (Pages 189 to 192)

---

189

(Recess from 2:01 p.m. to 2:13 p.m.)
        THE REPORTER:  On the record.
                EXAMINATION
BY MR. BRAZIL:
    Q.  Good afternoon.
    A.  Hi.
    Q.  I just want to follow-up on a few areas that
you touched on in earlier testimony.  You talked about
the equipment of the mobile EIC stations or units.  Do
you recall that?
    A.  I do.
    Q.  Okay.  Can you describe what equipment exactly
makes up one of the mobile units?
    A.  I don't know if I can do it exactly.
    Q.  Sure.
    A.  I'll give you the best I can.  So a mobile
unit will consist of a laptop computer, a printer.
There's a number of forms -- DPS forms necessary to
issue EICs.  There will be a ream of paper.  There's a
tripod, a camera, a digital camera.  The connections,
the cables, and that stuff that makes all that business
work.  There's a -- there's a blue screen that we -- we
use as a backdrop for the photographs that we take.
There's a tripod for that or some kind of a stand.  I
don't know if it's a tripod or not.  There's the tubs

---

190

to put it in.  And -- and depending whether it is a
county EIC unit or a DPS EIC unit, it will have a cell
phone.  If it's a DPS EIC unit, it will have a DPS
issued cell phone with phone numbers entered into for
the ease of the CSRs.  I can't recall if we still give
the -- the CSRs a dolly to carry -- there were
complaints about that.  They didn't like our dollies
because the boxes were light.  There were 25 of them.
And the Phase 3, which are the county EIC units, I
can't remember if there were 78 or 79 of them.  There
were somewhere around 80.  I can't remember if we kept

    Q.  The laptop, is it connected to any DPS
databank --
    A.  No, sir.
    Q.  -- remotely?
    A.  No, sir.
    Q.  So it's a standalone laptop?
    A.  The laptop has been configured by our IT
people so that it is not able to connect to anything.
    Q.  Okay.  And how many of those mobile units were
established by DPS, approximately?
    A.  So, to the best of my knowledge, the Phase 2
EICs -- EIC mobile units were -- there were 25 of them.
And the Phase 3, which are the county EIC units, I
can't remember if there were 78 or 79 of them.  There
were somewhere around 80.  I can't remember if we kept

---

191

one to do -- to use -- it's called bench testing.  So
they -- our tech people are, you know, running tests on
it to make sure that the applications work properly,
and that would be called what's called the bench test
unit.  There's somewhere around 80 of those.
    Q.  When you say 80, you're talking about the
county mobile units?
    A.  Yes.
    Q.  And how do you distinguish between a DPS
mobile unit and a county mobile unit?
    A.  The only distinction -- in reality, the only
distinction is the inclusion of the cell phone that I
mentioned earlier.
    Q.  That's the only difference?
    A.  To the best of my recollection, yes, sir.
    Q.  And of the approximately 80 county units, are
those permanent?  I mean, are they given to the county
permanently or are they retrieved by DPS after the
county has finished using them?
    A.  The 80 units or so that that were provided to
the counties, the counties don't own them.  The State
of Texas owns them.  And I don't -- I don't recall if
Secretary of State actually paid for them or DPS did.
That part I don't know.  But those units are provided
to the county.  The county inventories them and they

---

192

are responsible for them.
    Q.  So they keep the units as long as they need
them?
    A.  They maintain the units, yes, sir.
    Q.  Okay.  Are they charged any fee, rental or
otherwise, by DPS or the Secretary of State's office
for these mobile units?
    A.  No, sir.  We even provide toner cartridges if
they need them.
    Q.  Do you know what the approximate cost of each
unit was to the State?
    A.  I knew at one time.  I don't know now.  I
don't recall the cost of the unit.
    Q.  Do you have a range, like $5,000 to $10,000
or --
    A.  I couldn't even speculate because there were
all kinds of peripherals.  I don't know.
    Q.  What about the total of cost of all,
approximately, 105 mobile units?
    A.  No, sir, I don't know.
    Q.  Did some of the counties already have some of
the equipment that they could use as part of the mobile
units?  For example, paper, printer, laptop, things
like that?
    A.  No.

---

TONY RODRIGUEZ                                                    5/8/2014

---

193

1    Q.  I'm sorry?
2    A.  No.
3    Q.  And the 80 -- approximately 80 county units,
4  were those given to certain counties or were they given
5  to counties that requested them or how did that work?
6  How did you determine -- or how did DPS determine who
7  got the 80 mobile units?
8    A.  DPS reached out to the counties that do not
9  have driver license offices.  There are 78 counties
10 that do not have driver license offices in the state.
11 And there was a letter -- I can't recall if A.D. Peters
12 signed it or not, but that letter established that I
13 was the point of contact and that letter went out to --
14 to the counties.  I can't recall exactly who -- I can't
15 remember if it was the county commissioners or the
16 county judge, but it went to -- it went to a county
17 official to make them aware of -- of the availability
18 of these the units.
19   Q.  Did all of the counties that did not have a
20 driver's license office accept one of the mobile units?
21   A.  No, sir.
22   Q.  So did some of the counties take more than
23 one?
24   A.  No, sir.
25   Q.  Okay.  So some of these 80 units went to

---

194

1  counties that had a driver's license office?
2    A.  No, sir.
3    Q.  So what happened to the other --
4    A.  DPS maintains the control of those units.
5    Q.  And they're available if a county asks for
6  them today?
7    A.  If a county were to ask for them and the
8  county didn't have a driver license office and the
9  county returned a memorandum of understanding signed by
10 the county judge and they participated in the training
11 to operate the unit, then we would provide the mobile
12 unit to the county.
13   Q.  How many counties that did not have a driver's
14 license office not accept the training and not accept
15 one of the mobile units?
16   A.  I would have to refer to one of our -- one of
17 our charts.  The number is -- is relatively small.  I
18 believe, to the best of my recollection, it's 17.
19   Q.  17, approximately?
20   A.  Approximately, yes, sir.
21   Q.  You also spoke earlier about the EIC database
22 is kept separate from the driver's license database?
23   A.  So within the driver license system, okay,
24 that we use when we're issuing driver licenses or ID
25 cards, the EIC database, it's a separate tab and that's

---

195

1  kept separately.
2    Q.  Okay.  So -- but the overall driver's license
3  database has within it EIC information?
4    A.  That's -- that's not an accurate statement.
5    Q.  Okay.  I didn't think it was.  I was asking
6  you to explain it to me.  I didn't understand it
7  earlier.
8    A.  Yes, sir, I'll try.  When -- when the system
9  was -- when the driver license system that we use for
10 our offices was configured and EIC was added into it,
11 the information in that was placed -- it's maintained
12 in a separate database.  It's not accessible -- the
13 document in that database are not accessible to driver
14 license personnel unless they have special access to
15 that.
16   Q.  Okay.  That explains it.  Now, what about the
17 CHL, is that a separate database?
18   A.  Yes, sir.  And it's separate and distinct from
19 driver license.  It's maintained by another -- another
20 department in -- in DPS.
21   Q.  What department maintains the CHL database?
22   A.  To the best of my knowledge, it's called RSD.
23 It's Regulatory Services Division.
24   Q.  Okay.  Does -- now, we know the EIC forms have
25 a box or category for race, correct?

---

196

1    A.  Yes.
2    Q.  Okay.  What about the driver's license
3  database and those forms, is there a place for someone
4  to designate their race?
5    A.  Yes.
6    Q.  And what about the CHL?
7    A.  I don't recall.
8    Q.  Can you search the driver's license database
9  by race?
10   A.  I don't know.
11   Q.  What about the EIC?
12   A.  I don't think so, no, sir.  I don't know that
13 either.
14   Q.  So the form -- even though the form on the EIC
15 has a box for race, is that not inputted into the
16 database?
17   A.  Yes.
18   Q.  It is?
19   A.  Yes, but I don't know -- I don't know the
20 searchability of the database.
21   Q.  Fair enough.  It is inputted, though?
22   A.  Yes.
23   Q.  Okay.  That's all I have.  Thank you.
24   A.  Thank you.
25       MS. KORGAONKAR:  Before I start, could

TONY RODRIGUEZ                                                5/8/2014

50 (Pages 197 to 200)

---

197

1  you just let me know how much time we have.
2          THE REPORTER:  Off the record.
3          (Discussion off the record.)
4          THE REPORTER:  Back on the record.
5              EXAMINATION
6  BY MS. KORGAONKAR:
7      Q.  Good afternoon, Mr. Rodriguez.  I understand
8  it's late in the day and you're probably a little bit
9  tired.
10     A.  Not at all.
11     Q.  So my name is Natasha Korgaonkar, just to
12 reintroduce myself, from the NAACP Legal Defense Fund.
13 In this case, I represent the Texas League of Young
14 Voters and two individual plaintiffs, Imani Clark and
15 Michelle Bessiake.
16         So Ms. Maranzano has been asking you, and
17 Mr. Brazil as well, a series of questions.  I'm going
18 to continue that series of questions on a slightly
19 different topic.  It's Topics 3 and 4 from the notice,
20 which you testified earlier today that you were
21 prepared for.  I just want to remind you that you're
22 still under oath and you're required to answer all of
23 the questions as truthfully and completely as you were
24 this morning, okay?
25     A.  That's fine.

---

198

1      Q.  Is it correct that DPS is the only state
2  agency that can issue EICs?
3      A.  Yes.
4      Q.  Okay.  Now, I would like to hand you an
5  exhibit.  I'll give you a moment to review it.
6          (Exhibit No. 84 marked.)
7          THE REPORTER:  Exhibit 84.
8          (Discussion off the record.)
9      Q.  (BY MS. KORGAONKAR)  Exhibit 84 is
10 Bates-stamped TEX-0511323, for the record.  When you've
11 had a minute to look at it, if you could just let me
12 know.
13     A.  Okay.
14     Q.  Okay.  Have you seen this document before?
15     A.  Yes, ma'am.
16     Q.  Okay.  And what is this document?
17     A.  Well, it appears to be an e-mail from me to
18 the leadership and the -- the driver license leadership
19 and the different driver license regions about EIC
20 reporting -- information reporting requirements.
21     Q.  And are these the regions for which you're
22 responsible?
23     A.  In part.
24     Q.  And what do you mean by that?
25     A.  As I explained previously, I'm responsible for

---

199

1  DPS Regions 3, 4, 5, 6A and 6B, and this is all of the
2  DPS Regions 1 through 6B.
3      Q.  Okay.  So these include regions that your
4  colleague, Mr. Bell, also supervises; is that right?
5      A.  Yes, ma'am.
6      Q.  Okay.  And could you just read the first
7  sentence of this e-mail?
8      A.  Sure.  "Folks, EICs are becoming a big deal
9  now and the information requirements are tightening
10 up."
11     Q.  Okay.  So what did you mean when you said that
12 EICs were becoming a big deal?
13     A.  It means that -- that people were asking about
14 them and the quality of information that I was getting
15 needed to be increased.  And that's why, if you look
16 further down in the e-mail, I'm asking for additional
17 information, specifically the date, the office name and
18 the station number, and a narrative for each of the
19 issuances.  And I sent this because -- because we were
20 getting different information from different regions.
21     Q.  And who was asking for the information that
22 you're now requesting?
23     A.  Me.
24     Q.  Aside from you, was there anyone else?
25     A.  No.  I collected the information and I

---

200

1  provided it to -- to my chain of command.
2      Q.  And, to your knowledge, was it only provided
3  to your chain of command within DPS or did it go
4  outside of DPS as well?
5      A.  To my knowledge, it went to my chain of
6  command, and that would be Paul Watkins and A.D.
7  Peters.
8      Q.  Okay.  And could you tell me what you meant by
9  "tightening up"?  It seems like there's a change in the
10 requirements.  I guess what I'm trying to get at is
11 what were the requirements before and then what
12 happened?
13     A.  I would have to see -- I would have to see
14 whatever I had sent out previously.
15     Q.  Okay.  As far as you can recall.
16     A.  As near as I can recall, they -- obviously,
17 since I had asked for it, the regions were not
18 including the office name or the station number.  And
19 then that would -- then the narrative -- I mean, they
20 may have been providing a narrative.
21     Q.  Okay.
22     A.  Because if you look at the example, it lays
23 out what I was looking for.
24     Q.  And in the last sentence, you wrote, "The
25 clearer you make this up front, the fewer follow-up

---

TONY RODRIGUEZ                                                5/8/2014

51 (Pages 201 to 204)

201

1   phone calls we have to have."
2       A.  Yeah.
3       Q.  Is that right?
4       A.  Yes, ma'am.
5       Q.  What -- what exactly did you mean by that?
6       A.  If I got information from a region that --
7   that was -- was incomplete, then I would have to call
8   them.
9       Q.  You would have to call them in order to
10  complete the information, right?
11      A.  To find out what the information was.
12      Q.  And why would you have to do that?
13      A.  Well, because I was in charge of the program
14  and I viewed it as my responsibility to provide as
15  complete information as I could get to my chain of
16  command.
17      Q.  Okay.  And was there a problem with phone --
18  you mentioned fewer follow-up phone calls.  At the
19  time, were there too many follow-up phone calls, as far
20  as you can remember?
21      A.  Well, when you're trying to call nine people
22  about something it consumes a fair amount of your time.
23      Q.  Okay, fair enough.  And when the information
24  requirements changed, do you recall where you got the
25  change information from or -- that's a confusing

202

1   question.
2       A.  Yes.
3       Q.  Did someone ask that the information
4   requirements be changed?
5       A.  No, I decided.
6       Q.  And you decided for what purpose?
7       A.  I decided to ensure that we had more
8   continuity of the information and clarity and quality.
9       Q.  Okay.  You can set that document aside for
10  now.
11      A.  I'll keep them in order.
12      Q.  Okay.  Currently, what are all of the types of
13  places that someone can apply for an EIC?
14      A.  A customer can get -- can apply for an EIC in
15  a driver license office.  They can apply for an EIC at
16  a mobile location that's operated by DPS employees.
17  They can go and they can apply -- in some -- in some of
18  the counties that I've touched on before, the counties
19  that don't have driver license offices that have
20  entered into the memorandum of understanding with DPS,
21  they can go to wherever that county is designated for
22  EIC issuance.  And the Secretary of State has some
23  mobile units and they can go to a location where the
24  Secretary of State are conducting mobile operations and
25  they can apply for an election certificate there.

203

1       Q.  Okay.  So just for my understanding, the
2   mobile units that are operated by DPS are different
3   from the mobile units that are operated by the
4   Secretary of State?
5       A.  The -- those units -- with the exception of
6   the cell phone, those are the same units.  The cell
7   phone is the only change in terms of equipment.
8       Q.  But in terms of who is organizing the
9   availability of those units --
10      A.  The Secretary of State has units and
11  they can -- we maintain the units.  They tell us where
12  they're going to go and our employees bring the unit to
13  that location.  The Secretary of State operates the
14  unit.  They set it up, they operate it.
15      Q.  Okay.  So for that category, I'll call them
16  the Secretary of State mobile units.
17      A.  Okay.
18      Q.  The DPS's responsibility is to bring the
19  equipment to a place that the Secretary of State has
20  designated to set up and then it's operated entirely by
21  the Secretary of State from that point on or does a DPS
22  employee remain?
23      A.  Depending on where it is, the DPS employee may
24  or may not remain because we -- we did train a number
25  of Secretary of State personnel.  Some of them are less

204

1   confident in their ability to issue and, in that case,
2   we have instructed our employees to remain to help to
3   make sure that it's done properly.
4       Q.  Okay.  And why are some of them less
5   confident?
6       A.  We're asking them to do something they've
7   never done before.  It would be as if I were to give
8   you an eight-hour block of instruction and send you out
9   by yourself.
10      Q.  Right.
11      A.  You would want someone who has done it before
12  to go with you.
13      Q.  Is it right that most of the Secretary of
14  State employees have probably not done any kind of
15  licensing, at least in their job in the Secretary of
16  State's office?
17      A.  I don't know what their jobs entail, so I
18  wouldn't want to speculate.
19      Q.  Okay.  Has -- to your knowledge, has the --
20  has the biggest problem been that they don't issue
21  usually issue any kind of licenses the way that DPS
22  employees do with frequency?
23      A.  I wouldn't categorize it as a problem.
24      Q.  Or the source of a lack of confidence, as you
25  called it earlier?

TONY RODRIGUEZ                                                    5/8/2014

205

1    A.  I don't know.  I mean, it's -- it's difficult
2  for me to categorize what somebody is thinking.  I hate
3  to be imprecise.  If you could help me -- rephrase the
4  question and I can try and answer it better.
5    Q.  It's just a very simple point.  So I
6  understand from your testimony, but correct if I'm
7  mistaken, that for these Secretary of State operated
8  mobile units, you have perceived -- or DPS has
9  perceived that some of the Secretary of State employees
10 who are manning them are a little bit less confident
11 than DPS employees when they man the DPS mobile units?
12   A.  Well, that's not entirely an accurate
13 statement.  And if I said that, that's not what I
14 meant.  Depending on the distances involved, our
15 employees will bring the unit out there and will link
16 up with the Secretary of State employees.  And then
17 there could be a variety of reasons they stay.  They
18 might not want to drive back six hours.  They might
19 stay and help out.
20   Q.  Okay.
21   A.  Or -- or the Secretary of State personnel can
22 say, "Please stay," in which case we're happy to do
23 that.
24   Q.  All right, fair enough.  Are there -- so you
25 listed out four different categories of places where

206

1  people right now can apply for EICs.  Are there
2  currently any plans, that you're aware of, to expand
3  that list of categories?
4    A.  Yes.
5    Q.  And what are some of -- or what are all of
6  those plans right now, as you know them?
7    A.  As I know the plans is that we -- we are in
8  the process or we have -- I can't remember if we have
9  trained them all or not.  But we have provided training
10 for a number of Health and Human Services employees who
11 are in seven counties around the State.
12   Q.  And those employees, have they been trained to
13 man mobile stations, mobile EIC units?
14   A.  The equipment that we have -- the equipment
15 that we have leftover was part of the original 80 that
16 we purchased for counties, okay.
17   Q.  Uh-huh.
18   A.  So we didn't go out and buy new.  We have got
19 this equipment that still -- it's been -- we still have
20 it.  So if the -- if the seven HHSC county employees,
21 if they are going to use the equipment, it would be
22 the -- part of the original 80 or so that we purchased
23 as part of the county -- the county effort.
24   Q.  Okay.  And do you know which counties those
25 seven are?

207

1    A.  I would have to refer to a map.  I mean, we
2  have that, but --
3    Q.  You don't remember offhand any of them?
4    A.  Garza is one that I remember, yeah.
5    Q.  Garza is one of them?
6    A.  It's Garza, Blanco, and then there are some
7  other ones.  Off the top of my head, those are the ones
8  I can recall.
9    Q.  Okay.  And what is the timeframe for those
10 seven counties to begin participating in the mobile
11 program through these HHS employees?
12   A.  When do we think they're going to be issuing
13 EICs?
14   Q.  Or accepting applications.
15   A.  I don't know yet.  I don't -- I don't have
16 that information.
17   Q.  How did those seven counties get chosen or how
18 did they come about to be the ones?
19   A.  Those were counties in which we did not have
20 an existing driver license office.
21   Q.  Okay.
22   A.  So it was part of the 78 counties that didn't
23 have any.  And there were discussions at senior levels
24 between DPS and HHSC to determine if there were -- if
25 HHSC had a presence in some of those locations.  It

208

1  turned out that it was -- or they did.
2    Q.  Do you know approximately when those
3  conversations started?
4    A.  I wasn't a party to them.  I don't know.  I
5  know that I spoke with a gentleman named Rolando Garza
6  in probably March -- maybe March.
7    Q.  Okay.  So early spring of this year, to your
8  knowledge?
9    A.  To my knowledge, yes.
10   Q.  Okay.  And any other plans for expanding the
11 types of places where a person could get an EIC,
12 besides the one that you listed so far?
13   A.  Not at the present time.
14   Q.  Okay.  So I would like to get just a general
15 sense of the current availability of places where
16 people can apply for EICs, and I would like to start
17 with the brick and mortar DPS locations generally.
18       So how many DPS offices are there in
19 Texas?
20   A.  229.
21   Q.  229.  How many driver's license offices are
22 there?
23   A.  I'm sorry.  There are 229 driver license
24 offices in the State of Texas.
25   Q.  Do you know approximately how many DPS

TONY RODRIGUEZ                                                    5/8/2014

53 (Pages 209 to 212)

209

1   offices?
2       A.   No, I don't.  I'm not a facility person.  I
3   wouldn't speculate.
4       Q.   Okay.  And just for the sake of clarity, what
5   is the difference between a DPS office and a driver's
6   license office?
7       A.   Certainly.  A DPS office is a facility that's
8   operated by DPS.  It may have -- it may have highway
9   patrol.  It may have Texas Rangers.  It may be a
10  maintenance point.  It may be nothing more than a
11  communications building or it could be a driver license
12  office.  We're a large agency.  We have a lot of
13  other -- a lot of subdivisions within the agency and
14  they could crew some of our offices.  And then we also
15  have some offices that -- in which all of those
16  entities or portions of those entities work together.
17      Q.   Okay.  And how many counties don't have a
18  driver's license office?  Is it around 79 or 80?
19      A.   78.
20      Q.   78, okay.  Are there counties that you know of
21  that have no DPS office at all?
22      A.   I don't know.
23      Q.   Why do some counties not have driver's license
24  offices?
25      A.   Well, there's a variety of reasons.  The

211

1   standpoint, it doesn't make -- it doesn't make much
2   business sense to put an office out in Loving County.
3       Q.   And who is making the decisions about whether
4   it makes sense from a business standpoint?
5       A.   Ultimately, within driver license, it's A.D.
6   Peters based on the recommendation of the staff.
7       Q.   Okay.  And, similarly -- I should have asked
8   this a minute ago.  But when it came to deciding which
9   counties would receive the updated equipment around
10  2009 or so, do you know who made the decision about
11  which counties would get the updated equipment?
12      A.   So we have had -- we have had two sets of
13  updated equipment.  So we switched in 2009 and we just
14  switched now to the current -- the current equipment
15  that we have.  But the decision was made by driver
16  license leadership.  It would have been the A.D. at the
17  time, which was Rebecca Davio, or now for the
18  current -- current equipment, it's A.D. Peters.
19      Q.   In your professional opinion, are there some
20  counties where it might make sense to have driver's
21  license offices but that don't right now?
22      A.   Well, I wouldn't want to -- to speculate,
23  other than to say that I think that the number of
24  offices that we have matches the population density and
25  the business that we -- we currently experience in our

210

1   population of the county.  The availability of
2   equipment to send to counties.  Other resources.
3       Q.   So what do you mean when you say "the
4   availability of equipment"?
5       A.   We have a -- our driver license equipment and
6   we have purchased that after -- well, after our old
7   equipment was so obsolete that it ceased to function.
8   So we purchased a given number of sets, and with those
9   given number of sets we can only equip so many offices.
10      Q.   And do you know around what time it was that
11  the old equipment, it sounds like, went obsolete, just
12  a rough timeframe?
13      A.   It was -- to the best of my knowledge, it was
14  somewhere around 2009.
15      Q.   Okay.  So did certain counties before 2009
16  have functioning driver's license offices that then
17  closed and have not since reopened because of the
18  problem with the equipment?
19      A.   I believe so, yes.
20      Q.   And you also mentioned population was one of
21  the reasons that some of these counties may not have
22  driver's license offices.  Can you tell me what you
23  meant by that?
24      A.   Well, an example is Loving County where they
25  have fewer than 100 people.  From a business process

212

1   offices.
2       Q.   So right -- is it correct to say that right
3   now, you don't feel there are any places where it might
4   make sense to have a driver's license office, but that,
5   at least at this moment, don't?
6       A.   None come to mind right now.
7       Q.   Okay.  Can all driver's license offices, all
8   229 of them, issue EICs?
9       A.   Yes.
10      Q.   And how long has that been accurate?
11      A.   Well, it was -- it was accurate from when we
12  were asked to -- to start the program.
13      Q.   When was that, roughly?
14      A.   Late June.
15      Q.   Has that been true continuously of all 229
16  since late June?
17      A.   Yes.
18      Q.   Okay.  Who sets the hours for these driver's
19  license offices?
20      A.   The -- the hours are -- in general, they're
21  set by headquarters in Austin, and there are some local
22  variations.
23      Q.   Okay.  So in terms of the hours that are set
24  in Austin, which division of DPS is it that sets those
25  hours?

TONY RODRIGUEZ                                                    5/8/2014

54 (Pages 213 to 216)

213

1    A.   That would be the Driver License Division who
2  sets the driver license operation -- operating hours.
3    Q.   And do you have a role in that?
4    A.   I have an advisory role, yes.
5    Q.   So what factors go into considering the hours
6  for the license offices?
7    A.   Well, it's -- it's the population, customer
8  flow, the number of transactions, drive -- number of
9  drive tests.
10    Q.   And would you say that all of those factors
11  factor in about equally?
12    A.   Well, we have -- generally speaking, we have a
13  standard set of hours.  The only real variations are in
14  smaller offices.
15    Q.   Is that -- are those the variations that you
16  said were the second group, the ones that have some
17  local variations?
18    A.   Yes.
19    Q.   Okay.  And when -- when local hours vary to
20  those local offices, say an office wants to expand or
21  truncate the hours that they're open, do they need
22  permission from Austin?
23    A.   They -- the permission is routed through the
24  chain of command, yes.
25    Q.   So they do?

214

1    A.   Yes.
2    Q.   Okay.
3    A.   But I haven't seen any truncation of hours.
4  You have to understand that the hours, especially in
5  rural offices, generally speaking, are based on travel
6  time.  So if we're asking an employee to travel to an
7  office to conduct business and there's banking and
8  stuff that needs to be done at the close of business
9  day, and so that's what sets the hours.  It's a
10  decision that we make based on that information.
11    Q.   So it's a decision based on information that
12  you may receive from the local employee about what they
13  think is the -- makes the most sense for their office?
14    A.   No.
15    Q.   Correct me.  Tell me how it works.
16    A.   Okay.  So there's a dialogue that occurs
17  between the -- the CSR and the office supervisor and
18  the regional manager.  And based on that dialogue, the
19  regional manager contacts me and we discuss the hours.
20    Q.   And, in general, what is -- what is the
21  dialogue about?
22    A.   Well, it would depend on the office,
23  obviously.  But it would be -- it would be, "I have a
24  two-hour drive to get to Office X and a two-hour drive
25  to get back at the close of the day.  If you're okay

215

1  with it, I would like to set the hours to open at such
2  and such time with a lunch and a dinner or to
3  close the doors at another time."
4    Q.   And when the decision ultimately comes to you
5  to approve, what do you think about when you're
6  deciding whether it makes sense for the hours to change
7  in X or Y way?
8    A.   It depends on -- it depends on the location of
9  the office and the -- and the discussion that I have
10  with the -- with the manager.  But, generally speaking,
11  I'm concerned about servicing the public.  That's our
12  job.  And I'm also concerned about what we're asking
13  the employee to do and the number of hours we're asking
14  them to work over a given period of time.
15    Q.   So when you say that it depends on the
16  location, is that -- do you mean the location with
17  respect to wherever that employee would need to come
18  from?
19    A.   The location of the office, yes.
20    Q.   But the location -- for what purpose?  You
21  mentioned earlier that some employee might need to
22  drive two hours, it might take them some time to get
23  there.
24    A.   Sure.
25    Q.   And then when you say "location," I also think

216

1  about population, which varies, obviously, based on the
2  location.  So when you say that you -- one of things
3  that you consider is the location, what about the
4  location?
5    A.   It's -- it's where the location of the office
6  is relative to where the employee is coming from.
7    Q.   Okay.  So for the 229 driver's license
8  offices, is it right that none of them needed to opt in
9  or opt out of the EIC program?
10    A.   No.  That was an assignment they were given.
11    Q.   Okay.  So there was no discretion.  All 229 of
12  the actual driver's license offices have issued EICs
13  from the end of June through the present?
14    A.   Well, I don't know if each office had issued
15  one, but they all have the capability to issue an EIC.
16    Q.   Okay.  Has DPS conducted any studies into the
17  relative distances that the EIC applicants or just the
18  people at large might travel in order to go to a place
19  where they can get an EIC application?
20    A.   I don't know if you would call it a study.
21  There are a couple of map charts, PowerPoint slides
22  that were produced that indicate -- to the best of my
23  knowledge, one of them showed the location of offices
24  with a 25-mile circle and one of them showed the
25  location of our offices with a 50-mile circle radius

TONY RODRIGUEZ                                                      5/8/2014

55 (Pages 217 to 220)

---

217

1  around the office.
2      Q.  Okay.  I think that this next exhibit is what
3  you are describing.
4              THE REPORTER:  Is it both pages?
5              MS. KORGAONKAR:  Yes.
6              THE REPORTER:  Don't we already have this
7  as an exhibit?
8              (Discussion off the record.)
9              (Exhibit No. 85 marked.)
10             THE REPORTER:  Exhibit 85.
11     Q.  (BY MS. KORGAONKAR)  Take a moment to look at
12 it and let me know when you're ready.
13     A.  Okay.
14     Q.  Have you seen this document before?
15     A.  Yes.
16     Q.  And is this the type of document that you
17 referred to just a minute ago?
18     A.  Yes, ma'am, it is.
19     Q.  Okay.  So tell me a little bit about who
20 prepared the document and just where it came from.
21     A.  Well, the gentleman who prepared it is named
22 Christopher Krueger.  He is one of our strategic
23 analysts in Driver License Division.
24     Q.  Okay.  And why did he prepare this?
25     A.  I'm sure he was asked to prepare it, and I

---

218

1  don't remember who directed its preparation.
2      Q.  Okay.  And do you know for what -- for what
3  purpose?
4      A.  Merely to depict the radiuses -- the 25-mile
5  radiuses around driver license offices or -- or the
6  50-mile radius around the offices relative to
7  population.
8      Q.  But it wasn't -- it wasn't prepared with a
9  specific goal in mind, other than to prepare it?
10     A.  Well, again, I wasn't -- I wasn't party to the
11 decision to why it came about.  I know that it was done
12 just to show the distances that the percentage of the
13 population is from the -- from one of our offices in
14 either 50 or 25 miles.
15     Q.  So was there something happening at DPS in
16 September that made this a useful document for someone
17 to -- to direct Mr. Krueger to create?
18     A.  I'm sure there was.  I can't -- I can't
19 recall.  I don't -- I don't know.
20     Q.  Okay.  Could it have been related to --
21     A.  EICs?
22     Q.  -- DPS offices and EICs?
23     A.  Let's see.  It could have been, yes.
24     Q.  And do you -- do you know whether there are
25 any similar maps like this that were -- that either

---

219

1  predate this one from September or that postdate it or
2  was this the only one like this created?
3      A.  For EICs?
4      Q.  Well, of this document.  Do you need to me to
5  clarify?
6      A.  The reason I asked is because there is another
7  chart that we use for a different thing.  We use it to
8  figure out where the offices are for commercial driver
9  licenses.  It's in no way related to CELs, but I've
10 seen similar documents.  But it deals with commercial
11 driver licenses, not EICs.  That's why I was --
12     Q.  No, I appreciate that.  So I'll limit it.  I
13 just mean, is there another document like this that
14 would have been prepared for the purposes of EICs?
15     A.  Not to my knowledge.  I don't know.
16     Q.  Okay.  So, to your knowledge, this is the only
17 one --
18     A.  As far as I know.
19     Q.  -- this one from September?
20     A.  Yes, ma'am, as far as I know.
21     Q.  All right.  And after you received this
22 document, did you or anyone else at DPS think about
23 what this may have shown in terms of EIC availability
24 in Texas?
25     A.  Well, I'm sure we had a meeting, but I don't

---

220

1  recall the discussion internal to the meeting.  I know
2  I've seen it, but that's as good as I can tell you
3  right now.
4      Q.  That's fine.  Can you recall who would have
5  been at such a meeting in addition to you?
6      A.  Sure.  That would be -- probably would be A.D.
7  Peters; Paul Watkins; Deputy Assistant Director JoeAnna
8  Mastracchio; Krueger, of course; Steve Bell, the other
9  guy.  Other than that --
10     Q.  Do you think anyone from outside of DPS might
11 have been there?
12     A.  No, I don't think so.
13     Q.  And do you know whether this -- whether this
14 map was forwarded outside of the agency?
15     A.  I don't know.
16     Q.  Do you think anyone at DPS would know?
17     A.  I don't know.
18     Q.  Okay.  You can set this one aside.  I'm going
19 to hand you the next exhibit.
20             THE REPORTER:  Do they go together?
21             MS. KORGAONKAR:  They do.  It's an e-mail
22 and the attachment to that e-mail.
23             THE REPORTER:  So staple it?
24             MS. KORGAONKAR:  Please.  Sorry that they
25 were not stapled.

---

TONY RODRIGUEZ                                          5/8/2014

---

221

```
1              (Exhibit No. 86 marked.)
2         THE REPORTER:  Exhibit 86.
3         Q.  (BY MS. KORGAONKAR)  Just take a moment to
4    look at it and let me know.
5         A.  Okay.
6         Q.  Have you seen this document before?
7         A.  Yes, ma'am, I have.
8         Q.  And what is it?
9         A.  This is an e-mail with an attachment.  The
10   attachment shows, as near as I can determine, the
11   counties in Texas which don't have driver license
12   offices resident in them.
13        Q.  Okay.  So in the e-mail that begins the chain,
14   which is found at --
15        A.  Yes.
16        Q.  -- TEX-0511236, could you read the last
17   sentence in that e-mail for the record?
18        A.  The last sentence?
19        Q.  Uh-huh.
20        A.  "I have highlighted the counties in which
21   there is a temporary DPS office set up already in the
22   county with contact information, if available, for that
23   office."  Can I read that again?
24        Q.  Sure.
25        A.  "I have highlighted the counties in which
```

---

222

```
1    there is a temporary DPS office set up already in the
2    county with contact information, if available, for that
3    office."
4         Q.  Okay.  So I just wanted to talk about the
5    temporary DPS office that was already set up.  Can you
6    tell me what those offices would have been or are?
7         A.  I don't know.  Jennifer Templeton is a
8    Secretary of State employee.  I don't know where she
9    got that information.
10        Q.  So, to your knowledge, were there any
11   temporary DPS offices set up in any counties as of the
12   date of the e-mail?
13        A.  No.  This appears to be a list of the
14   counties -- the 80 counties where we don't have offices
15   I don't know.  Why she would have referred to them as
16   temporary.
17        Q.  So, unfortunately, this attachment isn't
18   printed in color, but I can represent to you that if it
19   were, the three counties that would have been
20   highlighted are Motley, Armstrong, and Sutton.
21        A.  Hang on a second.
22        Q.  If that refreshes your recollection.
23        A.  In order to answer your question, I need to
24   refer to another document.
25        Q.  I'm fine with that if that's --
```

---

223

```
1         A.  Which counties did you say?
2         Q.  So in Ms. Templeton's attachment --
3         A.  Yes.
4         Q.  -- from September 25th --
5         A.  Yes.
6         Q.  -- Motley, Armstrong, and --
7         A.  Hold that thought.
8         Q.  Sure.
9         A.  Motley, Armstrong --
10        Q.  And Sutton.
11        A.  Sutton.  I can't find Sutton county, okay.  I
12   can't find Sutton county.  I can tell you that
13   Armstrong County and Motley County are counties in
14   which we don't have a driver license office, and I can
15   tell you that because this chart that I have here in
16   blue depicts the counties where we sent mobile units.
17        Q.  Okay.
18        A.  And we sent mobile units to counties that did
19   not have driver license offices.  And if I could ever
20   find Sutton, I can tell you -- give you the answer on
21   that one.
22        Q.  Well, I can tell you that I'm trying to
23   understand something specific.
24        A.  Sure.
25        Q.  Do you -- strike that.
```

---

224

```
1             What are the temporary DPS offices --
2         A.  I don't know what --
3         Q.  -- that would have been set up?
4         A.  I don't know what she's talking about.
5         Q.  To your knowledge, were there any temporary
6    offices set up in September?
7         A.  Temporary, no.  I don't --
8         Q.  Were there --
9         A.  I'm telling you, I don't know what this woman
10   wrote.  I don't understand why she used that term.
11        Q.  Okay.
12        A.  I'm sorry, I don't understand what she wrote.
13        Q.  That's quite all right.  Do you see that you
14   received the e-mails on the first page?
15        A.  Sure.
16        Q.  September 26th at 2:30 p.m., and then it looks
17   as if you forwarded it the next morning.  Why did you
18   forward this e-mail?
19        A.  Bob Meyers and Lynn Hale, they're part of our
20   training team.  And so I forwarded it to them so they
21   could plan where they might need to go because,
22   potentially, they might need to cover all these
23   counties to train the employees there.
24        Q.  Okay.  And as you stated just a minute ago,
25   the list shows the 79 counties without driver's license
```

---

TONY RODRIGUEZ                                      5/8/2014

---

225

1    offices, and Ms. Templeton's e-mail states that 55
2    counties are interested.
3         A.  It does, yes.
4         Q.  What happened next with those 55 interested
5    counties?
6         A.  Well, somebody in DPS would reach out to them
7    and offer them training.  They would offer to train the
8    counties on how to issue EICs.  And -- and then the
9    counties would go to a point that we designated, they
10   would receive the training, they would take the
11   equipment back to their -- to their county, and they
12   were also provided with a blank memorandum of
13   understanding, which they could provide to their county
14   commissioners to vote on.  And then, depending on the
15   county, did their business, the judge would sign, and
16   they would forward it to us.
17        Q.  And of those 55 counties, do you know how many
18   ultimately ended up signing the memorandum?
19        A.  Yes.  As of the 5th of May, 55 counties.
20        Q.  And what happened in September with the 24
21   counties that Ms. Templeton indicated are outstanding
22   with a response?
23        A.  Okay.  They hadn't answered us back.  I mean,
24   we would have contacted them again.
25        Q.  Okay.  And would it have been Mr. Meyers or

---

226

1    Ms. Hale who would have contacted them or you or
2    someone else?
3         A.  No.  When did you say again, by September?
4         Q.  Well, as of -- right after this e-mail
5    presumably, so late September or sometime thereafter.
6         A.  I believe it was -- it was Mr. Krueger who
7    contacted the counties because -- because the -- it was
8    getting so ponderous that Krueger was the one that was
9    the point of contact for -- for counties to return
10   their MOUs.
11        Q.  And you said, when you referred to the
12   document that you were holding, that 55 of these
13   counties as of May --
14        A.  The 5th of May, yes.
15        Q.  -- as of the 5th of May had signed a
16   memorandum of understanding and had EIC capabilities.
17   Do you know how many that number was by the time of the
18   November 2013 election?
19        A.  Give me a second.  No, I don't remember.
20        Q.  And do you know what the number would have
21   been as of the March primaries just a couple of months
22   ago?
23        A.  No.  I would have to go back and -- I can't
24   tell you.  I don't know what they were.
25        Q.  Okay.  Are all forms of DPS issued

---

227

1    identification available at any driver's license
2    office?
3         A.  No.
4         Q.  Can you explain which forms might not be?
5         A.  Employee ID cards.
6         Q.  For DPS employees?
7         A.  That's correct.
8         Q.  Okay.  So I mean, just to clarify, the types
9    of DPS issued ID that the public can apply for.  Are
10   all of those forms available at any driver's license
11   office?
12        A.  I understand those forms to be driver
13   licenses, Texas personal identification cards, and
14   election certificates, and those are available for
15   issue at all of our driver license offices.
16        Q.  And what about concealed handgun licenses?
17        A.  The concealed handgun program, as I've said
18   before, is operated through headquarters.  It's
19   operated through -- I don't know how you would
20   categorize it.  A division, I guess.  Well, a
21   division -- by the Regulatory Services Division.  It's
22   not done in person face-to-face.
23        Q.  Okay.  And with respect to driver's licenses
24   specifically, can you -- strike that.
25             With respect to driver's licenses, can a

---

228

1    person applying for one go through all the steps
2    required to ultimately get one at any driver's license
3    office?
4         A.  Yes.
5         Q.  So there aren't any offices where you would
6    apply for a driver's license, but you couldn't take the
7    test, for example?
8         A.  Which test?
9         Q.  The test to get a driver's license, the
10   driving test.
11        A.  The drive test, there may be an office which
12   is not offering what we categorize as the skills test,
13   the drive test.  None of them come to mind.  I'm under
14   the impression, to the best of my knowledge, all of the
15   offices offer drive tests.  There may be one or two
16   that don't, but none of them come to mind and I don't
17   know why they wouldn't.
18        Q.  All right.  I would like to take just a quick
19   break, if that's okay.
20        A.  Sure.
21             (Recess from 3:10 p.m. to 3:20 p.m.)
22             THE REPORTER:  Back on the record.
23        Q.  (BY MS. KORGAONKAR) So I just had,
24   Mr. Rodriguez, one more question about Exhibit 86.
25        A.  Yes, ma'am.

TONY RODRIGUEZ                                                    5/8/2014

58 (Pages 229 to 232)

---

229

1    Q.  In the attachment, which is stamped 511237 --
2    A.  Uh-huh, yes.
3    Q.  -- through -- well, that's -- if you'll see
4  the comment -- on the comments column on the far
5  right --
6    A.  Armstrong County.
7    Q.  Right, and it continues through on the other
8  pages to other counties as well.  So I just wanted to
9  ask, with Armstrong, for example, starting there, it
10 says, "Sergeant Ward, DPS," and then there's what
11 appears to be a phone number.  And then it says,
12 "Located, Clarendon."  I just wanted to confirm -- or
13 to ask your understanding of that.  Does that seem to
14 indicate that there might be a DPS office in that
15 county, but, perhaps, not a driver's license office?
16   A.  There may be.  And just based on the little
17 bit of information that's provided in the box, it
18 appears that there's some commissioned -- commissioned
19 law enforcement officer is located in Clarendon County,
20 or Clarendon.
21   Q.  And if you turn to the next page and look at
22 Sutton County, there's another note in the comments
23 column that says, "Sheriff's office building has DPS
24 office and courthouse has DPS office open Thursday" --
25 sorry -- "open every Thursday," and then what appears

---

230

1  to be a phone number.  Do you know what that note might
2  mean?
3    A.  No more than you've read.  I can't even find
4  Sutton county on the map.  I don't know what they meant
5  because this document was produced by somebody in the
6  Secretary of State's office, so I don't know -- I don't
7  know what Jennifer Templeton was thinking when she
8  populated it.
9    Q.  Okay.
10          (Exhibit No. 87 marked.)
11   Q.  (BY MS. KORGAONKAR)  I will now hand you
12 Exhibit 87.  Exhibit 87 is marked TEX-0496271 through
13 6273.
14   A.  I think I have two copies of that.
15         MS. KORGAONKAR:  Off the record.
16         (Discussion off the record.)
17         THE REPORTER:  Back on the record.
18   Q.  (BY MS. KORGAONKAR)  Okay.  So we're on
19 Exhibit 87, I believe it is.  I just wanted to turn
20 your attention to the first e-mail in the chain that is
21 dated September 9th, 2013.
22   A.  At 5:59 p.m.?
23   Q.  Exactly.
24   A.  Yes.
25   Q.  So before we get into the -- into the

---

231

1  substance of the e-mail, around this time of year, how
2  many EIC applications would DPS have been processing?
3    A.  I don't know.
4    Q.  Do you have a rough estimate?
5    A.  No.  I would -- I would have to refer to
6  something someplace.  I don't know off the top of my
7  head.
8    Q.  Okay.  So in this e-mail, you write, "Folks,
9  the word has come down that we need to open offices in
10 the top 13 counties where the Secretary of State thinks
11 there are potential voters who do not possess ID."  Is
12 that right?
13   A.  That's what it says, yes, ma'am.
14   Q.  So tell me what you meant when you said "the
15 word has come down"?
16   A.  That's -- as I said before, that's the way I
17 speak.  So when I say "the word has come down," it
18 means that I've been -- I don't know civilians would
19 say it.  I've been asked to, I've been invited to -- to
20 do something.  And, in this case, it was to open
21 offices in the top 13 counties where the Secretary of
22 State thinks there are potential voters who don't
23 possess IDs.  It's just the way I talk.
24   Q.  And when you said "come down," did that, to
25 you, imply that you had been required to do something

---

232

1  or invited to?
2    A.  I understood that to mean that was a -- that
3  was a directive from my chain of command.  You can put
4  whatever you want on it.  They asked me to do it and I
5  did it.
6    Q.  So it was a mandatory instruction.  Is that
7  fair to say?
8    A.  Yes.
9    Q.  And was it the Secretary of State that gave
10 you -- that gave DPS this instruction?
11   A.  I don't know who -- I don't know who gave the
12 Secretary of State the -- or who gave DPS the
13 instruction.  What I wrote here is that the Secretary
14 of State thinks there are potential voters in those
15 counties.
16   Q.  Right.  But setting aside the second part of
17 the sentence, was the instruction that DPS received to
18 open offices in these 13 counties received from the
19 Secretary of State's office?
20   A.  I received it from my chain of command.
21   Q.  Do you know where DPS received it from?
22   A.  No.
23   Q.  Did DPS have any role in determining which
24 those counties were?
25   A.  No.

---

TONY RODRIGUEZ                                                    5/8/2014

59 (Pages 233 to 236)

---

233

1      Q.   Now, dealing with the second part of the
2  sentence, you said, "The top 13 counties where the
3  Secretary of State thinks there are potential voters
4  who don't possess ID."
5      A.   Uh-huh.
6      Q.   Did you -- strike that.
7           As far as you know, based on what did the
8  Secretary of State's office think this?
9      A.   Excuse me.  Would you mind rephrasing that,
10 please?
11     Q.   Sure.  So you've stated the Secretary of State
12 thinks there are these 13 counties with voters who may
13 not possess ID.
14     A.   Yes.
15     Q.   Do you know what the Secretary of State's
16 assessment was based on?
17     A.   No.
18     Q.   Did DPS have any role in determining which
19 those 13 counties were?
20     A.   I don't believe so.
21     Q.   Did you ask anyone why these 13 counties?
22     A.   No.  I was told to do it in 13 counties and
23 that's what I did.
24     Q.   So did DPS -- not you personally, but DPS --
25 inquire to the Secretary of State, "Why are these 13

---

234

1  counties the ones and how did you determine that they
2  would be the ones?"
3      A.   I don't know what discussions went on between
4  DPS and the Secretary of State's office.
5      Q.   And then in the last sentence in this
6  same e-mail, you wrote, "In the meantime, I need you to
7  start working on getting your folks energized."
8           Did you think that it would be a problem
9  to get folks excited about this or energized about it?
10     A.   To ask somebody to come in on a Saturday.  I
11 think that we would need to talk to our employees and
12 we would need to explain to them what needed to be
13 done.  And that's -- but that's also a colloquialism
14 to -- if I ask you to get energized, we're going to go
15 to dinner, you need to get energized, get your stuff,
16 let's go.
17     Q.   Right.
18     A.   So in that respect, it's not that -- that the
19 individual may or may not be willing to go or not.
20 It's that when you -- it's a slang term, it's jargon.
21 And so when you went someone to be energized, it's
22 let's get them moving in that direction.
23     Q.   Of course.  But did you think that it might be
24 hard to get DPS employees energized about working on a
25 Saturday?

---

235

1      A.   I didn't know.  I mean, that's why I said, "I
2  need you to start working on getting your folks
3  energized."  They're the people that are closer to the
4  employees than I am.  And that's part of the give and
5  take that I have with my supervisors.
6      Q.   Okay.  Did you think there might be some
7  resistance from employees to the idea that they would
8  have to come in on a Saturday when they usually didn't?
9      A.   Our employees are people.  I don't like
10 working on Saturdays unless it's required to.  I mean,
11 I do it.  We can -- they'll do what we ask them to do.
12     Q.   Of course, okay.  So now I want to look at the
13 next e-mail in this same chain, the one --
14     A.   Directly above it?
15     Q.   I'm sorry?
16     A.   Directly above it?
17     Q.   That's right.  The one that is time-stamped
18 6:24 p.m.
19     A.   Uh-huh.
20     Q.   Could you read the first sentence in this
21 e-mail?
22     A.   Yes.  It says, "Gentlemen, we have been asked
23 to open driver license offices in" -- pardon me -- "in
24 13 counties that the Secretary of State's office
25 believes have the highest number of Texans who require

---

236

1  election identification certificates (EICs)."
2      Q.   Okay.  So who asked that these license --
3  driver's license offices be opened?
4      A.   It gets back to the -- your first question,
5  which is we have been asked -- I mean, I was asked by
6  my chain of command.  It's part of -- I don't -- I
7  don't think I fully understand your question.
8      Q.   Do you know whether the Secretary of State's
9  office asked DPS to do this?
10     A.   I don't know.
11     Q.   You don't know, okay.  So in this e-mail, you
12 go on to state, "The bottom line is that these offices
13 will open part of the day Saturday to issue EICs only."
14     A.   Hang on a second.  Yes, I see that paragraph.
15     Q.   Okay.
16     A.   I'm sorry.  That sentence, yes.
17     Q.   Okay, great.  So I noticed that this e-mail
18 was sent on a Monday.  September 9th was a Monday.
19     A.   Okay.
20     Q.   So I'll represent that to you.
21     A.   Thank you.
22     Q.   Was that short notice to be receiving and then
23 giving this instruction on a Monday for Saturday hours
24 that Saturday?
25     A.   Well, if you -- if you consider the audience

---

TONY RODRIGUEZ                                                    5/8/2014

60 (Pages 237 to 240)

---

**237**

to which the e-mail was being sent, not necessarily.

Q.  What do you mean by that?

A.  Well, the audience are the regional commanders -- the DPS regional commanders.  Remember, I talked about DPS regions.  So they have a commander who is commissioned -- he is in charge of each of those regions.  So I was informing them that they -- that those offices -- our driver licenses in those areas would be open.

Q.  So do you mean that for those people who were the recipients of this e-mail hearing on Monday that they had to get some of their offices open on Saturday wouldn't have been short notice for them?

A.  You have to understand how the DPS is organized.  So I've spoken about regional managers, okay, and the regional managers are the driver license representatives in the DPS region, okay.  There's also a regional commander, and that's a commissioned law enforcement officer and he is -- he is the highest ranking DPS person within that region and he exercises command over the driver license offices, highway patrol, the Rangers, CID.  So he's the highest ranking person in the region.  So for me to correspond with a regional commander to inform them that there are some offices that may be open, what is that, five days in

---

**238**

advance, that may not be -- there is -- they just need to be aware of it.

Q.  Was this the first that they had learned of these Saturdays?

A.  As far as I know, yes.

Q.  So do you not -- it's not a trick question.  I'm just trying to understand --

A.  No, I understand.  I don't think we understand -- we're talking past each other.

Q.  Okay.  I'll try to be more clear.

A.  Okay.

Q.  So telling them on a Monday that they have to mobilize certain offices to stay open on Saturday, would you consider that short notice considering that they did not know before the 9th that would need to be open on the 14th?

A.  No, because they are responsible for other functions, okay.  The people who are responsible to ensure the offices are open are the regional managers, not the regional commanders.

Q.  But were the commanders deputized to then pass this information along to the managers?

A.  No.

Q.  So how did the managers receive the information?

---

**239**

A.  Well, they would have either received it either in an e-mail, which you may or may not have -- you should have, if I sent one -- or it would be during our 8:00 conference calls.

Q.  And what day of the week are the 8:00 calls?

A.  When we're in an EIC cycle, as we are now, it's every -- every workday.

Q.  And would you have been in an EIC cycle on the 9th of September?

A.  I -- to the best of my knowledge, I was, yes.

Q.  And did the regional managers receive notice prior to this date --

A.  I --

Q.  -- of the Saturday openings?

A.  I -- I don't know for sure.  They should have.  It's -- it's the way that I would -- I would ordinarily do business.

Q.  So is it common for the for the managers to learn of something like this before the commanders would have?

A.  In some instances.  It would depend on what it is.  I mean the regional commander, as I stated, has a number of other functions.  Okay.  So they're -- it's hard to describe what they do to someone who doesn't work in driver license or DPS, so bear with me.

---

**240**

So the regional managers in driver license, they're the ones that ensure that the offices are open.  So they're the ones that have to -- to get the resources available to open those offices.  The regional commanders should be informed because it's an occurrence within their area of responsibility, which is their region; and -- and they're responsible for everything that happens within that region.  So this was a -- it just -- it was merely a notification.  But there was not much they had to do in order to -- in order for the offices to be open.  They needed to be aware of it and perhaps a couple other things to let the communications people know or the highway patrol know that there would be offices and there may be customers outside of driver license open, it's open on a Saturday when it wasn't ordinarily.

Q.  I want to then draw your attention to what looks like a bullet point, although it's faint here.

A.  Hold on a second.  I need to get a drink of water.

Q.  Sure.

A.  Okay.  I'm with you.

Q.  On that first bullet point, you state, "I realize that this creates a real issue for you."

A.  Yes.

---

TONY RODRIGUEZ                                              5/8/2014

61 (Pages 241 to 244)

241

1    Q.  What was the issue that you believed it
2  created --
3    A.  Well --
4    Q.  -- for the commanders?
5    A.  So I believed that the issue that it would
6  create for those regional commanders was that there
7  would be offices, which -- which are not open
8  ordinarily that would be open on whatever day I
9  specified in there; and that may be a resource issue
10 for them.
11   Q.  Okay.  And then in the final sentence of the
12 first paragraph, could you read that starting, "We were
13 told"?
14   A.  Okay.  "We were told to expect that this
15 effort would continue until the elections in November,
16 but my personal thought is that we don't get" -- that
17 was a misspelled -- "that we don't get any demand if --
18 if we don't get any demand for EICs, we can make a case
19 to stop opening these offices."
20   Q.  So who told you to expect that the effort
21 would only continue through November elections?
22   A.  Well, here's my personal thought.
23   Q.  When you say, "We were told to expect"?
24   A.  Oh.
25   Q.  Someone told you that?

242

1    A.  It was my chain of command.  I'm sorry.  It
2  would be Paul Watkins or perhaps AD Peters.  I don't
3  know exactly who said this.
4    Q.  Okay.  And do you know whether they're the
5  ones who made that decision?
6    A.  The decision to open on Saturdays?
7    Q.  Yes -- I'm sorry.  The decision to stay open
8  through November elections on Saturdays.
9    A.  That was a discussion between -- between AD
10 Peters and Paul and Steve Bell and myself.
11   Q.  Okay.  And was anyone from outside of DPS
12 involved in that decision?
13   A.  I don't recall.  No, I don't recall.
14   Q.  And then the second part of the sentence about
15 your personal thought.
16   A.  Yes.
17   Q.  Tell me what you meant by that clause.
18   A.  It's merely that that's what my thought was
19 and that we were asking people to come in on Saturdays
20 and that if we didn't get any demand, if there wasn't a
21 group of people that came in -- because at that point
22 this appears to be relatively early in our EICs
23 efforts, and we weren't sure how many people would show
24 up.  And -- and if a -- if a lot -- a lot of
25 customers showed up in the offices to receive their

243

1  EICs, obviously we would stay open.  If a lot of -- a
2  lot of customers didn't show up, then we may be able to
3  go back and say -- you know, we're asking employees to
4  come in on Saturday.  It cuts into their quality of
5  life and their family time, and we could make a case
6  that, you know, it might not be worth burning out our
7  employees -- that's my term -- to issue a small number
8  of EICs or potentially none.
9    Q.  Did you anticipate that there wouldn't be that
10 many people?
11   A.  I didn't know what to anticipate.
12   Q.  And what ended up happening, were there any
13 people for those first Saturday -- for that first
14 Saturday?
15   A.  The offices that I visit indicated on that
16 first Saturday, I was the only person to walk in.
17 Those were a couple of small offices.
18   Q.  Which -- which area?
19   A.  Killeen.  I live in Gatesville.  It was easy
20 for me to drive to Killeen.
21   Q.  Do you know about the other offices in
22 general?
23   A.  I don't believe we had -- we don't -- had many
24 customers; but in order to answer that question, I
25 would have to go and look and see where our --

244

1    Q.  Okay.  But just your recollection.
2    A.  My recollection was that we had very few
3  customers.
4    Q.  Okay.  And "very few," could you quantity very
5  few or --
6    A.  I'd say -- as near as I can determine, I
7  believe the number was less than ten.
8    Q.  Less than ten for that date or for that series
9  of Saturdays?
10   A.  Well, for the first Saturday is the question
11 that I was answering for you.
12   Q.  Okay.
13   A.  If you want any more information, I have to go
14 back and look at the charts that we have to get you a
15 precise answer.
16   Q.  To just the best of your recollection, did the
17 numbers grow after that first Saturday or stay about
18 the same?
19   A.  Saturday service stayed roughly the same.
20   Q.  Roughly the same.  Okay.
21       (Exhibit 88 marked.)
22   Q.  (BY MS. KORGAONKAR)  Okay.  I'm handing you
23 Exhibit 88.  Just let me know when you're ready.
24   A.  Okay.
25   Q.  I just wanted to turn your attention to the

TONY RODRIGUEZ                                                    5/8/2014

---

245

1  first e-mail in this chain, and that's the e-mail at
2  9:28 a.m. on the page Bates marked TEX-0511360.
3      A.  Yes, I see it.
4      Q.  Is this a complete list here, this chart below
5  of the regions within your area that were open on those
6  Saturdays?
7      A.  No.
8      Q.  Do you know if such a list is available, a
9  complete list?
10     A.  I don't know.  I -- these aren't my regions.
11     Q.  So one 1A, 1B, 2A, and 2B?
12     A.  Those are Steve's.
13     Q.  Okay.  Those are -- okay.  Do you know whether
14  this is a complete list of the Saturday open offices in
15  that time period for his regions?
16     A.  I would have to compare that to other
17  documents.  It appears to be -- it appears to be
18  complete with the exception of Townhurst.  Townhurst
19  was undergoing remodelling.
20     Q.  Okay.
21     A.  I do not believe the office was open at this
22  point.
23     Q.  And then flipping back to the previous
24  document.  Yes.
25     A.  So that's Exhibit 87?

---

246

1      Q.  87.  That's right.
2      A.  Okay.
3      Q.  Do you see the chart under the top e-mail, the
4  6:26 p.m. e-mail that has your regions?
5      A.  Wait a second.  I have a 6/24 e-mail.
6      Q.  Yes.  Sorry.  I misspoke.  That's what I
7  meant.  That chart there under the 6/24 e-mail.
8      A.  Yes.
9      Q.  Does that represent a complete list of the
10  offices in your regions that were open for those
11  Saturday hours?
12     A.  It appears to.  Again, I would have to go back
13  and check with other documentation; but as near as I
14  can determine, it appears to be a complete list, yes.
15     Q.  And I noticed that it doesn't look as though
16  there's anywhere open in Region 5.
17     A.  That's correct.
18     Q.  Do you know whether -- so were there no
19  offices, to your recollection, open in that region for
20  this time period on Saturday?
21     A.  No.
22     Q.  Why is that?
23     A.  Because the population density in Region 5
24  does not warrant opening offices on Saturdays for EIC
25  purposes.

---

247

1      Q.  Does that mean there aren't enough people for
2  it to make business sense?
3      A.  Aren't enough people?
4      Q.  There's not enough of a population for it to
5  make business sense open an office on a Saturday for
6  EICs in that region?
7      A.  There are not enough potential customers in
8  Region 5 to warrant opening an office on Saturday.
9      Q.  What is a sufficient number of potential
10  customers?
11     A.  I don't recall that number.  I would have to
12  go back and check other documents.  I don't recall
13  right now.  I just remember that Region 5, because of
14  the low density of population, didn't open offices on
15  Saturdays.
16     Q.  Okay.  And do you recall whose determination
17  it was to not have a Region 5 office open?
18     A.  It was -- since the determination was based on
19  population, then it was -- I don't know.  I -- I can't
20  remember who made the determination.  I can't remember
21  if I recommended it or -- or -- I'm sure ultimately
22  within driver license it was Joe Peters, but I cannot
23  recall the discussion that led up to that decision.
24     Q.  Ultimately, would you have had to sign off on
25  that since it's your region?

---

248

1      A.  Well, I report to -- I report to my chain of
2  command.
3      Q.  Okay.
4      A.  It would have been a recommendation that I
5  would have made.
6      Q.  Okay.  And would it have been signed off on by
7  Mr. Peters?
8      A.  We don't sign off on these thing like you sign
9  a ticket.  It would have been a verbal discussion
10  between Mr. Peters and myself or myself and Mr. Watkins
11  or some combination thereof.  We would have been told
12  to do it or not to do it.
13     Q.  So you would have reached an agreement among
14  the three of you?
15     A.  Yes.
16     Q.  Or you and one of those two people, at least?
17     A.  Yes.  Yes.
18         MS. KORGAONKAR:  Next exhibit is 89.
19         (Exhibit No. 89 marked.)
20         THE WITNESS:  Thank you very much.
21  That's when my son was born.
22     Q.  (BY MS. KORGAONKAR)  Okay.  So this exhibit is
23  Bates stamped TEX-00304974.  And it is a press release
24  issued by the Secretary of State on September 13th,
25  2013, is that right?

---

TONY RODRIGUEZ                                                          5/8/2014

63 (Pages 249 to 252)

---

249

1    A.  Yes, that's what it says.
2    Q.  And the title is, "Secretary of State's
3  commends DPS for opening offices on Saturdays to issue
4  election IDs."
5    A.  Yes.
6    Q.  So I just have a couple of questions about
7  this.  You'll see that in the first sentence, the press
8  release states that nearly 50 driver's license offices
9  are offering Saturday hours in order to issue EICs.
10   Is that right?
11   A.  It says "more election certificates," but yes.
12   Q.  Okay.  Sorry.  It says, "more election
13 certificates."
14   Do you know what the number actually was
15 of offices?
16   A.  As of the 13th of September, no.  I'm sorry.
17 Election certificates?
18   Q.  No.  Offices.
19   A.  I believe the number was 49 offices were open.
20   Q.  Okay.  Okay.  Do you know the process for
21 selecting those 49 offices?
22   A.  The Secretary of State provided some
23 information to DPS; and based on that information, I
24 was directed to have the offices open.
25   Q.  What was the information that was provided?

---

250

1    A.  If I recall correctly, there was a -- an Excel
2  spreadsheet that had -- it had the number -- it was a
3  potential -- as it was explained to me, it was the --
4  it was the number of potential Texans who might not
5  have -- or might require an election certificate.
6    Q.  Was it a number in a certain geographic
7  region?  Just to the best of your recollection.
8    A.  Yeah.  To the best of my recollection, it was
9  a county list; and that was one column.  And then there
10 were numbers in another column.  I can't remember much
11 else other than that.
12   Q.  And did the Secretary of State's office
13 generate that list?
14   A.  When I saw it, I was given that by my chain of
15 command; so I don't know who generated it.  I know that
16 my chain of command gave it to me.
17   Q.  And gave it to you stating that it was a
18 document from the Secretary of State's office, right?
19   A.  Yes.
20   Q.  Okay.  Do you know what those numbers were
21 based on?
22   A.  Not more than what I've already told you is
23 that it was -- it was the number -- the -- it was an
24 estimate of the number of individual Texans in those
25 counties who -- there was -- who they thought might

---

251

1  need an election certificate.
2    Q.  And do you know based on what they thought
3  people in those counties might need an EIC?
4    A.  Say that again, please.
5    Q.  Do you know what the basis was for the
6  Secretary of State's belief that people in X or Y
7  county?
8    A.  I'm under the impression it was a comparison
9  of databases.
10   Q.  Did DPS, to your knowledge, work on that
11 comparison of databases at all?
12   A.  I don't know if DPS worked on the comparison
13 of databases, no.
14   Q.  Okay.
15   MS. KORGAONKAR:  And do you know whether
16 that list has been provided to us?
17   MR. KEISTER: I have no idea.
18   Q.  (BY MS. KORGAONKAR)  So the 59 office -- or
19 the 50 offices -- or 49 --
20   A.  49.
21   Q.  -- approximately, which regions of the state
22 were they concentrated in?
23   A.  Concentrated or existed?
24   Q.  Where were they?
25   A.  DPS Regions 1A, 2 -- I'm sorry -- 1A, 1B, 2A,

---

252

1  2B, 3, 4, 6A, 6B.
2    Q.  So every region except Region 5, it sounds
3  like?
4    A.  That's correct, yes.
5    Q.  Were there -- was there any particular part of
6  the state or region in which they were concentrated?
7    A.  I -- I don't recall any.  I mean, it was
8  centered around population centers.  They were dealing
9  with people.  So to the best of my recollection, it was
10 based around where the people were.
11   Q.  Okay.  That makes sense.
12   Were there more of them near -- near big
13 urban centers than in very, very rural areas?
14   A.  More of them?
15   Q.  More of these Saturday opened offices?
16   A.  The offices that were open on Saturdays were
17 in the counties -- that was 'cause it was -- I did it
18 by county, and the counties were selected or based on
19 the population.
20   Q.  Okay.
21   A.  If that answers your question.
22   Q.  It does.
23   A.  Okay.
24   Q.  Is it fair to say that DPS locations that were
25 in places with smaller populations were less likely to

---

TONY RODRIGUEZ                                    5/8/2014

64 (Pages 253 to 256)

---

253

1    have Saturday open hours?
2        A.   I'm not sure if that's an accurate statement,
3    because we went on the -- we used the population by
4    county.  So Bell County would have -- and had offices
5    that were open, you know; so parts of Bell County are
6    rural.  So when we broke it out, we broke it out by
7    county.  It wasn't -- it wasn't -- it was all the
8    offices within a given county that were open.
9        Q.   Okay.  So some counties had more than one
10   office open for Saturday hours in this time period?
11       A.   Potentially, yes.
12       Q.   All right.  So it looks to me from the past
13   few documents that we've received that on Monday of
14   that week you let the commanders know that Saturday
15   hours were going into effect.  And then on Monday and
16   Tuesday, it sounds like you were working on figuring
17   out which offices would actually be open.  On Friday
18   this press release goes out; and on Saturday, that's
19   the first open Saturday hours.
20            Does that sound about right from your
21   recollection for that week?
22       A.   In order for me to answer specifically, I
23   would want to see all the chain; but it sounds -- it
24   sounds -- generally speaking, if what you've described
25   is accurate, then generally speaking, yes.

---

254

1        Q.   And that information is just based on the last
2    few e-mails that we have discussed today.
3        A.   We've looked at a lot of e-mails today.
4        Q.   I understand that.
5            So was that a busy week for you at DPS?
6        A.   I don't know.  I suppose.
7        Q.   Do you think it would be fair to say it was a
8    busier week than usual, given that you had a big,
9    different event occurring on Saturday?
10       A.   I leave the office at 7 o'clock every night
11   anyway, so no.  Sometimes I leave at 6:30 because I
12   want to give myself a break.
13       Q.   Okay.  Understood.  Was -- were people rushing
14   to accommodate those Saturday hours for that first
15   week, at least?  It seems like it would be a busy week.
16       A.   I don't -- I don't -- I don't recall it as
17   being rushing.  I was -- I was actually very pleased
18   with our employees.  They did what we wanted them to
19   do, and they did it in a darn good way.  And I was -- I
20   was very satisfied with how they were doing it.  And so
21   I didn't perceive it as a busy week, necessarily.
22       Q.   Were there any offices that you-all had
23   discussed or maybe wanted to have open for that first
24   set of Saturday hours that ultimately it didn't work
25   out in?

---

255

1        A.   Only in the office that I've mentioned to you,
2    Townhurst, because it was undergoing renovations.
3        Q.   But aside from Townhurst, everywhere else that
4    you and your colleagues discussed wanted to have open
5    and everywhere else that the Secretary of State
6    requested be open ended up being open on that Saturday?
7        A.   To the best of the my knowledge, yes.
8        Q.   Okay.
9
10           MS. KORGAONKAR:  Can we go off the record
11   for one second?
12           THE REPORTER:  Off the record.
13           (Discussion off the record.)
14           THE REPORTER:  Back on the record.
15           (Exhibit No. 90 marked.)
16       Q.   (BY MS. KORGAONKAR)  I will hand you
17   Exhibit 90, which is Bates marked TEX-00462137 through
18   2139.  If you could just take a moment, and let me know
19   when you're ready.
20       A.   Okay.
21       Q.   Have you seen this document before?
22       A.   I don't recall seeing this document.
23       Q.   So I wanted to draw your attention to the very
24   first e-mail, which is at the bottom of the chain.  It
25   is from Janie Ramon to Keith Ingram with John Steen

---

256

1    copied --
2        A.   Okay.
3        Q.   -- from October 7th, 2013, at 10:18 a.m.  So
4    in this, Ms. Ramon states to Mr. Ingram and Secretary
5    Steen, "Would like to request your assistance."  And
6    then she states that she understands that opening --
7    sorry -- strike that.
8            "I understand that this has to be
9    approved by SOS.  We're currently trying to get some
10   Saturday openings of the local DPS office for election
11   certificates"; is that right?
12       A.   That's what it says.
13       Q.   Okay.  In the e-mail, when Mr. Ingram responds
14   to her that's just above it.
15       A.   Hold on a second.
16       Q.   -- at --
17       A.   Give me a second.
18       Q.   Sure.
19       A.   Okay.  I'm with you.
20       Q.   Okay.  So this is the 11:03 a.m. e-mail in the
21   chain from Mr. Ingram in response to Ms. Ramon?
22       A.   I see that.
23       Q.   He states, "Thank you for letting us know of
24   your request to DPS.  We don't have any ability to
25   request Saturday openings in Val Verde County, but we

---

TONY RODRIGUEZ                                          5/8/2014

65 (Pages 257 to 260)

257

1  are scheduled to bring mobile EICs units to your county
2  on October 31st to November 1st."
3           Is that right?
4       A.  Happy Halloween, yes.
5       Q.  Okay.  So starting with Ms. Ramon's e-mail,
6  she indicates that the Secretary of State's office
7  needs to approve requests for DPS offices.
8       A.  Okay.
9       Q.  To be open on certain dates.
10          Is that how you understand it as well?
11      A.  I was informed --
12          MR. KEISTER:  Object to speculation.
13      Q.  (BY MS. KORGAONKAR)  I'm asking how you
14  understand it, not what she necessarily meant.
15          MR. KEISTER:  I'll object.  It's
16  speculation.  He's not -- he's not a participant, so --
17      Q.  (BY MS. KORGAONKAR)  Right.  But you don't
18  have to speculate when it comes to what you take this
19  to mean.  That's all I'll asking you.
20          How do you understand this?
21      A.  Okay.  Give me a second.
22      Q.  Sure.
23      A.  I understand that this has to be approved by
24  SOS, yeah.  Yes.
25      Q.  So do -- did you understand her request also

259

1  wanted to open on Saturday hours that wasn't already
2  within the counties specified by the Secretary of
3  State's office, did they need to get approval from DPS
4  from you?
5       A.  Assuming they had an office in the county,
6  then they would have to -- it wouldn't so much be -- I
7  suppose you could categorize it as approval but the
8  employees worked for us and we would have to authorize
9  them to go into the office.  So if that's how you
10  categorize approval, then the answer to your question
11  is yes.
12      Q.  Okay.  And then turning to Mr. Ingram's
13  response, as I read before, he stated, "We don't have
14  any ability to request Saturday openings in Val Verde
15  County."
16      A.  Okay.
17      Q.  Is that accurate, as you understand it?
18      A.  Well, they can request it.
19      Q.  Did they have the ability to require DPS to
20  open certain offices for Saturday hours?
21      A.  Does the Secretary of State have the ability
22  to require DPS to open an office on a Saturday?  Not to
23  my knowledge.
24      Q.  But didn't the previous e-mails establish that
25  there were certain offices that the Secretary of

258

1  to have had to be approved by the Secretary of State?
2       A.  Well, I wasn't e-mailed the request.  But what
3  you've handed me, it looks -- it appears that they have
4  to ask the Secretary of State.  This a county clerk in
5  Val Verde.
6       Q.  Right.  I understand that.
7           So my question is, do you also think that
8  that is the correct process that she would have had to
9  go through?
10          MR. KEISTER:  Objection, calls for
11  speculation.
12          THE WITNESS:  I believe there would have
13  to be some -- the counties that we -- this is for
14  Saturday openings?
15          They would have to have some discussion
16  with the Secretary of State's office.
17      Q.  (BY MS. KORGAONKAR)  Okay.
18      A.  Yeah.
19      Q.  Would you have also -- "you" being DPS --
20  needed to approve such a thing, or would it only have
21  been the Secretary of State's office?
22      A.  Well, the selection of Saturday offices was
23  based on other -- other criteria than requests.
24      Q.  But elective Saturday hours for a county that
25  may not have been selected.  If the county voluntarily

260

1  State's office requested DPS to open on Saturday?
2       A.  Yes.
3       Q.  So to me that sounds in consistent.  Maybe I'm
4  just not understanding.
5       A.  I think you don't understand.
6       Q.  Okay.
7       A.  It's because the offices that were selected
8  for Saturday were based on the population of those
9  counties.
10      Q.  But the Secretary of State's office selected
11  them?
12      A.  Based on the population of those counties.
13      Q.  So could the Secretary of State's office have
14  selected different counties based on something else, if
15  it had chosen to?
16      A.  I suppose they could have.
17      Q.  Based on something else that even made sense,
18  let's say?
19      A.  I would say that having an office open on
20  extended hours near the bulk of the population
21  certainly makes sense to me.
22      Q.  Right.  But there's a number of other things
23  that could have made sense.  So I'm saying, you
24  agree -- or tell me if you disagree that the Secretary
25  of State's office could have instructed DPS to open 13

TONY RODRIGUEZ                                              5/8/2014

261

1   different county offices if under some other criteria
2   those offices would have made sense to open, right?
3       A.   I suppose so.
4       Q.   So then is it correct that the Secretary of
5   State's office doesn't have the ability to request
6   Saturday openings in Val Verde County?
7       A.   They can request them.
8       Q.   Okay.  And did the Secretary of State's office
9   request certain other county offices to be open on
10  Saturdays?
11      A.   Not to my knowledge.
12      Q.   The 13 counties from the previous --
13      A.   Oh, yeah.  Those ones, yes.
14          May I -- so let's be clear.  The
15  Secretary of State asked for driver licenses to be
16  opened in certain counties, not county offices.
17      Q.   Okay.
18      A.   Okay.
19      Q.   And just looking through the rest of
20  the exchange, which goes over to the first page, it
21  doesn't appear to me in this chain that there are any
22  DPS people on this e-mail; is that right?
23      A.   I believe that to be correct, yes.
24      Q.   Did this e-mail, to your knowledge, ever get
25  forwarded to DPS?

262

1       A.   I don't know.
2           MS. KORGAONKAR:  The next document,
3   Exhibit 91.  Yes.
4           (Exhibit No. 91 marked.)
5       Q.   (BY MS. KORGAONKAR)  I'm handing you
6   Exhibit 91, which is not Bates marked.  Just take a
7   minute to look at it.
8       A.   Okay.
9       Q.   So this is a printout from earlier this week
10  from the DPS website.  It's a document that states the
11  listed driver license offices will be opening the
12  following Saturdays; May 10th, 17th, and 24th.
13      A.   Yes, that's correct.
14      Q.   Can you tell me when or approximately when
15  this list would have been posted on your website?
16      A.   No.  It would have been posted some -- because
17  we started our -- sometime after the 28th of April is
18  all I can tell you.
19      Q.   Okay.  And why the 28th of April?
20      A.   That's the date when we started to have our
21  daily EIC conference calls.
22      Q.   Okay.  And to your knowledge, is this list
23  complete as of today?
24      A.   Yes.
25      Q.   And was the -- well, strike that.

263

1           What was the process of establishing
2   Saturday hours for these offices this May?
3       A.   The process we -- the process we used to open
4   these offices was that these were the offices that we
5   had opened on Saturdays previously.
6       Q.   "Previously" meaning what?
7       A.   Previous election cycles.
8       Q.   In the fall of 2013?
9       A.   With the exception of Townhurst.  And I
10  believe there's an office in Dallas, which is opened.
11  I can't -- I can't remember if it's Dallas East or
12  Dallas Southwest, but there's an office that we've
13  opened since the 2013 to now.  And because it's in
14  Dallas County, it's open.
15      Q.   Okay.  Like a brand-new office?
16      A.   Yes.
17      Q.   Okay.  So because this is based on the offices
18  that were open in the fall 2013 cycle, that means that
19  ultimately this is based on that same set of data from
20  the Secretary of State's office; is that right?
21      A.   That's correct.
22      Q.   Okay.  Besides the period of time in the fall
23  of 2011 preceding the November 2013 elections, and
24  besides the period of time right now, this May, when
25  there's Saturday hours, have there been any other

264

1   Saturday hours for people to get EICs?
2       A.   Outside of an election cycle?
3       Q.   I guess both outside of an election cycle; and
4   also, are those are those the only two election cycles
5   when Saturday hours were instituted?
6       A.   To the best of my recollection, we've had a
7   constitutional election, we've had primaries, and we're
8   in the midst of a runoff.  And if I'm not mistaken, to
9   the best of my recollection, we've had Saturday
10  operations during each one of those three election
11  cycles.
12      Q.   All right.  And have there been other Saturday
13  hours since last September, let say?
14      A.   Outside of the times that I just described as
15  election cycles?
16      Q.   Correct.
17      A.   No.
18      Q.   Okay.  Do you know if this notice that we're
19  looking at now is distributed in all of these counties?
20      A.   This notice?  This notice is posted on our
21  website.
22      Q.   And is there a different notice that goes to
23  the counties from DPS?
24      A.   I don't know.
25      Q.   Is it upon the local DPS offices to publicize

TONY RODRIGUEZ                                             5/8/2014

265

1   the Saturday hours?
2        A.   That's media and communications.  I don't
3   know.  I don't know their -- I don't know how they do
4   business.  It's not my business to know their business.
5        Q.   Okay.  All right.
6             MS. KORGAONKAR:  All right.  You want to
7   take a quick break?
8             THE REPORTER:  Off the record.
9             (Recess from 4:15 p.m. to 4:27 p.m.)
10            THE REPORTER:  Back on the record.
11       Q.   (BY MS. KORGAONKAR)  Okay.  I'm going to shift
12   gears just a little now.  I want to talk about the
13   mobile EICs units.
14       A.   Okay.
15       Q.   Could you just tell me what a mobile EIC unit
16   is?
17       A.   Okay.  We call a mobile EIC unit -- I had
18   described it before.  I'll do it again.  It's nothing
19   more than a term we use for a -- called collection
20   equipment.  It's -- roughly speaking, it's a laptop.
21   There's a printer.  There's cartridges, and then
22   there's the -- thank you -- the digital camera, the
23   tripod for the digital camera.  There's the blue screen
24   that we have to use as a backdrop for when we take
25   applicant pictures.  There are forms.  There's blank

266

1   sheets of paper, and there -- it's containerized inside
2   of a tub.  There's -- for the units that we -- that DPS
3   provides that -- for use of DPS employees, there's a
4   cell phone that's a DPS-provided cell phone.  For the
5   county units, there's not a DPS-provided cell phone.
6   It's the major distinction between the county EIC,
7   mobile EICs units, and the DPS mobile EIC unit.
8        Q.   Is there a car or a vehicle associated with
9   the mobile unit?
10            (Phone buzzing.)
11            THE WITNESS:  It's our friend.
12   No.
13       Q.   (BY MS. KORGAONKAR)  So to get to wherever a
14   mobile station is set up, employees, whoever they are,
15   use their own cars generally?
16       A.   I misunderstood your question.  I understood
17   your question to be:  Is a car associated with a
18   specific unit?  In other words, is that part of the
19   unit set?  And the answer to that question is no.
20       Q.   Okay.
21       A.   The Department of Public Safety, insofar as
22   the resources that we have available, provides fleet
23   vehicles for the employees to go and issue EICs.
24       Q.   And are those fleet vehicles available any
25   type a DPS employee needs to make it to a mobile unit?

267

1        A.   Within the -- within the resources that we
2   have available, yes.
3        Q.   Okay.  Is a mobile unit the same thing as a
4   mobile light unit?
5        A.   Yes.
6        Q.   They're the same?
7        A.   Yes.  The mobile light and -- you've heard the
8   term "pet peeve"?
9        Q.   I have, indeed.
10       A.   The making -- calling things names like mobile
11   light is one of my pet peeves, and -- but essentially,
12   the mobile light is a mobile unit, yes.
13       Q.   Is there any difference between the two?
14       A.   Someone put it on slide, and everybody refers
15   to it as that.  Other than somebody thought it was a
16   great ideal to call them that, no.
17       Q.   So there's never been a substantive
18   distinction or difference between these two things.
19   It's just what people call them.
20       A.   That's right.
21       Q.   Okay.  When did DPS first learn of mobile
22   units for EICs?
23       A.   I'm going need you to rephrase that question,
24   please.
25       Q.   When did the idea of -- of issuing mobile

268

1   units first occur?
2        A.   Issuing EICs through mobile units?
3        Q.   Correct.
4        A.   Okay.  I don't remember exactly what day.  It
5   was -- it was sometime during the constitutional
6   election cycle, and the -- the -- the initial
7   suggestion that was in the September, that fall, the
8   period of 2013, the initial suggestion was that we use
9   one of our six disaster response units to issue EICs.
10   And there are a variety of reasons that we didn't want
11   to do that.  And we decided to -- to enter into an
12   agreement with the Secretary of State, and I don't
13   remember who paid for them.  But -- but we constituted
14   25 sets of mobile units; and then later, on we
15   constituted approximately 80 sets of mobile units.
16       Q.   Okay.  And did the idea generate within DPS,
17   or did it generate from the Secretary of State's
18   office?
19       A.   I don't know -- I don't know where the idea
20   generated from.
21       Q.   Okay.  And whose, to the best of your
22   recollection, idea was it to use one of those disaster
23   response units?
24       A.   I don't recall.
25       Q.   Who all was involved in the -- in the planning

TONY RODRIGUEZ                                              5/8/2014

68 (Pages 269 to 272)

269

1  in fall of 2013 to involve -- strike that -- the
2  planning in 2013 to create and then to dispatch mobile
3  EIC units?  By "who," I mean which offices.
4      A.  Well, the driver license division of DPS,
5  certainly, we were the executor of that.  I cannot
6  recall if there was discussion between DPS and the
7  Secretary of State about mobile units.  I just can't.
8  I don't recall.
9      Q.  Do you recall whether the Governor's office
10 was involved?
11     A.  I don't know about that.
12     Q.  Do you recall whether the Lieutenant
13 Governor's office was involved?
14     A.  I don't know about that either.
15     Q.  What was the goal of the mobile EIC units?
16     A.  The goal was to provide Texans, who lived in
17 those 80 -- or 79 counties that I talked about, the
18 opportunity to -- to get an EIC.
19     Q.  What were some of the potential difficulties
20 discussed when you were planning this and implementing
21 the program?
22     A.  Well, we had to -- we had to get the
23 resources.  We had to get the money.
24     Q.  Uh-huh.
25     A.  And of course, there's a -- because we're a

270

1  government agency, there's a process it needs to go
2  through in order to get the money.  We had to -- we had
3  to purchase the computers themselves, and we had to --
4  we had to ensure that the computers were able to do
5  what we wanted them to do.  And so DPS IT has IT
6  security.  I'm not an IT guy, but I know they have
7  certain security requirements.  So those computers had
8  to meet those security requirements.  They also had to
9  configure the application, the desktop application to
10 enable to -- or to make the screens that were displayed
11 for the CSRs to look as much like the screens that are
12 displayed in our brick-and-mortar offices as possible
13 so that -- so that we wouldn't have to train people to
14 do a completely different system and would be as
15 similar to what they had already done as possible.
16     So there was that -- the IT and the
17 IT-related issues of getting all that done under a
18 relatively short period of time.  I believe it was ten
19 days or so.  We had to -- we had to -- we received the
20 computers from the vendors.  It was a lot of logistics.
21 We received the computers from the vendors.  They had
22 to be imaged.  They had to be -- the application had to
23 be loaded on the computer.  The physical loading all
24 the applications takes time when you're dealing with 25
25 computers.  You know, there's going be a problem.  We

271

1  had a bench test.  We had to make sure that all the
2  peripherals worked and everything like that.  So there
3  was --
4      Q.  Okay.  And you mentioned that money was one
5  potential concern, but clearly the money came.
6      Do you know where it came from?
7      A.  No.  We were told to -- Steve Bell and I were
8  told to put it on our purchase cards, and that's what
9  we did.
10     Q.  Okay.  And is your purchase card a credit card
11 that you have for your employment at DPS?
12     A.  It's -- yeah, it's a P card.  I'm authorized
13 to use it under certain circumstances and within
14 certain spending limits.  Steve did most of the buying
15 because he was -- as I said before, he was the person
16 who dealt with logistics.  And so I was under -- I was
17 operations, and he was logistics.
18     Q.  Do you know whether ultimately the amounts
19 that you-all paid for the equipment came out of DPS's
20 budget, or was DPS reimbursed by the Secretary of State
21 or any other agency?
22     A.  I have no idea.
23     Q.  And so you mentioned money and the difficult
24 IT work that needed to be done as two of the --
25     A.  Well, there were -- there were a challenge

272

1  that needed to be done.  We needed to receive the
2  equipment.  We needed to configure the equipment and
3  the boxes that I talked about before.
4      Q.  Right.
5      A.  We had to physically bring the CSRs to Austin
6  and conduct a training class.  And then we dispatched
7  them to their home regions with the equipment in hand
8  after they had -- after they had inventoried it and
9  made sure that it all ran.
10     Q.  And was there ever any concern about which
11 would be the right places to receive equipment for
12 mobile EIC units?
13     A.  I don't understand what you're asking me.
14     Q.  Well, how were the places selected?
15     A.  The -- the locations for EIC operations were
16 selected based on that they were the 80 counties in the
17 state that didn't have driver license offices.
18     Q.  So what about the initial 25?  Maybe I'm
19 getting different phases confused.
20     A.  Okay.  So it's very easy, to my mind anyway.
21 Nobody else seems to --
22     Okay.  Phase 1 --
23     Q.  Uh-huh.
24     A.  -- Saturday opening.
25     Q.  So Phase 1 has nothing to do with mobile EIC

TONY RODRIGUEZ                                    5/8/2014

273

1  units?
2       A.  No, ma'am.
3       Q.  Is at the Saturday openings that we discussed
4  earlier?
5       A.  Yes.
6       Q.  Okay.
7       A.  Phase 2, 25 Secretary of State EIC mobile
8  units.
9       Q.  Okay.
10      A.  Phase 3 are the 80 county units -- about 80, I
11  think.  I can't remember exactly how many of them there
12  were.  So that allowed me to organize the operation
13  within my own mind.
14      Q.  And for my clarification, the 80 county units
15  are still considered mobile units?
16      A.  Well, yes, because -- because -- because of
17  the equipment that comprises the unit, yes.
18      Q.  But the -- those 80 units, are they themselves
19  ambulatory; or are they set up in one spot and they
20  stay in that spot in the county?
21      A.  You mean do they get up and walk around?
22      Q.  Do they get moved around?
23      A.  They can be moved to wherever the county
24  determines that they want to issue EICs.  If the county
25  wants to move them, then the county can do that,

274

1  because the units -- because the set -- the equipment
2  set they've been given enables them to do that; and
3  we've had counties ask about that.  The answer is, if
4  that's what you want to do, it's your equipment to use
5  for the time being.
6       Q.  So to your knowledge, of those 80 Phase 3
7  units, do the counties generally set them up in one --
8  in one spot in a courthouse, for example, and keep it
9  there; or do the counties sometimes take them outside
10  of a Target?
11      A.  Outside of a target.
12      Q.  A Target or a grocery store or to --
13      A.  Oh, you're talking about a store.
14      Q.  Yes.
15      A.  Sorry.  I'll be honest with you, I don't know
16  what the counties do with them.  I've never visited a
17  county to -- to see their EIC units.  It's just -- I
18  couldn't speculate on that.
19      Q.  Okay.  And to your knowledge, for the 25, the
20  Phase 2 --
21      A.  Uh-huh.
22      Q.  -- are those ones set up outside of shops and
23  places like that where people can go?
24      A.  So the -- the site selection for the Phase 2
25  units was given to us by the Secretary of State.

275

1       Q.  Okay.  And did you, DPS, have any role in the
2  site selection for those Phase 2 units?
3       A.  I'm trying to answer your question.  We could,
4  is the short answer.  The Secretary of State would tell
5  us to go to a given location -- and I'll use an
6  example.  123 Main Street, Val Verde, Texas -- and we
7  would send employees to that location and they would
8  make sure that the people at that location knew that we
9  were coming, okay, and that they had the -- the
10  infrastructure quote, unquote that we needed.  And the
11  infrastructure was a chair -- you know, chairs and a
12  table and a plug.  And once they had done that, then
13  that site -- we would go to that site.
14      Q.  Okay.  And for the 25, is it right that those
15  were manned by Secretary of State employees plus a DPS
16  employee, maybe?
17      A.  That's not an accurate statement, no.
18      Q.  Okay.  Who were they manned by?
19      A.  So the 25 Phase 2 units have up, until this
20  election cycle that we're currently in --
21      I -- it's possible that the Secretary of
22  State units might have some employees at one of those
23  25 -- with one of those 25 units but not during the --
24  not during the fall elections.  It was only after we
25  provided them with training.  I just don't know.

276

1       Q.  Okay.  Is it correct that the 80 county units
2  are manned by county employees?
3       A.  That's not correct.
4       Q.  Okay.  What is correct?
5       A.  What is correct is that the 55 units that
6  we've sent to the counties who have signed the MOUs and
7  who have received training are being crewed by county
8  employees.  The delta -- the difference between
9  whatever, 80 minus 55, is those are being maintained by
10  DPS.  We have control of those units.
11      Q.  Is the only difference between the 55 and the
12  remaining balance, that for the 55, those county
13  employees have been trained and have gone through that
14  and signed the MOU?
15      A.  Yes.
16      Q.  And for these three phases -- well, strike
17  that.  We've covered the time period associated with
18  Phase 1.
19      But can you let me know what the time
20  period is associated with Phase 2?  Are those ongoing?
21      A.  When I refer to those phases, it was during
22  the fall election that ended in November.  And the only
23  reason I did that is because we had a lot of moving
24  parts and because it allowed me to separate those
25  moving parts in my mind.  When I was talking to people,

TONY RODRIGUEZ                                            5/8/2014

70 (Pages 277 to 280)

---

277

1  I would -- I would refer to things as Phase 1, Phase 2,
2  Phase 3, because that's been my experience.  And it was
3  also how I wanted to get all of our employees on the
4  same sheet of music, so to speak, so they would
5  understand.  That way we get away from the mobile light
6  colloquialism.
7       Q.  Are the Phase 2 units still out there?
8       A.  The Phase 2 units are currently still being
9  used, yes.
10      Q.  Are they still in the same places where they
11 started?
12      A.  I --
13          MR. KEISTER:  Objection, vague.
14          THE WITNESS:  I don't know.  I mean,
15 they're in the field.  Okay.  They've -- Steve Bell
16 keeps track of which -- specifically which units are
17 where.  So the broad answer is yes, they're still out
18 in the field; but I can't give you granularity on which
19 units and which office.
20      Q.  And the Phase 3 units, when did those start
21 being operated, approximately?
22      A.  I don't recall.  I believe it was -- it was
23 associated with the same constitutional election.  I
24 believe we had Phase 1, 2, and 3; and they were running
25 concurrently.

---

278

1       Q.  Okay.  Is it correct that Phase 3 units are
2  still operating now?
3       A.  That's an accurate statement, yes.
4       Q.  That was the clearest description of phases?
5       A.  That's what --
6       Q.  I appreciate that.
7       A.  That's what I've been told.
8       Q.  Thank you.
9           You've been -- you've been kicking that
10 one around for some time.
11      A.  All it did is it -- because we had a lot of
12 things that were going on, it allowed me to
13 intellectually separate things that were happening so
14 that when I was talking to certain people about certain
15 things, I can say, "Well, that's a Phase 1 issue."  Got
16 that.  Because we would have different issues on
17 different phases.  And then within the Army lexicon is
18 a that phases can run concurrently.  They can overlap,
19 or they could be sequential.  In this case, they all
20 overlapped; so that's --
21      Q.  Thank you.  We appreciate that.
22      A.  Just to be clear, is that we're no longer
23 referring to any phases during our current election
24 cycle.
25      Q.  Okay.

---

279

1       A.  Okay.
2       Q.  When did phases get phased out?
3       A.  I'm sorry.  We stopped referring to things in
4  phases at the November election, whenever that was.  It
5  was, what, the 11th or the 12th, I believe.  Once we
6  stopped that initial constitutional election, that was
7  the end of it because we didn't need to.  We just
8  had -- all we had were EIC units that were in the
9  counties; and everything else we didn't need to
10 separate things in people's minds.
11      Q.  Okay.  I will hand you Exhibit 92.
12          (Exhibit No. 92 marked.)
13          THE WITNESS:  Thank you very much.
14      Q.  (BY MS. KORGAONKAR)  This exhibit is Bates
15 marked TEX-0511208 to 209.  And let me know when you've
16 had a minute to review.
17      A.  Okay.
18      Q.  So I wanted to turn your attention to the
19 initial e-mail in the chain, which is dated
20 September 24th, 2013, from 3:18 p.m.?
21      A.  Yes.
22      Q.  It's an e-mail from you.
23      A.  Uh-huh.
24      Q.  The subject is "Rumor control election
25 certificates," and it's been designated with an

---

280

1  importance level of high.  In the first sentence you
2  write, "Managers, I'm trying to control some rumors.
3  There's a change in the way we will do EIC operations
4  that will impact your regions."
5           So I just wanted to know, first of all,
6  what the rumors are, as you recall them.
7       A.  I'm sorry.  I can't recall anything right now.
8       Q.  Okay.  And does reading the rest of the chain
9  maybe refresh your recollection?
10      A.  Well, let's see.  (Witness reading.)
11          Only that it must deal with something
12 with county units and these counties.  Although I would
13 like to point out that previously I told you there were
14 78 counties.  Okay?  And this here says 79.  In
15 reality, Kimball County had opened an office right
16 around this time period.  So there was some minor
17 confusion whether Kimball was a county with a driver
18 license or not; and some people thought it was and
19 thought it wasn't.  Kimball County has an office in
20 there.  It's not counted as one of the 78.
21      Q.  Understood.  So with respect to the rumors?
22      A.  All I can -- the only illumination I can give
23 you is that it must -- it must have had something to do
24 with -- with these mobile units.
25      Q.  And your next sentence, "There's a change in

---

TONY RODRIGUEZ                                          5/8/2014

71 (Pages 281 to 284)

---

281

1  the way we'll do EIC operations that will impact your
2  regions."
3      A.  Yes.
4      Q.  What was that change?
5      A.  The changes as loaded out -- as below.  So
6  your facilitators and assistant manager will need to be
7  trained by ITS -- stands for Innovation and Tech
8  Solutions, people on the new EIC system for the new
9  computers.  So all that -- all that deals with is that
10 we're going to get the 79 Phase 3, 78 Phase 3 county
11 units; and we're going to shift the responsibility for
12 training.  We're going to have distributed training.
13     Q.  What is "distributed training"?
14     A.  Distributed training is that we're telling the
15 facilitator, who is an employee who is a resident in a
16 county -- or I'm sorry -- a DPS region that they're
17 responsible to train the county -- the county
18 employees.  So we'll provide the training to the
19 facilitator, and the facilitator will provide the
20 training to the County.  What that allows us to do is
21 to train much faster.
22     Q.  And is it correct that previously everyone
23 getting trained would have been trained here in Austin?
24     A.  It is, but only when you -- but in order to --
25 in order for that -- you have to understand that prior

---

282

1  to this the only people that we had trained were DPS
2  employees.  So Phase 2, we had a new system.  We
3  brought the people who were going to operate the
4  system, and we conduct the training in a central
5  location.  Okay?  This is Phase 3 now; and since there
6  are a large number of counties that will receive
7  training in a distributed manner, it made more sense
8  for us to go ahead and train the trainer.
9      Q.  Okay.  And what was the difference in the --
10 in the two computer systems, the old one versus the new
11 one, as of this date?
12     A.  When I refer to the new computers, it's merely
13 that they're -- that they're computers that were
14 purchased.  There should be -- and to the best of my
15 knowledge, the laptops that we purchased to send out
16 for Phase 2 and for Phase 3 were the same model of Dell
17 or whatever they were.  So when I say -- when I refer
18 to "new computers," it's not a new computer system.
19 It's merely that we've purchase a new computer.
20     Q.  Okay.  I have another document.
21         (Exhibit No. 93 marked.)
22     Q.  (BY MS. KORGAONKAR)  So Exhibit 93 is Bates
23 stamped TEX-0511590 through 591.
24     A.  Okay.
25     Q.  Okay.  Do you recognize this e-mail?

---

283

1      A.  Yes.
2      Q.  What is it?
3      A.  Going from the bottom up, this is an e-mail
4  that my counterpart, Steve Bell, sent out; and he sent
5  it to the regional managers for regions 1 and 2.  And
6  it just says that we're going to set up these 25 units.
7  And then later on in the e-mail, there's some other
8  information from a guy named -- DPS employee named Bob
9  Meyers.  Bob Meyers is one of our training people, and
10 he provides the -- the -- some -- some specifics for
11 training, when we're going to do the training.
12         And then the very top is from Deborah
13 Pitzer.  Deborah Pitzer is an assistant manager in
14 Region 1B, and she just provides the names of the
15 employees who are going to travel to Austin and receive
16 the training.
17     Q.  And at this time period, with this --
18     A.  September.
19     Q.  -- the end of September --
20     A.  Yes.
21     Q.  -- do you know how many EICs were being
22 processed at that point?
23     A.  I don't know.
24     Q.  And I just wanted to ask you a question about
25 the first e-mail -- the first sentence, rather, in

---

284

1  Mr. Bell's initial e-mail.
2      A.  Yes.
3      Q.  He writes, "We are going to be required by the
4  Secretary of State's office to deploy up to 25 mobile
5  light EIC units."
6         My question about this sentence is, he
7  has stated "required by the Secretary of State's
8  office."  Is that how DPS understood the -- the chain
9  of command when it came to the 25 units in September?
10     A.  You have to understand Steve Bell.  Steve Bell
11 is a retired non-commissioned officer.  He's got four
12 tours of combat.  That's how Steve Bell talks and
13 writes.  We all talk about things that are required.
14 So if I were to go home, I would be required to bring
15 things for my wife.  That's just how we talk.
16     Q.  But what did the Secretary of State, in fact,
17 require DPS to -- to work with the Secretary of State
18 on the 25 mobile units?
19     A.  We did work with the Secretary of State and we
20 knew that we were going to have to provide some sort of
21 coverage in these counties.  I think you're paying an
22 inordinate amount of attention to the word
23 "requirement," and I think that you and I have a
24 different view of what the word "required" means.
25         But we were -- it was -- that was what we

---

TONY RODRIGUEZ                                                    5/8/2014

---

285

1  were told to do, so that's what we did.  And we were
2  told by our chain of command.  I don't know how Steve
3  wrote that.  I wasn't a party to this e-mail except
4  that I received it am some point.
5      Q.  Well, I'll put it differently.
6      A.  Please.
7      Q.  Did DPS have any discretion?  Could DPS have
8  said," We actually don't want to work on these 25
9  mobile units with you"?
10     A.  Wow.  I don't think DPS had that kind of
11 discretion.
12     Q.  Okay.
13     A.  That was -- that's we were asked to do, and
14 that's what we did.
15     Q.  So to date, do you know how many EICs have
16 been applied for?
17     A.  Yes.
18     Q.  How many?
19     A.  As of the 5th of May, 271.
20     Q.  As of May 5th.
21     A.  As of the 5th of May.
22     Q.  Do you know how many have been issued?
23     A.  252, as of the 5th of May.
24     Q.  And those are totals statewide?
25     A.  That's correct.

---

286

1      Q.  And that's -- those figures, 271 applications,
2  and 252 issued?
3      A.  Yes.
4      Q.  Is in the entirety of EIC's existence?
5      A.  That's every EIC we ever issued.
6      Q.  Okay.
7      A.  252 is every EIC we've issued.
8      Q.  Okay.  So earlier, I think when Ms. Maranzano
9  was wrapping up with you, she asked whether your --
10 whether you felt that the success of the EICs were
11 related to the number of those issued.
12         Do you remember?
13     A.  I remember some discussion.  I don't remember
14 exactly what the question was.
15     Q.  So I -- my recollection is that the question
16 had generally been whether the success of the EIC
17 program was related to the number of EICs that had been
18 issued by the state.
19     A.  Okay.
20     Q.  And your testimony was basically that that was
21 not correct, that the success wouldn't be based on the
22 number of EICs issued.
23     A.  The success of the program does not -- gauging
24 duck success as a metric for the program does not hinge
25 on the number of documents issued.

---

287

1      Q.  So if, hypothetically, zero EICs had been
2  issued, could the program still have been successful?
3      A.  Well, I suppose so.  We provided a service.
4  We were asked to provide a service.  We provided a
5  service across the State on Texas.  We provided an
6  opportunity for Texans to come and -- come to an office
7  or come to a mobile site to -- to get a document that
8  they felt they required in order to vote.
9      Q.  Okay.  Do you have any sense of how many
10 people in Texas do not have any of the forms of ID
11 required by the voter ID law?
12     A.  I have no sense of that.
13         (Exhibit No. 94 marked.)
14     Q.  (BY MS. KORGAONKAR) Exhibit 94 is Bates
15 marked TEX-511199 through 5119200.
16     A.  Okay.
17     Q.  Do you recognize this document?
18     A.  Hang on a second.  Yes.
19     Q.  And is it entitled "EIC meeting minutes,
20 9/25"?
21     A.  Yes, it is.
22     Q.  Sent on September 25th, 2013?
23     A.  That's correct.
24     Q.  I just wanted to direct your attention to the
25 two final bullet points under the heading "Status of

---

288

1  EIC initiative in progress."
2      A.  I see them.
3      Q.  The final bullet point, could you read that
4  aloud, the one that starts, "Voters without"?
5      A.  "The voters without who photo ID cast provisional
6  ballots.  They'll have six days under law to return to
7  a DL office with photo ID to make their vote count."
8      Q.  Is that your understanding of how provisional
9  ballots work?
10     A.  Well, I'm not an election official.  That's
11 how I understand it to work.
12     Q.  Okay.  And the previous bullet point, if you
13 could read that out loud.
14     A.  Sure.  Starts with the word "anticipate"?
15     Q.  That's right.
16     A.  "Anticipate keeping the equipment for a week
17 after the election because of provisional ballots."
18     Q.  Can you help me understand what that -- what
19 that means?
20     A.  Yes.  So we, DPS, were under the impression --
21 and we wanted to be able to -- to provide the
22 opportunity for people to get their EIC during what's
23 called a cure period, which is a period that I
24 understand, as a layman, to be after the vote; but
25 there's a period of time when people who, for whatever

---

TONY RODRIGUEZ                                                    5/8/2014

73 (Pages 289 to 292)

289

1   reason, they cast that provisional ballot, they may
2   come in and then they can prove -- they can show their
3   EIC.  So we wanted to make sure that we extended our
4   operations to enable Texans to do that.
5        Q.   Okay.  Thank you.
6             And one other quick question.  Under the
7   heading "Documentation."
8        A.   Give me a second.
9        Q.   Sure.
10       A.   Yes.
11       Q.   In the middle bullet, it reads, "Tiffany and
12  Andrea working to complete process for exceptions
13  path" -- or exception "paths," rather.
14       A.   Yes.
15       Q.   What are exception paths?
16       A.   I have no clue.  That's outside my area.
17       Q.   Then on the next page, under "Considerations,"
18  the third bullet point.
19       A.   Brian Lane?
20       Q.   Exactly.  If you could read that aloud.
21       A.   Brian Lane is having discussions with SOS
22  office about security requirements for non-DPS people
23  gathering EIC data, parens, background checks, comma,
24  training, closed parens.
25       Q.   Can you help me understand what that one

290

1   means?
2        A.   Sure.  Brian Lane, I think he's a deputy
3   assistant director.  He's in IT, no matter what his
4   rank is.  So what this appears to me that Brian Lane is
5   talking with -- about the security requirements to
6   allow DPS people to gather information.
7        Q.   Okay.
8        A.   And so because -- because we have people who
9   are who are not DPS employees who are interacting with
10  customers.
11       Q.   Okay.  So this is about background checks for
12  state employees who would be working on issuance of the
13  EICs?
14       A.   That's correct, yeah.  Yes.
15            MS. KORGAONKAR:  Off the record for just
16  a minute.
17            (Exhibit No. 95 marked.)
18       Q.   (BY MS. KORGAONKAR) I'm handing you Exhibit
19  95.
20       A.   Yes, ma'am.
21       Q.   The exhibit is marked TEX-0511902 through 905.
22  If you would take just a minute to review it.
23       A.   Okay.
24       Q.   In e-mail from Stephen Bell to a group of
25  people --

291

1        A.   On the very top?
2        Q.   The one at 4:50 p.m., the second one on the
3   first page.
4             Mr. Bell writes, "We are trying to rework
5   the hours from 8:00 to 5:00" --
6        A.   Wait.  Wait.
7             MR. KEISTER:  Down here (indicating).
8   She said at the end of the paragraph.
9             THE WITNESS:  Oh, I'm sorry.  I was
10  looking at the top one because they both have 4:50 time
11  stamp.
12       Q.   (BY MS. KORGAONKAR) I'm sorry.
13       A.   It's okay.  It's fine.  We're good.
14       Q.   Mr. Bell writes, "We are trying to rework the
15  hours from 8:00 to 5:00 to 9:00 to 4:00 for any future
16  deployments."
17       A.   Yes.
18       Q.   Why was he trying to rework the hours?
19       A.   That takes into consideration the travel time
20  for the employee to get from wherever they draw the
21  equipment from to the site for EIC issuance.  And then
22  at the conclusion of the day -- because as I mentioned
23  before, these are stand-alone units and they have no
24  other connectivity, all of the information is placed
25  onto USB drive and then the employee has to go back to

292

1   the office and transfer the information from the
2   computer hard drive onto the USB into driver license
3   systems.  And so that what he's doing is this takes
4   into consideration the administrative time on either
5   end of the operation.
6        Q.   Were those hours reworked as he's described
7   here?
8        A.   To the best of my knowledge, yes.  I believe
9   9:00 to 4:00 became standard.
10       Q.   Okay.
11            (Exhibit No. 96 marked.)
12       Q.   (BY MS. KORGAONKAR) Exhibit 96 is Bates
13  marked TEX-00462497 --
14       A.   Yes.
15       Q.   -- through 499.
16       A.   Yes.
17       Q.   If you could just take a moment.
18       A.   Okay.
19       Q.   And I wanted to direct your attention to the
20  e-mail on the page marked 462498, the second page.
21       A.   Yes.
22       Q.   In the middle at 10:24 a.m.
23       A.   Wroe Jackson.
24       Q.   Yes, from Wroe Jackson to you.
25       A.   Okay.

TONY RODRIGUEZ                                                    5/8/2014

74 (Pages 293 to 296)

293

1    Q.  If you could read that e-mail.
2    A.  "Thank you, Keith has already contacted them
3    to request the change in hours from 9:00 a.m. to
4    4:00 p.m. with one day available for off-business hours
5    as we discussed."
6    Q.  So who made the request to change the hours
7    from 9:00 a.m. to 4:00 p.m.?
8    A.  As near as I can determine, they did.
9    Q.  Who is "they"?
10   A.  I don't know.
11   Q.  In the e-mail below that stems from you on
12   October 2nd at 10:20 a.m. --
13   A.  Yes.
14   Q.  -- can you read the second sentence?
15   A.  "While the requested times are from 1100 to
16   1900," which is 7:00 p.m. -- "the Secretary of State or
17   sec state is working to see if we can change the
18   hours."
19   Q.  Why was the Secretary of State working to see
20   if the hours could be changed?
21   A.  Off the top of my head, I don't know.  I could
22   speculate.
23   Q.  Well, did the request to change the hours come
24   from DPS, based on these e-mails?
25   A.  Possibly.

294

1    Q.  Why did DPS ask that the hours be changed?
2    A.  Why would we want the hours changed, if that's
3    what we asked for?  Simply because 7 o'clock at night
4    is awfully late for us to keep employees working.
5    Q.  I just want to point out on the e-mail that
6    you sent at 10:53 a.m., it starts on the first page and
7    ends on the second.
8    A.  Yes.
9    Q.  "Okay.  Do we know which day yet?  No
10   pressure.  I'm just asking."
11       Does that refresh your recollection as to
12   whether it was also you or DPS that asked that the
13   hours be changed?
14   A.  Not really.  Hang on a second.  Possibly.
15   Q.  Okay.
16       (Exhibit 97 marked.)
17   Q.  (BY MS. KORGAONKAR)  Exhibit 97 is Bates
18   marked TEX-00462079.
19   A.  I see it.
20   Q.  If you could just take a minute to read the
21   chain.
22   A.  Okay.  (Witness reading.)
23   Q.  In the chain --
24   A.  Hang on.
25   Q.  Sorry.

295

1    A.  Okay.  I'm sorry.
2    Q.  Okay.  So this chain discusses mobile EIC
3    units for Hays County; is that right?
4    A.  Yes.
5    Q.  So you'll see in the e-mail from Keith Ingram
6    to Joyce Cowan, September 24th, 2013, at 3:52 p.m.,
7    Mr. Ingram states --
8    A.  3:52?
9    Q.  3:52.  I apologize.
10   A.  Okay.  "Excellent"?  Okay.
11   Q.  He writes, "Excellent.  The times are
12   basically up to you.  We think during business hours is
13   better."
14       Is it DPS's position that during business
15   hours is a better time for mobile EIC units as well?
16   A.  Well, we -- for -- because of our employees,
17   we prefer to issue the EICs during business hours.
18   That's what we do everywhere else in the state.
19   Q.  And with respect to the actual citizens who
20   would be applying for them, does DPS have a position as
21   to whether business hours or non-business hours would
22   be better for those people?
23   A.  Well, we're not open during non-business
24   hours.  Our business hours are established, as I talked
25   about somewhere here.

296

1    Q.  Right.  So I understand that.  My question --
2    A.  Okay.
3    Q.  -- is a little bit different.  I understand
4    that you just stated that during business hours is much
5    better for DPS employees because, obviously, those are
6    the hours that they generally work.
7    A.  Yes.
8    Q.  Right?
9        Has DPS ever considered whether business
10   hours also work better for people who would be going to
11   use mobile EIC units?
12   A.  Not to my knowledge.
13   Q.  Okay.  Did DPS request that Mr. Ingram relay
14   this message to Hays County that business hours are
15   better?
16   A.  I don't recall.  I -- without seeing more, I
17   don't -- I don't know.
18   Q.  So just to clarify, your testimony is that you
19   don't recall whether this statement from Mr. Ingram
20   was, in fact, relayed from DPS to Hays County through
21   him?
22   A.  No.
23   Q.  Okay.
24       (Exhibit 98 marked.)
25   Q.  (BY MS. KORGAONKAR)  This is Exhibit 98.

TONY RODRIGUEZ                                                    5/8/2014

                                                    75 (Pages 297 to 300)

297

1    A.  Okay.
2    Q.  If you could just take a minute.  Exhibit 98
3    is Bates marked TEX-511238 through 239.
4    A.  Yes.
5    Q.  Okay.  So this exchange concerns Sabine
6    County's EIC participation; is that right?
7    A.  Yes.
8    Q.  So in it a Kathy Bergman from DPS has sent to
9    Janice McDaniel of Sabine County some information about
10   EIC training; is that right?
11          That's found at the e-mail from 3:20 p.m.
12   A.  From when?
13   Q.  3:20 p.m.
14   A.  3:20 p.m.
15   Q.  On the first page.  It's confusing 'cause it's
16   a little squished together.
17   A.  I'm not sure I'm looking at the same thing
18   you're looking at.  Oh, I see it.  I see it.  I see it.
19   Okay.  I'm sorry.  So --
20   Q.  So do you agree that Kathy Bergman is relaying
21   information here to Janice McDaniel of Sabine County
22   and that that information is about EIC training?
23   A.  Yes, that's what it appears to be.
24   Q.  And then Janice McDaniel has written back to
25   Ms. Bergman.

298

1    A.  Yes.
2    At 10:26 a.m.
3    A.  I see that, yeah.
4    Q.  Could you read that e-mail?
5    A.  "Ms. Bergman, Judge Watson and I have
6    discussed the EIC participation; and we don't feel we
7    have the staff to commit to this.  I am short an
8    employee, plus I have early voting starting next
9    Monday.  Thank you, Janice McNeil, Sabine County
10   Clerk."
11   Q.  And then at noon that same day, it looks as
12   though Ms. Bergman forwarded this e-mail exchange to
13   you, to Kristopher Krueger, and a number of other
14   people; is that right?
15   A.  That's -- yes.
16   Q.  What was DPS's reaction to Sabine County's
17   inability to participate because of resource issues?
18   A.  So there were resource issues on the part of
19   the county.
20   Q.  Correct.
21   A.  Okay.  Well, that was -- that's Sabine
22   County's decision to make.  They still haven't been
23   trained.
24   Q.  And are there a number of other counties that
25   couldn't participate in the program because of a lack

299

1    of resources?
2          MR. KEISTER:  Object to form, calls for
3    speculation.
4          Go ahead.
5          THE WITNESS:  Yes.
6    Q.  (BY MS. KORGAONKAR)  Do you know approximately
7    how many?
8    A.  Approximately 17.
9    Q.  And did DPS follow-up with Sabine County after
10   this e-mail exchange to see whether there was a way
11   that DPS could offer any resources or try to help the
12   county fill the gap in a different way?
13   A.  DPS has reached out to Sabine County on a
14   number of occasions and offered to provide them with a
15   mobile EIC training and the equipment.  Sabine County
16   has declined to do that.
17   Q.  Because of the staff resource issue?
18   A.  Because of the -- because of the source issue,
19   they have here.  So Sabine County is currently being
20   serviced by HHSC.
21   Q.  So did -- is it correct that DPS never reached
22   back out to Sabine County to try to help fill the staff
23   shortage?
24   A.  Did DPS reach out to the county to fill a
25   county employee staff shortage, is that your question?

300

1    Q.  It's little bit different.  So Sabine County
2    writes back to Ms. Bergman and says, "We want to
3    participate, but we can't because I don't have enough
4    staff to do it."
5    A.  Yes.
6    Q.  And my question is:  Did DPS e-mail or reach
7    back out to Sabine County and say, "How can we help you
8    with that staff problem in order to get this EIC mobile
9    unit up and running?"
10   A.  No.
11   Q.  And for the other counties, I think you said
12   there were about 17 that couldn't participate because
13   of various resource issues.  Did DPS --
14   A.  Various issues.
15   Q.  Okay.  So how many couldn't participate
16   because of resource issues?
17   A.  I don't know.
18          MR. KEISTER:  Objection, calls for
19   speculation.
20   Q.  (BY MS. KORGAONKAR)  So it's subset of the 17.
21   Is that fair to say?
22          MR. KEISTER:  Speculation.
23          THE WITNESS:  Possibly.
24   Q.  (BY MS. KORGAONKAR)  Did DPS ever offer to
25   help counties that had resource problems when it came

TONY RODRIGUEZ                                            5/8/2014

---

301

1  to EIC availability?
2      A.  I don't understand.  You used the term "help."
3  Can you define that, or can you rephrase the question?
4      Q.  Sure.
5          So is it fair to say that a number of
6  counties didn't have enough staff to be able to
7  participate in the EIC program?
8          MR. KEISTER:  Objection, calls for
9  speculation.
10         THE WITNESS:  I can't answer that.  I
11 don't know.
12     Q.  (BY MS. KORGAONKAR)  Is there anyone at DPS
13 who would know?
14     A.  No.
15     Q.  So then how does DPS know why counties can't
16 participate if no one at DPS knows why they can't
17 participate?
18     A.  The county just either doesn't return the MOU
19 or doesn't accept the training or just says they're not
20 interested.
21     Q.  But DPS has received a number of e-mails from
22 counties stating that they don't have enough space or
23 money in the budget or staff to be able to participate;
24 is that not right?
25     A.  DPS has received e-mail or communication from

---

302

1  some counties, yes.
2      Q.  So in response to those e-mails that DPS has
3  received, has DPS ever tried to work with those
4  counties to address whatever the limiting reactant is
5  and to try to enable that county to, in fact, be able
6  to issue EICs?
7      A.  To enable the county to issue EICs?
8      Q.  To enable the citizens in the county to apply
9  for EICs within the county.
10     A.  Yes.
11     Q.  And how has DPS done that?
12     A.  DPS sends mobile teams to those county that
13 have not entered into the MOU, and we issue the EICs at
14 mobile location in those counties.
15     Q.  Has DPS been able to do that with all such
16 counties?
17     A.  Yes.
18         THE REPORTER:  This is Exhibit 100.
19         (Discussion off the record.)
20         THE REPORTER:  This is Exhibit 99.
21         (Exhibit No. 99 marked.)
22     Q.  (BY MS. KORGAONKAR)  So Exhibit 99 is Bates
23 marked TEX-0511298 through 299.
24     A.  Yes.
25     Q.  Let's take a moment, and let me know when

---

303

1  you're ready.
2      A.  (Witness reading.)
3          Okay.
4      Q.  This is an e-mail exchange between you and a
5  Ms. Lyndie Madden-Warren of Trinity County; is that
6  right?
7      A.  Yes.
8      Q.  And it looks as though she's the tax assessor
9  and the voter registrar from her signature; is that
10 accurate?
11     A.  Tax assessor/collector, yes.
12     Q.  Okay.  In her 9/01 e-mail to you, Ms. Warren
13 writes, "After the initial e-mail regarding this pilot
14 program, I responded because our county does not have a
15 licensing department for driver's licenses."
16         And then later in the e-mail she states,
17 "Trinity County is a small county; and in turn, I have
18 a small staff to provide service that we already
19 offer."
20         Is that right?
21     A.  That's what it says, yes.
22     Q.  Okay.  And then in your response to her at
23 9:47 a.m., you explain two different programs being run
24 by the Department of Public Safety.  And then you
25 state, "We will remove Trinity County from the list.

---

304

1  If you have any further questions, please don't
2  hesitate to contact me again"; is that right?
3      A.  That's right.
4      Q.  Beyond this e-mail, did DPS offer any further
5  assistant to Trinity County with respect to the mobile
6  EIC program?
7      A.  We may have conducted EIC mobile operations in
8  Trinity County, although my reference indicates that
9  Trinity County has signed the MOU, returned -- or
10 received their training, and their equipment is
11 currently operational as of 5 May.
12     Q.  Okay.  But that would have likely occurred
13 after this exchange at some point?
14     A.  That's correct.
15     Q.  Do you know at what point that occurred?  Can
16 you tell me?
17     A.  No.
18     Q.  Okay.  What do people in counties like Trinity
19 County that don't have licensing departments do to
20 apply for any other forms of DPS ID?  If you need a
21 license and you live in Trinity County, what do you do?
22     A.  They travel to a location where they can get
23 one.
24     Q.  Do you know where the closest location is to
25 Trinity County where someone could get one?

---

TONY RODRIGUEZ                                                5/8/2014

---

305

1    A.  I would have to reference our website.
2    Q.  And your response would be the same with
3  respect to personal identification cards as well,
4  right?
5    A.  Driver's license or Texas identification
6  cards, that's correct.
7    Q.  In general, when it comes to counties that
8  decline to participate in the program, what were the
9  reasons generally offered by those counties?
10    A.  The reasons could be varied.  I've had
11  conversations with the County judge that said the
12  sheriff is the election official, and I can't make him
13  do it.  I've -- we've had exchanges with counties that
14  say they don't have the personnel or the -- or the
15  resources to do that.  And some of them don't offer us
16  any answer at all.
17    Q.  Okay.  And are these counties generally
18  comparatively poor counties?
19    A.  I don't know.
20    Q.  Are they generally located in specific regions
21  of the state?
22    A.  Specific regions?
23    Q.  Are they concentrated in certain regions of
24  the state?
25    A.  Those counties are -- please clarify which

---

306

1  counties you're talking about in order for me to answer
2  your question.
3    Q.  The counties that declined to participate in
4  the program.
5    A.  Yes.
6    Q.  In general, are those distributed evenly
7  throughout the State; or are they concentrated in
8  certain regions of the State?
9    A.  By way -- to answer your question, I would say
10  that they're scattered.  They're across the State.
11    Q.  Would you say it's a fairly even distribution
12  throughout the state?
13    A.  I would have to --
14       MR. KEISTER:  Objection, vague.
15       THE WITNESS:  I would say no.
16    Q.  (BY MS. KORGAONKAR)  So if it's not a fairly
17  even distribution.  In general, terms where are they
18  concentrated?
19    A.  The panhandle.
20    Q.  Do you have any sense as to why that would be?
21    A.  No.
22       (Exhibit No. 100 marked.)
23       (Discussion of the record.)
24    Q.  (BY MS. KORGAONKAR)  This exhibit is Bates
25  stamped TEX-00462181 through 2184.

---

307

1    A.  Yes.
2    Q.  Let me know when you have had a moment to
3  review.
4    A.  (Witness reading.)
5       Okay.
6    Q.  So this e-mail chain is initiated by the
7  Dallas County Elections Department, and it concerns
8  that county's request to work with DPS on a mobile
9  voter ID initiative; is that right?
10    A.  That's the subject, yes.
11    Q.  And is that generally the content of the
12  exchange as well?
13    A.  Yes.
14    Q.  Okay.  I want to direct your attention to the
15  e-mail located at Page 462182, which is the second page
16  of the packet.
17    A.  Yes.
18    Q.  And it's an e-mail that you sent Tuesday,
19  September 10th at 7:29 p.m.
20    A.  Yes.
21    Q.  Okay.  Could you read that e-mail?
22    A.  It says mission creep.  These folks would like
23  our DSUs at locations other than offices, semicolon,
24  quote, appropriate public and private events, unquote,
25  like state fairs to issue EICs.  I'm not sure who would

---

308

1  like -- who would we like to reach out to them.
2    Q.  What does "mission creep" mean?
3    A.  Mission Creep is a colloquialism.  We used it
4  just to describe a change in mission in a dynamic
5  environment.
6    Q.  What does -- what does "creep" mean in the
7  context of mission creep?  I understand the mission.
8    A.  It's the evolution -- it's the evolution of a
9  mission.
10    Q.  Does it mean that a mission is growing, like,
11  creeping like a vine, for example?
12    A.  It could, or it could mean that the mission is
13  changing in terms of what we've been asked to do.
14    Q.  Does it have any kind of connotation --
15    A.  It's a statement.
16    Q.  -- to you?
17    A.  Not to me.  It's a statement.
18    Q.  Do you see how it could have a negative
19  connotation?
20    A.  No.
21    Q.  Okay.  And what are DSUs?
22    A.  Disaster support units.
23    Q.  Those are the six units that you mentioned
24  earlier?
25    A.  That's right.  And you have to understand when

---

TONY RODRIGUEZ                                                    5/8/2014

78 (Pages 309 to 312)

---

309

1  this e-mail was sent in relation to the information
2  that I provided you earlier, what they would ask for
3  was those six disaster support units.  And I would have
4  to look and see when we constituted the 25 units to
5  satisfy the mobile requirement.
6      Q.  Okay.  Since your -- it's your -- I just want
7  to be clear.  Your testimony is that mission creep has
8  no negative connotation whatsoever?
9      A.  Not to me.
10     Q.  Okay.
11         MS. KORGAONKAR:  Let's take a final
12  break, and then I think we'll be done shortly.
13         THE REPORTER:  Off the record.
14         (Recess from 5:43 p.m. to 5:51 p.m.)
15         THE REPORTER:  Back on the record.
16     Q.  (BY MS. KORGAONKAR)  So you stated earlier
17  that HHSC employees are being trained --
18     A.  Yes, I did.
19     Q.  -- in certain counties to issue EICs; is that
20  right?
21     A.  That's what I said, yes.
22     Q.  When was it decided that those employees would
23  accept the EIC applications?
24     A.  To the best of my recollection, it was
25  sometime in February or March, sometime in that time

---

310

1  period.  It may have been as early as January.  I
2  honestly can't recall.
3      Q.  And whose decision was it?
4      A.  Well, whoever is in charge of HHSC.
5      Q.  What type of HHSC employees are being trained?
6      A.  I don't understand their structure or the
7  proper titles of the employees.  Based on my discussion
8  with -- with the gentleman who have I have been working
9  with at HHSC, I'm given to understand that their HHSC
10  employees whose duty station is -- is one of those
11  seven counties that they're going to work in.  And I
12  know that one of them is a registered nurse.  But other
13  than that, I don't exactly why they do.
14     Q.  Okay.  And do you know what type of presence
15  HHSC has in counties where it's issuing EICs in those
16  seven counties?
17     A.  Over and above the one or two people that I've
18  been made aware of or I might be a party on e-mails
19  that might be in a certain county, no.
20     Q.  So you don't know really know what they have
21  in those counties, what kind of presence, how many
22  employees?
23     A.  No.  I have a hard enough time keeping track
24  with DPS stuff.
25     Q.  Okay.  And has DPS provided training to those

---

311

1  employees who will be accepting the applications?
2      A.  Yes.
3      Q.  What kind of training?
4      A.  It's training that's similar to the training
5  that we've provided to the county employees to
6  familiarize the HHSC employee with everything that he
7  or she would need to know in order to issue an election
8  certificate.
9      Q.  Okay.  And was -- was that training provided
10  from Austin, or was it provided by a regional manager
11  or regional commander?
12     A.  The training to HHSC employees was provided by
13  a DPS employee, and we refer to those DPS employees as
14  facilitators.
15     Q.  Okay.  And has any notice gone out to the
16  public at large concerning EIC availability from HHSC
17  offices?
18     A.  I'm unaware.  I don't know.
19     Q.  And you don't know whether DPS has issued any
20  kind of notices to that effect?
21     A.  No, ma'am, I don't.
22     Q.  Do you know whether any of the HHSC office
23  that will be accepting EIC applications are also able
24  to provide certified copies of birth records?
25     A.  I don't know what other services HHSC provides

---

312

1  in their offices.
2      Q.  And how many -- strike.
3          It's HHSC offices; is that right?
4      A.  Yes.  It's -- it's seven -- it's HHSC offices
5  in seven counties.
6      Q.  Okay.  Thank you.
7      A.  I don't know how many offices they are.
8      Q.  Okay.  Understood.  Thank you.
9          Is DPS currently using all of the
10  equipment that it has purchased to facilitate the
11  remote acceptance of EIC applications?
12     A.  All of what equipment?
13     Q.  All of the equipment that you would have
14  mentioned earlier that goes with mobile EIC stations'
15  all of the printers, computers, cables, blue screens.
16     A.  So --
17     Q.  Cameras.
18     A.  I understand your question to be:  Did we
19  break it apart?
20     Q.  No.  The question --
21     A.  Okay.
22     Q.  -- is all -- of all of those pieces of
23  equipment that was purchased for the purpose of using
24  the mobile EIC stations, is every piece of equipment in
25  use currently?

---

TONY RODRIGUEZ                                          5/8/2014

79 (Pages 313 to 316)

313

1    A.  Every piece of equipment that was purchased --
2    and again, I don't know who actually paid for it --
3    that was configured into an EIC set remains in the EIC
4    set, except for the bench stock that I mentioned
5    before, which is used for testing.
6        Q.  Okay.  So are there any -- was any equipment
7    purchased that was not configured?
8        A.  I don't believe so, no.
9        Q.  Okay.  And are all of the configured kits
10   being used right now throughout the State somewhere to
11   accept mobile EIC applications?
12       A.  I don't believe so, no.
13       Q.  Do you have an estimate about how many kits
14   might be unused at this moment?
15       A.  I don't -- I don't know.  I know -- I know
16   that -- that some of those kits are being used by
17   employees and -- and that there's a schedule for those
18   kits to be deployed to sites to issue EICs.  I know
19   that we have issued 55 of those kits to counties, and I
20   know that we're in the -- somewhere in the process of
21   issuing up to seven of those kits to HHSC; but I can't
22   provide you the granularity of which kit's being
23   currently used, which kit was used today, or which kit
24   was used tomorrow.
25       Q.  So for the kits that you mentioned, there are

314

1    employees using right now, what are they using them
2    for?
3        A.  Well, we're currently issuing EICs.  Well, not
4    right now; but I mean, today we're issuing EICs.
5        Q.  So are there any kits that are configured
6    today --
7        A.  Right.
8        Q.  -- to issue EICs remotely but that are not
9    being used for that purpose, that are lying around?
10       A.  Not -- I don't believe so, no.
11       Q.  So each configured EIC kit is out there being
12   used for EICs?
13       A.  Again, it would depend on the schedule that
14   that unit's being -- that that unit's -- that the
15   schedule for that unit.  So a unit may sit in an office
16   today; but if it's going to Glasscock County tomorrow,
17   then it would be used tomorrow.  So I suppose strictly
18   speaking about it, the narrow parameters of your
19   question, it wasn't used today; but it will be used
20   tomorrow.
21       Q.  Okay.  So they're all -- all the configured
22   ones are in circulation; is that fair to say?
23       A.  That's a good characterization.
24       Q.  You would agree with that?
25       A.  I would agree with it.

315

1        Q.  Are there any plans to purchase more kits?
2        A.  Not that I'm aware of.
3        Q.  Why were there only seven HHSC counties
4    selected to participate?
5        A.  Because that's the number of -- of counties
6    that HHSC offered to provide employees for based on the
7    78 counties that don't have driver license offices
8    and -- and -- and haven't also received the EIC
9    equipment or training.
10       Q.  Did DPS ask HHSC whether it was willing to
11   participate in more than seven counties?
12       A.  I don't recall.  I don't know.  I was not a
13   party to any of those discussions.
14       Q.  Okay.  Do you know what the largest county is
15   without a driver's license office?
16           MR. KEISTER:  Objection, vague.
17           THE WITNESS:  Yeah.
18       Q.  (BY MS. KORGAONKAR)  Do you know what the
19   geographic largest county is that doesn't have a
20   driver's license office?
21       A.  I have no idea.
22       Q.  Do you know what the county with -- do you
23   know what the most populous county without a driver's
24   license office is?
25       A.  I do not know.

316

1            MS. KORGAONKAR:  I'm done.
2            MS. MARANZANO:  I don't have anything
3    further, but I just want to say for the record that
4    because we had a disagreement about an instruction that
5    was given we're going to hold the deposition open.
6            MR. KEISTER:  Okay.  Well, I have a few
7    questions.  I promise not to use up an hour.
8                    EXAMINATION
9    BY MR. KEISTER:
10       Q.  Mr. Rodriguez, pursuant to the deposition
11   notice did you bring documents with you today that you
12   relied on in preparing for this deposition?
13       A.  Yes, sir, I did.
14       Q.  Okay.  Would you please pull out Exhibits 82
15   and 83.  And would you look at Exhibit 83, please?
16       A.  Yes.
17       Q.  Is Exhibit 83 a document that you brought
18   today for use in the deposition that you relied on in
19   preparing for the deposition?
20       A.  Yes, sir.
21       Q.  Could you tell us briefly what Exhibit 83 is?
22       A.  Exhibit 83 is a printout of the spreadsheet
23   that we used to collect EIC application information.
24       Q.  Okay.  And where is this Exhibit 83?  What is
25   it printed out from?

TONY RODRIGUEZ                                            5/8/2014

80 (Pages 317 to 320)

317

1    A.  It's printed out from the spreadsheet that's
2   maintained on the SharePoint site --
3    Q.  Okay.
4    A.  -- the DPS SharePoint site.
5    Q.  Okay.  And is there a -- is there a name for
6   that site?
7    A.  The DPS SharePoint site.  That's -- that's
8   what I call it.
9    Q.  Okay.  Is that referred to as the dashboard?
10   A.  The dashboard is a document that's derived
11  from the information available on the SharePoint site.
12   Q.  Okay.  Would you hand this document to the
13  court reporter and ask her to mark it, please?
14       (Exhibit No. 101 marked.)
15       THE REPORTER:  Exhibit 101.
16   Q.  (BY MR. KEISTER) Can you identify
17  Exhibit 101, please?
18   A.  Yes, sir.  Exhibit 101 essentially is
19  Exhibit 83, however what we -- for legibility purposes,
20  what -- what I asked the analyst to do was to collapse
21  some of the cells, some of the columns that -- that are
22  not relevant to EIC issuance, and the information
23  contained in those columns is administrative
24  information.
25   Q.  Okay.  Are all of the same EIC issuances that

318

1   are listed on 101 also listed on Exhibit --
2    A.  83?
3    Q.  -- 83?
4    A.  Yes, sir.  Yeah.
5    Q.  Okay.
6       MR. HAYGOOD:  Can we get a look at 83, do
7   you mind?
8       MR. KEISTER:  Yeah.  But I don't know
9   about -- if I get them messed up what we're going to
10  do.
11   Q.  (BY MR. KEISTER) Can you take a look at
12  Exhibit 82, please.
13   A.  Yes, sir.
14   Q.  Is Exhibit 82 a document that you brought
15  today to the deposition?
16   A.  Yes, sir, it is.
17   Q.  Okay.  And can you identify what Exhibit 82
18  is?
19   A.  Yes, sir.  Exhibit 82 contains information --
20  it's a printed copy of the information from our -- from
21  a spreadsheet that's resident on our SharePoint site,
22  and the information deals with -- excuse me --
23  inquiries that are made either at mobile or brick and
24  mortar offices --
25   Q.  Okay.

319

1    A.  -- or counties.
2    Q.  And with respect to Exhibit 83, 101, and
3   Exhibit 82, when were those documents printed out?
4    A.  We asked for these -- I asked for these
5   documents to be printed out -- I believe it was -- it
6   was this week, and I believe the date was Tuesday.
7    Q.  Okay.  And does that mean that these documents
8   contained all the information as of Tuesday with
9   respect to the issuances and the inquiries?
10   A.  Yes.
11       MS. KORGAONKAR:  Objection, leading.
12       THE WITNESS:  And she hasn't said that
13  before.
14   Q.  (BY MR. KEISTER) Okay.  That's fine.  That's
15  fine.  Just keep all those in front of you.
16       Okay.  Do you have Exhibit 80 in front of
17  you?
18   A.  Yes, sir.
19   Q.  Is Exhibit 80 a document that you brought to
20  the deposition today?
21   A.  Yes, sir, it is.
22   Q.  Okay.  And is this a document you relied upon
23  in preparation for the deposition?
24       MS. KORGAONKAR:  Objection, leading.
25   Q.  (BY MR. KEISTER)  You can answer.

320

1    A.  Okay.  Yes.
2    Q.  Okay.  Can you tell us what Exhibit 80 is,
3   please?
4    A.  Exhibit 80 is referred to as titled.  It's an
5   EIC dashboard.  And a dashboard is just a depiction of
6   information on a -- on a printed document.
7    Q.  Okay.  And when was this document printed out?
8    A.  This document was -- was also printed on
9   Tuesday.
10   Q.  Okay.  And does this document contain
11  up-to-date information as of Tuesday?
12   A.  As of Tuesday, yes, sir.
13   Q.  Okay.  Let me ask you to hand this document to
14  the court reporter and have her mark it.
15       (Exhibit No. 102 marked.)
16       THE REPORTER:  Exhibit 102.
17   Q.  (BY MR. KEISTER) Can you identify
18  Exhibit 102, please?
19   A.  Exhibit 102 shows -- it's a three-page
20  document.  It shows the -- the number or the -- it
21  enumerates the invalid applications for 2013 and for
22  2014.
23   Q.  Okay.  And is Exhibit 102 a document that you
24  brought to the deposition today?
25   A.  Yes, sir.

TONY RODRIGUEZ                                              5/8/2014

81 (Pages 321 to 324)

321

1   Q.  Okay.  And does Exhibit 102 contain
2   information current as of the date that it was printed
3   out?
4   A.  Yes, sir, as of Tuesday.
5   Q.  Okay.  Thank you.
6       Would you pass this to the court reporter
7   and ask her to mark it, please?
8       THE REPORTER:  Thank you.
9       (Exhibit No. 103 marked.)
10      THE REPORTER:  Exhibit 103.
11  Q.  (BY MR. KEISTER) Can you identify
12  Exhibit 103, please?
13  A.  Exhibit 103 are -- are a series of map charts
14  that -- that are used during our daily updates to
15  provide us with situational awareness on the status of
16  EIC operations across the state.
17  Q.  And what type information does the map charts
18  on Exhibit 103 provide?
19  A.  The map chart is color coded by county.
20  There's a legend in the lower left-hand side along with
21  the as of date of the -- of the production of this --
22  of that particular document.  And it shows the status
23  of each county, vis-à-vis driver license, EIC
24  operations, the county issuing EICs, whether the status
25  of the county has returned their MOU, if the county

322

1   needs to be trained in the EIC of issuance or if
2   they're experiencing -- in this instance the county
3   has -- has equipment issues.
4       There's also on -- on further -- or on
5   subsequent documents there's also a small data block in
6   the top left-hand corner that provides the -- the as of
7   date.  It provides the number of EICs that were issued,
8   the number of EICs that -- the approval for which is
9   pending, the EICs that have not been approved, and the
10  total number of transactions.  And then below that is
11  what -- what I refer to as a slant report, which merely
12  provides those -- those numbers that are rolled up on a
13  single line of information.
14  Q.  Okay.  Is there any other documentation within
15  those reports or attached to those reports?
16  A.  On the back -- on the second -- the second
17  slide, what that shows -- or the subsequent slides,
18  what they show are they show that the -- the date,
19  time, region, county, location, and -- and the status
20  of that location for EIC units across the state of
21  Texas.  And when I say "verified by the column of
22  information" means that one of our employees has gone
23  to that location and has ensured that the location is
24  suitable for our needs in the EIC operations.
25  Q.  Okay.  And how many -- how many separate

323

1   clipped documents are contained within that exhibit,
2   please?
3   A.  Nine.
4   Q.  Okay.  Thank you, sir.
5       Would you pass this document to the court
6   reporter, please?
7       THE REPORTER:  Thank you.
8       (Exhibit No. 104 marked.)
9       THE REPORTER:  Exhibit 104.
10  Q.  (BY MR. KEISTER) Can you identify
11  Exhibit 104, please?
12  A.  Yes, sir.
13  Q.  What is Exhibit 104?
14  A.  Exhibit 104 is the driver license division
15  customer operations organization chart.  It's also
16  referred to as an org chart.  And what it does is it
17  provides the hierarchical structure for each of our DPS
18  regions, 1A through 6B.  It shows the chain of command,
19  the supervisory chain of command; it lists the offices
20  within each region; and it also lists the city where
21  the office is resident and the employees at that office
22  or it shows if there's a vacancy in that office.
23  Q.  Okay.  Is that a document that you brought
24  today to the deposition that you relied upon in
25  preparation for the deposition?

324

1       MS. KORGAONKAR:  Objection, leading.
2       THE WITNESS:  I relied on this in
3   preparation for my deposition.
4   Q.  (BY MR. KEISTER) And you brought that today?
5   A.  And I brought it with me.
6   Q.  Pass that to the court reporter to be marked,
7   please.
8       (Discussion off the record.)
9       (Exhibit No. 105 marked.)
10      THE REPORTER:  Exhibit 105.
11  Q.  (BY MR. KEISTER) Can you identify
12  Exhibit 105, please?
13  A.  Exhibit 105 are a series -- pardon me -- are a
14  series of sheets of paper.  They're organized by DPS
15  region.  There's multiple pages per region.  What it
16  shows is it provides more information for the
17  hierarchical structure of the DPS regions.  It provides
18  the chain of command, the office supervisors, their
19  contact information; phone, fax, cell, and also their
20  physical location, their duty -- their duty location.
21  On subsequent pages it provides the -- the physical
22  location, the street location for each office; the
23  station number; the area number, which is -- which is
24  an archaic term.  We used to use that when -- when
25  commissioned personnel were in charge of those offices,

TONY RODRIGUEZ                                                    5/8/2014

---

325

1  but we still reflect it anyway.  It reflects the days
2  that are open, it reflects the hours of operation of
3  each office, and it also reflects the contact
4  information; telephone numbers and fax for each.  And
5  it does that for DPS Regions 1A through 6B -- 6B.
6       Q.  Okay.  Is this information reflected in that
7  document current as of today?
8            MS. KORGAONKAR:  Objection, leading.
9            THE WITNESS:  This information is current
10 as of the time that it was printed, which I believe was
11 Tuesday.
12      Q.  (BY MR. KEISTER) Okay.  Do you have any
13 reason to think any of those offices have changed
14 between now and Tuesday?
15      A.  No, sir.
16      Q.  Okay.  Is Exhibit --
17      A.  105.
18      Q.  -- 105 a document that you brought today for
19 this deposition?
20      A.  I did, yes, sir.
21      Q.  Is it a document that you relied upon in
22 preparation for this deposition?
23      A.  Yes, sir.
24      Q.  And with respect to -- I may have asked you
25 this, but I don't remember.  With respect to

---

326

1  Exhibit 104 --
2       A.  Yes.
3       Q.  -- is the information contained within
4  Exhibit 104 current as of today?
5            MS. KORGAONKAR:  Objection, leading.
6            THE WITNESS:  This information that's
7  reflected on 104 is current as of when it was printed
8  on Tuesday.
9       Q.  (BY MR. KEISTER) Okay.  Do you have any
10 reason to think there's been any changes between
11 Tuesday and today?
12      A.  No.  The -- the only changes may be some
13 employees who -- who are working who may have been
14 employed or may have left the employ.  But -- but
15 the -- the majority of the information in terms of
16 office supervisors, assistant manager, and the rest of
17 the chain of command should remain the same.
18      Q.  Okay.
19      A.  And maybe some -- and maybe some
20 discrepancies.
21      Q.  Okay.  Thank you.
22          Have we identified all of the documents
23 that you brought for the deposition today?
24      A.  These are -- yes, sir.
25      Q.  Okay.  When did the DPS begin tracking the

---

327

1  issuances of the EICs?
2       A.  We began tracking EIC issuances and inquiries
3  at the -- at the beginning of the program.
4       Q.  Okay.  And how did DPS track the issuance of
5  EICs at the beginning of the program?
6       A.  The -- the way we used -- the method we used
7  to track it, the -- that information was that the
8  regional managers would consolidate that information
9  and provide it to me, generally speaking, through
10 e-mail.  And if I am not mistaken, it was done several
11 times a day.  And that -- that went on for about a
12 week, and then I would produce a -- a weekly report
13 that I referred to earlier.
14      Q.  Okay.  And the reports you referred to
15 earlier, how were -- how were they styled?  What were
16 they called?
17      A.  I believe it was just called EIC report, or it
18 may have been referred to as a daily or a weekly EIC
19 report.
20      Q.  Okay.
21      A.  I would need to see for certain.  I need to go
22 back and look at it.
23      Q.  If -- well, that's fine.
24      A.  Okay.
25      Q.  Yeah.  How long did you prepare the EIC

---

328

1  reports?
2       A.  I prepared the EIC reports and I sent them
3  until, roughly, the beginning of November.
4       Q.  Okay.  Did anyone else in the agency prepare
5  EIC reports or were you the only one?
6       A.  From the beginning of the program until about
7  the beginning of December, I was the only one that did
8  that with -- with the exception of -- I believe there
9  was a day or so that I had gone on leave, on vacation,
10 and -- and I was unavailable to collect the
11 information, so -- I left, so somebody had done that.
12 And I can't remember if it was either Steve Bell or
13 Paul Watkins, one of those.
14      Q.  Okay.  Why did you discontinue the preparation
15 of the EIC reports?
16      A.  Because it was extremely time-consuming.
17      Q.  Okay.  Any other reasons?
18      A.  Well, there -- there was the -- the potential
19 for errors.  And I spent a lot of time going back and
20 finding out -- you know, confirming the information
21 that I had been given.
22      Q.  Okay.  Did the department, DPS, continue
23 tracking EIC issuances after you discontinued your
24 preparation of the EIC reports?
25      A.  Yes.

---

TONY RODRIGUEZ                                                    5/8/2014

83 (Pages 329 to 332)

329

1     Q. How did that tracking go forward or continue?
2     A. There's an analyst -- one of our analysts
3   named Ryan O'Connor, and Ryan was asked to work with me
4   on -- on the -- on the data tracking, on EIC tracking.
5   And Ryan and I had a discussion about how we should
6   track EICs. And, as a consequence, he began -- he
7   began to collect it, the information, on a spreadsheet
8   that he kept, and he would produce some documents.
9     Q. Okay. Did -- did Ryan create EIC reports like
10  you did and circulate those reports as you did?
11    A. No.
12    Q. Okay. What happened to the information that
13  Ryan would collect?
14    A. Ryan collected the report -- or the
15  information -- excuse me -- and he would provide what
16  can be best categorized as -- as an ad hoc report. So
17  if somebody were to want -- want specific -- an updated
18  EIC information, Ryan would print the -- the tables
19  from the Excel spreadsheet and they would provide it to
20  that individual.
21    Q. Okay. Did there come a time when Ryan
22  discontinued his participation in the tracking of EICs?
23          MS. KORGAONKAR: Objection, leading.
24          THE WITNESS: Yes.
25    Q. (BY MR. KEISTER) And do you know when that

330

1   was?
2     A. It was -- it was the winter -- it was December
3   of '13 or early in January of '14.
4     Q. Okay. Did the DPS continue tracking EIC
5   issuances after Ryan discontinued or -- or stopped his
6   participation?
7     A. Yes.
8     Q. How did the -- how did DPS track EIC
9   issuances?
10    A. We -- what we did was, we moved the -- the
11  information, the spreadsheet, that Ryan was maintaining
12  from his computer onto a SharePoint site. So that
13  was -- that was the first part of it. And the second
14  part was -- was the important part, because Ryan and I
15  had a discussion that -- you know, we were still
16  collecting information the same way. And -- and so
17  what Ryan suggested was a better way to collect the
18  information. And that gave birth to the -- its current
19  form where the -- the input is available on the DPS
20  share point site and the CSR can -- can go to that site
21  and can enter the information about an EIC issuance or
22  an inquiry directly into the share point site. And
23  then that's kept -- that's kept resident. That updates
24  the spreadsheet.
25          And then from that spreadsheet we can --

331

1   we can pull -- we can pull ad hoc queries or we can
2   print pages or tables or whatever we decide -- whatever
3   information we decide we decide we need we can print
4   from that database.
5     Q. Do any of the documents that you brought to
6   the deposition today demonstrate how -- how that --
7   that tracking system works?
8          MS. KORGAONKAR: Objection, leading.
9          THE WITNESS: The documents that I
10  brought with me, what they do is they --
11    Q. (BY MR. KEISTER) And you can refer to them --
12    A. I'm going to have to.
13    Q. -- by exhibit numbers.
14    A. Okay. So the CSR inputs information onto the
15  SharePoint site and that serves to populate Exhibit
16  No. 83, okay, or Exhibit No. 82, depending on -- on
17  whether it's an issuance or it's an inquiry. I won't
18  talk about that because it's the same things.
19    Q. Okay.
20    A. Okay. And based on that, then there's a -- a
21  document that's -- there's a link -- hyperlink to -- on
22  our website, on the -- the SharePoint site, and the
23  hyperlink is -- is called EIC executive dashboard. And
24  that is depicted on Exhibit No. 80. And what that is
25  is that's an Excel spreadsheet with a number of tabs

332

1   associated with that spreadsheet. And we've discussed
2   some of these tabs earlier today.
3     Q. Okay. To your knowledge, does anyone at DPS
4   create an EIC report as you did last year based upon
5   the information that is kept on the -- on the share
6   site?
7     A. No, sir. We discontinued that when I stopped
8   producing the report.
9     Q. Okay. Thank you, sir.
10          MR. KEISTER: I'll pass the witness.
11          MS. KORGAONKAR: I have one question --
12  or two questions, rather, about the documents that --
13  that you were just looking at with Mr. Keister.
14          FURTHER EXAMINATION
15  BY MS. KORGAONKAR:
16    Q. The first is, you testified earlier that
17  271 EICs had been applied for --
18    A. Yes.
19    Q. -- is that right? Is that number reflected in
20  any of these exhibits?
21    A. Yes.
22    Q. Can you direct me to that, please?
23    A. Yes.
24          (Discussion off the record.)
25          THE WITNESS: It's the last page of

TONY RODRIGUEZ                                                    5/8/2014

333

1  that -- of that exhibit.
2      Q.  (BY MS. KORGAONKAR)  So, for the record, you
3  are indicating the last page of Exhibit 103?
4      A.  I'm sorry.  I misspoke.  It's -- it's -- I'll
5  keep it together.  It's this packet.
6      Q.  So it's the first page of the last packet in
7  Exhibit 103 --
8      A.  Yes.
9      Q.  -- is that right?  Okay.  And is that the same
10 document that indicates the number of EICs that have
11 been issued?
12     A.  Yes.  If you refer to the block in the upper
13 left-hand corner, do you see the text that's there?
14     Q.  I do.
15     A.  That -- that establishes the information that
16 you're asking.
17         MS. KORGAONKAR:  And we just want to
18 request that the State of Texas produce the documents
19 that you all brought with you today in native format to
20 the plaintiffs with the appropriate metadata.
21         MR. KEISTER:  I'm sorry.  I don't make
22 discovery agreements on the record.  I'll be happy to
23 entertain whatever discovery we need to do.
24         MS. MARANZANO:  I have a quick follow-up
25 question.

334

1         Are you done?
2         MR. KEISTER:  I am.
3         MS. MARANZANO:  Okay.
4             FURTHER EXAMINATION
5  BY MS. MARANZANO:
6      Q.  I believe when your counsel was asking you
7  questions, Mr. Rodriguez, he asked you to compare the
8  reports that Ryan O'Connor had made -- the reports
9  that -- weekly reports that you made, and he asked you
10 to compare the circulation of those reports.  Do you
11 recall that?
12     A.  No.
13     Q.  Let me ask you this.  Can you describe the
14 circulation of the weekly reports?
15     A.  Okay.  So we -- we have to understand that
16 when I produced the documents that I produced from June
17 to the beginning of November, that's what I call a
18 report.  Okay?  And -- and the circulation of that
19 report that was e-mailed, as I said before, would be
20 pushed out, sent in an e-mail form, to -- to different
21 people in DPS; regional managers and other people who
22 were involved in the EIC process.
23     Q.  So can you list everybody who it was sent to
24 for me?
25     A.  I would have to -- if you want an exhaustive

335

1  list, I would have to see some of those e-mails that I
2  did.  I can -- I can answer as best I ask.
3      Q.  Would looking at a previous exhibit help
4  refresh your recollection?
5      A.  Tremendously, yes.
6      Q.  Okay.  Let's see.  I don't have the numbers in
7  front of me, but I believe -- perhaps I could look at
8  the pile of exhibits.
9      A.  You're going to need a wheelbarrow.
10         THE REPORTER:  Well, they were in order.
11         MS. MARANZANO:  No, I think it's ones
12 that we introduced today.
13     Q.  (BY MS. MARANZANO)  Do you have all of the
14 exhibits in front of you that --
15     A.  I have the ones that we introduced.
16     Q.  Is that the one --
17     A.  These ones?
18         MR. KEISTER:  You can stop typing until
19 we get it sorted.  You're not going to do it?
20         MS. MARANZANO:  Okay.  Are we still on
21 the record?
22         THE REPORTER:  Yes.
23     Q.  (BY MS. MARANZANO)  Can I show you what we
24 previously marked as Exhibit 74.  Is that an example of
25 one of your weekly reports?

336

1      A.  This is an example of one of my weekly
2  reports, yes.
3      Q.  Does that help refresh your recollection as to
4  who it was circulated to?
5      A.  Well, not entirely.  This is a partial list of
6  people who would get it.
7      Q.  And who's on that list?
8      A.  Well, I'm on it.  Kristopher Krueger, who
9  is -- is one of our strategic analysts; Lisa Daughtry,
10 who works at license and records services; Ryan
11 O'Connor, who was -- who was helping me collect
12 tracking information; Maria Flores is a -- is an
13 assistant manager in one of the two regions.  She's not
14 in mine.  I don't know.  And Raquel Ramirez is an
15 assistant manager in Region 3.
16     Q.  Did you send these reports to -- to
17 Mr. McCraw?
18     A.  I believe he may be on some of the
19 distribution, yes.
20     Q.  Did you send these reports to anybody outside
21 DPS?
22     A.  I don't recall having done that.  I may have.
23     Q.  Okay.  Did you send these reports to the DPS
24 commission?
25     A.  The DPS commission?